

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 1 of 78

Pa

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: | ) |
| PHARMACEUTICAL INDUSTRY | ) CA No. 01-12257-PBS |
| AVERAGE WHOLESALE PRICE | ) MDL No. 1456 |
| LITIGATION | ) |

MOTION HEARING
BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
January 27, 2006, 2:10 p.m.

LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA 02210
(617)345-6787




Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 2 of 78

A P P E A R A N C E S:

THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge, Massachusetts, 02142.

DONALD E. HAVILAND, JR., ESQ. and TERRIANNE BENEDETTO, ESQ., Kline & Specter, P.C., 1525 Locust Street, 19th Floor, Philadelphia, Pennsylvania, 19102.

STEPHEN T. SULLIVAN, JR., ESQ., Lynch, Keefe & Bartels, 830 Broad Street, Shrewsbury, New Jersey, 07702.

ROBERT S. LIBMAN, ESQ., Miner, Barnhill & Galland, 14 E. Eric Street, Chicago, Illinois, 60610.

C. DAVID JOHNSTONE, ESQ., Assistant Attorney General, Office of the Attorney General, 1024 Capital Center Drive, Frankfort, Kentucky, 40601.

CAROL HUNT, ESQ., Assistant Attorney General, Office of the Attorney General, Health Care Bureau, 120 Broadway, 25th Floor, New York, New York, 10271.

SUSAN SCHNEIDER THOMAS, ESQ., Berger & Montague, P.C., 1622 Locust Street, Philadelphia, Pennsylvania, 19103-6305.

MARK S. THOMAS, ESQ., Office of the Attorney General, Medicaid Fraud Control Unit, PL-01, The Capitol, Tallahassee, Florida, 32399-1050.

MARK LYNCH, ESQ., Covington & Burling, 1201 Pennsylvania Avenue N.W., Washington, D.C., 20015.

JOHN T. MONTGOMERY, ESQ., Ropes & Gray, LLP, One International Place, Boston, Massachusetts, 02110.

MICHAEL S. FLYNN, ESQ., Davis, Polk & Wardwell, 450 Lexington Avenue, New York, New York, 10017.

Case 1:01-cv-12257-PBS Document 4729-2 Filed 09/18/07 Page 3 of 78

A P P E A R A N C E S: (Continued)

JOHN R. FLEDER, ESQ., Hyman, Phelps & McNamara, P.C., 700 Thirteenth Street, N.W., Suite 1200, Washington, D.C., 20005.

HELEN E. WITT, ESQ., Kirkland & Ellis, LLP, 200 East Randolph Drive, Chicago, Illinois, 60601.

NICHOLAS C. THEODOROU, ESQ., Foley Hoag, LLP, 155 Seaport Boulevard, Seaport World Trade Center West, Boston, Massachusetts, 02210.

DAVID J. COONER, ESQ., McCarter & English, LLP, Four Gateway Center, 100 Mulberry Street, Newark, New Jersey, 07102-4056.

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 4 of 78

P R O C E E D I N G S

THE CLERK: In re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Action No. 01-12257, MDL No. 1456, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. SOBOL: Good afternoon, your Honor. Tom Sobol for the MDL plaintiffs.

MR. HAVILAND: Good afternoon, your Honor. Don Haviland, Kline & Specter, for Local 68 and (Inaudible.)

THE COURT: You need to speak up, okay?

MR. HAVILAND: Sure thing.

THE COURT: Everybody needs to hear you behind.

MS. BENEDETTO: Good afternoon, your Honor. TerriAnne Benedetto from Kline & Specter on behalf of Local 68.

MR. SULLIVAN: Good afternoon, your Honor. Stephen Sullivan from Lynch Keefe Bartels, also on behalf of Local 68.

MR. LIBMAN: Good afternoon, your Honor. Robert Libman on behalf of the State of Illinois and the Commonwealth of Kentucky.

MR. JOHNSTONE: David Johnstone, Assistant Attorney General, for the Commonwealth of Kentucky.

MS. HUNT: Good afternoon, your Honor. Carol Hunt on behalf of the people of the state of New York.



PDF-XCHANGE Click to buy NOW! www.docu-track.com

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 5 of 78

MR. THOMAS: Mark Thomas, state of Florida.

THE COURT: Do you want to go up with the other AGs, or are you happy back there? Where are you from? Are you from New York as well?

MS. THOMAS: No. Susan Thomas for the relator Ven-A-Care for the state of Florida.

THE COURT: All right, any other states, commonwealths, attorney generals? All right, okay, there we go. All right, now --

MR. LYNCH: Mark Lynch, your Honor, for GlaxoSmithKline.

MR. MONTGOMERY: John Montgomery, your Honor, for Schering-Plough and Warrick.

MR. FLEDER: John Fleder for the pharma defendants.

MS. WITT: Helen Witt on behalf of Boehringer Ingelheim.

MR. THEODOROU: Nicholas Theodorou for AstraZeneca, your Honor.

MR. FLYNN: Michael Flynn for AstraZeneca, your Honor.

MR. COONER: David Cooner for AstraZeneca, your Honor.

THE COURT: Have you all spoken as to the priority or the lineup? Does anyone have a plane to catch that you cannot miss? All right, so why don't we start off with what



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 6 of 78

Pag

I view as the simpler, I think the easiest issue, not necessarily the one whether or not a new Supreme Court decision is an order, and easy in terms of it's very narrow and it's a one-issue kind of thing. Then I thought I'd move into the fraudulent joinder/ -- I guess you'd have to call it material misrepresentation and petition case, which is I think Florida, right, the local case? And then move into the last which is the most difficult, I think substantively, which is the Florida Medicaid statute and whether that's a substantial federal question.

Am I missing something, any of these cases?

MR. LIBMAN: The only other issue, and hopefully we won't need to reach it, but beyond the timeliness issue for Illinois, Kentucky, and I believe New York as well, is if you find timely removal, whether there is in fact a federal question here under Grable.

THE COURT: Right, fair enough. All right, so who's going to argue -- I guess what we literally have pending is the motion to remand, and who's going to argue on behalf of the states? Are you all arguing separately?

MR. LIBMAN: Your Honor, Robert Libman. I intend to argue for Illinois and Kentucky. Carol Hunt and I have spoken to the extent that there's some additional argument that's necessary or some issues unique to New York that Ms. Hunt would like to make, but I intend to speak primarily

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 7 of 78

for Illinois and Kentucky.

THE COURT: Well, I think that's a good place to start.

MS. HUNT: I won't be overlapping.

THE COURT: Sure. And does anybody else want to speak from any of the states?

MS. THOMAS: Yes, your Honor. Mark Thomas for the state of Florida.

THE COURT: That's not this order issue, right? Or is it? I thought that was a more substantive -- that didn't deal with whether or not it was timely.

MS. THOMAS: Correct. That's the remand issue.

THE COURT: Right, but it isn't whether or not it was within the 30 days?

MS. THOMAS: Yes.

THE COURT: Okay.

MR. LIBMAN: Thank you, your Honor. The starting point really for this issue should be the notice of removals themselves for Illinois and Kentucky. And Paragraph 15 of those notices make clear that there is only one basis for the removal, and that is whether the states' claims on behalf of its Medicare Part B beneficiaries raises a federal question. Specifically, the basis for removal, though, is whether the Grable decision issued by the Supreme Court in 2005 is a, quote, "other paper."

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 8 of 78

Now, their briefs make the argument that that decision may also be an order within the meaning of the removal statute, but the notice of removal only relies on the argument that it is a, quote, "other paper." And as our briefs point out, the majority rule is that within the meaning of that removal statute, the "other paper" must be a paper that is within the action itself. That comes from the plain meaning and the plain reading of the statute. It talks about "other papers" being served on a defendant. People don't think of Supreme Court decisions as being served on parties.

THE COURT: Is there any law in the First Circuit construing this?

MR. LIBMAN: I'm not certain that there is, your Honor, certainly not First Circuit case law that I'm aware of.

THE COURT: There's so little appellate case law, in any event.

MR. LIBMAN: Right.

THE COURT: Apart from the First Circuit, are there other District Court cases directly on point?

MR. LIBMAN: I don't believe so, your Honor, at least not that I've located. The majority rule, though, is summarized by the Morsani case we've cited in our brief, I believe from the Middle District of Florida. The point here



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 9 of 78

is that important deadlines, your Honor, should not be subject to dispute. That's the reason for the rule.

THE COURT: Do you know what the batting average is? I know many District Courts have written on it, and there's a divide.

MR. LIBMAN: I don't know the precise count, your Honor, but I would say, to me, at least, 70-80 percent of the cases, perhaps more, follow this rule. And the cases that they have cited are including the Smith case where it's explicitly repudiated by another District Court in that same district. But the point is that important deadlines should not be subject to dispute. That's the reason for the rule.

I mean, you can imagine, for example, that as there are in this case about the meaning of Grable, if a decision from an appellate court were to trigger a new time for removal, you'd have disagreements about the meaning of that court decision as well as the date that the party, quote, "received" the decision.

We're urging the Court to just look at the plain language of the removal statute, an "other paper," there's got to be a paper that was within the same case.

Now, they've cited the Doe V. Red Cross and the Green cases, which I should point out initially only speak to the issue of whether a Supreme Court or appellate court decision is an order within the meaning of the removal



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 10 of 78

statute. And as I've explained, the notices of removal here do not make that argument.

THE COURT: Why should that be so important?

MR. LIBMAN: Well, perhaps it's not, but I think if you're going to look at the notice of removal itself, which I think is -- unless they're going to be allowed to make new arguments every time while we're waiting for this issue to be resolved --

THE COURT: The removal issue I can see. You're supposed to put in the petition the basis for removal.

MR. LIBMAN: Yes.

THE COURT: But the paper versus the order, I don't know if that would --

MR. LIBMAN: I can knock it down anyway, your Honor. That is, Doe and Green themselves, first of all, recognized the majority rule which I just cited to you, which is that the order, if it is an order, of another appellate court should be within the same -- come from the same case. And it's a very narrow exception that Doe and Green carved out, and it's a four-part test, and they took great pains to say that this was a narrow exception as well. The four-part test is whether the case comes from a court superior in judicial hierarchy -- I'll concede that's been met here, the Supreme Court -- or whether it's directed to a particular defendant. It must expressly authorize that same defendant



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 11 of 78

PDF-XCHANGE Click to buy NOW! www.docu-track.com

to remove an action against another case, and the case must involve similar facts and legal issues. And none of those last three factors have been met here.

That really should be the end of the inquiry. Simply, Doe and Green do not support removal here. And in fact the defendants are not asking you simply to apply the Green and Doe cases here. They're asking you to go beyond what Green and Doe held for the reasons I just said: This does not involve a case with the same defendants, there's no express authorization for removal of the case, and certainly no similar facts or legal issues. So they're looking for an expansion of Doe and Green.

The problem, of course, is that the litigation floodgates would open if every time an appellate court decision came down it would start the removal clock again, and that's clearly not what was contemplated by Congress when they enacted the statute. So we would urge you again to just simply apply the plain meaning of the statute and find that a Supreme Court decision is not an "other paper" or an order within the meaning of the removal statute.

I would also like to briefly touch on a second argument, which is whether the Grable case, even if you consider it to be an order within the meaning of the removal statute, was when the defendants, quote ". . . first ascertained that the case was removable." That's also a

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 12 of 78

requirement of the removal statute itself. And their argument again is that a decision you issued in June of 2003 essentially would have foreclosed them from removing; you would have certainly remanded these cases if they had removed at the time.

There's a number of reasons why that argument simply is without merit. First is that less than a month after you issued that decision, many of the defendants in our cases removed the Local 68 case. That is, they -- and the notice of removal there said the very same basis for removal that is cited in the notices of removal as to Illinois and Kentucky, that the Medicare Part B claims raised a substantial federal question as to the meaning of AWP. So many of the defendants themselves realized at that time that your opinion didn't foreclose them from removing. They in fact did remove.

Secondly, as to the three Kentucky cases --

THE COURT: Well, it's always a good question. In many of these cases, there's screaming, "This is frivolous. Give us attorneys' fees." But once I've ruled under First Circuit law, which I think I had no choice in doing because our Circuit followed one split in the analysis, which is you had to have a cause of action, once I followed that, it was pretty hopeless.

MR. LIBMAN: Well, then why did they remove the



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 13 of 78

Local 68 case on the same basis?

THE COURT: I can't answer that.

MR. LIBMAN: I can't either, and I don't think anyone can. Well, perhaps the defendants can.

But, additionally, let me ask you to focus on the Sixth Circuit case law as well. Grable was a case that came from the Sixth Circuit. In the Grable decision, the Supreme Court affirmed the Sixth Circuit opinion in Grable.

Now, the Sixth Circuit opinion was decided in July of 2004. And as to the three Kentucky cases, two of them were filed prior to that time, and the Grable case in that event may not have been the controlling law. But clearly as to the third Kentucky case, which is the larger one -- and for the record, it's civil action here 05-12493 -- was filed in November of 2000. So the controlling law in the Sixth Circuit was that the lack of a private right of action did not per se preclude --

THE COURT: Were they in the other split? In other words, I can't remember how it lined up, but there were a group of circuits that went one way and a group of circuits that had gone another way.

MR. LIBMAN: The Supreme Court only cites the Sixth Circuit and then a Seventh Circuit opinion that went the other way. Those are the only two. The Sixth Circuit was affirmed by Grable.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 14 of 78

THE COURT: Right. And I think the First Circuit cited the Seventh Circuit, if I remember.

MR. LIBMAN: It had, and I'll get to the First Circuit in a moment, however, your Honor. But in the Sixth Circuit, the law was not changed by the Supreme Court decision in Grable. And they have argued that the law of the Sixth Circuit wouldn't apply; they would have notified the JPML and had it transferred over here, and you would have to apply, being the transferee court, the law of the First Circuit.

There was a case, and I don't think it's cited in our brief, but the Templeton case out of the First Circuit that was decided shortly after your opinion in June of 2003, and the Templeton decision is consistent with what the Supreme Court said in Grable. In fact, just quoting briefly from it, and citing to a previous First Circuit case, the Almond V. Capital Properties case, which I believe you cited in your opinion as well, said, "We believe that Almond also stands for the proposition that there is a discrete type of case where federal subject matter jurisdiction will lie notwithstanding the absence of a federal cause of action."

THE COURT: That was a contract case because we had to deal with that line of cases.

MR. LIBMAN: The Almond case, right. The Templeton case was not. In any event, my point simply is that the law



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 15 of 78

in the First Circuit, to the extent that you were following case law prior to Templeton, was also in effect at the time of the removal of the Illinois case and the later --

THE COURT: All right, thank you. Why don't I get to defense because I don't know that I need to enter into a Grable analysis, which seems quite complicated here.

MR. LYNCH: I wouldn't think so, your Honor. I think that when you had the Minnesota and Montana cases, you decided that there was a federal question, you remanded because of the lack of a private cause of action. Grable, certiorari was taken, it says right in the opinion was taken for the sole purpose of resolving a split in the circuits as to whether a private cause of action was a necessary condition for federal jurisdiction. And it's true Grable says a lot of things that are kind of complicated, but it's clear that Grable wasn't undertaking to restate the law of what a substantial federal question is.

THE COURT: But can we move backwards --

MR. LYNCH: Yes, let's move backwards.

THE COURT: -- because, I mean, we've done some research, probably not as much as all of you have done. I think it's quite correct that the majority rules against you here.

MR. LYNCH: The majority of the District Court cases is against us, your Honor. There's no doubt about



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 16 of 78

that. But the key cases here are the Third Circuit decision in Red Cross and the Fifth Circuit decision in Green. And I'll concede right off the bat that the facts here are different, but the inevitable implication of those two circuit cases supports us. The ratio decidendi of those cases supports us, and if you'll give me a little time to go through the facts, I'll explain why that's the case, your Honor.

The states want to take the position that 1446(b) is confined to papers or orders within the case that is being removed, and the one thing that the Red Cross and the Green case made clear is that an order or an opinion from another case can start the clock for removal anew. So Green and Red Cross clearly break out of the fence that the states are trying to put around 1446(b) with this so-called rule that it has to be an order or other paper generated within the case that's being removed. That simply isn't what happened in Red Cross and Green.

Now, it is true that in Red Cross, Red Cross was a defendant in both cases, and the Supreme Court case included an order that authorized Red Cross to remove its other cases. But the fact remains, it was another case. And in Green the facts get even better for us. In Green, the first case that was removed was remanded because there was no fraudulent joinder. Then the Fifth Circuit decided a case


Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 17 of 78

construing the Texas product liability statute that made it clear that there was fraudulent joinder; there was no claim against the grocery store, the local grocery store that was sued. And Green was removed again on that basis, and the Fifth Circuit held that the clock had begun to run anew on the basis of its prior decision.

Now, in that case, sort of gratuitously, the tobacco companies that were the defendants happened to be defendants in both cases, but the cases were not related the way the Red Cross cases were, and clearly there was no order from the Fifth Circuit explicitly authorizing the tobacco companies to re-remove as was the case in Red Cross.

I think what we have here, your Honor, is sort of a classic case of common law expansion of legal principles to different factual situations. And I'll be quite candid that we're asking you to take one more step because none of the parties here, none of the defendants in this case were defendants in Grable. We're asking you to take one more step, but we submit, your Honor, that that step is compelled clearly by the rationale, by the ratio decidendi of those two Circuit cases in Red Cross and Green.

THE COURT: But here Grable is a hard case because what Souter is telling me to do is a very nuanced kind of decision. He's saying there are no bright lines here, and no bright lines, you can't use the existence or nonexistence of



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 18 of 78

a cause of action. But the existence of a substantial federal question is not by itself enough either. He asks you to look at some wholistic states and federal government and --

MR. LYNCH: Right.

THE COURT: That's why I reserved till the last the Florida question. So that even my thought process at the time, which I'm sticking with, which is that it's a substantial federal question, that's not -- what did he call it? -- that may be a welcome mat but not the key? I forget his metaphor. What's the response to his point, which is, every time there's a new federal case, bang, you have to reexamine the whole removal analysis?

MR. LYNCH: The Grable decision is one of those Supreme Court decisions that makes life hard for district judges and litigators. There's no doubt about that. But the key thing, I think -- I think what Justice Souter does in Grable is, he says: If there is a substantial federal question, federal jurisdiction may still be subject to veto. And then he gets into this question of whether exercising federal jurisdiction would upset any Congressionally approved balance of labor between the state and Federal Courts.

THE COURT: Well, that's particularly poignant in our case.

MR. LYNCH: I think, in our view, you've already



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 19 of 78

got state cases here.

THE COURT: No, but it's also true that the federal government entrusted to the states -- in other words, we can have this big debate, which I expect to have in about a half an hour, but all I'm saying is, I think the thing that strikes me the most is the argument that you need some finality in where you're going to be. And unless there's a slam-dunk opinion as there was in Red Cross where for sure just, you know, there's a clear-cut question of law, if I were doing this, wouldn't I be inviting an appeal in absolutely every case that was remanded for any appellate case that arguably undercut the rationale?

MR. LYNCH: I don't think so, your Honor, and you've thrown up several issues for me to address there. First of all, when you're talking about -- well, let's go back to this division of labor between the state and Federal Courts. We are removing on the basis of state claims seeking to recover on behalf of Medicare beneficiaries. The Florida case is a Medicaid case only. There aren't claims for Medicare beneficiaries. And as you said last week when we were here, Medicare beneficiaries are your people.

THE COURT: Right, they're federal protectees, if you will.

MR. LYNCH: The claims for Medicare beneficiaries are thoroughly subfused with federal interests, and I think



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 20 of 78
PDF-XCHANGE Click to buy NOW! www.docu-track.com

PDF-XCHANGE Click to buy NOW! www.docu-track.com

that that's been clearly established in the course of this case.

Now, there's one decision I'd recommend to your Honor that was decided after the briefing was complete. It's County of Santa Clara, 224 Fed Supp 2nd, 292. I'm sorry that's the wrong one. Well, I'll get you the cite in a minute. It was a case decided in December by Judge Alsop in the Northern District of California, and it was a case brought by the County of Santa Clara alleging, in much the same way as the states allege here, that the pharmaceutical companies had overcharged them under something called the 340(b) program, which provides for sales of pharmaceuticals to public health facilities. And there was no timeliness issue there, but there's a very thorough discussion in that case of the substantial federal question and this question of whether there's going to be any upset of the division between state and Federal Courts. And Judge Alsop says something that's very, very relevant. He said there is no Congressionally approved division of labor with respect to these cases; they're regularly litigated in both the state and the Federal Courts.

THE COURT: When you're dealing with Medicare.

MR. LYNCH: Medicare, right. And we are dealing with Medicare in Kentucky, Illinois, and New York, so those are Medicare claims.

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 21 of 78

THE COURT: Are there Medicaid claims as well?

MR. LYNCH: There are also Medicaid claims. But it's also clear, also clear from your Honor's early opinion, and particularly there's a Second Circuit case that we've cited, Bruder, that all it takes is one federal question to remove the case. There has to be a federal question; there doesn't have to be all federal questions.

Let me explain why we -- the point that was made about the New Jersey case, as you'll recall, you initially --

THE COURT: Which one's the New Jersey case?

MR. LYNCH: Mr. Libman was saying that we removed the New Jersey case after your decision, so why didn't we remove these other cases?

THE COURT: Is that the Local --

MR. LYNCH: Yes, Local whatever, 65.

THE COURT: -- 68 case?

MR. LYNCH: 68. And the reason for that is, your decision in Montana came down on June 11, 2003. The time for removal of the Local 68 from New Jersey came in July 3, 2003. But as you'll recall, we filed a motion for reconsideration from your decision, and you wrote an opinion which you issued on August 20, 2003. So when the time came for us to remove in July, we still had the hope that you might reconsider your decision on Abbott, and that's why we



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 22 of 78

asserted the same grounds there that we had in the Montana case.

THE COURT: But before we get into the very, in my opinion, interesting question of the extent of Grable, you have to get past paper or order. And what you're saying to me is, what you'd like me to do is take Green and Red Cross one step further?

MR. LYNCH: That's absolutely right, your Honor. That's our submission.

THE COURT: All right, thank you very much.

MR. LYNCH: Thank you, your Honor. Oh, the Santa Clara, Judge, it's 401 Fed Supp 2nd, 1022.

THE COURT: So he's disagreeing with the judge who wrote that very long decision from the Eastern District of Pennsylvania?

MR. LYNCH: Yes.

THE COURT: Judge Sanchez?

MR. LYNCH: Judge Sanchez. One of the interesting things is, Judge, the cases that have gone against us not only disagree with your decision in Montana and Minnesota; they disagree with each other. And one of the problems here is, these judges made these decisions the first thing that came up in the case. They didn't have the opportunity to familiarize themselves with these programs the way you've had, probably more than you'd like, but they were making



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 23 of 78

decisions about Medicare.

THE COURT: At every second I love this case.

(Laughter.)

MR. LYNCH: We do too, your Honor. We've had a great time for four years. And Judge Sanchez said there's no federal question at all, clearly inconsistent with you. Then Judge Crabb in Wisconsin said, "Well, I disagree with Judge Sanchez about that, but I'm going to remand because I get into this Justice Souter, whether there's upset of the balance between the state and Federal Courts." And then Judge Alsop said, "No, well, Judge Crabb got it wrong." So there's great contrariety here and --

THE COURT: Well, this piece of it is difficult, and so that's what I have to get into, if I get beyond whether it's a paper or an order. How does Wright & Miller rule on it?

MR. LYNCH: Well, they don't get this particular. They haven't dealt with this particular issue. They take actually quite an expansive view of what "order" and "other paper" is. And you asked about First Circuit cases. I'm pretty certain there are no cases from the Court of Appeals, but we have found a couple of District Court cases in the First Circuit. One is Mill-Bern Associates, 69 Fed Supp 2nd, 240, Judge O'Toole here in Massachusetts, and Parker V. County of Oxford, 224 Fed Supp 2nd, 292, Judge Carter in



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 24 of 78

Maine. And these cases are not directly on point. They deal with --

THE COURT: They go against you, right?

MR. LYNCH: No, I don't think -- one does and one doesn't, I think. There's a Connecticut case as well that does go our way.

THE COURT: I love Connecticut, but we actually moved that into the Second Circuit, so --

(Laughter.)

THE COURT: I've always wondered why, but --

MR. LYNCH: Connecticut was originally in the First Circuit.

These cases deal with whether an affidavit or a deposition transcript, but they have some general language about "order" or "other paper." But the key cases, frankly, your Honor, our position rises and falls on your willingness to take Green and Red Cross that one step further, which we think is compelled by the logic of those cases.

THE COURT: Well, thank you very much. Did you want to respond at all?

MR. LIBMAN: I'll do it from here. Briefly, your Honor, on the issue of timeliness, the five courts that have remanded, not all reach the timeliness question. All those that did found it was untimely.

THE COURT: In these pharmaceutical kinds of cases?



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 25 of 78

MR. LIBMAN: The precise same issues that removal was sought, the basis for which removal was sought here as well. They're unanimous. Alabama didn't say much about it. I don't think they reached it. But the other cases are Minnesota, Pennsylvania, Wisconsin, and Texas. They're unanimous in terms of this timeliness question, and they reject the argument that the defendants are asking you to accept here.

The Green case, just very briefly, the Green case, the intervening appellate court decision there found that the federal law preempted state law as to these very same defendants. So you have Red Cross that the Supreme Court specifically said these cases could be removed, and in Green it's a preemption issue, very different from the facts here.

And then, finally, the Santa Clara case -- I know this speaks to Grable, but in the Santa Clara case, there was a federal contract at issue that had to be interpreted in accordance with federal common law, and that should inform your judgment about whether that is analogous to this situation here.

THE COURT: Thank you very much. All right, so we're going to move on.

MS. HUNT: Your Honor, is it necessary for me to just tell you one more reason why Grable is not "other paper"?



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 26 of 78

THE COURT: Go for it. I forget, your name again?

MS. HUNT: Carol Hunt. I just wanted to bring it to your Honor's attention that in New York, again, there's another reason why Grable is not "other paper," and that's because this is the second time that New York and New York cases have been removed. You remanded these actions back in 2003, and Section 1447(d) of Title 28 states that "An order remanding a case is not reviewable on appeal or otherwise." And that's an absolute prohibition. And what defendants are doing is essentially seeking a review of your previous remand order, and in the removal papers, they said, "Judge Saris was incorrect in light of this new law." And in fact what they're doing is trying to go into the very same thing they argued before. They're arguing federal claims raised --

THE COURT: But in fact I denied the motion for reconsideration. I was quite convinced that the First Circuit mandated a certain thing. However, it is true that that line of analysis, what I'll call roughly the Seventh Circuit line, was rejected.

MS. HUNT: But as you also pointed out, Grable brings into this whole a nuanced interpretation beyond what you decided. In fact, your decision could still hold in light of the Grable analysis of the balancing between the state and federal --

THE COURT: Right, and that's a far more



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 27 of 78

complicated problem.

MS. HUNT: And that's the point, that Grable expressly did not overrule any law, and that's why in fact the defendants are just adding yet another opinion to their argument that removal is appropriate, and they cannot do that under 1447(d).

The "other paper" cases that involved two removals all found not only that an opinion, a subsequent court opinion was not "other paper," but they also said, "Well, you can't do this anyway under 1447(d)." Morsani said it's an irony, the defendants are arguing that they were asking to review an unreviewable order. It's regardless -- regardless of whether the court was right or wrong in their previous decision. Combs says the same thing, that remand is appropriate for a second reason, in that the decision was unreviewable.

THE COURT: Thank you very much.

MS. HUNT: Thank you.

MR. LYNCH: Your Honor, could I just speak to that point briefly? If Ms. Hunt were correct, then the cases in Red Cross and Green could not have been removed the second time. And in fact there's a discussion of this very point within the Red Cross, the Third Circuit decision. It's not a re-removal, and if New York's position were correct, those cases would have been stuck and couldn't have been

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 28 of 78

re-removed.

THE COURT: Thank you very much. All right, now we're going to move on to part two, so. . .

MS. BENEDETTO: Local 68, your Honor.

THE COURT: You're Local 68, all right. And your name again is?

MS. BENEDETTO: I'm Terry Benedetto.

THE COURT: All right, Ms. Benedetto, and you represent the local?

MS. BENEDETTO: Yes, your Honor. This is the local's motion for remand, which this case has been around a while. The remand was filed back in June of '03, and I'm sure your Honor has, I think, four rounds of briefing on this remand.

THE COURT: What are the underlying claims? Are they all under state law?

MS. BENEDETTO: Yes, your Honor.

THE COURT: So this is a diversity case?

MS. BENEDETTO: Well, your Honor, they basically --

THE COURT: You're claiming -- all right, go ahead.

MS. BENEDETTO: They removed the case based on ERISA and Medicare preemption. And we claim that before you even get to the substantive basis of removal, you have to satisfy the procedural bases for removal, which they didn't have unanimity of consent.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 29 of 78

Basically there are three key points that I want to touch on. The first is that the plaintiff has viable claims against these doctor defendants.

THE COURT: All right, help me. How many doctor defendants are there?

MS. BENEDETTO: There are three. There's Antoun, Hopkins, and Berkman, New Jersey, Florida, and Ohio respectively. And these doctors pled guilty to federal criminal charges respecting a conspiracy to bill for free samples of AstraZeneca's drug Zoladex.

THE COURT: Did they sell to the Local 68?

MS. BENEDETTO: Well, it's also a class case, your Honor, Local 68 on behalf of an alleged purported nationwide class. And certainly Local 68 --

THE COURT: Would Local 68 have standing against the doctors?

MS. BENEDETTO: Yes, your Honor. One of the doctors is in New Jersey, Dr. Antoun, and in the same area as Local 68's base of employees.

THE COURT: So you have evidence that some of your employees bought these pills, or whatever it was, from Antoun?

MS. BENEDETTO: We know that he is in the area of our employees and certainly many of whom bought Zoladex. We also represent a class, nationwide class, respecting

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 30 of 78

purchasers of Zoladex and the other drugs that these defendant pharmaceuticals companies manufacture.

And my second point is that the doctor defendants don't want to be in Federal Court either. They filed their own motion for remand based on Section 1448, and those motions were filed back in July of 2003 and August of 2003, their motions for remand under the defendants' right to file for remand under Section 1448.

And my third major point is that this Court's decision in Mills, which is cited in the briefing extensively, governs. And that requires that in an analysis of fraudulent joinder, an objective standard is used. And clearly this circles back to my first point, that plaintiffs have objectively a viable claim against these defendants who pled guilty to federal criminal charges. And therefore the defendant AstraZeneca shouldn't be entitled to discovery or to get into the subjective settlement negotiations, if any took place, of the plaintiffs and the doctor defendants.

THE COURT: Well, it plays out in different ways. I mean, did any of these doctors -- well, did all of these doctors settle?

MS. BENEDETTO: With the federal government.

THE COURT: No, but with you?

MS. BENEDETTO: No, your Honor. The negotiations were stalled.

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 31 of 78
PDF-XCHANGE Click to buy NOW! www.docu-track.com

THE COURT: So have you settled with -- prior to adding them, did you settle with any of these?

MS. BENEDETTO: No, your Honor.

THE COURT: Have you since settled with any of them?

MS. BENEDETTO: No, your Honor.

THE COURT: There are no settlement agreements?

MS. BENEDETTO: That's correct. Well, AstraZeneca was able to obtain from one of the counsel for one of the doctor defendants, there was a memorandum of understanding that was never executed, and AstraZeneca has set that memorandum of understanding in its papers before the Court.

THE COURT: Were there any oral -- in other words, here's the problem --

MS. BENEDETTO: There was no quid pro quo.

THE COURT: Have there been depositions -- I haven't been able to figure out how far this has gone in discovery. Has there been discovery with respect to any of these doctors?

MS. BENEDETTO: Your Honor, the defendant AstraZeneca's counsel was at the depositions taken in this case. Not related to Local 68 but in MDL 1456, each one of these doctors were deposed. They were deposed before your Honor even ordered --

THE COURT: About the settlement, about the

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 32 of 78

discussions?

MS. BENEDETTO: Well, they had already asked for discovery in that regard, and they had the opportunity to take these doctors' depositions. Our position is that the only thing that they should be discovering from these doctors is whether or not in fact Local 68 has a viable claim against the doctors.

THE COURT: Well, I see it differently actually, and that's why I was a little annoyed that the discovery isn't complete now because this is just taking too long. It strikes me, if you have a viable claim against these doctors and you settle it in cooperation, almost like a criminal case, for want of a better word -- you know, viable case, reasonable basis in fact and law -- and you know they're not the deep pockets, and they agree to provide documents and otherwise testify for you, I'm not sure that's a violation of any law. But if you've settled the whole thing up before suit and you add them, and then you bring the suit only for purposes of them refusing to consent, I might have a problem with that. And so chronology is everything.

MS. BENEDETTO: Your Honor, there are no settlements with any of these doctors.

THE COURT: But here's my problem: It's your say-so. And so that's why I authorized discovery. And I got some objection from Dr. Hopkins' lawyer, who asked not to be



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 33 of 78

here, which is fine. But, you know, Judge Bowler said, "Provide the information," and it didn't happen. So I'm just trying to figure out, how far did it go in discovery?

MS. BENEDETTO: There was significant amount of discovery produced.

THE COURT: I just want to know.

MS. BENEDETTO: Dr. Hopkins produced -- was up to Bates No. 500 and something pages' worth of E-mails back and forth between himself and the lawyers from my firm, and, frankly, the lawyers from the defense firms. And Mr. Mustakoff, who was counsel for Dr. Antoun, actually produced the memorandum of understanding that was being negotiated, but there was never a final agreement reached.

THE COURT: And what was the third doctor?

MS. BENEDETTO: Berkman.

THE COURT: Yes, and what happened with him?

MS. BENEDETTO: His counsel produced an affidavit which satisfied the defendants. The defendants didn't pursue any further. And I think he produced, like, seven pages' worth of documents.

THE COURT: Well, what hasn't been produced? In other words, did the defendants request depositions and people refused to do it?

MS. BENEDETTO: The only thing outstanding, your Honor -- I believe the defendants are satisfied with what



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 34 of 78

they've received from Dr. Berkman's counsel, Mr. Sherman, and I believe they're satisfied with what they received from Dr. Antoun's counsel, Mr. Mustakoff. What they are still pursuing ostensibly is the settlement negotiations documents from Dr. Hopkins' counsel, which is Mr. Fernandez.

THE COURT: Well, do you have them? Do you have the settlement papers with Hopkins?

MS. BENEDETTO: Your Honor, obviously there were settlement negotiations with Dr. Hopkins. It's listed on his privilege log as the basis for why he was not turning over those E-mails back and forth.

THE COURT: But they're not privileged. I mean, they are if they're between him and his counsel, but not if they're between you and the counsel, or whoever is representing the local.

MS. BENEDETTO: Your Honor, our point in all of this is, if we're having settlement discussions with -- for example, if we're having settlement discussions with AstraZeneca, is GlaxoSmithKline entitled to find out about that? I mean, it could open up a whole can of worms.

THE COURT: It depends, it depends. You know, everything is "It depends." So I'm happy to put it under a protective order, but I just have to be content in my heart there was no collusion.

MS. BENEDETTO: And I think the point of the matter



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 35 of 78

is that as differing from the other cases that the defendants cite, such as in the Fen-Phen case that they cite from the Eastern District, the lawyer for the plaintiff said that there was such a quid pro quo agreement, "If you agree to object to removal, we'll settle with you," the phentermine defendants. But there was also an added aspect there. In that case, there was clearly no way that the plaintiffs could make out a cause of action against the phentermine defendants as opposed to the Pondimin and Redux defendants. Here we have defendants who pled guilty to the cause of action that we're alleging.

THE COURT: I agree, but there's at least a question about standing, and that's what I'm sort of stuck on. Now, I've also got a problem with that because there was a misrepresentation in the removal papers, so I'm not sure which trumps which. But I think that you're quite right, that if there's a reasonable basis in fact and law, and then you settled it for purposes of discovery or to cooperate as witnesses or whatever, I'm not sure that violates anything. What would worry me is if there was an agreement, verbally or in E-mail form, and you simply sued them anyway so they wouldn't consent. I'm assuming for a minute that that's not going to prove up, but that's why I ordered discovery. And one of the reasons I'm a little annoyed is, I had hoped this would all be done by now so we could stop the skirmishing and



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 36 of 78

PDF-XCHANGE Click to buy NOW! www.docu-track.com

I could just rule.

MS. BENEDETTO: Your Honor, I'm here today to tell you and Mr. Haviland is here today to tell you that there are no such settlement agreements.

THE COURT: I know, but that's why we have discovery, so someone says it under oath, you know? That's the thing. Now, if you want to put it -- I don't know, counsel usually don't like putting things under oath, but, you know, if somebody who was involved wants to put it under oath, "There was no discussion about it, no agreement about it," whatever, it would go a long way.

MR. HAVILAND: Your Honor, I'm Don Haviland for the local plaintiffs, and I'll put under oath that there was no discussion with any of these doctors' counsel as a quid pro quo that "If you refuse your consent to removal, we will settle with you." I'll tell you exactly what happened.

THE COURT: But did you discuss consent to removal at all? Did it come up?

MR. HAVILAND: Not prior to removal, Judge, not prior to the removal. The removal came. The discussion was raised, as it was with the defense counsel, about whether they would consent.

THE COURT: But I guess they remove, and then there's a question of -- well, you know, I don't want to do this here. At some point, if you want to put in affidavit



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 37 of 78

form the chronology and exactly what happened with respect to consent, both of you, and then you get counsel from the other side to do it, that may be enough for me. But what I don't like is, I ordered it, and it hasn't happened. And then Judge Bowler ordered it again and I've got some objection. It should be pretty simple. It should just be easy.

MR. HAVILAND: The objection we had, your Honor, as plaintiffs' counsel is, when you have post-litigation communications amongst plaintiffs' counsel and with defense counsel about settlement, we have our work product, our internal notes, we've got internal communications. And we were asked by AstraZeneca's counsel, respectfully, to log everything.

THE COURT: You can't -- then fine, assert the privilege. I'm only talking about documents between you and the doctors.

MR. HAVILAND: And I believe they have everything, your Honor. I don't believe the defendant has withheld --

THE COURT: Well, somebody wrote me a -- is objecting to Judge Bowler's order.

MR. HAVILAND: I know Dr. Hopkins has taken a strong line on that. I know that. I don't know about the case of Dr. Antoun.

THE COURT: I'm about to overrule that, but I just want it to all happen soon so I can just rule.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 38 of 78

MR. HAVILAND: Your Honor, we're asking to put it in affidavit form.

THE COURT: Let me just assume for a second you get past this hurdle. Okay, let's just address the merits for a minute. Now, let's assume I find that there was a misrepresentation in the removal papers, all right, that they actually consented. So now what do I -- and let's assume for a minute, however, that their point is well-taken that, in any event, it wasn't material because they hadn't been properly served it. What do I do with that fact pattern?

MS. BENEDETTO: Your Honor, I think under the New Jersey rules -- and I've been a member of the New Jersey bar for fifteen years -- if a defense counsel accepts service on your behalf, they've accepted service. These doctors' counsel have said that they -- particularly if you look at Dr. Antoun, he accepted service on July 1. The case was removed on July 3. And they point to Rule 4:4-4(c).

THE COURT: Okay, this is helpful. So they say it was removed on the 3rd, and then they accepted service on --

MS. BENEDETTO: The 1st, two days before, Dr. Antoun's counsel.

THE COURT: There was one little squirmish about whether they signed something. Did they?

MS. BENEDETTO: No. There's no requirement that they have to. What the rule says, 4:4-4(c), is that a



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 39 of 78

plaintiff's attorney could not take default against a defendant who had accepted mail service until such time as that defendant appeared or answered.

THE COURT: So there's no requirement.

MS. BENEDETTO: We wouldn't be able to take a default against Dr. Antoun by virtue of the fact that his counsel agreed to accept service on his behalf on July 1. There's nothing in the rule that says, by virtue of the fact that Dr. Antoun's counsel didn't appear in the case until he filed his joinder in the remand on July 18, that does not mean that the effective date of service then becomes July the 18th. That's not what the rule says.

THE COURT: So just to play it out, so let's assume he accepts service on the 1st. You say that was enough to be valid service, and that the argument about when it went into effect doesn't defeat the validity of service? Is that right?

MS. BENEDETTO: Well, the way the rule is worded does not deem that the effective date of service changes to the date on which the defense counsel appears. So the only thing that that rule goes to is the default issue. The rule goes to the issue of plaintiff's counsel can't serve by mail a counsel or a defendant and then take a default against them before that counsel has appeared in the case.

THE COURT: Is there a case or a New Jersey



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 40 of 78

practice that talks about the effect of that rule? You know how we have Mass. Practice here, you know, and it tells you how to serve, et cetera.

MS. BENEDETTO: I did research, your Honor. I couldn't find it. I do know there's cases out there that talk about, you know, defense counsel accepting service. It's certainly anticipated and it's certainly done in practice in New Jersey.

THE COURT: So you don't have a practice series from New Jersey that you know of?

MS. BENEDETTO: I didn't look at -- I did research on Westlaw for that. I didn't look at the practice series.

THE COURT: If you see something, that would be very useful, because I know we have a very practical treatise on what it all means and plays out under state law, and sometimes a district court, you know, lower court opinions in the state court, and it would be very useful to have that.

So assume for a minute it was effective service. You're saying that they didn't consent, and they would have objected? Is that it?

MS. BENEDETTO: Well, counsel for the defendants stated that they tried to contact Mr. Mustakoff, who's Dr. Antoun's counsel, a doctor in New Jersey, and he was on trial, they didn't contact him. Yet they still put in their removal papers that "We believe we're the only served



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 41 of 78

defendant," even though AstraZeneca and Dr. Antoun were subject to the motion for our preliminary restraints that we filed and both of them have indicated on the certificate of service were served via overnight mail, Federal Express. So Dr. Antoun got service the same way AstraZeneca did. So if there's anything wrong with Dr. Antoun's service, then AstraZeneca is basically saying, "It's okay the way you served us, but it's not okay the way that you served Dr. Antoun." So, I mean, they used the service upon them on July 1 as a basis, you know, to remove the case.

THE COURT: Okay, thank you.

MS. BENEDETTO: And if I could just make one more point, your Honor. Just with respect to this discovery, this did not come to a head -- I mean, we even filed a 16.1 statement with your Honor back in April, and the defendants never raised at that point in time that they wanted to have a discovery schedule.

THE COURT: Didn't I put it in my last order?

MS. BENEDETTO: Yes, your Honor, but, I mean, they waited to press it until this last round of briefing. And, I mean, they have been arguing fraudulent joinder all along, and it's only --

THE COURT: Did they give notices of deposition for these people?

MS. BENEDETTO: They did originally, yes, your

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 42 of 78

Honor, back in July of 2003, and then they abandoned them.

THE COURT: I issued my order a lot more recently than that.

MS. BENEDETTO: Correct, correct.

THE COURT: It certainly wasn't 2003, right? It was just within the last six months, right?

MS. BENEDETTO: Yes, your Honor.

THE COURT: Did they renotice the depositions?

MS. BENEDETTO: They did, they did. And then, as to Dr. Antoun's lawyer and as to Dr. Hopkins' lawyer, they accepted the affidavits and the documents they produced, and then did not pursue the depositions.

THE COURT: All right, well, I'll ask them what it is that they think they don't have.

MS. BENEDETTO: Thank you, your Honor.

THE COURT: Thank you.

MR. FLYNN: Good afternoon, your Honor. Michael Flynn from Davis Polk. A number of things have been said which I'll clarify.

THE COURT: Can I just start off by saying, look, I had a real problem with the statement made in the removal petition. It was just wrong.

MR. FLYNN: I think our statement, your Honor, was twofold. First of all, as we said initially, we believe that under New Jersey service rules, that none of the doctor

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 43 of 78

defendants --

THE COURT: Then you should have just said that.

MR. FLYNN: We did, and, your Honor, the first statement in the removal petition says, "We believe no doctor defendant has been served." In the second statement, we went above and beyond that because at the time we had no belief, your Honor, that these doctor defendants would not consent to removal. And here's the basis for --

THE COURT: You know what, I just was pretty upset when I read it because I just thought that -- now, it could have been negligence rather than an intentional misrepresentation -- it way overstated what it was.

MR. FLYNN: I can explain to your Honor in good faith why we believe that, and if there's any confusion about the language chosen, we obviously did not mean anything intentional by that language. But let me tell you the basis on which we believe that the doctor defendants would consent. An associate in our office called counsel for two of the doctors on the day the removal petition was filed, indicated to them that we intended to remove, asked them, had they been properly served? The answer to that was "no." In both instances, they did not believe they had been properly served, so we did not believe we needed their consent. But having raised the issue of our removal, neither of them objected.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 44 of 78

THE COURT: Yes, but then you should have said, "Having raised the issue, neither objected." That's different than they consented. You never asked the question, "Do you consent?"

MR. FLYNN: And I agree, your Honor, we did not ask that question because our belief was that we did not need their consent. And I don't believe the removal --

THE COURT: Then you should have said that in the removal petition. It overstated your case.

MR. FLYNN: And I think it was, again, your Honor, it was above and beyond what we thought was necessary.

The other reason is, your Honor, which really informed our belief about whether or not the doctor defendants would consent, is that we had every reason to believe, until they started to file papers in opposition to remand, that they would want to be in the MDL proceedings. Under your Case Management Order No. 2, your Honor, their case, subsequently transferred class action, would be subsumed in the AMCC --

THE COURT: Well, then you say that, you say that. It looked when I read it as if they consented, they said to you, "We agree." That's the way it is usually when all these pharmaceutical companies are called -- I'm hoping that that's true -- that somebody from the firm actually says, "We consent."

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 45 of 78

It overstated the case, and I'm not sure what to do with that. I mean, I sort of half expected someone to come in and say, "Yes, I'm the partner who signed off on that thing, and I just misunderstood what my associate said, and I'm sorry." But instead I get a justification for it.

MR. FLYNN: Well, I think, your Honor -- and Mr. Wise's affidavit in response to your order I think explains and no need for me to continue to reiterate it. I understand, and I apologize for any confusion on that point, but we really did believe, your Honor, for several reasons that the doctors would be amenable to being in this court because they would be subsumed in a case where they were not a defendant, and we had no reason to believe that they would want to stay in New Jersey state court.

Let me address, your Honor, unless you have other questions --

THE COURT: Well, let me ask you this: Suppose I find that there was a material misrepresentation in the removal petition. What do I do with that?

MR. FLYNN: If you find that, your Honor, again, it's not, in our view -- and I'll get to this in a minute -- we believe it has nothing to do with the remand issue.

THE COURT: Well, that's what I'm asking you.

MR. FLYNN: Yes, but because the remand issue, your Honor, we believe, with respect to the procedural defect,

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 46 of 78

rises or falls completely on the issue of whether or not, as you pointed out before, whether or not the doctor defendants have been properly served under New Jersey law at the time the removal petition was filed. And I have with me, your Honor, cocounsel from New Jersey who can speak to the New Jersey service rules. And so to answer --

THE COURT: Can I just say, I did not hear that cell phone, but if I had, there's a $250 fine in Federal Court for it. So I didn't hear it, but I don't want to hear it again, all right? Some judges are pretty strict on it, but I have the one-ring rule, so, hopefully, if somebody turns it off and I haven't seen whom.

All right, go ahead.

MR. FLYNN: So we believe, your Honor, that it has no material effect on the remand and the removal notice here because we believe that consent was irrelevant because of the service issue. So if you find that there was a material misrepresentation on the issue of consent, we believe it has no effect on the remand issue at all because we believe that the doctor defendants' consent was not required because they had not been served.

THE COURT: All right. So now let's get to part two. I found this very, you know, like a law exam question here. So let's assume for a minute that there's a little mud on the defendants. Now let's assume for a minute that there



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 47 of 78

was an agreement between plaintiffs and the doctors that they would settle with them in exchange for production of documents and cooperative testimony. What's wrong with that?

MR. FLYNN: The only thing that's wrong with it, your Honor, is if they were joined in order to defeat removal.

THE COURT: All right, fair enough, okay, because you throw a lot out about how this was just about -- you know, it wasn't about really suing them; they were suing them in order to get cooperation. I couldn't think of a reason why that was wrong.

MR. FLYNN: Well, that in and of itself, your Honor, might not be wrong, but when it's coupled in a circumstance where we believe there's significant indicia that there's no intent on the plaintiff here to pursue a claim against these doctor defendants to join judgment, we think that satisfies the fraudulent joinder. And, again, we don't think you need to reach it because of the issue of service, and their consent is not required.

But we do think there's a lot of indicia here of discussions. Before your Honor, counsel for plaintiff indicated that they had no discussions with the doctors. The discovery we've been able to take so far, your Honor, indicates the following things: We have an affidavit from

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 48 of 78

one of the doctor's lawyers who says in his affidavit undisputed that counsel for the plaintiffs indicated at the time the service issue was arising, the removal issue was arising in early July, 2003, that "We are not interested in your client as a defendant, only as a fact witness. And it is in your best interest," meaning the doctor defendant -- this is Dr. Berkman from Ohio -- "for the case to remain in New Jersey state court."

We have prior to the complaint --

THE COURT: So let me just ask. So with Berkman, are you content with the discovery at this point?

MR. FLYNN: Yes.

THE COURT: All right, so Berkman is complete. All right, now move on to the next one.

MR. FLYNN: The next one, your Honor, is of Dr. Antoun in New Jersey. Several pieces of evidence, your Honor, we believe indicates that the plaintiff had no intention to pursue a joint judgment with respect to Dr. Antoun. Number one, your Honor, Dr. Antoun was also part of a preliminary injunction that the plaintiff filed against AstraZeneca and the individual doctors, and it was hotly contested in the New Jersey courts before removal was -- before a decision was made. And Dr. Antoun never answered, never appeared, and they never pursued that injunctive relief against him. There is no --



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 49 of 78

THE COURT: What do you want in terms of discovery against Antoun, anything?

MR. FLYNN: No. Dr. Antoun, we have an affidavit from his attorney, Mr. Mustakoff, which we believe establishes that under New Jersey service rules, service was not effected, and so therefore Dr. Antoun's consent was not required.

THE COURT: So you don't want any more discovery on Mr. --

MR. FLYNN: No, no. We've got a draft MOU, memorandum of understanding, circulated to Dr. Antoun's counsel before the complaint was even filed. We also have, your Honor --

THE COURT: Wait a minute. Does it discuss consent, and in exchange you've got to consent?

MR. FLYNN: No, it does not, your Honor.

THE COURT: So who's the last one?

MR. FLYNN: The last one is Dr. Hopkins, Mr. Fernandez. You have his papers, your Honor. And your Honor is correct that Mr. Fernandez moved for a protective order. After your order issued in August, we issued discovery notices pursuant to that order, and Mr. Fernandez moved for a protective order. We opposed. Judge Bowler agreed with us, as your Honor has already indicated. Notwithstanding that, Dr. Hopkins and his attorney have filed

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 50 of 78

objections, and we have opposed those, your Honor, and those are now before you.

The privilege log, your Honor, that Mr. Fernandez produced indicates that he is withholding documents, E-mail correspondence with plaintiff's counsel in the early July, 2003 time period relating to discussions regarding settlement. And this is at the very time, your Honor --

THE COURT: Sure, I understand that. So what you want from him is what, just these documents?

MR. FLYNN: And also we've noticed his deposition, and he's refused.

THE COURT: And did you notice it in a timely way, within three months?

MR. FLYNN: Yes. Yes, we did, your Honor.

THE COURT: So you just want a deposition with the lawyer?

MR. FLYNN: With the lawyer. We've noticed his deposition, unless, as we've done with the other doctors -- we're not trying to be unreasonable here -- to the extent that doctors are willing to put in affidavits, we're not looking to drag people through unnecessary discovery.

THE COURT: So whom did you notice?

MR. FLYNN: We noticed Dr. Antoun's lawyer, Mr. Mustakoff.

THE COURT: No, no, no, no. Whom did you notice



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 51 of 78

that you want now?

MR. FLYNN: Now the only person who is left is Mr. Fernandez.

THE COURT: All right.

MR. FLYNN: Let me go through, your Honor, a couple of other indicia.

THE COURT: So how long would it take to do his deposition and get those documents, two weeks?

MR. FLYNN: I assume so, your Honor, yes, that would be fine. If he produces the documents to us, we'd be ready to go as soon as your Honor wanted us to.

THE COURT: He didn't want to show today, so I'm going to do that on the papers, but I'll do that as soon as I can.

MR. FLYNN: Okay. A couple of other points, your Honor, just because I think this issue of fraudulent joinder is important. You raised the issue before, your Honor, in questions to counsel about standing and about the face of the complaint, which were other reasons why we believed, your Honor, that there's no intent here to pursue a joint judgment against these doctor defendants. There is no allegation in the complaint that the plaintiff was prescribed our client's drug Zoladex at all, that plaintiff ever paid for Zoladex, not one single allegation. There are no personal jurisdiction allegations against the two out-of-state



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 52 of 78

doctors, not a single allegation in the complaint that would suggest that there is any claim to be pursued.

They make a lot of noise about the fact that these doctor defendants pled guilty to crimes in a conspiracy with our client. Those relate to totally different issues not at issue in the AWP case. Those relate to free samples, and it's not something that is a claim that they have asserted any right to bring to seek relief on. So there's nothing on the face of the complaint, your Honor, that we believe suggests that there are real claims here.

THE COURT: Well, suppose I have both. This is what I have been struggling with with my law clerks: I have what I consider a material misrepresentation and removal petition and a question about whether there's a reasonable basis for standing against these doctors, or jurisdiction, whatever you want. I don't think there's a problem that you just -- suing them in order for their testimony. I don't think there's case law that says that. So what do I do with that?

MR. FLYNN: Well, your Honor, a couple of things. Let's be clear here that something that they don't want to talk about at all is, there's clearly federal jurisdiction here, ERISA, complete preemption. Under your California decision, all three prongs are met. They don't even seriously contest that.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 53 of 78

THE COURT: The issue is consent and --

MR. FLYNN: Well, no. The issue is consent on the procedural defect. We think that, again to reiterate, the consent issue need not be reached because the doctors weren't served, and if your Honor would like --

THE COURT: Did you find a New Jersey practice series?

MR. FLYNN: I can turn it over to my colleague, Mr. Cooner, to talk about the New Jersey service rules, which I believe are clear, your Honor, that the effective date of service has to be an initial appearance. Think of a situation, your Honor -- and Mr. Cooner pointed this out to me before -- think of a situation where someone says, "I'll agree to accept service on July 1." On August 20 they make their first appearance. If the July 1 date is the effective date, when they make their first appearance, they are already in default. It makes no sense, your Honor, and --

THE COURT: That's what she was saying, which is you can't default someone for that.

MR. FLYNN: Well, they've cited no basis for that, your Honor. And I think Mr. Cooner can explain to you --

THE COURT: Do you have a New Jersey practice section? You must have like a New Jersey practice series, right?

MR. COONER: There is a New Jersey practice series,



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 54 of 78

and more than that, the bible of New Jersey practice is Pressler's handbook, Judge Pressler, Sylvia Pressler.

THE COURT: Do you have the Pressler handbook for me?

MR. COONER: I have the sections of it as it relates to this issue, and I can let you know that --

THE COURT: I'd love it.

MR. COONER: -- as to the specific issue that you're raising, it is silent on it.

THE COURT: Of course.

(Laughter.)

THE COURT: Okay, but is this the only treatise on point?

MR. COONER: No. There's a broader New Jersey practice series that covers a whole series of different topics, one of which is civil practice and procedure. I believe the author of that book is Del Deo.

THE COURT: Okay, well --

MR. COONER: Affectionately known as the "Red Books."

THE COURT: What I'd appreciate is if there is -- on that rule about attorney acceptance of service, if there are sections on it from either side, I'd appreciate it. It's not crystal clear what it all means when you read it.

MR. FLYNN: I just point out, your Honor, in our

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 55 of 78

briefs, it's not New Jersey practice itself, but we do cite practice series that make it abundantly clear that the effective date for service does not relate back to an oral agreement to accept service. And that's in our papers.

MR. COONER: And that's the cornerstone of what we've tried to say, your Honor, is not just merely service, but does service become effective? If you step back a little bit, consent is only required from properly served defendants. And you spoke earlier today about the chronology, and in this case, the chronology is that snapshot, and the snapshot is on July 3, 2003. And on that day, there are three different ways you can effect service in New Jersey, and they're all in the Rule 4:4-4. There's an (a), a (b), and a (c). (a) is the primary way that you effect service. It's delivery to the person. It is sheriff service.

THE COURT: We agree that didn't happen.

MR. COONER: Okay, (b) is substituted service. Substituted service is also not in play here because you need to --

THE COURT: Right. (c)?

MR. COONER: (c) is mail service, and mail service, incidentally, requires it to be done by ordinary mail, certified mail, United States mail, not private service mail. Regardless, though, it's effective only when there's



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 56 of 78

an answer or an appearance. A snapshot again, 7303: There was no answer. There was no appearance. There was no document in any way, shape, or form at that moment.

THE COURT: So you're saying, if everybody is served on the same day this way, everyone becomes effective at the same time, the defendants can jump the process, remove it, and say, "I don't need the consent of anyone." In other words, it's effective against all of them on the same day. They say, "Ah-huh, we've got the better firm. We've figured this out. We're jumping into Federal Court, and we don't have to have the consent of the other folks because it's not effective for another ten days."

MR. COONER: What I would say, your Honor, there, defendants don't choose how to be served. It's the plaintiff who goes, and the plaintiff is the one who initiates the lawsuit, and they initiate the service of process. It's the plaintiff who chooses to go in the (c) direction.

THE COURT: Okay, I understand, I think, the issue right now. And I've got to actually cut people. We've got to get to the Florida case. And I have a revocation hearing at 3:30, so I need to -- is there one last --

MR. COONER: To underscore the point made by Mr. Flynn, 60 days you have to answer or appear. If someone were served today, they wouldn't have to answer until March 27. If they entered an appearance, filed a notice of



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 57 of 78

appearance on St. Patrick's Day, and that somehow reverted back to today, they would be out of time to answer. Our rules stress --

THE COURT: Suppose you serve all fifteen defendants on the same day this way, and then on the next day only one of them removes and says, "Ah-huh, I don't need anyone else's consent." That's your view as to how it works?

MR. COONER: There's not effective service, that's correct.

MS. BENEDETTO: If I may hand something up?

THE COURT: What is it?

MS. BENEDETTO: These are the documents produced by Mr. Mustakoff. It's a whole packet. I'm only going to turn to the documents, the pages that appear at MUST-000001 --

THE COURT: I tell you what, don't do it this way. Send me a motion to supplement record and flag where you want me to look, okay?

MS. BENEDETTO: Also, your Honor, in an effort to save the issue of a deposition, instead of a deposition, could Mr. Fernandez put forth an affidavit that he wants to put forth to the Court? I think the problem is, he didn't want to sign the affidavit that AstraZeneca wanted him to sign. He'd sign an affidavit but --

THE COURT: If you work it out that way, I'm



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 58 of 78

happy. Otherwise, I don't know what the harm here is, take a two-hour deposition. How long could the thing take?

MR. FLYNN: Your Honor, could I just add one thing I forgot to mention? We've also served discovery on plaintiffs, who have refused to produce documents, and there's a hearing before Judge Bowler next week on February 2 on our motion to compel.

THE COURT: It's too late. All I'm going to do right now is -- I don't want this to go forever. That's why I did it. I'm annoyed that this didn't happen because I was hoping to rule on the whole thing, you know, have something tied up. I just want it all to happen within two weeks.

MR. FLYNN: And that means their producing documents as well?

THE COURT: Yes. They've got to produce documents unless they're privileged.

MR. FLYNN: And they have to produce a privilege log. They've refused to do that.

THE COURT: You've got to produce a privilege log. That's the way it works.

MR. FLYNN: Thank you, your Honor.

THE COURT: And the settlement papers aren't privileged. Now, there may be other grounds, work product, attorney-client. I mean, for sure there are others, joint defense or joint, I guess, plaintiff's memos and that sort of



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 59 of 78

thing. But you've got to give a reason for it. But I don't want to be here for the rest of my life on privilege issues. You're either going to -- what's it? -- a clear and convincing case or not. And I must say, to bring it back, I wasn't happy. I don't believe that you thought it was not material to say everyone consented or you wouldn't have put it in. And I'm just saying that I don't know what legal significance it all has, and I find that complicated. It's just it shouldn't even be part of this case. It shouldn't be.

MR. FLYNN: I understand, your Honor. We believe it wasn't, but --

THE COURT: Okay, thank you. Now we're going to just move on to Florida.

MR. THOMAS: Thank you, your Honor. Mark Thomas, state of Florida. I'll be very brief, your Honor. I know we're running short on time.

First of all, thank you very much for allowing the state of Florida to appear. We're going to split our argument today. Ms. Thomas, who represents the relator, is going to handle the matters involving disputed substantial federal question.

THE COURT: Can I actually start with this. I got confused at some point with the --

MR. THOMAS: Yes, Judge.

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 60 of 78

THE COURT: What's the status of that other case? There are two cases.

MR. THOMAS: Mylan and Alpharma?

THE COURT: Yes. And you practically begged to come in, and I'm happy to have you in Boston, but I'm just wondering why I shouldn't hear you and then just wait until I hear from the other folks as well.

MR. THOMAS: It is our expectation that Judge Hinkle in the Northern District will timely rule on the state's motion for remand. While there has been a conditional transfer order issued, we have anticipation that Judge Hinkle will be ruling quickly in the Mylan case, and it will not come up to this MDL.

THE COURT: Well, when will I know?

MR. THOMAS: I had to turn my cell phone off prior to coming into court, but I was hoping for a decision --

THE COURT: So it wasn't yours, huh?

MR. THOMAS: No, your Honor. I was hoping for a decision before we began argument. It should be imminent.

THE COURT: Well, let me just say this: You'll probably be the bottom of my barrel anyway because some of these others will be easier to write, and yours is a more complex analysis. So if in fact the other folks are still in federal jurisdiction and they want a hearing, I would wait to rule on yours till they got in here as well because that was



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 61 of 78

my big concern, as you can well imagine, that I not do it twice, but here you are.

MR. THOMAS: Yes, your Honor, and glad to be here. We will try and keep this simple. Actually, we're surprised to hear that you find the Florida case one of the more complex cases because we found it rather simple. Ms. Thomas is going to be handling the disputed substantial federal question argument. If necessary, I'll be happy to address Justice Souter's more ephemeral Grable matters.

THE COURT: Not ephemeral, wholistic.

MR. THOMAS: Wholistic.

MS. THOMAS: Good afternoon, your Honor. Susan Thomas from Berger Montague, who represent the relator Ven-A-Care, who is the relator in the Florida case.

As Mr. Thomas -- no relationship, by the way -- indicated, we actually were quite surprised to hear your Honor indicate that she thought there was a real issue with Florida because the Florida case asserts claims under the Florida False Claims Act and under Florida common law. These claims are Medicaid price fraud only.

THE COURT: All right, so Medicaid, now, does the -- I had a hard time understanding the statutory scheme. Does your Medicaid state statute use the term "AWP"?

MS. THOMAS: It is in the statute and the regs, your Honor, and indeed that is where the term "AWP" and "WAC"



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 62 of 78

come from in terms of pharmaceutical reimbursement. They do not come from the federal statute or regs; they come from the state.

THE COURT: All right, and do they -- this is what I need to understand better and where you'll be very helpful because it wasn't so clear from the briefings. So when they use the word "average wholesale price," do they make specific reference to as defined in the Medicare statute? I'd like to see the statutory sections and the regs themselves. Do they reference back to the federal standard?

MS. THOMAS: No, your Honor, they do not because there isn't a federal statute.

THE COURT: The federal statutory term, do they reference back to the federal statutory term?

MS. THOMAS: There is a Medicare federal statutory term, and they do not reference to that.

THE COURT: I actually know that, okay? They do not --

MS. THOMAS: They do not reference to it. In Medicaid, there is no federal term "AWP" and "WAC" because Medicaid allows each state to set up its own plan and its own reimbursement.

THE COURT: Right, and sometimes they piggyback on the federal terms, and I just want to know, do they say -- does the Florida statute use the term "average wholesale



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 63 of 78

price"? You say "yes," right?

MS. THOMAS: Yes, it does. It uses that and "WAC."

THE COURT: Okay, and "wholesale acquisition cost," right?

MS. THOMAS: Yes.

THE COURT: And then they're defined by regulation, right?

MS. THOMAS: They are not defined, which I'm sure your Honor is familiar with at this point in this litigation.

THE COURT: Yes.

MS. THOMAS: But nor do they in any way reference back to anything in the federal statute.

THE COURT: Okay, they do not reference back at all to anything, you know, as defined in the federal statute or --

MS. THOMAS: Absolutely not.

THE COURT: -- as codified in policies from the Center for -- what is it, Medicare and -- what's it called?

MS. THOMAS: Medicare or Medicaid Services or something?

THE COURT: Yes. So they don't reference back in any way to federal standards, either in the statute, regulation, or policy?

MS. THOMAS: That is correct.

THE COURT: All right, thank you.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 64 of 78

MS. THOMAS: And that is consistent with the way the system is set up where although Medicaid is a jointly funded federal and state program, it is primarily administered by the states. And with respect to pharmaceutical reimbursement, first of all, that's an option of a state Medicaid program whether or not to reimburse to cover pharmaceuticals, and then how they do it is governed by state statute or regulations, and that is indeed as it is done in Florida. So we have no Medicare copay claims, either by the Medicaid state agency paying copays for dual eligibles or as parens patriae on behalf of Florida citizens who are themselves paying the Medicare copays. We have no Medicaid rebate claims, which might well have been confusing from the defendants' briefs because they spent pages and pages talking about Medicaid rebates. They're not in our case.

THE COURT: Does Medicaid pay for the copays for the Medicare patients who are poor?

MS. THOMAS: I believe it does, your Honor, but we are not bringing those claims.

MR. THOMAS: Correct.

MS. THOMAS: So they're not in this case. And there is no reference to Medicare AWP, which was the issue that was presented to the Texas court where under the physician reimbursement structure of the Texas Medicaid program, physician reimbursement specifically looked to


Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 65 of 78

Medicare AWP, and that became the question for decision that the Federal Court there decided. Still sent it back, by the way, still found there was not a substantial federal question, but at least had something to think about. We don't see anything to think about here.

THE COURT: Yes, but if I get a clear understanding of the state statute, maybe I won't either, but what's not crystal clear is, I'm dealing with how many different states at this point?

MS. THOMAS: I understand, your Honor.

THE COURT: I understand there's a state statutory scheme, and your point is that there are no policies, regulations, or state statutes at the state level that piggyback onto a federal standard?

MS. THOMAS: That is correct, with respect to the terms "AWP" and "WAC."

THE COURT: And WAC. Thank you.

MS. THOMAS: I mean, they do use federal upper limits. There's some other connections. Obviously they're part of the federal Medicaid rebate program, but those are not claims in our case. With respect these pricing terms, they have no federal connotation.

THE COURT: So you're saying the FUL -- I'm glad you reminded me of that -- is only relevant with respect to the size of a rebate, and you're not challenging the rebates

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 66 of 78

here?

MS. THOMAS: Those are two different points, your Honor.

THE COURT: Okay, well, go for it.

MS. THOMAS: The rebate is one issue, and we have no claims pertaining to rebate. And if your Honor would ask me, I would happily answer as to whether or not the relator's still-sealed complaint has any allegations about rebates, although I can't otherwise discuss that without your Honor's permission. But I don't want your Honor to have a misapprehension that there's something going on as it was in California, if you remember back to that case.

THE COURT: Well, I'm reluctant to do that here because there's a reason it's sealed and -- let me put it this way: I'm asking you that question, but I don't want you to answer here. I want you to answer in an in camera affidavit.

MS. THOMAS: Okay. I will tell you that defendants certainly have made no arguments that there is anything in the still-sealed complaint that affects this Court's decision.

THE COURT: Thank you.

MS. THOMAS: And I just, because I'm familiar with what was going on in California, I just don't want there to be a misapprehension on that point either.

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 67 of 78

THE COURT: All right, thank you very much.

I'm going to jump to defense at this point. Who's handling this?

MS. THOMAS: Could I just take a few minutes to address the arguments they make as to why --

THE COURT: No. Maybe on rebuttal if you do, because I've got a pretty good understanding of what your position is.

MR. FLEDER: Good afternoon, your Honor.

THE COURT: You spent a lot of time in your brief talking about why this will affect certain aspects of reimbursement by the federal government. Is that really the limit of what you think the federal interest is at this point?

MR. FLEDER: No, it isn't, your Honor. There are a number of federal interests that are implicated by the complaint in this case, and it's not just limited to the words of the complaint, but as we've cited in our case, it's the underlying claim. But just on the basis of the words in the complaint, AWP and WAC do have meanings that have federal implications. I think if you look at Judge Crabb's decision in the Wisconsin case, which was both a Medicare and a Medicaid decision, she said that the plaintiff's claims did represent a substantial and disputed question of federal law with regard to recoupment of alleged overpayments under the



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 68 of 78

federal Medicaid and Medicare laws.

But in addition to AWP and --

THE COURT: Can I just say, I happen to agree under Medicare. How it all balances out we can discuss, but if in fact it's true that this is only under Medicaid and they don't specifically reference back to the federal standards, you're essentially asking me to draw the inference that that's what it must be doing?

MR. FLEDER: It's more than that, your Honor, because, first of all, Ms. Thomas made reference to the federal upper limits. And as I understood what she was saying, she was saying it's only relevant to the rebate. But on Page 7 of their complaint, Paragraph 19, the state talks about the way that reimbursement occurs independent of rebates, and they talk about average wholesale price. That's Factor A, B is wholesale acquisition costs, and C is the federal upper limit. So they have put the applicability of federal upper limit into the Florida statute and therefore into the cause of action that they have brought in this case.

But it does go beyond that because as we did say in our case, in Paragraph 93 of their complaint, they are seeking damages based on what they paid versus what they think they should have paid, without obviously conceding that they should have paid any less. By definition, by necessity,



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 69 of 78

there is a federal component in that analysis. There has to be in two different respects: both the rebates that are paid by the pharmaceutical companies to the state of Florida, which obviously is set by federal law and by a federal contract --

THE COURT: Isn't that basically a best price benchmark?

MR. FLEDER: Best price and average manufacturer's price.

THE COURT: Right, so it's a different standard.

MR. FLEDER: It's a different standard, but it is governed by federal common law, and it is governed by the federal contract. And there's absolutely no doubt that if the state were to be correct that they are entitled to damages, by necessity this Court would have to get into whether the rebates were proper because we would be seeking, for certain, a setoff for any rebate payments that were made: Were they too much? Were they too little? Were they just the right amount?

THE COURT: But if I'm doing the balancing, the Souter balancing, then I would say -- let's assume your point, there is a federal interest here. Wouldn't the state interest under its own statute with its own scheme outweigh it?

MR. FLEDER: I don't think so, your Honor. Can I



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 70 of 78

just mention also the other part of this and then directly answer your question? There's also the second side of this which is the federal payment, the FFP made to the state of Florida for the drugs that were purchased and are the subject of this case. That is obviously something that has a very direct federal interest.

THE COURT: That's what you're saying, it affected the amount of the FFP how you ruled on that.

MR. FLEDER: That's correct.

THE COURT: So I'm not denigrating at all your argument that there's some federal interest here. The part that I think -- I don't know your colleagues -- there would be a lot of litigation over is, how do I balance that all out? And that's why I said this was the hardest piece of this. There's obviously some federal interest, but there's also a strong state interest.

MR. FLEDER: Well, and we are not saying and have not said that the state of Florida has no legal right to bring a cause of action. That's not an issue in this case. They could have brought a cause of action in state court. They could have done what the Commonwealth of Massachusetts did in a Medicaid case, which is to bring a cause of action directly in Federal Court, the same cause of action, just different venue.

Now, I'd like to just supplement on what Mr. Lynch



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 71 of 78

said and refer the Court to the recent decision in the Santa Clara case where the judge -- this is the County of Santa Clara V. Astra U.S.A., Inc.

THE COURT: Could you remind me, was that Medicaid or Medicare?

MR. FLEDER: I believe it was Medicare, but what the court did was go into a great analysis, and I'll just read a short paragraph: "Santa Clara nevertheless argues that shifting cases to Federal Court premised on pharmaceutical companies' overcharges would disrupt the proper federal-state balance. There is, however, no Congressionally approved balance of judicial responsibilities in this arena. Counsel for Santa Clara also argued that Pharmacy and Wisconsin, two of the recent state cases, persuasively found that federalizing a case such as this one would upset the proper balance of judicial responsibilities. This order disagrees. This order also disagrees with the Wisconsin court's suggestion that moving all state cases involving drug price into Federal Court would work a destruction akin to that feared by the Merrill-Dow court."

So let's look at what Congress intended with regard to Medicaid lawsuits. To the extent that Congress has said anything in the statute, the Medicaid statute, there is not a word, as we looked at it recently, there's not a word, your Honor, that suggests that any Medicaid case should be going



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 72 of 78

to state court.

Now, we're not saying that no Medicaid case should go to state court. What we're saying is, if you look at the statute, if there's judicial review provisions at all, they go into Federal Court. And just like the recent case that we cited in our brief that's going to be heard by the Supreme Court is a dispute between what I believe is a resident of the state of Arkansas and the Arkansas Medicaid agency, and we went back and looked, and the District Court took jurisdiction under federal question jurisdiction, 28 U.S.C. 1331. There's a legion of cases involving Medicaid questions that are brought in Federal Court under federal question jurisdiction. So using the --

THE COURT: Well, it's a partnership. I've written so much in this area. I think in one of my opinions, I mean, both sides are allowed to bring suits frequently. I mean, it authorizes, in fact encourages, Medicaid to police its own program.

MR. FLEDER: And, again, we're not disputing the state of Florida's right to bring a suit. The question is, using the Grable analysis and your Honor's prior rulings, where does this case best lie? And we submit that the answer is very clear.

THE COURT: Okay, thank you. I understand that. All right, as I say, I have a revocation coming up. I need

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 73 of 78

to just report to counsel on a few things. I did talk to Professor Berndt, and I basically cut him loose, so there will be no need for further payments. I told him that I very much valued his services and would very much like to use him if I need him on a motion for summary judgment. I didn't know exactly when that would be happening, and I wasn't sure whether or not he would take a case, a client or whatever, in the interim that would preclude that. So I just left it with him that I'd deal with it at the time. But what I want to be quite clear on is, I don't need his services any more for class cert, and so plaintiffs are not obligated or defendants to pay, you know, the bookmark expenses that you were incurring to hold onto him.

As far as I'm concerned, I did yesterday or today or something receive a letter response from defendants, as well as I got a letter from plaintiffs, about the class cert motion. I don't like letters, so just please in the future, just do it in memos. But that's it. I don't want any more briefing on it, and I'll just take that under advisement. I need to work on that, and I'll hopefully get something out soon on that. And so I think that that record is pretty much closed unless I -- I haven't even read the defense response yet because I've been in court all day, but unless I don't understand something, I certainly am not going to take up any new arguments. I'm just not even going there, so you don't

Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 74 of 78

need to reply to anything new. I'm just going to take what I've got and rule, hopefully next week, but for sure by the following week.

MR. MONTGOMERY: Your Honor, you also asked us last week to discuss scheduling going forward in the MDL. We have done that, and you will see when it comes across your desk that we have substantial differences on how to schedule the case going forward. And I know you have a revocation hearing, but if you'd like us to stick around, I think we could resolve that in a few minutes.

THE COURT: I have no idea how long that will be, so I think that probably not. Just give me just two different versions, and I'll rule.

MR. MONTGOMERY: We have already done that but without any supporting argument.

THE COURT: Local 68, without killing yourselves, how much longer to finish up, to clean up this last piece of discovery, which is one deposition and/or an affidavit and the production of documents and/or privilege log by plaintiffs?

MS. BENEDETTO: One week, your Honor.

THE COURT: One week? Could you all do that in a week?

MR. FLYNN: Yes, your Honor. Assuming we get the documents, we could pursue the deposition.



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 75 of 78

THE COURT: Why don't we just say two weeks so there are no associates doing round-the-clock, okay? Can we do that? And so two weeks just to clean up the discovery, and within that time period, no longer than a five-page supplemental brief, if it's warranted by whatever comes in. No reply briefs or replies or whatever, just if you need a cleanup brief on anything new that's learned.

MS. BENEDETTO: So simultaneously submitted supplemental briefs on --

THE COURT: That's fine, okay, and with the attachments --

MS. BENEDETTO: Two weeks from today, Friday? I'm sorry, I don't have a calendar.

THE COURT: Two weeks puts us at --

MS. BENEDETTO: February 10?

THE CLERK: February 10.

MR. FLYNN: Your Honor, will you issue a written order for Mr. Fernandez so he knows he has to act?

THE COURT: That's a good point. I suppose I should do that, although I'm assuming that you all always order these transcripts. So Ms. Marzilli is in the middle of a big trial. I don't know when she can get it out, but if you want to give me a draft of one, I'll work on it.

MR. FLYNN: We'll submit an order, your Honor.

THE COURT: Okay. And you flew up from Florida,



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 76 of 78

right?

MS. THOMAS: I flew up from Philadelphia actually. Mr. Thomas flew up from Florida.

THE COURT: Anyone who would fly up from Florida --

MS. THOMAS: We would like a few more minutes, or, alternatively, a chance to submit a simultaneous three- or four-page --

THE COURT: No. I think I've got the gravamen of this.

MS. THOMAS: I mean, truthfully, if Florida stays -- I don't want to antagonize all the other AGs here -- every case that has been before your Honor and that is now before your Honor would still be here. Every case has state Medicaid price fraud claims, and you have routinely sent them back if they don't have something more.

THE COURT: Thank you. I've got that point. Anything you want to add?

MR. THOMAS: That's it your Honor. Under Grable, if Florida stays in Federal Court, they're all coming to you, every single one of them. There is no case more state-specific than the Florida case.

THE COURT: Thank you very much. Have a wonderful weekend. And if I need you on case management, I'll let you know.

MR. LYNCH: Your Honor, could I throw out one



more --

THE COURT: No, no. I've got this revocation. Sorry, sorry.

THE CLERK: Court is in recess.

(Adjourned, 3:40 p.m.)



Case 1:01-cv-12257-PBS Document 4727-2 Filed 09/18/2007 Page 78 of 78

# C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 77 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 15th day of February, 2006.

__________________________________

LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER