samples of Zoladex® from the AstraZeneca Defendants and billing his patients and their health insurance providers for at least 220 of them.

## DEFENDANTS TAP'S AND TAKEDA'S
## UNLAWFUL CONDUCT IN NEW JERSEY

161. It is believed and therefore averred that TAP and Takeda engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that TAP and Takeda adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for TAP's and Takeda's cancer and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

162. The drugs manufactured, distributed, marketed and sold by TAP and Takeda and covered by government and private assistance programs include, but may not be limited to: Lupron® and Prevacid®. These drugs had "spreads" and were paid for by plaintiff and the Class.

163. As set forth herein, Takeda manufactures both Lupron® and Prevacid® for TAP, among other drugs. Through TAP, both companies, along with Abbott, have admitted their unlawful conduct in the October 2001 guilty plea by TAP. This case seeks to recover against these companies for unlawful conduct relating to Prevacid® only.

## DEFENDANT ABBOTT'S
## UNLAWFUL CONDUCT IN NEW JERSEY

164. It is believed and therefore averred that Abbott engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by it. In particular, it is averred that Abbott adopted similar unlawful practices, such as the provision of free samples for

which doctors could charge and the artificial inflation of the AWPs for Abbott's cancer and miscellaneous other drugs, in order to create spreads in its drug prices for the benefit of medical providers and others.

165.   The drugs manufactured, distributed, marketed and sold by Abbott and covered by government and private assistance programs include, but may not be limited to: acetylcysteine, acyclovir, amikacin sulfate, calcitriol, cimetidine hydrochloride, clindamycin phosphate, evelosporine, dextrose, dextrose sodium chloride, diazepam, furosemide, gentamicin sulfate, heparin lock flush, lansoprazole, leuprolide acetate, metholprednisolone sodium succinate, sodium chloride, tobramycin sulfate, vancomycin, and zemplar, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

166.   Nearly all of the intravenously administered medications listed herein are administered via some form of infusion and must be mixed with an intravenous carrier solution consisting of dextrose solution, sodium chloride solution, or dextrose sodium chloride solution, as are manufactured and sold by Abbott. The antibiotics manufactured, marketed and sold by Abbott may be administered to patients whose immune systems are suppressed by anti-neoplastic medications, such as anti-neoplastic drugs manufactured by, among others, AstraZeneca Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin - cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, Toposar - etoposide, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol- Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants (etoposide, doxorubicin), as may the anti-viral medication acyclovir. Abbott's Calcitriol and Zemplar may be used to raise serum

calcium level in dialysis patients who are prone to anemia and may receive drugs of the epoetin class such as Procrit (the J&J Defendants), Epogen® (the Amgen Defendants) and Aranesp™ (the Amgen Defendants).

167.    United States Congressman Pete Stark underscored the unlawful conduct of defendant Abbott in a letter to Abbott Chief Executive Officer Miles White, dated October 31, 2000:

> The price manipulation scheme is executed through Abbott's inflated representations of average wholesale price ("AWP") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.   The difference between the inflated representations of AWP and DP versus the true price providers are paying, is regularly referred to... as "the spread." ...Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims. ...Abbott manipulated prices for the express purpose of expanding sales and increasing market share for certain drugs... by arranging financial benefits or inducements that influenced the decisions of health care providers submitting Medicare and Medicaid claims.

168.    Abbott has admitted that it deliberately sets the AWPs for its drug products, including Calcijex, to ensure that medical providers achieve profits from the spreads created by Abbott.

169.    Abbott's unlawful behavior is reflected in a letter from Congressman Tom Bliley to the Health Care Financing Administration dated, February 25, 2000, which notes that "prices... are routinely made available to many providers.... far below Medicare reimbursement rates.  They include 1999 prices for vancomycin, the Abbott Labs-manufactured antibiotic, which a health care provider could buy for $76.00 but for which the AWP upon which Medicare's reimbursement was based on was $261.84."

© 2003 KLINE & SPECTER                                        49

### THE J&J DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

170.   It is believed and therefore averred that the J&J Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the J&J Defendants adopted similar unlawful practices, such as the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs in order to create spreads in their drug prices for the benefit of medical providers and others. Further, it is averred that the J&J defendants engaged in unlawful promotion activities with other defendants, like TAP, with respect to their medical products.

171.   The drugs manufactured, distributed, marketed and sold by the J&J Defendants and covered by government and private assistance programs include, but may not be limited to: Viadur®, (leuprolide acetate), ReoPro® (abciximab), an anti-blood clotting medication, Retavase® (reteplase), an anti-blood clotting agent, Procrit® (epoetin alfa), for the treatment of anemia, Leustatin® (cladribine), for the treatment of leukemia, Orthoclone® (muromonab-CD3), used to prevent organ transplant rejection, Sporanox® (itraconazole), used in the treatment of fungal infections, Doxil® (doxorubicin), an anti-neoplastic drug, and Remicade® (infliximab), an anti-inflammatory drug, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

172.   Anemia and fungal infections occur in patients undergoing cancer chemotherapy with any of a number of chemotherapy agents. Therefore patients receiving these drugs are likely to receive medications in the epoetin alpha class (Procrit®), such as Aranesp™ (darbepoetin alfa - the Amgen Defendants) and Epogen® (epoetin alpha - the Amgen Defendants). They may also be in

© 2003 KLINE & SPECTER                    50

need of the administration of a drug like Sporanox®, Amphocin (amphotericin - the Pharmacia Defendants) or Fujizone (the Bristol-Myers Defendants).  Cancer or anti-neoplastic drugs are manufactured and sold by TAP, Abbott and Takeda (Lupron® - leuprolide), the AstraZeneca Defendants (Zoladex® - goserelin, Tomudex® - raltitrexed), the J&J Defendants (Leustatin - cladribine, Doxil - doxorubicin hydrochloride), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, Trelstar™, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants (etoposide, doxorubicin), among others.

175.  In addition to the evidence set forth above respecting the J&J Defendants, the J&J Defendants deliberately marketed and promoted the sale of Remicade® to physicians based on the availability of inflated payments made by Medicare, assuring them that they would make a significant profit from the purchase of Remicade as a result of the spread between the actual price to physicians and reimbursement based on the published AWP.  The J&J Defendants created promotional materials and worksheets to market the spread.  For example, a publication accessible through the J&J Defendants' website entitled "Office-Based Infusion Guide" demonstrates the J&J Defendants' aggressive marketing of this spread, specifically noting that, "[d]epending on reimbursement, office-based infusion may provide a financial impact to a physician's practice." Moreover, the "Financial Analysis" section of the guide includes a "REMICADE® (infliximab) Financial Impact Worksheet," which enables doctors to see in actual dollars how much additional revenue the use of Remicade would bring to their practice.  Remicad competes with other anti-inflammatory drugs, such as Enbrel® and Kineret™ (the Amgen Defendants).

© 2003 KLINE & SPECTER                    51

## THE PHARMACIA DEFENDANTS'
## UNLAWFUL CONDUCT IN NEW JERSEY

174.    It is believed and therefore averred that the Pharmacia Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Pharmacia Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer, inhalant and miscellaneous other drugs in order to create spreads in their drug prices for the benefit of medical providers and others.

175.    The drugs manufactured, distributed, marketed and sold by the Pharmacia Defendants and covered by government and private assistance programs include, but may not be limited to: Adriamycin PFS® (doxorubicin hydrochloride), Adrucil® (fluorouracil), Amphocin® (amphotericin), Aromasin® (bleomycin), Camptosar® (irinotecan hydrochloride), Cleocin Phosphate® (clindamycin phosphate), Cytosar-U (cytarabine), Depo-Testosterone® (testosterone cypionate), Ellence® (epirubicin HCL), Glynase (glyburide), Idamycin® (idarubicin hydrochloride), Medrol® (methylprednisolone), Micronase (glyburide), Neosar®  (cyclophosphamide), Solu-Cortef® (hydrocortisone sodium succinate), Toposar® (etoposide), Trelstar™ (triptorelin pamoate), and Vincasar® (vincristine sulfate), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and Class.

176.    The majority of the above-named medications manufactured and marketed by Pharmacia Defendants are members of the cancer (anti-neoplastic) class of medications.  Patients receiving these medications therefore may receive physician-administered anti-nausea medications such as Kytril® (granisetron hydrochloride - Hoffman), Zofran® (ondansetron hydrochloride -

© 2003 KLINE & SPECTER                    52

GlaxoSmithKline Defendants), Lemet (ondonsetron - the Sicor Defendants), Reglan (metoclopramide - the Wyeth Defendants), Pramilem (metoclopramide – the Sicor Defendants), and Anzemet (dolasetron mesylate - the Aventis Defendants). They may also receive medications to treat anemia by increasing the production of red blood cells, such as Procrit® (epoetin alpha - J&J Defendants), Epogen® (epoetin alpha - the Amgen Defendants) and Aranesp™ (darbepoetin alfa - the Amgen Defendants). Side effects such as a decrease in white blood cells or platelets may necessitate the administration of agents such as Neupogen® (filgrastim - the Amgen Defendants) or Neumega (oprelvekin - the Wyeth Defendants).

177.    In September 1995, and prior to that time, P&U often used such offers of free goods to offset price differences between its drugs and those of its competitors.

178.    By early October 1996, P&U had in place a free goods program to support its sales representatives' efforts to sell Adriamycin® against other forms of generic doxorubicin. Free goods were used to lower the cost of Adriamycin® and increase profits to medical providers.

179.    Representative Pete Stark commented before the Congressional Ways and Means Committee that:

> The evidence... shows that Pharmacia & Upjohn has knowingly and deliberately inflated their representations of the average wholesale price ("AWP"), wholesale acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.

180.    An excerpt of a letter from Congressman Stark to Pharmacia details the fraudulent practices by Pharmacia to manipulate AWPs for its drugs.

> The manipulated disparities between your company's reported AWPs and DP are staggering. For example, in 1997, Pharmacia & Upjohn reported an AWP of $946.94 for 200 mg. of Adriamycin PFS while offering to sell it to American Oncology Resources (AOR) for $168.00 and to Comprehensive Cancer Center for $152.00

(Composite Exhibit "1"). Your company then aggressively marketed its cancer drugs to health care providers by touting financial inducements and other types of incentives. Pharmacia & Upjohn created and marketed the financial inducements for the express purpose of influencing the professional judgment of doctors and other health care providers in order to increase the company's market share.

The linking of doctor participation in FDA clinical drug trials to their purchase and administration of profit-generating oncology drugs is entirely inconsistent with the objective scientific testing that is essential to the integrity of the trial.

It is clear that Pharmacia & Upjohn targeted health care providers, who might be potential purchasers, by creating and then touting the windfall profits arising from the price manipulation. For example, Pharmacia & Upjohn routinely reported inflated average wholesale prices for its cancer drug Bleomycin, 15u, as well as direct prices. The actual prices paid by industry insiders was in many years less than half of what Pharmacia & Upjohn represented. Pharmacia & Upjohn reported that the average wholesale price for Bleomycin, 15u, rose from $292.43 to $309.98, while the price charged to industry insiders fell by $43.15 (Composite Exhibit "4").

[I]nternal Pharmacia & Upjohn documents... show that Pharmacia & Upjohn also utilized a large array of other inducements to stimulate product sales... including "educational grants" and free goods... designed to result in a lower net cost to the purchaser while concealing the actual price beneath a high invoice price. Through these means, drug purchasers were provided substantial discounts that induced their patronage while maintaining the fiction of higher invoice price - the price that corresponded to reported AWPs and inflated reimbursements from the government.

In a September 28, 2000 letter to the Pharmaceutical Research and Manufacturers of America

("PhRMA"), Congressman Pete Stark summarized the drug profits that Pharmacia marketed to

doctors:

PHARMACIA: Some of the drugs on the multi-source list offer you savings of over 75% below list price of the drug. For a drug like Adriamycin, the reduced pricing offers AOR a reimbursement of over $8,000,000 profit when reimbursed at AWP. The spread from acquisition cost to reimbursement on the multi-source products offered on the contract give AOR a wide margin for profit.

© 2003 KLINE & SPECTER                54

## THE AMGEN DEFENDANTS'
## UNLAWFUL CONDUCT IN NEW JERSEY

181.    It is believed and therefore averred that the Amgen Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that Amgen Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer, inhalant and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

182.    The drugs manufactured, distributed, marketed and sold by the Amgen Defendants-and covered by government and private assistance programs include, but may not be limited to: Aranesp™ (darbepoetin alfa), Enbrel® (etanercept), Epogen® (epoetin alfa), Kineret™ (anakinra), Neulasta™ (pegfilgrastim), and Neupogen® (filgrastim), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

183.    These medications, some of which may be used to treat the bone marrow suppressant effects of many cancer (anti-neoplastic) medications, may be administered to the same patient population receiving cancer (anti-neoplastic) drugs manufactured by the AstraZeneca Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin® - cladribine), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide), and the Baxter Defendants

© 2003 KLINE & SPECTER                    55

(etoposide, doxorubicin), among others.  Enbrel® also treats rheumatoid arthritis as does Remicaid (the J&J defendants).

184.    On May 10, 2002, Fresenius AG, National Medical Care (NMC), Dialysis Division, reached a settlement with the Office of Inspector General (OIG) of the Department of Defense (DoD), after an investigation disclosed that NMC had billed federal health care programs, including TRICARE/CHAMPUS, for Amgen's drug Epogen®, which NMC had received free of charge from the Amgen Defendants as part of a clinical study.  The Amgen Defendants knew and expected that NMC would bill for the free samples of Epogen® supplied to NMC.

185.    Moreover, as set forth herein, because of the integral relationship of the drug products of the Amgen Defendants in the treatment of cancer, the Amgen Defendants had the same interest as other defendants in maintaining AWP as the benchmark for reimbursement under government and private assistance programs.  Accordingly, beginning in at least 1994, the Amgen Defendants met and communicated with other defendants, including TAP, Abbott, the AstraZeneca Defendants and the Bristol-Myers Defendants, among others, to work to oppose efforts by the government to change reimbursement for cancer drugs and miscellaneous other drugs.  In particular, these defendants and possibly others, worked in concert among themselves and with others to maintain AWP as a reimbursement benchmark and to prevent plaintiff and the Class from discovering their fraudulent inflation of AWP and promotion of spreads with respect to their cancer, inhalant and miscellaneous other drugs.

186.    Congressman Stark exposed Immunex's involvement in the scheme to inflate AWPs in a letter dated September 28, 2000, to the president of a national pharmaceutical trade group:

> The documents further expose the fact that certain of your members deliberately concealed and misrepresented the source of AWP's: In

© 2003 KLINE & SPECTER                    56

a 1996 Barron's article entitled "Hooked on Drugs" the following
quote from Immunex appeared (Composite Exhibit #11):

> IMMUNEX: "But Immunex, with a thriving generic
> cancer-drug business says its average wholesale prices
> aren't its own. The drug manufacturers have no
> control over the AWP's published...." (IMX003079)
> However, Immunex's own internal documents
> indisputably establish the knowledge of the origin of
> their AWP's and their active concealment.

## THE AVENTIS DEFENDANTS'
## UNLAWFUL CONDUCT IN NEW JERSEY

187.    It is believed and therefore averred that the Aventis Defendants engaged in conduct

similar to the other defendants with respect to their marketing, promotion, sale and distribution of

cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In

particular, it is averred that the Aventis Defendants adopted similar unlawful practices, such as the

provision of free samples for which doctors could charge and the artificial inflation of the AWPs for

their cancer, inhalant and miscellaneous other drugs in order to create spreads in their drug prices

for the benefit of medical providers and others.

188.    The drugs manufactured by the Aventis Defendants and covered by government and

private assistance programs include, but may not be limited to: Anzemet® (dolasteron mesylate),

Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii),

Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P®

(antihemo factor viii) and Taxotere® (docetaxel), among other prescription drugs. All of these drugs

had "spreads" and were paid for by plaintiff and the Class.

189.    Taxotere is a cancer (anti-neoplastic) drug used to treat cancers of the breasts and

lungs. Like cancer drugs of other defendants, such as the Bristol-Myers Defendants (Taxol®) and

Abbott (Paclitaxel). Anzemet is an intravenous anti-nausea medication similar to Kytril®

© 2003 KLINE & SPECTER                                            57

(granisetron hydrochloride - Hoffman) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants). It may be administered to patients receiving cancer (anti-neoplastic) medications including, but not limited to cancer (anti-neoplastic) drugs manufactured by the AstraZeneca Defendants (Tomudex® - raltitrexed), the J&J Defendants (Leustatin® - cladribine), the Pharmacia Defendants (Adriamycin® - doxorubicin hydrochloride, Adrucil® - fluorouracil, Neosar® - cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide) and the Baxter Defendants (etoposide, doxorubicin), among others.

190. U.S. Congressman, Thomas J. Bliley, in a letter dated May 4, 2002 to Behring, highlighted the unlawful practice of the Aventis Defendants of inflating average wholesale prices for their drugs.

> The Office of Inspector General (OIG) at the Department of Health and Human Services determined that the Medicare allowed amount for immune globulin, a pharmaceutical product sold by your company under the name Gammar, in Fiscal Year 1996 was $42.21. The OIG further estimated that the actual wholesale price of this drug was $16.12 and the highest available wholesale price that the OIG was able to identify was $32.11.

191. Similarly, Congressman Pete Stark, summarized the scheme implemented by Hoechst to inflate the AWPs for its drugs. In a letter to the PhRMA, dated September 28, 2000, Congressman Stark explains:

> The following chart represents a comparison of Hoechst's fraudulent price representations for its injectable...drug versus the truthful prices paid by the industry insider. It... also compares Hoechst's price representations for the tablet form of Anzemet and the insider's true prices. It is extremely interesting that Hoechst did not create a spread for its tablet form of Anzemet but only the injectable form. This is because Medicare reimburses Doctors for the injectable form of this

© 2003 KLINE & SPECTER                     58

drug and by giving them a profit, can influence prescribing. The tablet form is dispensed by pharmacists, who accept the Doctor's order. And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs and underscores the fact that, if we cannot rely upon the drug companies to make honest and truthful representations of their prices, Congress will be left with no alternative other than to legislate price controls.

192.   The government's investigation has uncovered substantial evidence that the Aventis Defendants' fraudulent practices are widespread. For example, in a report published by DHHS, the DOJ documented at least 15 instances where the published AWPs for drugs manufactured by the Aventis Defendants were substantially higher than the actual prices listed by wholesalers.

193.   The same report concluded that (i) the AWP for all immune globulin 5 mg doses listed in the 1997 *Red Book* were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet® had a Medicare median of $14.82 and a Catalog median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg dose of Taxotere® had a Medicare median of $283.65 and a Catalog median of $8.29, resulting in a spread of 18.75%.

## THE BOEHRINGER DEFENDANTS'
## UNLAWFUL CONDUCT IN NEW JERSEY

194.   It is believed and therefore averred that the Boehringer Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Boehringer Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

195.   The drugs manufactured, distributed, marketed and sold by the Boehringer Defendants and covered by government and private assistance programs include, but may not be limited to: acyclovir, amikacin sulfate, bleomycin, cisplatin, cyclosporine, cytarabine, doxorubicin hydrochloride, doxycycline, etoposide, ipratropium bromide, leucovorin calcium, methotrexate, mitomycin, paclitaxel, pamidronate disodium, and vinblastine sulfate, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

196.   Most of the above medications are members of the cancer (anti-neoplastic) class. Therefore, patients receiving them may need anti-nausea medications such as Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan (metoclopramide - the Wyeth Defendants), (ondansetron - the Sicor Defendants), Pramilem (metoclopramide - the Sicor Defendants) . Patients receiving these anti-neoplastics may also require medications in the epoetin alpha class such as Procrit®, (J&J Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants) and Epogen® (epoetin alpha - Amgen Defendants).

197.   Senior executives of the Boehringer Defendants have communicated directly with executives of competitor companies in furtherance of the fraudulent scheme alleged herein. Moreover, executives of the Boehringer Defendants have worked to maintain the provision of other inducements, as set forth herein, to advance the prescription of cancer, inhalant and miscellaneous other drugs pursuant to the fraudulent scheme herein.

198.   One such executive, Ursula Bartels, while she was employed as an executive of SmithKline accused SmithKline's competitor, Glaxo, of fraudulent conduct in furtherance of the fraudulent scheme alleged herein. Glaxo, in turn, accused Ms. Bartels and SmithKline of similar

fraudulent conduct. Neither company, aware of each other's fraudulent conduct, either changed its conduct or reported the fraud to the authorities.

199.    While at Boehringer, Ms. Bartels has continued to advance the fraudulent scheme through her efforts in conjunction with the industry trade association, PhRMA, and in chairing the committee that drafted the PhRMA Code of Conduct described herein.

200.    The Boehringer Defendants also have fraudulently promoted the AWPs for their drugs as being low priced, among other things.

### THE BAXTER DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

201.    It is believed and therefore averred that the Baxter Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Baxter Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

202.    The drugs manufactured, distributed, marketed and sold by the Baxter Defendants and covered by government and private assistance programs include, but may not be limited to: Bebulin® (factor ix complex), Buminate® (human albumin), cisplatin, dextrose, diazepam, Endoxan® (cyclophosphamid), Gammagard® (immune globulin), Hemofil M® (antihemo factor viii), Holoxan® (ifosfanide), Iveegam® (immune globulin), Proplex T® (factor ix complex), Recombinate® (antihemo factor viii), sodium chloride and Uromitexan® (mesna), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                              61

203.    The above group of medications include anti-hemophilic factors (Bebulin, Hemofil, Hemofil M, Proplex, and Recombinate). Patients receiving those medications may receive similar agents such as Bioclate (factor VIII - Aventis Defendants), Mononine (factor IX - Aventis Defendants), and Kogenate (factor VIII - Bayer). In addition, patients treated with anti-neoplastics such as Endoxan® and cisplatin, may need treatment for nausea with drugs such as Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan (metoclopramide - the Wyeth Defendants), (ondansetron - the Sicor Defendants), Pramilem (metoclopramide - the Sicor Defendants). Patients receiving these anti-neoplastics may also require medications in the epoetin alpha class such as Procrit® (J&J Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants) and Epogen® (epoetin alpha - Amgen Defendants), among others.

204.    The Baxter Defendants also provided medical providers and other purchasers of their drugs with free samples of drugs with the knowledge and expectation that the medical providers and purchasers would bill for those free samples, in violation of the law. In particular, the Baxter Defendants provided Quantum Healthcare with free goods as a way to reduce its overall price for Recombinate.

205.    The Baxter Defendants have admitted that increasing AWPs was a large part of our negotiations it's the large homecare company purchasers.

206.    The Baxter Defendants also have acknowledge the involvement of other defendants in the fraudulent scheme. In particular, the Baxter defendants were aware of the problem of other defendants using spreads for their drugs, and profits therefrom, and the need for the Baxter Defendants to address this problem. The Baxter Defendants addressed the problem by joining the

fraudulent scheme and conspiracy by manipulating the AWPs for their drugs and creating and maintaining spreads comparable to those of their competitors.

## THE BAYER'S DEFENDANTS'
## UNLAWFUL CONDUCT IN NEW JERSEY

207.    It is believed and therefore averred that the Bayer Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Bayer Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

208.    The drugs manufactured, distributed, marketed and sold by the Bayer Defendants and covered by government and private assistance programs include, but may not be limited to: Viadur® (leuprolide acetate implant), Kogenate® (antihemo factor viii), and Koate-DVI® (antihemo factor viii) and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in the treatment of immunodeficiency and autoimmune disorders, among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

209.    The Bayer Defendants have acknowledged their involvement in the fraudulent scheme through the fact that they admit that "many" health care providers are paid on a discount from AWP.

210.    A September 28, 2000 letter from Representative Stark to PhRMA also shows the Bayer Defendants' deliberate and unlawful scheme to inflate the AWPs and market the spreads for their products.

> BAYER:..".[I]f Baxter has increased their AWP then we must do the same. Many of the Homecare companies are paid based on a discount

> from AWP. If we are lowed [sic] than Baxter then the return will be
> lower to the HHC. It is a very simple process to increase our AWP,
> and can be done overnight."

211.    A Justice Department press release regarding settlement of claims against Bayer,

dated January 23, 2001, clearly indicates the involvement of the Bayer Defendants in the fraudulent

scheme and conspiracy to inflate AWPs for their products.

> [B]eginning in the early 1990s [Bayer] falsely inflated the reported
> drug prices - referred to by the industry as the Average Wholesale
> Price (AWP), the Direct Price and the Wholesale Acquisition Cost -
> used by state governments to set reimbursement rates for the
> Medicaid program. By setting an extremely high AWP and... selling
> the product to doctors at a dramatic discount, Bayer induced
> physicians to purchase its products rather than those of competitors
> by enabling doctors to profit from reimbursement paid to them by the
> government.

> —  The investigation further revealed that the practice in which Bayer
> selectively engaged, commonly referred to as "marketing the spread,"
> also had the effect of discouraging market competition from
> manufacturers that do not inflate AWPs as a way of inducing doctors
> to purchase their products.

212.    The DOJ also found that "some physicians and home health companies ignore the

products of companies that refuse to create these profit windfalls for customers."

213.    Beginning in the early 1990s, the Bayer Defendants began to falsely inflate reported

drug prices. Bayer set an extremely high AWP and sold prescription drugs and medical products to

medical providers at dramatic discounts which enabled those medical providers to receive excessive

reimbursements from patients and government and private assistance programs.

214.    Similar to TAP, the Bayer Defendants agreed to settle criminal charges brought by

the federal government alleging that the Bayer Defendants caused medical providers to submit

fraudulent claims to 47 state Medicaid programs. The government had alleged, as here, that the

© 2003 KLINE & SPECTER                        64

Bayer Defendants falsely inflated the AWPs for certain of its drugs and biologic products and "marketed the spread" between those AWPs and the actual cost to medical providers.

215.   In settlement of these charges, the Bayer Defendants agreed to pay the total sum of $257 million to the United States and 47 states, including New Jersey. The Bayer Defendants also agreed to enter into a Corporate Integrity Agreement which, like the one entered into by TAP, provides for Bayer to change its drug pricing practices. Despite this settlement, plaintiff and the Class have not been compensated for their losses.

### THE BRISTOL-MYERS DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

216.   It is believed and therefore averred that the Bristol-Myers Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Bristol-Myers Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

217.   The drugs manufactured, distributed, marketed and sold by the Bristol-Myers Defendants and covered by government and private assistance programs include, but may not be limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide), Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), VePesid® (etoposide), TaxolV (paclitaxel) and Fungizone® (amphotericin B), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                            65

218.    It is believed and therefore averred that the Bristol-Myers Squibb Defendants had a similar "free goods" program designed to lower the net cost to their purchasers while concealing the actual cost of the drugs from the government and plaintiff and the Class. Such arrangements had the effect of lowering the net cost of the cancer drugs and miscellaneous other drugs to the medical providers and others who purchased these drugs and creating even greater spreads than would already result from the invoiced prices.

219.    The Bristol-Myers Defendants worked with the other defendants, including TAP Abbott, the AstraZeneca Defendants, and the Amgen Defendants,  to ensure that government assistance programs did not change the AWP-based reimbursement systems put in place beginning in 1992. Among other things, the Bristol-Myers Defendants held meetings with and otherwise communicated with the other defendants to maintain AWP as a basis for reimbursement under government assistance programs.

220.    Acknowledging the need for all the defendants to conspire and agree to work together to ensure AWP remained a benchmark for reimbursement, Bristol-Myers' 1994 Annual Report stated that "[t]he possibility of price controls being included in future proposals [to reform the U.S. Healthcare system] is something to which Bristol-Myers Squibb and the entire pharmaceutical industry must remain vigilant."

221.    As part of this "vigilance" maintained by the "pharmaceutical industry," in 1994, employees and/or representatives of the Bristol-Myers Defendants met with employees and/or representatives of Abbott, TAP, the AstraZeneca Defendants and the Amgen Defendants to discuss proposed changes by HCFA in the payment for certain drugs, especially the highest volume drugs, reimbursed by government assistance programs. These proposed changes included changes in the AWP and/or the use of AWP as a basis for reimbursement. As a result of these meetings and

© 2003 KLINE & SPECTER                66

communications between and among the aforesaid defendants, it is believed and therefore averred that subsequent meetings and communications took place between and among these defendants and other defendants to ensure that all agreed to work to ensure that AWP remained a fixture of a government assistance reimbursement, so that the fraudulent scheme and conspiracy to inflate AWPs could continue.

222.   By 2001, members of Congress were accusing the Bristol-Myers Defendants of fraud. In a letter dated February 27, 2001, Congressman Pete Stark of the Committee on Ways and Means of the U.S. House of Representatives wrote to Peter Bolen, President of Bristol-Myers, the following:

> Ongoing Congressional investigations have uncovered compelling evidence that Bristol-Myers Squibb ("Bristol") has for many years deliberately overstated the prices of some of its prescription drugs in order to cause the Medicare and Medicaid programs to pay inflated amounts to Bristol's customers.  Bristol's participation in this scheme is costing American taxpayers billions of dollars in excessive drug costs and is jeopardizing the public's health, safety and welfare.

> The price manipulation scheme is executed through Bristol's falsely inflated representations of average wholesale price ("AWP"), direct price ("DP") and wholesaler acquisition cost ("WAC"), which are utilized by Medicare, Medicaid and most private third party payers in establishing drug reimbursements to providers.  The difference between the inflated representations of AWP, DP, and WAC versus the true prices that providers are paying is regularly referred to in your industry as "the spread."

### THE GLAXOSMITHKLINE DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

223.   It is believed and therefore averred that the GlaxoSmithKline Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the GlaxoSmithKline Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial

© 2003 KLINE & SPECTER                              67

inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads
in their drug prices for the benefit of medical providers and others.

224.    The drugs manufactured, distributed, marketed and sold by the GlaxoSmithKline
Defendants and covered by government and private assistance programs include, but may not be
limited to: Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron
hydrochloride).  Pierre Fabré Médicament licenses another government and private assistance
program, Navelbine® (vinorelbine tartrate), to GlaxoSmithKline. GlaxoSmithKline Beecham P.L.C.
manufactured and sold Kytril® (granisteron hydrochloride), another drug covered by government and
private assistance programs (and a competitor to Zofran®), prior to the merger. To secure regulatory
approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group
now part of Hoffman La-Roche, in approximately December of 2000.  All of these drugs of the
GlaxoSmithKline Defendants had "spreads" and were paid for by plaintiff and the Class.

225.    The GlaxoSmithKline Defendants acted to avoid government price controls in drug
reimbursement under government assistance programs.

226.    In 1994, Glaxo recognized the implications of increasing the AWP for Zofran to
create a better spread, which implications included increased costs to patients and government and
private assistance programs.  Despite such recognition, Glaxo chose to continue to not disclose its
pricing strategy respecting increased AWPs and spreads for Zofran in order to conceal the same from
the public, including plaintiff and the Class.

227.    Similar to the way the in-house lawyers for TAP and the AstraZeneca Defendants first
accused each other of fraud in the creation and promotion of spreads, among other things, but then
forged an agreement to mutually engage in the scheme to defraud patients and proceed "full criminal

speed ahead," in-house counsel for Glaxo and SmithKline, before the companies merged, accused each other of similar fraud, but then conspired and agreed to not stop one another.

228.    Timothy D. Proctor, Senior Vice President, General Counsel and Secretary for Glaxo, wrote to J. Charles Wakerly, Senior Vice President, Director and General Counsel for SmithKline accusing SmithKline of fraud in the advertising and marketing of Kytril®, including the promotion of spreads and profits to medical providers and other purchasers.

229.    Ursula B. Bartels, Vice President and Associate General Counsel for SmithKline (now General Counsel of Boehringer) wrote in response and accused Glaxo of engaging in similar fraudulent conduct.

230.    On April 25, 1995, Adrianna L. Carter, Glaxo Assistant General Counsel responded to SmithKline's accusations and admitted that Glaxo's AWP increase for Zofran® did not affect the actual cost to medical providers and that Glaxo's sales representatives were using the spread to gain market share.

231.    The fact that Glaxo and SmithKline each accused the other of the same fraudulent conduct, but neither brought it to the attention of the public or the federal or state authorities, is evidence that both companies were engaged in the same fraudulent scheme and conspiracy.

232.    In a September 27, 2000 article in USA Today, Glaxo spokesman Rick Sluder stated that average wholesale prices are not "representative of actual prices." Mr. Sluder also noted that Glaxo changed its wholesale prices to keep up with its competitors because "We [Glaxo] didn't want to put ourselves at a price disadvantage." Mr. Sluder admitted that the marketing of Glaxo drugs is based, in part, on the spread. He noted that Glaxo's sales staff is briefed on the price advantages to doctors who get reimbursed based upon the AWP.

© 2003 KLINE & SPECTER                    69

### THE SCHERING DEFENDANTS'
### UNLAWFUL CONDUCT IN NEW JERSEY

233.    It is believed and therefore averred that the Schering Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Schering Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

234.    The drugs manufactured, distributed, marketed and sold by the Schering Defendants and covered by government and private assistance programs include, but may not be limited to: Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant) and Temodar® (temozolomide), among other prescription drugs. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

235.    Temodar® (temozolomide) is a cancer (anti-neoplastic) agent similar to those manufactured by the J&J Defendants (Leustatin®), the Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), the Boehringer Defendants (bleomyscin, cisplatin, paclitaxel, vinblastine and others), the Baxter Defendants (Endoxan®), the GlaxoSmithKline Defendants (Hycamptin, Navelbine), the Schering Defendants (Temodar), the Bristol-Myers Squibb Defendants (Blenoxane, Paraplatin®, Rubex, Etophopos), the Wyeth Defendants (Mylotarg), and the Sicor Defendants (Bleomycin, Epirubicin, Thiotepa), among others. Proventil® is an albuterol sulfate product similar to ones manufactured and sold by the Boehringer Defendants, the GlaxoSmithKline Defendants and Dey.

236.   The Schering Defendants have engaged in the fraudulent scheme to inflate AWPs and promote spreads.   A May 4, 2000, letter from Congressman Tom Bliley, Chairman of the Congressional Committee on Commerce, to the President of Defendant Warrick noted that:

> [O]ne of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Warrick Pharmaceuticals.

237.   In a May 4, 2000 letter, Congressman Bliley outlined the Schering Defendants' fraudulent scheme with respect to the prescription drug albuterol sulfate. The government's investigation uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and the amount the Schering Defendants actually charged. U.S. Representative Bliley also stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

238.   In June 2003, the Schering Defendants revealed that they had been notified by the U.S. Attorney in Boston that they were going to be indicted criminally for engaging in various aspects of the fraudulent scheme alleged herein, including the provision of free samples of drugs knowing and expecting that medical providers and other purchasers would charge for them and inflating the AWPs for their drugs and promoting spreads.

### THE WYETH DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

239.   It is believed and therefore averred that the Wyeth Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In

particular, it is averred that the Wyeth Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

240.    The drugs manufactured, distributed, marketed and sold by the Wyeth Defendants and covered by government and private assistance programs include, but may not be limited to: Ativan (lorazepam), Benefix (recombinant antihemophilic), Mylotarg (gemtuzumab ozogamicin), Neumega (oprelvekin), Pipracil® (piperacillin sodium), Refacto (antihemophilic factor recombinant), Reglan (metoclopramide), Zocyn (piperacillin sodium/tazobactam sodium), and Protonix® (pantoprazole sodium).  All of these drugs had "spreads" and were paid for by plaintiff and the Class.

241.    Reglan is an antiemetic, *i.e.*, anti-nausea, medication used to treat the side effects of cancer (anti-neoplastic) chemotherapy agents such as those manufactured and marketed by the J&J Defendants (Leustatin®), the Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), the Boehringer Defendants (bleomyscin, cisplatin, paclitaxel, vinblastine and others), the Baxter Defendants (Endoxan®), the GlaxoSmithKline Defendants (Hycamptin, Navelbine), the Schering Defendants (Temodar), the Bristol Myers (Blenoxane, Paraplatin®, Rubex, Etophopos), the Wyeth Defendants (Mylotarg), and the Sicor Defendants (Bleomycin, Epirubicin, Thiotepa), among others).  Reglan is in the same class of medications and is used in the same patient population as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis Defendants), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants).

242.    Neumega (oprelvekin) is a drug used to help maintain adequate numbers of blood platelets in patients whose bone marrow has been suppressed by the effect of cancer (anti-neoplastic)

chemotherapy agents such as those listed in the preceding paragraph, and others. It may be used in patients also receiving other drugs that counter the effects of bone marrow suppression, such as Procrit (epoetin alpha - J&J Defendants), Epogen® (epoetin alpha - Amgen Defendants), Aranesp™ (darbepoetin alfa - Amgen Defendants), and Neupogen® (filgrastim - Amgen Defendants).

243.    Patients receiving cancer (anti-neoplastic) medications may have an increased susceptibility to infection and may require the administration of antibiotics, such as those manufactured by the Wyeth Defendants (Zosyn® and Pipracil®).

244.    Protonix® competes with TAP, Abbott and Takeda's Prevacid® and the AstraZeneca Defendants' Prilosec®, among others.

245.    Despite the OIG Guidelines on inducements to medical providers to prescribe particular drugs, the Wyeth Defendants continue to provide inducements, including unrestricted cash grants, in furtherance of the fraudulent scheme alleged herein.

### DEFENDANT DEY'S
### UNLAWFUL CONDUCT IN NEW JERSEY

246.    It is believed and therefore averred that Dey engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that Dey adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

247.    The drugs manufactured, distributed, marketed and sold by Dey and covered by government and private assistance programs include, but may not be limited to: AccuNeb (albuterol),

albuterol sulfate solution, cromolyn sodium solution, DuoNeb (albuterol solution/ipratropium bromide solution), ipratropium bromide solution, and sodium chloride solution for inhalation. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

248. All of these products are used in the treatment of obstructive airways disease in the same patient populations as other bronchodilator drugs in the same form, including Atrovent (ipratropium bromide - Boehringer Defendants), Ventolin® (albuterol - GlaxoSmithKline Defendants) and Proventil® (albuterol - Schering Defendants). Sodium chloride for inhalation may be used alone or as a diluent for administration of bronchodilator medications.

249. Dey has engaged in fraudulent pricing practices with respect to albuterol sulfate. The Office of Inspector General (OIG) found that Medicare's reimbursement amount for albuterol was nearly six times higher than the median catalog price and that "Medicare and its beneficiaries would save between $226 million and $245 million a year if albuterol were reimbursed at prices available to suppliers."

250. On June 13, 2003, it was reported that Dey settled a civil case brought by the federal government and the State of Texas for $18.5 million.

### THE FUJISAWA DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

251. It is believed and therefore averred that the Fujisawa Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Fujisawa Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for

their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

252.    The drugs manufactured, distributed, marketed and sold by the Fujisawa Defendants and covered by government and private assistance programs include, but may not be limited to: AmBisome (amphoteracin B liposome for injection), Aristocort suspension and Arisocort Forte suspension (sterile triamcinolone diacetate suspension), Atristospan suspension (sterile triamcinolone hexacetonide suspension, USP), Cefizox IM/IV Injection and Cefizox IV Injection Minibag (ceftizoxime sodium), Prograf (tacrolimus) and Ganite (galliumnitrate). All these drugs had "spreads" and were paid for by plaintiff and the Class.

253.    AmBisome is an antifungal agent that may be used to treat opportunistic fungal infections in patients with compromised immune systems due to treatment with cancer (anti-neoplastic) medications, such as those manufactured and marketed by J&J Defendants (Leustatin®), Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), Boehringer Defendants (bleomyscin, cisplatin, paclitaxel, vinblastine and others), Baxter Defendants (Endoxan®), GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol Myers Defendants (Blenoxane, Paraplatin®, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor Defendants (Bleomycin, Epirubicin, Thiotepa, and others). Patients receiving these cancer (anti-neoplastic) medications may also receive medications to treat the side effect of nausea, such as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants). They may also be treated with agents to counter the bone marrow suppressant effects of cancer (anti-neoplastic) drugs, such as Procrit (epoetin alpha - J&J Defendants), Epogen® (epoetin

alpha - Amgen), Aranesp™ (darbepoetin alfa - Amgen), Neupogen® (filgrastim - Amgen), and Neumega (oprelvekin - Wyeth). These patients may also receive antibiotics made by Fujisawa Defendants such as Cefizox and antivirals such as Acyclovir (GlaxoSmithKline Defendants). The patients to whom AmBisome is marketed also comprise the market for antifungals made by other defendants, including the Pharmacia Defendants (Amphocin - amphotericin B), the J&J defendants (Sporanox - itraconazole), and the Bristol Myers Defendants Fungizone (Amphotericin B). Granite was co-promoted with Defendant TAP and is a hypercalcemic drug like Aredia® (Novartis Defendants) and Bumotonide (the Boehringer Defendants).

254. A letter dated September 28, 2000 from U.S. Representative Pete Stark to the PhRMA details how the Fujisawa Defendants fraudulently inflated the AWPs for their drugs.

> I would have liked to see us match Abbott's AWP for our complete Vanco, [Vancomycin Hydrochloride], and Cefezolin line. I will settle for the five gram at $1 below Abbott but that means that we still have to compete at the other end of the equation. For example, if Abbott's AWP is $163 and their contract is $30 and if our AWP is $162 we will have to be at least $29 to have the same spread. Follow?

## THE SICOR DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

255. It is believed and therefore averred that the Sicor Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Sicor Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

© 2003 KLINE & SPECTER                    76

256. The drugs manufactured, distributed, marketed and sold by the Sicor Defendants and covered by government and private assistance programs include, but may not be limited to: bleomycin sulfate, cyclosporine, daunorubicin hydrochloride, dexrazoxane, doxorubicin hydrochloride, epirubicin hydrochloride, etoposide, mitomycon, thiotepa, amikacin sulfate, idarubicin hydrochloride, l-cysteine hydrochloride, vincristine sulfate, leucovorin calcium, cisplatin, amphotericin, vancomycin, clindamycin, metoclopramide, ondansetron, carboplatin, flutamide, paclitaxel and leuprolide acetate, among others. All of these drugs had "spreads" and were paid for by plaintiff and the Class.

257. The Sicor Defendants' marketing strategies further demonstrate its fraudulent practices, including the provision of free samples with knowledge and the expectation that medical providers would bill patients for them. For instance, Gensia offered a 10% free goods program to its top AIDS hospital which accounts which reduced the price for drugs supplied by Gensia by 10%.

258. The Sicor Defendants also have engaged in the fraudulent scheme to inflate AWPs. By letter dated September 25, 2000 to the HCFA administrator, the chairman of the Commerce Committee stated that:

> [I]n 1998, a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97.

### THE NOVARTIS DEFENDANTS' UNLAWFUL CONDUCT IN NEW JERSEY

259. It is believed and therefore averred that the Novartis Defendants engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Novartis Defendants adopted similar unlawful practices, such as the

© 2003 KLINE & SPECTER

provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

260. The drugs manufactured, distributed, marketed and sold by the Novartis Defendants and covered by government and private assistance programs include, but may not be limited to: Aredia® (pamindronate disodium), Femara (letrozole), Gleevec/Glivec (imatinib mesylate), Lentaron (fomestane), Leucomas (mulgramostim), Navoban (tropisetron hydrochloride), Neoral® (cyclosporine), Orimeten (aminoglutethimide), Sandimmun Neoral® (cyclosporin), Simulect (basiliximab), and Zometa (zoledronic acid). All of these drugs had "spreads" and were paid for by plaintiff and the Class.

261. Navoban is an anti-nausea medication used to treat the side effects of cancer (anti-neoplastic) chemotherapy agents such as those manufactured and marketed by the J&J Defendants (Leustatin®), Pharmacia Defendants (Adriamycin®, Adrucil®, Neosar®, Idamycin®, and others), Boehringer Defendants (bleomycin, cisplatin, paclitaxel, vinblastine, and others), Baxter Defendants (Endoxan®), GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol Myers (Blenoxane, Paraplatin®, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor Defendants (Bleomycin, Epirubicin, Thitepa), among others. Navoban is in the same class of medications and is used in the same patient population as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasetron mesylate - Aventis), Kytril® (granisetron hydrochloride - Hoffman Defendants) and Zofran® (ondansetron hydrochloride - GlaxoSmithKline Defendants).

262. Leucomas (mulgramostim) is a drug used to help maintain adequate numbers of white blood cells in patients whose bone marrow has been suppressed by the effect of cancer

(anti-neoplastic) chemotherapy agents such as those listed in the preceding paragraph, and others. It may be used in patients also receiving other drugs that counter the effects of bone marrow suppression, such as Procrit (epoetin alpha - J&J defendants), Epogen® (epoetin alpha - Amgen), Aranesp™ (daropoetin alpha - Amgen), and Neupogen® (filgrastim - Amgen). Leucomas is in the same class of agents and helps to maintain numbers of the same line of blood cells as Neupogen® (filgrastim - Amgen).

263. Cancer (anti-neoplastic) chemotherapy agents manufactured, distributed and sold by the Novartis Defendants include Femara (letrozole), Gleevec (also marketed as Glivec) (imatinib mesylate), Lentaron (fomestane), Orimeten (aminoglutethimide), and Zometa (zoledronic acid).

264. Neoral® (cyclosporine) and Sandimmun Neoral (cyclophosporine) are immunosuppressant drugs administered to patients who have had organ transplants, including kidney transplants, to prevent organ rejection, similar to Rapamune (sirolimus - Wyeth Defendants), Prograf (tacrolimus - Fujisawa Defendants), and Gengraf (cyclosporine - Abbott). Simulect (basiliximab) is used for prophylaxis against acute rejection of transplanted organs.

265. Aredia® (pamindronate disodium) is an anti-osteopenic drug used in patients undergoing various types of cancer chemotherapy to combat the effects of those chemotherapeutic agents that cause reduction in bone density, similar to drugs such as Bumetanide (the Boehringer Defendants) and Ganite (galliumnitrate - Fujisawa and TAP).

266. Patients undergoing cancer chemotherapy very often suffer from opportunistic bacterial and viral infections due to the immunosuppressant effects of many of the chemotherapeutic agents used. Famvir (famcyclovir) is an antiviral agent, similar to Zovirax (acyclovir - GlaxoSmithKline Defendants), Foscavir (foscarnet sodium - Astra Zeneca), and Valtrex (valcyclovir

- GlaxoSmithKline Defendants), which is used in the treatment of opportunistic herpes virus infections that can occur in patients undergoing chemotherapy.

267.    Among other things, in 1995, Sandoz Pharmaceuticals (now part of Novartis) considered expediting monthly shipments of free drug (Sandoglobulin®) to be a critical item when servicing customer accounts and promoting lower prices to its purchasers.

### DEFENDANT ALPHA'S
### UNLAWFUL CONDUCT IN NEW JERSEY

268.    It is believed and therefore averred that Alpha engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that Alpha adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement prices) for their cancer drugs and miscellaneous other drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

269.    The drugs manufactured, distributed, marketed and sold by Alpha and covered by the government and private assistance programs include, but may not be limited to: Venoglobulin-S (human immune globulin intravenous), Alphanate (human antihemophilic factor), AlphaNine SD (human coagulation factor IX), Profilnine SD (human coagulation factor IX), Albutein 5% (5% human albumin), Albutein 10% (10% human albumin), and Albutein 25% (25% human albumin). Venoglobulin-S is an immune globulin for intravenous administration for the treatment of immunodeficiency and other disorders, similar to Gammagard® (immune globulin - Baxter Defendants), Iveegam® (immune globulin - Baxter Defendants), and Gamimmune (immune globulin - Bayer Defendants).  Alphanate, AlphaNine SD, and Profilnine SD are human coagulation factors used in the treatment of hemophilia, similar to Kogenate® (factor VIII - Bayer Defendants),

Koate-DVI® (factor VIII - Bayer Defendants), Bioclate (factor VIII - Aventis Defendants), Mononine (factor IX - Aventis Defendants), Bebulin (factor IX - Baxter Defendants), Hemofil (factor VIII - Baxter Defendants), Hemofil M (factor VIII - Baxter Defendants), Proplex T® (factor IX - Baxter Defendants), and Recombinate® (factor VIII - Baxter Defendants). Albuten 5%, Albutein 10%, and Albutein 25% are human albumin preparations used as volume expanders as well as an adjunct in kidney dialysis, similar to Buminat (human albumin - Baxter Defendants), Albuminar-5 and Albuminar 10 (human albumin - Aventis Defendants), and Plasbumin -5, Plasbumin-10, and Plasbumin-25 (human albumin - Bayer Defendants). All of these drugs had "spreads" and were paid for by plaintiff and the Class.

270.    Alpha engaged in the fraudulent scheme alleged herein by, among other things, deliberately adjusting its spreads for its drugs to compete with or exceed the spreads offered by Alpha's competitor's, and promoting such spreads to Alpha's purchasers.

## HOFFMAN'S
### UNLAWFUL CONDUCT IN NEW JERSEY

271.    It is believed and therefore averred that Hoffman engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Hoffman Defendants adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

272.    The drugs manufactured, distributed, marketed and sold by the Hoffman Defendants and covered by government and private assistance programs include, but may not be limited to:

Kytril® (granisetron hydrochloride), Roferon®-A (interferon 2-alpha), Vesanoid® (tretinoin), Xeloda® (capecitabine), Rocaltrol® (calcitriol), and CellCept® (mycophenolate mofetil). All of these drugs had "spreads" and were paid for by plaintiff and the Class.

273.    Hoffman acquired Kytril® from the GlaxoSmithKline Defendants and, pursuant to the fraudulent scheme and conspiracy alleged herein, maintained the same spreads for the drugs. In addition, and in furtherance of the scheme and conspiracy and the fraudulent concealment of the same, Hoffman has stated falsely that it does not set the AWPs for its drugs, including Kytril®, Rocaltrol®, and CellCept®, among others. Instead, Hoffman has stated falsely that the AWPs for its drugs have been set by the *Red Book* and other publications.

## SANOFI'S
## UNLAWFUL CONDUCT IN NEW JERSEY

274.    It is believed and therefore averred that Sanofi engaged in conduct similar to the other defendants with respect to their marketing, promotion, sale and distribution of cancer and miscellaneous other drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that Sanofi adopted similar unlawful practices, such as the provision of free samples for which doctors could charge and the artificial inflation of the AWPs for their cancer drugs and miscellaneous other drugs, in order to create spreads in their drug prices for the benefit of medical providers and others.

275.    The drugs manufactured, distributed, marketed and sold by Sanofi and covered by government and private assistance programs include, but may not be limited to: Eligard™ (leuprolide acetate), Plavix® (clopidogrel bisulfate), Avapro® (irbesartan), Ambien® (zolpidem tartrate), Primacor® (milrinone lactate injection), and Hyalgan® (sodium hyaluronate). All of these drugs had "spreads" and were paid for by plaintiff and the Class.

© 2003 KLINE & SPECTER                    82

276. Irbesarten and Plavix® have been part of a co-development and marketing agreement with Bristol-Myers since 1993. Through this joint marketing effort, the defendants have advanced the fraudulent scheme and conspiracy set forth herein.

277. In addition, Sanofi has artificially inflated the AWPs for Eligard™ and has set the spreads for this drug to be competitive with the spread for Lupron®, Zoladex®, Trelstar™ and Viadur®, in furtherance of the fraudulent scheme and conspiracy set forth herein.

### FRAUDULENT CONCEALMENT

278. Plaintiff had no knowledge of the conspiracy, concerted action and other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence. Plaintiff could not have discovered the conspiracy, concerted action or other unlawful conduct alleged herein by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy. These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the AWP, and other conduct alleged herein.

279. Because the unlawful conduct and conspiracy was kept secret by Defendants and their co-conspirators, plaintiff and the Class were unaware of the fact that the prices of cancer, inhalant and miscellaneous other drugs were secretly agreed upon and artificially set as alleged herein. Plaintiff also did not know that Defendants provided free samples of their cancer and other prescription drugs to medical providers with knowledge and the expectation that such providers would bill their patients for them.

280. By reason of the foregoing, the claims of plaintiff and members of the Class are timely under any applicable statute of limitations (as tolled by the filing of this class action Complaint) pursuant to the discovery rule and the doctrine of fraudulent concealment.

281. The defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably before that time.

282. Despite this knowledge and awareness, the defendants have continued to promote and sell cancer, inhalant and miscellaneous other drugs at artificially inflated prices, and to give away free samples of their drugs knowing and expecting that doctors would bill patients for them.

283. The defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the plaintiff and members of the Class.

## COUNT I
## UNJUST ENRICHMENT

284. Plaintiff hereby incorporates by reference thereto the averments of paragraphs 1 through 283 hereof as if fully set forth here and further allege as follows.

285. By engaging in the conduct described in this Complaint, defendants have knowingly obtained benefits from plaintiff and the Class under circumstances such that it would be inequitable and unjust for these defendants to retain them.

286. Defendants have collected payments for cancer, inhalant and miscellaneous other drugs from plaintiff and each member of the Class which payment vastly exceeded the payments to which defendants were entitled as a matter of law. Moreover, certain defendants have admitted that they supplied medical providers and others with free samples of Prevacid®, Zoladex®, among other

drugs and encouraged them to charge patients for such samples, in violation of the PDMA and other federal and state laws. TAP, Abbott, Bayer, GlaxoSmithKline Defendants, AstraZeneca Defendants and Dey have likewise settled charges that they unlawfully inflated the AWP for their drugs and/or manipulated their drug prices in violation of federal and state laws.

287.   Thus, defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by plaintiff and each member of the Class, either directly or indirectly. The claims of plaintiff and each member of the Class seek to recover the individual payments made by plaintiff and the Class for cancer, inhalant and miscellaneous other drugs.

288.   Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the profits derived by defendants by means of the overcharges they imposed upon plaintiff and each member of the Class.

289.   Plaintiff and the members of the Class have no remedy at law to prevent defendants from continuing the inequitable conduct alleged herein.

WHEREFORE, Plaintiff, on behalf of itself and each member of the Class, respectfully seeks the relief set forth below.

### COUNT II
### FRAUD

290.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 289 hereof as if fully set forth here and further allege as follows.

291.   By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the plaintiff and the Class.

© 2003 KLINE & SPECTER                    85

292.    Defendants have made false and fraudulent statements and material omissions relating to the costs of their cancer, inhalant and miscellaneous other drugs, the AWPs for such drugs, the spreads for such drugs, the fact that certain of these drugs were provided as free samples, and the fact that they provided other inducements to prescribe these drugs, among other things.

293.    These defendants intended that plaintiff and the Class would rely on their statements, representations and omissions to their detriment.  In particular, the defendants reported inflated prices for cancer, inhalant and miscellaneous other drugs in the AWPs reported to *Red Book* and other publications upon which plaintiff, members of the Class, patients and government and private assistance programs relied.  Defendants knew these AWPs were false.  Plaintiff and the Class did in fact reasonably and rightfully rely on the false representations and statements of these defendants and suffered injury and damages thereby, as more fully set forth herein.

294.    In addition, these defendants concealed and suppressed and/or omitted material facts about their unlawful agreements and discussions with one another and others, and they concealed and suppressed their unlawful acts and omissions as set forth more fully herein.  Among other things, these Defendants concealed and suppressed and/or omitted the fact that the AWPs upon which the prices paid for cancer, inhalant and miscellaneous other drugs by plaintiff and the Class were based were artificially inflated, thereby causing plaintiff and the Class to pay more for these drugs than they otherwise would have.  Defendants also concealed and suppressed their provision of free samples for which patients were charged, and they concealed and suppressed their concerted efforts to circumvent efforts to reduce prescription drug costs.

295.    As a result of Defendants' acts of concealment and suppression, and their fraudulent omissions as to the true costs of their drugs, including that some of their drugs were given for free, plaintiff and the Class were unaware of the above-referenced facts, and would not have paid the

artificially inflated prices for cancer, inhalant and miscellaneous other drugs that they did had they known of the facts Defendants misrepresented concealed, suppressed and omitted.

296.   Indeed, as a result of the federal government's investigation into certain of Defendants' practices, TAP, Bayer, the AstraZeneca Defendants and the GlaxoSmithKline Defendants as part of their respective settlements of the criminal charges, have agreed to report the true, lower prices of their respective drugs to the government and to allow regular auditing of their sales and marketing practices.

297.   As a direct and proximate result of defendants' fraudulent representations and omissions, and the concealment and suppression of material facts by defendants, plaintiff and the Class have suffered and will continue to suffer damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

### COUNT III
### CIVIL CONSPIRACY

298.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 297 hereof as if fully set forth here and further allege as follows.

299.   As set forth more fully above, beginning at least as early as 1991, the exact date being unknown to plaintiff and the Class, and continuing thereafter until the present, defendants and their co-conspirators entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the plaintiff and the Class by causing plaintiff and the Class to pay more for cancer, inhalant and miscellaneous other drugs than they otherwise would have in the absence of defendants' conspiracy.

300.   According to the DOJ, on or before October 3, 2001, defendants Abbott and Takeda, by and through their joint venture, TAP, agreed to plead guilty to a federal conspiracy with other unnamed parties to violate the PDMA in violation of 18 U.S.C. § 371, and to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case. Additionally, these Defendants agreed to settle the government's claims for $875 million, plus interest, which consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia.

301.   Defendant Bayer, the GlaxoSmithKline Defendants, and the AstraZeneca Defendants also have agreed to settle similar charges of unlawfully inflating the AWPs for their drugs, and paid substantial fines.

302.   Ten individual employees of TAP were also indicted for their participation in the federal conspiracy with others, along with eight urologists/urologic practices throughout the country, involving Lupron®.

303.   Moreover, three current and former employees of the J&J Defendants, all pleaded guilty to conspiracy involving cancer drugs.

304.   Three doctors have been indicted for and pleaded guilty to conspiracy with the AstraZeneca Defendants involving free samples of Zoladex®.

305.   Pursuant to their widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the plaintiff and the Class and to act or take substantial steps in furtherance of the conspiracy. Those activities include the following:

(a) Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free samples to medical providers and encourage medical providers to charge for such samples;

(b) Defendants discussed and agreed among themselves and with their co-conspirators that they would fix the AWPs for cancer, inhalant and miscellaneous other drugs;

(c) Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other inducements and incentives to medical providers to prescribe their respective drugs, instead of other drugs and instead of alternative therapies;

(d) Defendants discussed and agreed amongst themselves and with their co-conspirators that they would market and promote the spreads between the AWPs and the actual wholesale costs (or list prices) for their drugs as an incentive for medical providers to prescribe their drugs instead of other drugs or alternative therapies; and

(e) Defendants discussed and agreed among themselves and with their co-conspirators that they would work together to oppose and avoid efforts to reduce prescription drug costs.

306. Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with knowledge of the injury and damage it would cause to plaintiff and the Class and with intent to cause such injuries or with reckless disregard for the consequences.

307.   As a direct and proximate result of defendants' conspiracy as alleged herein, plaintiff and the Class have been injured and damaged, and defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

### COUNT IV
### CONCERT OF ACTION

308.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 307 hereof as if fully set forth here and further allege as follows.

309.   Beginning at least as early as 1991, the exact date being unknown to plaintiff and the Class, and continuing thereafter until the present, defendants and their co-conspirators engaged in concerted activity and/or a concert of action with each other to commit fraud and other tortious acts and omissions on the plaintiff and the Class, causing plaintiff and the Class to pay more for cancer and other prescription drugs than they otherwise would have in the absence of defendants' concerted activity.

310.   Defendants acted in concert with one another, and with medical providers and others throughout New Jersey and the country, to commit fraud on plaintiff and the Class. Moreover, defendants acted pursuant to a common design or plan with respect to the commission of such fraud.

311.   Defendants gave substantial assistance or encouragement to medical providers and others throughout New Jersey and the country to charge plaintiff and the Class the AWPs for their drugs, even though their actual acquisition costs (or list price) were much lower. Defendants also gave substantial assistance or encouragement to medical providers and others to charge for free

© 2003 KLINE & SPECTER                                    90

samples of drugs. Defendants also gave substantial assistance or encouragement to medical providers and others to oppose and avoid efforts to reduce prescription drug costs.

312.   In providing such substantial assistance or encouragement to medical providers and others, and performing such other acts and omissions set forth in this Complaint, defendants violated federal and state laws, and otherwise breached a duty owed to plaintiff and the Class.

313.   Defendants knew that the conduct of medical providers and others in charging the AWPs for their drugs (when their acquisition costs were much lower) and charging for free samples of their drugs constituted a fraud on plaintiff and the Class, violated federal and state laws, and otherwise breached a duty owed by medical providers and others to plaintiff and the Class.

314.   Despite such knowledge, defendants gave substantial assistance or encouragement to medical providers to so conduct themselves.

315.   As a direct and proximate result of defendants' concerted action as alleged herein, plaintiff and the Class have been injured and damaged, and defendants are jointly and severely liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## COUNT V
## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

316.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 315 hereof as if fully set forth here and further allege as follows.

317.   Plaintiff and the Class are consumers who purchased cancer and other prescription drugs for personal use. New Jersey has enacted laws to protect consumers against unfair, deceptive

© 2003 KLINE & SPECTER                              91

or fraudulent business practices, unfair competition and false advertising.  New Jersey allows consumers a private right of action under such laws.

318.   By the misrepresentations and non-disclosure of material facts alleged above, the defendants deceived and continue to deceive consumers, such as plaintiff and the Class.  This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq.*

319.   In addition, the defendants' continuous and systematic reporting of inflated AWPs for their cancer, inhalant and miscellaneous other drugs to the *Red Book* based in New Jersey and their use of media to promote the sales of their drugs through false and deceptive representations in New Jersey, and other conduct as alleged above, constitutes an unconscionable business practice, unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq*, and warrants the application of the laws of New Jersey to all defendants in this Court.

320.   As part of their guilty pleas and payments of fines and money for civil liabilities, Defendants TAP, Abbott, Takeda, Bayer, the GlaxoSmithKline Defendants and the AstraZeneca Defendants agreed to pay substantial sums of money to the states, including New Jersey.  Such admission of liability and payment of civil liabilities to the states warrants the application of the laws of New Jersey to all defendants in this Court.

321.   As a result of the defendants' unfair and deceptive trade practices throughout the fifty states and the District of Columbia, including New Jersey, plaintiff and the Class have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class request the Court to enter the following relief:

a.     Certify this case as a class action pursuant to New Jersey Court Rules 4:32- 1, *et seq.* and denominating plaintiff as representatives for the Class and their undersigned counsel as counsel for the Class;

b.     Enter judgment against all defendants for the violations alleged herein;

c.     Enjoin the defendants from committing the acts complained of herein;

d.     Award the actual damages incurred by plaintiff and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.     Award of treble damages or multiple damages by operation of law;

f.     Award punitive damages;

g.     Award plaintiff the costs of this action, including reasonable attorney's fees, and, where applicable, expert fees; and

h.     Award such other and further relief as the Court may deem just and appropriate.

© 2003 KLINE & SPECTER                    93

## JURY DEMAND

Plaintiff and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,

Dated: June 30 , 2003

_Donald C. Haviland_   DCH

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
TerriAnne Benedetto, Esquire
R. Matthew Plona, Esquire
**KLINE & SPECTER**
1800 Chapel Avenue, Suite 302
Cherry Hill, NJ 08002
856-424-9162 telephone
856-424-4446 facsimile

John E. Keefe, Jr., Esquire
**LYNCH ♦ MARTIN**
830 Broad Street
Shrewsbury, NJ 07702
732-224-9400 telephone
732-224-9494 facsimile

Raymond A. Gill, Jr., Esquire
**GILL & CHAMAS**
655 Florida Grove Road
P.O. Box 760
Woodbridge, NJ 07095
732-324-7600 telephone
732-324-7606 facsimile

**ATTORNEYS FOR PLAINTIFF AND THE CLASS**

G:\DEH\LAWFN\3701-final

© 2003 KLINE & SPECTER

94