UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) Civil Action No. 01-12257-PBS ) |
| THIS DOCUMENT RELATES TO: | ) Hon. Patti Saris ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) Magistrate Judge Marianne B. Bowler ) ) ) |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 10

```
                STATE OF NORTH CAROLINA IN THE GENERAL COURT
                     NEW HANOVER COUNTY OF JUSTICE
                         SUPERIOR COURT DIVISION
```

CONFIDENTIAL

```
HARRY E. STETSER, et al.,              )
         Plaintiffs,                   )
  vs.                                  )  No. 1-CV-5268
TAP PHARMACEUTICAL PRODUCTS, INC.,)
et al.,                                )
         Defendants.                   )
```

  The videotaped deposition of Thomas Hodgson, taken pursuant to notice in the above-entitled cause on the 19th day of February, 2004, at 225 East Illinois Road, Lake Forest, Illinois, at 9:00 a.m.

REPORTED BY ELVIRA M. KOKOTT
CERTIFIED SHORTHAND REPORTER LICENSE NO. 84-3309

ABT-DOJ 0297310
Highly Confidential

5 (Pages 14 to 17)

**Page 14**

1  deposition of Mr. Hodgson or in the litigation --
2  or in the federal litigation, and I believe that's
3  something that Mr. Haviland has -- has assented to.
4      MR. HAVILAND: I agree that the signature on
5  the agreements to abide by the protective orders in
6  Walker and Stetser does not by that signature give
7  up any rights that MDL has to claim whatever they
8  will with respect to this deposition transcript.
9  It's simply to make clear that counsel in MDL has
10 agreed to be bound by the protective orders in the
11 cases for which this deposition has been noticed.
12      I am going to hand the court reporter now
13 the agreement signed by counsel for the MDL in
14 Stetser as Hodgson Exhibit 1A and Walker as Hodgson
15 Exhibit 1B.
16      (Whereupon, Hodgson Deposition
17      Exhibit Nos. 1A-1B were marked for
18      identification as of 2/19/04.)
19      MR. PORCELLI: Mr. Haviland, now that the
20 preliminaries are out of the way, and it appears
21 this deposition will be going forward in both the
22 Walker and the Stetser cases, I would like to
23 restate that I am here on behalf of Takeda in the
24 Walker case only, pursuant to the North Carolina

**Page 15**

1  Appellate Court's February 3rd ruling in the
2  Stetser case.
3      MR. HAVILAND: I don't know that that requires
4  a response of plaintiff's counsel. Counsel is here
5  appearing in one case. What is happening in
6  Stetser in the Appellate Courts is happening in
7  Stetser in the Appellate Courts.
8      Any other preliminaries? Okay.
9      Thomas Hodgson,
10 called as a witness herein, having been first duly
11 sworn, was examined and testified as follows:
12      EXAMINATION
13 BY MR. HAVILAND:
14   Q. Mr. Hodgson, my name is Don Haviland. I
15 am counsel for the plaintiff in the class in a case
16 that's been certified as a national class action in
17 North Carolina State Court.
18      I am also counsel for plaintiffs in a
19 class that's been certified in New Jersey State
20 Court.
21      I would like you to start by please
22 telling the court reporter and the jury in this
23 case your full name.
24   A. Thomas R. Hodgson.

**Page 16**

1   Q. Can you tell me where you presently live,
2  sir.
3   A. 1015 Ashley Road, Lake Forest, Illinois.
4   Q. And, for how long have you lived in
5  Lake Forest, Illinois?
6   A. Approximately, I would say about 25 years.
7   Q. And, you understand that you're appearing
8  today to give deposition testimony in the two cases
9  I referenced?
10  A. I do.
11  Q. Do you also understand that you're
12 appearing today not only in your individual
13 capacity, but also as a corporate designee on
14 behalf of Abbott Laboratories?
15  A. Yes.
16  Q. Okay. Can you tell me when you first
17 learned that you would be appearing today as a
18 corporate designee on behalf of Abbott?
19  A. Specifically this date or generally?
20  Q. Just generally.
21  A. I think I was aware of it some time last
22 year.
23  Q. All right. Can you tell me what your
24 understanding was then in terms of what role you

**Page 17**

1  would be playing on behalf of Abbott at the
2  deposition today?
3   A. I didn't have a very clear understanding
4  at that point. I do now.
5   Q. Okay. Could you tell me what your
6  understanding is today?
7   A. My understanding today is that there are
8  certain points that were raised, and I am to cover
9  those points.
10  Q. Okay. Could you tell me what those points
11 are as you know them today?
12  A. Basically, Abbott's relationship to TAP,
13 the various business practices of TAP, and Abbott's
14 knowledge of those previous practices.
15  Q. Anything else?
16  A. That's, basically, my understanding.
17 There may be more points, but my overall
18 understanding is that I am to testify relative to
19 Abbott's relationship to TAP.
20  Q. Okay. And, can you tell me in greater
21 detail what your understanding of what the
22 testimony is you can provide today with respect to
23 that topic?
24      MS. RUSSO: Objection, form.

ABT-DOJ 0297314
Highly Confidential

57 (Pages 222 to 225)

**222**

1  these tactical elements.
2  Q. One of the subjects you have been asked to
3  testify on behalf of Abbott, too, has to deal with
4  marketing and sales programs, and so I just want to
5  explore the depth of your knowledge.
6  A. No, I understand.
7  Q. And beyond any --
8  A. And, I didn't have a lot of knowledge, and
9  if I didn't have the knowledge, nobody would have
10 the knowledge, because I was closest to it. The
11 fact of the matter was this was an independent
12 company. Abbott was not involved in the detail
13 nitty-gritty operations of this company.
14 Q. Did -- do you recall if at any time at a
15 board meeting did anyone from TAP present
16 specifically on issues relating to educating
17 doctors about the business aspects of Lupron?
18 A. I don't remember the specifics.
19 Q. In general, prior to board meetings, did
20 you receive any documents from anyone at TAP to
21 prepare for the board meetings?
22 A. No, but I, as I said, because typically we
23 were heavily involved in the plan and update
24 process, I had a pretty good understanding of the

**223**

1  overall operation and what was going to be proposed
2  in terms of plans, financials and so forth.
3  Q. Okay. So, you had some knowledge going in
4  what was going to be discussed?
5  A. I did because of my interface role as did
6  Kunio Takeda.
7  Q. Okay. So, there were no periodic
8  documents, to your knowledge, prepared for
9  Mr. Burnham, Mr. Konishi, and others at the board
10 in advance of board meetings?
11 A. I don't recall any. In -- in specific
12 situations where, for example, the Syntex patent
13 buyout issue, that wasn't handled within the
14 context of a board meeting, because we typically
15 only met once or twice a year. And, Burnham and
16 Konishi or Morita would have been briefed by myself
17 and Kunio Takeda respectively on those issues.
18        (Whereupon, Hodgson Deposition
19        Exhibit No. 21 was marked for
20        identification as of 2/19/04.)
21 BY MR. HAVILAND:
22 Q. Mr. Hodgson, I am showing you what I've
23 marked as Hodgson Exhibit 21, the minutes of the
24 meeting of the board of directors of TAP for

**224**

1  July 11, 1994.
2        Do you see in the first paragraph you're
3  listed as an attendee? And, do you have any reason
4  to believe you're not at this meeting?
5  A. No, I know I was at this meeting.
6  Q. Okay. How do you know you were at this
7  one?
8  A. Because I remember playing golf with
9  Mr. Morita.
10 Q. Did you play skins?
11 A. No, but he took nine shots to get out of
12 the sand trap.
13 Q. That Pebble Beach course was a hard one,
14 huh?
15 A. I said use your hand wedge, pal. Let's
16 move on.
17 Q. Mr. Hasegawa now as the president
18 conducted the agenda of the meeting, and in the
19 fourth paragraph he indicates that he outlined what
20 he deemed critical factors for 1994, 1995. And,
21 then, he says, prepare a contingency plan for
22 Lupron depot 7.5 milligram in the face of changes
23 to the Medicare program.
24        Do you have any recollection as to what,

**225**

1  in light of the fact that Pebble Beach comes to
2  mind, whether or not you recall what the Medicare
3  changes or the contingency plan were that
4  Mr. Hasegawa described?
5  A. Well, this says prepare contingency plan,
6  so I don't know if one actually was prepared or
7  not. But I think at this point in time, roughly,
8  we had Hillary Clinton doing her thing in terms of
9  reformation of the entire health care system. And,
10 I think at the same time there was some discussions
11 and analyses under way at HCFA relative to
12 reimbursement and alternate forms of reimbursement
13 of drugs prescribed in physician offices.
14 Q. Do you recall that HCFA was looking at the
15 alternative of reimbursing on straight acquisition
16 cost at that time?
17 A. I think that was one option. Another
18 option was steeper discount off AWP, and there were
19 probably three or four other options that I don't
20 recall or maybe nobody knows about.
21 Q. Do you recall what was discussed with TAP
22 either between TAP and the board or TAP and you
23 specifically in this time frame with respect to
24 what TAP should do to prepare for those eventual

ABT-DOJ 0297365
Highly Confidential

**250**

1   A. No. I didn't get into this kind of
2   detail.
3   Q. Did you know that TAP had engaged a
4   company to assist it on reimbursement issues with
5   physicians?
6   MS. RUSSO: Objection, form.
7   THE WITNESS: On reimbursement issues with
8   physicians? To represent it vis-a-vis whom?
9   BY MR. HAVILAND:
10   Q. Well, I was looking on the document for --
11   I think there was a page missing.
12   Did you ever hear of a company called
13   Rescon Reimbursement Consultants?
14   A. No.
15   Q. Did you know that TAP had a -- did you
16   ever hear of a company called discovery
17   international?
18   A. No.
19   Q. Did you know that TAP had engaged either
20   of those companies to work with TAP on these
21   consultant programs?
22   A. No.
23   MS. RUSSO: Object to the form.
24   (Whereupon, Hodgson Deposition

**251**

1   Exhibit No. 27 was marked for
2   identification as of 2/19/04.)
3   BY MR. HAVILAND:
4   Q. Mr. Hodgson, I am showing you what I
5   marked as Hodgson Exhibit 27, memorandum dated
6   September 6, 1995, from Mr. Alan MacKenzie to
7   Yasu Hasegawa and Mr. Patton.
8   You're not listed as a recipient, but in
9   the first paragraph, after the subject, it says,
10   HCFA reimbursement update and current action plans.
11   Mr. MacKenzie writes, Yasu, per our recent
12   discussion, I wanted to update you, Tom Hodgson,
13   and Kunio Takeda on the current status of any
14   threats to Medicare reimbursement policy for Lupron
15   depot.
16   Let me first ask you, do you recall in
17   1995 having a discussion with Mr. Takeda and/or
18   Mr. Hasegawa about reimbursement?
19   A. No.
20   Q. All right. Mr. MacKenzie sets forth here,
21   he says, I wanted to review our direct consumer
22   campaign we are piloting in response to the
23   changing reimbursement landscape. And, then, he
24   goes on to say, first a review of the threats.

**252**

1   Do you know why it is Mr. MacKenzie deemed
2   changes in Medicare reimbursement a threat to TAP?
3   MR. BUCHMAN: Object to the form.
4   THE WITNESS: I don't know specifically what
5   was in his mind. Obviously, any time you have
6   something as significant as reimbursement changes,
7   marketing and salespeople are concerned.
8   BY MR. HAVILAND:
9   Q. In the memorandum, he talks about the HCFA
10   enforcing OBRA 89 estimated acquisition cost policy
11   for drugs paid by Medicare. And, he reports, the
12   current status is health care finance
13   administration, HCFA, and the office of management
14   and budget, OMB, are having difficulty agreeing on
15   survey methodology to establish estimated
16   acquisition cost.
17   Skip down. He says, for the short term
18   '95 and '96, AWP reimbursement seems safe.
19   Did you know then or do you know now that
20   the HCFA, H-C-F-A, and OMB, were attempting to
21   survey acquisition costs of physicians for Lupron?
22   A. I knew that, as we discussed earlier, that
23   HCFA was considering a number of alternatives to
24   AWP reimbursement. In terms of how they were

**253**

1   actually pursuing that, I wasn't aware, other than,
2   obviously, I got this memo or I was briefed on it.
3   So, at that time, I was, obviously, aware that they
4   were doing a survey.
5   Q. Do you know what the results of the survey
6   were, or do you know if, in fact, the survey was
7   actually concluded?
8   A. I don't know.
9   Q. Did you ever have occasion to speak to
10   anyone at the American Urological Association?
11   A. No. Oh, you mean a representative of --
12   Q. Yes.
13   A. -- the association?
14   No, not that I know of. I have met a few
15   doctors, but I don't think they were members. I
16   don't think they were in the executive management
17   of the AUA. That's what you really mean, right?
18   Q. Yes.
19   A. People employed by the trade association.
20   Q. Correct.
21   A. Yes. Not to my knowledge.
22   Q. Did you know that TAP individuals had
23   contacts with individuals at AUA?
24   A. Yes, because that would have been part of