UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 11

Lupron Marketing and
Sales Practices Litigation

Thomas Richard Hodgson
February 20, 2004

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MASSACHUSETTS
 3    ------------------------------:
 4    IN RE:              : MDL No. 1430
      LUPRON MARKETING AND SALES :
 5    PRACTICES LITIGATION : Master File No.
                          : 01-CV-10861
 6    THIS DOCUMENT RELATES TO :
      ALL ACTIONS         : Judge
 7                        : Richard Stearns
      ------------------------------:
 8
 9       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
10
11       VIDEOTAPED 30(b)(6) DEPOSITION of Abbott
12    Laboratories through its representative THOMAS
13    RICHARD HODGSON, taken in the hereinbefore-
14    entitled action, taken before Rebecca L.
15    Stonerock, at the Deerpath Inn, Windsor Hall II,
16    255 East Illinois Road, Lake Forest, Illinois,
17    on February 20, 2004, commencing at 8:10 a.m.
18    pursuant to notice.
19
20                        . . .
21
22             JOSEPH ALBANESE & ASSOCIATES
                 Certified Shorthand Reporters
23                     805 Main Street
                Toms River, New Jersey  08753
24
                   Telephone (732) 244-6100
25                   Fax (732) 286-6316
```

**Page 2**

```
 1   APPEARANCES:
 2       SPECTOR, ROSEMAN & KODROFF
         1818 Market Street, Suite 2500
 3       Philadelphia, Pennsylvania 19103
         BY: JOHN A. MACORETTA
 4       Attorneys for Plaintiffs
 5       HAGENS BERMAN
         225 Franklin Street, 26th Floor
 6       Boston, Massachusetts 02210
         BY: EDWARD NOTARGIACOMO
 7       Attorneys for Plaintiffs
 8       McDERMOTT, WILL & EMERY
         227 West Monroe Street
 9       Chicago, Illinois 60606-5096
         BY: JOSHUA T. BUCHMAN
10       Attorneys for Defendant
         Abbott Laboratories
11
         ABBOTT LABORATORIES
12       Department 324, Building AP6D
         100 Abbott Park Road
13       Abbott Park, Illinois 60064-3500
         BY: CATHERINE McCAIN
14       In-House Counsel for Abbott Laboratories
15       JONES, DAY, REAVIS & POGUE
         77 West Wacker Drive
16       Chicago, Illinois 60601-1692
         BY: LEE ANN RUSSO
17       Attorneys for Defendants TAP
         Pharmaceutical Products, Inc.
18
         JENNER & BLOCK
19       One IBM Plaza
         Chicago, Illinois 60611-7603
20       BY: ANTHONY C. PORCELLI
         Attorneys for Defendants Takeda
21       Chemical Industries Limited and
         Takeda America Holdings, Inc.
22
         WINSTON & STRAWN
23       35 West Wacker Drive
         Chicago, Illinois 60601-9703
24       BY: ROBERT L. MICHELS
         Attorneys for Witness Thomas Hodgson
25
```

**Page 3**

```
 1   APPEARANCES (Continued)
 2
 3   Also Present:
 4       John D'Andrea, Videotape Specialist
 5                    . . .
```

**Page 4**

```
 1                      I N D E X
 2   NAME OF WITNESS      DIRECT  CROSS  REDIR  RECRO
 3   THOMAS RICHARD HODGSON
 4     by Mr. Macoretta    9
 5
 6              HODGSON EXHIBITS
 7   No.      Description                    Page
 8    1  Notice of Rule 30(b)(6) Deposition   20
 9    2  Bates Nos. TAP 2045698 - 709         30
10    3  Bates Nos. TAP 1047928 - 931         42
11    4  Bates Nos. TAP 2013907 - 912         56
12    5  Bates Nos. TAP 2007748               70
13    6  Bates Nos. TAP 2007810 - 812         72
14    7  Bates Nos. TAP 1003798 - 801         74
15    8  Bates Nos. TCI 001934 - 936          77
16    9  Bates Nos. TAP 2018812               82
17   10  Bates Nos. TAP 00045096              83
18   11  Bates Nos. TAP 2012062              109
19   12  Bates Nos. TAP 2066248 - 250        112
20   13  Bates Nos. TAP 2066854 - 855        123
21   14  Bates Nos. TCI 001420 - 423         127
22   15  Bates Nos. TAP 8003431 - 434, 8003421  141
23   16  Bates Nos. TAP 00063741 - 742       144
24   17  Bates Nos. TAP 2011336 - 352        149
25   18  Bates Nos. ABT 02903 - 919          152
```

---

ALBANESE & ASSOCIATES                732-244-6100                (1) Page 1 to Page 4

ABT-DOJ 0297453
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

Thomas Richard Hodgson
February 20, 2004

Page 13

Q  Okay. You've heard the term "average wholesale price" in connection with drug pricing?
A  Yes.
Q  Could you tell me what you understand that term to mean?
A  It's the definition that is developed by the Red Book based on inputs from pharmaceutical companies.
Q  Okay. What is that definition? Do you know?
A  It's a markup on the wholesaler acquisition price or cost.
Q  And what is -- could you tell me what "wholesaler acquisition cost" means?
A  It's the average price that the wholesaler would pay to the pharmaceutical company.
Q  To purchase the drug in question?
A  To purchase the drug in question.
Q  Now, that definition that you just gave me of AWP, was that the definition that was used by TAP when discussing AWP?
A  I don't know what definition they used. I didn't get into that degree of detail with

Page 14

them.
Q  Okay. How about Abbott? Did Abbott have some definition of AWP?
A  I wasn't aware of any particular definition of it.
Q  Well, an AWP was published for Abbott drugs as well, correct?
A  That's correct.
Q  Okay. Do you have any knowledge as to how Red Book creates -- or calculates AWP?
A  Broadstroke-wise I do. Basically they take the wholesaler acquisition cost and mark it up by a percentage.
Q  Do you know how that percentage is chosen for the markup?
A  No, I don't.
Q  Okay. Do you know if that percentage is given to Red Book by the pharmaceutical company?
A  I don't believe it is, but I'm not familiar or in any way conversant with what the Red Book does.
Q  Okay. And when we say "Red Book," that's one of several industry compendia that publishes an AWP; is that correct?

Page 15

A  It's -- it's one. I don't know if there are others that publish it or not. That's the one I'm familiar with.
Q  Okay. And you would agree that AWP is used as a basis for reimbursement by certain private insurers, wouldn't you?
A  Yes.
    MS. RUSSO: Objection, form.
Q  And you'd agree that AWP is used as a basis for reimbursement by Medicare as well, wouldn't you?
A  Yes.
Q  What -- what do you understand the term "list price" to mean?
A  In what context?
Q  In the context of a list price for Lupron.
A  I didn't use that terminology.
Q  Okay. How about the term "direct price"? Have you ever heard that terminology?
A  No.
Q  Did TAP have something equivalent to a list price for Lupron?
    MR. BUCHMAN: Object to the form.
A  I believe they had a wholesaler

Page 16

acquisition cost type of price.
Q  How did TAP calculate the wholesaler acquisition cost for Lupron?
A  I don't know.
    MS. RUSSO: Objection, form.
A  I didn't get into those details.
Q  But that's -- we can agree that that's a number that TAP would generate internally, correct?
A  Correct.
Q  Okay. How was wholesale acquisition price calculated for drugs by Abbott?
    MR. BUCHMAN: Object. Object to this witness testifying as to drugs other than Lupron.
Q  You can answer the question.
A  I don't know because I didn't get into that degree of detail. That kind of detail was multiple levels of staff below where I operated.
Q  So you don't know if there was a companywide policy or formula for how WAC is going to be calculated at Abbott?
A  I don't know if there was a company-wide formula, no.

ALBANESE & ASSOCIATES         732-244-6100         (4) Page 13 to Page 16

ABT-DOJ 0297456
Highly Confidential

**Page 97**

1  MR. BUCHMAN: Objection.
2  A   I don't believe that the economics of the
3  proposition were the driving force for the --
4  for the product marketing strategy. I think
5  that the critical aspect of Lupron was that it
6  was a very innovative product and it provided
7  the physician with a form of therapy which was
8  truly a breakthrough.
9      Q   And when we say -- and when you
10 say "the economics," you're talking about the
11 economics to the physician?
12 A   Yes.
13     Q   Okay. And when you don't say --
14 when you say you don't believe that was a
15 driving force, you're talking about from
16 whenever the one-month came on up through the
17 present?
18     MS. RUSSO: Objection to form.
19 A   I -- I believe physicians make judgments
20 relative to therapy based on what's in the best
21 interests of the patient. I think that's their
22 primary focus.
23     Q   Okay. Would you agree with me
24 that at certain points one of the ways TAP
25 marketed to Lupron -- marketed Lupron to

**Page 98**

1  physicians was by demonstrating to the
2  physicians how much money they could make by
3  prescribing Lupron?
4      MS. RUSSO: Objection, form.
5  A   I don't think that was a stress of their
6  marketing effort. I think that as part of their
7  dialogue with the physician relative to the
8  reimbursement process, the subject of economics
9  may or may not have come up. And in that
10 context they would have dealt with it.
11     Q   Okay. So you would agree that --
12 all right. I understand that it wasn't the
13 thrust of the marketing effort and I'm not
14 asking you what percentage of marketing related
15 to one or the other. I'm asking you did TAP
16 ever, to your knowledge, make any efforts to
17 market Lupron based on profit to the physicians.
18 A   Not based on profit to physicians. As I
19 said, there was a business aspect to it that
20 they would discuss with the physician. They
21 would point out to the physician, if they asked,
22 what the economics were.
23     I don't think that was the principal
24 thrust. I think the principal thrust, as I said
25 before, was, number one, creating awareness in

**Page 99**

1  the medical community of prostate cancer and the
2  ways to diagnose it, and number two, to -- to
3  recommend Lupron as an innovative therapy. I
4  think the business aspects were secondary to
5  most physicians. Perhaps not all.
6      Q   Okay. So do you know if TAP made
7  marketing materials available to the sales
8  representatives that talked about the business
9  aspects of Lupron?
10 A   I know that at one point in time that the
11 TAP representatives had computers -- laptop
12 computers and computer systems that would show
13 the economic aspects of the physician
14 prescribing the drug.
15     Q   Okay. And that was a computer
16 program created by somebody at TAP or for TAP,
17 correct?
18 A   Yes.
19     Q   Okay. So at least in that
20 instance TAP made an effort to market Lupron by
21 talking about how much money the physician could
22 make?
23     MR. BUCHMAN: Objection to the
24 form of the question.
25 A   Well, you keep talking about marketing

**Page 100**

1  and I keep trying to direct you to what I think
2  the principal thrust of the marketing was. That
3  was an element of it, but I don't think it was a
4  major element.
5      Q   I understand that.
6  A   Okay.
7      Q   And by the way, so we get to -- to
8  terminology, would you agree with me that --
9  well, let me try it this way: The term "return
10 to practice," what do you understand that to
11 mean?
12 A   I understand it to mean contribution to
13 the overhead of a physician's practice.
14     Q   How about the spread on Lupron?
15 What do you understand that to mean?
16 A   I understand that to mean the difference
17 between the acquisition cost or price to the
18 physician and what he was reimbursed.
19     Q   Okay. And understanding that you
20 don't think that this was a thrust of the
21 marketing effort, when TAP made any marketing
22 effort to talk about profit to the physician, is
23 that referred to internally as "marketing the
24 spread"?
25     MR. BUCHMAN: Object to the form

**225**

1  call the "spread," what you would call
2  "contribution to overhead" --
3  A    Uh-huh.
4       Q    -- and I think we agreed
5  earlier -- tell me if I'm wrong -- that what
6  we're talking about is the difference between
7  what a physician pays for the drug and the
8  amount he is reimbursed for the drug.
9  A    Yes.
10      Q    Okay. And as to Lupron, would you
11 agree that TAP could make that amount bigger by
12 reducing the amount it charges the physician for
13 the drug?
14      MS. RUSSO: Objection, form.
15 A    By reducing their price.
16      Q    Yes.
17 A    Yes.
18      Q    Okay. Either directly or through
19 some form of discount or rebate?
20 A    Yes.
21      Q    Okay. That's regardless -- and
22 TAP could do that, could lower the bottom half
23 of what we're calling -- what I'll call your
24 contribution to overhead, TAP could lower the
25 bottom half in that irrespective of what

**226**

1  happened to the top number, right? I mean,
2  regardless of whether or not the top number,
3  meaning the reimbursement, goes up, down or
4  stays the same, TAP had the ability to lower the
5  bottom half?
6       MR. BUCHMAN: Object to form.
7  A    Through the -- the ways that we
8  discussed.
9       Q    Let me show you -- I want to chat
10 with you for a few minutes about some of the
11 Board of Directors minutes. I'm going to
12 start -- we'll mark this number 35. I'm going
13 to start with the -- I'm going to start with the
14 October 15, '91 Board of Directors minutes.
15      (Discussion off the record.)
16      (HODGSON Exhibit Number 35 was marked for
17 identification.)
18      Q    Now, at this time, October '91,
19 the board was meeting twice a year, do you
20 recollect, or --
21 A    I believe they were.
22      MR. BUCHMAN: What did you mark
23 this, 35?
24      MR. MACORETTA: Yes.
25      Q    And I'm looking at the third --

**227**

1  this says you were at the meeting?
2  A    Yes.
3       Q    Have no reason to think that's
4  wrong, right?
5  A    Right.
6       Q    Okay. I'm looking at the,
7  "Mr. Pietraszek presented" -- third paragraph,
8  "Mr. Pietraszek presented his Executive
9  Overview," "cited 1991 TAP highlights and TAP's
10 1992 challenges." There's a list of challenges.
11 The next-to-last line says, "expansion of
12 patient reimbursement program." What does that
13 mean?
14 A    I don't know. I think it's a typo.
15      Q    Which part's the typo?
16 A    We weren't reimbursing patients.
17      Q    I didn't think so. So you think
18 that should say, "physician reimbursement
19 program"?
20 A    And I -- I don't -- I really don't know
21 what it is because we didn't reimburse
22 physicians either. So I think that whoever
23 wrote this was confused and I have no idea what
24 this really means.
25      Q    I'll give you a chance to take

**228**

1  that back when we turn to the last page and we
2  see Maureen McShane is the secretary who wrote
3  the minutes.
4  A    Well, she could have been confused.
5       Q    Okay.
6  A    Because I don't know what it means.
7  Patient reimbursement, clearly patients weren't
8  being reimbursed. And we weren't reimbursing
9  anybody. So --
10      Q    Okay. And obviously had somebody
11 stood up at the Board of Directors meeting and
12 talked about patient reimbursement, you would
13 have said, "What are you talking about?"
14 A    Exactly. Now, I can speculate what --
15 what was really being discussed here.
16      Q    I understand you're speculating,
17 but go ahead.
18 A    I think he was really talking about
19 expansion of the program whereby we assisted
20 physicians in working their way through the
21 laborious process of -- of obtaining
22 reimbursement. That's what I think this means.
23 Because it clearly doesn't mean what the words
24 say.
25      Q    Okay. And that was an effort that