# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>Civil Action: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Judge Patti B. Saris<br>Magistrate Judge Marianne Bowler |

**PLAINTIFFS' REBUTTAL TO WATSON PHARMACEUTICALS, INC.'S RESPONSE TO CLASS PLAINTIFFS' RESPONSE TO AMGEN'S AND WATSON'S SUPPLEMENTAL OPPOSITION TO CLASS CERTIFICATION**

Watson's sprawling Response to Class Plaintiffs' Response to Amgen and Watson's Supplemental Opposition to Class Certification ("Watson's Brief") is a largely merits-based plea for this Court to deny class certification with respect to Watson. Although Watson's precise points are difficult to discern because Watson never groups them by drug or by proposed class representative, Plaintiffs have attempted to summarize them below.

| Drug | Watson's General Argument | Watson's Plaintiff-Specific Arguments[1] |
|---|---|---|
| Ferrlecit | Plaintiffs' post-December 2000 coverage is precluded based on Watson's new "government knowledge" defense | |
| InFed | Plaintiffs' post-December 2000 coverage is precluded based on Watson's new "government knowledge" defense | |
| Dexamethasone Acetate | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |

---

[1] Coverage information for Pipefitters is based on Exhibit 1 to the Declaration of Charles Hannaford filed with Plaintiffs' Motion in Support of Motion to Certify Claims With Respect to Track 2 Defendants, attached here as Exhibit A. Exhibit A reflects Pipefitters' coverage for Massachusetts only. Coverage information for Sheet Metals, UFCW and Pirelli is set forth in Exhibit B. Exhibit B reflects nationwide coverage for those entities.

| Drug | Watson's General Argument | Watson's Plaintiff-Specific Arguments[1] |
|------|---------------------------|------------------------------------------|
| Dexamethasone Sodium | Watson stopped manufacturing in late 1998.<br><br>Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |
| Diazepam | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |
| Fluphenzine | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |
| Gentamicin | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |
| Lorazepam | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |
| Vancomycin | Plaintiffs could not have coverage for this drug because Watson's market share for this drug was minimal. | Proposed class representative reimbursement of a multisource Watson drug does not give that representative standing against Watson. |

None of the arguments set forth above should either preclude class certification or keep this Court from naming Sheet Metals Workers National Health Fund ("Sheet Metals") (Class 2), Pipefitters Local 537 Trust Funds ("Pipefitters") (Class 3), United Food Commercial Workers Unions and Employers Midwest Health Fund ("UFCW") (Class 2 and Class 3) and Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust   ("Pirelli") (Class 3) as class representatives for the classes they seek to represent.  As becomes evident by the number of

times Watson claims what it has "established" or what "the evidence" shows, Watson's general arguments improperly go to the merits of the case and therefore should not be considered.  In addition, Watson's drug-specific arguments, namely that a class representative's reimbursements for multisource drugs do not give that representative standing against Watson for the Ferrlecit trial, are contrary to this Court's prior standing rulings in this case.

Watson also argues that this Court should not certify UFCW or Pirelli as proposed class representatives because Plaintiffs never moved to include them as class representatives.  Watson attributes this to some type of "reprehensible" maneuvering by Plaintiffs, but in making this argument Watson ignores that both of these proposed class representatives have sat for multiple days of depositions, and made full document productions, including their claims data, years ago. It should therefore come as no surprise, now that Plaintiffs are seeking nationwide classes for Classes 2 and 3, that Plaintiffs seek to use these representatives who have been known to Defendants, including Watson, for almost three years and, in the case of UFCW, since the very beginning of this case.

## I.   Watson's "Government Knowledge" Arguments Are Merits Arguments Inappropriate for Class Certification

Watson's argument that the class period for Ferrlecit should end in December 2000 because Congress "took deliberate action to ensure that dialysis clinics' profits on Medicare drug reimbursements cross-subsidized the losses on Medicare reimbursements for dialysis treatments" (Watson's Br. At 8) is an argument on the merits that is inappropriate at the class certification stage.  The inappropriateness of this inquiry is evident from the language used by Watson to describe this point.  *See* Watson Br., at 8 ("Watson **can establish** that the amount of cross-subsidization was appropriate when Congress took action in 2000 to protect the 'spread.'") (emphasis added); *id.* at 16 ("Watson can easily make such a showing.").  Likewise, during the Track 1 Class 2/3 trial this Court only made findings regarding so-called "government

knowledge" after hearing evidence during nine weeks of trial. *See* Findings of Fact and Conclusions of Law (June 21, 2007) ("FOFCOL"), at 28-36. Even Watson acknowledges that the Court rejected Track 1 Defendants' cross-subsidization "defense" because the Court found no *evidence* of it. Watson's Brief at 15.

It is well-established in the First Circuit that the types of inquiries suggested by Watson's "government knowledge" argument are prohibited at class certification. *See In re Neurontin Mktg & Sale Practices Litig.*, Civil Action No. 04-10981, MDL Docket No. 1629, 2007 U.S. Dist. LEXIS 63898 (D. Mass. Aug. 29, 2007) (Saris, J.), at *3 ("In 'determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'") (citations omitted). *See also Waste Mgmt Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974)); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 307 (D. Mass. 1987) ("A motion for class certification is not the appropriate point at which to resolve the merits of the plaintiffs' claim.") (citing *Eisen*).

Even if this Court were to consider Watson's "government knowledge" argument, it is easily dismissed. Watson argues that Congress' enactment of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000) ("BIPA"), which contained provisions that required the study and analysis of rates paid to providers for services rendered in connection with dialysis, was equivalent to Congress' enactment of the Medicare Prescription Drug, Improvement and Modernization Act ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 for oncology drugs. However, adjusting payments for services so that inflated drug payments would no longer be "cross-subsidizing" "low" payments for physician services did nothing to ensure that AWP was no longer inflated. In contrast, moving to an ASP-based reimbursement system, as the MMA provided, did. *See* FOFCOL at

34.[2]  Reimbursements for ESRD drugs like Watson's Ferrlecit remained inflated until, pursuant

to BIPA, Medicare instituted concomitant increases in Medicare's reimbursement for services

rendered in connection with dialysis treatment.  Congress' action on ESRD drugs in connection

with BIPA is thus more equivalent to the GAO study (also ordered by BIPA) that this Court did

***not*** hold ended the class period.  *See* FOFCOL at 33.  Nothing in BIPA eliminated over-

payments; the MMA did.  *See* CMS End Stage Renal Disease Composite Rate Fact Sheet (Apr.

2006), attached as Ex. 5 to Watson's Brief ("Medicare will spend the same amount of money as

would have been spent under the prior system, but the cross-subsidy will be eliminated.").[3, 4]

Finally, it would be unfair to apply this argument to hold that certain proposed class

representatives lack standing for Ferrlecit.  The coverage set forth in Exhibits A and B are based

on searches for Codes J-2916 and, in some cases, J-2915.[5]  The J-2915 Code was assigned to

Ferrlecit in 2001 and the J-2916 Code was assigned to Ferrlecit on 2003.  The reason, therefore,

that these proposed class representatives cannot establish they have Ferrlecit reimbursements

---

[2]   Unlike the hypothetical "knowledge" Watson posits in its brief, Watson's own documents reveal that what it *actually* feared was HFCA obtaining knowledge about the spread on Watson's drugs.  *See* MDLW00002-4 at MDLW00003 ("When an unclassified or miscellaneous J code is assigned [prior to Ferrlecit receiving its own J-Code] . . . the actual invoice for the product may need to be submitted . . . If an invoice is submitted the claim will be paid at the invoice price, not based on AWP.  ***This will raise significant issues at HCFA given the anticipated spread between AWP and ASP.***") (emphasis added), Ex. C; MDLW12564-6 ("The WAC price of INFeD is essentially a meaningless number since AWP drives reimbursement and ASP (acquisition cost) determines the spread, or profit, an account makes versus AWP. . . .  Any AWP increases could raise red flags at HCFA."), Ex. D.

[3]   Watson also argues that the findings of the June 2000 OIG report entitled *Medicare Reimbursement of End Stage Renal Disease Drugs* showing spreads for ESRD drugs ***but not Watson's ESRD drugs*** somehow shows "government knowledge".  This argument is nonsensical.  Watson claims that "Ferrlecit was doubtless not mentioned in the OIG report because it was new to the market" (Brief at 15), but it is equally plausible that Ferrlecit did not appear in that report because the government had no knowledge about Ferrlecit spreads.

[4]   Tom Scully's excerpted Congressional testimony and deposition testimony in this case does not change this analysis.  Indeed, he testified that Congress did not attempt to replace money lost from inflated drug payments with increased service payments until the enactment of the MMA.  Deposition Tr. of Thomas A. Scully (July 13, 2007), at 776:7- 778:11, Ex. E.

[5]   Sheet Metals, Pirelli and UFCW's coverage does not reflect a search for J-2915.

prior to 2001 is because in order to seek reimbursement for Ferrlecit prior to 2001 these class representatives would have had to use the miscellaneous J-Code, J-3490, which could have been for Ferrlecit but also could have been for nearly any other Medicare Part B-covered drug that had not yet been assigned a unique J-Code.  Therefore, regardless of whether the Court ultimately accepts Watson's "government knowledge" argument, it would be grossly unfair to apply that argument to preclude individual class representatives from having standing against Watson.

## II.   Watson's Arguments About Whether Class Representative Reimbursements *Could Have Been* Watson's Drugs Should Be Rejected

Watson's arguments about whether class representative reimbursements *could have been* Watson's drugs should be similarly rejected.   First, as Plaintiffs explained in their Reply Memorandum in Support of Motion to Certify Claims With Respect to Track 2 Defendants [Doc. No. 2889], all of Watson's points on this issue are hypothetical ones.  They rely entirely on the Declaration of Jeffrey J. Johnson attached to Watson Pharmaceuticals, Inc.'s Individual Memorandum in Opposition to Class Certification [Ex. 1 to Doc. No. 2818].   Johnson is a Watson employee (*see id.* ¶ 2) who, after reviewing IMS data, concludes that there is purportedly a low probability that class representative reimbursements for Watson's drugs are, in fact, Watson's drugs.  *See id.* ¶ 4 ("I reviewed the IMS data to determine estimates of volume of sales of each drug for Watson (or its affiliates), compared with estimates of volumes of sales for the same drug for Watson's competitors, during the relevant time period.").  Mr. Johnson did not analyze any Sheet Metals' claims data.  Moreover, the Johnson Declaration relies on rank speculation and hearsay in several places (*see id.* ¶¶ 6, 9) and concludes, even for drugs where Watson had approximately 12% of the market, that it is "unlikely" that Sheet Metals reimbursed for a Watson drug.  Indeed, because the findings of the Johnson Declaration did not necessarily support Watson's argument when it came to Sheet Metals, Watson was forced to represent to this Court in its initial opposition brief that "only the proposed Class 2 representative [Sheet Metals]

may have paid any portion of a Medicare co-payment on two brand-name subject drugs sold by Watson or one of its affiliates."  Watson's individual class certification opposition, at 1.  This is decidedly different from Watson's claim in its current Brief that "Watson has already established that the reimbursement Plaintiffs claim for Sheet Metal Workers for the one multi-source drug they mention could not have been for Watson's drug."  *Id.* at 1.

Notably, even though Watson ***could have done so***, and even though it has had over a year since Plaintiffs' Track 2 reply brief to pursue Plaintiffs' suggestion that it do so, Watson did not "establish" that the reimbursements of the proposed class representatives were not Watson's drugs by reviewing its own data.[6]  Instead, Watson asks this Court to accept its own employee's analysis of what IMS data ***might,*** in certain cases, say about Watson's market share for certain drugs.  Second, as it was with its "government knowledge" argument, Watson is again improperly asking this Court to engage in a merits-based inquiry on class certification.  *See, e.g.*, Watson's Br., at 1 ("Watson ***has already established*** that the reimbursement Plaintiffs claims for Sheet Metal Workers for the one multi-source drug they mention could not have been for Watson's drug."); *id.* at 10 ("it ***was demonstrated that*** Watson and its affiliates were responsible for none or for a very small percentage of sales of the particular drugs involved.") (emphasis added).  For this reason alone its speculative arguments about whether Plaintiffs' reimbursements could be for Watson's drugs should be rejected.

---

[6]   Plaintiffs acknowledge that they have the burden to establish that the proposed class representatives have standing.  But what they have to prove must be defined by reference to what this Court has previously required Plaintiffs to establish.  As Watson acknowledges, this Court only asked that Plaintiffs "disclose the documents demonstrating that the proposed class representatives made co-insurance payments (at least in part) under Medicare Part B based on AWP."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 81 (D. Mass. 2005).  Plaintiffs have done so.

**III.    Reimbursement for a Multisource Watson Drug Gives Class Representatives Standing Against Watson**

Watson argues that reimbursements by proposed class representatives for Watson's multisource drugs do not give those proposed class representatives standing against Watson. This is, of course, inconsistent with this Court's prior rulings on standing. *See* Consolidated Order re:   Motion for Class Certification (Jan. 30, 2006) (Doc. No. 2097) ¶ 3 ("The representative of a Subclass need only have paid for one of the Subject Drugs manufactured or marketed by a defendant group.").[7]   Watson claims that because Track 2 trials for multisource drugs have been postponed that Plaintiffs cannot rely on coverage for *any* multisource drugs. Whatever concerns this Court has or has not had about the multisource part of Plaintiffs' case, it has never made that holding, and it would be extremely prejudicial to Plaintiffs to do so now. Watson claims that so holding would be the same thing as precluding class representatives who reimbursed for drugs in 2005 from pursuing their claims (Brief at 10), but that is apples and oranges.   This Court has held as a matter of law that Plaintiffs' claims for payments or reimbursements after the MMA was enacted were barred; it has never made a similar finding with regard to Plaintiffs' claims for multisource drugs.

In its brief Watson claims that "[a] class representative is not adequate if its only connection to the underlying activities relates to a portion of the case that will probably be rejected by the Court." *Id.* at 9.   However, the cases cited by Watson do not support that proposition as applied here to a class representative who reimbursed only for Watson's multisource drugs.   In those cases, none of which are First Circuit cases, the proposed class representative either engaged in entirely different conduct from the remainder of the class (*Commander Props. Corp. v. Beech Aircraft Corp.*, 164 F.R.D. 529, 536 (D. Kan. 1995)) or made no showing of typicality at all (*Sperling v. Donovan*, 104 F.R.D. 4, 6 (D.D.C. 1984).   Two

---

[7]   This language actually refers to Class 1 but is consistent with what this Court has required from Plaintiffs throughout this litigation, including for the Track 1 Class 2/3 trial.

of the decisions, *Weinberger v. Retail Credit Co.*, 498 F.2d 552 (4th Cir. 1974) and *Great Rivers Cooperative of Southeastern Iowa v. Farmland Indus., Inc.*, 120 F.3d 893 (8th Cir. 1997), were decided on motions for summary judgment, not motions for class certification.

Watson makes a similar argument that allowing a class representative who reimbursed for a multisource version of a Watson drug would somehow preclude certification because it would subject that class representative to "unique defenses" Watson's Brief, at 11. However, there are no such unique defenses. In *Neurontin*, relied on by Watson, the plaintiffs sought certification of a class of individuals who had been prescribed a drug for off-label uses. This Court held that typicality was not satisfied because the proposed class representatives had not been prescribed the drug for other off-label uses the plaintiffs were challenging. Here, the only relevant issue is whether a TPP reimbursed for one of the drugs at issue based on AWP. All the proposed class representatives here have done that. Therefore, *Neurontin* is not persuasive authority for Watson's argument.

## IV.   This Court May Certify UFCW and Pirelli As Class Representatives for Nationwide Classes

Watson feigns surprise that Plaintiffs have sought to have UFCW and Pirelli named as proposed class representatives for a nationwide Class 3. However, both proposed class representatives have been long known to Watson and every other defendant in this case. UFCW has been a plaintiff in this case since the very beginning. Plaintiffs proposed UFCW as a class representative in the Track 1 case. Although the Court ultimately certified a Massachusetts-only class (of which UFCW is not a member), in its August 16, 2005 order this Court did find that UFCW was adequate and typical as a Class 2 representative. And, as Watson acknowledges, UFCW was listed as a proposed class representative in the Third, Fourth and Fifth Amended Consolidated Class Action Complaints for Classes 2 and 3. Likewise, Plaintiffs proposed adding Pirelli as a Class 3 representative in their Third Amended Class Action Complaint, filed on

October 17, 2005, and was included in the Fourth and Fifth Amended Consolidated Class Action Complaints. They were proposed as a representative for Class 3 if the Court chose to certify a nationwide class. While the Court ultimately chose not to do so, Pirelli submitted itself to full class certification discovery. *See* Case Management Order No. 19 (Dec. 29, 2005), Doc. No. 2016.

In addition, both UFCW and Pirelli have provided extensive discovery in this case. UFCW has produced thousands of pages of documents, including all relevant claims data, and its fund administrator has had his deposition taken twice, on March 16, 2004 and April 30, 2004.[8] Likewise, Pirelli has produced thousands of pages of paper claims data and other documents and has presented both an employee from its third party administrator and one of its trustees for depositions on January 13, 2006 and January 17, 2006, respectively. Therefore, Watson's claim that "Defendants have conducted only very limited discovery as to these entities" (Watson's Brief at 18) could not be further from the truth. Finally, Watson claims that allowing UFCW and Pirelli to serve as class representatives would expand this case. That statement is again not accurate. UFCW and Pirelli have been in this case for years.[9]

---

[8]  In its brief Watson claims that UFCW produced its claims data six days before Watson's brief was due. *See id.* at 7 n.5. This is brazenly false. UFCW produced its claims data in 2003. When Watson's attorney called UFCW's counsel because she either could not locate the correct claims data on Defendants' shared Internet database or because she could not understand the claims data she was reviewing, UFCW's counsel provided her with a spreadsheet of UFCW's claims data organized by J-Code. Since this data was extracted from UFCW's raw data, it was technically work product; however, Plaintiffs' counsel provided it to her **as a courtesy** to facilitate the additional briefing the Court has requested on Track 2 class certification**.**

[9]  Watson claims that it would need additional briefing on these class representatives. Brief at 19. That request should be denied. As Watson admits, it has already examined UFCW's and Pirelli's claims data. Each class representative has submitted to two depositions. They have each produced thousands of pages of documents: UFCW did so four years ago and Pirelli's production was completed nearly a year-and-a-half ago. As the Court can see attached to Watson's Brief, Plaintiffs provided Watson with detailed charts matching every claimed reimbursement to the Bates range of Pirelli's claims data. All of these were fully available to Watson in preparing its Brief.

WHEREFORE Plaintiffs respectfully request that the Court certify Class 2 and Class 3 claims against Watson, and all other relief that this Court deems just and proper.

DATED:  September 27, 2007

By:  /s/ Jennifer Fountain Connolly
　　　Thomas M. Sobol (BBO#471770)
　　　Edward Notargiacomo (BBO#567636)
　　　Hagens Berman Sobol Shapiro LLP
　　　One Main Street, 4th Floor
　　　Cambridge, MA  02142
　　　Telephone: (617) 482-3700
　　　Facsimile: (617) 482-3003

　　　***Liaison Counsel***

　　　Kenneth A. Wexler
　　　Jennifer Fountain Connolly
　　　Wexler Toriseva Wallace LLP
　　　55 West Monroe Street, Suite 3300
　　　Chicago, IL  60603
　　　Telephone: (312) 346-2222
　　　Facsimile: (312) 346-0022

　　　Steve W. Berman
　　　Sean R. Matt
　　　Hagens Berman Sobol Shapiro LLP
　　　1301 Fifth Avenue, Suite 2900
　　　Seattle, WA  98101
　　　Telephone: (206) 623-7292
　　　Facsimile: (206) 623-0594

　　　Elizabeth Fegan
　　　Hagens Berman Sobol Shapiro LLP
　　　820 North Boulevard, Suite B
　　　Oak Park, IL  60302
　　　Telephone: (708) 776-5600
　　　Facsimile: (708) 776-5601

　　　Jeffrey Kodroff
　　　John A. Macoretta
　　　Spector, Roseman & Kodroff, P.C.
　　　1818 Market Street, Suite 2500
　　　Philadelphia, PA  19103
　　　Telephone: (215) 496-0300
　　　Facsimile: (215) 496-6611

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

***Co-Lead Counsel For Plaintiffs***

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>
Docket No. MDL 1456

      I, Jennifer Fountain Connolly, hereby certify that I am one of plaintiffs' attorneys and that, on September 27, 2007, I caused copies of ***Plaintiffs' Rebuttal to Watson Pharmaceuticals, Inc.'s Response to Class Plaintiffs' Response to Amgen's and Watson's Supplemental Opposition to Class Certification*** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


                    /s/ Jennifer Fountain Connolly
                    Jennifer Fountain Connolly

# Exhibit A

**EXHIBIT 1**

**Pipefitters Local 537 Trust Fund
Summary of Track 2 Drug Coverage**

| HCPCS Code | AWP Track 2 Manufacturer(s) | Drug Name(s) | HCPCS Description |
|---|---|---|---|
| J1070 | Pharmacia | Depo-Testosterone | INJECTION - TESTOSTERONE CYPIONATE, UP TO 100 MG |
| J1080 | Pharmacia | Depo-Testosterone | INJECTION - TESTOSTERONE CYPIONATE, 1 CC, 200 MG |
| J1100 | Watson | Dexamethasone Acetate | INJECTION - DEXAMETHOSONE SODIUM PHOSPHATE, UP TO 4 MG/ML |
| J1260 | Aventis | Anzemet | INJECTION, DOLASETRON MESYLATE, 1MG,1/1/00-10MG |
| J1440 | Amgen | Neupogen | INJECTION, FILGRASTIM (G-CSF), 300 MCG |
| J1441 | Amgen | Neupogen | INJECTION, FILGRASTIM (G-CSF), 480 MCG |
| J1561 | Aventis/Bayer/Baxter | Gammar-P IV/Gamimune/Gammagard | INJECTION - IMMUNE GLOBULIN, INTRAVENOUS, PER 500 MG |
| J1562 | Aventis/Bayer/Baxter | Gamimune | IMMUNE GLOBULIN INTRAVENOUS (HUMAN), 10%, PER 5 GRAMS |
| J1563 | Aventis/Bayer/Baxter | Gamimune | INJECTION - IMMUNE GLOBULIN, INTRAVENOUS, IG |
| J1642 | Abbott/Baxter | Heparin/Heparin/Heparin | INJECTION - HEPARIN SODIUM, (HEPARIN LOCK FLUSH), PER 10 UNITS |
| J2920 | Pharmacia | Solu-Medrol | INJECTION - METHYLPREDNISOLONE SODIUM SUCCINATE, UP TO 40 MG |
| J2930 | Abbott | A-Methapred | INJECTION - METHYLPREDNISOLONE SODIUM SUCCINATE, UP TO 125 MG |
| J3010 | Abbott | Fentanyl Citrate | INJECTION - FENTANYL CITRATE, UP TO 2 ML |
| J3360 | Abbott/Watson | Diazepam/Diazepam IV | INJECTION - DIAZEPAM, UP TO 5 MG |
| J3370 | Abbott/Baxter/ Fujisawa/Watson | Vancomycin/Vancocin/Lyph ocin/Vancomycin | INJECTION - VANOMYCIN HCL, UP TO 500 MG |
| J3490 | Baxter | Brevibloc/Travasol/Bretylium | HOME INFUSION-UNCLASSIFIED DRUGS |
| J7030 | Baxter | Sodium Chloride | INFUSION, NORMAL SALINE SOLUTION, 1000 CC |
| J7040 | Baxter | Sodium Chloride | INFUSION, NORMAL SALINE SOLUTION, STERILE (500 ML OR 1 UNIT) |

| HCPCS Code | AWP Track 2 Manufacturer(s) | Drug Name(s) | HCPCS Description |
|---|---|---|---|
| J7050 | Baxter | Sodium Chloride | INFUSION, NORMAL SALINE SOLUTIION 250 CC |
| J7194 | Baxter | Bebulin | FACTOR IX, COMPLEX, PER UNIT |
| J7625 | Dey | Albuterol Sulfate/Ventolin/Proventil | ALBUTEROL SULFATE,0.5%, PER ML, INHAL SOLUTION ADMIN THRU DME |
| J9100 | Pharmacia | Cytarabine | CYTARABINE HCL, 100 MG |
| J9250 | Immunex | Methotrexate | METHOTREXATE SODIUM MIX, 2 CC OR 5 MG |

# Exhibit B

# Watson Track II Drug Coverage Class 2 (Sheet Metal Workers and UFCW) and Class 3 (Pirelli and UFCW)

| Drug | HCPCS Code | Drug Source | Class 2 Coverage Sheet Metal Workers | Class 2 Coverage UFCW | Class 3 Coverage Pirelli | Class 3 Coverage UFCW |
|---|---|---|---|---|---|---|
| Dexamethasone Acetate | J1094 | Multi | AL AR AZ CA FL GA IL IN LA MS NY OH PA TN | none | AZ CA IA MS TN | IL |
| Dexamethasone Sodium | J1100, J7637, J7638 | Multi | AL AR AZ CA CO CT FL GA IA IL IN KS KY LA MA MD MI MN MO MS MT NC ND NE NJ NV NY OH OK OR PA RI SC TN TX VA VT WA WI WV | IL | AZ CA FL IA IL KY LA MO MS TN | AR FL IL IN MO NV OK TX WI |
| Diazepam | J3360 | Multi | AL AR CA FL GA IL IN KS MA MN NY OH OR PA SC TN TX | none | FL IA NV TN | AR AZ IL |
| Ferlecit | J2915, J2916 | Multi | GA IL LA MA NJ NY OH PA TX WI | none | TN | none |
| Fluphenazine | J2680 | Multi | none | none | none | IL |
| Gentamicin | J1580 | Multi | AL AR AZ CA CO CT FL GA IL IN LA MA MD MI MN MO NC ND NJ NY OH PA SC TN TX VA WA WI | none | CA FL IA LA MS TN | FL IL MO |
| Infed | J1750 | Multi | AZ CA CO FL IA IL IN KY LA MA MD MI MN ND NE NJ NY OH PA TX WA WI WV | none | CA IA MO | IL WI |
| Lorazepam | J2060 | Multi | AR AZ CA FL GA IL IN KS KY MD MN NE NJ NV OH TX WA WI | none | MS | IL IN |
| Vancomycin | J3370 | Multi | AL AR CA CO FL GA IA IL IN KS KY LA MA MD MN MO NE NJ NY OH PA TN TX WA WI WV | none | FL TN | FL IL |

# Exhibit C

# Ferrlecit Reimbursement/J Code Submission Process and Requirements

### New J Code Determination

The Level II HCPCS National Coding System contains a group of codes called "J" Codes. This section of codes lists injectable therapeutic medications, antigens, allergy vaccine supplies, miscellaneous solutions, and chemotherapy drugs. These codes represent the cost of the supply and do not include administration of the drug, which in most cases is separately billable. A "J" code is assigned by HCFA to reflect the unique chemical entity of a new drug product. Drug products comprised of the same chemical entity will not have individual J codes, but will share the same code. The advantage of having a J code is to reduce the number of delayed or denied claims by facilitating prompt billing and payment for the drug.

HCFA has established specific criteria which must be met when requesting a modification to the HCPCS coding classification. To request a new J code, the drug must be approved for marketing, and a minimum of six months of marketing data should be available when submitting the application. HCFA will review the submitted criteria and will make a determination whether a new unique J code (sodium ferric gluconate complex in sucrose injection) should be assigned. Not all requests for modification are approved.

After Ferrlecit has been approved for marketing, the alphanumeric coding recommendation form can be prepared, and these requests for new J codes must be submitted by April 1 of a given year (1999). By November of the same year, the criteria will be evaluated and a determination will be made on whether a new J code is warranted. If approved, the new J code will become effective on January 1 of the following year (2000).

The following information must be included in the request for modification to the HCPCS classification:

- Indications for use, action, dosage and route of administration, how supplied (published literature, package insert and any other materials should be submitted)
- Current HCPCS codes and rationale for why they do not adequately classify the product
- A list of any local codes used by third-party payers (if applicable)
- Information on how the drug is currently billed
- When the product was approved for marketing and the time it has been marketed
- Information on what Medicare carriers are currently paying for the drug
- Sales projections by payer
- Anticipated drug volume and percentages for each applicable treatment setting
- Wholesale and retail costs
- Competitors who market a similar drug
- Differentiation of why this drug is different from competitive products

S000002

**Coding**

The current HCPCS code for iron dextran will not be applicable for Ferrlecit which will require a unique J code for billing.

When a new injectable drug is launched, a miscellaneous or unclassified HCPCS Level II J code is assigned until the Health Care Financing Administration (HCFA) determines whether a new, unique code will be created. Upon launch, claims for Ferrlecit (sodium ferric gluconate complex in sucrose injection) will be billed using the following HCPCS drug code:

> J3490   Unclassified drugs (Ferrlecit)

When an unclassified or miscellaneous J code is assigned, claims must be processed manually and additional information has to be provided with the claim including drug name, NDC number (may be required), and the dose given. Further, depending on the carrier, the actual invoice for the product may need to be submitted.

If an invoice is submitted the claim will be paid at the invoice price, not based on AWP. This will raise significant issues at HCFA given the anticipated spread between AWP and ASP. Furthermore, once the intermediaries begin reimbursing at ASP, it is unlikely that we could get them to move payment up to AWP. **Therefore, the important point to note is that the pricing services must be notified of the AWP prior to the launch of Ferrlecit** to insure that they have this information for pricing the claim. In the absence of this data it is likely that an invoice would be required.

If the insurer does not recognize HCPCS codes, the physician may bill for Ferrlecit with the CPT-4 code listed below.

> 99070   Supplies and materials (except spectacles), provided by the physician over and above those usually included with the office visit or other services rendered [list Ferrlecit]

This coding would trigger the same type of manual review just as the miscellaneous J Code would.

**Reimbursement**

Reimbursement for the miscellaneous J code for Ferrlecit injection will be based on 95 percent of average wholesale price (AWP). Again, this would necessitate that those reviewing the claim know the AWP of Ferrlecit ahead of time - reinforcing the importance of adequate notification of all intermediaries and pricing services.

S000003

MDLW 00003

**Next Steps**

In order to insure that the appropriate activities take place prior to launch, Parexel will be managing the following projects associated with the launch of Ferrlecit:

Compendia Submission (AHFS-DI and USP-DI)
Payer Education (package for intermediaries educating them on Ferrlecit)
Pricing Services Notification (Red Book, First DataBank, Medi-Span)
Launch Meeting Presentation (Educate reps on Ferrlecit reimbursement)
HCPCS Code Application
Ongoing Reimbursement Hotline

S000004

**Highly Confidential**

**MDLW 00004**

# Exhibit D

# *MEMO*

INFeD
F → Price



**TO:**    Mike Casey

**FROM:**  Tim Callahan

**DATE:**  February 24, 1997

**RE:**    INFeD Price Strategy

**CC:**    S. Basile, A. Levitt, B. Mundy

After discussing the issue of a price increase on INFeD it became apparent that what we really needed was a **price differentiation strategy** for the product. Our ultimate goal behind this strategy is to correctly position INFeD as a premium priced injectable iron product. Based on the strategy that was agreed upon we conducted a review of both the financial and strategic implications of a price change, and *the INFeD team has come to the conclusion that it would not be appropriate to implement a WAC price increase at this time.*

The WAC price of INFeD is essentially a meaningless number since **AWP drives reimbursement and ASP (acquisition cost) determines the spread, or profit, an account makes versus AWP. Therefore, the real driver of the market price is ASP.** Our assumption is that we would want to obtain a 10-15% premium on the market price for Ferrlecit when it is launched; *this premium we can charge on Ferrlecit will be determined by our market price of INFeD.* Thus, an increase in the WAC price would not really give us any strategic positioning advantage for Ferrlecit. *This strategic positioning will ultimately be derived from maintaining and increasing our ASP.*

Increasing our ASP necessarily means increasing our contract pricing, which represents 90% of our business. While this is not possible in the immediate future, we believe that this is possible within the 12-18 month time frame prior to the launch of Ferrlecit. Further, it is our recommendation that we evaluate each contract that expires in this time frame to determine if a contract price increase is warranted. In order to implement these contract price increases however, we will need to further differentiate INFeD from Dexferrum. The data is starting to accumulate on this differentiation, but in order for it to affect our ASP in the near term, we will require additional resources.

Because of this need for additional resources, we propose that the INFeD Marketing Budget be increased by $375,000. This amounts to roughly three quarters of the money that would be initially lost due to a price increase on INFeD ($497,000 - see discussion below). This additional money would be used to facilitate the publishing of adverse events data and Public Relations activities related to American Regents product Dexferrum. We would hire a consulting group to collect data and write up one to two retrospective studies that could be published in peer reviewed journals. These studies would then be distributed via direct mail, representative handouts, and ultimately could be used for presentation to the FDA that might affect withdrawal of the product Dexferrum

What follows below is the detailed explanation for why we believe that any WAC or AWP changes are not warranted at this time. Further, a break-even analysis for a price increase has been provided by Finance.

**S012552**

**Highly Confidential**

## Financial Analysis

> The top section of the spreadsheet details an initial revenue loss of $497,000 due to immediate increases in the chargebacks we will receive on existing inventory and "buy-in" inventory, from wholesalers and distributors.

> The middle section details the monthly revenue Schein would realize from a 4% price increase given two different scenarios. (1) The price increase is made on WAC sales only {10% of sales}. (2) The price increase is made on WAC sales as well as selected contracts that currently have a price greater than $220. Given our current competitive situation, the price increase on WAC sales only is the most appropriate scenario.

> The final section of the spreadsheet is a break-even analysis of the price increase situation. For our purposes the second column (Non-Cont) is the most likely scenario. The net result is that with an initial $497,000 loss, and a revenue gain on a 4% price increase of $29,000 per month, it will take 17.3 months to recoup the loss incurred by the price increase.

Based on a purely financial analysis, a price increase is not warranted at this time. However, the INFeD Team has also addressed the idea of a price increase from a strategic point of view in light of Ferrlecit. The unknown in this analysis is, of course, American Regents response to any changes we make. We have, never-the-less, made an attempt to predict their likely actions.

## Strategic Analysis

Currently American Regent has only ~ 10% market share and they have been very aggressive in pricing at several key accounts. From the start, their primary tool to gain market share has been a lower price, and we expect this to continue. In light of this fact it is unlikely that American Regent would follow suit with any price increases that we may institute (WAC or AWP), as our increase would only strengthen their current position as a low cost supplier.

This being said, any WAC price increases that we may institute could drive further business to American Regent as the gap between the products would grow. With this piece alone we have the potential of losing $5-10 Million. Any AWP increases could raise red flags at HCFA because they will only reimburse at the lower of the two AWP's. Most importantly however, is that a change in the WAC or AWP price will not affect the market price, which is what we need to increase prior to the launch of Ferrlecit.

All things considered, both financially and strategically, we believe that it is not in our best interest to raise the WAC price of INFeD at this time. Financially the decision is clear, and strategically we believe that Ferrlecit is a sufficiently different chemical entity that it will not be subject to the current price structures of iron dextran (AWP and WAC). Further, the large spread between AWP and WAC on INFeD provides price cushion for Ferrlecit in the event that HCFA would not allow it to have a higher AWP.

**S012553**

**Highly Confidential**

## INFeD Price Increase Evaluation
### ($ in 000's)

### *Revenue Loss*

| | Total | Direct | Indirect |
|---|---|---|---|
| Sept 96 Trailing 12 Mos Sales | 86,741 | 12,144 *14%* | 74,597 *86%* |
| Avg Invty on Hand - 1 Mo Sales | | | 6,216 |
| 1 Month Buy-in | | | 6,216 |
| Total Subject to Chargebacks | | | 12,433 |
| Expected Price Increase | | | 4% |
| Chargebacks on Price Increase | | | 497 |

### *Revenue Gain*

| | Total | Non-Contr | Increase Contracts | No Incr Contracts |
|---|---|---|---|---|
| Sept 96 Trailing 12 Mos Sales | 86,741 | 8,648 *10%* | 9,587 *11%* | 68,506 *79%* |
| Avg Monthly Sales | | 721 | 799 | |
| Expected Price Increase | | 4% | 4% | |
| Monthly Revenue Gain | 61 | 29 | 32 | |

### *Breakeven Analysis*

| | | | |
|---|---|---|---|
| Revenue Cost | 497 | 497 | 497 |
| Monthly Revenue Gain | 61 | 29 | 32 |
| Months to Break Even | 8.2 | 17.3 | 15.6 |

**Highly Confidential**

12554

MDLW 12566

# Exhibit E

Scully, Thomas A. - Vol. II                July 13, 2007
Washington, DC

Page 443

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL        :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   :   CIVIL ACTION

PRICE LITIGATION             :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO     :   U.S. ex rel.

Ven-a-Care of The Florida    :   Judge Patti B. Saris

Keys, Inc.                   :

     v.                      :

Abbott Laboratories, Inc.,   :   Chief Magistrate

No. 06-CV-11337-PBS          :   Judge Marianne B.

- - - - - - - - - - - - - -x   Bowler


        THOMAS A. SCULLY - VOLUME II

            JULY 13, 2007

            WASHINGTON, DC




    (CAPTION CONTINUED)

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                July 13, 2007
Washington, DC

Page 452

1                                       Volume II

2                                    Washington, D.C.

3                                Friday, July 13, 2007

4

5

6              Videotaped Deposition of THOMAS A.

7     SCULLY, a witness herein, called for examination by

8     counsel for Abbott Laboratories in the above-entitled

9     matter, pursuant to subpoena, the witness being duly

10    sworn by Cassandra E. Ellis, a Notary Public in and

11    for the District of Columbia, taken at the offices of

12    Jones Day, 51 Louisiana Avenue, Northwest, Washington,

13    D.C., at 8:50 a.m. on Friday, July 13, 2007, and the

14    proceedings being taken down by Stenotype by CASSANDRA

15    E. ELLIS, RPR, Livenote Certified Reporter, and

16    transcribed under her direction.

17

18

19

20

21

22

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                    July 13, 2007
                    Washington, DC

Page 776

1    judgment whether it's appropriate or legal.  I'm

2    saying policy wise it's not a good policy.  So

3    you're talking about the system being gamed, from

4    the point of view of taxpayers overpaying for

5    patient services, the system produced a bad

6    result.

7         Q.   Now, on the first day of your

8    deposition, you were asked a number of questions

9    about cross-subsidization; do you recall that?

10        A.   Yes.

11        Q.   And this is the cross subsidization

12   between the reimbursement for the drug and the

13   reimbursement for the services?

14        A.   Yes.

15        Q.   And you agreed, I think, that prior to

16   the Medicare Modernization Act cross-

17   subsidization occurred?

18        MR. NEAL:  I'll object to the form. You

19   can answer.

20        A.   Yes, some did.

21        Q.   And -- and that's because the payment

22   that Medicare made for the services component of

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                July 13, 2007
                    Washington, DC

```
                                            Page 777

 1    it was inadequate?

 2              MR. NEAL:  I'll object to the form. You

 3    can answer the question.

 4         A.    I think what I said, just to restate

 5    it, not to bore you with what I said before, was

 6    that I believe as the margins on oncology drugs

 7    exploded in the prior late `90s and early 2000s

 8    CMS, somewhat consciously, knowing that

 9    oncologists had this very high level of

10    relatively new income, that they probably and

11    fairly consciously did not update their practice

12    expenses and other practice costs to Medicare as

13    much.

14              So you can make an argument that if

15    you're going to take away their what I consider

16    to be their inappropriate drug spread you should

17    give them back some reimbursement in the form of

18    patient services.

19              And we did that, in the bill, but it

20    wasn't one for one, it was probably one for five

21    or six.

22              Very similarly, on the Epo side, with
```

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                July 13, 2007
                    Washington, DC

Page 778

1   dialysis, the judgment was very directly made, on

2   the Epo side, with dialysis, where the decision

3   was made that, in fact, they really needed all of

4   it back, we added back dollar for dollar, every

5   dollar we took away from AWP to ASP plus six,

6   change in dialysis side, went back dollar for

7   dollar into a drug add-on.

8           So, there was a cross-subsidy, and

9   acknowledgment of it, but it was not dollar for

10  dollar.  I'd say it was one for five or six on

11  the oncology side.

12      Q.   Well, I believe you testified, on the

13  first day, that you thought the underpayment was

14  48 million to 52 million?

15      A.   The first estimate of the staff was 48

16  to 52 million.

17      Q.   And --

18      A.   It turned out to be low.

19      Q.   Excuse me?

20      A.   Which turned out to be low.  We added

21  significantly more back.

22      Q.   Right.  I was going to just mention

15199ddc-fb97-46a6-9907-a9804764b3c3