UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456<br>Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** ) ) | Hon. Patti B. Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*<br>CIVIL ACTION NO. 06-11337-PBS ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

# EXHIBIT E

To The United States Response To Third-Party
TAP Pharmaceutical Product, Inc.'s
Motion to Clarify Paragraph Six
of the Court's September 7, 2007 Order

Tobiason Virginia - Vol 2

230

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2

 3   IN RE:  PHARMACEUTICAL           )
     INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
 4   PRICE LITIGATION                 ) Civil Action No.
                                      )    01-12257-PBS
 5                                    )
     THIS DOCUMENT RELATES TO:        )
 6                                    )
     United States of America,        ) Hon. Patti Saris
 7   ex rel. Ven-a-Care of the        )
     Florida Keys, Inc., v.           )
 8   Abbott Laboratories, Inc.,       )
     and Hospira, Inc.                )
 9   CIVIL ACTION NO. 06-11337-PBS    )

10
     ***********************************************************
11
                  UNITED STATES DISTRICT COURT
12                  DISTRICT OF MASSACHUSETTS

13
     IN RE:  PHARMACEUTICAL           )
14   INDUSTRY AVERAGE WHOLESALE       ) MDL No. 1456
     PRICE LITIGATION                 ) Civil Action No.
15                                    )    01-CV-12257-PBS
                                      )
16   THIS DOCUMENT RELATES TO:        )
                                      ) Judge Patti B. Saris
17   State of Arizona v. Abbott       )
     Labs., et al.                    )
18   Civil Action No. 06-CV-11069-PBS )

19

20   ***********************************************************
            ORAL AND VIDEOTAPED DEPOSITION OF
21                  VIRGINIA TOBIASON

22               HIGHLY CONFIDENTIAL

23                   May 15, 2007

24                    Volume 2

25   ***********************************************************
```

231

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
                         Page 1
```

Tobiason Virginia - Vol  2

12   parenteral and enteral nutrition.
13       Q.   Okay.  Here you are reporting on a proposed
14   rule that extends beyond what you just described.  It
15   extended to renal, pain management and home
16   chemotherapy.  Do you see that?
17       A.   Yes.
18       Q.   All right.  Now, you're identifying certain
19   what you described as major issues.  Do you see under
20   the heading of major?
21       A.   Yes, uh-huh.
22       Q.   Okay.  Can you tell me what your purpose was
23   in doing that?
24       A.   I think it was to identify changes in
25   reimbursement.

                                                          267

1        Q.   Well, if I direct your attention to the
2    second page, you'll see comments are due by 5:00 p.m.
3    on August 5th.  Do you see that?
4        A.   Yes.
5        Q.   Was it your intention to solicit input of the
6    individuals in this memo for purposes of submitting
7    comments on the proposed rule?
8        A.   I don't remember.
9        Q.   All right.
10       A.   Could have been, but I don't know.
11       Q.   Do you know if Abbott, in fact, submitted
12   comments?
13       A.   I have no idea.  I don't remember.
14       Q.   It's possible, you just don't remember?

Tobiason Virginia - Vol  2

15    A.    I just don't remember.
16    Q.    Okay.  So to the best of your recollection,
17 were you identifying issues you thought were relevant
18 to Abbott for purposes of the proposed rule and
19 comments?
20          MS. TABACCHI:  Object to the form.
21    A.    Say that again.
22    Q.    (BY MR. HAVILAND)  To the best of your
23 recollection, were you identifying major issues for
24 Abbott for purposes of submitting comments for the
25 proposed rule?

                                                    268

1     A.    I believe I was identifying a proposed rule
2  that we might want to have comments on.
3     Q.    What I'm asking about is your section in the
4  memo about major issues.  Were you flagging what you
5  thought were major issues for Abbott in the context of
6  that proposed rule?
7           MS. TABACCHI:  Object to the form.
8     A.    That's what it appears to be, yes.
9     Q.    (BY MR. HAVILAND)  Okay.  That's all I'm
10 asking is your best recollection.
11    A.    That's my best recollection.
12    Q.    All right.  You say in the first bullet, if
13 you will, "There is a question whether HCFA has the
14 authority to limit reimbursement for these drugs
15 through regulation."
16    A.    Uh-huh.
17    Q.    "It can be argued based on the Medicare

Tobiason Virginia - Vol 2

18  statute that such a change requires Congressional
19  approval." Did you believe that to be true then?
20      A.   I think it was just a question.
21      Q.   Okay. Do you have an answer to that question
22  today as to whether or not you believe that that's the
23  rule, whether or not HCFA has authority?
24      A.   Well, I do know when they did change
25  reimbursement, they did it through legislation.

269

1       Q.   Okay. It says in the next bullet that "In
2   the proposed rule, HCFA indicates ... they are going
3   to consider establishing national drug fee screens in
4   the future. This is definitely the start of national
5   'drug pricing' controls." Do you see that?
6       A.   Yes.
7       Q.   Was that a concern for Abbott, having price
8   control?
9            MS. TABACCHI:  Objection, foundation.
10  The witness can testify as to her personal knowledge.
11      Q.   (BY MR. HAVILAND)  Was that your concern,
12  drug pricing controls?
13      A.   I -- I don't know if that was my concern or
14  not.
15      Q.   Well, it's a concern you flagged in your
16  memo, so --
17      A.   Yeah.
18      Q.   -- I'm just trying to understand whether that
19  was a concern that you had individually or whether it
20  was an expression of what you believe was a -- should

Tobiason Virginia - Vol  2

21  be a concern for Abbott.
22              MS. TABACCHI:  Object to the form.
23      A.   I don't remember having a personal concern.
24      Q.   (BY MR. HAVILAND)  Your best recollection
25  that -- is that it was a major issue at that time.

270

1       A.   It was a major -- it would have been a major
2   issue, yes.
3       Q.   Okay.  Why?
4       A.   Well, anything in reimbursement that -- that
5   there might be changes, we -- I identify.  I do it for
6   other product lines, too.
7       Q.   Okay.  Why is that a major concern?
8       A.   Because of our customers.  Our customers may
9   be impacted by these changes.
10      Q.   Okay.  And how does that impact on Abbott?
11              MS. TABACCHI:  Object to the form.
12      A.   Customers may -- may -- I don't deal with
13  sales and marketing, but when something impacts
14  customers on reimbursement, they might identify it to
15  the sales and marketing agency.
16      Q.   (BY MR. HAVILAND)  Is it fair to say,
17  Mrs. Tobiason, that when reimbursement goes down,
18  Abbott's price goes down?
19              MS. TABACCHI:  Object to the form.  Lack
20  of foundation.
21      A.   I have no idea.
22      Q.   (BY MR. HAVILAND)  No idea?
23      A.   No idea.  I don't handle contracting.

Page 37

Tobiason Virginia - Vol 2

24    Q.   Well, you're reporting in the memo on the

25  next paragraph, "Also included in the rule is a

271

1  proposal to reduce even further the payment for very

2  high volume drugs." Do you see that?

3    A.   Yes.

4    Q.   Abbott at the time had very high volume

5  drugs, did it not?

6           MS. TABACCHI:  Object to the form. Lack

7  of foundation.

8    A.   I was commenting on what was in the rule.

9    Q.   (BY MR. HAVILAND) I understand that. I'm

10  just asking a factual question that Abbott at the time

11  had a very high -- had very high volume drugs.

12           MS. TABACCHI:  Object to the form.

13    A.   I don't know if -- if Abbott's high volume

14  would apply in this policy.

15    Q.   (BY MR. HAVILAND) I'm not asking that. I'm

16  asking simply in your estimation sitting here today at

17  the time Abbott had very high volume drugs.

18           MS. TABACCHI:  Object to the form.

19    A.   I don't know.

20    Q.   (BY MR. HAVILAND) You don't know?

21    A.   I don't know.

22    Q.   TAP at the time had a very high volume

23  drug --

24           MS. TABACCHI:  Objection, lack --

25    Q.   (BY MR. HAVILAND) -- called Lupron.

 1              MS. TABACCHI:  -- lack of foundation.
 2    The witness is not a TAP employee.
 3              MR. HAVILAND:  Well, she's writing on
 4    TAP and I'm getting there, so -- because at the very
 5    end she says, I think TAP could use this argument
 6    effectively.  So I think I do have a foundation.
 7        Q.   (BY MR. HAVILAND)  Are you aware that TAP had
 8    a very high volume drug at the time?
 9              MS. TABACCHI:  Lack of foundation.
10    Objection.
11        A.   I was -- I was aware that -- that TAP sold
12    Lupron.
13        Q.   (BY MR. HAVILAND)  And it was a very high
14    volume drug.
15              MS. TABACCHI:  Object to the form.  Lack
16    of foundation.
17        A.   High volume compared -- I don't know what you
18    mean by "high volume."
19        Q.   (BY MR. HAVILAND)  Well, what did you mean in
20    this memo when you wrote that --
21        A.   I meant what they said in the rule high
22    volume.  I believe that in this they said high volume.
23    CMS identified -- said high volume.
24        Q.   You had no sense at the time what that meant
25    in terms of Abbott's business?

Tobiason Virginia - Vol 2

1   A.   I did not see TAP sales reports.
2   Q.   No, no. Abbott I said.
3   A.   Abbott.
4   Q.   Sorry.
5   A.   I didn't see Abbott sales reports for
6   Hospital Products or others by drug.
7   Q.   The next sentence says, "This would be
8   limited to the lower of ... estimated acquisition cost
9   as determined by HCFA or 85% of A.W.P." Do you see
10  that?
11  A.   Yes.
12  Q.   Okay. Now, you said earlier you don't
13  believe that that came into being. In fact, didn't
14  the reimbursement come about to be the lesser of
15  estimated acquisition cost or AWP? Do you recall
16  that?
17  A.   I remember that there were proposals on that.
18  I don't remember if it was ever implemented.
19  Q.   You don't know if that regulation was ever
20  implemented?
21  A.   I don't remember. I know there was
22  proposals.
23  Q.   Focus on the time frame from 1991 through
24  1998. Can you tell me what the reimbursement protocol
25  was for Medicare?

274

1           MS. TABACCHI: Object to the form. For
2   what?
3           THE WITNESS: Yeah.

Page 40

Tobiason Virginia - Vol  2

```
18            MS. TABACCHI:  Object to the form.
19      A.    Higher or lower.  I -- I just don't know.
20      Q.    (BY MR. HAVILAND)  Okay.
21      A.    I don't -- I don't ever quantify those costs.
22      Q.    You say in the next bullet there,
23  "disincentives to use higher cost, more effective
24  drugs because of reimbursement limits."
25      A.    Uh-huh.
```

311

```
1       Q.    "This could have a serious impact on patient
2   care.  I would think TAP or Renal could use this
3   argument effectively."  By "TAP" you mean TAP
4   Pharmaceuticals?
5       A.    Oh, yes.
6       Q.    And by "Renal" you're referring to?
7       A.    Renal -- Renal Product.
8       Q.    Two divisions?
9             MS. TABACCHI:  Object to the form.
10      A.    No.
11      Q.    (BY MR. HAVILAND)  You're referring to the
12  two divisions at Abbott, TAP and Renal?
13            MS. TABACCHI:  Object to the form.
14      A.    Renal is not a division.
15      Q.    (BY MR. HAVILAND)  What was it at this time?
16      A.    It was an operating -- operating unit.
17      Q.    An operating unit.
18      A.    I believe, yes.
19      Q.    As opposed to a division?
20      A.    A division would have been Hospital Products.
```
Page 74

Tobiason Virginia - Vol 2

21   Q.   What's the difference between an operating
22   unit and a division?
23   A.   Operating unit is in a division.
24   Q.   I see. So Renal was part of HPD?
25   A.   Yes.

312

1    Q.   All right. Why did you think that the
2    argument of having a serious impact on patient care
3    could be effectively used by TAP?
4    A.   I was -- you know, I don't recall what I
5    meant by this. I -- I think that I would have -- that
6    there could be some potential, depending on -- I mean,
7    access to drugs.
8    Q.   How so?
9    A.   To make --
10   Q.   Let me ask you this. TAP had Lupron at that
11   time, 1981?
12   A.   Yes.
13   Q.   It had no other drug products?
14          MS. TABACCHI:   Objection, foundation.
15   A.   Not that I know of.
16   Q.   (BY MR. HAVILAND) So, in your mind, Lupron
17   was a higher cost, more effective drug?
18   A.   That -- I thought -- as much as I know, I
19   didn't -- I wasn't involved in the clinical side, but
20   I think -- I always heard that Lupron was an effective
21   drug for treating certain conditions.
22   Q.   And you thought that if Medicare put
23   reimbursement limits on the order that it suggested

Tobiason Virginia - Vol 2

24   here, 85 percent of AWP or EAC, that might impact on
25   TAP's business?

313

1                MS. TABACCHI:  Object to the form.
2       A.   I'm saying here it could have an impact on
3    patient care.
4       Q.   (BY MR. HAVILAND)  And what I'm asking you is
5    you thought that that might impact -- that the payment
6    limits might impact TAP's -- TAP's business?
7                MS. TABACCHI:  Objection, asked and
8    answered.
9       A.   I think I'm saying here that -- that we want
10   to make sure that -- that the appropriate products are
11   available to patients.
12      Q.   (BY MR. HAVILAND)  How would payment limits
13   restrict the product to patients for TAP?
14               MS. TABACCHI:  Object to the form.
15      A.   I -- I -- I -- I don't remember -- well,
16   there -- there are ways CMS can -- has used different
17   methodologies to compare to price drugs, combining
18   different drugs in one category, and that can mean
19   that doctors may pick one drug over another.
20      Q.   (BY MR. HAVILAND)  Based on how much they can
21   profit from the various drugs?
22               MS. TABACCHI:  Objection.
23      A.   No.
24      Q.   (BY MR. HAVILAND)  Based on what then?
25      A.   Make sure they cover their cost.

```
                    Tobiason Virginia - Vol  2
10     A.    I thought you meant 10 years.
11     Q.    -- to put us in place.  No.
12           So did her position beneath you overlap
13  your time as manager?
14     A.    Yes.
15     Q.    All right.  So in a hierarchy she was a
16  direct report to you?  Directly beneath you.
17     A.    At some times, yes.
18     Q.    Okay.  What about other times?
19     A.    She might have reported to a different
20  manager.
21     Q.    Who was that?
22     A.    Alice Bonick.
23     Q.    Allies who?
24     A.    Alice Bonick.
25     Q.    Okay.  Is she still with Abbott?
```

                                                            340

```
1      A.    I don't know.
2      Q.    All right.  Do you know if at any point in
3   time she went to work for TAP?
4      A.    Yes, I think she -- I think I recall that,
5   yes.
6      Q.    Okay.  Do you remember when that was?
7      A.    No.
8      Q.    Do you know if she left her position beneath
9   you as a reimbursement specialist to go to TAP?
10     A.    I think so, yes.
11     Q.    Do you know how she came to get that job?
12     A.    No.
```

Page 100

Tobiason Virginia - Vol 2

13  Q.  I'm sorry.  Did you -- did you tell me you
14  knew that her name actually did change to Chichillo?
15  A.  Yes.
16  Q.  Do you know when she got married?
17  A.  Yeah.  I went to her wedding.
18  Q.  I figured as much.  All right.  And you don't
19  know when she left the Abbott family of companies?
20  A.  No.
21           MS. TABACCHI:  Object to the form.
22           MR. HAVILAND:  I'm going to go ahead and
23  mark as our next exhibit 759.
24           (Exhibit 759 marked)
25           MS. TABACCHI:  Okay.  Don, this is

341

1   another TAP document that is marked confidential by
2   TAP.
3            MR. HAVILAND:  Right.
4            MS. ST. PETER-GRIFFITH:  The government
5   renews its agreement, frankly, for any TAP document
6   introduced in this case to continue the protection of
7   the existing CMO and protective order.
8   Q.  (BY MR. HAVILAND) Ms. Tobiason, I'm showing
9   you what I've marked as Exhibit 759.  They are notes
10  from a meeting that took place in November of 1993, as
11  identified by a TAP corporate designee.  I'm showing
12  you this for the purpose of -- by the way, they are
13  the notes of Maureen McShane, as they were identified
14  by TAP's designee.
15           I want to direct your attention to the

Tobiason Virginia - Vol 2

16    second to the last page, if you will. Do you see
17    that? It's Bates number 6500380.
18        A.   Yes.
19        Q.   Okay. If you look up from there you'll see a
20    circle. It says "Talk to Nancy/Ginny Tobiason." Do
21    you see that?
22        A.   Yes.
23        Q.   All right. Now, I want to go through this
24    page with you. You see at the top it says, "Set up in
25    prostate cancer" with an arrow "Can build on" and then

342

1     it says "Medicare." January 1991 with a hash over,
2     AWP. And it says, Medicare reform - lower of
3     estimated acquisition cost, abbreviated, or AWP. You
4     with me so far?
5         A.   Yes.
6         Q.   All right. And you see the arrow swoops down
7     and then it says, "How do you establish this? HCFA
8     said you will have to consider breakage, etc. We'll
9     get back to you on how to do this. OAG reports on how
10    to establish" -- I don't have the rest of that. It
11    says, "for the" -- "for the" -- go off to the margin
12    where it says, "What is doctor required to submit."
13    You have that?
14        A.   Yes.
15        Q.   And then it says in the circle, "default
16    AWP." And both of those boxes then relate to the box
17    that says, "Talk to Nancy/Ginny Tobiason."
18                 Now, my question is, does this refresh

Tobiason Virginia - Vol 2

19   your recollection having a conversation with
20   Ms. McShane or Nancy Sattelberg about what doctors are
21   required to submit to Medicare as part of the OBRA '89
22   amendments?
23            MS. TABACCHI:  Object to the form.
24       A.   No.
25       Q.   (BY MR. HAVILAND)  Beneath that it says,

343

1   "What our goal is is to give back to doctor his
2   numbers."  Do you see that?
3            MS. TABACCHI:  Object to the form.  I
4   can't read that myself.
5       A.   It's hard to read.  I don't know -- I assume
6   that's what -- if you say that.
7       Q.   (BY MR. HAVILAND)  Does that refresh your
8   recollection about the subject matter discussed in
9   these notes with Ms. McShane?
10           MS. TABACCHI:  Object to the form.
11      A.   No.
12      Q.   (BY MR. HAVILAND)  Do you know why
13  Ms. McShane would have reached out to you or Nancy
14  Sattelberg for answers to questions about what doctors
15  are required to submit to Medicare?
16      A.   No.
17           MS. TABACCHI:  Object to the form.
18      Q.   (BY MR. HAVILAND)  If you go to the first
19  page.  I want to direct your attention to -- right
20  after it says "11/2" it says, "Document program:
21  Aggressive financial selling."  Do you see that?

Tobiason Virginia - Vol 2

22  A.  Yes.
23  Q.  And then beneath there it says "7.5" and
24  "3.75." Are you aware that Lupron had two dosages at
25  the time, 7.5 for men and 3.75 for women?

344

1           MS. TABACCHI:  Object to the form.  Lack
2   of foundation.
3       A.  No.
4       Q.  (BY MR. HAVILAND)  You weren't aware of that?
5       A.  No.  I didn't -- didn't -- I wasn't involved
6   with Lupron.
7       Q.  All right.  Are you aware that TAP -- TAP
8   actually had laptop computers that promoted the drug
9   products to providers in terms of the spread doctors
10  could realize?
11          MS. TABACCHI:  Object to the form.  Lack
12  of foundation.
13      A.  During this time period?
14      Q.  (BY MR. HAVILAND)  Yes.  And by that I mean
15  1991 through 1993.
16      A.  No.
17      Q.  You weren't aware of that?
18      A.  No.
19          MR. HAVILAND:  Let me go ahead and mark
20  Exhibit 760.
21          Hold those notes there for a second.
22          (Exhibit 760 marked)
23      Q.  (BY MR. HAVILAND)  I'm showing you what I
24  have marked as 760, which comes a month after the

Page 104