UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION

THIS DOCUMENT RELATES TO:

*United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*
CIVIL ACTION NO. 06-11337-PBS

MDL No. 1456
Civil Action No. 01-12257-PBS

Hon. Patti B. Saris

Magistrate Judge Marianne B. Bowler

# EXHIBIT H

To The United States Response To Third-Party TAP Pharmaceutical Product, Inc.'s Motion to Clarify Paragraph Six of the Court's September 7, 2007 Order

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) |
| United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc., and Hospira, Inc. CIVIL ACTION NO. 06-11337-PBS | ) Hon. Patti Saris |

******************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) Civil Action No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) |
| State of Arizona v. Abbott Labs., et al. Civil Action No. 06-CV-11069-PBS | ) Judge Patti B. Saris |

******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
VIRGINIA TOBIASON

HIGHLY CONFIDENTIAL

March 28, 2007

Volume 1

******************************************************

4bee3001-1763-447c-9971-2ec60b39d527



JUN 11 1991

INTEROFFICE CORRESPONDENCE

FROM: Virginia Tobiason
Manager, Reimbursement
DEPT: D-H56 BLDG: J14 EXT: 7-0768

TO: B. Dempsey
M. Heggie
M. King
D. Robertson
J. Ward

DATE: June 11, 1991

On June 5th HCFA published the proposed rule on physician payment reform. This rule included a proposal to lower the payment for drugs "incident to" a physician's services to Average Wholesale Price (AWP) minus 15%. In effect, this rule will change reimbursement for all Medicare Part B injectable drugs, including renal, pain management and home chemotherapy. I have attached a copy of the section of the rule pertaining to the drug fee schedule. The following is a summary of some of the key issues.

Current Policy

- Medicare currently reimburses drugs either based on reasonable charges or the drug cost based on A.W.P. as published in Redbook. Each Medicare intermediary/carrier has the discretion to determine the reimbursement level with some paying below A.W.P. and others paying above A.W.P.

Major Issues

- There is a question whether HCFA has the authority to limit reimbursement for these drugs through regulation. It can be argued based on the Medicare statute that such a change requires Congressional approval.
- In the proposed rule, HCFA indicates that they are going to consider establishing national drug fee screens in the future. This is definitely the start of national "drug pricing" controls.
- Also included in the rule is a proposal to reduce even further the payment for very high volume drugs. This would be limited to the lower of the estimated acquisition cost as determined by HCFA or 85% of A.W.P. HCFA will publish a list of these drugs and the reimbursement rates in the Medicare carriers manual. Drug Manufacturers will then be excluded from input into the decision on which drugs will be included and the reimbursement level. This list should be open to a 60-day comment period.
- HCFA is seeking comments on the level of discount. I believe there are a number of arguments we can use in response. Some of these are as follows:
  - Discounts vary among purchasers. Some providers may pay full A.W.P. and others may get a discount but not a full 15% due to manufacturers discounting practices.

1992 plan – quantitative model pricing strategy
* how much covered by Medicare
* what stance do we want to take
Adria products

MEMO12.DOC/1

ABT212051

EXHIBIT 757
WIT: Tobiason
DATE: 5-15-07
Cynthia Vohlken

- Actual drug costs are not the only costs to be considered when establishing a drug fee screen. Others include waste, breakage, inventory costs and drug procurement costs. Also bad debt needs to be considered since Medicare only covers 80% of the drug cost.
- There are disincentives to use higher cost, more effective drugs because of reimbursement limits. This could have a serious impact on patient care. I would think TAP or Renal could use this argument effectively.

Comments are due by 5 p.m. on August 5th. I have scheduled a meeting for Friday, June 14th, in the HomeCare Conference Room from 8:00 a.m. to 9:00am, to discuss this further.

propose to determine national average allowed charges for these supplies. We are also in the process of obtaining catalogs from national surgical supply companies to review information on list prices for the supplies for which we are considering allowing a separate payment. Based on our analysis of these data performed thus far, we expect to establish a fee schedule payment amount for selected supplies used for a facility-based procedure when it is performed in the physician's office. We are also considering limiting this proposed policy to only ASC procedures or to some other subset of procedures. We will continue to study this issue, and invite comments on the proposed policy.

We are especially interested in receiving comments on the issues of (1) our method of establishing fee schedule amounts for these office medical supplies, (2) the content of the list of office medical supplies for which we propose to provide separate payment, and (3) whether payment for such supplies, if made, should be limited to procedures on the ASC list or some other subset of procedures. Commenters who want additional office medical supplies to be placed on this list should provide a specific rationale for why the supply should not be considered to be routine practice expense and should provide supporting information on the cost of the office medical supply to physicians. Reference to items such as "trays" or "packs" should itemize the specific contents.

*b. Services furnished incident to a physician's service.* We propose in § 415.32(b) that services of nonphysicians that are covered as incident to a physician's service would be paid under the fee schedule as if the physician had furnished the service. This is a continuation of current practice under reasonable charge payment in which the physician bills reasonable charges for the services of staff that are incident to the care as if the physician had furnished the services personally. These services and [illegible] typically include the services of [illegible] professionals such as [illegible] or PAs who furnish a service under the direct supervision of a physician for which the physician bills. For example, a registered nurse under the supervision of a physician may see a patient on the physician's behalf to administer an injection. The physician would bill for the injection as if the physician had administered it. Several CPT codes (for example, minimal established office visits and physical medicine codes) acknowledge these arrangements.

We request public comment on whether the policy of paying the same amount for the service whether furnished personally by a physician or by someone incident to a physician's service should continue. The salary of the nonphysician staff is a practice expense and the physician work in these services is arguably non-existent or at least something less than if the physician furnished the service directly. Because physicians bill for these services as if they furnished them personally, we do not know to what extent these services furnished by physician staff without a patient encounter are billed and paid as physician services. We are considering whether to require use of a modifier when these services are furnished by physician staff so that we can evaluate both their frequency and the amount of payments made for them.

*c. Drugs.* The program currently pays for drugs furnished in physician's offices that are not self-administrable under the "incident to" provision set forth in section 1861(s)(2) of the Act. For the most part, drugs paid for under the "incident to" benefit consist of drugs furnished by injection or by infusion. This includes chemotherapy agents. Generally, carriers base payment for the drug on the physician's estimated cost of the drug using one of the wholesale price guides such as the Red Book. However, some carriers base payment on actual acquisition costs determined on the basis of carrier surveys.

We considered the following options for paying for drugs under the fee schedule:

Option 1—Establish a fee schedule payment amount for each drug.
Option 2—Bundle the payment for the drug into payment for the visit or consultation service.
Option 3—Make a separate payment for a drug and leave the pricing of the drug to each carrier.
Option 4—Make a separate payment for a drug but require a consistent method in pricing to be used by the carriers.

We believe that ultimately there should be a national fee schedule allowance for all "incident to" drugs. However, given the large number of different drugs and the myriad of dosage levels, we have decided that it is not practical for us to consider establishing a national drug fee schedule at this time. However, we will consider this issue in the future. Section 1848(j)(3) of the Act gives us the authority to specify that items and services be excluded from the fee schedule. Thus, we have decided to exclude the cost of drugs from the national fee schedule and to continue to pay for them under the current "reasonable charge" system. We believe, however, that there is a need for greater consistency in how drugs are paid for under the program and for this reason we have chosen Option 4. For purposes of payment for drugs furnished incident to a physician's service, the term "drug" includes those covered drugs and biologicals that cannot be self-administered. Also, we are proposing that we will instruct all carriers to base payment for drugs on 85 percent of the national average wholesale price of the drug (as published in the Red Book and similar price listings), but we welcome comments regarding the appropriate discount.

Medicare policy, since the beginning of the Medicare program, has been to base payment for "incident to" drugs on the estimated acquisition costs. However, based on studies by the Office of the Inspector General (OIG) ("Changes to the Medicaid Prescription Drug Program Could Save Millions" (ACN 06-40216) and "Use of Average Wholesale Prices in Reimbursing Pharmacies in Medicaid and the Medicare Prescription Drug Program" (A-06-89-00037)) and other information, we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs. The OIG reports indicate that pharmacies are getting an average discount of 15.9 percent off the published wholesale price. We have no reason to believe prices paid by physicians are any higher than pharmacies pay. Moreover, we are proposing for very high volume drugs that payment for the drug would be limited to the lower of the estimated acquisition cost for the drug as determined by us and specified in instructions to carriers or 85 percent of the national average wholesale price for the drug. The listing of the high volume drugs and payment limits for them will be included in the Medicare Carriers Manual.

We propose this payment policy for drugs that are incident to physician services under the authority of section 1842(b)(8) of the Act, which permits us to establish limits on charges based on inherent reasonableness. This provision of the law is implemented in regulations at § 405.502(g). The regulations permit us to establish a limit on the reasonable charge for an item or service if we determine that charge is grossly lower than or in excess of acquisition or production costs for the item or service (§ 405.502(g)(1)(vii)).

As indicated in our previous discussion, we base the payment

ABT212053

ABBOTT

BMW035-3496



limitation for drugs on the findings of the OIG with regard to the discounting of drugs to pharmacies below the average wholesale price. We believe that physicians also have the opportunity to achieve these discounts from drug manufacturers and wholesalers, since drug sales are dependent upon the drugs a physician prescribes for his or her patients, not only for administration in the physician's office, but also for self-administration or administration in a hospital or other institution. Therefore, we believe that physicians are in an excellent position to demand discounts such as those that the OIG study finds are typically given to pharmacies.

We believe that the impact of this special charge on physician services will be minimal because the drugs to which this provision applies are incidental to the physician's professional services and, to be covered, the law requires that they be "* * * of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills," (section 1861(s)(2)(A) of the Act). Since the physician has great leverage with the entity from which he or she purchases drugs to acquire a significant discount for the drug, we do not anticipate that there will be an adverse effect upon quality, access, beneficiary liability, assignment rates, reasonable charge reductions on unassigned claims, and participation rates of physicians.

Currently, the program usually pays a separate charge for an injection by a physician or by other health personnel incident to a physician's service (see the Medicare Carriers Manual, section 5202). If the customary practice in the area is not to charge for the injection furnished in the course of a visit, no payment is currently made for the injection. If the purpose of a visit is only to receive an injection, payment for the injection is made and payment for the visit is not allowed. If special skills are needed for the injection, payment is made based on the reasonable charge practices in the area (the Medicare Carriers Manual, section 5202.2). We propose to change this current policy with implementation of the fee schedule. In general, when a physician provides a visit or other service to a beneficiary and, in the course of that encounter, the beneficiary also receives a subcutaneous, intramuscular, intravenous, or intra-arterial injection, no additional payment would be made for the administration of the injection. The drug would be paid separately as discussed above. Payment for both the cost of non-drug supplies and administration of the drug would be included in the payment for the visit or other service. Generally, if a beneficiary receives an injection, we expect that the physician would bill for a minimal office visit. We believe it is rare when a beneficiary who needs an injection does not also need at least a minimal level of involvement of a physician as part of the service.

In those unusual circumstances in which no evaluation and management service or other service is furnished to the beneficiary and the physician bills only for the injection (for example, a routine B12 injection for pernicious anemia), payment for the injection would be based on the RVUs for the applicable injection code.

This general policy would also apply to subcutaneous, intramuscular, intravenous, and intra-arterial injections for purposes of cancer chemotherapy. However, infusion of cancer chemotherapy drugs (CPT 96410, 96412, 96414, 96422, 96423, 96425) and administration of cancer chemotherapeutic agents into specialized body cavities (CPT 96440, 96445, 96450) are considered to be procedures, not injections, for purposes of this policy. Therefore, we propose to pay separately for chemotherapy infusions and chemotherapy administration into specialized body cavities regardless of whether these services occur during a visit, infusion of another drug, or while another service is furnished. We would also pay separately for drugs and chemotherapy agents as discussed in this section.

Of course, when cancer chemotherapy is administered to a hospital patient by personnel other than those practitioners authorized to bill separately under Part B for their professional services (that is, a physician, PA, NM, CRNA, or CP), the chemotherapy administration is a hospital service and cannot be billed by a practitioner. Chemotherapy administration can be billed by a physician only when it is furnished by the physician or staff outside a hospital setting. Chemotherapy furnished by the physician's staff may be paid by Medicare only when the requirements for coverage as "incident to a physician's service" contained in Medicare Carriers Manual, section 2050 are met. The proposed regulations for the payment of drugs beginning January 1, 1992 appear in new § 415.34.

*B. Formula for Computing Payment Amounts*

Section 1848(a) of the Act specifies that payment for Medicare physicians' services must be based on the lesser of the actual charge or the payment amount computed under the fee schedule. Although the law refers to the fee schedule values as "payment amounts," in fact under the statutory formula the amount paid to a physician (often referred to as the "allowed charge") would be 80 percent of the actual charge or 80 percent of the fee schedule payment amount, whichever was less. The beneficiary is required to pay the remaining 20 percent. Throughout the preamble of this proposed rule and in the proposed regulation itself, we have used the terms "fee schedule payment amount," "payment amount," and "payment" as used in the statute to include the amounts for which both the beneficiary and Medicare are responsible.

Under the formula set forth in section 1848(b)(1) of the Act, payment amounts for particular services under the physician fee schedule would be computed as the product of three factors: (1) A relative value for the service, (2) the GAF for the fee schedule area, and (3) a nationally uniform dollar CF. (Although we generally describe a single nationally uniform CF, different CFs for surgical services and other services may be established as part of the Medicare volume performance standards (MVPS) and annual update process. (See section IV.E.4. for further explanation.) This general formula can be expressed as:

$$Payments = RVUt_s \times GAFt_{fs} \times CF$$

where

RVUt = Total relative value units for the service

GAFt = Total geographic adjustment factor for the fee schedule area

CF = Uniform national conversion factor

$_s$ = Service

$_{fs}$ = Fee schedule area

Section 1848(e)(2) of the Act requires the total GAF for a fee schedule area be the sum of three components, relating to the three components of the total RVU for a service. The three components are: (1) Physician work; (2) practice expenses or overhead such as rent, staff salaries, equipment, and supplies, exclusive of professional malpractice liability insurance costs; and (3) professional liability insurance or malpractice costs.

Section 1848(c)(1) of the Act defines the components of the RVU for a physician service. The physician work RVU must reflect the physician resources required to furnish the service, including time and intensity of effort. Under the formula specified at section 1848(c)(2)(C), the practice expense and malpractice RVUs are based on

ABT212054

ABT2120055


Ginny
• Composite rate
institutional provider
• part A / B
• update on Medicaid rebate
• Medicaid rebate update
Burris