# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLASS ACTIONS | CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**CORRECTED[1] [REDACTED] REPLY MEMORANDUM CONCERNING
THE APPOINTMENT OF CLASS COUNSEL FOR THE TRACK 2
CLASSES PURSUANT TO FED.R.CIV.PROC. 23(g),
AND CLASS COUNSEL'S SUBMISSION DATED SEPTEMBER 18, 2007**

---

[1]This pleading corrects certain non-substantive errors contained in the original pleading filed October 1, 2007 [at Docket No. 4762].

# Table of Contents

**Table of Contents**

I      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.   \_FACTUAL RECORD RELEVANT TO THE BERMAN GROUP'S RULE 23(G) APPOINTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    The *Lupron* litigation, MDL 1430 . . . .8

    B.    The Berman Group's Wholesale Mismanagement and Deceptive Conduct in *Average Wholesale Price Litigation*, MDL 1456 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

        1.    Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

            a.    The GSK Settlement . . . . . . . . . . . . . . . . . . . . . . . . .14

            b.    The AstraZeneca Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            c.    The BMS Settlement . . . . . . . . . . . . . . . . . . . . ...... 16

        2.    Litigation Mis-Management by The Berman Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

            a.    The Berman Group now claims that HLF is not Co-Lead Counsel, despite having asserted otherwise countless times before now. . . . . . . . . . . . . . . . . . . . 18

            b.    Failure to provide pre-filing notice under State consumer fraud laws . . . . . . . . . . . . . . . . . . . . . . . .22

            c.    Failure to proffer to the Court a known, available Class 1 representative for Schering, leading to the dismissal of the Class 1 case against Schering in its entirety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

            d.    Acting contrary to the best interests of the consumer clients and the Class . . . . . . . . . . . . . . . . . . . . . . . . .25

        3.    Conduct of Class Litigation and Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        4.    Pursuit of Exorbitant Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    C.    Other Cases Involving Members of The Berman Group, Yet Ignored by It. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

        1.    *Poland Spring* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35

        2.     *iPod Nano* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**39**

        3.     *First American Title* Case . . . . . . . . . . . . . . . . . . . . . . . . . .**40**

   **D.**     **The Factual Record Concerning The Haviland Law Firm, LLC**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

        1.     **The *Local 68* case in New Jersey**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**

        2.     **The *Bridgeport Fire* Litigation in Pennsylvania**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

        3.     **Other Miscellaneous Issues Pertaining to this Case**
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**

**III.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**

## I.   <u>INTRODUCTION</u>

As the Court is aware by now, The Haviland Law Firm, LLC ("HLF") has withdrawn its Motion for Appointment pursuant to Rule 23(g) of the Federal Rules of Civil Procedure[2] due to the standing of most of its clients to represent Track 2 consumers being rendered moot by this Court's rulings and the irreconcilable conflict that has arisen with other class counsel.[3]   Nonetheless, the issue of appointing adequate class representatives and counsel for all of the Track 2 Sub-Classes remains.[4]   This Reply Memorandum to the submissions by The Berman Group[5] is

---

[2] *See* The Haviland Law Firm LLC's Notice of Withdrawal as Class Counsel filed contemporaneously herewith.

[3] The original firms appointed as interim class counsel for the Track 2 classes pursuant to CMO 1 included, but were not limited to, Hagens Berman, Spector Roseman & Kodroff, Wexler & Associates and Hoffman & Edelson.  These firms are referred to herein collectively and appropriately as "The Berman Group." (Other firms originally appointed as interim class counsel included, *inter alia*, Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser"), Heins, Mills & Olsen, P.C. ("HMO"), Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("Cohen Milstein") and Milberg Weiss Bershad Hynes & Lerach, LLP ("Milberg Weiss")).While The Berman Group charges it is "false and misleading" to refer to them as "interim class counsel," to date there has been no class ruling on Track 2, or Rule 23(g) appointment of them alone as class counsel, to suggest otherwise.  Class Counsel Submission at 13.

[4] As with Track 1, the Track 2 Sub-Classes include the Class 1 Medicare Beneficiary Sub-Class, the Class 2 Medicare TPP Sub-Class, and Class 3 TPP/consumer Sub-Class.  Since this case was first filed in May 2001, The Berman Group has proferred only one consumer class representative, Robert Townsend, on behalf of Class 1 Medicare beneficiaries who were prescribed AstraZeneca's Zoladex.

[5] The Berman Group filed two pleadings last week to which this pleading responds: (1) Class Counsel's Submission Regarding Mr. Haviland's Participation as Co-Lead Counsel ("Class Counsel Submission") and (2) Class Counsel's Response to the Misrepresentations Contained in the Supplemental Memorandum of The Haviland Law Firm, LLC in Support of Motin for Appointment as Class Counsel for the Track 2 Consumer Sub-Classes Pursuant to Fed.R.Civ.P.

required for two reasons: (1) to respond to the baseless allegations by The Berman

Group which seek to impugn the undersigned's integrity and smear HLF's reputation,

and (2) to provide this Court with a more complete factual record[6] by which it may

fulfill its fiduciary duty to select adequate representatives to protect the interests of

the Class.[7]

     The evidence bearing on The Berman Group's fitness to serve as consumer

class counsel reveals that certain members of The Berman Group have engaged in a

---

23(g)("Class Counsel Response").

[6] Since The Berman Group has made no attempt to rebut with evidence any of the verified facts set forth in HLF's prior submissions, such facts must be deemed admitted for purposes of this Court's Rule 23(g) determination.

[7] On September 11, 2007, the Court said it did not "know the little nuances and niceties" between HLF's split from Kline & Specter "until it was briefed." Hearing Transcript at 26:19. Respectfully, the implications of HLF's split from Kline & Specter still have not been briefed, nor is this split any longer relevant to the Court's class consideration. What is relevant are the "little nuances and niceties" of, *inter alia*, Mr. Sobol's split from Lieff Cabraser [and his taking the position of "Liaison Counsel" with him without express Court approval], the various firm changes conducted by Messrs. Wexler and Edelson [taking the title "Co-Lead" with them], the apparent departure from the case of other highly qualified Lead Counsel (including Leiff Cabraser, HMO, Cohen Milsetin, and Milberg Weiss), the deliberate misconduct of Co-Lead Counsel in *Lupron*, *Poland Spring* and *iPod Nano*, and their pattern of lies, deceit and misconduct in this litigation.

     The undersigned has seen enough misconduct in this case by The Berman Group to know that, even if all of HLF's consumer clients had standing to pursue claims on behalf of the classes alleged in this litigation, it would be folly to join a leadership structure controlled by attorneys who continually breach their ethical obligations to this Court and the classes they represent. (The mass exodus of other respected class action law firms from the Rule 23(g) consideration speaks volumes about those firms they left behind.) The instant Reply Memorandum is only intended to present the Court with a counterstatement to the inaccurate picture The Berman Group has tried to paint about themselves and the undersigned.

pattern of deceit against courts, clients and parties in this and other class action litigation, including the following:

- diverted millions of settlement dollars from Lupron cancer patients to their rich TPP clients and friends in the *Lupron* case, by, among other things, having Dr. Hartman put forth an erroneous damage methodology that ignored consumers' co-insurance payments under Medicare Part B;

- lied to Judge Stearns about their undisclosed payoff of the lone TPP objector to the *Lupron* settlement in order to get the settlement approved, and then tried to cover up this lie by resisting Judge Stearns' directive to file a public accounting as to their illicit payments out of the class settlement fund;

- were accused by their own clients of committing malpractice and breach of fiduciary duty, **not once, but twice**, in class action lawsuits, and were prosecuted for the same by Robert Kennedy, Jr. who described their work on his behalf in the case as "not a case of the attorneys taking care of consumers.  This was a case of the attorneys grabbing everything they could for themselves;"

- in the *Poland Spring* litigation, were sued for breaching their ethical obligations to some of their former clients, were found to be liable by a jury for the same, and then settled with their former clients before punitive damages could be assessed against them;

- during the pendency of their motion for appointment as class counsel in this case, failed to disclose to this Court that they had been found liable by a Maine jury for breaching their ethical duties to their former clients, a fact which is directly relevant to their fitness to represent class members;

- had such complete disregard for the rights and interests of their individual clients that they inspired one former client to write an entire exposé book about them, entitled *First American Title to Injustice*;

3

-   failed to disclose to this Court that conflicted GSK settlement allocation counsel for TPPs, after negotiating an allocation for TPPs, threatened to lead a massive opt-out that would blow the deal unless they and their clients were paid off with settlement funds, and then tried to conceal what one of them described as a settlement process that ███████ ████████████ by substituting somebody else's name as allocation counsel for TPPs in the settlement papers;

-   lied to the Court repeatedly about the so-called "consent" by the undersigned and his client to the proposed AstraZeneca settlement;

-   misrepresented to this Court that fees were negotiated separately from other settlement terms in the AstraZeneca settlement, and only abandoned this lie when confronted with their own statements in emails demonstrating that they had in fact negotiated a hefty "Quick Pay" fee for themselves at the same time they negotiated other settlement terms;

-   lied to this Court about the BMS settlement **not** including 2004 purchasers, (which would have eliminated the lone certified class representative, and client of the undersigned, Reverend Aaronson), only to have BMS dispute this lie six (6) days later by confirming that 2004 purchasers **are** in fact included in the BMS settlement;

-   broke their promise to the Court to produce the BMS settlement agreement by August 2, and ignored this Court's directive to keep the undersigned "in the loop," as they scrambled to fix the problem of having lied to the Court about the time period covered by the proposed BMS settlement and as they unilaterally sought to replace the certified Class 1 representative Reverend Aaronson with a Stage 4 cancer patient (who has provided no supporting documentation proving her membership in the settlement class);

-   diverted tens of millions of dollars from millions of cancer patients *in this case* to their rich TPP clients and friends, by having Dr. Hartman replicate his erroneous damage methodology from *Lupron* that ignored consumers' co-insurance payments under Medicare Part B;

4

- fought to maintain Dr. Hartman's erroneous damage methodology in the face of irrefutable evidence that it overpaid TPPs, and then tried to slip the correction past the parties and the Court in an eleventh-hour supplement; and

- have coordinated behind the scenes with former Co-Lead Counsel since their departure to undermine HLF's position in this case and work on behalf of its clients, admittedly to the detriment of the consumer class.

## II.   FACTUAL RECORD RELEVANT TO THE BERMAN GROUP'S RULE 23(G) APPOINTMENT

### A.   The *Lupron* litigation, MDL 1430.[8]

The following material facts about The Berman Group in *Lupron* are unrebutted:

1. The Berman Group agreed to a reverse auction settlement that provided a 30% refund to consumers, despite overwhelming evidence in the case that the actual overcharges were considerably higher.

2. Thanks to the efforts of the undersigned and his colleagues, the *Lupron* Defendants ultimately agreed to a 50% refund, or more than 60% more than what The Berman Group had contended was "fair, reasonable and adequate" compensation for the losses suffered by consumers.

3. The eventual 50% recovery achieved for consumers – which The Berman Group have repeatedly held out to this Court as a stunning

---

[8] All of the members of The Berman Group who seek to be Track 2 Class Counsel were class counsel in *Lupron*.

achievement[9] – was obtained by the efforts of the undersigned and his co-counsel in state court, <u>not</u> The Berman Group.

4.      Apparently for no reason other than because The Berman Group told him to do so (as it conflicted with the actual evidence in the case), Dr. Hartman adopted a damage methodology in *Lupron* – for both litigation and settlement – which mis-allocated millions of dollars of consumer damages to TPPs.

5.      Dr. Hartman's error, and the inequity it has caused [and continues to cause] *Lupron* consumers, remains unresolved, despite repeated, unfulfilled promises by The Berman Group to resolve outstanding issues pertaining to the overall consumer class settlement fund in a timely manner.[10]

6.      Mirroring their disregard for the interests of both Mrs. Howe in the AstraZeneca settlement and Reverend Aaronson in the BMS settlement,[11] The Berman Group do not appear to have told their lone consumer class representative who testified at the Fairness Hearing, Mr. Porter, about the proposed settlement until more than a month ***after*** The Berman Group had submitted the settlement to Judge Stearns for preliminary approval, which he granted.[12]

---

[9] *See, e.g.*, Declaration of Jeffrey L. Kodroff [at Docket 4512], par. 7 ("In the Lupron settlement consumer class members received a full recovery of their single damages estimate at 50% of their out of pocket expenditures.")

[10] The *Lupron* case remains pending, and members of The Berman Group have continued to delay resolving consumer settlement fund issues for more than a year.

[11] *See* discussion below and in HLF's prior-filed papers.

[12] *Compare* Order Granting Preliminary Approval of Settlement dated November 24, 2004 *with* Testimony of Mr. Porter at Fairness Hearing, at 8:14-19 (at Exhibit "A" to the Declaration of Donald E. Haviland, Jr. In Support of the Reply Memorandum Concerning the Appointment of Class Counsel for the Track 2 Classes Pursuant to Fed.R.Civ.Proc. 23(g), and Class Counsel's Submission dated September 18, 2007 ("Haviland Reply Decl.")(Wherein Mr. Porter testifies that he did not believe he saw the *Lupron* settlement agreement until after Christmas 2004).

7.    As they have reported to this Court, The Berman Group promised to submit to Judge Stearns a proposal as to how to distribute any outstanding consumer settlement fund proceeds. To date, although more than $11 million remains to be distributed, no such submission has been made.[13]

8.    The Berman Group deliberately tried to conceal from Judge Stearns their accounting for the distribution of the *Lupron* settlement proceeds, including the payout of attorneys' fees,[14] which accounting, once ordered by Judge Stearns to be filed of record,[15] revealed that The Berman Group had improperly paid off the lawyers for the only TPP objector to the class settlement, and had lied about it to the Court, not once but twice, both in their proffer at the Final Fairness Hearing and in subsequent submissions to the Court. Such a deliberate, secret payoff of an objector to a class action settlement is, at a minimum, unethical and violative of the express provisions of revised class action Rules.[16]

---

[13] *See* July 19, 2007 Hrg. Tr. at 9:15; *See also* Supplement to Accounting Pursuant to the Court's Order of July 11, 2007 [MDL 1430 at Docket No. 516].

[14] *See, e.g*, May 15, 2006 Order for An Accounting [MDL 1430 Docket No.495]; June 21, 2006 Order [MDL 1430 Docket No. 499]("On May 15, 2006, the Court ordered an accounting from Class Counsel to be filed within thirty days, as to all funds paid out (including attorneys' fees and costs) from the Settlement Fund. Class Counsel filed an accounting on June 14, 2006, with a motion that the amounts of fees and costs paid to all class counsel for their services (set out in Ex. C) be kept under seal as 'the amount of fees paid and expenses reimburse to each law firm is confidential income information for the law firms, that need not and should not be made public.'").

[15] Judge Stearns disagreed with the rationale of The Berman Group for sealing their private fee dealings, and ordered counsel to "make a better case" within seven days. June 21, 2006 Order [MDL 1430 Docket No. 499], at 2. Unable to do so, The Berman Group capitulated but buried among the other payments to class counsel their improper $300,000 payment to the objector's counsel. *See* Notice of Withdrawal of Motion [MDL 1430 Docket No. 500].

[16] Fed.R.Civ.Proc. 23(e)(2)("The parties seeking approval of a settlement ... under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement..."); Rule 23(e)(4)(A)("Any class member may object to a proposed settlement..."); Rule 23(e)(2)(B)("An objection made under Rule 23(e)(4)(A) may be withdrawn only with the court's approval"). *See also* Advisory Committees notes to the 2003 Amendments, Subdivision (e)(2)("[The requirement of the statement] aims instead at related undertakings that, although

The Berman Group cites for perhaps the fourth time in their papers – as if repetition will make the argument more convincing – the language of Judge Stearns taking issue with the state court approved *Lupron* websites and the "Dear Client" letters sent to the Kline & Specter clients stating that, in the opinion of the undersigned, the settlement did not adequately compensate consumers for their losses. As has previously been noted, Judge Stearns ultimately recognized that the contribution in *Lupron* by the undersigned and his colleagues was a positive one – a fact that The Berman Group ignores. But more importantly, The Berman Group also fails to address their repeated misrepresentations and ethical breaches summarized above, and the fact that their misconduct in the *Lupron* litigation informs the question of their own fitness to represent class members in this litigation.

The Berman Group also continues to lie about the facts from the *Lupron* case, in the face of the uncontroverted evidence presented in the case. The evidence showed that the websites and specific web content Judge Stearns found to be offending had been established by Orders of two (2) state Courts entered over a year before The Berman Group consummated their reverse-auction settlement in MDL 1430.  Since both of these state courts had already certified classes – and the MDL

---

seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others.  Doubts should be resolved in favor of identification.").

had none – both courts reviewed and approved of the websites and their content as part of their approval of the overall class notice plans, including the banner stating "Welcome to the Class" that Judge Stearns found to be "blatantly misleading and deliberately intended to deceive," over a year later.  While the undersigned can not change Judge Stearns' finding at this juncture,[17]  The Berman Group's deliberate deception about the *Lupron* facts in this case will not go unchallenged.

For the first time, The Berman Group accuses the undersigned of seeking to disqualify Judge Stearns.  Such accusation is false; and the offense of the charge exceeds the bounds of decency, even for the likes of The Berman Group, whose members have demonstrated that nothing is out of bounds when it comes to their campaign of character assassination.  As many in *Lupron* knew at the time the Motion to Disqualify Judge Stearns was filed, the undersigned was away from Kline & Specter on a personal leave of absence attending to his terminally ill father, who passed away only weeks later.  If they didn't already know it, given their recent history of behind-the-scenes interactions with Kline & Specter, The Berman Group could easily have confirmed (if they wanted to) that the architects of the strategy to

---

[17] The Berman Group tries to make a point about the undersigned's alleged failure to appeal certain entered Orders in *Lupron*.  *See* Class Counsel Submission at 3.  The undersigned fought hard with Kline & Specter to preserve the right to appeal the above Order, but Kline & Specter traded away the right of appeal as part of the global settlement with Defendants which settlement achieved a 60% increase in consumer payments over what The Berman Group had agreed to.

remove Judge Stearns were the principals of Kline & Specter, acting with other attorneys at the firm and outside.[18]  Indeed, Kline & Specter (whose name does not appear on the Declaration) pressed a lawyer from another firm – one who was a member of the Kline & Specter Group but was not part of Kline & Specter – to sign the Motion to Disqualify Judge Stearns to make it appear as if Kline & Specter was not behind it.[19]  Before the Motion was filed, the lawyer who was asked to sign the pleading, raised the following concern:



Email dated February 2, 2005 at 10:28 a.m. e.s.t. at Haviland Reply Decl. Exhibit "GG".

 Undeterred, Kline & Specter wrote back:



---

[18] Whether they knew it or not, The Berman Group's baseless accusation is inexcusable.

[19] *See generally*, emails at Haviland Reply Decl. Exhibit "GG".  *See also*, Motion to Disqualify [at MDL 1430 Docket Nos. 315-317](in which Kline & Specter's name appears nowhere on the Declaration).

████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████

Email dated February 2, 2005 at 10:40 a.m. e.s.t. at Haviland Reply Decl. Exhibit "GG".[20]

## B.     The Berman Group's Wholesale Mismanagement and Deceptive Conduct in *Average Wholesale Price Litigation*, MDL 1456

### 1.     Settlements

#### a.     The GSK Settlement

The Berman Group has claimed several times that the undersigned never objected to anything about the GSK settlement.[21] These representations are false. As set forth in HLF's moving papers, the undersigned, while he was at Kline & Specter, objected to the involvement of counsel for large TPPs in the allocation of the GSK settlement – Attorneys Richard Cohen and Scott Simmer – after it was revealed to him [but was apparently known by other Co-Leads all along] that these lawyers intended to threaten to opt out of the settlement after the class allocation was consummated in order to obtain for themselves a separate deal providing for "quick

---

[20] Kline & Specter was so adamant that someone outside Kline & Specter sign the pleading, that when an associate at Kline & Specter mistakenly prepared a draft for Mr. Specter's signature, the associate was rebuked and ordered to have the outside lawyer sign it. *See* Haviland Reply Decl. Exhibit "GG".

[21] In their most recent submission, they claim the undersigned "did not assert the type of objections that he now brings." Class Counsel Submission at 9.

11

pay" payments for themselves and their clients.  The undersigned viewed such a ploy as akin to extortion, and raised objections about the same to the other Co-Leads.[22]  At one point, the undersigned suggested that these lawyers [and their clients, which included BC/BS Massachusetts] should be removed from the allocation process because of the obvious conflict.  The undersigned also proposed that full disclosure should be made to this Court about the unseemly tactics undertaken by these TPP lawyers.  The other Co-Lead counsel disagreed, however, and the matter was never brought to the attention of this Court.

Instead, certain members of The Berman Group appear to have discussed the matter among themselves about how they might substitute as nominal "TPP allocation counsel" someone who had never fulfilled such a role, but who did not have the same conflict of interest that Messrs. Cohen and Simmer had.  It was not until the GSK Settlement Agreement was finally produced to this Court last summer that it was revealed that The Berman Group had decided to conceal from this Court the fact that Messrs. Cohen and Simmer had acted as principal "TPP allocation counsel."  Instead, The Berman Group fraudulently listed "Jonathan Karmel" as "TPP allocation counsel," despite the fact that, unlike Messrs. Cohen and Simmer, Mr. Karmel did not attend any of the allocation meetings in person, did not engage in direct negotiations

---

[22] *See, e.g.*, Exhibit "B" hereto (collecting exemplar communications).

with consumer allocation counsel, and played only a minor role at most. Furthermore, The Berman Group listed Messrs. Cohen and Simmer as "ISHP Counsel," even though the "ISHP" group was created only <u>after</u> the GSK settlement allocation between consumers and TPPs had been completed, and only <u>after</u> Messrs. Cohen and Simmer threatened to opt their own clients out of the allocation they had negotiated for the TPP Class.[23]

The Berman Group promised to provide to this Court (and the undersigned back when The Berman Group at least pretended to respect the undersigned's status as Co-Lead Counsel) any agreement reached with Messrs. Cohen and Simmer as part of the resolution of their threatened opt-outs. *See* Exhibit "B."  Of course, true to form, no such agreement has ever been produced to either the undersigned or the Court.[24]  The undersigned has been apprised orally, however, that ISHP Counsel are to receive a whopping 15% share of Class Counsel fees out of the GSK Settlement.

---

[23] The Berman Group lied about this fact as well, representing to the Court that the allocation was among independent counsel representing consumers, TPPs and ISHPs.  Consumer allocation counsel, Attorneys Dianne Nast and Kent Williams, are witnesses to the fact that consumers only negotiated with TPPs, and not ISHPs.

[24] In fact, Mr. Berman concocted an elaborate story about how he allegedly deletes all his emails on a weekly basis, and thus could not share with the other Co-Leads the emails he sent to Cohen and Simmer negotiating and consummating the agreement reached. *See* Exhibit "B". This is despite the prior agreement reached amongst the Co-Leads to not negotiate a deal with Cohen and Simmer unless and until the same was fully vetted with and agreed to by all Lead Counsel. *See* Exhibit "BB". (Given the fact that this side agreement later evolved into the "ISHP" agreement presented to the Court as part of the overall GSK settlement, such agreement should have been fully disclosed to the Court pursuant to Fed.R.Civ.Proc. 23(e). *See supra.* n.14.

Still, without the fee agreement, this aspect of the settlement (and the unseemly process that preceded it) has been entirely unreviewed by the Court.

Members of The Berman Group were fully aware of their wrongful deception of this Court regarding the above material facts about the GSK Settlement.  On May 26, 2006, Attorney Wexler wrote to the other Co-Leads that the draft GSK Settlement Agreement (which then accurately listed Messrs. Cohen and Simmer as "TPP Allocation Counsel"), ███████████ because it had TPP allocation counsel also listed as counsel for the ISHP group, and thus revealed the lack of independent counsel acting for the constituent groups.  *See* Exhibit "C" hereto.  Rather than fix the problem, however, The Berman Group simply re-labeled Messrs. Cohen and Simmer as "ISHP Counsel" which they intended to conceal the fact that the settlement allocation process had been, in Mr. Wexler's words, ███████████ *Id.*

The embarrassing performance by The Berman Group at the Final Approval hearing held on July 19, 2007 underscores the inadequacy of The Berman Group.  In response to the Court's simple request to, "explain the basic contention and proof... what the initial case was about,"  not one of the half-dozen lawyers representing The Berman Group – all of whom sought collective fees of over $23 million – could provide a cogent response.  Mercifully, this Court let them off the hook, approved the settlement, and awarded them their fees.  *See* July 19, 2007 Hrg. Tr. at 13:24 - 18:5.

### b.    The AstraZeneca Settlement

The following material facts about the AstraZeneca settlement are unrebutted:

1.    Contrary to The Berman Group's earlier, "verified" statements to this Court, The Berman Group negotiated a one-third percentage-of-the-fund "Quick Pay" attorney fee award *simultaneously* with the other terms of the class settlement.

2.    Contrary to The Berman Group's earlier, "verified" statements to this Court, the named class representative, Mrs. Howe, through counsel, timely interposed objections to certain material terms of the AstraZeneca settlement before the May 4 mediation was held and the final settlement was consummated.

3.    Besides raising his concerns directly with The Berman Group, the undersigned raised his client's concerns about the AstraZeneca settlement directly with Mediator Green on at least three separate occasions, before May 4, on May 4, and after May 4.[25]

4.    Mrs. Howe and her counsel were taken out of the decision-making loop with respect to the AstraZeneca settlement negotiations during the critical settlement document drafting period of May 4 to May 21, 2007.[26]

---

[25] *See* emails dated February 6, 2007 and May 3, 2007 (at Haviland Supplemental Decl. Exhs. "C" and "I" ███████████████████████████ Haviland Supplemental Decl. at par. 25 █████████████████████████████████████████████ and Haviland Supplemental Decl. at par. 28 ███████████████████████████████████ ████████

[26] The Berman Group has admitted that "the parties were ***still*** negotiating into the evening on Sunday May 21, over ***important details*** (of the settlement, and) … it was still unclear just the evening before the papers were filed whether the deal would unravel."  Class Counsels' Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca ("Class Counsel Opp. To Reconsideration"), at n.4, p.14 [emphasis in original].  Interestingly, however, Mr. Edelson appears to take a contrary view in his Declaration, claiming that "Mr. Haviland and I left the mediation after all of the substantive terms were agreed to."  Edelson Decl.at 6 [Docket No. 4514].

5.      The Berman Group has represented to this Court that they too spoke with Mr. Green and promised that Mr. Green would attest to their claim that they did not negotiate their attorneys' fees simultaneously with the class settlement. Once again, the members of The Berman Group have broken their promise: no such attestation has ever been submitted, despite the many conversations over the last few months between The Berman Group and Mr. Green.[27]   Nevertheless, The Berman Group continues to assert that the undersigned never objected to the proposed AstraZeneca settlement, without even attempting to rebut the overwhelming evidence demonstrating otherwise.

6.      The members of The Berman Group all deny noticing at the time that the undersigned's name, which had appeared in the draft Memorandum of Understanding ("MOU") circulated the day before, had been removed from the final MOU signed by each of them on May 4.   This fact, directly contradicts their assertions that the undersigned was on board with the AstraZeneca settlement is, in their words, simply a "mystery."[28]

### c.      The BMS Settlement

The following material facts about the BMS settlement are unrebutted:

1.      The Berman Group proceeded to engage in settlement negotiations without authority from the lone, certified consumer class representative, Reverend David Aaronson.[29]

---

[27] The Berman Group is either lying or being deliberately obtuse.  While Mr. Berman claims to have had extensive discussions with Mr. Green about his alleged "anger" about the disclosure of evidence rebutting The Berman Group's lies about the mediation, he still has seemingly never learned of Mr. Green's awareness of Mrs. Howe's concerns about the AstraZeneca settlement. *See* September 11, 2007 Hrg. Tr. at 20:22-21:10.  Or else, Mr. Berman has so learned, but he has simply failed to correct his prior misstatements to the Court.

[28] Declaration of Kenneth A. Wexler in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration at par. 4.

[29] This is exactly what they did in *Lupron*.  *See supra.* p.8-9.

16

2.      Although the Court had (at the time) recognized the undersigned as Co-Lead Counsel for the Track 1 Classes, and had admonished The Berman Group to keep the undersigned "in the loop,"[30] The Berman Group disregarded this Court's directive.

3.      The Berman Group has lied to this Court about the scope of the settlement Class – *ie.*, by representing that it excluded 2004 purchasers, like Rev. Aaronson, when it did not – in order to settle the BMS litigation out from under the only certified consumer class representative and his counsel.[31]

4.      *After* they had achieved an agreement in principle to settle Class 1's claims against BMS, The Berman Group "cherrypicked" names from the GSK Settlement Class database in order to solicit "replacement" consumer class representatives for Rev. Aaronson.[32]  Given that the proposed settlement apparently covers persons who, like Rev. Aaronson, have claims for purchases through 2004, there is no need to "replace" Rev. Aaronson, just as there was no need to replace the Aaronsons with respect to the GSK settlement (which also ran through 2004). Thus, the effort to replace Rev. Aaronson appears to have been motivated more by a desire to eliminate the need for consent from the certified class

---

[30] *See* Transcript of July 3, 2007 Hearing at 46:8-10 ("I think you need to bring Mr. Haviland in the loop so at least I know…").; 46:22-24 (." . . as long as he's still lead counsel, I think you have to let him know what's happening.")

[31] Despite what The Berman Group has said about the BMS class settlement excluding 2004 purchasers (like Rev. Aaronson), BMS has said otherwise.  *See* Defendants AstraZeneca and BMS's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Reconsideration of Class 2/3 Damages [Docket No.4440] at p.3 n.2 (representing to this Court that "[t]he consumers in Class 1 are not affected by plaintiffs' failure to pursue data post-2002.  Both AstraZeneca and BMS have agreed to settle the Class 1 claims under terms that provide for recovery through 2004.").  Either BMS or The Berman Group is not telling the truth.

[32] *See, e.g*, Plaintiff's Response to BMS' Notice of Lack of Class Representative as to Defendants Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp [Docket No. 4283] at Exhibit "1" (enclosing the 2007 CMS Medicare Summary Notice for proposed replacement BMS Class 1 representative, Agnes Swayze of Lancaster, California reflecting her receipt of GSK's Zofran (ondansetron hcl injection)).

representative and the undersigned, rather than to fulfill the Rule 23(a)(4) requirement of an adequate representative.

5.    The "replacement" representatives have never been produced, for depositions or otherwise (despite BMS' request for the same and this Court's Order granting the same)[33], and they have never been found to be adequate to represent any BMS Class.  One of them, sadly, is reportedly a Stage 4 cancer patient, which only goes to show the unseemly depths to which The Berman Group is willing to stoop to achieve their personal objectives.  *Id.* at 8:22-9:24.

6.    The Berman Group broke their promise to this Court to present the BMS settlement approval papers by August 2.  July 3, 2007 Hrg Tr. at 17:8-16.  To date, nothing has been produced, despite the Court's apparent misconception that such a submission had been made.  *See* August 27, 2007 Hrg. Tr. at 27:19-20 (inquiring "How have you not seen [the BMS settlement papers]?  Haven't I seen them?").

### 2.    Litigation Mis-management and Other Misconduct by The Berman Group

#### a.    The Berman Group now claims that HLF is not Co-Lead Counsel, despite having asserted otherwise countless times before now.

The Berman Group lambasts HLF for supposedly falsely claiming status as Co-Lead Counsel in this case, and for simply adopting the mantle of Co-Lead Counsel upon Mr. Haviland's departure from Kline & Specter.[34] In fact, both The Berman

---

[33]*See* June 6, 2007 Hrg. Tr. at 6:10, 9:9 – 10:6.

[34]While the undersigned was transitioning the *AWP* files from Kline & Specter to HLF, Mr. Specter acknowledged on behalf of the firm that the undersigned was to assume Kline & Specter's role as Co-Lead Counsel in the case, and enter an appearance as Co-Lead Counsel.  *See* Exhibit "Y."  As anticipated and discussed with The Berman Group, the pleading entitled "Notice of Change of Entry of Appearance of Co-Lead Counsel for Plaintiffs and the Class and Change of Address" was filed by Hagens Berman on behalf of the undersigned and The Haviland Law Firm LLC on September 11, 2006.  *See* Docket No. 3088.

Group and this Court have previously acknowledged HLF's status as Co-Lead Counsel. *See, e.g.,* Docket No. 3088, fn. 24 *supra,* and Exhibit "E" hereto. Moreover, members of The Berman Group have similarly adopted the Co-Lead Counsel title when their predecessor firms ceased to exist or withdrew from the case. Not surprisingly, however, the members of The Berman Group simply ignore their prior representations, just as they ignore their own history of doing precisely what they now condemn HLF for doing.

Over the last several years, members of The Berman Group have simply ignored the express language of this Court's CMO 1 appointing various firms to positions in this case, and elevated themselves to Co-Lead Counsel positions without express Court appointments.  The following examples prove this point:

1.    The law firm of Lieff, Cabraser, Heimann & Bernstein, LLP ("Lieff Cabraser") was appointed "Liaison Counsel" to the Class, not Thomas Sobol individually, who was an attorney at Lieff Cabraser at the time. Yet, when Mr. Sobol moved from Lieff Cabraser to Hagens Berman, he simply took with him the "Liaison Counsel" position that had been occupied in the name of Lieff Cabraser.[35]  No Order has been issued

---

[35] The Berman Group challenges the undersigned's status as Co-Lead Counsel by claiming that Court appointments "go to firms, not individuals," and HLF has been admonished by this Court for allegedly misstating that it had been recognized in the past as "Co-Lead Counsel" for the Class in MDL 1456. Yet, there was no such hue and cry when Mr. Sobol took the Liaison Counsel position with him to Hagens Berman, after he left Lieff Cabraser. Moreover, it was Hagens Berman who filed HLF's Entry of Appearance as Co-Lead Counsel in September 2006 [Docket No. 3088], and dozens of pleadings have been filed since by The Berman Group listing HLF as a "Co-Lead Counsel" signatory.  *See generally, infra* n. 39 (listing exemplar pleadings). Indeed, this Court expressly recognized the undersigned's status as Co-Lead on July 3, 2007, by

authorizing this switch, and this Court appears to have said nothing about it.[36]  As a result, Hagens Berman obtained two (2) important positions in the case: "Liaison Counsel" and "Co-Chair of the Co-Lead Counsel Committee."

2.       As if this weren't enough, Mr. Berman proceeded to unilaterally list three of his offices as separate "Co-Lead Counsel," Mr. Sobol in Boston, Ms. Elizabeth Fegan in Chicago and Mr. Berman in Seattle.  Neither Mr. Sobol nor Ms. Fegan have been appointed individually as "Co-Lead Counsel" for any Class in this case.

3.       The firms of The Wexler Firm and Hoffman & Edelson were never Co-Chairs of the Lead Counsel Committee.  But, with the exodus of other firms, they unilaterally and without Court authorization exalted themselves to "Co-Lead Counsel" status.

4.       The Wexler Firm ceases to exist.  Nevertheless, the firm's principal, Attorney Ken Wexler, simply transferred his self-proclaimed "Co-Lead Counsel" status to his new firm, Wexler Toriseva Wallace, LLP – again, without any Court authorization.

5.       The same is true of Hoffman & Edelson; it ceases to exist.  Attorney Marc Edelson has created a new firm, Edelson & Associates, LLC,[37] and like Mr. Wexler, simply took his firm's self-proclaimed position as "Co-Lead Counsel" with him to his new firm – again, without Court authorization.

6.       Each member of The Berman Group used to file pleadings listing their respective appropriate titles given to them by the Court.  Now, they just

---

directing The Berman Group to keep Mr. Haviland apprised of settlement efforts with BMS and stating, "as long as [Mr. Haviland is] still lead counsel, I think you have to let him know what's happening."  July 3, 2007 Tr. at 46:22-24.  *See also, id.* at 42:3-4 (acknowledging that the issue was whether the plaintiffs' counsel could "continue to serve together on any kind of steering committee").

[36] Certainly CMO 1 was never so modified.

[37] *See, e.g.,* Docket No. 4747 (most recently filed by The Berman Group).

call themselves (and each other) "Co-Lead Counsel" – undoubtedly to keep from drawing attention to their unauthorized acts.[38]

7.  Although The Berman Group now asserts that HLF was never Co-Lead Counsel, they have filed dozens of pleadings over the last year listing HLF as Co-Lead Counsel.  Thus, if their new-found contention (that only firms and not individuals can receive Court appointments, and that HLF was never Co-Lead Counsel) is correct, then The Berman Group has knowingly committed countless Rule 11 violations by falsely claiming that they and HLF are Co-Lead Counsel in this case. *See infra.* n. 39 (citing examples of such erroneous pleadings).

In claiming that HLF has never been Co-Lead Counsel in this case, The Berman Group further contradicts their past statements and actions in connection with trial preparation, settlement, and other activities. For example, in defending their actions with respect to the AstraZeneca settlement,[39] they claimed that HLF was invited to and did fully participate in Co-Lead Counsel meetings regarding settlement negotiations, and that HLF had a vote in Co-Lead Counsel matters decided by majority vote. The Berman Group also included HLF on Co-Lead calls regarding preparation for the AstraZeneca Class 1 trial, elicited HLF's assistance for the same, demanded assessment payments from HLF, and otherwise treated HLF as a Co-Lead. Their new-found claim that HLF has never been Co-Lead Counsel contradicts these statements and actions.

---

[38]*Compare* Docket No. 561 *with* Docket No. 4747.

[39]The Court will recall that The Berman Group claimed HLF approved the settlement as Co-Lead.

21

### b.   Failure to provide pre-filing notice under State consumer fraud laws.[40]

As The Berman Group knows, the undersigned and Kline & Specter were fully prepared to intervene in this litigation in the Fall of 2005 with their consumer clients in order to protect Class 1 consumers' interests. The Berman Group's need for clients was clear: despite their representations to this Court that they had people "waiting in the wings" to represent consumers, 230 F.R.D. 61, 81, The Berman Group lacked consumer representatives sufficient to lead most of the consumer classes they sought to certify.[41]

---

[40]The following represents a listing of poignant examples for each month from September 2006 through May 2007: Docket No. 3088 (September 11, 2006 "Notice of Change of Entry of Appearance of Co-Lead Counsel for Plaintiffs and the Class and Change of Address"); Docket No. 3220 (October 16, 2006 "Class Plaintiffs' Submission of the "Generic Chart" Pursuant to the Oral Request of the Court During the Class Certification Hearing in Connection with Track 2"); Docket No. 3298 (November 2, 2006 "Plaintiffs' Supplemental Pretrial Disclosures Pursuant to the Court's Amended Pretrial Order of August 21, 2006 As to Exhibits"); Docket No. 3474 (December 15, 2006 "Plaintiffs' Response to the "Fair Allocation" of Time Motion"); Docket No. 3555 (January 19, 2007 "Plaintiffs' Post-Trial Omnibus Trial Brief"); Docket No. 3795 (February 14, 2007 "Plaintiffs' Memorandum Concerning the Start of the AstraZeneca Jury Trial"); Docket No. 3856 (March 16, 2007 "Plaintiffs' Rule 26(a)(3) Disclosures: Deposition Designations of Sworn Testimony"); Docket No. 4105 (April 26, 2007 "Class Plaintiffs' Motion for Leave to File an Amended Complaint") (erroneously claiming on behalf of the consumer class representatives that The Berman Group "satisfied the statutory requirements regarding notice and demand in each state," and seeking to file a Fifth Amended Complaint that was never shown to or verified by the consumer plaintiffs whose names appear in the pleading); Docket No.4217 (May 21, 2007 "Class Plaintiffs' Corrected Reply Memorandum in Support of Motion for Leave to File Amended Complaint") (again, erroneously claiming to "have complied with the notice provisions of other states"); Docket No. 4225 (May 21, 2007 "Class Plaintiffs' and AstraZeneca's Joint Motion for Entry of an Order Granting Preliminary Approval of the AstraZeneca Class 1 Settlement and Approving the Form and Method of Notice to the Class").

[41]Contrary to what The Berman Group says now, it was their desperate need for the undersigned's consumer clients, rather than Mr. Specter's "trial skills," that caused The Berman

Along with an intervention complaint, Kline & Specter had prepared appropriate pre-filing notices under all the requisite state consumer fraud laws. *See, generally,* Exhibit "D" (collecting exhibits). The Berman Group, however - desiring to have the undersigned's clients join into their existing lawsuit - proposed to make the undersigned and Kline & Specter "Co-Lead" counsel. *See, e.g.,* Exhibit "E" hereto ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ *See also,* ████████████ at Exhibit "F."[42] The Berman Group also represented that they had accomplished sending all the requisite notices. As it turns out, they lied. As a direct result, consumers will suffer, especially consumers in the State of Texas and other states whose claims this Court has dismissed for lack of pre-filing notice.

While the penalty for such mismanagement of litigation should be far greater, at a minimum, this Court should protect the Class that is left by restricting The

---

Group to invite Kline & Specter into this litigation as a Co-Lead, despite the residual animosity between Kline & Specter and The Berman Group after their *Lupron* battle. *Compare* Exhibit "HH" ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ *with* Docket No. 3993 ████████████████████████████████

[42]After the undersigned left Kine & Specter, the same agreement was extended to The Haviland Law Firm, LLC. *See* Exhibit "G." *See also* Exhibit "F."

Berman Group's fee award to only the work they performed during the time period after the consumer representatives were added to this litigation, and notice was given under Massachusetts Chapter 93, consistent with the law of this Commonwealth.

      c. **Failure to proffer to the Court a known, available Class 1 representative for Schering, leading to the dismissal of the Class 1 case against Schering in its entirety.**

After the Third Amended Consolidated Complaint with consumer class representatives was filed, the undersigned learned that one of his consumer clients, Harold Bean, had purchased and paid for Proventil, one of the Subject Drugs sold by Track 1 Defendant Schering. The record of such purchase was produced to the Defendants by Class Counsel. *See* Exhibit "H" hereto. The undersigned repeatedly urged the other Co-Lead Counsel to proffer Mr. Bean as a Class 1 consumer representative of the Schering Sub-Class, but the majority refused to do so for reasons unknown to the undersigned. *Id.* (citing one example). The Berman Group ignored cogent evidence establishing the bona fides of the only potential known class representative against a major Track 1 Defendant.

One has to seriously question the adequacy of counsel who elevate their own selfish interests over the rights of class members they profess to represent. Rather than present the evidence and preserve the case against Schering, however, The

Berman Group chose to sit idly by while that Defendant was dismissed from the case.[43]  Where that leaves consumers like Harold Bean remains to be seen.

>    **d.   Acting contrary to the best interests of the consumer clients and the Class.**

The Berman Group tries to paint a picture of the undersigned – after having resigned from Kline & Specter in August 2006[44] – having suddenly "done little work" and, instead, had a "change of course" "colored" by leaving Kline & Specter. According to them, this apparent change of course led to the undersigned wanting to control everything ostensibly in the pursuit of an attorney's fee.

---

[43] *See* July 17, 2007 Hrg. Tr. at 32:19-22 (Court: "And, as you know, Schering-Plough, there never was a rep that was named . . . I dismissed them."); "Proposed Findings and Order On Motion of Track 1 Defendants for the Entry of Judgments Pursuant to Federal Rule of Civil Procedure 54(b) [Docket No. 4616-2] at par. 4 ("Class 1 was not certified as to Schering/Warrick, because there was no class representative who made a co-payment for a Schering or Warrick product under Medicare Part B").  Such a conclusion is only partially accurate.  A more accurate finding would read: "Class 1 was not certified as to Schering/Warrick, because there was no class representative presented by the Court-appointed Co-Lead Counsel for Track 1, despite the fact that one clearly existed."

[44] Emblematic of how The Berman Group try to twist allegations into fact, they claim several times in their Submission that the undersigned was fired from Kline & Specter.  As explained below, there is no dispute by even Kline & Specter that undersigned resigned from the firm on August 14, 2006.  Moreover, the undersigned was conveniently terminated in the late afternoon a day before his planned last day at Kline & Specter, and only because the undersigned informed his *Bridgeport Fire* clients that he was leaving Kline & Specter - which notice ethically had to be given and which notice Kline & Specter subsequently took issue with because it included the invitation of the clients to make an "election of counsel" (not "class counsel," as has been contended), consistent with the ethical mandates in Pennsylvania.  While the propriety of the undersigned's actions are currently before the Pennsylvania court of appeals, suffice it to say now that it is perhaps more than coincidental that Mr. Berman would adopt the same "party line" about the undersigned being "fired" as ████████ Mr. Specter, given their history of secret coordinated actions against the undersigned since his departure from Kline & Specter.  *See* discussion *infra*.

25

The problem with The Berman Group's story is it doesn't hold water.  If the primary motivation of the undersigned was the pursuit of fees, then the easiest way to obtain these fees would have been to toe the line – *i.e.,* refrain from rocking the boat, sit back and attend endless conference calls that others attended, and then file a big fee petition, which would of course be fully supported by the other Co-Leads who did the same.  This is the model being pursued by at least some members of The Berman Group.  *See* discussion *infra*. at "Pursuit of Exorbitant Attorneys' Fees."

For those attorneys who actually respect their obligations to both representative and absent class members, however, the "do nothing and get paid" model is simply not an option.  HLF's clients matter.  At the appropriate time, HLF will justify to this Court all that it has done in the pursuit of its clients' best interests in this case, and it will seek a reasonable fee for such work.  But today is not that day.

Today, since HLF has withdrawn as class counsel, this Court must test the veracity of The Berman Group's story of how they have "diligently and faithfully discharged their duties to the Classes in this long-running litigation."  Class Counsel Submission, at 20.  In addition to the above, HLF  respectfully submits, for this Court's  consideration, a few snapshots in time of this "long-running litigation:"

-        In early April 2006, the undersigned directed [while at Kline & Specter] the preparation of a document entitled "Response of Class 1 Plaintiffs to Statement of Undisputed Facts in Support of Track 1 Defendants'

Motion for Summary Judgment," and suggested to the other Co-Leads that it should be filed as a separate document from the TPPs' response in order to highlight the differences between consumers and TPPs. The purpose of this submission would be to explain to the Court the unavailability of defendants' "everybody knew" defense against consumers in knowledge.[45]  Predictably, this suggestion was "outvoted" by the other Leads.[46]

- In late July/early August 2006, in preparation for the August 3 status conference with the Court on the Track 1 trials, the undersigned again tried to engage the other Co-Leads in separating consumers from TPPs to make clear the differences in their cases to prevent consumer claims from being swept away with any negative TPP findings or verdict.  *See* Exhibits "J" and "K" [July 31, 2006 and August 1, 2006 emails, respectively].  Raising the urgency of the matter, the undersigned said, ███████████████████████████████████████████████████████████████ Exhibit "J" at p. 2.  Again, the various efforts were rejected.  There was no vote, and no change of course.

- On November 3, 2006, just before the Class 2/3 trial began, on November 3, 2006, after this Court issued its summary judgment ruling, the Co-Leads discussed the implications of the Court's summary judgment ruling.  The email "discussion" was brief.  *See* November 3, 2006 emails at Exhibits "L" and "M."   The undersigned suggested several times that what was viewed as ████████████████ at the end of the Court's opinion might be ███████████ for the benefit and protection of consumers by the filing of a simple memorandum explaining why, as

---

[45] Of course, the separate advocacy for consumers in Class 1 never saw the light of day, and the consumers of Johnson & Johnson Subject Drugs, like HLF's clients and named class representatives, Mr. Young and Mrs. Shepley, paid the ultimate price by having their claims dismissed by the Court on the basis of the TPP-focused summary judgment briefing only.  *See* July 3, 2007 Hearing Tr. at 7:22-23 ("Now, am I right, that this basically wraps up Track 1? Because I dismissed Johnson & Johnson"); *See also* July 17, 2007 Hrg. Tr. at 32:19-22.

[46] *See* Exhibit "I" (Haviland: ██████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████

a matter of law, consumers should not be bound by what TPPs or Congress knew. The proposal fell on deaf ears. In the end, The Berman Group opted for what they called a ████████████████████ ██████████████ As was harbingered, that ████████████ on the bulk of the **consumer case** was devastating, since most of the consumer representatives purchased Subject Drugs in late 2003 or 2004. But, there was no vote, and no change of course.

- Six (6) days later, the severity of the situation for consumers seemed to register with a junior member of Hagens Berman who queried, ██████ ████████████████████████████████████ *See* Exhibit "N" (November 9, 2006 email). The undersigned responded, ███████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████ *Id.* Despite the apparent realization by at least one attorney within The Berman Group of what they had done, there was no vote, and no change of course.

- The realization of the consumers' doomed plight as a result of their decision favoring TPPs continued to grow among The Berman Group. Later that day, another junior member of The Berman Group firm queried the undersigned, ██████████████████████████████████ ████████████████████████████████████████ *See* Exhibit "O" (November 9, 2006 email). After an unseemly and unethical suggestion by one member of the Co-Lead counsel group that the problem created for the consumer clients' should simply be ignored by just ████████████████████████████ the undersigned weighed in heavily as follows: ███████████████████████████

---

[47] This Court subsequently found Reverend Aaronson to be the lone, adequate class representative of the GSK settlement class, despite the fact that the Aaronsons only bought GSK drugs in 2004. Respectfully, neither this Court nor The Berman Group can have it both ways: the Aaronsons can not be adequate for one class, yet inadequate for another, in the same case, with the same records of 2004 purchases of Subject Drugs. Consumers, like the Aaronsons, cannot be so abused.

███████████████████████████████████████████

████████████████████████████ *Id.*

-      During the trial, the Court invited plaintiffs to submit an alternative damage calculation.  While the same ultimately was rejected by the Court, as the undersigned had predicted, the undersigned's suggestion to try to distance consumers from the fallout was never pursued.  *See* Exhibit "P" (November 9, 2006 email).  There was no vote, and no change of course.

-      In January 2007, the same issue arose for the fifth time toward the end of the Class 2/3 trial when the Court suggested that Class 3 should be decertified as to consumers.  In response to a draft pleading circulated by Mr. Berman, the undersigned suggested that there needed to be some separate discussion of Class 3 consumers, and that consumers ████████ ████████████████ *See* Exhibit "Q" (January 19, 2007 email).  Mr. Berman himself rejected the proposal out of hand. There was no vote, and no change of course.[48]

The Berman Group's record respecting the pursuit of damages for consumers in this case is pathetic.   As the record already submitted, and as supplemented by further evidence in Exhibit "R" hereto, demonstrates, were it not for the efforts of the undersigned in battling The Berman Group (and Dr. Hartman), tens of millions of dollars in consumer damages would have been wrongly diverted to the TPPs represented by The Berman Group.   If that were the only thing HLF had accomplished on behalf of its consumer clients and the consumer class in this case,

---

[48] As a result, this Court was never asked by Co-Lead Counsel to de-certify Class 3, and all consumers have paid the price of having the Class 2/3 verdict applied universally against them.

it would still be far greater than what The Berman Group has accomplished for consumers.

In contrast to the feeble efforts of The Berman Group on behalf of consumers, and to rebut some of the spurious claims that HLF never pressed certain issues on behalf of its consumer-clients, we submit the following additional facts:

- In early July 2006, after the undersigned learned that one of the non-"Co-Lead" Hagens Berman attorneys[49] had stipulated with a defendant to simply drop certain drugs from the case [that had been pled properly in the Complaint], the undersigned raised the matter directly with Mr. Berman because it would moot out the claims of certain representative consumer plaintiffs that had already been tendered to the Court for such Defendant Sub-Class. *See* Exhibit "S." Nothing was done to correct the situation. And again, there was not even a "vote."

- In seeking to defend their adoption of a similar "scary claim form" for the AstraZeneca settlement (as they did in the *Lupron* settlement), The Berman Group fails to explain to the Court that, in late July 2006, the undersigned learned about and raised with The Berman Group the fact that some representative plaintiffs in this case had not been paid their *Lupron* settlement amounts, despite the passage of over a year since the *Lupron* settlement had been approved by Judge Stearns.[50] *See* Exhibit "T." It was also raised that ██████████████████████ ████████ While the representatives were eventually paid (after further effort on their behalf), many more remain unpaid. There has been no vote and no change.

---

[49] *See discussion supra.* of the three-office, Hagens Berman Co-Lead position.

[50] In light of this Court expressing a feeling about being threatened by the recent Declarations filed by the named representative plaintiffs, we respectfully commend to the Court's review paragraph two of the referenced Exhibit. We politely suggest that the Court should bear in mind that these cancer patients also lived through the *Lupron* case, and for that reason, it should not be surprising that they only trust certain lawyers, and not others, to look out for their best interests. *See, e.g.,* Declaration of Harold Bean at pars. 4-5 [Docket No. 4653].

3.      **Conduct of Class Litigation and Trials**

The Berman Group tries to paint a picture where they did everything with respect to the class trials, and HLF did nothing.  This much is true: Steve Berman took upon himself everything and then tried to shuffle off to others, including HLF, some of the workload when it got to be too much for him.

For example, in the midst of the Class 2/3 trial, and out of the blue, Mr. Berman sent to the undersigned the following email:

████████████████

███████

*See* Exhibit "U"  (email dated November 7, 2006 at 2:32pm)████████████

████████████████████████████████████████████

████████████████████████████

Then, two (2) days later, on November 8, Mr. Berman sent the undersigned another email reading:



31

*Id.*  Now, because the undersigned did not merely hang around the courtroom each day after he had done what he was asked to do,[51] as charged[52] and as so many other lawyers in The Berman Group did,[53] the undersigned was unsure at exactly what Mr. Berman was suggesting.  The only understanding the undersigned heard from the other members of The Berman Group was that their witness examinations during the first week of trial had so angered Mr. Berman that he wanted different counsel to take over some of the remaining witness presentations[54]

Indeed, The Berman Group also now admits that few among them had any trial experience.  In early 2006, they turned to both Mr. Specter and the undersigned for help with the trials.[55]  *See* Exhibit "V" (May 17, 2006 email)(evidencing some of the

[51] By the time of trial, the undersigned was asked to present one consumer witness, Mrs. Hopkins, who was well-prepared and presented the only admissible consumer testimony ever presented in a trial in this court to date.

[52] Class Counsel Submission at 6 (claiming HLF "made a big effort to attend as many court hearings as possible...").

[53] *See* suggestion *infra.* about this Court having an independent audit of all plaintiffs' counsel fee submissions to weed out such surplusage.

[54] Certain unnamed plaintiffs' counsel were visibly shaken as a result of the stinging rebuke they received from Mr. Berman.  Observing the situation, the undersigned immediately pulled Mr. Berman aside to advise him that such exchanges were properly conducted in private.  It was then Mr. Berman suggested that ███████████████████████████████████████████

[55] The Co-Leads had agreed that four (4) lawyers would handle the trial: Mr. Berman, Mr. Sobol, Mr. Specter and Mr. Haviland.  In the fall of 2006, however, after the undersigned left Kline & Specter, and after Mr. Specter pulled out, Mr. Berman decided to try the case alone with his younger partner, Mr. Matt.  *See* email date September 6, 2006 at Exh. "W" ████████████ ██████████████████████████████████████████ Thus, any complaints about the amount of work performed by the undersigned should be made to Mr. Berman.

32

earliest discussion held between Messrs. Berman, Sobol, Specter and Haviland *only* on this subject).[56]  Mr. Berman also relied upon the undersigned to carry much of the burden with respect to arguing class certification.  After the undersigned had tendered his resignation to Kline & Specter, but evidencing that the good working relationship that had developed would continue, on August 16, 2006, Mr. Berman wrote to the undersigned and Mr. Sobol ***only*** as follows regarding the hearing on Track 2 class certification:



Exhibit  "X" (August 16, 2006 email).  In response, the undersigned wrote back:



---

[56] Despite the territorial battle going on between Mr. Berman and Mr. Specter for primacy, it was recognized by both that the undersigned ███████████████████████████████████████ ███████████████████████████████████ *Id.*

*Id.*

To demonstrate how much The Berman Group has tried to re-write history in this case – about the agreement to HLF act as "Co-Lead" in the Fall of 2006, to cost-share on an equitable basis [which HLF always did by sending checks that Hagens Berman never cashed],[57] and to work together fairly and honestly – the Court need only read the following lines from Mr. Berman himself in the Fall of last year:



---

[57]The Berman Group claims it is "[e]mblematic of the games" of the undersigned to have sent a cost-sharing check when asked to do so.  It is "gamesmanship" to have received no less that three (3) substantial cost-sharing checks from HLF over the course of the last year and never to have cashed (or returned) one of them.  And, for the record, the most recent tender of $200,000.00 was sent <u>before</u> the undersigned had any clue that "the Court questioned [the undersigned's] fitness to serve as a Co-Lead at September 11, 2007 hearing."  Class Counsel Submission at 6 n. 1.  *See* Exhibit "II" hereto.

Exhibit "E" (October 3, 2006 email). In response, the undersigned wrote:



It is also noteworthy that HLF is not the only dissenting party to have been forced out of a meaningful role in this litigation by The Berman Group. One of the original, Court-appointed Co-Chairs of the Lead Counsel Committee under CMO 1 in this case, Heins Mills & Olsen ("HMO"), departed this litigation after encountering The Berman Group's "my way or the highway" style of case management. Since the Court never inquired about the circumstances of HMO's departure as Co-Lead,[58] the only evidence available as to what actually happened is the following statement by HMO in its response to HLF's Petition:

> "Beginning in October 2004 and continuing through February 2005, several divergences of opinion occurred between Heins Mills & Olson, P.L.C. and certain other members of Plaintiffs' Lead Counsel

---

[58]Other members of Plaintiff's Lead Counsel Committee that have departed the case for unspecified reasons include Cohen Milstein and Milberg Weiss.

Committee.  Those differences involved certain case strategy and other issues, including day-to-day management issues.  Heins Mills & Olson, P.L.C. and other Committee members attempted to discuss and reconcile their differences but, regretfully, without success.   Following the surfacing and lack of resolution of those differences, Heins Mills & Olson, P.L.C. continued to participate in the prosecution of the case by performing certain tasks at the request of other members of the Lead Counsel Committee, including preparation and appearances on behalf of Plaintiffs at various depositions, and review and analysis of documents.

*See* Heins Mills & Olson, P.L.C.'s Response to Motion for Amendment of Case Management Order No. 1 and Consolidated Order Re: Motion for Class Certification [Docket No. 3968] at p. 3.  The Berman Group has never rebutted HMO's statements. While The Berman Group professes that it cannot get along with HLF, it apparently cannot get along with HMO either.  In any event, if HLF is viewed as having taken a less significant role than other Co-Leads in the prosecution of this litigation, it was (in the words of HMO) solely due to "divergences of opinion" between HLF and "certain other members of the Plaintiffs' Lead Counsel Committee," rather than any indolence on the part of HLF.

### 4.    Pursuit of Exorbitant Attorneys' Fees

As the old adage goes, "people who live in glass houses should not throw stones."  Astoundingly, The Berman Group actually accuses the undersigned of "making a big effort to attend as many Court hearings as possible in Boston and lodge

an appearance to make it appear like he was a key member of the prosecution..."
Class Counsel Submission at 6. Nothing could be further from the truth. In fact, HLF
is willing to put its money where its mouth is and respectfully suggests to the Court
that it should strike from any class counsel attorney fee petition the time spent by any
lawyer preparing for or attending a hearing in which that lawyer did <u>not</u> present the
matter. At such time, HLF will not only support fully its time and effort expended in
pursuit of the best interests of its clients and the Class, but it will demonstrate how
The Berman Group has used this case as a money machine, churning out lodestar
through duplicative, wasteful effort, and using attorney time and effort in this case to
advance their interests in other cases. We respectfully suggest that an independent
forensic accounting group should be appointed to assist the Court in sorting through
these issues and making appropriate findings.

### C.  Other Cases Involving Members of The Berman Group, Yet Ignored by It.

#### 1.  *Poland Spring*

The silence of certain members of The Berman Group about their civil
prosecution and the jury verdict against them for attorney malpractice and breach of
fiduciary duty speaks volumes about their character.

Since this Court has reached out to other courts and jurists to investigate the undersigned's trustworthiness, perhaps it might apply the same standard to the remaining applicants for appointment under 23(g).  For the Court's benefit, the appropriate identifying contact information with respect to the *Poland Spring* matter is as follows:

- The Honorable George Z. Singal, Chief USDJ Maine;

- Robert F. Kennedy, Jr., co-owner of plaintiff, Tear of the Clouds LLC;[59]

- Jan Schlichtmann, Esquire, plaintiff counsel and co-counsel to Messr. Sobol and Berman.[60]

And, perhaps the Court might find it interesting to learn that the article alerting the undersigned to the *Poland Spring* verdict was sent to the undersigned by Mr. Edelson, one of the proposed Track 2 Class Counsel and a member of The Berman Group.[61]  *See* Exhibit. "Z."

---

[59] As Mr. Kennedy put it, "[t]his was not a case of the attorneys taking care of consumers.  This was a case of attorneys grabbing everything they could for themselves."  March 23, 2006, Associated Press article, "Jury awards more than $10 million in water bottlers' lawsuit," attached to Haviland Supplemental Decl. at Exhibit "H."

[60] As Mr. Schlichtmann described the "work" of his co-counsel, "[t]hey trashed me and they trashed the clients, but the jury saw it right."  *Id.*

[61] Without a named representative plaintiff-client in this case, and having never addressed this Court, but with an astounding lodestar of over $10 million from a law firm with only three (3) lawyers - spent largely in the pursuit of the failed case against the Johnson & Johnson Defendants - perhaps greater scrutiny should be given to the application for appointment as class counsel of Edelson & Associates, LLC.

What should be most troubling to this Court is the complete failure of Hagens Berman to disclose the March 22, 2006 malpractice jury verdict against the firm, Steve Berman and Tom Sobol.  The jury's verdict of malpractice and breach of fiduciary duty was and is relevant the instant Rule 23(g) determination which was called for by the Track 2 class certification Motion filed by Hagens Berman on May 8, 2006.  *See* Docket No. 2523 at 4 (claiming with respect to Rule 23(a)(4), "Plaintiffs' counsel are qualified" because "[t]he Court has already approved counsel so this element is satisfied).

### 2.      *iPod Nano*

The silence of The Berman Group gets deafening when the Court considers the fact that **just two months after the malpractice verdict** was rendered in *Poland Spring*, and while this Court was still considering the application of Hagens Berman for appointment as class counsel for the Track II Sub-Classes, a man whom the firm claimed was an existing client in its already filed class action case against Apple for the Ipod Nano disclosed to the world, via an internet posting, that he "did not approve, endorse, authorize, initiate or promote the lawsuit against Apple."  *See* May 22, 2006, Open Letter to the Mac Community, The Truth Behind the iPod Nano "Scratch" Class Action Suit, attached to Haviland Supplemental Decl. at Exhibit "I."  Since the outcome of this **second malpractice lawsuit** filed against Hagens Berman

is unknown, perhaps the Court may wish to inquire of the Los Angeles Superior Court and the plaintiff's counsel in that case as well.  *See Jason Tomczak v. Hagen Berman Sobol Shapiro LLP, et. al.* Civil Action No. BC347824 (the complaint in which is attached to Haviland Supplemental Decl. at Exhibit "J").

<div align="center">

**3.**     ***First American Title* Case**

</div>

The Hagens Berman firm's complete disregard for the rights and interests of their individual clients inspired one former client to write an entire expose' book about the firm, entitled *First American Title to Injustice*.[62]  The book, written by Louis Leclezio, details the author's experiences throughout the litigation of an action in the United States District Court for the Western District of Washington, *Leclezio, et al. v. First American Title*, Civil Action No. 98-01198 (W.D.Wash), from his retention of the Hagens Berman firm to the eventual demise of the case.  The book, reflecting on the author's own recollections and opinions, is at the very least a profound example of yet another instance of an individual client who feels that he has been betrayed by the Hagens Berman firm.

**D.     The Factual Record Concerning The Haviland Law Firm, LLC**

**1.     The *Local 68* case in New Jersey**

---

[62]*First American Title to Injustice* is available directly through the publisher's website at
http://www.keystarpublications.com/books.htm

<div align="center">

40

</div>

In trying to inflate one typographical error in the June 2003 *Local 68* Complaint into some deliberate effort to deceive,[63] The Berman Group completely (and deliberately) misses the forest for the trees.[64]  True to form, they say nothing about their blatant misrepresentation to this Court on September 11, 2007 that they supposedly knew nothing about the *Local 68* case or the scope of its class claims pled.  *See* Supplemental Memorandum of HLF filed September 18, 2007 at 3 (demonstrating that Tom Sobol was sitting in the courtroom during the remand hearing on January 27, 2006 during which a Kline & Specter lawyer twice advised the Court that the *Local 68* case was seeking a nationwide class).[65]  Instead, they continue their lies and deceit by now suggesting that it is a "last straw" for them to

---

[63]*See generally* Class Counsel's Response [Docket No. 4735].  If The Berman Group is to be believed that there can be no typographical errors in a Complaint, then their recently-filed (and approved) Motion for Leave to File Amended Complaint, submitting a Fifth Amended Master Consolidated Complaint, violated Rule 11 because, contrary to their statements to this Court in their "Corrected Reply Memorandum in Support" and consistent with Defendants' charge, The Berman Group <u>did</u> add a host of new drugs including the following: adenosine (Abbott and Fujisawa) (at ¶ 16), casodex (AstraZeneca), eligard (Aventis) (at  ¶ 19), Viadur (the Johnson & Johnson Group) (at  ¶ 22), and depo-provera (Pfizer) (at  ¶ 23), among others.  It also should be sanctionable to list a plaintiff as being alive and "adequate" long after he or she has passed away.  *See id.* at  ¶ 15 (Mrs. Aaronson), ¶ 18 (Mr. Howe),  ¶ 20 (Mr. Shepley) and  ¶ 24 (Mr. Walters).

[64]The Court need only review the Complaint to see that it pleads nationwide class claims.  *See, e.g.,* paragraphs 24, 137, 310 and 311 (the latter of which use the same convention "throughout New Jersey and the country").

[65]The Berman Group insist that there is no excuse for HLF's failure to point out an obvious typographical error in the class definition of Local 68's complaint, while at the same time insisting that they and the Court should be excused for not noticing at the remand hearing that Local 68's counsel *twice* mentioned the fact that Local 68 was seeking a nationwide class.

have allegedly just learned about the scope of the *Local 68* case as pled in the Complaint.

Although The Berman Group feign astonishment at the nature and scope of the claims alleged in the *Local 68* case, the fact is, the *Local 68* case was discussed with The Berman Group from the very inception of the relationship between the undersigned, Kline & Specter and them.  The Court need only review the exemplar email exchanges at Exhibits "AA" and "BB" hereto to see the truth of the matter.  Significantly, at no time did The Berman Group express any objection or other dissatisfaction with the pendency of the *Local 68* case.  Quite the opposite: all Co-Lead Counsel, including the members of The Berman Group, fully understood that the *Local 68* case could be used as means for pursuing defendants who had been dismissed from this litigation, or who successfully apposed nationwide class certification in this litigation.  *Id.*

### 2.   The *Bridgeport Fire* Litigation in Pennsylvania

Rather than muster any explanation for their many misdeeds, The Berman Group does what it does best: "trashing" others.  Yet, attempting to "shoot the messenger" can only take The Berman Group so far.  It does nothing to support their cause to show "adequacy" under Rule 23(g).

42

The lead line into their presentation of the circumstances of the pending *Bridgeport Fire* Litigation – "[a]ccording to Kline & Specter" – speaks volumes as to the record of half-truths and outright lies they try to present to this Court as fact about the undersigned's work in that case.  Class Counsel Submission at 9.  The glaring thing they neglect to point out is that the Order they cite issued by the Pennsylvania court **is currently on appeal** in the Superior Court of Pennsylvania.[66] *See* appellate court papers attached hereto collectively as Exhibit "CC" hereto.  As the Court can see, the question of "unethical activity" was raised, not by the Court, not even by Kline & Specter, **but only by the undersigned and HLF <u>against Kline & Specter</u> on behalf of the clients, the named class representatives in *Bridgeport Fire* whom Kline & Specter was seeking to bar from speaking to their chosen counsel.**

In any event, because it is completely inappropriate for The Berman Group to seek to litigate the *Bridgeport Fire* case in this Court, and thereby try to divest [or otherwise interfere with] the proper jurisdiction of the Superior Court of Pennsylvania, we refuse to do so.  Instead, for the record, we will address only some

---

[66] Ironically, while The Berman Group insists to this Court that the order on appeal in *Bridgeport Fire* was an injunction, Kline & Specter contends that it is <u>was not an injunction</u>.  But accurately describing the record in *Bridgeport Fire,* however, might detract from the drama The Berman Group is trying to create in this litigation by accusing the undersigned of having been "enjoined," so it is little wonder that they don't bother being accurate.  *See generally,* appellate papers at Exhibit "CC" hereto.

of the spurious allegations raised by The Berman Group to make clear that neither the undersigned nor HLF has done anything wrong in *Bridgeport Fire*, and always has acted in the best interests of its clients, whose case it is and whose case it was long before the undersigned went to work at Kline & Specter.[67]

First, based upon the record of coordination between Messrs. Berman and Specter, it is now patently clear that these two lawyers have been working off the same "playbook," a playbook which includes such plays as, "in order to highjack a class action case from the class representatives and ignore their views, make sure you trash their individual counsel."  *See* Exhibit "W" (reflecting the email from Mr. Berman to Mr. Specter stating, ███████████████████████████ ████████ to which the undersigned suggested to Mr. Specter, ███████████ ████████████████████████████████████████████████ ████████ *See also,* Exhibit "DD."[68]

---

[67] The undersigned began representing the individual named representative businesses in May 2001 in the *Bridgeport Fire* litigation, long before he was asked to go to Kline & Specter and start up a class action department.  The case was in suit when it was brought to Kline & Specter, but Kline & Specter sought to highjack it from these sophisticated clients, despite the firm's employment agreement with the undersigned and email agreement in August 2006, expressly allowing the undersigned to continue to work the case.  *See* appellate papers at Exh. "CC."

[68] Of course, The Berman Group claims to have just become aware of the *Bridgeport Fire* proceedings in order to claim the same as the "last straw."  Class Counsel Submission at 20. This misrepresentation is belied by the many, many times the undersigned has discussed the situation going on in *Bridgeport Fire* with members of The Berman Group, including Mr. Edelson.

Second, citing as "fact" the Declaration of Mr. Kline (which was never subject to cross-examination in *Bridgeport Fire*), The Berman Group claims that the undersigned was fired on September 7, 2006 [a half-truth at best, given the lack of dispute that a resignation had been tendered on August 14, 2006 and that the firm insisted upon the undersigned staying on an additional month, which he agreed to do], and that he sent a "solicitation letter" to his own clients.  Since the question of this alleged "solicitation" of one's own clients is the subject matter of the appeal, we simply commend to the Court the appellate briefing which clearly discusses the non-delegable ethical duty of a departing lawyer to notify the clients of his or her departure, a duty that was remitted by the undersigned ***despite*** Kline & Specter's efforts to prevent it.

Third, The Berman Group accuses HLF of having filed an entry of appearance that was improperly motivated.  Even Kline & Specter dropped that baseless and spurious charge when the Court acknowledged the right of the clients to have lawyers of their choosing represent them in the lawsuit.  *See* Withdrawal of Motion to Strike Praecipe to Enter Appearance at Exhibit "CC" hereto.  Again, however, the fact that the challenge to the undersigned's entry of appearance was withdrawn is not even mentioned by The Berman Group.

Fourth, The Berman Group fails to point out that the Court in *Bridgeport Fire* invited the undersigned and HLF to file a motion to be appointed co-lead counsel in the case to resolve the dispute between Kline & Specter and the undersigned over the latter's role in the case. *See generally,* transcript of September 8 hearing at Exhibit "CC." Since they evidently scoured the transcript of the proceedings in *Bridgeport Fire* for derogatory material against the undersigned, The Berman Group must have been aware of this fact. The duty of candor to the tribunal compelled The Berman Group to at least mention this fact, rather than try to portray the undersigned as some sort of serial Rule 23(g) interloper in class action matters.

Fifth, as HLF contends on its appeal, the record of the proceeding on HLF's motion is scattered with innuendo and outright misrepresentations by Kline & Specter, all aimed at undermining HLF's petition in the matter. *See id.* The record of HLF's rebuttal of these falsehoods is fully available for review in the Superior Court of Pennsylvania, should the Court be inclined to review it. Not surprisingly, however, The Berman Group ignores HLF's responses, and presents only out of context excerpts to paint its picture of "various misrepresentations." Class Counsel Submission at 1.

Sixth, one example of the spurious claims made by The Berman Group to this Court is that HLF wrongly represented that it was Co-Lead Counsel and one of the

46

principal lead trial counsel in its September 2006 website and biography created after HLF was formed. The record herein demonstrates that it was true at the time. Moreover, while HLF's website was on the web for all to see (and several members of The Berman Group did see it because they complimented the undersigned for the appearance of the website), no one in The Berman Group took issue with any of the postings, until now. Indeed, Kline & Specter did not challenge the matter here at the time because it *wanted* HLF to assume its role as Co-Lead in MDL 1456 so it could quietly withdraw from this litigation without Court approval.[69]  *See* Exhibit "Y" (August 24, 2006 email stating ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ (emphasis supplied). Kline & Specter even arranged for Hagens Berman to handle the filing of the "Entry of Appearance as Co-Lead Counsel" for HLF filed by Hagens Berman on September 11, 2006. *See* Docket No.3088.

As for the claims of "inappropriate[] bill[ing] of attorney time and numerous expenses to the AWP case" (which The Berman Group implies were established in

---

[69]Kline & Specter simply pulled out of this case, without seeking Court approval and in violation of the clear mandates of the local rules and class action jurisprudence respecting the withdrawal of certified class counsel from the case. When asked in *Bridgeport Fire* why he did not get this Court's approval for his withdrawal of appearance as certified class counsel in MDL 1456, Mr. Specter said "I did not regard and do not regard Court approval as being required." *See* transcript of Nov. 21, 2006 hearing at 145:25 - 146:1-11, Exh. "CC."

*Bridgeport Fire*, but were not), these allegations are likewise false.  For instance, as was demonstrated to the Court in *Bridgeport Fire*, Kline & Specter never paid for appropriate licenses for all its attorneys to have Westlaw services; instead, it had a practice – contrary to Westlaw's licensing requirements - to have multiple attorneys use the same Westlaw account.   The record in *Bridgeport Fire* reveals that, unbeknownst to the undersigned, multiple attorneys utilized the Westlaw account registered under the undersigned's name, including non-attorneys at the firm, since the undersigned was the head of the Class Action Department.  Indeed, when Kline & Specter was presented with such evidence that certain Westlaw charges had been misapplied to various client files (including the file for the Pennsylvania Attorney General's AWP case), these charges were removed promptly.  Of course, if there was such "inappropriate billing" – as The Berman Group charges against Kline & Specter during the time it was a Co-Lead – then it should warrant this Court appointing an independent auditor for all attorney fee submissions in this case.  HLF welcomes such a move, and will match the accuracy of its time records against those of any other firm in this case.  *See* discussion *supra.* concerning "Pursuit of Exorbitant Attorney's Fees."

Lastly, just so the record is absolutely clear, HLF withdrew its application for Co-Lead Counsel in *Bridgeport Fire*, as here, to serve its clients' best interests, not

to run from any alleged "written findings."  In doing so, HLF was able to "unstick" the case, in the words of the *Bridgeport Fire* Court, which also said to all counsel present in accepting HLF's withdrawal as class counsel, "I appreciate the way we were able to resolve this."  *See* transcript of Dec. 13, 2006 hearing at 25:11-13, Exh "CC."  Far from "enjoining" HLF, the Court has allowed HLF to continue to participate in the *Bridgeport Fire* litigation as legal counsel for the class representatives in their individual capacity.  The unsettled issues will be resolved on appeal.

### 3.     Other Miscellaneous Issues Pertaining to this Case

The Berman Group has made other accusations against HLF and the undersigned which merit a response.  The Berman Group accuses HLF of breaching some undefined duty of confidentiality for alerting the Court to their various misrepresentations.  As the Court will recall, the Court issued an Order directing the undersigned to file a Declaration about the AstraZeneca settlement in response to the "serious allegations"[70] of The Berman Group.  In response, the undersigned first brought to the attention of the Court the <u>potential need</u>[71] to maintain certain

---

[70] *See* Tr. of July 3, 2007 Hrg. Tr. at 38:9-13.

[71] In making the request for a determination of the propriety of sealing the exhibits, HLF did not believe that they contained "attorney client" or "confidential" material, as contended by The Berman Group.

confidentiality as to evidence that would be relevant to rebut The Berman Group's spurious claims in their submissions about the AstraZeneca settlement at the hearing on July 3, 2007.[72]  The undersigned then submitted a Declaration with a request for the Court to determine whether the same should be maintained under seal.  More importantly, The Berman Group did not take a position on the request or otherwise advise the Court that they believed any portion of the Declaration was confidential. Instead, they addressed the merits of the Declaration in their public response, even at times quoting verbatim the very documents they now claim to be "privileged" or "confidential."

HLF took all appropriate steps to preserve the confidentiality, if any, of the materials.  Indeed, after the August 27, 2007 hearing, the undersigned and Mr. Sobol approached the Court Clerk about submitting a second, immediate request to have the Court determine the propriety of a seal.  That afternoon, the undersigned forwarded to Mr. Sobol an agreeable, stipulated motion.  *See* Exhibit "JJ" hereto.  The Berman Group never filed it, likely to preserve their argument that the "public" filing was egregious.

---

[72] *See* July 3, 2007 Hrg. Tr. at 39:22, 40:20, 43:9-13  (Court: "put something under oath... I'll read whatever you submit."  Mr. Haviland: "We'll go ahead and file something, Your Honor. And, I believe that some part of it may need to be put under seal.  I'm just not comfortable with that part of it because we may seek leave from Your Honor for that.").

The Berman Group attempts to make much of what they contend is a discrepancy between an exchange between the undersigned and the Court at the September 11, 2007 hearing, when the undersigned admitted that it was a "mistake" to publicly file HLF's 23(g) application, and a passage in the undersigned's Declaration stating that the 23(g) application was being filed publicly because the Court had not responded to the undersigned's earlier inquiry about whether certain material in the Declaration should be placed under seal.

The undersigned's statements are not inconsistent.  HLF did publicly file the 23(g) application and supporting papers, as the undersigned stated in the papers themselves.  The undersigned also confirmed this to the Court at the September 11 hearing.  *See* Sept. 11, 2007 Hrg. Tr. at 22:5-7.  After the undersigned explained that the Declaration had originally been filed with a request that it be placed under seal, and that the request had never been answered, the Court asked whether the Declaration had been filed with a motion to seal.  *Id.* at 21:16-21.  The undersigned responded that it had been accompanied by a request (as the Court had asked).[73]  The undersigned responded that he did not know whose fault it was, but that the request had been made as the Court had asked, that the ECF had picked it up on Friday before

---

[73]At this point, the transcript shows that the undersigned was interrupted by Mr. Berman, who blurted, "It was filed via ECF."  As the undersigned did not understand the Court to have directed any of its questions to Mr. Berman, the undersigned did not respond, nor was it understood that the Court took note of Mr. Berman's unsolicited remark.

the hearing, and the undersigned and Mr. Sobol had approached the Court's clerk about submitting a request that it be filed under seal.  *Id.* at 21:22-22:22.

The Court asked the undersigned to confirm that the Declaration had been publicly docketed by my office, which was confirmed.  *Id.* at 22:3-7.  The Court then informed the undersigned that, in doing so, "somebody in your office made a mistake."  Sept. 11, 2007 Hrg. Tr. at 22:8-9.  Although the allegedly confidential nature of the material was not (and still has not been) established, the undersigned did not dispute the Court's view about the "mistake," but once again pointed out that, after the Declaration had been filed, Mr. Sobol and the undersigned had spoken to the Court's clerk about submitting a joint request that the submission be place under seal, and, furthermore, the undersigned had provided Mr. Sobol with a draft stipulation to that effect.  *Id.* at 22:8-15.

Significantly, The Berman group has not responded to this draft stipulation, nor made any other effort to have the undersigned's 23(g) application placed under seal.  *See* Exhibit "JJ" hereto.  This lack of action by The Berman Group implies that the issue of the so-called "confidentiality" of the material at issue is a red herring.  In any event, at no time did the undersigned deny the public filing of the Declaration, even when the Court opined that it was a "mistake" to do so.

III.   **<u>CONCLUSION</u>**

Mr. Berman recently wrote to a defense lawyer in this case, when it appeared that an issue of concern raised by the undersigned might become a problem for a settlement he was trying to broker, "[w]e may have to take Havilland out against his will if it came to that."  Exhibit "FF."  Clearly, Mr. Berman and other members of The Berman Group are bent on cashing this case out and rolling over anyone in their path.

The Berman Group has undermined, manipulated, compromised and/or abandoned the only consumer class representatives that exist in the Track 2 case, all of whom are the undersigned's clients, which has effectively mooted the application of The Haviland Law Firm, LLC for appointment as Class Counsel for the Track 2 consumer Sub-Classes.[74]  Members of the consumer class now have only the members of The Berman Group as their representatives in this case, which should now perhaps be more accurately captioned, *The Berman Group versus the Drug Industry*.

---

[74] So that the Court does not feel threatened by HLF's withdrawal of its application for appointment under Rule 23(g), or subsequently impute to the firm some ulterior, selfish motive, we wish to make clear that, although these consumers have been cast aside by The Berman Group, these consumers are not dismissing their claims and they intend to continue to fight for themselves and others like them to the extent permitted by this Court.

At the conclusion of our initial Memorandum filed August 24, 2007, we suggested that consumers deserve better than what the Berman Group is willing or able to offer.  That remains for this Court to decide.

<div style="margin-left: 40%;">

Respectfully submitted,

</div>

Dated:   October 2, 2007

<div style="margin-left: 40%;">

/s/ Donald E. Haviland, Jr. Esquire
Donald E. Haviland, Jr. Esquire
THE HAVILAND LAW FIRM, LLC
740 South Third Street, Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Donald E. Haviland, Jr., Esquire, hereby certify that on October 2, 2007, below-listed documents were filed with the Clerk of this Court and used the CM/ECF system to send notification of such filing to all registered persons:

- Corrected [Redacted] Reply Memorandum Concerning the Appointment of Class Counsel for the Track 2 Classes Pursuant to Fed.R.Civ.Proc. 23(g), and Class Counsel's Submission Dated September 18, 2007

<div style="text-align: right">

/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
THE HAVILAND LAW FIRM
740 South Third Street
Third Floor
Philadelphia, PA 19147
Telephone: (215) 609-4661
Facsimile: (215) 392-4400
haviland@havilandlaw.com

</div>

55