# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.,* | ) | |
| No. 06-CV-11337-PBS | ) | |

**REPLY OF ABBOTT LABORATORIES INC., DUANE BURNHAM, AND THOMAS
HODGSON IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER**

In their opening brief, movants demonstrated that there is no legitimate justification for

the Government's request to depose Duane Burnham (Abbott's former CEO and Chairman of the

Board of Directors) or Thomas Hodgson (Abbott's former President, COO, and Board member).

(Dkt. No. 4692.) The Government's response confirms as much. Misstating the law and the

facts, the Government prevails upon the Court simply to ignore the significant burden that a

deposition would place upon these gentlemen, both of whom have been retired from Abbott for

nearly a decade. This argument should fail. As discussed below, none of the Government's

contrived rationales can overcome the uncontroverted declarations of Messrs. Burnham and

Hodgson that they have no unique personal knowledge of issues relevant to this litigation.

Particularly in light of the Government's failure to seek information through less burdensome

means, the request to depose Messrs. Burnham and Hodgson should be denied.

**A.     The "Apex" Standard Applies to Messrs. Burnham and Hodgson**

The Government first decrees that the "apex" standard does not apply here, because

Messrs. Burnham and Hodgson are no longer in Abbott's employ. (Opp. at 11-12.) Yet, the

only case the Government proffers in support of this declaration is a Missouri decision applying

Missouri state law, which does not recognize an "apex" standard for *any* corporate executive deponent (current or retired). *See State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 607 (Mo. 2002) ("This Court declines to adopt an "apex" rule. Instead, depositions of top-level decision-makers should proceed in accordance with [local court rules]."). Unfortunately for the Government, federal law, not Missouri state law, governs this dispute, and federal law *does* follow an apex standard – for both current and retired senior executives. *See, e.g., In re Ski Train Fire of November 11, 2000 Kaprun Aus.*, 2006 U.S. Dist. LEXIS 29987, * 29 (S.D.N.Y. May 16, 2006) (applying apex standard and denying request to depose defendants' former CEO; court holds that other discovery methods, such as interrogatories or a 30(b)(6) request, were more appropriate); *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 U.S. Dist. LEXIS 20481, *11-17 (S.D. Cal. Mar. 22, 2007) (finding that plaintiff's retired CEO was still treated as an apex witness and directing defendant (i) to first pursue alternative discovery means, such as a 30(b)(6) deposition, before imposing upon the retired CEO; and (ii) to limit any eventual deposition of the retired CEO to just those topics as to which he was alleged to have some "unique, first-hand knowledge").

The Government's desire to avoid application of the apex standard is understandable, since it cannot come close to establishing that either Mr. Burnham or Mr. Hodgson has unique, personal knowledge of issues relevant to this litigation, much less that the Government has first pursued other, less burdensome means to acquire any such information. Failing both prongs of the apex standard, the Government's request to depose Messrs. Burnham and Hodgson is doomed. (*See* cases collected in Dkt. No. 4692 at 4-7.) As can be seen below, however, the Court need not rely solely on the apex standard, for even under a traditional relevance/burden analysis, the Government falls flat.

**B.     The Government Has Not Shown That Either Mr. Burnham or Mr. Hodgson
        Has Unique or Superior Personal Knowledge Of Any Relevant Issue**

**1.     There Is No Legitimate Reason to Depose Mr. Burnham**

The primary basis the Government articulates for its request to depose Mr. Burnham is

that he allegedly was involved in some way in Abbott's lobbying efforts relating to the 1997

Balanced Budget Act. (Opp. at 3-9.) Cutting through the needless collection of pejoratives that

clutter the Government's response, the real issue is whether the Government has shown that Mr.

Burnham has some unique knowledge about lobbying to offer that would outweigh the clear

burden to him that a deposition would entail. The answer is unquestionably "No."

Mr. Burnham has attested that he has no recollection of being involved in any lobbying

efforts relating to the 1997 Balanced Budget Act, or any other legislation relating to

reimbursement. (Ex. B at ¶ 3.)[1] Moreover, any possible testimony from Mr. Burnham on this

issue would be needlessly cumulative. In addition to asking virtually every Abbott witness they

meet about lobbying, the Government's counsel already have deposed two senior officials

(Cynthia Sensibaugh and Rosemary Haas) in Abbott's Governmental Affairs group about

Abbott's lobbying efforts, including with respect to the 1997 Balanced Budget Act. In addition,

David Landsidle, the former head of the Government Affairs group in 1997, has agreed to appear

voluntarily for deposition in October. And Abbott has agreed to produce for deposition Mark

Barmak, a former Abbott in-house counsel who oversaw the Governmental Affairs group for a

time. Enough is enough.

Abbott has been more than reasonable in accommodating the Government's endless

requests for information about lobbying – particularly given the fact that Abbott's lobbying

---

[1] All citations to letter exhibits (A, B, C) refer to the exhibits appended to movants' original brief. (Dkt.
No. 4692.) Exhibits to this reply brief are assigned numbers (1 and 2).

efforts are privileged under the First Amendment, and thus could never be the source of *any* liability in this case. *See* U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances"); *see also Eastern R.R. Presidents Conf. v Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (the First Amendment right to petition covers lobbying efforts, and no civil or other liability can be based on such efforts); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) (same); *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999) (the *Noerr-Pennington* doctrine allows "parties [to] petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others"). The Government has harassed Abbott about its privileged lobbying efforts for months – securing Abbott's documents and deposing numerous personnel about these issues. There is simply no basis for adding Mr. Burnham's deposition to this discovery pile, especially when he already has averred that he has no memory of the alleged events.

The remaining bases proffered by the Government for deposing Mr. Burnham are even more flimsy. First, the Government wishes to depose him about his alleged "review and approval of marketing, business or sales plans for Abbott divisions, including [HPD]," and about his involvement in any "pricing decisions." (Opp. at 9.) Yet, the only evidence before the Court on these issues is Mr. Burnham's declaration, in which he attests that as the CEO, he "was not responsible for the day-to-day oversight of matters such as the pricing, marketing and sale of Abbott's products around the world." (Ex. B at ¶ 6.) Instead, others within the organization were responsible for these matters, and they kept Mr. Burnham advised as necessary. (*Id.*) Next, the Government indicates a desire to depose Mr. Burnham about his involvement with Abbott's former Home Infusion Services business. (Opp. at 9.) The Government made no mention of this

issue with respect to Mr. Burnham during the several meet and confer sessions related to this deposition (Ex. A at ¶ 6), but no matter. The Government has offered no documents or other evidence that would suggest that Mr. Burnham had any involvement with Home Infusion. There is no showing of unique, personal knowledge here; it is simply a fishing expedition.

### 2.   There Is No Legitimate Reason to Depose Mr. Hodgson

With respect to Mr. Hodgson, the Government's principle argument is disingenuous in the extreme. Conceding that it cannot put forth evidence of a single act Mr. Hodgson took that is relevant to this case, the Government instead attempts (falsely) to paint Mr. Hodgson as an authority on AWP and reimbursement issues. Thus, the Government argues that Mr. Hodgson was deposed in other AWP-related litigation, "including as an Abbott 30(b)(6) corporate designee." (Opp. at 1, 10.) What the Government conveniently omits, however, is that the actions in question related exclusively to Lupron® (a drug not at issue in this case, and which the Court already has recognized as irrelevant), and, more importantly, that Mr. Hodgson was only made corporate designee as to the issue of the nature of the organizational relationship between Abbott and TAP and, relatedly, Abbott's knowledge of certain of TAP's Lupron®-related business practices. (*See* Feb. 19, 2004 deposition tr. of Thomas Hodgson, excerpts attached as Ex. 1, at 17 ("I am to testify relative to Abbott's relationship to TAP").) Mr. Hodgson was *never* appointed as a corporate designee with respect to any issue relating to Abbott and AWP or reimbursement or pricing, as the Government boldly implies in its opposition.

It is certainly true that Mr. Hodgson was asked about pricing issues in those depositions, and, to the extent his testimony is in any way relevant here (something Abbott does not concede), the Government has the transcripts. But, there is nothing about the passages that the Government trots out in its brief that would justify deposing Mr. Hodgson yet again. (Opp. at 10.) To the contrary, he testified that he had only a very high-level understanding of these

issues, but did not get involved in the details. (*See* Feb. 20, 2004 deposition tr. of Thomas Hodgson, excerpts attached as Ex. 2, at 16 ("I didn't get into that degree of detail [as to how Abbott's WAC price was calculated]. That kind of detail was multiple levels of staff below where I operated").) This is perfectly consistent with Mr. Hodgson's declaration offered in support of the instant motion, in which he makes clear that, as President and COO, he was not directly involved in day-to-day issues concerning the pricing, marketing or sale of Abbott's products around the world. (Ex. C at ¶ 3.)[2] The Government has deposed and will continue to depose many other current and former Abbott employees who, unlike Mr. Hodgson, were directly involved in pricing for Abbott's products and who have a far more detailed understanding with respect to issues like AWP and reimbursement. There cannot be any showing that Mr. Hodgson's high-level knowledge is in any way unique or superior within the organization.[3]

---

[2] Thus, this case stands in stark contrast to cases where courts have been willing to find that a corporate executive possesses unique and personal knowledge, such as *Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987). In that case, the plaintiff made a strong factual showing that the corporate executives at issue had unique personal knowledge of the discrete policy that was the topic of the requested deposition. *Id.* at 143 (executive was "significantly involved in the administration and implementation" of program central to the parties' dispute); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 104 (S.D.N.Y. 2001) (allowing deposition of Sony's CEO where plaintiff offered evidence showing that the executive had unique knowledge about the subject of the suit and plaintiff had already exhausted other, less-intrusive means to obtain the discovery). Although apex depositions may be appropriate when the focus is narrowly-defined, and substantial evidence demonstrates that the executive has unique insight into the relevant topics, this case presents the polar opposite situation. Here, the Government wishes to take a scattershot deposition of Abbott's former CEO and former President and COO about AWP-related issues, yet it has offered no showing whatsoever that either Mr. Burnham or Mr. Hodgson has any unique or superior personal knowledge about these issues.

[3] The Government makes much of the fact that a former HPD officer testified that Mr. Hodgson would "sign off on the sales plans" for Abbott's business units, and further speculated that he would have expected Mr. Hodgson "probably" to be involved in the decision to shut down the former Home Infusion Services business. (Opp. at 11 and Ex. 12.) Even assuming that the former were true, the fact that a high-level corporate officer would sign off on business plans hardly suggests that he has some unique personal knowledge of their contents. And the witness' comments about Home Infusion Services were pure guesswork that can in no way justify the deposition of Mr. Hodgson. The Government recently has noticed the deposition of Michael Sellers, who was the head of Home Infusion Services at the time the business was discontinued. Mr. Sellers clearly is the best source of information about this business, and the Government will be able to question him about it.

C.     **The Government Has Not Exhausted Less Burdensome Means of Discovery**

The second prong of the apex standard mandates that, before conducting the deposition of a senior executive, the party seeking the deposition must first exhaust all other avenues of less-burdensome discovery, such as written discovery, depositions of lower-level employees, or 30(b)(6) depositions. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 682 (7th Cir. 2002) (failure to utilize such alternative discovery "casts serious doubt over [plaintiff's] claim that [the executive] possessed information that was more than marginally relevant to her civil action."); *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Stone v. Morton Int'l*, 170 F.R.D. 498, 504 (D. Utah 1997); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. R.I. 1985); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991); *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 176 (Tex. 2000); *Liberty Mutual Ins. Co. v. Superior Ct. of San Mateo County*, 10 Cal. App. 4th 1282, 1289 (1st Dist. 1992). The Government cannot even suggest that it has *met* this exhaustion requirement, so it urges the Court simply to ignore it – arguing that there is no exhaustion requirement where there has been some showing that the witness has relevant knowledge. (Opp. at 16-17.)

Not surprisingly, the Government does not offer a single case to support this assertion, nor could it. The apex standard is a two-prong test, and the cases make clear that both prongs (a showing of unique personal knowledge *and* exhaustion of all less-burdensome avenues for discovery) must be met before executive deposition can go forward. (*See, e.g.,* cases collected in movants' opening brief (Dkt. No. 4692) at 4-7.) In light of the Government's admitted failure to pursue all less-burdensome methods of discovery before seeking the depositions of Messrs. Burnham and Hodgson, these depositions should not proceed. Instead, the Government, at a minimum, should be ordered to defer its request for these depositions until the end of the discovery process, after the lower-level employees with the greatest knowledge about topics

relevant to the litigation have been deposed.  Then, the Government can reassess whether it still deems these depositions to be necessary.  If so, then the Court can resolve the dispute at that time, based upon a full record.  *See Baine*, 141 F.R.D. at 335;  *Liberty Mutual*, 10 Cal. App. 4th at 1287.[4]

### D.   The Burden to Messrs. Burnham and Hodgson Far Outweighs Any Possible Benefit To Be Gained From Their Depositions

Although the Government seeks to brush aside the burden that its proposed depositions would place upon Messrs. Burnham and Hodgson, this Court should not.  *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. R.I. 1985) (recognizing that an apex executive is "a singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse" and concluding that "courts have a duty to recognize [such executives'] vulnerability"); *see also Consol. Rail Corp. v. Primary Coal, Inc.*, 1993 WL 364471 at *1 (S.D.N.Y. Sept. 10, 1993) ("permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation").  Both of these gentlemen remain active in the business and civic communities.  Mr. Burnham serves as a Trustee for the National Trust for Historic Preservation and as a Life Trustee of Northwestern University.  (Ex. B at ¶ 7.)  Mr. Hodgson currently sits on the Boards of Directors for two public companies (The Travelers Companies, Inc. and Idenix Pharmaceuticals, Inc.).  (Ex. C at ¶ 6.) The responsibilities of corporate directors, especially after the passage of the Sarbanes-Oxley

---

[4] Were the Court to order that the deposition of Messrs. Burnham or Hodgson go forward now, there clearly should be strict limitations on the time period for the depositions and the scope of permissible topics.  During the meet and confer process, the Government agreed only that it would attempt to complete each of these depositions in one full day, but it would not agree to any limitation as to topics.  (Ex. A at ¶ 8.)  That is unreasonable on both fronts.  There is no reason that these depositions could not be completed in an hour or two at most.  In addition, in order to protect against inefficiency and harassment, the topics to be covered with these witnesses in the event a deposition is ever allowed should be limited, and should be set forth in advance.  *See, e.g., WebSideStory, Inc. v. NetRatings, Inc.*, 2007 U.S. Dist. LEXIS 20481, 17 (D. Cal. 2007) (limiting deposition of former executive to certain enumerated topics).

Act, are multi-faceted and time-consuming.  In addition, Mr. Hodgson also serves in governance roles for several privately-held companies in a variety of business fields, as well as civic organizations.  (*Id.*)

There is no doubt that the proposed depositions would impose a significant burden upon these retired executives, and the Government cannot credibly contend otherwise.  In light of the Government's failure (i) to show that either Mr. Burnham or Mr. Hodgson has any unique or superior personal knowledge of relevant issues, and (ii) to first exhaust other avenues of discovery available to it, the Court is entitled to consider the burden to these witnesses and to order that the depositions not be had.

## CONCLUSION

For all of the reasons discussed above and in movants' opening brief, the Court should grant this motion, and should enter an order prohibiting the depositions of Duane Burnham and Thomas Hodgson.  Alternatively, the Court at a minimum should order that the Government defer its request to depose Messrs. Burnham and Hodgson until the end of the fact discovery period, at which time the parties and, if necessary, the Court can reassess any perceived need for these depositions based upon a more fully-developed record.

Dated:  October 5, 2007                         Respectfully submitted,


                                                /s/ Brian J. Murray


                                                James R. Daly
                                                Jason G. Winchester
                                                Brian J. Murray
                                                JONES DAY
                                                77 W. Wacker Dr., Suite 3500
                                                Chicago, Illinois  60601-1692
                                                Telephone: (312) 782-3939
                                                Facsimile:  (312) 782-8585

                                                R. Christopher Cook
                                                David S. Torborg
                                                JONES DAY
                                                51 Louisiana Avenue, N.W.
                                                Washington, D.C.  20001-2113
                                                Telephone:  (202) 879-3939
                                                Fax:  (202) 626-1700

                                                *Attorneys for Abbott Laboratories Inc. and*
                                                *Duane L. Burnham*



                                                /s/ Robert L. Michels
                                                Robert L. Michels
                                                WINSTON & STRAWN LLP
                                                35 W. Wacker Dr.
                                                Chicago, Illinois 60601
                                                Telephone: (312) 558-5600
                                                Facsimile:  (312) 558-5700

                                                *Attorney for Thomas R. Hodgson*

-10-

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 5, 2007, the foregoing **REPLY OF ABBOTT LABORATORIES INC., DUANE BURNHAM, AND THOMAS HODGSON IN SUPPORT OF THEIR MOTION FOR A PROTECTIVE ORDER** was served upon all counsel of record in this action electronically by posting a true and correct copy of same via Lexis-Nexis.

/s/ Brian J. Murray

CHI-1608505v1

Exhibit 1

1          STATE OF NORTH CAROLINA IN THE GENERAL COURT

2             NEW HANOVER COUNTY OF JUSTICE

3                SUPERIOR COURT DIVISION

4                                            CONFIDENTIAL

5     HARRY E. STETSER, et al.,            )

6             Plaintiffs,                  )

7      vs.                                 ) No. 1-CV-5268

8     TAP PHARMACEUTICAL PRODUCTS, INC.,)

9     et al.,                              )

10            Defendants.                  )

11

12      The videotaped deposition of Thomas Hodgson,

13    taken pursuant to notice in the above-entitled

14    cause on the 19th day of February, 2004, at

15    225 East Illinois Road, Lake Forest, Illinois, at

16    9:00 a.m.

17

18

19

20

21

22

23    REPORTED BY ELVIRA M. KOKOTT

24    CERTIFIED SHORTHAND REPORTER LICENSE NO. 84-3309

REPORTING ASSOCIATES, LLC 1-888-795-2323

ABT-DOJ 0297310
Highly Confidential

5 (Pages 14 to 17)

**14**

1    deposition of Mr. Hodgson or in the litigation --
2    or in the federal litigation, and I believe that's
3    something that Mr. Haviland has -- has assented to.
4      MR. HAVILAND: I agree that the signature on
5    the agreements to abide by the protective orders in
6    Walker and Stetser does not by that signature give
7    up any rights that MDL has to claim whatever they
8    will with respect to this deposition transcript.
9    It's simply to make clear that counsel in MDL has
10    agreed to be bound by the protective orders in the
11    cases for which this deposition has been noticed.
12      I am going to hand the court reporter now
13    the agreement signed by counsel for the MDL in
14    Stetser as Hodgson Exhibit 1A and Walker as Hodgson
15    Exhibit 1B.
16      (Whereupon, Hodgson Deposition
17      Exhibit Nos. 1A-1B were marked for
18      identification as of 2/19/04.)
19    MR. PORCELLI: Mr. Haviland, now that the
20    preliminaries are out of the way, and it appears
21    this deposition will be going forward in both the
22    Walker and the Stetser cases, I would like to
23    restate that I am here on behalf of Takeda in the
24    Walker case only, pursuant to the North Carolina

**15**

1    Appellate Court's February 3rd ruling in the
2    Stetser case.
3    MR. HAVILAND: I don't know that that requires
4    a response of plaintiff's counsel. Counsel is here
5    appearing in one case. What is happening in
6    Stetser in the Appellate Courts is happening in
7    Stetser in the Appellate Courts.
8      Any other preliminaries? Okay.
9      Thomas Hodgson,
10    called as a witness herein, having been first duly
11    sworn, was examined and testified as follows:
12      EXAMINATION
13    BY MR. HAVILAND:
14    Q. Mr. Hodgson, my name is Don Haviland. I
15    am counsel for the plaintiff in the class in a case
16    that's been certified as a national class action in
17    North Carolina State Court.
18      I am also counsel for plaintiffs in a
19    class that's been certified in New Jersey State
20    Court.
21      I would like you to start by please
22    telling the court reporter and the jury in this
23    case your full name.
24    A. Thomas R. Hodgson.

**16**

1    Q. Can you tell me where you presently live,
2    sir.
3    A. 1015 Ashley Road, Lake Forest, Illinois.
4    Q. And, for how long have you lived in
5    Lake Forest, Illinois?
6    A. Approximately, I would say about 25 years.
7    Q. And, you understand that you're appearing
8    today to give deposition testimony in the two cases
9    I referenced?
10    A. I do.
11    Q. Do you also understand that you're
12    appearing today not only in your individual
13    capacity, but also as a corporate designee on
14    behalf of Abbott Laboratories?
15    A. Yes.
16    Q. Okay. Can you tell me when you first
17    learned that you would be appearing today as a
18    corporate designee on behalf of Abbott?
19    A. Specifically this date or generally?
20    Q. Just generally.
21    A. I think I was aware of it some time last
22    year.
23    Q. All right. Can you tell me what your
24    understanding was then in terms of what role you

**17**

1    would be playing on behalf of Abbott at the
2    deposition today?
3    A. I didn't have a very clear understanding
4    at that point. I do now.
5    Q. Okay. Could you tell me what your
6    understanding is today?
7    A. My understanding today is that there are
8    certain points that were raised, and I am to cover
9    those points.
10    Q. Okay. Could you tell me what those points
11    are as you know them today?
12    A. Basically, Abbott's relationship to TAP,
13    the various business practices of TAP, and Abbott's
14    knowledge of those previous practices.
15    Q. Anything else?
16    A. That's, basically, my understanding.
17    There may be more points, but my overall
18    understanding is that I am to testify relative to
19    Abbott's relationship to TAP.
20    Q. Okay. And, can you tell me in greater
21    detail what your understanding of what the
22    testimony is you can provide today with respect to
23    that topic?
24    MS. RUSSO: Objection, form.

REPORTING ASSOCIATES, LLC 1-888-795-2323

ABT-DOJ 0297314
Highly Confidential

Exhibit 2

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
February 20, 2004

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3    ------------------------:
 4    IN RE:         MDL No. 1430
      LUPRON MARKETING AND SALES  :
 5    PRACTICES LITIGATION    Master File No.
                           01-CV-10861
 6    THIS DOCUMENT RELATES TO   :
      ALL ACTIONS             : Judge
 7                          : Richard Stearns
 8    ------------------------:
 9       CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
10
11       VIDEOTAPED 30(b)(6) DEPOSITION of Abbott
12    Laboratories through its representative THOMAS
13    RICHARD HODGSON, taken in the hereinbefore-
14    entitled action, taken before Rebecca L.
15    Stonerock, at the Deerpath Inn, Windsor Hall II,
16    255 East Illinois Road, Lake Forest, Illinois,
17    on February 20, 2004, commencing at 8:10 a.m.
18    pursuant to notice.
19
20              * * *
21
22          JOSEPH ALBANESE & ASSOCIATES
                Certified Shorthand Reporters
23                    805 Main Street
               Toms River, New Jersey 08753
24
                  Telephone (732) 244-6100
25                   Fax (732) 286-6316
```

**Page 2**

```
 1    A P P E A R A N C E S :
 2       SPECTOR, ROSEMAN & KODROFF
         1818 Market Street, Suite 2500
 3       Philadelphia, Pennsylvania  19103
         BY:  JOHN A. MACORETTA
 4       Attorneys for Plaintiffs
 5       HAGENS BERMAN
         225 Franklin Street, 26th Floor
 6       Boston, Massachusetts  02210
         BY:  EDWARD NOTARGIACOMO
 7       Attorneys for Plaintiffs
 8       McDERMOTT, WILL & EMERY
         227 West Monroe Street
 9       Chicago, Illinois  60606-5096
         BY:  JOSHUA T. BUCHMAN
10       Attorneys for Defendant
         Abbott Laboratories
11
         ABBOTT LABORATORIES
12       Department 324, Building AP6D
         100 Abbott Park Road
13       Abbott Park, Illinois  60064-3500
         BY:  CATHERINE McCAIN
14       In-House Counsel for Abbott Laboratories
15       JONES, DAY, REAVIS & POGUE
         77 West Wacker Drive
16       Chicago, Illinois  60601-1692
         BY:  LEE ANN RUSSO
17       Attorneys for Defendants TAP
         Pharmaceutical Products, Inc.
18
         JENNER & BLOCK
19       One IBM Plaza
         Chicago, Illinois  60611-7603
20       BY:  ANTHONY C. PORCELLI
         Attorneys for Defendants Takeda
21       Chemical Industries Limited and
         Takeda America Holdings, Inc.
22
         WINSTON & STRAWN
23       35 West Wacker Drive
         Chicago, Illinois  60601-9703
24       BY:  ROBERT L. MICHELS
         Attorneys for Witness Thomas Hodgson
25
```

**Page 3**

```
 1    APPEARANCES (Continued)
 2
 3    Also Present:
 4       John D'Andrea, Videotape Specialist
 5             * * *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 I N D E X
 2    NAME OF WITNESS   DIRECT CROSS REDIR RECRO
 3    THOMAS RICHARD HODGSON
 4       by Mr. Macoretta    9
 5
 6            HODGSON EXHIBITS
 7    No.      Description            Page
 8    1  Notice of Rule 30(b)(6) Deposition   20
 9    2  Bates Nos. TAP 2045698 - 709        30
10    3  Bates Nos. TAP 1047928 - 931        42
11    4  Bates Nos. TAP 2013907 - 912        56
12    5  Bates Nos. TAP 2007748              70
13    6  Bates Nos. TAP 2007810 - 812        72
14    7  Bates Nos. TAP 1003798 - 801        74
15    8  Bates Nos. TCI 001934 - 936         77
16    9  Bates Nos. TAP 2018812              82
17   10  Bates Nos. TAP 00045096             83
18   11  Bates Nos. TAP 2012062             109
19   12  Bates Nos. TAP 2066248 - 250       112
20   13  Bates Nos. TAP 2066854 - 855       123
21   14  Bates Nos. TCI 001420 - 423        127
22   15  Bates Nos. TAP 8003431 - 434, 8003421  141
23   16  Bates Nos. TAP 00063741 - 742      144
24   17  Bates Nos. TAP 2011336 - 352       149
25   18  Bates Nos. ABT 02903 - 919         152
```

ALBANESE & ASSOCIATES                732-244-6100                (1) Page 1 to Page 4

ABT-DOJ 0297453
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
February 20, 2004

---

13

```
1      Q     Okay.  You've heard the term
2   "average wholesale price" in connection with
3   drug pricing?
4      A     Yes.
5      Q     Could you tell me what you
6   understand that term to mean?
7      A     It's the definition that is developed by
8   the Red Book based on inputs from pharmaceutical
9   companies.
10     Q     Okay.  What is that definition?
11  Do you know?
12     A     It's a markup on the wholesaler
13  acquisition price or cost.
14     Q     And what is -- could you tell me
15  what "wholesaler acquisition cost" means?
16     A     It's the average price that the
17  wholesaler would pay to the pharmaceutical
18  company.
19     Q     To purchase the drug in question?
20     A     To purchase the drug in question.
21     Q     Now, that definition that you just
22  gave me of AWP, was that the definition that was
23  used by TAP when discussing AWP?
24     A     I don't know what definition they used.
25  I didn't get into that degree of detail with
```

---

15

```
1      A     It's -- it's one.  I don't know if there
2   are others that publish it or not.  That's the
3   one I'm familiar with.
4      Q     Okay.  And you would agree that
5   AWP is used as a basis for reimbursement by
6   certain private insurers, wouldn't you?
7      A     Yes.
8            MS. RUSSO:  Objection, form.
9      Q     And you'd agree that AWP is used
10  as a basis for reimbursement by Medicare as
11  well, wouldn't you?
12     A     Yes.
13     Q     What -- what do you understand the
14  term "list price" to mean?
15     A     In what context?
16     Q     In the context of a list price for
17  Lupron.
18     A     I didn't use that terminology.
19     Q     Okay.  How about the term "direct
20  price"?  Have you ever heard that terminology?
21     A     No.
22     Q     Did TAP have something equivalent
23  to a list price for Lupron?
24           MR. BUCHMAN:  Object to the form.
25     A     I believe they had a wholesaler
```

---

14

```
1   them.
2      Q     Okay.  How about Abbott?  Did
3   Abbott have some definition of AWP?
4      A     I wasn't aware of any particular
5   definition of it.
6      Q     Well, an AWP was published for
7   Abbott drugs as well, correct?
8      A     That's correct.
9      Q     Okay.  Do you have any knowledge
10  as to how Red Book creates -- or calculates AWP?
11     A     Broadstroke-wise I do.  Basically they
12  take the wholesaler acquisition cost and mark it
13  up by a percentage.
14     Q     Do you know how that percentage is
15  chosen for the markup?
16     A     No, I don't.
17     Q     Okay.  Do you know if that
18  percentage is given to Red Book by the
19  pharmaceutical company?
20     A     I don't believe it is, but I'm not
21  familiar or in any way conversant with what the
22  Red Book does.
23     Q     Okay.  And when we say "Red Book,"
24  that's one of several industry compendia that
25  publishes an AWP; is that correct?
```

---

16

```
1   acquisition cost type of price.
2      Q     How did TAP calculate the
3   wholesaler acquisition cost for Lupron?
4      A     I don't know.
5            MS. RUSSO:  Objection, form.
6      A     I didn't get into those details.
7      Q     But that's -- we can agree that
8   that's a number that TAP would generate
9   internally, correct?
10     A     Correct.
11     Q     Okay.  How was wholesale
12  acquisition price calculated for drugs by
13  Abbott?
14           MR. BUCHMAN:  Object.  Object to
15  this witness testifying as to drugs other than
16  Lupron.
17     Q     You can answer the question.
18     A     I don't know because I didn't get into
19  that degree of detail.  That kind of detail was
20  multiple levels of staff below where I operated.
21     Q     So you don't know if there was a
22  companywide policy or formula for how WAC is
23  going to be calculated at Abbott?
24     A     I don't know if there was a company-wide
25  formula, no.
```

---

**ALBANESE & ASSOCIATES**          732-244-6100          (4) Page 13 to Page 16

ABT-DOJ 0297456
Highly Confidential