# EXHIBIT G

```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS


In re:                              )
PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE             ) MDL No. 1456
LITIGATION                          )  Pages 1 - ^



                      MOTION HEARING

          BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    October 26, 2006










               LEE A. MARZILLI
           CERTIFIED REALTIME REPORTER
           United States District Court
           1 Courthouse Way, Room 3205
              Boston, MA  02210
                (617)345-6787
```

Draft Copy

f84ce52a-673e-44b4-b257-977a0fe6feb8

Page 2

1  A P P E A R A N C E S:
2  For the Plaintiffs:
   For the Defendants:

Page 3

                  P R O C E E D I N G S
2       THE CLERK:  In re:  Pharmaceutical Industry Average
3  Wholesale Price Litigation, Civil Action No. 01-12257,
4  MDL No. 1456, will now be heard before this Court.  Will
5  counsel please identify themselves for the record.
6       MR. GOBENA:  On behalf of the United States, Gejaa
7  Gobena.
8       MR. MAO:  Andy Mao for the government.
9       MR. SOBOL:  On behalf of the relator Ven-A-Care of
10 the Florida Keys, James Breen.
11      MR. HENDERSON:  George Henderson.
12      MS. BROOKER:  Renee Brooker on behalf of the United
13 States.
14      MR. DALY:  Good afternoon, your Honor.  Jim Daly
15 for Abbott Laboratories.
16      THE COURT:  Good.  Today we have the motion to
17 dismiss pending.  Is that right?
18      MR. GOBENA:  That's correct, your Honor.
19      MR. DALY:  Yes, your Honor, and the CMO motion I
20 think is up today as well, if that fits with your schedule.
21      THE COURT:  Well, let me say this.  Unfortunately,
22 I have an emergency motion for a preliminary injunction that
23 was filed, and I need to hear them at 4:00 o'clock.  So we
24 can handle this in two ways.  You're all here, and so, of
25 course, I'm going to hear you on the motions to dismiss.  We

Page 4

1  can get through as much as I can on the case management
2  order, but I don't have all afternoon.  So if I gave you
3  fifteen minutes a side on the argument, I don't know if
4  that's enough time, with five minutes apiece for rebuttal.
5       MR. DALY:  It might take slightly longer than that
6  on my end, your Honor, slightly more than the fifteen
7  minutes, but hopefully I can get as close to that as
8  possible.
9       THE COURT:  Well, you might have to come back.
10 Where are you from?
11      MR. DALY:  I'm from Chicago, Judge.  I'm happy to
12 come back.
13      THE COURT:  And you're all from D.C.?
14      MR. SOBOL:  Atlanta.
15      THE COURT:  Atlanta?  One possibility would be
16 tomorrow morning if you wanted to stay over, if we don't
17 finish.  This is a motion for preliminary injunction
18 involving the election coming up which just came in the front
19 door, and I've got to do it, okay.  So I could see you all
20 tomorrow morning if we don't finish, but why don't I not take
21 any more time on that, see how far we go, and then we'll see
22 what needs to be addressed on the case management order.
23 Sound okay?
24      MR. DALY:  Yes, your Honor.
25      THE COURT:  Great.  Your motion, sir.

Page 5

1       MR. DALY:  Your Honor, we believe that the
2  complaint should be dismissed, and whatever is left really
3  gets to the CMO order, and whatever is left we're going to
4  request that we begin discovery today or tomorrow, if that's
5  what it takes.  I want to tell you a little bit about the
6  case so that we can put it in context.  This is the
7  government suing over forty-four NDCs which relate to four
8  drugs, all of which are multiple-source drugs.  We have
9  sodium chloride, salt water, we have dextrose, sugar water,
10 we have sterile water, and we have vancomycin, which is an
11 antibiotic, all of which are generic, all of which are
12 multiple source.  They're suing for --
13      THE COURT:  Well, those aren't necessarily the same
14 thing.  So are they multi-source or generic?  Both?
15      MR. DALY:  In this case they're both, your Honor.
16 Many manufacturers make each of those categories.
17      THE COURT:  And none of these are brand name?
18      MR. DALY:  Right.  The suit covers ten years of
19 Medicare for those drugs, and it covers ten years of Medicaid
20 for all fifty states.  So, in our view, it's a very broad
21 case.  It's fifty states, each of which we believe has, you
22 know, different procedures, different reimbursement rates,
23 different histories, different dealings with the providers
24 that they deal with within their states and their own state
25 legislatures in terms of setting reimbursement levels.

Page 6

1    What I've done, Judge, is, I want to take a couple
2 of minutes to do an illustration of the claim and our
3 defenses as it relates to both our motion to dismiss and the
4 CMO. And I just have a little chart I'm going to walk
5 through in just a couple minutes, if I may. Pass that up.
6    THE COURT: Sure, good. I am sorry because I
7 should know this by heart, but are you involved in the big
8 AWP case?
9    MR. DALY: Yes, your Honor.
10    THE COURT: So some of this looks familiar.
11    MR. DALY: It is, it is very familiar. It's now
12 the other shoe dropping. It's the United States government
13 coming in and suing for the other 80 percent of Medicare that
14 we've been litigating the 20 percent with in the MDL.
15    THE COURT: Because some of these arguments I've
16 rejected before. In other words, essentially it's a
17 political question and it's through cross reimbursement, and
18 I've just not allowed that all in a motion to dismiss.
19    MR. DALY: Well, I mean, we actually have some
20 decisions pending on that, and you've never looked at it
21 where it's not consumers, it's not elderly people, it's not
22 sick people.
23    THE COURT: Totally fair. I haven't done False
24 Claims Act, but I'm just saying some of the arguments raised
25 resonated.

Page 7

1    MR. DALY: They're similar, but in this and the
2 point I want to make is that the people that we're talking
3 about making those pronouncements, making those policies,
4 creating those investigations, creating those reports,
5 telling the Congress that AWP is not the same as actual
6 acquisition cost, in fact it's much, much higher, telling the
7 states that, telling anybody who will listen that those are
8 the facts for forty years, is this plaintiff.
9    THE COURT: But wouldn't that be a statute of
10 limitations issue, when they should have been on notice?
11    MR. DALY: Well, it is a statute of limitations
12 issue. It's a causation issue. It's a scienterless issue.
13 It's all those things.
14    THE COURT: I agree with that, but how do I do that
15 on a motion to dismiss?
16    MR. DALY: There's no falsity is where this goes.
17 This is where I want to take it anyway.
18    THE COURT: All right, you make your argument.
19 I'll let you go.
20    MR. DALY: I just want to put the claim in
21 context. What we've got, Judge, they allege a 1,000 percent
22 spread, and what I've done here is created an illustration of
23 a 1,000 percent spread. We've got one of Abbott's drugs, the
24 AWP is 10. The average sale price is a dollar, and Abbott's
25 profit on that is about ten cents. We're getting sued for

Page 8

1 the $9 here. The $9 is the $9 that goes to the providers.
2    The damages that the government is seeking is three
3 times that, $27. The spread between what Abbott makes of
4 tents and the damages being sought by the government is
5 27,000 percent, if anybody wants to do the math.
6    This is what the lawsuit is about, this spread,
7 this money that went to the providers only; not to Abbott,
8 not to anybody else. The providers aren't here. They're not
9 being sued. Abbott is being sued and other manufacturers are
10 being sued in the other cases for the $9 that went to the
11 provider. And I'm not going to go through all of the stuff
12 we gave you in the big binder. I mean, we have evidence of
13 not government knowledge but government policy.
14    THE COURT: The big binder in the big case?
15    MR. DALY: That accompanied our motion to dismiss.
16 We have about 31 exhibits I think we gave you, some of which,
17 I grant you, you've seen before. I just want to talk about a
18 couple of them.
19    In 1990 -- this is the beginning of the period that
20 the government is suing us for -- the states were talking
21 about reducing pharmacy reimbursements, reducing the level of
22 reimbursements under their Medicaid program. They went to
23 Congress with that. Congress says "no." It passes OBRA,
24 which I think the Court has seen in other contexts, the
25 Omnibus Budget Reconciliation Act of 1990. And what Congress

Page 9

1 said is, "We understand you might want to reduce these
2 things. You are hereby forbidden to do that. We understand
3 that AWP is a higher price than actual acquisition cost, but
4 you can't change it."
5    1995, an important year for us in this case, that's
6 when this complaint was filed, your Honor. This complaint
7 has been pending in the Southern District of Florida since
8 June or July of 1995. Eleven years the government has taken
9 to get to this point to unseal this thing this spring.
10    THE COURT: So if you had actually unsealed it in
11 1995, the Florida District Court could have had the whole
12 thing.
13    MR. GOBENA: That's correct, your Honor.
14    MR. DALY: But the very allegations that they're
15 bringing to you now they've had in their pocket for eleven
16 years.
17    In 1997, HHS, the Health and Human Services, their
18 client, goes to Congress and says, "We want to reduce
19 acquisitions costs under Medicare to actual acquisition
20 costs." Congress says, "Well, no. We'll reduce it to
21 95 percent of AWP. We understand what actual acquistion cost
22 is, but we're not going to do it."
23    2000, Donna Shalala, HHS again, their client, goes
24 to Congress and says, "You know what? We've looked at this
25 thing, we've done all these nice studies, and, as we've been

3 (Pages 6 to 9)

Page 10

1  telling you for years, AWP is a lot higher than actual
2  acquistion cost, so we're going to change it."
3       THE COURT:  You know, I actually have been going
4  through this as part of how to statutorily define AWP.  I'm
5  trying to understand.  I mean, I define what the statute
6  means ultimately, and we have statutory canons to do that one
7  way or another.  So what are you essentially doing, asking me
8  to construe it in a way similar to what we have in the big
9  litigation, or are you arguing it in an estoppel theory?
10      MR. DALY:  Well, you know, I'm not arguing the
11 meaning of AWP as a matter of statutory construction.  I
12 think everything that I've talked to now, there was no
13 statute that defined AWP.  What you have to look at in this
14 context is, what were people doing?  What was Congress itself
15 saying --
16      THE COURT:  That's been the industry's argument all
17 along, but assume for a second that I don't go along with
18 that.  As you know, I've had skepticism about that argument
19 throughout the big case.  Would the alternative way of
20 spinning this, if you will, would be an estoppel argument,
21 because these are the people who actually, you would say,
22 shut their eyes to what was going on, or had eyes wide open?
23      MR. DALY:  I think it's eyes wide open.  I mean,
24 there's no question that the federal government, HHS, and the
25 Department of Justice, the lawyers here, in 2000, that's when

Page 11

1  they sent around what you've heard of as the "DOJ true AWPs"
2  for about 400 NDCs.  All of the drugs they're suing my client
3  on right now are on that list.
4       THE COURT:  So you're looking for an estoppel?
5       MR. DALY:  In a sense, you can call it that.
6       THE COURT:  So how do I do that on a motion to
7  dismiss?
8       MR. DALY:  Well, we're talking about the False
9  Claims Act.  We're talking about falsity.  We're talking
10 about whether or not AWP can be true or false and whether
11 there's a false claim here, and when the federal government
12 knows that AWP is not equivalent with actual acquisition
13 costs, when it tells the states with these DOJ -- go ahead.
14      THE COURT:  Suppose, though -- I've been going
15 through all of this, obviously, for the big case.  And
16 suppose the question is, they knew that it's not equivalent,
17 but they're thinking along the lines of 5 percent,
18 10 percent, you know, the kinds of quotes that you get, you
19 know, monitor them to make sure they don't just adjust the
20 price, and instead it's 1,000 percent, is that enough?  In
21 other words, you could have a debate whether they knew it was
22 5 percent, or, as the plaintiff's expert does in the big
23 case, Hartman says it's 30 percent, but I don't think there's
24 any evidence they knew it was 1,000 percent.
25      MR. DALY:  Well, actually, Judge, if you look at

Page 12

1  the things that we've attached and I think other defendants
2  have attached at different times, that it's very much in the
3  thousands of percents.
4       THE COURT:  Do they know that these specific drugs
5  were -- were some of these drugs part of the --
6       MR. DALY:  Yes, the drugs that they're suing Abbott
7  on in this case that we're arguing today are on that list.
8       THE COURT:  As of 2000?
9       MR. DALY:  As of 2000, and there's evidence as to
10 that before, but our drugs in this case are on that list.
11      THE COURT:  So would you argue that the estoppel
12 was as of 2000?
13      MR. DALY:  Well, I think that if you look at the
14 stuff that's attached, Judge, there's all kinds of evidence
15 that puts these -- when the ---let me just give you an
16 example.  You've seen these reports that say actual
17 acquisition costs, it's 40 to 60 percent less than AWP for
18 generics.  That's the report that a lot of people like to
19 talk about.  Well, 64 percent off of AWP, I mean, that's
20 almost two to one.  That's a 200 percent spread.  You have
21 other evidence talking about the VA being able to get drugs
22 for 99 percent off of AWP.  That's a 9,000 percent spread.
23 When you take huge percentages off of AWP and say that's the
24 actual acquistion cost, the spread, as compared to the actual
25 acquistion cost, starts to go into the hundreds and indeed

Page 13

1  sometimes the thousands, and --
2       THE COURT:  Well, why isn't this all summary
3  judgment?  I mean, I've had tons of these False Claims Acts
4  in other circumstances where the defense is, well, the
5  government knew or someone else told the government, so this
6  isn't really a False Claims Act thing, the government knew.
7  How can I do that on a motion to dismiss?  I keep coming back
8  to that.
9       MR. DALY:  Well, because I think, when you look at
10 the public record here, it's not disputed what these things
11 are.  These things are in the Federal Register.  These are
12 things that are published in Congress.  These are laws
13 enacted by Congress.  We're not finding esoteric, you know,
14 stuff that you'd have to look for the rest of your life to
15 find.
16      THE COURT:  Would there be some debate whether they
17 knew it in 2000 as opposed to 2002?  I mean, if it was filed
18 in 1995, there would be some debate whether they knew it
19 between 1995 and 2000.
20      MR. DALY:  Well, they should know it in 1995.  They
21 had the complaint in front of them, and they didn't do a darn
22 thing.
23      THE COURT:  But that's just a complaint.
24      MR. DALY:  Well, they issued their subpoenas.  They
25 conducted an investigation.  They had the allegations.  And

Page 14

1  our reports go back to 1968, as the Court knows, but I just
2  started in 1990 to give the Court a flavor.
3      But the final point about this, Judge, is that when
4  the MMA is instituted, the Medicaid Modernization Act, they
5  finally quote/unquote "fix" the problem.  And how do they fix
6  the problem?  They fix the problem by raising service and
7  dispensing fees and lowering the drug costs to the point
8  where the director of CMS says that the dollars going out are
9  the same.  Medicare is still going to spend the same amount
10 of money, but now we're not overpaying for drugs because
11 we're underpaying for services.  Now we're going to pay more
12 for services and pay less for drugs.  But the thing that we
13 used to pay 20 bucks for, we're still paying 20 bucks for
14 it.
15     So all they did was adjust the system.  The same
16 amount of dollars are going out.  And the point I'm trying to
17 make is that this isn't about government knowledge.  It's
18 about government policy.  It's about that $9 being used to
19 prop up the system.
20     And the final point on this is --
21     THE COURT:  So the big difference -- well, at least
22 in terms of money -- is that you have the Medicare
23 beneficiaries not paying the inflated copay.
24     MR. DALY:  Well, I could argue with that, but
25 that's not this case.  This is just them.  This is just the

Page 15

1  federal government that knew all about it that we're talking
2  about here.  And so when they talk about --
3      THE COURT:  Well, what about the state government?
4      MR. DALY:  Well, let's talk about the state
5  government.  In 2000, all those DOJ true AWPs with my
6  client's drugs on them go out to the states.  That was almost
7  seven years ago because it was January of 2000 that that
8  happened.  Seven years later not a single state has moved to
9  those true AWPs.  Not a single state is using ASP.  Why?
10 Because that $9 is needed to keep the providers in each state
11 in the program.  The states are very concerned that if they
12 cut their payments to providers, that they will not
13 participate in the program.  So with all this information out
14 there, with the true AWPs in their hands, with the MMA having
15 been instituted, with the DOJ having sent them these actual
16 prices and saying "Use them," nobody's doing it.  Why?
17 Because they need to pay that $9.
18     So what does the federal government do?  Do they
19 come in and say, "States, you know, stop doing what you're
20 doing.  Start charging AAC.  Start using my true AWPs"?  They
21 say "no."  They don't tell them to do a thing, even though
22 they could, and instead what do they do?  They sue my
23 client.  They sue the manufacturer.  "You, states, for the
24 last seven years, and long before, keep paying the providers
25 that $9.  I'm going to go sue Abbott for it."  That's what

Page 16

1  this case is about, in my view, and that's undisputed.
2      THE COURT:  You may be right, but I don't see how I
3  do this on a motion to dismiss.  That's the concern I have.
4  I mean, at the end of the day, almost all of these cases on
5  knowledge, and when the knowledge was acquired, and when it
6  was reasonably acquired, and when it became can clear to the
7  government it was false, I just don't know how I do that on a
8  motion to dismiss.  You may win on a motion for summary
9  judgment, at least for part of it.
10     MR. DALY:  Okay, I can finish up this part of it
11 quickly then because they allege that they didn't know in
12 their complaint two or three times, that they didn't know
13 about the spreads and they didn't know about Abbott's --
14     THE COURT:  They probably didn't know about the
15 magnitude of the spreads.
16     MR. DALY:  Well, that's not what they say.  They
17 say, "We didn't know about the Abbott spread as alleged in
18 the complaint."  They also say that they wouldn't have paid
19 for the Abbott drugs had they known about the spreads.
20     Well, if you accept this public record, you have to
21 conclude that they did know and that those allegations are
22 incorrect.  And therefore on that part of it, I would suggest
23 that it leads to a dismissal.
24     THE COURT:  So if the government knows that Abbott
25 is violating the law and does nothing and continues accepting

Page 17

1  it, you would say that's not a false claim?
2      MR. DALY:  I would because it's no longer false.
3  It's a matter of government policy.
4      THE COURT:  You have a statute.  Let's suppose I
5  define it to mean what its plain language says it means,
6  okay, average wholesale price, a mean or a median,
7  et cetera.  Let's assume the prices are not the average
8  wholesale price, but the government knows it, a violation of
9  a statute but the government knows it, your legal position is
10 that that's not a false claim?
11     MR. DALY:  That's not a false claim, your Honor,
12 because if the government knows, then it's not false.  You
13 need causation under the False Claims Act, you need scienter
14 under the False Claims Act.
15     THE COURT:  Okay.  Well, let me turn to you.  Do
16 you have any other points because I want to turn to them on
17 that point?  Is your point on the kickback that there's no
18 actual money exchanging hands from the pharmaceutical to the
19 provider?
20     MR. DALY:  Yes, that's part of our point, your
21 Honor.
22     THE COURT:  So their big point is that that's still
23 an inducement.  Even though the money is not technically
24 coming out of the pharmaceutical's pockets, it's an
25 inducement because they say -- and I've seen the marketing

5 (Pages 14 to 17)

Page 18

1  documents -- you know, "Buy our drugs and you'll get this
2  break."
3      MR. DALY: I think that's their argument, Judge,
4  but I'll tell you --
5      THE COURT: I've seen those documents. I can't
6  remember if it's Abbott, in fairness to you. I don't
7  remember, but, you know, the marketing documents are salient
8  in your mind. I mean, I've seen them.
9      MR. DALY: One of the problems with that, Judge, is
10 that all we have for the Anti-Kickback Statute in their
11 complaint is one sentence. So we don't know what their
12 theory is there. I think for a whole bunch of reasons that I
13 could talk to you about the Anti-Kickback Statute doesn't
14 work here. But before I turn it over, I do want to try and
15 make one or two additional points about the False Claims
16 Act.
17     You have to file a false claim or cause a false
18 claim to be submitted. Now I'm getting away from this, and
19 I'm getting into the Act with you for just a second. I don't
20 think -- they don't allege that Abbott submitted any false
21 claims, so that's out.
22     THE COURT: It's a cause to be presented.
23     MR. DALY: Yes, a cause to be presented. Two
24 problems with that: First of all, there's nothing alleged to
25 be false about the claim. In other words, who submits the

Page 19

1  claim here, the providers, the guys who got the $9 who aren't
2  being sued here, that claim form doesn't have anything on it
3  that relates to an Abbott price. There's no Abbott price.
4  There's no published AWP that the compendia publishes for
5  Abbott's drugs. There's nothing on there that makes that
6  claim false.
7      THE COURT: But you know that -- what do they put
8  down, the NDC or something?
9      MR. DALY: Well, funny you should say that. It's
10 actually not the NDC.
11     THE COURT: What do they put down?
12     MR. DALY: They put down the J-Code because --
13     THE COURT: Okay. And you know and the provider
14 knows that the J-Code comes with a certain AWP. I mean, for
15 the record the J-Code is -- I learned all about crosswalking,
16 but it's the technical code, right, that reads on a generic?
17     MR. DALY: It reads on, yes, every generic within
18 that thing. So you could have one J-Code might cover, as it
19 does in this case with my client's drugs, five, six, seven or
20 more drugs.
21     THE COURT: It creates a proof problem I'm familiar
22 with, but, in any event, you know and the provider knows that
23 the J-Code comes with a certain AWP which triggers the
24 reimbursement, right?
25     MR. DALY: Well, actually, no, because it's not my

Page 20

1  client's AWP. It's the median AWP. It doesn't matter what
2  my client's AWP is.
3      THE COURT: Sure it does, because when you do a
4  median, it has an impact on the -- if the whole industry is
5  inflating the price and you're one of the inflaters, it just
6  keeps the median up high.
7      MR. DALY: But they haven't alleged that, and they
8  don't know that. In other words, there's nothing in this
9  complaint or in this case at this point that says that
10 there's any kind of median creation by any of the
11 defendants. Let them plead that. Do they want to come in
12 and plead that there's some thing going on with everybody in
13 a J-Code? They haven't even come close to doing that. In
14 fact, they admit in their surreply that for all of Medicare
15 and part of Medicaid, all of my client's drugs are J-Coded,
16 and so that the reimbursement is not in fact based on
17 Abbott's AWP. So --
18     THE COURT: Sure. It's on the median.
19     MR. DALY: It's on the median. But what's their
20 claim here? Their claim is that my client ran around
21 marketing the spread. How do you market a spread? You can't
22 market a spread or do anything like that when you have a
23 J-Code. That provider is going to get -- let's say that the
24 J-Code says $10. That provider gets $10 whether it's my
25 client's drugs or one of the other dozen or so manufacturers

Page 21

1  who are in that J-Code. There's nothing to be done. There's
2  nothing to be gained, there's nothing to be lost by doing any
3  of the things that the government alleges that my client did
4  here. It's not possible because that person is going to get
5  ten bucks whether it's my drug or somebody else's drug,
6  whether I tell them that my drug is a great drug or that it
7  has, you know, or tell them what the J-Code is. It's the
8  same no matter what. So this scheme that they have alleged,
9  this business about my client marketing the spread, it just
10 falls completely apart.
11     THE COURT: Okay, thank you. I need to jump to
12 them in order to give them a chance because I do have a 4:00
13 o'clock that I've got to do.
14     MR. GOBENA: Your Honor, I'd like to clarify
15 something up front, a point that Mr. Daly is making. A large
16 amount of the damages in our case come from our Medicaid
17 claims, and in connection with our Medicaid claims, there's a
18 direct correlation between the prices that Abbott was
19 reporting that end up in these price reporting compendia and
20 what these states were reimbursing. So I don't want the
21 Court to be misled into thinking that a very small portion of
22 our case is this situation where there's a direct
23 relationship between these prices Abbott was reporting and
24 reimbursement, and that the large part of the case is this
25 J-Code part of the case. There's two different --

6 (Pages 18 to 21)

Page 22

1        THE COURT:  Tell me about your Medicaid claims.
2        MR. GOBENA:  Sure.  I mean, the Medicaid claims are
3   relatively straightforward.  In the Medicaid program, when
4   there's a drug that's physician-administered, then, yes, the
5   reimbursement is done on a J-Code system.  But when the drug
6   is reimbursed by a pharmacy, it's done on the basis of the
7   NDC.  It's NDC-based.  So, for example, in our complaint we
8   lay out how the state of New York, when it was reimbursing
9   for Abbott's vancomycin, they reported an AWP in 1999 of
10  $74.42.  What they did is, they took that AWP.  They had a
11  state formula, AWP minus 10 percent.  They applied it, and
12  they ended up reimbursing at $68.77, a direct correlation
13  between the AWP --
14       THE COURT:  But at the end of the day when they
15  have to report best price, why isn't the state and the
16  federal government recouping that?
17       MR. GOBENA:  Well, because, of course, in
18  connection with the best price program, they were reporting
19  the average manufacturer's price that's used to determine the
20  rebate that's going to go back, and that AMP is very
21  different from the price that Abbott is reporting in
22  connection --
23       THE COURT:  Right, but you get it back.
24       MR. GOBENA:  Well, you don't.  You get a small
25  fraction, your Honor, because the AMP is closer to the actual

Page 23

1   transaction prices.  Let's go back to that example I was
2   talking about, New York state.
3        THE COURT:  Yes, show me how it works because I
4   couldn't understand the Medicaid claim.
5        MR. GOBENA:  Sure.  With respect to the Medicaid
6   claim, when you're talking about a claim that's going to be
7   reimbursed by a pharmacy, a large chunk of our case, a large
8   chunk of our damages, it's very simple.  A pharmacist will
9   come in, they'll dispense the drug, and they'll key in the
10  code for Abbott's NDC.  And that ultimately works it way into
11  the claim system.  The state's Medicaid program will then
12  determine:  Okay, that's Abbott's NDC.  Here's our
13  reimbursement amount for that particular NDC.  Not a J-Code.
14  And that reimbursement amount is going to be set off of
15  either an AWP for most of the states -- there's about forty
16  of the states -- but for ten of the states, they use
17  wholesale acquisition cost, WAC.  And Abbott was reporting a
18  WAC that was also inflated.  And so on the Medicaid side,
19  that's a huge chunk of the reimbursement.
20       In addition, there are some reimbursements that are
21  done --
22       THE COURT:  Just walk it through.  So let's say,
23  pick a price, for vancomycin, how much would it be, the AWP?
24       MR. GOBENA:  The AWP, let's take 1999, it was
25  $76.42 cents.  That's the AWP.

Page 24

1        THE COURT:  Say it again?
2        MR. GOBENA:  $76.42.
3        THE COURT:  All right, and so that's the AWP.  And
4   what would be the -- how would they go about at the end of
5   every year, or whenever they do their tally, figuring out the
6   averaging manufacturing price?
7        MR. GOBENA:  That's a fact issue that we're going
8   to get down to with respect to Abbott and what they were
9   doing for calculating their AMPs, but --
10       THE COURT:  I know from all my other cases that at
11  some point Abbott has to report best price, which is
12  actually --
13       MR. GOBENA:  Sorry, not for a generic price.  It's
14  not best price for a generic drug.
15       THE COURT:  So it's what?
16       MR. GOBENA:  They report an AMP.
17       THE COURT:  All right, AMP.  And that should be --
18  and you're saying that AMP is dramatically lower than AWP --
19       MR. GOBENA:  It's closer.
20       THE COURT:  -- which it should -- what?
21       MR. GOBENA:  It's closer to the actual transaction
22  prices.  I don't know, I can't -- until we get full discovery
23  on it, we can't verify that, but we know --
24       THE COURT:  So why at the end of every year isn't
25  Abbott actually paying back the money?

Page 25

1        MR. GOBENA:  Because they'd be paying a percentage
2   off of the AMP as a rebate, and the AMP is much lower, and
3   you're not recapturing that huge spread that they created on
4   the front end when they reported an inflated price that
5   became AWP.
6        THE COURT:  So what does Abbott have to pay back,
7   AWP minus AMP?
8        MR. GOBENA:  You're talking about damages
9   ultimately?
10       THE COURT:  No, but what do they have to pay back
11  to the state and the feds on the Medicare?
12       MR. GOBENA:  The state is a percentage of AMP,
13  11 percent of AMP.  So let's say they're reporting an AMP
14  that is more accurate, for the same vancomycin drug we're
15  talking about?
16       THE COURT:  Yes.
17       MR. GOBENA:  They're selling it on average for
18  about $5, and then they're reporting $65 to the price
19  reporting (Inaudible).  That AMP would be closer to $5, and
20  they'd be paying 11 percent off of that.  Let's say it is $5
21  they report as their AMP.  That's the rebate that's going
22  back, so you're not recapturing anything.
23       THE COURT:  They're paying back what, $4.90 or
24  11 percent of it?
25       MR. GOBENA:  Eleven percent of $5, so I think

Page 26

```
 1  that's --
 2       THE COURT:  About 50 cents?
 3       MR. GOBENA:  55 cents, 60 cents.
 4       THE COURT:  I just want to understand.  Now, that
 5  11 percent is by state statute or by federal statute?
 6       MR. GOBENA:  That's federal statute.
 7       THE COURT:  So in the generic context --
 8       MR. GOBENA:  Yes, that's the formula.  Then on the
 9  brand context, it's obviously a different formula.
10       THE COURT:  That's best price.
11       MR. GOBENA:  Right, exactly, exactly.
12       THE COURT:  All right.
13       MR. GOBENA:  Okay.  You know, I know we don't have
14  a lot of time here, and I think our briefs pretty in detail
15  lay out a lot of our positions, but I just want to emphasize
16  a few points here.
17       THE COURT:  Well, what do you with -- I mean, I am
18  a little troubled.  I'm likely to define AWP to mean the
19  plain language of what the statute says AWP means, and we can
20  have a debate about, you know, is it mean or median or that
21  sort of thing?
22       MR. GOBENA:  Right.
23       THE COURT:  But what about the point that at some
24  point the federal government did know and for a False Claims
25  Act they did know it was false?
```

Page 27

```
 1       MR. GOBENA:  Well, it's interesting.  Let me take a
 2  step back.  As far as government knowledge goes, it's our
 3  position and we lay out in our brief that it only goes in the
 4  False Claims Act context to scienter.  It only goes to
 5  scienter.  It doesn't go to falsity, as much as the
 6  defendants would like it to go there.  And scienter is
 7  defendant-specific, so I think when you're dealing with --
 8       THE COURT:  It also goes to statute of limitations,
 9  right?
10       MR. GOBENA:  It could in certain circumstances.
11       THE COURT:  When you knew or should have known to
12  bring the suit.  I mean, this was brought so early.  I mean,
13  I don't know, should you have known -- what's a False Claims
14  Act, six?
15       MR. GOBENA:  Six or ten years.  It depends.
16  There's a tolling provision built in based on -- so, in any
17  event, as far as what we knew, the question that needs to be
18  asked ultimately is, what did we know about Abbott's conduct
19  and these drugs?
20       THE COURT:  Right.
21       MR. GOBENA:  And that information was known --
22  these reports that we see out here that the defendants love
23  to trot out there, if you look at all of them, only one
24  report that Abbott has attached actually mentions an Abbott
25  drug in this case.  So if you're talking about what the
```

Page 28

```
 1  government knowledge --
 2       THE COURT:  In 2000, right?
 3       MR. GOBENA:  No, I'm talking about -- well, there
 4  is one report that they mention that's a 1997 report.
 5       THE COURT:  1997, it mentions these four drugs?
 6       MR. GOBENA:  One of them.  Vancomycin is
 7  mentioned.  It's talking about Medicare reimbursement.
 8       THE COURT:  So taking their best case which is
 9  vancomycin, why doesn't after 1997 their knowledge of the
10  falsity --
11       MR. GOBENA:  Well, this is the nature of the
12  government's knowledge defense, and it's not really a
13  defense.  The way the government relates (?) Scienter with
14  the False Claims Act, in order for them to be insulated from
15  liability, which what they're seeking to do, they're seeking
16  to use these government reports to do that, they have to show
17  that there's a meeting of the minds between them and the
18  government that allowed them to engage in this conduct.  And
19  the best case that they can make from these reports is, well,
20  the government recognized that some manufacturers were
21  misrepresenting the prices and didn't do anything.  Well,
22  that's not a meeting of the minds with the government to
23  sanction them, sanction they are reporting the false prices.
24  And so, again, this is why this is going to be a very fact
25  specific issue, your Honor, and I agree with you that it's
```

Page 29

```
 1  difficult to deal with these on a motion to dismiss.  You're
 2  going to have to get facts, important facts.  First of all,
 3  what did Abbott disclose to the government, if anything?
 4  Secondly, was there any dialogue with the government, and,
 5  third, did the government sanction this particular conduct
 6  that Abbott was engaged in?  And, again, we're talking about
 7  very specific drugs and very specific conduct.  And the
 8  allegations of the complaint lay out that not only are we
 9  talking about large spreads, but Abbott was out there
10  actively marketing them as an inducement to their customers
11  to purchase their drugs.
12       THE COURT:  That's your kickback case.
13       MR. GOBENA:  That's the kickback theory, but also,
14  as we laid out, there's three theories of False Claims Act
15  liability in our complaint.  One is the kickback theory, that
16  they were creating -- the spread was illegal remuneration
17  that was being used to induce customers to go buy the drugs
18  that are reimbursed by the federal government.  We also
19  allege that they engaged -- that it also constitutes a
20  fraudulent course of conduct that led to the claims being
21  presented to the United States.  And we realize that if you
22  drew a diagram, there would a cross over between the two
23  theories, but you have to look at all the conduct and the
24  particular times that this particular company engaged in, and
25  then view that against the dropback of the False Claims Act.
```

Page 30

1  And there's certainly nothing that's been presented in their
2  motion to dismiss papers that warrants dismissal of the case.
3       THE COURT: What do you do with his J-Code argument
4  about the median? Because it is true, you couldn't market
5  the spread when you have a median price.
6       MR. GOBENA: Sure. I mean, we know -- I think the
7  issue there with the median is that they knew very well that
8  it could affect the median. And secondly --
9       THE COURT: Do you know if they were above or below
10 the median? Do you know whether it in fact did have an
11 effect on the median?
12      MR. GOBENA: It varies.
13      THE COURT: On those four drugs?
14      MR. GOBENA: I can't speak to --
15      THE COURT: Because I know that AWP has an effect,
16 for example, as you point out, on Medicaid, and it certainly
17 does in the third-party payor, but it was hard to figure out
18 whether it would have an effect on the federal government,
19 any one -- it depends on where you were in the median and
20 whether there's collusion set in the median and all that kind
21 of stuff.
22      MR. GOBENA: Well, we think that ultimately that
23 issue, what effect it had on a median, is more of a damage
24 question rather than a liability question because ultimately
25 they reported these false prices to induce their customers by

Page 31

1  their drugs. So if it turned out that they were unlucky and
2  they didn't get an effect on the median, that shouldn't
3  insulate them, because, I mean, on the front end, they were
4  engaging in conduct to affect whether there was direct
5  relationship between their prices and reimbursement, and
6  ultimately, you know, there's a corollary effect on the
7  situation with the J-Code.
8       THE COURT: Well, how many multi-source drugs are
9  there for -- let's say, I don't know, vancomycin or whatever
10 the salts or the sugery waters?
11      MR. GOBENA: It really varies. In the vancomycin
12 context, it could go up or down anywhere from, you know, 5 or
13 6 to as high as 8.
14      THE COURT: So if they were the low ball, don't
15 they get off the hook because they don't affect the median?
16      MR. GOBENA: Well, I think it goes back to what
17 your Honor was pointing to, everybody was acting in the same
18 way within an array, because, I mean, then they're all
19 basically acting to inflate the median J-Code. And in the
20 context of --
21      THE COURT: I do think there are difficult
22 causation issues.
23      MR. GOBENA: Well, again, if you take a step back,
24 another way to look at this too is that, you know, that when
25 a pharmacist goes out to buy their drugs or decides whose

Page 32

1  manufacturer's drugs it's going to buy, they don't
2  distinguish between I'm going to buy Abbott's for Medicaid
3  and company Xs for Medicare reimbursers and company Y's for
4  third-party party reimbursers. They go out and buy Abbott
5  drugs. So another argument we make is that with respect to
6  these Medicare claims, regardless of whether or not Abbott
7  actually affected the median, the fact that they're trying to
8  affect Medicare reimbursement, and also third-party payor
9  reimbursers that aren't the government, those tainted the
10 claims for the Medicare because Medicare (Inaudible) are
11 accused by the fraud on the Medicaid side. In other words, I
12 think we've argued that there's a tainted claim theory that
13 could be made out there that in fact just even the Medicare
14 claims are tainted by the fraudulent conduct with respect to
15 Medicaid.
16      THE COURT: Would it affect the kickback claim, in
17 other words, if it didn't matter because there's no
18 inducement to buy their drugs, everyone's getting paid at the
19 same amount?
20      MR. GOBENA: It could, I guess, but I think
21 ultimately what needs to be determined is the extent to which
22 they created an inducement. But at the same time it
23 shouldn't be whether or not they were successful or not with
24 respect to whether they were able to create that inducement
25 that determines their potential liability for submitting

Page 33

1  false pricing information on the front end.
2       THE COURT: So you're saying the only place that
3  really the inducement thing there would work is in the
4  Medicaid context because the pharmacy might go to the higher
5  AWP or not?
6       MR. GOBENA: Well, I'm not necessarily saying
7  that. Again, the bottom line is, there's much more of a
8  guaranteed inducement on the Medicaid side. As far as the
9  inducement on the Medicare and the J-Code side, it could very
10 well be that they don't necessarily create the inducement
11 they're intending to make with their drug, but ultimately the
12 pharmacist is still buying Abbott's drugs, so in some
13 respects, it doesn't matter. Their buying decisions are
14 tainted by the inducements on the Medicaid side, as well as
15 the inducements are being created for third-party payors.
16 Their inducements involving government funds that are being
17 created, and the pharmacist is buying it, and it would be odd
18 to suggest that the pharmacist decides to use a different
19 manufacturer's drug on the Medicare side separates out the
20 buying decision. That's not usually how it happens. So in
21 our view, you know, the fact that Abbott is trying to affect
22 buyers' decisions involving a failed health care program
23 directly shouldn't insulate them from liability on the
24 Medicaid side, shouldn't insulate them from potential harm
25 that they're causing on the Medicare side.

9 (Pages 30 to 33)

Page 34

 1      THE COURT:  What does the federal government think
 2  it was out of pocket for these four drugs?
 3      MR. GOBENA:  You're talking about the ultimate
 4  damages all together?  You know, that's an open question in
 5  some respects.  At a minimum, tens of millions of dollars
 6  because if you're talking about with this spread here, this
 7  $10 and $1 example that Mr. Daly used, that's the typical
 8  spread you'd find on the water-based drugs, the salt water,
 9  the sugar water, the sterile water.  And there's a hundred
10  million dollars in identifiable reimbursement at a minimum
11  that was involved in the period at issue.  If 90 percent of
12  that was the spread, you're looking at somewhere around
13  90 percent, I think, the damages there, the amount of money
14  that was improperly paid out by the government that payment
15  was caused by Abbott's conduct.
16      THE COURT:  Is the federal government coming in on
17  behalf of all these beneficiaries that have been overpaying
18  all these years the 20 percent?
19      MR. GOBENA:  Well, you know, we're certainly suing
20  on the 80 percent part.  As far as whether or not we're
21  covering on the 20 percent, I think the answer is not in this
22  part as part of this lawsuit, but obviously as part of the
23  class action case that's pending before your Honor, so we're
24  being made whole somewhere.
25      THE COURT:  So, anyway, what's the -- you probably

Page 35

 1  want to reply to that?
 2      MR. DALY:  Yes, your Honor.  Judge, what I want to
 3  say about this is that I think that both the False Claims Act
 4  and the Anti-Kickback Statute is kind of a square peg in a
 5  round hole problem.  I think on the False Claims Act, I go
 6  back to the fact that we don't hear anything about what's
 7  false about the claim.  There's no information that the
 8  provider submits to the government that is false, and having
 9  a false claim is the sine qua non of the False Claims Act.
10  If you don't have a false claim, you don't have a cause of
11  action.
12      THE COURT:  They're urging me to look in the
13  Medicaid context.  Then they say your J-Code argument doesn't
14  work.
15      MR. DALY:  Well, that's where they want to use the
16  Anti-Kickback Statute, I think, but one of the problems with
17  that is that when you look at the cases, they have to use an
18  implied certification theory, which I think that your Honor
19  may have seen in the briefs being discussed.  The implied
20  certification has never been applied beyond Medicare.  Why?
21  Because in Medicare you have a certification that each
22  provider signs that says, you know, "I will abide by the laws
23  including the Antikickback Statute."  You don't have that in
24  Medicaid, and therefore you can't use the implied
25  certification theory to create something that is arguably,

Page 36

 1  they want to say, an Anti-Kickback Statute violation, which
 2  then they could bootstrap into the False Claims Act.  It
 3  doesn't work because you can't have implied certification.
 4      THE COURT:  So then go to the False Claims Act and
 5  the Medicaid.  Suppose there you don't have the J-Code
 6  multiple source issue.  You're reimbursed based on an AWP.
 7  The doctor writes down vancomycin knowing full well that he's
 8  going to get reimbursed on an AWP, or the pharmacist.  Why
 9  isn't that a false claim?
10      MR. DALY:  Because there's nothing false on the
11  claim.  In other words --
12      THE COURT:  Vancomycin brings an implied
13  statement, "I want reimbursement at AWP."
14      MR. DALY:  Well, that's up to the state, I mean,
15  you know, whatever methodology it's following to reimburse.
16      THE COURT:  So you're claiming there's no false
17  claim to the federal government?
18      MR. DALY:  Right.
19      THE COURT:  Where do you get the false claims to
20  the federal government.
21      MR. GOBENA:  Your Honor, the federal government is
22  paying part of that Medicaid reimbursement to any federal or
23  state program.  So of course if there's a claim made to the
24  state under the Medicaid program, that might --
25      THE COURT:  You pay what?  I forget.

Page 37

 1      MR. GOBENA:  It depends.  On average, about
 2  57 percent across all the states, but --
 3      THE COURT:  Is there case law that says that a
 4  false claim to a state under Medicaid constitutes a false
 5  claim to the federal government under the False Claims Act?
 6      MR. GOBENA:  I think so, absolutely.  Again it's
 7  federal money involved, so, you know, do I have one off the
 8  top of my head?  No.
 9      THE COURT:  Because you'd say that the state then
10  submits that claim to the federal government.  So is that
11  enough?  I don't know.
12      MR. GOBENA:  I think it absolutely is enough
13  because there's a presentment of a claim to the government
14  ultimately.
15      THE COURT:  By --
16      MR. GOBENA:  By the state in order to get that
17  money back, and so you don't have any of those presentment
18  issues.  I think it's important to really clarify another
19  issue, though.  It's the law of the circuit, the Rivera case,
20  that a claim does not have to be false on its face in order
21  to be actionable under the False Claims Act.  Rivera in fact
22  sort of embraces a fraudulent course of conduct theory under
23  a potential basis for False Claims Act liability.  So this
24  whole argument that claims forms don't have any false
25  information on them particularly is not going to insulate

10 (Pages 34 to 37)

Page 38

1  them from liability ultimately.  Another thing I want to
2  point out is that the Poe decision actually had Medicaid
3  claims in it.  The Poe decision that Mr. Daly referenced, if
4  you look at Page 263, that's 238 F. Supp. 2nd 263, right
5  there the judge is talking about how the claims were
6  sustained in that case and that there are Medicaid claims in
7  Paragraph 48 of the Fourth Amended Complaint.  So I'm not
8  quite sure where Mr. Daly is coming from on that point.  But
9  leaving that aside, I think that there's an important, I
10 think, point there.
11       THE COURT:  So you would agree with him that all
12 the doctor or the pharmacist writes down is vancomycin.
13       MR. GOBENA:  NDC probably.
14       THE COURT:  Right, the NDC.  And then your point is
15 implicit in that, it is going to be reimbursed at the AWP.
16 He says that's not enough for a false claim.
17       MR. GOBENA:  That triggers the process, in our
18 view.  That leads to the submission of the claim --
19       THE COURT:  All right, I got the debate.  Okay.
20       MR. DALY:  I don't think that's a false claim.  I
21 think they can sue us for fraud if they want to, which they
22 have done.  So it's a square peg round hole problem.  To
23 answer the question about the Poe case, if you look at it,
24 Judge, there's no analysis of whether or not you can use the
25 Antikickback Statute on an implied certification theory for

Page 39

1  Medicaid.  All it does is, it recites in a footnote that
2  Paragraph 42 of the complaint alleged Medicare and Medicaid.
3  There's no analysis of the question that I think is presented
4  to the Court today, which is, can you use it in that way?
5       And then, finally, just to be clear, I'm not saying
6  that I think that in the Medicaid context, that certainly
7  that submitting it to the state creates a false claim.  I
8  still have my other arguments that there's still nothing
9  false about that.
10      THE COURT:  Sure.  Okay, I understand the debate.
11 We've got to move on.  What did you want?  We need to get
12 discovery going, right?
13      MR. DALY:  Yes, your Honor, absolutely.
14      THE COURT:  So are you ready to do like a
15 scheduling order?
16      MR. GOBENA:  Well, your Honor, there's actually --
17      MR. DALY:  We are.  I think we've submitted
18 competing orders to the Court which sort of differ, and we
19 want to move quickly, and they want to move less quickly, we
20 want more, they want less, generally speaking.
21      MS. BROOKER:  Your Honor, I would just say briefly,
22 if your Honor is not going to hear either today or tomorrow
23 the briefs -- we were initially before Judge Bowler on Monday
24 on this issue, so the government did not file a reply.  We
25 were going to seek leave to file a reply.  To the extent that

Page 40

1  your Honor doesn't want to hear that today --
2       THE COURT:  Do you want me to just do it on the
3  papers?
4       MR. GOBENA:  We could do it on the papers, your
5  Honor, or we could appear before your Honor.  I think there
6  are more issues involved than simply they want more
7  limitations in our case and we want a different number.
8       (Discussion off the record.)
9       THE COURT:  So how much time do you want?
10      MS. BROOKER:  I would say, your Honor, I was
11 planning on about 20 minutes you know.
12      THE COURT:  Okay, for the discovery.
13      MS. BROOKER:  I'm sorry, your Honor.  I thought you
14 meant to argue.
15      THE COURT:  Twenty minutes, that's going to be the
16 quickest case in Federal Court.
17      MS. BROOKER:  I think it will take a lot longer
18 than that, your Honor.  In terms of the time period for
19 discovery, is that your question?
20      THE COURT:  Yes.
21      MS. BROOKER:  That really depends on the scope of
22 discovery, which is what we've argued in our CMO, but the
23 government believes that if the scope of discovery, if the
24 parameters are set as they should be, that this case could be
25 -- you know we could go through the discovery process in 18

Page 41

1  months.
2       THE COURT:  How much do you need?
3       MR. DALY:  Judge, there's a very large issue in
4  what counsel just indicated.  In terms of the scope of
5  discovery, that's the big issue for the CMO.  They're trying
6  to say that my client doesn't get any discovery of government
7  knowledge, government policy, all these things that are on
8  the board up there, they're irrelevant to the case, and
9  Abbott doesn't need any discovery on it whatsoever.  It's a
10 big issue for us.  We think it's one that we win.  We think
11 that -- but that's the big issue on the CMO.  We've proposed
12 a year, Judge.  We think that this case has been pending --
13      THE COURT:  The debate is between a year and 18
14 months?  Is that the debate?  Can't I resolve that right
15 thousand?  Why don't I say halfway between the two?
16      MR. GOBENA:  Your Honor, the debate is that we say
17 18 months, but we say that parameters should be set on the
18 scope of discovery within 18 months.
19      THE COURT:  Why can't they get what you guys know
20 and did?
21      MR. GOBENA:  Well, your Honor, we disagree with
22 that position.
23      THE COURT:  Why?
24      MR. GOBENA:  We have not taken the position that
25 there should be no discovery on government knowledge.  Our

Page 42

1  position is much more refined than that.  What we have said,
2  however, is that defendants are not entitled to have
3  discovery on the entire federal government, which is
4  essentially what they're seeking, for all pharmaceutical
5  companies, for all drugs, for the last 41 years.
6         THE COURT:  Oh, I see.
7         MR. GOBENA:  It's not limited to Abbott's specific
8  conduct and Abbott's drugs, and it's certainly not limited to
9  HHS and CMS.
10         THE COURT:  I'm not going to resolve the scope of
11  discovery issue right this second.  What I am going to do is
12  kick start this case.
13         MR. DALY:  Thank you.
14         THE COURT:  Because as far as I'm concerned, you've
15  been dealing with it since 1995 -- maybe not you
16  personally -- but it's been around since 1995, and I'm going
17  to open up everything that happened in MDL, we're going to
18  have a trial starting in two weeks.  By the way, the
19  government, have you made a decision about whether these
20  folks are going to testify?
21         MR. HENDERSON:  Your Honor, CMS has denied, and
22  there's been an emergency motion by the defendants, CMS has
23  denied the Tooey request.  I'd also note that there are no
24  subpoenas out.
25         THE COURT:  For trial, for trial, for trial

Page 43

1  subpoenas or just -- I've already ruled on the pretrial
2  depositions.
3         MR. HENDERSON:  There are no trial subpoenas
4  outstanding.  I mean, these people are beyond the subpoena
5  power of the court.  They're not within the district.
6         THE COURT:  All right, so then it's full square up
7  for this case, right?
8         MR. HENDERSON:  I'm sorry?
9         THE COURT:  Because, I mean, I denied the request
10  because just because it's too late for discovery, but this
11  case is in a different posture, so I'm going to have to deal
12  with this case.
13         MR. HENDERSON:  Yes.
14         MS. BROOKER:  Your Honor, if I may be permitted to
15  say one more brief thing.  I didn't want to leave your Honor
16  with a misimpression.
17         THE COURT:  Yes.
18         MS. BROOKER:  Our position is that Abbott
19  specifically, and Abbott as lead counsel on discovery in this
20  MDL proceeding as well as the Lupron MDL proceeding, has
21  received all discovery on broad government knowledge.  That's
22  why they have all these government reports, for example.
23         THE COURT:  So they can have everything that
24  happened in the MDL.
25         MR. DALY:  Well, we have that anyway, Judge.

Page 44

1         MS. BROOKER:  What we're seeking to set parameters
2  on is Abbott starting discovery, and if your Honor opens the
3  gates now and says "go," Abbott is going to be seeking
4  discovery against all of the Department of Defense on all
5  pharmaceuticals for forty years, the same thing with the
6  Department of Commerce, the same thing with the VA.
7         THE COURT:  And you'll move for a protective
8  order.  So, you know, the truth is, I'm just doing a
9  scheduling order.  I'm not going to resolve every issue in
10  this litigation going forward, and this is huge, you know,
11  how much was -- you know, this is huge.  I'm not going to
12  decide every single one of those issues right now.  What I am
13  going to do is 15 months for discovery, all right, not being
14  too Solomonic about it.  I think that's actually incredibly
15  generous, given the fact of how much has happened so far, and
16  then -- so that pulls us to, like, through December 31 of
17  next year?  Does that sound roughly okay?  Then January 31
18  for the government's expert reports, and February 28,
19  assuming it's not a leap year, for the Abbott expert reports,
20  April 30 for the expert discovery.
21         MR. DALY:  Deposition.
22         THE COURT:  And so I might be willing to guess, if
23  I don't, that at least on all remaining claims, I am likely
24  to see motions for summary judgment.
25         MR. DALY:  It's possible, your Honor.

Page 45

1         THE COURT:  Just possibly.  So I think we'll
2  probably do -- why don't we just say June 15 for a motion for
3  summary judgment.  Is this pushing it out too far?  Do you
4  think this is --
5         MS. BROOKER:  No.
6         THE COURT:  July 15 for the opposition, August 1
7  for the reply, August 15 for the surreply.  And the next
8  group of law clerks can get the whole shebang for the motion
9  for summary judgment.
10         When do you want to go to mediation?
11         MR. DALY:  Can we get together and propose
12  something.
13         MS. BROOKER:  We can propose something, your Honor.
14         MR. DALY:  Or you can just fix a date anywhere in
15  there.
16         THE COURT:  You know, there are just a bunch of --
17  we could send it to the United States magistrate judges.  I
18  think in this kind of case, you may want to go to the people
19  who deal with the really big stuff.  And why don't you both
20  talk within two weeks and send me letters and counter letters
21  for a proposed settlement.
22         Now let me ask the government this.  Is this just
23  the first?
24         MR. HENDERSON:  That's what I wanted to speak to,
25  your Honor.  I'm one of the counsel on another case that's

Page 46

1  been filed, an AWP case that's before Judge Lasker against
2  Dey, Incorporated.  And we intervened a couple of months
3  ago.  Dey has not answered.  We did file a notice of related
4  case before Judge Lasker.  Judge Lasker probably hasn't
5  looked at it, and we've asked Dey on its position about a
6  motion to transfer to the MDL.
7       THE COURT:  How many more am I going to look at
8  brought by the federal government against the drug
9  companies?
10      MR. HENDERSON:  I can't answer that, your Honor,
11 but at this point in time I do anticipate that there will be
12 an additional case.
13      THE COURT:  At least the Dey case?
14      MR. HENDERSON:  Well, the Dey case is before
15 Judge Lasker and then one additional to that.  Beyond that, I
16 can't really say.
17      THE COURT:  Well, here's my issue.  When will all
18 this be happening?
19      MR. HENDERSON:  Well, the Dey case anytime.  I
20 think we've agreed that their response to the complaint is
21 due in late December, December 22.
22      THE COURT:  Because my concern is really to some
23 extent internally with resources with me.  I will at this
24 time around I've been very lucky the fishing has given me a
25 third law clerk /SR-RS /SR-RS maybe at some point during the

Page 47

1  trial as it's coming up, I'm just going to need to know
2  what's happening on the big picture.
3       MR. HENDERSON:  In addition one of the things I'm
4  concerned with your Honor is that we go through a lot of
5  discovery by Abbott against the government and then Dey says
6  well wait a second we didn't have the opportunity to
7  participate in that discovery, we've got to retake these same
8  depositions all over again, and then a few months later we
9  have another defendant who says well we've got to take depose
10 these people.
11      THE COURT:  Well that may happen I don't know how
12 to protect against it other than the fact I incorporate the
13 deposition and they just would supplement and not start from
14 base one, you know?
15      MR. HENDERSON:  Perhaps.  If we could at least get
16 the Dey case before the Court and discovery proceedings
17 consolidated on the same schedule.
18      THE COURT:  That will be another day, huh?  It's
19 been a long day.  I've got to go I have this other case.  So
20 why don't we do this:  I have been more focused on the motion
21 to dismiss, I have to confess, than the CMO.  I'm moving it.
22 It's going.  You file your inevitable as day follows night
23 deposition subpoenas.  You're going to move for a protective
24 order, and I'll either refer it to Judge Bowler if I think
25 it's a cutting-edge issue I'll take it myself or maybe give

Page 48

1  her the first crack at it will be appealable if people didn't
2  like the results of it I'll just play that by ear but this
3  needs to get going.  It's been pending since 195, right?
4  Good thank you.
5       MR. DALY:  Thanks four*/*.
6       (Adjourned, 4:07 p.m.)

Draft Copy