# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: | ) | |
| PHARMACEUTICAL INDUSTRY | ) | CA No. 01-12257-PBS |
| AVERAGE WHOLESALE PRICE | ) | MDL No. 1456 |
| LITIGATION | ) | Pages 1 - 49 |

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 27, 2007, 10:10 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA 02210
(617)345-6787

A P P E A R A N C E S:

For the Plaintiffs:

RENEE' BROOKER, ESQ. and GEJAA T. GOBENA, ESQ., United States Department of Justice, Civil Division, Commercial Litigation, Fraud, 601 D Street, N.W., Washington, D.C., 20004.

JAMES J. BREEN, ESQ., 3562 Old Milton Parkway, Alpharetta, Georgia, 30005, for the Relator, Ven-A-Care of the Florida Keys.

For the Defendants:

JAMES R. DALY, ESQ., Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692, for Abbott Laboratories.

P R O C E E D I N G S

THE CLERK: In re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Action 01-12257, will now be heard before this Court. Will counsel please identify themselves for the record.

MS. BROOKER: Good morning, your Honor. Renee' Brooker on behalf of the United States. I'm from the Commercial Litigation Branch in Washington, D.C. at Main Justice.

MR. BREEN: Jim Breen on behalf of the Relator, Ven-A-Care of the Florida Keys.

MR. GOBENA: Gejaa Gobena on behalf of the United States.

MR. DALY: Good morning, your Honor. Jim Daly on behalf of Abbott Laboratories.

THE COURT: Now, this is just against Abbott?

MR. DALY: Yes, your Honor.

MS. BROOKER: This particular case, yes, your Honor.

THE COURT: That sends chills down my spine. So are there others? I know I've got a couple of other intervenor cases.

MS. BROOKER: That's right, your Honor.

THE COURT: And what do those involve?

MS. BROOKER: They involve the same issues,

obviously different pharmaceutical manufacturers, different drugs, but those are Dey and Roxane, and I do not believe that Roxane is before the Court. The United States did file an unopposed motion -- I believe it may have been Friday -- to transfer a third case before your Honor.

THE COURT: Now, does it make some sense -- how old are those other two cases?

MS. BROOKER: They're about the same age, your Honor, as the Abbott case.

THE COURT: Does it make some sense to put you all into some sort of a lockstep?

MS. BROOKER: It does make sense to us, your Honor, yes.

MR. DALY: From our perspective, it does not, Judge, for the following main reason: I mean, we've been at this since the spring. We have a discovery cutoff of the end of this year to 12/31/07. My understanding, although I'm not directly privy to the conversations that the United States has had with the other defendants, but I believe they are agreeing to much longer time periods to deal with their case.

THE COURT: So you think it's -- so bring me up to -- this is why I brought you all in here.

MR. DALY: Right.

THE COURT: This is somewhat, I have to say I'm sorry, a court mistake. This somehow ended up in purgatory

between the United States Magistrate Judge and me, with me thinking she was going to handle it and she thinking that I was going to handle it. And the reality is that we both talked, and I brought it back up here because I understood it was part of a bigger picture, so --

MS. BROOKER: It is, your Honor.

THE COURT: So I probably should hear what's been happening so far, you know, like, what needs to happen to bring this case to the point where --

MS. BROOKER: Yes, your Honor, and I think I can give you a brief overview of where the parties are at.

The United States and Abbott and relator Ven-A-Care have been proceeding with discovery in this case. A couple depositions have been taken. There are deposition notices outstanding, document requests, interrogatories. Requests for admissions have been served. At the time that Dey joined a few months ago, we have been attempting to, and Dey has been cooperative, in trying to coordinate at least with respect to the deposition discovery that's being taken against the United States.

THE COURT: Let me stop you right there. When you say Dey joined, it's a separate action against Dey?

MS. BROOKER: Yes, it is.

THE COURT: So you just mean sort of informal coordination?

514bf967-2d22-4082-baaa-b8173ddef2eb

MS. BROOKER: Yes, we have been coordinating. Dey has been coordinating. We have been notifying Dey about depositions against government witnesses. They have appeared, I believe, at the first two depositions. We also, the United States, whenever we serve documents pursuant to document requests upon Abbott, we also send a copy to Dey, and so there has been some coordination going on.

Now, I will tell the Court that the parties, Abbott and the United States and relator, came here this morning with the intent of informing the Court in the first instance that we believe we have substantially, although I want to carve out a big significant issue, but we have substantially agreed upon a case management order. We've been working on this for the last several months. We were working on it all the way up until the time, you know, ten minutes outside of the courthouse. I think that we, again, carving out one issue that we would like to raise, we can present the Court with a proposed CMO that does just apply to this case.

THE COURT: Okay.

MR. DALY: That's correct, your Honor.

THE COURT: So what's the big remaining issue?

MS. BROOKER: Okay, this is the big remaining issue, your Honor.

THE COURT: Of course, without knowing the rest of what you agreed on, it might be --

MR. DALY: We'll walk through that with your Honor and make sure your Honor agrees.

MS. BROOKER: Yes, basically just to summarize, we have largely agreed to parameters for discovery; you know, discovery limitations, numerical limitations largely. We've agreed to deposition protocols, document production protocols primarily.

The significant issue that we would like to bring to the Court's attention today is an issue that has prevented the United States from moving forward with discovery. Abbott has served initially in this case a set of initial disclosures. The United States has been attempting for months now, since we appeared before your Honor on August 26 when your Honor said, "I'm going to open up everything that's happened in the MDL proceeding," we served document requests, and we've asked repeatedly Abbott to provide to us a set of materials that it has produced in other AWP cases, including in this case pursuant to CMO 5 and pursuant to CMO 7. We have a small subset of those materials. Abbott has obstructed us from --

THE COURT: Well, without using the verbs, why don't you produce them?

MR. DALY: Your Honor, the reason for it is that the United States has only sued us for four drugs. This court has -- they talk about CMO 5 and 10, but they never

talk about CMO 9 which the Court entered, which very clearly states in Paragraph 3 that any governmental plaintiff that comes into these cases gets what has been produced in other cases to the extent they relate to the drugs that the governmental entity has sued upon. Our problem with this is that if you take Texas, for example, the state court action in Texas, they've sued Abbott for all kinds of drugs, branded drugs. The government suit is only four generics. Texas has sued for hundreds of drugs.

THE COURT: Well, I suppose you both have a good point, but what about what I would call crosscutting documents about, you know, like mode of operation and marketing techniques or something?

MR. DALY: Right, and your order provides for that, Judge. I didn't mean that -- I wasn't done, but it talks about drugs that have been sued on or otherwise relevant to the complaint, and we have not withheld the kind of documents that the Court just described.

MS. BROOKER: We take great issue with that, your Honor. If I may --

THE COURT: But you're not entitled to every drug if you haven't sued on it.

MS. BROOKER: Well, your Honor, two points I would like to make. First, I'd like to address that. I'd also like to say that Mr. Breen, who is the relator in a Texas

state action, would like to address the Court on this issue because he has information that he needs to provide the Court on this. But we do believe, your Honor, we have two problems with this. Number one, the MDL private plaintiffs in this case have a set of documents that we know are relevant in this litigation. All Abbott has to do is burn a copy of the CD-ROMs and provide it to us.

THE COURT: Well, like what? What do you know you --

MS. BROOKER: Well, I would allow Mr. Breen to address that because he is also in the Texas case. And in the Texas case, the relator and the State of Texas had to move to compel Abbott to produce documents on numerous occasions. Abbott attempted to vacate the trial court's order by seeking several writs of mandamus that went all the way up to the Supreme Court of Texas on two occasions. That's how much --

THE COURT: What are the documents? In other words, let me put it this way. I generally believe the following: You're not entitled to documents on any single drug if you haven't charged it. You are entitled to do discovery beyond the four drugs to the extent it shows that there's some practice or pattern of conduct.

MS. BROOKER: That's right.

THE COURT: Now, where it falls in between, I'm not

514bf967-2d22-4082-baaa-b8173ddef2eb

sure how to do that. Perhaps one thing would be --
Yes? You're in the other case?
MR. BREEN: Yes, your Honor, and that's why I think it might be helpful if I can just go over a couple of points.
THE COURT: All right.
MR. BREEN: Mr. Daly is one of lead counsels for Abbott in the Texas litigation. We've been litigating it --
THE COURT: In state court, is that it?
MR. BREEN: State court, Judge. We've been litigating it for three years now?
MR. DALY: It seems.
MR. BREEN: It seems longer? It seems longer, and it is for more drugs. But the documents -- and I'm kind of in a unique position because I see both sides, and I've got --
THE COURT: The documents do what?
MR. BREEN: Pardon me, your Honor?
THE COURT: What do the documents do? What do they say?
MR. BREEN: A number of things. There's about three times more documents that have been produced in the Texas case than have been produced here.
THE COURT: Sure, because there are more drugs, but what are the crosscutting issues?
MR. BREEN: But that's not why.

THE COURT: Why?
MR. BREEN: Number one, the crosscutting issues are -- and there's, like, categories, if I can just break them down. One is, Abbott has taken a position regarding temporal scope in this case. It tried to take a similar position in Texas, lost at the trial level, lost at the appellate level, lost at the Supreme Court level. And so we've got a broader temporal scope that covers the drugs at issue in this case. So that's number one. And there's lots of documents, and when I say "lots" --
THE COURT: So you're saying that it relates to these drugs?
MR. BREEN: These drugs, and I've already got the documents, so there's no burden whatsoever.
THE COURT: Have you conferred with him on those?
MR. BREEN: Your Honor, we have, and we've made some progress on temporal scope but not -- but it's still the same issue. What Abbott says is --
THE COURT: All right, so temporal scope. What's the next one?
MR. BREEN: The next issue, your Honor, is, there's just flat-out held-back documents. And I'm not going to suggest it's by intent. We're talking about millions of documents here.
THE COURT: All right, and what's --

MR. DALY: Not that they have been held back but millions of documents.
MR. BREEN: Right. I'm saying -- I'm not saying --
THE COURT: So what's the third one? Just held back. And they may relate to these drugs?
MR. BREEN: These drugs that we've used as recently as two weeks ago in a 30(b)(6) deposition in Texas to make critical points.
THE COURT: And what's the third one?
MR. BREEN: The third issue, your Honor, is other drugs but either the same practice, or it demonstrates Abbott's overall business practice in how it reports its prices. And so Texas has sued on more drugs, but to the extent that Abbott's --
THE COURT: I tell you what, why don't we do this. This is a unique situation.
MR. BREEN: And I've already got the documents.
THE COURT: Why don't you take fifty, a hundred representative documents from each of those categories. You gave me three: A, temporal scope, B, just plain old didn't produce them, and, C, sort of they show business practice during a relevant time period. You confer with him, show him, because you luckily have two hats, so I don't have to operate off of some blinders. You take those. You show it to Mr. Daly. If he's persuaded, then you'll produce.

Otherwise you're going to submit them in camera to me or Magistrate -- is Judge Bowler involved in this case?
MR. DALY: Yes.
THE COURT: And if you win on the fifty documents apiece you choose, I'm just going to say "Produce the CD." So, in other words, if you're not being reasonable about this, you're just going to lose. I'm not going to look at millions of documents.
MR. BREEN: And, your Honor, may I just add one request?
THE COURT: Yes.
MR. BREEN: Because understand that these documents are subject to the Texas protective order. I can see them, I can use them, but I cannot show them to my co- --
THE COURT: I understand you can.
MR. BREEN: But hold on, your Honor. Mr. Daly has got to consent to my showing them to your Honor in camera, and I just need their consent.
MR. DALY: I consent, your Honor.
MR. BREEN: And I've asked that before and have not gotten an answer yet. That's the first time I got that answer.
THE COURT: And it may be, just out of respect to the Texas court, you may need to sort of file some sort of a --

514bf967-2d22-4082-baaa-b8173ddef2eb

Page 14

MR. BREEN: Not without his consent, Judge. And that's the critical point. All he has to do is say "I consent" and --

THE COURT: So he's consented. So what you need to do is just -- I can't rule off the cuff on this. That's going to be impossible. What you need to do is, you have three categories you've very neatly, succinctly set out. You show him representative documents from -- you've seen them -- from each of those categories by yourself as intervenor. You try and confer and see what you can work out. If you can't, come up with a timetable, briefing timetable, motion to compel, response. You probably need to file it under seal, right?

MR. DALY: I think that's probably appropriate, Judge.

THE COURT: And I'll either refer it to Judge Bowler or take it myself, likely refer to Judge Bowler. And because neither Judge Bowler nor I with all these cases have time to go through a million documents apiece, I'll look at the representative ones; and if you win most of them, I'll just say "Turn over the CD." If you only win a small fraction and I think you're overreaching, I'm just going to say "Denied." So it's in everybody's interest to try and work this out. Take your best documents.

MR. BREEN: But, your Honor, we will do that

Page 15

exactly as you say, but I just want to emphasize, the whole point here is to streamline discovery. We've got a December 7 deadline. We have been involved in years of -- we've already fought this battle, and it's done. This is an MDL.

THE COURT: I understand, but neither can you use a lawsuit as a fishing expedition for ten more drugs that you're interested in. So one possibility would be an agreement that you're not going to sue for the other drugs, and I'll order you to turn over all the CDs right now. But you can't use discovery as a fishing expedition. That's the big bottom line. On the other hand, you can't barnstorm and just say it's just the four drugs, if in fact they show some overarching business principle, and I -- because they get to prove their case as to what management was thinking and doing, you know, prior bad acts kind of evidence.

MR. BREEN: Your Honor, can I respectfully address the fishing expedition issue and we can't prove our case through fishing for the drugs, just very briefly? I just want to emphasize that this is an intervening case by the United States. And we're not fishing. I've got the boat. The boat's got the fish in it. I just want to bring it to the dock.

THE COURT: With those four drugs, but what you can't use the discovery for is to get another fifteen drugs.

Page 16

MR. BREEN: Your Honor, a relator can't, and I wouldn't.

THE COURT: But neither can they. Unless they want to do it under the auspices of administrative subpoenas, neither can they. They've got to be able to have a good-faith basis for saying they were defrauded or there was false claims with respect to the other fifteen drugs. If they do, amend your complaint. And you might already have that. Do you? I don't know.

MS. BROOKER: Your Honor, can I just briefly address your Honor's two points about the fishing expedition? And, also, I don't want to leave the Court with the impression that this is just unique to Texas. So the solution that your Honor has proposed is not going to solve the issue, and the problem is --

THE COURT: I can't rule off the bench like this, so that's unrealistic. You haven't filed a motion to compel. He hasn't filed an opposition. It's a huge issue. So I'm trying to cut through it right now thinking out loud. So if you feel really strongly, you file a motion to compel, but I can't resolve it. Right now I'll -- do you have a typed-up scheduling order that I can look at?

MS. BROOKER: We don't, your Honor, because we just agreed to some things in the hallway.

THE COURT: Frankly, if you agree, I'm

Page 17

overwhelmingly likely to agree unless it essentially taxes my resources too much, given the other cases that I'm trying to handle here.

MS. BROOKER: But just a couple issues, your Honor. With respect to -- we are just talking about the state of Texas. In your Honor's CMOs 5 and 7, you made available to the plaintiffs, the MDL plaintiffs, all materials without respect to the subject drugs, all materials that any defendant provided in any investigation, any prior state court proceeding. The United States for some reason is getting less discovery than a private commercial plaintiff. We don't understand why that is.

THE COURT: Maybe it wasn't opposed. I don't remember. They tended to come in by agreement as well. I don't remember if this was opposed. I don't remember what the debate was. I don't remember what the drugs were. You cite my CMOs as if I've got them memorized. Between the Neurontin case and this case, I have no memory, no present memory of what the debate was, so that's why I can't rule off the bat. If you want to move to compel, move to compel. This is going to be a shortcut in this case.

MS. BROOKER: I do understand, your Honor. And let say, first of all, we have, in addition to raising this issue in the CMO, since it wasn't being addressed, we also filed a motion to compel. That motion to compel is still pending.

514bf967-2d22-4082-baaa-b8173ddef2eb

It's been fully briefed.

THE COURT: Oh, well, I didn't know that.

MS. BROOKER: Yes.

MR. DALY: It's before Judge Magistrate Bowler, your Honor.

THE COURT: So why don't you just let her decide? Why am I even ruling on it?

MR. BREEN: Your Honor, without the suggestion you made, I can't file the documents, and this is an important point. Let me just add -- can I ask one question to make sure I -- can I serve the government with this motion and including the sealed documents?

MR. DALY: You know, it's hard for me to say in terms of whatever it is that you're doing, Mr. Breen. I mean, our problem is this, Judge: I mean, there are temporal problems. The government is only suing us up until 2001. They cut off their complaint thereafter. Mr. Breen in Texas is suing us up to the present day. Every hour that goes by is part of Mr. Breen's suit there.

THE COURT: Is this based on AWP?

MR. BREEN: Yes, your Honor, the same case.

THE COURT: Let me just say, in one of my many other suits, I cut things off at 2003 because at that point the Medicare Modernization Act came through, so that's where I cut it off. I don't know where the -- that strikes me as a

reasonable cutoff, at least for the time being. That's when the ASP came into play and the whole world knew about inflated AWPs, or at least anyone who was part of this world knew probably by 2001, but certainly by the time Congress passed the statute, right, everybody knew? So that would be one compromise date, a couple of years after the ending of your class. I mean, some of this should just be worked out.

MS. BROOKER: Judge, we have been trying to work this out for three months, and let me just explain. Here's the problem: The government, we are just standing still. We are prevented from moving further. Here's what we cannot do.

THE COURT: What do you want me to do now? I haven't read these motions to compel? I walked in here thinking I was just going to set deadlines. You may be right or wrong. I'm trying to cut through this, okay?

MS. BROOKER: Yes, your Honor. We're just asking for, frankly, what all the CMOs have said, even your most recent --

THE COURT: I can't rule off the bench. I haven't even read my CMOs. I don't remember what the debate was. I don't know. So I'm happy to rule. I can't do it right this second, that's all. I think this compromise will get you through a lot. And so I am suggesting that what -- you may win. You may win. I haven't read anything. I don't know about you; I don't know how you rule off the bench when you

haven't read anything. I don't remember the CMOs. I don't know what the issues are. I haven't read your full-blown recent complaint. I don't know the case. This is my fault that I thought the CMO had been entered a millennia ago. I'll enter your agreed-upon CMO. Then I promise to get to your issues as soon as I read the briefs. I just don't know.

What I do know is, I can cut through a fair amount of this if I'm going to have you show to the other side the documents that you -- I'm sure you're a fine attorney, and I don't know whether at this point we need to get agreement to show it to the government or not. And if in fact you can't resolve it based on that, then what I'm going to do is, I will either -- I will forward all the documents over to Judge Bowler, and hopefully she'll rule on it. Does she know -- when was it fully joined, the motion to compel?

MS. BROOKER: The last time we had appeared before Judge Bowler it had already been fully briefed. Do you recall --

MR. DALY: It was in January.

THE COURT: She's away now, I think.

MS. BROOKER: Yes, that's partly the reason, I believe, for the delay.

THE COURT: She's been away for a couple of weeks, so --

MS. BROOKER: Yes, but in the meantime, just

providing the status, we just wanted the Court to know that the discovery clock is ticking, and we can't speak with plaintiff's counsel in this case about this case. We can't speak with our own co-plaintiff in this case about any documents or any discovery in the case. Abbott has told us that when we cross-notice depositions in this MDL proceeding or in other cases, they're probably going to kick us out whenever they deem something irrelevant.

MR. DALY: I haven't said that, your Honor.

MR. BREEN: Counsel, your cocounsel has said that on a couple of occasions.

MS. BROOKER: Repeatedly.

THE COURT: Let me say this, that you're precluded from doing that. Okay, so we're going to go through this. We're not going to stop depositions. We're going to keep this thing going. Nothing is so sacrosanct that --

MR. DALY: Judge, we haven't thrown anybody out.

THE COURT: Everybody can stay in.

MS. BROOKER: We don't have the documents is the problem.

THE COURT: All right, you don't have the documents. We need to proceed with discovery. You need to put together all the documents that you think -- do you have some team of paralegals or someone --

MR. BREEN: Your Honor, we put so much money into

514bf967-2d22-4082-baaa-b8173ddef2eb

this. I've got two huge databases of the federal documents that they produced, the Texas documents. I've cross-walked them. If I can show you that chart, you'll see that they're providing -- you know, but my point is, my question is, because this is not just Texas: Do you want me to include -- for example, you've got the state of Pennsylvania, and they've got documents. Can I include some of their documents in this too so you'll see the whole picture? Because there's a lot of folks doing discovery --

THE COURT: I don't know enough is the thing. You can include what you think you need to include. I am telling you I am working -- I have thousands of documents right now that I'm reviewing based on the bench trial that I've done. I have the Neurontin case. I have twelve state Attorney General cases. I have the second stage of the AWP case. I've got these. I know the issues, so in some sense it makes sense, but I can't sit and go through thousands of documents. That's what I can't do.

MR. BREEN: I know, Judge. That's what we're trying to prevent, and that's the point. That is the point. We're trying to prevent that from ever happening because these plaintiffs have done all this discovery. It's there. Rather than be moving to compel every week to get these documents --

THE COURT: I tell you what, you two confer.

MR. BREEN: We will.

THE COURT: And give him a hundred of your best documents from all the categories. And then if you can't agree on what should be produced, either I or Judge Bowler will go through it as soon as possible and jump-start this. I will simply say this: If the issue is temporal, produce them. I don't know what the big issue is. If the issue is it's the drugs in issue in this, produce them. The problem for me is, if it's unique to some individual drug that's another drug -- and how many other drugs involved in the other litigation?

MR. DALY: Over a hundred, Judge.

MR. BREEN: Well, there's multiple indices, but, Judge --

THE COURT: So you need to be reasonable. You need to do the crosscutting documents, and maybe you can come up with a thousand that you think are crosscutting as opposed to every -- I've seen these documents on Zoladex and -- you go thousands and thousands of pages that would not have relevance to your issues.

MS. BROOKER: We can't do that, your Honor, because we don't have access to the documents, so we don't know what's relevant.

THE COURT: I know. I'm simply saying there's something called overly burdensome and overly broad. Overly

burdensome does not apply because it's already on a CD. Overly broad might. So I think what needs to happen is any sales and marketing documents that relate to other drugs in the time period which basically talk about marketing the spread -- is that your big issue right now?

MR. BREEN: That's it.

THE COURT: Okay. I've seen these documents in my other litigation. There are documents that are put out by sales teams: "This is how you put together the spread. This is how you put together --" That should come out, but not every internal document about every drug. I mean, that's overly broad.

Now, I've seen these kinds of documents, not from Abbott, in fairness, from Glaxo, Bristol, Johnson & Johnson, AstraZeneca, and Schering-Plough. I've seen the differences in the kinds of documents, and there are crosscutting, you know, message-to-sales-team kinds of documents, which in general should be produced. There's very specific stuff to each document which doesn't need to be; you know, debates about the --

MS. BROOKER: We understand. I think we understand, your Honor. Our concern is just, again, the discovery clock is ticking. All the motions to compel have already happened, and now the documents are just waiting for us to use. And we are going to reinvent the wheel. We are

going to be filing, I can tell you now, based on Abbott's conduct in Texas and in this case, we are going to be filing motion to compel after motion to compel to get the same exact set of documents that they've already produced.

THE COURT: Do you feel like you now have a good-faith basis for amending your complaint to add any drugs?

MS. BROOKER: Well, your Honor, I think the problem is that we're not necessarily using some of those documents to amend the complaint. That's not the issue. Abbott, and particularly even with the drugs at issue here, Abbott markets drugs in a broad way. There are no carved-out subset of documents on marketing, for example, that only talk about this drug or that. It's a broad-based set of marketing documents.

THE COURT: And to the extent that there are, you should have them produced. To the extent that they're very unique to a particular drug and a particular doctor in a particular location, it may be overly broad if it's not one of the drugs you're suing about.

MS. BROOKER: I understand, but this will require motion, motions practice.

THE COURT: I can't help that. What can I do? You can't have a hundred documents relating to a hundred drugs when you're suing on four. But if there are crosscutting

514bf967-2d22-4082-baaa-b8173ddef2eb

Page 26

sales documents, they should all be produced.

MR. DALY: That's the effort we've made, Judge. If we missed a few, and I believe that Mr. Breen -- well, you laugh, but you brought forward a hundred documents that you said weren't produced. We showed you that about half of them in fact had been produced, and we're still talking about the other half of them. Isn't that correct?

MR. BREEN: I don't think that's --

MR. DALY: I mean, it's not like we're not working through this. And one thing I want to correct, Judge, is any misimpression that they are stymied in their discovery. We produced -- we've made our 26(a)(1) disclosures. We've produced our other documents.

THE COURT: I tell you what, since you have them, we actually have a way of breaking through this. You come up with every document you want to produce and show it to them. To the extent there are disagreements -- I mean, this is actually easier than most of my cases; you actually have them. Put them together, show them to him, and to the extent there are objections, you'll see what you really care about, and then we'll have a debate over it.

MS. BROOKER: Your Honor, that's just the Texas set. There are 650,000 of them that were produced. There's also the MDL set. We cannot contact Jennifer Connolly. In fact, Abbott has threatened sanctions if we speak with them

Page 27

about what documents they have. They've already gone through a set of documents. We can't coordinate --

THE COURT: You can call up Jennifer Connolly and ask her, "What documents do you have relating to your drugs or to general sales practices?"

MR. BREEN: Can we see them?

MS. BROOKER: Can she provide those to us? I mean, that's what we're asking for.

THE COURT: Have her file a motion to open the protective order. Is she the -- who's she? She's the --

MR. BREEN: Class.

MS. BROOKER: We're all under a protective order in this case. The issue is --

THE COURT: So have her file a motion to allow you to see the documents which she believes -- you tell her what the issues are in your case which you believe are crosscutting and apply to your case. She works for the U.S. Attorney's office, doesn't she?

MS. BROOKER: Oh, no. I'm referring to plaintiffs' class counsel.

THE COURT: Who's Jennifer Connolly?

MS. BROOKER: She represents the private plaintiffs in the class action suit, and all I'm saying is, we can't even coordinate --

THE COURT: Which firm is she with?

Page 28

MR. BREEN: The Chicago firm, Wexler's firm.

MS. BROOKER: But it's just an example, your Honor. We thought we were in an MDL proceeding when we got here, and we thought we understood your Honor's October 26 ruling from the bench.

THE COURT: You are in an MDL, which is why I can do these things. If she wants to show you documents relating to their sales marketing efforts that are across the board, all she needs to do is -- that's why I'm here, that's exactly -- bingo, file a motion to allow her to show you the documents. Of course you can call her.

MR. BREEN: Your Honor, I know this is frustrating, but we're getting somewhere. If I can just ask one more question.

THE COURT: Yes.

MR. BREEN: The problem is, if I call Jennifer Connolly and I say, "I need these documents," then I've got to take the working set of documents, the hottest documents. Do I have to go to Mr. Daly and say, "Can we have these documents?" That's part of the problem because we're taking our work product and taking our --

THE COURT: You can go one of two ways: You can move to open the protective order so that you can see them.

MR. BREEN: Okay.

THE COURT: And have her gather what's relevant to

Page 29

your claims, which is some work on her part, so you may have to pay her for the work, I mean, it's not part of -- or you can go and get consent from him. But you can come directly to me. That's why you are here. But I can't -- I'm not simply going to say you're across the board entitled to every document they produced in every suit, even if it involves drugs that have nothing to do with yours. I can't say that across the board. That may be overly broad. It may be unreasonable. And, as you know, for example, the Rules of Civil Procedure have been changed, so it's got to be likely to lead to relevant evidence.

On the other hand, I don't know why it isn't just simpler for you to hand over the CDs.

MR. BREEN: Let me do it. I've got them. Just let me show them to the government. He doesn't have to do anything but say "OK," two letters, O-K.

MR. DALY: There have to be limits, Judge. I mean, even if they ask the MDL plaintiffs, I mean, they can't ask them for stuff that they're not entitled to that go beyond even the temporal limits that your Honor is suggesting or drugs. We agree that if there are documents relating to general marketing practices that would apply, that we should be producing those, and we made a good-faith effort to do that.

THE COURT: For example, so it's not too narrow on

514bf967-2d22-4082-baaa-b8173ddef2eb

your part, let's assume there's a marketing document for Drug X, Y, Z, all right?

MR. DALY: Right.

THE COURT: And that's not one of the drugs here, and it says, "What I want you to do is go out and market the spread, and this is how the --" see, I'm going through these documents now, like, last night -- "and here's what the doctors will get reimbursed at, and here's what the return to practice is, and here's what the copay will be, and here's your profit." Even if it's Drug X, Y, Z which isn't one of the drugs here, that should be produced.

MR. DALY: I agree, and we have done that. There are no such documents, I don't believe, but anything that's related to that we've given them.

THE COURT: Now, if it's an individual contract with an individual doctor about a drug which does not have general marketing language, I don't expect those all to be produced.

MR. BREEN: I understand, Judge, but the issue is, every document that we're talking about here I've got in a database because we litigated this to the Supreme Court twice to get them in Texas, okay? I've got them in a database.

THE COURT: Good.

MR. BREEN: And there's three times as many as they produced to the federal government, but I can't show them to

the federal government without his approval.

THE COURT: Or you come back to me. That's why I am here.

MR. BREEN: Judge, I understand fully.

THE COURT: And so you can come to me. Connolly can come to me.

MR. BREEN: I understand.

THE COURT: You are in a great position because you've seen it all, so you actually know what's out there rather than some hypothetical thing. I've given you two polar extremes: an individual contract with an individual doctor over X, Y, Z which may show a charge-back or a rebate or something. That seems too narrow and too specific. Anything coming out of the sales and marketing team talking about how you market stuff during the relevant time period should be produced. And then the temporal scope should at least be up to 2003 because that's when the MMA kicked in, right? Is that right?

MR. DALY: Yes.

MR. BREEN: Correct. Well, that's when they passed it.

THE COURT: Right, and then they do 85 percent of AWP, and everybody in the world knew AWP did not reflect cost at that point. That's actually not accurate, since I actually saw some third-party payors here who still believed

it two years after the fact. But any sophisticated market player knew -- I'll added "sophisticated," and I put the government in that category because they were part of it -- knew in 2003 there a was different situation. And when did you switch to ASP, 2004?

MR. BREEN: It took about a year to get it up and running.

THE COURT: All right, so through 2003. And when do you claim that it starts? 1991 was when Medicare started using AWP.

MR. BREEN: No, Judge. '91 was when they started the regulations, but this is a Medicare/Medicaid case, number one.

THE COURT: So when did Medicaid start using it?

MR. BREEN: Medicaid started using AWP back in the late '70s and the '80s. So that's one of the other issues here, because Abbott has set another unilateral early point on discovery, and we got a lot of the preparatory stuff. You know how this works. I mean, you want to see the stuff that they were --

THE COURT: I mean, I don't know. That's why I don't know your complaint well enough. So Medicare started this regulation in '91, so I don't know about Medicaid. I know it started in the '60s in California somewhere, so --

MR. BREEN: Before our damage period begins,

Medicaid was already doing it, but there's some late '80s documents --

THE COURT: When does your damage period begin?

MR. DALY: '91 to 2001.

MS. BROOKER: Except that we would have go back prior to 1991 because there are definitely relevant documents, particularly with respect to the subject drugs in this case.

THE COURT: Going back how far?

MS. BROOKER: Well, we have served document requests. I mean, Abbott should not --

THE COURT: Going back to when?

MS. BROOKER: At least back to 1988. And the reason is --

THE COURT: So talk about this possible temporal scope between '88 and 2003. I can't -- you're asking me to microscript something I haven't seen any briefings on, and I'm suggesting a few ways of doing it. Like, I look at you and I say "You're golden." You've actually got these documents, so tell me what you want to show her and try and work it out with him. And if you can't agree, that's why we're here.

MR. BREEN: Your Honor, your comments up to this point in time, believe me, okay, you cut through a lot of it already that I think we're going to be able to --

514bf967-2d22-4082-baaa-b8173ddef2eb

THE COURT: And with respect to Connolly, have her move for an opening of the protective order with respect to certain kinds of documents. You of course can talk to whoever you want. No, you shouldn't be thrown out of a deposition, and none of this is so super secret. On the other hand, I have to say, it can't be a fishing expedition to find a hundred more drugs to sue on. So that's sort of where I'm trying to think about. Once I get into specifics, I will get to specifics.

Now, let me get to Part B, which is, when are you doing the depositions of the government people?

MS. BROOKER: We are doing them on an ongoing basis. We're in the process of this right now.

MR. DALY: We've had a couple, your Honor. I think we have four noticed.

THE COURT: Like who? Who?

MS. BROOKER: Well, Abbott has largely sought to notice topics which they would call spoliation issues, your Honor. There haven't been very many substantive depositions that have taken place or that are noticed. They are seeking to depose every individual that we put in an interrogatory to find out whether their documents were preserved. For example, there was a broad request for individuals who are responsible or knowledgeable about the reimbursement process in general; and then there are 30(b)(6) depositions going

forward over where are their files, people who left years ago. So there are not that many substantive government depositions.

THE COURT: Let me say this on the flip side of this issue, which is, I was somewhat frustrated over the refusal of the U.S. government to produce witnesses in the big trial that I just went through. It all came up sort of too late, and it wasn't specific enough, at least for the issues there. To the extent -- Abbott, you're in Class 2?

MR. DALY: Yes, your Honor.

THE COURT: To the extent there are depositions on a substantive basis, they should be open to everyone. Everyone has the right to understand what the government was doing during the time period.

MS. BROOKER: Your Honor, we have actually been doing that. In fact, more than that, and there hasn't been an opposition to this, but we've been insisting that everyone join the depositions so that we only need to offer a witness one time. So when there is a deposition notice, it is served on LexisNexis, and we encourage and almost insist that other parties appear so that we don't have to recall over and over again a government witness. That's just not been an issue.

THE COURT: Because at some point I anticipate in this case under the False Claims Act -- and I don't remember, I think there are very complicated legal issues, very

complicated legal issues -- but, in any event, what Centers for Medicare and Medicaid services understood and knew and what they agreed to and what they didn't.

MS. BROOKER: And with respect to Abbott's conduct and the Abbott drugs at issue in this case or the Dey drugs and the Dey conduct.

THE COURT: Yes, and in general -- I mean, I'm probably now more steeped in this than most people, but it came -- the Office of the Inspector General was actually quite persistent in trying to flag some of these issues. I don't know if it's Abbott drugs or not. I just don't know. And at some point, at least Mr. Scully and other people were testifying on the Hill about this stuff. And so it's relevant, not only to statute of limitations, but it's also relevant to -- I think a very difficult area of the law is when the government knows about a fraud, let's say, knows about a fraud and it continues. I don't know what happens when -- the solution is a very complicated one. In other words, when the solution has to do with increasing administrative fees and getting something through Congress, I don't know what the answer is under False Claims Act, but at least we need a factual record.

MS. BROOKER: Certainly, your Honor, and government intends to be very open about the process. And I will remind the Court that, you know, the United States has not sued the

entire pharmaceutical industry, and we have not sued Abbott on all of its drugs. We are really focused on very discrete conduct of a very discrete company or, you know, an additional two companies. So we believe that the proper focus is on what the reimbursement officials at CMS knew about these thousand plus percent spreads by Abbott on these particular drugs.

THE COURT: Are they cancer drugs?

MS. BROOKER: Some of those are. There's a large antibiotic and then there are water solubles that are generally at issue.

THE COURT: Are they generics?

MR. DALY: Yes, they're all generics, Judge.

THE COURT: Are they part of Track 2?

MR. DALY: We're in Track 2, your Honor. Yes, what we're hearing again is that they're suggesting without coming out and saying it that they want to try to limit us, that we can ask the CMS people and the OIG people what they knew and understood, but only if they knew and understood about a 5-milliliter bag of saline solution. Our position, of course, and we talked about this when we were here in the fall, is much broader than that. And we need to find out what the government knew about spreads and mega spreads and cross-subsidization and all of this information. And counsel is correct that, you know, we're going to go ahead and we're

going to be talking to Mr. Scully; we're going to notice him up for a deposition as well as other people. The other defendants in both cases before your Honor have cross-noticed those, so, yes, everybody is very interested in getting to the bottom of this, and we'll be doing that.

THE COURT: Because it's really not so relevant to my case that I just finished the trial on. It might be quite relevant to this case.

MR. DALY: Yes, your Honor, absolutely.

THE COURT: I mean, it might have some relevance but not as heartland as here.

Now, let me go off the record for a minute.

(Discussion off the record.)

MR. DALY: Judge, I wanted to correct a couple of things, I mean, just to make sure to clarify. The Court has already entered dates on this matter.

THE COURT: Right.

MR. DALY: You did this in October, so that's going to be part of what we submit jointly to the Court today. I think we also agreed on a mediation, but we'll have to check that, but we'll talk about that.

MS. BROOKER: I feel like we did as well.

MR. DALY: Yes. Now, Judge, in terms of the briefing that was submitted, we submitted a brief, I think yesterday actually around -- yes, no, Sunday. And we have

been able to agree on most of the stuff that was in the brief, in both parties' briefs back in September that we've been fighting about. So we've agreed on the number of interrogatories that each side can ask. We've agreed on the request-to-admit issue about how many each side can propound. I mean, I think we're going to have a situation there, just to get the Court's approval, where we can do 150 sort of regular requests to admit that are really substantive, and then otherwise where you can do additional requests to admit where we actually admit that senator so-and-so said X as stated in the Federal Register, attach the document --

THE COURT: How many of them?

MR. DALY: Those will be unlimited because you have to actually attach the document. We've agreed to that, Judge.

THE COURT: You know, I was -- I don't know if you know this -- back in the day, I was actually in the Civil Division of the U.S. Attorney's office. I agreed to something -- like, back in 1981, we had a superfund case involving New Bedford Harbor. We agreed to that, thousands, thousands. It filled Judge Young's conference room. There's got to be a limit on it, or I know what will happen.

MS. BROOKER: Okay. We were pushing for limitations in general. And the other issue that is --

THE COURT: If it's a hundred, I don't have a problem with it, but just I would think that that wouldn't -- I'll read through it, but I would think that that was not a good idea.

MS. BROOKER: Okay.

MR. DALY: Well, what we have, Judge, is, you've seen -- you know, you get all the defendants' motions to dismiss -- for example, all those appendices of famous things that, you know, the President of the United States said this, Congressmen said that, OIG. All we've done is taken those things, and because it's from the government, we've simply asked them to authenticate it. That's what we're talking about, and we've already done this.

MS. BROOKER: We can do that by stipulation as well.

THE COURT: Let me just simply say, unlimited is not a good thing, not in a case of this magnitude. A hundred sounds right to me with no subparts.

MS. BROOKER: Okay.

THE COURT: Because I don't see how -- you can produce all the documents and say, do you have an objection to the authenticity of any? And then you can do the -- you know, like, I think it's crazy to do it that way. Unlimited is never a good idea.

MS. BROOKER: I agree, your Honor. We can agree to

one hundred.

THE COURT: Yes, that makes sense.

MS. BROOKER: And the last remaining issue --

MR. DALY: But before we move off of that, we had also agreed -- I want to make sure this is okay with the Court -- that -- those are the authentication ones -- we had agreed also to 150 regular requests to admit; in other words, that don't attach the documents.

MS. BROOKER: But what I hear your Honor saying is, you need to have it under limitation.

THE COURT: Yes, if you agree, I agree, but not infinite.

MR. DALY: Right, I understand.

THE COURT: What I'm not going to do is what Judge Young did, which is find a storage room for the thousands and thousands of requests to admit. It got to the point of ludicrous, and so limits are good.

MS. BROOKER: Limits are good, your Honor. We have been pushing limits.

The last remaining area are depositions. In the initial proposal, we asked for 250 hours for each side to take in deposition hours. Instead of, you know, full days, we just said, "Use your hours however you want. You might want to depose this person for two hours, someone else for twenty-one hours." They said "500 hours." Now Abbott wants

Page 42

no deposition limitation. And I think 500 hours, which is 70 days for each side, between now and eight months from now is not good enough. We want some sort of limitation.

THE COURT: Yes, you need a limit.

MR. DALY: Judge, here's our problem with that. They've sued us for ten years of Medicaid. That's fifty states. Each of those states has a financial intermediary. They've sued us for ten years of Medicare. We have about fifty Medicare carriers that we're seeking discovery from. We've got ten years of CMS, HCFA, and other federal employees, present and former. Five hundred hours is only 70 depositions of one day.

MS. BROOKER: Each side.

MR. DALY: Well, I'm only talking about what I need to do.

THE COURT: Listen, just come up with a reasonable calculation of, let's say, four hours per person or eight hours per person and come up with an hour limit.

MS. BROOKER: Your Honor, what we --

THE COURT: Not unlimited. Just come up with a reasonable calculation, and then you'll have to economize internally. So let's say fifty states? So let's say eight hours for each administrator? So that's 400 right there, right?

MR. DALY: Right.

Page 43

THE COURT: So let's say you need to do how many officials at Medicare?

MR. DALY: We're not sure. They've listed about 35 in their 26(a)(1) disclosures. I don't know if those will be the ones we depose.

THE COURT: So maybe four hours apiece.

MS. BROOKER: Well, they recommended 500 hours, and we said 250, and today outside the courtroom we said, "Okay, we'll go with your highest number." Five hundred hours, your Honor, for each side between now and the end of the month is not even feasible.

THE COURT: I'm not disagreeing. You need to come up with a limit, or it will eat you. And if you can't agree, I'll come up with one. You'll have to come up with an estimate. So it does strike me as fair, though, if you're suing him for fifty Medicaid states, they have the right to take fifty Medicaid administrators, right?

MS. BROOKER: Well, I think, you know, there can be a more efficient way than to depose fifty individuals.

THE COURT: How? I don't know. I don't know enough about it.

MR. DALY: But our position, Judge, is, even if we didn't do them all, we have to do enough to get a reasonable cross-section to do it, and it might take more than one person from each state. We don't know.

Page 44

THE COURT: I'm not giving you unlimited. Unlimited isn't happening. You're finishing it by December 7. Even though it's the federal government, they can't -- how many lawyers are working on this case?

MS. BROOKER: For this side? On our side, we have, there's five or six of us.

THE COURT: So it needs to be reasonable.

MS. BROOKER: Yes.

THE COURT: Because at the end of the day, it's not going to come down to what each Medicaid administrator did. It's going to be, was there a fraudulent marketing of the spread, and was there knowledge?

MS. BROOKER: And without the limitation, your Honor, I mean, it's just going to cripple CMS. It's already been very difficult for CMS because we're pulling program people trying to implement the program to prepare for depositions to help us find 30(b)(6) information. We've got to limit.

THE COURT: I'm not that sympathetic on that. That piece I'm not as sympathetic on. You just have to do that.

MS. BROOKER: Right, we've been doing that.

THE COURT: All right, great. Are we done?

MS. BROOKER: Just two more tiny little things, your Honor.

THE COURT: Where are you from? Are you from

Page 45

Washington?

MS. BROOKER: Yes. I'm sorry, your Honor.

THE COURT: No, no, that's okay. Not "I'm sorry."

MR. BREEN: Why are you sorry you're from Washington?

MS. BROOKER: No, no, I thought you said, "Oh, okay, you're from Washington."

THE COURT: No, no, no. I just don't know you.

MS. BROOKER: Yes, I'm with the Commercial Litigation Branch in Washington.

THE COURT: I see my local folks. I just didn't know. All right, go ahead.

MS. BROOKER: The other thing is, you know, we just wanted to remind the Court that Abbott still hasn't answered here. So while we can speculate about, obviously, what some of their answers will be --

THE COURT: That's my fault, isn't it? Isn't there a motion to dismiss?

MR. DALY: It's pending, your Honor, and we will respond however the Court rules.

THE COURT: Is there motions to dismiss? I've got like three Ven-A-Care cases, right? I have New York, California --

MR. BREEN: No, your Honor, just two.

THE COURT: California and Florida, right?

514bf967-2d22-4082-baaa-b8173ddef2eb

MR. BREEN: Well, Florida is on a motion to remand right now, but there's California, which we have actually briefed and argued the motion in May.

THE COURT: Right.

MR. BREEN: That hasn't been ruled on yet. And then there is the federal cases, the three federal -- soon to be three federal Ven-A-Care cases.

THE COURT: And you've moved to dismiss?

MR. DALY: We did, your Honor. We argued that, I believe, in the fall.

THE COURT: So let me tell you the issue I'm actually struggling with, since I've got law clerk drafts on at least a couple of these. I'm not sure it's critical, but the issue is -- and I wasn't even sure how much it was being pressed -- whether AWP, if you increase it to get more remuneration for the doctor, is some sort of a kickback, it violates the kickbacks, as opposed to offering discounts and rebates, which strikes me as falling fully within it. But I'm not sure it matters, just so that you can know legally where I'm struggling. It wasn't briefed so clearly under the various state statutes; in other words, whether or not -- I think discounts offered to get someone to purchase may fall within the kickback provisions, but simply publishing an inflated AWP without a direct offer to the doctor strikes me as an extremely close question, and I don't know what to do

with that. I'm not sure whether it matters that I deal with it on a motion to dismiss because if you fall under one, I'm not sure it's going to get you to Step B, but I'm struggling with it. I haven't found any case law on it. I found no regulatory guidance on it. And even the OIG fudged it in its compliance manuals. So a heads-up, and I haven't forgotten about you, but I'm --

MR. BREEN: And that's definitely in the California case and in this case, that issue.

THE COURT: That issue is a big one, and I'm worried about getting it wrong. I'm not sure that I need to get to it because, as I said, offering discounts, at least on a motion to dismiss stage, might be enough. But I'm having trouble with, if you've got an AWP out there and you market it -- in other words, you explain what the reimbursement spread is -- but you're not actually the one paying the amount of money and you're not actually offering the amount of money, it's a very difficult question.

MR. BREEN: Direct or indirect.

THE COURT: Huh?

MR. BREEN: Direct or indirect, in cash or in kind.

THE COURT: I know that's your argument, but there's not actually an offer of money. So it's hard, and it's hard under the state statutes, and it's hard under the federal statutes. Have you weighed in on this yet, the

government?

MR. GOBENA: Yes, we have.

THE COURT: And Your position is?

MR. GOBENA: We take the position that, just as Mr. Breen said, that it can be an offer that's direct or redirect. And remuneration, there's a broad definition of what remuneration is. It's not necessarily limited to a cash transaction. The offering of potential profit could constitute remuneration under the statute, so --

THE COURT: It's hard. No case has gone that far, at least that we can find. No case has addressed this, so that's the one I'm just worried about it because it could have sweeping ramifications, if you want to know what's holding it up.

MR. DALY: I think that it stretches the Anti-Kickback Statute too far, your Honor.

THE COURT: I know you do, and can I say that you both have fabulous arguments on this particular one, and I'm sort of stuck on it. But, in any event, it should not hold up discovery. Okay, thank you.

MR. BREEN: But the point is, your Honor, the more we can coordinate the California case with the federal case, I think the better for everybody concerned.

THE COURT: Say it again?

MR. BREEN: The more we can coordinate the

California Ven-A-Care case with the other Ven-A-Care cases, it is going to expedite things because I've got the same lawyers working --

THE COURT: But nothing's being held up, right? Discovery is happening while --

MR. BREEN: No, it is. You've got a stay. There's no stay on their intraparty discovery in the federal case, but you stayed intraparty discovery in the California case.

THE COURT: All right, so I should make that a priority.

MR. BREEN: And if we could at least get the intraparty discovery issue resolved, we could at least coordinate discovery on that.

THE COURT: Okay, thank you. Now, you'll give me that stuff. Whatever you can agree on, though, at least let me enter as soon as possible.

MS. BROOKER: Yes, we will submit it tomorrow.

THE COURT: Good. Thank you.

MR. DALY: Thank you, your Honor.

MS. BROOKER: Thank you.

(Adjourned, 11:05 a.m.)

514bf967-2d22-4082-baaa-b8173ddef2eb

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 49 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 5th day of March, 2007.

___________________________________
LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER