# EXHIBIT O

Page 1

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

IN RE:  PHARMACEUTICAL          : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      : CIVIL ACTION:

PRICE LITIGATION                : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO        :

U.S. ex rel. Ven-a-Care of      : Judge Patti B. Saris

the Florida Keys, Inc. v.       :

Abbott Laboratories, Inc.,      : Chief Magistrate

No. 06-CV-11337-PBS             : Judge Marianne B.

- - - - - - - - - - - - - - - - x Bowler

               IN THE CIRCUIT COURT OF

             MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - - - x

STATE OF ALABAMA,               :

              Plaintiff,        :

        vs.                     : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,      : Judge Charles Price

et al.,                         :

              Defendants.       :

- - - - - - - - - - - - - - - - x
```

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                                May 18, 2007
                              Washington, DC

---

Page 2

```
 1      IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3
 4   THE STATE OF FLORIDA
 5   ex rel.
 6   - - - - - - - - - - - - - - - - x
 7   VEN-A-CARE OF THE FLORIDA       :
 8   KEYS, INC., a Florida           :
 9   Corporation, by and through its :
10   principal officers and directors, :
11   ZACHARY T. BENTLEY and          :
12   T. MARK JONES,                  :
13        Plaintiffs,                :
14     vs.                           : Civil Action
15   MYLAN LABORATORIES INC.; MYLAN  : No.: 98-3032G
16   PHARMACEUTICALS INC.; NOVOPHARM : Judge: William
17   LTD., SCHEIN PHARMACEUTICAL, INC.;:  L. Gary
18   TEVA PHARMACEUTICAL INDUSTRIES  :
19   LTD., TEVA PHARMACEUTICAL USA;  :
20   and WATSON PHARMACEUTICALS, INC.,:
21        Defendants,                :
22   - - - - - - - - - - - - - - - - x
```

Page 3

```
 1      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2              STATE OF MISSOURI
 3   - - - - - - - - - - - - - - - - x
 4   STATE OF MISSOURI, ex rel.,     :
 5   JEREMIAH W. (JAY) NIXON,        :
 6   Attorney General,               :
 7   and                             :
 8   MISSOURI DEPARTMENT OF SOCIAL   :
 9   SERVICES, DIVISION OF MEDICAL   : Case No.:
10   SERVICES,                       : 054-1216
11        Plaintiffs,                : Division No. 31
12     vs.                           :
13   DEY INC., DEY, L.P., MERCK KGaA,:
14   EMD, INC., WARRICK              :
15   PHARMACEUTICALS CORPORATION,    :
16   SCHERING-PLOUGH CORPORATION, and:
17   SCHERING CORPORATION,           :
18        Defendants,                :
19   - - - - - - - - - - - - - - - - x
20
21
22
```

Page 4

```
 1        Videotaped Deposition of NANCY-ANN
 2   DePARLE, a witness herein, called for examination by
 3   counsel for Abbott Laboratories in the
 4   above-entitled matter, pursuant to notice, the
 5   witness being duly sworn by Robert M. Jakupciak, a
 6   Notary Public in and for the District of Columbia,
 7   taken at the offices of Jones Day, 51 Louisiana
 8   Avenue, N.W., Washington, D.C. , 20001, at 9:00
 9   a.m., on May 18, 2007, and the proceedings being
10   taken down by Stenotype by Robert M. Jakupciak, RPR.
```

Page 5

```
 1   APPEARANCES:
 2
 3   On behalf of the United States of America:
 4       JAMIE ANN YAVELBERG, ESQUIRE
 5       U.S. Department of Justice
 6       Civil Division
 7       P.O. Box 261
 8       Ben Franklin Station
 9       Washington, D.C.  20044
10       (202) 514-6514
11
12   and
13
14       REBECCA A. FORD, ESQUIRE
15       U.S. Department of Justice
16       601 D Street, N.W.
17       Patrick Henry Building - 9133
18       Washington, D.C.  20044
19       (202) 514-1511
```

2 (Pages 2 to 5)

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                                May 18, 2007
Washington, DC

Page 142

1    Do you recall a series of OIG reports,
2  before you arrived even, that identified what OIG
3  felt to be excessive Medicare payments for
4  Albuterol Sulfate?
5    A.  No, I don't.
6    Q.  I would like to focus particularly on
7  the second OIG recommendation at the bottom of
8  the page. OIG recommendation was that HCFA should
9  consider promulgating rules for a greater
10 reduction in Albuterol Sulfate reimbursement.
11 And then the HCFA response, if you could read
12 that response to yourself and let me know when
13 you are done.  It begins with, we concur.
14   A.  Yes.  All right.
15   Q.  Is it your recollection that in June of
16 1998 HCFA felt that it did not have the authority
17 to increase the discount that it took on the
18 average, published average wholesale price to pay
19 for Albuterol Sulfate?
20   A.  I understood that we were to pay as
21 directed by the Balanced Budget Act, 95 percent
22 of the average wholesale price.

Page 143

1    Q.  And the third sentence of the OIG
2  response you describe the acquisition price, and
3  the average wholesale price being two different,
4  two distinct pricing methods.
5       Do you see that?
6    A.  Yes, I do.
7    Q.  And that the acquisition cost, of
8  course, relates to the invoice price for an item;
9  is that correct?
10   A.  I believe that I was referring here to
11 the actual acquisition cost method, which was
12 what had been proposed in the President's budget
13 and rejected by Congress.
14   Q.  And the alternative that you, that you
15 contrast that to is the AWP method that Congress
16 chose to reimburse for Medicare Part B drugs;
17 correct?
18       MS. YAVELBERG:  Objection; form.
19   A.  Yes.
20   Q.  And you described the AWP methodology
21 for paying for drugs as involving a price that is
22 essentially established by the industry similar

Page 144

1  to the sticker price on a vehicle; correct?
2    A.  That's what this says.
3    Q.  And that was the official statement of
4  the agency in June of 1998 on that particular
5  issue; correct?
6    A.  Well, it was -- I don't know if was the
7  official statement of the agency, but that was
8  what's in this response.
9    Q.  And the next sentence indicates that
10 HCFA believed that the AWP did not accurately
11 reflect the true reimbursement for this product,
12 but rather was an inflated number for Albuterol
13 Sulfate; correct?
14   A.  That's what this says.
15   Q.  And then to round out the, the
16 response, the last sentence reads, quote:  As
17 long as HCFA is required to use the AWP, which is
18 essentially retail, we will continue to pay more
19 than other payers, end quote.
20       Is that an accurate statement of HCFA's
21 position as of June of 1998?
22   A.  I believe so.

Page 145

1    Q.  I would like to talk with you a bit,
2  Ms. DeParle, about the efforts that you and the
3  administration undertook to try to move away from
4  an average wholesale price method for paying for
5  drugs and towards an alternative methodology such
6  as acquisition cost.  Hang on just a minute.  I'm
7  going to pull a fast one on my colleague again.
8        MR. COOK:  I'll mark this as Exhibit
9  Abbott 203.
10       (Exhibit Abbott 203 was marked for
11 identification.)
12 BY MR. COOK:
13   Q.  And ask you to take a look at that
14 time. For the record, this is a document that was
15 produced by the Office of Inspector General.  It
16 is a fax dated March 2, 1998.  It's to Rob Vito
17 from Maureen Furletti, Re: Medicare overpayment
18 for drugs.  The note on the cover to the fax, for
19 the record, is, quote:  Attached is last year's
20 language from the President's Budget Bill.  The
21 Administration is again putting forth this
22 proposal in the fiscal year 1999 Budget package.

37 (Pages 142 to 145)

a2e99778-7e61-4f3d-8317-e255e740d5a9

DeParle, Nancy-Ann                                              May 18, 2007
                              Washington, DC

Page 146

1  Also attached is a short summary/rationale from
2  last year's Budget package. Let me know if you
3  need further info.  And attached is two pages of
4  what appears to be -- three pages of what appears
5  to be a proposed budget and one page of a
6  document at the bottom of which is entitled,
7  Medicare Savings and Investments Proposals in the
8  President's Fiscal Year 1998 Budget.
9       I suspect I know the answer.  Have you
10 ever seen this particular document before?
11    A.  No.
12    Q.  What is the Health Care Financing
13 Administration Office of Legislation?
14    A.  It's the office of legislation.  It's a
15 group of staff who work on legislative matters
16 and deal with Congress.
17    Q.  How big was that office when you were
18 Administrator of HCFA?
19    A.  I have no idea, but I don't know who
20 this person is, Maureen Adolph Furletti.  I never
21 heard that name before.
22    Q.  You're anticipating my next question.

Page 147

1  Do you know who Rob Vito is?
2     A.  No, I don't.
3     Q.  If you turn to the first page of the
4  attached facsimile, and I apologize, I don't have
5  a fuller copy of this, but this is the only copy
6  we've received so far of the President's proposed
7  budget from any of the years.
8        The first page has a section referred
9  to, illumination of mark-up for drugs and
10 biologicals, and you'll see that it provides that
11 Medicare would pay a physician's actual
12 acquisition cost as defined in the proposed
13 legislation for drugs payable by, separately
14 payable by Medicare.
15       Do you see that?
16    A.  Yes, I do.
17    Q.  Do you recall that --
18    A.  Actually, it says the lowest of the
19 actual acquisition cost average wholesale price
20 or median actual acquisition cost, is what it
21 says.  I do see the paragraph you are --
22    Q.  You are actually right.  Is this, as

Page 148

1  best as you recall, an accurate representation of
2  the President's proposal for going to an actual
3  acquisition cost method of reimbursement in the
4  1998 Fiscal Year Budget?
5     A.  I don't recall.
6     Q.  Any reason to believe that this is not
7  an accurate copy of it?
8     A.  No.
9     Q.  And just so I have the timing down
10 right, when would it be that the Administration
11 would have submitted its proposed budget for
12 fiscal year 1998?
13    A.  For fiscal year 1998, it would have
14 been submitted in the early part of the year of
15 '97.
16    Q.  So this would have been while you were
17 at the Office of Management and Budget and before
18 you had moved over to HCFA; correct?
19    A.  Well, this would --
20    Q.  Just the timing of it?
21    A.  This is a fax that is from March of
22 1998.  I was at HCFA at that point.  If we are to

Page 149

1  believe that this is what it says, it says this
2  is last year's language from the President's
3  Budget Bill.
4     Q.  Right.  So when I refer to this,
5  without reference to the document, the
6  President's Proposed Budget for Fiscal Year 1998,
7  would have been submitted to Congress during the
8  time when you were at the Office of Management
9  and Budget?
10    A.  Yes.
11    Q.  That would have been in early 1997?
12    A.  Yes.
13    Q.  And if this is an accurate copy of the
14 President's Proposed Fiscal Year 1998 Budget,
15 this would be the provision in which the
16 Administration was proposing to legislatively
17 abandon AWP in favor of acquisition cost, albeit,
18 keeping average wholesale price, if lower, as the
19 reimbursement methodology; correct?
20    A.  Yes, but actually what confuses me is
21 that average wholesale price is even, is in this.
22 What I remembered was that we proposed actual

                                          38 (Pages 146 to 149)

DeParle, Nancy-Ann                                                May 18, 2007
Washington, DC

Page 150

1   acquisition costs.  So while I don't have any
2   reason to think this isn't the proposal, if you
3   woke me up and said what did you propose, I would
4   have said actual acquisition cost.
5       Q.  Okay.  What would be the process for
6   developing this sort of a budget proposal within
7   the Administration in 1997?  To put it more
8   sharply, if this is the President's 1997 budget,
9   who probably wrote that?
10      A.  I don't know.  It wouldn't have been
11  me.
12      Q.  Some poor underpaid staffer in the
13  bowels of the Executive Office building?
14      A.  The budget language, legislative
15  language was put together in a variety of ways.
16  Sometimes it was languages that had been drafted
17  on the Hill from previous years.  Sometimes it
18  was language that had been drafted by an agency.
19  Sometimes OMB asked the agency to draft -- here
20  is what the Administration wants to do, agency,
21  you draft the legislative language.  Sometimes it
22  would have been drafted within the Office of

Page 151

1   Management and Budget.
2           So it just depended.  And I don't know
3   how this came to be drafted.
4       Q.  Who would be responsible, if anybody,
5   for collecting all of this legislative language
6   together and putting together the formal proposed
7   budget of the Administration in 1997?
8       A.  It would have been an office within the
9   Office of Management and Budget.
10      Q.  Do you know who the individual would
11  have been in 1997, who was in charge of that
12  office?
13      A.  No.  I really don't.
14      Q.  What I'm trying to get to is, if I were
15  going to try to find a copy of the proposed
16  budgets and the people who worked on it, granted
17  ten years ago, do you have any suggestions about
18  how you would go about doing that?
19      A.  Well, the budget document is published
20  by the Government Printing Office.  Every year
21  when it's submitted, the President goes up and
22  gives the State of the Union, which includes a

Page 152

1   budget message and the next day stacks of these
2   things go out, and there is a always a big
3   picture on the front of USA Today, stacks of
4   budgets and how big is it this year.  So I'm sure
5   they are all on file with the Government Printing
6   Office.
7       Q.  Okay.  In terms of determining the
8   process by which -- I almost slipped into what
9   your successor said -- the process by which the
10  sausage was made, how would I go about doing
11  that?
12      A.  Meaning, where did specific language
13  come from?  Gosh, I don't know.  The budget
14  document, there is about six different volumes of
15  the budget document, and some of them are just
16  tables and some of them are legislative language.
17  And I believe -- wait a minute.  You know, I may
18  be misremembering this.  Because there's five or
19  six volumes of the budget and as I said, they are
20  printed by the Government Printing Office and
21  they would be in any library, any large library
22  in town.  You might have them here at your law

Page 153

1   firm.  They are bound and all that.
2           Legislative language is somewhat
3   different.  I believe there are even times when
4   the Administration doesn't send legislative
5   language, just relies on the verbiage in the
6   budget document.
7       Q.  And leaves it to Congress to draft it?
8       A.  Leaves it to Congress to draft it.
9   Because that's -- they have full-time staff that
10  draft legislation.  So in trying help you
11  determine what process, I just, I don't really
12  know.  It would depend on the year and probably
13  if I were looking for it I would go to the
14  Congressional Budget Committee, because they
15  would have been the recipient of -- if the
16  Administration did do a draft of the legislative
17  proposals to enact its budget, probably it would
18  have gone to the committee on the budget in
19  either House.
20      Q.  So if this is the proposed language
21  submitted by the President in 1997, there's a
22  Congressional Budget Committee that would have

39 (Pages 150 to 153)

DeParle, Nancy-Ann                                            May 18, 2007
                          Washington, DC

Page 154

1   received this proposed language as what the
2   President wanted to be enacted?
3       A.  I believe there would be that, in the
4   House and the Senate.
5       Q.  And in this instance, what was enacted,
6   was payment at 95 percent of AWP; right?
7       A.  For fiscal year '98, yes.
8       Q.  Yes, ma'am.  If you turn to the very
9   last page of this document, the one page of the
10  fax entitled, Medicare Savings and Investments
11  Proposals in the President's Fiscal Year 1998
12  Budget.  It's only one page out of a document
13  that's at least nine pages long.  It seems to
14  summarize and then give a financial impact for
15  various provisions in the budget.
16          Do you recognize this?
17      A.  No.
18      Q.  Have you ever seen anything -- did you
19  ever see anything like it when you were at OMB or
20  HCFA?
21      A.  Yes.
22      Q.  When you saw things like it, what was

Page 155

1   the context in which documents like this were
2   prepared or used?
3           MS. YAVELBERG:  Objection; form.
4       A.  Well, I don't recall seeing this kind
5   of thing at HCFA, but at OMB when the President's
6   Budget was submitted to Congress, normally there
7   would be some shorter documents in addition to
8   the big stack of actual, you know, budget
9   documents that I mentioned, that would give a
10  more plain English description of things.
11      Q.  I would like to direct your attention
12  on this particular document to the second
13  paragraph from the bottom, which is the paragraph
14  entitled, Pay based on acquisition costs, subject
15  to a limit for outpatient drugs prescribed in the
16  physician's office.
17          You'll see that that paragraph first
18  goes to state that Medicare does not have an
19  expansive outpatient drug benefit.  It does
20  describe the limited circumstances under which
21  Medicare does pay for outpatient drugs; correct?
22      A.  Yes.

Page 156

1       Q.  And those are some of the contexts
2   which we've described before; home infusion,
3   inhalation equipment, some drugs prescribed for
4   dialysis; correct?
5       A.  Yes.
6       Q.  And home infusion, do you understand
7   that to be referring to the infusion of drugs in
8   the home that could be paid for if done with,
9   under the Durable Medical Equipment Benefit?
10          MS. YAVELBERG:  Objection; form.
11      A.  Now I do.  As I told you, that wasn't
12  something I ever spent much time on.  But, yeah,
13  I think that's basically right.
14      Q.  The paragraph then goes on to describe
15  how Medicare typically pays for the drugs based
16  on the charge submitted by the providers, and
17  talks about the Office of Inspector General
18  estimating Medicare is paying more than what
19  providers are actually acquiring the drugs at;
20  correct?
21          MS. YAVELBERG:  Objection; form.
22      A.  That's what this says, but that

Page 157

1   language seems odd to me.
2       Q.  And then according to this summary, it
3   indicates that the President's proposal for an
4   acquisition cost methodology for paying it would
5   eliminate the mark-up by basing Medicare's
6   payment on the provider's acquisition cost of the
7   drug.
8           Is that consistent with your
9   recollection of what it was that the President
10  proposed for the Fiscal Year 1998 Budget?
11      A.  That sentence, yes, this proposal would
12  eliminate that mark-up and base Medicare's
13  payments on the provider's acquisition costs.
14  Yes, I remember that.  What seems odd to me is
15  Medicare typically pays for these drugs based on
16  the charge submitted by providers.  I would have
17  said AWP, but --
18      Q.  You'll recall the program memorandum we
19  looked at earlier indicated that it was the lower
20  of the charge or the AWP; right?
21      A.  Well, no.  I thought it said estimated
22  acquisition cost based on the --

40 (Pages 154 to 157)

Page 158

1  Q.  This would be the September 1998
2  program memorandum.
3  A.  No.  I'm referring to the regulation --
4  Q.  I'm sorry.
5  A.  -- that you showed me.  That was the
6  regulation --
7  Q.  Of 405.517?  That would be Exhibit
8  Abbott 038.  This one here.  That's Exhibit Abbott
9  038, which is a copy of 42 CFR 405.517?
10 A.  Yeah.  So this says payment for a drug
11 is based on the lower of the estimated
12 acquisition cost or the national average
13 wholesale price of the drug. It doesn't say a
14 providers charge.
15 Q.  So the regulations indicated that the
16 allowable amount was the lower of the acquisition
17 cost or the average wholesale price, and then the
18 program memorandum from January 1998, which is
19 Exhibit Abbott 202, suggested that, in fact -- if
20 you could take a look at that -- that, in fact,
21 Medicare was paying the lower of the billed
22 charge or the average wholesale price in 1997;

Page 159

1  correct?
2      MS. YAVELBERG:  Objection; form.
3  A.  I don't know about in fact, but this
4  says, this January 1998 document does say drugs
5  and biologicals not paid on the cost of
6  prospective payment basis are paid based on the
7  lower of the billed charge or the AWP as
8  reflected in sources such as the Red Book, Blue
9  Book or Medispan.
10     So what I'm confused by is this
11 language that you showed me from the fax in March
12 of 1998, the last page of it, it says page 9, I
13 guess, sounds different than those other
14 descriptions and I don't know why.
15 Q.  So if an infusion pharmacy administers
16 a bag of saline and bills Medicare $9 for it and
17 the AWP is $9, under both methodologies the
18 infusion pharmacy would receive $9; right?  The
19 billed charge or the AWP?
20 A.  Yes.
21 Q.  And the question you have is, if the
22 pharmacy acquires it for two dollars and only

Page 160

1  bills Medicare two dollars, would they receive
2  the 9 dollar AWP or would they receive the 2
3  dollar charge that they submitted on their
4  payment form?
5  A.  Well, that isn't what I was thinking.
6  I just think the descriptions are different --
7  Q.  Right.
8  A.  -- of what the current methodology was
9  at that time.  But as far as what the President's
10 Budget Proposal was, what I remember is that it
11 was to pay providers what it cost them to get the
12 drug and that was what was referred to as actual
13 acquisition cost.
14 Q.  And the last page of Exhibit Abbott
15 203, the last sentence of the paragraph we were
16 looking at on the AAC proposal?
17 A.  Yes.
18 Q.  Indicates that this policy achieves
19 about $.8 billion in savings over five years.  Is
20 that consistent with your memory, if you have
21 one, of how much money was going to be saved by
22 the policy?

Page 161

1  A.  I don't have a memory of it.
2  Q.  Okay.  I would like for you to take a
3  look at the paragraph that immediately precedes
4  the paragraph that we were just looking at on
5  paying based upon acquisition costs.
6  A.  So, are we on page 9?
7  Q.  Yes, ma'am.  The last page of Exhibit
8  Abbott 203.  It's the paragraph that begins with
9  the heading, Direct Payment to Physician
10 Assistants, Nurse Practitioners and Clinical
11 Nurse Specialists and Home and Ambulatory Care
12 Settings.
13 A.  Yes.
14 Q.  If you could read that paragraph to
15 yourself and let me know when you are done.
16 A.  Yes.
17 Q.  Does that appear to refer to, if you go
18 back one page in the Exhibit to Section 11237 of
19 what appears to be the President's Proposal for
20 Fiscal Year 1998, which is the section entitled,
21 Payments to Physician Assistants, Nurse
22 Practitioners and Clinical Nurse Specialists?

41 (Pages 158 to 161)

DeParle, Nancy-Ann                                          May 18, 2007
                          Washington, DC

Page 238

 1  you.  And Exhibit Abbott 208 is an April 20, 1998
 2  response from you to Bill Thomas.  If you could
 3  take your time and read those and then tell me
 4  whether you recall those documents.
 5          MS. YAVELBERG:  Can I have the second
 6  document?
 7          MR. COOK:  Oh, I'm sorry.
 8  BY MR. COOK:
 9      Q.  Do you recall this exchange?
10      A.  No.
11      Q.  Do you recall that HCFA proposed Stark
12  II regulations in January of 1998?
13      A.  No.
14      Q.  What -- first of all, do you know what
15  the Stark Law is?
16      A.  Generally, yes.
17      Q.  What is the Stark Law generally?
18      A.  It's a prohibition against self-
19  referral on the part of physicians.
20      Q.  And the February 1998 letter to you,
21  Exhibit Abbott 207, do I read this correctly that
22  Congressman Bill Archer and Bill Thomas -- Bill

Page 239

 1  Archer being the Chairman of the Committee on
 2  Ways and Means and Bill Thomas being the Chairman
 3  of the Subcommittee on Health of the Committee on
 4  Ways and Means -- are writing you out of concern
 5  for proposed regulations that had been published
 6  by HCFA under the Stark Law in January of 1998?
 7          MS. YAVELBERG:  Objection; form.
 8      A.  That's what it appears to be, yes.
 9      Q.  And do Congressman Archer and Thomas
10  express concern that the proposed regulations
11  might require physicians to bill Medicare at
12  their acquisition cost under the BBA of 1997,
13  which provides for payment of drugs at 95 percent
14  of average wholesale price?
15          MS. YAVELBERG:  Objection; form.
16      A.  No.  What it says is the BBA includes a
17  provision reducing the Medicare payment for drugs
18  to 95 percent of average wholesale price.
19  Congress adopted this approach instead of the
20  Administration's proposal to pay for drugs on the
21  basis of acquisition costs.
22          Then it going on to say on January 9th

Page 240

 1  your agency issued proposed regulations -- it
 2  goes on to say on January 9th your agency issued
 3  proposed regulations to implement the Stark II
 4  legislation. Included in the proposal is a
 5  discussion of discounts as a form of
 6  remuneration.
 7          Then it goes on to say we are concerned
 8  that this proposal is intended to require
 9  physicians to bill Medicare for drugs at their
10  acquisition cost.  We would view any such attempt
11  by HCFA to impose acquisition costs in direct
12  conflict with Congressional intent.
13          So what they are saying is they think
14  we were trying to subvert Congressional intent by
15  implementing the Administration's original
16  proposal to pay physicians based on actual
17  acquisition costs instead of paying based on 95
18  percent of AWP.
19      Q.  And the reason that's an issue is
20  because AWP exceeds acquisition cost; correct?
21          MS. YAVELBERG:  Objection; form.
22      A.  I don't know.

Page 241

 1      Q.  How else would it be an issue?
 2      A.  Because to these two gentlemen if you
 3  were doing something different than what they put
 4  in the law, it would be an issue no matter which
 5  way it went.  I don't remember this exchange, but
 6  --
 7      Q.  Exhibit Abbott 208 went out over your
 8  signature. I assume that somebody else would have
 9  prepared that response for you?
10      A.  Yes.
11      Q.  Do you know who would have prepared
12  that response for you?
13      A.  No idea.
14      Q.  Did you have any discussions with
15  Congressman Thomas or Congressman Archer about
16  their concerns?
17      A.  No.
18      Q.  And did you discuss with anybody,
19  whether in Congress or at the agency, how the
20  proposed Stark II regulations would undermine
21  Congressional intent in BBA 1997?
22      A.  No.

                                    61 (Pages 238 to 241)

DeParle, Nancy-Ann                                                May 18, 2007
Washington, DC

Page 258

1    MS. YAVELBERG:  Sounds good.
2    VIDEOGRAPHER:  The time is 3:51 p.m.
3  We are going off the record concluding tape
4  number five in the deposition of Nancy-Ann
5  DeParle in the matter of In Re: Pharmaceutical
6  Industry Average Wholesale Price Litigation.
7        - - -
8     (Recessed at 3:51 p.m.)
9     (Reconvened at 4:04 p.m.)
10        - - -
11   VIDEOGRAPHER:  The time is 4:04 p.m.
12 We are going back on the record starting tape six
13 in the deposition of Nancy-Ann DeParle in the
14 matter of In Re: Pharmaceutical Industry Average
15 Wholesale Price litigation.
16 BY MR. COOK:
17    Q.  I think I have in front of you what we
18 previously marked Exhibit Abbott 064.  This is
19 the August '98 Albuterol Sulfate report from OIG.
20 If I could get you to turn to your June 11, '98
21 memo that's attached to that.  It's the last two
22 pages of the exhibit.

Page 259

1     A.  Yes.
2     Q.  I would like to direct your attention
3  specifically to one line in this.  It's the
4  fourth paragraph down, the HCFA response that
5  begins we concur with the intent of the
6  recommendation.
7        The second sentence of that paragraph
8  reads, quote:  While HCFA's use of its inherent
9  reasonableness authority as outlined in the BBA
10 is a way to reduce the amount HCFA reimburses for
11 Albuterol Sulfate, more comprehensive reform is
12 necessary.
13       What did you mean by more comprehensive
14 reform being necessary?
15    A.  Actual acquisition cost was the payment
16 level.
17    Q.  And this would have been in June of
18 1998, so this would have been approximately one
19 year after the original proposal was made and
20 about the time that the second proposal for
21 actual acquisition cost was being submitted to
22 Congress; correct?

Page 260

1     MS. YAVELBERG:  Objection; form.
2     A.  Well, the FY 1998 budget proposal would
3  have been submitted in January or February of
4  '97.  And the -- by this point it would have been
5  the FY 1999 proposal for actual acquisition
6  costs, and that would have probably been
7  submitted again in February, so it had been out
8  there for a couple months.
9     Q.  Okay.  And your understanding is that
10 the Congress didn't enacted the actual
11 acquisition cost reform in 1998 either; correct?
12    A.  That's correct.
13    Q.  Do you recall whether the
14 Administration proposed a reduction for fiscal
15 year 2000 to 83 percent of AWP?
16    MS. YAVELBERG:  Objection; form.
17    A.  Yes.
18    Q.  I would like to turn your attention to
19 a document we will mark as exhibit -- I think we
20 are up to Exhibit Abbott 212.
21      (Exhibit Abbott 212 was marked for
22 identification.)

Page 261

1  BY MR. COOK:
2     Q.  For the record, Exhibit Abbott 212 is a
3  letter dated May 5, 2000.  It's to the Honorable
4  Donna Shalala from Tom Bliley, Congressman Tom
5  Bliley.  And we printed this off the Web site for
6  the Committee on Commerce where at the time
7  apparently Congressman Bliley was the chairman.
8  And then just for efficiency I'll go ahead and
9  mark as Exhibit Abbott 213 a letter dated May 31,
10 2000.
11      (Exhibit Abbott 213 was marked for
12 identification.)
13 BY MR. COOK:
14    Q.  And this is a May 31, 2000 letter from
15 Secretary Shalala back to Congressman Bliley.  Do
16 you recall this exchange of letters?
17    A.  Yes.
18    Q.  What do you recall about this May 5,
19 2000 letter from Congressman Bliley?
20    MS. YAVELBERG:  Objection; form.
21    A.  I recall that when it -- it wasn't
22 addressed to me, but -- and I don't think it was

66 (Pages 258 to 261)