# EXHIBIT T

<pre>





Wednesday
June 5, 1991

## Part III

## Department of Health and Human Services

Health Care Financing Administration

42 CFR Parts 405 and 415
Medicare Program; Fee Schedule for Physicians' Services; Proposed Rule

Abbott
EXHIBIT NO. 120
KY  4/23/07

</pre>

Case 1:01-cv-12257-PBS   Document 4791-24   Filed 10/11/07   Page 3 of 6

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Health Care Financing Administration

### 42 CFR Parts 405 and 415

[BPD-2-P]

RIN 0938-AE91

### Medicare Program; Fee Schedule for Physicians' Services

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Proposed rule.

**SUMMARY:** This proposed rule sets forth a fee schedule for payment for physicians' services beginning January 1, 1992. Establishment of this fee schedule is required by section 6102(a) of the Omnibus Budget Reconciliation Act of 1989, as amended by the Omnibus Budget Reconciliation Act of 1990. This proposed rule explains which services would be included in the fee schedule and sets forth the formula for computing payment amounts. Application of transition rules during 1992 through 1995 is also described, as well as other adjustments to fee schedule payment amounts.

**DATES:** Comments will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on August 5, 1991.

**ADDRESSES:** Mail comments to the following address:

Health Care Financing Administration, Department of Health and Human Services, Attention: BPD-712-P, P.O. Box 26688, Baltimore, Maryland 21207.

If you prefer, you may deliver your comments to one of the following addresses:

- Room 309-G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC, or
- Room 132, East High Rise Building, 6325 Security Boulevard, Baltimore, Maryland.

Due to staffing and resource limitations, we cannot accept facsimile (FAX) copies of comments. In commenting, please refer to file code BPD-712-P. Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in room 309-G of the Department's offices at 200 Independence Avenue SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (phone: 202-245-7890).

If you wish to submit comments on the information collection requirements contained in this proposed rule, you may submit comments to: Allison Herron, HCFA Desk Officer, Office of Information and Regulatory Affairs, Room 3002, New Executive Office Building, Washington, DC 20503.

Copies: To order copies of the Federal Register containing this document, send your request to the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402-9325. Specify the date of the issue requested and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or Master Card number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 783-3238 or by faxing to (202) 275-6802. The cost for each copy (in paper or microfiche form) is $1.50. In addition, you may view and photocopy the Federal Register document at most libraries designated as U.S. Government Depository Libraries and at many other public and academic libraries throughout the country that receive the Federal Register. The order desk operator will be able to tell you the location of the Government Depository Library nearest to you.

**FOR FURTHER INFORMATION CONTACT:** Terrence L. Kay, (301) 966-4494.

**SUPPLEMENTARY INFORMATION:**

### Overview

In this proposed rule, we explain in detail the statutory authority for the physician fee schedule and the provisions of the regulations we propose under that authority. Addenda to the rule provide technical documentation to the fee schedule tables, tables containing proposed relative values for physician services and geographic practice cost index values, and information to assist readers in obtaining documents referenced in the proposed rule.

This proposed rule would add a new 42 CFR part 415 to apply to physicians' services furnished beginning on January 1, 1992. Existing rules pertaining to reasonable charge payment at 42 CFR part 405 subpart E would be amended to reflect the narrower application of reasonable charge principles once the physician fee schedule becomes effective.

The information in this proposed rule updates the information supplied September 4, 1990 in the model fee schedule notice (55 FR 36178). Comments on the model fee schedule have been considered in developing the policies proposed here. (If commenters wish to have their comments summarized and responded to in the Federal Register, they should comment on this proposed rule and we will respond to them in the final rule.)

To assist readers in referencing sections contained in this proposed rule, we are providing the following table of contents:

Table of Contents

Background

I. Legislative History
II. Early Development of the Fee Schedule
III. Future Implementation Steps

Description of Specific Statutory Requirements and Proposed Implementing Regulations

IV. Description of the Fee Schedule
 A. Services to be Included in the Fee Schedule
  1. Physicians' Services—General
  2. Limited Licensed Practitioner Services
  3. Services of Nonphysician Practitioners
   a. Physical/Occupational Therapists (PT/OTs)
   b. Physician Assistants (PAs)
   c. Nurse Practitioners (NPs) and Clinical Nurse Specialists (CNSs)
   d. Certified Registered Nurse Anesthetists (CRNAs)
   e. Nurse Midwives (NMs)
   f. Clinical Psychologists (CPs)
   g. Clinical Social Workers (CSWs)
  4. Services of Physicians to Patients in Provider Settings and Services of Teaching Physicians
  5. Payment for Supplies, Services, and Drugs Furnished Incident to a Physician's Service
   a. Supplies
   b. Services Furnished Incident to a Physician's Service
   c. Drugs
 B. Formula for Computing Payment Amounts
 C. Sources of Relative Value Units (RVUs)
  1. Physician Work RVUs
  2. Charge-based Relative Value Scale to Provide RVUs for Gaps
  3. Unlisted Procedures and Local Codes
  4. RVUs for Limited Licensed Practitioner Services
  5. Radiology Services
   a. Integration of Existing Radiologist Fee Schedule into Physician Fee Schedule
   b. Rescaling Values for the Physician Fee Schedule
   c. Portable X-ray
   d. Other Radiology Issues
  6. Anesthesia Services
   a. Integration of Anesthesia Services into the Physician Fee Schedule
   b. Elimination or Continuation of Recognition of Time Units
   c. Method for Integrating Anesthesia Services
   d. Payment for Specialized Services Furnished by Anesthesiologists
   e. Monitored Anesthesia Care
   f. Other Anesthesia Issues
  7. Physician Pathology Services
   a. Charge-based Computation of Practice Expense and Malpractice RVUs
   b. Combining Work, Practice Expense, and Malpractice RVUs onto a Common Scale

10. Periodic Review and Adjustments in RVUs
 a. Proposed Policy for Review and Adjustments
 b. Establishment of Interim RVUs for New or Revised Services
 c. Options for Establishing and Revising RVUs for Existing, Revised, and New Services
 d. Creation and Review of RVUs for New or Revised Services
 e. Implementation of the $20 Million Limitation
D. Geographic Adjustment Factors (GAFs)
E. Conversion Factor (CF)
1. Computation of Budget-neutral CF
2. Accounting for Transition Payment Rules in CF Calculation
3. Determining the Initial CF
4. Future Updates of CF
F. Data Used to Develop the Fee Schedule
1. Sources of Data
2. Description of Data Files
a. Part B Medicare Annual Data (BMAD)
b. National Claims History (NCH)
3. Data Validation
4. Aging of Data to Reflect 1991 Payment Rules and Expenditures
a. Pub. L. 101-239 Payment Provisions Requiring Data Adjustments for 1990
b. Pub. L. 101-508 Payment Provisions Requiring Data Adjustments
V. Definitions
 A. Defining a Unit of Service
 1. Coding of Medical Visit Services
 a. Current Use of CPT Visit Codes
 b. Variation in Coding of Medical Visit Services
 c. HCFA Goals for New Visit Codes
 d. Recent Studies to Support the Creation of New Visit and Consultation Codes
 e. Harvard Study Phase II
 f. CPT Panel Development of New Visit Codes
 g. Pilot Test of New Visit Codes
 h. Revising the Other Visit Codes
 2. Scope of the Global Surgery Policy
 a. Background and Current Carrier Procedures
 b. Harvard Study Assumptions
 c. Proposed Definitions
 d. Computing RVUs for Global Surgery
 3. Minor Surgery and Nonincisional Procedures
 a. Minor Surgery
 b. Nonincisional Procedures ("Scopies")
 c. Preferred Approach
 B. Defining Geographic Payment Localities
 1. Current System
 2. Localities under the Fee Schedule
VI. Adjustments to Fee Schedule Payments
 A. Site of Service Differential
 1. General
 2. Options under a Fee Schedule
 B. Professional/Technical Component Services
 1. Radiology Services
 2. Diagnostic Tests
 a. General
 b. Electrocardiograms
 c. Technical component of cardiac catheterization services
 d. Purchased diagnostic tests
 3. Physician Pathology Services
 4. Future Plans
 C. Payment Modifiers

1. Multiple Surgery (CPT modifier 51)
2. Bilateral Surgery (CPT modifier 50)
3. Providers Furnishing Less Than the Global Fee Package (CPT modifiers 54, 55, and 56)
4. Physicians Who Assist at Surgery (CPT modifiers 80, 81, and 82)
5. Two Surgeons and Surgical Team (CPT modifiers 62 and 66)
6. Unusual Services (CPT modifier 22) or Reduced Services (CPT modifier 52)
7. Multiple Modifiers (CPT modifier 99)
8. Multiple Patients and Single Patient Modifiers on Nursing Home Visit Bills (HCPCS alpha-numeric modifiers MP and SP)
9. Modifiers That Would Not Affect Payment Levels
 a. CPT Modifiers That Would Not Affect Payment
 b. HCPCS Alpha-numeric Modifiers That Would Not Affect Fee Schedule Payment Amounts
 c. Carrier Unique Local Modifiers (HCPCS Level 3 modifiers beginning with the letters w through z)
10. Travel
D. New Physician/Practitioner Adjustment
1. General and to Whom It Applies
2. Exceptions
3. Amounts of Adjustments
4. Years of Practice
E. Participating Physician Differential
F. Health Manpower Shortage Area Bonus Payment
G. Comparability and Inherent Reasonableness Rules
1. Comparability Rule
2. Inherent Reasonableness Rule
VII. Limiting Charge on Nonparticipating Physicians

Other Information

VIII. Information Collection Requirements
IX. Responses to Comments
X. Regulatory Impact Analysis
 A. Executive Order 12291 and Regulatory Flexibility Act
 1. Effects on Physician Payments
 a. Impact Estimation Methodology
 b. Overall Fee Schedule Impact
 c. Specialty Level Effects
 d. State Level Effects
 e. Effects of Separate Payment for Drugs
 2. Effects on Beneficiaries' Costs and Access to Services
 3. Effects on Carriers
 B. Rural Hospital Impact Statement

Text of Proposed Regulations

Addenda

A—Technical Documentation/Explanation and Guide to Use of Fee Schedule Tables
B—Relative Value Units by Service
C—Geographic Practice Cost Indices by Fee Schedule Areas
D—Information for Obtaining Sources of Data Underlying Fee Schedule
E—CPT Definitions for Visit Codes

In addition, because of the many agencies and terms to which we refer by acronym in this proposed rule, we are listing those acronyms and their corresponding terms in alphabetical order below:

AA—Anesthetist assistant
ACR—American College of Radiology
ACS—American College of Surgeons
AMA—American Medical Association
ASC—Ambulatory surgical center
BMAD—[Part] B Medicare Annual Data
CAT—Computerized axial tomography
CBO—Congressional Budget Office
CF—Conversion factor
CFR—Code of Federal Regulations
CHER—Center for Health Economics Research
CNIBM Laser—CoverageHPLAIIDPRSEtion (copyrighted by the American Medical Association (1991))
CRNA—Certified registered nurse anesthetist
CSW—Clinical social worker
CWF—Common working file
CY—Calendar year
DHHS—Department of Health and Human Services
DME—Durable medical equipment
DO—Doctor of Osteopathy
DRG—Diagnosis-related group
EEG—Electroencephalogram
EKG—Electrocardiogram
EO—Executive Order
FY—Fiscal year
GAF—Geographic adjustment factor
GPCI—Geographic practice cost index
HHA—Home health agency
HCFA—Health Care Financing Administration
HCPCS—HCFA Common Procedure Coding System
HHS—Department of Health and Human Services
HI—Hospital Insurance (Part A of the Medicare Program)
HMO—Health maintenance organization
HMSA—Health Manpower Shortage Area
ICF—Intermediate care facility
ID—Identification
IIC—Inflation-indexed charge
MAAC—Maximum Allowable Actual Charge
MAC—Monitored Anesthesia Care
MCP—Monthly Capitation Payment
MD—Doctor of Medicine
MEI—Medicare Economic Index
MP—Multiple patient
MRI—Magnetic resonance imaging
MSA—Metropolitan statistical area
MVPS—Medicare volume performance standards
NAMCS—National Ambulatory Medical Care Survey
NCH—National Claims History
NCHS—National Center for Health Statistics
NF—Nursing facility
NM—Nurse midwife
NP—Nurse practitioner
OBRA—Omnibus Budget Reconciliation Act
OIG—Office of the Inspector General
OMB—Office of Management and Budget
OT—Occupational therapist
PA—Physician assistant
PBP—Provider-based physician
PET—Provider Education and Training
PHS—Public Health Service
Pub. L.—Public Law
PPRC—Physician Payment Review Commission
PPR—Physician Payment Reform
PROs—[Utilization and Quality Control] Peer Review Organizations

25800    Federal Register / Vol. 56, No. 108 / Wednesday, June 5, 1991 / Proposed Rules

propose to determine national average allowed charges for these supplies. We are also in the process of obtaining catalogs from national surgical supply companies to review information on list prices for the supplies for which we are considering allowing a separate payment. Based on our analysis of these data performed thus far, we expect to establish a fee schedule payment amount for selected supplies used for a facility-based procedure when it is performed in the physician's office. We are also considering limiting this proposed policy to only ASC procedures or to some other subset of procedures. We will continue to study this issue, and invite comments on the proposed policy.

We are especially interested in receiving comments on the issues of (1) our method of establishing fee schedule amounts for these office medical supplies, (2) the content of the list of office medical supplies for which we propose to provide separate payment, and (3) whether payment for such supplies, if made, should be limited to procedures on the ASC list or some other subset of procedures. Commenters who want additional office medical supplies to be placed on this list should provide a specific rationale for why the supply should not be considered to be routine practice expense and should provide supporting information on the cost of the office medical supply to physicians. Reference to items such as "trays" or "packs" should itemize the specific contents.

b. *Services furnished incident to a physician's service.* We propose in § 415.52(b) that services of nonphysicians that are covered as incident to a physician's service would be paid under the fee schedule as if the physician had furnished the service. This is a continuation of current practice under reasonable charge payment in which the physician bills reasonable charges for the services of staff that are incident to the care as if the physician had furnished the services personally. These services and items typically include the services of health professionals such as nurses or PAs who furnish a service under the direct supervision of a physician, for which the physician bills. For example, a registered nurse under the supervision of a physician may see a patient on the physician's behalf to administer an injection. The physician would bill for the injection as if the physician had administered it. Several CPT codes (for example, minimal established office visits and physical medicine codes) acknowledge these arrangements.

We request public comment on whether the policy of paying the same amount for the service whether furnished personally by a physician or by someone incident to a physician's service should continue. The salary of the nonphysician staff is a practice expense and the physician work in these services is arguably non-existent or at least something less than if the physician furnished the service directly. Because physicians bill for these services as if they furnished them personally, we do not know to what extent these services furnished by physician staff without a patient encounter are billed and paid as physician services. We are considering whether to require use of a modifier when these services are furnished by physician staff so that we can evaluate both their frequency and the amount of payments made for them.

c. *Drugs.* The program currently pays for drugs furnished in physician's offices that are not self-administrable under the "incident to" provision set forth in section 1861(s)(2) of the Act. For the most part, drugs paid for under the "incident to" benefit consist of drugs furnished by injection or by infusion. This includes chemotherapy agents. Generally, carriers base payment for the drug on the physician's estimated cost of the drug using one of the wholesale price guides such as the Red Book. However, some carriers base payment on actual acquisition costs determined on the basis of carrier surveys.

We considered the following options for paying for drugs under the fee schedule:

Option 1—Establish a fee schedule payment amount for each drug.
Option 2—Bundle the payment for the drug into payment for the visit or consultation service.
Option 3—Make a separate payment for a drug and leave the pricing of the drug to each carrier.
Option 4—Make a separate payment for a drug but require a consistent method in pricing to be used by the carriers.

We believe that ultimately there should be a national fee schedule allowance for all "incident to" drugs. However, given the large number of different drugs and the myriad of dosage levels, we have decided that it is not practical for us to consider establishing a national drug fee schedule at this time. However, we will consider this issue in the future. Section 1848(j)(3) of the Act gives us the authority to specify that items and services be excluded from the fee schedule. Thus, we have decided to exclude the cost of drugs from the national fee schedule and to continue to pay for them under the current "reasonable charge" system. We believe, however, that there is a need for greater consistency in how drugs are paid for under the program and for this reason we have chosen Option 4. For purposes of payment for drugs furnished incident to a physician's service, the term "drug" includes those covered drugs and biologicals that cannot be self-administered. Also, we are proposing that we will instruct all carriers to base payment for drugs on 85 percent of the national average wholesale price of the drug (as published in the Red Book and similar price listings), but we welcome comments regarding the appropriate discount.

Medicare policy, since the beginning of the Medicare program, has been to base payment for "incident to" drugs on the estimated acquisition costs. However, based on studies by the Office of the Inspector General (OIG) ("Changes to the Medicaid Prescription Drug Program Could Save Millions" (ACN 06-40216) and "Use of Average Wholesale Prices in Reimbursing Pharmacies in Medicaid and the Medicare Prescription Drug Program" (A-06-80-00037)) and other information, we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs. The OIG reports indicate that pharmacies are getting an average discount of 15.9 percent off the published wholesale price. We have no reason to believe prices paid by physicians are any higher than pharmacies pay. Moreover, we are proposing for very high volume drugs that payment for the drug would be limited to the lower of the estimated acquisition cost for the drug as determined by us and specified in instructions to carriers or 85 percent of the national average wholesale price for the drug. The listing of the high volume drugs and payment limits for them will be included in the Medicare Carriers Manual.

We propose this payment policy for drugs that are incident to physician services under the authority of section 1842(b)(8) of the Act, which permits us to establish limits on charges based on inherent reasonableness. This provision of the law is implemented in regulations at § 405.502(g). The regulations permit us to establish a limit on the reasonable charge for an item or service if we determine that charge is grossly lower than or in excess of acquisition or production costs for the item or service (§ 405.502(g)(1)(vi)).

As indicated in our previous discussion, we base the payment

limitation for drugs on the findings of the OIG with regard to the discounting of drugs to pharmacies below the average wholesale price. We believe that physicians also have the opportunity to achieve these discounts from drug manufacturers and wholesalers, since drug sales are dependent upon the drugs a physician prescribes for his or her patients, not only for administration in the physician's office, but also for self-administration or administration in a hospital or other institution. Therefore, we believe that physicians are in an excellent position to demand discounts such as those that the OIG study finds are typically given to pharmacies.

We believe that the impact of this special charge on physician services will be minimal because the drugs to which this provision applies are incidental to the physician's professional services and, to be covered, the law requires that they be "* * * of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills." (section 1861(s)(2)(A) of the Act). Since the physician has great leverage with the entity from which he or she purchases drugs to acquire a significant discount for the drug, we do not anticipate that there will be an adverse effect upon quality, access, beneficiary liability, assignment rates, reasonable charge reductions on unassigned claims, and participation rates of physicians.

Currently, the program usually pays a separate charge for an injection by a physician or by other health personnel incident to a physician's service (see the Medicare Carriers Manual, section 5202). If the customary practice in the area is not to charge for the injection furnished in the course of a visit, no payment is currently made for the injection. If the purpose of a visit is only to receive an injection, payment for the injection is made and payment for the visit is not allowed. If special skills are needed for the injection, payment is made based on the reasonable charge practices in the area (the Medicare Carriers Manual, section 5202.2). We propose to change this current policy with implementation of the fee schedule. In general, when a physician provides a visit or other service to a beneficiary and, in the course of that encounter, the beneficiary also receives a subcutaneous, intramuscular, intravenous, or intra-arterial injection, no additional payment would be made for the administration of the injection. The drug would be paid separately as discussed above. Payment for both the cost of non-drug supplies and administration of the drug would be included in the payment for the visit or other service. Generally, if a beneficiary receives an injection, we expect that the physician would bill for a minimal office visit. We believe it is rare when a beneficiary who needs an injection does not also need at least a minimal level of involvement of a physician as part of the service.

In those unusual circumstances in which no evaluation and management service or other service is furnished to the beneficiary and the physician bills only for the injection (for example, a routine B12 injection for pernicious anemia), payment for the injection would be based on the RVUs for the applicable injection code.

This general policy would also apply to subcutaneous, intramuscular, intravenous, and intra-arterial injections for purposes of cancer chemotherapy. However, infusion of cancer chemotherapy drugs (CPT 96410, 96412, 96414, 96422, 96423, 96425) and administration of cancer chemotherapeutic agents into specialized body cavities (CPT 96440, 96445, 96450) are considered to be procedures, not injections, for purposes of this policy. Therefore, we propose to pay separately for chemotherapy infusions and chemotherapy administration into specialized body cavities regardless of whether these services occur during a visit, infusion of another drug, or while another service is furnished. We would also pay separately for drugs and chemotherapy agents as discussed in this section.

Of course, when cancer chemotherapy is administered to a hospital patient by personnel other than those practitioners authorized to bill separately under Part B for their professional services (that is, a physician, PA, NM, CRNA, or CP), the chemotherapy administration is a hospital service and cannot be billed by a practitioner. Chemotherapy administration can be billed by a physician only when it is furnished by the physician or staff outside a hospital setting. Chemotherapy furnished by the physician's staff may be paid by Medicare only when the requirements for coverage as "incident to a physician's service" contained in Medicare Carriers Manual, section 2050 are met. The proposed regulations for the payment of drugs beginning January 1, 1992 appear in new § 415.34.

*B. Formula for Computing Payment Amounts*

Section 1848(a) of the Act specifies that payment for Medicare physicians' services must be based on the lesser of the actual charge or the payment amount computed under the fee schedule. Although the law refers to the fee schedule values as "payment amounts," in fact under the statutory formula the amount paid to a physician (often referred to as the "allowed charge") would be 80 percent of the actual charge or 80 percent of the fee schedule payment amount, whichever was less. The beneficiary is required to pay the remaining 20 percent. Throughout the preamble of this proposed rule and in the proposed regulation itself, we have used the terms "fee schedule payment amount," "payment amount," and "payment" as used in the statute to include the amounts for which both the beneficiary and Medicare are responsible.

Under the formula set forth in section 1848(b)(1) of the Act, payment amounts for particular services under the physician fee schedule would be computed as the product of three factors: (1) A relative value for the service, (2) the GAF for the fee schedule area, and (3) a nationally uniform dollar CF. (Although we generally describe a single nationally uniform CF, different CFs for surgical services and other services may be established as part of the Medicare volume performance standards (MVPS) and annual update process. (See section IV.E.4. for further explanation.) This general formula can be expressed as:

$$\text{Payments} = RVU_s \times GAF_{sa} \times CF$$

where

$RVU_s$ = Total relative value units for the service

$GAF_s$ = Total geographic adjustment factor for the fee schedule area

$CF$ = Uniform national conversion factor

$_s$ = Service

$_a$ = Fee schedule area

Section 1848(e)(2) of the Act requires the total GAF for a fee schedule area be the sum of three components, relating to the three components of the total RVU for a service. The three components are: (1) Physician work; (2) practice expenses or overhead such as rent, staff salaries, equipment, and supplies, exclusive of professional malpractice liability insurance costs; and (3) professional liability insurance or malpractice costs.

Section 1848(c)(1) of the Act defines the components of the RVU for a physician service. The physician work RVU must reflect the physician resources required to furnish the service, including time and intensity of effort. Under the formula specified at section 1848(c)(2)(C), the practice expense and malpractice RVUs are based on