# EXHIBIT V




Monday
November 2, 1998

## Part II

# Department of Health and Human Services

Health Care Financing Administration

42 CFR Part 405, et al.

Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999; Final Rule and Notice



EXHIBIT
209
Abbott

**58814** Federal Register / Vol. 63, No. 211 / Monday, November 2, 1998 / Rules and Regulations

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Health Care Financing Administration

### 42 CFR Parts 405, 410, 413, 414, 415, 424, and 485

[HCFA-1006-FC]

RIN 0938-AI52

### Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999

**AGENCY:** Health Care Financing Administration (HCFA), HHS.

**ACTION:** Final rule with comment period

**SUMMARY:** This final rule makes several policy changes affecting Medicare Part B payment. The changes that relate to physicians' services include resource-based practice expense relative value units (RVUs), medical direction rules for anesthesia services, and payment for abnormal Pap smears. Also, we are rebasing the Medicare Economic Index from a 1989 base year to a 1996 base year. Under the law, we are required to develop a resource-based system for determining practice expense RVUs. The Balanced Budget Act of 1997 (BBA) delayed, for 1 year, implementation of the resource-based practice expense RVUs until January 1, 1999. Also, BBA revised our payment policy for nonphysician practitioners, for outpatient rehabilitation services, and for drugs and biologicals not paid on a cost or prospective payment basis. In addition, BBA permits certain physicians and practitioners to opt out of Medicare and furnish covered services to Medicare beneficiaries through private contracts and permits payment for professional consultations via interactive telecommunication systems. Furthermore, we are finalizing the 1998 interim RVUs and are issuing interim RVUs for new and revised codes for 1999. This final rule also announces the calendar year 1999 Medicare physician fee schedule conversion factor under the Medicare Supplementary Medical Insurance (Part B) program as required by section 1848(d) of the Social Security Act. The 1999 Medicare physician fee schedule conversion factor is $34.7315.

**DATES:** *Effective date:* This rule this rule is effective January 1, 1999.

*Applicability date:* Part 405 subpart D is applicable for private contract affidavits signed and private contracts entered into on or after January 1, 1999

This rule is a major rule as defined in Title 5, United States Code, section 804(2). Pursuant to 5 U.S.C section 801(a)(1)(A), we are submitting a report to the Congress on this rule on October 30, 1998.

*Comment date:* We will accept comments on interim RVUs for selected procedure codes identified in Addendum C and on interim practice expense RVUs for all codes as shown in Addendum B. Comments will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on January 4, 1999.

**ADDRESSES:** Mail written comments (1 original and 3 copies) to the following address: Health Care Financing Administration, Department of Health and Human Services, Attention: HCFA-1006-FC, P.O. Box 26688, Baltimore, MD 21207-0488.

If you prefer, you may deliver your written comments (1 original and 3 copies) to one of the following addresses:

Room 443-G, Hubert H Humphrey Building, 200 Independence Avenue, SW, Washington, DC 20201, or

Room C5-14-03, 7500 Security Boulevard, Baltimore, MD 21244-1850

Because of staffing and resource limitations, we cannot accept comments by facsimile (FAX) transmission In commenting, please refer to file code HCFA-1006-FC. Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in Room 443-G of the Department's offices at 200 Independence Avenue, SW., Washington, DC, on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (phone (202) 690-7890).

**FOR FURTHER INFORMATION CONTACT:**

Roberta Epps, (410) 786-4503 (for issues related to outpatient rehabilitation services)

Stephen Heffler, (410) 786-1211 (for issues related to the Medicare Economic Index)

Anita Heygster, (410) 786-4486 (for issues related to private contracts).

Jim Menas, (410) 786-4507 (for issues related to Pap smears and medical direction for anesthesia services).

Robert Niemann, (410) 786-4569 (for issues related to the drugs and biologicals policy).

Regina Walker-Wren, (410) 786-9160 (for issues related to physician assistants, nurse practitioners, clinical nurse specialists, and certified nurse-midwives).

Craig Dobyski, (410) 786-4584 (for issues related to teleconsultations).

Stanley Weintraub, (410) 786-4498 (for issues related to practice expense

relative value units and all other issues).

**SUPPLEMENTARY INFORMATION:**

*Copies:* To order copies of the Federal Register containing this document, send your request to: New Orders, Superintendent of Documents, P.O Box 371954, Pittsburgh, PA 15250-7954. Please specify the date of the issue requested, and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa, Discover, or Master Card number and expiration date. Credit card orders can also be placed by calling the order desk at (202) 512-1800 (or toll free at 1-888-293-6498) or by faxing to (202) 512-2250 The cost for each copy is $8 As an alternative, you can view and photocopy the Federal Register document at most libraries designated as Federal Depository Libraries and at many other public and academic libraries throughout the country that receive the Federal Register

This Federal Register document is also available from the Federal Register online database through GPO Access, a service of the U.S. Government Printing Office Free public access is available on a Wide Area Information Server (WAIS) through the Internet and via asynchronous dial-in. Internet users can access the database by using the World Wide Web, the Superintendent of Documents home page address is http://www.access.gpo.gov/nara/index.html, by using local WAIS client software, or by telnet to swais.access.gpo.gov, then login as guest (no password required). Dial-in users should use communications software and modem to call 202-512-1661, type swais, then login as guest (no password required).

To assist readers in referencing sections contained in this preamble, we are providing the following table of contents. Some of the issues discussed in this preamble affect the payment policies but do not require changes to the regulations in the Code of Federal Regulations. Information on the regulation's impact appears throughout the preamble and not exclusively in part IX.

**Table of Contents**

I. Background
  A. Legislative History
  B. Published Changes to the Fee Schedule
II. Specific Proposals for Calendar Year 1998, Response to Comments
  A. Resource-Based Practice Expense Relative Value Units
    1. Resource-Based Practice Expense Legislation
    2. Proposed Methodology for Computing Practice Expense Relative Value Units
    3. Other Practice Expense Policies

Case 1:01-cv-12257-PBS    Document 4791-26    Filed 10/11/07    Page 4 of 7

4. Refinement of Practice Expense Relative Value Units
5. Reductions in Practice Expense Relative Value Units for Multiple Procedures
6. Transition
B. Medical Direction for Anesthesia Services
C. Separate Payment for a Physician's Interpretation of an Abnormal Papanicolaou Smear
D. Rebasing and Revising the Medicare Economic Index
III. Implementation of the Balanced Budget Act
  A. Payment for Drugs and Biologicals
  B. Private Contracting with Medicare Beneficiaries
  C. Payment for Outpatient Rehabilitation Services
    1. BBA 1997 Provisions Affecting Payment for Outpatient Rehabilitation Services
      a. Reasonable Cost-Based Payments
      b. Prospective Payment System for Outpatient Rehabilitation Services
        (1) Overview
        (2) Services Furnished by Skilled Nursing Facilities
        (3) Services Furnished by Home Health Agencies
        (4) Services Furnished by Comprehensive Outpatient Rehabilitation Facilities
        (5) Site-of-Service Differential
        (6) Mandatory Assignment
    2. Uniform Procedure Codes for Outpatient Rehabilitation Services
    3. Financial Limitation
      a. Overview
      b. Use of Modifiers to Track the Financial Limitation
      c. Treatment of Services Exceeding the Financial Limitation
    4. Qualified Therapists
    5. Plan of Treatment
  D. Payment for Services of Certain Nonphysician Practitioners and Services Furnished Incident to their Professional Services
  E. Payment for Teleconsultations in Rural Health Professional Shortage Areas
IV. Refinement of Relative Value Units for Calendar Year 1999 and Responses to Public Comments on Interim Relative Value Units for 1998
  A. Summary of Issues Discussed Related to the Adjustment of Relative Value Units
  B. Process for Establishing Work Relative Value Units for the 1999 Fee Schedule
V. Physician Fee Schedule Update and Conversion Factor for Calendar Year 1999
VI. Provisions of the Final Rule
VII. Collection of Information Requirements
VIII. Regulatory Impact Analysis
  A. Regulatory Flexibility Act
  B. Resource-Based Practice Expense Relative Value Units
  C. Medical Direction for Anesthesia Services
  D. Separate Payment for a Physician's Interpretation of an Abnormal Papanicolaou Smear
  E. Rebasing and Revising the Medicare Economic Index
  F. Payment for Nurse Midwives' Services
  G. BBA Provisions Included in This Proposed Rule
  H. Impact on Beneficiaries
Addendum A—Explanation and Use of Addenda B and C
Addendum B—Relative Value Units (RVUs) and Related Information
Addendum C—Codes with Interim RVUs

In addition, because of the many organizations and terms to which we refer by acronym in this final rule, we are listing these acronyms and their corresponding terms in alphabetical order below.

AANA: American Association of Nurse Anesthetists
ABC: Activity based costing
ABN: Advance Beneficiary Notice
AHE: Average hourly earnings
AMA: American Medical Association
ANCC: American Nurses Credentialing Center
ASA: American Society of Anesthesiologists
ASOPA: American Society of Orthopedic Physician Assistants
AWP: Average wholesale price
BBA: Balanced Budget Act of 1997
BLS: Bureau of Labor Statistics
CAAHEP: Commission on Accreditation of Allied Health Education Programs
CF: Conversion factor
CFR: Code of Federal Regulations
CMSAs: Consolidated Metropolitan Statistical Areas
CORF: Comprehensive outpatient rehabilitation facility
CPEPs: Clinical Practice Expert Panels
CPI: Consumer Price Index
CPI–U: Consumer Price Index for All Urban Consumers
CPS: Current Population Survey
CPT: [Physicians'] Current Procedural Terminology
CRNA: Certified Registered Nurse Anesthetist
DME: Durable medical equipment
DMEPOS: Durable medical equipment, prosthetics, orthotics, and supplies
DRG: Diagnosis-related group
EAC: Estimated acquisition cost
ECI: Employment Cost Index
ES-202 Data: Bureau of Labor Statistics from State unemployment insurance agencies
ESRD: End-stage renal disease
FDA: Food and Drug Administration
FMR: Fair market rental
FQHC: Federally qualified health center
GAAP: Generally accepted accounting principles
GAF: Geographic adjustment factor
GPCI: Geographic practice cost index
HCFA: Health Care Financing Administration
HCPAC: Health Care Professionals Advisory Committee
HCPCS: HCFA Common Procedure Coding System
HHA: Home health agency
HHS: [Department of] Health and Human Services
HMO: Health maintenance organization
HPSA: Health professional shortage area
HRSA: Health Resources and Services Administration
HUD: [Department of] Housing and Urban Development
IPLs: Independent Physiologic Laboratories
MedPAC: Medicare Payment Advisory Commission
MEI: Medicare Economic Index
MGMA: Medical Group Management Association
MSA: Metropolitan Statistical Area
MSA: Medicare Supplemental Insurance
MVPS: Medicare volume performance standard
NAIC: National Association of Insurance Commissioners
NBCOPA: National Board on Certification for Orthopedic Physician Assistants
NCCPA: National Council on Certification of Physician Assistants
NPI: National provider identifier
OBRA: Omnibus Budget Reconciliation Act
OTIP: Occupational therapist in independent practice
PC: Professional component
PHS: Public Health Service
PMSA: Primary Metropolitan Statistical Area
PPI: Producer price index
PPS: Prospective payment system
PTIP: Physical therapist in independent practice
RBRVS: Resource Based Relative Value Scale
RHC: Rural health clinic
RUC: [AMA's Specialty Society] Relative [Value] Update Committee
RN: Registered nurse
RVU: Relative value unit
SMS: Socioeconomic Monitoring System
SNF: Skilled nursing facility
TC: Technical component
TEFRA: Tax Equity and Fiscal Responsibility Act
UPIN: Uniform provider identifier number

I. Background

A. Legislative History

Since January 1, 1992, Medicare has paid for physicians' services under section 1848 of the Social Security Act (the Act), "Payment for Physicians' Services." This section contains three major elements: (1) A fee schedule for the payment of physicians' services, (2) a sustainable growth rate for the rates of increase in Medicare expenditures for physicians' services, and (3) limits on the amounts that nonparticipating physicians can charge beneficiaries. The Act requires that payments under the fee schedule be based on national uniform relative value units (RVUs) based on the resources used in furnishing a service. Section 1848(c) of the Act requires that national RVUs be established for physician work, practice expense, and malpractice expense.

Section 1848(c)(2)(B)(ii)(II) of the Act provides that adjustments in RVUs because of changes resulting from a review of those RVUs may not cause total physician fee schedule payments to differ by more than $20 million from what they would have been had the adjustments not been made. If this tolerance is exceeded, we must make adjustments to the conversion factors (CFs) to preserve budget neutrality.

Case 1:01-cv-12257-PBS   Document 4791-26   Filed 10/11/07   Page 5 of 7

such a market, competitive forces lead to increased efficiencies (productivity). Therefore, a competitive output price does not rise as fast as a competitive input price, with the difference reflecting this increased efficiency (productivity). Thus, the input prices in the MEI need to be appropriately adjusted for productivity to approximate a freely functioning, competitive output price change. The PPS hospital input price index (market basket) is similarly adjusted for productivity, but the adjustment is included as a separate component of the PPS update framework.

The commenter believed that using economy-wide labor productivity to make the adjustment to the MEI input prices was inappropriate because physician productivity is lower than economy-wide productivity. While it is true that service industry productivity tends to be lower than economy-wide productivity, there is wide variation in productivity among specific sectors of the service industry. For physicians, the substantial influence they have over the volume and intensity of services provided to their patients allows them to increase output and, therefore, productivity.

The commenter provided information on the declining number of patient contacts per physician as evidence of declining productivity. To estimate productivity per physician, however, the large increase in volume and intensity of services per contact has to be accounted for. An approximation of the change in volume and intensity of physicians' services is the increase in allowed charges per enrollee in excess of the MEI increase (shown in the 1998 Annual Report of the Board of Trustees of the Federal Supplementary Medical Insurance Trust Fund). The increase in allowed charges per enrollee from Table II.F3. of this report has exceeded the MEI increase by 3.1 percentage points in 1994, 5 8 percentage points in 1995, and 2.1 percentage points in 1996. These data show that volume-and-intensity increases for physicians' services are still high relative to economy-wide productivity, which has historically grown around 1 percentage point annually on a 10-year moving average basis.

Economy-wide labor productivity increases automatically result in economy-wide wage rate increases as less worker time or other inputs are needed to produce the same outputs. Thus, the AHEs wage variable implicitly includes productivity increases in the overall economy. The productivity adjustment to the MEI factors out these economy-wide productivity increases. However, an individual physician practice still benefits from its own productivity increases in excess of economy-wide productivity increases. This means each individual physician practice is allowed to reap the rewards of having high productivity Thus, it is both technically correct and fair to both providers and payers to adjust the MEI input prices by economy-wide productivity increases.

*Result of Evaluation of Comments*

As proposed, we rebased the MEI to 1996. We used the same data sources (for base year weights and price proxies) and methodology as explained in the June 5, 1998 proposed rule. The percent change in the MEI for CY 1999 is 2 3 percent.

**III. Implementation of the Balanced Budget Act**

In addition to the resource-based practice expense relative value units, BBA provides for revisions to the payment policy for drugs and biologicals, includes a provision allowing private contracting with Medicare beneficiaries, institutes payment for outpatient rehabilitation services based on the physician fee schedule, and changes the policy for nonphysician practitioners and for teleconsultations.

*A. Payment for Drugs and Biologicals*

Before January 1, 1998, drugs and biologicals not paid on a cost or prospective payment basis were paid based on the lower of the estimated acquisition cost (EAC) or the national average wholesale price (AWP) as reflected in sources such as the Red Book, Blue Book, or Medispan. (For purposes of this discussion, we will use the term "drugs" to refer to both drugs and biologicals). Examples of drugs that are paid on this basis are drugs furnished incident to a physician's service, drugs furnished by pharmacies under the durable medical equipment (DME) benefit, and drugs furnished by independent dialysis facilities that are not included in the end-stage renal disease (ESRD) composite rate payment.

Section 4556 of BBA established payment for drugs not paid on a cost or prospective payment basis at the lower of the actual billed amount or 95 percent of the AWP, effective January 1, 1998. In this final rule, we are revising the current regulations at § 405 517 to conform to this statutory change. This regulation is removing the EAC and provide for payment at the lower of the actual charge on the Medicare claim or 95 percent of the AWP.

Also, we are revising the method of calculating the AWP. Our current regulations provide that, for multiple-source drugs, the AWP equals the median AWP of the generic forms of the drug The AWP of the brand name products is ignored on the presumption the brand AWP is always higher than the generic AWPs While this may have been true when the policy was first promulgated, it is not always true now. Therefore, the AWP for multiple-source drugs would equal the lower of the median price of the generic AWPs or the lowest brand name AWP

*Comment:* We received some comments on the proposed methodology for determining the AWP in the case of multi-source drugs Some commenters suggested we use the average AWP instead of the median AWP. Others objected to the use of the lowest brand AWP saying that in all cases all AWPs, both generic and brand, should be used. One commenter stated that the law does not distinguish brand AWP from generic AWP; therefore, we should not make this distinction.

*Response.* We agree that the law does not define the term "average wholesale price," and, therefore, does not distinguish brand AWP from generic AWP or average versus median price. However, we believe it is within our general authority in implementing the statute to define terms that do not have explicit statutory definitions. We believe that when there is an array of charges, the median is an appropriate measure of central tendency. This is consistent with many other areas of the program in which the median is used With respect to distinguishing between brand and generic AWPs, as we stated in the final rule titled "Medicare Program; Fee Schedule for Physicians" Services (BPD-712-F)," published in the Federal Register on November 25, 1991 (56 FR 59502), when this policy was promulgated, the brand AWP was believed to be always greater than the generic AWPs (56 FR 59507). Now there is evidence from the Office of Inspector General (OIG) in its report titled "The Impact of High-Priced Generic Drugs on Medicare and Medicaid" (OEI-03-97-00510) that this is no longer true From a series of OIG reports spanning the past 10 years, it is clear that the AWP is higher than the amount typically paid for drugs by physicians who bill the program It is also true that when a brand AWP is lower than the median generic AWP, typically there are also other generic AWPs that are as low as or lower than this brand AWP. We believe, therefore, that the payment allowance resulting from this methodology will be adequate.

Case 1:01-cv-12257-PBS   Document 4791-26   Filed 10/11/07   Page 6 of 7

*Comment:* Some commenters objected to a payment allowance of less than the AWP. One commenter alleged that not all physicians can buy drugs at less than retail prices. Another commenter stated that only large physician practices can obtain bulk purchase discounts. Another commenter suggested that we monitor access to drugs. Another suggested that we study actual acquisition costs before implementing the limit of 95 percent of AWP. Two commenters stated that physicians should not be burdened with maintaining price controls or cost containment or tracking the prices of drugs. Physicians should only be responsible for choosing the best drug and not be responsible for the cost of the drug. Furthermore, if physicians are not paid sufficiently for the drugs they now inject, they will stop injecting drugs and refer patients to the hospital instead. This will cost the program much more.

*Response:* First, the law now requires that the Medicare program limit its payment allowance to 95 percent of the AWP. Furthermore, there are numerous reports by the OIG over the past 10 years showing that significant discounts from the AWP are common and are not related to bulk purchases. In the absence of evidence to the contrary of the OIG findings, we believe it is reasonable to set the payment limit as we have proposed. With respect to the comment that physicians will refer patients to hospitals for injections, we believe that for the reasons stated and because payment for outpatient hospital services will be changed to a prospective payment basis, this will not occur.

*Comment:* One commenter stated that our definition of "brand" should be "the product of the innovator company." The commenter objected to considering other manufacturers' products that are marketed under a proprietary name other than the generic chemical name of the drug as a "brand."

*Response:* Our definition of "brand" is any product that is marketed under a name other than the generic chemical name of the drug. If a manufacturer chooses to market its product under a proprietary name rather than the generic chemical name of the drug, we believe this is a brand. We do not limit the definition of "brand" to the innovator company product or any product manufactured under a direct license from the innovator. Furthermore, we believe that it is an unreasonable administrative burden to require our contractors to determine which of the thousands of AWPs they must look up, to also determine which of those are innovator drugs or licensed by the innovator company.

*Comment:* Two commenters supported our proposal stating that our proposal was consistent with the statute.

*Response:* We agree with this comment.

*Comment:* A commenter stated that radiopharmaceuticals are drugs, but because of their unique nature they do not have AWPs. Therefore, the commenter recommended that we pay for radiopharmaceutical drugs at the billed amount.

*Response:* We agree that radiopharmaceutical drugs do not have AWPs, and, therefore, require a different pricing methodology. However, we do not agree that these drugs should be paid at the amount billed to the program. Currently, our contractors determine an allowance for these drugs that is reasonable in light of prices paid by physicians who use them. We will continue this policy of local pricing by our contractors.

*Result of evaluation of comments:* We are adopting our proposal with further clarifications. The Medicare allowed charge for drugs and biologicals is the lower of 95 percent of the median generic AWP or 95 percent of the lowest brand AWP. A "brand" product is defined as a product that is marketed under a labeled name that is other than the generic chemical name of the drug or biological. The allowed charge for drugs and biologicals that do not have an AWP is determined by the local Medicare contractor considering the prices paid by physicians and suppliers who use them.

*B. Private Contracting with Medicare Beneficiaries*

Section 4507 of BBA 1997 amended section 1802 of the Act to permit certain physicians and practitioners to opt-out of Medicare and to provide through private contracts services that would otherwise be covered by Medicare. This rule conforms the regulations to sections 1802(b) and 1862(a)(19) of the Act. In addition, this rule contains ancillary policies that we believe are necessary to clarify what it means when a physician or practitioner "opts-out" of Medicare, and to otherwise effectuate the Congress" intent in enacting section 4507 of BBA 1997.

The private contracting provision is effective for private contracts entered into on, or after, January 1, 1998. We implemented private contracting through a series of operating instructions for Medicare carriers and information that carriers were instructed to provide to physicians and practitioners.

The Medicare claims submission and private contracting rules apply only when a physician or practitioner furnishes Part B Medicare-covered services to a beneficiary who is enrolled in Medicare Part B. The private contracting rules do not apply to individuals who have only Medicare Part A, to individuals who are age 65 or over but who do not have Medicare, or to services that Medicare does not cover.

### General Issues

*State of Law Before Section 4507 of the BBA*

*Comment:* Some commenters disagreed with our view that private contracting is not valid except as specified in section 4507 of the BBA. They believed that section 1848(g) of the Act does not preclude private contracting. In addition, they believed that the claims submission requirements apply only to "services for which payment is made" under the fee schedule and, therefore, by definition, do not apply if no claim is submitted.

*Response:* We continue to believe that under the Act, private contracts between beneficiaries and physicians or practitioners are not enforceable unless they meet the requirements of section 4507 of the BBA. The mandatory claims submission rules of section 1848(g)(4) of the Act specify that "For services furnished on or after September 1, 1990, within 1 year after the date of providing a service for which payment is made under this part on a reasonable charge or fee schedule basis, a physician, supplier or other person (or an employer or facility in the cases described in section 1842(b)(6)(A))—

• (i) Shall complete and submit a claim for such service on a standard claim form specified by the Secretary to the carrier on behalf of a beneficiary, and

• (ii) May not impose any charge related to completing and submitting such a form."

Because there must be a claim to Medicare before payment can be made, the meaning of the phrase ". . . for which payment is made on a reasonable charge or fee schedule *basis* . . . (emphasis added)" must be to define the universe of claims to which the mandatory claims submission rules apply as being those services for which Medicare makes payment on a fee schedule or reasonable charge basis once a claim is submitted. The only exceptions the law provides to the mandatory claims submission rules are those found in the private contracting provisions of section 1802(b) of the Act and those implied by the phrase "on

must comply with the regulations at § 1001.1901 (Scope and effect of exclusion) of this title when he or she furnishes emergency services to beneficiaries and may not bill and be paid for urgent care services.

### § 405.445 Renewal and early termination of opt-out.

(a) A physician or practitioner may renew opt-out by filing an affidavit with each carrier with which he or she would file claims absent completion of opt-out, provided the affidavits are filed within 30 days after the current opt-out period expires.

(b) To properly terminate opt-out a physician or practitioner must:

(1) Not have previously opted out of Medicare.

(2) Notify all Medicare carriers, with which he or she filed an affidavit, of the termination of the opt-out no later than 90 days after the effective date of the opt-out period.

(3) Refund to each beneficiary with whom he or she has privately contracted all payment collected in excess of

(i) The Medicare limiting charge (in the case of physicians), or

(ii) The deductible and coinsurance (in the case of practitioners).

(4) Notify all beneficiaries with whom the physician or practitioner entered into private contracts of the physician's or practitioner's decision to terminate opt-out and of the beneficiaries' right to have claims filed on their behalf with Medicare for the services furnished during the period between the effective date of the opt-out and the effective date of the termination of the opt-out period.

(c) When the physician or practitioner properly terminates opt-out in accordance with paragraph (b), he or she will be reinstated in Medicare as if there had been no opt-out, and the provision of § 405.425 shall not apply unless the physician or practitioner subsequently properly opts out.

(d) A physician or practitioner who has completed opt-out on or before January 1, 1999 may terminate opt-out during the 90 days following January 1, 1999 if he or she notifies all carriers to whom he or she would otherwise submit claims of the intent to terminate opt-out and complies with paragraphs (b)(3) and (4) of this section. Paragraph (c) of this section applies in these cases.

### § 405.450 Appeals.

(a) A determination by HCFA that a physician or practitioner has failed to properly opt-out, failed to maintain opt-out, failed to timely renew opt-out, failed to privately contract, or failed to properly terminate opt-out is an initial determination for purposes of § 405.803.

(b) A determination by HCFA that no payment can be made to a beneficiary for the services of a physician who has opted-out is an initial determination for purposes of § 405.803

### § 405.455 Application to Medicare+Choice contracts.

An organization that has a contract with HCFA to provide one or more Medicare+Choice (M+C) plans to beneficiaries (part 422 of this chapter):

(a) Must acquire and maintain information from Medicare carriers on physicians and practitioners who have opted-out of Medicare

(b) Must make no payment directly or indirectly for Medicare covered services furnished to a Medicare beneficiary by a physician or practitioner who has opted-out of Medicare.

(c) May make payment to a physician or practitioner who furnishes emergency or urgent care services to a beneficiary who has not previously entered into a private contract with the physician or practitioner in accordance with § 405.440.

### Subpart E—Criteria for Determining Reasonable Charges

2. The authority citation for part 405, subpart E, continues to read as follows:

Authority: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh)

3. Section 405.517 is revised to read as follows.

### § 405.517 Payment for drugs and biologicals that are not paid on a cost or prospective payment basis.

(a) *Applicability.* Payment for a drug or biological that is not paid on a cost or prospective payment basis is determined by the standard methodology described in paragraph (b) of this section. Examples of when this procedure applies include a drug or biological furnished incident to a physician's service, a drug or biological furnished by an independent dialysis facility that is not included in the ESRD composite rate set forth in § 413.170(c) of this chapter, and a drug or biological furnished as part of the durable medical equipment benefit

(b) *Methodology.* Payment for a drug or biological described in paragraph (a) of this section is based on the lower of the actual charge on the Medicare claim for benefits or 95 percent of the national average wholesale price of the drug or biological.

(c) *Multiple-source drugs.* For multiple-source drugs and biologicals, for purposes of this regulation, the average wholesale price is defined as the lesser of the median average wholesale price for all sources of the generic forms of the drug or biological or the lowest average wholesale price of the brand name forms of the drug or biological

4. A new § 405.520 is added to read as follows:

### § 405.520 Payment for a physician assistants, nurse practitioners, and clinical nurse specialists' services and services furnished incident to their professional services.

(a) *General rule.* A physician assistants, nurse practitioners, and clinical nurse specialists' services, and services and supplies furnished incident to their professional services, are paid in accordance with the physician fee schedule. The payment for a physician assistants' services may not exceed the limits at § 414.52 of this chapter. The payment for a nurse practitioners' and clinical nurse specialists' services may not exceed the limits at § 414.56 of this chapter.

(b) *Requirements.* Medicare payment is made only if all claims for payment are made on an assignment-related basis in accordance with § 424.55 of this chapter, that sets forth, respectively, the conditions for coverage of physician assistants' services, nurse practitioners' services and clinical nurse specialists' services, and services and supplies furnished incident to their professional services.

(c) *Civil money penalties.* Any person or entity who knowingly and willingly bills a Medicare beneficiary amounts in excess of the appropriate coinsurance and deductible is subject to a civil money penalty not to exceed $2,000 for each bill or request for payment.

### PART 410—SUPPLEMENTARY MEDICAL INSURANCE (SMI) BENEFITS

B Part 410 is amended as set forth below.

1. The authority citation for part 410 continues to read as follows:

Authority: Secs. 1102 and 1871 of the Social Security Act (42 U.S.C 1302 and 1395hh)

### § 410.1 [Amended]

2. Section 410.1, paragraph (a) is amended by adding the following sentence at the end: "Section 4206 of the Balanced Budget Act of 1997 sets forth the conditions for payment for professional consultations that take place by means of telecommunications systems."