# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUME, et al      .  CIVIL ACTION NO. 01-12257-PBS
          Plaintiffs            .
                                .
          v.                    .  BOSTON, MASSACHUSETTS
                                .  MAY 16, 2007
ABBOTT LABORATORIES, et al       .
          Defendants            .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:    Rene Brooker, Esquire
                          Justin Draycott, Esquire
                          United States Department of Justice
                          601 D Street, NW
                          Patrick Henry Building, Room 9028
                          Washington, DC  20004
                          202-307-1088

For Ven-A-Care:           James J. Breen, Esquire
                          The Breen Law Firm, P.A.
                          3562 Old Milton Parkway
                          Alpharetta, GA 30005
                          770-740-0008

For Abbott Laboratories:  James Daly, Esquire
                          Jason Winchester, Esquire
                          Jones Day Reavis & Pogue
                          77 West Wacker Drive
                          Chicago, IL  60601-1692
                          312-782-3939

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1                              **I  N  D  E  X**

2   Proceedings                                              3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          (Court called into session)

3              THE CLERK:  The Honorable Marianne B. Bowler

4    presiding.  Today is May 16th, 2007 in the case of Citizens for

5    Consume, et al v. Abbott Laboratories, et al, Civil Action No.

6    01-12257 will now be heard.

7              Would counsel please identify themselves for the

8    record.

9              MS. BROOKER:  Rene Brooker on behalf of the United

10   States.

11             MR. BREEN:  Jim Breen on behalf of Ven-A-Care of the

12   Florida Keyes, the relator.

13             MR. DRAYCOTT:  Justin Draycott on behalf of the

14   United States.

15             MR. DALEY:  Good afternoon, Your Honor, Jim Daly on

16   behalf of Abbott Laboratories.

17             MR. WINCHESTER:  And Jason Winchester, also for

18   Abbott.  Your Honor, I filed an appearance, I believe

19   yesterday, and also a motion for admission pro hac vice.  I've

20   not appeared--

21             THE COURT:  I think I allowed it this morning.

22             MR. WINCHESTER:  --before the Court before.

23             THE COURT:  8:00.

24             MR. WINCHESTER:  Thank you, Judge.

25             THE COURT:  All right.  I have five motions that were

 1   noticed, and I will deal with those in the order in which

 2   they were filed.  And then there are a couple of additional

 3   motions that are now ripe.  Whether or not we have time to get

 4   to those, we will see when we deal with the ones that were

 5   scheduled.

 6           So, starting with docket entry number 3529, motion to

 7   compel Abbott by the United States.

 8           MS. BROOKER:  Good afternoon, Your Honor.  Again, I'm

 9   Rene Brooker.  Just to remind the Court, I'm from the civil

10   division of the Department of Justice in Washington, and Justin

11   Draycott, who will argue two of the motions today, we're from

12   the same office.  And I do want to thank, Your Honor, for

13   putting these all on the docket all at the same time.  I think

14   both Abbott counsel and government counsel and relator's

15   counsel, we appreciate when you--

16           THE COURT:  Sure.

17           MS. BROOKER:  --accumulate them all so we come here

18   and hit as many in one day, so we appreciate that.

19           I think I can briefly set forth for the Court what

20   this motion is about and since I believe it was only last week

21   when Abbott filed, or excuse me, not with respect to this one,

22   let me just say, I just want to briefly lay out our position

23   and I will briefly address what I know Abbott counsel will

24   probably stand up and address and try to be most efficient.

25   Your Honor may recall that the last time we were before the

I - 5

1    Court, we argued the issue of the, amending the MDL

2    protective order and particularly the big issue on Your Honor's

3    plate was the sharing provision.  Your Honor did amend the MDL

4    protective order and allowed us to share documents that Abbott

5    produces in this case with the states and Your Honor is

6    probably aware, Judge Saris signed that.  Abbott did not appeal

7    Your Honor's decision, and what we are here on on today's

8    motion is exactly the flip side of the Department of Justice

9    sharing Abbott documents with the states and that is it's a

10   pretty simple straight forward issue.  We also would like by

11   this motion for other government entities and relator, Ven-A-

12   Care, who is the same relator in the Texas case, to be able to

13   share the set of documents that Abbott has produced to again

14   other government agencies and to relator, Ven-A-Care, in Texas

15   with us.  So it's really just kind of the flip side which the

16   MDL protective order could not address head on so that's why we

17   filed this separate motion.  We do believe that allowing this

18   is as simple as enforcing Judge Saris' earlier CMO's in this

19   MDL proceeding on this very issue.  I think we set forth in our

20   brief CMO 5 and 10 and also CMO 9 address this very issue and

21   in fact ordered the defendants over the course of years to

22   produce to everyone as they joined the MDL proceeding

23   everything they had previously produced to other entities and

24   obviously the reasons for Judge Saris' opinion are apparent to

25   streamline the discovery process, to minimize the amount of

1   motions practice that come before the court.  We believe

2   that those same considerations and concerns are here.  You

3   know, obviously there is no burden to Abbott, and I don't

4   believe Abbott, counsel will speak for Abbott, but I don't

5   believe there's any real burden objection that's not the

6   objection by Abbott.  In fact, all we're really asking Abbott

7   to do at most is to burn some CD Roms and just produce to us

8   what they've already given to several other jurisdictions,

9   including again, Mr. Breen has this very set of documents, so

10  we could even minimize the burden to Abbott by asking Mr. Breen

11  just to give those CD Roms to us.  It's as simple as that.

12          We have a couple of practical problems.  I consider

13  this a very practical motion because we have some practical

14  problems that we had to date as a result of not having this

15  provision or this order in place.  We are working, obviously

16  with relator, Ven-A-Care.  We are obviously going to have some

17  of the same experts that appear in the Texas case, that appear

18  in our case.  To date, it has been extremely costly and onerous

19  for Mr. Breen himself to share documents with us and to discuss

20  documents, even those that we got from Abbott in this case

21  because he has to go through a very laborious process of trying

22  to determine what documents Abbott gave him in Texas and are

23  they on the list that Abbott gave us to be sure that we don't,

24  you know, mix the documents and to be sure, frankly, he has not

25  discussed with us any documents that he received in Texas that

1    Abbott hasn't yet produced us.  Its cost some costly

2    impractical problems for us.

3            Here's Abbott's arguments which we respond to and I

4    hope I capture them all.  You know, first I think that Abbott

5    would say this is a relevance issue.  For Abbott I think that's

6    what it comes down to.  They believe that from their

7    determination of the documents since some of the other

8    jurisdictions have sued on different drugs, which is true, then

9    what we've sued on in this case, Abbott would say, well, some

10   of the documents on those CD Roms are not directly relevant to

11   this case.  And that may be true.  There may be some documents

12   that, you know, we may get more documents than we need to or

13   care to review, but we've also learned in a separate motion

14   that may or may not at this time yet be before Your Honor,

15   relator, Ven-A-Care, has identified many documents in a subset

16   of highly relevant documents that Abbott produced in Texas but

17   has not produced to us.  Whether that is intentional or

18   inadvertent is sort of really beside the point.  And some of

19   those we're going to be start filing, you know, we're going to

20   be filing motions to compel on, we're going to have to argue

21   about those.  All of this can be completely streamlined if we

22   just get that set of documents.

23           The other point that Abbott may raise here today is

24   that recently Judge Saris, we held a hearing before Judge Saris

25   on the CMO, and I believe that was back in late February, and

1    pursuant to that CMO conference, this issue of sharing came

2    up because it was sort of a part of the CMO.  It did not get

3    addressed, however, and Judge Saris expressly said that she was

4    going to leave this issue to the Court.  She also asked in

5    order to I think assist the Court with determining at least

6    with respect to the subset of documents that relator has, not

7    with respect to the entire subset of documents we're trying to

8    get from all the jurisdictions, but at least with respect to

9    Vena-A-Care subset of documents, she asked Ven-A-Care to set up

10   a procedure which has happened and a motion has been filed.

11   It's been fully briefed, where Ven-A-Care and Abbott have

12   exchanged documents that were produced in Texas and not

13   produced here, and determined that there was significant sample

14   of documents that are highly relevant to us in this case that

15   we did not get.  That's a separate motion, and again I'm not

16   sure, that may be one of these ancillary motions--

17              THE COURT:  Uh-huh.

18              MS. BROOKER:  --which we'll get to.  The point being

19   there is nothing that Judge Saris said at the hearing which you

20   may hear from Abbott counsel that prevents the Court from

21   entering this order.  Judge Saris did recognize and it is true

22   that under the Federal Rules of Civil Procedure that have been

23   in effect for the last seven years, that parties are not

24   entitled to go on wide fishing expeditions at great expense and

25   burden to another party if the documents are not directly

1   relevant to claims or defenses.  So one thing we would say

2   in response to that is we embrace Rule 26 as it exists today.

3   All of our briefing, we cite Rule 26, and we believe that all

4   the documents we're seeking are relevant to claims or defenses

5   in this case.

6            Also, I would say, Your Honor, you know, so to the

7   extent that Judge Saris' comments, you know, Abbott here,

8   counsel will argue today bar us from getting that relief.  I

9   don't believe that's true.  She was very adamant that she had

10  not read these briefs.  She was not prejudging this motion, and

11  also she did expressly state at the hearing that she recognizes

12  that even if documents do not relate directly to the subject

13  drugs at issue in this case, they may very well be relevant to

14  this case for 404(b) evidence as evidence of knowledge, intent

15  or other crimes.  We also would argue that they are, a lot of

16  the documents that Ven-A-Care has set aside as material, we

17  should be getting from Abbott's Texas production, also relate

18  to 406 under the Federal Rules of Evidence habit, you know, we

19  want all documents that have anything to do with AWP, with

20  reimbursement and that shows the force of conduct that we see

21  here today, even if they are not directly related to the four

22  subject drugs.

23           So, I believe I've addressed, and if not, I'm happy

24  to address once Abbott counsel stands up, the reasons for this

25  motion.

1    MR. BREEN:  One point.

2    MS. BROOKER:  I'm sorry, if I could just consult.

3    I don't know, Mr. Breen wants to make a point.  Is

4 that okay with Your Honor if he addresses you now?  He has--

5    THE COURT:  Sure.

6    MS. BROOKER:  --joined in this motion.

7    THE COURT:  Sure.

8    MS. BROOKER:  Okay.  But all of that being said, I

9 just wanted to summarize that I do believe that this would

10 streamline discovery in this case and greatly minimize the

11 motions practice we have before this Court because in large

12 measure, when we get that subset of materials, we will then

13 really be able to focus and troubleshoot on areas of documents

14 that are still remaining to be produced.  But we do believe

15 that probably what Texas received is significant in terms of

16 materials that we are trying to get Abbott to produce to us

17 right now, particularly because the Texas AG's office and

18 Mr. Breen spent a year before the Texas Appellate Court, the

19 Texas Supreme Court, litigating this issue, getting documents

20 released off of Abbott's privilege log that relate to the exact

21 same issues in this case.  So basically we're trying to avoid

22 this Court having to have the same battle all over again that

23 the Texas court has already engaged in, and that's all I'll say

24 at the moment, Your Honor.  Thank you for hearing me.

25    THE COURT:  All right.  I'll hear you now.

1      MR. BREEN:  Thank you, Your Honor.  Really

2  briefly, I just wanted to kind of point out one thing and that

3  is that I think this is a little simplified if we go back and

4  look at CMOs 5 and 10 because, and that's really what this

5  motion is based upon because there's really two universes of

6  documents that we're talking about here.  First off, we're only

7  talking about documents that Abbott has already produced and

8  one universe is documents produced to other government

9  litigants or investigative agencies.  The other universe is

10  documents they produced in the MDL, primarily in the class

11  cases.  And CMO 5 and CMO 10, which postdates 9, are very clear

12  that if Abbott or defendant turned over documents to a

13  government, they're supposed to share them with other

14  governments.  CMO 9, which Abbott raises as being different,

15  talks about documents that Abbott produced in the MDL and

16  that's the one that says if, they don't have to give to a

17  government documents from the MDL that may relate to drugs that

18  aren't pled or things of that nature.  We'd have to go back and

19  litigate the motions on those, the 404(b) and 406 motions, but

20  we're just talking about the documents that Abbott has given to

21  Texas already, Pennsylvania, California, any of these

22  government litigants, most of which Ven-A-Care and myself are,

23  I mean, I'm an attorney of record in all those cases, and we've

24  been litigating in advance in Texas.  As Ms. Brooker said,

25  we've been to the Supreme Court twice.  We've won every writ of

1   mandamus Abbott's filed.  They filed four of them out there,

2   and we're slowly hitting this stuff now because we're taking

3   joint depositions, but the problem is I can't show the

4   government a lot of these documents that were actually in a

5   joint deposition and that's when the documents are provided or

6   until we get, until Abbott agrees to turn over a transcript and

7   there are still a lot of outstanding transcript issues.  All we

8   want with this discrete motion is to enforce CMO 5 and 10, and

9   let the United States and Ven-A-Care as government litigants in

10  this MDL get exactly what those orders say, and that is

11  anything Abbott has given to another government entity, be it

12  in an investigation or in litigation and those CMO's cover

13  both.  That's all we're asking.  The flip side of what Your

14  Honor has already ruled, which is we can share with those same

15  government parties, that's what your protective order says.  We

16  can share with those same government parties, and now, but it's

17  got to work both ways or you can't have the cooperation that's

18  intended by the Manual for Complex Litigation among common

19  litigants and there's no more common litigant than Ven-A-Care

20  who is in all these cases.

21          Thank you, Judge.

22          THE COURT:  Mr. Daly, or your colleague?

23          MR. WINCHESTER:  Actually, it's me, Judge, Jason

24  Winchester.

25          With respect, Judge, our view is that this motion

1    completely dead in the water as a result primarily of the

2    proceedings before Judge Saris on February 27th.  Ms. Brooker is

3    correct the parties did appear before Judge Saris on that day

4    in conjunction with what was later entered as CMO 29 and the

5    plaintiffs for their own purposes on that day sort of jumped

6    the gun and raised this directly with Judge Saris.  This motion

7    asks you to direct that in this case where the government has

8    charged only four drugs, that they should be allowed and Abbott

9    should be forced to give them, every document that we've ever

10   produced in any other case, including in the Texas litigation

11   Mr. Breen referenced where there are 188 more MDCs at issue in

12   that case that are in issue here.  They raise that specific

13   point to Judge Saris.  We want everything from all the other

14   cases.  Please tell Abbott to give us everything from all the

15   other cases, and I'm happy to give the Court a transcript of

16   the February 27th proceedings, but Judge Saris says, and this is

17   at page 9, "You are not entitled to documents on any single

18   drug if you haven't charged it."  She goes on to state at page

19   15 that, "You cannot use this lawsuit as a fishing expedition

20   for 10 more drugs that you are interested in but have not

21   charged."  There are additional statements to this effect at

22   pages 16, 23, 24 and 25 of the transcript, and then on page 29

23   she states what I think is really the depth of this motion

24   before the Court, "I am not simply going to say you," the

25   government, "across the board are entitled to every document

1  produced in every suit even if it involves drugs that have

2  nothing to do with yours." There is nothing left of this

3  motion. Judge Saris took this up directly and said you,

4  government, are not entitled to all those documents that Abbott

5  had to produce in other cases about other drugs that are not at

6  issue here because they are at issue in those other cases.

7  This case is four drugs, all from the hospital products

8  division, vancomycin, sodium chloride, dextrose and sterile

9  water. That's it. The government chose to bring that case and

10 to bring it much more narrowly than the one that Mr. Breen is

11 involved with in Texas or in other places where he is

12 litigating.

13        To the extent, Your Honor, that there's anything left

14 of this motion and there really isn't, we think that it's

15 properly before Judge Saris because as counsel I think

16 accurately stated, once Judge Saris made clear, okay, you're

17 not entitled to everything, you've only charge four drugs here,

18 Mr. Breen brought up this issue of well, Judge, even setting

19 that aside, I still think there are some documents that we've

20 got in the other cases from Abbott that DOJ should get here,

21 and Judge Saris set up a platform for having that aired, which

22 was codified in CMO 29. She said, bring me your 100 best most

23 representative documents, show them to Abbott, the ones that

24 they agree should be produced they'll produce. If you guys

25 can't agree on certain other, then bring them to me, and that

1    motion was filed or that exercise was gone through.  We did

2    agree after a meet and confer with Mr. Breen that certain of

3    the documents he provided to us as not being produced, first of

4    all certain of them had been produced, and second, there were

5    certain other ones we agreed should be produced to the

6    government.  We produced those.  There are certain documents,

7    we believe, should not be produced, and that is the subject of

8    a separate motion which I believe is before Judge Saris,

9    although I could be wrong on that, but she invited it to be

10   filed before her.  It has been filed and has been briefed.

11              THE COURT:  Can you give me the docket number?

12              MR. WINCHESTER:  I don't know that, Your Honor.  I'm

13   not sure if Mr. Breen knows.  It was his motion.

14              MR. BREEN:  I was trying to find it but all my copies

15   don't have the docket number on it.  I was just looking for

16   that knowing that it might come up.  I think we were asking

17   before the hearing whether that was one of the ones that was

18   set before Your Honor also.

19              MS. BROOKER:  Your Honor, I can give you a docket

20   number.  I just need to go back to my bag--

21              THE COURT:  Sure.

22              MS. BROOKER:  --at the appropriate moment.  Would you

23   like me to do that right now?

24              THE COURT:  When it's convenient.

25              MR. WINCHESTER:  If I'm reading it correctly, Judge,

1  it may be document 4122.

2          THE COURT:  All right.

3          MR. BREEN:  Is that your response?

4          MR. WINCHESTER:  No, I'm reading your motion here.

5          THE COURT:  I think 4122 is a response.

6          MR. BREEN:  It is, Your Honor.  4122 is my memo of

7  law, so 4121 would have been the motion.

8          THE COURT:  And that is in my group of ripe today but

9  not noticed motions, so--

10         MS. BROOKER:  Yes, and it is correct.

11         MR. WINCHESTER:  So that's the other motion, Judge,

12 which I don't think is actually up before the Court today but

13 for this, this particular motion--

14         THE COURT:  It's your feeling Judge Saris should deal

15 with that motion?

16         MR. WINCHESTER:  I think that's completely up to the

17 Court.

18         THE COURT:  All right.  Okay.

19         MR. WINCHESTER:  It was my understanding just based

20 on her, the conversation initially was before her, she said

21 bring your motion to me.  She may well have discussed it off-

22 line with Your Honor and decided to have Your Honor take that

23 up, which is totally fine with us.

24         But I think based on those issues, this motion that's

25 before the Court right now, which is the give us everything

1   motion because we want it, is dead.  That the court has made

2   very clear the government is not entitled to all those

3   documents having only charged four.  And I would also point out

4   to Your Honor that that is a completely consistent position

5   with CMO 9 which has been on the books for a very long time

6   wherein the Court says a governmental entity plaintiff that is

7   a party to the MDL proceeding, which is the government here,

8   shall be entitled to documents, except that no such plaintiff

9   shall be entitled to have access to A) documents produced by a

10  defendant that is not a named defendant in the operative

11  complaint filed by such plaintiff; B) which is the one that is

12  at issue for us here, documents relating to drugs that are not

13  identified in the operative complaint filed by such plaintiff,

14  and C) documents produced by defendant that are not otherwise

15  relevant to the claims asserted.  So here, CMO 9 as applied in

16  this instance is very consistent with what Judge Saris said

17  back in February which is you get the documents for the drugs

18  you've brought in your case that's consistent with the post

19  2000 rules under Rule 26, which is you get the documents and

20  the discovery for the case you brought.  This is the

21  government's case.  We have agreed to give them all of the

22  relevant documents concerning the four drugs they brought.  We

23  even agreed to go beyond that and to give them documents that

24  would relate to those four drugs, even if they don't

25  specifically mention them, and we've agreed to go even further

1  beyond that and to produce any documents that would arguably

2  establish what counsel referred to as a pattern and practice

3  regardless of drugs.  So I think Abbott has agreed to give the

4  government everything to which it is rationally and

5  legitimately entitled in this case.  The further request, which

6  is give us documents that have nothing to do with our case, we

7  submit has been denied by Judge Saris and should be denied by

8  this Court.

9          MS. BROOKER:  May I address, Your Honor?

10          THE COURT:  Briefly.

11          MS. BROOKER:  Yes, I will be brief.  Your Honor, may

12  I pass to your law clerk and to the Court so you have a copy of

13  Judge Saris' whole transcript.

14          THE COURT:  Certainly, that's helpful.

15          MS. BROOKER:  Thank you.  Your Honor, this was the

16  issue that I was directing, oh, excuse me, addressing in my

17  direct argument. I think that what the Court will find and I'll

18  cite this so your law clerk can find these cites as well, the

19  portions that were just read to you were incomplete snippets of

20  what Judge Saris said at the hearing, and even some of them on

21  the same exact page.  What Judge Saris said, and I just want to

22  point out a couple of her comments to give you the more

23  complete picture, when this issue came up, first of all, she

24  made it very clear that she had not read the briefs in this

25  case and she repeatedly said at the hearing, you are all

1  talking about my prior CMOs and I don't recall at all what I

2  said in any CMO.  I don't have them committed to memory and I

3  just don't recall.  You may be right but I don't recall what my

4  CMOs say, so I won't repeat what I said at the outset.  The

5  CMOs which are the basis of the government's motion allow this

6  kind of sharing.  CMO 9, which we directly address, which,

7  along time ago, counsel has raised this today, but it's been

8  addressed already, CMO 9 was only talking specifically about

9  documents Abbott produced to the private plaintiffs.  The CMO

10 that preceded 9 and came after 9 made it very clear that the

11 government gets all documents Abbott produced to all other

12 government entities, including investigations and whatnot.

13 Also, these are two separate motions before the Court.  I do

14 believe, and obviously I'm not going to speak for Judge Saris,

15 she says in this transcript that she's going to decide when the

16 motion comes in, whether she's going to decide it or send it to

17 you and she said I'm probably going to send it to Judge Bowler,

18 but I'm not going to speak for her.  She never said definitely.

19 I guess I'm not surprised that it ended up on your docket, but

20 just to complete the snippets, on pages 9 and 15, when this

21 issue came up and Abbott counsel said exactly what was just

22 said now, four drugs, you get nothing more than the four drugs,

23 she said, "You're not entitled to documents on any single drug

24 if you have—"

25           THE COURT:  What page are you on?

1    MS. BROOKER:  I'm sorry, page 9 at the bottom,

2   lines 18 to 23, where the Court says, "I generally believe the

3   following," and again, she made it clear she was talking not

4   based on anything she had recalled about the CMOs or read in

5   the motion, "you're not entitled to documents on any single

6   drug if you haven't charged it.  You are entitled to do

7   discovery beyond the four drugs to the extent it shows that

8   there is some practice or pattern of conduct."  Then you flip

9   to another page that was just read, page 15, lines 6 through

10   16.  You know, Judge Saris was saying, "So one possibility

11   would be an agreement that you're not going to sue for the

12   other drugs and I'll order you to turn over all the CDs right

13   now.  You can't use discovery as a fishing expedition.  That's

14   the big bottom line.  On the other hand, you can't barnstorm

15   and just say it's just the four drugs.  If in fact they show

16   some overarching business principle and I, because they get to

17   prove their case as to what management was thinking and doing,

18   you know, prior bad acts kind of evidence," and, you know,

19   Judge Saris went on also on pages 31 and 33 to talk, again,

20   anything coming out of the sales and marketing team, talking

21   about how you market stuff during the relevant time period,

22   should be produced.  But again, much more important than this

23   is that Judge Saris said, we were citing her CMOs but she

24   hadn't read them.  She didn't remember what they said, and I'm

25   telling the Court that they do say that the government gets to

1  have access to all of these documents.  And one final point

2  I would make about Judge Saris' comments, Judge Saris, since

3  she hadn't read the brief, she was talking about in general

4  Rule 26, and it is absolutely true that Rule 26 seven years ago

5  said you can't overly burden a party with this huge fishing

6  expedition for documents that don't relate to claims or

7  defenses.  No burden is implicated here, so Rule 26, contrary

8  to what I've seen defendant argue in their brief, does not

9  adjudicate substantive rights of a party and tell a party what

10  it is they can or cannot do based upon documents that they

11  received legitimately in discovery.  We're not asking Abbott to

12  even give us the CDs.  We're just asking that we be allowed to

13  share what's already been produced.  If Abbott has some larger

14  concern about charges that we later bring in a complaint, if

15  that were to happen, they could deal with that issue at the

16  time.  Again, the issue is streamlining.  I do believe that

17  this brief is ripe for the Court to decide and particularly

18  because I do want the Court to understand that if the only

19  issue that's decided is Mr. Breen's motion, then we have to

20  come back to the Court again and ask the Court, well, what

21  about our larger motion, which asks for us to get documents

22  that Pennsylvania shares with us and other states. And again,

23  it doesn't make any sense that we can now share with states but

24  states cannot share back with us, and I think it doesn't make

25  sense because it's not consistent with what Judge Saris had in

 1    mind in this MDL proceeding and I thank you for hearing me

 2    out.

 3             THE COURT:  Okay, just a minute.

 4             MR. WINCHESTER:  Very, very briefly, Judge.  They can

 5    dance around it all they probably want.  I'd invite the Court

 6    to read the transcript.  Those were quotes I read to you.

 7    Judge Saris says fully knowing this case, you don't get

 8    documents about drugs you haven't sued on unless they go to

 9    pattern and practice.  As I represent to the Court and counsel

10    know as well, we have agreed to give them documents beyond just

11    the four drugs, not just documents that mention the four drugs,

12    any documents that deal with the four drugs even if not

13    mentioned and any documents that would arguably relate to

14    pattern and practice.  Beyond that, Judge Saris could not be

15    more clear, you do not get 100 other drugs when you've sued on

16    four.  That should end the issue.

17             THE COURT:  All right.  I'll take 2529 under

18    advisement.  Moving on to 3540, which is the motion for a

19    protective order relating to the deposition of government

20    counsel.

21             MR. DRAYCOTT:  Thank you, Your Honor.  Again, Justin

22    Draycott on behalf of the United States.  Just to refresh Your

23    Honor's recollection, the notice of deposition states that

24    pursuant to Rule 31(b)(1) of the Federal Rules of Civil

25    Procedure, Abbott will take the deposition of, and I'm quoting,

1   "One or more employees of the Department of Health and Human

2   Services who reviewed, approved or were consulted regarding the

3   brief of the United States as amicus curia that was admitted by

4   the Department of Justice on behalf of the Secretary of HHS in

5   response to the Court's request that the secretary explain his

6   views on the term average wholesale price as reflected in the

7   Medicare Act and federal regulations."  This is a deposition

8   notice that calls for the deposition of government counsel.  As

9   you would expect the consultation between the Department of

10  Justice and HHS was about a legal brief that addressed a legal

11  question.  It is unquestionably, goes to the deposition of

12  government counsel.  That in and of itself is highly

13  disfavored.

14          Separate and apart from that is any communication

15  that occurred is of course privileged.  This would be core

16  deliberative process and attorney-client communications

17  regardless of whether or not the employees were, at HHS were

18  attorneys or not, they'd still be privileged communications.

19  So it is 1) a highly disfavored deposition notice for

20  government attorney; 2) it goes to privileged communications,

21  and also it goes to an issue that is now been rendered moot by

22  the Court's order resolving the issue that was addressed by the

23  amicus brief.  The Court found that the term average wholesale

24  price, which was the issue addressed by the amicus brief, will

25  be construed pursuant to its plain meaning.  So the issue has

1  also been decided.  What's more, the issue is not decided or

2  the issue does not turn on the personal beliefs or personal

3  communications or the information that was provided in those

4  communications between government counsel and agency counsel.

5  This is decided it's a legal matter.  It was briefed as a legal

6  question.  There is no fact, there are no factual

7  representations in the government's brief, the citation to all

8  authority is a legal authority.  The case was brief in

9  accordance with the principals articulated by the First Circuit

10  in the *Lachman* case, which is that the, if the Court, first of

11  all the Court didn't actually go to agency interpretations

12  because it stopped at the plain meaning construction of the

13  statute, but had it gone and looked at the agency, and had the

14  issue come up of deference to the agency interpretation, the

15  deference is to the formal expressions of agency interpretation

16  and formal public pronouncements.  This is clearly a protective

17  order that should be issued, Your Honor.

18         THE COURT:  Mr. Daly, why is it not moot?

19         MR. DALY:  Why is it not moot?  It's not moot because

20  what Judge Saris asked the government to do or asked CMS to do

21  is to file an amicus brief that set forth the position of the

22  secretary of HHS and the administrator of CMS as to what their

23  understanding of the term AWP means as used in the statutes and

24  regulations.  This was actually over my objection when it first

25  came up because I said, Your Honor, they've sued us.  They're

1  litigants.  I object to litigants filing a friend of the

2  court brief with Your Honor and the Court said, well, I'll take

3  that under consideration and I am interested in what the agency

4  has to say.  After all, I'm talking about a regulation, first

5  of all prior to 1997, and I'm talking about a statute from 1997

6  on, and counsel for the government indicated that CMS was the

7  client of DOJ and the Court said, well, great.  I want to hear

8  what the government's position is.  So they come in and they

9  write a brief, which in the first line says that it is the,

10  filed on behalf of the secretary of HHS and Mr. Draycott says

11  in his argument today that it contains no factual assertions.

12  I beg to differ, and I'm just going to read very briefly from

13  our brief, page 9, Your Honor.  On page 13 of the amicus brief,

14  they state, "The final rule continued to reflect the

15  secretary's intention to limit Part B drug payments to an

16  amount related to supplier acquisition cost."  They have a

17  factual assertion of the secretary's intent.  They have in the,

18  on page 15 of the brief, they say, "The secretary understood

19  that Redbook and other wholesale price tags updated their

20  information monthly and thus for me, the secretary believed

21  that they published wholesale prices were a source of

22  acquisition costs of some physicians and therefore could be

23  used to calculate Part B drug reimbursement."  They say on page

24  13 and 14, "Rather, the published data was a resource to the

25  secretary in setting the agency's national average wholesale

1   price for payment purposes."  And there are other quotes of

2   factual assertions that are in the amicus brief.  Now, why do

3   we want to know about that?  We want to know about that because

4   what the agency knew and understood about AWP is central to

5   this case.  They have sued us for hundreds of millions of

6   dollars saying that we're entitled to the spread between the

7   published AWP on the one hand and the actual acquisition cost

8   on the other.  They file a brief as a friend of the court

9   saying out loud what the secretary of HHS and the administrator

10  of CMS knew and believed and what those people knew and what

11  those agency's knew is critical to the case.  What Judge Saris

12  has said over and over again, after her summary judgment

13  ruling, and we cited this in the brief, but after her summary

14  judgment ruling, she says, and this is in February 27th, the

15  same hearing that was cited and I guess maybe you have it, page

16  35 to 36, but it's cited in our brief as well, Your Honor, on

17  page 12, the court says, "Everyone has a right to understand

18  what the government was doing during the time period."  And

19  then court also recognized that, "What the Centers for Medicaid

20  and Medicaid Services", I'm sorry, "Medicare and Medicaid

21  Services, understood and knew and what they agreed to and what

22  they didn't are things that the court was very interested in

23  hearing."  And this is when we were going to go out and start

24  taking the depositions of current and former administrators of

25  CMS.  So the court has made it very clear, and now I'm coming

1   full circle to your mootness point, that the issues of what

2   HCMS and its people and its administrators knew and understood

3   and what they believe and what they thought AWP meant and

4   whether they knew there was a spread or not is critical to the

5   issues per Judge Saris.  They go to causation, they go to

6   scienter, they go to the statute of Limitations.  This is a

7   fraud case after all.  They sued us for common law fraud.  It

8   goes to reliance.  It goes to misrepresentation.  It goes to

9   falsity.  It goes to all kinds of issues after the Court's

10  decision on summary judgment.  You can have a plain meaning and

11  the Court has construed a plain meaning, but first of all, it's

12  not a final order.  Secondly, even if that remains Judge Saris'

13  ruling, you can still have a plain meaning but in order to

14  prove fraud, in order to prove that the government was misled,

15  they have to prove that they were misled.  They have to prove

16  that they were deceived.  They have to prove that they didn't

17  know and that is, goes to the core of our defense.

18          So back to our little motion hearing.  The key to the

19  motion I think is in footnote 1 on page 5 of their brief, Your

20  Honor, and there it says, this is after saying that the only

21  people who fit the description of our request for a deposition

22  person are lawyers.  They drop a footnote and they say, to the

23  extent that CMS attorneys in turn conferred with other agency

24  personnel, those communications are plainly protected by the

25  attorney-client privilege and attorney work product doctrine.

1    If you look at that carefully, it says, to the extent.

2    They're not even willing to tell us that they actually

3    conferred with anybody.  They're leaving it – it's very crafty

4    and to this day, and we've asked them over and over again, did

5    you in fact talk to anybody or was this simply a lawyer driven

6    litigation posturing brief that you filed in front of Judge

7    Saris and they won't tell us, and they craft a footnote that

8    says, well, to the extent we did, and we're not telling you, we

9    won't tell you whether we did or not, that of course would be

10   privileged.  Well, you know what, it's not privileged if they

11   went and talked to people inside of CMS or HHS or anywhere else

12   in the government and got information about these factual

13   assertions that I just read to you from the amicus brief, we're

14   entitled to find out who those people are and what they knew.

15   We told them the first time that they raised this issue of, oh,

16   well, then you're just asking for a lawyer thing.  This is an

17   exhibit, one of the exhibits to our brief is a letter from my

18   colleague, Mr. Torborge, who wrote I believe to Mr. Draycott

19   and said, no, no, no.  Let's be absolutely clear.  I don't want

20   a lawyer dep.  If it's just lawyers, tell me that and then we

21   know that it's just a litigation brief.  But in response what

22   they do is they craft this crafty little footnote where we do

23   not know today whether or not they actually talked to anybody

24   and it's critical to--

25              THE COURT:  By the way, is the government willing to

1    put that in affidavit form who they conferred with?

2          MR. DRAYCOTT:  We'll certainly consider.  I did not

3    prepare the amicus brief, Your Honor, so I will respond to

4    that, but I think there's a couple of other points.  I don't

5    know if Mr. Daly was done.

6          THE COURT:  Well, that was just my question.  I don't

7    think he's finished.

8          MR. DRAYCOTT:  Okay.

9          THE COURT:  That was just a question that I throw out

10   to you.

11         MR. DALY:  So I believe it is relevant, Judge.  It is

12   not moot.  It goes to the agency interpretation.  It goes to

13   what the agency knew and understood during these years which is

14   exactly what the quote I read from Judge Saris that she says

15   she's interested in finding out.  It goes to the merits of the

16   case.  It also goes to the weight that should be given to the

17   supposed agency position that's reflected in the amicus brief.

18   As the Court knows, courts look to what agencies say about the

19   regulations that they handles and it matters to courts.  It

20   matters to Judge Saris.  It matters to appellate courts.  It

21   matters to other courts who may look at this to say is this a

22   litigation posturing brief or is it actually something where

23   they went and talked to anybody and actually got their views of

24   the agency.  And we've cited a bunch of cases, I think on

25   pages--

1    THE COURT:  Well, I'm just asking them whether or

2    not they'd be willing to put in affidavit form who they

3    consulted.

4    MR. DRAYCOTT:  Two things, Your Honor.  One, we'll

5    certainly consider that and consider that request.  I would say

6    that under *Lachman*, such consultations would be irrelevant

7    because *Lachman* tells, is explicit.  It couldn't be a more

8    explicit case which says what the source of agency

9    interpretation must be and the brief was prepared in accordance

10    with the principles in *Lachman*.

11    If I can quickly respond to, which is why there are

12    no factual assertions here.  If it turned to Mr., the defense

13    brief at page 9 where there is a series of quotes from the

14    government's brief.  What is not included there is the citation

15    for every statement that's made.  For example, Mr. Daly read

16    you the first one.  The final rule reflected the secretary's

17    continue belief as in 1991 of the wholesale price date, et

18    cetera, et cetera.  The citation for that in the brief is 56

19    Federal Register at 59 524.  For the next excerpt which is –

20    actually I think you then jump down to number 15, the citation

21    in the brief to the, the secretary understood the redbook and

22    other wholesale price guides, et cetera, et cetera.  The

23    citation in the government's brief is 56 Federal Register 59

24    524.  With respect to the first, or the second excerpted quote

25    from the government's brief, the citation there was 56 Federal

1   Register 25 792 and 2580, and I can fill in.  In fact, I

2   don't have to do it because what defendants have had since the

3   brief was filed were citation to the Federal Register record

4   for each of the statements contained in the government's brief.

5   In other words, it was a brief that was prepared entirely in

6   accordance with *Lachman*.  That is, you don't go to personal

7   opinions or agency officials.  You go to formal statements in

8   the public record which is the way that statutes and

9   regulations are to be construed and the First Circuit couldn't

10  have been more explicit on that in the *Lachman* case.  So had we

11  done what Mr. Daly suggest and that we go out and we start

12  interviewing people as to their personnel views, that is not

13  one of the cannons of regulatory construction that the First

14  Circuit recognizes.  That's why this is a legal brief and of

15  why the consultation was with agency counsel.  And I'll

16  certainly say for the record, Your Honor, that our liaison with

17  the agency is through the Office of General Counsel for the

18  agency.  I mean, that's very clear.  When we want to talk to

19  the agency, we do it through the Office of General Counsel, and

20  I'm, that's the nature of this.  But the most important point I

21  think I have to make with Your Honor, is what relief that

22  we're, is the nature of the relief that we're requesting here.

23  What has been going on in this case, defendants have been

24  taking discovery and doing depositions of government witnesses

25  in terms of, and at this point, they've already taken the

1   depositions of three former HICFA administrators.  We're not

2   asking for a protective order that prohibits the line of

3   questioning that Mr. Daly is talking about.  In fact, in every

4   deposition that I've been to, I haven't been to every

5   deposition in this case, but at every deposition that I've

6   attended, there has been full questioning about the witness'

7   personal opinions.  We've objected but the witness has

8   consistently answered those questions.  So we're not shutting

9   down a whole avenue of discovery.  All that discovery is

10  ongoing, and as recently as yesterday when a former HICFA

11  administrator was being deposed, he was questioned extensively

12  about his personal views.  This is a very narrow motion for

13  protective order that goes to a very, very narrowly crafted,

14  very specific deposition notice.  We are just talking about the

15  consultations with the client with regard to the preparation of

16  a legal brief.  That's the only protective order that is at

17  issue by virtue of the government's motion.  We have not asked,

18  and we believe that everything that Mr. Daly just talked about

19  is irrelevant.  The personal opinions is clearly made relevant

20  by the *Lachman* decision, was made irrelevant by the Lachman

21  decision, but we're not asking this Court to shut that all down

22  or say, you know, hence force you may not inquire of the HICFA

23  administrator's personal opinion on any of these matters or any

24  of his understandings.  In fact, that discovery is ongoing and

25  it's crossed all levels of the agency, they've been asking

1   these questions of OIG personnel, that is Office of

2   Inspector General.  They've been asking it of former

3   administrators.  They've been asking it of program people.  All

4   of that's ongoing.  So there is no discovery that is being

5   denied except discovery relating to consultations between DOJ

6   attorneys and CNS, Office of General Counsel attorneys.  That,

7   the relief requested goes no broader than the deposition notice

8   that we've moved on.

9         THE COURT:  All right.  I'll take it under

10   advisement.  The next being 3849, which is the motion to compel

11   plaintiffs to provide an adequate response to interrogatories.

12         MR. DALY:  Your Honor, in my view, I think there's

13   been a lot of briefs filed on this particular motion that I

14   think really is, tries to make a very simple point.  I'm going

15   to try to bring it into focus.  As I stated, in the conference

16   with the other motion, this is a fraud case.  This is common

17   law fraud.  It's FCA.  We've cited all the cases that indicate

18   at pages 6 and 7 of the brief on this case, talk about how in

19   an FCA case the government has to prove that it was misled.

20   Actually, Judge, I am going to, if I may, just get some

21   materials from the exhibit that I refer to.  I can get you an

22   extra copy if you need one.

23         MR. BREEN:  Jim, just for the record, this is

24   directed at Ven-A-Care also, right, not just the government?

25         MR. DALY:  Yes.

1        MR. BREEN:  I'll also be arguing that.

2        MR. DALY:  So we cited in our brief the cases about

3   misleading.  I've also already made the argument and these

4   arguments are related, Judge, between the one we just did, I

5   think it's very clear that Judge Saris has put causation,

6   reliance, also the Statute of Limitations, latches, estoppel

7   are concepts that she herself has mentioned as perhaps being

8   applicable here.  They're all in play, and what they go to is

9   what does the government have to say about what it knew and

10  understood about AWP, and that's what this case is about.

11  That's what it's been about from the beginning.  That's what

12  our defense is based on.  That's what the claim is based on, so

13  that's why we're conducting all these depositions on the

14  subjects where those present and former administrators, Judge,

15  are telling us over and over and over again that they

16  understood AWP not to be some kind of actual average wholesale

17  price.  In fact, they knew every single one of them testified

18  that it was not.  I deposed Mr. Skully yesterday, the

19  administrator who was in charge when the MMA was finally

20  approved in 2003, and he says as far back as 1991 he knew that

21  AWP was nothing but air.  He says the entire system was sane

22  and everybody, insane and everybody knew about it, everybody at

23  CMS, everybody within the government that he talked to and

24  everybody in the private sector.  So the notion that anybody

25  was running around thinking that AWP was actually the actual

1    average wholesale price is just poppy cock from the mouths

2    of the heads of the agencies themselves as well as the people

3    that work for them.  So what happens?  We have paragraph 42 of

4    the complaint is what this goes to, and in paragraph 42, the

5    government alleges AWP is used to refer to the price at which a

6    pharmaceutical firm or a wholesaler sells a drug to a retail

7    customer who then administers it to a patient.  That's the

8    allegation.  It's the only allegation in the entire complaint

9    that says what AWP was supposed to be.  It's the only place in

10   the complaint where they say that that's what AWP represents in

11   the minds of the government.  So we ask, and when we read this

12   complaint, we said, okay, says who?  And so we sent them an

13   interrogatory that said essentially please tell us everybody

14   that, you know, in the government, that believes this or says

15   this or takes this position because we want to know.  We're

16   taking depositions and nobody said it yet, and we simply asked

17   that that be done, and we want to know who believed it and who

18   understood it and any evidence that Abbott ever made any

19   representation that that's what AWP was in accordance with

20   paragraph 42, and we think we're entitled to know that,

21   entitled to know if anyone in the government or at CMS believed

22   that, and in their initial response, and this is at Tab 3 of

23   what I gave you, Judge, they filed an initial response to this,

24   and on page 3 or tab 3, the last page, about halfway in, it's

25   at about page 35 at the bottom, Judge, if you look up at the

1   second full paragraph, the government said, the general

2   concept that the AWP refers to the price, the general concept

3   that the AWP refers to the price at which a pharmaceutical firm

4   or a wholesaler sells a drug to its customers is commonly

5   understood in the industry.  That's how they responded to the

6   interrogatory, and we said, okay, who understood it that way?

7   Who understood that commonly in the industry?  Who in the

8   industry thought that?  Who in the government thought that

9   that's they way the industry commonly understood it?  Remember,

10  we're getting all this testimony that says we didn't understand

11  it that way.  Far from it.  We thought it was, the system was

12  insane.  Administrator Skully says, AWP, I've known for 10 or

13  15 years that it's mostly air.  So we asked them about that and

14  they say that they're not going to provide any further

15  information and they're not going to verify this.  So when they

16  filed this response, it had no verification and we said, well,

17  you know, this is an interrogatory.  If that's the position

18  you're going to take, we want you to verify it so that we can

19  depose the person who verified it because we want to know who

20  on your side of the table is saying that this is the, how the

21  term is commonly understood in the industry.  They refused to

22  verify it.  So we filed a motion to compel asking for it to be

23  verified and asking for a fuller answer.  In other words, who

24  held this position.  So what they did was instead of responding

25  to that, they filed a supplemental answer where this language

1  that I just read you has been deleted, but it's still out,

2  it's deleted in the supplement.

3           THE COURT:  And is the supplemental answer verified?

4           MR. DALY:  It is verified.  And the commonly

5  understood language is deleted apparently or I think because

6  they couldn't find anybody who could verify that sentence, but

7  paragraph 42 of the complaint is still there.  In other words,

8  this allegation that we started with, which is that AWP is the

9  actual average wholesale price of drugs and that's what it is

10  understood to be, it's still there.  It's still the focal point

11  of their complaint against us and we're still trying to get

12  information about who has that.  And, you know, we want to know

13  if there are people who hold that belief.  That's going to go

14  to the proof of whether or not they were misled about anything.

15  And again, page 53 or paragraph 42 is the only--

16           THE COURT:  But can you narrow it a little bit as to

17  people in what positions?  I mean, it's pretty general.

18           MR. DALY:  Well, I mean we haven't asked for--

19           THE COURT:  You're starting with the White House

20  down?  I mean--

21           MR. DALY:  In our meet and confers with the

22  government on this point, it's been, we've been offered to let

23  it be somebody within CMS, somebody within HHS.  I mean,

24  obviously we don't want every agency of the government searched

25  on this but the critical agencies, yes.  Certainly, CMS,

1    certainly HHS and, you know, if there's somebody in the

2    legislative branch that's been involved in health care issues

3    that held this belief, we want to know.  And we've been, you

4    know, they haven't been willing to agree to that at least up to

5    this point.

6              And so that's kind of where we end up.  We end up

7    with, and I've given you this material in the attachments, but

8    I not only have the depositions of folks, but I have included

9    in the excerpts that I've given to you examples like Donna

10   Shalala, the former head of HHS, who talks about in several

11   excerpts that I gave you from her letters and reports where she

12   talks about AWP is the thing that is reported in the compendia,

13   and she comes right out and says it.  It's not, it's not the

14   actual average wholesale price, and I suppose it may be worth

15   taking a quick look at that, Your Honor.

16             Well, you start with Tab 5, Your Honor, of the

17   materials that I gave you.  This is actually Nancy-Ann Min

18   DeParle, who is the former administrator of CMS before

19   Mr. Skully took over, and at that bottom of the first page of

20   her letter, which is at page A-2 of Exhibit 5 that I've given

21   you, she writes, she is agreeing with something the OIG says,

22   and she says, "If given that the authority HICFA would like to

23   increase the discount we now take on the published average

24   wholesale price and base our price on the acquisition cost."

25   This is the head administrator of CMS telling us, telling the

1   world in this public document that we take our discount on

2   the published average wholesale price, the one that's published

3   in the compendia, not some paragraph like 42 of the complaint

4   that we're looking at where they say that it's some reference

5   to actual acquisition costs.

6           But my point in all this is to, just to bring it full

7   circle is that paragraph of the complaint is out there.  They

8   have made this critical allegation.  All we've asked for is to

9   identify for us somebody on your side of the table, and we can

10  limit that in a way that's appropriate, we offered to do that,

11  certainly, it has to begin with anybody in CMS.  I mean, I'd

12  like--

13          THE COURT:  Well, can we start with identifying one

14  person in CMS?

15          MR. DALY:  That would be a start.  I'm not sure they

16  can do it, but I'd like to see that.

17          MR. DRAYCOTT:  Your Honor--

18          THE COURT:  Why can't you do that?

19          MR. DRAYCOTT:  Your Honor, this, the first thing I

20  think we need to put this motion in context.  What I think has

21  become abundantly clear from everything I've just heard is the

22  purpose of this is to reargue a legal point that's actually

23  already been decided by Judge Saris in the November 2nd order.

24  She's ruled on the meaning of AWP.  But if we, I think the

25  first thing is to step back.  Their, this complaint is true to

1   form of most complaints.  It has a series of background

2   paragraphs including one on the jurisdiction of this court, and

3   then in Section 6 it describes by way of background the

4   operation of government health care programs.  The allegations

5   against Abbott actually begin on paragraph 51.  In paragraph 42

6   there is a legal statement which says what AWP is.  It is

7   exactly consistent with they way this, with the way Judge Saris

8   ruled.  It is a legal statement in the complaint providing a

9   background statement and a citation in most of these sections

10  of the brief, I'm sorry, of the complaint, are to the program

11  regulations which control as to why the government asserts that

12  AWP is not just any price that can be reported and can't

13  certainly be a price that was constructed to act as a kickback

14  to physicians or providers that were purchasing drugs, that's

15  been laid out in the brief of the United States' amicus curiae.

16          The one issue that Abbott has to understand by now in

17  this case is the government's position with respect to the

18  meaning of AWP.  What's more the issue has now been laid to

19  rest by Judge Saris' order which expressly adopts a plain

20  language construction.  So it is, you know, now with respect to

21  again, the, Mr. Daly has gone on a wide range in discourse of

22  the fight that he wants to have with the government regarding

23  the result reached by Judge Saris in her November 2nd order, but

24  an interrogatory directed to sort of a preambled paragraph in

25  the complaint is just not the way that the bait is going to

1  move forward.  I mean, technically at some point could be I

2  guess a motion for consideration of Judge Saris' November 2nd

3  order, but with respect to who in the government knew what, the

4  one thing that certainly defendants, one issue the defendants

5  are taking discovery on right now, is this, these are issues

6  that are being discussed with every government deponent that's

7  being caught out there.  It's been discussed with three former

8  HICFA administrators.  It's being discussed with every program

9  person that's being deposed.  With respect to the people in the

10 Office of Inspector General who are not part of CMS but are

11 doing studies analyzing reimbursement, it's being addressed

12 with all of those witnesses.  This is just not an area where,

13 that's properly subject to a motion to compel with respect to

14 the background and legal statement in a complaint.  It's, I'm

15 trying to put this in context.  It's as if we had put, you

16 know, when, if and when Abbott files an answer, it's as if we

17 noticed every interrogatory with respect to every legal

18 contention in their complaint or every legal contention in a

19 brief they filed.  Identify everybody at Abbott that believes

20 that this case may be subject to the Statute of Limitations.

21 It's just not going to, it's irrelevant because it's not going

22 to drive the resolution of the legal issues that lie at the

23 core of the issue they're looking at.  The issue of what any

24 individual thought or believed, ultimately is irrelevant and

25 *Lachman* again makes that clear.  They issue her is this is a

1   statute, it's a term that appears in statute and

2   regulations, it's been resolved as a legal question.  To the

3   extent that they wish to take discovery on what individuals

4   thought, again, we've noted our objections to that line of

5   questioning, but we certainly haven't ever instructed a witness

6   not to answer those questions.  So they're fully developing a

7   record.  There is also an abundant record in the public record

8   already in terms of the Federal Register of published OIG

9   reports.  There is, and certainly Abbott has made this point

10  since the motion to dismiss which is, there is a voluminous

11  public record about the agency interpretation of this term,

12  what they knew.  It doesn't get resolved by a motion to compel

13  on a background statement--

14          THE COURT:  Okay.

15          MR. DRAYCOTT:  --in a complaint which states a legal

16  definition which has been, which is absolutely consistent with

17  the court's holding.  What's more, we've cited to industry

18  publications in the answer as to why, and just to make one

19  thing very clear, we don't believe that verification is

20  necessary on a straight legal term.  Notwithstanding that, we

21  agreed to verify before they filed their motion, and the

22  question, why did they move to compel?  That's the mystery.

23          THE COURT:  Okay.  I'm going to take it under

24  advisement.  I want to go back and look some of the things

25  Judge Saris has said.

1          MR. BREEN:  Your Honor, can I make one point on

2  this--

3          THE COURT:  Sure.

4          MR. BREEN:  --because he's shooting at me too on

5  this, so, and it's--

6          MR. DALY:  I object to that, Your Honor.

7          THE COURT:  We don't like to talk about shooting in

8  here.

9          MR. BREEN:  Poor choice of words, Judge.  But anyway,

10  number one, I just would reiterate and I'm not going to go over

11  the argument, but AWP is the issue, and it's our right to find

12  it's average wholesale price.  Now, what happened as far as

13  what was reported in those facts, that's really a separate

14  issue, but they're asking us to put up a, give a factual

15  interrogatory about what is in fact a legal term at this point.

16  Well, that's one.

17      But the main purpose for my jumping in here, this is,

18  I think we can all agree, this is basically a contention

19  interrogatory and we need to address this now early on in the

20  case because this is a, my client is a qui tam relator under

21  the False Claims Act and we filed a separate memorandum on

22  this--

23          THE COURT:  Uh-huh.

24          MR. BREEN:  --and I can't speak for the government.

25  I'm precluded by the statute--

1           THE COURT:  Right.

2           MR. BREEN:  -- from speaking for the government, and

3   I think it would be a waste of time for me to have to make that

4   objection every time they serve a contention interrogatory on

5   Ven-A-Care.  What Ven-A-Care thinks the government's position

6   is on the definition of average wholesale or rather AWP is

7   irrelevant, and even if I said something that was crazy, I

8   couldn't bind the government because I can't prejudice the

9   government's rights.  So it's really overly burdensome and I'm

10  using harassing not in a preserved term with the adversary, Mr.

11  Daly, but it is harassing to have to keep filing motions and

12  objections on that basis.

13          So I would ask that the Ven-A-Care specific portion

14  also be taken under advisement so that we don't keep getting

15  these contention interrogatories.  We're bound by law not to

16  answer.

17          MR. DALY:  Your Honor, may I say two very quick

18  things?

19          THE COURT:  Very quick.

20          MR. DALY:  Okay.  One, counsel for the government I

21  think mixing apples and oranges talking about *Lachman*.  This

22  motion isn't about statutory construction of AWP.  It's about

23  the allegation in paragraph 42 which says AWP is used in a

24  certain way.  It's a factual allegation that we're trying to

25  get to.  *Lachman* says in any event that you can in certain

1   circumstances be looking to the intent and how things were

2   used in industry parlance in the appropriate circumstances.  So

3   even if it were a statutory construction argument, it would

4   allow us to get into this.  And finally, all we want is for

5   them to identify somebody who can support this.  It's not a

6   moot issue.  If it were moot, why would Judge Saris be talking

7   about this on February 27th, the last time we were in front of

8   her.  I mean clearly, these issues are very much alive in the

9   case.

10          Thank you, Your Honor.

11          THE COURT:  All right.  Moving on to docket entry

12   4047, which is the government's second motion to compel.

13          MS. BROOKER:  Thank you, Your Honor.  Your Honor,

14   this is a fairly straight forward request for production of

15   documents in that the United States has outlined five specific

16   targeted categories of documents that we believe Abbott has not

17   yet produced and should produce in this case.  These five

18   categories are based directly on Abbott's defenses, testimony

19   that we've gotten already in the fairly short amount of time

20   that we've been taken deposition of, depositions of Abbott's

21   witnesses.  I will tell the Court that this is one in a long

22   series of motions to compel that are coming with respect to

23   Abbott.  We've got a whole bunch more in the pipeline.  After

24   Abbott produced its initial disclosures back in august, it has

25   bickered with us on just about every single category of

1 documents that we come across, again, either through witness

2 testimony or their defenses.  And again, we haven't really

3 gotten their answer yet, which makes their withholding

4 documents early on very problematic.  We know that they're

5 going to be filing an answer I think in the next six weeks

6 because Judge Saris did just deny their motion to dismiss, but

7 I will say, again, we set out and I have personally written

8 more than a dozen letters outlining these categories of

9 documents, trying to get Abbott to respond to the letters and

10 we have not hid the ball at all.  We tell them exactly why the

11 categories are relevant.  It's not a game we're engaged in.  we

12 have long discourse over why they're relevant, but they bicker

13 with every single category.  Some of it is downright silly.

14 And let me just say, the second thing besides wanting those

15 five categories of documents, we have not gotten a single

16 privilege log from Abbott in this case and we know they're

17 withholding documents on the basis of privilege.  We know that.

18           THE COURT:  Well, have they said it?

19           MS. BROOKER:  Yes.  I mean, we know it from the Texas

20 case.  We were just told very recently in our last phone call

21 with them that we would get a privilege log, but it's really

22 late in coming given that these are documents that should have

23 been disclosed to us like eight months ago when they made their

24 initial disclosures and long since past the deadline that Judge

25 Saris set for a CMO.  I mean, arguably, I guess--

1        THE COURT:  When are they going to get it, Mr.

2   Daly?  Mr. Winchester?

3        MR. WINCHESTER:  As we explained to counsel in our

4   last phone call and also by letter last night, they will have a

5   privilege log by this coming Monday.  It's not part of the

6   motion so I don't know why it's up, but they will have a

7   privileged log by this coming Monday.

8        MS. BROOKER:  Yes, it is part of our motion, but I

9   would ask is that going to include all documents to date for

10  all categories of documents we've requested that they're

11  withholding as privileged or is it some smaller subset of

12  privileged materials?

13        THE COURT:  Can you enlighten us on that?

14        MR. WINCHESTER:  I'm happy to, Judge, although we

15  just did have this out by way of conversation between us but

16  I'm happy to tell the Court as well.  As I told counsel, we are

17  crafting a privilege log for this case, so it will

18  be--

19        THE COURT:  In it's entirety.

20        MR. WINCHESTER:  Yes, for this case.  In other words,

21  there are four drug cases--

22        THE COURT:  Four drugs.

23        MR. WINCHESTER:  --and the additional documents that

24  I talked to you about, which are documents that don't

25  necessarily talk directly about these drugs but would relate to

1   them and documents that would arguably suggest some pattern

2   of practice relating to other drugs.  We will do our best to

3   make sure that the privilege log is current as of the time that

4   we turn it over.  We're working very hard to do that, obviously

5   understanding that we have an obligation to seasonably

6   supplement the log as other things come in.  I think what

7   counsel's question is is are we going to take their view of the

8   universe, which is every document Abbott has about any of its

9   products ever and do a privilege log on that?  No, we're not.

10  We are doing a privilege log for this case, which will cover

11  the documents that are the body of documents at issue at this

12  case and we will describe for them the documents that are being

13  withheld on grounds of privilege.

14          THE COURT:  All right. You are going to get it

15  Monday.

16          MS. BROOKER:  Yes.

17          THE COURT:  You'll look at it then and we'll go from

18  there.

19          MS.BROOKER:  All right, Your Honor.  At any rate, I

20  will just briefly go over because I think I thoroughly laid

21  this out in the motion, the five categories of documents and

22  why they are relevant and briefly address Abbott's responses to

23  them.   Average manufacturer price data or AMP data that we

24  refer to, it's all over Abbott's defenses.  It's disgusted in

25  their motion to dismiss.  They go to each government witness

1   deposition and ask this question about isn't it a fact that

2   you got our AMP data?  They are representing in depositions and

3   they are representing in their motion to dismiss, and I presume

4   we're going to see it in their answer as well, that their AMP

5   data was accurate and that the government could have relied

6   upon it.  Now, setting aside for the moment because I don't

7   think we need to resolve this here, we believe that issue is

8   irrelevant and it's a red herring, but nonetheless, it's

9   ridiculous for them to say that this is an issue in this case

10  and to be proceeding full speed ahead clearly intent to try and

11  get this issue before a jury and to tell the government, but

12  we're not going to give you our calculations on AMP.  As a

13  matter of fact, Abbott served us with requests for admission

14  and asked us to admit that their AMP data was accurate, which

15  is initially why we asked for their AMP data in addition to the

16  fact that it's all over their briefs and all over their

17  deposition question of witnesses.  Now, granted they've

18  withdrawn only the request for admission at the moment, they

19  have non pending.  They're obviously going to be reserving

20  them.  I don't know if that specific request will be in there

21  but it's even beside the point.  This is something that they

22  are putting forth.  They need to produce that AMP data to us.

23  It's not sufficient for them to say you already have it.  We

24  gave it to you and we don't have to have our underlying price

25  information or how we got that information or all of the

1  details which we do need for this case for their defenses at

2  the very least.  So that I put forth, Your Honor, as a

3  ridiculous basis to bicker with us over providing that AMP

4  data.  Also, I would submit to the Court that we've asked only

5  at this time for the AMP data for the subject drug.  So that's

6  not even an issue.  It should not be a burden for them to

7  produce that, and even if it is, there's going to be some

8  burden to defend it in this case for producing material.

9           The second category of documents--

10          THE COURT:  Well, let's do one at a time.

11          MS. BROOKER:  Okay.

12          MR. WINCHESTER:  Thank you, Your Honor.

13          There's I think a quality distinction that counsel is

14  glossing over here and I think misstating how we're using AMP.

15  Average manufacturer's price or AMP is a creature of statute

16  that Abbott and every other pharmaceutical company is required

17  to report to the government.  It is used by the government for

18  purposes of relating to calculation of Medicaid rebates.  So,

19  just so the Court has that background, it should also be

20  pointed out there is no claim in this case that relates in any

21  way to AMP or to Medicaid rebates.  The government has not

22  brought those claims.  It had every opportunity.  It has not

23  brought those claims.  They're not in the case, so under the

24  rules that have been in place since 2000, they are entitled to

25  discovery about their case.  This is not their case.  The

I - 51

1   contention always has been that well, you, Abbott, put AMP

2   in play by, either through your request for admission or by

3   pointing out the fact that the government gets AMP data.  Both

4   of those are not true.  First of all as counsel states, there

5   is no request for admission.  That's just a red herring.  There

6   isn't one.  As to the I think more pertinent issue, which is,

7   has our defense somehow put this at issue, I think the answer

8   is unquestionably no.  Our defense and our use of AMP has

9   nothing to do with how the AMP gets calculated.  That's a

10  statutory calculation.  The use we make of AMP is simply to

11  say, look government, when you come to this court and say I was

12  defrauded in overpaying for drugs because I thought as we see

13  in their complaint and we've heard hear at least from the

14  lawyers and not from the actual people who ran the show, I

15  thought AWP was the actual price people were paying in the

16  marketplace.  When they come to the Court and say that, I think

17  it's relevant for us to show and we've said, wait a minute, you

18  were getting the AMP submissions that showed you for these

19  drugs and every other drug in every case that the average

20  manufacturer price was substantially below this AWP that you

21  were supposedly relying on as the street price of the drug.  So

22  it's what we liken to a hearsay statement that comes in to show

23  effect on a listener.  It doesn't matter how the statement was

24  made, whether it's true or anything else.  It matters for the

25  effect on the listener.  In this case, we haven't said, you,

1    government have an issue here because here's how we

2    calculate AMP.  We say, you have an issue in saying that you

3    thought AWP was the real price when you're sitting there

4    getting reported to you an average manufacturer's price that

5    was much lower, regardless of how it's calculated.  That's the

6    only issue we made of it.  So we have not put the calculation

7    in issue.  There's no claim in this case relating to

8    calculation and for that reason we would oppose their motion.

9              MS. BROOKER:  Your Honor, I would just briefly

10   respond.  Their AMP data, first of all their legal arguments on

11   AMP data we completely disagree with.  Again, I think that will

12   be briefed at a later time.  Their AMP data that they submit is

13   their actual prices, that's at the very heart of this case, and

14   again, as you will see, defendants bicker with every single,

15   solitary cat, this is a very discrete specific category of

16   documents.

17             THE COURT:  To be produced.

18             MS. BROOKER:  Thank you, Your Honor.

19             The next category of documents, again, very discrete

20   and finite.  The alternate site sales force, that particular

21   group within Abbott, hospital products divisions, there's no

22   doubt, there's no dispute I don't think at all between the

23   parties that the focus of that particular group is relevant.

24   We've been taking a lot of depositions in that area, and

25   there's a finite set of individuals.  We have been asking now

1   for probably six months that Abbott tell us how many

2   individuals are in that group, in that sales force.  We have

3   not gotten a response.  I had to depose somebody to find out

4   the answer to that and learned recently a couple of weeks ago

5   at a deposition of Cliff Krajewski, who is in that particular

6   group for a number of years, that at any given point in time,

7   at least from 1990 to `96, and it suggests that this is

8   probably true for all the time period that we're talking about,

9   that there were no more than 30 field sales persons in here.

10  So we're talking about a small finite group of people, and from

11  among those materials at this time, all we're talking about are

12  specifically their written goals and evaluations that they

13  received in terms of how they received, you know, their

14  end-of-the-year evaluation, how they were compensated and so

15  forth.

16          THE COURT:  How many people are we talking about?

17          MS. BROOKER:  We're talking about, again, 30 sales

18  persons a year for over the course of at least, you know, a 10-

19  year time period for starters.  And it depends on what we see

20  in those documents whether we have to trouble shoot and, you

21  know, and ask for something broader than that.  Very finite.  I

22  also deposed two people, Cliff Krajewski and another person,

23  again both of these occurred two days in a row, a couple of

24  weeks ago.  Their testimony was very clear.  Even though

25  neither one of those are the sales people, they testified that

1   each of them in different parts of Abbott have written very,

2   very specific written goals that they must meet each year and

3   then they have an evaluation that is in writing.  Both of them

4   have those.  Of course people save their written evaluations.

5   One man testified that all the years he's been at Abbott, I

6   think it was 25 years, he has his whole stack sitting on his

7   desk.  So not necessarily, you know, bringing this to Your

8   Honor's attention to talk about those two individuals' files,

9   but the point is, clearly the documents exist.  Clearly they're

10  probably not that hard to obtain, and again, we've been very

11  specific with Abbott.  They're relevant to show what marketing

12  incentives the sales persons were offered to receive their

13  compensation and their evaluation.  Whether spread marketing

14  was encouraged or rewarded, whether there were any changes

15  during the relevant time period to the policy or practice in

16  Abbott's marketing its drugs, what their recognition was, and

17  it does matter and particularly Daryl Dorsey, granted he is a

18  lobbyist, but he testified his goals would be very specific,

19  that he would maintain, for example that he would see to it

20  that a particular law went into effect or didn't go into effect

21  and at the end of the year his performance would be measured

22  against that very specific goal.  Presumably, the sales persons

23  are going to have no more or less specific goals than the other

24  witnesses that we've deposed.

25          Now, the only real objection Abbott has to this, it

1    can't really realistically be burdensomeness.  First of all,

2    they never really undertook other than the deposition that I

3    took to find out what the burdensome nature of it was, they say

4    the documents are confidential personnel records, but I direct

5    the Court to the MDL protective order and the one that this

6    Court entered in this case, and the protective order expressly

7    anticipates that this type of information might be produced,

8    and it specifically allows for "past or current company

9    personnel or employee information."  Abbott produces almost

10   everything in this case as highly confidential or confidential.

11   So confidentiality, you know, is just not an issue in this

12   case.  And again, for Abbott to say that this is irrelevant is,

13   I would say another category that's ridiculous.  The only last

14   thing I will say is that what Abbott did offer to produce,

15   which we still haven't even gotten, are the policies.  They

16   think that's sufficient that we get whatever their policy was.

17   Of course we want to see what the policy was, but it doesn't

18   matter until we see how it was implemented with respect to any

19   one particular employee and the policy is going to presumably

20   say something broad such as employees will have goals and they

21   will be evaluated according to those goals.  It's not going to

22   tell us whether they met those goals and whether they had to do

23   with marketing incentives and marketing the spread and so

24   forth.  So I can see no reason at all that these materials do

25   not get searched for and produced in this case.

1      Thank you.

2      THE COURT:  To be produced.

3      MR. WINCHESTER:  Your Honor, could I inquire just

4  briefly about that.  Is it the Court's ruling that the

5  personnel files be produced in their entirety or simply that we

6  review them and produce any material that would be responsive?

7      THE COURT:  No, I think what is responsive to the

8  interrogatory because people have all other kinds of

9  information that's totally irrelevant.

10      MS. BROOKER:  Yeah, I mean, there may be, we don't

11  want irrelevant stuff, Your Honor, and we're happy to, it's a

12  document request, not an interrogatory, but we're happy to

13  specify that.

14      THE COURT:  You don't need copies of peoples' degrees

15  and--

16      MS. BROOKER:  Exactly.

17      THE COURT:  --things like that.

18      MR. WINCHESTER:  But to the extent if we review a

19  personnel file and there's absolutely nothing in there from

20  which you could possibly argue that somebody was talking about

21  marketing based on spread or compensated based on marketing,

22  based on spread, it wouldn't be the Court's view they'd be

23  entitled to that file, would it?

24      MS. BROOKER:  I'd like to respond to that and

25  Mr. Breen is saying he would like to respond.  Your Honor, I

I - 57

1   would say we will be the judge of that.  It's a finite set

2   of materials.  How they were evaluated may be inculpatory or

3   exculpatory, but it is important to see whether there are

4   specific goals involved, reimbursement, AWP.  We don't want to

5   leave this.  This is Abbott's position throughout which is

6   making discovery like pulling teeth.

7            THE COURT:  I've ruled, that which is not relevant

8   should not be produced and if there is no information in the

9   file relating to the request, the file is not produced.

10           MR. WINCHESTER:  Thank you, Judge.

11           THE COURT:  The time is getting short, so--

12           MS. BROOKER:  Yes, Your Honor, the next category of

13  documents, again, finite discrete set of documents, and

14  specifically they are, there was a Tap settlement in this case.

15  Tap was a joint venture between Abbott and another entity.  We

16  are not asking that the Court require Abbott to produce

17  everything they produced in the Tap case or everything relevant

18  to the TAP case.

19           THE COURT:  the Tap case in this Court?

20           MS. BROOKER:  Yes, Your Honor.  Very specific, at the

21  time that the Tap settlement took place, Abbott, around that

22  same exact time changed dramatically its prices which is in

23  large part the reason for the cutoff of the year 2001 for this

24  lawsuit.  When we say okay your damages is stop, we believe

25  that the Tap settlement, which again it related to a different

1    drug, it was Lupron, but it was the same exact conduct, we

2    believe that there were high level discussions within Abbott

3    which caused them to start reporting accurate prices, which is

4    the very crux of this case.  So what we asked for, and I guess

5    there's generally two categories, but the first category, which

6    is specifically laid out, what we call Tap impact documents,

7    and all we mean by that are any, I don't want to mis-cite what

8    we wrote, but it was basically very specific, any documents

9    that relate to discussions within Abbott not limited to

10   hospital products division but among high level corporate

11   individuals anything from their Medicare working group or

12   wherever the documents come from that discuss how they reacted

13   basically to the Tap settlement because we do believe it may

14   have impacted the price reporting changes that they made in

15   this case which again is the crux of this--

16            THE COURT:  How are they reactive?  I mean, be a

17   little more specific than that, I'm afraid.

18            MS. BROOKER:  Yeah, I mean, Mr. Breen said he can

19   help with that if he's allowed, if he's permitted to respond to

20   that, but here's what, here's how we've drafted it, all

21   documents relating to or otherwise regarding the impact of the

22   2001 Tap pharmaceuticals criminal plea and civil settlement on

23   the prices or practices, excuse me, or pricing practices for

24   Abbott's pharmaceuticals.  So, you know, it's broad.  Abbott

25   has to interpret just like any document request.  We don't know

1   what they have internally so we can't be more specific than

2   that.  But again, it goes, we're not asking for everything that

3   was produced in Tap to be produced here.  We're asking for that

4   finite set.  And the second set of Tap documents that I will

5   mention relating back to the earlier argument that we had on

6   the first motion before the Court, there are documents produced

7   by Abbott and produced by Tap that other states have received

8   from Abbott or from another entity in the Tap litigation that

9   have very highly relevant witnesses in this case working for

10  Abbott, have their name on those documents.  One witness, Ms.

11  Tobiason, who was just deposed for a second time yesterday, and

12  she was shown Tap documents which show that Tap was consulting

13  with hospital product division personnel on reimbursement and

14  spread and average wholesale prices very relevant to this case.

15  So there's also another set of documents.  We're not asking

16  Abbott to go back and search for that set.  We're just asking

17  that they be again allowed to be shared, some of which are

18  being shared because they're used at depositions.  But

19  obviously at a deposition, you can't ask a witness about, you

20  know, 100 documents, because there's just no time.  We want all

21  the documents that they produced related to these issues that

22  impact our case to be shared with us.  Again, there's no burden

23  to Abbott, and I don't know if Mr. Breen--

24        MR. BREEN:  Just a quick point here, Judge, and it

25  shows, I know a lot about Tap from the other litigation, and we

1   know, and we've got a little bit of corroboration already

2   that we could get even with the documents we got from Abbott in

3   this case, that they restructured their entire way of doing

4   business on the heels of the Tap and Ross settlements.  They

5   paid well over a billion dollars already for the same kind of

6   conduct and to a great degree we're talking about here, but

7   also for example Abbott's former president, Thomas Hodgson,

8   went over to run Tap.  He gave me highly relevant deposition in

9   the Tap case.  We had to move to compel to get it in the Texas

10   case.  It talks about the spread and knowledge – (inaudible -

11   #3:29:58) – about it.

12          In this case, Abbott, I too the 30(b)(6) document

13   witness, Ellen Klauss, she says they hadn't even searched

14   Abbott's corporate hierarchy for documents responsive to the

15   government's request in this case ever.  She testified to that.

16   Now, Thomas Hodgson, I got his deposition in the Texas case.  I

17   can't turn, I can't show it to Ms. Brooker because it's

18   declared confidential in the Texas case.  It wasn't taken in

19   the Texas case.  We got it through a motion to compel in the

20   Texas case.  We've already been over that ground.  So the Tap

21   and Ross reactions, Miles White, their CEO, got a letter from

22   Pete Stark, the ranking member--

23          THE COURT:  We know who he is.

24          MR. BREEN:  Well, weighs and means, okay, there was

25   all kinds of reactions going on about that time where Abbott

I - 61

1    changed their policy and they had to change it from

2    something and we all, you know, subsequent other measures may

3    not be admissible at trial but they're certainly discoverable

4    so that we can get a feel for and work back from what they did

5    to establish the truth and the facts in this case.  That's all

6    we're trying to do.

7              Thank you.

8              THE COURT:  Mr. Winchester.

9              MR. WINCHESTER:  Briefly, Your Honor.  Obviously

10   let's bring this back to what this case is and what it isn't.

11   Tap is not a defendant in this case.  Lupron is not a drug at

12   issue in this case.  The 2001 settlement that they want to talk

13   about is a criminal plea for Tap where it pled guilty, Tap, not

14   Abbott pled guilty to one single count having to do with--

15             THE COURT:  I remember this well.

16             MR. WINCHESTER:  Okay.  So this is the three samples

17   that were then billed for, not AWP.  Okay?  So this case is not

18   about Tap, it's not about Lupron.  I think Your Honor hit the

19   nail on the head.  There isn't anything even vaguely focused or

20   pointed about this request nor relevant to this case.

21   Mr. Breen talks about Texas, and I think that actually is

22   relevant because what they did in Texas was request this very

23   same information from Judge Jenkins.  We objected and he

24   sustained that objection.  They did not get a 30(b)(6) witness

25   to talk about--

1          THE COURT:  This is what happens when you get to

2     4:00.  Everybody--

3          MR. BREEN:  That's right.  I'm sorry.

4          MR. WINCHESTER:  --but we attached those papers to

5     our response.  Your Honor can see that.  They asked to have

6     Abbott designate a 30(b)(6) witness to talk about this, what

7     impact did the Tap settlement have on Abbott, whatever that

8     means, and the judge said, no, you don't get that.  It's not at

9     issue in the case.  It's no more at issue here than it is

10    there.

11         In terms of I guess counsel's statements which is

12    well, Abbott may have changed the way it did business as a

13    result of seeing what happened in Tap, to the extent they're

14    trying to discovery things about this reduction of price in

15    2001, which by the way is where their complaint ends, then

16    we've already told them we're giving them all the non-privilege

17    documents that have to do with the reduction of prices for

18    these drugs that happen in 2001.  They're getting those

19    documents.  This class of things--

20         THE COURT:  All right.

21         MR. WINCHESTER:  --class of things they're talking

22    about is outside the case.

23         THE COURT:  Denied without prejudice at this time,

24    maybe to be renewed upon at further showing down the road.

25    Right now I don't see the relevance.

1          MS. BROOKER:  Okay.  Thank you, Your Honor.  I

2    appreciate that.

3          THE COURT:  How much more do we have?

4          MS. BROOKER:  Two more categories of documents and

5    then a motion to compel 20 interrogatories, which I hopefully

6    can summarize for you, interrogatory responses.

7          Okay.  The next category of documents are all

8    documents relating to the drug vancomycin, one of the four

9    subject drugs in this case.  We have gone around and around

10   with Abbott on this issue.  Frankly, Your Honor, we never feel

11   as though we have any firm representation from them that we

12   have received all the vancomycin documents.  The drug was first

13   marketed I believe around 1988, so we've asked for the

14   documents to be produced relative to vancomycin back to 1988.

15   It's not too far prior to 1991.  Obviously, you know, launch

16   documents and other types of documents would be relevant.  I

17   know that Abbott has represented most recently in its

18   opposition to this specific request what they've already

19   searched for and produced to us and that they searched for them

20   back in 1996 pursuant to the government's first civil

21   investigative demand, and if I understand, maybe I don't, but

22   if I understand correctly their position is that they're not

23   going back and searching again.  And I will say that their

24   corporate designee on this issue, Ellen Klauss, who just

25   testified in this case maybe four weeks ago, maybe a little bit

1  longer, my understanding of her testimony on this issues is

2  that at that time they did not search back as far as 1988.

3  Now, I know Abbott's counsel is going to stand up here and say,

4  for the group of documents we produced in other cases that we,

5  that relate to vancomycin back to 1998, we'll give you those,

6  and maybe they're going to represent they already have because

7  we just got a small number of documents in the last week or

8  two, but that's not a representation that they had searched for

9  and produced all those documents.  The other bit of testimony I

10  believe from Ms. Klauss is that they never searched for

11  documents relevant to that drug outside of the hospital

12  products division, and for Abbott to stand up here and say that

13  only documents in the hospital product division are relevant,

14  that's not true either.  We have seen in other cases where

15  Abbott's produced documents that, a lot of relevant documents

16  from corporate offices and not just that one single operating

17  division are relevant, so we want a representation that Abbott

18  either has or is going to produce to us and search again for

19  all documents relevant to the drug vancomycin, particularly

20  because it is one of the four subject drugs.

21          Thank you.

22          MR. WINCHESTER:  Judge, we're not sure why this

23  motion got filed for vancomycin.  They talk about back and

24  forth, but I've been clear in every letter, every conversation,

25  clear in our brief.  They've asked for documents on the

1    marketing, pricing and sale of vancomycin.  That is one of

2    the subject drugs.  We've agreed to give them those documents.

3    That's not at issue.  Why they moved, I have no idea other than

4    to reach this point of pre `91 documents.  For the pre `91 let

5    me state very briefly, if they serve a CIB on Abbott back in

6    1996 that requested documents dating back to 1986, Abbott

7    responded.  They have or if they don't have them already we've

8    agreed to give them, any document pre `91 on vancomycin that's

9    been produced in any other case.  They're going to get those.

10   They have documents pre `91.  I've been in depositions where

11   they've used documents pre `91.  The question is should we in

12   this case now have to go back and research again, and it isn't

13   as simple as just saying, oh, grab that box of pre `91 stuff.

14   It's literally going back and looking in every place we ever

15   looked before.  There's no reason to do it here.  Judge Saris

16   has set in the MDL discovery starting in `91 as far as we're

17   aware of all these 25 or so AWP related cases nobody has forced

18   discovery prior to 1991, that's years before the act on which

19   they're complaint is based was even enacted.  It's before the

20   time that they've alleged specifically in their complaint as

21   when the misconduct they've charge occurred.  There is no

22   reason to force Abbott to go back through this.  It's not an

23   easy undertaking.  The burden clearly outweighs the benefit of

24   getting these ancient documents, whatever additional ones there

25   might be that they don't already have, let me make that clear.

1          MS. BROOKER:  Your Honor, again, we--

2          THE COURT:  I'm inclined to agree with Abbott on this

3     one.

4          MS. BROOKER:  Your Honor, we have - I'm sorry.  Do

5     you want to say something, Jim, you should stand up, but we

6     have concerns about the testimony of their corporate designee.

7     We don't believe that the representations that were just made

8     are consistent with her testimony.  We do not believe that

9     there were ever thorough searches done, and I will tell the

10    Court that since we have been involved with Abbott in this

11    discovery, according to the corporate designee and frankly

12    according to the representations of counsel, Abbott has done

13    very little, if any, additional searches.  They are producing,

14    everything that we've gotten is pretty much by and large what

15    they said we should expect to get other than a few trickling

16    little documents, but we have new document requests.  We are

17    not bound by whatever we put in a CID at an investigative stage

18    in 1996.  Abbott is not spending very much time at all

19    searching for documents.  They say, look, whatever we gave

20    everyone else cherry picked, we're giving to you and hardly

21    any, and new searches were being done and that was confirmed by

22    Ms. Klauss.  We have sued Abbott on these drugs.  They are very

23    relevant.  They can't run from the fact that it's a subject

24    drug.  They have not stated any burden.  You can't just vaguely

25    state burden without more than that.  They should be in a

1  position to go back and search for documents, no different

2  than the government is having to search ancient files to

3  produce documents to Abbott even though we believe most of what

4  they're asking for is irrelevant.  You don't, you know, I have

5  to represent, Your Honor, you don't see Abbott here with a

6  bunch of motions against the government because we have been

7  running circles around ourselves trying to give them everything

8  that they ask for no matter how irrelevant it is, while on our

9  end they bicker with ever set of categories that we set forth

10  even though they're specific.  So I would say Abbott is

11  obligated in this litigation to go back and search for

12  vancomycin documents.

13          THE COURT:  Denied at this time.

14          Now, as to the next motion--

15          MS. BROOKER:  There's one last category--

16          THE COURT:  Is there one more?

17          MS. BROOKER:  Yes, alternate site customers, Abbott

18  has agreed, and I'm trying to shortcut this for Your Honor,

19  Abbott has agreed to produce documents with regard to its

20  largest customers, which is 80 percent of its customers, we

21  accept that representation they've made to us.  The 20 percent,

22  there are, granted thousands of customers, so we, without

23  knowing more Abbott has stated that that would be burdensome.

24  But again, Abbott is not giving us any detail about the burden.

25  We have always just like with respect to vancomycin and other

1  categories, made ourselves open to discussing and weighing

2  the burden, but for them to come forward and say we're not

3  doing any searches at all for specific categories because it's

4  burdensome without more, we need more than that.  If they're

5  going to tell us, well, we can search current files or we can

6  search, you know, this subset, we may be able to go back and

7  forth with them, but they just basically said no.  You're not

8  getting documents on the 20 percent of customers, and, you

9  know, we believe that those documents are relevant.  Now, the

10 one thing that I will say that we will accept here today, if

11 Abbott wants to stipulate, which I doubt seriously it's

12 prepared to do, that it is not going to be producing testimony

13 or evidence or seeking to do that at trial of any of those

14 customers that relate to the 20 percent that they say they're

15 not producing and that are not burdensome, and if they're

16 willing to stipulate that we're not going to hear from any of

17 those customers at trial, then we're willing to consider

18 withdrawing our document request, but as far--

19        THE COURT:  All right.  Denied without prejudice at

20 this time.  They're given 14 days to make a decision.

21        MS. BROOKER:  I'm sorry, Abbott is given 14 days to

22 make a decision about that stipulation?

23        THE COURT:  Exactly.

24        MS. BROOKER:  Okay.

25        MR. BREEN:  Can I just add one point to that, Your

1   Honor?  The key thing in that stipulation too is not only

2   hearing from those customers but they're not going to put their

3   customer's prices into evidence.  That's critical because I

4   don't want to hear about some customer paid some high price

5   that I didn't know about before trial.

6           THE COURT:  All right.  I'm not going to get to 4060,

7   docket entry 4060 simply because it's after 4:00, and I have

8   some commitments upstairs.  That leaves at least four motions

9   for the next hearing.  What I suggest you do after we adjourn

10  here today is to confer with Mr. Duffy and see if you can pick

11  a mutually convenient date.

12          MS. BROOKER:  Thank you for that, Your Honor.

13          THE COURT:  I will take under advisement 3529, 3540,

14  3849 and on 4047, the ruling will reflect as ruled in open

15  court.

16          MR. DALY:  Your Honor, may I raise one important

17  issue as a result of one of your rulings?  On the AMP issue,

18  Judge, AMP is a very confidential thing.  It's not shared among

19  companies.  It's not shared, states don't have that

20  information.  Even when we give it to Medicaid or to CMS,

21  Medicaid doesn't share it with Medicare, the two divisions.

22  The problem I want to raise is that if we give it to them

23  pursuant to your order, remember you've ordered that the

24  government can then share that with everybody.  So boom, all of

25  our confidential AMP information goes out from the government

1   to everybody.  Meanwhile, Mr. Breen is in the Texas case,

2   he'll have the information.  He's got a protective order in

3   that case that allows him to share it with anybody who comes in

4   and signs an undertaking, so the issue quickly is, we've got

5   real confidentiality concerns and I guess I would ask the court

6   to at least maybe subject to additional paper, although I hate

7   to bring the court, that we don't allow your order to say that

8   they can transmit it to everybody else.

9          THE COURT:  All right.  Can you work out a

10  stipulation as to these particular documents?

11         MS. BROOKER:  Well, they should be allowed to be

12  provided to any states if what we're talking about is other

13  defendants, that's another matter, and I do believe that that

14  is something that is really something that Abbott counsel

15  should be working out with the other defendants.

16         MR. DALY:  Judge, none of the other states have sued

17  us, and for the Medicaid rebates are not in the cases except in

18  the couple where they have suits.  This allows them a wholesale

19  sharing of any state they want.

20         THE COURT:  I'll give you 14 days to try to work out

21  a stipulation.

22         MR. DALY: Thank you, Your Honor.

23         THE COURT:  And if you can't, come back and—

24         MS. BROOKER:  Thank you, Your Honor.

25         THE COURT:  All right.  All right.  We stand in

I - 71

1   recess.

2            MR. DALY:  Thanks for your time, Your Honor.

3            MS. BROOKER:  Have a good day, Your Honor.

4   //

5   //

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.


_____                    May 21, 2007
                                             _____

Maryann V. Young_____