# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------x

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-A-Care of | : Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc., | : Chief Magistrate |
| No. 06-CV-11337-PBS | : Judge Marianne B. |
| | : Bowler |

---------------------------x

HIGHLY CONFIDENTIAL

Tuesday, March 20, 2007

The video 30(b)(6) deposition of VICTORIA ROBEY, called for oral examination by Counsel for the Defendant Abbott Laboratories, Inc., pursuant to notice, held in the law offices of Hogan & Hartson, 111 South Calvert Street, Baltimore, Maryland 21202, beginning at 9:20 a.m., before

Page 2

1  Carol J. Robinson, Registered Professional
2  Reporter and a Notary Public, when were present:

Page 3

1           APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFFS:
4  United States Department of Justice
5  BY:  ANA MARIA MARTINEZ, ESQUIRE
6  Assistant United States Attorney
7  Southern District of Florida
8  99 N.E. 4th Street
9  Miami, FL 33132
10 (305) 961-9431
11
12 Department of Health and Human Services
13 BY: LESLIE M. STAFFORD, ESQUIRE
14 Office of General Counsel
15 CMS Division
16 7500 Security Boulevard
17 Baltimore, Maryland 21244
18 (410) 786-9655
19
20
21
22 (CONTINUED)

Page 4

1     APPEARANCES (CONTINUED)
2
3  BERGER & MONTAGUE, P.C.
4  BY: SUSAN SCHNEIDER THOMAS, ESQUIRE
5  1622 Locust Street
6  Philadelphia, PA 19103
7  (215) 875-3000
8  sthomas@bm.net
9
10 ON BEHALF OF DEFENDANT ABBOTT LABORATORIES:
11 JONES DAY
12 BY: R. CHRISTOPHER COOK, ESQUIRE
13    LOUIS GABEL, ESQ.
14 51 Louisiana Avenue, N.W.
15 Washington, D.C. 20001
16 (202) 879-3939
17 christophercook@jonesday.com
18
19
20
21
22 (CONTINUED)

Page 5

1     APPEARANCES (CONTINUED)
2
3  ON BEHALF OF DEY, INC.,
4  DEY, LP AND DEY, LP, INC.:
5  KELLEY DRYE & WARREN LLP
6  BY: ANTONIA F. GIULIANA, ESQUIRE
7  101 Park Avenue
8  New York, New York 10178
9  (212) 808-7609
10 agiuliana@kelleydrye.com
11
12 ON BEHALF OF ROXANNE LABORATORIES:
13 KIRKLAND & ELLIS
14 BY:  JARED T. HECK, Esquire
15 200 East Randolph Drive
16 Chicago, IL 60601
17 312-469-7087
18 jheck@kirkland.com
19 (via telephone)
20
21
22 (CONTINUED)

126bfa54-4e4e-49ff-85e7-999d676a1331

Page 6

1         A P P E A R A N C E S (CONTINUED)
2
3  ON BEHALF OF SCHEIRING-WARRICK CORPORATION:
4  ROPES AND GRAY
5  BY: JOBE G. DANGANAN, Esquire
6  One International Place
7  Boston, MA 02110-2624
8  (617)951-7290
9  jobe.danganan@ropesgray.com
10 (via telephone)
11
12 ON BEHALF OF BAXTER HEALTHCARE:
13 DICKSTEIN SHAPIRO
14 BY: TINA D. REYNOLDS, Esquire
15 1825 Eye Street NW
16 Washington, DC 20006
17 (202) 420-4114
18 reynoldst@dicksteinshapiro.com
19 (via telephone)
20
21
22 (CONTINUED)

Page 7

1         A P P E A R A N C E S (CONTINUED)
2
3  ON BEHALF OF ASTRAZENECA:
4  DAVIS POLK & WARDWELL
5  BY: CATHERINE LIFESO, Esquire
6  450 Lexington Avenue
7  New York, NY 10017
8  (212)450-4452
9  catherine.lifeso@dpw.com
10 (via telephone)
11
12 Also Present: Michael Hunterton, Videographer
13
14
15
16
17
18
19
20
21
22

Page 8

1                   C O N T E N T S
2  EXAMINATION OF VICTORIA ROBEY              Page
3  By Mr. Cook................................ 11
4  By Mr. Heck................................ 187
5
6                   E X H I B I T S
7  Number      Description             Page
8  Exhibit Abbott 069 Memo Dated 5-21-92
9           w/Attachments................ 20
10 Exhibit Abbott 070 Document Entitled
11          Original Complaint........... 75
12 Exhibit Abbott 071 Abbott Laboratories,
13          Inc.'s Notice of
14          30(b)(6) Deposition of
15          Plaintiff The United
16          States of America............ 86
17 Exhibit Abbott 072 Group Exhibit Consisting
18          of Memo dated 6-8-92 with
19          attachments.................. 88
20 Exhibit Abbott 073 Document Retention
21          Schedule..................... 154
22

Page 9

1        THE VIDEOGRAPHER: Good morning.
2  This is the videotape deposition of Vicky Robey
3  taken by the defendant party in the matter of In
4  Re Pharmaceutical Industry Average Wholesale
5  Price Litigation, MDL Number 1456, Civil Action
6  Number 01-CV-12257-PBS before the United States
7  District Court for the District of Massachusetts.
8        The date is March 20, 2007 and this
9  deposition is being held at Hogan and Hartson,
10 111 South Calvert Street in Baltimore, Maryland.
11 The time on the monitor is 9:20 a.m.
12       My name is Michael Hunterton and I am
13 the certified videographer associated with the
14 firm of Henderson Legal Services located at 1015
15 Fifteenth Street, Northwest in Washington, D.C.
16 The court reporter is Carol Robinson, associated
17 with the same firm.
18       Will counsel on the telephone please
19 introduce themselves for the record?
20       MR. HECK: This is Jared Heck with
21 Kirkland & Ellis, LLP. I represent Defendant
22 Roxanne Laboratories, Incorporated and several

### Page 22

1  contractors and CMS, our staff, that they were to
2  preserve specific documents for other
3  litigations.
4      Q   Who was the author of those
5  documents?
6      A   I was the author -- it's -- there are
7  various authors throughout CMS, depending on
8  where the documents were.
9      Q   I suppose I should have asked first,
10 how big a pile of documents are we talking?
11     A   Not very.
12     Q   A dozen pages, two dozen pages?
13     A   Approximately no more than two dozen
14 pages.
15     Q   All right. You indicated that you
16 were the author of some, other people within CMS
17 were the author of others?
18     A   Yes.
19     Q   Were any of them authored by
20 attorneys?
21     A   I don't recall.
22         MR. COOK: Okay. Just so I know

### Page 23

1  whether to be cautious about it, are any of those
2  -- are you asserting privileges to any of those?
3         MS. MARTINEZ: Yes. There may be
4  privileges to some.
5         MR. COOK: Okay.
6         BY MR. COOK:
7      Q   Who were the recipients of those
8  documents?
9      A   CMS staff and our Medicare
10 contractors.
11     Q   Were any of the recipients
12 specifically attorneys, addressed to attorneys?
13     A   Not that I recall.
14     Q   Did those documents relate to in any
15 way this litigation, that is, the Ven-a-Care ex
16 rel. United States versus Abbott litigation, to
17 the best of your knowledge?
18     A   I don't think so, no.
19     Q   Did those documents relate to the
20 collection or preservation of documents relating
21 to either drug pricing or drug reimbursement?
22     A   Not that I recall.

### Page 24

1      Q   I'd like to go through the documents
2  I just handed you in Exhibit Abbott 069. As I
3  understand, they are out of Bates number order
4  although they are all there. They are in date
5  order. And so if you could just -- I'd like to
6  go through page by page and have you describe for
7  me what each of them is.
8          The first is -- and I'll describe it
9  just for the record so we have an idea what we
10 are looking at, it's page 8, Bates number page
11 0008, is dated May 21, 1992. It purports to be
12 from the Chief, Distribution Management Branch of
13 OBA to regional office records liaison officers
14 regarding freeze on all Medicare claims at the
15 Federal Records Center, and it's signed by Jane
16 Eagan, E-A-G-A-N. It's copied to the director of
17 OFO, the director of BPO, with blind copies to
18 Bill Zavoina, Z-A-V-O-I-N-A; Don Posen,
19 P-O-S-E-N; Les, L-E-S, Horneman, H-O-R-N-E-M-A-N;
20 and Lee, L-E-E, Mosedale, M-O-S-E-D-A-L-E.
21         Are you familiar with this document?
22     A   Yes. I wrote it.

### Page 25

1      Q   You wrote it?
2      A   Yes.
3      Q   You aren't Jane Eagan, are you?
4      A   No, I'm Vicky Robey, down at the
5  bottom.
6      Q   Could you tell me what the document
7  is?
8      A   Yes. This is a notice that went out
9  to our regional records liaison officers. They
10 were to notify the Medicare contractors to
11 preserve all Medicare claims records. This was a
12 result of a notice that CMS received from the
13 Department of Justice through our general
14 counsel, asking them not to destroy any records.
15     Q   You say Medicare claims records.
16 What is a Medicare claim record?
17     A   A form 1500. It's what the doctors
18 fill out, hospitals fill out for Medicare
19 patients as far as patient back from CMS.
20     Q   And in 1992, that was a paper
21 document or was it electronic?
22     A   Both formats.

Page 26

1  Q  Other than the actual 1500 which I
2  understand is a single piece of paper, right?
3  A  Yes.
4  Q  Other than the 1500, did this freeze
5  notice apply to any other documents.
6  A  It was anything that pertained to
7  Medicare claims and/or payment records.
8  Q  Could you give me an example of what
9  that would include?
10 A  I don't know off the top of my head.
11 It is listed in our agency's records schedule.
12 Q  Oh, okay.  So, when we get to the
13 document, I guess there is a '98 document
14 retention policy and a 2004 document retention
15 policy that were produced in this litigation,
16 that would have a list of what's included in a --
17 A  It would give you a --
18 Q  -- claims record?
19 A  A description of it, yes.
20 Q  Okay.  But, for example -- I am just
21 guessing here, tell me if I have guessed right --
22 if there was some sort of a remittance, perhaps,

Page 27

1  would it be included?
2  A  Yes, if it dealt with payment.
3  Q  Okay.  So, it deals specifically with
4  the submission of the claim and the payment for
5  the claim?
6  A  Yes.
7  Q  To your knowledge, is this freeze
8  from May of 1992 still in place?
9  A  Yes, it is.
10 Q  And so in 1992, how far back did
11 Medicare have claims that it was freezing?
12 A  1986.
13 Q  And so as a result of this May 1992
14 freeze, all HCFA 1500s and whatever other related
15 documents are within the Medicare claims policy
16 description --
17 A  Yes.
18 Q  -- would be in existence from 1986
19 through today?
20 A  Correct.
21 Q  I'm getting a bit ahead of myself but
22 that sounds like an awful lot of pieces of paper

Page 28

1  and electronic forms.
2  A  Yes, it is.
3  Q  How did you keep them all?
4  A  How do we keep them all?  I can
5  address the paper issue.
6  Q  Okay.
7  A  In the beginning, our Medicare
8  contractors used the National Archives Federal
9  Record Centers to store their records.  That's
10 where they still are.
11     When we implemented this freeze, we
12 notified the National Archives that we were not
13 going to be able to destroy the records.  They
14 came back to us and said that they could no
15 longer accept any additional records but they
16 would keep the ones that they had.  We then
17 instructed our Medicare contractors to procure
18 offsite storage for those records, and that's
19 what they continued to do.
20 Q  In 1992, do you know what percentage
21 of Medicare claims were paper versus electronic?
22 A  No, I don't.

Page 29

1  Q  Now, I assume they have got to be all
2  electronic, is that correct?
3  A  I don't know the ratio.
4  Q  So, you are still getting some paper
5  claims even today?
6  A  Yes.
7  Q  What was the solution that you
8  implemented in terms of non-Federal Records
9  Center offsite storage?
10 A  The Medicare contractors were
11 instructed to find facilities that closely --
12 that closely or met so that it protected the
13 records.  They had to do a facility.
14 Q  So, it is carrier by carrier has some
15 sort of offsite storage?
16 A  Yes.
17 Q  And that would be for the claims
18 submitted to that carrier, presumably?
19 A  Yes.
20 Q  So, if I am Blue Cross/Blue Shield, I
21 preserve the claims that are submitted to Blue
22 Cross/Blue Shield?

Page 30

1    A    Yes. Blue Cross and Blue Shield
2    would be the ones to do the storage.
3    Q    So, if one were to try to retrieve --
4    to pick an example, if a patient was seen by
5    Ven-a-Care and received administration of an
6    Abbott drug like Comasin and submitted a claim to
7    Medicare, was paid that claim, whoever the
8    carrier was would, according to your instructions
9    have kept that HCFA 1500 for the claim and
10   payment?
11   A    Yes.
12        MS. THOMAS: Objection to form.
13        BY MR. COOK:
14   Q    How would I go about finding it? If
15   I knew a particular patient on a particular date,
16   how would I go about retrieving that HCFA 1500
17   form?
18        THE WITNESS: You would have to --
19        MS. THOMAS: Objection.
20        BY MR. COOK:
21   Q    You can answer.
22   A    You would have to go to the carrier

Page 31

1    that has that claim stored.
2    Q    Do you know how the carriers index
3    these? Because I imagine it is a pretty large
4    volume of the documents.
5    A    No, I don't.
6    Q    Have you ever been involved in
7    retrieving claims forms or claims data from the
8    carriers?
9    A    I have not, no.
10   Q    Who does that?
11   A    Someone in CMS in the program area.
12   Q    Okay. So, there would be someone in
13   CMS, presumably not you, who has the
14   responsibility for retrieving claims forms from
15   the carriers when there is a need for that
16   particular piece of paper?
17   A    Yes.
18   Q    What was the impetus for this
19   May 1992 freeze?
20   A    Medicare secondary payer.
21   Q    And was that -- I assume that was
22   litigation?

Page 32

1    A    Yes.
2    Q    Was that litigation initiated by the
3    government or against the government?
4    A    I don't know.
5    Q    Okay. I asked it because I don't
6    know. What was the Medicare secondary payer
7    litigation about, do you know?
8         MS. MARTINEZ: Objection in two ways.
9    One, it may call fir -- to the extent it may call
10   for communications with counsel and number two,
11   she is not a lawyer.
12        MR. COOK: Sure.
13        BY MR. COOK:
14   Q    I understand you are not a lawyer and
15   I'm not trying to pry into attorney-client
16   communications but if you have an understanding
17   of what the underlying litigation was about that
18   precipitated this May 1992 freeze, can you tell
19   me what your understanding is?
20   A    It was when Medicare was the primary
21   pay -- Medicare paid the primary and if the
22   person had secondary insurance, then the

Page 33

1    secondary insurance would kick in. But it should
2    be the other way around. The primary insurance
3    should have kicked in first and then Medicare
4    would have been the secondary payer.
5    Q    And I take it from this memo, it
6    indicates that on May 6, the Department of
7    Justice requested HCFA, that's H-C-F-A, to freeze
8    all Medicare claims and payments records because
9    of current and future litigation and indicates
10   there is an attachment. Did you see that May 6
11   communication from DOJ?
12        MS. MARTINEZ: Objection.
13   Privileged. We did redact that attachment.
14   That's why you don't have it.
15        BY MR. COOK:
16   Q    Without getting into what the
17   substance of it is, did you see the May 6
18   communication?
19   A    Yes.
20   Q    And so according to this memo, DOJ
21   asked HCFA to freeze a universe of documents.
22   Correct?

Page 34

1  A  Yes.
2  Q  And CMS did so?
3  A  Yes.
4  Q  And by this indication, it looks like
5  CMS did so within 15 days.
6  A  Yes.
7  Q  And has done so for the last 15 years
8  or approximately?
9  A  Uh-huh.
10  Q  You have to say yes.
11  A  I'm sorry. Yes.
12  Q  Has continued to do so?
13  A  Yes.
14  Q  Effectively?
15  A  Yes.
16  Q  Before going on to the next document,
17  are there any other instances that you are aware
18  of that DOJ has asked HCFA or I guess now CMS to
19  freeze documents in connection with litigation?
20      MS. MARTINEZ: Objection to the
21  extent that it calls for privileged
22  communications.

Page 35

1      MR. COOK: Okay.
2      BY MR. COOK:
3  Q  Are you aware of any other instances
4  in which -- again, I don't know to know your
5  conversations with your lawyers but are you aware
6  of any other instance in which DOJ has asked HCFA
7  to freeze documents in connection with
8  litigation?
9  A  I'm not sure if what I am aware of
10  was issued by Department of Justice.
11  Q  Let me come back from the other way.
12  Are you aware of any other instances other than
13  this in which HCFA is currently or has frozen
14  documents since 1992 because of pending
15  litigation?
16  A  Yes.
17  Q  Approximately how many?
18  A  Maybe around nine or ten.
19  Q  So, less than one a year on average--
20      MS. THOMAS: Objection.
21      BY MR. COOK:
22  Q  -- for the last 15 years?

Page 36

1      MS. MARTINEZ: Objection to the form.
2      BY MR. COOK:
3  Q  You're right. I'm asking that in a
4  bad way. When you say nine or ten, are you aware
5  of nine or ten that have been instituted or nine
6  or ten that are in place now?
7  A  Nine or ten that were instituted.
8  Q  And some have expired or are they all
9  still in place?
10  A  I don't think any of them have
11  expired. They are all still being frozen.
12  Q  Sure. And I got ahead of myself with
13  this document and I apologize. I'd like to go
14  back a little bit and just go over your
15  background and what you do. That's my fault.
16  Tell me, where did you go to school?
17  A  Catonsville High School.
18  Q  Where did you go to school after
19  Catonsville High School?
20  A  Nowhere else.
21  Q  And what did you do after high
22  school?

Page 37

1  A  I started to work for government.
2  Q  Where did you start work for
3  government?
4  A  It was the bureau of Health Insurance
5  when they were part of the Social Security
6  Administration. I was a clerk-steno.
7  Q  Is that the predecessor to what is
8  now CMS or is that a different agency?
9  A  Originally it was the Bureau of
10  Health Insurance, then HCFA, and now CMS.
11  Q  When did you start working for the
12  government?
13  A  1973.
14  Q  And you say you started out as a
15  steno --
16  A  Clerk-stenographer.
17  Q  How long were you a
18  clerk-stenographer?
19  A  Approximately three or four years.
20  Q  And then can you give me just
21  generally what your progression through
22  government employment has been since then?

Page 66

1  subpoena in civil litigation and that there is
2  civil litigation going on, that the fiscal
3  intermediaries and carriers may have documents
4  responsive or relating to that litigation?
5      A    Uh-huh.
6      Q    And that should be an indication to
7  them that they should not destroy documents. Is
8  that what I understand you to be saying about the
9  implicit message of this memo?
10     A    And I can't answer to --
11          MS. THOMAS: Objection.
12          THE WITNESS: I can't answer to that
13 because I was not an author of this so I don't
14 know what -- what they were relaying.
15          BY MR. COOK:
16     Q    And I want to step completely out of
17 this memo and say when you say that it's an
18 indication to you that the existence of
19 litigation indicates you should preserve
20 documents, I'm just wondering how you came to
21 that understanding.
22          MS. MARTINEZ: Objection --

Page 67

1           MS. THOMAS: Objection.
2           MS. MARTINEZ: -- to the extent that
3  it calls for privileged communication.
4           BY MR. COOK:
5      Q    I don't want you to talk about
6  conversations with your lawyers but how did you
7  come to the understanding that if there is
8  litigation ongoing and you have documents
9  relating to that litigation, that one should
10 preserve those documents?
11          MS. THOMAS: Objection.
12          BY MR. COOK:
13     Q    If you remember.
14     A    I mean, that's just common sense.
15 You don't want to throw away things.
16     Q    Anything other than common sense?
17     A    Pardon me?
18     Q    Anything other than common sense?
19     A    No.
20     Q    No? Just self-apparent?
21     A    Yes.
22     Q    Everybody should know?

Page 68

1           MS. THOMAS: Objection.
2           BY MR. COOK:
3      Q    I apologize. Let me move on. I'm
4  asking you about a memo that you know nothing
5  about, and I know that's hard to do. I'm afraid
6  this one maybe similar but I do have to find out
7  if you had any involvement other than just
8  receiving it, Ms. Robey.
9           There is a November 18, 2003 memo.
10 For the record, it is documents 0003 through
11 0004. It is from, again, Gregory Carson. It's
12 directed this time not only to the fiscal
13 intermediaries and all carriers but to all
14 durable medical equipment regional carriers, and
15 this also has a similar subject. It is
16 coordination of responses to subpoenas and other
17 requests from outside entities regarding TAP, all
18 caps, T-A-P, Pharmaceutical Products, Inc. and
19 Lupron, L-U-P-R-O-N, Part II, Roman numeral II,
20 preservation of documents and contact
21 identification.
22          As a preliminary matter, were you

Page 69

1  also not involved --
2      A    Correct.
3      Q    -- in drafting this one?
4      A    Correct.
5      Q    But you received it?
6      A    Yes.
7      Q    Is it fair to say this document does
8  direct the addressees to preserve documents?
9      A    Yes.
10     Q    And it indicates, at least as of
11 November 18, 2003, that the recipients of the
12 memorandum should preserve documents that concern
13 TAP, Lupron, Zoladex, Z-O-L-A-D-E-X, drug
14 companies other than TAP, or any other drug
15 reimbursed by Medicare.
16          MS. THOMAS: Objection.
17          BY MR. COOK:
18     Q    Did you have any documents that you
19 preserved in response to this memorandum?
20     A    I myself or the agency?
21     Q    That's a silly question. You're not
22 an FI carrier or a DMU regional carrier, are you?

Page 70

1   A   No.
2   Q   So, you wouldn't preserve anything in
3   response to this, I take it?
4   A   (Witness shakes head.)
5   Q   Did you have any involvement with
6   this other than receiving it and putting in your
7   file?
8   A   No.
9   Q   In what capacity did you receive
10  this? Why did it come to you?
11  A   I'm listed as a cc on the second
12  page.
13  Q   Do you have any idea why you would
14  you be a cc to this memo to the carrier and the
15  FIs?
16  A   Because I'm the agency records
17  officer.
18  Q   So, you would keep a record of
19  directions to these outside entities to preserve
20  documents?
21  A   Yes.
22  Q   To the best of your knowledge, did

Page 71

1   the recipients of this memo comply with its
2   instructions?
3       MS. THOMAS: Objection.
4       THE WITNESS: I have no way of
5   knowing.
6       BY MR. COOK:
7   Q   You haven't heard that nobody did not
8   comply?
9   A   Correct.
10  Q   A double negative there.
11      The next memo is Bates numbered 0005
12  through 0007. For the record, I'll describe it.
13  It is dated February 19, 2004. It is addressed
14  to all center and office directors and regional
15  administrators. It is from Jacquelyn,
16  J-A-C-Q-U-E-L-Y-N, Y. White, who appears to be
17  the or purports to be, at least, the director,
18  Office of Strategic Operations and Regulatory
19  Affairs. The subject is Document Preservation
20  and Production, Lupron Marketing and Sales
21  Practice Litigation, and Pharmaceutical Industry
22  Average Wholesale Price Litigation. It has a

Page 72

1   portion of the second page redacted.
2       Ms. Robey, do you recognize Bates
3   numbered -- pages Bates numbered 5 through 7?
4   A   Yes.
5   Q   What is it?
6   A   It's a notice that was sent out to
7   CMS centers and offices asking them to identify a
8   person who is going to coordinate the discovery
9   request.
10  Q   Other than receiving this memo, were
11  you involved at all in the preparation of this
12  memo?
13  A   No, I was not.
14  Q   Prior to receiving this memo on
15  February 19, 2004, are you aware of any steps
16  that were taken to preserve documents as
17  described in this memorandum?
18  A   No.
19      MS. THOMAS: Objection.
20      BY MR. COOK:
21  Q   Sorry. We spoke over each other.
22  Was that no?

Page 73

1   A   No.
2   Q   Thank you. After receiving this memo
3   in February 2004, what role did you have in the
4   activities described in this memorandum?
5       MS. MARTINEZ: Objection to form.
6       BY MR. COOK:
7   Q   It was poorly phrased. I'll try it
8   again.
9       Ms. Robey, were you involved at all
10  actively in the preservation of records as
11  directed in this memorandum?
12  A   No because I did not keep these
13  records.
14  Q   And did you gather any documents
15  responsive to this particular request?
16  A   No.
17      MS. MARTINEZ: I just want to be
18  clear for the record that these questions you are
19  addressing to Vicky Robey as Vicky Robey, not
20  Vicky Robey at CMS; for example, when you ask her
21  did yourself gather any documents, I mean, you're
22  obviously asking Ms. Robey, not for her to answer

19 (Pages 70 to 73)

Page 74

1  on behalf of all of CMS with respect to this.
2        MR. COOK: Oh, sure.
3        BY MR. COOK:
4     Q   Oh, sure. We're not asking you what
5  you've done to gather documents. I'm not asking
6  for CMS to testify about what you, Vicky Robey,
7  did to preserve the documents.
8        MS. MARTINEZ: No, no. What I mean
9  is that you were not asking -- since this is a
10 30(b)(6) depo, I just want to be clear on the
11 record that that was not the answer on behalf of
12 CMS.
13       BY MR. COOK:
14    Q   Correct. That question and answer,
15 you were testifying as Vicky Robey, not as the
16 designee of the 30(b)(6). I should have made
17 that clear.
18       Back into character, though -- do we
19 have a copy of the complaint?
20       MR. GABEL: The original?
21       MR. COOK: Yes.
22       BY MR. COOK:

Page 75

1     Q   I'd like to show you real quickly --
2  we'll set those aside and come back it -- a copy,
3  I'll mark it as Exhibit Abbott 070.
4            (Exhibit Abbott 070,
5            document entitled Original
6            Complaint, was marked for
7            identification.)
8        MS. MARTINEZ: Could I see it before
9  you --
10       MR. COOK: Oh, absolutely. It is a
11 copy of -- that one is thicker because it is two
12 of them. It is a copy of the original complaint
13 filed by Ven-a-Care. It indicates on the cover
14 sheet that Ven-a-Care put on the document
15 Original Complaint filed on about June 23, 1996.
16 I believe that's incorrect for the record, that
17 it is 1995, inasmuch as the civil case number is
18 a '95 case number.
19       MS. MARTINEZ: Do you have an extra
20 copy that counsel for Ven-a-Care could use?
21       MR. COOK: Absolutely. Absolutely.
22       MS. THOMAS: Thank you.

Page 76

1        MR. COOK: Does anybody else need a
2  copy? I would love to get rid of them so I don't
3  have to carry them back.
4        BY MR. COOK:
5     Q   If you could just take a quick
6  moment, I realize that's a lengthy document but
7  take a look at it and tell me whether you've ever
8  seen that document before?
9        MS. THOMAS: You might want to
10 clarify whether you mean, whether she's ever seen
11 this document that may or may not have had these
12 redactions.
13       MR. COOK: Okay.
14       THE WITNESS: No. I've never seen
15 this before.
16       BY MR. COOK:
17    Q   Either with or without the
18 redactions?
19    A   No.
20    Q   And just for the record, on page 69,
21 it indicates that it was served on June 23 of
22 1995.

Page 77

1        To the best of your knowledge,
2  Ms. Robey, did CMS institute any document
3  preservation instruction in connection with this
4  complaint that was filed on June 23, 1995?
5     A   Not that I'm aware of.
6     Q   Going back to the February 19, 2004
7  memorandum included within Exhibit Abbott 069, are
8  you aware of any subsequent memoranda that were
9  issued relating to the litigation described in
10 this February 19, 2004 memorandum regarding
11 preservation of documents?
12    A   There was one after this in January
13 of 2007, I believe.
14    Q   And what did that one -- again, is
15 that a privileged communication?
16       MS. MARTINEZ: Objection to the
17 extent it calls for privileged communication.
18 You may be able to ask her if she has information
19 from anybody who is a nonlawyer regarding that.
20       BY MR. COOK:
21    Q   Just sticking with the memorandum and
22 then moving on to information from a nonlawyer,

Page 78

1  do you remember from whom the January 2007
2  memorandum was from?
3      A    It was from our program area -- I'm
4  trying to remember the lady's name, Mary Beth --
5  Mary Beth Jason, I think. I'm not sure about the
6  last name.
7      Q    Is she an attorney?
8      A    No.
9      Q    Without describing the contents of
10 the memorandum, can you describe generally what
11 the nature of the document was?
12          MS. THOMAS: Objection.
13          MS. MARTINEZ: If you would focus
14 your question with respect, if she has any
15 information from a nonlawyer regarding whether or
16 not that document instructed anyone to preserve,
17 you might be able to get an answer that is
18 helpful.
19          BY MR. COOK:
20     Q     Do you have any information from a
21 nonlawyer that would indicate whether that
22 document was intended to preserve documents

Page 79

1  relating to litigation?
2      A    Yes, I do.
3      Q    From whom do you have that
4  information?
5      A    It is from Mary Beth, I think the
6  last name is Jason.
7      Q    She was the author of the memorandum?
8      A    I believe so, yes.
9      Q    Is this a conversation you had with
10 Ms. Jason?
11     A    A conversation as well as a copy of
12 the correspondence.
13     Q    Do you remember when and where this
14 conversation took place, approximately?
15     A    I talked with her yesterday as well
16 as in the past where she contacted me regarding
17 the agency's policy on retention.
18     Q    As best you can recall, what did you
19 say to Ms. Jason, what did she say to you in the
20 earlier conversations?
21     A    I can't remember.
22     Q    Do you remember the nature of the

Page 80

1  conversation?
2      A    It was with regard to preservation --
3  not preservation but what the agency's policy was
4  on retention and the appropriate way to word
5  records management language in notice about
6  preservation.
7      Q    So, she called with a question?
8      A    Yes.
9      Q    And you answered her question?
10     A    Yes.
11     Q    A long conversation? Short
12 conversation?
13     A    I can't remember. It was before the
14 holidays.
15     Q    But she called to ask you about how
16 one would go about drafting a document
17 preservation or a hold memorandum?
18     A    She wanted records management
19 language to use. She didn't -- I did not -- I --
20 I didn't give her content. I just talked with
21 her and gave her instructions.
22     Q    And what was your understanding about

Page 81

1  why she was asking this question of you?
2      A    Because she was going to be preparing
3  correspondence that was being released about
4  preservation.
5      Q    Do you know why she was going to send
6  out correspondence relating to preservation at
7  that time?
8      A    She did not go into that with me.
9      Q    You say just before the holidays.
10 This would have been December of '96?
11          MS. THOMAS: Objection.
12          THE WITNESS: Oh. I'm talking -- no.
13          BY MR. COOK:
14     Q     You said January of 2007. That's why
15 I had my dates off. About when was this
16 conversation, I should ask you?
17     A    It was before the holidays in 2006.
18     Q    Okay. So, before the Christmas
19 holidays of 2006?
20     A    I believe, yes.
21     Q    So, it would have been November,
22 December of 2006?

21 (Pages 78 to 81)

Page 82

1  A  I can't remember.
2  Q  But within the last five months, six
3  months?
4  A  Maybe.
5  Q  Okay. I just wanted to make sure I
6  had the right year, that I wasn't off by 12
7  months.
8  A  You just said '96 before that.
9  Q  Right. So, before the holidays,
10 December of --
11 A  But you said 1996.
12 Q  I'm so old that '96 and 2006 seem
13 like the same year. I apologize. I didn't even
14 understand it when you told me I had it wrong.
15 So, 2006.
16 A  Okay.
17 Q  Within the last half a year?
18 A  (Witness nods head.)
19 Q  Is there any way you would figure out
20 when that conversation took place?
21 A  No.
22 Q  As the records management officer for

Page 83

1  the CMS home office had -- let me strike that and
2  step one step back. Do you know what litigation
3  she was asking in connection with?
4  A  I can't remember. I get hundreds of
5  calls.
6  Q  The case about which Ms. Jason --
7  A  Mary Beth, I think the last name is
8  Jason. The first name is Mary Beth.
9  Q  The case about which Mary Beth
10 contacted you before the holidays in 2006, was
11 that a case about which anybody, to your memory,
12 had contacted you before?
13    MS. THOMAS: Objection.
14    THE WITNESS: I can't remember.
15    BY MR. COOK:
16 Q  And without revealing any of the
17 substance of it, did a memorandum subsequently
18 come out from Mary Beth?
19 A  Yes.
20 Q  To whom was it addressed?
21 A  I can't remember.
22 Q  Did it describe -- did it relate

Page 84

1  specifically to a particular litigation?
2  A  Yes.
3  Q  Prior to that memorandum being
4  distributed, without revealing the contents of
5  that of that memorandum, had there ever been any
6  prior communications within CMS relating to
7  document preservations in connection to that
8  case?
9     MS. MARTINEZ: Objection to the
10 extent that she knows.
11    MR. COOK: Sure.
12    BY MR. COOK:
13 Q  To the extent that you are aware of
14 as the records officer for CMS, had there ever
15 been any prior records preservation directions
16 issued relating to that case that was the subject
17 of Mary Beth's memorandum?
18 A  Yes.
19 Q  When was that?
20 A  Early 2003, late 2004.
21 Q  So, it is your understanding that
22 those two cases were somehow connected?

Page 85

1  A  Yes.
2  Q  The same case or connected?
3  A  I just associated it because of
4  information that was provided in the subject
5  line.
6  Q  Okay.
7  A  I'm not an expert on that.
8  Q  And I understand completely. Other
9  than the 2003-2004 prior preservation memo, and
10 that's the one we have here at pages 5 through 7,
11 correct -- yes, 5 through 7.
12 A  Yes.
13 Q  Other than that February 19, 2004
14 communication, had there ever, before that, been
15 any preservation instructions issued in
16 connection with that case?
17 A  Not that I'm --
18    MS. THOMAS: Objection.
19    THE WITNESS: Not that I'm aware of.
20    THE REPORTER: Counsel, is this a
21 good time to take a recess?
22    MR. COOK: I'd be happy to. Thank

22 (Pages 82 to 85)

Page 102

1   What do you understand this document
2   to mean?
3     A   That employees must take necessary
4   actions to preserve any e-mail records.
5     Q   Now, you indicated before that your
6   primary responsibility is to paper records, as I
7   recall. Were you involved in crafting or
8   implementing this particular policy?
9     A   I gave them records management
10  language.
11    Q   When you say records management
12  language, what would that be?
13    A   The paragraph that says, general
14  agency records management guidelines.
15    Q   So that heading?
16    A   Yes. Anything that's created or
17  received while conducting agency business is
18  classified as a record.
19    Q   Okay. So, a description of what is a
20  record and then that gets incorporated into their
21  instructions as to what should be archived and
22  preserved? Did I get that right?

Page 103

1     A   What do you mean their instructions?
2     Q   Michael Odachowski's instructions.
3   He got from you the description of what a record
4   is?
5     A   Yes and that's what that paragraph
6   was, the general agency records management
7   guidelines.
8     Q   Other than providing the description
9   of what constitutes an agency record, did you
10  have any other involvement in crafting this
11  policy?
12    A   No. I mean, they gave -- they sent
13  to me before it was released to make sure what
14  they were saying was correct.
15    Q   Did you review for accuracy anything
16  other than that section entitled general agency
17  records management guidelines?
18    A   Yes, where they have my name listed
19  in the next paragraph down, if anyone has
20  questions about the agency's record retention
21  schedule, they could contact me.
22    Q   Okay. What's your understanding --

Page 104

1   pursuant to this 1999 e-mail autodeletion
2   procedures and retention guidelines, what's your
3   understanding of what would happen to an e-mail
4   if a user didn't move it to an archived location?
5     A   If they didn't move it to an archived
6   location or print it out, then after 180 days, it
7   would be deleted.
8     Q   So, am I correct in understanding
9   that the decision whether a particular electronic
10  record would be deleted or preserved was in the
11  hands of the individual employee who is the
12  custodian of that e-mail account?
13    A   Yes.
14    Q   What was the policy before this was
15  implemented, do you know?
16    A   1999 is when I think we began our
17  e-mail.
18    Q   Oh, okay. So, this was at the same
19  time as CMS was going to actually use e-mail?
20    A   Yes.
21    Q   On the second page, there are four
22  bullet points, the first of which was -- let me

Page 105

1   read the sentence.
2         It says, "Here are a few questions
3   you can apply to such material to decide if you
4   should store the message for future retrieval."
5   The first bullet is: "Does it have any legal
6   value?" Is that language that you provided or
7   that someone else wrote?
8     A   I did not provide that.
9     Q   Do you have any understanding of what
10  it means, for that to have legal value?
11    A   If it has been identified under a
12  preservation order.
13    Q   Moving on to next document in the
14  sequence is number 764. It is a January 28, 1999
15  e-mail from you to all e-mail users and the
16  subject is Records Filing Guidelines.
17        Could you tell me what that e-mail
18  is?
19    A   Every calendar year, a notice will go
20  out to all employees reminding them that they
21  need to purge their files, file the retention
22  guidelines as stipulated, and just reminding them

27 (Pages 102 to 105)

### Page 106

1  that there are specific time frames that are
2  outlined in the records schedule, that they have
3  to keep the records and they have to abide by
4  that.
5      Q   And so would it be, I guess, in
6  January of each year CMS before that, HCFA, would
7  actually go through a process to make sure that
8  people preserve documents they should preserve
9  and destroy documents that, according to your
10 policy, should be destroyed?
11     A   Right, or they could pack them up and
12 send them to storage.
13     Q   You give a description here as you go
14 down of some guidelines in determining whether to
15 keep a file or destroy it. The first one you
16 have is administrative files, which you indicate
17 in the parenthetical: "Travel training,
18 highlight reports and extra copies of release
19 correspondence should be kept for two years."
20         Administrative files, how would you
21 describe administrative files other than the
22 examples given?

### Page 107

1      A   Just the normal operating files that
2  an office has to be able to run. That are
3  operating files. You have travel. You have
4  personnel. You would have training -- I'm trying
5  to think -- just the operational files of the
6  office, nothing program related, all
7  administrative records.
8      Q   Okay.
9          So, if it is program related, it
10 falls within the --
11     A   The CMS records schedule.
12     Q   That I skipped over to go back to
13 later?
14     A   Yes.
15     Q   I understand.
16         If you flip to the next page, page
17 765, it's a January 27, '99 e-mail from you to
18 Mark Wong that looks like the same. Earlier one
19 you looked at?
20     A   Yes but I was just going back to see.
21 It is.
22     Q   Okay. If you just flip to the next

### Page 108

1  page, page 766, it is an e-mail from Delores
2  Buendia, I'll spell it, B-U-E-N-D-I-A, to you and
3  to M. Gordon on January 29, 1999 on Records
4  Filing Guidelines. It is addressed to you, I
5  guess. It says: "Vicky, thanks for the
6  clarification. I'll make sure everyone in our
7  region gets the reminder on the DOJ freeze and
8  clarify to them even though you send out the note
9  on records filing guidelines, those are just the
10 guidelines and we still need to keep all and not
11 destroy Medicare documents that you specified
12 because of the freeze."
13         Am I correct this whole e-mail
14 relates to the 1992 and 1997 Medicare secondary
15 payer freeze that you described earlier?
16     A   Yes.
17         MS. MARTINEZ: Objection to form. I
18 couldn't get that in in time.
19         THE WITNESS: I'm sorry.
20         BY MR. COOK:
21     Q   If you go to the very bottom of that
22 page, there is again a few bullet points and it

### Page 109

1  says: "Paper files can be disposed of in the
2  recycling bin and electronic files should be
3  deleted only if they meet the following
4  requirements:
5          That they are not required to be
6  retained according to the comprehensive records,
7  have no legal informational value, and are no
8  longer needed for office operations."
9          Is that an accurate description, in
10 1999, of the process the CMS employee should use
11 in determining whether to destroy or keep
12 documents?
13     A   Yes.
14     Q   In the first bullet point, you
15 describe there copies of records schedule, that's
16 the policy we skipped over and are to go back to?
17     A   Yes.
18     Q   The no legal informational value is,
19 among other things, whether there is a litigation
20 hold in place, correct?
21     A   Yes.
22     Q   Anything else other than litigation

Page 110

1  hold?
2  A    Unless a case is active.
3  Q    And the third is if you don't need
4  it, you should throw it away?
5  A    Right.
6  Q    So, if I'm an employee, it's fairly
7  simple. I have a policy that tells me how long
8  this particular piece of paper should be kept
9  before being destroyed; I've got a litigation
10 hold that tells me I should keep it or I've got
11 an active case, that I know that the case is out
12 there and I should keep it; or three, I don't
13 need it anymore, I throw it in the garbage or the
14 recycling bin?
15 A    Or if an employee knows that
16 possible -- there may be possible litigation or
17 there may be a possible case that is upcoming.
18 But, I mean, that -- it's up to each individual.
19 Q    And this process of policy, existing
20 or pending or future litigation or I don't need
21 it, is that generally understood, to the best of
22 your knowledge, within CMS?

Page 111

1  A    Yes, because that is put in the
2  annual reminders to them.
3  Q    And so, every year, each employee
4  gets a reminder that if there is existing future
5  or pending litigation, they should keep that
6  document?
7  A    Yes.
8  Q    The next document is the
9  September 30, 1997 note to HCFA regional records
10 liaisons from you. That's the same as we saw
11 before?
12 A    Yes, it is.
13 Q    And then the final document looks
14 like just an extra copy from the document we had
15 before?
16 A    Yes.
17 Q    I'd like to flip back to page 727,
18 the one I asked you to keep your thumb in, and go
19 through that May 12, 1998 comprehensive records
20 schedule. On May 12, 1998, do you know what it
21 was that this superseded?
22 A    AIS 0902-1.

Page 112

1  Q    Is it possible to tell what year that
2  prior records schedule was implemented?
3  A    If my memory serves me correctly, it
4  was in 1979.
5  Q    Oh, goodness. So, it would have been
6  around a long time?
7  A    Yes.
8  Q    Were there any -- I assume there were
9  some changes between the '79 and the '98 policy.
10 Were there any notable changes between the two?
11 A    I can't remember.
12 Q    Okay. I guess that should have been
13 my question. Can you remember any changes
14 between the '98 and the '79 policy?
15 A    Not specific changes, no.
16 Q    Is there anywhere a summary of what
17 the changes are that would show how the policies
18 changed or redlined, that you are aware of?
19     MS. MARTINEZ: Objection to form.
20     THE WITNESS: I don't know.
21     BY MR. COOK:
22 Q    I think we touched on this a little

Page 113

1  bit earlier, but when applying this policy to
2  paper documents and electronic documents, I
3  understand this policy does apply explicitly to
4  all paper documents.
5  A    Yes.
6  Q    How does this May 1998 policy apply
7  to electronic documents?
8  A    If somewhere in the schedule it
9  specifically identifies a particular format.
10 Q    Okay. And if it doesn't mention
11 format at all, how does it apply?
12 A    To all formats.
13 Q    Okay.
14 A    In 1999, though, most of it was
15 paper.
16 Q    But people had word processors and
17 trials?
18 A    Yes.
19 Q    And so we'll look at -- to the extent
20 we'll look at it later, there was a 2004
21 revision. Were there any revisions between '98
22 and 2004, do you recall?

**Page 114**

1   A   There may have been. I don't want to
2   say yes or no.
3   Q   Okay. If you could flip to this,
4   I've got questions about very specific sections
5   in here. Before I go any further, at the top of
6   every page on and the first page, it says
7   appendix B. What is this appendix B to, do you
8   know?
9   A   That is going way back. Appendix A,
10  I think, was the National Archives and Records
11  Administration's general records schedules, and
12  those are schedules that give retention
13  guidelines to all federal agencies that have
14  records that are common to all, like everyone has
15  payroll. Everyone has personnel. Everyone has
16  budget, Freedom of Information, those different
17  types of records. I think that's what appendix A
18  was.
19  Q   You mentioned the Federal Records
20  Center. It may be good to go through before
21  starting into this records schedule. What is the
22  Federal Records Center?

**Page 115**

1   A   The Federal Records Center, that is
2   run and operated by the National Archives and
3   Records Administration who has the authority over
4   all federal agency records programs. They give
5   us our direction on what the federal guidelines
6   are and what we have to follow.
7       The Federal Records Centers are the
8   places that store the federal records for federal
9   agencies.
10  Q   With the notable exception of the
11  offsite storage described in the 1992 and 1997
12  memoranda that we looked at earlier in the
13  Massachusetts litigation --
14  A   Uh-huh.
15  Q   -- that the Federal Records Center --
16  what document from CMS does the Federal Records
17  Center hold?
18      MS. MARTINEZ: Objection to form.
19      BY MR. COOK:
20  Q   I know. It was confusing. I'll try
21  again.
22      As I understand it, the Federal

**Page 116**

1   Records Center is not the repository for certain
2   documents described in the '92 and '97 MSP
3   litigation hold memoranda, am I correct?
4   A   The Federal Records Center has
5   various records, whether they're from the
6   Medicare contractors or from CMS as an agency.
7   Q   Okay. So, to the extent that CMS,
8   with the exception of those claims records that
9   we described earlier --
10  A   Yes.
11  Q   -- to the extent that CMS has records
12  that should be preserved pursuant to its document
13  retention schedule, what does CMS do with those
14  documents?
15  A   We either -- they are either stored
16  at the Federal Records Center or they are stored
17  in office file systems, or they are kept in the
18  agency's records holding area, which is a
19  warehouse where we maintain records only.
20  Q   And in this schedule when we go
21  through, does it direct CMS employees which
22  location a document should go to?

**Page 117**

1   A   I don't know without looking.
2   Q   We'll find out as we go through.
3   A   Okay.
4   Q   Just so I understand, of those three
5   locations, starting with the closest, you said
6   the files within CMS?
7   A   Yes.
8   Q   Could you describe for me what do you
9   refer to when you say that?
10  A   General filing areas or within an
11  employee's cubicle or an office. There are file
12  cabinets where official records -- official --
13  official records of the office are kept.
14  Q   Who is -- it may be obvious but who
15  is responsible for keeping and maintaining those
16  records in individual files such as that?
17  A   Each office has their own -- they are
18  responsible for their own.
19  Q   So, there will be CMS employees who
20  are the custodian of a set of files of some sort?
21  A   Yes.
22  Q   You mentioned a non-Federal Records

Page 118

1  Center storage facility, a warehouse, I think?
2     A    The warehouse is on our premises.
3     Q    Oh. It's on the premises?
4     A    Yes. Yes.
5     Q    Describe that for me.
6     A    It's a level above our warehouse, the
7  mezzanine level. It will hold close to 9,000
8  cubic feet of records, and that is where our
9  temporary records are kept.
10    Q    What is a temporary record?
11    A    A temporary record is a record that
12 does not have permanent value, and they are
13 identified in the records schedule, which ones
14 are permanent, which ones are temporary. The
15 ones that are temporary will have a time frame
16 associated to those records as far as when they
17 can be destroyed.
18    Q    Tell me about the physical set-up of
19 the warehouse. Is it shelves with boxes on it
20 and labels on the outside of the boxes?
21    A    No. It is a secured room on the
22 mezzanine level. They are -- I am trying to

Page 119

1  think -- it's a track file system, sort of like
2  some of your libraries have where you turn a
3  crank and then the whole section moves down.
4         Each box is labeled with an accession
5  number which is assigned by me. The boxes are
6  also numbered. They are numbered consecutively.
7  If under one accession, there are 20 boxes, the
8  boxes are numbered one of 20, two of 20, three of
9  20, and then they are placed on the shelves in
10 assigned storage locations.
11    Q    What other information do you keep
12 about the boxes that are put on the shelves in
13 this location?
14    A    There is a records transmittal form
15 that the record owner fills out as well as an
16 inventory of what's in the boxes.
17    Q    This may seem like an odd question.
18 What's the oldest record that you have in this
19 temporary storage area?
20    A    I don't know.
21    Q    So, it's possible that there are very
22 old records in there? It's not as if this

Page 120

1  records area is only for documents younger than a
2  certain number of years?
3     A    Correct. I have some MSP records
4  there, if that's an indication.
5     Q    Leaving aside the MSP records, is
6  there any rule of thumb for how long documents
7  are kept in the temporary storage area?
8     A    They are kept there in accordance
9  with the records schedule.
10    Q    The information that you have on the
11 form relating to each box, is that put into some
12 sort of a database or electronic format?
13    A    I have a spreadsheet that I keep for
14 the records -- I'm sorry -- the records that are
15 in the warehouse, it is in a database that I
16 maintain.
17    Q    Okay. And so if you have a
18 particular box, it was sent by Louie Gabel to the
19 temporary records location, you would know who it
20 came from, a description, a general description
21 of what's in it?
22    A    Uh-huh.

Page 121

1     Q    How would you assign the document
2  destruction date for that box?
3     A    It's in accordance with the agency
4  records schedule.
5     Q    And so would the database have a
6  field for the date --
7     A    Yes.
8     Q    -- on which it is to be destroyed?
9     A    Yes.
10    Q    Any other fields in the database?
11    A    The accession number -- I am trying
12 to think -- the accession number, description,
13 disposal date, the number of boxes, the
14 customer's name as well as their location and
15 phone number.
16    Q    When the date comes -- when the
17 disposal date arrives -- my eyesight is getting
18 bad, I can't read my own writing -- the 20th of
19 March 2007, what happens?
20    A    I won't have that as a disposal date
21 my disposals are done quarterly.
22    Q    Okay. So, what would be an example

31 (Pages 118 to 121)

Page 122

1  of the disposal date you would have?
2      A    January -- April -- January 1,
3  April 1 --
4      Q    The first day of each quarter?
5      A    Yes. Yes. Thank you.
6      Q    And so on January 1 -- that's a bad
7  date, the beginning of the year -- April 1, the
8  date comes along and there are certain number of
9  boxes that have April 1, 2007 on them?
10     A    Yes.
11     Q    What happens to those boxes?
12     A    I go into my database and generate a
13 notice that goes to the record owner that
14 transmits the records to storage, telling them
15 these records are eligible for disposal, asking
16 them to sign off authorization for their
17 disposal.
18          If they cannot authorize their
19 disposal because of litigation or other issues,
20 they need to defer the disposal to a later date.
21 They have to provide a justification why. They
22 send that notice back to me. I go into the

Page 123

1  system and I change the disposal date to the new
2  disposal date.
3           If they authorize their disposal, I
4  then generate a notice to our warehouse staff,
5  giving them the accession number, the box numbers
6  and the locations of the boxes that are to be
7  pulled and destroyed, and they do that. Once
8  that's completed, they send the notice back to
9  me. When I get the notice, I go back into the
10 system and put that records were destroyed.
11     Q    And so the record stays within your
12 system as having been destroyed?
13     A    Yes.
14     Q    So, you can go back and determine I
15 received the box on this date, the custodian was
16 Louie Gabel. I sent the notice to Louie Gabel on
17 this date telling him it was time to dispose of
18 it. We authorized it on this date?
19     A    Not all that is my system, the
20 authorization date or anything.
21     Q    But it does show the date it was
22 received, who the custodian was, what the

Page 124

1  contents were, the disposal date, and the fact
2  that it was destroyed?
3      A    Yes. When you say it tells you the
4  contents, it only gives you a subject line. The
5  contents are included with the paperwork that
6  they submit, the inventory. And that's what
7  gives the detailed description of what is in each
8  box.
9      Q    Is the inventory kept even after the
10 box is destroyed?
11     A    Yes. I have it.
12     Q    So if a box was destroyed -- let me
13 ask another question. How far back does your
14 current database go?
15     A    I can't remember. I am trying to
16 remember when we moved up to -- I'm trying to
17 remember when we moved up to the complex. I
18 think it was in '98, probably around this time,
19 in '98.
20     Q    And so for records from this
21 warehouse that were destroyed between '98 and
22 today, you would be able to go into your database

Page 125

1  and determine by custodian the contents,
2  referring back to an index which is filed
3  elsewhere?
4      A    Uh-huh.
5      Q    And the date on which that box with
6  those contents was destroyed?
7      A    Yes.
8      Q    How were they destroyed?
9      A    Shredded.
10     Q    Cross shred? I assume there is some
11 sort of --
12     A    I don't know. The warehouse has --
13 they go through -- it's the warehouse's
14 responsibility. They have a contractor, a
15 federal contractor that does disposals.
16     Q    Prior to 1998, how were records kept
17 of the retention or disposal of documents in the
18 CMS warehouse?
19     A    Prior to '98, we were at an offsite
20 warehouse and they were kept in a caged area.
21 They were boxed and numbered with an accession
22 number and an inventory sheet was done. It was