# EXHIBIT C

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL         : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    : CIVIL ACTION:

PRICE LITIGATION              : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-a-Care of    : Judge Patti B. Saris

the Florida Keys, Inc. v.     :

Abbott Laboratories, Inc.,    : Chief Magistrate

No. 06-CV-11337-PBS           : Judge Marianne B.

- - - - - - - - - - - - - -x Bowler

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,             :

            Plaintiff,        :

       vs.                    : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,    : Judge Charles Price

et al.,                       :

            Defendants.:

- - - - - - - - - - - - - -x

**Page 2**

```
1    IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2       IN AND FOR LEON COUNTY, FLORIDA
3
4    THE STATE OF FLORIDA
5    ex rel.
6    ------------------x
7    VEN-A-CARE OF THE FLORIDA       :
8    KEYS, INC., a Florida           :
9    Corporation, by and through its :
10   principal officers and directors, :
11   ZACHARY T. BENTLEY and          :
12   T. MARK JONES,                  :
13        Plaintiffs,                :
14        vs.                        : Civil Action
15   MYLAN LABORATORIES INC.; MYLAN  : No.: 98-3032G
16   PHARMACEUTICALS INC.; NOVOPHARM : Judge: William
17   LTD., SCHEIN PHARMACEUTICAL, INC.;: L. Gary
18   TEVA PHARMACEUTICAL INDUSTRIES  :
19   LTD., TEVA PHARMACEUTICAL USA;  :
20   and WATSON PHARMACEUTICALS, INC.,:
21        Defendants,                :
22   ------------------x
```

**Page 3**

```
1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2              STATE OF MISSOURI
3    ------------------x
4    STATE OF MISSOURI, ex rel.,     :
5    JEREMIAH W. (JAY) NIXON,        :
6    Attorney General,               :
7    and                             :
8    MISSOURI DEPARTMENT OF SOCIAL   :
9    SERVICES, DIVISION OF MEDICAL   : Case No.:
10   SERVICES,                       : 054-1216
11        Plaintiffs,    : Division No. 31
12        vs.                        :
13   DEY INC., DEY, L.P., MERCK KGaA,:
14   EMD, INC., WARRICK              :
15   PHARMACEUTICALS CORPORATION,    :
16   SCHERING-PLOUGH CORPORATION, and:
17   SCHERING CORPORATION,           :
18        Defendants,                :
19   ------------------x
```

**Page 4**

Videotaped Deposition of LISA PARKER, a witness herein, called for examination by counsel for Abbott Laboratories in the above-entitled matter, pursuant to notice, the witness being duly sworn by Robert M. Jakupciak, a Notary Public in and for the District of Columbia, taken at the offices of Center for Medicare & Medicaid Services, 7111 Security Blvd., Baltimore, Maryland, 21244, at 2:20 p.m., on June 6, 2007, and the proceedings being taken down by Stenotype by Robert M. Jakupciak, RPR.

**Page 5**

APPEARANCES:

On behalf of the United States of America:

    ANA MARIA MARTINEZ, ESQUIRE
    U.S. Department of Justice
    99 N.E. 4th Street
    Miami, Florida 33132
    (305) 961-9431

On behalf of the U.S. Department of Health and Human Services:

    TROY A. BARSKY, ESQUIRE
    U.S. Department of Health and Human Services
    C2-05-23
    7500 Security Blvd.
    Baltimore, Maryland 21244-1850
    (410) 786-8873

(CONTINUED)

**Page 6**

APPEARANCES: (CONTINUED)

On behalf of Abbott Laboratories:

    LOUIS P. GABEL, ESQUIRE
    Jones Day
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    (202) 879-5411

(The following attorneys present by phone.)

On behalf of Dey Companies and Mylan:

    CLIFFORD KATZ, ESQUIRE
    Kelly Drye & Warren LLP
    101 Park Avenue
    New York, New York 10178
    (212) 808-7609

(CONTINUED)

**Page 7**

APPEARANCES: (CONTINUED)

On behalf of Roxane Laboratories and
Boehringer-Ingelheim and affiliated entities:

    JARED THOMAS HECK, ESQUIRE
    Kirkland & Ellis LLP
    200 East Randolph Drive
    Chicago, Illinois 60601
    (312) 469-7087

On behalf of Baxter Healthcare Corporation:

    TINA DUCHARME REYNOLDS, ESQUIRE
    Dickstein Shapiro LLP
    1825 Eye Street, N.W.
    Washington, D.C. 20006
    (202) 420-4114

(CONTINUED)

**Page 8**

APPEARANCES: (CONTINUED)

On behalf of KMS New York Counties:

    MICHAEL WINGET-HERNANDEZ, ESQUIRE
    Winget-Hernandez, LLC
    3112 Windsor Road, #228
    Austin, Texas 78703

Also Present
Videographer: Conway Barker

**Page 9**

CONTENTS

THE WITNESS: LISA PARKER    PAGE
Examination By Mr. Gabel..................... 012

EXHIBITS

NUMBER    DESCRIPTION    PAGE
Exhibit Abbott 226-Request for Production of
    Documents................... 022
Exhibit Abbott 227-Abbott's Second set of
    production.................. 023

**Page 50**

1  collect documents?
2  A. For what?
3  Q. Related to AWP matters?
4  A. I don't remember.
5  Q. Do you recall receiving any
6  instructions to preserve documents in 2003 or
7  2004 in connection with AWP matters?
8  A. I don't remember.
9  Q. What about prior to 2003/2004?
10 A. No.
11 Q. Have you received any instructions to
12 preserve documents since 2004 relating to the AWP
13 cases?
14 A. Yes.
15 Q. When did you receive those
16 instructions?
17 A. Maybe two or three months ago.
18 Q. So in 2007?
19 A. Yes.
20 Q. Who sent those instructions to you?
21 A. Glenda would have sent them. Glenda
22 Bailey.

**Page 51**

1  Q. Did she send you something by e-mail?
2  A. Yes.
3  Q. Was it a memo?
4  A. Yes. It was the same thing I was
5  talking about earlier.
6  Q. Okay. And did that memo have
7  instructions to preserve documents?
8  A. It would have, yes.
9  Q. Do you understand which documents you
10 were requested to preserve?
11 A. Well, I know which ones we are working
12 on, which documents we are working on pulling.
13 Q. What about preserving documents; do you
14 know which documents the instructions instructed
15 you to preserve?
16 A. I don't remember which ones, but -- and
17 we --
18 Q. You would look in the memo?
19 A. Yes.
20 Q. So the best place to figure out the
21 preservation efforts would be to look at the
22 memo?

**Page 52**

1  A. Correct.
2  Q. Do you have any recollection whatsoever
3  about search or collection efforts of documents
4  in 2004?
5  A. I don't.
6  Q. The 2007 memo that you received from
7  Glenda Bailey, do you know who the author of that
8  memo was?
9  A. No. I don't remember.
10 Q. How long was the memo?
11 A. Don't remember. It was pretty long.
12 Q. Actually, I think --
13 A. It's the same one we already talked
14 about.
15 Q. Gotcha. Do you know why you received
16 the e-mailed memo from Glenda Bailey in early
17 2007?
18 A. Yes.
19 Q. Why?
20 A. Because there was some litigation going
21 on, OGC needed some documents and we needed to
22 make sure that we had them and that we produced

**Page 53**

1  them.
2  Q. Were you selected because you are in
3  charge of records management --
4  A. Yes.
5  Q. -- for the regulations --
6  A. Development.
7  Q. -- group?
8  A. Uh-huh.
9  Q. You say that you have gone about
10 collecting documents; correct?
11 A. Yes.
12 Q. What's the volume of the documents that
13 you've collected thus far?
14 A. Voluminous.
15 Q. How have you gone about collecting
16 these?
17 A. Well, my staff person is working with a
18 GC attorney who is requesting certain documents
19 related to regulations, and my staff person
20 requests that the documents be retrieved from the
21 federal record center and she delivers them to
22 the attorney for his review.

**54**

1  Q. Who is the attorney?
2  A. Brian Kelly.
3  Q. Brian Kelly?
4  A. Kelly.
5  Q. Okay. Have you asked employees within
6  your group to search for documents?
7  A. No. That wouldn't be standard
8  procedure.
9  Q. Is there any search being conducted
10 aside from the search of documents that have been
11 stored at the federal record center?
12 A. Not that I know of.
13 Q. And you say there have been voluminous
14 documents retrieved from the federal record
15 center; right?
16 A. Yes.
17 Q. Could you describe generally how many
18 boxes?
19 A. Maybe 50 or 60 boxes so far.
20 Q. And how do you know which boxes to
21 retrieve from the federal record center?
22 A. When the attorney tells us what

**55**

1  regulation he would like to review, we look in
2  the database and the database tells us by
3  regulation which boxes that regulation is in in
4  the record center.
5  Q. So the attorney will specify a
6  regulation, you'll go to the database, determine
7  where it is, if it still exists, and then track
8  it back down from the federal records center?
9  A. Yes.
10    MS. MARTINEZ: Objection to form. You
11 can answer. It just was objecting to form.
12    MR. GABEL: She just didn't like my
13 question.
14 A. The records are permanent records, so
15 they will exist.
16    MS. MARTINEZ: That was the nature of
17 my objection. There had been nothing on the
18 record to say that they wouldn't exist.
19 A. Right. They are permanent records, so
20 they are there.
21 Q. Okay. Which records are permanent
22 records?

**56**

1  A. Rule-making records for regulations are
2  permanent records.
3  Q. All records relating to rule-making are
4  permanent?
5  A. It would be the rule-making record is
6  permanent.
7  Q. What do you mean by rule-making record?
8  A. A rule-making record is defined in our
9  record schedule, and it consists of a copy of the
10 published regulation, all public comments
11 submitted on the regulation, any other
12 publications related to a regulation, such as a
13 correction notice or an extension of comment
14 period, and any information that the agency
15 relied on in making its policy, such as studies
16 that may have been cited in the regulation or
17 reports or something like that.
18 Q. Is it fair to say that the rule-making
19 records as you've described them all deal with
20 public documents?
21 A. I don't understand your question.
22 Q. The rule-making records that you've

**57**

1  just described, were those all public documents
2  at the time the regulations were proposed and
3  eventually published?
4  A. And by public you mean that we would --
5  what do you mean by public documents?
6  Q. The public comments?
7  A. Yes.
8  Q. Things available to the general public
9  as opposed to internal discussions within CMS.
10 A. Ask me one more time.
11 Q. Would the rule-making records include
12 solely documents that were available to the
13 public during the process of the regulation being
14 implemented or proposed or does it also include
15 internal documents within CMS?
16 A. That depends on the time of when the
17 document was shipped to the record center.
18 Because in 2004 we obtained approval to change
19 our record schedule. So before 2004 we included
20 all -- we included everything, internal documents
21 as well as public documents, in what we shipped
22 to the record center.

**Page 58**

1 After 2004 we obtained approval through
2 the national archives to change our record
3 schedule so that the rule-making record only
4 consists of those things that I previously
5 mentioned and does not consist of any internal
6 documents.
7   Q. For the documents that prior to 2004
8 had been shipped to the federal record center,
9 did you go back and parse through what was public
10 and internal?
11   A. We can't do that.
12   Q. So if it's at the federal record
13 center, it's there in whatever form you sent it
14 to them?
15   A. Correct. Yes.
16   Q. Is it a difficult process to request
17 documents from the federal record center?
18   A. No.
19   Q. After you request documents, how long
20 does it take for you to get them back from the
21 federal record center?
22   A. About a week on average. Five working

**Page 59**

1 days.
2   Q. And the 50 or 60 boxes that you
3 collected, do you know if those have been turned
4 over to defendants in this case?
5   A. I don't know.
6   Q. Where are those 50 or 60 boxes?
7   A. Some of them are being stored at OGC
8 and I believe some of them are being stored in
9 our warehouse.
10   Q. Do you know what's going to happen to
11 those 50 or 60 boxes?
12   A. I do understand from Brian Kelly that
13 an outside attorney is supposed to be coming to
14 review some of the boxes.
15   Q. By outside attorney do you mean someone
16 outside of the government or outside of CMS?
17   A. I think outside of the government.
18   Q. With respect to the search that is
19 currently being done, are there any other
20 measures besides looking at the regulations that
21 the attorneys request -- looking for documents
22 pertaining to the regulations that the attorneys

**Page 60**

1 specifically request being done in your group?
2   A. Well, I mean the general procedure
3 would be that I would get a memo from Glenda, I
4 would review it to see which regulations are
5 needed, and then we would work in consultation
6 with the general counsel to pull together rule-
7 making records or whatever documents they read.
8   Q. Does the memo from Glenda Bailey set
9 forth the actual regulations themselves that you
10 are supposed to look for?
11   A. Yes. Those memos usually contain a
12 list, usually prepared by the outside party, of
13 what things they would like to have.
14   Q. Which regulations have you been asked
15 to look for?
16   A. Right now we are working on two
17 physician fee schedule regulations. One was
18 published I think in '92, and that's the one with
19 many boxes. And one was published I believe in
20 '98.
21   Q. Any other regulations that you have
22 been asked to retrieve boxes for?

**Page 61**

1   A. In this case I know those are the ones
2 we are currently working on and I'm not sure if
3 that was the whole list or if there are more or
4 what.
5   Q. No other ones that you can recall
6 though as of right now?
7   A. Not right now. But I will say that
8 sometimes we do it in stages because we don't
9 have the space to hold. So it could be we are
10 trying to work through these, look at these, and
11 then move on to the next few.
12   Q. Do you know the specific citation to
13 the regulations?
14   A. No.
15   Q. When you say the physician fee schedule
16 regulation from 1992, was that when -- 1992, was
17 that when the regulation was proposed?
18   A. It would have been proposed and
19 finalized I think in the same year. And that's
20 an annual publication.
21   Q. In collecting any of these documents
22 have you reviewed them for privilege?

Page 62

1   A. I don't do that.
2   Q. Do you know of any CMS employees who
3 have been involved in determining whether
4 documents are privileged under the due process
5 privilege?
6       MS. MARTINEZ: Objection to form, but
7 only because you said due process.
8   Q. Sorry. I made that mistake already
9 once today. Do you know of any CMS employees who
10 have been involved in determining if documents
11 were privileged under the deliberative process
12 privilege?
13   A. I don't.
14   Q. What steps have you taken to preserve
15 documents since you received the notice in early
16 2007?
17   A. We preserve all documents in accordance
18 with your record schedule and documents are only
19 disposed of if I give the okay that they are
20 expired and we don't need them for anything else.
21 And we haven't disposed of any records at all.
22   Q. In 2007?

Page 63

1   A. At all. We are working toward getting
2 there, but we haven't destroyed any records.
3   Q. So for what time period have you not
4 destroyed --
5   A. Well, with regard to regulations files,
6 we have not yet instituted our process of
7 disposal of records. So any regulations files
8 that we acquired and maintained, we still have
9 them.
10   Q. If the document retention schedule for
11 CMS calls for the destruction, would you expect
12 them to be destroyed pursuant to that policy?
13   A. Yes.
14   Q. So they could have been destroyed?
15   A. No. No the CMS records officer would
16 send me a form saying, you know, these are up for
17 disposal or destruction, whatever, and then I
18 would compare that against anything that I have
19 saying that these need to be protected or held
20 out, and so they wouldn't be disposed of.
21   Q. Okay. Have you in response to the
22 federal record center sending you a notice that

Page 64

1 the documents are scheduled for destruction, have
2 you ever --
3       MS. MARTINEZ: Object to form.
4   Q. Who sends you the notice that documents
5 are scheduled for destruction?
6   A. I have never received such a notice.
7   Q. Maybe I misunderstood your testimony.
8   A. Right. I was explaining what the
9 process would be. But I'm saying that we are not
10 there yet. We haven't destroyed any records.
11 And, furthermore, any documents that go to the
12 federal record center are permanent records, so
13 they would never be destroyed. After they are
14 maintained at the federal record center for 20
15 years, then they go to the national archives.
16   Q. That's for all records that come out of
17 --
18   A. For permanent records.
19   Q. For permanent records only. If they
20 are not permanent records though they have a
21 different --
22   A. Yes.

Page 65

1   Q. -- production or retention?
2   A. Retention, yes. That's correct.
3   Q. Schedule. So you have only been
4 talking about permanent records with respect to
5 the non-destruction of documents?
6   A. I'm saying that we never destroy any
7 documents, temporary or otherwise.
8   Q. Okay. And is that according to a
9 written policy of CMS?
10   A. Well, as I was trying to explain, in
11 2004 when we changed our record schedule, we
12 provided for a shorter retention period for
13 temporary records. And we are not yet to the
14 place in the process or we haven't yet developed,
15 we haven't started destroying temporary records
16 yet.
17   Q. So although the policy calls for the
18 destruction, you haven't destroyed any?
19   A. Right. Not yet. Not yet. And if --
20 when we get there, if there are any that need to
21 be preserved under a preservation order, then I
22 would ensure that they were preserved.

Page 82

1  Q. Hopefully, this will narrow it down for
2  us.
3  A. Okay.
4  Q. Specifically, if you would look at
5  HHC015-0727. And that appears to be HCFA's
6  comprehensive records schedule and it's dated May
7  12, 1998.
8  A. Okay.
9  Q. Then if you could turn in to document
10 or page number HHS015-0732.
11 A. Okay.
12 Q. Have you seen this page before?
13 A. No. So I'm confused. Is this a cover
14 memo, attachments or different --
15 Q. I think it's a number of documents
16 grouped together.
17 A. Okay.
18 Q. Instead of a single larger document.
19 A. Okay. Okay. They look the same.
20 Q. I think it's identical.
21 A. Okay.
22 Q. Is this consistent with your

Page 83

1  understanding of what the document retention
2  schedule was as of May 12, 1998?
3  A. I really can't speak on that. I wasn't
4  working on records management then.
5  Q. Do you know what the record schedule
6  was prior to 1998?
7  A. No.
8  Q. How do you know then that there was a
9  schedule that called for the intermingling of the
10 rule-making record and the rule-making support
11 file?
12 A. I know when I started working with
13 records sometime in 2004, I know how they were
14 being packed and shipped at that time. And at
15 that time we were sending everything, including
16 the support file and the public comments, maybe
17 in separate boxes, comments in one box and
18 support file in another, but everything was going
19 to the federal record center. And then I worked
20 on an initiative to only send things to the
21 record center that would be in the rule-making
22 record.

Page 84

1  Q. Okay. Now for documents that were sent
2  to the federal record center prior to your time
3  as the records manager for your department, can
4  you testify as to whether those documents were
5  preserved or whether they were in fact destroyed
6  under the policy that we have in front of us?
7  A. I believe that they were preserved,
8  because when we called them back they are there
9  and we get many requests. So.
10 Q. Okay.
11 A. So I believe they were preserved, but I
12 think that the records officer could tell you if
13 anything was destroyed.
14 Q. So you are not aware one way or the
15 other whether destruction occurred? You can only
16 testify as to what you request today and what
17 happens to still be there from the time before
18 you became the records manager?
19 A. Correct. Correct. And I don't recall
20 anything ever being destroyed. So.
21 Q. So am I correct to say that you -- any
22 documents that you have requested from the

Page 85

1  federal record center in connection with the AWP
2  cases have been there?
3  A. For the most part, yeah. I would say
4  yes.
5  Q. For the most part. Are there any that
6  you have requested that haven't been there?
7  A. I mean there is none that I can recall
8  that we don't have. But I don't want to say yes,
9  we have everything, because there is always a
10 possibility that for some reason one little piece
11 of paper or something, you know, we might not be
12 able to find in the 20 years and thousands of
13 boxes that we send over there. So I want to be
14 clear that we are pulling stuff back and it
15 appears to be there, so.
16 Q. And with the passage of time there is
17 more of a likelihood that documents could be
18 misplaced?
19 A. No.
20    MS. MARTINEZ: Objection as to form.
21 You can answer.
22 A. I keep forgetting. No. It's not the

**Page 86**

1  passage of time. Once something is at the
2  records center it's there and it's with the
3  archive. So if we send it over there, it's
4  preserved. It's in the packing did a folder get
5  missed; when we are packing boxes did a folder
6  get missed or did something inadvertently get
7  left out, which is not a frequent occurrence,
8  it's very rare. But there are some cases where a
9  folder is missing from a box or we can't find a
10 specific document.
11     Q. So are you telling me that the record
12 retention policy that we've seen in Exhibit
13 Abbott 073 as well as Exhibit Abbott 072, to your
14 knowledge, was not followed by your department?
15     MS. MARTINEZ: Objection as to --
16     Q. -- prior to -- prior to you becoming
17 the records manager for your department?
18     MS. MARTINEZ: Objection as to form,
19 and only because you asked about the entire
20 Exhibit Abbott 072 or Exhibit Abbott 073, and --
21     Q. With respect to just the sections N and
22 O regarding the rule-making record and the rule-

**Page 87**

1  making support file?
2      MS. MARTINEZ: And I object as form. I
3  think you probably meant to only ask about O.
4  BY MR. GABEL:
5      Q. Let me restate the entire thing. Do
6  you know one way or another whether Section 0 on
7  the rule-making support file and the section
8  specifically that talks about the disposition of
9  the rule-making support file resulted in the
10 destruction of any rule-making support files
11 prior to you becoming the records manager for
12 your department?
13     A. I don't know for sure.
14     Q. Since you've become the record manager,
15 which you became in 2004; is that right?
16     A. Yes.
17     Q. What month in 2004?
18     A. The spring sometime.
19     Q. Sometime in the spring?
20     A. Uh-huh.
21     Q. Since you became records manager in
22 spring of 2004, are you aware of any rule-making

**Page 88**

1  support files that have been destroyed?
2      A. No, I'm not.
3      Q. So to the extent this policy still
4  applied -- applied from 2004 until it was changed
5  in 2006, it would not have been followed?
6      A. That's what it seems like, yes.
7      Q. And you don't know one way or another
8  whether it was followed prior to you becoming the
9  records manager?
10     A. Well, what I'm saying, I don't know
11 definitively whether or not it was followed, but
12 because I'm responsible for calling back
13 information, it doesn't appear that it was
14 followed. It doesn't appear that anything was
15 destroyed.
16     Q. Okay. So if the defendants in this
17 case wanted any documents related to previously
18 published regulations or proposed regulations,
19 those documents should be able to be retrieved
20 from the federal record center?
21     A. Yes, I believe so.
22     Q. And it typically takes you

**Page 89**

1  approximately a week to receive the documents
2  back from the federal record center?
3      A. Correct.
4      Q. Have any litigation holds that you've
5  seen or preservation instructions instructed you
6  specifically to refrain from destroying rule-
7  making support files?
8      A. I believe that those preservation memos
9  say that any documents related to thus and so
10 regulation should be preserved, so we would
11 preserve the public file as well as the internal
12 work as well.
13     Q. And which regulations have you been
14 instructed to preserve documents on?
15     A. Well, I know those two that we are
16 working on, and I don't recall any others, but to
17 the extent they are in the memo, I refer to the
18 memo.
19     Q. For the 1998 regulation that you've
20 requested documents from the federal records
21 center on, does the reference number HCFA-1006-FC
22 refresh your recollection at all?