# EXHIBIT D

                                                                        1

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL       : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   : CIVIL ACTION:

PRICE LITIGATION             : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO     :

U.S. ex rel. Ven-a-Care of   : Judge Patti B. Saris

the Florida Keys, Inc. v.    :

Abbott Laboratories, Inc.,   : Chief Magistrate

No. 06-CV-11337-PBS          : Judge Marianne B.

- - - - - - - - - - - - - -x Bowler

            IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,            :

         Plaintiff,          :

     vs.                     : Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,   : Judge Charles Price

et al.,                      :

         Defendants.         :

- - - - - - - - - - - - - -x

**Page 6**

APPEARANCES: (CONTINUED)

On behalf of Abbott Laboratories:

    HILARY A. RAMSEY, ESQUIRE
    R. CHRISTOPHER COOK, ESQUIRE
    Jones Day
    51 Louisiana Avenue, N.W.
    Washington, D.C. 20001
    (202) 879-3939

(The following attorneys present by phone.)

On behalf of Dey Companies and Mylan:

    MARISA A. SZELAG, ESQUIRE
    Kelley Drye & Warren LLP
    101 Park Avenue
    New York, New York 10178
    (212) 808-7697

(CONTINUED)

**Page 7**

APPEARANCES: (CONTINUED)

On behalf of Baxter Healthcare Corporation:

    TINA DUCHARME REYNOLDS, ESQUIRE
    Dickstein Shapiro LLP
    1825 Eye Street, N.W.
    Washington, D.C. 20006
    (202) 420-4114

On behalf of KMS New York Counties:

    MICHAEL WINGET-HERNANDEZ, ESQUIRE
    Winget-Hernandez, LLC
    3112 Windsor Road, #228
    Austin, Texas 78703

    Also Present
    Videographer: Rick Sanborn

**Page 8**

C O N T E N T S

THE WITNESS: MARIANNE BOWEN     PAGE
  Examination By Ms. Ramsey.................... 011
  Examination By Ms. Szelag.................... 280

E X H I B I T S
NUMBER     DESCRIPTION     PAGE
Exhibit Abbott 222-Amended Notice of
    Deposition.................. 022
Exhibit Abbott 223-Notice of Deposition of
    Marianne Bowen.............. 022
Exhibit Abbott 224-Chart....................... 200

**Page 9**

Whereupon,

    VIDEOGRAPHER: This begins videotape number one in the deposition of Marianne Bowen in Re: Pharmaceutical Industry Average Wholesale Price Litigation; MDL Number 1456; Civil Action Number 01-CV-12257-PBS, filed in the United States District Court for the District of Massachusetts.

    Today's date is June 5th, 2007. The time is 9:42 a.m. This deposition is being held at the offices of Hogan & Hartson, 111 South Calvert Street, Baltimore, Maryland. The court reporter today is Robert Jakupciak. The video camera operator is Rick Sanborn. Both are on behalf of Henderson Legal Services.

    Will counsel please introduce themselves and state who they represent.

    MS. RAMSEY: Hilary Ramsey, I'm from the law firm of Jones Day and we represent Abbott Laboratories in this matter.

    MR. COOK: Christopher Cook, from Jones Day.

**Page 54**

1  A. At that point in time, because we had
2  not provided e-mail capabilities to everyone at
3  their desktop, we did have, you know, we called
4  it e-mail etiquette. And part of that e-mail
5  etiquette talked about if documents are
6  important, e-mail is not your official record.
7  You need to save those documents in hard copy.
8  They need to be handled through our retention
9  policies that, you know, were published, and it
10 is, you know, your responsibility as a user to
11 retain those documents in hard copy and follow
12 processes and policies that the agency had
13 established.
14   Q. So you recall contacting the users that
15 did have e-mail and telling them if it's
16 important, print it?
17   A. Yes.
18      MS. MARTINEZ: I object to the form of
19 that question. I'm sorry I did that late.
20 BY MS. RAMSEY:
21   Q. Do you recall whether that
22 communication was provided to every individual

**Page 55**

1  that had an e-mail account?
2      MS. MARTINEZ: Objection to the form of
3  the question. I'm just -- just to clarify. I'm
4  having an issue with you referring to that
5  communication, because I'm not sure what you're
6  referring to, and I think it might have just been
7  a general policy that everyone was under, not per
8  se, you know, I contact you and I tell you do
9  this, but just everyone. That's what I'm having
10 trouble with.
11 BY MS. RAMSEY:
12   Q. Ms. Bowen, can you describe the
13 communication, if there was one, with the e-mail
14 users regarding the discontinuation of the PROFS
15 system and the importance to print off hard
16 copies of their e-mails if they were important?
17   A. At that time, because everyone did not
18 have an e-mail account, and because we did not
19 have full connectivity or Internet technology at
20 that time, we did a lot of things more in hard
21 copy format. And so when you were given an e-
22 mail account, you were given a document that

**Page 56**

1  basically was e-mail etiquette -- pardon me. E-
2  mail etiquette, which included information
3  concerning retention of important documents that
4  were deemed important.
5      At the time we were very clear about
6  the fact that e-mail was not considered a system
7  of record and they should not assume that
8  everything in their e-mail system could be, you
9  know, maintained forever, and so anything
10 important they had the responsibility of
11 determining it was important, printing it out and
12 retaining it based on the agency's policies.
13   Q. Do you recall whether this e-mail
14 etiquette was a hard copy document that was
15 circulated?
16   A. It was a hard copy document.
17   Q. Did you play any role in drafting the
18 e-mail etiquette document?
19   A. Yes, I did.
20   Q. Were you the sole drafter?
21   A. I was the initiator. There were
22 several people who had input, and I was the final

**Page 57**

1  author.
2    Q. Do you know whether that document still
3  exists today?
4    A. The document in its original form does
5  not exist today. As technologies changed, as the
6  agency improved its technologies and moved to
7  different means of communications and
8  connectivity, the document has been revised many
9  times and there is an e-mail document that exists
10 today, but it is not the original document.
11   Q. The e-mail that exists today, does it
12 communicate the same idea of if it's an important
13 e-mail, print it out?
14   A. I cannot tell you that it does. I was
15 not the author of the latest and greatest
16 document. I will tell that the agency has always
17 had its retention policy, you should keep hard
18 copies of anything important. And a lot of that
19 has to do with the fact that technology is not a
20 perfect science. Things happen. Systems blow
21 up. Hard drives go bad and can never be
22 retrieved.

**58**

So anything you think you have that's important, you better keep a hard copy of it.
Q. Did archiving exist back in the days of the PROFS system?
A. I don't believe it did.
Q. We discussed that Ms. Wilensky may or may not have had an e-mail account, but you don't believe that she personally had a desktop computer.
Do you recall who the administrator was following Ms. Wilensky?
A. Bruce Vladeck. There may have been an interim administrator between Gail and Bruce, but I believe Bruce was the next officially sworn in administrator.
Q. Do you recall whether the interim administrator, if there was one, before Mr. Vladeck were issued desktop computers?
A. I know Bruce was, Bruce Vladeck was issued a desktop computer.
Q. Would he also have had an e-mail account?

**59**

A. Yes, he would.
Q. What e-mail system were you using when Dr. Vladeck became administrator?
A. That would have been GroupWise.
Q. Was there any overlap between the PROFS and the GroupWise or did one day PROFS ended, the next day GroupWise began?
A. I don't remember specifically how we handled that transition, but typically we do a turnkey from one system to another. We do all the prep work to prepare people for the change and then on a day, one is shut off and one is turned on.
Q. Did you consider making a back-up or archive of the PROFS system when you moved to GroupWise?
A. I don't remember specifically what we did. My assumption is I would have done that for a period of time. That is -- that's more of my safety net.
If something goes wrong in the transition and mail is lost or someone needs to

**60**

retrieve something, I would have kept things alive with PROFS for a bit of time. But then there becomes a point of time where, from a financial perspective as well as a maintenance perspective, it just makes sense to retire one and solely rely on the other.
Q. I probably want to go into GroupWise more in a few minutes, but I believe we're still going through your time at HCFA?
A. My career.
Q. So the -- let's see. The position that I currently believe what we have worked up to is around 1992 when you were working more in a capacity dealing with software?
A. Yes. More dealing with office automation software on the desktop.
Q. What would an example of that be?
A. An example would be, oh, goodness. I'm trying to remember the names of software back then. Correll was the name of a company, I believe, that supported WordPerfect at the time and WordPerfect was closely associated with

**61**

GroupWise, so.
When we made the decision to move to a GroupWise e-mail environment, I would look at, does it make sense for us to start using Correll. Correll WordPerfect as our office automation tool of choice for documents. Start looking at spread sheet technologies, start looking at different types of off-the-shelf software that might be usable in the office automation arena.
Q. What period did you move to your next position?
A. I stayed in that job, I believe, just for a couple of years. In the 1994 time frame we began gearing up to move to the facility that CMS is located in today at 7500 Security Boulevard and there was a very long prep that took place to gear up for the move there. And I moved onto that team that was responsible for preparing for that move.
Q. So around 1994, '95, you were on the team move?
A. Yes.

Page 62

1  Q. Were you responsible for moving the
2  electronic documents and data in any capacity?
3  A. My responsibility during that move was
4  prepping -- it sounds very glamorous when I say
5  it now -- prepping the work stations in the new
6  facility for the movement of computers into those
7  work stations, and assuring that the day after
8  they were moved everything worked and there was
9  nothing corrupted, et cetera. The data was not
10 physically moved, per se. There were a number of
11 moves that took place in 1995, including the
12 complete movement of the data center from one
13 location to another.
14      So my responsibility was more the
15 physical desktops themselves, making sure they
16 got set up correctly in the new organization.
17 Q. You wanted to make sure that Bob on 7s
18 new computer at the new building on two, worked
19 fine?
20 A. That's correct.
21 Q. Were there any interruptions or
22 problems with transferring the electronic

Page 63

1  documents or data associated with that move?
2  A. Just for the record, there are always
3  problems when you do a move.
4  Q. I can believe it.
5  A. So I don't want to go into that finite
6  level of detail. It was an incredibly successful
7  move.
8      During that period of time CMS made the
9  decision to launch into some new technologies.
10 Up until that point in time everyone did not have
11 e-mail. Even under the GroupWise scenario
12 everyone did not have an e-mail account.
13 Q. And GroupWise was started around when?
14 A. GroupWise was started around 1992ish.
15 Q. Okay.
16 A. By the time we moved to the new
17 facility that we're located in today in 1995, we
18 were implementing, during that move, LAN
19 technology, which actually connected all the
20 desktops together. Up to that point in time the
21 desktops, most of them were stand alone. They
22 were great for creating documents and printing

Page 64

1  them.
2  Q. So a user could only save a document to
3  their hard drive, for example?
4  A. Or to a diskette.
5  Q. To a diskette. But there were no group
6  folders that you and I could both connect to?
7  A. Not at that point. There was very
8  little LAN technology in place at CMS at that
9  time. The conscious decision was in order to
10 completely implement a true LAN solution for the
11 agency, it had to be done when we consolidated
12 ourselves in to the facility we're located in
13 today.
14     Prior to the move in 1995 we were in 13
15 separate facilities, and trying to connect all of
16 those at that point in time just was not
17 feasible.
18 Q. How were the 13 separate facilities
19 broken up, generally speaking?
20 A. There was facility that was located on
21 the Social Security Administration campus, one
22 building that was devoted to HCFA at the time.

Page 65

1  There were several other facilities in the local
2  Woodlawn area, and they were broken up by
3  organization, as I mentioned before. Office of
4  Legislation and Policy might have been in a
5  building that was large enough to house the
6  number of people that worked there.
7      The Office of Research and
8  Demonstrations might be in another building that
9  was just big enough to house them.
10     They were split up around the Woodlawn
11 area. I don't think there was more than a three
12 mile distance between any of the buildings. We,
13 of course, have always had our ten regional
14 offices across the country and our Washington,
15 D.C. location, and I believe at the time there
16 were two Washington, D.C. locations.
17 Q. So in 1994, '95, HCFA decided to
18 consolidate the 13 offices into one?
19 A. One facility, that's correct.
20 Q. Is that the Security, the facility on
21 Security Boulevard?
22 A. That's the facility at 7500 Security

**Page 66**

1 Boulevard.
2     Q. Is there another facility at Security
3 Boulevard?
4     A. There was recently another facility
5 purchased or leased that is located at 7111
6 Security Boulevard.
7     Q. I think we may be there tomorrow.
8         MS. MARTINEZ: Yes.
9 BY MS. RAMSEY:
10    Q. When the consolidation occurred around
11 '94, '95, what efforts were made to ensure that
12 relevant documents were moved safely to the new
13 facility?
14    A. I can only speak to the electronic
15 documents. The physical hard copy documents were
16 handled separately and Vickie Robey was the
17 person. I apologize, I didn't remember her name
18 earlier. Vickie Robey would have been the person
19 responsible for that and that was on a different
20 track. From an electronic perspective, we hired
21 a moving company who specializes in physically
22 moving computer equipment for the desktop

**Page 67**

1 computers.
2         For the data center, which is really
3 where most of the data from an e-mail perspective
4 would have been stored, each of the vendors --
5 each of the vendors for the equipment that was
6 housed in that data center came in, in a
7 specified time. And their equipment was downed
8 by their employees, and moved physically by them
9 to the new location and brought back up by their
10 employees.
11    Q. Did individual employees have any
12 responsibility for maintaining their electronic
13 documents or data or was it handled exclusively
14 by the contractors and such?
15    A. We, at that time in preparation, we
16 asked everyone to print hard copies of anything
17 they had that was important and would be, and
18 would be, it would be devastating if it was lost.
19         We, of course, had back-ups of any
20 consolidated technology we had at that time,
21 which was not very much, but what we had we had
22 back-ups of.

**Page 68**

1         The process used to secure the desktop
2 computers was one that resulted in very, very
3 little corruption during the move. But other
4 than that, there was really no other effort
5 taken. A lot of the onus on keeping important
6 documents was left to the users themselves.
7     Q. Do you recall whether an electronic or
8 a hard copy document was sent to the employees
9 saying, print up anything that's important?
10    A. I do recall that our communication plan
11 included desk-to-desk documentation. By desk-to-
12 desk, I mean physically going to each desk with
13 instructions for your move. The moves were
14 conducted over the summer. And so they were
15 orchestrated mostly by organization.
16        So when we were ready to move the
17 Office of Legislation and Policy, I keep
18 recalling them because they're easy to remember,
19 but when we were ready to move them, I would have
20 a force of people that were assigned to that
21 location in our old facility or in their old
22 location and my group of people would go in and

**Page 69**

1 talk to each of the employees individually about
2 saving things, give them instructions for what
3 they were expected to do during the move, what
4 would take place during the move and what they
5 could inspect the first Monday they came back
6 after the move was complete.
7         And so those were physical hard copy
8 hand-to-hand drops.
9     Q. Do you know whether those documents
10 still exist today?
11    A. Oh, I seriously doubt that they exist
12 today. I don't know that for a fact. There
13 could be someone still around who kept it for
14 whatever reason, but I really wouldn't know how
15 to even begin looking for that.
16    Q. Do you recall whether there was a push
17 at that time to perhaps clean house or get rid of
18 documents that they may not want to take to the
19 next office?
20    A. There was a push at that time to not
21 take junk from one building to another. There
22 was never a push to destroy documents or get rid

**174**

1   Under Outlook there are no post
2   offices. It's all one giant plate of spaghetti
3   and we're just identified by our individual e-
4   mail addresses.
5       And so if I were given the challenge of
6   figuring out how to do that, I would first have
7   to understand the period of time in which we're
8   talking about, I would then have to have someone
9   provide for me the names of every person who
10  worked in an individual area during that period
11  of time, and if they still existed, if they were
12  still employees of CMS, would have to
13  individually go to each of their GroupWise PST
14  files and find that data.
15      And that would be a challenge.
16   Q.  So when the GroupWise e-mail was
17  transferred to Outlook as a PST file, you lost
18  the post office?
19   A.  Yes. We retained -- we identified the
20  mail for Marianne Bowen with Marianne Bowen's ID,
21  and Marianne Bowen got her mail. And that's it.
22  It's not connected anywhere else.

**175**

1   Q.  So you would have to do it on a user-
2   by-user basis?
3   A.  Correct. Assuming we could, making a
4   couple of assumptions. One, that the users who
5   were under a given post office during the period
6   of time that we would be looking for, are still
7   at CMS.
8   Q.  Why does that have anything to do with
9   it?
10  A.  When someone leaves employment with CMS
11  and goes off for greener pastures, we have no
12  reason, on a day-to-day basis under normal
13  circumstances, to retain their mail. When a
14  person leaves CMS, we -- I want to get this right
15  for you. We actually -- the day they leave, their
16  last day, we make a change to their e-mail
17  address that hides it from the address book.
18  Which means no one can send anymore mail to them,
19  and it locks their account.
20      The office that person works in has the
21  opportunity to retrieve any mail they want from
22  that e-mail account, store it however they feel

**176**

1   they need to, and after a period of about 30
2   days, the e-mail account itself is deleted.
3   Q.  Everything in that user's e-mail
4   account is deleted? Their archives are deleted?
5   I'm sorry, Ms. Bowen, I was just going to remind
6   --
7   A.  You told me that and I'm surprised that
8   was the first time I shook my head and didn't say
9   yes all day, but yes.
10  Q.  Can we repeat the question? I believe
11  that I asked, everything in that user's e-mail
12  account is deleted?
13  A.  That's correct.
14  Q.  Their archives are deleted?
15  A.  That's correct.
16  Q.  So unless special measures are taken,
17  an employee who leaves CMS, and every e-mail they
18  have is gone within 30 days?
19      MS. MARTINEZ: Objection to form.
20  A.  Unless someone takes the initiative to
21  save any of the documents or e-mail that was in
22  that person's account before the 30 days are up

**177**

1   or someone takes measures to assure that it's not
2   deleted for a given reason, the account is
3   deleted.
4   Q.  That's the same for the user's files
5   that are stored on the LAN drive and also for the
6   e-mails?
7   A.  The files that are stored on the LAN
8   drive, it works pretty much the same, with a
9   little variation to it.
10  Q.  For the e-mail files, are requests ever
11  made for a user's e-mail to be frozen once they
12  leave, or it not to be deleted?
13      MS. MARTINEZ: To the extent that she
14  knows.
15      MS. RAMSEY: Yes. To the extent that
16  you know.
17  A.  To the extent I know, we would never
18  agree. I have never agreed to retain someone's
19  e-mail forever. As I mentioned, if someone
20  leaves and there's information or data in their
21  e-mail that needs to be retained, it is the
22  responsibility of the organization the person

**Page 178**

1   worked in to get that information and retain it.
2       I have never approved retaining e-mail
3   forever. I have approved retaining e-mail for
4   more than 30 delays, but I've never approved
5   retaining it forever.
6       Q. When you do approve the e-mail be
7   retained, is a copy of that e-mail made or is the
8   account just frozen?
9       A. The account is frozen.
10      Q. Is this freezing of the e-mails
11  something that you would do in your current
12  position?
13      A. No.
14      Q. Who would do that?
15      A. That would again be Bridget Berardino.
16      Q. She is the individual who would receive
17  this request?
18      A. She would receive that request and
19  handle that.
20      Q. She may see a request from the
21  supervisor saying Hilary was working on some
22  really interesting stuff, I want to save her e-

**Page 179**

1   mails; hypothetically?
2       A. That's a possibility, yes.
3       Q. I'm just trying to get at, she would
4   receive the, Bridget is the individual who would
5   receive the requests from possibly the legal
6   department, but also from supervisors or co-
7   workers?
8       A. Bridget manages the agencies' instance
9   of e-mail and so any type of request related to
10  e-mail or any request to do anything other than
11  our normal process and procedures with e-mail
12  would go to Bridget for approval.
13      Q. Everything goes through her?
14      A. That's correct.
15      Q. Have you ever spoken with Bridget
16  regarding the freezing of someone's e-mail?
17      A. No. I don't believe I have. My
18  hesitation was around our transition. When I
19  left that position, she assumed that position and
20  I don't believe we ever had a discussion around
21  that.
22      Q. That takes me back to I think the last

**Page 180**

1   position we really talked about was your
2   coordination of the move, the agency move?
3       A. Correct.
4       Q. And that occurred '94, '95?
5       A. Yes.
6       Q. What did you do after that position?
7       A. After we moved into the new facility, I
8   remained in the same organization, same IT
9   organization, and I believe I was responsible for
10  the desktop computers at that point. I was not a
11  manager at that point, I was a staff person, and
12  I was responsible more for the hardware, software
13  on the desktops. So I was the person who would
14  be responsible for upgrading the computers,
15  upgrading the software, that type of activity.
16      Q. How long did you do that?
17      A. I did that until 1997.
18      Q. What did you do next?
19      A. In 1997 I was promoted, yeah for me, to
20  be the special assistant to the person who was
21  responsible for the agency's management
22  activities, which are personnel, training, the

**Page 181**

1   management of the facility itself, and at that
2   point in time the operation of the LAN e-mail and
3   the desktop computers fell under the organization
4   I was promoted in.
5       I will also mention that in 1997 the
6   agency did yet another reorganization.
7       Q. What was that?
8       A. It was a reorganization of the entire
9   agency. It was a realignment of functions
10  throughout the agency.
11      Q. What did you do after, or I guess what
12  was your next position?
13      A. Okay. I stayed in that position from
14  1997 until about 2000, at which time, yeah again
15  for me, I was promoted to a management position.
16  And the organization that I keep referring to as
17  the Enterprise Center Data Group. It was not
18  called that at that time. It had a different
19  name, but it was the same function.
20      Q. What was it called then?
21      A. Technology Management Group.
22      Q. How long were you in that position?

**222**

      I also asked some questions about what was available, what data was available from an e-mail and LAN perspective and what data was not.
    Q. Did they produce to you any hard copy documents?
    A. I do believe I have a couple of e-mail documents that transmit information you see on a spread sheet we handed out this morning as well as about a page of information about our back-ups and what happens when people leave, et cetera.
    Q. Did you provide to Lockheed Martin the list of the 34 names that are identified in the Amended Notice of Deposition?
    MS. MARTINEZ: It's 33.
    MS. RAMSEY: Is it 33? I keep saying 35.
    MS. MARTINEZ: I'm sorry. I believe it's 33. God willing, I'm not wrong. It's just that I have counted them a number of times and I think it is 33.
    MS. RAMSEY: It is 33. Let's start that again.

**223**

BY MS. RAMSEY:
    Q. Did you provide the 33 names of individuals that are listed in the Amended Notice of Deposition to Lockheed Martin?
    A. No, I did not.
    Q. Why did you not provide them to them?
    A. I wasn't sure -- I take that back a step. Of the 33 names, only five people still work here. So my conversations with Lockheed Martin -- my first conversations were around what happens when people leave.
    Q. What did they tell you?
    A. And what they told me was for e-mail we basically, with the department, working with them, we basically change the e-mail address, which is for all intents and purposes the user identifier in the e-mail system, so that it's not visible in the address book any longer. The data stays on the e-mail system for approximately 30 days which allows the component that the person worked in to have time to go get what they need out of that person's account, print it out, store

**224**

it electronically, do whatever they need to do, and then at the end of 30 days that e-mail account is deleted along with the data associated with it.
    Q. Is it your testimony today that there is not a single e-mail which exists for the former employees of CMS listed on this deposition notice?
    MS. MARTINEZ: Objection as to form.
    A. It is my testimony today that there are not e-mail accounts for the former CMS employees on this list that CMS or Lockheed Martin could go back to look for e-mails.
    Q. Is there any way at all to retrieve e-mails for the former employees which are provided on this list?
    MS. MARTINEZ: Objection as to form.
    A. There is no electronic way to retrieve e-mail for former employees on this list.
    Q. Other than the five individuals listed on your chart, no electronic e-mails have been retained for the other individuals listed on the

**225**

Amended Notice of Deposition?
    MS. MARTINEZ: Objection as to form.
    A. As I've stated earlier, when an employee leaves the agency, the component they worked in has the opportunity to go into their e-mail and remove data from it in the form of a hard copy that is filed as a paper copy, stored on some other storage media, moved into another employee's e-mail account. I would not have knowledge of that. It would be pretty hard to find that electronically.
    Q. Have any of the 28 other employees provided on the Amended Notice of Deposition left CMS since 1995?
    A. I would have to take a look at the list again.
    MS. MARTINEZ: You mean to the extent that she personally can recall other people's employment histories? It's going to be limited by her memory.
    A. It's definitely going to be limited by my memory. Some people I worked closely with, so