# EXHIBIT G

Page 1

              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :  06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


              IN THE CIRCUIT COURT OF

            MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

        Plaintiff,                   :  CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

        Defendants.                  :

------------------------------------X

Page 2

1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2  ---------------------------------X
3  STATE OF WISCONSIN,             : CASE NO.
4      Plaintiff,                  : 04-CV-1709
5  v.                              :
6  AMGEN INC., et al.,             :
7      Defendants.                 :
8  ---------------------------------X
9
10     IN THE COURT OF COMMON PLEAS
11         FIFTH JUDICIAL CIRCUIT
12 ---------------------------------X
13 STATE OF SOUTH CAROLINA, and     :    STATE OF
14 HENRY D. McMASTER, in his official : SOUTH CAROLINA
15 capacity as Attorney General for :    COUNTY OF
16 the State of South Carolina,     :    RICHLAND
17     Plaintiff,                   :
18 v.                               : CIVIL ACTION:
19 MYLAN LABORATORIES, INC.         : 07-CP-40-0283
20     Defendant.                   :
21 ---------------------------------X
22

Page 3

1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2         IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  ------------------x
6  VEN-A-CARE OF THE FLORIDA       :
7  KEYS, INC., a Florida           :
8  Corporation, by and through its :
9  principal officers and directors, :
10 ZACHARY T. BENTLEY and          :
11 T. MARK JONES,                  :
12     Plaintiffs,                 :
13 vs.                             : Civil Action
14 MYLAN LABORATORIES, INC.; MYLAN : No.: 98-3032G
15 PHARMACEUTICALS INC.; NOVOPHARM : Judge:
16 LTD., SCHEIN PHARMACEUTICAL, INC.;: William L.
17 TEVA PHARMACEUTICAL INDUSTRIES  : Gary
18 LTD., TEVA PHARMACEUTICAL USA;  :
19 and WATSON PHARMACEUTICALS, INC. :
20     Defendants.                 :
21 ------------------x
22

Page 4

1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2             STATE OF MISSOURI
3  ------------------x
4  STATE OF MISSOURI, ex rel.,     :
5  JEREMIAH W. (JAY) NIXON,        :
6  Attorney General,               :
7  and                             :
8  MISSOURI DEPARTMENT OF SOCIAL   :
9  SERVICES, DIVISION OF MEDICAL   : Case No.:
10 SERVICES,                       : 054-1216
11     Plaintiffs,                 : Division
12                                 : No. 31
13 vs.                             :
14 DEY INC., DEY, L.P., MERCK KGaA, :
15 EMD, INC., WARRICK             :
16 PHARMACEUTICALS CORPORATION,    :
17 SCHERING-PLOUGH CORPORATION, and :
18 SCHERING CORPORATION,           :
19     Defendants.                 :
20 ------------------x
21
22

Page 5

1             New York, New York
2             Friday, May 4, 2007
3
4
5         Videotaped Deposition of BRUCE C.
6  VLADECK, Ph.D., a witness herein, called for
7  examination by counsel for Abbott Laboratories in
8  the above-entitled matter, pursuant to Subpoena,
9  the witness being duly sworn by JOMANNA DEROSA, a
10 Notary Public in and for New York, taken at the
11 offices of Jones Day, 222 East 41st Street, New
12 York, New York, at 8:38 a.m. on Friday, May 4,
13 2007, and the proceedings being taken down by
14 Stenotype by JOMANNA DEROSA, and transcribed under
15 her direction.
16
17
18
19
20
21
22

Page 262

1  principle liaison with OIG. So, it probably
2  would have been that official plus people from
3  some of the other parts of the agency that had
4  particular concerns or particular agenda issues
5  or things of that sort. Undoubtedly, someone
6  from our financial management office as well
7  would have participated.
8      Q. And who was the director of the Office
9  for Program Integrity?
10     A. The first director was Judith Berik.
11 She was director from '94 through mid-to late
12 '96. I believe he was succeeded by Linda Ruiz.
13     MS. BROOKER: How do you spell that
14 last name?
15     THE WITNESS: Berik is B-E-R-I-K. Ruiz
16 is R-U-I-Z.
17     A. I think that was it during my tenure.
18     Q. We have a number of letters that I
19 would like to show that were addressed to you
20 from Ven-A-Care. Before pulling them out --
21 well, let me pull them out and put them in front
22 of you so you can recall them.

Page 263

1      The first is very lengthy, and I
2  apologize, but we're only going to be talking
3  about the first few pages of this very lengthy
4  document. And so this will be Exhibit Abbott
5  160. I'll ask the court reporter to mark that and
6  hand it to you.
7      (Exhibit Abbott 160, Exhibit
8  Abbott 161, Exhibit Abbott 162, and Exhibit
9  Abbott 163 marked for identification.)
10     (Discussion off the record.)
11     MR. COOK: For the record, we'll put
12 the following exhibits and then I'll hand them to
13 Dr. Vladeck. First is an October 2nd, 1996,
14 letter from Ven-A-Care to Dr. Vladeck. Its
15 Exhibit Abbott 160. The second is a December 3,
16 1996, letter from Ven-A-Care to Thomas Hoyer.
17 It's numbered Exhibit Abbott 161.
18     August 13, 1997, letter from --
19 addressed to Dr. Vladeck from Ven-A-Care. Its
20 Exhibit Abbott 162.
21     Next is a July 10, 1997, letter from
22 Ven-A-Care to Dr. Vladeck. It's Exhibit Abbott

Page 264

1  163.
2      Q. And I'll hand all of those to Dr.
3  Vladeck and ask you to take a quick look.
4      A. Thank you. This document is dated June
5  12th with a cover sheet to the Inspector General.
6  I don't have a number on it.
7      MS. BROOKER: We don't have a June 12th
8  one.
9      MR. COOK: I'm sorry. It's at the top.
10 It's been previously marked as Exhibit Abbott
11 017, a June 12, 1997, letter from Bruce Vladeck
12 to Ven-A-Care, with a cover fax sheet from Zach
13 Bentley and Mark Jones to June Gibbs Brown.
14     Q. Dr. Vladeck, I would like to turn first
15 to the October 2, 1996 letter. It's with the
16 large exhibit, and it's marked Exhibit Abbott
17 160. And I'm going to focus just on the first
18 few pages of that very large exhibit, which is
19 the actual letter from Zach Bentley and Mark
20 Jones at Ven-A-Care to you on October 2, 1996.
21     First, have you ever seen this letter
22 before?

Page 265

1      A. I have.
2      Q. When do you recall first seeing this
3  letter?
4      A. I -- I honestly don't recall whether I
5  saw it in -- in '96. I may have. I'm certain I
6  saw it when I was engaged by Mr. Azorsky in 2003.
7  I've seen it on a number of occasions since, but
8  during that time I tried to remember whether I
9  saw it in '96 and I -- I'm not certain one way or
10 another.
11     Q. If you did not see it in October --
12 whether or not you saw it in October of 1996,
13 what would have been the typical process for
14 handling this sort of correspondence coming in to
15 you as administrator of HCFA?
16     A. I'm not sure this would have received
17 the typical process because of the heading at the
18 top that it was sensitive and under court seal
19 and so forth. It might, therefore, have been
20 routed in the first instance to counsel's office.
21 Had it not been, it would have probably been
22 routed to the Department of Integrity Office by

Page 266

1  the agency's executive secretary to prepare a
2  response for my signature or something of that
3  sort.
4     Q. How would we go about determining, 11
5  years later, how this document and its contents
6  were circulated within HCFA in 1996?
7        MS. BROOKER: Objection. Form.
8     A. If there were ever a response received
9  from anywhere in the agency, a written response
10 by Ven-A-Care, one could track the letter back
11 through a correspondence file. If there was no
12 follow-up I think one would have to work
13 backwards from the correspondence and associated
14 -- documents associated with it as they made
15 their way through the agency.
16    Q. And so, to the extent that there was a
17 response, there would be a way from tracking from
18 the response to the documents supporting that
19 response?
20       MS. BROOKER: Objection, form.
21    A. There should be.
22    Q. Was that your understanding of how

Page 267

1  correspondence was kept at HCFA?
2     A. To the extent there was a response,
3  there should be a way of working backwards from
4  that to the initial incoming document and the
5  intermediate documents generated in the process
6  of preparing a response.
7        MR. COOK: I'll ask the court reporter
8  to mark as Exhibit Abbott 164.
9        (Exhibit Abbott 164 marked for
10 identification.)
11    Q. Could you take a look at that and tell
12 me if you've seen that document before?
13    A. No, I don't believe so.
14       MR. COOK: For the record, this is a
15 December 17, 1996, letter from Kathleen Buto to
16 T. Mark Jones of Ven-A-Care of the Florida Keys.
17    Q. Does this appear to be the response
18 from Kathleen Buto to Mr. Jones following the
19 October 2, 1996, letter to you?
20       MS. BROOKER: Objection, form.
21    A. It would appear to be that, yes.
22    Q. And at the end of the first paragraph

Page 268

1  when it says the administrator referred the
2  letter to Ms. Buto and payment policy is one of
3  her areas of responsibility, would that be
4  consistent with your regular practice and
5  procedure of handling correspondence such as
6  this?
7     A. Again, I wouldn't have personally done
8  that but, yes, that would have made its way to
9  Kathy, yes.
10    Q. And to the extent that someone within
11 HCFA was to be put on notice of facts contained
12 within the correspondence from Ven-A-Care, is it
13 fair to say that Ms. Buto is the one person most
14 responsible for Medicare drug payment policy at
15 this time within HCFA?
16    A. Yes, it would be.
17    Q. The letter from Ven-A-Care dated
18 October 2, 1996, ends with Mr. Bentley and Mr.
19 Jones stating that they would be happy to meet
20 with you and answer any questions or concerns
21 about the issues raised in the letter? Did you
22 ever meet with Mr. Jones or Mr. Bentley?

Page 269

1     A. No, I don't believe so.
2     Q. The letter begins at the beginning of
3  Exhibit Abbott 160 that Ven-A-Care of the Florida
4  Keys -- and it reads:
5        "Has attempted for more than seven
6  years to assist the health care financing
7  administration" -- regarding the issues in that
8  letter.
9        Do you know what, if anything, Ven-A-
10 Care did for seven years prior to 1996?
11       MS. BROOKER: Objection, form.
12    A. Again, other than some of the earlier
13 activities described in the letter itself, I had
14 no independent knowledge of anything about Ven-A-
15 Care.
16       MR. BREEN: I was not looking at the
17 document. I want to pose a form objection to the
18 last question and response now that I've looked
19 at what you're referring to as an exhibit.
20    Q. The second page of the letter lists a
21 number of Office of Inspector General reports. Do
22 you recall you and I looked at a report from 1992

Page 270

1  that talked about the invoice price of vancomycin
2  by dialysis providers?
3      A.  Yes, we did.
4      Q.  Can you tell me, does it appear that
5  that particular OIG report is not listed by Ven-
6  A-Care in the OIG reports that it enumerates
7  there for you?
8          MS. BROOKER: Objection to form.
9      A.  The list of IG reports on Page 2 does
10 not contain the report we were discussing about
11 earlier -- discussing earlier.
12     Q.  In the paragraph that follows, the
13 letter-writers from Ven-A-Care state in this
14 letter to you -- and I'll read it:
15         "Over a year ago we traveled to the
16 HCFA in Baltimore and made a detailed
17 presentation regarding these excessive
18 reimbursements and their impact on the health
19 care delivery system."
20         Do you know anything about whether Ven-
21 A-Care made a trip to Baltimore and met with HCFA
22 officials?

Page 271

1      A.  Other than the assertion in the letter,
2  that's all I know.
3      Q.  So you don't recall ever talking to
4  anybody within HCFA about meetings with Ven-A-
5  Care in approximately 1995?
6      A.  No, I don't.
7      Q.  The next sentence asserts that:
8          "No meaningful action has been either
9  proposed or implemented by your agency to deal
10 with these issues."
11         Would you agree that as of October of
12 1996 no meaningful action had been proposed or
13 implemented by HCFA --
14         MS. BROOKER: Objection.
15     Q.  -- to deal with the issues described in
16 this letter?
17         MR. BREEN: Objection, form.
18     A.  I would not agree. Again, we had
19 proposed to change the Medicare Part B drug
20 pricing methodology.
21     Q.  On Page 5 of the letter in the second
22 paragraph, the last sentence of the second

Page 272

1  paragraph reads:
2          "Our company has been solicited on
3  numerous occasions by drug manufacturers who brag
4  about their use of falsely inflated pricing
5  information as a reason for purchasing their
6  product over a competitors with a lower AWP."
7          First of all, do you have any idea
8  whether or not Ven-A-Care's allegation here is
9  true?
10         MS. BROOKER: Objection to form.
11     A.  I have no independent information about
12 that.
13     Q.  But you would agree with me that as of
14 October 2, 1996, Kathleen Buto at least was aware
15 that that was an allegation that Ven-A-Care was
16 making.
17     A.  I would say that whoever in the agency
18 actually read this letter and looked at the
19 material would have been aware of the allegation,
20 yes.
21         MR. COOK: And then the next letter, in
22 terms of sequencing of date, is Exhibit Abbott

Page 273

1  161, which is a December 3 letter to Thomas
2  Hoyer, H-O-Y-E-R, Office of Chronic Care and
3  Insurance Policy. And it's marked Exhibit Abbott
4  161.
5      Q.  Do you recognize that, Mr. Vladeck?
6      A.  No, I don't. I don't believe I've seen
7  it before today.
8      Q.  Who is Tomas Hoyer?
9      A.  Tom was the director, again, in charge
10 of essentially Medicare reimbursement for
11 everything other, but hospitals and physician.
12     Q.  So Thomas Hoyer would be responsible
13 for reimbursement for infusion therapy, for
14 example?
15     A.  He was certainly responsible for home
16 care and DME reimbursement policies.
17     Q.  The next letter in -- going again date
18 sequence is, I believe -- tell me if I'm wrong --
19 what we've previously marked as Exhibit Abbott
20 017, a June 12, 1997, letter to you?
21     A.  Yes.
22     Q.  Do you recall that letter, Dr. Vladeck?

```
            UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY      :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

Laboratories, Inc.                  :

------------------------------------X


           IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                   :  CASE NO.

        Plaintiff,                  :  CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,          :  JUDGE

et al.,                             :  CHARLES PRICE

        Defendants.                 :

------------------------------------X
```

Page 286

```
 1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
 2  ---------------------------------X
 3  STATE OF WISCONSIN,        : CASE NO.
 4       Plaintiff,            : 04-CV-1709
 5  v.                         :
 6  AMGEN INC., et al.,        :
 7       Defendants.           :
 8  ---------------------------------X
 9
10       IN THE COURT OF COMMON PLEAS
11         FIFTH JUDICIAL CIRCUIT
12  ---------------------------------X
13  STATE OF SOUTH CAROLINA, and   : STATE OF
14  HENRY D. McMASTER, in his official : SOUTH CAROLINA
15  capacity as Attorney General for : COUNTY OF
16  the State of South Carolina,   : RICHLAND
17       Plaintiff,             :
18  v.                          : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.    : 07-CP-40-0283
20       Defendant.             :
21  ---------------------------------X
22
```

Page 287

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2         IN AND FOR LEON COUNTY, FLORIDA
 3  THE STATE OF FLORIDA
 4  ex rel.
 5  ---------------------x
 6  VEN-A-CARE OF THE FLORIDA    :
 7  KEYS, INC., a Florida        :
 8  Corporation, by and through its :
 9  principal officers and directors, :
10  ZACHARY T. BENTLEY and       :
11  T. MARK JONES,               :
12       Plaintiffs,             :
13  vs.                          : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM  : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES  : Gary
18  LTD., TEVA PHARMACEUTICAL USA;  :
19  and WATSON PHARMACEUTICALS, INC. :
20       Defendants.             :
21  ---------------------x
22
```

Page 288

```
 1  IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2              STATE OF MISSOURI
 3  ------------------x
 4  STATE OF MISSOURI, ex rel.,    :
 5  JEREMIAH W. (JAY) NIXON,       :
 6  Attorney General,              :
 7  and                            :
 8  MISSOURI DEPARTMENT OF SOCIAL  :
 9  SERVICES, DIVISION OF MEDICAL  : Case No.:
10  SERVICES,                      : 054-1216
11       Plaintiffs,               : Division
12                                 : No. 31
13  vs.                            :
14  DEY INC., DEY, L.P., MERCK KGaA, :
15  EMD, INC., WARRICK             :
16  PHARMACEUTICALS CORPORATION,   :
17  SCHERING-PLOUGH CORPORATION, and :
18  SCHERING CORPORATION,          :
19       Defendants.               :
20  ------------------x
21
22
```

Page 289

```
 1              New York, New York
 2              Thursday, June 21, 2007
 3
 4       CONTINUED Videotaped Deposition of
 5  BRUCE C. VLADECK, Ph.D., a witness herein, called
 6  for examination by counsel for Abbott Laboratories
 7  in the above-entitled matter, pursuant to
 8  Subpoena, the witness being duly sworn by JOMANNA
 9  DEROSA, a Notary Public in and for New York, taken
10  at the offices of Jones Day, 222 East 41st Street,
11  New York, New York, at 8:54 a.m. on Thursday, June
12  21, 2007, and the proceedings being taken down by
13  Stenotype by JOMANNA DEROSA, and transcribed under
14  her direction.
15
```

2 (Pages 286 to 289)

Page 570

1  form. Leading. I don't think you're allowed to
2  lead that witness.
3         THE WITNESS: We're having an audio
4  problem.
5         THE VIDEOGRAPHER: The time is 4:03
6  p.m. We're going off the record with Tape No. 10.
7         (Off the record discussion.)
8         THE VIDEOGRAPHER: It's 4:03 p.m.
9  We're going back on the record, continuing with
10 Tape No. 10.
11        (The last question was read
12 back by the reporter.)
13     A.   I would --
14        MR. MC DONALD: Objection to form.
15     A.   I would sort of restate it more
16 generally. I think the whole of the Medicare
17 program is predicated on the --
18        (Teleconference static.)
19        THE WITNESS: It seems to be when I
20 talk we get the interference.
21     A.   The whole program is predicated on
22 a mutually trusting, honest, supportive

Page 571

1  relationship between providers and the program.
2      Q.   Does that trust extend to
3  participants like drug manufacturers who publish
4  AWPs that they know the Medicare program is
5  relying on?
6         MR. ESCOBAR: Objection to form.
7         MR. EDWARDS: Objection to form.
8      A.   I would say actually the drug
9  manufacturers are in a somewhat different
10 relationship with the Medicare program than
11 providers who are reimbursed directly by Medicare
12 because as a rule the manufacturers are not
13 reimbursed directly.
14        And so the relationship on the
15 Medicare side between drug manufacturers and the
16 agency prior to the enactment of Part D was one
17 step further removed than it was, say, with the
18 durable medical equipment suppliers or hospitals
19 or individual physicians.
20        Again, on the Medicaid side there
21 was a very specific relationship with the
22 manufacturers provided under the rebate program.

Page 572

1      Q.   Let me ask it to you this way: Did
2  you expect, as administrator of HCFA, that in
3  publishing AWPs that the manufacturers knew the
4  Medicare program would be relying on for
5  reimbursement, that they could make those AWPs
6  whatever they wanted to?
7         MR. MC DONALD: Objection to form.
8         MR. GORTNER: Object to form.
9         MR. EDWARDS: Objection to form.
10        MR. ESCOBAR: Objection to form.
11     A.   I think there are two separate
12 questions there. One is we assumed that the
13 manufacturers knew that the prices published in
14 the Red Book or the AWP prices that were publicly
15 reported affected Medicare reimbursement.
16        Again, our presumption was that
17 they were not reported at the level they were or
18 set at the level they were solely to maximize
19 Medicare reimbursement.
20     Q.   So, as HCFA administrator you never
21 advised any drug manufacturers that it was okay
22 for them to use the difference between AWP and

Page 573

1  acquisition price in order to influence purchase
2  of their products?
3      A.   I don't believe I ever had any
4  direct conversations with drug manufacturers or
5  their representatives around those issues.
6      Q.   Are you aware of anyone at HCFA
7  that authorized drug manufacturers to market their
8  drugs on the basis of the spread or the difference
9  between AWP and acquisition costs?
10        MR. ESCOBAR: Objection to form.
11     A.   No, I'm not aware.
12     Q.   Are you aware of anyone at HCFA who
13 told drug manufacturers that it was all right to
14 have physicians make prescribing decisions based
15 on the amount of money that they could make by
16 prescribing one manufacturer's drug over another?
17     A.   I would have been very upset if I
18 had learned that anyone at HCFA had condoned such
19 behavior.
20     Q.   And you have no knowledge that
21 anyone condoned that type behavior; did you?
22     A.   I certainly have no knowledge, but

Page 574

1  I couldn't entirely rule it out either, so.
2      Q.   In preparing to talk to you today I
3  read one of your many articles that you've written
4  about the Medicare program, and you make a comment
5  in there that data from one to two years are not
6  sufficiently accurate or a reliable source on
7  which to base conclusions or major changes in
8  public policy.
9           Do you recall ever making that
10 statement?
11     A.   I don't doubt it, but I -- I don't
12 recall the context.
13     Q.   It was actually in a different
14 context.  It didn't relate to drug reimbursement.
15 But what I wanted to ask you is whether you
16 believe that that statement has any accuracy in
17 the context of the reports that were published by
18 OIG in connection with drug reimbursement?
19          MR. ESCOBAR:  Objection to form.
20          MR. MC DONALD:  Objection to form.
21          MR. EDWARDS:  Objection.
22     A.   If we're talking about the various

Page 575

1  reports which have been exhibits in the -- during
2  the course of this deposition on which I was asked
3  to comment, I don't completely question the
4  accuracy of any of the data reported by OIG or
5  others.  I do think in general that the link
6  between a specific report of data and policy
7  decisions is not always entirely straightforward
8  and that there are lots of other considerations,
9  one of which would be how limited or short term or
10 whatever the data was.
11          In the case of the drug pricing
12 reports, many of which have been discussed in the
13 course of this deposition, I was, frankly, less --
14 to the extent I was paying attention at the time I
15 was, frankly, less concerned with the accuracy of
16 any particular number than by the recognition that
17 we were highly constrained in our policies by the
18 statutes which we had sought to change,
19 unsuccessfully.  So that whatever the right thing
20 to do might be, we were not in a position to do
21 it.
22     Q.   I wanted to turn next to asking you

Page 576

1  about some testimony that you gave in your first
2  deposition where you described two separate
3  discussions that you had had with drug
4  manufacturers.
5           Do you recall that testimony?
6      A.   Roughly, yes.
7      Q.   Just to refresh your recollection,
8  you had testified that on two occasions you spoke
9  with representatives of drug manufacturers.  The
10 first was in connection with a J&J subsidiary who
11 had a Medicaid rebate problem in about '96 or '97.
12          Do you recall that testimony?
13          MR. COHEN:  Objection.
14     A.   That's correct, yes.
15     Q.   Do you recall who initiated that
16 contact between yourself and the representative
17 from the J&J subsidiary?
18     A.   It would have been whoever the J&J
19 representative was.
20     Q.   And at the time you testified in
21 your first deposition, I believe you didn't recall
22 anything more specific about that conversation;

Page 577

1  did you?
2      A.   I -- I recalled that they described
3  the problem as they had offered such a significant
4  discount to state hospitals to maintain the market
5  for Halcion that when the rebate was applied to
6  other Medicaid -- the best-price provision was
7  applied to other Medicaid purchases of the drug,
8  they actually owed in rebates more than they had
9  received in reimbursement for the drug.  And they
10 thought that was unfair and unreasonable.
11     Q.   Do you recall specifically who you
12 spoke to in that conversation?
13     A.   No, I don't.
14     Q.   The second conversation you
15 testified to was a conversation with a -- a
16 lobbyist of a drug manufacturer that you couldn't
17 remember who was trying to convince HCFA to cover
18 an antiemetic drug.
19          Do you recall that testimony?
20     A.   Yes.
21     Q.   Again, who would have initiated
22 that contact?

Page 578

1   A.   It would have been the lobbyist.
2   Q.   You don't recall specifically who
3   you spoke to?
4   A.   Well, no, I do. I think it was a
5   Fred Griffy.
6   Q.   Do you recall anything about the
7   substance of the conversations with Mr. Griffy?
8   A.   Well, again, the -- his client had
9   just received FDA approval for a new oral
10  antiemetic drug. At the time Medicare covered,
11  under Part B, outpatient cancer chemotherapeutic
12  drugs, and he was trying to convince us that
13  antiemetics could be covered under that provision.
14  Q.   And you said a single meeting with
15  Mr. Griffy?
16  A.   There may have been two, because we
17  did have staff look into the issue and look at
18  some information they supplied. And there may --
19  there was undoubtedly a second conversation after
20  staff reported back on their analysis of it.
21  Whether it was face-to-face or over the phone I
22  don't recall.

Page 579

1   Q.   And since testifying at your first
2   deposition you don't recall any additional
3   conversations you had with drug manufacturers
4   while you were administrator of HCFA.
5   A.   No, I don't.
6   Q.   We talked a lot today with
7   defendants' counsel and most recently with Mr.
8   Edwards about efforts that HCFA may or may not
9   have made to speak with drug manufacturers.
10       Do you recall generally that
11  testimony?
12  A.   Yes.
13  Q.   Were you ever contacted by any drug
14  manufacturer at any time who, upon reviewing the
15  OIG reports, sought to enlighten HCFA about the
16  reasons that the OIG had found AWP inflation?
17       MR. EDWARDS: Objection to form.
18       MR. GORTNER: Objection to form.
19       MR. ESCOBAR: Objection to form.
20  A.   Not that I recall.
21  Q.   Did any drug manufacturer ever
22  contact you to let you know that the reason for

Page 580

1   that AWP inflation was because they were forced to
2   compete with other drug manufacturers by raising
3   their AWPs?
4        MR. EDWARDS: Objection to form.
5        MR. GORTNER: Objection to form.
6   A.   Not that I'm aware.
7   Q.   Did any drug manufacturer ever
8   contact you and advise you that spread marketing
9   was going on?
10       MR. EDWARDS: Objection to form.
11       MR. GORTNER: Objection to form.
12  A.   Not that I'm aware.
13       MS. CONNOLLY: I don't have any
14  further questions. Thank you for your time.
15       THE VIDEOGRAPHER: The time is 4:15
16  p.m. We're going off the record with Tape No. 10.
17       (Recess taken.)
18       THE VIDEOGRAPHER: The time is 4:25
19  p.m., and we're going back on the record,
20  continuing with Tape No. 10.
21       MR. LORUSSO: My name is Mike
22  Lorusso. I'm here on behalf of the Commonwealth

Page 581

1   of Pennsylvania. I'd just like to say that we
2   have questions for Dr. Vladeck on behalf of the
3   Commonwealth. However, at this time we're unable
4   to conduct our examination based on restrictions
5   that have been placed on the use of our discovery
6   documents by counsel for TAP. Therefore, we
7   reserve the right to conduct our examination at
8   such time as the dispute is resolved by the Court.
9        MR. BREEN: Okay. Let's roll.
10       MR. COOK: Just for a second, I
11  have no idea what that means, but as a
12  representative of the law firm representing TAP,
13  just for the record, if you have any questions for
14  the doctor, he's right there at the end of the
15  table, and we would expect you to ask them. He
16  can always be -- attempted to be brought back for
17  more questions, but in the future if we try to use
18  his testimony and you said that you didn't have a
19  chance to ask questions, we're going to -- we're
20  going to assert otherwise.
21       MR. LORUSSO: Let me just say on
22  the record that -- let me reiterate what I said.

Page 582

1  The reason why I don't have -- the reason why I
2  cannot ask the particular questions that I would
3  like to ask Dr. Vladeck is based on restrictions
4  that have been put on us by TAP. So, with respect
5  to those particular questions I believe the
6  record's clear.
7           MR. COOK: Since I don't know what
8  those questions are I don't know how clear it is,
9  but it is what it is.
10          MR. BREEN: All right. Roll.
11          MS. BROOKER: Let me just say in
12 response to all of that, the Government of the
13 United States reserves its right to respond to any
14 of those comments or objections, or whatever they
15 just were, at an appropriate time.
16          MR. BREEN: Now can we roll?
17
18      EXAMINATION BY COUNSEL FOR
19      VEN-A-CARE
20 BY MR. BREEN:
21   Q.   I just have a few questions, I
22 believe, Dr. Vladeck.

Page 583

1    A.   Yes.
2    Q.   And you know I'm Jim Breen. I
3  represent Ven-A-Care of the Florida Keys.
4    A.   I'm aware, yes.
5    Q.   The relator in a whole bunch of
6  these cases, including the one you're probably
7  noticed on.
8           You've spent a lot of time
9  testifying about average manufacturers' price in
10 response to both Mr. Cook's and Mr. Escobar's
11 questions earlier.
12          Do you recall that?
13   A.   Yes.
14   Q.   Now, they asked you about average
15 manufacturers' price, but do you also recall a
16 term "best price"?
17   A.   Yes.
18   Q.   As used in the Medicaid rebate
19 statute?
20   A.   That's correct. Yes.
21   Q.   And that would be OBRA '90.
22       Correct?

Page 584

1    A.   That's -- Yes.
2    Q.   All right. Now, when you were
3  testifying about confidentiality of pricing
4  information provided by the drug companies with
5  respect to the Medicaid rebate obligations, what
6  specific pricing information were you talking
7  about?
8           MR. ESCOBAR: Objection to the
9  form.
10   A.   Well, I would include all the
11 pricing information that was provided by the
12 manufacturers to HCFA, which would include both
13 average manufacturing price and best price.
14   Q.   Okay.
15          MR. BREEN: And what's wrong with
16 that question, counselor? I want to clean it up
17 if there's a problem.
18          MR. ESCOBAR: I didn't understand
19 it.
20          MR. BREEN: Okay.
21   Q.   What pricing information were you
22 aware that drug companies provided under their

Page 585

1  obligations under the Medicaid rebate program and
2  under their Medicaid rebate agreements --
3           MR. ESCOBAR: Objection to the
4  form.
5    Q.   -- with HHS?
6    A.   Again, it was my understanding that
7  manufacturers provided average manufacturer's
8  price and best price.
9    Q.   And best price, okay. Now, and was
10 it also your understanding that that information
11 had to be maintained as confidential by -- with
12 the Health Care Financing Administration?
13       Correct?
14   A.   By the unit in the Health Care
15 Financing Administration that administered the
16 rebate program.
17   Q.   Other than specific patient
18 information, can you think of any information that
19 was held to a higher degree of confidentiality by
20 HCFA during your term there?
21          MR. ESCOBAR: Objection to the
22 form.

Page 586

1   A.   No, I think the restrictions on the
2   information received under the rebate program were
3   quite extraordinary relative to other information
4   we received.
5       Q.   Now, you testified a lot about --
6   about your knowledge or at least your impressions
7   as to some of the political issues that were
8   affecting your job and your -- and your agency's
9   ability to make policy.
10          Do you remember that?
11      A.   Yes.
12      Q.   Well, along that line, when it came
13  to this confidentiality of information, was it --
14  do you have a recollection as to what group or
15  entity wanted to keep this information so
16  confidential?
17          MR. ESCOBAR:   Objection to the form
18  of the question.
19      A.   Again I have no firsthand
20  knowledge, but my understanding was that in the
21  legislative process that produced OBRA '90 the
22  manufacturers were quite insistent on maintenance

Page 587

1   of confidentiality associated with the mandatory
2   reporting requirements under the rebate
3   provisions.
4       Q.   Are you aware of any patient groups
5   that wanted this information to be kept
6   confidential?
7           MR. ESCOBAR:   Objection to the
8   form.
9       A.   Again, this is second to third-
10  hand, and the only -- the impression that I've
11  reported all I know.
12      Q.   Okay.  That it was the drug
13  manufacturers that wanted to keep this information
14  at an unprecedented level of confidentiality by
15  HCFA.
16          MR. ESCOBAR:   Objection to the
17  form, and you're mischaracterizing the rebate
18  agreement signed by the government on behalf of
19  the states.
20      Q.   Is that correct, Dr. Vladeck?
21      A.   Is what correct?
22      Q.   All right.  Let's go back.

Page 588

1           MR. ESCOBAR:   It's also leading.
2           MR. BREEN:   Counsel, I'm going to
3   tell you something right now.  I did not do
4   anything when you were inquiring of the witness
5   other than object on the basis of form.  I made no
6   speaking objections, and I don't expect any when
7   I'm questioning the witness.
8       Q.   Now, let's go back.
9           MR. ESCOBAR:   Mr. Breen, you're
10  mischaracterizing the rebate agreement
11  intentionally, and I assume that you really don't
12  want to do that, so I'm trying to help you --
13          MR. BREEN:   I understand that,
14  counsel.
15          MS. BROOKER:   I would like to make
16  an objection on behalf of the United States, Mr.
17  Escobar.  Much of your examination, particularly
18  in this area, was very misleading.  I made none of
19  those speaking objections on the record; I merely
20  objected to form.  It is improper that you make
21  any speaking objections.  You say "objection,
22  form," and we all agree here that all of your

Page 589

1   objections are preserved.
2           MR. BREEN:   All right.  Now, let's
3   move on.  The day is getting old very quickly, and
4   we all want to get finished.
5       Q.   Let's just go back to this
6   confidentiality requirement for information
7   provided to the Health Care Financing
8   Administration by drug companies in connection
9   with the requirements of OBRA '90 and the Medicaid
10  drug rebate program.  Okay?  I'm just focusing on
11  that right now.
12      A.   Okay.
13      Q.   Did you ever, in the entire time
14  you were with HCFA, either directly or hear about
15  a drug company encouraging HCFA to use its AMP
16  information and best-price information to set
17  reimbursement for its drugs either by the Medicare
18  program or the Medicaid program?
19          MR. ESCOBAR:   Objection to the
20  form.
21      A.   No.
22      Q.   So, when HCFA established these

Page 590

1  unprecedented protections for the drug company
2  pricing information, who did you believe HCFA was
3  trying to protect?
4         MR. ESCOBAR: Objection to the
5  form.
6     A.   Again, I don't believe we were
7  particularly trying to protect anyone. We were
8  interpreting the statute as it was explained to us
9  and interpreted to us, which required that. And,
10 again, second or thirdhand, it was my
11 understanding that it was at the behest of the
12 manufacturers that this level of confidentiality
13 was required.
14    Q.   Okay. Now, you testified earlier -
15 - you were asked a bunch of questions about
16 whether the state Medicaid programs were provided
17 with AMP information directly by HCFA.
18         Do you recall those questions
19 today?
20         MR. ESCOBAR: Objection to the
21 form.
22    A.   Yes.

Page 591

1     Q.   Okay. And sitting right now, do
2  you have a present recollection of HCFA actually
3  providing AMP information to any state?
4     A.   I had no firsthand exposure to any
5  such transactions at any time.
6     Q.   And as a matter of fact, has
7  anybody ever -- let me just ask you this question:
8  Has anybody ever directly told you that HCFA, on
9  any occasion, ever provided AMP information to any
10 state?
11    A.   Not that I'm aware of.
12    Q.   So, if you were to testify earlier
13 today about the HCFA giving up state AMP
14 information, was that -- were you speculating or
15 were you -- what were you basing that testimony
16 on?
17         MR. ESCOBAR: Objection to the
18 form, and you're mischaracterizing his testimony.
19    A.   If I testified to the contrary I
20 was in error. My -- I have no firsthand knowledge
21 of HCFA ever directly communicating AMP
22 information to a state. It was my understanding

Page 592

1  that some of that information would be shared as
2  part of the rebate process, but that's a second-
3  or third-hand understanding.
4     Q.   Okay. How about best-price
5  information? Was that ever communicated to a
6  state?
7     A.   I don't know.
8     Q.   Okay. Now, if you could pull up
9  Exhibit -- Exhibit Dey 022, this chart that Mr.
10 Escobar spent a lot of time asking you about.
11         Do you have that?
12    A.   Yes, I have it.
13    Q.   And just generally questions about
14 whether it was your understanding that these state
15 formulas were appropriate or allowed under the
16 applicable laws and regulations.
17         Do you recall that?
18         MR. ESCOBAR: Objection to the
19 form.
20    A.   Yes.
21    Q.   Okay. Now, to the extent you
22 answered any questions about Exhibit Dey 022, were

Page 593

1  any of your answers based upon your direct
2  knowledge that this exhibit correctly reflects the
3  state reimbursement formulas?
4         MR. ESCOBAR: Objection to the
5  form.
6     A.   I would state that in answering
7  questions based on this exhibit I assumed it was
8  accurate.
9     Q.   You assumed it was accurate, okay.
10 So, for example, where Mr. Escobar's questions
11 represented that New York only pays based upon
12 AWP, do you see that?
13    A.   Yes.
14    Q.   Were your answers based upon your
15 own knowledge of the New York reimbursement
16 requirements or was it based upon just your
17 assumption that this chart is correct?
18         MR. ESCOBAR: Objection to the
19 form.
20    A.   Actually, the New York instance
21 would be the only one in which I had any
22 independent knowledge, or one of the few in which

Vladeck, Ph.D., Bruce C. - Vol. II                                June 21, 2007
New York, NY

Page 594

1  I had independent knowledge, because of the recent
2  discussions in the last years of Medicaid
3  reimbursement for prescription drugs in New York.
4         And while I don't remember
5  specifically, I do remember that New York has long
6  had a reputation of being a disproportionately
7  generous payer for Medicaid drugs.
8      Q.   Now, with respect to each of these
9  reimbursement formulas on Exhibit Dey 022 which
10 are based upon WAC or AWP, is it -- well, have you
11 ever had an understanding that any state's
12 reimbursement formula that was approved by HHS
13 allowed it to pay more than average wholesale
14 price --
15         MR. ESCOBAR: Objection --
16     Q.   -- for the ingredient cost?
17         MR. ESCOBAR: Objection to the
18 form.
19     A.   Not -- not subsequent to the
20 implementation of OBRA '90.
21     Q.   And how about, are you aware of any
22 state reimbursement formula that had been approved

Page 595

1  by HHS that permits a state to pay less than --
2  strike that.
3         -- that permits a state to pay --
4  let me restate the question then.
5         If you look -- look at Florida on
6  the chart.
7         Do you see that?
8      A.   I do.
9      Q.   And according to this, it says that
10 its ingredient reimbursement basis is WAC plus 7
11 percent. Do you see that?
12     A.   I do.
13     Q.   Now, what is your understanding of
14 what WAC is?
15     A.   Again, my understanding of WAC is
16 it would be the actual market invoice costs paid
17 by pharmacies to acquire the drugs.
18     Q.   Okay. Now, by pharmacies or by the
19 wholesaler?
20     A.   No, I believe it would be -- my
21 understanding was that it would be by the
22 pharmacy.

Page 596

1      Q.   All right. Now, looking at Florida
2  again where you have WAC plus 7 percent, when you
3  were the HCFA administrator, did any
4  representative of Dey Laboratories, Mr. Escobar's
5  client, one of them, ever inform you, or anybody
6  else to your knowledge, that in May of 1995 Dey
7  Laboratories elected to materially inflate their
8  WAC report for albuterol in order to build in a
9  bigger reimbursement spread than their competitor,
10 Warrick, who is represented by Mr. McDonald here
11 today?
12         MR. ESCOBAR: Objection to the
13 form.
14     A.   I would say that I can be
15 reasonably certain that I never had such a
16 conversation remotely like that with any drug
17 manufacturer, and I would be surprised if any of
18 my colleagues did.
19     Q.   If you look at Exhibit Dey 023,
20 which was the Dey rebate agreement, and go to Page
21 122, the signature page, do you see who it's
22 signed by for Dey Laboratories?

Page 597

1      A.   Well, I can't quite read the
2  handwriting. It appears to be an R. Mozak.
3      Q.   Mozak. And I'll represent to you
4  that I believe that's Robert Mozak. And you see
5  VP of marketing was his title?
6      A.   I see that.
7      Q.   And you see purportedly he signed
8  it on February 28th, 1991?
9      A.   I see that.
10     Q.   Did Mr. Mozak or anybody else at
11 Dey Laboratories ever advise you that in February
12 of 1992 Mr. Mozak prepared a marketing plan that
13 said that Dey was going to market its drugs based
14 upon its reported prices and its influence over
15 Medicaid and Medicare reimbursement?
16         MR. ESCOBAR: Objection to the
17 form, and you're misrepresenting the evidence.
18         MR. BREEN: I absolutely am not
19 misrepresenting the evidence, counselor.
20         MR. ESCOBAR: You are.
21         MR. BREEN: Be that as it may,
22 we'll take that up later.

79 (Pages 594 to 597)

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Page 598

1  Q.  I'm asking you if anybody ever
2  informed you of that or anything -- anything like
3  that.
4  A.  No, I certainly would have
5  remembered such a conversation or communication if
6  I had it.
7  Q.  Now, did anybody ever communicate
8  to you as the HCFA administrator, or anyone else
9  at HCFA to your knowledge, that Warrick reported
10 prices that were maintained in a separate database
11 from its actual transaction prices that had no
12 relation to its actual transaction costs
13 whatsoever when it reported prices that it knew
14 would be used for Medicare and Medicaid
15 reimbursement?
16      MR. MC DONALD: Object to the form.
17 That's a gross misstatement of facts.
18      MR. BREEN: I do not believe it is,
19 counsel.
20 Q.  Did anybody ever inform you that
21 about Warrick?
22      MR. MC DONALD: Object to the form.

Page 599

1  A.  Perhaps I can finesse the issue by
2  saying that, with all due respect, I don't know
3  that I ever heard of Warrick during the course of
4  my tenure.
5      MS. BROOKER: I object on the
6  record to the speaking objections by defense
7  counsel here today.
8      MR. MC DONALD: I have a duty as
9  counsel to be sure that there's not
10 misrepresentations made to this witness.  He's an
11 officer of the court and he should not make gross
12 misrepresentations of fact, and I will make my
13 appropriate objections.
14     Thank you very much.
15     MS. BROOKER: Those are speaking
16 objections, and I did not make those speaking
17 objections to the gross misrepresentations made by
18 Mr. Escobar today.
19     MR. ESCOBAR: That's outrageous.
20 That really is outrageous.
21     MR. BREEN: Let me just finish this
22 up.

Page 600

1  Q.  Bristol-Myers.  Did you remember
2  questions about the drug VePesid?
3  A.  Yes.
4  Q.  And were you aware -- and that was
5  included in the Ven-A-Care letter of October 2nd
6  of 1996.  Correct?
7  A.  That's my understanding.  Yes, it
8  was.
9  Q.  And was it your understanding that
10 Bristol-Myers was the brand manufacturer for
11 VePesid?
12 A.  Yes.
13 Q.  And that's the etoposide brand.
14     Correct?
15 A.  Whatever the document said or I was
16 told.
17 Q.  Now, what was your understanding
18 the entire time as to -- that you were HCFA
19 administrator as to the relationship of brand
20 products to their AWP versus the actual prices
21 available in the marketplace?
22 A.  Again, as I think I've testified on

Page 601

1  a number of occasions both on the prior day and
2  today, my understanding was that there was a very
3  broad range of prices in the marketplace but that
4  for brand name products on average the difference
5  between actual transaction price and the price as
6  reported in the Red Book would be in the range of
7  15 to 20 percent.
8  Q.  Did anybody tell you when you were
9  at HCFA, or anybody to your knowledge at HCFA,
10 that Bristol priced its VePesid product to compete
11 with generics and created a spread similar to the
12 generics?
13     MR. EDWARDS: Objection.
14 A.  I don't believe I ever had a
15 conversation about the specific pricing of any
16 drug other than Lupron in -- in all the time I was
17 HCFA administrator.
18 Q.  Now, going back to Exhibit Dey 022,
19 if I remember your testimony correctly there were
20 times when you got to HCFA you -- it was your
21 understanding HCFA could not change the formula
22 for Medicaid reimbursement for a certain period of

Page 602

1  time. Correct?
2         MR. ESCOBAR: Objection to the
3  form. It mischaracterizes the testimony.
4     Q.   Is that correct?
5     A.   My understanding was that that
6  applied to the dispensing fees.
7     Q.   Dispense fees. Okay. Thank you
8  for correcting me.
9         And then later on there was a time
10 -- or are you aware that after you left HCFA your
11 successor for a limited period of time was told by
12 Congress not to change the reimbursement formula
13 for Medicare?
14    A.   For Medicare?
15    Q.   For Medicare.
16    A.   Yes. There were very extensive
17 back-and-forth on the Medicare drug pricing.
18    Q.   Okay. Now let's go to Exhibit Dey
19 022.
20        To the extent that any drug
21 manufacturer reported inflated pricing information
22 that -- or strike that.

Page 603

1         To the extent that any drug
2  manufacturer was reporting pricing information
3  that led to the publishing of their AWPs or led to
4  these WAC reports that are being -- that are
5  referred to here on this exhibit, to the extent
6  that the manufacturer would report a lower price,
7  either AWP for AWP reimbursement or WAC for WAC
8  reimbursement, would that result in lower
9  reimbursement for the ingredient cost?
10        MR. ESCOBAR: Objection to the
11 form.
12    Q.   Under the Medicaid program?
13        MR. ESCOBAR: Same objection.
14    A.   Yes.
15    Q.   Now, the whole time you were at
16 HCFA, did either you or anybody else ever inform a
17 drug manufacturer that it should not lower its
18 price reports if appropriate?
19        MR. COOK: Objection.
20    A.   Certainly not that I'm aware.
21    Q.   Okay. Now, while you were at HCFA
22 did you or anybody to your knowledge become aware

Page 604

1  that Abbott Laboratories was manufacturing a
2  generic Vancomycin and reported prices that caused
3  AWP to be reported higher than Lilly's brand?
4         MR. COOK: Objection.
5     A.   I don't -- I don't believe I was
6  ever aware of any pricing information having to do
7  with Vancomycin.
8     Q.   Okay. Now, these spreads that have
9  been talked about and you've seen them in the Ven-
10 A-Care letter and there's been discussions here
11 today and on your first day, when you were HCFA
12 administrator did you have an understanding that
13 the Department of Justice and the HHS office and
14 Inspector General were conducting the necessary
15 investigations to find out if, and if so, why,
16 prices were being reported at inflated levels that
17 were being used for drug reimbursement?
18        MR. ESCOBAR: Objection to the
19 form.
20        MS. BROOKER: Objection.
21        You know, I ask you to be mindful
22 not to disclose any deliberative predecisional

Page 605

1  conversations.
2         MR. BREEN: I'll restate the
3  question. I don't intend to cause that.
4         As a matter of fact, I'll withdraw
5  that question.
6     Q.   Let me ask this question: Did you
7  ever believe that it was your responsibility or
8  HCFA's responsibility to investigate drug company
9  conduct with respect to reporting prices that were
10 being used for Medicaid and Medicare
11 reimbursement?
12        MR. ESCOBAR: Objection to the
13 form.
14    A.   I believed it was our
15 responsibility, when we became aware of any
16 potential fraud or abuse involving our programs,
17 to alert the Inspector General and in some
18 instances the Department of Justice.
19        Again, other than the noted copies
20 on that Ven-A-Care letter, I don't recall ever
21 having been aware of that -- of the applicability
22 of that general policy to the issue of drug

81 (Pages 602 to 605)