## SETTLEMENT AGREEMENT

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into as of October *31*, 2005, among the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the Eastern District of Pennsylvania and on behalf of the Offices of Inspectors General of the Department of Health and Human Services ("HHS-OIG") and the Department of Veterans Affairs ("VA-OIG"), (collectively the "United States"), and King Pharmaceuticals, Inc., and Monarch Pharmaceuticals, Inc., (collectively "King" and, together with the United States, the "Parties"), through their authorized representatives.

## II. PREAMBLE

As a preamble to this Agreement, the Parties recite the following:

A.     King Pharmaceuticals, which has its principal place of business in Bristol, Tennessee, manufactures and sells generic and branded pharmaceuticals through several wholly-owned subsidiaries. The subsidiaries of King Pharmaceuticals are listed on Attachment A. For purposes of this Agreement, all references to King include its subsidiaries to the extent that they have manufactured or sold pharmaceuticals that fall within the "Covered Conduct" of this Agreement. The "Covered Conduct" is fully described in Paragraph I, below. King has manufacturing facilities in several locations in the United States, and its sales force is located throughout the United States. King sells its products throughout the United States, including in the Eastern District of Pennsylvania.

B.     Edward Bogart (the "relator") is an individual residing in the State of Tennessee. On March 12, 2003, the relator filed a qui tam action in the United States District Court for the

[{NYCORP:2543891}]

Eastern District of Pennsylvania captioned <u>United States ex rel. Edward Bogart, et al. v. King</u> <u>Pharmaceuticals, Inc., et al.</u> (the "Civil Action"). Relator had been employed as a director of National Accounts at Monarch Pharmaceuticals from January 1998 to October 14, 2002, and he was responsible for the negotiation of certain sales agreements between Monarch Pharmaceuticals and certain customers.

      C.    The Civil Action also named as plaintiffs twelve states and the District of Columbia that had, during the relevant period, state false claims act statutes (collectively, the "Plaintiff States"). This Agreement resolves the civil claims of the United States against King as set forth in Paragraph 4, below. King has entered into an agreement (the "NAMFCU Agreement") with the National Association of Medicaid Fraud Control Units ("NAMFCU") providing for, among other things, the disbursement of the State Settlement Amount (as defined in Paragraph 3, below).

      D.    King sold pharmaceuticals that were purchased or reimbursed by commercial and government payors and other customers, including the Department of Health and Human Services ("HHS") and the Department of Veterans Affairs ("VA"). Each of the government customers was required by federal law to receive certain prices or pricing information, and federal law required King to pay certain rebates in connection with its pharmaceutical products.

      E.    At all relevant times, the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, required participating manufacturers to pay rebates to the state Medicaid agencies pursuant to specific rules based in part, in the case of single-source and innovator multiple-source pharmaceuticals, upon the lowest price at which the manufacturer sold its products to certain commercial customers. The purpose of these specific rules is to ensure that Medicaid receives the benefit of discounts in relation to the pricing available in the commercial marketplace. King

-2-

entered into a rebate agreement with the Health Care Financing Administration ("HCFA"), now the Centers for Medicare & Medicaid Services ("CMS"), and certain of King's products were at all relevant times covered by state Medicaid plans that provided medical assistance for outpatient prescription drugs. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12), and 1396r-8(a)(1). Under the Medicaid Rebate Program and rebate agreement with CMS, King generally agreed: (i) to report quarterly to CMS its average manufacturer price ("AMP") and, in the case of single-source and innovator multiple-source pharmaceuticals, best price for its pharmaceutical products, as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C); and (ii) to pay quarterly rebates to the states based on the product of (a) the units of each dosage form and strength paid for under the state Medicaid plan during the rebate period as reported by the state, and (b) the greater of the difference between the AMP and best price, or minimum rebate percentage of the AMP, as further defined in 42 U.S.C. § 1396r-8(c). The states receiving Medicaid rebates are referred to in this Agreement as the "Participating States."

F.     At all relevant times, King participated in the Drug Pricing Program, 42 U.S.C. § 256b, which is part of the Public Health Service ("PHS") Act, 42 U.S.C. §§ 201-300gg-92 (the "PHS Drug Pricing Program"). As a participant in the Drug Pricing Program, King entered into an agreement with HHS in connection with the pricing of its drug products sold to entities such as AIDS drug purchasing assistance programs, community health centers, hemophilia treatment centers, and certain disproportionate share hospitals, as defined in 42 U.S.C. § 256b(a)(4) ("the PHS entities"). Under the Drug Pricing Program and its agreement with HHS, King generally agreed that the amount that King required the PHS entities to pay for drug products would not exceed the AMP, as reported by King to CMS in the previous calendar quarter, minus a specified

[NYCORP:2543891]]

rebate percentage that was derived, in part, from the Medicaid rebate paid by King in the preceding calendar quarter for each drug, as further described in 42 U.S.C. § 256b(a).

G.     King was party to a Master Agreement with the VA and a Federal Supply Schedule contract, number V797P-5185x.  Under its agreements with the VA, King was required to make its "covered drugs" available for procurement on the Federal Supply Schedule of the General Services Administration.  38 U.S.C. § 8126(a)(1).  With few exceptions, King was not allowed to charge a price for its "covered drugs" that exceeded a "Federal Ceiling Price" of 76 percent of the non-Federal AMP less an additional discount.  38 U.S.C. § 8126(a)(2).  King's "covered drugs" are defined in 38 U.S.C. § 8126(h)(2).  Eligible purchasers at the Federal Ceiling Price with King included the VA, the PHS, the Department of Defense ("DOD"), Indian Health Service, and the Coast Guard.  38 U.S.C. § 8126(b).  In addition, King was required to disclose certain commercial pricing information to the VA in connection with its Federal Supply Schedule contract and to offer Federal Supply Schedule customers certain discounts under the contract's "Price Reductions Clause."  King's Master Agreement with the VA, its Federal Supply Schedule contract, and the related legal and contractual requirements described in this paragraph are sometimes collectively referred to hereinafter as the "VA Pricing Program".

H.     King also participated in certain state rebate programs ("State Programs") that generally required a rebate separate from the Medicaid rebate for each state's utilization.  The affected states were California, Connecticut, Delaware, Florida, Indiana, Massachusetts, Maryland, Maine, Minnesota, Missouri, Montana, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Vermont, Wisconsin, and Wyoming (referred to in this Agreement as "the State Program States").  The affected programs by state are listed in Attachment B.

-4-

I.      The United States contends that it has certain civil claims against King as specified in Paragraph 4, below, for engaging in the conduct alleged in Sections (i) through (v) of this paragraph during the period January 1, 1994, through December 31, 2002, unless otherwise specified below (the "Covered Conduct").

(i)      The United States contends that King knowingly did not collect and analyze its pricing information in a manner that ensured that King would be able to accurately determine the AMP and best price on a quarterly basis. The United States also contends that King knowingly did not adequately train its personnel to calculate accurate AMP and best price data, and that King knowingly did not provide its employees with appropriate tools, such as specialized software programs or other commonly used means for calculating Medicaid rebate payments, so that its employees could calculate AMPs and best prices accurately.

(ii)      The United States also contends that King knowingly included inappropriate customers in its retail class of trade, which resulted in inaccurate calculations of AMPs.

(iii)      The United States contends that because of the knowing misconduct alleged in Sections (i) and (ii) above, certain of King's AMP and best price calculations constituted "false records" within the meaning of 31 U.S.C. § 3729. The United States further contends that, by including such "false records" in its quarterly submissions to CMS, King failed to report accurately to CMS on a quarterly basis the AMPs and best prices, where applicable, for its pharmaceutical products, and to pay the corresponding proper amounts of Medicaid rebates resulting in an overall underpayment of Medicaid rebates for the relevant time period. Further, the United States contends that because of King's knowing misconduct with respect to certain of its pharmaceutical products, King overcharged the PHS entities, failed to deliver accurate

-5-

information to the VA and overcharged purchasers from the VA Federal Supply Schedule. The State Program States also contend that King failed to pay the proper State Program rebates, resulting in an overall underpayment of State Program rebates for the relevant time period.

        (iv)    Accordingly, the United States contends that the activities alleged in Paragraph I (i) through (iii) rendered false the following claims or statements: (1) King's reports to CMS of AMPs and best prices, and the related state invoices, for the pharmaceutical products listed in Attachment C for the 36 quarters from January 1, 1994, through December 31, 2002; (2) King's charges to PHS entities for the pharmaceutical products listed in Attachment D for the period January 1, 1994, through December 31, 2002; and (3) King's charges to VA Federal Supply Schedule customers for the pharmaceutical products listed in Attachment E for the period January 1, 1994, through December 31, 2002 and pricing and other information delivered to the United States in connection with its negotiation of and performance under its Federal Supply Schedule contract and the various amendments and modifications thereto. In addition, the State Program States contend that the activities alleged in Paragraph I (i) through (iii) rendered false King's State Program invoices for the programs listed in Attachment B for the pharmaceutical products listed in Attachment F, for the period January 1, 1994, through December 31, 2002.

        (v)    All other conduct of King alleged in the Civil Action is also included in the "Covered Conduct."

        J.    King represents: After King received an SEC subpoena regarding various matters, the Audit Committee of King's Board of Directors initiated an independent internal investigation. When this investigation identified the deficiencies in King's AMP and best price methodologies described in Paragraph I, above, King's outside counsel retained KPMG, a nationally recognized accounting firm that, in part, specializes in health care and Medicaid

-6-

[[NYCORP:2543891]]

reporting. With KPMG's assistance, King undertook a comprehensive recalculation to determine the amount of King's underpayments under the Medicaid rebate program, underpayments under the State Programs, and overcharges to the PHS entities and Federal Supply Schedule customers. King and KPMG began this recalculation by compiling a database of all King transactional data (including sales, rebates and chargebacks), government utilization, customer, contract and product data relevant to the calculation of AMP, best price, Medicaid unit rebate amounts and related PHS, Federal Supply Schedule and State Program calculations for the relevant period. This data was compiled from sources that included King's sales, adjustment and chargeback records, records of amounts paid to purchasers and other payors, records of product utilization by, and rebates paid to, the state Medicaid agencies and State Programs, contracts and other agreements with pharmaceutical product purchasers, and King's historical pricing records. King and KPMG confirmed the completeness of the data they compiled by reconciling it to the net sales data in the general ledger trial balances underlying King's audited financial statements. In addition, KPMG helped King to determine the appropriate class of trade for each of the purchasers of King's pharmaceutical products.

King further represents: It re-calculated the AMPs and best prices for its pharmaceutical products from January 1, 1998, through December 31, 2002. King compared the AMPs and best prices that it had originally reported to CMS with the re-calculated AMPs and best prices. This data is contained in a summary document prepared by King, known as the Medicaid variance report, which also identifies King's total underpayment of Medicaid rebates for that period. According to King, all AMP and best price differences between what King originally reported to CMS and the corrected AMPs and best prices are reflected in the Medicaid variance report on a product and quarter basis. In addition, King prepared variance reports reflecting its overcharges

[[NYCORP:2543891]]

from January 1, 1998, through December 31, 2002, to PHS entities and certain VA Federal Supply Schedule customers and its underpayments of rebates from January 1, 1998 through December 31, 2002 to the State Program States. In addition, King used the results of the recalculation for the 1998 to 2002 period to determine by extrapolation Medicaid, PHS, VA Federal Supply Schedule and State Program variances for all King products with utilization under the applicable program for the period from January 1, 1994 through December 31, 1997.

     K.    King represents that it has performed the review and calculations and prepared the variance reports described in Paragraph J, above in good faith and that it believes that such calculations and variance reports are complete and accurate in all material respects. King acknowledges that the United States considered, among other things, the variance reports described in Paragraph J, above, and other information provided by King in its settlement of the Covered Conduct.

     L.    The United States contends that it also has certain administrative claims, as specified in Paragraph 6, below, against King for the Covered Conduct.

     M.    This Agreement is made in compromise of disputed claims. It is neither an admission of liability by King nor a concession by the United States that its claims are not well founded. King expressly denies the allegations of the United States and the relator as set forth herein and in the Civil Action and denies that it has engaged in any wrongful conduct in connection with the Covered Conduct. Neither this Agreement, its execution, nor the performance of any obligations under it, including any payments, nor the fact of the settlement, is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting upon the merits of the dispute by King.

-8-

[[NYCORP:2543891]]

N.    To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, the Parties reach a full and final settlement pursuant to the Terms and Conditions below.

## III. TERMS AND CONDITIONS

1.    King agrees to pay to the United States, the Plaintiff States, the Participating States, and the State Program States, collectively, $124,057,318, with interest accrued to the date that King makes the payment provided for in Paragraph 2, below (the "Settlement Amount"). King has also agreed that this interest accrues at 3.75 percent per annum from July 1, 2005. The Settlement Amount shall constitute a debt immediately due and owing on the Effective Date of this Agreement (as defined in Paragraph 21, below).

2.    Of the Settlement Amount in Paragraph 1, above, King and the United States agree that the sum of $73,420,225, with accrued interest, shall represent the federal share of the Settlement Amount (the "Federal Settlement Amount"). The Federal Settlement Amount includes all amounts payable in respect of the federal share of the Medicaid Rebate Program, the VA Pricing Program and the PHS Drug Pricing Program. With respect to the first two programs, King agrees to make an electronic funds transfer of the Federal Settlement Amount in accordance with the written instructions to be provided by the Department of Justice. King agrees to make such transfer no later than ten business days following the Effective Date (as defined in Paragraph 21, below).

With respect to the PHS Drug Pricing Program, King agrees to transfer the portion of the Federal Settlement Amount payable to the PHS entities listed on Attachment G into a segregated bank account (the "PHS Settlement Account") no later than ten business days following the Effective Date (as defined in Paragraph 21 below). As will be provided in written instructions from the United States, King will disburse the amount transferred into the PHS Settlement

-9-

Account to the individual PHS entities listed on Attachment G within thirty days following the Effective Date (as defined in Paragraph 21, below).

3.      Of the Settlement Amount in Paragraph 1, above, King, the Plaintiff States, the Participating States, and the State Program States (collectively, the "States") have agreed that the sum of $50,637,093, with accrued interest as provided in Paragraph 1, above, shall represent the state share of the Settlement Amount (the "State Settlement Amount"). King agrees to transfer the State Settlement Amount in accordance with the provisions of the NAMFCU Agreement and the individual state settlement agreements referred to therein (the "State Settlement Agreements").

4.      Subject to the exceptions in Paragraph 5, and subject to Paragraph 15, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement), and in consideration of the obligations of King set forth in this Agreement, the United States, on behalf of itself, its officers, agents, agencies, and departments, agrees fully and finally to release King, its past and present parents, corporate affiliates, divisions, and subsidiaries, and each of their predecessors, subsidiaries, successors and assigns (the "King Corporate Entities"), and, except as provided in Paragraph 5, below, their past and present directors, officers, agents and employees (together with the King Corporate Parties, the "King Released Parties"), from any civil or administrative monetary claim that the United States has or may have under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, the Medicaid Rebate Statute, 42 U.S.C. § 1396r-8, the Drug Pricing Program, 42 U.S.C. § 256b, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, § 603 of the Veterans Health Care Act of 1992, 38 U.S.C. § 8126, any statutory provision applicable to the programs in this Agreement for which the Civil Division, United

-10-

[[NYCORP:2543891]]

States Department of Justice, has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I, § 0.45(d) (1995), and common law claims, including claims for fraud, unjust enrichment, payment by mistake, or breach of contract, for the Covered Conduct.

5.      Notwithstanding any term of this Agreement, the United States specifically does not in this Agreement release King and the other King Released Parties from any and all of the following: (a) any criminal, civil, or administrative liability arising under Title 26, United States Code (Internal Revenue Code); (b) any criminal liability; (c) any liability to the United States (or any agencies thereof) for any conduct other than the Covered Conduct; (d) any liability based upon obligations created by this Agreement; (e) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (f) any express or implied warranty claims or other liability for defective or deficient products and services provided by King; (g) any liability based on a failure to deliver items or services due; (h) any civil liability against individuals, if they have received written notification that they are the "target" of a criminal investigation (as defined in the U.S. Attorneys' Manual), have been indicted, charged or convicted, or have entered into a plea agreement, in each case related to the Covered Conduct; and (i) except as expressly stated in this Agreement, any administrative liability against individuals, including current and former directors, officers, and employees of King and the other King Corporate Entities.

6.      In consideration of the obligations of King set forth in this Agreement and the Corporate Integrity Agreement ("CIA") referred to in Paragraph 19, below, and incorporated by reference into this Agreement, subject to Paragraph 15, below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement), and conditioned on payment of the Federal Settlement Amount, HHS-OIG agrees to release and

-11-

refrain from instituting, directing or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against King and each other King Corporate Entity under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 5, above, and as reserved in this paragraph. HHS-OIG expressly reserves all rights to comply with any statutory obligations under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) to exclude King from the Medicare, Medicaid, or other Federal health care program based upon the Covered Conduct. Nothing in this paragraph precludes HHS-OIG from taking action against entities or persons, or for conduct and practice, for which claims have been reserved in Paragraph 5, above.

7.     The United States will file a motion to dismiss the federal count of the Civil Action promptly following execution of this Agreement; however, the motion will provide that dismissal with prejudice will not occur until King has transferred the applicable portions of the Federal Settlement Amount to the United States and into the PHS Settlement Account, as described in Paragraph 2, above.

8.     King waives and will not assert any defenses King may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by

-12-

[[NYCORP:2543891]]

the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

9.    King, on behalf of itself and the other King Corporate Entities, fully and finally releases, waives, and discharges the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs and expenses of every kind and however denominated) which King or any other King Corporate Entity has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to or arising from the United States' investigation and prosecution of the Covered Conduct.

10.    The Settlement Amount that King must pay pursuant to this Agreement shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicaid program payor, or any State payor, or any other government payor; and, if applicable, King agrees not to resubmit to any Medicaid program, state payor, or any other government payor any previously denied claims, which denials were based on the Covered Conduct, and agrees not to appeal any such denials of claims.

11.    King agrees to the following:

a.    Unallowable Costs Defined: that all costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47, and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of King or any other King Released Party in connection with the following shall be "unallowable costs" on government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program ("FEHBP"): (1) the matters covered by this Agreement; (2)

-13-

[[NYCORP:2543891]]

the United States' audit and civil investigation of the matters covered by this Agreement; (3) King's investigation, defense, and corrective actions undertaken in response to the United States' audit and civil investigation in connection with the matters covered by this Agreement (including attorneys' fees); (4) the negotiation and performance of this Agreement; (5) the payment King makes to the United States pursuant to this Agreement and any payments that King may make to the relator, including costs and attorneys' fees; and (6) the negotiation of, and obligations undertaken pursuant to the CIA to: (i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to the OIG-HHS. Nothing, however, in Subparagraph a(6) of this paragraph affects the status of costs that are not allowable based on any other authority applicable to King.

     b.   <u>Future Treatment of Unallowable Costs</u>: These unallowable costs shall be separately determined and accounted for by King, and King shall not charge such unallowable costs directly or indirectly to any contracts with the United States or any state Medicaid program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by King or any of its subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

     c.   <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: King further agrees that within 90 days of the Effective Date of this Agreement, it shall identify to applicable Medicaid, State, and VA fiscal agents, any unallowable costs (as defined in this paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by King or any of its subsidiaries or affiliates, and shall request, and agree, that such cost reports, cost statements,

[[NYCORP:2543891]]

information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. King agrees that the United States, at a minimum, shall be entitled to recoup from King any overpayment plus applicable interest and penalties as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by King or any of its subsidiaries or affiliates on the effect of inclusion of unallowable costs (as defined in this paragraph) on King or any of its subsidiaries or affiliates' cost reports, cost statements, or information reports.

d.      Nothing in this Agreement shall constitute a waiver of the rights of the United States to audit, examine, or re-examine King's books and records to determine that no unallowable costs have been claimed in accordance with the provisions of this paragraph.

12.     This Agreement is intended to be for the benefit of the Parties only, and, except to the extent expressly provided in Paragraph 13, below, by this instrument the Parties do not release any claims against any other person or entity other than King and the other King Released Parties.

13.     King agrees that it shall not seek payment for any of the monies owed under this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors. King waives any causes of action against these beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims for payment covered by this Agreement. Nothing in this Paragraph 13 shall affect King's

-15-

[[NYCORP:2543891]]

rights to recover amounts due under agreements with non-governmental third parties, including sellers and manufacturers of pharmaceutical products to whom King previously has paid royalties, co-promotion fees or other amounts determined directly or indirectly by reference to the net sales of King's products.

14.      King expressly warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and that it is not aware of any reasonably foreseeable circumstances under which it would not remain solvent following payment of the Settlement Amount. Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth in this Agreement constitute a contemporaneous exchange for new value given to King, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended and do, in fact, represent a reasonably equivalent exchange of value which is not intended to hinder, delay, or defraud any entity to which King was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

15.      If within 91 days of the Effective Date of this Agreement or of any payment made hereunder, King commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, (a) seeking to have any order for relief of King's debts, or seeking to adjudicate King as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for King or for all or any substantial part of King's assets, King agrees as follows:

-16-

[NYCORP:2543891]]

     a.     King's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. §§ 547 or 548, and King will not argue or otherwise take the position in any such case, proceeding, or action that: (i) King's obligations under this Agreement may be avoided under 11 U.S.C. §§ 547 or 548; (ii) King was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment of the Settlement Amount; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to King.

     b.     If King's obligations under this Agreement are avoided for any reason, including, but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code, the United States, at its sole option, may rescind the releases in this Agreement, and bring any civil and/or administrative claim, action, or proceeding against King for the claims that would otherwise be covered by the releases provided in Paragraphs 4 and 6, above. King agrees that (i) any such claims, actions, or proceedings brought by the United States (including any proceedings to exclude King from participation in Medicare, Medicaid, or other Federal health care programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the action, case, or proceeding described in the first clause of this paragraph, and that King will not argue or otherwise contend that the United States' claims, actions, or proceedings are subject to an automatic stay; (ii) King will not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceeding which are brought by the United States within 90 calendar days of written notification to King that the releases have been rescinded pursuant to this paragraph, except to the extent such defenses were available on the Effective Date; and (iii) King will not contest the United States' assertion that it

-17-

has a valid claim against King in the amount of $186,085,977 and which may be subject to penalties of $5,000 to $10,000 for each false claim submitted to an agency of the United States or caused to be submitted to an agency of the United States, and the United States may pursue its claim in the case, action, or proceeding referenced in the first clause of this paragraph, as well as in any other case, action, or proceeding.

      c.    King acknowledges that its agreements in this paragraph are provided in exchange for valuable consideration provided in this Agreement.

16.    Each party to this Agreement shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

17.    King represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

18.    This Agreement is covered by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement shall be the United States District Court for the Eastern District of Pennsylvania, except that disputes arising under the CIA incorporated herein by reference shall be resolved exclusively through the dispute resolution provisions set forth in the CIA.

19.    King has entered into the CIA with HHS-OIG, attached as Attachment H, which is incorporated by reference into this Agreement. King will immediately upon the execution of the CIA begin to implement its obligations under the CIA.

20.    The undersigned King signatories represent and warrant that they are authorized by their respective Boards of Directors to execute this Agreement. The undersigned United States signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement through their respective agencies and departments.

-18-

[NYCORP:2543891]]

21.    As used in this Agreement, the "Effective Date" shall mean the first business day on which the later of the following events shall have taken place: (1) this Agreement has been fully executed by all the Parties; and (2) the district court has granted the motion to dismiss described in Paragraph 7 of this Agreement and has entered an appropriate order.

22.    The Parties acknowledge that their respective rights and obligations under this Agreement are not dependent upon the consummation of the NAMFCU Agreement or the State Settlement Agreements, including in the event that such other agreements do not receive any required court approval. Notwithstanding anything herein to the contrary, King's obligation to pay the State Settlement Amount, or any individual State's share thereof, shall arise only under the NAMFCU Agreement and the State Settlement Agreements, and this Agreement shall not create any presumption that King has any liability to any state, or as to the amount of any such liability that may be found to exist.

23.    King contends that beginning with its calculations and reports for products utilized in the first quarter of 2003 it has been calculating and reporting AMP for its pharmaceutical products using a methodology that has resulted in it overpaying its quarterly rebates to Medicaid and to state rebate programs. Nothing in this Agreement shall limit King's right to pursue recovery of any overpayments that may have resulted from its use of this methodology from the United States, the state Medicaid agencies or the state rebate programs, and nothing in this Agreement shall limit the right of the United States or any state Medicaid agency or rebate program to contest any such recovery.

24.    This Agreement shall be binding on all successors, transferees, heirs, and assigns to the Parties.

{[NYCORP:2543891]}

25.     This Agreement, together with the CIA incorporated by reference, constitutes the complete agreement between the Parties with regard to the Covered Conduct. This Agreement may not be amended except by written consent of the Parties, except that the CIA may be modified with only the mutual written consent of King and HHS-OIG.

26.     This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Agreement. Facsimiles of signatures shall constitute acceptable binding signatures for purposes of this Agreement.

[The remainder of this page is intentionally left blank.]

-20-

[[NYCORP:2543891]]

THE UNITED STATES OF AMERICA

DATED: _**10/31/05**_          BY: _____

PATRICK L. MEEHAN
United States Attorney


DATED: _10/31/05_          BY: _____

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division


DATED: _10/31/05_          BY: _____

BARBARA ROWLAND
Assistant United States Attorney


DATED: _____          BY: _____

SANJAY BHAMBHANI
Trial Attorney
United States Department of Justice – Civil
Division, Commercial Litigation, Fraud
Section


DATED: _____          BY: _____

LEWIS MORRIS
Chief Counsel to the Inspector General
Office of Inspector General
United States Department of Health and
Human Services


-21-

[[NYCORP:2543891]]

THE UNITED STATES OF AMERICA

DATED: _____     BY: _____
                                          PATRICK L. MEEHAN
                                          United States Attorney


DATED: _____     BY: _____
                                          VIRGINIA A. GIBSON
                                          Assistant United States Attorney
                                          Chief, Civil Division


DATED: _____     BY: _____
                                          BARBARA ROWLAND
                                          Assistant United States Attorney


DATED: _10/25/05_____      BY: _____
                                          SANJAY BHAMBHANI
                                          Trial Attorney
                                          United States Department of Justice – Civil
                                          Division, Commercial Litigation, Fraud
                                          Section


DATED: _____     BY: _____
                                          LEWIS MORRIS
                                          Chief Counsel to the Inspector General
                                          Office of Inspector General
                                          United States Department of Health and
                                          Human Services


-21-

[[NYCORP:2543891]]

Case 1:01-cv-12257-PBS   Document 4847-2   Filed 10/26/07   Page 23 of 40

Case 2:03-cv-01538-MK   Document 286-2   Filed 02/23/2006   Page 23 of 120
Oct-28-2005  05:18pm   From-OFFICE OF INSPECTOR GENERAL (DHHS)   +2024010400   T-321   P.003/005   F-697

## THE UNITED STATES OF AMERICA

DATED: _____   BY: _____
                                     PATRICK L. MEEHAN
                                     United States Attorney


DATED: _____   BY: _____
                                     VIRGINIA A. GIBSON
                                     Assistant United States Attorney
                                     Chief, Civil Division


DATED: _____   BY: _____
                                     BARBARA ROWLAND
                                     Assistant United States Attorney


DATED: _____   BY: _____
                                     SANJAY BHAMBHANI
                                     Trial Attorney
                                     United States Department of Justice – Civil
                                     Division, Commercial Litigation, Fraud
                                     Section


DATED: __10/28/05_____   BY: _____
                                     LEWIS MORRIS
                                     Chief Counsel to the Inspector General
                                     Office of Inspector General
                                     United States Department of Health and
                                     Human Services


-21-

[NYCORP:2543891]]

<u>KING PHARMACEUTICALS, INC.</u>
<u>MONARCH PHARMACEUTICALS, INC.</u>

DATED: _10/31/05_       BY: _____
                                            EXECUTIVE SIGNATORY
                                            King Pharmaceuticals, Inc.

DATED: _10/31/05_       BY: _____
                                              EXECUTIVE SIGNATORY
                                            Monarch Pharmaceuticals, Inc.

DATED: _10/31/05_       BY: _____
                                              MARC ROSENBERG, ESQ.
                                            Cravath, Swaine & Moore LLP

-22-

Attachment A

King Pharmaceuticals of Nevada, Inc.
King Pharmaceuticals Research and Development, Inc.
Gentrac, Inc.
JMI-Daniels, Inc.
Meridian Medical Technologies, Inc.
Brunswick Biomedical Investment Corporation
STI International Limited
Meridian Medical Technologies Limited
Monarch Pharmaceuticals, Inc.
Monarch Pharmaceuticals of Ireland Limited
Parkedale Pharmaceuticals, Inc.
Jones Pharma Incorporated
Daniels Pharmaceuticals, Inc.

Attachment B

California ADAP
California COHS
California FPACT
California Unknown
Connecticut ADAP
Connecticut PACE
Connecticut SAGA
Connecticut Unknown
Delaware PA
Delaware SRP
Delaware Unknown
Florida Senior Rx
Indiana AIM
Indiana Unknown
Maine ADAP
Maine ERP
Maine LCDE
Maine Unknown
Maryland KDP
Maryland PAP
Maryland Unknown
Massachusetts ACH
Massachusetts DEL
Massachusetts SPP
Massachusetts Unknown
Minnesota ADAP
Minnesota PDP
Minnesota SD
Minnesota Unknown
Missouri ADAP
Missouri Senior Rx
Montana Unknown
New Jersey ADAP
New Jersey ADRP
New Jersey PAAD
New Jersey SG
New Jersey Unknown
New York ADAP
New York DS
New York EAC
New York EPIC
New York HHR
New York HR
New York MDP
New York Unknown
North Carolina Unknown

[[NYCORP:2547823]]

Oregon ADAP
Pennsylvania ESRD
Pennsylvania GA
Pennsylvania PACE
Pennsylvania PB
Pennsylvania Unknown
Rhode Island PAE
Rhode Island Unknown
Texas CHIP
Texas CIDC
Texas CSHCN
Texas KH
Utah ADAP
Vermont Script
Wisconsin CD
Wisconsin SC 200
Wisconsin Unknown
Wyoming ADAP
Wyoming MMP

-2-

Attachment C

ACETAMINOPHEN
ADRENALIN
ALTACE
AMANTADINE
ANEXSIA
ANUSOL
APLISOL
AVC
BARIUM
BICILLIN
BREVITAL
BROMPHEN
BROMPHENIRAMINE
CHLORAMPHENICOL
CHLOROMYCETIN
CODEINE
COLY-MYCIN
CORGARD
CORTISPORIN
CORZIDE
CYTOMEL
DELESTROGEN
DRIZE-R
ENDAGEN
FLORINEF
FLUOGEN
FLUPHENAZINE
GUAIFENESIN
HCBT/APAP
HISTOPLASMIN
HUMATIN
HYDROCODONE
HYDROCORTISONE
KEMADRIN
KETALAR
KETAMINE
KGDAL
KGFED
KGHIST
LEVOXYL
LORABID
MANTADIL
MENEST
MONAFED
MORPHINE
NASABID

NEOPOLYMYXIN
NEOSPORIN
NORDETTE
NUCOFED
ORTHO-PREFEST
OTOCAIN
OXYCODONE
PAPAVERINE
PEDIOTIC
PENICILLIN
PHENIRAMINE
PHENOBARBITAL
PHENTERMINE
PITOCIN
PITRESSIN
POLYSORIN
POLYSPORIN
PROCANBID
PROCTOCORT
PROLOPRIM
QUIBRON
SEPTRA
SILVADENE
TAPAZOLE
THALITONE
THEREVAC
THIOMALATE
THROMBIN
THYROID
TIGAN
TUSSEND
TUSSIGON
TUSSIN
VANEX
VIRA-A
VIROPTIC
WYCILLIN

-2-

Attachment D

ACETAMINOPHEN
ADRENALIN
ALTACE
AMANTADINE
ANEXSIA
ANUSOL
APLISOL
AVC
BARIUM
BICILLIN
BREVITAL
BROMPHEN
BROMPHENIRAMINE
CHLORAMPHENICOL
CHLOROMYCETIN
CODEINE
COLY-MYCIN
CORGARD
CORTISPORIN
CORZIDE
CYTOMEL
DELESTROGEN
DRIZE-R
ENDAGEN
FLORINEF
FLUOGEN
FLUPHENAZINE
GUAIFENESIN
HCBT/APAP
HISTOPLASMIN
HUMATIN
HYDROCODONE
HYDROCORTISONE
KEMADRIN
KETALAR
KETAMINE
KGDAL
KGFED
KGHIST
LEVOXYL
LORABID
MANTADIL
MENEST
MONAFED
MORPHINE
NASABID

[[NYCORP:2547823]]

NEOPOLYMYXIN
NEOSPORIN
NORDETTE
NUCOFED
ORTHO-PREFEST
OTOCAIN
OXYCODONE
PAPAVERINE
PEDIOTIC
PENICILLIN
PHENIRAMINE
PHENOBARBITAL
PHENTERMINE
PITOCIN
PITRESSIN
POLYSORIN
POLYSPORIN
PROCANBID
PROCTOCORT
PROLOPRIM
QUIBRON
SEPTRA
SILVADENE
TAPAZOLE
THALITONE
THEREVAC
THIOMALATE
THROMBIN
THYROID
TIGAN
TUSSEND
TUSSIGON
TUSSIN
VANEX
VIRA-A
VIROPTIC
WYCILLIN

-2-

Attachment E

ACETAMINOPHEN
ADRENALIN
ALTACE
AMANTADINE
ANEXSIA
ANUSOL
APLISOL
AVC
BARIUM
BICILLIN
BREVITAL
BROMPHEN
BROMPHENIRAMINE
CHLORAMPHENICOL
CHLOROMYCETIN
CODEINE
COLY-MYCIN
CORGARD
CORTISPORIN
CORZIDE
CYTOMEL
DELESTROGEN
DRIZE-R
ENDAGEN
FLORINEF
FLUOGEN
FLUPHENAZINE
GUAIFENESIN
HCBT/APAP
HISTOPLASMIN
HUMATIN
HYDROCODONE
HYDROCORTISONE
KEMADRIN
KETALAR
KETAMINE
KGDAL
KGFED
KGHIST
LEVOXYL
LORABID
MANTADIL
MENEST
MONAFED
MORPHINE
NASABID

[[NYCORP:2547823]]

NEOPOLYMYXIN
NEOSPORIN
NORDETTE
NUCOFED
ORTHO-PREFEST
OTOCAIN
OXYCODONE
PAPAVERINE
PEDIOTIC
PENICILLIN
PHENIRAMINE
PHENOBARBITAL
PHENTERMINE
PITOCIN
PITRESSIN
POLYSORIN
POLYSPORIN
PROCANBID
PROCTOCORT
PROLOPRIM
QUIBRON
SEPTRA
SILVADENE
TAPAZOLE
THALITONE
THEREVAC
THIOMALATE
THROMBIN
THYROID
TIGAN
TUSSEND
TUSSIGON
TUSSIN
VANEX
VIRA-A
VIROPTIC
WYCILLIN

-2-

Attachment F

ACETAMINOPHEN
ADRENALIN
ALTACE
AMANTADINE
ANEXSIA
ANUSOL
APLISOL
AVC
BARIUM
BICILLIN
BREVITAL
BROMPHEN
BROMPHENIRAMINE
CHLORAMPHENICOL
CHLOROMYCETIN
CODEINE
COLY-MYCIN
CORGARD
CORTISPORIN
CORZIDE
CYTOMEL
DELESTROGEN
DRIZE-R
ENDAGEN
FLORINEF
FLUOGEN
FLUPHENAZINE
GUAIFENESIN
HCBT/APAP
HISTOPLASMIN
HUMATIN
HYDROCODONE
HYDROCORTISONE
KEMADRIN
KETALAR
KETAMINE
KGDAL
KGFED
KGHIST
LEVOXYL
LORABID
MANTADIL
MENEST
MONAFED
MORPHINE
NASABID

[[NYCORP:2547823]]

NEOPOLYMYXIN
NEOSPORIN
NORDETTE
NUCOFED
ORTHO-PREFEST
OTOCAIN
OXYCODONE
PAPAVERINE
PEDIOTIC
PENICILLIN
PHENIRAMINE
PHENOBARBITAL
PHENTERMINE
PITOCIN
PITRESSIN
POLYSORIN
POLYSPORIN
PROCANBID
PROCTOCORT
PROLOPRIM
QUIBRON
SEPTRA
SILVADENE
TAPAZOLE
THALITONE
THEREVAC
THIOMALATE
THROMBIN
THYROID
TIGAN
TUSSEND
TUSSIGON
TUSSIN
VANEX
VIRA-A
VIROPTIC
WYCILLIN

[[NYCORP:2547823]]

Attachment G

Abbeville County Health Dept
Access Community Health Network
Addison County Health Dept
Adult & Child Health (cab For Hlth
Adventist Majuro Hospital
Adventist Majuro Hospital
Aids Arms Inc
Aids Healthcare Foundation
Aids Healthcare Foundation
Aids Healthcare Foundation
Aids Healthcare Foundation
Akron Health Department
Ala D/H Cherokee County/TB
Ala D/H Dallas Cty/TB
ALA D/H Greene Cty/TB
Ala D/H Lee County/TB
Ala D/H Monroe Cty/TB
Alamance County Hospital
Alameda - Eastmont Wellness Center
Alameda - Hayward Health Center
Alameda - Newark Health Center
Alameda Co Dept of Health
Alameda County Medical Center
Albany Cty Mntl Hlth Clinic
Alexander Co Health Dept
Alexander, Vicki Ann MD
Alexandria Health Department Pharma
Allegany County Health Dept
Allen County Health Dept
Allentown Bureau of Health
Alma Illery Medical Center
Ammonoosuc Community Hlth Svs
Anchorage Neighborhood Health Cl
Anchorage Neighborhood Health/
Andrew County Health Dept
Angle, Marcia A MD
Anne Arundel County Government
Anson Cty Health Department
Antonio Delacruz
Appalachia Health District
Appalachian District Health Departm
Arasu, Gopinath MD
Area Health Development Board, Inc.
Arizona Dept of Health Serv, STD Section
Arkansas Dept. of Health
Arlington Comm Clin Pharmacy

[[NYCORP:2547823]]

Arsenal Health Center A/B/of
Asche Inc Pharmacy of
Ashe County Health Department
Atlantic City Med Ctr Pharm
Atlantic City Medical Center
Atlantic Medical Center, Inc
Atlanticare Medical Center
Audrain County Health Unit
Aurora Sinai Medical Center, Inc.
Autauga County Health Dept.
Bacon, Janice E MD
Baldwin Co Health Department
Baldwin Co. Health Dept
Baltimore City Health Dept
Baltimore City Hlth Dept Cshs
Baltimore City Hlth Dept DFHC
Baltimore Medical System, Inc.
Barbour County Health Dept
Barbour County Health Dept.
Barnes Kasson Hospital
Barnwell Co Health Department
Barnwell County Health Dept
Barnwell County Health Dept.
Barren River District
Barringer Pharmacy
Barringer Pharmacy
Barry County Health Dept
Barton County Health Dept
Bashas' United Drug, #55 (contracted pharmacy)
Bates County Health Department
Bay Medical Center
Beaufort County Health Dept
Beaufort County Health Dept.
Beaufort-Jasper Comp Health
Behaviorial Health Center
Bellevue Hospital Center - Hhc
Benjamin, Robert Aaron MD
Bentaubgeneralhospital
Benton County Health Dept
Benton-Franklin Dist Hth Dept
Berkeley Vd Health Clinic
Bernalillo County Sw Hlth Fld
Bertie County Health Dept
Bexar County Hospital District
Bibb County TB Program
Birmingham Dept of Health

-2-

Blackburn Community Hlth Ctr
Bladen County Health Departmen
Blanchard, Patricia S NP
Blount Co Health Department
Blue Ridge Medical Center, Inc.
Bluitt-Flowers Health Center
Bollinger County Health Ctr
Bond Community Health Center
Boston Health Care For The Homeless
Boston Medical Center
Boston Medical Center - Newton Stre
Boston Medical Center Intptn
Bowling Green Warren Co Hlth C
Boydton Medical Center
Boydton Medical Center
Brackenridge Hospital
Brackenridge Hospital
Brackenridge Hospital Phcy
Brexton Chase MD Office
Broadlawns Medical Center
Broadlawns Medical Center
Brooks Pharmacy 335
Broome County Health Dept
Broward Chd
Broward Co Health Department
Broward County Health Department
Brunswick Co Health Dept Ncstd
Brunswick Co Health Dept-FP
Bullet County Health Department
Bullock County Health Dept.
Burgess Health Center
Butler Co Health Department
Buttonwillow Health Center
Cabarrus Health Alliance
Cabarrus Health Alliance
Caldwell Co Health Department
Caldwell County Health Department
Calhoun County Health Dept.
Cambridge Heatlh Alliance Abo
Camden On Gauley Med Ctr, Pharm
Camuy Health Services, Inc
Camuy Health Services, Inc
Cantner's Drug Store
Canyonlands Health Care
Capitol Diaylsis
Carolina Medical Center Northpark Pharmacy

-3-

[[NYCORP:2547823]]

Carolinas Medical Center
Carolinas Medical Center
Carolinas Medical Center
Carolyn Stith Clinic Pharmacy
Carpenter, S Gayle Do
Carroll, John R MD
Cass County Health Dept
Cassandra Beatty, M.D.
Castaner General Hospital, Inc
Caswell County Health Dept.
Catahoula Parish Medical Ctr
Catawba County Health Dept
Cdt Playa
Cent.de Servicios Prim.de Salud
Center For Mental Health Pharmacy
Centerville Clinics Inc
Central Florida Health Care
Central Florida Healthcare
Central Georgia Medical Ctr
Central North Alabama Health Servic
Centro De Salud De Lares
Centro De Salud Familiar
Centro De Salud Familiar
Centro Salud Familiar
Cermak Health Services
Chamber County Health Dept
Chambers County Health Dept
Chang, Carlos Felipe MD
Channel Medical Center Phmcy
Channel Pharmacy
Charles County Health Dept.
Charles Davis
Charles Drew Health Center
Charles Drew Health Center
Charles, Ronald A MD
Charleston Co Health Departmen
Charleston Co.Health Dept.
Charleston Memorial Hospital
Charleston Memorial Hospital
Chatham County Health Dept
Chautauqua Co Health Dept
Chemist Shop (contracted pharmacy)
Chesterfield County Health Dept
Chesterfield County Health Dept.
Childrens Hospital Pharmacy
Chilton Co Health Department

-4-

Chiricahua Community Health Ce
Choctaw Co Health Department
Choptank Community Health
Choptank Community Health Caroline
Chowan County Health Dept
Christopher, Kim L Np
Christus - St. Michael Health Syste
Christus Spohn Memorial Hosp
Chu, Michael M A MD
Church Health Center
Ciales Primary Health Care
Citizen Health Corp Phcy
City of Baltimore
City of Chicago, Department of Proc
City of Detroit Health Department
City of Long Beach Health Dept
City of Saint Louis
City of Toledo, Dept of Hlth
City-County Health Dept.
Clackamas County Public Health
Clarian Health Partners, Inc.
Clark County Health Dept
Clark County Health District
Clarke County Health Dept - TB
Clay Co. Health Department
Clay County Health Department
Clay County Health Department
Cleburne Co Health Department
Cleveland Clinic Pharmacy
Clinch River Pharmacy
Clinica Adelante-buckeye
Clinica Campesina
Clinica Compesina Family Health
Clinica Msr Oscar A Romero
Clinicas De Salud Del Pueblo
Cloud County Health Department
Cloverfork Clinic
Cmc Biddle Point Pharmacy
Cmc Myers Park Pharmacy
CMC Myers Park Pharmacy
Cmc-biddle Point
Cmc-north Park
Coastal Family Health Center
Coastal Family Hlth Center
Coats, Rebecca A MD
Coconino County Public Health

-5-

[[NYCORP:2547823]]