# EXHIBIT 2

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1                    IN THE CIRCUIT COURT OF

2                  MONTGOMERY COUNTY, ALABAMA

3        - - - - - - - - - - - - - - - - - - - -

4    STATE OF ALABAMA,                  )

5              Plaintiff,               ) Case No.

6        vs.                            ) CV-05-219

7    ABBOTT LABORATORIES, INC.,         ) Judge Charles

8    et al.,                            ) Price

9              Defendants.              )

10       - - - - - - - - - - - - - - - - - - - -

11

12

13          STATE OF WISCONSIN CIRCUIT COURT

14                    DANE COUNTY

15       - - - - - - - - - - - - - - - - - - - -

16   STATE OF WISCONSIN,                )

17             Plaintiff,               )

18       vs.                            ) CASE NO.

19   AMGEN INC., et al.,                ) 04-CV-1709

20             Defendants.              )

21       - - - - - - - - - - - - - - - - - - - -

22

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                    September 12, 2007
                        Washington, DC

1      identification.)

2      BY MR. TORBORG:

3           Q.    For the record, what I've marked as

4      Exhibit Abbott 298 is a Westlaw printout of

5      certain portions of the proposed rule dated June

6      5th 1991 for fee schedule for physician services.

7      The actual proposed regulation is quite long.  I

8      printed out portions that I wanted to ask you

9      some questions about.

10          A.    Okay.

11          Q.    And I believe you stated earlier that

12     this was an effort, this particular fee schedule

13     regulation, that you were involved in, correct?

14          A.    Correct.

15          Q.    If I could direct you to the second

16     page of the document that I've handed you.   It

17     has page 24 at the top?

18          A.    Yes.  Mm-hmm.

19          Q.    The section under drugs states "The

20     program currently pays for drugs furnished in

21     physician's offices that are not self-

22     administered under the incident 2 provision set

Henderson Legal Services
202-220-4158

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 254

1    forth in section 1861(S)(2) of the act."

2           And then the next paragraph states "We

3    considered the following options for paying for

4    drugs under the fee schedule:  Option 1,

5    establish a fee schedule amount for each drug."

6    And option 2 was "Bundle the payment for the drug

7    into payment for the visit or consultation

8    service."

9           3, "Make a separate payment for a drug

10   and leave the pricing of the drug to each

11   carrier." Option 4, "Make a separate payment for

12   a drug but require a consistent method in pricing

13   to be used by the carriers."  Correct?

14        A.   Yes.

15        Q.   And then below I believe the comments

16   state that option 1 was rejected at least for the

17   time being because it was not practical; is that

18   correct?

19        A.   Right.

20        Q.   And do you recall that?

21        A.   Yes.

22        Q.   And there's reference to considering

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                     September 12, 2007
                  Washington, DC

1   the issue in the future?

2        A.    Mm-hmm.

3        Q.    Do you recall whether that was

4   considered in the future?

5        A.    I don't think so.

6        Q.    Do you know why not?

7        A.    The press of other business.

8        Q.    Option 2, "Bundle the payment for the

9   drug into the payment for the visit or

10  consultation service," was that --

11       A.    Well, actually, let me just amend what

12  I just said.  I think the other reason was we

13  were going down a different path in drug

14  reimbursement looking to do at a lower percentage

15  off AWP.  So we decided -- we sort of went down

16  that path and didn't go down the other path of

17  trying to compute individual prices for a whole

18  fee schedule for all drugs that Medicare uses at

19  all dosing levels. Just a laborious, labor-

20  intensive effort.

21       Q.    In the paragraph under option 4, that

22  next paragraph that starts "We believe," the last

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1    sentence states "Also we are proposing that we

2    will instruct all carriers to base payment for

3    drugs on 85 percent of the national average

4    wholesale price of the drug (as published in the

5    Red Book in and similar price listings), but we

6    welcome comments regarding the appropriate

7    discount."

8              Do you recall receiving comments

9    regarding the appropriate discount?

10        A.   I don't.  But I am guessing there were

11   comments.

12        Q.   Who was responsible for reviewing the

13   public comments that came in to your office as

14   recognition --

15        A.   Oh.  We had a --

16        Q.   For drugs?

17        A.   Well, it's for everything.  There was a

18   regulation staff and the regulation staff has a

19   fairly systematic way of bringing comments in, as

20   many as forty to ninety thousand comments on

21   certain regulations.  So they catalogue them.

22   Log them in, date stamp them.

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1            And they try to categorize them by

2    category in the regulation because different

3    regulations have different staff involvement.  So

4    you've got to group them so that the staff who

5    has to look at them has a binder like that

6    (indicating) of the comments they have to review.

7    And that staff, the regulation staff, is the one

8    that pulls all the comments together.

9            I believe the staff was headed up by a

10   woman named Sue Brown, B-r-o-w-n, at the time

11   this regulation was done.

12       Q.   In the next paragraph about three-

13   fourths of the way down there's a sentence that

14   starts with "moreover."  Do you see that?

15       A.   No.

16       Q.   I think it's the third, fourth full

17   sentence under the Medicare policy paragraph.

18       A.   Fifth from the bottom?

19       Q.   Second-to-last sentence from the bottom

20   in the paragraph.  "Moreover."  It states

21   "Moreover, we are proposing for very high volume

22   drugs the payment for the drug would be limited

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 258

1    to the lower of the estimated acquisition cost of
2    the drug as determined by us and specified in
3    instructions to carriers or 85 percent of the
4    national average wholesale price for the drug."
5         A.    Right.
6         Q.    What did you mean when you say
7    "national average wholesale price for the drug"?
8         A.    AWP.
9         Q.    As reflected in Red Book or a similar -
10   -
11        A.    Yes, or some other resource.
12        Q.    Why did you propose this estimated
13   acquisition cost option for very high volume
14   drugs?
15        A.    Because we didn't think that Red Book
16   even a 15 percent discount was an accurate
17   acquisition cost.  We wanted to do a survey,
18   actually look at the acquisition cost.
19        Q.    You believed that for some drugs the
20   discount might be greater than 15 percent?
21        A.    Yes.  And we were -- as you can see, we
22   were looking for the low hanging fruit.  We were

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 259

1    looking for the high volume drugs where Medicare

2    was probably a dominant payor.

3                    (Exhibit Abbott 299 was marked for

4    identification.)

5    BY MR. TORBORG:

6        Q.    For the record, what I've marked as

7    Exhibit Abbott 299 is is a document that was I

8    believe collected in counsel's review of public

9    comments maintained by HCFA for this proposed

10   regulation. This particular one comes from the

11   National Medical Care, Inc. organization.

12       A.    Right.

13       Q.    I have a number of questions for you on

14   this document, but let me start off with a few to

15   start off with.  Are you familiar with National

16   Medical Care?

17       A.    Yes.

18       Q.    And what kind of an organization are

19   they?

20       A.    They run for-profit dialysis centers.

21       Q.    If you would go to the third page of

22   the document, the last paragraph, NMC wrote "As a

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 260

1   technical matter it should be noted that while in

2   the discussion of the proposal it is clear that

3   HCFA proposes to pay 85 percent of AWP of a drug"

4   -- and this is in italics -- "as published in

5   redbook" -- end italics -- "the actual proposed

6   regulatory language is '85 percent of the

7   national average wholesale price of the drug" --

8   and then in italics -- "as determined by HCFA.'

9           "In the first case, AWP is a category

10  of data of questionable relationship to reality

11  contained in the particular published source.  In

12  the second, AWP is empirically determined by HCFA

13  and might in fact be an accurate reflection of

14  prices paid.  But certainly HCFA does not propose

15  to pay 85 percent of the actual average

16  acquisition cost - a policy which would result in

17  none of the affected drugs being provided.  This

18  inconsistency needs to be eliminated."

19          And if you look back at the document I

20  just showed you, the proposed legislation, on the

21  last page of that exhibit, page 137 at the top,

22  in fact in the payment rule they did -- that is

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 261

1    how you defined AWP in that proposed regulation,

2    correct?  I'm under 42 C.F.R. section 415.34,

3    section B, payment rule.

4           A.    Okay.

5           Q.    It states "Except as specified in

6    paragraph D of this section, payment for drugs

7    furnished incident to a physician's service is

8    limited to 85 percent of the national average

9    wholesale price of the drug as determined by

10   HCFA," correct?

11          A.    (Nods head).

12          Q.    And that was the language that NMC had

13   pointed out to you as being --

14          A.    Yes.

15                (Exhibit Abbott 300 was marked for

16   identification.)

17                MR. DRAYCOTT:  With this document we

18   reach another milestone?

19                MR. TORBORG:  Yes.  Exhibit Abbott 300.

20   BY MR. TORBORG:

21          Q.    Ms. Buto, what we've marked as Exhibit

22   Abbott 300 is another comment that was obtained

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1    by counsel in reviewing the public comments at

2    site at HCFA.  And I'll ask you some questions

3    about this later.  But in later footnote 1 on the

4    fourth page of the document --

5         A.   Yes.

6         Q.   -- if you would read that.  Or I'll

7    read it into the record and you can follow along.

8         A.   Is this --

9         Q.   This is ASCO's comment to the proposed

10   rule.  ASCO wrote "We note an apparent

11   discrepancy between the proposal as discussed in

12   the preamble and the text of the proposed

13   regulation.  The preamble refers to the" --

14   underlined -- "published average wholesale price

15   whereas the proposed regulation (section 415.34)

16   refers to the 'national average wholesale price

17   of the drug as determined by HCFA.'

18             "Since the underlying rationale of the

19   proposal is that AWP as published in sources such

20   as the" -- underlined -- "Red Book" -- end

21   underline -- does not reflect the true price, any

22   reference in the regulation must be to" --

6d424235-0f61-4f68-bb27-bd89de0f8093

Page 263

1   underlined -- "published AWP.  Insofar as the

2   regulation suggests that HCFA could determine

3   true average wholesale price and then pay only 85

4   percent of that, it is plainly inconsistent with

5   the rationale of the rule."

6       A.   Sure sounds like NMC and ASCO were

7   talking with each other.

8       Q.   But they had the same criticism,

9   correct?

10      A.   Yes.

11      Q.   Do you recall discussing that with

12  anyone?

13      A.   No.  But I agree with them in the

14  interpretation, their interpretation of the

15  inconsistency.

16              (Exhibit Abbott 301 was marked for

17  identification.)

18  BY MR. TORBORG:

19      Q.   Ms. Buto, this is a copy of the final

20  rule, excerpts of it that I've printed off

21  Westlaw.

22      A.   Mm-hmm.

Buto, Kathleen                          September 12, 2007
                     Washington, DC

1        Q.   I've printed off the sections that

2    seemed relevant to reimbursement of drugs because

3    otherwise I would probably kill a number of

4    trees.

5        A.   Right.

6        Q.   Does this appear to you to be a copy of

7    some of the final rule?

8        A.   You know, it's been a long time but I'm

9    going to say it looks familiar.

10       Q.   And in the final rule -- if I could ask

11   you to turn to page 56 first under the section

12   payment for drugs --

13       A.   Mm-hmm.

14       Q.   -- there's a comment that states "We

15   received a great many comments on this issue

16   primarily from oncologists indicating that our 85

17   percent standard was inappropriate.  The thrust

18   of most of the comments was that many drugs could

19   be purchased for considerably less than 85

20   percent of AWP, particularly multisource drugs,

21   while others were not discounted.

22            "Other commenters suggested that while

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                    September 12, 2007
                        Washington, DC

Page 265

1    pharmacies and perhaps large practices could

2    receive substantial discounts on their drug

3    purchases, individual physicians could not.  The

4    bulk of the comments suggesting alternatives to

5    our proposal indicated that the amounts paid

6    should be based on actual or estimated

7    acquisition costs."

8              And then if we could skip a paragraph

9    and go to the response, the rule states "After

10   considering all the comments on this issue we

11   have decided to modify the proposed policy.

12   Payment for drugs would be based on the lower of

13   the national AWP or the Medicare carrier's

14   estimate of actual acquisition costs.

15             "Since there can be many wholesale

16   prices listed for each drug because of multiple

17   sources for the drug, we are defining the

18   national AWP as the median price for all sources

19   of the generic form of the drug.  Estimated

20   acquisition costs would be based on individual

21   carrier estimates of the costs that physicians,

22   or other providers as appropriate, actually pay

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                              September 12, 2007
                   Washington, DC

Page 266

1    for drugs."

2                   And in that sentence in your final rule

3    the reference to national AWP was to what?

4         A.    Say that again.

5         Q.    The reference to the term AWP in this

6    regulation was referring to what?

7         A.    Well, it sounds like they're -- I guess

8    the thing that I'm stuck on is that it's defined

9    as a median price for all sources of the generic

10   form of the drug.  It doesn't seem to address the

11   brand where there is no generic substitution.

12   The national AWP is a median price for all

13   sources of the generic form of the drug.

14        Q.    My question I think was a little

15   simpler one than than.

16        A.    Okay.  Sorry.

17        Q.    What does AWP mean in that language?

18        A.    Average wholesale price?  Is that what

19   you mean?

20        Q.    Yes.  Does it refer to the prices in

21   Red Book and other compendia?

22        A.    It doesn't seem to.

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                    September 12, 2007
                        Washington, DC

1      Q.   It does not explicitly there, correct?

2      A.   It's not explicitly here.

3      Q.   Let's go, if we could to section --

4   page 265 at the end of the document.  And if you

5   would also have side by side the proposed rule

6   that we looked at previously --

7      A.   Right.

8      Q.   Do you have that in front of you?

9      A.   Mm-hmm.

10      Q.   Under the final rule the methodology

11   section B states "Payment for a drug described in

12   paragraph A of this section is based on the lower

13   of the estimated acquisition cost or the national

14   average wholesale price of the drug," correct?

15      A.   Yes.

16      Q.   The proposed rule had stated under B,

17   payment rule, "Except as specified in paragraph D

18   of this section, payment for drugs furnished

19   incident to a physician's service is limited to

20   85 percent of the national average wholesale

21   price as determined by HCFA."  And it's that "as

22   determined by HCFA" language that NMC and ASCO

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

Page 268

1    had raised an issue with, correct?

2         A.    Mm-hmm.

3         Q.    And in the final rule you deleted that

4    reference to "as determined by HCFA," correct?

5         A.    Correct.

6         Q.    And do you know the purpose of that

7    deletion?

8         A.    I think we must have -- although I

9    don't really remember this -- agreed with their

10   characterization if the national average

11   wholesale price was our way of computing a more

12   accurate cost then saying that we wanted to pay

13   85 percent of that would be unreasonable.

14         So it seemed to be confusing to match a

15   national average wholesale price that was based

16   on some degree of rigor in developing what the

17   actual cost was and taking only 85 percent of

18   that and reimbursing at that level.  So I think

19   that's what we were responding to there in

20   dropping the reference to "as determined by

21   HCFA."

22         Q.    If I could ask you to go to page 24 of

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                                September 12, 2007
                        Washington, DC

Page 269

1    the final rule.  And I'm referring to the page

2    numbers on my printout, not any particular number

3    in the Federal Register.  There's a section that

4    talks and it's subsection F.  Do you see that?

5    "Low contrast media (LOCM)"?

6            A.    Yes.

7            Q.    What is low osmolar contrast media?

8            A.    It's -- contrast material is used to do

9    sort of imaging studies.  And low osmolar

10   contrast media were developed because some people

11   have a very bad allergic reaction to the more

12   traditional contrast media.  So -- and these are

13   called non-ionic contrast media.

14           The issue was -- and I'm just trying to

15   see if this is reflected here.  The issue was

16   every patient doesn't need this.  It's a lot more

17   expensive.  But it's essential for somebody who's

18   allergic to the traditional media.  So I'm

19   looking at this to see if this was addressing

20   that issue.

21           (Reading)  Okay.  This deals with

22   a different issue then.  This is really about --

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                          September 12, 2007
                    Washington, DC

1    sorry.  The situation I was talking about, which

2    is a difference in coverage, if you will, existed

3    more in a hospital setting.  This one is trying

4    to establish how you pay for these.

5         Q.   And it says "We will pay separately for

6    LOCM if it is used for patients with specified

7    characteristics under the standard methodology

8    for the payment of drugs generally," correct?

9    And those are the provisions we just looked at,

10   correct?

11        A.   Right.  And the phrase "patients with

12   specified characteristics" -- the meaning of that

13   is we are not paying for it for everybody but

14   we're going to use the standard methodology.

15        Q.   And when you -- in the next sentence it

16   appears you summarize the standard methodology

17   for the payment of drugs generally; is that

18   right?

19        A.   Yes.

20        Q.   And you state "That is, we will base

21   payment on the lower of the estimated actual cost

22   or the published wholesale price of the drug"; is

6d424235-0f61-4f68-bb27-bd89de0f8093

Case 1:01-cv-12257-PBS   Document 4869-3   Filed 11/02/07   Page 21 of 23

Page 271

1    that right?

2         A.   (Nods head).

3         Q.   And the word "published" refers to --

4         A.   It seems to be a change from the

5    language elsewhere in the final rule where we

6    used the national average wholesale price instead

7    of -- here we're using the published wholesale

8    price.

9         Q.   If you go to the second to the last

10   page, page 247 of the document, under section E,

11   you understand that in drafting these regulations

12   typically you perform an impact assessment,

13   correct?

14        A.   Yes.

15        Q.   This section E discusses effects of

16   separate payment for drugs and states -- I'll

17   skip the first couple sentences and read the

18   sentence that starts with "Under our final

19   policy."  It states "Under our final policy

20   carriers will be instructed to base payment for

21   drugs on the lower of the estimated acquisition

22   cost or the national average wholesale price of

Buto, Kathleen                        September 12, 2007
                    Washington, DC

1   the drug as published in the Red Book and similar

2   price listings."

3          Is it fair to say, Ms. Buto, that the

4   intent of CMS in drafting this provision with

5   respect to average wholesale price was to refer

6   to the prices that are found in Red Book and

7   similar price listings?

8       A.   Yeah.  The intent, though,

9   unfortunately, which was never really achieved,

10  was that was the fallback if the agency couldn't

11  come up with estimated acquisition cost.  The

12  agency never really came up with estimated

13  acquisition cost.

14      Q.   There were two possibilities for

15  determining the payment amount, one was estimated

16  acquisition cost.  If you were not able to find

17  that for a particular drug then it would be

18  reimbursed under the intent of your regulations

19  by virtue of the average wholesale price as

20  published in Red Book and similar price listings,

21  correct?

22      A.   Yes.  That's certainly the result.  The

Henderson Legal Services
202-220-4158

6d424235-0f61-4f68-bb27-bd89de0f8093

Buto, Kathleen                              September 12, 2007
                        Washington, DC

Page 273

1    -- I can't even remember the deliberations and I
2    wouldn't speak of them anyway, as you know.  But
3    I do know that our expectation would be that we
4    would be able to do estimated acquisition cost
5    surveys.  Unfortunately it didn't work out that
6    way.
7              MR. TORBORG:  We're at 5:00.  We've
8    probably got to stop for the day.
9              THE WITNESS:  Okay.  Thank you.
10             THE VIDEOGRAPHER:  This concludes tape
11   5 in the deposition of Kathleen Buto.  We adjourn
12   for the day at 5:06.
13             (Whereupon, at 5:06 p.m. the
14   deposition was adjourned.)
15
16             _____
17                  KATHLEEN BUTO
18   Subscribed and sworn to and before me
19   this _____ day of _____, 20____.
20
21   _____
22        Notary Public

6d424235-0f61-4f68-bb27-bd89de0f8093