# EXHIBIT 3

DeParle, Nancy-Ann                                       May 18, 2007
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

| | |
|---|---|
| IN RE: PHARMACEUTICAL | : MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : CIVIL ACTION: |
| PRICE LITIGATION | : 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : |
| U.S. ex rel. Ven-a-Care of | : Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : |
| Abbott Laboratories, Inc., | : Chief Magistrate |
| No. 06-CV-11337-PBS | : Judge Marianne B. |

- - - - - - - - - - - - - - - x Bowler

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - - - x

| | |
|---|---|
| STATE OF ALABAMA, | : |
|             Plaintiff, | : |
|     vs. | : Case No.: CV-05-219 |
| ABBOTT LABORATORIES, INC., | : Judge Charles Price |
| et al., | : |
|             Defendants. | : |

- - - - - - - - - - - - - - - - x

Henderson Legal Services
202-220-4158

a2e99778-7e61-4f3d-8317-e255e740d5a9

Page 242

1       MS. YAVELBERG:  Objection; form.
2               (Exhibit Abbott 209 was marked for
3    identification.)
4    BY MR. COOK:
5       Q.   Let me show you what I'll mark as
6    Exhibit Abbott 209.  If you would take a look at
7    it.  The language I'm going to be asking you to
8    focus your attention on is at page 58849.  This
9    is a November 2, 1998 excerpt from the Federal
10   Register, Volume 63, page 58814.  It's a final --
11   titled A Final Rule of Comment Period, and it is
12   the promulgation of 42 CFR 405.517 following BBA
13   1997.
14           And if I could direct your attention --
15   first of all, the preamble to this regulation
16   includes comments and agency response.  Could you
17   describe for me when HCFA promulgates a
18   regulation and includes in the preamble
19   descriptions of comments and responses, what is
20   that?
21      A.   Well, we follow the Administrative
22   Procedures Act and do a notice of proposed rule-

1   making, receive comments, as I mentioned, you
2   know, tens of thousands of comments usually with
3   respect to any rules being promulgated on a
4   proposed basis, and then under the Administrative
5   Procedures Act you are required to, in the final
6   rule, address each comment.
7        Q.   How was it when you were Administrator
8   of HCFA that the agency would prepare its
9   responses to comments?
10       A.   Well, I don't remember this specific
11  one, but in general there was a team of people
12  within the agency who worked on regulations.  And
13  they would work with other program staff in other
14  divisions on preparing the responses to comments.
15  And it had a process that went through the
16  department for comment, it came to the Department
17  of Justice usually, you know.
18       Q.   Were efforts made to ensure that
19  statements made in such preambles accurately
20  reflected agency policy at the time?
21            MS. YAVELBERG:  Objection; form.
22       A.   I can't even find the preamble here.

1    So I would like to look at it and see.
2         Q.   Well, let me focus you just on the
3    response to comments.  Is it fair to assume that
4    when the agency published in the Federal Register
5    a response to a comment in promulgating a final
6    regulation that that response was an accurate
7    reflection of agency policy?
8         A.   I believe so.
9         Q.   If you look at page 58849, the right
10   hand column, there is a comment, the second
11   paragraph of the third column on the right.  If
12   you could read the comment and then we will get
13   to the response. Just read it yourself.
14        A.   Is this the one that begins:  We
15   received some comments on the proposed
16   methodology?
17        Q.   Yes, ma'am.
18        A.   All right.
19        Q.   The response begins that HCFA agrees
20   that the law does not define the term average
21   wholesale price.  Do you see that?
22        A.   Yes.

1    Q.    Do you recall whether there were any
2    effort within HCFA beyond the calculation
3    methodology described here to further define
4    average wholesale price?
5         MS. YAVELBERG:  Objection; form.
6    A.    I don't recall.
7    Q.    The second sentence down indicates:  We
8    believe it is within our general authority in
9    implementing the statute to define terms that do
10   not have explicit statutory definition.  Is that
11   consistent with your understanding of what HCFA
12   believed its authority was in 1998?
13        MS. YAVELBERG:  Objection; form.
14   A.    I don't recall ever thinking about
15   that.
16   Q.    Do you recall having any discussions
17   whatsoever about the definition of AWP or
18   promulgating regulations to further define AWP?
19   A.    Not at this time.
20   Q.    Did you have discussions about that
21   later?
22   A.    Yes.

Page 246

1    Q.   When was that?
2    A.   In the spring and summer of 2000.
3    Q.   That would be after Congressman Bliley
4    sent a letter to Secretary Shalala?
5    A.   Yes.
6    Q.   If you go about two-thirds of the way
7    down that paragraph, it's a lengthy paragraph,
8    there is a sentence beginning:  Now there is
9    evidence from the OIG, and it describes a series
10   of OIG reports spanning ten years, making it
11   clear that the AWP is higher than the amounts
12   typically paid for drugs by physicians who bill
13   the program.
14        Do you see that?
15   A.   I see what you are referring to, but it
16   doesn't say what you said.
17   Q.   I'm sorry.  I can read it.
18   A.   You conflated two sentences.
19   Q.   Sure.  I'll just read the second
20   sentence in its entirety.  Quote: From a series
21   of OIG reports spanning the past ten years, it is
22   clear that the AWP is higher than the amount

DeParle, Nancy-Ann                                May 18, 2007
                        Washington, DC

Page 247

1   typically paid for drugs by physicians who bill
2   the program.
3           Do you see that?
4       A.  I see that.
5       Q.  Was it your understanding that HCFA
6   would incorporate within its policy-making facts
7   learned through OIG reports?
8           MS. YAVELBERG: Objection; form.
9       A.  Not necessarily.
10      Q.  It appears that in this instance at
11  least the OIG was or the OIG conclusions from a
12  particular report were being incorporated into
13  HCFA policy-making; correct?
14          MS. YAVELBERG: Objection; form.
15      A.  I can't say that. I mean I haven't
16  read this entire document. This was one of
17  hundreds of rules that we published during this
18  time. There is a -- I'll agree with you there is
19  a reference to a specific OIG report, that I
20  believe is the one that you presented to me
21  earlier that came in before I became
22  Administrator. And then there is a reference to

1   a series of OIG reports spanning the past ten
2   years, that sentence that you read. But I can't
3   say whether that, those reports are being
4   incorporated into this rule. This rule appears
5   to be the rule just implementing the Balanced
6   Budget Act.
7           This is a response to a comment
8   explaining why median AWP was chosen as opposed
9   to what some commenters said. So I don't know if
10  that's incorporating findings of the OIG or just
11  making reference to them.
12       Q.   You would at least agree with me that
13  the agency at this time was aware of OIG reports
14  spanning ten years?
15       A.   That appears to be the case.
16       Q.   In the Balanced Budget Act of 1997 do
17  you recall whether there was a provision in the
18  law that allowed HCFA to reduce payments for
19  drugs or services to the extent that those drugs
20  -- the payment for those drugs or services were
21  inherently unreasonable?
22       A.   Yes.

1    Q.   Do you recall ever considering whether
2 to reduce payments for drugs by Medicare under
3 the inherent reasonableness authority granted
4 under BBA 1997?
5         MS. YAVELBERG:  Objection; form.
6    A.   Yes.
7    Q.   What do you recall about that?
8    A.   I recall that we sought, the agency and
9 I, sought that authority and we tried to use it
10 with respect to Albuterol and as soon as we
11 could. Pretty soon after the BBA was made.
12   Q.   Were you successful in using that
13 authority?
14   A.   No.
15        MS. YAVELBERG:  Objection; form.
16   Q.   Why not?
17   A.   I don't recall exactly, but in the end
18 I believe there was an appropriations bill or
19 another statute that said we couldn't go forward
20 with it until there was a GAO report.
21   Q.   Was that unusual for Congress to get
22 involved in HCFA exercising its administrative

DeParle, Nancy-Ann                                May 18, 2007
                        Washington, DC

                                                      Page 250

1    authority on Medicare payment issues?
2              MS. YAVELBERG:  Objection; form.
3         A.   Well, in that case it wasn't just
4    administrative authority, it was statutory.
5         Q.   Okay.
6         A.   And, no, it wasn't unusual.
7         Q.   So was it -- strike that.
8              So as I understand it, Congress passes
9    a law saying pay based upon 95 percent of AWP,
10   right, in 1997?
11        A.   Right.
12        Q.   In that law Congress tells you, as the
13   Administrator of HCFA, if you find that it's
14   inherently unreasonable to pay AWP, we give you
15   the authority to change the payments, to reduce
16   them; correct?
17             MS. YAVELBERG:  Objection; form.
18        A.   No.  Actually, it was broader than
19   that.  It was not just for AWP, it was for other
20   items and services as well.
21        Q.   Okay.
22        A.   It was authority that the

DeParle, Nancy-Ann                                May 18, 2007
                    Washington, DC

Page 251

1   Administration sought and it said -- I haven't
2   looked at it in years, but as I recall, you may
3   go forward in the absence of seeking a
4   legislative change and reduce by -- if you -- if
5   you find that the Secretary -- it wasn't the
6   Administrator, it was the Secretary -- find that
7   the price paid by Medicare is inherently
8   unreasonable, you may reduce by 15 percent I
9   believe it was, and no more than a total of 20 or
10  30.  So there was a restraint on how much you
11  could reduce it and over what period of time.
12  But that's what it said.  It didn't have a
13  specific reference I don't believe to AWP or to
14  drugs.  It just said in general.  And I believe
15  when we tried to use it it wasn't just on
16  Albuterol; I think we might have tried to use it
17  on a couple other items as well.
18       Q.   And when you tried to use it Congress
19  essentially prevented you from using that
20  authority?
21            MS. YAVELBERG:  Objection; form.
22       A.   That's right.  And that wasn't unusual.

Page 252

1  Q. Do you recall any discussions at all
2  with Congress or anybody in Congress, staff or
3  Congressmen, about the department's attempt to
4  use its inherent reasonableness authority?
5      MS. YAVELBERG: Objection; form.
6  A. I don't recall them, but I'm sure I had
7  some.
8  Q. I'll give you a document that we will
9  mark as Exhibit Abbott 210.
10     (Exhibit Abbott 210 was marked for
11 identification.)
12 BY MR. COOK:
13 Q. This is a document that was produced by
14 CMS to us. It's Bates numbered HHC001-0606. It
15 appears to be a copy of a January 7, 1998 interim
16 final rule with comment period on the Secretary's
17 inherent reasonableness authority.
18     And I would like -- first of all, do
19 you recognize this interim final rule?
20 A. No.
21 Q. Do you know that the agency promulgated
22 an interim final rule describing or at least

Page 253

1  implementing its inherent reasonableness
2  authority under BBA 1997?
3      A.  No.
4      Q.  If you could look to page Bates Number
5  608, the center column, the second column.  In
6  the middle of the column are four bullet points
7  that are described -- described as additional
8  factors that the agency may consider in
9  exercising its inherent reasonableness authority.
10 And the third bullet point is that the payment
11 amounts grossly exceeded acquisition or
12 production costs for the category of items or
13 services.
14          Was it your understanding that the
15 Secretary's inherent reasonableness authority
16 allowed the Secretary to reduce by some measure
17 reimbursement for goods or services for which the
18 Secretary found that the payment amount grossly
19 exceeded acquisition cost?
20          MS. YAVELBERG:  Objection; form.
21     A.  What this is saying is that in their
22 interim final rule implementing Section

Page 254

1    1842(b)(8)(c) of the BBA, certain factors could
2    be taken into account by the Secretary in
3    deciding whether it was appropriate to use the
4    authority in the BBA and it lists those factors.
5    And one of them is whether the payment amounts
6    grossly exceed acquisition or production costs
7    for that category of items.  As I said, I don't
8    recall this particular regulation.
9                (Exhibit Abbott 211 was marked for
10   identification.)
11   BY MR. COOK:
12       Q.   I'll show you a copy of what we've
13   marked as Exhibit Abbott 211.  For the record,
14   this is a letter from you to the Honorable Bill
15   Thomas dated March 25, 1999.  It's one page long
16   and it bears Bates Number HHC003-0349.  If you
17   could read that letter and tell me whether you
18   recognize it or recall it?
19       A.   I don't.
20       Q.   Do you recall the discussion with
21   Congress Thomas on the issues described in the
22   letter?

Page 255

1        MS. YAVELBERG:  Objection; form.
2    A.   I don't recall ever discussing it with
3    him.  This doesn't say that I did.
4    Q.   Do you recall the exchange with
5    Congressman Thomas?
6    A.   The letter?
7    Q.   Yes.
8    A.   No, I don't.
9    Q.   The letter states that, in the first
10   sentence, that you understand that Congressman
11   Thomas had requested that the GAO analyze a
12   proposal that HCFA had sent to its durable
13   medical equipment regional carriers to apply
14   inherent reasonableness authority to several
15   types of supplies; correct?
16   A.   I think -- no, not exactly.  I think
17   what it says is the DMERCs, the durable medical
18   equipment regional carriers, made the proposal,
19   not that HCFA made the proposal.
20   Q.   Oh.  So do you recall the DMERCs -- and
21   that's D-M-E-R-C -- do you recall the DMERCs
22   proposing to apply an inherent reasonableness

Page 256

1    authority to several types of supplies?
2        A.   Yes.
3        Q.   What types of supplies did the DMERCs
4    propose to apply the inherent reasonableness
5    authority to?
6        A.   I recall Albuterol and I think oxygen
7    might have been in there, too.
8        Q.   You mentioned in the next sentence that
9    Deputy Administrator Michael Hash had recently
10   met with industry representatives about the
11   DMERC's proposal.  Do you recall anything at all
12   about that meeting?
13       A.   No.
14       Q.   You indicate in the second paragraph
15   you share some of the concerns raised by industry
16   representatives in the meeting.  Do you recall
17   what those concerns were?
18            MS. YAVELBERG:  Objection; form.
19       A.   No.  And as I look at this, it looks
20   like the autopen.  So I'm not even sure I saw
21   this letter.
22       Q.   Do you recall why it was that Congress

Page 257

1  prevented HCFA from exercising its inherent
2  reasonableness authority as to Albuterol Sulfate?
3           MS. YAVELBERG:  Objection; form.
4       A.  No, I don't.
5       Q.  Did you have any discussions with
6  anyone inside HCFA about the possibility of using
7  inherent reasonableness to reduce Medicare
8  payments for the drugs described in Ven-A-Care's
9  March 1998 proposal, presentation to you?
10          MS. YAVELBERG:  Objection; form.
11      A.  Did I have any discussions?
12      Q.  Yes, ma'am.
13      A.  I don't recall.
14      Q.  Do you know whether anybody within HCFA
15 considered using the inherent reasonableness
16 authority to reduce Medicare payments for drugs
17 as described in Ven-A-Care's March 1998
18 presentation?
19          MS. YAVELBERG:  Objection; form.
20      A.  I don't know.
21          MR. COOK:  Why don't we take a very
22 short break and try to wrap up after that break?