UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL DOCKET NO. 1456<br><br>Civil Action No. 06-CV-11337<br>Lead Case No. 01-CV-12257 |
| _____<br><br>THIS DOCUMENT RELATES TO:<br>*U.S. ex rel. Ven-A-Care of the Florida Keys, Inc., et al., v. Abbott Laboratories, Inc., et al.* | ) ) ) ) | Judge Patti B. Saris<br><br>Chief Magistrate Judge Marianne B. Bowler |

## ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO THE UNITED STATES' THIRD MOTION TO COMPEL DOCUMENTS

The United States' motion to compel seeks two types of relief, both of which should be denied. *First*, the Government – using its typical broad brush and heated rhetoric – complains that it has not yet received a variety of documents from Abbott. As discussed below, however, the Government protests far too much. Most of the categories of documents the Government complains about already have been produced. As to several others, there is no dispute as to production, only timing, and Abbott has endeavored to provide the Court (as it has done for the Government) with its best estimate as to when production will be completed. As for those few areas where a genuine dispute exists, it is because the Government is overreaching yet again, and its demands should be rejected.

*Second*, the Government asks for an order compelling Abbott to go back through its entire production -- nearly 1,000,000 pages -- and redo its confidentiality designations wholesale. This request is inconsistent with the protective order in place in this case (which provides a procedure for any party to challenge the confidentiality designations of another on a document-by-document basis), and it would impose an extraordinary burden upon Abbott. On either basis, the Government's request should be denied.

I. **THE GOVERNMENT'S MOTION TO COMPEL DOCUMENTS SHOULD BE DENIED**

    A. **As to Most Categories of Documents Identified by DOJ, There Is No Dispute That Requires the Court's Intervention**

In its race to Court, the Government complains of disputes as to several categories of documents where no dispute exists. Indeed, Abbott has already produced the vast majority of document categories at issue. As to many others, there is no dispute about production; the only issue is when Abbott's production will be completed – a subject that hardly warrants this Court's intervention.[1]

        1. **AWP, Spread, and Cross-Cutting Documents**

After previous motion practice, this Court issued on May 22, 2007 (Dkt. 4244) a clear directive that Abbott is required to produce:

> [A]ll documents that mention the four charged drugs; all documents that relate to the four charged drugs including general sales and across the board marketing information that would encompass the four charged drugs; and all documents that reflect any alleged effort on the part of Abbott to market the spread or manipulate the published average wholesale price ("AWP") for any drug within Abbott's former hospital products division. . . . [Such documents] should include inter alia all documents regarding other drugs sold by the hospital products division to the extent such documents involve how Abbott "put together the spread" as well as all cross-cutting sales documents inclusive of broad based marketing documents. . . . [T]he temporal period shall be "through 2003."

Abbott has complied with that Order. In so doing, it has not focused only on documents within the former hospital products division ("HPD"), as the Government falsely asserts (Mtn. at 5), but has instead searched within Abbott generally, regardless of division. The vast majority of

---

[1] In even raising such complaints about timing of production, the Government is hurling rocks from a very thin glass house. The Government owes Abbott scores of documents and other information, and relies on specious objections and non-answers to obstruct any effort to complete discovery in a timely fashion. These abuses are discussed in a motion to compel that Abbott was forced to file recently. (*See* Dkt. No. 4790.)

documents that Abbott has produced do originate with HPD, but that should come as no surprise to anyone. The charged drugs at issue in this case are all HPD products, and there is no dispute that HPD products are different from products in other Abbott divisions (i.e., PPD and Ross) in terms of how they were distributed in the marketplace and reimbursed by third parties like Medicare and Medicaid.[2] Abbott has produced all of its communications with the price reporting compendia relating in any way to the charged drugs. In Abbott's view, production of the materials ordered by the Court on May 22, 2007 is complete.[3]

Nothing in Judge Saris' recent rulings addressing the permissible scope of third party discovery (Dkt. No. 4701) suggests in any way that Abbott's production should be expanded. In contending otherwise, the Government appears to focus on that portion of Judge Saris' September 7, 2007 order wherein she directed the third parties to produce "all documents which refer or relate to Abbott's marketing a spread on a drug involving AWP no matter what drug or what year"; her directives otherwise were generally limited temporally to 1991-2003. (Dkt. No. 4701.) This ruling dealt only with discovery from a few third parties; it said nothing about the proper temporal scope of discovery among the actual litigants. And for good reason, as Judge Saris already has plainly set the metes and bounds for such discovery. At a hearing in February 2007, Judge Saris made clear that, as to parties, discovery even of AWP-related documents and

---

[2] For a description of the differences between PPD and HPD products, *see* Dkt. No. 3583 at 6-7. PPD products tend to be single-source pills. These products have very little "spread," and they are marketed by Abbott to the physicians who prescribe the drugs, not to the pharmacists who actually process claims for reimbursement to third party payers. (*Id.*)

[3] To support its false assertion that documents relating to divisions other than PPD have not been searched for or produced, the Government trumpets a document from former Ross Products employee Michael Tootell – which document the Government admits to having had in its possession all along. (Mtn. at 5-6.) This hardly suggests that the Government is being denied relevant documents. Moreover, Abbott conducted a full review of Mr. Tootell's files and has produced responsive materials. The Government even had an opportunity to depose Mr. Tootell recently, at which time he made clear that, while manufacturers submit list prices to the price reporting compendia that is used in the calculation of AWP, the actual setting of AWP is performed by the compendia. (*See* Ex. A at 123:16 – 124:7.)

information cuts off in 2003 because that marks the date of the passage of the Medicare Modernization Act and, by that time, "the whole world knew about inflated AWP's." (Hr'g. Tr. 18-19 (Feb. 27, 2007), attached as Ex. B.) That is the temporal limitation that Judge Saris has imposed for party discovery in the related MDL class action case (*id.*), and this Court has followed suit – twice ruling that party discovery in this case ends in 2003 (Dkt. No. 4244, *see also* Hr'g Tr. 1-12 (June 19, 2007)). The Government never sought review of those rulings, and it ought not be allowed to attempt a back-door reconsideration here.

### 2.     Sales and Marketing Documents

As mentioned above, Abbott is mindful of the Court's May 22, 2007 order commanding the production of marketing documents relating to the subject drugs, and it has complied with that Order. As the Government well knows, the charged products in this case (sterile water, dextrose, sodium chloride and vancomycin) were all generic, multi-source products – not the sort of brand name products that are heavily marketed by pharmaceutical companies with glossy brochures, detail materials, and the like. To the extent that documents exist evidencing marketing plans or strategies relating to these products, they have been produced to the Government (not to mention all of the depositions the Government has conducted on these issues), and that is all that can be required. There is no conceivable way for Abbott to comply with the Government's ludicrous demand that Abbott identify whether any other sales and marketing documents ever existed over the course of the last 16 years and then detail how and when they may have been lost or discarded.

### 3.     ASPS Personnel Files

Pursuant to the Court's May 16, 2007 order, Abbott has, with extraordinary effort, assembled and reviewed the personnel files for all of the field sales personnel who worked for the HPD Alternate Site sector during the relevant time period. Abbott began its rolling

production of materials from these files to the Government several weeks ago, and that production is now complete.

### 4.     Contracts for Alternate Site Bottom 20% of Customers

The Government appears to be confused about the record on this issue.  On May 16, 2007, the Court heard argument about the Government's request for access to Abbott's contracts with those customers that accounted for the bottom 20% of sales in the former HPD Alternate Site sector (Abbott already had agreed to provide such contract documents for the larger customers accounting for the top 80% of sales).  (*See* Hr'g Tr. 67-68 (May 16, 2007).)  The Court ordered Abbott either to agree to produce the contract documents for the bottom 20% of customers, or agree to stipulate that Abbott would not attempt to introduce evidence about such customers at trial.  (*Id.*)  Abbott chose the former option, and it has been working to complete this production along with the myriad other categories demanded by the Government and all of the other plaintiffs in the many AWP actions.

At no time, however, did the Court order, or did Abbott agree to, the blanket production of all "emails, correspondence or any form of communications with [such] customers," as the Government incorrectly states in its motion.  (Mtn. at 6.)  To the extent that such customer communications would otherwise fall within one of the categories already addressed by the Court (AWP, spread, etc.), then they have been produced.  There is no justification for going beyond that to produce random, irrelevant communications between Abbott and its customers that have no bearing on this case.

### 5.     Home Infusion Documents

Abbott has been extremely thorough in its production of documents relating to its former Home Infusion Services business.  In order to provide the relevant electronic data, Abbott had to locate and purchase the necessary hardware (the proprietary machinery used for this business

was decommissioned years ago) and then recover the information. After this time consuming and expensive process, Abbott produced to the Government on August 15, 2007, all of the relevant data for this business – including all of the Home Infusion customers, all of the claims submitted to third party payers like Medicare and Medicaid, and all of the revenue earned by Abbott on the Home Infusion operation. Abbott also provided extensive materials to enable the Government to interpret and use the data. Notably, in order to speed the production, Abbott provided this Home Infusion data in toto, without limiting it to just the charged drugs. In addition, Abbott has committed to produce all of the hard-copy documents in its possession that relate to Home Infusion (approximately 80 boxes of material), and it has substantially completed that production. The small volume of remaining relevant materials will be produced on or before November 9, 2007.

The only dispute between Abbott and the Government in the area of Home Infusion Services documents concerns the production of so-called HCFA 1500 forms. These are forms that are filled out by providers every time a patient receives any form of treatment that is reimbursed by a third party payer, like Medicare or Medicaid. The forms show information like patient name and contact data, diagnosis, and treatment. The HCFA 1500 forms are standard forms that are then submitted to the payers. The only data on these forms that is even conceivably relevant to this case is the amount of any claim submitted to Medicare or Medicaid through Abbott's Home Infusion Services business. Yet this information already has been produced to the Government in far more useful form as part of the electronic data described above. To actually produce the HCFA 1500 forms would be needlessly cumulative, and also would raise serious concerns about the disclosure of patient information (verboten under the HIPAA statute and associated regulations) and would impose a substantial burden on Abbott.

The Government has not articulated any justification (because there is none) for forcing Abbott to reproduce mounds of documents and deal with the necessary redaction of patient information, all to provide forms that are at best cumulative and less useful than the electronic information already in the Government's hands.

### 6.    Transactional Sales Data

The Government's argument about the production of transactional sales data is a red herring.  Abbott produced full transactional level sales data to the Government in December 2005 for 166 NDC's (which included all of the charged drugs and many others).  Since that time, Abbott has been working with the Government to iron out any issues they had with respect to the completeness of the data.  Ultimately, Abbott determined that the cleanest way to resolve these issues was to reassemble the data for all of the charged drugs.  Abbott has done that, and produced the results to the Government on November 5, 2007.  Thus, the Government's complaints on this issue are moot.

### B.    In Light of Abbott's Pending Motion to Dismiss, Acyclovir Discovery Is Inappropriate at This Time

After conducting 11 years of one-sided, secret investigation, the Government elected to intervene in this action on March 17, 2006 as to only four products (sterile water, vancomycin, dextrose, and sodium chloride).  Thereafter, Ven-a-Care (the relator) sought and was granted leave to amend its own underlying complaint to conform to the Government's complaint-in-intervention – i.e., to move forward solely on the four charged products and thereby to drop its claims as to all other products, including acyclovir.  (Mtn. For Leave to Amend, attached as Ex. C.)  On June 4, 2007, however, the Government purported to amend its own complaint-in-intervention to add claims relating to acyclovir.  (Dkt. No. 4281.)  Abbott has moved to dismiss the first amended complaint on a number of grounds, including that the Government cannot

properly intervene in any claims related to acyclovir in this case because Ven-a-Care dropped all such claims months ago.  (*See* Dkt. No. 4469.)

Abbott's motion to dismiss is fully briefed and was argued before Judge Saris on November 5, 2007.  If Judge Saris grants the motion, then it is clear that no discovery relating to acyclovir (other than that which would otherwise fall within one of the cross-cutting categories the Court already has ordered produced) should be had.  Given that a ruling is imminent, there is not legitimate reason to force Abbott to incur the burden and expense of searching for and producing volumes of acyclovir-related documents and data that may (indeed, should) prove irrelevant.  The Government's request for this information should be deferred pending Judge Saris' ruling.

## II.  THE GOVERNMENT'S DEMAND FOR A WHOLESALE REDESIGNATION OF ABBOTT'S ENTIRE PRODUCTION SHOULD BE REJECTED

In yet another attempt to heap unnecessary burden and expense on Abbott, the Government asks the Court to order Abbott to go back through every document it has produced since this case began (nearly 1 million pages) and reassess its confidentiality designations -- all within 20 days, no less.  (Mtn. at 10-11.)  This sweeping request should be denied out of hand.

*First*, the Government's blanket demand for a wholesale re-designation of *all* of Abbott's documents is a violation of the Protective Order, and must be rejected on that basis alone.  If the Government wishes to contest Abbott's confidentiality designation as to any particular document, then the proper course is to identify such objection, in writing, "*specifying the information in issue and its grounds for questioning the designation*."  (Protective Order, attached as Ex. D, at ¶ 17) (emphasis added).)  In the event of a disagreement, the parties "shall try first to dispose of such dispute in good faith on an informal basis." (*Id.*)  This procedure is more than adequate, and it has been employed by the parties numerous times in the past – in

circumstances when the Government has presented specific documents to Abbott that it wished to append to briefs or other court filings. In those instances, as the Protective Order envisions, Abbott has been able to review the Government's specific objections to specific documents, and it has on certain occasions agreed to alter confidentiality designations in light of those expressed concerns.

Here, by contrast, the Government simply objects to all documents in Abbott's entire production, without any specific grounds for questioning any specific designation. As a consequence, Abbott cannot reasonably be expected to meaningfully rebut the Government's arbitrary claims. This sort of shotgun approach was considered and rejected in *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.*, 529 F. Supp. 866 (E.D. Pa. 1981). In *Matsushita*, plaintiffs moved the court to de-designate millions of pages of discovery marked confidential. *See id*. at 893. Plaintiffs asserted that, merely by contesting the need for confidentiality of all documents in a blanket fashion, they shifted the burden to defendants to justify confidentiality on a document-by-document basis. *See id*. The court disagreed, noting that:

> [T]he proposed procedure would effect an unintended metamorphosis of [the applicable protective order], for there is a qualitative difference between sustaining the confidentiality of a single document at the time of its designation and sustaining the confidentiality of hundreds of thousands of documents…We conclude that wholesale declassification cannot rationally be sustained without reviewing each of the countless separate documents or at least the many discrete categories which constitute the mass of protected documents.

*Id*.  Like the plaintiffs in *Matsushita*, the Government's proposed approach would effectively rewrite the Protective Order that has governed this case from the beginning.  This, the Court should not allow.[4]

*Second*, the Government has no support for its claim that Abbott has abused the process defined in the Protective Order for designating materials as confidential.  Cherry picking two documents from a production of nearly one million pages and appending them to this motion certainly does not suffice.  (Mtn. Ex. 9.)  Indeed, as to both of these documents, when the Government raised them with Abbott (as the Protective Order requires), Abbott agreed to their public filing – proving that the mechanism in place under the Protective Order is more than adequate to allow the parties to address any disputes over confidentiality designations on particular documents.

The Government argues, based on certain comments from Judge Saris in the context of under seal filings, that Abbott should simply remove any confidentiality designation from documents that are more than five to seven years old.  (Mtn. at 9-10.)  It is not the case that documents lose their confidential character simply by virtue of age, however.  For instance, an Abbott long range plan from the 1990's might very well contain sensitive information that would give competitors an advantage in seeing how Abbott viewed the marketplace for its products.  Similarly, pricing documents might well remain confidential for more than five years if the price was relatively static, such that disclosure of older documents would effectively reveal current prices.  In considering a similar request to that made here by the Government, the court in

---

[4] Nothing about Judge Saris' recent orders concerning filing documents under seal suggests a contrary result.  The Court has made clear that it takes a narrow view regarding what documents can be kept from the public file by filing them under seal, and it has put in place a specific procedure for under seal filings.  (Elec. Order Nov. 11, 2007.)  The Court did not in any way undercut or revise the provisions of the Protective Order that govern designating materials as confidential or challenging such designations.  Those provisions stand and must be followed.

*Matsushita* noted that "there is sense in the argument, which defendants urge, that old business data may be extrapolated and interpreted to reveal a business' current strategy, strengths, and weaknesses. It would appear that, in the hands of an able and shrewd competitor, old data could indeed be used for competitive purposes." 529 F. Supp. at 891-92; *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 16 (D.D.C. 2000) ("Information does not become stale merely because it is old…such insights would allow a competitor to determine the direction of the company's past and current efforts in research and development (and thus beat them to new advancements)."); *Timken Co. v. United States Customs Serv.*, 1983 WL 486422 (D.D.C. 1983) (finding that the release of pre-1973 information in 1981 would cause substantial harm to the competitive position of the companies from which it was obtained). This case law again underscores that the appropriate means to address confidentiality is on a document-by-document basis, as the Protective Order directs, as opposed to the wholesale re-designation demanded by the Government.

*Finally*, the Government has not established any sort of prejudice that could justify the extraordinary relief it seeks. Although the Government makes the vague and unsupported assertion that it feels inhibited in its ability to prepare for trial by Abbott's confidentiality designations (Mtn. at 11), it offers no specifics. And it does not even argue that whatever concerns it might have could not be adequately addressed by following the procedures outlined in the Protective Order. On the other hand, granting the Government's motion would impose a tremendous burden upon Abbott to review nearly one million pages (plus scores of electronic data) and reassess its confidentiality designations. This could never be accomplished in the mere 20 days the Government blithely prescribes, and it would be woefully inefficient. It would require Abbott to review thousands of documents that are of little or no interest to the

Government.  And the results of any review by Abbott would doubtless start this whole process over from the beginning, as the Government is sure to continue in its refusal to acknowledge *any* confidentiality designation Abbott makes.  The prejudice to Abbott from the Government's proposal far outweighs any possible benefit (particularly in light of the procedure already in place under the Protective Order for challenging confidentiality designations), and this proposal therefore should be rejected.

### III.   CONCLUSION

For these reasons, Abbott respectfully requests that the Court deny the Government's motion to compel in its entirety.

Dated:  November 7, 2007                                            Respectfully submitted,

/s/  Brian J. Murray
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on November 7, 2007, the foregoing **ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO THE UNITED STATES' THIRD MOTION TO COMPEL DOCUMENTS** was served upon all counsel of record in this action electronically by posting a true and correct copy of same via Lexis-Nexis.

/s/ Carol P. Geisler