# EXHIBIT 2

Vladeck, Ph.D., Bruce C.                                          May 4, 2007
                    New York, NY

Page 1

```
              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
-----------------------------------X  MDL NO. 1456
IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:
AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS
-----------------------------------X
THIS DOCUMENT RELATES TO:          :
U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:
Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS
Laboratories, Inc.                 :
-----------------------------------X


                IN THE CIRCUIT COURT OF
              MONTGOMERY COUNTY, ALABAMA
-----------------------------------X
STATE OF ALABAMA,                  :  CASE NO.
         Plaintiff,                :  CV-05-219
    v.                             :
ABBOTT LABORATORIES, INC.,         :  JUDGE
et al.,                            :  CHARLES PRICE
         Defendants.               :
-----------------------------------X
```

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                May 4, 2007
New York, NY

Page 182

1   A. That's correct.
2   Q. One was EAC, established according to
3   survey. Correct?
4   A. That's correct.
5   Q. We'll get to it later, but for whatever
6   reason, that was not available to you because the
7   surveys were not or could not be conducted?
8   A. That's correct.
9   MS. BROOKER: Objection to form.
10  Q. And so, your understanding was that
11  pursuant to regulation, your only alternative
12  between '93 and '97, while you were administrator
13  of HCFA, was to pay based upon the published
14  average wholesale price. Correct?
15  A. That's correct.
16  Q. And during the time that you were
17  paying the published average wholesale price, you
18  were aware that average wholesale price exceeded
19  acquisition cost. Correct?
20  MS. BROOKER: Objection. Form.
21  A. Yes.
22  Q. You were aware that for generic drugs,

Page 183

1   the difference could be greater than for brand
2   name drugs. Correct?
3   MR. BREEN: Objection.
4   A. I'm not certain I was aware of that.
5   Q. But for supplies such as sodium
6   chloride, you were aware that the difference
7   could be as much as 99 percent. Correct?
8   A. Yes, I was.
9   MR. BREEN: Objection. Form.
10  MS. BROOKER: Objection. Form.
11  Q. And the same would be true for other
12  commodity products similar to sodium chloride
13  such as, for example, dextrose in water.
14  Correct?
15  MR. BREEN: Objection. Form.
16  A. Yes, that's correct. Or sterile saline
17  or something of that sort.
18  Q. Which are two of the other drugs at
19  issue in this case. Correct?
20  A. I wasn't aware that -- that they were,
21  but okay.
22  Q. And during that time, you, as

Page 184

1   administrator of HCFA, considered alternatives to
2   100 percent of AWP. Correct?
3   You, as administrator of HCFA,
4   considered alternatives to reimbursing at 100
5   percent of AWP. Correct?
6   A. I don't know if we're getting into
7   deliberative --
8   MS. BROOKER: You should be mindful
9   that you should not disclose any pre-decisional
10  deliberative process.
11  MR. COOK: I think it's going to be
12  easier if you either direct him not to answer or
13  let him answer, because I'm aware -- I'm a little
14  leery of having the witness put in the difficult
15  position of having to parse within his head --
16  A. Well, let me -- I can say I was aware
17  that conceptually there were alternatives to 100
18  percent of AWP.
19  MS. BROOKER: Let me say you can state
20  what your understanding was in your official
21  capacity, and you can certainly state what the
22  official policy was or the regulation, or what

Page 185

1   the statute was. You just cannot discuss pre-
2   decisional deliberative conversations that you --
3   that you had with others.
4   THE WITNESS: I think I got that.
5   Q. All right. Without revealing what the
6   deliberations were, were there deliberations
7   within HCFA about alternative methods for
8   reimbursing to undiscounted AWP?
9   MS. BROOKER: Objection to form.
10  A. Extensive discussion.
11  Q. Who -- who was involved in those
12  extensive discussions?
13  A. I don't know if that gets too
14  deliberative.
15  MS. BROOKER: You can say who was
16  involved in deliberations.
17  A. I would say that with the exception of
18  the Medicaid folks, the list of people I
19  enumerated earlier as experts I would have
20  consulted on these issues would have been
21  involved, whoever the deputy administrator was at
22  the time would have been involved. And, again,

47 (Pages 182 to 185)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                             May 4, 2007
                        New York, NY

Page 186

1  probably other members of the staff of the office
2  administrator probably would have been involved,
3  as would additional staff in the Office of
4  Legislation and Policy, in addition to the
5  individuals I named earlier.
6      Q.  And it involved numerous meetings at
7  which the -- the -- the possibilities were
8  discussed; I take it?
9          MS. BROOKER: Objection. Form.
10     A.  I would say we were, in 1996 and 1997 -
11 - certainly probably beginning in 1995, there
12 were very frequent conversations about budgetary
13 issues and policies with potential budgetary
14 impacts of one kind or another, and there was
15 always a list of potential policies and changes
16 to Part B drug reimbursement was frequently on
17 those lists, and was not discussed at every
18 meeting, but was frequently discussed.
19     Q.  How many alternatives were discussed?
20         MS. BROOKER: Objection. You should
21 not discuss exactly what -- you should not
22 discuss any of your deliberations, so you

Page 187

1  shouldn't talk about -- I mean, that's -- that's
2  prohibited.
3          MR. COOK: Well, are you instructing
4  him not to answer?
5          MS. BROOKER: You can talk about what
6  official policy was.
7          MR. COOK: All right. I'll make it
8  easy.
9      Q.  In your internal deliberations at HCFA,
10 how many alternative methods of reimbursement did
11 you consider?
12     A.  I couldn't say. I -- it's not a
13 question of privilege. I couldn't say.
14     Q.  Okay. But within your internal
15 deliberations, you did consider alternative
16 methods of reimbursement. Correct?
17     A.  That is correct.
18     Q.  And, again, to -- to make the record as
19 sharp as possible, what did you discuss in those
20 deliberations?
21         MS. BROOKER: Objection. You cannot
22 discuss exactly what your deliberations were.

Page 188

1         And I also object that these questions
2  are incredibly vague. So, I object to form. I
3  don't know exactly what program we're even
4  talking about. I don't know what time period
5  we're talking about. I don't know what the
6  specifics are that you're talking about in this
7  whole line of questions.
8         MR. COOK: But you understand enough
9  that you won't let him answer it?
10        MS. BROOKER: If he's going to talk
11 about internal deliberations. And -- and, again,
12 just for the record, it's not that I won't let
13 him talk about it. I am here to protect on --
14 not on behalf of the witness, but on behalf of
15 the government, deliberative process privilege.
16 It's not my privilege. It's not the witness'
17 privilege. It's the federal government's
18 privilege.
19        MR. COOK: All right. The United
20 States, who has sued my client, will not allow
21 the witness to talk about it.
22        Is that fair to say?

Page 189

1         MS. BROOKER: I don't think that's a
2  fair characterization.
3         MR. COOK: Okay.
4         MS. BROOKER: Look, Chris --
5         MR. COOK: I know. I know.
6         MS. BROOKER: We have this issue before
7  the Judge. There's no reason to bicker about it
8  before the witness. Let's just all be
9  professional about it.
10     Q.  And so, it is fair to say that during
11 the time you were the administrator of HCFA, the
12 agency did not choose to change the manner in
13 which it reimbursed Medicare Part B drugs?
14        MS. BROOKER: Objection. Form.
15     A.  I would -- I would frankly personally
16 object to that characterization because I had a
17 growing feeling -- again, I would put this in a
18 period probably beginning about 1995 through the
19 time I left the government -- of frustration that
20 we were significantly overpaying for Part B
21 drugs, and that because of some combination,
22 frankly, of political and legal constraints, we

Vladeck, Ph.D., Bruce C.                                                May 4, 2007
New York, NY

Page 214

1  that, please, and tell me when you're done.
2     A.  Okay.
3     Q.  Do you recall this report?
4     A.  Not specifically at the time, but I
5  believe I've probably seen it since.
6     Q.  Who within your administration would
7  have been primarily responsible for responding to
8  and considering this particular report?
9     A.  Probably the Medicaid drug folks, I
10 would guess.
11    Q.  And who -- who would that be, do you
12 think?
13    A.  Again, if it wasn't Mr. Graydon at the
14 time, I don't know who it would have been.
15    Q.  You'll notice in the cover memo the
16 Inspector General writes in the beginning of the
17 second paragraph:
18        "They estimate the pharmacies pay an
19 average of 42.5 percent less than AWP for generic
20 drugs sold to Medicaid beneficiaries."
21        MS. BROOKER:  Object to the extent that
22 generic -- the word "generic" is just not does

Page 215

1  not -- does not appear there.
2     Q.  Well, you see that it refers to 42-and-
3  a-half percent less than drugs sold to Medicaid
4  beneficiaries?  Correct?
5     A.  That's correct.
6     Q.  And this is a report dealing
7  specifically with generic prescription drug
8  products, it says it on the subject line, I
9  believe?
10        Is it your understanding that the
11 estimates communicated to HCFA by OIG in this
12 report is limited to generic drugs?
13    A.  That's my understanding.
14    Q.  Okay.  Actually, if you turn to
15 Appendix 2 it summarizes nicely the numeric
16 conclusions of the report.  And it gives a column
17 of percentage estimates of variation from AWP.
18 Is that what you understand the fifth column of
19 that to be?
20    A.  On my -- my copy the headings are not
21 legible, but --
22    Q.  Okay.  We can pull it out of the -- out

Page 216

1  of the text of the -- of the report.  If you turn
2  to Page 4, under Findings and Recommendations?
3     A.  Okay.
4     Q.  Again, it repeats a finding of an
5  estimate of 42-and-a-half percent below AWP --
6     A.  Right.
7     Q.  -- for drugs sold to Medicaid
8  beneficiaries.  Right?
9         And you'll see, am I correct, that
10 they're basing that on a comparison of AWP for
11 9,075 invoices from 314 pharmacies in 11 states?
12    A.  I see that, yes.
13    Q.  The chart down below there is that --
14 is that clear, where it indicates in the second
15 column the point estimate?
16    A.  Yes.
17    Q.  And the bottom column you see shows an
18 overall point estimate of 42-and-a-half percent
19 variation from AWP for the generic drugs
20 reviewed?
21    A.  Yes, it does.
22    Q.  And the column goes down and shows 47-

Page 217

1  and-a-half percent for rural chain pharmacies.
2         Right?
3     A.  Correct.
4     Q.  47.4 percent for rural independent
5  pharmacies.  Right?
6     A.  Right.
7     Q.  And then for urban chain, 37.6 percent;
8  for urban independent, 46.7 percent; and for non-
9  traditional pharmacies, 57.7 percent.
10        Correct?
11    A.  That's correct.
12    Q.  Do you recall being advised about those
13 discounts from AWP when you were administrator of
14 HCFA in August of 1997?
15    A.  I don't specifically recall, but this
16 is -- I don't specifically recall.
17    Q.  You would agree with me that it's
18 consistent with your belief that average
19 wholesale price does not reflect acquisition cost
20 for providers.  Correct?
21    A.  That's correct.
22    Q.  But it indicates a percentage variation

Vladeck, Ph.D., Bruce C. - Vol. II				June 21, 2007
New York, NY

Page 285

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X  MDL NO. 1456

IN RE:   PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION   :  01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :  06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :  CASE NO.

        Plaintiff,                   :  CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :  JUDGE

et al.,                              :  CHARLES PRICE

        Defendants.                  :

------------------------------------X

Vladeck, Ph.D., Bruce C. - Vol. II  
New York, NY

June 21, 2007

Page 470

1     A.   Not to my knowledge.
2     Q.   And would you agree with me that
3 HCFA had the power and the authority to ask
4 manufacturers to tell HCFA how the manufacturers
5 calculated the WAC price of any of their drugs?
6       MS. BROOKER: Objection, form.
7     A.   I believe so, yes.
8     Q.   And do you know whether during your
9 tenure HCFA ever asked any manufacturer to tell
10 them HCFA how it calculated its WAC, or wholesale
11 acquisition cost?
12     A.   I don't believe so.
13     Q.   Why not?
14     A.   Well, there are an infinite number
15 of things the agency could do if it had the
16 resources to improve the administration of the
17 program, and only a very small fraction of which
18 get done.
19     Q.   Now, the -- your -- the Secretary,
20 or the HCFA had the right to audit manufacturer
21 calculations of AMP. Right?
22       MS. BROOKER: Objection, form.

Page 471

1     Q.   Is that right?
2     A.   Well, it says Secretary. I would
3 think that sort of audit activity would more
4 ordinarily be carried out by the Office of
5 Inspector General rather than by HCFA.
6     Q.   The Office of Inspector General of
7 Health and Human Services.
8     A.   That's right.
9     Q.   And when the -- when it says in
10 Provision B of Item Roman III that the Secretary
11 may survey manufacturers regarding manufacturer
12 prices, who was it that you understood would be --
13 had the right to do those surveys?
14     A.   Well, I -- I think any of a number
15 of agencies within HHS could have been asked to
16 undertake that.
17     Q.   There was something called the
18 Office of Program Integrity also. Correct?
19     A.   That is correct.
20     Q.   And that was an office that was
21 created under your tenure?
22     A.   That's correct.

Page 472

1     Q.   What was the purpose of that Office
2 of Program Integrity?
3     A.   To provide leadership to and
4 oversee all the program integrity activities of
5 the agency and to serve as the primary point of
6 liaison with the Inspector General and the
7 Department of Justice.
8     Q.   And the Office of Program Integrity
9 would have access to AMP information that was
10 submitted by manufacturers. Right?
11       MS. BROOKER: Objection to form.
12     A.   Not as I understood it, no.
13     Q.   They were prohibited from seeing
14 that?
15       MS. BROOKER: Objection to form.
16     A.   They were not directly involved in
17 the administration of the rebate program.
18     Q.   So, was the Office of Public
19 Integrity precluded from investigating whether
20 they were getting the right rebates?
21       MS. BROOKER: Objection to form.
22       MR. BREEN: Objection to form.

Page 473

1     A.   I don't know the answer to that.
2     Q.   So, it's possible that in
3 connection with rebate-related matters the Office
4 of Public Integrity could look at AMP data.
5 Right?
6       MS. BROOKER: Objection to form.
7     A.   I don't know the answer to that.
8     Q.   Who was the head of that office
9 when you ran the agency?
10     A.   For most of the time I was there it
11 was Judith Berek. She was succeeded, I believe,
12 by Linda Ruiz, and I think Linda was still there
13 when I left the agency.
14     Q.   Did anyone from the Office of
15 Public Integrity ever come to you and tell you
16 that there was a fraud going on because AWP was
17 not equal to actual acquisition cost?
18       MS. BROOKER: Objection, form.
19     A.   We never believed AWP was equal to
20 actual acquisition cost.
21     Q.   So, I take it nobody ever told you
22 there was any fraud because of that fact?

48 (Pages 470 to 473)