# EXHIBIT 5

```
                           Booth, Charles R. - Vol. II
00265
  1              UNITED STATES DISTRICT COURT
  2            FOR THE DISTRICT OF MASSACHUSETTS
  3   - - - - - - - - - - - - - - -
  4   IN RE:   PHARMACEUTICAL        ) MDL NO. 1456
  5   INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION
  6   PRICE LITIGATION               ) 01-CV-12257-PBS
  7   THIS DOCUMENT RELATES TO       )
  8   U.S. ex rel. Ven-a-Care of     ) Judge Patti B. Saris
  9   the Florida Keys, Inc.         )
 10        v.                        ) Chief Magistrate
 11   Abbott Laboratories, Inc.,     ) Judge Marianne B.
 12   No. 06-CV-11337-PBS            ) Bowler
 13   - - - - - - - - - - - - - - -
 14         (captions continue on following pages)
 15
 16       Videotaped deposition of CHARLES R. BOOTH
 17                       Volume II
 18
 19
 20                       Washington, D.C.
 21                       Monday, October 29, 2007
 22                       10:00 a.m.
00266
  1               IN THE CIRCUIT COURT OF
  2             MONTGOMERY COUNTY, ALABAMA
  3   - - - - - - - - - - - - - - - -
  4   STATE OF ALABAMA,              )
  5           Plaintiff,              )
  6        vs.                        ) Case No. CV-05-219
  7   ABBOTT LABORATORIES, INC.,     ) Judge Charles Price
  8   et al.,                         )
  9           Defendants.             )
 10   - - - - - - - - - - - - - - - -
 11
 12
 13          STATE OF WISCONSIN CIRCUIT COURT
 14                   DANE COUNTY
 15   - - - - - - - - - - - - - - - -
 16   STATE OF WISCONSIN,            )
 17           Plaintiff,              )
 18        vs.                        ) CASE NO. 04-CV-1709
 19   AMGEN INC., et al.,            )
 20           Defendants.             )
 21   - - - - - - - - - - - - - - - -
 22
00267
  1              COMMONWEALTH OF KENTUCKY
  2         FRANKLIN CIRCUIT COURT - DIV. II
  3   - - - - - - - - - - - - - - - -
  4   COMMONWEALTH OF KENTUCKY,      )
  5           Plaintiff,              ) Civil Action No.
  6        vs.                        ) 03-CI-1134
  7   ABBOTT LABORATORIES, INC., et al.,)
  8           Defendants.             )
  9   - - - - - - - - - - - - - - - -
 10
 11              COMMONWEALTH OF KENTUCKY
 12         FRANKLIN CIRCUIT COURT - DIV. I
 13   - - - - - - - - - - - - - - - -
 14   COMMONWEALTH OF KENTUCKY, ex rel. )
 15   GREGORY D. STUMBO, Attorney General )
 16           Plaintiff,              ) Civil Action
```

```
                                    Booth, Charles R. - Vol. II
12   downsides to using an estimated acquisition cost
13   payment methodology rather than an average wholesale
14   price methodology?
15            MR. BATES:  Object to the form.
16            MR. GOBENA:  Object to the form.
17       A.   I don't believe that we were prepared to
18   make that judgment until after we saw the data.
19       Q.   So you were at least leaving open the
20   possibility that there may be negative consequences,
21   legitimate negative consequences to consider in
22   going to an estimated acquisition cost methodology?
00512
 1            MR. GOBENA:  Objection to the form.
 2            MR. HAVILAND:  Objection.
 3       A.   I think we were prepared to allow for the
 4   possibility.
 5       Q.   Were you familiar at the time with the
 6   notion of a downward spiral of drug prices that
 7   might result from an acquisition cost methodology
 8   for determining Medicare payment policies?
 9       A.   No, I didn't see any indication there was
10   going to be a downward spiral.
11       Q.   But leaving aside whether there would be
12   a downward spiral in this case, are you there are
13   with the concept of how an acquisition cost
14   methodology for setting payment amounts could lead
15   in some circumstances to a downward spiral of
16   prices?
17            MR. BATES:  Objection.
18            MR. GOBENA:  Object to the form.
19       A.   I don't see how.
20       Q.   You would agree with me that if in year
21   one payment amounts were based upon an average of
22   acquisition cost, you would agree with me that by
00513
 1   definition approximately half of providers would be
 2   reimbursed at an amount below their acquisition
 3   cost, correct?
 4            MR. WINGET-HERNANDEZ:  Object to the
 5   form.
 6            MR. BATES:  Objection to form.
 7            MR. GOBENA:  Objection to form.
 8       A.   No.
 9       Q.   Just as a matter of math it wouldn't be
10   the case that if one were to average, if one could
11   do it, all providers' acquisition costs and set
12   payment amount at the average, that some portion of
13   providers, some portion of suppliers or physicians
14   would be reimbursed at an amount below their
15   acquisition costs.
16            MR. GOBENA:  Object to the form.
17       A.   I don't necessarily agree with that.
18       Q.   Why not?
19       A.   Because once the price were set
20   physicians and suppliers would then negotiate with
21   those from whom they were buying the product to get
22   a better price.
00514
 1       Q.   And the estimated acquisition cost would
 2   presumably become the ceiling for price competition
 3   in year two, correct?
 4            MR. HAVILAND:  Objection.
 5            MR. GOBENA:  Objection to the form.
```

Page 91

Booth, Charles R. - Vol. II

```
 6    A.    Not necessarily.
 7    Q.    Why not necessarily?
 8    A.    Well, I don't know what happens in year
 9  two. I mean, is there a new survey, is there nor
10  data, is there occasions from the Joe Baileses of
11  the world that there are a number of clinical
12  oncologists who cannot buy the drug with some
13  objective indication. Then we might want to change
14  the price. I mean, there are a myriad of
15  possibilities and you can't just say, you know,
16  median is median and therefore half the people are
17  going to pay more than the average price. I just
18  don't agree with that.
19    Q.    Because it's an extraordinarily
20  complicated proposition in trying to set an
21  appropriate payment amount for payments for Medicare
22  Part B, correct?
00515
 1              MR. GOBENA:  Objection.
 2              MR. WINGET-HERNANDEZ:  Objection.
 3    A.    No. I just believe physicians and
 4  suppliers are smarter than that and they are going
 5  to negotiate a better price once they find out that
 6  they are only -- if you're only going to get paid
 7  10 bucks you're going to find somebody who'll sell
 8  it to you for 10 bucks or less.
 9    Q.    Would you agree with me that it would be
10  a possibility that in year two another survey would
11  be done, the range from which the average would be
12  taken would be $10 at the high end and something
13  lower than $10 for the low end?
14              MR. HAVILAND:  Objection.
15              MR. BATES:  Object to the form.
16              MR. GOBENA:  Same objection.
17    A.    It's possible there would be a different
18  result. What that result would be I wouldn't want
19  to prejudge.
20    Q.    And I'm not asking you to predict what
21  would have been. I'm simply asking if you can
22  understand how doing successive averages of
00516
 1  acquisition cost going forward from year to year
 2  could result in a downward spiral of drug prices?
 3              MR. BATES:  Objection to form.
 4              MR. WINGET-HERNANDEZ:  Object to the
 5  form.
 6              MR. GOBENA:  Objection to form.
 7    A.    I would agree that there would be a limit
 8  on what would be paid for a particular drug. I
 9  don't know that there would -- that that limit would
10  necessarily decrease in year two, three, four or
11  five.
12    Q.    But it could, correct?
13              MR. WINGET-HERNANDEZ:  Object to the
14  form.
15    A.    It could also increase.
16    Q.    Precisely. But you would agree with me
17  that it could result to a downward spiral of prices?
18              MR. HAVILAND:  Objection to form.
19              MR. BATES:  Objection to form.
20              MR. WINGET-HERNANDEZ:  Objection to the
21  form.
22              MR. GOBENA:  Objection to the form.
```

Page 92