# EXHIBIT 1

Scully, Thomas A.                                           May 15, 2007
                            Washington, DC

                                                                  Page 1

            UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL         :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

PRICE LITIGATION               :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     :  Judge Patti B. Saris

the Florida Keys, Inc.         :

     v.                        :

Abbott Laboratories, Inc.,     :  Chief Magistrate

No. 06-CV-11337-PBS            :  Judge Marianne B.

- - - - - - - - - - - - - - -x    Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 270

 1  that point, and trying to get medical session
 2  services.  And in the middle of this hearing, when I
 3  got the GAO report a couple days before, I hadn't
 4  spent a whole lot of time trying to figure out
 5  exactly what was going on with AMP pricing.  So I was
 6  aware of all these issues, but probably still months
 7  away from spending a lot of time trying to figure out
 8  the right thing to do.
 9          BY MR. DALY:
10      Q.  I'm just asking whether -- let's just take
11  it in small steps.  AMP potentially creates
12  provider -- using AMP for reimbursement potentially
13  creates provider access issues, right?
14          MR. GOBENA:  Object to the form.
15          THE WITNESS:  Theoretically, AMP and ASP
16  on the same concept.  Theoretically, the reason we
17  did ASP plus 6 was to make sure that all providers
18  within a 6 percent margin, whether they were paying
19  ASP plus 3 or minus 3 would have some margin, be able
20  to acquire the drugs, and have some margin.  Maybe a
21  rural provider would have less.  That was our
22  judgment that 6 was the right amount.

Page 271

 1          If you had done flat ASP or flat AMP, in
 2  theory, some smaller providers would have been
 3  victims of a cost shift from bigger purchasers and
 4  could not have gotten that price.  That was the whole
 5  reason we did ASP plus 6.  Or had we chosen AMP, and
 6  decided that was right, we would have done AMP plus
 7  6.
 8          But I don't believe conceptually, you
 9  know, some measurement of what the true average sales
10  price was, whether it was AMP or ASP, and they are
11  different calculations, was the right way to go.  Not
12  one that was self-reported that could be inflated.
13          BY MR. DALY:
14      Q.  I'm not talking about ASP, I'm just saying
15  AAC, actual acquisition costs.  In other words, if
16  AMP creates potential provider access problems, is
17  there any reason that you couldn't have a system that
18  said you get reimbursed AMP or actual acquisition
19  costs, whichever is greater, that would take care of
20  the provider access problem, wouldn't it.
21          MR. GOBENA:  Object to the form.
22          THE WITNESS:  We went through all these

Page 272

 1  things.  I mean, in theory, it would, but it also
 2  creates inflation, bigger inflation incentive, as I
 3  said before.  So we made the judgment in the
 4  conference eventually, that the right way to do it
 5  was ASP plus 6, which was the hybrid of all these.
 6          BY MR. DALY:
 7      Q.  ASP plus 6 is something that could have
 8  been instituted many years prior to 2003, correct?
 9          MR. GOBENA:  Object to the form.  You can
10  answer.
11          THE WITNESS:  It would have been a
12  wonderful thing if it had been adopted in 1991.  The
13  government would have saved many billions of dollars,
14  as would have consumers.  But it wasn't.
15          BY MR. DALY:
16      Q.  Got caught up in politics?
17          MR. GOBENA:  Object to the form.
18          THE WITNESS:  I would say got caught up in
19  the politics of this whole -- many providers trying
20  to maximize reimbursement, which is -- they have
21  every right to do, theoretically, depending on how
22  it's done.

Page 273

 1          BY MR. DALY:
 2      Q.  And you had mentioned earlier that you
 3  don't think the providers were doing anything wrong
 4  in terms of maximizing revenues, is that true?
 5          MR. GOBENA:  Object to the form.
 6  Mischaracterizes the witness's testimony.
 7          THE WITNESS:  It depends on the details.
 8  Obviously there is different ways.  If a provider is
 9  doing nothing more than following the acquisition
10  rules, you know, that gets into the details of the
11  cases that I don't think I should comment on as to
12  what's a kickback and what improper incentives are.
13  But you know, much like I said in the Tenet hospital
14  outlier cases, depending how you do it, if that's
15  what the law creates, and you're following the letter
16  of the law, without any inappropriate incentives -- I
17  mean, it's stupid federal policy.  And if people
18  follow it, that's what I was trying to fix is stupid
19  federal policy.  On the other hand, if people game
20  it, that's a gray area, and I'm sure that's what
21  you're all here about.
22          BY MR. DALY:

69 (Pages 270 to 273)

Page 274

1   Q.   Page 99.  Near the -- about two-thirds of
2   the way down, you say, "it is not an easy solution.
3   I spent four hours the other day with probably 10
4   people at CMS that have worked on this for the
5   longest time."  Do you see that?  I mean, the
6   sentence continues, but do you see that language?
7   A.   Yes.
8   Q.   I was wondering if you can identify for us
9   any of those 10 people.
10  A.   Well, two I mentioned already.  Ira Bernie
11  was probably always the key guy driving the CMS
12  internally, works in the office of legislative
13  affairs.
14  Q.   Is he still with CMS?  I'm sorry to
15  interrupt.
16  A.   Has been for 30 years.  Most incredibly
17  complex policies come from Ira over the years,
18  probably half your litigation.  Second person,
19  believe it or not, in the small world category, is
20  Erin Clapton, who has also been there for years.  And
21  her husband Chuck Clapton is the chief counsel in
22  this committee and is still the minority counsel on

Page 275

1   Ways and Means.
2        So she works in CMS policy office and her
3   husband was the primary guy driving this in Congress.
4   So it was a lot -- somebody I've known for years, so
5   I would say those two -- of the 10, you know, there
6   is quite a bit of staff people.  I can't remember all
7   the names that probably worked on this.  Probably Tom
8   Gustafson, Tom Grissam, Ira and Erin, were probably
9   the four I can remember the most clearly involved in
10  this.  Rob Forman probably was involved in it as my
11  head of legislative affairs at CMS probably was also
12  in there.
13  Q.   Later on in your testimony, we can find
14  it, but I think you mentioned maybe as many as 15
15  people.  Are those -- is that --
16  A.   Same basic.
17  Q.   Anybody else that you can recall that
18  would be in this area of knowledge about having
19  worked on the AWP issue for a number of years within
20  CMS?
21  A.   It was a big staff.  I mean, I had staff
22  meetings the size of this to discuss this.  I can't

Page 276

1   remember every staff person that worked on it, the
2   senior staff people I think I've mentioned.  It was
3   an area of pretty intense focus for a while.
4         (Exhibit Abbott 188 was
5         marked for identification.)
6       BY MR. DALY:
7   Q.   Mr. Scully, I'm handing you what the court
8   reporter has marked as Exhibit Abbott 188, which is a
9   copy of what I believe is your prepared testimony
10  before the Senate Finance Health Care Committee on
11  March 14, 2002.  And do you recognize it to be such?
12  A.   Yes.
13  Q.   And did you write this?
14  A.   Probably not.
15  Q.   Okay.
16  A.   Probably reviewed it, maybe threw a few
17  sentences here and there.  Probably drafted by staff.
18  Q.   Did you review this in preparation for
19  your deposition?
20  A.   No.  I may have looked through it briefly.
21  I probably had a copy.
22  Q.   Okay.

Page 277

1   A.   Not in this format.  Anyway.
2   Q.   On page 2 of the document, you mentioned
3   in the second full paragraph, about two-thirds of the
4   way through it, that under BIPA, which provided some
5   authority for the Secretary to act after reviewing
6   the General Accounting Office report to Congress,
7   "under BIPA, we could move to a market-based system
8   or drugs and adjust payments for services related to
9   furnishing drugs such as practice expenses for
10  oncology administration."  Do you see that?
11  A.   Yes.
12  Q.   And can you explain what that means?
13  A.   No, I probably -- I can't remember
14  precisely, but I'm thinking it probably means is we
15  have the authority to actually save money in drugs
16  arguably, and this is a new legal argument, I think,
17  that I had gotten since the first testimony, because
18  I was trying to find ways to threaten to fix it
19  administratively if I couldn't get Congress to act.
20       I believe at one point, I got some
21  discretion or at least a reading of BIPA from my
22  attorneys, I may be wrong about this, but I believe

Page 443

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

| IN RE: PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | U.S. ex rel. |
| Ven-a-Care of The Florida | : | Judge Patti B. Saris |
| Keys, Inc. | : | |
| v. | : | |
| Abbott Laboratories, Inc., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |

- - - - - - - - - - - - - -x   Bowler


THOMAS A. SCULLY - VOLUME II

JULY 13, 2007

WASHINGTON, DC




     (CAPTION CONTINUED)

Page 476

1    MR. COOK: Mr. Gobena, if we can get a
2  log, of whatever was held on whatever privilege I
3  think that would be helpful and we can just move
4  on.
5    MR. GOBENA: Absolutely. I think John
6  Neal indicated that he's going to be providing a
7  log to you.
8    MR. COOK: Oh, outstanding,
9  outstanding. Thank you.
10 BY MR. COOK:
11   Q. And, on May 15th, you indicated that
12 fixing the Medicare drug reimbursement system was
13 one of your top priorities, if not your top
14 priority, when you started as the director of
15 CMS, in 2001; do you recall that?
16   A. Yeah, it was probably one of 10 or 15 I
17 told Secretary Thompson I wanted to do, I would
18 say it was the top couple.
19   Q. Do you recall any specific meetings you
20 attended, when you first came on as director of
21 CMS, relating specifically to that issue, that
22 is, changing the AWP reimbursement system?

Page 477

1    A. I initiated a bunch of them from the
2  first day, so I'm sure that I probably did.
3    Q. Do you have any specific --
4    A. I don't have a memory of it.
5    Q. Do you have any specific memories?
6    A. I put 20 things on my to do list every
7  day, and the drug benefit was number one, this
8  was probably number two or three, and I had many,
9  many, many things about it, so I was largely
10 driving the reform.
11   Q. With whom did you set up meetings to
12 discuss this issue?
13   A. Lots of internal staff, people on the
14 hill, congressman, senators, probably came up
15 with most of my confirmation meetings.
16   Q. It may be easier, I guess, to look at
17 it from another perspective, is what did you do
18 to drive it? I mean, I don't know the internal
19 workings of CMS, and so when you say to drive it,
20 as the director of CMS, what exactly do you do to
21 drive an issue and push it?
22   A. Well, everybody does things

Page 478

1  differently. What I did was I met with lots of
2  congressional staff, whom I already knew; met
3  with lots of senators and congressman, and tried
4  to build support for fixing it; and I told the
5  internal staff, every day, it was one of my top
6  priorities; and I probably mentioned it in every
7  staff meeting, for two years, until it got fixed.
8    So I kept pounding it into people on
9  the staff that we were going to fix it, somehow,
10 and so it was not -- it was not a minor issue.
11   Q. Did anybody educate you, at all, or did
12 you have any --
13   A. I already knew quite a bit about it.
14   Q. Did you --
15   A. Most -- more than most of the staff.
16   Q. Okay.
17   A. I believe, except for a few exceptions.
18   Q. And who were the exceptions that you
19 think knew at least as much if not more than you?
20   A. I think I said, before this, that
21 probably the -- I can't remember all the staff
22 that were involved. You mentioned some I

Page 479

1  couldn't remember, actually, the last time
2  around.
3    I would say the primary people that
4  probably worked on this were Ira Bernie, in the
5  office of legislative affairs, who had been
6  working on it for many years, and whom I had know
7  from 15 years before, in the first Bush
8  administration, and a whole host of other people
9  in the legislative affairs office, as well as in
10 the -- in the centers for Medicare management in
11 -- in Baltimore, probably a core of 10 people who
12 actually worked on it.
13   Q. Do you recall --
14   A. On a regular basis.
15   Q. Do you recall what Mr. Bernie's take on
16 the issue was?
17   MR. GOBENA: I am going to object to
18 the extent that you're asking about deliberative
19 discussions and caution the witness to only
20 answer it to the extent to which he had
21 discussions outside the deliberations related to
22 the final ruling making or legislation.

10 (Pages 476 to 479)