# EXHIBIT 5

Page 1

1              THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4      In re: PHARMACEUTICAL            )

5      INDUSTRY AVERAGE WHOLESALE       )

6      PRICE LITIGATION                 )

7      ------------------------------)   MDL DOCKET NO.

8                                      )   Civil Action

9      THIS DOCUMENT RELATES TO:        )   01CV12257-PBS

10     ALL ACTIONS                      )

11     ------------------------------)

12

13              The deposition of ELLEN TRACY KLAUS, called

14     by the Defendants for examination, taken pursuant to

15     the Federal Rules of Civil Procedure of the United

16     States District Courts pertaining to the taking of

17     depositions, taken before ROBIN M. CHIMNIAK, a Notary

18     Public within and for the County of DuPage, State of

19     Illinois, and a Certified Shorthand Reporter of said

20     State, taken at 77 West Wacker Drive, Suite 3500,

21     Conference Room C, Chicago, Illinois, on the 14th day

22     of March, 2007, at the hour of 1:14 o'clock p.m.

Page 2

```
 1   APPEARANCES:
 2
 3       THE BREEN LAW FIRM
 4       BY:  MR. JAMES JOSEPH BREEN
 5            5755 North Point Parkway
 6            Suite 39
 7            Alpharetta, Georgia 30022
 8            (770)961-9419
 9
10       and
11
12       UNITED STATES ATTORNEY'S OFFICE
13       SOUTHERN DISTRICT OF FLORIDA
14       BY:  MS. ANN M. ST. PETER-GRIFFITH
15            Assistant U.S. Attorney
16            99 N.E. Fourth Street
17            Miami, Florida 33132
18            (305)961-9419
19
20            Appeared on behalf of the
21            Plaintiffs;
22
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3       JONES DAY
 4       BY:  MR. JASON G. WINCHESTER
 5            77 West Wacker Drive
 6            Suite 3500
 7            Chicago, Illinois 60601-1592
 8              Appeared on behalf of Abbott
 9              Laboratories.
10
11   ALSO PRESENT:
12
13       ANTHONY MICHELETTO, Videographer
14       MS. SARAH LYKE, Abbott Laboratories
15       MR. T. MARK JONES, Ven-A-Care Florida Keys, Inc.
16
17
18
19
20
21
22
```

Page 4

```
 1                I N D E X
 2   WITNESS                                    PAGE
 3
 4   ELLEN TRACY KLAUS
 5       Examination by Ms. St. Peter-Griffith    11
 6
 7
                     E X H I B I T S
 8
 9   EX NUMBER                                  PAGE
10   Exhibit Klaus 001   ABT-DOJ 0228265-0228466  23
11   Exhibit Klaus 002   DOJ Sources Vols. 1-6 Txt,
12                       Pages 1-339              23
13   Exhibit Klaus 003   United States Department
14                       of Justice Civil
15                       Investigative
16                       Demand No. 95-125
17   Exhibit Klaus 004   United States of America
18                       Department of Health and
19                       Human Services Office of
20                       Inspector General Subpoena
21                       Duces Tecum to Abbott
22                       Pharmaceuticals,9 pages  23
```

Page 5

```
 1   Exhibit Klaus 005   September 30, 1999, letter
 2                       from T. Reed Stephens to
 3                       Daniel E. Reidy, 10 pages  40
 4   Exhibit Klaus 006   July 25, 2000, Letter from
 5                       Linda J. Hillier to Abbott
 6                       Laboratories with subpoena
 7                       attached, 10 pages         42
 8   Exhibit Klaus 007   Complaint                  45
 9   Exhibit Klaus 008   United States' First Request
10                       for Production to Defendants
11                       Abbott and Hospira         64
12   Exhibit Klaus 009   Defendant Abbott Laboratories,
13                       Inc.'s Responses to the United
14                       States' Second Request for
15                       Production                 64
16   Exhibit Klaus 010   Defendants' disclosures Pursuant
17                       to Fed. R. Civ. P. 26(a)(1)  77
18   Exhibit Klaus 011   ABTWV 11269-11276          92
19
20
21
22
```

Klaus, Ellen Tracy
Chicago, IL
March 14, 2007

Page 46

1  until 2006, are you aware of any changes in the
2  corporate structure at Abbott that we've -- that
3  you've already testified to?
4       MR. WINCHESTER: Object to the question as
5  outside the scope of the notice.
6       You can answer if you know.
7       THE WITNESS: What was the time period
8  again?
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  From 2000 until 2006.
11     A.  Yes.
12     Q.  Okay. What were the changes?
13     A.  I don't recall all of them, but I know that
14  there have been a couple. For example, our hospital
15  products division was spun off and is no longer, as of
16  2006, a division of Abbott Laboratories.
17     Q.  Okay. Was that spun off into an entity
18  called Hospira?
19     A.  The spin-off company was called Hospira or
20  renamed Hospira.
21     Q.  Is that H-o-s-p-i-r-a?
22     A.  Yes.

Page 47

1    Q.  Okay. Do you remember when that was?
2    A.  May 3rd, 2004.
3    Q.  And was that just the hospital products
4  division that was spun off?
5    A.  Yes.
6    Q.  Okay. Any other changes that you're aware
7  of?
8    A.  At some point there was a division called
9  specialty products division; SPD --
10   Q.  Okay.
11   A.  (Continuing) -- added or -- I guess added.
12   Q.  Do you remember when it was added?
13   A.  No, I don't.
14   Q.  Was it -- do you have any -- even a year
15  that you --
16   A.  I don't.
17   Q.  Okay. And what was the special products
18  division?
19   A.  Handled specialty -- specialty products,
20  veterinary-type products, some manufacturing for drugs
21  that were in the -- in the PPD division. That's about
22  all I know.

Page 48

1    Q.  Okay. Any other changes?
2    A.  We acquired a company and renamed an area
3  to be called Abbott diabetes care, ADC.
4    Q.  Okay. When was that?
5    A.  I don't recall.
6    Q.  Do you remember a year?
7    A.  No. Later, later on. Not early 2000s but
8  later 2000s.
9    Q.  So closer to 2006 than 2000?
10   A.  Yeah.
11   Q.  Is that fair to say?
12   A.  Yes.
13   Q.  Okay. And what kind of -- what did Abbott
14  diabetes care do?
15   A.  Abbott diabetes care sold glucose meters
16  and diabetes testing equipment.
17   Q.  Anything else?
18   A.  There was an area of the pharmaceutical
19  division that was created or renamed called GPRD,
20  global product -- global pharmaceutical research and
21  development.
22   Q.  Okay.

Page 49

1    A.  Another area within the pharmaceutical
2  division called GPO, global pharmaceutical
3  organization.
4    Q.  Okay. And do you remember when GPRD was
5  created?
6    A.  No, I don't.
7    Q.  What about GPO?
8    A.  No.
9    Q.  And what did GPO do or what -- what was
10  that department responsible for or division
11  responsible for?
12   A.  The global pharmaceutical organization
13  handled pharmaceuticals internationally.
14   Q.  Okay.
15   A.  Essentially did what we did here
16  domestically with PPD internationally.
17   Q.  Okay. Any other changes?
18   A.  There may be. I can't -- I can't recall.
19   Q.  What about after '96? Were there any
20  changes to the -- to the corporate divisions?
21      MR. WINCHESTER: Object to the form. You
22  mean after 2006?

Page 50

1    MS. ST. PETER-GRIFFITH: I'm sorry. I'm
2  sorry. Yes, after 2006.
3    MR. WINCHESTER: I'll also object to the
4  question, while you're thinking, as outside the scope
5  of the notice.
6    You can answer.
7    THE WITNESS: I don't recall for sure.
8  BY MS. ST. PETER-GRIFFITH:
9    Q. Okay. With regard to responding to the '96
10 CID, the '97 subpoena, the 2000 subpoena, or any
11 discovery in this -- the lawsuit that's the instant
12 lawsuit in this case, from '96 until the present can
13 you tell me -- well, first let me ask you, were you --
14 were you involved in the collection, retention, or
15 search for documents responsive to any -- any of those
16 requests?
17   A. Yes.
18   Q. Okay. Can you identify for me those
19 divisions or departments within Abbott that you worked
20 with or spoke to in the collection, retention, or
21 search for documents responsive to any of those
22 requests?

Page 51

1    A. The hospital products division.
2    Q. Any other divisions or departments?
3    A. No.
4    Q. Were you the only one who was searching for
5  or working on the collection, retention, and search
6  for documents responsive to the '96 CID, the 2000
7  subpoena, the '97 subpoena, or any discovery
8  propounded in this case?
9    A. No.
10   Q. Who else was?
11   MR. WINCHESTER: I'll just object to the
12 form of the question, that you're asking about these
13 things all lumped together in one big mash.
14   MS. ST. PETER-GRIFFITH: We'll cut it --
15 we'll break it down later.
16   THE WITNESS: So for -- for that entire
17 time frame?
18 BY MS. ST. PETER-GRIFFITH:
19   Q. For that entire time frame.
20   A. Sharon Jones.
21   Q. And who is Ms. Jones?
22   A. She was an attorney in the litigation

Page 52

1  department at Abbott Laboratories; Rod Chambers; Molly
2  Fisher; Rick Mateja; José Rivera; Michelle Campbell;
3  Emily Schuetz -- I take that back. Emily -- scratch
4  Emily. Kim Serzynski.
5    Q. Can you spell her last name?
6    A. S-e-r-z-y-n-s-k-i.
7    Q. Anybody else?
8    A. I think that's it.
9    Q. Okay. And Mr. Chambers, what was his
10 position?
11   A. He was a paralegal at Abbott Laboratories.
12   Q. And Ms. Fisher, what was her --
13   A. Paralegal at Abbott Laboratories.
14   Q. Mr. Mateja, he's an attorney?
15   A. Paralegal at Abbott Laboratories.
16   Q. Mr. Rivera?
17   A. An attorney at Abbott Laboratories.
18   Q. Okay. Ms. Campbell?
19   A. Paralegal at Abbott Laboratories.
20   Q. And Ms. Serzynski?
21   A. A paralegal at Abbott Laboratories.
22   Q. Okay. Now you testified earlier that you

Page 53

1  only looked in the hospital products division --
2    A. Correct.
3    Q. (Continuing) -- for documents responsive to
4  the request from the government, either instance this
5  lawsuit or in the CID for 2000 and in the '97
6  subpoenas? Is that's right? Just the hospital
7  products division?
8    A. Correct.
9    Q. All right. Did any of these other
10 individuals that you just named look for documents
11 anyplace else, other than the hospital products
12 division?
13   A. For --
14   Q. For the CID. That's the 2000 subpoena, the
15 '97 subpoena, or any discovery requests propounded in
16 this case?
17   A. No.
18   Q. So is it a fair statement, then, that in
19 responding to the CID, the 2000 subpoena, the '97
20 subpoena, and any discovery propounded in this case,
21 that the only place where Abbott searched for
22 documents was within the hospital products division?

Page 54

1  MR. WINCHESTER: Object to the question as
2  asked and answered.
3  THE WITNESS: Yes. Can I clarify
4  something?
5  BY MS. ST. PETER-GRIFFITH:
6  Q. Sure.
7  A. Because I'm lumping this together. We also
8  searched in our corporate records facility, which has
9  documents from the hospital products division. So I'm
10 kind of lumping that all together.
11 Q. Did you only look for documents from the
12 hospital products division at your corporate records
13 facility?
14 A. For the subpoenas that you mentioned?
15 Q. Yes, for the CID, for the 2000, the '97 --
16 the 2000 subpoena, the '97 subpoena, and any discovery
17 in this case.
18 A. Yes.
19 Q. And what -- why did you only search there?
20 MR. WINCHESTER: I'll object to the
21 question and instruct you not to answer to the extent
22 it would require you to reveal the contents of any

Page 55

1  instructions from or discussions with counsel for
2  Abbott.
3  MS. ST. PETER-GRIFFITH: Thank you,
4  Mr. Winchester. I actually wanted to state that at
5  the beginning.
6  BY MS. ST. PETER-GRIFFITH:
7  Q. I don't want you to tell me any of your --
8  about any conversations that you've had with lawyers,
9  but -- when you answer any of my questions, okay? But
10 if you could tell me why it is that you only -- that
11 Abbott only searched for records in the hospital
12 products division?
13 MR. WINCHESTER: I have the same
14 instruction. If you can answer it without revealing
15 the contents of any instructions from or conversations
16 with counsel for Abbott, then you can answer.
17 THE WITNESS: Well, the drugs at issue are
18 HPD drugs.
19 BY MS. ST. PETER-GRIFFITH:
20 Q. Any other reason?
21 MR. WINCHESTER: I'll give you the same
22 instruction.

Page 56

1  BY MS. ST. PETER-GRIFFITH:
2  Q. Is that the sole reason?
3  MR. WINCHESTER: It's the same instruction
4  to you.
5  THE WITNESS: I'm going on the advice of
6  counsel.
7  MR. BREEN: I'm sorry. I just want the
8  record a little bit more -- a little clearer than it
9  is, just so we can turn some more corners here and it
10 is easier for the witness.
11 I'd request that when we get into these
12 areas, that it may be a mixed bag between what Abbott
13 would -- asserted being privileged versus
14 nonprivileged, at least as far as the objection. If
15 we sort of draw a clear line, have the witness
16 articulate what she can tell us, but then say either
17 there is more or there is not more, but it -- I can --
18 I will not answer based upon my counsel's
19 instructions.
20 Could we -- could we sort of try to do
21 that, make the record a little bit more clear.
22 MR. WINCHESTER: I can guess you can ask --

Page 57

1  you can ask the question whether there's additional
2  information she can give. Although I think in certain
3  respects that, by itself, answers some -- answers some
4  questions about whether there's -- there's other
5  material there. I mean, all I can do is instruct, and
6  I don't believe you're entitled to -- to access any
7  conversations with or instructions she received in
8  this kind of way from lawyers for Abbott.
9  I don't mind the follow-up question, if you
10 want to say is there additional information you're
11 aware of.
12 MR. BREEN: I understand. It's just the
13 last -- the last one we handled it, you gave the
14 instruction, and the witness said, "I'm going to
15 follow my lawyer's instruction," which impliedly she's
16 not going to answer further because everything else
17 would be subject to your objection. I just want to
18 make it clear and make it as explanative as possible.
19 MS. ST. PETER-GRIFFITH: I will -- I'll
20 back up and ask the question.
21
22 BY MS. ST. PETER-GRIFFITH:

Klaus, Ellen Tracy                                                                                                   March 14, 2007
Chicago, IL

Page 58

1  Q. You stated that Abbott did not search for
2  any other records in the HPD -- other than in the HPD
3  division because the drugs at issue were only HPD
4  drugs; is that right?
5  A. Yes.
6  Q. Okay. Is there any other reason that you
7  can or cannot tell me as to why you -- Abbott only
8  searched for records or information in the HPD
9  division?
10      MR. WINCHESTER: I'll object to the form of
11 that question.
12      THE WITNESS: I don't recall every
13 conversation with counsel at this point. In our
14 document collection primarily the drugs are HPD drugs,
15 and we would --
16 BY MS. ST. PETER-GRIFFITH:
17  Q. Is there any other reason why Abbott
18 searched only in the HPD division?
19      MR. WINCHESTER: That question is asked and
20 answered. And again, to the extent it would require
21 you to reveal the substance of conversations with
22 counsel, I'd instruct you not to answer it.

Page 59

1      THE WITNESS: These are only HPD drugs.
2  Any -- anyplace to look would be in the hospital
3  products division.
4  BY MS. ST. PETER-GRIFFITH:
5  Q. What about Abbott corporate records? Did
6  you look for any records responsive to the requests in
7  the CID, the '97 subpoena, the 2000 subpoena, or
8  incident to discovery propounded in this case in the
9  Abbott corporate records?
10      MR. WINCHESTER: I'll object to the form,
11 and also to the use of the term "Abbott corporate
12 records" as vague.
13      THE WITNESS: We searched for documents and
14 are continuing to search for documents in corporate
15 records -- in Abbott corporate records.
16 BY MS. ST. PETER-GRIFFITH:
17  Q. How do you define "Abbott corporate
18 records"?
19  A. Abbott corporate records is an off-site
20 facility that stores all inactive or closed --
21 generally inactive or closed files for the entire --
22 for generally all the -- generally the entire company.

Page 60

1  Q. And are they compart- -- is -- are the
2  records at Abbott corporate records compartmentalized
3  by division or department?
4  A. I'm not sure what you mean by
5  "compartmentalized."
6  Q. Meaning when you go there is it just one
7  giant records facility, or can you go to, for example,
8  the PPD documents or the HPD documents?
9      MR. WINCHESTER: Object to the form.
10      THE WITNESS: Abbott -- Abbott corporate
11 records is a general -- it's a warehouse full of
12 documents.
13 BY MS. ST. PETER-GRIFFITH:
14  Q. When you searched Abbott corporate records,
15 and you testified you're also continuing to search
16 corporate records, the corporate records at this
17 off-site storage facility, are you looking for records
18 that go beyond records that previously were maintained
19 in the hospital products division?
20      MR. WINCHESTER: Object to the form.
21      THE WITNESS: We are searching for records
22 that are requested in the document requests.

Page 61

1  BY MS. ST. PETER-GRIFFITH:
2  Q. No matter --
3  A. Currently.
4  Q. No matter where they came from? No matter
5  which department or division they came from?
6  A. Generally starting with the HPD division.
7  Q. But do you look for documents that were
8  generated by any other division or department?
9      MR. WINCHESTER: Object to the question as
10 being asked and answered several times now, but you
11 can answer again.
12      THE WITNESS: These are -- these are HPD
13 products, so we're looking within the HPD corporate
14 records documents.
15 BY MS. ST. PETER-GRIFFITH:
16  Q. In HPD only?
17  A. At this point we don't have any reason to
18 look for any other -- they're just HPD products.
19      MR. BREEN: I'll object as nonresponsive.
20 BY MS. ST. PETER-GRIFFITH:
21  Q. Are you looking for any other documents at
22 this corporate off-site storage facility, the

16 (Pages 58 to 61)

Klaus, Ellen Tracy                                       March 14, 2007
Chicago, IL

Page 62

1  corporate records facility, that were generated or
2  created by another division, other -- or another
3  division or department or employee outside of the
4  hospital products division?
5       MR. WINCHESTER:  I'll object to that
6  question as compound, asked and answered several
7  times, and unspecific as to any time frame.
8       THE WITNESS:  We're looking within the
9  hospital products division's records retained in
10 corporate records.
11
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  But only the hospital products division
14 records?
15      MR. WINCHESTER:  Again, asked and answered.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Is that a yes?
18    A.  At -- at this point, yes.  Yes.
19    Q.  What does the hospital products division do
20 that -- that would be -- make it the -- strike that.
21      Why are you looking in the hospital
22 products division?

Page 63

1       MR. WINCHESTER:  Object to that question as
2  asked and answered many times.
3       THE WITNESS:  The products that are listed
4  in that -- in the subpoenas and the lawsuit are
5  hospital products division products.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  What does the hospital products division
8  do?
9       MR. WINCHESTER:  Object to the question as
10 to time frame.
11      MS. ST. PETER-GRIFFITH:  From '96 until the
12 present.
13      MR. WINCHESTER:  I'll object to the
14 question as outside the scope of the notice.
15      You can answer.
16      THE WITNESS:  I -- I don't work in the
17 hospital products.  I have a general understanding of
18 they -- they sell and they manufacture hospital
19 products; products including pumps, sets, drugs.
20 BY MS. ST. PETER-GRIFFITH:
21    Q.  Anything else?
22    A.  There may be.  I don't know.

Page 64

1       MS. ST. PETER-GRIFFITH:  Okay.  If we could
2  just take a quick break here.
3       MR. WINCHESTER:  Sure.
4       THE VIDEOGRAPHER:  We are off the record at
5  2:23 p.m. with the end of Tape No. 1.
6            (Brief pause.)
7            (Whereupon Exhibit Klaus 008
8             and Exhibit Klaus 009 were
9             marked as requested during
10            the break.)
11      THE VIDEOGRAPHER:  We are back on the
12 record at 2:33 p.m. with the start of Tape No. 2.
13      MS. ST. PETER-GRIFFITH:  If we could
14 mark -- there are two additional exhibits in front of
15 you, Ms. Klaus, with -- and if you could just take a
16 look at them briefly.  I believe they are 10 and 11 --
17      THE REPORTER:  Exhibit Klaus 008 and Exhibit
18 Klaus 009.
19      MS. ST. PETER-GRIFFITH:  Oh, Exhibit Klaus
20 008 and Exhibit Klaus 009.
21      THE WITNESS:  Do you have these?
22      MR. WINCHESTER:  Okay.

Page 65

1       MS. ST. PETER-GRIFFITH:  And I'll just
2  submit these are the two document productions served
3  in this case.
4            (Witness examines documents.)
5       THE WITNESS:  Okay.
6  BY MS. ST. PETER-GRIFFITH:
7     Q.  And I'd like to backtrack a little bit to
8  break down a question that I'd asked you earlier.
9       Can you tell me, in responding to the 1996
10 CID, who at Abbott was responsible for responding to
11 that CID and gathering the information responsive to
12 that CID?
13    A.  The legal division within Abbott.
14    Q.  Okay.  And who specifically?
15    A.  Sharon Jones was the attorney, and I was
16 the paralegal.
17    Q.  Is that one of your first assignments?
18    A.  Yes.
19    Q.  Okay.  Anyone else?
20    A.  Not that I can recall.
21    Q.  Okay.  What about for the '97 HHS OIG
22 subpoena?

17 (Pages 62 to 65)

Page 66

1    A.  The '97 subpoena was handled by José
2    Rivera, Rick Mateja, Rod Chambers, Molly Fisher, and
3    myself.
4    Q.  Anyone else?
5    A.  No.
6    Q.  Let me backtrack a little bit. For the
7    CID, did you enlist the assistance of any computer
8    individuals or computer-savvy folks?
9         MR. WINCHESTER: Object to the form.
10        THE WITNESS: I'm not sure I -- I'm not
11   sure I understand.
12   BY MS. ST. PETER-GRIFFITH:
13   Q.  Did you -- okay?
14   A.  Ask again.
15   Q.  Did you enlist the assistance of anyone,
16   any technical support in your search for information
17   responsive to the CID, the '96 CID?
18   A.  I don't recall a hundred percent. I don't
19   think so.
20   Q.  Okay. What about in responding to the '97
21   subpoena? Was there any technical support or anyone
22   who provided computer assistance or comparable

Page 67

1    technical assistance?
2    A.  I -- I don't know for sure.
3    Q.  Is there anything that would help refresh
4    your recollection on that?
5    A.  I don't know.
6    Q.  Were there any memoranda assigning this
7    task to different people?
8    A.  I don't know.
9    Q.  Okay. What about in 2000? Who was
10   responsible within Abbott to search for and respond to
11   the 2000 subpoena?
12   A.  Well, the --
13   Q.  The HHS OIG subpoena.
14   A.  Abbott objected to the subpoena, so the
15   individuals assigned to it within Abbott Laboratories
16   were -- I can't remember the attorney's name.
17   Q.  Is there any way that we can find out that
18   attorney's name?
19   A.  It -- it may have been José Rivera, and
20   then I was the paralegal.
21   Q.  Could it have been anyone other than José
22   Rivera?

Page 68

1         MR. WINCHESTER: Object as asked and
2    answered, and also to the hypothetical.
3         THE WITNESS: I don't know. It may --
4    BY MS. ST. PETER-GRIFFITH:
5    Q.  Who at Abbott was responsible for preparing
6    the information provided incident to Abbott's initial
7    disclosures or Rule 26 disclosures in this lawsuit?
8    A.  The -- Jones Day.
9    Q.  Did anyone at Abbott lend support or
10   assistance in collecting the information?
11   A.  I don't know what Jones Day did to prepare
12   the disclosures.
13   Q.  Did you participate at all in that process?
14        MR. WINCHESTER: Let me object to the form
15   of the question, and I think maybe get some
16   clarification between whether you're talking about the
17   gathering of the documents versus the actual
18   preparation of what was given to --
19   BY MS. ST. PETER-GRIFFITH:
20   Q.  Either?
21        MR. WINCHESTER: (Continuing) -- the
22   Department of Justice.

Page 69

1    BY MS. ST. PETER-GRIFFITH:
2    Q.  Either. Any -- any phase of either
3    preparing written response -- written initial
4    disclosures, or collecting information for the content
5    of those written disclosures, or documents that were
6    produced incident to those disclosures?
7    A.  Document collection was performed by Abbott
8    Laboratories, the paralegals at Abbott.
9    Q.  Okay. And who were they?
10   A.  Well, throughout the time period it's the
11   same people I -- I had mentioned. So the -- I don't
12   know a hundred percent what document each person
13   collected.
14   Q.  Okay.
15   A.  But I can tell you generally from 1996 to
16   that time period it was the same individuals I had
17   mentioned before; myself, Molly Fisher, Rod Chambers,
18   Rick Mateja, Kim Serzynski, and Michelle Campbell.
19   Q.  And were they all employed with Abbott from
20   '96 until the time frame of this lawsuit, 2006?
21   A.  At some -- at some point in time. Not
22   during that whole entire period consistently.

Page 66

1  A. The '97 subpoena was handled by José
2  Rivera, Rick Mateja, Rod Chambers, Molly Fisher, and
3  myself.
4  Q. Anyone else?
5  A. No.
6  Q. Let me backtrack a little bit. For the
7  CID, did you enlist the assistance of any computer
8  individuals or computer-savvy folks?
9      MR. WINCHESTER: Object to the form.
10     THE WITNESS: I'm not sure I -- I'm not
11 sure I understand.
12 BY MS. ST. PETER-GRIFFITH:
13 Q. Did you -- okay?
14 A. Ask again.
15 Q. Did you enlist the assistance of anyone,
16 any technical support in your search for information
17 responsive to the CID, the '96 CID?
18 A. I don't recall a hundred percent. I don't
19 think so.
20 Q. Okay. What about in responding to the '97
21 subpoena? Was there any technical support or anyone
22 who provided computer assistance or comparable

Page 67

1  technical assistance?
2  A. I -- I don't know for sure.
3  Q. Is there anything that would help refresh
4  your recollection on that?
5  A. I don't know.
6  Q. Were there any memoranda assigning this
7  task to different people?
8  A. I don't know.
9  Q. Okay. What about in 2000? Who was
10 responsible within Abbott to search for and respond to
11 the 2000 subpoena?
12 A. Well, the --
13 Q. The HHS OIG subpoena.
14 A. Abbott objected to the subpoena, so the
15 individuals assigned to it within Abbott Laboratories
16 were -- I can't remember the attorney's name.
17 Q. Is there any way that we can find out that
18 attorney's name?
19 A. It -- it may have been José Rivera, and
20 then I was the paralegal.
21 Q. Could it have been anyone other than José
22 Rivera?

Page 68

1      MR. WINCHESTER: Object as asked and
2  answered, and also to the hypothetical.
3      THE WITNESS: I don't know. It may --
4  BY MS. ST. PETER-GRIFFITH:
5  Q. Who at Abbott was responsible for preparing
6  the information provided incident to Abbott's initial
7  disclosures or Rule 26 disclosures in this lawsuit?
8  A. The -- Jones Day.
9  Q. Did anyone at Abbott lend support or
10 assistance in collecting the information?
11 A. I don't know what Jones Day did to prepare
12 the disclosures.
13 Q. Did you participate at all in that process?
14     MR. WINCHESTER: Let me object to the form
15 of the question, and I think maybe get some
16 clarification between whether you're talking about the
17 gathering of the documents versus the actual
18 preparation of what was given to --
19 BY MS. ST. PETER-GRIFFITH:
20 Q. Either?
21     MR. WINCHESTER: (Continuing) -- the
22 Department of Justice.

Page 69

1  BY MS. ST. PETER-GRIFFITH:
2  Q. Either. Any -- any phase of either
3  preparing written response -- written initial
4  disclosures, or collecting information for the content
5  of those written disclosures, or documents that were
6  produced incident to those disclosures?
7  A. Document collection was performed by Abbott
8  Laboratories, the paralegals at Abbott.
9  Q. Okay. And who were they?
10 A. Well, throughout the time period it's the
11 same people I -- I had mentioned. So the -- I don't
12 know a hundred percent what document each person
13 collected.
14 Q. Okay.
15 A. But I can tell you generally from 1996 to
16 that time period it was the same individuals I had
17 mentioned before; myself, Molly Fisher, Rod Chambers,
18 Rick Mateja, Kim Serzynski, and Michelle Campbell.
19 Q. And were they all employed with Abbott from
20 '96 until the time frame of this lawsuit, 2006?
21 A. At some -- at some point in time. Not
22 during that whole entire period consistently.

Page 70

1  Q. Okay.
2  A. And Kim is a contractor for Abbott, so
3  she's not employed by Abbott.
4  Q. Okay. Going back, who participated in the
5  collection of documents that were disclosed as part of
6  Abbott's initial disclosures in this lawsuit?
7       MR. WINCHESTER: Object to the question as
8  asked and answered.
9       THE WITNESS: As I had said, I -- I don't
10 know every piece of paper that was -- or who collected
11 every piece of paper that was produced in response
12 with the initial disclosures.
13
14 BY MS. ST. PETER-GRIFFITH:
15 Q. Who do you know participated in the
16 document collection though?
17 A. In the document collection those same
18 individuals that I mentioned, from 1996 to the initial
19 disclosure time frame. At some point in time each one
20 of those individuals would have participated in the
21 document collection.
22 Q. But the lawsuit wasn't filed until 2006.

Page 71

1  Were you collecting documents for disclosure in --
2  in -- for initial disclosure under Rule 26 prior to
3  the filing of the lawsuit?
4  A. Abbott has been collecting documents since
5  1996 when it first received the subpoena and for other
6  -- and -- up until the time of disclosures for other
7  litigation matters, as -- other AWP litigation matters
8  as well. We call them AWP litigation.
9  Q. What other AWP litigation were you
10 collecting documents for?
11 A. There's -- I don't know. There's --
12 there's many of them. I can't tell you as I sit here
13 what we collected what documents for.
14 Q. Did you participate in the collection of
15 documents for other lawsuits?
16 A. For other AWP litigation?
17 Q. Other AWP litigation.
18 A. Yes.
19 Q. Which -- what AWP lawsuits did you collect
20 documents for?
21 A. Anything that --
22      MR. WINCHESTER: Let me object to the

Page 72

1  question before you answer as outside the scope of the
2  notice.
3       You can answer.
4       THE WITNESS: Anything that's currently
5  pending.
6  BY MS. ST. PETER-GRIFFITH:
7  Q. Is it fair to say that you worked on every
8  AWP litigation?
9  A. If there was activity that was needed
10 paralegal assistance from Abbott Laboratories, yes.
11 Q. What about searching for records incident
12 to the production of documents responsive to the
13 United States's first request for production, which I
14 believe is Exhibit Klaus 008 there? Do you see that?
15 Who -- who at Abbott collected documents responsive to
16 that first request for production?
17      MR. WINCHESTER: Let me object to the
18 question to the extent it asks her to determine and
19 testify about what -- what is or is not responsive to
20 a document request.
21      THE WITNESS: Could you repeat the
22 question?

Page 73

1       MS. ST. PETER-GRIFFITH: Sure. Let me
2  backtrack a little bit first.
3  BY MS. ST. PETER-GRIFFITH:
4  Q. Have you seen that document before?
5  A. Yes.
6  Q. Was that one of the documents you reviewed
7  in preparation for your deposition?
8  A. Yes.
9  Q. Okay. Who at Abbott was responsible for
10 collecting documents in response to that Abbott -- for
11 Abbott's response to that production request?
12      MR. WINCHESTER: Make the same objection.
13      THE WITNESS: Documents have been collected
14 at Abbott throughout the time period from 1996 to the
15 time of this request by various individuals. I -- I
16 can't tell you specifically what document was
17 collected by what person, but the same individuals
18 that I had mentioned previously would have had some
19 involvement in the document collection.
20 BY MS. ST. PETER-GRIFFITH:
21 Q. Okay. What about for the second request
22 for production? Who -- who collected documents in