# EXHIBIT 9, PART 1

Page 216

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action No. |
| | )    01-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| United States of America, | ) Hon. Patti Saris |
| ex rel. Ven-a-Care of the | ) |
| Florida Keys, Inc., v. | ) |
| Abbott Laboratories, Inc., | ) |
| and Hospira, Inc. | ) |
| CIVIL ACTION NO. 06-11337-PBS | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action No. |
| | )    01-CV-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) Judge Patti B. Saris |
| State of California, ex rel. | ) |
| Ven-A-Care v. Abbott | ) Magistrate |
| Laboratories, et al. | ) Judge Marianne Bowler |
| Cause Nos. 03-cv-11226-PBS | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF
BRUCE STOWELL
August 30, 2007

Volume 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1       NO. D-1-GV-04-001286

2  THE STATE OF TEXAS            ) IN THE DISTRICT COURT
                                 )
3  ex rel.                       )
       VEN-A-CARE OF THE         )
4      FLORIDA KEYS, INC.,       )
           Plaintiffs,           )
5                                )
   VS.                           ) TRAVIS COUNTY, TEXAS
6                                )
   ABBOTT LABORATORIES INC.,     )
7  ABBOTT LABORATORIES, and      )
   HOSPIRA, INC.,                )
8          Defendant(s).         ) 201ST JUDICIAL DISTRICT

9  **********************************************************

10

11     ORAL AND VIDEOTAPED DEPOSITION OF BRUCE STOWELL,

12  produced as a witness at the instance of the

13  Plaintiff(s), and duly sworn, was taken in the

14  above-styled and numbered causes on the 30th of

15  August, 2007, from 9:18 a.m. to 5:03 p.m., before

16  CYNTHIA VOHLKEN, CSR in and for the State of Texas,

17  reported by machine shorthand, at the offices of Jones

18  Day, 77 W. Wacker, Suite 3500, Chicago, Illinois,

19  pursuant to the Federal and Texas Rules of Civil

20  Procedure and the provisions attached previously.

21

22

23

24

25

Page 218

```
 1                    A P P E A R A N C E S
 2     FOR THE PLAINTIFF THE STATE OF TEXAS:
 3              Ms. Margaret Moore
                Assistant Attorney General
 4              Office of the Attorney General
                State of Texas
 5              Post Office Box 12548  (78711-2548)
                300 W. 15th Street, 9th Floor
 6              Austin, Texas  78701
 7     FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 8              Ms. Ann M. St. Peter-Griffith
                Assistant U.S. Attorney
 9              United States Attorney's Office
                Southern District of Florida
10              99 N.E. Fourth Street
                Miami, Florida  33132
11
12     FOR THE PLAINTIFF THE STATE OF CALIFORNIA:
13              Mr. Eliseo Sisneros
                Deputy Attorney General
14              BMFEA
                Bureau of Medi-Cal Fraud & Elder Abuse
15              State of California Department of Justice
                110 West A Street #1100
16              San Diego, California  92101
17
       FOR THE RELATOR:
18
                Mr. James Joseph Breen
19              The Breen Law Firm, P.A.
                P. O. Box 297470
20              Pembroke Pines, Florida 33029-7470
21              -and-
22              Mr. C. Jarrett Anderson
                Anderson LLC
23              1300 Guadalupe, Suite 103
                Austin, Texas  78703
24
25
```

Page 219

1   FOR THE DEFENDANTS ABBOTT LABORATORIES INC. AND
     HOSPIRA, INC.:

2

3           Ms. Carol P. Geisler
            Jones Day
            77 West Wacker, Suite 3500
4           Chicago, Illinois  60601-1692

5

   ALSO PRESENT:
6

            Mr. Bruce Witty, Videographer
7

8
                     * - * - * - * - *
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

decfb018-12eb-416b-892c-7c5f4ca6152c

Page 237

1    from which I drove the extract and I believe there

2    were 258 items on that final fifth list.

3         Q.   Actually, I think it's 254.

4              MS. GEISLER:  34.

5         Q.   (BY MS. MOORE)  234.

6         A.   234.  Okay.  Well, whatever it is.  I worked

7    from a list that was provided to me and we built a

8    file out of the list and that's what we drove the

9    extract with.

10        Q.   As Abbott's corporate rep, then, is it your

11   testimony that you were -- it was your intention to

12   pull the data for each and every NDC that is listed on

13   Exhibit 498?

14        A.   That's correct.

15        Q.   And did you, as the Abbott representative,

16   attempt, then, or intend to produce all of the data

17   for those NDCs?

18        A.   Correct.

19        Q.   And did you take the steps that you believed

20   were necessary to produce full and correct and

21   complete data to Texas?

22        A.   That's correct.

23        Q.   Let's talk about this letter just for a

24   minute.

25        A.   Okay.

Page 238

1      Q.   Item 2 refers to the additional fields that

2   you've mentioned before.  Let's list those.  There is

3   one called BD-CUST-CO.  What is that field?

4      A.   That is -- bid customer code is the name of

5   it.

6      Q.   What data is contained in that field?  What

7   information?

8      A.   We're not -- it's an obsolete field as far as

9   we're concerned.  And I know we produced it, but I

10  don't know exactly what data was in there.

11     Q.   Did you examine the data before you produced

12  it?

13     A.   No.  We just told the program to go find

14  anything that had that name on it.

15     Q.   All right.  CAT-PRICE?

16     A.   Catalog price.

17     Q.   How is that field populated?

18     A.   That field is also an obsolete field.

19     Q.   Do you know if it contains any data or not?

20     A.   I don't think it has any data.

21     Q.   DISC-CD?

22     A.   That's discount code.

23     Q.   All right.  What does that field contain?

24     A.   That's another obsolete field.

25     Q.   All right.  MERCH-CD.

1    A.    That's merchandise code.

2    Q.    All right.

3    A.    Which we have discussed in Exhibit 1190.

4    Q.    Right.  And you gave us a list of those.

5    A.    Right.

6    Q.    All right.  REBATE-TYP?

7    A.    That stands for rebate type.  It's also

8    another obsolete field.

9    Q.    And PRICE-SEL?

10   A.    That's price select code.

11   Q.    All right.  What is that?

12   A.    That is a field that points to price -- what

13   price we are going to charge in the event that it's a

14   catalog price or a wholesaler -- sale to a wholesaler.

15   Q.    All right.

16   A.    So it will point -- if it's a wholesaler

17   buying product, it will point to the wholesaler

18   acquisition price.  If it's a retailer, it will point

19   to a retail price.

20   Q.    What are the characters that are in this

21   field?  How is that -- are there codes?

22   A.    There are numbers in that field which are

23   actually the numbers of the price fields on our price

24   records.

25   Q.    I see.  Did you produce to us a -- an

Page 240

1    explanation of those codes, those numbers?

2        A.   I don't recall producing that.

3        Q.   Does such a list exist?

4        A.   That could be put together, yes.   An

5    explanation could be put together.

6        Q.   Did you under -- was it conveyed to Abbott

7    that the agreement that was reached by Ms. Citera and

8    Mr. Winget-Hernandez in February of '05 that extended

9    forward and then ultimately included this Rule 11

10   agreement, Exhibit 1192?

11       A.   Uh-huh.

12       Q.   Did you understand that -- and it -- that we

13   were to receive not only the data, but explanations or

14   look-up tables, or whatever, for the codes that are

15   contained in them?

16       A.   No.   They just told me that you wanted those

17   six fields, so that's what we gave you.

18       Q.   I see.   So Abbott is capable of producing an

19   explanation for those numbers that are contained in

20   that field, correct?

21       A.   Except for the fields that are obsolete.   We

22   don't know what they're doing.

23       Q.   All right.   Well, we'll talk about their

24   being obsolete in a minute.   But as far as this price

25   select field, there -- Abbott is able to produce an

1    explanation for the values that are in those fields,

2    correct?

3         A.    Right.

4         Q.    I don't think the rest of this is of

5    particular relevance to your testimony.

6                   All right.  So subsequent to that a data

7    pull was ordered then by you?

8         A.    Uh-huh.

9         Q.    And to whom did you direct the instructions

10   to pull the data?

11        A.    I actually interact with the computer.  We

12   built a file of the NDCs that were requested and

13   loaded them into our program for the years that were

14   requested, generated the jobs to do it.

15        Q.    All right.  When you say you interacted with

16   the computer, what -- could you elaborate on that?

17        A.    Sure.  I sat down and first built a file of

18   these NDC numbers.  So that's a file that is then read

19   into the system.  And then we also have a screen that

20   we go into and load in the time frames that we want

21   and the divisions that we want.  And then that program

22   picks up the list number file, NDC file, and goes and

23   finds the sales data.

24        Q.    Do you recall on what date you built the file

25   of NDCs?

Page 242

1      A.   Would have been sometime shortly prior to the

2   extract.   I don't know when we actually saw the

3   extract.

4      Q.   All right.

5      A.   Sometime in May, maybe.

6      Q.   Did -- was that the first time that you were

7   given a list of NDCs or --

8      A.   No.  All these pulls had lists of NDCs.  They

9   were all different, which is why these gaps occurred.

10  We always just pull what we are told to pull.

11     Q.   I see.

12     A.   So ...

13     Q.   Is it your personal recollection that you did

14  the extract in May?

15     A.   Somewhere in that neighborhood.

16     Q.   Does Abbott have any record of when this

17  extract was actually pulled?

18     A.   I would say that that could be found.

19     Q.   I would like you to look at Exhibit 1192.  Do

20  you see the date of that agreement?

21     A.   April 2, '07.

22     Q.   Yes.  Does Abbott have an explanation for why

23  there was a month or more between the entering of this

24  agreement and the extraction of the data?

25     A.   I can only tell you that when I was made

1    aware that there was a request, I usually do them the

2    same day or the next day.  So I can't explain what

3    time gap there was between, so ...

4        Q.   Do you -- does Abbott -- can Abbott tell us

5    today, through you, when the request was made clear to

6    Abbott, when this agreement was conveyed to Abbott?

7        A.   The only way to do that would be I would have

8    to go into our computer system and see if the create

9    date is on the driver file that I built.

10       Q.   But the create date on the driver file is

11   only going to be the date that you built --

12       A.   That I was -- that I built the file.  That

13   would be the only thing that I could get to and now

14   that I'm retired, I don't have any access to that

15   stuff anymore, so ...

16       Q.   All right.  So you know or --

17       A.   It could be found out.

18       Q.   That it could be found out when you created

19   the driver file.

20       A.   Sure.

21       Q.   How could it be found out when Abbott knew

22   that it had an obligation to produce this data?

23       A.   I don't know.  I would suggest this was sent

24   to Jones Day, so I don't know when Jones Day made it

25   available to Abbott legal.  That was conversations I

1    was not party to.

2         Q.    However, to be perfectly clear, you are

3    testifying today as Abbott, that Abbott did not

4    commence complying with this agreement until you

5    created that driver file; is that correct?

6         A.    That would be correct.

7         Q.    And your recollection now is that that would

8    have been sometime in May.

9         A.    Maybe.  Could have been April.  April/May

10   time frame, so ...

11        Q.    How many days did it take to actually extract

12   the data once the driver file was created?

13        A.    Those jobs probably took about five days to

14   run.

15        Q.    What did you do with the data once it had

16   been extracted?

17        A.    We burn it onto a CD and send it to the legal

18   people.

19        Q.    When you said "the legal people," are you

20   talking about people within Abbott?

21        A.    Yes.

22        Q.    Do you have a name of a person that you --

23        A.    We usually send that kind of data to Ellen

24   Klaus.

25                    (Exhibit 1193 marked)

Page 245

1      Q.    (BY MS. MOORE)  All righty.  I'm going to

2  hand you a set of documents marked Exhibit 1193.

3      A.    Uh-huh.

4      Q.    And I'm going to tell you they're in reverse

5  order as far as chronological.

6              MS. GEISLER:  Counsel, do you

7  intend the --

8              MS. MOORE:  I don't.  I'm sorry.  These

9  were PDF'd to me this morning.  I really want to focus

10 on the last document there, which is dated May 30th,

11 2007.

12             MS. GEISLER:  Okay.  So Mr. Stowell is

13 not prepared to discuss any of the privilege issues

14 that --

15             MS. MOORE:  Absolutely not.  We will not

16 even discuss those letters.  I'm sorry, my

17 paralegal -- I asked her for the transmittal letters

18 of the data and she sent everything, which Jarrett

19 just went and printed out.

20             MS. GEISLER:  There are a lot of dates

21 and things here.  I'm just trying to help the witness.

22             MS. MOORE:  Yeah.

23             MR. BREEN:  Just so the record is clear,

24 the reason why we are going back and forth,

25 Exhibit 11 -- is it 1193?  Is a stack of

1   correspondence between counsel.  It begins -- the

2   earliest date is the last page, which is May 30th,

3   2007.  And I'm assuming the latest date is the first

4   page, which says -- is a letter from Jones Day from

5   Carol -- from Ms. Geisler dated August 24th --

6             MS. MOORE:   That's correct.

7             MR. BREEN:   -- 2007.

8        Q.   (BY MS. MOORE)  So I would like to just

9   direct your attention to the very last page of this --

10       A.   Yes.

11       Q.   -- which is the letter dated May 30th, 2007.

12  Do you see that?

13       A.   Yes.  Yes.

14       Q.   And the -- beginning with the second

15  paragraph of the content.  "In addition, enclosed you

16  will find 21 CDs of Abbott direct and indirect sales

17  data."

18       A.   Uh-huh.

19       Q.   "This is the comprehensive rerun of the data

20  including the new fields of direct data." Did I read

21  that correctly?

22       A.   That's correct.

23       Q.   And then it lists the Bates labels that were

24  attached to the CDs, correct?

25       A.   Uh-huh.

Page 247

1    Q.   All right.  Would this be the production to

2  which you have been referring?

3    A.   Yes.

4    Q.   All right.  And would you agree that -- well,

5  can you tell me if you would have given this to legal

6  sometime in the vicinity of this May 30th, 2007 date?

7    A.   I would say that's probably correct.  I don't

8  recall the exact date, but it would have been -- May

9  would be a reasonable time frame.  Sometime in May.

10   Q.   All right.  And then I hate to do this to

11 you, but you're going to have to thumb forward to a

12 letter dated July 27, 2007.  It's signed by

13 Ms. Geisler.

14   A.   I see it.

15   Q.   All right.  This letter states, "I am

16 enclosing a CD Bates labeled TXABT-675787 containing

17 the indirect sales data for NDC 00074-7983-03"; is

18 that correct?

19   A.   Yes.

20   Q.   All right.  And this was additional data that

21 this letter states was inadvertently omitted from the

22 recent production.

23   A.   Uh-huh.

24   Q.   All right.  And the date of this letter,

25 July 27th of '07.