# MDL EXHIBIT 1-A

Westlaw.

228 F.R.D. 75                                                                 Page 1
228 F.R.D. 75, RICO Bus.Disp.Guide 10,888
**(Cite as: 228 F.R.D. 75)**

HIn re Lupron Marketing and Sales Practices Litigation
D.Mass.,2005.

United States District Court,D. Massachusetts.
In re LUPRON® MARKETING AND SALES PRACTICES LITIGATION.
Master File No. 01-CV-10861-RGS.
MDL NO. 1430.

May 12, 2005.

**Background:** Patients, health care plans, and insurers filed multi-district litigation (MDL) class action under Racketeer Influenced and Corrupt Organizations Act (RICO) and state consumer protection statutes seeking damages incurred because of alleged scheme orchestrated by pharmaceutical manufacturer to inflate retail price of prescription drug. Parties filed motion for final approval of settlement agreement, permanent certification of class, and entry of final judgment.

**Holdings:** The District Court, Stearns, J., held that:

(1) class counsel adequately notified class members of proposed settlement;

(2) certification of settlement class was warranted; and

(3) approval of proposed settlement was warranted.

Motion granted.
West Headnotes
[1] Compromise and Settlement 89 €—68

89 Compromise and Settlement
    89II Judicial Approval
        89k66 Proceedings
            89k68 k. Notice and Communications. Most Cited Cases

Federal Civil Procedure 170A €—179

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak177 Notice and Communications
                    170Ak179 k. Sufficiency. Most Cited Cases
Class counsel adequately notified class members of proposed settlement of consumer protection claims against pharmaceutical manufacturer, even though direct mail was not used to contact consumer class, where notice plan called for nationwide publication notice, solicitation of public service radio announcements and mainstream news coverage, posting of court-approved notices on websites, establishment of interactive claims information website, and toll free telephone number to take questions from class members, plan exposed 80 percent of members of consumer class on three or more occasions to notice of proposed settlement and procedure for submitting claims, and accurate mailing list for direct mail would have required obtaining of patient names and addresses from medical providers, insurers, and pharmacies. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

[2] Federal Civil Procedure 170A €—161.1

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
In determining whether to certify settlement class, court need not inquire whether case, if tried, would present intractable management problems. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

[3] Federal Civil Procedure 170A €—161.1

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak161.1 k. Factors, Grounds, Objections, and Considerations in General. Most Cited Cases
When settlement class is proposed, it is incumbent on district court to give heightened scrutiny to class certification requirements in order to protect absent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class members. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⟬182.5**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)3 Particular Classes Represented
                170Ak182.5 k. Consumers, Purchasers, Borrowers, and Debtors. Most Cited Cases
Certification of settlement class was warranted in action seeking damages incurred because of alleged scheme orchestrated by pharmaceutical manufacturer to inflate retail price of prescription drug, where class included tens of thousands of third party payers (TPP), hundreds of thousands of consumers, all class members would need to establish that they purchased drug at price derived from fraudulently inflated average wholesale price (AWP), as well as scienter on manufacturer's part, and complicity on part of physicians and clinics who billed members directly or through their insurers at price derived from inflated AWP, claims of class representatives were typical of those of members of class, class representatives were adequate, individual issues primarily involved amount of damages to be awarded to individual class members, and few, if any, members of settlement class had incurred damages in amount sufficient to justify costs of pursuing individual action. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟬165**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak165 k. Common Interest in Subject Matter, Questions and Relief; Damages Issues. Most Cited Cases
Commonality requirement for class certification does not require that every class member share every factual and legal predicate of action. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⟬164**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)1 In General
                170Ak164 k. Representation of Class; Typicality. Most Cited Cases
Sufficient nexus is established to show typicality necessary for class certification if claims or defenses of class and class representative arise from same event or pattern or practice and are based on same legal theory. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⟬176**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak176 k. Identification of Class; Subclasses. Most Cited Cases
Proposed class must be precisely defined and its members must be ascertainable through application of stable and objective factors so that court can decide, among other things, who will receive notice, who will share in any recovery, and who will be bound by judgment. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[8] Compromise and Settlement 89 ⟬51**

89 Compromise and Settlement
    89II Judicial Approval
        89k51 k. In General. Most Cited Cases
While settlement and compromise are favored by law, in ruling on proposed settlement in class action, court has fiduciary duty to absent members of class in light of potential for conflicts of interest among class representatives and class counsel and absent members. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[9] Compromise and Settlement 89 ⟬57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, Adequacy, and Reasonableness. Most Cited Cases

**Compromise and Settlement 89 ⟬59**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

228 F.R.D. 75                                                                                   Page 3
228 F.R.D. 75, RICO Bus.Disp.Guide 10,888
**(Cite as: 228 F.R.D. 75)**

        89k59 k. Adequacy or Representation; Collusion. Most Cited Cases
Approval of proposed settlement in class action is to be given if settlement is untainted by collusion and is fair, adequate, and reasonable. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[10] Compromise and Settlement 89 ⚿70**

89 Compromise and Settlement
    89II Judicial Approval
        89k66 Proceedings
            89k70 k. Evidence; Affidavits. Most Cited Cases
When sufficient discovery has been provided and parties have bargained at arms-length, there is presumption in favor of proposed settlement in class action. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[11] Compromise and Settlement 89 ⚿56.1**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k56.1 k. In General. Most Cited Cases
In assessing proposed settlement of class action, court should consider: (1) complexity, expense and likely duration of litigation; (2) reaction of class to settlement; (3) stage of proceedings and amount of discovery completed; (4) risks of establishing liability; (5) risks of establishing damages; (6) risks of maintaining class action through trial; (7) ability of defendants to withstand greater judgment; (8) range of reasonableness of settlement fund in light of best possible recovery; (9) range of reasonableness of settlement fund to possible recovery in light of all attendant risks of litigation. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[12] Compromise and Settlement 89 ⚿59**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k59 k. Adequacy or Representation; Collusion. Most Cited Cases
Storm warnings indicative of collusive settlement of class action are lack of significant discovery and extremely expedited settlement of questionable value accompanied by enormous legal fee. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[13] Compromise and Settlement 89 ⚿61**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k61 k. Particular Applications. Most Cited Cases
Approval of proposed settlement was warranted in multi-district litigation (MDL) class action seeking damages incurred because of alleged scheme orchestrated by pharmaceutical manufacturer to inflate retail price of prescription drug, despite objectors' contentions that larger settlement could have been obtained, and that release was broader than warranted by size of settlement, where negotiations were conducted at arms-length, unclaimed funds would not revert to manufacturer, release would have no effect on liability of any alleged coconspirator, continued litigation of case would be noxiously burdensome to all involved, most vociferous objectors were persons enlisted by counsel competing with MDL counsel for control of litigation, case was in litigation for nearly four years before settlement was reached, case was very complex, proving damages represented significant risks to consumer class, and consumer fund appeared more than adequate to fully compensate all consumer claimants and to perhaps pay dividend. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[14] Compromise and Settlement 89 ⚿57**

89 Compromise and Settlement
    89II Judicial Approval
        89k56 Factors, Standards and Considerations; Discretion Generally
            89k57 k. Fairness, Adequacy, and Reasonableness. Most Cited Cases
Settlement court reviewing fairness of compromise in class action does not decide merits of case or resolve unsettled legal questions. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

*76 Elizabeth K. Ainslie, Schnader, Harrison, Segal & Lewis LLP, Philadelphia, PA, Kenneth D. Quat, Concord, MA, for Objectors.
Stephen D. Annand, Cohen, Milstein, Hausfeld & Toll, Washington, DC, *77 Richard W. Cohen, Lowey, Dannenberg, Bemporad & Slelinger, P.C.,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

White Plains, NY, Michael J. Flannery, The David Danis Law Firm, P.C., St. Louis, MO, Marlene F. Gibbons, Cohen Milstein Hasufeld & Toll West Tower, Washington, DC, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Joseph D. Jackson, Jr., Baxley, Dillard, Dauphin, McKnight & Barclift, Birmingham, AL, Jeffrey L. Kodroff, Spector & Roseman, Philadelphia, PA, Lisa M. Mezzetti, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Todd A. Seaver, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, Thomas M. Sobol, Hagens, Berman LLP, Boston, MA, Donna F. Solen, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Plaintiffs.

Anita B. Bapooji, Goodwin, Procter LLP, Boston, MA, Laura D. Cullison, Winston & Strawn, Chicago, IL, Daniel A. Curto, McDermott, Will & Emery LLP, Boston, MA, James R. Daly, Jones, Day, Chicago, IL, Monica Meier Franceschini, Goodwin Procter LLP, Boston, MA, Donald R. Frederico, McDermott, Will & Emery, Boston, MA, George Lombardi, Winston & Strawn, Chicago, IL, Martin F. Murphy, Bingham, McCutchen LLP, Boston, MA, Rheba Rutkowski, Bingham, McCutchen LLP, Boston, MA, Joseph F. Savage, Jr., Goodwin Procter, LLP, Boston, MA, Eric W. Snapp, Winston & Strawn, LLP, Chicago, IL, Fiona S. Trevelyan, Bingham, McCutchen LLP, Boston, MA, Matthew A. Wolfman, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Defendants.

Donald E. Haviland, Kline & Specter, Philadelphia, PA, Ronald J. Ranta, Beverly, MA, Shanin Specter, Kline & Specter, Philadelphia, PA, for Intervenor Plaintiffs.

### MEMORANDUM AND ORDER APPROVING SETTLEMENT AND CERTIFYING THE CLASS

STEARNS, District Judge.

This aspiring Multi-District Litigation (MDL) class action was brought by patients, health care plans, and insurers seeking damages incurred because of an alleged scheme orchestrated by TAP Pharmaceutical Products, Inc. (TAP) to inflate the retail price of the prescription drug Lupron®.[FN1] Plaintiffs' principal claims are based on the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and various state consumer protection statutes. On November 24, 2004, the court preliminarily certified a settlement class consisting of consumers and certain Third Party Payers (TPPs), and gave its preliminary approval to a proposed settlement agreement between TAP, Abbott Laboratories (Abbott), and Takeda Pharmaceuticals Company Ltd. (Takeda),[FN2] and the universe of prospective litigants who claimed to have suffered economic damages as a result of TAP's Lupron®-related pricing practices.[FN3] Under the terms of the settlement, TAP transferred $150 million into an escrow account to satisfy the claims of consumers and TPPs who had made purchases of Lupron® between 1985 and 2005, and to pay the fees and expenses of plaintiffs' counsel. The parties now seek final approval of the settlement, permanent certification*78 of the class, and entry of final judgment.

> FN1. Lupron®, the trade name for leuprolide acetate, is principally used in the treatment of prostrate cancer. It is also effective in the treatment of endometriosis, precocious puberty, and uterine fibroid preoperative anemia. Lupron® is administered by intramuscular injection, typically in the arm or buttocks, in daily or monthly doses. Consequently, most Lupron® is sold through doctors who administer the injections to their patients.

> FN2. TAP is a venture jointly owned by Abbott and Takeda. TAP, which is based in Waukegan, Illinois, has a corporate identity separate from its owners, that is, it has its own officers and board of directors.

> FN3. In the Settlement Agreement, the class is defined as "[a]ll individual persons or entities who, [between January 1, 1985, through March 15, 2005] made Lupron® Purchases. Excluded from the class are the Settling Health Plans; Defendants, their respective present and former, direct and indirect, parents, subsidiaries, divisions, partners and affiliates; and the United States government, its officers, agents, agencies and departments, and all other government entities' claims, to the extent that they previously released their claims pursuant to the 2001 Settlement Agreement and Release resolving the matter of *United States of America v. TAP Pharmaceutical Products, Inc.* (D.Mass.) and related litigation."

The court held a three-day Fairness Hearing beginning on April 13, 2005. Valerie Samsell and

Milton Greene were permitted to intervene as objectors to the settlement. The Intervenors participated in the hearing through retained counsel, the Philadelphia-based firm of Kline & Specter. Having considered the evidence presented at the hearing, the objections, the arguments of counsel, and the full record of the case, the court will grant the motion for final certification of the class, confirm the appointment of class counsel, and approve the proposed settlement.

### BACKGROUND

### *Procedural History*

On October 16, 2001, TAP pled guilty in the federal district court to violations of the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t), 333(b).[FN4] TAP admitted that it had encouraged doctors to fraudulently bill the federal Medicare program for free samples of Lupron® as part of a "brand loyalty" scheme. The intent was to provide incentives to doctors to prescribe Lupron® instead of cheaper, similarly effective drugs, such as Zoladex® (manufactured by AstraZeneca). Pursuant to a plea agreement with the United States government, TAP paid a $290,000,000 criminal fine and $559,483,560 in civil restitution and penalties, the largest beneficiary of which was the federal Medicare program, although $25,516,440 was paid to the fifty States and the District of Columbia to compensate for overcharges absorbed by state Medicaid programs. TAP also executed a Corporate Integrity Agreement with the Inspector General of the Department of Health and Human Services (HHS) and the state Attorneys-General committing to changes in the supervision of its marketing and sales staff and agreeing to report to Medicare and Medicaid the true "Average Sales Price" (ASP) of its reimbursable drugs. Abbott and Takeda agreed to cooperate fully with any further government investigation of TAP in exchange for an agreement by the United States to forgo a prosecution alleging complicity by Abbott and Takeda in TAP's wrongdoing.

> FN4. Following TAP's plea, an indictment was unsealed against six present and former TAP employees and a Massachusetts urologist alleging a criminal conspiracy to defraud Medicare. Several other urologists pled guilty to criminal informations. Alan Mackenzie, W. Donald Meek, Donald Patton, and Eric Otterbein, the highest ranking TAP executives indicted in connection with the alleged scheme, were among a group of TAP employees who, after a lengthy trial, were acquitted on July 14, 2004, of any criminal wrongdoing. *See U.S. v. MacKenzie,* No. 01-CR-10350-DPW (D.Mass.).

At the heart of the scheme was TAP's overt or tacit encouragement of doctors to bill Medicare for Lupron® at an imaginary "Average Wholesale Price" (AWP) provided by TAP to the *Red Book,* an industry publication used by Medicare and other TPPs to establish payment schedules for reimbursable prescription drugs.[FN5] "TAP knew that [it] could 'raise' the average wholesale price of Lupron® at any time by simply forwarding to the *Redbook* a new and higher average wholesale price. This allowed TAP, in effect, to control the maximum Medicare reimbursement paid to a doctor for [prescribing] *\*79* Lupron®." Government's Sentencing Memorandum, at 12. The government acknowledged that its "global" settlement with TAP did not provide restitution to private insurers and co-paying patients who may have been overcharged for Lupron®, but noted that "some patients and health insurers have commenced litigation against TAP to recover overpayments caused by the criminal conduct and thus have a forum in which to demonstrate and obtain any appropriate damages." *Id.* at 4.

> FN5. While Medicare Part B does not generally reimburse the costs of self-administered drugs, it does pay providers for up to 80 percent of the "allowable cost" of physician-injected drugs like Lupron®. The remaining 20 percent is paid by the Medicare beneficiary as a "co-payment." "Allowable cost" was defined by HHS regulations from 1992 to 1998 as the lesser of a drug's estimated actual acquisition cost or its national average wholesale price (AWP). 42 C.F.R. § 405.517 (amended Nov. 2, 1998; Jan. 7, 2004; Nov. 15, 2004). Prior to 1992, Medicare reimbursements were based on the "reasonable charge method." From 1998 to 2004, "allowable cost" was defined as the lesser of a drug's estimated actual acquisition cost or 95 percent of AWP. 42 C.F.R. § 405.517. For 2004, reimbursement for Lupron® was set at the lesser of the actual charge on the bill or 81 percent of the April 1, 2003 AWP for

Lupron®. 42 C.F.R. § 414.707. For 2005, reimbursement is based on the ASP. 42 C.F.R. § 414.904. The AWP was taken by HHS from the *Drug Topics Red Book* (*Red Book* ), a pharmaceutical industry publication compiling wholesale drug prices. The AWP for Lupron® published in the *Red Book* was supplied by TAP. No independent verification of the actual AWP was undertaken by HHS, Medicare, or the editors of the *Red Book.* The published AWP for Lupron® as reported by TAP ranged from $418.75 in 1992 to $623.79 in 2001.

In fact, a number of actions were brought in various state and federal courts against TAP, Abbott, and Takeda on behalf of co-paying patients, direct purchasers of Lupron®, private health care plans, and insurers that were not included in the government-negotiated civil settlement. The unifying themes of these civil claims are allegations that the defendants fraudulently manipulated the AWP for Lupron® and engaged in unscrupulous practices in the marketing of the drug. They are also mostly pled, as in this case, under the federal RICO law and state consumer protection statutes.[FN6] According to plaintiffs, the AWP reported by TAP for Lupron® bore no resemblance to the actual prices being charged to doctors, nor did it bear any relationship to a reasonable interpretation of the terms "average" or "wholesale." The AWP rather was inflated at plaintiffs' expense to funnel hidden profits to doctors. As summarized in the Consolidated Amended Complaint:

> FN6. The factual allegations and legal theories underlying the Consolidated Amended Complaint are set out at length in *In re Lupron® Marketing and Sales Practices Litigation,* 295 F.Supp.2d 148 (D.Mass.2003).

[t]he improper marketing and sales practices include, *inter alia:* (a) deliberately overstating the published average wholesale price ("AWP") for Lupron®-the rate upon which Medicare reimbursement (and Medicare beneficiaries ['] co-payments) as well as many other insurers' payments are set-so that Plaintiffs and the Class pay an artificially inflated amount of money for Lupron®; (b) providing free samples of Lupron® to medical providers and instructing them, with the intent, that they could and should unlawfully bill Medicare, private insurers and individual patients for the free samples; (c) providing other unlawful financial inducements and hidden price discounts; and (d) actively concealing, and causing others to conceal, information about the true price being charged for Lupron®.

*Id.* ¶ 4. TAP's concession in its guilty plea that its sales representatives distributed $31 million in "free" Lupron® samples between 1993 and 1999 figures prominently in most of the civil complaints. The complaints also mirror the government's criminal case in reciting other irregular financial inducements offered by TAP to doctors to stimulate the sales of Lupron®, including volume discounts, rebates, "education" grants, junkets, off-invoice pricing, free goods, credit memos, supposed consulting fees, and debt forgiveness.

William Porter filed the first of two Lupron®-related class actions in the Massachusetts federal district court on May 18, 2001. Similar cases seeking class action status were filed in Alabama, Illinois, and Minnesota.[FN7] On December 17, 2001, all pending federal class actions were consolidated by the MDL Panel (MDLP) in this district for pretrial proceedings. Two cases filed on behalf of Blue Cross and Blue Shield entities (Blues) in the District of Massachusetts were later joined with the MDL action as related cases.[FN8]

> FN7. The lead plaintiffs in six of these cases are named as plaintiffs in the Consolidated Amended Complaint. The six cases are: *Russano v. TAP Pharmaceutical Products, Inc.* (N.D.Ill.C.A. No. 01-6982); *Goetting v. TAP Pharmaceutical Products, Inc.* (S.D.Ill.C.A. No. 01-703); *Porter v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01-10861); *Beacon Health Plans, Inc. v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01-10897); *Brickey v. TAP Pharmaceutical Products, Inc.* (N.D.Ala.C.A. No. 01-2770); and *Twin Cities Bakery Workers Health and Welfare Fund v. TAP Pharmaceutical Products, Inc.* (D.Minn.C.A. No. 01-2023).

> FN8. The Blues cases are *Empire Healthchoice, Inc., d/b/a/ Empire Blue Cross and Blue Shield v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A.02-10015), and *Blue Cross and Blue Shield of Florida, Inc. v. TAP Pharmaceutical Products, Inc.*

(D.Mass.C.A.02-10139). On January 14, 2003, the court approved a stipulation adding Oxford Health Plans, Inc., and Horizon Healthcare Services, Inc., as parties to the Consolidated Amended Complaint.

*80 Several Lupron®/AWP cases were also filed as either state or nationwide class actions in state courts. Counsel in a number of these cases, including those in California (*In re Lupron® Drug Cases,* San Francisco Superior Court, JCCP No. 4238; *Peralta v. Abbott Laboratories,* Los Angeles County Superior Court, No. BC 259587); Texas (*Benoit v. Takeda Chemical Industries Ltd., et al.,* Jefferson County District Court, No. B166742); and Illinois (*Clark v. TAP Pharmaceuticals, Inc. et al.,* Williamson County Circuit Court No. 01L132; *Jarman v. TAP Pharmaceutical Products, Inc. et al.,* Madison County Circuit Court, No. 01L1019), agreed to coordinate discovery efforts with the counsel appointed by this court as the interim representatives of the interests of the MDL plaintiffs. However, Kline & Specter, which directly or through local counsel had brought class actions in Arizona, North Carolina, and New Jersey, refused to join in the cooperative effort.[FN9] Kline & Specter instead embarked on a preemptive strategy to seize control of the litigation by using the state court proceedings to gain leverage over counsel cooperating with the MDL action.[FN10]

FN9. On December 31, 2001, Kline & Specter filed a class action in the North Carolina Superior Court on behalf of lead plaintiff Harry Stetser. The complaint named the Lupron® defendants (TAP, Abbott and Takeda), as well as Johnson & Johnson, a distributor of Lupron®, and two wholly-owned Johnson & Johnson subsidiaries, Ethicon Endo-Surgery and Indigo Laser Corporation as defendants. On April 24, 2003, Superior Court Judge Paul Jones certified *Stetser* as a nationwide class action. On July 6, 2004, the Court of Appeals reversed the decision and decertified the nationwide class. On January 7, 2005, Judge Jones recertified *Stetser* as a North Carolina-only class action, retroactive to October 8, 2004. On October 9, 2001, Kline & Specter filed a class action against the Lupron® defendants in the New Jersey Superior Court on behalf of lead plaintiff Bernard Walker alleging unjust enrichment, fraud, civil conspiracy, and violations of the New Jersey consumer protection statute. On August 29, 2003, Superior Court Judge Joseph Visalli denied the request to certify a nationwide class of Lupron® purchasers, but certified a New Jersey-only Lupron® class. Judge Visalli is proceeding to trial on Walker's individual claims. On June 28, 2002, an Arizona law firm allied with Kline & Specter filed a class action in the Maricopa County Superior Court against the Lupron® defendants and other drug manufacturers that had also used AWP as a marketing tool. The complaint mirrors the causes of action set out in the *Walker* complaint. On March 10, 2005, Superior Court Judge Rebecca Albrecht stayed proceedings in *Swanston* pending a certification ruling in the MDL action.

FN10. Bringing an end to unseemly attempts to exact advantage over class action defendants or lawyers representing competing plaintiffs' claims by exploiting the potential for conflict inherent in a federal system of coordinate sovereigns was a principal argument advanced by advocates of the Class Action Fairness Act of 2005. The Act essentially consolidates all class actions with multi-state constituencies in the federal courts.

On February 11, 2002, the court held a case management conference to establish a discovery and motions schedule. By that time, the defendants had assembled a central depository containing more than 300 boxes of case-related documents to which plaintiffs' counsel (including Kline & Specter) were given access. On March 15, 2002, the MDL plaintiffs filed a Consolidated Amended Complaint, and on June 7, 2002, a Corrected Consolidated Amended Complaint. Takeda, a Japanese company, challenged the Consolidated Amended Complaint on jurisdictional grounds. On January 24, 2003, the court denied Takeda's motion to dismiss in part, holding that while plaintiffs Goetting and Russano had failed to establish specific jurisdiction over Takeda, they had produced sufficient prima facie evidence to establish general jurisdiction under the "doing business" test of the Illinois Long-Arm Statute, 735 Ill. Comp. Stat. § 5/2-209(b)(4). See *In re Lupron Mktg. & Sales Practices Litig.,* 245 F.Supp.2d 280, 295-297 (D.Mass.2003).

On November 25, 2003, after another heated exchange of briefs and arguments, the court issued a lengthy decision on defendants' Rule 12(b)(6) motion to dismiss, ultimately rejecting the (not inconsequential) arguments that political question considerations, statutes of limitations issues, and the "filed rate doctrine" operated to bar the litigation in its entirety. The court found the RICO claims as pled (alternatively identifying TAP as the enterprise and Takeda and Abbott as RICO "persons," or the three defendants as an "enterprise-in-fact" with each *81 defendant acting as a RICO "person") sufficient to satisfy the requirements of Rule 9(b). The court also ruled that the state consumer protection act claims were not preempted by the Employment Retirement Income Security Act of 1974 (ERISA), § 514(a), 29 U.S.C. § 1144(a), or the Medicare Act. The court, however, agreed with defendants that plaintiffs had failed to plead a manageable RICO claim of an "association-in-fact" involving all doctors and clinics in the United States who had sold Lupron® at a price derived from AWP. Consequently, it dismissed the physician-related claims.

In February of 2004, the MDL plaintiffs, apparently content with the nucleus of the remaining state and federal claims, moved to certify a class consisting of [a]ll persons or entities who paid for Lupron® at a price in whole or in part calculated by reference to the AWP as published in national pharmaceutical publications such as the *Red Book* and *First Data Bank* (the "Class") during the period from January 1, 1991, through September 30, 2001 (the "Class Period"). Excluded from the Class are (a) Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officer, directors, assignees and successors, and (b) any co-conspirators.

The impending hearing on the certification motion precipitated a flurry of discovery disputes as the parties maneuvered for position. *See* Orders dated March 1, 2004 (re: Motion to Compel Calculations); March 1, 2004 (re: Motion to Compel Individual Plaintiffs' Releases); March 2, 2004 (re: Motion to Compel Individual Plaintiffs to Produce Documents); March 17, 2004 (re: Motion to Compel TAP to Produce Documents); April 5, 2004 (re: Temporary Stay); April 16, 2004 (re: Certification of Order for Appellate Review); April 23, 2004 (re: Production of Transcripts of Deposition of TAP Employees); June 14, 2004 (re: protective order); June 25, 2004 (re:

motion for modification of schedule). On May 6, 2004, TAP filed an emergency petition with the First Circuit Court of Appeals seeking an order of mandamus vacating the order of this court compelling the production of documents for which TAP had claimed attorney-client privilege and attorney work-product protection. On July 12, 2004, the First Circuit denied TAP's petition.

On January 22, 2004, the MDLP transferred to this court "tag-along" actions brought by Liberty National Life Insurance Company (Liberty) and United American Insurance Company (United) against TAP and Abbott. Liberty reimburses beneficiaries under a special cancer treatment policy for Lupron® injections. United reimburses beneficiaries who purchase a supplemental Medicare insurance policy for prescription drug co-payments including Lupron®. Both insurers based their reimbursement rates on the published AWP. On May 14, 2004, the court issued a decision denying motions by TAP and Abbott to dismiss both complaints. On August 4, 2004, the court denied a motion by TAP to dismiss a similar complaint brought by Aetna Health, Inc., alleging claims under RICO and the Pennsylvania insurance fraud statute, 18 PA. CONS. STAT. ANN. § 4117(a)(2) (West 2005).[FN11]

> FN11. On October 3, 2003, Aetna filed suit in the Eastern District of Pennsylvania. After the complaint was transferred by the MDLP to the District of Massachusetts, Aetna added by amendment three counts under RICO. At oral argument, Aetna waived three of its originally filed state law claims.

On August 12, 2004, the court held an extended hearing on MDL plaintiffs' class certification motion, and took the matter under advisement. On October 11, 2004, as the court was completing the draft of its decision, the MDL parties notified the court that they had reached a settlement, which if approved, would eliminate the need to certify a litigation class. The MDL parties then moved for preliminary approval of the negotiated settlement.

Immediately after the settlement was announced, Kline & Specter filed a motion to intervene on behalf of Valerie Samsell and Milton Greene.[FN12] The court allowed the motion *82 "for the purpose of participating in the process established by the court for the evaluation of the proposed settlement." On

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

November 24, 2004, after a hearing in which counsel for the MDL parties and the Intervenors participated, the court gave preliminary approval to the proposed settlement and settlement class.[FN13] MDL counsel were ordered to implement the Settlement Notice Plan and to establish an interactive website on which notice materials could be accessed and downloaded by prospective class members.

> FN12. Samsell and Greene object to the settlement as negotiated. Although Samsell and Greene are clients of Kline & Specter, neither appears to be a potential beneficiary of a pending Lupron® lawsuit other than the MDL action, including any lawsuit brought by Kline & Specter. Samsell believes (apparently mistakenly) that Kline & Specter represents her in a coverage dispute with an insurer who refused to reimburse her for Lupron® purchased on behalf of family members.

> FN13. On December 6, 2004, the Intervenors appealed the Preliminary Approval Order and asked the district court to stay its proceedings pending the outcome of the appeal. The district court declined to do so. *See* Rule 23(f). As of this date, no action has been taken by the Court of Appeals.

On December 10, 2004, less than three weeks after the court's preliminary approval order, the MDL plaintiffs filed an emergency motion asking the court to enjoin Kline & Specter from
improper communication with members of the Lupron® Purchaser Class, dissemination of false, misleading and confusing information to members of the Lupron® Purchaser Class concerning both the MDL settlement and the status of other state court proceedings related to Lupron®, the improper solicitation of opt outs from the MDL settlement, and plans to conduct individual trials of Lupron® related claims in specific state court proceedings while the MDL settlement is pending review and approval by this court.

Defendants filed a similar motion of their own. The MDL parties directed the court to Kline & Specter websites established under the domain names *www.lupronlaw.com* and *www.lupronclass.com* purporting to "welcome" potential members to "the class" and inviting Lupron® purchasers "to register for the Lupron® class action." After reviewing the websites, the court issued a Memorandum and Order in which it found that the Kline & Specter websites were intended to mislead potential members of the MDL class. The court concluded that the typical registrant on a Kline & Specter website would not know that he or she was opting out as a participant in the MDL class by "registering" with Kline & Specter. Moreover, neither of the websites explained that a registrant who opted for inclusion "in litigation in the state courts" might (depending on his or her state of residence) be left with no means of recovery.[FN14] The court acknowledged that while "[Kline & Specter] and attorney Haviland are perfectly free to criticize the proposed settlement agreement ... they are not privileged to engage in deceptive conduct manipulating the very consumers they claim to protect." Order dated December 21, 2004, at 3. The court ordered Kline & Specter to remove the purported "registration" form from the websites and to prominently display a banner stating that the websites had not been authorized by the MDL court, and directed that a complete list of all "registrants" be produced to the court (under seal) for inspection. Upon *in camera* review of the list, the court found that the great majority of those who had "registered" were not residents of New Jersey or North Carolina, the states in which Kline & Specter had Lupron® actions pending.[FN15]

> FN14. The websites appear to have originated as part of the notice plan undertaken in the later decertified North Carolina *Stetser* action, and to have been resuscitated by Kline & Specter as convenient fora for attacking the proposed MDL settlement.

> FN15. According to the list submitted by Kline & Specter, some 7,000 prospective class members had registered with Kline & Specter, of whom some 600 are residents of New Jersey and North Carolina.

Immediately after the court ruled on the website issue, it learned that on December 29, 2004, attorney Haviland had addressed a "Dear Client" letter to every person who had registered on the Kline & Specter websites. The letter began by noting that the national class previously certified in North Carolina had "recently" been decertified (in fact, it had been decertified six months earlier) and *83 reported (accurately) that nonresidents of North Carolina were

"no longer included in and being protected by the North Carolina case." The letter then advised registrants "to affirmatively protect their rights going forward" by opting out of the MDL settlement and by completing a Kline & Specter Retainer Agreement. The letter then presented a distorted picture of the MDL settlement, including the patently false statement that MDL claimants would be paid only 3 cents for each dollar of their actual damages. The letter was signed by attorney Haviland as "Co-Lead Counsel for State Court Plaintiffs and the State Court Classes," without any disclosure of the fact that Kline & Specter was serving as lead counsel in pending Lupron® actions in only two states.

Having found the "Dear Client" letter to contain a number of deliberate misrepresentations and falsehoods, the court ordered that a curative notice be sent by Kline & Specter to all of the letter's recipients.[FN16] The notice highlighted misstatements in the "Dear Client" letter, informed recipients living outside of North Carolina and New Jersey that Kline & Specter had not filed state lawsuits on their behalf, and warned that persons opting out of the MDL class might be required to bring a lawsuit personally to recover damages from the Lupron® defendants. The court advised recipients of the "Dear Client" letter desiring more information to contact the MDL Claims Administrator or to discuss with Kline & Specter their rights and obligations under any retainer agreement.[FN17]

> FN16. The curative notice was drafted by the court after soliciting suggestions from the MDL parties and comments from Kline & Specter.
>
> FN17. The court allowed Kline & Specter's request that for economic and client privacy reasons it rather than the MDL Claims Administrator be permitted to mail the curative notice to the list of registrants.

After the mailing of the curative notice, the court sent Letters of Request to Judge Jones in North Carolina (dated February 2, 2004), and Judge Visalli in New Jersey (dated January 27, 2004), the presiding judges in the *Stetser* and *Walker* cases. The Letters noted the misinformation disseminated by Kline & Specter and the efforts undertaken by the court to provide prospective MDL class members with a full understanding of their rights and the opportunity to make an informed choice about participating in either the federal or (where available) state Lupron® litigation. As a matter of comity, the court asked Judge Jones and Judge Visalli to defer ruling on dispositive motions or proceeding with any potentially preclusive trials until this court could convene a hearing and rule on the fairness of the proposed MDL settlement.

Intervenors then moved to disqualify this judge from continuing to preside over the MDL proceedings, arguing that the federal court's "unsolicited" communications with the state court judges gave "an objective appearance of partiality, if not actual partiality," by demonstrating that "Judge Stearns has become fully engaged with the MDL litigants in their efforts to deprive Walker, Stetser, Nelson and DeMontbrun of their timely day in court." Intervenors' Memorandum, at 5. The court denied the motion, noting the longstanding federal policy encouraging MDL judges to communicate directly with state court judges presiding over parallel cases in the interests of avoiding conflicts and conserving judicial resources. *See Manual for Complex Litigation, Fourth*, § 20.312 (Fed.Jud.Ctr.2004) (*Manual*).

The court commenced a three-day Fairness Hearing on April 13, 2005. Prior to the hearing, the Intervenors filed seven boxes of exhibits, together with associated memoranda and affidavits. MDL plaintiffs and TAP also submitted substantial briefs and affidavits. The court provided the MDL parties and Intervenors each a total of fours hours for the presentation of evidence, with an additional hour for argument. Objectors who requested to appear were allotted time to address the court, including several objectors affiliated with Kline & Specter.[FN18] The *84 court heard direct testimony from nine witnesses called by the MDL plaintiffs and the Intervenors, and received in deposition form the testimony of seven additional witnesses offered by Intervenors. The Intervenors submitted twenty-three exhibits at the hearing, the MDL plaintiffs eighteen, and the MDL defendants four. Three insurers appeared to express their support for the settlement.[FN19]

> FN18. Prior to the hearing, Paula Treskow withdrew her objection after reviewing with MDL counsel the reasons for the apportionment of the settlement funds between the consumer and TPP classes. Larry Crown (co-counsel with Kline & Specter in the Arizona AWP case) addressed

the court on behalf of objector Swanston. Jennifer Koiles, Esq., explained that an objection filed on behalf of Rhonda Marcus on the mistaken belief that the settlement documents had been sealed by the court.

FN19. Michael Hefter, Esq., addressed the court in support of the settlement on behalf of Empire Health Choice, Inc., Aetna, and Cobalt.

*Notice*

Notice to the class was disseminated by Hilsoft Notifications, a Pennsylvania company "specializing in designing, developing, analyzing and implementing large-scale, un-biased legal notification plans." Hilsee Aff. ¶ 2. Todd B. Hilsee, the president of Hilsoft, has served as a notice expert in more than 175 class action cases, including *In re Holocaust Victims Assets Litig.,* No. CV-96-4849 (E.D.N.Y.); *In re Domestic Air Transp. Antitrust Litig.,* MDL 861 (N.D.Ga.); *In re Dow Corning Corp.,* 95-20512-11 (Bankr.E.D.Mich.); *In re Synthroid Mktg.,* MDL 1182 (N.D.Ill.); and *In re Bridgestone/Firestone Tires Prods. Liab. Litig.,* MDL No. 1373 (S.D.Ind.). Hilsee was the only notice expert invited to testify before the Advisory Committee on Civil Rules on the amendment to Rule 23 requiring "clear, concise, plain language notices." Hilsee was also asked by the Federal Judicial Center to design model notices to illustrate Rule 23 plain language "best practices."

The notice plan approved by the court provided for individual notice where practicable as well as nationwide publication notice, the solicitation of public service radio announcements and mainstream news coverage, the posting of court-approved notices on Lupron®-related websites, the establishment of an interactive claims information website (*www.lupronclaims.com*), and a toll free telephone number to take questions from class members. The Notice Program was designed to
(a) effectively reach approximately 80% or more of consumer Class members; (b) provide the consumer Class members reached with multiple opportunities to be exposed to the Notice-on average three or more times each; (c) provide a comprehensive and virtually complete reach of TPP Class members by way of mailed summary Notice; (d) use targeted notice vehicles and state-of-art notice planning (i.e. media known to be used by Class members), with audiences that can be mathematically calculated; (e) provide thorough and fair geographic coverage of the United States; (f) design a program broadly targeting Class members without disadvantaging any potential Class member on the basis of geography (where they choose to live) or demographics (e.g. their age or socio-economic status); (g) develop a program consistent with other notice programs we have designed that have been court-approved and that we have implemented for large classes certified for purposes of settlement in federal courts, Massachusetts courts, and elsewhere; (h) use high quality notification vehicles and methods in order to convey the importance of the information affecting Class members' rights; (i) write and design Notices in plain language that will be "noticed" as well as simple, clear, easy to understand and act upon; (j) ensure that Class members who choose to participate can conveniently act on their right to claim a payment from the settlement through repetition, a variety of notice distribution methods, and notice design features; and (k) ensure an overall effective effort based on all relevant communication standards.

Hilsee Aff. ¶ 28. To enhance consumer exposure, Hilsoft studied the media habits of persons most likely to have received or procured Lupron® injections: men fifty years of age and older (prostate cancer); women ages 18 to 64 (endometriosis); parents of children likely to have been afflicted by precocious puberty; and African-American women ages 18 to 64 (the population group most susceptible to uterine fibroids).

The Claims Administrator, Complete Claim Solutions, Inc., reported that on January*85 7, 2005, it mailed a "TPP Notice Packet" to 235,480 potential TPP class members. TPP and Consumer Notice Packets were mailed to the Attorneys General of the fifty States (two packets were sent to the Office of the Attorney General in Pennsylvania-one to the then current Attorney General and one to the Attorney General-elect), Puerto Rico, and the Virgin Islands. As of April 4, 2005, 3,206 Consumer Notice Packets had been mailed to potential class members who contacted the Lupron® Hotline to request a claims package.

According to Hilsee, the plan exposed 80 percent of the members of the consumer class on three or more occasions to notice of the proposed settlement and the procedure for submitting claims. Specifically, Hilsee calculates that adults over 18 were reached an average of 3 times, 85 percent of living adults treated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for prostate cancer were exposed an average of 3.7 times, 80.7 percent of all men over 50 were exposed an average of 3.1 times, 83.2 percent of women between the ages of 18 and 64 3.0 times, 80.8 percent of parents 3.1 times, and 86.2 percent of African American women between the ages of 18 and 64 an average of 3.2 times. Hilsee published notice in 947 newspapers, in Sunday newspaper supplements (Parade Magazine and USA Weekend), and in publications as diverse as *American Legion, Cosmopolitan, Ebony, Field & Stream, National Enquirer, Newsweek, Parents, People, Popular Mechanics, Reader's Digest, Time* and *VFW Magazine*. Hilsee testified that the notice was positioned opposite news articles and editorial features to increase the likelihood that it would be read.

Hilsee testified that additional exposure was achieved through public service announcements, the website, and free media coverage of the settlement. Hilsoft produced and distributed fifteen, thirty and sixty second public service announcements to 1,250 radio stations, including the top three to six adult stations in every major media market. Hilsoft also "selected the voice talent to help ensure that Class members would identify with the voice from the standpoint of demographic matching." Hilsee Aff. ¶ 70. As of March 15, 2005, 127 radio stations in thirty-seven states had aired the announcement a total of 25,083 times (an average of 198 broadcasts per radio station). Hilsee estimates that this figure translates into an audience of 61,953,500 adults. The *www.lupronclaims.com* website address was prominently displayed in all notice materials and website keywords were registered with hundreds of search engines, including Google, AOL, Ask Jeeves, Lycos, Yahoo!, WebCrawler, and AltaVista. Hilsee testified that as of April 15, 2005, 38,187 "hits" had been recorded at the website.[FN20] On January 7, 2005, a court-approved informational release was issued to established news wires reaching more than 450 health and medical publications, as well as 4,200 press outlets throughout the country. The informational release was also sent to sixty-eight support groups for the diseases treated by Lupron®.

> FN20. A "hit" is an instance of a web page being loaded by an Internet user into his or her browser.

At the Fairness Hearing, Hilsee testified that direct mail was not used to contact the consumer class because of privacy and practicality concerns. To compile an accurate mailing list would have required the obtaining of patient names and addresses from medical providers, insurers, and pharmacies that are for the most part forbidden from divulging patient information by federal and state privacy laws. Hilsee testified that in his experience with similar cases, including the Synthroid® and Paxil® drug litigations, "privacy concerns stood in the way of being able to consider giving individual notice to patients.... In this particular circumstance, it's even more problematic, because these are very personal issues, prostate, infertility, [and] precocious puberty." Fairness Hearing, April 14, 2005 Tr. at 154. Also, because the class period dates back to 1985, most of the older addresses (even if they could be obtained) would have no value for purposes of direct mail. *Id.*, April 14, 2005 Tr. at 151.[FN21]

> FN21. Hilsee also cited studies showing that 75 percent of direct mail is thrown away by the recipient or the recipient's "gatekeeper" without being opened. Hilsee Aff. at 55 n. 30.

*86[1] Hilsee explained that a "placard" program (advocated by Intervenors' counsel) would have been ineffective for several reasons. Placard notice is usually positioned in pharmacies while almost all consumer class members received Lupron® injections directly from their physicians (who would be unlikely to display a potentially incriminating notice in their offices). According to Hilsee, placard notice is "a tool that [he] would [n]ever rely on nor has [he] ever [done so] in providing constitutionally-adequate notice under due process concerns." Fairness Hearing, April 14, 2005 Tr. at 163. Hilsee pointed out that the Intervenors' counsel did not utilize placard notice (or patient direct mail) in giving notice of a proposed settlement to the *Stetser* "national class." In Hilsee's opinion the Notice Plan "as implemented, fully satisfied the notice requirements of Federal Rule of Civil Procedure 23, including the new plain language requirements of Rule 23(c)(2)." Hilsee Aff. ¶ 81.

*The Parties to the Settlement*

The proposed settlement of this case involves two distinct agreements. The first is between the defendants and the Settling Health Plans (SHPs).[FN22] The SHPs are a consortium of insurance companies and health plans that provide prescription drug