# MDL EXHIBIT 1-B

benefits to an estimated 70 percent of the 197,869,000 persons in the United States who are covered by private medical insurance. The SHPs brought a separate complaint against the defendants. The SHPs are not associated as a class and have settled in their individual capacities with the defendants. The SHPs agreement is before the court for informational purposes only.

> FN22. The term SHPs is common to both agreements.

The second agreement, which has been presented for the court's approval, is between the defendants and the "Lupron® Purchaser Class." This class consists of consumer-purchasers and TPPs that are not part of the SHPs settlement. The class TPPs consist primarily of self-insured employers and Taft-Hartley benefit plans. The SHPs are explicitly excluded from the Lupron® Purchaser Class.

*The Proposed Settlement*

The total amount allocated between the two settlement agreements is $150 million. Of this sum, $40 million is earmarked for the claims of individual consumers, while $55 million is initially allocated to the claims of the TPP class members, and an additional $55 million to those of the SHPs. Attorneys' fees and expenses are subtracted from each pool, with the SHPs paying their own fees and costs, and the members of the Lupron® Purchaser Class paying the fees and costs of class counsel in proportion to the ultimate amounts awarded to consumer-purchasers and class TPPs. The first $1 million in notice and claims expenses is to be borne by the class TPPs; thereafter the TPPs and the consumer-purchasers are to bear their respective costs in processing any remaining claims. Incentive payments to class representatives will be borne separately by each funding pool. Any unclaimed surplus in the consumer pool will not revert to TAP, but will be distributed by the court at its discretion.[FN23] TAP is, however, entitled to a refund from the TPP pool in proportion to the value of the claims of those TPPs that opt out of the class settlement.

> FN23. If the court designates a charity as the recipient of any surplus funds, the Settlement Agreement permits TAP to take a corresponding tax deduction.

A mechanism is also provided to adjust the division of funds between the class TPPs and the SHPs depending on claims experience. To the extent that the SHPs group accounts for more than 50 percent of the eligible claims, it will receive a proportionate contribution from the class TPP pool, net of expenses, attorneys' fees, and the deduction for opt outs from the TPP class. Conversely, if the SHPs group accounts for less than 50 percent of the eligible claims, the TPPs will take a proportionate share of the SHPs pool, to a maximum of $15 million.[FN24] By way of example, if 70 percent of the approved claims *87 originate from the SHPs group, it will be entitled to an additional $22 million (20 percent) of the $110 million allocated between the SHPs and the class TPPs, net of fees, expenses, and opt out deductions.

> FN24. To insure payment of this $15 million, the SHPs will initially distribute only $40 million in claims, and will place the remaining $15 million in escrow until the claims of all SHPs and class TPPs are processed.

Consumer-purchasers are entitled to recover 30 percent of their total out-of-pocket payments for Lupron®, or $100, whichever is greater, unless the total amount of claims exceeds the amount allotted to the consumer pool. If the pool is depleted, pay-outs to consumers will be reduced on a pro rata basis. MDL counsel estimate that after payment of expenses and attorneys' fees, $27.5 million will be available to the consumer-purchaser class, an amount that MDL plaintiffs' counsel believe will be sufficient to pay all claims in full. On the other hand, because the TPP class may experience a higher claims rate, in the event its fund pool becomes oversubscribed the class through its representatives has agreed to share the funds available on a pro rata basis according to each TPP's purchase of Lupron® in 2000-2001. A representative sample method was chosen to avoid the expense involved in recreating twenty years of purchasing data.

According to the analysis of MDL plaintiff's expert, Dr. Raymond Hartman, the allocation of the settlement funds is deliberately weighted to favor the consumer-purchaser class over the SHPs and the class TPPs. (Hartman Decl., at 1-2). By Dr. Hartman's calculation, the average spread (AWP/ASP) was 182 percent between 1993 and 2000 (the years for which reliable data is available).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Hartman Decl. at 15.) Assuming that an AWP/ASP percentage spread of 125 percent (the "but-for spread") would be expected by the market, the difference between the actual and the but-for spread in the years analyzed by Dr. Hartman is 57 percent. This "unreasonable" 57 percent excess in the spread amounts to approximately 30 percent of the actual spread, explaining Dr. Hartman's opinion that a 30 percent of AWP recovery to consumers is reasonable.[FN25,FN26]

>FN25. As an example, a 30 percent claims reimbursement pegged to an AWP of $182 would result in a recovery of $54.60 (roughly equivalent to the presumed overcharge of $57).

>FN26. Dr. Meredith Rosenthal, an MDL plaintiffs' expert who testified at the final approval hearing, points out that while consumer claims most likely account for 9 to 13 percent of the total overcharges (with extremes of 7 to 25 percent), consumers will receive 27 percent of the settlement. Dr. Rosenthal and Dr. Hartman believe that consumer damages over the period from 1991 to 2001 amounted to some $166 million. Of this amount, $150 million was borne by Medicare patients making out-of-pocket or coinsurance payments, and $16 million was borne by consumers paying coinsurance in a private context. Both experts are of the opinion that the overcharge for private consumers was around 30 percent, whereas for Medicare patients it was around 45 percent, because of the difference in what they consider to be the baseline. The but-for price for Medicare (that is, what Medicare patients would have paid absent the inflation) they set at the ASP, whereas the but-for price in the private context they set at 80 percent of the AWP. Both experts, however, consider a 30 percent recovery to be a reasonable approximation of the economic damages to the class members.

*CLASS CERTIFICATION*

Rule 23(a) sets out several prerequisites for a class action. A class may be certified only if:
(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representatives will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Plaintiffs seek to certify a class pursuant to Rule 23(b)(3). This section provides that a class action may be maintained only if, in additional to the prerequisite of Rule 23(a):
the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members **88** of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

[2][3] "A district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir.2003). In "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Waste Mgt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir.2000) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal citation omitted)). In the settlement context, however, there is an important refinement to the Rule 23 analysis: the court "need not inquire whether the case, if tried, would present intractable management problems." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). When a settlement class is proposed, it is incumbent on the district court to give heightened scrutiny to the requirements of Rule 23 in order to protect absent class members.[FN27] *Amchem*, 521 U.S. at 620, 117

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. 2231. This cautionary approach notwithstanding, the law favors class action settlements. _City P'ship Co. v. Atl. Acquisition Ltd. P'ship,_ 100 F.3d 1041, 1043 (1st Cir.1996).

> FN27. The heightened scrutiny rule is a byproduct of the controversy over the concept of a settlement class, a litigation device that was initially viewed with deep suspicion by courts and commentators who feared (not without justification) that it invited collusion between defendants and fee-hungry lawyers. Judge Becker summarizes the arguments for and against settlement classes in his seminal decision on the subject, _In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,_ 55 F.3d 768, 787-792 (3d Cir.1995).

(a) Numerosity

[4] The class easily meets the Rule 23(a) requirement that "the class [be] so numerous that joinder of all members is impracticable." While the mortality rate associated with prostate cancer, coupled with the extended class period, makes it impossible to predict the size of the class to any degree of mathematical certainty, the class includes thousands of TPPs and tens if not hundreds of thousands of consumer-purchasers or their estates.

(b) Commonality

[5] While at least one common issue of fact or law at the core of the action must shape the class, Rule 23(a) does not require that every class member share every factual and legal predicate of the action. _In re General Motors Corp.,_ 55 F.3d at 817. "The threshold of 'commonality,' is not high. Aimed in part at 'determining whether there is a need for combined treatment and a benefit to be derived therefrom,' the rule requires only that resolution of the common questions affect all or a substantial number of the class members." _Jenkins v. Raymark Indus., Inc.,_ 782 F.2d 468, 472 (5th Cir.1986) (citation omitted). In this case, there are a number of common issues of fact and law that the class members would be required to establish to prove the defendants' liability, as well as their entitlement to damages. All class members would need to establish that (1) they purchased Lupron® (2) at a price derived from a fraudulently inflated AWP (3) published by defendants as part of a concerted marketing scheme involving, inter alia, the provision of "free" samples, rebates, debt forgiveness, junkets, and "education grants" (4) that was intended to funnel hidden profits to doctors (5) as an inducement to prescribe Lupron® instead of less expensive alternatives like Zoladex®. The class would also be required to prove scienter on defendants' part, as well as complicity on the part of physicians and clinics who billed members directly or through their insurers at a price derived from the inflated AWP. The civil RICO statute (the mainstay of the Consolidated Amended Complaint) would require the class to prove as a matter of fact and law that defendants (1) conducted (2) an enterprise (either a legal entity or an association in fact) (3) through a pattern (at least two *89 related acts) (4) of racketeering activity.[FN28] _Sedima, S.P.R.L. v. Imrex Co., Inc.,_ 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In short, the commonality requirement is easily satisfied.[FN29]

> FN28. The predicate acts alleged by plaintiffs to constitute racketeering activity on the part of the defendants are mostly mailings and electronic communications plead as violations of the mail and wire fraud statutes. _See Neder v. United States,_ 527 U.S. 1, 20, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

> FN29. While the Intervenors suggest that some Lupron® purchasers might not have been charged an AWP-based price or might not have paid for Lupron® distributed to doctors as "free" samples, plaintiffs' evidence credibly demonstrates that virtually every purchase of Lupron® during the class period was influenced to one degree or another by the defendants' manipulation of the published AWP. Given the needle and haystack problems that would be associated with any attempt to cull out the minuscule number of purchasers (if they in fact exist) who did not pay for Lupron® based on AWP or who did not receive a bill for a free sample, the inclusion of all purchasers of Lupron® in the class is an expeditious means of insuring that all purchasers who were affected by the scheme receive relief.

(c) Typicality

[6] "A sufficient nexus is established [to show typicality] if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 686 (S.D.Fla.2004) (finding that representatives were typical of plaintiffs subject to an overcharge for a prescription drug despite the fact that class members paid for the overcharge in different ways) (quoting *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984)). "Although [the plaintiffs] may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 28 (D.D.C.2001) (finding representatives' claims typical despite the fact that some class members bought prescription drugs directly while others bought from agents or wholesalers at various rates) (quoting *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 9 (D.D.C.1992)). Typicality is not a demanding test. *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir.1993).

Intervenors challenge the typicality of the claims of the class representatives, relying on the briefs filed by the defendants prior to the hearing on the certification of a litigation class asserting that no class representative actually paid for Lupron® at the AWP.[FN30] The challenge is without merit. The court is satisfied, based on the affidavits presented by the MDL plaintiffs, that the Lupron® purchases of the class representatives were impacted by TAP's publication of an inflated AWP for Lupron®. The class representatives, in common with all other class members, claim to have been damaged by the defendants' price manipulation scheme. They claim to have been unaware of the fraudulent conduct in which the defendants were engaged. They seek to recover the maximum amount of damages possible, as would any member of the class, and they seek to do so under the civil RICO statute and state consumer protection laws, as would most of the members of the class. In sum, I find that the claims of the class representatives*90 are typical of those of the members of the class.

> FN30. Intervenors additionally assert that the class representatives are not typical of class members who have claims based on the diversion theory pressed by Intervenors' counsel in the North Carolina state court action in that no class representative claims to have been victimized by this alleged scheme. The complaint filed in North Carolina alleges that the Johnson & Johnson companies are liable for conspiring with TAP to sell excess Lupron® to doctors in North Carolina, a "Least Costly Alternative" (LCA) state, at a discount. The defendants then allegedly allowed or encouraged doctors to resell the surplus Lupron® in non-LCA states at a profit, as a means of preserving Lupron®'s market share at a time when doctors were switching their patients to Zoladex® because of LCA programs. Assuming that these allegations are true, they simply represent a variant in the overall marketing scheme resulting in the same generic injury-economic damages-suffered by the class representatives. See *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311-312 (3d Cir.1998) (rejecting the argument that to satisfy the typicality requirement, the class representatives must share every form of injury suffered by the class); *City P'ship*, 100 F.3d. at 1044 (same).

(d) Adequacy

"The [adequacy] rule has two parts. The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985). "In complex actions such as this one, named plaintiffs are not required to 'have expert knowledge of all details of the case, ... and a great deal of reliance on the expertise of counsel is to be expected.' " *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1416 (E.D.N.Y.1989) (citation omitted).

Intervenors challenge the adequacy of the class representatives, but the challenge is lacking in analysis, and for the most part appears to be the product of sloppy investigation.[FN31] The Intervenors first accuse the TPP representatives, Twin Cities Bakeries and Beacon Health Plans, of being "professional plaintiffs." Even if the accusation is true (no evidence suggests that it is), it has no relevance to the competence of these TPPs to act as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives of the TPP class. If anything, experience with prior similar litigation and knowledge of the legal issues involved enhances their role as class representatives. Intervenors also complain that the consumer representatives are reluctant role players who lack knowledge of allocation issues, the scope of the releases granted to the defendants, and the settlement in general. These allegations are not borne out by the record. Mrs. Brickey, in her capacity as the executor of the estate of William Brickey, submitted to a seven hour deposition at the defendants' request. There is nothing surprising in the fact that Mrs. Brickey and Mrs. Goetting, the widows of the original class representatives, are unschooled in the intricacies of the legal process or the complexities of prescription drug pricing. They are, however, fully aware of the circumstances in which their husbands purchased Lupron®. During the Fairness Hearing, consumer class representative William Porter (who is 78 years old) gave a telephone deposition in which he demonstrated a full understanding of the settlement and the consequences of the release being offered to the defendants. Intervenors also argue that a number of potential conflicts exist among class members. Those that are identified are illogical. Individual differences in damages suffered do not create a class conflict when recovery varies in direct proportion to the amount of individual damages incurred. The fact that a SHP may be able to pull into the SHPs group benefit plans that it has a contractual right to represent does not create a conflict by allowing a SHP to "steal" from the TPP class. There is nothing untoward about contracts for representation, and the only likely effect of a SHP's exercise of the right to appropriate a claim is the revenue-neutral shift of a payment that would be made in any event from one pool to the other. Also, unlike the situation in *In re General Motors Corp.*, 55 F.3d at 800-01, where the class representatives were individual truck owners whose interests were in conflict with unrepresented fleet owners who received a less generous settlement, the Lupron® class representatives include both TPPs and consumer-purchasers. No objector has complained of any disparity in the benefits negotiated on behalf of consumer-purchasers and TPPs giving rise to an intra-class conflict. Nor are there any potential disparities in possible recoveries under state law of a significant enough magnitude to warrant separate state proceedings.[FN32] In *91 sum, I find the representation to be adequate.

FN31. With respect to the second component of the adequacy of representation prerequisite, the Intervenors make a rhetorical attack on the competence of MDL plaintiffs' counsel, accusing them of being "feeble," "disarmed," "ineffectual," and interested only in their fees, but without citing anything by way of evidentiary support for these insults (other than reckless claims of conflicts of interest that were exposed at the Fairness Hearing as false). The court has previously found MDL counsel to be highly competent and zealous in their pursuit of the interests of the class. Nothing said in the Intervenors' brief or adduced at the Fairness Hearing would cause the court to revise that finding.

FN32. Intervenors claim that certain MDL plaintiffs' counsel face ethical conflicts because of their involvement in other drug pricing cases. Intervenors, for example, assert that the lead class counsel represents the State of Nevada in a suit involving similar Lupron® claims. In fact, the Nevada lawsuit does not involve Lupron®, but other drugs. A similar accusation that one of the class counsel represented doctors suing certain SHPs who were also plaintiffs in the MDL action proved equally untrue.

(e) Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws." *Id.* at 625, 117 S.Ct. 2231. "Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain," for "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)." *Smilow,* 323 F.3d at 40. *See also Tardiff v. Knox County,* 365 F.3d 1, 6-7 (1st Cir.2004) (the certification of a litigation class of individuals subjected to illegal strip searches was not improper despite the fact that individual damages would inevitably vary depending upon each individual's claims of emotional distress, lost wages, and medical bills). Similarly, "where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

individual issues were present in one or more affirmative defenses," for "[i]f ... evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms." *Smilow*, 323 F.3d at 39-40. See also *Waste Mgt.*, 208 F.3d at 296 ("Although a necessity for individualized statute-of-limitations determinations invariably weighs against class certification under Rule 23(b)(3), we reject any per se rule that treats the presence of such issues as an automatic disqualifier."); *Tardiff*, 365 F.3d at 5 (noting that the probability that some members of the class were lawfully strip searched did not defeat class certification, since class members could be grouped by the seriousness of the crime for which they were arrested); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-63 (7th Cir.2004) (Posner, J.) (affirming a RICO class certification and suggesting procedural mechanisms that at a later stage in the proceedings could be used to address the issues of whether particular class members were defrauded and the extent of any corresponding damages).

Courts dealing with allegations of pricing fraud in an analogous antitrust context have generally found common issues to predominate despite individual differences in amounts paid, the method of payment, and potential knowledge of the fraud. *See, e.g., In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir.2002) ("Key questions will not revolve around whether Appellees knew that the prices paid were higher than they should have been or whether Appellees knew of the alleged conspiracy among Appellants. Instead, the critical inquiry will be whether 'defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members in each class.'") (citation omitted); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (E.D.Mich.2001) ("The courts have routinely rejected similar arguments, despite differences in prices paid by class members, where the plaintiffs show that the 'minimum baseline for beginning negotiations, or the range of prices which resulted from negotiations, was artificially raised (or slowed in its descent) by the collusive actions of the defendants.'") (quoting *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D.Fla.1998) (internal citations omitted)); *Terazosin*, 220 F.R.D. at 694-700 (finding plaintiff purchasers of drugs showed predominance of common issues in a suit alleging increased prices from antitrust conspiracy to prevent generic competition). But see *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 147-49 (4th Cir.2001) (decertifying class in part because of the possible contributory negligence of contractors who may have failed to follow instructions in installing defendant's house siding product); *Markarian v. Conn. Mutual Life Ins. Co.*, 202 F.R.D. 60, 63-70 (D.Mass.2001)*92 (denying certification in part because despite evidence that company may have encouraged salespersons to use a misleading sales pitch, determination of whether it was actually used in particular cases would require individual inquiry).

Here, issues common to the class predominate over those that are personal to class members. The core factual issues involve the manner in which the defendants marketed Lupron® to physicians; the methodology of the Medicare and private-payor reimbursement systems; the effect of competition from Zoladex® on Lupron®'s market share; and the impact of the defendant's marketing scheme on the actual price of the drug. As previously observed, the need to establish the elements of a civil RICO claim-the conduct of an enterprise through a pattern of racketeering activity-poses mixed issues of fact and law common to the class. Individual issues, on the other hand, primarily involve the amount of damages to be awarded to individual class members, a factor disfavored in determining predominance. While the extent to which individual class members were aware of the defendants' marketing scheme might weigh against certification, particularly in the case of the larger insurers that were arguably aware that the AWP for Lupron® was an artificial number, these entities are part of the SHPs group that has settled outside of the class.[FN33] Thus, this issue does not create individual predominance.

> FN33. Intervenors finally note some differences in the state consumer protection laws plead by various members of the class. These differences, however, do not pose a serious obstacle to certification. See *In re Prudential Ins. Litig.*, 148 F.3d at 315 ("Courts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit."); *Mowbray*, 208 F.3d at 292, 296-297 (variations in twenty states' laws concerning reliance, waiver, and statutes of limitations did not cause individual issues to

predominate). In any event, the issue is one of manageability, which is not a consideration in the certification of a settlement class. *See* <u>Amchem, 521 U.S. at 620, 117 S.Ct. 2231</u>.

(f) Superiority

<u>Rule 23(b)(3)</u> requires a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy."
The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " <u>Amchem, 521 U.S. at 615, 117 S.Ct. 2231</u>. "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative-no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied-to no litigation at all." <u>Carnegie, 376 F.3d at 661</u>.

The superiority analysis dovetails with the predominance analysis. The issue here is one that lies at the very heart of the invention of the class action as a litigation vehicle: few, if any, members of the settlement class have incurred damages in an amount sufficient to justify the costs of pursuing an individual action. That fact alone makes a class action the only means by which most class members can obtain redress. Even if the claims could be prosecuted individually, their sheer number would make it unlikely that any significant number would be resolved during the lifetimes of the consumer class members. The court finds that under the circumstances, a class action is superior to any other mechanism for adjudicating this case (including joinder).<u>FN34</u>

FN34. In the court's experience, joinder of parties for trial in numbers above two dozen is unworkable.

*93 (g) Ascertainability of the Class

[7] "The proposed class must be precisely defined and its members must be ascertainable through the application of 'stable and objective factors' so that a court can decide, among other things, 'who will receive notice, who will share in any recovery, and who will be bound by the judgment.' " <u>Van West v. Midland Nat'l Life Ins. Co., 199 F.R.D. 448, 451 (D.R.I.2001)</u> (finding insufficiently definite a class of persons harmed by the unspecified "wrongful conduct" of defendant's sales agents, whose practices differed from transaction to transaction). *Compare* <u>Crosby v. Soc. Sec. Admin., 796 F.2d 576, 580 (1st Cir.1986)</u> (finding that a class of disability benefits claimants who did not receive a hearing "within a reasonable time" was impossible to ascertain in any objective fashion); <u>In re Copper Antitrust Litig., 196 F.R.D. 348, 358-360 (W.D.Wis.2000)</u> (finding that the class was unascertainable where indirect purchasers had no means of knowing if they had been harmed) *with* <u>Lorazepam, 202 F.R.D. at 22-25</u> (finding that the complexities of the pharmaceutical market did not make purchasers of drugs unascertainable, and collecting cases certifying classes of direct purchasers in complex markets).

Intervenors make three challenges to ascertainability. First, they argue that self-funded plans might not know if they are members of the class. Second, they argue that the class period post-dates the notice, so that some persons who purchase Lupron® after the notice period may not know that they are in the class. Even if these persons learn of the class, Intervenors argue, they may do so after the March 15 deadline for objections and with a limited opportunity to opt out. Third, they argue that the class is "sprawling," making it difficult to ascertain the appropriate time frame and to differentiate included from excluded entities.

The first argument is without merit. A self-funded plan may determine whether it has the right to file a claim in its own name, or whether the right belongs to the SHP that administers claims on its behalf, by simply reviewing its contract with the SHP. The second argument has no relevance to ascertainability,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

but is rather concerns the sufficiency of the notice given to members of the class. The third argument is entirely unsupported by analysis, and is on its face unpersuasive. The inclusion of "all purchasers" rather than purchasers who paid in reference to AWP makes purchasers easier, not harder, to ascertain, while the opening and closing dates of the class could not be set out any more clearly than they are in the class definition.

*FAIRNESS DETERMINATION*

*General Considerations*

[8][9][10][11] While the factors to be considered in making a fairness determination pursuant to Rule 23(e) often overlap with the class certification requirements of Rule 23(a) and (b), a court is required to analyze fairness as a separate and distinct issue. Rule 23(e) "was designed to function as an additional requirement, not a superseding direction, for the 'class action' to which Rule 23(e) refers is one qualified for certification under Rule 23(a) and (b)." Amchem, 521 U.S. at 621, 117 S.Ct. 2231. While settlement and compromise are favored by the law, the court has a fiduciary duty to absent members of the class in light of the potential for conflicts of interest among class representatives and class counsel and the absent members. "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims." In re General Motors Corp., 55 F.3d at 805. Approval is to be given if a settlement is untainted by collusion and is fair, adequate, and reasonable. "When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." City P'ship, 100 F.3d at 1043. While the First Circuit has not established a formal protocol for assessing the fairness of a settlement, other circuits have identified factors deemed appropriate for consideration. The most commonly referenced factors were identified by the Second Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir.1974), overruled on other grounds by Missouri v. Jenkins, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989):

*94 (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463 (citations omitted). As a prelude to consideration of each of each of these factors, the court will briefly describe the negotiations that produced the proposed settlement and the principal objections tabled by the Intervenors, and principally the allegation that this is a collusive settlement.

[12][13] The storm warnings indicative of collusion are a "lack of significant discovery and [an] extremely expedited settlement of questionable value accompanied by an enormous legal fee." In re General Motors Corp., 55 F.3d at 801. The successful negotiations that led to this settlement were consummated relatively quickly (they appear to have been concluded in one or two days). However, the negotiations must be viewed in the context of the litigation as a whole.[FN35] The successful negotiation built on an earlier, three-month attempt to reach a settlement in 2003. The negotiations were not bilateral. MDL counsel wisely chose to secure separate and independent representation for the two distinct subclasses, the consumer-purchasers and the TPPs. At the Fairness Hearing, the court heard the testimony of Gregory Cox, the lead counsel in the Texas Lupron® action, and Stephen Rosenfeld, an attorney with extensive experience in pharmaceutical litigation (who is not affiliated with the MDL steering committee). Cox and Rosenfeld were designated to represent consumers in the negotiations. Operating on the assumption that the consumer share of the damages might amount to at most 15 percent of the total damages, Rosenfeld testified that his (and Cox's) primary objective was to maximize their percentage recovery from the settlement fund. The achievement of that objective over the resistance of the more powerful SHPs group is strong evidence of the arms-length nature of the negotiations. A secondary objective of the consumer representatives, insuring that any unclaimed funds did not revert to TAP, was also achieved.

> FN35. One of the concerns with so-called "drive by" class actions is that the court called upon to certify the class and approve

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the settlement is presented with a fait accompli and has no independent means of verifying the lawyers' representations. Here, several years of hotly contested litigation has educated the court in the factual and legal intricacies of the case and the relative strengths and weaknesses of the parties' respective positions.

Intervenors' criticism is directed less at the percentage of the allocation of the fund to consumers than at the size of the fund itself, which they contend would be larger but for a "reverse auction" orchestrated by the defendants. The only support offered for this allegation is the affidavit of Geoffrey Miller, a New York University law professor, which while instructive on the theory of reverse auctions, disavows any familiarity with the negotiations in this case. Intervenors' stronger argument is that the impetus to settle on defendants' part arose from the impending *Walker* trial in New Jersey (where attorney Haviland serves as lead counsel), and that the defendants found the MDL steering committee to be a more pliant negotiating partner than Kline & Specter as the latter would have insisted on a larger settlement fund in exchange for a release. This would be a persuasive argument if it were true. I credit defendants' representation that the global peace that they desired could never have been negotiated with Kline & Specter. The firm represents less than 5 percent of the national pool of consumer-purchasers and more critically, almost none of the TPPs, the entities with claims of 90 percent of the damages. As a consequence, a settlement with Kline & Specter was never considered a realistic alternative, and hence no global negotiations were ever undertaken with the firm.

Intervenors' final substantive objection is that the release agreed to by MDL counsel is *95 broader than warranted by the size of the settlement. Intervenors offered two witnesses on the subject, Ms. Samsell, who is involved in a dispute with her insurer over coverage for Lupron®, and Steven Rowan, a prostate cancer patient who appears to have been the victim of fraudulent billing by his treating clinic. Both witnesses had been told by Kline & Specter that the release would extinguish their claims. An attorney appearing for Robert Swanston, the class representative in the Arizona action, argued that the release given to TAP might conceivably be interpreted as immunizing other pharmaceutical companies which Swanston alleges conspired with TAP in the manipulation of the AWP of other drugs. As to the first two issues, MDL counsel agree that the only claims extinguished by the release are those related to defendants' marketing, pricing, and sale of Lupron®.[FN36] The release would have no affect on insurance coverage disputes or on overcharging claims unrelated to TAP's conduct. Insofar as *Swanston* is concerned, the release of TAP would have no affect on the liability of any alleged coconspirator. It has always been the law that a legally immune party may be part of an actionable conspiracy.[FN37] *See, e.g., Standefer v. United States, 447 U.S. 10, 15-21, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980)*. While the issue of the release of physicians who prescribed Lupron® was not a subject of testimony at the Fairness Hearing, it is touched upon in the Intervenors' brief. However, as MDL counsel point out, their RICO enterprise theories involving physicians were dismissed by the court as either failing the RICO tests of association, organization and control, or if brought individually against 10,000 urologist enterprises as totally impracticable and unmanageable. *In re Lupron® Litig., 295 F.Supp.2d at 173-174 & n. 27*. Consequently, MDL plaintiffs' counsel state, and correctly so, that in releasing the claims against the urologists, they gave up little of consequence.[FN38]

> FN36. I agree with Intervenors that as written the release does not make the point as clearly as did MDL counsel at the Fairness Hearing that it is intended to cover only conduct related to defendants' alleged fraudulent activity in marketing Lupron®. I will ask that the Proposed Final Judgment clarify the scope of the release in this respect.

> FN37. Intervenors also complain of the absence of prospective injunctive relief barring TAP from engaging in similar overpricing in the future. I agree with the MDL parties that the Corporate Integrity Agreements entered by TAP with the United States Government and the State Attorneys General make any such relief redundant.

> FN38. MDL counsel also note that neither Intervenors' counsel nor anyone else has actually brought a direct claim against a urologist.

*The Grinnell Factors*[FN39]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN39. I have not considered one of the traditional *Grinnell* factors, the risks of maintaining the suit as a class action through trial. As Judge Scirica observed in *In re Prudential Ins. Litig.*, 148 F.3d at 321, this factor is largely irrelevant in settlement-only cases as *Amchem* does not require a manageability inquiry in a settlement context.

(a) the complexity, expense and likely duration of the litigation

The continued litigation of the case would be noxiously burdensome to all involved, given the twenty year duration of the alleged RICO conspiracy, the involvement of a foreign party (Takeda), and the differing orders of proof required to establish (or defeat) the claims of the consumer and TPP subclasses. MDL plaintiffs' counsel report having incurred over $14 million in fees and over $1 million in costs to date. I have to assume that the costs incurred in defending the case are of a similar magnitude and are compounded by the rearguard skirmishes being fought with Kline & Specter. These costs and fees would escalate precipitously if the case were to be litigated through certification of a litigation class, summary judgment and the two or four trials (depending on the bifurcation of liability and damages as between the two subclasses) that would be required to achieve a comprehensive verdict. This process would reasonably take another two to three years to complete, and at least another year to resolve on appeal. Given the fact that many in the consumer claimant class are elderly and/or ill, it is in the interest of this subclass to bring the litigation to a closure, particularly one that allows a distribution of damages, as expeditiously as possible.

*96 (b) the reaction of the class to the settlement

Absent polling data, which is not available to the court, this factor can be analyzed only by comparing the number of objectors and opt outs with the number of claimants, and by assessing the extent to which notice effectively reached absent class members. As of May 9, 2005, 10,614 consumer claims had been filed with the Claims Administrator. To date 7,123 of these claims have been processed for a total claimed amount of $15,320,831.81. The only significant number of opt outs are persons who have been excluded from the settlement by Kline & Specter.[FN40] Most of the these persons are residents of states in which the firm has no Lupron® action pending. Only forty-nine persons unaffiliated with Kline & Specter have opted out of the settlement on their own initiative and only ten persons submitted objections (several of whom are associated with Kline & Specter).[FN41] *See In re Prudential Ins. Litig.*, 148 F.3d at 318 (in assessing the weight of the objections, the district court properly considered the fact that the most vociferous objectors were persons enlisted by counsel competing with MDL counsel for control of the litigation). As previously indicated, the SHPs, the parties with the largest claim to damages, but also the group most vulnerable to defendants' affirmative defenses, have settled separately with defendants. Of the TPP class members, 880 have submitted claims, of which 286 have been processed for a total claimed amount of $39,160,604.89. None of the TPPs has objected to the settlement, and of the some 235,000 TPPs who received mail notice, only fourteen have elected to opt out. Finally, six state Attorneys General purported to exercise opt outs on behalf of the citizens of their states who are otherwise qualified as members of the consumer-purchaser class.[FN42] With respect to the effectiveness of notice, in the absence of any evidence to the contrary, I accept the testimony of Todd Hilsee that the plan he designed achieved its objective of exposing 80 percent of the members of the consumer class on three or more occasions to notice of the proposed settlement and the procedure for submitting claims, and of providing direct written notice to all TPPs that might be affected by the settlement. I have examined the materials that were used to publicize the settlement, and I agree with Hilsee's opinion that they complied in all respects with the "plain, easily understood language" requirement of Rule 23(c). In sum, I find that the notice given meets the requirements of due process.

> FN40. The Claims Administrator has received several letters from attorney Haviland purporting to exercise blanket opt outs on behalf of 783 (or as many as 978) consumers who are said to be clients of Kline & Specter. (The exact number is difficult to ascertain as the lists submitted by attorney Haviland are inconsistent). *See* Supplemental Decl. of Thomas R. Glenn. Some of the consumers on various of the lists have independently filed claims with the MDL Claims Administrator. The MDL

parties have asked that the court either strike the Haviland opt outs and give each person affected an opportunity to decide personally whether or not to join the MDL class, or at a minimum, that the court require Kline & Specter to submit proof that attorney Haviland has the authority to exercise the exclusions on each individual's behalf.

FN41. As previously noted, the objection of Paula Treskow was withdrawn prior to the Fairness Hearing. After hearing the uncontradicted statements of MDL counsel that no consideration was given in exchange for withdrawal of the objection, and that the objection was withdrawn on the merits after Treskow and her attorney had the opportunity to review the settlement documents in depth, the court will give its approval for the withdrawal as required by Rule 23(e)(4)(B).

FN42. This matter is in the process of being separately briefed after the court questioned the authority of the Attorneys General to act on behalf of private citizens without their express consent. It would appear now that at least some of the Attorneys General have come to the view that the court's scepticism is well-taken.

(c) stage of the proceedings and the amount of discovery completed

As the procedural history of the case outlined earlier makes clear, the case was in litigation for nearly four years before the settlement was reached. Some 500 boxes of documents totaling over a million pages had been produced by the defendants for review. Twenty-six depositions had been taken, including depositions of TAP's senior management. Discovery has been sufficient to give *97 counsel an informed view of the strengths and weaknesses of plaintiffs' case. More impressive, however, than the sheer volume of documents reviewed and depositions taken is the skillful use that MDL plaintiffs' counsel have made of that discovery in fending off aggressive and equally skillful motions brought by defendants, several of which had the potential of collapsing the plaintiffs' case.

(d) the risks of establishing liability and damages

[14] As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication. With respect to establishing liability, plaintiffs' principal risks arise from: (1) the complexity of the case; (2) the difficulty of establishing any uniform practice in the actual use of the AWP in marketing Lupron®, particularly Lupron® sold through TPPs pursuant to negotiated contracts; (3) the difficulty of deflecting defenses based on imputed knowledge that the AWP was subject to manipulation by the defendants, as well as apparent government ratification of the defendants' conduct; and (4) related statutes of limitations defenses.[FN43] The plaintiffs face formidable, albeit not insurmountable obstacles in presenting to a lay jury a clear, and yet legally sufficient, narrative of the evidence,[FN44] while defendants have a powerful argument that the AWP was known to Congress and large insurers to be an artificial benchmark with no real market significance.[FN45] Proving damages represents two significant risks to the consumer class: (1) a number of consumers (or their estates) would likely no longer have records available to prove the extent of their Lupron® purchases; while (2) those consumers who made flat co-payments for prescription drugs might be found to have suffered no damages at all, as a co-payment is a fixed fee that does not vary with the price of the drug in question. The TPPs, on the other hand, which account for the lion's share of the damages, were the most likely to have been aware of the manipulation of AWP by TAP and therefore the most vulnerable to TAP's knowledge defense.

FN43. In noting the risks, the court is not passing judgment on the ultimate outcome. A settlement court reviewing the fairness of a compromise does not "decide the merits of the case or resolve unsettled legal questions." Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981).

FN44. While the standard of proof in a criminal case is much higher than in a civil one, it cannot go unremarked that the government failed to win a single conviction in its trial of some dozen TAP executives and employees who were indicted for their roles in the marketing of Lupron®.

FN45. This consideration appears to have

led the government to abandon an AWP-based criminal prosecution of TAP and to substitute instead the allegations of "free sample" fraud to which TAP pled guilty.

(e) ability of the defendants to withstand a greater judgment

This defendant-oriented factor is largely neutral as there seems little doubt that TAP and its venture partners (Takeda and Abbott) are defendants with classic deep pockets.

(f) the amount of the settlement fund in contrast to the best possible recovery

In applying this test of reasonableness, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." *In re General Motors Corp.,* 55 F.3d at 806 (quoting Manual § 30.44). Measured against the civil recovery from TAP obtained by the government under the threat of debarment, the proposed settlement is roughly commensurate in size. More importantly, the sufficiency of the allotment to the consumer fund, which was initially difficult to judge because of the lack of claims experience and uncertainty as to the size of the ultimate claimant pool, now appears more than adequate to fully compensate all consumer claimants and to perhaps pay a dividend. While it is possible to hypothesize about larger amounts that might have been recovered,[FN46] as do Intervenors, *98 Judge Becker counsels: "[t]he evaluating court must ... guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re General Motors Corp.,* 55 F.3d at 806. Based on Dr. Hartman's and Dr. Rosenthal's analysis of the likely damages, the opinions of experienced MDL counsel, and my own determination that the risks plaintiffs face in establishing a viable litigation class outweigh any potential benefit to be gained by further litigation, I find that the proposed settlement lies within the range of reasonableness.

FN46. Intervenors' counsel are consistently inconsistent in their evaluation of what might optimally be recovered, ranging from $300 million with a 50 percent chance of an adverse result to literally billions of dollars with no risk whatsoever.

*ATTORNEYS' FEES AND COSTS*

Under the terms of the Settlement Agreement, and subject to the court's approval, class counsel may seek reasonable attorneys' fees not to exceed 30 percent of the $95,000,000 settlement fund (after deducting any amount that might be rebated to TAP because of TPP exclusions).[FN47] MDL class counsel have petitioned the court for an award of attorneys' fees in the amount of $23,750,000 and for reimbursement of $1,822,754.71 in costs.[FN48] The court finds the fee request to be within the range of reasonableness, given the duration and intensity of the litigation, and the results achieved.[FN49] It will, however, defer making specific findings until all outstanding motions are resolved and final judgment is entered. The award of attorneys' fees will in any event not exceed 25 percent of the settlement fund, and should the court award less, it will order any surplus to be paid into the appropriate pool. Class counsel also request that the court approve modest incentive awards totaling $100,000, including $5,000 to be paid to each named consumer plaintiff who was deposed, $2,500 to be paid to each named consumer plaintiff who was not deposed, and $25,000 to be paid to each of the named TPP plaintiffs. Incentive awards are recognized as serving an important function in promoting class action settlements, particularly where as here, the named plaintiffs participated actively in the litigation. *Denney v. Jenkens & Gilchrist,* 2005 WL 388562, at *31 (S.D.N.Y. Feb.18, 2005). Consequently, I will approve the awards as requested.

FN47. Despite the terms of the Settlement Agreement, class counsel have agreed that the collective request for fees will not exceed 25 percent of the settlement fund.

FN48. The lodestar as of the date the petition was filed, April 6, 2005, amounted to $14,503,055.50, meaning that class counsel were seeking an award at a multiplier of 1.64, a number that will shrink as additional hours are expended implementing the settlement. The court takes no position for present purposes as to the appropriateness of the requested multiplier.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

FN49. At the Fairness Hearing, MDL counsel and TAP suggested that any excess funds in the consumer pool be used to increase the percentage of the recovery allocated to consumer-purchasers, to provide for additional notice and further distribution to absent class members, or to fund a *cy pres* award to benefit the consumer class as a whole.

ORDER

For the foregoing reasons, the court will:

(1) *OVERRULE* the objections to the settlement class and the proposed settlement;

(2) *APPROVE* the withdrawal of the Treskow and Marcus objections pursuant to Rule 23(e)(4)(b);

(3) *CERTIFY* the proposed class, the court having found that the class satisfies the prerequisites of Rules 23(a) and (b);

(4) *APPROVE* the proposed settlement as fair, reasonable, and adequate for purposes of Rule 23(e);

(5) *APPOINT* interim class counsel as permanent class counsel pursuant to Rule 23(g)(1)(A);

(6) *APPROVE* the award of incentive fees to the named class plaintiffs;

(7) *DEFER* acting on the petitions for attorneys' fees and costs until all outstanding motions are resolved, including any involving disputes over the allocation of an attorneys' fee award; and

(8) *ORDER* MDL counsel to submit a joint proposed form of final judgment within *99 thirty (30) days of the court's resolution of all outstanding motions other than those concerning the award of attorneys' fees and costs.

SO ORDERED.

D.Mass.,2005.
In re Lupron Marketing and Sales Practices Litigation
228 F.R.D. 75, RICO Bus.Disp.Guide 10,888

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.