# MDL

# EXHIBIT

# 2-B

1   it's like the third strike kind of thing, and I'm just -- I

2   have to make sure that someone's going to have the utmost

3   duty and loyalty to the class.

4           MR. HAVILAND:  My problem, your Honor, is, when I

5   was at Kline & Specter, we were engaged by a number of firms

6   to work with them.  When Kline & Specter decided to pull out

7   of these cases, we were left with them.  So this is a case

8   that I had the responsibility for by a prior arrangement.

9           I want you to see the case management order that's

10  been proposed.  Andy Jackson proposed it.  We agree with it.

11  It's got coordination under CMO 9 directly.  We've always

12  agreed with the defendants that this case should be under the

13  rubric of the MDL, despite the fact it went back to state

14  court.

15          And I know you understand from Judge Stearns what

16  happened there.  Lupron was an unfortunate circumstance where

17  cases were filed at the same time and proceeded to trial in

18  state court, and it just so happens that the case got settled

19  up here.  And it got worked out with a lot of work by the

20  lawyers and the attorneys general, and it got resolved.

21          And, you know, I won't go back and revisit the fact

22  that there were thousands of folks that were unhappy about

23  that, and we were representing them directly by direct

24  retainer agreements.  It's one of the problems you have, as

25  in this case, where I represent a dozen folks directly.

1    Mrs. Howe, for instance, in AstraZeneca -- I see Mr. Wise is

2    in the courtroom -- she paid 50 percent out of pocket, and

3    the settlement doesn't accomplish her issue.  So it's still a

4    problem, but we're working together cooperatively.  We've had

5    a call about that to try to resolve that.

6              THE COURT:  It's just she's not part of the class.

7    It doesn't mean that you can't represent her separately on a

8    separate cause of action.  She's just not part of this class

9    because of the common question issue.  But putting that

10   aside, I need to trust you.  Let's get past all the legal --

11             MR. HAVILAND:  Sure, absolutely.

12             THE COURT:  I need to trust you, and I keep trying

13   to make sure that if there's a consensus among the

14   plaintiffs' team, well, I'll trust you.  But truthfully, at

15   this point, I don't trust you.  I mean, that sounds like a

16   very mean thing to say, but, you know, at some point I tell

17   people, "You make your bed, you lie in it."  You know, I put

18   aside the Stearns things -- well, okay you started a new

19   chapter -- and then there were all the problems with the

20   mediation in front of Eric Green, and there was, like, just

21   this huge human cry about what happened, and I said, "All

22   right, well, that's contested."  And then I got the

23   affidavits from these class reps saying, "I'm going to pull

24   out unless it's me," that makes me worried that you were more

25   concerned about you than you were about the class reps.  And

1   then I sealed it, and then I see this, and I feel like you

2   weren't --

3          MR. HAVILAND:  I'm concerned about those clients,

4   your Honor.  That's the number one thing.

5          THE COURT:  The what?

6          MR. HAVILAND:  I'm concerned about those clients.

7   I've always been concerned about those clients.  They're the

8   folks represented since 2001 in Lupron and this case.  This

9   case is a case that we cocounseled with the Local 68

10  counsel.  We encouraged this coordination for the

11  Keefe Bartels firm so that your Honor would know fully about

12  this, as soon as Judge Bassler got appointed with his

13  experience as a federal judge, that he would speak with you

14  and that there wouldn't be a problem.  We're trying to avoid

15  that.

16          I think Mr. Jackson will agree, we've worked

17  cooperatively to make sure that we don't have a problem.

18  Nobody wants another Lupron.  I certainly don't want another

19  Lupron, your Honor, on my card.  I want to see this thing

20  worked out where everyone is brought to the table.

21          One thing we're disagreeing with defendants on is a

22  mediation.  Judge Bassler spoke at that conference a long

23  time about mediation.  We want the mediation to be here as

24  part of the mediation your Honor has ordered.  The defendants

25  didn't agree to that.  Their cover letter said, "No, we want

1  something else."  So I don't know how that's going to play

2  out.  I suspect Judge Bassler is going to go with his

3  instincts and order that it happen here.  That's certainly

4  something we encourage.

5          MR. BERMAN:  Your Honor, this is Steve Berman.

6          THE COURT:  I need some thought from the

7  plaintiffs' team about what makes sense here, and then I need

8  to know from the defense team.  Although you don't have a

9  direct role in this, what happens in New Jersey will affect

10  you.  The last thing I want to do is to disqualify him if it

11  means that every class rep pulls out, and yet I'm worried

12  here.

13          MR. BERMAN:  Let me mention two things on that.  If

14  the class reps pull out, which I think he's -- I don't know

15  how he can do that consistent with his obligation to the

16  class, we've done an examination of this; and, unfortunately,

17  because we didn't want it to be this way, we think 99 percent

18  of the class reps that he currently has only bought drugs in

19  2004 or later.  And therefore, under your prior rulings, we

20  actually don't have consumer class reps for most of the

21  defendants at this point.

22          The second thing -- and I apologize I didn't point

23  this out earlier -- on the trustworthy issue, when I talked

24  to Professor Green about this, I think I should disclose to

25  the Court that he was very upset.  I mean, he said he

1   couldn't call me for two days, he was so angry that

2   Mr. Haviland would file the internal workings, E-mails back

3   and forth of the settlement negotiations with the Court in

4   open court, because one thing you do with Professor Green is,

5   you sign a confidentiality statement that he thinks is like

6   the bible of how you have to conduct settlement

7   negotiations.  So he was very upset and concerned that that

8   happened and is trying to figure out, you know, going

9   forward, if Mr. Haviland is one of the co-lead counsel, you

10  know, how could this work.

11          MR. HAVILAND:  Your Honor, we sought leave to put

12  that under seal, and we're still asking you.  The request for

13  that is still before your Honor.

14          THE COURT:  When you filed it, did you file it with

15  a motion to seal?

16          MR. HAVILAND:  We sent it to your Honor first as

17  your Honor had asked for with a request that it be put under

18  seal, so that if there was --

19          MR. BERMAN:  It was filed on the ECF.

20          THE COURT:  Was that a mistake in court chambers,

21  or was that a mistake of counsel?

22          MR. HAVILAND:  Well, we don't know, your Honor.  We

23  first sent it to you when your Honor asked for the

24  declaration, and we asked that it be treated under seal.

25  The ECF picked it up on the Friday before that hearing.  We

1   spoke to Robert, Mr. Sobol and I did, about sending a request

2   under seal.  I submitted that to Tom --

3          THE COURT:  Well, you must know.  Did someone on

4   your staff docket it on -- that's the only way it gets there

5   initially.  Did someone forget to put it -- did someone send

6   it over the Internet?

7          MR. HAVILAND:  I think so, yes.

8          THE COURT:  All right, so someone in your office

9   made a mistake.

10          MR. HAVILAND:  Right, and what we asked for it to

11   be under seal, your Honor, consent for it to be under seal.

12          THE COURT:  Well, it's that problem with the

13   Internet.  We can pull it off, but once it's there --

14          MR. HAVILAND:  Right, that's what we talked to

15   Robert about that day.

16          THE COURT:  In any event, I don't know what to do.

17   I must say, as soon as I read it, I wanted to think about it

18   for a few days.  I want this.  I'm not doing anything

19   precipitously.  If anybody in this room wants to file some

20   thoughts for me -- at this point I actually don't even have a

21   pending motion, and yet I do have certain fiduciary

22   obligations as a court.  In the meantime, regardless of how

23   this works, I need you to do something about that New Jersey

24   action.  They're under the impression, because you said it,

25   that you're pursuing a national class action.  Regardless of

1   whether you're co-lead or not, I'm going to enjoin that.

2   That needs to end with respect to the overlap here.

3         MR. HAVILAND:   Right.   I think your Honor's

4   suggestion to just stipulate to it, we're happy to do that

5   with Mr. Jackson and get the New Jersey court to enter it so

6   that your Honor then has that, which it shows in the record

7   in New Jersey it's not happened.   That letter was sent in

8   response to a letter that Mr. Jackson had written asking

9   about the framework for the discussion with Judge Bassler,

10   and we cited, as I said, the complaint, which originally

11   sought the New Jersey class pre the Supreme Court in Vioxx,

12   pre any of this.   So --

13         THE COURT:   Well, I may be misremembering.   I

14   believe that the Hagens Berman Sobol, whatever the whole name

15   of the firm is, filed a memo saying that it was basically

16   beyond dispute right now that you can't certify a state court

17   class action that's national.   Something to that effect,

18   right?   It was somewhere in one of your briefs, through state

19   court as opposed as through Federal Court.

20         MR. SOBOL:   Oh, well, newly filed actions under

21   CAFA.

22         THE COURT:   Right.

23         MR. SOBOL:   But this is, Operating Engineers, the

24   New Jersey case is pre-CAFA.

25         THE COURT:   So it's predating it.

1          MR. SOBOL:  Right.  If your Honor may, I think that

2     the co-lead counsel -- well, it sounds like Mr. Haviland

3     would like to file something, so can we have a date for that

4     just so you would have a date that you would be expecting to

5     see something from us?

6          THE COURT:  A week?

7          MR. SOBOL:  Is that doable, Mr. Berman, a week?

8          MR. BERMAN:  A week is fine.

9          THE COURT:  I don't know if Baxter wants to say

10    anything or AstraZeneca.  I don't know.  I'm troubled.  I

11    actually don't have anything in front of me.  I sort of with

12    some misgivings, I guess, agreed to your settlement because

13    of the profound riff that had existed before and what I knew

14    about Judge Stearns's case and my concern about the

15    affidavits coming in that Friday before.  I just bit my

16    tongue and I agreed to it on the theory that, well, it was --

17    it was a majority vote?  Was that how it worked?

18         MR. SOBOL:  Well, that's right, your Honor.  And,

19    of course, as you can expect, one of the reasons we entered

20    into the stipulation was to avoid the need for the Court to

21    have to grapple with the issues too.

22         THE COURT:  In any event, I agreed to it and I

23    appointed him to it.  And then literally within two days I

24    got this phone call, and I have been worried because it is, I

25    think, ultimately my call as to what's going to serve the

1   best interest of the class, and there's now a trust issue.

2           MR. HAVILAND:  Well, your Honor, since the time of

3   that agreement, we had a productive call.  We don't want to

4   talk about the logistics of what's going on in the settlement

5   discussions, but it was raised, the issue of the rearview

6   mirror stuff, the BMS and the Astra settlement.  And I

7   learned some things that I didn't know from the time that we

8   were taken out of the loop that were encouraging, that could

9   resolve that.  And I don't want to say too much about where

10  that's at and where we're working, but we're working

11  cooperatively.  A lot of the issues were vetted that they

12  hadn't been before, and that's essentially what we were

13  trying to get to when we reached the agreement with

14  Mr. Sobol.

15          THE COURT:  I'm going to take this under

16  advisement.  I just need to think about it.  I obviously

17  wasn't going to do anything without seeing folks, but, for

18  example, I don't know how you represented to this New Jersey

19  court that you were co-lead counsel when that was so

20  embattled at that point.

21          MR. HAVILAND:  Well, your Honor, in fairness, we

22  believed from the time that we came in in August of '05 that

23  all the papers had us listed as co-lead counsel.  There never

24  was a dispute until AstraZeneca.  That's the point in time

25  when it became a question.  Your Honor had -- there was an

Page 26

1    entry of appearance for us in September, '05, so we never had

2    cause to question that as the Haviland Law Firm.  When we

3    were Kline & Specter, there was never an express appointment

4    there either, so there was always that fifth chair, your

5    Honor, if you will.  And so the embattlement came in

6    Track Two when we were talking about interim class counsel

7    becoming class counsel for Track Two, and that was the whole

8    issue of 23(g), not Track One where we had served with GSK

9    and Astra and the Track One defendants.

10           THE COURT:  It says, "The undersigned lead counsel

11   for plaintiffs in this action have been recognized by the

12   Boston Court as one of the co-lead counsels for class

13   plaintiffs in MDL 1456."

14           I think a fairer or truer statement would have been

15   that this is -- you've taken the position that you've always

16   been one, the other lead counsel had taken the position that

17   you weren't, and this would be decided by me, right?  I mean,

18   I remember you always sitting back there and there not being

19   a battle, but I truthfully don't know the little nuances and

20   the niceties until it was briefed to me between the -- with

21   the split-off from Kline & Specter and your new firms.

22           MR. HAVILAND:  And, your Honor, it was all done by

23   a consensus, and none of it was vetted, in fairness.  I mean,

24   the original CMO had a firm Heins, Mills & Olson, which is no

25   longer -- they're not even around anymore.  They're still

1   here, but they're not here.  So there have been a lot of

2   changes since 2001.

3           THE COURT:  And I agree you may or may not have had

4   a valid position, but at the time you wrote this letter, it

5   was a matter of huge acrimonious disagreement.

6           MR. HAVILAND:  That's fair.

7           THE COURT:  So it was a little misleading to this

8   court, the New Jersey court, and I knew what was going on.

9           MR. HAVILAND:  But there was no intent, your Honor,

10  to deceive.  By having it vetted, by having Judge Bassler

11  coordinate with your Honor to speak, we wanted this to be

12  open, discussed.

13          One of the problems, if I can go back to something

14  that I think is not a good thing to discuss is Lupron.  We

15  didn't do that early on.  We didn't have Judge Visalli from

16  Cape May County speak to Judge Stearns and Judge Brewster

17  (Phon), the special master, speak to Judge Stearns early.  In

18  the summer of, I think, 2004, Judge Stearns was considering

19  an injunction against the state court case a month from

20  trial, and it was only at that point in time that the

21  dialogue began, that the coordination began, that the

22  resolution finally came a year later.  That's why it's

23  productive to have it, your Honor, and I encourage that in

24  all of our cases.

25          THE COURT:  And I think that is a good idea, and

1  I've done it in the Neurontin cases.  And I think over time,

2  I hope when I transfer some of these cases back, I'll be

3  talking to the judges in those federal district courts, and

4  when I start remanding cases to state courts, I'll talk to

5  those state courts.  I mean, I'm trying to get to stage two

6  of this big massive case.  The federal government is starting

7  to unleash a bunch of qui tam actions.  I mean, it's a huge

8  case, as you know, and I'll need to coordinate with the state

9  courts.

10         However, my basic obligation is to oversee this

11  case, and I am at this point troubled on the co-lead counsel

12  thing.  And although there's been nothing pending in front of

13  me, I need your thoughts on what your position is and what's

14  in the best interest of the class.  If you want to file

15  something, Mr. Haviland, you should probably do this within a

16  week.  If anyone here wants to file something, you can.

17  Regardless of how I rule on it, I order that you dismiss any

18  of the cases that conflict with this one.

19         Now, you may have to do something -- I'm pointing

20  to the Baxter folks -- may have to do something with respect

21  to that case.  I don't know.  You do your own thing.  I can't

22  have jurisdiction at this point over the rest of the case

23  that doesn't overlap with mine.  I mean, you might be better

24  off there.  I mean, I'm just swamped with this case, so you

25  might get better attention from what seems like a lovely and

1   experienced, probably more experienced than I am, federal

2   judge who's doing this down in New Jersey for the state

3   court.  So that's your call, but I need to take care of this

4   case.

5              MR. SOBOL:  The July 27 letter that you mentioned,

6   it's a letter -- I just want to make sure -- we're going to

7   try and get copies because we'll need to read it.

8              THE COURT:  July 27 to the Honorable William G.

9   Bassler from Donald D. Haviland, Jr., cc:  John Keefe, Jr.,

10  Andrew Jackson, Esq., Michael Rosenberg.  I'll just leave it

11  here, and you can underline it.

12             MR. SOBOL:  Well, Mr. Haviland has indicated that

13  he'll get us a copy now that I know exactly which letter it

14  is.  Thank you.

15             THE COURT:  In any event, so something within a

16  week?

17             MR. JACKSON:  Your Honor, to the extent that

18  they're going to file something, I think we'd like to look at

19  it first --

20             THE COURT:  Fair enough.

21             MR. JACKSON:  -- before the defendants either here

22  or in New Jersey or elsewhere.  I mean, we'd like to see it,

23  and then we'll decide whether we need to respond.

24             THE COURT:  To the extent the case does stay in

25  New Jersey, though, Judge Bassler and I are talking.  As you

1    know, Judge Bowler is the coordinating magistrate judge on

2    this case -- I gave him her phone number -- to the extent

3    there are outstanding discovery issues that could be

4    coordinated between the two actions, and I am happy to help

5    that out.  That having been said, as soon as we stay it with

6    respect to all the cases that are here, I'm not sure that

7    there will be a lot of overlap anymore.

8              MR. HAVILAND:  Your Honor, can I show you the case

9    management order that's under consideration just so you can

10   see that we've already got that built in?

11             THE COURT:  Okay.  I think that's it, right?

12             MR. SOBOL:  Thank you, your Honor.

13             THE CLERK:  Court is in recess.

14             (Adjourned, 10:45 a.m.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS     ) ss.
CITY OF BOSTON                )

         I, Lee A. Marzilli, Official Federal Court
Reporter, do hereby certify that the foregoing transcript,
Pages 1 through 30 inclusive, was recorded by me
stenographically at the time and place aforesaid in Civil
Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical
Industry Average Wholesale Price Litigation, and thereafter
by me reduced to typewriting and is a true and accurate
record of the proceedings.
         In witness whereof I have hereunto set my hand this
13th day of September, 2007.




         /s/ Lee A. Marzilli
         _____

         LEE A. MARZILLI, CRR
         OFFICIAL FEDERAL COURT REPORTER