# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO PROPOSED NATIONWIDE CLASSES 2 AND 3 AS TO ASTRAZENECA AND BMS | Civil Action No. 01-CV-12257 PBS<br><br>Hon. Patti B. Saris |

## DEFENDANT BMS's MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY NATIONWIDE CLASSES 2 & 3

<u>Preliminary Statement</u>

In its first class certification decision in this MDL, this Court wrote that "the trial of a [Massachusetts] statewide class will provide important information for an accurate evaluation of claims under other states' laws." <u>In re Pharm. Indus. AWP Lit.</u>, 230 F.R.D. 61, 86 (D. Mass. 2005) ("AWP Class Cert. I"). The experience from that trial confirms the weight of legal authority (which has only grown since the Court's 2005 decision) that plaintiffs cannot satisfy Fed. R. Civ. P. 23 as to their proposed classes under multiple states' consumer protection statutes. Nor can a class be certified on any issue where knowledge is a relevant factor because knowledge – by definition – will vary from class member to class member.

For both Classes 2 and 3, the Court faced a number of difficult issues of fact and law in the first trial, including whether the third-party payor ("TPP") plaintiffs should be treated as "businesses" or "consumers"; whether there was a privity or transaction requirement between plaintiffs and defendants; the extent to which knowledge of plaintiffs' employees, subsidiaries and agents should be attributable to principals; and what was the appropriate beginning and end date for the class. <u>A fortiori</u>, consideration of these issues by the Court and a jury under 38 different state statutes (implicating such disparate issues as defendants' state of mind, plaintiffs' sophistication/knowledge of the alleged fraud, plaintiffs' lack of reliance on the alleged misstatements, proximate cause, duty to mitigate, fraudulent concealment, statutes of limitation and punitive or multiple damages) presents an insurmountable barrier to certification.

Plaintiffs' proposed solution -- in which they purport to harmonize the requirements of myriad different statutes by taking on the burden of proving common law fraud -- does not solve the problem. In fact, such a "grand bargain" (accepting a stricter legal standard in exchange for a bigger class) is fundamentally flawed as a matter of law under Fed. R. Civ. P.

23.  Either (a) the named plaintiffs and their counsel are inadequate representatives/counsel for those absent class members in states that provide for liability based on a lower standard such as "unfairness" or (b) the class action contemplated by plaintiffs is not superior to separate class actions under distinct state statutes because if defendants win the fraud trial in this Court, the parties (and numerous other courts around the nation) will still have to deal with a multiplicity of subsequent lawsuits in other venues under the lower standards.[1]

Even if the grand bargain were acceptable, it nevertheless remains that the proposed Class 3 cannot be certified for reasons that the Massachusetts-only Class 3 trial made obvious.  Outside of Medicare, each Class 3 TPP reacted to AWPs individually based on its own knowledge and competitive dynamics.  As Blue Cross Blue Shield of Massachusetts ("BCBSMA") witness Deborah Devaux testified, "we don't blindly follow CMS, because what the Government can do and what is sustained by the marketplace . . . doesn't necessarily work for a commercial insurer."  (Nov. 7, 2006 Trial Tr. at 162; see also Testimony of John Akscin, Dec. 6, 2006 Trial Tr. at 89-91 (noting that many TPPs had not followed Medicare's use of Average Selling Prices ("ASPs") and that the insurer-physician reimbursement methodology used "depends on your locality . . . and the competitive environment there" ).)  Indeed, the Court noted that the continued use by BCBSMA of AWPs with full knowledge of the savings to be had by switching to Medicare's ASPs jeopardized any claim that deception caused the loss.[2]

Plaintiffs cannot get around this problem by selecting Taft-Hartley funds as class representatives and claiming that they are "blissfully ignorant" about AWPs and physician reimbursement.   First, even plaintiffs' expert admitted that such funds vary in their degree of

---

[1] Plaintiffs' back-up plan of having the jury answer numerous interrogatories that (they contend) might allow this Court to apply the lower standards is also unworkable.

[2] See, e.g., Comments by Court, Nov. 7, 2006 Trial Tr. at 201 ("I've got some concern today after what I've heard today about BlueCross BlueShield, because they didn't change their position.").

sophistication on these issues, with some being "incredibly sophisticated."  (Test. of Meredith

Rosenthal, Ph.D., Nov. 15, 2006 Trial Tr. at 32.)  Second, as the named plaintiffs in the

Massachusetts-only trial demonstrated, while the funds may be self-insured from an economic

standpoint, the actual decisions regarding physician-administered drug coverage are made by a

third-party administrator ("TPA") as part of the major medical coverage -- so it is really the TPA

that is the relevant focus of the knowledge/reliance/causation inquiry for class issues.  Third, it is

virtually an axiom of class action jurisprudence that, in the absence of an efficient market (such

as that which often exists in securities cases) where there can be a presumption of reliance, fraud

claims cannot be certified for class treatment because individual issues predominate over

common ones.  See generally In re Polymedica Corp. Sec. Lit., 432 F.3d 1, 7 (1st Cir. 2005);

Castano v. Am. Tobacco Co., 84 F.3d 734, 735 (5th Cir. 1996).

>            For all these reasons and others (described below), the motion for class

certification should be denied.

### Factual and Procedural Background[3]

AWP Class Cert. I

>            In AWP Class Cert. I, this Court noted that "'[i]n a multi-state class action,

variations in state law may swamp any common issues and defeat predominance.'" 230 F.R.D. at

82 (quoting Klay v. Humana, Inc., 382 F.3d 1241, 1261 (11th Cir. 2004)).  The Court suggested

that, "in the context of claims of consumer-patients under Medicare Part B, [i.e., Class 1] these

---

[3]  BMS incorporates by reference the discovery record, independent expert's report and briefing that led to the
Court's AWP Class Cert. I decision.  [Dkt Nos. 1129, 1132, 1159-67, 1222, 1224, 1292, 1306-07, 1327-28, 1369,
1384, 1609-11, 1653-54].  BMS also incorporates by reference the briefing by the so-called "Track 2" defendants on
plaintiffs' motion for class certification as to them.  [Dkt Nos. 2829, 2832-33, 3018, 3020-26, 3119, 4740.]  In this
section, BMS highlights some of the more pertinent aspects of the prior record, report and briefs, as well as relevant
portions of the trial of the Massachusetts-only Class 2/3 claims, which show why the nationwide classes proposed
herein does not satisfy Fed. R. Civ. P. 23.

variations are unlikely to be material." Id. at 85.  Where the claims are brought on behalf of

TPPs, as with Classes 2 and 3, the potential for individual issues to predominate is far greater.

      As the Court acknowledged in AWP Class Cert. I, "[s]ome TPPs might have

greater sophistication with respect to spreads," and it suggested that class certification might not

be feasible if TPPs purchase physician administered drugs ("PADs") or have knowledge of

"mega-spreads." Id. at 86.  The Court also opined that some consumer protection statutes do not

permit corporations, unions and entities "to bring such class actions" and that "those that do have

widely varying requirements."  Id.  The Court refused to certify a nationwide class because

plaintiffs had failed to propose feasible groupings of the state consumer protection statutes.  It

certified Class 2 only under Mass. Gen. Laws ch. 93A.  Id.

      The Court struggled even more with the proposed nationwide Class 3 for

physician administered drugs outside of Medicare Part B.    After taking a "sneak peak" at the

plaintiffs' "yardstick" theory of liability and damages, the Court wrote that:

> TPPs' injuries vary  based on their individual expectations of the price and their
> reimbursement ra tes.  … [P]laintiffs have not adequatel  y ex plained how each
> class member will show where its expectation as to the spread between AWP and
> ASP falls within the [Hartman-theorized] 18% to 33% range (and hence damages)
> absent an individual trial.
>
> Additionally, plaintiffs admit that defendants may be entitled to a jury      trial on
> defenses such as when, if ever, individual TPPs had sufficient knowledge to
> trigger the statute of limitations and whether the market power of the doctors with
> whom a TPP deal was an intervening cause of damages, breaking the causal chain.
> To further complicate matters, the allegations span a decade requiring
> individualized inquiries concerning each TPP in different time periods.
>
> While it is conceivable that a method such as grouping          categories of class
> members . . . may   be feasible  – particularly s ince the number of TPPs covering
> physician-administered drugs in Massachusetts would be a small subset of the
> national class – plaintiffs have failed to explain why  class certification is su perior
> if an extensive separate trial will be needed for each TPP at the damages phase.

Id. at 91 (footnote omitted, emphasis added).  While the Court ultimately certified Class 3 for

Massachusetts only, it expressed concern about the "varying standards and burdens" of the laws of other states.  Id. at 90.

The Massachusetts-Only Class 2/3 Bench Trial

At the Massachusetts-only trial, the Court sat for "twenty days," heard "nearly forty witness" and received in evidence "hundreds of documents and deposition transcripts," 491 F. Supp. 2d 20, 30 (D. Mass. 2007) -- much of which related to one plaintiff, BCBSMA, which insured "46% of the covered lives in Massachusetts."  Id. at 46.  The Court had to apply only one statute, Mass. Gen. Laws Ch. 93A, but was forced to deal with numerous state law issues beyond the traditional legal elements of deception, unfairness, causation and damages.  For example, the Court had to consider whether the named TPP plaintiffs, as a not-for-profit, could sue under Section 9 or Section 11 of Mass. Gen. Laws Ch. 93A.  Id. at 80-82.  The parties also briefed the "transaction requirement" – whether, under, Section 11 plaintiffs and defendants had to have some transactional privity for the statute to apply.   (See, e.g., Dkt No. 3326.)  In addition, the Court flagged the legal question of "when is the knowledge of an employee or agent imputed to the principal" as being important to resolving whether the understanding of BCBSMA's present and former employees of AWPs and reimbursement issues defeated the corporation's claims. (Dec. 8, 2006 Trial Tr. at 76-77.)

This last issue was extremely important because the proof at trial revealed that not only is TPP "knowledge" a highly individualized issue across proposed class members, but also knowledge may vary within an organization.   BCBSMA had employees that handled Medigap and commercial insurance.  It had employees who were formerly pharmacists (Gary Schramek) or who worked with others in staff-model HMO subsidiaries (Ed Curran, Sharon Smith) and thus had access to drug prices, as well other employees who came from other TPPs and brought their

learning about AWPs from their past jobs (e.g. John Killion, Deborah Devaux).  It also had

employees (like Maureen Coneys, whom plaintiffs called to testify at trial) who had little

exposure to pricing and reimbursement issues at all.

On the issues of deception and statute of limitations, the Court had to consider not

only the actual individualized knowledge within BCBSMA,[4] but also what a reasonable TPP

might be charged with knowing about AWPs and spreads.  491 F.Supp.2d 78-79.  The Court

traced the history of HHS OIG reports, news articles and Executive Branch initiatives and

Congressional responses from 1992 to 1997 and found that by August 1997 "sufficient facts

were available for BCBSMA and any similarly situated large TPP" for the Massachusetts' statute

of limitations to start running against them.  Id. at 79.   Because Taft-Hartley funds like

Pipefitters and Sheet Metal Workers used the big TPPs as TPAs and consultants, the Court held

that Massachusetts agency principles caused the statute of limitations to begin running against

the funds in 1997 as well.[5]  Id. at 79-80.

The Court also considered the actual knowledge of the named plaintiffs as well as

publicly-available information on issues of deception versus unfairness under M.G.L. c. 93A,

noting that one "difference between unfair conduct and deceptive conduct may turn on whether

the plaintiff had knowledge of the conduct."  Id. at 93.  The Court added, however, that neither

the statute nor the Massachusetts courts had defined unfairness.  Id.  The Court ultimately made

---

[4] The Court recognized that individualized facts, such as BCBSMA's ownership of staff model HMOs that
themselves bought PADs, could change the analysis, but it found that the "dispute [wa]s inconsequential" in light of
the timing of BCBSMA's ownership and sale of those HMOs.  491 F.Supp.2d at 79 n.47.

[5] Pipefitters had delegated all decision-making authority with respect to physician-administered drug coverage to
BCBSMA and, even after Piperfitters had joined the lawsuit, it had not questioned BCBSMA's decision to continue
paying doctors for drugs based on AWP instead of the publicly-available ASPs.  Testimony of Charles Hannaford,
Nov. 6, 2006 Trial Tr. at 183-84.   Similarly, Sheet Metal Workers used a TPA and benefits consultant called
Southern Benefit Administrators to handle that fund's physician-administered drug benefits, including those related
to supplemental Medicare Part B coverage.   Testimony of Glen Randle, Nov. 6, 2006 Trial Tr. at 204-208.  The
Court considered and rejected plaintiffs' argument based on Massachusetts law of fraudulent concealment that  there
had been any tolling of the running of the statute.  491 F. Supp. 2d at 80 n.48.

the determination that a "perfect storm" of information about mega-spreads by 2001 prevented any claims for deception after that time, but that "the conduct was still egregious under the unfairness prong of Chapter 93A because neither the TPPs nor the government could move quickly to fix the problem." Id. at 95.[6]

There was extensive proof at trial on the decision of BCBSMA to continue to reimburse at 95% of AWP even though ASPs were available after 2003. While the Court ultimately ruled that this evidence did not affect causation or impose a duty of mitigation, it acknowledged that this was a close question. See 491 F. Supp. 2d at 96-97. A jury might well come out the other way.

Finally, on the issue of causation and damages, the Court engaged in a lengthy analysis of "extremely difficult legal issues" of joint and several liability, market share liability and apportionment among tortfeasors as they relate to Class 2 claims against BMS's multi-source drugs. See id. at 98-101. The Court ultimately held that BMS should be held liable for its "individual market share[ ] for each of [its] multi-source drugs for Massachusetts, measured on an annual basis for each year of the Class Period." Id. at 101. On Class 3, the Court noted that BMS disputed plaintiffs' expert's damages calculations because its own expert's analysis of even one named plaintiff's (BCBSMA's) claims data showed that as much as 43% of the reimbursements were not based on AWP. Id. at 105. On rebuttal, plaintiffs' expert conceded the point, although he maintained that the number was only 36% for BCBSMA. (See Rebuttal Test. of Dr. Raymond Hartman ¶¶ 65-68 [Dkt No.3470].)

---

[6] In yet another interpretation of Massachusetts law, the Court ruled that even though Congress intended a "plain meaning" of AWP in the Medicare statutes and did not adopt the industry's understanding of the term, the "unfair and deceptive standard of . . . Ch. 93A is different from a strict liability statutory violation" and therefore the defendants' failure to cause the publications to publish "a true average of wholesale prices does not trigger per se liability under Chapter 93A." 491 F. Supp. 2d at 97.

<u>Argument</u>

I.      THE CONSUMER FRAUD STATUTES AT ISSUE CANNOT BE GROUPED FOR
        CLASS TREATMENT.

        As this Court noted in AWP Class Cert I, most courts have refused to certify

nationwide classes under the consumer protection statutes of various states.  230 F.R.D. at 84.  In

at least one circuit, the Court of Appeals has repeatedly rejected such attempts.  <u>See</u> <u>In re</u>

<u>Bridgestone/Firestone Inc.</u>, 288 F.3d 1012, 1018-21 (7th Cir. 2002).  Moreover, since the Court's

earlier decision on class certification, the consensus of other courts against certifying nationwide

classes under the various state consumer fraud statutes has only grown stronger.

        For example, in <u>Southern States Police Benevolent Association, Inc. v. First</u>

<u>Choice Armor & Equipment, Inc.</u>, 241 F.R.D. 85 (D. Mass. 2007), Judge Gorton refused to

certify a class of plaintiffs asserting claims under the consumer protection statutes of just eight

states, concluding "that variances in the substantive prerequisites of such claims render a

certification …unmanageable."  <u>Id.</u> at 93.  Similarly, in <u>In re Prempro Products Liability</u>

<u>Litigation</u>, 230 F.R.D. 555 (E.D. Ark. 2005), the court noted that state consumer fraud statutes

"differ with regard to the defendant's state of mind, type of prohibited conduct, proof of injury-

in-fact, available remedies, and reliance, just to name a few differences."  <u>Id.</u> at 564.  Even a

"cursory" evaluation the differences with respect to five state statutes (Arkansas, California,

Colorado, Georgia and Wyoming), led the court to conclude that "<u>none</u> of these states could

properly be grouped together" for the purposes of plaintiffs' state consumer fraud claims.  <u>Id.</u>

(emphasis in original).  Unsurprisingly, the same result has been reached in other recent cases as

well.  <u>See, e.g.</u>, <u>In re Worldcom, Inc.</u>, 343 B.R. 412, 427 (Bankr. S.D.N.Y. 2006) (rejecting effort

to "certify a nationwide class based on the consumer fraud statutes of 41 individual states and the

District of Columbia," because of "substantial differences" between the statutes "regarding

8

scienter, reliance, statute of limitations, and proof of injury"); see also Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414 (E.D. Pa. 2006) (noting that "when district courts have faced the problem of nationwide classes which seek to apply state consumer protection laws, those courts have refused to certify a class, in part because choice of law would require applying the consumer protection law of each class member's home state").[7]

## II. PLAINTIFFS' ATTEMPT TO ACCOUNT FOR VARIATIONS IN STATE LAW THROUGH JURY INSTRUCTIONS BASED ON COMMON LAW FRAUD FAILS AS A MATTER OF LAW.

Plaintiffs contend that they can overcome variations in the state consumer fraud statutes by undertaking to prove a composite claim of "common law fraud" that will allegedly satisfy them all.  They further propose additional instructions or interrogatories that will supposedly allow the Court to apply statutory consumer protection concepts, such as whether the alleged conduct is "unfair" or "deceptive," whether the "public interest" is implicated.  (Pls.' Mem. in Support of Mot. to Certify Nationwide Classes 2 and 3 Against Defs. AstraZenica & BMS ("Pls.' Mem." at 5-9 [Dkt No. 4903].)  Plaintiffs' "grand bargain," which relies on an "Esperanto" approach to merging the laws of various states,[8] does not work for several reasons.

### A. The "Grand Bargain" Of A Common Law Fraud Charge Violates Rule 23.

Rule 23 requires (among other things) that (1) the class representatives "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and (2) the class action be

---

[7] In addition, it should be noted that, the First Circuit presently has sub judice an appeal that it allowed pursuant Fed. R. Civ. P. 23(f) to review an order of the District of Maine certifying twenty state-wide damages classes under the various states' antitrust and/or consumer fraud statutes, and a nationwide injunction class under the federal antitrust statute.  In re New Motor Vehicles Canadian Export Antitrust Litigation, Nos. 07-2257, 07-2258 and 07-2259 (argued Oct. 3, 2007).   The Circuit's decision on appeal is likely to provide further guidance to this Court on the propriety, or lack thereof, of multi-state classes.

[8] See In re Prempro Prods. Liab. Litig., 230 F.R.D. at 564 (referring to the movement to divine a neutral or universal language) .  As discussed below, courts have "expressly rejected" efforts to encompass the various state common law into a single set of instructions that does not reflect the law of any single state.  Id. (citing In the Matter of Rhone Poulenc Rorer Inc., 51 F.3d 1293, 1300 (7th Cir. 1995)).

"superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).  Plaintiffs' proposal violates these requirements.

1.      Adequacy of representation

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (internal quotation marks and citation omitted).  This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent," id.  at 625, and is "essential to due process, because a final judgment in a class action is binding on all class members," In re Am. Med. Sys., Inc., 75 F.3d 1069, 1083 (6th Cir. 1996).

Here, plaintiffs' willingness to assume a strict, uniform fraud standard in exchange for nationwide status gives rise to a fundamental conflict between the class representatives and the putative class members from more "lenient" jurisdictions whom they are purporting to represent.   If BMS were to prevail at trial, the class would be precluded from pursuing claims under its members' own state statutes as a result of the rules of merger, bar and claim-splitting.  Those class members, in effect, are being forced to forgo the advantages of their individual claims in order to accommodate the class representatives' and/or their counsel's willingness to take on a higher burden in exchange for a broader class.  Cf. In re Relafen Antitrust Litig., 221 F.R.D. 260, 280 (D. Mass. 2004) (forcing members to forego state claims as a condition of class treatment "rais[es] adequacy concerns for [plaintiffs] who might prefer to litigate their statutory claims individually or as part of a State … class"); In re Currency Conversion Fee Antitrust Litig., 229 F.R.D. 57, 65 (S.D.N.Y. 2005) (class representative not adequate where he has no incentive to establish facts that would help absent class members).

2.      Superiority

This "adequacy" problem cannot be solved by relieving class members from "lenient" jurisdictions of the res judicata effect of a defendant's verdict on fraud and giving them another bite at the apple in their home courts under their respective state statutes.   Even if legally possible, that would destroy the very basis for certifying a class in the first instance.  Rule 23's "superiority" requirement ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Amchem, 521 U.S. at 615.  A class action must actually reduce the number of prospective trials for it to be a superior method of adjudicating the case.  See Madison P'ship Liquidity Investors 31, LLC v. USAA Properties III Inc., No. CIV.SA-98-CA-324-EP, 1999 WL 33292714, at *4 (W.D. Tex. July 16, 1999) ("Because of the need for individual trials on the § 10(b) claims, plaintiff cannot satisfy the superiority requirement of Rule 23(b)(3) with respect to any claim in the case."); Elster v. Alexander, 76 F.R.D. 440, 443 (D. Ga. 1977) ("[I]n deciding whether a class action is superior to individual actions, the Court must find that the number of individual actions will actually be reduced.").  Where, as here, the "follow-up trials" would involve the same common issues that were presented in the main trial – indeed, they would essentially be "re-trials," except under a different legal standard – the proposed class is not superior.  Castano v. Am. Tobacco Co., 84 F.3d 734, 749 (5th Cir. 1996) (In such circumstances, "[t]he net result may be a waste, not a savings, in judicial resources.")

B.      The "Grand Bargain" Violates the Federal Rules Enabling Act.

Aside from these general principles rooted in Rule 23, there are sound constitutional reasons to reject plaintiffs' attempt to establish BMS's liability "under a legal standard that does not actually exist anywhere in the world."  In the Matter of Rhone Poulenc

11

Rorer Inc., 51 F.3d 1293, 1300 (7th Cir. 1995).  Although courts may be tempted to streamline complex multistate litigation by eliding seemingly minor variations among state laws, these variations "are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court."[9]  In re Bridgestone/Firestone, 288 F.3d at 1020.  Instead, "judges must resist [that temptation] so that all parties' legal rights may be respected."  Id. at 1020-21; see also Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state…. There is no federal general common law.").  The Rules Enabling Act prohibits a construction of the Federal Rules of Civil Procedure that would "abridge, enlarge or modify any substantive right," 28 U.S.C. § 2072(b), which is precisely what the imposition of a uniform non-existent legal standard to plaintiffs' claims would do in the circumstances of this case.[10]

C.    *Plaintiffs' Proposed Jury Instructions and Interrogatories Fail to Capture the Variations in the State Laws at Issue.*

Plaintiffs' fallback position is that the Court can instruct the jurors to "report their findings on each element" of plaintiffs' fictitious fraud charge, so that "even if the jury does not find that plaintiffs proved the existence of all nine elements of common law fraud, a subset of those elements may nonetheless constitute a violation of a state UDTPA."  (Pls.' Mem. at 7.)

---

[9] Even where differences among state laws exist "only in nuance," … "nuance can be important" – especially where "one of the theories pressed by the plaintiffs … is novel."  Rhone Poulenc Rorer, 51 F.3d at 1300.  In the bench trial, the Court noted that there was very little law beyond FTC Guidelines to inform it on whether BMS's list prices were deceptive or unfair and the Court struggled with defining the concept of substantial sales at list.  See 491 F. Supp. 2d at 104-05.  These are novel issues that are not susceptible of fair treatment in the plaintiffs' proposed "grand bargain."

[10] Relatedly, in Phillips Petroleum Co. v. Shutts, 472 U.S. 797 (1985), the Supreme Court had occasion to rule on the application of a forum state's substantive law to the claims asserted by a nationwide class, the vast majority of whose members had no connection to the forum whatsoever.  The Court held that the forum state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class … in order to ensure that the choice of … law is not arbitrary or unfair."  Id. at 821-22.  Under the reasoning of Shutts, neither may a court apply a non-existent composite of state laws: "Shutts suggests that each plaintiff in this case has the right to have its claims judged according to the law of its jurisdiction, not according to that of a putative or imaginary strictest state."  In re School Asbestos Litig., 977 F.2d 764, 797 (3d Cir. 1992).

Even if there were authority for a court to "mix and match" to various state consumer protection statues a jury's findings in response individual elements of a fictitious common law fraud charge (which there is not), no one set of jury instructions or interrogatories can even begin to address the variations that exist between the relevant bodies of state law.  For example:

- Government knowledge.  This Court found that Medicare's knowledge could not defeat causation because it could not be imputed to the members of Class 2.  That is not the law of a number of states, where knowledge of the alleged fraud on the part of a third party who determines the terms of the transaction breaks the causal connection  See Shannon v. Boise Cascade Corp., 805 N.E.2d 213, 217 (Ill. 2004); Valente v. Sofamor, S.N.C., 48 F. Supp. 2d 862, 874 (E.D. Wis. 1999).

- Reliance.  Plaintiffs contend that they can satisfy any "reliance" standard if a jury were to find (i) that "a Plaintiff made a payment for a [defendant] drug," and (ii) that the reliance was "reasonable and justified under the circumstances."  (Pls. Mem. Ex. B ¶¶ 1.01 (7)-(8), 1.04-1.05.)  In addition to numerous flaws that have been highlighted by other defendants,[11] this proposal posits a test for reliance (i.e. "made a payment") that would permit a finding of reliance where the class member is not actually deceived – a proposition that has been rejected by numerous states.[12]  Moreover, plaintiffs' conflation of "justifiable" and "reasonable" reliance elides an important distinction between the two,[13] and completely omits a third standard for reliance ("actual" reliance), as well as any reference to whether the "justifiable" or "reasonable" reliance required by the relevant statute must be "objective" or "subjective."[14]

- Causation.  Plaintiffs suggest that they can propose a causation instruction that refers to two burdens of proof (either "preponderance of the evidence" or "clear and convincing evidence"), and defines "proximate cause" as "but-for" causation.  (Pls.' Mem. Ex. B ¶ 1.05.)  Some jurisdictions distinguish between "but-for" and proximate causation, while

---

[11] See generally Resp. of Defs.' Amgen Inc. & Watson Pharms., Inc. to Pls.' Supp. Mem. in Support of Track 2 Class Cert. Regarding State Law Issues ("Amgen & Watson Resp.") at 9-10, Ex A. 3-13 [Dkt No. 4740].

[12] For example, for those states that hold that reliance is negated where the plaintiff has "actual knowledge of [the] false representations," Matis v. Golden, 228 S.W.3d 301, 311 (Tex. App. 2007), the fact that payments were made "based on AWP" simply does not answer the relevant question.  See Luscher v. Empkey, 293 N.W.2d 866, 868 (Neb. 1980) ("If [the plaintiff] would have acted in the same way even in the absence of the representation, then he has not relied thereon.").

[13] See, e.g., Rich Food Servs., Inc. v. Rich Plan Corp., [cite] (E.D.N.C. Nov. 19, 2001) ("Justifiable reliance differs from reasonable reliance and is a fact-intensive inquiry."); Baker v. Metro. Life Ins. Co., 907 So.2d 419, 420-21 (Ala. 2005) (analyzing the difference between justifiable and reasonable reliance).

[14] Compare 4 Minn. PJI, Civil 4th § 57.10 (2005) (comments) ("various factors may be considered, including the relationship between the parties, as well as the opportunity the parties have for knowledge"), with Fellows, Read & Assocs. v. Rider, 194 B.R. 734, 737 (S.D.N.Y. 1996) (reasonable reliance is an objective standard).

13

others do not.  See Adas v. Ames Color-File, 407 N.W.2d 640, 642 (Mich. Ct. App. 1987) (there are "countless variations" on the definition of proximate causation).[15]

- Scienter.  Plaintiffs' fictitious "common law" fraud instruction completely ignores the varying intent-related requirements for the imposition of punitive damages[16] under the consumer fraud statutes that permit such damages.[17]  "State punitive damages law varies not only in terms of the conduct required to obtain punitives, but also in terms of the burden of proof required.  Any instructions attempting to account for these variations would surely baffle a jury."  In re Stucco Litigation, 175 F.R.D. 210, 216 (E.D.N.C. 1997).

- Statutes of limitations.  Plaintiffs provide no instructions relating to the varying statutes of limitations among the state consumer fraud statutes, yet it is clear that these variances – along with equally wide-ranging variations with regard to the doctrine of equitable tolling and its availability – render Plaintiffs' claims unsuitable for nationwide class treatment.  See KMC Leasing Inc. v. Rockwell-Standard Corp., 9 P.3d 683, 690 (Okla. 2000).

    If more examples are needed, the experience of the Massachusetts-only trial

provides additional reasons why the Court must deny nationwide certification for Class 2 and

Class 3.  The Court ruled on issues related the apportionment of damages for multi-source drugs

– issues that bore no explicit relationship to Chapter 93A and yet were a source of Massachusetts

law that the Court had to consult.   In addition, the Court acknowledged – but never ruled on –

issues related to Plaintiffs' duty to mitigate once they had knowledge of the alleged misconduct.

See 491 F. Supp. 2d at 91 n.67.  Again, these issues of state law that lie outside the area of

---

[15] Compare Duphily v. Delaware Elec. Coop., Inc., 662 A.2d 821, 828-29 (Del. 1995) (defining proximate cause as "but for" cause), with Am. Rockwool, Inc. v. Owens-Corning fiberglass Corp., 640 F. Supp. 1411, 1444 (E.D.N.C. 1986) (defining proximate cause as "substantial cause").

[16] Plaintiffs state that, "for present purposes," they "are not presenting instructions relating to fraudulent concealment, statute of limitations and enhanced damages."  (Pls.' Mem. at 5 n.5.)  Plaintiffs do not explain what "present purposes" are preventing them from doing so, but the Federal Rules are clear:  "An order certifying a class action must define the class and class claims, issues, or defenses."  Fed. R. Civ. P. 23(c)(1)(B); Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 185 (3d Cir. 2006).  Plaintiffs' withholding of any indication as to how they intend to address issues related to fraudulent concealment, statute of limitations and enhanced damages at trial – for "present purposes" or otherwise – precludes the Court from rendering the certification order required by Rule 23.

[17] See, e.g., Rawlings v. Apodaca, 72 P.2d 565, 578 (Ariz. 1986) (evil mind); Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1076-77 (Del. 1983) (gross, oppressive or aggravated conduct); Alcorn v. Union Pac. R.R. Co., 50 S.W.3d 226, 247 (Mo. 2001) ("complete indifference to or conscious disregard for the safety of others"); McFarland v. Brier, 769 A.2d 605, 612 (R.I. 2001) (willfulness, recklessness or wickedness as amounts to criminality).

14

consumer protection, and many others, will likely resurface were this class action to proceed to trial once again.  Of course, the difference this time would be that the Court would have to grapple with the laws of 38 states instead of only one.   This is a recipe for disaster.  See Cole v. Gen. Motors Corp., 484 F.3d 717, 725-26 (5th Cir. 2007) (dismissing motion for nationwide certification under various state laws because "Plaintiffs' largely textual presentation of legal authority oversimplified the required analysis and glossed over the glaring substantive legal conflicts among the applicable laws of each jurisdiction.").[18]

III.    EVEN IF A NATIONWIDE CLASS COULD BE CERTIFIED UNDER THE
        CONSUMER PROTECTION LAWS OF 38 STATES, SUCH A CLASS DOES NOT
        WORK FOR CLASS 3 BECAUSE INDIVIDUAL ISSUES OF RELIANCE AND
        CAUSATION PREDOMINATE.

        Class 3 differs from Class 2 in at least one significant respect.  Class 2 TPPs provide supplemental insurance pursuant to terms that Medicare Part B has established.  Class 3 TPPs, by contrast, establish their own terms, and their individual knowledge and actions have a direct impact on the amounts they pay for physician-administered drugs.

        As a result of this difference, individual issues regarding the reliance and causation elements of Class 3 members' claims predominate over common issues.  As the Massachusetts-only trial showed, each TPP had different employees, subsidiaries, affiliates, consultants and TPAs with different degrees of knowledge and sophistication over time concerning AWPs, spreads and physician reimbursement.  Each TPP reacted differently to advent of specialty pharmacies and Medicare ASPs based on its perception of the competitive

---

[18] The Court also considered a number of other requirements under Chapter 93A that, if a nationwide class is certified as to Classes 2 and 3, it will be forced to grapple with under the other consumer fraud statutes.  Can non-profit TPPs sue under other state consumer fraud statutes?  Is there a "transaction requirement" that is more exacting than that of Chapter 93A?  Does the alleged conduct provide a basis for suit under the relevant consumer fraud statute?  These are also mixed questions of law and fact that will require development of a factual record, parsing of the different legal requirements from state-to-state, and application of the different facts to those different legal requirements on a class member-by-class member, and state-by-state, basis.

15

environment both among other TPPs and with the physician groups against whom the TPPs were negotiating.  Opening the class up to other states will show even more variation.[19]

        That reliance is an element of common law fraud – whatever the jurisdiction – cannot be disputed.  It is also a formal element of a number of the consumer fraud statutes under which plaintiffs are asserting claims,[20] and has been made part of the "proximate cause" analysis for still others.[21]  It is hornbook class action law that "[a] fraud class action cannot be certified when individual reliance will be an issue."  In re TJX Companies Retail Sec. Breach Litig., Civ. Action No. 07-10162-WGY, 2007 WL 4199597, at *5 (D. Mass. Nov. 29, 2007) (quoting Castano, 84 F.3d at 735); 5 Newberg on Class Actions § 17:10.

        Plaintiffs' request "that the Court find as a matter of law that the elements relating to reliance and reasonable and justifiable reliance are satisfied such that these factors need not be decided by the jury" (Pls.' Mem. at 7) must be rejected out of hand for two primary reasons. First, the foundation for this request – plaintiffs' contention that "reliance is manifest here, since Plaintiffs and Class members made payments based on AWP"  (id. (emphasis in original)) – is simply wrong as a matter of law because it removes the class members' state of mind from the analysis.[22]  Plaintiffs effectively seek a presumption of reliance under a theory akin to the "fraud

---

[19] For example, BMS documents produced in discovery, but not used in the Massachusetts trial, show that TPPs in Florida used specialty pharmacies as a method to lower their drug reimbursements as early as 1999.  (See Decl. of Lyndon M. Tretter in Support of Def. BMS's Opp'n to Pls.' Mot. to Certify Nationwide Classes 2 & 3 ("Tretter Decl."), Ex. A.)

[20] Those states are: Arizona, Hawaii, Indiana, Kansas, Maryland, North Carolina, Oregon, Pennsylvania, South Dakota, Texas, Vermont, Washington, Wisconsin and Wyoming.  (See Amgen & Watson Resp., Ex. A at 4 & n.4.)

[21] Those states are: Connecticut, District of Columbia, Illinois, Michigan, Minnesota, Nebraska, New Jersey, and Tennessee.  (See Amgen & Watson Resp., Ex. A at 6-9.)

[22] Reliance refers to whether defendant's statement or omission actually or reasonably induced action or inaction on the plaintiff's part.  Causation refers to whether the defendant's statement or omission (as supposed to some extraneous factor) is factually and legally responsible for the plaintiff's loss.  When a plaintiff  "makes a payment" based on a defendant's allegedly inflated AWP, that price may rightly be said to have determined or "caused" the plaintiff's loss.  But, unless the plaintiff was acting under an misimpression created by a defendant that the AWP

on the market" doctrine that is found in – and has been repeatedly limited to – "efficient markets" in the securities law context.  See, e.g., Int'l Union of Operating Engineer Local No. 68 Welfare Fund v. Merck & Co., Inc. 929 A.2d 1076, 1088 (N.J. 2006) (rejecting attempt to impose "fraud on the market" presumption to claims for fraudulent marketing of pharmaceutical product brought under New Jersey consumer fraud statute); see also In re Polymedica Corp. Sec. Litig., 432 F.3d at 7 (limiting the use of the presumption even in securities cases to "efficient" markets).  Furthermore, plaintiffs' expert has conceded that the market at issue in this case is not an efficient market.  (Hartman Dep. 115:3-8, Oct. 7, 2004 (Tretter Decl. Ex. B).)

Second, even if reliance were not an element of either common law fraud or most consumer protection statutes, proximate cause is indisputably an element and individual causation issues will predominate over common ones in any nationwide Class 3 trial.  A plaintiff's voluntary decision to proceed with a transaction with knowledge of an alleged fraud breaks the chain of causation.[23]  Therefore, there are individualized issues of causation that are fatal to a plaintiffs' proposed Class 3 even in those states that do not have a reliance requirement in their consumer fraud statute.

Finally, Plaintiffs cannot avoid individualized issues of reliance/causation by simply cherry-picking ignorant class representatives from among an orchard of otherwise knowledgeable absent class members.  As the Massachusetts trial revealed, many ostensibly "ignorant" Taft-Hartley funds used big TPPs as TPAs and consultants who were or should reasonably have been aware of the industry's AWP usage.  491 F. Supp. 2d at 79-80.  As the

---

was an actual average, the plaintiff cannot be said to have "relied" on anything defendant said or did.   Most importantly for purposes of this case, however, a plaintiff's willingness to proceed with a transaction knowing the truth of defendant's allegedly false statement or omission cuts off both reliance and causation.

[23] See Mem. of Law in Support of Track 1 Defs.' Joint Mot. for Summ. J. 17-19 & nn. 51-52 (collecting cases).

Court repeatedly recognized during the trial, Class 3 probably should not have been certified to begin with; certifying such a class on a nationwide scale will only compound the error.

IV.     CLASS 3 ALSO IS NOT CERTIFIABLE BECAUSE IT IS NOT POSSIBLE TO CALCULATE CLASS-WIDE DAMAGES.

Plaintiffs' Class 3 damages analysis is built on the assumption that all non-hospital drug reimbursements are based on AWP throughout the class period.  Just the microcosm of the BCBSMA experience shows that this is untrue.  For example, prior to 1995, BCBSMA did not use AWP at all and instead reimbursed physicians at their reasonable and customary billed charges.  (Mulrey Trial Aff. ¶¶ 10-11 [Dkt No. 3274].)  Even thereafter, according to defendants' expert Dr. Eric Gaier, some 43% of BCBSMA's PAD reimbursements were not based on AWP.  (Gaier Trial Aff. ¶ 59 [Dkt No. 3343]; DX-3006 (Tretter Decl. Ex. C).)  Plaintiff's expert disputed only a small proportion of Dr. Gaier's analysis, leaving approximately 36% of BCBSMA's reimbursements indisputably characterized as not based on AWPs. (Rebuttal Test. of Dr. Raymond Hartman ¶¶ 65-68 [Dkt No. 3470].) There was also proof at trial that other Massachusetts TPPs make extensive use of reimbursement mechanisms not based on AWPs in their commercial insurance.  (Test. of Michael T. Mulrey, Nov. 8, 2006 Trial Tr. at 32-33; see also Cizauskaus Dep. 63, Mar. 10, 2006 (Tretter Decl. Ex. D).)

In short, there is no way to calculate aggregate damages for Class 3 because each class member used AWP as a benchmark to a different – and unknown – degree.  While individual damages can be the subject of individual proofs of claim, there must be a way of calculating aggregate damages for a class to be certified.  In re TJX Cos. Retail Sec. Breach Lit., Civ. Action No. 07-10162-WGY, 2007 WL 4199597, at *8-9 (D. Mass. Nov. 29, 2007) ("Absent an acceptable method for determining damages in the aggregate, identifying damages will necessarily be an individualized issue."); In re Transit Co. Tire Antitrust Litig., 67 F.R.D. 59, 74

(W.D. Mo. 1975) (class certification inappropriate where "proof of damages will not be a simple

matter of calculation, but rather will involve numerous calculations pertaining to the individual

class members . . . .").

V.     THERE ARE NUMEROUS FLAWS WITH RESPECT  TO THE PROPOSED CLASS
       REPRESENTATIVES.

       Plaintiffs have proposed two Class 2 representatives – United Food and

Commercial Workers Unions and Employees Midwest Health Benefits Fund ("UFCW") and

Sheet Metal Workers National Health Fund.  UFCW cannot be a class representative for Class 2

because it does not make co-payments under Medicare Part B.  All of UFCW's payments, which

are made to Blue Cross Blue Shield of Illinois ("BCBSIL"), are based on BCBSIL's

contractually negotiated amounts with the physicians in its network.  (Ryan Dep. 99-103, 113-

114, Mar. 16, 2004 (Tretter Decl. Ex. E).)

       Plaintiffs have proposed 14 individual Class 3 representatives.  Only one of those

individuals – Joyce Dison – paid for a BMS drug at issue in this case.[24]  Ms. Dison's records

unequivocally show that her insurer covered the entire amount of the payment for the drug.  (See

Dison 0038-40 (Tretter Decl. Ex. F) (demonstrating that for each administration, Ms. Dison's

insurer covered the provider's charge after it was adjusted based on a contractual allowance).)

       Finally, of the six TPPs whom plaintiffs have proposed as Class 3 representatives,

only one – UFCW – has produced documentation demonstrating that it made payments based on

AWP.  Three of the six TPPs whom plaintiffs have proposed as Class 3 representatives – Board

of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund,

Philadelphia Federation of Teachers Health and Welfare Fund, and Man-U Service Contract

Trust Fund – have failed to provide <u>any</u> documentation or data to establish that they made any

---

[24] In the Massachusetts-only trial, the Court limited BMS's liability to sales of Taxol for a six-month period in 2001.
491 F. Supp. 2d at 106-08.

payments for any physician-administered drugs.  A fourth TPP – Teamsters Health & Welfare Fund of Philadelphia and Vicinity – produced a small amount of undated physician-administered claims data that makes it impossible to tell if it made payments for Taxol during the appropriate time period.  The remaining TPP – Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust – has produced physician-administered drug claims data that indicate it paid for Taxol in the relevant period, but it has not produced any information to suggest that the payments were based on AWP.

Conclusion

For all of the above reasons, Plaintiffs' motion for certification of "nationwide" Classes 2 and 3 as to BMS should be denied.

Dated: Boston, Massachusetts
January  4, 2008

Respectfully submitted,

**DWYER & COLLORA, LLP**
By:  /s/ Thomas E. Dwyer (BBO#139660)
    Thomas E. Dwyer (BBO# 139660)
    Jennifer M. Ryan (BBO#661498)
600 Atlantic Avenue
Boston, MA  02210
Tel:  (617) 371-1000
Fax:  (617) 371-1037
tdwyer@dwyercollora.com
jryan@dwyercollora.com

**HOGAN & HARTSON LLP**
Steven M. Edwards, Esq. (SE 2773)
Lyndon M. Tretter (LT 4031)
Thomas J. Sweeney (TS 6557)
875 Third Avenue
New York, NY  10022
Tel:  (212) 918-3640
Fax:  (212) 918-3100

*Attorneys for Defendants Bristol-Myers Squibb Company, Oncology Therapeutics Network Corporation and Apothecon, Inc.*

20

## <u>CERTIFICATE OF SERVICE</u>

I, Andrea W. Trento, hereby certify that on January 4, 2008, I have caused true and correct copies of the foregoing Defendant BMS's Memorandum of Law in Opposition to Plaintiffs' Motion to Certify Nationwide Classes 2 and 3, and the accompanying Declaration of Lyndon M. Tretter, Esq. in Support of Defendant BMS's Memorandum of Law in Opposition to Plaintiffs' Motion to Certify Nationwide Classes 2 and 3, with attached exhibits, to be served on all counsel of record by electronic service, pursuant to Paragraph 11 of the Case Management Order No. 2, by sending a copy to Lexis/Nexis for posting and notification to all parties.

Date:   New York, New York
        January 4, 2008


                                          /s/ Andrea W. Trento
                                         Andrea W. Trento