# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) | MDL No. 1456 |
| ) | |
| THIS DOCUMENT RELATES TO PROPOSED NATIONWIDE CLASSES 2 AND 3 AS TO ASTRAZENECA AND BMS ) ) ) ) | Civil Action No. 01-CV-12257 PBS<br><br>Hon. Patti B. Saris |

### DECLARATION OF LYNDON M. TRETTER, ESQ. IN SUPPORT OF DEFENDANT BMS's OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY NATIONWIDE CLASSES 2 & 3

I, LYNDON M. TRETTER, declare as follows:

1.      I am a partner with the law firm of Hogan & Hartson, L.L.P., attorneys for defendant Bristol Myers Squibb Company ("BMS").  I have been admitted to this Court pro hac vice.  I submit this declaration in support of BMS's Opposition to Plaintiffs' Motion to Certify Nationwide Classes 2 & 3.

2.      Annexed hereto as Exhibit A are true and correct copies of internal BMS memoranda previously produced in this litigation, on the subject of drug replacement by specialty pharmacies in Florida.

3.      Annexed hereto as Exhibit B is a true and correct copy of pages 114 to 117 of the deposition transcript of the October 7, 2004 deposition of Dr. Raymond S. Hartman.

4.      Annexed hereto as Exhibit C is a true and correct copy of Defendants' Exhibit 3006, entered into evidence at the Class 2/3 Massachusetts-only trial.

5.      Annexed hereto as Exhibit D is a true and correct copy of page 63 of the deposition transcript of the March, 10, 2006 deposition of Sheila R. Cizauskas.

6.      Annexed hereto as Exhibit E is a true and correct copy of pages 99-103 and 113-114 of the deposition transcript of the March 16, 2007 deposition of UFCW Administrator Daniel Ryan.

7.      Annexed hereto as Exhibit F is a true and correct copy of an excerpt from plaintiff Joyce Dison's document production in this litigation purporting to reflect Ms. Dison's drug payments (Dison 0038-0040), that has been redacted by counsel for BMS to reflect only payments for BMS drugs for which the Court has found potential liability.  These redactions were made to preserve the confidentiality of Ms. Dison's other medical records.  If the Court so desires, BMS would be happy to file this excerpt in unredacted form under seal with the Court.

I declare under the penalty of perjury that the foregoing is correct.  This declaration was executed by me on January 4, 2008 at New York, New York.


_____/s/ Lyndon M. Tretter_____
             Lyndon M. Tretter

# Exhibit A



# Memorandum

## Bristol-Myers Squibb Company
### Oncology/Immunology

To:       Suzanne Greenwood                    Date:    September 8, 1999
From:     Miami Team                           cc:
Subject:  Drug Replacement Update

This is the first in a series of updates regarding the Drug Replacement situation in Miami, Florida. We have completed our survey with all the major accounts in the territory to secure information regarding their HMO affiliations and the drug replacement agreements with each one. Those lists are included in this update.

We have been able to secure drug tickets from some accounts (Saltzman, Troner, Diaz-Lacayo) and those are also included. Adding up the tickets we have received for 2 relatively small accounts for the whole year, plus some tickets just to show the accounts are affected, the grand total for Taxol comes up to $52,075.80 and for Paraplatin is $7190.08.

| Drug/size | Number Vials | Price per vial | Total |
|---|---|---|---|
| Taxol 30mg | 44 | 140.26 | $6171.44 |
| Taxol 100 mg | 76 | 467.53 | $35,532.28 |
| Taxol 300 mg | 3 | 1402.56 | $4207.68 |
| Taxol milligrams | 1320 | 4.67/mg | $6164.40 |
| Paraplatin 450 mg | 5 | 719.54 | $3597.70 |
| Paraplatin 150 mg | 10 | 239.85 | $2398.50 |
| Paraplatin 50 mg | 3 | 79.96 | $239.88 |
| Paraplatin milligrams | 600 | 1.59/mg | $954.00 |

This doesn't include 16 other accounts we have approached for tickets. So far, we have only gotten commitment from one more account to give us one month's worth of tickets, and some others will give us a week or two. It is obvious that this problem is not going to go away as long as we have HMO's in the territory. Many accounts have been telling us that between 60% and 90% of their drugs come through replacement because of the increasing number of patients joining HMO's and more contracts being signed by the offices. Another issue that is making the offices flock to these services is the one of reimbursement. Many managers complain that they are loosing money because of the low AWP for our products and their high price, namely Paraplatin. With Medicare reimbursing 80% of 95% and Medicaid not allowing copays it is becoming a money loosing business for oncologists to purchase their own drugs and administer them in the office. Drug replacement therefore is a very attractive alternative.

We feel that this problem will continue to grow throughout the territory and eventually the rest of the Nation. It would be to all our benefit to assign a person at the corporate level to investigate this issue and possibly come to an agreement with the HMO's or the drug replacement companies to have the data distributed as to the drugs' final destination just as a wholesaler does with DDD.



Defendants' Exhibit

**2566**

01-12257-PBS

ARMAND
DEPOSITION
EXHIBIT
1

323000020

BMS/AWP/001504076
HIGHLY CONFIDENTIAL





# M E M O R A N D U M

TO:  <u>Florida Drug Replacement Team:</u>
     T.W. Walls
     Fred Wiseman
     Raul Armand

FROM:  Vik Khanna
       Brian Garofalo

DATE:  February 8, 2000

RE:  Florida drug replacement – Orlando meeting follow-up

CC:  Tim Cook

This memo summarizes the results of our meeting in Orlando, Florida (FL) on Tuesday, February 1, 2000 to discuss the issue of chemotherapy replacement as it is occurring in New York (NY) and FL. In the first section of the memo, we identify the attendees at our meeting and summarize the key issues addressed there. In the next section, we list the action items for the project. In the final section, we discuss some strategic options to consider as we move forward with this project.

## Meeting attendees and issue summary

The following persons attended the meeting in Orlando. Except for Vik Khanna, all the attendees were from Bristol Myers Squibb Oncology/Immunology (BMSOI).

Tim Cook                    Raul Armand
Brian Garofalo              Keith McGunnigle
Tim Wert                    Joe Ulery
Mark Thornton               Dennis Buckley
T.W. Walls                  Vik Khanna
Irene Paulin

Fred Wiseman had anticipated attending the meeting, but was not able to do so. For the purposes of the project, the primary team is Brian Garofalo, T. Walls, Fred Wiseman, Raul Armand, and Vik Khanna.

### *Issue summary*

At the meeting, we identified two identified two important issues regarding patient access to chemotherapy in the physician's office. The first is brown-bagging. In this scenario, some patients are asked by their health plan to go to a network pharmacy, retrieve their

---

9168 Carriage House Lane
Columbia, MD 21045-4076
Phone and Fax: 410.997.9283
Mobile Phone: 443.226.7009
E-mail: shpsllc@home.com

323200037

BMS/AWP/001504077
HIGHLY CONFIDENTIAL




Brian Garofalo
February 8, 2000
Page 2

chemotherapy, and carry it to the physician's office for administration. This problem appears to be occurring most frequently in the New York metropolitan area. It raises a number of concerns about patient safety, drug mixing and storage, and reimbursement. Based on the team conversation on Tuesday, we will not address the brown-bagging just yet, concentrating instead on the drug replacement problem in FL.

## Drug replacement in FL

Raul Armand, Senior Territory Manager for the Miami area identified the drug replacement problem in FL. Several large oncology practices brought it to his attention. In this scenario, oncologists' supervision of chemotherapy storage, selection, mixing, and administration is being undermined by health plans that force the use of an independent vendor to supply the drugs necessary to treat a patient.

In a typical case, a physician decides to start chemotherapy for a patient. Normally, the chemotherapy is administered in the physician's office, under the supervision of the physician and oncology nurses. Drugs are stored and mixed on the premises, under carefully controlled conditions, to maximize patient safety and reduce the likelihood of medication mixing or administration errors. The physician purchases the drugs from a drug wholesaler and bills the health plan for reimbursement, which is often a predetermined percentage off the Average Wholesale Price (AWP). Because of the substantial overhead involved in running an oncology office, and the widely acknowledged underpayment by health plans for oncologists' cognitive services, reimbursement for chemotherapy is a significant underpinning for the financial viability of the practice.

In the drug replacement situation, the health plan takes a substantial amount of control away from the physician and, simultaneously, seriously undercuts reimbursement, which threatens financial survival of oncology practices. Now, when the physician decides to begin chemotherapy, he or she must provide the chemotherapy order to a third-party vendor selected by the health plan. The vendor mixes the chemotherapy regimen, per the physician's prescription, and delivers it to the doctor's office for administration, often by an overnight package express service. The health plan pays the chemotherapy vendor a contractually determined amount for the chemotherapy, which we suspect is substantially less than it would have to pay the doctor. It also provides the physician a token administration fee, often in the range of $30.

This drug replacement approach is problematic for several reasons. First, the chemotherapy vendor is completely outside the control and supervision of the physician, which means that quality control is uncertain. The vendors are sometimes far away from Miami. Further, when the vendor is asked to fill a prescription for generic drug products, it will use a drug of its choosing, not necessarily the one the physician prefers and knows to be safer and more effective for the patient. Some vendors may also try to engage in therapeutic substitution, replacing the drug ordered by the physician with another product from the same class. Both these potential vendor activities could jeopardize patient care. Second, the physician has no means by which to supervise the safe and appropriate storage and mixing of the medicine. Third, it creates an administrative burden for the office staff to collect, sort, verify, and store drug shipments. Finally, the lack of appropriate reimbursement substantially undercuts the financing necessary to run an oncology practice.

323200038

BMS/AWP/001504078
HIGHLY CONFIDENTIAL





Brian Garofalo
February 8, 2000
Page 3

If this situation persists, it will threaten physicians' ability to administer chemotherapy in their offices.  Ironically, this effort by health plans to reduce costs could lead to cost increases if physicians are forced to either admit patients for inpatient care (which is likely to be extremely costly and be a giant step backwards in oncology care) or refer patients to hospital-based or other outpatient chemotherapy administration centers.  There are several important implications here.  Recent federal data show that hospital outpatient costs are rising even faster than prescription drug costs[1].  This price jump in hospital outpatient costs reflects recognition by hospital executives that health plans are less vigilant about outpatient price increases, so hospitals are essentially grabbing profit on the outpatient side they can no longer get on the inpatient side.

If physicians refer patients to hospital-based or other outpatient chemotherapy centers, other problems will arise.  This fractures the continuity of the patient's oncology care by introducing another provider into the process.  The attending physician has no control over the chemotherapy administration center, cannot ensure that the center follows appropriate standards, or that it maintains the personnel and equipment necessary to deal with adverse drug reactions or other complications.

Finally, by requiring oncologists to participate in the drug replacement process, the health plans engaged in this practice are increasing the likelihood of errors that will hurt patients.  In a recent article on health care carve-outs, Business and Health Magazine reported that the carve out process raises significant questions about quality and requires constant vigilance on the part of the health plan[2].  Health plans that carve out certain services also need to ensure that they set standards for their carve-out partners and take steps to coordinate care between the physician, the patient, the carve-out vendor, and the health plan.  Clearly, in the FL situation, it does not appear that health plans have taken these common sense, cautionary steps.

There are several major health plans engaging in this practice in the Miami area.  They include Prudential (which Aetna USHealthcare has purchased), Humana, Cigna, HIP, Health Options, and Principal.  They use numerous chemotherapy vendors, in and out of FL, including FL IV Services, ChemoLab, Broward Infusion, Med Choice, Nations Health Care, National Specialty Services, Option Care, Humana Pharmacy, Vida Rx, and several others.

## Action Items

Considering the team discussion, and our discussion afterwards, there are 9 immediate action items.  Below we identify each item, the person(s) responsible, and its status.  Please review this list and let us know what changes you would like to make.

> Obtain and review oncologists' health plan contracts.  Raul Armand is responsible for obtaining as many contracts as possible and forwarding them to Vik for review and analysis.  Raul has started this process and sent Vik a portion of one contract by fax.  T. has also provided the team with a list of the physician practices involved and has asked several practices to get copies of their contracts for us.

---

[1] Outpatient prices jump: costs rise 6.7%, surpassing increase in prescription prices.  Modern Healthcare. Jan. 31, 2000.  Page 2 (The Week in Healthcare).  Source: www.modernhealthcare.com.  2/2/00.
[2] Hagland, M., What we've learned about carving out health care.  Business and Health.  January 2000.  Pp. 28-32.

323200039



BMS/AWP/001504079
HIGHLY CONFIDENTIAL

Brian Garofalo
February 8, 2000
Page 4

- o Beyond the contracts and the practice list, we need to identify a lead contact person in each office, either the physician or the office administrator.
- o Raul should generate a list of active patient advocacy groups in Miami area.
- o Raul also should ask the practice's to supply us with their payer mixes, if possible, so we can see what proportions of the practice's patients are affected.

➤ **Arrange series of meetings in FL.** Raul should lead the effort arrange meetings in Miami for Vik and one or more of us, over a period of two or three days, with leading oncologists and their office managers, to discuss the issue and gather additional details. These meetings should not occur until after we complete the contract review and literature search/review. Consequently, we should target early March as the right time to spend some a few days in Miami and meet with the principals. We also can meet with some of the office managers in April around the FLASCO meeting.

➤ **Literature search and review.** Vik is taking the lead on conducting a literature search now to identify resources on trends, issues, and problems in chemotherapy services and reimbursement and carve-outs. He is confident that we will find additional literature that will help us build a case against the use of a third-party chemotherapy vendor to supply drugs to a physician's office. The lit search is underway, and Vik expects to have some insight on how fruitful it will be in a week or so.

- o Vik also will try to establish the payer mix for the health insurance market in South FL, including how rapidly patients are moving into Medicare or Medicaid managed care plans. While these plans do not appear to be the prime movers behind the drug replacement, they likely will move in this direction if they think they can do so without opposition. Based on very preliminary research, it appears that their share of the dominant payers in the South FL market are United Healthcare (21 percent share of all health maintenance organization [HMO] enrollees), Humana (17 percent), and Health Options (15 percent)[3].

➤ **Re-establish contact with the Florida Medical Association (FMA), state oncology society, and oncology managers society.** Raul should take the lead on identifying leading physician and administrative contacts in Miami. We likely will need them to take the lead on cultivating interest and support on the issue with other organizations. T. and Fred, please also let us know what contacts you have in these groups who might be helpful.

➤ **Follow-up with OTN.** We need to know OTN's awareness of this issue and whether they are doing anything about it. Brian will take the lead on this.

➤ **Research FL pharmacy laws.** Vik will take the lead on finding out whether FL pharmacy laws would have any impact on this practice. To accomplish this, he plans to contact the FL board of pharmacy, speak with board officials, and review any pertinent statutes or regulations.

➤ **Develop a multi-faceted approach to the issue.** Vik will take the lead on developing our strategic approach to this issue. His initial thoughts on our approach are in the next section of this memo. Vik will concentrate on a developing three-part approach that includes

---

[3] Forman, E. Florida's HMOs keep growing, study finds. Sun-Sentinel, South Florida. 11/27/98. Source: Dow Jones Publications Library.

323200040

BMS/AWP/001504080
HIGHLY CONFIDENTIAL

Brian Garofalo
February 8, 2000
Page 5

potential legislative action, media strategy, and educational approaches. Our educational approaches could involve the state medical society or the individual oncology practices. Further, we may also wish to consider how to support the practices in a direct dialogue with the health plans.

➢ **Address patient impact.** As part of our approach to the issue, Vik will address the impact of this issue on patients. To help define this impact, he suggests that at our sessions in Miami, we meet with patients who the practices identify as potentially helpful advocates on the issue. Having patients available is essential to legislative, market, and educational strategies. We do not need to find "horror" stories, but only need to find patients who can speak to the further loss of control over their care, the uncertainty about the quality of the products they are receiving, added stress during a serious illness, etc.

➢ **Identify additional resources.** Several people at the meeting mentioned using Jim Albertson, who is familiar with managed care contracting issues. We also should contact and speak with the physicians in California who were mentioned by Irene Paulin as having successfully dealt with this issue. Irene has already provided two contacts to Vik, who will take the lead on interviewing these physicians and their office managers to gather data.

We believe this list covers all the major items discussed last week. Please Vik know if we have missed any pieces.

## Initial strategy

Based on our conversation last week, and our thoughts since then, we have a couple of initial strategic observations to offer. At this point, we do not have enough details to completely develop a strategic approach. Nonetheless, we want to provide some directions that we can consider pursuing over the next several weeks and months. We should envision strategic approaches that can attack the problem on several fronts, including, for example:

➢ An educational and media campaign,
➢ Market-based dialogue with the health plans, and
➢ Public policy remedy.

We briefly discuss each of these options below. Regardless of the precise approach, our success on this issue hinges on finding the right mix of physicians, office managers, and patients to work with us. If they are not willing to get out front on the issue, with our comprehensive support and guidance, it is very unlikely that we will be able to generate either meaningful responses from health plan administrators or a sympathetic response from the media or legislators.

### *Educational and media campaign*

There are several levels of education we will need to address. The first is to educate oncologists about new drug replacement practices and what they need to do to ensure they are not trapped in something that is financially threatening to them and harmful to their patients. We should consider doing this through the state medical, oncology, and oncology managers' societies. BMSOI also could develop a stand-alone educational piece, as we discussed at the meeting, which is in news bulletin format, for distribution to oncology practices. Vik is prepared to do this for us as we move forward.

323200041

BMS/AWP/001504081
HIGHLY CONFIDENTIAL



Brian Garofalo
February 8, 2000
Page 6

The second educational effort should aim at teaching the media about this practice and why it is harmful to oncology care.  To do this, we need to complete the contract and literature reviews and recruit a team of articulate spokespersons to engage print, television, and radio reporters.  A sympathetic, well-informed reporter could go a long way toward resolving this matter successfully.

The third educational initiative needs to target the two parties who can resolve this issue: health plans and, if they do not cooperate, legislators.

## Market-based dialogue

One of the most direct routes to solving this problem is to educate leading oncologists and let them engage in a dialogue with health plans on the issue, with our step-by-step support.  This dialogue could happen on a practice-by-practice basis, or under the auspices of one of the state societies.  One option to consider is to "lend" Vik to one of the societies or large practices and allow him to assist with any negotiations.

This process is critical not only because it may solve the problem, but also because if we move toward a public policy approach, we want to be able to say, "We tried to talk to them, but they would not negotiate in good faith."  If we do not attempt a dialogue, the plans will have the upper hand, because they could claim (disingenuously, of course) that they were unaware of any problem, and no one came to discuss it with them.

When we have these conversations, we also will pick up useful intelligence about their business practices and positions  that will contribute to our public policy approaches.

## Public policy strategy

The final part of our triad is the public policy approach, which we should consider if all else fails.  Because of the timing of this project, we are starting it right around the time that the FL state legislature begins its annual session.  We believe the FL legislature convenes in March, for a 60-day session, which can be extended by a vote of both chambers.  This means that by sometime in March, we might have enough information to consider working with a legislator to craft a bill.  We will, of course, need our people on the ground in FL, or at one of the state societies, to help guide us to a friendly legislator.  It is too early to say what the bill might look like.  The draft language, which Vik will create, will depend, to a large degree, on the results of our preliminary steps.

We should also evaluate this issue from another public policy perspective, and that is whether there is a legal strategy that we can pursue.  It is possible that the contracts the physicians entered into are not legally enforceable, because of the wording and the fact that they were drafted by health plans in such as way as to provide the plans with unfair market leverage.  Lawyers call this a contract of adhesion.  Once we fully analyze the contracts, we need to reassess what options we can provide the oncologists, including advising them on a "just say no" strategy, such as that executed in California.

Please let one of us know if we have missed any major pieces.  Please also contact us with any questions, comments, and information.

323200042

BMS/AWP/001504082
HIGHLY CONFIDENTIAL





Brian Garofalo
February 8, 2000
Page 7

orlando follow up memo 02_04_00.doc

323200043

BMS/AWP/001504083
HIGHLY CONFIDENTIAL

BMS/AWP/001504084
HIGHLY CONFIDENTIAL

# Exhibit B

1

1          THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

            MDL DOCKET NO. 01CV12257-PBS

3

4      ******************************

       IN RE:  PHARMACEUTICAL

5      INDUSTRY AVERAGE WHOLESALE

6      PRICE LITIGATION

       ******************************

7      THIS DOCUMENT RELATES TO:

8      ALL ACTIONS

       ******************************

9            C O N F I D E N T I A L

10              VOLUME: I

11     DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

       witness called on behalf of the Defendants

12     pursuant to the Federal Rules of Civil

13     Procedure, before Judith McGovern

14     Williams, Certified Shorthand Reporter,

15     Registered Professional Reporter,

16     Certified Realtime Reporter, and Notary

17     Public in and for the Commonwealth of

18     Massachusetts, at the offices of Ropes &

19     Gray, One International Place, Boston,

20     Massachusetts  02110, on Thursday,

21     October 7, 2004, commencing at 10:16 a.m.

22

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                                 Boston, MA

30 (Pages 114 to 117)

114

1  who doesn't have perfect knowledge has
2  been defrauded?  Is that your economic
3  theory here?
4          MR. SOBOL:  Objection to the
5  form.
6  A.  No.
7  Q.  There are many markets in which people
8  don't have perfect knowledge?
9  A.  That's correct.
10 Q.  Are you familiar with the concept of the
11 efficient market as it is used in
12 securities cases?
13 A.  I'm not an expert in it, but I -- I have a
14 -- a basic understanding of it.
15 Q.  What do you understand it to mean?
16 A.  Well, in -- with regard to securities --
17 the pricing of securities, when you have
18 enough people buying and selling a given
19 security based on all the information that
20 the various people have, that the
21 securities market will be the most
22 efficient way of incorporating all of the

115

1  information that is in the market into the
2  pricing of a particular equity.
3  Q.  And is the market that you are studying in
4  connection with this case an efficient
5  market?
6          MR. SOBOL:  Objection to the
7  form.
8  A.  I would say no.
9  Q.  Okay.  By the way, what is the market that
10 you are studying in this case, or are
11 there many markets?
12         MR. SOBOL:  Objection to the
13 form.
14 A.  And are you -- what -- your definition of
15 "market" is what?  Under the merger
16 guidelines or --
17 Q.  I don't know.  Do economists ever use the
18 term "market"?
19 A.  Sure.  They use it in a lot of different
20 ways.
21 Q.  Okay.  How would you use it in connection
22 with this case?

116

1          MR. SOBOL:  Objection to the
2  form.
3  A.  There is an area of -- there are sets of
4  markets that constitute the distribution
5  of pharmaceutical products from
6  manufacturers to the ultimate consumers,
7  and those markets may be as small as the
8  market for a given molecule in evaluating
9  certain kinds of economic events or
10 alleged violations, but I'm looking at the
11 global -- I am looking in the context of
12 the structure as laid out in Attachment C
13 as discussed by Schondelmeyer and Wrobel
14 in their Abt Associates' report, which
15 consists of the flow of all
16 pharmaceuticals from all manufacturers
17 through the distribution chains, through
18 the intermediaries, to the final
19 consumers, and then the reverse flow of
20 financial payments.
21 Q.  How many markets are there in this case?
22         MR. SOBOL:  Objection to form.

117

1  A.  Innumerable.
2  Q.  And the thing that causes you as an
3  economist to state that opinion is the
4  fact that there are differences among
5  various drugs and various methods of
6  distribution and various methods of
7  payment?  Is that correct?
8  A.  Well, I don't know if --
9          MR. SOBOL:  Objection to the
10 form.
11 A.  There is -- those differences exist.  I
12 don't know if that's the reason I have
13 said there are different markets, but.
14 Q.  Well, one reason you would draw the
15 conclusion that two products are not in
16 the same market is because there are
17 differences between the two products?
18 Right?
19 A.  Well, the --
20 Q.  The ultimate situation in which you have
21 got two products in the same market is
22 where the two products are exactly the

# Exhibit C

**Attachment 1: BCBS-MA drug reimbursements by payment basis, 1995-2005[1]**

| Payment basis[2] | Count of reimbursements | Percent of total reimbursements | Count of reimbursements not equal to fee schedule price[3] | Percent of reimbursements not equal to fee schedule price |
|---|---|---|---|---|
| MED-RELATED FEE SCHEDULE DIRECT PRICING | 46,197 | 41.32% | 0 | 0.00% |
| PPO FEE SCHEDULE | 2,774 | 2.48% | 0 | 0.00% |
| CUT CHECK,FORMER BSHC FEE SCHEDULE | 56 | 0.05% | 0 | 0.00% |
| FEE SCHEDULE SPECIAL PRICING | 13 | 0.01% | 0 | 0.00% |
| **Fee Schedule Total** | **49,040** | **43.86%** | **0** | **0.00%** |
| UNKNOWN | 20,898 | 18.69% | 19,249 | 92.11% |
| PAY CHARGE | 18,663 | 16.69% | 16,715 | 89.56% |
| UCR PRICING - LEVEL 2 | 10,124 | 9.05% | 933 | 9.21% |
| MANUAL CALCULATION | 3,659 | 3.27% | 2,610 | 71.33% |
| CUT CHECK, APPLY HMO WITHHOLD | 3,552 | 3.18% | 3,552 | 100.00% |
| NO CHECK (CAPITATED/STATISTICAL SERVICE) | 3,042 | 2.72% | 3,042 | 100.00% |
| ALLOW CHARGE | 1,323 | 1.18% | 1,302 | 98.41% |
| OUT OF STATE ALLOWED REPLACED BY CHARGES | 409 | 0.37% | 409 | 100.00% |
| COVERED CHARGES | 344 | 0.31% | 269 | 78.29% |
| HIAA PRICING METHOD LEVEL III USED | 258 | 0.23% | 35 | 13.68% |
| CUT CHECK, APPLY HMO INCENTIVE | 223 | 0.20% | 223 | 100.00% |
| OTHER | 178 | 0.16% | 177 | 99.25% |
| HIAA LEVEL 3 | 93 | 0.08% | 40 | 42.86% |
| **Non-Fee Schedule Total** | **62,766** | **56.14%** | **48,556** | **77.36%** |
| **Grand Total** | **111,806** | **100.00%** | **48,556** | **43.43%** |

Source: BCBS-MA medical claim data (BCBSMA-AWP-16946). PCC and HMO Clm Payment decode descriptions from Pay Cal Codes.XLS (BCBSMA-AWP-10248) and letter from Stephen Coco to Adeel Mangi, dated July 7, 2006.

Defendants' Exhibit
3006
01-12257 - PBS

---

[1] I include only non-Medicare, office-based drugs payments with positive allowed amounts. Medicare claims are identified by values of the *claim type* field ending in "8." Office-based claims are identified by the value of "3" in the field *pos* (place of service).

[2] Payment basis codes are contained in the *pcc* (payment calculation code) and *HMO Clm Payment* fields. Values of the *pcc* field are used in the analysis except when the *HMO Clm Payment* is equal to one of the following: "CUT CHECK,FORMER BSHC FEE SCHEDULE ," "CUT CHECK, APPLY HMO WITHHOLD," "NO CHECK (CAPITATED/STATISTICAL SERVICE)," and "CUT CHECK, APPLY HMO INCENTIVE."

[3] The fee schedule price is calculated, by month, as the median of the payments associated with a fee schedule price basis.

# Exhibit D

1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3              NO. 01CV12257-PBS

4

5    ———————————————————————

6   In re:  PHARMACEUTICAL          )

7   INDUSTRY AVERAGE WHOLESALE       )

8   PRICE LITIGATION                 )

9   ———————————————————————)

10   THIS DOCUMENT RELATES TO:       )

11   ALL ACTIONS                      )

12   ———————————————————————)

13

14

15            HIGHLY CONFIDENTIAL

16

17

18    VIDEOTAPED DEPOSITION OF SHEILA R. CIZAUSKAS

19             800 BOYLSTON STREET

20            BOSTON, MASSACHUSETTS

21           FRIDAY, 10 MARCH, 2006

22               9:38 AM

63

1  were risk sharing, as opposed to fee for service.

2      A.   I didn't do any fee-for-service

3  contracting.   My responsibility was the

4  risk-sharing contracting.

5      Q.   Okay.  So, let me rephrase it then.   For

6  the period '97 to '03 when you were at Harvard

7  Pilgrim Health Care, you were responsible for

8  risk-sharing contracts, but you understood that

9  those risk-sharing contracts constituted the

10 majority of Harvard Pilgrim's total physician

11 contracts.

12     A.   Yes.

13          MR. COCO:  Objection.

14     Q.   And those risk-sharing contracts included

15 physician-administered drugs.

16          MR. COCO:  Objection.

17     A.   As far as I can remember, yes.

18     Q.   Now, in 2003, you then made a transition

19 to Blue Cross Blue Shield of Massachusetts, right?

20     A.   Yes.

21     Q.   What were the reasons why you moved from

22 Harvard Pilgrim to BCBS of Massachusetts?

# Exhibit E

1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3

4   IN RE:  PHARMACEUTICAL   )  MDL No. 1456

5   INDUSTRY AVERAGE         )

6   WHOLESALE PRICE          )  Civil Action No.

    LITIGATION               )  01-CV-12257-PBS

7

8

9              DEPOSITION OF WITNESS, DANIEL RYAN,

10  produced, sworn and examined on the 16th day of

11  March, 2004, between the hours of eight o'clock in

12  the forenoon and six o'clock in the afternoon of

13  that day, at the offices of Spherion Deposition

14  Services, 11 South LaSalle Street, Suite 900,

15  Chicago, Illinois, before Tara Schwake, a

16  Certified Realtime Reporter and Notary Public

17  within and for the State of Illinois, in a certain

18  cause now pending in the United States District

19  Court for the District of Massachusetts, In Re:

20  Pharmaceutical Industry Average Wholesale Price

21  Litigation.

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14      Q      (By Mr. Tretter)  Where were we?  We

15  were talking about how this might go in the first

16  instance to Blue Cross/Blue Shield because if it,

17  in fact, were a COBRA employee, is that the --

18  because they're still getting benefits under the

19  program?

20      A      Anyone who has medical benefits

21  under us goes through Blue Cross.

22      Q      Okay.  And what would Blue Cross do

1  with this when it's possible that somebody's

2  Medicare is primary?

3          A       I don't think Blue Cross takes that

4  into consideration.  They would enter the bill

5  into their system and reprice it to their

6  allowances.

7          Q       All right.

8          A       All right?  And then it is fed

9  electronically to us.

10         Q       And what is left once they've

11  processed it?  When you say it's fed

12  electronically, they tell you what the actual

13  charge was, their eligible --

14         A       Their eligible amount, yes.

15         Q       And then what does the Fund do with

16  it?

17         A       And then the Fund in this case

18  processes the bill, sees that the individual has

19  Medicare primary, and asks for a Medicare

20  explanation of benefits.

21         Q       From whom?

22         A       Either we do it through Blue Cross

1   or we do it through Medicare or we do it through

2   the member.  I'm not sure specifically where we

3   get it from.  Or the provider.  The provider might

4   be able to tell us what they've got from Medicare.

5   We need to see the Medicare payment.

6        Q     And, well, there's another document

7   here which is called a Medicare Remittance Notice,

8   which is UFCW 16798.  Is that the document that

9   you're talking about?

10       A     That's what I'm referring to.

11       Q     So this is something that's

12   generated by a Medicare carrier?

13       A     By a carrier meaning like the state

14   administrator of Medicare claims?

15       Q     Yes.

16       A     Correct.

17       Q     Is that correct?

18       A     Correct.

19       Q     All right.  So now putting all these

20   documents together, can you explain to me how the

21   Fund determines what it's going to pay?

22       A     We then take either the -- we take

102

1    the Blue Cross allowance, okay, and subtract from

2    that the amount that was made eligible -- that was

3    -- that was covered by Medicare.  And then we pay

4    the difference.

5         Q       In this scenario, is the provider

6    getting paid by both Blue Cross/Blue Shield and by

7    Medicare?

8         A       They're getting paid by Medicare and

9    us through Blue Cross.

10        Q       How does that work?  How does it --

11        A       Well, they've already gotten their

12   Medicare payment.  Okay?

13        Q       Through Blue Cross?

14        A       No.  From the Medicare carrier.

15        Q       Okay.

16        A       Who might be Blue Cross, but it

17   would be totally different than our arrangement.

18        Q       Right.

19        A       And then they get a payment through

20   the Blue Cross system of our benefits authorized

21   by us.

22        Q       Why isn't that double counting, is

1   what I'm trying to understand?

2        A      Well, the two added together don't

3   exceed Blue Cross allowance.

4        Q      Let's try to break it down.  Let's

5   assume that you have a Medicare service in which

6   80 percent -- you know, there's a Medicare allowed

7   amount and Medicare will pay 80 percent of it, and

8   the Medicare beneficiary has to pay 20 percent of

9   it.  How does that work, how does that jibe with

10  the Blue Cross arrangement?

11       A      Okay.  So the -- as you described,

12  Medicare figured out its allowance and paid 80

13  percent of it.

14       Q      Right.

15       A      And the patient had a 20 percent

16  balance.

17       Q      Correct.

18       A      That balance eligible under our plan

19  for payment.  We take the Blue Cross allowance,

20  not the Medicare allowance, but the Blue Cross

21  allowance, okay, and subtract from that the

22  Medicare payment, and then that becomes eligible

1

2

3

4              (Exhibit UFCW 007 marked for

5  identification by the court reporter.)

6       Q      (By Mr. Tretter)  We'll mark it as

7  Exhibit UFCW 007, and it has a range of UFCW 16534

8  through 594.  Look at that, and maybe the first

9  question would be is that first page a worksheet?

10      A      Yes.

11      Q      So that's what the letter refers to

12  in Exhibit UFCW 006?

13      A      I believe so.

14      Q      Now, if you go to the next page,

15  which I think is page 35, you see there's a

16  similar, I guess, explanation of benefits form

17  that you called this?  And again, there is a new

18  code, though, this time on the right-hand side.

19  It's 052.

20      A      Mm-hmm.

21      Q      "Other insurance paid in full; no

22  liability for this charge."  What does that mean?

114

1    A    I think it's as it states.  That

2  there's -- the Blue Cross allowance had been paid

3  in full, there was no -- there was no obligation

4  for us to pay.

5    Q    So this was another situation where

6  the Blue Cross/Blue Shield allowance would be less

7  than the Medicaid [sic] allowance, and therefore,

8  it would relieve the UFCW of having to pay?

9    A    I believe so.

10    MS. HARTWEG:  I believe that you

11  referenced Medicaid as opposed to --

12    MR. TRETTER:  I'm sorry.  Medicare,

13  not Medicaid.

14    Q    (By Mr. Tretter)  Does your answer

15  stay the same if I use the word "Medicare" instead

16  of "Medicaid"?

17    A    It's the same.

18    MR. TRETTER:  All right.  That's all

19  I'm going to have on that particular exhibit.  Now

20  I'm going to mark some other documents.  What are

21  we up to, Exhibit UFCW 008?  This is the prepared --

22  the AWP lawsuit documents.

# Exhibit F

| 4/30/2001 | Chg | J9265 - Pacfitaxel 30 mg | 3,240.00 | 0.00 | 3,240.00 | 0.00 | 3,240.00 |
| 6/6/2001 | Adj | Cont Allwd | 0.00 | 0.00 | 0.00 | (1,164.00) | 2,076.00 |
| 6/6/2001 | Pay | Ins Check | 0.00 | 0.00 | 0.00 | (2,076.00) | 0.00 |

**Confidential Material Redacted**

DISON 0038

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5/19/2001 | Chg | J9265 - Paclitaxel 30 mg | 2,970.00 | 0.00 | 2,970.00 | 0.00 | 2,970.00 |
| 6/19/2001 | Adj | Cont Allwd | 0.00 | 0.00 | 0.00 | (1,166.00) | 1,804.00 |
| 6/19/2001 | Pay | Ins Check | 0.00 | 0.00 | 0.00 | (1,804.00) | 0.00 |

**Confidential Material Redacted**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6/6/2001 | Chg | J9265 - Paclitaxel 30 mg | 2,700.00 | 0.00 | 2,700.00 | 0.00 | 2,700.00 |
| 7/9/2001 | Adj | Cont Allwd | 0.00 | 0.00 | 0.00 | (1,060.00) | 1,640.00 |
| 7/9/2001 | Pay | Ins Check | 0.00 | 0.00 | 0.00 | (1,640.00) | 0.00 |

**DISON 0039**

| 6/29/2001 | Chg | J9265 - Paclitaxel 30 mg | 2,970.00 | 0.00 | 2,970.00 | 0.00 | 2,970.00 |
| 8/6/2001 | Adj | Cont Altwd | 0.00 | 0.00 | 0.00 | (1,166.00) | 1,804.00 |
| 8/6/2001 | Pay | Ins Check | 0.00 | 0.00 | 0.00 | (1,804.00) | 0.00 |

**Confidential Material Redacted**

**DISON 0040**