# EXHIBIT B

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3

    In Re:                        )
4   PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS
    AVERAGE WHOLESALE PRICE       ) MDL No. 1456
5   LITIGATION                    ) Pages 1 - 35
6

7

                   SETTLEMENT STATUS CONFERENCE
8
               BEFORE THE HONORABLE PATTI B. SARIS
9                 UNITED STATES DISTRICT JUDGE
10

11

12

13                              United States District Court
                                1 Courthouse Way, Courtroom 19
14                              Boston, Massachusetts
                                May 22, 2007, 11:10 a.m.
15

16

17

18

19

20

21

22

                        LEE A. MARZILLI
23                OFFICIAL COURT REPORTER
                United States District Court
24              1 Courthouse Way, Room 3205
                    Boston, MA  02210
25                    (617)345-6787

1   A P P E A R A N C E S:

2   For the Plaintiffs:

3       STEVE W. BERMAN, ESQ., Hagens Berman Sobol Shapiro LLP,
1301 5th Avenue, Suite 2900, Seattle, Washington, 98101-1090.

4

        THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,

5   One Main Street, Cambridge, Massachusetts, 02142.

6       JEFFREY L. KODROFF, ESQ., Spector Roseman & Kodroff,
P.C., 1818 Market Street, Suite 2500, Philadelphia,

7   Pennsylvania, 19103.

8       KENNETH A. WEXLER, ESQ., Wexler Toriseva Wallace, LLP,
One North LaSalle Street, Suite 2000, Chicago, Illinois,

9   60602.

10

    For AstraZeneca:

11

        D. SCOTT WISE, ESQ. and KIMBERLEY D. HARRIS, ESQ.,

12  Davis, Polk & Wardwell, 450 Lexington Avenue, New York,
New York, 10017.

13

        NICHOLAS C. THEODOROU, ESQ. and MICHAEL P. BOUDETT,

14  ESQ., Foley Hoag, LLP, 155 Seaport Boulevard, Seaport World
Trade Center West, Boston, Massachusetts, 02210.

15

    ALSO PRESENT:  Michael DeMarco, Esq.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price litigation, Civil Action No. 01-12257,

4    MDL 1456, will now be heard before this Court.  Will counsel

5    please identify themselves for the record.

6            MR. SOBOL:  Good morning, your Honor.  Tom Sobol

7    for the class plaintiffs.

8            MR. BERMAN:  Good morning, your Honor.  Steve

9    Berman.

10           MR. KODROFF:  Jeff Kodroff and Ken Wexler, your

11   Honor.

12           MR. THEODOROU:  Nicholas Theodorou, AstraZeneca,

13   your Honor.

14           MR. WISE:  Scott Wise for AstraZeneca, your Honor.

15           MS. HARRIS:  Kim Harris for AstraZeneca, your

16   Honor.

17           MR. BOUDETT:  Michael Boudett.  Good morning.

18           THE COURT:  Okay.  So, first, congratulations, you

19   got the papers in.  I haven't had a lot of time to look at

20   them, but I've skimmed them, I guess would be the best way to

21   go at this point.  And I did have a number of questions, and

22   I thought maybe you and I could go through them in greater

23   depth as we sat here.

24           The first really goes back to the settlement with

25   GlaxoSmithKline.  I don't know if you have the data.  I'm

Page 4

1    somewhat skeptical about these huge media campaigns if we can

2    get actual names of people, individual notice.  And didn't we

3    do a media campaign with Glaxo?

4              MR. BERMAN:  Well, there is going to be an

5    individual notice here.

6              THE COURT:  Right, that's precisely my point, so

7    why do we need the media campaign?

8              MR. BERMAN:  Well, for two reasons, your Honor.

9    The mailing list will not get everyone in the class because

10   people will die, people have moved, we have some bad mail

11   addresses; and, secondly, although we have the names of the

12   people who took Zoladex, some of these people have passed

13   away, as you know.  For example, some of the named

14   plaintiffs, their estate might not get the notice from CMS.

15             THE COURT:  Well, that's what I was going to ask

16   you.  We went this route with Glaxo.  How many people do you

17   know came in off of an ad rather than an individualized

18   notice?

19             MR. BERMAN:  I can make some inquiry.

20             THE COURT:  I just want to know how productive it

21   is.  My general sense is that this kind of a class, as we all

22   know, creates a very difficult set of notice issues because

23   the people are old and the people are poor for the most part,

24   right?  I guess that or they're so wealthy they feel like

25   they don't need supplemental insurance, but, in any event,

1  right, for the most part old and poor?  So there's a huge

2  number that have died, I'm assuming, and I'm just skeptical.

3  How much money do you plan to pay for the media?

4          MR. BERMAN:  I don't think we've got a final

5  estimate on that.

6          THE COURT:  What's our ballpark?

7          MS. HARRIS:  The current estimate from the

8  plaintiffs' media company is $1.8 million.

9          THE COURT:  I'm just not sure, given our

10  experience, for example, in Serono, which is a different kind

11  of case with the AIDS people.  And it's not your case, it's

12  another case, and in general I've been doing these cases.

13  It's not -- individual notice is the key here, and even that

14  doesn't always work.  So I'm worried about spending that much

15  money --

16          MR. BERMAN:  It's not the class's money, okay.

17          THE COURT:  I know, but it's just whether there's

18  enough of a bang for the buck.  So I don't know whether

19  it's -- you've got hundreds of possible, I mean, attachments

20  here.  I think it's worthwhile, since we now have a source --

21  did your people find out in Glaxo how many responded to an ad

22  versus the individual notice?

23          MR. BERMAN:  No.

24          THE COURT:  Would there be a way of knowing whether

25  that's a worthwhile expenditure?

1          MR. BERMAN:  We can make some inquiries.

2          THE COURT:  Why don't we see if that's effective,

3    see if that's needed.

4          MR. BERMAN:  I mean, I can tell you from my

5    personal law firm experience that we handle calls every day

6    from the notices.  We get people calling.

7          THE COURT:  In the media?

8          MR. BERMAN:  From the media notices, they're asking

9    for a notice.  And we should be able to tell perhaps from the

10   claims administrator how many people are calling asking for a

11   claims form.

12         THE COURT:  Yes, because otherwise you would have

13   received it in the mail.

14         MR. BERMAN:  Correct.

15         THE COURT:  Just get some sense whether it's worth

16   it because it's very expensive.  Obviously, I'll do it if

17   there's a good and rational reason for doing it.

18             The second thing is, when you talk about the

19   $24 million, is that based on your -- is it zero tolerance,

20   or is that based on the 30 percent yardstick?

21         MR. BERMAN:  Well, when we talk about the

22   $24 million, that's two different things actually.  The

23   samples that we gave you of the average monthly overcharge

24   that will be used to calculate a class member's return,

25   that's based on zero, not the 30 percent, because we're

1    taking this case to be a statutory case.

2           THE COURT:  All right.  And I'm assuming your

3    position is that that doesn't bind you at all with respect to

4    Classes 2 and 3?

5           MR. WISE:  Right.

6           THE COURT:  The concern I have is more of an

7    appearance issue.  I guess I don't have that many problems

8    with it simply because these people are old and poor, as

9    opposed to a third-party payor, which is more of an

10   institution.  Does it look somehow funny if I have

11   approved -- as I strongly suggested, I think, at trial, so no

12   shock to anyone, I'm leaning against that position for

13   purposes of a 93A liability as a pure statutory strict

14   liability.  Does that create an --

15          MR. BERMAN:  Appearance of --

16          THE COURT:  -- appearance of, why am I approving a

17   settlement for one thing and not for another, that

18   third-party payors, depending on how I come out on the big

19   case, for want of a better word, would be upset with?

20          MR. BERMAN:  Well, I don't think they will be upset

21   with it because if you look at the facts, I mean, we're

22   asserting here that the consumers had zero knowledge of any

23   spread whatsoever, and there was a lot of testimony in the

24   trial that TPPs knew there was some type of spread.

25          THE COURT:  Okay, that's a principled basis.

1          The third thing is incentive payments to

2  plaintiffs.  I generally don't provide those.  I provide them

3  with compensation for the time that they lost in the

4  deposition.  I don't provide incentive payments.  I think

5  that looks unseemly and brings disrepute to the notion that

6  you're paying off people to be plaintiffs.  So how much time

7  did each of them play?

8          MR. BERMAN:  Well, they each, you know, had to

9  search for records and prepare for a deposition.  It takes

10  probably a day and a half.

11          MR. KODROFF:  I believe a couple of them were

12  deposed twice; one, the plaintiff, one, the estate, wasn't

13  it?

14          THE COURT:  Was the what?

15          MR. KODROFF:  The estate was also deposed after the

16  named plaintiff passed away.

17          THE COURT:  Sure.  So why don't we just say

18  something along the lines of $100 an hour.  Just estimate it

19  for me, and just change it and say "compensation."

20          MR. BERMAN:  That's fine, your Honor.

21          THE COURT:  Okay.  The next thing is -- obviously

22  you're going to expect this question -- is attorneys' fees

23  and expenses.  Where did that number come from?  Is that in

24  here, because I missed it?

25          MR. BERMAN:  Yes.

1          THE COURT:  Which attachment is it?

2          MR. BERMAN:  Well, it's in the notice, for example.

3          THE COURT:  No, I'm talking about how it was

4    derived.

5          MR. BERMAN:  Oh, how it was derived.  First, we

6    negotiated the --

7          THE COURT:  Is that in here?  There's no lodestar,

8    is there, hours?

9          MR. BERMAN:  There's no lodestar.

10         THE COURT:  Because I was flipping through, but I

11   wasn't sure if I missed it.  So help me with that before I

12   approve that.

13         MR. BERMAN:  Well, what we basically looked at was,

14   if this was a common fund case, which it is, you know, you

15   could say that we would be asking for a third.  A third of

16   $24 million is $8 million.  And so what we were negotiating,

17   because we didn't want to mix up the two, we negotiated the

18   entire settlement, and then we said, "Now we'd like

19   attorneys' fees."  And our view is that we should approach

20   this, you know, as a third of the common fund we've created,

21   and that's the way it was negotiated.

22         THE COURT:  I don't have a huge problem with that,

23   although I will tell you that I firmly reserve the right to

24   decrease that because I want to look at hours and lodestar.

25   I think this is, unlike many cases, one where some multiplier

1  might be appropriate simply because of the volume and size of

2  the case.  But then how do I distinguish that from -- let's

3  assume for a minute that there is some liability vis-a-vis

4  one of the other many cases.  You're essentially getting paid

5  twice for the same amount of work.

6         MR. BERMAN:  No.  Well, first of all, it's not a

7  third because what we've done is, we've taken 2 point

8  something million as costs, so our actual fees are

9  $6 million, so it's less than a third.  It's like 23 percent

10 or something.

11        In terms of double payment, I mean, we can show you

12 our time records, but I can tell you that the lodestar in the

13 case is in excess of $40 million for all defendants.

14        THE COURT:  That doesn't surprise me at all.  I'm

15 simply saying, for example -- and I'm not saying this -- I

16 will get out an opinion by the end of August, hopefully

17 sooner, on the big case.  But if there is some liability

18 against some companies for some amount, so you're going to

19 get the -- in other words, that's an exact overlap.

20        MR. BERMAN:  Well, right now --

21        THE COURT:  So how do I begin to deal with --

22        MR. SOBOL:  It would be a nice problem to have.

23        MR. BERMAN:  I mean, it seems to me one way to do

24 it is for each time we get a settlement --

25        THE COURT:  Is that on the record?

1        MR. SOBOL:  Yes.

2        THE COURT:  So I just need to think about that

3  because the $40 million was primarily directed towards the

4  bench trial that we just had, and --

5        MR. BERMAN:  Not really.  I mean, if you look at

6  what we're doing, you know, the evidence we gathered for the

7  bench trial is the same evidence that we gathered for this

8  trial, so that there is intermingling of the --

9        THE COURT:  Right, so you're getting paid for it,

10  right, right, and so I agree with that actually.

11        MR. BERMAN:  But let's assume that we have one

12  settlement, we somehow got all these people in the room, we

13  had one settlement of $200 million, you know, we would come

14  in and ask for a percentage of that settlement.  And here

15  we're going to ask for percentages as we go through one by

16  one.  At the end of the day, you know, if you see us

17  approaching what you think is a number that's too high for

18  the overall, I don't know how that could be because we'll

19  never -- if we keep taking 20 to 25 percent, we will always

20  be within the benchmark as we go on, hopefully.

21        THE COURT:  I don't know.  I'm just flagging that

22  as the problem of doing this piecemeal.  That's the concern

23  that I have, not so much -- I've assumed you've spent -- I

24  mean, this is probably the biggest case I've ever handled and

25  maybe you too.  I don't know.  You do a lot of these cases.

Page 12

1   But I'm just more concerned about how to make sure that it's

2   fair compensation, even assuming some multiplier, and not

3   something that's so over the top that it feels unseemly.  And

4   I don't know whether we'll know that by the time we walk in

5   here.  So it may be -- so when do you plan -- so assume I

6   approve this, we come back what, in three months?

7          MR. BERMAN:  Well, we have to wait -- here's what

8   we're doing on the notice, your Honor.  The CMS direct mail

9   notice that we did before reached about a million people.

10  Many of those people had nothing to do with Zoladex.  We

11  don't want to send them another notice, "If you took a

12  Schering product or a BMS product. . ."

13         THE COURT:  So you need a new notice?

14         MR. BERMAN:  We need a new notice, and we're asking

15  CMS to rerun the database to just give us the Zoladex folks.

16  That would take, you know, time for CMS.

17         THE COURT:  It takes up to six months, right?

18         MR. BERMAN:  Well, we're asking, and we hope to

19  have an answer soon.

20         THE COURT:  Okay, so we'll do individual notice.

21  Question on the published notice.

22         On the attorneys' fees, I don't have a problem with

23  giving preliminary approval to this.  Where my big problem is

24  is how I think about the big picture, and I don't know what

25  to do with that.  I mean --

1          MR. BERMAN:  Well, at final approval, we'll give

2     you some materials that hopefully will make you more

3     comfortable on why this makes sense on a percentage approach

4     as we go forward, and we'll give you some lodestar so you can

5     see how we could claim that this is a reasonable allocation

6     of the time spent of the total time apportioned to the AZ

7     case.

8          THE COURT:  Because, you see, a lot of people say

9     it doesn't matter because AZ is paying for it, but I think I

10    still need to approve it so it's not, like, an excessive

11    payoff to the point where someone thinks that there's

12    something wrong with the settlement.  And so that's my

13    concern, and without any underlying documentation of how many

14    hours you've spent that could be fairly isolated as being

15    AstraZeneca --

16         MR. BERMAN:  Well, there's going to be some time

17    before we get this out, and if you want us to give you that

18    material --

19         THE COURT:  The preliminary approval I've come to

20    peace with in the sense of I used to believe that I actually

21    had to approve it on the merits.  I now have the, "Does this

22    pass my basic sense of what I know about the case?"  And it's

23    plausible.  I had problems, as you know, with the First

24    DataBank one, and I made you go back and redo it at some

25    point.  I mean, this $24 million makes some sense.

1              Let me get to the next issue which worried me,

2    though.  I mentioned this before to you, Mr. Wise, and

3    Mr. Keating maybe.  We had really bad returns on some of our

4    drug cases, really bad, in the sense of people who have been

5    either opting out or not submitting claims, one in Serono and

6    one with Glaxo.  And we're having a hard time -- we're doing

7    a survey right now -- trying to figure out why.  Is it

8    because they never took the drug -- because, remember, we did

9    overinclusive things -- is it because they never took the

10   drug so they're just not class members?  Is it because the

11   doctor never billed them is also a possibility?  Is it

12   because the doctor billed them but they never paid, so they

13   felt like in good faith that they couldn't submit it?  Is it

14   as you posited, they just don't believe in class actions, or

15   that they love the drug and don't want to be involved because

16   they're cured now?  Or is it, six, that they were just

17   confused?  They sent in something being -- we don't know, and

18   we're doing a survey right now.

19             The issue came up again in Serono, which is a big,

20   serious issue, which is almost no one has submitted claims.

21   These are AIDS people.  It's obviously a very different

22   case.  Is it because they're embarrassed or they're dead?

23   You know, we don't know.  And so we have yet this group who

24   almost by definition have profound mortality, right?  They've

25   had cancer and they're older, they're over sixty-five.

Page 15

1          So I'm worried about when you can give almost half

2   of a settlement fund in a cy pres fund with charity.   Is

3   there precedent for that?   That's huge.   You said up to

4   $10 million, so that must mean you think that could happen

5   again in this suit.

6          MR. BERMAN:   Well, we don't know.   And what we've

7   done here, your Honor, is, we've made the payments to class

8   members very aggressive.   And what I mean by that is, we took

9   all the benefit of the zero calculation.   We give someone a

10  monthly overcharge every month that they took the drug, and

11  then we're doubling the damages.

12         THE COURT:   Yes, and I thought that was good, the

13  doubling.

14         MR. BERMAN:   The reason we're doing that is to

15  increase the chance that people will say, "Wow, I can really

16  get a lot of money out of the settlement, and I'm going to

17  take the time to submit a claim form," which we think will be

18  important; and, two, if there are -- let's say only ten

19  percent of the class claimed.   By the calculations, some

20  rough calculations that I've done, kind of back of the

21  envelope, that should exhaust the $24 million.   So we hope

22  that we're right, and because of these two different prongs,

23  the high payment --

24         THE COURT:   Which charity are you thinking that

25  would be appropriate?

1          MR. BERMAN:  We've had preliminary discussions.  We

2     really haven't gotten there.

3          THE COURT:  Like, what kind of a charity?

4          MR. WISE:  We haven't really had a full discussion

5     about it yet, but the company is developing some

6     suggestions.  There will be national either cancer advocacy

7     kind of organizations or medical research organizations, but

8     we haven't had that conversation yet.

9          THE COURT:  I'm sort of thinking --

10         MR. WISE:  You know, really, I mean, names that you

11    would recognize.

12         MR. BERMAN:  We were thinking as a candidate the

13    same charity that received the cy pres in the Lupron case

14    because it's a similar drug.

15         THE COURT:  Which charity was that?

16         MR. SOBOL:  The American Cancer Society is being

17    proposed.  There are several proposals, but they're all

18    proposals that are geared towards trying to go to relief of

19    prostate cancer victims, either research in that area,

20    advocacy for early detection, that kind of thing.

21         THE COURT:  It might be worthwhile listing in the

22    notice "charities like" so we might hear some feedback.

23         MR. WISE:  That's a good idea.  We'll have time to

24    do that.

25         MR. BERMAN:  But you will in fact get feedback from

1    all kinds of groups who want to be the candidate, if that's

2    okay.

3              THE COURT:  And they may be better suited.  I have

4    no particular -- I was just reading in the paper today, for

5    example -- did you read in the New York -- I read so many

6    papers in the morning, but, anyway, I think it was the

7    New York Times, possibly the Globe, where a woman had some

8    rare form of cancer where they can't attract people to be

9    willing to do research in that area.  So it may be that if

10   we've given all this from the Lupron suit, there may be other

11   cancer-based areas where everybody would agree it would be a

12   good thing to do.  But my only point is not that I have a

13   particular stake in this, but that if you're going to send

14   out the class notice, it might be worthwhile to --

15             MR. BERMAN:  I think that's a good suggestion.

16             MR. SOBOL:  The example of what's being looked at,

17   at least one of the examples, the most aggressive example in

18   Lupron is that apparently there's a lot of research that

19   supports the notion that there could be significant lives

20   saved through early detection of prostate cancer that's not

21   made their way out towards particularly uninsured

22   populations.  So programs are being put together to educate

23   advocacy groups and to fund advocacy for obtaining and making

24   available early detection for prostate cancer.  I mean,

25   that's sort of the --

1          THE COURT:  It's just such a huge pot of money

2    suddenly that's potential.  And I would normally say, "No

3    way, we'll get everybody to come and claim for it," but our

4    experience in two basic suits makes me think that -- by the

5    way, the third-party payors are not shy about asking.  I'm

6    talking about the individual sick people.  Either there's

7    just been a surprise, really, so much so that Mr. McGovern

8    who's an expert in this area is running this survey just to

9    find out what on earth is going on here --

10         MR. SOBOL:  In Lupron, the cy pres is approximately

11   $11 million to $12 million also.

12         THE COURT:  Wow.  So Judge Stearns hasn't picked a

13   charity yet?

14         MR. SOBOL:  No.

15         THE COURT:  I'm just worrying whether that's a lot

16   of money thrown into -- but I can pick that later, but you

17   might want to just throw in a few "like" and so that people

18   can send in ideas and see what they --

19         So you're going to change the incentive.

20   Preliminary approval.  The doubling I think is a good idea.

21   And once again --

22         MR. BERMAN:  Oh, there's one other thing we did,

23   your Honor, to make it easier, and that is --

24         THE COURT:  Oh, we need a new notice for the

25   opt-outs, for the states that there was no consumer --

1          MR. BERMAN:  Correct.

2          THE COURT:  And that one I think probably is going

3     to spin us out even more for the opt-outs, right?  So,

4     timewise, you're going to both work out a set of dates and

5     just make sure that -- you'll give me a finalized order on

6     all the dates that make sense for you, but you're going to

7     let me know whether the publication -- have you all looked at

8     publication to see whether it's worth it?

9          MR. WISE:  We are looking at that at the moment.

10    We had the very same question you did, so --

11         THE COURT:  If we can get individualized notice,

12    I'm not as sure we need such an extensive media campaign.

13    And have you talked through -- Mr. McGovern was quite

14    critical of my notice.  Which notice was it that he hated?

15         MR. BERMAN:  The GSK notice, your Honor.

16         THE COURT:  He hated it.  He thought it was very

17    complicated and wasn't going to -- and created -- he thought

18    was not state of the art in the notices.  So have you

19    worked -- have you revised the notice?  Do I have a copy of

20    the notice?

21         MR. BERMAN:  Yes, you do, your Honor.

22         THE COURT:  Where is that?

23         MR. BERMAN:  The long form should be Attachment V1.

24         THE COURT:  Is that similar to what we did in the

25    other one, since I don't remember?

1          MR. BERMAN:  It is, and --

2          THE COURT:  Did you agree with Professor McGovern's

3    criticism?  Have any of you talked to him?

4          MR. BERMAN:  I have.

5          THE COURT:  He really didn't like it.

6          MR. BERMAN:  I know that.

7          THE COURT:  He really didn't like it, so I felt

8    sort of like --

9          MR. BERMAN:  And the only thing I can tell you,

10   your Honor, is that I've spent a lot of time, probably more

11   than Professor McGovern, on notices.  This idea of, like,

12   having questions and then an answer in a simple Q-and-A form

13   is something that we developed, and I disagree with him.  I

14   think what happened --

15         THE COURT:  I basically didn't like the initial

16   notice, you may remember.  Then we went back to the Lupron

17   notice which I liked better that Judge Stearns had done, and

18   I liked that.  And so this is the Lupron-type notice, right?

19         MR. BERMAN:  Yes.

20         THE COURT:  But he still thought, even about that,

21   that it wasn't -- what was he suggesting we should do?

22         MR. BERMAN:  He felt we had to make it simpler

23   basically, shorter and simpler, and we think we've tried to

24   do that as best we can.  I mean, there's a lot of things you

25   have to communicate.  And we've made the claim form very

1    simple, unlike a lot of other settlements.  If you can't find

2    your documentation, that's all you've got to say, without

3    notarization or an affidavit, that you took the drug and you

4    had an out-of-pocket payment.  So we've eased the burden on

5    claimants in a significant way.

6              THE COURT:  Right, by not notarizing it.

7              MR. BERMAN:  Correct.

8              THE COURT:  He made that point to me, which I

9    thought was a -- what do you all think about that?

10             MR. BERMAN:  Well, they've agreed to it.

11             THE COURT:  All right, you've agreed to that?  So

12   no notarization.

13             MR. WISE:  If I can ask a question, your Honor,

14   what is the timing of Professor McGovern's survey work?

15             THE COURT:  End of June, I think.  He was going to

16   interview a thousand people, and it was very expensive, so I

17   told him to give me a first bite after 500 to see if this was

18   worth the dime, kind of thing.  And then if we feel like it's

19   still worthwhile, we'll do the next 500.  He says you

20   statistic- -- how many people opted out?

21             MR. SOBOL:  Thousands.

22             THE COURT:  What?

23             MR. KODROFF:  Thousands.

24             THE COURT:  20,000.

25             MR. BERMAN:  Something like 20,000.

1          THE COURT:  Something like 20,000 people opted

2     out.  Now, we did an overinclusive notice, so a lot of those

3     could just plain old not be beneficiaries, which is fine with

4     me.  If I find from the first 500 that most of those people

5     say, "I never took this drug," I'm fine, I don't want to

6     spend the next 500.  But if I'm finding a significant number

7     of them say they were confused, that is of a huge concern to

8     me.

9          MR. BERMAN:  Well, we know from our own survey that

10    was done for us that at least a third said they were

11    confused.  A third said that they didn't take the drug.  So

12    we know that issue is going to be out there, I think, when

13    this comes back to you.

14         THE COURT:  Right, so I'm wondering, if he's trying

15    to make it more simple, if --

16         MR. SOBOL:  Did he include an opt-out notice, a

17    form?  Part of the problem with the GSK thing, of course, was

18    that there was two forms, and as a result, some people filled

19    out both forms.

20         THE COURT:  Right, so we're going to avoid that

21    here, right?

22         MR. BERMAN:  We have no opt-out form.

23         THE COURT:  Good.  That was my idea.  It was a bad

24    one, arguably; a good one, depending on why people opted

25    out.  Did anyone opt out just because they didn't want to be

1   part of it?

2         MR. BERMAN:  Yes, there were some.

3         THE COURT:  And then some opt out because they

4   weren't covered.  So will we have that problem here?  Because

5   you do want people to opt out if they're not covered, maybe.

6   Well, then they just won't submit a claim.

7         MR. SOBOL:  There's no claim.

8         THE COURT:  All right, so what if we just said, "If

9   you are a Medicare beneficiary and took Zoladex," just to get

10  their attention, because they may not know whether they made

11  a percentage copayment.  It's all lingo we know so well.

12  What if you were to say, "If you were a Medicare beneficiary

13  and took Zoladex for prostate cancer --" I mean, you're going

14  to get their attention right away -- "you may be able to

15  receive a payment"?  And should we say "a significant

16  payment"?

17        MR. BERMAN:  I would be in favor of that.

18        THE COURT:  And then I would take your italicized

19  last point, "You must complete and return the attached claim

20  form to be eligible," I would make that much -- I'm trying to

21  think -- much more prominent.

22        MR. BERMAN:  Well, we could put it right up as a

23  second caption at the top.

24        THE COURT:  That's what I would do.

25        MR. BERMAN:  Okay.

1              THE COURT:  And then is it possible to -- I think,

2    without getting too personal, at least the members of my

3    family who are in this age group don't use e-mail or the Web

4    or anything.  I would just have a phone number really right

5    up on top:  "For more information or if you're confused, call

6    this number."  I don't know whether -- you've done surveys.

7    It wouldn't be a dumb question to ask how many people

8    actually in that age group -- you can probably think of your

9    own relatives in that over-65 category.  Just it was so

10   striking in the last suits of this --

11             MR. BERMAN:  What's it like at that age?

12             THE COURT:  Say?

13             MR. BERMAN:  Mr. Sobol asked me what it's like at

14   that age.  But I can't hear him.

15             THE COURT:  So, ideally speaking, if we have that

16   all front-loaded, a phone number that they can call rather

17   than a Web site, which a lot of people just freeze at.  And

18   obviously you can put a Web site on there because there's

19   many -- I mean, I know plenty of older people who use it,

20   even if one were to go to some of the judges that are on this

21   court.  I think at the end of the day, you're better off with

22   a phone number rather than a Web site.

23             MS. HARRIS:  Your Honor, I think, since we're

24   taking out percentage copayment from the heading, that we

25   should put something up front that says, "This is not about

1    the safety or efficacy of Zoladex," because I would be

2    worried that we would concern people out there if we're just

3    having a heading that says, "If you took Zoladex --"

4         THE COURT:  I think that should be a bullet point.

5    I think that's a very good point.  Okay?

6         MR. BERMAN:  There's one other issue in the notice,

7    your Honor, and the only thing that's still in dispute is at

8    Page 6 of that notice.  It's at the very bottom.  There's

9    something called "Sample Calculation," and it spills out into

10   Page 7.  We thought it was important to give a class member,

11   to incentivize them to make a claim, to give an example of

12   what you might get.  And so we had a sample calculation based

13   on a set of facts in that calculation that we'd like to

14   include, to which AstraZeneca objects.

15        THE COURT:  Is it inaccurate, or you think it's

16   confusing?

17        MS. HARRIS:  Well, your Honor, we're concerned that

18   it may be misleading for class members.  There are basically

19   two pools of people who take Zoladex.  You can take it for

20   advanced prostate cancer, or you may take it for a number of

21   months, including up to a number of years.  But there's also

22   quite a significant pool which takes it in connection with

23   radiation therapy that only takes it for four months.  And to

24   give an example in the notice which suggests what your

25   payment would be if you took it for two years could be

1   significantly misleading to class members.  And so we agree

2   that the chart listing the monthly overcharges and the

3   calculation that it will be doubled should be in the notice

4   because that will allow each class member to calculate what

5   their return might be if they submit a valid claim form.

6            THE COURT:  They won't be able to do that.

7            MS. HARRIS:  It's just a matter of multiplying the

8   number of months that you took the product by the overcharge

9   and then doubling it.  I mean, it's a quite simple process to

10  figure out how much you may be entitled to if you submit a

11  valid claim.

12           THE COURT:  I just think a lot of these people

13  would be confused.  My big issue is whether you -- I mean,

14  you could do, if you want alternative calculations, "If you

15  took it for this kind of cancer, you'll get this, and if you

16  took it for this kind, you'll get this."

17           MS. HARRIS:  I mean, that would certainly be less

18  misleading than giving a two-year calculation, if that's the

19  average or the typical recovery such as --

20           THE COURT:  What would you say would be the typical

21  recovery for the more expensive one?  Is this accurate, $753

22  annually?

23           MS. HARRIS:  For people who take it for one to two

24  years, it certainly would be closer to what would be the

25  accurate.

Page 27

1          THE COURT:  And what would it be for the lower end

2   of the range?

3          MS. HARRIS:  It would be only four months, so

4   whatever the calculations would come out to be for about four

5   months.

6          THE COURT:  Why don't you just -- wouldn't it be a

7   better way of saying it, "Depending on how long you took it,

8   the range of recovery could be $753 at the high end," and

9   whatever it is at the low end?

10          MR. BERMAN:  Well, why don't we just have two

11   examples so that people with one kind of cancer can see where

12   they are and other people can see where they are.  I just

13   think that the more you show them the realness of the

14   payment, the more likely it is they're going to make a claim.

15          THE COURT:  I'm happy to do that.  I don't think

16   they'll understand any of it.  Up front I would say in one of

17   those bullets, just say, "It depends on how long you took it

18   and your stage of cancer, but it could range from the high

19   end to the low end of this."

20          MS. HARRIS:  Okay, your Honor, thank you.

21          THE COURT:  Okay?  That sounds good.  Thank you for

22   that suggestion.

23          So you're going to get me a revised order.  Let me

24   just say, despite my what I call nitpicks, I think this is a

25   very positive sign and a good thing.

1              And let me ask you this:  Are you now working with

2    Bristol-Myers, because we're on for trial in July, right?

3              MR. BERMAN:  Yes, your Honor, July 23.

4              THE COURT:  July 23.  And I actually -- and so if

5    you were a betting person -- have you even started that

6    process?

7              MR. BERMAN:  I believe Professor Green has made a

8    couple phone calls to both sides.

9              THE COURT:  But you have no way of gauging whether

10   or not that's real or not?

11             MR. BERMAN:  Right now my gauge is on the empty

12   side.

13             THE COURT:  Well, that's because you haven't

14   actually started doing anything.  If you were a betting

15   person, do you think there's a greater -- the only reason I

16   say this, I have criminal cases, I have other civil cases.

17   You are my number one priority.  I'm going to get through

18   this this summer.

19             MR. BERMAN:  I don't think the case will settle

20   without your ruling.

21             THE COURT:  So --

22             MR. BERMAN:  I don't want to put pressure on you.

23   I just see that there --

24             THE COURT:  I feel it, I feel it.

25             (Laughter.)

1          MR. BERMAN:  They're convinced they didn't publish

2    AWPs, so they won't talk to us.  I mean, that's the

3    back-and-forth.

4          THE COURT:  And I see a friend back there from

5    Track Two.

6          MR. DeMARCO:  Good morning, your Honor.

7          THE COURT:  I notice you come to all of these

8    things because whatever is happening, we're essentially

9    wrapping up Track One, so you are next.  What do I owe you?

10   I owe you class certification.  And have you filed motions

11   for summary judgment?

12         MR. DeMARCO:  Yes.

13         THE COURT:  I have so many boxes from so many

14   cases.

15         MR. DeMARCO:  Wait a minute.  I'm sorry, I stand

16   corrected.  We have not as yet.

17         THE COURT:  All right, good.  Honestly, if you saw

18   my office, I've actually begged and just received another

19   room from building management to just keep the files and the

20   binders and everything.

21         So let me say this:  I will issue an opinion on the

22   big case by the end of the summer, maybe before then, because

23   I'm, as you probably know, I'm not off the draw, so I'm doing

24   the rest of my case load too.  So the big issue is, if I do

25   that, I may need that reargued, the class cert, in light of

1  whatever I've done.

2          And I also think, I hate to say this, but I also

3  think summary judgment -- I loved, they probably didn't, but

4  I loved the bench trial because I actually learned hugely

5  about each drug and each circumstance in a way sometimes that

6  the millions of crates don't do for me.  Basically it forces

7  you all to parse through and present it in a clean way.  So I

8  don't know that I would do summary judgment, and I hate to

9  have you spend -- I didn't in Track One.  Isn't that

10 essentially -- we just bypassed it.

11          MR. BERMAN:  You bypassed it.  We argued it and

12 briefed it.

13          THE COURT:  I bypassed.

14          (Laughter.)

15          THE COURT:  You all need trial experience, and I

16 let some associates have experiences, and it was --

17          MR. THEODOROU:  What happened next?

18          THE COURT:  It was incredibly important to me in

19 understanding this case.  Now, maybe I wouldn't need the full

20 whammy again just simply because I've been through it once,

21 but I think there are different issues, and you all have the

22 right to present it your own way and that sort of thing.

23          MR. DeMARCO:  I'm here.  I have to talk to the

24 troops, of course, about all this because I'm just one guy

25 standing here, and there are a number of people that all

1   have --

2          THE COURT:  Absolutely, but before you start -- do

3   we have a date for the summary judgment, or is everyone

4   waiting for class cert?

5          MR. BERMAN:  I think it was timed to your class

6   cert.

7          MR. DeMARCO:  It was timed to class cert.

8          THE COURT:  So what we'll do is, when I issue the

9   big opinion, I'm going to call you all back in here and say,

10  "Okay, we're jump starting Track Two."

11         MR. DeMARCO:  Well, you've got the remainder of

12  Track One to deal with with Johnson & Johnson and BMS.

13         THE COURT:  Right.  What I'm saying is, we're

14  moving.  It's going to be done.

15         MR. DeMARCO:  I've lived here my whole life.  I'm

16  not going anywhere.

17         THE COURT:  I know.  Just I think that it's time to

18  sort of rally the troops because it's no longer the distant

19  future.

20         MR. BERMAN:  Right, we filed a motion in this

21  regard last week.

22         THE COURT:  Which is what?

23         MR. BERMAN:  Asking for a trial of the Class 2, 3,

24  rest of the case against AstraZeneca for October.

25         MR. DeMARCO:  He means Aventis.

1       MR. BERMAN:  No, AstraZeneca.

2       THE COURT:  Say that again?

3       MR. BERMAN:  Well, we still have the issue of,

4  after you get done with Massachusetts, what to do with the

5  rest of the country, and we're going to ask for it to be

6  certified and to have a trial.

7       THE COURT:  I'm going to hit Track 2 first.

8       MR. BERMAN:  Okay.

9       THE COURT:  I need to give them a little break

10  here.

11      MR. BERMAN:  I want to at least get rid of one

12  alphabet.

13      THE COURT:  I need to do something with Class 2,

14  and I need to do something with all the state attorney

15  general actions.  I need to give guidance to them.  I need to

16  move on drug cases and just either get a momentum to

17  settlement or to trial.  I've been luckily -- I'm pleased,

18  the First Circuit gave me money for a third law clerk again,

19  so I can actually staff this in the way it needs to be.  And

20  so I'm really eager to at least have next year be Track Two

21  year.  They're probably sick of being in Boston, so -- you

22  don't have any Track Two, do you, Mr. Theodorou?

23      MR. THEODOROU:  I'm only One, and whatever then

24  raises this other issue, which I'm glad to say we're not

25  there for two more years, this October trial.

1          THE COURT:  All right.  And don't forget, you all

2     don't know this and aren't a part of it, but I've got all now

3     the Justice Department's False Claims Act cases.  So that's

4     really going to be a big piece of my puzzle too.  So I'm just

5     trying to get it so there's enough of a knowledge on each

6     person's side, at least my position is, that you can either

7     settle it or appeal it under 54(b), and just basically make

8     some decisions and get on to the next group.  And I think, by

9     the end of next year, I hope to have touched at least at some

10    point on the merits each company, so that they can make

11    decisions about trial, settlement, appeal, those kinds of

12    things.  That's at least my goal.  So just tell the Track Two

13    people I haven't forgotten about them.

14          MR. DeMARCO:  I will do that, your Honor.

15          THE COURT:  And I want to thank you all for

16    settling.  I at least -- as you could tell from all the

17    comments I made in the first part, the third-party payors are

18    a different group.  I was always worried about the people

19    making the copays.  So whoever is left alive, I think this is

20    a great first step.  Thank you.

21          MR. WISE:  Thank you, your Honor.

22          MR. BERMAN:  Thank you, your Honor.

23          THE CLERK:  Court is in recess.

24          THE COURT:  You guys are here, like, permanently

25    today?

1          MR. BERMAN:  Yes, your Honor.

2          THE COURT:  Oh, by the way, can I just do one more

3    thing?  You need to get me an order with all the timing and

4    just check with Mr. Alba for the end date, so that the actual

5    final, I approve it on a preliminary basis.  You're going to

6    change compensation.  You're going to get to me on whether or

7    not this $1.5 million is worth it.  I don't think -- do you

8    think that we need to worry about that media campaign, just

9    sign this and go, the extent of the media campaign?  Is there

10   enough of a commitment here, or can you fudge it a little in

11   here?

12          MR. BERMAN:  I'm not sure I'm following you, your

13   Honor.

14          THE COURT:  In other words, what if I think

15   $1.5 million is just too much if we can get individual

16   notice?

17          MR. WISE:  Why don't you preliminarily approve it

18   subject to that condition and just the parties look into --

19          THE COURT:  Subject to the decision of the extent

20   of the media campaign?  So just rewrite it that way with all

21   the key dates and log-in --

22          MR. WISE:  We won't know all the dates until we get

23   the word from CMS on the mailing list, so it will be a while

24   before we could even supply a new schedule to your Honor.

25          THE COURT:  Good, thank you.  I'll see you later

1    today.   You're not part of later today, are you?

2              MR. THEODOROU:  No.  We're Track Two.

3              THE COURT:  Have a great July 4.

4              MR. THEODOROU:  Thank you, your Honor.

5              THE COURT:  Or Memorial Day starting with.

6              (Adjourned, 11:45 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )

4  DISTRICT OF MASSACHUSETTS     ) ss.

   CITY OF BOSTON                )

5

6

7

8          I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 35 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13 Industry Average Wholesale Price Litigation, and thereafter

14 by me reduced to typewriting and is a true and accurate

15 record of the proceedings.

16         In witness whereof I have hereunto set my hand this

17 30th day of May, 2007.

18

19

20

21

22

23         _____

           LEE A. MARZILLI, CRR

           OFFICIAL FEDERAL COURT REPORTER

24

25