1    210.    Moreover, as set forth herein, because of the integral relationship of the drug products

2    of the Amgen Defendants in the treatment of cancer, the Amgen Defendants had the same interest

3    as other Corporate Defendants in maintaining AWP as the benchmark for reimbursement under

4    government and private assistance programs.  Accordingly, beginning in at least 1994, the Amgen

5    Defendants met and communicate with other Corporate Defendants, including TAP, Abbott, the

6    AstraZeneca Defendants and the Bristol-Myers Defendants, among others, to work to oppose effects

7    by HCFA to change Medicare reimbursement for cancer drugs and other prescription drugs.

8    211.    Congressman Stark exposed Immunex's scheme to inflate AWP's in a letter dated

9    September 28, 2000, to the president of a national pharmaceutical trade group:

> The documents further expose the fact that certain of your members deliberately concealed and misrepresented the source of AWP's:
> In a 1996 Barron's article entitled "Hooked on Drugs" the following quote from Immunex appeared (Composite Exhibit #11):
>
> IMMUNEX: "But Immunex, with a thriving generic cancer-drug business says its average wholesale prices aren't its own.  The drug manufacturers have no control over the AWP's published. ..." (IMX003079)
>
> However, Immunex's own internal documents indisputably establish the knowledge of the origin of their AWP's and their active concealment.

17    212.    Schering Defendant engaged in an ongoing scheme to inflate AWP's. In a May 4,

18    2000, letter from Congressman Tom Bliley, Chairman of the Congressional Committee on

19    Commerce, to the President of Defendant Warrick:

> [O]ne of the drugs reflecting a significant variation between the AWP-based prices paid by Medicare and the prices generally charged to private sector purchasers is albuterol sulfate, a drug manufactured by Warrick Pharmaceuticals.

213.    In a May 4, 2000, letter, Congressman Bliley outlined the Schering defendants'

scheme with respect to the prescription drug albuterol sulfate. The government's investigation

uncovered a significant spread between the amount Medicare reimbursed for albuterol sulfate and

the amount the Schering Defendants actually charged. U.S. Rep. Bliley also stated:

> The OIG [Office of the Inspector General] has determined that the Medicare-allowed amount for albuterol sulfate, a pharmaceutical product sold by your company, in the Fiscal Year 1996 was $.42. The

OIG further estimated that the actual wholesale price of this drug was $.15 and the highest available wholesale price that the OIG was able to identify was $.21.

## THE AVENTIS DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

214.   It is believed and therefore averred that, during the Class period, the Aventis Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Aventis Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer and other prescription drugs in order to create a spread in their drug prices for the benefit of medical providers and others. All these drugs had "spreads."

215.   The drugs manufactured by the Aventis Defendants and covered by government and private assistance programs include, but may not be limited to: Anzemet® (dolasteron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii) and Taxotere® (docetaxel), among other prescription drugs. All these drugs had "spreads."

216.   Anzemet is an intravenous anti-nausea medication similar to Kytril (gransietron hydrochloride - GlaxoSmithKline Defendants) and Zofran (ondansetron hydrochloride - GlaxoSmithKline Defendants).  It may be administered to patients receiving anti-neoplastic medications including, but not limited to anti-neoplastic drugs manufactured by the AstraZeneca Defendants (Tomudex - raltitrexed), the J&J Defendants (Leustatin - cladribine), the Pharmacia Defendants (Adriamycin - doxorubicin hydrochloride, Adrucil - fluorouracil, Neosar - cyclophosphamide, Cystosar-U - cytarabine, and others), the Boehringer Defendants (bleomycin, cisplatin, cyclosporine, etoposide, leukovorin and others), the Bristol-Myers Defendants (Cytoxan - cyclophosphamide, Rubex - doxorubicin hydrochloride, VePesid and Etopophos - etoposide) and the Baxter Defendants (etoposide, doxorubicin), among others.

217.   U.S. Congressman, Thomas J. Bliley, in a letter dated May 4, 2002 to Defendant Behring, highlights the unlawful practice of the Company of inflating average wholesale prices for its drugs.

> The Office of Inspector General (OIG) at the Department of Health and Human Services determined that the Medicare allowed amount for immune globulin, a pharmaceutical product sold by your company under the name Gammar, in Fiscal Year 1996 was $42.21. The OIG further estimated that the actual wholesale price of this drug was $16.12 and the highest available wholesale price that the OIG was able to identify was $32.11.

218.   Similarly, Congressman Pete Stark, summarized the scheme implemented by Hoechst to inflate the AWPs for its drugs. In a letter to the Pharmaceutical Research and Manufacturers of American dated September 28, 2000, Congressman Stark explains:

> The following chart represents a comparison of Hoechst's fraudulent price representations for its injectable...drug versus the truthful prices paid by the industry insider. It . . . also compares Hoechst's price representations for the tablet form of Anzemet and the insider's true prices. It is extremely interesting that Hoechst did not create a spread for its tablet form of Anzemet but only the injectable form. This is because Medicare reimburses Doctors for the injectable form of this drug and by giving them a profit, can influence prescribing. The tablet form is dispensed by pharmacists, who accept the Doctor's order. And this underscores the frustration that federal and state regulators have experienced in their attempts to estimate the truthful prices being paid by providers in the marketplace for prescription drugs and underscores the fact that, if we cannot rely upon the drug companies to make honest and truthful representations of their prices, Congress will be left with no alternative other than to legislate price controls.

219.   The government's investigation has uncovered substantial evidence that the Aventis Defendants' fraudulent practices are widespread. For example, in a report published by DHHS, the DOJ documented at least 15 instances where the published AWPs for drugs manufactured by the Aventis Defendants were substantially higher than the actual prices listed by wholesalers.

220.   The same report concluded that (i) the AWP for all immune globulin 5 mg doses listed in the 1997 *Red Book* were inflated by an average spread of 32.21%; (ii) a 10 mg dose of Anzemet® had a Medicare Median of $14.82 and a Catalog Median of $8.29, resulting in a spread of 78.76%; and (iii) a 20 mg does of Taxotere® had a Medicare Median of $283.65 and a Catalog median of $8.29, resulting in a spread of 18.75%.

1
2

### THE BOEHRINGER DEFENDANTS'
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

3      221.   It is believed and therefore averred that, during the Class period, the Boehringer

4   Defendants engaged in conduct similar to the other Corporate Defendants with respect to their

5   marketing, promotion, sale and distribution of cancer drugs and other prescription drugs

6   manufactured, distributed, marketed and sold by them. In particular, it is averred that the Boehringer

7   Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

8   reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread

9   in their drug prices for the benefit of medical providers and others.

10      222.   The drugs manufactured, distributed, marketed and sold by the Boehringer

11   Defendants and covered by government and private assistance programs include, but may not be

12   limited to injectable forms of: acyclovir, bleomycin, cisplatin, cyclosporine, cytarabine, doxorubicin

13   hydrochloride, doxorubicin hydrochloride, doxycycline, etoposide, leucovorin calcium, leucovorin

14   calcium, methotrexate, mitomycin, paclitaxel, pamidronate disodium, and vinblastine sulfate, among

15   other prescription drugs. All these drugs had "spreads."

16      223.   Most of the above medications are members of the anti-neoplastic class. Therefore

17   patients receiving them may need anti-nausea medications such as Anzemet (dolasteron mesylate -

18   Aventis Defendants), Kytril (gransietron hydrochloride - GlaxoSmithKline Defendants), Zofran

19   (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan (metoclopramide - the Wyeth

20   Defendants), (ondansetron - the Sicor Defendants), Pramilem (metoclopramide - the Sicor

21   Defendants) . Patients receiving these anti-neoplastics may also require medications in the epoetin

22   alpha class (Procrit - J&J Defendants), such as Aranesp (darbepoetin alpha - Amgen Defendants) and

23   Epogen (epoetin alpha - Amgen Defendants).

24
25

### THE BAXTER DEFENDANTS'
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

26      224.   It is believed and therefore averred that, during the Class period, the Baxter

27   Defendants engaged in conduct similar to the other Corporate Defendants with respect to their

28

1  marketing, promotion, sale and distribution of cancer drugs and other prescription drugs

2  manufactured, distributed, marketed and sold by them. In particular, it is averred that the Baxter

3  Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

4  reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread

5  in their drug prices for the benefit of medical providers and others.

6     225.    The drugs manufactured, distributed, marketed and sold by the Baxter Defendants and

7  covered by government and private assistance programs include, but may not be limited to: albumin,

8  Bebulin® (factor ix complex), Buminat® (human albumin), dextrose, dextrose sodium chloride,

9  Gammagard® (immune globulin), Iveegam® (immune globulin), Holoxan® (ifosfanide), Uromitexan®

10  (mesna), Endoxan® (cyclophosphamide), Hemofil M® (antihemo factor viii), Proplex T® (factor ix

11  complex), Recombinate® (antihemo factor viii), cisplatin, sodium chloride and diazepam, among

12  other prescription drugs. All these drugs had "spreads."

13     226.    The above group of medications include anti-hemophilic factors (Bebulin, Hemofil,

14  Hemofil M, Proplex, and Recombinate). Patients receiving those medications may receive similar

15  agents such as Bioclate (factor VIII - Aventis Defendants), Mononine (factor IX - Aventis

16  Defendants), and Kogenate (factor VIII - Bayer). In addition patients treated with anti-neoplastics

17  such as Endoxan and cisplatin, may need treatment for nausea with drugs such as Anzemet

18  (dolasteron mesylate - Aventis Defendants), Kytril (gransietron hydrochloride - GlaxoSmithKline

19  Defendants), Zofran (ondansetron hydrochloride - GlaxoSmithKline Defendants), Reglan

20  (metoclopramide - the Wyeth Defendants), (ondansetron - the Sicor Defendants), Pramilem

21  (metoclopramide - the Sicor Defendants). Patients receiving these anti-neoplastics may also require

22  medications in the epoetin alpha class (Procrit - J&J Defendants), such as Aranesp (darbepoetin

23  alpha - Amgen Defendants) and Epogen (epoetin alpha - Amgen Defendants).

24     227.    The Congressional investigation of Defendant Baxter uncovered Baxter's AWP

25  scheme in a document entitled, "Confidential - Baxter Internal Use Only," and further stating that,

26  "Increasing AWPs was a large part of our negotiations with the large homecare companies."

27

28

228.    Another Baxter document explains Baxter's awareness of the fraudulent scheme and its need to do something to "address" the "problem."

> The deliberate manipulation of AWP or WAC prices is a problem that we need to address.  The spread between acquisition cost and AWP/WAC is direct profit for customers, and is being used to increase product positioning in the market by certain manufacturers.  What Baxter did was join the conspiracy by manipulating the AWPs for its drugs and creating spreads.

229.    The Baxter Defendants also provided physicians with free goods with the understanding that physicians would bill for those goods, in violation of federal law":

> BAXTER: "The attached notice from Quantum Headquarters was sent on April 10th to all their centers regarding the reduction on Recombinate pricing.  Please note that they want to continue to be invoiced at the $.81 price.  They have requested that we send them free product every quarter calculated by looking at the number of units purchased in that quarter and the $.13 reduction in price...free product given to achieve overall price reduction."

### DEFENDANT BAYER'S
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

230.    It is believed and therefore averred that, during the Class period, Bayer engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that Bayer adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

231.    The drugs manufactured, distributed, marketed and sold by Bayer and covered by government and private assistance programs include, but may not be limited to: Viadur (leuprolide), Kogenate® (antihemo factor viii), FS/Kogenate® (antihemo factor viii), and Koate-DVI® (antihemo factor viii) and Gamimune® (immune globulin), all used to treat hemophilia, and Gamimune® which is used in the treatment of immunodeficiency and autoimmune disorders, among other prescription drugs.  All these drugs had "spreads."

232.    Bayer acknowledges its involvement in the fraudulent scheme in internal documents that attest to the fact that "many" health care providers are "paid on a discount from AW[P]."

233.    A September 28, 2000 letter from Representative Stark to Pharmaceutical Research and Manufacturers of America shows Bayer's deliberate and unlawful scheme to inflate the AWP's and market the spread for their products.

> BAYER:"...[I]f Baxter has increased their AWP then we must do the same. Many of the Homecare companies are paid based on a discount from AWP. If we are lowed [sic] than Baxter then the return will be lower to the HHC. It is a very simple process to increase our AWP, and can be done overnight."

234.    A Justice Department press release regarding settlement of claims against Bayer, dated January 23, 2001, clearly implicates Defendant Bayer in the scheme to fraudulently inflate AWP's for its products.

> [B]eginning in the early 1990s [Bayer] falsely inflated the reported drug prices - referred to by the industry as the Average Wholesale Price (AWP), the Direct Price and the Wholesale Acquisition Cost - used by state governments to set reimbursement rates for the Medicaid program. By setting an extremely high AWP and... selling the product to doctors at a dramatic discount, Bayer induced physicians to purchase its products rather than those of competitors by enabling doctors to profit from reimbursement paid to them by the government.

> The investigation further revealed that the practice in which Bayer selectively engaged, commonly referred to as "marketing the spread," also had the effect of discouraging market competition from manufacturers that do n o inflate AWPs as a way of inducing doctors to purchase their products.

235.    Beginning in the early 1990s, Bayer began to falsely inflate reported drug prices. Bayer set an extremely high AWP and sold prescription drugs and medical products to medical providers at dramatic discounts which enabled those medical providers to receive excessive reimbursements from Government and Private Assistance programs and patients.

236.    In an independent investigation, the DOJ concluded that Bayer's conduct in marketing the spread had the "effect of discouraging market competition from companies that do not inflate AWPs as a way of attracting doctors to their products."

237.    The DOJ also found that "some physicians and home health companies ignore the products of companies that refuse to create these profit windfalls for customers."

238.    Similar to the Lupron® Manufacturer Defendants, Bayer has agreed to settle criminal charges brought by the federal government alleging that Bayer caused medical providers to submit fraudulent claims to 47 state Medicaid programs. The government had alleged, as here, that Bayer falsely inflated the AWPs for certain of its drugs and biologic products and "marketed the spread" between those AWPs and the actual cost to medical providers.

239.    In settlement of these charges, Bayer paid the sum of $14 million to the United States and 47 states including Arizona. Bayer also agreed to enter into a Corporate Integrity Agreement which, liked the one entered into by TAP on behalf of the Lupron® Manufacturer Defendants, provides for Bayer to change its drug pricing practices.

## THE BRISTOL-MYERS DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

240.    It is believed and therefore averred that, during the Class period, the Bristol-Myers Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Bristol-Myers Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

241.    The drugs manufactured, distributed, marketed and sold by the Bristol-Myers Defendants and covered by government and private assistance programs include, but may not be limited to: Blenoxane® (bleomycin sulfate), Paraplatin® (carboplatin), Cytoxan® (cyclophospamide), Rubex® (doxorubicin hydrochloride), Etopophos® (etoposide), VePesid® (etoposide), TaxolV (paclitaxel) and Fungizone® (amphotericin B), among other prescription drugs. All these drugs had "spreads."

242.    The Bristol Myers' Defendants worked with the other Corporate Defendants to ensure that Medicare and other government assistance programs did not change the reimbursement system put in place in the beginning of 1992. Among other things, the Bristol-Myers' Defendants held meetings with and otherwise communicated with the other Corporate Defendants to maintain AWP as a basis for reimbursement under government assistance programs, like Medicare.

243.    Acknowledging the need for all the Corporate Defendants to conspire and agree to work together to ensure AWP remained a benchmark for reimbursement, Bristol-Myers' 1994 Annual Report stated that "[t]he possibility of price controls being included in future proposals [to reform the U.S. Healthcare system] is something to which Bristol-Myers Squibb and the entire pharmaceutical industry must remain vigilant."

244.    As part of this "vigilance" maintained by the "pharmaceutical industry", in 1994, employees and/or representatives of the Bristol-Myers Defendants met with employees and/or representatives of Abbott, TAP, the AstraZeneca Defendants and the Amgen Defendants to discuss proposed changes by HCFA in the payment for certain drugs, especially the highest volume drugs, reimbursed by Medicare. These proposed changes included changes in the AWP and/or the use of AWP as a basis for reimbursement. As a result of these meetings and communications between and among the aforesaid Corporate Defendants, it is believed and therefore that subsequent meetings and communications took place between and among these Corporate Defendants and the other Corporate Defendants to ensure that all agreed to work to ensure that AWP remained a fixture of a government assistance reimbursement so that the fraudulent scheme and conspiracy to inflate AWPs could continue.

245.    By 2001, members of Congress were accusing the Bristol-Myers Defendants of fraud. In a letter dated February 27, 2001, Congressman Pete Stark of the Committee on Ways and Means of the U.S. House of Representatives wrote to Peter Bolen, President of Bristol-Myers, the following:

> Ongoing Congressional investigations have uncovered compelling evidence that Bristol-Myers Squibb ("Bristol") has for many years deliberately overstated the prices of some of its prescription drugs in order to cause the Medicare and Medicaid programs to pay inflated amounts to Bristol's customers. Bristols' participation in this scheme

is costing American taxpayers billions of dollars in excessive drug costs and is jeopardizing the public's health safety and welfare.

The price manipulation scheme is executed through Bristol's falsely inflated representations of average wholesale price ("AWP"), direct price ("DP") and wholesaler acquisition cost ("WAC"), which are utilized by Medicare, Medicaid and most private third party payers in establishing drug reimbursements to providers. The difference between the inflated representations of AWP, DP, and WAC versus the true prices that providers are paying is regularly referred to in your industry as "the spread".

## THE GLAXOSMITHKLINE DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

246.    It is believed and therefore averred that, during the Class period, the GlaxoSmithKline Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them.  In particular, it is averred that the GlaxoSmithKline Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

247.    The drugs manufactured, distributed, marketed and sold by the GlaxoSmithKline Defendants and covered by government and private assistance programs include, but may not be limited to: Hycamtin® (topotecan hydrochloride), Ventolin® (albuterol) and Zofran® (ondansetron hydrochloride).  Pierre Fabré Médicament licenses another government and private assistance programs, Navelbine® (vinorelbine tartrate), to GlaxoSmithKline.  GlaxoSmithKline Beecham P.L.C. manufactured and sold Kytril® (granisteron hydrochloride), another drug covered by government and private assistance programs (and a competitor to Zofran®), prior to the merger.  To secure regulatory approval for the merger, SmithKline Beecham P.L.C. sold Kytril®'s global rights to the Roche Group in approximately December of 2000.  All the drugs of the GlaxoSmithKline Defendants had "spreads."

248.     There is evidence that the GlaxoSmithKline Defendants were involved in "vigilance" described above to avoid government price controls in drug reimbursement under government assistance programs.

249.     In a Glaxo internal memo dated October 25, 1994, entitled "Issue considerations of Zofran pricing strategies," Nancy Pekarek (a communications manager for Glaxo who later became Vice President of U.S. Corporate Media Relations) recognized the implications of increasing the AWP to create a better spread:

> If Glaxo chooses to increase the NWP and AWP for Zofran in order to increase the amount of Medicaid reimbursement for clinical oncology practices, we must prepare for the potential of a negative reaction from a number of quarters. Some likely responses:

> Press: Glaxo's health care reform messages stressed the importance of allowing the marketplace to moderate prices. On the surface, it seems that in response to the entrance of a competitor in the market, Glaxo has actually raised its price on Zofran-perhaps twice in one year. How do we explain that price increase on a drug that [has] already been cited in the press as one of, if not the most expensive drug on the hospital formulary?

> *If we choose to explain the price increase by explaining the pricing strategy, which we have not done before, then we risk further charges that we are cost shifting to government in an attempt to retain market share.*

> Congress: Congress has paid a good deal of attention to pharmaceutical industry pricing practices and is likely to continue doing so in the next session. How do we explain to Congress an 8 % increase in the NWP between January and November of 1994, if this policy is implemented this year? How do we explain a single 9% increase in the AWP? *What arguments can we make to explain congressional watchdogs that we are cost-shifting at the expense of the government?* How will this new pricing structure compare with costs in other countries?

> *Private insurers, out-of-pocket payers: These groups, and perhaps other, are likely to incur greater costs as a result of this pricing strategy. How will they be affected? What response do we have for them?* (Emphasis added.)

250.     Thus, Glaxo knew that, it had to fraudulently conceal its AWP inflation conduct in order to continue to be able to "cost-shift[] at the expense of the government" and patients.

251.     Similar to the way the in-house lawyers for TAP and the AstraZeneca Defendants first accused each other of Medicare fraud, but then forged an agreement to mutually engage in the

scheme to defraud Medicare and Medicare patients, in-house counsel for Glaxo and SmithKline,

before the companies merged, accused each other of Medicare fraud, but then did nothing to stop one

another.

252.    On February 6, 1995, Timothy D. Proctor, Senior Vice President, General Counsel

and Secretary for Glaxo, sent a letter to J.Charles Wakerly, Senor Vice President, Director and

General Counsel for SmithKline informing him of "several issues pertaining to the advertising and

marketing of Kytril":

> Glaxo's sales representatives have encountered a substantial amount
> of what appear to be "homemade" Kytril vs. Zofran cost comparisons.
> It is our understanding that many of these pieces have been generated
> through a company-provided lap top computer program.
>
> ...
>
> In additional, a significant number of these pieces (*see* Exhibits F-J)
> contain direct statements or make references as to how institutions
> can increase their "profits" from Medicare through the use of Kytril.
> Some even go so far as to recommend that the medical professional
> use one vial of Kytril for two patients (*see* Exhibit F) but charge
> Medicaid for three vials.  This raises significant fraud and abuse
> issues which I am sure you will want to investigate."

253.    On February 22, 1995, Ursula B. Bartels, Vice President and Associate General

Counsel for SmithKline (now General Counsel of Boehrigner) wrote in response that SmithKline

was investigating Glaxo's claims and asked whether Glaxo had specific information regarding the

improper marketing of Kytril.  Ms. Bartels also accused Glaxo of using false and misleading

marketing materials regarding Zofran that rely on the medical providers' ability to garner more

profit.  Specifically, he stated:

> Regarding similar concerns, we would like to draw your attention to
> reports we are receiving from our field force regarding reimbursement
> issues.  In an apparent effort to increase reimbursement to physicians
> and clinics, effective 1/10/95, Glaxo increased AWP for Zofran by
> 8.5%, while simultaneously fully discounting the increase to
> physicians.  The latter was accomplished by a 14% rebate available
> to wholesalers on all non-hospital Zofran sales on a multi-dose vial.
> *The net effect of these adjustments is to increase the amount of*
> *reimbursement available to physicians from Medicare and other third*
> *party payors whose reimbursement is based on AWP.* (Emphasis
> added.) Since the net price paid to Glaxco for the non-hospital sales
> of the Zofran multi-does vial is actually lower, it does not appear that
> the increase in AWP was designed to increase revenue per unit to

1
2
3
4
5

> Glaxo. *Absent any other tenable explanation, this adjustment appears to reflect an intent to induce physicians to purchase Zofran based on the opportunity to receive increased reimbursements from Medicare and other third party payors. In fact, we have had numerous verbal reports from the field concerning Glaxo representatives who are now selling Zofran based on the opportunity for physicians to receive a higher reimbursement from Medicare and other third-party payors while the cost to the physician of Zofran has not changed.* (Emphasis added).

6   254.   On April 25, 1995, Adrianna L. Carter, Glaxo Assistant General Counsel responded

7   to SmithKline's February 22, 1995 letter. Pursuant to the request of SmithKline, Ms. Carter

8   provided numerous additional examples of false and misleading marketing materials concerning

9   "cost comparisons distributed to health care professionals by SmithKline representatives." Ms.

10  Carter also denied SmithKline's allegations regarding 'fraud and abuse" over the price increase of

11  Zofran. However, Ms. Carter did admit that the AWP price increase for Zofran (R), did not affect

12  the actual cost to medical providers and that Glaxo's sales representatives were using the "spread"

13  to gain market share. Specifically, Ms. Carter stated:

14
15

> It is true that, despite a price increase, some physicians and other healthcare professionals will not see the higher price as the result of rebates or other incentives.
>
> \* \* \*

16
17

> It is also true that our sales representatives have been explaining the relationship between the price and Medicare reimbursement for Zofran to physicians.

18  255.   Finally, Ms. Carter stated that despite SmithKline's assertions that any alleged

19  improper marketing of Kytril would end, "Unfortunately, despite your efforts, these activities are still

20  ongoing."

21

22  256.   The fact that Glaxo and SmithKline each accused the other of the same fraudulent

23  conduct, but neither brought it to the attention of the public or the federal or state authorities, is

24  evidence that both companies were engaged in the same fraudulent scheme and conspiracy.

25  257.   In a September 27, 2000 article in USA Today, Glaxo spokesman Rick Sluder stated

26  that average wholesale prices are not "representative of actual prices." Mr. Sluder also noted that

27  Glaxo changed its wholesale prices to keep up with its competitors because "We [Glaxo] didn't want

28

1   to put ourselves at a price disadvantage." Mr. Sluder admitted that the marketing of Glaxo drugs is

2   based, in part, on the spread. He noted that Glaxo's sales staff is briefed on the price advantages to

3   doctors who get reimbursed based upon the AWP.

### THE SCHERING DEFENDANTS' UNLAWFUL CONDUCT IN ARIZONA AND THROUGHOUT THE COUNTRY

6      258.   It is believed and therefore averred that, during the Class period, the Schering

7   Defendants engaged in conduct similar to the other Corporate Defendants with respect to their

8   marketing, promotion, sale and distribution of cancer drugs and other prescription drugs

9   manufactured, distributed, marketed and sold by them. In particular, it is averred that the Schering

10   Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

11   reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread

12   in their drug prices for the benefit of medical providers and others.

13      259.   The drugs manufactured, distributed, marketed and sold by the Schering Defendants

14   and covered by government and private assistance programs include, but may not be limited to:

15   Proventil® (albuterol sulfate), Integrelin® (eptifibatide), Intron A® (interferon alfa-2b recombinant)

16   and Temodar® (temozolomide), among other prescription drugs. All these drugs had "spreads." The

17   Schering Defendants Albuterol sulfate sales alone totaled $154 million in 2000. All these drugs had

18   "spreads."

19      260.   The Schering Defendants engaged in an ongoing scheme to inflate AWPs. In a May

20   4, 2000, letter from Congressman

> The OIG [Office of the Inspector General] has determined that the
> Medicare-allowed amount for albuterol sulfate, a pharmaceutical
> product sold by your company, in the Fiscal Year 1996 was $.42. The
> OIG further estimated that the actual wholesale price of this drug was
> $.15 and the highest available wholesale price that the OIG was able
> to identify was $.21.

### THE WYETH DEFENDANTS'
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

262.    It is believed and therefore averred that, during the Class period, the Wyeth
Defendants engaged in conduct similar to the other Corporate Defendants with respect to their
marketing, promotion, sale and distribution of cancer drugs and other prescription drugs
manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Wyeth
Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or
reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread
in their drug prices for the benefit of medical providers and others.

263.    The drugs manufactured, distributed, marketed and sold by the Wyeth Defendants and
covered by government and private assistance programs include, but may not be limited to: Ativan
(lorazepam), Benefix (recombinant antihemophilic Mylotarg (gemtuzumab ozogamicin), Neumega
(oprelvekin), Pipracil (piperacillin sodium), Refacto (antihemophilic factor recombinant), Reglan
(metoclopramide), and Zocyn (piperacillin sodium/tazobactam sodium).  All these drugs had
"spreads."

264.    Reglan is an anti-nausea medication used to treat the side effects of anti-neoplastic
chemotherapy agents such as those manufactured and marketed by the J&J Defendants (Leustatin),
Pharmacia Defendants (Adriamycin, Adrucil, Neosar, Idamycin, and others), Boehringer Defendants
(bleomyscin, cisplatin, paclitaxel, vinblastine and others), Baxter Defendants (Endoxan),
GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol
Myers (Blenoxane, Paraplatin, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor
Defendants (Bleomycin, Epirubicin, Thiotepa), among others).  Reglan is in the same class of
medications and is used in the same patient population as Pramilem (metoclopramide - Sicor
Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis),

1  Kytril (gransietron hydrochloride - GlaxoSmithKline Defendants) and Zofran (ondansetron

2  hydrochloride - GlaxoSmithKline Defendants).

3  .   265.   Neumega (oprelvekin) is a drug used to help maintain adequate numbers of blood

4  platelets in patients whose bone marrow has been suppressed by the effect of anti-neoplastic

5  chemotherapy agents such as those listed in the preceding paragraph, and others. It may be used in

6  patients also receiving other drugs that counter the effects of bone marrow suppression such as

7  Procrit (epoetin alpha - J&J Defendants), Epogen (epoetin alpha - Amgen), Aranesp (darbepoetin

8  alpha - Amgen), and Neupogen (filgrastim - Amgen).

9  266.   Patients receiving anti-neoplastic medications may have an increased susceptibility

10  to infection and may require the administration of antibiotics such as those manufactured by Wyeth

11  Defendants such as Zosyn and Pipracil.

12
13
**DEFENDANT DEY'S**
**UNLAWFUL CONDUCT IN ARIZONA**
**AND THROUGHOUT THE COUNTRY**

14  267.   It is believed and therefore averred that, during the Class period, Dey engaged in

15  conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale

16  and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed

17  and sold by them. In particular, it is averred that Dey adopted similar unlawful practices, such as the

18  artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription

19  drugs, in order to create a spread in their drug prices for the benefit of medical providers and others

20  268.   The drugs manufactured, distributed, marketed and sold by Dey and covered by

21  government and private assistance programs include, but may not be limited to: AccuNeb (albuterol),

22  albuterol sulfate solution, cromolyn sodium solution, DuoNeb (albuterol solution/ipratropium

23  bromide solution), ipratropium bromide solution, and sodium chloride solution for inhalation. All

24  these drugs had "spreads."

25  269.   All of these products are used in the treatment of obstructive airways disease in the

26  same patient populations as other bronchodilator drugs in the same form, including Atrovent

27  (ipratropium bromide - Boehringer Defendants), Ventolin (albuterol - GlaxoSmithKline Defendants)

28

1 and Proventil (albuterol - Schering Defendants).  Sodium chloride for inhalation may be used alone

2 or as a diluent for administration of bronchodilator medications.

3      270.   Dey has engaged in fraudulent pricing practices with respect to albuterol sulfate. The

4 Office of Inspector General (OIG) found that Medicare's reimbursement amounts/or albuterol was

5 nearly six times higher than the median catalog price and that "Medicare and its beneficiaries would

6 save between $226 million and $245 million a year if albuterol were reimbursed at prices available

7 to suppliers".

8
9

**THE FUJISAWA DEFENDANTS'**
**UNLAWFUL CONDUCT IN ARIZONA**
**AND THROUGHOUT THE COUNTRY**

10      271.   It is believed and therefore averred that, during the Class period, the Fujisawa

11 Defendants engaged in conduct similar to the other Corporate Defendants with respect to their

12 marketing, promotion, sale and distribution of cancer drugs and other prescription drugs

13 manufactured, distributed, marketed and sold by them.  In particular, it is averred that the Fujisawa

14 Defendants adopted similar unlawful practices, such as the artificial inflation of the AWP (or

15 reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread

16 in their drug prices for the benefit of medical providers and others.

17      272.   The drugs manufactured, distributed, marketed and sold by the Fujisawa Defendants

18 and covered by government and private assistance programs include, but may not be limited to:

19 AmBisome (amphoteracin B liposome for injection), Aristocort supension and Arisocort Forte

20 suspension (sterile triamcinolone diacetate suspension), Atristospan suspension (sterile

21 triamcinolone hexacetonide suspension, USP), Cefizox IM/IV Injection and Cefizox IV Injection

22 Minibag (ceftizoxime sodium), and Prograf (tacrolimus).  All these drugs had "spreads."

23      273.   AmBisome is an antifungal agent that may be used to treat opportunistic fungal

24 infections in patients with compromised immune systems due to treatment with anti-neoplastic

25 medications such as those manufactured and marketed by J&J Defendants (Leustatin), Pharmacia

26 Defendants (Adriamycin, Adrucil, Neosar, Idamycin, and others), Boehringer Defendants

27 (bleomyscin, cisplatin, paclitaxel,, vinblastine and others), Baxter Defendants (Endoxan),

28

GlaxoSmithKline Defendants (Hycamptin, Navelbine), Schering Defendants (Temodar), Bristol Myers (Blenoxane, Paraplatin, Rubex, Etophopos), Wyeth Defendants (Mylotarg), and Sicor Defendants (Bleomycin, Epirubicin, Thiotepa , and others). Patients receiving these anti-neoplastic medications may also receive medications to treat the side effect of nausea such as Pramilem (metoclopramide - Sicor Defendants), Lemet (ondansetron - Sicor Defendants), Anzemet (dolasteron mesylate - Aventis), Kytril (gransietron hydrochloride - GlaxoSmithKline Defendants) and Zofran (ondansetron hydrochloride - GlaxoSmithKline Defendants). They may also be treated with agents to counter the bone marrow suppressant effects of anti-neoplastic drugs, such as Procrit (epoetin alpha - J&J Defendants), Epogen (epoetin alpha - Amgen), Aranesp (darbepoetin alpha - Amgen), Neupogen (filgrastim - Amgen), and Neumega (oprelvekin -  Wyeth). These patients may also receive antibiotics made by Fujisawa Defendants such as Cefizox and antivirals such as Acyclovir (GlaxoSmithKline Defendants). The patients to whom AmBisome is marketed also comprise the market for antifungals made by other defendants including Pharmacia Defendants (Amphocin - amphotericin B), J&J defendants (Sporanox - itraconazole), and Fungizone (Amphotericin B - Bristol Myers Defendants).

274.    A letter dated September 28, 2000 from U.S. Rep. Pete Stark to the Pharmaceutical Research and Manufacturers of America details how the Fujisawa Defendants fraudulently inflated the AWP's/for its drugs.

> I would have liked to see us match Abbott's AWP for our complete Vanco, [Vancomycin Hydrochloride], and Cefesolin line. I will settle for the five gram at $1 below Abbott but that means that we still have to compete at the other end of the equation. For example, if Abbott's AWP is $163 and their contract is $30 and if our AWP is $162 we will have to be at least $29 to have the same spread. Follow?

### THE SICOR DEFENDANTS'
### UNLAWFUL CONDUCT IN ARIZONA
### AND THROUGHOUT THE COUNTRY

275.    It is believed and therefore averred that, during the Class period, the Sicor Defendants engaged in conduct similar to the other Corporate Defendants with respect to their marketing, promotion, sale and distribution of cancer drugs and other prescription drugs manufactured, distributed, marketed and sold by them. In particular, it is averred that the Sicor Defendants adopted

similar unlawful practices, such as the artificial inflation of the AWP (or reimbursement price) for their cancer drugs and other prescription drugs, in order to create a spread in their drug prices for the benefit of medical providers and others.

276.   The drugs manufactured, distributed, marketed and sold by the Sicor Defendants and covered by government and private assistance programs include, but may not be limited to: bleomycin sulfate, cyclosporine, daunorubicin hydrochloride, dexrazoxane, doxorubicin hydrochloride, epirubicin hydrochloride, etoposide, mitomycon, thiotepa, amikacin sulfate, idarubicin hydrochloride, l-cysteine hydrochloride, vincristine sulfate, leucovorin calcium, cisplatin, amphotericin, vancomycin, clindamycin, metoclopramide, ondansetron, carboplatin, flutamide, paclitaxel and leuprolide acetate, among others. All these drugs had "spreads."

277.   The Sicor Defendants have engaged in an ongoing scheme to inflate AWP's. By letter dated September 25, 2000 to the HFCA administrator, the chairman of the Commerce Committee stated that:

> [I]n 1998, a health care provider could buy Gensia's Etoposide for $14.00, while the AWP used to determine Medicare reimbursement was $141.97.

278.   The Sicor Defendants' marketing strategies further demonstrate its fraudulent practices. A marketing document prepared by Gensia stated:

> Concentrate field reps. on the top 40 AIDS hospitals using a $54.00 price in conjunction with a 10% free goods program to mask final price. Provides the account with an effective price of $48.60 pre vial.

279.   *See* letter dated September 28, 2000 from U.S. Rep. Pete Stark to the, President of the Pharmaceutical Research and Manufacturers of America.

## FRAUDULENT CONCEALMENT

280.   Plaintiff had no knowledge of the conspiracy, concerted action and other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until early October, 2001, when it was announced that Defendants Abbott, Takeda and TAP, through TAP agreed to enter a plea of guilty to a conspiracy to violate the PDMA. Plaintiff could not have discovered the conspiracy, concerted action or other unlawful conduct alleged

herein at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy. These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the AWP, and other conduct alleged herein.

281.   Because the unlawful conduct and conspiracy was kept secret by Defendants and their co-conspirators, Plaintiff was unaware of the fact that the prices of cancer drugs and other prescription drugs were secretly agreed upon and artificially set as alleged herein.

282.   By reason of the foregoing, the claims of Plaintiff and members of the Class are timely under any applicable statute of limitations (as tolled by the filing of this class action Complaint) pursuant to the discovery rule and the doctrine of fraudulent concealment.

283.   The Defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably before that time.

284.   Despite this knowledge and awareness, the Defendants have continued to promote and sell cancer drugs and other prescription drugs at artificially inflated prices.

285.   The Defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the Plaintiff and members of the plaintiff Class.

## COUNT I

### UNJUST ENRICHMENT

286.   Plaintiff hereby incorporates by reference thereto the averments of paragraphs 1 through _____ hereof as if fully set forth here and further allege as follows.

287.   By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits from Plaintiff and the Class under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

288.   Defendants have collected payments for cancer drugs and other prescription drugs from Plaintiff and each member of the Class which payment vastly exceeded the payments to which Defendants were entitled as a matter of law.  Moreover, the Lupron® Manufacturer Defendants have admitted that they unlawfully inflated the price of Lupron® paid by Plaintiff and the Class and supplied medical providers with free samples of Lupron® and encouraged them to charge patients for such samples, in violation of the PDMA and other federal and state laws.  Bayer has likewise settled charges that it unlawfully inflated the AWP for its drugs. The Individual Defendants have profited from kickbacks and other inducements from the involvement in the scheme to divert Lupron®, among other things.

289.   Thus, Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by Plaintiff and each member of the Class, either directly or indirectly.

290.   Plaintiff and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the profits derived by Defendants by means of the overcharges they imposed upon Plaintiff and each member of the Class.

291.   Plaintiff and the members of the Class have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged herein.

WHEREFORE, Plaintiff, on behalf of himself and each member of the Class, respectfully seeks the relief set forth below.

## COUNT II

### FRAUD

292.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 291 hereof as if fully set forth here and further allege as follows.

293.   By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the Plaintiff and the Class.

294.   These Defendants intended that Plaintiff and the Class would rely on their statements and representations with respect to the inflated AWPs for their drugs, among other things, to the

1   detriment of Plaintiff and the Class. In particular, the Corporate Defendants reported inflated prices

2   for cancer drugs and prescription drugs in the AWPs reported to third party publications upon which

3   government and private assistance programs and members of the Class relied. Defendants knew

4   these AWPs were false. Plaintiff and the Class did in fact reasonably and rightfully rely on the false

5   representations and statements of these Defendants and suffered injury and damages thereby, as more

6   fully set forth herein.

7        295.   In addition, these Defendants concealed and suppressed and/or omitted material facts

8   about their unlawful agreements and discussions with one another and others, and they concealed

9   and suppressed their unlawful acts and omissions as set forth more fully herein. Among other things,

10   these Defendants concealed and suppressed and/or omitted the fact that the AWPs upon which the

11   prices paid for cancer drugs and other prescription drugs by Plaintiff and the Class were based were

12   artificially inflated, thereby causing Plaintiff and the Class to pay more for these drugs than they

13   otherwise would have. Defendants also concealed and suppressed their concerted efforts to

14   circumvent initiatives by the government to reduce prescription drug costs to government assistance

15   programs, including their scheme to avoid LCA, among other things.

16        296.   As a result of Defendants acts of concealment and suppression, and their fraudulent

17   omissions as to the true cost of their drugs, including that some of their drugs were given for free,.

18   Plaintiff and the Class were unaware of the above-referenced facts, and would not have paid the

19   artificially inflated prices for cancer drugs and other prescription drugs that they did had they known

20   of the facts Defendants concealed, suppressed and omitted.

21        297.   Indeed, as soon as these facts came to light as a result of the government's

22   investigation, both the Lupron® Manufacturer Defendants and Bayer, as part of their respective

23   settlements of the criminal charges, agreed to report the true, lower prices of their respective drugs

24   to the government and to allow regular auditing of their sales and marketing practices. *See* TAP CIA

25   at Exhibit "A". As a result of these settlements, the prices paid for Lupron® and drugs manufactured

26   by Bayer by Plaintiff and the Class should be lower.

27

28

298.   Moreover, as part of their settlements with the government, the Individual Defendants have agreed to turn over the illegal kickback payments they received.

299.   As a direct and proximate result of Defendants' fraudulent representations and omissions, and the concealment and suppression of material facts by Defendants, Plaintiff and the Class have suffered and will continue to suffer damages.

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully seeks the relief set forth below.

## COUNT III

### CIVIL CONSPIRACY

300.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 299 hereof as if fully set forth here and further allege as follows.

301.   As set forth more fully above, beginning at least as early as 1991, the exact date being unknown to Plaintiff and the Class, and continuing thereafter until at least October, 2001, Defendants and their co-conspirators entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiff and the Class by causing Plaintiff and the Class to pay more for cancer drugs and other prescription drugs than they otherwise would have in the absence of Defendants' conspiracy.

302.   According to the DOJ, on or before October 3, 2001, Defendants Abbott and Takeda, by and through their joint venture, TAP, agreed to plead guilty to a federal conspiracy to violate the PDMA in violation of 18 U.S.C. § 371, and to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case.  Additionally, these Defendants agreed to settle the government's claims for $875 million, plus interest, which consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia.

303.   Defendant Bayer also agreed to settle similar charges of unlawfully inflating the AWPs for its drugs, and paid a fine of $14 million.

1    304.    Six individual employees of TAP were also indicted for their participation in the

2    federal conspiracy, along with eight urologists/urologic practices through the country.

3    305.    Moreover, three current and former employees of the J&J Defendants, and the owner

4    of the largest community-based oncologist network, all pleaded guilty to the same federal conspiracy.

5    306.    Pursuant to their widespread conspiracy alleged herein and in furtherance thereof,

6    Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect

7    of which was to defraud the Plaintiff and the Class and to act or take substantial steps in furtherance

8    of the conspiracy.  Those activities include the following:

9          (a)    Defendants discussed and agreed among themselves and with their co-

10                conspirators that they would fix the AWPs for cancer drugs and other

11                prescription drugs;

12         (b)    Defendants discussed and agreed among themselves and with their co-

13                conspirators that they would provide free samples to medical providers and

14                encourage medical providers to charge for such samples;

15         (c)    Defendants discussed and agreed among themselves and with their co-

16                conspirators that they would provide other financial inducements and

17                incentives to medical providers to prescribe their respective drugs, instead of

18                other drugs and instead of alternative therapies;

19         (d)    Defendants discussed and agreed amongst themselves and with their co-

20                conspirators that they would market and promote the spreads between the

21                AWPs and the actual wholesale costs (or list prices) for their drugs as an

22                incentive for medical providers to prescribe their drugs instead of other drugs

23                or alternative therapies; and

24         (e)    Defendants discussed and agreed among themselves and with their co-

25                conspirators that they would work together to oppose and avoid the efforts of

26                Medicare and its intermediaries to reduce prescription drug costs, including

27                the imposition of LCA by states like Arizona.

28

307.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with knowledge of the injury and damage it would cause to Plaintiff and the Class and with intent to cause such injuries or with reckless disregard for the consequences.

308.    As a direct and proximate result of Defendants' conspiracy as alleged herein, Plaintiff and the Class have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully seeks the relief set forth below.

## COUNT IV

### CONCERT OF ACTION

309.    Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 308 hereof as if fully set forth here and further allege as follows.

310.    Beginning at least as early as 1991, the exact date being unknown to Plaintiff and the Class, and continuing thereafter until October, 2001, Defendants and their co-conspirators engaged in concerted activity and/or a concert of action with each other to commit fraud and other tortious acts and omissions on the Plaintiff and the Class, causing Plaintiff and the Class to pay more for Lupron® than they otherwise would have in the absence of Defendants' concerted activity.

311.    Defendants acted in concert with one another, and with medical providers throughout the country, to commit fraud on Plaintiff and the Class.  Moreover, Defendants acted pursuant to a common design or plan with respect to the commission of such fraud.

312.    Defendants gave substantial assistance or encouragement to medical providers throughout the country to charge government assistance programs and patients, such as Plaintiff, the AWPs for their drugs, even though their actual acquisition costs (or list price) were much lower. Defendants also gave substantial assistance or encouragement to medical providers to charge for free samples of drugs.  Defendants also gave substantial assistance or encouragement to medical providers to oppose and avoid the effects of LCA in states like Arizona.

313.    In providing such substantial assistance or encouragement to medical providers, Defendants, and performing such other acts and omissions set forth in this Complaint, Defendants violated federal laws such as the PDMA, and otherwise breached a duty owed to Plaintiff and the Class.

314.    Defendants knew that the conduct of medical providers in charging the AWPs for their drugs (when their acquisition costs were much lower) and charging for free samples of their drugs constituted a fraud on both government and private assistance programs and Government, Private and No Assistance Patients, violated federal laws, such as the PDMA, and otherwise breached a duty owed by medical providers to Plaintiff and the Class.

315.    Despite such knowledge, Defendants gave substantial assistance or encouragement to medical providers to so conduct themselves.

316.    As a direct and proximate result of Defendants' concerted action as alleged herein, Plaintiffs and the Class have been injured and damaged, and Defendants are jointly and severely liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully seeks the relief set forth below.

## COUNT V

### AIDING & ABETTING/FACILITATING

317.    Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 316 hereof as if fully set forth here and further allege as follows.

318.    Defendants acted with knowledge of their wrongdoing, and that of medical providers throughout the country, as set forth in this Complaint, and they provided substantial assistance or encouragement to medical providers in the commission of the fraud on Plaintiff and the Class.

319.    Defendants' conduct was a substantial factor in causing the resulting fraud and other tortious conduct alleged herein.

320.   Defendants had actual knowledge of the fraud and other tortious conduct being effectuated on Plaintiff and the Class, and of their respective roles in furthering such fraud and tortious conduct.

321.   Defendants' guilty pleas represent their respective acknowledgments of their wrongdoing.

322.   It is believed and therefore averred that the former Vice-President of Sales of Defendant TAP and whistleblower, Mr. Durand, has provided extensive information to federal authorities relating to the knowledge of TAP and other Defendants of the fraud and other tortious conduct alleged herein.

323.   Moreover, one of several employees of TAP charged by the U.S. DOJ with various crimes as part of the overall conspiracy/concert of action alleged herein, Kimberlee Chase, a former District Sales Manager of the company, was also charged specifically charged with aiding and abetting.

324.   Defendant Jett was also indicted for and pled guilty to assisting in the conspiracy/concert of action alleged herein.

325.   As a direct and proximate result of Defendants' aiding and abetting/facilitating as alleged herein, Plaintiff and the Class have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully seeks the relief set forth below.

## COUNT VI

### VIOLATION OF CONSUMER PROTECTION STATUTES

326.   Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 325 hereof as if fully set forth here and further allege as follows.

327.   Plaintiff and the Class are consumers who purchased cancer and other prescription drugs for personal use. Arizona has enacted statutes to protect consumers against unfair, deceptive

1   or fraudulent business practices, unfair competition and false advertising. Arizona allows consumers

2   a private right of action under these statutes.

3       328.   By the misrepresentations and non-disclosure of material facts alleged above, the

4   Defendants deceived and continue to deceive consumers, such as Plaintiff and the Class.  This

5   conduct constitutes unlawful, unfair, deceptive and fraudulent business practices within the meaning

6   of the Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

7       329.   In addition, the Defendants' use of media to promote the sale of their drugs through

8   false and deceptive representations, and other conduct as alleged above, constitutes unfair

9   competition and unfair, deceptive, untrue, or misleading advertising within the meaning of the

10   Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*

11       330.   As part of their guilty pleas and payments of fines and money for civil liabilities,

12   Defendants Abbott, Takeda and TAP agreed to pay the sum of $25.5 million in civil liabilities to

13   fifty states and the District of Columbia, and Defendant Bayer agreed to pay the sum of $14 million

14   to the United States and 47 states, including Arizona.  Such admission of liability and payment of

15   civil liabilities to the states and the District of Columbia warrants the application of the laws of

16   Arizona to all Defendants in this Court.

17       331.   As a result of the Defendants' unfair and deceptive trade practices throughout the fifty

18   states and the District of Columbia, including Arizona, Plaintiff and the Class have and will continue

19   to suffer damages in an amount to be determined at trial.

20       WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, respectfully

21   seeks the relief set forth below.

22                       **COUNT VII**

23             **CONSPIRACY IN VIOLATION**
      **OF THE ARIZONA ANTITRUST LAWS**

24

25       332.   Plaintiff and the Class hereby incorporate by reference thereto the averments of

26   paragraphs 1 through 331 hereof as if fully set forth here and further allege as follows.

27       333.   Defendants' unlawful agreements, arrangements, and combinations in restraint of

28   trade or commerce alleged herein, and involvement in conspiracies as alleged herein, including a

1  price fixing conspiracy, violate Arizona Revised Statutes, § 44-1402, *et seq.*, and Article 14, §15,

2  Constitution of the State of Arizona.

3      334.   The trade or commerce involved is the manufacture, marketing, promotion,

4  distribution and sale of prostate cancer drugs and other prescription drugs whose prices charged were

5  based, in whole or in part, on the published AWPs for those drugs sold throughout Arizona.

6      335.   By the acts and omissions set forth herein, the Defendants' conduct violates the

7  Arizona statutes referenced above.

8      336.   During the Class Period, Defendants sold and shipped substantial quantities of their

9  drugs.  Sales and competition within Arizona were significantly and adversely affected by the

10  Defendants' conspiracy, and trade or commerce within Arizona was thereby unlawfully restrained.

11      337.   As a result of the conduct described above, Plaintiff and the Class have sustained and

12  will continue to sustain substantial losses and damage to their businesses and property in the form

13  of, *inter alia*, paying prices for cancer drugs and other prescription drugs that were higher than they

14  would have been but for Defendant's improper actions.  These losses and damages were proximately

15  caused by Defendants' fraudulent scheme and conspiracy alleged herein.  These losses and damage

16  constitute antitrust injury within the meaning of the Arizona antitrust laws.  The full amount of such

17  damages is presently unknown and will be determined after discovery and upon proof at trial.

18      338.   Plaintiff and the Class seek compensatory damages and multiple damages as

19  permitted by law for their injuries caused by Defendants' intentional and/or flagrant violations

20  pursuant to these statutes.

21      WHEREFORE, Plaintiff, on behalf of himself and the members Class, respectfully seeks the

22  relief set forth below.

23                      **PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiff and the Class request the Court to enter the following relief:

25          a.   Certify this case as a class action pursuant to Rule 23 of the Arizona Rules

26  of Civil Procedure and denominating Plaintiff as representative for the Class and his counsel as

27  counsel for the Class;

28

1         b.     Enter judgment against all Defendants for the violations alleged herein;

2         c.     Enjoin the Defendants from committing the acts complained of herein;

3         d.     Award the actual damages incurred by Plaintiff and the members of the Class

4  as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest

5  at the maximum rate allowed by law;

6         e.     Award of treble damages or multiple damages by operation of law;

7         f.     Award punitive damages;

8         g.     Award Plaintiff the costs of this action, including reasonable attorney's fees,

9  and, where applicable, expert fees; and

10         h.     Award such other and further relief as the Court may deem just and

11  appropriate.

12  **JURY DEMAND**

13      Plaintiff and the Class demand a trial by jury of all issues so triable in this cause.

14  This the 20th day of December, 2002.

15

16                      _____

17                      Harry J. Miller, Esquire
                    **Harry J. Miller, P.L.L.C.**

18                      Arizona Bar No.: 014556
                    80 E. Columbus Avenue

19                      Phoenix, AZ 85012
                    (602) 264-4965 telephone

20                      (602) 277-0144 facsimile

21

22                      Donald E. Haviland, Jr., Esquire
                    **KLINE & SPECTER, P.C.**

23                      1525 Locust Street, 19th Floor
                    Philadelphia, PA  19102

24                      (215) 772-1000 telephone
                    (215) 735-0957 facsimile

25

26

27

28

1

2

3

4

Bryan L. Clobes, Esquire
**MILLER FAUCHER AND CAFFERTY LLP**
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA 19103
(215) 864-2800 telephone
(215) 864-2810 facsimile

5

6

7

8

Kent Williams, Esquire
**GIEBEL, GILBERT, WILLIAMS & KOHL, P.L.L.P.**
2233 North Hamlin Avenue, Suite 620
St. Paul, MN 55113
(651) 633-9000 telephone
(651) 639-1551 facsimile

9

10

11

Jonathan Shub, Esquire
**SHELLER, LUDWIG & BADEY**
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300 telephone
(215) 546-0942 facsimile

12

13

14

15

Marvin K. Blount, Jr., Esquire
Ted Mackall, Jr., Esquire
Marvin K. Blount III, Esquire
**THE BLOUNT LAW FIRM, P.L.L.C.**
400 West First Street
Greenville, NC 27834
(252) 752-6000 telephone
(255) 752-2174 facsimile

16

17

18

19

20

Lewis B. April, Esquire
**COOPER, PERSKIE, APRIL, NIEDELMAN,**
**WAGENHEIM & LEVENSON**
1125 Atlantic Avenue - Third Floor
P.O. Box 1125
Atlantic City, NJ 08404-1125
(609) 572-7338 telephone
(609) 344-0939 facsimile

21

**ATTORNEYS FOR PLAINTIFF AND THE CLASS**

22

**RESPECTFULLY SUBMITTED** this 20 day of December, 2002.

23

D: Data Clients 1: Lupron Litigation Pleadings Second Amended Complaint.wpd

24

25

26

27

28

© 2002 KLINE & SPECTER, P.C.

90

## CERTIFICATE OF MAILING

I hereby certify that the foregoing document was duly served this dated, December 20, 2002, on the following parties via U.S. First Class Mail, postage prepaid:

Bryan L. Clobes, Esquire
**MILLER FAUCHER AND CAFFERTY LLP**
One Logan Sq., Ste. 1700, 18th & Cherry Sts.
Philadelphia, PA 19103
215-864-2800 telephone
215-864-2810 facsimile
*Plaintiff's Counsel*

Jonathan Shub, Esquire
**SHELLER LUDWIG & BADEY**
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
215-790-7300 telephone
215-546-0942 facsimile
*Plaintiff's Counsel*

Kent Williams, Esquire
**GIEBEL GILBERT WILLIAMS & KOHL**
2233 North Hamlin Ave., Suite 620
St. Paul, MN 55113
(651) 633-9000 telephone
*Plaintiff's Counsel*

Marvin K. Blount, Jr., Esquire
Ted Mackall, Jr.
Marvin K. Blount III, Esquire
**THE BLOUNT LAW FIRM, P.L.L.C.**
400 West First Street
Greenville, NC 27834
(252) 752-6000 telephone
(255) 752-2174 facsimile
*Plaintiff's Counsel*

Lewis B. April, Esquire
**COOPER, PERSKIE, APRIL, NIEDELMAN,**
   **WAGENHEIM & LEVENSON**
1125 Atlantic Ave. - Third Floor
P.O. Box 1125
Atlantic City, NJ 08404-1125
(609) 344-0939 facsimile
*Plaintiff's Counsel*

Daniel E. Reidy, Esquire
Lee Ann Russo, Esquire
Mark P. Rotatori, Esquire
**JONES DAY REAVIS & POGUE**
77 West Wacker
Chicago, IL 60601-1692
312-782-3939 telephone
312-782-8585 facsimile
*National Counsel for Deft., TAP Pharm. Prods., Inc.*

Timothy J. Burke, Esquire
**FENNEMORE CRAIG, P.C.**
3003 North Central Ave., Suite 2600
Phoenix, AZ 85012-2913
602-916-5000 telephone
602-916-5999 facsimile
*Local Counsel for Deft., TAP Pharm. Prods., Inc.*

Daniel A. Goldfried, Esquire
Randy Papetti, Esquire
**LEWIS AND ROCA LLP**
40 North Central Ave.
Phoenix, AZ 85004-4429
602-262-5311 telephone
602-734-3862 facsimile
*Local Counsel for Deft., Abbott Laboratories*

Joshua T. Buchman, Esquire
**MCDERMOTT, WILL & EMERY**
227 West Monroe Street
Chicago, IL 60606-5096
312-984-7600 telephone
312-984-7700 facsimile
*National Counsel for Deft., Abbott Laboratories*

Robert R. Stauffer, Esquire
**JENNER & BLOCK**
One IBM Plaza, 45th Floor
Chicago, IL 60611
312-222-9350 telephone
312-840-7305 facsimile
*Counsel for Deft., Takeda Chem. Indus., Ltd.*

Donald P. Martin, Esquire
**QUARLES & BRADY STREICH LANG LLP**
One Renaissance Square, Two North Central Ave.
Phoenix, AZ 85004-2391
602-229-5200 telephone
602-229-5690 facsimile
*Local Counsel for Deft., Takeda Chem. Indus., Ltd.*

Andrew D. Schau, Esquire
**PATTERSON, BELKNAP, WEBB & TYLER, LLP**
1133 Ave. of the Americas
New York, NY 10036-6710
212-336-2546 telephone
212-336-2222 facsimile
*National Counsel for Defts., Johnson & Johnson,*
*Ethicon Endo-Surgery, Inc. & Indigo Laser Corp.*

Mary G. Pryor, Esquire
**THE CAVANAGH LAW FIRM**
1850 North Central Ave., Suite 2400
Phoenix, AZ 85004-4527
602-322-4035 telephone
602-322-4100 facsimile
*Local Counsel for Defts., Johnson & Johnson,*
*Ethicon Endo-Surgery, Inc., Indigo [Medical Inc.]*
*Laser Corporation, and Alza Corporation*

William J. Maledon, Esquire
**OSBORN MALEDON, P.A.**
2929 North Central Ave., 21st Floor
Phoenix, AZ 85012
602-640-9000 telephone
602-640-9050 facsimile
*Local Counsel for Deft., AstraZeneca*

D. Scott Wise, Esquire
Kimberley Harris, Esquire
Eric Gill, Esquire
**DAVIS POLK & WARDWELL**
450 Lexington Ave.
New York, NY 10017
212-450-4000 telephone
212-450-3800 facsimile
*National Counsel for Deft., AstraZeneca*

John C. Dodds, Esquire
Mitchell Edwards, Esquire
**MORGAN, LEWIS & BOCKIUS, LLP**
1701 Market Street
Philadelphia, PA 19103-2921
215-963-5000 telephone
215-963-5299 facsimile
*Counsel for Defts.,*
*Pharmacia Corp. and Pharmacia & Upjohn*

Barry D. Halpern, Esquire
GinaMarie Slattery, Esquire
Stephanie Vithoulkas, Esquire
**SNELL & WILMER L.L.P.**
One Arizona Center
400 East Van Buren
Phoenix, AZ 85004-2202
602-382-6000 telephone
602-382-6070 facsimile
*Counsel for Defts.,*
*Pharmacia Corp. and Pharmacia & Upjohn*

Richard D. Raskin, Esquire
Bruce M. Zessar, Esquire
**SIDLEY AUSTIN BROWN & WOOD LLP**
Bank One Plaza
10 S. Dearborn Street, 48th Floor
Chicago, IL 60603
312-853-7000 telephone
312-853-7036 facsimile
*Counsel for Deft., Bayer Corporation*

Alan H. Blankenheimer, Esquire
Timothy J. Franks, Esquire
**BROWN & BAIN, P.C.**
2901 North Central Ave., Suite 2000
Phoenix, AZ 85012-2788
Mailing Address:
P.O. Box 400, Phoenix, AZ, 85001-0400
602-351-8000 telephone
602-648-7000 facsimile
*Local Counsel for Deft., Bayer Corporation*

Thomas M. Durkin, Esquire
Sheila Finnegan, Esquire
MAYER, BROWN, ROWE & MAW
190 South La Salle Street
Chicago, IL  60603-3441
312-782-0600 telephone
312-701-7711 facsimile
*Counsel for Deft., Kimberlee Chase*

Elizabeth M. Harvey, Esquire
Robert L. Ullmann, Esquire
NUTTER MCCLENNEN & FISH LLP
One International Place
Boston, MA  02210
617-439-2000 telephone
617-310-9000 facsimile
*Counsel for Deft., Henry VanMourik*

Jeremy D. Margolis, Esquire
Mark A. Flessner, Esquire
ALTHEIMER & GRAY
Suite 4000, 10 South Wacker Drive
Chicago, IL  60606
312-715-4000 telephone
312-715-4800 facsimile
*Counsel for Deft., David Guido*

Charles S. Price, Esquire
Robert E. B. Allen, Esquire
ALLEN, PRICE & PADDEN, P.C.
3131 East Camelback Road, Suite 110
Phoenix, AZ  85016-4597
602-381-0500 telephone
602-381-8899 facsimile
*Counsel for Individual TAP Defts.*

William P. Ziegelmueller, Esquire
STETLER & DUFFY , LTD.
140 S. Dearborn St., Ste. 400
Chicago, IL 60603
*Counsel for Deft., Alan McKenzie*

Robert M. Casale, Esquire
250 W. Main Street
Branford, CT  06405
203-488-6363 telephone
203-483-9850 facsimile
*Counsel for Deft., David Jett*

Tracy Miner, Esquire
Jay Tangney, Esquire
McKenzie Webster, Esquire
MINTZ LEVIN COHN FERRIS GLOVSKY POPEO
One Financial Center
Boston, MA  02111
617-542-6000 telephone
617-542-2241 facsimile
*Counsel for Deft., Janice Swirski*

Curtis C. Coleman, III, Esquire
CURTIS C. COLEMAN, III, P.A.
916 S. Evans Street
P.O. Box 588
Greenville, NC 27835-0588
252-757-1500 telephone
252-757-0911 facsimile
*Counsel for Deft., Christopher Coleman*

Robert Sherman, Esquire
Robert L. Kirby, Jr., Esquire
HUTCHINS, WHEELER & DITTMAR
101 Federal Street
Boston, MA  02110
617-951-6600 telephone
617-951-1295 facsimile
*Counsel for Deft., Donna Tom*

Chandler R. Muller, P.A.
LAW OFFICES OF CHANDLER R. MULLER, P.A.
1150 Louisiana Ave., Suite 2
P.O. Box 2128
Winter Park, FL  32789
407-647-8200 telephone
407-645-3000 facsimile
*Counsel for Deft., Scott Hidalgo*

Charles M. Greene, Esquire
111 North Orange Ave.
Orlando, FL 32801
407-648-1700 telephone
407-872-0704 facsimile
*Counsel for Deft., Eddy James Hack*

1   John E. Riley, Esquire
    **VAIRA & RILEY, P.C.**
2   1600 Market Street, Suite 2650
    Philadelphia, PA 19103-7226
3   215-751-2700 telephone
    215-751-9420 facsimile
4   *Counsel for Deft., Michael T. Gendelman*

5
        I hereby certify that the foregoing document was duly served in conjunction with service of
6
7   Plaintiff's Second Amended Complaint on the following parties via U.S. First Class Mail, postage

8   paid:

9                                                   617-261-3100
                                                    Counsel for Aventis Pharmacy
10  John W. Nields, Jr., Esquire
11  Alan M. Wiseman, Esquire              Robert J. Higgins, Esquire
    Laura S. Shores, Esquire              J. Andrew Jackson, Esquire
12  Diane E. Bieri, Esquire               Dickstein, Shapiro & Morin
    Sarah H. Garb, Esquire                2101 L Street, N.W.
13  HOWREY SIMON ARNOLD & WHITE, LLP      Washington, DC 20037
    1299 Pennsylvania Avenue, N.W.        202-785-9700
14  Washington, DC 20004-2402             Counsel for Baxter International, Inc.
    202-783-0800 telephone
15  202-383-6610 facsimile                Thomas E. Dwyer, Jr., Esquire
16  Counsel for Schering-Plough Corp.     Dwyer & Collora
                                          600 Atlantic Avenue
17                                        Boston, MA 02110-2211
    James C. Burling, Esquire             617-371-1000
18  William F. Lee, Esquire               Counsel for Bristol-Myers Squibb Company
    Hale & Dorr
19  60 State Street
    Boston, MA 02109·                     S. Elaine McChesney, Esquire
20  617-526-6334                          Terry Klein, Esquire
21  Counsel for American Home Products Corp. Bingham McCutchen, LLP
                                          150 Federal Street
22  Joseph H. Young, Esquire              Boston, MA 02110
    Hogan & Hartson, LLP                  617-951-8000
23  111 South Calvert Street              Counsel for Fugisawa Healthcare, Inc.
    Baltimore, MD 21202
24  617-338-9300                          Frederick G. Herold, Esquire
25  Counsel for AMGEN, Inc.               Dechert, Price & Rhoads
                                          1717 Arch Street
26  Michael DeMaro, Esquire               4000 Bell Atlantic Tower
    Jeanne E. Demers, Esquire             Philadelphia, PA 19103
27  Kirkpatrick & Lockhart LLP            Counsel for Glaxosmithkline, PLC
    75 State Street
28  Boston, MA 02109                      Thomas J. Sartory, Esquire

Goulston & Storrs
400 Atlantic Avenue
Boston, MA  02210-333
617-482-1776
Counsel for Immunex Corp.

Kevin M. McGinty, Esquire
William M. Cowan, Esquire
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo,
P.C.
One Financial Center
Boston, MA 02111
617-542-6000
Counsel for Hoescht Marion Roussel, Inc.

Thomas E. Dwyer, Jr., Esquire
Thomas E. Dwyer, Jr., Esquire
Dwyer & Collora
600 Atlantic Avenue
Boston, MA 02110-2211
617-371-1000
Counsel for Oncology Therapeutics Network
Corp.

Bruce E. Falby, Esquire
Hill & Barlow
One International Place
100 Oliver Street
Boston, MA 02110-2607
617-428-3000
Counsel for Schering-Plough, Corp.

Matthew A. Rossi, Esquire

Mark J. MacDougall, Esquire
Lisa Colcock Phelan, Esquire
Akin Gump
2029 Century Park East
Suite 2600
Los Angeles, CA 90067
310-229-1000
Counsel for Baxter Healthcare Corp.
Stephen M. Hudspeth, Esquire
Coudert Brothers LLP
303 Almaden Boulevard
Fifth Floor
San Jose, CA   95110-2721

408-297-9982
Counsel for Dey LP

Ursula B. Bartels, Esquire
Boehringer Ingelheim Corporation
900 Ridgebury Road
P.O. Box 368
Ridgefield, Connecticut 06877
Counsel for Boehringer Ingelheim Corp.

Andrew D. Schau, Esquire
William F. Cavanaugh, Jr., Esquire
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Counsel for Bedford Laboratories
Counsel for Roxane Laboratories, Inc.
Counsel for Ortho Biotech Products, L.P.
Counsel for Centocor, Inc.

John T. Montgomery, Esquire
Kirsten V. Mayer, Esquire
David C. Potter, Esquire
Ropes & Gray
One International Place
Boston, MA 02110
617-951-7000
Counsel for Warrick Pharmaceuticals Corporation

1
2
3
4
C:\DOCUMENTS AND SETTINGS\ADMINISTRATOR\LOCAL SETTINGS\TEMP\CERTIFICATE OF MAILING_MASTER - ARIZONA.WPD
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**HARRY J. MILLER**