UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 1 TRIALS | Judge Patti B. Saris |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY
NATIONWIDE CLASSES 2 AND 3 AGAINST DEFENDANTS
ASTRAZENECA AND BMS[1]**

---

[1] AstraZeneca and BMS filed separate briefs opposing Plaintiffs' motion. For the convenience of the Court, and because Defendants present many overlapping arguments, Plaintiffs are filing a single, consolidated reply brief. This brief is shorter than the 40-pages that Plaintiffs would be allotted under the Court's custom of permitting 20-page long reply briefs. Defendants do not object to Plaintiffs' submission of a consolidated reply of this length.

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION .................................................................................................1

II.  ARGUMENT ......................................................................................................3

    A.   Trial Will Not Focus On The Conduct Of The Named Class
        Representatives .........................................................................................3

    B.   Plaintiffs' Extensive State Law Analysis And Proposed Groupings
        Cogently Accommodate Material State Law Variations, Which
        Are Minimal..............................................................................................7

        1.   Plaintiffs do not propose an "Esperanto" instruction.................10

        2.   Defendants ignore Plaintiffs' proposed unfair and deceptive
            acts or practices instructions .....................................................12

        3.   Defendants ignore Plaintiffs' proposed alternative groupings..................13

        4.   Scienter does not present management difficulties....................14

        5.   Reliance is not an impediment to certification ..........................15

        6.   Causation may be proved on a class-wide basis ........................19

        7.   The Court has already ruled that Dr. Hartman's aggregate
            damages methodology is reliable...............................................20

        8.   Apportionment is not an issue....................................................21

        9.   Punitive damages standards vary minimally and are easily
            accommodated by proposed jury instructions.............................22

        10.  Affirmative defenses do not preclude certification....................23

    C.   The Court Can Determine Other Subsidiary Legal Issues, If Any,
        Before Trial..............................................................................................26

    D.   Plaintiffs Have Offered A More Tailored, Alternative Approach
        To Trying Claims......................................................................................28

    E.   Plaintiffs' Claims Are Typical Of Those Of The Class Members,
        And Plaintiffs Are Adequate Representatives ........................................29

        1.   The consumer Plaintiffs .............................................................29

2.    United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund ("UFCW") ................................................. 30

3.    Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli") ................................................................................ 32

4.    Man-U Service Contract Trust Fund ("Manu-U") and Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHWF") .............. 32

5.    Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV") ........................................... 33

6.    Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") ...................................................................................... 33

III.    CONCLUSION .................................................................................... 34

001534-16  216749 V1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*In re Bridgestone/Firestone Inc. Tire Prods. Liab. Litig.*,
 288 F.3d 1012 (7th Cir. 2002) ........................................................8

*In re Cardizem CD Antitrust Litig.*,
 200 F.R.D. 326 (E.D. Mich. 2001) ...................................................6

*Carnegie v. Household Int'l, Inc.*,
 376 F.3d 656 (7th Cir. 2004) ........................................................28

*Chisolm v. TranSouth Fin. Corp.*,
 194 F.R.D. 538 (E.D. Va. 2000) ..........................................17, 18, 28

*Colaizzi v. Beck*,
 895 A.2d 36 (Pa. Super. Ct. 2006) ...............................................14

*Cole v. GMC*,
 484 F.3d 717 (5th Cir. 2007) ........................................................8

*In re Copley Pharm., Inc.*,
 161 F.R.D. 456 (D. Wyo. 1995) ....................................................9

*Deadwyler v. Volkswagen of Am., Inc.*,
 1986 U.S. Dist. Lexis 28449 (W.D.N.C. 1986) ................................9

*Devaney v. Nationwide Mut. Ins. Co.*,
 679 A.2d 71 (Del. 1996) ..............................................................22

*District Cablevision Ltd. P'ship v. Bassin*,
 828 A.2d 714 (D.C. 2003) ...........................................................22

*FTC v. Sperry & Hutchinson Co.*,
 405 U.S. 233 (1972) ...............................................................12, 13

*Garner v. Healy*,
 184 F.R.D. 598 (N.D. Ill, 1999) ...................................................17

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) .......................................................9

*Harris v. ChartOne*,
 841 N.E.2d 1028 (Ill. Ct. App. 2005) ...........................................26

*Holeman v. Neils*,
    803 F. Supp. 237 (D. Ariz. 1992) ................................................................15

*Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*,
    907 P.2d 506 (Ariz. Ct. App. 1995)...............................................................22

*Jahanshahi v. Centura Dev. Co., Inc.*,
    816 A.2d 1179 (Pa. Super. 2003)...................................................................23

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ..............................................................17, 29

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002).........................................................................9

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ............................................................11

*Margaret Hall Found. v. Atlantic Fin. Mgmt.*,
    1987 U.S. Dist. Lexis 7528 (D. Mass. July 30, 1987) ....................................24

*Moore v. Bird Eng'g Co., P.A.*,
    41 P.3d 755 (Kan. 2002)................................................................................14

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
    189 F.R.D. 194 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000) .............10

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................29

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)...........................................................................16

*Parrott v. Carr Chevrolet, Inc.*,
    17 P.3d 473 (Or. 2001) .................................................................................23

*Patterson v. Beall*,
    19 P.3d 839 (Okla. 2000)...............................................................................14

*Peterson v. H & R Block Tax Servs.*,
    174 F.R.D. 78 (N.D. Ill. 1997).......................................................................17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)............................................................. *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   233 F.R.D. 229 (D. Mass. 2006)....................................................................................30

*In re Prempro Prods. Liab. Litig.*,
   230 F.R.D. 555 (E.D. Ark. 2005)......................................................................................9

*In re Prudential Ins. Co. Am. Sales Practice Litig., Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)..............................................................................................9

*Randazzo v. Harris Bank Palatine, N.A.*,
   262 F.3d 663 (7th Cir. 2001) ...........................................................................................26

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................................................8

*In re School Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986)............................................................................................10

*In re School Asbestos Litig.*,
   977 F.2d 764 (3d Cir. 1992) ..............................................................................................8

*Shaw v. Toshiba Am. Info. Sys.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ................................................................................9

*Smilow v. Southwestern Bell Mobile Sys.*,
   323 F.3d 32 (1st Cir. 2003)..............................................................................................24

*Southern States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc.*,
   241 F.R.D. 85 (D. Mass. 2007)..........................................................................................8

*Stein v. Lukas*,
   823 S.W.2d 832 (Ark. 1992)............................................................................................22

*Stevenson v. Louis Dreyfus Corp.*,
   811 P.2d 1308 (N.M. 1991) .............................................................................................14

*In re Stucco Litig.*,
   175 F.R.D. 210 (E.D.N.C. 1997) .......................................................................................8

*In re Synthroid Mktg. Litig.*,
   188 F.R.D. 287 (N.D. Ill. 1999)......................................................................................24

*Systems Mgmt. v. Loiselle*,
   303 F.3d 100 (1st Cir. 2002)............................................................................................17

*Tardiff v. Knox County*,

365 F.3d 1 (1st Cir. 2004) ................................................................................................6

*In re Telectronics Pacing Sys., Inc.*,
172 F.R.D. 271 (S.D. Ohio 1997) ..................................................................................9

*Thorogood v. Sears Roebuck & Co.*,
2007 U.S. Dist. Lexis 81035 (N.D. Ill. Nov. 1, 2007) ..............................................9, 17

*Vacu-Matic Carburetor Co. v. FTC*,
157 F.2d 711 (7th Cir. 1946) .......................................................................................13

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) .........................................................................................28

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ...........................................................................................9

*Waste Management Holdings v. Mowbray*,
208 F.3d 288 (1st Cir. 2000) .......................................................................1, 6, 18, 25

*Weinberg v. Sun Co., Inc.*,
777 A.2d 442 (Pa. 2001) ...............................................................................................16

*Wilson v. Blue Ridge Elec. Mbrshp. Corp.*,
578 S.E.2d 692 (N.C. Ct. App. 2003) ...........................................................................15

## STATUTES

CAL. CIV. CODE § 3294(a) ....................................................................................................22

CAL. CIV. CODE § 3295(d) ....................................................................................................23

IND. CODE § 24-5-0.5-2(a)(8) ..............................................................................................14

IND. CODE § 24-5-0.5-4(a) ...................................................................................................15

KAN. STAT. ANN. § 50-626(b)(2), (3), (7) ..........................................................................14

MINN. STAT. § 549.20(1)(a) .................................................................................................22

MINN. STAT. § 549.20(4) ......................................................................................................23

NEV. REV. STAT. § 42.005(3) ...............................................................................................23

NEV. REV. STAT. § 598.0915(15) .........................................................................................14

NEV. REV. STAT. § 598.0923(2) ................................................................................14

NEV. REV. STAT. § 598.0977 ....................................................................................22

OKLA. STAT. TIT. 15 § 753(11) ...............................................................................14

OR. REV. STAT. § 646.638(1) ...................................................................................14

S.D. CODIFIED LAWS § 37-24-6(1) ..........................................................................14

WYO. STAT. § 40-12-105(a) ....................................................................................14

WYO. STAT. § 40-12-108(a) ....................................................................................16

## MISCELLANEOUS

*Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive
        Advertising and Labeling of Cigarettes in Relation to the Health Hazards of
        Smoking,* 29 Fed. Reg. 8355 (1964) ...............................................................12

## I.    INTRODUCTION

The issues invoked by Defendants AstraZeneca and BMS in their opposition to Plaintiffs'

motion are not new and have been raised numerous times and in several contexts in this long-

running litigation.  The Court has already grappled with these issues in certifying the state-wide

classes, ruling on other motions too numerous to recount, witnessing the individual and class-

wide issues unfold at trial, upholding class certification in the face of Defendants' renewed

challenge post-trial and rendering class-wide verdicts against AstraZeneca and BMS.  As a result

of this "battle tested" experience, the Court is intimately familiar with "how specific issues will

play out in order to determine whether common or individual issues predominate in a given

case," *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000), and ultimately

found – appropriately – that common issues did indeed predominate.

The Court intended the Massachusetts Class 2 and 3 trial to be a bellwether to establish

parameters for the resolution of the balance of the litigation.  Consequently, when the Court

ordered that Plaintiffs renew their nationwide motion for class certification, Plaintiffs reasonably

concluded that the Court wanted the parties to focus on a discrete issue, one that had led the

Court to originally deny, without prejudice, nationwide certification of Classes 2 and 3:  whether

the many unfair and deceptive trade practices acts ("UDTPAs") at issue could be grouped in

order to hold a manageable trial.  As the Court previously recognized, the First Circuit has

approved the grouping of similar state laws for trial on a class-wide basis.  *See In re Pharm.*

*Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83-84 (D. Mass. 2005) ("*AWP*").

Plaintiffs' opening memorandum focused on this very issue, demonstrating – through the

submission of a 104-page detailed Summary of State Unfair Trade Practice Law, proposed

UDTPA groupings and actual jury instructions – that this case can be efficiently and fairly tried

under the UDTPAs of 39 jurisdictions.

In response, AstraZeneca and BMS reargue a wide variety of certification issues, acting as if a trial was never held and as if the Court had not previously found that common issues predominated. They want to start over again from scratch, exclaiming that individual issues relating to industry knowledge trump common issues. But this is not what the Court intended; nor is such a result supported by the record. To the contrary, the trial presented no insurmountable management difficulties and demonstrated that Plaintiffs' legal claims can be resolved on a class-wide basis under Rule 23. This is not an ephemeral prediction but a real-life fact borne of trial experience; what better laboratory exists for honoring *Mowbray* and determining how issues play out at trial than having held an actual trial? There is no better analogue. As was demonstrated at trial, the host of individual "knowledge" issues raised once again by AstraZeneca and BMS do not impede a class trial of Plaintiffs' claims because the Court's findings related to knowledge of AWP and spreads were made on a class-wide basis after considering the totality of the evidence and, in particular, expert testimony and the review of publicly-available information. In light of this experience, it is likely that the jury will employ a similar approach.

Turning to the UDTPA groupings, in contrast to the extensive and detailed analysis of the relevant UDTPAs that Plaintiffs submitted, AstraZeneca and BMS fail to provide a comprehensive counter-analysis, instead choosing to rely on general platitudes and misleading challenges on a handful of discrete topics, including scienter and reliance, that, upon closer examination, do not vitiate class certification. Plaintiffs submit that their extensive state law analysis and proposed groupings cogently accommodate material state law variations, which are minimal. Because the states' UDTPAs grew from common roots, common legal issues will pervade the jury's deliberations. AstraZeneca and BMS have failed to demonstrate otherwise.

Defendants also fail to consider the importance of the Class Action Fairness Act ("CAFA"), which has largely "federalized" class action lawsuits.  Prior to CAFA, cases in various state jurisdictions proceeded as class actions without management difficulties, cases that will now proceed in federal district courts, which are well equipped to handle the multitude of state law issues that will arise.  The instant case fits this new paradigm (albeit as a result of the MDL process), and the Court has already applied the law of one state to a complex factual scenario.  But Defendants claim that grouping other state statutes will be unmanageable, with the logical conclusion that no multi-state cases can ever be certified – not here, not anywhere.  Nothing in CAFA or its legislative history suggests that federal courts should suddenly turn a blind eye to the application of substantive state law and deny the certification of classes seeking to apply the laws of many states.  There certainly is no justice in such a result, which would leave consumers across the nation with no means to redress unfair and deceptive acts.

Finally, with the exception of two Plaintiffs who are being withdrawn as proposed class representatives,[2] Defendants' attacks on the adequacy and typicality of the remaining Plaintiffs – consumers and TPPs alike – do not withstand a proper analysis of the evidence.  All remaining Plaintiffs made AWP-based reimbursements for the drugs at issue during the proposed Class Period, are adequate representatives and have claims that are typical of other class members.

## II.      ARGUMENT[3]

### A.      Trial Will Not Focus On The Conduct Of The Named Class Representatives

The centerpiece of both AstraZeneca's and BMS's opposition to class certification is their assertion that an inquiry into each individual Plaintiff's relative "knowledge" of AWP

---

[2] It now appears that Plaintiffs Man-U Service Contract Trust Fund and Philadelphia Federation of Teachers Health and Welfare Fund did not make any reimbursements for subject AstraZeneca or BMS drugs.

[3] Plaintiffs incorporate by reference all prior briefing on class certification issues, including Plaintiffs' Memorandum in Support of Class Certification (filed under seal) and Corrected Plaintiffs' Reply Memorandum in Support of Class Certification (Dkt. No. 1271).

vitiates class treatment.  For example, BMS asserts that, outside of the Medicare Part B context, Class 3 TPPs differed in sophistication and reacted to AWPs based on their "own knowledge and competitive dynamics."  BMS Br. at 2-3.  Consequently, BMS claims that it will be necessary at trial to inquire into each individual TPP's actual knowledge of publicly-available information regarding spreads, BMS Br. at 6-7, and that this will be an unmanageable undertaking since each TPP has "different employees, subsidiaries, affiliates, consultants and TPAs with different degrees of knowledge and sophistication over time concerning AWPs, spreads and physician reimbursement."  BMS Br. at 15; *see also* Astra Br. at 9 (causation hinges upon individual inquiry into each plaintiff's own knowledge of spreads and other facts).  The individual inquiries into these issues, the argument goes, demonstrate that common issues cannot predominate in a national class trial.

*Defendants have already made all of these arguments, and the Court has rejected them not once but twice*.  The Court first rejected them in its initial class certification opinion, finding that common factual issues predominate for both Classes 2 and 3.  *See AWP*, 230 F.R.D. at 81-82, 87-100.  The only basis upon which the Court denied certification of nationwide Classes 2 and 3 was that, in the Court's view, Plaintiffs had not proposed feasible state law groupings.  *Id.* at 82.  Plaintiffs have since addressed this concern in the instant motion, which is discussed again *infra*.

The next rejection of Defendants' arguments against class certification came at trial. Early in the Massachusetts trial, and after hearing some of the TPP testimony, the Court considered whether the Classes should be partially or completely decertified.  However, after letting the issues play out and considering the totality of the evidence, the Court decided that knowledge issues were *not* a material impediment to class certification.  In short, the Court

- 4 -

found that differing levels of knowledge about the precise definition of AWP, as well as a general awareness that some spreads existed for some drugs, were ultimately not defenses to liability.

For example, the Court found that class members had varying levels of knowledge and that most were aware that AWP did not reflect actual sales prices but, nonetheless, bore a reasonably predictable relationship to actual prices.  *See, e.g.,* June 21, 2007 Findings of Fact and Conclusions of Law at 25 (Dkt. No. 4366) (hereinafter "Trial Ruling") (some TPPs had staff model HMOs that were aware of discounts off of AWP); *id.* ("[T]hroughout the class period, most knowledgeable insiders understood that AWP did not reflect the average sales price to providers, but that it bore a formulaic relationship to WAC of a 20 to 25 percent markup.  In addition, payors were aware there was some discounting from WAC.").  But, notwithstanding the foregoing factual findings, the Court made a ***class-wide*** ruling that "TPPs and the government did not understand the extent of the mega-spreads between published prices and true average provider acquisition costs" and that, with this in mind, "Defendants unfairly and deceptively caused to be published false AWPs (or their formulaic counterparts:  false WACs or WLPs)."  *Id.* at 144; *see also id.* at 26-27 (finding that "[l]ess sophisticated participants, like Taft-Hartley Plans, which are union benefit funds, still did not understand that AWP was not a true market average because there was so much misinformation in the market").

Individual knowledge issues did not vitiate class certification for another reason.  As the Court found – again on a ***class-wide basis*** – even after spreads became widely known, class members were locked into the AWP system.  The Court found that class members faced an "insurmountable barrier to devising an alternative system," and that it was "it was not feasible for each TPP to devise its own ASP system either by doing its own survey of drug pricing, or by

- 5 -

developing a pragmatic pricing methodology to handle the millions of annual drug transactions when there were different prices per NDC and per dose." *Id.* at 136.  Thus, even after "mega-spreads became widely known, the conduct was still egregious under the unfairness prong of Chapter 93A because neither the third party payors nor the government could move quickly or effectively to fix the problem," *id.* at 5, particularly since "defendants knew that neither the government nor the TPPs could do much to change the AWP reimbursement benchmark because they were locked into the nationwide reimbursement scheme established by statute or contract." *Id.* at 144-45.

The foregoing findings are important touchstones to class certification, because, in weighing whether the Rule 23 factors are satisfied, the Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d at 298.  In other words, the court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or ***are susceptible of common proof*** equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (emphasis added) (quoting *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997)).  If so, the existence of common disputed issues "weighs in favor of class action status." *Tardiff v. Knox County*, 365 F.3d 1, 5 (1st Cir. 2004).

As the Massachusetts trial demonstrated, Plaintiffs' claims were "principally . . . susceptible of common proof," and the Court had no trouble with making class-wide findings on, among other issues, the impact of industry "knowledge."  There is no reason to believe – and Defendants advance none – that the issues will play out any differently in the next trial.  As

before, the trial's inquiry will be whether the named Plaintiffs have a level of knowledge that is typical of that found to exist class-wide based on expert testimony and a review of publicly-available reports.[4]

**B.      Plaintiffs' Extensive State Law Analysis And Proposed Groupings Cogently Accommodate Material State Law Variations, Which Are Minimal**

There are variations among UDTPAs, but most are immaterial to Plaintiffs' evidence and claims.  As the Court already recognized, to have an impact on manageability, variations in state law must be material to the case:

> Courts should look at how issues are likely to play out in the context of the case to see what individual issues are likely to arise, and what state law differences are irrelevant and may be ignored.  See *Mowbray*, 208 F.3d at 296-97 ("Under either [grouping's] rule, the factual proffer will be largely the same. . . ."); *Relafen,* 221 F.R.D. at 279 n.17 ("Yet with the exception of the variation discussed below, such differences [in state law] prove largely irrelevant.").

*AWP*, 230 F.R.D. at 84.  And the Court has found that the First Circuit has approved the grouping of similar state laws for trial on a class-wide basis. *Id.* at 83-84 (citing, among other cases, *Mowbray*, 208 F.3d at 296-97).

Courts require plaintiffs to submit an "extensive analysis" that considers how variations in law impact the predominance of common issues requirement of Rule 23.  *Id.* at 84.  Far from ignoring state law variations or failing to sufficiently analyze those variations as Defendants accuse, Plaintiffs have presented an "extensive analysis" that takes into consideration material variations and results in a cogent and manageable grouping approach backed by both a comprehensive survey of state UDTPA jurisprudence (*see* Plaintiffs' detailed Summary of State

---

[4] In the Massachusetts trial, which involved different class representatives than proffered here, the Court found that the named Plaintiffs' knowledge was typical of the knowledge of absent class members:  "[P]laintiffs were not typically aware of the publicly available reports and articles that began surfacing about the AWP abuse early in the class period.  Thus, plaintiffs typically had no actual knowledge of the abuse of the AWP system for PADs prior to December 1997."  Trial Ruling at 103-04.  Nor did any Plaintiff or class member testify that they were aware of Defendants' spread marketing activities.

Unfair Trade Practice Law, hereafter the "Summary") and jury instruction exemplars.  In sum, Plaintiffs have done the work that many plaintiffs before in other cases have not done.

Defendants do not challenge Plaintiffs' detailed Summary.  *Where is a detailed counter-summary of law from AstraZeneca and BMS, one that purportedly rebuts Plaintiffs' Summary?  We do not have one.*  AstraZeneca and BMS have elected not to submit a rebuttal, likely because they recognize that Plaintiffs' Summary is not only extensive but also correct.

Instead, Defendants take a generalized approach and attempt to portray Plaintiffs' cogent state law groupings as but an unsupported "grand bargain" that attempts to sweep away state law variations and try a hypothetical dispute that will not result in any binding judgment.  *See* Astra Br. at 3-6; BMS Br. at 9-12.  In doing so, Defendants cite to the same tired cases denying certification of multi-state classes.  *See, e.g.*, *Cole v. GMC*, 484 F.3d 717, 725-26 (5th Cir. 2007); *In re Bridgestone/Firestone Inc. Tire Prods. Liab. Litig.*, 288 F.3d 1012 (7th Cir. 2002); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995); *In re Stucco Litig.*, 175 F.R.D. 210 (E.D.N.C. 1997); *In re School Asbestos Litig.*, 977 F.2d 764 (3d Cir. 1992).  Such cases are readily distinguishable on the basis that they involved (i) plaintiffs who failed to present a comprehensive state law analysis (unlike here) and/or (ii) defective products that invoke subsidiary concepts of duty of care, foreseeability, and very complex causation issues, which lead to legal inquiries that can vary substantially from state to state.[5]

---

[5] BMS also cites to Judge Gorton's decision in *Southern States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85 (D. Mass. 2007), where the court declined to certify a subclass of eight consumer protection acts.  Unfortunately, that decision provides little guidance as to (i) the extent of the UDTPA analysis submitted by the plaintiffs and (ii) the court's rationale.  The court merely stated that "variances in the substantive prerequisites of such claims render a certification of Subclass A unmanageable" and provided no further details.  The court even failed to review the statutes at issue and otherwise provide a rationale for its ruling, merely noting, in a presumptive nod to this Court's certification in *AWP*, that "[a]lthough another session of this Court has recently certified a multi-state consumer protection class, this session finds that the particular facts and legal issues in this case distinguishable."  *Id.* at 93.  The *First Choice* court ultimately certified a multi-state class under warranty laws and a subclass under Ch. 93A.  *Id.* at 92-93.

Emblematic of a common failure by class plaintiffs to submit an extensive analysis of the UDTPAs at issue is the decision in *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005) (cited by BMS Br. at 8), where the court declined to certify a nationwide class under UDTPAs. The plaintiffs, when asked at the certification hearing about how the court should handle state-law variations, responded that "they may need to 'kick this around a little bit more.'" *Id.* at 565; *see also id.* ("In the absence of a satisfactory showing that the variations in state laws can be reasonably reconciled with, at the very least, jury instructions capable of being understood by a jury, and a trial plan that adequately sets forth how the case will proceed, class certification is not warranted."). The instant case presents a markedly different scenario, where Plaintiffs have done the hard work of researching, preparing and presenting a detailed UDTPA survey, proposed groupings and proposed jury instructions.

Defendants also ignore the fact that courts frequently certify multi-state claims. ***In Defendants' world, no court could ever certify a class action applying multi-state law***. But many courts have certified nationwide classes under the laws of the various states, including actions alleging overpayment for prescription drugs.[6] Many of the certifications involved tort causes of action that can have a higher degree of variation from state-to-state than the relatively more uniform consumer protection acts.[7] Defendants fail to even mention – let alone attempt to distinguish – these authorities.

_____

[6] *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 530 (3d Cir. 2004) ("variations in the rights and remedies available to injured class members under the various laws of the fifty states … does not defeat commonality and predominance"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) (certifying settlement class under various state antitrust laws); *see also Thorogood v. Sears Roebuck & Co.*, 2007 U.S. Dist. Lexis 81035, at *8 (N.D. Ill. Nov. 1, 2007) (class certified under UDTPAs on 29 states); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *Deadwyler v. Volkswagen of Am., Inc.*, 1986 U.S. Dist. Lexis 28449 (W.D.N.C. 1986).

[7] *See, e,g.*, *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) (product liability); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 465 (D. Wyo. 1995) (defective products case certified under product liability laws); *In re Prudential Ins. Co. Am. Sales Practice Litig., Agent Actions*, 148 F.3d 283 (3d Cir. 1998) (common law fraud, breach of contract, bad faith, negligent misrepresentation, negligence, unjust enrichment, in addition to breach

- 9 -

Nor can Defendants deny that federal district courts will be increasingly called upon to certify claims under various state laws now that most class actions will proceed in federal courts in light of the Class Action Fairness Act ("CAFA").  Prior to CAFA, cases in various state jurisdictions proceeded as class actions without management difficulties.  With the enactment of CAFA, many, if not most, of these cases will proceed in federal district courts, which are well equipped to handle the multitude of state law issues that will arise.  Nothing in CAFA or its legislative history suggests that, now that class actions are largely "federalized," federal courts should suddenly turn a blind eye to the application of substantive state law and deny the certification of classes seeking to apply the laws of many states.

The time for generalizations and tired platitudes has long passed.  In the face of Plaintiffs' very specific state law groupings, backed by concrete legal research submitted to the Court, the burden shifted to AstraZeneca and BMS to come back with specific arguments as to why the legal standards of the respective UDTPAs materially differ such that they cannot be grouped for purposes of a manageable trial.  AstraZeneca and BMS have failed to do so. Plaintiffs have demonstrated that state law claims can be efficiently managed for trial and that variations do not "swamp" common issues.  *See Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 199 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000).

Plaintiffs now turn to a closer analysis of the few specific issues raised by Defendants.

### 1. Plaintiffs do not propose an "Esperanto" instruction

AstraZeneca challenges the submission of an "Esperanto" common law fraud instruction to the jury, claiming that it cannot act as a substitute for consumer protection statutes.  Astra Br.

---

of state consumer fraud statutes; affirming nationwide certification of class under multi-state law where plaintiffs compiled a series of charts setting forth comprehensive analyses of various state laws demonstrating that the elements of the claims were substantially similar with differences falling into a limited number of predicable patterns); *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (affirming nationwide certification under multi-state product liability laws where plaintiffs grouped claims into four categories).

at 4-5. But the proposed instruction, based on an idea that originated with the Court, is **not** intended to be a substitute for any UDTPA requirements. To the contrary, after the jury makes findings the Court intends to apply each finding to the UDTPA requirements of each state, which can be done as a matter of law after trial. *See* April 11, 2007 Hearing Tr. at 9 ("So I plan on charging them on fraud, deception, intent to deceive. And I really was planning on a very brief – and to the extent that you're right and it's only against the law to be fraudulent for a boat and not for drugs, we'll carve it out. I can do that afterwards."). As the Court recognized, fraud satisfies the elements of most consumer protection act claims. *See id.* at 8-9 (Court states that it is not aware of any state in which fraud is not also an unfair or deceptive act); *AWP*, 230 F.R.D. at 85 ("Defendants point to no state where the intentional, fraudulent acts alleged would be permitted under the consumer protection statute."). Even Defendants have agreed that a finding of intent to deceive can be taken and applied to each UDTPA to see if it fits specific prohibitions, even if they continue to contest certification. April 11, 2007 Hearing Tr. at 9 (describing how a fraud verdict would have to be compared to a specific UDTPA). And Judge Stearns has also agreed, in reaching the same conclusion with respect to the elements of RICO: "If plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of course." *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 181 (D. Mass. 2003).[8]

Furthermore, while AstraZeneca avers generally that some UDTPAs require scienter, reliance, causation, etc. (Astra Br. at 4-5), AstraZeneca tellingly fails to discuss precisely what those purported variations are by UDTPA. AstraZeneca also fails to explain how the proposed

---

[8] The court was referencing the consumer acts in New York, Florida, Virginia, Missouri, South Dakota, Montana, California, Pennsylvania, Nebraska, Louisiana, Tennessee, Connecticut and New Jersey. *Id.* at 181 n.35.

fraud instruction will not suffice for purposes of finding scienter, reliance, causation and the like. For instance, AstraZeneca does not cite a single UDTPA or case that demonstrates that a jury finding of scienter and reliance under Plaintiffs' proposed fraud instruction will not suffice to support a finding that Defendants violated the UDTPAs of those very few states that require scienter and reliance.  The same is true for causation.  Again, AstraZeneca gives the Court no specifics, and the time for unsupported generalizations is long past.

    **2.**    **Defendants ignore Plaintiffs' proposed unfair and deceptive acts or practices instructions**

While directing the bulk of their fire at the proposed fraud instruction, Defendants conveniently dodge Plaintiffs' proposed unfair and deceptive acts practices jury instruction that would apply to the grouping of UDTPAs with broad prohibitions against such conduct.  *See* Proposed Instructions 1.02-1.04.  As Plaintiffs have explained, these proposed instructions would encompass the UDTPAs of the following states:[9]

- *Unfair* acts or practices (16 states):  California, Connecticut, Florida, Hawaii, Maine, Maryland, Missouri, New Hampshire, Oklahoma, Rhode Island, South Carolina, Tennessee, Vermont, Washington, West Virginia and Wyoming.  The common test for unfairness under the UDTPA in each of these states is whether the conduct at issue is (i) immoral, unethical, oppressive or unscrupulous, or (ii) causes substantial injury to consumers, competitors or other business persons.  This test is remarkably similar across these 16 jurisdictions, which AstraZeneca and BMS do not specifically contest in their opposition briefs.[10]

---

[9] In Plaintiffs' proposed order, Maine's UDTPA was inadvertently excluded from the below grouping.  It is included in Plaintiffs' revised proposed order being submitted herewith.  Plaintiffs are also submitting revised Tables 1 and 2 to their Exhibit C:  UDTPA Groupings in order to reflect the addition of Maine.  Plaintiffs also inadvertently included the BMS drugs Coumadin and Etopophos in the original proposed order, and these drugs have been eliminated from the revised proposed order (*see* Berman Decl., Ex. 7).

[10] In 1965, the FTC described the factors it considers in determining whether a practice is unfair:  "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking,* 29 Fed. Reg. 8355 (1964).  These factors, which are sometimes referred to as the "Cigarette Rule," were approved by the Supreme Court in *FTC v. Sperry &*

- 12 -

- • *Deceptive* acts or practices (25 jurisdictions):  Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Idaho, Kansas, Maine, Maryland, Minnesota, Missouri, New Hampshire, New Jersey, New York, North Dakota, Oklahoma, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Washington, West Virginia and Wyoming.  The common test for deception under the UDTPA in each of these jurisdictions is whether the conduct at issue had the likelihood, capacity or tendency to mislead or deceive.[11]  This test, too, is remarkably similar across these 25 jurisdictions, which AstraZeneca and BMS do not specifically contest in their opposition briefs.

Defendants do not specifically dispute the applicability of Proposed Instructions 1.02-1.04 to these two UDTPA groupings.

### 3.    Defendants ignore Plaintiffs' proposed alternative groupings

In the event that the Court declines to employ a RESTATEMENT-based fraud instruction, Plaintiffs have grouped the state UDTPAs based on their prohibitions, as set forth in Exhibit C to Plaintiffs' opening memorandum.  These groupings organize the UDTPAs into the following categories:  unfair acts or practices; deceptive acts or practices; unconscionable acts or practices; misrepresentations or omissions generally; misrepresentations regarding price; misrepresentations regarding the characteristics of goods; misrepresentations regarding the standards of goods; and false advertising.  As an alternative to the general fraud approach already contemplated by the Court, consumers can be classed by these groupings and, if necessary, the creation of sub-classes to accommodate minimally-varying scienter and reliance requirements, although these variations can be handled through the use of simple jury instructions as discussed in greater detail below.

Defendants apparently do not contest these groupings, or at least fail to do so in their opposition memoranda.

---

*Hutchinson Co.*, 405 U.S. 233, 244 (1972).  As Table 1 in Exhibit C demonstrates, these factors will apply in one form or another to each of these states.

[11] This is the time-honored test used by the FTC.  *See, e.g., Vacu-Matic Carburetor Co. v. FTC*, 157 F.2d 711, 713 (7th Cir. 1946).

- 13 -

### 4.      Scienter does not present management difficulties

Without identifying a single jurisdiction that requires scienter or illuminating how, if at all, scienter standards can differ, Defendants assert that differing variations on scienter preclude certification.  Astra Br. at 7.  Of the nine UDTPAs that require a jury to find some form of intent,[12] *all of them* encompass knowledge or intentional misconduct.[13]  As the Court has already found with respect to submitting an intent to deceive instruction to the jury, "different standards governing scienter do not present individual issues."  *AWP*, 230 F.R.D. at 85.  And if the Court foregoes the fraud instruction, a simple, additional instruction regarding scienter can be submitted to the jury, as originally proposed by Plaintiffs in their AstraZeneca jury instructions. *See* April 6, 2007, Plaintiffs' Proposed Jury Instructions for AstraZeneca Trial (Dkt. No. 4039), Instruction 4.08.  Defendants will not be able to dispute that this instruction conforms to the scienter standards of the UDTPAs in the foregoing states.

Here, Plaintiffs will prove that both AstraZeneca and BMS acted with complete knowledge that their published AWPs were false and that they fully intended to deceive the

---

[12] The states at issue:  Indiana, Kansas, Nevada, New Mexico, Oklahoma, Oregon, Pennsylvania, South Dakota and Wyoming.

[13] *See* IND. CODE § 24-5-0.5-2(a)(8) (An "incurable deceptive act" is one "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead."); KAN. STAT. ANN. § 50-626(b)(2), (3), (7) (defendant must have engaged in willful misrepresentation or concealment or knowingly misrepresented price; note, however, that intent to deceive is *not* required to prove a deceptive act, *Moore v. Bird Eng'g Co., P.A.*, 41 P.3d 755, 764 (Kan. 2002), which Plaintiffs also plead); NEV. REV. STAT. § 598.0923(2) (knowingly failing to disclose a material fact); NEV. REV. STAT. § 598.0915(15) (knowingly making a false representation); *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991) (the false or misleading representation must have been knowingly made); OKLA. STAT. TIT. 15 § 753(11) (prohibits false or misleading statements of fact, knowingly or with reason to know; however, proving a violation of § 753(20), which references unfair and deceptive acts generally, does *not* require a finding of intent to deceive – *see Patterson v. Beall*, 19 P.3d 839, 847 n.12 (Okla. 2000)); OR. REV. STAT. § 646.638(1) (providing right of action to remedy willful violations); *Colaizzi v. Beck*, 895 A.2d 36, 40 (Pa. Super. Ct. 2006) (73 PENN. STAT. § 201-2(3) (xxi)'s "catch-all" provision requires intent to deceive, although other parts of the statute under which Plaintiffs are proceeding do not); S.D. CODIFIED LAWS § 37-24-6(1) (prohibitions include "[k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby"); WYO. STAT. § 40-12-105(a) (by the terms of the statute, the defendant must "knowingly" engage in the prohibited acts).

- 14 -

Classes.  Whether AstraZeneca or BMS could be liable for mere recklessness in some states but not others will be immaterial to the Classes' proof at trial.  Notably, the Court had no trouble finding that Defendants acted knowingly and willfully in carrying out their schemes.  *See, e.g.,* Trial Ruling at 144-45 (discussing Defendants' knowledge that TPPs and the government were not aware of the extent of mega-spreads); *see also id.* at 5 ("I conclude that defendants' conduct was both knowing and willful because they knew that Medicare beneficiaries, and thus their insurers, were locked by statute into paying twenty-percent of grossly inflated phony AWPs, which bore no relation to any average of wholesale prices in the marketplace.").

The Court's prior findings are relevant to how the scienter issue will play out at trial.  And the fact that most state UDTPAs require no showing of knowledge or intent enhances the manageability of class treatment.

### 5.      Reliance is not an impediment to certification

Both AstraZeneca and BMS assert that individual issues of reliance preclude certification.  Astra Br. at 7-8; BMS Br. at 15-17.  In doing so, they misidentify those state UDTPAs that require reliance and otherwise overlook important precedent highlighting that, in circumstances similar to the instant case, reliance can be established on a class-wide basis.

The UDTPAs of the following states require a finding of reliance:  Arizona, Indiana, North Carolina, Pennsylvania and Wyoming.  *See Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992) ("Damage or injury occurs when the consumer relies on the misrepresentation even though the reliance is not reasonable."); IND. CODE § 24-5-0.5-4(a) ("A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater."); *Wilson v. Blue Ridge Elec. Mbrshp. Corp.*, 578 S.E.2d 692, 694 (N.C. Ct. App. 2003) (plaintiff must show that (i) he or she detrimentally relied on the statement or misrepresentation, and (ii)

suffered actual injury as a proximate result of the deceptive statement or misrepresentation); *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 446 (Pa. 2001) (in cases involving false advertising or misrepresentation, plaintiff must demonstrate that he or she relied on the challenged practice to their detriment); WYO. STAT. § 40-12-108(a) ("A person relying upon an uncured unlawful deceptive trade practice" can recover damages "actually suffered as a consumer as a result of such unlawful deceptive trade practice.").

AstraZeneca and BMS claim that many more states require reliance, and would add to the foregoing the jurisdictions of Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Kansas, Maryland, New Jersey, Oregon, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington and Wisconsin.  Astra Br. at 7-8 n.8 & 9; *see also* BMS Br. at 16, n.20 & n.21.[14]  But the UDTPAs in these jurisdictions do not require reliance, as is demonstrated by the analysis set forth in Appendix A hereto.

In any event, for class members claiming under those few UDTPAs that require reliance, by virtue of class membership each class member has demonstrated reliance.  In other words, by making payments based on AWP, class members are relying on the benchmark to be a reasonable proxy of prices prevailing in the marketplace.  This is only logical, for individualized reliance is not needed to prove causation in price fixing cases.  "[A]n illegal price-fixing scheme presumptively damages all purchasers of a price-fixed product in an affected market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 n.21 (3d Cir. 2001) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977)).  Further, in "overcharging cases that warrant a presumption of reliance," plaintiffs meet the causation element where "they sustain economic loss by reason of the alleged conduct." *Newton*, 259 F.3d at 179.  And courts

---

[14] BMS fails to cite to a single statute or case in support of its list of so-called reliance states, merely referring to briefing prepared by Amgen and Watson.

frequently find reliance based on the introduction of class-wide evidence.  *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (circumstantial evidence that is common to the whole class can be used to show reliance) (RICO case); *Thorogood v. Sears Roebuck & Co.*, 2007 U.S. Dist. Lexis 81035, at *8 (N.D. Ill. Nov. 1, 2007) (noting that reliance can be presumed based on class-wide evidence that defendant marketed its dryers on a uniform, standard basis of being made of stainless steel, when they were not; class certified under UDTPAs of 29 states); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D. Ill, 1999) (courts typically hold that individual reliance questions do not predominate where the fraud was perpetrated in a uniform manner); *Peterson v. H & R Block Tax Servs.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997) ("[C]ourts will presume class members' reliance when it is logical to do so or when the complaint's allegations make reliance apparent.") (RICO case); *see also Systems Mgmt. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002) ("Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way:  Loiselle does not deny that a reasonably predictable consequence of his mailings was, by deceiving the college, to enable him to continue to underpay his workers.").

Defendants' arguments echo those rejected by the court in *Chisolm v. TranSouth Fin. Corp*., 194 F.R.D. 538, 563 (E.D. Va. 2000), a civil RICO, consumer protection and common law fraud where defendants argued that they would need to "inquire into the situation of each putative class member, subjecting each to cross-examination and discovery," with the end result being "an endless string of mini-trials."  *Id.* at 557.  The court disagreed, finding that the very fact that class members made deficiency payments after repossession constituted circumstantial proof of reliance.  *Id.* at 560-62.  Thus framed, the issue of whether their reliance was reasonable ***was an objective inquiry common to the entire class***:  "To conclude otherwise would deny

human nature, run counter to the traditional presumption in favor of actors operating under rational economic choice, and leave the Court with an absurd conclusion." *Id.* at 561.[15]

The rationale espoused by *Chisolm* applies here. Rational economic choice dictates that third-party payors would not have agreed to use AWP as the pricing benchmark in their contracts – which are ***all*** based on AWP – had they known of Defendants' fraud. Furthermore, mere knowledge of the availability of discounts in the marketplace does ***not*** reveal the fraud unless Class members were aware of what everyone else was paying – and they were not, particularly given the lengths to which Defendants went to maintain the confidentiality of their pricing data (as the Court noted in its trial ruling). In fact, at trial Defendants could not identify class representatives (or class members) who knew that Defendants intentionally inflated AWPs in order to impact drug usage patterns and that they marketed spreads. To the contrary, the evidence at trial demonstrated that market participants believed that AWP was a consistent and reliable benchmark for use in negotiating drug pricing. *See supra* Section II. A. Therefore, Defendants' argument that the reliance requirement calls for individual inquiries into what "everyone knew" is but one "woven entirely out of gossamer strands of speculation and surmise" that should not be permitted "to tip the decisional scales in a class certification ruling." *Mowbray*, 208 F.3d at 298.

Finally, Plaintiffs have proposed simple reliance instructions that easily accommodate minor state law variations. *See* Proposed Instructions 1.014-1.015.

---

[15] The court concluded that, even though the three subclasses reflected different theories of liability and an individualized computation of damages, the subclasses all alleged liability stemming "from the one common pattern of activity – the churning scheme that anchors this litigation." Therefore, "a proper jury charge combined with a well-reasoned special verdict sheet and judicial assistance, if required pursuant to Federal Rule of Civil Procedure 53," made "treatment of these claims under a single, consolidated class action . . . superior to any other form of proceeding." *Id.* at 569.

**6.      Causation may be proved on a class-wide basis**

AstraZeneca and BMS point to the individualized nature of causation and varying

causation and mitigation standards (Astra Br. at 8-9, 12; BMS Br. at 13, 16-17), but causation

issues do not present any management difficulties.  As it did with other issues, at trial the Court

resolved causation by relying on expert testimony of class-wide impact.  The Court cited Dr.

Rosenthal's opinion that all class members paid more for drugs based on a false AWP than they

would have if Defendants had reported a true AWP and Dr. Rosenthal's analysis demonstrating

that reimbursements on many of the Medicare Part B drugs have gone down with the advent of

the ASP system.  Trial Ruling at 147-48.  The Court also specifically recognized that "the fact

that the TPPs have been slow to change their reimbursement systems does not negate

causation. . . .  Even Dr. Bell admitted that TPPs faced several significant impediments to

quickly changing reimbursement practices."  *Id.* at 148 (footnote omitted).  In doing so, the

Court found that "mitigation was only possible once Medicare had developed an ASP

methodology."  *Id.* at n.70.  The Court also cited to industry knowledge of causation:  "[S]everal

pharmaceutical witnesses confirmed causation by testifying that they knew that TPPs and

consumers were paying more for a drug every time the AWP was raised.  Plaintiffs' damages

were not only foreseeable, defendants were well aware of them throughout the class period."  *Id.*

at 148.

The above class-wide findings were used to find causation on a class-wide basis.  There

is no reason why the same approach will not work again.  Indeed, Defendants do not even assert

that, if Plaintiffs once again prove the foregoing, that such evidence will not support a finding of

causation under each UDTPA at issue in the forthcoming trial (particularly given the fact that the

Court employed a stringent "but for" causation test, *see* Trial Ruling at 154).  Some state

UDTPAs require a plaintiff to establish proximate causation via proof that the unfair or deceptive

practice directly produces the harm and without which the harm would not occurred.  *See, e.g.,*
Del. P.J. I. Civ. § 21.1 (2000); Washington Pattern Jury Instruction 310.07.  Other UDTPAs
require only that the practice be a substantial factor in bringing about the damage.  Mass.
Superior Ct. Civil Prac. Jury Instruction § 16.5; Hawaii Civil Jury Instructions, Instruction No.
7.1 (1999).  AstraZeneca and BMS misreported AWPs and artificially inflated the prices of
Subject Drugs, thereby overcharging the Classes and causing Class members harm – under ***any***
of the standards for proving causation.  For this reason, Class Plaintiffs' single proposed jury
instruction for causation (*see* Instruction No. 1.05) reflects the strictest causation standard of any
of the state UDTPAs that require direct, "but for" causation.  And an additional instruction for
the more lenient "substantial factor" test can be easily added if the Court desires.

> **7.    The Court has already ruled that Dr. Hartman's aggregate damages
> methodology is reliable**

AstraZeneca and BMS attack certification on the basis that damages are too
individualized and cannot be calculated on an aggregate, class-wide basis.  Astra Br. at 10-11;
BMS Br. at 18.  Defendants have already made this argument *ad nauseaum*, and the Court has
already rejected it – twice.

Employing an inquiry lower than *Daubert* standards, the Court first rejected Defendants'
arguments attacking Dr. Hartman's aggregate damages model in its class certification opinion.
*See AWP*, 230 F.R.D. at 99.  "Based on the current cold record," the Court explained, "I
conclude that Hartman's but-for methodology for calculating damages on an aggregate class-
wide basis, while preliminary, is not so insubstantial as to preclude class certification."  *Id.*  The
First Circuit later endorsed the Court's approach and rejected Defendants' interlocutory appeal.

Then, after taking into consideration all of the evidence and the competing views of the
experts at trial, the Court found Dr. Hartman's "yardstick" and aggregate damages methodology

to be reliable and admissible under the *Daubert* standard.  *See* Trial Ruling at 123-40.  In doing

so, the Court rejected the attacks that AstraZeneca and BMS renew here.  As the Court

summarized:

> Given my adoption of Dr. Hartman's basic methodology for determining liability and damages, I further find that his calculation of aggregate damages for the class is sufficiently reliable and reject defendants' argument that aggregate damages are inappropriate on this record.  *See* 3 Alba Conte & Herbert Newberg, <u>Newberg on Class Actions</u> § 10.2 (4th ed. 2002) ("The evidentiary standard for proof . . . submitted must be sufficiently reliable to permit a just determination of the defendant's liability within recognized standards of admissible and probative evidence. . . .  Individual damage issues should not, except in extraordinary situations, have any adverse effect on the propriety of aggregate class judgments as a proper means for determining the defendant's liability to the class.").

*Id.* at 140.

The Court has endorsed Dr. Hartman's aggregate damages model, and awarded damages

against AstraZeneca and BMS on that basis.  This issue is now the law of the case and should not

be re-plowed here.

### 8.     Apportionment is not an issue

BMS claims that the Court's apportionment analysis for damages would entail a

complex, jurisdiction-by-jurisdiction review.  BMS Br. at 14.  But BMS fails to suggest that the

damages apportionment analysis would be different under the law of any state within the Class

and fails to point out that the Court's analysis of this issue was not based just on the laws of

Massachusetts but on a broader survey of legal authority.  *See* Trial Ruling at 156-59 (citing the

RESTATEMENT (THIRD) OF TORTS: APPORTIONMENT OF LIABILITY, in addition to cases from

various jurisdictions).  However, in any event, the Court's damages award against AstraZeneca

and BMS was ultimately based on units sold of each drug, and not on an apportionment theory.

Plaintiffs intend to present the same model in the next trial.

9.     **Punitive damages standards vary minimally and are easily accommodated by proposed jury instructions**

BMS exclaims that punitive damages standards vary from jurisdiction to jurisdiction and that jury instructions could not account for the variations and would "baffle" the jury, even though BMS fails to detail what those varying standards purportedly are.  BMS Br. at 14.  BMS is wrong.  The variations for the nine states at issue permitting punitive damage jury awards under UDTPAs are minimal, flowing from the common touchstones of aggravated conduct and willful indifference to the rights of others.[16]  *See Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 907 P.2d 506, 518 (Ariz. Ct. App. 1995) (punitive damages available where the defendant "engaged in aggravated and outrageous conduct with an 'evil mind'"); *Stein v. Lukas*, 823 S.W.2d 832, 834 (Ark. 1992) (punitive damages justified where defendant acted wantonly in causing the injury or with such a conscious indifference to the consequences that malice may be inferred); Cal. Civ. Code § 3294(a), California Jury Instructions, Civil § 14.72.2 (9th ed) (punitive damages available where fraud is shown, and jury considers the reprehensibility of defendant's conduct, the amount of punitive damages which will have a deterrent effect on the defendant in light of the defendant's financial condition, and whether the award of punitive damages bears a reasonable relationship to the injury, harm or damage actually suffered by the plaintiff); *Devaney v. Nationwide Mut. Ins. Co.*, 679 A.2d 71, 77 (Del. 1996) (punitive damages awarded based on a finding of outrageous or reckless conduct); *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 726 (D.C. 2003) (punitive damages awardable for egregious conduct); Minn. Stat. § 549.20(1)(a) (punitive damages allowed when acts of the defendant show deliberate disregard for the rights or safety of others); Nev. Rev. Stat. § 598.0977 (elderly or

---

[16] Plaintiffs are potentially entitled to an award of punitive damages in 13 jurisdictions as follows:  Arizona, Arkansas, California, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Minnesota, Missouri, Nevada, Oregon and Pennsylvania.  The Court evaluates the award in Connecticut, Idaho, Illinois and Missouri.  In the remaining states, the jury determines whether to award punitive damages.

- 22 -

disabled person who "suffers damage or injury as a result of a deceptive trade practice" may

recover punitive damages); *Parrott v. Carr Chevrolet, Inc.*, 17 P.3d 473, 487 (Or. 2001)

(punitives available where defendant engaged in conduct amounting to a particularly aggravated,

deliberate disregard of the rights of others); *Jahanshahi v. Centura Dev. Co., Inc.*, 816 A.2d

1179, 1188 (Pa. Super. 2003) (punitive damages may be awarded if the defendant's conduct was

malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of

others).  As such, a handful of instructions can be used that will be simple for the jury to follow,

like those that Plaintiffs previously proposed prior to the AstraZeneca Class 1 trial.  *See* May 2,

2007 Class Plaintiffs' Memorandum in Support of Revised Proposed Jury Instructions (Dkt. No.

4147), Ex. A, Instructions 6.01-6.10.

Furthermore, the Court previously indicated that it would likely hold a separate phase for

the determination of punitive damages after the jury returns its liability and compensatory

damages verdict.  April 11, 2007 Hearing Tr. at 54.  This is also the preferred procedure under,

for example, California law, when plaintiffs seek to introduce evidence relating to the financial

condition of the defendant and defendant moves to preclude such evidence.  CAL. CIV. CODE

§ 3295(d); *accord* MINN. STAT. § 549.20(4); NEV. REV. STAT. § 42.005(3).  An approach that

treats punitive damages as a "stand-alone" procedure, as the Court contemplates, contributes to

the ease with which the jury can address the issue.

### 10.    Affirmative defenses do not preclude certification

AstraZeneca argues that inquiries into its affirmative defenses relating to statute of

limitations, comparative fault, and the voluntary payment doctrine will overwhelm common

issues.  Astra Br. at 11-13; *see also* BMS Br. at 14 (discussing statute of limitations).  As an

initial matter, courts in this District have refused to deny class certification where the named

plaintiffs may have been subject to unique defenses such as lack of reliance, statute of

limitations, or compulsory counterclaims.  *See*, *e.g.*, *Margaret Hall Found. v. Atlantic Fin.*

*Mgmt.*, 1987 U.S. Dist. Lexis 7528, at *7 (D. Mass. July 30, 1987) ("possible statute of

limitations defenses, like possible nonreliance defenses, do not vitiate typicality").  As the First

Circuit has explained, individual questions in the context of affirmative defenses should not

affect class certification decisions:

> Courts traditionally have been reluctant to deny class action status
> under Rule 23(b)(3) simply because affirmative defenses may be
> available against individual members. . . .  Instead, where common
> issues otherwise predominated, courts have usually certified Rule
> 23(b)(3) classes even though individual issues were present in one
> or more affirmative defenses.  *See, e.g.*, *Wal-Mart Stores, Inc. v.*
> *Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*,
> 280 F.3d 124, 138-40 (2d Cir. 2001); *Hoxworth*, 980 F.2d at 924;
> *Cameron*, 547 F.2d at 477-78.  After all, Rule 23(b)(3) requires
> merely that common issues predominate, not that all issues be
> common to the class.  *Krell v. Prudential Ins. Co. of Am. (In re*
> *Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148
> F.3d 283, 315 (3rd Cir. 1998); *see* 5 J.W. Moore, *Moore's Federal*
> *Practice* § 23.46[.1], at 23-206 to 23-207 (3d ed. 1997 & Supp.
> 2002). If, moreover, evidence later shows that an affirmative
> defense is likely to bar claims against at least some class members,
> then a court has available adequate procedural mechanisms.  *In re*
> *Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 141
> (describing procedural options and collecting authorities); 1 H.
> Newberg & A. Conte, *Newberg on Class Actions* § 4.26, at 4-91 to
> 4-97 (3d ed. 1992) (same).  For example, it can place class
> members with potentially barred claims in a separate subclass, 29A
> Fed. Proc., L. Ed. 70:411 & n.69, *Predominance of Common*
> *Issues* (2002) (citing cases); *see* Fed. R. Civ. P. 23(c)(4)(B), or
> exclude them from the class altogether, *In re Visa*
> *Check/MasterMoney Antitrust Litig.*, 280 F.3d at 141; 6A Fed.
> Proc., *supra*, § 12:248 & n.6 (citing cases).

*Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 39-40 (1st Cir. 2003).

The existence of affirmative defenses would only counsel against class certification if

they became "a major focus of the litigation" and "consume the merits" of the case.  *In re*

*Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D. Ill. 1999).  **As the Massachusetts trial amply**

***demonstrated, affirmative defenses will not become the major focus of this trial or consume its merits***. As before, the focus of trial will be on AstraZeneca's and BMS's conduct.

Moreover, "the mere fact that [statute of limitations] concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)." *Mowbray*, 208 F.3d at 296. Further, as in *Mowbray*, most class members' claims will be unaffected by possible limitations defenses and, "in those few instances in which a limitations defense might have bite, a common proffer likely would establish the factual predicate necessary for a tolling determination." *Id.* at 297.

The Court made rulings with respect to when class members were reasonably on notice that AWP did not reasonably track with underlying market prices, and it did so on a class-wide basis. The Court did not rely on a plaintiff-by-plaintiff inquiry, as Defendants advocate here, but by an examination of class-wide evidence presented by experts and publicly-available information. There is no reason why the jury cannot employ the same approach, utilizing statute of limitations instructions for each UDTPA as Plaintiffs have previously suggested. *See* April 6, 2007 Plaintiffs' Memorandum in Support of Plaintiffs' Proposed Jury Instructions (Dkt. No.4039), Ex. A, Instructions 7.01-7.38.[17] The Court may also choose to apply specific statutes of limitation through post-trial "carveouts" based on the jury's findings of when the Class as a whole was on notice of Defendants' conduct.

Regarding the effect of limitations periods on damages, damages periods can be grouped by years (that is, states with one, two, three, four-year, etc. limitations periods), and Dr. Hartman

---

[17] The Court need not, at this time, adopt or reject these specific jury instructions. Plaintiffs reference them as a manageable method of handling statute of limitations inquiries.

will present damages by state.  Thus, this should not serve to impede certification.  In Plaintiffs'

Summary of State Unfair Trade Practice Law, Plaintiffs identified the relevant statute of

limitation under each UDTPA.  Defendants do not contest these limitations periods.

AstraZeneca also raises the "voluntary payment doctrine," but this doctrine does not help

it.  First, AstraZeneca fails to show that the doctrine has any force outside of the State of Illinois,

and, indeed, most jurisdictions reject its application in all but very limited circumstances.  *See*

*Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 668 (7th Cir. 2001).[18]  Second, the

doctrine does not apply in the face of allegations of fraud, *Harris v. ChartOne*, 841 N.E.2d 1028,

1031 (Ill. Ct. App. 2005), which underpin Plaintiffs' allegations here.  Third, it only applies

when one has full knowledge of the facts upon which he or she is making payment, *id.*, and, as

noted earlier, the Court has found that even the most savvy payors were not typically aware that

mega-spreads were available to physicians and that drug manufacturers were marketing those

spreads.  Trial Ruling at 103.

## C.     The Court Can Determine Other Subsidiary Legal Issues, If Any, Before Trial

BMS argues that the Court dealt with "difficult" issues of law via motion practice prior to

the Massachusetts trial, and that, consequently, similar issues may arise in applying the law of

other states and, if so, this should defeat certification because it will all be too complicated for

the Court to handle.  BMS Br. at 1.  The purported "difficult" issues include whether TPPs

should be treated as "businesses" or "consumers," whether the Massachusetts act contained a

"privity" requirement, and agency-principal imputation issues.  *Id.* at 1, 5.  The specter of these

same issues ***potentially*** arising in the larger trial is not a reason for rejecting class certification.

---

[18] Notably, although AstraZeneca cites *Randazzo*, Astra Br. at 13, it fails to advise the Court that the *Randazzo* court only applied the doctrine to the plaintiffs' breach of contract claim and not to the plaintiff's claim under the Illinois Consumer Fraud Act.

First, the pre-trial issues that the Court handled in the Massachusetts trial were hardly difficult.  For example, and notwithstanding AstraZeneca's bold declaration on the first day of trial that a "new" development in Chapter 93A jurisprudence warranted dismissal of Plaintiffs' claims on the basis of lack of privity, the Court quickly and appropriately rejected AstraZeneca's "privity" challenge as completely unfounded.  On the agency issue, the Court imputed knowledge from agent to principal but ultimately held such knowledge immaterial to liability. *See, e.g.,* Trial Ruling at 110-11.  And with respect to the status of TPPs under Chapter 93A, the Court determined that TPPs had standing under Chapter 93A, § 9, after Defendants argued that TPPs should be claiming under § 11 instead.  *Id.* at 112-15.  Even so, Defendants fail to explain how this latter analysis under Massachusetts law is even relevant to other state UDTPAs. Although it is relevant to inquire whether businesses have standing under various UDTPAs, Plaintiffs have already done that analysis (*see* Opening Br. at 9-10), and AstraZeneca and BMS do not dispute it.

Second, BMS cannot defeat certification by simply speculating that the Court ***may*** have to grapple with similar issues under other state laws.  For instance, neither AstraZeneca nor BMS identify any state UDTPA that has a transaction privity requirement.  The burden is on BMS to identify the precise issues ***now***, or face a certified class.  Hypotheticals, which is all AstraZeneca and BMS rely on, do not suffice.

Third, should AstraZeneca or BMS actually raise such specific issues via pre-trial motion backed by specific legal research under specific state statutes (which they studiously avoid doing now), the Court can address them at that time.  And just because we can foresee that these Defendants might raise numerous motions is not a reason for finding against manageability.  As the history of this litigation demonstrates, Defendants – and AstraZeneca in particular – have

- 27 -

frequently raised all sorts of legal arguments that turned out to be unsupported.  This prospect should never discourage certification.  To be sure, it will take more work to try a case under numerous state UDTPAs than under a single one, but the Court has the resources and skill to handle it, with the able assistance of counsel to the parties.  Only a cavalcade of particularly vexing issues would weigh against certification, but Defendants make no concrete showing that this will be the result here.

**D.      Plaintiffs Have Offered A More Tailored, Alternative Approach To Trying Claims**

Plaintiffs have offered the Court a more detailed set of jury instructions that could be deployed if the Court does not believe that Plaintiffs' groupings will work.  *See* Appendix A to April 6, 2007 Memorandum in Support of Plaintiffs' Proposed Jury Instructions (Dkt. No. 4039), submitted on behalf of Class 1 during pre-trail proceedings against AstraZeneca.  Although the Court previously expressed its concern with the length of such instructions, Plaintiffs still believe that the jury, with appropriate guidance, will be able to answer verdict interrogatories based on those instructions.

Complexity should not be a reason for failing to certify a class, just as suggestions that a wrong is too extensive to be heard before a single court are "deeply disfavored in our society which is predicated upon the rule of law."  *Chisolm*, 194 F.R.D. at 557; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (failing to certify on manageability grounds is disfavored and "should be the exception rather than the rule").  Therefore, "a class action has to be unwieldy . . . before it can be pronounced an inferior alternative – no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied – to no litigation at all."  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  Denial of class certification "on the basis of vaguely perceived manageability obstacles is acting counter to the policy behind Rule 23" and unduly discounts the

Court's "power and creativity in dealing with a class action flexibly as difficulties arise."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 528 (S.D.N.Y. 1996).  As the *Humana* court counseled, "[e]ven potentially severe management issues have been held insufficient to defeat class certification," and "we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives (including, most notably, 600,000 separate lawsuits by the class members)."  382 F.3d at 1273.

Plaintiffs respectfully submit that they have presented two viable approaches to efficiently trying the remaining claims against AstraZeneca and BMS:  one with a small set of jury instructions focusing on fraud and unfair and deceptive acts, and another comprised of a larger set tailored more specifically to state law variations.  At this juncture, if the Court wishes, it has the discretion to find that *either* approach is manageable and certify the Classes and save for trial the ultimate decision as to which jury instructions to employ.

**E.      Plaintiffs' Claims Are Typical Of Those Of The Class Members, And Plaintiffs Are Adequate Representatives**

AstraZeneca and BMS both raise challenges to each individual Plaintiff's adequacy to represent the proposed Classes, as well as assertions that Plaintiffs' claims are not typical of those of the Classes.  Plaintiffs' rebuttal follows.

**1.      The consumer Plaintiffs**

BMS claims that Plaintiffs have no consumer Class 3 representatives against BMS because the company's liability is limited to sales of Taxol for a six-month period in 2001.  BMS Br. at 19.  Although the Court found that Class 3 damages, though not BMS's liability, are in fact limited to Taxol for only a brief six-month window of time in 2001 (Trial Ruling at 166-75), BMS ignores the fact that a jury in the nationwide case could find and apply different windows

- 29 -

of liability based on its own reading of the evidence.  The following individual Class 3 consumers made payments for BMS drugs still at issue in this case:  Cheryl Barreca (Cytoxan and Rubex), Anna Choice (Cytoxan and Rubex), Joyce Dison (Cytoxan and Rubex), Donna Kendall (Cytoxan and Rubex), Sandra Leef (Cytoxan and Rubex), Constance Nelson (Cytoxan and Rubex), Regina Shoemaker (Cytoxan), Scott Tell (Paraplatin), Pauline Vernick (Cytoxan and Rubex), and Mardolyn Vescovi (Cytoxan and Rubex).  Their payments were made within the Class Period, at times when a jury could still find BMS liable for damages.

And if this Court holds that those consumer representatives are not adequate because in the Massachusetts trial the Court found no liability for the drugs those consumers were administered, the Court has already ruled that TPPs may represent the interests of consumers in Class 3.  *See AWP*, 230 F.R.D. at 86 (class cert. opinion); *In re Pharm. Indus. Average Wholesale Price Litig*., 233 F.R.D. 229, 231 (D. Mass. 2006) (class cert. order).[19]

AstraZeneca argues that consumer Class 3 claims against it should be dismissed because Susan Wessels was administered and paid for Zoladex® after 2004.  However, AstraZeneca's arguments about Ms. Wessels are irrelevant because this Court has already held that TPPs can be adequate representatives for all members of Class 3.

### 2. United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund ("UFCW")

AstraZeneca argues that proposed Class 2 representative UFCW knew about AWP spreads and therefore cannot show actual deception required to establish proximate cause under

---

[19] Justification for this finding is clear, as the claims of a Class 3 TPP and its individual members arise from the same course of conduct and are based on similar legal theories.  Here, both the TPP and its members made co-payments on the basis of contractually-mandated reimbursement formulas based on AWP, both paid inflated co-payment amounts, both suffered the same type of damages as a direct and proximate result of Defendants' AWP scheme, and both can pursue the same legal claims against Defendants for UDTPA violations.  They likewise have the same incentive to pursue their claims.  Indeed, a TPP may even be a superior class representative, given that it has made a broad array of AWP-based reimbursements for Subject Drugs and can more easily bear the burden of representation.

some state statutes.  Astra Br. at 18.  To support this claim, AstraZeneca cites to statements made by Edward A. Kaplan, a representative of industry consultant The Segal Company (an individual who testified to having only "a little bit" of knowledge concerning the work Segal did for UFCW (Kaplan Dep. at 104:15-20)), that "at some point" he personally believed doctors were making a margin.  *Id.* at 197:10-15.  AstraZeneca overlooks both Mr. Kaplan's prior testimony, stating, "[w]e really weren't aware of the magnitude . . . of the relationship between actual price, wholesale price and what they charged our clients" (*id.* at 196:5-9), and his later testimony that the knowledge within the consulting community was not detailed enough to encompass specific AWPs on a drug-by-drug basis.  *Id.* at 268:15-19.  It also overlooks UFCW's **actual** testimony that in 2000 Segal told the Fund that escalating prescription drug costs were due to increased patient demand (Deposition of Daniel Ryan at 469:3-9)[20], and that the Fund's administrator could not recall having any discussions with Segal about AWPs influencing prescription drug costs, nor seeing any literature to that effect (*Id.* at 470:1-10).

Moreover, the Court has already addressed this issue, finding that by the mid-90s "[l]ess sophisticated participants, like Taft-Hartley Plans . . . still did not understand that AWP was not a true market average. . . ."  Trial Ruling at 27.  Furthermore, a TPP's knowledge that some degree of spread existed "does not exonerate defendants," who continued to deceptively and unfairly cause false AWPs to be published "knowing that TPPs . . . did not understand the extent of the mega-spreads," and could not do anything to change the AWP benchmark they were locked into by contract.  *Id.* at 144-45.  Accordingly, even if UFCW had the degree of knowledge that AstraZeneca would attribute to it (and it did not), it would not render UFCW's claims atypical of the claims of other class members.

---

[20] *See* Declaration of Steve W. Berman in Support of Plaintiffs' Reply Memorandum in Support of Motion to Certify Nationwide Classes 2 and 3 Against Defendants AstraZeneca and BMS ("Berman Decl."), Ex. 1.

BMS's claim that UFCW does not make co-payments under Medicare B has long been established as inaccurate.  All of the Track 1 Defendants made this very same argument in their October 25, 2004 opposition to class certification, citing the very same deposition testimony.  In his affidavit in support of Plaintiffs' Motion for Class Certification for Track 1, UFCW's Fund Administrator Daniel W. Ryan responded to this argument by unequivocally asserting that UFCW made co-payments under Medicare Part B throughout the Class Period, and by providing documentation showing specific examples of claims in which UFCW paid secondary to Medicare, including those produced at UFCW0016470-798.  *See* Ryan Aff. (Dkt. No. 1248, filed Dec. 15, 2004).  This led the Court to conclude that UFCW met the Rule 23(a) typicality requirement because "UFCW's underlying legal theory and its motivations are similar to those of the other TPP class members that make full payments."  Mem. and  Order Re. Mot. for Class Cert. (Aug. 16, 2005), at 59 (Dkt. No. 1648).  Nothing has changed that would alter this conclusion.

### 3. Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("Pirelli")

BMS claims that Pirelli has not produced any information to suggest that its reimbursements for Taxol were based on AWP.  BMS Br. at 20.  On the contrary, Pirelli has produced claims data that shows that the Trust reimbursed for Taxol during the period that Taxol was a single source drug.  *See* Berman Decl., Ex. 2.

### 4. Man-U Service Contract Trust Fund ("Manu-U") and Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHWF")

Plaintiffs now confirm that Man-U and PFTHWF did not pay for any of the drugs at issue and, consequently, they are being withdrawn as proposed class representatives for claims against AstraZeneca and BMS.

5. **Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV")**

AstraZeneca complains that CMHV's third-party administrator, Zenith, admittedly knew that AWP was "only a benchmark," Astra Br. at 19, but, of course, says nothing about whether Zenith knew that AWP was inflated and manipulated as Defendants saw fit (and there is no testimony indicating that it did). Moreover, AstraZeneca fails to cite to actual CMHV testimony demonstrating that CMHV itself believed that the AWP benchmark was "an actual average." Berman Decl., Ex. 3 (John Bell Dep. at 32-34; *see also id.* at 39 ("Well, I – 'average' means an average. I meant, that's what – that was my understanding of it. That was the average price that everyone worked off of. It's an average.")).

BMS claims that CMHV did not make any payments based on AWP for physician-administered drugs, BMS Br. at 19-20, but CMHV produced claims data showing, *inter alia*, payments for Cytoxan and Vepesid. *See id.*, Ex. 3A.

6. **Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF")**

During the proposed Class Period, Plaintiff THWF unquestionably paid for Zoladex and at least four of the BMS drugs at issue, Taxol, Vepesid, carboplatin and Cytoxan. *See* Extracts from THWF Prescription Claims Data, Berman Decl., Ex. 4, and printout of THWF J-Code drug payments, Ex. 5.[21] The fact that THWF may have only paid for three injections of Zoladex, as AstraZeneca asserts, is irrelevant. THWF made a reimbursement for the drug and is otherwise adequate.

The only other challenge to THWF is that, under Pennsylvania law, it must prove justifiable reliance and somehow becomes inadequate due to this more stringent requirement. As

---

[21] At his deposition, THWF's Bill Einhorn testified that the claims on the THWF spreadsheet represented J-Code drug payments made by THWF during a 36-42 month period prior to the beginning of 2002, when a different provider began handling claims for physician administered drugs. *See* Berman Decl., Ex. 6 (William Einhorn Dep. at 46-48).

Plaintiffs explained above, the need to prove reliance in certain states is not a barrier, since all Plaintiffs paid based on AWP.  Indeed, THWF's Administrator, William Einhorn has previously stated that THWF's J-Code drug purchases were based on AWP.  *See* Einhorn Aff. (Dkt. No. 1032, filed Aug. 31, 2004) and Berman Decl., Ex. 6 (Einhorn Dep. at 77-78).

### III.    CONCLUSION

The Court has already recognized that AstraZeneca and BMS violated the law, and that Plaintiffs' AWP inflation and manipulation claims are amenable to a class trial.  Absent certification, countless TPPs and consumers will be deprived of a remedy, because there is no viable alternative to this class action.  If the present multi-state class is unmanageable, as Defendants insist, then separate trials on behalf of 39 separate classes – one for each jurisdiction – purports to be the next alternative.  But this is not a realistic alternative and would consume far too much judicial time and resources to complete.  Plaintiffs have demonstrated that their claims can be grouped for a manageable trial, and it is time to certify the nationwide Classes so that these long-pending claims can finally be adjudicated.

DATED:  February 1, 2008.

By   **/s/ Steve W. Berman**
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

     I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on February 1, 2008, I caused copies of **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY NATIONWIDE CLASSES 2 AND 3 AGAINST DEFENDANTS ASTRAZENECA AND BMS** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


                                     **/s/ Steve W. Berman**
                                    Steve W. Berman

001534-16 216749 V1

**APPENDIX A:**

**REBUTTAL TO DEFENDANTS' ASSERTION OF RELIANCE REQUIREMENTS**

1.        Under the <u>Colorado</u> act, a representation is false and, therefore, unfair and deceptive if it induces a party act or refrain from acting ***or*** has the capacity or tendency to deceive (even if it did not). *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003). Thus, reliance is not required. AstraZeneca cites to *Martinez v. Lewis*, 969 P.2d 213, 220-21 (Colo. 1998) (Astra Br. at 7 n.8), but that opinion does not state that reliance is required under the Colorado Consumer Protection Act.

2.        No court in <u>Connecticut</u> has ever required that a plaintiff prove reliance in order to sustain an Unfair Trade Practices Act claim. Indeed, the case relied upon by Defendants, *Collins v. Anthem Health Plans., Inc.*, 880 A.2d 106 (Conn. 2005), merely held that plaintiffs are required to show an ascertainable loss (which could not be done on a class-wide basis given the inquiries necessary into each doctor's relationship with his or her insurer). *Id.* at 120-21.

3.        Under the <u>Delaware</u> act, reliance by the plaintiff is not required to prove a violation of 6 DEL. CODE § 2513(a). *See, e.g., S & R Assocs., L.P., III v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. Super. Ct. 1998) ("While a fraud action at common law requires the plaintiff to prove reliance, there is no corresponding reliance requirement in 6 Del. C § 2513."). AstraZeneca's case cite, *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069 (Del. 1983) (Astra Br. at 7 n.9), not only did ***not*** hold that reliance was required, but acknowledged the opposite: "An unlawful practice under section 2513(a), however, is committed regardless of actual reliance by the plaintiff." *Id.* at 1074.

4.        Reliance is not required under the <u>District of Columbia</u>'s act, which expressly provides that "[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. CODE § 28-3904. AstraZeneca's citation to *Smith v. Brown & Williamson Tobacco Corp.*, 108 F. Supp. 2d 12 (D.D.C. 2000) (Astra Br. 7 n.8), is inapposite, as the district court there was discussing the common law fraud reliance requirement and not the District of Columbia Consumer Protection Procedures Act. *See id.* at 17 ("As discussed, a plaintiff must establish that she relied on a defendant's conduct in order to make out a claim of fraud. *See Higgs*, 472 A.2d at 876. Here, Mrs. Smith's own deposition testimony leaves no doubt that she did not rely on defendants' nondisclosure of information in making decisions with respect to cigarette smoking.").

5.        Under <u>Hawaii</u>'s act, the elements of proving up a damages action are: (i) a violation of chapter 480; (ii) injury to plaintiff's business or property resulting from such violation; (iii) proof of the amount of damages; and (iv) a showing that the action is in the public interest or that the defendant is a merchant. *Wiginton v. Pac. Credit Corp.*, 634 P.2d 111, 119 (Haw. Ct. App. 1981). Although Defendants cite *Wiginton* for the proposition that reliance is required, the court never discussed reliance and, in fact, excluded it from the foregoing elements. Defendants' other case, *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1230 (Haw. 2002), also does not stand for the proposition that reliance is required; its discussion of reliance was limited to an analysis of the tort of negligent misrepresentation. *Id.* at 1235-36. Moreover, *Zanakis-Pico* actually helps Plaintiffs here, because the court held, in discussing the consumer

fraud statute, that no actual purchase is necessary to recover damages for false advertising. *Id.* at 1231-32.

6.      Under the <u>Illinois</u> act, the very terms of the statute do not require reliance. *See* 815 ILCS 505/2 (unfair or deceptive acts or practices are prohibited "whether any person has in fact been misled, deceived or damaged thereby[.]"); *see also Arenson v. Whitehall Convalescent & Nursing Home*, 164 F.R.D. 659, 666 (N.D. Ill. 1996) (reliance is not an element of a Consumer Fraud Act violation); *Garner v. Healy*, 184 F.R.D. 598, (N.D. Ill. 1999) ("proof of 'actual reliance' on the part of each plaintiff is not required under the Illinois Consumer Fraud Act"). However, in cases of false advertising, in order to show proximate cause, the plaintiff has to actually have seen the advertisement at issue and act upon it. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 153 (Ill. 2002).

7.      In <u>Kansas</u>, the statute explicitly states that an action is available "whether or not any consumer has in fact been misled[.]" AstraZeneca relies on *Finstad v. Washburn Univ. of Topeka,* 845 P.2d 685, 690 (Kan. 1993) (Astra Br. at 7 n.8), where the court, in observing that plaintiffs had been aggrieved (that is, suffered any loss), stated that plaintiffs had not relied on the false statement at issue. *Id.* at 691. However, the court was careful to explain that its decision was made under a version of the statute that was silent as to reliance, and the KCPA was later amended to apply "whether or not any consumer has in fact been misled." *Id.* at 690.

8.      In <u>Maryland</u>, the plain terms of the statute demonstrate that reliance is not required:  "Any practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." MD. COM. LAW CODE § 13-302.  Reliance is not required to show a violation of the statute or to recover damages and is only an element in seeking restitution. *See Luskin's, Inc. v. Consumer Protection Div.*, 726 A.2d 702, 727 (Md. Ct. App. 1999). *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (Md. 2000), cited by AstraZeneca (Br. at 7 n.8), relied on *Luskin's* but failed to recognize *Luskin's* limitation to restitution.

9.      Under the <u>New Jersey</u> act, it is not necessary to show that any person was in fact misled or deceived; all that is required is that the conduct has the capacity to mislead. *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994).  Indeed, AstraZeneca's case, *Fink v. Ricoh Corp.*, 839 A.2d 942 (N.J. Super. 2003), explicitly states that "reliance need not be proven under the NJCFA," *id.* at 958, and only reiterated that proximate cause was required.

10.     In <u>Oregon</u>, reliance is required where affirmative misrepresentations are alleged, *Feitler v. The Animation Celection, Inc.*, 13 P.3d 1044, 1047 (Or. Ct. App. 2000), but not for wrongs involving omissions. *Sanders v. Francis*, 561 P.2d 1003, 1006 (Or. 1977) (noting that, in cases of omission, "it would be artificial to require . . . that plaintiff had 'relied' on [the] non-disclosure").

11.     No case in <u>South Carolina</u> holds that the South Carolina Unfair Trade Practices Act ("SCUTPA") requires reliance.  AstraZeneca relies on *Charleston Lumber Co., Inc. v. Miller Housing Corp.*, 458 S.E.2d 431, 438 (S.C. Ct. App. 1995) (Astra Br. at 8 n.9), yet that case discussed reliance only in the context of the common law fraud and, in listing the elements of a cause of action under the SCUTPA, the court ***omitted*** reliance.

12.     No state court in <u>South Dakota</u> has ever ruled that reliance is a requirement under S.D. CODIFIED LAWS § 37-24-6(1), and the statute states that a deceptive act or practice may be found "regardless of whether any person has in fact been mislead, deceived or damaged thereby."  AstraZeneca's sole authority, *Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F. Supp. 2d 1169, 1178 (D.S.D. 2000) (Astra Br. at 7 n.8), simply conflated the elements of common law fraud and deceptive acts or practices without any analysis or citation to South Dakota supporting authority.

13.     <u>Tennessee</u> courts have expressly held that reliance is not a required element under the Tennessee Consumer Protection Act.  *See, e.g., Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 469 (Tenn. Ct. App. 2003).

14.     In <u>Texas</u>, Tex. Bus. & Com. Code Ann. § 17.50(a)(3), prohibiting unconscionable acts or practices, does not contain a reliance requirement.  *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex. 1985) (explaining that a general reliance requirement was rejected by the legislature).[22]

15.     Reliance is not required in <u>Vermont</u> because the statute provides a private right of action to recover damages on behalf of "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of this title, *or* who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title . . . ."  VT. STAT. ANN. TIT. 9 § 2461(b) (emphasis added).  No Vermont court has ever held that reliance is a required element of a Consumer Fraud Act claim.

16.     Reliance is not required under the <u>Washington</u> Consumer Protection Act.  *Schnall v. AT&T Wireless Servs., Inc*., 161 P.3d 395, 401-02 (Wash. Ct. App. 2007) ("[D]eceptive acts or practices are unlawful whether or not they actually deceive anyone. . . .  It is sufficient to prove that a practice has the capacity to deceive a substantial portion of the public to prevail on a CPA claim. . . .  We hold that the trial court erred in denying class certification on the CPA claim.  Plaintiffs are not required to prove that each individual class member relied on AT&T's nondisclosure because, as the courts in Pickett I and Pickett II recognized, reliance is not the only means by which causation can be proven in CPA cases.") (footnotes omitted).  AstraZeneca's sole authority, *Consolidated Dairy Prods. Co. v. Bar-T Ranch Dairy, Inc.*, 97 Wn.2d 167, 180 (Wash. 1982), does not hold that reliance is required, only that causation must be proved.

17.     In <u>Wisconsin</u>, the very case that AstraZeneca cites for the proposition that reliance is required, *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 720 N.W.2d 507, 521 (Wis. Ct. App. 2006) (Astra Br. at 8 n.9), actually holds that reliance is *not* required: "WISCONSIN STAT. § 100.18 does not require reasonable reliance on the misrepresentation. . . . The supreme court's most recent statement of the elements of a claim under § 100.18 does not contain reasonable reliance but instead tracks the statutory language on the causation of pecuniary loss element.  *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, P39, 270 Wis. 2d 146, 677 N.W.2d 233 (2004) ("[T]he plaintiff has sustained a pecuniary loss as a result of the 'assertion, representation or statement of fact.'Wis. Stat. § 100.18(1); *see also* Wis JI-Civil 2418")."

---

[22] Later, the legislature added a reliance requirement to Section 17.50(a)(1), but *not* to Section 17.50(a)(3).