UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | |

**UNITED STATES' OBJECTIONS TO JANUARY 31, 2008 ORDER BY MAGISTRATE JUDGE BOWLER REGARDING THE DEPOSITIONS OF MILES WHITE, RICHARD GONZALEZ, DUANE BURNHAM AND THOMAS HODGSON**

Beginning in April 2007, the United States has attempted to depose four Abbott

Laboratories, Inc. (Abbott) fact witnesses (Richard Gonzalez, Miles White, Duane Burnham and

Thomas Hodgson) with direct and important knowledge of key events and issues in the case.

Abbott has endeavored to block these depositions invoking the law governing the deposition of

high-level or "apex" corporate executives, which provides some protection for such witnesses

under limited circumstances. On January 31, 2008, Magistrate Judge Bowler granted Abbott's

motions for protective orders for all of these witnesses, preventing the United States' depositions

of these witnesses. Pursuant to Fed R. Civ. P. 72(a) and Rule 2(b) of the Rules for United States

Magistrates in the District of Massachusetts, the United States respectfully files its objections to

Magistrate Judge Bowler's January 31, 2008 Order on these protective orders.

The United States respectfully submits that apex witness protection should not be

afforded to these witnesses. Three of the witnesses – Richard Gonzalez, Duane Burnham and

Thomas Hodgson – are no longer even high level corporate executives; they are retired. As

such, no apex witness protections extend to them. Regardless, these retired Abbott employees are witnesses with direct, personal and unique knowledge of the circumstances and issues in the case. During a portion of the claims period, Mr. Gonzalez was head of the specific business unit (Hospital Products Division) and was personally involved in several crucial decisions related to the fraudulent conduct (including the decision by Abbott in 2001 to ultimately provide lower prices to the price reporting compendia). Mr. Burnham, a long retired former Abbott CEO, directly lobbied members of Congress seeking to strip the Department of Health and Human Services (HHS) of having any discretion over setting Medicare reimbursement for drugs at anything other than AWP. Mr. Hodgson was offered up as an Abbott corporate designee in other AWP-related litigation and testified extensively on AWP-reimbursement issues.

The only non-retired witness is Miles White, Abbott's current chief executive officer and chairman of the board. Mr. White has injected himself into the matters involved in this case through his numerous public statements about AWP and government drug reimbursement issues. Further, Mr. White was personally confronted in October 2000 with a letter from a member of Congress about the fraudulent conduct at issue in this matter. The Congressman's allegations of fraud mirror those in the United States' complaint. According to Abbott internal documents, this confrontation was one of the impetuses for Abbott lowering its reported prices in 2001, which essentially ended the fraud. There is a precedent for taking CEO testimony in AWP cases "because of the magnitude of these cases." *See* Attachment L, September 29, 2005 Magistrate Judge Bowler Hearing Transcript at 17. The United States respectfully submits that its case against Abbott is similarly significant, and, as set forth below and in the attached briefs, there is an ample factual predicate for taking the depositions of these retired and current high level

Abbott executives. In sum, there is a strong likelihood that these witnesses will be called by the United States at trial, and it is imperative that the United States be permitted to conduct discovery as soon as possible into their knowledge and conduct given the very short time period – six weeks – to complete fact discovery in this case.

Further, a state trial court in Pennsylvania has already authorized the depositions of three of the witnesses – Mr. Gonzalez, Mr. Burnham and Mr. Hodgson – in a related state court AWP proceeding involving Abbott. *See* Attachment J at 8, fn.2 (the deposition notices for which the Pennsylvania state court protection was sought were for these three witnesses, among others). Abbott has appealed the ruling to the Pennsylvania Supreme Court, and there is a stay in place on those depositions until February 22. *See* Attachment K. Pennsylvania has also noticed the deposition of Miles White, the only apex witness who is a current employee, and Abbott has not filed a motion for protective order.[1] Once the stay ends, the United States understands that the Commonwealth of Pennsylvania will be pressing forth expeditiously to complete the depositions. Since it is likely these depositions will take place regardless some time after February 22, reversing Magistrate Judge Bowler's Order will allow the United States to coordinate with other parties to facilitate the efficient conduct and completion of the depositions of these witnesses. To mitigate burden to the witnesses and minimize duplicative questioning, the United States will coordinate the depositions with Pennsylvania. If the Pennsylvania depositions take place, Abbott's arguments concerning prejudice and burdensomeness to the witnesses will be moot.

---

[1] While Mr. White's deposition is not the subject of the appeal in Pennsylvania, it is referenced in Abbott's brief to the Supreme Court, and has been stayed as part of a global deposition discovery stay pending resolution of the appeal. *See* Attachment K.

Finally, the United States is nearing the close of fact discovery and was careful to seek only the depositions of those executives who had unique information that could not be derived from subordinates. The United States has exhausted its ability to depose other witnesses who may have had personal knowledge on certain topics to be addressed by these higher level executives.

## OBJECTIONS AND PROPOSED RELIEF

The standard of review by a district court of a Magistrate Judge's nondispositive discovery ruling is set forth in 28 U.S.C. § 636(b)(1)(A). Pursuant to this provision, a Magistrate Judge's discovery ruling will be set aside if it is "clearly erroneous or contrary to law." *Id*; *In re Administrative Subpoena Blue Cross Blue Shield of Massachusetts*, 400 F.Supp.2d 386, 388 (D. Mass. 2005).

The United States objects to the Order of Magistrate Judge Bowler as follows:

- The Order requires the United States to complete previously-scheduled, largely unrelated Rule 30(b)(6) corporate designee testimony in lieu of Rule 30(b)(1) testimony about Mr. Gonzalez's, Mr. White's, Mr. Burnham's and Mr. Hodgson's personal knowledge and conduct with respect to the issues in this matter.

- The Rule 30(b)(6) depositions are no substitute for the direct, personal knowledge of these witnesses. It is unlikely that the Abbott corporate designees will or are required to educate themselves about these witnesses' personal knowledge of the issues in this case. Requiring the United States to complete the Rule 30(b)(6) depositions before renewing a request to depose these witnesses would cause undue delay. Any such delay greatly prejudices the United States given the very limited time – six weeks – to complete discovery in this matter.

- Three of the witnesses – Mr. Gonzalez, Mr. Burnham and Mr. Hodgson – are not apex witnesses. They are retirees who are not afforded the limited protection available to high level corporate executive witnesses.

- The law governing apex witnesses permits the depositions of apex executive witnesses to occur without exhaustion of other discovery avenues where the facts demonstrate that the

4

deponent will have direct, personal or unique knowledge of the issues. All of the four witnesses have documented direct, personal and unique knowledge of the issues in this matter.

The United States respectfully asks that this Court overrule the Order and permit the United States to depose these witnesses based on their direct, personal and unique knowledge of the issues. The United States respectfully asks that should the Court grant the requested relief that it order the depositions to occur within 15 days of this Court's order. Abbott and the witnesses have long been on notice of the United States intent to take these depositions, and there is no prejudice to Abbott or the witnesses if the deposition is scheduled promptly.

## PROCEDURAL BACKGROUND

Abbott filed three protective order motions to prevent the depositions of Mr. Gonzalez, Mr. White, Mr. Burnham and Mr. Hodgson. *See* Dkt Nos. 4692, 4774, and 4781. In Abbott's briefing of the issues, it submitted porous "know nothing" affidavits from the witnesses and argued that the witnesses lacked personal, direct or unique knowledge of the issues in the case. *See generally*, Attachments F (Gonzalez MPO Memorandum of Law), G (White MPO Memorandum of Law), H (Renewed White MPO Memorandum of Law) and I (Burnham and Hodgson MPO Memorandum of Law).[2] Abbott further argued that the United States should be required to exhaust alternative means of discovery before being permitted to depose these fact witnesses. *Id.*

---

[2] For the sake of convenience, the United States has attached to these Objections the memoranda of law for these motions for protective orders and the United States' opposition briefs. The United States has only provided the Exhibits to those briefs cited herein, not all of the exhibits provided with the briefs.

At oral argument, Abbott raised a new argument for the first time: that these witnesses should not be deposed about their personal knowledge of the issues in the case because the United States has and will be taking testimony of corporate designees pursuant to Rule 30(b)(6) about largely unrelated topics. *See* Attachment E,  January 31, 2008 Magistrate Hearing Transcript 109:7-11.  Abbott contended that since there is some subject matter overlap on a few of the Rule 30(b)(6) topics, the United States should be limited to those depositions and prevented from deposing these witnesses.

Magistrate Judge Bowler granted the protective order motions on the basis of these new arguments.  Attachment E, January 31, 2008 Magistrate Hearing Transcript 118-119, 122.  On the motions for three of these witnesses, Magistrate Judge Bowler granted the protective orders on the basis of these new arguments before the United States had the opportunity to address them.  *See* Attachment E, January 31, 2008 Hearing Transcript at 118-122.[3]  Magistrate Judge Bowler did appear to leave open the opportunity to pursue the depositions at a future date.  *See Id.* at 122:18-21, 124:6-10 ("At this time, the motion is allowed as to White;" "I've given you the ability to renew, when you get all of the 30(b)(6) testimony and you feel you still want to pursue this, I'll entertain it.").  Given that discovery will likely end before these Rule 30(b)(6) depositions are completed and the depositions re-noticed, Magistrate Judge Bowler's order effectively blocks the United States from deposing these important witnesses in the discovery phase of this case.

The United States respectfully contends that these depositions are not premature, particularly given the direct, personal and unique knowledge these witnesses possess and the

---

[3]  The United States attempted to argue in opposition of the motions after the ruling, but the decision stood.  Attachment E, January 31, 2008 Hearing Transcript at 122-124.

posture of this litigation.  The Rule 30(b)(6) depositions Abbott offers in the alternative are a

grossly inadequate substitute for deposition testimony of Mr. Gonzalez, Mr. White, Mr. Burnham

and Mr. Hodgson.  The United States is seeking testimony about these witnesses' demonstrated

personal knowledge and conduct, not to determine the corporation's knowledge or position on a

topic.

Finally, as noted above, the Commonwealth of Pennsylvania – barring a reversal by the

state Supreme Court – has been authorized by a state court to depose at least Mr. Gonzalez, Mr.

Burnham and Mr. Hodgson (Attachment J); vacating the January 31, 2008 Protective Order

would allow the United States to coordinate with that state in the conduct of depositions that will

likely take place regardless.

## FACTUAL BACKGROUND

As discussed below, the law on the taking of "apex" depositions is clear – if there are

facts establishing that an apex witness has direct, unique or personal knowledge of the issues in a

case, a party can depose that witness without having to seek that information through alternative

means.  There is a clear factual and documentary record establishing these witnesses' direct,

personal and unique knowledge of the events and issues in this case.  Those facts and the related

documents are set forth in detail in the oppositions to Abbott's motions for protective orders

(attached hereto as Attachments A, B, C and D) and summarized below.

**I.      Richard Gonzalez**

Mr. Gonzalez was the President of the Hospital Products Division (HPD) – the division

whose drugs and conduct are at the core of this matter –  during part of the claims period in this

case.  Attachment F, Gonzalez Motion for a Protective Order (Gonzalez MPO), Exhibit A at 2,

¶5. Mr. Gonzalez was later promoted to Executive Vice President and Chief Operating Officer, Medical Products; in that capacity, he still oversaw the activities of HPD and was involved in the 2001 deliberations where Abbott decided to end its fraudulent price reporting conduct. *Id.; see also* Attachment A, Opposition to Gonzalez MPO, Exhibits 2 and 5. Mr. Gonzalez retired from Abbott in 2007, and it is the United States' current understanding that Mr. Gonzalez is not employed by another company.

As HPD president, he had oversight responsibility for Abbott HPD's Alternate Site Group. It is the marketing activities of this group while selling HPD drugs that give rise to the claims in this case, including but not limited to:

- **Negotiation of major HPD Alternate Site contracts**. Mr. Gonzalez was involved in major Alternate Site contract negotiations, even before he became the president of HPD. For example, he was a participant in negotiations with a home infusion company called Coram in June 1995. *See* Attachment A, Opposition to Gonzalez MPO, Exhibit 3. Coram was a major HPD customer that came to rely on the spreads Abbott created and marketed.

- **Deliberations about government reimbursement issues**. Mr. Gonzalez was involved in HPD discussions regarding government reimbursement for Abbott drugs. In the spring of 2000, First DataBank (FDB) announced that it was going to use pricing information developed from previous Department of Justice investigations. Abbott HPD drugs constituted almost a quarter of the products affected by the FDB proposal. Mr. Gonzalez was part of the team of senior HPD executives that analyzed and discussed the impact of the FDB proposal. *See Id.,* Exhibit 4.

- **Deliberations regarding the 2001 catalogue/list price reductions**. Abbott wound down its fraudulent scheme in mid-2001, when it chose to report reduced prices to the pricing compendia. Despite the fact that Mr. Gonzalez had left HPD, he still oversaw HPD's operations and was involved in discussions pertaining to Abbott's decision to report lower prices in 2001. Exhibit 5 are materials for a March 7, 2001 meeting among Mr. Gonzalez and others to discuss Abbott's "price adjustment" project; included in the materials are documents proposing revised

definitions for Abbott pricing terms and analyses of the financial impact of reporting lower, more accurate prices to the compendia. *Id*, Exhibit 5.

As the previous head of the business unit whose conduct is at issue, the need and appropriateness of Mr. Gonzalez's testimony is evident; the documents and facts cited above simply memorialize his direct involvement in the facts and circumstances of this matter.

## II.    Miles White

Miles White has made numerous public statements regarding AWP and government drug reimbursement issues and documents suggest he was involved in Abbott's decision to drastically reduce its reported prices in 2001. When Abbott was accused by members of Congress of committing drug pricing fraud in September 2000 – the same conduct that Abbott now claims Congress approved of – Mr. White acted as the company's spokesman, providing informed, albeit incorrect, statements on the company's behalf. Indeed, one of Mr. White's comments was that government drug reimbursement policies should be changed to curb unspecified "abuses." These statements are equivalent to public testimony by HCFA or CMS officials about the same topics; the United States has permitted the deposition of several former HCFA and CMS Administrators regarding their public statements about AWP and government reimbursement for drugs. Mr. White's statements include, but are not limited to:

- "'[The allegations by Congress] is really nothing new,' White said in Chicago earlier Wednesday in a brief interview after he addressed a luncheon of business executives on the company's e-commerce strategies. 'There's nothing new here.'" Attachment B, Opposition to First White Motion for a Protective Order (First White MPO Opposition), Exhibit 2, September 28, 2000 Chicago Tribune, "Abbott, Baxter Fight Back."

- "Any concerns [Congressman] Bliley may have result from the fact that Congress and the Health Care Financing Administration, which runs Medicare, 'have never defined the pricing' policies clearly, White said." *Id.*

9

- "Abbott Chief Executive <u>Miles White also said he supports changing the system to curb abuses.</u>" *Id.* (emphasis added).

- "Congressman Bliley has an interest in this issue," White said. "But I think you need to look at the structure of the regulations." *Id.*

- "The chairman and CEO of Abbott Laboratories hinted Wednesday that election-year politics are playing a role in investigations into whether drugmakers inflate their average wholesale prices to boost profits on their products. 'The election is only four to six weeks away,' said Miles D. White, CEO of North Chicago-based Abbott, referring to the Nov. 7 presidential election." Exhibit 3, September 28, 2000 Chicago Sun Times, "Abbott Chief Downplays Drug Probe."

In addition, Mr. White was involved in Abbott's 2001 decision to report lower prices, a key event that wound down the fraudulent scheme. A member of Congress wrote a letter to Mr. White refuting Mr. White's September 2000 public statements to the press and accusing Abbott of fraud and jeopardizing the public's health in the process. The Congressman wrote, among other things:

- "You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading price data and has engaged in other deceptive business practices. **This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing the public health.**" Attachment B, First White MPO Opposition, Exhibit 6, Stark 10/31/00 Letter to Miles White ("Stark/White Letter") at 1. (emphasis added)

- "The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs." *Id.*

- **"Contrary to Abbott's recent assertions in the national media, the price manipulation conduct was in no way required by or consistent with existing reimbursement laws or policies.** Indeed, Abbott did not falsify published prices in connection with other drugs, where sales and market penetration strategies did not include arranging financial 'kickbacks' to health care providers." *Id.* (emphasis added)

10

After Mr. White's receipt of the letter, Abbott reduced its reported prices; a draft

memorandum explaining the reduction noted that Congressman Stark's letter to Mr. White was

an impetus.[4]  Attachment B, First White MPO Opposition, Exhibit 8 (filed under seal) ("The

wide disparity in [Abbott's] catalogue prices and average market prices as currently configured is

not supported by sufficient financial or market factors to survive scrutiny of public opinion.  This

was voiced in December 2000 (sic) in a letter from U.S. Representative Pete Stark to Miles

White.")

This is not the first time Abbott has moved for a protective order barring Mr. White's

deposition.  On July 20, 2007 – in connection with the previous motion for a protective order to

shield Mr. White from testifying – Magistrate Judge Bowler ordered that Mr. White answer three

written deposition questions.  Attachment C, Opposition to Renewed Motion for Protective

Order Barring the Deposition of Miles White at 1.  The United States issued the written

---

[4] There are additional issues upon which to question Mr. White, including but not limited to:

- Mr. White's involvement in Justice Department and Congressional investigations of possible drug pricing fraud committed by Abbott in late 2000 generally.

- Mr. White's involvement in enhancements to Abbott's corporate compliance program at the time Abbott made a corporate decision to report reduced prices for its drugs in 2001.

- Mr. White's involvement in the decision to resolve criminal charges and civil claims in 2001 involving Abbott's joint venture TAP Pharmaceuticals.  That matter, specifically the civil portion, involved the exact same type of AWP price inflation and spread marketing allegations at issue in this action.

- The circumstances surrounding Mr. White's receipt of an October 1999 litigation hold memorandum regarding the government's investigation of Abbott.

11

deposition questions pursuant to Fed. R. Civ. P. 31 on August 7, 2007. *Id.* Instead of providing

his own testimony, Mr. White provided an affidavit that was crafted all or in part by Abbott's

lawyers. *See Id.*, Exhibit 1, Abbott's Responses to United States' Second Set of Interrogatories at

1. Mr. White and his lawyers' answers proved non-responsive and evaded the subject matter

addressed by the deposition questions. The written deposition proved to be an inadequate

substitute for Mr. White's live testimony and direct questioning by the United States.

### III.    Duane Burnham

Duane Burnham, Abbott's former chief executive officer (CEO) and chairman of the

board, has been retired from Abbott since 1999. Attachment I, Burnham/Hodgson MPO, Exhibit

B, ¶ 1. He is not currently employed on a full time basis; he works as a trustee for two

organizations. *Id.* at ¶ 7.

Mr. Burnham has direct involvement in the events and circumstances of this case. In

1997, HHS sought to change Medicare drug reimbursement so that it would be based on actual

cost. *See* Attachment D, Opposition to Burnham/Hodgson MPO, Exhibit 3, March 3, 1997 Fax

Transmittal of Proposed Legislation to Set Drug Reimbursement at Actual Cost. The proposed

legislation would have set Medicare drug reimbursement at (1) actual cost, (2) an AWP set by the

HHS secretary or (3) a median actual acquisition cost. *Id.* at ABT 53035.

Ultimately, the House and Senate proposed legislation that altered the President's

proposed legislation. In the June 20, 1997 memorandum referenced above, Mr. Landsidle wrote

to Mr. Barmak that there was a pending Senate bill on Medicare drug reimbursement that was

"not good" because it would require HHS to study drug acquisition costs and grant the agency

discretion to determine the appropriate reimbursement level from drugs. *Id*, Exhibit 5, June 20,

1997 Memorandum On Lobbying Medicare Drug Reimbursement.  In that memorandum, Mr.

Landsidle suggested that Abbott needed to substantially augment its direct lobbying efforts by

having Mr. Burnham directly lobby certain Congressmen.  *Id.*  The decision to involve Mr.

Burnham was made with some trepidation; Mr. Landsidle noted further, "[th]e downside is

Duane being exposed to having to defend our position which is profit motivated." *Id.*

Mr. Burnham was ultimately asked to, and did, directly lobby against the Senate bill.  On

June 30, 1997, Mr. Landsidle wrote a memorandum to Mr. Burnham explaining why and how Mr.

Burnham should lobby against the Senate bill on Medicare drug reimbursement.  Mr. Landsidle

wrote:

> The House and the Senate have passed different changes to how Medicare
> reimburses for drugs (i.e., Lupron and Calcijex).  The basic change is that future
> reimbursement will be 95% of average wholesale price (AWP) rather than AWP.
> However, the Senate bill has additional language we oppose.
>
> . . . The Senate bill calls on the Secretary of HHS to do a study of AWP and report
> back to Congress within 6 months. *This gets HHS looking at prices.* The House bill
> has no such language.
>
> . . . Your message to both [Congressmen] is simple:
>
> Abbott thinks the house language providing for Medicare reimbursement of drugs
> at 95% of AWP . . . is much better than the Senate language.

*Id.*, Exhibit 8, June 30, 1997 Memorandum from D. Landsidle to D. Burnham (emphasis added).

Ultimately, Mr. Burnham contacted members of Congress, seeking support for the Medicare drug

reimbursement provisions in the House version of the bill. *See Id*, Exhibit 9, August 5, 1997 letter

from D. Burnham to a Member of Congress.  Thus, Mr. Burnham was directly and intimately

involved in AWP and drug reimbursement issues.  There is ample basis for taking his deposition

at this time.

**IV.    Thomas Hodgson**

13

Thomas Hodgson has testified twice in cases dealing with AWP issues. *See* Attachment D, Opposition to the Burnham/Hodgson MPO, Exhibits 10 and 11, February 19, 2004 and February 20, 2004 Hodgson Deposition Transcripts. He testified both in his individual capacity and as a corporate Rule 30(b)(6) designee on behalf of Abbott. *See, e.g.,* Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 16. He testified regarding a number of matters at issue in this litigation:

- Mr. Hodgson is familiar with AWP. "Q. You've heard of the term "average wholesale price" in connection with drug pricing. A. Yes." Exhibit 11, February 20, 2004 Hodgson Deposition Transcript at 13.

- He also knows how AWP is used for reimbursement: "Q. And you'd agree that AWP is used as a basis for reimbursement by Medicare as well, wouldn't you? A. Yes." *Id.* at 15.

- Mr. Hodgson testified that he knew what a "spread" was; "I understand that to mean the difference between the acquisition cost or price to the physician and what he was reimbursed." *Id.* at 100. He also testified that he knew the spread on drugs can be increased various ways, including by decreasing actual acquisition cost. *Id.* at 225.

- Mr. Hodgson is familiar with various alternatives the federal government considered to AWP-based drug reimbursement. "Q. Do you recall that HCFA was looking at the alternative of reimbursing on straight cost [in the mid-1990s]. A. I think that was one option. Another option was steeper discount off AWP, and there were probably three or four other options that I don't recall or maybe nobody knows about." Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 225.

- Mr. Hodgson further testified of his knowledge and education regarding developments in Medicare drug reimbursement. Mr. Hodgson was questioned about his receipt of a memorandum in 1995 discussing HCFA and OMB surveys of actual prices. "Q. Did you know then or do you know now that HCFA . . . and OMB, were attempting to survey acquisition costs of physicians [at the time of the memorandum] for Lupron? A. I knew, as we discussed earlier, that HCFA was considering a number of alternatives to AWP reimbursement. In terms of how they were actually pursuing that, I wasn't aware, other than, obviously, I got this memo or I was briefed on it." *Id.* at 252-253.

## ARGUMENT

**I.    Mr. Gonzalez, Mr. Burnham and Mr. Hodgson Are Not Apex Witnesses and Are Not Shielded from Being Deposed.**

Mr. Gonzalez, Mr. Burnham and Mr. Hodgson are retired from Abbott.  They are not currently high level corporate officers at Abbott or elsewhere.  There is no case law to suggest that protections afforded current high level apex witnesses – whether government or corporate – apply to corporate retirees.  *Cf. State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 608 (Mo. 2002) (court concludes that arguments for apex protection of executive were moot in light of his retirement).  Considerations such as harassment or business disruption that normally inform a court's decision making regarding the permissibility of apex depositions do not apply to retired executives.  *See generally*, *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001).  Indeed, broadening apex protections to block the depositions of a long retired corporate executive would be inconsistent with the well recognized notion that notwithstanding the protections that may be afforded an apex witness, "it is very unusual . . . for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances, as such an order would likely be in error." *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567 (S.D. Ca. April 6, 2007) at *2.

In its protective order briefings, Abbott has contended that apex witness protection does apply to all retired senior corporate executives, citing *In re Ski Train Fire of November 11, 2000*, 2006 WL 1328259 (S.D.N.Y. May 16, 2006) and the *WebSideStory* case noted immediately above.  These cases are easily distinguishable and do not stand for that extraordinarily broad proposition.  In *In re Ski Train Fire*, the only apex witness in that case remotely analogous to the retired executive in this litigation was the "recently" retired CEO of the defendant, who still

15

continued as the chairman of its board of directors.  The deponent in the *WebSideStory* case was also a current chairman of the board who had retired from his CEO position at the plaintiff corporation.   The court in *WebSideStory* considered the deponent an apex witness because he (1) continued to be a top executive for the plaintiff corporation and (2) was also the CEO and chairman of the board of a new company.  2007 WL 1120567 at *3.   None of the retired Abbott executives hold any top corporate positions at Abbott or elsewhere.

Therefore, apex witness protection does not apply to Mr. Gonzalez, Mr. Burnham and Mr. Hodgson.  Given that these three witnesses will likely be deposed soon in a Pennsylvania state AWP action, *see supra*, it would be appropriate, consistent with the law and not prejudicial to Abbott for this court to vacate the protective orders.

## II.   The Depositions of Mr. Gonzalez, Mr. White, Mr. Burnham and Mr. Hodgson Are Mandated Even Under the Rules Governing Apex Witnesses.

Even if the Court were to afford the three Abbott retirees and the current Abbott executive apex status, their depositions should be permitted.  The United States "may obtain discovery regarding any matter, not privileged, that is relevant to [a] claim or defense," and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1).  Further, "[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive] has a busy schedule'" does not exempt them from being deposed. *Consolidated Rail Corp. v. Primary Industries Corp.*, No. 92 Civ. 4927, 1993 WL 364471, at * 1 (S.D.N.Y. Sept. 10, 1993) (*quoting CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)).  "Federal courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case."

16

*In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 205 F.R.D. 535, 536 (S.D. Ind. 2002).

As the *WebSideStory* decision cited by Abbott notes, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." 2007 WL 1120567 at *2; *see also, Travelers Rental Co., Inc. v. Ford Motor Company*, 116 F.R.D. 140 (D. Mass 1981); *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98 (S.D.N.Y. 2001) (deposition of high-level corporate officials permitted when officials have some unique or superior knowledge of the issues in the case. ). That sentiment is echoed in the *In re Sky Train Fire* decision as well, which noted that courts allow apex depositions where "they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action." 2006 WL 1328259 at *10.

A.    **The Witnesses Have Failed to Meet Their Burden to Show That a Protective Order Is Warranted.**

It is the burden of the party seeking a protective order to prove that an apex official does not possess information relevant to the issues in the case or that his knowledge of particular issues in a case is completely duplicative of other witnesses. *General Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002); *First United Methodist Church of San Jose v. Atlantic Mutual Ins. Co.*, 1995 WL 566026 at (N.D.Cal. 1995) (movant seeking to block high level executive deposition carries heavy burden to show lack of first hand knowledge of the facts of a case). All of the witnesses submitted a "know nothing" declaration claiming that they possessed no unique or superior knowledge on the issues in this litigation. The declarations are not credible, and are vague, conclusory and wholly insufficient to support a motion for a protective order. *See Rolscreen Co. v. Pella Products of St. Louis Inc.*, 145 F.R.D. 92, 96 (S.D.

Iowa 1992) ("party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.") (citations omitted.)

Regardless, in the *Travelers* case from this District, several high level Ford employees filed similar "know nothing" declarations in a failed attempt to evade being deposed. *Id.* at 143. As that court noted, "[t]he plaintiff is entitled to 'test' the claim of lack of knowledge or lack of recollection by deposing the witness." *Id.* at 143, *citing Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 121-23 (D. Conn., 1974) (citations omitted). *Travelers* further noted:

> [T]here is nothing in the law which would indicate that Travelers has to accept the claimed failures on their face or rely on whatever efforts Ford's counsel may have undertaken to refresh recollections. Considering that Travelers has demonstrated that these individuals were personally involved in matters relevant to this case, it would be extremely rare that an asserted failure of recollection would be sufficient to entitle the deponent to an order quashing the deposition.

*Travelers*, 116 F.R.D. at 143; *see also Six West* 203 F.R.D. at 102. This reasoning is especially apt in the case of these witnesses, where the declarations submitted lack credibility in light of the documentary record.

Abbott and the witnesses have failed to meet their burden. The documentary and evidentiary record contradicts the "know nothing" declarations filed with the protective order motions.

**B.     The United States Need Not Exhaust Other Means of Discovery Before Deposing These Witnesses.**

Abbott has argued, "[t]he case law uniformly instructs that, before a party is permitted to conduct an apex deposition, it must first pursue other avenues, such as (i) depositions of lower-level employees or corporate 30(b)(6) designees; or (ii) written discovery." *See, e.g.,* ,

Attachment F, Gonzalez MPO at 11. That is not correct. If it is essential that a high-level corporate official possesses direct, personal or unique knowledge of the facts and issues in the case, then his or her deposition is permitted. *See Six West*, 203 F.R.D. at 105 (allowing deposition of apex witnesses where plaintiffs showed unique knowledge and there was not evidence the deposition was being done merely for harassment).[5] The evidence of that direct, personal and/or unique knowledge has been set forth above.[6] Since the United States has shown clearly that these fact witnesses have unique, direct or personal knowledge of key issues in this matter, the United States need not depose lower-level employees or pursue written discovery before taking his deposition. *See WebSideStory*, 2007 WL 1120567 at *2. It is only if some direct, personal or unique knowledge *cannot* be shown then "'it may be appropriate to preclude a redundant deposition of [this] highly-placed executive while allowing other witnesses with the same

---

[5] Both in *Six West* and in this case, the plaintiffs deposed numerous lower-level employees before the deposition of the apex witnesses and gave ample notice to the defendant. The *Six West* court found that those additional factors made the deposition of the apex witness with unique knowledge even more justified. 203 F.R.D. at 105.

[6] In some cases, courts have directed that lower-level employees be deposed before the opposing party can ask for discovery from the apex officials. *See, e.g., Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Baine v General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991). Those courts sought to protect these officials from repetitive and harassing depositions where unique or direct knowledge cannot be shown. These cases are easily distinguishable. Many of these decisions involve personal injury, employment or contract disputes where the upper-level officials had no personal involvement. *Bridgestone/Firestone*, 205 F.R.D. at 536 ("Nearly every decision Ford has cited [in support of its protective order] involves an individual personal injury, employment, or contract dispute with which the "apex" official had no personal involvement."), citing *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) (individual employment case); *Salter*, 593 F.2d 649 (individual negligence case); *Baine*, 141 F.R.D. 332 (individual personal injury case); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (individual personal injury case); *Wal-Mart Stores, Inc. V. Vidalakis*, 2007 WL 4591569 at *1-2 (W.D.Ark. 2007) (distinguishing between cases involving direct knowledge and personal injury matters). In the present case, the claims involve conduct and knowledge at the highest corporate level; thus, the justification for apex official protection is lacking. *See* Fed. R. Civ. P. 26 (b)(2)(C)(iii) (in weighing whether to limit discovery, courts take into consideration the importance of the issues).

knowledge to be questioned." *Six West*, 203 F.R.D. at 102, (quoting *Consolidated Rail Corp.*, 1993 WL 364471, at *1.)

As Abbott notes in its briefing on these motions, the United States has deposed several of these witnesses' subordinates. Their testimony cannot substitute for direct testimony from these particular fact witnesses about their knowledge and actions. *See Mansourian v. Board of Regents of University of California*, 2007 WL 4557104 (E.D. Cal. 2007) (court denies motion for protective order, noting that "less burdensome" discovery would be a poor substitute for apex witness' direct, personal knowledge). Fact discovery in this matter ends soon, and there is no time for additional delays for interrogatories or written deposition questions that yield vague and incomplete responses drafted by Abbott's counsel.

Even where a party may have previously-scheduled Rule 30(b)(6) depositions on topics to be explored with an apex witness, that fact does not preclude a deposition where it is established that the apex witness has direct, firsthand knowledge. *See WedSideStory*, 2007 WL 1120567 at *4-5 (allowing both Rule 30(b)(6) deposition and apex witness deposition). Where an apex witness has direct or first-hand knowledge of facts, events or issues in a case, there is no substitute for their direct testimony.

## CONCLUSION

For the foregoing reasons, the United States requests that its objections to the Magistrate Judge's January 31, 2008 Order be sustained, and that the Court vacate the protective orders preventing the depositions of Richard Gonzalez, Miles White, Duane Burnham and Thomas Hodgson. The United States further requests that these witnesses be ordered to appear for depositions within 15 days of the protective orders being vacated.

Respectfully submitted,


For the United States of America,

MICHAEL J. SULLIVAN                 JEFFREY S. BUCHOLTZ
UNITED STATES ATTORNEY              ACTING ASSISTANT ATTORNEY
                                    GENERAL


 /s/ George B. Henderson, II
George B. Henderson, II              /s/ Gejaa T. Gobena
Assistant U.S. Attorney             Joyce R. Branda
John Joseph Moakley U.S. Courthouse Daniel R. Anderson
Suite 9200, 1 Courthouse Way        Renée Brooker
Boston, MA 02210                    Justin Draycott
(617) 748-3398                      Rebecca Ford
(617) 748-3272                      Gejaa T. Gobena
                                    Civil Division
                                    Commercial Litigation Branch
R. ALEXANDER ACOSTA                 P. O. Box 261
UNITED STATES ATTORNEY              Ben Franklin Station
SOUTHERN DISTRICT OF FLORIDA        Washington, D.C.  20044
                                    Phone:  (202) 307-1088

 /s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101



Dated: February 13, 2008

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' OBJECTIONS TO JANUARY 31, 2008 ORDER BY MAGISTRATE JUDGE BOWLER REGARDING THE DEPOSITIONS OF MILES WHITE, RICHARD GONZALEZ, DUANE BURNHAM AND THOMAS HODGSON** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/Renée Brooker
Renée Brooker

Dated: February 13, 2008