# ATTACHMENT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER BARRING THE
DEPOSITION OF MILES WHITE**

Abbott Laboratories Inc. ("Abbott") has filed a Motion for a Protective Order Barring the

Deposition of its CEO, Miles White ("White MPO"). Abbott's principal arguments are that (1)

Mr. White is too important[1] to be deposed in this matter and (2) this deposition is a "naked

attempt to harass Abbott." As discussed below, there is ample evidence that Mr. White was

directly and significantly involved in Abbott's decision in 2001 to stop reporting the false prices

that inflated Medicare and Medicaid reimbursement levels, which essentially ended Abbott's

fraudulent scheme. As demonstrated below, Mr. White has unique and personal knowledge of

key issues in the case that fully justifies the taking of his deposition.

---

[1] Meanwhile, Abbott has deposed three former Administrators of the Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS"), each of whom oversaw the $500+ billion Medicare and Medicaid programs. They are agency equivalents of apex witnesses. There is no evidence from those depositions that the former Administrators have any knowledge about the specific Abbott-related allegations identified in the United States' Complaint.

## BACKGROUND

### I.      Meet and Confer Efforts

Abbott's recitation of the facts surrounding the United States' efforts to set a date for Mr.

White's deposition is incomplete and misstates the United States' rationales for taking Mr.

White's deposition.  In the White MPO, Abbott attempts to recount for the Court the substance

of the parties' meet and confer discussions through an incomplete affidavit from counsel. White

MPO at 3 and Exhibit D.

The affidavit from counsel is unnecessary and should be not be considered by the Court.

The United States reiterated several of its actual reasons for deposing Mr. White in an April 17,

2007 letter to Abbott's counsel.  White MPO, Exhibit A.  In that letter, counsel for the United

States advanced the following rationales:

- The United States wanted to question Mr. White about his involvement in Justice Department and Congressional investigations of possible drug pricing fraud committed by Abbott in late 2000.  Mr. White has been widely quoted in the press regarding these investigations, and documents suggest his direct, personal involvement in these matters.

- The United States wanted to question Mr. White about his actions taken after his receipt of Congressman Fortney Pete Stark's October 31, 2000 letter addressed to Mr. White accusing Abbott of reporting inflated drug prices.  The United States wanted to explore with Mr. White the connection between his receipt of the letter and any action taken by him or Abbott as a result; Abbott decided to report reduced prices in May 2001, six months after Mr. White received Congressman Stark's letter.

- The United States wanted to question Mr. White about his involvement in enhancements to Abbott's corporate compliance program at the time Abbott made a corporate decision to report reduced prices for its drugs in 2001.

- The United States wanted to question Mr. White about his involvement in the decision to resolve criminal charges and civil claims in 2001 involving Abbott's

2

joint venture TAP Pharmaceuticals. That matter, specifically the civil portion, involved the exact same type of AWP price inflation and spread marketing allegations at issue in this action.

- • The United States wanted to inquire into the circumstances surrounding Mr. White's receipt of an October 1999 litigation hold memorandum related to the Government's investigation of Abbott's pricing and marketing conduct.

White MPO, Exhibit A at 2-3. Thus, there are multiple, compelling reasons for taking Mr. White's deposition; each are discussed further below.

## II.   Discovery To Date

Abbott argues that the deposition of Mr. White is premature because the United States has deposed only a "handful of witnesses." Abbott is factually inaccurate. To date, the Government has taken the deposition of 11 Abbott witnesses. In addition to the federal case, Abbott witnesses have been deposed on the same drug pricing issues over 30 times in various state and private plaintiff class cases. The United States has another 17 depositions noticed or scheduled for June and July. Thus, by the end of July, there will have been almost 60 depositions taken of lower-level Abbott current and former employees.

Abbott's contention that it is premature to depose Mr. White now is inconsistent with its own affirmative discovery tactics. Abbott has deposed only 12 federal government witnesses. Yet, the United States has made available to Abbott three former CMS Administrators (Bruce Vladek, Nancy-Ann DeParle, and Thomas Scully), who oversaw the Medicare and Medicaid programs from 1993 through 2003. All three witnesses are apex witnesses. These CMS Administrators administered anywhere from $272 billion in benefits for some 70 million beneficiaries in 1993 to over $580 billion in benefits for over 80 million Medicare and Medicaid beneficiaries in 2003. Abbott suggests that Mr. White, its CEO, is more important than not one,

but three CMS Administrators.[2]  In any event, the United States has several legitimate reasons to take Mr. White's deposition at this time.

**III.    Mr. White's Unique Knowledge of the Issues in This Case**

Miles White has unique knowledge regarding the issues in this case, particularly Abbott's scienter.  Mr. White has filed an affidavit suggesting that his only involvement in any Average Wholesale Price ("AWP") investigation or matters came solely through discussions with counsel and that he does not have unique knowledge of the issues in this case.  *See generally* White MPO, Exhibit C.  The facts, as set forth below, call the several of the statements in Mr. White's affidavit into question.

Abbott's principal defense in this case is that the federal "government" – either the executive branch or Congress – was fully aware of the specific allegations in the United States' Complaint and *approved* Abbott's price reporting and marketing conduct as alleged therein.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation,* Docket Entry 4056 at p. 17 (J. Saris March 22, 2007) (denying motion to dismiss California FCA claim, noting that government approval of the particulars is necessary for a government knowledge defense).  Mere acquiescence is not enough to constitute the kind of government approval that negates FCA scienter. *See United States ex rel. Tyson v. Amerigroup,* Slip Copy at 8, 2007 WL 781729 (N.D. Ill. March 13, 2007) (denying defendant's motion for new trial, noting that the proper test is whether the government knew and approved the particulars of defendant's conduct, and that mere

---

[2] Notably, Abbott has refrained from asking these CMS Administrators the most relevant question as it relates to a government knowledge defense under the False Claims Act ("FCA"): did these administrators have full knowledge of and approve the conduct set forth in the United States' Complaint?

acquiescence, rather than approval, by government employees is not sufficient to avoid FCA

liability).

The United States has sued Abbott for the same conduct that Abbott now claims the

United States approved. It is perhaps an understatement to say that it will be difficult for Abbott

to show that the federal government approved of the particular conduct set forth in the United

States' Complaint.[3] Abbott also suggests that Congress approved of the specific conduct alleged

in the United States' Complaint. *See* Abbott's Motion to Dismiss Memorandum of Law at 7-9.

On or around September 27, 2000, Congressional investigators for the House Ways and

Means Committee released documents suggesting that Abbott engaged in the same type of price

manipulation and drug pricing conduct that is the subject of this litigation. *See* Exhibit 1,

September 27, 2000 Chicago Tribune, "Congressional Panel's Report Accuses Drug Companies

of Inflating Prices." That House investigation specifically identified Abbott pricing misconduct;

"[i]n a stinging rebuke to the pharmaceutical industry, congressional investigators say they have

uncovered evidence that several drug companies -- including Abbott Laboratories and Baxter

International Inc. -- reported inflated drug prices to the government to protect their market share

and boost profits." *Id.*

Mr. White responded in the press on Abbott's behalf, presenting himself as a

knowledgeable authority on the drug pricing issues that were the subject of the House Ways and

Means Committee's investigation:

- "'This is really nothing new,' White said in Chicago earlier Wednesday in a brief
  interview after he addressed a luncheon of business executives on the company's

---

[3] To date, Abbott has failed to produce evidence of such government approval for the
conduct at issue in discovery.

e-commerce strategies. 'There's nothing new here.'" Exhibit 2, September 28,
2000 Chicago Tribune, "Abbott, Baxter Fight Back."

- "Any concerns [Congressman] Bliley may have result from the fact that Congress
  and the Health Care Financing Administration, which runs Medicare, 'have never
  defined the pricing' policies clearly, White said." *Id.*

- "Abbott Chief Executive Miles White also said he supports changing the system
  to curb abuses." *Id.*

- "Congressman Bliley has an interest in this issue," White said. "But I think you
  need to look at the structure of the regulations." *Id.*

- "The chairman and CEO of Abbott Laboratories hinted Wednesday that
  election-year politics are playing a role in investigations into whether drugmakers
  inflate their average wholesale prices  to boost profits on their products. 'The
  election is only four to six weeks away,' said Miles D. White, CEO of North
  Chicago-based Abbott, referring to the Nov. 7 presidential election." Exhibit 3,
  September 28, 2000 Chicago Sun Times, "Abbott Chief Downplays Drug Probe"

In the affidavit submitted with his motion for a protective order, Mr. White now claims

that any knowledge he had about drug pricing issues came from legal counsel.  White MPO,

Exhibit C at ¶ 3.  That claim seems dubious in light of the broad and extensive comments Mr.

White made in the press about AWP and government reimbursement for drugs.  These

statements contradict the notion that Mr. White's knowledge of these issues was narrowly limited

to what he was told by his counsel.  Indeed, an obvious and relevant area of inquiry by the United

States would be Mr. White's proposed reforms to curb "abuses" to drug reimbursement under the

Medicare to referred to in the September 28, 2000 Chicago Tribune article, "Abbott, Baxter Fight

Back."  *See* Exhibit 2 ("Abbott Chief Executive Miles White also said he supports changing the

[Medicare drug reimbursement] system to curb abuses.").

Moreover, documents recently produced by Abbott to the United States call that

statement in the affidavit into question.  In an October 10, 2000 email, Abbott public relation

6

staffers email Abbott Hospital Products Division employee Mike Sellers asking for pricing

information regarding Vancomycin (a drug at issue in the United States' Complaint); they state

that they need the information for inclusion in an "issues brief" to be reviewed by Mr. White.

*See* Exhibit 4.  The email indicates that Mr. White was being briefed on these issues by, at a

minimum, non-lawyer public relations personnel, using government reimbursement information

supplied by other, non-lawyer Abbott senior sales personnel.  That email combined with the

breadth of Mr. White's knowledge of AWP and drug pricing issues as evidenced by his public

comments strongly suggests his knowledge of these issues comes from numerous sources beyond

his counsel.[4]

Ultimately, members of Congress rejected Mr. White's public statements regarding the

House Ways and Means Committee findings.  On October 31, 2000, Miles White received a

letter from Congressman Fortney Pete Stark which stated, among other things, the following:

- "You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading price data and has engaged in other deceptive business practices. **This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing the public health.**" Exhibit 6, Stark 10/31/00 Letter to Miles White ("Stark/White Letter") at 1. (emphasis added)

- "The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in

---

[4] Indeed, in 2004, Mr. White, in his capacity as Abbott's CEO and as Chair of the Pharmaceutical Research and Manufacturers of America ("PhRMA"), met with then CMS Administrator Mark McClellan to discuss drug pricing, specifically the change from using AWP to using Average Sales Price ("ASP") under the Medicare Modernization Act of 2003. *See* Exhibit 5 ("Miles White would like to discuss the following issues . . . Average Sales Price . . .") If he did not have unique or superior knowledge on this issue, one would expect Mr. White to ask another of his executives to have attended that 2004 meeting with Mr. McClellan. Mr. White's affidavit is an insufficient basis upon which to conclude that he did not discuss AWP pricing issues with non-lawyers at Abbott.

order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs." *Id.*

- **"Contrary to Abbott's recent assertions in the national media, the price manipulation conduct was in no way required by or consistent with existing reimbursement laws or policies.** Indeed, Abbott did not falsify published prices in connection with other drugs, where sales and market penetration strategies did not include arranging financial 'kickbacks' to health care providers." *Id.* (emphasis added)

- "Another example of Abbott's price manipulation concerns the IV antibiotic Vancomycin, the drug of last resort in combating many life threatening infections . . . **Abbott's apparent price manipulation created a financial incentive for doctors to increase their usage of Vancomycin, at the very same time that overutilization of the drug created a health crisis. This is an especially reprehensible misuse of Abbott's position as a drug manufacturer.**" *Id.* at 2, 4. (emphasis added)

- "**I urge Abbott to immediately cease reporting inflated and misleading price data. Such action places the nation's health care at great risk and overcharges taxpayers.** Based on the evidence collected, Abbott should make arrangements to compensate taxpayers for the financial injury caused to federally funded programs." *Id.* at 7. (emphasis added)

- "I would appreciate your sharing this letter with your Board of Directors and I particular the Board's Corporate Integrity Committee." *Id.*

Congressman Stark's letter to Mr. White was entered into the Congressional Record that same day. *See* Exhibit 6.

It is not every day that a Congressman writes the CEO of a company accusing it of fraud and putting the nation's health care at risk. Abbott argues that it never wrote a letter back to Congressman Stark, but that does not answer the question of what Abbott did in response to the letter. White MPO at 9.

In fact, Abbott did respond to Congressman Stark's demand that they cease their fraudulent conduct. On April 30, 2001, approximately six months after Mr. White received this

8

letter from Congressman Stark, Abbott reported reduced prices (effective May 7, 2001) to the

price reporting compendia relied upon by the Medicare and Medicaid programs to set

reimbursement levels for drugs. *See* Exhibit 7. A draft January 18, 2001 internal Abbott

memorandum analyzing the impact of reporting reduced prices to the price compendia indicated

that the strategy was, in part, in response to Congressman Stark's October 31, 2000 letter to Mr.

White. *See* Exhibit 8 at 1. On June 13, 2001 – on the heels of the reporting of reduced prices –

Abbott introduced an expanded compliance program overseen by Mr. White; the enhanced

compliance program mandated expedited completion of the Abbott's fraud and abuse training

module. *See* Exhibits 9 and 10.

     In sum, after the receipt of Congressman Stark's letter to Mr. White, Abbott instituted

major corporate changes, including the reporting of reduced pricing and the institution of an

enhanced corporate compliance program. The United States has been investigating Abbott's

drug pricing conduct for years and notified Abbott in a September 30, 1999 letter to Abbott's

counsel that Abbott's drug pricing conduct ran afoul of the False Claims Act. *See* Exhibit 11.

However, Abbott's fraudulent pricing conduct stopped only after Mr. White was directly asked

by Congressman Stark to take action. Mr. White's role in the decision to end any fraudulent

conduct, therefore, is a crucial area of inquiry for the United States as it develops evidence

regarding Abbott's scienter.

     Moreover, in 2001, Abbott was also in the process of resolving the TAP Pharmaceuticals

matter involving the drug Lupron for $875 million. That case, specifically the civil portion,

involved spread marketing allegations. Given the size of the civil settlement, Mr. White and

Abbott's Board of Directors were likely involved in analyzing the allegations and settlement

amount (a fact not contradicted in the affidavit submitted by Mr. White in connection with this

motion).[5]  Mr. White's involvement of any consideration by Abbott of the TAP settlement –

particularly the settlement of civil claims relating to the marketing of the spread on Lupron – is

directly relevant to the issues in this case.

## ARGUMENT

The United States "may obtain discovery regarding any matter, not privileged, that is

relevant to [a] claim or defense," and "[f]or good cause, the court may order discovery of any

matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1).  Further,

"[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive]

has a busy schedule'" does not exempt them from being deposed. *Consolidated Rail Corp. v.

Primary Industries Corp.*, No. 92 Civ. 4927, 1993 WL 364471, at * 1 (S.D.N.Y. Sept. 10, 1993)

(*quoting CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)).  "Federal courts have

permitted the depositions of high level executives when conduct and knowledge at the highest

corporate levels of the defendant are relevant in the case." *In re Bridgestone/Firestone, Inc.

Tires Products Liability Litigation*, 205 F.R.D. 535, 536 (S.D. Ind. 2002).

The deposition of high-level corporate officials is permitted when those officials have

some unique or superior knowledge of the issues in the case. *See, e.g., Travelers Rental Co., Inc.

v. Ford Motor Company*, 116 F.R.D. 140 (D. Mass 1981); *Six West Retail Acquisition, Inc. v.

Sony Theatre Management Corp.*, 203 F.R.D. 98 (S.D.N.Y. 2001).  Abbott misstates the law on

these "apex" depositions, claiming that the United States (1) must show that Mr. White has

---

[5] Abbott refuses to produce any documents reflecting the impact of the TAP settlement on
Abbott's price reporting for its drugs.  Magistrate Bowler has recently denied the United States
motion to compel those documents. *See* Exhibit 12, May 16, 2007 Hearing Transcript at 62.

unique and superior knowledge of the issues in this case *and* (2) must first seek to obtain any

such information through "less-intrusive" means of discovery.  There is no such two-step

precondition to taking apex depositions.

If a high-level corporate official has some unique or superior knowledge of the issues in

the case, then their deposition is permitted.  *See Six West*, 203 F.R.D. at 105 (allowing deposition

of apex witnesses where plaintiffs showed unique knowledge and there was not evidence the

deposition was being done merely for harassment).[6]  If some unique or superior knowledge

*cannot* be shown then "'it may be appropriate to preclude a redundant deposition of [this]

highly-placed executive' while allowing other witnesses with the same knowledge to be

questioned." *Six West*, 203 F.R.D. at 102, (quoting *Consolidated Rail Corp.*, 1993 WL 364471,

at *1.)

Abbott's two-step test is not found even in Texas state case it cites most frequently in

support of its Motion for a Protective Order.  In *Alcatel*, a Texas appeals court made the same

mistake Abbott makes and concluded "[a] party requesting an apex deposition must show that the

corporate official to be deposed has an [sic] unique or superior personal knowledge that is

unavailable through less intrusive means." *In re Alcatel USA, Inc.*, 1998 WL 851123 (Tex. App.

December 10, 1998).  The Texas Supreme Court rejected that formulation and stated, "[t]he party

seeking the apex deposition is required to pursue less intrusive means of discovering the

information *only when that party cannot make the requisite showing concerning unique or*

---

[6] Both in *Six West* and in this case, the plaintiffs deposed numerous lower-level
employees before the deposition of the apex witnesses and gave ample notice to the defendant.
The *Six West* court found that those additional factors made the deposition of the apex witness
with unique knowledge even more justified.  203 F.R.D. at 105.

*superior knowledge.*" *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 176 (Tex. 2000) (emphasis added). In other words, courts only entertain the propriety of requiring a party to first take the depositions lower-level company officials when it cannot be established that the apex witness(es) have some unique knowledge.

As discussed below, Mr. White has unique or superior knowledge on several relevant issues in this case.

**I.      Mr. White Has Unique or Superior Knowledge of Critical Issues in This Case**

   **A.      Mr. White Has Unique and Direct Knowledge of the Events That Ended Abbott's Fraudulent Drug Pricing Scheme.**

Effective May 7, 2001, Abbott lowered the reported prices for many of its drugs. *See* Exhibit 7. For example, Abbott's reported prices resulted in an AWP for its 1 Gram dose of Vancomycin of $76.42 per unit in early 2001; after Abbott started reporting reduced prices to the price reporting compendia, the AWP for that dose of Vancomycin dropped to $6.06 a unit by 2002. Complaint at ¶ 84. Abbott could have and should have reported those reduced prices all along. Instead, Abbott made a business decision to submit fraudulent pricing information until after Mr. White received the letter from Congressman Stark. Abbott's subsequent decision in 2001 to finally report reduced prices is a reflection of the falsity of the inflated prices it reported prior to then.

It is evident that the Congressional investigation and the October 31, 2000 letter from Congressman Stark started the process of Abbott finally ending its illegal price reporting conduct. An internal Abbott memorandum noted that continuing to report inflated prices to the price compendia relied upon by Medicare and Medicaid to set reimbursement rates was not

justifiable in light of public scrutiny of the issue as evidenced by Congressman Stark's October

31, 2000 letter to Mr. White.  Exhibit 8 at 1.

That same memorandum showed the multi-million dollar financial impact of reducing

Abbott's reported prices.  *Id.* at 2.  The decision to make such a significant corporate change

would likely have been made at the top corporate level.  *See Travelers*, 116 F.R.D. at 146

("[T]hose with greater authority may have the last word on why [the company] formulated and/or

administered the plan in the manner which the lower-level executives described it as being

formulated and/or administered.  And as the ultimate authority, their views as to why may be of

far greater probative value on the issue of intent and motive than the views of the lower-level

executives.")  Mr. White's approval or involvement of the subsequent remedial actions is a

proper area of inquiry, and the United States is entitled to question him about the events

surrounding the Congressional investigations and the 2001 price change.  As a court in this

district noted, "[w]hen the motives behind corporate action are at issue, an opposing party usually

has to depose those officers and employees who in fact approved and/or administered the

particular action."  *Travelers*, 116 F.R.D. at 142; *see also Rolscreen Co. v. Pella Products of St.

Louis Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992).

It is the burden of the party seeking a protective order to prove that an apex official does

not possess information relevant to the issues in the case or that his knowledge of particular

issues in a case is completely duplicative of other witnesses.  *General Star Indem. Co. v.

Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002).  Mr. White submitted a sworn

declaration claiming that (1) he has no unique or superior knowledge on the issues in this

litigation and (2) his knowledge regarding AWP issues came through consultations with Abbott

legal counsel.  Mr. White's affidavit is vague, conclusory and wholly insufficient to support a

motion for a protective order.  *Rolscreen*, 145 F.R.D. at 96 ("party requesting a protective order

must make a specific demonstration of facts in support of the request as opposed to conclusory or

speculative statements about the need for a protective order and the harm which will be suffered

without one. ") (citations omitted.)

Regardless, in the *Travelers* case, several high level Ford employees filed similar "know

nothing" affidavits in a failed attempt to evade being deposed.  *Id.* at 143.  As that court noted,

"[t]he plaintiff is entitled to "test" the claim of lack of knowledge or lack of recollection by

deposing the witness." *Id.* at 143, *citing  Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121,

121-23 (D. Conn., 1974) (citations omitted).  *Travelers* further noted:

> [T]here is nothing in the law which would indicate that Travelers has to accept the
> claimed failures on their face or rely on whatever efforts Ford's counsel may have
> undertaken to refresh recollections.   Considering that Travelers has demonstrated
> that these individuals were personally involved in matters relevant to this case, it
> would be extremely rare that an asserted failure of recollection would be sufficient
> to entitle the deponent to an order quashing the deposition.

*Travelers*, 116 F.R.D. at 143; *see also Six West* 203 F.R.D. at 102.

This reasoning is especially apt in Mr. White's case, where his affidavit raises more

questions than it provides answers.  As discussed above, Mr. White was personally involved in

matters highly relevant to this case, particularly the events that led to Abbott ending the

fraudulent scheme.[7]  As noted above, Mr. White played a very public role in defending Abbott's

---

[7] Moreover, there is additional evidence that Mr. White's knowledge of drug pricing
issues predated his public statements in 2000.  As noted in the United States April 17, 2007 letter
to Abbott, Mr. White received a October 1999 litigation hold memorandum related to the
Government's investigation of Abbott's pricing and marketing conduct.  White MPO, Exhibit E.
If Mr. White's involvement in AWP and drug pricing matters was limited, it is unclear why he
would have been a recipient of the 1999 litigation hold memorandum related to the United

price reporting conduct in the press, showing himself to be knowledgeable about the statutory

and regulatory framework regarding AWP and government reimbursement issues. *See* Exhibit 2,

September 28, 2000 Chicago Tribune article "Abbott, Baxter Fight Back." ("'Congressman

Bliley has an interest in [AWP pricing] issue,' White said. 'But I think you need to look at the

structure of the regulations.'").

   If three CMS Administrators can be questioned about AWP and government

reimbursements for drugs, so too can Mr. White, who has made numerous public statements

about those issues as they relate to his company. Mr. White certainly knows more about

Abbott's drug pricing conduct than the three CMS Administrators Abbott has deposed.

**B.     Mr. White Was Likely Involved in the TAP Settlement Which Also Involved
          Spread Marketing Allegations**

   In the summer and fall of 2001 – at the same time Abbott was lowering its reported prices

– Abbott was in the process of resolving the TAP Pharmaceuticals matter involving the drug

Lupron. Abbott was a part of the TAP pharmaceuticals joint venture that paid $875 million as

part of a criminal plea and civil settlement involving a variety of fraud claims. The civil portion

of the settlement resolved allegations that TAP *marketed the spread* on Lupron, a cancer drug:

> The United States contends that TAP knowingly and willfully offered and paid
> illegal remuneration to physicians by marketing TAP's "Return-to-Practice"
> program to physicians to unlawfully induce orders to purchase the drug Lupron
> for treatment of prostate cancer, which drug TAP knew was largely paid for by the
> Medicare program. The United States further contends that TAP's Return-to-
> Practice program consisted of inflating the Average Wholesale Price ("AWP")
> used by Medicare and others for reimbursement of the drug Lupron, deeply
> discounting the price paid by physicians to TAP for the drug ("the discounted
> price"), and marketing the spread between the AWP and the discounted price to

States' drug pricing fraud investigation. If he was the recipient of privileged communications
about these issues, they have not been listed on Abbott's privilege log in this matter.

> physicians as additional profit to be returned to the physician's practice from
> Medicare reimbursements for Lupron. The United States further contends that
> TAP concealed the discounted price from Medicare and governmental agencies by
> omitting material information in response to Medicare carriers' requests for
> information about physicians' actual cost, by falsely advising physicians that the
> discounted price could not and should not be reported to Medicare, and by
> auditing physicians to ensure the claims for payment were submitted at the
> inflated AWP rather than the discounted price paid by the physician.

United States' Memorandum in Support of its Second Motion to Compel Production of

Documents (Docket # 4048), Ex. 10 (Settlement Agreement Between the United States and TAP

Pharmaceuticals) ¶ H(iii).  The relevance of the testimony sought from Mr. White is self-evident.

The fact that TAP involved a different drug is meaningless; what is meaningful is that the TAP

settlement involved a joint venture in which Abbott participated and that was engaged in the

same fraudulent conduct set forth in the United States' Complaint in this action.

Given the size of the settlement, Mr. White and Abbott's Board of Directors (of which

Mr. White is the chairman) were likely involved in analyzing the allegations and settlement

amount.  This would have been another instance where Mr. White would have analyzed issues

similar to those involved in the Government's price fraud case against Abbott.  This is plainly a

relevant area of inquiry, and the United States is entitled to query the Mr. White's consideration

of AWP and drug pricing issues arising from his consideration of the TAP allegations and

settlement.

### C.    Mr. White Was Involved in Key 2001 Corporate Compliance Efforts

Abbott acknowledges that Mr. White was the top corporate compliance officer at Abbott,

but argues that the United States cannot show that Mr. White has superior or unique knowledge

about compliance or ethics issues.  White MPO at 10-11.  A month after Abbott reported reduced

prices to the price compendia used by Medicare and Medicaid to set reimbursement rates, Abbott introduced an expanded corporate compliance program. *See* Exhibits 9 and 10. In June 2001, Abbott launched the Legal Ethics and Resource Network ("LERN"), which it described as designed to educate employees the various legal and ethical issues they may encounter in their work. Exhibit 9 at 1. Employees were instructed to complete a fraud and abuse module on an expedited basis, by September 30, 2001; other ethical training modules could be completed by July 31, 2002. *Id.* The LERN program rollout featured correspondence from Mr. White emphasizing the importance of the expanded ethics program; that correspondence has not yet been produced to the United States in this litigation. *Id.*

The increased emphasis on corporate compliance reflects a change in Abbott corporate culture that appears to coincide with other changes that occurred after Mr. White received the October 31, 2000 letter from Congressman Stark. The United States is entitled to explore Mr. White's unique knowledge about the nexus between the decision to lower its reported prices, the settlement of the TAP spread marketing allegations and the introduction of LERN, the enhanced corporate compliance program.

## II. The United States Need Not Exhaust Other Means of Discovery Before Deposing Mr. White.

Abbott asserts, "[t]he case law uniformly instructs that, before a party is permitted to conduct an apex deposition, it must first pursue other avenues, such as (i) depositions of lower-level employees or corporate 30(b)(6) designees; or (ii) written discovery." White MPO at 12. That is simply not the law on apex depositions. Since the United States has shown clearly that Mr. White has unique or superior knowledge of key issues in this matter, the United States

need not depose lower-level employees or pursue written discovery before taking his deposition.
*See Six West*, 203 F.R.D. at 102, 105.  The October 31, 2000 letter directed to Mr. White and the
subsequent remedial measures taken at Abbott were unique events in which Mr. White was
involved.  He is clearly the best source of what he did in response to the direct request from
Congressman Stark that Abbott stop reporting inflated prices for its drugs.[8]

## CONCLUSION

For the reasons set forth herein, Abbott's Motion for a Protective Order Barring the
Deposition of its CEO, Miles White should be denied.

---

[8] In some cases, courts have directed that lower-level employees be deposed before the
opposing party can ask for discovery from the apex officials. *See, e.g., Salter v. Upjohn Co.*, 593
F.2d 649, 651 (5th Cir. 1979); *Baine v General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala.
1991).   Those courts sought to protect these officials from repetitive and harassing depositions
where unique or direct knowledge cannot be shown.  These cases are easily distinguishable.
Many of these decisions involve personal injury, employment or contract disputes where the
upper-level officials had no personal involvement. *Bridgestone/Firestone*, 205 F.R.D. at 536
("Nearly every decision Ford has cited [in support of its protective order] involves an individual
personal injury, employment, or contract dispute with which the "apex" official had no personal
involvement."), citing *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) (individual employment
case); *Salter*, 593 F.2d 649 (individual negligence case); *Baine*, 141 F.R.D. 332 (individual
personal injury case); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (individual
personal injury case).  In the present case, the claims involve conduct and knowledge at the
highest corporate level; thus, the justification for apex official protection is lacking.  *See* Fed. R.
Civ. P. 26 (b)(2) (in weighing whether to limit discovery, courts take into consideration the
importance of the issues).

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

 /s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852

Dated: May 24, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **THE UNITED STATES'S OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF MILES WHITE** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/ Gejaa T. Gobena

Dated: May 24, 2007          Gejaa T. Gobena