# ATTACHMENT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.* ) ) ) | Magistrate Judge Marianne B. Bowler |
| CIVIL ACTION NO. 06-11337-PBS ) | |

# THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S RENEWED MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF MILES WHITE

Abbott Laboratories Inc. ("Abbott") has filed a Renewed Motion for a Protective Order Barring the Deposition of its CEO, Miles White ("Renewed White MPO"). On July 20, Magistrate Judge Bowler ordered that Mr. White answer three written deposition questions. Renewed White MPO, Ex. A at 46. The United States issued the written deposition questions pursuant to Fed. R. Civ. P. 31 on August 7, 2007. Renewed White MPO, Exhibit B. Instead of providing his own testimony, Mr. White provided responses crafted all or in part by Abbott's lawyers. *See* Exhibit 1, Abbott's Responses to United States' Second Set of Interrogatories at 1. Mr. White and his lawyers' answers are non-responsive and evade the subject matter addressed by the deposition questions. As described below, Mr. White is a witness to events in this case with personal and unique knowledge and information about the conduct at issue. The time for his deposition is now.

## BACKGROUND

Mr. White is a witness with direct knowledge and involvement in key events at issue in this case. When Abbott was accused by members of Congress of committing drug pricing fraud in September 2000 – the same conduct that Abbott now claims Congress approved of – Mr. White acted as the company's spokesman, providing knowledgeable, if incorrect, statements on the company's behalf:

- "'[The allegations by Congress] is really nothing new,' White said in Chicago earlier Wednesday in a brief interview after he addressed a luncheon of business executives on the company's e-commerce strategies. 'There's nothing new here.'" Docket No. 4252, Opposition to First White Motion for a Protective Order (First White MPO Opposition), Exhibit 2, September 28, 2000 Chicago Tribune, "Abbott, Baxter Fight Back."

- "Any concerns [Congressman] Bliley may have result from the fact that Congress and the Health Care Financing Administration, which runs Medicare, 'have never defined the pricing' policies clearly, White said." *Id.*

- "Abbott Chief Executive Miles White also said he supports changing the system to curb abuses." *Id.*

- "Congressman Bliley has an interest in this issue," White said. "But I think you need to look at the structure of the regulations." *Id.*

- "The chairman and CEO of Abbott Laboratories hinted Wednesday that election-year politics are playing a role in investigations into whether drugmakers inflate their average wholesale prices to boost profits on their products. 'The election is only four to six weeks away,' said Miles D. White, CEO of North Chicago-based Abbott, referring to the Nov. 7 presidential election." Exhibit 3, September 28, 2000 Chicago Sun Times, "Abbott Chief Downplays Drug Probe"

The United States has a right to examine Mr. White on the personal knowledge upon which these public statements about AWP and government reimbursement are based.

In addition, Mr. White was involved in Abbott's 2001 decision to report lower prices. Congressman Fortney "Pete" Stark wrote a letter to Mr. White refuting Mr. White's September

2

2000 statements to the press and accusing Abbott of fraud and jeopardizing the public's health in the process. Congressman Stark wrote, among other things:

- "You should by now be aware of Congressional investigations revealing that Abbott has for many years reported and published inflated and misleading price data and has engaged in other deceptive business practices. **This letter is a call for your company to immediately cease overcharging taxpayers and jeopardizing the public health.**" Docket No. 4252, First White MPO Opposition, Exhibit 6, Stark 10/31/00 Letter to Miles White ("Stark/White Letter") at 1. (emphasis added)

- "The evidence amassed by Congress clearly shows that Abbott has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs." *Id.*

- **"Contrary to Abbott's recent assertions in the national media, the price manipulation conduct was in no way required by or consistent with existing reimbursement laws or policies.** Indeed, Abbott did not falsify published prices in connection with other drugs, where sales and market penetration strategies did not include arranging financial 'kickbacks' to health care providers." *Id.* (emphasis added)

After Mr. White's receipt of the letter, Abbott reduced its reported prices; draft memorandum explaining the reduction noted that Congressman Stark's letter to Mr. White was an impetus. Docket No. 4252, First White MPO Opposition, Exhibit 8 ("The wide disparity in [Abbott's] catalogue prices and average market prices as currently configured is not supported by sufficient financial or market factors to survive scrutiny of public opinion. This was voiced in December 2000 (sic) in a letter from U.S. Representative Pete Stark to Miles White.")

Mr. White was at the center of Abbott's efforts to respond to public accusations of fraud and to reform its price reporting practices. Thus, he has direct, personal knowledge of several important issues and events in this case. In the answers Mr. White and/or his lawyers drafted to the United States' deposition questions about these events, however, they claim that Mr. White

3

does not recall receiving the letter. Renewed White MPO, Exhibit C, *passim*; *see also* Exhibit 1 (the answers to the deposition questions were drafted by "Miles White, in conjunction with legal counsel").

Yet, this answer is non-responsive and reflects more lawyering than candor from the witness. It avoids the purpose of the questioning on the letter identifying Abbott's fraud sent by the member of Congress. The United States does not simply want to ask Mr. White whether he recalls receiving the specific letter on or around the specific date it was sent to him. Rather, the United States seeks to ask Mr. White about the issues raised in and related to the letter sent to him by Congressman Stark. There are multiple documents and statements that relate to the subject matter of the letter that the United States could use to elicit more meaningful testimony about (1) Mr. White being notified by Congressman Stark of fraud allegations in October 2000 and (2) Abbott's decision to end its fraudulent price reporting conduct several months later in mid 2001.[1]

---

[1] There are additional issues upon which to question Mr. White, including but not limited to:

- Mr. White's involvement in Justice Department and Congressional investigations of possible drug pricing fraud committed by Abbott in late 2000 generally.

- Mr. White's involvement in enhancements to Abbott's corporate compliance program at the time Abbott made a corporate decision to report reduced prices for its drugs in 2001.

- Mr. White's involvement in the decision to resolve criminal charges and civil claims in 2001 involving Abbott's joint venture TAP Pharmaceuticals. That matter, specifically the civil portion, involved the exact same type of AWP price inflation and spread marketing allegations at issue in this action.

- The circumstances surrounding Mr. White's receipt of an October 1999 litigation hold memorandum related to the government's investigation of Abbott's pricing

4

In ruling on the First White MPO, Magistrate Judge Bowler stated:

> I'm not saying that you're not going to be permitted to have that deposition, but what I'm saying is as a preliminary matter I will allow three written deposition questions on this limited area, and you can renew the motion after that if you're not satisfied with the information you get and you think you need then to have this live deposition. So it's a start.

Renewed White MPO, Exhibit A at 47.

Unfortunately, the responses crafted by Abbott counsel and Mr. White are completely unsatisfactory and mandate live testimony from this important witness. Indeed, the level of Mr. White's involvement in the preparation of these sworn answers to the United States' written deposition is an issue in and of itself in this matter. In an oral deposition, Mr. White would be less able to evade the questions being posed and rely on lawyer-crafted answers. Further, a live deposition would permit the United States' lawyers – not Abbott's lawyers – to control their questioning of this important witness, as is envisioned by the Federal Rules of Civil Procedure generally.

## ARGUMENT

**I.   The Law Requires That Mr. White Submit to a Deposition.**

The United States "may obtain discovery regarding any matter, not privileged, that is relevant to [a] claim or defense," and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Further, "[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive] has a busy schedule'" does not exempt them from being deposed. *Consolidated Rail Corp. v. Primary Industries Corp.*, No. 92 Civ. 4927, 1993 WL 364471, at * 1 (S.D.N.Y. Sept. 10, 1993)

---

and marketing conduct.

(*quoting CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)). "Federal courts have permitted the depositions of high level executives when conduct and knowledge at the highest corporate levels of the defendant are relevant in the case." *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 205 F.R.D. 535, 536 (S.D. Ind. 2002).

As one court has noted, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567 (S.D. Ca. April 6, 2007) at *2; *see also, Travelers Rental Co., Inc. v. Ford Motor Company*, 116 F.R.D. 140 (D. Mass 1981); *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98 (S.D.N.Y. 2001) (deposition of high-level corporate officials permitted when officials have some unique or superior knowledge of the issues in the case ). That sentiment is echoed in the *In re Sky Train Fire* decision as well, which noted that courts allow apex depositions where "they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action." 2006 WL 1328259 (S.D.N.Y. May 16, 2006) at *10.

As detailed above and discussed below, Mr. White has direct, personal and unique knowledge of relevant, critical issues in this case. It is Mr. White's burden to prove that he does not possess information relevant to the issues in the case or that his knowledge of particular issues in a case is completely duplicative of other witnesses. *General Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002). Mr. White's declaration and written deposition answers are vague, conclusory and wholly insufficient to support a motion for a protective order. *Rolscreen*, 145 F.R.D. at 96 ("party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative

6

statements about the need for a protective order and the harm which will be suffered without one.") (citations omitted.)

In the *Travelers* case, several high level Ford employees filed similar "know nothing" declarations in a failed attempt to evade being deposed. *Id.* at 143. As that court noted, "[t]he plaintiff is entitled to 'test' the claim of lack of knowledge or lack of recollection by deposing the witness." *Id.* at 143, *citing Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 121-23 (D. Conn., 1974) (citations omitted). *Travelers* further noted:

> [T]here is nothing in the law which would indicate that Travelers has to accept the claimed failures on their face or rely on whatever efforts Ford's counsel may have undertaken to refresh recollections. Considering that Travelers has demonstrated that these individuals were personally involved in matters relevant to this case, it would be extremely rare that an asserted failure of recollection would be sufficient to entitle the deponent to an order quashing the deposition.

*Travelers*, 116 F.R.D. at 143; *see also Six West* 203 F.R.D. at 102. This conclusion is especially apt here where Mr. White and his lawyers reframed the United States' deposition questions from (1) covering the events and circumstances surrounding his being notified by a congressman of fraud by his company to (2) a query about whether he specifically recalled when he first saw the letter from Congressman Stark. This is unfortunately the harm that can result when a party's questions are filtered through opposing counsel.

Further, Mr. White does not deny or address whether he would have had to authorize the 2001 price change that came after the receipt of the letter from Congressman Stark. As a court in this district noted, "[w]hen the motives behind corporate action are at issue, an opposing party usually has to depose those officers and employees who in fact approved and/or administered the particular action." *Travelers*, 116 F.R.D. at 142; *see also Rolscreen Co. v. Pella Products of St.*

7

*Louis Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992). Mr. White's claim to not recall a major price reporting decision that had a major impact on one of Abbott's divisions – while also generating customer complaints and news accounts (Exhibit 2) – is not credible; further, direct inquiry by the United States is required.

## II. The United States Need Not Exhaust Other Means of Discovery Before Deposing Mr. White

For almost six months now, Abbott has fought vigorously to block Mr. White from testifying live and under oath and discovery in this case is rapidly coming to a close; with less than three months left in discovery in this case, there is no time to waste insofar as scheduling Mr. White's deposition. Since the United States has shown clearly that both Mr. White is a witness with unique and personal knowledge of key issues in this matter, the United States need not depose lower-level employees or pursue written discovery before taking his deposition.[2] *See WebSideStory*, 2007 WL 1120567 at *2. His subordinates' testimony cannot substitute for his direct testimony about his knowledge and actions.

---

[2] In some cases, courts have directed that lower-level employees be deposed before the opposing party can ask for discovery from the apex officials. *See, e.g., Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Baine v General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991). Those courts sought to protect these officials from repetitive and harassing depositions where unique or direct knowledge cannot be shown. These cases are easily distinguishable. Many of these decisions involve personal injury, employment or contract disputes where the upper-level officials had no personal involvement. *Bridgestone/Firestone*, 205 F.R.D. at 536 ("Nearly every decision Ford has cited [in support of its protective order] involves an individual personal injury, employment, or contract dispute with which the "apex" official had no personal involvement."), citing *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) (individual employment case); *Salter*, 593 F.2d 649 (individual negligence case); *Baine*, 141 F.R.D. 332 (individual personal injury case); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (individual personal injury case). In the present case, the claims involve conduct and knowledge at the highest corporate level; thus, the justification for apex official protection is lacking. *See* Fed. R. Civ. P. 26 (b)(2) (in weighing whether to limit discovery, courts take into consideration the importance of the issues).

## CONCLUSION

For the reasons set forth herein, Abbott's Renewed Motion for a Protective Order Barring the Deposition of Mr. White should be denied. Abbott should be ordered to produce Mr. White for deposition within 15 business days of the Court's order.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: October 9, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S RENEWED MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF MILES WHITE** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: October 9, 2007

/s/ Gejaa T. Gobena
Gejaa T. Gobena

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.* <br><br> CIVIL ACTION NO. 06-11337-PBS | MDL No. 1456 <br> Civil Action No. 01-12257-PBS <br><br> Hon. Patti Saris |

### ABBOTT LABORATORIES INC.'S RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES

Defendants Abbott Laboratories Inc. ("Abbott") responds to Plaintiff, the United States' ("Plaintiff") Second Set of Interrogatories ("Interrogatories") as follows:

### GENERAL OBJECTIONS

Abbott incorporates by reference as if fully set forth herein the General Objections, Objections to Instructions, and Objections to Definitions contained in its responses to the United States' First Set of Interrogatories.

### RESPONSES

**INTERROGATORY NO. 1:** Identify all individuals, whether Abbott employees or not, involved in any manner in the drafting, preparation, or completion of responses to the United States' Deposition Upon Written Questions of Miles White, served on Abbott on August 7, 2007.

**RESPONSE:** In addition to its General Objections, Abbott objects to this Interrogatory because the terms "preparation" and "completion" are vague and to the extent that this Interrogatory calls for information that is protected by the attorney-client privilege. Subject to and without waiving its objections, Abbott responds as follows: Miles White, in conjunction with legal counsel.

Dated: October 4, 2007                        Respectfully submitted,

                                              ABBOTT LABORATORIES INC.

                                              By: _____

                                              James R. Daly
                                              Tina M. Tabacchi
                                              Jason G. Winchester
                                              JONES DAY
                                              77 W. Wacker Dr., Suite 3500
                                              Chicago, Illinois 60601-1692
                                              Telephone: (312) 782-3939
                                              Facsimile: (312) 782-8585

                                              R. Christopher Cook
                                              David S. Torborg
                                              JONES DAY
                                              51 Louisiana Avenue, N.W.
                                              Washington, D.C. 20001-2113
                                              Telephone: (202) 879-3939
                                              Fax: (202) 626-1700

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2007, a true and correct copy of the foregoing **ABBOTT LABORATORIES INC.'S RESPONSES TO THE UNITED STATES' SECOND SET OF INTERROGATORIES** was served upon:

Mark A. Lavine, Esq. **(By email)**
United States Attorney's Office
99 N.E. 4 Street
Miami, FL 33132

Gejaa T. Gobena, Esq. **(By email)**
United States Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

James J. Breen, Esq. **(By email)**
Alison Simon, Esq.
The Breen Law Firm
3350 S. W. 148th Avenue, Suite 110
Miramar, FL 33029

CHI-1610323v1

# EXHIBIT 2

Westlaw.                                                                NewsRoom

6/14/01 KRT-CHITRIB (No Page)                                            Page 1


6/14/01 **Chicago Tribune** (KRTBN) (Pg. Unavail. Online)
**2001** WLNR 10072887

                           **Chicago Tribune** (KRT)
    (c) 2001, Chicago Tribune. Distributed by Knight Ridder/Tribune Business News.

                                June 14, 2001



        <u>Abbott     Laboratories</u>  Cuts Prices Amid Investigation into Drug Costs


  Jun . 14-- <u>Abbott     Laboratories</u> has quietly lowered prices on dozens of drugs
and medical treatments amid multiple state and federal investigations alleging that
U.S. drug companies lied to the government about the wholesale price of certain
pharmaceuticals.

**Chicago Tribune**

Jun. 14--**Abbott Laboratories** has quietly lowered prices on dozens of drugs and
medical treatments amid multiple state and federal investigations alleging that U.S.
drug companies lied to the government about the wholesale price of certain
pharmaceuticals.

New government documents show that many **Abbott** prices have been slashed to a
fraction of their list price of less than two months ago. The reductions on scores
of **Abbott** drugs paid for by the Illinois Department of Public Aid mean an immediate
savings of about $2.5 million annually to taxpayers, state officials said.

Applied to Medicaid programs across the country, savings from the new prices likely
would amount to many times that figure, according to analysts and Medicaid
officials.

Abbott's recent price adjustments bolster assertions by state and federal
investigators that public health insurance programs have been grossly overpaying for
many products. Prosecutors and congressional probes suggest that overpayments--
resulting because government programs in essence pay whatever drug companies ask--
exceed $1 billion annually.

Many of the cuts are enormous, affecting everything from intravenous solutions to
pain killers to heart medicine. For example, Abbott's wholesale price for a 20
milliliter vial of the cardiac drug Dobutamine is now $9.26--just one-sixth of the
$54.11 listed just weeks ago.

A drug kit used by home health workers to clear clogged IVs was $127 before and is
now $2.39, according to a list of prices obtained from the Illinois Department of
Public Aid, which administers the Medicaid program.

Prices on dozens of other drugs, however, remained the same or were lowered only
modestly. North Chicago-based Abbott is one of more than 20 drug companies under
U.S. Justice Department scrutiny amid allegations that they inflated prices paid by
Medicare, the federal health insurance program for the elderly, and Medicaid, the
state/federal health insurance program for the poor. Abbott also acknowledges
separate investigations of pricing practices in five states, including Illinois.

In addition, TAP Pharmaceutical Products Inc. which is 50 percent owned by Abbott,
is under a separate federal investigation of its methods used to market Lupron, a
leading prostate cancer treatment. Neither TAP nor Abbott has been charged, but four
urologists have pleaded guilty or agreed to plead guilty in the case. Lake Forest-
based TAP has been negotiating a settlement that could top $800 million, which would


                © 2007 Thomson/West. No Claim to Orig. US Gov. Works.

6/14/01 KRT-CHITRIB (No Page)                                          Page 2


be a record for a pharmaceutical company.

Abbott, the first major drugmaker known to have notified notify Medicaid of reductions in so-called average wholesale prices of its drugs, may be trying to lower its liability in any potential settlements of investigations, say sources close to the investigation.

The price cuts also have implications for the private sector, because many large employers that provide a prescription drug benefit to workers and retirees base their payments on the same price list supplied to the government programs.

Yet an Abbott spokeswoman characterized the price cuts as routine. "In all of our businesses, Abbott periodically and routinely evaluates pricing based on a number of factors, including competitor pricing, operation costs, etc.," said Abbott spokeswoman Christy Beckmann.

But a member of a national task force scrutinizing drug company pricing in the U.S. said Abbott is bending to regulatory pressure.

"I attribute it to doing the right thing in the enforcement atmosphere they're in," said David Waterbury, chief of Medicaid fraud investigation for the state of Washington and a leader of an inquiry by the National Association of Medicaid Fraud Control Units.

It's not clear whether other drug companies will follow Abbott's lead.

At least one other company, Germany-based Bayer AG has agreed to pay $14 million to resolve allegations that it lied about the wholesale prices of certain drugs, including treatments for AIDS. Bayer's settlement requires the company to give state regulators more accurate price information and cooperate with the ongoing investigation, the company said in September.

"I don't think it's a surprise to see some reduction in prices being charged to the Medicaid program, but to this degree--it surprises me," said Sarah Ross, an analyst who follows **Abbott** and other medical product companies for brokerage Edward Jones in St. Louis. "I think other drug companies are going to be taking a close look at their prices. But to this magnitude, I wouldn't count on it."

**Abbott** said that the company did not set the prices used by Medicaid and Medicare programs to reimburse providers for its products.

"The **AWP** is not set by **Abbott** for any of its products, nor does **Abbott** establish the formula for calculating **AWP**," Beckmann said.

**Abbott** said the company reports its published list prices to so-called reporting agencies like health information firm First DataBank, and "they calculate **AWP**," Beckmann said.

But First DataBank executive vice president and chief operating officer Jim Wilson said: "We have nothing to do with setting the prices. We are simply a conduit for the industry."

"We simply collect the information from drug companies and wholesalers and pass it along," to governments and other insurers, Wilson said.

Illinois Medicaid Director Matt Powers said many public and private insurers, particularly state Medicaid programs use the information reported from First DataBank to reimburse providers.

Pharmacists, doctors and hospitals, buy the drugs at a discount. They in turn get to keep the spread between the prices they pay and government reimbursement, which is pegged to **AWP**. Federal investigators say drug makers inflate their prices to win providers' favor and keep market share.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:01-cv-12257-PBS   Document 4784-3   Filed 10/09/2007   Page 4 of 4

6/14/01 KRT-CHITRIB (No Page)                                                    Page 3

In Illinois, providers are generally paid 90 percent of **AWP**, while other states are reimbursed at roughly between 85 and 95 percent of **AWP**.

Although it's not clear how much the cuts could cost **Abbott**, the short-term bottom line is not the company's only concern.

"Drug companies' biggest issue now is the world of public opinion, and they have come up against some real challenges that, in some cases, they could have handled better," Edward Jones' Ross said. "They are trying to regain confidence of the public."

By **Bruce Japsen** and Andrew Zajac

-----

To see more of the **Chicago Tribune**, or to subscribe to the newspaper, go to http://www.chicago.tribune.com/

---- INDEX REFERENCES ----

COMPANY: EDWARD JONES; ABBOTT LABORATORIES; TAP PHARMACEUTICAL PRODUCTS INC; BAYER AG

NEWS SUBJECT:   (Major Corporations (1MA93))

INDUSTRY:  (Pharmaceuticals Cost-Benefits (1PH30); Pharmaceuticals & Biotechnology (1PH13); Manufacturing (1MA74); Prescription Drugs (1PR52))

REGION:  (Germany (1GE16); Europe (1EU83); Central Europe (1CE50); USA (1US73); Americas (1AM92); Illinois (1IL01); North America (1NO39); Western Europe (1WE41))

Language:  EN

OTHER INDEXING:   (**ABBOTT**; **ABBOTT LABORATORIES**; **ABBOTT LABORATORIES** CUTS PRICES; **AWP**; BAYER AG; EDWARD JONES; ILLINOIS; ILLINOIS DEPARTMENT; ILLINOIS DEPARTMENT OF PUBLIC AID; ILLINOIS MEDICAID; MEDICAID; NATIONAL ASSOCIATION OF MEDICAID FRAUD CONTROL; STATE MEDICAID; TAP; TAP PHARMACEUTICAL PRODUCTS INC; US JUSTICE DEPARTMENT) (Andrew Zajac; Bayer; Beckmann; Bruce Japsen; Christy Beckmann; David Waterbury; Drug; Jim Wilson; Matt Powers; Pharmacists; Prosecutors; Ross; Sarah Ross; Wilson) (Pharmaceuticals)

TICKER SYMBOL: ABT

Word Count: 1333
6/14/01 KRT-CHITRIB (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.