# ATTACHMENT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) Civil Action No. 01-12257-PBS ) |
| **THIS DOCUMENT RELATES TO:** | ) Hon. Patti Saris ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) Magistrate Judge Marianne B. Bowler ) ) ) |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

Abbott Laboratories Inc. (Abbott), Duane Burnham and Thomas Hodgson (collectively, Movants) have filed a Motion for a Protective Order barring the deposition of long-retired executives Duane Burnham and Thomas Hodgson (Burnham/Hodgson MPO). Mr. Burnham and Mr. Hodgson are not currently high-level or "apex" Abbott corporate officers; they are not entitled to the same legal protections from depositions that an apex government or corporate witness would have. Since apex protection is the only basis for the Burnham/Hodgson MPO, it should be summarily denied on this basis.

Regardless, both witnesses have extensive knowledge of the issues in this case sufficient to warrant their deposition even if they were current apex officers at Abbott. Mr. Hodgson has given two lengthy depositions in cases involving average wholesale price (AWP) issues, including as an Abbott 30(b)(6) corporate designee. The fact that Mr. Hodgson has given these depositions is conspicuously absent from the Burnham/Hodgson MPO or Mr. Hodgson's

declaration submitted therewith. In those depositions, Mr. Hodgson showed a command of the concept of AWP and how it relates to government reimbursement.

Mr. Burnham was very active on AWP and government reimbursement matters for Abbott. He directly – and successfully – lobbied Congress in 1997 to block legislation that would have (1) instructed the Department of Health and Human Services (HHS) to formally collect actual pricing information and (2) expressly granted HHS discretion over the setting of Medicare drug reimbursement levels. The final law that passed – the Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 462-463 (1997) – contained no such provisions and codified AWP-based reimbursement in federal law. Mr. Burnham's testimony direct involvement in this effort reflects his knowledge and experience on AWP and government reimbursement matters; his testimony is crucial and relates directly to key defenses advanced by Abbott.

There is absolutely no merit to the Burnham/Hodgson MPO. The court should deny the motion and permit these long-delayed depositions of Abbott retirees to finally proceed.

## BACKGROUND

### I.   Meet and Confer Efforts

Movants submit a declaration from Abbott's counsel supposedly recounting the parties' meet and confer discussions. Burnham/Hodgson MPO, Exhibit A. It is incomplete and should not be considered.

The United States requested Mr. Hodgson's deposition on June 28, 2007. *See* Exhibit 1, June 28, 2007 email from G. Gobena to J. Winchester. The declaration is correct in that a meet and confer was held on July 17, 2007; at that time, the United States requested Mr. Burnham's deposition as well. Burnham/Hodgson MPO, Exhibit A, ¶ 4. The next day, per a request from

government counsel, Abbott counsel transmitted via email over 600 pages of deposition testimony given by Mr. Hodgson in class action suits involving AWP fraud and the TAP Pharmaceutical (TAP) drug Lupron. *See* Exhibits 10 and 11 (which contain excerpts from the two depositions), Thomas Hodgson Deposition Transcripts. A subsequent meet and confer call was held on July 27, 2007. Burnham/Hodgson MPO, Exhibit A, ¶ 4.

During the meet and confers, Abbott counsel inquired into rationales for taking Mr. Hodgson's and Burnham's depositions, and government counsel gave Abbott counsel some reasons; the declaration from Abbott counsel – Burnham/Hodgson MPO, Exhibit A, ¶¶ 6-7 – does not fully capture the rationales for taking their depositions. Unvarnished justifications for taking these former executives' depositions are set forth in detail below.

Abbott counsel is correct, however, that the United States is willing to discuss ways to accommodate the Abbott retirees' schedules. *Id.* at ¶ 8.

## II. Mr. Burnham's Current Status and Knowledge of the Issues in This Case

Duane Burnham, Abbott's former chief executive officer (CEO) and chairman of the board, has been retired from Abbott since 1999. Burnham/Hodgson MPO, Exhibit B, ¶ 1. He is not currently employed on a full time basis; he works as a trustee for two organizations. *Id.* at ¶ 7. Mr. Burnham states his deposition will cause him substantial burden, but that burden is not evidenced in the two page, nine paragraph declaration he has provided this Court.

Further, Mr. Burnham has personal, unique knowledge regarding critical issues in this case, particularly regarding government reimbursement for Abbott drugs. Abbott's principal defense in this case is that the federal "government" – either the executive branch or Congress – was fully aware of the specific allegations in the United States' Complaint and *approved*

3

Abbott's price reporting and marketing conduct as alleged therein. *See In re Pharmaceutical Industry Average Wholesale Price Litigation,* 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (denying motion to dismiss California FCA claim, noting that government approval of the particulars is necessary for a government knowledge defense). Mere acquiescence is not enough to constitute the kind of government approval that negates FCA scienter. *See United States ex rel. Tyson v. Amerigroup,* 488 F. Supp.2d 719, 730 (N.D. Ill. 2007) (denying defendant's motion for new trial, noting that the proper test is whether the government knew and approved the particulars of defendant's conduct, and that mere acquiescence, rather than approval, by government employees is not sufficient to avoid FCA liability).

Abbott's government knowledge arguments rely heavily on the fact that HHS did not change from an AWP-based reimbursement system to an actual cost-based reimbursement system for several years despite generalized government knowledge of the existence of spreads. Abbott has argued that HHS knowingly used inflated AWP to set reimbursement benchmarks because it wanted to overpay Medicare and Medicaid providers for drug ingredient costs to compensate them for the cost of providing drug administration services. *See* Abbott's Motion to Dismiss the United States' Original Complaint at 5-9, attached hereto as Exhibit 2.

It is a disingenuous defense. HHS, as a policy matter or otherwise, has never embraced the practice of overpaying providers for drug ingredient costs by using inflated AWPs. Indeed, HHS has attempted over the years to use more accurate pricing information to set drug reimbursement levels. In 1997, for example, HHS sought to change Medicare drug reimbursement so that it was based on actual cost. The President proposed legislation to codify such a reimbursement system; Abbott's Washington Affairs office carefully monitored this

legislative development. *See* Exhibit 3, March 3, 1997 Fax Transmittal of Proposed Legislation to Set Drug Reimbursement at Actual Cost. The proposed legislation would have set Medicare drug reimbursement at (1) actual cost, (2) an AWP set by the HHS secretary or (3) a median actual acquisition cost. *Id.* at ABT 53035.

The United States has learned through discovery that Abbott – and ultimately Mr. Burnham – directly participated in the effort to block this legislative effort. Abbott's Washington Affairs office – *i.e.*, its in-house lobbyists – spearheaded the company's individual efforts against the actual cost legislation. The Washington Affairs office engaged in a multi-pronged attack that involved working with industry trade groups and direct Congressional lobbying.

Abbott closely coordinated with external trade groups representing the interests of its customers as those groups developed arguments against the proposed legislation. *See* Exhibit 4, April 4, 1997 fax from C. Sensibaugh to M. Barmak. ("Mark, enclosed please find the position paper on the President's acquisition cost proposal that is being used by the American Society of Clinical Oncology.") Ms. Sensibaugh noted to another colleague elsewhere in the faxed document:

> As we discussed, this is what the oncologists are using. They are opposing the President's acquisition cost proposal and not offering any alternatives. The renal community plans to use this as a guide for drafting their paper

*Id.* at ABT-DOJ 296153.

Abbott's joint venture, TAP, manufactured the cancer drug Lupron; one of Abbott's major drugs was Calcijex, a renal drug. As such, the concerns of customers in the oncology and renal markets – as articulated by their advocacy groups – were critically important to Abbott. David Landsidle, Abbott's Divisional Vice President in charge of its Washington Affairs office,

5

would later explain this to his supervisor at Abbott corporate, Mark Barmak, in a June 20, 1997 memorandum:

> Lupron and Calcijex benefit enormously from Medicare reimbursement. In 1994, (the last year for which I have data) the HHS allowance for TAP's Lupron was $381.2 million, by far the largest allowance. The second largest was only $74.3 million. HPD's Calcijex comprises 1/3 of division's profits.

Exhibit 5, June 20, 1997 Memorandum from D. Landsidle to M. Barmak Regarding Lobbying Medicare Reimbursement.

Abbott's Washington Affairs office also directly lobbied members of Congress on this Medicare drug reimbursement issue. Mr. Burnham was regularly kept abreast of these efforts. In a June 5, 1997 monthly activities memorandum, Mr. Landsidle informed Mr. Burnham and others of meetings he had with "Members of Congress and staff on the issue of Medicare drug reimbursement being changed from average wholesale price to acquisition cost." Exhibit 6, June 5, 1997 Washington Office Monthly Highlights Report.

These legislative efforts and industry advocacy ultimately culminated in competing House and Senate bills. As an internal Abbott Washington Affairs memorandum shows, the House bill would have set Medicare drug reimbursement at 95% of AWP; the Senate version would have given the Secretary discretion to set Medicare drug reimbursement at amounts other than the AWP reported by drug companies. *See, e.g.,* Exhibit 7, July 15, 1997 Memorandum from C. Sensibaugh on House Version of Budget Reconciliation Bill.

Abbott was greatly concerned with the Senate version of the Medicare drug reimbursement legislation. In the June 20, 1997 memorandum referenced above, Mr. Landsidle wrote to Mr. Barmak that there was a pending Senate bill on Medicare drug reimbursement that was "not good"

6

because it would require HHS to study drug acquisition costs and determine the appropriate reimbursement level from drugs. Exhibit 5, June 20, 1997 Memorandum On Lobbying Medicare Drug Reimbursement. In that memorandum, Mr. Landsidle suggested that Abbott needed to substantially augment its direct lobbying efforts:

> . . . I suggest having Duane [Burnham] come to town to lobby . . . Abbott has a lot at stake in the reimbursement fight. I do not want to feel, or having others feel, we did not do everything possible to win in conference. Duane could help. I cannot get an appointment with [House Ways and Means Committee Chairman Bill] Archer. With Duane I can. A visit by him increases the importance of Abbott to the issue.

*Id*. The decision to involve Mr. Burnham was made with some trepidation; Mr. Landsidle noted further, "[th]e downside is Duane being exposed to having to defend our position which is profit motivated." *Id*. In other words, the proposed active lobbying by Mr. Burnham to block legislation giving HHS discretion to set Medicare drug reimbursement levels at some level untethered to AWP was "profit motivated" and was a "reimbursement fight" in which Abbott "has a lot at stake."

Mr. Burnham was ultimately asked to, and did, directly lobby against the Senate bill. On June 30, 1997, Mr. Landsidle wrote a memorandum to Mr. Burnham explaining why and how Mr. Burnham should lobby against the Senate bill on Medicare drug reimbursement. Mr. Landsidle wrote:

> The House and the Senate have passed different changes to how Medicare reimburses for drugs (i.e., Lupron and Calcijex). The basic change is that future reimbursement will be 95% of average wholesale price (AWP) rather than AWP. However, the Senate bill has additional language we oppose.
>
> . . . The Senate bill calls on the Secretary of HHS to do a study of AWP and report back to Congress within 6 months. *This gets HHS looking at prices.* The House bill has no such language.

7

> . . . Your message to both [Congressmen] is simple:
>
> Abbott thinks the house language providing for Medicare reimbursement of drugs at 95% of AWP . . . is much better than the Senate language.

Exhibit 8, June 30, 1997 Memorandum from D. Landsidle to D. Burnham (emphasis added). Mr. Landsidle could not have been any clearer; Abbott was going to lobby Congress to push for the adoption of the House bill (which set reimbursement at 95% of AWP with no HHS survey of actual prices) over the Senate bill to prevent HHS from having the statutory mandate to survey Abbott's actual transaction prices to set appropriate reimbursement levels.

Ultimately, Mr. Burnham contacted members of Congress, seeking support for the Medicare drug reimbursement provisions in the House version of the bill. *See* Exhibit 9, August 5, 1997 letter from D. Burnham to a Member of Congress. As evidenced by Exhibit 9, the effort by Abbott and others in the industry helped defeat the Senate version and codified AWP-based reimbursement in the Medicare statute.

The documents provided with this Opposition show that Abbott had a direct interest in government drug reimbursement policies and preserving the use of AWP in setting government drug reimbursements levels.[1] Mr. Burnham's involvement in these lobbying activities demonstrate that he has unique and important knowledge about these issues that warrants his deposition.

In addition, There are other issues for which Mr. Burnham's testimony is critical including, but not limited to:

---

[1] Mr. Burnham has filed an declaration claiming not to remember participating in these efforts. *See generally* Burnham/Hodgson MPO, Exhibit B. Mr. Burnham's statements are not credible in light of the documentary record in this case, and it is not clear whether Abbott or its counsel engaged in any effort to refresh his recollection prior to securing his declaration.

8

- Mr. Burnham's involvement in the review and approval of marketing, business or sales plans for Abbott divisions, including the division whose conduct is at issue in this case.

- Mr. Burnham's involvement in the review or approval of any and all pricing decisions.

- Mr. Burnham's involvement in the decision to create and/or maintain Abbott's home infusion operation, which entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of government reimbursements for its drugs.

### III. Mr. Hodgson's Current Status and Knowledge of the Issues in This Case

Thomas Hodgson, Abbott's former president and chief operating officer (COO), has been retired from Abbott since January 1999. Burnham/Hodgson MPO, Exhibit C at ¶ 1. He is not currently employed full time; he serves on a few boards of directors. *Id.* at ¶ 6. He vaguely claims his board work is "time-consuming," but provides no evidence to support how much time is consumed by these activities. For example, Mr. Hodgson provides no information on how often the corporate boards he serves on meet or how many hours per year he spends on board of directors' matters. Mr. Hodgson has established no burden.

Further, Mr. Hodgson has direct, personal knowledge of the issues in this case. Movants claim that the government has "not identified *any* action that Mr. Hodgson took that would justify his deposition." Burnham/Hodgson MPO at 10. Mr. Hodgson also filed a "know nothing" eight paragraph declaration where he – Abbott's former President and COO – claims to have had no responsibility for the pricing, marketing or sales Abbott's products. Burnham/Hodgson MPO, Exhibit C.

The United States does not want to take Mr. Hodgson's deposition solely because of actions he took, but also what he knows. Indeed, both Mr. Hodgson's declaration and the Burnham/Hodgson MPO mask the depth of his knowledge of AWP and government

reimbursement issues. Thomas Hodgson has testified twice in cases dealing with AWP issues. *See* Exhibits 10 and 11, February 19, 2004 and February 20, 2004 Hodgson Deposition Transcripts. He testified both in his individual capacity and a corporate Rule 30(b)(6) designee on behalf of Abbott. *See, e.g.,* Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 16. He testified regarding a number of matters at issue in this litigation:

- Mr. Hodgson is familiar with AWP. "Q. You've heard of the term "average wholesale price" in connection with drug pricing. A. Yes." Exhibit 11, February 20, 2004 Hodgson Deposition Transcript at 13.

- He also knows how AWP is used for reimbursement: "Q. And you'd agree that AWP is used as a basis for reimbursement by Medicare as well, wouldn't you? A. Yes." *Id.* at 15.

- Mr. Hodgson testified that he knew what a "spread" was; "I understand that to mean the difference between the acquisition cost or price to the physician and what he was reimbursed." *Id.* at 100. He also testified that he knew the spread on drugs can be increased various ways, including by decreasing actual acquisition cost. *Id.* at 225.

- Mr. Hodgson is familiar with various alternatives the federal government considered to AWP-based drug reimbursement. "Q. Do you recall that HCFA was looking at the alternative of reimbursing on straight cost [in the mid-1990s]. A. I think that was one option. Another option was steeper discount off AWP, and there were probably three or four other options that I don't recall or maybe nobody knows about." Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 225.

- Mr. Hodgson further testified of his knowledge and education regarding developments in Medicare drug reimbursement. Mr. Hodgson was questioned about his receipt of a memorandum in 1995 discussing HCFA and OMB surveys of actual prices. "Q. Did you know then or do you know now that HCFA . . . and OMB, were attempting to survey acquisition costs of physicians [at the time of the memorandum] for Lupron? A. I knew, as we discussed earlier, that HCFA was considering a number of alternatives to AWP reimbursement. In terms of how they were actually pursuing that, I wasn't aware, other than, obviously, I got this memo or I was briefed on it." *Id.* at 252-253.

Although Mr. Hodgson was being deposed in his personal capacity and as Rule 30(b)(6) Abbott corporate designee in those depositions, the subject matter concerned a multi-district litigation regarding TAP's drug Lupron. There are additional documents and lines of Abbott-

10

specific questions the United States has for Mr. Hodgson that cannot be satisfied merely by reference to these prior depositions, including but not limited to:

- A further, more in-depth examination of Mr. Hodgson's personal and/or unique knowledge about AWP, spread or government reimbursement issues.

- Mr. Hodgson's involvement in the review and approval of marketing, business or sales plans for Abbott divisions, including the division whose conduct is at issue in this case. The divisional vice president for the group whose marketing conduct is at issue in this case recently testified that Mr. Hodgson would review and approve any such plans. Exhibit 12, Donald Robertson Deposition Transcript at 90-92.

- Mr. Hodgson's involvement in the review or approval of any and all pricing decisions.

- Mr. Hodgson's involvement in the decision to create and/or maintain Abbott's Home Infusion business, which entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. The divisional vice president for the group whose marketing conduct is at issue in this case recently testified that Mr. Hodgson would have been involved in any business decisions regard that unit. Exhibit 12, Donald Robertson Deposition Transcript at 93.

## ARGUMENT

I. **Mr. Hodgson and Mr. Burnham Are Not Apex Witnesses and Are Not Shielded from Being Deposed.**

Both Mr. Burnham and Mr. Hodgson have been retired from Abbott for over seven years. They are not currently high level corporate officers at Abbott or elsewhere. There is no case law to suggest that protections afforded current high level apex witnesses – whether government or corporate – apply to corporate retirees. *Cf. State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 608 (Mo. 2002) (court concludes that arguments for apex protection of executive were moot in light of his retirement). Considerations such as harassment or business disruption that normally inform a court's decision making regarding the permissibility of apex depositions do not apply to retired executives. *See generally, Six West Retail Acquisition, Inc. v. Sony Theatre Management*

11

*Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001). Indeed, broadening apex protections to impede the depositions of long retired corporate executives would be inconsistent with the well recognized notion that notwithstanding the protections that may be afforded an apex witness, "it is very unusual . . . for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances, as such an order would likely be in error." *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567 (S.D. Ca. April 6, 2007) at *2.

Abbott contends that apex witness protection does indeed apply to all retired senior corporate executives, citing *In re Ski Train Fire of November 11, 2000*, 2006 WL 1328259 (S.D.N.Y. May 16, 2006) and the *WebSideStory* case noted immediately above. These cases are easily distinguishable and do not stand for that extraordinarily broad proposition. In *In re Ski Train Fire*, the only apex witness in that case remotely analogous to the retired executives in this litigation was the "recently" retired CEO of the defendant, who still continued as the chairman of its board of directors. That Court did not consider the effect of the board chairman's retirement from his CEO position on his status as an apex witness, perhaps due to his continued role as a senior corporate official.

The deponent in the *WebSideStory* case was also a current chairman of the board who had retired from his CEO position at the plaintiff corporation. The court in *WebSideStory* considered the deponent an apex witness was because he (1) continued to be a top executive for the plaintiff corporation and (2) was also the CEO and chairman of the board of a new company. 2007 WL 1120567 at *3 ("since Mr. Lunsford is currently the CEO and Chairman of the Board of Directors for another company, Limelight Networks, as well as a member of the Board of Directors for WebSideStory and its former CEO, Mr. Lunsford is an official at the highest level or "apex" of a

12

Case 1:01-cv-12257-PBS   Document 5043-7   Filed 02/13/08   Page 14 of 20
Case 1:01-cv-12257-PBS   Document 4736   Filed 09/21/2007   Page 13 of 19

corporation, and while he may not possess the celebrity status of apex deponents in other cases, the Court finds his responsibilities to current and prior employers to be of similar proportions.") Neither Mr. Burnham nor Mr. Hodgson hold any top corporate positions at Abbott or elsewhere,[2] and neither have responsibilities to Abbott any more, whether as a corporate officer or director.

Therefore, apex witness protection does not apply to Mr. Burnham or Mr. Hodgson. Since this was the only rationale advanced for blocking their testimony, the motion should be summarily denied.

## II. The Depositions of Mr. Burnham and Mr. Hodgson Are Permissible Even Under the Rules Governing Apex Witnesses.

Even if the Court were to afford Mr. Burnham and Mr. Hodgson apex status, their depositions should be permitted. The United States "may obtain discovery regarding any matter, not privileged, that is relevant to [a] claim or defense," and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Further, "[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive] has a busy schedule'" does not exempt them from being deposed. *Consolidated Rail Corp. v. Primary Industries Corp.*, No. 92 Civ. 4927, 1993 WL 364471, at * 1 (S.D.N.Y. Sept. 10, 1993) (*quoting CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)). "Federal courts have permitted the depositions of high level executives when conduct and knowledge at the

---

[2] Mr. Hodgson is a member of the board of two public companies. Burnham/Hodgson MPO, Ex. C at ¶6. There is nothing in the scant case law on former senior corporate executives seeking apex protection to suggest that merely being the member of the board of a company qualifies a deponent for apex status, particularly when the case involves the board member's tenure at a previous corporation.

highest corporate levels of the defendant are relevant in the case." *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 205 F.R.D. 535, 536 (S.D. Ind. 2002).

As the *WebSideStory* decision cited by Abbott notes, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." 2007 WL 1120567 at *2; *see also, Travelers Rental Co., Inc. v. Ford Motor Company*, 116 F.R.D. 140 (D. Mass 1981); *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98 (S.D.N.Y. 2001) (deposition of high-level corporate officials permitted when officials have some unique or superior knowledge of the issues in the case. ). That sentiment is echoed in the *In re Sky Train Fire* decision as well, which noted that courts allow apex depositions where "they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action." 2006 WL 1328259 at *10.

As detailed above and discussed below, Mr. Burnham and Mr. Hodgson have extensive personal and unique knowledge of relevant, critical issues in this case.

### A. The Movants Have Failed to Meet Their Burden to Show That a Protective Order Is Warranted.

It is the burden of the party seeking a protective order to prove that an apex official does not possess information relevant to the issues in the case or that his knowledge of particular issues in a case is completely duplicative of other witnesses. *General Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002). Both Mr. Burnham and Mr. Hodgson submitted declarations claiming that (1) they have no unique or superior knowledge on the issues in this litigation and (2) they do not recall any of their work on AWP and government reimbursement issues. Both declarations are vague, conclusory and wholly insufficient to support a motion for a

14

protective order. *Rolscreen*, 145 F.R.D. at 96 ("party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.") (citations omitted.)

Regardless, in the *Travelers* case, several high level Ford employees filed similar "know nothing" declarations in a failed attempt to evade being deposed. *Id.* at 143. As that court noted, "[t]he plaintiff is entitled to 'test' the claim of lack of knowledge or lack of recollection by deposing the witness." *Id.* at 143, citing *Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 121-23 (D. Conn., 1974) (citations omitted). *Travelers* further noted:

> [T]here is nothing in the law which would indicate that Travelers has to accept the claimed failures on their face or rely on whatever efforts Ford's counsel may have undertaken to refresh recollections. Considering that Travelers has demonstrated that these individuals were personally involved in matters relevant to this case, it would be extremely rare that an asserted failure of recollection would be sufficient to entitle the deponent to an order quashing the deposition.

*Travelers*, 116 F.R.D. at 143; *see also Six West* 203 F.R.D. at 102.

This reasoning is especially apt in Mr. Burnham's and Mr. Hodgson's cases, where their declarations lack credibility in light of the documentary record. As discussed above, Mr. Burnham was personally involved in major government reimbursement policymaking that company officials claimed to be of the utmost importance to Abbott. His "know nothing" declaration is ripe for challenge, and the United States is entitled to direct testimony about his personal work on Abbott's behalf related to government reimbursement for drugs. *See Travelers*, 116 F.R.D. at 146 ("[T]hose with greater authority may have the last word on why [the company] formulated and/or administered the plan in the manner which the lower-level executives described

it as being formulated and/or administered. And as the ultimate authority, their views as to why may be of far greater probative value on the issue of intent and motive than the views of the lower-level executives.") All aspects of Mr. Burnham's efforts to lobby Congress to prohibit HHS from having statutory discretion in the setting Medicare drug reimbursement levels must be queried as they bear on Abbott's scienter and affirmative defenses. As a court in this district noted, "[w]hen the motives behind corporate action are at issue, an opposing party usually has to depose those officers and employees who in fact approved and/or administered the particular action." *Travelers*, 116 F.R.D. at 142; *see also Rolscreen Co. v. Pella Products of St. Louis Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992).

The appropriateness of Mr. Hodgson's deposition is similarly clear. Mr. Hodgson has been proffered by Abbott as a corporate designee in other AWP litigation. *See, supra*, at 9-12. He was asked about AWP and government reimbursement issues and has shown that he was knowledgeable about them. *Id*; *see also* Exhibits 12 and 13. That questioning was not done in the context of the Abbott conduct at issue here; the United States should be permitted to explore Mr. Hodgson's – Abbott's former President and Chief Operating Officer – unique knowledge of AWP and government reimbursement issues as they apply to this case.

**B.    The United States Need Not Exhaust Other Means of Discovery Before Deposing Mr. Burnham and Mr. Hodgson.**

Abbott asserts, "[t]he case law uniformly instructs that, before a party is permitted to conduct an apex deposition, it must first pursue other avenues, such as (I) depositions of lower-level employees or corporate 30(b)(6) designees; or (ii) written discovery." Burnham/Hodgson MPO at 11. Even if the Court considered Mr. Hodgson and Mr. Burnham

16

apex witnesses, these lesser means of discovery are not required when an apex witness has personal knowledge. Since the United States has shown clearly that both Mr. Burnham and Mr. Hodgson have unique or personal knowledge of key issues in this matter, the United States need not depose lower-level employees or pursue written discovery before taking his deposition. *See WebSideStory*, 2007 WL 1120567 at *2. The evidence of that personal and/or unique knowledge has been set froth in detail above.[3]

As Abbott notes, the United States has deposed several of Mr. Burnham's and Mr. Hodgson's subordinates at Abbott. Their testimony cannot substitute for direct testimony from Mr. Burnham and Mr. Hodgson about their knowledge and actions. The period for completing fact discovery in this matter is closing soon, and there is no time for additional delays for interrogatories or written deposition questions that yield vague and incomplete responses.

---

[3] In some cases, courts have directed that lower-level employees be deposed before the opposing party can ask for discovery from the apex officials. *See, e.g., Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Baine v General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991). Those courts sought to protect these officials from repetitive and harassing depositions where unique or direct knowledge cannot be shown. These cases are easily distinguishable. Many of these decisions involve personal injury, employment or contract disputes where the upper-level officials had no personal involvement. *Bridgestone/Firestone*, 205 F.R.D. at 536 ("Nearly every decision Ford has cited [in support of its protective order] involves an individual personal injury, employment, or contract dispute with which the "apex" official had no personal involvement."), citing *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) (individual employment case); *Salter*, 593 F.2d 649 (individual negligence case); *Baine*, 141 F.R.D. 332 (individual personal injury case); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (individual personal injury case). In the present case, the claims involve conduct and knowledge at the highest corporate level; thus, the justification for apex official protection is lacking. *See* Fed. R. Civ. P. 26 (b)(2) (in weighing whether to limit discovery, courts take into consideration the importance of the issues).

## CONCLUSION

For the reasons set forth herein, Abbott's Motion for a Protective Order Barring the Deposition of Mr. Burnham and Mr. White should be denied.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: September 21, 2007

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day caused an electronic copy of the above **THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF MR. BURNHAM AND MR. HODGSON** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: September 21, 2007

/s/ Gejaa T. Gobena
Gejaa T. Gobena