# ATTACHMENT D
# PART 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 3

MAR 03 '97  05:55PM ABBOTT LABORATORY                          P.1/12



## ABBOTT LABORATORIES

1710 Rhode Island Avenue, N.W. #300          Phone:  202/659-8524
Washington, DC 20036                          Fax:    202/466-8366

## FACSIMILE COVER SHEET

*Legislative Language for Congress*

TO: _Rich Rieger_                    DATE: _3/3/97_

FR:  David W. Landsidle
     Cynthia Sensibaugh              No. of Pages: _12_
     Rosemary Haas
     Sandie Preiss
     Lee Harp
     Lorna Huff

**Additional Comments:**

Here is the legislative language from the President's proposal on AWP, Competitive bidding and changes in payment for automated clinical laboratory tests. The diabetes language isn't complete so I think it is best not to give it out. When I get a complete version, I will send it out.

Thanks,
Cindy

Confidential
Subject to Protective Order

ABT 53033

ABT-DOJ 232740                    TXABT 674051
                                  Confidential

MAR 03 '97  05:56PM ABBOTT LABORATORY                                    P.2/12

1/2?/97Subtitle B—Medicare Savings

**SEC. 11200. CONTENTS.**

The table of contents of this subtitle is as follows:
Part 1 — Provisions Relating to Part A
    Subpart A — Hospitals
    Subpart B — Skilled Nursing Facilities
    Subpart C — Demonstration Concerning Working Disabled
Part 2 — Provisions Relating to Part B
    Subpart A — Physicians' And Other Practitioners' Services
    Subpart B — Preventive Benefits
    Subpart C — Other Provisions
Part 3 — Provisions Relating to Parts A and B
    Subpart A — Beneficiary Centered Purchasing
    Subpart B — Home Health Services
    Subpart C — Coordination of Benefits
    Subpart D — Other Provisions

Part 4 — Part B Premium

PART 1—PROVISIONS RELATING TO PART A

Subpart A—Hospitals

**SEC. 11201. UPDATES FOR PPS HOSPITALS.**

(a) UPDATE FACTORS.—Section 1886(b)(3)(B)(i) (42 U.S.C.
1395ww(b)(3)(B)(i)) is amended—

(1) by striking "and" at the end of subclause (XII), and.

(2) by striking subclause (XIII) and inserting the following:

"(XIII) for each of the fiscal years 1998 through 2002,
the market basket percentage increase minus 1 percentage
point for hospitals in all areas, and.

Confidential
Subject to Protective Order

ABT 53034

ABT-DOJ 232741

TXABT 674052
Confidential

MAR 03 '97   05:56PM ABBOTT LABORATORY                                    P.3/12

(a) apply to services furnished on or after January 1, 2000.

(2) SUBSECTION (b).—The amendments made by subsection

(b) apply to services furnished on or after January 1, 1999.

**SEC. 11234. DIAGNOSTIC INFORMATION FROM PHYSICIANS.**

**SEC. 11235. NO X-RAY REQUIRED FOR CHIROPRACTIC SERVICES.**

(a) IN GENERAL.—Section 1861(r)(5) (42 U.S.C. 1395x(r)(5))

is amended by striking "demonstrated by X-ray to exist".

(b) EFFECTIVE DATE.—The amendment made by subsection (a)

applies to services furnished on or after January 1, 1998.

**SEC. 11236. NO MARK-UP FOR DRUGS COVERED BY MEDICARE.**

(a) IN GENERAL.—Section 1842(o) (42 U.S.C. 1395u(o)) is

amended to read as follows:

"(o) ELIMINATION OF MARK-UP FOR DRUGS AND BIOLOGICALS.—

"(1) IN GENERAL.—If a physician's, supplier's or any

other person's bill or request for payment for services

includes a charge for a drug or biological for which payment

may be made under this part and the drug or biological is

not paid on a cost or prospective payment basis as otherwise

provided in this part, the amount payable for the drug or

biological shall be the lowest of—

"(A) the physician's, supplier's or other person's

actual acquisition cost, as specified in paragraph (2),

"(B) the average wholesale price, as specified by

the Secretary,

"(C) the median actual acquisition cost of all

claims for the drug or biological for the 12-month

period beginning July 1, 1998, adjusted annually and

Confidential
Subject to Protective Order

*Legislative language from President Clinton's
proposal for Pay based on Acquisition Costs
Subject to a Limit for Outpatient Drugs
Prescribed in Physicians Offices."*

ABT-DOJ 232742        TXABT 674053        ABT 53035
                      Confidential

MAR 03 '97  05:56PM ABBOTT LABORATORY                          P.4/12

effective on January 1 of each year, and

"(D) the amount otherwise determined under this part.

"(2) ACTUAL ACQUISITION COST.—The actual acquisition cost is the physician's, supplier's or other person's cost based on the most economical case size in inventory on the date of dispensing or, if less, the most economical case size purchased within six months of the date of dispensing whether that specific drug was furnished to an individual whether or not enrolled under this part.  The actual acquisition cost includes all discounts, rebates, or any other benefit in cash or in kind (including, but not limited to, travel, equipment, or free products).

"(3) BILLING RULES.—

"(A) BILL TO INCLUDE ACTUAL ACQUISITION COST.—If a physician's, supplier or other person's bill or request for payment does not include the physician's, supplier's or other person's actual acquisition cost, no payment shall be made under this part.

"(B) BENEFICIARY PROTECTIONS.—A physician, supplier or other person may not bill an individual enrolled under this part—

"(i) any amount other than the payment amount specified in paragraph (1) and any applicable deductible and coinsurance for a drug or biological for which payment

Confidential
Subject to Protective Order

TXABT 674054
Confidential

ABT 53036

ABT-DOJ 232743

MAR 03 '97  05:57PM ABBOTT LABORATORY                                    P.5/12

is made pursuant to paragraph

(1), or

"(ii) any amount for a drug or biological for

which payment may not be made

pursuant to paragraph (3)(A).

"(C) PENALTIES.—If a physician, supplier or other

person knowingly and willfully in repeated cases bills

one or more individuals in violation of subparagraph

(B), the Secretary may apply sanctions against such

physician, supplier or other person in accordance with

subsection (j)(2).

"(4) DISPENSING FEE FOR PHARMACIES.—The Secretary may

pay a reasonable dispensing fee to licensed

pharmacies approved to dispense drugs under this

part.".

(b) EFFECTIVE DATE.—The amendments made by subsection (a)

apply to drugs and biologicals furnished on or after January 1,

1998.

SEC. 11237. PAYMENTS TO PHYSICIAN ASSISTANTS, NURSE

PRACTITIONERS, AND CLINICAL NURSE SPECIALISTS.

(a) COVERAGE IN HOME AND AMBULATORY SETTINGS IN WHICH A

FACILITY OR PROVIDER FEE IS NOT BILLED FOR PHYSICIAN ASSISTANTS,

NURSE PRACTITIONERS, AND CLINICAL NURSE SPECIALISTS.—Section

1861(s)(2)(K) (42 U.S.C. 1395x(s)(2)(K)) is amended—

(1) in clause (i)—

(A) by striking "or" at the end of subclause (II),

and

Confidential
Subject to Protective Order

ABT 53037

TXABT 674055
Confidential

ABT-DOJ 232744

MAR 03 '97  05:57PM ABBOTT LABORATORY                                    P.6/12

   (1) by striking "a fiscal year (beginning with fiscal
year 1996)" and inserting "fiscal year 1996, fiscal year
1997 and for other fiscal years beginning with 2003", and

   (2) by inserting after the subparagraph designation
"(C)" the following: "Notwithstanding the second sentence of
subparagraph (A) or the second sentence of subparagraph (B),
with respect to fiscal years 1998 through 2002, the
Secretary shall increase amounts for facility services by
the percentage increase in the consumer price index for all
urban consumers (U.S. city average) as estimated by the
Secretary for the 12-month period ending with the midpoint
of the year involved, reduced by two percentage points for
fiscal years 1998 through 2002.".

SEC. 11252. CHANGES IN PAYMENT FOR AUTOMATED CLINICAL LABORATORY
            TESTS.

   (a) IN GENERAL.-Section 1833(h)(2)(A)(iii) (42 U.S.C.
13951(h)(2)(A)(iii)) is amended-

     (1) by striking the clause designation "(iii)" and
   inserting "(iii)(I)", and

     (2) by adding at the and the following;

   "(II) In lieu of the fees established under subclause (I),
the Secretary may pay for tests classified as automated tests on
the basis of a nationally uniform fee for a group of tests (of
whatever number) performed together.

   "(III) The Secretary shall pay for tests for amylate,
apolipoprotein A, apolipoprotein B, creatine kinase, gamma
glutamyl transferase, iron, lipase, magnesium, thyroxine,

*Legislative language from President Clinton's proposal for "Reforming Payment for Certain Automated Laboratory Tests"*

Confidential
Subject to Protective Order

ABT-DOJ 232745

ABT 53038
TXABT 674056
Confidential

triglyceride, or triiodothyronine uptake on the same basis as the Secretary pays for other tests classified as automated tests.

"(IV) The Secretary may, from time to time, reclassify specific tests as automated or not automated, based on the volume of a test and the relative frequency by which the test is performed on automated equipment.".

(b) EFFECTIVE DATE AND INITIAL PAYMENT LEVELS.--

(1) The amendments made by subsection (a) apply to tests performed after 1997.

(2) If the Secretary sets a nationally uniform fee under subclause (II) of section 1833 (h)(2)(A)(iii) of the Social Security Act (42 U.S.C. 1395(h)(2)(A)(iii)), such a fee shall be initially established so that estimated aggregate payments under such fee shall equal the estimated aggregate amounts that would otherwise have been payable for the tests under subclause (1).

SEC. 11253. PROSPECTIVE PAYMENT SYSTEM FOR HOSPITAL OUTPATIENT DEPARTMENT SERVICES.

(a) IN GENERAL.—Section 1833 (42 U.S.C. 1395l) is amended by adding at the end the following:

"(t) PROSPECTIVE PAYMENT SYSTEM FOR HOSPITAL OUTPATIENT DEPARTMENT SERVICES.—

"(1) IN GENERAL.—With respect to hospital outpatient services designated by the Secretary and furnished during years beginning with January 1, 1999, the amount of payment made for the services determined under this part shall be determined under a prospective payment system established by

Confidential
Subject to Protective Order

ABT 53039

ABT-DOJ 232746

TXABT 674057
Confidential

MAR 03 '97  05:58PM ABBOTT LABORATORY                              P.8/12

the terms of the contract or applicable law) if the Secretary
finds that specified outcomes are not being achieved, if the
services agreed to are not being provided, or if quality
standards are not being met.

"(e) INCENTIVES FOR USE OF CENTERS.-The Secretary may permit
entities under a contract under this section to furnish
additional services or waive beneficiary cost-sharing, subject to
the approval of the Secretary.

"(f) BENEFICIARY LOCK-IN.—Individuals entitled to benefits
under this title who elect to obtain services under a contract
under this section may not otherwise receive benefits related to
the applicable condition or need (subject to such exceptions for
emergency services and as the Secretary may otherwise specify),
but shall be permitted, within 30 days of a request, to
discontinue participation under the contract and receive benefits
as otherwise provided by this title.".

SEC. 11263. COMPETITIVE BIDDING.

(a) GENERAL RULE.--Part B of title XVIII (42 U.S.C. 1395j et
seq.) is amended by inserting after section 1846 the following:

"COMPETITIVE ACQUISITION OF ITEMS AND SERVICES

"SEC. 1847. (a) ESTABLISHMENT OF BIDDING AREAS.-

"(1) IN GENERAL.-The Secretary shall establish
competitive acquisition areas for the purposes of awarding
contracts for the furnishing under this part of the
items and services described in subsection (c) after
1996.  The Secretary may establish different
competitive acquisition areas under this subsection for

*Legislative language from President Clinton's
Proposal for "Establishing Competitive Bidding
for Laboratories, Durable Medical Equipment, and
other Items"*

Confidential
Subject to Protective Order

ABT 53040

ABT-DOJ 232747

TXABT 674058
Confidential

different classes of items and services under this
part.

"(2) CRITERIA FOR ESTABLISHMENT.-The competitive
acquisition areas established under paragraph (1) shall—

"(A) initially be, or be within, metropolitan
statistical areas, and

"(B) be chosen based on the availability and
accessibility of entities able to furnish items and
services, and the probable savings to be realized by
the use of competitive bidding in the furnishing of
items and services in the area.

"(b) AWARDING OF CONTRACTS IN AREAS.-

"(1) IN GENERAL.-The Secretary shall conduct a
competition among individuals and entities supplying items
and services under this part for each competitive
acquisition area established under subsection (a) for each
class of items and services.

"(2) CONDITIONS FOR AWARDING CONTRACT.-The Secretary
may not award a contract to any entity under the competition
conducted pursuant to paragraph (1) to furnish an item or
service under this part unless the Secretary finds that the
entity meets quality standards specified by the Secretary
for the furnishing of the item or service.

"(3) CONTENTS OF CONTRACT.-A contract entered into
with an entity under the competition conducted
pursuant to paragraph (1) shall specify (for all
of the items and services within a class)—

Confidential
Subject to Protective Order

ABT 53041

TXABT 674059
Confidential

ABT-DOJ 232748

"(A) the quantity of items and services the entity

shall provide; and

"(B) such other terms and conditions as the

Secretary may require.

"(c) SERVICES DESCRIBED.-The items and services to which the

provisions of this section shall apply are as follows:

"(1) Clinical diagnostic laboratory services.

"(2) Durable medical equipment.

"(3) Prosthetics and orthotics.

"(4) Such other items as the Secretary may specify.".

(b) ITEMS AND SERVICES TO BE FURNISHED ONLY THROUGH COMPETITION

ACQUISITION.-Section 1862(a) (42 U.S.C. 1395y(a)) is amended--

(1) by striking "or" at the end of paragraph (14),

(2) by striking the period at the end of paragraph (15) and

inserting ";or", and

(3) by inserting after paragraph (15) the following:

"(16) where such expenses are for an item or service

furnished in a competitive acquisition area (as established

by the Secretary under section 1847(a)) by an entity other

than an entity with which the Secretary has entered into a

contract under section 1847(b) for the furnishing of such an

item or service in that area, unless the Secretary finds

that such expenses were incurred in a case of urgent need.".

(c) REDUCTION IN PAYMENT AMOUNTS IF COMPETITIVE ACQUISITION

FAILS TO ACHIEVE MINIMUM REDUCTION IN PAYMENTS.--Notwithstanding

any provision of title XVIII of the Social Security Act (42

U.S.C. 1395 et seq.), if the establishment of competitive

Confidential
Subject to Protective Order

ABT 53042

TXABT 674060
Confidential

ABT-DOJ 232749

MAR 03 '97  05:59PM ABBOTT LABORATORY                                    P.11/12

acquisition areas under section 1847 of that Act (as added by
this part) and the furnishing of items and services under that
section during 2001 does not result in a reduction of at least 20
percent in the projected payment amounts that would apply to a
class of items or services under part B of that title (42 U.S.C.
1395j et seq.) if that class of items or services were not to be
furnished under that section in 2001, the Secretary shall reduce
for that year the payment amounts for that class of items
services (except oxygen and oxygen equipment) by the percentage
the Secretary determines necessary to result in that reduction
for that year (and those reduced amounts shall be considered the
full payment amounts for that year in calculating payment amounts
for future years).

Potential alternative default:

(c) REDUCTION IN FEE SCHEDULES IF COMPETITIVE ACQUISITION FAILS
TO ACHIEVE EXPECTED SAVINGS.--

    (1) Notwithstanding any provision of title XVIII of the
Social Security Act (42 U.S.C. 1395 et seq.), the Secretary shall
reduce fee schedules for clinical diagnostic laboratory tests,
durable medical equipment other than oxygen and oxygen equipment,
and prosthetics and orthotics in all areas by 20 percent for
tests furnished on or after January 1, 2001.

    (2) If the Secretary has signed one or more contracts for
competitive acquisition of clinical diagnostic laboratory tests
in an area, the Secretary may reduce the size of the reduction
specified in paragraph (1) in that area by the number of
percentage points that (i) the average Medicare fee for such

Confidential
Subject to Protective Order

ABT 53043

ABT-DOJ 232750

TXABT 674061
Confidential

tests or services in 1997 in the area updated by the applicable updates for 1998, 1999, 2000 and 2001 exceeds (ii) the average Medicare fee for such services for 2001 for such area.

(d)  EFFECTIVE DATE.--The amendments made by subsections (a) and (b) apply to items and services furnished under part B of title XVIII of the Social Security Act (42 U.S.C. 1395j et seq. after 1997.

SEC. 11264. FLEXIBLE PURCHASING.

Title XVIII (42 U.S.C. 1395 et seq.) is amended by adding at the end the following:

"SEC. 1895. FLEXIBLE PURCHASING.

"(a)  IN GENERAL.—The Secretary may enter into contracts with providers of services, physicians, and other entities that furnish items or services under the programs established by this title under which the Secretary may utilize—

"(1) alternative claims processing, administrative, and related procedures, and

"(2) reduced payment rates or alternative payment methodologies.

"(b)  SAVINGS TO BENEFICIARIES.—Contracts under this section may provide for reductions in payments required from individuals entitled to benefits under this title.

"(c)  REQUIREMENTS—Under a contract under this section—

"(1) the provisions of subtitle B of title XI (42 U.S.C. 1320c et seq.), other provisions concerned with quality of care, and conditions of participation shall apply unchanged,

Confidential
Subject to Protective Order

ABT 53044

ABT-DOJ 232751                    TXABT 674062
                                  Confidential

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| ———————————————— | ) ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 5

 **ABBOTT**

**From:** David Landsidle
Divisional Vice President ,
Washington

**INTEROFFICE CORRESPONDENCE**

**Dept:** Washington Office
202/659-8524

---

**TO:**  Mark Barmak

**DATE:** June 20, 1997

**cc:**  Cynthia Sensibaugh

**RE:** *Lobbying Medicare Drug Reimbursement*

- - - - - - - - - -VIA FAX- - - - - - - - - -

The House and Senate are expected to vote next week on the budget reconciliation bills.  The bills will pass and the conference committee will begin work the week of July 7.  The conference could take anywhere from 2 to 4 weeks.  The Congress plans to vote on the conference bill before the August 2 start of the summer recess.

Regarding the Medicare reimbursement issue, the House has a good provision although we need to add "specific" drug or biological.  The Senate provision is not good.  It says:

- payment could not exceed 95% of the AWP, as specified by the Secretary

- the effective date is retroactive to May 1, 1997 (changed by a Moseley-Braun amendment from January 1, 1997)

- the amount payable is limited by an annual CPI adjustment

- an HHS study is required to determine the AWP or other appropriate price of outpatient prescription drugs which then could be used to "further adjust the payment amounts for outpatient prescription drugs.

The Senate provision also lacks the "specific" drug language.

Lupron and Calcijex benefit enormously from Medicare reimbursement.  In 1994, (the last year for which I have data) the HHS allowance for TAP's Lupron was $381.2 million, by far the largest allowance. The second largest was only $74.3 million.  HPD's Calcijex comprises 1/3 of division's profits.  For these reasons, I suggest two additional lobbying actions be considered.



Highly Confidential

First, targeted grassroots to specific conferees calling on them to support the House bill over the Senate bill. For example, Congressman Bill Archer (R-TX) will be a conferee. While he's from Houston, we could ask employees at our Texas plants in Austin and Irving to write. Or, Rep. Denny Hastert (R-IL) is a likely conferee. We could have Illinois employees write Hastert. Texas Senator Gramm (R) and Illinois Senator Moseley-Braun (D) will not be conferees but are on the Finance Committee and could be asked in letters to talk to conferees. The drawback to grassroots is that the reimbursement rate message is not a good grassroots message, although not giving the Secretary discretionary powers could be put in a letter.

Second, I suggest having Duane come to town to lobby. We would see conferees or those who could influence conferees, such as the four cited above. Our basic message would be to support the House provision. This office, in consultation with you and others, would prepare background papers.

Abbott has a lot at stake in the reimbursement fight. I do not want to feel, or having others feel, we did not do everything possible to win in conference. Duane could help. I can not get an appointment with Archer during conference. With Duane I can. A visit by him increases the importance of Abbott to the issue, which congressmen can understand. He reinforces our efforts and those of Nancy Taylor, our consultant. Nancy has done a good job—she got Senator Hatch to introduce our amendment—but a CEO adds a good deal of clout. Using Duane certainly does not guarantee success, but it increases our chances.

The downside is Duane being exposed to having to defend our position which is profit motivated. There is no way to avoid that fact. But our reasons for opposing the Senate bill are justifiable and defendable. Also he would be seeing people who are either with us (i.e. Archer who wants the House language to prevail) or are inclined to help if possible (i.e. Moseley-Braun). He is not going to see someone like Henry Waxman.

Duane's lobbied before, on 936, trade and the Clinton health bill. He is good and knows CEOs have influence on Capitol Hill. I do not know if he is available to come to Washington, but if he is, do you think he should be asked?

Highly Confidential

ABT-DOJ 295994

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 8

**ABBOTT**

**From:**   David W. Landsidle
Divisional Vice President
Washington

INTEROFFICE CORRESPONDENCE

**Dept:**   Washington Office

**TO:**   Duane L. Burnham

**DATE:** June 30, 1997

—————VIA FAX—————

RE:   Medicare Drug Reimbursement

The House and Senate have passed different changes to how Medicare reimburses drugs (i. e., Lupron and Calcijex).  The basic change is that future reimbursement will be 95% of average wholesale price (AWP) rather than full AWP.  However, the Senate bill has additional language we oppose.

    o The Senate bill makes the reimbursement rate retroactive to May 1, 1997.  The reimbursement rate would  the AWP on that date.  The House bill's effective date is January 1, 1998.

    o The Senate bill says that the amount reimbursed can not exceed the May 1, 1997, amount increased annually by the CPI.  The House has no CPI lanuage.

    o The Senate bill calls on the Secretary of HHS to do a study of AWP and report back to Congress within 6 months.  This gets HHS looking at prices.  The House bill has no such language.

I am putting together phone calls between you and Ways and Means Chairman Bill Archer (R-TX) and Congressman Denny Hastert (R-IL).  Both will be House conferees when the House and Senate meet to reconcile differences.  Your message to both men is simple:

    o Abbott thinks the House language providing for Medicare reimbursement of drugs at 95% of AWP, effective January 1, 1998, is much better than the Senate language. It raises $300 million without the unnecessary Senate provisions.

    o Abbott asks that you fight to retain the House language in the conference committee and that Abbott joins you in fighting for their language.

You should also congratulate both congressmen for putting together legislation that will bring the Federal budget into balance for the first time since 1969.  This was a massive undertaking and Archer and Hastert were crucial to the deal being struck.

Archer will call you.  I have given his office your number.  I will not know until tomorrow if Hastert will call you or if you are to call him.  I will tell Debbie which way it is scheduled and get her a phone number, if necessary.

cc:  Mark Barmak

Highly Confidential

ABT-DOJ 295996



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| ─────────────────────── | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 9

# ABBOTT

August 5, 1997

The Honorable Bill Archer
1236 Longworth House Office Building
United States House of Representatives
Washington, DC 20515

Dear Bill:

First, let me congratulate you for leading the effort to pass the balanced budget legislation. The tax and spending bills you passed are truly historic in importance and their passage was due, in no small part, to the many hours you personally spent putting the package together.

Second, I want to express our gratitude for what you accomplished with the Medicare drug reimbursement provision. When we spoke on the telephone you said you intended to hold the House language in the conference committee, and you did. Your language was clearly superior to the Senate's and Abbott thanks you for convincing the rest of the conferees. I know you had far bigger issues on the agenda. Taking the time to call me and discuss our concerns was greatly appreciated.

I wish you continued success in the 105th Congress.

Sincerely,

DLB:par

Highly Confidential

ABT-DOJ 296003

EXHIBIT
Plaintiff's 1146
Rms    7/3-07

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | ) ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 10

1            STATE OF NORTH CAROLINA IN THE GENERAL COURT

2                NEW HANOVER COUNTY OF JUSTICE

3                 SUPERIOR COURT DIVISION

4                                              CONFIDENTIAL

5     HARRY E. STETSER, et al.,              )

6            Plaintiffs,                      )

7      vs.                                    )  No. 1-CV-5268

8     TAP PHARMACEUTICAL PRODUCTS, INC.,)

9     et al.,                                 )

10            Defendants.                      )

11

12       The videotaped deposition of Thomas Hodgson,

13    taken pursuant to notice in the above-entitled

14    cause on the 19th day of February, 2004, at

15    225 East Illinois Road, Lake Forest, Illinois, at

16    9:00 a.m.

17

18

19

20

21

22

23    REPORTED BY ELVIRA M. KOKOTT

24    CERTIFIED SHORTHAND REPORTER LICENSE NO. 84-3309

ABT-DOJ 0297310
Highly Confidential

5 (Pages 14 to 17)

14

1  deposition of Mr. Hodgson or in the litigation --
2  or in the federal litigation, and I believe that's
3  something that Mr. Haviland has -- has assented to.
4      MR. HAVILAND: I agree that the signature on
5  the agreements to abide by the protective orders in
6  Walker and Stetser does not by that signature give
7  up any rights that MDL has to claim whatever they
8  will with respect to this deposition transcript.
9  It's simply to make clear that counsel in MDL has
10  agreed to be bound by the protective orders in the
11  cases for which this deposition has been noticed.
12      I am going to hand the court reporter now
13  the agreement signed by counsel for the MDL in
14  Stetser as Hodgson Exhibit 1A and Walker as Hodgson
15  Exhibit 1B.
16      (Whereupon, Hodgson Deposition
17          Exhibit Nos. 1A-1B were marked for
18          identification as of 2/19/04.)
19      MR. PORCELLI: Mr. Haviland, now that the
20  preliminaries are out of the way, and it appears
21  this deposition will be going forward in both the
22  Walker and the Stetser cases, I would like to
23  restate that I am here on behalf of Takeda in the
24  Walker case only, pursuant to the North Carolina

15

1  Appellate Court's February 3rd ruling in the
2  Stetser case.
3      MR. HAVILAND: I don't know that that requires
4  a response of plaintiff's counsel. Counsel is here
5  appearing in one case. What is happening in
6  Stetser in the Appellate Courts is happening in
7  Stetser in the Appellate Courts.
8      Any other preliminaries? Okay.
9          Thomas Hodgson,
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12          EXAMINATION
13  BY MR. HAVILAND:
14      Q. Mr. Hodgson, my name is Don Haviland. I
15  am counsel for the plaintiff in the class in a case
16  that's been certified as a national class action in
17  North Carolina State Court.
18      I am also counsel for plaintiffs in a
19  class that's been certified in New Jersey State
20  Court.
21      I would like you to start by please
22  telling the court reporter and the jury in this
23  case your full name.
24      A. Thomas R. Hodgson.

16

1      Q. Can you tell me where you presently live,
2  sir.
3      A. 1015 Ashley Road, Lake Forest, Illinois.
4      Q. And, for how long have you lived in
5  Lake Forest, Illinois?
6      A. Approximately, I would say about 25 years.
7      Q. And, you understand that you're appearing
8  today to give deposition testimony in the two cases
9  I referenced?
10      A. I do.
11      Q. Do you also understand that you're
12  appearing today not only in your individual
13  capacity, but also as a corporate designee on
14  behalf of Abbott Laboratories?
15      A. Yes.
16      Q. Okay. Can you tell me when you first
17  learned that you would be appearing today as a
18  corporate designee on behalf of Abbott?
19      A. Specifically this date or generally?
20      Q. Just generally.
21      A. I think I was aware of it some time last
22  year.
23      Q. All right. Can you tell me what your
24  understanding was then in terms of what role you

17

1  would be playing on behalf of Abbott at the
2  deposition today?
3      A. I didn't have a very clear understanding
4  at that point. I do now.
5      Q. Okay. Could you tell me what your
6  understanding is today?
7      A. My understanding today is that there are
8  certain points that were raised, and I am to cover
9  those points.
10      Q. Okay. Could you tell me what those points
11  are as you know them today?
12      A. Basically, Abbott's relationship to TAP,
13  the various business practices of TAP, and Abbott's
14  knowledge of those previous practices.
15      Q. Anything else?
16      A. That's, basically, my understanding.
17  There may be more points, but my overall
18  understanding is that I am to testify relative to
19  Abbott's relationship to TAP.
20      Q. Okay. And, can you tell me in greater
21  detail what your understanding of what the
22  testimony is you can provide today with respect to
23  that topic?
24      MS. RUSSO: Objection, form.

ABT-DOJ 0297314
Highly Confidential

57 (Pages 222 to 225)

222

1  these tactical elements.
2  Q.  One of the subjects you have been asked to
3  testify on behalf of Abbott, too, has to deal with
4  marketing and sales programs, and so I just want to
5  explore the depth of your knowledge.
6  A.  No, I understand.
7  Q.  And beyond any --
8  A.  And, I didn't have a lot of knowledge, and
9  if I didn't have the knowledge, nobody would have
10  the knowledge, because I was closest to it.  The
11  fact of the matter was this was an independent
12  company.  Abbott was not involved in the detail
13  nitty-gritty operations of this company.
14  Q.  Did -- do you recall if at any time at a
15  board meeting did anyone from TAP present
16  specifically on issues relating to educating
17  doctors about the business aspects of Lupron?
18  A.  I don't remember the specifics.
19  Q.  In general, prior to board meetings, did
20  you receive any documents from anyone at TAP to
21  prepare for the board meetings?
22  A.  No, but I, as I said, because typically we
23  were heavily involved in the plan and update
24  process, I had a pretty good understanding of the

223

1  overall operation and what was going to be proposed
2  in terms of plans, financials and so forth.
3  Q.  Okay.  So, you had some knowledge going in
4  what was going to be discussed?
5  A.  I did because of my interface role as did
6  Kunio Takeda.
7  Q.  Okay.  So, there were no periodic
8  documents, to your knowledge, prepared for
9  Mr. Burnham, Mr. Konishi, and others at the board
10  in advance of board meetings?
11  A.  I don't recall any.  In -- in specific
12  situations where, for example, the Syntex patent
13  buyout issue, that wasn't handled within the
14  context of a board meeting, because we typically
15  only met once or twice a year.  And, Burnham and
16  Konishi or Morita would have been briefed by myself
17  and Kunio Takeda respectively on those issues.
18       (Whereupon, Hodgson Deposition
19       Exhibit No. 21 was marked for
20       identification as of 2/19/04.)
21  BY MR. HAVILAND:
22  Q.  Mr. Hodgson, I am showing you what I've
23  marked as Hodgson Exhibit 21, the minutes of the
24  meeting of the board of directors of TAP for

224

1  July 11, 1994.
2       Do you see in the first paragraph you're
3  listed as an attendee?  And, do you have any reason
4  to believe you're not at this meeting?
5  A.  No, I know I was at this meeting.
6  Q.  Okay.  How do you know you were at this
7  one?
8  A.  Because I remember playing golf with
9  Mr. Morita.
10  Q.  Did you play skins?
11  A.  No, but he took nine shots to get out of
12  the sand trap.
13  Q.  That Pebble Beach course was a hard one,
14  huh?
15  A.  I said use your hand wedge, pal.  Let's
16  move on.
17  Q.  Mr. Hasegawa now as the president
18  conducted the agenda of the meeting, and in the
19  fourth paragraph he indicates that he outlined what
20  he deemed critical factors for 1994, 1995.  And,
21  then, he says, prepare a contingency plan for
22  Lupron depot 7.5 milligram in the face of changes
23  to the Medicare program.
24       Do you have any recollection as to what,

225

1  in light of the fact that Pebble Beach comes to
2  mind, whether or not you recall what the Medicare
3  changes or the contingency plan were that
4  Mr. Hasegawa described?
5  A.  Well, this says prepare contingency plan,
6  so I don't know if one actually was prepared or
7  not.  But I think at this point in time, roughly,
8  we had Hillary Clinton doing her thing in terms of
9  reformation of the entire health care system.  And,
10  I think at the same time there was some discussions
11  and analyses under way at HCFA relative to
12  reimbursement and alternate forms of reimbursement
13  of drugs prescribed in physician offices.
14  Q.  Do you recall that HCFA was looking at the
15  alternative of reimbursing on straight acquisition
16  cost at that time?
17  A.  I think that was one option.  Another
18  option was steeper discount off AWP, and there were
19  probably three or four other options that I don't
20  recall or maybe nobody knows about.
21  Q.  Do you recall what was discussed with TAP
22  either between TAP and the board or TAP and you
23  specifically in this time frame with respect to
24  what TAP should do to prepare for those eventual

REPORTING ASSOCIATES, LLC 1-888-795-2323

ABT-DOJ 0297365
Highly Confidential

64 (Pages 250 to 253)

**250**

1    A.  No.  I didn't get into this kind of
2  detail.
3    Q.  Did you know that TAP had engaged a
4  company to assist it on reimbursement issues with
5  physicians?
6    MS. RUSSO:  Objection, form.
7    THE WITNESS:  On reimbursement issues with
8  physicians?  To represent it vis-a-vis whom?
9  BY MR. HAVILAND:
10    Q.  Well, I was looking on the document for --
11  I think there was a page missing.
12    Did you ever hear of a company called
13  Rescon Reimbursement Consultants?
14    A.  No.
15    Q.  Did you know that TAP had a -- did you
16  ever hear of a company called discovery
17  international?
18    A.  No.
19    Q.  Did you know that TAP had engaged either
20  of those companies to work with TAP on these
21  consultant programs?
22    A.  No.
23    MS. RUSSO:  Object to the form.
24    (Whereupon, Hodgson Deposition

**251**

1    Exhibit No. 27 was marked for
2    identification as of 2/19/04.)
3  BY MR. HAVILAND:
4    Q.  Mr. Hodgson, I am showing you what I
5  marked as Hodgson Exhibit 27, memorandum dated
6  September 6, 1995, from Mr. Alan MacKenzie to
7  Yasu Hasegawa and Mr. Patton.
8    You're not listed as a recipient, but in
9  the first paragraph, after the subject, it says,
10  HCFA reimbursement update and current action plans.
11    Mr. MacKenzie writes, Yasu, per our recent
12  discussion, I wanted to update you, Tom Hodgson,
13  and Kunio Takeda on the current status of any
14  threats to Medicare reimbursement policy for Lupron
15  depot.
16    Let me first ask you, do you recall in
17  1995 having a discussion with Mr. Takeda and/or
18  Mr. Hasegawa about reimbursement?
19    A.  No.
20    Q.  All right.  Mr. MacKenzie sets forth here,
21  he says, I wanted to review our direct consumer
22  campaign we are piloting in response to the
23  changing reimbursement landscape.  And, then, he
24  goes on to say, first a review of the threats.

**252**

1    Do you know why it is Mr. MacKenzie deemed
2  changes in Medicare reimbursement a threat to TAP?
3    MR. BUCHMAN:  Object to the form.
4    THE WITNESS:  I don't know specifically what
5  was in his mind.  Obviously, any time you have
6  something as significant as reimbursement changes,
7  marketing and salespeople are concerned.
8  BY MR. HAVILAND:
9    Q.  In the memorandum, he talks about the HCFA
10  enforcing OBRA 89 estimated acquisition cost policy
11  for drugs paid by Medicare.  And, he reports, the
12  current status is health care finance
13  administration, HCFA, and the office of management
14  and budget, OMB, are having difficulty agreeing on
15  survey methodology to establish estimated
16  acquisition cost.
17    Skip down.  He says, for the short term
18  '95 and '96, AWP reimbursement seems safe.
19    Did you know then or do you know now that
20  the HCFA, H-C-F-A, and OMB, were attempting to
21  survey acquisition costs of physicians for Lupron?
22    A.  I knew that, as we discussed earlier, that
23  HCFA was considering a number of alternatives to
24  AWP reimbursement.  In terms of how they were

**253**

1  actually pursuing that, I wasn't aware, other than,
2  obviously, I got this memo or I was briefed on it.
3  So, at that time, I was, obviously, aware that they
4  were doing a survey.
5    Q.  Do you know what the results of the survey
6  were, or do you know if, in fact, the survey was
7  actually concluded?
8    A.  I don't know.
9    Q.  Did you ever have occasion to speak to
10  anyone at the American Urological Association?
11    A.  No.  Oh, you mean a representative of --
12    Q.  Yes.
13    A.  -- the association?
14    No, not that I know of.  I have met a few
15  doctors, but I don't think they were members.  I
16  don't think they were in the executive management
17  of the AUA.  That's what you really mean, right?
18    Q.  Yes.
19    A.  People employed by the trade association.
20    Q.  Correct.
21    A.  Yes.  Not to my knowledge.
22    Q.  Did you know that TAP individuals had
23  contacts with individuals at AUA?
24    A.  Yes, because that would have been part of

ABT-DOJ 0297372
Highly Confidential

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 11

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
**February 20, 2004**

---

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3  ----------------------------

4  IN RE:       : MDL No. 1430
    LUPRON MARKETING AND SALES  :

5  PRACTICES LITIGATION  :  Master File No.
         : 01-CV-10861

6  THIS DOCUMENT RELATES TO  :
    ALL ACTIONS      : Judge

7           : Richard Stearns

8  ----------------------------

9      CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

11     VIDEOTAPED 30(b)(6) DEPOSITION of Abbott

12  Laboratories through its representative THOMAS

13  RICHARD HODGSON, taken in the hereinbefore-

14  entitled action, taken before Rebecca L.

15  Stonerock, at the Deerpath Inn, Windsor Hall II,

16  255 East Illinois Road, Lake Forest, Illinois,

17  on February 20, 2004, commencing at 8:10 a.m.

18  pursuant to notice.

19

20          * * *

21

22      JOSEPH ALBANESE & ASSOCIATES
        Certified Shorthand Reporters

23          805 Main Street
        Toms River, New Jersey 08753

24

25        Telephone (732) 244-5100
          Fax (732) 286-6318

---

**Page 2**

1  A P P E A R A N C E S :

2  SPECTOR, ROSEMAN & KODROFF
    1818 Market Street, Suite 2500

3  Philadelphia, Pennsylvania 19103
    BY: JOHN A. MACORETTA

4  Attorneys for Plaintiffs

5  HAGENS BERMAN
    225 Franklin Street, 26th Floor

6  Boston, Massachusetts 02210
    BY: EDWARD NOTARGIACOMO

7  Attorneys for Plaintiffs

8  McDERMOTT, WILL & EMERY
    227 West Monroe Street

9  Chicago, Illinois 60606-5096
    BY: JOSHUA T. BUCHMAN

10  Attorneys for Defendant
    Abbott Laboratories

11

12  ABBOTT LABORATORIES
    Department 324, Building AP6D

13  100 Abbott Park Road
    Abbott Park, Illinois 60064-3500

14  BY: CATHERINE McCAIN
    In-House Counsel for Abbott Laboratories

15  JONES, DAY, REAVIS & POGUE
    77 West Wacker Drive

16  Chicago, Illinois 60601-1692
    BY: LEE ANN RUSSO

17  Attorneys for Defendants TAP
    Pharmaceutical Products, Inc.

18

19  JENNER & BLOCK
    One IBM Plaza

20  Chicago, Illinois 60611-7603
    BY: ANTHONY C. PORCELLI

21  Attorneys for Defendants Takeda
    Chemical Industries Limited and
    Takeda America Holdings, Inc.

22

23  WINSTON & STRAWN
    35 West Wacker Drive

24  Chicago, Illinois 60601-9703
    BY: ROBERT L. MICHELS

25  Attorneys for Witness Thomas Hodgson

---

**Page 3**

1  APPEARANCES (Continued)

2

3    Also Present:

4      John D'Andrea, Videotape Specialist

5          * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4**

1           I N D E X

2  NAME OF WITNESS  DIRECT CROSS REDIR RECRO

3  THOMAS RICHARD HODGSON

4    by Mr. Macoretta    9

5

6          HODGSON EXHIBITS

7  No.    Description        Page

8  1  Notice of Rule 30(b)(6) Deposition    20

9  2  Bates Nos. TAP 2045698 - 709     30

10  3  Bates Nos. TAP 1047928 - 931     42

11  4  Bates Nos. TAP 2013907 - 912     56

12  5  Bates Nos. TAP 2007748        70

13  6  Bates Nos. TAP 2007910 - 812     72

14  7  Bates Nos. TAP 1003798 - 801     74

15  8  Bates Nos. TCI 001934 - 936      77

16  9  Bates Nos. TAP 2016812       82

17  10  Bates Nos. TAP 00045096      83

18  11  Bates Nos. TAP 2012062     109

19  12  Bates Nos. TAP 2086248 - 250   112

20  13  Bates Nos. TAP 2066854 - 855   123

21  14  Bates Nos. TCI 001420 - 423    127

22  15  Bates Nos. TAP 8003431 - 434, 8003421  141

23  16  Bates Nos. TAP 00063741 - 742   144

24  17  Bates Nos. TAP 2011336 - 352   149

25  18  Bates Nos. ABT 02903 - 919    152

---

ABT-DOJ 0297453
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
**February 20, 2004**

---

**13**

1  Q   Okay. You've heard the term
2  "average wholesale price" in connection with
3  drug pricing?
4  A   Yes.
5  Q   Could you tell me what you
6  understand that term to mean?
7  A   It's the definition that is developed by
8  the Red Book based on inputs from pharmaceutical
9  companies.
10  Q   Okay. What is that definition?
11  Do you know?
12  A   It's a markup on the wholesaler
13  acquisition price or cost.
14  Q   And what is -- could you tell me
15  what "wholesaler acquisition cost" means?
16  A   It's the average price that the
17  wholesaler would pay to the pharmaceutical
18  company.
19  Q   To purchase the drug in question?
20  A   To purchase the drug in question.
21  Q   Now, that definition that you just
22  gave me of AWP, was that the definition that was
23  used by TAP when discussing AWP?
24  A   I don't know what definition they used.
25  I didn't get into that degree of detail with

**14**

1  them.
2  Q   Okay. How about Abbott? Did
3  Abbott have some definition of AWP?
4  A   I wasn't aware of any particular
5  definition of it.
6  Q   Well, an AWP was published for
7  Abbott drugs as well, correct?
8  A   That's correct.
9  Q   Okay. Do you have any knowledge
10  as to how Red Book creates -- or calculates AWP?
11  A   Broadstroke-wise I do. Basically they
12  take the wholesaler acquisition cost and mark it
13  up by a percentage.
14  Q   Do you know how that percentage is
15  chosen for the markup?
16  A   No, I don't.
17  Q   Okay. Do you know if that
18  percentage is given to Red Book by the
19  pharmaceutical company?
20  A   I don't believe it is, but I'm not
21  familiar or in any way conversant with what the
22  Red Book does.
23  Q   Okay. And when we say "Red Book,"
24  that's one of several industry compendia that
25  publishes an AWP; is that correct?

**15**

1  A   It's -- it's one. I don't know if there
2  are others that publish it or not. That's the
3  one I'm familiar with.
4  Q   Okay. And you would agree that
5  AWP is used as a basis for reimbursement by
6  certain private insurers, wouldn't you?
7  A   Yes.
8      MS. RUSSO:  Objection, form.
9  Q   And you'd agree that AWP is used
10  as a basis for reimbursement by Medicare as
11  well, wouldn't you?
12  A   Yes.
13  Q   What -- what do you understand the
14  term "list price" to mean?
15  A   In what context?
16  Q   In the context of a list price for
17  Lupron.
18  A   I didn't use that terminology.
19  Q   Okay. How about the term "direct
20  price"? Have you ever heard that terminology?
21  A   No.
22  Q   Did TAP have something equivalent
23  to a list price for Lupron?
24      MR. BUCHMAN:  Object to the form.
25  A   I believe they had a wholesaler

**16**

1  acquisition cost type of price.
2  Q   How did TAP calculate the
3  wholesaler acquisition cost for Lupron?
4  A   I don't know.
5      MS. RUSSO:  Objection, form.
6  A   I didn't get into those details.
7  Q   But that's -- we can agree that
8  that's a number that TAP would generate
9  internally, correct?
10  A   Correct.
11  Q   Okay. How was wholesale
12  acquisition price calculated for drugs by
13  Abbott?
14      MR. BUCHMAN:  Object. Object to
15  this witness testifying as to drugs other than
16  Lupron.
17  Q   You can answer the question.
18  A   I don't know because I didn't get into
19  that degree of detail. That kind of detail was
20  multiple levels of staff below where I operated.
21  Q   So you don't know if there was a
22  companywide policy or formula for how WAC is
23  going to be calculated at Abbott?
24  A   I don't know if there was a company-wide
25  formula, no.

---

ALBANESE & ASSOCIATES          732-244-6100          (4) Page 13 to Page 16

ABT-DOJ 0297456
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

Thomas Richard Hodgson
February 20, 2004

97

1        MR. BUCHMAN: Objection.
2    A    I don't believe that the economics of the
3  proposition were the driving force for the --
4  for the product marketing strategy. I think
5  that the critical aspect of Lupron was that it
6  was a very innovative product and it provided
7  the physician with a form of therapy which was
8  truly a breakthrough.
9        Q    And when we say -- and when you
10  say "the economics," you're talking about the
11  economics to the physician?
12    A    Yes.
13        Q    Okay. And when you don't say --
14  when you say you don't believe that was a
15  driving force, you're talking about from
16  whenever the one-month came on up through the
17  present?
18        MS. RUSSO: Objection to form.
19    A    I -- I believe physicians make judgments
20  relative to therapy based on what's in the best
21  interests of the patient. I think that's their
22  primary focus.
23        Q    Okay. Would you agree with me
24  that at certain points one of the ways TAP
25  marketed to Lupron -- marketed Lupron to

98

1  physicians was by demonstrating to the
2  physicians how much money they could make by
3  prescribing Lupron?
4        MS. RUSSO: Objection, form.
5    A    I don't think that was a stress of their
6  marketing effort. I think that as part of their
7  dialogue with the physician relative to the
8  reimbursement process, the subject of economics
9  may or may not have come up. And in that
10  context they would have dealt with it.
11        Q    Okay. So you would agree that --
12  all right. I understand that it wasn't the
13  thrust of the marketing effort and I'm not
14  asking you what percentage of marketing related
15  to one or the other. I'm asking you did TAP
16  ever, to your knowledge, make any efforts to
17  market Lupron based on profit to the physicians.
18    A    Not based on profit to physicians. As I
19  said, there was a business aspect to it that
20  they would discuss with the physician. They
21  would point out to the physician, if they asked,
22  what the economics were.
23        I don't think that was the principal
24  thrust. I think the principal thrust, as I said
25  before, was, number one, creating awareness in

99

1  the medical community of prostate cancer and the
2  ways to diagnose it, and number two, to -- to
3  recommend Lupron as an innovative therapy. I
4  think the business aspects were secondary to
5  most physicians. Perhaps not all.
6        Q    Okay. So do you know if TAP made
7  marketing materials available to the sales
8  representatives that talked about the business
9  aspects of Lupron?
10    A    I know that at one point in time that the
11  TAP representatives had computers -- laptop
12  computers and computer systems that would show
13  the economic aspects of the physician
14  prescribing the drug.
15        Q    Okay. And that was a computer
16  program created by somebody at TAP or for TAP,
17  correct?
18    A    Yes.
19        Q    Okay. So at least in that
20  instance TAP made an effort to market Lupron by
21  talking about how much money the physician could
22  make?
23        MR. BUCHMAN: Objection to the
24  form of the question.
25    A    Well, you keep talking about marketing

100

1  and I keep trying to direct you to what I think
2  the principal thrust of the marketing was. That
3  was an element of it, but I don't think it was a
4  major element.
5        Q    I understand that.
6    A    Okay.
7        Q    And by the way, so we get to -- to
8  terminology, would you agree with me that --
9  well, let me try it this way: The term "return
10  to practice," what do you understand that to
11  mean?
12    A    I understand it to mean contribution to
13  the overhead of a physician's practice.
14        Q    How about the spread on Lupron?
15  What do you understand that to mean?
16    A    I understand that to mean the difference
17  between the acquisition cost or price to the
18  physician and what he was reimbursed.
19        Q    Okay. And understanding that you
20  don't think that this was a thrust of the
21  marketing effort, when TAP made any marketing
22  effort to talk about profit to the physician, is
23  that referred to internally as "marketing the
24  spread"?
25        MR. BUCHMAN: Object to the form

ABT-DOJ 0297477
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

Thomas Richard Hodgson
February 20, 2004

---

**225**

1 call the "spread," what you would call
2 "contribution to overhead" --
3 A   Uh-huh.
4       Q   -- and I think we agreed
5 earlier -- tell me if I'm wrong -- that what
6 we're talking about is the difference between
7 what a physician pays for the drug and the
8 amount he is reimbursed for the drug.
9 A   Yes.
10       Q   Okay. And as to Lupron, would you
11 agree that TAP could make that amount bigger by
12 reducing the amount it charges the physician for
13 the drug?
14             MS. RUSSO: Objection, form.
15 A   By reducing their price.
16       Q   Yes.
17 A   Yes.
18       Q   Okay. Either directly or through
19 some form of discount or rebate?
20 A   Yes.
21       Q   Okay. That's regardless -- and
22 TAP could do that, could lower the bottom half
23 of what we're calling -- what I'll call your
24 contribution to overhead, TAP could lower the
25 bottom half in that irrespective of what

---

**226**

1 happened to the top number, right? I mean,
2 regardless of whether or not the top number,
3 meaning the reimbursement, goes up, down or
4 stays the same, TAP had the ability to lower the
5 bottom half?
6             MR. BUCHMAN: Object to form.
7 A   Through the -- the ways that we
8 discussed.
9       Q   Let me show you -- I want to chat
10 with you for a few minutes about some of the
11 Board of Directors minutes. I'm going to
12 start -- we'll mark this number 35. I'm going
13 to start with the -- I'm going to start with the
14 October 15, '91 Board of Directors minutes.
15             (Discussion off the record.)
16       (HODGSON Exhibit Number 35 was marked for
17 identification.)
18       Q   Now, at this time, October '91,
19 the board was meeting twice a year, do you
20 recollect, or --
21 A   I believe they were.
22             MR. BUCHMAN: What did you mark
23 this, 35?
24             MR. MACORETTA: Yes.
25       Q   And I'm looking at the third --

---

**227**

1 this says you were at the meeting?
2 A   Yes.
3       Q   Have no reason to think that's
4 wrong, right?
5 A   Right.
6       Q   Okay. I'm looking at the,
7 "Mr. Pietraszek presented" -- third paragraph,
8 "Mr. Pietraszek presented his Executive
9 Overview," "cited 1991 TAP highlights and TAP's
10 1992 challenges." There's a list of challenges.
11 The next-to-last line says, "expansion of
12 patient reimbursement program." What does that
13 mean?
14 A   I don't know. I think it's a typo.
15       Q   Which part's the typo?
16 A   We weren't reimbursing patients.
17       Q   I didn't think so. So you think
18 that should say, "physician reimbursement
19 program"?
20 A   And I -- I don't -- I really don't know
21 what it is because we didn't reimburse
22 physicians either. So I think that whoever
23 wrote this was confused and I have no idea what
24 this really means.
25       Q   I'll give you a chance to take

---

**228**

1 that back when we turn to the last page and we
2 see Maureen McShane is the secretary who wrote
3 the minutes.
4 A   Well, she could have been confused.
5       Q   Okay.
6 A   Because I don't know what it means.
7 Patient reimbursement, clearly patients weren't
8 being reimbursed. And we weren't reimbursing
9 anybody. So --
10       Q   Okay. And obviously had somebody
11 stood up at the Board of Directors meeting and
12 talked about patient reimbursement, you would
13 have said, "What are you talking about?"
14 A   Exactly. Now, I can speculate what --
15 what was really being discussed here.
16       Q   I understand you're speculating,
17 but go ahead.
18 A   I think he was really talking about
19 expansion of the program whereby we assisted
20 physicians in working their way through the
21 laborious process of -- of obtaining
22 reimbursement. That's what I think this means.
23 Because it clearly doesn't mean what the words
24 say.
25       Q   Okay. And that was an effort that

---

ALBANESE & ASSOCIATES                 732-244-6100                 (57) Page 225 to Page 228

ABT-DOJ 0297509
Highly Confidential