# ATTACHMENT F

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.,* | ) | |
| No. 06-CV-11337-PBS | ) | |

**MOTION FOR A PROTECTIVE ORDER RELATING TO THE
PROPOSED DEPOSITION OF RICHARD A. GONZALEZ**

Plaintiff United States of America has notified Abbott that it wishes to conduct the

deposition of Richard A. Gonzalez, Abbott's recently-retired President and Chief Operating

Officer. (*See* Declaration of Richard A. Gonzalez, Ex. A, at ¶ 1; *see also* Declaration of Jason G.

Winchester, Ex. B, at ¶ 2.) Until his retirement a few days ago, Mr. Gonzalez was the second

highest ranking corporate officer of Abbott. As such, Mr. Gonzalez is considered an "apex"

witness, and ought only be subject to deposition if the Government first (i) demonstrates that he

has "unique personal knowledge" of an issue relevant to this litigation; and (ii) attempts first to

obtain any such information through less-intrusive methods of discovery. As discussed below,

the Government cannot satisfy either prong of this standard. Under Federal Rule of Civil

Procedure 26(c), the Court is entitled to, and should, enter a protective order barring the

proposed deposition of Mr. Gonzalez.

**FACTUAL BACKGROUND**

In this action, the Government alleges that, from January 1, 1991, to January 2001,

Abbott reported inflated drug prices for four drugs that were marketed by Abbott's former

Hospital Products Division (dextrose solutions, sodium chloride solutions, sterile water, and

Vancomycin), in an effort to create a profit spread for customers, who would be reimbursed by

Medicare and Medicaid for more than what they actually paid for the drugs.  (*See* Complaint.)[1]

The Government has served extensive written discovery, and it has deposed and/or requested the

depositions of a host of Abbott employees who were directly involved in matters such as drug

pricing, price reporting to various outside entities (including the federal and state governments

and third-party publishing compendia), product marketing, product sales, and other issues

relevant to this case.

Not content simply to depose the persons who were directly involved in (and therefore

have the greatest knowledge about) these issues, however, the Government has lately turned its

attention to seeking the depositions of Abbott's top corporate officers.  From Abbott's

perspective, this strategy is designed much more to "turn the heat up" on Abbott than to serve

any legitimate need for fact investigation – a fact made manifest by the Government's refusal to

narrow the subject matter of these apex depositions in any way.  Yet, the controlling law

recognizes that senior corporate officials are particularly susceptible to, and entitled to protection

from, such harassment.  *E.g.*, *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. R.I. 1985).

Heeding this precedent, the Court recently considered and denied the Government's request to

depose Abbott CEO Miles White, finding that the parties' respective interests could be better

served by the submission of three, narrowly-focused questions to Mr. White in writing.

Undeterred, the Government has sought the deposition of a host of other current and former

Abbott senior executives, including:

♦       Cathy Babington – Current Vice President of Public Affairs

---

[1] The Government has sought to add allegations relating to a fifth drug – acyclovir (also an HPD product) – in its First Amended Complaint.  Abbott has moved to dismiss that complaint, however, and that motion is presently pending before Judge Saris.  (Dkt. Nos. 4469, 4470.)

- ◆    Duane Burnham – Former CEO and Chairman of the Board of Directors

- ◆    Richard Gonzalez – Former President and COO

- ◆    Rosemary Haas – Senior Director, Federal Government Affairs

- ◆    Thomas Hodgson – Former President and COO

- ◆    Peter Karas – Former HPD Divisional Vice President of Sales

- ◆    David Landsidle – Former Divisional Vice President, Government Affairs

- ◆    Loreen Mershimer – Current Vice President of Integrated Health Care Marketing

- ◆    Donald Robertson – Former Vice President of the Alternate Site business unit in HPD

- ◆    Cynthia Sensibaugh – Senior Director, Federal Government Affairs

Abbott has not taken the position that no corporate executive should ever be deposed. To the contrary, where it is apparent that such persons may have been directly involved in, or have directly supervised, matters that are potentially relevant to this litigation, Abbott has agreed to make them available for deposition – despite the substantial inconvenience that such depositions entail for the witnesses and the organization. For example, Abbott has agreed to the depositions of Ms. Babington, Ms. Mershimer, Ms. Haas, Ms. Sensibaugh, and Messrs. Karas, Robertson, and Landsidle.

Abbott cannot agree, however, to the Government's request as to Mr. Gonzalez.[2] Abbott met and conferred with the Government on July 17, July 27, and August 8 regarding these depositions. During these discussions, the Government had a full opportunity (several, in fact) to articulate why, consistent with the apex standards, Mr. Gonzalez should be deposed. As discussed below, the Government's proffered reasons, individually or collectively, are not

---

[2] Abbott has separately moved for a protective order as to Messrs. Burnham and Hodgson as well. (Dkt. No. 4692.)

enough to clear the high bar that the law sets for apex depositions.  The Government's request should therefore be denied.

## ARGUMENT

Federal Rule of Civil Procedure 26(b)(2)(C) gives courts the discretion to prevent discovery that "is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive."  Courts have been especially willing to apply this rule when parties involved in litigation against a large corporation demand the deposition of the opponent's senior corporate officers – commonly referred to as "apex" depositions.  *See, e.g., Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 126 (Tex. 1995); *Evans v. Allstate Ins. Co.*, 216 F.R.D. 515, 518 (N.D. Okla. 2003).  A top corporate official is "a singularly unique and important individual who can be easily subjected to unwarranted harassment and abuse."  *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D. R.I. 1985).  In light of the "tremendous potential for discovery abuse and harassment," *Liberty Mutual Ins. Co. v. Superior Ct. of San Mateo County*, 10 Cal. App. 4th 1282, 1287 (1st Dist. 1992), both state and federal courts have long disfavored such depositions.  *See Baine v. General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991).  Indeed, it has been said that "courts have a duty to recognize [the] vulnerability" of such persons to harassment, and to protect them from it. *Mulvey*, 106 F.R.D. at 366; *see also Consol. Rail Corp. v. Primary Coal, Inc.*, 1993 WL 364471 at *1 (S.D.N.Y. Sept. 10, 1993) ("permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation").  This same protection also applies to retired executives. *See, e.g., WebSideStory, Inc. v. NetRatings, Inc.*, 2007 U.S. Dist. LEXIS 20481, 11-12 (D. Cal. 2007); *In re Ski Train Fire of November 11, 2000 Kaprun Aus.*, 2006 U.S. Dist. LEXIS 29987, 29 (D.N.Y. 2006).

In order to justify the deposition of high-ranking corporate executives, like Mr. Gonzalez, the party seeking the deposition has to overcome two major hurdles. *First,* the party must show that the executive in question has "unique personal knowledge" of an issue relevant to the case. *See, e.g., Thomas v. Int'l Bus. Mach.,* 48 F.3d 478, 483 (10th Cir. 1995) (protective order proper where plaintiff "made no attempt to demonstrate that the information she seeks to obtain from [the executive] could not be gathered from other IBM personnel, for whom a deposition might have been less burdensome"); *Evans,* 216 F.R.D. at 518 (denying depositions of three high-level executives of Allstate because "the information can . . . be obtained from other sources without deposing these 'apex' officers"); *Baine,* 141 F.R.D. at 334 (denying deposition of GM vice president, noting that "when a party seeks to depose high-level decisionmakers who are removed from the daily subjects of the litigation, the party much first demonstrate that the would-be deponent has 'unique personal knowledge' of the matter in issue."); *M.A. Porazzi Co. v. The Mormaclark,* 16 F.R.D. 383, 383 (S.D.N.Y. 1951) (denying deposition of vice president because the same information could be gained from a lower-level employee); *Cardenas v. The Prudential Ins. Co. of Am.,* 2003 WL 21293757 at *2 (D. Minn. May 16, 2003) (denying depositions of several Prudential executives, finding that the plaintiffs had not shown that the executives "possess any information that could not be obtained from lower-level employees or other sources, much less that their knowledge of plaintiffs' allegations is 'unique.'"); *Consol. Rail Corp.,* 1993 WL 364471 at *1 (deferring depositions of three executives until "it has been demonstrated that they have some unique knowledge pertinent to the issues in these cases."); *In re Alcatel USA, Inc.,* 11 S.W.3d 173, 179 (Tex. 2000) (trial court abused its discretion by allowing depositions of two Samsung executives, in part because they had no unique knowledge); *Liberty Mutual,* 10 Cal. App. 4th at 1289 ("when a plaintiff seeks to depose a

corporate president . . . the trial court should first determine whether the plaintiff has shown good cause that the official has unique or superior personal knowledge of discoverable information.").

  *Second,* courts have insisted that all avenues of less-burdensome discovery, such as written interrogatories and depositions of more easily-accessible witnesses who might be able to reveal the same information, be exhausted before allowing a high-level executive to be deposed. *See, e.g.,* FED. R. CIV. P. 26(b)(2)(C) (giving courts discretion to prevent discovery that "is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive."); *In re Ski Train Fire of November 11, 2000 Kaprun Aus.,* 2006 U.S. Dist. LEXIS 29987, 29 (D.N.Y. 2006) (directing plaintiff to submit interrogatories or pursue a 30(b)(6) witness in lieu of deposing the former CEO of defendant's subsidiary); *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 682 (7th Cir. 2002) (noting that "failure to take advantage of [an] inexpensive, convenient method of discovery, *i.e.* interrogatories, casts serious doubt over [the] claim that [the executive] possessed information that was more than marginally relevant to [the] civil action."); *Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir. 1979) (deposition of Upjohn president properly barred where plaintiff had not first taken depositions of lower-level employees who could provide the same information); *Stone v. Morton Int'l,* 170 F.R.D. 498, 504 (D. Utah 1997) (requiring 30(b)(6) deposition and exhaustion of other discovery methods before corporate officer could be deposed); *Mulvey,* 106 F.R.D. at 366 (quashing deposition notice of CEO because less intrusive discovery methods should be pursued first); *In re Alcatel USA, Inc.,* 11 S.W.3d at 180-81 (holding that trial court abused its discretion by allowing deposition of two Samsung apex executives in part because Plaintiff had been given opportunity to depose other employees who arguably possess the same information and had declined); *Liberty Mutual,* 10 Cal. App. 4th at 1287 ("We conclude it

amounts to an abuse of discretion to withhold a protective order when a plaintiff seeks to depose a corporate president . . . absent exhaustion of less intrusive discovery methods.").

The result should be no different here. Mr. Gonzalez retired just a few days ago, after a long and distinguished career. The Government has not made and cannot make any showing that Mr. Gonzalez has unique personal knowledge of any issue relevant to this case. As important, the Government has made no effort to exhaust fully other, less intrusive, means to discover any relevant information, such as deposing other Abbott employees or serving written discovery (as this Court directed with respect to Mr. White). Failing both prongs of the applicable legal standard, the Government's request to depose Mr. Gonzalez must be denied.

I.      **PLAINTIFFS HAVE MADE NO SHOWING THAT MR. GONZALEZ HAS "UNIQUE PERSONAL KNOWLEDGE" OF ANY TOPIC RELEVANT TO THE CASE**

The "unique and personal knowledge" standard cannot be satisfied merely by asserting that the executive might have some knowledge of relevant information. "If 'some knowledge' were enough, the apex deposition guidelines would be meaningless; they would be virtually indistinguishable from the scope of general discovery." *In re Alcatel USA, Inc.*, 11 S.W.3d at 179; *see also Baine v. General Motors Corp.*, 141 F.R.D. at 334; *Consol. Rail Corp.*, 1993 WL 364471 at *1. Although the "unique personal knowledge" standard is not rigidly defined, in order to have any meaning at all, "there must be some showing beyond mere relevance, such as evidence that a high-level executive is the *only* person with personal knowledge of the information sought or that the executive arguably possesses relevant knowledge greater in quality or quantity than other available sources." *Alcatel*, 11 S.W.3d at 179 (emphasis added). The Government cannot make that showing here.

### 1.    Receipt of a Document Preservation Memorandum

Plaintiffs have suggested that they should be allowed to depose Mr. Gonzalez because he was copied on a document preservation memorandum from Abbott's in-house counsel. (*See* Ex. B at ¶ 6.) The document preservation memo in question was distributed to more than 70 people within Abbott, including Mr. Gonzalez, Abbott CEO Miles White, and Abbott's General Counsel, Jose deLasa. (*See* Ex. C.) The Government's contention that it can show that Mr. Gonzalez has "unique and personal" knowledge of any matter relevant to this litigation because he was one of about 70 people at Abbott who were copied on a litigation hold memorandum is ridiculous on its face. If the Government really wants to know about Mr. Gonzalez's compliance with this document preservation notice, it surely can seek this information through some means (such as written discovery) that is far less burdensome than a deposition.

### 2.    Knowledge About Pricing of HPD Products

The Government's remaining justifications for deposing Mr. Gonzalez are equally groundless. Moving on from his receipt of a litigation hold notice, the Government next claims that, because Mr. Gonzalez served for a brief period as the head of HPD, he must possess relevant information regarding the pricing of HPD products. (Ex. B at ¶ 6.)

After spending the bulk of his career in Abbott's Diagnostics Division (where the business focus is on diagnostic mechanisms and other instruments, rather than pharmaceutical drug products), Mr. Gonzalez served as the President of the former HPD from March 1998 to July 2000. (Ex. A at ¶ 2.) He then transferred from HPD to Abbott's Medical Products Division, where he served until his elevation to President and COO of Abbott in 2006. (*Id.* at ¶ 1-2.) The time that Mr. Gonzalez spent nearly a decade ago as the head of HPD appears to be the focus of the Government's interest in seeking his deposition.

Yet, Mr. Gonzalez has made clear that, during his time as the President of HPD, he had

no unique knowledge about the pricing of HPD products.  (*Id.* at ¶ 5.)  Other persons within HPD

were directly responsible for pricing determinations, and those persons would keep Mr. Gonzalez

advised as necessary about pricing issues.  (*Id.*)  Because others within HPD were more directly

responsible for product pricing than Mr. Gonzalez, he cannot possibly have the sort of unique

personal knowledge necessary to justify his deposition; the mere fact that he was the head of

HPD is not enough.  *See In re Alcatel USA, Inc.*, 11 S.W.3d. at 177; *see also id.* at 179 (noting

that if "some knowledge" was the equivalent of "unique" knowledge, the standards for apex

executives would be "virtually indistinguishable from the scope of general discovery"). [3]

### 3.      Meeting with Coram Executives

The Government next argues that Mr. Gonzalez should be deposed because he allegedly

met with executives of Coram, a client of the Alternate Site business unit within HPD, to discuss

contract negotiations.  (Ex. B at ¶ 6.)  Mr. Gonzalez has attested, however, that he has no

memory of any such meeting with Coram, nor of ever being involved in contract negotiations

with Coram or any other Alternate Site customer.  (Ex. A at ¶ 6.)  That should end the inquiry.

---

[3] Thus, this case stands in stark contrast to cases where courts have been willing to find that a corporate executive possesses unique and personal knowledge, such as *Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140 (D. Mass. 1987).  In that case, the plaintiff made a strong factual showing that the corporate executives at issue had unique personal knowledge of the discrete policy that was the topic of the requested deposition.  *Id.* at 143 (executive was "significantly involved in the administration and implementation" of program central to the parties' dispute); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 104 (S.D.N.Y. 2001) (allowing deposition of Sony's CEO where plaintiff offered evidence showing that the executive had unique knowledge about the subject of the suit and plaintiff had already exhausted other, less-intrusive means to obtain the discovery).  Although apex depositions may be appropriate when the focus is narrowly-defined, and substantial evidence demonstrates that the executive has unique insight into the relevant topics, this case presents the polar opposite situation.  Here, the Government wishes to take a scattershot deposition of Abbott's former President and COO about AWP-related issues, yet it has offered no showing whatsoever that Mr. Gonzalez has any unique or superior personal knowledge about these issues within the company.

### 4.      The DOJ "True AWP's" Publication

Similarly, Mr. Gonzalez has averred that he has no memory of any publication in or about 2000 concerning a list of so-called "true AWP's" that was issued by the U.S. Department of Justice. (*Id.* at ¶ 7.) Mr. Gonzalez has no unique knowledge within Abbott about reimbursement issues. (*Id.* at ¶ 8.) The Government has deposed more than 60 witnesses already in this case, and has asked every one of them about reimbursement; there can be no doubt that the Government knows who the most knowledgeable witnesses are within Abbott about this issue, and that Mr. Gonzalez is not among them. The mere fact that Mr. Gonzalez may have been sent a publication that he no longer remembers cannot justify his deposition.

### 5.      Involvement in HPD Operational Decisions

Finally, the Government claims that Mr. Gonzalez should be deposed because he allegedly was involved in Abbott's decisions (i) to discontinue the Home Infusion Services business; and (ii) to merge together the contract marketing groups of the Hospital and Alternate Site business units within HPD. (Ex. B at ¶ 6.) As with each of the Government's other rationales, however, these are wide of the mark because Mr. Gonzalez does not possess any unique information that would justify his deposition.

For instance, Mr. Gonzalez has averred that he has no unique personal knowledge about these issues. (Ex. A at ¶ 9, 10.) As to the decision to discontinue the Home Infusion Services business, the Government recently has requested the deposition of Michael Sellers (who served as the head of Home Infusion Services at the time it was discontinued). Mr. Sellers, not Mr. Gonzalez, is clearly the best source for information on this subject. Similarly, the persons with the greatest knowledge about the merger of the two contract marketing groups within HPD would be those persons who worked in and managed those groups at the time. Mr. Gonzalez's knowledge of this subject is in no way unique or superior within Abbott. (*Id.*)

\*       \*       \*       \*

None of the Government's arguments establish that Mr. Gonzalez has unique or superior personal knowledge of any matter relevant to this litigation.  Case law, including this district's own, is clear that such a showing is a necessary precursor to allowing an apex deposition.  Because this showing has not been, and cannot be, made here, this court should grant a protective order barring plaintiffs from deposing this witness.

## II.   ANY ARGUABLY RELEVANT DISCOVERY FROM MR. GONZALEZ COULD BE ACQUIRED THROUGH LESS BURDENSOME MEANS THAN A DEPOSITION

Although the Court need not reach this issue in order to grant Abbott's motion, a protective order is also warranted here because the Government has not exhausted other, less-intrusive means of gathering discovery before seeking the deposition of Mr. Gonzalez.  The case law uniformly instructs that, before a party is permitted to conduct an apex deposition, it must first pursue other avenues, such as (i) depositions of lower-level employees or corporate 30(b)(6) designees; or (ii) written discovery.  *Patterson,* 281 F.3d at 682 (failure to utilize such alternative discovery "casts serious doubt over [plaintiff's] claim that [the executive] possessed information that was more than marginally relevant to her civil action."); *Salter v. Upjohn Co.*, 593 F.2d at 651; *Stone*, 170 F.R.D. at 504; *Mulvey*, 106 F.R.D. at 366; *Baine,* 141 F.R.D. at 335; *In re Alcatel USA, Inc.*, 11 S.W.3d at 176; *Liberty Mutual*, 10 Cal. App. 4th at 1289.

The rationale for this rule is simple.  Often, lower-level employees have the greatest and most direct knowledge of the relevant facts.  *Upjohn*, 593 F.2d at 651.  It is "very likely that, after taking the other employees' depositions, plaintiff would be satisfied and abandon [its] requests to depose [the apex executive.]" *Id.*  That is almost surely the case here, as Mr. Gonzalez was at the very top of the organization.  His knowledge, if any, about such issues as the pricing, marketing or sale of the subject drugs will in no way be unique within the organization,

or superior to the knowledge held by lower-level employees who were more directly involved

with these matters. The Government can access any relevant evidence about topics germane to

this litigation by deposing lower-level employees – a process that is currently underway, but far

from complete.

At a minimum, therefore, the Government should be required to defer its request to

depose Mr. Gonzalez until the end of the discovery process, after the lower-level employees with

the greatest knowledge about topics relevant to the litigation have been deposed. Then, the

Government can reassess whether, in light of all of the discovery conducted, it still believes that

this deposition is necessary. If it does, then the Court can determine, based on a full record,

whether there is a proper basis for the deposition to go forward, and on what terms. "At the very

least, [further discovery] would aid in developing and refining a line of questioning [for the apex

executive]," and should result in less duplicative, inconvenient, and burdensome discovery.

*Baine*, 141 F.R.D. at 335; *Liberty Mutual*, 10 Cal. App. 4th at 1287 ("it would seem sensible to

prevent a plaintiff from leap-frogging to the apex of the corporate hierarchy in the first instance,

without the intermediate steps of seeking discovery from lower-level employees more involved

in everyday corporate operations").[4]

In addition, as this Court recognized with respect to Mr. White, written interrogatories

provide another, less-burdensome alternative to deposing a high-level executive. Such

interrogatories allow "plaintiffs' rights [to] be fully protected as well as those of [the executive],"

---

[4] Were the Court to order that the deposition of Mr. Gonzalez go forward now, there clearly should be strict limitations on the time period for the deposition and the scope of permissible topics. During the meet and confer process, the Government agreed only that it would attempt to complete this deposition in one full day, but it would not agree to any limitation as to topics. (Ex. B at ¶ 7.) That is unreasonable on both fronts. There is no reason that this deposition could not be completed in an hour or two at most. In addition, in order to protect against inefficiency and harassment, the topics to be covered with Mr. Gonzalez in the event a deposition is ever allowed should be limited, and should be set forth in advance. *See, e.g., WebSideStory, Inc. v. NetRatings, Inc.*, 2007 U.S. Dist. LEXIS 20481, 17 (D. Cal. 2007) (limiting deposition of former executive to certain enumerated topics).

and allow "an orderly discovery process [to] be best served[.]" *Mulvey*, 106 F.R.D. at 366; *see also Patterson*, 281 F.3d at 682; *Baine*, 141 F.R.D. at 334-35; *Liberty Mutual*, 10 Cal. App. 4th 1289-90; *Colonial Capital Co. v. General Motors*, 29 F.R.D. 514, 518 (D. Conn. 1961) (granting CEO of General Motors's request to answer interrogatories in lieu of deposition "to minimize the amount of time he must take from his duties").

Rather than pursue any of these options, the Government instead seeks the "unreasonable" option of forcing the deposition of Mr. Gonzalez, a retired senior Abbott executive. *Liberty Mutual*, 10 Cal. App. 4th at 1287. This would impose a substantial burden upon Mr. Gonzalez (Ex. A at ¶ 11), and should not be allowed.

## CONCLUSION

Because the Government has not shown that Mr. Gonzalez has unique or superior personal knowledge of any issue relevant to this litigation, and because it has not exhausted other, less-burdensome means to gather relevant discovery, the Court should grant this motion, and should enter an order prohibiting this proposed deposition. Alternatively, the Court at a minimum should order that the Government defer its request to depose Mr. Gonzalez until the end of the fact discovery period, at which time the parties and, if necessary, the Court can reassess any perceived need for this deposition based upon a more fully-developed record.

Dated:  October 5, 2007

Respectfully submitted,

ABBOTT LABORATORIES INC.

By:  /s/ Brian J. Murray

James R. Daly
Jason G. Winchester
Brian J. Murray
JONES DAY
77 W. Wacker Dr., Suite 3500
Chicago, Illinois  60601-1692
Telephone: (312) 782-3939
Facsimile:  (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Fax:  (202) 626-1700

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 5, 2007, the foregoing **ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE PROPOSED DEPOSITION OF RICHARD A. GONZALEZ** was served upon all counsel of record in this action electronically by posting a true and correct copy of same via Lexis-Nexis.

/s/ Brian J. Murray

CHI-1605473v1

# EXHIBIT A

1-04-07   15:15   From-FedEx Kinko,s #1071 561-367-9577      5613629199      T-891   P.001/003   F-492

## DECLARATION OF RICHARD A. GONZALEZ

I, Richard A. Gonzalez, make the following statements based upon my own personal knowledge:

1.      My name is Richard A. Gonzalez.  Until my retirement on September 28, 2007, I was the President and Chief Operating Officer of Abbott Laboratories and its subsidiary Abbott Laboratories Inc. (together, "Abbott").  I held these positions from March 2006 until my retirement.  As President and COO, I was the second highest ranking corporate officer at Abbott. In addition, I served as a member of Abbott's Board of Directors.

2.      I began my employment with Abbott in 1977.  Much of my career was spent in the Diagnostics Division of Abbott, which specializes in *in vitro* diagnostics and other instrument systems, rather than pharmaceutical drug products.  From March 1998 to July 2000, I was a Senior Vice President and President of Abbott's former Hospital Products Division ("HPD"). From August 2000 to March 2006, I was the Executive Vice President and Chief Operating Officer, Medical Products.

3.      I understand that the Plaintiffs in this lawsuit claim that they require my deposition in order to discover information about a number of topics, including: the pricing of HPD products; my supposed participation in one or more meetings with executives from Coram, a customer of Abbott's former Alternate Site unit within HPD, regarding contract negotiations; my knowledge of a publication in or about 2000 addressing a list of "true AWP's" from the U.S. Department of Justice; my supposed involvement in Abbott's decision to discontinue the Home Infusion Services business; and my supposed involvement in Abbott's decision to merge together the contract marketing departments of the Hospital and Alternate Site business units within HPD.

Oct-04-07   15:15   From-FedEx Kinko,s #1071 561-367-9577   5613628199   T-891   P.002/003   F-492

4.   During the time period of 1998 to 2000, when I was President of HPD, the division had thousands of employees that I was ultimately responsible for and that I relied upon to run the day-to-day operations of the division.  HPD at that time had two business units – the Hospital Business Sector and Alternate Site.

5.   I do not have unique or superior personal knowledge relating to the pricing of HPD products.  During the two years I served as the President of HPD, I was not directly involved in determining the pricing of products.  Others within the division had that responsibility, and would advise me as necessary about pricing matters.  Persons who served in the Hospital Business Sector during that time frame would have greater knowledge than me regarding the setting of list prices for HPD products, and persons who served within the HPD contract marketing groups would have greater knowledge than me regarding contract pricing.  I became the Executive Vice President of the Medical Products Division at Abbott in August 2000.  As such, I was responsible for all of Abbott's Medical Product business, including diagnostics, nutrition, spinal products, diabetes, and hospital products.  I have no unique or superior personal knowledge of pricing or any other operational issue during this period.

6.   I do not recall meeting with any executives from Coram, nor of ever being involved in negotiating contract terms with Coram or any other Alternate Site customer.

7.   I do not recall any publication in or about 2000 discussing a listing of "true AWP's" issued by the Department of Justice.

8.   I have no unique or superior personal knowledge regarding reimbursement for Abbott products by third parties such as Medicare or Medicaid.

9.   I have no unique or superior personal knowledge relating to Abbott's decision to discontinue the Home Infusion Services business.

Oct-04-07   15:15   From-FedEx Kinko,s #1071 561-367-9577      5613528199       T-891   P.003/003   F-492

10.    I have no unique or superior personal knowledge relating to Abbott's decision to merge together the contract marketing operations of the Hospital Business Sector and Alternate Site.

11.    It would impose a substantial burden upon me if I were forced to give a deposition in this matter, particularly given the fact that I have no unique or superior personal knowledge of any matters relating to this litigation.

12.    I declare under penalty of perjury that the foregoing is true and correct.

Dated: October  4th , 2007.

Richard A. Gonzalez

# EXHIBIT B

### DECLARATION OF JASON G. WINCHESTER

Jason G. Winchester, make the following statements based upon my own personal knowledge:

1. My name is Jason G. Winchester. I am a partner in the law firm JONES DAY, which represents Abbott Laboratories Inc. ("Abbott") in a variety of litigation matters relating to pharmaceutical pricing, including the lawsuit captioned *United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, No. 06-CV-11337-PBS.

2. I received an e-mail from Mr. Gejaa Gobena, counsel for the United States of America, requesting that Abbott provide dates for Mr. Richard A. Gonzalez, who at the time was Abbott's President and Chief Operating Officer. I understand that Mr. Gonzalez retired on September 28, 2007.

3. In order to evaluate counsel's request, I requested a meet and confer conference to discuss the issue.

4. Mr. Gobena agreed, and a meet and confer was held via telephone on July 17, 2007. This conference was attended by Mr. Gobena, Mr. Nicholas Paul (an attorney with the California Department of Justice, who represents the state in a related action pending against Abbott in California), and me. Mr. Gobena, Mr. Paul and I continued our meet and confer on July 27, 2007, at which time we were joined by Mr. Chris Cook from my firm and Ms. Ann St. Peter-Griffith, counsel for the Government. I spoke with Mr. Gobena, Mr. Paul, and Ms. St. Peter-Griffith again about these depositions on August 8, 2007.

CHI-1607673v1

5.      During these conferences, plaintiffs were invited to state the grounds for their request to

depose Mr. Gonzalez.

6.      Counsel articulated the following bases: (i) he was copied on a document preservation

memorandum issued by Abbott's in-house counsel; (ii) he might have information

regarding the pricing of HPD products; (iii) he was allegedly involved in one or more

meetings with executives from Coram, a customer of the former Alternate Site business

unit within HPD, relating to contract negotiations; (iv) he received a publication in or

about 2000 relating to a list of "true AWP's" issued by the U.S. Department of Justice;

(v) he was allegedly involved in Abbott's decision to discontinue the former Home

Infusion Services business; and (vi) he was allegedly involved in Abbott's decision to

merge together the contract marketing departments of the Hospital and Alternate Site

business units within HPD.

7.      I asked whether the Government would be willing to agree to any limitations as to the

duration of Mr. Gonzalez's proposed deposition, or to a set list of subjects that could be

covered during the deposition.  As to timing, Mr. Gobena indicated that the Government

would work with the other plaintiffs' counsel interested in this depositions to attempt to

complete it in one day.  He would not agree to any shorter time period.  As to subject

matter, Mr. Gobena indicated that the Government would not agree to any limitation as to

the subjects that could be covered at deposition with Mr. Gonzalez.

8.      I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and present ability to recall the events in question.

Dated: October 5, 2007

Jason G. Winchester

- 2 -

CHI-1607673v1

# EXHIBIT C

DISTRIBUTION LIST:

| Name | | |
|---|---|---|
| Harold Adams | D361 | AP30 |
| Robyn Allen-McKinnon | D361 | AP30 |
| Peter Baker | DH83 | AP34 |
| Barry Barnard | D335 | AP6B |
| Jeffery Blazer | DOP83 | AP34-2 |
| Jerry Boesch | D361 | AP30 |
| Tracey Brill | D97W | AP30 |
| Robert Bryan | D361 | AP30 |
| Anthony Cacich | D97W | AP30-2 |
| Michael Casper | DH51 | AP34 |
| Nancy Conway | D389 | AP30 |
| William Dwyer | D49U | AP6B |
| Robert Felicelli | D977 | ZP30 |
| Sam Fischer | D494 | AP6B |
| Nelda Flores | D313 | AP6C |
| Thomas Freyman | D312 | AP6D |
| B.L. Gerber | D49Z | Field Sales |
| Michael Glass | D96J | AP30 |
| T. Scott Glover | DH83 | AP34 |
| Rick Gonzalez | D960 | AP30 |
| Greg Gordon | D439 | AP34 |
| Jeff Gott | D4k | AP6C |
| Cindy Grady | D49T | AP6B |
| Edward Hayman | D4EF | AP30 |
| Christopher Herden | D97W | AP30-2 |
| Laurie Hernandez | D96E | AP30 |
| Patricia Holma | D97W | AP30-2 |
| James Jackson | D361 | AP30 |
| Jerry Joiner | D494 | AP6B-2 |
| Peter Karas | D494 | AP6B |
| Ashok Kaul | D4EF | AP30-2 |
| Patrick Keely | D361 | AP30 |
| Steven Kipperman | DH50 | AP34 |
| Karla Kreklow | DH85 | AP34 |
| Russell Layman | D492 | AP6B |
| Elaine Leavenworth | D290 | AP6B-2 |
| Kristina Leistner | D335 | AP6B |
| Lynn Leone | DH83 | AP34 |
| Bruce Lweis | D49Z | Field Sales |
| Ted Lyjak | DH83 | AP34 |

X0016793

| Robert Lyman | D361 | AP30 |
|---|---|---|
| Suzanne McDonald | D494 | AP6B |
| Michael McGibbon | D99F | AP30 |
| Loreen Mershimer | D96J | AP30 |
| Thomas Moore | D97W | AP30 |
| Pamela Navarre | D4EF | AP30 |
| Michael Novak | DH83 | AP34 |
| Edward Ogunro | D87W | AP30 |
| Timothy Oswald | D977 | AP30 |
| W. Perry | D49Z | Field Sales |
| Kari Peterson | D97W | AP30-2 |
| M.R. Pettus | D49Z | Field Sales |
| Maureen Power | D4EF | AP30 |
| AnneMarie Renick | D97W | AP30 |
| Don Robertson | DH50 | AP34 |
| Michael Sellers | DH50 | AP34 |
| Gary Smith | D97W | AP30-3 |
| Craig Smith | DH83 | AP34 |
| Timothy Sykes | DH60 | AP34 |
| Mary Szela | D96E | AP30 |
| Michelle Thomas | D49T | AP6B |
| James Tillery | D977 | AP30 |
| Virginia Tobiason | DZHP | AP6C |
| Scott Toner | D97W | AP30 |
| Eric Waehner | D99F | AP30-3 |
| Nelson Weaver | D49Z | AP6B |
| Sheldon Wecker | D977 | AP30 |
| Chris Westermeyer | D5PP | AP34 |
| James Wetrich | D494 | AP6B-2 |
| Guy Wiebking | D349 | AP30 |

X0016794

 **ABBOTT**

**INTEROFFICE CORRESPONDENCE**

FROM:  José E. Rivera, Jr.
DEPT:  D324, Bldg. AP6D  EXT. 7-5201
DATE:  October 25, 1999

To:     Distribution List

CC:    Cathy Babington
         Mark Barmak
         Jose de Lasa
         Robert Parkinson
         Miles White

Re:    <u>U.S. Department of Health and Human Services Subpoena</u>

This notice is a reminder that, pursuant to a memo dated October 20, 1997 (attached), all original documents in this matter must continue to be retained. On October 6, 1997, a subpoena was served on Abbott related to Abbott's pricing and Medicaid/Medicare programs and reimbursement practices for the following drugs:

1.     Amikacin Sulfate
2.     Clindamycin Phosphate
3.     Dextrose 5%
4.     Dextrose 5%/Sodium Chloride 0.9%
5.     Furosemide
6.     Heparin Lock Flush
7.     Pentamidine Isethionate
8.     Lactated Ringers
9.     Sodium Bicarbonate
10.    Sodium Chloride .9%
11.    Tobramycin Sulfate
12.    Vancomycin HCL
13.    Water for Injection, Sterile

The subpoena required us to produce all documents that discussed or related in any way to the pricing of Medicaid/Medicare reimbursement of these drugs in the following states: Texas, Florida, Colorado, Alabama, Massachusetts and Maryland.

You must continue to save all documents (physical and electronic) that could in any way be responsive to the subpoena. "Documents" includes, but are not limited to, department files, personal files, desk files, business, reports, opinions, handwritten notes, overheads, electronic data and e-mail messages, correspondence, and any other similar materials. Please be aware that "documents" also include drafts and handwritten notes on the drafts or final documents. Also, this definition is not limited to "official" documents.

These documents cannot be part of any corporate, divisional or other program that calls for

X0016795

periodic destruction of records. None of these documents should be destroyed as part of such program until further notice.

Please distribute this memorandum to all individuals that report to you who might have relevant documents, and are not copies on this memorandum.

Please contact me or Ellen Klaus should you have any questions or concerns.

JER:etk

Attachment

X0016796

 **ABBOTT**

**INTEROFFICE CORRESPONDENCE**

FROM:   José E. Rivera, Jr.
DEPT.   324 BLDG. AP6D  EXT. 7-5201
DATE:   October 20, 1997

TO:   DISTRIBUTION LIST

RE:   <u>U.S. Department of Health and Human Services Subpoena</u>

    Abbott received a Subpoena from the U.S. Department of Health and Human Services relating to Abbott's pricing and Medicaid/Medicare programs and reimbursement practices for the following drugs:

       1.   Amikacin Sulfate
       2.   Clindamycin Phosphate
       3.   Dextrose 5%
       4.   Dextrose 5%/Sodium Chloride 0.9%
       5.   Furosemide
       6.   Heparin Lock Flush
       7.   Pentamidine Isethionate
       8.   Lactated Ringers
       9.   Sodium Bicarbonate
     10.   Sodium Chloride .9%
     11.   Tobramycin Sulfate
     12.   Vancomycin HCL
     13.   Water for Injection, Sterile

    The subpoena, which is attached, requires us to produce all the documents that discuss or relate in any way to the pricing or Medicaid/Medicare reimbursement of these drugs in the following states: Texas, Florida, Colorado, Alabama, Massachusetts and Maryland.

    <u>**You must save all documents that could in any way be responsive to the subpoena.**</u>  This includes but is not limited to departmental files, business plans, long range plans, reports, desk files, personal files, handwritten notes, buck slips, post-it notes, electronic data and e-mail messages, and any other materials from **January 1, 1994 to the present.**

X0016797

Any corporate, divisional, or other program that calls for the periodic destruction of records must be suspended with respect to these types of documents. No documents should be destroyed as part of such a program until further notice.

Please distribute this memorandum to all individuals that report to you who might have relevant documents and who are not shown as a recipient of this memorandum. If you have any questions, please call José Rivera (x75201) in the Legal Division.

JER

Attachment

X0016798

## DISTRIBUTION LIST

TO:   Thomas Alles, D-98F-AP30
Jack Aten, D-961/AP30.
Peter Baker, D-H83/AP34
William Burris, D-H51/AP34
Clair Callan, D-970/AP30
Bill Dempsey, D-96E/AP30
Lee Gutman, D-439/AP30
Michael Heggie, D-R69/AP34
Patrick Keely, D-361/AP30
Curt Kirkemo, D-98P/AP4A
Kris Kringel, D-960/AP30
Lynn Leone, D-H83/AP34
Greg Linder, D-981/AP30
Ted Lyjak, D-H83/AP34
Charlie Mitchell, D-97W/AP30
Sean Murphy, D-980/AP30
Wally Narajowski, D-197/Morgan Hill
Michael Novak, D-H83/AP34
Randy Prozeller, D-977/AP30
Don Robertson, D-H50/AP34
Steve Slaughter, D-980/AP30
John Ward, D-96E/AP30
Henry Weishaar, D-969/AP30
Guy Wiebking, D-349/AP30

CC:   Cathy Babington
Mark Barmak
Duane Burnham
Gary Coughlan
José de Lasa
Tom Hodgson

RE:   U.S. Department of Health and Human Services Subpoena

X0016799