## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 06-CV-11337-PBS | ) | |

### ABBOTT LABORATORIES, INC.'S OBJECTIONS TO
### <u>MAGISTRATE JUDGE BOWLER'S FEBRUARY 1, 2008 ORDERS</u>

Pursuant to Federal Rule of Civil Procedure 72(a), Abbott Laboratories, Inc. respectfully

files these objections to Judge Bowler's February 1, 2008 Orders (Exs. A & B).  Judge Bowler's

Orders denied three related Abbott motions to compel (Dkt. Nos. 4790, 4892 & 4901).

### <u>INTRODUCTION</u>

The instant objections focus primarily on the correct interpretation of this Court's

November 9, 2007 Order.  That Order concerned the parties' objections to Judge Bowler's

August 13, 2007 ruling on the scope of the deliberative process privilege in this case.  In its

entirety, the Court's November 9 Order provides as follows:

> The government must produce for *in camera* inspection by the magistrate judge
> *all documents which relate to* its knowledge of a "spread" for Abbott's drugs at
> issue in this litigation or its knowledge of Abbott's "marketing the spread" for any
> of its drugs.  *The documents are directly relevant to the issues in this litigation*.
> However, as both parties agree, it is hard to do the weighing under the balancing
> test without seeing the documents.  *With respect to each of these documents
> sought to be withheld*, the government shall explain why it should not be
> disclosed under the "balancing test."  The government should remember that *in
> camera* review is quite onerous, and *the government should not seek overly broad
> protection*.  If necessary, the Court will review the magistrate judge's
> determination on an abuse of discretion basis.

> The objections to magistrate judge's order are otherwise **<u>Denied</u>**.

Dkt. No. 4885 (emphasis added).

The parties subsequently exchanged correspondence setting forth very different interpretations of this Order. The Government claims it is required to produce for *in camera* review *only* those documents that explicitly reference Abbott or the specific drugs at issue in this case (the "Subject Drugs"). It asserts that documents relating to all drugs (which would include Abbott's drugs), or some class of drugs (*e.g.*, generics, infusion or injectible drugs, which also include Abbott's drugs), somehow do not "*relate to*" the small subset of drugs specifically named in the Complaint. Based on its self-serving and exceedingly narrow interpretation, the Government provided just 21 documents (from over a thousand responsive documents on its privilege logs) to Judge Bowler for *in camera* review. *See* Dkt. No. 4920.

The Government ignored the Court's direction that documents relating to its knowledge are "directly relevant to the issues in this litigation." Dkt. No. 4885. And it disregarded the Court's warning that it should "not seek overly broad protection." *Id.* Indeed, from the outset of this case, the Government has sought to protect *every single draft or other document* it believes meets the threshold deliberative process privilege criteria.[1] In doing so, Government counsel has *admitted* to withholding documents with utter disregard of the relevance of those documents to Abbott's defenses. *See* Letter from D. Torborg to J. Neal (3/20/2007) (Ex. D) (confirming the Government has made no effort to balance its purported need to maintain the confidentiality of documents with their possible relevance to Abbott's defenses). No judgment or any notion of fairness has been applied here.[2] And, incredibly, the Government has actually *reduced* the

---

[1] The Government did this even though another federal district court told the Department of Health and Human Services over a year ago that such an approach was inappropriate. *See Commonwealth of Pa. Dep't of Pub. Welfare v. U.S.*, No CIVA 05-1285, 2006 WL 3792628, at *25 (W.D. Pa. Dec. 21, 2006) (attached as Ex. C) ("[S]imply because a document has been designated as a 'draft' does not automatically entitle the [Department of Health and Human Services] to withhold it based on the deliberative process privilege.").

[2] Indeed, before Judge Bowler ruled that only documents referencing Abbott or the Subject Drugs needed to be produced (a filter that even the Government has never really argued was legitimate), the Government was fully prepared to ask this Court to individually review each of the documents on its logs. *See* Dkt. No. 4076 at 14 ("This Court should assess the merits of the United States' privilege assertions on a document-by-document basis . . .").

number of documents it had initially produced for *in camera* inspection as a result of Judge

Bowler's August 13, 2007 Order.  *See* Dkt. No. 4697 at 5 n.2 (stating it had found 41 documents

referencing Abbott and/or the Subject Drugs).

The Government's actions contravene the plain language of the November 9 Order

(specifically, what is meant by "relate to"), run afoul of common sense and fairness, and

disregard this Court's prior statements on the importance in this case of Government knowledge

and decision-making.  In an effort to correct the Government's self-serving and improperly

narrow interpretation of the November 9 Order, Abbott filed its "Emergency Motion to Compel

Submission of 'Cross-Cutting' Evidence Consistent with the Court's 11/[9]/2007 Deliberative

Process Privilege Order" (Dkt. No. 4901).

In addition to that motion, Abbott had earlier filed two related motions seeking other

documents the Government had withheld under the deliberative process privilege.  In particular,

these motions sought production of responsive documents from key locations within CMS that

the Government deliberately excluded from its search—CMS's official Rulemaking Support

Files, its Office of Legislation, and the files of long-time Office of Legislation employee Ira

Burney.  *See* Dkt. Nos. 4790 & 4892.[3]  The Government's wholesale exclusion of these files is

particularly troublesome.  It refuses *even to review* all of the files, or to provide a log for any

responsive, yet allegedly privileged, documents.  *See* Jan. 31, 2008 Hr'g Tr. at 148 (Ex. E).  The

Government simply declares without more that each of the documents is covered by the

deliberative process privilege.  Not one of these has been submitted for *in camera* review.

Instead, the Government has simply deep-sixed these documents.

---

[3] Abbott was scheduled to depose Mr. Burney on November 20 and 21.  In preparation for his deposition, however, Abbott was able to locate only ten documents containing Mr. Burney's name.  This paucity of documents is disturbing given that Mr. Burney has worked for CMS or its predecessors for decades and has been described by Thomas Scully, former CMS Administrator, as the "key guy" on Medicare Part B drug payment issues.  *See* Scully Dep. at 274-75 (Ex. F).

On February 1, 2008, Magistrate Judge Bowler denied each of Abbott's motions.  On Abbott's cross-cutting motion, Judge Bowler found "that the government's construction and implementation of the November 9, 2007 Order to be correct."  Ex. A.  She denied Abbott's two other motions based on a finding that the "requested information is cumulative and the burden imposed outweighs the likely benefit within the meaning of Rule 26(b)(2)(C)."  Ex. B.

Absent corrective action by this Court, Abbott respectfully submits this litigation will be tainted with a host of serious problems that will have to await appeal for resolution:

- Thousands of responsive, relevant, and *potentially dispositive* documents will never see the light of day (or even be identified) merely because they allegedly meet the threshold requirements of the deliberative process privilege.  None of these documents will ever be subjected to the balancing test required by law.

- Only those 21 documents that happen to mention Abbott or the Subject Drugs by name will ever be submitted for *in camera* review.

- Key documents expected to go to the heart of the Government's claims and Abbott's defenses—including those demonstrating that the Government deliberately authorized payments above acquisition cost in order to cross-subsidize other payment insufficiencies, encourage use of generic drugs, and provide the necessary monetary incentives to ensure provider participation—will never be produced merely because they do not mention Abbott or a Subject Drug by name.

- Given the Government's complete failure to retain documents, and the passage of time, Abbott will be kept from what precious little evidence of the Government's knowledge and decision-making remains today (and the Government will have the Court's *imprimatur* to continue to destroy them).

## OBJECTIONS

1.       Magistrate Judge Bowler erred in upholding the Government's interpretation of this Court's November 9, 2007 Order.  The Government's crabbed interpretation contravenes the plain language of the Order, common sense, and the Federal Rules governing what is "relevant" for discovery.  Documents that discuss the Government's knowledge of spreads (and/or the marketing of spreads) across all drugs or some subset of drugs necessarily "relate to" Abbott and the Subject Drugs that fall under those broader categories.

2.      With respect to Abbott's motions to compel documents from CMS's Office of Legislation (including files from Ira Burney) and its Rulemaking Support Files, Judge Bowler erred in determining that the requested documents were cumulative and overly burdensome to produce.  Apart from CMS's official correspondence with Congress, the Government has yet to produce a single non-public document from either of these sources.  The Government has produced just *two boxes* from the entirety of CMS's Central Office.  The Government itself admits that the documents are unique—it argues these documents must be "deliberative" by their very source (even though the Government has not reviewed them all).  Documents that concern *why* CMS used an AWP-based system, and the pros and cons of alternative methodologies that were considered and rejected—what we expect to and what the privilege log tells us we will find in these sources—are not cumulative of *anything* that has been produced to date.  Finally, in a case where the Government is seeking hundreds of millions of dollars in damages over a ten-year period (after waiting twelve years to bring suit), the relevance of what the Government describes as a few thousand documents (which the Government also admits have already been collected) far outweighs the *de minimis* burden of reviewing and producing them.

3.      Judge Bowler's order denying Abbott's motions on the Office of Legislation and CMS' Rulemaking Support Files did not address Abbott's argument that the Government should be required to at least review and log the documents withheld.  The Government's failure to follow the fundamental procedures for invoking the privilege violates clear authority, including the Federal and Local Rules, and precludes Abbott from even making an appropriate record concerning these documents.  Permitting the Government to simply secrete these potentially dispositive documents is antithetical to the basic tenets of discovery and due process.

## REQUESTED RELIEF

1.      The Court should clarify its November 9, 2007 Order as it relates to "cross-cutting" documents, and order the Government to either produce or submit for *in camera* review all documents that "*relate to* its knowledge of a 'spread' for Abbott's drugs at issue in this litigation or its knowledge of Abbott's 'marketing the spread' for any of its drugs," *see* Nov. 9, 2007 Order (Dkt. No. 4885) (emphasis added).  The Court should make clear to the Government that such documents that reference a broader category of drugs or group of manufacturers necessarily "relate to" Abbott or the drugs at issue here.

2.      Abbott is very mindful of the potential burden created by *in camera* review.  But this circumstance has been created by the Government's unilaterally imposed filter and its decision to ignore the directives and warnings in the Court's November 9 Order.  *See* Dkt. No. 4885.  Because the Government did not do what the Court told it to do, Abbott believes the Court should simply order the documents to be produced.  As an alternative, Abbott requests the Court order one or more of the following: (1) allow Abbott to select for *in camera* review a small sample subset of documents based upon the descriptions on the Government's privilege logs (attached at Exhibit G is a proposed sample of 50 documents selected by Abbott)—a decision concerning what to do about the rest of the documents on the Government's privilege log could be made based on the *in camera* review of the sample; or (2) appoint a special master to conduct an *in camera* review of all or a sample of apparent cross-cutting documents.

3.      The Court should direct the Government to produce all responsive documents from CMS's Office of Legislation and the agency's Rulemaking Support Files.  Given the central role that the custodians of these files played in determining the drug payment policies for CMS and Congress, documents in these files are especially relevant to Abbott's defenses.  These

documents will likely shed light on why the Medicare and Medicaid programs continued to use AWP, despite knowledge that it exceeded providers' acquisition cost for pharmaceuticals.

4.      If the Government is permitted to withhold documents from CMS's Office of Legislation and the agency's Rulemaking Support Files, the Court should require it to follow the appropriate procedures for making such designations, including having a responsible agency official review the documents to determine that each falls within the privilege, and enunciate what harm would come to the agency if these documents were disclosed under a protective order. The Court should also require a privilege log explaining why each document should not be disclosed, as the Court ordered the Government to do in the November 9 Order, as opposed to the blanket assertion of privilege employed here.

## ARGUMENT

## I.      THE GOVERNMENT'S INTERPRETATION OF THE COURT'S NOVEMBER 9, 2007 ORDER IS IMPROPERLY NARROW AND ILLOGICAL.

The Government's interpretation of the November 9 Order should be rejected for three principal reasons:  (1) its construction of the phrase "relate to" ignores the plain language definition of that phrase in favor of an overly-restrictive interpretation that would constitute reversible error; (2) it contradicts this Court's previous rulings and statements on the relevance of "cross-cutting" evidence in this litigation; and (3) it would allow the Government to withhold potentially exculpatory documents from Abbott.

*First*, the Government's argument that documents are "relevant" only if they explicitly reference "Abbott" or a Subject Drug turns the phrase "relates to" on its head.  This Court did not adopt the language in Judge Bowler's August 13, 2007 Order requiring production only of those documents that "expressly reference Abbott Laboratories, Inc. ('Abbott') and/or the subject

drugs." *See* Aug. 13, 2007 Order (Ex. H).  The Court rejected this clearly inadequate relevance filter, and imposed a more appropriate—and broader—one.

The Black's Law Dictionary defines "relate" as follows:  "To stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with; with 'to.'"  Black's Law Dictionary 1288 (6th ed. 1990).  Courts repeatedly cite Black's in construing the term "relate to," and consistently note that the "ordinary meaning of these words [relating to] *is a broad one*."  *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992) (collecting cases) (emphasis added); *see also New Hampshire Motor Transit Ass'n v. Rowe*, 448 F.3d 66, 75 (1st Cir. 2006).  The Government's interpretation of "relate to" is anything but "broad."

The Government's position that a document mentioning the "spread" or "marketing the spread" in reference to all prescription drugs—or at least all generic, injectible or infusion drugs, for instance—does not "relate to" the Subject Drugs is also illogical.  Abbott's products are a subset of drugs that falls under the larger umbrella of many different general categories of drugs (*e.g.*, Medicare Part B drugs, generic drugs, sterile supplies, infusion supplies and drugs, etc.).  The mere fact that a document discusses the spread for such larger categories of products, without happening to mention Abbott or a specific drug product by name, does not mean that the document does not "relate to [the Government's] knowledge of a 'spread' for Abbott's drugs at issue in this litigation or its knowledge of Abbott's 'marketing the spread' for any of its drugs."  Dkt. No. 4885.  It certainly does not render the document "irrelevant."  As Government counsel admitted during oral argument, CMS did not make drug payment policies by specific reference to Abbott's products.  *See* Jan. 31, 2008 Hr'g Tr. at 148 (Ex. E) ("[T]he policy of CMS [was] not established, was not developed by reference to Abbott's water product.").  Deliberations regarding the efficacy of the AWP-based payment system occurred instead in the context of a

broader discussion, and those deliberations necessarily "relate to" Abbott and the drugs at issue here.

Abbott is justifiably concerned that the Government's self-serving interpretation has buried highly relevant—potentially dispositive—evidence, keeping it from the crucible of trial. Documents that Abbott has seen (almost all of which come from the public record, usually with unattributed sources) and testimony that has been blocked by the Government illustrate the type of evidence that Abbott believes the Government may be hiding under the broad blanket of the deliberative process privilege. This evidence supports Abbott's contention that the Government intentionally allowed providers to realize a margin on drug costs and, thus, shows that payment of the types of spreads at issue in this case do not constitute fraudulent or "false claims."

A few examples of this publicly-available material and obstructed testimony illustrate what is being hidden:

- A 1993 report by the Government Accounting Office ("GAO") is very revealing. In this report, the GAO stated that while Medicaid payments exceeded drug costs, "[n]either HCFA nor the states have determined what would be an appropriate margin between reimbursements and costs." GAO, *Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland* (Mar. 1993) at 6 (Ex. I). GAO further stated that "HCFA officials also noted that . . . states . . . were not willing to increase dispensing fees regardless of survey results" and "HCFA and state Medicaid officials agreed that pharmacies must often use excess Medicaid reimbursements to cover their dispensing costs." *Id.* It is not a stretch to suggest that CMS allowed an "appropriate margin" to cross-subsidize insufficient dispensing fees. Payment of that margin did not render a claim "false" or "fraudulent."[4]

- Responses by the state Medicaid programs to OIG's work in the mid-1990s—which found an average discount from AWP for generic drugs of 42.5% (58% for nursing home and home infusion pharmacies)—paint a similar picture. For example, Montana was worried that OIG's report would prompt immediate calls to reduce reimbursement to pharmacies, even though Montana "believe[d] that the dispensing [fee was] below the cost to dispense because of the cap on dispensing fees." Ex. J. In a similar response, Missouri stated that "ingredient cost is only one component to be

---

[4] The drugs at issue here are primarily inexpensive commodity products (sodium chloride and dextrose solutions) with "spreads" or "margins" of less than $10 per dose.

considered in determining a pharmacy reimbursement level," and noted that dispensing fees paid by the state had not been raised to recommended levels.  Ex. K.

- Numerous articles in the public press hint at what lies below the surface.  For example, a 1997 article published by Eli's Home Care Week quotes a homecare industry representative as stating:  "Medicare officials would argue that the service component was 'built into the fee schedule' for drugs."  HHD009-0150 (Ex. L).  A later article from Eli's stated:  "In response to the OIG report, HCFA acknowledged that respiratory and infusion drug providers rely on the reimbursement rate to cover services for which Medicare does not currently reimburse."  HHD061-1445 (Ex. M).

- In 2005 testimony, the Congressional Budget Office ("CBO") noted that pharmacies receive "markups" on generic drugs equal to or larger than markups on brand-name drugs.  The CBO noted that "[m]aintaining such incentives might be an important consideration in assessing Medicaid's payment system for prescription drugs." Statement of Douglas Holtz-Eakin, *Payments for Prescription Drugs Under Medicaid*, Before the Special Committee on Aging, United States Senate (July 20, 2005) (Ex. N).

- In 2004, the research firm Abt reported the results of a CMS-sponsored conference of pharmaceutical industry experts that included CMS and OIG personnel (Deirdre Duzor and Robert Vito).  *See* Ex. O (excerpts).  In that report, Abt stated:  "Most experts agree that AWP, or even the typical discounts to AWP, exceed actual acquisition costs for both pharmacies and physicians.  This is particularly true for generic drugs.  At the same time, these experts agree that Medicaid dispensing fees are low relative to actual dispensing costs. . . . Payments based on the cost structure experience by pharmacies may warrant payment of a reasonable and managed spread (an amount paid above the actual acquisition cost), in addition to a fixed dispensing fee and an appropriate service fee for medication therapy management."[5]

- Robert Vito, an official with OIG who was the point person for analyzing prescription drug pricing issues, recently testified that he met with officials at CMS during the claims period to discuss the issue of whether providers needed to receive a profit on drug payments from Medicare to cover the extra costs associated with dispensing these drugs to Medicare recipients.  *See* Vito Rough Dep. Tr. (2/5/08) at 50-51 (Ex. P).  Citing the deliberative process privilege, Mr. Vito was instructed by counsel not to provide any details about those conversations.  *Id.*

Even while the Government is pursuing this lawsuit alleging that it was defrauded into paying too much for drugs and never intentionally overpaid, CMS just last month sanctioned margins on par with the spreads at issue here in order to advance its policy goals.  Specifically,

---

[5] The 2004 Abt report also comments that "deliberately or not, the drug cost component of the payment has offered a margin relative to acquisition cost," and that this "may be appropriate since other costs . . . vary in proportion to the cost of the drug."  *Id.* at 6.  Abbott's discovery, of course, has focused on whether Medicare and Medicaid's payment of a margin was, in fact, "deliberate."

CMS offered public comments on an OIG report that studied the percentage difference between pharmacy acquisition costs and Medicare Part D payments.[6]  OIG found that the percentage difference between acquisition costs and Part D payments was nine times greater for generic drugs than brand-name drugs, but was careful to point out that "generic and brand-name drugs had similar per prescription dollar differences" ($9.12 and $9.18, respectively).  *Id.* at 6.  Instead of expressing shock at the notion of an average $9 dollar spread, CMS stated quite to the contrary that it was "*pleased* by the findings in this report that the private market contract model in Part D *provides margins* to community pharmacies with respect to their acquisition costs."  *Id.* at Appendix G (emphasis added).  CMS further commented that OIG's findings were "*expected* as it is one method for pharmacies to *support the expense of dispensing costs*."  *Id.* (emphasis added).  Finally, in response to OIG's finding that the difference between cost and payment was nine times greater for generic drugs, CMS stated:

> Clinically appropriate generic prescribing is one of the key ways in which the Part D program is able to provide high quality coverage at a reasonable cost to both beneficiaries and the government.  We fully encourage the use of generic drugs since their use provides good value to both the beneficiary and the taxpayer, and we note that *incentives are aligned to encourage promotion of generics* by community pharmacists.

*Id.* (emphasis added).

One might ask: How CMS can be "pleased" with a $9 dollar spread today, yet at the same maintain a suit against Abbott for "defrauding" it into paying similar $9 dollar markups?  And how can payment of a $9 margin over acquisition cost be acceptable and encouraged in one instance, yet constitute a "false claim" in another?

---

[6] *See* HHS-OIG, *Review of the Relationship Between Medicare Part D Payments to Local, Community Pharmacies and The Pharmacies' Drug Acquisition Costs* (A-06-07-00107, Jan. 2008) (Ex. Q) (see Appendix G, last two pages of the document, for CMS's comments).

None of these documents mention Abbott or the Subject Drugs.  If they were not publicly available to Abbott, they would never have seen the light of day under the Government's filter. It is readily apparent that many of the documents currently being withheld—and which do not happen to mention Abbott or the Subject Drugs—are similarly revealing.  A few likely candidates from the Government's privilege logs include (emphasis added):

- HHC902-00050016, a 1995 "draft proposal" described on DOJ's privilege log as "*Discussion of alternative reimbursement mechanisms for the Medicare Program's payment for drugs*, and *the pros and cons of such policies*;"

- HHC902-00590062, described on the DOJ's privilege log as a "Draft NPRM ... on drug and biological pricing policy.  Discusses potential affects of alternative reimbursement mechanisms;"

- HHC902-02140244, a 1999 Memo with attachments described on DOJ's privilege log as "Discussion of the issue regarding alternative reimbursement mechanisms and the use of DOJ data regarding one such alternative.  *Presents an impact analysis of changes in reimbursement and its potential effect on the delivery of care*, includes different documents, including a memo, handwritten notes, and charts."

Thus, so long as Abbott or the Subject Drugs are not mentioned by name, the Government has withheld documents like these that are likely to have explicitly memorialized the Government's willingness to pay the very type of margins at issue in this case.  Such a result constitutes an abuse of the deliberative process privilege.[7]

*Second*, the Government's interpretation contradicts the Court's previous rulings and statements on the scope of relevance in this case.  This Court has consistently reiterated that relevance in this case extends not just to documents specifically naming the Subject Drugs, but also to "cross-cutting" documents dealing with categories of products into which Abbott's products fall.  This principle is most evident in the Court's decision regarding the Government's January 9, 2007 Motion to Compel Abbott to Produce All Discovery Required by CMOs 5 and

---

[7] Although the descriptions of these documents suggest that they could not be more relevant, it appears that these documents were not submitted to Magistrate Judge Bowler for *in camera* review.  *See* Dkt. 4920.

10 (Dkt. No. 3529).  In that motion, the Government argued that Abbott's "production should not be limited by the . . . drugs identified in the Complaint in this case" and that "limiting production of marketing materials to only the 'Subject Drugs' will not yield all of the relevant evidence" because Abbott marketed some of its drugs under broader categories "without regard to a marketing plan for a specific drug."  *See* Dkt. No. 3529, at 8-10.

The Court *granted* the Government's motion for cross-cutting documents, requiring production of "all documents that *relate to* the four charged drugs including general sales and across the board marketing information that would encompass the four charged drugs."  *See* Dkt. No. 4244.  This included "all documents regarding other drugs marketed and sold by the hospital products division to the extent such documents involve how Abbott 'put together the spread' as well as all cross cutting sales documents inclusive of broad based marketing documents."  *Id.* Discovery must be a two-way street.  Just as the Government argued that Abbott's core pricing and marketing policies "cut across" many drugs, Abbott maintains that the Government's core drug payment policies likewise "cut across" multiple drugs and manufacturers.  The Government has never argued otherwise.

*Third*, the consequences of Judge Bowler's rulings would be fundamentally unfair to Abbott and would likely constitute reversible error.  Abbott will be denied access, and the Court will not even have the opportunity to review *in camera*, hundreds of potentially dispositive documents.[8]  Similar to CMS's response to the January 2008 OIG report, these documents are likely to show that CMS has deliberately allowed payment of margins similar to those at issue in

---

[8] *In camera* review is typically favored when the Government asserts the deliberative process privilege, and authority counsels in favor of its use for such cross-cutting documents.  *See Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 405 (1976) ("In light of the potential seriousness of these considerations and in light of the fact that the weight to be accorded them *will inevitably vary with the nature of the specific documents in question*, it would seem that an *in camera* review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of irrelevance and privilege and plaintiffs' asserted need for the documents is correctly struck.") (emphasis added); *Scott Paper Co. v. United States*, 943 F. Supp. 489, 498 n.8 (E.D. Pa. 1996) (noting the deliberative process privilege "usually requires examination of the documents *in camera*").

this case in order to cross-subsidize insufficient professional fee payments, to encourage use of generics, because of political pressure, or for other reasons that the Government has been able to keep in the dark.

Without access to such documents, neither this Court nor Abbott will ever know the content of the withheld documents, including whether they would completely debunk the Government's claims in this case.  This is why courts have repeatedly held that the deliberative process privilege does not apply at all, or is at least severely restricted, when the Government chooses to become a plaintiff—especially where the Government has brought a fraud claim.  *See, e.g., U.S. v. Ernstoff*, 183 F.R.D. 148, 153 (D.N.J. 1998) (when the Government seeks relief that puts its deliberations at issue, "courts have severely restricted the use of the privilege by government agencies"); *Dept. of Econ. Dev. v. Arthur Andersen & Co.*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) ("Where adjudication of fraud claims turns upon issues of knowledge, reliance, and causation, direct evidence of the deliberative process is irreplaceable.").

## II.  DOCUMENTS FROM THE OFFICE OF LEGISLATION AND CMS'S RULEMAKING SUPPORT FILES ARE HIGHLY RELEVANT, NOT CUMULATIVE, AND NOT BURDENSOME TO PRODUCE.

Everyone would agree that Medicare and Medicaid payment for drugs is a politically charged issue.  Government witnesses have repeatedly admitted as much.[9]  The two principal places where the political process impacted what Medicare and Medicaid agreed to pay for drugs are in federal legislation and regulations.  The Government itself recognizes the potential

---

[9] *See, e.g.*, Buto Dep. at 362-63  (Ex. R) (when asked her opinion on why the Government maintained the AWP system:  "Politics, so a lot of concern on the part of physician groups, particularly oncologists, that, you know, they preferred the current AWP-based system for a number of reasons . . . And concern broadly across a variety of groups that a change would impede access to important treatment."); Scully Dep. at 141-42, 173 (Ex. S) (recalling political backlash when the various Presidential administrations tried to reform the AWP system from 1990 through 2003, and noting "politics is politics and that's what drove this issue for 10 years"); Vladeck Dep. at 189-90 (Ex. T) ("I had a growing feeling – again, I would put this in a period probably beginning about 1995 through the time I left the government – of frustration that we were significantly overpaying for Part B drugs, and that because of some combination, frankly, of political and legal constraints, we were unable to change it.").

relevance of material relating to the political process, and has sought extensive discovery from Abbott related to its lobbying efforts. *See* Dkt. No. 4791 at 10; Dkt. No. at 4938. At the same time, however, the Government has been completely unreceptive to allowing discovery into how that political process actually impacted the decision-maker. That is illogical and unfair.

Among the obvious places to look for how the political process impacted Medicare and Medicaid payment for drugs—and the real reasons underpinning the Government's decision to maintain the AWP-system until it fixed other inadequacies in the system—are CMS's Office of Legislation and its official Rulemaking Support Files.[10] Among other things, these files would likely contain evidence of what the Government expected and intended when it choose to maintain a payment scheme tied to AWP. For example, the Rulemaking Support File for the 1991 regulation basing Medicare payment for drugs upon "national average wholesale price" (56 Fed. Reg. 59,424) would likely explain, *inter alia*, what CMS meant by those terms and why CMS abandoned its initial plan to pay only at 85% of AWP. Both issues are important to Abbott's defense and potentially dispositive.

Magistrate Judge Bowler's finding that material from the Office of Legislation and the official Rulemaking Support Files would be "cumulative" of evidence already produced has no support in the record. The Government has not produced a scrap of non-public or internal material from these two key locations within CMS. By definition, then, these documents cannot be cumulative of what has already been produced. Indeed, the Government itself trumpets the unique "deliberative" nature of these documents, refusing to even thoroughly review or log them.

The Court should also be made aware of certain facts that Abbott finds remarkable, yet very disturbing: Despite its bluster about the magnitude of its production, the Government has

---

[10] Abbott's memorandum in support of its earlier motion to compel, Dkt. No. 4791, describes the duties of the Office of Legislation and its role of working with Congress on new legislation and policy concerning the concept of AWP and prescription drug payment. That brief also describes the documents in the Rulemaking Support Files.

actually produced just roughly *two boxes* of documents from CMS's Central Office—where most, if not all, of the key decisions were made.  The rest of its production comes from secondary locations like CMS Regional Offices, OIG, and Medicare Part B carriers.  The reason Abbott has received such a paltry production from CMS is readily apparent: as detailed in Abbott's Motion for a Preservation Order (Dkt. No. 4711) presently pending before the Court, the Government did not circulate a litigation document hold memorandum until 2007, and witness after witness has testified that their emails and files have been destroyed.[11]  As a result, the documents that the Government is hiding under its unsubstantiated privilege claim may be the *only* source of the information that is critical to Abbott's defenses.

Finally, on the subject of cumulativeness, Judge Bowler's finding ignores the difference between evidence that Abbott has already obtained and the evidence it has thus far been refused.  Undoubtedly, Abbott has obtained (largely through its own efforts) significant evidence demonstrating extensive Government awareness of spreads.  In marked contrast, Abbott has been denied access to documents on the dispositive question of *why* the Government did not do anything about its payment methodology in light of this knowledge and the various factors it considered and rejected in the process.  That is the other piece of the puzzle—the piece on which Abbott has been stonewalled.  The law does not countenance this result.  *See Dept. of Econ. Dev. v. Arthur Andersen & Co.*, 139 F.R.D. at 299 ("By asserting the claims of fraud against AA, the British Government necessarily places at issue questions of knowledge, justifiable reliance and causation … [A]t issue is the British Government's knowledge of DeLorean's activities, the extent of that knowledge, whether they justifiably relied upon AA's reports or *whether, as the*

---

[11] *See* Abbott's Memorandum in Support of its Motion for a Preservation Order and Affidavit Regarding Spoliation Issues (Dkt. No. 4711), at 2-7 (detailing the Government's destruction of documents, including emails, from key custodians, even after the this case was filed and subpoenas were issued to CMS).

*defendants contend, the government chose to ignore certain information it had before it and nonetheless approve the grants for political issues*.") (emphasis added).

Judge Bowler's finding on burdensomeness is also clearly erroneous.  In a case that seeks hundreds of million of dollars in damages dating back to 1001, and involves millions of pages of documents, it cannot be too much to ask the *plaintiff* to perform a privilege review on less than 5,000 already compiled documents.[12]  *See* Dkt. No. 4937 at 6; L. Parker Decl. at ¶ 12 (Ex. U). That is, in fact, precisely what the Court ordered the Government to do in its November 9 Order. This relatively slight burden is outweighed by the direct relevance of the documents to Abbott's defenses.  Indeed, regardless of Abbott's discovery requests, Government counsel should have reviewed this material to ensure the appropriateness of its allegations.  Requiring the Government to simply follow through with the production (or logging) of these already-compiled documents will impose no more than a *de minimis* burden.  *See Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1331 (N.D. Ill. 1991) ("The [documents] clearly contain information which is relevant to the damages issue, and because the information has already been compiled, there is no substantial burden imposed by ordering their production."); *Triax Co. v. U.S.*, 11 Cl. Ct. 130, 135 (Cl. Ct. 1986) ("Granting plaintiff's request should not overly burden defendant since the documents have been collected and photocopied already for the court.").[13]

The Government's burden argument rings hollow when compared with what it has demanded of Abbott and entities that are not even parties to this case.  Among other things,

---

[12] The Court's frame of reference with respect to the burdensomeness of discovery must align with the importance and scope of the litigation.  *See* Fed. R. Civ. P. 26(b)(2)(C) (when determining whether the proposed discovery is burdensome, the court is to take into account "the needs of the case, the amount in controversy, the parties' resources, the importance of the proposed discovery in resolving the issues").

[13] As a result of Abbott's motions to compel, the Government has already agreed to review 13 boxes of documents from CMS's Rulemaking Support Files containing "unknown documents."  There is no basis for Magistrate Judge Bowler's finding that reviewing the 18 boxes containing Rulemaking Support Files would impose an undue burden on the Government, or that production of documents from the Office of Legislation would be burdensome.

Abbott has had to restore decommissioned computer systems, search for and produce files from third-party locations and employees, produce documents from now defunct divisions, and collect and produce documents from more than 150 current and former employees dating back to 1991. These efforts have cost millions of dollars and consumed considerable time.  And take, for example, the case of Managed Healthcare Associates ("MHA"), a third-party that has faced extensive discovery demands in response to a Rule 45 subpoena from the Government.  MHA was asked to search each of its employees emails, as well as voluminous material from multiple MHA databases.  *See* Thomas Dep. at 11-12, 42 (rough transcript) (Ex. V).  MHA's president of information technology alone spent over *200 hours* of his personal time—and over $10,000 on software costs—to comply with the Government's production demands.  *Id.* at 45.  The result was a production of 50 to 60 gigabytes of data (well over 100,000 pages of documents and data). *Id.* at 44.  The Government's complaints about having to review and produce less than 20 boxes of already-assembled boxes documents merit little consideration.

## III.   THE GOVERNMENT'S BLANKET PRIVILEGE ASSERTION AND ITS REFUSAL TO EVEN REVIEW DOCUMENTS IS CONTRARY TO LAW.

With respect to documents from the Office of Legislation and CMS's Rulemaking Support Files, the Government has suggested that it has not even undertaken a review of the individual documents in those files to determine if all responsive, non-privileged documents have been produced.  *See* Jan. 31, 2008 Hr'g Tr. at 148 (Ex. E).  No privilege log of any kind has been created for these documents.  This superficial, short-cut approach is inappropriate.

*First*, the Government's blanket assertion of the privilege is improper under well-established law.  *See Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 135 (2006) ("Blanket assertions of the privilege are insufficient."); *Kaufman v. City of N.Y.*, No. 98-2648, 1999 WL 239698, at *4 (S.D.N.Y. 1999) ("This blanket approach to asserting the privilege is

unacceptable and *is itself grounds for denying invocation of the privilege*.") (emphasis added). This catch-all approach should be rejected, as it gives neither the Court nor the defendants any assurance that the privilege is being asserted appropriately.  Although Judge Bowler did not address this failure, it is reason enough to reject the Government's privilege assertions.

*Second*, the Government's refusal to have a responsible agency official review all of the material in the files of the Office of Legislation and the Rulemaking Support Files disregards the procedural requirements that are prerequisites to any assertion of the deliberative process privilege.  *See Pacific Gas & Electric Co. v. U.S.*, 70 Fed. Cl. 128, 136-37 (Fed. Cl. 2006); *United States v. Salemme*, Nos. 94-10287-MLW, 97-10009-MLW, 1997 WL 810057 (D. Mass. Dec. 29, 1997); *Grossman v. Schwarz*, 125 F.R.D. 376, 381 (S.D.N.Y. 1989).  These procedural requirements are an important check on over-aggressive and after-the-fact assertions of privilege by agency attorneys.  *See Mobil Oil v. Dept. of Energy*, 102 F.R.D. 1, 7 (N.D.N.Y. 1983) (finding that a failure to enforce these procedural prerequisites encourages government agencies "automatically to claim the broadest possible grounds for exemption for the greatest amount of information").  That, of course, is exactly what has happened here.

 The perfunctory (and tellingly imprecise) claims by the Government's declarants that "a large number of the documents" or "the substantial majority of documents" in these files could be privileged do not pass muster.  *See* Decl. of D. Johnson (Ex. W) & Decl. of L. Parker (Ex. U). If anything, it demonstrates the importance of document-by-document review.  If such a review were undertaken, Abbott and the Court would not have to rely on conclusory generalizations such as those offered by the Government's declarants.

*Finally*, the Government's refusal to provide a privilege log that adequately describes the documents it is withholding violates Federal and Local Rules.  *See* Local Rule 34.1(e) (requiring

the attorney asserting the privilege to identify the nature of the privilege that is being claimed

with respect to *each* document); Fed. R. Civ. P. 26(b)(5) ("When a party withholds information

otherwise discoverable under these rules by claiming that it is privileged . . . , the party shall

make the claim expressly and shall describe the nature of the documents, communications, or

things not produced or disclosed in a manner that, without revealing information itself privileged

or protected, will enable other parties to assess the applicability of the privilege or protection.").

The Federal and Local Rules do not provide any litigant, including the federal Government, a

free pass to ignore these fundamental rules.  Allowing the Government to deep-six these

documents without even providing a log to its opponent is offensive to our system of discovery.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that its objections be sustained

and that the Court issue a ruling requiring the Government to produce for *in camera* review

cross-cutting documents in accordance with the Court's November 9, 2007 Order.  In the

alternative, Abbott should be allowed to select a subset of documents from the Government's

privilege log that it believes will demonstrate that a substantial number of documents withheld

by the Government should be produced in this litigation, or the Court should appoint a special

master to assist with *in camera* review of cross-cutting documents.  In addition, Abbott requests

the Court order the Government to produce all relevant non-privileged documents, including

cross-cutting documents, from CMS's Office of Legislation and Rulemaking Support Files.  In

the event the Government withholds any documents from the Office of Legislation and

Rulemaking Support Files as protected under the deliberative process privilege, the Court should

require the Government to follow the appropriate procedures for asserting the privilege and

require the Government to provide a privilege log that complies with Local Rule 34.1(e).

Dated:  February 15, 2007

Respectfully submitted,

/s/ James R. Daly
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Louis P. Gabel, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S OBJECTIONS TO MAGISTRATE JUDGE BOWLER'S FEBRUARY 1, 2008 ORDERS to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 15th day of February, 2008.


_____/s/ Louis P. Gabel_____
Louis P. Gabel