# Exhibit M

tion drugs may look frighteningly familiar to durable medical equipment suppliers.

The study compared the median Medicare reimbursement amount for 24 drugs, including albuterol sulfate and two other nebulizer drugs, with the median amount the **Department of Veteran Affairs** paid for the same drugs. The study claims Medicare paid an estimated $1.6 billion too much for drugs in 1999.

"The published [average wholesale prices] that Medicare carriers currently use to establish reimbursement amounts bear little or no resemblance to actual wholesale prices that are available to physicians, suppliers, and other large government purchasers" such as the VA, the OIG charges. It recommends the **Health Care Financing Administration** use the AWPs supplied by the **Department of Justice** and **First Databank** as a first step in reducing these "excessive drug reimbursement amounts."

This other set of AWPs is exactly what HCFA proposed to use to set payment rates starting in October 2000, before Congress stepped in and halted its efforts to do so—a move that received a standing ovation from suppliers everywhere. And the use of this other set of AWPs would result not only in DME suppliers exiting the Medicare market for prescription drugs, but also a decline in patient choice and quality, charges a competing study by Falls Church, VA-based research firm **The Lewin Group**.

The Lewin study, commissioned by the **American Association for Homecare**, surveyed 12 suppliers of respiratory therapy and infusion drugs to determine the potential consequences of Medicare switching over to these new AWPs. And its findings shouldn't surprise suppliers:

1) the total cost of providing respiratory and infusion drugs in the home far exceeds the cost of simply acquiring the drug;

2) under the reductions, all 12 companies surveyed expected to experience an average 93 percent operating loss for these drugs;

3) the companies expecting the largest losses tended to be the largest suppliers and serve the largest number of Medicare patients; and

4) beneficiaries' access to these drugs and treatments would diminish drastically because many suppliers would leave the Medicare market.

The main problem is that up to 74 percent of the costs of providing respiratory and infusion therapy aren't related to acquiring the drug itself, the study says. Other services such as patient education, clinical monitoring of patients, nursing care,

sponse, and delivery are the most costly. And currently Medicare doesn't pay for these services beyond the "excessive" drug reimbursement amounts.

Indeed, "no company surveyed would remain profitable for the provision of home respiratory and infusion drug therapies to Medicare and Medicaid patients should the proposed AWP reductions be implemented," the study claims.

And real-world experiments in such cuts prove the study's point. Currently 17 states have imposed similar cuts in their drug reimbursement rates for Medicaid patients, according to the **National Home Infusion Association**. Companies in 15 of these states already have begun curtailing their services to new Medicaid patients, NHIA says.

In response to the OIG report, HCFA acknowledged that respiratory and infusion drug providers rely on the reimbursement rates to cover services for which Medicare does not currently reimburse. In a letter to former HHS Inspector General **June Gibbs Brown**, former HCFA Acting Administrator **Michael Hash** writes "the administrative actions we take to reduce the price of a drug need to take such expenses into account."

What kinds of administrative actions HCFA will take are unknown, and will remain so at least until the **General Accounting Office** performs another AWP study as BIPA orders. ◊

*Editor's Note: To see the OIG report, go to: http://www.hhs.gov/oig/oei/reports/a508.pdf.*

*Quality Improvement*
## HHAs SHOULD EXAMINE ADVERSE EVENT REPORTS IMMEDIATELY

The way your agency prioritizes adverse events for investigation could make all the difference when a surveyor shows up on your doorstep.

Home health agencies must download and inspect the new case mix and adverse event outcome reports as soon as state systems allow, urges **Mark Fuentes**, financial consultant with **The Anesis Group** in Knoxville, TN. Figuring out how to prioritize the adverse events for investigation and incorporate the process into existing quality improvement efforts is bound to take a while, and the **Health Care Financing Administration** gives agencies only three to six months to do so.

HHAs first must realize the data reflected in the adverse event and case mix reports could be off, since it is based on the beginning of Outcome and Assessment Information Set collection. "Un-