# Exhibit O



EXHIBIT

Abbott 381

PENGAD 800-631-6989



**Abt Associates Inc.**

# Medicaid and Medicare Drug Pricing:  Strategy to Determine Market Prices

**Final Report**

Cambridge, MA
Lexington, MA
Hadley, MA
Bethesda, MD
Washington, DC
Chicago, IL
Cairo, Egypt
Johannesburg, South Africa

**Contract #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
Task Order 1**

August 30, 2004

*Prepared for*
Deirdre Duzor
Centers for Medicare and
    Medicaid Services
Mailstop s2-01-16
7500 Security Boulevard
Baltimore, MD  21244

*Prepared by*
Stephen W. Schondelmeyer
*PRIME Institute,*
*University of Minnesota*
Marian V. Wrobel
*Abt Associates Inc.*

Abt Associates Inc.
55 Wheeler Street
Cambridge, MA  02138

based on a Federal upper limit (FUL), also known as a maximum allowable cost (MAC) limit and some states have state MACs on many more drug products than included on the federal FUL list. This FUL or MAC is not directly based on AWP, but is almost always substantially less than AWP for most generic drug products.

Most experts agree that AWP, or even the typical discounts to AWP, exceed actual acquisition costs for both pharmacies and physicians.[15]  This is particularly true for generic drugs.  At the same time, these experts agree that Medicaid dispensing fees are low relative to actual dispensing costs.  One panel member commented, "If it weren't for the AWP spread, the pharmacies would be out of business."  Payments based on the cost structure experienced by pharmacies may warrant payment of a reasonable and managed spread (an amount paid above the actual acquisition cost), in addition to a fixed dispensing fee and an appropriate service fee for medication therapy management.  Therefore, reform of the drug product cost component of the payment system must be considered in association with reform of other components of the payment system.

## 2.4   Medicare Part B Drug Program and Expenditures

Currently, Medicare Part B generally covers drugs that are "incident to" a physician's service, durable medical equipment (DME) drugs, and drugs specifically covered by statute (for example, oral immunosuppressive drugs).  Drugs that fall under the category of "incident to a physician's service" include drugs that cannot be self-administered such as injectible and intravenous agents for oncology, rheumatoid arthritis, and nausea.    Part B drug expenditures grew from $3.3 billion in 1998 to $8.4 billion in 2002   nearly a three-fold increase in four years.  Both payment method and trends for specific drugs within the Medicare Part B drug program have contributed to the growth in drug program expenditures.

**Legislative and Regulatory History**

From 1991 to 1998, the method of payment for drugs under Medicare Part B was based on the lower of:  (1) estimated acquisition cost (EAC) or (2) average wholesale price (AWP) for a drug.  If a drug was available from multiple sources, the payment was based on the median of the national average wholesale prices for generic equivalents.  The estimated acquisition costs were defined as the "actual invoice prices paid by the providers furnishing the drug" and were to be determined based on provider surveys.[16]  In addition to the drug cost, the survey was to include indirect costs such as inventory, waste, and spoilage.  Practically, the fiscal intermediaries set the payment limit as AWP according to the Red Book or First Databank's Blue Book.  In contrast, in the early 1990s the Medicaid program was using EAC defined by most states as AWP –X percent, with the reduction to AWP ranging from 5 to 15 percent.  The statutory basis for Medicare drug payments changed to AWP – 5 percent beginning on January 1, 1998.  Another change known as 'least costly alternative' (LCA) developed through certain fiscal intermediaries as early as mid-1997.  The LCA approach reasoned that when there were two or more similar or equivalent therapeutic alternatives, the Medicare Part B payment could be limited to the cost of the least costly alternative.  This LCA approach started in just a few states, but by 2002 had spread to more than 40 states.

Beginning January 1, 2004, the payment amount for drugs administered by physicians was revised based on statutory language contained in the Medicare Prescription Drug, Improvement, and Modernization Act (MMA; Pub.L. 108-173).  The new payment method was to be 85 percent of the AWP as of April 1, 2004 for most physician-administered drugs with certain exceptions.  The MMA further described payment rules to be implemented January 1, 2005 based on manufacturer submission of data on a drug's average sale price (ASP).  The ASP is defined in the MMA as the amount of the manufacturer's sales revenue to all purchasers divided by the total number of units sold in a given quarter.  The manufacturer should include the effect of "volume discounts, prompt pay