# Exhibit N

# CBO
# TESTIMONY

Statement of
Douglas Holtz-Eakin
Director

## Payments for Prescription Drugs Under Medicaid

before the
Special Committee on Aging
United States Senate

July 20, 2005

*This statement is embargoed until it is delivered at 2:30 p.m. (EDT) on Wednesday, July 20, 2005. The contents may not be published, transmitted, or otherwise communicated by any print, broadcast, or electronic media before that time.*



**CONGRESSIONAL BUDGET OFFICE**
SECOND AND D STREETS, S.W.
WASHINGTON, D.C. 20515

Case 1:01-cv-12257-PBS Document 5049-15 Filed 02/15/2008 Page 3 of 10

Case 1:01-cv-12257-PBS Document 5051-15 Filed 02/15/08 Page 3 of 10
Case 1:01-cv-12257-PBS Document 5049-15 Filed 02/15/2008 Page 3 of 10

Mr. Chairman, Ranking Member Kohl, and Members of the Committee, thank you for the opportunity to be here today to discuss the government's system for purchasing prescription drugs under the Medicaid program. Medicaid's spending on prescription drugs has increased rapidly in recent years, growing at an average annual inflation-adjusted rate of 15 percent between 1998 and 2004 to a level of about $30 billion. That spending will undergo a significant onetime drop—of roughly one-half—with the introduction of the Medicare drug benefit in 2006, as dually eligible beneficiaries switch their coverage to Medicare. Nonetheless, upward pressure on prescription drug spending will continue to pose budgetary challenges for the federal government as well as for state governments under Medicaid.

In my testimony today, I will discuss some important features of the process by which Medicaid purchases prescription drugs in the fee-for-service sector of the program, including the way it reimburses pharmacies for drug purchases and the rebate it receives from drug manufacturers. I will also briefly address how the prices that Medicaid pays for drugs compare with the prices paid by other purchasers.

## Medicaid's System for Purchasing Prescription Drugs

In the fee-for-service portion of the program, Medicaid pays private pharmacies for prescription drugs that the pharmacies have dispensed to Medicaid beneficiaries.[1] The process by which drug products and payments flow between drugmakers, pharmacies, state Medicaid agencies, and beneficiaries is illustrated in Figure 1. (This is a stylized depiction of the highly varied state programs and may not fit any one program precisely.)

The system works in the following way. A Medicaid beneficiary obtains a prescription drug from a participating pharmacy, which has previously purchased the drug in the marketplace from a manufacturer or wholesaler. The pharmacist receives payment from the state Medicaid agency based on the state's formula for approximating the cost of acquiring and dispensing the drug. The drugmaker pays rebates directly to the state Medicaid agency, which also receives matching payments from the federal government. (Those rebates are taken into account when federal matching payments to the states are calculated. Thus, the federal government shares the savings from the rebates with the states.)

---

1. In some cases, state Medicaid programs pay a capitated amount to a health maintenance organization to manage the drug benefit for certain beneficiaries. Such cases are not part of the analysis presented here.

**Figure 1.**
## Medicaid's System for Purchasing Prescription Drugs



Source: Congressional Budget Office.

## Medicaid's Payments to Pharmacies

Federal regulations allow states broad discretion in setting payments to pharmacies for Medicaid drug purchases, and states vary significantly in the formulas they use to determine the payments. Generally, though, the payment has two components. One component is a dispensing fee, usually a fixed amount of $3 to $5, which is meant to cover costs associated with storage, consultation, and dispensing. The second component is an approximation of the prevailing market price for the drug, which is meant to cover the cost that the pharmacy faces in acquiring it. Currently, the proxy used for that second component is usually based on the average wholesale price (AWP) of the drug. The AWP is essentially a sticker price and does not directly correspond to any actual market transaction. As a list price, it offers the advantage of being readily available. But it suffers the drawback of being an imperfect representation of the true cost a pharmacy faces when acquiring a drug. In practice, the AWP is usually higher than actual market-transaction prices. In recognition of that fact, the second component of Medicaid's payment for brand-name drugs is often set at roughly 10 percent to 15 percent below the AWP.

For brand-name drugs, pharmacies typically pay a fairly constant proportion of the list price, and states can adjust their pharmacy payment rates to reflect the gap between acquisition costs and list prices. For generic drugs, however, the list price is not a good predictor of what pharmacies actually pay. In recognition of that fact, both the Centers for Medicare and Medicaid Services (CMS) and the states set payment limits on generic drugs, although those limits—especially for newer generic drugs—often take considerable time to establish. When pharmacies are paid for newer generic drugs on the basis of the average wholesale price, Medicaid's payments can greatly exceed the actual cost of the drugs.

In a recent analysis, the Congressional Budget Office (CBO) compared Medicaid's payments to pharmacies with the amounts actually received by the manufacturers of the drugs.[2] The difference between Medicaid's payment and the amount received by manufacturers is referred to as the markup on the drug and reflects what is retained by all parts of the drug distribution chain, including wholesalers, where relevant.

CBO found that in 2002 Medicaid paid pharmacies about $61 per prescription, on average (see Table 1). That payment consisted of two parts: an amount that went to the manufacturer to acquire the drug, which averaged $47 per prescription, and the amount retained by pharmacies and wholesalers—the markup—which averaged about $14 per prescription. Thus, on average, pharmacies and wholesalers retained about 23 percent of the amount that Medicaid paid pharmacies for prescription drugs in 2002.

While brand-name drugs were much more expensive than generic drugs, the amount retained by pharmacies and wholesalers on a per-prescription basis was about the same—at $14 per prescription—for the two categories of drugs. (It is also the case that the bulk of the cost of distributing and dispensing drugs does not differ much between brand-name and generic drugs.) Overall, brand-name drugs cost the Medicaid program about $97 per prescription, with the amount received by manufacturers constituting most of that cost. Generic drugs cost Medicaid about $20 per prescription, with the amount retained by pharmacies and wholesalers constituting the bulk of that cost.

Generic drugs are an important source of revenue for pharmacies. About half of all Medicaid prescriptions are for generic drugs, and generic drugs make up about half of the total markup revenues retained by pharmacies and wholesalers. By contrast, brand-name drugs constitute nearly 85 percent of Medicaid's total spending on prescription drugs.

---

2. See Congressional Budget Office, *Medicaid's Reimbursements to Pharmacies for Prescription Drugs* (December 2004).

3

**Table 1.**

## Components of Medicaid's Payments for Prescription Drugs, 2002

(Dollars per prescription)

|  | Medicaid's Payments to Pharmacies | Acquisition Costs[a] | Markups | Percentage of Prescriptions Dispensed |
|---|---|---|---|---|
| All Drugs | 60.90 | 47.10 | 13.80 | 100 |
| Generic Drugs | 19.90 | 6.00 | 13.80 | 47 |
|   Newer | 45.70 | 13.60 | 32.10 | 8 |
|   Older | 14.20 | 4.40 | 9.90 | 39 |
| Brand-Name Drugs | 97.30 | 83.40 | 13.80 | 53 |

Source: Congressional Budget Office (CBO) based on data from the Centers for Medicare and Medicaid Services (CMS).

Note: Numbers in the tables of this testimony may not add up to totals because of rounding.

a. To estimate acquisition costs, CBO used the average price that manufacturers earned on sales of outpatient drugs to wholesalers and pharmacies, as reported to CMS under Medicaid's rebate program; see Congressional Budget Office, *Medicaid's Reimbursements to Pharmacies for Prescription Drugs* (December 2004).

Markups for newer generic drugs were substantially higher than markups for older generics. Older generic drugs cost $14 and had an average markup of about $10—less than that for any other category of prescription drugs. New generic drugs cost $46 on average and had an average markup of $32—much higher than for any other category of drugs.

When the amount a pharmacist retains on a generic drug is higher than the amount retained on its brand-name counterpart, the pharmacist has a clear incentive to dispense the generic drug. Thus, the higher markups on newer generic drugs probably give pharmacists a strong incentive, where possible, to steer beneficiaries to those drugs.[3] From the perspective of the system as a whole, that outcome may be desirable because it makes the total cost of the prescription much lower than if the brand-name drug were used. Maintaining such incentives

---

3. For generic drugs, because pharmacies frequently have the choice of acquiring what is essentially the same drug from several manufacturers, manufacturers may also have an incentive to increase the gap between their list prices and the prices they charge pharmacies as they compete for pharmacies' business. This is particularly true before an upper limit has been placed on pharmacy payments for the generic drug.

4

might be an important consideration in assessing Medicaid's payment system for prescription drugs.

## Medicaid's Rebate from Manufacturers

Payments to pharmacies are one part of the financial flows in Medicaid. Another part is the rebate that manufacturers pay to the Medicaid program. In order to have their products covered by Medicaid, drug manufacturers must enter into a rebate agreement with CMS.

The size of the rebate is determined by two confidential prices reported quarterly to CMS by the manufacturer. The first is the average manufacturer price (AMP), which is the average price that a drugmaker receives on a drug in a given quarter for sales to the retail pharmacy class of trade. The second is the lowest transaction price, or "best price," charged to any buyer in the private market (including any rebates or discounts).[4]

For brand-name prescription drugs, the amount that drugmakers are obliged to rebate to Medicaid has two components: the basic rebate and the additional rebate. (For generic and over-the-counter drugs, drug manufacturers must pay a rebate of 11 percent of the AMP.)

Under the basic rebate formula, the required payment is the larger of either a "flat rebate" amount—currently 15.1 percent of the AMP—or the difference between the AMP and the best price extended to any private buyer. For example, suppose that the AMP for a given drug is $2 per unit, and the reported best price in the private market is $1 per unit. The best-price discount in this case would be $1, or 50 percent of the AMP. Because the percentage discount in this case exceeds the flat rebate of 15.1 percent, the rebate (for all units of this drug purchased on behalf of Medicaid beneficiaries) would be 50 percent of the AMP. If the AMP was $2 and the best price was $1.80, then the best-price discount would reflect only a 10 percent discount relative to the AMP, and the appropriate rebate would be 15.1 percent of the AMP.

Depending on how much they increase the prices that they charge private purchasers over time, manufacturers may have to pay an additional rebate to Medicaid beyond the basic rebate. Every drug covered by Medicaid has a base-period AMP that is determined by the drug's original market price and that serves as a reference point for calculating the additional rebate. For a given quarter, no additional rebate is owed if the drug's current AMP does not exceed

---

4. Manufacturers sometimes charge nominal prices for drugs such as those provided to charities or other not-for-profit entities. Those nominal prices are not part of the best-price calculation.

5

**Table 2.**

## Estimated Average Unit Rebate Received by Medicaid for Brand-Name Prescription Drugs, 2003

(As a percentage of the average manufacturer price)

| Basic Rebate | Additional Rebate | Total |
|---|---|---|
| 19.6 | 11.7 | 31.4 |

Source: Congressional Budget Office, *The Rebate Medicaid Receives on Brand-Name Prescription Drugs* (June 21, 2005).

its inflation-adjusted base-period level, as measured using the consumer price index for urban consumers (CPI-U). If the AMP does exceed that inflation-adjusted level, then an additional rebate equal to the excess amount is owed.

According to CBO's estimates, in 2003 the average rebate received by Medicaid for brand-name prescription drugs was 31.4 percent of the AMP (see Table 2).[5] The average basic rebate was 19.6 percent of the AMP, or slightly less than two-thirds of the total rebate percentage. The remainder, 11.7 percent of the AMP, was attributable to the additional rebate.

The average basic rebate percentage has remained fairly stable at about 20 percent of the AMP in recent years. The additional rebate percentage, however, has risen somewhat. The latter outcome would be expected to occur in periods during which average manufacturer prices increased rapidly compared with overall inflation. The slight growth in the total unit rebate from the mid-1990s to 2003 is attributable to a higher additional rebate.

## How Medicaid's Net Payments Compare with Those of Other Purchasers

After accounting for the rebates, how does the amount that Medicaid pays for drugs compare with the prices paid by other federal programs and private-sector purchasers? CBO finds that the net prices Medicaid pays for brand-name drugs are, on average, about as low as Federal Supply Schedule prices.[6] (The Federal Supply Schedule is a list of negotiated prices at which any direct federal

---

5. See Congressional Budget Office, *The Rebate Medicaid Receives on Brand-Name Prescription Drugs* (June 21, 2005).

6. See Congressional Budget Office, *Prices for Brand-Name Drugs Under Selected Federal Programs* (June 2005).

6

purchaser can buy prescription drugs.) And Medicaid prices are significantly lower on average than the lowest prices paid to manufacturers by private-sector purchasers (as reported by manufacturers under Medicaid's rebate program). So in terms of net payments to manufacturers for brand-name drugs, Medicaid does as well as many other federal purchasers and better than the private sector. However, some federal agencies, such as the Department of Veterans Affairs—which makes active use of formularies—pay net prices to manufacturers that on average are even lower than the net price paid by Medicaid.