# Exhibit E



# HOGAN & HARTSON



Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
+1.212.918.3000 Tel
+1.212.918.3100 Fax

www.hhlaw.com

Jan 30 2008
7:21PM

January 30, 2008

Lyndon M. Tretter
Partner
1.212.918.3528
lmtretter@hhlaw.com

*VIA FACSIMILE AND FIRST CLASS MAIL*

Shoshanah V. Asnis, Esq.
Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224-0341

Re:   **In re Pharmaceutical Indus. Average Wholesale Price Lit.
MDL No. 1456 (D. Mass)(Saris, J.) (the "AWP MDL").**

Dear Shoshanah:

This is respond to your letter of January 28, 2008 concerning the deposition and document subpoena issued to the New York State Department of Health in the above-captioned AWP MDL. I am available to meet and confer on the scope of the subpoena at your earliest convenience. Also, as requested, this is to give you a preview in writing of how the topic areas we have identified in the subpoena are relevant and necessary to the defense of the Revised First Amended Consolidated Complaint (the "Complaint") filed by New York City and numerous New York counties in that case.

The three primary surviving causes of action in the Complaint are under Gen. Business Law § 349, Soc. Serv. Law 145-b and common law fraud. The latter two require, among other things, proof of (i) the defendant's intent to defraud and (ii) plaintiff's reasonable reliance on the defendant's falsity. All three require proof of causation; that is, proof that defendant's falsity not only caused plaintiff to act differently, but also that defendant's conduct (as opposed to some extraneous factor) foreseeably caused plaintiff's loss. The topic areas in the subpoena go to these issues, among others in the case. They also go to defendants' affirmative defense based on statutes of limitations that New York Medicaid was on notice of the alleged fraud well before the first county commenced suit. Finally, the subpoena is directed to the State Department of Health because it is the State, not the counties, that made the decisions based on defendants' alleged fraud.

\\\NY - 058559/000180 - 1071141 v1

Shoshanah V. Asnis, Esq.
January 30, 2008
Page 2

FULs and their relationship to acquisition costs (see Doc Req. Nos. 5, 7, 17)

      New York Medicaid paid medical providers who supplied a beneficiary with a multi-source drug for which there was a federal upper limit ("FUL") an ingredient cost amount equal to the FUL. According to federal regulation, the FUL is calculated at 150% of the lowest price published among certain therapeutic equivalents of the drug in question. The Complaint alleges that manufacturers engaged in a fraud upon New York Medicaid whenever they sold one of these therapeutic equivalents to providers at prices more than 50% below the FUL. (Complaint ¶ 15). Obviously, there can be no claim of fraud unless New York Medicaid paid providers the FUL while acting under the false assumption of that the FUL was no more than 50% over pharmacies' actual acquisition costs. The discovery we seek is directly relevant and necessary to testing this assumption.

MACs and other measures for reimbursing multi-source drugs (see Doc. Req. Nos. 4, 18)

      Federal regulations state that FULs are "upper limits" and that individual state Medicaid programs are free to pay providers for multi-source drugs at rates below those limits. Pursuant to that authority many States have adopted MACs or have adopted alternative methods for lowering ingredient cost reimbursement amounts for multi-source drugs. New York Medicaid did not adopt MACs until very recently. Discovery into New York Medicaid's understanding of MACs is relevant to the above question of the relationship (or lack thereof) between FULs and provider acquisition costs for multi-source drugs and the causation question of whether New York Medicaid had reasons other than the alleged falsity of the published prices for choosing to rely on FULs instead of MACs or other alternative payment measures.

Dispensing and/administering costs and dispensing fees (see Doc Req. Nos. 6-9)

      Under New York Medicaid, a provider not reimbursed under a single "usual and customary" billed amount is entitled to a separate fee for dispensing or administering a drug to a beneficiary in addition to a payment for the drug ingredient itself. In 1994, the Pharmacists Society of the State of New York and the Governor's office settled their litigation over Medicaid reimbursements for drugs by agreeing to "language included in Ch. 170 of the Laws of 1994 specifying how the Department of Social Services . . . will pay for prescription drugs" under New York Medicaid. Specifically, the parties "mutually agreed that . . . the drug payment and the dispensing fee payments of the methodology [to be submitted to the Legislature] would be implemented together and are interdependent . . . ." We believe that the Department will have additional information on this subject which will disprove plaintiffs' claim that ingredient cost reimbursements were affected by "inflated" published prices and that will show that, for ingredient costs and dispensing fees must be seen as one "bundle."

Amount of Medicaid drug co-payments and the collectibility thereof (see Doc. Req. No. 13)

      Part of the federal mandate for state Medicaid programs is that beneficiaries be afforded access to care similar to that enjoyed by persons with private health coverage. If a State chooses to impose a co-payment obligation on a Medicaid beneficiary, it must consider the

Shoshanah V. Asnis, Esq.
January 30, 2008
Page 3

beneficiaries' ability to pay as well as the providers' ability to collect as part of the "access" equation. If, for example, the co-payment amount is significant and providers have difficulty collecting it, then the providers may not participate in the Medicaid program and this could affect beneficiaries' access to care. Discovery will show that New York Medicaid is aware of co-payment collection rates on prescription drugs and that it modifies its own ingredient cost and dispensing fee payments to providers accordingly. This discovery is necessary and relevant to showing that access-to-care concerns, not defendants' allegedly false published prices, are the proximate cause of the amounts paid by New York Medicaid to providers.

Drug reimbursement to physicians at actual cost, while other (non-physician) providers receive reimbursement for the same drug at a different rate (see Doc. Req. Nos. 10-12, 19)

New York Medicaid pays for the same drug's ingredient cost at different rates based on the kind of provider who supplies the drug to the beneficiary. For example, pharmacies may be paid based on published prices for drugs whereas physicians may be paid based on their actual acquisition cost of the drug. Discovery into these disparities is relevant to whether New York Medicaid was defrauded by the published prices and to the question of whether defendants had an intent to defraud or reason to believe that the State understood the differences between published prices and acquisition costs.

Supplemental Medicaid rebates; AMP (see Doc Req. Nos. 14, 19)

The Complaint repeatedly contends that published AWPs, WACs and FULs are "inflated" compared to the "true" prices paid by for drugs by providers. Defendants seek discovery into New York Medicaid's understanding of other price terms such as AMP (a term based on actual transaction prices that is often used when States obtain "supplemental" rebates) to demonstrate that New York Medicaid understood the difference between published price terms and transactional price terms. Simply put, if New York Medicaid understood the difference between AWP and AMP and had access to information about both, then it was not defrauded by the AWPs.

Actual and potential changes to prescription drug reimbursement methodology under Medicaid or EPIC (see Doc. Req. No. 20)

Defendants are aware that New York Medicaid and the EPIC program have changed over time the amounts that they pay providers for ingredient costs and dispensing fees. We are aware that the programs have considered, but not adopted, many other changes. We believe that this discovery will prove that New York Medicaid has tracked provider acquisition costs, dispensing costs, co-payment collections, beneficiaries' access to care, inflation -- among many other factors that go into setting provider payment rates relating to prescription drugs. We are confident that this discovery will show that it is these factors and not the alleged falsity in published prices for drugs that have influenced New York Medicaid's payment rates.

Shoshanah V. Asnis, Esq.
January 30, 2008
Page 4

The "carve-out" of drug coverage from the Medicaid managed care plans (see Doc Req. No. 21)

   Prior to 1998, Medicaid beneficiaries enrolled in certain managed care programs were permitted to receive prescription drugs only from a closed pharmacy network approved by the program operator. The Medicaid program paid the operator a capitated per member per month allowance for prescription drugs. In 1998, New York Medicaid agreed to allow managed care enrollees to go to any licensed pharmacy for their prescription drugs and agreed to pay the pharmacy provider based on the same "fee for service" methodology (i.e. including ingredient costs based on published drug prices and dispensing fees) applied to Medicaid beneficiaries not in managed care programs . At the same time, New York Medicaid lowered the dispensing fees paid to all pharmacies under the fee for service model. Defendants seek discovery of this episode because we believe it presents a "crystallized" example of the factors – ingredient costs, dispensing fees, access to care – that New York Medicaid has sought to balance. It shows that, far from being defrauded by allegedly "false" or "inflated" published prices, New York Medicaid understood what the published prices meant and used them in carefully crafted ways.

Drug pricing compendia:  MediSpan, First Databank and Redbook (Doc. Req. Nos. 24, 25)

   New York Medicaid used primarily MediSpan and First Databank as its source of published AWPs for ingredient cost reimbursement of single-source drugs and multi-source drugs not subject to FULs. It is these prices that plaintiffs claim were false and inflated. A claim of fraud necessarily assumes that New York Medicaid believed the published prices to be one thing (i.e., true and accurate representations of transaction prices) instead of another (i.e., manufacturer list prices subject to mark-ups by the publications). Obviously, we need discovery of New York Medicaid's understanding of the publications' prices.

Litigation Demonstration Projects involving NYC and the Counties (see Doc Req. Nos. 39-40)

   The plaintiffs contend that the State Department of Health has authorized their lawsuits as "Litigation Demonstration Projects." Discovery on this subject is relevant because if the lawsuits have not been so authorized the Counties may not have standing to proceed with the lawsuit.

*    *    *

   The above discussion is not intended to be an exhaustive explanation of why the discovery defendants seek in the subpoena is relevant and necessary. As noted at the outset, this letter is intended only to outline defendants' positions in advance of our telephone call. I would be happy to explain any and all of the requests in greater detail when we speak. I also direct your attention to a letter I have sent to Gregor Macmillan, Esq. regarding his objections to the depositions that we seek of specific former and current employees of the New York State Department of Health. It is responsive to your letter's invocation of Judge Saris's June 21, 2007 Findings of Fact and Conclusions of Law in the AWP MDL and the Third Department's decision in *Spitzer v. Pharmacia.* Enclosed for your convenience is a copy of that letter. Finally, I am

Shoshanah V. Asnis, Esq.
January 30, 2008
Page 5


copying Joanne Cicala, counsel for New York City and the Counties in the AWP MDL, since
you have seen fit to include Ms. Cicala as a recipient of your letter to me.

Sincerely,

Lyndon M. Tretter

/lmt

Enclosure

Cc:  Gregor N. Macmillan, Esq. (via fax w/o enc.)
     All counsel of record via Lexis/Nexis (w/o enc.)





Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022
+1.212.918.3000 Tel
+1.212.918.3100 Fax

**www.hhlaw.com**

January 30, 2008

Lyndon M. Tretter
Partner
1.212.918.3528
lmtretter@hhlaw.com

*VIA FACSIMILE AND FIRST CLASS MAIL*

Gregor N. Macmillan, Esq.
Director, Bureau of Health Insurance Programs
Division of Legal Affairs
New York State Department of Health
Corning Tower
Gov. Nelson A Rockefeller Empire State Plaza
Albany, New York 12237

      Re:    **In re Pharmaceutical Indus. Average Wholesale Price Lit.**
              **MDL No. 1456 (D. Mass).**

Dear Mr. Macmillan:

        This is respond to your three letters of January 25, 2008 concerning the deposition and document subpoenas issued in the above captioned "AWP MDL" to Mark Richard Butt, Mary Alice Brankman and Michael Falzano as present and former employees of the New York State Department of Health (the "Department").

        First, as a procedural matter, I am unaware of any rule of federal or state court practice that requires a deposition subpoena to an individual fact witness to itemize subject areas of testimony sought. The point is simply to obtain the individual's best recollection of matters as to which the witness has personal knowledge. However, several of the subject areas are broadly described in a letter that I have sent to the New York Attorney General's office concerning a subpoena addressed to the Department as an entity. I attach a copy of that letter for your convenience.1/ Moreover, I am also willing to work with you and the witnesses on the other

---

    1/ In the spirit of cooperation, I also enclose herewith a few examples of the kind of documents with which I expect to question the witnesses: (1) draft memorandum dated February 11, 1988 by Mary A. Brankman on behalf of Ilene Margolin to Governor Cuomo (discussing federal upper limits for multi-source drugs and states' abilities to substitute "their own unique approach as long as it meets the 'aggregate test'"); (2) September 20, 1994 fax from the Budget Department of the State Executive to Mike Falzano enclosing letter for countersignature by Pharmacists Society of the State of New York ("PSSNY") (in which parties confirm the basis for "our agreement regarding the language included in Ch. 170 of the Laws of 1994 specifying how the Department . . . will pay for prescription drugs under" Medicaid); and (3) responses in 2002 by Mark

Gregor N. Macmillan, Esq.
January 30, 2008
Page 2

issues you raise, such as timing of compliance with the subpoenas, burden, reimbursement of expenses and protection of legitimate claims of privilege.

Second, I certainly understand that, as former employees of the Department, Ms. Brankman and Mr. Falzano might not have access to documents responsive to the subpoenas addressed to them. It is sufficient for them to confirm that under oath at the depositions. I find it hard to believe, however, that Mr. Butt as a present Department employee does not have possession, custody or control of responsive documents. Indeed, based on a handful of documents to which the Attorney General's office has directed me, some of which I discuss in the footnote above, I have reason to believe that Mr. Butt has many more responsive documents.

Third, you state that the three witnesses each request that we withdraw the subpoenas for their depositions and that if we fail to do so, they will move to quash based on, among other things, Judge Saris's June 21, 2007 Findings of Fact and Conclusions of Law in the AWP MDL and the Third Department's decision in *Spitzer v. Pharmacia*. We decline to withdraw the subpoenas and believe that the authorities you cite are inapposite.

In *Pharmacia*, the Court denied the requested discovery because "the causes of action" pled by the State "do not depend on an allegation that [Medicaid] agencies or officials were deceived." Instead, the State had assumed the burden of "prov[ing] that the Legislature had intended the 'average wholesale price' to be based upon prices actually paid and that [drug manufacturers] were required to provide those prices rather than list prices to the reporting services." 39 A.D.3d 1117, 1118-19. By contrast, the plaintiff counties and New York City assert common law fraud and Soc. Serv. Law 145-b claims that are necessarily based on (a) manufacturers' having an intent to defraud in their price reporting (not on a statutory duty to report prices in a particular manner) and (b) on New York Medicaid's and its officials' having relied on a false impression about published prices. Moreover, the cases in the AWP MDL, and thus our subpoenas, involve many issues besides "average wholesale prices", such as federal upper limits, maximum allowable costs, dispensing fees, Medicaid beneficiary co-payments -- just to name a few -- as to which the *Pharmacia* decision has not the slightest bearing.

I am not exactly sure to what aspect of Judge Saris's ruling you refer in threatening to move to quash our subpoena, but having been an active participant in the litigation before Judge Saris, I can tell you that the type of discovery we are seeking from the witnesses whom you represent is routine in that MDL. Judge Saris is familiar with legal theories, such as those adopted by the counties and New York City, in which the plaintiff claims that there was an "expectation" of a relationship between published prices and transaction prices. She permitted discovery of and accepted into evidence documents and testimony probative of government knowledge of published pricing terms and their relationship (or lack thereof) to transaction prices. This discovery and evidence went to issues on which plaintiffs bore the burden of proof and affirmative defenses relating to the statutes of limitations.

---

Richard Butt to State Medicaid Drug Cost Containment Strategies Survey and Pharmacy Reimbursement Survey conducted by U.S. Department of Health and Human Services, Office of Inspector General.

Gregor N. Macmillan, Esq.
January 30, 2008
Page 3

In sum, I hope that you will reconsider your position in light of the above.  If, however, you intend to move to quash the subpoenas, please do so promptly as we are proceeding under tight timetables for discovery.

Sincerely,

Lyndon M. Tretter

/lmt

Enclosures

Cc:  Shoshanah V. Asnis, Esq. (via fax w/enc.)
      All counsel of record via Lexis/Nexis (w/enc.)

*A- 210*

STATE OF NEW YORK

Prepared by:  Mary A. Brankman
Typed by:     Maria Maclasco   3-5650

TO:    Governor Mario M. Cuomo          DATE:          2/11/88

FROM:  Ilene Margolin          SUBJECT:   Medicaid Pharmacy Reimbursement

---

DRAF [DRAFT watermark]

## Federal Regulation

A federal regulation regarding Medicaid reimbursement for pharmacy services was promulgated in August 1987 (42 CFR 447.331). This regulation sets upper limits on reimbursement for prescription drugs and requires states to pay no more, in the aggregate, than would have been the case if the specific federally suggested limits had been used. This approach permits states to adopt the federal plan or to use their own unique approach as long as it meets the "aggregate test."

The federal regulation identifies three groups of prescription drugs:

o    Multisource drugs.  Those drugs for which the patent protection has expired and recognized therapeutically equivalent generic drugs are available.

o    Sole source drugs.  Those for which the patent protection still remains and there are no generic equivalents.

o    Other multisource drugs.  Those drugs which are not identified in the first group.

The Department of Social Services intends to implement the federal upper limits on multisource drugs effective March 1, 1988 to comply with the federal requirement.

## Other State Experience

Most other states have, by this time, complied with the regulatory requirement. In many cases, no additional effort was required as most states have taken steps to reduce prescription drug expenditures through their own maximum allowable cost (MAC) programs. These programs have attempted to place reimbursement for ingredients at levels approximating the pharmacists' actual acquisition cost.

New York State's Department of Social Services had entered into a stipulation to end a 1978 lawsuit which has resulted in New York State's Medicaid Program using the Average Wholesale Price (AWP) as the Estimated Acquisition Cost (EAC) for drug ingredient costs. The Department's position is that the federal regulatory requirement overrides the stipulation and to meet the "aggregate test", it will begin pricing multisource drugs at the upper limit. The sole source drugs and the "other" multisource drugs will continue to be reimbursed at the AWP with changes in determining the EAC to be evaluated in the near future.

NYSHD-FOIL 01394

-2-

## Physician Override

By applying the federal upper limit to all the drugs in a generic group, the Medicaid Program intends to reimburse all drugs, including the brand name product, at that level, unless the AWP is already lower. (Incidentally, this limit was calculated by the Health Care Financing Administration as 150% of the lowest price nationally available generic product.) The application of the upper limit to the brand name product is controversial, since in New York the Generic Substitution Law requires the pharmacist to dispense the brand name product when it is ordered by the physician and dispense as written (DAW) is indicated on the prescription form. Pharmacists, through their professional representatives, have indicated that this will unfairly require the individual pharmacist to absorb the difference between the brand name acquisition cost and the upper limit. The policy as proposed is estimated to generate $40 million dollars in savings which has been identified in the FY 88-89 budget as an offset to the cost of increasing Medicaid eligibility to currently uncovered individuals. The Department has taken the position that:

o   The upper limit will cost pharmacists profit.

o   In some individual cases, where the physician feels that the brand name is necessary and the pharmacist is unable to acquire the ingredients at a favorable price, the pharmacist may be faced with absorbing the difference in the ingredient cost of the brand name product.

o   Overall, New York's Medicaid pharmacy reimbursement continues to pay for ingredients at a rate most favorable to the pharmacist.

## Brand Name Drug Market Share

Medicaid imposition of the upper limit on reimbursement will accelerate the movement toward dispensing the generic equivalent items at every available opportunity and will create an incentive for pharmacists to encourage physicians to permit substitution unless there is a medical reason not to.

This situation will generate significant opposition from the Pharmaceutical Manufacturers Association (PMA) and can be expected to become an issue with the Legislature this session. The Department has already had correspondence from several members with the promulgation of the federal and supporting state regulations. As the March 1st implementation nears, it will become a more visible issue.

34232   P.01



STATE OF NEW YORK
EXECUTIVE DEPARTMENT
DIVISION OF THE BUDGET
STATE CAPITOL
ALBANY, NEW YORK  12224

RUDY F. RUNKO
DIRECTOR OF THE BUDGET

# FAX TRANSMISSION SHEET
## PLEASE DELIVER

TO: *Mike Falzano*

FROM: **Rosina S. Mulligan**, Assistant Chief Budget Examiner

TELEPHONE: 4·7570

FAX # – DIVISION OF THE BUDGET (518) 473-4580

NUMBER OF PAGES: **3**   DATE: 9/20/94
(including this sheet)

COMMENTS: *Copy to PSS NY*

*for counter signature.*

*If you do not receive complete transmittal, contact* Nyla (518/474-2936).

ORIGINAL WILL BE SENT THROUGH THE MAIL

YES   NO

SEP-20-1994  13:46

94%        P.01

NYSHD-FOIL 03589



STATE OF NEW YORK
EXECUTIVE CHAMBER
ALBANY 12224

September 19, 1994

John Westerman, President
Pharmaceutical Society of
the State of New York
Pine West Plaza IV
Washington Avenue Extension
Albany, New York  12205

Dear Mr. Westerman:

Re:  Drug Reimbursement

This will confirm our agreement regarding the language included in Ch. 170 of the Laws of 1994 specifying how the Department of Social Services (Department) will pay for prescription drugs under the State's Medical Assistance (MA) program.  The methodology consists of two basic parts, one setting forth the payment for the drug itself and one for the payment of a dispensing fee.

The language is intended to reflect our mutual understanding of the federal law and regulations limiting states' payments for drugs and payment of reasonable dispensing fees. As such, the enactment of this legislation moots the parties dispute in PSSNY v Cuomo, Civil Action 76-5080 (KTD) (S.D.N.Y.).  Accordingly, we have agreed that the parties will stipulate to the vacatur of the Stipulation and Order of the Court, dated July 5, 1978 (the "Consent Decree") and the dismissal of the underlying action.

Notwithstanding the above, the Department has agreed to continue the existence of a Pharmacy Advisory Committee (PAC), which had been established in paragraph six of the Consent Decree.  The Pharmacy Advisory Committee established shall consist of from nine (9) to fifteen (15) members, a majority of whom shall be pharmacists participating in the Medicaid program in the State of New York.  The Department shall meet with this committee from time to time but not less than quarterly, for purposes of seeking its advice in matters relating to pharmacy.

Finally, we mutually agreed that, since the drug payment and dispensing fee payment portions of the methodology would be implemented together and are interdependent, if, contrary to what we have assumed, the drug payment provisions of the bill were found to be not in compliance with federal law and regulations, then the Department would develop and implement a payment methodology which was acceptable under federal law and regulations and which was fiscally neutral to both the pharmacy community and the State.

NYSHD-FOIL 03590

2

I believe that the above fairly summarizes the full agreement of the pharmaceutical community and the Executive, including the essence of the proposed legislation and the additional terms and conditions agreed upon.  Please sign the enclosed copy of this letter indicating your agreement to these terms of our agreement and return it to me as soon as possible.

Thank you for your consideration in resolving this long-standing issue between the State and the pharmacy community.

Sincerely,

Richard M. Cook
Deputy Secretary to the Governor
for Human Services

Accepted and agreed to, on behalf
of the Pharmaceutical Society of
the State of New York

_____          _____
John Westerman, President                Date

NYSHD-FOIL 03591

Mark's Copy: 12/23/2002 - 04:08:48 PM - 3



<pavarista@gw.dhs.state.ri.us>, "Peggy King (E-mail)"
<peggyking@wvdhhr.org>, Phile Soulé (E-mail)
<cdenemark@eds.com>, "R. Homar (E-mail)" <rhomar@state.wi.us>,
"Robert Reid (E-mail)" <rreid@odjfs.state.oh.us>
cc:
Subject: Office of Inspector General Medicaid Drug Cost Containment Survey

Dear State Medicaid Director and Medicaid Pharmacy Representative:

The US Department of Health and Human Services, Office of Inspector General,
Office of Evaluation and Inspections is conducting a study of Medicaid
outpatient drug costs and state-initiated drug cost containment strategies.
We intend to provide information that will assist states and the Centers for
Medicare and Medicaid Services (CMS) in their efforts to pursue Medicaid drug
cost savings.  To this end, we request that you complete the following three
parts of our survey:

    1.    State Medicaid Drug Cost Containment Strategies Survey
    2.    Request for Reimbursement Data for Sample of 30 Drugs
    3.    State Medicaid Pharmacy Reimbursement Survey

The "State Medicaid Drug Cost Containment Strategies Survey" reviews the
states' drug cost control strategies, including assessments of savings and
other outcomes, barriers to cost containment, the role of CMS, and suggestions
for facilitating drug cost containment.  By "drug cost containment
strategies," we mean policies or practices intended to produce cost savings
(or limit expenditure growth) in the Medicaid outpatient pharmacy benefit.
Cost containment need not be the sole objective of a measure.  Examples
include (but are not limited to):  preferred drug lists, pharmacy
reimbursement changes, maximum allowable costs, generic substitution
requirements, prescription limits, and provider education efforts.

In addition, we ask that you submit copies of any written evaluations,
reports, analyses, and other documented measurements or estimates of cost
savings associated with any of your state's Medicaid prescription drug cost
saving measures or combinations of measures.

Our study will also examine drug reimbursement for a random sample of 30 drugs
(by NDC) in federal fiscal year (FFY) 2001.  We ask that you complete the
spreadsheet with reimbursement and utilization data for these drugs.  Also,
the "State Medicaid Pharmacy Reimbursement Survey" asks about reimbursement
methodologies in effect during FFY 2001.

We have made every effort to keep the attached surveys brief to minimize the
burden of participating in our study.  However, we encourage you to provide
any additional information that you feel is important to this issue.

Our office is aware of the sensitivity of this information and will take all
steps to ensure the confidentiality of responses.  Section 6 of the Inspector
General Act authorizes our receipt of this information.

Please complete and return the attached survey and spreadsheet by December 13,
2002 via email to Jennifer Gera at: jgera@oig.hhs.gov  or fax to 312-353-1421.

Mark's Copy: 12/23/2002 - 04:08:48 PM - 4

We appreciate your participation in this study.  If you have any questions or need any clarification, please call Erin Bliss at (312) 886-9453 or Jennifer Gera at (312) 353-4303.

Sincerely,


William C. Moran
Regional Inspector General for Evaluation and Inspections

Attachments
  <<Pharmacy reimbursement survey Final.doc>>  <<Medicaid Drug Cost Containment Survey.doc>>  <<Drug Price Variation Survey.xls>>

NYSHD-FOIL 02612

US Department of Health and Human Services, Office of Inspector General
State Medicaid Drug Cost Containment Strategies Survey

STATE: NY  Designated Contact Name:  Mark Richard Butt   Phone:518-485-3209        Email:
                                                                                  mrb01@health.state.ny.us

**NOTE:** We may need to follow up by phone or email with your designated contact to obtain more specific information on cost savings measurement data and methodologies.

**Outcomes of Drug Cost Containment Strategies**

1.    Has your program measured total cost savings resulting from any *combination* of Medicaid drug cost containment strategies?

     _X_ NO                    *(If NO, please skip to #2)*        ___YES  *(If YES, please continue to parts a and b)*

   a.    Please indicate the amount and time period of this total cost savings.

   Total savings: $_____    Time Period of Savings:_____*(e.g., State FY 2002)*

   b.    Please list the cost containment strategies in effect during this time period that contributed to this savings.

2.    Has your program measured actual cost savings that can be attributed to any *individual* cost containment strategy?

    X__ NO      *(If NO, please SKIP to #3)*        ___YES  *(If YES, please complete the chart in part a below)*

a.    Based upon these measurements, please complete the following chart for the top three strategies in terms of cost savings to your Medicaid pharmacy program.

| Drug Cost Containment Measure | Actual Savings Measured | Time Period of Savings | Savings Data Contact |
|---|---|---|---|
| *EXAMPLE:*<br>*1. Reduced Pharmacy Reimbursement Rate* | *$1 million* | *State Fiscal Year 2002* | *John Doe, 555-1212*<br>*jdoe@medicaid.state.us* |
| 1. | | | |
| 2. | | | |
| 3. | | | |

1

NYSHD-FOIL 02613

3.    We recognize that cost containment decisions may be based upon estimates or projections of cost savings when actual savings measurements are not available.  Please complete the following table for the top three cost containment strategies in terms of estimated or projected cost savings over a specified time period.

| Drug Cost Containment Measure | Estimated/Projected Savings (please specify time period) | Savings Data Contact |
|---|---|---|
| *EXAMPLE:* *1. Voluntary Preferred Drug List* | *We estimated our PDL would save $500,000 for State Fiscal Year 2002* | *Jane Doe, 555-1212* *jdoe@medicaid.state.us* |
| 1.  Zyvox Prior Authorization (started 11/01/01) | Estimated cost avoidance $315,208 (1st 6months of program) | Mark Richard Butt 515-486-3209 mrb01@health.state.ny.us |
| 2.  Serostim Prior Authorization (started 01/15/02) | Estimated cost avoidance $28.2 M (as of 12/09/02) | Mark Richard Butt 515-486-3209 mrb01@health.state.ny.us |
| 3.  Mandatory Generic Drug Program started (11/17/02) | Info not yet available | Mark Richard Butt 515-486-3209 mrb01@health.state.ny.us |

4.    Do you have any <u>written</u> evaluations, reports, analyses, or other documented measurement of cost savings resulting from any Medicaid drug cost containment efforts?

___NO         X_YES     *If YES,* please submit copies of these documents to us with your completed survey.

Serostim

5.    Has your program measured any *other* outcomes (e.g., beneficiary access, quality of care, etc) from any of your drug cost containment strategies?

_X__NO                    ___YES      *If YES,* which outcome(s)?

6.    Are there any cost containment strategies or measures in your State that you would like to highlight?

___NO       _X__YES      *If YES,* please describe:

NYS Medicaid Mandatory Generic Drug Program
Enclosure:  October 2002 Medicaid Update Special Edition
Projected Savings:  $5M

NYSHD-FOIL 02614

**Medicaid Drug Cost Containment: Barriers and Suggested Improvements**

7.    Has your Medicaid program faced any *Federal* legislative or regulatory barriers to implementing drug cost containment measures?

___NO                    _X_YES          *If YES*, please describe these barriers:

1. Federal law requires states to reimburse for <u>ALL</u> drugs, with selective exemptions.  States need more leeway, especially with "life style" type drugs.

2. States having difficulty identifying rebates for drugs with J codes where more than one manufacturer has been identified.

8.    Are there any changes to *Federal* laws or regulations that would help you to contain your Medicaid drug costs?

___NO                    _X__YES          *If YES*, please describe these changes:

1. OBRA '90 – Amended to allow states to exempt additional drug/classes of drugs from coverage (e.g. "life-style" drugs – see 1. above)

2. OBRA '90 – Amended to provide for enhanced rebates for generic drugs (so that with rebates, generic drugs will not be more costly than their brand name counterparts).

9.    Has your Medicaid program faced any *State* legislative or regulatory barriers to implementing drug cost containment measures?

X__NO                    ___YES          *If YES*, please describe these barriers:

10.   Are there any changes to *State* laws or regulations that would help you to contain your Medicaid drug costs?

X__NO                    ___YES          *If YES*, please describe these changes:

3

NYSHD-FOIL 02615

11.     Please indicate whether or not your program has encountered each of the following barriers in seeking to implement drug cost containment strategies.

| Potential Barrier | Has your program faced this barrier? | If yes, for which measure(s) does this barrier apply? (e.g., reimbursement change, preferred drug list, etc.) |
|---|---|---|
| a. Lack of information on how to successfully implement measure | [x] No    9 Yes ! | |
| b. Lack of information on cost effectiveness of measure | [x] No    9 Yes ! | |
| c. Opposition from pharmaceutical companies | 9 No    [x] Yes ! | NYS Medicaid Mandatory Generic Drug Program |
| d. Opposition from pharmacies | 9 No    [x] Yes ! | Reimbursement methodology changes |
| e. Opposition from consumer or patient advocates | 9 No    [x] Yes ! | NYS Medicaid Mandatory Generic Drug Program |
| f. Opposition from health care providers | [x] No    9 Yes ! | |
| g. Other (please list): | [x] No    9 Yes ! | |

4

12.     **What has helped (or would help) your State to overcome barriers to Medicaid drug cost containment listed above?**

NYS provides extensive education to pharmacies and medical prescribers regarding various program initiatives, as well as answering questions and correspondence from providers and consumers.  Drug manufacturers, health care providers, and advocacy groups are given opportunities to provide input regarding any changes.

NYSHD-FOIL 02617

**Collaboration with CMS**

13. **Has CMS provided your program with sufficient technical assistance or guidance regarding each of the following:**

| | Received SUFFICIENT CMS guidance | Received INSUFFICIENT CMS guidance | Did not need CMS guidance/Non-Applicable |
|---|---|---|---|
| a. selection or implementation of cost containment strategies? | 9 | [X] | 9 |
| b. data collection or evaluation of cost saving measures? | [X] | 9 | 9 |
| c. pharmacy reimbursement methodologies? | 9 | 9 | [X] |

14. **Has CMS provided any other information or assistance regarding Medicaid drug cost containment that were beneficial to your program [e.g. guidance letters to State Medicaid Directors, etc.] ?**

   X_NO                                    ___YES        *If YES*, please describe this
                              information/assistance:

15. **Are there any further actions that CMS could take that would assist your program to contain drug costs?**

   ___NO                                                _X__YES
                                                 *If YES*, please describe those
                                                 actions:

Help states in coordinating benefit payments covered through Medicare that are being billed through Medicaid.

16. **Please feel free to share any additional comments or suggestions on Medicaid drug cost containment.**
    (You may attach additional pages if necessary.)

NYSHD-FOIL 02618

**Thank you for your participation in this important study.**
Please return your completed survey by fax to 312-353-1421 or by email to jgera@oig.hhs.gov
by **DECEMBER 13, 2002.**
If you have any questions, please call Erin Bliss at 312-886-9453 or Jennifer Gera at (312)353-4303.

7

NYSHD-FOIL 02619

US Department of Health and Human Services, Office of Inspector General
State Medicaid Pharmacy Reimbursement Survey

STATE:_NY_ Designated Contact:_Mark-Richard Butt__ Phone:518-486-3209__ Email:mrb01@health.state.ny.us

*All of the following questions pertain to Federal Fiscal Year (FFY) 2001, October 2000 through September 2001.*

1.  **In FFY 2001, how did your State Medicaid agency calculate estimated acquisition cost (EAC) for each of the following types of outpatient prescription drugs:**

    *(NOTE: IF YOUR STATE CHANGED ITS EAC FORMULA DURING FFY 2001, PLEASE INCLUDE ALL FORMULAS USED AND THE EFFECTIVE DATES FOR EACH.)*

    a.  **Single Source Drugs** (brand name drugs without generic equivalents)

        EAC= AWP-10% or Federal FUL where applicable_____ Effective dates: 07/01/95

    b.  **Innovator Multiple Source Drugs** (brand name drugs with generic equivalents)

        EAC= AWP-10% or Federal FUL where applicable        Effective dates: 07/01/95

    c.  **Non-innovator Multiple Source Drugs** (generic drugs)

        EAC= AWP-10% or Federal FUL where applicable        Effective dates: 07/01/95

2.  **In FFY 2001, from what source(s) (e.g., First Databank, Red Book, etc) did you obtain the pricing information that you used to calculate EAC?**

    SOURCE(S):  Medispan

    a.  **How often do you update this pricing data?**

        ___ CONTINUOUSLY
        ___ WEEKLY
        _X_ MONTHLY
        ___ QUARTERLY
        ___ OTHER      *(PLEASE SPECIFY_____     )*

3.  **Medicaid regulations (42 CFR 447.331) require that States reimburse for single source drugs at the lower of estimated acquisition cost or "providers' usual and customary charges to the general public." How does your State define these "usual and customary" charges?** The price which a pharmacy charges to the "general public". The general public is defined as the group accounting for the largest number of non-Medicaid transactions from the individual pharmacy and does not include third party payors.

4.  **What dispensing fee(s) did your State pay to pharmacies, *per prescription*, in FFY 2001?**
    Brand drugs  $3.50
    Generic drugs $4.50

US Department of Health and Human Services, Office of Inspector General
If you have any questions please call Jennifer Gera at 312-353-4303 or Erin Bliss at 312-886-9453.

NYSHD-FOIL 02620

5. **How does your State determine the following:   N/A**

   a.  **which drugs will have a Maximum Allowable Cost (MAC)?**
NYS MA does not currently have a state MAC on prescription drugs. We use the Federal FUL where applicable. Note: there is a state MAC on OTC drugs, including insulin and blood products.

   b.  **the MAC amount for each drug?   N/A**

6. **For each of the following drugs in our sample, please indicate whether the drug was subject to a Maximum Allowable Cost (MAC) in your State during FFY 2001. If so, please indicate the MAC amount *per unit*.**

| Pharmaceutical by NDC | Subject to MAC? | | MAC Amount per unit |
|---|---|---|---|
| Detrol Tablets, 2MG, 00009454402 | ☐Yes | [x]No | |
| Risperdal Tablets, 2MG, 50458032050 | ☐Yes | [x]No | |
| Zyprexa Tablets, 7.5MG, 00002411660 | ☐Yes | [x]No | |
| Combivent Aerosol Inhalation, 103;18MCG;MCG, 00597001314 | ☐Yes | [x]No | |
| Avonex Kit Administration Pack, 30MCG/VIL, 59627000103 | ☐Yes | [x]No | |
| Depakote Tablets, 250MG, 00074621413 | ☐Yes | [x]No | |
| Vioxx Tablet, 12.5 MG, 00006007468 | ☐Yes | [x]No | |
| Prilosec Capsules Delayed Release, 20 MG, 00186074282 | ☐Yes | [x]No | |
| Lipitor Tablets, 20 MG, 00071015623 | ☐Yes | [x]No | |
| Glucophage Tablets, 500 MG, 00087606010 | ☐Yes | [x]No | |
| Nor-QD, .35 MG, 52544023528 | ☐Yes | [x]No | |
| Sandimmune Oral Solution, 100 MG/ML, 00078011022 | ☐Yes | [x]No | |
| Clotrimazole Cream, 0.01, 59930157003 | ☐Yes | [x]No | |
| Zestril Tablets, 5MG, 00310013034 | ☐Yes | [x]No | |
| Luvox, 100 MG, 00032421001 | ☐Yes | [x]No | |
| Zestoretic 20 25 MG Tablets, 25;20 MG; MG, 00310014510 | ☐Yes | [x]No | |
| Nicoderm CQ 21 MG Transdermal Patch, 21 MG, 00766145020 | ☐Yes | [x]No | |
| Actiq Lozenge, 1600 MCG, 00074246524 | ☐Yes | [x]No | |
| Normodyne (Labetalol Hydrochloride), 200 MG, 59930163601 | ☐Yes | [x]No | |
| Albuterol Sulfate, 0.005, 59930151504 | ☐Yes | [x]No | |
| Ranitidine HCl, 150 MG, 55953054470 | ☐Yes | [x]No | |
| Diltiazem CD Capsules, 240 MG, 00228257809 | ☐Yes | [x]No | |
| Trimox Capsules, 500 MG, 00003010960 | ☐Yes | [x]No | |
| Ranitidine HCl, 150 MG, 55953054480 | ☐Yes | [x]No | |
| Oxycontin Tablets Controlled Release, 40 MG, 59011010510 | ☐Yes | [x]No | |
| Atenolol Tablets, 50 MG, 00378023110 | ☐Yes | [x]No | |
| Naltrexone Hydrochloride Tablets, 50 MG, 00555090201 | ☐Yes | [x]No | |
| Ranitidine Tablets, 150 MG, 00781188305 | ☐Yes | [x]No | |
| Isosorbide Mononitrate Tablets Extended Release, 60 MG, 00228271111 | ☐Yes | [x]No | |
| Methylphenidate Hydrochloride Tablets, 10 MG, 00364047901 | ☐Yes | [x]No | |

2
US Department of Health and Human Services, Office of Inspector General
If you have any questions, please call Jennifer Gera at 312-353-4303 or Erin Bliss at 312-886-9453.

7.  **In FFY 2001, did your State receive any State-negotiated, supplemental rebates, *in addition to the Federally-mandated rebates*, on any of the 40 drugs listed above?**

     __X__ NO      ____YES       (Note:  If YES, we will follow up with you for additional information.)

     ┌─────────────────────────────────────────────────────────────────────────────┐
     │ **THANK YOU FOR YOUR PARTICIPATION IN THIS STUDY.  PLEASE RETURN YOUR COMPLETED SURVEY, PREFERABLY BY** │
     │ **EMAIL, TO JGERA@OIG.HHS.GOV OR BY FAX TO 312-353-1421 BY DECEMBER 11, 2002.** │
     └─────────────────────────────────────────────────────────────────────────────┘

3

US Department of Health and Human Services, Office of Inspector General
If you have any questions, please call Jennifer Gera at 312-353-4303 or Erin Bliss at 312-886-9453.