**EXHIBIT R**

**REPORT TO CONGRESS**

**THE AVERAGE WHOLESALE PRICE
FOR DRUGS COVERED UNDER MEDICARE**

DONNA E. SHALALA
SECRETARY
DEPARTMENT OF HEALTH AND HUMAN SERVICES
1999

Defendants' Exhibit
**1080**
01-12257 - PBS

HHC902-0801

## I.   INTRODUCTION

PURPOSE.--

Sections 4556(a) and (b) of the Balanced Budget Act of 1997 (BBA) amended section
1842 of the Social Security Act to provide, effective January 1, 1998, a new method for
establishing the payment limit for drugs and biologicals covered under the Medicare
program and not paid on a cost or prospective payment basis.  That payment limit is equal
to 95 percent of the average wholesale price (AWP) of the drug.  Section 4556(a) of the
BBA requires the Secretary, by July 1, 1999, to report to the Committees on Ways and
Means and Commerce of the House of Representatives and the Committee on Finance of
the Senate, the effect, if any, that the new payment limit may have had on the AWP of
these drugs and biologicals.  The following is that report.

HISTORY.--

Medicare has a limited prescription drug benefit outside the hospital inpatient setting.
The basic benefit covers only drugs that are furnished incident to a physician's service
and that cannot be self-administered.  There are very few statutory exceptions to this
general exclusion of drugs that can be self-administered.  Some examples include
immunosuppressive drugs, hemophilia clotting factors, erythropoietin for trained home
dialysis patients, allergens under certain conditions, and certain oral anti-cancer drugs.
Also covered are a very few drugs that are used in conjunction with Medicare covered
durable medical equipment; e.g., inhalation drugs used with a nebulizer.

Traditionally, Medicare has paid for drugs and biologicals (hereinafter referred to as
"drugs") under several payment methodologies.  Drugs are paid on a cost basis when
furnished to hospital outpatients.  Drugs are paid on a prospective payment basis when
furnished to hospital inpatients under the hospital prospective payment system and when
furnished to end stage renal disease (ESRD) patients paid under the ESRD composite
rate.  Drugs not paid on a cost or prospective payment basis were paid based on the lower
of the billed charge or the AWP as reflected in commercial sources such as Red Book,
Blue Book, or Medispan.  If the drug was a multi-source product, then the program
payment limit would be equal to the lowest AWP of all the generic forms of the product.
In 1991, we published a final rule to revise the regulations to set payment at the lower of
the estimated acquisition cost (EAC) or the AWP.  For multi-source products, the limit
was equal to the lower of the EAC or median AWP of all generic forms of the product.
These regulations were never implemented due to paperwork and reporting burdens and
problems associated with statistical sampling that would be used to determine the EAC.

For the past 13 years, the Office of Inspector General (OIG) has issued a series of reports
that consistently show a finding that the Medicare program overpays for the drugs and
biologicals it covers.  This is because most drugs can be obtained at a much lower cost
than the AWP.  To address this problem, the President's 1997 budget contained a

HHC902-0802

2

legislative proposal that would have based payment on the lower of the billed charge or the actual acquisition cost (AAC) for the drug of the physician or supplier billing Medicare. However, as discussed above, in the BBA, Congress rejected this proposal in favor of the current rule, which is to pay based on the lower of the billed charge, or 95 percent of AWP. The Medicare Part B coinsurance and deductible requirements apply to this benefit.

BACKGROUND.--

The AWP is not a well-defined concept nor is it regulated in any way. OIG reports that the AWP is set by the manufacturer as a suggested price and published in various commercial sources. However, it is not truly an average of wholesale prices because very few purchasers actually pay this amount.

Rather, the AWP is used as a standard benchmark, with negotiated prices often expressed in terms of AWP minus a certain percentage. OIG found that the AWP published in the commercial sources for 22 of the top drugs paid by Medicare is not representative of any price that is actually charged by wholesalers to their customers. The OIG's most recent studies are "Excessive Medicare Payments for Prescription Drugs" (OEI-03-97-00290, December 1997), and "Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs" (OEI-03-97-293, November 1998). On average, for the 22 drugs in the OIG study, Medicare payment at the AWP allowed a markup of 41 percent above the drugs' wholesale catalog price advertised to the physicians and suppliers who bill Medicare.

II.     Data

In order to analyze any changes in the AWP due to enactment of section 4556 of the BBA, we first identified all Medicare Part B charges involving pharmaceutical claims using the HCFA Common Procedure Coding System (HCPCS). Relevant codes in the HCPCS were then ranked by total Medicare allowed charges processed by Medicare carriers in 1997. The rank distribution indicates that total allowed charges for the top 50 drug-related codes accounted for 93.48 percent of the total allowed charges for all Medicare claims for drugs processed by carriers. Table 1 lists the top 50 drugs, their allowed charges for 1997 and the percent those charges represent of total Medicare charges for drugs. Because the remaining drug codes account for an insignificant amount of benefit payments, we have focused our analysis on the top 50 codes.

We subsequently excluded 6 codes from the top 50 list. In general, these codes were excluded because they represent more than one drug product and, thus, cannot be evaluated in terms of a specific AWP. Influenza immunization (code, 90724) represents a

HHC902-0803

number of different vaccines that are based on different viruses. Other codes could not be mapped to particular drugs as they are broad categories of drugs, such as, J9999, other chemotherapy drugs, or J3490, unclassified injections. Therefore, the remainder of our analysis is based on the remaining 44 drugs.

We obtained our data on AWP from the January 13 electronic version of First Data Bank drug pricing data. Commonly referred to as the Blue Book, this data file lists the most current, as well as historical, AWPs and dates of revisions to the AWP for all pharmaceutical products identified by an 11-digit National Drug Code (NDC). In this analysis, we considered each 11-digit NDC as a drug product as it uniquely describes the drug by manufacturer, drug compound, and unit dosage package. In order to present a long-term perspective, we obtained AWP data spanning a total of 7 years beginning January 1, 1992 through December 31, 1998. Contained in our Medicare part B drug-related HCPCS are 795 separate drug products (NDCs). The comparison group for the study is composed of the entire group of prescription drugs approved by the Food and Drug Administration (FDA). The comparison group numbered 48,922 drug products as represented by individual NDCs.

III.    Method

In order to examine changes in prices, we developed price indices from the AWP data. To preserve consistency of the price indices over time, we excluded all obsolete drugs from the analysis data base. We defined obsolete drugs as those drugs that existed at sometime during the analysis period, but, as of December 1998 are no longer manufactured. Although a few products are pulled from the market for adverse clinical outcomes, other causes for obsolescence include changing manufacturing entities and revisions in unit dosage packaging. Thus, a majority of obsolete drugs are replaced by other drugs that are incorporated in this analysis. This process resulted in the inclusion of 795 Medicare covered drugs and approximately 49,000 prescription drugs by NDC.

Drugs were classified in the Medicare covered group and the comparison group by patent and marketing exclusivity status. As shown in Table 2, this resulted in three classes of drugs in each group: brand single source, brand multi-source, and the generics. For each of the six classes of drugs, we constructed a simple average price index using the first quarter 1992 price as the base period.[1] This simple average of the AWP is an inferior

---

[1] Many widely used price indices, such as the Consumer Price Index (CPI) and the Producer Price Index (PPI), are quantity-weighted average prices calculated from a sample of commodities. Although weighted price indices have additional desirable properties, constructing weighted price indices from the Medicare claims data system is not possible because the claims billing codes are generally not specific to dosage levels or manufacturers. Consequently, we adopted an unweighted average price indexing method.

HHC902-0804

4

measure of economy-wide drug price levels because the AWP only suggests a baseline price in the trade. However, this indexing method is entirely appropriate for Medicare because its payment rule uses the median AWP in calculating its payment limit. A detailed description of the price indexing method is provided in the appendix.

IV.    The Analysis

A. The Long Run AWP Trend for Medicare Drugs

First, we present the average Medicare drug AWP index along with the consumer price index for prescription drugs (CPI-Rx) in Figure 1. The CPI-Rx is a weighted average price of pharmaceuticals and other medical supplies calculated by the Department of Labor, Bureau of Labor Statistics. As a weighted average price of a subset of pharmaceuticals for urban consumers, it represents different elements of drug pricing. With this caveat, the CPI-Rx is presented for comparison purposes. The price indices are calculated using prices at the end of each year.[2]

As demonstrated in Figure 1, the Medicare drug inflation rate closely tracks the CPI-Rx inflation rate, indicating a high degree of parallelism (with a correlation coefficient of 0.982). However, while the Medicare AWP index trailed the CPI-Rx through the first half of 1998, it then rose above the CPI-Rx index in the second half of 1998.

A comparison of Medicare AWPs and industry-wide AWPs is presented for each drug class in Table 3. The annual average growth rate of the AWP for Medicare covered drugs is lower than the industry-wide average AWP growth rate. Over the entire period between January 1992 through December 1998, Medicare brand single source drugs had an inflation of 19.84 percent with an annual average of 2.64 percent. This is 8.27 percent less than the industry-wide average for the brand single source drugs. On the other hand, the Medicare covered brand multi-source drugs showed a much higher inflation rate of 32.23 percent, corresponding to an average annual rate of 4.08 percent. It is noteworthy that this rate of inflation is the highest among the three classes, closely tracking the industry-wide average of 32.31 percent. Contrary to a conventional perception that the generic drug prices are closely checked by the competitive forces in the market, the generic price index growth was 24.94 percent (3.26 percent annually) for Medicare drugs

HHC902-0805

---

[2]The observations for 1991 are exceptions. They were based on January 1, 1992 prices.

5

during the 7 year period. Moreover, the data show that the industry-wide average inflation rate was the highest for this group at 48.08 percent during this period.

Averaging annual growth rates over time has a potential inaccuracy. Two data series may have the same average inflation rate over the same period, but one may reach a higher level than the other. When one series has relatively higher growth rates in the earlier period than the other, it can reach a higher level at the end due to the power of compounding.

In order to visually present the inflation rates without this potential bias, we calculated each price index as a difference from the market AWP average for each class. The results are graphically shown in Figure 2. In this diagram, any points above the 0 percent line indicate that the index exceeded the industry-wide AWP growth rate, and any points in the negative indicate the index lagged the industry-wide average. Once corrected for this bias, it is evident from Figure 2 that the average AWP for brand multi-source drugs stayed above the market average between 1993 and 1997. It was not until 1998 that this index declined to the industry-wide average level. Conversely, our estimate for the brand single source and generic drugs consistently lags below the industry-wide AWP level. In particular, the gap between the industry-wide AWP average and the Medicare generic drug index has been widening since the beginning of our observation period (1992). The difference reached approximately 23 percent by 1998.

In Figure 3, Medicare AWPs are compared to CPI-Rx for the same period. The comparison shows that the generic price index grew at a higher rate than the CPI-Rx. In addition, by 1998, brand multi-source drug prices exceeded the CPI-Rx. Conversely, the brand single source drug index was lower than the CRI-Rx for the entire data period. It is important to note that drug expenditure growth in recent years is driven to a significant extent by the introduction of expensive brand drugs. Since our pricing method fails to capture such a trend, our index for brand drugs contains a certain downward bias.

B. Medicare AWP Growth Before and After BBA

An important objective of this report is to determine if there was a difference in the growth of Medicare covered drug prices in the period following the enactment of the BBA drug payment provision. To assess the impact, a benchmark date is needed that divides the AWPs for Medicare covered drugs into two periods. One possible benchmark is the implementation date for the BBA payment provision (January 1, 1998). An alternative possibility is the date of the first legislative proposal suggesting a payment provision, under the assumption that anticipation of the payment reform would begin to influence the industry's pricing strategy immediately. This second date is January 1997.

HHC902-0806

6

In this report, we considered both of these benchmarks to analyze the effects of the BBA payment provision on the AWP.

Using the method described above, we calculated the average rate of inflation for each group.[3]  First, using January 1997 as a benchmark, we compared the average rates of inflation between the two periods i.e., before January 1997 and after January 1997 we will refer to this period as the "post-BBA" period.  Figure 4 shows that there was an elevated rate of inflation for all classes of drugs in the post-BBA period.  All three classes of Medicare covered drugs recorded a higher rate of price increase in this period.  While this trend is consistent with the overall trend in the AWP, it is important to note that the CPI-Rx inflation rate actually declined by 20.65 percent in the post-BBA period.

The greatest average growth rate is in the generic drug class, where AWP inflation was 5.04 percent per year, compared to only 2.55 percent per year growth pre-BBA.  This is equivalent to a .97 percent increase in AWP inflation rate in the post-BBA period.  The post-BBA rate substantially exceeds the CPI-Rx growth of 3.18 percent.  In the brand multi-source drug class, we observed a sizeable increase in AWP inflation rate.  Compared to the pre-BBA period, the AWP index for this class of drugs increased 25.6 percent.  The brand single source drug class showed the lowest increase in AWP inflation rate in the post-BBA period at 8.82 percent, as well as the lowest inflation levels overall.

Alternatively, we examined the data using the implementation date as the benchmark.  Since the new payment rule took effect on January 1, 1998, our study includes only one year in this period.  This poses a number of limitations in the study.  The conceptual concern is about using only the implementation date to study the effects of the new payment rule.  Essentially, in doing that, we are assuming that the industry was either unaware of the legislative reform or it chose not to react to the impending new payment rule until it was enacted and implemented.  If the industry reacted to the anticipated revision of the payment rule by raising AWPs before the implementation, this estimate would fail to capture that response.  The analytical concern is the limitation that we have only one year to examine any changes in the trend.  A longer time period would be required for a more accurate assessment of a time trend with a high statistical level of confidence.

With these caveats, the results of this second analysis are presented in Figure 5.

---

[3] We note that the industry-wide average AWP in each drug class has a high (95 percent - 99 percent) level of statistical significance, but the Medicare drug indices have a marginal statistical significance ranging from 80 percent - 85 percent.

HHC902-0807

Comparing the overall trend to the behavior in the last year, AWP inflation rates for both brand single source drugs and brand multi-source drugs were slightly lower than their earlier annual average rates, while the generic drug index shows an inflation of 9.14 percent.[4] Although this seems a significantly high rate of inflation, the industry-wide comparison group shows a nearly identical inflation rate. The industry-wide average inflation for the generic drugs was 9.21 percent in 1998.

The result of our analysis depends on the choice of the benchmark period. Assuming that the industry either had no knowledge of the impending legislative reform or that the industry would not respond to it until it was implemented, the conclusion would be that the AWP in 1998 is consistent with the long term pricing trends in the industry for the brand single source drugs and brand multi-source drugs. By contrast, the generic drug industry average AWP showed a substantial increase in 1998. However, this is not necessarily the generic industry's response to offset the effects of the BBA payment reform. This is because the AWP inflation rate of 9.14 percent for the Medicare-covered generic drugs parallels closely the growth rate of the industry-wide AWP, which presumably was not affected by the BBA reform.

More probable is the assumption that the industry began responding to the legislative initiative when first introduced rather than the implementation of the revised payment rule. In addition, we could conjecture that brand drugs may have begun reacting to the legislation before the generic industry. Under this assumption, 1997 and 1998 were grouped together to examine the effect of the BBA change. The results indicate that all three drug groups showed a higher AWP inflation rate in the post-BBA period. This high AWP growth rate is in apparent contrast to the slowdown of the CPI-Rx during the same period.

V.   Conclusion

Our basic conclusion is that there is no statistically measurable difference in the rate of increase in AWP after the statutory change in Medicare program payment for drugs as compared to before the change. We can only speculate about the reason for this. It may be that drug manufacturers decided to wait to offset the 5 percent reduction until after the report is written since there was only about one year between the effective date of the reduction and the time we had to collect the data for the report. It may be that there are

---

[4] It is notable that price revision is less frequent among the generic drugs than among the brand drugs. However, while generic drug revisions are less frequent, they tend to be larger increase when they occur. Under this alternative benchmark, results are generally statistically insignificant.

HHC902-0808

8

so few drugs for which Medicare is the primary market (there are only 36 specific drugs of $10 million or more in Medicare allowed charges, and only 12 specific drugs of $50 million or more) that total drug sales are generally not affected significantly by Medicare's payment amount. Another possible explanation is that a 5 percent reduction may have been relatively minor compared to the average profit margin for drugs covered by Medicare. If this is so, either the drug manufacturer or the wholesaler may have absorbed the reduction and lowered the real market price to the physicians purchasing the drugs.

As shown by table 3, the rate of increase for the Medicare generic AWP drug group increased abruptly in 1998, but not as much as the industry-wide generic AWP group. Therefore, we do not believe this is due to the change in Medicare pricing policy. It may be that generic drug AWPs were historically low and are simply catching up with brand drug AWPs in the past year or two.

Conclusions are further obfuscated by the OIG finding cited earlier in this report that, as an unregulated, suggested price, typically set by the manufacturer, the AWP bears no consistent or predictable relationship to the prices actually paid by physicians and suppliers to drug wholesalers in the marketplace.

HHC902-0809

## Appendix

The AWP file contains the current and historical AWPs and effective dates of each AWP. These AWPs were converted to a quarterly time series of price data. If a particular drug product was available at the beginning of the observation period (i.e., the first quarter of 1992), then the AWP at the beginning of the observation period became the base for that drug. The base for drugs that entered the market at a later time was the AWP at the time of entry into the marketplace.

By dividing the price series by the first available price, we created a normalized price series with the first observation value being one, and all subsequent price changes expressed as a proportional ratio to the original value. Based on this normalized price series, we calculated quarterly price adjustment rates. A simple average of price changes was then computed for each class of drugs. The price indices were constructed by multiplying these average periodic adjustment rates to the base value of one. This method has the disadvantage of missing the initial effect of a new product at the time of entry into the market. However, it captures any subsequent price changes. This method effectively deals with the problem of incorporating new drug prices into an index.

HHC902-0810

## Table 1. Medicare Part B Top 50 Drug-Related Procedures in 1997

| Rank | HCPC | Code Description | Service Frequency | Total Charge in $ | Charge% |
|------|------|------------------|-------------------|-------------------|---------|
| 1 | J9217 | Leuprolide acetate suspension | 1,293,637 | 643,733,319 | 22.75 |
| 2 | K0505 | Albuterol inhalation solution | 481,660,654 | 206,532,197 | 7.30 |
| 3 | J9265 | Paclitaxel injection | 909,269 | 163,021,593 | 5.76 |
| 4 | J9999* | Chemotherapy drug | 639,415 | 141,985,451 | 5.02 |
| 5 | J9202 | Goserelin acetate implant | 332,604 | 132,061,675 | 4.67 |
| 6 | Q0136 | Epoetin alpha | 10,734,693 | 128,513,533 | 4.54 |
| 7 | K0518 | Ipratropium bromide inh solution | 54,217,683 | 115,919,620 | 4.10 |
| 8 | J9045 | Carboplatin injection | 991,120 | 85,471,778 | 3.02 |
| 9 | J1625 | Granisetron hydrochloride | 415,365 | 68,458,154 | 2.42 |
| 10 | J0640 | Leucovorin calcium injection | 2,797,743 | 58,961,589 | 2.08 |
| 11 | J1440 | Filgrastim 300 mcg injection | 373,269 | 56,920,518 | 2.01 |
| 12 | J2405 | Ondansetron hcl injection | 8,813,084 | 53,555,285 | 1.89 |
| 13 | 90724* | Influenza immunization | 11,275,541 | 50,183,001 | 1.77 |
| 14 | J1441 | Filgrastim 480 mcg injection | 197,577 | 48,308,852 | 1.71 |
| 15 | J2430 | Pamidronate disodium | 232,980 | 45,204,074 | 1.60 |
| 16 | J1562 | Immune globulin 10% /5 grams | 951,464 | 44,421,038 | 1.57 |
| 17 | J1561 | Immune globulin injection | 1,058,250 | 42,339,976 | 1.50 |
| 18 | J0780* | IV infusion therapy, 1 hour | 880,191 | 33,205,117 | 1.17 |
| 19 | J1923 | Factor viii (recombinant) | 41,027,593 | 32,210,870 | 1.14 |
| 20 | J7190 | Factor viii | 4,630,258 | 30,811,997 | 1.09 |
| 21 | J9000* | Doxorubicin hcl | 638,860 | 28,006,311 | 0.99 |
| 22 | J3490 | Drugs unclassified injection | 786,761 | 24,611,907 | 0.87 |
| 23 | J9182 | Etoposide 100 mg inj | 182,771 | 23,135,330 | 0.82 |
| 24 | 90732 | Pneumococcal immunization | 1,811,047 | 22,752,453 | 0.80 |
| 25 | J9293 | Mitoxantrone hydrochl / 5 MG | 122,958 | 21,856,470 | 0.77 |
| 26 | J9390 | Vinorelbine tartrate / 10 MG | 353,916 | 20,488,196 | 0.72 |
| 27 | K0418 | Cyclosporine oral 100 MG | 3,810,721 | 19,119,355 | 0.68 |
| 28 | J9185 | Fludarabine phosphate inj | 103,374 | 19,040,183 | 0.67 |
| 29 | K0412 | Mycophenolate mofetil oral 250 | 9,963,364 | 18,878,408 | 0.67 |
| 30 | K0503* | Acetylcysteine inh sol u d | 6,311,548 | 18,686,188 | 0.66 |
| 31 | J9031 | Bcg live intravesical vac | 116,040 | 17,752,520 | 0.63 |
| 32 | J0150 | Adenosine 6 MG inj | 740,917 | 15,258,996 | 0.54 |
| 33 | J7699* | Inhalation solution for DME | 25,329,126 | 14,593,808 | 0.52 |
| 34 | J0696 | Ceftriaxone sodium injection | 1,138,348 | 13,924,429 | 0.47 |
| 35 | J7050 | Normal saline solution infus | 1,463,942 | 13,167,307 | 0.47 |
| 36 | J1245 | Dipyridamole injection | 523,190 | 12,900,629 | 0.46 |
| 37 | J0585 | Botulinum toxin a per 100 u | 2,931,031 | 12,374,432 | 0.44 |
| 38 | J9214 | Interferon alfa-2b inj | 1,119,421 | 12,309,847 | 0.43 |
| 39 | J2820 | Sargramostim injection | 514,378 | 12,238,227 | 0.43 |
| 40 | J9181 | Etoposide 10 MG inj | 886,144 | 11,995,065 | 0.42 |
| 41 | J1785* | Imiglucerase /unit inj | 2,111,081 | 11,625,547 | 0.41 |
| 42 | J9062 | Cisplatin 50 MG injeciton | 62,202 | 10,612,402 | 0.37 |
| 43 | J9291 | Mitomycin 40 MG inj | 12,470 | 10,271,455 | 0.36 |
| 44 | J7196 | Hemophilia clot factors othr | 892,001 | 9,941,853 | 0.35 |
| 45 | 90781* | IV infusion, additional hour | 521,623 | 9,803,333 | 0.35 |
| 46 | J9060 | Cisplatin 10 MG injeciton | 256,849 | 9,183,982 | 0.32 |
| 47 | J7507 | Tacrolimus oral per 1 MG | 3,874,791 | 9,035,128 | 0.32 |
| 48 | K0524 | Metaproterenol inh sol u d | 9,889,294 | 8,894,485 | 0.31 |
| 49 | 90799* | Therapeutic/diag injection | 192,945 | 7,260,298 | 0.26 |
| 50 | J9213 | Interferon alfa-2a inj | 202,687 | 6,461,028 | 0.23 |

HHC902-0811

Table 2. Classification of Drugs

| | Manufactured under Patent | Manufactured Off-Patent |
|---|---|---|
| Exclusive Marketing | Brand Single-source Drugs | None |
| Nonexclusive Marketing | Brand Multi-source Drugs | Generic Drugs |

HHC902-0812



Figure 1. Drug Price Trend:
Medicare AWP Versus CPI-Rx

HHC902-0813



Figure 2. MEDICARE AWP INDEX Minus MARKET AWP

HHC902-0814

Table 3.  Annual Inflation of AWPs and CPI-Rx

| | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Average |
|---|---|---|---|---|---|---|---|---|
| MEDICARE BRAND SINGLE | 0.00% | -0.63% | 5.50% | 2.57% | 5.44% | 3.54% | 2.07% | 2.64% |
| ALL BRAND SINGLE | 2.72% | 3.60% | 2.29% | 4.02% | 4.09% | 4.06% | 4.45% | 3.60% |
| MEDICARE BRAND MULTI | 2.98% | 5.08% | 3.16% | 3.64% | 4.14% | 3.97% | 5.57% | 4.08% |
| ALL BRAND MULTI | 2.98% | 2.00% | 3.13% | 3.70% | 4.70% | 5.29% | 6.85% | 4.09% |
| MEDICARE GENERIC | 2.31% | 1.57% | 2.88% | 2.01% | 3.99% | 0.94% | 9.14% | 3.26% |
| ALL GENERIC | 2.90% | 6.92% | 4.47% | 7.05% | 5.09% | 4.87% | 9.21% | 5.79% |
| CPI-Rx | 7.51% | 3.87% | 3.41% | 1.91% | 3.36% | 2.63% | 3.73% | 3.77% |

HHC902-0815



Figure 3. Medicare AWP Trend.

HHC902-0816



Figure 4. Medicare AWP Average Inflation: 1992-96 Versus 1997-98

HHC902-0817



Figure 5. Medicare AWP Average Inflation: 1992-1997 Versus 1998

HHC902-0818

**EXHIBIT S**



**H**
Southard v. Visa U.S.A., Inc.
Iowa Dist.,2004.
Only the Westlaw citation is currently available.
Iowa District Court.
Jeff SOUTHARD, Trish Southard, Jeffrey Stickel
and Heather Stickel, Mel Lint, Keith Goodyk, and
Greg Dana, on behalf of themselves and all others
similarly situated in the State of Iowa, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
Betty Jo WINTER, on behalf of herself and all
others similarly situated, Plaintiff,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
**No. LACV 031729, 94491.**

Nov. 17, 2004.

Edward Remsburg of Ahlers & Cooney, Des
Moines, IA; Stepher V. Bomse and David M.
Goldstein of Heller Ehrman White & McAuliffe
LLP, San Francisco, CA, Robert C. Mason of
Arnold & Porter LLP, New York, NY, for
Defendant Visa U.S.A. Inc.
Kim J. Walker of Faegre & Benson LLP, Des
Moines, IA; Kenneth A. Gallo of Clifford Chance
U.S. LLP, Washington, DC; Keila D. Ravelo, Gary
R. Carney and Wesley R. Powell of Clifford Chance
U.S. LLP, New York, NY, for Defendant
MasterCard International Incorporated.
Michael P. Mallaney and J. Barton Goplerud of
Hudson, Mallaney & Shindler, PC, Des Moines, IA;
Gordon Ball of Ball & Scott, Knoxville, TN;
Jonathan W. Cuneo and Daniel M. Cohen of Cuneo
Waldman & Gilbert, LLP, Washington, DC;
Michael D. Hausfeld of Cohen, Milstein, Hausfeld
& Toll, Washington, DC; Steve W. Berman and
George W. Sampson of Hagens Berman, LLP,
Seattle, WA; Maxwell M. Blecher and Don
Pepperman of Blecher & Collins, Los Angeles, CA,

for Plaintiffs.

RULING

GOODHUE, J.
   **\*1** The defendants have filed a motion to
dismiss as to each of the entitled cases which have
been consolidated by prior court order. A motion to
dismiss admits the allegation of the petition and
must stand or fall on the contents of the petition and
matters of which the Court can take judicial notice.
(See *Leuchtemmacher v. Farm Bureau Mutual, Inc.,*
460 N.W.2d 858 and *Curtis v. Board of
Supervisors,* 220 NW 2d 44.) The petition itself
becomes the statement of facts and need not be
reiterated at length. A brief statement of the salient
facts will suffice.

   (1) The defendants, for purpose of this
proceeding, are considered a single entity and any
theory of recovery or amendment offered by either
plaintiff will be afforded to both.

   (2) Together, the two defendants dominate the
credit card industry.

   (3) During the relevant period the defendants
issued both credit cards and debit cards.

   (4) The defendants forced merchants to use
their debit card services if in fact they were to have
the right to use their credit card services and then
charged the same for both services. Requiring
merchants to use both services is called "tying."

   (5) Debit cards involve an immediate or almost
immediate withdrawal of funds from the purchaser's
account instead of an advancement of credit as
when a credit card is used. Accordingly, the risk of
loss is significantly less when a debit card is used.

   (6) Frequently merchants were unable to tell
whether a credit card or debit card was being used.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
**(Cite as: Not Reported in N.W.2d)**

(7) A merchant who honors the defendants' cards pays an interchange fee in the form of a discount on each sale made using one of the defendants' cards. A portion of the interchange fee goes to the defendants, a portion to the bank issuing the card, and a portion to the acquiring institution or bank who services the merchants.

(8) The tying together of the credit cards and debit cards and the identical charge for both uses for purposes of this motion result in the assessment of excessive and unjustified fees in violation of the Iowa Competition Law (Iowa Code Chapter 553.)

(9) The merchants who paid the excessive fees have passed those costs on to the citizens of Iowa who have done business with the merchants using the defendants' services. The plaintiffs are representative of that class of Iowa citizens.

(10) The Court believes it can and, accordingly, does take judicial notice of *In re Visa Check/MasterMoney Antitrust Litigation,* 297 F.Supp.2d 503 and the facts it chronicles regarding the successful litigation by merchants against these same defendants predicated on these same tying acts alleged in the plaintiffs' petition as being violations of federal competition statutes.

Based on the facts alleged in the petition and as briefly summarized above, the plaintiffs have brought this class action on the behalf of Iowa consumers, alleging they are entitled to relief under Chapter 553 of the Code of Iowa or, alternatively, by way of an action for unjust enrichment.

**\*2** Motions to dismiss are not favored and have been said to be virtually emasculated. (See *Unertl v. Benzanson,* 414 N.W.2d 321.)Nevertheless, such motions continue to be used and recognized where the issue is standing or capacity to sue. (See *Comes v. Microsoft,* 646 N.W.2d 440 and *Troester v. Sisters of Mercy Health Corp.,* 328 N.W.2d 308.) Although motions for summary judgment are preferred, the motion to dismiss seems particularly appropriate when, as in this case, the petition contains an exhaustive statement of the pertinent facts. The thrust of the defendants' motion is a challenge to the plaintiffs' standing to bring action

as to the violation of the Iowa Competition Law. That there has been such a violation as alleged in the petition may be assumed.

It is not disputed that under federal law " indirect purchasers" cannot recover damages for violations of competition statutes. (See *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707.)The *Comes* decision rendered by the Iowa Supreme Court and cited above specifically held that "indirect purchasers" can sue for damages under the Iowa Competition Law. The inclusion of "indirect purchasers" by the *Comes* court was primarily made to turn on Iowa Code Sect. 553.12 which provides in part that "(a) person who is injured ... by conduct prohibited under this chapter may bring suit."Plaintiffs' claim to be " indirect purchasers" within the meaning of *Comes* and therefore afforded standing and the ability to bring this action. Nevertheless, even the plaintiffs in oral argument admit that some line must necessarily be drawn beyond which an injured party may not recover because of remoteness or lack of standing. The defendants, relying in part on Iowa Code Sect. 557.2 which mandates "uniform application of state and federal laws prohibiting restraints of economic activity and monopolistic practices," contend that the issue of remoteness or standing should be determined by the guidelines set out by the federal court in *General Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723.Plaintiffs contend that remoteness and standing should be determined by tests used in other areas of Iowa law such as " foreseeability" or "proximate cause."

Several other state trial courts have been confronted with nearly identical issue which this Court faces. These are primarily states where the bright line rule excluding "indirect purchasers" from competition cases as set out in *Illinois Brick* has been abrogated by statute or prior court decision. Counsel has made several of these state court cases available to this Court. Almost universally, motions to dismiss have been sustained and the factors set out in *Associated Contractors,* supra, have been considered applicable in determining standing. The General Court of Justice Superior Court Division in the County of Harnett,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
**(Cite as: Not Reported in N.W.2d)**

North Carolina in *Morris v. Visa USA, Inc. and Mastercard International, Inc.,* 03 CVS 2514 filed a particularly instructive ruling which is nearly as exhaustive as a law review article. That ruling enumerates eight other states which recognize indirect purchaser claims but their trial courts have held that consumers such as these plaintiffs with derivative claims have no standing. Apparently no state appellate court has addressed the issue at this time.

   **\*3** Plaintiffs contend that *Comes* places Iowa in a unique position which differentiates it from other states. *Comes* does in fact include some rather broad language, but the instant factual situation is distinctly different than what existed in *Comes.* In *Comes* the plaintiffs were in fact "indirect purchasers" of a product that the defendant Microsoft produced. In *Comes* the plaintiffs ended up with the software the defendant produced, in their computers. The cost of the Microsoft product was directly reflected in the price of the hardware the plaintiffs purchased from the third party who was the "direct purchaser" from Microsoft. The plaintiffs in the instant case are not really "indirect purchasers." Their claims against these defendants could more accurately be termed "derivative." These plaintiffs have not ended up with a product the defendant supplied. Instead, they dealt with a merchant who was charged a fee by a bank who in turn paid a fee to the defendant. Their contention is that the cost of the service that the defendants supplied to the banks and was paid for by the banks was transferred to and paid by the merchants and ultimately shifted to the plaintiffs as the final consumer.

   Since the plaintiffs are not "indirect purchasers" in the sense that the plaintiffs in *Comes* were, *Comes* is helpful only by analogy or by use of some of the broad language the *Comes* court employed in interpreting the Iowa Competition Law. That the bright line excluding indirect purchasers as announced in *Illinois Brick* has been abrogated does not answer the remoteness or standing issue.

   The remoteness doctrine is not a simple application of a "but for" test or "foreseeability" or "proximate cause" but is instead dependent on public policy considerations applicable to the many facets of the law where damage awards are sought. (See *State ex rel. Miller v. Phillip Morris, Inc.,* 577 N.W.2d 401,*Beyond the Garden Gate, Inc. v. Northstar Freezer Dry Mfg., Inc.,* 526 N.W.2d 305 and *Virden v. Betts and Beer Const. Co., Inc.,* 656 N.W.2d 805.)The issue then that emerges is what is the test of standing or remoteness that is to be applied under the Iowa Competition Law.

   It is noteworthy that the *Comes* court, although relying on the broad sweep of the statutory language as to those protected, devoted appreciable consideration to the announced policies and reasoning employed in *Illinois Brick.* The *Comes* case specifically points out the factual differences between the *Comes* case and *Illinois Brick.* This discussion leads this Court to the conclusion that the Iowa Supreme Court is quite sensitive to the legislative direction for uniform application of the state and federal statutes. Furthermore, a fair reading of *Comes* suggests that the trial court is being directed to weigh the policy considerations as set out in *Illinois Brick* as refined by *Associated General Contractors* in determining whether or not a plaintiff has standing or his damage is too remote to bring an action under the Iowa Competition Law.

   **\*4** The five factors set out in *Associated General Contractors* which the Court believes it must consider are:

   (1) The nature of the plaintiffs' claim.

   (2) The directness of the injury.

   (3) The specific intent of the defendants.

   (4) The character of the alleged damages, including the risk of duplicative recovery, the complexity of the apportionment, and their speculative nature.

   (5) The existence of other more appropriate plaintiffs.

   To begin with, the nature of the plaintiffs' action is derivative and not simply indirect, as previously noted. As opposed to the factual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 4

Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
**(Cite as: Not Reported in N.W.2d)**

situation in *Comes,* there are more appropriate
plaintiffs to bring action and they have successfully
done so. Any recovery made would be duplicative.
The damages incurred are substantially more
indirect than in *Comes* and, as noted, are more
accurately termed "derivative." Apportionment
would be complex, speculative, and arbitrary. The
willingness of the *Winters* plaintiffs to redefine the
plaintiff class is illustrative of the complexity and
arbitrary nature of the apportionment that would be
required. Even defining the class is arbitrary. The
North Carolina trial court in Morris as previously
cited sets out in detail the complexity and
speculative and arbitrary nature of the decisions that
would be involved in any apportionment. The
criteria set out in *Associated General Contractors*
are simply not met.

In summary, the Court concludes that the thrust
of the *Comes* case is that although the bright line
exclusion of indirect purchasers as set out in *Illinois
Brick* has been abrogated under the Iowa
Competition Law, an analysis of standing and
remoteness is still appropriate and must be made.
That the guidelines announced in *Associated
General Contractors* are appropriate to consider in
resolving the issues of standing and remoteness.
Applying those standards as per the prior
discussion, the plaintiffs do not have standing under
the Iowa Competition Law and to the extent the
plaintiffs have pled a cause of action pursuant to
Chapter 553 of the Code of Iowa, the defendants'
motion to dismiss is sustained and the plaintiffs'
action dismissed.

The Southard plaintiffs have also made a claim
based on unjust enrichment and for money had and
received. In reality, the two concepts pled constitute
the same cause of action. (See *State Dept. of
Human Services, ex rel. Palmer v. Unisys Corp.,*
637 N.W.2d 142.)

Plaintiffs rely on the asserted breadth of unjust
enrichment as it exists as a cause of action in Iowa.
In the *Palmer* case cited above it is stated that "We
recognize unjust enrichment is a broad principle
with few limitations. We have never limited the
principle to require benefits to be conferred directly
by the plaintiff."*Palmer v. Unisys,* supra p. 155.)In

referring to Iowa law, the federal court in *Iconco v.
Jensen Const. Co.,* 622 F.2d 1291 at page 1302
stated "We are impressed with the simplicity of the
rule echoed by the Iowa unjust enrichment cases. It
is essential merely to prove that a defendant has
received money which in equity and good
conscience belongs to plaintiff," quoting *In Re
Estate of Shatman,* 231 Iowa 480, 1 N.W.2d 636,
642.

**\*5** However, *Iconco* proceeds to state that "
Unjust enrichment does not occur in the abstract.
One is unjustly enriched only by reference to some
standard of justice and fairness. Iowa would, of
course, be free to look to the provisions of state
statute defining legal rights and responsibilities to
discern whether one's enrichment at the expense of
another has been unjust."*Iconco* at p. 1296,1
N.W.2d 636.There is nothing "unjust" in Iowa law
about the charges the defendants made to the banks
and the banks in turn to the merchants, absent the
Iowa Competition Law. To allow the plaintiffs to
proceed based on a theory of unjust enrichment
would require the reinfusion of the Iowa
Competition Law which is unavailable to them
because of a lack of standing.

The plaintiffs cite *Palmer* and, in particular, the
language set out above for their contention that
privity has no application in unjust enrichment
cases. The *Palmer* case did not turn on the language
cited above, and in that sense it is dicta. In *Palmer,*
Heritage, the party receiving the ultimate benefit,
was potentially primarily liable to the plaintiff.
There is no primary liability between these plaintiffs
and defendants. Furthermore, *Palmer* at page 155
states that "We also agree a plaintiff who has an
independent obligation to a third person cannot
maintain an action for unjust enrichment against a
defendant who is incidentally benefited by the
performance of that obligation to the third person."
The prohibition cited is exactly the type of
derivative lawsuit which the plaintiffs in this case
are bringing. These plaintiffs had an independent
obligation to the merchants and any benefit
conferred on the defendants by reason of that
obligation is incidental. The defendants approached
the deficiency in a different way by contending that
no direct benefit was conferred upon them by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 5

Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)
**(Cite as: Not Reported in N.W.2d)**

act in question. In other factual situations involving a claim of unjust enrichment, recovery has been denied because of a lack of "privity." See *Commercial Federal Bank v. Quest Corp.,* 2004 WL 22 96370 (Iowa App.). In essence, the plaintiffs' problem is the same under the unjust enrichment claim as it was under the Iowa Competition Law. In addition to an inability to utilize the unfairness standard set out by the Iowa Competition Law, the plaintiffs' damages are too remote and derivative to allow the plaintiffs to make recovery. The plaintiffs have no cause of action under the theory of unjust enrichment.

It would be illogical and a strange application of the law to rule that the plaintiffs' cause of action is too remote to confer standing under the Iowa Competition Law but to use the same acts and the Iowa Competition Law as a predicate for recovery under a theory of unjust enrichment.

Finally, it appears that because of the merchants' previous recovery in the *In re Visa Check/MasterMoney Antitrust Litigation,* supra, that the defendants have been stripped of their ill-gotten gains and that no "unjust enrichment" remains.

*6 Defendants' motion to dismiss as to the plaintiffs' claim of unjust enrichment is granted and the plaintiffs' cause of action is dismissed.

Costs are assessed to the plaintiffs.

Iowa Dist.,2004.
Southard v. Visa U.S.A., Inc.
Not Reported in N.W.2d, 2004 WL 3030028 (Iowa Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.