# EXHIBIT L



17717432

Dec 18 2007
9:03PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.* CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) ) ) | |

## <u>UNITED STATES' THIRD SET OF REQUESTS FOR ADMISSION</u>

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiff, United States of America, requests that Abbott Laboratories, Inc. (hereafter "Abbott" or "Defendant") answer the following requests for admission.  The United States requests that Abbott serve all written answers to these admissions within 30 days.

### I.  INSTRUCTIONS

A.      Whenever appropriate, the singular form of a word shall be interpreted as plural, and the masculine gender shall be deemed to include the feminine.

B.      If the contention is made that any requested admission subject is not subject to discovery in whole or part by reason of privilege or otherwise, identify each privilege assertion and the basis therefore.

C.      You are required to answer these requests as to each Pharmaceutical identified in the United States's Complaint.  To the extent that You may only admit the requested admission

in part with respect to any particular Pharmaceutical or a particular part of the relevant time period, as those terms are defined herein, please qualify Your answer to identify which Pharmaceutical and/or time period to whichYour admission applies.

D.     Relevant Time Period: Unless otherwise indicated in a specific admission request, the admissions requests herein cover the time period of January 1, 1985 to the present and documents or events relating to such period even though created or occurring before that period.

## II.  DEFINITIONS

A.     As used herein, the term "Documents" is used in its broadest sense, as defined in the Federal Rules of Civil Procedure, and includes the original of each existing identical or non-identical copy or draft thereof, by whatever means made, of any writing of any kind.  The term "Documents" includes writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemical process photographs; video, phonographic, tape, or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

B.     As used herein, the terms "You," "Your," "Abbott," and "Defendant" refer to Abbott; to its corporate predecessors, including all merged predecessor corporations; to any other

2

past or present subsidiary, affiliate, spinoffs or d/b/a of Abbott; and to all entities currently or formerly owned, operated, or managed by Abbott, and all current and former directors, officers, principals, partners, employees, agents, representatives, or other persons acting for or on behalf thereof, including, but not limited to, any otherwise independent attorney, accountant, investigator or consultant.

C.      The term "affiliated" shall mean any form of business relationship, including, but not limited to, employee, director, officer, owner, agent, consultant, or contractor.

D.      Words in the singular should be construed as including the plural, and plural words should be construed as including the singular.

E.      The terms "accuracy," "accurate" or "accurately," when used in reference to Price Representations or sales transactions, are used with reference to whether the information is reflective of the prices actually paid in the marketplace by any purchasers, including but not limited to prices paid by wholesalers, pharmacies, oncology supply houses, group purchasing organizations or physicians.

F.      The term "Price Representations" means any statement, assertion, representation or declaration of the price of any Pharmaceuticals, including but not limited to Average Wholesale Price, Wholesale Acquisition Cost, Wholesale Net Price, Direct Price, List Price or Suggested Net Trade.

G.      The term "Pharmaceutical" means any drug or other product sold by You.

H.      The term "Spread" is used to refer to the difference between the actual acquisition cost or purchase price of a Pharmaceutical (paid by purchasers of the Pharmaceuticals) and the price or cost determined, published or arranged by the manufacturer or the reimbursement rate

3

paid by third party payors (to purchasers of the Pharmaceuticals). Third party payors include Medicare, Medicaid and private insurance. Thus, the Spread is the gross profit or margin actually or potentially realized by the purchasers of the Pharmaceuticals.

I. The term "AWP" means the price that You report, advertise, market, publish or cause to be published, directly or indirectly, as the average wholesale price for any Pharmaceutical.

J. The term "WAC" means the price that You report, advertise, market, publish or cause to be published, directly or indirectly, as the wholesale acquisition cost or wholesaler acquisition cost for any Pharmaceutical.

K. The term "Direct Price" means the price You report, advertise, publish or cause to be published, directly or indirectly, as the "DP" or direct price for any Pharmaceutical.

L. The term "List Price" means the price You report, advertise, publish or cause to be published, directly or indirectly, as the list or catalogue price for any Pharmaceutical.

M. The term "Best Price" means the price You report or otherwise disseminate as the best price for any Pharmaceutical, including the price You report for purposes of the Medicaid Rebate Program.

N. The term "AMP" means the price You report or otherwise disseminate as the average manufacturer's price for any Pharmaceutical, including the price You report for purposes of the Medicaid Rebate Program.

O. The term "Price Publications" means (1) the *Red Book* published by Thomson Publishing, (2) the *Blue Book* published by First Databank, (3) the electronic or automated price service and the Hospital Formulary Pricing Guide published by Medi-Span, Inc., and any other

4

pricing compendia published by those companies.

P.      The term "average or estimated acquisition cost" is the average or estimated – as those terms are defined in any commonly-available dictionary – amount that Your customers would pay to purchase Your Pharmaceuticals.

Q.      The terms "disclose," "disclosed" or "disclosure" as used below means to reveal, make known, make public or expose.  It explicitly does <u>not</u> refer to the reporting of any AMPs by You as part of the Medicaid Drug Rebate Program.

R.      The term or phrase "marketed the Spread" means the use of Spreads or potential profit margins as one of the means of inducing or encouraging Your customers to buy Your Pharmaceuticals.

S.      The term "Subject Drugs" refers to the drugs identified in ¶ 34 of the United States' First Amended Complaint.

T.      The term "Consignment Partner" shall mean any entity which entered into a contractual arrangement with Your Alternate Site or Home Infusion Business units whereby You agreed to provide all or some of Your Product on a consignment basis.

U.      The term "TAP" shall refer to "TAP Pharmaceutical Product, Inc.", which is an Abbott Joint Venture.

### III.  REQUESTS FOR ADMISSION

1.    Admit that Abbott received a letter dated September 30, 1999 from T. Reed Stephens and Mark A. Lavine, that was directed to Abbott's counsel, Daniel Reidy, and that a true and correct copy of that letter is attached hereto as Exhibit "A."

2.    Admit that Abbott undertook no corrective or remedial action(s) or measure(s) upon receipt of the letter dated September 30, 1999 from T. Reed Stephens and Mark A. Lavine, that was directed to Abbott's counsel, Daniel Reidy.

3.    Admit that from the date of its receipt of the letter dated September 30, 1999 from T. Reed Stephens and Mark A. Lavine, that was directed to Abbott's counsel, Daniel Reidy, Abbott did not lower its list or catalogue price that it reported to the pricing compendia on the Subject Drugs until April/May 2001.

4.    Admit that Abbott undertook no corrective or remedial action(s) or measure(s) upon receipt of the letter dated October 31, 2000 to Miles White from Congressman Stark (attached to the United States' First Requests for Admission).

5.    Admit that from the date of its receipt of the letter dated October 31, 2000 to Miles White from Congressman Stark, Abbott did not lower its list price that it reported to the pricing compendia on the Subject Drugs until April/May 2001.

6.    Admit that the United States, or any official thereof, never expressly approved of, acquiesced to, or ratified Abbott's price reporting conduct and the spreads for the Subject Drugs at any time from 1991 until the present.

7.    Admit that no state, state or federal Medicaid office, or state agency, or any official thereof, ever expressly approved of, acquiesced to or ratified Abbott's price reporting

6

conduct and the spreads for the Subject Drugs at any time from 1991 until the present.

8.    Admit that Abbott did not change its spreads or spread marketing activities concerning the Subject Drugs upon learning of TAP Pharmaceutical's conduct, for which it pled guilty, entered into a civil settlement with the United States, or entered into a CIA.

9.    Admit that Abbott did not change its spreads or spread marketing activities concerning the Subject Drugs upon learning of its Ross Products Division conduct, for which it pled guilty, entered into a civil settlement with the United States, or entered into a CIA.

10.    Admit that Abbott is not relying upon any advice of counsel defense for any purpose in this case.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3398
Fax: (617) 748-3272

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

  /s/ Ann M. St. Peter-Griffith
Mark A. Lavine
Ana Maria Martinez
Ann St. Peter-Griffith
Special Assistant U.S. Attorneys
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

JEFFREY S. BUCHOLTZ
ACTING ASSISTANT ATTORNEY
GENERAL

  /s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca Ford
Gejaa T. Gobena
Elizabeth A. Strawn
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax: (202) 307-3852

Dated: December 18, 2007

8

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' THIRD SET OF REQUESTS FOR ADMISSION** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.


Dated: December 18, 2007          /s/  Renée Brooker_____
                                                   Renée Brooker



17717432

Dec 18 2007
9:03PM

# EXHIBIT A



**United States Department of Justice**

Civil Division

MFH:JRB:TRStephens                         (202) 307-0404
46-19-1821                                 *Post Office Box 261*
                                           *Benjamin Franklin Station*
                                           *Washington, D.C. 20044*

**COMMUNICATION MADE PURSUANT TO FEDERAL RULE OF EVIDENCE 408**

September 30, 1999

**BY FACSIMILE AND FIRST CLASS MAIL**

Daniel E. Reidy, Esq.
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692

          Re:   United States ex rel. [Relator] v.
                [Abbott Labs] [FILED UNDER SEAL]

Dear Mr. Reidy:

     The purpose of this letter is to notify your client Abbott
Laboratories ("Abbott") that a <u>qui tam</u> has been filed naming it
as a defendant in a False Claims Act matter.  This <u>qui tam</u> matter
is still subject to a sealing order, and you may not disclose its
existence beyond your client.  In addition to this notification,
our purpose is also to inform you and your client of our
perspective of the legal and factual elements of the case as the
government determines whether to proceed against Abbott under the
False Claims Act and/or common law theories.

     In the <u>qui tam</u> complaint, which is over two hundred pages in
length (exclusive of exhibits), the relator alleges that Abbott
caused the Medicare and the state Medicaid programs to pay
excessive reimbursement for infusion and oncology drugs by
inflating the drugs' Average Wholesale Prices ("AWP"), Wholesale
Acquisition Costs ("WAC"), and Direct Prices ("DP").  The states
and the federal government use these prices as benchmarks in
establishing provider reimbursement for hundreds of thousands of
National Drug Codes.  The relator alleges that Abbott is aware of
this reliance and, in turn, manipulated the AWPs, WACs, and DPs
so as to increase the Medicare and Medicaid reimbursement paid to
Abbott's customers.  These customers, healthcare providers, are
paid through claims presented to Medicaid and Medicare which are
allegedly false because these claims knowingly overstated several

times over both the provider acquisition cost and the wholesaler acquisition cost for the drugs. The complaint alleges that Abbott is culpable for the submission and payment of these false claims because of the high degree of control that it exercises over the amount of reimbursement paid to the providers.

## A.  Legally Enforceable Or "Truthful" Claims May Still Be Rendered False By A Fraudulent Course of Conduct

The provider claims at issue in the <u>qui tam</u> are neither facially "truthful" nor legally enforceable. Even if a court disagreed, however, the courts have repeatedly looked beyond the face of such claims to the nature of the conduct underlying the submission of the claims. In past False Claims Act litigation, the government has successfully relied on the proposition that a claim that may be truthful on its face can be rendered false if it was submitted pursuant to a fraudulent course of conduct.

In <u>United States v. Incorporated Village of Island Park</u>, 888 F. Supp. 419 (E.D. N.Y. 1995), the district court held that

> the provisions of the False Claims Act are to be read broadly and reach beyond "claims" <u>which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money</u>; thus the statute is violated not only by the person who makes a false statement or false record to get the government to pay a claim, <u>but also by one who engages in fraudulent course of conduct that causes government to pay a claim for money</u>.  (Emphasis added).

<u>Island Park</u>, 888 F. Supp. at 439, citing <u>United States v. McLeod</u>, 721 F. 2d 282, 284 (9th Cir. 1983)(payments by government for timber sale proceeds were legally enforceable claims but not enforceable by defendant who no longer owned land)(quoting <u>United States v. Niefert-White Co.</u>, 390 U.S. 228, 233, 88 S. Ct. 959, 962 (1968).

<u>Island Park</u> is not a "rogue" decision but rather a well-reasoned one that includes a lengthy precedential and legislative backdrop for the court's holding.[1/]  The <u>Island Park</u> court makes clear that "the legislative history indicates that the FCA was intended to cover each and every claim submitted . . . by means

---

[1/]     The expansive language of the <u>Niefert-White</u> opinion was recently cited with approval in <u>United States v. Carpentieri</u>, 1998 WL 749042, *4 (October 26, 1998 S.D.N.Y.)(Sand, J.) quoting <u>United States v. General Dynamics</u>, 19 F.3d 770,773 (2d Cir. 1994)("refus[ing] to accept a rigid, restrictive reading" of FCA).

- 2 -

of false statements, or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation."  S. Rep. No. 345 at 9, reprinted in 1986 U.S. Code Cong. and Admin. News, 5266, 5274.  Bid-rigging schemes, such as that described in United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943), are indicative of claims that technically may not be false but that were derived from "a fraudulent course of conduct."  The "truthful" claims become false because of the fraudulent course of conduct used to trick the government into paying them.  See also United States v. CFW Construction Co., 649 F. Supp. 616, 618 (D.S.C. 1986)(in bid rigging cases the proscribed harm does not stop with the execution of the contract but extends to each intermediate step along the path to payment by the government), appeal dismissed, 819 F. 2d 1139 (4th Cir. 1987).

The Island Park court followed this analysis when it held the following:

"[w]hen claims for payment on those mortgages were submitted by the innocent mortgagees, the fraudulent course of conduct pursuant to which the mortgages were approved emerge in `full vigor' and become part of those claims, which therefore constitute false claims within the meaning of the False Claims Act."

Island Park, supra, at 440.

Other holdings that similarly deal with otherwise legally enforceable claims include United States ex rel. Sanders v. East Alabama Healthcare Authority, 953 F. Supp. 1404 (M.D. Ala. 1996)(no requirement that government prove that services underlying alleged false Medicare and Medicaid claims were "unnecessary, not rendered") citing Peterson v. Weinberger, 508 F. 2d 45, 52 (5th Cir. 1975); United States ex rel. LaValley v. First National Bank of Boston, 707 F. Supp. 1351, 1352 (D. Mass. 1988)(lender's claim upon government loan guarantee was not fraudulent but false statement in loan application was); and United States v. Ehrlich, 643 F. 2d 634 (9th Cir.) cert. denied 454 U.S. 940 (1981).

The progeny of the Niefert-White case do not require a showing that the defendant violated a specific statute or regulation.  Even so, the allegedly false and misleading price information disseminated by Abbott potentially violates the Food and Drug Administration's ("FDA") primary labeling provision contained in the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C.A. § 301 et seq.  We believe that the FDA, which has direct regulatory authority over your client and its products, will conclude that Abbott's price representations (directly to the Medicaid programs, First DataBank, Medi-Span and/or the Red Book) may be false and/or misleading within the meaning of section 502 of the FDCA.

- 3 -

**B.    Abbott's AWPs May Be False and Fraudulent Even
If It Argues That The AWPs Represent a "Reasonable
Interpretation" Of An Ambiguous Regulation or Statute**

After the fact assertions by drug manufacturers that their
AWPs are set under "reasonable" criteria in the face of
"ambiguous" guidance from applicable regulations and statute
cannot provide a dispositive defense to the <u>qui tam</u> allegations.
The Ninth Circuit Court of Appeals' recent decision in <u>United
States ex rel. Oliver v. Parsons Company, et al.</u>, 1999 WL 503843
(9th Cir. (Cal.))(July 19, 1999), gives a cogent analysis of why
this defense argument fails. In <u>Oliver</u>, the panel held that the
district court erred in finding that the "'falsity' element under
the Act was not met because Parsons demonstrated that it made a
reasonable interpretation of an ambiguous accounting standard,
citing <u>Hagood v. Sonoma County Water Agency</u> . . . ".   <u>Oliver</u>,
1999 WL 503843, at *3.   The Ninth Circuit stated that "<u>Hagood</u>
does not stand for the proposition that a 'reasonable
interpretation' of a regulation precludes falsity."  <u>Id</u>.   The
Ninth Circuit concluded, rather, that it is "Parsons' compliance
with these regulations, as interpreted by this court, that
determines whether" the claims were false.   <u>Id</u>.

The purported "reasonableness" of a drug manufacturer's
interpretations of Average Wholesale Price and Wholesale
Acquisition Cost cannot alone preclude a finding of falsity.   The
<u>Oliver</u> court explicitly approved of the Department of Justice's
reading of the law in footnote 2 where it stated

the Government correctly points out the potential
problem created by embracing a 'reasonable
interpretation' exception to the 'falsity' of a claim.
A defendant could submit a claim, knowing it is false
or at least with reckless disregard as to falsity, thus
meeting the intent element, but nevertheless avoid
liability by successfully arguing that its claim
reflected a 'reasonable interpretation' of the
requirements.   <u>Id</u>. at *5.

We have extensive evidence of deceptive manufacturer
marketing tactics designed to shift excessive government drug
reimbursement dollars from payors to providers.   In one Abbott
document, dated January 1996, the Abbott employee outlines an
ongoing Abbott scheme to set the AWP of Calcijex at 125% of the
"single case price" because the Medicare program only reimburses
Abbott's customers for "80% of the published AWP."   This scheme
which was "not something new and [] is not a change in policy"
resulted in Abbott customers being reimbursed for at least 100%

- 4 -

of their acquisition cost for the drug rather than Medicare's
stated policy of paying 80%.  The Abbott employee states that
Abbott inflates the AWPs for "other HPD products" by "120% of
list."  This evidence — that Abbott knowingly circumvents
government Medicare policy — contradicts any assertion that
Abbott employs "reasonable interpretations" of the applicable
Medicaid and Medicare regulations and statutes.

## B.  False Statements To Government Contractors Or Other Third Parties May Also Provide the Predicate For A False Claims Act Violation

In addition to the allegedly false and misleading price
representations made directly to the state Medicaid programs by
your client, the evidence shows that Abbott submitted price
information to First DataBank, a contractor to the state
governments, that was allegedly intended to give a false
impression of the true wholesale and direct prices of the drugs
at issue here.  These allegedly false statements may form the
predicate of a False Claims Act violation even though the
communications were not directly between your client and the
government.  Moreover, the case law in the Eleventh Circuit
extends the reach of the False Claims Act to false statements
made to third parties who are not government contractors.  Under
the latter circumstance, false statements to Medi-Span and Red
Book must also be taken into consideration.[2]

In <u>United States ex rel. Luther v. Consolidated Industries,
et al.</u>, 720 F. Supp. 919 (N.D. Ala. 1989)(false claims submitted
by subcontractor to government contractor), the court led its
analysis with the following:  "[a] false claim is actionable
although the claims or false statements were made to a party
other than the Government, if the payment would ultimately result
in a loss to the United States." <u>Luther</u>, 720 F. Supp. at 921.
The <u>Luther</u> court cited a number of other supporting opinions
involving false statements made to government contractors and
other entities not directly in a contractual relationship with
the government.  <u>See</u>, <u>e.g.</u>, <u>United States v. Lagerbusch</u>, 361 F.
2d 449 (3rd Cir. 1966)(defendant's false representations were
made to private employer which operated government installation
under terms whereby government reimbursed employer for all
operating costs), <u>United States v. Douglas</u>, 626 F. Supp. 621,
626-27 (E.D. Va. 1985)(film makers potentially liable for false
report submitted to Navy by Navy pilot used by filmmakers to

---

[2]   In the January 1996 Abbott memorandum referenced above, the
Abbott employee notes that Abbott sends the inflated AWPs to
Medi-Span so that the Medicare Intermediaries, who "get their
pricing from the published AWP's of the three reporting
agencies," will receive the false and misleading information.

organize stunts even though filmmakers took no part in making report), and <u>Murray & Sorenson, Inc. v. United States</u>, 207 F. 2d 119 (1st Cir. 1953).  As the <u>Luther</u> court summed up, "even though the false claims in this case were presented to Teledyne, and not the government directly, a claim was submitted 'upon or against the government' under the False Claims Act."  <u>Id</u>.

We find additional authority in the Fourth Circuit Court of Appeals' recent decision in <u>Harrison v. Westinghouse Savannah River Company</u>, 1999 WL 308587 (4th Cir. (S.C.)) (May 17, 1999) (defendant allegedly made false statements in order to induce government into offering subcontract to third party), as significant evidence of the likelihood that the courts will view Fujisawa as culpable for the provider claims submitted to Medicaid and Medicare.  The decision makes clear that the holding of <u>United States v. Niefert-White</u> — that the False Claims Act is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government" — is a sound cornerstone of False Claims Act case law.  <u>Harrison</u>, <u>supra</u>, at *9, quoting, <u>United States v. Niefert-White</u>, 390 U.S. 228, 232 (1968).

In the decision, the <u>Harrison</u> court makes clear that False Claims Act liability extends to cover any source of false information sent to the government whether or not that source is the "recipient or beneficiary of the fraudulently induced contract."  <u>Id</u>. at *14.  This liability attaches not just in the case of contracts and subcontracts but any time there is " . . . fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder."  <u>Id</u>. at *9.  This is so whether or not the claims submitted were otherwise "truthful." <u>Id</u>.  In fact, the <u>Harrison</u> court's opinion is closely aligned with the reasoning set forth in our letter to you, dated April 26, 1999.

Nowhere in the opinion does the <u>Harrison</u> court restrict the definition of "falsity" to statements that violate a statute or regulation.  Nor does the court require a falsified certification.  Rather the court takes the common sense approach of analyzing — through its four prong test -- whether or not the allegedly false statement is true.  <u>Id</u>. at *9.

For example, in January 1995, Abbott sent a memorandum to First DataBank by facsimile that purports to give Abbott's "trade" and "wholesale" prices for Dextrose 50% Injection 2000ML. Abbott reported a wholesale price of $238.74.  This price far exceeds the actual wholesale price of Dextrose when sold through an infusion wholesaler such as Florida Infusion or Oncology Therapeutics Network.  Similarly, on September 23, 1998, Abbott informed First DataBank by electronic mail that the "Direct" price of Vancomycin HCL was $612.90 per package of ten while the "WHLS" price was $380.00 per package of ten.  These prices far

outstrip the actual direct and wholesale prices of these products
that were commonly purchased through the so-called distributor
channels.   For example, the Ultracare wholesale catalog lists the
same Vancomycin NDC at $7.41 per unit and $370.59 for a package
of 50.   Additional inflated "Wholesale" prices were provided for
Dextrose 5% Injection 150 ML, Sodium Chloride 0.9% Injection 10
ML, and Sodium Chloride 0.9% Injection 150 ML on November 24,
1998.

        In April and May 1995, Abbott provided inflated "wholesale"
prices for Amikacin Sulfate and Vancomycin HCL.   Abbott staff
notes from March 1997 confirm that Abbott employees consider WAC
and "wholesale" to be synonymous so there is little doubt that
Abbott understood that it was representing WAC prices as the
prices at which it was selling its products to wholesalers. Even
as Abbott provided First DataBank in 1998 with Direct Prices that
were hundreds of dollars higher than WAC prices for products such
as Acyclovir, Abbott staff appear to have chalked up the
discrepancies to "contract savings" that applied only to WAC
pricing.

        These allegedly false or misleading statements — whether
made directly to the states or transmitted through First
DataBank, Medi-Span or the Red Book — would very likely fall
within the Eleventh Circuit definition of materiality.   In United
States v. Diaz, 690 F. 2d 1352, 1357 (11th Cir. 1982), the
Eleventh Circuit held that an allegedly false statement is
material if "[it] had a natural tendency to influence, or be
capable of affecting or influencing a government function."
Moreover, the government does not have to show

        actual reliance on the false statements.  A statement
        can be material even if it is ignored or never read by
        the agency receiving the misstatement.   False
        statements must simply have the capacity to impair or
        pervert the functioning of a government agency.

Id.

        Based on the current evidence, Abbott's conduct appears to
have directly contributed to the costly perversion of the
functioning of both the Medicare and Medicaid reimbursement
systems.

        **C.    Defendants' Assertion of "Government Knowledge"
                Is Undermined By Repeated Industry Lobbying
                Regarding AWP And Actual Drug Cost**

        During the course of our investigation, we have become aware
of the assertion that the "government" had knowledge that AWP is
not indicative of providers' actual acquisition cost for

- 7 -

pharmaceuticals.  Even taking this at face value, this assertion
is only an affirmative defense to the allegation that your client
acted "knowingly" within the meaning of the False Claims Act.
Assertions of government knowledge will be undermined by (1)
contrary assertions within the industry that AWP is a
representation of actual cost and (2) false and misleading price
representations made by Abbott directly to state Medicaid
agencies.

Specifically, we have credible evidence that at least one
defendant — acting in concert with an "independent" patient
group — represented to congressional staffers this past October
that AWP is the actual measure of cost to providers for a host of
oncology drugs.  These representations were not limited to this
defendant's products but, in fact, were made about the brand name
and generic versions of many chemotherapy drugs without reference
to specific manufacturers.  These facts will undermine the
government knowledge defense.

Moreover, throughout 1996, one defendant used a consultant,
characterized as an "independent" health care provider group,
which attempted to influence Medicare Carrier medical directors
on important reimbursement issues.[3/]  This evidence further
demonstrates the tactics used by the industry to discourage
reforms in the drug reimbursement system.  Ironically, one
letter-writing campaign involved the defendant's effort to
discredit a major product by another defendant.  The consultant
intended to discredit this other company without stampeding HCFA
into "implementing new reimbursement methodologies" that would
result in acquisition cost reimbursement in the Medicare and
Medicaid programs."[4/]  The consultant was also concerned about
the government discovering that it was actually acting on behalf
of the first defendant.

_____

[3/]    The purported provider interest group upon whose letterhead
the Medicare correspondence was sent had the same mailing address
and telephone number as that of the consultants hired by the
defendant.

[4/]    The evidence will also reflect that HCFA  — rather than
acquiescing to AWP-based reimbursement — took steps to shift
Medicare reimbursement to an actual acquisition cost basis (see
42 C.F.R. Part 405.517) in 1992.  HCFA was thwarted on procedural
grounds by measures sponsored by the American Society of Clinical
Oncologists — a constituency that reaps tremendous financial
benefit from the continuation of AWP-based reimbursement.   The
state Medicaid programs have consistently taken discounts off of
AWP in recognition that it overstates costs by 10-20%.

As to the second counter to the "government knowledge"
defense, in June 1993, Abbott provided false and misleading
wholesale price information about Vancomycin HCL in response to
Texas Medicaid's request for accurate, certified wholesaler and
distributor price information.  For example, Abbott listed
Vancomycin HCL, 1 gram for $49.42 per unit and $494.20 per case
of 10.  Ultracare listed the same product with a unit price of
$7.41 and offered a case of 50 units for $370.59. In January
1993, Abbott provided similarly misleading wholesale price
information about Dextrose 5% injectable solution.  These
documents demonstrate that states did seek accurate price
reporting for reimbursement purposes.

We suspect that this evidence is only the tip of the
iceberg.  Our view is that the "government knowledge" defense can
be effectively countered on summary judgment by evidence that the
industry has undermined the impact of HCFA's and the Office of
Inspector General's price/cost research by systematically giving
important government officials misleading information regarding
AWP's relationship to actual cost.

### Conclusion

At this time, we are not persuaded that either (1) the
purported lack of false statements directly to the government,
(2) the "government knowledge defense" or (3) the "truthful"
claims defense can establish -- as a matter of law -- that
neither the federal nor the state governments have a claim for
which relief can be granted.

Thus far, the evidence supports the allegation that your
client was engaged in a course of conduct designed specifically
to get provider claims paid in amounts far exceeding what the
providers — particularly those purchasing from wholesalers —
paid to acquire their products.  Your client was never compelled
by the government to create dramatic reimbursement "spreads" for
its products.  Moreover, your client has the unilateral power to
eliminate these "spreads" overnight.[5]

---

[5]    We have compiled evidence showing that other large drug
companies — operating within the same system — not only resist
the temptation to set initial wide spreads or increase spreads
over time but actually reduce AWP's when their customers' actual
acquisition costs go down.  The preliminary evidence shows that
the normal "spread" is approximately 16.66%.  This figure is well
within the range of state efforts to discount AWP for
reimbursement purposes.  Several manufacturers that are also
defendants in this qui tam have dozens of products for which they
have set spreads of exactly 16.66% where the spread reflects
actual wholesale prices to providers.

Government payors should not have to change their systems of
drug reimbursement just to police reimbursement abuses involving
what appears to be less than 1% of the tens of thousands of drugs
on their formularies. Our view is in accord with the Eleventh
Circuit Court of Appeals in United States v. Calhoon, 97 F. 3d
518, 528 (11th Cir. 1996), when it stated that the Medicare
reimbursement system is not to be reduced to "a cat and mouse
game" where the overwhelmed government is required to police the
honesty of providers seeking to maximize profits.   The Eleventh
Circuit acknowledged that the government has neither the
resources nor the obligation to audit the entire Medicare system.
We think this observation is no less applicable to the Medicaid
system.

Feel free to contact us to discuss the evidence (documents
or potential witness interviews) or case law that you consider
relevant to the government's intervention decision. We look
forward to hearing from you.

Sincerely,

T. REED STEPHENS
Trial Attorney
Commercial Litigation Branch
Civil Division

THOMAS E. SCOTT
UNITED STATES ATTORNEY

By: Mark A. Lavine
ASSISTANT U. S. ATTORNEY
U.S. Attorney's Office

cc:   Mary Riordan, HHS-OIG OGC
      Carolyn McElroy, Maryland MFCU Director