# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                           )
PHARMACEUTICAL INDUSTRY           ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE           ) MDL No. 1456
LITIGATION                        ) Pages 1 - 53


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 26, 2007, 2:05 p.m.


LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1  A P P E A R A N C E S:

2  For the Plaintiffs:

3       JOANNE M. CICALA, ESQ., JAMES P. CARROLL, ESQ.,
   AARON D. HOVAN, ESQ., and J. BRADLEY VATRT, ESQ.,
4  Kirby, McInerney & Squire, LLP, 830 Third Avenue, New York,
   New York, 10022, appearing for the City of New York and all
5  New York counties except Nassau.

6       ROSS B. BROOKS, ESQ., Milberg Weiss & Bershad, LLP,
   One Pennsylvania Plaza, New York, New York, 10119,
7  appearing for Nassau County.

8       THERESA A. VITELLO, ESQ., Levy, Phillips & Konigsberg,
   LLP, 800 Third Avenue, New York, New York, 10022, appearing
9  for Orange County.

10 For the Defendants:

11      LYNDON M. TRETTER, ESQ. and HOA T. T. HOANG, ESQ.,
   Hogan & Hartson, 875 Third Avenue, New York, New York, 10022,
12 appearing for Bristol-Myers Squibb and as liaison counsel for
   the defendants.
13
        JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
14 Ropes & Gray, LLP, One International Place, Boston,
   Massachusetts, 02110, appearing for Schering and Warrick.
15
        MARK H. LYNCH, ESQ., Covington & Burling, LLP,
16 1201 Pennsylvania Avenue, N.W., Washington, D.C., 20004-2401,
   appearing for GlaxoSmithKline.
17

18

19

20

21

22

23

24

25

Page 12

1   And I understand your point, but I have to draw certain lines
2   here, so that's what I'm doing.
3          And the other issue is, with respect to some didn't
4   have spreads and they've added in a spread, that's okay, but
5   no completely -- we're not adding.  And this is it.  This is
6   the frozen list right now.
7          MS. CICALA:  That's fine, your Honor.
8          THE COURT:  Now, with respect to
9   physician-administered drugs, I have to admit I don't
10  understand the issue, and I found it very confusing.
11         MR. TRETTER:  I'm prepared to discuss that, and I
12  would also like to discuss the 30 percent rule as it applies
13  to single-source because that's an important gating decision
14  as well.
15         THE COURT:  I understand.  But the
16  physician-administered drugs --
17         MR. TRETTER:  I can explain that in two shakes,
18  your Honor.
19         THE COURT:  Yes.
20         MR. TRETTER:  Where we started is that when the
21  drug is administered by a physician in a physician's office,
22  it is not reimbursed on an AWP logic, and therefore it is out
23  of the case.  Everybody agrees with that.
24         THE COURT:  Right, and they still do.
25         MR. TRETTER:  Now, you have the same drug that

1  could be theoretically brown-bagged to the physician's
2  office.  In other words, it can be purchased or picked up by
3  the Medicaid patient from a retail pharmacist, for example,
4  and walked over to the doctor's office.  And in that case,
5  what the plaintiffs are alleging is, the retail pharmacist is
6  entitled to be reimbursed for that same
7  physician-administered drug on an AWP logic.  So it's the
8  situs of where it's infused or dispensed.
9           THE COURT:  Okay, so why isn't that enough to
10 count?
11          MR. TRETTER:  Because what they do is, they have
12 one allegation that we spent $1.4 billion on such drugs for
13 such non-physician providers.  And we say, and your
14 Honor's --
15          THE COURT:  They say they get it out of their
16 records that they paid for these based on AWP, so they came
17 from the pharmacy.
18          MR. TRETTER:  Right, but what we're saying is that
19 they don't have any particularization as to any county.  For
20 instance, we don't know whether Onondaga County --
21          THE COURT:  Why does it matter?
22          MR. TRETTER:  Well, it matters because each
23 defendant is a separate defendant in this case, and we don't
24 know whether this all relates to one physician-administered
25 drug, 20 physician-administered drugs, because take my --

Page 14

1    THE COURT: Excuse me. They don't list the
2 specific physician-administered drugs?
3    MR. TRETTER: They list physician-administered
4 drugs but not bearing any relationship to whether a county
5 reimbursed a nonphysician provider for it. In other words,
6 physician-administered drugs are listed in the abstract.
7    Take my client's drugs, Vepesid, which you're
8 familiar with. These are oncology products.
9    THE COURT: So they don't say that so much Vepesid
10 was purchased at AWP?
11    MR. TRETTER: Correct. They don't have that, nor
12 do they have, and most importantly --
13    THE COURT: I don't think it matters, though, one
14 county versus another, because they're representing all
15 the --
16    MR. TRETTER: All right, but, your Honor, at least
17 we should break it down by drug. And the reason it's very
18 important, your Honor, is because ultimately they have to
19 allege a spread, and a retailer --
20    THE COURT: Did you allege the
21 physician-administered drugs drug by drug?
22    MS. CICALA: We did not identify which drugs in
23 Exhibit B are, quote, "physician-administered drugs," your
24 Honor. What we allege and what is simply a fact is -- and if
25 you want an affidavit from the New York State Department of

Page 15

1  Medicaid pharmacy director, we will supply it -- that every
2  single drug in our Exhibit B was reimbursed on the basis of
3  either AWP or FUL.
4          THE COURT:  So why doesn't he list the specific
5  ones which they believe were physician-administered based on
6  AWP?
7          MR. TRETTER:  And what the spread was to those
8  particular providers as opposed to physicians.  Part of what
9  the problem is, your Honor, is the physicians who
10 purchased --
11         THE COURT:  Did you allege the spreads?
12         MS. CICALA:  Yes, of course.  Every single NDC in
13 Exhibit B has a spread, your Honor, for a relevant class of
14 trade, meaning the class of trade that's reimbursed based on
15 AWP or FUL.
16         THE COURT:  I don't understand what the issue is.
17 I mean, if you want to get from discovery exactly what
18 those -- or even automatic disclosure, I'll order her to do
19 it.
20         MS. CICALA:  We're happy to do that, your Honor.
21 We can supply the claims data to show the reimbursement price
22 and the method of reimbursement to the retail pharmacy, the
23 specialty pharmacy and --
24         THE COURT:  That should be enough.
25         MS. CICALA:  And, your Honor, with respect to the

Page 16

1   class drugs, the counties spent over $180 million based on
2   AWP or FUL on the class drugs, not based on actual cost,
3   based on AWP or FUL. We've done the research. Every one of
4   the class drugs is in Exhibit B.
5           THE COURT: When you say "class drug," what do you
6   mean?
7           MS. CICALA: I'm saying the drugs -- I'm sorry --
8   the drugs that your Honor considered in the context of the
9   recent MDL class trial, those drugs were reimbursed on the
10  basis of AWP.
11          THE COURT: So you're going to turn over to them
12  exactly what drugs that you're talking about are the
13  physician-administered drugs that are typically reimbursed
14  based on a different basis and you're alleging were
15  reimbursed out of a pharmacy based on AWP.
16          MR. TRETTER: I would like to just put a practical
17  point on it, your Honor. I would like to know for a
18  chemotherapy drug how much they're really contending was
19  issued out of retail pharmacies and whether the retail
20  pharmacist gets it at the doctor's price or --
21          THE COURT: You know what, that's why you have
22  discovery. I'm not doing that on a motion to dismiss. So
23  you want that on automatic disclosure. We should do that.
24  When can you do that by?
25          MS. CICALA: I want to be clear what the automatic

1  disclosure is, your Honor, if I may.
2      THE COURT: I think he's saying he doesn't know
3  which ones you're alleging are the physician-administered
4  drugs that are being reimbursed out of AWP. Like, Vepesid
5  would be his example.
6      MS. CICALA: I do not understand why we would need
7  to single out the physician-administered drugs as a subset of
8  the whole if our spread allegations are --
9      THE COURT: I'm not dismissing the compliant. I'm
10 just simply saying that it should be -- if you say you can do
11 it, do it. It helps move it along, that's all. I'm not
12 dismissing on that ground.
13      Now, let me jump back to you.
14      MS. CICALA: Sure.
15      THE COURT: Which is, I understand you're not bound
16 by what I did in my major trial. You're not. You don't have
17 to agree with Raymond Hartman, Dr. Hartman. Maybe there's
18 some other guy out there who disagrees, okay? On the other
19 hand, this case is massive. As was just pointed out, it's a
20 gateway issue. It's how much discovery has to be done. It's
21 not like my typical case where I say, "Huh, manana, I'll
22 worry about it later." If I say "Go ahead," then I'm opening
23 huge amounts of expensive discovery. I have to have the
24 basis for believing that some expert somewhere disagrees with
25 what Raymond Hartman says because he was viewed as