# EXHIBIT 2

Page 1

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

                          - - -

IN RE:  PHARMACEUTICAL          : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      : CIVIL ACTION:

PRICE LITIGATION                : 01-CV-12257-PBS

                                :

THIS DOCUMENT RELATES TO        :

U.S. ex rel. Ven-A-Care of      :

the Florida Keys, Inc. v.       :

Abbott Laboratories, Inc.       :

No. 06-CV-11337-PBS             :

                          - - -

        Videotaped deposition of ROBERT

VITO was taken, pursuant to notice, at MORGAN

LEWIS & BOCKIUS, LLP, 1701 Market Street,

Philadelphia, Pennsylvania, on Tuesday, June

19, 2007, beginning at 9:10 a.m., before M.

Kathleen Muino, Professional Shorthand

Reporter, Notary Public; Michael Hunterton,

Certified Legal Video Specialist, there being

present:

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Page 38

1    Q.  Generally.
2    A.  No.
3    Q.  Do you attend seminars on a regular
4  basis?
5    A.  No.
6    Q.  Do you attend seminars at all?
7    A.  Yes.
8    Q.  Which -- which seminars -- what kind of
9  seminars do you attend?
10   A.  It's usually seminars relating to
11 prescription drug payments by the federal
12 government.
13   Q.  When did you begin attending seminars
14 relating to prescription drug payments by the
15 federal government?
16   A.  Don't remember exactly what the dates
17 are.
18   Q.  Generally speaking, do you have a
19 recollection of how long it is that you've been
20 attending seminars relating to prescription drugs?
21   A.  For a while, but I don't know the exact
22 date that they even started.

Page 39

1    Q.  I'm not looking for exact dates.  I'm
2  looking for your general recollection of when you
3  started attending seminars related to prescription
4  drug payments.
5    A.  Probably late-'90s.
6    Q.  Did you attend any seminars when you
7  were working at the Office of Audit Services
8  related to prescription drugs?
9    A.  I don't remember.
10   Q.  And that's because it's been quite some
11 time since you were at the Office --
12   A.  That's correct.
13   Q.  -- of Audit Services, correct?
14   A.  That is correct.
15   Q.  If you had to ballpark how many seminars
16 you've attended relating to prescription drug
17 payments, Mr. Vito, what would it be?
18   A.  Thirty.
19   Q.  And who typically puts -- or sponsors
20 these seminars?
21       MR. NEAL:  I'll object to the form.
22       You can answer the question.

Page 40

1  BY MR. TORBORG:
2    Q.  If anyone?
3    A.  There's certain groups that do it, but I
4  don't remember their names.
5    Q.  Can you recall, generally speaking, what
6  types of groups they were; were they state pharmacy
7  association meetings?
8    A.  They have them as well.
9    Q.  And you've attended some of those,
10 correct?
11   A.  That is correct.
12   Q.  How many of those have you attended?
13   A.  Five or six.
14   Q.  And do you recall when you started
15 attending those?
16   A.  The state ones, you can only attend when
17 they request that you attend.  And I believe they
18 asked me -- the first one I went to was involving
19 less than effective drugs, when we did the audits
20 of less than effective drugs.
21   Q.  And that was 199 -- early-1990s?
22   A.  I honestly don't know.

Page 41

1    Q.  Because it's been some time since that,
2  right?
3        MR. NEAL:  I'll object to the form.
4        You can answer.
5        THE WITNESS:  Yes, it's been some time.
6  BY MR. TORBORG:
7    Q.  I'll -- I'll be asking you some more
8  questions about the state pharmacy meetings later.
9        MR. WINGET-HERNANDEZ:  Object to the
10 form.
11 BY MR. TORBORG:
12   Q.  What other types of meetings have you
13 attended?
14       MR. NEAL:  I'll object to the form.
15       You can answer.
16 BY MR. TORBORG:
17   Q.  Let me restate that.  We talked about
18 the fact that sometimes the meetings would be
19 sponsored by organizations such as state pharmacy
20 -- state pharmacy associations, correct?
21   A.  That is one group that has meetings, but
22 -- but that -- I -- I -- I was under the impression

11 (Pages 38 to 41)

Vito, Robert                                                       June 19, 2007
                              Philadelphia, PA

Page 42

  1   you were asking about meetings in which -- or
  2   conferences in which it's open to the public and --
  3   and you could go to learn about certain items at
  4   those conferences.
  5       Q.  Okay.  Have you attended meetings that
  6   are not open to the public relating to prescription
  7   drug pricing or payment issues?
  8           MR. NEAL:  I'll object to the form.
  9           You can answer the question.
 10           THE WITNESS:  Yes.
 11   BY MR. TORBORG:
 12       Q.  And how many of such meetings have you
 13   attended?
 14       A.  I attended the Medicaid Pharmacy
 15   Directors Meeting, which I told you, five or six
 16   times.
 17       Q.  Any others?
 18       A.  Don't remember.
 19       Q.  So would the state pharmacy association
 20   meetings be included within the ballpark of thirty
 21   that you stated earlier?
 22       A.  No.  I think it would be above that,

Page 43

  1   because I -- I didn't -- didn't understand the
  2   question to know --
  3       Q.  That's fine.
  4       A.  -- that you mean -- meaning -- meant
  5   that.
  6       Q.  Okay.  That's fine.  So what -- what
  7   other organizations or groups have held meetings
  8   that you attended relating to prescription drug
  9   payments?
 10       A.  Like I said, I don't remember all the
 11   names.  I think one might be the IIR group, and
 12   there's some other groups that offer pharmaceutical
 13   education via conferences.
 14       Q.  What is the IIR group?
 15       A.  I don't know.  I forget what they stand
 16   for, but I think it's one of the companies that
 17   have these conferences.
 18       Q.  Do you have any sense for the type of
 19   people who would attend that conference or seminar?
 20           MR. NEAL:  I'll object to the form.
 21           You can answer.
 22           THE WITNESS:  I think it's members of the

Page 44

  1   pharmaceutical industry; state representatives, you
  2   know, like state -- state Medicaid people; other
  3   people, like the OIG.
  4   BY MR. TORBORG:
  5       Q.  I think the other category you mentioned
  6   were pharmaceutical groups, as another group that
  7   would have sponsored or convened conferences
  8   relating to prescription drug payments?  Did I
  9   misunderstand you?
 10       A.  I think so.
 11       Q.  Okay.  Do you recall any other
 12   organizations who would convene or sponsor a
 13   conference relating -- conferences relating to
 14   prescription drug payments besides IIR?
 15       A.  I know there are them -- there are
 16   others, but I don't remember their names at this
 17   time.
 18       Q.  And what types of individuals would
 19   attend those meetings?
 20       A.  The same as the ones that attended the
 21   other ones.
 22       Q.  So you -- you recall, as you sit here

Page 45

  1   today, that you've attended approximately thirty
  2   meetings relating to prescription drug payments
  3   that were attended by, among others, members of the
  4   pharmaceutical industry, state pharmaceutical rep
  5   -- state Medicaid pharmaceutical personnel,
  6   correct?
  7           MR. NEAL:  I'll object to the form.
  8           You can answer.
  9           THE WITNESS:  Yeah.
 10   BY MR. TORBORG:
 11       Q.  As well as five or six state pharmacy
 12   association meetings that were not open to the
 13   public, correct?
 14       A.  Yes.
 15       Q.  That you were invited to attend?
 16       A.  Yes.  I was asked to speak.
 17       Q.  So you -- you were asked to give
 18   presentations at those, correct?
 19       A.  Yes.
 20       Q.  Did you ever decline to speak at any of
 21   those meetings?
 22       A.  I believe that I did decline, but I

Vito, Robert                                                                June 19, 2007
Philadelphia, PA

Page 162

1  biologicals.
2      Q.  Is this implementing the provisions in
3  the Balanced Budget Act of 1997 with respect to
4  reimbursement of prescription drugs by Medicare?
5          MR. NEAL:  Object to the form.
6          You can answer.
7          THE WITNESS:  I think so.
8  BY MR. TORBORG:
9      Q.  And this is something you would have
10 reviewed at the time?
11     A.  This is something that -- what do -- I
12 don't understand the word "review."
13     Q.  Would you have seen this at around the
14 time it was created?
15     A.  I hope -- I hope so, yes.
16     Q.  And under the section that states
17 payment -- Payments For Drugs and Biologicals, this
18 document states:  Drugs and biologicals not paid on
19 a cost or prospective payment basis are paid based
20 on the lower of the billed charge or 95 percent of
21 the AWP as reflected in sources such as the Red
22 Book, Blue Book, or Medispan.

Page 163

1  Mr. Vito, is that consistent with your
2  understanding of how the Balanced Budget Act of
3  1997 directed CMS to reimburse drugs under Part B?
4      A.  I think so.
5      Q.  Would you agree with me that at least
6  this is how CMS interpreted the provisions in the
7  Balanced Budget Act of 1997?
8          MR. NEAL:  Objection as to form.
9          MR. AZORSKY:  Objection to form.
10         MR. NEAL:  You can answer.
11         THE WITNESS:  I -- I -- this is a CMS
12 document, so this is what they sent out, so I would
13 imagine this is what -- the way they interpreted
14 it.
15 BY MR. TORBORG:
16     Q.  If you go to the second page, the
17 contact person listed is Robert Niemann.  Do you
18 know who Mr. Niemann is?
19     A.  Yes.
20     Q.  Who is he?
21     A.  He works at -- it was then HCFA, and he
22 was one of the more knowledgeable people in the

Page 164

1  payments for prescription drugs in Medicare Part B.
2      Q.  And have you had discussions with Mr.
3  Niemann about prescription drug reimbursement?
4      A.  Have -- have we?
5      Q.  Yeah.  Have you?
6      A.  Yes.
7      Q.  About how many?
8      A.  Many.
9      Q.  If you had to ballpark?
10     A.  Well, every -- every one of our reports,
11 we had a meeting in which he would be at when we
12 design the study, then he would be at a meeting in
13 which we had an exit at the study, and then he
14 would also have discussions about our
15 recommendations, so many times.  So three or four
16 times for each review we have at least.
17     Q.  Was there anyone else at HCFA, now CMS,
18 who was more involved than Mr. Niemann with respect
19 to the issue of Medicare reimbursement of drugs?
20     A.  I -- I -- I think that Mr. Niemann was
21 the most knowledgeable person on the Part B drugs.
22 There might have been his supervisors, but I

Page 165

1  believe Mr. Niemann was the most knowledgeable
2  person.
3      Q.  And Mr. Niemann is the contact person of
4  a regulation -- or of a CMS document that indicates
5  that the Balanced Budget Act of 1997 called for CMS
6  to reimburse prescription drugs at 95 percent of
7  the AWP as reflected in sources such as Red Book,
8  Blue Book, or Medispan, correct?
9      A.  Yes.
10     Q.  Do you recall anyone else at CMS who was
11 particularly involved in the issue of Medicare
12 reimbursement of drugs?
13     A.  There -- there were some others, but the
14 main person always seems to be -- is Bob Niemann.
15     Q.  Do you recall anyone who was sort of Mr.
16 Niemann's counterpart with respect to Medicaid
17 reimbursement of drugs at CMS?
18     A.  Yes.
19     Q.  And who was that?
20     A.  Larry Reed.
21     Q.  And did you have conversations with Mr.
22 Reed?

42 (Pages 162 to 165)

0cfa4ef9-679b-48aa-88d6-df3d22db9f34

Vito, Robert  June 19, 2007
Philadelphia, PA

Page 166

1    A.  Yes.
2    Q.  How many conversations have you had with
3  Mr. Reed about prescription drugs?
4    A.  Multiple.
5    Q.  Was Mr. Reed in attendance at exit and
6  entrance conferences of the reports that you did
7  relating both to Medicaid reimbursement of drugs,
8  but also Medicare reimbursement of drugs?
9    A.  Not on every occasion.  If there were
10 some overlaps, then he would be there.  But,
11 generally speaking, you know, Mr. Niemann was
12 responsible for the Part B, and Larry Reed was
13 responsible for the Medicaid side.
14      MR. TORBORG:  I'm about ready to turn to
15 a different angle, and we're five minutes from the
16 agreed-upon time, so why don't we go ahead and take
17 lunch now.
18      MR. NEAL:  That's fine.  Thank you.
19      THE VIDEOGRAPHER:  The time is 12:37 p.m.
20 We're going off the record, concluding Tape No. 3
21 in the deposition of Robert Vito, in the matter of
22 In Re: Pharmaceutical Industry Average Wholesale

Page 167

1  Price Litigation.
2         - - -
3      (Whereupon, a luncheon recess was taken.)
4         - - -
5      (Whereupon, Exhibit Abbott 234 was marked
6  for Identification.)
7         - - -
8      THE VIDEOGRAPHER:  The time is 1:40 p.m.
9  We're going back on the record, starting Tape No. 4
10 of the deposition of Robert Vito, in the matter of
11 In Re: Pharmaceutical Industry Average Wholesale
12 Price Litigation.
13 BY MR. TORBORG:
14   Q.  Welcome back, Mr. Vito.  During the
15 break, I handed you -- or just -- just now handed
16 you what we've marked as Exhibit Abbott 234.  It
17 bears the Bates Nos. HHD068-0977 through 1029, and
18 this is a document, I understand, was produced from
19 your files.
20   And after you've had a chance to -- to give it
21 a look, I'd ask that you tell me if you recognize
22 this document.

Page 168

1    A.  Yes.
2    Q.  Okay.  Can you tell us what this
3  document is, Mr. Vito?
4    A.  It looks like a presentation.  It looks
5  like the materials for a presentation that I
6  prepared.
7    Q.  And you prepared this yourself?
8    A.  Yes.
9    Q.  And do you recall when you prepared it?
10   A.  Not exactly.
11   Q.  But you prepared it in connection with
12 your work at OIG?
13   A.  That is correct.
14   Q.  And do you recall where you used this
15 presentation?
16   A.  I might have used it at a presentation
17 that was for prescription drugs, an internal
18 presentation to members of the office of inspect --
19 Office of Investigation and maybe some people from
20 the Office of Audit Service.
21   Q.  And do you know why you were making a
22 presentation to members of the Office of

Page 169

1  Investigations and possibly Office of Audit
2  Services relating to your reports on prescription
3  drugs and drug pricing?
4    A.  Yeah.  I think they wanted to understand
5  a little bit about the work that we did and the
6  pricing reviews, and we presented -- I believe this
7  is the place where I presented this.
8    Q.  Do you recall where that presentation
9  took place?
10   A.  I know it wasn't in Philadelphia, so it
11 was some -- someplace out of town.
12   Q.  Do you know how many people attended
13 this presentation?
14   A.  To be honest, I -- I -- I don't.
15   Q.  Generally speaking?  Ballpark?
16   A.  Maybe 30.  I don't know.  30, 40, I -- I
17 don't remember, to be honest with you.
18   Q.  Do you recall if there was anyone from
19 outside of OIG who attended this presentation that
20 you did?
21   A.  If it -- if I'm thinking about the
22 correct one, I believe it was only internal people.

43 (Pages 166 to 169)

Page 289

```
             UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS
                     VOLUME II
IN RE:   PHARMACEUTICAL          : MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE       : CIVIL ACTION:
PRICE LITIGATION                 : 01-CV-12257-PBS
                                 :
THIS DOCUMENT RELATES TO         :
U.S. ex rel. Ven-A-Care of       :
the Florida Keys, Inc. v.        :
Abbott Laboratories, Inc.        :
No. 06-CV-11337-PBS              :
                               - - -
```

          Continuation of the videotaped
deposition of ROBERT VITO was taken, pursuant
to notice, at MORGAN LEWIS & BOCKIUS, LLP,
1701 Market Street, Philadelphia,
Pennsylvania, on Wednesday, June 20, 2007,
beginning at 8:43 a.m., before M. Kathleen
Muino, Professional Shorthand Reporter, Notary
Public; Michael Hunterton, Certified Legal
Video Specialist, there being present:

Page 346

1  drug, we believe current Medicare reimbursements
2  more than compensate suppliers for these costs
3  along with a reasonable profit margin.
4      What did you believe was a reasonable profit
5  margin for this drug?
6          MR. NEAL:  I'll object to the form.
7          THE WITNESS:  We -- we did not have a
8  specific number in mind.
9  BY MR. TORBORG:
10     Q.  But you believed that the supplier
11 should have some profit margin?
12     A.  There would be no one in the business if
13 there wasn't any incentive to have a profit.
14     Q.  Do you recall having any discussions at
15 any time with anyone at OIG or HCFA about what a
16 reasonable profit margin would be for albuterol
17 sulfate?
18         MR. NEAL:  I'll object to the form.
19         You can answer that to the extent that
20 you don't disclose any communications that took
21 place in entrance/exit conferences or other
22 privileged settings.

Page 347

1          THE WITNESS:  I think we had general
2  discussions.
3  BY MR. TORBORG:
4      Q.  What -- what do you remember about those
5  discussions?
6      A.  That it was just, you know, discussions
7  about what -- what should be a -- a markup.
8      Q.  What do you recall about what markup
9  would be appropriate in those discussions?
10         MR. NEAL:  Object to the form.
11         And my instruction stands.
12         THE WITNESS:  I -- I -- I don't remember
13 all the details, but there were discussions about
14 that, because we -- we believed that providers
15 should be paid a fair price.
16         MR. TORBORG:  Can you get me Tab 181.
17             - - -
18         (Whereupon, Exhibit Abbott 240 was marked
19 for Identification.)
20             - - -
21 BY MR. TORBORG:
22     Q.  Mr. Vito, what I've handed you as

Page 348

1  Exhibit Abbott 240 is a copy of a regulation that,
2  I believe, actually relates to the Medicaid
3  program.  I'm going to ask you to, if you would, go
4  to the second page, to the Section 447.204,
5  Encouragement of provider participation.  Are you
6  with me?
7      A.  Yes.
8      Q.  I'll read it in -- into the record.  If
9  you would follow along.  That section provides:
10 The agency's payments -- and I believe this is
11 referring to a state agency given what comes before
12 it on the page.
13     The agency's payments must be sufficient to
14 enlist enough providers so that services under the
15 plan are available to recipients at least to the
16 extent that those services are available to the
17 general population.
18     Mr. Vito, have you reviewed that regulation
19 before today?
20         MR. AZORSKY:  Objection to form.
21         THE WITNESS:  This -- this -- this
22 relates to Medicaid, and all the other lines of

Page 349

1  questionings were Medicare.
2  BY MR. TORBORG:
3      Q.  Yeah.  I -- I'm switching over to
4  Medicaid.
5      A.  Okay.  So this is now focused on
6  Medicaid?
7      Q.  Yes.
8      A.  Okay.  I -- I -- I -- I believe -- I --
9  I don't remember.
10     Q.  Do you recall having discussions about
11 the fact that Medicaid regulations had a provision
12 in them that required that the payment that the
13 state plan provided for drugs needed to be enough
14 to enlist enough providers --
15     A.  Yeah, yeah --
16     Q.  -- so that --
17     A.  -- I think we were certainly aware of
18 that.
19         MR. NEAL:  I'll object to the form.
20         You've answered.
21 BY MR. TORBORG:
22     Q.  Do you recall discussions about that?

Page 434

1  a way to pay less for albuterol sulfate, correct?
2     A.  Yes.
3     Q.  And in response, Ms. Min DeParle wrote:
4  We concur.  If given the authority, HCFA would like
5  to increase the discount we now take on the
6  published average wholesale price, AWP, and base
7  our price on acquisition cost.  The acquisition
8  price and the average wholesale price are two
9  distinct pricing methods.  The acquisition cost
10 relates to the invoice price for an item.  The AWP
11 is a price that is essentially established by the
12 industry, similar to the sticker price on a
13 vehicle.  It is HCFA's belief that AWP does not
14 accurately reflect the true reimbursement for this
15 product, but rather is an inflated number.  As long
16 as HCFA is required to use the AWP, which is
17 essentially retail, we will continue to pay more
18 than other payers.
19    Mr. Vito, do you recall this particular
20 response?
21    A.  I -- now that you read it, I recall it,
22 but I didn't -- it wasn't on the top of my mind.

Page 435

1     Q.  Did you agree -- do -- do you agree with
2  Ms. Min DeParle that the acquisition price and the
3  average wholesale price are two distinct pricing
4  methods?
5         MR. NEAL:  Object to the form.
6         You can answer.
7         THE WITNESS:  Can you repeat that?  I'm
8  sorry.  One more time.
9  BY MR. TORBORG:
10    Q.  Do you agree with Ms. Min DeParle that
11 the acquisition price and the average wholesale
12 price are two distinct pricing methods?
13        MR. AZORSKY:  Object to the form.
14        MR. NEAL:  The same objection.
15        You can answer.
16        THE WITNESS:  Yes.
17 BY MR. TORBORG:
18    Q.  Was it your understanding that the AWP
19 methodology was one that required HCFA to use
20 prices published in Red Book?
21        MR. NEAL:  Objection as to form.
22 BY MR. TORBORG:

Page 436

1     Q.  Or in other --
2     A.  I think they had to use others -- Red
3  Book and other similar pricing.  It was suggested
4  that those prices were listed in Red Book, Blue
5  Book, or Medispan.
6     Q.  So is it your understanding that the --
7  the -- the basic message that Ms. Min DeParle was
8  -- is saying is we recognize that the acquisition
9  cost for suppliers for this particular drug,
10 albuterol sulfate, is a lot lower than the AWP, but
11 by statute we are required to pay an amount based
12 on AWP as published in Red Book and other price
13 listings?
14    A.  That's --
15        MR. NEAL:  Objection as to form.
16        MR. AZORSKY:  Objection.
17        THE WITNESS:  That's what she said, yes.
18 BY MR. TORBORG:
19    Q.  And do you recall having conversations
20 like that with members of HCFA?
21        MR. NEAL:  I'll object to the form.
22        You can answer that to the extent that

Page 437

1  you don't implicate any privileged conversations
2  with HCFA personnel, such as those at entrance or
3  exit conferences for your reports.
4         THE WITNESS:  Did we have discussions
5  with HCFA people on this issue?
6  BY MR. TORBORG:
7     Q.  Yeah.
8     A.  On this particular report, yes, we did.
9     Q.  Do you recall having conversations with
10 the members of HCFA that they felt they were
11 required to -- to use the prices in Red Book and
12 other pricing compendia in reimbursing drugs?
13        MR. NEAL:  Objection as to form.
14        You can answer that consistent --
15        THE WITNESS:  I think --
16        MR. NEAL:  -- with my previous
17 instruction.
18        THE WITNESS:  Yeah, I think they used
19 that.  They -- they -- they -- they used those.  I
20 don't know if they used all of them, but they used
21 at least one of them.
22 BY MR. TORBORG:

                                      38 (Pages 434 to 437)

Vito, Robert - Vol. II                                    June 20, 2007
                         Philadelphia, PA

Page 438

1  Q.  My conversation was -- my question was:
2  Do you recall having conversations with HCFA where
3  they indicated to you that they understood they
4  were required to use the prices in Red Book and
5  other pricing compendia in determining
6  reimbursement for Medicare Part B drugs?
7       MR. NEAL:  Objection as to form.
8       You can answer that so long as you don't
9  implicate any privileged conversations --
10      THE WITNESS:  Right.
11      MR. NEAL:  -- with HCFA personnel.
12      THE WITNESS:  I think it again depends on
13 the time, because there was a regulation that said
14 estimated acquisition cost, and then if they had
15 that, they could have used that or they could use
16 the other ones.  But then I think there was a
17 change in -- in the actual regulation, and it --
18 and it said that you should be using those.  I know
19 that as a pol -- as a policy, they used those
20 documents to set prices.
21 BY MR. TORBORG:
22   Q.  Do you recall conversations with HCFA

Page 439

1  where they said, well, we see your findings, Mr.
2  Vito, but we have to pay based on AWP because
3  that's what Congress told us we have to do?
4       MR. AZORSKY:  Objection.
5       MR. NEAL:  Objection as to form.
6  BY MR. TORBORG:
7    Q.  Something to that effect?
8       MR. NEAL:  Objection as to form.
9       And you can answer that consistent with
10 my previous instruction on privileged
11 communications.
12      THE WITNESS:  Something similar to that,
13 but we -- we -- we suggested that there was other
14 opportunities for them to take price reductions and
15 to utilize those other options.
16 BY MR. TORBORG:
17   Q.  But you recall having conversations
18 along the lines that I just outlined, correct?
19      MR. NEAL:  Objection as to form.
20      MR. AZORSKY:  Objection to form.
21      THE WITNESS:  That -- that they were
22 required to use this?

Page 440

1  BY MR. TORBORG:
2    Q.  Yes.
3    A.  At -- at -- at certain times, yes, but
4  not at all time -- you know, as the regulation
5  required.  There were different parts -- different
6  times that regulations said estimated acquisition
7  cost, so if they had the estimated acquisition
8  cost, they possibly could have used that, but with
9  that, then there were other regulations that, I
10 think, changed it, and said that they had to use
11 this.
12 BY MR. TORBORG:
13   Q.  And you recall conversations about that
14 --
15      MR. NEAL:  Objection as to form.
16 BY MR. TORBORG:
17   Q.  -- with HCFA?
18   A.  I think so.
19   Q.  So the problem wasn't that HCFA didn't
20 know about how much suppliers were paying for
21 albuterol sulfate; it was because they had felt
22 that they were required by Congress to use

Page 441

1  different pricing; isn't that right?
2       MR. NEAL:  Objection as to form.
3       MR. AZORSKY:  Objection to form.
4       THE WITNESS:  The way -- the way
5  Nancy-Ann responded, it says, as long as HCFA is
6  required to use AWP, which is essential, we will
7  continue, so they believe that they are required to
8  do it.  That's based on her comment there.
9  BY MR. TORBORG:
10   Q.  Yeah.  And -- but you had told them the
11 market prices for albuterol sulfate, didn't you?
12      MR. NEAL:  Objection as to form.
13      MR. HAVILAND:  Objection.
14      THE WITNESS:  Oh.  Our -- our -- our
15 work, we tried to provide pricing points for all
16 different ways of purchasing the products so that
17 they would have an idea of what -- what -- what the
18 purchase price was, yes, we did try to do that.
19 BY MR. TORBORG:
20   Q.  And you -- and we'll look at some of the
21 other reports later.  And you -- and you provided
22 market pricing information for a number of drugs to

39 (Pages 438 to 441)

Page 450

1       THE WITNESS: In -- in -- in 199 -- in
2  October 1st 1997, in -- in her response?
3  BY MR. TORBORG:
4       Q.  Yes.
5       A.  I -- I -- I didn't see anything
6  specifically in her response relating to albuterol
7  sulfate, but I didn't look at it carefully.
8       Q.  And when you had conversations with HCFA
9  about the fact that they had to reimburse based
10 upon the prices in Red Book and other price
11 listings, it wasn't limited to albuterol sulfate,
12 was it?
13      MR. NEAL: Object to the form of the
14 question.
15      THE WITNESS: When -- when we -- when we
16 met with CMS on this report, it was specifically
17 addressing this report. When we met with CMS on
18 the other report, it was to specifically address
19 that report.
20 BY MR. TORBORG:
21      Q.  I think earlier you testified that you
22 recalled some conversations with HCFA with respect

Page 451

1  to the fact that they felt that they had to pay
2  based upon the average wholesale prices published
3  in Red Book and other price listings?
4       A.  Yeah, I said depending upon what time it
5  was --
6       Q.  Yeah, the time period.
7       A.  Yes. That --
8       Q.  Okay.
9       A.  Because even in her comments on October
10 1st, 1997, they're talking about estimated -- it
11 says: Contracted carriers determine the amount
12 that Medicare will pay for its drugs based on the
13 lower of the estimated acquisition cost or the
14 national wholesale average price.
15      Then it further defines estimated acquisition
16 cost as the survey of actual invoice prices paid
17 for the drug.
18      Q.  Which report are you referring to?
19      A.  The one that --
20      Q.  The '97 report?
21      A.  Yes, on Page D-2.  Do --
22      Q.  Yeah, I see.

Page 452

1       A.  Okay.
2       Q.  And in your report, page little I --
3       A.  Yes.
4       Q.  -- Roman et I, you had indicated that:
5  On January 1, 1998, Medicare Part B will begin to
6  reimburse covered drugs at 95 percent of the
7  average wholesale price.  Correct?
8       A.  Yes, sir.
9       Q.  So that -- that's the date at which the
10 regulation changed to no longer allow use of
11 estimated acquisition cost, but then required the
12 use of average wholesale price; is that right?
13      A.  I -- I -- I believe so, yes.
14      Q.  And do you recall having conversations
15 after the Balanced Budget Act of 1997 or after
16 January 1, 1998 about the fact that HCFA felt it
17 was required to pay based upon the published prices
18 in Red Book and other price listings?
19      MR. NEAL: I'll object to the form.
20      And again instruct you:  You can answer
21 that so long as you don't disclose the substance of
22 any communications that took place in privileged

Page 453

1  settings, such as the exit or entrance conferences.
2       THE WITNESS: I'm -- I'm -- I -- I think
3  we probably did.
4  BY MR. TORBORG:
5       Q.  And were those conversations limited to
6  albuterol sulfate, or did they apply to all drugs
7  reimbursed by the Medicare program?
8       MR. NEAL: I'll object to the form.
9       You can answer.
10      THE WITNESS: I think it depended upon
11 when -- when we issue one report, we only talk
12 about the findings that relate to that specific
13 report. So that when we were talking about
14 albuterol sulfate, it was focused mainly on
15 albuterol sulfate. On the other -- in this
16 particular report, the one in 1997, it was twenty
17 of the top utilized drugs by dollar volume, so we
18 would be talking about those in this -- in this
19 report.
20      Q.  Did you have conversations with respect
21 to the drugs of the 1997 report, where HCFA told
22 you that they felt that they had to pay based upon

Vito, Robert - Vol. II                                           June 20, 2007
                        Philadelphia, PA

Page 490

1    Q.  Starting with the -- the first part of
2  the article, in the first column, where the type
3  gets really small, and I'll -- I'll do the favor of
4  reading it --
5    A.  Thank you.
6    Q.  -- because it -- it will be even
7  difficult for me to read it, but I'll do my best.
8    A.  As you get older, it's harder to see.
9    Q.  It's starting to get for me as well.  For
10 many drugs, especially the growing number coming
11 off patent and going generic, the drug providers
12 actually pay wholesale prices that are 60 to 90
13 percent below the so-called average wholesale
14 price, or AWP, used in reimbursement claims.
15    When did you become aware of the fact that
16 there were -- that generic drugs were being sold to
17 providers at amounts 60 to 90 percent below average
18 wholesale prices?
19        MR. NEAL:  I'll object to the form of the
20 question.
21        THE WITNESS:  I think we became -- I
22 mean, of course, this article pointed it out, but I

Page 491

1  think we also, our work in albuterol sulfate, which
2  is the generic, demonstrated some of those issues
3  as well, as well as some of the other work that we
4  have done here.  I believe at this time Leucovorin
5  was also a generic, so there were other generic
6  products that we had seen and seen some pricing
7  variations on.
8  BY MR. TORBORG:
9    Q.  Do you recall discussions with CMS
10 officials in this time frame about the fact that
11 generic drugs were selling at amounts 60 to 90
12 percent below the so-called average wholesale
13 prices?
14        MR. NEAL:  Objection as to form.
15        THE WITNESS:  I believe when we issued
16 our reports, the reports pointed out that the
17 products were selling below the -- the AWP and that
18 clearly some of the products were generic.
19 BY MR. TORBORG:
20    Q.  Did you have a more global discussion
21 about generic drugs in general and what was causing
22 many of those drugs to sell at prices -- for there

Page 492

1  to be such a difference between the actual selling
2  price and average wholesale prices?
3        MR. NEAL:  I'll object to the form and
4  just instruct the --
5        Instruct you that you can answer that
6  question consistent with my previous instructions
7  not to disclose the substance of any communications
8  that took place at entrance or exit conferences
9  with CMS.
10        THE WITNESS:  Could you restate the
11 question now?  I -- I -- I totally --
12        MR. NEAL:  That's a lengthy instruction.
13        THE WITNESS:  Yeah.
14        MR. NEAL:  I apologize.
15 BY MR. TORBORG:
16    Q.  Did you have any global discussions
17 about generic drugs in general with CMS --
18    A.  Well --
19    Q.  Let me finish.
20    A.  I'm sorry.
21    Q.  -- regarding the fact that there was a
22 -- a larger difference between the actual selling

Page 493

1  prices to providers and the published average
2  wholesale price?
3        MR. AZORSKY:  Object to the form.
4        MR. NEAL:  I object to the form as well.
5        And you heard my previous instruction.
6        THE WITNESS:  I -- I -- I believe that we
7  -- our reports spoke for themself, in that there
8  were some products that were generics that were --
9  that had that difference, and there were also some
10 brand name products that had that difference as
11 well.  And, again, it was each -- each report stood
12 on its own merit.  Albuterol, I think that you
13 showed me we probably did at least -- I saw at
14 least four of the ones that we did, and they were
15 generic drugs, and we were showing what was going
16 on in that.
17        In addition to that, I -- I -- the
18 excessive Medicare reimbursement report, I believe
19 that also pointed out some problems both with the
20 brand name products and the generic products.
21 BY MR. TORBORG:
22    Q.  And we'll -- we'll get into the 1997

52 (Pages 490 to 493)

Henderson Legal Services
202-220-4158

37dbe22c-39bb-473f-8cc6-c16d7974b122

Page 606

1    A.  I don't recall it, but I -- I -- I'm
2  sure I read it.
3    Q.  If I could ask you to go to the bottom
4  of the first column, last paragraph, it starts,
5  With drugs?
6    A.  Uh-huh.
7    Q.  The article states:  With drugs such as
8  albuterol and infusion drugs, quote, there is a
9  profit margin, end quote, notes Tim Redmon, with
10 the National Community Pharmacists Association.  He
11 adds that, after last year's small reduction,
12 industry observers, quote, at least suspected that
13 somebody would come back for more cuts.  That's
14 exactly what's happening now.  End quote.
15   Then there's a section that says, HCFA Can
16 Develop a Dispensing Fee, where the article states:
17 In addition to reducing the reimbursement for
18 prescription drugs to 95 percent of the average
19 wholesale price, the 1998 budget gave the Health
20 Care Financing Administration the authority to
21 develop a dispensing fee for those drugs, notes
22 Attorney Alan Parver with Powell, Goldstein, Frazer

Page 607

1  and Murphy in Washington, DC.  That authority is
2  something we could certainly use to develop our
3  educational efforts with HCFA, Parver notes.
4    Pharmacies, infusion providers, and DME
5  dealers need to teach HCFA more about what they do
6  and what services they render, since Medicare
7  currently does not pay at all for services in
8  addition to drugs, Parver insists.
9    Quote, it's unclear to me how, if an entity is
10 paid its acquisition cost for a drug, it could
11 possibly provide any services, Parver adds.  In the
12 infusion area, that would probably make it very
13 difficult for a pharmacy to provide any services.
14   In the past, Redmon claims, Medicare officials
15 would argue that the service component was, quote,
16 built into the fee schedule for prescription drugs.
17 Now that this component may be removed, Medicare's
18 insistence that it, quote, won't pay for services,
19 end quote, means that the providers are left unable
20 to service beneficiaries, he maintains.
21   I wanted to read all of that just to give you
22 the -- the context.  Do you recall comments to the

Page 608

1  effect, Mr. Vito, from HCFA officials that claimant
2  -- that payment for services was built into the fee
3  schedule for prescription drugs?
4        MR. NEAL:  I'll object to the form.
5        And just instruct you that you can answer
6  that to the extent you don't implicate any
7  privileged communications with HCFA officials.
8        THE WITNESS:  I -- I -- I am not certain
9  on -- on that.  I -- I -- I don't know for
10 sure if that's what was discussed or if they said
11 that the cost is -- is -- that the reimbursement is
12 the reimbursement, so I don't -- I -- I don't
13 recall.
14       THE VIDEOGRAPHER:  Excuse me, Counsel.
15       Whoever just joined the conference call,
16 if you'll please put your phone on mute; we're
17 getting a feedback echo on this end.
18       My apologies.
19 BY MR. TORBORG:
20   Q.  So are -- are you not -- not certain it
21 was discussed, or you just --
22   A.  I -- I am --

Page 609

1    Q.  -- don't know --
2    A.  I --
3        MR. PAUL:  Objection.
4        THE WITNESS:  I don't totally recall and
5  that the answer to your question [sic].  I'm not
6  sure.
7  BY MR. TORBORG:
8    Q.  Have you ever heard the term cross
9  subsidize?
10   A.  I have.
11   Q.  And in what context?
12   A.  I believe that in the prescription drug
13 work, they said that -- I -- I -- I -- I heard that
14 prices, excessive prices for the ingredient cost
15 would be used to help subsidize the other side.
16   Q.  And who is "they"?
17   A.  I believe that that was mentioned at the
18 hearing, and I don't know exactly who -- who talked
19 about that at the hearing.
20       THE VIDEOGRAPHER:  Excuse me, Counsel,
21 we're still getting a feedback on the audio.  Do
22 you want me to --

81 (Pages 606 to 609)

Page 610

1  MR. TORBORG: I'm just about done.
2  THE VIDEOGRAPHER: -- get an operator on
3  the phone?
4  MR. McDONALD: Well, yeah, but, David,
5  it's going to terrible. Why don't you just mute it
6  or something? It's going to be worthless to have
7  the video and not -- I mean, I can hear the
8  feedback back here. Just mute the conference call.
9          - --
10 (Whereupon, the telephone was muted.)
11         - - -
12 BY MR. TORBORG:
13    Q.  And do you recall who it was that made
14 the comment at the hearing?
15    A.  I don't recall, but I do believe that
16 that was mentioned at -- at the -- at the hearing.
17 It might have been GAO or it might have been -- I
18 don't know exactly who it was, but there is a
19 record of the hearing. I believe it was in -- in
20 2001, either September or October.
21    Q.  Was that concept ever discussed at the
22 state pharmacy association meetings that you

Page 611

1  attended?
2     A.  The -- the -- again, you're talking
3  about the Medicare context of -- and then the other
4  -- the state representatives are the Medicaid. So
5  I believe that the Medicaid, we mainly talked about
6  the AWP issues. We did not -- in our reports, we
7  did not talk about the Medicare issues with them
8  unless it had to do with J codes, in which they
9  were being billed to the Medicaid program.
10    Q.  Do you recall discussions at the state
11 pharmaceutical meetings that you attended that the
12 payment for ingredient costs would subsi --
13 subsidize an insufficient dispensing fee?
14         MR. NEAL: Objection as to form.
15         THE WITNESS: I -- I think there has
16 always been questions about the dispensing fee and
17 if it's proper or not, so there probably was some
18 discussions about that.
19 BY MR. TORBORG:
20    Q.  And do you recall any conversations with
21 HCFA relating to the Medicare side about whether or
22 not the payment for ingredient cost would subsidize

Page 612

1  inadequate payment for services?
2         MR. NEAL: You can answer that consistent
3  with my previous instruction on privileged
4  communications with HCFA officials.
5         THE WITNESS: I think it --
6         MR. AZORSKY: Objection to form.
7         THE WITNESS: I think it was -- in our
8  later reports, we mention that in the conclusion or
9  the recommendation, so I think there was -- that
10 was definitely, I believe, in a public document
11 from the OIG.
12 BY MR. TORBORG:
13    Q.  With -- without revealing to me the
14 substance of the communications, was that a -- a
15 topic that was discussed at the exit conferences
16 that you had with HCFA?
17         MR. NEAL: You can answer that question
18 yes or no.
19         THE WITNESS: Hmph.
20         MR. NEAL: Or I -- or I don't remember.
21         MR. AZORSKY: Objection to form.
22         THE WITNESS: I don't remember.

Page 613

1         MR. TORBORG: Why don't we break for the
2  day.
3         MR. NEAL: That's fine.
4         MR. TORBORG: Thank you very much, Mr.
5  Vito, for your time.
6         THE VIDEOGRAPHER: The time is 4:34 p.m.
7  We're going off the record, concluding this day's
8  testimony, consisting of six tapes in the
9  deposition of Robert Vito, in the matter of In Re:
10 Pharmaceutical Average Wholesale Price Litigation.
11 This -- this day of testimony consists of six tapes
12 and will be held by Henderson Legal Services of
13 Washington, DC.
14         - - -
15 (Whereupon, the deposition adjourned at
16 4:35 p.m.)
17         - --
18
19
20
21
22

82 (Pages 610 to 613)

37dbe22c-39bb-473f-8cc6-c16d7974b122

Page 616

```
            UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

---------------------------X

IN RE:  PHARMACEUTICALS        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  Civil Action

PRICE LITIGATION               )  01-CV-12257-PBS

---------------------------X

THIS DOCUMENT RELATES TO:      )  Judge Patti

U.S. ex rel. Ven-A-Care        )   B. Saris

of the Florida Keys, Inc.      )

v. Abbott Laboratories,        )  Magistrate

Inc., et al,                   )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

---------------------------X
```

VOLUME THREE

         Continued Video Taped Deposition of ROBERT
VITO, was taken pursuant to notice at Morgan, Lewis,
1701 Market Street, Philadelphia, Pennsylvania, on
Tuesday, February 5, 2008, beginning at 9:00 a.m.,
before Jeanne Christian, Court Reporter-Notary
Public, and Richard Kanzinger, Jr., Video Tape
Operator, there being present.

Vito, Robert - Vol. III  
Philadelphia, PA  
February 5, 2008

Page 649

1  surveyed would remain profitable for revision of
2  home respiratory and infusion drug therapies to
3  Medicare and Medicaid patients, should the
4  proposed AWP reductions be implemented.
5       Do you see that?
6    A.  Yes, sir.
7    Q.  Is that a sentiment that you recall
8  being discussed in meetings that you attended?
9       MR. DRAYCOTT:  Objection.  You can
10 answer, if you can.
11      THE WITNESS:  I don't understand your
12 question.
13 BY MR. TORBORG:
14   Q.  Do you recall anyone ever expressing
15 the sentiment that if the AWP -- if the drug
16 payment was reduced, that providers of home
17 respiratory and infusion drug therapies to
18 Medicare and Medicaid beneficiaries would not be
19 profitable?
20      MR. DRAYCOTT:  Objection.  It is
21 extremely broad.  To the extent that it is
22 intended to also encompass any information or

Page 650

1  discussion that occurred in the context of an
2  exit conference, we would ask the witness --
3  instruct the witness not to answer with respect
4  to that part of the question.
5  BY MR. TORBORG:
6    Q.  Just so you understand, I think Mr.
7  Draycott's instruction is limited to
8  conversations you may have had at entrance and
9  exit conferences.  So I guess my question then is
10 that -- I would like to know, were there
11 conversations first.
12      Did you have conversations at the
13 entrance and exit meetings about that issue?
14   A.  I believe that's deliberative process.
15      MR. DRAYCOTT:  You can answer if this
16 was a topic.  Beyond that level of generality,
17 you shouldn't answer further.  I think you can
18 answer yes or no as to whether or not it was
19 something that was ever discussed.
20      THE WITNESS:  Yes.
21 BY MR. TORBORG:
22   Q.  And you believe communicating those --

Page 651

1  the substance of those conversations to me would
2  impinge upon your deliberative process privilege?
3  Is that your position?
4    A.  At those meetings, yes.
5    Q.  Have you had any -- and because of
6  that, you are going to take your counsel's
7  instruction not to answer; is that correct?
8    A.  Yes.
9    Q.  Do you recall any other conversations
10 along those lines with anyone else and besides
11 the exit and entrance conferences?
12   A.  I read them, but I don't recall
13 discussing.
14   Q.  When you say you read them, what do you
15 mean by that?
16   A.  In the articles that you just showed
17 me.
18   Q.  If I could ask you to go back to the
19 article I just showed you, Abbott Exhibit 468,
20 that's the Eli's Home Care Week.
21      I would like to ask you, the second
22 column, third full paragraph there, do you see

Page 652

1  that?  In response to the OIG report?  Are you
2  there?
3    A.  Yes, sir.
4    Q.  In response to the OIG -- this is what
5  the document says:  In response to the OIG
6  report, HCFA acknowledged that respiratory and
7  infusion drug providers rely on the reimbursement
8  rates to cover services for which Medicare does
9  not currently reimburse.
10      Do you see that?
11   A.  Yes, sir.
12   Q.  Do you recall conversations that you
13 were involved in where HCFA acknowledged that
14 respiratory infusion drug providers relied upon
15 reimbursement rates for drugs to cover services?
16      MR. DRAYCOTT:  Objection.  You can
17 answer to the extent it doesn't reveal the
18 contents of communications and deliberations
19 occurring at entrance or exit conferences with
20 CMS.
21      THE WITNESS:  Yes.
22 BY MR. TORBORG:

10 (Pages 649 to 652)

Henderson Legal Services, Inc.

202-220-4158                                www.hendersonlegalservices.com

6a03178a-4216-49ac-ad16-e26a4b9c5e48

Page 653

1    Q. Did you have those conversations in
2    connection with the entrance and exit conferences
3    for your reports?
4    A. Yes.
5    Q. Did you have conversations outside of
6    those meetings regarding that topic?
7    A. I'm not sure. It could have been also
8    when we were actually getting data for them or
9    discussing data or at an informational meeting.
10   Q. And would the them in your answer be
11   providers?
12   A. No, it would be HCFA.
13   Q. HCFA?
14   A. Now CMS.
15   Q. So it may have been that HCFA discussed
16   that issue with you apart from the formal
17   entrance and exit conferences; correct?
18   A. I'm not sure. I don't recall.
19   Q. You don't recall -- you think they may
20   have happened? You just don't recall them, given
21   the passage of time; is that fair to say?
22   A. I just don't recall in general, but it

Page 654

1    might have happened.
2    Q. And do you recall having the
3    conversations at the exit and entrance
4    conversation -- at those meetings?
5    A. Yes.
6    Q. Can you tell me about those
7    discussions?
8       MR. DRAYCOTT: Objection. I instruct
9    you not to answer to the extent that it would
10   reveal the communications and deliberations that
11   occurred at those entrance and exit conferences.
12   BY MR. TORBORG:
13   Q. Because of that, are you accepting the
14   instruction not to answer?
15   A. Yes, sir.
16   Q. Do you recall, Mr. Vito, attending a
17   set of committee hearings held by the House Ways
18   and Means Committee regarding Medicare and
19   Medicaid payments for drugs?
20   A. Which year was that, sir?
21   Q. Roughly 2001, I believe, September
22   2001.

Page 655

1    A. I don't know. I have been to a lot of
2    the hearings and testified at some, but I don't
3    know if that -- there was one in particular that
4    I did not attend, and I don't know if that was
5    the one.
6    Q. Do you recall which one you did not
7    attend, who was there?
8    A. Yeah, I believe it was either -- it
9    might have been Janet Rehnquist was the one who
10   testified, and I -- but I'm not certain, but I
11   know I wasn't at one of the hearings.
12   Q. But it was your practice to attend
13   those hearings?
14   A. If I was able to do so, I would like to
15   have done so, yes, sir.
16   Q. Did anyone else from your office attend
17   those?
18   A. Yes, sir.
19   Q. Who was that?
20   A. It varied. Usually, we tried to get
21   the team who worked on the review to -- if there
22   was a hearing, we would let them come down to

Page 656

1    attend the hearing.
2    Q. Can you give me any names?
3    A. Linda Ragone, David Tawes.
4    Q. Did you attend or did you see the
5    testimony provided by anyone from Ven-A-Care?
6    A. Did I see it? I'm sure I saw it.
7    Q. You recall attending a committee
8    hearing at which someone from Ven-A-Care spoke?
9    A. I'm not certain if I was there. I
10   believe I have seen some of their documents, I
11   think, but I don't remember. I'm sorry.
12   Q. When you say documents, what are you
13   talking about?
14   A. When you said -- when you go to the
15   hearing, whoever testifies, they all have their
16   written statement, and usually, I would try to
17   obtain all of the written statements from all the
18   people who had testified there. So if they had
19   ever testified, I would have obtained that
20   statement, if I was there.
21   Q. Let's defer that one, and at the break,
22   I will get copies of that made and ask you about

11 (Pages 653 to 656)

Vito, Robert - Vol. III                                February 5, 2008
Philadelphia, PA

Page 685

1   instruction as the last time.
2           THE WITNESS:  Right.  It is based on
3   our discussions, right.
4   BY MR. TORBORG:
5       Q.  So the topic was discussed in exit and
6   entrance conversations, but you are not going to
7   tell me about the discussion because of
8   deliberative process privilege; is that right?
9           MR. AZORSKY:  Objection to form.
10          MR. WINGET-HERNANDEZ: Objection to
11  form.
12          MR. TORBORG:  Why don't we take our
13  first break?
14          THE VIDEO TAPE OPERATOR:  Off the
15  video, 10:34.
16          (Whereupon a short break was taken
17  at this time.)
18          THE VIDEO TAPE OPERATOR:  We are back
19  on the record.  The time is 10:50.
20  BY MR. TORBORG:
21      Q.  Mr. Vito, I would like to hand you
22  another document.  This one will be marked as

Page 686

1   Abbott Exhibit 473.
2           (Whereupon the court reporter
3   marked document as Exhibit Abbott 473 for
4   identification.)
5   BY MR. TORBORG:
6       Q.  Earlier, you testified that you had a
7   practice of printing out the written statements
8   at congressional hearings that you attended; is
9   that right, Mr. Vito?
10      A.  Yes, sir.
11      Q.  I have handed you a document I printed
12  off the House Ways and Means -- I'm sorry, the
13  House and Energy Commerce Committee web site, a
14  documented dated September 24, 2001.  This is a
15  statement from a Mr. Thomas Connaughton.  And if
16  you would take a skim through that to tell me
17  whether or not you recall printing out and
18  reviewing this statement.
19      A.  (Witness complies.)  I think I saw this
20  document.  I was at that hearing.
21      Q.  Do you recall ever speaking with Mr.
22  Connaughton?

Page 687

1       A.  I don't recall.
2       Q.  In the fourth paragraph of this
3   statement, Mr. Connaughton wrote or stated:  I
4   want to begin by making an important distinction
5   between infusion and inhalation therapies
6   administered to patients in their homes and
7   conventional outpatient drugs, such as pills and
8   patches.  The key difference is that pills and
9   patches do not require professional services to
10  administer.
11          Do you recall, Mr. Vito, having a
12  discussion about the need to draw a distinction
13  between infusion and inhalation drugs and
14  outpatient drugs, such as pills and patches, in
15  connection with the average wholesale price
16  debate?
17      A.  Yes.
18      Q.  Can you tell me about those
19  conversations?
20          MR. DRAYCOTT:  Objection.  As on
21  previous instructions, you can answer it, except
22  to the extent it reveals deliberative

Page 688

1   communications occurring at an exit or entrance
2   conference.
3   BY MR. TORBORG:
4       Q.  Is your testimony that you can't give
5   me the details, given the deliberative process
6   privilege?
7       A.  If you -- I'm sorry again.
8       Q.  Did you have conversations relating to
9   that distinction with anyone?
10      A.  Yes.
11      Q.  Did you have that conversation with
12  anyone outside of HCFA or OIG?
13      A.  Yes.
14      Q.  Tell me about those conversations.
15      A.  I don't remember them, but I am sure
16  that we probably had them.  If we had any
17  discussion with congressional staffers or
18  something, we would have probably said something
19  there.
20      Q.  So you believe you had those
21  discussions, you just don't recall the specifics
22  about them at all?  Do you recall anything about

19 (Pages 685 to 688)

Vito, Robert - Vol. III                                         February 5, 2008
                    Philadelphia, PA

Page 689

1  the discussions, other than the fact that --
2      A.  I'm sorry, yes, I know that we had
3  them.
4      Q.  Do you recall having those
5  conversations with HCFA?
6      A.  Yes.
7      Q.  Did you have any of those conversations
8  outside of the exit and entrance conferences?
9      A.  I don't think so.
10     Q.  Will you tell me about the
11 conversations that you had regarding that
12 distinction with HCFA?
13         MR. DRAYCOTT:  Objection.  I instruct
14 you not to answer to the extent that those
15 communications occurred in an entrance or exit
16 conference.
17         THE WITNESS:  Right, no.
18 BY MR. TORBORG:
19     Q.  Mr. Vito, was it your understanding
20 that HCFA set any policies in its administration
21 of the Medicare and Medicaid program relating to
22 that distinction between inhalation and infusion

Page 690

1  drugs and outpatient drugs such as pills or
2  patches?
3          MR. DRAYCOTT:  Objection, but you may
4  answer the question, if you can.
5          THE WITNESS:  I think it is better to
6  ask them.
7  BY MR. TORBORG:
8      Q.  Do you know of any?
9      A.  Do I know of any --
10     Q.  Do you know of any policies that HCFA
11 had with respect to infusion and inhalation drugs
12 and the reimbursement of those drugs?
13     A.  I know some of the policies, yes.
14     Q.  Which policies are you --
15     A.  I knew the inhalation drug policies.
16     Q.  Did you know of any policies that drew
17 a distinction between infusion and inhalation
18 reimbursement and reimbursement of pills or
19 patches?
20     A.  I don't recall.
21     Q.  Mr. Vito, would I like to hand you what
22 we have marked previously as Abbott Exhibit 381.

Page 691

1  I happen to have copies of this.  I wasn't sure
2  if they were in the folders yet or not.
3          For the record, Abbott Exhibit 381 is a
4  report titled Medicaid and Medicare Drug Pricing,
5  Strategy to Determine Market Prices, Final
6  Report.  It appears to be prepared by an
7  organization called Abt Associates.
8          Mr. Vito, if you would take a look
9  through that, let me know if you are familiar
10 with this document or anything connected to this
11 report or study.
12     A.  (Witness complies.)
13     Q.  Mr. Vito, have you had a chance to skim
14 the document?
15     A.  Yes, sir.
16     Q.  Do you recall this document?
17     A.  I think I saw this document, yes, sir.
18     Q.  I would like you to ask you to go to
19 Page 33 of the document, of this particular
20 document.
21     A.  (Witness complies.)
22     Q.  And then flip one more page to Appendix

Page 692

1  A, members of the panel?
2      A.  Yes.
3      Q.  You are listed there as an observer.
4          Do you see that?
5      A.  Yes.
6      Q.  Can you tell us what this report is?
7      A.  I think it was something that was
8  prepared by Abt to develop strategies to
9  determine how to arrive at the market price.
10     Q.  And Appendix A lists members of the
11 expert panel.
12         Do you recall if there was a meeting or
13 meetings that were held in connection with the
14 preparation of this report?
15     A.  There was one meeting, I believe.
16     Q.  Do you know where it was?
17     A.  In Washington, D.C.
18     Q.  And did you attend the meeting?
19     A.  Yes, I did.
20     Q.  Do you know why you were asked to be
21 one of the individuals to attend the meeting?
22     A.  I believe because they thought that I

20 (Pages 689 to 692)