# EXHIBIT 5

# MEDICARE DRUG REIMBURSEMENTS: A BROKEN SYSTEM FOR PATIENTS AND TAXPAYERS

## JOINT HEARING

BEFORE THE

### SUBCOMMITTEE ON HEALTH

AND THE

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON ENERGY AND COMMERCE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

SEPTEMBER 21, 2001

### Serial No. 107–65

Printed for the use of the Committee on Energy and Commerce



Available via the World Wide Web: http://www.access.gpo.gov/congress/house

U.S. GOVERNMENT PRINTING OFFICE

75–756CC                    WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001



EXHIBIT
Abbott 187

## COMMITTEE ON ENERGY AND COMMERCE

W.J. "BILLY" TAUZIN, Louisiana, *Chairman*

MICHAEL BILIRAKIS, Florida
JOE BARTON, Texas
FRED UPTON, Michigan
CLIFF STEARNS, Florida
PAUL E. GILLMOR, Ohio
JAMES C. GREENWOOD, Pennsylvania
CHRISTOPHER COX, California
NATHAN DEAL, Georgia
STEVE LARGENT, Oklahoma
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
GREG GANSKE, Iowa
CHARLIE NORWOOD, Georgia
BARBARA CUBIN, Wyoming
JOHN SHIMKUS, Illinois
HEATHER WILSON, New Mexico
JOHN B. SHADEGG, Arizona
CHARLES "CHIP" PICKERING, Mississippi
VITO FOSSELLA, New York
ROY BLUNT, Missouri
TOM DAVIS, Virginia
ED BRYANT, Tennessee
ROBERT L. EHRLICH, Jr., Maryland
STEVE BUYER, Indiana
GEORGE RADANOVICH, California
CHARLES F. BASS, New Hampshire
JOSEPH R. PITTS, Pennsylvania
MARY BONO, California
GREG WALDEN, Oregon
LEE TERRY, Nebraska

JOHN D. DINGELL, Michigan
HENRY A. WAXMAN, California
EDWARD J. MARKEY, Massachusetts
RALPH M. HALL, Texas
RICK BOUCHER, Virginia
EDOLPHUS TOWNS, New York
FRANK PALLONE, Jr., New Jersey
SHERROD BROWN, Ohio
BART GORDON, Tennessee
PETER DEUTSCH, Florida
BOBBY L. RUSH, Illinois
ANNA G. ESHOO, California
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
TOM SAWYER, Ohio
ALBERT R. WYNN, Maryland
GENE GREEN, Texas
KAREN McCARTHY, Missouri
TED STRICKLAND, Ohio
DIANA DeGETTE, Colorado
THOMAS M. BARRETT, Wisconsin
BILL LUTHER, Minnesota
LOIS CAPPS, California
MICHAEL F. DOYLE, Pennsylvania
CHRISTOPHER JOHN, Louisiana
JANE HARMAN, California

DAVID V. MARVENTANO, *Staff Director*
JAMES D. BARNETTE, *General Counsel*
REID P.F. STUNTZ, *Minority Staff Director and Chief Counsel*

## SUBCOMMITTEE ON HEALTH

MICHAEL BILIRAKIS, Florida, *Chairman*

JOE BARTON, Texas
FRED UPTON, Michigan
JAMES C. GREENWOOD, Pennsylvania
NATHAN DEAL, Georgia
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
GREG GANSKE, Iowa
CHARLIE NORWOOD, Georgia
  *Vice Chairman*
BARBARA CUBIN, Wyoming
HEATHER WILSON, New Mexico
JOHN B. SHADEGG, Arizona
CHARLES "CHIP" PICKERING, Mississippi
ED BRYANT, Tennessee
ROBERT L. EHRLICH, Jr., Maryland
STEVE BUYER, Indiana
JOSEPH R. PITTS, Pennsylvania
W.J. "BILLY" TAUZIN, Louisiana
  (Ex Officio)

SHERROD BROWN, Ohio
HENRY A. WAXMAN, California
TED STRICKLAND, Ohio
THOMAS M. BARRETT, Wisconsin
LOIS CAPPS, California
RALPH M. HALL, Texas
EDOLPHUS TOWNS, New York
FRANK PALLONE, Jr., New Jersey
PETER DEUTSCH, Florida
ANNA G. ESHOO, California
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
ALBERT R. WYNN, Maryland
GENE GREEN, Texas
JOHN D. DINGELL, Michigan,
  (Ex Officio)

(II)

SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

JAMES C. GREENWOOD, Pennsylvania, *Chairman*

MICHAEL BILIRAKIS, Florida
CLIFF STEARNS, Florida
PAUL E. GILLMOR, Ohio
STEVE LARGENT, Oklahoma
RICHARD BURR, North Carolina
ED WHITFIELD, Kentucky
 *Vice Chairman*
CHARLES F. BASS, New Hampshire
W.J. "BILLY" TAUZIN, Louisiana
 (Ex Officio)

PETER DEUTSCH, Florida
BART STUPAK, Michigan
TED STRICKLAND, Ohio
DIANA DeGETTE, Colorado
CHRISTOPHER JOHN, Louisiana
BOBBY L. RUSH, Illinois
JOHN D. DINGELL, Michigan,
 (Ex Officio)

(III)

# CONTENTS

Testimony of:    **Page**

Bentley, Zachary T., President, Ven-A-Care, Inc ............................................. 46
Connaughton, Thomas A., President, American Association of Homecare .. 110
Emanuel, Ezekiel, Chief, Clinical Bioethics Department, Warren G. Magnuson Clinical Center, National Institutes of Health ................................ 117
Grob, George F., Deputy Inspector General, Department of Health and Human Services ............................................................................................ 38
Lamphere, JoAnn, Lewin Group ................................................................... 115
Martyn, Kevin, Executive Director, Care For Life ..................................... 107
Norton, Larry, President, American Society of Clinical Oncologists ........... 101
Scanlon, William J., Director, Health Care Issues, General Accounting Office ............................................................................................................. 30
Scully, Thomas A., Administrator, Centers for Medicare and Medicaid Services ........................................................................................................... 82
Material submitted for the record by:
Sands, Leo E., Executive Vice President, Chief Compliance Officer, US Oncology, Inc., letter dated September 19, 2001, to Hon. James Greenwood, enclosing material for the record ........................................................ 145
Stark, Hon. Pete, a Representative in Congress from the State of California, prepared statement of ........................................................................ 143

(v)

4

82

ment, subject to audit and review. It forms a good base case for anything else you want to do.

Now, you could then take that base case, you could, say, make our percentage higher than that, or something lower. You could then test it with some samples. But it gives you a nice centralized piece. When we tried to come up with these ideas, we know that none of them will work perfectly, but we were looking for some practical ideas, something that is within the means to actually do it. That one kept emerging as one of the good starting points, if you will, for data.

Mr. GANSKE. I thank you. Thank you, Mr. Chairman.

Mr. GREENWOOD. The Chair thanks the gentleman.

The Chair thanks the witnesses for their 3½ hours of endurance. Your testimony has been extremely valuable to us, and the interest has been high. We appreciate your contributions. Thank you, and you are excused.

Mr. GREENWOOD. Now we call forth Mr. Thomas Scully, the Administrator for the Centers for Medicare and Medicaid Services; and we thank you in advance for your forbearance. As has been your habit, you have been here for the entire hearing, and probably only adding to the agony of waiting is watching the membership dwindle from 25 to three. But we look forward to your testimony.

Mr. SCULLY. Thank you, Mr. Chairman, Chairman Tauzin, Mr. Brown——

Mr. GREENWOOD. Before you begin your testimony, you're aware, Mr. Scully, that this is a joint hearing between the Oversight and Investigations Subcommittee and the Health Subcommittee, and it is our practice—the practice of the Oversight and Investigations Subcommittee to take our testimony under oath. Do you have any objections to testifying under oath?

Also consistent with the rules of the House and the committee, you have the right to be represented by an attorney. Do you wish to be represented by an attorney?

Mr. SCULLY. I used to be a bad attorney.

Mr. GREENWOOD. So saying, I'll administer the oath.

[Witness sworn.]

Mr. GREENWOOD. You're now under oath, and you're recognized for your testimony.

### TESTIMONY OF THOMAS A. SCULLY, ADMINISTRATOR, CENTERS FOR MEDICARE AND MEDICAID SERVICES

Mr. SCULLY. Thank you, Mr. Chairman, for having me.

I will quickly get to AWP. I'm not sure how much I have left to add after that, but a few ideas I hope.

If I could, just quickly, before I get to that, I just wanted to thank a lot of the—you talked about New York earlier, and I'd just like to thank the New York hospitals who we spent a lot of time working with the last few weeks. I wish we had more people in the hospitals. But a lot of you also don't realize that outside the hospitals in the bottom part of Manhattan there are also a lot of disabled people that weren't getting home health. And since I have a chance to publicly, I'd like to thank the home health agencies. The Visiting Nurse Association of New York was particularly terrific in the last 2 weeks. But I think a lot of the health care problems that

83

weren't directly related to the World Trade Centers in the southern Manhattan have been dealt with incredibly well by the City, the State and hopefully with a little bit of help from CMS but with a lot of help from some incredibly selfless providers in lower New York.

Second, if I could just before I get into the AWP issue, one issue that I've become extremely focused on the last 2 weeks since I've now been at the CMS about 3½ months has been a problem you're probably going to get to, if not this year certainly next year, which is HIPAA compliance. And I've recently been extremely focused in the last week on the fact that, like it or not, in a year we have to have a completely new coding system put in place for all providers—Medicare, Medicaid, everyone else.

I don't think I've talked about it enough since I've been on the job. I've only recently begun to understand what a gigantic mission that is, and I think it's obviously like Nancy-Ann's mission to focus the industry on Y2K; and my predecessor, I think it's our mission in the next year to focus people on HIPAA. And whether Congress changes or delays the law or not, we could have a debate about that, I'm sure, at a future time. We have a big, big mission in front of us with HIPAA in the next year, and I intend to—in every speech I give and every time I testify or talk about it, if nothing else, raise the awareness of providers that we have a major, major change in the health financing system that we have to deal with outside this.

Anyway, switching back to HIPAA, the one thing I can say to start with—and I'll try not to go through every issue again—is we agree. And my frustration with the hearing, if anything, is that I hope most of the members that were here didn't leave with the idea that CMS all the way back to Bruce Lanakin before has not been focused on this. And the press also may have already left.

I was involved in this in 1991 in the first Bush administration. We tried to fix it, and there's a long track record from 1991 to 1992.

I was very involved, by the way, in Andrews Air Force Base in creating Medicaid drug rebates with Chris Jennings who was on the Hill, President Clinton's most recent—so I have a long history in Medicaid drug rebates.

This whole issue, people have been trying to fix this for years. And back to Secretary Shalala and Nancy-Ann DeParle last year, they tried to fix it. Got an outpouring of screaming from every affected party, appropriate or inappropriate, and then were hit with a Congressional prohibition for a year not to look at it.

So where we are currently at CMS is we're prohibited, until the GAO report that came out today and until the Secretary reads it, is what the law says, we cannot respond to it. Certainly it will take us a while to put out a rule. But also we're required by law to pay 95 percent of AWP.

Now, could I creatively go back and change it? I'm sure we probably could, and we'd be willing to look at that, but I also have no doubt we'd be sued and it's not the easiest way to fix it.

So I'm here to talk about a number of issues today, but one thing I would ask for is I think this cries out for a legislative solution. We're very anxious to work with you on a legislative solution. I

84

hope we can do it this year before you leave, and we'll give all our staff resources and everything we can to help you fix it. It's an issue that's been around for a long time, and I'm excited that Chairman Tauzin, you, Mr. Brown, Mr. Deutsch and everyone else seem to be in agreement that we need to fix it; and whatever help you need from CMS on a technical basis to fix it, we are very, very anxious to do so.

We have been paying more than any other purchaser for Medicare drugs on an outpatient basis for a long time, and we're determined to get the price down to a reasonable level. What that is, I'll try to give you a few ideas.

In the meantime, I do think, however, the concern—it is a legitimate concern for the providers—is that if you're going to lower—do we always fix the right price in Medicare, which is what we do for providers? Probably not. Do we have the right price for oncologists and their practice expenses? Probably not.

I think at the same time we reduce the prices for the drugs we need to go back and look at oncologists. I think we probably need to look at the ESRD clinics, dialysis centers that also use these drugs quite a bit. Hemophiliac agencies also rely on this to a large degree. DME providers probably have some argument.

I'm not saying they should all have their rates increased, but there is a substantial amount of money to be saved here. And I think at the same time we do that I think we should also go back and look at the base payment rates and make sure there's a balance. I have very little doubt it's not dollar for dollar, as you're aware and we've talked about, but I do think it's appropriate to make sure that, to the extent we can set prices right for drugs, then for practice expenses, then for practice patterns, we should set them right. And I think there's very little doubt they're not right right now.

But in fairness to Nancy-Ann DePerle, my predecessor in the agency, I think this is something the agency has been trying to do for years, and every time it's put its head up, it's got creamed. So we're anxious and excited that many Members of Congress are now aware of it and are interested in fixing it as well.

Let me just talk quickly and give you a couple of suggestions. One is, Mr. Deutsch and Chairman Tauzin both mentioned that this is not just a problem with the Medicare program, it's a huge problem for beneficiaries. And I totally agree. The fact that the beneficiaries pay the 20 percent copayments is a gigantic problem. There are a lot of things wrong with the Medicare problem. There are very few places where beneficiaries feel the inequities of the program as much as they do here. So I think it's important that the chairman focused on that, and I think that we need to focus on that in the fix. Seniors are paying a big chunk of the inequities in the drug payments that we have here.

Second point, 20 drugs account for 75 percent of the spending in this area. So do we have the tools to look at it? We do, and we can talk a little bit about Medicaid and what we have available in Medicaid. The numbers are big, but the number of drugs you're dealing with are relatively small. Single source drugs account for 60 percent of all the Medicare drug spending. So it's relatively narrow. The numbers are big, but the numbers of drugs we're talking about

85

are relatively narrow. So I think if we focus on this problem, hopefully legislatively, it is very fixable.

A fourth point I'd make is that I think we need to be sensitive. Physicians do in fact—back as far as I believe it was 1997—actually it was 1991 was the first time I believe that then HCFA proposed to have 85 percent of AWP. Then physicians came back and said we can't get it for 85 percent of AWP. And that may be the case. I think it's important when we look at new reimbursement systems that we understand it's not like the Federal supply schedule where the VA sets prices. Doctors actually have to go out and buy this on the market. And while the prices may be outrageous, they actually have to go get it.

So our real issue is to focus on the manufacturers and how we get the money back at the end of the game from the—to the manufacturers—hopefully no game at the end of the day from manufacturers. And it is a legitimate problem that physicians out there around the country can't always get it for less than a certain amount of AWP.

So I think we need to look at the bottom line of what the program is paying without squeezing providers to the point where physicians out there in the real world can't get ahold of it. And I think in our legislative—hopefully legislative fix, we need to look at that.

There are a number of different approaches that you have talked about, and I'll just try to run through a couple of them that I think are possible.

The Federal supply schedule has been mentioned. I think that when you look at the VA and when you look at the agencies, Coast Guard and others in the Federal supply schedule, it's really not an apples to apples comparison. I think that probably wouldn't work. Those are really Federal agencies buying the drugs for direct use in Federal agencies.

Average manufacturers' price, which is the bottom line number that was used in the Medicaid program, and we do in fact have those numbers and they are audited and I think they're pretty solid, but again, by statute they're confidential and we're not allowed to use them. In fact, our Medicare staff doesn't have access to them. Only the Medicaid staff does. So is that a more legitimate number? Absolutely.

I think there may be some problems there, but average manufacturers' price, which GAO seemed to suggest is a very auditable and very reasonable number, I think if you went to average manufacturers' price, you might run the risk of squeezing access to physicians out there in the market trying to buy them. So I think there's a possibility.

I think the Medicaid program has some flaws, but there's a model there, and I'll suggest that in a second.

You've talked about wholesale acquisition costs which I think is a better price than AWP. But, again, AWP is largely air, and I think wholesale acquisition costs may be a little better, but it's still potentially air, and you can raise it and lower it as you like, and I think it's a very—the potential for manipulation of that is relatively high as well. As a short-term fix it might work, but I think there are probably better ones.

86

People have proposed that we do a survey of market prices, which also might work. I talked to my staff about trying to do a survey of what nursing homes pay, for instance, because nursing home chains usually have—they're not as big as the Federal supply schedule, but large nursing homes, Manor Care, somebody like that frequently buys—you know, has a similar group of patients buying in large bulk volume.

The problem in doing that—and I think that's a possibility—is that you're looking back a year. And obviously, as you can see from the earlier testimony, the prices change by the day, and looking back and doing a snapshot looking back a year at anybody, for us to do a survey of 2000 prices to set 2001 prices is never going to be quite right. So I think that has its flaws as well.

There is a concept similar to average manufacturers' price called average sales price that you could possibly use, but I think a combination of these we certainly could work on legislatively, and I think the bottom line is that the manufacturers know at the end of the day how many units they're selling to Medicare. They know how many we're paying for.

If we can, in fact, require them, as we do in Medicaid, to tell us what the price is and calculate at the end of the year how many they sold to Medicare and what the price is and recover that price and there is a mechanism to do that, I think to find that balance that we end up getting the right price charged us by the manufacturer, while not limiting and denying access to the physicians that are actually out there in the market, potentially in a small town trying to get it, is the mix that we need to find, and I think it's very doable.

Can we do this administratively? I think we probably won't in the near term, because we probably would get sued. We'd certainly prefer to do it legislatively. I think we could. And if Congress doesn't act, it would probably take us a year to a year and a half to do it. It would take a long rulemaking process. I have zero doubt that we'd be sued, because of what the law says on 95 percent of AWP.

So I would strongly, strongly, strongly prefer to work with Congress hopefully in the next month to find a legislative solution that works, that is fair to the oncologists, that is fair to the dialysis clinics, that is fair to the other patient groups involved and that gets our payment back on the right track. Because it's clearly a very messy system we're in right now.

So I know you've had a long hearing already. That's about as fast as I can talk, and I skipped over a whole bunch of other things I was going to say, but I hope—it may be more valuable just to answer questions. But there is zero doubt that the administration, while we don't have the set solution, is extremely interested in working to fix this problem.

[The prepared statement of Thomas A. Scully follows:]

PREPARED STATEMENT OF THOMAS A. SCULLY, ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES

Chairman Greenwood, Chairman Bilirakis, Congressman Deutsch, Congressman Brown, distinguished Subcommittee members, thank you for inviting me to discuss Medicare payment for outpatient prescription drugs. As you know, prescription drugs are becoming an increasingly important component of modern health care,

87

particularly for Medicare beneficiaries. We are working with Congress to modernize Medicare to cover prescription drugs and provide relief to seniors from high drug costs. In addition, it is clear that the payment system for selected outpatient drugs that are now covered by Medicare is a mess. Medicare now pays more than many other purchasers for the drugs we cover due to the way that drug manufacturers report their prices and Medicare's payment policies. Medicare should pay appropriately for all Medicare beneficiaries, including the drugs we currently cover, and it is unacceptable that the current system results in Medicare paying excessive prices. We also need to pay appropriately for the services required to furnish these drugs. I appreciate your dedication and leadership on this issue, and I look forward to working with you and your colleagues to ensure that Medicare beneficiaries have access to the drugs they need and that Medicare pays competitive prices for these prescription drugs.

By law, Medicare does not pay for most outpatient prescription drugs. However, there are some specific exceptions where Medicare covers pharmaceuticals, such as drugs furnished incident to a physician's covered services, and in these cases, the law mandates that we pay physicians and other providers based on the lower of the billed charge or 95 percent of the drugs' average wholesale price (AWP). Numerous studies have indicated that the industry's reported wholesale prices, the data on which Medicare payments are based, are vastly higher than the amounts that drug manufacturers and wholesalers actually charge providers. That means Medicare beneficiaries, through their premiums and cost sharing, and U.S. taxpayers are spending far more than the "average" price that we believe the law intended them to pay. Some affected physicians and providers have suggested that they need these Medicare "drug profits" to cross subsidize what they believe are inadequate Medicare payments for services related to furnishing the drugs, such as the administration of chemotherapy for cancer. I believe we need to pay appropriately for both the drugs and the services related to furnishing the drugs.

Clearly, Medicare drug pricing is a complex issue. Over the years, numerous legislative efforts have failed to develop an effective alternative to AWP and ensure that Medicare and its beneficiaries do not pay more than they should for the limited number of prescription drugs that Medicare covers. We are committed to working with Congress on a bipartisan basis to ensure that Medicare pays accurately for all of its benefits. As we look to the future, particularly in the context of developing a Medicare drug benefit that does not make the same mistakes, I think it might be important to review previous efforts to reform the AWP payments so that together we can develop a workable solution.

MEDICARE'S LIMITED DRUG BENEFIT

The Centers for Medicare & Medicaid Services (CMS) pays most of the health care expenses of almost 40 million Medicare beneficiaries. If we were creating the Medicare program today, a prescription drug benefit certainly would be included. However, in 1965, prescription drugs played a less prominent role in health care, and the emphasis then was on ensuring access to inpatient hospital care in Medicare Part A and providing access to physicians in Medicare Part B. Today, Medicare beneficiaries rely on prescription drugs as an integral part of their health care. Although by law, Medicare does not generally cover over-the-counter or outpatient prescription drugs, currently Medicare does cover some drugs, including:

- Drugs that are not self-administered and furnished "incident to" a physician's service, such as prostate cancer drugs;
- Certain self-administered oral cancer and anti-nausea drugs;
- Certain drugs used as part of durable medical equipment or infusion devices, (e.g., the albuterol that is put into nebulizers, which are devices used by asthma patients);
- Immunosuppressive drugs, which are used following organ transplants;
- Erythropoietin (EPO), far and away the drug Medicare spends the most money on, is used primarily to treat anemia in end stage renal disease patients and in cancer patients; and
- Osteoporosis drugs furnished to certain beneficiaries by home health agencies.

These drugs are typically provided in the hospital outpatient setting, dialysis centers, or in the doctor's office, and are purchased directly by the physician or provider. Additionally, vaccines for diseases like influenza, pneumonia, and hepatitis are considered drugs, and are covered by Medicare.

By law, we generally pay for these drugs based on the actual charge or 95 percent of the AWP, whichever is lower. This adds up to more than $5 billion a year for currently covered drugs, approximately 80 percent of which is paid for by the Medicare program. In general, Medicare beneficiaries must also share in the cost of pur-

chasing these drugs through their Part B premiums, and except for the flu and pneumonia vaccines, the $100 Part B annual deductible, and a 20 percent coinsurance.

MEDICARE PAYMENT FOR CURRENTLY COVERED DRUGS

The AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies. Traditionally, AWP has been based on prices reported by drug manufacturers and published in compendia such as the Red Book, which is published by Medical Economics Company, Inc. However, manufacturers and wholesalers increasingly give physicians and providers discounts that reduce the actual amount that the physician or provider actually pays for the drugs. These discounts are not reflected in the published price and reduce the amount providers actually pay to levels far below those prices published in the Red Book. Furthermore, use of the AWP, as reported by manufacturers to companies which compile such prices creates a situation where a manufacturer can, for certain drugs, increase the reported AWP and, in turn, offer physicians a deeper discount.

This Committee, CMS, the Department's Office of the Inspector General (IG), and others have long recognized the shortcomings of AWP as a way for Medicare to reimburse for drugs. The IG has published numerous reports showing that true market prices for the top drugs billed to the Medicare program by physicians, independent dialysis facilities, and durable medical equipment suppliers were actually significantly less than the AWP reported in the *Red Book* and like publications. As competitive discounts have become widespread, the AWP mechanism has resulted in increasing payment distortions. However, Medicare has continued to pay for these drugs based on the reported AWP amount. By offering physicians and providers deep discounts compared to the price they could bill Medicare, the drug manufacturers are able to use profit margins to manipulate physicians and providers to use their products for Medicare beneficiaries. It is simply unacceptable for Medicare to continue paying for drugs in a way that costs beneficiaries and the program far more than it should.

In the past, the Agency has attempted to remedy disparities between Medicare payments based on AWP and the amount actually paid competitively by physicians and providers. However, these efforts have not been successful. For example, in CMS/HCFA's June 1991 proposed physician fee schedule, the Agency proposed that payment be based on 85 percent of AWP. We also proposed that certain very high volume drugs be reimbursed at levels equal to the lesser of 85 percent of AWP or the physician's or provider's estimated acquisition cost. We received many comments, primarily from oncologists, indicating that this 85 percent standard was inappropriate. Most comments indicated that while many drugs could be purchased for less than 85 percent of AWP, other drugs were not discounted. Others suggested that while pharmacies and perhaps large practices could receive substantial discounts on their drug prices, individual physicians could not. As an alternative, beginning with 1992, a policy was established for Medicare to pay the AWP or the estimated acquisition cost, whichever was less.

Since the Estimated Acquisition Cost approach proved to be unworkable, subsequent legislation was proposed that would have required Medicare to pay physicians their actual acquisition cost for drugs. Under this proposal, physicians would tell Medicare what they paid for the drugs and be reimbursed that amount, rather than the Agency developing an estimate of acquisition costs and paying physicians based on that estimate. After considering this proposal, Congress adopted an alternative approach in the Balanced Budget Act of 1997 (BBA), setting Medicare's payment for drugs at the lesser of the billed charge or 95 percent of AWP. While this brought Medicare payments closer to the prices that physicians and providers pay for drugs, Medicare payments were still significantly greater than the competitive discounts obtained by physicians and the system still tied Medicare payments to the artificially inflated industry-reported list prices. In fact, in a December 1997 report, the IG found payments based on AWP to be substantially greater than the prices available to the physician community. As an alternative to actual acquisition costs, Congress considered proposals to pay all Medicare drugs at 83 percent of AWP, a compromise between 95 percent of the AWP and the average discount found by the IG.

In May 2000, the DOJ and the National Association of Medicaid Fraud Control Units made accurate market wholesale prices for 49 drugs covered by Medicaid available to State Medicaid programs and to First Data Bank, a drug price compendia owned by the Hearst Corporation. These wholesale prices, culled from wholesale catalogs circulated among the provider community, reflected the actual Average Wholesale Prices for these drugs far more accurately than the drug manufacturers'

AWP. Last year, HCFA sent this new information to Medicare carriers and instructed them to consider these alternative wholesale prices as another source of AWP data in determining their January 1, 2001 quarterly update for many of these drugs. However, due to concerns about Medicare payments related to the administration of the chemotherapy and clotting factor drugs, the Administration instructed our carriers not to use the data for those drugs at that time.

In December 2000, Congress enacted the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act (BIPA), which established a moratorium on decreases in Medicare drug payments while the General Accounting Office (GAO) conducted a study of Medicare drug pricing and related payment issues. HCFA postponed Medicare carriers' use of the DOJ data until we could review the GAO report. We look forward to reviewing the GAO's findings and working with you to revise Medicare's drug payment policy. We must ensure that beneficiaries and Medicare pay appropriately for both the drugs that we cover and the services related to furnishing the drugs.

CONCLUSION

Medicare beneficiaries rely on prescription drugs, and the coinsurance they pay for covered drugs is tied directly to the prices that Medicare pays. We must find a competitive way to ensure that Medicare beneficiaries and taxpayers are no longer paying excessive prices for drugs that are far above the competitive discounts that are widely available today. We need to pay appropriately for all Medicare benefits, including the prescription drugs we cover and the services required to furnish those drugs. We look forward to reviewing the GAO report, and working with you Mr. Chairman, this Subcommittee, and the Congress to revise Medicare's payment policy for currently covered drugs. Thank you for the opportunity to discuss this important issue with you today, and I am happy to answer your questions.

Mr. GREENWOOD. Thank you, Mr. Scully. We appreciate your testimony and your presence and again your endurance in staying with us all this time.

Let me, first of all, comment on why the 85 percent of AWP obviously won't work. Because, as we've seen, some AWPs are actually straight; and particularly when there's no competition there's no incentive for the drug companies to falsify the AWP. So to reimburse 85 percent wouldn't be fair for those who are paying a hundred percent of the AWP, because the physicians would lose money every time. So clearly that won't work.

We do have five principles that my staff and I have worked out in terms of what we think the direction of the legislation that we hope to enact into law in the next month is, and I'd just like to tick these off for you and see if we have general conceptual agreement on how to proceed.

No. 1 is that any new drug reimbursement should not adversely impact Medicare patient access to quality health care. Would you like me to repeat that?

Mr. SCULLY. I'm sorry. I was trying to find your——

Mr. GREENWOOD. The question is, would you agree in concept with these five principles for legislation: Any new drug reimbursement should not adversely impact Medicare patient access to quality health care?

Mr. SCULLY. Sure. Absolutely.

Mr. GREENWOOD. That is a no-brainer.

Mr. SCULLY. That was an easy one. Thank you.

Mr. GREENWOOD. Medicare's reimbursement for coverage drugs should be closely linked to the prices that providers actually pay for the drugs.

Mr. SCULLY. I think that is the bottom line goal, yes.

Mr. GREENWOOD. Three, Medicare services and administration should be reimbursed according to their costs, exclusive of any reference to drug reimbursements?

Mr. SCULLY. The only caveat I'll put into that is, having been in the hospital business for years, costs—but, yeah, actual, real expenses, yes, because cost is what we paid for for years, and that is real life.

Mr. GREENWOOD. Understood.

Fourth, the impact of Medicare's drug reimbursement policies have—upon the making of clinical decisions should be eliminated or reduced to the greatest extent possible.

Mr. SCULLY. Yes. I think absolutely.

Mr. GREENWOOD. Okay. And, fifth, Medicare's reimbursement for treatments in related settings should be equalized to discourage migration between settings based upon relative levels of profit available to providers.

Mr. SCULLY. Yes.

Mr. GREENWOOD. Bottom line there is we don't want to drive these patients certainly back to a hospital setting which costs Medicare more and is sometimes a less pleasant experience for the patient.

Let me ask you this. These principles are not rocket science. This is a very manageable issue, as far as I'm concerned, based on my research here. The GAO report today gives us the foundation in terms of the expenses or costs for the oncologists. I hope we'll erase what has been an obstacle before, which is the legitimate concern raised by Members of Congress, frankly, because we do not have the data to forestall anything that might have some of these adverse effects on patients or providers.

If in fact we can put a legislative solution into some kind of an omnibus package that we sign into law—have signed into law, let us say sometime in October, do you have a sense from talking with your staff yet how long it might take CMS? How much time do you need to enact this so that we get a good system that works well, meets all of these objectives and begins to save the beneficiaries and Medicare the billions of dollars that we've talked about?

Mr. SCULLY. Well, clearly you can start paying different drug prices in AWP pretty quickly. The real issue is making—I think there is some legitimate argument that oncologists, as I mentioned, dialysis clinics—there are a variety of practice groups, at least an argument I've heard, on DME providers. The issue is that we put out our rates on January 1. Most of those rates are already in place. The systems are hard to change. The issue is from an equity point of view, and if there are providers that rely on inappropriately high AWP payments——

Mr. GREENWOOD. If I may, I should have included—incorporated that in my question. But if we give you the objective of coordinating in time this two-step process, move from AWP to a more cost-related—price-related reimbursement rate and reset the practice expense and the reimbursements for these specialties who are—specialists who will in fact lose revenue as a result of this change, how long would that take?

Mr. SCULLY. The quickest way we could rationally do it—again, I can tell you what my—all the people that have to do the actual

work, which a lot of people forget. There's actually lots of people
in Baltimore here that have to actually do this. The quickest way
you really do it is fiscal year 2003, for the fee schedules that come
out in January of 2003, because that is really only the time you go
back and recalibrate up the practice expenses and everything else.

It's possible—nobody is happy with this answer in CMS, I can
tell you, but it's possible that if you directed us and you put money
into the second half of 2002, that for the last two quarters of 2002,
we could possibly—and I'm not even certain of this now—recali-
brate some of the payments up.

We certainly can pay less on AWP, but if you're trying to find
the balance, what I've heard from oncologists and others is, if
you're going to cut the AWP, which we rely on, you need to fix the
practice expense at the same time and in the same bill. I imagine
they wouldn't be very happy to have the drug reimbursement cut
at the same time the practice expenses don't go up. So pushing the
envelope as much as it possibly can be—and I can tell you this is
an extremely unpopular opinion with the staff at CMS—the fastest
we could possibly do it is probably next July, and under normal cir-
cumstances, the fastest we could do it is January of 2003.

Mr. GREENWOOD. That is very helpful. I appreciate that.

My time has expired. The Chair recognizes the gentleman from
Ohio, Mr. Brown, for 5 minutes.

Mr. BROWN. Thank you, Mr. Chairman.

Mr. Scully, nice to have you in front of the subcommittee.

You have the authority now to use an inherent reasonableness
standard to reduce reimbursements for Medicare drugs which basi-
cally bear no resemblance to actual costs or actual cost plus. Do
you have that story?

Mr. SCULLY. I think we do. I think the issue here is, as I men-
tioned, the agencies have a hard time getting around that. We ac-
tually sent out guidance of what we thought was an AWP—not me,
but, as you know, Nancy-Ann DeParle and Secretary Shalala—
about a year and a half ago to have our carriers interpret what was
a low AWP, and there was quite an uproar about that, and the re-
sult of it was a legislative prohibition about changing it. So it's
very debatable from a legal point of view as to whether we do have
the authority. So if Congress doesn't act, we'll certainly look into
it, but it would be far preferable to have legislative guidance.

Mr. BROWN. Wasn't there a GAO review and they said it was
adequate? GAO did a review and said it was adequate?

Mr. SCULLY. A review of the practice expenses or the——

Mr. BROWN. Of the inherit reasonableness.

Mr. SCULLY. I think I read the report last night, and I think
that—their view was we have an inherent reasonableness authority
to interpret what the AWP is, and I believe he said in his testi-
mony that it says average wholesale price in the statute. But as
a former pretty bad lawyer, somebody who has had—been sued nu-
merous times this fall, I would say that with the track record of
having the government use the AWP for 30 years, I would have
very little doubt that our authority to do that would be challenged.
We certainly are willing to do it if it comes to that, but it would
be much sounder I think if we get legislative guidance.

Mr. BROWN. Would it be appropriate first, Mr. Chairman, or Mr. Scanlon to address that, that the GAO did in fact find that. Correct?

Mr. SCANLON. We reported on the expedited inherent reasonableness authority that you gave to the agency in the Balanced Budget Act which allows for up to a 15 percent reduction, again, in an expedited fashion. Whether we have the ability to redefine AWP and define it any way we'd like is a somewhat dicey legal issue. We're happy to—believe me, we're very anxious as you are to fix this. I would say it would be certainly much more likely to succeed if we had additional legislative guidance.

Mr. BROWN. Could you submit a legal opinion for the record on that?

Mr. SCANLON. Sure.

Mr. BROWN. Let me shift gears for a second. Before that, I just—if in fact you can do that, using an inherent reasonableness standard to reduce reimbursements, I would hope that CMS could be more aggressive. I guess you have a pilot project in Texas and look to do more of that for competitive pricing in the months ahead.

All the talk about the solutions that have been bandied about in the prior panel and from opening statements and others, if Medicare changes the way that Congress pays for prescription drugs, obviously then changing the reimbursement rate for oncologists and saying that the practice expense payment system needs to be adjusted, what does that do—my understanding is the entire pool of practice expense payment needs to be budget neutral. Does that mean any increase in practice expenses for oncologists would then cause a reduction in practice expenses for other specialties?

Mr. SCULLY. Well, under current law it would or wouldn't change, and I personally would not recommend us doing that, because I don't think we should be taking funds from other practice expenses to fund oncology. I think the discussion that's been had in some quarters about legislation is that if you're going to change the AWP legislatively you will get significant baseline savings, and some of that could go back into just adding in a nonbudget neutral fashion back into the practice expense pot, which you can do legislatively to increase, where appropriate, some practice expenses in some areas without taking it from others.

But, clearly, without legislation, any practice expense change has to be budget neutral.

Mr. BROWN. So if we were to do that, do you have any suggestions on the amounts of—you, first of all, say we in a sense legislatively break the budget neutral concept of practice expense, at least for this particular case. What kind of money do you talk about in terms of the oncologists then versus what we've done?

Mr. SCULLY. Chairman Greenwood and I talked about this a little bit, and he—apparently in the GAO reports read last night, they suggested $51 million. It's not always easy to get a quick back-of-the-envelope read from my staff, but I think that number is in the ballpark. It's close, somewhere in the 40—I mentioned to him that our back-of-the-envelope number was pretty close to that, in the $45 to $55 million range.

Mr. BROWN. What are you hearing from other physicians, other specialties about the practice expense issue?

93

Mr. SCULLY. You know, in fairness, I was one of the drafters of my first job and the first—one of my first jobs in the first Bush administration was passing RVRS in 1989, since I was primarily responsible for the administration's position back then.

One of the reasons I like it——

Mr. BROWN. A lot of complaints should be directed to you then.

Mr. SCULLY. Yeah. It's all my fault. They didn't like it much back then, but, in fairness, I think the system has worked reasonably well. If you look at all the other reimbursements over the last 15 years, nursing homes, hospitals, everything else has been an up-and-down roller coaster. Physician reimbursement has been relatively—as I'm sure the physicians on the committee might not agree, but I think generally even the AMA would tell you that, relative to other reimbursements in Medicare, it's been more predictable and more stable and the system has worked reasonably well.

The thing about practice expense is that basically we rely 98 percent of the time on the—what's called the RUC, which is essentially the committee through the physician groups to recommend what the practice expenses should be. So if the oncologists think they're underpaid, they have to come argue why it should come out of the oncologists versus the surgeons, versus the gastroenterologists, and they sit around a table every year and make recommendations, the vast majority of which we take. But it's a finite pot, and I think it works reasonably well.

So the issue here is—it's the physicians all sitting around the table with CMS saying who is underpaid and who is overpaid, and they're all arguing over a finite pot that you've authorized. And I think it works actually reasonably well. I mean, everybody is unhappy, but once everybody is unhappy that usually means it's working right.

Mr. BROWN. Thank you, Mr. Chairman.

Chairman TAUZIN. I thank my friend. The Chair recognized him so briefly for a round of questions.

Thanks for coming, Mr. Scully. Of course we appreciate you being here.

Let me ask you in regard to that finite pot. If we are going to work out a solution that establishes a responsible AWP, something more akin to the real cost of the drug, and it reduces the income to the oncologists significantly and the oncologist does have a claim that he is under-reimbursed for practice expenses, which you and I think GAO both have conceded is true, at least to some extent—you've identified it around $50 million. If we simply say that we're going to permit the oncologist to have a larger share of that finite pool, does that ipso facto mean that other physicians, other service providers will lose reimbursement as a result?

Mr. SCULLY. If we were directed to do that administratively without new money in the pot, it would, but my hope would be that in the same—what I've heard from responsible oncologists, of which there are many, is that they agree that many of the things in the system are broken and in fact if we fixed in the same bill simultaneously AWP and adjusted their practice expenses, they don't think that is necessarily unfair. Now some may disagree with that.

94

Chairman TAUZIN. Provided we increased the pool to accommodate to whatever few reimbursements we ought to provide for those physicians. Is that correct?

Mr. SCULLY. Once again, in fairness, Mr. Chairman, I think—and I'd like to work with your staff on—I do think it's not oncologists who've made the most noise on this. I do think dialysis providers of a number of drugs and I think hemophilia agencies do. And, to a lesser degree, we ought to look at other providers and make sure they also are made whole.

Chairman TAUZIN. We've got to look at every single provider that may be losing income as a result of a change in AWP and examine whether or not in fact their practice is being properly reimbursed under the current system. Is that correct?

Mr. SCULLY. Yes.

Chairman TAUZIN. And we need to come up with a number that we need to add to the pool to make it fair, and there is a disagreement on that number, right? I mean, you and GAO have a number around 50——

Mr. SCULLY. Pretty close. I think we're pretty close.

Chairman TAUZIN. I've heard some extraordinary numbers coming from some of the care providers. So we're going to have to somehow provide some rationale for a proper number. Is that correct?

Mr. SCULLY. Yes, sir.

Chairman TAUZIN. Second, why don't you now use the average manufacturers' price and best price under the Medicaid rebate program in establishing an average wholesale—or average wholesale price? I think I know the answer why you don't, but tell me.

Mr. SCULLY. I believe it's statutory. That's another thing that I hate to say that I helped create at Andrews Air Force Base in——

Chairman TAUZIN. So if you're going to use it, we have to change the law?

Mr. SCULLY. If you wanted—the way it works is we do use average manufacturers' price, I believe, and my staff might correct me if I'm wrong, but the rebate—it comes up that the difference between the AWP that's charged and the average manufacturers' price is just a small piece of it. So you could, in fact, correct Medicaid law as well and arguably make it more appropriate.

Now, the two sides—just to give the other side, you probably hear from private insurance companies is there's no doubt what we're paying in Medicare in a big way and arguably in Medicaid in a smaller way, but when you put those two programs together and you squeeze the pot that's going to bounce back on the private insurers. So—to some degree.

Now, there's no question to some it's excessive margin. But if you take Medicare and Medicaid which are—at least in the hospital outpatient setting, 40 percent of that is usually Medicare. Maybe 12, 14 percent is Medicaid. Then you squeeze down on their reimbursement there, which we certainly need to do, you're going to have the insurers and others on the private payer side come back and say our drug prices just went up.

Now, again, I would very much doubt that is a wash. I think the margins on the Medicare side are extreme, to say the least.

95

Chairman TAUZIN. And you both tend to say that. We have at least some evidence coming in from the other side claiming that it's a wash. We're going to have to again get some sort of arbitration on that number to find out what it is.

Mr. SCULLY. I think generally the insurance plans are—you know, they have the flexibility to negotiate prices, and they generally can fend for themselves pretty well, but you will hear a push back from the other side.

Chairman TAUZIN. Let me ask you a very simple question that I think I know the answer to, but you might give us some insight on it. Why on earth do we have a system that requires a Medicare beneficiary to pay 20 percent as a copay of an artificial price? It can exceed the real cost of the drug to the physician. What would happen if the law would change or some provision were made, either administratively or by change of law, to require that the 20 percent copay would be 20 percent of the real price paid by the care provider for the drug? What is wrong with that?

Mr. SCULLY. Other than the budget spending, it sounds like a great idea, and I think——

Chairman TAUZIN. It would save American patients $177 million that they're spending on excessive copays, because copays are based on fictitious numbers. I mean, when a patient has to pay 500 percent for this one drug I cited of the amount the doctor is having to pay for that drug as a copay, I mean, citizens look at that and say, you know, that's Alice in Wonderland. It's just crazy. Shouldn't the copay be based upon the real cost of the drug to the doctor, and what would it take to do that?

Mr. SCULLY. Well, that may be—that gets into the delicate difference, as I said. But we can probably figure out exactly what we should be paying the manufacturers and recoup it, much the way Medicaid does through a reconciliation.

The issue is, if you're trying not to squeeze, the physician is trying to buy it out in the market at the beginning of the year. Finding out what—the right number to charge the 20 percent copay against is one the tougher things to figure out.

Chairman TAUZIN. It is not hard to figure out. You simply have a provision that says you can't charge the doctor or physician as a co-pay more than 20 percent of the drug——

Mr. BROWN. Will you be able to do that administratively, the chairman's suggestion, simply so that the patient would pay the 20 percent of what the actual charge, what the doctor's actually charging for the drug? Could you do that?

Mr. SCULLY. Well, the closest thing we have right now, the ability to actually determine what the actual price paid is, is the average manufacturer's price which we have for the purposes of Medicaid the worst——

Chairman TAUZIN. Let me say it again. If the law said that the doctor can't charge the patient more than 20 percent of the actual cost, it is the health care provider's obligation then not to send a bill that is represented on 20 percent of some fictitious price, he's got to look at what he has actually paid and send a bill based on 20 percent of what he really paid for the drug. Otherwise he is in violation. That is pretty stiff, but what is wrong logically with that

96

if at the same time we are making the proper adjustments for practice reimbursement to the physician?

Mr. SCULLY. Nothing. It seems logical, and I think the question from Mr. Brown was can we do it now administratively and I don't think we can.

Chairman TAUZIN. Also doing it administratively without correcting the reimbursement on the fund is disjointed. I understand that. There is a $177 million hit for health care providers. But the fairness of asking a Medicare patient to pay 20 percent of a price that is totally fictitious, way in excess of what the physician actually bought that drug for, seems to me to be absolutely insane. It contradicts what we did in the Medicare program, which was literally to provide a co-pay requirement on the patient that was supposed to be one-fifth of the actual cost and, because of this crazy system of average wholesale pricing, can run as high as 500 percent of the cost. And I mean not only is it unfair basically to think about that but think about it in terms of if you happen to be the wrong patient, you happen to need that drug that is 500 percent as opposed to another patient that is paying closer to the real 20 percent. There is an inequity in the requirements under the Medicare system depending upon how unlucky you are, what disease you have got, what drug you need to help you.

I would think that we should all look at expediting a cure for that particular problem. Perhaps we can do that sooner than later.

Mr. SCULLY. We would love it. We are totally with you. I think the best thing about this hearing was for the health care policy wonks in the world, many on your committee, this issue has been around about 10 years and I never heard this thorough a discussion on it, and usually what happens is somebody tries to cut a rate and somebody screams that patients are going to be hurt, which is frequently not the case, and we are legislatively prohibited from fixing it.

Chairman TAUZIN. You said the right thing, legislatively prohibited from fixing it, and that can't stand any longer. It is our obligation right here to fix it. We have allowed this to exist too long, as we thoroughly understand it, as we understand its pernicious effects upon the health care system, and particularly upon the very people it is designed to help, we have got to fix it, and if there are legislative impediments to your fixing it, we need to take them out of the way.

Thank you very much. I will recognize Mr. Ganske for 5 minutes.

Mr. GANSKE. Thank you, Mr. Chairman. I want to follow up on your line of questioning. It seems to me that the problem with instituting a limit on the co-pay to the actual cost without doing the rest is just what we have been talking about multiple times this morning; that is, that you are not taking into account the overhead involved with the administration, with the storage, with the ordering, with the time involved for personnel and things like that, and so I think that that issue of the co-pay is corrected when you actually have the inaccurate index of the cost, I mean of the drug, whether it's an AVP, or whatever letters you want to use.

Mr. Scully, I want to go to this issue of the AMP data. This is a quote from the IG report. "This option would require legislation to allow Medicare access to AMP data. Prior to this option being

97

implemented, it would be useful to clarify or refine certain definitions. We also believe that an initial intensive effort should be made to audit AMP data." We don't want to just substitute some letters. We need to have some accuracy. Do you have any idea of what the definitions that we would need to address to clarify and define what the IG is talking about in terms of AMP?

Mr. SCULLY. That is considerably lower and I think it generally works. It is confined to Medicaid by statute, and our Medicaid staff has access to what the Medicare staff does not. It is audited. If we use it for a broader chunk of the market and used it for Medicare as well as Medicaid, obviously incentives for people reporting their prices would—we'd have to probably audit more carefully, as the IG said, and be much more thorough in making sure the prices are accurate. But the idea of AMP, which is similar to an average sales price concept, is to actually find out what the manufacturer sells it to all customers in the country in any particular year and then come back and make it that that is the average price that we pay. I think the data is there now to make it work, and it is certainly the best measure to make it work.

The problem is if you go out to many areas of the country where physicians and oncologists may actually have to pay more for it, there may be places where somebody can't get access to that. That was the argument about paying 85 percent of AMP back in 1991. If a physician in Iowa, for instance, couldn't get access to the drug for that price, he might never get it. So some have suggested that just consensually what we would do is allow the companies charge whatever they want, but then at the end of the year come back and reconcile, similar to what Medicaid does now, and say you sold us a million units of the drug times whatever the average manufacturer's average sales price is, you owe us the difference. That way you keep access to the physician out there buying in the market while actually recovering from the manufacturer.

The problem with that, which is what I was trying to get to Mr. Brown, is then what do you do up front as far as charging 20 percent of what, the inflated AMP or the real end of the year price the government ends up paying, and that is difficult.

All things I think we can talk about fixing legislatively, but it is a complicated problem to make sure we don't overpay, but that we also don't shut off access to physicians who may not in some parts of the country be able to get access to the drugs. So it is a complicated problem. I think we can fix it, but I have only been looking at it intensively the last 2 or 3 days and I can't tell you all the answers yet.

Mr. GANSKE. Can this committee expect from the administration and from you and CMS some specific suggestions for instance on the, quote, clarification and refinement of certain definitions, unquote, that we would need to do legislatively if we were looking at going the AMP route?

Mr. SCULLY. Sure. Obviously we are hoping, and if we are only here for a month to spend a lot of time on legislative issues, we certainly have a lot of suggestions in this area. We have already spent a lot of time talking to committee staff.

Mr. GANSKE. We are dealing with 24 drugs; is that right?

Mr. SCULLY. I think the bulk of the 24 is about 90 percent.

98

Mr. GANSKE. It would seem to me that we ought to be able to get a handle through sampling of real invoices on 24 drugs, what the real average wholesale price, or the AMP, should be to address this.

Mr. SCULLY. Actually the companies that report AMP are required to tell us what their average price was to all their buyers in the course of the year in any category, and we audit that. So it should be a pretty accurate number. We just can't use it right now for Medicare.

Mr. GANSKE. How do you audit that?

Mr. SCULLY. I believe the IG—the Medicaid actually goes into the companies and audits——

Mr. GANSKE. It goes into the company books and then checks——

Mr. SCULLY. That is right. It is the OIG who actually does it for us.

Mr. GANSKE. And then checks back with the customers of those companies to see whether that in fact——

Mr. SCULLY. Yeah. The only potential flaw I have seen is that some drugs, once you put Medicare and Medicaid together, it is—you know, to figure out what the rest of the market is paying and piggyback on that. A few of these drugs, the market is mostly Medicare and Medicaid. So it is a little difficult to figure out the prices if the non-Medicaid/Medicare market is 10 percent. That is the only flaw I have seen so far in looking at it.

Mr. GANSKE. We both know it has been difficult to get accurate indices of practice expense. There has been a lot of controversy in those areas. If we are talking about changing this reimbursement, what will be the process to get an accurate assessment from these medical specialties that will be affected?

Mr. SCULLY. I believe, and again I hope somebody will jump in here if I am wrong, all the specialties already have the ability to put in their own surveys. The oncologists could have put in their own practice survey and did not. The data that we had on oncology combined their actual drug costs so close to their practice expense costs that we made the decision, which I believe GAO agreed with, that we couldn't use that data. So we used the average physician's practice expense. I think that was defensible because arguably the physicians are already, from what we have heard today, being overcompensated on the drug side; so using the average physicians practice expense is reasonable.

If you in fact reduce the AVP and you made the judgment that we should go back in and do a survey of oncology data or have them submit their own, we believe that would result in their practice expenses going up, but right now the practice expense component for oncologists is the actual average practice expense for all physicians because we don't use oncology specific data.

Mr. GANSKE. We have testimony today from Dr. Norton to the effect that the Medicare payment for services for administration may be one quarter what the actual costs are. Do you have a feeling for that?

Mr. SCULLY. I have not, to be honest with you, looked at that level of detail. Totally independent of each other, both the GAO and our staff looked at this number and came up with a remarkably close initial determination. So I am happy to go back and

spend time with the oncologists discussing it, I am sure I will if you are looking at legislation, but I have yet to find a physician group that was not unhappy with their practice expense allocation. I think that is the nature of the beast.

Mr. GANSKE. Thank you, Mr. Chairman.

Mr. GREENWOOD. The Chair thanks the gentleman and recognizes the gentleman, Mr. Norwood, for 5 minutes.

Mr. NORWOOD. I thank the chairman and I only have one question. I am curious to see what Mr. Scully has to say. You implied earlier there seems to have been a problem at least as far as 10 years back, that HCFA has been concerned and has raised questions about this for a long time, however generally when you raised questions very loud and stuck your head up very far, Congress pounced on you. Is that where we have been?

Mr. SCULLY. That is fair, but sometimes in fairness it is Congress, sometimes it is, you know, groups coming in and screaming within your own administration, whether it is—Gail Walinsky was the first person to get involved in this in 1991 and I was in the White House then, and I remember not knowing very much about it but I remember we got a lot of heat for it. I think the level of understanding and interest this year is an all-time high and that is positive. I think generally whether it is Congress or just people complaining about it, when you have talk about cutting, the groups that are affected are always upset, and generally they are upset because in the past the issue has generally been lowering reimbursements without being sensitive to the fact that maybe there is an unfortunate—but reality is cautious. As I mentioned, I know for ESRD clinics, they argue that their rates are too low as well and that they rely on AVP transfers and cost shifts. Generally the answer in the past has been cut the rates and don't be sensitive to the other side, which does not seem to be the case this year.

Mr. NORWOOD. My question, Mr. Scully, though, is since this has been a problem for a long time, I am a little bit surprised that why would not CMS or GAO or somebody be coming to this hearing today with a solution?

Mr. SCULLY. It is not an easy solution. I spent 4 hours the other day with probably 10 people at CMS that have worked on this for the longest time and went around with the options I put in front of you today briefly, and I am not sure we have a consensus in our agency about what is right. We are going to have to pick one. I think it will be a hybrid of a bunch of these, but I am not sure that you could find a consensus solution anywhere. I would be happy to sit down with the committee and give you my opinions.

Mr. NORWOOD. I was struck by the different options that you sort of threw at us pretty quickly, and I guess is this not solvable?

Mr. SCULLY. I think it is very solvable. I think there are shortcomings to every solution and some benefits to every solution, and some people are not troubled by just saying let us pay the Federal Supply Schedule. I don't think that that—which the VA pays, which the Coast Guard and other agencies pay. I think that probably causes significant access problems for some physicians in some places. So there are pros and cons to every option and, if you would like, I would be happy to share my staff paper on the pros and cons with you.

100

Mr. NORWOOD. I think my feeling is this, the Energy and Commerce Committee is going to do something about this one which way or the other and it certainly should be and is our responsibility, but I also think it is the responsibility of the Federal agency to also come up with a solution. It doesn't necessarily mean we will adopt that. It doesn't mean that that will be the final solution. But I think you need to lead your organization to the plate, get up to bat, let us hear what you want to do. And at the same time our chairman, all of them along the line are going to be doing the same thing. But I am not sure I feel like we, the members of this committee have—should have had the experience dealing with this problem for 10 years at the same level as your agency has had experience dealing with this problem, and I am suggesting that you have some responsibility in my mind to not give us a dart board and hope we hit the right one. Come in here and say what you want to do.

Mr. SCULLY. Mr. Norwood, I almost have never been accused of not having strong opinions about things for better or worse. The problem is that we are legislatively prohibited at least until today from considering this. So there is not an administration position. As I have——

Mr. NORWOOD. Are you prohibited from coming up with a solution?

Mr. SCULLY. No. But the fact is we have an administration with a White House and the Secretary—I have talked to the Secretary a little bit about it. I am not sure that the White House is aware of this. I can't state the administration's position publicly today. I have opinions. I will talk in the next week or so with people in the administration, and I have no doubt we will have a strongly held administration position. I am just not in a position today to go any further than I have.

Mr. NORWOOD. I didn't expect today for you to come up with a solution. I expected for you to turn to some of that staff that has been over there over the last 10 years and I presume are working on this. At some point in time the agency itself should make a recommendation as to how they think we would best solve this problem and hopefully this committee and the subcommittees and full committee will go along with that, maybe alter that, maybe change that. But you need to have a position.

Mr. SCULLY. I hope we can come up with a joint position with the committee, and we will give you lots of technical input, and whatever the committee decides I have a feeling will be the administration's position as well and we will hopefully do it together aggressively and on a bipartisan basis.

Mr. NORWOOD. Thank you, Mr. Chairman.

Mr. GREENWOOD. The time for the gentleman has expired. Let me comment that in fairness to everyone, we have all been on hold until the GAO study came out, which has been released today, and we now feel that we have a solid footing upon which to build our solution. The wholesale acquisition costs will almost certainly be the basis for the new reimbursement rates, will take care of the oncologists and others based on the data that we have now, and I think we will be prepared to work with CMS over the next couple

of weeks and have a firm detailed legislative product in short order.

Mr. Scully, thank you for your excellent testimony. Thank you for your patience and you are excused. Look forward to working with you.

I call now the third and final panel: Dr. Larry Norton, President of the American Society of Clinical Oncologists; Mr. Kevin Martyn, Executive Director of Care for Life; Mr. Thomas Connaughton, President of American Association of Homecare; and Dr. Ezekiel Emanuel, Chief, Clinical Bioethics Department, Warren G. National Magnuson Clinical Center, National Institutes of Health. Welcome. We thank you for your patience in waiting all morning and all afternoon to testify, but we are glad to have you with us.

As you probably heard me say to the previous witnesses, this is a joint committee hearing between the Health Subcommittee as well as the Oversight and Investigation Subcommittee, and when the Oversight and Investigation Subcommittee is involved, we take testimony under oath. Do any of you object to providing your testimony under oath?

Seeing no such objection, I would inform you that you are entitled under the rules of this committee and under the rules of the House to be represented by counsel. Do any of you desire to be represented by counsel? Seeing no such desire, if you will rise I will give you the oath.

[Witnesses Sworn.]

Mr. GREENWOOD. Thank you. You are each under oath now, and we will begin with you, Dr. Norton. You are recognized for 5 minutes for your testimony. Make sure your button is——

Dr. NORTON. Am I on?

Mr. GREENWOOD. Yes.

## TESTIMONY OF LARRY NORTON, PRESIDENT, AMERICAN SOCIETY OF CLINICAL ONCOLOGISTS; KEVIN MARTYN, EXECUTIVE DIRECTOR, CARE FOR LIFE; THOMAS A. CONNAUGHTON, PRESIDENT, AMERICAN ASSOCIATION OF HOMECARE; JoANN LAMPHERE, LEWIN GROUP; AND EZEKIEL EMANUEL, CHIEF, CLINICAL BIOETHICS DEPARTMENT, WARREN G. MAGNUSON CLINICAL CENTER, NATIONAL INSTITUTES OF HEALTH

Mr. NORTON. Hi, I am Larry Norton. Pleasure to be here. I am a physician, an oncologist, and this year I am President of the American Society of Clinical Oncology. I am also a New Yorker. So I don't have to belabor this. It has been a really rough couple of weeks, but I am delighted that you are having this hearing at this time because this is a topic of great urgency and importance to cancer doctors and cancer therapists in the United States.

My organization represents cancer therapists, physicians, nurses, patient advocates, and others who take care of people with cancer and also people doing clinical research. I currently am also the head of Medical Oncology, called the Division of Solid Tumor Oncology, at Memorial Sloan-Kettering Cancer Center in New York. I have dedicated my life almost 30 years to cancer treatments, largely chemotherapy treatments and largely for breast cancer, and it is of critical importance to me and my colleagues that the thera-