# EXHIBIT 7

Page 1

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

-----------------------------x

| | | |
|---|---|---|
| IN RE:  PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | |
| U.S. ex rel. Ven-A-Care of | : | Judge Patti B. |
| The Florida Keys, Inc., | : | Saris |
| Plaintiff, | : | |
| vs. | : | |
| ABBOTT LABORATORIES, INC., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |
| Defendants. | : | Bowler |

-----------------------------x

VOLUME I

Baltimore, Maryland

Wednesday, September 26, 2007

Videotape Deposition of:

LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

6beda74d-d4ef-4589-b133-19d88d943a5d

Reed, Larry                                                September 26, 2007
Baltimore, MD

Page 54

1   Q.  And do you know how it was that you
2   came to work on the Medicaid Drug Rebate
3   legislation?
4   A.  I believe because I had worked on the
5   Medicare Catastrophic Coverage Act and had some
6   experience with legislation on prescription
7   drugs.
8   Q.  Were you recruited to this position?
9   A.  I was working in that -- again, I was
10  working on the Medicaid side of the house, again,
11  HCFA at that point, and I was asked to work on
12  that.  I'm not sure by "recruited" what -- if you
13  mean anything more than that?
14  Q.  That's good enough.
15  A.  Okay.
16  Q.  Now, the Medicaid rebate legislation --
17  drug rebate legislation was passed in 1990; is
18  that right?
19  A.  November of 1990, as I remember.
20  Q.  Okay.  And so you would have been
21  working in this position sometime before that?
22  A.  Beginning in the summer of 1990.

Page 55

1   Q.  What was your -- do you recall what
2   your title was in that position?
3   A.  For the first part of that position, I
4   was still a branch chief for the claims
5   processing branch.
6   Q.  I think you said that for the first
7   part of this assignment, you were still the
8   branch chief of a processing policy division?
9   A.  That's correct.
10  Q.  Did that change?
11  A.  That did change.
12  Q.  And what was your next position?
13  A.  The next position was as the branch
14  chief of the Medicaid Non-Institutional Payment
15  Policy Branch.
16  Q.  That's a mouthful.  Branch chief of the
17  Medicaid Non-Institutional -- I'm going to write
18  this down.
19  A.  Okay.
20  Q.  Give me one second --
21  A.  Sure.
22  Q.  -- because I won't remember it.

Page 56

1       Non-Institutional -- can you give me
2   the rest of it again?
3   A.  Payment Policy --
4   Q.  Payment Policy?
5   A.  -- Branch.
6   Q.  And when we say "non-institutional,"
7   we're talking about non-hospital?
8   A.  Correct, non-hospital, and I don't
9   recall -- I don't believe we worked on nursing
10  facility issues either, non-institutional issues.
11  Q.  After the Medicaid Drug Rebate
12  legislation was passed and you were no longer
13  advising on legislation, what did you do then?
14  A.  At that point, our job was to implement
15  the law.
16  Q.  And you were the -- where did you fit
17  in in terms of implementing that law?  Were you
18  the head of the division in charge of doing it,
19  second in command, third in command?  Where were
20  you?
21  A.  I was the branch chief for the branch
22  that had that area of responsibility.  Above the

Page 57

1   branch would be a division, and above the
2   division would be an office.  Above the office
3   would be a bureau, and on from there.
4   Q.  Okay.  Who did you report to in your
5   position as the branch chief of the Medicaid Non-
6   Institutional Payment Policy Branch?
7   A.  Bill Hickman was the office director.
8   There was a division director, Bernie Trueffer,
9   in between.
10  Q.  And how was Mr. Trueffer's name
11  spelled?
12  A.  Trueffer, T-R-U-E-F-F-E-R, I believe.
13  I might have the E and the U mixed around.
14  Q.  What is Mr. Hickman doing today, do you
15  know?
16  A.  Bill Hickman is retired.
17  Q.  Do you know when he retired, roughly?
18  A.  A number of years ago.  I don't
19  remember exactly the year he retired.
20  Q.  More than 10 years ago?
21  A.  Again, probably in the area of 5 or 10
22  years.  I don't -- I don't recall any more

15 (Pages 54 to 57)

Reed, Larry                                                    September 26, 2007
                              Baltimore, MD

Page 58

1   specifically than that.
2       Q.  Did you have anyone who reported to you
3   who was involved in implementing the Medicaid
4   Drug Rebate legislation?
5       A.  Yes.
6       Q.  Who is that?
7       A.  Several analysts that did work on the
8   program.
9       Q.  Do you recall the names?
10      A.  I do.
11      Q.  Would you state them for me?
12      A.  Sure.  I'm giving myself some time to
13  try to recall them, not to be difficult.
14      Q.  Okay.
15      A.  Estelle Chisholm, Mike Keogh, Pete
16  Rodler.  Those were the initial analysts, as I
17  recall.
18      Q.  Did individuals take their place at
19  some point?
20      A.  There are a number of analysts that
21  have worked in the program since that time.
22      Q.  Who was particularly involved in the

Page 59

1   Medicaid Drug Rebate implementation that you
2   recall?
3       A.  In the initial implementation of the
4   program?
5       Q.  No, just as time went on.
6       A.  Up until the current time?
7       Q.  Yes.
8       A.  Okay.
9       Q.  Give me your top five names.
10      A.  At this point --
11      Q.  Throughout that time period.
12      A.  Throughout that time period?  The
13  division director now is Deirdre Duzor; lead
14  analyst, Kim Howell; Marge Watchorn.
15          There may be others, but I -- there's
16  other analysts that have come more recently or
17  had us -- a different part of implementing the
18  program maybe not to the same extent as some of
19  those individuals.
20      Q.  Now, I've seen in the documents that
21  have your name on them that have been produced
22  that, at some point, you also got involved with

Page 60

1   the issue of what state Medicaid programs were
2   paying for drugs.
3       A.  And let me correct -- if I can, go back
4   and add one other name to the initial list of
5   individuals.  Sue Gaston.
6           And, I'm sorry, I thought about that
7   and didn't listen to your question.
8       Q.  Okay.  In looking at the documents that
9   were produced in this case, your name's on quite
10  a few documents, and it appears, looking at the
11  documents, that, at some point, you became
12  involved with the issue of what state Medicaid
13  programs were paying for drugs.
14      A.  That's correct.
15      Q.  And when did that issue come within
16  your realm of responsibility?
17      A.  Because that was a non-institutional
18  payment policy issue, it would have been
19  approximately the same time as I took over the
20  branch chief for that branch.
21      Q.  So 1990?
22      A.  Approximately that, right.

Page 61

1       Q.  Were there individuals -- we talked
2   earlier about individuals who were particularly
3   involved in implementing the Medicaid Drug Rebate
4   Program.  Similar question with respect to what
5   state Medicaid programs reimburse for drugs.
6           Do you recall particular individuals
7   under your direction who were involved in that
8   issue?
9           MS. MARTINEZ:  Objection to form.
10          THE WITNESS:  There were individuals
11  that worked both on state plans and rebate
12  programs.  There -- really at that point for the
13  analyst work, there wasn't a distinction.
14  BY MR. TORBORG:
15      Q.  The same individuals who worked in the
16  Medicaid Drug Rebate implementation also worked
17  on the issue of what state Medicaid programs were
18  paying for drugs; fair to say?
19      A.  Some might have worked a little bit
20  more in one or the other, but generally that's
21  correct.
22      Q.  In -- how long did you serve as the

16 (Pages 58 to 61)

Page 62

1  branch chief of the Medicaid Non-Institutional
2  Payment Policy Branch?  How long did you have
3  that position?
4      A.  Approximately until we moved into our
5  new headquarters, and that was in the mid '90s,
6  around 1995, our new headquarter building.
7      Q.  And what position did you take at that
8  point?
9      A.  There was a reorganization, and at that
10 point, the groups were -- I'm sorry, the -- they
11 were -- I'm trying to think of the right name,
12 teams, divisions, whatever they were called, were
13 reorganized and I became a technical director in
14 one of those areas.
15     Q.  Which area was that?
16     A.  It was generally the same area.  It did
17 pick up some added functions.  I don't remember -
18 - I don't recall the actual official name of that
19 area.
20     Q.  But it was the division that was
21 charged with both implementing the drug rebate
22 legislation and what -- and overseeing what

Page 63

1  states were paying for drugs?
2      A.  At that point, the legislation -- it
3  was 1995, so the legislation was fairly well
4  along in being implemented.  It was for the
5  ongoing operational policy issues as well as
6  state plan amendments for paying for drugs.
7      Q.  When did Mr. Rodler retire?
8      A.  I don't remember -- I don't recall Pete
9  moving to the new building, so it was likely
10 before 1995.  That's my recollection.
11     Q.  When did Sue Gaston start?
12     A.  Sue Gaston started fairly early on with
13 the -- after the law was passed.
14     Q.  Another name I've seen in some of the
15 documents is a -- I gather it's a woman -- Cindy
16 Pelter?
17     A.  Cindy Pelter.
18     Q.  What was her job?
19     A.  Cindy was an analyst that worked on --
20 again, on state plan amendments and the Drug
21 Rebate Program.  She works on the operations side
22 of the program now.  She doesn't work for our

Page 64

1  side any longer.  She doesn't work on the policy
2  side.
3      Q.  There's an operational side and a
4  policy side?
5      A.  That's correct.
6      Q.  And the issue of what state Medicaid
7  programs should be paying for drugs was a policy
8  issue, right?
9      A.  That issue of state plan amendments or
10 state payment for drugs was a policy issue,
11 that's correct.
12     Q.  Did Ms. Pelter work in the Baltimore
13 office?
14     A.  She did.
15     Q.  Okay.  Is she still there today?
16     A.  She is.
17     Q.  Is Ms. Gaston still there today?
18     A.  She is -- also on the operations side,
19 she is.
20     Q.  What are they doing on the operational
21 side?
22     A.  Cindy works on general operational

Page 65

1  issues, Sue Gaston -- Sue works on a dispute
2  resolution program.
3      Q.  Does the dispute resolution program
4  have anything to do with drugs?
5      A.  It does.
6      Q.  Okay.  Does it deal with the Medicaid
7  Drug Rebate law?
8      A.  That's correct.
9      Q.  Anything else?
10     A.  Do you want me to describe the program
11 further?
12     Q.  Yes.
13     A.  Okay.  The dispute resolution program
14 basically brings manufacturers and states
15 together where -- where there's not agreement on
16 how much rebate should be paid by that
17 manufacturer to the state, there's a question of
18 units, of some other question where they're not
19 in agreement.
20     Q.  What involvement does CMS have in that
21 program?  You said I think that it would bring
22 the manufacturers together with the states.

17 (Pages 62 to 65)

Reed, Larry                                                    September 26, 2007
Baltimore, MD

Page 74

1  include the impact of discounts and rebates; is
2  that fair to say?
3          MS. MARTINEZ:  Objection to form.
4          THE WITNESS:  The rebate definition
5  does I believe have a -- have language in it that
6  addresses that issue.
7  BY MR. TORBORG:
8      Q.  I've heard something -- I've seen
9  something in the documents to something called
10 the Medicaid Bureau?
11     A.  Correct.
12     Q.  What is that?
13     A.  The Medicaid Bureau was a precursor,
14 predecessor of -- in the agency that had
15 responsibility for the Medicaid issues.
16     Q.  And did that entity change its name at
17 some point?
18     A.  At some point it did.  It changed its
19 name to the Centers for -- the Center for
20 Medicaid & State Operations.
21     Q.  And you worked within that
22 organization, correct?

Page 75

1      A.  Which one?
2      Q.  Both the Medicaid Bureau and the Center
3  for Medicaid & State Operations?
4      A.  Correct.
5      Q.  I want to go back -- I sort of got off
6  track.  I wanted to go back to tracing through.
7          I believe you said in 1995 you took a
8  different position in connection with the
9  reorganization of HCFA, correct?
10     A.  Correct.
11     Q.  Was your job basically the same even
12 though the reorganization had shifted your title
13 and perhaps the division you worked in?
14     A.  It was a bit different.  A technical
15 director has non-management responsibilities, and
16 there were other areas in the new -- new group --
17 I'm sorry, I can't -- just can't remember the
18 name of that group -- that I also worked on.
19     Q.  What do you mean by "non-management
20 responsibilities"?
21     A.  There's two tracks basically.  There's
22 a division director, which has personnel and

Page 76

1  management responsibilities, and a technical
2  director, which has technical and expert
3  responsibilities, if you will.
4      Q.  And you took this position in 1995.
5  How long did you have that job?
6      A.  Technical director -- there's been
7  various permutations since that time of being a
8  technical director or a division director, and at
9  this point, I am a technical director.
10     Q.  Even today?
11     A.  Again, with different -- different, if
12 you will, stops in between.
13     Q.  What stops in between are there?
14     A.  A technical director, and for a while I
15 served as the director -- the deputy director of
16 the division, I had responsibility for this area,
17 and, for a short while, as a director.
18     Q.  When you say "this area," do we mean
19 drug reimbursement?
20     A.  Among other areas, correct.
21     Q.  What other areas?
22     A.  Hospital reimbursement, upper payment

Page 77

1  limits.
2      Q.  Upper payment limits, is that something
3  that relates to drugs?
4      A.  Upper payment limits does relate to
5  drugs and it does relate to other services within
6  the Medicaid program.
7      Q.  Okay.  And when did you have that
8  position?
9      A.  Which one?
10     Q.  The deputy director position.
11     A.  Deputy director was early -- the early
12 2000s.  Around 2002, it was a team -- a team that
13 reported to the head of CMSO, with two team
14 leaders that was separated out of that group.
15     Q.  Is that something called the pharm
16 team?
17     A.  Correct.  It was called the pharmacy
18 team at that point?  Yes, it was.
19     Q.  When did the pharm -- the pharmacy team
20 start?
21     A.  The pharmacy team was -- started around
22 mid 2002.

20 (Pages 74 to 77)

Page 298

1  Q. Okay. And was that possibility of
2  using the AMP data in deciding whether or not to
3  approve state plans something that HCFA
4  considered?
5      MS. MARTINEZ: Objection. To the
6  extent that that question would go to internal
7  deliberations about whether or not to use it,
8  you're instructed not to answer.
9      MR. TORBORG: Why don't we take our
10 last break for the day and come back and finish
11 up.
12     THE VIDEOGRAPHER: Going off the
13 record. The time is 16:05:39.
14     (A break was taken.)
15     THE VIDEOGRAPHER: Going back on the
16 record. The time is 16:21:37.
17 BY MR. TORBORG:
18 Q. Welcome back, Mr. Reed.
19 A. Thank you.
20 Q. I'd like to finish off this discussion
21 with AMP with some hopefully unobjectionable
22 questions.

Page 299

1      First, you started -- CMS started
2  receiving this AMP information from manufacturers
3  roughly in 1991; is that correct?
4  A. Starting with the first part of 1991.
5  Q. Okay. And where did that information
6  go in CMS?
7  A. Information was housed in electronic
8  storage. There were some other hard copy
9  documents, signed rebate agreements and the like,
10 which are maintained in hard files.
11 Q. Okay. And do you know if Abbott was
12 one of the manufacturers who participated in the
13 Medicare Drug Rebate Program?
14 A. In the Medicaid Drug Rebate Program?
15 Q. Yes.
16 A. Back at that point?
17 Q. Yes.
18 A. Offhand, I don't know, no.
19 Q. Do you know if they eventually did
20 become a member of that program?
21 A. I don't know specifically. Most
22 manufacturers are participating in the program.

Page 300

1  Q. Okay. And did you have access to that
2  information yourself, the AMP information?
3  A. I had access to it, meaning I could
4  look at it if I wanted to, but I didn't have
5  access to it in the sense that I would normally
6  look at it.
7  Q. Okay. Who all had access to the AMP
8  information within CMS, within HCFA?
9  A. The people that maintain the system
10 would have access to it, and the program people
11 would have access as well.
12     It wasn't protected information within
13 HCFA when used for that purpose.
14 Q. And unlike AWP, which was a list price,
15 AMP was not a list price; fair to say?
16     MS. MARTINEZ: Objection to form.
17     THE WITNESS: They're just completely
18 different terms. AMP is just AMP. You can't --
19 there is nothing to compare it to, I mean, within
20 that context of the rebate program. There isn't
21 a list AMP and an AMP, if that's your question.
22 BY MR. TORBORG:

Page 301

1  Q. Do you know if there are differences
2  between average wholesale prices as published in
3  the compendia and AMP? Are there differences
4  between those two prices?
5  A. Are there differences between those two
6  prices?
7  Q. Yes.
8  A. Yes.
9  Q. What are those differences?
10 A. In definition, in --
11 Q. Yes.
12 A. -- in monetary terms?
13 Q. In definition.
14 A. In definitions, for AWP, again, we
15 don't have a statutory definition in the Medicaid
16 program or a regulatory definition for AWP.
17     For AMP, we do have a -- we did have a
18 statutory definition, we do now have a regulatory
19 definition. In the meantime, for AMP, we also
20 had a National Drug Rebate definition.
21 Q. And do you know if there are certain
22 things that are included in the AMP calculation

76 (Pages 298 to 301)

Page 310

1  attorney, but go ahead.  You guys want to take a
2  break, you're entitled to do that.
3          MR. MERKL:  Well, again, for the
4  record, I object to the witness leading while
5  there's a question pending.  The nature of the
6  question as counsel just indicated is the names
7  of counsel, and that is obviously not privileged,
8  so there's no basis to have the witness leave
9  while that question is pending.
10         MR. DRAYCOTT:  Sure.  This all goes to
11 privileged information, privileged
12 communications, and the question goes to what --
13 as it expressly implicates the privilege, the,
14 you know, discussions with counsel.  We'll see --
15         MR. TORBORG:  Why don't you go outside
16 and have your discussion.
17         MR. DRAYCOTT:  I think that's what
18 we'll do.
19         MR. TORBORG:  I object to you doing it
20 as well, but, you know, you're going to get up
21 and leave anyway, so no reason to argue about it.
22         THE VIDEOGRAPHER:  Are we going off the

Page 311

1  record or staying on?
2          MR. TORBORG:  Let's go off the record
3  until they come back.
4          THE VIDEOGRAPHER:  Going off the
5  record.  The time is 16:32:34.
6          (A break was taken.)
7          THE VIDEOGRAPHER:  Going back on the
8  record.  The time is 16:48:04.
9          MR. TORBORG:  Okay.  As we stopped, I
10 think I had a question pending, and there was an
11 instruction not to answer, and counsel for the
12 United States and the witness stepped out of the
13 room and wanted to talk about some issues
14 relating to an attorney-client privilege issue.
15         Justin, it looks like you want to make
16 some comments before we get --
17         MR. DRAYCOTT:  We talked to him about
18 both attorney-client and deliberative process.  I
19 think we are convinced after that conferral that
20 the witness's concerns were well-founded and that
21 there are privileged communications that he was
22 legitimately concerned would be revealed in his

Page 312

1  answer if he were to on a number of points, both
2  ones that were visited or touched upon earlier in
3  the deposition.
4          It would be helpful for me at this time
5  to hear the outstanding question.
6          MR. TORBORG:  What I'm going to do is
7  ask a couple questions, have you object, have you
8  tell me what grounds you're objecting upon, and
9  we'll go from there.  How's that?
10         First question, Mr. Reed, for you is
11 this:  Did you have discussions within HCFA about
12 whether or not AMP data could be shared with the
13 states?
14         MR. DRAYCOTT:  You can answer that
15 question -- if you can answer that question yes
16 or no, you may answer it.
17         THE WITNESS:  Going back to the start
18 of the program discussing having AMP shared with
19 the states, we did have those discussions.
20 BY MR. TORBORG:
21    Q.  Okay.  Can you tell me about those
22 discussions?

Page 313

1          MR. DRAYCOTT:  And you can't -- you may
2  -- you're instructed not to answer to the extent
3  that those discussions were deliberations that
4  ended up with the adoption of a policy on that
5  issue.
6          THE WITNESS:  Okay.  Could you repeat
7  the question?
8  BY MR. TORBORG:
9     Q.  Tell me about the discussions you had
10 within HCFA about whether or not AMP data could
11 be shared with the states.
12    A.  Those discussions led us to conclude
13 that it was better to share unit rebate amounts
14 with the states.
15    Q.  And why did you conclude that?
16         MR. DRAYCOTT:  And you may answer that
17 question except to the extent it will reveal
18 either the content of the deliberations or
19 communications with agency counsel.
20         So you can only -- can you answer that
21 question without revealing either of those?
22         THE WITNESS:  No.

Page 329

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

-----------------------------x

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | |
| U.S. ex rel. Ven-A-Care of | : | Judge Patti B. |
| The Florida Keys, Inc., | : |     Saris |
|           Plaintiff, | : | |
|      vs. | : | |
| ABBOTT LABORATORIES, INC., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |
|           Defendants. | : |     Bowler |

-----------------------------x

VOLUME II

Baltimore, Maryland

Thursday, September 27, 2007

Continued Videotape Deposition of:

LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Page 418

1  Q.  If I could ask you to go to the comment
2  on the next page.  It's a March 12, 1991
3  memorandum from Kevin Moley to Richard Kusserow,
4  Inspector General.
5      Do you know Kevin Moley?
6  A.  I don't know him personally.  I've
7  heard the name.
8  Q.  In this comment, Mr. Moley stated, "We
9  recommend that the OIG reconsider the proposal in
10 this report in light of the actions taken by
11 Congress in OBRA '90.  Section 4401 of that Act
12 prohibits the secretary from changing the formula
13 used in determining reimbursement rates for
14 outpatient drugs until after December 31, 1994.
15     Congress took this action in order to
16 allow adequate time to evaluate the impact of the
17 rebate provisions also enacted in OBRA '90.  It
18 is extremely doubtful, therefore, that Congress
19 would be receptive to a recommendation for
20 immediate repeal of this provision, especially
21 considering the relatively small savings that
22 could be expected."

Page 419

1      Do you recall, Mr. Reed, that overnight
2  the OBRA legislation passed in 1990 placed a
3  moratorium on decreases in pharmacy
4  reimbursement?
5      MR. HERNANDEZ:  Objection, form.
6      THE WITNESS:  I do recall that there
7  was a provision in the original OBRA '90 law that
8  did have a moratorium on certain pharmacy
9  payments.
10 BY MR. TORBORG:
11 Q.  What do you recall about that?
12 A.  I think I've pretty much told you what
13 I recall at this point.  That's all I recall
14 about that part of it.
15 Q.  Was your impression within HCFA and the
16 division that was responsible -- or the branch
17 that was responsible for Medicaid reimbursement
18 of drugs, was your understanding of the
19 moratorium was that Congress did not want
20 pharmacies to get paid less until December 31,
21 1994?
22     MS. MARTINEZ:  Objection, form.

Page 420

1      THE WITNESS:  My understanding was that
2  the reimbursements that state had -- that states
3  had in their state plans would be frozen for a
4  period of time for those states that had a
5  discounted AWP or a discounted payment rate.
6  BY MR. TORBORG:
7  Q.  Do you recall discussions within HCFA
8  about the fact that Congress did not want
9  pharmacies to be making less money in treating
10 Medicaid patients until December 31, 1994?
11     MS. MARTINEZ:  Objection, form, and
12 also objection to the extent that it asks for
13 internal deliberations.
14     You can answer to the extent that
15 you're not revealing any internal deliberations
16 that lead to a decision.
17     THE WITNESS:  Okay.  So I can answer
18 yes, that there were discussions?
19     MS. MARTINEZ:  If it didn't lead to a
20 decision, yes.
21     MR. TORBORG:  I think from now on,
22 Annie, I'd like you to just say objection,

Page 421

1  deliberative process privilege.  I think he's
2  been given enough direction on how to deal with
3  this issue.
4      I think there's a question pending.
5      MS. MARTINEZ:  I think he answered it.
6  BY MR. TORBORG:
7  Q.  What was the answer?
8      MS. MARTINEZ:  Yes.
9  BY MR. TORBORG:
10 Q.  You do recall discussions about that?
11 A.  About this provision?
12 Q.  Can you tell me about those
13 discussions?
14     MS. MARTINEZ:  Objection to the extent
15 that you're asking for privileged communications.
16     THE WITNESS:  No.
17     MR. TORBORG:  We need to take a break
18 for a tape change and also take a break.
19     THE VIDEOGRAPHER:  This marks the end
20 of Tape 1 in the deposition of Volume II of Larry
21 Reed.
22     Going off the record.  The time is

24 (Pages 418 to 421)

Page 486

1  of the statement, that that is what they
2  recommended to the state agency.
3  BY MR. TORBORG:
4      Q.  What is your understanding?
5      A.  That, again, what the language says,
6  that they recommend this as a factor in future
7  changes to pharmacy reimbursement.
8      Q.  You don't have any further
9  understanding of what these results would be used
10 for?  Would it be to increase the discount off of
11 AWP or something else?
12     A.  It would be to -- it would likely be to
13 look at their Medicaid -- let me make sure I have
14 this right -- to look at their Medicaid
15 prescription drug program.
16     Q.  In what way?  To decrease
17 reimbursement?
18         MS. MARTINEZ:  Objection, form.
19         THE WITNESS:  I'm looking to see what
20 their current -- or their then reimbursement was.
21 It does look like they should consider again
22 changing the reimbursement.

Page 487

1  BY MR. TORBORG:
2      Q.  Change in what way?
3      A.  It isn't further specified here.
4      Q.  If I could ask you to go to the Bates
5  page ending in 551 of this report, last paragraph
6  states, "In November 1990, the Omnibus Budget
7  Reconciliation Act of 1990 was passed, which
8  placed a 4-year moratorium on changes to states'
9  reimbursement policies.  The moratorium expired
10 on December 31, 1994, and HCFA requested that we,
11 once again, determine the difference between AWP
12 and actual pharmacy acquisition cost."
13         Does that refresh your recollection at
14 all, Mr. Reed, about the purpose of these
15 studies?
16     A.  No, it doesn't refresh my recollection.
17 I don't have a recollection of this.
18     Q.  Do you believe it's a fair inference
19 for me to make that the impetus of this study was
20 the exploration of the moratorium?
21         MR. HERNANDEZ:  Objection, form.
22         MS. MARTINEZ:  Objection, form.

Page 488

1         THE WITNESS:  From the paragraph that
2  you read me, or that part of it, it does appear
3  that that was the OIG's understanding of HCFA's
4  intention.
5  BY MR. TORBORG:
6      Q.  Let me ask you to flip to the next
7  page, Bates page ending 552, second sentence
8  under the section "Scope."
9         OIG wrote, "Our review was limited to
10 ingredient acquisition costs and do not address
11 other areas such as the effect of Medicaid
12 business as a contribution to other store sales."
13 I'd like to stop there.
14        Do you recall that being an issue that
15 was discussed at HCFA, the contribution of -- to
16 other store sales of Medicaid business?
17        MS. MARTINEZ:  Objection, form.
18        THE WITNESS:  I believe this may have
19 been an issue that we addressed in the notice of
20 proposed rulemaking for the Deficit Reduction
21 Act.
22 BY MR. TORBORG:

Page 489

1      Q.  How so?
2      A.  I think it was looking for a discussion
3  of -- if I remember correctly, it was a
4  discussion of Medicaid pricing versus what that
5  pharmacy might earn in other store sales.
6      Q.  HCFA was looking for comments from the
7  industry on that; is that right?
8      A.  That's correct, not only industry, but
9  from any commenter.
10     Q.  And do you recall the results you
11 received on that question?
12     A.  No, not offhand, I don't.
13     Q.  Do you recall that topic being
14 discussed prior to HCFA's looking for comments in
15 that in connection with the DRA of 2005?
16        MS. MARTINEZ:  Objection, privilege.
17 You're instructed not to answer, to the extent
18 that there were discussions leading up to the
19 issuance of that proposed rule.
20 BY MR. TORBORG:
21     Q.  Have you had any other discussions,
22 apart from the Deficit Reduction Act of 2005 or

41 (Pages 486 to 489)

Reed, Larry - Vol. II                                           September 27, 2007
                          Baltimore, MD

Page 490

1   the deliberations that went into that, about the
2   issue of how Medicaid's business as a
3   contribution to other store sales should impact
4   Medicaid reimbursement for drugs?
5       A.  Not that I recall.
6       Q.  You don't recall having discussions
7   with states in connection with the approval
8   process of that issue?
9       A.  I don't recall that.
10      Q.  You have an understanding of, generally
11  speaking, what that issue involves, right?
12      A.  This issue --
13      Q.  Yes.
14      A.  -- the effect of Medicaid business as a
15  contribution to other store sales?
16          Again, as I've stated, our NPRM
17  addressed that, that that and this statement is
18  my understanding.
19      Q.  Let me try to see if I can state my
20  understanding and see if you'll agree with it.
21          Was it the case that pharmacies have
22  claimed that they don't make as much money on

Page 491

1   other store sales from Medicaid businesses
2   because of the indigent nature of the Medicaid
3   patients?
4           MS. MARTINEZ:  Objection, form.
5           MR. HERNANDEZ:  Objection, form.
6   BY MR. TORBORG:
7       Q.  Isn't that something that pharmacies
8   have raised with you at HCFA?
9       A.  Could you clarify a little bit?
10      Q.  I don't know whether I can.
11      A.  Okay.  Have they stated what again?
12      Q.  That they don't make as much money in
13  other store sales, so non-drug sales, from
14  Medicaid patients as they do from other patients.
15          Has that been an issue that's been
16  raised?
17          MS. MARTINEZ:  Objection, form.
18          THE WITNESS:  In the broader sense, has
19  it been an issue raised in the Medicaid program?
20  It may have been raised.
21  BY MR. TORBORG:
22      Q.  And then this sentence also -- OIG also

Page 492

1   says other areas they do not address included
2   "the cost to provide professional services other
3   than a -- other than dispensing a prescription,
4   such as therapeutic interventions, patient
5   education and physician consultation."
6           Do you have an understanding of what
7   those things are about?
8       A.  I think I have a general understanding
9   of those -- of that topic.
10      Q.  And what is your general understanding
11  of that topic?
12      A.  From this, the part of the sentence
13  that you read me, that they looked only at the
14  dispensing -- the cost of dispensing a
15  prescription and did not look at these other
16  services.
17      Q.  And do you recall discussions in your
18  current HCFA about the cost of pharmacies to
19  provide professional services other than
20  dispensing prescriptions, such as therapeutic
21  intervention, patient education and physician
22  consultation?

Page 493

1           Do you recall discussions about that?
2       A.  Yes.
3       Q.  Can you tell me about those
4   discussions?
5           MS. MARTINEZ:  Objection, privileged.
6   To the extent that those discussions were done in
7   anticipation of a decision or a proposed
8   rulemaking or another decision at HCFA, you're
9   instructed not to answer.  Otherwise, you can
10  answer.
11          THE WITNESS:  I can't answer.
12  BY MR. TORBORG:
13      Q.  Because of the privilege issue?
14      A.  Correct.
15      Q.  Okay.  What policy does that -- do
16  those deliberations relate to?
17      A.  There are policies -- and I don't
18  remember the format that they're in -- on other
19  services.  It goes -- they go by different names,
20  but other services that pharmacists provide that
21  would be reimbursed separate from ingredient cost
22  and dispensing fee.

42 (Pages 490 to 493)

## Page 494

1    Q. Okay. So HCFA had discussions about a
2  policy on that issue; is that fair to say?
3    A. Yes.
4    Q. Because of the instruction of counsel,
5  I'm not going to be allowed to learn about those
6  through questioning of you; is that right?
7    A. Correct.
8    Q. Another thing that OIG states is "the
9  cost of dispensing, which includes costs for
10 computers, multipart labels, containers,
11 technical staff, transaction fees, Medicaid-
12 specific administrative costs, and general
13 overhead."
14       Did you have discussion about those
15 issues in your career at HCFA?
16   A. Not that I recall.
17   Q. The discussions that you had relating
18 to that second category that we talked about,
19 professional services -- that category, correct?
20   A. Correct.
21   Q. -- did those have any impact on HCFA's
22 policies for reimbursement of drugs?

## Page 495

1       MS. MARTINEZ: Objection, form.
2       THE WITNESS: And I think I need
3  further clarification. Of which policies, for
4  prescription drugs?
5  BY MR. TORBORG:
6    Q. I don't know what specific policies it
7  would result in, but I'm trying to figure out if
8  there's a connection between the discussions that
9  you had relating to the cost to provide
10 professional services other than dispensing, what
11 impact, if any, those discussions had on the
12 actual amount that state Medicaid programs
13 reimbursed for drugs and/or what HCFA approved on
14 that topic.
15      MS. MARTINEZ: Objection, form.
16      THE WITNESS: The cost for other
17 services are -- is a separate cost determination
18 from the ingredient cost and from -- from the
19 cost of dispensing a prescription.
20 BY MR. TORBORG:
21   Q. And my question was did those
22 discussions have any impact at all on the amount

## Page 496

1  of money state Medicaid programs would be
2  permitted to reimburse for ingredient cost or
3  dispensing fees?
4    A. Not as I recall, no.
5    Q. Do you recall either way?
6    A. I recall that they likely did not have
7  an impact on ingredient cost or dispensing fee.
8    Q. So they were considered -- so they were
9  costs that you considered, but after you
10 considered them, didn't worry about whether or
11 not to pay for them at all; is that right?
12   A. No.
13      MS. MARTINEZ: Objection, form.
14      MR. TORBORG: Okay. Well, let me
15 strike that and try again.
16      Did HCFA provide or did the states
17 provide a separate payment for professional
18 services other than dispensing of prescription,
19 such as therapeutic interventions, patient
20 education and physical (sic) consultation?
21      THE WITNESS: Some states -- under our
22 policy instructions, states could provide for

## Page 497

1  that payment. Which states did provide for that
2  payment, I don't know.
3  BY MR. TORBORG:
4    Q. I'd ask you to go to the response from
5  the state of California. It's Bates page 562.
6  It's a letter from John Rodiguez dated March
7  25th, 1996.
8       Now, this is dated before the final --
9  before the date of the final report; is that
10 right?
11   A. This -- I'm sorry, is this dated before
12 the letter to the state; is that your question?
13   Q. Is it dated before the date of the
14 report?
15   A. Yes.
16   Q. Was it your understanding that the
17 states would be given draft copies of the
18 reports, of these particular reports in this
19 1995-1996 nationwide survey?
20   A. The letter indicates that the state did
21 receive the results of the audit contained in
22 that draft report.

Page 518

 1      Q.  Also I'd like to ask you to go to Bates
 2  page ending 667, "Conclusions and
 3  Recommendations," for this report.
 4          The first paragraph states, "Based on
 5  our review, we have determined that there is a
 6  significant difference between AWP and pharmacy
 7  acquisition costs.  The difference between AWP
 8  and pharmacy acquisition costs is significantly
 9  greater for generic drugs than for brand name
10  drugs."
11          Do you recall becoming aware of that
12  comment in OIG's report?
13      A.  Of this specific comment in this
14  specific report?
15      Q.  Just the general notion, I guess, a
16  broader notion that OIG had found in its work
17  that there was a significantly greater difference
18  in the spread, if you will, between AWP and
19  acquisition costs for generic drugs.
20          MS. MARTINEZ:  Objection, form.
21          THE WITNESS:  That there is a
22  difference between the AWP discount for a brand

Page 519

 1  and generic drug, yes.
 2  BY MR. TORBORG:
 3      Q.  You recall having those -- you recall
 4  observing that in the reports or having
 5  discussions with HCFA, or what do you recall
 6  about that subject?
 7      A.  Observing the report, observing that in
 8  the reports.
 9      Q.  Did you have discussions about the
10  significantly greater difference between AWP and
11  acquisition costs for generic drugs as opposed to
12  branded drugs?
13          MS. MARTINEZ:  Objection, form.
14          MS. POLLACK:  Objection, form.
15          THE WITNESS:  I believe we had those
16  discussions.
17  BY MR. TORBORG:
18      Q.  Who were those discussions with?
19          MS. MARTINEZ:  Objection, privilege.
20          MR. TORBORG:  We have to decide who the
21  discussions were with before we can decide what
22  privilege applies.

Page 520

 1          MS. MARTINEZ:  No, the discussions were
 2  within HCFA, and if they related to an
 3  anticipated decision by HCFA, then it would be
 4  privileged and then you would be instructed not
 5  to answer.
 6          If you had a discussion with somebody
 7  in the outside that's not related to a policy
 8  decision like that, you can -- you can answer.
 9          THE WITNESS:  I can't answer.
10  BY MR. TORBORG:
11      Q.  So you had discussions within HCFA
12  about the significantly greater difference
13  between acquisition costs and AWP for generic
14  drugs as compared to branded drugs, correct?
15          MS. MARTINEZ:  Objection, form.
16          THE WITNESS:  We did have those
17  discussions.
18  BY MR. TORBORG:
19      Q.  And I'm not permitted to probe your
20  memory here today because you've been instructed
21  not to answer, correct?
22      A.  Correct.

Page 521

 1      Q.  And did your discussions have any
 2  impact on the amount at which HCFA approved state
 3  Medicaid plans for payment of drugs?
 4      A.  I'm not sure I understand your
 5  question.
 6      Q.  Okay.  Let me see if I understand.
 7          We agree we had -- you had discussions
 8  within HCFA about the significantly greater
 9  difference between acquisition costs and AWP for
10  generic drugs.
11          MS. MARTINEZ:  Objection, form.
12  BY MR. TORBORG:
13      Q.  You had those discussions, right?
14          MS. MARTINEZ:  Objection, form.
15          THE WITNESS:  There were discussions.
16  BY MR. TORBORG:
17      Q.  And in your office, you are responsible
18  for determining whether or not to approve or
19  disapprove state Medicaid plans in the -- at
20  least in the area of prescription drug
21  reimbursement, correct?
22      A.  No, that's not correct.

49 (Pages 518 to 521)

Page 522

1   Q.  This regional offices -- the regional
2   offices had that responsibility?
3   A.  It was a shared responsibility.
4   Q.  Okay.  And if I understand the basis
5   for the insertion of privilege and your
6   observation of the privilege is that those
7   discussions related to some sort of policy,
8   correct?
9       MR. HERNANDEZ:  Objection to form.
10      MS. MARTINEZ:  Decision -- decision by
11  HCFA.
12  BY MR. TORBORG:
13  Q.  A decision or a policy, correct?
14  A.  A decision or a policy, correct.
15  Q.  Okay.  What decision or policy was
16  that?
17      MS. MARTINEZ:  Objection, form.
18      THE WITNESS:  And, I'm sorry, I'm not
19  sure what you're looking -- what you're --
20  BY MR. TORBORG:
21  Q.  The deliberative process privilege is
22  supposed to apply to deliberations leading to a

Page 523

1   decision or a policy.
2   A.  Right.
3   Q.  I'm trying to decide -- trying to
4   figure out what decision or policy those
5   discussions related to.
6   A.  The decision would be how to look at
7   this and reviewing a state plan.
8   Q.  And whether or not to approve or
9   disapprove the plan?
10  A.  That could be part of that decision.
11  Q.  Which would ultimately determine how
12  much providers were paid for drugs, correct?
13  A.  Correct.
14  Q.  I'd like to ask you to go to the last
15  page of the document -- second to last page and
16  the last page, which are the letter response from
17  the state of Minnesota to OIG's report.
18      MS. MARTINEZ:  Montana?
19      MR. TORBORG:  Come again?
20      MS. MARTINEZ:  Montana?
21      MR. TORBORG:  Montana report, yes,
22  Bates 673, 674.

Page 524

1       Let me ask you, after you've had a
2   chance to review those two pages, whether you
3   recall this response from the state of Montana.
4       THE WITNESS:  I don't recall this
5   response.
6   BY MR. TORBORG:
7   Q.  In the first paragraph, Montana's Peter
8   Blouke -- I'm sure I'm not pronouncing that right
9   -- indicated that, "Montana currently pays the
10  lesser of AWP minus 10 percent, federal upper
11  limit for multisource generic products.  In
12  addition to the product cost, Medicaid also
13  reimburses a dispensing fee not to exceed $4.08
14  per script," then it continues.
15      And that's consistent, is it not, with
16  the NPC report that I marked as Exhibit Abbott
17  326, the 1996 page?
18      MS. MARTINEZ:  Sorry, are you -- is it
19  Exhibit Abbott 327?
20      MR. TORBORG:  Exhibit Abbott 326 is the
21  NPC reports.
22      MS. MARTINEZ:  Oh, right, right.

Page 525

1       THE WITNESS:  The NPC 1996 report
2   references AWP minus 10.  It doesn't reference a
3   federal upper limit price.
4   BY MR. TORBORG:
5   Q.  Okay.  The federal upper limit price
6   was a -- was that a mandatory price?
7       MR. HERNANDEZ:  Objection, form.
8       MS. MARTINEZ:  Objection, form.
9       MR. TORBORG:  Actually, strike that.
10  That's probably not a very good way to ask that
11  question.  It doesn't matter.
12      And the NPC report also showed a
13  dispensing fee of between $2 and $4.08, correct,
14  which is consistent with the Montana letter?
15      MR. HERNANDEZ:  Objection, form.
16      THE WITNESS:  You're referring to the
17  NPC 1996?  I put it away, so I had to go back to
18  it.
19  BY MR. TORBORG:
20  Q.  Yes.
21  A.  The dispensing fee is listed for
22  Montana as $2 to 4.08.

50 (Pages 522 to 525)

Page 526

```
 1     Q.  Which is consistent with the letter,
 2  correct?
 3     A.  The letter indicates a dispensing fee
 4  not to exceed 4.08.
 5     Q.  So it's consistent, correct?
 6     A.  I can't --
 7        MR. HERNANDEZ:  Objection, form.
 8        THE WITNESS:  I can't -- they're
 9  different statements.
10  BY MR. TORBORG:
11     Q.  Okay.  This first paragraph also notes,
12  "Montana's corresponding average discounts as
13  computed by the OIG are 16.23 percent and 48.46
14  percent respectively."
15        Correct?
16     A.  Correct.
17     Q.  And then they note they currently are
18  reimbursing the lesser of AWP minus 10 percent or
19  the federal upper limit, correct?
20     A.  Montana currently pays the lesser of
21  AWP minus 10 percent -- that statement is
22  correct.
```

Page 527

```
 1     Q.  And so there's quite a bit of
 2  difference between OIG's findings and Montana --
 3  Montana's reimbursement methodology at that time,
 4  correct?
 5        MS. MARTINEZ:  Objection, form.
 6        THE WITNESS:  And clarify your question
 7  again.  Are you referring to the set of drugs
 8  that the OIG looked at?
 9  BY MR. TORBORG:
10     Q.  I'm just comparing the Montana drug
11  reimbursement methodology for ingredient cost
12  with OIG's findings.  They're inconsistent, are
13  they not?
14        MS. MARTINEZ:  Objection, form.
15        THE WITNESS:  Again, this is a sample
16  that the OIG did, and I don't know.
17  BY MR. TORBORG:
18     Q.  Did you find OIG's work to be reliable
19  in your work?
20        MS. MARTINEZ:  Objection, form.
21        THE WITNESS:  In some cases, we relied
22  on it; in other cases, we did not.
```

Page 528

```
 1  BY MR. TORBORG:
 2     Q.  For these specific reports, did you
 3  find OIG's work to be reliable?
 4        MS. MARTINEZ:  Objection, form.
 5        THE WITNESS:  I think these reports are
 6  directed more at the states, so I don't know that
 7  we needed to look at the reliability.  These were
 8  directed at what the -- what the amounts were in
 9  individual states.
10        MR. TORBORG:  We have to do a tape
11  change.
12        THE VIDEOGRAPHER:  This marks the end
13  of Tape 3 of Volume II of the deposition of Larry
14  Reed.
15        Going off the record.  The time is
16  14:13:50.
17          (A break was taken.)
18        THE VIDEOGRAPHER:  This marks the
19  beginning of Tape 4 of Volume II of the
20  deposition of Larry Reed.
21        Going back on the record.  The time is
22  14:44:16.
```

Page 529

```
 1  BY MR. TORBORG:
 2     Q.  Welcome back, Mr. Reed.
 3     A.  Thank you.
 4     Q.  I want to revisit some testimony we had
 5  during the last session.
 6        You indicated there were some
 7  discussions within HCFA about the differences --
 8  the greater difference in AWP acquisition cost
 9  for generic drugs versus branded drugs, correct?
10        MS. MARTINEZ:  Objection to form.
11        THE WITNESS:  That there was HCFA
12  discussion of that?  Yes.
13  BY MR. TORBORG:
14     Q.  And I asked you about those
15  discussions, counsel asserted the deliberative
16  process privilege.  I then asked you what policy
17  or decision that those discussions related to,
18  and your answer was the decision would be how to
19  look at this in reviewing the state plans, and I
20  asked whether or not to approve or disapprove the
21  plans, and you answered that could be part of the
22  decision.
```

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                                          September 27, 2007
                              Baltimore, MD

Page 530

1    My follow-up question for you, Mr.
2    Reed, was what was HCFA's decision or policy?
3    What was the final decision or policy that HCFA
4    reached?
5         MS. MARTINEZ:  Objection to form.
6         THE WITNESS:  The decision that -- and
7    I'm not sure, HCFA may too broad of a term here,
8    all of HCFA, but the decision was whether or not
9    to revise regulations for looking at these types
10   of ingredient costs or whether to issue policy
11   instructions for that, and we didn't do -- we did
12   not do either.
13   BY MR. TORBORG:
14       Q.  So the decision was not to revise the
15   ingredient cost regulations for -- what was the
16   second?
17       A.  A policy guidance document.
18       Q.  And what was the rationale for that
19   decision?
20        MR. DRAYCOTT:  You can answer, but only
21   limit it to the decision itself.  You should not
22   answer to the -- with respect to -- to the extent

Page 531

1    the answer would reveal the deliberations that
2    resulted in that final decision.
3         MR. TORBORG:  I just want to argue with
4    counsel a little bit here before you answer, and
5    that is, the deliberative process privilege does
6    not apply to prevent us from understanding the
7    rationale for the decision.
8         We, I think, all agree on that, and if
9    we don't agree, we can go get some case law, and
10   I think we'll come to a quick agreement.
11        So I am allowed to know what the
12   rationale for the decision was.
13        MR. DRAYCOTT:  And he was so instructed
14   just now.
15        MR. TORBORG:  Okay.
16        MR. DRAYCOTT:  You may state the
17   rationale, but you have to be careful in just
18   stating the rationale that resulted from the
19   deliberations, not the deliberations themselves.
20        THE WITNESS:  Okay.  The rationale
21   basically is that there's a structure between CMS
22   and the state Medicaid programs on how they

Page 532

1    operate their program and to what extent we
2    intercede in -- in directly making them make
3    changes to the program versus overseeing their
4    program through the state plan process.
5    BY MR. TORBORG:
6        Q.  And what about that structure led to
7    your decision not to revise regulations or issue
8    any other policy guidance?
9        A.  That there is a structure -- there is a
10   structure in place, again, of how we relate to
11   state Medicaid agencies.  There are parts of the
12   prescription drug program where we direct the
13   states how to pay for drugs, or a maximum in
14   aggregate to pay for drugs.  There are other
15   parts where the states make their determination
16   of prescription drug payment policies -- of
17   prescription drug payment methodologies.
18       Q.  Any other further rationale you can
19   provide?
20       A.  No, not at this point.
21           (Deposition Exhibit Abbott 328 was
22   marked for identification.)

Page 533

1    BY MR. TORBORG:
2        Q.  For the record, Mr. Reed, what I've
3    marked as Exhibit Abbott 328 bears Bates numbers
4    HHC004-0188 through 90.  I'd like you to take a
5    look at that document to the extent necessary to
6    tell me whether you recall it.
7         And I'll note, Mr. Reed, that given the
8    file -- some information that counsel has given
9    us about where different documents came from, I
10   have some reason to believe that this document
11   may have come from your files.  I don't know for
12   sure, but I have some reason to believe it may
13   have come from your files.
14        Also for the record, this document is
15   titled "Review of Medicaid Drug State Plan
16   Amendments."  It's not dated, and there are no
17   particular names on the document.
18        While Mr. Reed's doing that, let me ask
19   counsel for the United States, previous
20   discussions about trying to get a file source
21   index for documents, the government did state if
22   there were particular documents for which we'd

52 (Pages 530 to 533)

Page 554

1  Amendments."
2     Q.  So does it not provide some insight
3  into HCFA's thinking on whether it should approve
4  state plan amendments?
5         MR. DRAYCOTT:  Objection.
6         THE WITNESS:  It provides -- answer?
7         MR. DRAYCOTT:  Well, you can -- again,
8  without going into revealing the deliberations,
9  the options that were considered, you can state
10 what the purpose of the document is.
11        THE WITNESS:  The purpose of the
12 document was to look at ways of how would we
13 react to state -- submitted state plan
14 amendments.
15 BY MR. TORBORG:
16    Q.  Particularly in the context of the
17 OIG's work identifying larger differences in --
18 larger differences between average wholesale
19 price and average acquisition cost than as
20 specified in the state plan amendments, correct?
21    A.  The OIG reports were a factor in that.
22        MR. GORTNER:  Eric Gortner for Roxane.

Page 555

1  I move to strike that answer as non-responsive.
2         THE WITNESS:  Can I have the question
3  again?
4         MR. TORBORG:  I object to your motion
5  to strike because I think he did answer the
6  question that I asked, but let's ask it again.
7            (The reporter read back the
8  record.)
9         MR. GORTNER:  I stand on my objection.
10 BY MR. TORBORG:
11    Q.  Whose decision was it, Mr. Reed, on
12 whether or not to approve or disapprove state
13 plan amendments that did not call for a
14 reimbursement methodology consistent with OIG's
15 findings?
16        MR. DRAYCOTT:  Objection.  You can
17 answer if you can.
18        THE WITNESS:  I can't because I don't
19 understand your question.  Whose decision was it
20 to do what?
21 BY MR. TORBORG:
22    Q.  To approve or disapprove state plan

Page 556

1  amendments that did not provide a reimbursement
2  methodology consistent with OIG's findings?
3     A.  The decision making authority for any
4  state plan amendment rests with the Director of
5  the Medicaid Bureau -- I'm not going to say that,
6  because, at that point, it rests for some time --
7  for some time period with the regions and for
8  some time period with the Director of the Centers
9  for Medicaid & State Operations within CMS.
10    Q.  When was the -- when did that shift in
11 responsibility occur?
12    A.  The shift occurred I believe in the
13 early summer, late spring of 2002.
14    Q.  What caused that change in
15 responsibility?
16    A.  I think there were some concerns that
17 there may be differing interpretations in the
18 regions to state plan amendments in this area.
19    Q.  Are those concerns that you had?
20        MR. DRAYCOTT:  Objection.  To the
21 extent -- you can answer, but only to the extent
22 that you're not revealing your own participation

Page 557

1  in the deliberations that yielded the final
2  policy decision about where authority would
3  finally reside.
4         THE WITNESS:  Then I can't answer.
5            (A discussion was held off the
6  record.)
7         MR. TORBORG:  Why would Mr. -- why
8  would the fact of whether or not he participated
9  in the deliberations be something that would be
10 covered by the deliberative process privilege?
11        MR. DRAYCOTT:  I don't think it's the
12 fact of his participation in the deliberations.
13 It's -- I think you asked the question -- that
14 wasn't the question you asked him is whether or
15 not he participated in those deliberations.  You
16 asked him for his personal view, and if he has a
17 personal view that exists outside of those
18 deliberations, this goes to the core deliberative
19 process.
20        Deliberative process covers the
21 exchange of opinions amongst agency officials who
22 contribute to the final policy decision, so to

58 (Pages 554 to 557)

Page 558

1   the extent that you're asking for his personal
2   view and his personal view is one that was
3   offered during those deliberations, it's
4   privileged.
5       MR. TORBORG:  The fact that his
6   personal view was shared with others is the
7   reason why it's privileged?
8       MR. DRAYCOTT:  No.  That's not your
9   question.  Your question was what was his view,
10  and to the extent that he was, at the level that
11  he occupied within HCFA, a part of the
12  deliberations that resulted in the decision where
13  authority to disapprove or approve a state plan
14  resided, that's a deliberation that resulted in
15  that decision.
16      So he can answer except to the extent
17  that it reveals the content of the deliberations,
18  that is, the exchange of ideas amongst the people
19  who were responsible for formulating policy.
20  BY MR. TORBORG:
21      Q.  Do you understand his instruction?
22      A.  I believe I do.

Page 559

1       Q.  Okay.  He's directing you not to reveal
2   the exchange of information that occurred during
3   those deliberations.
4       I'm asking you for your personal view
5   of whether or not there needed to be a change in
6   who had the authority for approving or
7   disapproving state plan amendments.
8       MR. DRAYCOTT:  Objection.  You can --
9       MR. TORBORG:  You've already given him
10  the instruction.  I think he answers it.  No need
11  for coaching anymore.  I think he can answer it.
12      THE WITNESS:  Well, I --
13      MR. DRAYCOTT:  Objection.  There's been
14  no coaching, Counsel.  There's been clear
15  instructions about privilege.
16      MR. TORBORG:  Yeah, more than enough,
17  so I think he's got it.
18      THE WITNESS:  I think -- I think I
19  heard two questions.  One was what was my
20  personal view on this, and in this regard, I
21  think -- I can't answer that question.
22      And then your second question was a bit

Page 560

1   of a different question, but now I've forgotten
2   what that is, too.
3   BY MR. TORBORG:
4       Q.  Did you have concerns yourself about
5   whether or not there needed to be a change in who
6   was approving state plan amendments?
7       A.  I can't answer that question.
8       Q.  Because it would reveal internal
9   deliberations within HCFA?
10      A.  That's correct.
11      Q.  Your personal view?
12      A.  My personal view, if it was part of --
13  as I understand the instructions, if it was part
14  of the decision making process, yes.
15      Q.  The fact that your personal views are
16  involved in the decision making process doesn't
17  automatically cover it -- make them covered by
18  the deliberative process privilege.
19      The deliberative process privilege
20  covers the exchange of ideas, not necessarily
21  your personal view.
22      MR. DRAYCOTT:  Objection.

Page 561

1   BY MR. TORBORG:
2       Q.  With that clarification, can you answer
3   my question?
4       A.  But as I understand it, if my personal
5   opinion were a part of the deliberative process
6   because I expressed that opinion in reaching that
7   decision, it would be covered.
8       Q.  And that's your understanding of the
9   deliberative process privilege as conveyed to you
10  by counsel?
11      A.  That's correct.
12      MR. TORBORG:  And that's a view, Mr.
13  Draycott, that you share?  You agree with his
14  understanding; is that right?
15      MR. DRAYCOTT:  Counsel, if you have a
16  question that you'd like to direct to the
17  witness, you may.  You've already told me that my
18  instruction to the witness was clear and that you
19  didn't want further elaboration, so the
20  instruction stands.
21      David, I mean, we've made our position
22  very clear and our position about this document