# EXHIBIT 16

Booth, Charles R.                               April 23, 2007
                        Washington, DC

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL       :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   :  CIVIL ACTION:

PRICE LITIGATION             :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO     :

U.S. ex rel. Ven-a-Care of   :  Judge Patti B. Saris

the Florida Keys, Inc. v.    :

Abbott Laboratories, Inc.,   :  Chief Magistrate

No. 06-CV-11337-PBS          :  Judge Marianne B.

- - - - - - - - - - - - - -x    Bowler

                 IN THE CIRCUIT COURT OF

                MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - -x

STATE OF ALABAMA,            :

             Plaintiff,      :

           vs.               :  Case No.: CV-05-219

ABBOTT LABORATORIES, INC.,   :  Judge Charles Price

et al.,                      :

             Defendants.     :

- - - - - - - - - - - - - -x

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                           April 23, 2007
                          Washington, DC

| Page 174 | Page 176 |
|---|---|

**Page 174**

1           MR. GOBENA:  Object to the form.
2      A.    Since I clearly wasn't doing it myself,
3   yes.
4      Q.    What did you expect of the individuals
5   within your office when it came to factoring in
6   information that came into the Office of Payment
7   Policy regarding the cost to providers of drugs?
8      A.    Of drugs?  Was that the last word?
9      Q.    Of drugs, yes, sir, drugs.
10     A.    I'm not sure I had one.  No one actually
11  had, you know, their sole responsibility to deal
12  with drug issues.
13     Q.    But there were individuals in the office
14  for whom it was one of their responsibilities,
15  correct?
16     A.    Right.
17     Q.    And that would be Mr. Patashnik and the
18  people who reported to Mr. Patashnik?
19     A.    Yes, as one of their minor sidelines.
20     Q.    You say minor sidelines.  The drug
21  payments for Medicare even during this time period,
22  do you recall about what they were?

**Page 175**

1      A.    Well, depending upon what time frame
2   you're talking about, a couple of billion dollars
3   excluding Epogen.
4      Q.    And a couple billion dollars was a minor
5   sideline?
6      A.    In terms of what we might be able to do
7   about it and in terms of spending time on issues
8   such as durable medical equipment or physician
9   issues, yes.
10     Q.    When you say in terms of what you could do
11  about it, what do you mean?
12     A.    Well, we talked about having to change the
13  regulations after '91 if we were going to do
14  something about drug payment.  That's what I'm
15  talking about.  There were other issues and other
16  areas of the program that we could do something
17  about administratively that did not require the
18  amount of work that would have been required for
19  changes in drug payments.
20     Q.    So even if individuals within the office
21  were aware of drugs available in discounts in excess
22  of 20 percent from AWP, is it your testimony that

**Page 176**

1   your office devoted its resources to other things
2   that promised greater savings?
3           MR. GOBENA:  Object to the form.
4      A.    Well, saving money was not the sole issue
5   that caused our existence.  It might be the IG's
6   sole purpose, but we were always interested in
7   paying the correct amount to the correct provider,
8   physician, supplier, hospital, and being sure that
9   the beneficiary paid no more in co-insurance that
10  was -- than was absolutely necessary.
11     Q.    Which raises the question I was getting to
12  a little bit earlier, and that is whatever the
13  range, given that -- strike that.  If a drug were
14  available at a range of prices and if HCFA were
15  looking to pick one reimbursement price, were there
16  factors that you considered in making that policy
17  decision?
18          MR. GOBENA:  Object to the form.
19     A.    I don't remember.
20     Q.    I mean, is it fair to say that in deciding
21  what HCFA chose to pay for drugs reimbursable by
22  Part B, that you would consider access to care for

**Page 177**

1   beneficiaries?
2      A.    I would hope.
3      Q.    And that if you picked a price point too
4   low, it would impact access to care for
5   beneficiaries, correct?
6          MR. BREEN:  Objection to form.
7          MR. GOBENA:  Also I'm going to instruct
8   the witness the extent to which he needs to get into
9   issues that are part of the deliberative process, I
10  instruct you not to answer it, but if you can answer
11  it otherwise, then please go ahead and answer.
12         THE WITNESS:  Well, I think that one of
13  the objectives for at least my office at the time
14  was not to adversely impact the quality or quantity
15  of patient care.
16         MR. COOK:  Just so I know what he's not
17  telling me, I don't quite understand when you tell
18  him things that impact the deliberative process,
19  what are you telling him not to tell me?
20         MR. GOBENA:  Well, to the extent -- your
21  questions are vague, so I'm not quite sure if you're
22  asking about what gave rise to the '91 regulation,

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                    April 23, 2007
                           Washington, DC

Page 190

1  We discussed usual and customary and prevailing this
2  morning.
3      Q.   Uh-huh.
4      A.   One would have to develop proxies for that
5  at the beginning and then determine what the data
6  was.
7          MR. GOBENA:  Chris, I want to clarify, are
8  you asking about the discussions with the Amgen
9  representatives, the representatives from HHS and
10  OIG, or are you starting to ask about the
11  discussions between senior staff?
12          MR. COOK:  I'm asking what Mr. Booth
13  personally considered.
14          THE WITNESS:  Well, this is what we
15  discussed with Amgen.
16          BY MR. COOK:
17      Q.   Okay.  I'd like to know what you
18  personally considered, not simply the conversations
19  with Amgen, but you were the director of the Office
20  of Payment Policy, you ultimately made a
21  recommendation to the acting administrator of HCFA
22  that HCFA adopt a fee schedule, correct?

Page 191

1      A.   Yes.
2      Q.   You indicated to me that in discussions
3  with Amgen, the possibilities of an AWP methodology
4  or reasonable charge methodology were discussed.
5      A.   Yes.
6      Q.   I think I've asked you whether you can
7  remember any other methodologies that you personally
8  considered, and that these three are the only ones
9  that you recall right now, correct?
10      A.   That's what I've said.
11      Q.   What I'd like to know is not restricting
12  this simply to conversations with Amgen, could you
13  describe for me what you considered in connection
14  with reasonable charge?
15          MR. GOBENA:  I'm going to object and I'll
16  have to instruct the witness not to answer to the
17  extent that we're going -- that he's going to get
18  into areas of deliberative process.  The question as
19  phrased, I don't know whether or not it would touch
20  on discussions, deliberations that Mr. Booth had
21  with any members of his staff, so --
22          MR. COOK:  Feel free to instruct him not

Page 192

1  to answer.
2          MR. GOBENA:  Okay.
3          BY MR. COOK:
4      Q.   Mr. Booth, what factors did you consider
5  in rejecting the reasonable charge in favor of the
6  fee schedule for your recommendation to the
7  administrator of HCFA?
8          MR. GOBENA:  Same objection, instruct the
9  witness not to answer on the basis of deliberative
10  process.
11          BY MR. COOK:
12      Q.   You considered average wholesale price as
13  another methodology, correct?
14      A.   Yes.
15      Q.   And you ultimately rejected that
16  methodology in favor of recommending a fee schedule,
17  correct?
18      A.   Yes.
19      Q.   What factors did you consider in choosing
20  a fee schedule over an AWP-based methodology?
21          MR. GOBENA:  I'm going to object and
22  instruct the witness not to answer on deliberative

Page 193

1  process grounds.
2          BY MR. COOK:
3      Q.   What was your understanding of what an
4  AWP-based methodology would entail as opposed to the
5  fee schedule that you ultimately recommended?
6      A.   Epogen is a drug that Amgen brought to
7  market solely for patients with end-stage renal
8  disease.
9      Q.   Okay.
10      A.   In order to bring Epogen to the market,
11  Amgen in my parlance cannibalized themselves by
12  selling the rights to the use of the drug to another
13  company, so Medicare was basically Amgen's only
14  customer since Medicare paid at the time about 96
15  percent of end-stage renal disease costs.  By using
16  AWP, Amgen would have set its own price.  That was
17  not in my judgment the best way to set the policy.
18  In addition, I wanted a policy that would have
19  controlled utilization.
20      Q.   And what do you mean by controlling
21  utilization?
22      A.   Well, I'll try to explain it.  The problem

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                      April 23, 2007
                    Washington, DC

| Page 202 | Page 204 |
|---|---|

**Page 202**

1    Q.   Let me rephrase that.  Why did HCFA
2  reimburse at an amount greater than what it
3  understood to be the ingredient cost for a provider
4  who administered an appropriate dose of Epogen?
5       MR. GOBENA:  Object to the form.
6    A.   I think you've mischaracterized my
7  remarks.
8    Q.   You've indicated to me that the
9  reimbursement amount for Epogen in many instances
10  would exceed ingredient cost to the provider,
11  correct?
12   A.   No.
13   Q.   No?  Their ingredient cost would be less?
14   A.   I don't think I said many.
15   Q.   All?
16   A.   Not all.  Actually, most.
17   Q.   Most.  For those providers where the
18  reimbursement amount exceeded the ingredient cost,
19  did HCFA have an understanding of what that excess
20  amount would be used to pay for?
21       MR. GOBENA:  Object to the form.  He's not
22  a 30(b)(6) witness.  You can answer in your personal

**Page 203**

1  capacity.
2    A.   There was clearly going to be some
3  spoilage of the drug because particularly at the
4  beginning, it was difficult to make, difficult to
5  ship, difficult to store.  There were clearly going
6  to be administration costs to administer the drug
7  even where there was a shunt, and in some cases
8  there wasn't, and we wanted to set the reimbursement
9  rate high enough that facilities would administer
10  Epogen to those patients who were receiving blood
11  transfusions.  And obviously this is not an exact
12  science.  We have only the clinical trials to base
13  the judgments on that we made, and we said at the
14  time that if it turned out that we had made
15  incorrect judgments, that we would make adjustments
16  in the price.
17   Q.   After 1989, as I understand it, ESRD
18  facilities would be paid based upon a combination of
19  a composite rate in the separately billed drugs.  Do
20  I have that correct?
21   A.   Not just after 1989.
22   Q.   Before 1989 also, correct?

**Page 204**

1    A.   From sometime in 1984, as I recall.
2    Q.   So between 1989 and some point after 2001,
3  ESRD facilities received both a composite rate
4  payment and a payment for separately billable drugs,
5  correct?
6       MR. GOBENA:  Object to the form.
7    A.   At least through 19 -- June of 1997.
8    Q.   Between 1989 and June of 1997, did HCFA
9  change the composite rate that ESRD facilities were
10  paid for treating Medicare beneficiaries?
11   A.   I don't remember.
12   Q.   Do you recall any discussions about
13  whether the composite rate should be changed in
14  light of profits the facilities were making on the
15  drug component?
16       MR. GOBENA:  Chris, can I clarify?  What
17  discussions?  Discussions with agency officials
18  within the agency or --
19       MR. COOK:  With anybody at all.
20       MR. GOBENA:  Okay, I'll instruct you to
21  not answer the question on deliberative process
22  grounds the extent to which your answer would cover

**Page 205**

1  discussions within the agency.
2       THE WITNESS:  Then I can only tell you
3  that there were end-stage renal facilities that came
4  to see us and wanted an increase in the composite
5  rate.
6       BY MR. COOK:
7    Q.   Do you recall what response you gave to
8  those facilities about whether you would give an
9  increase to the composite rate?
10   A.   I recall very few increases in the
11  composite rate.
12   Q.   Do you recall expressing to any of these
13  facilities the notion that the composite rate was
14  not being increased because of money being made on
15  the drug component?
16   A.   Never.
17   Q.   Do you recall internal discussions in
18  which the decision not to raise the composite rate
19  was tied to money being made on the drug component?
20       MR. GOBENA:  I'm going to object and
21  instruct the witness not to answer on deliberative
22  process grounds.

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                    April 23, 2007
                        Washington, DC

Page 258

1  November of 1991, correct?
2         MR. GOBENA:  Object to the form.
3      A.  I believe it was November 25th, 1991, but
4  I'd have to look it up.
5      Q.  And do you recall, what was the payment
6  methodology that was codified in that particular
7  regulation?
8      A.  I believe it was undiscounted AWP.
9      Q.  Was it still the case in November of 1991
10  -- strike that.  Did you participate in any
11  discussions about why the Department of Health and
12  Human Services published a regulation in November of
13  1991 paying undiscounted AWP rather than a discount
14  off of AWP?
15     A.  I don't recall the conversations.
16     Q.  Did you make the decision to go to
17  undiscounted AWP rather than discounted AWP?
18     A.  I don't know -- I don't remember how the
19  decision was made.
20     Q.  But do you know whether you personally
21  made it?
22     A.  I did not make it.

Page 259

1      Q.  Did you concur in that decision?
2      A.  There were discussions about what we
3  should pay, and the agency and the department made a
4  decision.
5      Q.  With whom did you have discussions about
6  what you should pay?
7      A.  Well, again, in the clearance process of
8  the final rule, with the same parties that
9  participated in the proposed rule.
10     Q.  And do you remember the names of any of
11  the people that you discussed this particular issue
12  with?
13     A.  I don't recall discussing this particular
14  issue.
15     Q.  Did you make known your disagreement with
16  a policy paying at undiscounted AWP?
17         MR. BREEN:  I'll object to the form.
18         MR. GOBENA:  I'll allow the question to
19  the extent you're asking a yes or no question, but
20  if you're going to get into the substance of what he
21  discussed with people in terms of his --
22         BY MR. COOK:

Page 260

1      Q.  Let me ask it openly.  Mr. Booth, what did
2  you recommend should be the payment methodology in
3  the final rule?
4         MR. GOBENA:  I'm going to object and
5  instruct the witness not to answer to the extent it
6  reflects deliberative process discussions.  If
7  there's some discussion -- if there's some way you
8  can answer the question without getting into
9  discussions you had within the agency about the
10  final rule, you can answer the question.  Otherwise
11  I'll instruct you not to answer it.
12     A.  There were conversations with people
13  outside the agency that suggested that for at least
14  many individual drug codes, that a discounted AWP of
15  15 percent would be too harsh.
16     Q.  And did you relay those discussions to
17  anybody within the agency?
18     A.  Well, some of them were reflected in the
19  formal comments.
20         MR. COOK:  Give me two seconds.
21         THE VIDEOGRAPHER:  We're going off the
22  record.  The time is 4:57.

Page 261

1         (Discussion off the record)
2         THE VIDEOGRAPHER:  We're going back on the
3  record.  The time is 4:58.
4         MR. COOK:  Thank you very much, Mr. Booth.
5  I apologize that we're going to bring you back
6  again, but as we discussed off the record, I think
7  we're going to convene for today.  Mr. Breen has
8  indicated that he has some questions.  I have some
9  more questions and other people do as well, and so
10  we'll work with your counsel and with you and others
11  to get a mutually convenient day so that we
12  interrupt your life as little as possible.
13         THE WITNESS:  Well, I've outlined some of
14  my major time blocks, so within those constraints,
15  hopefully we can find a mutually agreeable date.
16         MR. COOK:  We'll do our absolute best.
17  Thank you, sir.
18         THE WITNESS:  Thank you.
19         THE VIDEOGRAPHER:  We're going off the
20  record.  The time is 4:59.  This marks the end of
21  Videotape Number 5 and the conclusion of this day's
22  deposition of Charles Booth.

66 (Pages 258 to 261)

5570917b-ccec-4522-964a-1aa1ed72506d

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                        New York, NY

                   UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

---------------------------------X


                  IN THE CIRCUIT COURT OF

                MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

          Plaintiff,               :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

          Defendants.              :

---------------------------------X

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                         May 4, 2007
                    New York, NY

---

Page 146

1   from the pharmaceutical market that list prices,
2   are essentially entirely meaningless and that
3   only the weakest and smallest scale buyers pay
4   anything close to it.
5       Q.  And so, as of 1993, for example, would
6   you be surprised if a single bag of sodium saline
7   solution sold to a provider who bought maybe five
8   would pay $10 per bag, and a large purchaser who
9   bought a very large volume would pay less than a
10  dollar?
11          MS. BROOKER:  Objection.  Form.
12      A.  I would not have been surprised.
13      Q.  Okay.  So, to that extent that --
14  President Clinton referring to a 10-to-1 ratio is
15  something that would be consistent with your
16  understanding of that particular market.
17  Correct?
18          MS. BROOKER:  Objection.  Form.
19      Q.  I'm sorry.  You have to verbalize.
20      A.  Again, I would have thought that market
21  was a subset of the supplies market rather than
22  the drug market.

Page 147

1       Q.  That was my question.  But you would
2   have distinguished between the drug market, where
3   10-to-1 would not -- you would not expect to see.
4   Correct?
5       A.  That's correct.
6       Q.  And the supply market, where sodium
7   saline solution would be found, where there could
8   be a huge variation between a small purchaser
9   purchasing at list price and a very large
10  purchaser purchasing at 99 percent off of list
11  price?
12          MS. BROOKER:  Objection.  Form.
13      A.  I would have made such a distinction,
14  and I would not have been surprised to see those
15  sorts of differentials of the supply market.
16      Q.  And in between the commodities supply
17  market of sodium saline and the patent-protected
18  market of a brand name drug, would you expect
19  generic drugs to be somewhere between those two
20  extremes?
21          MS. BROOKER:  Objection.  Form.
22          MR. BREEN:  Objection.  Form.

---

Page 148

1       A.  That would be a question I never
2   thought about before today.  But today I would
3   say that we always made the distinction between -
4   - between drugs and -- and supplies.  And, again,
5   I would fall back on the Medicare green eyeshade
6   distinction between what's sterile supplies and
7   what's pharmacy.
8           MR. COOK:  Let's take a break.
9           THE VIDEOGRAPHER:  The time is 11:28
10  a.m.  We're going off the record, concluding Tape
11  No. 2 in the deposition of Dr. Bruce Vladeck in
12  the matter of In re Pharmaceutical Average
13  Wholesale Price Litigation.
14          (Recess taken.)
15          THE VIDEOGRAPHER:  The time is 11:46
16  a.m.  We're going back on the record, starting
17  Tape No. 3 of the deposition of Dr. Bruce Vladeck
18  in the matter of In re Pharmaceutical Average
19  Wholesale Price Litigation.
20      Q.  Doctor, based upon what we were talking
21  about just before the break, would it be fair to
22  say that while you were administrator of HCFA,

Page 149

1   you did not understand published average
2   wholesale price to be the average of prices at
3   which wholesalers were selling their drugs to
4   their customers?
5       A.  It would -- it would be fair to say
6   that I did not believe it was, in fact, an
7   empirical estimate, that rather it was a -- an
8   amount reported by the manufacturer to -- of the
9   compendium compilers or whatever, yes.
10      Q.  And, again, akin to a sticker price?
11      A.  That's correct.
12      Q.  Where did you get that understanding?
13      A.  I believe that was probably what my
14  staff explained to me when I first encountered
15  the concept sometime after I took office.
16      Q.  Do you recall anybody within HCFA who
17  was under the belief that average wholesale price
18  was an average of prices at which wholesalers
19  sold drugs to customers?
20          MS. BROOKER:  Object to form.  And I
21  would just instruct the witness, just, you know,
22  be mindful of not disclosing deliberations,

---

38 (Pages 146 to 149)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                      May 4, 2007
                          New York, NY

Page 150

1   internal deliberations.
2        THE WITNESS:  Understood.
3        A.  I -- I think the most accurate way for
4   me to answer the question -- I hope his response
5   would be to say we did not believe -- I did not
6   believe that it was an actually empirically-
7   derived number in any form, that it was not
8   necessarily, although it was possible, by chance,
9   a reflection of what was occurring in the
10  marketplace.
11       Let me perhaps expand on that.  Again,
12  the analogy of the sticker price was one that had
13  great influence in my thinking, and I would
14  probably have expected, at that point, that there
15  were always some poor suckers who were paying
16  that price, just like there's always folks who
17  end up paying list.
18       Q.  Were you familiar with the distinction
19  between average wholesale price as published in
20  these compendia, and a list price or direct price
21  that manufacturers would -- would have for their
22  products?

Page 151

1        MR. BREEN:  Objection.  Form.
2        MS. BROOKER:  Objection.  Form.
3        A.  I would have understood, at the time,
4   if someone had made that sort of intellectual
5   distinction.  I would -- again, trying to
6   characterize precisely what I thought ten or 12
7   years ago -- I would have been perhaps puzzled or
8   surprised, but probably not shocked to learn that
9   there was a significant discrepancy between a
10  formal published price list and an average
11  wholesale price that appeared in a compendium.
12       Again, I would have -- let me not put
13  so many negatives in there, perhaps for clarity.
14  I would have expected that most published price
15  lists conformed, by -- that manufacturers
16  themselves issued to their salespeople or to
17  their customers would have contained list prices
18  that were equivalent to the average wholesale
19  prices they reported to the compendium.
20       Q.  Did you understand, between 1993 and
21  1997, then that AWP did not refer to the price at
22  which a pharmaceutical firm sold a drug to its

Page 152

1   customer?
2        MS. BROOKER:  Objection.  Form.
3        MR. BREEN:  Objection.  Form.
4        A.  Again, I would have expected there were
5   some customers who, in fact, paid the average
6   wholesale price, but I didn't not believe that it
7   was an accurate reflection of the average revenue
8   received by the manufacturer for -- or the
9   wholesaler for a particular product.
10       Q.  I guess to put it another way, you
11  understood, between 1993 and 1997, that AWP did
12  not represent the average acquisition cost for a
13  pharmaceutical?
14       A.  That's correct.  We --
15       MS. BROOKER:  Objection.  Form.
16       MR. BREEN:  Form.
17       A.  -- we distinguished acquisition cost
18  from average wholesale price, and believed that,
19  in general, it was likely to be lower.
20       Q.  I would like to get back a bit to the -
21  - we were talking a bit about the relationship
22  between published average wholesale prices and

Page 153

1   prices within the marketplace.
2        You indicated your belief about the
3   relationship between AWP and prices in the
4   marketplace for brand name drugs, I think.
5        Correct?
6        MS. BROOKER:  Objection.  Form.
7        A.  I believe I did, yes.
8        Q.  Okay.  And -- and you testified, as I
9   recall, that you thought that there was a
10  percentage difference, on average, between
11  published AWP's and prices within the
12  marketplace.
13       Do I have that correct?
14       MS. BROOKER:  Objection.  Form.
15       A.  That is correct.
16       Q.  Regardless of whether that's what you
17  testified before, I've correctly summarized what
18  your belief was.  Correct?
19       A.  That's correct.
20       Q.  When you say that it was an average, do
21  I understand correctly it was your belief that it
22  wasn't a fixed percentage between the two?

                                     39 (Pages 150 to 153)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                        New York, NY

Page 174

1    A.  That's correct.
2    Q.  We were talking a little bit earlier
3  about the -- the range of prices that a -- a
4  commodity, a supply such as sodium chloride
5  solution might have, being as much as 100-to-1.
6       Correct?  You recall that?
7    A.  Yes.
8    Q.  Okay.  As to generic drugs, would it be
9  consistent with your understanding, between 1993
10 and 1997, that a generic drug such as vancomycin
11 could have a market range of prices as wide as
12 that reflected in this chart?
13      MS. BROOKER:  Objection.  Form.
14   A.  I am -- I think the most accurate way
15 to answer that was I am surprised, as of today,
16 to see that kind of data, and I think I would
17 have been even more surprised, during the '93 to
18 '97 period, to see that kind of data.
19   Q.  But this is data that was reported to
20 your agency.  Correct?
21   A.  That's -- that's my understanding, yes.
22   Q.  And you would have expected members of

Page 175

1  your staff to have taken this data into account
2  in either a -- and let's start with establishing
3  Medicaid or Medicare reimbursement policy.
4       MS. BROOKER:  Objection.  Form.
5    A.  I would have expected, given the nature
6  of this report then, to have been much more
7  influenced by the bolded section in the box on
8  Page 2.
9    Q.  And what aspect of that would you
10 expect them to be influenced by?
11   A.  Again, the finding that -- that most
12 prices were, in fact, below the AWP, but that in
13 two of the cases the differential was 15 to 20
14 percent.
15   Q.  And that would refer, presumably, going
16 back to Appendix 2, to the Calcigex and Inferon?
17   A.  I -- presumably, yes.
18   Q.  Because those were the single-source
19 drugs.  Correct?
20   A.  Yes.
21   Q.  And to the extent that Medicare
22 reimbursed for the multiple-source drug here,

Page 176

1  vancomycin, would you expect your staff to take
2  into account the difference between single-source
3  drug prices and multiple-source drug prices in --
4  in considering changes to Medicare payment
5  policies?
6       MS. BROOKER:  Objection.  Form.
7    A.  The only thing I can observe
8  empirically is that I don't recall, in our
9  conversations over the years about changing
10 Medicare drug pricing policy, the distinction
11 between brand and generics arising very often, if
12 at all.
13   Q.  At the time this report was -- was
14 written, am I correct that Medicare was
15 reimbursing at undiscounted AWP for Part B drugs?
16      Correct?
17      MS. BROOKER:  Objection.  Form.
18   A.  I -- I believe that's correct.
19   Q.  It was either EAC, according to survey
20 --
21   A.  Right.
22   Q.  -- or AWP.  Right?

Page 177

1    A.  The only reason I hesitate in response
2  to your question is trying to remember whether
3  dialysis drugs were treated separately from other
4  Part B drugs, but I don't believe they were.
5    Q.  To the extent that -- that dialysis
6  drugs were reimbursed pursuant to 405.517, they
7  were being reimbursed by Medicare at 100 percent
8  of AWP.  Correct?
9    A.  That is correct.
10   Q.  And to the extent that the data on the
11 chart at Appendix 2 is -- is accurate, that would
12 indicate that for Calcigex, for example, if it
13 were reimbursed under that methodology, am I
14 correct that every single one of the providers
15 surveyed would be reimbursed at an amount in
16 excess of their acquisition cost?  Correct?
17   A.  That is correct.
18   Q.  And for Inferon, all but two of the
19 providers would have been reimbursed at above
20 their acquisition cost.  Correct?
21      MS. BROOKER:  Objection.  Form.
22   A.  That's what it shows, yes.

45 (Pages 174 to 177)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                        New York, NY

Page 182

1    A.  That's correct.
2    Q.  One was EAC, established according to
3  survey.  Correct?
4    A.  That's correct.
5    Q.  We'll get to it later, but for whatever
6  reason, that was not available to you because the
7  surveys were not or could not be conducted?
8    A.  That's correct.
9       MS. BROOKER:  Objection to form.
10    Q.  And so, your understanding was that
11  pursuant to regulation, your only alternative
12  between '93 and '97, while you were administrator
13  of HCFA, was to pay based upon the published
14  average wholesale price.  Correct?
15    A.  That's correct.
16    Q.  And during the time that you were
17  paying the published average wholesale price, you
18  were aware that average wholesale price exceeded
19  acquisition cost.  Correct?
20       MS. BROOKER:  Objection.  Form.
21    A.  Yes.
22    Q.  You were aware that for generic drugs,

Page 183

1  the difference could be greater than for brand
2  name drugs.  Correct?
3       MR. BREEN:  Objection.
4    A.  I'm not certain I was aware of that.
5    Q.  But for supplies such as sodium
6  chloride, you were aware that the difference
7  could be as much as 99 percent.  Correct?
8    A.  Yes, I was.
9       MR. BREEN:  Objection.  Form.
10       MS. BROOKER:  Objection.  Form.
11    Q.  And the same would be true for other
12  commodity products similar to sodium chloride
13  such as, for example, dextrose in water.
14       Correct?
15       MR. BREEN:  Objection.  Form.
16    A.  Yes, that's correct.  Or sterile saline
17  or something of that sort.
18    Q.  Which are two of the other drugs at
19  issue in this case.  Correct?
20    A.  I wasn't aware that -- that they were,
21  but okay.
22    Q.  And during that time, you, as

Page 184

1  administrator of HCFA, considered alternatives to
2  100 percent of AWP.  Correct?
3       You, as administrator of HCFA,
4  considered alternatives to reimbursing at 100
5  percent of AWP.  Correct?
6    A.  I don't know if we're getting into
7  deliberative --
8       MS. BROOKER:  You should be mindful
9  that you should not disclose any pre-decisional
10  deliberative process.
11       MR. COOK:  I think it's going to be
12  easier if you either direct him not to answer or
13  let him answer, because I'm aware -- I'm a little
14  leery of having the witness put in the difficult
15  position of having to parse within his head --
16    A.  Well, let me -- I can say I was aware
17  that conceptually there were alternatives to 100
18  percent of AWP.
19       MS. BROOKER:  Let me say you can state
20  what your understanding was in your official
21  capacity, and you can certainly state what the
22  official policy was or the regulation, or what

Page 185

1  the statute was.  You just cannot discuss pre-
2  decisional deliberative conversations that you --
3  that you had with others.
4       THE WITNESS:  I think I got that.
5    Q.  All right.  Without revealing what the
6  deliberations were, were there deliberations
7  within HCFA about alternative methods for
8  reimbursing to undiscounted AWP?
9       MS. BROOKER:  Objection to form.
10    A.  Extensive discussion.
11    Q.  Who -- who was involved in those
12  extensive discussions?
13    A.  I don't know if that gets too
14  deliberative.
15       MS. BROOKER:  You can say who was
16  involved in deliberations.
17    A.  I would say that with the exception of
18  the Medicaid folks, the list of people I
19  enumerated earlier as experts I would have
20  consulted on these issues would have been
21  involved, whoever the deputy administrator was at
22  the time would have been involved.  And, again,

47 (Pages 182 to 185)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                              New York, NY

| Page 186 | Page 188 |
|---|---|

**Page 186**

1  probably other members of the staff of the office
2  administrator probably would have been involved,
3  as would additional staff in the Office of
4  Legislation and Policy, in addition to the
5  individuals I named earlier.
6      Q.  And it involved numerous meetings at
7  which the -- the -- the possibilities were
8  discussed; I take it?
9          MS. BROOKER: Objection. Form.
10      A.  I would say we were, in 1996 and 1997 -
11  - certainly probably beginning in 1995, there
12  were very frequent conversations about budgetary
13  issues and policies with potential budgetary
14  impacts of one kind or another, and there was
15  always a list of potential policies and changes
16  to Part B drug reimbursement was frequently on
17  those lists, and was not discussed at every
18  meeting, but was frequently discussed.
19      Q.  How many alternatives were discussed?
20          MS. BROOKER: Objection. You should
21  not discuss exactly what -- you should not
22  discuss any of your deliberations, so you

**Page 187**

1  shouldn't talk about -- I mean, that's -- that's
2  prohibited.
3          MR. COOK: Well, are you instructing
4  him not to answer?
5          MS. BROOKER: You can talk about what
6  official policy was.
7          MR. COOK: All right. I'll make it
8  easy.
9      Q.  In your internal deliberations at HCFA,
10  how many alternative methods of reimbursement did
11  you consider?
12      A.  I couldn't say. I -- it's not a
13  question of privilege. I couldn't say.
14      Q.  Okay. But within your internal
15  deliberations, you did consider alternative
16  methods of reimbursement. Correct?
17      A.  That is correct.
18      Q.  And, again, to -- to make the record as
19  sharp as possible, what did you discuss in those
20  deliberations?
21          MS. BROOKER: Objection. You cannot
22  discuss exactly what your deliberations were.

**Page 188**

1          And I also object that these questions
2  are incredibly vague. So, I object to form. I
3  don't know exactly what program we're even
4  talking about. I don't know what time period
5  we're talking about. I don't know what the
6  specifics are that you're talking about in this
7  whole line of questions.
8          MR. COOK: But you understand enough
9  that you won't let him answer it?
10          MS. BROOKER: If he's going to talk
11  about internal deliberations. And -- and, again,
12  just for the record, it's not that I won't let
13  him talk about it. I am here to protect on --
14  not on behalf of the witness, but on behalf of
15  the government, deliberative process privilege.
16  It's not my privilege. It's not the witness'
17  privilege. It's the federal government's
18  privilege.
19          MR. COOK: All right. The United
20  States, who has sued my client, will not allow
21  the witness to talk about it.
22          Is that fair to say?

**Page 189**

1          MS. BROOKER: I don't think that's a
2  fair characterization.
3          MR. COOK: Okay.
4          MS. BROOKER: Look, Chris --
5          MR. COOK: I know. I know.
6          MS. BROOKER: We have this issue before
7  the Judge. There's no reason to bicker about it
8  before the witness. Let's just all be
9  professional about it.
10      Q.  And so, it is fair to say that during
11  the time you were the administrator of HCFA, the
12  agency did not choose to change the manner in
13  which it reimbursed Medicare Part B drugs?
14          MS. BROOKER: Objection. Form.
15      A.  I would -- I would frankly personally
16  object to that characterization because I had a
17  growing feeling -- again, I would put this in a
18  period probably beginning about 1995 through the
19  time I left the government -- of frustration that
20  we were significantly overpaying for Part B
21  drugs, and that because of some combination,
22  frankly, of political and legal constraints, we

                                  48 (Pages 186 to 189)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C. - Vol. II                    June 21, 2007
                      New York, NY

Page 285

               UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

--------------------------------X


               IN THE CIRCUIT COURT OF

          MONTGOMERY COUNTY, ALABAMA

--------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

          Plaintiff,               :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

          Defendants.              :

--------------------------------X

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                     June 21, 2007
                    New York, NY

Page 370

1  you testified about, back on May 4th relating to
2  going to an actual acquisition cost methodology
3  for payment of drugs?
4          MS. BROOKER: Objection. Form.
5      A.    That is my -- consistent with my
6  memory of what we had proposed, yes.
7      Q.    And could you describe what the
8  payment methodology would have been if this
9  statutory proposal had been adopted by Congress?
10     A.    Well, again, it would have been
11 lower of average wholesale price, now with -- with
12 the little clause there under Section B, the
13 opportunity to write regulations -- defining what
14 average wholesale price was or actual acquisition
15 cost, with a further provision that if there was
16 insufficient information about the actual
17 acquisition cost to the individual physician or
18 supplier, we could employ national average data.
19     Q.    Assuming that this is language from
20 a budget proposal for the administration in Fiscal
21 Year 1998, who would have actually drafted this
22 language?

Page 371

1      A.    Probably the actual -- the actual
2  drafting of the language would have been done, I
3  believe, by staff in the counsel's office at HHS,
4  working with HCFA staff and staff of the Office of
5  Legislation.
6      Q.    Do you recall being involved in the
7  crafting of -- of the language relating to this
8  budget proposal?
9      A.    I -- I don't believe I was involved
10 in the actual language drafting, no.
11     Q.    If you look at the -- Page 4 of the
12 facsimile, which is Page 0322 on the Bates
13 numbers, the second paragraph -- the first full
14 paragraph at the top refers to a dispensing fee
15 for pharmacies.
16          Absent this legislation, or at the
17 time this legislation was proposed, Medicare did
18 not pay a dispensing fee for pharmacies for drugs
19 reimbursed under Part B. Is that correct?
20     A.    That is correct.
21     Q.    And this would have given the
22 Secretary authority to pay entities such as Ven-A-

Page 372

1  Care an explicit dispensing fee.
2          Correct?
3      A.    That's how I understand it, yes.
4      Q.    Was there any discussion within
5  HCFA that the creation of that dispensing fee was
6  to make up, in some measure, for the lost profits
7  from going from AWP to acquisition costs?
8          MS. BROOKER: Objection.
9          I would just instruct you to be
10 mindful of not disclosing pre-decisional
11 deliberations, and to just stick to policy.
12     A.    I don't know if this addresses the
13 objection of the concern or not. I don't recall
14 any specific discussion about that. My
15 presumption was that as a policy it would have the
16 effect similar to what you described, but I don't
17 have any specific memory of this provision at all,
18 frankly.
19     Q.    Okay. Who would be the best person
20 to ask within HCFA for the -- the reason that this
21 dispensing fee for pharmacies provision was
22 included in the proposed legislation?

Page 373

1      A.    I think probably again Ms. Buto or
2  Mr. Hoyer.
3      Q.    The other provision that piques my
4  interest -- and unfortunately it's cut off -- is
5  the Section 11237 immediately following. This
6  says:
7          "Payments to physicians'
8  assistants, nurse practitioners, and clinical
9  nurse specialists."
10          And the first subheading refers to:
11          "Coverage in home and ambulatory
12 settings in which a facility or a provider fee is
13 not billed for physicians' assistants, nurse
14 practitioners, and clinical nurse specialists."
15          First, do you know what that teaser
16 of a heading relates to in terms of the proposed
17 legislation?
18          MS. BROOKER: Objection. Form.
19     A.    I have a surmise. I don't have any
20 direct memory.
21     Q.    And what would the surmise be?
22     A.    My guess would be it would permit

Henderson Legal Services
202-220-4158

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Vladeck, Ph.D., Bruce C. - Vol. II                                June 21, 2007
                              New York, NY

Page 498

1   should have known earlier; that, in fact, the 15
2   to 25 percent or 15 to 20 percent was the rule of
3   thumb for sole-source brand drugs, that, in fact,
4   the expectation, the belief about generics, was
5   that it was more likely to be between 25 and 40
6   percent difference between actual market price and
7   average wholesale price.
8        Q.    So, when you testified about your
9   belief that the difference was somewhere between
10  15 and 20 percent, you were just talking about
11  your own personal belief and not the belief of
12  others at HCFA. Is that correct?
13            MS. BROOKER: Objection to form.
14       A.    I think it's fair to say that my
15  own beliefs were formed on the basis of what I was
16  told by my colleagues at HCFA. So, I think if I
17  described that as the consensus view among the
18  people I would have consulted or would have
19  advised me about the issue, that would be a fair
20  characterization, because there's nowhere else
21  from which I would have got that impression.
22       Q.    Did you have discussions with

Page 499

1   others at HCFA prior to 1996 or 1997 concerning
2   what the difference between AWP and transaction
3   prices was for generics?
4            MS. BROOKER: Objection.
5            I would ask you also to be mindful
6   of not discussing predecisional deliberative
7   conversations.
8        A.    I think I can say that, again, in
9   thinking about the average wholesale price and its
10  relationship to anything else, it was not prior to
11  then that I distinguished between generics and
12  brand name drugs and, therefore, it's unlikely I
13  would have had such a conversation at all.
14       Q.    Okay. How many people worked at
15  HCFA during the time that you were there?
16            MS. BROOKER: Objection.
17       A.    About 4,000.
18       Q.    And did some of those people have
19  the responsibility to understand what was going on
20  in the marketplace?
21            MS. BROOKER: Objection.
22       A.    That's an interesting question and

Page 500

1   a somewhat sore subject. I don't know that there
2   was anyone in the agency who had specific
3   responsibility for detailed knowledge of the
4   prescription drug marketplace.
5        Q.    I take it some of them did have
6   knowledge of the prescription drug marketplace.
7            Is that correct?
8            MS. CONNOLLY: Objection to form.
9        A.    That was my perception.
10       Q.    Let's take a look once again at the
11  1991 regulation. I believe it's been marked as
12  Exhibit Abbott 261?
13       A.    Yes, sir.
14       Q.    And I believe you may have
15  testified earlier that you had seen this
16  regulation before. Is that correct?
17       A.    That is correct.
18       Q.    What I want you to do is look at
19  the page with the No. 62 in the upper right-hand
20  corner.
21       A.    Yes, sir.
22       Q.    Under the "comment" section it --

Page 501

1   it talks about the reimbursement level for drugs
2   and it says:
3            "We received a great many comments
4   on this issue, primarily from oncologists,
5   indicating that our 85 percent standard was
6   inappropriate."
7            Was it your understanding that
8   originally HCFA proposed that the reimbursement
9   level be set at 85 percent of AWP?
10            MS. BROOKER: Objection.
11       A.    Yes.
12       Q.    And it published a proposed reg and
13  then solicited comments from interested persons.
14            Is that correct?
15       A.    The typical administrativesque
16  process, yes.
17       Q.    Okay. And the next sentence says:
18            "The thrust of most of the comments
19  was that many drugs could be purchased for
20  considerably less than 85 percent of AWP,
21  particularly multisourced drugs, while others were
22  not discounted."

55 (Pages 498 to 501)

320d321f-596a-4e1f-8444-2c4e6f42d4ae

Gustafson, Thomas A.                         September 28, 2007
                    Washington, DC

                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE      )  CIVIL ACTION

PRICE LITIGATION                )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO        )

U.S. ex rel. Ven-a-Care of      )  Judge Patti B. Saris

the Florida Keys, Inc.          )

     v.                         )  Chief Magistrate

Abbott Laboratories, Inc.,      )  Judge Marianne B.

No. 06-CV-11337-PBS             )  Bowler

- - - - - - - - - - - - - - - -

        (captions continue on following pages)


     Videotaped deposition of THOMAS A. GUSTAFSON

                    Volume I




                    Washington, D.C.

                    Friday, September 28, 2007

                    9:00 a.m.

Henderson Legal Services
202-220-4158

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                        September 28, 2007
                    Washington, DC

Page 174

1     A.   I do not know.
2     Q.   Who would know?
3     A.   If I had world enough and time I would
4  ask Bob Neimann if he had ever done such a thing,
5  understanding that the payment environment of some
6  of these other programs was not comparable to that
7  of the Medicaid -- excuse me -- Medicaid or
8  Medicare programs.
9          In particular those are vendor payment
10 programs, which means that the program pays --
11 sometimes the term is reimburses -- a provider for
12 services that they provide.  In a number of other
13 government programs the provider is in fact a part
14 of the program.  Veterans Administration is the
15 most evident.  Indian Health Service same
16 characteristic.  Defense Department same
17 characteristic.
18         So their processes for paying for and
19 delivering drugs is likely to be very different.
20 So whether that would be a fruitful endeavor, a
21 fruitful area for staff to spend time on, would be
22 an open question.  I mean, a question one could

Page 175

1  raise ex ante before you even ask the question.
2     Q.   You drew a distinction in your response
3  between Medicare and Medicaid paying for or
4  reimbursing for drugs?
5          MR. WINGET-HERNANDEZ:  Objection, form.
6     Q.   In your last answer, Mr. Gustafson -- am
7  I pronouncing it right, Gustafson?
8     A.   Gustafson is fine.
9     Q.   In your last answer did you draw a
10 distinction between a vendor drug program --
11    A.   Vendor payment program was the term.
12    Q.   A vendor payment program.
13    A.   Was the term I used.
14    Q.   Let me start over.  I mucked it all up.
15         In your last answer, Mr. Gustafson, did
16 you draw a distinction between a vendor payment
17 program paying for or reimbursing for a drug?
18    A.   Mm-hmm.
19    Q.   Yes?
20    A.   I drew that distinction, correct.
21    Q.   What is the significance of that
22 distinction?

Page 176

1     A.   The principal payment policy, the
2  Medicare program in general pays providers for
3  services in almost all instances now at prices that
4  are established in advance by the agency.  This is
5  thought of as different from a world of
6  reimbursement, although that term is commonly used
7  to cover what I've just described.  But those of us
8  who are immersed in the technical details of
9  payment policy understand reimbursement to be a
10 notion which would be more applicable in the old
11 world of cost-based payments so that you are
12 filling someone's purse after they have emptied it.
13         The notion there is that the provider
14 decides how much they should be paid as opposed to
15 the program.  So this distinction has mattered to
16 the agency at different times.  And in fact
17 portions of the agency have been renamed in order
18 to remove the remove the word reimbursement.
19    Q.   The current system in place for paying
20 for part B drugs under Medicare part B is that a
21 payment system or a reimbursement system?
22    A.   That's payment system.

Page 177

1     Q.   Between 1991 and 2001, beginning with
2  the promulgation of regulations in November 1991
3  through 2001 under Medicare part B for physician
4  administered drugs, was that a payment system or a
5  reimbursement system?
6     A.   As I understand it, you'd have to
7  characterize it as payment system if you want to
8  draw that distinction.  In other words, the agency
9  set, established, endorsed, acquiesced and used a
10 set of payment rates that were known in advance,
11 that were not differentiated by a particular
12 provider, but which established a payment rate that
13 carriers and FIs used in order to pay.
14         Does that answer your question?
15    Q.   Yes, it does.
16         Do you know what factors CMS took into
17 account in determining what rate it should pay for
18 part B covered drugs?
19         MR. MAO:  Tom, you should respond to the
20 question again with the caveat to the extent that
21 if your response requires you to reveal
22 deliberations --

45  (Pages 174 to 177)

Henderson Legal Services
202-220-4158

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                                    September 28, 2007
                    Washington, DC

Page 186

1   exactly how we did it, we deflected the attention
2   of the carriers from that program memorandum.
3       Q.   This is another interrogatory response
4   that you verified.
5       A.   So it must be true then, right?
6       Q.   It must be.  If you could look to the
7   last paragraph of the response --
8       A.   Which page are we on?
9       Q.   On page 54.
10      A.   Persons who had a role?  Is that when
11  you're looking at?
12      Q.   Correct.  The previous paragraph states
13  that the government will produce copies of two
14  program memoranda dated September and November of
15  2000.  And then the next paragraph gives a list of
16  individuals' names.  Do I have that correct?
17      A.   Yes.
18          MR. MAO: Object to the form.
19      Q.   Is that the interrogatory response that
20  you were verifying the accuracy of?
21      A.   That is correct.
22      Q.   And was it accurate, by the way?

Page 187

1       A.   As far as I know, yes.
2       Q.   If you could turn back --
3       A.   To the best of my knowledge and belief.
4       Q.   If you could turn back to interrogatory
5   number 15 on pages 52 and 53 and just look through
6   the various subdivisions of information that was
7   requested in interrogatory number 15.  Mr.
8   Gustafson, could you have responded to all of the
9   provisions of interrogatory number 15 if you had
10  been asked to do so?
11          MR. MAO: Objection, form.
12      A.   Are you asking me if I had substantive
13  knowledge that would have enabled a fuller
14  discussion than is in this document?
15      Q.   In part, yes.
16      A.   And is there some other part?
17      Q.   Well, to start, do you understand what
18  interrogatory number 15 is requesting?
19      A.   Let me read it.  (Reading).
20          I have read it.  Will you reengage the
21  question here?
22      Q.   Do you understand interrogatory number

Page 188

1   15?
2       A.   I'm sorry.
3       Q.   Do you understand what interrogatory
4   number 15 is asking?
5       A.   Yes.
6       Q.   I'm not asking you to do so, but given
7   time could you give a complete response to
8   interrogatory number 15?
9          MR. WINGET-HERNANDEZ: Objection, form.
10         MR. COOK: You're right.  I ought to
11  drop the adjective.
12         BY MR. COOK:
13      Q.   Could you provide a fuller response to
14  interrogatory number 15 than is provided here in
15  the written response?
16         MR. MAO: Objection, form.
17      A.   That calls upon me to make an
18  interpretation of what fuller might mean.  The
19  response to the -- the response that I verified
20  here makes reference to these two documents, AB
21  0086 and AB 0085, which I have not reviewed lately.
22  So I'm not sure if I can go beyond what is said in

Page 189

1   those documents.  B is covered by this last
2   paragraph I believe quite effectively.
3          So I'm not sure if I can give you a
4   better answer than that.
5       Q.   Sitting here today, correct?
6       A.   Correct.
7       Q.   In December of 2006 could you have
8   personally or through the offices of people with
9   whom you worked explained why HCFA issued program
10  memorandum AB-00-86 to Medicare carriers?
11         MR. MAO: Objection, form.  And also,
12  again, you can go ahead and answer except to the
13  extent that your response would require you to
14  discuss internal deliberations that ultimately
15  resulted in the guidance or directive that was
16  published by the agency.
17      A.   If you are asking me could I have
18  written more words on the page, then yes.
19      Q.   The second question of course would be
20  would those words have been accurate?
21         MR. WINGET-HERNANDEZ: Object to the
22  form.

48 (Pages 186 to 189)

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Thomas A.                         September 28, 2007
                    Washington, DC

Page 190

1    A.   Well, of course.  I would have verified
2  them.  Therefore they would have been accurate.
3  No.  I'm sorry.  I don't mean to be flip.
4       Bumping in again to the question of I'm
5  not recalling exactly what was in those two
6  documents I referred to a moment ago, I'm not sure
7  if it would have expanded one's understanding too
8  much beyond what was there.  And I believe, having
9  discussed this previously with counsel, that I
10  can't go beyond what I've said already without
11  bumping into questions of deliberative privilege.
12    Q.   And without going into what the response
13  would have been, are there any aspects of
14  interrogatory number 15 that you either do not
15  understand or that you believe the agency would be
16  incapable of providing a full response to?
17       MR. MAO:  Objection, form.
18    A.   Repeat the question, please.
19    Q.   Sure.  I'll break it down into two.  I
20  think you've already testified that you understand
21  what the interrogatory is requesting, right?
22    A.   I've got it.

Page 191

1    Q.   Would the agency, CMS, in your
2  experience be capable of answering the questions
3  posed in interrogatory number 15?
4       MR. MAO:  Objection, form.
5    A.   You're going to have to be more precise,
6  I think, because I keep bumping into we answered
7  this.  Here is AB 0086 and AB 00115.  So are you
8  alleging to me that those documents do not answer
9  these questions?
10    Q.   It certainly is not your contention, is
11  it, that providing the documents provides an answer
12  to the first question, which is to explain why the
13  agency --
14    A.   Well, I don't know what it says in that
15  document.  Frequently we do say why we are doing
16  things.  Is that everything that might be said on
17  that subject?  Perhaps not.  But bingo,
18  deliberative privilege.
19    Q.   Leaving aside questions of deliberative
20  process privilege and whether it applies, whether
21  it's been waived, all issues beyond the scope of
22  this conversation, could the agency have explained

Page 192

1  why HCFA issued AB-00-860 Medicare carriers?
2       MR. MAO:  Objection, form.
3    A.   The agency explains things in policy
4  documents of which this is one.  So insofar as the
5  agency has something to say it says it in cleared
6  documents in relevant form and so forth and so on.
7  So I don't think it's answerable to know what the
8  agency could have said in some other document that
9  it didn't say here.
10       If on the other hand the question is
11  were there folks within the agency who were
12  involved in these decisions who might be able to
13  provide additional detail about what was motivating
14  the agency to proceed as it did, insofar as that is
15  not sufficiently clear in the published documents
16  already, conceivably that could be true.
17    Q.   And you of course verified the response
18  to this particular interrogatory, correct?
19       MR. WINGET-HERNANDEZ:  Objection, form.
20    A.   I signed it, yes.
21       MR. WINGET-HERNANDEZ:  You need to give
22  us a chance to interpose our objection so we don't

Page 193

1  have this problem.  If you'll just wait for a
2  second so we can speak and then answer.
3       THE WITNESS:  I'm sorry.
4    Q.   Do you have any reason to believe that
5  the agency could not have provided additional
6  information in response to interrogatory number 15,
7  leaving aside questions of privilege?
8       MR. MAO:  Objection, form.
9    A.   Do I have any reason to believe --
10  please repeat the question.
11    Q.   Sure.  I'll reread it.  Do you have any
12  reason to believe that the agency could not have
13  provided additional information in response to
14  interrogatory number 15, leaving aside questions of
15  privilege?
16    A.   I have no reason to believe they could
17  not have insofar as the whatever is in this
18  document did not fully cover the matter.  And I
19  don't know the answer to that question.  And
20  obviously deliberative privilege -- deliberative
21  process privilege -- excuse me -- enters this
22  profoundly.

49 (Pages 190 to 193)

8d657762-8fb9-483b-bb85-12b9bc9eea17

Gustafson, Dr. Thomas A.                    December 17, 2007

Page 200

                    FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :  CIVIL ACTION

PRICE LITIGATION              :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-a-Care of    :  Judge Patti B. Saris

the Florida Keys, Inc.        :

       v.                     :

Abbott Laboratories, Inc.,    :  Chief Magistrate

No. 06-CV-11337-PBS           :  Judge Marianne B.

- - - - - - - - - - - - - - -x   Bowler

     (CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

   Videotaped deposition of DR. THOMAS A. GUSTAFSON

                      Volume II

                            Washington, D.C.

                            Monday, December 17, 2007

                            9:19 a.m.

Gustafson, Dr. Thomas A.                         December 17, 2007

---

Page 257

1  billion claims a year, and the administrative
2  resources available are slender, and not typically
3  increased when Congress puts on new mandates for
4  different changes in law.
5          So in this instance, we more or less
6  stayed still, as I recall, and continued to use the
7  Red Book-based average wholesale price as a
8  reasonable way of proceeding in reflecting the
9  statute.
10         BY MR. COOK:
11     Q.   Now, as I understand this particular
12  statute, the Balanced Budget Act of 1997, was
13  addressed to the agency, correct?
14     A.   The mandate typically runs to the
15  Secretary, but allowing that precision, yes.
16     Q.   So the mandate runs to the Secretary who
17  then delegates it to the agency, in this case it was
18  HCFA, right?
19     A.   That's correct.
20     Q.   You said that the agency first must
21  interpret the statute to determine what the mandate
22  is, right? I'm sorry. You have to verbalize. Is

---

Page 258

1  that correct?
2     A.   I believe so. Yes.
3     Q.   How did the agency interpret the statute
4  in this particular instance?
5     A.   I think it's well-known. We used average
6  wholesale price in the Red Book as a reflection of
7  average wholesale price as called for by the statute.
8     Q.   Who made the decision to interpret the
9  statute in that manner?
10         MR. MAO: You can answer except to the
11  extent that it reveals deliberative process and
12  deliberative discussions that they had internally.
13         MR. AZORSKY: Objection to form.
14         THE WITNESS: I don't think I can say
15  anything on that subject without invading
16  deliberative process questions.
17         BY MR. COOK:
18     Q.   Well, let me break it down just a little
19  bit. Congress gives a mandate to pay 95 percent of
20  the average wholesale price, correct?
21     A.   Uh-huh.
22     Q.   Someone within the agency has to make a

---

Page 259

1  determination that in order to put that mandate
2  forward, the agency is going to engage in this
3  particular course of conduct, correct?
4     A.   Uh-huh.
5     Q.   And in this instance, the agency had
6  available to it at least two courses of conduct.
7  One, as I see it, and you can correct me if I'm
8  wrong, was to continue doing what it was doing, which
9  was to look it up in the compendium, correct?
10     A.   Uh-huh.
11     Q.   I'm sorry. You have to verbalize.
12     A.   Excuse me. When you say verbalize, you
13  want me to talk.
14         MR. AZORSKY: Objection. Form.
15         BY MR. COOK:
16     Q.   Were there other courses of action
17  available to the agency to implement that mandate?
18     A.   Yes, conceivably. I mean, there certainly
19  were other compendia available other on the Red Book.
20  And if I understood the landscape at the time
21  correctly, the Medicare carriers had traditionally
22  and typically, if not by our instruction, used the

---

Page 260

1  Red Book, where as I understand the Medicaid program
2  more typically used the Blue Book.
3          Having said that, I couldn't tell you what
4  the differences of those two, and I don't think I
5  ever saw either of them. It's not like there was a
6  Blue Book on my credenza and a Red Book standing next
7  to it. So there were alternative sources of
8  information available in a published form similar to
9  the, to the Red Book. It would be conceivable for us
10  to have mounted a survey operation of our own in
11  order to attempt to acquire this information in a
12  more direct fashion, have exactly what was going on
13  more under our own control.
14         As I can speak as a general matter, the
15  agency is called upon in all manner of forms to
16  implement statutory directives. They typically do
17  this in a regulatory context. Sometimes initial
18  implementation goes out through program instructions,
19  but eventually we rely on regulations -- excuse me,
20  the agency relies on regulations, to be precise about
21  my pronouns here, since I'm no longer affiliated with
22  the agency.

16 (Pages 257 to 260)

0f5405d9-4c43-466a-acf4-74791a0d4549

Tawes, David - Vol. I                    April 24, 2007
                    Philadelphia, PA

             UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

---------------------------------X


           IN THE CIRCUIT COURT OF

         MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

         Plaintiff,                :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

         Defendants.               :

---------------------------------X

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                        April 24, 2007
                    Philadelphia, PA

Page 86

1  an exit and entrance conference are?
2      MR. NEAL:  Objection as to form.
3      You can answer.
4      THE WITNESS:  When we begin a study, we
5  typically have a meeting with staff at CMS that are
6  interested in the topic, provide them a design of
7  the work that we're planning to do, sort of a
8  research design, and get their feedback on what
9  we're planning to do, see if they think that it's a
10 good topic and if there might be better ways for us
11 to approach the subject.
12     When we finish a report, before it goes
13 out in an official draft, we have an exit
14 conference with CMS, where we share with them a
15 working-draft version of the report and get their
16 feedback on it.
17 BY MR. TORBORG:
18     Q.  Are -- are records kept of these
19 meetings?
20     A.  Yes.
21     Q.  How are they kept?
22     A.  Someone on the team will typically type

Page 87

1  up the notes, the meeting notes.
2      Q.  Have you ever typed up the meeting
3  notes?
4      A.  Yes.
5      Q.  Okay.  And where are those kept?
6      A.  In a primary file in the -- in the
7  report file.
8      Q.  Can you think of any better place to
9  learn what happened at these meetings, entrance and
10 exit conference meetings, than those notes?
11     MR. NEAL:  Objection as to form.
12     THE WITNESS:  No.
13 BY MR. TORBORG:
14     Q.  How many people typically attended the
15 exit conference meetings?
16     A.  It really depends.  It might be as low
17 as, you know, six or seven people, up to 25 or 30.
18     Q.  Have any of the exit conferences that
19 you've been involved in included 25 or 30 people?
20     A.  Yes.
21     Q.  Do you recall with respect to what
22 reports?

Page 88

1      A.  I know the federal upper limit reports
2  usually get a decent-sized crowd.  I don't recall
3  any particular Medicare reports.  I mean,
4  typically, you know, they might draw 15 or 16
5  people.
6      Q.  Do you know why the federal upper limit
7  ones usually draw a larger crowd?
8      A.  No.
9      Q.  Who else from OIG attends the exit
10 conferences?
11     A.  Typically one or both managers in the
12 office, so Rob Vito and Linda Ragone or Rob Vito
13 and myself, along with the staff that worked on the
14 project, the other analysts in the regional office
15 that worked on the project, as well as a program
16 specialist in Baltimore.
17     Q.  Do you recall the names of the program
18 specialists who were involved in exit conferences
19 relating to reimbursement of drugs?
20     A.  Linda Abbott, Sara Craren, Linda Frisch,
21 Lisa Foley, Bambi Straw.
22     Q.  In your discussions with CMS, have they

Page 89

1  ever expressed frustration to you about drug
2  reimbursement?
3      MR. NEAL:  I'm going to instruct the
4  witness not to answer that question and put an
5  objection on the record.
6      MR. TORBORG:  What's the basis of the
7  objection?
8      MR. NEAL:  He's mentioned that his
9  conversations with CMS personnel have taken place
10 at exit and entrance conferences. We believe those
11 conferences are integral to the deliberative
12 process privilege.  They are predecisional
13 discussions with agency personnel relating to
14 policy development, and as a result, we've asserted
15 a privilege over the subject of those
16 conversations.  Your last question, I believe,
17 would necessarily implicate those conversations.
18 BY MR. TORBORG:
19     Q.  Without telling me the specific words
20 that were said at these conferences, can you tell
21 me your understanding of whether or not they were
22 frustrated?

23 (Pages 86 to 89)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                           April 24, 2007
                        Philadelphia, PA

Page 90

1       MR. NEAL: I'm going to instruct the
2   witness not to answer, so... That would reveal the
3   substance of the communication, so my objection
4   stands.
5   BY MR. TORBORG:
6       Q.  Mr. Tawes, you understand that you're
7   here today in connection with a lawsuit that The
8   United States has brought against Abbott, correct?
9       A.  Yes.
10      Q.  Do you have an understanding of the
11  nature of that lawsuit?
12      A.  No.
13      Q.  When did you first become aware that
14  there was an under-seal case brought against Abbott
15  and other manufacturers of drugs?
16      A.  When the first person in our office got
17  deposed.
18      Q.  And do you know who that was?
19      A.  I believe it was Nancy Molyneaux.
20      Q.  Did you talk to Nancy Molyneaux about
21  her deposition?
22      A.  No.

Page 91

1       Q.  Have you talked to any of the -- of your
2   office mates about the testimony they've given in
3   this case?
4       A.  Aside from the general question, how'd
5   it go, and receiving nothing except a nod or
6   something like that, no.
7       Q.  What -- what do you mean by a nod?
8       A.  Meaning (indicating), it was fine or
9   okay. I mean, none -- there was -- none of the
10  contents of the depositions were discussed.
11      Q.  So in your discussions with your office
12  mates, the only thing you've talked about with
13  respect to deposition and the only correspondence
14  you've had has been a nod, right?
15      MR. NEAL: Objection as to form.
16      You can answer.
17      THE WITNESS: Similar to that. It was --
18  I wouldn't call it a discussion. It would be a
19  question such as, are you glad it's over, you know,
20  and hearing (indicating) yes, you know. That's --
21  that -- it's not really a discussion.
22  BY MR. TORBORG:

Page 92

1       Q.  Have you ever reviewed any internal
2   Abbott documents?
3       A.  Not that I know of.
4       Q.  And I think I asked you this before, but
5   do you have an understanding of -- a general
6   understanding at all about what it is that the
7   government alleges that Abbott did wrong in this
8   case?
9       MR. NEAL: I'm going to object to the
10  question and instruct the witness:
11      You can answer that to the extent that it
12  doesn't reveal communications that you've had with
13  your attorneys in this case.
14      THE WITNESS: I assume that it's similar
15  to the other legislation [sic] that the -- that has
16  been brought against other manufacturers. So I
17  don't know the specifics of the case, no.
18  BY MR. TORBORG:
19      Q.  And when you say "similar to other
20  legislation," do you mean lawsuits?
21      A.  Yeah, that's what I -- yeah. That's
22  what I meant. Sorry.

Page 93

1       Q.  That's all right.
2       A.  I misspoke.
3       Q.  That's all right. And your
4   understanding of those other litigations is what?
5       MR. NEAL: I'll object to the form.
6       You can answer.
7       THE WITNESS: It goes back to what I said
8   about Tapp and AstraZeneca.
9   BY MR. TORBORG:
10      Q.  Okay. Sorry. I'm just trying to find a
11  new writing utensil.
12      What did you do to prepare for today's
13  deposition?
14      A.  I reviewed the -- the deposition notice,
15  I provided -- I met with my attorneys; I provided
16  computer files, e-mails, and primary and secondary
17  files from our reports.
18      Q.  When did you meet with your attorneys?
19      A.  Two or three weeks ago. I don't
20  remember the exact date. And I also saw them
21  briefly yesterday.
22      Q.  Okay. And how long did you meet with

24 (Pages 90 to 93)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Page 178

1    And then using my highlighter, would you
2  highlight the ones that were -- that are
3  multiple-source, MS?
4    A.  (Complies.)
5    Q.  Now, as you review that schedule, does
6  anything pop out at you in the Percent Saved column
7  for the highlighted columns, multiple-source drugs?
8        MR. NEAL:  Objection as to form.
9        THE WITNESS:  That there is large
10 potential savings for almost all of the -- as far
11 as percent saved, for the multiple-source drugs.
12 BY MR. TORBORG:
13   Q.  And does that mean there was a larger
14 difference between acquisition cost, as shown in
15 the market and shown in the pricing catalogs, and
16 the AWPs?
17       MR. NEAL:  Objection as to form.
18       THE WITNESS:  Yes.
19 BY MR. TORBORG:
20   Q.  Okay.  Do you recall discussions at OIG
21 relating to the fact that there were such large
22 differences between the catalog prices for

Page 179

1  multiple-source drugs and the AWPs for those drugs?
2    A.  I don't recall talking about
3  multiple-source drugs specifically.
4    Q.  How about generics?
5    A.  Or -- or generics specifically.  I mean,
6  obviously we did some specific studies on a few of
7  these projects because of the large spreads we
8  found in here.
9    Q.  But fair to say that your -- as
10 reflected in this chart, which provides the detail
11 of your report, right, shows very large savings
12 potential for multiple-source drugs --
13       MR. NEAL:  Objection to --
14 BY MR. TORBORG:
15   Q.  -- right?
16       MR. NEAL:  -- the form.
17       THE WITNESS:  Again, large savings
18 potential as a -- as a percentage, not necessarily
19 as a total dollar figure.
20 BY MR. TORBORG:
21   Q.  Do you think it's appropriate to
22 evaluate the differences between prices as a

Page 180

1  percentage?
2        MR. NEAL:  Objection as to form.
3        THE WITNESS:  I think it's certainly one
4  way to evaluate it.
5  BY MR. TORBORG:
6    Q.  You -- do you recall any discussions at
7  any time at OIG with the fact that there was such
8  large spreads for generic multi-source drugs?
9    A.  Not generic as a whole.  Again, for a
10 couple particular products, we certainly discussed
11 it.
12   Q.  And which products were those?
13   A.  That would be Albuterol and Leucovorin
14 Calcium, I remember specifically.
15   Q.  What do you recall about Leucovorin
16 Calcium?
17   A.  That in later -- a couple later reports
18 that I worked on, it was a generic, I believe,
19 cancer drug that seemed to have AWPs that were
20 vastly out of line with actual acquisition costs.
21   Q.  Did you have any discussions with
22 individuals at CMS about the large percentage

Page 181

1  differences in the -- in the prices for generic
2  drugs between actual acquisition cost, as shown in
3  catalogs, versus published AWPs?
4        MR. NEAL:  I'm going to object to the
5  question.
6        I'll instruct you not to answer to the
7  extent that those -- your answer would reveal
8  communications that took place in the context of
9  entrance or exit conferences with CMS personnel.
10       THE WITNESS:  Not outside of entrance or
11 exit conferences.
12 BY MR. TORBORG:
13   Q.  Do you recall having the discussions at
14 all?
15       MR. NEAL:  I'm going to instruct the
16 witness not to answer that question.
17       MR. TORBORG:  Can I ask him whether,
18 without divulging specific communications, if he
19 recall the discussions happening at all?
20       MR. NEAL:  The problem is, the
21 discussions you're talking about involve a specific
22 substance area.

46 (Pages 178 to 181)

Tawes, David - Vol. I                    April 24, 2007
                    Philadelphia, PA

Page 182

1        MR. TORBORG:  That I think is important
2   to the case; that's why I'm asking about it.
3        MR. NEAL:  That may be, but, you know,
4   that -- that doesn't play into our privilege --
5   privilege assertion, so...
6        MR. TORBORG:  So what you're saying, in
7   essence, is regardless of how important it may be
8   to my defense, you're still going to assert the
9   privilege, no matter what?
10       MR. NEAL:  You can characterize it
11  however you want to.  I mean, the fact is, this is
12  an important governmental privilege, and we're
13  going to assert the privilege in this case.  We
14  have motions pending on -- you know, on this matter
15  as we speak, and the Court will presumably resolve
16  it for us.
17       MR. TORBORG:  Okay.  Hopefully this will
18  be of assistance.
19  BY MR. TORBORG:
20       Q.  If we go to Page 10 of your report,
21  Recommendations, what was the purpose for the
22  Recommendations section of the report?

Page 183

1        A.  To make recommendations to CMS about how
2   they could impact or -- or implement some of the
3   changes that would be called for by the findings of
4   our report.
5        Q.  Did you attend the exit conference for
6   this report?
7        A.  I don't believe so.
8        Q.  Do you recall any discussions with CMS
9   about this report?
10       A.  No.
11       Q.  If you look at page -- I'm sorry -- the
12  section under Discounted Wholesale Price, that
13  recommendation, the fifth sentence down, it starts
14  with, In addition.  Are you with me?
15       A.  Uh-huh.
16       Q.  It says:  In addition, the secretary
17  should be granted the authority to conduct sample
18  surveys of actual wholesale prices to determine the
19  amount of difference between actual average
20  wholesale prices and published AWPs.  The
21  percentage difference found in the sample could
22  then be applied to all AWPs used by the program to

Page 184

1   determine drug reimbursement.
2        Do you have an understanding of what that
3   recommendation is -- is all about?
4        A.  Yes.
5        Q.  Do you recall discussing -- discussing
6   that recommendation with anyone at CMS at any time?
7        MR. NEAL:  Objection.
8        You can answer that to the extent that
9   you don't reveal the substance of communications
10  that took place at exit or entrance conferences.
11       THE WITNESS:  No.
12  BY MR. TORBORG:
13       Q.  The second recommendation is Acquisition
14  Cost.  It states:  Medicare could base the payment
15  of drugs on either actual or estimated acquisition
16  costs.  Although Medicare currently has the
17  authority to use EAC, carriers have yet to
18  successfully implement the option.
19       Do you recall any discussions about the
20  inability to use the estimated acquisition cost
21  approach in reimbursing Medicare Part B drugs?
22       A.  No.

Page 185

1        Q.  By the time you came in, in 1997,
2   estimated acquisition cost was sort of a
3   methodology of the past; is that fair to say?
4        MR. NEAL:  I'll object to the form.
5        You can answer.
6        THE WITNESS:  In Medicare, yes.
7   BY MR. TORBORG:
8        Q.  How about for Medicaid?
9        A.  In Medicaid, as far as I know, estimated
10  acquisition cost is still on the books, and it's up
11  to states to determine the definition -- or not the
12  definition, but it's up to states to determine what
13  estimated acquisition cost is.
14       Q.  Okay.  And do you recall any discussions
15  at OIG about whether or not states were
16  implementing that requirement in accordance with
17  the law?
18       MR. NEAL:  Objection as to form.
19       THE WITNESS:  I don't think the law gave
20  them specific instruction about how to implement
21  the requirement.
22  BY MR. TORBORG:

47 (Pages 182 to 185)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                    April 24, 2007
                    Philadelphia, PA

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY     :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott        :  06-CV-11337-PBS

Laboratories, Inc.                  :

---------------------------------X


            IN THE CIRCUIT COURT OF

          MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                   :  CASE NO.

         Plaintiff,                 :  CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,          :  JUDGE

et al.,                             :  CHARLES PRICE

         Defendants.                :

---------------------------------X

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                          April 24, 2007
                    Philadelphia, PA

Page 86

1  an exit and entrance conference are?
2      MR. NEAL: Objection as to form.
3      You can answer.
4      THE WITNESS: When we begin a study, we
5  typically have a meeting with staff at CMS that are
6  interested in the topic, provide them a design of
7  the work that we're planning to do, sort of a
8  research design, and get their feedback on what
9  we're planning to do, see if they think that it's a
10 good topic and if there might be better ways for us
11 to approach the subject.
12     When we finish a report, before it goes
13 out in an official draft, we have an exit
14 conference with CMS, where we share with them a
15 working-draft version of the report and get their
16 feedback on it.
17 BY MR. TORBORG:
18     Q.  Are -- are records kept of these
19 meetings?
20     A.  Yes.
21     Q.  How are they kept?
22     A.  Someone on the team will typically type

Page 87

1  up the notes, the meeting notes.
2      Q.  Have you ever typed up the meeting
3  notes?
4      A.  Yes.
5      Q.  Okay.  And where are those kept?
6      A.  In a primary file in the -- in the
7  report file.
8      Q.  Can you think of any better place to
9  learn what happened at these meetings, entrance and
10 exit conference meetings, than those notes?
11     MR. NEAL: Objection as to form.
12     THE WITNESS: No.
13 BY MR. TORBORG:
14     Q.  How many people typically attended the
15 exit conference meetings?
16     A.  It really depends.  It might be as low
17 as, you know, six or seven people, up to 25 or 30.
18     Q.  Have any of the exit conferences that
19 you've been involved in included 25 or 30 people?
20     A.  Yes.
21     Q.  Do you recall with respect to what
22 reports?

Page 88

1      A.  I know the federal upper limit reports
2  usually get a decent-sized crowd.  I don't recall
3  any particular Medicare reports.  I mean,
4  typically, you know, they might draw 15 or 16
5  people.
6      Q.  Do you know why the federal upper limit
7  ones usually draw a larger crowd?
8      A.  No.
9      Q.  Who else from OIG attends the exit
10 conferences?
11     A.  Typically one or both managers in the
12 office, so Rob Vito and Linda Ragone or Rob Vito
13 and myself, along with the staff that worked on the
14 project, the other analysts in the regional office
15 that worked on the project, as well as a program
16 specialist in Baltimore.
17     Q.  Do you recall the names of the program
18 specialists who were involved in exit conferences
19 relating to reimbursement of drugs?
20     A.  Linda Abbott, Sara Craren, Linda Frisch,
21 Lisa Foley, Bambi Straw.
22     Q.  In your discussions with CMS, have they

Page 89

1  ever expressed frustration to you about drug
2  reimbursement?
3      MR. NEAL: I'm going to instruct the
4  witness not to answer that question and put an
5  objection on the record.
6      MR. TORBORG: What's the basis of the
7  objection?
8      MR. NEAL: He's mentioned that his
9  conversations with CMS personnel have taken place
10 at exit and entrance conferences. We believe those
11 conferences are integral to the deliberative
12 process privilege. They are predecisional
13 discussions with agency personnel relating to
14 policy development, and as a result, we've asserted
15 a privilege over the subject of those
16 conversations.  Your last question, I believe,
17 would necessarily implicate those conversations.
18 BY MR. TORBORG:
19     Q.  Without telling me the specific words
20 that were said at these conferences, can you tell
21 me your understanding of whether or not they were
22 frustrated?

23  (Pages 86 to 89)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                    April 24, 2007
                    Philadelphia, PA

Page 90

1       MR. NEAL: I'm going to instruct the
2  witness not to answer, so... That would reveal the
3  substance of the communication, so my objection
4  stands.
5  BY MR. TORBORG:
6       Q.  Mr. Tawes, you understand that you're
7  here today in connection with a lawsuit that The
8  United States has brought against Abbott, correct?
9       A.  Yes.
10      Q.  Do you have an understanding of the
11  nature of that lawsuit?
12      A.  No.
13      Q.  When did you first become aware that
14  there was an under-seal case brought against Abbott
15  and other manufacturers of drugs?
16      A.  When the first person in our office got
17  deposed.
18      Q.  And do you know who that was?
19      A.  I believe it was Nancy Molyneaux.
20      Q.  Did you talk to Nancy Molyneaux about
21  her deposition?
22      A.  No.

Page 91

1       Q.  Have you talked to any of the -- of your
2  office mates about the testimony they've given in
3  this case?
4       A.  Aside from the general question, how'd
5  it go, and receiving nothing except a nod or
6  something like that, no.
7       Q.  What -- what do you mean by a nod?
8       A.  Meaning (indicating), it was fine or
9  okay. I mean, none -- there was -- none of the
10  contents of the depositions were discussed.
11      Q.  So in your discussions with your office
12  mates, the only thing you've talked about with
13  respect to deposition and the only correspondence
14  you've had has been a nod, right?
15      MR. NEAL: Objection as to form.
16      You can answer.
17      THE WITNESS: Similar to that. It was --
18  I wouldn't call it a discussion. It would be a
19  question such as, are you glad it's over, you know,
20  and hearing (indicating) yes, you know. That's --
21  that -- it's not really a discussion.
22  BY MR. TORBORG:

Page 92

1       Q.  Have you ever reviewed any internal
2  Abbott documents?
3       A.  Not that I know of.
4       Q.  And I think I asked you this before, but
5  do you have an understanding of -- a general
6  understanding at all about what it is that the
7  government alleges that Abbott did wrong in this
8  case?
9       MR. NEAL: I'm going to object to the
10  question and instruct the witness:
11      You can answer that to the extent that it
12  doesn't reveal communications that you've had with
13  your attorneys in this case.
14      THE WITNESS: I assume that it's similar
15  to the other legislation [sic] that the -- that has
16  been brought against other manufacturers. So I
17  don't know the specifics of the case, no.
18  BY MR. TORBORG:
19      Q.  And when you say "similar to other
20  legislation," do you mean lawsuits?
21      A.  Yeah, that's what I -- yeah. That's
22  what I meant. Sorry.

Page 93

1       Q.  That's all right.
2       A.  I misspoke.
3       Q.  That's all right. And your
4  understanding of those other litigations is what?
5       MR. NEAL: I'll object to the form.
6       You can answer.
7       THE WITNESS: It goes back to what I said
8  about Tapp and AstraZeneca.
9  BY MR. TORBORG:
10      Q.  Okay. Sorry. I'm just trying to find a
11  new writing utensil.
12      What did you do to prepare for today's
13  deposition?
14      A.  I reviewed the -- the deposition notice,
15  I provided -- I met with my attorneys; I provided
16  computer files, e-mails, and primary and secondary
17  files from our reports.
18      Q.  When did you meet with your attorneys?
19      A.  Two or three weeks ago. I don't
20  remember the exact date. And I also saw them
21  briefly yesterday.
22      Q.  Okay. And how long did you meet with

24 (Pages 90 to 93)

Henderson Legal Services
202-220-4158

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                                    April 24, 2007
                          Philadelphia, PA

Page 178

1     And then using my highlighter, would you
2  highlight the ones that were -- that are
3  multiple-source, MS?
4     A.  (Complies.)
5     Q.  Now, as you review that schedule, does
6  anything pop out at you in the Percent Saved column
7  for the highlighted columns, multiple-source drugs?
8         MR. NEAL:  Objection as to form.
9         THE WITNESS:  That there is large
10 potential savings for almost all of the -- as far
11 as percent saved, for the multiple-source drugs.
12 BY MR. TORBORG:
13    Q.  And does that mean there was a larger
14 difference between acquisition cost, as shown in
15 the market and shown in the pricing catalogs, and
16 the AWPs?
17        MR. NEAL:  Objection as to form.
18        THE WITNESS:  Yes.
19 BY MR. TORBORG:
20    Q.  Okay.  Do you recall discussions at OIG
21 relating to the fact that there were such large
22 differences between the catalog prices for

Page 179

1  multiple-source drugs and the AWPs for those drugs?
2     A.  I don't recall talking about
3  multiple-source drugs specifically.
4     Q.  How about generics?
5     A.  Or -- or generics specifically.  I mean,
6  obviously we did some specific studies on a few of
7  these projects because of the large spreads we
8  found in here.
9     Q.  But fair to say that your -- as
10 reflected in this chart, which provides the detail
11 of your report, right, shows very large savings
12 potential for multiple-source drugs --
13        MR. NEAL:  Objection to --
14 BY MR. TORBORG:
15    Q.  -- right?
16        MR. NEAL:  -- the form.
17        THE WITNESS:  Again, large savings
18 potential as a -- as a percentage, not necessarily
19 as a total dollar figure.
20 BY MR. TORBORG:
21    Q.  Do you think it's appropriate to
22 evaluate the differences between prices as a

Page 180

1  percentage?
2         MR. NEAL:  Objection as to form.
3         THE WITNESS:  I think it's certainly one
4  way to evaluate it.
5  BY MR. TORBORG:
6     Q.  You -- do you recall any discussions at
7  any time at OIG with the fact that there was such
8  large spreads for generic multi-source drugs?
9     A.  Not generic as a whole.  Again, for a
10 couple particular products, we certainly discussed
11 it.
12    Q.  And which products were those?
13    A.  That would be Albuterol and Leucovorin
14 Calcium, I remember specifically.
15    Q.  What do you recall about Leucovorin
16 Calcium?
17    A.  That in later -- a couple later reports
18 that I worked on, it was a generic, I believe,
19 cancer drug that seemed to have AWPs that were
20 vastly out of line with actual acquisition costs.
21    Q.  Did you have any discussions with
22 individuals at CMS about the large percentage

Page 181

1  differences in the -- in the prices for generic
2  drugs between actual acquisition cost, as shown in
3  catalogs, versus published AWPs?
4         MR. NEAL:  I'm going to object to the
5  question.
6         I'll instruct you not to answer to the
7  extent that those -- your answer would reveal
8  communications that took place in the context of
9  entrance or exit conferences with CMS personnel.
10        THE WITNESS:  Not outside of entrance or
11 exit conferences.
12 BY MR. TORBORG:
13    Q.  Do you recall having the discussions at
14 all?
15        MR. NEAL:  I'm going to instruct the
16 witness not to answer that question.
17        MR. TORBORG:  Can I ask him whether,
18 without divulging specific communications, if he
19 recall the discussions happening at all?
20        MR. NEAL:  The problem is, the
21 discussions you're talking about involve a specific
22 substance area.

Henderson Legal Services
202-220-4158

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                              April 24, 2007
                        Philadelphia, PA

Page 182

1     MR. TORBORG: That I think is important
2  to the case; that's why I'm asking about it.
3     MR. NEAL: That may be, but, you know,
4  that -- that doesn't play into our privilege --
5  privilege assertion, so...
6     MR. TORBORG: So what you're saying, in
7  essence, is regardless of how important it may be
8  to my defense, you're still going to assert the
9  privilege, no matter what?
10     MR. NEAL: You can characterize it
11  however you want to. I mean, the fact is, this is
12  an important governmental privilege, and we're
13  going to assert the privilege in this case. We
14  have motions pending on -- you know, on this matter
15  as we speak, and the Court will presumably resolve
16  it for us.
17     MR. TORBORG: Okay. Hopefully this will
18  be of assistance.
19  BY MR. TORBORG:
20     Q. If we go to Page 10 of your report,
21  Recommendations, what was the purpose for the
22  Recommendations section of the report?

Page 183

1     A. To make recommendations to CMS about how
2  they could impact or -- or implement some of the
3  changes that would be called for by the findings of
4  our report.
5     Q. Did you attend the exit conference for
6  this report?
7     A. I don't believe so.
8     Q. Do you recall any discussions with CMS
9  about this report?
10     A. No.
11     Q. If you look at page -- I'm sorry -- the
12  section under Discounted Wholesale Price, that
13  recommendation, the fifth sentence down, it starts
14  with, In addition. Are you with me?
15     A. Uh-huh.
16     Q. It says: In addition, the secretary
17  should be granted the authority to conduct sample
18  surveys of actual wholesale prices to determine the
19  amount of difference between actual average
20  wholesale prices and published AWPs. The
21  percentage difference found in the sample could
22  then be applied to all AWPs used by the program to

Page 184

1  determine drug reimbursement.
2     Do you have an understanding of what that
3  recommendation is -- is all about?
4     A. Yes.
5     Q. Do you recall discussing -- discussing
6  that recommendation with anyone at CMS at any time?
7     MR. NEAL: Objection.
8     You can answer that to the extent that
9  you don't reveal the substance of communications
10  that took place at exit or entrance conferences.
11     THE WITNESS: No.
12  BY MR. TORBORG:
13     Q. The second recommendation is Acquisition
14  Cost. It states: Medicare could base the payment
15  of drugs on either actual or estimated acquisition
16  costs. Although Medicare currently has the
17  authority to use EAC, carriers have yet to
18  successfully implement the option.
19     Do you recall any discussions about the
20  inability to use the estimated acquisition cost
21  approach in reimbursing Medicare Part B drugs?
22     A. No.

Page 185

1     Q. By the time you came in, in 1997,
2  estimated acquisition cost was sort of a
3  methodology of the past; is that fair to say?
4     MR. NEAL: I'll object to the form.
5     You can answer.
6     THE WITNESS: In Medicare, yes.
7  BY MR. TORBORG:
8     Q. How about for Medicaid?
9     A. In Medicaid, as far as I know, estimated
10  acquisition cost is still on the books, and it's up
11  to states to determine the definition -- or not the
12  definition, but it's up to states to determine what
13  estimated acquisition cost is.
14     Q. Okay. And do you recall any discussions
15  at OIG about whether or not states were
16  implementing that requirement in accordance with
17  the law?
18     MR. NEAL: Objection as to form.
19     THE WITNESS: I don't think the law gave
20  them specific instruction about how to implement
21  the requirement.
22  BY MR. TORBORG:

47 (Pages 182 to 185)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                          April 24, 2007
                      Philadelphia, PA

Page 1

                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

Laboratories, Inc.                :

--------------------------------X


              IN THE CIRCUIT COURT OF

             MONTGOMERY COUNTY, ALABAMA

--------------------------------X

STATE OF ALABAMA,                 :  CASE NO.

          Plaintiff,              :  CV-05-219

     v.                           :

ABBOTT LABORATORIES, INC.,        :  JUDGE

et al.,                           :  CHARLES PRICE

          Defendants.             :

--------------------------------X

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                                    April 24, 2007
                            Philadelphia, PA

Page 262

1   what's referred to in this report as high-priced
2   generic drugs?
3       A.  No.
4       Q.  What is your understanding of what
5   HCFA's responsibility is with respect to
6   determining how much the Medicaid program
7   reimburses for drugs?
8           MR. NEAL:  Object to the form.
9           You can answer the question.
10          THE WITNESS:  It's my understanding that
11  they set broad guidelines that states are supposed
12  to abide by, and as long as states are within those
13  broad guidelines, short of any other law or
14  regulation saying otherwise, that -- you know, that
15  the -- they just wanted to ensure that states
16  generally meet the -- meet the guidelines.
17  BY MR. TORBORG:
18      Q.  What broad guidelines are in existence
19  with respect to Medicaid reimbursement of drugs?
20          MR. NEAL:  Objection as to form.
21          THE WITNESS:  That states should pay
22  either the lower of the estimated acquisition cost

Page 263

1   or the usual and customary charge for the drug.
2   BY MR. TORBORG:
3       Q.  Do you have an understanding of what
4   CMS's statutory or regulatory obligation is to
5   assure that states are reimbursing drugs at a true
6   estimated acquisition cost?
7           MR. NEAL:  Objection as to form.
8           You can answer.
9           THE WITNESS:  I -- I don't know what
10  CMS's specific authority is to ensure that.
11  BY MR. TORBORG:
12      Q.  Do you recall any discussions about
13  whether or not CMS was performing its obligation in
14  overseeing the Medicaid program for reimbursement
15  of drugs?
16      A.  In specific Federal Upper Limit studies,
17  I'm sure we looked at the way CMS was sort of
18  ensuring that drugs were added to the Federal Upper
19  Limit List for Medicaid in a timely manner and also
20  ensuring that those prices were appropriate.  But
21  as far as, you know, all drugs as a whole, no.
22  BY MR. TORBORG:

Page 264

1       Q.  And skipping ahead a little bit to
2   tomorrow, what you found with respect to -- to
3   Federal Upper Limits is that CMS was not timely
4   adding drugs to the Federal Upper Limit List,
5   correct?
6       A.  Correct.
7       Q.  And it was your understanding that it
8   was CMS or HCFA's statutory obligation to add
9   qualified drugs -- or drugs that were supposed to
10  be on the Federal Upper Limit List to the Federal
11  Upper Limit List, correct?
12          MR. NEAL:  Objection as to form.
13          THE WITNESS:  Yes, even though the law
14  never said anything about when it had to be done.
15  BY MR. TORBORG:
16      Q.  Did you have discussions with anyone at
17  CMS about why it was that CMS was not adding drugs
18  to the Federal Upper Limit List that should have
19  been added to the FUL List?
20          MR. NEAL:  Objection.
21          You can answer that question so long as
22  you don't disclose the contents of any

Page 265

1   conversations that took place during exit or
2   entrance conferences.
3           THE WITNESS:  The conversations were all
4   in entrance and exit conferences.
5   BY MR. TORBORG:
6       Q.  Well, let me see if I can ask this.  Did
7   CMS officials at the entrance and exit conferences
8   explain to you why it was that drugs were not being
9   added timely to the Federal Upper Limit List?
10          MR. NEAL:  I'm going to instruct you not
11  to answer the question.
12          It gets into the substance of their --
13          MR. TORBORG:  Just a yes --
14          MR. NEAL:  -- topics --
15          MR. TORBORG:  -- or no question.
16          MR. NEAL:  Answering that question yes or
17  no would reveal the contents of the communications,
18  so...
19          MR. TORBORG:  It wouldn't reveal -- it's
20  just a -- the broad general topic, whether it was
21  discussed.
22          MR. NEAL:  It's on the borderline, but

67 (Pages 262 to 265)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                                    April 24, 2007
                              Philadelphia, PA

Page 266

1    I'm going instruct him not to answer at this time.
2    BY MR. TORBORG:
3        Q.  Other than a lack of resources, did HCFA
4    provide any other explanations as to why drugs were
5    not being added to the Federal Upper Limit List?
6        MR. NEAL:  Objection.
7        You can answer that to the extent that
8    you don't reveal the substance of any
9    communications that took place during entrance or
10   exit conferences with CMS.
11       THE WITNESS:  Outside of those
12   conferences, anything -- any explanations that they
13   came up with would have been in their comments to
14   the reports.
15   BY MR. TORBORG:
16       Q.  Let me see if I can ask that again.
17   Other than a lack of resources at CMS, did HCFA
18   provide any other explanations as to why drugs were
19   not being added to the Federal Upper Limit List?
20       MR. NEAL:  I'll object to the question.
21       And then you can answer that to the
22   extent that you don't reveal the substance of

Page 267

1    communications that took place at entrance or exit
2    conferences with CMS.
3        THE WITNESS:  Again, without going back
4    to their official comments to the report, I mean,
5    that's the extent outside of entrance and exit
6    conferences.
7    BY MR. TORBORG:
8        Q.  At the entrance and exit conferences,
9    did CMS provide any explanations, besides
10   resource-based reasons, why drugs were not being
11   added to the FUL List?
12       MR. NEAL:  I'm going to instruct you not
13   to answer the question.
14       MR. TORBORG:  Just a yes or no, he can't
15   answer that?
16       MR. NEAL:  I'm going to instruct not to
17   answer, yeah, it's -- my objection stands.
18       MR. TORBORG:  So there may be reasons why
19   CMS did not add specific drugs to the FUL List that
20   I'm not going to get to figure out?
21       MR. NEAL:  I mean, your question
22   presupposes certain substantive communications from

Page 268

1    CMS and --
2        MR. TORBORG:  That's why --
3        MR. NEAL:  -- he's not --
4        MR. TORBORG:  -- I'm asking --
5        MR. NEAL:  -- going to disclose --
6        MR. TORBORG:  -- yes or no.
7        MR. NEAL:  He's not going to disclose
8    those communications.
9        MR. TORBORG:  Well --
10       MR. NEAL:  The objection stands. I'm not
11   --
12       MR. TORBORG:  -- I'm not --
13       MR. NEAL:  -- going to debate --
14       MR. TORBORG:  -- trying to pre --
15       MR. NEAL:  -- with you right now, but, I
16   mean, I -- the objection stands. You're asking
17   about the substance of communications that took
18   place and entrance and exit conferences, and, you
19   know, we've asserted a -- a fairly broad objection
20   over the substance of those communications.  I
21   don't think he can answer that even yes or no
22   without disclosing the substance of the

Page 269

1    communication.
2        MR. TORBORG:  I guess that answers the
3    question in itself, but --
4        MR. NEAL:  I don't know --
5        MR. WINGET-HERNANDEZ:  Objection to form.
6        MR. NEAL:  -- what you're talking about,
7    but...
8        MR. HAVILAND:  John, you're under oath
9    now.
10       MR. TORBORG:  Yeah.
11   BY MR. TORBORG:
12       Q.  The last paragraph of HCFA's response to
13   this report states:  Furthermore, HCFA is
14   undertaking a more comprehensive review of drug
15   prices and how they affect the Medicaid program and
16   will issue future guidance to the states on this as
17   appropriate.
18       Do you recall HCFA taking a more comprehensive
19   review of drug prices?
20       A.  No.
21       Q.  Do you have any idea what they're
22   referring to there?

                            68  (Pages 266 to 269)

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. II                        April 25, 2007
                    Philadelphia, PA

Page 296

                UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF MASSACHUSETTS

                      VOLUME II

---------------------------------X MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY    : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:         :

U.S. ex rel. Ven-A-Care of the    : CIVIL ACTION:

Florida Keys, Inc. v. Abbott      : 06-CV-11337-PBS

Laboratories, Inc.                :

---------------------------------X

              IN THE CIRCUIT COURT OF

             MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                 : CASE NO.

          Plaintiff,              : CV-05-219

     v.                           :

ABBOTT LABORATORIES, INC.,        : JUDGE

et al.,                           : CHARLES PRICE

          Defendants.             :

---------------------------------X

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                          April 25, 2007
                    Philadelphia, PA

---

Page 365

1  inadequate Medicare payments for services related
2  to furnishing the drug, such as the administration
3  of chemotherapy for cancer.  We need to pay
4  appropriately for the drugs and the services
5  related to furnishing these drugs.
6     Do you recall any discussions about that with
7  CMS?
8        MR. NEAL:  You can answer that question
9  to the extent that your answer doesn't implicate
10 any privileged communication.
11       MR. WINGET-HERNANDEZ:  Objection to form.
12       THE WITNESS:  I don't recall any specific
13 discussions outside of entrance or exit
14 conferences.
15 BY MR. TORBORG:
16    Q.  Did you ever use the term "drug profits"
17 during your time at OIG?
18       MR. NEAL:  Object to the form.
19       You can answer.
20       THE WITNESS:  I -- I don't recall using
21 that specific term.
22 BY MR. TORBORG:

---

Page 366

1     Q.  Did you ever use -- do you ever recall
2  using the term "cross-subsidize"?
3     A.  I don't think I would have used that
4  specific term either.
5     Q.  Do you recall anyone else using that
6  term?
7     A.  Aside from -- that specific term, aside
8  from these comments, no.
9     Q.  Do you recall any discussions within OIG
10 or CMS about the concept of the payment for the
11 drug making up for underpayment for physician
12 services?
13       MR. NEAL:  You can answer that consistent
14 with my previous instruction on privileged
15 communication.
16       MR. WINGET-HERNANDEZ:  Objection to form.
17       THE WITNESS:  I recall those discussions.
18 However, again, I'm not sure that it was -- it was
19 more along the lines of this is what physicians
20 say.  There was no real discussion of the validity
21 of -- of the physicians' claims.
22 BY MR. TORBORG:

---

Page 367

1     Q.  Because OIG had never studied that
2  particular issue, right?
3        MR. NEAL:  Objection as to form.
4        THE WITNESS:  As far as I know, at least
5  OEI had not studied that issue.
6  BY MR. TORBORG:
7     Q.  Do you recall CMS ever asking OIG to
8  study that issue?
9        MR. WINGET-HERNANDEZ:  Objection to form.
10       THE WITNESS:  I recall being asked to
11 look at the dispensing-fee issue.  I don't
12 necessarily recall being asked to look into
13 physician service costs.
14 BY MR. TORBORG:
15    Q.  What do you -- what do you recall about
16 being asked to look at the dispensing-fee issue?
17    A.  In converse -- in conversations with
18 CMS, them asking how much it really cost physicians
19 -- I'm sorry -- how much it really cost the
20 pharmacies to dispense the drugs and what services
21 they're -- they're providing for those dispensing
22 fees.

---

Page 368

1     Q.  And just to back up a step, what is a
2  dispensing fee?
3     A.  A dispensing fee is a fee paid with each
4  prescription filled by a pharmacy.
5     Q.  Is the dispensing fee supposed to
6  include a level of profit?
7        MR. NEAL:  Objection as to form.
8        THE WITNESS:  I am not sure about the --
9  about what it's supposed to include.
10 BY MR. TORBORG:
11    Q.  With whom did you have these
12 conversations?
13       MR. NEAL:  Let me just instruct you to
14 answer that question consistent with my previous
15 instruction.  You can discuss this so long as you
16 don't implicate essentially privileged
17 communications at entrance and exit conferences.
18       THE WITNESS:  I don't recall exactly who
19 was at the meeting.  It would have been someone
20 that I mentioned earlier as folks that I had met
21 with, but I can't remember specifically who was
22 there.

---

19 (Pages 365 to 368)

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                           April 25, 2007
                    Philadelphia, PA

Page 393

1    worked with in the last year on Federal Upper Limit
2    topics.
3        Q.  Do you remember an individual named
4    William Scanlon (ph)?
5        A.  I've -- I've heard that name, but I
6    don't know exactly who he was.  I know I never --
7        Q.  That's not --
8        A.  -- spoke with him.
9        Q.  That's not one of the people that you --
10       A.  No.
11       Q.  -- talked with?  Okay.  In the bottom of
12   the first column, last paragraph, it states:
13   There's no doubt there are problems with AWP-based
14   payments, acknowledged Susan Winckler, group
15   director of policy and advocacy for the American
16   Pharmaceutical Association.  She agreed that AWP is
17   neither an average price nor a wholesale price.
18   But focusing on AWP distracts attention from the
19   real problem - payment for professional services.
20       Quote, if you want to base drug payments on
21   more accurate figures, fine, Winckler said, but
22   that must be coupled with an acknowledgment of all

Page 394

1    the costs involved in getting the product out the
2    door.  We can unbundle the costs of professional,
3    administrative, and distributive services, but we
4    cannot ignore -- but we can't ignore them.  No other
5    business is expected to sell products at cost or
6    lower.
7        Do you agree or disagree with the statements
8    made by Ms. Winckler as quoted in this article?
9            MR. NEAL:  Objection as to form.
10           MR. WINGET-HERNANDEZ:  Compound.
11           THE WITNESS:  In relation to pharmacies,
12   I don't disagree that businesses aren't expected to
13   sell products at cost or lower.  And I think that
14   in order to determine -- in -- in order to ensure
15   that providers are reimbursed fairly, that both
16   segments need to be considered.  That's why it --
17   you know, that's why those recommendations were
18   typically in our reports.
19   BY MR. TORBORG:
20       Q.  If we go to the -- to the third column,
21   there is a quote from John Rector, vice president
22   of the government affairs and general counsel for

Page 395

1    the National Community Pharmacists Association.
2    And the article states:  Focusing acquisition --
3    focusing on acquisition cost sounds good in
4    congressional testimony, but it's a recipe for
5    financial disaster.
6        Do you see that?
7        A.  Yes.
8        Q.  Do you recall any discussions with OIG
9    or HCFA of what would happen if CMS changed the way
10   it reimbursed for drugs?
11           MR. WINGET-HERNANDEZ:  Objection to form.
12           MR. NEAL:  I'll object to the form as
13   well.
14           You can answer that question to the
15   extent that your answer would not divulge any
16   privileged communication.
17           THE WITNESS:  In various conversations, I
18   know that especially in the pharmacy area, not
19   necessarily in the physician area, that there --
20   and that's why we had conversations about
21   dispensing fees -- that CMS wanted to ensure that
22   -- that beneficiary access wasn't inhibited based

Page 396

1    on any -- based on any cost reductions.
2    BY MR. TORBORG:
3        Q.  Do you recall who made those -- with
4    whom you had those conversations?
5        A.  No.
6        Q.  Do you have a recollection of when those
7    conversations occurred?
8        A.  They have occurred recently about the
9    Federal Upper -- the Federal Upper Limit work that
10   we've done.  They -- I don't recall earlier
11   conversations.  They were most likely done in
12   entrance or exit conferences, some of them, and
13   others during work planning meetings.
14       Q.  A fairly frequent topic of conversation?
15       A.  No.  I mean, maybe once a year at most.
16       Q.  With respect to the recent work you're
17   doing on Federal Upper Limits, you indicated that
18   you had discussions with CMS about what I'll call
19   the access issue; is that fair to say?
20           MR. NEAL:  I'll --
21           MR. PAUL:  Objection to --
22           MR. NEAL:  I'll object to the form.

                                26  (Pages 393 to 396)

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                          April 25, 2007
                        Philadelphia, PA

Page 397

1        You can answer.
2        THE WITNESS:  Yes.
3   BY MR. TORBORG:
4        Q.  And with whom did you have
5   conversations; do you recall?
6        A.  Larry Reid and Deirdre Duzor.
7        Q.  And do you -- what can you recall about
8   those conversations?
9        MR. NEAL:  You can answer that question
10  consistent with my previous instruction on
11  privileged communication.
12       THE WITNESS:  It was simply based on
13  initial results from a draft report that we're
14  working on and how the new Federal Upper Limit
15  amounts related to actual acquisition costs for
16  pharmacies.
17  BY MR. TORBORG:
18       Q.  And what stage is that report at right
19  now?
20       A.  We're awaiting comments from CMS, so
21  it's a draft report.
22       Q.  And so you've received some oral

Page 398

1   comments from CMS?
2        A.  Yes.
3        Q.  But not formal?
4        A.  Correct.
5        Q.  How long ago -- how long ago did you
6   receive the oral comments?
7        A.  Two or three months ago.
8        Q.  Is there any record of those oral
9   comments?
10       A.  Yes.
11       Q.  Did you take notes?
12       A.  Yes.
13       Q.  Where -- where are those notes today?
14       A.  They would be part of the exit
15  conference notes.
16       Q.  Anything else you -- you can recall
17  about the specifics of those conversations?
18       MR. NEAL:  You can answer that question
19  consistent with my previous instructions.
20       THE WITNESS:  No.
21  BY MR. TORBORG:
22       Q.  Is CMS concerned that basing the Federal

Page 399

1   Upper Limits on AMP data may cause an access issue?
2        MR. NEAL:  Objection as to form.
3        You can answer that question consistent
4   with my instruction on privileged communications.
5        THE WITNESS:  Since I haven't seen their
6   official comments, I can't say what the official
7   position of CMS is.
8        Outside of exit conference, there have
9   been a couple conversations involving the data that
10  we have that does -- that -- where they did
11  indicate that there may be some small issues that
12  they're concerned with.  You can also look at their
13  comments to the GAO report which -- and which
14  looked at the same issue that we're looking at in
15  this and -- and get a better idea of where they --
16  where they stand.
17  BY MR. TORBORG:
18       Q.  Do you recall in other conversations
19  you've had with CMS relating to the Federal Upper
20  Limit issue and -- let me back up.
21       You've done other reports on Federal Upper
22  Limits --

Page 400

1        A.  Yes.
2        Q.  -- correct?  Starting, I think, in about
3   2004?
4        A.  It may have been earlier.  I'm not sure.
5        Q.  Have any of the conversations you've had
6   with CMS relating to those reports discussed the
7   access issue?
8        MR. NEAL:  I'll instruct you not to
9   answer that question to the extent that it will
10  require you to divulge privileged communications
11  with CMS.
12       THE WITNESS:  Outside of entrance and
13  exit conferences, there were a few discussions
14  about how Federal Upper Limits were calculated and
15  concerns that sometimes that the lowest price
16  available -- or the lowest price listed in
17  compendia wasn't accurate and not available to --
18  to all pharmacies, and, therefore, setting the
19  Federal Upper Limit amount based on that price
20  could lead to access issues.
21  BY MR. TORBORG:
22       Q.  Do you recall with whom those

                              27 (Pages 397 to 400)

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                                    April 25, 2007
                           Philadelphia, PA

Page 489

1  state Medicaid agencies would have access to that
2  information.  In September 1995, CMS addressed this
3  issue in response to comments received on a
4  proposed rule regarding Medicaid payment for
5  outpatient drugs.  The CMS asserted that they would
6  not disclose AMP to states, but maintained that the
7  statute contemplates a disclosure of manufacturer
8  pricing data to the states, and that they believe
9  Congress intended that states have access to
10 sufficient pricing information to implement the
11 Medicaid drug rebate program.
12     Do you recall any conversations at any time,
13 Mr. Tawes, regarding the ability of CMS to share
14 AMP data with states?
15     A.  Yes.
16     Q.  Okay.  Tell me what you recall about
17 those conversations.
18        MR. NEAL:  I'll just instruct the
19 witness:
20        You can answer that question to the
21 extent that your answer would not implicate
22 privileged communications that you may have had.

Page 490

1        THE WITNESS:  Simply a difference of
2  opinion between CMS and some of the folks in Region
3  5 OIG, and I would assume O -- the OIG in general,
4  as to whether CMS could provide AMP data to states.
5  BY MR. TORBORG:
6     Q.  Did Region 3 of OIG have a position on
7  that issue?
8        MR. NEAL:  Objection as to form.
9        THE WITNESS:  No.
10 BY MR. TORBORG:
11     Q.  Had you ever evaluated that issue
12 yourself?
13     A.  No.
14     Q.  What do you recall about conversations
15 regarding this issue; who were they with, when they
16 were --
17     A.  It would have --
18     Q.  -- what was said?
19     A.  It would have been with -- with various
20 staff in Region 5 -- Madeline Francescatti, Ann
21 Maxwell, Erin Lemire, just about whether they
22 believed states -- or CMS could provide this data

Page 491

1  to states or not.
2     Q.  Do you recall what they said?
3     A.  That they believed that -- that CMS
4  could provide this information to states.
5     Q.  Did they make any comments about why CMS
6  was narrowly interpreting the confidentiality
7  clause?
8        MR. NEAL:  Objection as to form.
9        THE WITNESS:  Not that I recall.
10 BY MR. TORBORG:
11     Q.  Have you ever formed any opinion on this
12 yourself?
13        MR. NEAL:  I'll object to the form.
14        You can answer.
15        THE WITNESS:  No.
16 BY MR. TORBORG:
17     Q.  Do you know if Mr. Vito has formed any
18 opinion on this?
19        MR. NEAL:  The same objection.
20        You can answer.
21        THE WITNESS:  No.
22 BY MR. TORBORG:

Page 492

1     Q.  If I could ask you to go to the 2004
2  report that you did relating -- entitled, Omission
3  of Drugs From the Federal Upper Limit List in 2001,
4  and then if you would -- do you have the exhibit
5  number there?
6     A.  Exhibit Abbott 108.
7     Q.  Thank you.  And this is a report that
8  you were the team leader for?
9     A.  Yes.
10    Q.  And did you draft this report?
11    A.  Yes.
12    Q.  Did you share this report with state
13 Medicaid programs?
14    A.  I don't believe so.
15    Q.  And in summary, can you explain to the
16 jury what you found in this report?
17        MR. NEAL:  Objection as to form.
18        THE WITNESS:  We found that numerous
19 drugs that met the established criteria for being
20 included on the Federal Upper Limit List -- on the
21 Federal Upper Limit List were not being included on
22 the list in 2001.

50 (Pages 489 to 492)

Henderson Legal Services
202-220-4158

58feec2f-99ac-42be-8c4e-803a680a2c55

Ragone, Linda - Vol. I                    April 17, 2007
                    Philadelphia, PA

                                                    Page 1

           UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

--------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

--------------------------------X


          IN THE CIRCUIT COURT OF

        MONTGOMERY COUNTY, ALABAMA

--------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

          Plaintiff,               :  CV-05-219

     v.                            :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

          Defendants.              :

--------------------------------X

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                          April 17, 2007
                    Philadelphia, PA

Page 330

1  was following the fact that they had to pay at AWP.
2  BY MR. COOK:
3      Q.  And to the extent that HCFA promulgated
4  a regulation, HCFA determined that it believed, at
5  least, that that was the appropriate amount,
6  correct?
7          MR. NEAL:  Objection as to form.
8          THE WITNESS:  I don't know if they felt
9  it was appropriate.
10 BY MR. COOK:
11     Q.  Did you ever discuss with anybody at
12 HCFA what they thought was an appropriate amount of
13 reimbursement?
14         MR. NEAL:  I'm going to object to the
15 question.
16         In fact, I'm going to instruct you not to
17 answer to the extent that that would reveal any
18 communications that took place at exit or entrance
19 conferences.  You've stated that you didn't -- you
20 don't have any recollection of those conferences.
21         If you can answer the question without
22 referring to any communications that took place

Page 331

1  there, you can answer the question.
2          THE WITNESS:  Would you repeat the
3  question again, please?
4  BY MR. COOK:
5      Q.  Sure.
6          MR. NEAL:  That was a lengthy objection.
7  I apologize.  There are privilege concerns.
8  BY MR. COOK:
9      Q.  Did you ever discuss with anybody at
10 HCFA what HCFA believed would be an appropriate
11 amount of reimbursement for drugs under Medicare
12 Part B?
13     A.  I don't remember if we discussed that at
14 the entrance and exit conferences.
15     Q.  At any time, with any HCFA official, did
16 you discuss what an appropriate amount of Medicare
17 reimbursement would be?
18     A.  I don't remember discussing what the
19 exact amount of appropriate reimbursement would be.
20     Q.  Leaving aside an exact precise amount,
21 do you remember discussing with any HCFA officials
22 how one would go about determining an appropriate

Page 332

1  level of reimbursement for Medicare Part B paid
2  drugs?
3          MR. NEAL:  Objection.
4          You can answer that to the extent that
5  you do not reveal communications that took place at
6  entrance or exit conferences.
7          THE WITNESS:  I believe based on the
8  options we provided them, those were some of the --
9  the discussion was based on the -- our
10 recommendations.
11 BY MR. COOK:
12     Q.  Do you recall, did HCFA implement any of
13 your recommendations?
14     A.  I -- can I go back and read them?
15     Q.  Sure.
16     A.  May I go back and read them?
17     Q.  Absolutely.  It's at Page 7 of Exhibit
18 Abbott 060.
19     A.  I believe, and I don't remember if it
20 was regulatory or legislated, that there was a
21 change made to AWP in later years to provide that
22 Medicare pay a discounted rate.

Page 333

1      Q.  And that would be 95 percent of AWP; is
2  that correct?
3      A.  That's the figure I remember.
4      Q.  And that would have been the Balanced
5  Budget Amendment -- Balanced Budget Act of 1997;
6  does that sound right?
7      A.  It sounds right.
8      Q.  Okay.
9      A.  I don't believe that they'd ever
10 instituted a manufacturer rebate.  I do believe
11 that there are items being competitively bid now.
12 I recall discussions about inherent -- inherent
13 reasonableness.  I do not know if CMS ever did it.
14 And I do not believe that they have -- are paying
15 based on an estimated -- based on an estimated
16 acquisition cost, using that term.
17     Q.  And so you made the recommendation that
18 discounted wholesale price would get to, perhaps,
19 an appropriate reimbursement amount for Albuterol
20 Sulfate, correct?
21         MR. NEAL:  Objection as to form.
22         THE WITNESS:  I think that the

84 (Pages 330 to 333)

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                          April 17, 2007
                    Philadelphia, PA

| Page 366 | Page 368 |
|---|---|

**Page 366**

1      Q.   Did you have a range of amounts that
2   would have been appropriate in mind?
3          MR. NEAL:  The same objection.
4          THE WITNESS:  I don't -- I don't remember
5   exactly what I recalled at the time I was writing
6   this, but I don't think I had a range of amounts
7   that I thought would be appropriate.
8   BY MR. COOK:
9      Q.   And sticking with the summary findings,
10  you found that the Department of Veterans Affairs
11  -- well, let me switch that over and strike that.
12       You found that Medicare pays between 56
13  percent and 550 percent more than the Department of
14  Veterans Affairs for Albuterol Sulfate in 1998; is
15  that correct?
16     A.   That's the way I read that statement.
17     Q.   And that was the finding in the report
18  that you drafted, correct?
19     A.   Yes.
20     Q.   And as the project leader, you would
21  have drafted the report?
22     A.   Most likely, yes.

**Page 367**

1      Q.   And the second point under this was that
2   Medicare allowed 20 percent more than the average
3   Medicaid payment for Albuterol Sulfate in 1997; is
4   that correct?
5      A.   Yes.
6      Q.   You further found that Medicare allowed
7   up to 333 percent more than acquisition costs
8   available for Albuterol Sulfate in 1998, correct?
9      A.   Yes.
10     Q.   And finally, you found that the
11  customers of mail order pharmacies would pay up to
12  30 percent less than Medicare for Albuterol Sulfate
13  in 1998, correct?
14     A.   Yes.
15     Q.   Do you remember what it was that
16  prompted you to issue an additional report in
17  August 1998, following your June 1996 report on
18  Albuterol Sulfate?
19     A.   I don't remember.
20     Q.   To your knowledge, had HCFA taken any
21  actions to respond to the recommendations in your
22  June 1996 report at the time you issued this August

**Page 368**

1   1998 report?
2          MR. NEAL:  Objection as to form.
3          You can answer.
4          THE WITNESS:  I -- I don't remember.  I'd
5   have to read the comments, the CMS comments of the
6   report.
7   BY MR. COOK:
8      Q.   And where would I find those?
9      A.   If the agency commented, it would be in
10  the back -- it's in the back of the report.
11     Q.   And so that would be this June 11, 1998
12  memo to June Gibbs Brown from Nancy-Ann Min
13  DeParle; is that correct?
14     A.   Yes.
15     Q.   Looking at that report, it indicates: We
16  reviewed the above-referenced report.
17     Any reason to believe that the Health Care
18  Finance Administration had not reviewed the report?
19     A.   I have no reason to believe that, since
20  the statement says that they reviewed it.
21     Q.   It indicates, in the second paragraph
22  there, that:  HCFA concurs with the intent of the

**Page 369**

1   OIG report recommendation.
2     And then goes on to make specific responses.
3     Do you recall HCFA concurring with the intent
4   of your recommendations in June of 1998?
5      A.   I do not recall it.  I'm reading it here
6   now.
7      Q.   But you would have had communications
8   with HCFA officials, correct?
9      A.   This would have been the official
10  communication on their concurrence or
11  nonconcurrence with the findings and
12  recommendations of the report.
13     Q.   But in addition to this, you would have
14  had an entrance -- an entrance meeting, right?
15     A.   Normally we would.  I can't tell you if
16  we absolutely had it for here.  We would have
17  normally had an entrance and an exit conference for
18  this report.
19     Q.   Any reason to believe that any of the
20  sentiments expressed in the entrance and exit
21  conferences for this report varied from the
22  official responses given by Ms. Min DeParle in this

93 (Pages 366 to 369)

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. I                          April 17, 2007
                        Philadelphia, PA

Page 370

1  memo?
2        MR. NEAL:  I'm going to object to the
3  question and instruct you not to answer.
4  BY MR. COOK:
5     Q.  Ms. Ragone --
6        MR. MERKL:  You're not going to let her
7  answer that yes or no?
8        MR. NEAL:  Answering it yes or no would
9  possibly implicate the substance of communications
10 that she had in an exit conference concerning this
11 report.
12 BY MR. COOK:
13    Q.  Generally speaking, Ms. Ragone, did you
14 ever find it to be the case that your oral
15 communications with officials at HCFA conflicted at
16 all with the written responses that they would
17 submit to the Office of Inspector General?
18       MR. NEAL:  You can answer that generally.
19       THE WITNESS:  Generally, for our -- in
20 our -- all of our inspections, not just
21 prescription drugs, there have been times when
22 there haven't been what we believed to be

Page 371

1  objections raised during these conversations, and
2  then when we get the formal comments, there will be
3  technical comments or objections raised that we
4  never heard at the exit conference.
5  BY MR. COOK:
6     Q.  And so if -- back up one.  Have you ever
7  had the experience where an objection was raised at
8  the exit conference that was not reflected in the
9  written --
10    A.  Yes --
11    Q.  -- comments?
12    A.  -- I believe I've had an experience
13 where somebody has raised a personal objection,
14 their feelings, and that doesn't become part of the
15 formal comments back to our agency.
16    Q.  And so if Abbott and the other
17 defendants were seeking to determine what it is
18 that HCFA knew and what it is that HCFA intended to
19 do when it comes to Medicare reimbursement, we
20 would need to find out what was said at the exit
21 conference to get a complete picture of what the
22 agency knew and intended, correct?

Page 372

1        MR. NEAL:  I'm going to object --
2        MS. POLLACK:  Objection.
3        MR. NEAL:  -- to the form of the
4  question.
5        THE WITNESS:  I don't know --
6        MR. NEAL:  You can answer.
7        THE WITNESS:  I don't know if you would
8  get from those what the whole agency intended or
9  knew about it.  You would just -- if you heard
10 anything, it would be the people that were in that
11 room, and not everybody in those converse -- in
12 those conferences speaks, so I don't know what you
13 would get from those. I don't remember the
14 conversations.
15 BY MR. COOK:
16    Q.  But there would -- you admit that there
17 would be more information about what the agency
18 knew and intended from those communications than
19 from simply the written comments submitted,
20 correct?
21       MR. NEAL:  I'm going to object to the
22 form of the question.

Page 373

1        THE WITNESS:  I believe that there are
2  statements made during those conferences that do
3  not appear in the formal written comments.
4  BY MR. COOK:
5     Q.  Do you know why?
6     A.  I don't know why.  I believe that it's
7  because it's an informal conversation.  I mean, we
8  often will provide them with details during those
9  conferences that we discuss back and forth.  As I
10 said, sometimes there's conversation, sometimes
11 there's not a lot of conversation.  It varies based
12 on the report.
13    Q.  The first OIG recommendation listed in
14 this June 11, 1998 memorandum says:  HCFA
15 immediately reduced Medicare reimbursement for
16 Albuterol Sulfate by 15 percent, using the new
17 authority outlined in the Balanced Budget Act of
18 1997.
19       That's on Page A2.
20    A.  Well, you're looking at their comments.
21 Yes.
22    Q.  Yes, ma'am.  I'm looking at that the

94  (Pages 370 to 373)

752f543d-a1b8-4aaf-8de4-a5ada851a581

Ragone, Linda - Vol. II                    April 18, 2007
                    Philadelphia, PA

```
                                                      Page 412

                UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF MASSACHUSETTS

                      VOLUME II

---------------------------------X  MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

---------------------------------X

THIS DOCUMENT RELATES TO:          :

U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:

Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS

Laboratories, Inc.                 :

---------------------------------X

            IN THE CIRCUIT COURT OF

            MONTGOMERY COUNTY, ALABAMA

---------------------------------X

STATE OF ALABAMA,                  :  CASE NO.

        Plaintiff,                 :  CV-05-219

    v.                             :

ABBOTT LABORATORIES, INC.,         :  JUDGE

et al.,                            :  CHARLES PRICE

        Defendants.                :

---------------------------------X
```

Henderson Legal Services
202-220-4158

Ragone, Linda - Vol. II                          April 18, 2007
                    Philadelphia, PA

Page 477

1    A.  It goes -- right now it goes up on the
2  Internet, yes.
3    Q.  And the purpose of that distribution
4  process is to put these reports in the hands of
5  policymakers, who can use this information in
6  making policy decisions?
7         MR. DRAYCOTT:  Objection.
8         MR. COOK:  What's the objection?
9         MR. DRAYCOTT:  For one, you didn't, first
10  of all, establish that she would know what the
11  purpose for the distribution is when you asked her
12  what the distribution -- what the purpose is.
13  BY MR. COOK:
14    Q.  If I ever ask you a question, Ms.
15  Ragone, and you don't know the answer, feel free to
16  say I don't know.
17         Can you tell me whether one of the purposes of
18  distributing these reports was to put it in the
19  hands of policymakers who can use this information
20  in making policy decisions?
21    A.  I believe it is our hope that by putting
22  these findings and recommendations together and

Page 478

1  putting them in published reports, that the people
2  who this information would be germane to would read
3  it and have access to it.
4    Q.  Now, this was in December 1997.  Do you
5  know if anytime after December 1997, HCFA, later
6  CMS, abandoned AWP as the benchmark for reimbursing
7  Medicare Part B drugs?
8    A.  I haven't been in the drug arena as much
9  at the end.  I believe that they are using new
10  strategies now, reimbursement methodologies, in
11  Medicare.
12    Q.  When was it that you left the
13  prescription drug -- was that 2004?
14    A.  There were a few times I had been the
15  DRIG, and then a team leader, Dave Tawes, began
16  leading most of the drug work, and he would work
17  more often directly with our manager, Robert Vito,
18  so the actual pricing work, I haven't done in quite
19  some time.
20    Q.  As of 2004, was Medicare still using AWP
21  to base its Medicare Part B drug reimbursement?
22    A.  I don't remember what the time period

Page 479

1  was when it changed to --
2    Q.  Can you give me a rough?  After 2000?
3    A.  Yes.
4    Q.  After 2002?  After 2001?
5    A.  I think after 2002.  I'm not quite sure
6  when the legislation was enacted.
7    Q.  So whenever the legislation was enacted,
8  perhaps for as many as five years after receiving
9  the conclusions of this report, Medicare Part B
10  continued to pay, for the 22 drugs reviewed in this
11  report, based upon AWP, correct?
12         MR. DRAYCOTT:  Objection.
13         THE WITNESS:  Based upon, I guess,
14  starting in 1998, they paid AWP minus 5 percent.
15  BY MR. COOK:
16    Q.  But still based upon the AWP?
17    A.  Correct.
18    Q.  Did you ever have an argument with
19  anybody at HCFA about the wisdom of doing that?
20         MR. DRAYCOTT:  Objection.
21         THE WITNESS:  I'm not -- I don't know if
22  I would call it an argument.  We've certainly had

Page 480

1  discussions during exit conferences about the fact
2  that a different pricing methodology might be
3  appropriate.
4  BY MR. COOK:
5    Q.  What do they say about that?
6         MR. DRAYCOTT:  Objection.
7         Instruct you not to answer.
8  BY MR. COOK:
9    Q.  I know you're going to be instructed not
10  to answer, but I do have to put the questions on
11  the record, Ms. Ragone.
12         So let me get this straight.  You sit down in
13  a room, at a conference table like this with folks
14  from HCFA; you tell them that AWP exceeds
15  acquisition costs, as defined in the report, by up
16  to ten times, right?
17    A.  Yes.
18    Q.  You tell them that the OIG recommends
19  that they stop paying that high an amount for
20  prescription drugs, right?
21         MR. DRAYCOTT:  Objection to the extent
22  that you're asking for the contents of her

18  (Pages 477 to 480)

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Ragone, Linda - Vol. II                          April 18, 2007
                        Philadelphia, PA

Page 481

1   communications to HCFA during the exit conference.
2          MR. COOK:  If you'd just instruct her not
3   to answer.  Are you instructing her not to answer?
4          MR. DRAYCOTT:  I am.
5   BY MR. COOK:
6      Q.  So you make whatever communications you
7   do to HCFA in these exit conferences --
8          MR. DRAYCOTT:  Objection.
9   BY MR. COOK:
10     Q.  -- after giving them a copy of this
11  report, right?
12         MR. DRAYCOTT:  Objection.
13         And you're instructed not to answer.
14  BY MR. COOK:
15     Q.  And you make your recommendations,
16  correct?
17         MR. DRAYCOTT:  You can answer that
18  question.
19         THE WITNESS:  During the exit
20  conferences, we will tell them the findings and
21  recommendations.
22  BY MR. COOK:

Page 482

1      Q.  And you encourage them, that is,
2   officials at HCFA, to reimburse prescription drugs
3   based upon something other than the published
4   average wholesale price?
5          MR. DRAYCOTT:  Objection.
6          You're instructed not to answer.
7   BY MR. COOK:
8      Q.  And, in fact, you do so heatedly,
9   correct?
10         MR. DRAYCOTT:  Objection.
11         And you're instructed not to answer.
12  BY MR. COOK:
13     Q.  And they respond?
14         MR. DRAYCOTT:  You can answer whether or
15  not they responded.
16         THE WITNESS:  If they have comments, they
17  will respond when we provide the findings and
18  recommendations.
19  BY MR. COOK:
20     Q.  Did they explain why HCFA continued to
21  pay based upon AWP, notwithstanding the fact that
22  HCFA knew average wholesale price could exceed

Page 483

1   acquisition cost by as much as ten times?
2          MR. DRAYCOTT:  You can answer as to
3   whether or not they responded without revealing the
4   response, if you remember.
5          THE WITNESS:  I believe that they stated
6   why they were using the reimbursement strategy they
7   were using at that time.
8   BY MR. COOK:
9      Q.  And what was their explanation?
10         MR. DRAYCOTT:  Objection.
11         And you're instructed not to answer.
12  BY MR. COOK:
13     Q.  Why do you believe HCFA continued to use
14  average wholesale price to pay for Medicare Part B
15  drugs after you issued this report in December
16  1997?
17         MR. DRAYCOTT:  Objection.
18         And you're instructed not to answer to
19  the extent your belief is based on communications
20  from HCFA during an exit conference.
21  BY MR. COOK:
22     Q.  I'll let you work out that metaphysical

Page 484

1   problem.
2      A.  I -- I believe --
3          MR. DRAYCOTT:  Well --
4          THE WITNESS:  -- that the --
5          MR. DRAYCOTT:  Let me ask you: Can you
6   answer that question without revealing the content
7   of communication from HCFA during the conference?
8          THE WITNESS:  I believe I can.  I believe
9   I can.
10         MR. DRAYCOTT:  Okay.
11         THE WITNESS:  I believe that the level of
12  people that we were talking to believed that the
13  regulations or legislations were set for payment at
14  a certain place and that that's what Medicare was
15  bound to reimburse at.
16  BY MR. COOK:
17     Q.  Who at HCFA is responsible for setting
18  Medicare Part B drug payment policy?
19     A.  Policy?
20     Q.  What the amount is that they would pay.
21     A.  I believe that would be regulated or
22  legislated.

                            19 (Pages 481 to 484)

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Bassano, Amy                                    November 7, 2007
Baltimore, MD

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - -


     Videotaped deposition of AMY BASSANO


               Baltimore, Maryland

               Wednesday, November 7, 2007

               9:00 a.m.

10942f81-3a49-4b7f-93de-66c3efd80418

Bassano, Amy                                    November 7, 2007
                        Baltimore, MD

---

Page 82

1  reviewing the legislation, the regulations, OIG
2  reports and what you might pick up from discussions
3  with other people?
4      A.   Yes.
5      Q.   Anything else?
6      A.   No.
7      Q.   Can you testify about the conduct of any
8  drug manufacturers from 1991 through 2001?
9          MR. DRAYCOTT: Objection. You can answer
10 if you can.
11     A.   No.
12     Q.   Do you have any personal knowledge
13 regarding Abbott or any of the other drug
14 manufacturers did or did not report to drug pricing
15 compendia from 1991 to 2001?
16         MR. DRAYCOTT: Objection. You can answer
17 if you can.
18     A.   No.
19     Q.   Can you testify from your personal
20 knowledge as to what CMS understood about drug
21 pricing in the industry from 1991 through 2001?
22         MR. DRAYCOTT: Objection. You can answer

---

Page 83

1  if you can.
2      A.   No.
3      Q.   Can you testify from your personal
4  knowledge regarding the comparison of AWP to actual
5  acquisition cost from 1991 through 2001?
6          MR. DRAYCOTT: Objection. You can answer
7  if you can.
8      A.   No.
9      Q.   Can you testify from your personal
10 knowledge about any of the allegations that Abbott
11 committed fraud?
12         MR. DRAYCOTT: Objection. You can answer
13 if you can.
14     A.   No.
15     Q.   Do you have any personal knowledge
16 regarding the allegations that Abbott caused false
17 claims to be submitted?
18         MR. DRAYCOTT: Objection. You can answer
19 if you can.
20     A.   No.
21     Q.   Okay. Let's talk about what you could
22 testify about. Regarding Medicare Part B

---

Page 84

1  reimbursement for drugs what testimony could you
2  offer -- well, actually, let me step back and let me
3  strike that.
4          Do you have an understanding of when
5  Medicare first began paying for Part B drugs?
6      A.   Yes.
7      Q.   When was that?
8      A.   I believe at the beginning of the
9  inception of the Medicare program.
10     Q.   Which would have been?
11     A.   1965.
12     Q.   Do you know when they first began basing
13 payments for Part B drugs on AWP?
14     A.   I believe it was sometime in the 1980s or
15 '90s.
16     Q.   Do you know why from your personal
17 knowledge AWP was selected as opposed to some other
18 methodology for paying for Part B drugs?
19         MR. DRAYCOTT: Objection. You can answer
20 if you can.
21     A.   No, I don't.
22     Q.   Do you know if any other options aside

---

Page 85

1  from AWP were considered?
2          MR. DRAYCOTT: Objection. You can answer
3  if you can.
4      A.   When?
5      Q.   From 1991 through 2001.
6      A.   Sorry. Can you ask me the question
7  again?
8      Q.   Okay. Do you know if any other options
9  aside from basing payment for Part B drugs on AWP
10 were considered from the period 1991 through 2001?
11         THE WITNESS: Should I answer?
12         MR. DRAYCOTT: The answer is just -- you
13 asked the question is she aware.
14     Q.   Are you aware, were there any other
15 options considered?
16         MR. DRAYCOTT: You can answer that yes or
17 no.
18     A.   1991 to 2001? I believe there may have
19 been.
20     Q.   And is this based upon your personal
21 knowledge?
22     A.   No.

                                22 (Pages 82 to 85)

10942f81-3a49-4b7f-93de-66c3efd80418

Bassano, Amy                                          November 7, 2007
                              Baltimore, MD

Page 86

1    Q.   Based upon your review of historical
2  documents?
3    A.   No.
4    Q.   What is it based on?
5    A.   Conversations with other people.
6    Q.   Conversations with people who worked with
7  CMS at the time?
8    A.   Yes.
9    Q.   And they said other options aside from
10 AWP were considered?
11   A.   Yes.
12   Q.   What were those options?
13       MR. DRAYCOTT:  Objection to the -- I
14 mean, what is the context in which you're asking
15 this?  I mean, if you're talking about -- if you're
16 going through internal deliberations within CMS
17 policy making areas, such as the Office of
18 Legislation where Ms. Bassano worked then I'd
19 instruct her not to reveal the content of those
20 deliberations within OL to the extent they were
21 before developing a policy regarding reimbursement
22 methodology.

Page 87

1        You've asked a very broad question.  So
2  I'm going to object to the question based on its
3  breadth.  I can try to instruct the witness to
4  answer if she can with respect to non-privileged
5  information or it may help to clarify the question.
6    Q.   Could you answer with respect to
7  non-privileged information what other options aside
8  from AWP were considered?
9    A.   No.  Because I don't recall what actually
10 ever was made public versus what was discussed
11 internally and just had been considered.
12   Q.   In what perform was it considered?
13   A.   What does that mean?
14   Q.   Was it considered through policy papers?
15 Was it considered just in discussions in meetings?
16       MR. DRAYCOTT:  If you can answer the
17 question or if you have a recollection about the
18 particular format --
19   A.   I don't know.  No one ever
20 specifically -- I don't know what formats it was
21 considered in.
22   Q.   And was that something that you

Page 88

1  personally worked on for the Office of Legislation
2  or is it something you were told in discussions?
3    A.   Something I was told.
4    Q.   Who told you this?
5    A.   I don't recall specifically.  I heard it
6  from various sources over time, various individuals
7  over time.
8    Q.   Do you remember any of them by name?
9        MR. DRAYCOTT:  You can name the
10 individuals.
11   A.   As I said earlier, Don Thompson and
12 Parashar Patel were my main contacts at CMS on this
13 particular issue.
14   Q.   Do you know what their positions were
15 between 1991 and 2001?  Let's start with Mr.
16 Thompson.
17   A.   Not specifically.
18   Q.   Okay.  Generally what section they worked
19 in?
20   A.   He -- I know he began his time at CMS in
21 the Office of the Actuary.  And then he moved to the
22 Hospital and Ambulatory Policy Group, at it wasn't

Page 89

1  called that at that time.  It's been through a
2  variety of reorganizations.  But generally Medicare
3  payment policy area.
4    Q.   What about Mr. Patel?  What positions did
5  he hold to the best of your knowledge from '91
6  through 2001?
7    A.   At least for the very tail end of that
8  period he was the deputy group director of the
9  precursor to the Hospital and Ambulatory Policy
10 Group.  He -- when I first met him in 1999 he was
11 the special assistant to the person who was the head
12 of, again, the precursor to the Center for Medicare
13 Management.
14   Q.   Now, when AWP was first implemented as a
15 method for payment for Part B drugs what is your
16 understanding of the methodology on which that
17 payment was based?
18       MR. DRAYCOTT:  Objection.  You can answer
19 if you can.
20   A.   I'm sorry.  I don't understand the
21 question.
22   Q.   You've mentioned that AWP was first used

23  (Pages 86 to 89)

10942f81-3a49-4b7f-93de-66c3efd80418

Bassano, Amy                                        November 7, 2007
                         Baltimore, MD

Page 106

1 being defrauded by a drug manufacturers?
2        MR. DRAYCOTT: Objection. You can answer
3 if you can.
4    A.   What were those first couple words? I
5 didn't --
6    Q.   Have you ever encountered a situation in
7 which you believe that the Medicare system was being
8 defrauded by a drug manufacturer?
9        MR. DRAYCOTT: Objection. You can answer
10 if you can.
11    A.   No.
12    Q.   Do you know whether during the period of
13 1991 through 2001 CMS relied on AWP to reflect the
14 prices providers actually paid for drugs?
15    A.   Can you -- I'm confused about the second
16 part of your question.
17    Q.   From 1991 through 2001 was CMS to your
18 knowledge relying on AWP to reflect the actual
19 market prices for drugs?
20        MR. DRAYCOTT: Objection. But you can
21 answer.
22    A.   I don't know.

Page 107

1    Q.   Did you discuss that with anyone who was
2 working at CMS on Part B issues from '91 through
3 2001?
4    A.   If it reflected actual market prices?
5    Q.   Yes.
6        MR. DRAYCOTT: You're looking at me --
7 when you're looking at me is it because of a concern
8 that you're being asked for privileged information
9 or --
10        THE WITNESS: Well, it's sort of what can
11 I say about conversations I've had or didn't have
12 with people at CMS.
13        MR. DRAYCOTT: Well, it depends --
14 certainly what you can't testify about are
15 conversations that would be covered by an attorney-
16 client privilege or work product privilege such as
17 conversations with office of general counsel or the
18 Department of Justice. And you also can't testify
19 as deliberative conversations that were directed at
20 implementing or changing or considering the change
21 to a policy.
22        If Mr. Gabel's question -- I think -- it

Page 108

1 is a broad question -- is as to how something was
2 implemented and how a policy was implemented, you
3 can testify to that. So if it's the conversations
4 that he's referring to -- and I understand why the
5 question is difficult --
6        MR. GABEL: Let me restate the question.
7        MR. DRAYCOTT: Yeah. I think you need to
8 be more specific in your question.
9        MR. GABEL: I will.
10        BY MR. GABEL:
11    Q.   Are you aware of anyone from the period
12 of 1991 through 2001, anyone at CMS who relied on
13 AWP to actually reflect the prices paid for drugs in
14 the marketplace?
15        MR. DRAYCOTT: Objection. But you can
16 answer it if you can.
17    A.   I don't think anyone personally relied on
18 the AWP or held it out and said this is the actual
19 market price.
20    Q.   And have you reviewed OIG reports from
21 the period of '91 through 2001?
22    A.   Yes.

Page 109

1    Q.   And those reports actually stated that
2 AWP was not an accurate reflection of market prices,
3 right?
4        MR. DRAYCOTT: Objection. But you can
5 answer.
6    A.   I don't remember the exact words in the
7 IG report, but I think that was the general
8 sentiment expressed in their findings.
9    Q.   In fact AWP exceeded market prices by a
10 considerable amount according to those OIG reports,
11 right?
12        MR. DRAYCOTT: Objection, but you can
13 answer to the extent you have an opinion.
14    A.   Yes. I believe those were the findings
15 of the reports.
16    Q.   Have you ever heard allegations that the
17 manufacturers were marketing the spread on their
18 drugs?
19    A.   Yes. I've heard that term.
20    Q.   Do you have any personal knowledge
21 regarding those allegations?
22    A.   No.

28 (Pages 106 to 109)

10942f81-3a49-4b7f-93de-66c3efd80418