# EXHIBIT 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    IN RE PHARMACEUTICAL        )

 5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

 6    PRICE LITIGATION            )   Civil Action: 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO    )

 8    ALL CLASS ACTIONS           )

 9

10

11        Deposition of MIKE BEADERSTADT, taken before

12    GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

13    pursuant to the Federal Rules of Civil Procedure for

14    the United States District Court pertaining to the

15    taking of depositions, at Suite 300, 1630 Fifth

16    Avenue, in the City of Moline, Illinois, commencing

17    at 9:07 o'clock a.m., on the 17th day of September,

18    2004.

19

20

21

22
```

Mike Beaderstadt                        September 17, 2004

Moline, IL

72

1    started insisting that they be sourced from that

2    supplier.

3        Q.   So prior to 1999, doctors had the option

4    of utilizing that alternative to the buy-and-bill

5    methodology, and it was starting in 1999 that

6    John Deere required that?

7        A.   Yes, approximately '99.

8            MR. HAAS:   Okay.  I have no further

9    questions.

10           MS. MacMENAMIN:   I actually have some

11   follow-up questions for Mr. Beaderstadt.  I didn't

12   know you were going to go straight there.  And one

13   follow-up question for Carol, for Ms. Sidwell.

14                      (Whereupon, an off-the-record

15                      discussion was held.)

16                      EXAMINATION

17   BY MS. MacMENAMIN:

18       Q.   All right.  Mr. Beaderstadt, can I ask you

19   generally, what is your understanding of the term

20   average wholesale price?

21       A.   Generally my understanding is that it's a

22   benchmark that we use to price specific drugs in the

Mike Beaderstadt                                    September 17, 2004
Moline, IL

73

1    physician's office and the pharmacies.

2         Q.   Do you understand it to have a

3    relationship to any actual acquisition cost?

4         A.   I don't believe it has any relationship

5    that is a consistent relationship.

6         Q.   Are you aware of who establishes or sets

7    AWP?

8         A.   I don't know exactly how it's established.

9    I know that we get different numbers from a variety

10   of sources.

11        Q.   In your time at John Deere, was it ever

12   your responsibility or your role to negotiate

13   pharmacy reimbursement contracts?

14        A.   Indirectly in my oversight of Carol's

15   role.

16        Q.   Was it ever your role to negotiate rebates

17   or discounts with drug manufacturers?

18        A.   Once again, indirectly.

19        Q.   Was it ever your role or responsibility to

20   negotiate contracts with PBMs?

21        A.   No.

22        Q.   In your oversight of the pharmacy and

Mike Beaderstadt                                 September 17, 2004

Moline, IL

1    ever doubted AWP as an accurate source for

2    reimbursement?

3             MR. HAAS:  Objection to form.

4             THE WITNESS:  We have never used AWP in

5    the pharmaceutical world as a source for

6    reimbursement.  We have used it as a source to

7    calculate our reimbursement.

8    BY MS. MacMENAMIN:

9        Q.    Correct.  Have you ever doubted AWP as a

10   basis or benchmark for reimbursement in the pharmacy

11   world?

12       A.    My perspective is that we always try to

13   get that price as low as possible that still puts

14   together a reasonable network, and we'd go to minus

15   25 percent and nobody would sign it and we'd try

16   minus 13 percent and everybody signed up, so we knew

17   we had to have it somewhere in between there.  And

18   minus 20 is our latest venture there, and that has

19   produced some headaches for us, but we have been

20   able to put together a reasonable network based on

21   that.

22            So again, it's simply a basis for

Mike Beaderstadt                          September 17, 2004
Moline, IL

77

1    negotiation, and we try to do as well as we can to

2    lower our costs for acquiring those drugs.

3         Q.    I want to skip to part of your testimony

4    regarding certain drugs called Remicaid, Lupron and

5    Synagis I believe it's called.

6         A.    Yes.

7         Q.    And at some point there was a change in

8    the reimbursement benchmark for these drugs.

9               Can you tell me, can you first of all just

10   describe for me that change and what went on?

11        A.    Essentially, and again I'm recalling here

12   something that I wasn't directly involved in, but we

13   knew that we could acquire that drug.  Those are

14   very expensive, high-cost drugs that are used in

15   very specific cases, very specific diseases.  Most

16   of those patients who require those drugs are going

17   through our case management program, being medically

18   managed in some other fashion.

19              So rather than purchase those at prices

20   that we would pay under our physician contracts, we

21   made the decision that we wanted to source those

22   drugs exclusively from specialty pharmacy

EXHIBIT 2

1

1             UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

2

  IN RE:  PHARMACEUTICAL INDUSTRY

3  AVERAGE WHOLESALE PRICE
  LITIGATION           MDL NO. 1456

4

  THIS DOCUMENT RELATES TO:

5  ALL CLASS ACTIONS  MASTER FILE NO. 01-CV-12257-PBS

6        —————————————————

7  IN THE SUPERIOR COURT OF THE STATE OF ARIZONA IN AND
  FOR THE COUNTY OF MARICOPA

8

  ROBERT J. SWANSTON, INDIVIDUALLY AND

9  ON BEHALF OF HIMSELF AND ALL
  OTHERS SIMILARLY SITUATED        PLAINTIFF

10

  VERSUS           NO. CV2002-004988

11

  TAP PHARMACEUTICAL PRODUCTS,

12  INC.; ET AL.          DEFENDANTS

13  *************************************************

14

          DEPOSITION OF MICKEY BROWN

15

16  *************************************************

17        APPEARANCES NOTED HEREIN

18       TAKEN AT INSTANCE OF: DEFENDANTS
          DATE: MARCH 9th, 2005

19     PLACE: BRUNINI, GRANTHAM, GROWER & HEWES
        POST OFFICE DRAWER 119

20     JACKSON, MISSISSIPPI 39205-0119
         TIME: 10:00 a.m.

22

39

1   actually change as needed throughout the course of

2   an individual year.

3       Q    Can the methodology be reduced to a --

4   to a formula?

5       A    No.

6       Q    How -- how is the -- what is the

7   methodology?  Is it -- for example, is it linked to

8   AWP?  Is it linked to some other benchmark or --

9               MS. FEGAN:  Objection to form.

10  MR. ROBBEN:  (Continuing.)

11      Q    You can answer.

12      A    Okay.  Again, we use -- as I said in the

13  earlier part of the deposition, we use AWP as a

14  reference point.  Reimbursement is established based

15  on -- based on our needs as a company to present

16  fair and reasonable reimbursement to the provider

17  community and fair and reasonable reimbursement to

18  Blue Cross/Blue Shield of Mississippi and our

19  subscribers.

20              We do use AWP as a point of reference.

21  We -- we reimburse for physician-administered

22  pharmaceuticals, in the physician's office using the

40

1    various HCPC codes assigned to the type of service

2    they provide.  You know, a HCPC code, a J code, and

3    I believe a G code -- there's a few other types of

4    HCPC codes -- can have multiple drugs assigned to

5    that -- to that -- to that J code or other HCPC

6    code.

7             And -- and we will choose either -- we'll

8    choose the lesser of the lowest-priced brand using

9    AWP for the -- to determine that or the low -- or

10   the median generic, whichever is less.  And then we

11   apply some -- either a markup or markdown, just

12   depending on our business need, to produce fair

13   reimbursement to the folks I mentioned earlier.

14            So it's -- it's used in the calculation

15   as a point of reference, a starting point for us to

16   develop what we think is fair to the physician

17   community, to Blue Cross to our subscribers.

18       Q    Okay.  Let me -- let me back up a little

19   bit, because I think you said a lot of things there,

20   and I want to understand it correctly.

21            Now, am I correct that when you -- that

22   doctors submit their claims for drugs that they

1    administer by J code?

2           A    Or other HCPC code.  There are other

3    HCPC codes that --

4           Q    That might take in --

5           A    That might take into account an

6    injectable drug or a physician-administered drug.

7           Q    Okay.  Now, when you get that claim in

8    with that code, what's your next step?

9           A    We have a set allowance for that

10   particular HCPC code.  We apply that allowance to

11   the claim, then apply the subscriber's benefits, and

12   we process the claim.  Now, the -- the technical of

13   how that flows, I'm not -- definitely not an expert

14   in that area, but that's generally how it works.

15          Q    Okay.  How do you --

16          A    So we have an established allowance for

17   that.

18          Q    Okay.  How do you establish that

19   allowance amount?

20          A    We take the -- using the J code and a

21   crosswalk to the NDC number for all of the drugs

22   that -- that tie to that J code, we take the median

42

1    generic or the lowest brand, whichever is less, and

2    then we apply either a markup or a markdown, just

3    depending on -- again, back to fair and reasonable

4    reimbursement and what's acceptable in our

5    marketplace.

6            Q    Okay.  Now, when you say you take the

7    lowest brand of the median generic, you're talking

8    about the lowest brand or median generic's AWP?

9            A    Correct.

10           Q    Now -- now, what's your source for the

1    AWP?

12           A    I believe it's Red Book.

13           Q    Okay.  Now, when you're dealing with

14   generics, where do you find the median generic

15   price?

16           A    Every -- every NDC number ties to a J

17   code in that range of drugs.  So we take the average

18   wholesale price for all of those national drug code

19   numbers, and we determine the median internally.

20           Q    So it's something you do in-house?

1            A    Correct.

22           Q    Okay.  So, for example, I know, just

126

1    answer that because I'm not faced with that

2    decision.

3            I don't know how -- I don't know that the

4    practice happens or is prevalent or how that affects

5    what is fair and reasonable.  All of those questions

6    would have to be answered before I think I could

7    answer the question that you've asked.

8    MR. MANGI: (Continuing.)

9        Q    Do you know whether or not physicians

10   contract in any cases with manufacturers to get

11   rebates and discounts on drugs?

12       A    I don't have any idea.

13       Q    Now, I believe you agreed earlier that

14   acquisition costs for drugs could vary from

15   physician to physician, correct?

16       A    I think what I said is that I didn't

17   know whether it did or didn't.  My assumption would

18   be that it does.  But I don't know whether it does

19   or doesn't.

20       Q    Well, certainly, we can agree that the

21   AWP for any given drug bears no fixed relationship

22   to acquisition costs for that drug, correct?

127

1        A       As I've said before, I don't know where

2   average wholesale price comes from.  So the relation

3   of average wholesale price to acquisition cost is

4   not something that I'm familiar with.  So I don't

5   know that I can agree or disagree with your

6   statement.

7        Q       Then it's certainly fair to say you have

8   no particular expectation that there will be a fixed

9   relationship between AWP and acquisition cost?

10                  MS. FEGAN:  Objection to form.

11       A       Average wholesale price is a point of

12  reference that we use.  It's relation to acquisition

13  cost, I'm not familiar with.  So, I mean, I don't

14  have an expectation one way or the other on that.

15 MR. MANGI: (Continuing.)

16       Q       Certainly, you don't have an expectation

17  that acquisition costs will be 20 percent less than

18  AWP, 40 percent, 80 percent.  You just have no

19  expectation at all about that; is that a fair

20  statement?

21                  MS. FEGAN:  Objection to form.

22       A       I mean, I -- all I can -- all I can

1   answer to answer honestly is I have no understanding

2   of the relation between the two.  And to speculate

3   on, you know, what is and what isn't the

4   relationship, I'm not comfortable doing.

5   MR. MANGI: (Continuing.)

6        Q    So it's fair to say, then, certainly you

7   have no expectation of what the relationship is

8   either, correct?

9        A    I think it's fair to say I don't know

10  what the relationship between the two is.  And we

11  strictly use AWP as a point of reference, and that's

12  really all I feel comfortable responding to.

13       Q    On a separate note, you mentioned that

14  CMS fee schedules are used as a point of reference

15  in generating your fee schedules, correct?

16       A    I said it is another source that we look

17  at just so that we have an understanding of what's

18  going on in the marketplace.  It's not a point of

19  reference in the same sense that average wholesale

20  price is.  Our -- our reimbursement is not based on

21  what Medicare's reimbursement is.

22       Q    Do you -- does Blue Cross/Blue Shield of

# EXHIBIT 3

Eric Cannon                Highly Confidential        September 13, 2004
30(b)(6)                   Salt Lake City, UT

1

1                   IN THE DISTRICT OF MASSACHUSETTS

2

3                                 -O-

4

5    IN RE:                        :

6    PHARMACEUTICAL INDUSTRY              MDL No. 1456

7    AVERAGE WHOLESALE PRICE      :    01-CV-1225

8    LITIGATION

9

10        30(b)(6) DEPOSITION OF:  IHC HEALTH PLANS

11

12                          ERIC CANNON

13

14                             -O-

15

16              Place:       IHC Health Plans

17                           4646 West Lake Park Blvd.

18                           Salt Lake City, Utah 84120

19              Date:        September 13, 2004

20                           9:40 a.m.

21              Reporter:    Vickie Larsen, CSR/RPR

22                             -O-

Eric Cannon                  Highly Confidential          September 13, 2004
30(b)(6)                     Salt Lake City, UT

35

1    Medispan that include pricing information.  We talk

2    with vendors about pricing changes, price increases.

3    We receive from manufacturers notification when prices

4    are raised.

5              We track closely the number of

6    manufacturers that may be selling a generic product

7    that would indicate price competition in a specific

8    category.  We monitor communications that may take

9    place through newsletter groups or journal articles or

10   internet or wherever information -- wherever we can

11   find information, we'll take it.

12        Q.      One of the things that you mentioned is

13   that you keep track of the number of companies selling

14   generic products?

15        A.      Yes.

16        Q.      Why is the number of companies selling a

17   generic product important?

18        A.      The number of companies selling a generic

19   product is important to us in that as the number of

20   companies selling a particular product increases, so

21   does competition.  Generally speaking as price or as

22   competition increases within a category, the price

Henderson Legal / Spherion
(202) 220-4158

Eric Cannon                Highly Confidential          September 13, 2004
30(b)(6)                   Salt Lake City, UT

36

1    then begins to drop.

2          Q.     Are you familiar with the term "AWP" or

3    "average wholesale price" in the context of

4    prescription drugs?

5          A.     Yes, I am.

6          Q.     And you mentioned that you subscribe to

7    First Data Bank and/or Medispan databases; is that

8    correct?

9          A.     Yes.

10         Q.     Are AWPs published in those?

11         A.     Yes.

12         Q.     Are AWPs for generic products also

13   published?

14         A.     Yes.

15         Q.     In your experience does the AWP for a

16   generic product tend to decrease when additional

17   sellers of generic products enter the market?

18         A.     No, it does not.

19                MR. EVERETT:  Let's go off the record.

20                (There was a break taken.)

21                MR. EVERETT:  Let's go back on the

22   record.

# EXHIBIT 4

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

\* \* \* \* \* \* \* \* \* \* \* \* \*

IN RE:  PHARMACEUTICAL INDUSTRY          \*

AVERAGE WHOLESALE PRICE LITIGATION          \*

                                                    \*
_____

THIS DOCUMENT RELATES TO ALL ACTIONS          \*

\* \* \* \* \* \* \* \* \* \* \* \* \*

VOLUME I

DEPOSITION OF JAN L. COOK, M.D., a witness called on

behalf of Johnson & Johnson, pursuant to the Federal

Rules of  Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter, Certified

Realtime Reporter and Notary  Public in and for the

Commonwealth of  Massachusetts, at the Offices of

Robins,  Kaplan, Miller & Ciresi L.L.P., 800 Boylston

Street, Boston, Massachusetts, on Wednesday, March 6,

2006, commencing at 9:37 a.m.

Jan L. Cook, M.D.           CONFIDENTIAL           March 6, 2006
                              Boston, MA

202

1    relationship between the price at which they

2    acquire drugs and the amounts they reimburse, if

3    any?

4              MR. COCO:   Objection.

5         A.   I'm only aware of what our payment

6    policy is.  I'm not aware of what people in

7    general are paying for their drugs.

8         Q.   So is the answer to my question that you

9    have no understanding or expectation as to the

10   relationship between the price that they pay to

11   acquire drugs and the amount that they're

12   reimbursed for drugs?

13             MR. COCO:   Objection.

14        A.   Yeah.

15        Q.   Now, let me mark a document.  This will

16   be Exhibit Cook 002.

17             (Exhibit Cook 002, Document Bates-

18   numbered BCBSMA-AWP-12489 - 12492, marked for

19   identification.)

20             (Discussion off the record.)

21        Q.   Now, there are a number of e-mails on

22   this chain.  I'll draw your attention to specific

# EXHIBIT 5

1

```
 1        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2             IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 3
 4    ---------------------------x
      In Re: PHARMACEUTICAL        )
 5                                 )
      INDUSTRY AVERAGE WHOLESALE   ) MDL No. 1456
 6                                 )
      PRICE LITIGATION             ) CIVIL ACTION NO.
 7                                 )  01-CV-12257-PBS
                                   )
 8    ---------------------------)
      THIS DOCUMENT RELATES TO     )
 9    ALL ACTIONS                  )
      ---------------------------x
10
11
12
13       30(b)(6) DEPOSITION OF DAN DRAGALIN, M.D.
14              New York, New York
15           Friday, September 17, 2004
16
17
18
19
20
21
22
```

60

```
 1   the actual drug, it would be more palatable.

 2        Q.    And did any payors, to your

 3   knowledge, actually go in that direction?

 4        A.    Not through us.  They might have

 5   through their own primary networks, but not

 6   through us.

 7        Q.    Did any payors say something along

 8   the lines of yes, we understand that we're

 9   providing a margin on a drug to compensate these

10   providers for their services?

11        A.    Yeah, they all agreed to that.  It's

12   the size of the margin that's the issue here.

13   Well, the size and the variability of the margin,

14   I should say.

15        Q.    Is it fair to say that different

16   payors had different expectations of what those

17   margins should be?

18        A.    Yes.

19        Q.    I would like to move on to a second

20   e-mail here, this one is on page 12, and it's the

21   second e-mail, actually, on the page from you to

22   a group of people beginning with Andrea Rowe, and
```

# EXHIBIT 6

Kelly Ellston             Highly Confidential          November 23, 2004
                             Washington, DC

1

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - - x    CERTIFIED COPY

4     In re:  PHARMACEUTICAL           :MDL DOCKET NO.

5     INDUSTRY AVERAGE WHOLESALE       :CIVIL ACTION

6     PRICE LITIGATION                 :01CV12257-PBS

7     - - - - - - - - - - - - - - - x,

8                              Tuesday, November 23, 2004

9                              Washington, D.C.

10

11                  HIGHLY CONFIDENTIAL

12

13        Deposition of KELLY ELLSTON, commencing at

14   9:59 a.m., held at the offices of Morgan, Lewis &

15   Bockius, 1111 Pennsylvania Avenue, N.W., Washington,

16   D.C., before Keith Wilkerson, a notary public in and

17   for the District of Columbia.

18

19

20

21

22

Kelly Ellston               Highly Confidential          November 23, 2004
                              Washington, DC

                                                                    89

1          A.    That's correct, between the PPO and the

2    provider.

3          Q.    Now, based on the fact that Union Labor

4    Life does not know what physicians' acquisition costs

5    are, is it fair to say that Union Labor Life does not

6    know how much money physicians are or are not making

7    in relation to drugs they administer in office?

8          A.    That's correct.

9          Q.    Union Labor Life does not know how much

10   of a loss they're taking or how much of a profit

11   they're making?

12         A.    That's correct.

13         Q.    And it would be fair to say that Union

14   Labor Life certainly does not have a particular

15   percentage expectation of the amount of profit that a

16   physician may be making.  Correct?

17         A.    No.

18         Q.    It would be impossible to say that Union

19   Labor Life expects that they'll make a percentage

20   profit of 5 percent, 10 percent, 20 percent, 30

21   percent, 40 percent?

22         A.    That's not in our calculations.

90

1          Q.    That's something that is entirely

2    irrelevant to Union Labor Life's calculations of the

3    amounts that it's going to reimburse.  Is that

4    correct?

5          A.    Correct.

6          Q.    Now, we spoke about instances where

7    billing is a percentage of charges.

8          A.    Yes.

9          Q.    I just want to be clear here.  Do

10   physicians bill based on a fee schedule or on a

11   percentage of bill charges or either?

12         A.    It could be either.

13         Q.    Do you have any knowledge as to how

14   physicians would arrive at the amounts billed when

15   they're not using a fee schedule?

16         A.    Well, generally the physician doesn't

17   derive what they bill based on percentage of savings

18   or fee schedules.  To my knowledge, the physician's

19   billing is completely up to how they decide to set

20   their prices.  It's how they're reimbursed is the

21   percentage of savings or the fee schedule.  Billing,

22   they can charge what they charge.

# EXHIBIT 7

Robert C. Farias                                    October 20, 2004
Wellesley, MA

1

```
 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3                    NO. 01CV12257-PBS

 4

 5     _____

 6     In re:  PHARMACEUTICAL            )

 7     INDUSTRY AVERAGE WHOLESALE        )

 8     PRICE LITIGATION                  )

       _____ )

 9     THIS DOCUMENT RELATES TO:         )

       ALL ACTIONS                       )

10     _____ )

11

12                 DEPOSITION OF ROBERT C. FARIAS,

13     called as a witness by and on behalf of the

14     Defendants, pursuant to the applicable provisions

15     of the Federal Rules of Civil Procedure, before P.

16     Jodi Ohnemus, Notary Public, Certified Shorthand

17     Reporter, Certified Realtime Reporter, and

18     Registered Merit Reporter, within and for the

19     Commonwealth of Massachusetts, at the offices of

20     Harvard Pilgrim Health Care, 93 Worcester Road,

21     Wellesley, Massachusetts, on Wednesday, 20 October,

22     2004, commencing at 10:05 a.m.
```

Robert C. Farias                                    October 20, 2004
Wellesley, MA

```
1        Q.    So, if a physician were committing a crime
2   and billing for a drug that he had got as a free
3   sample, Harvard Pilgrim would still reimburse him,
4   but would hope that the authorities would catch up
5   with him, right?
6        A.    I think that's safe to say.
7        Q.    And Harvard Pilgrim doesn't have any
8   knowledge about what providers' acquisition costs
9   are, right?
10       A.    No.
11       Q.    Doesn't require them to disclose those.
12       A.    No.
13       Q.    And if it learned that those were higher
14  or lower than it currently thinks they are, that
15  wouldn't change the fact that it reimburses that
16  methodology, which is 95 percent of AWP?
17       A.    Correct.
18       Q.    Indeed, if it learned that in a particular
19  instance physicians were getting a particular drug
20  at a -- were getting a rebate or a discount from a
21  manufacturer on a particular drug, that wouldn't
22  change the fact that Harvard Pilgrim's standard
```

Henderson Legal / Spherion
(202) 220-4158

Robert C. Farias                              October 20, 2004
                      Wellesley, MA

153

1    across the board methodology is 95 percent of AWP?

2          A.    Correct.

3                MR. NALVEN:  Objection.

4                MR. MANGI:  That's it.

5                MR. NALVEN:  I have nothing further.

6                THE WITNESS:  Okay.  Great.

7                (Whereupon the deposition ended at

8                12:52 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

EXHIBIT 8

1

```
 1              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

 2

 3                    ---oOo---

 4

 5   In re:  PHARMACEUTICAL          MDL DOCKET NO.

     INDUSTRY AVERAGE WHOLESALE      CIVIL ACTION

 6   PRICE LITIGATION                01CV12257-PBS

 7   _____

     THIS DOCUMENT RELATES TO:

 8   ALL ACTIONS

 9

10   - - - - - - - - - - - - - - - - - - -x

11

12              CONFIDENTIAL TRANSCRIPT

13                   1340 Concord Terrace

14                   Third Floor

15                   Sunrise, Florida

16                   September 20, 2004

17                   9:20 a.m. - 1:05 p.m.

18        DEPOSITION OF HAL GOLDMAN, PHARM D., R.Ph.

19            Taken before LISA EDWARDS, Registered Merit

20   Reporter and Notary Public for the State of Florida at

21   Large, pursuant to Notice of Taking Deposition filed in

22   the above cause.
```

Hal Goldman, Pharm D., R.Ph.  Confidential                    September 20, 2004
Sunrise, FL

58

1    other?

2        A.    The oncologist will get maybe a different fee

3    because theirs are maybe more high tech than a

4    rheumatologist who's doing an infustion for arthritis.

5    So there may be some differences based on the contract

6    language.

7            It may even vary in an oncologist's language if

8    it's a high-tech infusion versus a lower-tech infusion.

9    And those can get spelled out a whole host of ways

10   depending upon the type of product we have.

11       Q.    Which factors does Vista consider in setting

12   the infusion fee that it pays to providers?

13       A.    Based on the knowledge I have, it's based on

14   what we actually discussed.  It's based on a physician's

15   practice location, do we need that physician in our

16   network, and how important is he to participate in our

17   drug replacement program based on our purchasing power

18   with volume.

19       Q.    Does Vista ever consider whether it's necessary

20   to increase the amount of the infusion fee to keep a

21   doctor who may already be in the network from referring

22   people to hospitals to get injectable drugs?

Hal Goldman, Pharm D., R.Ph.  Confidential                September 20, 2004
Sunrise, FL

59

1      A.     You always want to do things that are

2    office-based that can be done in an office.  So I think

3    that would be a factor that might be considered.  Here

4    again, it also depends on, do we have 20 doctors in that

5    geographic location that we could just decide to remove

6    the doctor from our panel and refer that line of

7    business somewhere else?

8      Q.     Why is it that Vista wants to always, if

9    possible, do these sorts of services in the provider

10   offices?

11     A.     There's probably a couple of reasons for that.

12   Number one, of course, there is a higher cost of doing

13   an infusion in an outpatient or hospital setting.

14   There's also a time for a member.  Traditionally, with

15   infusions in a physician's office you don't have the

16   long waiting period; so less time lost from work, less

17   time lost from family time.

18            The third thing is, putting somebody into an

19   infusion center or a hospital to get an infusion exposes

20   them to a lot more germs than you do in a doctor's

21   office.  So then you're increasing the risk of how

22   you're getting what we call an invasive procedure, which

EXHIBIT 9

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

CERTIFIED COPY

* * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL INDUSTRY          *

AVERAGE WHOLESALE PRICE LITIGATION       *

                                          *
_____

THIS DOCUMENT RELATES TO ALL ACTIONS     *

* * * * * * . * * * * * * * *


VOLUME I


DEPOSITION OF LISA M. GORMAN, a witness called on

behalf of Johnson & Johnson, pursuant to the Federal

Rules of Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter, Certified

Realtime Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Offices of

Robins, Kaplan, Miller & Ciresi L.L.P., 800 Boylston

Street, Boston, Massachusetts, on Tuesday, March 7,

2006, commencing at 9:00 a.m.

Lisa M. Gorman            HIGHLY CONFIDENTIAL            March 7, 2006
                              Boston, MA

106

Q.   Okay.  Now, earlier in the day you also testified that you don't know as a general matter what exactly physicians paid to acquire drugs, right?

A.   Yes.  It's not part of my job responsibility.

Q.   Okay.  So you do have an understanding here that different doctors may have paid different rates, but your testimony is that you don't know what the rates are that any doctors pay to acquire drugs?

A.   That's true, yeah.

Q.   So you have no understanding or expectation, then, as to what the relationship is between doctors' acquisition prices for drugs and the amounts that they are reimbursed for drugs?

MR. COCO:  Objection.

A.   I don't know, no.

Q.   So your answer is that you have no such understanding or expectation?

A.   I don't, yeah.

MR. MANGI:  Let's mark the next

# EXHIBIT 10

1

1       UNITED STATES DISTRICT COURT

2       DISTRICT OF MASSACHUSETTS

3

4       No. 01CV12257-PBS

5

6

*************************************

7                                      *

IN RE:   PHARMACEUTICAL INDUSTRY       *

8       AVERAGE WHOLESALE PRICE LITIGATION . *

                                       *

9       *************************************

10

11      DEPOSITION OF THOMAS E. GREENEBAUM, taken pursuant to

12      the Federal Rules of Civil Procedure, at CIGNA

13      Headquarters, 900 Cottage Grove Road, South Building,

14      Bloomfield, CT, before Diana M. Noel, a Registered

15      Professional Reporter, Certified Realtime Reporter,

16      and Licensed Shorthand Reporter No. 199, in and for

17      the State of Connecticut, on Friday, January 14, 2005,

18      commencing at 9:40 AM.

19

20

21

22

75

1    what AWP is.  We use it as an industry standard

2    benchmark that has been out there for years, and so

3    that's how we set up, how we sell and pay for services,

4    and we use, you know, our negotiating skills in terms

5    of what we buy from manufacturers.  We do use WAC as a

6    relationship when we purchase from a wholesaler only.

7    Otherwise, I really don't deal with WAC at all.

8              (The Court Reporter marked the question.)

9        Q.   I was also asking in addition to the question

10   about WAC, I was also asking about actual acquisition

11   costs.

12              Would the same statement that you just

13   made hold true for the actual acquisition cost, that

14   Cigna does not have an expectation of a relationship

15   between average wholesale price or actual acquisition

16   cost but, in fact, those are two separate pieces?

17              MR. ST. PHILLIP:  Whose acquisition

18        cost?

19              MS. SCHOEN:  Cigna's.

20              MR. NOTARGIACOMO:  I'll object to the

21        question.

22              MR. ST. PHILLIP:  Could you read it back

76

1          for me, please.

2               (The court reporter read back.)

3               MR. ST. PHILLIP:  So -- if you

4          understand that, you can answer.

5     A.    Yeah, I mean, I think that our acquisition

6     costs are separate from AWP, and we don't have any

7     expectations of what the relationship is between what

8     we purchase the drug for versus what AWP is.

9               MR. WADE:  Let me pause for one second.

10              (Discussion off the record.)

11    Q.    You explained to me earlier the methodology

12    that Cigna uses to reimburse pharmacies or historically

13    has used since 1991, which was a percentage off of AWP

14    plus a dispensing fee for branded drugs, and either a

15    percentage off of AWP or a MAC list price plus

16    dispensing fee for generic drugs.

17              Are there any other methodologies or

18    ways that Cigna has reimbursed pharmacies from 1991 to

19    the present for pharmaceutical products?

20    A.    First of all, we don't reimburse.  We pay.

21    We make payments to retail pharmacies.  There were a

22    couple specific instances where we were providing a