# EXHIBIT 11

629

1              THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3      * * * * * * * * * * * * * * * * * * * * * * * * *

4      IN RE:  PHARMACEUTICAL              MDL DOCKET NO.

5      INDUSTRY AVERAGE WHOLESALE          01CV12257-PBS

6      PRICE LITIGATION

7      * * * * * * * * * * * * * * * * * * * * * * * *       FEBRUARY 27, 2006

8      THIS DOCUMENT RELATES TO:           VOLUME: III

9      ALL ACTIONS                         PAGES: 629-904

10     * * * * * * * * * * * * * * * * * * * * * * * * *

11              C O N F I D E N T I A L

12         CONTINUED VIDEOTAPED DEPOSITION OF

13             RAYMOND S. HARTMAN, PH.D.

14     CONTINUED DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

15     witness called on behalf of the Defendants pursuant to

16     the Federal Rules of Civil Procedure, before Judith

17     McGovern Williams, Certified Shorthand Reporter,

18     Registered Professional Reporter, Certified Realtime

19     Reporter, and Notary Public in and for the Commonwealth

20     of Massachusetts, at the offices of Dwyer & Collora,

21     600 Atlantic Avenue, Boston, Massachusetts 02110, on

22     Monday, February 27, 2006, commencing at 9:42 a.m.

1   30 percent; correct?

2       A.   The -- the contracts that I have

3   reviewed that are in my attachment C, the

4   contracts that are reviewed in the Dyckman report,

5   the contracts that are reviewed in the University

6   of Chicago NORC survey or analysis all indicate to

7   me that the expectations were that the -- that the

8   spreads were within the yardstick that I have put

9   forward.   So what has been revealed by their

10  contracting behavior tells me that that is what

11  they have expected.

12      Q.   I am looking for a name, Dr. Hartman.

13  Can you identify by name any third-party payer who

14  has testified in this case that they expected AWP

15  to exceed ASP by a range that did not exceed 30

16  percent?

17          MR. SOBOL:   Objection to the form.

18      A.   I would have to go back and look at that

19  -- those materials.   I can't come up with a name

20  right now.

21      Q.   We were talking earlier about the

22  methodology that economists use, and I believe you

1    deponents.

2         Q.   But you are not in a position to say

3    that at least some payers did not understand that

4    there were mega-spreads?

5              MR. SOBOL:  Objection.

6         A.   It -- you are saying -- I cannot -- I

7    cannot make the statement that no one, no payer,

8    knew that there weren't mega-spreads.  I, you

9    know, I don't know whether they did or they

10   didn't.

11        Q.   Okay.

12             MR. EDWARDS:  And indeed let's take a

13   look at an article from the March 1997 issue of

14   Cancer Economics, which I will mark as Exhibit

15   Hartman 033.

16                  (Excerpt from Cancer Economics,

17   March 1997 marked Exhibit Hartman 033 for

18   identification.)

19                  (Handing Hartman Exhibit Hartman

20   033 to the witness.)

21   BY MR. EDWARDS:

22        Q.   Have you ever seen this article before,

798

1    Guideline Conference on March 3rd."

2        A.    Right.

3        Q.    Have you ever heard of Dr. Newcomer

4    before?

5        A.    No, I have not.

6        Q.    The article goes on to say that Dr.

7    Newcomer was an oncologist before he became chief

8    medical officer of United HealthCare.

9        A.    I see that.

10        Q.    So since the chief medical officer of

11   United HealthCare was an oncologist who acquired

12   chemotherapy drugs directly from manufacturers,

13   wouldn't it be safe to assume that United

14   understood as of 1997 that there could be mega-

15   spreads to the extent that they existed at the

16   time?

17            MR. SOBOL:   Objection.

18        A.    The -- what -- what this says to me is

19   that Lee Newcomer understood the allegations in

20   this matter and was making his voice heard, and

21   there -- I'm -- as -- there are no doubt other

22   students and experts in this area that also

EXHIBIT 12

Jill S. Herbold                                    January 14, 2005
                        Bloomfield, CT

                                                                   1

1                 UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4

5                   No. 01CV12257-PBS

6

7

8       *************************************

9                                         *

        IN RE:  PHARMACEUTICAL INDUSTRY     *

10      AVERAGE WHOLESALE PRICE LITIGATION   *

                                          *

11      *************************************

12

13      DEPOSITION OF JILL S. HERBOLD, taken pursuant to

14      the Federal Rules of Civil Procedure, at CIGNA

15      Headquarters, 900 Cottage Grove Road, South Building,

16      Bloomfield, CT, before Diana M. Noel, a Registered

17      Professional Reporter, Certified Realtime Reporter,

18      and Licensed Shorthand Reporter No. 199, in and for

19      the State of Connecticut, on Friday, January 14,

20      2005, commencing at 12:48 PM.

21

22

Jill S. Herbold                                           January 14, 2005
                          Bloomfield, CT

                                                                      85

1    from large markups on prescription drugs that it

2    administers?

3                    MS. SCHOEN:  Objection to form.

4        A.    With respect to the reimbursement of

5    practitioners for their services, we expect that the

6    physician is negotiating with us and another carrier so

7    that they can maintain sufficient profit margin to

8    operate their business and stay in business.  We don't

9    have a specific expectation about exactly what their

10   billed charges might be for a particular service

11   because it's a difference between that billed charge

12   and the reimbursement amount that I would call and

13   refer to as a markup.

14       Q.    When you use the term billed charge, what are

15   you referring to?

16       A.    What I'm referring to there is the fee amount

17   that the physician would submit on the claim in order

18   for the claim to get paid.  It's -- another way to say

19   it is it is the amount that the physician would charge

20   for an indemnity member.

21       Q.    Let's turn back to the 13 codes that we

22   talked about a few minutes ago.

Jill S. Herbold                                          January 14, 2005
                          Bloomfield, CT

86

 1                    I believe you testified that one -- and
 2    correct me if I'm wrong -- that the reason that Cigna
 3    singled out these 13 codes for different treatment was
 4    the fact that there became available on the market
 5    generic forms of those drugs that were available at a
 6    cheaper price, is that accurate?
 7          A.   Yes, and let me clarify.  Our change that we
 8    made was in reaction to the result of competitive
 9    market forces.  Generic drugs were introduced that'
10    drove down the acquisition cost, the cost of the
11    product in the marketplace.
12          Q.   And the change -- were you finished?
13          A.   Yes -- I'm finished, yes.
14          Q.   And the change in the reimbursement for those
15    codes that Cigna instituted, was that an attempt to
16    bring physician reimbursements for those codes in line
17    with the lower price available in the marketplace for
18    those drugs?
19          A.   Yes.
20          Q.   So if Cigna had information that other drugs
21    other than that 13 were available for a price that was
22    significantly less than the reimbursement that Cigna

# EXHIBIT 13

James T. Kenney                                    September 20, 2004
                        Wellesley, MA

1

1               UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                   NO. 01CV12257-PBS

4       _____

5       In re:  PHARMACEUTICAL              )

6       INDUSTRY AVERAGE WHOLESALE          )

7       PRICE LITIGATION                    )

8       _____    )

9       THIS DOCUMENT RELATES TO:           )

10      ALL ACTIONS                         )

11      _____    )

12                  DEPOSITION of HARVARD PILGRIM HEALTH

13      CARE BY JAMES T. KENNEY, called as a witness by and

14      on behalf of the Defendants, pursuant to the

15      applicable provisions of the Federal Rules of Civil

        Procedure, Rule 30 (b)(6), before P. Jodi Ohnemus,

16      Notary Public, Certified Shorthand Reporter,

17      Certified Realtime Reporter, and Registered Merit

18      Reporter, within and for the Commonwealth of

19      Massachusetts, at the offices of Harvard Pilgrim

20      Health Care, 93 Worcester Road, Wellesley,

21      Massachusetts, on Monday, 20 September, 2004,

22      commencing at 10:50 a.m.

James T. Kenney                                        September 20, 2004
                        Wellesley, MA

                                                                    12

1        Q.    Uh-huh.  And to your recollection, what

2    was the range of percentages markup or discount off

3    of WAC at which Harvard acquired drugs from

4    manufacturers for dispensing through its staff

5    model HMO pharmacists?

6             MR. HORGAN:  Objection.  You can answer.

7        A.    2 percent, to maybe 50, 60 percent.

8        Q.    Above or below WAC?

9             MR. HORGAN:  Objection.

10       A.    Below WAC.

11       Q.    With respect to brand name drugs -- let's

12   stick with brand name drugs for a moment.  What was

13   the percentage markup or discount off of WAC that

14   Harvard Pilgrim acquired drugs from manufacturers

15   for its staff model HMO?

16            MR. HORGAN:  Objection.  Can you -- all

17   these are just if you know, all these questions.

18       A.    The branded discount was 2 to 50 percent.

19       Q.    2 percent to 50 percent.

20       A.    2 to 50 percent off.

21       Q.    Did the discounts off of WAC differ with

22   respect to generic drugs that Harvard purchased on

James T. Kenney                           September 20, 2004
                    Wellesley, MA

13

1    behalf of its staff model HMO?

2         A.    Yes.

3         Q.    What were the discounts off of WAC that

4    Harvard Pilgrim received with respect to the

5    general risk purchased from manufacturers for its

6    staff model HMO?

7         A.    50 percent to 80 percent.

8         Q.    At that time did Harvard negotiate

9    separate manufacturer rebate agreements with

10   manufacturers for the drugs that were dispensed or

11   administered by the staff model HMO?

12        A.    No.

13        Q.    Were the rebate -- withdraw that question.

14   Were the discounts off of WAC at which Harvard

15   acquired drugs from manufacturers inclusive of a

16   rebate that pertained to the drugs that were

17   dispensed or administered by the pharmacies --

18             MR. HORGAN:   Objection.

19        Q.    -- or the clinics?

20             MR. HORGAN:   Objection.

21        A.    No.

22        Q.    Was it your understanding that at the time

James T. Kenney                                    September 20, 2004
                        Wellesley, MA

                                                                    15

1          A.    WAC.

2          Q.    Uh-huh.   What was the range of discounts

3    off of WAC or above WAC at which Harvard acquired

4    brand name drugs from wholesalers?

5          A.    WAC plus 2 percent.

6          Q.    What was the discount above or below WAC

7    at which Harvard acquired generic drugs from

8    wholesalers for its staff model HMO?

9          A.    50 to 80 percent.

10         Q.    Off WAC?

11         A.    Uh-huh.

12         Q.    And again, was it your understanding at

13   the time that those were market prices that

14   otherwise would be available in the industry?

15              MR. NALVEN:   Objection.

16              MR. HORGAN:   Objection.

17         A.    Yes.

18         Q.    When you were negotiating with

19   manufacturers and wholesalers for the purchase of

20   drugs on behalf of staff model HMO, what was your

21   understanding of the term "WAC" or wholesale

22   acquisition cost?

EXHIBIT 14

John M. Killion            HIGHLY CONFIDENTIAL            January 6, 2006
Boston, MA

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS 

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL                MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE            01CV12257-PBS

PRICE LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * *     DEPOSITION OF

THIS DOCUMENT RELATES TO:             JOHN M. KILLION

ALL ACTIONS                           JANUARY 6, 2006

* * * * * * * * * * * * * * * * * * * * * * * * * *

        H I G H L Y   C O N F I D E N T I A L

DEPOSITION of JOHN M. KILLION, a witness called on

behalf of the Defendant Johnson & Johnson pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, Certified LiveNote Reporter, and Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Robins, Kaplan, Miller & Ciresi,

L.L.P., 800 Boylston Street, Boston, Massachusetts

02199, on Friday, January 6, 2006, commencing at

9:41 a.m.

John M. Killion  HIGHLY CONFIDENTIAL  January 6, 2006
Boston, MA

122

1  Q. Was it also your understanding at the

2 time that when competition came into the market

3 for brand name drugs, i.e., multisource

4 competition, there were also discounts and

5 rebates that were provided on those drugs?

6    MR. SULLIVAN:  Objection. Beyond the

7 scope.

8  A. That's correct.

9  Q. So typically -- so it was your

10 understanding then in the 1998 time frame that

11 when a brand name drug first came to market there

12 typically were no incentives associated with the

13 drug, but then as competition entered the market,

14 first multisource, and then with generics, more

15 incentives were provided for the drug; correct?

16    MR. SULLIVAN:  Objection.

17  A. Correct.

18  Q. And that is what led to your

19 understanding that AWP was an artificial price

20 because it didn't bear a relationship to the

21 acquisition cost; correct?

22  A. Correct.

John M. Killion        HIGHLY CONFIDENTIAL        January 6, 2006
Boston, MA

126

1    basically common knowledge at this point in time?

2              MR. SULLIVAN:  Objection; beyond the

3    scope.  Objection; form.

4         A.    Common knowledge that generics were

5    less expensive?

6         Q.    No.  Just that brand name drugs --

7    excuse me -- common knowledge --

8              MR. HAAS:  Withdraw the question.

9         Q.    Was it your understanding at the time

10   that it was basically common knowledge that

11   acquisition costs varied depending upon whether a

12   drug was brand or multisource or generic given

13   the level of competition in the marketplace for

14   the drugs?

15        A.    Yes.

16             MR. SULLIVAN:  Objection to form.

17        A.    Yes.

18             MR. NOTARGIACOMO:  Let me clarify

19   "acquisition cost."

20             MR HAAS:  You can object.  He said yes.

21             MR. SULLIVAN:  I objected to the form

22   of the question.  I think it is unclear.

John M. Killion        HIGHLY CONFIDENTIAL        January 6, 2006
                            Boston, MA

136

1    your understanding that AWP was an artificial

2    price because it did not bear a relationship to

3    actual prices.   Do you remember agreeing to that

4    statement?

5            MR. HAAS:   Objection to form.

6        A.   I do.

7        Q.   Do you have an understanding -- well,

8    actually in 1998 when you were employed at Tufts,

9    do you have an understanding of how AWP was

10   calculated?

11           MR. HAAS:   Objection to form.

12       A.   No.   Not how it was calculated.

13       Q.   Do you have -- did you have an

14   understanding as to the relationship between AWP

15   and the actual prices that were paid by

16   physicians for physician- administered drugs?

17       A.   No.

18           MR. HAAS:   Objection to form.  The

19   record speaks for itself.

20       Q.   When you said and used the term

21   "artificial price" in that answer, what did you

22   mean by the term "artificial price"?

John M. Killion            HIGHLY CONFIDENTIAL            January 6, 2006
                                Boston, MA

137

1          MR. HAAS:  Objection to form.

2      A.    Artificial price meaning a -- a price

3   that -- that was referred to as it ain't what you

4   pay, or the acronym AWP, ain't what you pay, used

5   commonly at Tufts Health Plan.

6      Q.    **Did you have an understanding -- are**

7   **you using that term, "it ain't what it pays," is**

8   **it your understanding that AWP was not the**

9   **arithmetic actual average of wholesale prices?**

10      A.    That --

11          MR. HAAS:  Objection to form. Leading

12   question.

13      A.    That's correct.

14      Q.    **Did you understand what the**

15   **relationship was between average wholesale price**

16   **and as published or as --**

17          MR. NOTARGIACOMO:  Strike that.

18      Q.    **Did you have an understanding about**

19   **what average wholesale price was in relationship**

20   **to the prices that physicians were paying for**

21   **those drugs?**

22      A.    No, I did not.

Henderson Legal Services
(202) 220-4158

John M. Killion  HIGHLY CONFIDENTIAL  January 6, 2006
Boston, MA

138

1        MR. HAAS:  Objection to form. The

2   record speaks for itself.

3        MR. NOTARGIACOMO:  I have no further

4   questions.

5        REDIRECT EXAMINATION

6   BY MR. HAAS:

7     Q.  **Just to clarify, you testified after**

8   **the break following your conversations with**

9   **counsel that it was commonly discussed at Tufts**

10  **Plan in the 1998 time frame that AWP properly**

11  **stood for "ain't what's paid"; is that correct?**

12       MR. SULLIVAN:  Objection.  Form.

13    A.  That term had been used.  Correct.

14    Q.  **And I believe you just testified that**

15  **you had --**

16       MR. HAAS:  I withdraw that question.

17    Q.  **So you understood that by that phrase,**

18  **"ain't what's paid," that AWP was not in fact the**

19  **actual average of wholesale prices; correct?**

20    A.  That's correct.

21    Q.  **And you understood at this time and it**

22  **was discussed at Tufts that AWP bore no**

Henderson Legal Services
(202) 220-4158

EXHIBIT 15

Edward Lemke                Confidential                January 11, 2005
                           Louisville, KY

1

1         IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

            CIVIL ACTION NO.  01CV12257-PBS

3

4   IN RE:  PHARMACEUTICAL

    INDUSTRY AVERAGE WHOLESALE

5   PRICE LITIGATION

6   THIS DOCUMENT RELATES TO:

    ALL ACTIONS

7

8                 * * * * * * * * *

9        CONFIDENTIAL DEPOSITION OF

10              EDWARD LEMKE

11            JANUARY 11, 2005

12              * * * * * * * * *

13        TAKEN BY DEFENDANTS

14       AT 500 WEST MAIN STREET

15         LOUISVILLE, KENTUCKY

16              * * * * * * * * *

17

18        THE DEPOSITION OF EDWARD LEMKE, TAKEN AT

19   500 WEST MAIN STREET, LOUISVILLE, KENTUCKY ON

20   JANUARY 11, 2005; SAID DEPOSITION TAKEN PURSUANT TO

21   NOTICE AND IN ACCORDANCE WITH THE RULES OF CIVIL

22   PROCEDURE.

Edward Lemke                    Confidential                    January 11, 2005
                               Louisville, KY

                                                                          122
1    Lemke to provide an answer.

2              MR. MANGI:  I obviously disagree with that

3    interpretation, and the question is encompassed by

4    other subject matters.  You can answer.

5              THE WITNESS:  I know of no analysis that

6    exists that would indicate that being the case.

7    BY MR. MANGI:

8        Q.   Now, you testified earlier that you don't

9    know what exactly providers are paying to acquire

10   drugs, correct?

11       A.   Correct.

12       Q.   All right.  So it's fair to say that you

13   have no particular expectation that there is a given

14   relationship between the amount they paid to acquire

15   drugs and the amount that Humana reimburses for

16   those drugs; is that correct?

17             MR. ST. PHILLIP:  Objection, calls for

18   speculation.

19             THE WITNESS:  I have no personal knowledge

20   that -- of that.

21   BY MR. MANGI:

22       Q.   And certainly, Humana has no expectation

Henderson Legal Services
(202) 220-4158

Edward Lemke                  Confidential                  January 11, 2005
                             Louisville, KY

123

1    that the amount that physicians pay to acquire drugs

2    are 10 percent, 20 percent, 50 percent, 60 percent

3    less than the amounts that Humana reimburses in

4    relation to those drugs; would you agree with that

5    statement?

6              MR. ST. PHILLIP:  Objection, objection to

7    form.

8              THE WITNESS:  I have no knowledge of that.

9    BY MR. MANGI:

10        Q.   And you have no expectation to that effect

11   either; is that correct?

12             MR. ST. PHILLIP:  Objection.  Same

13   objection.

14             THE WITNESS:  I'm not quite sure what you

15   mean, whether I have an expectation of that.

16   BY MR. MANGI:

17        Q.   Is it Humana's expectation that the

18   amounts that providers pay to acquire drugs are a

19   fixed percentage less than the amount Humana

20   reimburses in relation to those drugs?

21        A.   The expectation that -- first of all, that

22   it's fixed, no.  The expectation that good business

Edward Lemke                 Confidential                January 11, 2005
                             Louisville, KY

124

 1    practice and assuming providers that we do business

 2    with practice good business practices, is that they

 3    would only accept payment that is at or above their

 4    costs.  That's my only expectation.

 5        Q.   And certainly, you have no fixed

 6    expectation as to how much higher it would be than

 7    their acquisition costs, correct?

 8        A.   Correct.

 9        Q.   And indeed, that would vary from provider

10    to provider, depending on what they paid to acquire

11    drugs and what Humana reimburses them for drugs?

12        A.   Correct.

13        Q.   The percentage could be 10 percent in one

14    case, 50 in another, 100 in another, correct?

15             MR. ST. PHILLIP:  Objection.

16             THE WITNESS:  Could be.

17             MR. MANGI:  Let's take a look at a few

18    documents.  Before that, does anyone need a break?

19             MR. ST. PHILLIP:  It's 12:35, let's take

20    one.

21             (A LUNCH BREAK WAS TAKEN.)

22    BY MR. MANGI:

# EXHIBIT 16

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE          MDL DOCKET NO.

PRICE LITIGATION                     CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION of Lee N.

Newcomer, M.D., taken on the 18th day of October,

commencing at 9:40 a.m., at Oppenheimer Wolff &

Donnelly, Plaza VII, Suite 3300, 45 South Seventh

Street, Minneapolis, Minnesota, before Caroline

Nyberg, Registered Professional Reporter and Notary

Public of and for the State of Minnesota.

Newcomer, M.D., Lee N.   HIGHLY CONFIDENTIAL          October 18, 2006
Minneapolis, MN

128

1    the exact correct amount is.

2         Q.   Okay.  Well, do you have any set

3    expectation as to what the profit will be that an

4    oncologist's office will make in terms of the

5    differential between its acquisition cost for

6    drugs and the amounts that its reimbursed for

7    drugs?

8              MR. PRAME:  Objection to form.

9              MR. HAVILAND:  Objection; vague -- vague

10   as to time, and foundation.

11        A.   My message in this speech and others has

12   been clearly that there shouldn't be any, that

13   physicians should be reimbursed for services they

14   actually render to patients and not for retailing

15   pharmaceuticals.

16        Q.   I understand that, and we'll get to the

17   rest of this article in a moment.  My question is

18   different.

19        A.   Okay.

20        Q.   My question is, Based on the testimony

21   you just gave regarding your understanding and

22   that there may be differences from practice to

Newcomer, M.D., Lee N.   HIGHLY CONFIDENTIAL                October 18, 2006
Minneapolis, MN

129

```
1    practice, --

2         A.    Mm-hmm.

3         Q.    -- my question is, do you have an

4    expectation as to whether the differential between

5    drug acquisition and drug reimbursement will be

6    the same for all practices or different from

7    practice to practice?

8              MR. PRAME:  Objection; --

9              MR. HAVILAND:  Same --

10             MR. PRAME:  -- foundation.

11        A.    I don't know that I have an expectation.

12   I have an understanding that they are different.

13        Q.    Okay.  So is it your understanding that

14   the amount that can be generated from that

15   differential between drug acquisition and drug

16   reimbursement will vary from practice to practice?

17        A.    Yes, as I just stated before.

18        Q.    And it will vary from drug to drug?

19        A.    I don't know that.

20        Q.    Okay.  In terms of practice to practice

21   -- well, withdraw that.

22             Let me ask you this:  Is it -- When
```

Henderson Legal Services, Inc.
(202) 220-4158

# EXHIBIT 17

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

In re: PHARMACEUTICAL                    MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE                CIVIL ACTION

PRICE LITIGATION                          01CV12257-PBS

_____/

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/

D E P O S I T I O N

DEPONENT: Bruce M. Niebylski, M.D.

DATE:       Friday, June 30, 2006

TIME:       9:49 a.m.

LOCATION: Feikens, Stevens, Kennedy & Galbraith, P.C.

            First National Building

            660 Woodward Avenue, Suite 700

            Detroit, Michigan  48226

REPORTER: Michele E. French, CSR-3091, RMR, RPR, CRR

Niebylski, M.D., Bruce M.                          June 30, 2006

Detroit, MI

71

1       A.    I had no idea what they were able to buy

2    for.  I just assumed that -- I had no idea what kind

3    of margin they were making, only I heard that they

4    were making a margin.

5       Q.    Did you have and have you at any time at

6    HAP had any particular expectation as to what

7    physicians' acquisition cost for drugs are in

8    relation to reimbursement?

9       A.    I don't know.  That's -- that hasn't been

10   a concern of mine.

11      Q.    Okay.  So if one were to say that, well,

12   your expectation is that acquisition costs will be

13   20 percent, 30 percent, 50 percent, something more,

14   something less, a specific number in relation to

15   reimbursement amounts, would that be inaccurate?

16          MR. WILLIAMS:  Objection to form.

17          THE WITNESS:  I haven't had any

18   expectations what their margin would be.

19   BY MR. MANGI:

20      Q.    When you considered the use of specialty

21   pharmacies in this 2003 time period, were you

22   looking at only Bioscript or did you consider

Niebylski, M.D., Bruce M.                                    June 30, 2006
                          Detroit, MI

                                                                    72

1    different vendors?

2          A.    I had asked our PBM, physician benefit

3    manager, is MedImpact in San Diego, and I had asked

4    them if they could do some utilization controls for

5    us.   They said no, but they got me in touch with

6    Bioscripts as a vendor that they had heard good

7    things about.

8          Q.    Does MedImpact contract with retail

9    pharmacies on HAP's behalf in relation to self-

10   administered drugs?

11         A.    No.   All MedImpact does is pay our claims

12   to the pharmacies.   They don't negotiate or anything

13   else.

14         Q.    Now, they put you in touch with Bioscript.

15   Did you talk to any other specialty pharmacy vendors

16   or just Bioscripts?

17         A.    No, just Bioscripts.

18         Q.    Were you the person in charge of those

19   initial discussions with Bioscript?

20         A.    Yes.

21         Q.    And what was Bioscript offering?

22         A.    They were offering delivery of the

# EXHIBIT 18

Paula Pfankuch                                    September 14, 2004
                        Chicago, IL

<pre>
                                                              1
  1             IN THE UNITED STATES DISTRICT COURT

  2             FOR THE DISTRICT OF MASSACHUSETTS

  3                         - - -

  4    In Re:  PHARMACEUTICAL        : MDL DOCKET NO.

  5    INDUSTRY AVERAGE WHOLESALE    : CIVIL ACTION #

  6    PRICE LITIGATION              :  01CV12257-PBS

  7    ----------------------------------------------

  8    THIS DOCUMENT RELATES TO:

  9    ALL ACTIONS

 10    ----------------------------------------------

 11             The deposition of PAULA PFANKUCH,

 12    called by the Defendants Pfizer, Pharmacia, and

 13    Upjohn for examination, taken pursuant to the

 14    Federal Rules of Civil Procedure of the United

 15    States District Courts pertaining to the taking

 16    of depositions, taken before KIMBERLY WINKLER

 17    CHRISTOPHER, a Notary Public within and for the

 18    County of Kane, State of Illinois, and a

 19    Certified Shorthand Reporter of said State, taken

 20    at 300 East Randolph Drive, Suite 2800, Chicago,

 21    Illinois, on the 14th day of September, 2004, at

 22    the hour of 9:40 o'clock a.m.
</pre>

Henderson Legal / Spherion
(202) 220-4158

Paula Pfankuch                                September 14, 2004
                        Chicago, IL

50

1        Q.    When we left off, we were talking about

2    the use of AWP as a benchmark.

3              Did BlueCross BlueShield of Illinois

4    understand that using a benchmark may result in

5    some providers getting a higher margin on drugs?

6        A.    What BlueCross BlueShield realizes is

7    that certain physician groups may because of

8    their volume be able to purchase things at a

9    lower rate than others.

10       Q.    And if all purchase groups are being

11   reimbursed at the same rate, then they would have

12   different margins for their drugs; is that

13   accurate?

14       A.    That would be accurate.

15       Q.    Did BlueCross BlueShield of Illinois

16   accept those different margins as a cost of being

17   able to use a benchmark?

18       A.    I guess I don't understand what you

19   mean by "cost."

20       Q.    Were you willing to allow different

21   providers to earn different margins so that you

22   could use a benchmark for pricing?

# EXHIBIT 19

Carol Sidwell                                    September 17, 2004

Moline, IL

1

```
 1           IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4    IN RE PHARMACEUTICAL          )

 5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

 6    PRICE LITIGATION             )   Civil Action: 01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO     )

 8    ALL CLASS ACTIONS            )

 9

10           Deposition of CAROL SIDWELL, taken before

11    GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

12    pursuant to the Federal Rules of Civil Procedure for

13    the United States District Court pertaining to the

14    taking of depositions, at Suite 300, 1630 Fifth

15    Avenue, in the City of Moline, Illinois, commencing

16    at 10:38 o'clock a.m., on the 17th day of September,

17    2004.

18

19

20

21

22
```

Carol Sidwell                                    September 17, 2004

Moline, IL

68

1      Q.    Are you aware of any other benchmarks that

2    are available for use in reimbursing pharmacies?

3      A.    Certainly like the HCFA MAC would be a

4    benchmark price.  That's one that I don't -- we

5    don't use in our business to implement it.  We use

6    it as one of the things in compiling our own MAC

7    pricing.

8      Q.    Is the HCFA MAC exclusive to generic

9    products?

10     A.    I believe so.  It doesn't include all

11   generics.

12     Q.    So just speaking of brand name drugs here

13   exclusively, are you aware of any other benchmarks

14   available for use in reimbursing pharmacies?

15            I'm sorry, I didn't hear your answer if

16   you did answer.

17     A.    I'm still thinking.  I'm not aware of any

18   easily definable other benchmark out there.

19   Certainly there are different sources of AWP than

20   what we use today.

21     Q.    So if you learned that AWP did not have a

22   relation to any sort of real world prices, would

Carol Sidwell                                September 17, 2004
                           Moline, IL

                                                              69

1    that affect your negotiations with pharmacies in

2    using AWP as a benchmark?

3              MR. HAAS:  Objection to form.

4              THE WITNESS:  I guess I already understand

5    that AWP is not necessarily a direct linear

6    relationship to the cost or the price that that

7    pharmacy pays for the drug, so since I know that

8    today, I'm not sure that it would change the way I'm

9    doing business or the way I'm contracting with my

10   pharmacies.

11   BY MS. MacMENAMIN:

12       Q.   In your negotiations with manufacturers

13   for rebates and discounts, are those negotiations

14   also based on the benchmarks AWP and WAC?

15       A.   Those are certainly two of the things that

16   are used to calculate the various levels of rebates.

17       Q.   Can you tell me of any other benchmarks

18   that are available?

19       A.   I look at the other costs of drugs in that

20   class based on AWP, based on WAC, and based on the

21   rebate amounts that the other manufacturers are

22   willing to offer to get down to a net price.

                   Henderson Legal / Spherion
                        (202) 220-4158

# EXHIBIT 20

1                       1           IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

2

3

     IN RE:                               )

4                                         )

     PHARMACEUTICAL INDUSTRY              ) Civil Action No.

5    AVERAGE WHOLESALE PRICE              )  01CV12257-PBS

     LITIGATION                           )

6

7

8                       HIGHLY CONFIDENTIAL

9                         DEPOSITION

10                        of JOE SPAHN

11

12                     Taken at Anthem

13                4361 Irwin Simpson Road

14                  Mason, Ohio   45040

15           on November 30, 2004, at 9:12 a.m.

16           Reported by: Rhonda Lawrence, RPR/CRR

17

18

19                        -=0=-

20

21

22

Joe Spahn                    Highly Confidential          November 30, 2004
                             Mason, OH

93

1          Q.  Okay.  Are you aware of any analysis

2     at Anthem regarding the relative costs of

3     administration of a drug in a physician's

4     office versus a hospital setting?

5          A.  No, I haven't.

6          Q.  Now, you testified earlier that

7     Anthem has -- does not know exactly what

8     providers are paying to acquire drugs,

9     correct?

10         A.  Correct.

11         Q.  That's not something that --

12    withdraw that.

13              Anthem does not require providers to

14    disclose their acquisition costs for drugs

15    as part of their contracts with those

16    providers, correct?

17         A.  Correct.

18         Q.  So providers' acquisition costs for

19    drugs do not form part of Anthem's

20    determination of what it will reimburse them

21    in relation to drugs?

22         A.  Correct.

Joe Spahn                    Highly Confidential                November 30, 2004
                                Mason, OH

94

1        Q.   The reimbursement is driven entirely

2   by the fee schedule?

3        A.   Correct.

4        Q.   Regardless of what the specific

5   provider's acquisition costs for those drugs

6   may be?

7        A.   Correct.

8        Q.   So if, for example, Anthem were to

9   learn that a particular provider were

10  getting a discount or a rebate on a

11  particular drug that lowered his acquisition

12  costs for that drug, that wouldn't change

13  the amount that Anthem is reimbursing that

14  practice in relation to that drug, right?

15       A.   No.

16       Q.   Because the reimbursement amount is

17  tied to the fee schedule?

18       A.   Right.

19       Q.   And if Anthem were to learn that

20  providers in a region were getting a

21  discount or rebate from a drug manufacturer

22  in relation to a particular drug, again,

Joe Spahn                    Highly Confidential                 November 30, 2004
                                   Mason, OH

95

```
 1   that wouldn't change the amount Anthem

 2   reimburses because that's tied to the fee

 3   schedule?

 4           MR. THOMAS:  Asked and answered.

 5       A.  Yes.  That's correct.

 6       Q.  Do you know whether Anthem's

 7   contracts with providers contain

 8   confidentiality clauses?

 9       A.  I don't know.

10       Q.  Do you know whether or not -- are

11   you aware of any free sample programs

12   whereby providers can get free samples of

13   drugs from manufacturers?

14       A.  No, I'm not aware.

15       Q.  That's not an area that you deal

16   with?

17       A.  No.

18       Q.  Are you familiar with the major drug

19   wholesalers operating the market today?

20       A.  No.

21       Q.  Do you have an understanding of what

22   wholesalers pay to acquire drugs?
```

Joe Spahn                Highly Confidential                November 30, 2004
                             Mason, OH

96

1        A.  No, I don't.

2        Q.  Are you familiar with prompt pay

3    discounts?

4        A.  No, I'm not.

5        Q.  You've never heard that term?

6        A.  No, I haven't.

7        Q.  To the best of your knowledge, do

8    you know of any instances where providers

9    have conspired with drug manufacturers to

10   inflate the average wholesale prices for

11   drugs?

12       A.  No.

13       Q.  Are you aware of any instances where

14   pharmacies or pharmacy benefits managers

15   have conspired with any drug manufacturers

16   to inflate any drug's average wholesale

17   prices?

18       A.  No.

19           MR. MATT:  Objection.  No

20   foundation.

21           MR. THOMAS:  I was just going to let

22   it go.

97

1      Q.  Do you know whether Anthem has been

2   involved in any litigations pertaining to

3   average wholesale prices for drugs other

4   than this one here today?

5      A.  No.

6         MR. THOMAS:  Objection.  Foundation.

7      Q.  Do you know of any other litigations

8   that Anthem has been involved in relating to

9   reimbursements to providers for drugs

10  administered in office?

11     A.  No.

12        MR. THOMAS:  Same objection.

13        MR. MANGI:  Let's take another quick

14  break and then we'll look at some documents.

15        (Recess taken.)

16  BY MR. MANGI:

17     Q.  Prior to the break, we were talking

18  about providers' acquisition costs and the

19  fact they're not relevant to Anthem's

20  reimbursement amounts.  Do you recall that

21  testimony?

22     A.  Yes.

98

1        Q.   Okay.  And part of that was that

2   Anthem has no information about what the

3   providers' acquisition costs are, right?

4        A.   Correct.

5        Q.   So it's fair to say that Anthem has

6   no particular expectation that providers'

7   costs would be, you know, 10 percent, 30

8   percent, 50 percent, something more,

9   something less than the amount they're

10  reimbursed in relation to those drugs,

11  right?

12           MR. THOMAS:  Object to form.

13       A.   Yes.

14       Q.   I'd like to just plug a couple of

15  gaps here.

16           Do you know how many states Anthem

17  operates in nationwide?

18       A.   Gosh.  I think it's nine.

19       Q.   Do you know how many regions that's

20  divided into?  One is the Midwest that we've

21  been discussing.

22       A.   You have Mideast, you have Midwest,

Joe Spahn                    Highly Confidential                November 30, 2004
                                  Mason, OH

                                                                              99

```
 1     you have West, and you have South,

 2     Southeast.  I think Virginia's called the

 3     Southeastern region.

 4           MR. THOMAS:  It's just East.  It's

 5     not Mideast.

 6        A.  Did I say Mideast?  Sorry.  East,

 7     West, Midwest and Southeast.

 8        Q.  So a total of four regions?

 9        A.  Four regions.

10        Q.  Do you have an understanding as to

11     whether or not Anthem reimburses providers

12     that are not part of its network if an

13     individual insured is treated by that

14     physician?

15        A.  I'm sorry.  Could you repeat that?

16        Q.  Sure.  You understand that Anthem

17     has contracts with providers, correct?

18        A.  Correct.

19        Q.  And you understand that Anthem's

20     insureds primarily are treated by those

21     providers?

22        A.  Correct.
```