# Exhibit 5

```
00001
 1            REPORTER'S RECORD
           VOLUME 1 OF 1 VOLUME
 2
        TRIAL COURT CAUSE NO. D-1-GV-04-001286
 3
   THE STATE OF TEXAS       *  IN THE DISTRICT COURT
 4 EX REL                   *
                            *
 5 VEN-A-CARE OF THE        *
   FLORIDA KEYS, INC.       *  TRAVIS COUNTY, TEXAS
 6                          *
   VS.                      *
 7                          *
   ABBOTT LABORATORIES, INC.,*
 8 ET AL                    *  201ST JUDICIAL DISTRICT

 9
   ***********************************************
10          PRETRIAL MOTIONS HEARING
   ***********************************************
11

12

13     On the 18th day of December, 2006, the following

14 proceedings came on to be heard in the above-entitled

15 and numbered cause before the Honorable Scott Jenkins,

16 Judge presiding, held in Austin, Travis County, Texas.

17     Proceedings reported by machine shorthand.

18

19

20

21

22

23

24

25
```

00128
1  find out the answer to that.

2  THE COURT: And all will be revealed.

3  MR. BERLIN: Well, their questions will be
4  answered. But in terms of this discrepancy amounting to
5  fraud, which then leads to a crime fraud exception,
6  which opens up the discovery into all the attorneys'
7  privileged work, it's just not even close. It doesn't
8  come close to meeting --

9  THE COURT: I understand the legal
10  argument on that. I thought perhaps you -- you were
11  talking about the misrepresentations, the specific
12  misrepresentations they alluded to. I didn't know if
13  that was one you wanted to address.

14  But I understand your point on the law, on
15  what it takes to get the crime fraud exception.

16  MR. BERLIN: Well, I want to honor the
17  time commitment. I could speak more, but I know you've
18  got to keep it to a certain minute, so I'll sit down
19  now. If you have any other questions, I'll be happy to
20  answer them.

21  THE COURT: You've answered my questions.
22  Ms. Moore, you wanted another two or three minutes, I
23  believe? You're yielding the floor?

24  MR. BREEN: Your Honor, they appointed me
25  for the two-minute drill. I promise not to read from

00129
1  any cases.

2          Your Honor, I just want to go through a
3  couple of quick points. No. 1, the at-issue issue.
4  What happened here? Abbott chose to have their in-house
5  counsel send a letter that contains misrepresentations.

6          There is no way to read that letter
7  against the information that has since come out in
8  discovery and not at least feel or conclude that there
9  is an issue here about misrepresentation.

10         There's just no way. They say that the
11 WAC on Vancomycin was $38.50, and their internal
12 documents before and after the letter showed that it's
13 less than half that. So there's no way that this is not
14 a misleading letter.

15         Lawyers send letters all the time. It
16 doesn't mean we get deposed for sending letters on
17 behalf of our clients. Sometimes our clients don't tell
18 us everything and the letter is not exactly accurate.

19         You can't depose a lawyer for that every
20 time. We know that, but the issue in this case is how
21 is Abbott Laboratories going to reconcile having their
22 general counsel send a letter saying "We made this good
23 faith representation and investigation," and then they
24 make misstatements?

25         How are they going to reconcile that? We

00130

1  have got a right to discover that. That's the issue.

2  How is Abbott going to explain this? And when Mr. Daly

3  said, "Take Ms. Chronis' deposition," they rang the

4  bell.

5         They can't unring that bell. We now have

6  a right to fully depose Ms. Chronis, because they put

7  her up and said, "Take her deposition. She's the one

8  who wrote the letter."

9         There was no requirement what that we be

10 limited to asking her questions as to "Who told you

11 what, and who gave you what?" If there's an

12 attorney/client privilege, it would cover that, also.

13        That's a waiver. They waived that. So

14 they've absolutely let us inquire, and they cannot allow

15 us to inquire just up to the point where they decide

16 they want to reassert the privilege. A waiver of an

17 attorney/client privilege doesn't work that way.

18        Abbott is going to have to answer these

19 questions about these statements in this letter, and

20 they chose to offer Ms. Chronis up to do it. That's

21 No. 1.

22        No. 2, we're talking about -- and I

23 believe that would be waiver under any state's waiver

24 law.

25        I can't imagine any better example of a

00131
1  waiver than a client that's presented with a letter that
2  it sent like this, saying, "Ask the lawyer who wrote the
3  letter in a deposition." If that is not a waiver, I
4  don't know what is.
5         And we started the deposition and -- while
6  they had a good faith defense up, and then they pull the
7  defense and they don't let us finish these questions in
8  the deposition.
9         They can't unring the bell with this
10 witness.
11        Next Your Honor, they make this statement
12 that we somehow didn't limit our questions to the
13 letter. And I don't have time to go through each of the
14 questions, but I think the context of each and every one
15 of these shows it was directly related to the letter or
16 it was the natural kind of information that, if she was
17 in possession of it when she did the letter, she would
18 acknowledge it in making these good faith
19 representations.
20        I asked her a question, for example -- she
21 made this statement in the letter. It's right in there.
22 "We don't have a price to distributors, and our direct
23 prices to pharmacies are listed. We only -- our
24 distributors only supply on a commission or sell on
25 commission," or words to that effect.

00132
1         So I showed her this document, which was a
2  list of prices, direct prices to pharmacists.  And this
3  is at Page J -- the exhibit is J, Exhibit J, and it's at
4  Page 123, Line 8.
5         And I asked her this question.  "Do you
6  recall reviewing anything like this when you made your
7  representation to Ms. McNeill that the direct price to
8  the pharmacy is, in fact, prices -- a list price that's
9  charged to customers, quote, 'that wishes to purchase
10 the product,' end quote, 'usually' -- or comma, 'usually
11 in small quantities, without negotiating an individual
12 contract,'" end quote.
13        I asked that question, "When you made your
14 representation, did you look at any document like this?
15        Mr. Berlin says, "That could solicit work
16 product information, but she's already testified she
17 hadn't seen this document or anything like it."
18        And then she says "No."  Then I go on,
19 "Okay, so you never saw anything like this when you made
20 that representation?"  Answer: "No."
21        Then I asked her to go -- "Now, if you'll
22 go to the second volume of this huge thing, and it
23 begins with TX, T-X, ABT 159354.
24        "Yes."
25        "And just look at the first page, and

00133

1  you'll see it's a two-column chart there.  Do you see

2  that?"

3         "Yes."

4         And I go through this document with her.

5         I'm trying to get down to the specific

6  objection.

7         Now, beginning on Page 126, Line 12, I

8  show her Exhibit 193, and I say, "It appears to be dated

9  September 11, 2001.  Do you see that?"  Answer: "I do."

10        "Now -- and then it says, 'Subject: List

11 prices' -- 'List price versus total sales.  Do you see

12 that?"

13        Answer: "I do."

14        Then it's marked attorney work product --

15 Question: "Attorney work product?"  Answer: "Yes."

16        Question: "So if it was attorney work

17 product in September 2001 -- or on September 11, 2001,

18 were you still working on this project then?"

19        I'm trying to get down to the exact

20 objection, Your Honor.  Let me just argue generally, and

21 I will try to find the specific one in a minute, because

22 I know my time is running out.

23        THE COURT: I've given you much more time

24 than that.  I'm going to have to have you wrap it up.

25        MR. BREEN: I apologize, and I'll just

00134
1  rely upon our papers. And you'll see that I asked her
2  questions about, "Did they show you this document?" And
3  the answer was no.
4       And then the question was, "Well, had you
5  seen a document like that, would you have done something
6  differently? What would you have done?" That's the
7  area they didn't want us to go into. That's one
8  example.
9       Ms. Moore asked her about other pricing
10 studies she saw. I asked her if she had ever seen a
11 price that was a thousand percent higher than the actual
12 prices. They wouldn't let her answer that question.
13      All this information goes to what she knew
14 and what she did with that knowledge at the time that
15 she sent this letter, or she signed this letter
16 representing good faith on behalf of Abbott.
17      In all those instances we were stopped
18 from finishing the deposition, which is important,
19 because Abbott may not intend to present Ms. Chronis to
20 the jury, but we certainly will present Ms. Chronis to
21 the jury.
22      And since Ms. Chronis is the one that
23 Abbott has offered up both when they communicated with
24 Texas Medicaid and when they represented to the Court
25 that we could go take her deposition as the person to

00135

1  explain all this, we have got a right to present to the

2  jury her full explanation.

3           So if she said, "I acted in good faith,"

4  but she didn't do anything in response to -- she wasn't

5  shown any documents by the client, or if she was shown

6  the documents, she didn't do anything about it, we have

7  a right to run that to ground to get that information

8  before the jury.  Thank you.

9           THE COURT:  I've read the record that you

10 have presented to me and I have read, of course, all of

11 the excerpts which you have highlighted.

12          The ones that you were talking about,

13 Mr. Breen, were not highlighted in your motion, so I

14 didn't focus so much on those.  I focused on what

15 counsel asked me to focus on.

16          You've asked me to make some very broad

17 rulings from the plaintiff's standpoint.  You've asked

18 me to find that there's waiver, and that because of the

19 at-issue doctrine, because of voluntary disclosure, you

20 can ask any and all questions concerning anything

21 pertaining to Ms. Chronis' activities, other

22 investigations, opinions, and you start off -- though I

23 appreciate you waiving it -- wanting to take the other

24 two lawyers' depositions, all prior to taking the two

25 fact witnesses who apparently compiled all the data

00136

1  which you say is false, and finally, the crime fraud

2  exception.

3         So those are the four big bases for fairly

4  broad rulings. There were some of the questions that I

5  would have said -- in fact, I wrote little notes to

6  myself, "Maybe." I might compel this question, "Maybe,"

7  and on some, "No."

8         You highlighted Page 83, Lines 2 through

9  6, Page 113, Lines 1 through 17. And I wrote "Maybe" by

10  that.

11        I wrote "No" by Page 131, 3 through 12,

12  "No" by Page 140 to 143 -- 140, Line 20 to 143, Line 8,

13  "Maybe" to Page 137, 24, to 138, 10.

14        But now I'm breaking down and going

15  through the deposition question by question, saying, "I

16  think that's legitimate, or maybe I would compel that,"

17  versus "Absolutely not."

18        But the way I read the motion and the

19  response was a more broad brush, "We want full and

20  complete and unfettered" -- this is your words --

21  "discovery. We want absolutely every objection

22  overruled."

23        And Ms. Moore candidly said that's what

24  she wants, based on waiver, at-issue, voluntary

25  disclosure and crime fraud. That motion is denied. And

00137

1  I'm going to let you go take these fact witness

2  depositions.

3         If there's another more discrete record

4  and discrete questions that are targeted along the lines

5  of the colloquy I had with Mr. Berlin -- there are

6  questions, I think, that could be asked and there are

7  doors that probably could be opened, but it will be one

8  by one, step by step.

9         This sort of broad approach to, "Identify

10 any and all investigations you've ever made," well, it

11 wasn't presented for that, and at some point there is --

12 you haven't opened that door to walk in.

13        So based on my review of the record --

14 and I did read every case she cited and think about the

15 at-issue doctrine, et cetera -- my best analysis of this

16 based on the record before me is that this motion should

17 be denied, and is.  Do you have an order for me to sign?

18        MR. BERLIN:  No, we don't.  We do not have

19 an order, Your Honor.

20        THE COURT:  Well, then, present an order

21 that is necessary on that, and I'll see where you go

22 with that.

23        That's why I tried to ask some of the

24 questions the way I did, to try to indicate what I think

25 legitimate questions should be asked and how they could

00138
1  be asked.

2           Sometimes that helps. Sometimes it
3  doesn't. Sometimes I can telegraph what I'm thinking
4  and the legitimate way to ask it, and sometimes I can't.

5           MR. LEWIS: Might I ask one brief
6  question, Your Honor?

7           THE COURT: Sure.

8           MR. LEWIS: Should that order simply say
9  that basically you have reviewed the record and the
10 motion is denied? Otherwise, we'll get into lots of
11 language about the various things that you said.

12          THE COURT: No. It's going to be very
13 simple. "Based on this record, this motion is denied,"
14 just that simple.

15          MR. LEWIS: Thank you, Your Honor.

16          THE COURT: Otherwise, there will be
17 hearing after hearing on the language of the order, and
18 we're not going to do that.

19          The next item is the scheduling order. I
20 guess we can discuss this without a record, can't we?

21          Let me just say that I really want a
22 scheduling order that gets this case tried as promptly
23 as possible, and so if anyone ever wonders why I'm
24 deviating from the scheduling order or why I'm refusing
25 to deviate from the scheduling order, we can be clear on

00139
1  why we're doing this.

2  You've handed me -- and we have agreed we
3  will replace the first amended scheduling order, which
4  was signed by me on July 7th, 2005. This case, as I
5  recall, came to me late in '04. Am I right about that?
6  Was it late in '04?

7  MR. WINTERS: Yes, sir, approximately
8  August of 2004.

9  THE COURT: I just remember not really
10 thinking about this case until late '04, and I don't
11 remember when Judge Dietz assigned it to me. But I
12 think the very first hearing I had was late '04, wasn't
13 it?

14 MR. WINTERS: That's true, Your Honor. I
15 think the first hearing you had was actually for the
16 entry of the scheduling order and the protective order.

17 THE COURT: Okay, which was just an agreed
18 order. That's all I did, right?

19 MR. WINTERS: We did them, I think -- if I
20 recall correctly, Judge, we did both the scheduling
21 order and the protective order simultaneously or in
22 really close proximity.

23 THE COURT: They were all done pretty much
24 by agreement.

25 MR. WINTERS: Well, more or less, although

00140
1  as I recall, Mr. Brothers, Mr. Lewis' partner, was here
2  and he said, "We're not" -- something to the effect of
3  "I can't agree to it, but we want you to approve this
4  one."
5          THE COURT:  All right.  Well, in any
6  event, it seems like I had my first hearing some time
7  late in '04.  '05 was just completely lost, because I
8  understand the parties entered into negotiations not
9  long after I had a hearing in February or March.
10         At the conclusion of that, the case was
11 removed to federal court.  It was remanded back right
12 before Christmas of '05, and so that whole year was just
13 kind of lost, at least from this Court's standpoint,
14 subject to what I brought up and certain suggestions --
15 you might have read certain suggestions otherwise with
16 regard to mandamus issues, like "The Court is waiting to
17 rule on something."
18         I'm anxious to rule on things as quickly
19 as I can.  But now, since we're started in earnest, now
20 a whole year has gone by, and we need to get a
21 scheduling order that we can live with and that there's
22 almost no possibility that we're going to deviate from.
23         So that's our goal for this.  Does
24 everybody agree that that's what we're going to try to
25 do?

00141
1        MR. BERLIN: Yes, Your Honor.
2        THE COURT: And you've handed me a list of
3   things that you want in a scheduling order, starting
4   with joinder of parties and ending with expert
5   witnesses, and a lot of things in between, including, of
6   course, the trial setting, and mediation.
7        And you have just got some differences on
8   dates. But otherwise I think this is what you want to
9   work from. Is that right?
10       MR. WINTERS: Your Honor, a slight
11  modification as to what we gave you before, because
12  there has been some narrowing of the dates. The
13  defendants have presented me with some revised dates, so
14  the current dates that you have, that I believe are in
15  pen and ink in the column under plaintiff's current
16  proposals, those are, indeed, the current plaintiff's
17  dates.
18       THE COURT: All right.
19       MR. WINTERS: The defendants have
20  presented me with some compromise positions, and so we
21  have narrowed the gap on the dates considerably, but
22  there are still some issues that remain, so it may be --
23       THE COURT: All right. Well, I think I've
24  said all I need to say. I want to give Betty a break,
25  but is there anything else you need on the record about

00142

1  why we're doing this, what we're doing or any dispute
2  you have about it?  Is there any of that you will need
3  on the record?
4          MR. BERLIN:  We have reasons for why we
5  want certain dates and why we want it structured.  I'm
6  not sure that needs to go on the record.
7          THE COURT:  That's my question, because if
8  someone thought I was just being too Draconian with the
9  deadline for defendant's experts after plaintiff's
10 experts, that could be a basis for saying that was just
11 so unfair as to be tantamount to preventing you from
12 having a fair opportunity to get experts.
13         But apparently no one needs that because
14 you're so -- at least what you're both proposing, though
15 you disagree on it, is within a range of what a Court
16 has discretion to do, and so there's no need for a
17 record on any of these particular scheduling issues.  Is
18 that right?
19         MR. BERLIN:  If if we're going to be
20 within the range of what we're negotiating, then I would
21 think that would be correct.
22         THE COURT:  Fair enough.  Same for you?
23         MR. WINTERS:  Well, Your Honor, before I
24 answer that, I need to speak with Mr. Breen about how
25 some of today's rulings impacts the scheduling order,

00143
1  because I think the Chapter 41 issue does play a part.
2  May I have five minutes to discuss with him?
3         THE COURT: You certainly may. My only
4  question at the outset is, do we need the court reporter
5  to take down the arguments? Is there had a chance you
6  would, Mr. Breen?
7         MR. BREEN: I don't need a record of the
8  argument. It's just that I want to go through my
9  mind -- we now know what your inclination is on Chapter
10 41.
11        I haven't thought about how that might
12 affect the scheduling order, verdict form, times, and
13 all that. I don't think it's argument. I just think I
14 need to think it through.
15        MR. WINTERS: No, we don't need a court
16 reporter.
17        THE COURT: All right. I just want to
18 make sure that people have all the record they could
19 ever need, in case anyone ever wants to question what
20 I've done or why I've done it.
21        (The court reporter was excused.)
22
23
24
25

```
00144
 1  THE STATE OF TEXAS     )
 2  COUNTY OF TRAVIS       )
 3       I, Betty Haygood, Substitute Court Reporter in and
 4  for the 53rd District Court of Travis County, State of
 5  Texas, do hereby certify that the above and foregoing
 6  contains a true and correct transcription of all
 7  portions of evidence and other proceedings requested in
 8  writing by counsel for the parties to be included in
 9  this volume of the Reporter's Record, in the
10  above-styled and numbered cause, all of which occurred
11  in open court or in chambers and were reported by me.
12       I further certify that this Reporter's Record of
13  the proceedings truly and correctly reflects the
14  exhibits, if any, admitted by the respective parties.
15       I further certify that the total cost for the
16  preparation of this Reporter's Record is $750.00 and was
17  paid/will be paid by the Attorney General's Office.
18       WITNESS MY OFFICIAL HAND this the 24th day of
19  January, 2007.
20
21       _____
         BETTY HAYGOOD, Texas CSR 471
22          Expiration Date:  12/31/08
         Certified Shorthand Reporter
23          P.O. Box 537
         Manchaca, Texas  78652
24          (512) 585-4901
25
```