# Exhibit 8

Page 1

UNITED STATES DISTRICT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------X

IN RE: PHARMACEUTICAL         )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

PRICE LITIGATION              )   01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )

of the Florida Keys, Inc.     )

    v.                        )   No.06-CV-11337-PBS

ABBOTT LABORATORIES, INC.,    )

------------------------------X

    (cross captions appear on following pages)


        Deposition of HARRY LEO SULLIVAN

                Volume I

            Nashville, Tennessee

        Tuesday, March 12, 2008

                9:05 a.m.

Page 150

1  concerns on whether or not the payment for these
2  kind of therapies was, was adequate?
3      A.  Well, my opinion, particularly in the,
4  in the home health arena, was -- and during this
5  specific time period, the growth in Tennessee was
6  such of those type of providers that it wouldn't
7  -- that wouldn't -- not lead you to believe that
8  the reimbursement for Medicaid was inadequate.
9      When people are hollering and screaming
10 or you have trouble getting providers to take
11 care of your patients is when that was more
12 likely a concern.
13     Q.  Well, do you know when the home
14 infusion business really started taking off?
15     A.  Well, it certainly took off in the
16 early Nineties.  And I can't remember -- and
17 Tennessee was a little bit different because we
18 very purposely avoided expansion of home
19 community based services under the Medicaid
20 program because the vast majority of the patients
21 who would receive those services were dual
22 eligibles, which meant they had Medicaid and

Page 151

1  Medicare.  And Medicare home health was, was
2  truly exploding.  We had hundreds of providers in
3  Tennessee of home health services.  I dare say
4  there's, you know, maybe 20 now.  Because there
5  was, there was indeed a bonanza on the Medicare
6  side in Tennessee.  Other states didn't face it
7  quite as -- if they had chosen to expand or had
8  very aggressive home community-based services
9  through Medicaid, might have had a little bit
10 different policy issues.  We purely shifted to
11 Medicare, cost shifted to Medicare, with the
12 duals.  And so it wasn't maybe not as, as intense
13 on a Medicaid issue in Tennessee as it might be
14 elsewhere is what I'm saying.
15     Q.  The page starting with -- at 425 and
16 then going over to 426, there is a discussion of
17 what some states are doing in the home IV
18 reimbursement area, Minnesota indicates
19 compounding or a dispensing fee of $8 for IV
20 drugs, and then Washington indicates that they're
21 paying a compounding amount, Ohio as well.
22     Do you have an understanding of what

Page 152

1  they're talking about when they talk about a
2  compounding fee?
3      A.  Yes.
4      Q.  And what, what is that?
5      A.  Well, certain, be it -- I mean you can
6  compound IV drugs if you have the right equipment
7  and filters and hoods to keep it, make it a
8  sterile product.
9      And you can compound drugs for
10 inhalation.  If you have, again, the right
11 equipment, similar to what would be in a
12 hospital, to, to handle sterile products.
13     And you take the raw ingredient and
14 mimic whatever, generally, the brand name or the
15 innovator product was.
16     Q.  And do you know in Tennessee, either
17 before TennCare or after TennCare was paying a
18 compounding fee for IV?  Do you know if that was
19 something that was being paid?
20     A.  Ah, no.  But there's, there's ways to
21 pay it without, without having a separate -- you
22 know, I noticed on here that one form is for

Page 153

1  payment, one form is for reimbursement of
2  supplies, one form is for -- you know, they're,
3  they're making a variety to submit multiple
4  forms.  And I wouldn't -- I can't tell you a
5  specific product or specific time period, but one
6  of my strategies was in issues like this, where
7  compounding was involved, I didn't want to go
8  down the road, at least in the early Nineties, of
9  getting into paying for compounded prescriptions,
10 because that can -- that could range from a
11 sterile product all the way down to an ointment,
12 okay?
13     And, and our claims reimbursement
14 system hadn't evolved to the current NCPDP
15 sophistication of today.  So it was very hard to
16 put in a, a set compounding fee for what, what
17 products?
18     One may take a minute to make, one may
19 take an hour and a half.
20     So getting back to, to the MAC issue,
21 some, sometimes for certain products in this
22 arena, you would take that into account for the

Page 154

1  MAC.
2       For example, I might say, I'm not
3  paying for the tape that you use to hold the IV
4  needle into place. I'm not paying for the IV
5  needle or the tube set. I'm not going to -- I
6  don't want bills for that. I know you've got to
7  do it to administer this drug. So we're going to
8  add on the cost of this drug X, because I know
9  this, this and this always goes with it, and I
10 know there is a fixed cost for that, but I don't
11 want five bills. I want 10 different places.
12 Bill me for the drug. And I'll make sure that
13 the -- whatever the MAC is incorporates all your
14 other costs. And you have to talk with providers
15 and know what that is. I mean, you know.
16      Q. So, in short, you would use the payment
17 for the drug itself to cross-subsidize other
18 things that might need to be paid to fairly --
19      A. And that would include compounding.
20      Q. And it may include nursing services
21 that were not included, things of that nature?
22      A. (Nodding yes.)

Page 155

1       Q. Did anyone in the federal government
2  ever tell you that you were not allowed to do
3  that?
4       A. No.
5       Q. And if they had told you that, what
6  would you have said?
7       A. That I wasn't allowed to pay for
8  compounding or --
9       Q. That you weren't allowed to use the
10 payment for the drug to cross-subsidize those
11 other services or supplies.
12      A. If they had told me I couldn't do it,
13 what would I do?
14      Q. Yes.
15      A. I would have had to have found another
16 way to, to handle the billing.
17      Q. But they never told you that.
18      A. No.
19      Q. Do you know if other states were doing
20 -- were adopting similar type strategies to run
21 the programs?
22      A. No, I don't -- I mean it may be

Page 156

1  addressed in this letter. I don't know. It
2  seems to talk about different states, but I'm
3  sure there were varying levels of complexity in
4  the billing process, and what was and wasn't
5  billable and what was and wasn't included, but I
6  don't know it and I didn't discuss it with folks.
7       Q. Have you heard the term cross-subsidy
8  or cross-subsidization in the context of pharmacy
9  reimbursement?
10      A. No, not -- no, I haven't.
11      Q. I'm going to show you another, another
12 -- going to mark that as another exhibit.
13           MR. TORBORG: I think this is 578.
14           (Exhibit Abbott 578 marked.)
15 BY MR. TORBORG:
16      Q. For the record, what we have marked as
17 Exhibit 578 bears the Bates numbers HHC 002-0400
18 through 407. It's another Medicaid pharmacy
19 bulletin. This one dated January-February of
20 1988.
21           Mr. Sullivan, if I could ask you to go
22 to Bates page ending in 402. In particular the

Page 157

1  discussion on the first full paragraph about
2  Montana Medicaid. Do you see that?
3       A. Yes.
4       Q. Where it says, Similarly, Montana
5  Medicaid compensates for the additional time and
6  expense of dispensing compounded drugs by
7  allowing the provider's usual and customary
8  charge up to 2.5 times the cost of ingredients,
9  paren, reimbursement for other outpatient drugs
10 is a lower of AWP minus 10 percent, or the cost
11 of the drug, end paren. Do you see that?
12      A. Yes.
13      Q. Is that the, the type of thing that
14 Tennessee was doing?
15      A. It's a different approach to -- yeah.
16 Make -- paying the provider for the, for the
17 compounding without -- and setting a limit on
18 what I will pay up to two and a half percent.
19 It's just a different, different twist.
20      Q. Does it -- does this refresh your
21 recollection about any other types of approaches
22 like this that other states were using?