# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
IN RE PHARMACEUTICAL INDUSTRY   )
AVERAGE WHOLESALE PRICE      )   MDL NO. 1456
LITIGATION                            )   Civil Action No. 01-12257-PBS
_____)
)   Judge Patti B. Saris
)
THIS DOCUMENT RELATES TO:   )
)
*The City of New York v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 04-CV-06054)   )
*County of Suffolk v. Abbott Labs., et al.*   )
(E.D.N.Y. No. CV-03-229)   )
*County of Westchester v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 03-CV-6178)   )
*County of Rockland v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 03-CV-7055)   )
*County of Dutchess v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 05-CV-06458)   )
*County of Putnam v. Abbott Labs., et al.*   )
(S.D.N.Y. No. 05-CV-04740)   )
*County of Washington v. Abbott Labs., et al.*   )
(N.D.N.Y. No. 05-CV-00408)   )
*County of Rensselaer v. Abbott Labs., et al.*   )
(N.D.N.Y. No. 05-CV-00422)   )
*County of Albany v. Abbott Labs., et al.*   )
(N.D.N.Y. No. 05-CV-00425)   )

[Caption Continues on Next Page]

## DEFENDANTS' JOINT MEMORANDUM IN OPPOSITION TO MOVANTS' CROSS MOTION TO QUASH AND IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO COMPEL SUBPOENAS ISSUED BY DEFENDANTS TO THE NEW YORK STATE DEPARTMENT OF HEALTH AND THREE KEY WITNESSES

*County of Warren v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00468)                               )
*County of Greene v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00474)                               )
*County of Saratoga v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00478)                               )
*County of Columbia v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00867)                               )
*Essex County v. Abbott Labs., et al.*                    )
(N.D.N.Y. No. 05-CV-00878)                               )
*County of Chenango v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00354)                               )
*County of Broome v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00456)                               )
*County of Onondaga v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00088)                               )
*County of Tompkins v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00397)                               )
*County of Cayuga v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00423)                               )
*County of Madison v. Abbott Labs., et al.*               )
(N.D.N.Y. No. 05-CV-00714)                               )
*County of Cortland v. Abbott Labs., et al.*              )
(N.D.N.Y. No. 05-CV-00881)                               )
*County of Herkimer v. Abbott Labs. et al.*               )
(N.D.N.Y. No. 05-CV-00415)                               )
*County of Oneida v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00489)                               )
*County of Fulton v. Abbott Labs., et al.*                )
(N.D.N.Y. No. 05-CV-00519)                               )
*County of St. Lawrence v. Abbott Labs., et al.*          )
(N.D.N.Y. No. 05-CV-00479)                               )
*County of Jefferson v. Abbott Labs., et al.*             )
(N.D.N.Y. No. 05-CV-00715)                               )
*County of Lewis v. Abbott Labs., et al.*                 )
(N.D.N.Y. No. 05-CV-00839)                               )
*County of Chautauqua v. Abbott Labs., et al.*            )
(W.D.N.Y. No. 05-CV-06204)                               )
*County of Allegany v. Abbott Labs., et al.*              )
(W.D.N.Y. No. 05-CV-06231)                               )
*County of Cattaraugus v. Abbott Labs., et al.*           )
(W.D.N.Y. No. 05-CV-06242)                               )

*County of Genesee v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06206)   )
*County of Wayne v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06138)   )
*County of Monroe v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06148)   )
*County of Yates v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06172)   )
*County of Niagara v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06296)   )
*County of Seneca v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06370)   )
*County of Orleans v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06371)   )
*County of Ontario v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06373)   )
*County of Schuyler v. Abbott Labs, et al.*   )
(W.D.N.Y. No. 05-CV-06387)   )
*County of Steuben v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06223)   )
*County of Chemung v. Abbott Labs., et al.*   )
(W.D.N.Y. No. 05-CV-06744)   )
                              AND   )
*County of Nassau v. Abbott Labs., et al.*   )
(E.D.N.Y. No. 04-CV-5126)   )
_____)

The Court should grant Defendants' Motion to Compel the Commissioner of the New York State Department of Health ("NYDOH") and Three Key Witnesses and deny NYDOH's Cross Motion to Quash the Subpoenas Issued by Defendants to NYDOH because the discovery sought by defendants is proper and goes to the core of the issues raised by the City of New York and certain New York Counties (collectively, "the Counties") in their Complaint seeking "billions" of dollars in alleged damages as a result of purported "AWP and FUL fraud." *See* Revised First Amended Consolidated Complaint (hereinafter "RFACC"), ¶¶ 37, 667.

The Counties claim that the only question that matters in this case is whether, by adopting published AWPs as the state's reimbursement benchmark, the legislature thought it was ensuring that drug ingredient cost reimbursements would be based upon prices actually paid by providers. For the reasons stated below, that is far from the only relevant question. But even if it was, defendants would still be entitled to the discovery they seek.

While accusing defendants of fraud, the Counties take a position on what discovery is relevant that is so protective that it is patently absurd, as illustrated by a simple hypothetical. Suppose numerous key New York Medicaid officials wrote a letter every year to every legislative body that considered Medicaid reimbursement issues, as well as to every single New York legislator, that said the following: "The published AWPs in national price reporting services are benchmarks that are virtually always higher than, and sometimes substantially higher than, what pharmacies and other providers actually pay for drugs. Reporting such AWPs is a common practice and is perfectly legal. By setting Medicaid reimbursement rates that are tied to published AWPs (without substantial discounts), the state will likely be choosing to reimburse providers for drug ingredient costs at more than the providers pay. There are many good policy reasons to allow for such a margin (such as ensuring that pharmacies have a strong

1

incentive to give Medicaid beneficiaries easy access to the drugs they need), but it is important that you are all aware of the consequences of choosing published AWPs as the reimbursement benchmark."  Under the Counties' view, defendants are not entitled to discover a single one of these letters (or anything like them) – even though such documents would undeniably be relevant to the core issues under the Counties' own "legislative-centric" view of the case.  This kind of Alice in Wonderland logic is not only absurd, it is so patently unfair as to violate defendants' fundamental due process right to defend against the fraud charges the Counties have chosen to level against virtually the entire pharmaceutical industry for virtually every drug they make.

To deny defendants the discovery sought in the subpoenas would effectively deny them the ability to defend themselves against plaintiffs' allegations for many other reasons as well.  For example, discovering whether NYDOH considered but rejected establishing a MAC program prior to 2006 (which would have provided an alternative to reimbursing all generic drugs at the level of the Federal Upper Limit ("FUL") set by CMS) or discovering whether NYDOH received and discussed the many reports of the Department of Health and Human Services Office of Inspector General regarding AWP is essential to defendants' ability to construct their defense.  If defendants are to obtain any discovery regarding these critically important subjects, it must be done through discovery of NYDOH as the Counties have disavowed themselves of any knowledge of the Medicaid reimbursement regime.  *See, e.g.,* Declaration of Kim B. Nemirow ("Nemirow Decl.") at Ex. A (12/21/08 Chautauqua County's  Objections and Responses to Defendants' First Set of Interrogatories to New York Counties at Resp. 3).

This type of "government knowledge" discovery is routine in these cases and has been recognized by this Court to be highly relevant.  *See, e.g.,* Nemirow Decl. at Ex. B (MDL No. 1456; 01-CV-12257-PBS, Hearing Tr. (10/26/06) at pp. 26-29) (stating that government

knowledge is relevant to statute of limitations issues, as well as scienter and knowledge of falsity). Movants' argument to the contrary is specious and built on a faulty premise. Although the New York Legislature currently determines in part the Medicaid reimbursement rate, for many years, NYDOH was exclusively responsible for setting the reimbursement rate. This history is relevant and important to understanding the rate that the Legislature ultimately set. NYDOH, moreover, continues to play an important role in setting reimbursement rates. The Legislature has expressly delegated to NYDOH sole responsibility for establishing state MACs or maximum allowable costs for prescription drugs reimbursed by New York Medicaid. The discovery sought is also relevant to defendants' statute of limitations defense.

## BACKGROUND

New York's pharmaceutical reimbursement policy is unique for at least two important reasons. First, for more than fifteen years, from 1978 until 1994, the New York Medicaid program operated under a consent decree that dictated how the reimbursement rates that New York Medicaid paid to providers for dispensing prescription drugs to Medicaid beneficiaries would be set. *See* Nemirow Decl. at Ex. C (7/7/78 Stipulation at ¶ 4, *PSSNY* v. *Cuomo*, Civ. No. 76-5080 (KTD) (S.D.N.Y)). In 1976, the Pharmaceutical Society of the State of New York ("PSSNY") initiated a lawsuit against the New York Department of Social Service ("NYDSS") (now NYDOH) alleging that the dispensing fee paid by New York Medicaid was too low and that New York Medicaid's Estimated Acquisition Cost ("EAC") formula did not adequately approximate prices paid by providers in the market. *See* Nemirow Decl. at Ex D (11/12/76 Complaint at ¶¶ 15-17, 23-25, *PSSNY* v. *Cuomo*). After two years of litigation, the parties negotiated a settlement and entered into a consent decree providing for an increased dispensing fee and, importantly, a methodology for setting the Medicaid EAC. According to the 1978

consent decree, the EAC would be set by NYDOH after "surveying and averaging the prices charged said pharmaceutical providers by twelve major wholesalers doing business" in New York.  Nemirow Decl. at Ex. C at ¶ 4.  The consent decree also provided for the formation of a committee, comprised largely of practicing pharmacists, to advise NYDOH on matters relating to prescription drug reimbursement and, specifically, the adequacy of the dispensing fee paid by the Medicaid program. The consent decree further required NYDOH to hold public hearings of the committee at least once a year regarding the adequacy of Medicaid's EAC and dispensing fees. *Id.* at ¶ 6.

With the entry of this consent decree, the PSSNY litigation went quiet from 1978 until 1987, when CMS mandated the implementation of FULs.  When NYDOH attempted to incorporate the FULs into its Medicaid reimbursement program by regulation, PSSNY sought relief from the Court arguing that, by failing to negotiate with the pharmacists and simply adopting the FULs, NYDOH was in violation of the consent decree.  Nemirow Decl. at Ex. E (12/19/89 Affidavit of Mary Alice Brankman at ¶¶ 8-11, *PSSNY* v. *Cuomo*).  The court found in favor of PSSNY, and issued an injunction enforcing the consent decree and preventing NYDOH from implementing FULs.  See Nemirow Decl. at Ex. F (2/19/88 Order, *PSSNY* v. *Carey*).  After several more years of negotiation and litigation, in 1994, NYDOH and PSSNY finally agreed to settle their difference, with NYDOH agreeing to continue reimbursing providers on the basis of the 1991 court ordered reimbursement formula of the lower of Usual & Customary or EAC (set at AWP-10%) or, where set by the federal government, the FUL.  *See* Nemirow Decl. at Ex. G (11/7/94 Order, *PSSNY* v. *Cuomo*); Nemirow Decl. at Ex. H (8/12/93 letter from Considine to Goldstein); Nemirow Decl. at Ex. I at 4 (12/12/91 Order, *PSSNY* v. *Cuomo*).   In connection with

that settlement, the court vacated the injunction and ordered pharmaceuticals to be reimbursed at the agreed upon rate.  *See* Nemirow Decl. at Ex. G.

When the New York Legislature first codified by statute the Medicaid pharmaceutical reimbursement rate in 1994, it merely adopted the same formula that had been the subject of these extensive negotiations and litigation between NYDOH and PSSNY.  N.Y. Soc. Serv. L. § 367-a(9) (1994) (amended 2003).[1]  This EAC of AWP-10% remained in effect until 2003 when it was changed to AWP-12% for brands and generics with no FUL.  N.Y. Soc. Serv. L. § 367-a(9) (2003) (amended 2004).

Second, New York is unique in that it had one of the first supplemental rebate programs in the country and one that required drug manufacturers to submit NDC-level pricing information directly to NYDOH beginning in 1991.  Through OBRA '90, the federal government established the Federal Medicaid Rebate Program under which manufacturers pay rebates to state Medicaid programs based on average pricing information provided quarterly by the manufacturers to the federal government.  42 U.S.C. § 11396r-8 *et seq.*  Shortly thereafter, using the federal rebate program as a model, New York began requiring manufacturers who wanted to have their drugs reimbursed under its New York's Elderly Pharmaceutical Insurance Coverage ("EPIC") program to sign supplemental rebate agreements with NYDOH.[2]  In order for a manufacturer's drugs to be reimbursed through the EPIC program, a manufacturer had to

---

[1] The 1991 Court Order did not address the issue of the adequacy of the dispensing fee.  The only substantive difference between the reimbursement formula resulting from the litigation involving PSSNY and the one that the Legislature enacted is that the Legislature raised the dispensing fee, setting the dispensing fee at $4.50 for brand and non-FUL multi-source drugs and $5.50 for drugs subject to a FUL.  *See* N.Y. Soc. Serv. L. § 367-a(9) (1994); Nemirow Decl. at Ex. I.

[2] EPIC is a supplemental insurance program that provides pharmacy benefits to moderate income seniors (ages 65 and older) who do not qualify for Medicaid.  In past years, the EPIC panel, charged with administration of the program, has consisted of the Commissioner of NYDOH, the Superintendent of the New York State Department of Insurance, and the Acting Director of the New York State Division of the Budget.  See Nemirow Decl. at Ex. J (Oct. 1998 – Sept. 1999, EPIC Annual Report to the Governor and Legislature.)

enter into a rebate agreement with EPIC.  Like the federal program, EPIC required manufacturers to report Average Manufacturer's Price ("AMP") and Best Price information to it on a quarterly basis.  N.Y. Exec. L. § 547-j(3)(a)-(c); *see also* Nemirow Decl. at Ex. K (8/28/91 EPIC Manufacturer Drug Rebate Agreement with Schering Corporation); Nemirow Decl. at Ex. L (7/28/00 letter from EPIC to Schering Corporation).  Thus, since at least 1991, NYDOH, through EPIC, has received quarterly AMP and Best Price information directly from numerous manufacturers, including several of the defendant manufacturers involved in this litigation such as Schering Corporation, Sanofi-Aventis' predecessor companies, and Purdue Pharma, L.P.

## **ARGUMENT**

Defendants served NYDOH and three of its current and former employees with subpoenas for documents and testimony in full compliance with the Federal Rules of Civil Procedure and the Court's Case Management Order.  *See City of New York* v. *Abbott Labs.*, MDL No. 1456; 01-CV-12257-PBS, CMO No. 33 (Docket No. 4745) (Sept. 14, 2007) ("CMO 33").  Despite the lawfulness and reasonableness of defendants' requests, NYDOH has refused to comply with the subpoenas and flatly rejected defendants' attempts to negotiate their scope to ease any unnecessary burdens resulting from the requested production.  *See* Ex. E to Diederich Decl. in Support of Defs.' Joint Mot. to Compel ("Diederich Decl.") (Docket No. 5054) (1/30/08 letter from Tretter to Asnis); Ex. F. to Diederich Decl. (2/15/08 letter from Asnis to Tretter). NYDOH's refusal to comply with the subpoenas or engage in any good faith negotiation as to their scope and its subsequent motion to quash are improper and unreasonable.  The Court should grant defendants' joint motion to compel the requested discovery.

I.   **DEFENDANTS' SUBPOENAS SEEK MATERIALS AND TESTIMONY THAT ARE NOT ONLY RELEVANT TO THE PLAINTIFFS' CLAIMS BUT ARE ESSENTIAL TO DEFENDANTS' ABILITY TO MOUNT A DEFENSE.**

Movants premise their argument to quash the subpoenas on the fallacy that every aspect of New York Medicaid's prescription drug reimbursement rate is determined by the New York Legislature without the significant involvement of NYDOH.  Specifically, NYDOH and the Counties assert that "what the State DOH or any other State Agency may have known or not known about defendants' prices or any other noticed issues is entirely irrelevant"  because, beginning in 1994, the New York Legislature began establishing the reimbursement rate for the Medicaid prescription drug benefit by statute as part of the annual budget approval process.  *See* NYDOH, Mark Richard Butt, Mary Alice Brankman, Michael Falzano and Pls.' Cross-Motion to Quash Subpoenas Issued by Defs. To NYDOH and/or its Current and Former Employees ("Cross Motion to Quash") (Docket No. 5120) at 5.

This premise is simply wrong.  NYDOH was solely responsible for setting the Medicaid prescription drug reimbursement rate prior to 1994 and, in 1994, the Legislature simply adopted the reimbursement rate scheme that NYDOH had negotiated with the state pharmacists' association in the context of settling their long-running litigation battle over the appropriateness of the reimbursement rate.  Thereafter, NYDOH remained integrally involved in the rate setting process, and has been delegated by the state Legislature express authority to establish MACs.  Thus, movants' argument that the discovery sought is irrelevant fails for at least five separate reasons.[3]

---

[3] Notably, the standard for evaluating what is "relevant" for purposes of discovery is quite low.  Parties to a civil action are entitled to seek discovery into "any matter . . . that is relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1); *De Silva* v. *Bluegreen Corp.*, No. 96-CV-0683, 1997 WL 375748 at *2 (N.D.N.Y. June 27, 1997).  This standard is liberally construed, and encompasses even inadmissible evidence where the discovery of that material could reasonably lead to the discovery of admissible evidence.  *See Daval Steel Prods.* v. *M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991).  Under this broad standard, NYDOH cannot credibly maintain that the information and testimony sought by Defendants' subpoenas is not subject to discovery.

<u>First</u>, under New York law, the Commissioner of NYDOH has direct control over whether NY Medicaid reimburses generic drugs on the basis of a state MAC in lieu of the FUL. N.Y. Soc. Serv. L. § 367-a(9)(e).  Although the Legislature granted NYDOH this authority in 2004, New York Medicaid did not establish a state MAC until 2006.   Defendants are entitled to discover from NYDOH, among other things, whether it ever considered establishing a state MAC prior to 2006, including but not limited to why, as early as 1991, it agreed to reimburse providers for dispensing generic drugs at the full amount permitted by FULs, rather than establishing state MACs as CMS had encouraged states to do, and what (if anything) New York Medicaid knew about the potential cost savings it chose not to pursue when it decided not to establish state MACs prior to 2006.

Even more specifically, defendants believe, based upon New York Medicaid's 1986 letter to HCFA advocating for the adoption of a "Revision of the MAC Program Alternative" (instead of the adoption of the FUL program), that New York Medicaid understood the importance of state MACs long before 2006, and that discovery of NYDOH's documents and testimony will lead to evidence that New York Medicaid knew that the published prices reported by the pricing compendia for generic drugs (and on which FULs are based) were higher than the market prices at which providers were acquiring generic drugs as early as 1986.  *See* Nemirow Decl. at Ex. M (10/3/86 letter from Perales to HCFA).  The Perales letter also suggests that NYDOH must have considered and raised the possibility of implementing state MACs long before 2006, but must have been stymied in those efforts by the state pharmacists' association. *Id.*  At the very least, defendants are entitled to authenticate the Perales letter by deposition so that it may be used at trial in this matter.

Second, with respect to setting the EAC-based reimbursement rate, the rate established through the settlement of NYDOH's litigation with the pharmacists' association was in effect until 2003 – *i.e.*, during most of the time period at issue here.  As described above, when the Legislature first codified the Medicaid pharmaceutical reimbursement rate in 1994, it simply adopted NYDOH's then-existing formula.  N.Y. Soc. Serv. L. § 367-a(9) (1994) (amended 2003);  Nemirow Decl. at Ex. I at 4 (12/12/91 Order, *PSSNY v. Cuomo*).  That formula, then, remained unchanged until 2003.  NYDOH, thus, had at least some influence in establishing the reimbursement rate that prevailed for most of the relevant time.

It is, moreover, impossible to believe that the executive agency charged with administering the New York Medicaid program sits on the sideline while the Legislature sets the Medicaid reimbursement rate without its input.  The practical reality is that the EAC, the dispensing fee, and the co-pay must be set based on significant input from the agency and officials charged with administering the Medicaid program.  Undoubtedly, NYDOH plays a role in recommending the annual budget for the program to the Governor and, ultimately, the Legislature.[4]  These Medicaid officials are the persons in the state most knowledgeable about the factors at play in maintaining a state Medicaid program, including the cost of pharmaceuticals,

---

[4] The assertion that some responsive documents are privileged is not a ground for producing nothing in response to the subpoenas.  To the extent NYDOH claims certain documents are privileged, it must comply with Fed. R. Civ. Proc. 45(d)(2)(a) and describe the documents it seeks to withhold in a manner that will enable defendants to assess whether the asserted claim of privilege is valid.  NYDOH has not done so, producing neither a privilege log nor any comparable list.  Rather, it has abstractly referenced the "deliberative process privilege," loosely characterizing that privilege as applying to all "documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *See* Cross Motion to Quash at n.2.  The privilege, in fact, is far more limited.  Intra-governmental documents are only protected under the deliberative process privilege if they are "(1) predecisional ... and (2) deliberative, that is, actually "related to the process by which policies are formulated." *Nat'l Wildlife Fed'n* v. *United States Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988).  Not only is the privilege a narrow one, but it applies only to predecisional documents *and* is discretionary.  *See, e.g.*, *Texaco Puerto Rico, Inc.,* v. *Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st. Cir. 1995) ("[I]n determining whether to honor an assertion of the privilege, a court must weigh competing interests," *citing First Eastern Corp.* v. *Mainwaring*, 21 F.3d 465, 468 (D.C. Cir. 1994).)  Despite NYDOH's threat of a broad invocation of this privilege, much, if not all, of what defendants seek is not privileged.  Moreover, any impact that this alleged privilege has on the discoverability of specific documents has no bearing on the propriety of the subpoenas in their entirety.

the dispensing costs incurred by pharmacies, the Medicaid reimbursement innovations adopted in states across the country, and the utilization of various drugs by New York Medicaid beneficiaries.  Defendants are entitled to learn the extent to which NYDOH shares this vast knowledge with the Governor and the Legislature and how this knowledge affected – or did not affect – New York Medicaid's reimbursement rates.  In addition, NYDOH has the *statutory* authority to request, obtain, and review wholesale price information from drug manufacturers and wholesalers.  *See* N.Y. Soc. Serv. L. § 367-a[7] (giving NYDOH the power to require "[e]very manufacturer or wholesaler of drugs...[to provide] upon request of [DOH] any information pertaining to wholesale prices charged to pharmacists for any drugs available").  Defendants are entitled to know if this authority has ever been invoked, and, if so, what was learned or, alternatively, why it has not been used.

As defendants point out in distinguishing *Spitzer* v. *Pharmacia*, 39 A.D.3d 1117 (N.Y. App. Div. 2007), the discovery sought by the subpoenas is not limited merely to evidence of statutory intent or divining the Legislature's meaning of the term AWP.  *See infra* at __.  Rather, the subpoenas intend to gather documents and testimony from the state's agency responsible for administering Medicaid regarding its research into pharmacy acquisition costs, its surveys of dispensing costs, its decision not to implement a MAC until 2005, and dozens of other things that have nothing to do with the interpretation of AWP under New York law.  *See* Diederich Decl. at Ex. A (Subpoena served on the NYDOH and Richard F. Daines, M.D., Commissioner).

At the very least, NYDOH is the agency with legal responsibility for administering New York's Medicaid program.  Accordingly, federal law requires NYDOH to justify as "reasonable" any change that New York might wish to make to the reimbursement rate or dispensing fee paid to Medicaid providers.  42 C.F.R. §§ 447.512-518 (2008).  Defendants are at a very minimum

entitled to learn what NYDOH communicated to CMS to justify any rate changes that the
Legislature adopted and also what, if anything, it has said to justify its own decision (or lack
thereof) to implement state MACs.

Third, as described above, NYDOH officials administer the EPIC program and, therefore,
had access to NDC-level AMP and Best Price information directly from manufacturers
beginning as early as 1991.  *See* Nemirow Decl. at Ex. K; Nemirow Decl. at Ex. L.  Defendants
intend to argue that, because NYDOH had access to this AMP and Best Price information, New
York Medicaid could not have been defrauded by the publication of any AWP.  After all,
NYDOH had at its fingertips NDC-level information about the average selling price of the drugs
it was reimbursing.  Thus, discovery into NYDOH's receipt of AMP and Best Price information
and what, if anything, it did with that information is vital.

Fourth, clearly NYDOH was involved in the process of establishing the FUL program as
evidenced by New York Medicaid's 1986 letter to HCFA advocating for the adoption of a
"Revision of the MAC Program Alternative" rather than FULs.  *See* Nemirow Decl. at Ex. M;
*see also* 52 Fed. Reg. 28,648, 649-51 (July 31, 1987).  As part of the discovery ordered by the
Court in CMO 33, defendants are entitled to learn whether NYDOH communicated to CMS
about the merits of establishing FULs and what it understood would be the result of basing those
FULs on published prices rather than continuing the federal MAC program, which surveyed drug
wholesalers as New York Medicaid favored.  Further, in ultimately implementing the FUL, CMS
permitted and, in fact, encouraged state Medicaid programs to experiment with and implement
additional cost-saving programs, such as state MACs, to increase savings in the reimbursement
of generic drugs.  52 Fed. Reg. at 28,650.  Any analysis done by NYDOH to determine whether
New York Medicaid would benefit from additional cost-savings programs for generic drugs is

reasonably a part of the discovery that the Court ordered in CMO 33 and that defendants seek through their subpoenas to NYDOH.

Fifth, and finally, the materials and testimony requested in the subpoenas are relevant to defendants' affirmative defense based on statutes of limitations that New York Medicaid was on notice of the allegedly fraudulent inflation of AWP well before the first county filed suit. Further, plaintiffs allege that they were defrauded because the defendant manufacturers intentionally inflated AWPs and plaintiffs reasonably relied on these AWPs as a basis for reimbursement without knowing (or being able to know) that these prices were inflated.  In order to rebut these allegations, defendants are entitled to seek discovery into the extent of NYDOH's knowledge regarding whether AWP was inflated and in particular its receipt and use of AMP information through the EPIC program.

## II.   THE DECISION IN *SPITZER* v. *PHARMACIA* HAS NO BEARING ON THE FACTUAL AND LEGAL QUESTIONS PARTICULAR TO THIS CASE, NEITHER AS PRECEDENT NOR AS A TRIGGER FOR JUDICIAL ESTOPPEL.

NYDOH argues it should be excused from complying with the subpoenas on the grounds that a New York intermediate state court, in *Spitzer* v. *Pharmacia*, 39 A.D.3d 1117 (N.Y. App. Div. 2007), denied defendants in that case discovery of the state Medicaid agency (NYDOH) and the State Legislature.  The *Pharmacia* case is irrelevant to this litigation because it involved entirely different causes of action, requiring different elements of proof, and, thus, different discovery.

### A.   The Claims at Issue in *Spitzer* v. *Pharmacia* Were Materially Different From the Ones Asserted in the Present Case.

In *Pharmacia*, the court denied discovery because the causes of action "d[id] not depend upon an allegation that [Medicaid] agencies or officials were deceived."  39 A.D.3d at 1118-19. Here, the analysis is completely different.  Two of the surviving causes of action in the complaint

are common law fraud and violation of N.Y. Soc. Serv. L. § 145-b (obtaining public funds by false statements).  In order to succeed on the claims at issue in this case, plaintiffs must show, among other elements, that New York Medicaid and its officials *relied* on some false impression about the reported AWPs or, in other words, that they were deceived.  *See Zanett Lombardier, Ltd.* v. *Maslow*, 29 A.D.3d 495, 495-96 (N.Y. App. Div. 2006).  In contrast, in *Pharmacia*, the causes of action were brought under N.Y. Gen. Bus. Law § 349 (unfair trade practices) and N.Y. Exec. Law § 63(12) (repeated or persistent fraud).  Neither of these causes of action require the same showing of deception as those at issue in our case.  *See People ex rel. Spitzer* v. *General Electric Co., Inc.* 302 A.D.2d 314, 315 (N.Y. App. Div. 2003) (finding that the test for fraud under § 63(12) is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud); *Eon Labs Mfg. Inc.* v. *Watson Pharmaceuticals, Inc.*, 164 F. Supp. 2d 350, 364 (S.D.N.Y. 2001) (enumerating the elements of a claim N.Y. Gen. Bus. L. § 349 and finding that no intent to deceive is required).

Defendants believe that discovery of NYDOH will reveal that NYDOH officials were aware of the fact that AWPs were pricing benchmarks and not representations about actual acquisition costs.  Likewise, defendants believe discovery will show that NYDOH understood that, by basing FULs on published prices, FULs would be in most cases higher than the prices at which Medicaid providers were acquiring products in the market place.  Indeed, discovery of Medicaid agencies conducted in other states has proven that Medicaid officials were well aware of the limitations of AWP and were actively participating in national discussions about alternative methods of reimbursement.  This knowledge by NYDOH officials will serve to disprove that New York relied upon an impression that the published AWPs represented actual costs in reimbursing providers through Medicaid.

Moreover, the New York Counties action involves many more issues than simply the definition of AWP. This case, as alleged by plaintiffs, involves an understanding of FUL, MAC, dispensing fees, and AMP, and goes far beyond the simple legislative intent behind the definition of AWP. *See* RFACC ¶¶ 11-15, 31-32. The *Pharmacia* case did not involve any of these terms, let alone the interplay between them and the development of complex programs such as the FUL.

### B.   Movants' Judicial Estoppel Argument Is Improper.

Movants assert that judicial estoppel precludes defendants from arguing that the *Pharmacia* decision is inapplicable to this case based on an argument made by defendants in the Nevada AWP litigation. *See* Cross Motion to Quash at 3, n. 1. In an attempt to manufacture a judicial estoppel when none exists, movants mischaracterize the nature of defendants' previous statements. Judicial estoppel does not apply here.

A party seeking judicial estoppel must establish that "(1) the party against whom estoppel is sought has pursued an inconsistent factual position in an earlier proceeding, and (2) this prior inconsistent position was somehow adopted by the first court." *In re WorldCom, Inc. Securities Litigation*, 308 F. Supp. 2d 236, 248 (S.D.N.Y. 2004) *citing Mulvaney Mechanical, Inc.,* v. *Sheet Metal Workers Intern. Assoc., Local 38*, 288 F.3d 491 (2d Cir. 2002); *Wight* v. *BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (emphasis added). Judicial estoppel is limited to instances where the two positions taken are directly inconsistent to the point of being mutually exclusive. *See*, *e.g.*, *Alternative Systems Concepts, Inc. v. Synopsis, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). The goal of the doctrine is to protect the integrity of the judicial process through avoidance of inconsistent judicial determinations. *Id*. No such protection is called for in this case.

The only factual position taken by defendants in the Nevada AWP proceeding was a simple description of what had taken place in the *Pharmacia* litigation: "the case that is cited there is a case in New York county involving interpretation of what the Judge sees is a statute

with the term AWP." *See* 9/19/06 Hearing Tr. before Magistrate Judge M. Bowler at 28:18-20.

Defendants argued that the facts surrounding *Pharmacia* were inapposite to the facts particular to

the Nevada litigation. *Id.* Specifically, defendants in the Nevada litigation argued that the

Nevada Department of Health and Human Services officials' understanding of AWP was

important to that litigation because those officials were involved in setting the Nevada

reimbursement formula. *Id.* at 28:18-29:2. Defendants took no position as to whether discovery

of NYDOH or New York Medicaid would be relevant to an AWP litigation in New York, and no

inconsistency exists. NYDOH's suggestion that by distinguishing *Pharmacia* in another case,

defendants have thereby made an "admission" that it was properly decided and applicable to this

motion is incorrect. Defendants arguments in the Nevada action were neither inconsistent with

the arguments supporting this motion to compel nor were they factual positions of the kind

required for judicial estoppel to apply. *See*, *e.g.*, *In re Worldcom, Inc., Securities Litigation*, 308

F. Supp. 2d at 248 (finding that an argument made before an MDL panel did not trigger judicial

estoppel in light of the fact that plaintiffs did not present inconsistent factual positions). There is

no bar to defendants' argument that the *Pharmacia* decision does not relieve NYDOH from

producing materials and testimony responsive to the subpoenas in this action.

## III. THE DISCOVERY SOUGHT BY DEFENDANTS IS NOT OVERBROAD AS TO VOLUME OR TIME IN THAT THE DISPUTED SUBPOENAS SPEAK DIRECTLY TO THE ISSUES CENTRAL TO THEIR DEFENSE AND ARE IN ACCORDANCE WITH THE ORDER OF THIS COURT.

Both the Federal Rules of Civil Procedure and CMO 33 allow defendants to seek

discovery from third parties. *See* Fed. R. Civ. P. 45; CMO 33 ¶ 5(b). In properly seeking

documents and testimony from NYDOH, defendants have not sought to harass or burden the

State of New York, but only to defend themselves against the lawsuit pursued by plaintiffs.

Plaintiffs, in concert with NYDOH, have impeded that proper discovery at every step, up to and including this Motion to Quash.

###### A.   Defendants Seek Only Those Documents Integral to Their Case and Remain Willing to Negotiate as to Scope and Timing of Production.

Despite dramatic assertions that complying with the subpoenas will bring the entire New York State government to a halt, any realistic inconvenience inflicted by the subpoenas is not disproportionate to defendants' needs in defending against plaintiffs' claims for literally billions of dollars.  The information sought, as detailed above, is critical to the issues at the very core of this litigation.  And even if the subpoenas were overbroad or unduly burdensome in some way, a motion to quash is not the proper remedy.  *See*, *e.g.*, *Wiwa* v. *Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004), *citing Linder* v. *Nat'l Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996) ("modification of a subpoena is generally preferred to outright quashing.")  Defendants have been and remain willing to negotiate the scope of the documents and testimony requested in the subpoenas.  *See* Diederich Ex. E (1/30/08 letter from Tretter to Asnis).

Contrary to NYDOH's argument, defendants have not requested "every scrap of paper" maintained by the state, but rather highly specific categories of documents carefully crafted to speak to the material issues of this case.  As discussed above, the agencies affected by the subpoenas at issue, principally NYDOH, are those with important decision-making responsibilities regarding pharmaceutical reimbursement methods and implementations.  They gather and maintain information provided to and received from plaintiffs – information defendants cannot acquire from any other source.  The information is used not only to implement policies relating to pharmaceutical reimbursement but to educate the Governor's Office and the Legislature about the impact of those policies on the interactions with providers and the counties.

16

As mentioned in defendants' motion to compel, NYDOH cannot in good faith contend that it is a non-party to this litigation.  The Counties have claimed that this action has been brought to recover money reimbursed by the Counties and New York State.  RFACC ¶ 34. Importantly, and as noted in defendants' joint motion to compel, New York has deputized the Counties' attorneys to represent its interests in this litigation.  *See* Pls.' Surreply in Opp'n to Defs.' Joint Mot. to Dismiss at 7 n. 6 (Docket No. 2638).  Indeed, plaintiffs joined NYDOH's cross-motion to quash the subpoenas and the motion itself was filed by the Counties' attorneys. *See* Cross Motion to Quash.  The Court should not permit NYDOH to actively pursue litigation against defendants but prevent defendants from taking discovery of this de-facto party.

NYDOH's claim of overbreadth rings especially hollow in light of defendants' oft-stated willingness to negotiate the scope of the subpoenas.  This willingness was expressed in multiple correspondences between counsel for defendants and counsel for the State of New York.  *See* Diederich Decl. at Ex. C (1/23/08 letter from Tretter to Asnis); Diederich Decl. at Ex. E (1/30/08 letter from Tretter to Asnis).  In light of these past discussions and the present opportunity to negotiate the scope of the subpoenas, quashing the subpoenas would be needlessly prejudicial to defendants' ability to mount a defense.

**B.      Defendants Have Properly Inquired into Documents and Testimony Relating to the Time Period Prior to 1997.**

Defendants must have access to documents and testimony prior to 1997 in order to adequately pursue the discovery contemplated by CMO 33.  Although CMO 33 limits the time period for discovery to the period of 1997 through 2005, in order to adequately understand the FUL and its implementation by New York Medicaid, as well as the unique history leading to the establishment of New York Medicaid's reimbursement formula that was in effect from 1995

until 2003, defendants must gather documents and testimony relating to events occurring prior to 1997.

The litigation between PSSNY and the Governor of the State of New York began in 1978 and continued through the 1990s.  Throughout this time period, much of New York's pharmaceutical reimbursement policy was mandated by a consent decree requiring periodic negotiations between the State and PSSNY over the adequacy of the dispensing fee paid by New York Medicaid and its ingredient cost reimbursement rate (EAC).  Nemirow Decl. at Ex. C. New York's attempts to change the reimbursement policies in the late 1980s were frustrated by an injunction enforcing that consent decree.  See Nemirow Decl. at Ex. F (2/19/88 Order, *PSSNY v. Carey*).  The reimbursement policy was significantly influenced by the consent decree, executive proposals, and legislative determination until at least 1994 when the Legislature codified by statute the reimbursement rate negotiated by NYDSS and PSSNY.  Defendants are also entitled to discovery into NYDOH's knowledge and use of the AMP and Best Price information, EPIC's reimbursement rate, and the extent to which information was shared between NYDOH and the Legislature during this critical time in New York Medicaid's reimbursement history.

Also relevant in this pre-1997 time period, as discussed above, is NYDOH's correspondence with the federal government regarding reimbursement for multisource drugs – the program that was eventually adopted as the FUL.  NYDOH's understanding of the FUL program as it was conceived and its participation in the formation of the FUL program is highly relevant and is a subject matter on which discovery is specifically permitted in paragraph 5 of CMO 33.

**C.    The Individual Subpoenas are Proper and the Requested Testimony is Necessary to a Defense of the General Allegations and the Allegations of FUL Fraud.**

The testimony of the three individuals subpoenaed by defendants is crucial to the defense of this litigation.  As current and former employees of NYDOH, these witnesses were intricately involved in the decision-making process and the implementation of the policies surrounding pharmaceutical reimbursements.  NYDOH's brief statement that the witnesses do not recollect any information regarding the relevant topics is insufficient as a basis to quash the subpoena. Defendants are entitled to depose these three key NYDOH employees and former employees to probe their knowledge and to refresh their memories with relevant documents.  *See*, *e.g.*, *Bradford* v. *Meditech, Inc.*, 2002 WL 392496, at *2 (D. Mass., Feb. 19, 2002) (finding a non-party affidavit claiming lack of memory insufficient as a basis to preclude a deposition:  "It may well be  ….  that the stuff of cross-examination - *e.g.,* focused questions, the use of other data to refresh one's recollection -- will yield a fruitful return"); *Shoen* v. *Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993) (holding that a witness' written statement claiming lack of memory is insufficient as a reason not to take a deposition).

As alluded to in defendants' motion to compel, Ms. Brankman served as Policy Director for NYDOH, and was instrumental in the litigation between PSSNY and NYDOH.  She also must have exhaustive knowledge and understanding of the implementation of the FUL.  *See*, *e.g.*, Nemirow Decl. at Ex. N (6/22/89 Affidavit of Mary Alice Brankman, *PSSNY v. Cuomo*); Nemirow Decl. at Ex. E (12/19/89 Affidavit of Mary Alice Brankman, *PSSNY v. Cuomo*). Defendants are entitled to question her on these topics, and, if she has in fact forgotten, to attempt to refresh her recollection with relevant documents, including her own affidavits.  At a minimum, defendants are entitled to authenticate these documents during a deposition of Ms. Brankman.

Mr. Falzano, as noted in defendants' motion to compel, served as a director in the Division of Medical Assistance and was also integrally involved in the litigation with PSSNY, and specifically was the individual who negotiated with PSSNY on behalf of NYDOH to bring that litigation to an end.  *See*, *e.g.*, Nemirow Decl. at Ex. O (3/15/91 Affidavit of Michael Falzano, *PSSNY* v. *Cuomo*); Nemirow Decl. at Ex. P (5/23/90 Memo from Lasky to PSSNY Negotiating Team) (evidencing Mr. Falzano's presence in negotiation meetings between PSSNY and NYDSS).  As with Ms. Brankman, any claim of lost recollection put forth by the state is an insufficient ground for a motion to quash the subpoena.  *Bradford*, 2002 WL 392496, at *2. Defendants are entitled to the opportunity to determine the scope of Mr. Falzano's knowledge and to attempt to refresh his recollection with relevant documents.

Mr. Butt is a current, long-time employee of NYDOH, and evidence shows that he has shared his knowledge regarding reimbursement policies and the results of those policies with the HHS Office of the Inspector General.  *See* Diederich Decl. Ex. J at n.1 and attached exhibits (1/30/08 letter from Tretter to MacMillan).  Indeed, in a "State Medicaid Drug Cost Containment Strategies Survey," Mr. Butt is listed as "NY Designated Contact Name" in 2002.  *Id*.  For this reason and others, his testimony is necessary to the defense of this litigation and, as set forth above, is relevant to the core issues in this case.

## **CONCLUSION**

For all the foregoing reasons, Defendants' Joint Motion to Compel Commissioner of New York State Department of Health and Three Key Witnesses to Comply with Subpoenas should be GRANTED and New York State Department of Health, Mark Richard Butt, Mary Alice Brankman, Michael A. Falzano and Plaintiffs' Cross-Motion to Quash Subpoenas Issued By Defendants should be DENIED.

Respectfully submitted,

Schering-Plough Corporation, Schering
Corporation, and Warrick Pharmaceuticals
Corporation on behalf of all other Defendants
identified in the Revised First Amended
Consolidated Complaint

 /s/ John P. Bueker
John T. Montgomery (BBO#352220)
John P. Bueker (BBO#636435)
Bryan R. Diederich (BBO#647632)
Kim B. Nemirow (BBO# 663258)

ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated: March 21, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2008, I caused a true and correct copy of the foregoing
to be served on all counsel of record by electronic service pursuant to Case Management Order
No. 2 entered by the Honorable Patti B. Saris in MDL 1456 and by facsimile and mail on counsel
for the New York Department of Health and the witnesses subpoenaed.

/s/ Renee Coshin
Renee Coshin

21