Exhibit A

## STATE SETTLEMENT AGREEMENT AND RELEASE

### I.   THE PARTIES

This Settlement Agreement ("Agreement") is entered into this _3rd_ day of _December_, 2001. The parties to the Agreement are the state of Iowa and TAP Pharmaceutical Products Inc. (formerly known as TAP Holdings Inc. and TAP Pharmaceuticals Inc.) ("TAP"), a Delaware corporation with a principal place of business in Lake Forest, Illinois, and are collectively referred to as the "Parties". The Parties now agree as follows:

### II.   PREAMBLE

A.   WHEREAS, TAP is entering into a civil settlement agreement with the United States of America, acting through and/or on behalf of its Department of Justice and the United States Attorney's Office for the District of Massachusetts, and the Office of Inspector General of the United States Department of Health and Human Services ("HHS-OIG"); TRICARE Management Activity ("TMA")(formerly known as the Office of the Civilian Health and Medical Program of the Uniformed Services), a field activity of the Office of the Secretary of Defense, the United States Department of Defense, and relators in certain federal False Claims Act lawsuits, as well as settlement agreements with the state of Iowa and numerous other states, all of which are intended to resolve civil claims for the conduct alleged in Paragraph F below;

B.   WHEREAS, this Agreement addresses the state of Iowa's claims against TAP for the conduct alleged in Preamble Paragraph F below;

C.   WHEREAS, on or before _October 16_, 2001, or such other date as the Court may set in United States of America v. TAP Pharmaceutical Products Inc., Criminal Action No. [to be assigned](District of Massachusetts) (the "Criminal Action"), or such other date as

1

may be determined by the Court, TAP has agreed to enter a plea of guilty pursuant to Fed. R. Crim. P. 11(e)(1)(C) to a one count Information alleging a violation of Title 18, United States Code, Section 371, namely, a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. ∋ 331(t) and 333(b) by causing the billing of free drug samples;

D.  WHEREAS, at all relevant times, TAP marketed and sold the drugs Lupron7 and Lupron Depot7 (collectively "Lupron") in various dosages to physicians, health maintenance organizations, hospitals, wholesalers, distributors and others for use in treatment of prostate cancer;

E.  WHEREAS, the state of Iowa contends that TAP caused to be submitted claims for payment for Lupron to the state's Medical Assistance Program ("Medicaid") established pursuant to Title XIX of the Social Security Act;

F.  WHEREAS, the state of Iowa contends that it has Medicaid-related civil claims against TAP under various statutes and the common law for engaging in the following alleged conduct from January 1991 through the present, involving the marketing, sale and pricing of Lupron for treatment of prostate cancer:

(i)     The state of Iowa contends that TAP, through certain of its employees, provided, and conspired to provide, free samples of the drug Lupron to certain providers (including physicians), knowing and expecting that those providers would prescribe, distribute and/or administer the free drug samples to patients and that those free samples would be illegally billed to the Medicaid program.  The state of Iowa further contends that the purpose of providing these free drug samples varied, but that among those purposes were:  permitting Medicaid providers to obtain money from the reimbursement for the samples of Lupron; inducing Medicaid

2

providers to order Lupron; providing a source of money for Medicaid providers to pay past-due balances owed to TAP; and increasing the income of Medicaid providers.

(ii)     The state of Iowa contends that TAP knowingly and willfully offered and/or paid illegal remuneration to certain providers, physicians, physician practices, health maintenance organizations and others in various forms, including, for example, grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services, administration fees, nominally priced drug, and VCRs and TVs, for the purpose of either unlawfully obtaining orders to purchase the drug Lupron from TAP or causing Lupron to be placed on formulary by a provider, which drug TAP knew was paid for by the Medicaid program.

(iii)     The state of Iowa contends that TAP knowingly and willfully offered and/or paid illegal remuneration to providers by marketing TAP=s AReturn-to-Practice≅ program to providers to induce unlawful orders to purchase the drug Lupron for treatment of prostate cancer, which drug TAP knew was paid for by the Medicaid program.  The state of Iowa further contends that TAP=s Return-to-Practice program consisted of inflating the Average Wholesale Price (AAWP≅) used by Medicaid for reimbursement of the drug Lupron, deeply discounting the price paid by providers to TAP for the drug (Athe discounted price≅), and marketing the spread between the AWP and the discounted price to providers as additional profit to be returned to the providers from Medicaid reimbursements for Lupron.  The state of Iowa further contends that TAP concealed the discounted price from Medicaid and other governmental agencies by omitting material information about providers= actual cost, by falsely advising providers that the discounted price could not and should not be reported to Medicaid, and by auditing providers to ensure the claims for payment were submitted at the inflated AWP rather than the discounted

3

price paid by the provider. The state of Iowa also contends that as a consequence of this conduct, its Medicaid program was damaged.

(iv)    The state of Iowa contends that TAP manipulated reported prices, including AWP, to increase reimbursement from the Medicaid program. Specifically, the state of Iowa contends that TAP engaged in a marketing scheme where it set AWPs of Lupron at levels far higher than the majority of its customers actually paid for the drug when purchasing either directly from TAP or through a wholesaler or distributor. As a result, the state of Iowa contends that TAP=s customers received reimbursement from the Medicaid program at levels significantly higher than the providers= actual costs or the wholesalers= average price. The state of Iowa further contends that certain providers submitted claims for payment to the Medicaid programs that were subsequently paid, based upon falsely inflated AWPs, to the financial detriment of the Medicaid program;

(v)    The state of Iowa contends that TAP knowingly misreported and underpaid its Medicaid rebates for Lupron used for treatment of prostate cancer, *i.e.,* the amounts that it owed to the state under the federal Medicaid Rebate Program, 42 U.S.C. ∋ 1396r-8. The state of Iowa further contends that TAP was generally required on a quarterly basis to rebate to its state Medicaid program the difference between the Average Manufacturer Price (AAMP≅) and its ABest Price,≅ as defined by 42 U.S.C. ∋ 1396r-8(k)(1) and 1396r-8(c)(1)(C). The state of Iowa alleges that TAP falsely reported to the Center for Medicare and Medicaid Services ("CMS") (formerly the "Health Care Financing Administration" or "HCFA") its Best Price for Lupron used for treatment of prostate cancer because TAP calculated its Best Prices for Lupron without accounting for Aoff-invoice≅ price concessions provided in various forms, including, for example,

4

grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services,

administration fees, nominally priced drugs, and VCRs and TVs.  As a result, the state of Iowa

contends that TAP misreported and underpaid its Medicaid rebates to the states under the

Medicaid Rebate Program.

TAP=s conduct alleged in Preamble Paragraph F is hereinafter referred to as the "Covered

Conduct."

G.  WHEREAS, the state of Iowa contends that it has administrative claims against TAP

for administrative and monetary penalties under state and federal law for the Covered Conduct.

H.  WHEREAS, other than such admissions as TAP makes in connection with its guilty

plea in the Criminal Action, TAP denies the remaining allegations of the state of Iowa set forth

herein.

I.  WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted

litigation of these claims, the Parties mutually desire to reach a full and final compromise of the

civil and administrative Medicaid-related claims the state of Iowa has against TAP.

### III.  TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in

consideration of the mutual promises, covenants, and obligations in this Agreement, and for good

and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.  TAP agrees to pay to the United States, to the individual states, to the relators in

certain federal False Claims Act lawsuits and to any relators in any pending state court *qui tam* or

"whistleblower" lawsuits, collectively, the maximum collective sum of five hundred eighty five

5

million dollars ($585,000,000) (the "Settlement Amount").  Payments to the United States and to the individual states shall be made pursuant to the following terms and conditions:

A.  TAP has agreed to pay to the United States the sum of five hundred fifty nine million four hundred eighty three thousand five hundred sixty dollars ($559,483,560) (the AFederal Settlement Amount≅), which represents the federal share of the Settlement Amount and the share of the Settlement Amount payable to the relators in certain federal False Claims Act lawsuits.  The Federal Settlement Amount shall be paid pursuant to the civil settlement agreement entered between TAP and the United States (the "Federal Agreement").

B.  TAP agrees to deposit into an escrow account the sum of twenty five million, five hundred sixteen thousand, four hundred forty dollars ($25,516,440) (the AState Settlement Amount≅), which represents the state-funded portions of the claims settled for the Medicaid programs of all fifty states and the District of Columbia ("the Participating States").  TAP shall pay the State Settlement Amount into an escrow account within seven business days after the latest date on which all of the following have occurred: (1) the Federal Agreement is fully executed by the Parties and delivered to TAP=s attorneys, (2) the stipulated dismissals described in the Federal Agreement are filed and copies provided to TAP=s attorneys, and (3) the Court accepts the Fed. R. Crim. P. 11(e)(1)(C) guilty plea in connection with the Criminal Action as described in Preamble Paragraph (B), and imposes sentence.  The escrow account into which TAP shall deposit the State Settlement Amount shall be an interest bearing escrow account under the custody and control of a Medicaid Fraud Control Unit, which shall be designated by the negotiating team for the National Association of Medicaid Fraud Control Units and which shall

6

act as Escrow Agent and shall retain such funds until their release in accordance with the payment terms set forth in subparagraph E below.

C.   The total portion of the Settlement Amount paid by TAP in settlement for alleged injury to the Medicaid Program for the state of Iowa is $315,150.86, consisting of a portion paid to the state of Iowa under this Agreement and another portion paid to the federal government as part of the Federal Settlement Amount.  The individual portion of the State Settlement Amount allocable to the state of Iowa, and which may be withdrawn by the state of Iowa from escrow pursuant to this Agreement, is $116,303.20 (the "Individual State Settlement Amount"), plus any accrued interest on that portion of the State Settlement Amount.  The portion of the Federal Settlement Amount allocable to the state of Iowa is $198,847.66.

D.   The state of Iowa shall be entitled to disbursement of its Individual State Settlement Amount from the escrow account ten days after the Escrow Agent has received fully executed state settlement agreements from all of the Participating States.  Any escrowed funds not disbursed within 200 days after the Escrow Agent has received the State Settlement Amount shall be disbursed to TAP.

E.   If TAP=s agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(e)(1)(C) in the Criminal Action described in Preamble Paragraph B is not accepted by the Court or the Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the state of Iowa or TAP.  If either the state of Iowa or TAP exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within four business days of the Court=s decision, the Parties will not object and this Agreement will be rescinded.  If this Agreement is rescinded, TAP waives any affirmative defense based in

7

whole or in part on the statute of limitations for the period of time between April 17, 2001, and thirty days after recission of this Agreement.

2.   In consideration of this Agreement and payment set forth herein and subject to the exceptions from release set forth in Paragraph 3 below, the state of Iowa on behalf of itself, its officers, agents, agencies and departments shall release and forever discharge TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any civil or administrative claims for damages or penalties that the state of Iowa has or may have relating to the Covered Conduct as defined in Preamble Paragraph F.  The payment of the Settlement Amount fully discharges TAP from any obligation to pay Medicaid-related restitution, damages, and/or any fine or penalty to the State for the Covered Conduct.

3.   Notwithstanding any term of this Agreement, the state of Iowa specifically does not herein release TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any and all of the following:  (a) any potential criminal, civil or administrative claims arising under state of Iowa revenue codes; (b) any criminal liability not specifically released by this Agreement; (c) any potential liability to the state of Iowa for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) any reporting of AWP for Lupron to First Data Bank or any other national reporting service for use in Medicaid reimbursement submitted subsequent to the effective date of this agreement; (f) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (g) any express or implied warranty claims or other claims for

8

defective or deficient products and services provided by TAP; (h) any claims for personal physical injury or property damage or for other consequential damages arising from the Covered Conduct; (i) any claim based on a failure to deliver items or services due; or (j) any civil or administrative claims against individuals, including current and former directors, officers, and employees of TAP, its predecessors, subsidiaries, joint venture owners, and their corporate affiliates, who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement related to the Covered Conduct.

4.   In consideration of the obligations of TAP set forth in this Agreement, conditioned upon TAP=s payment in full of the Settlement Amount and except as reserved in paragraph 3 above, the state of Iowa agrees to release and refrain from instituting, directing or maintaining any administrative claim or any action seeking exclusions from the state of Iowa's Medicaid program against TAP, its predecessors, subsidiaries, joint venture owners, their corporate parents and affiliates, successors and assigns, for the Covered Conduct or for TAP's conviction in the Criminal Action.  Nothing in this Agreement precludes the state of Iowa from taking action against TAP in the event that TAP is excluded by the federal government, or for conduct and practices other than the Covered Conduct or the conviction in the Criminal Action.  The Medicaid Fraud Control Unit for the state of Iowa further agrees to refrain from recommending, causing or attempting to cause any administrative action or sanction, including debarment, by any other government agency of the state of Iowa for the Covered Conduct or for the conviction in the Criminal Action.  TAP acknowledges that the state of Iowa does not have the authority to release TAP from any claims

9

∽r actions which may be asserted by private payors or insurers, including those that are paid on a capitated basis for providing health care to the States' Medicaid programs.

5.   This Agreement is expressly conditioned upon resolution of the Criminal Action.  In consideration of the Criminal Action, the state of Iowa agrees that it shall not investigate, prosecute, or refer for prosecution or investigation to any agency, TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns for the Covered Conduct.

6.   TAP fully and finally releases the state of Iowa, its agencies, employees, servants, and agents from any claims (including attorneys fees, costs, and expenses of every kind and however denominated) which TAP has asserted, could have asserted, or may assert in the future against the state of Iowa, its agencies, employees, servants, and agents, related to or arising from the investigation and prosecution of the Covered Conduct up to the effective date of this Settlement Agreement.

7.   TAP waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Settlement Agreement bars a remedy sought in such criminal prosecution or administrative action. Provided, however, that nothing in this paragraph is intended to, or will operate to, limit the scope of paragraph 5, in which the state of Iowa agrees not to prosecute or investigate TAP for certain conduct.

8.   The Settlement Amount that TAP must pay pursuant to Paragraph 1 above will not be decreased as a result of the denial of claims for payment now being withheld from payment by the state of Iowa's Medicaid program where such denial resulted from the Covered Conduct.  If applicable, TAP agrees not to resubmit to the program any previously denied claims where such denial resulted from the Covered Conduct and agrees not to appeal any such denials of claims.

9.   This Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, including but not limited to any individual or entity that purchased Lupron from TAP.

10. Nothing in any provision of this Agreement constitutes an agreement by the state of Iowa concerning the characterization of the Settlement Amount for purposes of the state internal revenue laws.

11. In addition to all other payment and responsibilities under this Agreement, TAP agrees to pay all reasonable travel costs and expenses of the state negotiating team.  TAP will pay this amount by separate check or wire transfer made payable to the National Association of Medicaid Fraud Control Units after all Participating States execute this Agreement.

12. TAP covenants to cooperate fully and truthfully with the state of Iowa in any ongoing investigation or investigation commenced within five years of the execution of this Agreement of individuals and entities not specifically released by this Agreement (including any parties with whom TAP has or has had a business or professional relationship, including but not limited to vendors, contractors, partners, joint venturers, physicians, and referral sources) relating to the Covered Conduct.  More specifically, upon reasonable request from the state of Iowa:

11

(a) TAP will make reasonable efforts to facilitate access to, and encourage the cooperation of, its current and former directors, officers, and employees for interviews and testimony relating to the Covered Conduct, consistent with the rights and privileges of such individuals. To encourage the cooperation of such individuals, TAP agrees to advise such individuals in writing that the state of Iowa wishes to interview them or seek their testimony, and that the individuals' cooperation is in the best interest of TAP. Cooperation provided pursuant to this subparagraph will include identification of witnesses who, to TAP's knowledge, may have material information related to the state of Iowa's inquiry. The testimony referred to in this paragraph includes, but is not limited to, testimony deemed necessary by the state of Iowa or a court to identify or establish the source, original location, authenticity, or other evidentiary foundation for any documents and to authenticate such documents in any criminal, civil and administrative investigations and proceedings in which the state of Iowa is involved.

(b) TAP will provide copies of non-privileged documents and records in its possession, custody or control relating to the Covered Conduct and relating to the subject of the state of Iowa's inquiry. In connection with this, TAP shall provide such technical assistance as is necessary and reasonable to facilitate the state of Iowa's access to any computerized information covered by this Paragraph.

Nothing in this agreement shall be construed as a waiver by TAP of its attorney-client privilege or work product privilege. Notwithstanding that fact, the existence of any such privilege does not affect TAP's obligation to comply with this Agreement.

13. Notwithstanding any provision of this Agreement, TAP is not required to (1) request of its present or former officers, directors, employees or agents that they forego seeking the

12

advice of an attorney nor that they act contrary to that advice; (2) take any action against its directors, employees or agents for following their attorney's advice or for failing to submit to an interview or otherwise cooperate with the state of Iowa; or (3) waive any privilege or claim of work product. The failure of any individual to submit to an interview or otherwise to refuse to cooperate with the state of Iowa shall not constitute a breach of this agreement by TAP.

14. The state of Iowa acknowledges TAP's cooperation in the state of Iowa's investigation of drug pricing practices and agrees to communicate the nature and extent of this cooperation to other parties upon the request of TAP. The making of this Agreement, and TAP's provision of information pursuant to it, shall not be construed by the state of Iowa as a basis for the exclusion of any of TAP's products from the state of Iowa's formulary.

15. TAP represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

16. TAP has entered into a Corporate Integrity Agreement ("CIA") with HHS-OIG. TAP acknowledges that the state of Iowa may gain access to and use the pricing information provided by TAP under the CIA, provided that the state of Iowa meets its obligations relating to the use and confidentiality of that information as set forth in this Agreement. TAP acknowledges that the CIA does not preclude the state from taking any appropriate action against TAP for future conduct under the state of Iowa's laws. The state of Iowa hereby agrees to abide by all confidentiality provisions and restrictions contained in the CIA and to afford all such information the maximum degree of confidentiality permitted by law.

17. TAP shall report directly to the Medicaid Program for the state of Iowa the average sale price, as defined below, for pharmaceutical and other products for which the Medicaid

13

Program for the state of Iowa provides reimbursement (hereafter "Government Reimbursed Products").

      (a) AVERAGE SALE PRICE DEFINITION:  For purposes of this Agreement, "average sale price" means, with respect to each dosage form, strength and volume of the Government Reimbursed Product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package) the average of all final sales prices charged by TAP for the product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding direct sales to hospitals.  (Those purchasers for which the sales are included in the calculation of average sale price are hereafter referred to as the "Relevant Purchasers".)  The prices identified in the calculation of the average sale price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates[1]; and all other price concessions provided by TAP to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser. Notwithstanding the foregoing, the average sale price shall not include the value of bona fide charity care or grants.

      TAP shall report the average sale price by National Drug Code ("NDC") for each Government Reimbursed Product identified by TAP's NDC.  The average sale price reported shall be properly weighted to reflect the volume of sales at each sale price, *i.e.,* for each NDC, the price reported shall be an average per unit price determined by dividing the sum of all final prices

---

[1] The term "rebate" as used in this paragraph does not include any payments made by TAP to the States pursuant to the Medicaid Drug Rebate Program (42 U.S.C. § 1396r-8)

charged by TAP to a Relevant Purchaser, net of all price reductions identified above, for a Government Reimbursed Product in a quarter by the total number of units of that product sold in that quarter.

(b) TIME FRAME: Except as otherwise noted below, thirty (30) days after the last day of each calendar quarter, TAP shall report, in accordance with section 17.a. above, the average sale prices of each of its Government Reimbursed Products identified by TAP's NDC to: (1) the Medicaid programs of those States who have executed a state settlement agreement with TAP; and (2) First DataBank Inc.[2] solely for the purpose of reporting pricing information based on those average sale prices to the Medicaid Programs of those States that have executed a state settlement agreement.  The first such report of average sale prices shall be made no later than 30 days after the end of the first full calendar quarter following the Effective Date of the CIA.

(c) CERTIFICATION:  With each report of price information TAP sends to the Medicaid Program for the state of Iowa, an appropriate employee or agent of TAP will certify that the price information reported has been reported to First DataBank, or any successor or alternative reporting agency, and that the price information has been calculated in accordance with the methodology described in this Agreement.  Said certification shall be in the form annexed to this Agreement as Exhibit "A".  TAP agrees that this certification by an appropriate employee or agent of TAP constitutes a certification by TAP.

---

[2] If appropriate to reflect changes in the sources from which the Medicaid programs for the Participating States receive pricing information, TAP agrees that, upon the receipt of a written request by any of the Participating States, TAP will report the required information to a drug pricing reporting source other than, and in addition to, First DataBank, provided that the price reporting source agrees to protect the confidentiality of TAP's pricing information in a written agreement containing reasonable provisions equivalent to the confidentiality provisions governing the submission of pricing information to First Data Bank.

(d) DOCUMENT RETENTION:  TAP shall retain all supporting work papers and documentation relating to the average sale price of its Government Reimbursed Products for eight years after the effective date of the CIA, and, to the extent not protected by appropriately asserted privileges, shall make such documentation available for inspection by the MFCU for the state of Iowa, or a duly authorized representative of the MFCU, pursuant to the confidentiality provisions set forth in paragraph 18 below.

(e) TIME PERIOD.  TAP agrees to submit average sale price in accordance with this Agreement for a period of seven years from the effective date of the CIA.

18. (a)  TAP and the state of Iowa acknowledge that the pricing information provided by TAP is considered to be confidential commercial information and proprietary trade secrets that if disclosed may cause substantial injury to the competitive position of TAP.  It is further understood that all information provided by TAP shall be made available to the state of Iowa's MFCU upon request.  The state of Iowa hereby agrees to afford to the pricing information disclosed by TAP the maximum degree of confidentiality permitted by law.

(b)  The Medicaid Program of the state of Iowa has been advised by the MFCU of the purpose and use of this information.  The parties acknowledge that this information may be relied upon by the state of Iowa in establishing reimbursement rates for TAP products, provided however the state of Iowa will not change reimbursement rates for any TAP product based on this information without conducting meaningful review for all government-reimbursed therapeutically similar products.

16

19. Unless otherwise stated in writing subsequent to the execution of this Agreement, all notifications and communications made pursuant to this Agreement shall be submitted to the entities listed below:

**STATE PHARMACY MANAGER**
**[For the submission of Average Sale Price Data]:**

Department of Human Services
Hoover State Office Building, Division of Medical Services
Des Moines, IA  50319-0114

**STATE MEDICAID FRAUD CONTROL UNIT**
**[For legal notices and other purposes]:**

MFCU of Iowa
Department of Inspections and Appeals
Lucas State Office Building
Des Moines, IA  50319

**TAP**

Legal Department
TAP Pharmaceutical Products Inc.
675 N. Field Drive
Lake Forest, IL  60045

20. The undersigned TAP signatory represents and warrants authorization by the Board of Directors to execute this Agreement.  The undersigned state of Iowa signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the state of Iowa through their respective agencies and departments.

21.     This Agreement is governed by the laws of the state of Iowa.

17

22.     This Agreement is effective on the date of signature of the last signatory to the Agreement.

23.     This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties; provided, however, this Agreement shall not apply to the products of an acquiring company or a company merging with TAP except to the extent such company, as a result of the acquisition of or merger with TAP, becomes involved in the sales, marketing or pricing of, or Medicaid Drug Rebate program obligations associated with, Government Reimbursed Products (as defined in this Agreement) originally manufactured by TAP prior to the merger or acquisition, in which case the obligations of this agreement shall apply only to those products which had been Government Reimbursed Products when they were manufactured by TAP.

24. This Agreement constitutes the complete agreement between the Parties with regard to the Covered Conduct.  This Agreement may not be amended except by written consent of the Parties.  As to Paragraph 1 only, TAP and the NAMFCU TAP Negotiating Team may agree in writing to amend this Agreement by (1) extending beyond 200 days the time in which all Participating States must execute settlement agreements and/or (2) reducing the number and identity of Participating States that must return executed state settlement agreements before funds are disbursed from escrow.

25. Each party agrees to perform any further acts and to execute and deliver any further documents reasonably necessary to carry out this Agreement.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

18

**For the state of Iowa:**

By: _Thomas R. Dunn_          Dated: ___9/17/01___

Title: _Administrator, Iowa Department of Inspections and Appeals_
_Director, Iowa Medicaid Fraud Control Unit_

**For the state of Iowa Medicaid Program:**

By: _Mary A. Sturgis_          Dated: ___9/17/01___

Title: _Chief, Contract Management Bureau_

**TAP PHARMACEUTICAL PRODUCTS INC.**

By: _H. Thomas Watkins_          Dated: ___12/3/01___
H. THOMAS WATKINS
President
TAP Pharmaceutical Products Inc.

By: _Daniel Reidy / rcc_          Dated: ___12/4/01___
DANIEL REIDY
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601
Counsel to TAP Pharmaceutical Products Inc.

By: _Joseph F. Savage / rcc_          Dated: ___12/4/01___
JOSEPH SAVAGE
Testa, Hurwitz & Thibeault, LLP
125 High Street
Boston, MA 02110
Counsel to TAP Pharmaceutical Products Inc.