

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*99 N.E. 4 Street*

*Miami, FL 33132*
*(305) 961-9000*

March 14, 2008

R. Christopher Cook
David Torborg
Jones Day
51 Louisiana Ave., N.W.
Washington, DC 20001-2113

Re:   *U.S. ex rel. Ven-a-Care of the Florida Keys Inc v Abbott Laboratories,* MDL No. 1456/Civil Action No. 01-12257-PBS

Dear Mr. Torborg and Mr. Cook:

    We are writing in response to your request that the United States provide additional information regarding the calculation of damages in this case. You have asked for information regarding the actual dollar amount of the damages as well as details regarding the methodology used to calculate the dollar figure. We have pointed out to you that we have been hampered in our development of damages theories and calculations by Abbott's delay in providing us with its own transactional data. Even now, quite serious concerns exist about whether we have complete transactional data. Abbott's corporate representative has testified that she never reviewed the United States' document and data requests; she did nothing more than pull a routine data extract, and it is clear that many data fields were never turned over to the United States. Recent depositions have additionally confirmed that the data reflecting the actual collection of customer payments on invoices and the issuance of checks or credits for chargebacks and rebates is contained in an entirely different database which Abbott has never produced.

    The unavailability of the transactional data has impaired our ability to evaluate and calculate a damages figure. In sum, our analysis has been delayed by Abbott's delay in producing its data. For further reference, please note the many times we have made this point to you over the past year, as summarized in our letter of September 17, 2007, and as set forth in our Third Motion to Compel Abbott to produce documents and data. *See* United States' Memorandum in Support of its Third Motion to Compel, filed 10/15/07 at 7. Notwithstanding our diligent efforts to obtain data since the time the Complaint was filed, it was not until February 14, 2008 that Abbott certified that its production of transactional data was complete. *See* Echevarria Affidavit, served 02/14/08. Furthermore, in light of Judge Saris's ruling yesterday on Abbott's Motion to Dismiss, Abbott is obligated to produce the Acyclovir Sodium data that

pre-dates June 4, 2007. The sooner we receive this data, the sooner our experts can complete their work.

In addition, as you are aware, detailed information regarding the United States' damages calculations will be provided when it is prepared by our expert witness. The deadline for expert reports is at the end of April, so Abbott will have that information soon. In fact, it will be difficult for our experts to meet the deadline because of the late and incomplete production of Abbott's transactional data. Abbott's demand at this late date to redirect the resources of our experts to provide preliminary damages estimates in the face of Abbott's serious delay in providing the relevant data is not only unfair, but burdensome.

Much of the information provided in this letter has been previously disclosed to Abbott throughout discovery. In any event, we provide some additional damages information based upon our current, albeit incomplete, knowledge. Hence, the amounts and methodologies identified herein are preliminary estimates and are subject to revision. Abbott is on notice that we reserve all rights to amend, update, alter or add to this information or our legal theories, subject to our expert reports.

As a general matter, based on the information currently in our possession, please be advised of the following:

1. The United States' damages calculations will cover Medicare and Medicaid damages for the period of 1991 through 2001;

2. The United States' damages calculations will include the federal portion of the damages inflicted by Abbott upon each state Medicaid program and will not include the state portion.

3. The United States' damages calculations will not include the inflated co-pays or deductibles paid by Medicare beneficiaries or Medicaid recipients;

4. The United States' damages calculations will not include monies paid by Medicaid Programs as dispensing fees;

5. The damages suffered in connection with Medicaid are not reduced by any amount paid under the Medicaid Rebate Program (the "Rebate Program") mandated by the Federal Omnibus Budget Reconciliation Act of 1990 ("OBRA '90"). The amount of the rebates paid under that program are unaffected by the reimbursement amounts, and are calculated by reference to the Average Manufacturer Price and the Best Price, and the other factors specified in the statute itself, which are independent of the reimbursement amount.

The United States' approach to calculating damages is based upon the traditional approach of calculating damages under the False Claims Act. *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). The measure of the government's damages under the False Claims Act is the amount that it paid out by reason of the false statements or claims over and above what it would have paid if the claims had been truthful. *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966); *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988); *BMY Combat Systems v. United States*, 44 Fed. Cl. 141, 147 (Ct. Cl. 1999). "A court should ask the question, 'How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant?'" *United States ex rel. Roby v. Boeing Co.,* 79 F. Supp. 877 (S.D. Ohio 1999). Moreover, there is "no set formula for determining the government's actual damages [under the False Claims Act]." *United States v. Killough*, 848 F.2d at 1532. "[D]amages under the FCA are to be determined in a flexible manner to ensure proper recovery of direct, and not consequential, damages resulting from the making of a false claim." *BMY-Combat Systems Division of Harsco Corporation v. United States*, 44 Fed.Cl. 141, 148. Damages do not need to be precisely determined. *United States v. American Packing Corp.*, 113 F. Supp. 223, 224 (D.C.N.J. 1953).

One methodology to calculating damages under this approach will be based upon a tainted claims theory. Under this theory, the United States will seek to recover 100% of the amounts paid by Medicare or Medicaid in any situation in which the reimbursement amount was based upon a false statement or claim which Abbott caused to be submitted through its dissemination of inflated price information. Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted. Thus, the total amount of the payment represents damages.

An alternative method of calculating damages will be to estimate the amount that would have been reimbursed for the Subject Drugs (as identified in the Amended Complaint) had Abbott not reported inflated prices. The details of this calculation are intimately related to the still incomplete Abbott transactional data which the United States is just beginning to analyze. Ultimately, the United States expects to identify a range of prices that Abbott could reasonably have reported as representing the prices which were generally and currently paid in the marketplace for its products. The United States will then estimate the AWP's that would have been published using those prices. The United States will then estimate the amounts that would have been reimbursed to providers using the AWP's derived from price information that was not false. The United States will then calculate the difference between the actual amounts reimbursed as compared to its estimate of the amounts that would have been reimbursed to providers using the AWP's derived from price information that was not false. At the current time, we expect that these calculations will be done on a quarter by quarter basis.

As an example, after completing its analysis of Abbott's transactional data, the United States might estimate that the price generally and currently paid in the first quarter of 1997 for Abbott's Vancomycin 1 GM Fliptop vial- sterile, NDC 00074-6533-01 ("Vancomycin 1 GM

FTV") was $5.30[1]. The evidence might also show that Abbott's List Price at that time of $55.59 per unit caused the publication of an AWP of $660.13 for a package of 10 for a per unit AWP of $66.01. As known by Abbott, the published AWP was routinely established by adding 18.75 % to the inflated list prices that Abbott reported. A state Medicaid Program would normally utilize that published AWP as part of its reimbursement methodology and reimburse for all claims for that Abbott product in that quarter in reliance on that figure. As an example, a state Medicaid program might take the published AWP of $66.01 and discount it by 12%, resulting in an allowed reimbursement amount of $58.09. If that state required the payment of a 20% co-pay by the Medicaid beneficiary, the amount paid by the state would be $46.47. If the federal portion of the Medicaid Program in that state were 60%, the portion of the paid amount funded by the federal government would be $27.88. In some instances, the state might have reimbursed based upon another component of its "lesser of" methodology instead of the AWP, but if the more accurate AWP would have been the lower of all other options, reimbursement would have been based thereon so that the damages would be comparable.

The United States would then estimate the reimbursement that would have been paid had Abbott reported the generally and currently paid price of $5.30. In that case, the published AWP would have been 18.75% higher, or $6.29. Thus, the amount reimbursed by the state Medicaid Program would have been that amount less 12%, or $5.54. The damages would then be $58.09 minus $5.54, or $52.55 for every unit paid that quarter by that state. Factoring in the co-pay and the federal portion results in a net damage figure to the United States of $25.22. The applicable state Medicaid Program dispensing fee, or an estimate thereof, would first be deducted before calculating the damages amount. Calculations of this type will be done for each NDC, for each state, for each quarter from 1991 to 2001. The sum total of those calculations will represent the total Medicaid related damages sought by the United States in this case under this damage methodology.

In order to perform actual calculations of damages for claims submitted upon the basis of J-codes to either the Medicare Program or to any Medicaid Program, the United States currently intends to take the same general approach. In sum, the J-code based damages will be first calculated based upon the tainted claims theory and then, alternately, based upon an analysis of the reimbursed amount had Abbott not inflated its prices. The damages suffered in connection

---

[1] The United States must engage in substantial additional analysis of Abbott's transactional data in order to identify the most appropriate price(s) that represent the generally and currently paid price. After analyzing Abbott's transactional data, the United States may conclude that the appropriate price was the actual average price paid by all of Abbott's customers, or may identify a price limited to certain classes of trade, such as for example, wholesalers and distributors. The United States also may conclude that some other percentile price point was appropriate. The United States may even identify one price as the most appropriate price, but base its damages calculations on a price that is a conservative method that favors Abbott. However, none of these positions can be finalized at this stage given that Abbott so recently completed its production of transactional data.

with J-code based claims will be based upon an estimate of the reimbursed amount that would have been utilized had Abbott not reported inflated prices. In general, at least for the purposes of this case, the allowed amount was based upon the median cost generic product. The United States will calculate these damages by estimating the allowed amount based upon the median price that would have been selected for reimbursement purposes had the AWP's utilized in the selection process been derived from price information that was not false.

One approach for identifying untainted AWPs will be to identify AWPs based upon prices that were generally and currently paid for Abbott products as described above and then adding 18.75%. That corrected and untainted AWP can be placed into an array of applicable generic products to see if the resulting median will be different than the median that was actually utilized for reimbursement. If the median based upon accurate information is lower than the median that was based upon Abbott's inflated information, then the United States will seek to recover the entire value of all claims submitted under that J-code during the corresponding time period. The entire value of the claim will be sought under the tainted claims theory. Damages from all claims, not just from claims attributable to Abbott products will be sought because the conduct of Abbott caused the median allowed amount to be false for every claim submitted under that J-code regardless of whether the underlying product was actually purchased from some other manufacturer. As an alternative to seeking the full amount of the claim, another alternative will be to calculate the difference between the amount that would have been reimbursed using a corrected AWP and the amount that was actually reimbursed. These calculations would be adjusted for any applicable co-pay or deductible, as appropriate.

An alternative approach to identifying on an array by array basis all situations in which the median was affected by Abbott's inflated prices will be to look to the real world impact of Abbott's decision to finally report lower, accurate prices in 2001 and thereafter. A comparison of the J-code reimbursements based upon Abbott's inflated prices with the J-code reimbursements based upon the lower prices reported by Abbott in 2001 and thereafter will allow for the calculation of an average reduction in reimbursement which can then be applied to prior years' reimbursement.

The United States will also calculate damages based upon the claims submitted by Abbott's Home Infusion division. After further verification of the CHIPs data and comparison to the claims data of Medicare and Medicaid, the United States expects that these claims will overlap with the claims data and will not give rise to substantial, additional damages. Still, the United States will calculate damages for claims directly submitted by Abbott. Thus, comparable damages calculations based upon CHIPs data will be prepared using each of the methodologies described above. Again, Abbott continues to delay the production of the CHIPs data in a useable format, thereby delaying the United States' ability to calculate damages.

As Abbott is aware, the United States seeks treble the amount of its actual damages under the False Claims Act, plus penalties of between $5,000/$5,500 and $10,000/$11,000 for each false statement or claim submitted or caused to be submitted by Abbott to Medicaid and Medicare during the time period identified in the Amended Complaint. For the common law

fraud claims, the Plaintiffs seek compensatory and punitive damages in an amount to be determined, together with costs and interest.

As set forth in the Amended Complaint, the recovery sought for the Plaintiffs' unjust enrichment claim is the amount by which Abbott was unjustly enriched, including an accounting of all revenues unlawfully obtained by Abbott, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Abbott, plus interest, costs, and expenses. The information required to quantify these amounts is in Abbott's possession and has still not been fully produced in discovery.

Thank you for your attention to this matter. The sooner Abbott completes it production of all relevant data, including the Acyclovir Sodium data, the sooner the United States and its experts can complete their work on damages calculations. If you believe we can answer additional questions or can provide additional information at this time, please feel free to contact me. We believe that the parties can resolve any outstanding issues without the need for motions practice at this time.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

/s Mark Lavine

Mark A. Lavine
Assistant U.S. Attorney
(305) 961-9303
(305) 536-4101 Fax
Mark.Lavine@usdoj.gov

N:\mlavine\Venacare\ABBOTT\Discovery\Initial Disclosures\Supplemental\03.14.2008 letter to Torborg and Cook.final.wpd