# EXHIBIT A

Page 1

```
          THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL       )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

PRICE LITIGATION             )   01-CV-12257-PBS

_____


              Videotaped Rule 30(b)(6) Deposition

              of MICHAEL SELLERS, at 77 West Wacker

              Drive, Chicago, Illinois, commencing

              at 9:00 a.m. on Sunday, March 16,

              2008, before Donna M. Kazaitis, RPR,

              CSR No. 084-003145.
```

Page 18

```
 1  deposition exhibits?
 2       MS. TABACCHI:  Object to the form.
 3       THE WITNESS:  No, nothing other than I
 4  had reviewed when sitting with counsel.
 5  BY MS. ST. PETER-GRIFFITH:
 6    Q.  So as part of your prep today, you also
 7  sat with counsel.  Is that Ms. Tabacchi?
 8    A.  Yes.
 9    Q.  How long did you sit with Ms. Tabacchi?
10    A.  It was probably about twelve hours.
11    Q.  When was that?
12    A.  Not straight.  That was last week.
13    Q.  Do you remember which days?
14    A.  Tuesday and Wednesday.
15    Q.  So the 11th and 12th?
16    A.  I believe so.
17    Q.  Sir, what else did you do to prepare for
18  today's deposition?
19    A.  Other than clean myself up and get
20  dressed up and come in, that's about it.
21       MS. TABACCHI:  I did promise Mr. Sellers
22  that I would assist him with this particular part
```

Page 19

```
 1  of the questioning.  And I don't know if you'd
 2  like me not to remind him --
 3       MS. ST. PETER-GRIFFITH:  Sure,
 4  absolutely.
 5       MS. TABACCHI:  -- of two interviews that
 6  he conducted.
 7       THE WITNESS:  Oh, that's right.
 8       I did talk to two people.  I talked
 9  to Joe Brundza, B-R-U-N-D-Z-A, and I talked to
10  Rick Gonzalez.
11  BY MS. ST. PETER-GRIFFITH:
12    Q.  When did you talk with Mr. Brundza?
13    A.  I talked to Mr. Brundza on I believe the
14  11th.
15    Q.  How long was your -- did you speak with
16  him in person?
17    A.  I spoke to him in person.  I was on the
18  phone.
19    Q.  How long was that phone conversation?
20    A.  Probably about twenty minutes.
21    Q.  And what did you discuss?
22    A.  I'm trying to remember.  It had to do
```

Page 20

```
 1  with the Basic Operating Procedures document.
 2    Q.  What did Mr. Brundza tell you about
 3  that?
 4    A.  That when he took over the organization
 5  that was within Contract Marketing, that basically
 6  they had ceased to use the Basic Operating
 7  Procedure document.
 8    Q.  When was that?
 9    A.  I believe that was in August of 2000.
10    Q.  What else did you discuss with
11  Mr. Brundza?
12    A.  That was about it.
13    Q.  What did you discuss -- well, first, let
14  me ask you, you said you also spoke with
15  Mr. Gonzalez?
16    A.  Yes.
17    Q.  Before we get to Mr. Gonzalez, your
18  conversation with him, what was Mr. Brundza's work
19  history with Abbott?
20    A.  He had been in a number of positions,
21  been in market research, he worked for me in
22  Contract Marketing as well as my predecessor in
```

Page 21

```
 1  Contract Marketing, in a few different positions.
 2  I had promoted him to the manager of our
 3  injectables business for Contract Marketing.
 4            Subsequent to that, he I believe
 5  now is the director of --
 6       MS. TABACCHI:  I'm just going to ask
 7  Mr. Sellers not to testify about Mr. Brundza's
 8  employment beyond 2004 other than you can confirm
 9  where he works.
10       THE WITNESS:  Okay.  He now works for
11  Hospira.  But he was through the end of his Abbott
12  work experience the manager for injectable
13  Contract Marketing for the hospital side.
14  BY MS. ST. PETER-GRIFFITH:
15    Q.  As opposed to the Alternate Site?
16    A.  Yes.
17    Q.  Why did you elect to speak with
18  Mr. Brundza about the Basic Operating Procedures
19  manual?
20    A.  What I was looking for was confirmation
21  that we had in fact ceased to use the Basic
22  Operating Procedures as I had recalled, and I was
```

Page 22

 1   looking for confirmation from that, and he
 2   confirmed that.
 3       Q.   Did you two discuss why there were later
 4   versions of the Contract Marketing Basic Operating
 5   Procedures manual beyond the year 2000?
 6           MS. TABACCHI:  Object to the form.
 7           THE WITNESS:  No.
 8   BY MS. ST. PETER-GRIFFITH:
 9       Q.   Were you aware that there were versions
10   beyond 2000?
11           MS. TABACCHI:  Object to the form.
12           THE WITNESS:  I was aware that there
13   were sections that were updated subsequent to that
14   time period.
15   BY MS. ST. PETER-GRIFFITH:
16       Q.   Did you have an opportunity to review
17   the Contract Marketing Basic Operating Procedures
18   manual that was a 2002 version which we utilized
19   in the Wiebking deposition?
20           MS. TABACCHI:  Object to the form.
21           I'll allow Mr. Sellers to clarify.
22   But if he doesn't, I will.  This is not an

Page 23

 1   accurate representation.
 2           THE WITNESS:  I saw the document that I
 3   believe was used in prior depositions.
 4           It did have a 2002 date on the
 5   bottom of it.  However, each of the sections had a
 6   create date or the majority of them did have a
 7   create or update date on the top.
 8           That document, and Joe Brundza
 9   confirmed this, that document resided on what we
10   call our shared drive in Contract Marketing.
11           So the 2002 date was basically the
12   date it was printed.  It wasn't the date that the
13   document had necessarily existed.  It was on the
14   shared drive.
15   BY MS. ST. PETER-GRIFFITH:
16       Q.   So you confirmed that with Mr. Brundza
17   as well?
18       A.   Yes, uh-huh.
19       Q.   Anything else that you discussed with
20   Mr. Brundza?
21       A.   No.
22       Q.   Now, you testified that you also spoke

Page 24

 1   with Rick Gonzalez.
 2       A.   Yes.
 3       Q.   Who is Mr. Gonzalez?
 4       A.   Rick Gonzalez in the early 2000
 5   timeframe was the president of the Hospital
 6   Products Division.
 7           He was subsequently promoted to
 8   executive vice president of Medical Products
 9   within Abbott Laboratories.  And I think when he
10   retired from Abbott Laboratories, he was the chief
11   operating officer for the corporation.
12       Q.   When did he retire?
13       A.   I believe he retired last September.
14       Q.   What years was he president of HPD?
15       A.   I don't recall.  It was prior to 2000,
16   and I think he was promoted in the fall of 2000.
17           MS. TABACCHI:  These types of questions
18   are obviously of Mr. Sellers in his individual
19   capacity.
20           MS. ST. PETER-GRIFFITH:  Yes.  I just
21   want to --
22           MS. TABACCHI:  Understood.  I don't want

Page 25

 1   to get in your way, but this is not corporate
 2   testimony.
 3           MS. ST. PETER-GRIFFITH:  Understood.
 4   BY MS. ST. PETER-GRIFFITH:
 5       Q.   He was your boss or in your chain of
 6   command?
 7           MS. TABACCHI:  Object to form.
 8           THE WITNESS:  He was the president of
 9   the division within which I worked, yes.
10
11   BY MS. ST. PETER-GRIFFITH:
12       Q.   Did you speak with Mr. Gonzalez over the
13   phone?
14       A.   Yes.
15       Q.   When was that?
16       A.   I believe that was Thursday, last
17   Thursday, which would have been the 13th.
18       Q.   What did you discuss with Mr. Gonzalez?
19       A.   Discussed the 2001 price change, the
20   change in organization of Contract Marketing for
21   Alternate Site.
22           There was one other subject.  Do

7 (Pages 22 to 25)

Page 26

 1  you mind if I refer to this?
 2     Q.  Absolutely.
 3     A.  The other was the decision to close down
 4  the Home Infusion Services business.
 5     Q.  First of all, how long was your
 6  conversation with Mr. Gonzalez?
 7     A.  It was probably about twenty to
 8  twenty-five minutes.
 9     Q.  What did you discuss concerning the 2001
10  price change with him?  Did you ask him questions?
11     A.  I was on there and questions were asked
12  of him by a Jones Day attorney.
13     Q.  What was asked?
14     A.  With regard to?
15     Q.  I'm sorry.  2001 price change.  Let's
16  start there.
17     A.  With regard to the 2001 price change.
18  One of the questions was who was involved in the
19  decision for the 2001 price change.
20     Q.  Did Mr. Gonzalez respond?
21     A.  Yes.
22     Q.  What did he say?

Page 27

 1     A.  He said that he was involved, Chris
 2  Begley was involved, Guy Wiebking, myself, and
 3  Laura Schumacher.
 4     Q.  Did he say anything else about that?
 5         MS. TABACCHI:  Object to the form.
 6         THE WITNESS:  He said that was the team
 7  that he had met with and talked about.
 8  BY MS. ST. PETER-GRIFFITH:
 9     Q.  What other questions were asked?
10     A.  The other question was who made the
11  decision for the change, and his answer was that
12  it was a consensus of that team.
13         He was also asked if he consulted
14  with Miles White on that decision, and he said no.
15     Q.  Any other questions?
16     A.  With regard to the price change, no.
17     Q.  Did Mr. Gonzalez say anything else with
18  regard to the price change?
19     A.  No.
20     Q.  Let's go to the decision to change the
21  organization of Contract Marketing for Alternate
22  Site.

Page 28

 1     A.  He was asked why that decision, why that
 2  decision was made, and what he remembered of it.
 3  He didn't have a lot of detailed memory with
 4  regard to that, but he did remember that he said
 5  it was done to make sure that we had consistency
 6  with regard to the management of prices in the
 7  division.
 8     Q.  Which change in Contract Marketing are
 9  you referencing?
10     A.  I'm talking about the change in
11  reporting relationship for the Contract Marketing
12  segment of Alternate Site.
13     Q.  And what was that change?
14     A.  Basically Lynn Leone worked as the
15  manager of Contract Marketing for Alternate Site
16  and she reported to the general manager of Product
17  Sales starting in 2000 and had a dotted line
18  reporting relationship to the general manager of
19  Contract Marketing.
20         Sometime in the first part of 2000,
21  as I recall, her organization began to formally
22  report to the general manager of Contract

Page 29

 1  Marketing and subsequently had a dotted line
 2  relationship with the general manager of Product
 3  Sales.
 4     Q.  Now, in 2000 who was the general manager
 5  of Product Sales?
 6     A.  Peter Baker.
 7     Q.  And in 2000 when this change occurred,
 8  who was the general manager of Contract Marketing?
 9     A.  Mike Sellers.
10     Q.  Did he indicate who made the decision?
11     A.  I don't remember him specifically saying
12  "I made the decision."  I think his statement was
13  the decision was made.  His memory was definitely
14  that he was part of the decision.
15     Q.  As a 30(b)(6) representative here today
16  for Abbott, what is Abbott's testimony as to who
17  made the decision?
18     A.  I think --
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  -- as I remember it and
21  as, you know, as we did it, it was a decision that
22  was a consensus of whether it be Rick Gonzalez,

Page 30

1  Guy Wiebking, myself.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  At the time the decision was made, was
4  there a concern regarding consistency with regard
5  to management concerning the pricing?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  I don't recall a specific
8  concern, no.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  What else did you discuss with
11 Mr. Gonzalez regarding the change in organization
12 of Contract Marketing for Alternate Site?
13     A.  That was it.
14     Q.  Did Mr. Gonzalez or anyone else discuss
15 anything else concerning that topic, the change in
16 organization for Contract Marketing?
17     A.  No.
18     Q.  Okay.  What about the decision to close
19 down Home Infusion?  What was asked of
20 Mr. Gonzalez and what did he answer?
21     A.  I believe the question was what do you
22 recall about the decision to close down Home

Page 31

1  Infusion Services.  And Mr. Gonzalez answered
2  that, as he remembered it, Home Infusion Services
3  was a small component of the Hospital Products
4  Division, that in the later years as he looked at
5  the business and when it was fully burdened with
6  the full cost of the division and corporate
7  overhead, that it wasn't profitable.  So he made a
8  decision to close it down.
9      Q.  And that was Mr. Gonzalez's decision?
10     A.  Yes.
11     Q.  When was that decision made?
12     A.  I believe it was in 1997.
13     Q.  I appreciate this might be in your
14 personal capacity, but do you know what position
15 Mr. Gonzalez held in 1997?
16     A.  He was the president of the Hospital
17 Products Division.
18     Q.  What else did Mr. Gonzalez discuss
19 concerning closure of Home Infusion?
20     A.  That was it.
21     Q.  Is there anything else that was
22 discussed in this conversation with Mr. Gonzalez?

Page 32

1      A.  No.
2      Q.  Sir, other than what you've testified to
3  so far, did you do anything else to prepare for
4  today's deposition?
5      A.  No.  I don't believe so.
6      Q.  What happened when the change in
7  reporting relationship occurred in 2000 for
8  Alternate Site Contract Marketing?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  What happened?
11 BY MS. ST. PETER-GRIFFITH:
12     Q.  Sure.  Well, let me ask you, from a
13 personnel standpoint what happened?  Was there a
14 change in -- first, what was the change in terms
15 of the reporting relationships?  Who reported to
16 who and what change occurred in that reporting
17 relationship?
18     A.  Lynn Leone and her Contract Marketing
19 organization, which was probably around eight
20 people that reported to her, if I remember right,
21 that organization prior to the change, as I said
22 before, reported to the general manager of Product

Page 33

1  Sales, Pete Baker.  There was no physical movement
2  of people.  So they remained where they were prior
3  to the change.
4          The difference was that Lynn and
5  her group became a part of the overall Contract
6  Marketing group.  And instead of Pete reviewing
7  what Lynn and her folks were doing, I took over
8  that responsibility.
9      Q.  In addition, were there any other
10 changes with regard to the day-to-day
11 responsibilities of the individuals in Contract
12 Marketing and Alternate Site that occurred as a
13 result of this change?
14     A.  Nothing other than, you know, we
15 established periodic meetings between me and Lynn
16 as well as myself meeting with her team so they
17 understood who I was, what we were trying to do.
18     Q.  What did you discuss with them during
19 those meetings?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  Typically, with all of my
22 managers I would have what I would call a