# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
IN RE PHARMACEUTICAL INDUSTRY  )   MDL NO. 1456
AVERAGE WHOLESALE PRICE         )   CIVIL ACTION NO.
LITIGATION                      )   01-12257-PBS
_____    )
                            )
```

## CASE MANAGEMENT ORDER NO. 13

March 10, 2005

Saris, U.S.D.J.

After review of the submissions, I order the following
revised schedule for track one defendants:

1.  Regardless of the status of the motion for class
certification:

| | |
|---|---|
| August 31, 2005 | - Close of Fact Discovery |
| October 1, 2005 | - Plaintiffs file their expert reports on liability |
| November 15, 2005 | - Defendants file expert reports on liability |
| January 15, 2006 | - Completion of expert depositions |

2.  If this Court's order on class certification is

unappealed, the parties shall propose a schedule for summary

judgment briefing within 15 days of the Court's order.

3.  If this Court's order on class certification is

appealed:

| | |
|---|---|
| 30 days after the Court of Appeals' decision on appeal from class certification ("Appeals Decision") | - Defendants' motion for summary judgment |
| 60 days after the Appeals Decision | - Plaintiffs' opposition |

| 75 days after the Appeals Decision | - The Reply |
|---|---|
| 90 days after the Appeals Decision | - The Surreply |

 **S/PATTI B. SARIS**

United States District Judge

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
IN RE PHARMACEUTICAL INDUSTRY   ) M.D.L. No. 1456
AVERAGE WHOLESALE PRICE         ) Civil Action No. 01-12257-PBS
LITIGATION                      )
_____)
                                )
THIS DOCUMENT RELATES TO ALL    )
CLASS ACTIONS                   )
_____)
```

## CASE MANAGEMENT ORDER #17

November 21, 2005

Saris, U.S.D.J.

Case Management Order No. 13 is amended as follows:

**December 15, 2005**: Plaintiffs file expert liability reports.

**February 15, 2006**: Defendants file expert liability reports.

**March 15, 2006**: Completion of expert depositions.

SO ORDERED.

**S/PATTI B. SARIS**
United States District Judge

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) |
| | ) |
| | ) MDL No. 1456 |
| | ) |
| | ) CIVIL ACTION: 01-CV-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) Judge Patti B. Saris |
| | ) |
| | ) Chief Magistrate Judge Marianne B. Bowler |
| | ) |
| | ) **[FILED UNDER SEAL PURSUANT TO** |
| | ) **COURT ORDER]** |
| | ) |

## DECLARATION OF RAYMOND S. HARTMAN
## IN SUPPORT OF PLAINTIFFS' CLAIMS OF LIABILITY
## AND CALCUATION OF DAMAGES

disaggregate those overcharge damages incurred by commercial payors for physician-administered drugs reimbursed by TPPs subject to Massachusetts state law (Sub-Class 2).

65.      I calculate damages for non-Medicare units using the formulation introduced in ¶ 25 of my September 3, 2004 Declaration, which made use of the notation developed in ¶¶ 21-23 of that Declaration.  Specifically, ignoring the subscripts j and k on the spread above, the actual reimbursement rate allowed by the commercial payors can be derived from the inflated AWP as allowed amount = $AA = AWP - x\% = (100\% - x\%)*AWP$, for any $x\%$[71] and where the retail dispensing fee (df) has been ignored for obvious reasons. Then the but-for $AA = AA_{but-for} = AWP_{but-for} - x\% = (100\% - x\%)*AWP_{but-for}$.  The injury or overcharge per unit reimbursed is $(AA - AA_{but-for}) = (100\% - x\%)*(AWP - AWP_{but-for})$ $= (100\% - x\%)*(Spread - Spread^{but-for})*ASP$.

Using this formulation, I calculate aggregate non-Medicare overcharge damages as follows:

(2b)      Aggregate overcharge damages $= (AA - AA^{but-for})*$total units reimbursed,
$\qquad\qquad\qquad\qquad = (100\% - 2.5\%)*(Spread - Spread^{but-for})*ASP*q_t$,

where 2.5% represents the average discount off AWP for physician-administered drugs reimbursed in a non-Medicare context by all commercial payors, as surveyed and reported by MedPAC,[72] and $q_t$ is the total units of the relevant NDC of the relevant drug reimbursed in period t under the non-Medicare branch of the schematic in Figure 2.

As noted in ¶ 63.b) above, I calculate non-Medicare overcharge damages for all single-source drugs until multiple generics launch, at which point I assume that MAC is put into effect and I set the overcharge damages to $0.00 beginning in the following year.

As with the Medicare damage, I first calculate aggregate overcharge damages in the U.S. for all non-Medicare units being reimbursed.  I then disaggregate that total to overcharge damages borne by all U.S. consumers (through inflated coinsurance payments

---

[71] As noted in ¶¶ 22.c) and 28.a) above, the MedPAC Report indicates that x% can range from ± 15% over the Class.  See also the next footnote.

[72] See MedPAC Report, Table 9-2.  The average weighted (by the number of respondent payors) reimbursement was 97.55%AWP.  I round that discount to (100%-2.5%) for ease of calculation and exposition.

and inflated out-of-pocket payments) and overcharge damages borne by all TPPs in the U.S., using the data described with Figure 2 for that disaggregation. I finally disaggregate from that national total the overcharge damages to the Massachusetts members of Sub-Class 3.

66.    The damage calculations are reported in Attachment J by manufacturer, by Medicare Sub-Classes and for all non-Medicare reimbursements, both nationally and for reimbursements in Massachusetts.

67.    Note the following regarding the damage analysis. I have used manufacturer sales data to calculate overcharge damages, which are incurred by the Class members as a result of inflated reimbursement payments to providers. The question arises: Does the use of manufacturer data provide an accurate calculation of overcharges in payor reimbursements to providers? The answer is yes.

68.    Manufacturer data are delineated by NDC. The damage calculations in the preceding paragraphs demonstrate the ease with which the crosswalk between J-Codes and NDCs can be accomplished, confirming the finding of the OIG from 1996 for 1994 Medicare claims (see footnote 52). For single-source drugs, all NDCs, including the NDC of the fundamental billing unit are readily available. Claims for reimbursement are calculated as percentages of the relevant AWP; the but-for AWP is calculated using the relevant ASP. For multi-source drugs, the data requirements are somewhat more onerous; however, it is straightforward to identify all the relevant generic and branded alternative NDCs, their AWPs, and the but-for AWPs.[73]

---

[73] More specifically, for Medicare and non-Medicare damages, the crosswalk between J-Codes and NDCs has been demonstrated to be particularly easy for single-source drugs. The NDCs by J-Code are listed; the providers can access those NDCs and AWPs; the payors can review those NDCs and AWPs. Calculation of damages for these drugs is straightforward and formulaic.

For multi-source drugs under Medicare Part B, I identify when any Class drug went generic (i.e., became multi-source), all relevant available generics possible, their AWPs (from RedBook) and the median of their AWPs for the period 1991 through 2003. This median AWP is the reimbursement alternative to ASP for any multi-source drug sold by Defendants and reimbursed by the Medicare Sub-Classes during the period 1991-1997. Over 1998-2003, the alternative to ASP is the lesser of 95% of the median generic AWP or 95% of the least expensive brand name AWP (also available through RedBook or First DataBank). Hence, the data requirements are clear and the data are readily available from publicly-available sources.

With the amendments altering reimbursement for multi-source drugs under Medicare (see ¶ 20 above) beginning January 1, 2004, the reimbursement alternatives rely upon the actual AWP as of April 1, 2003 and the but-for AWP which is determined by the ASPs of all generic and branded versions of the relevant

---

# EXHIBIT D

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| 01-CV-12257-PBS AND 01-CV-339 | ) | Chief Magistrate Judge Marianne B. |
| | ) | Bowler |
| | ) | |
| | ) | |
| | ) | |

**MERITS REPORT AND DECLARATION OF ERIC M. GAIER, PH.D.**

**March 21, 2006**

Declaration of Eric M. Gaier, Ph.D.          Drugs reimbursed by TPPs outside the Medicare context

alleged AWP scheme and would not have suffered economic harm. It therefore follows that those beneficiaries that make coinsurance payments under coverage from these TPPs also would not have suffered economic harm as a result of the alleged AWP scheme. Moreover, none of the evidence I have reviewed leads me to conclude that any TPP would have overpaid for physician-administered drugs as a result of the alleged AWP scheme.

## IV.1. TPPs are typically knowledgeable and sophisticated

(52)   As I noted in Section III.1 above, Dr. Hartman and I agree that knowledge regarding the differences between AWP and provider acquisition costs, as a matter of economic theory, would protect payors from overpaying for prescription drugs as a result of the alleged AWP scheme and therefore insulate them from economic harm. Specifically, Dr. Hartman states:

> Had the existence of the 'mega-spreads' been perceived and understood by TPPs, those payors would have negotiated more aggressively than they did, leading to lower reimbursement rates.[109]

Judge Saris also recognizes the importance of knowledge and sophistication of TPPs. Specifically, she states:

> Some TPPs may have greater sophistication because they purchase self-administered drugs, but there is no evidence that TPPs purchase physician-administered drugs or know of the mega-spreads that exist for these drugs.[110]

It is therefore appropriate to focus on the question of what TPPs in Massachusetts knew about the differences between AWP and provider acquisition costs, and in particular on whether they would have gained knowledge through purchases of physician-administered drugs. The evidence demonstrates that TPPs covering approximately 70 percent of

---

[109]   Hartman Liability and Damages Declaration, p. 10.
[110]   *Memorandum and Order Re: Motion for Class Certification*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257, August 16, 2005 ("Saris' Class Certification Order"), p.59.

Declaration of Eric M. Gaier, Ph.D.          Drugs reimbursed by TPPs outside the Medicare context

beneficiaries in Massachusetts bought physician-administered drugs throughout the class period. Through those purchases and other sources of evidence discussed below, Massachusetts TPPs knew of the widely varying differences between AWP and provider acquisition costs, generally knew the magnitude of these differences, and were aware of those differences since at least 1991.

(53)    The provision of health insurance in Massachusetts is relatively concentrated, with approximately 86 percent of the covered lives insured by five TPPs. Indeed, plaintiff BCBS-MA is the largest TPP in Massachusetts, insuring approximately 46 percent of the covered lives in 2004. BCBS-MA also offers Medicare Supplemental Insurance ("Medigap") plans to beneficiaries in Massachusetts.[111] It is instructive to also examine other large plans in Massachusetts; Table 2 summarizes the covered lives for the largest TPPs in Massachusetts.

**Table 2: Massachusetts health plans by number of enrollees**

| Health plan | Total enrollees (1,000s) | Share of covered lives |
|---|---|---|
| Blue Cross Blue Shield of Massachusetts | 2,288 | 46% |
| Tufts Associated Health Plan ("Tufts") | 803 | 16% |
| Harvard Pilgrim Health Care, Inc. ("Harvard Pilgrim") | 766 | 15% |
| CIGNA HealthCare of Massachusetts, Inc. ("CIGNA") | 229 | 5% |
| Fallon Community Health Plan ("Fallon") | 187 | 4% |
| Other (10 plans with more than 1,000 enrolled) | 695 | 14% |
| **Total** | **4,969** | **100%** |

Source: AIS database, 2004.

(54)    Sales data provided by defendants demonstrate that four of the top five Massachusetts TPPs—plaintiff BCBS-MA, Harvard Pilgrim, CIGNA, and Fallon—purchased physician-administered drugs directly through contracts with manufacturers, through Group Purchasing Organizations ("GPOs"), or through drug wholesalers. These purchases were made by organizations that provided medical care, required a supply of drugs for their operation, and

---

[111]   http://www.mass.gov/doi/Consumer/HealthLists/medicare_2006.PDF.

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

THIS ORDER RELATES TO
CLASS 1, BRISTOL-MYERS SQUIBB COMPANY

CIVIL ACTION
NO.  01-12257-PBS
MDL 1456


**PRETRIAL ORDER**


SARIS, D.J.                                                                              May 9, 2007


The above action has been set down for a JURY TRIAL on July 23, 2007, at 9:00 p.m.

A FINAL PRETRIAL CONFERENCE has been scheduled for July 16, 2007, at 3:00p.m.

By May 30, 2007, the parties shall make all expert disclosures as required by Fed. R. Civ.

P. 26(a)(2).

By June 11, 2007, the parties shall make pretrial disclosures as required by Fed. R. Civ.

P. 26(a)(3).

Objections to the pretrial disclosures shall be served and filed by June 25, 2007.

By June 11, 2007, the parties shall file a joint pretrial memorandum in accordance with

L.R. 16.5(d).  Counsel are required to confer fifteen days before the final pretrial conference for

the purpose of preparing the joint pretrial memorandum.

By June 11, 2007, the parties shall file/serve proposed jury instructions, proposed voir

dire questions, motions in limine, witness/exhibit lists[1], and any designations[2] of deposition

_____

[1] Exhibits shall be premarked with one set of exhibit numbers.  There should be no duplicative exhibit numbers.  For example, if plaintiff's exhibits are premarked ## 1 - 100, the defendant's exhibits should be premarked ## 101, 102, etc...  The case number is also to appear on each exhibit sticker.  Counsel shall file with the Court an original and two (2) copies of the exhibit and witness lists.

[2] It is helpful if designations and counter-designations are submitted on the same copy, with designations highlighted in one color and counter-designations highlighted in another.

testimony.

By June 25, 2007, the parties shall file/serve opposition to motions in limine, any

objections to witnesses or exhibits, and counter-designations of deposition testimony.

Trial briefs shall be filed/served by July 9, 2007.


**NOTE**: **IF THIS COURT RESCHEDULES THE TRIAL AND FINAL PRETRIAL CONFERENCE DATES, COUNSEL ARE TO CONFER AND ADJUST ALL OTHER DATES IN THIS ORDER COMMENSURATE WITH THE NEW TRIAL DATE.**



/s/ Patti B. Saris
Patti B. Saris
United States District Judge

# EXHIBIT F

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 28, 2006
Boston, MA

905

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL               MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE           01CV12257-PBS

PRICE LITIGATION

* * * * * * * * * * * * * * * * * * * * * * * * * * * *     FEBRUARY 28, 2006

THIS DOCUMENT RELATES TO:            VOLUME: IV

ALL ACTIONS                          PAGES: 905-1168

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

              C O N F I D E N T I A L

CONTINUED VIDEOTAPED DEPOSITION OF RAYMOND S.

HARTMAN, PH.D., called as a witness by and on behalf

of the Defendants, pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

before P. Jodi Ohnemus, Notary Public, Certified

Shorthand Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of Dwyer

& Collora, LLP, 600 Atlantic Avenue, Boston,

Massachusetts, on Tuesday, 28 February, 2006,

commencing at 9:33 a.m.

Raymond S. Hartman, Ph.D.  CONFIDENTIAL           February 28, 2006
Boston, MA

1054

1    if the acquisition cost of a drug is a certain

2    amount of money and there -- and that's what a -- a

3    provider is paying for that drug, then certainly

4    they're not going to take less than that.

5            Now, if they're being paid 500 times that

6    or 400 times that, you're saying is there anything

7    in -- in the -- in the Medicare report that I can

8    point to that said that they wouldn't?  And I'd have

9    to look closely to see if I can find a sentence like

10   that.  I think it -- to say that someone who is --

11   who is making thousands of percent on a particular

12   purchase would not be willing to take several

13   hundred percent is -- is -- doesn't accord with --

14   if the reality of the market changed and there is --

15   and there is information provided and payers can

16   respond to that and will -- are unwilling to pay

17   certain amounts and providers can't get anymore than

18   that and they're still making money on it, as a

19   matter of economics they will continue to accept

20   that much less.

21       Q.   **Well, they may accept less for the drug**

22   **price, but they would want more for the**

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

1055

1     **administration of the drug.  Isn't that what MedPac**

2     **found?**

3                    MR. NOTARGIACOMO:   Objection.

4          A.    MedPac and a variety of deponents we've

5     looked at have said that there are a number of

6     things that enter into reimbursement.  Services and

7     physician services administration and -- and the

8     pharmaceutical -- the cost of the pharmaceuticals.

9     It is my -- I've been asked to focus on the

10    pharmaceuticals.  I've been asked to focus on what

11    the impacts of the alleged fraudulent manipulation

12    are for those prices, and I've been told as a matter

13    of law that that -- that there's not -- that there's

14    not a recourse of allowing a cross subsidization

15    from some overcharge to pay other -- some other

16    amount of money.  Now, I haven't -- whether that's

17    necessary or not, I don't know.

18                    Certainly in -- as a matter of economics,

19    if there were enough oncologists out there, if we

20    start hypothesizing how a market could change, if

21    there's enough oncologists out there, payers can --

22    can negotiate -- and there's information about what

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

1056

1    those acquisition costs are so that they can

2    negotiate with full information and a full

3    understanding, they're going to say, look, I can

4    hire anybody else to give this shot.  I can hire a

5    nurse practitioner or whatever would be allowed, and

6    I can -- I know this drug only costs this much. This

7    is all I'm going to give you.  And these doctors

8    will compare that to what the other value of their

9    time, and they will come to another equilibrium, but

10   it will be lower than the one that we find under the

11   alleged manipulation.

12        Q.    **What is your support for that?**

13        A.    Basic.

14        Q.    **That certainly didn't happen in the case**

15   **of Blue Cross Blue Shield of Massachusetts, did it?**

16        A.    What didn't happen in the --

17        Q.    **They considered lowering the reimbursement**

18   **rate and decided not to because the oncologists**

19   **wouldn't go for it.**

20              MR. NOTARGIACOMO:  Objection.

21        A.    The --

22        Q.    **How do you explain that example?**

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 28, 2006
Boston, MA

1058

1    clear.  Now what --

2         Q.   Is --

3         A.   What's --

4         Q.   **Isn't it a fact that all the testimony in**

5    **the case suggests that if you change the**

6    **reimbursement formula, you're not going to change**

7    **the total amount that providers receive?  They're**

8    **still going to insist on getting X.**

9              MR. NOTARGIACOMO:  Objection.

10             THE WITNESS:  Could you -- could you

11   please repeat that question.

12                  (Question read back.)

13             THE WITNESS:  That's enough.  Thank you.

14        A.   All the testimony in the case suggests

15   that providers are not going to accept anything less

16   than what they're getting now?  I haven't seen any

17   testimony in the case that suggests that.  I've seen

18   testimony in the case that says there's trade-offs,

19   but you're telling me that all the testimony in this

20   case says that they're not going to accept anything

21   less than they're getting now? That's --

22        Q.   **Well, can you cite to me any testimony**

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                    February 28, 2006
Boston, MA

1064

1    Q.    Are you aware of the fact that patients

2    make copays on the services part of the treatment,

3    as well as the drug part?

4    A.    I'm aware -- are we talking under Medicare

5    or are we talking under --

6    Q.    Both.

7    A.    Both.  Certainly there is coinsurance on -

8    - under Medicare -- under Medicare claims, and that

9    coinsurance is either covered by the -- the

10   individual or by a supplemental insurer.  And there

11   are copays for private plans, and the -- depending

12   on -- I'd have to look more closely to know whether

13   it's a coinsurance amount or whether it's a flat

14   copay that would -- that would be part of the plan.

15   Q.    And are you aware of the fact that in the

16   1990s, Medicare determined that the reimbursement on

17   the services portion was inadequate?

18         MR. NOTARGIACOMO:  Objection.

19   A.    I'm aware that there was -- there were

20   different positions taken by different stakeholders

21   claiming -- addressing that issue.

22   Q.    And are you aware of the fact that even

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 28, 2006
Boston, MA

1065

1    though Medicare has reduced the reimbursement on the

2    drug portion, it has raised the reimbursement on the

3    services?

4        A.    I know that was being considered.

5        Q.    So, a patient making a copay in that

6    situation may have been able to make a lower copay

7    on the drug portion but would have to make a higher

8    copay on the services portion, correct?

9        A.    If under the -- under your hypothesis if

10   all of that is lumped together and the coinsurance

11   is on that totality, then the reduced prescription

12   drug price would be -- would be reflected in that

13   reimbursement along with the increased service fee.

14       Q.    And have you taken that into account in

15   your analysis?

16       A.    I have netted no changes in other fees,

17   and I understand that it's a legal issue of whether

18   changes in other fees should be netted against the

19   impacts of the -- this alleged abuse.

20       Q.    Have you considered what would happen to

21   reimbursement amounts if the judge simply adopted

22   your theory that all spreads above 30 percent are

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 9-1 - 9-144



BENCH TRIAL - DAY NINE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 21, 2006, 9:10 a.m.








LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

47

1 words, payors will pay doctors more for drugs in order to

2 make up for a shortfall on the payment for services?

3 **A.    Well, I know that Medicare, in its attempts to implement**

4 **the Resource-Based Relative Value Scale, was attempting to do**

5 **away with that kind of cross-subsidy, and I know that's an**

6 **attempt -- any economist would know that a system of**

7 **reimbursements should be designed so that they reflect costs**

8 **because cross-subsidies distort either the therapies that are**

9 **prescribed or dispensed or the doctor's services.  So I know**

10 **that that is there, and I know that payors try to avoid**

11 **that.  Does it occur?  Yes, it does at times.**

12 Q.    Okay.  And you haven't analyzed the extent to which that

13 occurs?

14 **A.    No.**

15 Q.    And there is also cross-subsidization among drugs.

16 Payors will pay more for some drugs with the understanding

17 that they're going to pay less for other drugs, correct?

18 **A.    I've seen no evidence of that.**

19 Q.    Well, have you seen the Trigon letter?  Let's take a

20 look at that.  It's Tab O in the binder, your Honor,

21 Defendants' Exhibit 1268.  What I want you to do -- well, let

22 me just state for the record, this is a letter from Trigon to

23 Ms. Karen Ford Manza dated January 5, 2000, and she's the

24 Regional Director of Managed Care for U.S. Oncology.  And

25 what I want to do, Dr. Hartman, is direct your attention to

49

1 **prevalent, physician-administered multi-source drugs became**

2 **more prevalent over the '90s and those spreads were**

3 **increasing, a much greater amount of money was being earned**

4 **by providers, as we now know.  And so it -- it is something**

5 **that in 2000 Trigon was able to say that and understand that**

6 **and tell providers.**

7        THE COURT:  Back up.  What is Trigon?

8        THE WITNESS:  Trigon is apparently a --

9        THE COURT:  Do you know?

10        THE WITNESS:  I'm assuming it's an insurer.  I

11 don't know them specifically.

12        MR. EDWARDS:  Trigon was the Blue Cross of

13 Virginia.  I believe it was originally Blue Cross of

14 Virginia.  Then it became Trigon, and now I think it's part

15 of Anthem.

16        THE COURT:  And U.S. Oncology is a managed care --

17        MR. EDWARDS:  U.S. Oncology is a buying group, as I

18 understand it, for oncologists, a GPO.

19        THE COURT:  So it's a specialty pharmacy? ?

20        MR. EDWARDS:  No, no.  The way to think of it is,

21 it's a provider group.

22        THE COURT:  Is that how you understand it too?

23        THE WITNESS:  That's how I understand it as he

24 answered the questions, yes.

25 Q.   Now, we're talking about cross-subsidization here,

50

1 Dr. Hartman, and the reason you didn't consider

2 cross-subsidization in your analysis is because counsel

3 instructed you not to; is that correct?

4 **A.   Well, the cross-subsidization that's reflected here is**

5 **drugs, and it's -- what I'm reading this at is that, look,**

6 **AWP is going to pretty much cover your costs on AWP minus**

7 **10 -- i.e., 90 percent of AWP -- is a reasonable measure of**

8 **what the spread might be for single-source drugs, but you're**

9 **going to make a lot of money on the multi-source drugs.  And**

10 **this was something that was becoming understood by the end of**

11 **the 1990s and into early 2000.  So I'm just -- this is a -- I**

12 **don't see cross-subsidization here.  I'm just saying, look,**

13 **here's some money to be made for these drugs.  It's a**

14 **statement of that.**

15 Q.   Okay.  We were talking a moment ago about

16 cross-subsidization between drugs and services, correct?

17 **A.   I was hearing just general cross-subsidization, but --**

18 Q.   Okay, let's just focus on drugs and services, okay?  And

19 the reason you didn't take that into account in your analysis

20 is because counsel told you not to, correct?

21 **A.   Yes, that's correct.**

22 Q.   Okay.  And this other type of cross-subsidization

23 illustrated by the Trigon letter that, you know, some drugs

24 you can earn a profit on, some drugs maybe a lower profit,

25 what that demonstrates is that payors don't care about the

# EXHIBIT G

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only        October 7, 2004
AM Session                          Boston, MA

1

1          THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

            MDL DOCKET NO. 01CV12257-PBS

3

4      * * * * * * * * * * * * * * * * * * * * * * * * * * *

    IN RE:  PHARMACEUTICAL

5   INDUSTRY AVERAGE WHOLESALE

6   PRICE LITIGATION

       * * * * * * * * * * * * * * * * * * * * * * * * * * *

7   THIS DOCUMENT RELATES TO:

8   ALL ACTIONS

       * * * * * * * * * * * * * * * * * * * * * * * * * *

9              C O N F I D E N T I A L

10               VOLUME:  I

11   DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

     witness called on behalf of the Defendants

12   pursuant to the Federal Rules of Civil

13   Procedure, before Judith McGovern

14   Williams, Certified Shorthand Reporter,

15   Registered Professional Reporter,

16   Certified Realtime Reporter, and Notary

17   Public in and for the Commonwealth of

18   Massachusetts, at the offices of Ropes &

19   Gray, One International Place, Boston,

20   Massachusetts  02110, on Thursday,

21   October 7, 2004, commencing at 10:16 a.m.

22

114

1          who doesn't have perfect knowledge has

2          been defrauded?  Is that your economic

3          theory here?

4                    MR. SOBOL:  Objection to the

5          form.

6     A.   No.

7     Q.   There are many markets in which people

8          don't have perfect knowledge?

9     A.   That's correct.

10    Q.   Are you familiar with the concept of the

11         efficient market as it is used in

12         securities cases?

13    A.   I'm not an expert in it, but I -- I have a

14         -- a basic understanding of it.

15    Q.   What do you understand it to mean?

16    A.   Well, in -- with regard to securities --

17         the pricing of securities, when you have

18         enough people buying and selling a given

19         security based on all the information that

20         the various people have, that the

21         securities market will be the most

22         efficient way of incorporating all of the

Raymond S. Hartman, Ph.D.   Confidential - Attorneys' Eyes Only          October 7, 2004
AM Session                              Boston, MA

115

1          information that is in the market into the

2          pricing of a particular equity.

3    Q.    And is the market that you are studying in

4          connection with this case an efficient

5          market?

6                    MR. SOBOL:  Objection to the

7          form.

8    A.    I would say no.

9    Q.    Okay.  By the way, what is the market that

10         you are studying in this case, or are

11         there many markets?

12                   MR. SOBOL:  Objection to the

13         form.

14   A.    And are you -- what -- your definition of

15         "market" is what?  Under the merger

16         guidelines or --

17   Q.    I don't know.  Do economists ever use the

18         term "market"?

19   A.    Sure.  They use it in a lot of different

20         ways.

21   Q.    Okay.  How would you use it in connection

22         with this case?

# EXHIBIT H

Raymond S. Hartman, Ph.D.  CONFIDENTIAL          February 27, 2006
Boston, MA

629

             THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

*****************************          CERTIFIED COPY

IN RE:  PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE          01CV12257-PBS

PRICE LITIGATION

*****************************          FEBRUARY 27, 2006

THIS DOCUMENT RELATES TO:           VOLUME: III

ALL ACTIONS                         PAGES: 629-904

*****************************

           C O N F I D E N T I A L

       CONTINUED VIDEOTAPED DEPOSITION OF

          RAYMOND S. HARTMAN, PH.D.

CONTINUED DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

witness called on behalf of the Defendants pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, and Notary Public in and for the Commonwealth

of Massachusetts, at the offices of Dwyer & Collora,

600 Atlantic Avenue, Boston, Massachusetts 02110, on

Monday, February 27, 2006, commencing at 9:42 a.m.

Henderson Legal Services
(202) 220-4158

Raymond S. Hartman, Ph.D.  CONFIDENTIAL                February 27, 2006
Boston, MA

796

1    deponents.

2         **Q.    But you are not in a position to say**

3    **that at least some payers did not understand that**

4    **there were mega-spreads?**

5              MR. SOBOL:  Objection.

6         A.    It -- you are saying -- I cannot -- I

7    cannot make the statement that no one, no payer,

8    knew that there weren't mega-spreads.  I, you

9    know, I don't know whether they did or they

10   didn't.

11        **Q.    Okay.**

12             MR. EDWARDS:  And indeed let's take a

13   look at an article from the March 1997 issue of

14   Cancer Economics, which I will mark as Exhibit

15   Hartman 033.

16             (Excerpt from Cancer Economics,

17   March 1997 marked Exhibit Hartman 033 for

18   identification.)

19             (Handing Hartman Exhibit Hartman

20   033 to the witness.)

21   BY MR. EDWARDS:

22        **Q.    Have you ever seen this article before,**

Henderson Legal Services
(202) 220-4158