# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No. 01-CV-12257-PBS |
| *State of Iowa* v. *Abbott Labs., Inc., et al.* S.D.IOWA 4:07-CV-00461-JAJ-CFB | Judge Patti B. Saris |

## STATE OF IOWA'S OMNIBUS OPPOSITION TO VARIOUS DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS

On March 6, 2008, the Court ordered that the parties should "brief only issues [the Court has] not yet addressed, but may preserve issues by referencing them in the memorandum." Electronic Order entered March 6, 2008 ("March 6, 2008 Order"). Defendants in the instant action had already submitted their individual motions to dismiss prior to the limiting instructions of the March 6, 2008 Order. However, all the instant individual briefs advance arguments already addressed and rejected by this Court in prior rulings and/or repeat the identical arguments now made in the Certain Other Defendants' Motion to Dismiss.[1]

### AMGEN

Defendant Amgen Inc.'s ("Amgen") individual motion seeks the dismissal of all claims against it relating to Epogen based on the grounds that "Epogen is not reimbursed by Iowa's Medicaid program based upon AWP, or upon any other 'pricing benchmarks' referenced in the State's complaint." Amgen Individual Motion to Dismiss at 1. Amgen is wrong.

---

[1] Except as identified herein, all other causes against AstraZeneca, Amgen, Boehringer Ingelheim Corporation, Chiron, Endo Pharmaceuticals, Eli Lilly, GlaxoSmithKline, Purdue Group, Pfizer and Pharmacia/Greenstone are addressed by the State of Iowa in their memorandum of law in opposition to Certain Defendants' Motion to Dismiss the Complaint. That memorandum is being filed contemporaneously.

Amgen contends that Epogen is only reimbursed pursuant to Iowa Code 441-78.1(12). *See* Amgen Individual Motion to Dismiss at 2.  Iowa Code 441-78.1(12) provides that when Epogen is used in connection with chronic renal disease the Medicare reimbursement protocol applies.[2]  But, Epogen is not only used in connection with treatment of chronic renal disease.  As Amgen knows full well, Epogen is also used to treat or as part of a treatment for anemia, certain cancers, radiotherapy, chemotherapy and other illnesses or treatments unrelated to chronic renal disease.  In these situations, the State of Iowa reimburses Epogen based upon AWP in accordance with its Medicaid reimbursement formula, as alleged.  *See* Complaint at ¶¶73-82.

Amgen's individual motion should be denied in its entirety.

## ASTRAZENECA

Defendants AstraZeneca Pharmaceuticals LP's and AstraZeneca LP's (collectively "AstraZeneca") individual memorandum seeks the dismissal of all claims against them relating to Zoladex based on the grounds that such claims are barred by a 2003 settlement agreement with the State of Iowa ("2003 Settlement Agreement").  The 2003 settlement only releases Zoladex claims prior to September 4, 2003, however.  Therefore, AstraZeneca's argument fails.

This Court has clearly ruled that the preclusive effect of a settlement is to be read "within the four corners" of the release.  NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23.

Based on the "four corners" of the 2003 Settlement release, the State of Iowa agrees that its Zoladex-related claims for the period prior to September 4, 2003 have been released.[3]  The Zoladex claims arising from misconduct thereafter are not.

---

[2]The State of Iowa does not dispute that with regard to the treatment of chronic renal disease the reimbursement amount and protocol is set by Medicare and not based upon AWP, WAC or FUL.

[3]The State of Iowa would have stipulated to this point, however, AstraZeneca did not seek to timely meet and confer prior to filing its individual motion, as required by Local Rule 7.1.

In sum, only Zoladex claims prior to September 4, 2003 should be dismissed.  All other Zoladex claims should not.

## BOEHRINGER INGELHEIM CORP.

Defendant Boehringer Ingelhiem Corporation's ("BIC") individual motion argues that all claims against it should be dismissed because the State of Iowa failed to allege any drugs manufactured by BIC or any BIC drug purchased by the State of Iowa.  Therefore, BIC maintains, the State of Iowa's complaint does not satisfy Fed. R. Civ. P. 9(b).   BIC is wrong on both fronts.

The State of Iowa alleges that BIC is engaged in the business of manufacturing and selling pharmaceuticals and that BIC is part of the "Boehringer Group".  Complaint at ¶30.  The "Boehringer Group" comprises BIC and its three wholly owned subsidiaries: Boehringer Ingelheim Pharmaceuticals Inc., Boehringer Ingelheim Roxane and Ben Venue Laboratories, Inc. *Id*.  The State of Iowa specifically alleges that its Medicaid Program purchased millions of dollars worth of "Boehringer Group Drugs", which includes BIC.  All of plaintiffs' specific BIC allegations speak in terms of the "Boehringer Group" or a BIC subsidiary.  *See* Complaint at ¶¶299-318.  Finally, plaintiffs' exhibits identify multiple Boehringer Group drugs.  *See* Exhibits A and B-9.  The foregoing satisfies the requirements of Fed. R. Civ. P. 9(b) and the Court's prior rulings.

BIC's individual motion should be denied in its entirety.

## CHIRON

Defendant Chiron Corporation ("Chiron") seeks the dismissal of all of the State of Iowa's claims with prejudice on the grounds that: (i) the spreads for Chiron drugs alleged by the State of Iowa do not exceed 30% and therefore do not meet the pleading standard set by the Court; (ii)

the State of Iowa alleged claims for a "phantom" drug in Exhibit B-10 and Chiron is clueless as to the identity of the "phantom" drug, thus the claims for the "phantom" drug are not pled with particularity; (iii) all allegations concerning drugs identified in the Complaint and not in the Exhibits should be stricken; and, (iv) the Court dismissed previously all claims against Chiron in the matter styled *County of Suffolk v. Abbott Labs., et al.* (Civ. Action No. 1:03-cv-10643)(MDL 1456)("*Suffolk*" or "the Suffolk County Case").

Chiron's arguments that a 30% spread is necessary to sustain a claim is disingenuous. The Court has already ruled that a claim is sufficiently particular where the spread is greater than 20-25%, based on weighted averages of wholesaler invoice prices or McKesson ServAll prices. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 WL 1051642 (D. Mass. April 2, 2007) ("*New York Counties I*") at *15, n.8; *In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007)("*New York Counties II*") at ¶4. The Court's rulings in *New York Counties I & II* are controlling. Chiron is a defendant in *City of New York et al. v. Abbott labs, et al.* ("NY Counties Case") MDL 1456 (D. Mass) and is fully aware of these rulings. Chiron is also a party to the New York Case Management Order ("CMO") #30, which specifically provides that claims associated with spreads of 25-30% have been sustained, though discovery is stayed. *See* CMO #33 at ¶¶2(c) & 4. This prong of Chiron's argument should be disregarded entirely.

The only unique arguments asserted by Chiron relate to the so-called "phantom" drug in Exhibit B-10 and the Chiron drugs in the body of the Complaint.

Chiron's professed inability to determine the identity of the "phantom" drug is disingenuous.[4]   It is obvious that the "phantom" drug is the same as the drug appearing

---

[4] The State of Iowa would have clarified any ambiguity on this.  However, Chiron did not seek to timely meet and confer prior to filing its motion, as required by Local Rule 7.1.

immediately above it, Proleukin 22 million IU Vial.  *See* Iowa Complaint Exhibit B-10.  The "phantom" drug presents, in fact, another price point in time that also shows an actionable spread for Proleukin 22 million IU Vial.  Chiron admits as much in its motion.  *See* Chiron Motion to Dismiss at 3 ("Chiron could assume that the phantom drug is the same drug as that identified by NDC in the line immediately above the phantom drug listing on Exhibit B-10").

Chiron's request to strike allegations because certain drugs in the body of the complaint do not also appear in Exhibit B is improper.  The State of Iowa is asserting claims only for drugs identified in Exhibit B-10.  The allegations in paragraphs 319-327, however, serve as foundation for Chiron's business practice showing with particularity that Chiron's pricing malfeasance is systemic throughout its business.  Notably, Chiron claims that one of this Court's CMOs supports striking paragraphs 319-327, but does not identify to which CMO it refers.

Chiron's motion to dismiss should be denied in its entirety.

## **ELI LILLY**

Defendant Eli Lilly ("Lilly") seeks dismissal of all of the State of Iowa's claims on the grounds that: (i) the State of Iowa, "in bad faith," is attempting to circumvent the pleading standard set by the Court by pleading spreads for drugs that do not exceed 30%; (ii) where spreads do exceed 30%, the State of Iowa "cherry picked" the spreads over a thirteen day period; and (iii) the State of Iowa did not allege that it reimbursed Iowa pharmacies that were members of McKesson ServAll.

Lilly's individual motion to dismiss, while loaded with hyperbole, is short on accuracy and fails on its face.

It is Lilly, not the State of Iowa, who is attempting to circumvent the pleading standard set by the Court.  The Court has unequivocally stated that AWP claims are sufficiently pled and

satisfy Fed. R. Civ. P.  8(a) and 9(b) particularity where the plaintiff alleges a spread greater than 20-25% using weighted averages of wholesaler transaction prices or McKesson ServAll prices (irrespective of whether pharmacies reimbursed by a state were members of McKesson ServAll). *See New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15, n.8; *New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also* CMO 33 at ¶¶2(c) & 4. Lilly is a defendant in the New York Counties Case and is fully aware of these rulings.  Lilly is also a party to the New York CMO #30, which specifically provides that claims associated with spreads of 25-30% have been sustained, though discovery is stayed.  *See* CMO #33 at ¶¶2(c) & 4.  Every spread in Iowa Complaint Exhibit B-12 for Lilly drugs exceeds the 20-25% pleading threshold set by the Court and is actionable.

Lilly fails to acknowledge the clear 20-25% threshold for actionable drugs set forth in the jointly proposed and adopted CMO #33 governing discovery in the New York Counties Case.

The Court has not set a specific temporal standard for a spread to have occurred in order to be actionable.  However, to the extent a 13-day period is deemed problematic, increasing the time frame for the actionable spread is easily resolved.  Any such temporal concerns with the spreads can be remedied with an amended Exhibit B-12.[5]

Lilly's individual motion to dismiss should be denied in its entirety.

## ENDO PHARMACEUTICALS

Defendant Endo Pharmaceuticals ("Endo") seeks the dismissal of the State of Iowa's claims against it on the grounds that: (i) the State of Iowa failed to properly allege that Endo NDCs were eligible to be used by CMS to set the FUL because they met the threshold of being therapeutically equivalent multi-source drugs and could be purchased in quantities of 100 tablets

---

[5] If this is an issue of concern for the Court, the State of Iowa promptly will seek leave to file such amended exhibit as to Lilly (and other defendants).

or capsules (or the most commonly listed package size); and, (ii) the State of Iowa only alleged that Endo provided false WACs to the reporting agencies and did not allege examples of the false WACs.

Endo is absolutely wrong on both counts. First, the State of Iowa alleges that CMS set the FUL based on reported prices for therapeutically equivalent drugs that can be purchased in the most common package size, typically quantities of 100 tablets. *See* Complaint at ¶102. Second, the State of Iowa alleges that "the FUL is a per-unit price that applies to all NDCs for a particular multi-source drug. In other words, if a FUL is in place for a particular multi-source drug, all NDCs for that drug will be reimbursed at that FUL." Complaint at ¶105. Third, Iowa alleges fraudulent pricing for assorted Endo multi-source drugs, many of which correspond to 100 tablet or capsule quantities. Complaint at ¶¶367-368, Exhibit B-13. The prior rulings of this Court make plain that such allegations are sufficient for a claim of FUL-fraud. *See New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *16.

Assuming *arguendo* that the Sate of Iowa had to allege, for each Endo NDC, that it was therapeutically equivalent and impacted the calculation of the FUL, the State of Iowa has done so. First, the State of Iowa alleges that all Endo drugs in the complaint and in Exhibit 13 that were subject to FUL reimbursement were therapeutically equivalent. *See* Complaint at ¶367. Second, the State of Iowa alleges that where Endo drugs were subject to FUL reimbursement, had Endo reported accurate prices for that <u>drug</u>, the FUL reimbursement for that <u>drug</u> (and all NDCs applicable thereto) would have been less. *Id.* at ¶¶104-108. Moreover, while the State of Iowa has identified some non-100 mg package sizes for which it overpaid, implicit in the allegations is that the pricing for Endo's 100 mg or most commonly available package size

resulted in a false FUL being set for that <u>drug</u>.  This is particularly true when all reasonable inferences are drawn in favor of the plaintiff at this stage of the litigation.  *See New York Counties I*, 2007 WL 1051642 at *3 (D. Mass. April 2, 2007), citing *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir.1992).  Endo's argument fails.

As for Endo's argument that the State of Iowa must identify the false Endo WACs in its allegations, this Court has already ruled that such is not required.  The Court has specifically held that Rule 9(b) is satisfied "with respect to those drugs (1) specifically identified in the complaint as (2) purchased by the [plaintiff] in any year subject to this lawsuit along with (3) an allegedly fraudulent AWP calculated on a good faith basis, together with a spread."  *See New York City I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15.  The allegations in the State of Iowa's complaint do exactly this.  Iowa has identified the Endo drugs and AWPs at issue and alleged that Endo's overall pricing fraud has resulted in false published prices that in turn have resulted in the State of Iowa's overpayment of Endo drugs.  *See* Complaint at ¶¶133-180, ¶¶367-368, Exhibit B-13.  Thus, Endo's second argument fails as well.

Endo's individual motion to dismiss the State of Iowa's complaint should be denied in its entirety.

## GLAXOSMITHKLINE (GSK)

Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline's ("GSK") individual memorandum seeks the dismissal of all claims against it relating to five (5) NDCs of Zofran and Kytril based on the grounds that all such claims are barred by a 2006 settlement agreement with the State of Iowa ("2006 Settlement Agreement").

As stated in the AstraZeneca section above, the Court has clearly ruled that the preclusive effect of a settlement is to be read "within the four corners" of the release.  NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23.

The State of Iowa concedes that claims seeking Medicaid reimbursement related to the five (5) NDCs of Kytril and Zofran identified in the 2006 Settlement are barred for the period prior to August 10, 1996, the effective date of the settlement and stated scope of the release.[6] The claims arising from misconduct thereafter and with regard to other NDCs of Kytril and Zofran are not.

In sum, only claims prior to August 10, 2006 relating to the five (5) NDCs of Kytril and Zofran identified in the 2006 Settlement should be dismissed.  All other Kytril and Zofran claims should not.

## PURDUE

Defendants Purdue Pharma L.P., Purdue Frederick Company and Purdue Pharma Company (collectively "Purdue") seek the dismissal of all of the State of Iowa's claims on the grounds that the Court dismissed all claims against Purdue in the Suffolk County Case, and, the State of Iowa's allegations do not satisfy Fed. R. Civ. P. 8(a) and 9(b).  Specifically, Purdue takes issue with: (i) the State of Iowa's failure to allege "FUL-based fraud" against Purdue; (ii) allegations concerning Purdue's "co-promotion agreements" and how these agreements resulted in fraud; (iii) allegations concerning comments by the Purdue spokesman that AWPs were "quite deceptive," which Purdue contends were mere "stray comments"; and, (iv) allegations concerning non-adjudicated government investigations, which Purdue contends are irrelevant. None of these arguments carry any weight for Purdue.

---

[6]The State of Iowa would have stipulated to this point, however, GSK did not seek to timely meet and confer prior to filing as required by Local Rule 7.1.

First, the Court has unequivocally stated that AWP claims are pled with sufficient particularity where the plaintiff alleges a spread greater than 20-25% using weighted averages of wholesaler invoice prices or McKesson ServAll prices. *See New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15, n.8; *New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also* CMO 33 at ¶¶2(c) & 4. Purdue is a defendant in the New York Counties Case and is fully aware of these rulings. Purdue is also a party to the New York CMO #30, which specifically provides that claims associated with spreads of 25-30% have been sustained, though discovery is stayed. *See* CMO #33 at ¶¶2(c) & 4. Every spread in Iowa Complaint Exhibit B-27 for Purdue drugs exceeds the 20-25% pleading threshold set by the Court and is actionable.

Second, Purdue complains that the State of Iowa's FUL-fraud allegations as against it are deficient. The State of Iowa does not allege any FUL-fraud claims against Purdue, so this prong of Purdue's argument should be ignored.

The balance of Purdue's motion provides no basis for dismissal. Purdue's business practices, comments by its designated spokesperson[7] and government investigations[8] are relevant and proper supporting allegations that establish a reasonable inference of Purdue's company-wide scheme of pricing malfeasance and knowledge thereof. *Id*.

---

[7] Purdue seeks to downplay Mr. Hogan's comment that AWPs were "deceptive" as a mere "stray comment by one employee." Purdue Individual Motion to Dismiss at 2. To the contrary, Mr. Hogan was a specifically identified spokesman for Purdue charged with responding to an annual AARP survey of drug pricing, which is a report by one of the largest if not the largest association representing the interests of all people over the age of 65 in the US and their purchasing of pharmaceuticals.

[8] The Court has specifically held that in order to maintain AWP-related claims, plaintiffs must "set forth [] factual allegations regarding a spread, internal documents or government investigations from which an inference of fraud [could] reasonably be made..." (emphasis added). *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 2004 WL 2387125 (D. Mass October 26, 2004) ("*Suffolk II*") at *2; *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 307 F. Supp. 2d 187, 209 (D. Mass. 2004)("*Pharm. III*"). The Court does not require an adjudication of the lawsuits or government investigations.

Purdue's individual motion to dismiss the State of Iowa's complaint should be dismissed in its entirety.

### PFIZER

Defendant Pfizer Inc. ("Pfizer") seeks the dismissal of all of the State of Iowa's claims on the grounds that: (i) it does not report, calculate or publish AWPs; it reports only "List Prices" to the publishing compendia; (ii) there are no allegations that Pfizer made any representations about AWP to the State of Iowa; and, (iii) spreads less than 30% are not unfair or deceptive.

This Court's prior rulings make plain that Pfizer's arguments must fail.  The Court has definitively held that: (1) manufacturers are aware of the formulaic relationship between the prices it provided to the publishing compendia and the AWPs that get published; (2) drug manufacturers knew third party payors, including government Medicaid agencies relied upon the published AWPs and that manufacturers did nothing to stop the publication of the AWPs; and, (3) AWP claims for Medicaid reimbursement are sufficiently pled where the spread is greater than 20-25%.  *See New York City I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *6-7, *14, *15, n.8; *New York City II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007) at ¶4; *see also* CMO 33 at ¶¶2(c) & 4.

The State of Iowa's allegations satisfy the requirements set forth in the above rulings. The State of Iowa specifically pleads that defendants, including Pfizer, reported false WACs or WAC equivalents like Pfizer's "List Prices" to pricing compendia, knowing the formulaic relationship used by the compendia to calculate a published AWP and that the published AWP would be relied upon by Medicaid agencies.  *See* Complaint at ¶¶87-101.

Pfizer's individual motion to dismiss should be denied in its entirety.

## PHARMACIA/GREENSTONE

Defendants Pharmacia Corporation and Greenstone Ltd. (collectively "Pharmacia/Greenstone") seek the dismissal of the State of Iowa's claims for FUL fraud against them on the grounds that the State of Iowa failed to allege that Pharmacia/Greenstone NDCs: (i) were evaluated as therapeutically equivalent; and, (ii) could be purchased in quantities of 100 tablets or capsules (or the most commonly listed package size), thus making the NDCs eligible for calculation in the FUL.  In support, Pharmacia/Greenstone incorporates Endo's individual motion to dismiss by reference and states that several of the NDCs for which the State of Iowa alleges FUL fraud are not eligible to be considered in the CMS' FUL calculation. Pharmacia/Greenstone cite the example of 500 tablet bottle of Greenstone's Alprazolam 0.25MG.  In essence, Pharmacia/Greenstone is arguing that there can only be FUL-fraud for NDCs used by CMS in the calculation of FUL.

Pharmacia/Greenstone, like Endo (*see supra)*, is absolutely wrong.  First, the State of Iowa sufficiently alleges the requirements for a FUL fraud claim, including that CMS sets the FUL based on the therapeutically equivalent drugs that can be purchased in the most common package size, typically quantities of 100 tablets.  *See* Complaint at ¶102.  Second, the State of Iowa alleges that "the FUL is a per-unit price that applies to all NDCs for a particular multi-source drug.  In other words, if a FUL is in place for a particular multi-source drug, all NDCs for that <u>drug</u> will be reimbursed at that FUL." Complaint at ¶105.  Third, Iowa alleges fraudulent pricing for assorted Pharmacia/Greenstone multi-source drugs, many of which correspond to 100 tablet or capsule quantities.  *See* Exhibit B-26.  Fourth, the State of Iowa alleges that where Pharmacia/Greenstone drugs were subject to FUL reimbursement, had Pharmacia/Greenstone reported accurate prices for that <u>drug</u>, the FUL reimbursement for that <u>drug</u> (and all NDCs

applicable thereto) would have been less.  Thus, the State of Iowa properly alleged FUL fraud for Pharmacia/Greenstone's example of 500 tablet bottle of Greenstone's Alprazolam 0.25MG as well as all NDCs for which it claims FUL-fraud.  Indeed, Pharmacia/Greenstone does not contend that they do not sell a 100 tablet bottle (or most commonly available size) of Alprazolam 0.25MG.  Pharmacia/Greenstone's argument fails.

Pharmacia/Greenstone's individual motion to dismiss should be denied in its entirety.

## TAP PHARMACEUTICALS

Defendant TAP Pharmaceutical Products, Inc.'s ("TAP") individual memorandum seeks the dismissal of all claims against it relating to Lupron and Prevacid on the grounds that such claims are barred by settlement agreements in 2001 and 2005.  TAP argues that the claims were released or that TAP was required to provide pricing data to the State of Iowa as part of its corporate integrity agreement under the 2001 settlement.  TAP overreaches.  Its motion should be denied.

First, this Court has already ruled that the preclusive effect of a settlement is to be read "within the four corners" of the release.  NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23.  Based on the "four corners" of the 2001 Settlement release, the State of Iowa agrees (and has so informed TAP) that its Lupron claims prior to December 3, 2001 have been released.  The Lupron claims arising from misconduct thereafter, however, are not.

With regard to the 2005 Settlement, the State of Iowa does not agree that its claims were released by the 2005 Settlement of *In re: Lupron Marketing and Sales Practices Litigation* ("2005 Settlement") (attached to TAP Individual Motion to Dismiss as Exhibit B).  First, the settlement relates to consumer claims and non-Medicaid third party payors.  Second, the State of

Iowa is not a "Releasor" under the 2005 Settlement and therefore cannot and did not release its Lupron claims.

The 2005 Settlement covers the Lupron Purchaser Class, which "is comprised of (i) third-party payor ("TPP") purchasers, and individual consumers ("Consumers")" who paid for Lurpon.[9]  *See* 2005 Settlement at p. 2.  The 2005 Settlement only bars "Released Claims" which are defined as "any and all claims ... that any Releasor ... ever had [...]".  *Id*. at ¶2(y).  "Releasors" includes all Consumer Class members and all TPP Class Members.  *See id*. at ¶2(z).  TPP Class Members are defined as "a private or governmental entity that was <u>at risk by contract</u> to pay all or part of the cost of Lupron..." *Id*. at ¶2(ll) (emphasis added).

The Iowa Medicaid program, was never "at risk by contract" to reimburse Lupron purchases.  All reimbursements at issue were pursuant to the State of Iowa's Medicaid statute.  Therefore, by the 2005 Settlement's own terms the State of Iowa cannot be a TPP Class Member and cannot be a "Releasor."  As such, the 2005 Settlement is not applicable to the claims at issue here.

TAP also contends that, under the terms of the 2001 Settlement, it has provided Average Sales Prices ("ASPs") to First Databank and the State of Iowa since December 4, 2001.  TAP argues that the State of Iowa's claims for Lupron and Prevacid are therefore barred.  This argument is fact-based and premature.  First, neither settlement addressed Prevacid.  Second, the Court has already addressed and rejected similar arguments made by Bayer in connection with its Cipro settlement.  *See Suffolk II*, 2004 WL 2387125 (D. Mass) at *2-3; NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23.  TAP's argument likewise must be rejected.

---

[9] Individual Consumer means "any person falling within the definition of the Lurpon Purchaser Class who is a natural persons who is not a TPP".  2005 Settlement at ¶2(b).

In sum, the State of Iowa is not pursuing claims prior to December 3, 2001 relating to Lupron.  TAP's motion to dismiss all other claims should be denied.

## <u>CONCLUSION</u>

For all the foregoing reasons, each of defendants' individual Motions to Dismiss the State of Iowa's Complaint should be denied in its entirety.

Dated: March 28, 2008

Respectfully submitted,

KIRBY McINERNEY, LLP
*Special Counsel to the State of Iowa*

By:                   /S/

                         Joanne M. Cicala (JC 5032)
                         James P. Carroll Jr. (JPC 8348)
                         Aaron D. Hovan (AH 3290)
                         830 Third Avenue
                         New York, New York 10022
                         (212) 371-6600


                         TOM MILLER, ATTORNEY GENERAL
                         FOR THE STATE OF IOWA

                         C. Roderick Reynolds
                         J. Bradley Horn
                         Assistant Attorneys General
                         Iowa Department of Justice
                         1305 E. Walnut St.
                         Hoover Bldg., 2nd Floor
                         Des Moines, IA  50319
                         (515) 281-4055

## <u>CERTIFICATE OF SERVICE</u>

I, James P Carroll Jr, hereby certify that I caused a true and correct copy of the foregoing STATE OF IOWA'S OMNIBUS OPPOSITION TO VARIOUS DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS, to be served on all counsel of record via electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by submitting a copy to Lexis/Nexis File & Serve for posting and notification to all parties.

Dated:  March 28, 2008                           ____/s/ James P. Carroll Jr._____
                                                                          James P. Carroll Jr.