**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL NO. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO<br>*U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>No. 06-CV-11337-PBS | ) ) ) ) ) | Judge Patti B. Saris<br><br>Magistrate Judge Marianne B. Bowler |

**ABBOTT LABORATORIES, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE UNITED STATES**

Abbott Laboratories, Inc. ("Abbott") respectfully moves the Court for an Order that the United States (the "Government") provide full and complete responses to six of Abbott's outstanding discovery requests. Specifically, Abbott requests an Order compelling the Government to provide:

1) an unredacted, final version of a "decision memorandum" concerning the Government's approval of the way in which state Medicaid programs paid providers and dispensed drugs to Medicaid beneficiaries, which the Government has already produced in draft form;

2) a representative sample of the allegedly false claims at issue in this case;

3) a provider look-up table that will allow Abbott to identify providers who submitted the allegedly false claims at issue in this case;

4) work papers for two recent HHS-OIG reports that Abbott believes will contain material undermining the Government's claims in this case;

5) all document preservation and collection memoranda responsive to Abbott's discovery requests; and

6) copies of all deposition transcripts from other AWP-related cases in the Government's possession.

## 1. Final "Decision Memorandum" (Abbott Ex. 487)

The memorandum in question is dated Oct. 22, 2002 and is entitled "Review of Medicaid Drug State Plan Amendments." It was drafted by members of CMS' Pharmacy Team. Reed Dep. Tr. at 540 (9/27/07) (Ex. 1); Duzor Dep. Tr. at 128 (10/30/07) (Ex. 2). The memorandum is signed by Dennis Smith, Director of CMS's Center for Medicaid and State Operations, and it recommends that former CMS Administrator Thomas Scully approve certain "criteria to be used for reviewing state plan amendments (SPAs) that seek to change the payment rates for drugs." Abbott Ex. 487 (10/22/02) (Ex. 3). Nearly all substantive portions of the document are redacted, but Mr. Scully's signature appears on the last page under the heading, "DECISION," and on a line next to the word, "Approve."

The memorandum was produced by the Government on February 22, 2008, days before the deposition of Dennis Smith. The Government cited the deliberative process privilege as grounds for its extensive redactions. Abbott has questioned the Government's privilege assertion, given that a draft version of the same document (Abbott Ex. 328) (Ex. 4) had already been produced in full and has been the subject of extensive questioning at three prior depositions. 2/25/08 and 2/29/08 Cook Emails to Martinez (Ex. 5); Reed Dep. Tr. at 533-565 (9/27/07); Duzor Dep. Tr. at 176-209 (10/30/07); Smith Dep. Tr. at 121-192 (2/26/08) (Ex. 6). Counsel for the Government have made no response to Abbott's argument that the Government has waived any privilege over the document. 3/3/08 Martinez Email to Cook (Ex. 7).

Abbott has pointed out the relevance of the already-disclosed draft in prior briefing,[1] but it is important to reiterate the significance of the document to this case. The draft memorandum acknowledges that federal regulations require state Medicaid programs to pay for drug costs based upon Estimated Acquisition Cost ("EAC"), which is defined as the state's "best estimate

---

[1] *See* Abbott Laboratories, Inc.'s Supplemental Submission in Support of its Objections to Magistrate Judge Bowler's August 13, 2007 Order (Oct. 1, 2007) (Dkt #4759).

of the price generally and currently paid by providers for a drug." 42 C.F.R. § 441.301 (July 31, 1987).  In this memorandum, however, CMS's Pharmacy Team recommended that CMS relax this requirement for a variety of pragmatic reasons.  Among other things, the draft states:

> It is proving increasingly difficult to require the states to establish payment rates in adherence to regulatory requirements.  Accordingly, we believe an analysis and an acceptance of other factors states are now using to establish payment rates should be considered in looking at the EAC and the dispensing fee.
>
> Finally, we think EAC needs to include a broader measure of factors that would result in a state agency's best estimate.  We could consider the actions of the legislature or negotiations that result in a lower payment rate, even if that rate may differ from other documentation, such as a state survey.

Abbott Ex. 328.  Referring to an OIG finding of an *average* 65.93% difference between acquisition costs and AWP for generic drugs, the document notes that "these State's reimbursement levels could have been reduced by a percentage greater than the proposed AWP discount levels."  *Id.*  In other words, the CMS Pharmacy Team acknowledges that states are not reimbursing at "estimated acquisition cost."  Instead, the "lesser level of discount is generally the result of negotiations that occur between the state and pharmacy representatives after the survey results are known."  *Id.*  "In other cases," the document notes, the states' legislatures set the discount in the ingredient cost formula, but the "[l]egislation usually does not address why these rates are the best estimates or are reasonable."  *Id.*  Taking these observations into account, the draft memorandum proposes to approve any state plan that decreases the ingredient cost payment so long as it is either (1) "no lower than that of another state, which has not experienced a significant decline in pharmacies (proxy measure for access)" or (2) "no lower than the levels of costs found by the OIG."  *Id.*

      The impact of this decision on the Government's case cannot be overstated.  The Government contends that claims paid in excess of a drug's ingredient cost are "false."  *See*, *e.g.*,

3

Compl.¶¶ 3, 6, 103. But this memorandum confirms that, prior to 2002, CMS already had in place a policy of *approving* such payments in excess of cost by state Medicaid programs because it was expedient to do so.[2] That deliberate choice by CMS is expressly contrary to the allegations of fraud in this case. There can be no legitimate dispute that this memorandum is important. Mr. Reed could not identify a single other instance in the drug payment area where this kind of decision memo was used. *See* Reed 30(b)(6) Rough Tr. at 208-210 (3/20/08).

It is understandable, then, that the Government would not want a final, signed version of this memorandum to come into evidence. One can fully expect the Government to oppose admission of the draft as not accurately describing agency views. The deliberative process privilege, however, offers no protection. As an initial matter, the privilege applies only to communications that are "predecisional"; it does not apply to final agency decisions. *See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995) (document is predecisional when it is "'antecedent to the adoption of agency policy'"). Abbott Ex. 487 is signed by the head of the agency beneath the heading, "DECISION," and on a line labeled, "Approve." Several witnesses have described this type of CMS document as a "decision memo." *See* Duzor Dep. Tr. at 177 (10/30/07); Smith Dep. Tr. at 173 (2/26/08). The memorandum cannot be subject to the deliberative process privilege.

More to the point, the Government waived any deliberative process privilege that arguably protected the document when it produced an unredacted draft version to Abbott and the other defendants in MDL 1456. The Government initially tried to recall the draft several months

---

[2] Documents show that the situation described in the draft memorandum arose prior to 2002, within the claims period in this case. *See*, *e.g.*, excerpts from Abbott Exs. 765-775 used at 3/20/08 Reed deposition, at HHC009-1324 (Illinois official states that "[o]ur drug cost methodology was derived via a two step approach which included 1) a thorough review of what other State's were doing and selecting the percentage off of AWP that was reasonable and 2) conducting negotiations with the Pharmacy Industry"), HHC009-1124 (Wisconsin declares that "[t]he Legislature set the rate, so we don't have estimating data") (Ex. 8). Mr. Reed, who was involved in these transactions, confirmed CMS's policy. *See* Reed 30(b)(6) Rough Tr. at 142-197, 202-203 (3/20/08).

ago when Abbott introduced it as an exhibit during the deposition of Larry Reed, a high-ranking CMS official with oversight responsibility for the drug payment policies of State Medicaid programs. Abbott challenged this assertion of the privilege and requested that the Government produce a final version of the document. Once Abbott brought the dispute to the Court's attention, however, the Government informed Abbott that it would no longer assert the privilege because the document had been widely distributed to MDL counsel. Accordingly, waiver would have occurred even if the Government had attempted to recall the draft. Such a conscious decision to relinquish a claim of privilege clearly constitutes a waiver.[3]

The Government's redaction of the final version of this decision memorandum seems to be designed simply to withhold damaging evidence. Abbott already knows the content of the allegedly privileged communication. The draft shows that CMS deliberately chose to let states pay providers more for prescription drugs than the "Estimated Acquisition Cost" required by the agency's own regulations, capitulating to the decisions of state legislatures focused on access to care and other political issues. Having waived any privilege over that decision, the Government cannot now withhold the document implementing the final policy.

Finally, even under the five-part balancing test used by courts to evaluate assertions of the privilege,[4] the Government's claim cannot withstand scrutiny. As described above, the document is highly relevant. In addition, the Government has produced very few documents from CMS's Central Office and its delay in prosecuting this case has led to the loss of key evidence due to fading memories and the destruction of relevant documents. There is also no

---

[3] The First Circuit appears to recognize waiver of the deliberative process privilege on the basis of even inadvertent disclosure. *See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 885 n.8 (1st Cir. 1995) (noting in *dicta* that waiver might "arguably" occur in such circumstances).

[4] *See, e.g.*, *In re Franklin Nat'l Bank Sec. Litig.*, 478 F.Supp. 577, 583 (E.D.N.Y. 1979) (courts should consider: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable").

5

doubt that the allegations leveled against Abbott are extremely serious and that by assuming the role of plaintiff in this litigation, the Government has undertaken an obligation to allow discovery of information relevant to Abbott's defenses, just like any other civil plaintiff.  *See EEOC v. Airborne Express*, No. 98-1471, 1999 WL 124380, at *2 (E.D. Pa. Feb. 23, 1999) (rejecting assertion of the deliberative process privilege because it would be "fundamentally unfair" for the Government, as plaintiff, to evade discovery of material that a private plaintiff would have to turn over); *United States v. Hooker Chems. & Plastics Corp.*, 123 F.R.D. 3, 12 (W.D.N.Y. 1988) ("Perhaps most importantly, the government asserting the privilege in this case is a party to the litigation.").  Nor can the Government can point to any concrete harm that would befall CMS if this document—a draft of which already has been disclosed and discussed in great detail—is produced in an unredacted form. *See Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 6 (N.D.N.Y. 1983) (Government must articulate "precise and certain reasons for preserving the confidentiality of the requested information").

### 2. Representative Sample of Allegedly False Claims

Despite repeated requests by Abbott and an explicit promise to the Court, the Government continues to withhold a representative sample of the false claims it alleges were submitted in this case.

Over a year ago, Abbott asked the Government to disclose the precise false claims it contends Abbott made that gave rise to this litigation.  *See* Defendant Abbott Laboratories Inc.'s Second Set of Requests for the Production of Documents and Tangible Things from Plaintiffs United States of America and Ven-A-Care, at 2 (Feb. 21, 2007) (Request No. 1).  After all, these claims presumably will be central to the Government's case at trial.  When the Government balked at the number of claims Abbott was requesting, Abbott suggested that the Government provide at least a sample of the allegedly false claims.  *See* Torborg Ltr. of 3/27/07 (Ex. 9)

6

(outlining Abbott's proposal).  Due to the great variation in the methods that Medicare carriers and state Medicaid programs used over time to determine payment amounts for the J-Codes and NDCs at issue in this case—including many methods that did not even use published prices such as AWP—Abbott asked that the sample of Medicaid claims include an allegedly "false claim" for each NDC at issue, each year, and each state Medicaid program, and that the sample of Medicare claims include an allegedly "false claim" for each J-Code at issue, each year, and each Medicare carrier.  *Id.*  Abbott believes this proposal is consistent with First Circuit law and this Court's prior announcement on the extent that actual false claims submissions should be produced in FCA cases.

The Government refused to provide the sample requested, so Abbott sought relief from the Court.  *See* Abbott's Motion to Compel Plaintiffs United States and Relator to Provide Adequate Responses to Abbott's Discovery Requests (May 1, 2007) (Dkt. #4135).  At oral argument, Abbott argued that it was entitled to the actual false claims, and Judge Bowler seemed to recognize the reasonableness of Abbott's request:

> "MR. DALY: . . . . The final category is we've asked for the government to produce to us their evidence of false claims and false statements, kind of a basic aspect of the case. They've sued us under the False Claims Act. We've asked for them to identify the false statements we made, the alleged misrepresentations. . . . [W]e've said, give us the false claims and we've even offered for them to do representative samples of both. In other words for each year, for each NDC, give us the misrepresentations or the representations, give us the alleged false claims and we'll start there because it is large job. . . .  So that's why we've offered at least preliminarily for them to do a representative sample of these items NDC by NDC, year by year.
>
> THE COURT: Why not?

Hearing Tr. Before Hearing Tr. Before Judge Bowler, at 31:19-33:9 (7/20/07) (Ex. 10).

Government counsel confused the issue by conflating claims *forms* with claims *data*:

7

> MR. DRAYCOTT: *Absolutely they're entitled to the claim data as I think Mr. Daly just indicated. We are endeavoring to produce it* . . . .
>
> THE COURT: All right, so you're going to get the claims data. . . .

*Id.* at 33:10-20.  This confusion allowed the Government to avoid the issue of claims *forms* for another day.  *Id.* at 36:2-10 ("THE COURT: All right, I'm going to wait until everything's produced. Denied without prejudice. You can renew it after you get a look at everything.").

The parties now have reached the end of discovery, and the Government still has not supplied anything close to a representative sample.  Instead, it has offered only a general description of thousands of allegedly false claims.  This is patently insufficient.  As the Court held in *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, the failure to produce the actual claims underlying a FCA case bars any recovery on those unproduced claims.  No. C 04-04632 SI, 2007 WL 421336, at *3-4 (N.D. Cal. Feb. 5, 2007) (limiting FCA plaintiff to proving at trial only the 97 "violations it identified during discovery," rather than the 629 false claims it purported to identify one week into trial because "[t]he inadequately disclosed information at issue here—the nature and number of the false claims—goes to the very heart of what remains of [plaintiff's] case.  Without this information, it would be difficult, if not impossible, for defendants to adequately and efficiently prepare their defense.").  This Court should again order the Government to produce a representative sample of false claims covering every J-code, every NDC, every Government health case program, every year and every carrier or fiscal intermediary at issue in this case.  That way, Abbott can contact the providers and conduct other discovery to determine whether even these sample claims are false.

### 3.     Provider Look-Up Table

Abbott stands accused in this case, not of submitting false claims to the Government, but of causing providers to do so.  Unsurprisingly, Abbott has sought to determine which providers

8

the Government alleges submitted the allegedly false claims—the providers who actually received the alleged "overpayment" but from whom the Government has not sought recovery. Abbott has reason to believe these providers could supply extensive evidence showing why they were not overpaid by the Medicare and Medicaid programs to dispense and administer the service-intensive home infusion drugs at issue in this case.

Data produced from CMS's information system contain provider identification numbers, but the data lack an explanation or key that would link those numbers with the actual name or type of the provider. Abbott has repeatedly asked for a provider look-up file or database, promising to keep the information confidential and limiting use of it to defense of this litigation. *See* 3/6/08 Torborg Ltr. to Draycott; 1/17/08 Torborg Email to Counsel; 9/6/07 Torborg Ltr. to Counsel (Ex. 11). This type of information was requested by Abbott's first set of requests for production. *See* Request for Production No. 6(g). Government counsel have repeatedly ignored Abbott's request.

The Government's refusal to produce the material requested by Abbott is difficult to understand. The Government contends that thousands of physicians, pharmacies and other providers submitted false claims, yet it refuses to identify which providers did so. Abbott has thus been precluded from asking these providers whether they submitted false claims and whether Abbott caused them to do so. As to all claims, Abbott should be able to call providers as witnesses to tell the jury that the reimbursement they received from Medicare and Medicaid covered more than just ingredient costs; it also covered administrative expenses and ensured that they had adequate incentive to serve beneficiaries.

### 4. Work Papers for April 2007 and January 2008 OIG Reports

Abbott has asked the Government to produce the work papers for two recent OIG reports that Abbott believes contain evidence supporting its defenses. The Government has refused,

despite the fact that it has produced work papers from many recent reports (as late as 2006). The truth of the matter is that the Government simply does not want to produce damaging evidence.

The first OIG report, published in April 2007 and entitled "States' Use of New Drug Pricing Data in the Medicaid Program," studied whether state Medicaid programs planned to use new drug pricing data, including average manufacturer prices ("AMP"), in their drug reimbursement methodologies. According to OIG, thirty-nine of the forty-seven states responding had not decided whether to use AMP data; four others had decided against it. *See* OIG Report at 3-4 (April 2007) (Ex. 12). Instead, most states continued to use AWP discounted by a specific percentage, expressing concern about the accuracy of the new AMP data and uncertainty as to its interpretation in final regulations. *Id.* at 4.

The OIG prepared a similar report back in 2001, when it studied whether the states planned to use "more accurate" pricing data for certain inhalation, infusion, and intravenous drugs. *See* "Medicaid's Use of Revised Average Wholesale Prices," Rpt. No. OEI-03-01-00010 (Sept. 2001). The work papers for this report contained pages of detailed responses from state Medicaid officials to a CMS survey inquiring into their experiences implementing DOJ's "revised" AWP pricing data. *See, e.g.* Abbott Ex. 583 (response of Tennessee Medicaid program) (Ex. 13). The survey and related work papers made clear that many states consciously chose not to reduce payment to actual acquisition costs but continued paying for drugs based on AWP out of concern that they might put providers out of business and thus limit beneficiaries' access to care. *See* excerpts from Abbott Ex. 143 (a 300 page collection of state responses), at HHD006-0234 (Arkansas Medicaid responds that it did not implement the new prices because "this list caused complaints" from providers) (Ex. 14); *id.* at HHD006-0240 (Colorado Medicaid cites "lots of letters; hemophilia centers & home infusion"); *id.* at HHD006-0474 (North Carolina responds: "Stressed access issues. Disp. fee not enough. Providers say – Making $ off

spread. Taking away spread and reimb. is too low."). Examining the work papers generated as part of the April 2007 OIG Report will allow Abbott to better understand the reasoning of state Medicaid agencies that continue to rely heavily on AWP-based payment systems, despite the availability of pricing information purportedly closer to acquisition cost.

Similarly, Abbott has sought the work papers for a report issued by HHS-OIG in January 2008, entitled, "Review of the Relationship Between Medicare Part D Payments to Local, Community Pharmacies and The Pharmacies' Drug Acquisition Costs." (Ex. 15). CMS' response to this report is flatly inconsistent with the Plaintiffs' claims against Abbott. In fact, CMS's response acknowledges what defendants have been saying for years in defense of AWP lawsuits—that large percentage spreads on generic drugs are deliberately accepted by third-party payors, including Medicare and Medicaid, both to encourage the use of generic drugs and to compensate for inadequate dispensing fees.

OIG's January 2008 report found that pharmacies purchased generic drugs at an *average* of 73.3% less than the AWP-driven payments made by Medicare Part D.[5] *Id.* at 6. The report also noted an average difference of approximately $9.00 between acquisition cost and Part D payments, *id.*, an amount similar to spreads at issue for the drugs in this case. Given CMS's litigating position in this case, one would expect the agency to have been disturbed by this finding. Instead, CMS stated it was "pleased by the findings of the OIG report that the private market competitive contracting model in Part D provides margins to community pharmacies with respect to their acquisition costs." *Id.* at Appendix G. CMS went on to recognize that spreads

---

[5] The Medicare Part D prescription drug program, established by Title I of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, covers the cost of prescriptions dispensed to Medicare beneficiaries at pharmacies. With its focus on prescription drugs dispensed at retail pharmacies, Medicare Part D is quite similar to the prescription drug benefits that have been provided by state Medicaid programs for decades and are at issue in this litigation.

between acquisition cost and payment for generic drugs are accepted as a way to encourage use of generic products. In particular, the agency stated:

> The report also found that the percentage differences between Part D payments and drug acquisition costs *were more than nine times higher for generic drugs than for brand-name drugs*. Clinically appropriate generic prescribing is one of the key ways in which the Part D program is able to provide high quality coverage at a reasonable cost to both beneficiaries and the government. *We fully encourage the use of generic drugs since their use provides good value to both the beneficiary and the taxpayer, and we note that incentives are aligned to encourage promotion of generics by community pharmacists.*

*Id.*

Abbott should be permitted to examine the work papers related to these CMS statements in order to develop, on the record, the blatant inconsistency between CMS' litigation position and how it actually runs the Medicare and Medicaid programs.

CMS's response to the January 2008 OIG report suggests that, as Abbott contends, Government officials at the state and federal level have known about and deliberately countenanced payment of such spreads for decades in order to encourage the use of generic products and cross-subsidize inadequate dispensing fees.[6] These same concerns have been acknowledged by HCFA officials for years.[7]

---

[6] For example, in responding to OIG's mid-1990s studies showing large differences between AWP and acquisition costs—including an average discount from AWP for generic drugs of 42.5% and 58% for nursing home and home infusion pharmacies—Montana's Medicaid Director declared that it was "important to note" that OIG's study did not investigate the payment for dispensing services, and that "we currently believe that the dispensing fee is below the cost to dispense because of the cap on dispensing fees that is currently in place and has been for many years." *Review of Pharmacy Acquisition Costs of the Montana DPHHS* (July 11, 1996) (Ex. 16). Likewise, Missouri responded that "ingredient cost is only one component to be considered in determining a pharmacy reimbursement level," and noted that dispensing fees paid by the state had not been raised to recommended levels. *Review of Pharmacy Acquisition Costs of the Missouri DSSS* (Jan. 1997) (Ex. 17).

[7] For example, the GAO stated in a 1993 report that while Medicaid payments exceeded drug costs, "[n]either HCFA nor the states have determined what would be an appropriate margin between reimbursements and costs." GAO, *Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland* (Mar. 1993) at 6 (Ex. 18). GAO further stated that "HCFA officials also noted that . . . states . . . were not willing to increase dispensing fees regardless of survey results" and "HCFA and state Medicaid officials agreed that pharmacies must often use excess Medicaid reimbursements to cover their dispensing costs." *Id.*

### 5. Document Preservation and Collection Memoranda

The Government stubbornly refuses to confirm that it has produced all documents concerning the preservation or collection of documents responsive to Abbott's requests and other AWP-related litigation, or to acknowledge that all the documents it has withheld have been placed on a privilege log. Again, this is basic information that Abbott requested more than a year ago. *See* Abbott Interrogatories 16 and 18. Abbott has produced its own preservation and collection memoranda. There is no reason the Government should not reciprocate. The Government's decision to redact its preservation memoranda is inconsistent with its reliance on those communications as proof that it has complied with its document preservation obligations. Those improper redactions are the subject of a separate motion to compel now pending before the Court. Abbott's Motion for a Preservation Order and Affidavit Regarding Spoliation Issues (9/13/07) (Dkt. # 4711).

### 6. Deposition Transcripts

Finally, the Government refuses to produce the AWP-related deposition transcripts in its possession, even though Abbott has shared with the Government a list of such transcripts its own possession. Instead, the Government contends that Abbott must first obtain written consent from other pharmaceutical companies that might have outstanding protective orders preventing the unauthorized disclosure of transcripts. Abbott is, of course, willing to seek such consent where appropriate, but without the transcripts and the names of manufacturers whose consent might be needed, Abbott would be forced to canvass the entire pharmaceutical industry in a directionless quest for transcripts that may not exist. This would be impractical and unfair.

Both parties possess a number of transcripts from depositions taken in related AWP litigation where the other party was not present. Both have asked the other to produce these transcripts, recognizing that protective orders applicable in other litigation must be followed and,

13

in some cases, written consent must be obtained from third parties prior to disclosure. As a practical first step, Abbott has produced a seven page chart showing the transcripts it has in its possession. 11/9/07 Winchester Email to Brooker (Ex. 19). The Government has refused to return the favor, despite a series of requests from Abbott. 10/29/07 Torborg Email to Brooker (Ex. 20). So that Abbott can efficiently target its requests for consent to interested third parties, the Government should immediately produce all transcripts in its possession that were taken at AWP-related depositions where Abbott was not present.

## CONCLUSION

For the foregoing reasons, the Court should grant Abbott's Motion to Compel the Production of Documents from the United States. Abbott respectfully requests that the Court enter an order requiring the Government to make a full and complete disclosure of:

1) an unredacted, final version of a "decision memorandum" concerning the Government's approval of the way in which state Medicaid programs paid providers and dispensed drugs to Medicaid beneficiaries, which the Government has already produced in draft form;

2) a representative sample of the allegedly false claims at issue in this case;

3) a provider look-up table that will allow Abbott to identify providers who submitted the allegedly false claims at issue in this case;

4) work papers for two recent HHS-OIG reports that Abbott believes will contain material undermining the Government's claims in this case;

5) all document preservation and collection memoranda responsive to Abbott's discovery requests; and

6) copies of all deposition transcripts from other AWP-related cases in the Government's possession.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1, Abbott requests oral argument on this Motion.

Dated:  March 31, 2008	Respectfully submitted,

/s/ R. Christopher Cook
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

## **CERTIFICATE OF SERVICE**

I, R. Christopher Cook, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE UNITED STATES to be served on counsel of record for the United States of America via email this 31st day of March, 2008.

                                              /s/ R. Christopher Cook
                                              R. Christopher Cook

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1**

 I certify that the moving party communicated with counsel for the Government in an effort to resolve the dispute referred to in this motion, and that the parties have not been able to reach agreement with respect thereto.

               /s/ R. Christopher Cook
               R. Christopher Cook