# EXHIBIT 1

Reed, Larry - Vol. II                        September 27, 2007
                        Baltimore, MD

Page 329

                   UNITED STATES DISTRICT COURT

                OF THE DISTRICT OF MASSACHUSETTS

----------------------------x

IN RE:  PHARMACEUTICAL        :    MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    :    CIVIL ACTION

PRICE LITIGATION              :    01-CV-12257-PBS

THIS DOCUMENT RELATES TO      :

U.S. ex rel. Ven-A-Care of    :    Judge Patti B.

The Florida Keys, Inc.,       :         Saris

              Plaintiff,      :

        vs.                   :

ABBOTT LABORATORIES, INC.,    :  Chief Magistrate

No. 06-CV-11337-PBS           :  Judge Marianne B.

              Defendants.     :       Bowler

----------------------------x

                           VOLUME II

                   Baltimore, Maryland

                   Thursday, September 27, 2007

Continued Videotape Deposition of:

                   LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                        Baltimore, MD

|  | Page 330 |
|---|---|
| 1 | at 9:15 a.m., at the law offices of |
| 2 | Hogan & Hartson, 111 South Calvert Street, |
| 3 | Baltimore, Maryland,  before Dawn A. Jaques, |
| 4 | Certified Shorthand Reporter and Notary Public in |
| 5 | and for the State of Maryland, when were present |
| 6 | on behalf of the respective parties: |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | (CAPTIONS CONTINUED) |

Page 332

```
 1     IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
 2        IN AND FOR LEON COUNTY, FLORIDA
 3  THE STATE OF FLORIDA
 4  ex rel.
 5  ----------------------------x
 6  VEN-A-CARE OF THE FLORIDA   :
 7  KEYS, INC., a Florida       :
 8  Corporation, by and through :
 9  its principal officers and  :
10  directors, ZACHARY T.       :
11  BENTLEY and T. MARK JONES,  :
12        Plaintiffs,  :
13        vs.          :
14  MYLAN LABORATORIES, INC.,   : Civil Action No.:
15  MYLAN PHARMACEUTICALS, INC., :  98-3032G
16  NOVOPHARM LTD., SCHEIN      :
17  PHARMACEUTICAL, INC., TEVA  : Judge William L.
18  PHARMACEUTICAL INDUSTRIES   :   Gary
19  LTD, TEVA PHARMACEUTICAL USA, :
20  WATSON PHARMACEUTICALS, INC., :
21        Defendants.  :
22  ----------------------------x
```

Page 331

```
 1       IN THE CIRCUIT COURT
 2     OF MONTGOMERY COUNTY, ALABAMA
 3  ------------------------x
 4  STATE OF ALABAMA,     :
 5     Plaintiff,   :   Case No.
 6     vs.         :   CV-05-219
 7  ABBOTT LABORATORIES,   :
 8  INC., et al.,        : Judge Charles
 9     Defendants. :    Price
10  ------------------------x
11
12
13    IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
14         STATE OF HAWAII
15  ----------------------------x
16  STATE OF HAWAII,       :
17     Plaintiff,   :   Case No.
18     vs.        :  06-10720-04-EEH
19  ABBOTT LABORATORIES, et al., :  Judge Eden
20     Defendants.  : Elizabeth Hifo
21  ----------------------------X
22
```

Page 333

```
 1     FRANKLIN CIRCUIT COURT - DIVISION II
 2        CIVIL ACTION NO. 03-CI-1134
 3
 4  ----------------------------X
 5  COMMONWEALTH OF KENTUCKY,    :
 6       Plaintiff,   :
 7     vs.          :    Judge
 8              : Crittenden
 9  ABBOTT LABORATORIES, INC.,   :
10       Defendant.   :
11  ----------------------------X
12
13    STATE OF WISCONSIN CIRCUIT COURT
14         DANE COUNTY
15         Branch 9
16  ------------------------x
17  STATE OF WISCONSIN,    :
18     Plaintiff,   :
19     vs.         :   Case No.
20  AMGEN, INC., et al.,   :   04-CV-1709
21     Defendants.  :
22  ------------------------x
```

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                        Baltimore, MD

| Page 334 | Page 336 |
|---|---|

**Page 334**

1  STATE OF SOUTH CAROLINA :  IN THE COURT OF
2  COUNTY OF RICHMOND    :   COMMON PLEAS
3  ------------------------X  FOR THE FIFTH
4  STATE OF SOUTH CAROLINA :  JUDICIAL DISTRICT
5  and HENRY D. McMASTER  :    Case No.
6  in his official capacity :  2006-CP-40-4394
7  as Attorney General for :
8  the State of South      :
9  Carolina,              :
10      Plaintiffs,   :
11     vs.            :
12  ABBOTT LABORATORIES,   :
13     Defendant.  :
14  ------------------------X
15
16
17
18
19
20
21
22  (CAPTIONS CONTINUED)

**Page 336**

1            A P P E A R A N C E S
2
3  On behalf of the United States of America:
4
5      ANA MARIA MARTINEZ, ESQ.
6      United States Department of Justice
7      Assistant United States Attorney
8      Southern District of Florida
9      99 N.E. 4th Street
10     Miami, Florida  33132
11     TELEPHONE: (305) 961-9431
12     E-MAIL: Ana.maria.martinez@usdoj.gov
13        -and-
14     JUSTIN DRAYCOTT, ESQ.
15     United States Department of Justice
16     Civil Division
17     P.O. Box 261
18     Ben Franklin Station
19     Washington, D.C.  20044
20     TELEPHONE: (202) 305-9300
21     E-MAIL: Justin.draycott@usdoj.gov
22

| Page 335 | Page 337 |
|---|---|

**Page 335**

1  STATE OF SOUTH CAROLINA :  IN THE COURT OF
2  COUNTY OF RICHMOND    :   COMMON PLEAS
3           :  FOR THE FIFTH
4           :  JUDICIAL CIRCUIT
5  STATE OF SOUTH CAROLINA :
6  and HENRY D. McMASTER,  :
7  in his official capacity :
8  as Attorney General for :
9  the State of South     :  Civil Action No.
10  Carolina,            :  07-CP-40-0285
11     Plaintiff,  :
12     vs.          :  Civil Action No.
13  SANDOZ, INC.,      :   07-CP-40-0287
14     Defendant.  :
15  ------------------------X
16
17
18
19
20
21
22

**Page 337**

1  APPEARANCES (Continued:)
2
3  On behalf of Ven-A-Care:
4
5      ROSLYN G. POLLACK, ESQ.
6      Berger & Montague, P.C.
7      1622 Locust Street
8      Philadelphia, Pennsylvania  19103-6305
9      TELEPHONE: (215) 875-4666
10     E-MAIL:  rpollack@bm.net
11
12  On behalf of U.S. Department of
13  Health and Human Services:
14
15     LESLIE STAFFORD, ESQ.
16     U.S. Department of Health and
17     Human Services
18     Office of General Counsel, CMS Division
19     7500 Security Boulevard
20     Mail Stop C2-05-23
21     Baltimore, Maryland  21244-1850
22     TELEPHONE: (410) 786-9655

                            3 (Pages 334 to 337)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                    Baltimore, MD

Page 338

1   APPEARANCES (Continued:)
2
3   On behalf of City of New York and New York
4   counties:
5
6       MICHAEL WINGET-HERNANDEZ, ESQ.
7       WINGET-HERNANDEZ LLC
8       3112 Windsor Road
9       Suite 228
10      Austin, Texas  78703
11      TELEPHONE:  (512) 474-4095
12      E-MAIL:  Michael@winget-hernandez.com
13
14  On behalf of Abbott Laboratories:
15
16      DAVID S. TORBORG, ESQ.
17      Jones Day
18      51 Louisiana Avenue, N.W.
19      Washington, D.C.  20001-2113
20      TELEPHONE:  (202) 879-5562
21      E-MAIL:  Dstorborg@jonesday.com
22

Page 339

1   APPEARANCES (Continued:)
2
3   On behalf of Dey, Inc.:
4
5       NEIL MERKL, ESQ.
6       Kelley Drye & Warren LLP
7       101 Park Avenue
8       New York, New York  10178
9       TELEPHONE:  (212) 808-7811
10      E-MAIL:  Nmerkl@kelleydrye.com
11
12  On behalf of Roxane Laboratories and
13  Boehringer Ingelheim:
14
15      ERIC GORTNER, ESQ.
16      Kirkland & Ellis LLP
17      200 East Randolph Drive
18      Chicago, Illinois  60601
19      TELEPHONE:  (312) 861-2285
20      E-MAIL:  Egortner@kirkland.com
21
22  (Continued)

Page 340

1   APPEARANCES (Continued:)
2
3   On behalf of GlaxoSmithKline:
4
5       SHANKAR DURAISWAMY, ESQ.
6       Covington & Burling LLP
7       1201 Pennsylvania Avenue, N.W.
8       Washington, D.C.  20004
9       TELEPHONE:  (202) 662-5273
10      E-MAIL:  Sduraiswamy@cov.com
11
12  On behalf of Bristol-Myers Squibb Company:
13  (via telephone)
14
15      ANDREA W. TRENTO, ESQ.
16      Hogan & Hartson LLP
17      875 Third Avenue
18      New York, New York  10022
19      TELEPHONE:  (212) 918-3532
20      E-MAIL:  Awtrento@hhlaw.com
21
22  (Continued)

Page 341

1   APPEARANCES (Continued:)
2
3   On behalf of Baxter Health Care Corporation
4   (via telephone):
5
6       EDEN M. HEARD, ESQ.
7       Dickstein Shapiro LLP
8       1825 Eye Street, N.W.
9       Washington, D.C.  20006
10      TELEPHONE:  (202) 420-2728
11      E-MAIL:  Hearde@dicksteinshapiro.com
12
13  On behalf of the State of Alabama (via telephone):
14
15      W. DANIEL (DEE) MILES, III
16      Beasley, Allen, Crow, Methvin,
17      Portis & Miles
18      218 Commerce Street
19      Post Office Box 4160
20      Montgomery, Alabama  36103-4160
21      TELEPHONE:  (334) 269-2343
22  (Continued)

4 (Pages 338 to 341)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                         Baltimore, MD

---

Page 342

```
1    APPEARANCES (Continued):
2
3    On behalf of Sandoz, Inc. (via telephone):
4
5         DAVID L. KLEINMAN, ESQ.
6         White & Case LLP
7         1155 Avenue of the Americas
8         New York, New York  10036-2787
9         TELEPHONE:  (212) 819-8254
10
11   On behalf of the State of California
12   (via telephone):
13
14        RITA HANSCOM, ESQ.
15        Bureau of Medi-Cal Fraud & Elder Abuse
16        Office of the Attorney General
17        California Department of Justice
18        TELEPHONE:  (619) 688-6099
19
20
21
22   (Continued)
```

Page 344

```
1    APPEARANCES (Continued):
2
3    On behalf of the State of California:
4         NICHOLAS N. PAUL, ESQ.
5         Bureau of Medi-Cal Fraud & Elder Abuse
6         Supervising Deputy Attorney General
7         Civil Prosecutions Unit
8         P.O. Box 85266
9         110 West A Street, Suite 1100
10        San Diego, California  92186
11        TELEPHONE:  (619) 688-6099
12        E-MAIL:  Nicholas.paul@doj.ca.gov
13
14
15
16
17
18
19
20
21
22
```

Page 343

```
1    APPEARANCES (Continued):
2
3    On behalf of the State of Florida (via telephone):
4
5         MARY S. MILLER, ESQ.
6         Office of the Attorney General of Florida
7         PL-01, The Capitol
8         Tallahassee, Florida  32399-1050
9         TELEPHONE:  (850) 414-3600
10
11   On behalf of Schering Corporation, Schering-Plough
12   Corporation and Warrick Pharmaceuticals
13   Corporation:
14
15        GINGER APPLEBERRY, ESQ.
16        Locke Liddell & Sapp PLLC
17        2200 Ross Avenue, Suite 2200
18        Dallas, Texas  75201
19        TELEPHONE:  (214) 740-8459
20        E-MAIL:  Gappleberry@lockeliddell.com
21
22   (Continued)
```

Page 345

```
1                    I-N-D-E-X
2    WITNESS:                        PAGE:
3    LARRY REED
4        Examination by Mr. Torborg................ 347
5
6
7
8               E-X-H-I-B-I-T-S
9    NUMBER        DESCRIPTION              PAGE
10   Exhibit Abbott 324-Letter dated August 3, 1994,
11        Bates Stamp No. HHD032-0040. 451
12   Exhibit Abbott 325-Documentation, Bates Stamp
13        Nos. HHD014-0544 through 562 461
14   Exhibit Abbott 326-Miscellaneous Documentation,
15        (22 pages, no Bates Stamp
16        Nos.)...................... 498
17   Exhibit Abbott 327-Documentation, Bates Stamp
18        Nos. HHD014-0657 through 674 516
19   Exhibit Abbott 328-Documentation, Bates Stamp
20        Nos. HHC004-0188 through 190 532
21   Exhibit Abbott 329-Documentation, Bates Stamp
22        Nos. HHD014-0764 through 782 580
```

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                         Baltimore, MD

---

Page 346

1          P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Good morning.  This
4   is Volume II in the continued video deposition of
5   Larry Reed, taken by counsel for Abbott
6   Laboratories, In Re: Pharmaceutical Industry
7   Average Wholesale Price Litigation, MDL No. 1456.
8          We are at Hogan & Hartson at 111 South
9   Calvert Street, Baltimore, Maryland.  The date is
10  Thursday, September 27th, 2007.  The time on the
11  video screen is 9:15 a.m.
12         My name is Ellen Hebert; I am the legal
13  video specialist.  The court reporter is Dawn
14  Jaques.  We are employed by Henderson Legal
15  Services.
16         Counsel who attended yesterday are on
17  the record.  Will counsel not present yesterday
18  please introduce themselves and the parties they
19  represent?
20         MR. PAUL:  Nicholas Paul for California
21  Department of Justice for California.
22         THE VIDEOGRAPHER:  Anyone on the phone

---

Page 347

1   not present yesterday?
2          (No response.)
3          THE VIDEOGRAPHER:  The witness has been
4   sworn in.  Please begin.
5
6          RESUME EXAMINATION BY COUNSEL FOR
7   ABBOTT LABORATORIES
8   BY MR. TORBORG:
9       Q.  Welcome back, Mr. Reed --
10      A.  Thank you.
11      Q.  -- and good morning.
12      A.  Good morning.
13      Q.  Before I continue with my questioning
14  with you, I need to figure out what's going on
15  with the beeping sound on the phone.
16         Let's go off the record, see if we
17  can't fix this.
18         THE VIDEOGRAPHER:  Going off the
19  record. The time is 9:16:27.
20         (A break was taken.)
21         THE VIDEOGRAPHER:  Going back on the
22  record. The time is 9:18:13.  This is the

---

Page 348

1   videographer.  We lost our phone connection.
2          Will any parties that did not attend
3   yesterday please identify yourselves for the
4   record?
5          MR. TRENTO:  This is Andrea Trento from
6   Hogan & Hartson, LLP, representing DMS.
7          MS. APPLEBERRY:  Ginger Appleberry from
8   Locke Liddell & Sapp, representing Sharon
9   Corporation, Sharon South Corporation and Merck
10  Pharmaceuticals Corporation.
11         MR. TORBORG:  Would you two --
12         MS. HEARD:  Eden Heard, Dickstein
13  Shapiro, LLP, representing Baxter Health Care
14  Corporation.
15         MR. TORBORG:  Hello, this is the
16  problem --
17         MR. MILES:  Dee Miles, representing --
18         THE COURT REPORTER:  I'm sorry, you
19  need to repeat your name.
20         MR. TORBORG:  Dee was here yesterday.
21         THE COURT REPORTER:  Okay, Dee -- okay.
22         MR. TORBORG:  We just need the people

---

Page 349

1   who were not here yesterday to introduce
2   themselves.
3          MR. MILES:  All right.
4          MR. TORBORG:  No one else needs to do
5   it again.
6          MR. MILES:  All right.
7          MR. TORBORG:  And those that are new to
8   the deposition are asked to fax their name, firm,
9   who they represent, their address and their e-
10  mail to the following fax number, 410-539-6981 --
11  again, that's 410-539-6981 -- and make that
12  attention Peter Coolbaugh, C-O-O-L-B-A-U-G-H.
13         The court reporter -- that will help
14  the court reporter.
15         MR. HERNANDEZ:  While we're on the
16  announcements, yesterday I left open the
17  possibility that -- of which states I would be
18  here on behalf of, and I went back last night and
19  looked at the cross-notices, and what I was able
20  to find were cross-notices for Hawaii, Kentucky
21  and Wisconsin, so just for the record, I'm here
22  on their behalf.

---

6 (Pages 346 to 349)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                      September 27, 2007
                        Baltimore, MD

| Page 530 | Page 532 |
|---|---|

**Page 530**

1    My follow-up question for you, Mr.
2  Reed, was what was HCFA's decision or policy?
3  What was the final decision or policy that HCFA
4  reached?
5    MS. MARTINEZ: Objection to form.
6    THE WITNESS: The decision that -- and
7  I'm not sure, HCFA may too broad of a term here,
8  all of HCFA, but the decision was whether or not
9  to revise regulations for looking at these types
10 of ingredient costs or whether to issue policy
11 instructions for that, and we didn't do -- we did
12 not do either.
13 BY MR. TORBORG:
14   Q.  So the decision was not to revise the
15 ingredient cost regulations for -- what was the
16 second?
17   A.  A policy guidance document.
18   Q.  And what was the rationale for that
19 decision?
20   MR. DRAYCOTT: You can answer, but only
21 limit it to the decision itself. You should not
22 answer to the -- with respect to -- to the extent

**Page 531**

1  the answer would reveal the deliberations that
2  resulted in that final decision.
3    MR. TORBORG: I just want to argue with
4  counsel a little bit here before you answer, and
5  that is, the deliberative process privilege does
6  not apply to prevent us from understanding the
7  rationale for the decision.
8    We, I think, all agree on that, and if
9  we don't agree, we can go get some case law, and
10 I think we'll come to a quick agreement.
11   So I am allowed to know what the
12 rationale for the decision was.
13   MR. DRAYCOTT: And he was so instructed
14 just now.
15   MR. TORBORG: Okay.
16   MR. DRAYCOTT: You may state the
17 rationale, but you have to be careful in just
18 stating the rationale that resulted from the
19 deliberations, not the deliberations themselves.
20   THE WITNESS: Okay. The rationale
21 basically is that there's a structure between CMS
22 and the state Medicaid programs on how they

**Page 532**

1  operate their program and to what extent we
2  intercede in -- in directly making them make
3  changes to the program versus overseeing their
4  program through the state plan process.
5  BY MR. TORBORG:
6    Q.  And what about that structure led to
7  your decision not to revise regulations or issue
8  any other policy guidance?
9    A.  That there is a structure -- there is a
10 structure in place, again, of how we relate to
11 state Medicaid agencies. There are parts of the
12 prescription drug program where we direct the
13 states how to pay for drugs, or a maximum in
14 aggregate to pay for drugs. There are other
15 parts where the states make their determination
16 of prescription drug payment policies -- of
17 prescription drug payment methodologies.
18   Q.  Any other further rationale you can
19 provide?
20   A.  No, not at this point.
21   (Deposition Exhibit Abbott 328 was
22 marked for identification.)

**Page 533**

1  BY MR. TORBORG:
2    Q.  For the record, Mr. Reed, what I've
3  marked as Exhibit Abbott 328 bears Bates numbers
4  HHC004-0188 through 90. I'd like you to take a
5  look at that document to the extent necessary to
6  tell me whether you recall it.
7    And I'll note, Mr. Reed, that given the
8  file -- some information that counsel has given
9  us about where different documents came from, I
10 have some reason to believe that this document
11 may have come from your files. I don't know for
12 sure, but I have some reason to believe it may
13 have come from your files.
14   Also for the record, this document is
15 titled "Review of Medicaid Drug State Plan
16 Amendments." It's not dated, and there are no
17 particular names on the document.
18   While Mr. Reed's doing that, let me ask
19 counsel for the United States, previous
20 discussions about trying to get a file source
21 index for documents, the government did state if
22 there were particular documents for which we'd

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                     Baltimore, MD

| Page 534 | Page 536 |
|---|---|

**Page 534**

1  like to know where the documents came, we could
2  request specific documents, and this would be one
3  that I'd like to make that request.
4      MR. DRAYCOTT:  By the way, do you have
5  the file source index that we gave you for the --
6  it appears this one is from the subpoena
7  production that occurred in 2004?
8      MR. TORBORG:  Correct.
9      MR. DRAYCOTT:  Do you have the file --
10 I neglected to bring that file source index with
11 us. Do you happen to have that with you?
12     MR. TORBORG:  No, but I can tell you
13 that I look at it before this deposition, and Mr.
14 Reed was one of the individuals listed in this
15 Bates -- this Bates range.
16     MR. DRAYCOTT:  Well, certainly we note
17 your request, and we'll also perhaps find out
18 more about this document from the witness.
19 BY MR. TORBORG:
20    Q.  Mr. Reed, have you had a chance to look
21 at the document?
22    A.  I have had a chance.

**Page 535**

1     Q.  Okay.  And do you recognize this
2  document?
3     A.  I'm sorry, I have to talk to counsel
4  about this document.
5     Q.  Can you answer the question first,
6  whether -- just the pending question of whether
7  you recognize the document?
8      MR. DRAYCOTT:  Do you recognize the
9  document?
10     THE WITNESS:  I recognize the document.
11 BY MR. TORBORG:
12    Q.  I guess if you're requesting the advice
13 of counsel, I have to let you do that.
14     MR. DRAYCOTT:  Why don't we do that.
15     THE VIDEOGRAPHER:  Going off the
16 record. The time is 14:54:24.
17        (A break was taken.)
18     THE VIDEOGRAPHER:  Going back on the
19 record.  The time is 15:06:38.
20     MR. TORBORG:  Mr. Draycott, you have
21 some comments on this document?
22     MR. DRAYCOTT:  Yeah, this is pursuant

**Page 536**

1  to the provisions of the case management order.
2  We are going to, at this point, recall this
3  document as an inadvertently produced privileged
4  document.
5      Just for the -- so the record is clear,
6  this has been currently marked as Exhibit Abbott
7  328.  It bears the Bates number HHC004-0188.  It
8  goes through -- it's a three-page document ending
9  HHC004-0190.
10     We'll further confer with CMS prior to
11 the resumption of Mr. Reed's deposition and give
12 you a final decision by the agency as to whether
13 or not it will assert deliberative process
14 privilege over the contents of this document.
15 Therefore, we propose that any questioning of Mr.
16 Reed about the document be deferred to the
17 resumption of his deposition.
18     MR. TORBORG:  Anything else?
19     MR. DRAYCOTT:  That should do it.
20     MS. MARTINEZ:  Let me just add that the
21 recall is also pursuant to the Rules of Federal
22 Civil Procedure as well as the protective order

**Page 537**

1  in the case.
2      MR. TORBORG:  We'll take your recall
3  under advisement.
4      MR. MERKL:  Is it -- I have a question,
5  though, insofar as it pertains to the document
6  production issue involving Dey.
7      It's your contention that this was
8  inadvertently produced?
9      MR. DRAYCOTT:  Correct.
10     MR. MERKL:  Is it on a privilege log?
11     MR. DRAYCOTT:  Obviously, it's not.
12 That's -- or it wouldn't have been -- it hasn't
13 been logged, no.
14     MR. MERKL:  Although sometimes a
15 document is inadvertently produced, it's logged
16 and --
17     MR. DRAYCOTT:  I understand your
18 question, and, yeah, this is not on a log.
19     MR. MERKL:  Okay.  I would ask that in
20 the context of your deliberations with HCFA that
21 you undertake an investigation and present to us
22 the basis for the claim of inadvertent

53 (Pages 534 to 537)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                        September 27, 2007
                        Baltimore, MD

| Page 538 |
| --- |

1   disclosure, because my understanding of the law
2   in that area is that if someone evaluates the
3   document, produces it and then later decides,
4   well, I shouldn't have produced it, looking at it
5   now, I think it really is privileged, that is not
6   -- you're not entitled to get it back.
7        MR. DRAYCOTT:  And that's -- again, I
8   can clarify for you that that's not the
9   situation. Indeed, the full nature of the
10  document and the grounds of the privilege were
11  established in part during the conferral we had
12  with the witness outside this deposition room.
13       MR. MERKL:  Again, I don't want to
14  argue the merits of it.  I am asking that when
15  you do formulate your opinion -- I'm sorry, your
16  position, that you do provide us with the
17  circumstances of how it came to be inadvertently
18  produced so we can fairly evaluate --
19       MR. DRAYCOTT:  Your request is on the
20  record.
21       MR. MERKL:  And of course in the
22  interim, we will abide by the court ruling.

| Page 539 |
| --- |

1        MR. TORBORG:  A couple housecleaning
2   matters on this before we move on to substantive
3   questioning.
4        The first question would be -- I would
5   ask the Department of Justice to get us an answer
6   within three days on this document, whether
7   you're going to recall it; the reason being is
8   I'm going to attach this document to something
9   I'll file into court and explain this is the type
10  of document that's being withheld from Abbott in
11  defense in this case, which is clearly
12  inconsistent with the allegations you're making
13  in this case.
14       So I'd like a decision within -- I'll
15  file it under seal, but I am going to file this
16  document with the court unless there's some order
17  that prevents me from doing it.  So I request a
18  decision within three days about -- your final
19  decision on this document, because what I don't
20  want to get into is a situation where my request
21  is not ripe, something of that nature.  I want to
22  know that you've made a final decision.

| Page 540 |
| --- |

1        MR. DRAYCOTT:  David, but understand
2   that the decision is not one by the Department of
3   Justice.  It's a decision by CMS, and we'll
4   certainly take that issue up with CMS, but it's
5   not simply a matter of the Department of Justice
6   making the decision about whether or not the
7   deliberative process privilege will be asserted
8   with respect to this document.
9        MR. TORBORG:  Okay.
10       Mr. Reed, is this a document that you
11  drafted?
12       MR. DRAYCOTT:  You may answer that
13  question.
14       THE WITNESS:  This was a document that
15  was drafted within our area.
16  BY MR. TORBORG:
17   Q.  Okay.  Did you review this document?
18   A.  Can I answer?
19       MR. DRAYCOTT:  You may answer.
20       THE WITNESS:  Yes.
21  BY MR. TORBORG:
22   Q.  Okay.  What harm would result to CMS if

| Page 541 |
| --- |

1   this document was produced to Abbott and other
2   Defendants in average wholesale price litigation,
3   should this be disclosed to us under protective
4   order in this case?
5        Doesn't go outside to the public, just
6   is used in this litigation under protective
7   order. What harm would you feel would come to
8   CMS?
9        MR. DRAYCOTT:  Objection, but you may
10  answer.
11       THE WITNESS:  This document does reveal
12  our deliberations in looking at state plan
13  amendments.
14  BY MR. TORBORG:
15   Q.  And you've done a nice job of
16  paraphrasing the purpose of the deliberative
17  process privilege.  My question is a little
18  deeper than that, and that is what precisely
19  would happen that would be detrimental to CMS if
20  this particular document was disclosed to the
21  Defendants in this litigation?
22       MR. DRAYCOTT:  Objection.  You may

                              54 (Pages 538 to 541)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                        Baltimore, MD

Page 542

1    answer.
2        THE WITNESS: Until I can look at this
3    document in more detail and can look at the other
4    records that relate to this document, I'm not
5    sure that this is a final document, I'm not sure
6    that there's -- that these are the final
7    recommendations, I'm not sure that this is the
8    final language.
9    BY MR. TORBORG:
10       Q. And you reviewed this document for
11   roughly three minutes when I gave it to you
12   before we took a break, correct?
13       A. I did look at the document.
14       Q. And then you were off the record with
15   your counsel for 13 minutes, correct, roughly?
16       A. Whatever amount of time that was.
17       Q. And can you articulate for me and Judge
18   Saris or Judge Bowler what particular harm would
19   result if this document were disclosed to Abbott
20   and other Defendants under protective order in
21   this case?
22       MR. DRAYCOTT: Objection. You can

Page 543

1    answer.
2        THE WITNESS: Again, these may not be
3    the final recommendations or the final decisions
4    made by CMS. I just don't know without being
5    able to look at this document and look at the --
6    this appears to be a draft of a document that we
7    did -- we did do. I'm not sure that this is the
8    final -- the final document.
9    BY MR. TORBORG:
10       Q. Now, this document relates to the topic
11   we were discussing previously, which was how you
12   used the information contained in OIG reports
13   relating to the significant difference between
14   AWP and acquisition costs for generic drugs in
15   approving state plans, correct?
16       A. This is a document that speaks to that
17   at a point in time.
18       Q. And as we talked brief -- as we
19   discussed earlier, HCFA's actions with respect to
20   how it approves state plans impacted the amount
21   that providers were reimbursed for drugs,
22   correct?

Page 544

1        MR. DRAYCOTT: Objection. You can
2    answer.
3        THE WITNESS: HCFA -- I'm sorry, give
4    me the question again.
5    BY MR. TORBORG:
6        Q. HCFA's actions with respect to how it
7    approved or disapproved state plans impacted the
8    amount that pharmacies were reimbursed for drugs,
9    correct?
10       A. In some cases, it could impact that
11   amount, not necessarily all cases.
12       Q. Including the Abbott generic drugs at
13   issue in this case, correct?
14       MR. DRAYCOTT: Objection.
15       THE WITNESS: Again, depending on what
16   the state plan amendment -- the amount in the
17   state plan amendment and what drugs it affected,
18   I don't know.
19   BY MR. TORBORG:
20       Q. And would you agree with me that -- I
21   think is a pretty common sense notion, but it's
22   been lost on others, so maybe I'm missing --

Page 545

1    that the government's policy, whether it be the
2    state government or the federal government's
3    policies, about how much to reimburse for drugs
4    impacts how much the pharmacies are actually paid
5    for drugs, correct?
6        MR. DRAYCOTT: Objection. You can
7    answer if you can.
8        THE WITNESS: Okay. The payment
9    policies do impact what pharmacies are paid for
10   drugs.
11   BY MR. TORBORG:
12       Q. Including the four families of Abbott
13   generic drugs in this case, correct?
14       A. Are you talking a specific -- are you
15   talking state plan amendment submitted by a state
16   at a given time? Are you talking something else?
17       Q. Broader. Government policies.
18       A. Government policies for payment of
19   prescription drugs would affect or could affect
20   any manufacturer's drugs, including Abbott's.
21       Q. And this is where HCFA was aware that
22   the average wholesale prices did not equal what

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                          September 27, 2007
                        Baltimore, MD

---

Page 546

1  providers were actually paying for those drugs,
2  correct?
3        MR. DRAYCOTT:  Objection.
4        THE WITNESS:  And at that point, I
5  think I can't probably confirm or deny that.
6  BY MR. TORBORG:
7        Q.   How about you personally, were you
8  aware that average wholesale prices published in
9  the compendia did not equal the amount that
10 providers actually paid for the drugs?
11       A.   No, I don't think I have any further
12 comment on that one.
13       Q.   Well, we reviewed some OIG reports
14 earlier today that noted a difference between
15 average wholesale price and acquisition costs as
16 found by OIG, correct?
17       A.   That for a set of drugs, there was a
18 difference between what the OIG found for that
19 set of drugs and what the state had in its state
20 plan or what we have for reference of what the
21 state plan -- what the state had in its state
22 plan for drugs.

---

Page 547

1        I think the missing ingredient is the
2  factors -- the decision making process that the
3  state needed to undertake to get from the OIG
4  report to whatever it might want to put in its --
5  in a state plan submission.
6        Q.   Well, what do you mean by missing an
7  ingredient there?  I'm not sure I follow.
8        A.   One of the first reports said that the
9  state should -- from the OIG, the OIG had
10 recommended the state consider this as a factor
11 in determining changes to its payment rate.
12       So there wasn't a direct connection
13 between the OIG says it should be AWP minus 41.4,
14 whatever the number was, and the state simply
15 saying that's correct, I'll change my plan to AWP
16 minus 41.4.
17       Q.   Well, there are other policy
18 considerations at play, correct?
19       A.   For the state, that's correct.
20       Q.   All right.  And for HCFA as well,
21 correct?
22       A.   I think for HCFA, or for CMS, at a

---

Page 548

1  later point, when it sees that state plan
2  submission.
3        Q.   If we look at Exhibit Abbott 284, this
4  is the copy of the Federal Register, it has the
5  rules for Medicaid reimbursement of drugs after
6  the 1997 federal upper limit legislation,
7  specifically the last page of that exhibit.
8        You'll see a copy or a -- yeah, a copy
9  of the regulations that are Part 447, "Payments
10 for Services."
11       Do you see that, second to last page of
12 Exhibit Abbott 284?
13       A.   Yes, I do.
14       Q.   Okay.  And particularly 447.301 and
15 331, you're familiar with these regulations, are
16 you not?
17       A.   I am.
18       Q.   Okay.  447.301, "Estimated acquisition
19 is defined as the agency's best estimate of the
20 price generally and currently paid by providers
21 for a drug marketed or sold by a particular
22 manufacturer or labeler in the package size of

---

Page 549

1  drug most frequently purchased by providers."
2        Do you see that?
3        A.   I do.
4        Q.   And then 447.331, "Drugs, aggregate
5  upper limits for payment."  If we go -- I'm sure
6  you're familiar with this, but multiple source
7  drugs, there are two categories, those that fall
8  within the federal upper limits, correct, would
9  be the first category?
10       A.   I think this makes a reference to how
11 the drugs are categorized, but basically, okay.
12       Q.   Okay.  And then the second category is
13 all other drugs?
14       A.   Other drugs.
15       Q.   Right.  And then it states, "For other
16 drugs, the agency's payments for brand name drugs
17 certified in accordance with paragraph C of this
18 section and drugs other than multiple source
19 drugs for which a specific limit has been
20 established under Section 447.332 must not exceed
21 in the aggregate payment levels that the agency
22 has determined by applying the lower of the, (1),

---

56 (Pages 546 to 549)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                    Baltimore, MD

Page 550

1  estimated acquisition cost, plus a reasonable
2  dispensing fee established by the agency, or,
3  (2), providers' usual and customary charges to
4  the general public."
5       Did I read that right?
6       A.  It looks correct.
7       Q.  And those are the regulations that HCFA
8  was charged with enforcing in deciding whether to
9  approve or disapprove state plans, correct?
10      MR. DRAYCOTT:  Objection.
11      THE WITNESS:  These are the regulations
12 that are directed at the states in determining
13 how they would set their payment amounts.
14 BY MR. TORBORG:
15      Q.  And it was HCFA's responsibility, was
16 it not, to -- this was the criteria by which HCFA
17 decided whether or not to approve or disapprove
18 state plans for prescription drugs, correct?
19      A.  This is a criteria that the states used
20 to determine their payments amounts -- or payment
21 amounts, I'm sorry.
22      Q.  What was HCFA's responsibility in this

Page 551

1  regard, Mr. Reed?
2       A.  HCFA's responsibility is to make sure
3  that the states basically do follow these
4  regulations.
5       Q.  And you had stated earlier that the
6  decision that you made when deciding what to do
7  about the OIG findings showing a significantly
8  greater discount for generic drugs from AWP
9  versus brand name drugs was whether or not to
10 revise the regulations, one, or, two, issue
11 policy guidance, correct?
12      A.  Correct.
13      Q.  And the document that the government is
14 attempting to take back from us, Exhibit Abbott
15 328, bears directly on that topic, does it not?
16      MR. DRAYCOTT:  Objection.
17      THE WITNESS:  Answer?
18      MR. DRAYCOTT:  You can answer.
19      THE WITNESS:  It involves the same
20 issue.  I'm not sure that it bears directly on
21 that topic.  That document does not address
22 whether or not we would issue regulations, I

Page 552

1  don't believe.
2  BY MR. TORBORG:
3       Q.  It's titled "Review of Medicaid Drug
4  State Plan Amendments."  First sentence says,
5  "Although there's no statutory provisions for
6  payment rates -- although there are no" --
7       MS. MARTINEZ:  No, we object to you
8  putting the document on the record.
9       MR. TORBORG:  You can mark all this
10 confidential.
11      MS. MARTINEZ:  No, we -- all we're
12 saying is that we're going to consult with the
13 agency, and then we're going to make a final
14 decision so that you'll have an opportunity to
15 question the witness again if we ultimately don't
16 recall the document.
17      But for you to right now try to put the
18 document on the record, I mean, it totally
19 defeats the recall, so -- I mean, we'd literally
20 have to, you know, excise this out of the
21 deposition for the recall to be effective.
22      All we're asking is for you just to

Page 553

1  defer what you're doing to the third day.  That's
2  all.
3  BY MR. TORBORG:
4       Q.  Mr. Reed, does this document provide
5  some insight into HCFA's thinking in deciding
6  whether or not to enforce the regulations at 42
7  C.F.R. Section 447.331?
8       MR. DRAYCOTT:  Objection.
9       THE WITNESS:  Can I hear the last part
10 of the question, repeat it?
11      (The reporter read back the
12 record.)
13      THE WITNESS:  It's a decision of how
14 CMS would look at state plan amendments.
15 BY MR. TORBORG:
16      Q.  And it references the regulations
17 447.331, correct?
18      A.  It references the regulation from 3 --
19 447.301 through 333.
20      Q.  And titled review of state plan
21 amendments, correct?
22      A.  "Review of Medicaid Drug State Plan

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                    Baltimore, MD

Page 554

1  Amendments."
2      Q.  So does it not provide some insight
3  into HCFA's thinking on whether it should approve
4  state plan amendments?
5          MR. DRAYCOTT:  Objection.
6          THE WITNESS:  It provides -- answer?
7          MR. DRAYCOTT:  Well, you can -- again,
8  without going into revealing the deliberations,
9  the options that were considered, you can state
10 what the purpose of the document is.
11         THE WITNESS:  The purpose of the
12 document was to look at ways of how would we
13 react to state -- submitted state plan
14 amendments.
15 BY MR. TORBORG:
16     Q.  Particularly in the context of the
17 OIG's work identifying larger differences in --
18 larger differences between average wholesale
19 price and average acquisition cost than as
20 specified in the state plan amendments, correct?
21     A.  The OIG reports were a factor in that.
22         MR. GORTNER:  Eric Gortner for Roxane.

Page 555

1  I move to strike that answer as non-responsive.
2          THE WITNESS:  Can I have the question
3  again?
4          MR. TORBORG:  I object to your motion
5  to strike because I think he did answer the
6  question that I asked, but let's ask it again.
7              (The reporter read back the
8  record.)
9          MR. GORTNER:  I stand on my objection.
10 BY MR. TORBORG:
11     Q.  Whose decision was it, Mr. Reed, on
12 whether or not to approve or disapprove state
13 plan amendments that did not call for a
14 reimbursement methodology consistent with OIG's
15 findings?
16         MR. DRAYCOTT:  Objection.  You can
17 answer if you can.
18         THE WITNESS:  I can't because I don't
19 understand your question.  Whose decision was it
20 to do what?
21 BY MR. TORBORG:
22     Q.  To approve or disapprove state plan

Page 556

1  amendments that did not provide a reimbursement
2  methodology consistent with OIG's findings?
3      A.  The decision making authority for any
4  state plan amendment rests with the Director of
5  the Medicaid Bureau -- I'm not going to say that,
6  because, at that point, it rests for some time --
7  for some time period with the regions and for
8  some time period with the Director of the Centers
9  for Medicaid & State Operations within CMS.
10     Q.  When was the -- when did that shift in
11 responsibility occur?
12     A.  The shift occurred I believe in the
13 early summer, late spring of 2002.
14     Q.  What caused that change in
15 responsibility?
16     A.  I think there were some concerns that
17 there may be differing interpretations in the
18 regions to state plan amendments in this area.
19     Q.  Are those concerns that you had?
20         MR. DRAYCOTT:  Objection.  To the
21 extent -- you can answer, but only to the extent
22 that you're not revealing your own participation

Page 557

1  in the deliberations that yielded the final
2  policy decision about where authority would
3  finally reside.
4          THE WITNESS:  Then I can't answer.
5              (A discussion was held off the
6  record.)
7          MR. TORBORG:  Why would Mr. -- why
8  would the fact of whether or not he participated
9  in the deliberations be something that would be
10 covered by the deliberative process privilege?
11         MR. DRAYCOTT:  I don't think it's the
12 fact of his participation in the deliberations.
13 It's -- I think you asked the question -- that
14 wasn't the question you asked him is whether or
15 not he participated in those deliberations.  You
16 asked him for his personal view, and if he has a
17 personal view that exists outside of those
18 deliberations, this goes to the core deliberative
19 process.
20         Deliberative process covers the
21 exchange of opinions amongst agency officials who
22 contribute to the final policy decision, so to

58 (Pages 554 to 557)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                        Baltimore, MD

| | |
|---|---|
| Page 558 | Page 560 |

**Page 558**

1 the extent that you're asking for his personal
2 view and his personal view is one that was
3 offered during those deliberations, it's
4 privileged.
5        MR. TORBORG:  The fact that his
6 personal view was shared with others is the
7 reason why it's privileged?
8        MR. DRAYCOTT:  No.  That's not your
9 question.  Your question was what was his view,
10 and to the extent that he was, at the level that
11 he occupied within HCFA, a part of the
12 deliberations that resulted in the decision where
13 authority to disapprove or approve a state plan
14 resided, that's a deliberation that resulted in
15 that decision.
16        So he can answer except to the extent
17 that it reveals the content of the deliberations,
18 that is, the exchange of ideas amongst the people
19 who were responsible for formulating policy.
20 BY MR. TORBORG:
21     Q.   Do you understand his instruction?
22     A.   I believe I do.

**Page 559**

1     Q.   Okay.  He's directing you not to reveal
2 the exchange of information that occurred during
3 those deliberations.
4        I'm asking you for your personal view
5 of whether or not there needed to be a change in
6 who had the authority for approving or
7 disapproving state plan amendments.
8        MR. DRAYCOTT:  Objection.  You can --
9        MR. TORBORG:  You've already given him
10 the instruction.  I think he answers it.  No need
11 for coaching anymore.  I think he can answer it.
12        THE WITNESS:  Well, I --
13        MR. DRAYCOTT:  Objection.  There's been
14 no coaching, Counsel.  There's been clear
15 instructions about privilege.
16        MR. TORBORG:  Yeah, more than enough,
17 so I think he's got it.
18        THE WITNESS:  I think -- I think I
19 heard two questions.  One was what was my
20 personal view on this, and in this regard, I
21 think -- I can't answer that question.
22        And then your second question was a bit

**Page 560**

1 of a different question, but now I've forgotten
2 what that is, too.
3 BY MR. TORBORG:
4     Q.   Did you have concerns yourself about
5 whether or not there needed to be a change in who
6 was approving state plan amendments?
7     A.   I can't answer that question.
8     Q.   Because it would reveal internal
9 deliberations within HCFA?
10     A.   That's correct.
11     Q.   Your personal view?
12     A.   My personal view, if it was part of --
13 as I understand the instructions, if it was part
14 of the decision making process, yes.
15     Q.   The fact that your personal views are
16 involved in the decision making process doesn't
17 automatically cover it -- make them covered by
18 the deliberative process privilege.
19        The deliberative process privilege
20 covers the exchange of ideas, not necessarily
21 your personal view.
22        MR. DRAYCOTT:  Objection.

**Page 561**

1 BY MR. TORBORG:
2     Q.   With that clarification, can you answer
3 my question?
4     A.   But as I understand it, if my personal
5 opinion were a part of the deliberative process
6 because I expressed that opinion in reaching that
7 decision, it would be covered.
8     Q.   And that's your understanding of the
9 deliberative process privilege as conveyed to you
10 by counsel?
11     A.   That's correct.
12        MR. TORBORG:  And that's a view, Mr.
13 Draycott, that you share?  You agree with his
14 understanding; is that right?
15        MR. DRAYCOTT:  Counsel, if you have a
16 question that you'd like to direct to the
17 witness, you may.  You've already told me that my
18 instruction to the witness was clear and that you
19 didn't want further elaboration, so the
20 instruction stands.
21        David, I mean, we've made our position
22 very clear and our position about this document

59 (Pages 558 to 561)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                        September 27, 2007
                        Baltimore, MD

| Page 562 | Page 564 |
|---|---|

**Page 562**

1  very clear. The agency is going to consider this
2  document and whether or not it's going to persist
3  in the recall of the document.
4      MR. TORBORG: Well, I have no doubt
5  that you'll take back the document because it
6  doesn't help your case, which seems to be how you
7  guys are already deciding these issues.
8      MR. DRAYCOTT: David, again, if you
9  have a question --
10     MS. MARTINEZ: Objection, motion to
11 strike commentary by counsel, not a pending
12 question. And also an incorrect characterization
13 of the facts.
14 BY MR. TORBORG:
15     Q.  Mr. Reed, tell me again, if you would,
16 in the late spring of 2002, did the decision of
17 whether to approve a state -- approve or
18 disapprove a state plan amendment, that shifted
19 to the Director of CMSO; is that right?
20     A.  That decision shifted to -- disapproval
21 of state plans was always in central office. It
22 was always a decision that was not made in the

**Page 563**

1  region, ultimately not made in the region.
2      The decision to approve state plans did
3  shift from regional offices to central office
4  under the authority of the Director of CMSO.
5      Q.  And at that time -- the time that
6  shifted was in the spring of 2002; is that your
7  best recollect?
8      A.  As best I recollect.
9      Q.  Okay. And the -- who is the individual
10 that held that position in the spring of 2002?
11 Was that Dennis Smith?
12     A.  I believe so. I'm trying to track back
13 to the dates that Dennis first got there. I
14 think that's correct. I'm not sure.
15     Q.  Who preceded Mr. Smith?
16     A.  Before that there were some acting
17 directors.
18     Q.  And did you report directly to Dennis
19 Smith?
20     A.  For that time period that we were that
21 team, we did report to the Director of CMSO.
22     Q.  And I apologize to you and to counsel

**Page 564**

1  if I've asked this already and you've already
2  instructed, but I'm not sure I did.
3      Why was it that you guys shifted the
4  responsibility -- what was the rationale for the
5  decision to change the approval process of state
6  plan amendments from the regional offices to the
7  central office? What was the rationale for the
8  decision?
9      MR. DRAYCOTT: Objection, asked and
10 answered, but I'm not going to direct you not to
11 answer a second time.
12     THE WITNESS: Again, that the -- that
13 was based, in part at least, on regional office
14 review of state plans being somewhat
15 inconsistent.
16 BY MR. TORBORG:
17     Q.  Yeah, I did ask that. You did answer
18 that. Thank you.
19     The document that's marked Exhibit
20 Abbott 328 at the bottom contains a signature
21 line --
22     MS. MARTINEZ: Objection, Counsel.

**Page 565**

1  You've spent over half an hour -- you've spent
2  over half an hour questioning the witness on a
3  document that we have just asked you to recall --
4  I mean, that we're going to recall and consult
5  with the witness -- I mean, sorry, with the
6  agency, and I think you're invading our privilege
7  or ability to invoke the privilege by continuing
8  to persist to question on the same document.
9      So I would just ask, as a matter of
10 courtesy, for you to just defer your questions.
11 If, indeed, you're going to be able to do this,
12 you can do this on the third day, but --
13     MR. TORBORG: I do take issue with the
14 statement that I've asked about this document for
15 a half hour, because I haven't. A lot of the
16 discussion has not been about this document.
17     That being said, I'm not going to ask
18 any more questions about the document, and we're
19 going to move on.
20     If I could ask you to go back to the
21 exhibit that I marked as the Montana state
22 report, Exhibit Abbott 320 something.

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

1078 Reed 30b6 draft.txt

1

DRAFT VERSION

```
 1          UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF MASSACHUSETTS
 3    - - - - - - - - - - - - - - -
 4   IN RE:  PHARMACEUTICAL      )   MDL NO. 1456
 5   INDUSTRY AVERAGE WHOLESALE  )   CIVIL ACTION
 6   PRICE LITIGATION            )   01-CV-12257-PBS
 7   THIS DOCUMENT RELATES TO    )
 8   U.S. ex rel. Ven-a-Care of  )   Judge Patti B. Saris
 9   the Florida Keys, Inc.      )
10       v.                      )   Chief Magistrate
11   Abbott Laboratories, Inc.,  )   Judge Marianne B.
12   No. 06-CV-11337-PBS         )   Bowler
13    - - - - - - - - - - - - - - -
14        (captions continue on following pages)
15
16
17     Videotaped deposition of LARRY REED as 30(b)(6)
18        witness for the UNITED STATES OF AMERICA
19
20
21
22                      Washington, D.C.
```

2

DRAFT VERSION

```
 1                    Thursday, March 19, 2008
 2                    9:00 a.m.
 3
```

Page 1

1078 Reed 30b6 draft.txt

1    Q.    And again, are you aware of any data that

2  shows that OIG's findings were incorrect?

3          MS. MARTINEZ:   Object to form.

4    A.    I don't know what other estimates there

5  might be out there.  So at this point I'd have to say

6  I'm not aware of other data.  But that's I think as

7  far as I could say that.

8                          (Abbott Exhibit 765 was

9                          marked for identification.)

10         BY MR. TORBORG:

11   Q.    For the record, what I've marked as Abbott

12  Exhibit 765 bears the Bates numbers HHC 004-0131

13  through 37.  It appears to be a series of e-mails

14  concerning a South Carolina state plan amendment

15  number 00-009.  Mr. Reed, if you would review those to

16  the extent necessary to tell me whether you are

17  familiar with any of these documents and I'll ask some

18  questions.

19   A.    (Reading.)

20   Q.    I think you'll see that a couple of the

21  e-mails are from you and others are addressed to you.

22   A.    (Reading.)  I'm sorry.  Was there a

                                                    143

                 DRAFT VERSION

1  question?

2    Q.    Do you recall any of this correspondence,

3  Mr. Reed?

4    A.    I don't recall specifically.

5    Q.    The first page of the exhibit, this is an

6  e-mail from Thomas Couch.  Do you know who he is?

                 Page 113

1078 Reed 30b6 draft.txt

7      A.      I believe he worked in the Atlanta regional

8   office.

9      Q.      Jessie Spillers is also in that office?

10     A.      I believe so.

11     Q.      And just to paraphrase, it indicates here

12   that South Carolina had proposed to change its

13   estimated acquisition cost formula from AWP minus 13

14   percent to AWP minus 10 percent, correct?

15     A.      From this note, it appears that's what

16   they're proposing.

17     Q.      So here they were actually proposing to

18   increase reimbursement on ingredient drugs; is that

19   right?

20     A.      That looks to be, again, what they are

21   doing.

22     Q.      And if we go to Bates page 133, this is an

144

DRAFT VERSION

1   e-mail from yourself to Cindy Pelter and Jessie

2   Spillers on this particular state plan amendment; is

3   that right?

4      A.      The first part; is that correct.  Actually,

5   probably the whole thing.

6      Q.      And in the portion that you wrote it says

7   "Jessie, the state really needs to prove its case when

8   proposing this change.  See 442 C.F.R. 447.301 through

9   333 (especially definition of EAC at point 301) and

10   memo from director of Medicaid bureau to all ARAs

11   dated 8/12/94.  Without that documentation I don't

12   think the amendment can be approved."  Do you see

13   that?

1078 Reed 30b6 draft.txt

14      A.      I do see that.

15      Q.      So what are you saying there, Mr. Reed?

16          MS. MARTINEZ:  Objection, form.

17      A.      It appears here that we're directing

18   that -- and I'll speak on the agency's behalf at this

19   point -- that we're directing the state to go back and

20   review the regulations especially regarding EAC.

21      Q.      You believe that they needed to provide

22   some sort of justification to decrease the discount

                                                        145

                        DRAFT VERSION

1   off of AWP, correct?

2       A.      To decrease the discount?

3       Q.      Yes.

4       A.      That they needed to prove their case,

5   correct.

6       Q.      And you were concerned that AWP minus 10

7   percent that they wanted to go to would not meet the

8   regulatory definition of estimated acquisition cost in

9   particular, correct?

10      A.      Well, again, the concern would be that what

11   percentage they wanted to go to would need to meet the

12   definition of EAC.

13      Q.      You were concerned that they had not

14   provided evidence to support that, correct?

15      A.      And, again, looking at this quickly, I'm

16   not seeing what they submitted that would support

17   that.

18      Q.      And that was sort of the point you were

19   making, right?

1078 Reed 30b6 draft.txt

20          MR. WINGET-HERNANDEZ:   Objection, form.

21      A.    In this e-mail it appears that I haven't

22    seen that evidence.

146

DRAFT VERSION

1       Q.    And if we go to the next page, Bates page

2    134, it appears as though Jessie Spillers responded to

3    your e-mail with the following.  She said "Larry, I'm

4    getting a lot of lack from the state on your response.

5    The reasons are, one, last year South Carolina SPA

6    99-08 increased the percentage from 10 percent to 13

7    percent.  Central office Sue Gaston never asked what

8    type of documentation then that is being asked for

9    now.  Two, it's because under-- underlined --

10    decreasing the percentage back to 10 percent that the

11    documentation is needed, three, they were directed by

12    their legislature to go back to 10 percent.  They also

13    claim that the other states in Region 4 are at 10

14    percent.  So hi the concern from central office with

15    South Carolina."  Do you see that?

16          MS. MARTINEZ:  Object to form.

17      A.    I do see that.

18      Q.    What she's saying there --

19      A.    I believe Jessie is a man.

20      Q.    What was that?

21      A.    Jessie is a man, by the way.

22      Q.    Oh, I'm sorry.  What Mr. Spillers is saying

147

DRAFT VERSION

1    is that the South Carolina legislature had directed
                        Page 116

1078 Reed 30b6 draft.txt

2    them to go back to AWP minus 10, correct?

3        A.    Correct.

4        Q.    They didn't have any evidence that AWP

5    minus 10 percent was really the best estimate,

6    correct?

7            MS. MARTINEZ:  Object it form.

8        A.    In must be 3 there I think they're claiming

9    that other states in that region pay at AWP minus 10

10   percent.

11       Q.    But that's not empirical evidence, is it?

12           MR. WINGET-HERNANDEZ:   Objection, form.

13           MS. MARTINEZ:  Objection, form.

14       A.    I think when we talked before we did allow

15   the states to look at neighboring states.

16       Q.    Well, let's go to the next page, 135.  This

17   is your response to Mr. Spillers, correct?  You state

18   I can't answer for the past but simply state what the

19   requirements are.  My answers follow your questions.

20   In response to his first point, question, you wrote

21   the regulatory requirements are that the state make

22   its best estimate of what the acquisition cost for the

                                              148

DRAFT VERSION

1    drugs are.  Why is this the state's best estimate?

2    For example, recent OIG studies have shown the average

3    brand name drug discount to be AWP minus 17 percent

4    and generics AWP minus 42 percent.  What is the basis

5    for South Carolina to include AWP minus 10 percent is

6    the proper discount?" ; is that correct?  That's what

7    you wrote?

Page 117

1078 Reed 30b6 draft.txt

8       A.      That's a statement in there, that's

9  correct.

10      Q.      This is something that you did not course

11  of your duties; is that right?

12      A.      Again, I don't have a specific recollection

13  of this e-mail, but that could have been something

14  that I would have written.

15      Q.      And here you're referring specifically to

16  OIG's work when questioning whether or not AWP minus

17  10 percent is the best estimate, are you not?

18      A.      That's correct.

19      Q.      So you asked Mr. Spillers to figure out

20  what is the basis for South Carolina's proposal to go

21  to AWP minus 10 percent, correct?

22      A.      That's correct.

                                                        149

                         DRAFT VERSION


1       Q.      And in response to number 3 where he had

2  told you they were directed by the legislature to go

3  back to 10 percent, right?  Do you remember that?  He

4  told you they were directed by the legislature to go

5  back to 10 percent?

6       A.      Again, I don't remember it specifically.

7  But I do see it here.

8       Q.      And you wrote "I think it would be a

9  difficult case for the state to make that its estimate

10  was based on the legislative directive (although

11  perhaps the directive was based on some estimate the

12  state could use.)  Please see the August '94 ARA memo

13  for other things the state might base its estimate

14  on."  So what you're telling him there is that the

                         Page 118

1078 Reed 30b6 draft.txt

15  legislature saying the rate must be AWP minus 10

16  percent does not necessarily meet the EAC regulation,

17  correct?

18          MS. MARTINEZ:  Object to form.

19      A.    That that would be a difficult case for the

20  state to make, that's correct.  That part is correct.

21      Q.    Do you know why the South Carolina

22  legislature directed South Carolina to go back to AWP

150

DRAFT VERSION

1   minus 10 percent?

2       A.    No, I don't.

3       Q.    Do you recall if the state ever provided

4   you with the additional information that they could

5   base its estimate on to go to AWP minus 10 percent?

6       A.    Not in this specific state plan amendment.

7   I don't recall that.

8       Q.    If you would go to the Bates page 137, this

9   is a later e-mail on the same state plan amendment; is

10  that right?

11      A.    It appears -- that appears to be correct.

12      Q.    This is an e-mail from Kimberly Howell that

13  worked in your office?

14      A.    That's correct.

15      Q.    And she's stating in part, Jessie, we have

16  completed our review of the South Carolina's state

17  plan amendment 00-09, and your request to the state

18  for additional information.  We concur with your

19  concerns and the state has not adequately provided

20  documentation to support changing their EAC from AWP

Page 119

1078 Reed 30b6 draft.txt
21  minus 13 percent to AWP minus 10 percent," correct?

22      A.    EACH.  I'm not quite sure what that refers

♀

                                                         151
                        DRAFT VERSION


 1  to.  But the EACH, correct.

 2      Q.    Do you know in HCFA eventually approved

 3  this amendment?

 4      A.    No.  I don't know that.

 5      Q.    If you would go to Abbott Exhibit 326,

 6  specifically if you would start with the year 2000,

 7  can you tell us what the South Carolina EAC formula

 8  was in the NPC publication for 2000, 2001, 2002, 2003,

 9  2004 and 2005?

10      A.    In each of those years it's AWP minus 10

11  percent.

12      Q.    So does it appear as though HCFA approved

13  the South Carolina SPM amendment 00-009 to go to AWP

14  minus 10 percent?

15          MS. MARTINEZ:  Object to form.

16      A.    Again, the NPC is a secondary reporting

17  source.  But from information in the NPC it looks to

18  be that the amendment was approved.

19      Q.    You don't recall taking any action to

20  disapprove federal financial participation for South

21  Carolina, do you, for this issue, in drug payments

22  ever?

♀

                                                         152
                        DRAFT VERSION


 1          MS. MARTINEZ:  Object to form.

 2      A.    And I'm not quite sure of your question.
                        Page 120

1078 Reed 30b6 draft.txt

3    To disapprove the amendment or hold the state plan out

4    of the compliance or --

5        Q.    Yes, the second.  Hold the state plan out

6    of compliance.

7        A.    No.  I don't recall that -- any such

8    action.

9        Q.    And can you point to any evidence that

10    South Carolina presented to you any data to show that

11    its best estimate was AWP minus 10 percent to rebut

12    the OIG work that you had pointed out to them?

13            MS. MARTINEZ:  Object to form.

14        A.    Again, I'm going to somewhat rely on the

15    e-mail notes that you showed me.  At that time I

16    believe the plans were approved by the regional office

17    was consultation, which does appear to have occurred

18    here, from central office.  And I don't have a

19    complete picture.  But I don't see other information

20    that the state presented here.

21                    (        Exhibit 766 was

22                            marked for identification.)

153

DRAFT VERSION

1            BY MR. TORBORG:

2        Q.    For the record, what I've marked as Abbott

3    Exhibit 766 is a series of documents that I have

4    ordered in chronological order, not necessarily Bates

5    order, that all appear to relate to a particular state

6    plan amelt for the state of Arkansas, number 99-03.

7    The specific Bates numbers though are as follows, HHC

8    010-0868, 861 through 62, 849 through 52, 842 through

1078 Reed 30b6 draft.txt

9   43, 836, 835, 833, 817 through 18, 802 through 07,

10  770, 764, 759, 756 through 57.  I marked them in out

11  of Bates order so we could go through them

12  chronologically.

13          Mr. Reed, if I could direct your attention

14  to the first page of the exhibit, under the e-mail at

15  the bottom this is a comment that appears Shirley

16  glees pee had written.  She says we believe the

17  dispensing fee is acceptable based on the results of

18  the survey.  However, we question the 10 and a half

19  percent reduction instead of 17.3.  Do you see that?

20      A.    Yes, I do.

21      Q.    And then it says this just increases the

22  margin of profit for the pharmacists; is that right?

154

DRAFT VERSION

1           MS. MARTINEZ:  Objection to form.

2       A.    That's a statement in here.

3       Q.    And then tailor Bruce -- she was with your

4   office, correct?

5       A.    For a certain period of time -- I don't

6   remember at this point.  She worked in two different

7   offices.

8       Q.    She responded in that e-mail to Sue Gaston

9   and Ms. Agrees pee, who I take it was in the Dallas

10  region office?

11      A.    That's correct.

12      Q.    She wrote "Sue and I just called you and

13  left a message that we send the final copy of the

14  Arkansas SPA letter, but we were wrong.  Larry Reed

15  had to leave early today and has to review this.  So

Page 122

1078 Reed 30b6 draft.txt

16  tomorrow morning we'll get it to you as soon as he's

17  finished reviewing it."  Do you see that?

18      A.    I do see that part of the e-mail.

19      Q.    Why would you have to review that?

20      A.    And again, it's a bit of a limited context.

21  But if I'm looking ahead here correctly it looks like

22  the next day I was the person that signed a --

155

DRAFT VERSION

1       Q.    Request for additional information?

2       A.    Yeah.  I want to make sure that's what it

3   is.  A request for additional information.

4       Q.    And looking at Bates page 867162 --

5   correct -- you signed for someone named Debbie I.

6   Chang; is that correct?

7       A.    That's right.

8       Q.    Who is that?

9       A.    Debbie Chang at that point was the director

10  of a division of benefits coverage and payment, as

11  indicated in the title from paragraph -- part of the

12  letter.

13      Q.    Was there another Debbie Chang that worked

14  at CMS that you're aware of?

15      A.    Not that I'm aware of.

16      Q.    Do you know if this Debbie Chang eventually

17  went to work for the Office of Legislation at CMS?

18      A.    No.  It was the other way around.  She

19  worked for the Office of Legislation before she worked

20  here.

21      Q.    But then she eventually worked on issues

Page 123

1078 Reed 30b6 draft.txt
22    relating to the state Medicaid program, correct?

156

DRAFT VERSION


1      A.    I'm sorry.  After that time?

2      Q.    After she left The Office of Legislation

3    she worked for the Center for Medicaid and State

4    Operations, correct?

5      A.    That's correct.

6      Q.    And that's someone that you would have

7    reported to; is that right?

8      A.    That's correct.

9      Q.    I'd like to direct your attention toward

10   the bottom of the page.  Would you have written this

11   letter, Mr. Reed?

12     A.    I don't think I would have directly written

13   a letter.

14     Q.    The second sentence of the paragraph or of

15   that page, 861, the last paragraph on the page, the

16   document that you signed states "The survey findings

17   clearly reflect that the majority of Arkansas

18   pharmacies report their ingredient costs for drugs to

19   be 17.3 percent of the mean discounted from AWP and

20   the larger pharmacies could achieve further discounts.

21   There is nothing in the survey to support the discount

22   of the reimbursement formula of AWP minus 10.5 percent

157

DRAFT VERSION


1    as reflected in the SPA.

2              "As such, it appears the state's

3    reimbursement methodology should reflect the

Page 124

1078 Reed 30b6 draft.txt

4   methodology described it the survey results, i.e., AWP

5   minus 17.3 percent.  Please provide documentation to

6   support this.  (There is reference in the cover letter

7   that the Arkansas Pharmacists' Association and the

8   state arrived at a mutual acceptable dispensing fee

9   and reimbursement formula.  However, the state does

10   not appear to provide adequate documentation for the

11   further reduced reimbursement formula of AWP minus

12   10.5 percent."  Do you see that?

13      A.   Yes, I do.

14      Q.   What you were saying there was Arkansas

15   provided data to HCFA showing that the real -- that

16   the average discount was 17.3 percent, but the state

17   plan called for a discount of only 10.5 percent from

18   AWP, correct?

19      MS. MARTINEZ:  Objection, form.

20      A.   There are survey findings here.  I'm not

21   sure where the survey findings come from.  But the

22   percentages appear to be correct.

♀

158

DRAFT VERSION

1      Q.   And you were informed here that Arkansas

2   had agreed upon the 10.5 percent formula based upon

3   discussions with the Arkansas Pharmacist Association,

4   correct?

5      MR. WINGET-HERNANDEZ:  Objection, form.

6      A.   That appears to have been in the state's

7   cover letter with the submission of the SPA.

8      Q.   Was that a common occurrence, Mr. Reed,

9   that the AWP rates were set based upon negotiations

1078 Reed 30b6 draft.txt

10   with pharmacist associations and not on survey

11   results?

12           MR. WINGET-HERNANDEZ:   Objection, form.

13           MS. MARTINEZ:   Objection, form.

14    A.    I don't know to what extent the states

15   might have discussed or negotiated those types of

16   discounts.   I just don't know.

17    Q.    Here you were advised of that, correct?

18    A.    That -- again, apparently, according to the

19   cover letter that they did arrive at this mutually

20   acceptable dispensing fee and reimbursement formula.

21    Q.    Identify only have I think a minute left on

22   the tape, so why don't we take a break and I'll

                                                    159

DRAFT VERSION


1    continue on.

2           THE VIDEOGRAPHER:   This is the end of tape

3    3.  Off the record at 2:34.

4           (Recess.)

5           THE VIDEOGRAPHER:   This is the beginning of

6    tape 4 in the 30(b)(6) of the United States of America

7    by Mr. Reed on the record at 2:51.

8           BY MR. TORBORG:

9     Q.    Mr. Reed, the document ending at Bates 849

10   to 852 appears to be the Arkansas response to HCFA's

11   request for additional information.   Does that appear

12   to be correct?

13    A.    That does appear to be correct.

14    Q.    If you would go to the Bates page ending

15   850, the last paragraph states "The acquisition cost

16   survey performed by Myers & Stauffer determined that

                    Page 126

1078 Reed 30b6 draft.txt

17   the average acquisition cost of brand name drugs is

18   AWP minus 17.3 percent.   To reiterate this was an

19   average.   There were many brand name drug products

20   sampled which had average acquisitions costs in the

21   range of AWP minus 11 to 16 percent.   Setting the

22   reimbursement level at AWP minus 10.5 ensures adequate

160

DRAFT VERSION

1    reimbursement for a broad range of products."   Do you

2    see that?

3         A.    I do see that part of the response.

4         Q.    Did that response satisfy the concerns HCFA

5    had raised on whether AWP minus 10.5 percent was

6    Arkansas' best estimate?

7              MS. MARTINEZ:   Object to form.

8         A.    I don't know without looking further to

9    record here, if that's in this record.

10        Q.    Why don't I ask you to go to Bates page

11   ending 842.   This is a response from the HCFA branch

12   office to the central office, in particular,

13   Ms. Chang; is that right relating to this?

14        A.    That appears to be correct.

15        Q.    If you would review the second paragraph of

16   that to yourself?   Actually, I'll just go ahead and

17   read it in.   It says "Based upon our review, we still

18   do not believe the state has adequately addressed our

19   concern relating to the additional profit that was

20   added to the dispensing fee.   On page 3 of the survey

21   report by Myers & Stauffer the statement is made that

22   rebate amounts are not captured on the wholesaler

Page 127

1078 Reed 30b6 draft.txt

161

DRAFT VERSION

1   invoices, nor are they reflected as offsets to the
2   costs in the dispensing survey.
3           "In addition, large discounts are shown on
4   page 5 under the heading estimated acquisition cost
5   findings which add an additional margin of profit.  In
6   a telephone conversation with the consultants we were
7   told that the savings are actually greater than 17.3
8   percent, which is only an average.  Therefore, we
9   question why there would be a need to add more profit
10  onto the dispensing fee."  Do you see that?
11          MS. MARTINEZ:  Object to form.
12     A.   I do see that part of the letter.
13     Q.   The regional office did not believe it was
14  appropriate to have profit in the distribution fee
15  because there was already profit in the ingredient
16  cost side of the equation that's correct?
17          MS. MARTINEZ:  Object to form.
18     A.   I'm not quite sure if they're talking about
19  them together or separately, but -- so I'm not sure.
20     Q.   Well, isn't it true that the regional
21  office is saying there's already a profit in the
22  ingredient side?  Correct?

162

DRAFT VERSION

1      A.   The first sentence is talking about dim
2   profit that was added to the distribution fee.  And
3   then they go on on page 3 to talk about -- I'm sorry.
4   They go on later this that same paragraph to reference
Page 128

1078 Reed 30b6 draft.txt

5   page 3 and talk about the survey.  But that appears to

6   be a dispensing survey.

7        Q.    And they talk about 17.3 percent, correct?

8   Then they say therefore we question why there would be

9   a need to add more profit onto the distribution fee.

10  Do you see that?

11            MS. MARTINEZ:  Object to form.

12       A.    I do see those sentences.

13       Q.    Aren't they saying there that because

14  there's already profit on the ingredient part side,

15  there's no need to put profit on the distribution fee

16  side?

17            MS. MARTINEZ:  Object to form.

18       A.    Again, I can only tell you what I see in

19  the letter.  "Therefore, we question whether you need

20  to add more profit onto dispensing fee."  I'm not sure

21  what they're referring to as more profit here.

22       Q.    Isn't it true that on many occasions HCFA

                                                        163

DRAFT VERSION

1   took issue with allowing an increase in distribution

2   fees because there was already profit built into the

3   payment for drug ingredients?

4            MS. MARTINEZ:  Objection, form.

5            MR. AZORSKY:  Objection, form.

6        A.    I don't have any information on that.

7        Q.    Certainly that appears to be what's

8   happening here; is that not right?

9            MR. AZORSKY:  Objection, form.

10       A.    .

1078 Reed 30b6 draft.txt

11      A.      And again, from this letter I simply can't

12   tell.  I can't tell it if they're objecting to

13   additional profit on the I'm not saying one way or the

14   other.  I can't tell.

15      Q.      Go to Bates page 35  And 33.  It appears to

16   be some notes of a conference call between the central

17   office of HCFA and the Arkansas Medicaid agency,

18   correct, including yourself?

19           MR. WINGET-HERNANDEZ:   Could you give us

20   those numbers again?

21           MR. TORBORG:   35 and 33.

22      A.      And I'm sorry.  Who did you say that was?

164

DRAFT VERSION

1   Representing what?  What agencies?

2      Q.      The central office of CMSO and people from

3   the Arkansas Medicaid agency.

4      A.      No.  I don't believe that's correct.

5      Q.      Okay.  What am I getting wrong?

6      A.      I believe it's members of CMS central

7   office and CMS or at that point HCFA regional office.

8   I don't think -- if I'm looking at the participants

9   listed here I don't believe any are state Medicaid

10   agency individuals, although I'm not quite sure on the

11   first page about Margaret Cano.

12      Q.      In any event, it appears you attended this

13   conference call relating to this particular state plan

14   amendment we've been discussing; is that right?

15      A.      From the context it does appear to be the

16   case.

17      Q.      If we go to 33.  That's where you are,

Page 130

1078 Reed 30b6 draft.txt

18  first paragraph, about halfway down, the sentence

19  starts with "The calculation?  Do you see that?  It

20  states the calculation of a dispensing fee should

21  already incorporate all activities related to the

22  dispensing of the drug and an additional profit should

♀

165

DRAFT VERSION

1   not be added to the distribution fee.  Do you see

2   that.

3        A.     I do see that.

4        Q.     Do you have an understanding of what that

5   means?

6        A.     Yes.  I believe I do.

7        Q.     Can you tell us what it means?

8        A.     That in the calculation of a dispensing fee

9   a method of payment for a state Medicaid program would

10  be the fee would equal the cost of of in this case

11  disdispenseing the drug and those costs by definition

12  would have profit built into them.

13       Q.     The next sentence of this document states

14  "In addition there is nothing in the vary to support

15  the discount off of the reimbursement formula of AWP

16  minus 10.5 percent as reflected in the state plan

17  amendment."  Correct?

18       A.     That is correct, that that's the statement

19  here.

20       Q.     If you would go to the Bates page 802

21  through 807 does this appear to be another letter from

22  Arkansas Department of Human Services responding to

♀

166

1078 Reed 30b6 draft.txt
DRAFT VERSION

1    issues concerning that particular state plan

2    amendment?

3         A.     This does appear to be a subsequent letter

4    to the -- I think they indicate January 4th.  It looks

5    like our letter was June 4th.  Anyway, this does look

6    like a separate response to the request for additional

7    information.

8         Q.     If you go to Bates page 805 under the

9    section ingredient cost, it appears HCFA had asked

10   "Does the survey find that the 17.3 percent discount

11   from AWP to be the best estimate of what pharmacies

12   are generally and currently paying for drugs in

13   Arkansas.  If not what does the survey show."  Do you

14   see that?

15        A.     I do see that statement, that sentence.

16        Q.     And the response indicates that this is

17   what Myers & Stauffer had found for brand name drugs,

18   correct?

19        A.     The second sentence does say that this is a

20   mean discount for brand name drugs.

21        Q.     Go to Bates page 764.  Does this appear to

22   be an approval of the Arkansas State plan amendment

                                                           167

DRAFT VERSION

1    99-033?  Or 003.  Sorry.

2             MS. MARTINEZ:  I am having trouble finding

3    it.  I found it.

4         A.     I'm sorry.  What was your question again?

5         Q.     Does this appear to be a HCFA approval
                        Page 132

1078 Reed 30b6 draft.txt

6    letter of Arkansas State plan amendment 99-003?

7        A.    No.

8        Q.    Okay.  Can you tell us what it is?

9        A.    That appears to be a letter from the

10   division of benefits, coverage and payments, the

11   central office, to the regional office, which would

12   not be the approval letter to the state.

13       Q.    But it shows the central office approved

14   the plan, correct?

15             MS. MARTINEZ:  Objection, form.

16       Q.    It was telling the regional office that?

17       A.    Let's see.  Let me read the letter a little

18   bit.  (Reading.)

19             It appears to be a letter from the central

20   office to the regional office saying that the central

21   office is okay with approving the plan.

22       Q.    And this was the state plan amendment that

                                                              168

                        DRAFT VERSION


1    set the reimbursement formula at AWP minus 10.5

2    percent, correct?

3              MS. MARTINEZ:  Objection, form.

4        A.    The letter makes reference to a dispensing

5    fee.  But the state plan numbers, though, are the

6    same.

7        Q.    If we go back to Bates page earlier in the

8    exhibit toward the beginning, maybe the fourth page

9    in, 850, under paragraph 3, ingredient cost, toward

10   the bottom, the first paragraph, does it refer to

11   reimbursement formula of AWP minus 10.5 percent?

                        Page 133

1078 Reed 30b6 draft.txt

12          Strike that.   Let's speed this up.

13     A.     Okay.

14     Q.     If we go to the NPC reports, Abbott Exhibit

15 326, specifically for the years 2000, 2001, 2002, take

16 a look at that.   Does it appear as though Arkansas had

17 an EAC formula of 10.5 percent?  Are you telling me

18 that this state plan amendment was effective for that

19 period?  State plan amendments have different

20 effective dates on them.

21     Q.     Does it appear, Mr. Reed, that HCFA

22 approved a state plan amendment for Arkansas that set

                                                      169

                       DRAFT VERSION


1 reimbursement at AWP minus 10.5 percent?

2          MS. MARTINEZ:   Objection, form.

3     A.     Again, I see NPC data that indicates AWP

4 minus 10.5 percent.  I see a letter from the central

5 office of CMS to the regional office.  I don't see the

6 actual approval letter, so I'm not certain.

7     Q.     You had raised concerns -- the central

8 office had raised concerns and you had raised concern

9 in your initial request for additional information for

10 why 10.5 percent was the best estimate, correct?

11     A.     In our request for additional information?

12     Q.     Yes.

13     A.     That's correct.

14     Q.     And did you -- and they indicated to you

15 that Myers & Stauffer had prepared a report that

16 showed for branded drugs AWP minus 17.3 percent was a

17 result of the survey, correct?

18     A.     It's a bit confusing because I think they
                       Page 134

1078 Reed 30b6 draft.txt

19  have two responses to the request for additional

20  information.  So which one are you referring to?

21      Q.    The initial one.  July 20th.  Bates page

22  849 through 852.

                                                      170

                    DRAFT VERSION

 1      A.    In that one they did.  But I suspect

 2  because there's two responses here, probably the

 3  earlier one was withdrawn.

 4      Q.    Did Idaho provide you any data showing that

 5  AWP minus 10 percent was their best estimate?

 6            MS. MARTINEZ:  I think you didn't mean to

 7  say Idaho.

 8            MR. TORBORG:  I'm sorry.  I didn't.

 9            MS. MARTINEZ:  Okay.

10            BY MR. TORBORG:

11      Q.    Arkansas provided data?

12      A.    I was hoping it would be a simple question.

13            What I see in here was that there were

14  additional conversations.  I don't see what the

15  results of those conversations were, so I don't know

16  if there were additional data beyond the response to

17  the request for additional information.  And I

18  don't -- unless a second request for additional

19  information has more information from the first, I

20  just -- I can't tell.  I don't know.

21      Q.    As you sit here today you can't point to

22  any data that Arkansas provided to you showing that

                                                      171

                    DRAFT VERSION

                    Page 135

1078 Reed 30b6 draft.txt

1    its best estimate was AWP minus 10.5; is that correct?

2              MS. MARTINEZ:  Objection, form.

3        A.    You see anything here in the information

4    that you've presented.

5                              (Abbott Exhibit 767 was

6                              marked for identification.)

7              BY MR. TORBORG:

8        Q.    Mr. Reed, what I've marked as Abbott

9    Exhibit 767 has the Bates numbers HHC 020-1589 through

10   90.  It appears to be a transmittal of an Idaho

11   Medicaid state plan from the department of health and

12   welfare, state of Idaho, to Robert Reed, who appears

13   to work in the regional office in Seattle; is that

14   right?

15       A.    He did work there at that time, correct.

16       Q.    And then the plan for prescribed drugs in

17   the second page under estimated acquisition cost says

18   as follows:  "Estimated acquisition cost as

19   established by the department following negotiations

20   with representatives of the Idaho pharmacy profession

21   defined as an approximation of the net cost of the

22   drug and a reasonable operating margin, plus the

                                                    172

DRAFT VERSION


1    assigned dispensing fee," do you see that?

2        A.    I see that section.

3        Q.    I bet you didn't like that one.

4              MS. MARTINEZ:  Object to form.

5        Q.    Do you recall, Mr. Reed, Idaho submitting a

6    state plan that sought to define estimated acquisition

1078 Reed 30b6 draft.txt

7    cost in that way?

8         A.    No.  I don't recall this one.

9         Q.    Do you believe that a state plan that

10   sought to provide a reasonable operating margin would

11   be in compliance with federal regulations?

12              MR. WINGET-HERNANDEZ:  Objection, form.

13        A.    I think probably the agency's view would be

14   that this would be better defined in EAC.  It would be

15   easier to judge within that context than what's

16   written here.

17                        (Abbott Exhibit 768 was

18                         marked for identification.)

19              BY MR. TORBORG:

20        Q.    For the record, what I've marked as Abbott

21   Exhibit 868 bears the Bates numbers HHC 020-1569

22   through 70.  It appears to be a May 6th 1999

                                                        173

DRAFT VERSION

1    memorandum that was signed by you on behalf of Debbie

2    Chang to the associate regional administrator in

3    Seattle concerning the same Idaho state plan amendment

4    that was the subject of Abbott Exhibit 767; is that

5    right?

6         A.    I don't see an identification number on

7    767.  I don't see a state plan amendment number.

8         Q.    Fair enough.  If you would go to the second

9    page, under item 2C?  The second paragraph states "The

10   state should remove 'a reasonable operating margin'

11   from the EAC reimbursement methodology.  The

12   dispensing fee allows for reasonable operating

Page 137

1078 Reed 30b6 draft.txt

13  margin."  Do you see that?

14      A.    I see that, those statements.

15      Q.    And that's referencing the same language

16  that we saw in Abbott Exhibit 767, correct?

17      A.    They both use the same words, that's

18  correct.

19      Q.    Does this refresh your recollection at all

20  regarding this particular state plan amendment?

21      A.    No, it does not.

22                  (Abbott Exhibit 769 was

174

DRAFT VERSION

1                  marked for identification.)

2          BY MR. TORBORG:

3      Q.    For the record, what I've marked as Abbott

4  Exhibit 769 bears the Bates numbers HHC 009-1316

5  through 35.  It appears to be a collection of

6  documents relating to an Illinois state plan amendment

7  concerning the reimbursement rate for drugs for the

8  time period of 2001.

9          Mr. Reed, I'd like to draw your attention

10  first to the page number 1318.  Does this appear to be

11  a document that provides a red line showing the

12  changes that Illinois was proposing to their payment

13  methodology for drugs?

14          MR. AZORSKY:  Objection to form.

15      A.    This does.

16      Q.    It appears for single source drugs Illinois

17  was proposing a change from AWP minus 10 plus a

18  distribution fee or WAC plus eight plus a distribution

19  fee to AWP minus 11; is that right?

Page 138

1078 Reed 30b6 draft.txt

20          MR. WINGET-HERNANDEZ:   Objection to form.

21     Q.     11 percent?

22     A.     11 percent.   That's correct.

♀

                                                              175

DRAFT VERSION


 1     Q.     And then they were changing the payment

 2  methodology for multiple-source drugs from AWP minus

 3  12 percent to AWP minus 20 percent; is that right?

 4     A.     That appears to be what's on the page,

 5  that's correct.

 6     Q.     And you knew by that time, Mr. Reed, of

 7  discounts from AWP for generic drugs of much greater

 8  than 20 percent; is that right?

 9          MS. MARTINEZ:   Object to form.

10     A.     The OIG had reported discounts.   I'm not

11  sure if they looked at Illinois specifically.   But for

12  some states that had reported discounts for generic

13  drugs that were higher than 20 percent.

14     Q.     If you would go to Bates page 335.   That

15  includes an e-mail from Cindy Pelter in your office,

16  right?

17     A.     At that point in time, that's correct.

18     Q.     To a Vera Drivalas?  Do you know who that

19  is?  D-r-i-v-a-l-a-s?

20     A.     She was either an analyst or a state rep in

21  the Chicago regional office.

22     Q.     And to summarize, she was asking for

♀

                                                              176

DRAFT VERSION

1078 Reed 30b6 draft.txt

1   Illinois to provide documentation to support the

2   changes they had made to the reimbursement

3   methodology.  And she finished her paragraph by

4   stating "I guess it's better to just go ahead and ask

5   for it now since I know that Larry's going to ask me

6   to get it anyway."  Right?

7           MS. MARTINEZ:  Objection, form.

8       A.     That is the statement in the e-mail.

9       Q.     If we go to page 1324, this is an e-mail

10   from John Claborn, C-l-a-b-o-r-n, to yourself, Ms.

11   Gaston and Ms. Drivalas; is that right?

12      A.     It appears to be.

13      Q.     Concerning the Illinois state plan

14   amendment 01-15, correct?

15      A.     Correct.

16      Q.     She says in her second paragraph, our drug

17   cost methodology was redrived via a two-step approach

18   which required, one, a thorough review when in what

19   other states were doing in selecting a percentage

20   offer of AWP that was reasonable, and two, conducting

21   negotiations with the pharmacy industry."  Do you see

22   that?

                                                        177

DRAFT VERSION

1       A.     I see that paragraph.

2       Q.     Any reason to believe that this was

3   incorrect?

4           MS. MARTINEZ:  Objection, form.

5       A.     I'm sorry.  That it's not an e-mail?  That

6   it's not correct information?

7       Q.     Any not correct information that she had

Page 140

1078 Reed 30b6 draft.txt

8   provided to you?

9        MS. MARTINEZ:  Objection, form.

10       A.    I just don't have a basis to judge.  I have

11  no recollection either way.

12       Q.    And how do negotiations with the pharmacy

13  industry establish a state's best estimate of what

14  providers were currently and generally paying for

15  drugs?

16       MS. MARTINEZ:  Objection, form.

17       A.    As part of any state plan amendment, for a

18  reimbursement change, the state is required to give

19  public notice of that change and on occasion will have

20  public hearings for that, regardless if they publish

21  public news they may well receive comments or even

22  requests for a meeting with a state.

                                                      178

DRAFT VERSION

1        So it wouldn't be atypical, or I guess it

2   could occur that a state would basically discuss the

3   change with the pharmacies or the pharmacy

4   organization or whoever would be affected in that

5   state.

6        Q.    And it could be that the EAC rate selected

7   by a state was not calculated based upon any survey of

8   actual acquisition costs, but instead was created

9   based upon negotiations with the pharmacy industry; is

10  that right?

11       MS. MARTINEZ:  Objection, form.

12       A.    I'm sorry.  The first part of your question

13  was it could be that?

Page 141

1078 Reed 30b6 draft.txt

14      Q.      The EAC rates selected by the state was not

15  calculated based upon any survey of actual acquisition

16  costs, but instead was created based upon negotiations

17  with the pharmacy industry.

18      A.      The best estimate could be based on a

19  number of factors.  Again, it didn't need to

20  necessarily be based on a survey.  It could a number

21  of different factors.

22      Q.      Would negotiations with the pharmacy

♀

179

DRAFT VERSION

1   industry be one of those factors that would be

2   appropriate under the federal regulations?

3       A.      I don't think that we address that one way

4   or the other.  I don't think in federal regulations or

5   in follow-up policy.

6       Q.      Well, if you knew -- if you had evidence,

7   Mr. Reed, that -- or all the evidence you had pointed

8   to the actual acquisition costs on average being, for

9   generic drugs, AWP minus 60 percent, and a state

10  wanted to use a formula that discounted AWP minus 20

11  percent, would that be appropriate under federal

12  regulations?

13      A.      Again, depending on the documentation a

14  state submitted, it might be.

15      Q.      What would that documentation have to

16  include for that to be in accordance with federal

17  regulations?

18      A.      There is no prescribed information it needs

19  to include.  We would react to whatever they

20  submitted.

Page 142

1078 Reed 30b6 draft.txt

21      Q.      Would they need to include empirical

22  evidence?

180

DRAFT VERSION

1       A.      That could include that.

2       Q.      Would a negotiated rate set with pharmacy

3   providers be in itself an acceptable methodology under

4   federal regulations?

5               MS. MARTINEZ:  Objection, form.

6       A.      To answer your question I think we would

7   need to see what rate was negotiated and under what

8   terms in that state.  I don't think I would rule it

9   out categorically.  I'm not sure that I would say it's

10  okay categorically either.

11      Q.      So it might be perfectly appropriate to

12  have that be the rate?

13      A.      Again, I think that would be --

14              MR. AZORSKY:  Objection, form.

15      A.      That would be based on individual -- that

16  would be based on this individual state plan and the

17  circumstances in that state plan.

18      Q.      So it could be, correct?

19      A.      I think I've probably gone as far as I can

20  go on that.  I just don't know.  You would have to see

21  specifics.  This would be a specifics-driven

22  determination.

181

DRAFT VERSION

1       Q.      But it could be, yes or no?

Page 143

1078 Reed 30b6 draft.txt

2        MR. AZORSKY:   Objection to form.

3     A.    Again, depending on what that negotiation

4 entailed and what information would be in conjunction

5 with that.  Here there is other information.  But I

6 don't know.

7     Q.    Bates page 1316, Mr. Reed, the first page

8 of the exhibit, is that the approval letter from HCFA

9 to the State of Illinois for state plan amendment

10 01-015?

11    A.    This looks to be an internal copy of the

12 approval letter.

13    Q.    So if HCFA approved the plan the

14 reimbursement rate in this instance that it knew was

15 negotiated with representatives of the pharmacy

16 community; is that right?

17        MS. MARTINEZ:  Objection, form.

18    A.    I'd want to go back and look at this again.

19 But I believe that there was other factors here as

20 well.

21    Q.    But one of the factors was -- or one of the

22 drivers of the methodology was negotiations with the

                                 182

DRAFT VERSION

1 pharmacy industry, correct?

2        MS. MARTINEZ:  Objection, form.

3    A.    Yeah.  If looks like in part with -- and

4 again, I'm reading from the note object page you

5 referenced before, 1324, what other states are doing

6 and in part conducting -- both in part and conducting

7 negotiations with the pharmacy industry."

8     Q.    If I could ask you to take out Abbott

1078 Reed 30b6 draft.txt

 9    Exhibit 455.

10        A.    I'm sorry.  The exhibit?

11        Q.    455.   This is a copy of the the cover

12   letter and report for a September 21 OIG report titled

13   "Medicaid's use of revised average wholesale prices."

14   Do you recall this report, Mr. Reed?

15        A.    No.  Not offhand.

16        Q.    Go to the Bates page ending 1284 can you

17   tell me what this page reflects?  You may want to look

18   to the page before it as well.

19        A.    The page itself is an internal control

20   sheet for correspondence.

21        Q.    It says "record of sign-offs."  What does

22   that mean?  Does it have reference to comments that

                                                      183

                     DRAFT VERSION

 1   CMS provided to this report?

 2        A.    I'm sorry.  Are you saying does this

 3   control sheet have that?

 4        Q.    Yes.

 5        A.    If it does, I'm missing it.

 6        Q.    What does a sign-off mean?

 7        A.    In general, for a control sheet it would

 8   indicate that the analyst and the persons on the upper

 9   line would have signed off on a particular document

10   before its signature or other release.

11        Q.    It appears as though this particular

12   sign-off is providing a sign-off or relates to the

13   comments that CMSO had to this particular OIG report?

14        A.    I just don't see that.

                     Page 145

1078 Reed 30b6 draft.txt

15      Q.      Is that -- page 1284, is that your name
16    under "cleared by," Reed, the second one down?
17      A.      Yes.
18      Q.      And the page before this document concerns
19    commenting upon the OIG report "Medicaid's use of
20    revised average wholesale prices"?  Do you see that?
21      A.      Yes, I do.
22      Q.      If you go two pages before that, does that

                                                        184
                        DRAFT VERSION

1    appear to be CMS's written comments to this particular
2    OIG report?
3      A.      Yes, it does.
4      Q.      Do you recall this particular comment, Mr.
5    Reed?
6      A.      No, I don't.
7      Q.      Do you recall when the last time was that
8    you looked at this comment?
9      A.      That I looked at this comment?
10     Q.      Yeah.   You would have reviewed the comments
11    that CMSO had to OIG reports, correct?
12             MS. MARTINEZ:  Objection, form.
13     Q.      That was part of your job?
14     A.      For reports on Medicaid pharmacy, I would
15    have have probably looked at the report or reviewed
16    the report, that's correct.  Or signed off on the
17    report.
18     Q.      And as we've seen today and in prior
19    depositions, you're a fairly precise person.  Is that
20    fair to say?
21             MR. AZORSKY:  Objection, form.
                        Page 146

1078 Reed 30b6 draft.txt

22          MS. MARTINEZ:  I guess you're talking about

♀

185

DRAFT VERSION


1   Mr. Reed, not CMS?

2           MR. TORBORG:  Yes, I am.

3   A.      Okay.  As an individual, I hope so.

4   Q.      So when you review a comment to an OIG

5   report you make sure that it's correct; is that right?

6           MS. MARTINEZ:  Objection, form.

7   A.      Again, to the best of my abilities.

8   Q.      Look at the second page of the comment.  It

9   states there "The OIG concludes that because most

10  states base their reimbursement for drugs on AWPs,

11  inflated AWPs have 'caused Medicaid to overpay for

12  these products' (see pages ii (conclusion) and 9

13  (first paragraph.))  Since the regulations and

14  relevant state plans authorize payment for drugs based

15  on AWPs, regardless of whether those prices are

16  inflated, we have concerns with the statement that

17  states and Medicaid have 'overpaid' for drugs.  We

18  therefore recommend that the sentences on pages ii

19  (penultimate paragraph, second sentence) and 9 (first

20  paragraph, second sentence) be deleted."

21          Do you recall that language, Mr. Reed, now

22  that I've read it?

♀

186

DRAFT VERSION


1   A.      No, I don't.

2   Q.      Do you have an understanding of -- as you

Page 147

1078 Reed 30b6 draft.txt

3   sit here today, do you have an understanding of what's

4   being conveyed there?

5        A.    I think CMS's position here was that there

6   was a -- that the regulations and state plans did rely

7   on AWPs.  So to some extent to call these overpayments

8   based on what were in existing state plans might be

9   considered by CMS to be a misnomer.

10       Q.    And it says "even if these AWPs are

11  inflated," correct?

12       A.    I'm sorry.  I'm in the seeing where you're

13  reading from.

14       Q.    It says since the regulations in relevant

15  state plans authorize payments for drugs based on

16  AWPs, regardless of whether those prices are inflated,

17  we have concerns with the statement that the state and

18  Medicaid have 'overpaid 'for drugs."  Do you see that?

19       A.    I do see that.

20       Q.    So what CMS is saying here is even though

21  the AWPs might be higher than acquisition costs,

22  because state plans and federal regulations allow that

                                                     187

DRAFT VERSION

1   it's improper to say that Medicaid has overpaid for

2   drugs, correct?

3            MS. MARTINEZ:  Objection, form.

4        A.    Again, I'm only skim reading pretty much

5   along with you.  But it appears to be that the OIG's

6   problem -- or that OIG's concern, if you will, isn't

7   necessarily overpayments but the use of AWP.  And

8   CMS's response is AWP, even if you consider it to be

9   inflated, still is used by the agencies.  Those

1078 Reed 30b6 draft.txt

10    agencies may discount that AWP.   And the simple use of

11    AWP doesn't necessarily mean that Medicaid has

12    overpaid for those drugs.

13         Q.     Mr. Reed, do you recall discussions within

14    CMS about the topic of whether or not payments based

15    upon inflated AWPs were resulting in overpayments?

16         A.     I think certainly there were interests in

17    looking at AWPs to look at how -- what they

18    represented, what they continued to represent.   And

19    again, just as something that we learned more about

20    over time, and even ultimately what other measures we

21    might choose.   And I think kind of the result of that

22    concern is eventually the use of AMPs in the Deficit

                                                              188

DRAFT VERSION


1     Reduction Act, for example, for the FULs program and

2     for those to be made publicly available.

3          Q.     Is there any other interpretation on this

4     language here that you'd like to provide?

5          A.     And again, I'm reading this quickly as

6     you're presenting it to me.   I'm not saying that there

7     isn't another interpretation.   That's how I would look

8     at it at this point.

9                              (Abbott Exhibits 770 through

10                             775 were marked for

11                             identification.)

12              BY MR. TORBORG:

13         Q.    Okay.   Just a little housekeeping to make

14    sure we're all on the same page and for the record.

15    What I've marked as Exhibit 770 bears the Bates

Page 149

1078 Reed 30b6 draft.txt

16    numbers HHC 009-1130.  And what I've marked as Abbott

17    Exhibit 771 bears the Bates numbers HHC 009-1124

18    through 25.  What I've marked as HHC 009-1117 through

19    19, that's 772.  What I've marked as Abbott Exhibit

20    773 bears the Bates numbers HHC 009-1084 through 88.

21    What I've marked as Abbott Exhibit 774 bears the Bates

22    numbers HHC 009-0978.  And finally what I've marked as

189

DRAFT VERSION

1     Abbott Exhibit 775 bears the Bates number HHC

2     009-0970.

3              Mr. Reed, I believe all of these documents

4     you see related to a contemplated amendment in 2001

5     01-009.  Does that appear to be the case, Mr. Reed?

6        A.    From a quick review that appears to be the

7     case.

8        Q.    The first one is a letter from yourself to

9     the associate regional administrator in Chicago that

10    indicates that you agree with concerns that the State

11    of Wisconsin has not adequately provided documentation

12    to support the reimbursement methodology of EAC --

13    or --I'm sorry --  the reimbursement methodology of

14    estimated acquisition cost representing AWP minus

15    11.25 percent.  Is that right?

16       A.    That's the statement in the first part of

17    the letter.  That's correct.

18       Q.    And then if we look at 771, this is an

19    e-mail -- a couple e-mails starting from the bottom

20    11/01 is the e-mail from Pamela Carson.  She was in

21    the regional office in Dallas; is that right?

22       A.    Pam Carson is in the regional office in

Page 150

1078 Reed 30b6 draft.txt

DRAFT VERSION

190

1    Chicago, I believe.

2        Q.    And her first point that she made in the

3    e-mail was the state needs to provide the data used in

4    the decision to determine that the change is -- I

5    think she meant in -- but is reimbursement is their

6    best estimate."  Do you see that?

7        A.    I see that statement.  That's correct.

8        Q.    And then in response there's an e-mail from

9    it appears a Rita Hallett.  Do you know who that is?

10       A.    No, I don't.

11       Q.    And her response to the first question

12   Ms. Carson wrote was, one, the legislature set the

13   rate so we don't have estimated data."do you see that?

14       A.    I see that sentence.

15       Q.    And that information was then forwarded on

16   to Ms. Carson at the regional office; is that right?

17       A.    Yeah.  I'm not sure of the chain of

18   addressees and the whole note has a -- is from Alfred

19   Matano, who if I'm reading the e-mail address

20   correctly, is in Wisconsin, to Pam Carson.  And with

21   all the e-mails it's hard to say who was writing who

22   at that point.

191

DRAFT VERSION

1        Q.    If we go to 772, it appears to be a

2    response to HCFA's response for additional information

3    about state plan amendment 01-009, correct., that was

Page 151

1078 Reed 30b6 draft.txt

4    sent to the Chicago regional office of HCFA?

5         A.    I don't see that request for additional

6    information.   That appears to be in response to a

7    letter requesting additional information dated

8    December 14th.   Right.

9         Q.    Does it appear that the first thing that

10   HCFA had asked for on page 1118 of Abbott Exhibit 772

11   was the documentation used to determine that the

12   proposed EAC is the best estimate of prices that

13   pharmacists in the state are generally and currently

14   paying for prescribed drugs, right?

15        A.    Again, without having the request for

16   additional information, I can't be sure.   But

17   generally it looks to be the information we had

18   requested.

19        Q.    And then if you would look at the paragraph

20   below the bullets on page 118, it states, the second

21   paragraph or -- I'm sorry -- in that paragraph -- "In

22   addition, the EAC of other states in our region was

DRAFT VERSION

1    considered to ensure equity in establishing the

2    Wisconsin price of prescription drugs.   After careful

3    review of all of the information, the Wisconsin

4    legislature established the price paid for

5    prescription drugs to be AWP minus 11.25 percent,"

6    correct?

7         A.    That statement is correct in the letter.

8    That's a correct reading.

9         Q.    If you would go to Abbott Exhibit 773, this

10   is correspondence between Pam Carson in the Chicago

Page 152

1078 Reed 30b6 draft.txt

11   regional office to Kimberly Howell of the CMS central

12   office, correct?

13        A.    That appears to be correct.

14        Q.    And then if be look at Bates page 10085,

15   the second page of the e-mail chain, it appears that

16   the first e-mail in this chain was dated March 22nd

17   '02 from Pam Carson, do you see that?

18        A.    I do see that.

19        Q.    She says "FYI, heads up.  The state plan

20   coordinator from Wisconsin just called and he thinks

21   the powers that be in the Wisconsin are going to be

22   angry about your request.  Stay tuned."  Do you see

193

DRAFT VERSION

1    that?

2         A.    I see those sentences.

3         Q.    Do you recall, Mr. Reed, becoming aware

4    that state legislatures were getting angry with HCFA

5    questioning the rates at which they established for

6    pharmacy reimbursement?

7               MR. WINGET-HERNANDEZ:  Objection, form.

8               MS. MARTINEZ:  Objection, form.

9         A.    No.  I don't recall that specifically.

10        Q.    If we go back to the first page of this

11   exhibit, this is the second e-mail from the top.  It

12   appears to be from Kimberly Howell dated March 25th

13   2002, 12:07.  Do you see that?

14        A.    I do.

15        Q.    About halfway through the paragraph there's

16   a sentence that starts with "the request was not meant

Page 153

1078 Reed 30b6 draft.txt

17  to question."  Do you see that?

18          MS. MARTINEZ:  I'm sorry.  I got lost.

19  Where are you?

20          MR. TORBORG:  It was an e-mail from

21  Kimberly -- Mr. Reed has got it.

22          THE WITNESS:  That's on the first page.

194

DRAFT VERSION

1           MS. MARTINEZ:  Okay.  Thank you.

2           BY MR. TORBORG:

3      Q.    Ms. Howell wrote "The request was not meant

4  to question Wisconsin's legislature, but simply to

5  obtain whatever documentation was used to derive at

6  the decision that AWP minus 11.25 percent was their

7  best estimate.  There are several prior instances

8  where the studies submitted by the state did not

9  support a proposed EAC.  However, a further analysis

10  performed by the state to derive at the proposed EAC

11  in conjunction of the study supported the state best

12  estimate at the EAC level.  I hope this information

13  addresses your concerns."  Do you see that?

14      A.    I do see those sentences.

15      Q.    If you would go to Abbott Exhibit 774, that

16  appears to be a document from the State of Wisconsin

17  dated April 1st to Pamela Carson, Chicago regional

18  office, correct?

19      A.    That looks to be correct.

20      Q.    And then under 2 it appears as though HCFA

21  had requested the additional analysis that was used to

22  arrive at the AWP minus 11.25 percent.  Do you see

1078 Reed 30b6 draft.txt

195

DRAFT VERSION


1   that?

2        A.    I do see that.

3        Q.    And he refers to an additional analysis

4   that was provided by the legislature fiscal bureau; is

5   that right?

6        A.    That's the indication in the letter.

7        Q.    Do you recall reviewing a document from the

8   Wisconsin legislature fiscal bureau?

9        A.    No.  I don't recall that.

10       Q.    Do you recall that Drug Topics had done

11   around this time period a survey of approximately 500

12   employers to see how they were reimbursing drugs?

13       A.    No.  I don't recall that.

14       Q.    Do you recall comparing what other third

15   party payors, how they were reimbursing drugs in

16   analyzing whether or not to approve state plans?

17       A.    No, I don't.

18       Q.    Do you think this would be a relevant

19   consideration?

20            MS. MARTINEZ:  Objection, form.

21       A.    Again, for us as -- to providing

22   information for the state, that might be helpful to

196

DRAFT VERSION


1   the state.  Like the OIG report itself, it would be

2   useful to know, but I'm not sure to what extent we

3   would use it to supercede, if you will, the

4   documentation the state presented in the state plan

Page 155

1078 Reed 30b6 draft.txt

5    amendment.

6         Q.    If we go to Abbott Exhibit 775, does this

7    appear to be a copy of the approval letter for this

8    state plan amendment that we've been talking about,

9    01-009, for Wisconsin?

10             MS. MARTINEZ:  Objection to form.

11        A.    This appears to be an internal control

12   copy.

13        Q.    Do you recall if Wisconsin had provided you

14   any empirical evidence that AWP minus 11.25 percent

15   was their best estimate of the price at which

16   providers were currently and generally paying for

17   drugs?

18             MR. WINGET-HERNANDEZ:  Objection, form.

19        A.    No.  I don't recall that.  Do you have

20   other examples of this same exhibit or is it about

21   time for a break?

22             MR. TORBORG:  That would be fine.  Allow me

197

DRAFT VERSION

1    to collect my thoughts and see.  I only have a couple

2    more minutes probably of questioning and then I'll be

3    done, I believe.

4             THE WITNESS:  A couple more minutes?

5             MS. MARTINEZ:  Right.  And then I'll have

6    some questions.

7             MR. TORBORG:  Okay.

8             THE WITNESS:  Do you want to break now?

9             MR. TORBORG:  Let's take a break and let me

10   collect exactly what I want to do at the end and then

11   we'll finish.

Page 156

1078 Reed 30b6 draft.txt

12          THE VIDEOGRAPHER:   This is the end of tape

13   4.  Off the record at 3:55.

14          (Recess.)

15          THE VIDEOGRAPHER:   This is the beginning of

16   tape 5 in the 30(b)(6) of the United States of America

17   by Mr. Reed.   On the record at 4:16.

18          BY MR. TORBORG:

19     Q.    Mr. Reed, I've asked you to take out Abbott

20   Exhibit 328.  It bears the Bates numbers HHC 004-0188

21   through 90.  You're familiar with this document,

22   right?

                                                          198

                    DRAFT VERSION


1     A.    I've seen this document in my prior

2   deposition.

3     Q.    And you've seen it prior to that as well?

4   Stated another way, your deposition was not the first

5   time you had seen this document?

6     A.    I've seen a version of this document.  I'm

7   not sure this particular document, at this point in

8   time document.

9     Q.    Do you know when this particular document

10   was dated?

11     A.    The final signed version?

12     Q.    Well -- when did the drafting of this

13   document start, the substance that led to the final?

14     A.    Yeah.  I don't recall when it was first

15   started to be drafted , when it first started to be

16   drafted, rear.

17     Q.    On the second page there's a section called

                    Page 157

1078 Reed 30b6 draft.txt
18  analysis.  The first paragraph states "In repeat

19  months there has been an increase in SPAs proposing to

20  change the reimbursement methodology (a listing of

21  these spas is attached.)  Where there are a survey of

22  costs the findings generally show that these states'

199

DRAFT VERSION

1  reimbursement could have been reduced by a percentage

2  greater than the proposed AWP discount levels."  Do

3  you see that?

4       A.    Yes.

5       Q.    You've an understanding of what that means?

6       A.    Yes.  I believe so.

7       Q.    And could you tell me what that means?

8       A.    Where there's a survey of cost for a given

9  state, if those were the findings upon which the

10  reimbursement would be based, it could have been by a

11  greater percentage than those proposed in the state

12  plan amendment.

13      Q.    And the next sentence says the lesser level

14  of discount is generally the route of negotiations

15  that occur between the state and pharmacy

16  representatives after the survey results are known.

17  In other cases the state's legislature have responded

18  to the escalating costs of Medicaid drugs by enacting

19  legislation that increases the discount in the

20  ingredient cost or the dispensing fee of these drugs.

21  Legislation usually does not address why these rates

22  are the best estimates or reasonable.  Do you see

200

DRAFT VERSION
Page 158

1078 Reed 30b6 draft.txt

1    that?

2         A.    I see that part of the program.

3         Q.    And was that consistent with your

4    experience at or around the time that this memorandum

5    was prepared?

6         A.    I believe it was.

7         Q.    In the next paragraph it says "It is

8    proving increasingly difficult to require the states

9    to establish payment rates in adherence to regulatory

10   requirements."  Do you see that?

11        A.    I see that sentence.

12        Q.    Do you have an understanding of what that

13   means?

14        A.    I believe I do.

15        Q.    Okay.  Can you tell us your understanding?

16        A.    That the states themselves are having a

17   more difficult time establishing their payment rates

18   here.

19        Q.    Is it saying -- what's it talking about

20   when it says difficult to require states to establish

21   payment rates in adherence to regulatory requirements?

22   What's being discussed there?

                                                        201

                    DRAFT VERSION

1         A.    In this case it would be the EAC and a

2    dispensing fee.

3         Q.    And why was it proving increasingly

4    difficult to require states to establish payment rates

5    in adherence to EAC and distribution fees?

                    Page 159

1078 Reed 30b6 draft.txt

 6          MS. MARTINEZ:  Objection to form.

 7      A.    I think at this point in time that there

 8  were, again, as we were becoming more aware of

 9  differences between AWPs and the appropriate discounts

10  through the OIG and other information that might have

11  become available, states were having a more difficult

12  time basing their payment rates on those -- on that

13  data.

14      Q.    Okay.  And this was a phenomena that had

15  started prior to 2001; is that fair to say?

16          MS. MARTINEZ:  Objection, form.

17      A.    I don't know what time period that would

18  cover.  I know what time period -- I mean, I know

19  approximately what time period this memo was

20  drafted -- or I'm sorry.  I don't know what time

21  period it was drafted, but I know when it was done in

22  final.  So I know that time frame.

                                                    202

                     DRAFT VERSION


 1      Q.    Well, we went through some documents

 2  earlier today in the late '90s, 2000 and 2001 where

 3  you were involved in discussions with the states where

 4  you were trying to get them to provide documentation

 5  to support the discount levels.  And in a couple

 6  instances you even pointed to OIG studies that would

 7  call for a higher discount, correct?

 8      A.    I can remember at least in one instance I

 9  reference OIG.  This time in my e-mail note.

10      Q.    And that's the type of thing that's being

11  talked about here, correct?

12      A.    I believe so.

                     Page 160

1078 Reed 30b6 draft.txt

13      Q.      It says accordingly -- the memo continues

14   "Accordingly we believe in an analysis and acceptance

15   of other factors states are now using to establish

16   payment rates should be considered in looking they EAC

17   and the distribution fee."  Do you have an

18   understanding what that means?

19      A.      I do.

20      Q.      Could you tell us what that means?

21      A.      Again, there's a number of ways to do a

22   best estimate.   Within the context of this memo, I

                                                           203

DRAFT VERSION

1   believe that this was for the final of this memo this

2   was where that responsibility was shifted for review

3   of the state plans from the regional office to the

4   central office.   And within this sentence we were

5   looking for the bases to establish these payment

6   rates.

7      Q.      What other factors were states using to

8   establish payment rates that CMS believed it should be

9   considering in looking at the EAC and the distribution

10   fee?

11      A.      I think some of those factors are the ones

12   that resulted in the options in this paper.

13      Q.      You're referring to the second page there?

14      A.      I'm referring to the page after the page

15   you're referencing, correct.

16      Q.      Bates page 190?

17      A.      I'd like to mark -- this has been marked

18   already, but I'm going to mark it ask a new exhibit

Page 161

1078 Reed 30b6 draft.txt
19   number because I've learned that we have two Abbott

20   Exhibit 487.  So I'm going to mark that as a new

21   exhibit number.

22                     (Abbott Exhibit 776 was

♀

                                                              204

DRAFT VERSION


1                     marked for identification.)

2             MS. MARTINEZ:  Mr. Torborg, just so that

3    you know, there is a production that you have that has

4    this document with a Bates label number.  I'm just

5    letting you know that.

6             MR. TORBORG:  Oh, okay.

7             MS. MARTINEZ:  I think it might be HHD 173.

8    It might be that container.  But there's okay.  It's

9    just you're using a copy that was send by pdf.

10            MR. TORBORG:  Okay.

11            BY MR. TORBORG:

12       Q.   What we've marked as Exhibit 776 is an

13   October 22nd memorandum from the director of the

14   Center for Medicaid and State Operations to Thomas

15   Scully and Rubin J. King-Shaw Jr.  It's redacted.

16   Eventually -- the memorandum appears signed by Dennis

17   Smith and then a decision block is signed by Thomas

18   Scully.

19            And let me ask you, Mr. Reed, if we go back

20   it Abbott Exhibit 328, at the bottom of that page

21   there's a recommendation there.  Do you see that?  And

22   a spot to approve or disapprove, correct?

♀

                                                              205

DRAFT VERSION

1078 Reed 30b6 draft.txt

1       A.      I'm sorry.  Which exhibit are you looking

2   at?

3       Q.      328 at the very end.

4       A.      I see that.

5       Q.      What is that all about?  Tell me what about

6   decision -- what's going on here.

7       A.      Generally within CMS options papers would

8   be sent to either the center director or the

9   administrator or deputy administrator, whoever the

10  appropriate official would be, to present options for

11  a particular issue.  In this case it was on the issues

12  here that I've described.  And there may or may not be

13  a meeting on those issues.  And after that point the

14  options would -- I'm sorry.  The recommendation, more

15  specifically, would be approved or disapproved.

16  Sometimes memos were signed and sometimes they were

17  not.

18      Q.      Why would there need to be a signature from

19  the administrator of HCFA to implement the options

20  that are set forth in Abbott Exhibit 776?

21          MS. MARTINEZ:  Objection, form.

22      A.      I'm sorry.  I'm not sure I understand your

206

DRAFT VERSION

1   question.

2       Q.      Why would there need to be -- why would Mr.

3   Scully, the administrator of HCFA, have to sign this

4   options paper as you've termed it?

5       A.      I think that would be a decision of the CMS

6   officials involved in this.  At that point it would be

Page 163

1078 Reed 30b6 draft.txt

7   at what level those officials thought it appropriate

8   for signature.

9       Q.    And did you believe it was appropriate for

10  signature, Mr. Reed?

11      A.    Speaking as CMS?

12      Q.    Yes.

13      A.    Certainly speaking as CMS the administrator

14  has every -- can certainly make a decision.

15      Q.    What was the decision being made here?  And

16  why did Mr. Scully, the administrator of HCFA have to

17  sign off on the decision?

18            MS. MARTINEZ:  Objection, form.

19      A.    Again, it's a prerogative of either the

20  administrator or of the center director as to how they

21  want to decide any particular issue.

22      Q.    And we've seen a number of approval memos

207

DRAFT VERSION

1   for state plan amendments today, correct?

2       A.    We've seen a number of approvals.

3       Q.    And those are generally signed by the

4   regional office after consultation with you and your

5   office, correct?

6             MS. MARTINEZ:  Objection, form.

7       A.    Either signed -- I'm sorry.  How did you

8   say they were signed again?

9       Q.    By the regional office, oftentimes after

10  consulting with you.

11      A.    Generally so, correct.  Or with the central

12  office, more specifically.

13      Q.    Mr. Scully didn't have to sign those

Page 164

1078 Reed 30b6 draft.txt

14    letters, did he, those decisions?

15        A.    He certainly would reserve the right to

16    sign any and all documents on state plans.  In those

17    cases that wasn't -- he had designated that further

18    down into the agency.

19        Q.    Why was this one not a decision that was

20    delegated down into the agency?

21        A.    Again, that's a prerogative of those

22    government officials if they're involved in it.  It's

                                                              208

DRAFT VERSION


1     simply their decision as to how and at what level they

2     want this issue decided.

3         Q.    And you wanted this decision decided at a

4     level above you; is that right?

5               MS. MARTINEZ:  Objection, form.

6         A.    CMS chose to have this decision made by the

7     administrator.

8         Q.    Does that imply that the decisions and the

9     options set forth in this paper are important?

10              MS. MARTINEZ:  Objection, form.

11        A.    I think within the context of what their

12    recommendations and options are, that they were at a

13    level that the administrator chose to review.

14        Q.    And do you know of any other decision in

15    the area of Medicaid prescription drugs from 1991

16    through 2003 besides this one where there was a

17    decision signed by the administrator of HCFA?

18        A.    Any disapproval would be signed by the

19    administrator of HCFA.

1078 Reed 30b6 draft.txt

20        Q.      How about any approval?

21        A.      I don't think any approval that I can

22    recall would be signed by the administrator.   An issue

209

DRAFT VERSION

1     in relation to an approval could be brought to the

2     attention of the administrator in addition to options

3     papers if there's other types of communication within

4     CMS on deciding issues, issues, meetings, that type of

5     thing.

6         Q.      Mr. Reed, was this options paper the draft

7     of which we see as Abbott Exhibit 328, and the final

8     redacted version we see as Abbott Exhibit 776, was

9     this something that was unique in the area of Medicaid

10    drug payments?

11        A.      I'm sorry.   Unique in which way?

12        Q.      Was there anything else leak it?   Options

13    papers setting forth ways to look at state plan

14    amendments that was signed by the administrator of

15    HCFA?

16            MR. AZORSKY:   Objection to form.

17            MS. MARTINEZ:   Objection, form.

18        A.      Certainly, there are options papers that go

19    to the administrator on a number of issues.   I think

20    you have to sort of look across the range of issues

21    that the administrator or the center director might

22    clues to either sign or raise to another level.   I'm

210

DRAFT VERSION

1     not aware of another particular issue on pharmacy

1078 Reed 30b6 draft.txt

2    reimbursement where this type of memo went out,

3    although, as I said, individual issues on state plan

4    amendments or other issues can certainly be raised to

5    the administrator.

6         Q.    Mr. Reed, to finish up, if you would take

7    out topic 14 again, in particular Ms. Martinez's

8    e-mail marked as Abbott Exhibit 757.  The topic 14 as

9    modified by the United States states "From 1991 to

10   2001 with respect to Medicaid how CMS defined and

11   implemented 'estimated acquisition cost'and whether

12   in general, not in detail as to each state for each

13   year, CMS believed that the formula in the state plans

14   would result in payment for drugs at the estimated

15   acquisition costs of those drugs."

16            Mr. Reed, was there any point in time from

17   1991 through 2001 where CMS did not believe that the

18   formula in state plans would result in payment for

19   drugs at the estimated acquisition cost of those

20   drugs?

21       A.    And I'm going back and testifying in

22   response to this topic 14 I can state that in general

211

DRAFT VERSION

1    CMS believed that the formula in the state plans would

2    result in payment for drugs at the estimated

3    acquisition cost of those drugs.

4         Q.    Do you know of any instances with any state

5    for which the formula would not result in

6    reimbursement in accordance with estimated acquisition

7    cost?

Page 167