# EXHIBIT 2

```
              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

     v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - - -

        (cross-captions on following pages)



                         Washington, D.C.

                         Tuesday, October 30, 2007

                         9:00 a.m.


     Videotaped deposition of DEIRDRE DUZOR

                 Volume I
```

Duzor, Deirdre												October 30, 2007
										Washington, DC

```
                                          Page 2                                                  Page 4
 1     IN THE SUPERIOR COURT FOR THE STATE OF ALASKA    1   IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 2        THIRD JUDICIAL DISTRICT AT ANCHORAGE          2       COUNTY DEPARTMENT, CHANCERY DIVISION
 3    ---------------                                   3   ---------------
 4    STATE OF ALASKA,        )                         4   THE PEOPLE OF THE STATE OF  )
 5         Plaintiff,   )                               5   ILLINOIS,          )
 6      vs.           ) Case No.                        6        Plaintiff,  ) Case No. 05 CH 02474
 7    ABBOTT LABORATORIES and    ) 3AN-06-12297 CI      7      vs.            )
 8    DEY, INC.,           )                            8   ABBOTT LABORATORIES, et al., )
 9         Defendants.    )                             9        Defendants.   )
10    ---------------                                  10   ---------------
11                                                     11
12                                                     12
13        IN THE CIRCUIT COURT OF                      13       COMMONWEALTH OF KENTUCKY
14       MONTGOMERY COUNTY, ALABAMA                    14      FRANKLIN CIRCUIT COURT - DIV. II
15    ---------------                                  15   -----------------
16    STATE OF ALABAMA,       )                        16   COMMONWEALTH OF KENTUCKY,     )
17         Plaintiff,  )                               17        Plaintiff,     ) Civil Action
18      vs.          ) Case No. CV-2005-219            18      vs.             ) NO. 03-CI-1134
19    ABBOTT LABORATORIES, INC.,  ) Judge Charles Price 19   ABBOTT LABORATORIES, INC., et al., )
20    et al.,         )                                20        Defendants.    )
21         Defendants.   )                             21   ------------------
22    ---------------                                  22

                                          Page 3                                                  Page 5
 1     IN THE CIRCUIT COURT OF THE FIRST CIRCUIT        1   IN THE CHANCERY COURT OF HINDS COUNTY, MISSISSIPPI
 2            STATE OF HAWAII                           2           FIRST JUDICIAL DISTRICT
 3    ---------------                                   3   --------------
 4    STATE OF HAWAII,        )                         4   STATE OF MISSISSIPPI,   )
 5         Plaintiff,   ) Case No.                      5        Plaintiff,  )
 6      vs.           ) 06-1-0720-04 EEH                6      vs.            ) Civil Action No.
 7    ABBOTT LABORATORIES, INC.,   )                    7   ABBOTT LABORATORIES, INC., ) G2005-2021
 8    et al.,          ) JUDGE EDEN                     8   et al.,           )
 9         Defendants.    ) ELIZABETH HIFO              9        Defendants.   )
10    ---------------                                  10   ---------------
11                                                     11
12                                                     12
13     IN THE FOURTH JUDICIAL DISTRICT OF THE STATE OF 13   STATE OF NEW YORK
14       IDAHO, IN AND FOR THE COUNTY OF ADA           14   SUPREME COURT: COUNTY OF ERIE
15    ---------------                                  15   ---------------
16    STATE OF IDAHO,        )                         16   COUNTY OF ERIE,        )
17         Plaintiff,  )                               17        Plaintiff,  )
18      vs.          ) Case No. CV OC 0701846          18      vs.             ) Index No. 05-2439
19    ABBOTT LABORATORIES,     )                       19   ABBOTT LABORATORIES, INC.,  )
20         Defendant.   )                              20   et al.,           )
21    --------------                                   21        Defendants.   )
22                                                     22   ---------------
```

2 (Pages 2 to 5)

Henderson Legal Services
202-220-4158

Duzor, Deirdre                                                                October 30, 2007
Washington, DC

```
                                   Page 6                                              Page 8
 1  STATE OF NEW YORK                            1      IN THE COMMONWEALTH COURT OF PENNSYLVANIA
 2  SUPREME COURT: COUNTY OF OSWEGO              2   ----------------
 3  ----------------                             3   COMMONWEALTH OF PENNSYLVANIA  )
 4  COUNTY OF OSWEGO,        )                   4   by Thomas W. Corbett, Jr. in  )
 5       Plaintiff,     )                        5   his capacity as Attorney     )
 6    vs.          ) Index No. 06-0697           6   General of the Commonwealth  )
 7  ABBOTT LABORATORIES, INC.,   )               7   of Pennsylvania,             )
 8  et al.,            )                         8       Plaintiff,    )
 9       Defendants.   )                         9    vs.          ) No. 212 M.D. 2004
10  ----------------                            10   TAP PHARMACEUTICAL PRODUCTS,  )
11                                              11   INC., et al.,           )
12                                              12       Defendants.    )
13  STATE OF NEW YORK                           13   ----------------
14  SUPREME COURT: COUNTY OF SCHENECTADY        14
15  ----------------                            15
16  COUNTY OF SCHENECTADY,      )               16
17       Plaintiff,     )                       17
18    vs.          ) Index No. 06-0886          18
19  ABBOTT LABORATORIES, INC.,   )              19
20  et al.,            )                        20
21       Defendants.    )                       21
22  ----------------                            22

                                   Page 7                                              Page 9
 1      UNITED STATES DISTRICT COURT FOR THE     1       IN THE COURT OF COMMON PLEAS
 2          SOUTHERN DISTRICT OF OHIO            2          FIFTH JUDICIAL CIRCUIT
 3              WESTERN DIVISION                 3   ----------------
 4  -------------                                4   STATE OF SOUTH CAROLINA, and  )  STATE OF
 5  STATE OF OHIO,       )                       5   HENRY D. McMASTER, in his    ) SOUTH CAROLINA
 6       Plaintiff,  ) Civil Action No.          6   official capacity as Attorney )  COUNTY OF
 7    vs.      ) 1:06-cv-00676-SSB-TSB           7   General for the State of South )  RICHLAND
 8  DEY, INC., et al.,    )                     8   Carolina,             )
 9       Defendants.  )                          9       Plaintiffs,    )
10  -------------                               10    vs.          ) Civil Action No.
11                                              11   ABBOTT LABORATORIES, INC.,   ) 2006-CP-40-4394
12                                              12       Defendants.    )
13       STATE OF WISCONSIN CIRCUIT COURT       13   ----------------
14              DANE COUNTY                     14
15  ----------------                            15
16  STATE OF WISCONSIN,      )                  16
17       Plaintiff,     )                       17
18    vs.          ) Case No. 04-CV-1709        18
19  AMGEN INC., et al.,       )                 19
20       Defendants.   )                        20
21  ----------------                            21
22                                              22
```

Page 10

                    Washington, D.C.
                    Tuesday, October 30, 2007
                    9:00 a.m.

         Videotaped deposition of DEIRDRE DUZOR, called for examination by counsel for Abbott Laboratories in the above-entitled matter, taken at the law offices of Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001-2113, the proceedings being recorded stenographically by Jonathan Wonnell, a Registered Professional Court Reporter and Notary Public of the District of Columbia, and transcribed under his direction.

Page 11

         A P P E A R A N C E S   O F   C O U N S E L

         On behalf of the United States of America:
             ANA MARIA MARTINEZ, ESQ.
             United States Department of Justice
             99 N.E. 4th Street
             Miami, Florida 33132
             (305) 961-9431
             ana.maria.martinez@usdoj.gov
         -- and --
             JOHN NEAL, ESQ.
             U.S. Department of Justice
             Civil Division
             P.O. Box 261, Ben Franklin Station
             Washington, D.C. 20044
             (202) 305-9300

Page 12

         A P P E A R A N C E S  (Cont'd)

         On behalf of the U.S. Department of Health and
            Human Services:
             BRIAN A. KELLEY, ESQ.
             U.S. Department of Health & Human
                Services
             Office of General Counsel, CMS Division
             330 Independence Avenue, S.W., Room 5345
             Washington, D.C. 20201
             (202) 205-8702

         On behalf of the State of Alabama:
             ROGER L. BATES, ESQ.
             Hand Arendall LLC
             1200 Park Place Tower
             2001 Park Place North
             Birmingham, Alabama 35203
             (205) 324-4400
             rbates@handarendall.com

Page 13

         A P P E A R A N C E S  (Cont'd)

         On behalf of the State of California:
             RITA HANSCOM, ESQ. (via phone)
             California Attorney General's Office
             Civil Prosecutions Unit
             P.O. Box 85266
             110 West A Street, #1100
             San Diego, California 82186
             (619) 688-6099
             rita.hanscom@doj.ca.gov

         On behalf of the State of Florida:
             MARY S. MILLER, ESQ. (via phone)
             Office of the Attorney General of Florida
             PL-01, The Capitol
             Tallahassee, Florida 32399-1050
             (850) 414-3600
             mary_miller@oag.state.fl.us

Page 14

```
 1          A P P E A R A N C E S  (Cont'd)
 2    On behalf of the City of New York and all New
 3       York Counties other than Nassau and
 4       Orange; the States of Wisconsin,
 5       Illinois, Kentucky, Idaho, Alaska,
 6       Hawaii, South Carolina and Mississippi:
 7       MICHAEL WINGET-HERNANDEZ, ESQ.
 8       Winget-Hernandez, LLC
 9       3112 Windsor Road, Suite 228
10       Austin, Texas 78703
11       michael@winget-hernandez.com
12
13    On behalf of Ven-A-Care of the Florida Keys,
14       Inc.:
15       ROSLYN G. POLLACK, ESQ.
16       Berger & Montague P.C.
17       1622 Locust Street
18       Philadelphia, Pennsylvania 19103-6305
19       (215) 875-3000
20       rpollack@bm.net
21
22
```

Page 15

```
 1          A P P E A R A N C E S  (Cont'd)
 2
 3    On behalf of Abbott Laboratories, Inc.:
 4       DAVID TORBORG, ESQ.
 5       SEAN P. MALONE, ESQ.
 6       Jones Day
 7       51 Louisiana Avenue, N.W.
 8       Washington, D.C. 20001-2113
 9       (202) 879-3939
10       dstorborg@jonesday.com
11       spmalone@jonesday.com
12
13    On behalf of Brisol-Myers Squibb:
14       EVA L. DIETZ, ESQ. (via phone)
15       Hogan & Hartson
16       875 Third Avenue
17       New York, New York 10022
18       eldietz@hhlaw.com
19       (212) 918-3542
20
21
22
```

Page 16

```
 1          A P P E A R A N C E S  (Cont'd)
 2
 3    On behalf of Dey, Inc., Dey, L.P. and Mylan:
 4       NEIL MERKL, ESQ.
 5       Kelley, Drye & Warren LLP
 6       101 Park Avenue
 7       New York, New York 10178
 8       (212) 808-7811
 9       nmerkl@kelleydrye.com
10
11    On behalf of Roxane Laboratories and
12       Boehringer Ingelheim:
13       ERIC GORTNER, ESQ.
14       Kirkland & Ellis
15       200 East Randolph Drive
16       Chicago, Illinois 60601
17       (312) 861-2285
18       egortner@kirkland.com
19
20
21
22
```

Page 17

```
 1          A P P E A R A N C E S  (Cont'd)
 2
 3    On behalf of Schering-Plough Corporation,
 4       Schering Corporation and Warrick
 5       Pharmaceuticals Corporation:
 6       GINGER APPLEBERRY, ESQ. (via phone)
 7       Locke, Liddell & Sapp
 8       2200 Ross Avenue, Suite 2200
 9       Dallas, Texas 75201
10       (214) 740-8459
11       gappleberry@lockeliddell.com
12
13    On behalf of Baxter Health Care and Baxter
14       International:
15       JARED D. RODRIGUES, ESQ. (via phone)
16       Dickstein Shapiro LLP
17       1825 Eye Street, N.W.
18       Washington, D.C. 20006
19       (202) 420-2571
20       hearde@dicksteinshapiro.com
21
22
```

Duzor, Deirdre  
Washington, DC  
October 30, 2007

Page 18

```
 1        A P P E A R A N C E S  (Cont'd)
 2   ALSO PRESENT:
 3       CONWAY BARKER, Videographer
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 19

```
 1        I N D E X   O F   E X A M I N A T I O N S
 2   WITNESS NAME                              PAGE
 3   DEIRDRE DUZOR
 4       By Mr. Torborg:            26
 5
 6        I N D E X   O F   E X H I B I T S
 7   NO. DESCRIPTION                           PAGE
 8   Exhibit Abbott 367, Resume of Deirdre Duzor (No  21
 9       Bates refs)
10   Exhibit Abbott 368, HHD086-0013 to 0015       113
11   Exhibit Abbott 369, HHD068-0403              126
12   Exhibit Abbott 370, HHC004-0222              159
13   Exhibit Abbott 371, HHD086-0001              168
14   Exhibit Abbott 372, Rehnquist letter to Scully  174
15       stamped 9/12/02 (No Bates refs)
16   Exhibit Abbott 373, HHC009-0976              209
17   Exhibit Abbott 374, HHC020-1199 to 1202       214
18   Exhibit Abbott 375, HHC020-1194 to 1198       214
19   Exhibit Abbott 376, HHC018-0016              215
20   Exhibit Abbott 377, HHC009-1574 to 1584       224
21   Exhibit Abbott 378, HHC009-1567 to 1570       224
22   Exhibit Abbott 379, HHC014-0772 to 0790       226
```

Page 20

```
 1        I N D E X   O F   E X H I B I T S  (Cont'd)
 2   NO. DESCRIPTION                           PAGE
 3   Exhibit Abbott 380, HHD086-0016 to 0019       242
 4   Exhibit Abbott 381, Report by ADT Associates  243
 5       dated 8/30/04 entitled Medicaid and
 6       Medicare Drug Pricing Strategy to
 7       Determine Market Prices (No Bates refs)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 21

```
 1               P R O C E E D I N G S
 2                    (8:58 a.m.)
 3                  (Exhibit Abbott 367 was
 4                   marked for
 5                   identification.)
 6        THE VIDEOGRAPHER:  In the United States
 7   District Court for the District of Massachusetts In
 8   Re: Pharmaceutical Industry Average Wholesale Price
 9   Litigation, this document relates to Ven-A-Care of
10   the Florida Keys Incorporated versus Abbott
11   Laboratories Incorporated et al., Case Number
12   06-CV-11337 PBS and other cases that are cross
13   noticed.
14        This is the deposition of Deirdra Duzor.
15   Today's date is October 30th 2007.  The location of
16   the deposition is Jones Day, 51 Louisiana Avenue,
17   Northwest, Washington, D.C.  Will counsel please
18   identify yourselves and state whom you represent?
19        MR. TORBORG:  David Torborg and also with
20   me today is Sean Malone, though he has left the room
21   for a second, with Jones Day on behalf of Abbott
22   Laboratories.
```

6 (Pages 18 to 21)

Henderson Legal Services  
202-220-4158

Duzor, Deirdre                                                          October 30, 2007
                                    Washington, DC

Page 22

1    MR. GORTNER:  Good morning.  Eric Gortner
2 from Kirkland & Ellis for Roxane Laboratories and
3 certain entities affiliated with Boehringer
4 Ingelheim Corporation.
5    MR. MERKL:  Neil Merkl for the Dey
6 companies.
7    MS. POLLACK:  Roslyn Pollack representing
8 Ven-A-Care of the Florida Keys.
9    MR. WINGET-HERNANDEZ:  Michael
10 Winget-Hernandez.  I'm here on behalf of the City of
11 New York and the New York Counties in MDL 1456 other
12 than Nassau and Orange.  Also on behalf of the
13 states of Wisconsin, Illinois, Kentucky, Idaho,
14 Alaska, Hawaii, South Carolina and Mississippi.
15    I'd like to note for the record that
16 while Abbott noticed the Kirby McInerney plaintiffs
17 for this deposition and we're pleased to appear and
18 participate in it, we cannot and will not agree to
19 close the deposition on today's testimony.  Given
20 the procedural posture of the cases on behalf of the
21 City of New York and the New York Counties, we have
22 yet to receive full discovery from Abbott and

Page 23

1 therefore reserve our right to recall this witness
2 at the appropriate time after such production by
3 Abbott has been made to us.
4    MR. NEAL:  John Neal with the Department
5 of Justice on behalf of the United States.
6    MS. MARTINEZ:  Ani Martinez on behalf of
7 the United States.  And before we begin I'd just
8 like to make a little statement regarding state
9 cross notices.
10    MR. TORBORG:  Do you want to have
11 everyone introduce themselves and then we can do
12 that?
13    MS. MARTINEZ:  Sure.  Let's go ahead.
14    THE VIDEOGRAPHER:  Those on the phone,
15 could you introduce yourselves, please?
16    MS. DIETZ:  This is Eva Dietz at Hogan &
17 Hartson on behalf of BMS.
18    MS. APPLEBERRY:  Ginger Appleberry,
19 Locke, Lord, Bissell & Liddell, on behalf of
20 Schering Plough Corporation and Warrick
21 Pharmaceuticals.
22    MS. MILLER:  Mary Miller on behalf of the

Page 24

1 State of Florida in the cross noticed matter for the
2 State of Florida.
3    MS. HANSCOM:  Good morning.  This is Rita
4 Hanscom at California attorney general's office.
5    MR. RODRIGUES:  Jared Rodriguez,
6 Dickstein Shapiro for Baxter Health Care.
7    (Mr. Kelley entered the deposition room.)
8    THE VIDEOGRAPHER:  Would you like to
9 introduce yourself?
10    MR. KELLEY:  And Brian Kelley from the
11 Department of Health and Human Services.
12    THE VIDEOGRAPHER:  The court reporter is
13 Jon Wonnell.  The video camera operator is Conway
14 Barker both on behalf of Henderson Legal Services.
15 This deposition commences at 9:16:04.  Please swear
16 in the witness.
17         * * * * *
18 Whereupon,
19     DEIRDRE DUZOR,
20 called as a Witness, was duly sworn by
21 Jonathan Wonnell, a Notary Public in and
22 for the District of Columbia, and was

Page 25

1 examined and testified as follows.
2         * * * * *
3    MR. TORBORG:  Ms. Duzor, before we get
4 started I think Ms. Martinez wanted to make a
5 statement on the record regarding state cross
6 notices.
7    MS. MARTINEZ:  Yes.  On behalf of the
8 United States I just wanted to state to any party
9 who was cross noticing this deposition in a state
10 court case that is not in front of Judge Saris in
11 Federal Court that in accordance with Judge Saris'
12 case management orders in the multi-district
13 litigation we have no objection to you all being
14 here with the understanding that any disputes with
15 respect to discovery et cetera would be resolved in
16 front of Judge Saris under federal rules.
17    We are not offering Ms. Duzor in any
18 state court case which would in any way subject her
19 or the United States to state court jurisdiction.
20 And we're making that objection based on the federal
21 regulations as well as what Judge Saris has
22 contemplated in the multi-district litigation.  But

7 (Pages 22 to 25)

Henderson Legal Services
202-220-4158

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Page 174

1   Q.  Was it your understanding that WAC was a
2   price that represented the actual price that
3   wholesalers purchased drugs from manufacturers?
4   A.  It was my understanding that that was the
5   original intent of WAC, not necessarily that that is
6   what WAC truly represented at the point that I
7   became involved in these issues.
8                (Exhibit Abbott 372 was
9                marked for
10               identification.)
11       BY MR. TORBORG:
12  Q.  For the record, what I've marked as
13  Exhibit Abbott 372 is a September 16th 2002 letter
14  from Janet Rehnquist to Thomas Scully attaching a
15  September 2002 report from OIG entitled Medicaid
16  pharmacy additional analysis of the actual
17  acquisition cost of prescription drug products.
18       If you would take a look at that, Ms.
19  Duzor, to the extent necessary to tell me if you
20  recall this document.
21  A.  (Reading.)  Yes, I do remember this
22  document.

Page 175

1   Q.  And the first sentence of Ms. Rehnquist's
2   letter, the first page of the exhibit, indicates
3   that it's a follow-up to the previous work, two
4   reports; is that right?
5   A.  Yes, it does.
6   Q.  Do you know why it is that OIG did this
7   additional report?
8   A.  Well, in this analysis the IG looked at
9   whether drugs -- it separately evaluated drugs for
10  which there was a FUL established and those that did
11  not have -- multiple drugs without those.  So I
12  think that was the distinction.  They were looking
13  at categorizing drugs by whether they have a FUL or
14  not.
15  Q.  Did CMS request that OIG prepare this
16  report?
17  A.  Not to my knowledge.
18  Q.  Do you know if this report was shared
19  with state Medicaid program?
20  A.  As a fact, no, I don't recall.
21  Q.  Generally speaking in your time at CMS in
22  the division of pharmacy has it been the practice

Page 176

1   that OIG reports relating to Medicaid payment for
2   drugs have been shared with states?
3   A.  Yes.
4       MR. TORBORG:  What do you think?  Should
5   we remark this document or keep the original exhibit
6   number?  I know you guys recalled it at one point
7   and then changed your mind.  So do you have any
8   thoughts of whether we should mark it as a new
9   exhibit?
10      MS. MARTINEZ:  No.  I mean, the exhibit
11  number --
12      MR. TORBORG:  328?
13      MS. MARTINEZ:  -- does not seem to be an
14  issue.
15      BY MR. TORBORG:
16  Q.  Ms. Duzor, I've handed you a copy of what
17  we've marked previously as Exhibit Abbott 328, a
18  document entitled Review of Medicaid Drug State Plan
19  Amendments.  I ask you to take some time and look at
20  that document.
21  A.  Okay.  (Reading.)
22  Q.  Ms. Duzor, have you had a chance to look

Page 177

1   at that document?
2   A.  Yes, I have.
3   Q.  Can you tell us what this document is?
4   A.  This document --
5   Q.  Let me strike that.  Are you familiar
6   with this document first?
7   A.  Yes.  I recall the document.
8   Q.  Can you tell us what it is?
9   A.  I believe it is a draft of a decision
10  memo seeking guidance from policymakers in CMS on
11  approaches to reviewing state plan amendments that
12  were proposing to revise either the ingredient cost
13  payment for drugs or the dispensing fees.
14  Q.  What is a decision memo?
15  A.  A decision memo is an issue paper with
16  recommendations to take to policy decision makers.
17  Options and recommendations generally.
18  Q.  Who are the policy decision makers to
19  which this document would go?
20  A.  Certainly to Dennis Smith and perhaps
21  beyond him.  Dennis reports to the administrator.
22  So it could be for Dennis or it could be something

Page 178

1  that Dennis would send up higher than him for
2  decision.
3      Q.  Do you know who drafted this document?
4      A.  I believe it was drafted in the pharmacy
5  team.  I believe I had a hand in it.  I wasn't the
6  major author.  I was still fairly new to the team, I
7  think, when this was done.
8      Q.  Do you know who the major author was?
9      A.  I suspect that Larry Reid played a large
10 role in it.  But there probably was -- one of the
11 analysts probably was actually the original drafter,
12 and I don't know who that would have been.
13     Q.  Who would be the most likely in your
14 opinion or guess to have been the person who
15 prepared the first draft of this?
16         MS. MARTINEZ:  Objection to form.
17     A.  I just -- I honestly don't know.  I don't
18 think it would be fair for me to guess.
19     Q.  Would Cindy Pelter be someone who it may
20 have been?
21     A.  It could have been.  It's well written
22 and Cindy is a good writer.  But that would be my

Page 179

1  only clue.
2      Q.  How about Kim Howell?
3      A.  It certainly could have been Kim.  Kim is
4  knowledgeable in the subject matter.
5      Q.  How about Sue Gaston?
6      A.  Possibly Sue also.  And I'm not that
7  familiar with her writing.  She was not there too
8  long after I came.
9      Q.  What hand did you have in this draft?
10     A.  I believe in -- basically in editing and
11 commenting on the draft.
12     Q.  Do you recall what comments you provided?
13 I'm sorry.  Were your comments reflected in this
14 particular draft or not?
15     A.  I don't know.  I can't recall enough
16 detail to know that.
17     Q.  Do you recall what comments you provided
18 generally?
19     A.  I think the nature of the comments was in
20 terms of editing clarity of the information
21 presented.
22     Q.  I'm not sure I understand what you mean

Page 180

1  by that.  Could you --
2      A.  Well, I was still new in the division.  I
3  did not consider myself at all a subject matter
4  expert at that time.  However, I do consider myself
5  to be a good writer and editor.  And so I think
6  that's kind of the role I played in this memo.
7      Q.  And do you know what happened with this
8  decision memo or option paper, as you referred to
9  it?
10     A.  I believe it went forward and I believe
11 we got some guidance as a result of it.
12     Q.  What guidance did you receive?
13     A.  I think in general the approaches that
14 are laid out here we were given the go ahead to
15 apply those as we reviewed the state plans.
16     Q.  Was -- if you look at the second to the
17 last page of the document there's a space for
18 decision.  Do you see that?
19     A.  Yes.
20     Q.  Approve, disapprove?
21     A.  Yes.
22     Q.  What is that?

Page 181

1      A.  Just as it appears, whoever was
2  determined to be the decision maker for this issue
3  in this type of memo is generally asked to document
4  their decision by signing and dating whether they
5  agree with the recommendations or disagree or want
6  to add something to them.
7      Q.  Do you know if the options laid out in
8  this document were formally approved via a signature
9  on documents similar to this?
10     A.  I believe we did get a signature on the
11 final document.  Whether that document was altered
12 from this one, I don't know.
13     Q.  What makes you believe that?
14     A.  That we did get a decision?
15     Q.  Mm-hmm.
16     A.  Because we felt that we needed some
17 guidance and I just remember that we did get some as
18 a result of sending forward -- sending the issue
19 forward with some options as to how to review the
20 state plans.
21     Q.  And your recollection is that the
22 guidance you received was that the options laid out

Duzor, Deirdre  
Washington, DC  
October 30, 2007

Page 182

1  in this memo were accepted?
2      A.  I think in general.  Again, in terms of
3  whether this was precisely what was presented and
4  signed off on without the actual document with
5  signature, I'm not sure.
6      Q.  Where could I get a copy of a signed copy
7  of a document -- of this document, whether it be a
8  slightly revised version or not?
9      A.  It probably resides in our records
10 somewhere.
11     Q.  Is there a place where it resides?
12     A.  There's not a specific folder in a
13 specific file cabinet that I know we would find it.
14 But I assume there must be a copy of it in our
15 records somewhere.
16     Q.  Are these the kind of decisions that are
17 made that are put in the Federal Register?
18     A.  No.  They're not.  These are more sort of
19 operating policy.
20     Q.  And do you believe this was a significant
21 operating policy?
22         MS. MARTINEZ:  Objection to form.

Page 183

1      A.  Yeah.  I honestly don't know what you
2  mean by significant.  I mean, it was important in
3  the sense that sort of things were changing in terms
4  of our knowledge of pharmacy pricing and we were
5  seeing more state plan amendments.  So we felt we
6  needed some guidance.  I don't think it's
7  particularly profound.  I think it's really -- you
8  know, there were some approaches that we thought
9  were reasonable we wanted to have ratified by higher
10 authority before we proceeded to apply these
11 approaches.
12     Q.  And why did you want to have them
13 ratified?
14     A.  Because there was significant interest in
15 pharmacy pricing.  There was sort of the general
16 sense that states were paying more than they should
17 be for drugs.  And we wanted to encourage states as
18 we did with sending out the IG reports to take
19 another look at how they were reimbursing for drugs.
20         So we were encouraging them to consider
21 changing their payments.  But when they did we had
22 to review them.  And we needed to make sure that our

Page 184

1  approach to reviewing them was what the decision
2  makers, the policymakers, in the agency, the types
3  of guidelines they wanted us to apply.
4      Q.  Is the other reason that your team wanted
5  a ratification of the approaches was because it did
6  not necessarily -- it was not necessarily consistent
7  with the actual federal regulations governing what
8  states should be paying for drugs?
9          MS. MARTINEZ:  Objection to form.
10     A.  My answer to that would be no.  I don't
11 think we saw anything inconsistent with these
12 guidelines with the regulations.  It was a way of
13 evaluating the state plans, amendments, that we were
14 receiving to determine whether they were in
15 general -- if they were in compliance with the
16 regulatory standard.
17     Q.  Let's take a look at the memo.  The first
18 paragraph states "Although there are no statutory
19 provisions for payment rates for Medicaid drugs,
20 states are required to set rates in accordance with
21 regulations at 42 C.F.R. 447.301-.333."  Those are
22 the regulations you alluded to earlier today,

Page 185

1  correct?
2      A.  Yes, that's correct.
3      Q.  And you agree that there are no statutory
4  provisions that govern what state Medicaid programs
5  can pay for drugs?
6      A.  There is a general statutory provision
7  about the economy and efficiency of the state
8  Medicaid program and that the state programs needed
9  to provide for the program to be run in that manner.
10 But there are no statutory provisions specific to
11 how drugs should be paid for.
12     Q.  Under the background section the first --
13 there's a section that states "Estimated acquisition
14 cost, EAC and dispensing fee."  The second sentence
15 says "The first is EAC, which simply means the cost
16 to the pharmacy of obtaining the drug," correct?
17     A.  Yes.  That's what it says.
18     Q.  And then it says a couple paragraphs
19 down, the ingredient cost is defined in 42 C.F.R.
20 447.301 as the "state agency's best estimate of the
21 price generally and currently paid by providers for
22 a drug marketed or sold by a particular manufacturer

47 (Pages 182 to 185)

Page 186

1  or labeler in the package size most frequently
2  purchased by providers," correct?
3      A.  Yes.  That's what it says.
4      Q.  And then there's a section that talks
5  about Office of Inspector General reports that have
6  been submitted to state audits.  Do you see that?
7      A.  Of the last paragraph?
8      Q.  Yes.
9      A.  Yes.
10     Q.  And it talks about one report showing
11 that the actual acquisition cost for brand name
12 drugs nationally is an average of AWP less 21.84
13 percent, right?
14     A.  Yes.
15     Q.  And it also refers to the last sentence
16 carrying over to the next page to a report on
17 generic drugs showing the actual acquisition cost
18 nationally to be an average of AWP less 65.93
19 percent, correct?
20     A.  Yes, correct.
21     Q.  And then there's a section that talks
22 about analysis where it says "In recent months there

Page 187

1  has been an increase in SPAs proposing to change the
2  reimbursement methodology.  A listing these SPAs is
3  attached.  Where there are surveys of costs the
4  findings generally show that these states'
5  reimbursements could have been reduced by a
6  percentage greater than the proposed AWP discount
7  levels."
8          Is that consistent with your recollection
9  of the facts around this time frame?
10     A.  I don't recall those surveys.  I don't
11 know whether -- they could have occurred before I
12 came.  But I don't recall the surveys.
13     Q.  Do you recall that state plan amendments
14 were proposing a discount off of AWP that was
15 significantly less than OIG's findings?
16         MR. BATES:  Object to the form.
17     A.  Yes.  And most states were not
18 differentiated between generic and innovator
19 products.  They were proposing a discount of AWP
20 across the board.
21     Q.  And the next sentence says "The lesser
22 level of discount is generally the result of

Page 188

1  negotiations that occur between the state and
2  pharmacy representatives after the survey results
3  are known.  In other cases the states' legislature
4  have responded to the escalating cost of Medicaid
5  drugs by enacting legislation that increases the
6  discount in the ingredient cost or the dispensing
7  fee of these drugs.  Legislation usually does not
8  address why these rates are the best estimates or
9  are reasonable."
10         Ms. Duzor, is that statement consistent
11 with your general understanding at the time?
12         MR. WINGET-HERNANDEZ:  Objection to form.
13         MS. MARTINEZ:  Objection to form.
14     A.  Certainly yes concerning state
15 legislation.  I'm not sure I understand what this
16 sentence means when it talks about negotiations that
17 occur between state and pharmacy representatives.  I
18 don't know if that means between the state Medicaid
19 agency or other entities in the state and pharmacy
20 representatives.  Certainly reductions in payments
21 in Medicaid in states is quite frequently a
22 political issue.

Page 189

1      Q.  And you had become aware -- you have been
2  aware in your roughly six years on the job doing
3  this pharmacy stuff that the states often
4  negotiation the level of discount from AWP with
5  pharmacist providers in the states?
6          MS. POLLACK:  Objection to the form.
7          MS. MARTINEZ:  Objection.
8          MR. BATES:  Objection to form.
9      A.  The reimbursement rates in many states is
10 set in state legislation.  And certainly my
11 understanding is that the pharmacies and their
12 representative groups are quite active in trying to
13 protect the interest of pharmacies with state
14 legislative bodies in terms of reimbursement rates.
15     Q.  But what if the state legislation -- that
16 the rate established by the state legislatures is
17 not the state's best estimate of the price generally
18 and currently paid by providers?  What happens in
19 that case?
20         MS. MARTINEZ:  Objection to form.
21     A.  Well, I think that was part of the
22 dilemma here because we were seeing that state

Duzor, Deirdre                                                    October 30, 2007
Washington, DC

Page 190

1  legislatures were talking up the issue of pharmacy
2  reimbursement.  And we commonly did not have
3  documentation as to what their reasoning was in
4  picking a particular figure or rate.
5         So we were getting state plan amendments
6  that would say we'd like to go to AWP minus 13
7  without any solid documentation that that did --
8  that that was a good estimate of acquisition cost.
9  And yet it was determined by the elected body, you
10 know, of the people of the state.  So that gave it
11 some legitimacy.
12    Q.   And CMS had every reason to believe that
13 a reimbursement methodology like AWP minus 13 would
14 not result in a payment by the state for generic
15 drugs that was the price generally and currently
16 paid by providers; isn't that right?
17        MR. WINGET-HERNANDEZ:  Objection to form.
18        MS. MARTINEZ:  Objection to form.
19    A.   Could you state that again?
20    Q.   Sure.  CMS had every reason to believe
21 that a reimbursement methodology like AWP minus 13
22 percent would not result in a payment by a state for

Page 191

1  generic drugs that was the price generally and
2  currently paid by providers; isn't that right?
3        MS. MARTINEZ:  Objection to form.
4    A.   I'm sorry.  I'm still having trouble with
5  the question.
6    Q.   I'll try it again.  CMS had every reason
7  to believe that a reimbursement methodology like AWP
8  minus 13 percent would not result in a payment by a
9  state for generic drugs that was the price generally
10 and currently paid by providers; isn't that right?
11        MS. MARTINEZ:  Objection to form.
12    A.   Okay.  So can I restate the question to
13 see if I understand it?
14    Q.   Okay.
15    A.   That CMS could have concluded that AWP
16 minus 13 was not a good estimate of estimated
17 acquisition cost?  Is that what you're saying?  Is
18 that what you're asking?
19    Q.   What did you believe on a national level
20 was the rate of discounts from AWP for generic
21 drugs?
22        MS. MARTINEZ:  Objection to form.

Page 192

1    A.   We knew that for generic drugs that AWP
2  minus 13 was a generous payment based upon the IG's
3  findings.
4    Q.   OIG had found on a national level that
5  generic drugs were selling at AWP minus 66 percent?
6    A.   Based on their sample, that's what they
7  showed.
8    Q.   And did you have any reason to believe
9  that sample was not representative of the price the
10 generic drugs were generally selling in the
11 marketplace?
12        MR. BATES:  Object to the form.
13    A.   I didn't know enough about their sample.
14 I certainly again would not say that their
15 conclusion was the right answer for all generic
16 drugs.  Most states were doing AWP minus across the
17 board not differentiating between generic and
18 non-generic.  So they were not giving us the state
19 plan amendments that we could align neatly with the
20 OIG report.  They were proposing it in a different
21 way.
22    Q.   And do you recall having discussions

Page 193

1  about that problem at CMS about the need to
2  differentiate between -- about the need to have a
3  reimbursement methodology that was different for
4  brand name drugs than for generic drugs?
5    A.   We didn't have a role or a policy that
6  states had to do that.  That was an approach they
7  could have followed and that was suggested by the
8  inspector general's reports.  But it wasn't an
9  agency policy that states should be doing that.
10 They could do a blended average.  That was not -- it
11 was not inconsistent with anything we had said.
12    Q.   Did you have any reason to believe that a
13 reimbursement methodology like AWP minus 10, AWP
14 minus 15 percent, could serve as a best estimate of
15 the blended average at which generic and branded
16 drugs were selling in the marketplace?
17        MS. MARTINEZ:  Objection to form.
18    A.   To my knowledge we never did the analysis
19 that would really be necessary to come to that
20 conclusion.
21    Q.   If you would go to the next paragraph on
22 Exhibit Abbott 328, it states "It is proving

49 (Pages 190 to 193)

Page 194

1  increasingly difficult to require the states to
2  establish payment rates in adherence to regulatory
3  requirements."  Do you see that?
4      A.  Yes, I do.
5      Q.  Do you know what that means?
6      A.  No.  And I think my difficulty is that --
7  the idea of increasingly difficult, I wasn't there
8  at the prior point in time to have an appreciation
9  of how it had been before I arrived.
10     Q.  Do you know what the regulatory
11 requirements were that are being referred to here?
12     A.  I believe they would be the regulatory
13 requirements related to estimated acquisition cost.
14     Q.  And what the authors of this document are
15 saying is that it's becoming difficult to require
16 states to set payment rates that get to estimated
17 acquisition cost, correct?
18         MR. WINGET-HERNANDEZ:  Objection to form.
19         MS. MARTINEZ:  Objection, form.
20     A.  The plain reading of it, yes.
21     Q.  Oh, is there a hidden meaning that I'm
22 not getting?

Page 195

1          MR. WINGET-HERNANDEZ:  Objection, form.
2      A.  No.  Again, I'm just saying that not
3  having the history I don't know the basis of the
4  statement saying that it is proving increasingly
5  difficult.
6      Q.  But based on your experience you did
7  observe that it was difficult to get states to
8  establish payment rates in adherence with the
9  estimated acquisition cost, correct?
10         MR. BATES:  Objection to the form.
11         MS. MARTINEZ:  Objection to form.
12     A.  Well, in order to determine estimated
13 acquisition cost my understanding of what had been
14 done previously was to require states to do surveys
15 and get invoices.  And I think states were saying
16 that that was too difficult, too time consuming, too
17 out of date.  By the time they did it prices were
18 changing.  So that states were telling us that they
19 couldn't really do that anymore.
20     Q.  Is it your testimony that you didn't know
21 that states were reimbursing drugs at levels higher
22 than estimated acquisition cost?

Page 196

1          MR. WINGET-HERNANDEZ:  Objection it form.
2          MR. BATES:  Objection to form.
3          MS. MARTINEZ:  Objection to form.
4      A.  I think based on the IG reports, yes, we
5  expected that they were.  But they were faced with
6  difficult choices in terms of reducing their
7  payments, which many states were doing, but they
8  were doing it in a cautious manner.  They didn't
9  want to do it in a very precipitous manner because
10 of course their pharmacy -- their pharmacist and
11 their pharmacy organizations were telling people
12 that the sky would be falling in then.
13         So I think they were in a difficult
14 position to know how much they could reduce their
15 rates.
16     Q.  Do you believe that their actions were
17 reasonable?
18         MS. MARTINEZ:  Objection to form.
19         MR. BATES:  Objection to form.
20     A.  I think we thought the direction they
21 were going was the proper direction.  Whether they
22 were being overly cautious or not I think is a hard

Page 197

1  judgment at the federal level to make.  But, you
2  know, I think we thought they were going in the
3  right direction.
4      Q.  What would have happened if overnight all
5  the AWPs reported for all drugs were automatically
6  turned into real prices?
7          MR. WINGET-HERNANDEZ:  Objection to form.
8          MS. MARTINEZ:  Objection to form.
9      Q.  What would have happened?
10         MR. BATES:  Objection to form.
11     A.  I think that a lot of telephones would
12 have been ringing all over the country in Medicaid
13 offices from pharmacists would be saying -- and they
14 do now, when states -- my understanding -- when
15 states establish MACs.  If a pharmacist can't get
16 the drug at the price that they're being reimbursed
17 by Medicaid they don't hesitate to call Medicaid and
18 say I'm going to come in and show you my invoice.
19 Here it is.  Here's what I'm paying.  I can't take
20 reimbursement from you that's less than what it's
21 costing me.
22         So I think they hear about it from the

50 (Pages 194 to 197)

Duzor, Deirdre                                              October 30, 2007
Washington, DC

Page 198

1  pharmacy community. And that's what would have
2  happened.
3        MR. TORBORG: We need to take a break and
4  change the tape and might as well take a break at
5  the same time.
6        MR. NEAL: Sounds good.
7        THE VIDEOGRAPHER: This is the end of
8  tape 4. Off the record at 3:00.
9        (Recess, 3:01-3:24 p.m.)
10       THE VIDEOGRAPHER: This is the beginning
11 to have tape 5 in the deposition of Ms. Duzor. On
12 the record at 3:24:15.
13       BY MR. TORBORG:
14    Q.  Welcome back, Ms. Duzor.
15    A.  Thank you.
16    Q.  I'd like to ask you to look at Abbott
17 Exhibit 328 again. It's the document we've been
18 looking at. The second page. In particular the
19 second paragraph under analysis. I'd asked you
20 about the first sentence there.
21       I wanted to go to the second sentence
22 where it states "Accordingly we believe an analysis

Page 199

1  and acceptance of other factors states are now using
2  to establish payment rates should be considered in
3  looking at the EAC and a dispensing fee." Do you
4  have an understanding of what that means?
5     A.  I believe what it means is that rather
6  than insisting on a dispensing fee study or an
7  analysis of invoices that we should look at other
8  ways that states were developing their EACs.
9     Q.  How were other states -- what other
10 factors were states using to establish payment
11 rates?
12       MS. MARTINEZ: Objection to form.
13    A.  As noted in the paragraph above, one was
14 through state legislation.
15    Q.  Any other factors that -- this refers to
16 factors in plural.
17    A.  Yeah. Well, it indicates above also that
18 there was this negotiation occurring. But again, as
19 I said before, I'm not really sure who the parties
20 are to those negotiations.
21    Q.  Do you have a guess as you sit here
22 today?

Page 200

1        MS. MARTINEZ: Objection to form.
2        MS. POLLACK: Objection to form.
3     A.  Well, it says states and pharmacy
4  representatives. Again, I'm not sure if that means
5  state Medicaid agencies or other bodies in the
6  state. I'm just not sure what this means. I'm a
7  little surprised that state Medicaid agencies --
8  that the phrase or word "negotiation" would be used
9  in connection with the state Medicaid agencies
10 because you generally just don't think of, you know,
11 the executive branch of government negotiating.
12    Q.  Well, you had been provided -- let me
13 strike that and start over.
14       You took part in approving state plans,
15 correct?
16    A.  Yes.
17    Q.  And in connection with that effort
18 documentation went back and forth between CMS and
19 state Medicaid officials, correct?
20    A.  Yes.
21    Q.  Your name appears on a lot of that
22 documentation, does it not?

Page 201

1     A.  Yes, it does.
2     Q.  And in that documentation, does it not
3  refer to negotiations with pharmacy provider
4  groups --
5        MS. MARTINEZ: Objection to form.
6     Q.  -- or do you just not recall that?
7     A.  I don't recall that.
8     Q.  So the factors that you believe this is
9  referring to are the rates set by state legislatures
10 and negotiations with the states and pharmacy
11 representatives, whoever those might be, correct?
12       MR. WINGET-HERNANDEZ: Objection to form.
13    A.  In reading this document, that seems to
14 be what it's saying to me.
15    Q.  Any other factors?
16       MS. MARTINEZ: Objection to form.
17    A.  No other that seem to be mentioned here
18 or that come to mind.
19    Q.  Okay. And what does the word "acceptance
20 of other factors" mean in that sentence?
21       MS. MARTINEZ: Objection to form.
22    A.  I believe it means approval of

51 (Pages 198 to 201)

Page 202

1  reimbursement rates based upon states pointing to
2  these other factors.
3      Q.   As opposed to a strict reliance on
4  estimated acquisition cost?
5           MS. MARTINEZ:  Objection to form.
6      A.   Rather than a strict reliance on pharmacy
7  pricing invoices, documentation of prices paid.
8      Q.   Is it your testimony that this sentence
9  refers -- that this sentence does not refer to
10 accepting payment levels that are higher than
11 estimated acquisition cost?
12          MS. MARTINEZ:  Objection to form.
13     A.   I think that we're trying to establish
14 other bases for the estimated acquisition cost other
15 than looking at actual prices paid.
16     Q.   So do you believe that the negotiations
17 referred to above relate to the actual prices or
18 data that would be used to set estimated acquisition
19 cost?
20          MS. MARTINEZ:  Objection to form.
21     Q.   Is that your testimony?
22     A.   What I'm saying is that in proposing

Page 203

1  state plan amendments states do it through a variety
2  of means.  And some of them -- one of them could be
3  legislation, one of them this memo is saying could
4  be with negotiations, that -- I believe what that
5  means is that a state may say we're thinking about
6  putting a state plan amendment that says for
7  generics it will be AWP minus 65.
8           And the pharmacy groups say you can't do
9  that, you'll put me out of business, and so there is
10 some negotiation there.  And that we would accept
11 that negotiation as being sort of -- you know, a
12 reasonable estimate or the best estimate we could
13 get of acquisition cost.
14     Q.   Did you believe that the negotiations
15 between pharmacy providers and states were providing
16 the best estimate of the price at which those
17 providers were currently and generally paying for
18 those drugs?
19          MR. WINGET-HERNANDEZ:  Objection to form.
20          MS. MARTINEZ: Objection to form.
21     A.   I think we're saying that it was
22 reasonable to accept that as a reasonable proxy.

Page 204

1      Q.   Of the actual price at which they
2  purchased the drugs?
3      A.   Of the best estimate that the state could
4  come up with of acquisition cost.
5      Q.   And what do you base that belief on, that
6  the negotiations with pharmacy providers and the
7  states were leading to the best estimate that the
8  state agency could come up with for what those
9  providers were paying for drugs?
10          MR. WINGET-HERNANDEZ:  Objection to form.
11     A.   That there are competing interests
12 between the states wanting to pay as low of a price
13 as they can pay in order to achieve budget savings,
14 the pharmacy certainly -- their interests being in
15 the opposite direction -- and that through
16 negotiation that was the best the state could do in
17 terms of coming up with an estimate of acquisition
18 cost that they would propose in a state plan to use.
19     Q.   The best estimate of the actual cost or
20 the best payment rate that they thought they could
21 keep to keep providers in the system?
22          MR. BATES:  Objection as to form.

Page 205

1           MR. WINGET-HERNANDEZ:  Objection to form.
2           MS. MARTINEZ: Objection to form.
3      A.   I think ideally you want those two
4  numbers to come very close to each other or even
5  though blend into one.  So I think that's what
6  states were trying to accomplish.  It was very hard
7  for us to judge.  And I think we were acknowledging
8  that it would always be hard for us to judge whether
9  those negotiations resulted in that best price or
10 not.
11          But it was the best approximation, the
12 best estimate.  It was something that we wanted to
13 be able to use as a basis for accepting the state's
14 proposal and approving their state plan.
15     Q.   I asked you earlier for your opinion on
16 what would have happened if all of the average
17 wholesale prices or a significant portion of them
18 had changed overnight to be the actual average price
19 at which providers purchased drugs from wholesalers.
20     A.   Yes.
21     Q.   And you provided a response to that,
22 correct?

                                      52 (Pages 202 to 205)

Duzor, Deirdre                                               October 30, 2007
                              Washington, DC

Page 206

1    A.  Yes.
2    Q.  Have you discussed that issue ever at
3  CMS?
4    A.  I recall talking to states about their
5  state MACs and states saying that what happens
6  within a state when they set a state MAC that they
7  subsequently decide is too low, that the way they
8  find out about that is that the pharmacy providers
9  are very quick to call and to demonstrate to the
10 state that they can't obtain the drug for that
11 price.  That that is the -- that that is the
12 behavior of pharmacies when they're in that
13 situation.
14   Q.  Did you discuss it with your colleagues
15 at CMS?
16   A.  I don't recall discussing it with
17 anybody.
18   Q.  Now, you've testified earlier that the
19 options set forth in this document you believe were
20 ratified by someone above the chain; is that right?
21   A.  Yes.  I believe we got the go ahead to
22 proceed with these -- evaluating state plans using

Page 207

1  these factors.
2    Q.  And that would be a decision that was
3  made within CMS, right?
4    A.  Yes.
5    Q.  And would that decision be published
6  anywhere?  I asked you earlier if it would be
7  published in the Federal Register.  But would it be
8  published anywhere?
9    A.  No.
10       MR. COOK:  I'd like to ask for a
11 production of the final signed copy of this document
12 to the extent it exists.  I have not seen it.  If it
13 exists --
14       MS. MARTINEZ:  My understanding is that
15 the agency is going to assert privilege over it due
16 to ongoing decision-making.  But we can discuss
17 that.  I mean, we don't have to take up Ms. Duzor's
18 time.
19       MR. MERKL:  Okay.  We join the request as
20 well.  We would also request all prior procedures
21 and subsequent procedures of a similar nature.
22       MS. MARTINEZ:  I'm sorry.  I didn't

Page 208

1  understand your last statement.
2        MR. KELLEY:  Yeah.  Procedures of a
3  similar nature, I didn't understand what you meant.
4        MR. MERKL:  The procedure outlined in the
5  document he's talking about.
6        MR. KELLEY:  Oh, okay.
7        MR. GORTNER:  The Roxane defendants join
8  that request.
9        MS. MARTINEZ:  I don't know that such
10 thing exists.
11       MR. MERKL:  Then we won't have an
12 argument.
13       BY MR. COOK:
14   Q.  And the decision that would be made as
15 reflected in this document and as we've discussed,
16 that would be something that would affect the amount
17 that states reimburse for drugs; is that right?
18       MS. MARTINEZ:  Objection to form.
19   A.  States would be reluctant to reimburse
20 for drugs at any amount higher than what the federal
21 government would fully match.  So yes.  If we didn't
22 approve their state plan it's unlikely, I think,

Page 209

1  that states would pay at a higher rate.
2              (Exhibit Abbott 373 was
3               marked for
4               identification.)
5        BY MR. TORBORG:
6    Q.  For the record, what I've marked as
7  Exhibit Abbott 373 bears the Bates number HHC
8  009-0976.  It appears to be an e-mail thread dated
9  June 3rd 2002 involving Larry Reid, Pamela Carson
10 and Kimberly Howell.  I ask you to look at that
11 e-mail, Ms. Duzor.
12       MS. MARTINEZ:  What's the number of that
13 exhibit?
14       MR. TORBORG:  Exhibit Abbott 373.
15   A.  (Reading.)  Okay.  I've read it.
16   Q.  Do you recall this e-mail?
17   A.  No, I don't.
18   Q.  Let me ask you about some names first.
19 Pamela Carson, she's identified as the national
20 account representative?
21   A.  Yes.
22   Q.  What is her position within CMS?  What

53 (Pages 206 to 209)

Henderson Legal Services
202-220-4158

f5f0cb67-5db5-4a19-acea-ff4afd75844b