# EXHIBIT 6

Smith, Dennis G.                              February 26, 2008
                    Washington, DC

                    UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

PRICE LITIGATION              ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    ) Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       ) Chief Magistrate

Abbott Laboratories, Inc.,    ) Judge Marianne B.

No. 06-CV-11337-PBS           ) Bowler

- - - - - - - - - - - - - - -

          (caption continues on following pages)




          Videotaped deposition of DENNIS G. SMITH

                    Volume I



                    Washington, D.C.

                    Tuesday, February 26, 2008

                    9:00 a.m.

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

Page 2

1        IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2            IN AND FOR LEON COUNTY, FLORIDA
3   THE STATE OF FLORIDA
4   ex rel.
5   - - - - - - - - - - - - - - - - - -
6   VEN-A-CARE OF THE FLORIDA KEYS,   )
7   INC., a Florida Corporation, by and )
8   through its principal officers and )
9   directors, ZACHARY T. BENTLEY and  )
10  T. MARK JONES,                     )
11          Plaintiffs,        ) Civil Action
12      vs.                    ) No. 98-3032G
13  MYLAN LABORATORIES INC.; MYLAN    )
14  PHARMACEUTICALS INC.; NOVOPHARM   ) Judge William
15  LTD., SCHEIN PHARMACEUTICAL, INC.; ) L. Gary
16  TEVA PHARMACEUTICAL INDUSTRIES    )
17  LTD.; TEVA PHARMACEUTICAL USA; and )
18  WATSON PHARMACEUTICALS, INC.,     )
19          DEFENDANTS.        )
20  - - - - - - - - - - - - - - - - - -
21
22

Page 3

1            IN THE CIRCUIT COURT OF
2          MONTGOMERY COUNTY, ALABAMA
3   - - - - - - - - - - - - - - -
4   STATE OF ALABAMA,           )
5          Plaintiff,       )
6      vs.                ) Case No. CV-2005-219
7   ABBOTT LABORATORIES, INC.,   ) Judge Charles Price
8   et al.,                )
9          Defendants.    )
10  - - - - - - - - - - - - - - -
11
12
13      Videotaped deposition of DENNIS G. SMITH,
14  held at the law offices of Jones Day, 51 Louisiana
15  Avenue, N.W., Washington, D.C. 20001-2113, the
16  proceedings being recorded stenographically by
17  Jonathan Wonnell, a Registered Professional Court
18  Reporter and Notary Public of the District of
19  Columbia, and transcribed under his direction.
20
21
22

Page 4

1        A P P E A R A N C E S   O F   C O U N S E L
2
3   On behalf of the United States of America:
4
5        ANA MARIA MARTINEZ, ESQ.
6        United States Department of Justice
7        99 N.E. 4th Street
8        Miami, Florida 33132
9        (305) 961-9431
10       ana.maria.martinez@usdoj.gov
11
12
13  On behalf of the U.S. Department of Health and
14  Human Services:
15
16       BRIAN A. KELLEY, ESQ.
17       U.S. Department of Health &
18       Human Services
19       Office of General Counsel, CMS Division
20       330 Independence Avenue, S.W., Room 5345
21       Washington, D.C. 20201
22       (202) 205-8702

Page 5

1        A P P E A R A N C E S   (Cont'd)
2
3   On behalf of the State of Alabama:
4
5        WINDY COCKRELL BITZER, ESQ. (via phone)
6        Hand Arendall LLC
7        1200 Park Place Tower
8        2001 Park Place North
9        Birmingham, Alabama 35203
10       (205) 324-4400
11       wbitzer@handarendall.com
12
13
14  On behalf of the State of California:
15
16       MATTHEW KILMAN, ESQ. (via phone)
17       Supervising Deputy Attorney General
18       Civil Prosecutions Unit
19       P.O. Box 85266
20       110 West A Street, #1100
21       San Diego, California 82186
22       (619) 688-6099

                              2 (Pages 2 to 5)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                February 26, 2008
                         Washington, DC

|  | Page 6 |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd) |
| 2 | |
| 3 | On behalf of the State of Florida: |
| 4 | |
| 5 | GRETCHEN WALLACE, ESQ. (via phone) |
| 6 | Office of the Attorney General of Florida |
| 7 | PL-01, The Capitol |
| 8 | Tallahassee, Florida 32399-1050 |
| 9 | (850) 414-3600 |
| 10 | |
| 11 | |
| 12 | On behalf of the City of New York and all New York |
| 13 | Counties other than Nassau and Orange; the States |
| 14 | of Wisconsin, Illinois, Kentucky, Idaho, Alaska, |
| 15 | Hawaii, South Carolina and Mississippi: |
| 16 | |
| 17 | MICHAEL WINGET-HERNANDEZ, ESQ. |
| 18 | Winget-Hernandez, LLC |
| 19 | 3112 Windsor Road, Suite 228 |
| 20 | Austin, Texas 78703 |
| 21 | (512) 858-4181 |
| 22 | michael@winget-hernandez.com |

|  | Page 8 |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd) |
| 2 | |
| 3 | On behalf of Bristol-Myers Squibb: |
| 4 | |
| 5 | SANDHYA P. KAWATRA, ESQ. (via phone) |
| 6 | Hogan & Hartson |
| 7 | 875 Third Avenue |
| 8 | New York, New York 10022 |
| 9 | (212) 918-3000 |
| 10 | spkawatra@hhlaw.com |
| 11 | |
| 12 | |
| 13 | On behalf of Dey, Inc., Dey, L.P. and Mylan: |
| 14 | |
| 15 | NEIL MERKL, ESQ. |
| 16 | Kelley, Drye & Warren LLP |
| 17 | 101 Park Avenue |
| 18 | New York, New York 10178 |
| 19 | (212) 808-7811 |
| 20 | nmerkl@kelleydrye.com |
| 21 | |
| 22 | |

|  | Page 7 |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd) |
| 2 | |
| 3 | On behalf of Ven-A-Care of the Florida Keys, Inc.: |
| 4 | |
| 5 | JOSEPH C. WILSON, ESQ. |
| 6 | Cotchett, Pitre & McCarthy |
| 7 | San Francisco Airport Office Center |
| 8 | 840 Malcolm Road |
| 9 | Burlingame, California 94010 |
| 10 | (650) 697-0577 |
| 11 | jwilson@cpmlegal.com |
| 12 | |
| 13 | On behalf of Abbott Laboratories, Inc.: |
| 14 | |
| 15 | R. CHRISTOPHER COOK, ESQ. |
| 16 | SEAN P. MALONE, ESQ. |
| 17 | Jones Day |
| 18 | 51 Louisiana Avenue, N.W. |
| 19 | Washington, D.C. 20001-2113 |
| 20 | (202) 879-3939 |
| 21 | christophercook@jonesday.com |
| 22 | spmalone@jonesday.com |

|  | Page 9 |
|---|---|
| 1 | A P P E A R A N C E S (Cont'd) |
| 2 | |
| 3 | On behalf of Endo Pharmaceuticals: |
| 4 | |
| 5 | VICTOR RORTVEDT, ESQ. |
| 6 | Arnold & Porter |
| 7 | 555 Twelfth Street, N.W. |
| 8 | Washington, D.C. 20004 |
| 9 | (202) 942-5000 |
| 10 | |
| 11 | |
| 12 | On behalf of Roxane Laboratories and |
| 13 | Boehringer Ingelheim: |
| 14 | |
| 15 | JOHN W. REALE, ESQ. |
| 16 | Kirkland & Ellis |
| 17 | 200 East Randolph Drive |
| 18 | Chicago, Illinois 60601 |
| 19 | (312) 861-3452 |
| 20 | jreale@kirkland.com |
| 21 | |
| 22 | |

3 (Pages 6 to 9)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

---

Page 10

1        A P P E A R A N C E S (Cont'd)
2
3    On behalf of Sandoz, Inc.:
4
5        LARA A. BERWANGER, ESQ. (via phone)
6        White & Case LLP
7        1155 Avenue of the Americas
8        New York, New York 10036-2787
9        (212) 819-2549
10       lberwanger@whitecase.com
11
12
13   On behalf of Schering-Plough Corporation,
14   Schering Corporation and Warrick
15   Pharmaceuticals Corporation:
16
17       GINGER APPLEBERRY, ESQ. (via phone)
18       Locke, Liddell & Sapp
19       2200 Ross Avenue, Suite 2200
20       Dallas, Texas 75201
21       (214) 740-8459
22       gappleberry@lockeliddell.com

---

Page 11

1        A P P E A R A N C E S (Cont'd)
2
3    ALSO PRESENT:
4
5        CONWAY BARKER, videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

Page 12

1              C O N T E N T S
2    WITNESS NAME                        PAGE
3    DENNIS G. SMITH
4        Examination By Mr. Cook.................... 016
5
6
7              E X H I B I T S
8    NUMBER           DESCRIPTION        PAGE
9    Exhibit Abbott-Smith 485, Resume of Dennis G.
10               Smith (no Bates ref). 018
11   Exhibit Abbott-Smith 486, HHD101-0489 - 0492... 118
12   Exhibit Abbott-Smith 487, Smith letter to Scully
13               dated 10/22/02
14               (redacted, no Bates
15               ref)................ 121
16
17
18   (Exhibit Abbott-Smith 486 was retained by Mr. Cook)
19
20
21
22

---

Page 13

1            P R O C E E D I N G S
2                (9:25 a.m.)
3        THE VIDEOGRAPHER:  In the United States
4    District Court for the District of Massachusetts
5    In Re: Pharmaceutical Industry Average Wholesale
6    Price Litigation, related to the United States of
7    America ex rel. Ven-A-Care of the Florida Keys
8    Incorporated versus Abbott Laboratories
9    Incorporated et al., Case Number 01-CV-12257
10   (PBS) and other cross noticed cases, this is the
11   deposition of Dennis G. Smith.
12       Today's date is February 26th 2008.
13   The location is Jones Day, 51 Louisiana Avenue,
14   Northwest, Washington, D.C.  Will counsel please
15   identify yourselves and state whom you represent?
16       MR. COOK:  Christopher Cook from Jones
17   Day.  We represent Abbott Laboratories, Inc.
18       MR. MERKL:  Neil Merkl from Kelley
19   Drye.  We represent the Dey companies.
20       MR. REALE:  John Reale from Kirkland &
21   Ellis and I represent the Boehringer entities.
22       MS. MARTINEZ:  Ani Martinez.  I

---

Henderson Legal Services, Inc.

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Page 14

1  represent the United States.
2      MR. KELLEY:  Brian Kelley.  I represent
3  the Department of Health and Human Services.
4      MR. WILSON:  Joe Wilson with Cotchett,
5  Pitre & McCarthy on behalf of Ven-A-Care, the
6  relator in this matter.
7      MR. WINGET-HERNANDEZ:  Michael Winget-
8  Hernandez.  I'm here on behalf of the New York
9  Counties and the City of New York in MDL 1456
10  other than Orange and Nassau; also on behalf of
11  the states of Wisconsin, Illinois, Kentucky,
12  Alaska, Hawaii and Idaho to the extent that they
13  have been cross noticed here.
14      THE VIDEOGRAPHER:  Those on the phone,
15  could you identify yourselves please?
16      MS. BITZER:  This is Windy Bitzer.  I
17  represent the state of Alabama.
18      MR. KILMAN:  Matt Kilman on behalf of
19  the state of California.
20      MS. WALLACE:  Gretchen Wallace on
21  behalf of the State of Florida attorney general's
22  office.

Page 15

1      MR. RORTVEDT:  Victor Rortvedt on
2  behalf of Endo Pharmaceuticals, Inc.
3      MS. APPLEBERRY:  Ginger Appleberry,
4  Schering, Schering-Plough and Warrick
5  Pharmaceuticals.
6      MS. BERWANGER:  Lara Berwanger from
7  White & Case on behalf of Sandoz, Inc.
8      MS. KAWATRA:  Sandhya Kawatra, Hogan &
9  Hartson on behalf of Bristol-Myers Squibb
10  Company.
11      THE VIDEOGRAPHER:  The court reporter
12  is Jon Wonnell.  The video camera operator is
13  Conway Barker, both on behalf of the Henderson
14  Legal Services.  This deposition commences at
15  9:27.
16
17  Whereupon,
18          DENNIS G. SMITH,
19  called as a Witness, was duly sworn by Jonathan
20  Wonnell, a Notary Public in and for the District
21  of Columbia, and was examined and testified as
22  follows.

Page 16

1      EXAMINATION BY COUNSEL FOR ABBOTT
2  LABORATORIES
3  BY MR. COOK:
4      Q.  Good morning, Mr. Smith.  My name is
5  Chris Cook.  I'm with Jones Day and I'll be
6  taking your deposition today.  To start with,
7  could you please tell the court reporter your
8  name and spell it?
9      A.  Dennis D-e-n-n-i-s, G., Smith, S-m-i-t-
10  h.
11      Q.  Where do you live, Mr. Smith?
12      A.  In Springfield, Virginia.
13      Q.  And what's your business address?
14      A.  200 Independence Avenue, Southwest,
15  Washington, D.C.
16      Q.  Do you have any immediate plans to
17  change either your residence or your business
18  position?
19      A.  The election will change my business
20  address.
21      Q.  Will we be able to reach you through
22  Ms. Martinez if we need to depose you in the

Page 17

1  future?
2      A.  Sure.
3      Q.  If you do change jobs and leave the
4  administration after the election, what would be
5  the best way to get in touch with you after that?
6      A.  At this point I have no idea.
7      MS. MARTINEZ:  Obviously through
8  counsel would be one way.
9      MR. COOK:  Sure.  And so you'll
10  continue to represent Mr. Smith even after he
11  leaves government employment?
12      MS. MARTINEZ:  Well, obviously that's
13  something we would discuss with him.  If he
14  requests that of course we would do that.
15  BY MR. COOK:
16      Q.  What's your current position?
17      A.  I'm the director of the Center for
18  Medicaid and State Operations.
19      Q.  With what organization?
20      A.  The Centers for Medicare and Medicaid
21  Services.
22      Q.  Would you understand it if I refer to

5 (Pages 14 to 17)

Smith, Dennis G.                                February 26, 2008
                        Washington, DC

Page 118

1  what would become the regulations to implement
2  the MMA.
3      Q.  Prior to implementation of MMA 2003,
4  how was it that Medicare paid for those few drugs
5  for which Medicare Part B did pay for separately?
6      A.  I don't know.  I couldn't explain.
7      Q.  And so you probably also couldn't
8  explain -- or you can tell me whether you can't -
9  - how it was that MMA 2003 changed the manner in
10 which Medicare paid for drugs under Part B?
11     A.  I couldn't explain.  Certainly lots of
12 other people can within the agency.
13         (Exhibit Abbott-Smith 486 was marked
14 for identification.)
15 BY MR. COOK:
16     Q.  Mr. Smith, let me hand you what I've
17 marked as Abbott Exhibit 486.  For the record,
18 Exhibit Abbott 486 bears Bates numbers HHD 101-
19 0489 through 0492.  It is a letter on CMS
20 letterhead to state Medicaid director.  And it
21 appears to be from you, although it is an
22 unsigned copy, with a summary statement added to

Page 119

1  the back of the -- what appears to be a draft
2  letter.
3         Do you recognize Exhibit 486?
4      A.  I'd have to read it.  I don't recognize
5  it offhand.
6      Q.  If you could take the time -- I'm
7  sorry.
8      A.  Generally things that are sent out over
9  my signature would have my signature.  This does
10 not.  So I don't know if this is --
11     Q.  I'm sorry.  You were saying?
12     A.  So I don't know offhand if it's an
13 earlier draft or -- usually if there was a final
14 it would have my signature or indicate that it
15 had been signed.
16         MS. MARTINEZ:  Counsel, just on a very
17 quick glance at this document it looks to me like
18 possibly it's a document that we should have
19 asserted privilege over.  I'd just like to have
20 an opportunity to discuss that with in-house
21 counsel.  Is it possible for you to move on to
22 another exhibit or give us a break?

Page 120

1         MR. COOK:  Oh, I'm happy to go off the
2  record.  I would say that we were unable to
3  locate a final version of this.  And so this is
4  the only version we have.  So I don't have
5  another version of this to use.  But let's go off
6  the record and let you discuss it.
7         THE VIDEOGRAPHER:  Off the record at
8  1:02.
9         (Recess.)
10        THE VIDEOGRAPHER:  On the record at
11 1:18.
12        MS. MARTINEZ:  This is Ani Martinez on
13 behalf of the United States.  We reviewed the
14 document that's been marked as Abbott Exhibit
15 486, which has the Bates labels HHD 101-0489
16 through HHD 101-0492.  It appears to us that this
17 is a document that was inadvertently disclosed
18 and we're asserting the deliberative process
19 privilege with respect to it.
20        MR. COOK:  We disagree, but I'll move
21 on to another document.  If you'll give me a
22 minute I'll pull it out to mark it.

Page 121

1         MR. MERKL:  For the record, we also
2  disagree.
3         MS. MARTINEZ:  And in case I didn't use
4  the words recall, we're recalling the document at
5  this time.
6         (Exhibit Abbott-Smith 487 was marked
7  for identification.)
8  BY MR. COOK:
9      Q.  Mr. Smith, I'll hand you a document
10 that I've marked Exhibit 487.  And at the same
11 time as you're looking at that I'll get your
12 counsel to pull out a copy of Exhibit 328.
13        MR. COOK:  And I apologize.  I don't
14 know what volume it's in, Ani.
15        MS. MARTINEZ:  That's okay.
16 BY MR. COOK:
17     Q.  While you're looking at Exhibit 487,
18 let me --
19        MR. WINGET-HERNANDEZ:  328?
20        MR. COOK:  Yes.  328.
21 BY MR. COOK:
22     Q.  -- let me indicate for the record

31 (Pages 118 to 121)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                           February 26, 2008
                              Washington, DC

| Page 122 |
| --- |

1   Exhibit 487 is a document that was produced to us
2   yesterday.  It does not have Bates numbers.
3   However, it is a copy of a memo from CMS dated
4   October 20, 2002.  It is from the director of the
5   Center for Medicaid and State Operations it
6   appears to have gone out over your signature.  It
7   is addressed to Tom Scully, the administrator,
8   and Rubin J. King-Shaw Jr., the deputy
9   administrator and chief operating officer of CMS.
10          It is redacted for much of pages 1, 2
11  and a part of page 3.  And on the fifth page it
12  bears your signature and it bears the signature
13  of Tom Scully with a date of what looks like
14  November 2, 2002 under the decision indicating
15  approved.
16          Mr. Smith, do you recognize Exhibit
17  487?
18     A.  If you'll give me a minute to read
19  through it just to refresh my memory.
20     Q.  Please do.
21     A.  This would have been 2002.
22     Q.  So it appears.

| Page 123 |
| --- |

1      A.  (Reading.)  Okay.
2      Q.  Do you recognize the document?
3      A.  I recall it, yes.
4      Q.  Is that your signature at the end of
5   the document?
6      A.  Yes, it is.
7      Q.  Do you recognize that as Mr. Scully's
8   signature under approved?
9      A.  Yes.
10     Q.  What is this memorandum?
11     A.  This is -- this would have been an
12  internal memo, that we would have prepared for
13  guidance on review of state plan amendments.
14  When states do want to change their payment
15  methodologies or any type of provider, then they
16  would submit plan amendments.  This was still
17  relatively early in the administration.  We were
18  trying to get some guidance on how to handle the
19  review.
20          I think that in general these are
21  helpful.  But as it indicates on the final
22  recommendation that we would look at the

| Page 124 |
| --- |

1   individual circumstances in the state as well as
2   its supporting documentation and rationale.  So I
3   think this is guidance for us as we would review
4   state plan amendments as they came in.
5      Q.  Who drafted this memorandum?
6      A.  I can't say with absolute certainty,
7   but it would most likely come from my staff.
8      Q.  Do you know who within your staff is
9   most likely to have had the pen on this document?
10     A.  Most likely it would be Larry Reed or -
11  - Larry at the time certainly was working on the
12  pharmacy issues.  I don't recall if Deirdra Duzor
13  had moved over to the pharmacy at that point in
14  time yet or not.  But Larry is certainly our
15  expert; was at that time, and continues to be so
16  today.
17     Q.  Did you participate in determining
18  whether to redact this document?
19     A.  I don't believe I did.
20     Q.  Do you know what it is that has been
21  redacted from this document?
22     A.  I don't recall.

| Page 125 |
| --- |

1      Q.  How was it that the issue of factors
2   for approving or denying state plan amendments
3   relating to the payment for prescription drugs
4   became an issue in around October of 2002?
5      A.  As I indicated, this is still
6   relatively early in the administration.  We were
7   getting state plan amendments in.  This was -- as
8   I said, I think we were just trying to make
9   certain we were getting some general guidance on
10  how to handle it.
11     Q.  Was there any event that occurred that
12  you recall that caused this to become an issue at
13  about this time?
14     A.  I don't recall any specific event.
15     Q.  What are the standards that govern the
16  approval or disapproval of state plan amendments?
17     A.  Well, the law, the regulations --
18     Q.  Yes, sir.  The law and regulations.
19  Could you describe to me what it is that the
20  legal parameters are that govern CMS's approval
21  or disapproval of state plan amendments?
22     A.  In general, as we discussed earlier,

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 126 |
|---|
| 1  Medicaid overall is supposed to be paying in an |

**Page 126**

1  Medicaid overall is supposed to be paying in an
2  efficient and economical manner.  The regulations
3  refer to -- I'm trying to recall the exact
4  wording -- I think best estimates of estimated
5  acquisition cost, a reasonable dispensing fee.
6  So I think as we had discussed earlier, that it
7  is, again, sort of those competing interests that
8  we often find ourselves in to Medicaid being a
9  program to provide access for poor people and
10 also balancing that with being a prudent
11 purchaser.
12      So I think the -- as the paper
13 indicates, as you go through the options,
14 breaking it down as reimbursement typically is,
15 one, on the ingredients side and, secondly, on
16 the dispensing side, because you're paying at the
17 counter for outpatient drugs, typically paying
18 the pharmacist.
19      As I said, this -- again, I think we
20 were just looking for some general guidance as to
21 review them as they come in.  But it clearly also
22 indicates that we would be looking at any of the

**Page 127**

1  supporting documentation that the states provided
2  us to justify their plan amendments.
3      Q.   So it's your understanding that the
4  pertinent regulations require CMS to approve
5  state plan amendments that in the aggregate will
6  pay the estimated acquisition cost plus a
7  reasonable dispensing fee for prescription drugs;
8  do I have that correct?
9      A.   Well, in the aggregate refers to
10 specifically drugs on the FULs.  Obviously we pay
11 for drugs that aren't on FULs also.
12      Q.   Yeah.  Let me go ahead and pull the
13 regulation.  That may be easier.
14      MR. COOK:  Ani, could you pull Exhibit
15 284?  I don't know which volume it's in.  I'm
16 sorry again.
17      MS. MARTINEZ:  Don't worry.  I'm
18 getting good at this.
19 BY MR. COOK:
20      Q.   Okay.  For the record, Exhibit 284 is a
21 copy of page 28648 and volume 52 number 147 of
22 the Federal Register dated July 31, 1987.  If I

**Page 128**

1  could get you to turn to the second to the last
2  page of that document, I believe it contains the
3  regulation that from 1987 until the last couple
4  of years governed the upper limits for payments
5  for prescription drugs by state Medicaid
6  programs.  I'll turn your attention to section
7  447.331.  It's in the third column from the left,
8  halfway down.
9      A.   Mm-hmm.
10      Q.   And I believe the provision that you
11 want to look at is subparagraph B, as in boy,
12 entitled "other drugs."  And if you could follow
13 with me.  Do you agree with me that this applies
14 to brand name drugs and to multiple source drugs
15 for which no FUL has been established, correct?
16      A.   If you'd give me a minute to read it,
17 please.
18      Q.   Oh, certainly.
19      A.   (Reading.)  Okay.
20      Q.   Just to walk through the regulation, do
21 I understand correctly that paragraph A of
22 section 447.331 relates to the aggregate upper

**Page 129**

1  limits for payment of drugs for which a federal
2  upper limit has been established?
3      A.   331 does refer to that.  But I think
4  it's also important the definition provided above
5  in 301 also applies.  Which is "The estimated
6  acquisition cost means the agency's best estimate
7  of the price."
8      Q.   Correct.
9      A.   So I think that modification is an
10 important one.
11      Q.   Certainly.  But before getting to the
12 term estimated acquisition cost in the
13 regulation, as I understand the way the
14 regulation breaks down -- and you can tell me if
15 I have it wrong -- in section 447.331 paragraph A
16 governs the upper limit for payments in the
17 aggregate for drugs for which a federal upper
18 limit has been established, right?
19      A.   Again, better people in the agency to
20 walk you precisely through the drug.  But A also
21 starts out "except for brand name drugs."  So
22 again, you have to read the regulation in its

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

---

Page 130

1  entirety.
2      Q.  Precisely.  And so except for brand
3  name drugs paragraph A relates to multiple source
4  drugs for which a federal upper limit has been
5  established, right?
6      A.  Yes.
7      Q.  And then subparagraph B relates to --
8          MS. MARTINEZ:  No, wait.  I know what
9  you're trying to do, Chris.  And I'm sorry to
10 interrupt.
11         MR. COOK:  Sure.
12         MS. MARTINEZ:  But it seems that
13 subsection A says "except for brand name drugs
14 that are certified in accordance with paragraph
15 C," blah, blah, blah, and then in B it says "the
16 agency payments for brand name drugs certified in
17 accordance with paragraph C."  I'm just saying
18 probably the best thing to do is if you want to
19 read the full text then you've got it accurately.
20         MR. COOK:  Actually, I'm just looking
21 for Mr. Smith's understanding of his obligations
22 or the agency's obligations for approving state

---

Page 131

1  plan amendments.  And it may be easier to
2  summarize it completely.
3  BY MR. COOK:
4      Q.  Is it your understanding that in
5  approving state plan amendments for the payment
6  of drugs not subject to a federal upper limit
7  that it was the obligation of the agency to
8  approve the state plan amendment only to the
9  extent that in the aggregate payment levels would
10 not exceed the lower of estimated acquisition
11 cost or the provider's usual and customary
12 charges to the general public?
13         MS. MARTINEZ:  I'm sorry.  I understand
14 what you're saying, Chris.  But you missed
15 estimated acquisition cost plus reasonable
16 dispensing fee established by the agency or
17 provider's usual and customary charges to the
18 general public.
19         MR. COOK:  Sure.  Let me ask the
20 question again.  I appreciate it.
21 BY MR. COOK:
22      Q.  Mr. Smith, is it your understanding

---

Page 132

1  that CMS when reviewing state plan amendments was
2  required to approve the state plan amendment only
3  to the extent that the agency has determined that
4  the payment levels in the aggregate would not
5  exceed either on the one hand estimated
6  acquisition cost plus a reasonable dispensing fee
7  or on the other hand the provider's usual and
8  customary charges to the general public?
9      A.  I think you are linking too many things
10 there together.
11     Q.  Okay.  Explain to me what --
12     A.  Let me step back in terms of approval
13 versus disapproval.  Again, Medicaid is generally
14 delegated to the states and they have the
15 authority to set provider reimbursement for all
16 types of providers.  The issue to us is
17 disapproving a state plan amendment.  So the
18 guidance that you saw in the previous exhibit for
19 the memorandum, when you put those on top of
20 regulations -- and again, in their entirety,
21 because they certainly say other things -- we are
22 not so much taking an affirmative position.

---

Page 133

1          The burden is on us to take a
2  disapproval on a state plan amendment, and we can
3  disapprove state plan amendments if they are not
4  consistent with the entirety of the Medicaid
5  regulations, which include efficiency and
6  economy, et cetera.
7      Q.  Realizing that we'll come back in a
8  moment to the other considerations that derive
9  from the other aspects of the Medicaid program,
10 can you explain for me what you understood to be
11 the regulatory requirements that you had to apply
12 in deciding whether or not to disapprove a state
13 plan amendment under the regulations marked as
14 Abbott Exhibit 284?
15     A.  Well, as I stated, when a state changes
16 its payment methodology, and whether, again, a
17 state even -- this regulation goes back to 1987,
18 which was well before my time.  And I certainly
19 can't tell you what they meant in 1987.  But with
20 the entirety of the regulations on -- again,
21 using all of the definitions in the regulation,
22 including the agency's best estimate, again, we

---

34  (Pages 130 to 133)

Henderson Legal Services, Inc.

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                February 26, 2008
                    Washington, DC

Page 134

1   would ask a state -- if sort of outside those
2   parameters you saw a big disparity amongst the
3   states you would say, well, how did you get that,
4   where did you get that from.
5        So in general if they met the
6   requirements of the regulation then it would go
7   into effect.
8        Q.  But you're getting ahead of me a little
9   bit.  My question to you is what you understand -
10  - and since 2001 have understood -- the
11  regulatory requirements to be.  And we'll get to
12  the policy decisions that affect how that's
13  implemented in a moment.
14       MR. WINGET-HERNANDEZ:  Objection, form.
15       Q.  And I'll ask that as a more clear
16  question.  Could you describe to me what you
17  understood those regulatory requirements to be?
18       MR. WINGET-HERNANDEZ:  Objection, form.
19       A.  The regulatory requirements are for a
20  state to pay its reimbursement for prescription
21  drugs to meet the entirety of the regulations
22  that include that they are based on the agency's

Page 135

1   best estimate of the acquisition cost and a
2   reasonable dispensing fee.
3        Q.   And so I understand --
4        A.   And if we believe them not to meet
5   those then it would be -- well, a state, if it
6   didn't meet those requirements or fit within
7   those parameters, we would have -- we would
8   question the state further.  And again, as the
9   October 2002 memo states, we would look at the
10  individual circumstances in the state as well as
11  its supporting documents.
12       So the documentation of how do you meet
13  the regulations, they fit together.  You can't
14  just pull one piece out and say that represents
15  the entirety.  That would be not accurate.
16       Q.   And so if one were -- let me back up
17  just a little bit.  I apologize.  Tell me if I'm
18  correct in hearing what you're telling me.  Is it
19  that looking simply at the definition of
20  estimated acquisition cost without taking into
21  account all of the goals of the Medicaid program
22  would provide an incomplete picture in what you

Page 136

1   were doing in reviewing state plan amendments?
2        MR. WINGET-HERNANDEZ:  Objection, form.
3        MS. MARTINEZ:  Objection, form.
4        A.  Every piece of a regulation is there
5   for a purpose and they all fit together.
6        Q.  But the standards that you felt
7   governed the approval of state plans extended
8   beyond merely the definition in section 447.301
9   and the language in 447.331 and extended to the
10  other goals and purposes of the Medicaid program,
11  correct?
12       MR. WINGET-HERNANDEZ:  Objection, form.
13       A.  I'm not following you.
14       Q.  Sure.  You would agree with me that one
15  could read the language in section 447.301 and
16  447.331 to allow for the approval of a state plan
17  amendment only if it with precision, as much as
18  possible, estimated the invoice price of the
19  drugs to the pharmacy?  That would be one
20  interpretation of this language, correct?
21       MR. WINGET-HERNANDEZ:  Objection to
22  form.

Page 137

1        MR. KELLEY:  Objection to form.
2        A.  The regulation itself doesn't say
3   invoice price, I don't think.  So, I mean, you're
4   asking me to read things into the regulation
5   where the words aren't there.
6        Q.  Did you understand this regulation to
7   require you to approve a state plan only if the
8   formula proposed by the state would pay as the
9   ingredient cost an amount that approximated the
10  invoice price for drugs to pharmacies?
11       MS. MARTINEZ:  Objection, form.
12       A.  I'm going back to my previous answer.
13  You are -- you have to look at it in the
14  entirety.  You can't just pick one piece of it
15  out and say would you approve or disapprove on
16  that alone.  You have to look at the entirety.
17       Q.  I actually intended that to be a
18  softball question.
19       A.  Okay.
20       Q.  Is it fair to say that you did not see
21  this regulation as requiring you -- or requiring
22  states, rather -- to establish a formula that set

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

Smith, Dennis G.                    February 26, 2008
                Washington, DC

| Page 138 |
| --- |

1   as the payment level the estimated invoice price
2   for the drugs to pharmacies?
3           MR. WINGET-HERNANDEZ:  Objection, form.
4       Q.  That was not the standard that was
5   being applied here?
6           MR. WINGET-HERNANDEZ:  Objection, form.
7       Q.  Let me ask it in another way that I
8   think might hew closer to what you're telling me.
9   You would agree with me that it would be an
10  overly simplistic view of this regulatory scheme
11  to look simply at the acquisition cost of
12  pharmacies for drugs and have that be the only
13  determining factor about whether or not a state
14  plan properly estimated the estimated acquisition
15  cost for drugs?
16          MR. WINGET-HERNANDEZ:  Objection to
17  form.
18          MR. KELLEY:  Objection to form.
19      A.  I think the construction does include
20  both acquisition cost and a dispensing fee.
21      Q.  Looking solely at the estimated
22  acquisition cost component of that formula, what

| Page 139 |
| --- |

1   is your understanding of what the acquisition
2   cost was that -- let me skip that.
3           Can you give me some examples of how
4   states appropriately estimated the acquisition
5   cost for the pharmacy payment portion of their
6   prescription drug payments?
7       A.  I think our website can give you for
8   every state their reimbursement formula of --
9   they're on our web.  So I don't know if it's one
10  of the exhibits.  But those are all obviously
11  state plan amendments that have been approved to
12  reflect reimbursement.
13      Q.  But can you give me an example?
14          MR. WINGET-HERNANDEZ:  Objection to
15  form.
16      A.  There are a number of different
17  variations.  Again, states using AWP minus a
18  percentage that's further modified by maximum
19  allowable cost.  That's further modified by a
20  wholesale acquisition cost.  So states have
21  flexibility, all of which would be approvable,
22  because again, Medicaid is designed to provide

| Page 140 |
| --- |

1   the states with flexibility.
2           This is not a national you will pay all
3   providers one way.  There is flexibility for the
4   states to choose among different ways.  And
5   states clearly do pay differently.  But they are
6   approvable.  Again, dating back to 1987, that
7   people who reviewed state plan amendments at that
8   time, Medicaid was paying for prescription drugs,
9   and clearly they approved state plan amendments
10  that were based on a variety of different
11  formulas.
12          But I believe in all cases it is a
13  combination of acquisition cost and dispensing
14  fee.  I could be corrected on that, but that's my
15  understanding.  I can't think of one that pays
16  only one way.
17      Q.  And so a state plan amendment would
18  come to your office and propose to pay for
19  prescription drugs at AWP minus 14 percent plus a
20  dispensing fee of some amount of money.  Do you
21  follow me?
22      A.  That would be an example.

| Page 141 |
| --- |

1       Q.  And your staff would look at that
2   proposal and look at whatever justifications are
3   for paying AWP minus 14 percent and decide
4   whether or not under the regulatory framework
5   staff is required to disapprove that state plan
6   amendment or allow it to go forward.  Do I have
7   it correct so far?
8       A.  I think that's a fair characterization.
9       Q.  In looking at that formula of AWP minus
10  14 percent what is your understanding of the
11  questions that the CMS staff would ask themselves
12  in order to determine whether or not that formula
13  meets the goals of the Medicaid programs and the
14  statutory and regulatory requirements?
15      A.  I can give you a recent example of
16  where state plans have recently come in to us to
17  increase the dispensing fee and our response back
18  to the state was, again, documentation, how do
19  you document the requested increase.  In I
20  believe one specific case we disapproved the
21  state plan amendment because the request for the
22  increase in dispensing fee was in excess of what

36 (Pages 138 to 141)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                    February 26, 2008
                  Washington, DC

Page 142

1  the study supported.
2    Q.  Now, the answer you gave me related to
3  some of the questions that were asked recently
4  for a state plan amendment that related to an
5  increase in a dispensing fee, correct?
6    A.  That was a particular to increase the
7  dispensing fee.
8    Q.  There are a number of occasions on
9  which state plan amendments were submitted to you
10  to either increase or decrease the ingredient
11  cost portion expressed by a percentage off of
12  AWP, correct?
13    A.  I can't think of a specific one, but
14  that would -- it seems likely that state plan
15  amendments making changes would have come in to
16  us.
17    Q.  And my question to you is when those
18  state plan amendments came across the desk of
19  your staff seeking to change the ingredient cost
20  portion of the payment, what are the questions
21  that you expect your staff to be asking to
22  determine whether that formula meets the

Page 143

1  regulatory requirements and the other goals of
2  the Medicaid program?
3    A.  Well, I think it's also fair to recall
4  that we have staff who have years of experience
5  in reviewing these state plans and the entire
6  history, et cetera.  I think that the specific
7  example that I just gave you on the dispensing
8  fee we asked them to back that up with supporting
9  documentation.  I think in -- I mean, in large
10  part I would just rely on the expertise of my
11  staff in putting together whatever appropriate
12  questions they would have to ask the state.
13    Q.  You would agree with me that it is not
14  so simple as to simply look at the formula and
15  compare it to what the average price in the
16  marketplace is for individual drugs to determine
17  whether that formula meets the regulatory
18  requirements, correct?
19      MR. WINGET-HERNANDEZ:  Objection to
20  form.
21      MS. MARTINEZ:  Objection to form.
22      MR. KELLEY:  Objection to form.

Page 144

1    A.  I'm not certain what you're meaning in
2  terms of individual drugs.  Because you're
3  adopting a formula that pays on all the drugs.
4  You don't generally pick -- you don't generally
5  isolate this drug from that drug.  Now, you may
6  pick a formula that distinguishes a brand name
7  from a generic.  But an individual drug price,
8  you generally are picking formulas that you pay
9  on all of the drugs.
10    Q.  You're actually getting ahead of me a
11  little bit.
12    A.  Okay.
13    Q.  You would agree with me then that it
14  certainly would not be appropriate to look at the
15  estimated acquisition cost regulations and
16  compare it to the average price of a single drug
17  in determining whether that regulation was being
18  complied with by the state, right?
19    A.  I'm not certain what you mean.
20    Q.  It would be an incomplete picture to
21  pick one drug out of the formulary, look at that
22  drug's price in the marketplace and determine

Page 145

1  that the estimated acquisition cost regulations
2  had somehow not been complied with, correct?
3      MR. WINGET-HERNANDEZ:  Objection, form.
4    A.  We are approving or leading to
5  disapproval of a state plan that deals with all
6  drugs that a state is paying for on that formula.
7  If you are looking at individual drugs I don't
8  think that discussion would typically come up in
9  a state plan amendment.  It may come up someplace
10  else, such as a review of providers.  It could
11  come up on a -- in a different form.  But it
12  generally wouldn't come up on a state plan
13  amendment review.
14    Q.  And state plan amendment reviews are
15  the only context in which this regulation
16  relating to estimated acquisition cost comes into
17  play, right?
18      MS. MARTINEZ:  Objection, form.
19    A.  I wouldn't say it's the only place that
20  it would come into play.
21    Q.  Can you tell me any other place in
22  which it comes into play in your administration

37 (Pages 142 to 145)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                          February 26, 2008
                    Washington, DC

Page 146

1   of the Medicaid program?
2       A.  I think it gives us the ability to use
3   at any time to question whether or not a state is
4   administering its program appropriately.  Once a
5   state plan amendment is approved we still have
6   the authority to go back and say are you
7   following your state plan, are you paying
8   according to your state plan, do you -- there are
9   audits.
10          The Congress just recently, for
11  example, gave us specific authority and funding
12  to do audits of providers.  Generally CMS did not
13  have those resources prior to 2005.  We now have
14  those resources to go and look at a particular
15  drug or a particular -- to get to the specific
16  particular that you're talking about, we have
17  that authority as well.
18          So that's what I meant by I don't think
19  we -- again, you could apply things in different
20  settings other than solely just a state plan
21  amendment approval.
22      Q.  All right.  But you would agree with me

Page 147

1   that the requirement that payments not exceed
2   estimated acquisition cost plus a reasonable
3   dispensing fee applies only in the aggregate?
4       A.  Well, again, I would make sure you
5   modify it.  It's the best estimate and reasonable
6   dispensing fees.
7       Q.  And that applies only in the aggregate,
8   correct?
9           MR. WINGET-HERNANDEZ:  Objection, form.
10      A.  If you'd give me a minute to read it
11  again.  I'm not certain whether the precise
12  wording refers only to the acquisition or to the
13  dispensing fee as well.
14      Q.  All right.  And I can actually read the
15  language to you here.
16      A.  Again, you have folks who have much
17  more intimate knowledge who have a lengthy
18  history of applying these regulations beyond what
19  I do.
20      Q.  All right.  Well, I'll just read the
21  language here and you can follow along with me.
22  I'm beginning at the subparagraph B under other

Page 148

1   drugs --
2       A.  Mm-hmm.
3       Q.  -- with the line that begins "must not
4   exceed."  And it's referring from the first line
5   to the payments.  And I'm cutting out the
6   descriptors in between.  But it says that the
7   payments "must not exceed in the aggregate
8   payment levels that the agency has determined by
9   applying the lower of the, one, estimated
10  acquisition cost plus reasonable dispensing fees
11  established by the agency, or, two, provider's
12  usual and customary charges to the general
13  public."
14      A.  Mm-hmm.
15      Q.  Would you agree with me that the
16  requirement that estimated acquisition cost be
17  paid, or no more than estimated acquisition cost
18  plus a reasonable dispensing fee be paid, applies
19  only in the aggregate?
20          MR. WINGET-HERNANDEZ:  Objection to
21  form.
22      A.  Again, you read the regulation in its

Page 149

1   entirety the purpose is to deal with an aggregate
2   amount, not an individually priced drug.  The
3   federal government does not -- in the Medicaid
4   program, anyway, we do not price set for
5   individual drugs.  Presumably that's a policy
6   choice that could have been made years ago.  But
7   that isn't how Medicaid was constructed.
8       Q.  What does it mean for the payment
9   limitation to be in the aggregate rather than on
10  a drug by drug basis?
11      A.  I think precisely that, all of them put
12  together.
13      Q.  And so a state could decide to pay more
14  for one drug, less for another drug, but as long
15  as once you add them all up in the end in the
16  aggregate it is at the appropriate level, that
17  would meet federal regulatory requirements,
18  right?
19      A.  That is correct.  States could pay even
20  more if they wanted to.  But this is a
21  restriction of how much we would be willing to
22  match.

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                      February 26, 2008
                         Washington, DC

Page 150

1    Q.  Given what you know about how state
2 Medicaid programs work as the former director of
3 Virginia Medicaid, you would expect that there
4 would be some drugs that pay more, some drugs
5 that pay less in that way rather than each and
6 every drug being paid at exactly estimated
7 acquisition cost, correct?
8        MS. MARTINEZ:  Objection, form.
9        MR. KELLEY:  Objection, form.
10   A.  I really don't remember how we did it
11 in Virginia.  Usually -- and what edits you put
12 into the system.  Whether we did it on the
13 individual or not, I don't remember how Virginia
14 did it.
15   Q.  Well, it's your understanding that the
16 vast majority of states are paying based upon
17 some sort of formula, whether it's AWP minus a
18 percentage or WAC plus a percentage, correct?
19   A.  That's correct.  And MACs also.
20   Q.  And you would expect that from drug to
21 drug and even from provider to provider the
22 difference between acquisition cost and the AWP

Page 151

1 would vary, correct?
2    A.  Well, a couple of distinctions to make.
3 In terms of provider to provider generally you
4 would not say I'm going to pay Pharmacist Smith
5 more than Pharmacist Jones.
6    Q.  Precisely.
7    A.  You may want to say I'm going to have a
8 class of providers to where rurals are paid
9 differently than urbans.  You might say I'm going
10 to pay independents differently than I do chains.
11   Q.  So two providers, each buying ten
12 different drugs would get the same formulaically
13 derived reimbursement payment, correct?  AWP
14 minus 10 percent, right?
15       MR. WINGET-HERNANDEZ:  Objection, form.
16   A.  Again, states have a good deal of
17 flexibility on how they determined their
18 reimbursement levels.  And in a combination with
19 their acquisition cost and dispensing fees.
20   Q.  But based upon your experience you
21 would expect that the application of a single
22 formula across many different types of providers

Page 152

1 and many different types of drugs and many
2 individual drugs and many individual providers
3 would result in varying differences between the
4 payment amount and the acquisition cost for each
5 provider, each drug, correct?
6        MS. MARTINEZ:  Objection, form.
7    A.  I think the reasonable expectation,
8 though, is that there wouldn't -- I think any
9 Medicaid agency would be very concerned with too
10 much variation.  And again, it's hard to -- I
11 can't properly define what too much variation is.
12 But I think it is -- these are not static things.
13 And agencies typically would want to continue to
14 review -- this isn't onetime only, here's my
15 state plan and just let the money flow.  I think
16 states typically would continue to look at to see
17 if there is variation among providers, among
18 types of drugs as well.
19       So although I would agree there is some
20 variation, I think you are looking for things
21 that says, well, there's something else going on
22 here rather than just the market.

Page 153

1    Q.  But you would agree with me that the
2 application of this formula to a variable market
3 results in variations between the payment amount
4 and the acquisition cost?
5    A.  And average is an average.  I mean,
6 that assumes that there are higher and lower and
7 you're taking an average.  But as I said, I think
8 you also would be looking for variations to
9 suggest that we're not dealing with just an
10 average any longer.
11   Q.  Do you have out in front of you Exhibit
12 328?
13       MS. MARTINEZ:  It's in that book.  This
14 particular book doesn't have it.  It says
15 recalled on the basis of privilege.
16       MR. COOK:  Ah.  This was the one that
17 you originally recalled and then --
18       MS. MARTINEZ:  We asserted privilege.
19 However, we did not do the recall because it had
20 been produced in 2004.  So it was impractical to
21 pull it from everybody in the MDL, but we
22 asserted that the document was privileged.  But I

39 (Pages 150 to 153)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                     February 26, 2008
                          Washington, DC

| Page 154 |
|---|

1  think you may have it somewhere else.
2          MR. COOK:  Let's go off the record for
3  a moment and I'll have somebody bring down some
4  extra copies of that document.  I didn't realize
5  that they were taken out of the booklets and not
6  put back in.
7          MS. MARTINEZ:  Okay.
8          MR. COOK:  Off the record.
9          THE VIDEOGRAPHER:  This is the end of
10 tape 3.  Off the record at 2:06.
11         (Recess.)
12         THE VIDEOGRAPHER:  This is the
13 beginning of tape 4 in the deposition of Mr.
14 Smith.  On the record at 2:21.
15 BY MR. COOK:
16    Q.  Before going back to the documents --
17 and I brought a copy of Exhibit 328 that should
18 be there in front of you, Mr. Smith.
19         MR. COOK:  Ms. Martinez, could you tell
20 us -- we didn't receive, given the time
21 restrictions, a privilege log describing what the
22 basis for the redactions are in Exhibit 487.

| Page 155 |
|---|

1  Could you for the record so we know what the
2  basis is for the redactions?
3          MS. MARTINEZ:  Yes.  It's a
4  deliberative process privilege.
5          MR. COOK:  And also for the record I'm
6  about to get to it with Abbott Exhibit 328.  But
7  it's my understanding that Abbott Exhibit 328 is
8  a draft of Exhibit 487, which is the final, and
9  that -- that was actually the reason Exhibit 487
10 was produced because we had requested the final
11 version of Exhibit 328, which is the draft.  And
12 just for the record, it's our position that the
13 production of the draft and the failure to
14 litigate return of the draft would constitute a
15 waiver of any privileges that would apply.  So we
16 would ask that an unredacted version be produced.
17         MS. MARTINEZ:  Yeah.  Obviously we
18 disagree on the issue of waiver for multiple
19 reasons.
20         MR. COOK:  Right.  And of course
21 preserving our argument that it's not privileged
22 in the first place.

| Page 156 |
|---|

1          MS. MARTINEZ:  Right.
2          MR. MERKL:  We also join Mr. Cook's
3  reservation.  And I would also point out that the
4  extensive testimony on the record also waives the
5  privilege as well.
6          MR. REALE:  Roxane joins as well.
7          MS. MARTINEZ:  Again, we disagree on
8  the issue of waiver for multiple reasons.
9  BY MR. COOK:
10    Q.  Mr. Smith, could you open up Abbott
11 Exhibit 328 and tell me whether you've seen that
12 document before?
13    A.  I'd have to take a moment to read
14 through it.
15    Q.  Please do.  Take your time.
16    A.  Okay.  (Reading.)
17    Q.  Have you read the document, Mr. Smith?
18    A.  Yes.
19    Q.  Have you seen this document before?
20    A.  I don't recall it offhand.
21    Q.  Do you recognize this document, Exhibit
22 328, as a prior draft of the language that is

| Page 157 |
|---|

1  redacted from Exhibit 487?
2    A.  As I said, I don't recall that that --
3  that it fits into that document.
4    Q.  You would agree that Exhibit 487 is
5  over your signature, correct?
6    A.  Yes.
7    Q.  And if in fact Exhibit 328 is a prior
8  draft of language that appears under the redacted
9  portions of Exhibit 487, you have no problem
10 adopting the statements contained in Exhibit 487
11 because they went out over your signature,
12 correct?
13         MS. MARTINEZ:  Objection, form.
14    A.  What you just related was this was a
15 draft.  I may not have seen this draft.  So I
16 don't know.
17    Q.  I'm not able to ask you about
18 statements that went out over your signature in
19 Exhibit 487, although -- because it's redacted,
20 right?
21    A.  The document is redacted, yes.
22    Q.  Would you agree with me that whatever

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                February 26, 2008
                        Washington, DC

Page 158

1    is underneath this redaction tape that went out
2    over your signature would be thoughts and
3    concepts and statements that are attributable to
4    you, Mr. Smith.
5           MS. MARTINEZ:  Objection, form.
6       A.  The final document would have had my
7    review of any of the other information.  But as I
8    said, I don't recall 328 offhand, so I don't know
9    what draft it was or --
10      Q.  Having read Abbott Exhibit 328, are
11   there any statements in it that you disagree
12   with?
13      A.  I didn't read it that carefully to go
14   through whether I would have any --
15      Q.  Okay.  Let's go off the record and you
16   can read it as carefully as you would like and we
17   can go back on the record and you can tell me if
18   there are any statements in Exhibit 328 that you
19   disagree with.
20      A.  Okay.
21          MR. COOK:  We can go off the record.
22          THE VIDEOGRAPHER:  Off the record at

Page 159

1    2:29.
2           (Recess.)
3           THE VIDEOGRAPHER:  On the record at
4    2:34.
5    BY MR. COOK:
6       Q.  Having reviewed the document in more
7    detail, Mr. Smith, can you now remember whether
8    this is a preliminary draft of the redacted
9    portions of Exhibit 487?
10      A.  I still don't particularly remember the
11   two documents being together.
12      Q.  And so my next question I think may be
13   self answered.  And that is, do you know which of
14   the statements in Exhibit 328 may have ultimately
15   made their way into the redacted portions of
16   Exhibit 487?
17      A.  I don't know.
18      Q.  Are there any statements in Exhibit 328
19   with which you disagree?
20      A.  I think I would take exception to the
21   very first statement in that it I think gives a -
22   - reading it in the context that we have here in

Page 160

1    the questioning that we've had, suggesting that
2    there is no authority for us to act, where I
3    think there are other places in the Medicaid
4    statute that still gives us the authority to -- I
5    think that's an overly broad statement that I
6    think would be --
7       Q.  And that's the sentence that reads
8    "Although there are no statutory provisions for
9    payment rates for Medicaid drugs, states are
10   required to set rates in accordance with
11   regulations at 42 C.F.R. 447.301 to 333"?
12      A.  There are still general provisions in
13   Title XIX that still apply as well.
14      Q.  So how would you modify that sentence
15   to make it accurate?
16          MR. WINGET-HERNANDEZ:  Objection, form.
17          MR. COOK:  What's the form objection?
18          MR. WINGET-HERNANDEZ:  The form
19   objection is that the question assumes that the
20   witness is under some obligation to rewrite this
21   statement.  I don't think he is under that
22   obligation.  He's already described to you what

Page 161

1    his disagreement with it is.
2    BY MR. COOK:
3       Q.  How would you change this statement to
4    make it accurate, if at all?
5       A.  The statement strikes me as overly
6    broad and does not account for other authorities
7    in the statute that are pertinent to state plan
8    amendments, pertinent to the integrity of the
9    Medicaid program.  I think it is an overly broad
10   statement that would not accurately reflect a
11   specific instance that the agency or a state
12   agency might believe would be in the best
13   interest of the Medicaid program.
14          So I think it leaves too much -- I
15   think it is too broad of a statement that doesn't
16   reflect the entirety of federal authority or
17   state authority in the management of the Medicaid
18   program.
19      Q.  Well, breaking this sentence down a
20   little bit, the first half, do you disagree with
21   the first half of the sentence, that "There are
22   no statutory provisions for payment rates for

41 (Pages 158 to 161)

Henderson Legal Services, Inc.

Smith, Dennis G.                                February 26, 2008
                        Washington, DC

Page 162

1  Medicaid drugs"?
2      A.  I think that is an overly broad
3  statement, because you I believe still could
4  appropriately -- the other provisions about
5  efficiency and economy in 19.02 I believe apply
6  to the entire Medicaid program, which would
7  include drugs.
8      Q.  And so could you explain to me how
9  those statutory provisions affect the payment
10 rates for Medicaid drugs?
11     A.  Because Medicaid -- it's an obligation
12 to pay and in terms of efficiency and economy.
13 That is broad statutory authority for the federal
14 government in its oversight role, which this
15 statement in itself would ignore.
16     Q.  So to the extent that that statement
17 made its way into the final memo that went out
18 over your signature, if we were able to peek
19 under the skirt, it would be inaccurate, right?
20         MR. KELLEY:  Objection to form.
21     A.  I think it is, as I said, an overly
22 broad statement that I think would -- it's

Page 163

1  further modified with a greater understanding of
2  what the entirety of Title XIX provides.
3      Q.  Do you disagree with the second half of
4  that sentence that reads "States are required to
5  set rates in accordance with regulations at 42
6  C.F.R.  447.301 to 333"?
7      A.  Again, I probably would choose somewhat
8  different words.  The citing of the regulation is
9  correct.  But again, there are other things that
10 would -- there are other things that apply.  It's
11 a very broad, simplistic statement.
12     Q.  What are the other things that apply?
13     A.  I just -- the economy and efficiency,
14 the integrity of the Medicaid program,
15 requirements to pay correctly.  I think there are
16 a number of other provisions that apply to the
17 program as a whole that apply to prescription
18 drugs as well.  I don't think the regulations can
19 be -- if you were looking at our entire authority
20 you have to look at the entire statute.
21     Q.  And one of those additional
22 considerations would be to ensure that the

Page 164

1  payment levels are sufficient to ensure access to
2  care for beneficiaries, correct?
3         MS. MARTINEZ:  Objection, form.
4      A.  As we discussed earlier, that is a
5  consideration among a number of considerations.
6      Q.  Are there any others that you can
7  enumerate specifically right here among the other
8  things that you said have to be considered beyond
9  the regulation that's cited in this memorandum?
10         MR. KELLEY:  Objection to form.
11     A.  Well, I think offhand the -- again,
12 broader provisions that apply in terms of state
13 responsibility to maintain the integrity of the
14 program.  I think that there are -- as I said, I
15 think it's a broad and overly simplistic
16 statement that doesn't reflect the entirety of
17 the statute.
18     Q.  Are there any other parts or statements
19 in Abbott Exhibit 328 with which you disagree,
20 Mr. Smith?
21     A.  Well, I think, again, there are a
22 number of things in here that perhaps you would

Page 165

1  write more precisely.  They use examples rather
2  than being, again, the entirety.  For example, in
3  the second paragraph "For dispensing fees we have
4  told the regional offices that they could" --
5  which implies some discretion in there -- "among
6  other things." So obviously there are other
7  things that could be considered as well.
8         So, again, I don't know if the
9  intention is for me to rewrite this paper.  But I
10 think there are things in the paper that could be
11 developed further if that were appropriate.
12         I think on the second page -- I think
13 that there are -- the second to the last
14 paragraph on the page, "Because requirements to
15 set dispensing fees are less specific, we would
16 continue to allow states greater flexibility
17 here," again, we could have -- if I were writing
18 this today, I would certainly I think go into
19 greater detail about what that would be.  Again,
20 it gives an example, but it doesn't restrict it
21 only to this example.
22     Q.  And which paragraph was that again?

42 (Pages 162 to 165)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                          February 26, 2008
                    Washington, DC

Page 166

1   A.  The second from the bottom.  It says
2   "for instance."
3   Q.  Okay.  Any other parts of it with which
4   you disagree?
5   A.  Again, I think it is a general outline
6   of issues that if you were to develop it more
7   specifically there might be other issues that
8   would be raised.
9   Q.  Are there any factually inaccurate
10  statement in Exhibit 328 of which you're aware?
11       MS. MARTINEZ:  Objection to form.
12  A.  The first sentence on the first page of
13  the second paragraph, "There are two components
14  of this payment rate and each is required to be
15  determined separately," I'm not certain I would
16  agree with that.  I think that while they are
17  components -- you could have two components that
18  are -- I think the sentence implies too much,
19  that they are completely on their own, which in
20  fact they do work together.
21  Q.  And when you say "they" you're
22  referring to the ingredient cost and the

Page 167

1   dispensing fee components of the pharmacy payment
2   under Medicaid drug benefit programs, correct?
3       MR. WINGET-HERNANDEZ:  Objection to
4   form.
5   A.  Correct.  Because, again, when a state
6   plan amendment comes in we don't ask you for just
7   one or the other, we ask you for both.
8   Q.  And in your experience when CMS
9   evaluates a state plan amendment it looks to both
10  aspects of the state plan, both the ingredient
11  cost and the dispensing fee, in determining
12  whether the payment amount is appropriate and
13  lawful, correct?
14  A.  We do this for the -- it's the
15  methodology to apply to all of the drugs that the
16  program is paying for.  That is not drug-
17  specific.  The state plan does not list the
18  acquisition cost for every one of the 50,000
19  individual drugs that Medicaid pays for.  So
20  you're describing a methodology that all of the -
21  - that applied to all of the drugs in the
22  aggregate of how they work rather than a drug-

Page 168

1   specific.
2       So again, I don't think it means that
3   we only care about one or the other.  We do care
4   about them both.  And they both should be done as
5   accurately as possible.
6   Q.  You testified that the ingredient cost
7   component and the dispensing fee worked together.
8   How do they work together?
9   A.  In terms of a state plan amendment, the
10  state tells us both components in their state
11  plan.  You generally would say this is what we
12  are paying.  We are paying AWP minus plus a
13  dispensing fee.  They would generally come
14  together in a plan amendment.
15  Q.  In your experience has a state ever
16  justified an ingredient cost by reference to a
17  dispensing fee that has not been raised over the
18  years?
19       MS. MARTINEZ:  Objection, form.
20  A.  I'm going to ask you to --
21  Q.  Sure.  In your experience have you ever
22  seen a state justifying an ingredient cost at a

Page 169

1   particular level higher than it might otherwise
2   be based upon a dispensing fee that has not been
3   raised over the years?
4   A.  I think that would be a better question
5   for my staff who know these in and out.
6   Q.  Is there any other aspect of the first
7   paragraph there that appears to be factually
8   inaccurate to you?
9   A.  Well, the second to the last sentence
10  and the last sentence in that paragraph again, I
11  think, perhaps would be written more precisely.
12  On the one hand it says "simply required to be
13  reasonable" and the next is "to be
14  comprehensive."
15  Q.  Sure.  And for the record I'll read
16  those two sentences.  They read "Dispensing fees
17  are simply required to be reasonable.  The
18  regulations require that the agency's payment
19  methodology for prescription drugs be described
20  comprehensively in the state plan."  And could
21  you tell me again --
22  A.  Well, again, I think that to go back

43 (Pages 166 to 169)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                    February 26, 2008
                Washington, DC

| Page 170 |

1  and start parsing words and sentences, the
2  dispensing fees are simply required to be
3  reasonable.  As I have also testified, we have
4  not simply accepted a state sending in a state
5  plan saying, well, we think this is reasonable.
6  We ask that they be backed up with a study.  And
7  as I testified, in particular we disapproved a
8  state plan that the documentation did not support
9  the request of the state.
10     Q.   Were the states trying to pay too much
11  or too little for the dispensing fee, as you
12  recall?
13     A.   As I recall, they were trying to pay --
14  they were increasing the dispensing fee beyond
15  what was supported in the study.  So again, that
16  sentence I think is too simple and doesn't
17  describe either the state's obligation to be
18  reasonable -- we would not accept simply a piece
19  of paper that says we think this is reasonable,
20  please allow it.  We have clearly said, no, you
21  have to back it up.
22         And so as I said, that's why I think I

| Page 171 |

1  would not write it that way.
2     Q.   Is there anything else in that first
3  paragraph on page 1 that you would write
4  differently?
5     A.   I think I've given you several
6  examples.  I'll leave it at that at this point.
7     Q.   If you think of anything else later let
8  me know.
9     A.   Okay.
10     Q.   To go back a little bit again to
11  whether this Exhibit 328 is a draft of Exhibit
12  487, could you compare for me the title of
13  Exhibit 328 to the subject line of Exhibit 487
14  and confirm for me that both are entitled "review
15  of Medicaid drug state plan amendments"?
16     A.   That is the subject of the October 22nd
17  memo.
18     Q.   And if you go to the end of Exhibit 487
19  after all the redactions on page 3 it lists out
20  several options, correct?
21     A.   I'm sorry.  Which one are you referring
22  to?

| Page 172 |

1     Q.   Exhibit 487, the redacted final memo.
2  On page 3 it lists out --
3     A.   Options, yes.
4     Q.   And there are options for ingredient
5  costs and options for dispensing fees, correct?
6     A.   That's correct.
7     Q.   And likewise in Exhibit 328 on page 3
8  there's a list of options for ingredient costs
9  and options for dispensing fees, correct?
10     A.   That is correct.
11     Q.   And although they are not verbatim the
12  same, can you look at the two and tell me that
13  they roughly follow each other?
14     A.   They roughly follow each other.
15     Q.   And then --
16     A.   As I also testified earlier, for the
17  circumstances, as I recalled, of why the memo was
18  generated was for a particular point in time
19  seeking guidance from the administrator for which
20  we also would be looking for other things as
21  well.  I don't think the memo restricts us solely
22  to the enumerated provisions.

| Page 173 |

1     Q.   And then on the next page of Exhibit
2  487 there's a section entitled "recommendations"?
3     A.   Yes.
4     Q.   And followed by decision with an
5  approved line and a disapproved signature line.
6  Do you see that?
7     A.   Yes.
8     Q.   Could you compare the two and confirm
9  for me that other than recommendations being
10  plural in Exhibit 328, the language between
11  Exhibits 487 and 328 are identical on the
12  recommendation paragraph?
13     A.   The form is different.  As you
14  stipulated, it's singular rather than plural.
15  The decision memo has a signature block for me on
16  the decision memo.
17     Q.   But the text underneath the title
18  "recommendation," that appears to be identical
19  between the two documents.  If you could confirm
20  that for me, please.
21     A.   The wording is the same.  I think the
22  wording itself is also important to point out

44 (Pages 170 to 173)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 174 |
| --- |

1  that says "On SPAs that did not meet the above
2  criteria, we would not automatically disapprove
3  that SPA," which again provides the understanding
4  that these were not the only things that we were
5  looking at in state plan amendment reviews.
6      Q.  Is there any doubt in your mind, Mr.
7  Smith, that Exhibit 328 is an earlier draft of
8  Exhibit 487?
9      A.  I think that there are a number of
10 similarities.  To go back and reconstruct the
11 history of it -- but they certainly relate to --
12 the topics are related to the memo.
13     Q.  And you would agree with me that it
14 would be preferable from your point of view at
15 least if I were asking about the final memo
16 rather than an earlier draft, correct?
17         MS. MARTINEZ:  Objection, form.
18     A.  I've pointed out a number of areas that
19 I think the draft -- that in Exhibit 328 I think
20 needs a greater context and understanding than --
21 it is very difficult in the Medicaid program --
22 as I've testified, I think there are a number of

| Page 175 |
| --- |

1  different areas that -- to where these issues
2  need to be looked at in their entirety as the
3  memo itself, the signed memo itself, says.  These
4  are among things.  These are things that we would
5  look at.  But there are other considerations as
6  well.
7      Q.  And some of these ambiguities may have
8  been cleared up in the final version of the memo,
9  correct?
10         MS. MARTINEZ:  Objection, form.
11     A.  I don't recall the final version of the
12 October memo.
13     Q.  Sure.  If you go back to Exhibit 328
14 and the second paragraph on the first page begins
15 with "in practice we have told the states" -- do
16 you see that paragraph?
17     A.  On the second page?
18     Q.  First page, second paragraph.
19     A.  "In practice we have told the states,"
20 yes.
21     Q.  Is there anything in that paragraph
22 that is factually inaccurate or with which you

| Page 176 |
| --- |

1  disagree? Let me be a little more specific.
2         The first sentence is factually
3  correct.  That is, that CMS has told states who
4  wish to modify their estimated acquisition cost
5  levels that they must provide a factual basis to
6  support a change in the EAC or the dispensing
7  fee, correct?
8      A.  I would say that's a correct statement.
9      Q.  And the second sentence, would you also
10 agree with that, that one method to support a
11 change in EAC would be to audit an appropriate
12 number of pharmacies to determine current
13 acquisition costs? Right?
14     A.  I think that's a correct statement,
15 that that would be one way of doing it.
16     Q.  And then the memo drops a footnote at
17 that point.  And the footnote reads "States
18 usually base the EAC on average wholesale price
19 levels with a significant discount, for example,
20 AWP less 10 percent."  Do you see that footnote?
21     A.  Yes.
22     Q.  Is that consistent with your

| Page 177 |
| --- |

1  understanding of how states usually base their
2  EAC?
3      A.  They usually do base -- there's
4  variation among the states on what that discount
5  is.  Other states also, as I testified earlier,
6  may have a MAC, may have a WAC.  Again -- this
7  may be one of the ways that states are pricing
8  their reimbursement system.
9      Q.  The next sentence indicates that CMS
10 has told its regional offices that "In reviewing
11 state plan amendments the regional office should
12 compare rates for contiguous states' rates as
13 well as other states in the region."
14     A.  I would say that's accurate of our
15 practice.
16     Q.  Do you understand that to be been the
17 practice before you arrived at CMS as well?
18     A.  I don't know.
19     Q.  It was a practice that was in existence
20 when you arrived at CMS, though, correct?
21     A.  I think that is how -- one of the
22 factors that was being looked at.

45 (Pages 174 to 177)

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 178 |
|---|

1    Q.   The next sentence states that "CMS has
2  told regional offices that they should consider
3  drug cost studies."  Do I read that correctly?
4    A.   It says -- yes, they should also
5  consider drug cost studies.
6    Q.   And the "they" would refer to regional
7  offices?  Am I correct about that?
8    A.   Correct.  Let me also point out that at
9  this point in time in 2002 organizationally I
10  don't remember the precise time that we made
11  changes, but when I first arrived at -- it was
12  still HCFA at the time.  We changed it to CMS
13  later -- there were a number of reimbursement
14  functions that had been decentralized.  One of
15  the things that I did was to centralize a number
16  of reimbursement policies -- reimbursement
17  reviews.
18       We formed an institutional
19  reimbursement team.  We formed -- after 2002, by
20  the way.  We formed a noninstitutional
21  reimbursement team.  We formed the pharmacy team
22  that precisely was formed to look at drugs.  So

| Page 179 |
|---|

1  prior to -- I guess I got there in July 2001.  I
2  can't make all the decisions the first day.  But
3  one of the things that I -- on reimbursement has
4  been a particular issue that central office over
5  time became more involved than prior periods.
6       So again, when you are reading it you
7  read it in the context that much of it had been
8  decentralized.  And over time central office took
9  a greater review of state plan amendments on
10  reimbursement across the board.
11    Q.   Why did you centralize the
12  reimbursement reviews after 2002?
13    A.   We started on the institutional
14  reimbursement side.  There is a great deal of
15  concern that providers were gaming the Medicaid
16  system, that the regional offices did not have
17  the expertise to be able to identify what we
18  believed were inappropriate funding mechanisms.
19       We centralized it to put it in the
20  hands of people who that was their sole
21  responsibility to learn the financing rules and
22  background and to review them on a national basis

| Page 180 |
|---|

1  so the decision making would be uniform across
2  the states and would not have the regional
3  variation that had occurred in the prior
4  administration.
5       I was very concerned when I took the
6  job and I became increasingly concerned over time
7  that we didn't have the expertise through that
8  decentralized process.
9    Q.   How were providers gaming the system
10  with respect to drug payments?
11    A.   Well, I think that the -- I'm trying to
12  sort of step -- I was thinking through it
13  sequentially of what we were looking at at the
14  time.
15       On the drug payment side I think there
16  was a -- that there was concern about the
17  accuracy of reporting.  The -- again, when we
18  looked at AWP as a method, for example, those are
19  reported through different compendium.  There was
20  a concern about the accuracy.  There is a concern
21  about whether or not we -- again, while we were
22  talking on average prices, could those -- a

| Page 181 |
|---|

1  concern of whether or not they were really being
2  monitored over time.
3       The compendiums that states use in the
4  Medicaid program that other payors have used in
5  the system were relying on these surveys and
6  reports.  And again, I think that there was -- I
7  would think it's fair to say widespread concern
8  about the accuracy of those, so much so that in
9  the Deficit Reduction Act of 2005 Congress
10  changed the methodology to inject much more
11  transparency into those systems.
12       In terms of the previous system of AWP,
13  again, those were reported.  There was kind of a
14  middleman in terms of the compendium.  Congress
15  changed that entirely and said we're going to a
16  much more transparent -- and I think the
17  rationale was a more reliable -- system of
18  reporting of using the average manufacturer
19  price, which is manufacturers reported directly
20  to HCFA/CMS, for purposes of the rebate side of
21  the prescription drug program.
22       But on -- you had a system where states

                                    46  (Pages 178 to 181)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

Page 182

1  were paying on AWP but didn't have the accuracy
2  of what the manufacturers themselves were
3  reporting.  So the -- I think that it's fair to
4  characterize there was widespread concern that
5  there needed to be more transparency in the
6  system.
7      Q.  Prior to passage of the BRA of 2005,
8  however, you unilaterally centralized the
9  reimbursement reviews in part because of those
10 concerns, correct?
11         MS. MARTINEZ:  Objection, form.
12     A.  There were a number of reasons that we
13 formed the pharm team, again, relying on the
14 expertise of a core group of people.  We added
15 people to the pharmacy team.  I think we added a
16 pharmacist that hadn't previously been on there.
17 So it certainly was to put a unit together that -
18 - reviewing state plan amendments were certainly
19 part of that, but their overall expertise to deal
20 with a variety of issues.
21     Q.  Did this pharm team have responsibility
22 for reviewing state plan amendments under the

Page 183

1  reorganization that you implemented?
2      A.  They reviewed the state plan
3  amendments, yes.  But there's still input from
4  regional offices as well.
5      Q.  Does Exhibit 487 describe the criteria
6  that the pharm team -- and pharm is p-h-a-r-m,
7  right?
8      A.  Yes.  That kind of pharm.  Not the
9  baseball farm.
10     Q.  Does Exhibit 487 describe criteria that
11 the pharm team used in deciding whether to
12 approve or disapprove state plans?
13     A.  I don't recall how it evolved.  Again,
14 this still leaves a lot of room for other
15 considerations.  So I don't think it spells out
16 all of the things that we would look at.
17     Q.  But these are some of the criteria?
18     A.  These would be some of the criteria.
19     Q.  Getting back to Exhibit 328, where we
20 left off was a sentence in which CMS indicates
21 that --
22     A.  I'm sorry.  Where are you?

Page 184

1      Q.  It's the center of paragraph 2.
2      A.  Okay.
3      Q.  It's a sentence that reads "We have
4  also said that they should consider drug costs
5  studies."  What do you understand the memorandum
6  to be referring to when it refers to drug cost
7  studies?
8          MS. MARTINEZ:  Objection, form.
9      A.  I would read that as, again, in the
10 context that it was meant of reviewing state plan
11 amendments that they changed their methodologies
12 for how they're paying.
13     Q.  And drug cost studies would include
14 studies such as the OIG reports that are
15 referenced in the following paragraph, correct?
16         MS. MARTINEZ:  Objection, form.
17     A.  I think it refers to what the states
18 should be doing.
19     Q.  And it was your understanding that CMS
20 had told regional offices that states should look
21 to OIG drug cost studies in establishing their
22 estimated acquisition cost formula, correct?

Page 185

1          MR. WINGET-HERNANDEZ:  Objection, form.
2          MS. MARTINEZ:  Objection, form.
3      A.  Again, this is what CMS is telling the
4  states to do to say you should do a drug study.
5  I think that that would mean the state would do a
6  drug study.
7      Q.  But was it your understanding the
8  states also could look to OIG reports as another
9  source of data for evaluating whether they were
10 appropriately paying for pharmaceutical products
11 under Medicaid?
12     A.  I think that -- I think in general,
13 being a former Medicaid director and being around
14 Medicaid directors, states tend to look at their
15 own way of putting studies together.  An
16 Inspector General report often has limitations to
17 translate it to make it specific to your state.
18 I think most states would look beyond just an OIG
19 study.  OIG studies deal typically with samples.
20 Generally a state wants to look within itself to
21 know what's going on within its own jurisdiction.
22     Q.  But you would agree with me that CMS

47 (Pages 182 to 185)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 186 |
| --- |

1  expected states to at least consider OIG studies
2  to the extent they were applicable to a
3  particular state's determination of EAC, correct?
4       MS. MARTINEZ: Objection to form.
5       A.  I don't want to read too much into it.
6  I don't want to read too little into it.  I think
7  we simply said that is something you might look
8  at.
9       Q.  It certainly didn't discourage states
10  from looking at OIG studies in establishing
11  estimated acquisition cost, correct?
12       A.  It did not discourage states, no.
13       Q.  That would be one source of potential
14  data recognizing that there may be other even
15  better sources of data that a state could look
16  to?
17       A.  Well, I think not just recognizing.  I
18  think that is the reality.  I think that a state
19  would want to look within its own state and, as I
20  said, there are limitations to what an OIG study
21  is going to tell you in your particular state.
22       Q.  Other than the fact that an OIG study

| Page 187 |
| --- |

1  may be looking at more than just one state, are
2  there other limitations that you're referring to?
3       MR. WINGET-HERNANDEZ: Objection, form.
4       A.  I'm not certain what --
5       Q.  Oh.  I just want to make sure I
6  understand your statement.  I understand you to
7  be saying that there are limitations to OIG
8  studies because an OIG studies often looks at
9  broader than just a single state.  Do I have that
10  correct?
11       A.  That's not the only limitation.  I
12  think it would be --
13       Q.  What are the other limitations?
14       A.  I think the sample size.  I think the -
15  - I'm not certain I can give you all of the
16  resource limitations that the OIG has in how they
17  design their study, how many samples they go get,
18  how they even pick their studies, what they look
19  for in particular.  All I meant to say was I
20  think as a state it wants to look beyond just
21  what an OIG report would be referring to.
22       Q.  The next two sentences relate to

| Page 188 |
| --- |

1  dispensing fees.  Do you see that?
2       A.  "For the dispensing fee"?  Is that
3  where you're at?
4       Q.  Yes, sir.
5       A.  Okay.  We have said states could
6  establish a reasonable fee.
7       Q.  And there are three methodologies that
8  could be used by states to establish a reasonable
9  fee.  Do you see that?
10       A.  It says "Audits and surveys of
11  operational costs, compilation of data regarding
12  professional salaries and fees and analysis of
13  compiled data regarding pharmacy overcosts,
14  profits, et cetera."
15       Q.  Is that an accurate description of the
16  factors that CMS expected states to consider in
17  establishing a reasonable dispensing fee?
18       MS. MARTINEZ: Objection, form.
19       A.  Again, I think it says "could."  And I
20  think it does not limit a state to come up with
21  better ways to put together what they believe to
22  be a reasonable dispensing fee.

| Page 189 |
| --- |

1       Q.  Because under the federal state program
2  in Medicaid, the primary responsibility is on the
3  state to come up with the way to manage their own
4  program, correct?
5       A.  In general, the states set
6  reimbursement.  As I said, there are lots of
7  checks and balances that go along with that.
8       Q.  The last sentence there indicates that
9  "For dispensing fees CMS has told the regional
10  offices that it can compare a proposed change to
11  a pricing index such as the consumer price
12  index."  Do you see that?
13       A.  Yes.
14       Q.  What do you understand that to be
15  saying?
16       A.  I would just read it as it is.  If
17  you're going to make a change you should make
18  some other comparison to what.  Drug prices in
19  terms of -- I think that there are -- I think it
20  says you ought to look at -- you're giving an
21  increase.  Make it some reasonable comparison to
22  determine what that is.

Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

b7dd559d-b1d7-4258-8177-e5ad61f48a0c

Smith, Dennis G.                                    February 26, 2008
                        Washington, DC

| Page 190 |
|---|

1      I think in drugs in particular one of
2  the areas -- this refers to the dispensing fee.
3  I think it makes -- I think what it's telling the
4  states to do when you're looking at that side of
5  the program, where does it fit within everything
6  else.  I mean, it is -- there is a medical
7  inflation index that is often referred to.  And
8  as a measurement, as an indicator, anyway, of how
9  do you compare to other indicators.
10     In terms of drug pricing, again,
11 there's been lots of changes over the years as to
12 how prescription drugs as more drugs come on the
13 market, go to generic, the whole idea of generic
14 is to lower the cost of the drug, to reduce the
15 price that the Medicaid program is paying for it.
16 So again, if you are -- you want to have a
17 comparison.  And if what's going on in one place
18 is inconsistent with what you are seeing
19 somewhere else, it should raise some alarm bells
20 to you.
21     Prescription drugs are -- again, I'm by
22 no means the world's expert on the changes in the

| Page 191 |
|---|

1  market of prescription drugs to where you've seen
2  pharmacy benefit managers come and go, generics,
3  authorized generics, the market continues to
4  change.  In terms of price competition in the
5  Medicaid program you should be looking for the
6  things that make your prices go down.
7      Q.  When you say you should be looking for
8  things --
9      A.  The state, for example, as it is making
10 comparisons to cost of its program, in general,
11 generics are believed to be beneficial on the
12 price competition side to lower spending.  If
13 what you're doing isn't lowering your spending
14 you probably ought to look at that again.
15     Q.  And this reference to the CPI in
16 Exhibit 328 refers to dispensing fees, correct?
17     A.  While it specifically says dispensing
18 fees, I think it would reasonably apply to both.
19     Q.  That annual increases --
20     A.  But we also recognize medical inflation
21 as a whole has generally outpaced the consumer
22 price index, which is -- I think it says related

| Page 192 |
|---|

1  price indices.  Again, we didn't -- if I were --
2  to my thinking related price indices would, while
3  this specifically says consumer price index, it
4  would be reasonable to also say the medical price
5  index, the component -- medical costs do rise
6  faster than general inflation.  They have for a
7  number of years now.
8      Q.  The next paragraph describes some
9  recently issued OIG reports compare average
10 wholesale price to actual acquisition cost.  Do I
11 have that correct?
12     A.  Yes.  It's referring to recent OIG
13 reports and doesn't give me what reports they are
14 or the time frame.
15     Q.  The final memo was -- that's marked as
16 Exhibit 487 -- was issued in October 2002,
17 correct?
18     A.  Exhibit 487 was October 22nd.
19     Q.  Right.  If you could turn to Exhibit
20 329 in the book to your left -- it's just tab
21 over, I believe.  That's a March 14, 2002 Office
22 of Inspector General report entitled "Medicaid

| Page 193 |
|---|

1  Pharmacy Actual Acquisition Cost of Generic
2  Prescription Drug Products."  If you could take a
3  quick look at that, do you recall that report?
4      A.  Not offhand.  I'd have to read it
5  first, if I may.
6      Q.  Certainly.  Please.  Take your time.
7      MS. MARTINEZ:  Mr. Cook, I think we've
8  gone more than an hour.
9      MR. COOK:  Oh, I apologize.  Why don't
10 we take a break.  Off the record, please.
11     THE VIDEOGRAPHER:  This is the end of
12 tape 4.  Off the record at 3:25.
13         (Recess.)
14     THE VIDEOGRAPHER:  This is the
15 beginning of tape 5 in the deposition of Mr.
16 Smith.  On the record at 3:40.
17 BY MR. COOK:
18     Q.  Mr. Smith, have you had a chance to
19 examine Exhibit 329?
20     A.  Yes.  I have looked at parts of it.  I
21 haven't read it in its entirety.  But it's
22 starting to bring back some memories.

49 (Pages 190 to 193)

b7dd559d-b1d7-4258-8177-e5ad61f48a0c