# EXHIBIT 15 (part 1)



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of Inspector General

Washington, D.C. 20201

JAN − 3 2008

TO:      Kerry Weems
          Acting Administrator
          Centers for Medicare & Medicaid Services

FROM:     Daniel R. Levinson *Daniel R. Levinson*
           Inspector General

SUBJECT:   Review of the Relationship Between Medicare Part D Payments to Local,
             Community Pharmacies and the Pharmacies' Drug Acquisition Costs
             (A-06-07-00107)

The attached final report presents the results of our review of the relationship between Medicare
Part D payments to local, community pharmacies and the pharmacies' drug acquisition costs.
We conducted this review at the request of 33 Senators.

Under Medicare Part D, the Centers for Medicare & Medicaid Services (CMS) contracts with
Part D sponsors to offer prescription drug benefits to eligible individuals. Pharmacies contract
with these sponsors to obtain Part D reimbursement for prescription drugs dispensed to
individuals enrolled in Part D plans. The sponsors pay pharmacies a rate for ingredient costs
(i.e., drug acquisition costs), usually a published average wholesale price of the drug minus some
percentage, as well as a dispensing fee.

Our objectives were to (1) analyze the relationship between Medicare Part D payments,
excluding dispensing fees, to local, community pharmacies and the pharmacies' drug acquisition
costs and (2) estimate Part D dispensing fees and compare them with Medicaid dispensing fees.

Medicare Part D payments, excluding dispensing fees, to local, community pharmacies exceeded
the pharmacies' drug acquisition costs by an estimated 18.1 percent when our analysis included
rebates that drug wholesalers paid to pharmacies. Excluding rebates, Part D payments exceeded
drug acquisition costs by an estimated 17.3 percent. The estimated difference between Part D
payments and drug acquisition costs was $9.13 per prescription including rebates and $8.78
excluding rebates.

The estimated average Medicare Part D dispensing fee paid to local, community pharmacies was
$2.27 per prescription, about $2 less than the average Medicaid dispensing fee.

Page 2 – Kerry Weems

We recommend that Congress and CMS consider the results of our review, including the data provided, in any deliberations regarding Medicare Part D reimbursement.

In its written comments on our draft report, CMS concurred with our recommendation.

Pursuant to the principles of the Freedom of Information Act, 5 U.S.C. § 552, as amended by Public Law 104-231, Office of Inspector General reports generally are made available to the public to the extent the information is not subject to exemptions in the Act (45 CFR part 5). Accordingly, within 10 business days after this report is issued, it will be posted on the Internet at http://oig.hhs.gov.

Please send us your final management decision, including any action plan, as appropriate, within 60 days.  If you have any questions or comments about this report, please do not hesitate to call me, or your staff may contact George M. Reeb, Assistant Inspector General for the Centers for Medicare & Medicaid Audits, at (410) 786-7104 or through e-mail at George.Reeb@oig.hhs.gov. Please refer to report number A-06-07-00107 in all correspondence.

Attachment

# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# REVIEW OF THE RELATIONSHIP BETWEEN MEDICARE PART D PAYMENTS TO LOCAL, COMMUNITY PHARMACIES AND THE PHARMACIES' DRUG ACQUISITION COSTS



Daniel R. Levinson
Inspector General

January 2008
A-06-07-00107

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# *Notices*

---

## THIS REPORT IS AVAILABLE TO THE PUBLIC
### at http://oig.hhs.gov

In accordance with the principles of the Freedom of Information Act (5 U.S.C. 552, as amended by Public Law 104-231), Office of Inspector General, Office of Audit Services reports are made available to members of the public to the extent the information is not subject to exemptions in the act.  (See 45 CFR part 5.)

## OAS FINDINGS AND OPINIONS

The designation of financial or management practices as questionable or a recommendation for the disallowance of costs incurred or claimed, as well as other conclusions and recommendations in this report, represent the findings and opinions of the HHS/OIG/OAS.  Authorized officials of the HHS divisions will make final determination on these matters.



# EXECUTIVE SUMMARY

## BACKGROUND

Title I of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 established the Medicare Part D prescription drug program.  Under Part D, which began January 1, 2006, individuals entitled to benefits under Part A or enrolled in Part B may obtain drug coverage.

The Centers for Medicare & Medicaid Services (CMS), which administers Medicare, contracts with Part D sponsors to offer prescription drug benefits to eligible individuals.  Pharmacies contract with these sponsors to obtain Part D reimbursement for prescription drugs dispensed to individuals enrolled in Part D plans.  The sponsors pay pharmacies a rate for ingredient costs (i.e., drug acquisition costs), usually a published average wholesale price of the drug minus some percentage, as well as a dispensing fee.

In a letter dated June 6, 2006, 33 Senators requested that we analyze three issues related to local, community pharmacies' participation in the Medicare Part D program:  network adequacy, contracting, and reimbursement.  This report, which addresses the reimbursement aspect of the request, is based on our reviews of Part D payments and drug acquisition costs at 100 statistically selected pharmacies in September 2006.

## OBJECTIVES

Our objectives were to (1) analyze the relationship between Medicare Part D payments, excluding dispensing fees, to local, community pharmacies and the pharmacies' drug acquisition costs and (2) estimate Part D dispensing fees and compare them with Medicaid dispensing fees.

## SUMMARY OF RESULTS

Medicare Part D payments, excluding dispensing fees, to local, community pharmacies exceeded the pharmacies' drug acquisition costs by an estimated 18.1 percent when our analysis included rebates that drug wholesalers paid to pharmacies.  Excluding rebates, Part D payments exceeded drug acquisition costs by an estimated 17.3 percent.  The estimated difference between Part D payments and drug acquisition costs was $9.13 per prescription including rebates and $8.78 excluding rebates.  Our analyses also found that, including rebates:

- Payments to pharmacies that were members of group purchasing organizations exceeded drug acquisition costs by an estimated 18.3 percent, compared with 17.7 percent for nonmember pharmacies.  Member pharmacies received rebates on more drugs that were common to both member and nonmember pharmacies than did nonmember pharmacies.

- Payments to rural pharmacies exceeded drug acquisition costs by an estimated 18.9 percent, compared with 17.3 percent for nonrural pharmacies.  The percentage difference appears to be related to the mix of generic and brand-name drugs dispensed rather than a difference in Part D payment rates.  Rural pharmacies filled more generic prescriptions than did nonrural pharmacies.  The percentage difference between Part D

i

payments and drug acquisition costs was significantly higher for generic drugs than for brand-name drugs.

The estimated average Medicare Part D dispensing fee paid to local, community pharmacies was $2.27 per prescription, about $2 less than the average Medicaid dispensing fee.

**RECOMMENDATION**

We recommend that Congress and CMS consider the results of our review, including the data provided, in any deliberations regarding Medicare Part D reimbursement.

**CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS**

In its written comments on our draft report, CMS concurred with our recommendation.  The full text of CMS's comments is included as Appendix G.

## TABLE OF CONTENTS

**Page**

INTRODUCTION................................................................................................1

    BACKGROUND ........................................................................................1
        Senate Request Letter ...............................................................1
        Medicare Part D Reimbursement of Drugs................................1
        National Council for Prescription Drug Programs Pharmacy Database.....2
        National Drug Codes.................................................................2
        First DataBank, Inc., Drug Database .......................................2

    OBJECTIVES, SCOPE, AND METHODOLOGY .............................3
        Objectives .................................................................................3
        Scope and Methodology ...........................................................3

RESULTS OF REVIEW ...................................................................................5

    RELATIONSHIP BETWEEN PAYMENTS AND
    DRUG ACQUISITION COSTS ...........................................................5
        Comparison of Group Purchasing Organization Member and
         Nonmember Pharmacies .......................................................6
        Comparison of Rural and Nonrural Pharmacies .......................7

    DISPENSING FEES .............................................................................8
        Estimated Average Part D Dispensing Fees ............................8
        Comparison of Part D and Medicaid Dispensing Fees .............8

    RECOMMENDATION………………………………………………...9

    CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS ...........9

    OFFICE OF INSPECTOR GENERAL RESPONSE ...........................9

OTHER MATTER:  DISPENSING COSTS................................................10

    SELECTED PHARMACIES' ESTIMATES .......................................10

    RECENT STUDIES............................................................................10

    CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS ...........11

    OFFICE OF INSPECTOR GENERAL RESPONSE .........................11

**APPENDIXES**

A – SAMPLE DESCRIPTION

B – PROJECTION RESULTS

C – PERCENTAGE DIFFERENCE BETWEEN PART D PAYMENTS AND DRUG
ACQUISITION COSTS FOR EACH SELECTED PHARMACY

D – AVERAGE DOLLAR DIFFERENCE BETWEEN PART D PAYMENTS AND
DRUG ACQUISITION COSTS PER PRESCRIPTION FOR EACH SELECTED
PHARMACY

E – BREAKDOWN OF PRESCRIPTIONS ANALYZED

F – SELECTED PHARMACIES' AVERAGE PART D DISPENSING FEES

G – CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS

# INTRODUCTION

## BACKGROUND

### Senate Request Letter

In a letter dated June 6, 2006, 33 Senators requested that we analyze three issues related to local, community pharmacies' participation in the Medicare Part D program:  network adequacy, contracting, and reimbursement.  With respect to reimbursement, the Senators requested that we analyze reimbursement from Medicare prescription drug plans to local, community pharmacies relative to the pharmacies' costs of acquiring and dispensing prescription drugs.[1]  Additionally, the Senators stated:  "We are also concerned about the sufficiency of reimbursement that local, community pharmacies receive from Medicare prescription drug plans.  Pharmacists have informed us that in many cases, reimbursements fall well below their costs, which will undermine the long-term viability of local pharmacies and the MMA [Medicare Prescription Drug, Improvement, and Modernization Act] goal of ensuring beneficiaries' access to them."

This report addresses the reimbursement aspect of the request.  We have issued a separate report addressing network adequacy (OEI-05-06-00320), and we will address contracting in two upcoming reports.

### Medicare Part D Reimbursement of Drugs

Title I of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 significantly expanded the Medicare program set forth in Title 18 of the Social Security Act by establishing the Medicare Part D prescription drug program.  Under Part D, which began January 1, 2006, individuals entitled to benefits under Part A or enrolled in Part B may obtain drug coverage.  Covered drugs include drugs and biological products dispensed by prescription, as well as insulin and supplies associated with insulin injection.[2]

Unlike Parts A and B of the Medicare program, under which Medicare acts as the payer and insurer and generally pays on a fee-for-service basis, the prescription drug benefit is based on a private market model.  The Centers for Medicare & Medicaid Services (CMS) contracts with prescription drug plans and Medicare Advantage plans, which then act as the payers and insurers for prescription drug benefits.  CMS refers to these private entities as Part D sponsors.  Retail pharmacies contract with Part D sponsors to obtain reimbursement for prescription drugs dispensed to Part D beneficiaries.  The sponsors pay pharmacies a rate for ingredient costs (i.e., drug acquisition costs), usually a published average wholesale price of the drug minus some percentage, as well as a dispensing fee.  Dispensing fees help pharmacies cover the costs of filling prescriptions.  According to a recent study, dispensing costs could include such costs as

---

[1] We defined local, community pharmacies as independent retail or franchise retail pharmacies for this review.

[2] Title 18 of the Social Security Act, sections 1860D-1(a)(2) and (3)(A) and 1860D-2(e)(1)(A) and (B).

payroll for prescription department employees and facility costs (e.g., rent, utilities, and maintenance costs).[3]

**National Council for Prescription Drug Programs Pharmacy Database**

The National Council for Prescription Drug Programs, Inc. (NCPDP), maintains a database of licensed pharmacies.  As of October 2, 2006, the NCPDP Pharmacy Database contained 59,848 retail pharmacies in the United States and Puerto Rico classified as chain, independent, or franchise.  As defined by NCPDP, a chain pharmacy is part of a group of four or more pharmacies under common ownership; an independent pharmacy is part of a group of three or fewer pharmacies under common ownership; and a franchise pharmacy is independently owned but has a franchise agreement with another company to receive marketing, training, and/or other support.[4] [5]

**National Drug Codes**

The Drug Listing Act of 1972 requires registered drug establishments to provide the Food and Drug Administration with a list of all drugs manufactured, prepared, propagated, compounded, or processed for commercial distribution.[6]  Drug establishments identify and report drugs using a unique, three-segment number called the National Drug Code (NDC), which is a universal product identifier for drugs for human use.  The first segment, the labeler code, identifies the labeler, which is any firm that manufactures or distributes (under its own name) the drug.  The second segment, the product code, identifies a specific strength, dosage form, and formulation for a particular labeler.  The third segment, the package code, identifies the package size and type.

**First DataBank, Inc., Drug Database**

The National Drug Data File Plus™, maintained by First DataBank, Inc., includes descriptive information for all drugs approved by the Food and Drug Administration.  The database contains, by NDC, such information as whether a drug is prescribed or purchased over the counter, whether a drug is brand name or generic, a product's package size, and the number of packages in a case.  Additionally, one data field contains the clinical formulation identification, which is a six-digit number used to aggregate drugs that share like ingredient sets, strength, dosage form, and route of administration (e.g., oral or injection) but are marketed by multiple manufacturers. Each like product receives the same identification number.

---

[3]Grant Thornton LLP, "National Study To Determine the Cost of Dispensing Prescriptions in Community Retail Pharmacies."  Available online at http://www.alphanet.org.  Accessed on May 14, 2007.

[4]"Pharmacy Update."  Available online at http://www.ncpdp.org/provider_update.asp.  Accessed on July 24, 2007.

[5]According to the National Association of Chain Drug Stores, chain drugstores filled 70.9 percent of the 3.42 billion prescriptions filled in 2006, independent pharmacies filled 21.1 percent, and franchise pharmacies filled 1.2 percent. Mail-order pharmacies accounted for the remaining prescriptions.

[6]This requirement is codified at 21 U.S.C. § 360(j).

**OBJECTIVES, SCOPE, AND METHODOLOGY**

**Objectives**

Our objectives were to (1) analyze the relationship between Medicare Part D payments, excluding dispensing fees, to local, community pharmacies and the pharmacies' drug acquisition costs and (2) estimate Part D dispensing fees and compare them with Medicaid dispensing fees.

**Scope and Methodology**

Using the NCPDP Pharmacy Database, we identified 21,331 independent and franchise retail pharmacies in the United States and Puerto Rico.  We included each pharmacy in our population four times to represent the 4 weeks[7] in September 2006.  The population thus consisted of 85,324 pharmacy weeks.  We randomly selected 100 of these pharmacy weeks for review.  (See Appendix A for a detailed description of our statistical sample design.)

The selected pharmacy weeks related to 99 pharmacies in 38 States and Puerto Rico.[8]  As Table 1 shows, these pharmacies received payments totaling $1,114,845 for the drugs in 18,864 Part D prescriptions (3,344 unique NDCs) and $42,959 in dispensing fees during the selected pharmacy weeks.

|  | Number of Prescriptions | Drug Payments | Dispensing Fee Payments |
|---|---|---|---|
| **Table 1:  Part D Payments to Selected Pharmacies** | | | |
| Brand-name drugs | 8,024 | $895,194 | $16,874 |
| Generic drugs | 10,840 | 219,651 | 26,085 |
| **Total** | **18,864** | **$1,114,845** | **$42,959** |

Sixty-four of the selected pharmacies received rebates, and 66 belonged to GPOs.[9]  On average, according to estimates provided by officials at the selected pharmacies, the pharmacies filled more than 4,200 prescriptions each month, almost 32 percent of which were for Medicare Part D

---

[7]We defined a week as a 5-day span of weekdays, excluding Federal holidays.

[8]Although we reviewed 100 pharmacies, we excluded the results from 1 pharmacy because it received Part D payments for only two prescriptions during the selected week, and the percentage difference between Part D payments and drug acquisition costs was more than three times higher than that of the next highest selected pharmacy.  As a result, all percentage and dollar estimates in this report are based on results at 99 pharmacies.  However, the estimated number of pharmacies that received rebates and pharmacies that were members of group purchasing organizations (GPO) are based on results at all 100 pharmacies.

[9]As members of GPOs, small pharmacies receive the benefits of volume purchasing by leveraging their combined purchasing power to negotiate discount pricing from wholesalers or, in some cases, manufacturers.  ("Follow the Pill:  Understanding the U.S. Commercial Pharmaceutical Supply Chain," prepared for the Kaiser Family Foundation by The Health Strategies Consultancy, LLC.  Available online at http://www.kff.org/rxdrugs/7296.cfm. Accessed on May 4, 2007.)

beneficiaries, and purchased about $184,000 worth of drugs through one or more wholesalers.[10]
(Twenty-five of the pharmacies used only one wholesaler.)

From December 2006 to April 2007, we visited the selected pharmacies to obtain data necessary
to compare the Medicare Part D payments that the pharmacies received with their drug
acquisition costs.  During each pharmacy audit, we:

- discussed Part D reimbursement and drug acquisition costs with pharmacy officials;

- reviewed reimbursement data (remittance advices) that Part D sponsors and other payers
  sent to the pharmacy, Part D claim data that the pharmacy submitted to Part D sponsors,
  and drug purchase invoices;

- determined Part D reimbursement for the week by matching remittance advices to Part D
  claim information from the pharmacy's computer system;

- determined drug acquisition costs by identifying drugs that the pharmacy purchased
  before the date each prescription was filled[11] and by matching the reimbursed drug to a
  purchase of (1) the same drug and package size, (2) the same drug with a different
  package size when we could not find a match under the first method (after obtaining the
  pharmacy's concurrence for these substitutions), or (3) a drug with the same clinical
  formulation identification when we could not find a match using the previous two
  methods (after obtaining the pharmacy's concurrence for these substitutions);

- calculated the difference between Part D reimbursement, excluding dispensing fees, and
  the pharmacy's drug acquisition costs, both including and excluding rebates, if
  applicable;[12]

- calculated the average Part D dispensing fees for all drugs, brand-name drugs, and
  generic drugs; and

- issued a separate report to the pharmacy describing the results of our analysis.

For this report, we used the calculations from the individual pharmacy audits to estimate the
difference between Part D reimbursement and drug acquisition costs and the average Medicare
dispensing fees across the population of local, community pharmacies.  We also compared the
calculations for (1) pharmacies that used GPOs versus those that did not and (2) rural versus
nonrural pharmacies.  To analyze the data on rural and nonrural pharmacies, we used a CMS file
that classified ZIP Codes as rural, suburban, or urban based on population density.  We grouped

---

[10]The average monthly prescriptions and Part D percentage were based on estimates provided by 97 pharmacies,
while the average monthly drug purchase information was based on estimates provided by 98 pharmacies.

[11]We used data for purchases on or after the prescription fill dates for 308 of the 18,864 prescriptions we analyzed
(after obtaining pharmacy officials' concurrence).

[12]We did not verify the actual rebates received from drug wholesalers; instead, we relied on pharmacy officials'
estimates.

the suburban and urban categories together in the nonrural category for estimation purposes. (See Appendix B for all statistical estimates in this report.)  Using CMS data, we also calculated the average Medicaid dispensing fees paid by each State and the District of Columbia for comparison with Medicare Part D dispensing fees.

We did not determine each selected pharmacy's cost of dispensing drugs.  The amount of work necessary to do so was prohibitive, and individual pharmacy cost structures vary substantially. Instead, we obtained cost estimates from the selected pharmacies and researched recent studies of dispensing costs.

Because our objectives did not require an understanding or assessment of the selected pharmacies' overall internal control structures, we did not perform such a review.  We limited our review of internal controls to obtaining an understanding of how the pharmacies maintained Part D reimbursement and drug purchase data.

We conducted our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

Medicare Part D payments, excluding dispensing fees, to local, community pharmacies exceeded the pharmacies' drug acquisition costs by an estimated 18.1 percent when our analysis included rebates that drug wholesalers paid to pharmacies.  Excluding rebates, Part D payments exceeded drug acquisition costs by an estimated 17.3 percent.  The estimated difference between Part D payments and drug acquisition costs was $9.13 per prescription including rebates and $8.78 excluding rebates.

The estimated average Medicare Part D dispensing fee paid to local, community pharmacies was $2.27 per prescription, about $2 less than the average Medicaid dispensing fee.

## RELATIONSHIP BETWEEN PAYMENTS AND DRUG ACQUISITION COSTS

All estimates in this section on the relationship between payments and drug acquisition costs exclude dispensing fees from Medicare Part D payments.  We determined the percentage difference between Part D payments and drug acquisition costs for each selected pharmacy by subtracting drug acquisition costs from Part D payments and dividing by drug acquisition costs.

Including rebates in our analysis, Medicare Part D payments to local, community pharmacies were an estimated 18.1 percent higher than drug acquisition costs.  For the selected pharmacies, Part D payments ranged from 1.9 percent to 55.1 percent higher than drug acquisition costs. (Based on the 64 selected pharmacies that received wholesaler rebates, we estimated that 13,652 of the 21,331 local, community pharmacies in our population received rebates, thus reducing their drug acquisition costs.)  Excluding rebates from our analysis, Part D payments were an estimated 17.3 percent higher than drug acquisition costs.  (See Appendix C for each selected pharmacy's percentage difference between Part D payments and drug acquisition costs.)

The Part D payment for each prescription exceeded drug acquisition costs by an estimated $9.13 including rebates and $8.78 excluding rebates.  (See Appendix D for each selected pharmacy's average dollar difference per prescription.)

Table 2 provides the estimated percentage and dollar differences both including and excluding rebates.

**Table 2:  Estimated Difference Between Part D Payments and Drug Acquisition Costs**

|  | Estimated Difference as a Percentage of Costs | | Estimated Dollar Difference per Prescription | |
|---|---|---|---|---|
|  | Including Rebates | Excluding Rebates | Including Rebates | Excluding Rebates |
| All drugs | 18.1% | 17.3% | $9.13 | $8.78 |
| Brand-name drugs | 7.9% | 7.6% | 9.18 | 8.86 |
| Generic drugs | 73.3% | 69.0% | 9.12 | 8.77 |

The percentage difference between Part D payments and drug acquisition costs was more than nine times higher for generic drugs than for brand-name drugs.  However, generic and brand-name drugs had similar per prescription dollar differences.

Pharmacies almost always acquired drugs for less than their reimbursement amounts.  For the 18,864 Part D prescriptions we analyzed, payments were higher than drug acquisition costs for 18,245 prescriptions (96.7 percent) and equal to or less than drug acquisition costs for 619 prescriptions (3.3 percent).[13]  (Appendix E provides, for each selected pharmacy, the number of prescriptions analyzed, the number of prescriptions with Part D payments higher than drug acquisition costs, and the number of prescriptions with Part D payments equal to or below drug acquisition costs.)

**Comparison of Group Purchasing Organization
Member and Nonmember Pharmacies**

Based on the 66 selected pharmacies that were members of GPOs, we estimated that 14,078 of the 21,331 pharmacies in our population were members of GPOs.  Including rebates, Part D payments to GPO member pharmacies were an estimated 18.3 percent higher than drug acquisition costs, and payments to nonmember pharmacies were an estimated 17.7 percent higher.  Table 3 presents the estimated percentage difference between Part D payments and drug acquisition costs for GPO members and nonmembers both including and excluding rebates.

---

[13]Payments were equal to drug acquisition costs for 9 prescriptions and less than drug acquisition costs for 610 prescriptions.

**Table 3:  Estimated Difference Between Part D Payments and Drug Acquisition Costs for GPO Members and Nonmembers**

|  | GPO Members | | Nonmembers | |
|---|---|---|---|---|
|  | Including Rebates | Excluding Rebates | Including Rebates | Excluding Rebates |
| All drugs | 18.3% | 17.2% | 17.7% | 17.4% |
| Brand-name drugs | 8.3% | 8.0% | 7.1% | 6.8% |
| Generic drugs | 73.7% | 68.0% | 72.6% | 71.0% |

The difference between GPO members and nonmembers appears to be related to the fact that members received rebates on more drugs.  For 1,351 drugs common to both GPO members and nonmembers, we found that members received rebates on 78 percent of the drugs and that nonmembers received rebates on 52 percent.

**Comparison of Rural and Nonrural Pharmacies**

CMS classified 11,528 pharmacies in our population as rural and 9,785 pharmacies as nonrural.[14]  Including rebates, Part D payments to rural pharmacies were an estimated 18.9 percent higher than drug acquisition costs, and payments to nonrural pharmacies were an estimated 17.3 percent higher.  Table 4 presents the estimated percentage difference between Part D payments and drug acquisition costs for rural and nonrural pharmacies both including and excluding rebates.

**Table 4:  Estimated Difference Between Part D Payments and Drug Acquisition Costs for Rural and Nonrural Pharmacies**

|  | Rural Pharmacies | | Nonrural Pharmacies | |
|---|---|---|---|---|
|  | Including Rebates | Excluding Rebates | Including Rebates | Excluding Rebates |
| All drugs | 18.9% | 17.9% | 17.3% | 16.6% |
| Brand-name drugs | 8.3% | 7.9% | 7.5% | 7.3% |
| Generic drugs | 71.2% | 66.4% | 75.3% | 71.5% |

The difference between rural and nonrural pharmacies appears to be related to the mix of generic and brand-name drugs dispensed rather than a difference in Part D payment rates.  Payments to rural and nonrural pharmacies were nearly identical for 1,396 drugs common to both groups. Rural pharmacies, on the other hand, filled more generic prescriptions.  Generic drugs accounted for 63 percent of the prescriptions filled by the selected rural pharmacies, compared with 52 percent of the prescriptions filled by nonrural pharmacies.  As noted previously, the percentage difference between Part D payments and drug acquisition costs was significantly higher for generic drugs than for brand-name drugs.

---

[14]The CMS file that classified ZIP Codes as rural, urban, or suburban did not include classifications for 18 pharmacies in our population.

## DISPENSING FEES

### Estimated Average Part D Dispensing Fees

The estimated average Medicare Part D dispensing fee paid to local, community pharmacies for all drugs was $2.27 per prescription.  Table 5 presents the estimated average Part D dispensing fees, as well as the lowest and highest average fees paid to the selected pharmacies.  (Appendix F presents the average Part D dispensing fee for each selected pharmacy.)

#### Table 5:  Estimated Average Part D Dispensing Fees and Lowest and Highest Average Fees for the Selected Pharmacies

|  | Number of Prescriptions Analyzed | Estimated Average Part D Dispensing Fee | Selected Pharmacies' Average Dispensing Fees | |
|---|---|---|---|---|
|  |  |  | Lowest | Highest |
| All drugs | 18,864 | $2.27 | $1.40 | $4.84 |
| Brand-name drugs | 8,024 | 2.11 | 1.28 | 3.89 |
| Generic drugs[15] | 10,840 | 2.36 | 1.38 | 5.41 |

### Comparison of Part D and Medicaid Dispensing Fees

The average <u>Medicaid</u> dispensing fee paid during September 2006 was $4.30 per prescription, which was $2.03 more than the estimated average Part D dispensing fee of $2.27.[16]  Table 6 compares the estimated average Medicare Part D dispensing fees with the average Medicaid dispensing fees.

#### Table 6:  Comparison of Medicare Part D and Medicaid Dispensing Fees

|  | Estimated Average Part D Dispensing Fee | Average Medicaid Dispensing Fee | Difference |
|---|---|---|---|
| All drugs | $2.27 | $4.30 | $2.03 |
| Brand-name drugs | 2.11 | 4.19 | 2.08 |
| Generic drugs | 2.36 | 4.42 | 2.06 |

---

[15]One Part D sponsor paid 31 selected pharmacies an enhanced dispensing fee that ranged from $0.80 to $1.80 per prescription, depending on the percentage of prescriptions filled using generic drugs.  Of the 18,864 prescriptions we analyzed, only 911 were generic drug prescriptions eligible for this enhanced fee.  We did not quantify the effect of the additional fee because it would have been minimal.

[16]We based the average Medicaid dispensing fee on dispensing fees paid by 49 States and the District of Columbia. We excluded one State because its data were not comparable to other States' data in that the State did not specifically identify dispensing fees paid to retail pharmacies.

Officials from the selected pharmacies voiced concerns related to dispensing fee payments for beneficiaries entitled to Medicare and eligible for Medicaid (dually eligible beneficiaries). Before the implementation of Medicare Part D, Medicaid covered prescription drugs dispensed to these beneficiaries; however, when Medicare Part D was implemented, dually eligible beneficiaries were automatically enrolled in Part D prescription drug plans.  As a result, pharmacies received the lower Medicare dispensing fees for these individuals.

**RECOMMENDATION**

We recommend that Congress and CMS consider the results of our review, including the data provided, in any deliberations regarding Medicare Part D reimbursement.

**CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS**

In its written comments on our draft report, CMS concurred with our recommendation and stated that our findings were generally consistent with its own expectations.  CMS also stated that the following aspects of our methodology were unclear:

- how we applied pharmacy officials' rebate estimates to the audited Part D claims and how these estimates could affect the percentage differences between Part D payments and drug acquisition costs,

- how we determined the acquisition cost of a drug with the same clinical formulation identification as the drug for which the pharmacy billed Part D, and

- how we calculated average Part D dispensing fees.

**OFFICE OF INSPECTOR GENERAL RESPONSE**

We have clarified our methodology below:

- We applied pharmacy officials' rebate estimates to drug acquisition costs, not to Part D claims.  We reduced each selected pharmacy's drug acquisition costs by its estimated rebate percentage.  We relied on the information provided to us by pharmacy officials familiar with their pharmacies' rebate terms and did not verify the actual rebates received.

- When identifying drug acquisition costs, we tried to match those costs with the same drugs for which the pharmacy billed Part D; however, pharmacies sometimes substituted a like drug for the billed drug (i.e., a drug with the same clinical formulation identification but a different manufacturer).  We were able to obtain the acquisition cost for the same drug billed to Part D for 90 percent of the analyzed prescriptions.  For the remaining 10 percent, we obtained pharmacy officials' concurrence to use the acquisition cost of a drug with the same clinical formulation identification.

- We obtained data identifying the dispensing fees that Part D sponsors paid to the selected pharmacies from reimbursement data (remittance advices) or the contracts between the

pharmacies and the Part D sponsors.  We calculated the average Part D dispensing fee for each selected pharmacy by totaling the dispensing fees paid by Part D sponsors and dividing these totals by the number of Part D prescriptions.

## OTHER MATTER:  DISPENSING COSTS

Although this report provides estimates of the percentage and per prescription dollar differences between Part D ingredient cost payments and drug acquisition costs, the pharmacies' incurred costs to dispense drugs would need to be factored into the calculation to derive the net difference between total Part D payments (i.e., ingredient cost payments plus dispensing fees) and total pharmacy costs (i.e., drug acquisition costs and dispensing costs, such as payroll for prescription department employees and facility costs).  Following are the selected pharmacies' estimates of dispensing costs and the results of two recent studies.

### SELECTED PHARMACIES' ESTIMATES

Of the 99 selected pharmacies, 69 pharmacies provided estimates of their costs to dispense prescription drugs based on various methods, including dividing total expenses by total prescriptions filled and using a formula created by a third-party contractor.  The estimates ranged from $3.50 to $19 per prescription and averaged $9.13.  The remaining 30 selected pharmacies did not provide estimates of their dispensing costs.

Given the scope of our review, we did not ask pharmacy officials to provide documentation supporting their estimated dispensing costs.  Therefore, we were unable to assess the accuracy of those estimates.

### RECENT STUDIES

Two recent studies conducted on behalf of pharmacy associations both concluded that pharmacies' costs to dispense prescription drugs averaged about $10.50 per prescription.

- Grant Thornton LLP conducted a study for the Coalition for Community Pharmacy Action[17] and issued "National Study To Determine the Cost of Dispensing Prescriptions in Community Retail Pharmacies" in January 2007.[18]  During this study, Grant Thornton LLP analyzed 6 months of data from 23,152 pharmacies and computed an average dispensing cost of $12.10.  However, Grant Thornton LLP computed a weighted average dispensing cost of $10.50 per prescription because of substantial variations in the number of prescriptions filled per pharmacy.  According to the report, high-volume pharmacies had significantly lower dispensing costs per prescription than low-volume pharmacies.

---

[17]The coalition is an alliance between the National Association of Chain Drug Stores and the National Community Pharmacists Association (NCPA).

[18]Available online at http://www.alphanet.org.  Accessed on May 14, 2007.

- The "2006 NCPA-Pfizer Digest"[19] concluded that pharmacies' average cost to dispense prescription drugs was $10.53, $1.29 more than the previous year's estimate of $9.24. According to the information in the digest, expenses increased as stores added new personnel; stayed open longer; and provided value-added services, such as educating patients about Medicare Part D.

We did not audit the results of these two studies.

**CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS**

CMS said that its primary concern with our draft report was the inclusion of estimated dispensing costs provided by the selected pharmacies, as well as the calculated dispensing costs from two pharmacy association studies.  CMS stated that these dispensing costs were potentially nonrepresentative and could obscure the ongoing Medicare Part D pharmacy debate.  While acknowledging that the report stated that we had not reviewed the accuracy of the dispensing cost estimates or study results, CMS said that the statement would not prevent readers from relying on those data.

**OFFICE OF INSPECTOR GENERAL RESPONSE**

As explained above, the dispensing cost information provides a more complete picture of pharmacies' operations.  We included the information because we did not want readers to misinterpret the differences between Part D payments and drug acquisition costs presented in the report as representing the difference between total pharmacy reimbursement and total pharmacy costs.  The dispensing cost information clarifies that our analysis did not account for all of the costs associated with dispensing prescription drugs.

---

[19]The "2006 NCPA-Pfizer Digest" is a summary of selected financial and demographic information for independent community pharmacies.  Available for purchase online at http://www.ncpanet.org.