# EXHIBIT D

*THIS PAGE IS NOT A COPY OF THE ORIGINAL COVER PAGE -- DUE TO THE POOR IMAGE QUALITY OF THE ORIGINAL DOCUMENT, THIS PAGE WAS RETYPED BY JONES, DAY, REAVIS & POGUE*

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 89-4566

_____

THE STATE OF LOUISIANA,

                                        Petitioner,

                    v.

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

                                        Respondent.

_____

Appeal from The Final Decision of
the Secretary of Health and Human
Services Disapproving Louisiana
State Plan Amendment No. 87-33
HHS #88-11

_____

BRIEF FOR RESPONDENT

_____

                          JOHN VOLZ
                          United States Attorney
                          Eastern District of Louisiana

                          DONALD F. DICKEY
                          Attorney
                          United States Department of
                            Health and Human Services
                          Room 500 East High Rise Building
                          6325 Security Blvd.
                          Baltimore, MD  21207
                          (301) 965-8861
                          (FTS) 625-8861

OF COUNSEL:

MACHAEL J. ASTRUE
General Counsel

DARREL GRINSTEAD
Chief Counsel

United States Department of
  Health and Human Services



<u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Medicaid program and the drug reimbursement regulations promulgated thereunder are extremely complex.  In addition, the issues and policies involved in this case have national significance.  Therefore, in the opinion of counsel, oral argument is warranted.

TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . 2

    I.   Course of Proceedings and Disposition in
        Administrative Hearing Below. . . . . . . . . . . . . 2

    II.  Statement of Facts. . . . . . . . . . . . . . . . . . 3

        A.   Statutory and Regulatory Background. . . . . . . 3

        B.   The Secretary's Policy With Regard To Use Of
            Published AWP In Determining The Upper Limit. . 8

        C.   The Disapproval of Louisiana State Plan
            Amendment No. 87-33. . . . . . . . . . . . . . 15

        D.   The HCFA Administrator's Decision. . . . . . . 16

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    THE DECISION OF THE ADMINISTRATOR DISAPPROVING LOUISIANA
    STATE PLAN AMENDMENT NO. 87-33 IS REASONABLE AND
    CONSISTENT WITH THE MEDICAID STATUTE AND REGULATIONS. . . 20

        I.   Standard of Review. . . . . . . . . . . . . . . . 20

        II.  The Administrator Properly Found That Use Of The
            Published Average Wholesale Price (AWP) Is Not A
            Reasonable "Best Estimate" Of The Price Generally
            Paid By Pharmacies For Prescription Drugs. . . 21

            A.   The Weight of Evidence Demonstrates That AWP
                Significantly Overstates The Prices That
                Providers Pay for Drug Products. . . . . . 22

            B.   The Secretary Has Followed A Consistent
                 Policy Against Use Of Published AWP Under
                 The Upper Limits Regulations. . . . . . 24

C.    The Secretary Properly Exercised His
      Authority To Assure That States Do Not
      Establish The Upper Limit Based On Pricing
      Methods That Have Been Shown To Be
      Inaccurate. . . . . . . . . . . . . . . . 30

D.    The State Cannot Use AWP In Determining The
      Upper Limit Simply Because Other Features In
      Its Plan Constrain Costs. . . . . . . . . 34

E.    The Secretary's Policy Against Use Of AWP In
      Determining the Upper Limit Applies To All
      States. . . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . 42

TABLE OF AUTHORITIES

### CASES

Alcaraz v. Block, 746 F.2d
   593 (9th Cir. 1984) . . . . . . . . . . . . . . .   29

American Hospital Ass'n v. Bowen,
   834 F.2d 1037 (D.C. Cir. 1987) . . . . . . . .   29

American Medical Ass'n v.
   Mathews, 429 F. Supp. 1179 (N.D. Ill. 1977) . . . . . . . . . .   5

Arkansas Pharmacists Ass'n v.
   Harris, 627 F.2d 867 (8th Cir. 1980) . . . . . . . .   5, 24, 40

Atkins v. Rivera, __ U.S. __,
   106 S. Ct. 2456 (1986) . . . . . . . . . . .   4

Batterton v. Marshall,
   648 F.2d 694 (D.C. Cir. 1980) . . . . . . . . . . . . .   33

Cabais v. Egger,
   690 F.2d 234 (D. C. Cir. 1982) . . . . . . . . . . . . .   34

Chevron U.S.A., Inc. v. Natural
   Resources Defense Council, Inc.,
   467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . .   20, 40

Cieutat v. Bowen,
   824 F.2d 348 (5th Cir. 1987) . . . . . . . . . . . .   20, 21

Citizens to Preserve Overton Park, Inc.
   v. Volpe, 401 U.S. 402 (1971) . . . . . . . . . . . . .   20

District of Columbia Podiatry Society
   v. District of Columbia,
   407 F. Supp. 1259 (D.D.C. 1975) . . . . . . . . . . . .   4

Harris v. McRae,
   448 U.S. 297 (1980) . . . . . . . . . . . . . .   4

Homan & Crimen, Inc. v. Harris,
   626 F.2d 1201 (5th Cir. 1980), cert.
   denied, 450 U.S. 975 (1981) . . . . . . . . . . . .   20, 29

Homemakers North Shore, Inc. v. Bowen,
   832 F.2d 408 (7th Cir. 1987) . . . . . . . . . . . .   27

Johnson's Professional Nursing Home v.
    Weinberger,
    490 F.2d 841 (5th Cir. 1974)  . . . . . . . . . . . . . . . . 20

Lewis v. Hegstrom,
    767 F.2d 1371 (9th Cir. 1985) . . . . . . . . . . . . . . . . 4

Mercy Hospital of Laredo v. Heckler,
    777 F.2d 1028 (5th Cir. 1988) . . . . . . . . . . . . . . 20, 21

National Ass'n of Chain Drug
    Stores, Inc. v. Bowen,
    [1989-2 Transfer Binder] Medicare &
    Medicaid Guide (CCH) ¶ 37,871 (April
    12, 1989) . . . . . . . . . . . . . . . . . . . . . . 5, 24, 39

New York Dept. of Social Services v. Bowen,
    835 F.2d 360 (D.C. Cir. 1987),
    cert. denied, ___ U.S. ___,
    108 S. Ct. 2820 (1988) . . . . . . . . . . . . . . . . . . . . 27

Ostrow Pharmacies, Inc. v. Beal,
    394 F. Supp. 22 (E.D. Pa. 1975),
    aff'd mem., 527 F.2d 645 (3rd Cir. 1976) . . . . . . . . . . . 5

Pennsylvania Pharmaceutical Ass'n
    v. Dept. of Public Welfare,
    542 F. Supp. 1349 (W.D. Pa. 1982) . . . . . . . . . . . . . 5, 24

Pharmacist Political Action Committee
    of Maryland (PHARMPAC) v. Harris,
    502 F. Supp. 1235 (D. Md. 1980) . . . . . . . . . . . . . . . 5

Schweiker v. Gray Panthers,
    453 U.S. 34 (1981) . . . . . . . . . . . . . . . . . . . . . 4

Schweiker v. Hogan,
    457 U.S. 569 (1982) . . . . . . . . . . . . . . . . . . . . . 4

Udall v. Tallman,
    380 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . 20

## STATUTES

42 U.S.C. §§1316(a)(1) . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. §1316(a)(3) . . . . . . . . . . . . . . . 1,  2,  3,  4,  5

42 U.S.C. §1396 et seq. . . . . . . . . . . . . . . . . . . . 4,  5

42 U.S.C. §1396a . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. §1396c . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. §706(2)(A) . . . . . . . . . . . . . . . . . . . 20

Medicare Catastrophic Coverage Act,
    Pub. L. No. 100-360 (1988), repealed,
    Pub. L. No. 101-234 (1989) . . . . . . . . . . . . . . . 23

## REGULATIONS

42 C.F.R. §430.0 et seq. (1988) . . . . . . . . . . . . . 4

42 C.F.R. §430.10 . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. §430.15 . . . . . . . . . . . . . . . . . . 4, 5

42 C.F.R. §§430.18 . . . . . . . . . . . . . . . . . . . 5

42 C.F.R. §430.30 . . . . . . . . . . . . . . . . . . . . 4

42 C.F.R. §430.60 et seq. . . . . . . . . . . . . . . . . 5

42 C.F.R. §447.300 et seq. . . . . . . . . . . . . . . . 18

42 C.F.R. §447.301 . . . . . . . . . . . . 16, 21, 22, 27, 31, 38

42 C.F.R. §447.331(b) . . . . . . . . . . . . . . 7, 22, 36

42 C.F.R. §447.332(b) . . . . . . . . . . . . . . 7, 40, 41

42 C.F.R. §447.333 . . . . . . . . . . . . . . . . 31, 33, 39

45 C.F.R. § 19.5 (1986) . . . . . . . . . . . . . . . . . 7

34 Fed. Reg. 1244 (January 25, 1969) . . . . . . . . . . . 6

39 Fed. Reg. 41,480 (November 27, 1974) . . . . . . . . 8, 25, 38

40 Fed. Reg. 34,516 (August 15, 1975) . . . . . . . . . 8, 25, 40

51 Fed. Reg. 29,560 (August 19, 1986) . . . . . . . . . . 14, 26

52 Fed. Reg. 28,648 (July 31, 1987) . . . . . . . . 7, 14, 30, 31, 33

**MISCELLANEOUS**

In re: The Disapproval of Louisiana State Plan
  Amendment No. 87-33, No. 88-11 (HCFA
  Administrator June 9, 1989)  . . . . .   . . . . . . . . . . PASSIM


Fed. R. App. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . .42

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NO. 89-4566

---

THE STATE OF LOUISIANA,

Petitioner,

v.

THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

Respondent.

---

Appeal from The Final Decision of
the Secretary of Health and Human
Services Disapproving Louisiana
State Plan Amendment No. 87-33
HHS #88-11

---

BRIEF FOR RESPONDENT

---

STATEMENT OF JURISDICTION

The statutory basis of the jurisdiction of this Court is 42
U.S.C. §1316(a)(3).  That statute provides for review by the
United States Courts of Appeals of a final determination of the
Secretary disapproving a state plan for failure to comply with
the requirements for federal approval.

1

## STATEMENT OF ISSUES

Whether the Administrator properly disapproved Louisiana State Plan Amendment 87-33, which provides for the use of average wholesale prices (AWPs) reported in national drug pricing compendia as the State's best estimate of the prices that pharmacies are paying for prescription drugs, when the great weight of evidence shows that published AWPs significantly overstate the prices paid by pharmacies.

## STATEMENT OF THE CASE

I.   Course of Proceedings and Disposition in Administrative Hearing Below.

This case presents a challenge by the State of Louisiana ("the State") to a final determination of the Secretary of Health and Human Services ("the Secretary") disapproving an amendment to the State's Medicaid state plan that was submitted to bring the state plan into compliance with certain federal requirements governing drug reimbursement.  See 42 U.S.C. §1316(a)(3).  The Secretary's final decision was rendered by the Administrator of the Health Care Financing Administration ("HCFA") after a reconsideration hearing held pursuant to 42 U.S.C. §1316(a)(2).[1]

Louisiana State Plan Amendment No. 87-33 was disapproved by HCFA by a notice dated May 12, 1988.  Administrative Record, p.

---

[1] The Secretary has delegated authority for carrying out the federal duties under the Medicaid statute to the Administrator of HCFA, an agency within HHS.

2

1142 ("A.R. 1142").[2]  Louisiana filed a request for
reconsideration of the disapproval on July 1, 1988.  A.R. 1145.
On August 4, 1988, the Administrator published a notice in the
Federal Register announcing the date of an administrative hearing
to reconsider the disapproval decision, the issues presented, and
the timetable for participation by interested parties.  A.R.
1613-14.  The State and three pharmaceutical associations
participated in the reconsideration hearing.  A.R. 5-6.  The
hearing officer issued a decision on December 29, 1988
recommending that the state plan amendment be disapproved.  A.R.
2.  Exceptions to the recommended decision were filed by the
State and the pharmaceutical associations.  A.R. 2.  On June 9,
1989, the HCFA Administrator issued his final decision upholding
disapproval of the state plan amendment.  In re: The Disapproval
of Louisiana State Plan Amendment No. 87-33, No. 88-11 (HCFA
Administrator June 9, 1989), A.R. 2-9.  The State then filed a
petition for review by this Court pursuant to 42 U.S.C.
§1316(a)(3).

II.  Statement of Facts.

   A.   Statutory and Regulatory Background.

   The Medicaid program, provided for under Title XIX of the
Social Security Act, is a cooperative federal-state program to
furnish medical assistance to eligible low-income individuals.

---

       [2] All references will be to the original record on review.
However, for the Court's convenience, the Secretary has provided
an appendix containing exerpts of essential materials in the
record.

42 U.S.C. §1396 et seq.  See Atkins v. Rivera, __ U.S. __, 106
S.Ct. 2456, 2458 (1986); Schweiker v. Hogan, 457 U.S. 569, 571
(1982); Harris v. McRae, 448 U.S. 297, 301 (1980).  The program
is jointly financed by the federal and state governments and is
administered by the states.  Id.  While the Medicaid program is
voluntary, states which choose to participate must submit a
"state plan" that fulfills the requirements imposed by the
Medicaid statute and other requirements imposed by the Secretary.
42 U.S.C. §1396a.  See Schweiker v. Gray Panthers, 453 U.S. 34,
36-37 (1981); Harris v. McRae, 448 U.S. at 301.  See also 42
C.F.R. §430.0 et seq. (1988).  The state plan must be approved by
the Secretary.  42 U.S.C. §1316(a)(1); 42 C.F.R. §430.10.  Upon
approval of the state plan, the state becomes entitled to
reimbursement by the federal government, termed "federal
financial participation" (or "FFP"), for a portion of its
payments to providers furnishing services to Medicaid recipients.
42 U.S.C. §1396b(a); 42 C.F.R. §430.30.

The Secretary is charged with responsibility to ensure that
state plans (including plan amendments and administrative
practices under the plans) originally meet and continue to meet
the federal requirements.  42 U.S.C. §§1316(a)(1), 1396a, 1396c;
42 C.F.R. §430.15.  States have considerable discretion to design
and operate their individual programs, but they must maintain
their plans in compliance with the federal requirements.  See
Lewis v. Hegstrom, 767 F.2d 1371, 1373 (9th Cir. 1985); District
of Columbia Podiatry Society v. District of Columbia, 407 F.

Supp. 1259, 1264 (D.D.C. 1975).  This rule fully applies in the context of Medicaid plan provisions providing for prescription drug reimbursement.[3]  If, on reviewing a state plan amendment, the Secretary determines that the amendment does not meet the federal requirements, he issues a disapproval.  42 C.F.R. §§430.15(c).  A state may seek administrative and judicial review of these disapproval determinations.  See 42 U.S.C. §1316(a)(2), (c); 42 C.F.R. §§430.18, 430.60 et seq.

State plans for implementing Medicaid must, among other things, "provide such methods and procedures relating to the utilization of, and payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care."  42 U.S.C. §1396a(a)(30)(A).  If a state provides prescription drug coverage, its plan must provide for payments that are in accordance with that standard.  See Arkansas Pharmacists Ass'n, 627 F.2d at 869; Pennsylvania Pharmaceutical Ass'n, 542 F. Supp. at 1353.  See National Ass'n of Chain Drug Stores, Inc. v. Bowen, [1989-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 37,871, at 20,099 (April 12, 1989) (Copy in Respondent's Appendix).  To implement this requirement, the

---

[3] See Arkansas Pharmacists Ass'n v. Harris, 627 F.2d 867, 869 (8th Cir. 1980); Pennsylvania Pharmaceutical Ass'n v. Dept. of Public Welfare, 542 F. Supp. 1349, 1353 (W.D. Pa. 1982); Pharmacist Political Action Committee of Maryland (PHARMPAC) v. Harris, 502 F. Supp. 1235, 1243 (D. Md. 1980); American Medical Ass'n v. Mathews, 429 F. Supp. 1179, 1194 (N.D. Ill. 1977); Ostrow Pharmacies, Inc. v. Beal, 394 F. Supp. 22, 25 (E.D. Pa. 1975), aff'd mem., 527 F.2d 645 (3rd Cir. 1976).

Secretary has, on three occasions, promulgated regulations governing the maximum amounts of state expenditures for prescription drugs that HCFA will recognize in paying FFP to the states.

In 1969, the Secretary provided that the upper limit on state prescription drug expenditures would be the lower of "cost as defined by the state plus a dispensing fee" or "customary charges which are reasonable."  34 Fed. Reg. 1244 et seq. (January 25, 1969), codified at 45 C.F.R. §250.30(b)(2) (1970), A.R. 1006.

In 1975, the Secretary revised the regulations to provide that the upper limit would be based on the lower of "the cost of the drug plus a dispensing fee" or "the provider's usual or customary charge to the general public."  40 Fed. Reg. 34,516 et seq. (August 15, 1975); codified at 45 C.F.R. §250.30(b)(2) (1976), A.R. 1015.  To contain federal spending on prescription drugs, the regulations established specific requirements governing what states could determine to be the "cost of the drug" under the cost-plus-dispensing-fee limit.  Id., A.R. 1012. These requirements divided drugs into two categories: (1) certain commonly dispensed multiple-source drugs[4] and (2) all other drugs.  Id., A.R. 1012-15.

For the multiple-source drug category, "cost" was defined as the lower of either the maximum allowable cost ("MAC") or the

_____

[4] Multiple-source drugs are drugs that are available under different brand names or both under a brand name and in generic form.

6

estimated acquisition cost ("EAC").  Id.  The MAC was the lowest price at which a drug product was widely and consistently available for purchase by pharmacists, as determined by a Pharmaceutical Reimbursement Board pursuant to procedures set forth at 45 C.F.R. § 19.5 (1986).  Id.  The EAC was defined as "the State's closest estimate of the price generally and currently paid by providers" for a drug.  Id.  For the "other drugs" category, comprised of multiple-source drugs not on the federal MAC list and single-source drugs, the "cost of the drug" was simply the EAC.  Id.  It is the application of the EAC limit in the context of "other drugs" that is involved in this case.

In 1987, the Secretary further revised the upper limit regulations.  52 Fed. Reg. 28,648 et seq. (July 31, 1987), codified at 42 C.F.R. §447.332 (1988), A.R. 1057.  For the "other drugs" category, the final rule retained the mechanism that had been in place since the 1975 final rule -- the lower of EAC-plus-dispensing-fee or customary charges.  42 C.F.R. §447.331(b).  However, while retaining this familiar mechanism, the final rule made one significant variation.  The rule provided that this upper limit would now apply on an aggregate rather than a drug-specific basis.  Id.[5]

---

[5] The main purpose of the 1987 final rule was to replace the cumbersome MAC system with a simple formula, under which HCFA establishes ingredient cost for specified multiple-source drugs at 150% of the lowest price published in drug price compendia. 42 C.F.R. §447.332(b).  In addition, the 1987 rule provided that this new upper limit (HCFA-established cost plus state's dispensing fee) would apply on an aggregate basis rather than on a prescription-by-prescription basis.  Id.  This upper limit for certain multiple-source drugs is not involved in this case.

B.   The Secretary's Policy With Regard To Use Of
     Published AWP In Determining The Upper Limit.

HCFA's predecessor in the administration of the Medicaid
program, the Social and Rehabilitation Service (SRS), first
adopted EAC as a specific upper limit requirement in 1975, in an
effort to achieve federal savings.  40 Fed. Reg. 34,516 et seq.,
A.R. 1015.  In the proposed rule, the SRS noted that most states
defined drug "cost" under the upper limit as AWP or other
standard prices that were "frequently in excess of actual
acquisition costs to the retail pharmacist."  39 Fed. Reg. 41,480
(November 27, 1974), A.R. 1009.  The SRS proposed to obtain
program savings by requiring use of actual acquisition cost for
the "cost" component of the upper limit.  Id.  When several
commenters suggested that AWP would be a better standard, the
Secretary responded that AWP was not acceptable because "AWP data
are frequently inflated."  40 Fed. Reg. 34,518 (August 15, 1975),
A.R. 1014.  While the increased audit and administrative expense
involved in determining actual acquisition cost led the SRS to
modify its proposal in the final rule, the EAC standard that was
adopted was defined as "the State's closest estimate of the price
generally and currently paid by providers."  Id., A.R. 1014,
1015.

In July 1976, the year in which the 1975 rule became
effective, the Department sent a memorandum to states enclosing
drug pricing data to assist them in determining their EACs.  A.R.
222.  The memorandum emphasized that this pricing data was being
furnished only "as guide material" and that it was still "each

8

State's responsibility to determine estimated acquisition costs (EAC) as closely as feasible to actual acquisition costs." <u>Id</u>. In December 1977, the Department sent an action transmittal to states which stated that although the regulations did not require states to limit drug cost to actual acquisition cost, "the intent of those regulations is to have each State's estimate be as close as feasible to the price generally and currently paid by the provider." A.R. 222-23. According to this transmittal, the Department was "not convinced" that those states which continued to reimburse at average wholesale price (AWP) had "made a real effort to approach AAC [actual acquisition cost]." <u>Id</u>. It suggested that states might make their EAC's more accurate by reducing AWP by a percentage or by using the direct prices of certain manufacturers.[6] <u>Id</u>. A recommendation that states reduce AWP by a percentage was also included in draft guidelines on the drug upper limits that were circulated to states in 1977. A.R. 671.

In June 1984, the Office of Inspector General ("OIG") published a lengthy report of an audit of pharmacy drug purchases in six states, entitled "Changes to the Medicaid Prescription Drug Program Could Save Millions." Office of Inspector General, Audit No. 06-40216, A.R. 633-72 ("OIG Report"). The OIG report found that 99.6 percent of the 3,469 pharmacy purchases audited

---

[6] The direct price is the price at which a manufacturer with a direct-to-retailer distribution system will sell a product directly to a pharmacist, bypassing the wholesaler in the channel of distribution.

were made at prices averaging about 15.93 percent below AWP, as a result of purchase and trade discounts that were routinely available to purchasing pharmacies. A.R. 643.  The report found that the availability of discounts was not affected by the location or size of towns where pharmacies were located, nor by the types of ownership (chain-owned or independent).  Id.  The OIG found that, as of 1984, 27 states used AWP primarily in establishing their reimbursement and 20 other states used AWP to a great extent.  A.R. 637.  Consequently, the OIG concluded that "the findings presented in this report demonstrate that the methods used nationwide in determining EAC have predominantly resulted in drug reimbursement limits that are significantly higher than the prices pharmacies generally pay for their drugs." A.R. 656.

The OIG report made a number of recommendations to HCFA. A.R. 657.  Among other things, the OIG recommended that HCFA provide guidance and work with State agencies in developing alternative methods for determining EAC that would more closely approximate the prices pharmacies pay for drugs.  Id.  The OIG also recommended that HCFA revise the upper limit regulations to include a specific prohibition on use of AWP in establishing the EAC.  Id.

HCFA generally agreed with the OIG's findings.  A.R. 669. However, in its comments on the draft report, HCFA maintained that it was premature to preclude state reliance on AWP in determining EAC until alternative pricing mechanisms were

developed.  A.R. 670.  HCFA also stated that it was not prepared to propose any changes in the regulations until the Secretary had made a decision on the report of a Task Force appointed to review prescription drug regulations for federally funded health programs.  A.R. 669.  HCFA did agree, though, to explore alternative data sources for use in determining acquisition costs, and to advise states of the problems with AWP and to suggest alternatives.  A.R. 670.  HCFA mentioned as one possible alternative that AWP might be reduced by a certain percentage to reflect purchase discounts not reflected in Red Book prices.  Id. HCFA agreed that steps were needed to provide additional direction to states on establishing reasonable EAC levels.  A.R. 671.

Around June 1984, the same month in which the OIG report was issued, HCFA's central office began formulating policy for an "EAC Initiative" that was to "focus specifically on examining the levels of reimbursement that states employ for prescription drugs under the Medicaid program."  A.R. 1196.  In September 1984, HCFA sent the OIG audit report to all state Medicaid agencies to make them aware of the potential savings that would result "if States will make a greater effort to determine more closely the price pharmacists pay for drugs rather than using AWP."  A.R. 633. HCFA's cover letter conveyed the OIG's finding -- described at the time as "contrary to widely held beliefs" -- that purchase discounts were "taken by pharmacies in all areas of the states in

the audit, regardless of population, by both chain-owned and independently-owned pharmacies." Id.[7]

Meanwhile, staff in HCFA's regional office in Region VI (comprising Arkansas, Louisiana, New Mexico, Oklahoma, and Texas) conducted reviews of pharmacy purchasing prices in Louisiana, New Mexico, Oklahoma, and Texas which provided further evidence, in HCFA's opinion, that AWP significantly overstates prices paid by providers. A.R. 198, 1466-67. The regional office also convened a region-level workgroup, composed of HCFA regional office staff and staff from state Medicaid agencies, which met in November 1984 and January 1985 to examine the use of AWP as the EAC and to develop alternative methods that could be used in arriving at more accurate estimates. See A.R. 1538, 1550.

In a letter sent the National Association of Retail Druggists in April or May of 1985, the HCFA Administrator expressed HCFA's view that use of AWP as a drug upper limit was "not consistent with the federal requirements." A.R. 198. The Administrator explained, however, that HCFA's policy was to make states aware of alternatives to AWP, and not to mandate any specific approach. Id.

On September 4, 1985, a conference call was held between senior HCFA central office officials and the ten HCFA regional office administrators to make sure that all of the regional

---

[7] According to HCFA correspondence in 1985, before the OIG's audit of drug pricing practices, HCFA was "unaware of the great discrepancy between published AWPs and the price providers generally pay for drug products." A.R. 1535-36, 1549.

offices were following the policy on EAC that had been decided on
by senior HCFA management.  A.R. 1196.  Under that policy,
"states were to be free to develop and adopt any method of drug
pricing that resulted in a more accurate reflection of providers'
cost since no specific methodology developed at the federal level
was mandated."  Id.

On September 17, 1985, a model letter concerning EAC policy
was sent at the direction of HCFA central office officials to
HCFA regional offices, to be immediately transmitted to states.
A.R. 1197-98.  The purpose of the letter was "to clear up
inconsistencies or errors in policy that may earlier have been
implied by some regional officials to states" and "to dispel the
notion that states were required to adopt any particular
methodology to achieve the objective of a more accurate drug
pricing methodology."  A.R. 1197-98.  See A.R. 1192, 1552.

The letter expressed HCFA's view that, in light of the OIG
audit findings, "States that rest solely on AWPs can no longer do
so and still claim that they are applying their best estimate to
determining prescription drugs costs as required by [the EAC
regulation] unless they can provide other evidence that supports
a contrary conclusion."  A.R. 1552.  In addition, the letter
stated that while HCFA was not mandating any particular method
for prescription drug reimbursement, each state was expected to
examine its drug pricing methodology with an eye toward
developing methods that would reflect more accurately than AWPs
the prices generally paid by pharmacists for drugs.  A.R. 1197,

13

1552-53.  The letter advised that states were free to develop
alternative approaches to those recommended by HCFA if the
alternative methodology was supported by documentation showing
that it accurately reflected provider purchasing patterns.  A.R.
1553.

During 1986 and 1987, a rulemaking proceeding was conducted
to consider three proposals for revising the Department's drug
reimbursement regulations.  See 51 Fed. Reg. 29,560 (August 19,
1986), A.R. 1029.  One of the options would have eliminated the
EAC requirement altogether.[8]

In 1987, HCFA revised the upper limit regulations and
decided, ultimately, to retain the EAC provision.  52 Fed. Reg.
28,657, A.R. 1066.  Two weeks after these regulations became
effective, the Under Secretary of the Department explained to an
officer of a major pharmaceutical association that, because AWP
"seldom represents true costs," an EAC relying on AWP was
"unlikely" to be accepted without "some reasonable discount."
A.R. 40.

---

[8] The proposed rule set forth three options.  Two of the
options would have replaced or revised the federal MAC program
affecting certain multiple-source drugs, but they proposed to
continue unchanged the upper limit mechanism applicable to the
"other drugs' category -- namely, the lower of EAC-plus-
dispensing-fee or customary charges.  Id., A.R. 1032-38.  The
third proposed option would have eliminated both the federal MAC
program and the EAC limit, by adopting a single upper limit based
solely on the individual pharmacist's retail charge, with a
special discount on single source drugs of 5 or 10 percent "to
maintain the level of savings achievable under the EAC
requirement."  Id., A.R. 1039, 1038-42.

C.   The Disapproval of Louisiana State Plan
     Amendment No. 87-33.

Louisiana State Plan Amendment No. 87-33 was submitted to
HCFA in October 1987 to bring the state plan into compliance with
the 1987 revisions in the upper limit regulations.  A.R. 4, 1083,
1096.  The amendment proposed to define EAC as "the Average
Wholesale Price of the drug dispensed," as reported by the
American Druggist Blue Book or other national compendia of drug
prices.  A.R. 1087.

On December 11, 1987, the HCFA regional office processing
the amendment sent a letter to the State requesting additional
information needed to complete review.  A.R. 1114.  The letter
requested the State Medicaid agency to "explain how you concluded
that AWP is your best estimate of the price generally and
currently paid by providers for drug products."  A.R. 1115.  On
February 12, 1988, the State responded that "[r]eviews conducted
by the State Agency indicate that Blue Book tape data is a
reliable indicator of the prices charged by wholesalers
throughout the State.  A.R. 1121.  The letter stated that to the
extent some providers received discounts from manufacturers and
wholesalers, the State would account for those discounts when
establishing the dispensing fee.  Id.

On May 16, 1988, the HCFA Administrator informed the State
that its state plan amendment was being disapproved for lack of
compliance with the federal regulations.  A.R. 1142.  The
Administrator explained the basis for the disapproval as follows:

> We believe there is a preponderance of evidence that
> demonstrates that AWP significantly overstates the
> price that pharmacy providers actually pay for drug
> products and, thus, is not "the price generally and
> currently paid by providers."  The continued use of AWP
> results in significant potential overpayments to
> pharmacy providers.  Consequently, the proposed state
> plan amendment violates 42 C.F.R. §447.301 and section
> 1902(a)(30) of the Social Security Act, requiring that
> State payments comply with efficiency, economy, and
> quality of care.

A.R. 1142.  Louisiana then filed a request for reconsideration of

the decision, and the matter proceeded as set out above at pages

2-3.

     D.   The HCFA Administrator's Decision.

     The HCFA Administrator sustained HCFA's disapproval after a

reconsideration hearing.  A.R. 2-9.  In his decision, the

Administrator found that "an unmodified AWP does not meet the

regulatory requirements of EAC" based on the evidence in the

hearing record showing that AWP significantly overstates the

prices actually paid by pharmacists.  A.R. 8.  The Administrator

noted that throughout the reconsideration proceedings, "neither

the State nor the Intervenors challenged the conclusion that AWP

overstates the prices actually paid."  Id.  The Administrator

recounted the history of HCFA's interpretation of the EAC

regulation and found that, since 1975, HCFA had a consistent

policy to move states away from use of published AWP.  A.R. 6-7.

The Administrator rejected the argument by the State that the

hearing officer had failed to take into account the cost-reducing

effect on drug payments of Louisiana's Maximum Allowable Cost

(LMAC) program.  A.R. 8.  The Administrator pointed out that the

issue was the effectiveness of the EAC in approximating cost for the drugs that were subject to it.  A.R. 8.  He noted that "[i]f EAC had been set at a level lower than AWP, the average reimbursement would have better approximated the acquisition cost for those drugs subject to it."  A.R. 9.  Finally, the Administrator responded to the State's concern that other states' plans using an unmodified AWP as the EAC had been approved by HCFA.  Id.  The Administrator concluded that "the correct approach to this apparent inconsistency is to initiate change to those other State plans rather than to approve another plan with an improper EAC."  Id.

<u>SUMMARY OF ARGUMENT</u>

The fundamental issue in this case is whether the Secretary has reasonably determined that, absent supporting documentation, Louisiana's Medicaid program cannot rely on the average wholesale prices (AWPs) reported in national drug pricing compendia as its "best estimate" of the drug prices paid by pharmacies.  The Secretary's position is clearly reasonable because the overwhelming weight of evidence in the record shows that published AWPs significantly overstate drug prices.  Because the State of Louisiana has presented virtually no evidence to the contrary, Louisiana State Plan Amendment No. 87-33 was disapproved.

The federal Medicaid regulations establish a system for determining the maximum amounts of state expenditures for prescription drugs that will be recognized by the Secretary in

17

paying FFP.  See 42 C.F.R. §447.300 et seq.  A state cannot claim
federal reimbursement for expenditures that exceed these upper
limits.  One of the federal upper limits restricts payment for
the ingredient cost of prescription drugs to the "estimated
acquisition cost" (EAC), which is defined as the state Medicaid
agency's "best estimate of the price generally and currently paid
by providers."  The Secretary has always interpreted the EAC
requirement to require that states approximate as closely as
feasible the actual prices paid by pharmacists in light of the
best available information concerning these prices.  Moreover, he
has always viewed the use of AWP in establishing the EAC as
inconsistent with the intent of the Medicaid regulations.

Prior to around 1984, the Secretary lacked cumulative, well-
documented evidence affirmatively demonstrating that AWP was in
fact not an accurate measure of the prices generally paid by
providers.  Because the Medicaid program is administered by the
states, state assurances of compliance with federal requirements
are presumed valid absent clear indications to the contrary.
Consequently, in the absence of firm evidence to support his
position, the Secretary attempted to move states away from use of
AWP through a strategy of technical assistance and encouragement
that was largely unsuccessful.

In June 1984, these circumstances changed dramatically when
the Secretary's Office of the Inspector General issued a report
based on an extensive audit of pharmacy purchasing practices.
The OIG audit provided, for the first time, carefully documented

18

evidence that average wholesale prices significantly overstate the prices that pharmacies actually pay for drugs.  The OIG found that virtually all states relied on AWP primarily or to a great extent in establishing reimbursement.  As a direct result of this report, HCFA launched a major program initiative to examine on a state-by-state basis the price-setting methods used by states in establishing their EACs.  HCFA made clear that, in light of the clear evidence showing that AWP did not reflect actual drug prices, it would no longer be acceptable for a state to base its "best estimate" of drug prices on published AWP without providing valid documentation to support its position.  This approach was consistent with the structure of the Medicaid program, under which a state may be required to furnish documentation if HCFA has a problem with a state's representation that it has complied with the federal requirements.

The State of Louisiana and the intervenors have not attempted to show that AWP is an accurate indicator of drug prices in Louisiana.  Instead, they argued that the Secretary's disapproval is invalid for other reasons.  However, none of these arguments has merit, and the Secretary's reconsideration decision disapproving Louisiana State Plan Amendment No. 87-33 must be upheld.

19

ARGUMENT

THE DECISION OF THE ADMINISTRATOR DISAPPROVING LOUISIANA
STATE PLAN AMENDMENT NO. 87-33 IS REASONABLE AND
CONSISTENT WITH THE MEDICAID STATUTE AND REGULATIONS.

I.   Standard of Review.

In this challenge to a final administrative decision, the
standard of judicial review is the familiar, highly deferential
standard of the Administrative Procedure Act, under which the
decision must be upheld unless "arbitrary, capricious, an abuse
of discretion, or otherwise not in accordance with law."  5
U.S.C. §706(2)(A).  See generally Citizens to Preserve Overton
Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Mercy Hospital of
Laredo v. Heckler, 777 F.2d 1028, 1031 (5th Cir. 1988).  Agency
rulings of law concerning the programs they execute are entitled
to great deference, especially those involving the interpretation
of the agency's own regulations.  See Udall v. Tallman, 380 U.S.
1, 16-17 (1965); Mercy Hospital of Laredo, 777 F.2d at 1031-32;
Cieutat v. Bowen, 824 F.2d 348, 352 (5th Cir. 1987).  Such
interpretations will be upheld unless they are plainly erroneous
or inconsistent with the regulations.  Id.  Even where a court
believes that an alternative interpretation would be "more
appropriate," it will not reverse an agency interpretation that
is a "permissible construction" of the regulation.  See Chevron
U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
837, 865 (1984); Homan & Crimen, Inc. v. Harris, 626 F.2d 1201,
1208-09 (5th Cir. 1980), cert. denied, 450 U.S. 975 (1981);
Johnson's Professional Nursing Home v. Weinberger, 490 F.2d 841,

20

844 (5th Cir. 1974).  Accordingly, those challenging an agency decision interpreting its own regulations must necessarily shoulder a heavy burden.  <u>Mercy Hospital of Laredo</u>, 777 F.2d at 1032; <u>Cieutat v. Bowen</u>, 824 F.2d at 352

The Administrator's decision clearly passes muster under this standard.  As shown below, the applicable Medicaid regulations governing upper limits for prescription drugs require that a State Medicaid agency establish the "estimated acquisition cost" of a drug at "the agency's best estimate of the price generally and currently paid by providers."  42 C.F.R. §§447.301, 447.331(b).  The evidence in the record shows that published AWP significantly overstates the prices generally paid by providers and that alternative drug pricing methods will result in far more accurate estimates of pharmacy purchase prices.  Faced with a state plan amendment which proposed to establish EAC at published AWP, the Administrator properly ruled that the state plan could not be found in compliance with the Medicaid regulations when no showing was made that AWP was an accurate indicator of the prices generally paid by pharmacists.

II.  The Administrator Properly Found That Use Of The Published Average Wholesale Price (AWP) Is Not A Reasonable "Best Estimate" Of The Price Generally Paid By Pharmacies For Prescription Drugs.

The Administrator acted reasonably and consistent with his authority in disapproving Louisiana State Plan Amendment No. 87-33 for failure to comply with the upper limit regulations.  Under these regulations, states must establish the "estimated acquisition cost" (EAC) of certain prescription drugs that are

21

referred to as "other drugs" in 42 C.F.R. §447.331.  The EAC is used in determining the maximum amounts of FFP that will be available in state expenditures for those drugs.  42 C.F.R. §447.331(b).  The regulations define "estimated acquisition cost" as the State Medicaid agency's "best estimate of the price generally and currently paid by providers for a drug marketed and sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers."  42 C.F.R. §447.301.  Louisiana's state plan amendment proposed to set the State's EAC at "the Average Wholesale Price of the drug . . . reported in one or more national compendia."  A.R. 8.  The Secretary, through the Administrator of HCFA, ruled after a reconsideration hearing that the State's use of published AWP did not comply with the definition of EAC set forth in the regulations "[i]n light of evidence showing that AWP significantly overstates the price actually paid by pharmacists."  Id.  This conclusion was reasonable and based on the overwhelming weight of evidence in the record.

A.  The Weight of Evidence Demonstrates That AWP
    Significantly Overstates The Prices That
    Providers Pay for Drug Products.

The great weight of evidence in the record supports the Secretary's position that AWP significantly overstates the prices that pharmacists are generally paying for prescription drugs.  In June 1984, the Office of the Inspector General issued a report based on an extensive audit of pharmacy purchasing practices. A.R. 633-72.  The OIG audit provided, for the first time,

22

carefully documented evidence that average wholesale prices
overstate the prices that pharmacies actually pay for drugs.
Based on a review of 3,469 pharmacy purchases in six states, the
OIG report found that, because of purchase discounts, over 99
percent of the purchases were made at prices averaging about 16
percent below AWP. A.R. 643.  The report also found that these
purchase discounts were routinely available to pharmacies,
regardless of where they were located or whether they were chain-
owned or independent.  Id.  HCFA conducted surveys and interviews
with wholesalers and pharmacists that corroborated the OIG's
finding that AWP is not a reliable tool for use by a state in
establishing its "best estimate" of what providers are paying.
A.R. 198, 1358-60, 1466-67, 1473.  Thus, at the time that the
State submitted its state plan amendment, the Secretary was aware
of a considerable body of evidence demonstrating that published
average wholesale prices overstate the prices that providers
generally pay for drugs.[9]

_____

   [9] As a HCFA official stated at the administrative hearing,
AWP has become like the "sticker price on an automobile.  It is
the very highest price that anyone would be expected to pay for a
drug product." A.R. 1450.  See A.R. 1472-73. Congress evidently
recognized the inflated nature of AWP in the Medicare
Catastrophic Coverage Act, Pub. L. No. 100-360 (1988), repealed,
Pub. L. No. 101-234 (1989).  Congress established a system that
would have required prices to be set in six-month increments
known as payment calculation periods.  See A.R. 247-49.  Drug
product prices paid during the period July 1 through December 1
were to be those AWPs that were in effect on January 1 of that
year.  Id.  This time lag between price setting and benefit
payments would have served to reduce AWP by a significant amount
given the current high inflation rates for prescription drugs.

In view of this evidence, HCFA had ample reason, indeed an affirmative obligation, to question the State's findings and assurances that its EAC methodology complied with the upper limit regulations. See A.R. 1115. The State's response provided only conclusory statements and no documentation that would substantiate that AWP did in fact accurately reflect pharmacy purchase prices in Louisiana. A.R. 1121. See A.R. 815, 1424-45 (indicating that the state agency supplied HCFA with everything it had to support its finding). In addition, as the Administrator recognized, throughout the reconsideration proceedings, "neither the State nor the intervenors challenged the conclusion that AWP overstates the prices actually paid." A.R. 8. Because the State failed to show that AWP meets the regulatory definition of EAC, its plan amendment was disapproved. A.R. 1142. This action was clearly proper. See Arkansas Pharmacists Ass'n, 627 F.2d at 869 (A state plan providing prescription drug coverage must provide for payments that are in accordance with the regulations); Pennsylvania Pharmaceutical Ass'n, 542 F. Supp. at 1353 (same); National Ass'n of Chain Drug Stores, [1989-2 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 37,871 at 20,099 (same).

> B.   The Secretary Has Followed A Consistent
>      Policy Against Use Of Published AWP Under The
>      Upper Limits Regulations.

The Administrator's decision properly concluded that the Department of HHS has had a consistent policy against the use of unmodified AWP as a state's EAC. See A.R. 6-7. HCFA's

predecessor in the administration of the Medicaid program, the
Social and Rehabilitation Service (SRS), first adopted EAC as a
specific upper limit requirement in 1975, in an effort to achieve
federal savings.  In the proposed rule, the SRS noted that most
states defined drug "cost" as AWP or other standard prices that
were "frequently in excess of actual acquisition costs to the
retail pharmacist."  39 Fed. Reg. 41,480, A.R. 1009.  The SRS
proposed to obtain program savings by requiring use of actual
acquisition cost for the "cost" component of the upper limit.
Id.  When several commenters suggested that AWP was a better
standard, the Secretary responded that AWP was not acceptable
because "AWP data are frequently inflated."  40 Fed. Reg. 34,518
(August 15, 1975), A.R. 1014 (emphasis added).  While the
increased audit and administrative expense of an actual
acquisition cost standard led the SRS to modify its proposal, the
EAC standard that was finally adopted required States to make the
"closest estimate of the price generally and currently paid by
providers."  Id., A.R. 1014, 1015.  The clear purpose of the EAC
regulation was to have states estimate provider prices with as
much precision as possible.  The objective was the same as set
forth under the proposed rule -- to achieve savings by moving
states away from primary reliance on AWP.

    After 1975, HCFA continued to make clear that use of
unmodified AWP as the state's EAC was not contemplated by the
regulations.  In 1976 and 1977, HCFA reminded states that it was
each state's responsibility to estimate drug prices "as close as

25

feasible" to the prices generally paid by providers, and that a percentage markdown appeared appropriate for AWP.  <u>See</u> A.R. 222-23.  <u>See</u> <u>also</u> A.R. 671.  In 1984, the HCFA Administrator concurred with the OIG's audit report which concluded that AWP significantly overstated provider purchase prices, and HCFA's comments on the report indicated that action would be taken to advise states of the problems with AWP and to make them aware of alternatives.  A.R. 669-70.  In early 1985, the HCFA Administrator stated in a letter to the National Association of Retail Druggists that use of AWP as a drug upper limit was "not consistent with the federal requirements."  A.R. 198.  The Administrator indicated that HCFA's policy was to make states aware of alternatives, but not to mandate any specific approach. A.R. 198.  In September 1985, an affidavit articulating official HCFA policy described a program initiative that involved contacting States to urge them to adopt more accurate drug pricing methods in establishing EAC, without dictating any specific method developed at the federal level.  A.R. 1196-97. That same month, a letter was sent at the direction of HCFA central office officials that put states on notice that, in light of the OIG audit findings, states could no longer rely solely on AWP as their best estimate of pharmacy drug prices without providing evidence to support their position.  A.R. 1552.  During 1986 and part of 1987, a rulemaking proceeding was conducted in which one option would have entirely eliminated EAC.  51 Fed. Reg. 29,560, A.R. 1038-42.  In November 1987, however,

immediately after HCFA revised the upper limit regulations and decided, ultimately, to retain the EAC provision, the Under Secretary of Department expressed in a letter to the National Association of Retail Druggists essentially the same position that had been maintained prior to the rulemaking.  A.R. 40.  See A.R. 14-15.  These policy pronouncements issued by the Department and by high officials within the Department reflect substantial overall consistency concerning the policy of the EAC regulation to move states away from sole reliance on AWP.[10]

The Secretary's disapproval of Louisiana State Plan Amendment No. 87-33 was consistent with his longstanding interpretation of the EAC requirement and did not represent a substantive change in the regulations.  The position articulated by the HCFA Administrator in the letter disapproving Louisiana's state plan amendment was as follows:

> We believe there is a preponderance of evidence that demonstrates that AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not "the price generally and currently paid by providers."  The continued use of AWP results in significant potential overpayments to pharmacy providers.  Consequently, the proposed state plan amendment violates 42 C.F.R. §447.301 and section 1902(a)(30) of the Social Security Act, requiring that State payments comply with efficiency, economy, and quality of care.

---

[10] Although the Secretary acknowledges that errors and inconsistencies in policy were implied from statements made by regional officials in 1985, the record shows that these statements did not represent official agency policy or the "position of the Department as an entity."  See A.R. 1197; New York Dept. of Social Services v. Bowen, 835 F.2d 360, 365-66 (D.C. Cir. 1987); cert. denied, ___ U.S. ___, 108 S.Ct. 2820 (1988); Homemakers North Shore, Inc. v. Bowen, 832 F.2d 408, 413 (7th Cir. 1987).

A.R. 1142.   The position articulated in this letter is consistent with the interpretation of the regulations that is reflected in the preamble to the 1975 regulations and in subsequent HCFA pronouncements, as set forth just above.   As the disapproval letter indicates, what changed over time was not the Secretary's interpretation of the EAC requirement, but rather the weight of the evidence that AWP overstates drugs prices and thus is not a reasonable "best estimate" of acquisition cost.   After 1984, the Secretary was aware of a widening base of documented evidence demonstrating that AWP significantly overstates provider purchase prices.   In light of this evidence, it became clear that HCFA could no longer stand by and permit states to rest on mere assurances that AWP was their "best estimate," without requiring them to provide support for their use of AWP in establishing EAC.[11]

   HCFA's more assertive enforcement initiative was fully consistent with its obligation to assure that states are using "best estimates" and not pricing methods that have been shown to be inaccurate.   Indeed, HCFA would have been remiss not to have undertaken such action once the Department became convinced as a

---

[11] Previously, HCFA had deferred to states' representations that AWP was their "best estimate" primarily because there was inconclusive evidence that it was not a reasonable "best estimate."   In fact, as the OIG audit revealed, pricing information that HCFA had been providing to states for use in evaluating the EACs frequently equaled or exceeded AWP, revealing the HCFA's substantial lack of awareness of the purchase and trade discounts routinely received by pharmacies.   See A.R. 651-52.   See also A.R. 222-23.

factual matter that there was a significant discrepancy between
AWP and the actual purchase prices.  Consequently, HCFA's
disapproval letter did not "effect a change in existing law or
policy" or otherwise constitute a substantive rule.  See American
Hospital Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987),
quoting Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir. 1984).  On
the contrary, the letter articulated the same view of the law
that HCFA has consistently maintained over the life of the EAC
regulation and applied in light of the best available
information.  See Homan & Crimen, Inc. v. Harris, 626 F.2d at
1210 (letter merely elaborated on what was already contained in
the regulations and was consistent with other agency
pronouncements).[12]

---

[12] The State and intervenors argue that the necessity of
notice and comment rulemaking is apparent from the fact that the
Secretary's own Department concluded that rulemaking was
necessary.  State's Brief at 18; Intervenors' Brief at 26; A.R.
15.  They refer to an internal agency discussion concerning
whether to adopt a national policy to require that EAC be
established as AWP minus a specific percentage, which, the
Department concluded, would have required notice and comment
rulemaking.  Id.  But their version of events is incomplete.  As
the Secretary has stated in a letter, the Department decided not
to adopt this rulemaking option, and elected instead to proceed
with "an initiative to provide states greater assistance in the
determination of an appropriate EAC."  A.R. 15.  Since this
initiative "merely involved the application of the existing rules
in light of the best available information, new rulemaking was
not necessary."  A.R. 15 (emphasis added).