# EXHIBIT F

Booth, Charles R.  April 23, 2007
Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | : | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | : | CIVIL ACTION: |
| PRICE LITIGATION | : | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | : | |
| U.S. ex rel. Ven-a-Care of | : | Judge Patti B. Saris |
| the Florida Keys, Inc. v. | : | |
| Abbott Laboratories, Inc., | : | Chief Magistrate |
| No. 06-CV-11337-PBS | : | Judge Marianne B. |
| - - - - - - - - - - - - - - -x | | Bowler |

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

- - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| STATE OF ALABAMA, | : | |
| Plaintiff, | : | |
| vs. | : | Case No.: CV-05-219 |
| ABBOTT LABORATORIES, INC., | : | Judge Charles Price |
| et al., | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - -x

Henderson Legal Services
202-220-4158

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                              April 23, 2007
Washington, DC

Page 202

1  Q.  Let me rephrase that. Why did HCFA
2  reimburse at an amount greater than what it
3  understood to be the ingredient cost for a provider
4  who administered an appropriate dose of Epogen?
5       MR. GOBENA: Object to the form.
6  A.  I think you've mischaracterized my
7  remarks.
8  Q.  You've indicated to me that the
9  reimbursement amount for Epogen in many instances
10 would exceed ingredient cost to the provider,
11 correct?
12 A.  No.
13 Q.  No? Their ingredient cost would be less?
14 A.  I don't think I said many.
15 Q.  All?
16 A.  Not all. Actually, most.
17 Q.  Most. For those providers where the
18 reimbursement amount exceeded the ingredient cost,
19 did HCFA have an understanding of what that excess
20 amount would be used to pay for?
21      MR. GOBENA: Object to the form. He's not
22 a 30(b)(6) witness. You can answer in your personal

Page 203

1  capacity.
2  A.  There was clearly going to be some
3  spoilage of the drug because particularly at the
4  beginning, it was difficult to make, difficult to
5  ship, difficult to store. There were clearly going
6  to be administration costs to administer the drug
7  even where there was a shunt, and in some cases
8  there wasn't, and we wanted to set the reimbursement
9  rate high enough that facilities would administer
10 Epogen to those patients who were receiving blood
11 transfusions. And obviously this is not an exact
12 science. We have only the clinical trials to base
13 the judgments on that we made, and we said at the
14 time that if it turned out that we had made
15 incorrect judgments, that we would make adjustments
16 in the price.
17 Q.  After 1989, as I understand it, ESRD
18 facilities would be paid based upon a combination of
19 a composite rate in the separately billed drugs. Do
20 I have that correct?
21 A.  Not just after 1989.
22 Q.  Before 1989 also, correct?

Page 204

1  A.  From sometime in 1984, as I recall.
2  Q.  So between 1989 and some point after 2001,
3  ESRD facilities received both a composite rate
4  payment and a payment for separately billable drugs,
5  correct?
6       MR. GOBENA: Object to the form.
7  A.  At least through 19 -- June of 1997.
8  Q.  Between 1989 and June of 1997, did HCFA
9  change the composite rate that ESRD facilities were
10 paid for treating Medicare beneficiaries?
11 A.  I don't remember.
12 Q.  Do you recall any discussions about
13 whether the composite rate should be changed in
14 light of profits the facilities were making on the
15 drug component?
16      MR. GOBENA: Chris, can I clarify? What
17 discussions? Discussions with agency officials
18 within the agency or --
19      MR. COOK: With anybody at all.
20      MR. GOBENA: Okay, I'll instruct you to
21 not answer the question on deliberative process
22 grounds the extent to which your answer would cover

Page 205

1  discussions within the agency.
2       THE WITNESS: Then I can only tell you
3  that there were end-stage renal facilities that came
4  to see us and wanted an increase in the composite
5  rate.
6       BY MR. COOK:
7  Q.  Do you recall what response you gave to
8  those facilities about whether you would give an
9  increase to the composite rate?
10 A.  I recall very few increases in the
11 composite rate.
12 Q.  Do you recall expressing to any of these
13 facilities the notion that the composite rate was
14 not being increased because of money being made on
15 the drug component?
16 A.  Never.
17 Q.  Do you recall internal discussions in
18 which the decision not to raise the composite rate
19 was tied to money being made on the drug component?
20      MR. GOBENA: I'm going to object and
21 instruct the witness not to answer on deliberative
22 process grounds.

52 (Pages 202 to 205)

5570917b-ccec-4522-964a-1aa1ed72506d

Booth, Charles R.                                                  April 23, 2007

Washington, DC

Page 226

1  a Medicaid issue, and for me, that went away in
2  1990. I probably would have forgotten it long
3  before 1996.
4      Q.  In the first paragraph -- there are a
5  number of quotes attributed to you in this, but in
6  the first paragraph, according to the article, I'll
7  read, "Charles Booth reasserted the agency's
8  position that it will continue to disapprove
9  AWP-based state Medicaid reimbursement plans and
10 indicated that the current HCFA effort would be
11 expanded to other states." First, though I think I
12 know the answer, do you recall making such a
13 statement to the NARD?
14     A.  Since I don't recall speaking to the NARD,
15 I don't recall making such a statement to the NARD.
16     Q.  Do you recall whether it was the agency's
17 position in 1989 that HCFA would continue to
18 disapprove AWP-based state Medicaid reimbursement
19 plans?
20     MR. GOBENA: Object to the form. The
21 witness is not here as a 30(b)(6) designee speaking
22 on behalf of the agency.

Page 227

1      A.  I do not recall.
2      Q.  Mr. Booth, in 1989, you were aware what
3  the agency's position was on various issues,
4  correct?
5      A.  On some issues, yes.
6      Q.  And just so you understand, when I ask you
7  what you understood the agency's position was on
8  something, I'm looking for what your understanding
9  was and I'm not asking you to give any 30(b)(6)
10 testimony, as Mr. Gobena has indicated.
11     A.  Well, I cannot testify what the agency's
12 position was in 1989 with respect to AWP for
13 Medicaid, since I don't remember what it was.
14     Q.  Do you recall whether HCFA was
15 disapproving state plans with AWP-based
16 reimbursement included in it back in 1989?
17     A.  No.
18     Q.  Do you recall promulgating regulations in
19 1987 relating to reimbursement of drugs by state
20 Medicaid programs?
21     A.  No.
22     Q.  If you look at the second paragraph -- the

Page 228

1  second column, one, two, three -- five lines down,
2  this article attributes to you the following quote.
3  "Our position is and continues to be I believe
4  relatively simple," colon, "We continue to believe
5  that pharmacists purchase drugs at prices
6  substantially below AWP," and that's the end of the
7  quote. Mr. Booth, do you remember today whether
8  that was the position of HCFA in 1989?
9      A.  No.
10     Q.  Do you recall that it was not the position
11 of HCFA in 1989?
12     A.  I have no recollection of what HCFA's
13 position was in 1989 with respect to drugs under the
14 Medicaid program.
15     Q.  How would I go about determining what
16 HCFA's position was in 1989 with respect to drugs
17 under the Medicaid program?
18     A.  Well, assuming the 1987 regs were in
19 effect, I would look at those.
20     Q.  And to the extent that you are attributed
21 with making policy statements outside the four
22 corners of the regulations, where would I go to

Page 229

1  determine what policies such as that were in 1989?
2      MS. CONNOLLY: Objection to form.
3      A.  Are you saying that what I said in 1989 is
4  inconsistent with the '87 regs?
5      Q.  No, sir. I'm asking you to the extent
6  that HCFA had a policy in 1989 that could not be
7  discerned from the four corners of a regulation,
8  where would I go to determine what that policy was?
9      MR. GOBENA: Object to the form.
10     A.  I have no idea.
11     Q.  Are you aware of any evidence other than
12 this particular document that would help me
13 determine whether or not it was the policy of HCFA
14 in 1989, or the position of HCFA in 1989 that HCFA
15 continued to believe that pharmacists purchased
16 drugs at prices substantially below AWP?
17     MR. BREEN: Objection, form.
18     MR. GOBENA: Join.
19     A.  A, I don't consider this article to be
20 evidence, and B, I have no idea.
21     Q.  The bottom of that column under the
22 heading "Attacking AWP," you are attributed with the

5570917b-ccec-4522-964a-1aa1ed72506d

Vladeck, Ph.D., Bruce C.                May 4, 2007
New York, NY

Page 1

```
               UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
------------------------------------X  MDL NO. 1456
IN RE:  PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:
AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS
------------------------------------X
THIS DOCUMENT RELATES TO:          :
U.S. ex rel. Ven-A-Care of the     :  CIVIL ACTION:
Florida Keys, Inc. v. Abbott       :  06-CV-11337-PBS
Laboratories, Inc.                 :
------------------------------------X


              IN THE CIRCUIT COURT OF
           MONTGOMERY COUNTY, ALABAMA
------------------------------------X
STATE OF ALABAMA,                  :  CASE NO.
         Plaintiff,                :  CV-05-219
     v.                            :
ABBOTT LABORATORIES, INC.,         :  JUDGE
et al.,                            :  CHARLES PRICE
         Defendants.               :
------------------------------------X
```

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 30

1   needs to introduce themselves for the record?
2       MR. RORTVEDT: This is Victor Rortvedt,
3   for Endel.
4       THE VIDEOGRAPHER: Anybody else?
5       MS. BROOKER: Is there anyone else new
6   on the phone call who hasn't introduced
7   themselves?
8       THE VIDEOGRAPHER: Okay. Will the
9   reporter please swear in the witness.
10      MS. BROOKER: Well, I'm sorry.
11      THE VIDEOGRAPHER: Oh, keep going.
12      MS. BROOKER: A couple of matters. I
13  just wanted to -- to make this easy for everyone.
14  Do you want to have an agreement that if there is
15  an objection to form or any questions at the
16  deposition --
17      MR. COOK: One will do.
18      MS. BROOKER: One will do. It's
19  preserved with respect to all others.
20      MR. COOK: That is my first two bullet
21  points.
22      MS. BROOKER: Okay. The second thing

Page 31

1   is, do you also want to agree that if it's a form
2   objection, it's sufficient to say "objection,
3   form" to preserve the objection?
4       MR. COOK: Yes.
5       MS. BROOKER: Okay.
6       MR. COOK: And I'll -- and I'll ask, if
7   -- if -- if I have a question, to see whether
8   it's curable.
9       MS. BROOKER: Okay. One other thing I
10  wanted to cover. I just wanted it to be very
11  clear at the outset of the deposition, and to
12  state on the record that Dr. Vladeck is here in
13  his capacity as a former HCFA administrator.
14  He's not here in his personal capacity. He is
15  certainly not here on behalf of the agency as a
16  corporate designee. He's not speaking on behalf
17  of the agency, and he's not here as an expert
18  witness to express his opinion.
19      So, I -- I just wanted to state that at
20  the outset.
21      MR. COOK: Yes. I don't know what all
22  the consequences of that are, but we certainly

Page 32

1   sent a deposition notice and subpoena for -- for
2   Dr. Vladeck, and he appeared and -- and not only
3   appeared, we did not send a 30(b)(6) notice to
4   him.
5       MS. BROOKER: Okay. Thank you.
6       MR. AZORSKY: And also, let me speak
7   for the record that -- I'm speaking specifically
8   now with relation to the Florida case.
9       Insofar as this deposition is cross-
10  noticed in the Florida case and no documents have
11  been produced by the defendants in that case
12  personally to properly serve the request for
13  production of documents, the plaintiffs in that
14  case object to the introduction and use of any
15  exhibits at this deposition, and reserve the
16  right to strike any testimony based upon such
17  exhibits as may be used in this deposition.
18      MR. COOK: And if I could ask the
19  Department of Justice, if this deposition needs
20  to be retaken because of objections that are
21  being asserted by the plaintiffs, will the
22  government assert objections to Mr. Vladeck

Page 33

1   testifying again?
2       MS. BROOKER: We'll take it under
3   consideration.
4       MR. COOK: And so, there's a
5   possibility that the plaintiffs' objection would
6   result in Dr. Vladeck's testimony never being
7   placed into the Florida case.
8       MS. BROOKER: Well, I think we're
9   premature on -- on this, but --
10      MR. COOK: Okay.
11      MS. BROOKER: -- we'll -- we'll --
12  we'll consider that.
13      Chris, did you have anything else
14  before we start?
15      MR. COOK: No.
16      MS. BROOKER: I think we can swear the
17  witness.
18      THE VIDEOGRAPHER: Just -- just -- just
19  a reminder to people on the conference phone, now
20  that we finished introductions, please put your
21  phones on mute.
22

9 (Pages 30 to 33)

Scully, Thomas A.                                              May 15, 2007
                            Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL              :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE         :  CIVIL ACTION

PRICE LITIGATION                   :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO           :

U.S. ex rel. Ven-a-Care of         :  Judge Patti B. Saris

the Florida Keys, Inc.             :

      v.                           :

Abbott Laboratories, Inc.,         :  Chief Magistrate

No. 06-CV-11337-PBS                :  Judge Marianne B.

- - - - - - - - - - - - - - -x       Bowler

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 294

say, this is you, you say, "everybody has acknowledged for years that oncologists have a significant cross-subsidy through AWP, so I think there was a subconscious effort within the RUC to not fully and completely consider all of the practice expenses for oncologists because of the acknowledged cross-subsidy from AWP's overpricing." Do you see that?
  A.  Yes.
  Q.  And everyone includes CMS, correct?
      MR. GOBENA: Object to the form.
      THE WITNESS: I think the staff that oversaw the RUC, when they sat down with the RUC every year to figure out which physicians needed more and which physicians didn't, they probably -- I'm fairly certain, which is the argument I made all along, consciously were trying to put more money into the other places because the oncologists had this other stream of income from very high drug margins.
      So do I think people were excited about that policy or supportive of it? No. It's just a fact of life. So when you're sitting there trying to

Page 295

equitably treat all physician groups, from a 70 billion pot, and you know the oncologists have this side stream of income, I think there was a subconscious movement for a couple of years to probably not be as concerned about giving them more money in the practice expense pocket.
      BY MR. DALY:
  Q.  Because CMS knew that they were making so much money on the drugs, correct?
      MR. GOBENA: Objection to the form. The witness is not here as a 30(b)(6) for CMS.
      THE WITNESS: As I said repeatedly, it was nowhere near one to one, it was more like a 1 to 20 -- you can debate whether it was 1 to 5 or 1 to 20, but the amount of money that perceived to be coming as income from drug margins was significantly higher than I think anybody would credibly argue was any perceived or real shortfall on the practice extension side.
      Then again, a lot of this was politics. I'm testifying, trying to get this passed, trying to send the signal to the oncology world that we feel

Page 296

your pain, we are sensitive. As we reform this, we're going to take concerns into the mind, because I had watched all previous efforts crash on the rocks.
      BY MR. DALY:
  Q.  I'm not sure the court reporter got your response, but because it was interfered with by the objection, but for just in terms of her being able to type it. But my question was, well, go back to my other question, would you, go back to my last question.
      MR. GOBENA: Maybe it would be help, Tom, if you would wait a beat before I object and then we won't talk over each other.
      THE WITNESS: Sorry.
      MR. GOBENA: That's okay. Certainly wasn't an interference, though.
      BY MR. DALY:
  Q.  You had in your -- one of your prior answers talked about how there had been maybe a subconscious effort not to put more money into the service side for oncology because everybody knew that they were making profits on the drugs, is that

Page 297

correct?
      MR. GOBENA: Object to the form.
      MR. BREEN: Objection. Form.
      MR. GOBENA: You can answer.
      THE WITNESS: Yes. I would say on rheumatology probably to a lesser degree as well because there was a general knowledge in some practice areas these physicians had a second income stream from margins on drugs that other providers did not. And so you're sitting around trying to figure out whether surgeons need more on a relative basis.
      Well, that's what the whole RUC process is about. Internists, surgeons, cardiac surgeons making an adjustment to find that pot of money when you know the oncologists have a second pot of money, you're generally not as concerned in making sure their practice expense goes up in a budget neutral pot as somebody else's.
      On the other hand, if you knew that some of that drug revenue was going to go away, you might make a certain calculation but it certainly wasn't in my estimation a one to one swap, whereas on the

Scully, Thomas A.                                           May 15, 2007
Washington, DC

Page 374

1    Q. And to do so -- well, I mean, I take it
2    that fixing 50 state Medicaid programs would be, you
3    know, versions of trying to fix Medicare times 50.
4    Is that fair?
5    A. Yes.
6    Q. Because each state would have its own
7    political issues, for example, correct?
8         MR. GOBENA: Object to the form.
9         THE WITNESS: Yes. Medicaid is 54
10   territories, 55 different programs that are all
11   complex and all different payment rates and different
12   politics and makes Medicare reform look simple.
13        BY MR. DALY:
14   Q. And for example, you would have, you know,
15   providers within each state, this time including
16   pharmacies, for example, that would be complaining to
17   state governments if reimbursement levels attempted
18   to be reduced, be reduced, is that true?
19        MR. GOBENA: Objection. Form.
20        THE WITNESS: Yes. Every state had
21   different pharmacy politics with the providers and
22   what the dispensing fees were and what the

Page 375

1    acquisition costs were. Yes.
2         BY MR. DALY:
3    Q. But it was your view, it was CMS's view
4    that if a state wanted to pay to reimburse pharmacies
5    at AWP minus, say, 10 percent, for example, even
6    though the actual acquisition cost of the drug might
7    be AWP minus 72 percent, you did not find that to be
8    unreasonable?
9         MR. GOBENA: Objection to the form. This
10   witness is not here as a 30(b)(6) testifying about
11   CMS's views.
12        BY MR. DALY:
13   Q. Go ahead.
14        MR. GOBENA: You can answer.
15        THE WITNESS: My personal view was that it
16   was -- was it unreasonable? Yes. I mean, I spent a
17   lot of time complaining to states about trying to
18   make sure that they paid the lower cost for drugs,
19   and some did. And I pushed on a lot of states to
20   hire third party PBMs which a lot of them did, to buy
21   their drugs and lower their acquisition costs and
22   come up with a market-based pricing, which

Page 376

1    increasingly some did.
2         And I authorized the number multi-state
3    purchasing groups which were controversial for states
4    to go ahead and use private PBMs to lower their cost.
5    So it was a concern. For me it was more direct and
6    immediate concern for the Medicare program, which I
7    was directly responsible for. But when states asked
8    me what to do on Medicaid drug pricing, my general
9    advice, which a lot of them did, was to hire a PBM to
10   go out, put them at risk, and drive prices down,
11   which a number of them did.
12        BY MR. DALY:
13   Q. In your testimony in 2003, you testified
14   that Medicaid has actually become a larger program
15   than Medicare. Do you recall that testimony?
16   A. Yes.
17   Q. And so why do you say that you didn't have
18   direct responsibility for trying to reduce the
19   federal government's Medicaid payments?
20        MR. GOBENA: Object to the form.
21   Mischaracterizes the witness's testimony. You can
22   answer.

Page 377

1         THE WITNESS: I did have responsibility
2    for Medicaid. The federal government runs and
3    manages Medicare day-to-day. And when you had a
4    situation like you did for Medicare, I felt it was
5    probably next to prescription drug reform, which was
6    my number one priority going back in the government.
7    And number two was probably fixing AWP, because it
8    was a big fiscal and management and policy problem
9    for the agency.
10        So I spent a lot of time trying to fix it.
11   On Medicaid, I had equal interest but the single
12   biggest Medicaid policy fiscal issue that we had was
13   if -- was the states scamming reimbursement matches
14   which I mentioned earlier, which was a multibillion
15   dollar problem, state by state, with the states
16   because they had a fiscal partnership between the
17   federal and state governments. The single biggest
18   policy problem there that I spent most of my time on
19   was to trying to prevent the states from putting up
20   air to match federal, and drawdown federal dollars
21   without putting out state dollars.
22        Once we got to the point where we're

95 (Pages 374 to 377)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A. - Vol. II                              July 13, 2007
                     Washington, DC

                                                              Page 443

                    UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF MASSACHUSETTS

    - - - - - - - - - - - - - - -x

    IN RE: PHARMACEUTICAL          :  MDL NO. 1456

    INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

    PRICE LITIGATION               :  01-CV-12257-PBS

    THIS DOCUMENT RELATES TO       :  U.S. ex rel.

    Ven-a-Care of The Florida      :  Judge Patti B. Saris

    Keys, Inc.                     :

          v.                       :

    Abbott Laboratories, Inc.,     :  Chief Magistrate

    No. 06-CV-11337-PBS            :  Judge Marianne B.

    - - - - - - - - - - - - - - -x  Bowler



                THOMAS A. SCULLY - VOLUME II

                      JULY 13, 2007

                      WASHINGTON, DC




       (CAPTION CONTINUED)

15199ddc-fb97-46a6-9907-a9804764b3c3

Scully, Thomas A. - Vol. II                     July 13, 2007
                    Washington, DC

Page 708

1  generally, that with generic products, as a
2  general proposition, WAC prices over time
3  declined to reflect competition?
4       MR. NEAL: Object to the form. You can
5  answer.
6       A. I didn't know that.
7       Q. Did you know that to the extent some
8  drugs end up having high spreads it's because --
9  some generic drugs -- end up with high spreads
10 it's because prices keep getting lower and lower
11 as there's more competition?
12      MR. NEAL: Objection.
13      MR. RIKLIN: Objection to form.
14      A. I was aware of that.
15      Q. So were you aware that -- that
16 increasing spreads were --
17      A. But prices get lower and lower to the
18 providers, not to the government.
19      Q. Well, to the providers, in the sense
20 that the, for example, the WAC keeps declining?
21      A. Right.
22      Q. And AMPs would keep declining, as well;

Page 709

1  right?
2       MR. NEAL: Objection to form. You can
3  answer.
4  BY MR. ESCOBAR:
5       Q. Well, that would be -- that would
6  generally be true; right?
7       MR. RIKLIN: Objection to form.
8  BY MR. ESCOBAR:
9       Q. And so the government would be able to
10 see that the life of a drug like Albuterol that
11 the WACs and the AMPs decline over time; right?
12      MR. RIKLIN: Objection to form.
13      MR. NEAL: I'll join in the objection.
14 You can answer.
15      A. Yes.
16      Q. Now, if you turn to page 13 of the
17 complaint, Exhibit Dey 028, just read to yourself
18 paragraph 40?
19      A. Yes.
20      Q. Okay. Now, this was a complaint that
21 was signed the 22nd day of August, 2006, and on
22 paragraph 40, in the first sentence, it says, AWP

Page 710

1  is used to refer to the price at which a
2  pharmaceutical firm or a wholesaler sells a drug
3  to a retail customer, who then administers it to
4  a patient; do you see that?
5       A. Yes.
6       Q. That's not what AWP was viewed as,
7  that's not the view of CMS as to what AWP was, is
8  it?
9       MR. NEAL: Objection as to form.
10 BY MR. ESCOBAR:
11      Q. Is it?
12      MR. NEAL: This is not a 30 (b)(6),
13 this is not a 30 (b)(6) deposition. You can
14 answer.
15      A. No, I don't think that's what AWP is
16 commonly considered to be, I think that's an
17 inaccurate description.
18      Q. In fact, that's a completely inaccurate
19 statement of AWP; right?
20      MR. NEAL: Objection as to form.
21      A. I think it's probably a poor
22 description, yes.

Page 711

1       Q. Because it's not accurate?
2       A. Yes.
3       MR. NEAL: Objection as to form.
4  BY MR. ESCOBAR:
5       Q. Now, you would think that -- well,
6  let's take the next one -- WAC is used to refer
7  to the price at which a pharmaceutical firm
8  typically sells a drug to wholesalers who will
9  then resell it to a retail customer; do you see
10 that?
11      A. Yes.
12      Q. And that's a description of what WAC
13 is, is also not accurate; is it?
14      MR. NEAL: Objection as to form.
15      A. Well, a little closer.
16      Q. But it's not accurate, is it?
17      MR. NEAL: Objection.
18      A. Probably not totally accurate.
19      Q. In fact, that sentence, where the
20 government describes in the complaint against Dey
21 what WAC is, this does not include the fact that
22 it's -- it lists price before discounts, which is

                          68 (Pages 708 to 711)

Scully, Thomas A. - Vol. II                                    July 13, 2007
                           Washington, DC

Page 900

1   document speaks for itself.
2      A.  I don't know.  I would have to read the
3   whole -- yeah, I'm not sure of the context it's
4   in.  I'd --
5      Q.  Well, let's talk about paragraph 42.
6   The sentence reads that AWP is used to refer to
7   the price at which a pharmaceutical firm or a
8   wholesaler sells a drug to a retail customer, who
9   then administers it to a patient, to start with,
10  do you use average wholesale price to refer to
11  the price at which a firm sells a drug to a
12  wholesaler or a customer?
13         MR. GOBENA:  Object to the form.
14     A.  Do I -- do I have my government
15  context, I would say no.
16     Q.  All right.  Have you ever used average
17  wholesale price to refer to the price at which a
18  pharmaceutical firm or a wholesaler sells a drug
19  to a retail customer?
20     A.  No.
21         MR. GOBENA:  Object to the form.
22  BY MR. COOK:

Page 901

1      Q.  Have you ever heard anybody else use
2   AWP to refer to the price of which a
3   pharmaceutical firm or a wholesaler sells a drug
4   to a retail customer?
5          MR. GOBENA:  Object to the form.
6      A.  No.
7      Q.  And when you talk about what average
8   wholesale price is supposed to be you're
9   referring to, I assume, and you can tell me if
10  I'm correct, the dictionary definition for the
11  words, average, wholesale, and price?
12     A.  Yes.
13     Q.  You're not referring to the manner in
14  which it's ever been used, commonly, in the
15  industry; correct?
16         MR. GOBENA:  Object to the form.
17         MR. KELLEY:  Objection to form.
18     A.  Yes, the definition is the same as
19  average sales price or average manufacturers
20  price, you would think that -- there are a
21  million ways to implement them and to actually
22  define them.  I mean, they're basic concepts.

Page 902

1      Q.  All right.  But paragraph 42, in front
2   of you, certainly does not describe any way in
3   which the government has ever defined AWP;
4   correct?
5          MR. GOBENA:  Object to the form.  This
6   is not a 30(b)(6) witness on behalf of the
7   government.
8          MR. RIKLIN:  Objection.
9      A.  My experience is that -- that in my
10  terms with the government nobody looked at what
11  the price of what AWP would pay.
12         MR. COOK:  I have no more questions.
13  Thank you.
14         MR. GOBENA:  All right.  We'll let go
15  of this witness.
16         THE VIDEOGRAPHER:  The time is 5:00 --
17  the time is 5:05 -- the time is 5:05 P.M.  We're
18  going off the record, concluding tape number six,
19  and this days' testimony, and volume two of the
20  deposition of Thomas Scully in the matter of in
21  re Pharmaceutical Industry Average Wholesale
22  Price Litigation.  This deposition contains five

Page 903

1   tapes, or six tapes.
2          (Signature having not been waived, the
3   deposition of Thomas Scully was concluded at 5:06
4   P.M.)

                ACKNOWLEDGMENT OF DEPONENT
       I, Thomas Scully, do hereby acknowledge that I
   have read and examined the foregoing testimony, and
   the same is a true, correct and complete transcription
   of the testimony given by me and any corrections
   appear on the attached Errata sheet signed by me.

   _____
   (DATE)          (SIGNATURE)

116 (Pages 900 to 903)

Henderson Legal Services
202-220-4158

15199ddc-fb97-46a6-9907-a9804764b3c3