# EXHIBIT H



18813616

Feb 29 2008
5:43PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Judge Patti B. Saris |
| | ) | |
| | ) | Magistrate Judge Marianne B. Bowler |
| *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.,* Civil Action No. 06-11337-PBS | ) ) ) ) ) | |

**UNITED STATES' NOTICE OF VIDEOTAPED RULE 30(b)(6) DEPOSITION TO DEFENDANT ABBOTT LABORATORIES, INC.**

PLEASE TAKE NOTICE that on Friday, March 7, 2008 at 9:00 a.m. at the offices of

Jones Day at 51 Louisiana Avenue, N.W., Washington, DC 20001 and continuing from day to

day until completed, the United States will take the deposition upon oral examination of

defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure.  The United States will take the examination through one or more of the

person(s) designated by Abbott to testify on its behalf as to matters known or reasonably

available to Abbott on the subject matters delineated below.  This deposition will be videotaped

and recorded stenographically.  It will be conducted under oath by an officer authorized to take

such testimony.  The deposition may be used for any purpose, including as evidence at trial.

The subject matters on which examination is requested are as follows:

1. Abbott's lobbying efforts on Medicare or Medicaid (federal or state) drug

reimbursement policies or issues, including but not limited to lobbying and advocacy in

connection with:

(a) CMS's Proposed Rule published at 56 Fed. Reg. 25792 (June 5, 1991);

(b) the Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997);

(c) CMS's Proposed Rule published at 63 Fed. Reg. 30818 (June 5, 1998);

(d) Program Memorandum Transmittal AB-00-86 (September 8, 2000); and

(e) CMS's Proposed Rule at 68 Fed. Reg. 50428 (August 20, 2003).

2. Consideration and approval of any positions, opinions or views advocated, advanced or supported by Abbott (or any employee, consultant or agent on Abbott's behalf) in connection with:

(a) CMS's Proposed Rule published at 56 Fed. Reg. 25792 (June 5, 1991);

(b) the Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997);

(c) CMS's Proposed Rule published at 63 Fed. Reg. 30818 (June 5, 1998);

(d) Program Memorandum Transmittal AB-00-86 (September 8, 2000); and

(e) CMS's Proposed Rule at 68 Fed. Reg. 50428 (August 20, 2003).

3. The distribution of, consideration of, and action taken with respect to the October 31, 2000 letter from Congressman Fortney "Pete" Stark to Miles White.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL


George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA  02210
Tel.: (617) 748-3398
Fax: (617) 748-3272

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Gejaa T. Gobena
Rebecca A. Ford
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel.:  (202) 307-1088
Fax:  (202) 307-3852

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA


_____
Mark A. Lavine
Ana Maria Martinez
Ann St. Peter-Griffith
Special Attorneys for the Attorney General
99 N. E. 4th Street, 3rd Floor
Miami, Florida  33l32
Tel.: (305) 961-9303
Fax: (305) 536-4101
Fla. Bar No. 648876
Email: Mark.Lavine@usdoj.gov

For the Relator, Ven-A-Care of the Florida
Keys, Inc.,

James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL  33027
Tel.:  (954) 874-1635
Fax:  (954) 874-1705
Email:  jbreen@breenlaw.com

Dated:  February 29, 2008

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' NOTICE OF VIDEOTAPED RULE 30(b)(6) DEPOSITION TO DEFENDANT ABBOTT LABORATORIES, INC.** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated:  February 29, 2008                              /s/ Gejaa T. Gobena
                                                       Gejaa T. Gobena



**U**
**.**
**S**
**.**
**D**
**epartment of Justice**

*United States Attorney*
*Southern District of Florida*

*500 East Broward Boulevard, Ste. 700*

*Fort Lauderdale, FL 33394*
*(954) 356-7255*

November 11, 2007

*Via E-Mail and U.S. Mail*

Jason Winchester
Jones Day
77 West Wacker
Chicago, Il   60601-1692

Re:    *United States ex rel. Ven-a-Care of the Florida Keys Inc. V. Abbott Laboratories, Inc.*,
       06-CIV-11337-PBS, In re Pharmaceutical Industry Average Wholesale Price Litigation,
       MDL No. 1456/Civil Action No. 01-12257

Dear Jason:

        In preparation for our telephonic conference on Wednesday, December 12, 2007, I am
writing to delineate the breakdown of Topics 4, 5, 7, 8, 10 and 11 for the United States' 30(b)(6)
deposition of Abbott's corporate representative.

TOPIC 4

        All facts related to Abbott's 2001 change in reporting any of its pricing to the public price
reporting compendia for HPD drugs, including:

        I.      Dates and location of meetings regarding the proposed change in Abbott's price
                reporting practices, including:

                a.      Identification of date and location of each meeting within HPD that Abbott

1

conducted concerning Abbott's 2001 price reporting;

b.     Identification of date and location of each meeting outside of HPD, if any, or with HPD and others not within HPD (e.g., Corporate, Legal, Ross, PPD) concerning Abbott's 2001 price reporting;

c.     Identification of date and location of each meeting with anyone outside of Abbott, if any, (e.g., consultants, lobbyists, trade groups, customers, or any others) concerning Abbott's 2001 price reporting;

d.     All record keeping concerning calendaring, conducting or setting up of any meetings within HPD, or within or outside of Abbott concerning Abbott's 2001 price reporting; and,

e.     The authentication of all relevant documents to this topic.

II.     Identification of the individuals involved in discussions or consideration of the change in prices, including:

a.     Identification of all attendees, or expected attendees at each meeting within HPD, that Abbott conducted concerning Abbott's 2001 price reporting and changes thereto;

b.     Identification of all attendees, or expected attendees at each meeting outside of HPD, if any, or with HPD and others not within HPD (e.g., Corporate, Legal, Ross, PPD) concerning Abbott's 2001 price reporting and changes thereto;

c.     Identification of all attendees, or expected attendees at each meeting with anyone outside of Abbott, if any, (e.g., consultants, lobbyists, trade groups, customers, or any others) concerning Abbott's 2001 price reporting and changes thereto;

d.     All facts and documentation concerning record keeping attendance records, or notes regarding expected attendees at meetings within HPD, or within or outside of Abbott, concerning Abbott's 2001 price reporting and changes thereto;

e.     Any and all facts concerning the decision making regarding who should be in attendance at any meeting, or who should have been invited to attend any meetings concerning Abbott's 2001 price reporting and changes thereto; and,

f.     The authentication of all relevant documents to this topic.

III.   Rationales considered for either maintaining the catalogue/list prices or lowering them, including:

     a.    Abbott's actual reason and rationale in 2001 for maintaining some catalogue prices and while changing others, including the actual facts and considerations that Abbott relied upon in making its decision to maintain and change some catalogue prices for HPD products in 2001;

     b.    All arguments and facts that Abbott considered in making the decision to make some catalogue price adjustments to HPD products in 2001, including, without limitation, all factors that Abbott considered and rejected;

     c.    Whether, how, and why the TAP Pharmaceutical criminal or civil investigations, or CIA  factored into or affected any decision making regarding Abbott's 2001 catalogue price adjustments;

     d.    Whether, how, and why the on-going criminal and civil investigations of the Ross products division factored into or affected any decision making regarding Abbott's 2001 catalogue price adjustments;

     e.    Whether, how and why the changes in AWP by First Databank, at the suggestion of the Department of Justice, factored into or affected any decision making regarding Abbott's 2001 catalogue price adjustments;

     f.    The identities of those Abbott personnel who advocated in favor of making the 2001 catalogue price changes (either orally or in writing) and the reasons and positions advocated by each such individual;

     g.    The identities of those Abbott personnel, including without limitation, Michael Sellers, who advocated against making the 2001 catalogue price changes and the reasons and positions advocated by each such individual;

     h.    The reasons why some arguments for and/or against the catalogue prices changes were considered and accepted or considered and rejected, if applicable; and,

     i.    The authentication of all relevant documents to this topic.

VI.   Identification of all documents or types of documents/analyses generated in connection with the 2001 catalogue/list price change, including:

3

a.    Identification and explanation of each document generated that referred, related or pertained to the decision to make and/or approve the 2001 catalogue price changes, or the consequences thereof, or any position advocated either in favor or against the changes;

b.    Identification and explanation of any internal communication documents within HPD that referred, related or pertained to the decision to make and/or approve, the 2001 catalogue price changes, or the consequences thereof, or any position advocated either in favor or against the changes;

c.    Identification and explanation of any internal communications within Abbott that referred, related or pertained to the decision to make and/or approve, the 2001 catalogue price changes, or the consequences thereof, or any position advocated either in favor or against the changes;

d.    Identification and explanation of any external communications between anyone at Abbott and any person or entity outside of Abbott that referred, related or pertained to the decision to make and/or approve the 2001 catalogue price changes, or the consequences thereof, or any position advocated either in favor or against the changes; and,

e.    The authentication of all relevant documents to this topic.

VII.    Identification of all individuals involved in the decision making and approval, including:

a.    All facts concerning who was involved in the decision making and approval of the 2001 price catalogue changes, (e.g., any HPD vice-presidents, any HPD president or to the Government Relations department, or any Corporate division officer or employee, including employees of the General Counsel's office);

b.    All facts concerning who was consulted before approval of the changes could be finalized, and why;

c.    The role of any non-Abbott employee in the decision making and approval of the 2001 catalogue price changes; and,

d.    The identification of the final decision maker who signed off on and approved the 2001 catalogue price changes.

TOPIC 5

4

The authorship, utilization, reliance upon, accuracy of content and distribution of the Contract Marketing Basic Operating Procedures Manual (CMBOPM), including answers to the following:

I.      What was the operative period of the CMBOPM;

II.     Why was it generated and what was its intended purpose, and how were the need for and nature of the topics of the various subparts of the CMBOPM determined;

III.    Who authored the CMBOPM, and/or its subparts or updates;

IV.    How was the CMBOPM used or relied upon, and by who;

V.     How accurate was the content of the CMBOPM;

VI.    How was the accuracy of the content of the CMBOPM verified, and if content was deemed inaccurate, how was that communicated to the distribution recipients of the CMBOPM;

VII.   What happened after Michael Sellers disavowed the CMBOPM in 2000 and why was it updated thereafter;

VIII.  Who was the CMBOPM distributed to and why;

IX.    Who, if anyone, was required to and/or permitted to consult and/or rely upon the CMBOPM, and under what circumstances;

X.     Whether the CMBOPM, or any subparts thereof, constituted official Abbott policy;

XI.    Who had ultimate authority for the review and approval of the content of the CMBOPM;

XII.   Any communications concerning the use or discontinuation of use of the CMBOPM, or any subsections thereof;

XIII.  Identification of who physically generated the word processed version of the CMBOPM, or who was responsible for making physical edits to it;

XIV.  Who maintained electronic or hard copies of the CMBOPM, in what locations, and under what circumstances?; and,

XV.   The authentication of all relevant documents to this topic.


TOPIC 7

    I.    Abbott's corporate integrity or compliance plans and/or agreements, including any actions taken in connection with or as a result of the investigation, prosecution, and resolution of governments claims against TAP and with regard to Medicare and all state Medicaid programs, including:

    a.    Identification of all measures undertaken by Abbott to ensure compliance with all state and federal Medicare and Medicaid laws and regulations after it learned of or participated in each the following: United States' or any state's investigation of TAP; TAP's criminal plea agreement; TAP's civil settlement with the United States; and, TAP's CIA with the United States;

    b.    Identification of all measures undertaken by Abbott to ensure compliance with all state and federal Medicare and Medicaid laws and regulations once Abbott or its counsel learned of the conduct that TAP engaged in, including spread and spread marketing conduct, that led to or resulted in TAP's guilty plea, civil settlement with the United States, and/or TAP's CIA;

    c.    Identification of all measures undertaken by Abbott to identify whether it was engaging in the same conduct for which TAP pled guilty, and/or the same conduct that was covered by the TAP CIA or TAP civil settlement with the United States, including, an evaluation (if any) of Abbott HPD's conduct in selling or distributing any TAP product, and whether disclosures should have been or were made to the United States concerning HPD's sale, consignment or distribution of Lupron; and,

    d.    The authentication of all relevant documents to this topic.

    II.    Compliance with all Medicare and Medicaid statutes, regulations, policies, procedures and requests from any CMS official, intermediary or state Medicaid program for information from Abbott, evaluation and analysis of government regulations and statutes, including:

    a.    Identification of all measures undertaken by Abbott to ensure that its HPD was in compliance with all state and federal Medicare and Medicaid laws and regulations for the operative period of the case;

6

b.  Identification of all measures undertaken by Abbott once Michael Tootell advised his supervisor and/or Abbott's in-house legal counsel about his concerns regarding Abbott's AWP pricing and high spreads on Abbott products;

c.  Identification of all training undertaken by Abbott regarding compliance with Medicare or Medicaid laws or regulations, including without limitation, the False Claims Act, Federal Anti-kickback statute, or any other Medicare or Medicaid or federal statutes or regulations.

d.  Identification of all policies and procedures concerning the implementation of any Compliance measures undertaken by Abbott regarding Medicare or Medicaid state or federal laws or regulations, whether or not they were written policies;

e.  Identification of all policies and procedures, if any, implemented or maintained at Abbott regarding employee reporting of non-compliance with Medicare or Medicaid state or federal laws or regulations;

f.  All policies and procedures, if any, that Abbott maintained concerning spreads and spread marketing, and the implementation and monitoring of those policies and procedures.

g.  Identification of all individuals responsible for developing or enforcing all Compliance programs, initiatives, policies or procedures that refer, relate or pertain to Medicare or Medicaid state or federal laws or regulations;

h.  Identification of all actions taken within Abbott HPD incident to the investigation of the Ross products division, the Ross CIA, or the Ross criminal plea and/or civil settlement, including without limitation, efforts to identify and report HPD's conduct in selling or distributing Ross products; efforts to determine whether disclosures should have been or were made to the United States concerning HPD's distribution of Ross products and pumps, and efforts to ascertain which HPD employees are covered persons under the Ross CIA; and,

i.  The authentication of all relevant documents to this topic.


TOPIC 8

Abbott's pricing policies, including procedures for setting pricing, pricing impact on Abbott markets and sales, the reporting or other dissemination of any pricing information

regarding any of the drugs at issue in this case, AWP practices, policies and procedures Abbott-wide, the existence of AWP related policies in some divisions like Ross but not in other divisions and the reasons therefore; all considerations that factored into or affected price setting including, the ability to a provider to recover dispensing fees, co-pays, etc., including:

I.     For the operative period of this case, all information concerning Abbott's pricing policies, including policies and procedures for setting prices for the Subject Drugs at issue in this case, including pricing for AWP, list price, catalog price, contract price, direct price WAC, RX link pricing, DAC pricing, or any other price that is related to any Abbott product at issue in this action;

II.    For the operative period of this case, all information concerning the pricing impact of Abbott's pricing of the HPD drugs and products upon Abbott's markets and sales to any customers of Abbott HPD, including, without limitation, Alternate Sites, GPOs, distributors, individual customers, pharmacies, hospital outpatient facilities, home infusion clients, home health agencies, consignment partners of Abbott's Home Infusion unit, or any other Abbott consumer or purchaser of Abbott's HPD products;

III.   For the operative period of this case, all information concerning the reporting or other dissemination of any pricing information regarding any of the drugs at issue in this case, including without limitation, AWP, list price, catalog price, contract price, direct price WAC, RX link pricing, DAC pricing, or any other price that is related to any Abbott product at issue in this action;

IV.   All information concerning Abbott's practices, policies and procedures concerning or referring or relating to AWP, either within Abbott HPD, or outside of HPD but within Abbott;

V.    An identification of what impact First Data Bank's changes, if any, of Abbott's AWPs or the inclusion of the "Department of Justice AWPs or prices" in First Data Bank's publication had upon Abbott's pricing of its HPD products at issue in this lawsuit;

VI    An identification of whether divisions other than HPD, like Ross, had stated or formalized policies concerning AWP at the same time that Abbott HPD did not, and why HPD did not have the same AWP policies that other divisions may have had;

VII.  All considerations that factored into or affected Abbott's price setting of its HPD drugs and products, including, whether Abbott considered in its pricing decision making the ability to a provider to recover dispensing fees, co-pays, or other risks

or costs that the provider may have in collecting payment for the dispensed drugs or product; and,

VIII.   The authentication of all relevant documents to this topic.


## TOPIC 10

Abbott's reasons for the spin off of HOSPIRA as a separate company, including answers to the following:

I.      Why did Abbott spin off its HPD unit into HOSPIRA.

II.     Did the decision to spin off HPD, in whole or in part, have anything to do with the diminished profitability or reduced sales volumes of HPD products after 2001.

III.    Was the spinoff of HPD into HOSPIRA, in whole or in part,  a subsequent remedial measure after Abbott changed its prices in 2001 on some of its HPD products.

IV.     Was the decision to spin off HOSPIRA made, in whole or in part, to avoid HPD compliance with the provisions of the Abbott (Ross) CIA.

IV.     Did the spin off of HPD occur, in part, so that further list price reductions could be taken on HPD products the first day of the spin off?; and,

V.      The authentication of all relevant documents to this topic.


## TOPIC 11

Abbott's Home Infusion operations, including its business model, consignment contracts, pricing policies, reimbursement services and training, and reasons for closing, including answers to the following:

I.      How did Abbott's Home Infusion business unit operate:

        a.      What were its business models, and how were they conceived of and developed;

        b.      Why did Home Infusion's business models change over the years of its existence;

9

    c.      What was the business model for the Home Infusion pharmacies;

    d.      Why did Abbott's Home Infusion business model include the sale, and/or consignment, and/or distribution of Ross products and Lupron?; and

    e.      Describe the total profit and profit margins of the Home Infusion business models for the operative period of this case?

II.      How did the consignment contracts work;

    a.      What were the mechanics of the consignment contracts and why did they change over time;

    b.      Why did Abbott Home Infusion continue to use its consignment contract arrangements even though some prospective customers advised Abbott that the arrangements contravened state and/or federal Medicare and/or Medicaid laws and regulations; and,

    c.      What prices did Abbott Home Infusion charge its consignment contract partners for Abbott or TAP product that was cosigned to the customer?

III.     How did Abbott's reimbursement department work;

    a.      What were the mechanics of how the reimbursement department operated;

    b.      How did the reimbursement staff process claims to Medicare and Medicaid;

    c.      How, if at all, did the reimbursement staff interact with clients throughout the claims process;

    d.      How did the reimbursement staff deal with claims that were rejected by Medicaid or Medicare; and,

    e.      What training initiatives did Abbott Home Infusion undertake in training its sales and reimbursement staffs?

VI.     What were the reasons for closing Abbott's Home Infusion business unit,

    a.      What considerations factored into or affected the decision to close Home Infusion and who evaluated those considerations;

    b.      Why didn't the Home Infusion business unit close earlier;

    c.      How was the closing of the Home Infusion business unit implemented; and,

    d.      Was the closure of the Home Infusion pharmacies an event that was independent of the closing of the Home Infusion business unit, and if so, why did Abbott close its Home Infusion pharmacies?; and,

VII.    The authentication of all relevant documents to this topic.


       We look forward to speaking with you on Wednesday.  Unless you would like for me to reach you at a different number, I will be calling your office directly at 11:00 a.m. EST.  I will be traveling this afternoon, but I will be accessible by e-mail via my blackberry.

       Thank you.


                    Sincerely,

                    R. ALEXANDER ACOSTA
                    UNITED STATES ATTORNEY

                    /s/ Ann M. St. Peter-Griffith
                    ANN M. ST. PETER-GRIFFITH
                    Assistant United States Attorney


cc:    James Breen, Esq.
       Renée Brooker, Esq,
       Mark Lavine, Esq.

 **U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

*99 N.E. 4 Street*

*Miami, FL 33132*
*(305) 961-9000*

December 11, 2007

Via E-mail

Toni-Ann Citera
Jones Day
222 East 41st Street
New York, NY 10017

Re:     *United States ex rel. Ven-a-Care of the Florida Keys Inc. V. Abbott Laboratories, Inc.*,
          06-CIV-11337-PBS, In re Pharmaceutical Industry Average Wholesale Price Litigation,
          MDL No. 1456/Civil Action No. 01-12257

Dear Toni:

          In preparation for our telephonic conference on Wednesday, December 12, 2007, I am writing to delineate the breakdown of Topics 12 and 13 for the United States' 30(b)(6) deposition of Abbott's corporate representative.  Our breakdown of the details of Topic 6 were sent previously, but are repeated herein for your convenience.


**Topic 13  Abbott's Hospital Products Division's financial performance from 1991 through the Hospira spin-off in 2004, including but not limited to revenues (both at the division and group/sector level), profits/losses (both at the division and group/sector level) and business plans (both at the division and group/sector level).**


          1.       Abbott's Hospital Products Division's (HPD) financial performance from 1991 through the Hospira spin-off in 2004, including but not limited to revenues (both at the division and group/sector level), profits/losses (both at the division and group sector/level) and business plans (both at the division and group/sector level) and business plans (both at the division and group/sector level)

          2.       Abbott's operational goals for growth of Alternate Site and Home Infusion Services, including when and whether those goals were met (i.e., actual performance of those goals)

Tina Tabacchi
December 11, 2007
Page 2 of 7

    3.      Abbott's marketing plans and marketing evaluations related to the Subject Drugs

    4.      How HPD's marketing activities (including but not limited to, its establishment and communication of list prices to customers/potential customers, and its communications of average wholesale prices or compendium prices to customers/potential customers) developed the Alternate Site and Home Infusion Businesses

    5.      HPD's creation of and attainment of a differential advantage in the marketplace on the Subject Drugs, and how Abbott's sales force communicated this advantage


**Topic 12.  All communications regarding pricing, reimbursement, AWP, or spread with third parties including CMS or states, trade/industry groups, consultants, etc.**

    1.      Any information upon which Abbott based its understanding of any Medicare or Medicaid drug reimbursement statute, rule, or regulation that was received by Abbott from any of the following persons or entities:

          a.      any representative of CMS, HHS or the United States;
          b.      any Medicare contractor, including, but not limited to, carriers, fiscal intermediaries, and affiliated contractors;
          c.      any legislator or their representatives;
          d.      any state Medicaid Program;
          e.      any Medicaid contractor.

    2.      Any information upon which Abbott bases its defense that claims against Abbott are barred, in whole or in part, because Abbott complied with all applicable regulations of the federal and state governments (as asserted in its Eighteenth Affirmative Defense to the Complaint of the Counties of New York) that was received by Abbott from any of the following persons or entities:

          a.      any representative of CMS, HHS or the United States;
          b.      any Medicare contractor, including, but not limited to, carriers, fiscal intermediaries, and affiliated contractors;
          c.      any legislator or their representatives;
          d.      any state Medicaid Program;
          e.      any Medicaid contractor.

    3.      Any information upon which Abbott bases its defense that claims against Abbott are barred, in whole or in part, on the basis that Abbott had no reasonable grounds to believe, and did not believe at the time such a statement was made, that the statement were false or misleading (as asserted in its Twenty-First Affirmative Defense to the Complaint of the Counties of New York) that was received by Abbott from any of the following persons or entities:

          a.      any representative of CMS, HHS or the United States;
          b.      any Medicare contractor, including, but not limited to, carriers, fiscal

Tina Tabacchi
December 11, 2007
Page 3 of 7

intermediaries, and affiliated contractors;

c.    any legislator or their representatives;

d.    any state Medicaid Program;

e.    any Medicaid contractor.

4.    The identification of all persons with responsibility for creating, evaluating, authorizing, approving or transmitting prices or other price information that was made available or otherwise distributed by Abbott to:

a.    any representative of CMS, HHS or the United States;

b.    any Medicare contractor, including, but not limited to, carriers, fiscal intermediaries, and affiliated contractors;

c.    any legislator or their representatives;

d.    any state Medicaid Program;

e.    any Medicaid contractor;

f.    Redbook/Thomson Publishing;

g.    Blue Book/First Data Bank;

h.    Medispan, Inc.;

i.    any trade or industry group, including, but not limited to, PhRMA, ASCO, the Generic Pharmaceutical manufacturers Association.

5.    The standards, guidelines or other factors followed by Abbott when determining what prices or price information to be made available to the entities described in 4.a. through 4.i.

6.    Any communications between Abbott and any of the entities described in 4.a. through 4.i. regarding the meaning of AWP.

7.    Any communications between Abbott and any of the entities described in 4.a. through 4.i. regarding the use, creation, reliance upon or choice of a price to be used as the basis for reimbursement of pharmaceutical products by Medicare or Medicaid.

8.    Any communications between Abbott and any of the entities described in 4.a. through 4.i. regarding spread, including, but not limited to, communications addressing the nature and scope of spreads on Abbott products and the reasons therefore, and the manner in which spreads affected the market for Abbott products.

9.    Any communications between Abbott and any of the entities described in 5.a. through 5.i. regarding Abbott's list prices (or any other price publicly disseminated by Abbott), including, but not limited to, communications addressing the relationship or connection between Abbott's list prices (or any other price publicly disseminated by Abbott) and the prices currently and generally paid for Abbott's products.

Tina Tabacchi
December 11, 2007
Page 4 of 7

**Topic 6.   Abbott's data, databases and computer systems, including databases containing prices (contract, list, RxLink, parameter, catalogs, competitive prices, etc.), sales/transactions, contracts, discounts, rebates, chargebacks, CHIPS, CAS, prices reported to third parties, IMS data, AMP's, ASP's, emails, storage and retention policies, accounting, tax reporting, forecasting and/or projecting revenues.**

1.    The procedure by which transactional data is retrieved from Your databases, including, but not limited to, the date on which any request for data in connection with this litigation was made, the content of any such request, the date on which the data request was processed or a driver file written or created, the dates on which the data extract was initiated and completed, and all steps taken to ensure that the extracted data was complete and accurate.

2.    All steps taken to respond to the data related inquiries contained in the letter sent on November 26, 2007 by Renee Brooker to Jason Winchester and Carol Geisler.

3.    All steps taken to extract, retrieve and produce data in this case, including, but not limited to, transactional sales data, CHIPs data, GAAT60 data, chargebacks, rebates, IMS data and any other document or information stored electronically.

4.    All steps taken to extract, retrieve and produce data in this case from any employees' hard drive contained on any desktop or laptop computer, or any other computing or storage device under the control of any individual employee.

5.    The receipt, storage, archiving, deletion and retrieval of any data or reports prepared by or received from IMS Health.

6.    The current and any prior system(s) used to create, transmit, store, retrieve, and delete e-mail including, but not limited to, name and version, installation dates, number of users, and location of users' mail files.

7.    The reason(s) why Abbott has failed to produce e-mails from any date prior to 2002 in electronic form, including, but not limited to:
   a.    a description of why those e-mails have not yet been produced;
   b.    if and when You plan or are able to produce those e-mails;
   c.    if You are unable to access or retrieve those e-mails, an explanation of the circumstances;
   d.    if the e-mails have been destroyed or otherwise rendered incapable of restoration and production, an explanation of how that occurred;
   e.    the details of any assessment of the cost to restore and retrieve those e-mails;
   f.    an explanation of the manner in which any Abbott e-mail became no longer "reasonably accessible";
   g.    all steps taken to respond to the e-mail related inquiries contained in the letter sent on November 16, 2007 by Mark Lavine to Jason Winchester and Carol Geisler, and in the follow-up e-mail sent on November 26, 2007 by

Tina Tabacchi
December 11, 2007
Page 5 of 7

Mark Lavine to Jason Winchester and Carol Geisler.

8.  The manner in which HPD chargeback information is entered into, maintained, and retrieved from Your direct and indirect transaction data, including, but not limited to:

    a.  the manner in which chargeback data is extracted from the GAAT60 file;

    b.  the reason why chargeback data was not extracted from the GAAT60 file in connection with the data provided to the United States or Texas;

    c.  the reason why chargeback data was not included in the data provided to the United States or Texas;

    d.  the meaning and use of "dummy list numbers" in any of Your transaction data;

    e.  the meaning and use of any transactions identified as "G2" in the branch code field, or any other field;

    f.  the reason why chargeback data is included in PPD data but is not included in HPD data;

    g.  the reason that HPD uses a "Rebate Accrual" rather than an actual chargeback entry;

    h.  the manner in which any "Rebate Accrual" is reconciled with actual chargebacks and the location of any data or reports related thereto.

9.  The manner in which rebate information is entered into, maintained, and retrieved from Your direct and indirect transaction data, including, but not limited to:

    a.  the location, storage, and retrieval of rebate transaction data.

10. The identity and meaning of all fields currently or formerly contained within or otherwise utilized in the GAAT60 file.

11. The identity and meaning of the Price Select field, and the reason the Price Select field was included in the data provided to Texas but not included in the data provided to the United States.

12. A complete, comprehensive description of each class of trade code used in any of Your data, including, but not limited to, a description of each class of trade and the identity of which classes of trade are included in reports utilized by You in the ordinary course of business.

13. The manner in which You performed calculations of Average Selling Price and Average Manufacturers Price, including, but not limited to, the location of any data or reports related thereto.

14. Your creation, storage and deletion of pricing histories, price profiles and resource files from any computer system, including, but not limited to, CAS, DELPHI, HUB, Rebate, COP, and GAA.

Tina Tabacchi
December 11, 2007
Page 6 of 7

15.    The acquisition, location, and disposition of personal computers used by employees and others, and any systems for recording such information.

16.    Abbott's data, databases and computer systems, including databases containing prices (contract, list, RxLink, parameter, catalogs, competitive prices, etc.), sales/transactions, contracts, discounts, rebates, chargebacks, CHIPS, CAS, prices reported to third parties, IMS data, AMP's, ASP's, emails, storage and retention policies, accounting, tax reporting, forecasting and/or projecting revenues.

17.    The identity and meaning of all fields currently or formerly contained within or otherwise utilized in the CHIP's system.

18.    The overall structure of Abbott's computer systems. This description will be of sufficient detail to provide a basic understanding of the computer resources available to Abbott's business users and the use of such resources in the ordinary course of business, including the types of databases used, including how the database is accessed, and any standard reports prepared..  For example, the witnesses will describe the computer resources that are available in the business process of making decisions about pricing, including, but limited to the application of discounts, charge-backs, and rebates.

19.    Specific and detailed information about the systems used for contract administration (the Contract Administration System), order processing (the Order Processing System), and enterprise [resource planning] system (the Abbott Enterprise System).

20.    Specific and detailed information about the systems used for  accounting, tax reporting, forecasting and/or projecting revenues for any Abbott entity that is in any way responsible for any of the Identified Drugs.

21.    To the extent not covered by any other specification, a specific description of Abbott's database(s) and/or data storage devices (e.g. tapes) that contain:

       a.    prices charged to customers who are on contracts with Abbott, including, but not limited to, all locations where such data is input, passes through or resides;
       b.    discounts, including, but not limited to, all locations where such data is input, passes through or resides;
       c.    rebates, including, but not limited to, all locations where such data is input, passes through or resides;
       d.    chargebacks, including, but not limited to, all locations where such data is input, passes through or resides;
       e.    prices reported to third party price reporting, including, but not limited to, all locations where such data is input, passes through or resides.

22.    To the extent not covered by any other specification, a specific description of

Tina Tabacchi
December 11, 2007
Page 7 of 7

      Abbott's historical and current business usage of RX Link pricing and RX Link Acquisition Cost pricing.

23.    A specific description of the databases and/or data storage devices (e.g. tapes) that maintain, and/or have maintained RX Link pricing and RX Link Acquisition Cost pricing.

      We look forward to hearing from you regarding the foregoing.  Thank you.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Mark A. Lavine
Assistant U.S. Attorney
(305) 961-9303
(305) 536-4101 Fax
Mark.Lavine@usdoj.gov

2007.12.11 Lavine to Citera.wpd

cc:    Renée Brooker