UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:  PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti B. Saris |
| | ) | |
| *United States of America, ex rel. Ven-A-Care* | ) | Magistrate Judge Marianne B. Bowler |
| *of the Florida Keys, Inc. v. Abbott* | ) | |
| *Laboratories, Inc.,* | ) | |
| CIVIL ACTION NO. 06–CV-11337-PBS | ) | |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'
MOTION TO COMPEL DOCUMENTS AND DEPOSITION TESTIMONY**

The United States of America, through its undersigned counsel, respectfully moves this

Court to compel the production of certain documents from Abbott Laboratories Inc. (Abbott) and

the deposition testimony of Duane Burnham and Thomas Hodgson.  It is with some reluctance

that the United States moves again to compel the production of documents and deposition

testimony, much of which has been sought and ordered in previous motions to compel.

However, Abbott's undue delay or plain refusal to provide the requested evidence before the

close of discovery in this matter has threatened several of the other deadlines in Case

Management Order 29 (as amended), mostly immediately the April 30, 2008 due date for the

government's expert reports and disclosures.  The United States has asked Abbott repeatedly for

the documents and testimony at issue in the motion; the United States could not secure from

Abbott commitments either to provide the documents and testimony or to provide them in a

timely manner.

## I.    Evidence Sought

### A.    Documents

#### 1.    Pre-2002 Emails.

The claims period in this case spans from, at a minimum, 1991 through 2001.  Testimony from Abbott witnesses indicates that Abbott has overwritten or otherwise destroyed every backup tape of Abbott e-mails prepared between 1991 and 2003 except for a two month period in 1997 (the "1997 backup tapes") and a two year period spanning from January 27, 2002 through September 6, 2004 which was ordered preserved and restored by the Court in connection with litigation involving Medi-Cal (the "Medi-Cal backup tapes").  *See, e.g.,* Exhibit 1, Alexandra Buck Deposition Tr. at 51, 166, and 196.  Abbott – or its employees or agents – destroyed these emails either during the federal government's pre-intervention investigation of Abbott's drug pricing conduct or after this litigation commenced.  An Abbott corporate designee testified that there are 18,000 pre-2002 emails on the backup tapes that escaped destruction.  *Id.* at 37-38. Abbott has promised – but to date failed to – produce the remaining pre-2002 emails.

The United States previously moved to compel the production of these same emails. Magistrate Judge Bowler ordered Abbott to certify by March 3, 2008 what pre-2002 emails Abbott has produced and what further production will be forthcoming.  Exhibit 2, January 31, 2008 Motions Hearing at 64:13-68:5.  Abbott has failed to comply with Magistrate Bowler's recent order.

Abbott has not restored any portion of the 1997 backup tapes and has only restored a limited portion of the Medi-Cal tapes.[1]  The United States requests that (1) Abbott be directed to

---

[1] As to the 1997 back-up tapes, Ms. Buck testified that the emails contained thereon are not accessible and need not be restored because it would be extremely costly to restore e-mails from the 1997 back-up tapes.  *See* Exhibit 1,  Alexandra Buck Deposition Tr. at 52.  However, she also admitted that she was not aware of any effort by Abbott to actually evaluate the cost of the restoration process.  *Id.* at 56-57.  Abbott has failed to establish that the 1997 e-mail tapes are inaccessible and cannot be restored.  Regardless, Abbott was obligated to preserve all relevant

immediately produce the 18,000 pre-2002 emails , (2) to restore the 1997 tapes containing pre-2002 emails and produce the responsive emails, and (3) to provide a sworn accounting of how and why a large amount of relevant pre-2002 emails were destroyed during the course of the United States' investigation and litigation of this matter.

2.       **Working and Personnel Files of Abbott's Alternate Site Sales Force**.

Sixteen months ago – on November 17, 2006, the United States served document requests for various documents from Abbott's sales force, including the working files and personnel files of each member of Abbott's Alternate Site sales force from 1991 to 2003. Abbott failed to produce those documents for over a year. The United States has already been forced to file multiple motions to compel the production of these documents. *See* Docket ## 4047, 4984 and 4958. Magistrate Judge Bowler has twice now ordered the production of these documents. *See* Docket # 4259 and Exhibit 2, January 31, 2008 Hrg. Tr. at 67-71. Magistrate Bowler ordered Abbott to produce within 30 days, dates for sales force depositions, outstanding sales force working files and personnel files, and identification for each sales force member disclosed by Abbott whether their working file and personnel file had been produced. *See* Exhibits 3 and 4, February 5, 2008 and February 21, 2008 letters from R. Brooker to J. Winchester. In response to that Order, on March 3, 2008, Abbott wrote to the United States, providing a "status of production of alternate site sales force personnel and personal/working files." *See* Exhibit 5, March 3, 2008 letter from J. Winchester to R. Brooker. Sixteen months after the issuance of discovery requests for these materials and multiple rounds of motions practice, Abbott contends in the letter that for many of the witnesses "collection efforts are ongoing."

Abbott has failed to complete this production in a timely manner. By failing to produce the outstanding sales force personnel and working files by March 3, 2008, Abbott violated the

---

documents, including emails, as early as 1996 (when Abbott was first put on notice of the government's investigation).

Court's Order.  The United States requests that the Court order Abbott to comply immediately

with Magistrate Judge Bowler's Order.

### 3.   Subpoenaed Documents in the Possession of Former Alternate Site sales Staff.

The United States has issued subpoenas to members of Abbott's former Alternate Site

sales force whom it has sought to depose.  Certain members of the sales force who have

produced documents responsive to those subpoenas have testified that the volume of documents

provided to Abbott counsel was much greater than the volume of documents produced to the

United States.  *See e.g.*, Exhibit 6, Frank Genuardi Deposition Transcript at 36-41.

Testimony from former sales staff indicates that the sales staff have collected large

volumes of documents responsive to government subpoenas that are being improperly withheld

by Abbott.  For example, Mr. Genuardi testified that in response to the United States' subpoena,

he provided Abbott counsel a box of documents weighing approximately 8 pounds, as well as an

8 inch high stack of documents. *Id.* at 37.  Mr. Genuardi testified that the documents he turned

over to Abbott counsel were the working files related to his accounts.  *Id.* at 37-38.  Despite the

volume and the nature of the documents that Mr. Genuardi provided to Abbott counsel in

response to the subpoena – documents which were responsive to requests F - P of the United

States' subpoena to Mr. Genuardi and to the United States' Request For Production of

Documents ("RFPs") served on Abbott many months ago – Abbott, on Mr. Genuardi's behalf,

produced to the United States only approximately 38 pages of documents consisting of Mr.

Genuardi's resume, performance appraisals and personnel type information. Abbott did not

produce to the United States any of Mr. Genuardi's working files that he gathered in response to

the subpoena.

Abbott has failed to comply generally with the Court's existing orders to produce sales force files. The United States respectfully requests that the Court order the withheld documents collected by former Abbott sales force be immediately produced.

4. **Shared Abbott and Hospira Drive**. Recent deposition testimony revealed that for some period of time after the Hospira spin-off, Abbott HPD and Hospira employees enjoyed access to a shared drive. *See generally,* Exhibit 1, Alexandra Buck Deposition Transcript. Until recently, Abbott ha done little to search this shared drive for documents responsive to the government's discovery requests. *Id.* at 134-45, 200, 271-78.

To date, Abbott has failed to produce documents from that shared drive responsive to the United States' discovery requests. The United States respectfully asks this Court to compel Abbott to produce immediately the responsive documents from that shared drive.

5. **CHIPS Data**. Abbott still has not provided complete data related to the claims that its own home infusion pharmacy submitted directly to Medicare and various Medicaid Programs. *See* Exhibit 7, Recent Correspondence Regarding CHIPs data. Abbott's home infusion pharmacy data system is known as the "CHIPs" system. According to the data dictionary produced by Abbott regarding the CHIPs system, it is made up of over 120 separate files. In June 2007 Abbott produced just two of those files. In November 2007, after the repeated efforts of the United States to decipher the two files proved fruitless, the United States requested a Rule 30(b)(6) deposition regarding the CHIP's system and related data and moved to compel the production of the CHIPs database in a useable format.

During discussions related to the deposition, the United States sought information about all of the files that were omitted from the production. In response, on February 15, 2008, Abbott represented that the two files already produced contained "the relevant information DOJ requested relating to" claims billed to Medicare and Medicaid by Abbott's home infusion pharmacy, and the payments made by Medicare and Medicaid. Abbott also represented that 34

other files had been restored, but again stated that "*we do not believe that these files contain any data that is relevant to your claims.*" Abbott offered to produce the additional files and stated that they could be produced in one to two weeks. After consulting the data dictionary, on February 28, 2008, the United States requested that Abbott produce 22 of the 34 files that seemed most likely to contain helpful information. No additional files have yet been produced.

Abbott originally sought to delay the Rule 30(b)(6) deposition of the person with the most knowledge of the CHIPs system until after it had produced the additional files. However, the United States thought it prudent to move forward because of the approaching Court-ordered discovery deadline. The deposition was taken on March 6, 2008. Some particularly important facts were discovered at the deposition, each of which directly contradicted the earlier representations of counsel:

• Abbott had restored all of the data files related to the CHIP system, not just the 34 listed in the correspondence of February 15, 2008. *See* Exhibit 8, Jerry Goldson Deposition Transcript at 103.

• The list of 34 files actually represented the files that the 30(b)(6) deponent had previously determined were relevant to the requests of the United States and were not irrelevant. Goldson Depo. *Id.* at 232-233.

• In addition to the 34 files, even more files were identified as being relevant to the requests of the United States. *Id.* at 233.

At the conclusion of the deposition, because the total size of all of the additional files was relatively large, it was agreed that Abbott's efforts to copy the 22 files previously requested would be briefly put on hold while the deponent reconsidered which of the files would be most appropriate for production in light of the additional information adduced during the deposition. Counsel for Abbott was to then contact the United States to propose the production of a set of the most relevant files. No word was ever forthcoming from counsel for Abbott. Two follow-up inquires were completely ignored.

Abbott has completely failed to respond to the forgoing inquiries and has completely failed to produce the promised CHIPs data files, thus rendering unuseable the CHIPs database produced to the government. Thus, the United States requests that Abbott be ordered to immediately produce all of the files identified at the deposition and requested by the United States. After the United States has had a chance to review the additional files, Abbott should be ordered to reconvene the 30(b)(6) deposition. The United States also seeks additional time to submit any aspect of its expert report which depends upon the CHIPs data.

### B.      Testimony

**The Deposition of Duane Burnham and Thomas Hodgson**. The United States requested Mr. Hodgson and Mr. Burnham's depositions in June and July 2007, respectively. As indicated in previous briefing, Mr. Burnham and Mr. Hodgson are retired and are no longer apex employees; they are and continue to be, however, critical witnesses with direct, personal and unique knowledge of the circumstances and issues in the case. Mr. Burnham, a long retired former Abbott CEO, directly lobbied members of Congress seeking to strip the Department of Health and Human Services (HHS) of any discretion over setting Medicare reimbursement for drugs at anything other than AWP. Mr. Hodgson was offered up as an Abbott corporate designee in other AWP-related litigation and testified extensively on AWP-reimbursement issues. In August 2007, Abbott and Mr. Burnham sought protective orders for Mr. Burnham and Mr. Hodgson's deposition. *See* Docket # 4774.

On January 31, 2008, Magistrate Bowler granted the motion for a protective order contingent upon the United States' completion of certain Rule 30(b)(6) depositions; Judge Bowler left open the taking of Mr. Burnham and Mr. Hodgson's depositions should those Rule 30(b)(6) depositions inadequately inform the United States of Mr. Hodgson and Mr. Burnham's role on the conduct at issue. The purpose of deposing these witnesses was not to learn about certain topics but to learn about their direct knowledge and approval of the conduct at issue.

As briefly discussed below, the Rule 30(b)(6) depositions proved to be an insufficient proxy for Mr. Burnham and Mr. Hodgson's direct testimony about their knowledge and conduct on the matter at issue.  In her March 13, 2008 ruling on the United States's Objections to the January 31, 2008 ruling on the protective orders sought by these witnesses, Judge Saris suggested that the depositions of Mr. Hodgson and Mr. Burnham should occur; the failure of the Rule 30(b)(6) depositions discussed below weigh heavily in favor of allowing them to finally proceed.

**Cynthia B. Sensibaugh**.  Abbott designated Ms. Sensibaugh as a Rule 30(b)(6) on various lobbying topics, including Abbott's lobbying efforts on the 1997 Balanced Budget Act. Various proposals in connection with that legislative activity included permitting HHS to use actual acquisition prices to set reimbursements and/or giving HHS the discretion to set reimbursement as appropriate.  Mr. Burnham led and was directly involved in those efforts, personally authorizing expanded lobbying efforts and calling at least two Congressmen; the goal of these efforts was to prevent HHS from having more discretion in setting Medicare drug reimbursement levels.  This testimony is critical in that it addresses Abbott's defenses rooted in government knowledge and approval.

Ms. Sensibaugh  could not testify about deliberations involving Mr. Burnham and Mr. Hodgson on the decision to take the position against allowing HHS to use actual acquisition cost information and/or to have discretion to set Medicare drug reimbursement levels.  Indeed, Abbott counsel objected to all questions regarding Mr. Burnham and Mr. Hodgson's involvement in these events as "beyond the scope" of the witnesses authorization to testify as a Rule 30(b)(6) witness:

> Q.                        But sitting here today, is it basically your testimony that you can't tell me who specifically, whether it's one or more persons, authorized Abbott's taking the position that Medicare drug reimbursement should be at 95 percent of AWP with no discretion to the Secretary, at least as set forth in 1997?

MS. TABACCHI:      Object to the form. Beyond the scope.

THE WITNESS:      That is correct.

BY MR. GOBENA:      And if I wanted to find out whether Mr. Burnham was involved in the decision-making process with regard to Abbott's position on the Medicare drug reimbursement issue, I would have to talk to Mr. Burnham; isn't that correct?

MS. TABACCHI:      Object to the form. Beyond the scope.

THE WITNESS:      I think you would be able to consult his affidavit where he talks about that he wasn't involved in the day-to-day activities.

BY MR. GOBENA:      I understand you're talking about an affidavit that was drafted on his behalf, but – you're not pointing to deposition testimony. But, if I wanted to get down to specifics, I would have to talk to him; isn't that correct?

MS. TABACCHI:      Object to the form. Beyond the scope.

THE WITNESS:      I mean, again, I think he makes it clear in his affidavit.

Exhibit 9, Cynthia Sensibaugh Rule 30(b)(6) Deposition Transcript at 103-104.  The witness was unprepared to testify about Mr. Burnham's well-documented role in directing and participating in forming and advocating Abbott's position on government drug reimbursement policies.  All Ms. Sensibaugh could do was to point to the three page know-nothing affidavit filed on Mr. Burnham's behalf by his counsel.  Abbott claimed the questioning was beyond the scope of what the witness was authorized to testify about on behalf of the company; however, it was Abbott that offered her as a substitute for Mr. Burnham's knowledge on this very issue.

Further, as detailed in previous briefing, Mr. Burnham was personally involved in lobbying against HHS having discretion over Medicare drug reimbursements.  Ms. Sensibaugh was completely unable to provide testimony on his efforts:

Q.      Mr. Burnham did lobby with respect to the Medicare drug reimbursement issue in 1997; isn't that correct?

MS. TABACCHI:          Objection as beyond the scope.

THE WITNESS:          It looks like – from this letter, it says there was a call with Congressman Archer where they discussed this issue.

BY MR. GOBENA:          You don't – well, strike that. Did you personally participate in the call that's reflected in the August 5 letter from Mr. Burnham to Mr. Archer about the Medicare drug reimbursement issue?

MS. TABACCHI:          Objection as beyond the scope.

THE WITNESS:          No, I don't remember participating in any call.

BY MR. GOBENA:          Do you know whether Mr. Landsidle participated in that call between Mr. Burnham and Mr. Archer in 1997 about the Medicare drug reimbursement issue?

MS. TABACCHI:          The same objection.

THE WITNESS:          No, I don't know.

BY MR. GOBENA:          Isn't it fair to say that the only way to find out what was actually said in that call with Mr. Burnham and Mr. Archer is to talk to Mr. Burnham about that call? Isn't that true?

MS. TABACCHI:          Objection. Beyond the scope.

THE WITNESS:          Well, again, I would refer to his affidavit where he says he doesn't have any recollection.

*** 

Q.          And if Mr. Burnham was being asked to lobby on a particular legislative issue or development, it was because that was an important legislative development; isn't that correct?

MS. TABACCHI:          Objection. Beyond the scope.

THE WITNESS:          Yes, or one where they thought his expertise and knowledge would be important to share.

BY MR. GOBENA:          Do you believe, then, that one of the reasons why Mr. Burnham was being asked to lobby on the Medicare drug

| | reimbursement issue is because he had some important expertise or knowledge that might help advance Abbott's position on the – with respect to the House version of the Medicare drug bill? |
|---|---|
| MS. TABACCHI: | Objection. Beyond the scope. |
| THE WITNESS: | Yes, I don't know – you know it's not clear the particular reason here. |
| BY MR. GOBENA: | So, it could be either that he has expertise or it could be that it's important. But that's – generally, those are the two scenarios where Mr. Burnham would be asked to weigh in on Abbott's lobbying efforts on a legislative development, correct? |
| MS. TABACCHI: | Object. Beyond the scope. |
| THE WITNESS: | I would say those could be two, I mean, there could be possibly others you could probably think of. |

*Id.* at 121-122, 127.  To the extent she relied on Mr. Burnham's know-nothing declaration, the witness' responses were wrong; Mr. Burnham's declaration contains no information on his direct lobbying efforts in 1997 on Medicare drug reimbursement issues.

**Michael Sellers**.  Abbott offered Mr. Sellers as a Rule 30(b)(6) witness on a variety of topics, including how Abbott determined the prices it reported to the compendia relied upon by the government to set drug reimbursement levels. He was completely unprepared to testify about Mr. Hodgson or Mr. Burnham's knowledge or involvement in the issues in this case.

| Q. | Okay. In prepping for today's deposition, did you do any inquiry to find out what the involvement was of Tom Hodgson in any of the topics that are at issue in today's deposition? |
|---|---|
| MS. TABACCHI: | Object to form. |
| THE WITNESS: | No. |

| | |
|---|---|
| Q. | What about Duane Burnham? |
| A. | No. |
| Q. | That was the same question with regards to Duane Burnham. You didn't research anything with regard to Mr. Burnham's involvement with regard to any of those subject matters on the topics at issue today? |
| MS. TABACCHI: | Object to form. |
| THE WITNESS: | No. I did not. |

Exhibit 10, Michael Sellers Rule 30(b)(6) Deposition Transcript at 38.

**David Fishman**.  Abbott offered Mr. Fishman as a Rule 30(b)(6) witness on corporate compliance matters.  As noted before, he did not prepare himself in any way to discuss Mr. Burnham or Mr. Hodgson's knowledge on this subject matter area.

| | |
|---|---|
| Q. | Okay. Did you do anything to research what Mr. Hodgson or Mr. Burnham's role was in compliance matters at any time from '91 through 2003? |
| A. | Neither of them would have been there that long, but in the period they were there, no. |

Exhibit 11, David Fishman Rule 30(b)(6) Deposition Transcript at 217.

***

At oral argument on January 31, 2008, Abbott promised the Court and the United States that these witnesses would provide substitute testimony sufficient to obviate the need for testimony about (1) Mr. Burnham and Mr. Hodgson's knowledge and approval of Abbott's pricing conduct and (2) their personal involvement on Medicare drug reimbursement issues.

Yet, at Ms. Sensibaugh's March 7, 2008 deposition, Abbott counsel objected to questions Mr. Burnham and Mr. Hodgson's direct involvement in lobbying matters as being beyond the

12

scope of the Rule 30(b)(6) deposition.  The objection was inconsistent with the representations made to the Court about the purpose and value of the proffered substitute testimony.  Regardless, none of the witnesses proved to be an adequate substitute for Mr. Burnham and Mr. Hodgson's testimony on these matter regarding their documented, direct role in the issues in the case.

Magistrate Judge Bowler indicated that the protective order for these witnesses can and should be revisited if the Rule 30(b)(6) testimony prove inadequate.  Judge Saris has indicated that these depositions should be permitted to occur.  *See* Exhibit 12, March 13, 2008 Electronic Endorsement.  Mr. Hodgson and Mr. Burnham's direct testimony is the only method of obtaining their direct knowledge on (1) their personal knowledge and approval of the pricing conduct at issue in this case, (2) their knowledge and approval of Abbott's lobbying positions on drug reimbursement issues, and (3) their direct participation in lobbying on drug reimbursement issues.  All of these issues go directly to Abbott's scienter in this case.

## III.    CONCLUSION

For the reasons set forth above, the United States respectfully asks this Court to grant its motion to compel the documents and testimony identified above.

Respectfully submitted,

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
 U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA  02210
Phone:  (617) 748-3272
Fax:  (617) 748-3971


R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax:  (305) 536-4101


For the relator, Ven-A-Care of the
Florida Keys, Inc.,

James J. Breen
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL  33027
Phone:  (954) 874-1635
Fax:  (954) 874-1705

JEFFREY S. BUCHOLTZ
ACTING ASSISTANT ATTORNEY
GENERAL


 /s/ Renée Brooker
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088
Fax:  (202) 305-7797

14

## CERTIFICATION

The undersigned counsel certifies pursuant to LR 7.1(a)(2) that he has conferred with counsel for the Defendant Abbott on the issues raised in this motion and have not been able to reach agreement.

Dated:  March 31, 2008

/s/    Gejaa T. Gobena
Gejaa T. Gobena


## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **United States' Motion to Compel**, to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated:  March 31, 2008

/s/    Gejaa T. Gobena
Gejaa T. Gobena