# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

-----------------------------) Civil Action

This document relates to:       ) No. 01-12257-PBS

United States of America,       )

ex. rel. Ven-a-Care of the      )

Florida Keys, Inc.,             ) Hon. Patti Saris

    vs.                         )

Abbott Laboratories, Inc.,      ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

-----------------------------X


VIDEOTAPED DEPOSITION OF

ALEXANDRA GRIGORAS BUCK

MARCH 13, 2008

CHICAGO, ILLINOIS

Buck, Alexandra Grigoras                            March 13, 2008
                        Chicago, IL

34

1   contract with them?
2       A.  I don't think Abbott does.  I believe -
3   - I don't know.  I don't know who has the
4   contract with them.
5       Q.  Okay.  And what was their charge?  What
6   was their responsibility?
7       A.  Their --
8       MR. WINCHESTER:  Object to the form.
9       THE WITNESS:  They -- I believe they
10  were charged with processing any electronic data
11  and scanning hard copy documents to put in some
12  sort of reviewable platform.
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  And what electronic data did they
15  review --
16      A.  I don't know specifically.
17      Q.  -- in that process?
18      A.  They didn't review any that -- I don't
19  know specifically.
20      Q.  Who furnished the data to them?
21      A.  Well, it's Abbott's data.
22      Q.  Okay, what Abbott data was provided to

35

1   CompuJet?
2       A.  I don't know.
3       Q.  Or CompuLit.
4       A.  I don't know specifically.
5       Q.  Who would know?
6       A.  I don't know.
7       Q.  Well, do you know why they weren't
8   asked to -- why they didn't search -- well, let
9   me ask you this.  You know that they did a search
10  for e-mail from 2002 to 2004, right?
11      A.  That was one of the searches that I
12  specifically asked them about.
13      Q.  Okay, what other searches did you ask
14  them about?
15      A.  I didn't ask them specifically about
16  any other search.
17      Q.  What -- do you know what other searches
18  they performed?
19      A.  No.
20      Q.  Did they ever search for data that
21  predated -- or e-mail that predated '02?
22      A.  Yes.

36

1       Q.  Okay, and when did they do that?
2       A.  I don't know when specifically they did
3   it.
4       Q.  Okay, what was the date range for that
5   data that they searched?
6       A.  Anything -- there was no date range.
7   So basically the -- no, that's not right.  They
8   also searched for data from anytime prior to
9   2003.
10      Q.  And what did they search looking for
11  that data?
12      A.  I don't understand the question.
13      Q.  Sure.  What -- did they search a
14  computer or did they search a particular hard
15  drive, did they search back-up tapes?  What did
16  they search?
17      A.  They searched e-mail or PST files.
18      Q.  Okay, and what e-mail or PST files did
19  they search?
20      A.  It was e-mail -- or it was PST files
21  that resided on share drives.
22      Q.  Okay, what shared drives?

37

1       A.  I believe it is a share drive that
2   currently sits at Hospira.
3       Q.  And what is the date range of the data
4   in that share drive at Hospira?
5       A.  I -- the share drive, I assume,
6   contains a lot more than just PST files.
7       Q.  Well, I'm sorry, let me limit it to e-
8   mail and PST files.
9       A.  I don't know the date range of every
10  single PST file that resides on that share drive,
11  but I do know that the search of those share
12  drives was conducted and the date cull was
13  anything prior to 2003.
14      Q.  And did they find anything prior to
15  2003?
16      A.  Yes, they did.
17      Q.  And how many e-mail did they find?
18      A.  I believe it was in the range of --
19  well, I don't know exactly what -- how many e-
20  mails were responsive to the -- that search, but
21  I do know, as a result of that search, counsel
22  for Abbott produced somewhere in the realm of

Buck, Alexandra Grigoras                    March 13, 2008
Chicago, IL

11 (Pages 38 to 41)

**38**

1   17,000, 18,000 e-mails.
2       Q.  Is that their recent production that
3   we've received over the past couple of weeks, do
4   you know?
5       A.  That, I don't know.
6       Q.  When was this search conducted?
7       A.  I don't know.
8       Q.  Do you know what the earliest e-mail
9   was -- the earliest e-mail -- the date of the
10  earliest e-mail that was produced?
11      A.  I don't know.
12      Q.  Okay, going back to Miss Markasey, do
13  you know what the exact six dates were that were
14  searched for this '02 through 2004 search?
15      A.  Unfortunately, I don't.
16      Q.  Okay.  Now, what is de-dupe?
17      A.  De-dupe means de-deduplication.  So if
18  one exact copy of a file exists, we would take
19  that out, and you find that by comparing what is
20  called an MD5 hash ID.  Every electronic document
21  has its own unique MD5 hash ID.  Therefore, if
22  two documents have the same MD5 hash, they're

**39**

1   absolutely the same 1s and 0s in every way, shape
2   and form.
3       Q.  So you can just take out the duplicate?
4       A.  Correct.
5       Q.  Okay.  And is that what you meant by
6   comparing the MD5 hash identifier?
7       A.  Correct.
8       Q.  Okay, so as part of the -- when you
9   said "MD5" -- and is it M or N?
10      A.  M as in Mary.
11      Q.  Okay.  That's the process of culling
12  out the duplicate document?
13      A.  Correct.
14      Q.  Okay, and what does it mean when you
15  de-duped by custodian as opposed to some other --
16  whatever you said?
17      A.  Sure.  The most conservative way of de-
18  duping is de-duping by custodian, meaning I'm
19  only going to look at this one person and take
20  out his or her duplicates.
21          You can also de-dupe across the matter,
22  where if Custodian A, B and C each had that same

**40**

1   document, you would take out all of those
2   instances except for one.  CompuLit did not do
3   that.  They just did it by custodian.  So if that
4   exact document was in three custodian's bins, it
5   remained in three custodian's bins.
6       Q.  Okay.  Is the same true not just for e-
7   mail, but also attachments to e-mail?
8       A.  It is.
9       Q.  Okay.  Is there -- what else -- what
10  else did you discuss with Miss Markasey?  It
11  sounds like a lot in ten minutes.
12      A.  Well, that's actually it.
13      Q.  Okay, were there any other
14  specifications used to cull and process the
15  electronic data?
16      A.  I'm sure there were, but it was not
17  what I asked about.
18      Q.  Okay, did you learn -- outside of your
19  conversation with Miss Markasey, did you learn
20  anything more about the specifications used to
21  cull and process electronic data?
22      A.  That's a very broad question.

**41**

1       Q.  Oh.  Well, can we parse it down to --
2   well, let me -- did you speak with anyone else
3   about the specifications used to cull and process
4   the e-mail data?  Let's start there.
5       A.  Yes.
6       Q.  Okay.
7       A.  I --
8       Q.  What did you learn?
9       A.  Well, I spoke to my attorneys, so Carol
10  and Jason.
11      Q.  Okay.
12      A.  So I'm not sure --
13      Q.  Well, what -- well, let me ask you.
14  What did Abbott do in its -- to -- what the
15  specifications -- you know what?  We'll get into
16  that in a second.  Why don't we finish these
17  individuals.
18      A.  Okay.
19      Q.  Is there anything else that you can
20  recall about your conversation with Miss
21  Markasey?
22      A.  No.

Buck, Alexandra Grigoras
Chicago, IL
March 13, 2008

14  (Pages 50 to 53)

**50**

1    Q.  Okay, so he issued that '97 Lit Hold?
2    A.  Right.  I think -- I believe we saw his
3  name on that document, and that's why we went to
4  talk to him.
5    Q.  And what did you learn about the
6  issuance of that Lit Hold -- well, let me ask
7  you, was it -- did he also collect information
8  for the -- for the response to the HHS subpoena?
9    A.  I'm not sure that he personally
10  collected information.
11    Q.  Okay, well, did he request that?  Did
12  he manage that?
13    A.  We didn't get into that -- the -- his
14  collection efforts.
15    Q.  Okay.  What did you learn from him
16  about the Lit Hold Memo?
17    A.  About the Lit Hold Memo?
18    Q.  Yeah, or the -- strike that.
19        What else did you learn from him?
20    A.  I learned that he issued the Litigation
21  Hold Memorandum, and I learned that he requested
22  that a snapshot of HPD back-up tapes be placed on

**51**

1  hold.
2    Q.  What are HPD back-up tapes?
3    A.  HPD is -- was Abbott's Hospital
4  Products Group --
5    Q.  Okay.
6    A.  -- and, apparently, that group's IT
7  people had some back-up tapes related to HPD
8  servers.
9    Q.  Do you know which servers?
10    A.  I don't.
11    Q.  And do you know what was on the back-up
12  tapes?
13    A.  I know that the snapshot was from
14  September 1st, '97 through October 31st, '97.
15    Q.  Okay, did you request any other back-up
16  tapes --
17    A.  No.
18    Q.  -- for any other period?
19    A.  No.
20    Q.  So the snapshot was just for this
21  basically two-month period?
22    A.  Correct.

**52**

1    Q.  Why did he request the snapshot for
2  this two-month period?
3    A.  I don't know.
4    Q.  And did you learn about what happened
5  to these back-up tapes?
6    A.  The back-up tapes are still in Abbott's
7  possession.
8    Q.  And has Abbott searched those back-up
9  tapes for responsive information responsive to
10  any requests for production served upon it by the
11  United States?
12    A.  The back-up tapes are inaccessible.
13  They are very, very old back-up tapes with very,
14  very old applications on them.  So, no, it would
15  be unbelievably costly for us to search them.
16    Q.  What has Abbott done to try to
17  ascertain the feasibility of accessing the
18  information on these back-up tapes?
19    A.  I --
20    Q.  Well, you just said it was costly and
21  that they're very old.  What has -- how has
22  Abbott determined that they are inaccessible and

**53**

1  it would be very costly to either, you know --
2    A.  Oh, okay.
3    Q.  -- access the information or
4  reconstruct the information or what have you?
5    A.  Sure.  The -- well, most of them we
6  don't know exactly what type of application they
7  were created with, and there was -- for example,
8  during that time, Abbott was under the MS Mail
9  umbrella, and if any of those e-mails contained
10  MS Mail data, we have no way to recreate that
11  environment.  There would be no way for Abbott to
12  access that data and review it.
13    Q.  Would there have been a way in '97 when
14  Mr. Rivera requested --
15    A.  I don't --
16    Q.  -- them?
17    A.  I don't know.  And, frankly, in '97,
18  the cost of back-up tapes and restoration was
19  expedientially higher than it is today.
20    Q.  Well, would it have been possible just
21  to blow back hard copies of the information?
22    A.  No.

Buck, Alexandra Grigoras

March 13, 2008

Chicago, IL

35 (Pages 134 to 137)

---

**134**

1    Q.  When you say "negotiated," what do you
2  mean?
3    A.  It was under that court order that we
4  talked about earlier.  There were 39 individuals
5  identified with the attorneys in the MDL as the
6  key folks who would have data related to AWP.
7    Q.  Do you know who negotiated this?
8    A.  Our attorneys, Jones Day.
9    Q.  But who were they negotiating with?
10   A.  The MDL attorney, plaintiffs'
11  attorneys.
12   Q.  Do you know which case --
13   A.  I don't.
14   Q.  -- which MDL case?
15   A.  I don't.
16   Q.  Other than doing that search for that
17  list of 39 names for PST files on the Hospira
18  server --
19   A.  On the share drive, right?
20   Q.  On the share drive.  (Continuing) --
21  what else has been done to search the shared
22  drive of the Hospira -- well, let me ask you this

---

**135**

1  first.  Is the Hospira server the former HPD
2  server?
3    A.  It is.
4    Q.  Okay.
5    A.  Well, it contains the data from HP.
6  I'm not sure if it's physically the exacte same
7  server.
8    Q.  Okay, but it contains the data?
9    A.  Correct.
10   Q.  Okay.  Other than searching for this
11  list of -- well, first, you don't have the list
12  of 39 names?
13   A.  I do not.
14       MS. ST. PETER-GRIFFITH:  Jason, can we
15  get that?
16       MR. WINCHESTER:  Sure.
17  BY MS. ST. PETER-GRIFFITH:
18   Q.  The --
19       MR. WINCHESTER:  You won't have any
20  surprises.
21       MS. ST. PETER-GRIFFITH:  Okay.  And I'm
22  assuming when she's talking about negotiations --

---

**136**

1  Jason, you know this better than I.  I am not
2  aware of any negotiations.  Is this a different
3  MDL plaintiff?
4       MR. WINCHESTER:  This was -- and it was
5  well before my time.
6       MS. ST. PETER-GRIFFITH:  Oh, okay.
7  Then it was before my time too.
8       MR. WINCHESTER:  It was -- this was as
9  a part of the process by which the Court ordered
10  -- and I believe it was the original MDL 1456 --
11      MS. ST. PETER-GRIFFITH:  Okay.
12      MR. WINCHESTER:  -- case --
13      MR. ANDERSON:  Class.
14      MR. WINCHESTER:  -- class case --
15      MS. ST. PETER-GRIFFITH:  Okay.
16      MR. WINCHESTER:  -- in which the Court
17  order to restore the tapes came out.  There was a
18  negotiation and a determined list of custodians
19  for whom the search would be made in the context
20  of backing up -- of restoring those back-up
21  tapes.
22      MS. ST. PETER-GRIFFITH:  Okay.

---

**137**

1       MR. WINCHESTER:  That's -- don't quote
2  me on any of that.  It was well before my time,
3  but that is -- that is the sum -- sum and
4  substance of my understanding of what happened.
5       MS. ST. PETER-GRIFFITH:  Okay.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Other than searching for that list of
8  39 on the former HPD server or server information
9  that is now with Hospira --
10   A.  Right.
11   Q.  -- what has been done to search the
12  former HPD server information at Hospira for
13  response -- documents responsive to the United
14  States's request for production?
15   A.  So prior to the spin, the managers and
16  individuals that were subject to the record hold
17  also searched that server for all the PST files
18  on there and printed out the e-mails, the same
19  process that we talked about earlier.  So, again,
20  it's sort of a redundant process, but, again,
21  sort of belt-and-suspenders sort of search.  So
22  those e-mails should have been printed or

---

Buck, Alexandra Grigoras                          March 13, 2008
                        Chicago, IL

---

138

1    produced electronically by those custodians.
2        Q.  So -- but that's -- that's --- that's
3    going back to what Miss Klaus was discussing in
4    terms of the collection of information?
5        A.  Correct.  So what I'm saying is that
6    repository on the share drive was also a
7    repository that was searched by those custodians
8    at the time when they were asked to print and --
9    throughout the collection process.
10       Q.  Okay, so the peo -- the individuals who
11   received the lit hold memos --
12       A.  You got it.
13       Q.  -- and who the paralegals may have sat
14   down with?
15       A.  Correct.
16       Q.  Other than what I will call the sort of
17   Miss Klaus initiative to collect lit hold
18   responsive documents and this search for the list
19   of 39 on the Hospira server --
20       A.  Okay.
21       A.  -- for the former HPD server
22   information --

---

139

1        A.  Right.
2        Q.  Is that fair?
3        A.  Right.
4        Q.  Okay, other than those two search
5    initiatives, what else has Abbott done to --
6    Abbott or Hospira on behalf of Abbott done to
7    search for -- to search the former HPD server for
8    documents -- for e-mails responsive to this
9    request to the United States's production
10   request?
11       A.  I'm -- other than the two efforts that
12   you just mentioned, I'm not aware of other
13   efforts.
14       Q.  Okay.  When did Abbott search or Abbott
15   or Hospira or Abbott's vendor search for the 39
16   files?
17       A.  I don't know the date.  And can I just
18   backtrack for a minute?
19       Q.  Sure.
20       A.  The -- the back-up tapes that we were
21   required to restore would also have been
22   duplicative or at least probably partially

---

140

1    duplicative of the e-mail that was -- the PSTs
2    that were stored on the network share.
3        Q.  Okay.
4        A.  And so, you know, there is likely some
5    overlap.
6        Q.  When you say "network share," you're
7    talking about the Hospira, former HPD?
8        A.  You got it.
9        Q.  Okay, as distinguished from the Lotus?
10       A.  Yes, yes, yes, yes.
11       Q.  Okay.  So other than those two
12   initiatives, was anything else done?
13       A.  Well, the back-up tape restoration and
14   search.
15       Q.  Okay, great.
16       A.  Okay.
17       Q.  Did the back -- did the search for the
18   39 names -- or let me ask you this.  Was the
19   back-up restoration and the search for the 39
20   names sort of the same thing --
21       A.  Well --
22       Q.  -- or was it the same search?

---

141

1        A.  Not exactly.  So --
2        Q.  Okay.
3        A.  -- the back-up tapes were the back-up
4    tapes saved pursuant to the Medi-Cal 2001
5    subpoena.
6        Q.  Right.
7        A.  Any back-up tapes that contained one of
8    those 39 individuals was, under Court order,
9    restored, and documents from 2002 to 2004 --
10   again, that was pursuant to that other Court
11   order -- were restored.
12       Q.  Okay, I got you.
13       A.  Okay.
14       Q.  So what you're saying is that basically
15   there were two searches, the search of the
16   restored data and the search on the server for
17   the 39 files?
18       A.  For the share drives, correct.
19       Q.  For the shared, okay.
20       A.  Correct.
21       Q.  Okay.
22       A.  But the file share search did not have

---

Buck, Alexandra Grigoras                                March 13, 2008

Chicago, IL

37 (Pages 142 to 145)

---

**142**

1    that -- you know, it was from 2003 back.
2        Q.   Okay, when you say "the file share
3    search," you're talking about the search of the
4    HPD server?
5        A.   Yes.
6        Q.   Okay.
7        A.   Sorry.
8        Q.   That's okay.  That was from 2003 back
9    to when, to --
10        A.   There was no beginning tape limitation.
11        Q.   Okay.  And how many documents
12    approximately did that garner for these 39 files?
13        A.   I don't know the -- what the result of
14    the search hits were prior to our attorneys'
15    review, you know, to cull out anything privileged
16    or non-responsive --
17        Q.   Okay.
18        A.   -- but I know we produced about 17 to
19    18 thousand e-mails as a result of that search.
20        Q.   Okay, so that's the 17 to 18 thousand
21    that you were referencing earlier?
22        A.   Correct.

---

**143**

1        Q.   Okay.  Other than that search, has
2    anything else been done to search the HPD server
3    which is -- or server information which is now
4    with Hospira?
5        A.   So that server may also contain things
6    other than PSTs, right?  They could contain just
7    --
8        Q.   Yeah, okay.
9        A.   -- documents.  So those were also
10    printed out.  I just want to make sure that we're
11    clear --
12        Q.   Sure.
13        A.   -- that it does not -- or it may not --
14        Q.   It does not collect the e-mail?
15        A.   Right, it's not an e-mail server.
16        Q.   Okay, we were going to jump into
17    additional documents shortly --
18        A.   Okay.
19        Q.   But -- so keep that thought.
20        A.   Okay.
21        Q.   Have we exhausted your knowledge of
22    what Abbott has done to search for e-mails?

---

**144**

1        A.   I believe so, yes.
2        Q.   Okay.  So does Abbott believe that it
3    has done a complete search for all e-mail?
4        A.   Absolutely, and we've doubled the
5    efforts and double checked and triple checked.
6        Q.   What about searching for e-mail beyond
7    the 39 individuals that were searched on the HPD
8    server?
9        A.   Well, certainly more than 39
10    individuals were subject to the record hold.  So,
11    again, back to that -- the searching when the
12    employees printed out or gave their e-mail to us
13    that went beyond the 39 employees, those 39
14    employees are the people most likely to have
15    documents or data relevant or responsive to
16    claims in this suit.
17        Q.   Well, at least as negotiated in the
18    first MDL, right?  Maybe not necessarily this MD
19    -- maybe not necessarily in this case?
20        A.   No, it's for this case as well.
21        Q.   Why do you say that?
22        A.   Because there -- all those 39 people

---

**145**

1    have been deposed in this case, and they are the
2    most likely individuals to have relevant data.
3        Q.   Okay, other than for the thirty -- let
4    me ask you.  Did anyone do a comparison of what
5    the 39 individuals printed out and produced, you
6    know, during the course of the collect -- the
7    Ellen Klaus search for documents pursuant to the
8    lit hold memos, did anyone compare those
9    documents to what was garnered from their files
10    on the server?
11        A.   That would be a Herculean efforts since
12    we produced millions and millions of paper
13    documents.  So, no, nobody has done that compare.
14        Q.   Were you able to ascertain whether or
15    not there were documents that were found on the
16    server for these 39 individuals that were not
17    previously produced?
18        A.   I don't know the answer to that.
19        Q.   Okay.  Did anything with regard to the
20    search for the 39 individuals on the server
21    trigger any sort of inquiry as to whether or not
22    -- or trigger any question about whether or not

---

Buck, Alexandra Grigoras                              March 13, 2008
                              Chicago, IL

                                43  (Pages 166 to 169)

---

166

1  course.  It was -- it's not common practice.  It
2  still is not common practice because that e-mail
3  was preserved by the individuals.
4      Q.  Okay, I understand it's not common
5  practice, but in '96 -- let me just confirm that,
6  pursuant to the '96 CID or any other requests
7  from the federal government up to the present,
8  Abbott never did this identification of a
9  particular server in having it skipped over in
10  the deletion process like what occurred for Medi-
11  Cal?
12     A.  That's incorrect.  We've -- we talked
13  about that '97 incident --
14     Q.  Okay, I'm sorry.
15     A.  -- for Mr. Rivera.
16     Q.  Other than the snapshot, other than the
17  '97 snapshot.
18     A.  And I can speak with respect to the HPD
19  data, that, that is correct, as a general
20  practice, Abbott did not pull back-up tapes from
21  rotation in response to litigation holds.
22     Q.  Okay, why not?

---

167

1      A.  It is absolutely not feasible to do it,
2  it is not practicable -- practical, it is not
3  reasonable to do it as a corporation.
4      Q.  But you could have?
5      A.  No.
6      Q.  Why?
7      A.  We would have -- we could have gone out
8  of business because we would have been spending
9  all of our money on back-up tapes.  It was
10  absolutely not feasible.
11     Q.  Well, could you -- could you have done
12  something to -- instead of putting it -- the
13  information on back-up tapes, could you have put
14  it on either -- a separate server?
15     A.  No.
16     Q.  Why not?
17     A.  Too much information.  That's the whole
18  point of back-up tapes.  There's no other
19  feasible way to compress the information.  Again,
20  we would have gone out of business.
21     Q.  You would have gone out of business
22  having a separate server?

---

168

1      A.  It's not just one separate server.
2  You're constantly creating new information.  The
3  whole point of back-up tapes is for disaster
4  recovery.  It is not feasible, nor it was it
5  feasible at that time, to replicate all the
6  company's data.
7      Q.  Well, I'm not talking about all the
8  company's data.  I'm talking about the HPD data -
9      A.  Okay.
10     Q.  -- that was responsive to the lit hold
11  memos, let's start there, or responsive to the
12  discovery requests propounded by the United
13  States.
14     A.  Um-hum.
15     Q.  It -- you're telling me it was
16  impossible to backup that information on a
17  separate server?
18     A.  All of HPD's data to be backed up on a
19  separate server on a daily basis?  There's just
20  no way to do that.  Or there was no way to do
21  that back then, and there was, frankly, no reason

---

169

1  to do it.  We were -- already implemented the
2  hold, there was no automated deletion, our
3  employees were complying with the hold.  There
4  was absolutely zero reason to do it.
5      Q.  Well, other than to have a source of
6  information in the event that the employees
7  didn't do what they were supposed to do, right?
8      A.  That is highly unlikely, and there was
9  no reason to do that.  I stand by that statement.
10     Q.  Okay, well, why -- okay, why do you say
11  it's highly unlikely?
12     A.  I think that our employees and we've
13  shown throughout the years that our employees
14  comply with record holds.  We've shown in this
15  case that they did indeed receive the record
16  holds.  They had documents, they printed them,
17  they had the record hold memos in their files,
18  and they produced documents.
19     Q.  But you didn't verify that they did
20  that, right?
21     A.  We've already been down this path, and
22  I said there's no way to verify every single

---

194

1    A.   Right.  So the Medi-Cal tapes would
2   have contained everything from that point in time
3   back from those three e-mail servers anyway.
4    Q.   Okay.
5    A.   Okay.
6    Q.   Now, the question I'm going to ask you
7   is for both e-mail --
8    A.   Um-hum.
9    Q.   -- as well as any other electronically
10  stored documents.
11   A.   Okay.
12   Q.   Okay?
13   A.   Okay.
14   Q.   We know about the searches that people
15  were supposed to do pursuant to the lit hold
16  memos.
17   A.   Okay.
18   Q.   Okay?  Other than those and other than
19  the '97 -- well, let me ask you, is the '97
20  snapshot, is that of the information that was on
21  the shared drive?
22   A.   No.  I actually can't answer

195

1   specifically because it's -- you -- we can't see
2   exactly --
3    A.   What it is.
4    A.   -- what information is on there.
5    Q.   Okay.
6    A.   It was a snap -- it appears from sort
7   of an index that some of it was just application
8   servers.  So let's say you had like -- it's -- in
9   other words, it's not even -- it doesn't even
10  actually have any actual data.  It's just
11  software.  So there were a lot of application
12  back-ups.  Some of it may contain e-mail, and I
13  am not sure whether any other share -- we can't
14  tell whether any of the share drives were part of
15  those back-ups.
16   Q.   Okay.  Well, let me ask you, when did
17  Abbott know that it could search the Medi-Cal
18  back-up tape data?  When was that capability in
19  place?
20   A.   Well, we could -- we could not search
21  it until we ordered to restore it because it was
22  inaccessible prior to the restoration.

196

1    Q.   Oh, Okay, so after the restoration --
2    A.   Right.
3    Q.   -- when did that occur?
4    A.   Oy.  I don't know.
5    Q.   Okay.  Well, is it fair to say that,
6   after that occurred, that then you could access
7   that e-mail?
8    A.   Yes, we could access the e-mail that
9   was restored --
10   Q.   That was restored?
11   A.   -- from the tapes that was restored.
12  You got it.
13   Q.   But the only reason why you had those
14  tapes was because someone put a hold on them when
15  they were doing that --
16   A.   In 2001.
17   Q.   -- in 2001?
18   A.   Correct.
19   Q.   Okay, and that's why you didn't have a
20  snapshot of before then?
21   A.   Right, because --
22   Q.   Because there --

197

1    A.   -- it wasn't on hold.
2    Q.   Because there wasn't a hold that was
3   placed on the circulating 30-day whatever it is?
4    A.   Correct.
5    Q.   Okay.  See, you're teaching me a lot
6   about these computers.  Now, we have the e-mail
7   server.  Let's take that out.
8    A.   Okay.
9    Q.   We've -- I think we've covered that.
10   A.   Right.
11   Q.   We've got the Medi-Cal restored
12  information.
13   A.   Right.
14   Q.   Okay, we have the snapshot.  We're not
15  sure where exactly that was drawn from --
16   A.   Right.
17   Q.   -- because we can't read it --
18   A.   Right.
19   Q.   -- right?  Okay.  We have the Ellen
20  Klaus instructions, Print off your information
21  that you've got on your computer --
22   A.   Correct.

Buck, Alexandra Grigoras

March 13, 2008

Chicago, IL

51 (Pages 198 to 201)

---

**198**

1    Q. -- if it's responsive and provide it,
2  okay?
3    A. Right.
4    Q. What other searches for electronic
5  information were done let's start with on the HPD
6  server?
7    A. Well, again, there's not just one HPD
8  server.
9    Q. Okay.
10   A. Okay.
11   Q. Well, let's cover that then. When
12 we're talking about the HPD server, how many
13 servers, non-e-mail servers are we talking about?
14   A. No idea. It could -- nobody keeps --
15 Abbott does not keep track of how many servers
16 supported a division over a period of time.
17         What we know is that there were three
18 e-mail servers that -- at that 2002 to 2004 time
19 frame and there were -- there were shared drives
20 on the network somewhere, and those shared drives
21 now sit at Hospira on one, two, three servers. I
22 don't know how they have their data parsed out.

---

**199**

1    Q. Oh, okay.
2    A. In terms -- I mean they could have --
3  HPD could have had had hundreds of application
4  servers. I don't know -- there's no way to -- to
5  get that information.
6    Q. Okay, how many shared drives were
7  there?
8    A. I don't know. I don't know the number
9  of share drives.
10   Q. Is it fair to say that those that were
11 in exist -- those shared drives that were in
12 existence at the time of the Hospira spin went to
13 Hospira?
14   A. I know that is true for the Alt Site
15 shared drives.
16   Q. Okay, what about HBS? Hospira
17 Business, I think.
18   A. Thank you.
19   Q. Okay.
20   A. I don't know.
21   Q. Okay. But Alt Site, which was a
22 component that almost wholesale went to Hospira,

---

**200**

1  that -- those servers -- those shared drives
2  went, but we don't know how many?
3    A. That is my understanding.
4    Q. Okay. Let's start with the shared
5  drives.
6    A. Um-hum. Yes.
7    Q. What has been done -- other than what
8  we've talked about in terms of Ms. Klaus's
9  search, what has been done by Abbott to search
10 those shared drives for information responsive to
11 either subpoenas served by HHS OIG or production
12 requests served by the United States in this
13 litigation or the Relator in this litigation?
14      MR. WINCHESTER: Objection, form.
15      THE WITNESS: Other than the efforts of
16 Miss Klaus through the printing process, I'm not
17 aware of an electronic search that was conducted
18 on the shared drive except for the PSTs, as we've
19 discussed, because all those PSTs resided on
20 their shared drives.
21 BY MS. ST. PETER-GRIFFITH:
22   Q. Okay, now, I want to make sure that the

---

**201**

1  PSTs are the computer-saved e-mail, is that
2  right, that are on the shared drive as opposed to
3  on the live e-mail account?
4    A. Well --
5    Q. Okay.
6    A. -- any Microsoft e-mail, so any Outlook
7  file is called a PST.
8    Q. Okay, so it could be like an attachment
9  or something?
10   A. No. No, no, no, no.
11   Q. Okay.
12   A. So anybody's mail file, not one --
13 don't think about individual e-mails or
14 individual attachments. We're talking about a
15 mail file, right?
16   Q. Okay.
17   A. So my e-mail file is referenced as a
18 PST. So whether it's live on the server, whether
19 I've saved it somewhere else, it's always called
20 a PST.
21   Q. Okay.
22   A. I just wanted to be very clear with

---

206

1    we can take a look to see what PST files reside
2    on the share drives. The only issue is like, for
3    example -- my e-mail log-in, for example, is
4    "buckag," okay? So if -- if I was in an Outlook
5    world and I saved a PST, you'd like to think that
6    my PST file was buckag.pst.
7        Q. Okay.
8        A. People could manipulate that. So they
9    could call it "ronaldmcdonald.pst."
10       Q. Okay.
11       A. So if the naming conventions work out
12   and you can sort of trace back and say, okay, who
13   -- okay, that identifier relates to that person,
14   I can tell how that person is, I suppose you
15   could figure out who has PST files on that share
16   drive.
17       Q. Has Abbott undertaken that initiative
18   to date?
19       A. To compile a list of --
20       Q. Let's start with compiling a list, and
21   then --
22       A. I don't know.

207

1        Q. Has Abbott undertaken anything to
2    search for those PST files that individuals
3    subject to lit hold memos may have moved to the
4    shared drive?
5        A. Yes. So we've already done the search
6    for the 39 custodians, which we've already
7    produced.
8        Q. Okay.
9        A. And we're actually in the process of
10   doing a search for any other people outside those
11   39 who have been deposed in this particular case
12   to see if they have had any PST files out on the
13   share drive.
14          Again, the majority is going to be, if
15   not all, is going to be duplicative of what we've
16   already produced in paper form, but we are -- we
17   are undertaking that effort.
18       Q. Okay, other than individuals who have
19   deposed in this case --
20       A. Okay.
21       Q. -- and other than the 39 individuals
22   that were subject to -- the list of names that

208

1    you restored for the Med -- Med --
2        A. Medi-Cal.
3        Q. -- Medi-Cal, what other initiatives is
4    Abbott undertaking to search the -- search for
5    PST files on the shared drives? And I'm assuming
6    this is all taking place either at Hospira or in
7    conjunction with Hospira.
8        A. That is correct.
9        Q. Okay, what -- other than searching for
10   the deponents and searching for those 39
11   individuals, what other searches either has
12   Abbott undertaken or does -- that Abbott intends
13   to undertake?
14       A. For PST files on the --
15       Q. For PST files on the shared drives.
16       A. That -- those are the only efforts of
17   which I'm aware at this time.
18       Q. How do you know that the PST files'
19   production will likely be duplicative of the
20   earlier production?
21       A. Because these -- all these individuals
22   were already instructed to print out the relevant

209

1    e-mails, and they were foldering and either
2    giving them to us electronically or printing
3    them. So those folders will be duplicative of
4    what they printed or Ellen printed or the
5    paralegal printed.
6        Q. Okay, so then, again, you're deferring
7    to what Ellen's testimony is as to what occurred
8    before on that?
9        A. Right.
10       Q. Okay. Why isn't Abbott undertaking any
11   other searches for PST files on the shared
12   drives?
13       A. Abbott does not believe other PST files
14   are likely to have non-duplicative, relevant,
15   responsive information in this case.
16       Q. Why not?
17       A. Because the duplicative issue, I
18   believe we've -- I have testified to at length.
19   Because the people were already requested to
20   print out the responsive e-mails, and the 39
21   people represent the individuals most likely to
22   have responsive or relevant information to this

Buck, Alexandra Grigoras                        March 13, 2008
Chicago, IL

54 (Pages 210 to 213)

210

1   case.
2        We've extended that to anybody who has
3   been deposed, and we -- Abbott does not believe
4   that other people are likely to have non-
5   duplicative, not already produced, responsive,
6   relevant information in the case.
7        Q.  Okay, now, the 39 individuals, was that
8   the most recent production, e-mail production at
9   the end of February?
10       A.  I believe that that's what it was, the
11  electronic e-mail production.
12       Q.  Okay, is that complete, the search for
13  the 39 individuals?
14       A.  I believe so.
15       Q.  Okay.  When did Abbott undertake its
16  search for PST files on the shared drives for the
17  deponents?
18       A.  We're in the process of doing that now.
19  I'm not sure when it began.
20       Q.  Okay.  Did it begin this year?
21       A.  I -- I -- I don't know.  I would be
22  guessing.

211

1        Q.  Who undertook that?  Who's undertaking
2   that initiative or search?  Who personally is
3   responsible for that?
4        A.  I assume somebody at Hospira is.  I
5   don't know what you mean.  Who's responsible for
6   physically going out and doing the search?
7        Q.  Yeah.
8        A.  I don't --
9        Q.  Who's been tasked with the
10  responsibility to do that, I guess?
11       A.  I really don't know.
12       Q.  Would the contractor do that?
13       A.  No.
14       Q.  In terms of the search of the PST files
15  for the 39 individuals, did the contractor do
16  that?
17       A.  The contractors don't come in on-site
18  either at Abbott or Hospira to pull any data.  So
19  the data gets sent to them, and then certainly
20  they can search it.
21       Q.  Okay.
22       A.  But, to my knowledge, third parties

212

1   have not gone in to extract data.
2        Q.  Okay.  So the search for the PST files
3   of the 39 individuals, that was done by someone
4   at Abbott or at Hospira?
5        A.  Correct.
6        Q.  Do you know who?
7        A.  I don't know who.
8        Q.  How long will it take to search for the
9   deponents?
10       A.  I don't know the answer to that.
11       Q.  Other than the deponents, is -- if the
12  United States or someone, a party in this
13  litigation beyond the deponents and beyond the
14  list of 39 names had a list of other names of
15  individuals, is it -- is Abbott capable of
16  searching the names of those individuals for PST
17  files that might be on the shared drive?
18       A.  I'm not sure that Abbott could
19  physically do it, but it is searchable data.
20       Q.  There's a possibility that it can be
21  done?
22       A.  Correct.

213

1        Q.  So you're doing it for the deponents
2   and you did it for the 39?
3        A.  Correct.
4        Q.  Okay.  Any other initiatives that -- I
5   think we've -- we've covered everything that
6   Abbott has done to date, right, for searches of
7   the shared drives for PST files?
8        A.  Yes.
9        Q.  Okay.  Other than the deponents, does
10  Abbott plan on doing any other searches of the
11  PST files on the shared drives?
12       A.  No.
13       Q.  If we could get you to research and get
14  back to us -- or, Jason, I'll direct the question
15  to you as to when this search for the deponents
16  started and -- and who is doing it.
17       You know, Jason, obviously, we're --
18  we've got this issue with -- as you know, with
19  the Hospira subpoena --
20       MR. WINCHESTER:  Um-hum.
21       MS. ST. PETER-GRIFFITH:  -- and Hospira
22  has told us that it is deferring to Abbott's

Buck, Alexandra Grigoras                                    March 13, 2008
                              Chicago, IL

                                    69 (Pages 270 to 273)

270

1    initiative to identify e-mail users who might
2    have generated e-mail that was subject to a
3    litigation hold memorandum?
4        A. Well, I think that's a
5    mischaracterization. Ellen Klaus did not work
6    with every custodian that was identified as a
7    recipient of litigation hold, and I think that
8    the identification and the continuing expansion
9    of litigation hold recipients is Abbott's effort
10   to identify anybody who generated any sort of
11   data, e-mail or otherwise, that could be
12   responsive to any matter in this litigation.
13       Q. Okay, let me ask you this. When
14   litigation hold memoranda were expanded --
15       A. Yes.
16       Q. Okay? So some folks -- you know, for
17   example, Don Robertson received one in '96, but
18   someone else might not have received one until
19   2001. Do you understand what I mean?
20       A. Correct.
21       Q. Okay, there was -- some of the lit hold
22   memoranda had much longer lists than the original

271

1    ones that went out.
2        A. Correct.
3        Q. For electronic information, what was
4    done by those individuals who didn't receive
5    earlier lit hold memoranda to go back and
6    retrieve their electronic information?
7        A. Well, there's nothing to retrieve. At
8    the point where you identify a person who is
9    likely to have information relevant to any
10   litigation, you can preserve everything that you
11   have from that point in time moving backward and
12   from that point in time moving forward.
13       Q. Okay.
14       A. Certainly nobody's under an obligation
15   to see into the future and see absolutely
16   everybody who could possibly be subject to any
17   litigation ever. So we can only do it as issues
18   arise.
19       Q. Okay. So there's a possibility then
20   that if someone didn't receive a lit hold
21   memoranda until 2000 and -- or until 2000 and
22   they may have had electronic documents that they

272

1    stored, but subsequently deleted prior to
2    receiving the lit hold memorandum, it's possible
3    that they didn't produce that electronic
4    information then?
5        A. That's a lot of speculation.
6        MR. WINCHESTER: Object to the form.
7        THE WITNESS: I'm not comfortable
8    answering either way on that.
9    BY MS. ST. PETER-GRIFFITH:
10       Q. Well, how does Abbott know that for
11   those individuals who might have had responsive
12   documents in 1996, 1997 and 1998, but didn't
13   receive a lit hold memo until 2000, that it
14   captured the responsive documents from '96 to
15   '98?
16       MR. WINCHESTER: Objection, form.
17       THE WITNESS: Abbott has no duty to put
18   people that it doesn't reasonably expect to have
19   relevant data on hold until we reasonably expect
20   that those people have relevant data to a
21   litigation. So I don't know how we could have
22   known whether people who were not subject to a

273

1    hold had data or deleted it prior to receiving
2    the hold.
3    BY MS. ST. PETER-GRIFFITH:
4        Q. Okay. So it's possible that they
5    deleted it?
6        A. I don't know.
7        Q. Okay. Well, if it's -- if not everyone
8    got captured or not everyone saved their
9    information until they started getting the lit
10   hold memoranda, doesn't it make sense to go back
11   and search the Hospira drive or shared drive to
12   see what information is there for everybody?
13       A. We're doing that.
14       Q. Okay, why didn't you do that before
15   2008?
16       A. Because anything that resided on the
17   Hospira share drive at the time -- so if a person
18   was added in 2001 and they had data on the shared
19   drive from 1996, it would have been printed out
20   at any number of the collections because many
21   eyes were looking at the share drives, many
22   employees were referencing the share drives for

Buck, Alexandra Grigoras                                   March 13, 2008
                                Chicago, IL

274

1   documents relevant.  It's not just my documents.
2   It's everyone's documents that everyone can
3   access.  So those documents were printed and
4   reprinted by any employee from 1996 to 2001
5   probably a gazillion times before -- they were
6   printed by any employee who identified one
7   particular document as relevant over and over and
8   over each collection.
9        Q.  Okay, but were they -- when they
10  received a lit hold memo, were they expected to
11  go back and retrieve their electronic information
12  that predated the date of the electronic -- the
13  date of the lit hold memo?
14       A.  So -- a shared drive has data on it
15  that everybody has access to.  So let's say even
16  if Joe Schmoe who is not on the lit hold until
17  2001 created something in 1997 and put it on the
18  share drive, and we had 30 people looking to the
19  share drive to print any document relevant to
20  this request, they would have printed Joe
21  Schmoe's document.
22       Q.  Okay.

275

1        A.  So I don't see what -- where you're
2   getting at.
3        Q.  Well, let me just tell you where I'm
4   getting at.  How do you know that the individuals
5   who received lit hold memorandas all did searches
6   of the shared drive information?
7        A.  Because they were instructed to search
8   their share drive, their computers, their e-mail
9   and their paper files.
10       Q.  Okay, for their documents or for every
11  --
12       A.  For any, any documents responsive.  The
13  share drive does not only contain their
14  documents.
15       Q.  Okay.  So it was the expectation of
16  Abbott that, if someone received a lit hold
17  memoranda, that they would go to the shared drive
18  and search not only for documents that they might
19  have had, but for any other documents that were
20  responsive to the lit hold memoranda?
21       A.  I think that is a fair assertion, that
22  the employees were looking on the share drives,

276

1   and any documents that they saw that would be
2   responsive, would then be printed and turned
3   over.
4        Q.  How do you know that they did that?
5        A.  Because we got production of documents,
6   as expected.
7        Q.  But did you ask them whether or not
8   they went -- did you verify what they -- what
9   each of the individuals did in terms of their
10  electronic search?
11       A.  I don't know whether we verified with
12  every single individual.
13       Q.  In terms of the preservation of
14  documents for electronically preserved documents,
15  other than the individuals identified in lit hold
16  memoranda and the 39 individuals listed who you
17  searched for pursuant to the Medi-Cal and Mike
18  Tootell, who are the other custodians that Abbott
19  has searched?  And when I say "custodians," I
20  mean individuals who created and maintained
21  electronic information.
22       A.  I don't know specifically the other

277

1   custodians.
2        Q.  For HPD, where was the back-up data
3   stored from the '91 through 2003 time period?
4        A.  In one of the buildings in Abbott Park.
5        Q.  Is that now part of Hospira?
6        A.  No.
7        Q.  No, okay.  Did Abbott have a price
8   database?
9        A.  I don't know.
10       Q.  Other than the shared drive, what other
11  Abbott -- or shared server, what other Abbott
12  servers existed within HPD from '91 until the
13  time of the spin?
14       A.  That it's impossible to say.  I don't
15  know.
16       Q.  Do you know what servers that are
17  former HPD servers currently exist at Hospira?
18       A.  I don't know.
19       Q.  Have you done -- undertaken any
20  initiative to find out?
21       A.  No.
22       Q.  Has Abbott undertaken any initiative to

Buck, Alexandra Grigoras                           March 13, 2008
                        Chicago, IL

71 (Pages 278 to 281)

278

1  find out whether a price database server exists?
2       A.  I don't know.
3       Q.  Do you know whether there is a separate
4  server or database utilized by Abbott in
5  performing audits of customers who -- as to
6  whether or not they'd been charged certain
7  prices?
8       A.  I don't know.
9       Q.  Other than the 30 -- well, have -- let
10 me ask you this question.  And if you've already
11 -- if it's what you've already answered before,
12 just let me know.  Have any mailboxes been
13 restored from back-up tapes at Abbott?
14      A.  We've answered that question with
15 respect to the Medi-Cal subpoena.
16      Q.  Okay, and the Mike Tootell?
17      A.  That wasn't restored.
18      Q.  Okay.
19      A.  That was live.
20      Q.  Who was responsible for backing up and
21 archiving files for Abbott's HPD computer systems
22 from '91 through 2003?

279

1       A.  Well, it wasn't one particular person
2  throughout that entire time frame.  At some
3  point, Chris Downey was responsible for it, but
4  that -- I don't know who was responsible
5  throughout the entire period, and that's the only
6  name that I'm aware of.
7       Q.  What were the procedures and devices
8  used to back up software and data from '91 to
9  2003 within HPD?
10      MR. WINCHESTER:  Object as asked and
11 answered.
12      THE WITNESS:  Again, that's an
13 unbelievably broad question.  I believe I've
14 already testified as to the back-up procedures
15 and software for e-mail.
16 BY MS. ST. PETER-GRIFFITH:
17      Q.  Is there anything additional that you
18 haven't testified about concerning that?
19      A.  No.
20      Q.  Was there a central location where e-
21 mails within Abbott HPD could be archived?
22      A.  There is no archival system in HPD.

280

1       Q.  What is an archival system?
2       A.  It's a way of storing larger or large
3  amounts of data that make it, I suppose,
4  retrievable, but you're not using up as much
5  server space.  That's the best definition I can
6  come up with.
7       Q.  Okay.  And there was never one in
8  existence from '91 through 2003?
9       A.  Not that I'm aware of.
10      Q.  Did Abbott ever consider using one?
11      A.  Abbott as a corporation, I don't know
12 whether we ever considered using an archival
13 system.  I'm not aware at HPD that there was ever
14 one in place.
15      Q.  Okay.  Why didn't Abbott consider using
16 -- or why didn't Abbott archive e-mail --
17      A.  What would be the --
18      Q.  -- or use an archival system?
19      MR. WINCHESTER:  Object to the form.
20      THE WITNESS:  What would be the
21 significance of archiving e-mail?
22      MR. WINCHESTER:  You don't get to ask.

281

1       THE WITNESS:  Sorry.  I don't know why
2  we didn't consider it.
3  BY MS. ST. PETER-GRIFFITH:
4       Q.  This is one of those technical
5  questions that I had someone help me with.
6       A.  Okay.
7       Q.  Are back-ups full, incremental or
8  differential?
9       MR. WINCHESTER:  Object as asked and
10 answered.
11      THE WITNESS:  So, yeah, I already
12 testified with respect to that.
13 BY MS. ST. PETER-GRIFFITH:
14      Q.  They're full?
15      A.  No.
16      Q.  No.
17      A.  The e-mail back-ups were incremental
18 daily --
19      Q.  Okay.
20      A.  -- full weekly, and at some point
21 became full monthly.
22      Q.  Do you have an inventory of the back-up