# EXHIBIT 9

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------X
IN RE PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE    )
PRICE LITIGATION,             )  MDL No. 1456
                              )  Civil Action No
THIS DOCUMENT RELATES TO:     )  01-12257-PBS
                              )  Judge Patti B.
United States of America,     )  Saris
ex rel. Ven-A-Care of the     )  Mag. Judge
Florida Keys, Inc., v.        )  Marianne Bowler
Abbott Laboratories Inc.      )
Civil Action No.              )
06-11337-PBS                  )
------------------------X
```

Videotaped Deposition of CYNTHIA B. SENSIBAUGH, a witness herein, at the offices of Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. commencing at 9:11 a.m. on Friday, March 7,

**102**

1  Sensibaugh Exhibit -- either 6 or 7. It's your
2  February 10, '97, brief memo. In that memo, you
3  say that you wanted to get together with Mr. Buell
4  and Mr. Heggie to get their thoughts on the
5  President's proposal to shift to an acquisition
6  cost-based drug reimbursement system.
7      Were you personally involved in
8  gathering some of the opinions that were solicited
9  in the process of developing Abbott's ultimate
10 position on what Medicare drug reimbursement
11 should be in '97?
12     MS. TABACCHI: Object to the form.
13 Beyond the scope.
14     THE WITNESS: I don't -- personally, I
15 do not remember, you know, getting any specific
16 feedback. And then I note that it does say in the
17 memo, "We would like to get your thoughts."
18     BY MR. GOBENA:
19   Q. So you're highlighting "we" is the fact
20 that the thoughts that might have been solicited
21 might have gone directly to Mr. Landsidle or
22 someone else?

**103**

1      MS. TABACCHI: Object to the form.
2  Beyond the scope.
3      THE WITNESS: Yes, I was highlighting
4  that this was kind of a request on behalf of the
5  Washington office.
6      BY MR. GOBENA:
7   Q. But sitting here today, is it basically
8  your testimony that you can't tell me who
9  specifically, whether it's one or more persons,
10 authorized Abbott's taking the position that
11 Medicare drug reimbursement should be at
12 95 percent of AWP with no discretion to the
13 Secretary, at least as set forth in 1997?
14     MS. TABACCHI: Object to the form.
15 Beyond the scope.
16     THE WITNESS: That is correct.
17     BY MR. GOBENA:
18   Q. And if I wanted to find out whether
19 Mr. Burnham was involved in the decision-making
20 process with regard to Abbott's position on the
21 Medicare drug reimbursement issue, I would have to
22 talk to Mr. Burnham; isn't that correct?

**104**

1      MS. TABACCHI: Object to the form.
2  Beyond the scope.
3      THE WITNESS: I think you would be able
4  to consult his affidavit where he talks about that
5  he wasn't involved in the day-to-day activities.
6      BY MR. GOBENA:
7   Q. I understand you're talking about an
8  affidavit that was drafted on his behalf, but --
9  you're not pointing to deposition testimony. But
10 if I wanted to get down to the specifics, I would
11 have to talk to him; isn't that correct?
12     MS. TABACCHI: Object to form. Beyond
13 the scope.
14     THE WITNESS: I mean, again, I think he
15 makes it clear in his affidavit there.
16     BY MR. GOBENA:
17   Q. If you go to the fourth paragraph of
18 the June 9, '97, memorandum from Mr. Landsidle to
19 the CEO of the company, he says that, "With
20 reimbursement for Lupron, Calcijex and Abbokinase
21 at issue, hiring Greenberg Traurig would be most
22 useful." And he goes on to say, "Reimbursement of

**105**

1  Medicare drugs is the Washington office's top
2  priority."
3      Was Mr. Landsidle correctly reflecting
4  the top priority for Abbott's Washington office in
5  1997?
6      MS. TABACCHI: Object to the form.
7  Beyond the scope.
8      THE WITNESS: Yes. As he says in the
9  memo, it's a top priority at the time, and I think
10 that's what he also confirmed in his testimony,
11 that it was -- the reimbursement policy in this
12 legislative sense was the top priority.
13     BY MR. GOBENA:
14   Q. And that's because the Medicare drug
15 reimbursement policy could have an impact on
16 Abbott's business; isn't that correct?
17     MS. TABACCHI: Object to the form.
18 Beyond the scope.
19     THE WITNESS: Well, it would have an
20 impact on the doctors' and patients' access to the
21 drugs we sell.
22     BY MR. GOBENA:

**118**

1  deposition that clearly showed that he did
2  participate in lobbying efforts; isn't that
3  correct, Ms. Sensibaugh?
4       MS. TABACCHI: Objection as beyond the
5  scope.
6       BY MR. GOBENA:
7    Q. I should clarify lobbying efforts at
8  least particularly with respect to these
9  legislative developments in '97 about Medicare
10 drug reimbursement, correct?
11      MS. TABACCHI: Object to the form.
12 Beyond the scope.
13      THE WITNESS: I would just ask as to
14 which particular one you're -- which documents
15 you're talking about. I'm not sure.
16      BY MR. GOBENA:
17   Q. If you want, we can take a look at
18 some -- we can have some exhibits marked, if it
19 makes it easier for you.
20      MR. GOBENA: I am going to have this
21 marked as Sensibaugh Exhibit 12.
22      (Exhibit Sensibaugh 012 was marked

**119**

1  for identification.)
2       MR. GOBENA: I am going to hold on to
3  this copy for a, second and then I will give it to
4  you.
5       MS. TABACCHI: It's okay.
6       BY MR. GOBENA:
7    Q. The exhibit we just had marked is an
8  August 5, '97, letter from Duane Burnham. And the
9  reason why you can identify that is if you look at
10 the top, there is a very faded header that says
11 Duane L. Burnham, and then at the bottom that
12 looks like Mr. Burnham's signature, correct?
13   A. Yes.
14      MS. TABACCHI: I am going to object as
15 beyond the scope to the witness' ability to speak
16 on behalf of the corporation authenticating
17 Mr. Burnham's signature.
18      BY MR. GOBENA:
19   Q. Do you recall reviewing this document
20 at your prior deposition?
21      MS. TABACCHI: Objection as beyond the
22 scope.

**120**

1       THE WITNESS: I do remember seeing it.
2       BY MR. GOBENA:
3    Q. If you go to the first paragraph he
4  says, "First, let me congratulate you for leading
5  the effort to pass the balanced budget
6  legislation. The tax and spending bills you
7  passed are truly historic in importance and their
8  passage was due, in no small part, to the many
9  hours you personally spent."
10      And he is directing this to Bill
11 Archer, a member of Congress. He then goes on to
12 say, "Second, I want to express our gratitude for
13 what you accomplished on the Medicare drug
14 reimbursement provision. When we spoke on the
15 phone, you said you intended to hold the House
16 language in the conference committee, and you did.
17 Your language was clearly superior to the
18 Senate's, and Abbott thanks you for convincing the
19 rest of the conferees. I know you had far bigger
20 issues on the agenda. Taking the time to call me
21 and discuss our concerns was greatly appreciated."
22      Do you see that there?

**121**

1    A. Yes, I do.
2    Q. Mr. Burnham did lobby with respect to
3  the Medicare drug reimbursement issue in 1997;
4  isn't that correct?
5       MS. TABACCHI: Objection as beyond the
6  scope.
7       THE WITNESS: It looks like -- from
8  this letter, it says that there was a call with
9  Congressman Archer where they discussed this
10 issue.
11      BY MR. GOBENA:
12   Q. You don't -- well, strike that.
13      Did you personally participate in the
14 call that's reflected in the August 5 letter from
15 Mr. Burnham to Mr. Archer about the Medicare drug
16 reimbursement issue?
17      MS. TABACCHI: Objection as beyond the
18 scope.
19      THE WITNESS: No, I don't remember
20 participating in any call.
21      BY MR. GOBENA:
22   Q. Do you know whether Mr. Landsidle

**122**

1  participated in that call between Mr. Burnham and
2  Mr. Archer in 1997 about the Medicare drug
3  reimbursement issue?
4          MS. TABACCHI: The same objection.
5          THE WITNESS: No, I don't know.
6          BY MR. GOBENA:
7      Q. Isn't it fair to say that the only way
8  to find out what actually was said in that call
9  between Mr. Burnham and Mr. Archer is to talk to
10 Mr. Burnham about that call? Isn't that true?
11         MS. TABACCHI: Objection. Beyond the
12 scope.
13         THE WITNESS: Well, again, I would
14 refer to his affidavit where he says he doesn't
15 have any recollection.
16         BY MR. GOBENA:
17     Q. No one from the Washington office
18 participated in that call between Mr. Archer and
19 Mr. Burnham; isn't that correct?
20         MS. TABACCHI: Object to the form.
21 Beyond the scope.
22         THE WITNESS: Not that I'm aware of.

**123**

1          MR. GOBENA: Why don't we go off the
2  record here and take a break.
3          MS. TABACCHI: Sure.
4          THE VIDEOGRAPHER: This is the end of
5  tape 2. Off the record at 11:36.
6          (Recess.)
7          THE VIDEOGRAPHER: This is the
8  beginning of tape 3 in the corporate deposition of
9  Abbott by Mrs. Sensibaugh. On the record at
10 11:51.
11         BY MR. GOBENA:
12     Q. Ms. Sensibaugh, I want to turn your
13 attention back to one of the prior exhibits --
14 it's either 9 or 10. It's the June 20 memo from
15 Mr. Landsidle to Mr. Barmak.
16     A. Okay.
17     Q. And if you go to the second page, you
18 recall there's some language from Mr. Landsidle
19 advocating for Mr. Burnham to be involved in
20 lobbying efforts on the Medicare drug
21 reimbursement issues transpiring in '97.
22         I want to go to the last paragraph. He

**124**

1  says, "Duane has lobbied before, on 936, trade and
2  the Clinton health bill. He is good and knows
3  CEOs have influence on Capitol Hill. I do not
4  know if he is available to come to Washington, but
5  if he is, do you think he should be asked?"
6          Do you know what Mr. Landsidle is
7  referring to when he said Mr. Burnham lobbied on
8  936? What was that?
9          MS. TABACCHI: Objection as beyond the
10 scope.
11         THE WITNESS: As I remember,
12 section 936 is a provision of the tax code.
13         BY MR. GOBENA:
14     Q. Do you recall what specific provision
15 it was or generally have -- do you have a general
16 recollection of what 936 referred to in the tax
17 code?
18         MS. TABACCHI: Beyond the scope.
19         THE WITNESS: As I remember, I have a
20 general recollection it has to do with benefits
21 for companies who locate in Puerto Rico.
22         BY MR. GOBENA:

**125**

1      Q. He says Mr. Burnham has also lobbied on
2  trade issues as well. Do you have any personal
3  recollection as to what trade issues Mr. Burnham
4  lobbied on?
5      A. No, I don't.
6      Q. He also mentions that Mr. Burnham
7  lobbied on the Clinton health bill. Do you know
8  which health bill Mr. Landsidle was referring to
9  there?
10         MS. TABACCHI: Beyond the scope.
11         THE WITNESS: No, I don't.
12         BY MR. GOBENA:
13     Q. You do recall that in 1993 or so there
14 was a health bill that was advanced or advocated
15 by the Clinton administration. Do you recall
16 that?
17         MS. TABACCHI: Objection. Beyond the
18 scope. Object to the form.
19         THE WITNESS: Yes, I do recall that.
20         BY MR. GOBENA:
21     Q. Does this appear to be a reference to
22 that 1993 comprehensive healthcare effort by the

**126**

1  Clinton administration?
2      MS. TABACCHI: The same objections.
3      THE WITNESS: Again, it's describing a
4  Clinton health bill. I don't know whether it's
5  that particular one.
6      BY MR. GOBENA:
7      Q. I guess my larger summary question is
8  that it appears that Mr. Burnham has been used by
9  Abbott to lobby from time to time on various
10 legislative issues, correct?
11     MS. TABACCHI: Beyond the scope.
12     THE WITNESS: Yes. I am aware that
13 while I was with Abbott, he came to Washington to
14 lobby on some issues.
15     BY MR. GOBENA:
16     Q. And if Mr. Burnham was being asked to
17 lobby on a particular legislative issue or
18 development, it was because that was an important
19 legislative development; isn't that correct?
20     MS. TABACCHI: Objection to the form.
21 Beyond the scope.
22     THE WITNESS: Yes, or one where they

**127**

1  thought his expertise and knowledge would be
2  important to share.
3      BY MR. GOBENA:
4      Q. Do you believe, then, that one of the
5  reasons why Mr. Burnham was being asked to lobby
6  on the Medicare drug reimbursement issue is
7  because he had some important expertise or
8  knowledge that might help advance Abbott's
9  position on the -- with respect to the House
10 version of the Medicare drug bill?
11     MS. TABACCHI: Objection. Beyond the
12 scope.
13     THE WITNESS: Yes, I don't know -- you
14 know, it's not clear the particular reason here.
15     BY MR. GOBENA:
16     Q. So it could be either that he has
17 expertise or it could be that it's important. But
18 that's -- generally, those are the two scenarios
19 where Mr. Burnham would be asked to weigh in on
20 Abbott's lobbying efforts on a legislative
21 development, correct?
22     MS. TABACCHI: Object. Beyond the

**128**

1  scope.
2      THE WITNESS: I would say those could
3  be two. I mean, there could be possibly others
4  you could probably think of.
5      BY MR. GOBENA:
6      Q. I am going to shift gears here for a
7  second and ask you a little bit about document
8  retention which we talked about when we were --
9  during your 30(b)(1) deposition. And I just want
10 to ask a couple of follow-up questions. Does
11 Abbott have a policy of documenting meetings that
12 people in the Washington office have with members
13 of Congress?
14     MS. TABACCHI: Can we just agree that
15 this entire line of questioning is beyond the
16 scope of the notice so I don't have to object to
17 every question?
18     MR. GOBENA: That's fine. Yes.
19     MS. TABACCHI: All right. Object to
20 the form.
21     THE WITNESS: Are you talking about
22 does Abbott have a corporate policy for

**129**

1  documenting meetings?
2      BY MR. GOBENA:
3      Q. Or let's say the Washington office. Is
4  there a particular policy that the Washington
5  office has about documenting meetings that it has
6  with members of Congress or their staff about
7  proposed legislation or legislative developments?
8      MS. TABACCHI: Object to the form.
9      THE WITNESS: From my personal
10 knowledge, there is no specific policy on
11 documenting meetings.
12     BY MR. GOBENA:
13     Q. When you participated in meetings with
14 members of Congress or their staff, did you
15 document those meetings in any way?
16     MS. TABACCHI: Object to the form.
17     THE WITNESS: It's my own personal
18 habits -- what I would normally do in most
19 instances would -- I would make a note of the
20 meeting.
21     BY MR. GOBENA:
22     Q. And was it in the form of a memorandum