**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| *In re:* PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION <br><br> **THIS DOCUMENT RELATES TO:** <br><br> *United States ex rel. Edward West, et al., v. Ortho-McNeil Pharmaceutical, Inc. and Johnson & Johnson.* <br><br> CIVIL ACTION NO. 06-12299-PBS | MDL No. 1456 <br><br> Civil Action No. 01-12257-PBS <br><br> Hon. Patti B. Saris |

## MEMORANDUM IN SUPPORT OF ORTHO-MCNEIL'S MOTION TO DISMISS WEST'S CLAIM FOR "MARKETING THE SPREAD TO HOSPITALS"

In its February 19, 2008 Memorandum Opinion ("Mem."), the Court dismissed relator Edward West's claim that defendant Ortho-McNeil Pharmaceutical, Inc., n/k/a Ortho-McNeil Pharmaceutical LLP ("OMP") fraudulently "marketed the spread" to hospitals in violation of the False Claims Act.  However, the Court granted West leave to re-plead to allege additional facts substantiating that claim.  West has now filed a Second Amended Complaint in which he has added allegations that hospitals paid less for one formulation of one drug (Levaquin IV) than the published AWP for that drug.

OMP renews its motion to dismiss West's "marketing the spread" claim because the "spread" described in West's new allegations -- the difference between AWP and the prices paid by hospitals -- was <u>irrelevant</u> to federal healthcare reimbursement.  Hospital reimbursement was not based on AWP during the relevant time period.  Accordingly, his new allegations fail to support a cause of action under the False Claims Act against OMP.

## BACKGROUND

In his First Amended Complaint, West alleged that while he worked for OMP between 1997 and 2000, OMP provided rebates to hospitals that purchased Levaquin IV in order "to increase the Medicare profit spread for hospitals." (First Amended Complaint, page 25 and ¶¶ 72-77.) *See also* Mem. at 28-29 (discussing West's claim that OMP "used rebates to 'market the spread' between what a hospital paid for [Levaquin] and what it would be reimbursed by Medicare and Medicaid.") The Court granted OMP's motion to dismiss this claim, but gave West leave to amend "to state with specificity the allegedly fraudulent spread." (*Id.* at 46.)

In response, West has filed a Second Amended Complaint containing two new allegations, which read as follows:

> 76. From 1997 to 2000, the Average Wholesale Price for 500 mg of Levaquin IV was $39.60. Ortho-McNeil employed a multi-tiered rebate system, whereby purchasers (such as hospitals) would pay the highest rate for 500 mg of Levaquin IV, which was $32, throughout the year. During the final quarter of the year, if the purchaser's market share reached a certain level, Ortho-McNeil would retroactively apply a discount to the price for the entire year and give the purchaser a cash rebate for the difference. This multi-tiered rebate system was comprised of eight levels of pricing ($32, $31, $29, $27, $25, $23, $21, and $19), with lower prices being given to purchasers with larger market share. Based on the published AWP of $39.60, the "spread" between what the purchasers paid for 500mg of Levaquin IV and the AWP exceeded 30% for all purchasers who paid from $29 to $19. In fact, this "spread" was 36.6% for purchasers paying $29 per dose for 500mg Levaquin IV and increased to 108% if the purchaser received the highest discounted rate of $19 per dose.
>
> 77. For example, when taking into account the rebates, discounts, and other incentive payments, Holy Cross Hospital in Chicago was in the $21 pricing tier. In other words, in 1999 Holy Cross Hospital paid $21 per 500 mg Levaquin IV dose, which represents a spread based on the fraudulent 1999 AWP of $39.60 of 88.6%.

(Second Amended Complaint ("SAC") ¶¶ 76-77.)

Notably, the Second Amended Complaint contains no allegation that OMP "marketed the spread" to <u>physicians,</u> for whom reimbursement was based on AWP. Like the allegations of the original complaint and the First Amended Complaint, the "marketing the spread" allegations Second Amended Complaint are focused solely on hospitals. *See, e.g.,* Mem. at 24 ("In essence, Relator accuses Defendants of using rebates to 'market the spread' between what the hospital paid for the drug and what it would be reimbursed by Medicare and Medicaid.") Indeed, the only specific example he provides of alleged marketing of a "fraudulent spread" relates to a hospital in Chicago. (SAC ¶ 77.[1])

As we explain below, hospitals are not reimbursed based on AWP. Accordingly, Relator's assertion that the prices paid by hospitals for Levaquin IV were lower than the AWP for Levaquin IV does not allege a "fraudulent spread" (Mem. at 46.) Indeed, there can be no legally cognizable claim for "marketing the spread" to hospitals to "increase the Medicare profit spread for hospitals." (SAC, page 22.)

## ARGUMENT

**I.   HOSPITALS ARE NOT REIMBURSED BASED ON AWP.**

West has described his "marketing the spread" theory as follows:

> [West] alleges that Ortho-McNeil used fraudulent marketing and billing schemes <u>to inflate the average wholesale price that hospitals could charge to government programs</u>. . . . He also alleges that Ortho-McNeil sales representatives were instructed on how to advise the hospital to hide rebates and to alter their billing methods on Levaquin in order <u>to bill Medicare at a higher AWP than they should have</u>.

---

[1] If Relator had any information concerning alleged "marketing of the spread" of Levaquin IV to physicians, he would have had to disclose that information to the government prior to filing his original complaint. *United Seniors Ass'n, Inc. v. Philip Morris USA*, 500 F.3d 19, 25 n.8 (1st Cir. 2007) (*citing* 31 U.S.C. § 3730(b)(2)). He did not.

3

Notice of Related Action to JPML, Defendants' Memorandum in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 4308), Ex. 3 at 2 (emphasis added).  But this theory -- that OMP charged hospitals less than the published AWP in order to enable hospitals "to bill Medicare at a higher AWP than they should have," or "to increase the Medicare profit spread for hospitals" (SAC, page 22) – is nonsense.  Unlike reimbursement to physicians under Medicare Part B, reimbursement to hospitals for inpatient and outpatient administration of Levaquin IV has been based on reimbursement formulae in which AWP played no factor.

      A.      **AWP Plays No Role In Hospital Inpatient Reimbursement.**

Reimbursement for administration of drugs like Levaquin IV to hospital inpatients is governed by Medicare Part A.  Since 1983, reimbursement for inpatient hospital services has been based on the inpatient prospective payment system ("IPPS").  48 Fed. Reg. 39752 (Sept. 1, 1983).  Under IPPS, a hospital receives a fixed, predetermined payment amount for each patient that is determined by the specific diagnosis-related group, or "DRG," classification assigned to the hospital administration.  42 U.S.C. § 1395ww(d)(1)(A)(iii).  The fixed, pre-determined DRG amount is the sole payment the hospital receives for providing all "inpatient hospital services" to the patient – including drugs.  42 U.S.C. § 1395ww(d); 42 U.S.C. § 1395x(b).[2]

Relator does not allege that the existence of a "spread" between AWP (a term that does not appear anywhere in the Medicare Part A statute) and the actual prices paid by hospitals had any effect on the reimbursement hospitals received for Levaquin IV administered to inpatients.  DRG amounts are set by the Department of Health and Human Services based on "national and regional averages for the cost of treating particular illnesses and [are] not based on

---

[2] There is an exception in the Medicare statute for "outliers," patients whose treatment expenses far exceed the typical DRG payment.  However, like the DRG amounts, the amounts paid for outliers are not tied in any way to AWP.

the cost to any particular hospital of treating particular DRG-classified illnesses." *Huntington Hospital v. Thompson*, 319 F.3d 73, 76 (2d Cir. 2003).  Indeed, hospitals are not even required to report their actual costs for drugs or other inpatient services.[3]  Thus, AWP – or the existence of a "spread" between AWP and the actual prices paid by hospitals – is wholly irrelevant to reimbursement for administration of Levaquin IV to hospital inpatients.

### B.     AWP Played No Role In Hospital Outpatient Reimbursement.

The existence of a "spread" between AWP and the prices paid by hospitals for Levaquin IV also was irrelevant to federal healthcare reimbursement to hospitals for administration of Levaquin IV in the outpatient setting.  During the relevant time period, reimbursement for services to hospital outpatients was based on the lesser of the hospital's "reasonable costs" or "customary charges."[4]  42 U.S.C. § 1395*l*(a)(2)(B)(i).  "Reasonable cost" refers to the hospital's <u>actual</u> costs.  42 C.F.R. § 413.9(c)(2).  Thus, as in the inpatient setting, there would be no incentive for a hospital to increase the "spread" between AWP and the actual price paid by the hospital, since it would be the hospital's actual cost to purchase Levaquin IV, not AWP, that would dictate the hospital's reimbursement.[5]

---

[3] While hospitals submit annual cost reports to the Centers for Medicare and Medicaid Services, DRG reimbursement is determined on the basis of claims submitted on uniform billing forms that only to report their "charges" for services (which are set entirely by the hospital).  In the case of outliers, it is hospital charges, and the ratio of charges to actual costs from the cost report, that determine inpatient reimbursement.  *See* 72 Fed. Reg. at 47249-50 (Aug. 22, 2007).  Costs reported on hospital cost reports do not determine Medicare reimbursement for hospitals under prospective payment.

[4] The Court has limited West's claims to the time period during which he was employed by OMP, *i.e.* between September 1997 and July 2000.  (Mem. at 44-45, 46).  In August 2000, Medicare transitioned to a new reimbursement formula for outpatient hospital services called the hospital outpatient prospective payment system ("HOPPS").  However, that change occurred after West was fired by OMP, and is thus outside the relevant time period of this case.

[5] In practical terms, providers' customary charges were rarely, if ever, lower than the reasonable costs reimbursed by Medicare, meaning that the *de facto* standard for hospital outpatient

5

## II. WEST HAS FAILED TO ALLEGE FACTS TO SUSTAIN A FALSE CLAIMS ACT THEORY BASED ON MARKETING THE SPREAD.

While West has alleged the existence of a "spread" between AWP and the prices paid by hospitals, that "spread" is legally meaningless. Accordingly, West has failed to allege a "<u>fraudulent</u> spread" in compliance with Rule 9(b), as directed by the Court. (Mem. at 36, emphasis supplied.)

The irrelevance of AWP to hospital reimbursement means that West also cannot state any claim on which relief may be granted under the False Claims Act. West alleges that "the prices paid for Levaquin by Medicare . . . were inflated in that they failed to account for the inducements paid by defendants to hospitals and other providers" (SAC ¶ 107). For the reasons explained in the previous section, that allegation is indisputably false with respect to West's "marketing the spread to hospitals" claim. In the parlance of the False Claims Act, any purported "spread" between AWP and the prices paid by hospitals was "immaterial" to federal healthcare reimbursement, and therefore not actionable under the False Claims Act. *See United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 181 (D. Mass. 2004) (*citing United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)) ("In addition to the FCA's explicit requirements, courts have inferred a requirement that the false statement or claim be material."). *Cf. In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-12257, MDL No. 1456, 2007 WL 1774644, at *2 n. 8 (D. Mass. June 21, 2007) (explaining that consumers who make flat co-pays would not be included in AWP class action because "they are not affected by an inflated AWP").

---

reimbursement was the reasonable cost standard. Regardless, whatever the hospital's "charges" were was the relevant factor, not AWP.

Indeed, the absence of any legally-relevant "spread" between AWP and hospital prices raises a more fundamental flaw with West's claim – the inability to allege any "false or fraudulent" claim for payment -- the "*sine qua non"* of a cause of action under the False Claims Act. *U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). In cases alleging that pharmaceutical manufacturers have marketed the spread to physicians, the False Claims Act theory is that manipulation of the spread amounts to providing a kickback to the physician equal to the difference between the provider's acquisition cost and AWP.  Because claims tainted by kickbacks are ineligible for federal healthcare reimbursement, such claims are "false or fraudulent" within the meaning of the False Claims Act.  Thus, in its case against Abbott, the federal government alleges that "Abbott knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted." *See* First Amended Complaint in *United States ex rel. Ven-A-Care of the Florida Keys v. Abbott Laboratories, Inc.*, D. Mass, Case No. 06-11337 (Docket No. 4281 in Case No. 01-12257), ¶ 140.

But this theory cannot be bootstrapped to a claim that OMP marketed the spread to hospitals.  Any "spread" between AWP and acquisition costs was irrelevant to reimbursement, and therefore could not act as an "inducement" to hospitals to purchase more drugs.  Simply alleging (as West does) that "each claim for reimbursement for such prescriptions submitted to a federal health insurance program represents a false or fraudulent claim for payment" (SAC ¶ 106), does not satisfy West's burden of pleading with particularity how charging hospitals less than AWP makes bills submitted by hospitals "false or fraudulent claims for payment." *See* Opinion and Order in *U.S. ex rel. Driscoll v. Serono, Inc., et al.*, Case No. 00-11680 (D. Mass, O'Toole, J., attached as Exhibit 1) at 3 ("Put another way, allegations about underlying schemes

7

and other wrongful activities 'invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action.'") (citation omitted).

A claim should be dismissed when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-12257, MDL No. 1456, 2007 WL 1051642, at *3 (D. Mass. Apr. 2, 2007) (*quoting Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987)).  West has failed to alleged with specificity any "<u>fraudulent</u> spread," as directed by the Court.  (Mem. at 46, emphasis added.)  Accordingly, his cause of action under the False Claims Act based on the provision of "rebates to increase the Medicare profit spread for hospitals" should be dismissed.

## **CONCLUSION**

WHEREFORE, defendant Ortho-McNeil Pharmaceutical, Inc. respectfully requests that the Court dismiss West's claim that OMP violated the False Claims Act by "marketing the spread" to hospitals.

Date:  April 2, 2008					Respectfully submitted,

							ORTHO-MCNEIL PHARMACEUTICAL,
							INC. and JOHNSON AND JOHNSON, INC.

							By: /s/  Scott D. Stein
							      One of Their Attorneys

							Scott R. Lassar
							Scott D. Stein
							Jordan S. Ginsberg
							SIDLEY AUSTIN LLP
							One South Dearborn Street
							Chicago, Illinois  60603
							(312) 853-7000

**CERTIFICATE OF SERVICE**

I, Jordan S. Ginsberg, certify that on April 2, 2008, I electronically filed the foregoing document with the Clerk of the Court for the District of Massachusetts using the court's CM/ECF system. A copy of the foregoing also has been served on the following individuals by depositing a copy in the U.S. mail, first-class postage pre-paid:

George A. Zelcs
Korein Tillery, LLC
205 N. Michigan Plaza
Suite 1950
Chicago, IL 60601

Samuel S. Miller
United States Attorney's Office
219 South Dearborn Street
Suite 500
Chicago, IL 60604

John Bruegger
Simmons Cooper LLC
707 Berkshire Blvd.
East Alton, IL 62024

Mary Louise Cohen
Phillips & Cohen LLP
2000 Massachusetts Ave N.W.
Washington, DC 20036

Erika A. Kelton
Phillips & Cohen LLP
2000 Massachusetts Ave, N.W.
Washington, DC 20036

Timothy D. Nimrod
Gregory Hooggasian, Esq.
Medicaid Fraud Control Unit
100 W. Randolph St.
12th Floor
Chicago, IL 60601

2

Lisa Madigan
Attorney General of Illinois
100 West Randolph Street
12th Floor
Chicago, IL 60601

Charles J Crist, Jr.
The Capitol PL-01
Tallahassee, FL 32399-1050

M. Jane Brady
Carvel State Office Building
Consumer Protection - 5th Floor
820 North French Street
Wilmington, DE 19801

Collin Wong
Bureau of Medi-Cal Fraud
Office of the Attorney General
1425 River Park Drive
Ste. 300
Sacramento, CA 95815

L Timothy Terry
Office of the Attorney General,
100 North Carson Street
Carson City, NV 89701

Randall L Clouse
Medicaid Fraud Control Unit
900 East Main St.,
5th Fl
Richmond, VA 23219

Steven Fermon
Medicaid Fraud Control Unit Illinois State Police
200 Isles Park Place
Ste 230
Springfield, IL 62703

Robert Spagnoletti
District of Columbia Attorney 's Office
Office of Corporation Counsel
441 4th St., NW
Washington, DC 20001

2

W Rick Copeland
Medicaid Fraud Control Unit
Office of the Attorney General
Austin, TX 78711

Jerry Kilgore
Virginia Attorney General
Office of the Attorney General
900E. Main St
5th FL
Richmond, VA 23219

Susan Kennedy
Medicaid Fraud Control Unit
Office of DC Inspector General
Washington, DC 20005

Robert Schlafly
Medicaid Fraud Control Unit Bureau of Investigations
901 R.S. Gass Blvd.
Nashville, TN 37216

Paul G Summers
Tennessee Attorney General
500 Charlotte Avenue
Nashville, TN 37243

Bill Lockyear
Office of the Attorney General
1300 I Street
Ste. 1740
Sacramento, CA 95814

Gary K Senega
Deputy Attorney General State of Hawaii
333 Queen Street
10th Floor
Honolulu, HI 96813

Greg Abbott
Texas Attorney General
Office of the Attorney General
Capitol Station, PO Box 12548
Austin, TX 78711

/s/ Jordan S. Ginsberg

3