UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) Civil Action No. 01-12257-PBS ) |
| THIS DOCUMENT RELATES TO: | ) Hon. Patti Saris ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) |

**UNITED STATES' OPPOSITION TO ABBOTT'S MOTION TO RECONSIDER THE COURT'S DENIAL OF ABBOTT'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE PROPOSED DEPOSITION OF RICHARD A. GONZALEZ AND INCORPORATED MEMORANDUM OF LAW**

The United States, by and through the undersigned Assistant United States Attorney, hereby submits its Opposition to Abbott's Motion to Reconsider the Court's Denial of Abbott's Motion for a Protective Order Relating to the Proposed Deposition of Richard A. Gonzalez (Docket #5161). In support thereof, the United States submits the following incorporated Memorandum of Law:

At the outset, though styled as a Motion for Reconsideration, Abbott's Motion merely attempts to rehash its previous unsuccessful argument seeking to preclude Mr. Gonzalez's testimony on the grounds that 30(b)(6) witness testimony can and should serve as a substitute for 30(b)(1) apex witness testimony. Also, Abbott raises in its so-called Reconsideration Motion a request for relief never argued or addressed before this Court. As an alternative argument, Abbott now impermissibly seeks to narrowly limit Mr. Gonzalez's testimony in the event that this Court once again rejects its attempt to preclude the United States from discovering his personal recollections and information. Both arguments are deficient on their face and should be

rejected out of hand.  Such filings only serve to further drain party and Court resources, and stall the deposition of this very significant fact witness.

FACTUAL AND PROCEDURAL BACKGROUND
REGARDING GONZALEZ DEPOSITION

*A.     Procedural History of Attempts to Schedule Mr. Gonzalez's Deposition*

Beginning in April 2007, the United States has attempted to depose Abbott Laboratories, Inc.'s (Abbott) fact witness Richard A. Gonzalez, among others, who had direct and important knowledge of key events and issues in the case.  Abbott has steadfastly attempted to block this deposition by invoking the law governing depositions of high-level or "apex" corporate executives, which provides some protection for such witnesses under limited circumstances.  However, Mr. Gonzalez, as a retired employee, is not an "apex witness."  On January 31, 2008, Magistrate Judge Bowler granted Abbott's motion for protective order for Mr. Gonzalez preventing the United States from deposing him.

Pursuant to Fed R. Civ. P. 72(a) and Rule 2(b) of the Rules for United States Magistrates in the District of Massachusetts, the United States filed its objections to Magistrate Judge Bowler's January 31, 2008 Order.  On March 13, 2008, the Court reversed the Magistrate's ruling with respect to Mr. Gonzalez ordering: "[t]he decision with respect to Richard Gonzale[z], a retired executive, is clearly erroneous because he was the head of the Hospital Products Division at a critical time."

After the Court's order issued, the United States immediately made and continued to make repeated e-mail and oral requests for deposition dates for Mr. Gonzalez, receiving no

response[1] from Abbott. Pursuant to the procedure set forth in Amended CMO 29 (MDL Docket No. 1456, Document 53) the United States was forced to unilaterally pick dates for Mr. Gonzalez's deposition prior to the close of discovery. The United States served a deposition notice and subpoena for Mr. Gonzalez upon Jones Day, which agreed to accept service on Mr. Gonzalez's behalf, setting the deposition for March 25 and 26, 2008. Counsel for Abbott notified the United States that Mr. Gonzalez would not appear and Abbott filed in the instant Motion for Reconsideration on March 24, causing the United States to hold Mr. Gonzalez's deposition in abeyance until the Motion's resolution.

In view of the timing of Abbott's Motion for Reconsideration and Abbott's decision not to produce Mr. Gonzalez for deposition, the Government requests that this Court authorize Mr. Gonzalez's deposition on consecutive days as soon as practicable given the impending expert disclosure deadline of April 30, 2008 in this case.

   B.  *Facts Concerning Importance of Mr. Gonzalez's Testimony*

In arguing that this Court should reconsider its March 13 Order, Abbott factually asserts that "the need the Government could have for Mr. Gonzalez's deposition has now been eliminated by Abbott's production of a designee under Rule 30(b)(6) to testify on behalf of the corporation as to the very subjects that the Government seeks to discover from Mr. Gonzalez. Indeed, in preparing to testify, the corporate designee consulted with Mr. Gonzalez and thus was able to relay information directly from Mr. Gonzalez in the deposition." (Motion for Reconsideration at 1). The Court has already considered and rejected this argument; the only

---

[1] Abbott initially answered only that it intended to file a Motion for Reconsideration no later than March 31, 2008.

3

difference is that now a portion of Abbott's 30(b)(6) testimony has been taken.  However, the referenced Michael Sellers 30(b)(6) deposition that Abbott relies upon utterly fails to serve as a substitute for Mr. Gonzalez's critical Rule 30(b)(1) testimony.  Abbott's ambitious account of what Mr. Sellers' 30(b)(6) testimony has established to date is factually inaccurate, as demonstrated by actual deposition testimony of the designee.

As Mr. Sellers testified, in preparing for his deposition he *listened to* a 20 to 25 minute conversation between Abbott counsel, James Daly, and Mr. Gonzalez, but Mr. Sellers never actually asked questions of Mr. Gonzalez.  (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 26, lines 5-12; 30(b)(6) Sellers Dep. 3/31/08, at 343-44).  Rather, Mr. Sellers merely heard Mr. Daly ask limited, select questions of Mr. Gonzalez regarding who was involved in the 2001 price change decision, Mr. Miles White's involvement in that decision, a change in the reporting structure for the Alternate Site Contract Marketing organization, and the term "DOJ AWPs".  At his deposition, Mr. Sellers merely recounted Mr. Gonzalez's brief responses.  Mr. Seller's hearsay account of the Daly-Gonzalez brief call does not specify that Mr. Gonzalez informed anyone that he had provided the sum total of all information he personally was aware of concerning his involvement with Abbott's Hospital Products Division ("HPD") from 1999 until 2003.  (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 26 - 32; 30(b)(6) Sellers Dep. 3/31/08, at 343-44).

Everything that was asked of Mr. Gonzalez in purported preparation for the 30(b)(6) deposition, which Abbott represented to the Court would be the substitute for apex testimony, was filtered through limited questions *from Abbott counsel*.  From Mr. Sellers' account, it does not appear that Jones Day's questions began to even scratch the surface of Mr. Gonzalez's

knowledge, or that any attempts were made to try to refresh Mr. Gonzalez's recollection concerning the minimal areas that were covered.  It is inconceivable that this 20 to 25 minute selective Q&A session by Abbott's lawyers could substitute for a complete deposition under oath, or cover the questions that the United States would have for Mr. Gonzalez.

If anything, as outlined below, Mr. Sellers' testimony, and that of other 30(b)(6) witnesses, have only raised *more* questions for Mr. Gonzalez.  As set forth in the March 13, 2008 Order, the Court is already keenly aware of the significance of Mr. Gonzalez as a witness at a critical time period for Abbott.  Mr. Gonzalez was active with HPD, first as the divisional president and then in his roles with the Medical Products Groups from 1999 until 2003.  He had ultimate oversight over HPD operations, and the day to day management team, including Mr. Sellers.

Mr. Sellers' corporate designee testimony has confirmed his own recollection concerning Mr. Gonzalez's consensus decision-making role regarding the 2001 price changes, which were predicated, in part, upon outside pressures including the government's investigation of HPD's pricing for the Subject Drugs.  (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 296-300; Exhibit "B", 1996 Civil Investigative Demand & 1999 DOJ Letter to Daniel Reidy).  This apparently was not covered in the Daly-Gonzalez conversation, evidencing the superficiality of the call.  That investigation was known, or should have been known, to Abbott by 1996, and especially by the time of Mr. Gonzalez's tenure given the Department of Justice's 1999 detailed letter to Abbott's counsel.

Further, as Mr. Sellers' testimony confirmed, the Home Infusion business unit ("HPD HI Unit") within HPD that Mr. Gonzalez was ultimately responsible for managing as HPD president was responsible for billing Medicare, Medicaid and other third party payors, directly on behalf of

Abbott itself, and Abbott's customers. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 253-259; 30(b)(6) Sellers Dep 3/31/08 at 345). The HPD HI Unit also shared in revenues collected by its own pharmacies and on behalf of its consignment partners – including reimbursement by Medicare and Medicaid for the Subject Drugs in this case. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 254-259; 30(b)(6) Sellers Dep 3/31/08 at 457-477).

Despite Abbott's awareness of the Government's position regarding spreads on the Subject Drugs, Mr. Gonzalez did not close the HPD HI Unit, or otherwise take steps to insure that Abbott's HI business unit was not directly submitting false claims, or collecting AWP spread for itself, or for others prior to 2001. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 259-260) (Exhibit "B", 1996 Civil Investigative Demand No. 95-125; 1999 DOJ Letter to Daniel Reidy). Mr. Gonzalez apparently also did not seek to reduce the spreads caused by HPD's inflated list prices reported by the pricing compendia prior to 2001. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 166-184).

Abbott's 30(b)(6) designee, Mr. Sellers, prepared a written analysis in 2001 for review by Mr. Gonzalez and others that estimated the financial consequences associated with Abbott's reduction of its inflated list prices, or that would result if the proposed DOJ AWPs were implemented on Abbott's products. Mr. Sellers analyzed and reported to Mr. Gonzalez the amount of projected loss associated with Alternate Site's anticipated lost market share in 2001, and annually thereafter, if its AWPs were reduced. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 240-260, & Exh. 14; 30(b)(6) Sellers Dep. 3/31/08, at 284-320 & Exh. 34 (formerly Texas Exh. 940)). The analysis also concluded that Abbott's HPD HI Unit would lose *millions* on the loss of a percentage of the AWP spread reimbursement that it could not share in or collect directly from payors like Medicare and Medicaid. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at

258 & Exh. 14 & Exh. 34).  The United States is entitled to probe these issues with Mr. Gonzalez[2], and to inquire about the timing behind and bases for his leadership decisions on Abbott's pricing and HPD HI Unit practices.

Contrary to Abbott's assertions, the record of Mr. Sellers' 30(b)(6) testimony does not come close to covering all areas of personal knowledge inquiry for Mr. Gonzalez.  For example, as president of HPD, Mr. Gonzalez reviewed and had substantial input into the bi-annual April and August business/marketing plans and plan updates for HPD, including its Alternate Site and HPD HI Units.  Fact witnesses have given testimony concerning the active role of the HPD president in the review and revision of these plans and updates.  (*See e.g.* Composite Exhibit "C", Renick Dep. at 28; Robertson Dep. at 88-93).  Despite the United States' persistent discovery requests, and motions practice, Abbott's HPD Alternate Site and HI Unit business/marketing plans and plan updates, purportedly have not been found.  (Composite Exhibit "C", Klaus 2/8/08 Dep. at 238-40).  Mr. Gonzalez's testimony about *his* input into the marketing plan and plan update process, and his general recollections about them, is particularly significant as there may be no other source from which the United States, and its experts, can derive this otherwise spoliated information.

---

[2] Mr. Sellers' 30(b)(6) testimony explains that Abbott's high spreads for an extended period of time on the Subject Drugs were mere "inadvertent disparities or discrepancies".  This casual, if not questionable, explanation for the maintenance of Abbott's high spreads only begs the question of why the alleged inadvertent disparities were not discovered long before 2001, especially given the fact that Abbott HPD knew that the United States Attorney General was investigating as early as 1996.  (*See* Exhibit "B", 1996 Civil Investigative Demand; 1999 DOJ Letter to Daniel Reidy).  The 1999 DOJ communication occurred on Mr. Gonzalez' HPD presidential watch, and the United States is entitled to ask Mr. Gonzalez why he permitted HPD to continue with its "inadvertent" conduct.  Pricing, including the setting of list pricing, was "reviewed with the management of the division," including Mr. Gonzalez when he was president. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 35-37).

Additionally, Mr. Gonzalez had involvement with other business executives within the Abbott organization. During his tenure, Abbott's HPD HI Unit sold Lupron, a TAP Pharmaceutical ("TAP") product, sold and consigned extensive items from the Ross Division nutritional and device product lines, Abbott either collected directly on behalf of its pharmacies, or, under the consignment program, shared in, Medicare and Medicaid reimbursement. (Exhibit "A", 30(b)(6) Sellers Dep. 3/20/08, at 395-99, 418-19, 457-477 & Exh. 23 at p. BR02430). Mr. Gonzalez's awareness of (or lack thereof) the TAP and Ross investigations, and subsequent criminal guilty pleas, and his efforts (or lack of efforts) to evaluate whether the same or similar conduct that led to the TAP and Ross criminal pleas also tainted HPD, or its sale of the Subject Drugs, is another important matter for deposition inquiry.

Additionally, as the former overall head of HPD, and thereafter in his role with the Medical Products Group (which includes Abbott's Hospital Products and Diagnostics divisions, and Ross Products Division) and continued involvement with HPD, Mr. Gonzalez can offer important testimony about *his* management expectations regarding, and involvement with the following, among a myriad of other issues: a) pricing for HPD products, including the Subject Drugs; b) the day to day operations of the HPD business unit; c) sales conduct and practices within HPD and interactions HPD customers; d) demands to make HPD sales; e) the decision-making regarding sharing in spread revenue collections with HPD HI Unit consignment partners; f) evaluations of HPD operations for fraud and abuse and kickback implications; g) contact or lack of contact with government officials regarding fraud and abuse implications and kickback of HPD's business practices; h) relationships with his lower level managers, including, Mr. Sellers, Mr. Robertson, Mr. Wiebking, Mr. Baker, Ms. Mershiemer, Ms. Leone, Ms. Kreklow, Ms. Tobiason, Mr. Adams, Mr. Ward, Mr. Heggie, Mr. Walker, Mr. Kipperman, other National

Account managers and sales staff; and, i) the impact of AWP and spread on HPD product competition and business plans.

Abbott has offered no evidence that Mr. Gonzalez's recollections and personal accounts would even be consistent with Abbott's corporate view as presented by Mr. Sellers.  Certainly, Abbott's counsel asking 20 to 25 minutes of a few filtered questions in preparation for Abbott's 30(b)(6) deposition did little to shed any light on any of these issues[3].  The list of questions and topics that the United States needs to pose to Mr. Gonzalez are not exhaustively listed in this Opposition, but just by highlighting above a number of those areas of necessary inquiry, it is clear that a deposition is critical to getting to the root of many questions about the president's role, management initiatives, understanding and perceptions.

<u>LEGAL DISCUSSION</u>

  A.  *Reconsideration of March 13 Order*

This Court has already ordered that the United States is entitled to take Mr. Gonzalez's deposition; in so ordering, no limitations were placed upon the United States.  In asking this Court to reconsider its prior determination that the Magistrate was clearly erroneous, Abbott needs to either: a) demonstrate that this Court's original determination that the Magistrate clearly erred "misapprehended some material fact or point of law"; or, b) demonstrate that newly discovered evidence or intervening change in law that warrants reconsideration.  *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006); *Agosto-Mendez v. Izquierdo-Encarnacion*,

---

[3] During the 30(b)(6) deposition, Mr. Sellers testified that, at some point prior to the consensus decision to dramatically drop the list prices in 2001, he personally opposed such a move because he was fearful that dropping the list prices would somehow inculpate Abbott in the price manipulation conduct claimed by DOJ. (Exhibit "A", 30(b)(6) Sellers Dep. 3/16/08, at 43-44).  It may be that Mr. Gonzalez discussed this concern with Mr. Sellers and others.  The United States needs to depose Mr. Gonzalez to ascertain his recollection and perspective of why Mr. Sellers eventually acquiesced to lower reported prices.

2007 WL 129059 (D. P.R. 2007); *see Jorge Rivera Surillo & Co., v. Falconer Glass Indus., Inc.*, 37 F.3d 25, 29 (1st Cir. 1994).  Abbott cannot make either showing and has not even attempted to do so.

Particularly given that the reversal of a clearly erroneous magistrate decision is not a determination that any district court makes lightly, the grant of a motion for reconsideration in this instance is "'an extraordinary remedy which should be used sparingly.'" *Palmer*, 465 F.3d at 30 (*quoting* 11 Charles Allen Wright et al., Federal Practice & Procedure § 2810.1 (2d ed 1995).  Abbott cannot use a motion for reconsideration as a vehicle to revisit or reargue the position it lost earlier when this Court sustained the United States' objection to the Magistrate's ruling.  *Id.*  In support of its Motion, Abbott interjects the same legal arguments regarding 30(b)(6) testimony serving as a substitute for a fact witness's testimony raised in opposition to the United States' Objection to the Magistrate's decision.  Abbott does not even attempt to suggest in its Reconsideration Motion that this Court misapprehended the pertinent law, or that the law has materially changed since March 13.  The Court has already considered Abbott's cited case authority and legal arguments, and appropriately rejected them.

As set forth above, the so-called "new" 30(b)(6) testimony from Mr. Sellers that Abbott contends obviates the need for Mr. Gonzalez's testimony does not even scratch the surface of what the United States intends to cover with Mr. Gonzalez at a deposition.  Moreover, the Sellers' 30(b)(6) testimony regarding the Daly-Gonzalez 20 to 25 minute call is not newly discovered information.  Rather, counsel for Abbott could have had that same 20 to 25 minute question and answer session with Mr. Gonzalez *at any time*.  As a result, this limited information was either known to Abbott's counsel, or could have been discovered by Abbott's counsel, before it filed its opposition to the United States' Objection, or even before this Court ruled on

10

March 13.  *See Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek*, 455 F.3d 7, 15-16 (1st Cir. 2006)(party cannot use a motion for reconsideration to advance new evidence or arguments that could have been raised before); *Emmanuel v. International Brotherhood of Teamsters, Local Union 25*, 426 F.3d 416, 422 (1st Cir. 2005)(district court does not abuse its discretion by denying a motion for reconsideration grounded on the discovery of evidence that the party could have presented earlier in the exercise of due diligence); *see also*, *Falconer Glass*, 37 F.3d at 29.  Since there has been no intervening change in law or facts since the March 13 Order issued, this Court should deny Abbott's reconsideration request for the same carefully considered reasons underlying its order permitting Mr. Gonzalez's deposition.

  B.  *Limitations on Gonzalez Deposition*

In the alternative to seeking reconsideration, Abbott for the first time requests that this Court limit the amount of time permitted for Mr. Gonzalez's deposition to 4 hours.  The existing CMO plainly covers this situation, and provides that the parties can take up to 14 hours total for each witness.  This was a CMO provision negotiated with, and endorsed by, Abbott, and entered by the Court.  There is no reason to revisit the CMO or limit the time for Mr. Gonzalez's deposition, especially given the significant role of Mr. Gonzalez in the conduct at issue in this case, his direct contact with others responsible for the conduct at issue in this case, and the breadth of issues that he needs to address at deposition.

This is unlike in situations where limits are imposed upon true apex witnesses – who are currently sitting corporate executives with limited personal knowledge.  Mr. Gonzalez is retired, and no newly discovered business disruption issues for Abbott have been argued or come to light.  *See Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.*, 203 F.R.D. 98,

102 (S.D.N.Y. 2001)(factors of business disruption are to be considered in allowing corporate executive deposition but executives are not immune from deposition).  As a retiree, Mr. Gonzalez is in a vastly different situation than a busy corporate apex executive who may have multiple pressing demands upon his time[4].  *Cf. In re Bridgestone/Firestone, Inc. Tires Prods Liability Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002)(setting time limits on deposition of current Ford Chairman of the Board, William Clay Ford, Jr. who possessed no or limited personal knowledge).  Here, there is no such jeopardy since Mr. Gonzalez no longer has such demands upon his time, and any inconvenience he may experience in appearing for deposition is no greater than that of any other witness in this case[5].

Further, the more that the United States learns through discovery in this case, the longer the list of questions that need to be directed to Mr. Gonzalez.  Based upon the most recent 30(b)(6) depositions last month, there are more issues now than even existed at the time the United States filed its Objection.  In addition to those areas of inquiry set forth in the United States' original Objection to the Magistrate's decision, and the numerous areas outlined above, the United States also needs to ask Mr. Gonzalez about his document creation, preservation, and production.

---

[4] Abbott argues that the United States is somehow acting improperly by seeking the normal deposition time allowed for a witness under CMO 29 because it agreed previously to coordinate its deposition of Mr. Gonzalez with other parties.  This argument rings hollow.  By proposing to coordinate with other parties who have noticed Mr. Gonzalez, like other litigating states, the United States was doing its best to reduce the risk to Mr. Gonzalez that he may have to be burdened with sitting for more than one deposition or with being questioned twice on the same topics.   The Government did not waive its rights to a full deposition under the CMO.

[5] Notably, the United States sought Mr. Gonzalez's deposition prior to his departure from Abbott.  If Abbott was concerned that a deposition would have disrupted Mr. Gonzalez's retirement, it could have produced him as a witness when he was still an employee.

On March 13, at the 30(b)(6) deposition of Alexandra Buck, Abbott's designee regarding computer production, the United States learned for the first time that Abbott had re-imaged the hard drives of only two employees in the entire company as part of its discovery obligations. One of those two employees was Mr. Gonzalez. (Exhibit "D", 3/13/08 Buck Dep. Page 293-295 & 233). As the organization head, Mr. Gonzalez should have been sensitive to the litigation hold requirements in place within HPD since 1996, and set an example for the rest of his division. According to Ms. Buck no responsive documents were found on Mr. Gonzalez's computer. *Id.* The United States needs to spend time questioning the former HPD head to evaluate why that was the case.

Critically, Mr. Gonzalez can also testify concerning *his* fraud and abuse compliance expectations and monitoring protocol for the HPD division. Recently, on March 12th and March 20th, David Fishman, Abbott's 30(b)(6) designee on compliance matters, testified that the corporation was unaware of certain Alternate Site and HPD HI Unit apparent spread marketing documents and conduct[6] that contravened Abbott's own purported practices. (Exhibit "E",

---

[6] Abbott's 30(b)(6) compliance designee was unaware of the prior testimony and documentary evidence reflecting that Abbott's contract marketing Alternate Site staff routinely provided AWP and AWP spread information in response to GPO bids and in proposal analyses to customers. Mr. Fishman testified that such conduct would violate Abbott practices purportedly prohibiting the provision of AWP and spread information to customers. (Exhibit "E", 3/12/08 Fishman Dep at 259-271). Moreover, Mr. Fishman was unaware of certain HPD HI Unit practices including (among others) the basic, uncontroverted fact that Abbott's pharmacies submitted claims to Medicare and Medicaid on Abbott's behalf, in addition to collecting a portion of AWP spread reimbursed to Abbott's HPD HI Unit "consignment partners". (Exhibit "E", 3/20/08 Fishman Dep. at 380-381; Abbott 4/1/08 Answer to Amended Complaint at Paragraphs 116-119 &127, MDL Docket No. 1456, Document 5188 Answer to Document 4281, Amended Complaint). This testimony only highlights the need to ask questions of the HPD head about the possible lack of understanding by the HPD leadership of the fraud and abuse implications of the HPD HI Unit business model.

3/12/08 Fishman Dep. at 259-271). Such testimony only heightens the need to seek testimony broadly from the HPD president about where, under his leadership, the "buck stopped" with regard to Abbott HPD policies and procedures and HPD measures to verify compliance with Medicare and Medicaid fraud and abuse statutes and regulations. *See e.g. Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140, 146 (D. Mass 1987)(permitting depositions to evaluate executive's role in decision making to determine whether the executive played a part in decision, or whether conduct at issue was attributable to recommendations and decisions of lower level employees).

In sum, where they deem necessary, the United States and parties related to this litigation should be permitted to use without limitation the full 14 hours allotted under the CMO for the deposition of any individual witness. In taking its own discovery, counsel for Abbott used as much time as Abbott chose – up to 14 hours – for numerous current and former CMS and OIG apex government officials. At times, the Government has facilitated current and former officials' appearances for deposition on multiple consecutive days of deposition. Here, there is no reason why Mr. Gonzalez should not have to similarly appear for a full deposition, especially given the expansive list of issues that need to explored at his deposition. The United States can easily take Mr. Gonzalez's deposition in Florida in Palm Beach County at a location convenient to him to minimize any burden associated with his travel.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that this Court deny Abbott's Motion to Reconsider the Court's Denial of Abbott's Motion for a Protective Order Relating to the Proposed Deposition of Richard A. Gonzalez**.** The United States further requests that Mr. Gonzalez be ordered to appear for deposition on consecutive days

within 10 calendar days of the Court's Order denying Abbott's Motion, without limitation to the

subject matter of the deposition or time period permitted under CMO 29.


Respectfully submitted,


For the United States of America,

| | |
|---|---|
| MICHAEL J. SULLIVAN<br>UNITED STATES ATTORNEY | JEFFREY S. BUCHOLTZ<br>ACTING ASSISTANT ATTORNEY GENERAL |
| /s/ George B. Henderson, II<br>George B. Henderson, II<br>Assistant U.S. Attorney<br>John Joseph Moakley U.S. Courthouse<br>Suite 9200, 1 Courthouse Way<br>Boston, MA 02210<br>Phone: (617) 748-3272<br>Fax: (617) 748-3398 | /s/ Gejaa T. Gobena<br>Joyce R. Branda<br>Daniel R. Anderson<br>Renée Brooker<br>Justin Draycott<br>Rebecca Ford<br>Gejaa T. Gobena<br>Elizabeth A. Strawn<br>Civil Division<br>Commercial Litigation Branch<br>P. O. Box 261<br>Ben Franklin Station<br>Washington, D.C.  20044<br>Phone:  (202) 307-1088 |
| R. ALEXANDER ACOSTA<br>UNITED STATES ATTORNEY<br>SOUTHERN DISTRICT OF FLORIDA | |
| /s/Ann M. St. Peter-Griffith<br>Mark A. Lavine<br>Ana Maria Martinez<br>Ann M. St.Peter-Griffith<br>Special Attorneys for the Attorney General<br>99 N.E. 4th Street, 3rd Floor<br>Miami, FL  33132<br>Phone:  (305) 961-9003<br>Fax: (305) 536-4101 | |

Dated: April 4, 2008

## CERTIFICATE OF SERVICE

     I hereby certify that I have this day caused an electronic copy of the above Opposition to Abbott's Motion to Reconsider the Court's Denial of Abbott's Motion for a Protective Order Relating to the Proposed Deposition of Richard A. Gonzalez. to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                          /s/ Ann. M. St. Peter-Griffith

Dated: April 4, 2008