# EXHIBIT A

30(b)(6) Sellers Deposition
3/16/08

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:   PHARMACEUTICAL          )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

PRICE LITIGATION                 )   01-CV-12257-PBS

_____   CONFIDENTIAL


Videotaped Rule 30(b)(6) Deposition

of MICHAEL SELLERS, at 77 West Wacker

Drive, Chicago, Illinois, commencing

at 9:00 a.m. on Sunday, March 16,

2008, before Donna M. Kazaitis, RPR,

CSR No. 084-003145.

2  (Pages 2 to 5)

---

**2**

1    APPEARANCES OF COUNSEL:

2

3    FOR THE UNITED STATES:

4         U.S. DEPARTMENT OF JUSTICE

5         CIVIL DIVISION

6         BY: MS. ANN ST. PETER-GRIFFITH

7         99 N.E. 4th Street

8         Miami, Florida 33132

9         (305) 961-9003

10        ann.st.peter-griffith@usdoj.gov

11

12   FOR ABBOTT LABORATORIES:

13        JONES DAY

14        BY: MS. TINA TABACCHI

15        77 West Wacker Drive

16        Chicago, Illinois 60601-1692

17        (312) 782-3939

18        ttabacchi@jonesday.com

19

20   ALSO PRESENT:

21        Ben Stanson, Videographer

22

---

**4**

1              INDEX OF EXHIBITS              PAGE

2    Exhibit Sellers 001, Deposition Notice          9

3    Exhibit Sellers 002, First Amended Complaint    51

4    Exhibit Sellers 003, Red Book 334 - 538,

5        745 - 897, 1172-1306, TX ABT 57845-879  109

6    Exhibit Sellers 004, TX ABT 57880 - 913,

7        57998 - 166, CA ABT 4791 - 195         114

8    Exhibit Sellers 005, TX ABT 57667 - 801       116

9    Exhibit Sellers 006, Collection of Documents   117

10   Exhibit Sellers 007, TXABT 38105 - 107        196

11   Exhibit Sellers 008, MHA Corporate Overview    217

12   Exhibit Sellers 009, TXABT 453403 - 413       223

13   Exhibit Sellers 010, TXABT 249852 - 856       225

14   Exhibit Sellers 011, TXABT 15896 - 931        228

15   Exhibit Sellers 012, VTP038-0106 - 145       231

16   Exhibit Sellers 013, TXABT 158775 - 776       235

17   Exhibit Sellers 014, TXABT 674736 - 739       240

18   Exhibit Sellers 015, TXABT 674741 - 742       260

19

20

21

22

---

**3**

1              I N D E X

2                 ⚓

3    Sunday, March 16, 2008

4

5    WITNESS               EXAMINATION

6

7    MICHAEL SELLERS

8        (By Ms. St. Peter-Griffith)     6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

**5**

1              THE VIDEOGRAPHER:  This is Ben Stanson

2    representing Henderson Legal Services.  I am the

3    operator of this camera.

4              This is the videotaped deposition

5    of 30(b)(6) witness Michael Sellers as being taken

6    pursuant to Federal Rules of Civil Procedure on

7    behalf of the plaintiffs.

8              We are on the record on March 16,

9    2008.  The time is 9:06 a.m. as indicated on the

10   video screen.  We are at the offices of Jones Day

11   at 77 West Wacker Drive in Chicago, Illinois.

12             This case is captioned In Re:

13   Pharmaceutical Industry Average Wholesale Price

14   Litigation, Case No. 01-12257-PBS.

15             Will the attorneys please identify

16   themselves for the video record.

17             MS. ST. PETER-GRIFFITH:  Ann

18   St. Peter-Griffith, United States Attorney's

19   Office on behalf of the United States.

20             MS. TABACCHI:  Tina Tabacchi on behalf

21   of Abbott Laboratories.

22             THE VIDEOGRAPHER:  Thank you.

---

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

8  (Pages 26 to 29)

| 26 |
|---|
| 1    you mind if I refer to this? |
| 2    Q.   Absolutely. |
| 3      A.   The other was the decision to close down |
| 4    the Home Infusion Services business. |
| 5    Q.   First of all, how long was your |
| 6    conversation with Mr. Gonzalez? |
| 7      A.   It was probably about twenty to |
| 8    twenty-five minutes. |
| 9    Q.   What did you discuss concerning the 2001 |
| 10   price change with him? Did you ask him questions? |
| 11     A.   I was on there and questions were asked |
| 12   of him by a Jones Day attorney. |
| 13   Q.   What was asked? |
| 14     A.   With regard to? |
| 15   Q.   I'm sorry.  2001 price change.  Let's |
| 16   start there. |
| 17     A.   With regard to the 2001 price change. |
| 18   One of the questions was who was involved in the |
| 19   decision for the 2001 price change. |
| 20   Q.   Did Mr. Gonzalez respond? |
| 21     A.   Yes. |
| 22   Q.   What did he say? |

| 27 |
|---|
| 1      A.   He said that he was involved, Chris |
| 2    Begley was involved, Guy Wiebking, myself, and |
| 3    Laura Schumacher. |
| 4    Q.   Did he say anything else about that? |
| 5      MS. TABACCHI:  Object to the form. |
| 6      THE WITNESS:  He said that was the team |
| 7    that he had met with and talked about. |
| 8    BY MS. ST. PETER-GRIFFITH: |
| 9    Q.   What other questions were asked? |
| 10     A.   The other question was who made the |
| 11   decision for the change, and his answer was that |
| 12   it was a consensus of that team. |
| 13        He was also asked if he consulted |
| 14   with Miles White on that decision, and he said no. |
| 15   Q.   Any other questions? |
| 16     A.   With regard to the price change, no. |
| 17   Q.   Did Mr. Gonzalez say anything else with |
| 18   regard to the price change? |
| 19     A.   No. |
| 20   Q.   Let's go to the decision to change the |
| 21   organization of Contract Marketing for Alternate |
| 22   Site. |

| 28 |
|---|
| 1      A.   He was asked why that decision, why that |
| 2    decision was made, and what he remembered of it. |
| 3    He didn't have a lot of detailed memory with |
| 4    regard to that, but he did remember that he said |
| 5    it was done to make sure that we had consistency |
| 6    with regard to the management of prices in the |
| 7    division. |
| 8    Q.   Which change in Contract Marketing are |
| 9    you referencing? |
| 10     A.   I'm talking about the change in |
| 11   reporting relationship for the Contract Marketing |
| 12   segment of Alternate Site. |
| 13   Q.   And what was that change? |
| 14     A.   Basically Lynn Leone worked as the |
| 15   manager of Contract Marketing for Alternate Site |
| 16   and she reported to the general manager of Product |
| 17   Sales starting in 2000 and had a dotted line |
| 18   reporting relationship to the general manager of |
| 19   Contract Marketing. |
| 20        Sometime in the first part of 2000, |
| 21   as I recall, her organization began to formally |
| 22   report to the general manager of Contract |

| 29 |
|---|
| 1    Marketing and subsequently had a dotted line |
| 2    relationship with the general manager of Product |
| 3    Sales. |
| 4    Q.   Now, in 2000 who was the general manager |
| 5    of Product Sales? |
| 6      A.   Peter Baker. |
| 7    Q.   And in 2000 when this change occurred, |
| 8    who was the general manager of Contract Marketing? |
| 9      A.   Mike Sellers. |
| 10   Q.   Did he indicate who made the decision? |
| 11     A.   I don't remember him specifically saying |
| 12   "I made the decision."  I think his statement was |
| 13   the decision was made.  His memory was definitely |
| 14   that he was part of the decision. |
| 15   Q.   As a 30(b)(6) representative here today |
| 16   for Abbott, what is Abbott's testimony as to who |
| 17   made the decision? |
| 18     A.   I think — |
| 19     MS. TABACCHI:  Object to the form. |
| 20     THE WITNESS:  — as I remember it and |
| 21   as, you know, as we did it, it was a decision that |
| 22   was a consensus of whether it be Rick Gonzalez, |

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

9  (Pages 30 to 33)

---

**30**

1    Guy Wiebking, myself.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   At the time the decision was made, was
4    there a concern regarding consistency with regard
5    to management concerning the pricing?
6            MS. TABACCHI:  Object to the form.
7            THE WITNESS:  I don't recall a specific
8    concern, no.
9    BY MS. ST. PETER-GRIFFITH:
10       Q.   What else did you discuss with
11   Mr. Gonzalez regarding the change in organization
12   of Contract Marketing for Alternate Site?
13       A.   That was it.
14       Q.   Did Mr. Gonzalez or anyone else discuss
15   anything else concerning that topic, the change in
16   organization for Contract Marketing?
17       A.   No.
18       Q.   Okay.  What about the decision to close
19   down Home Infusion?  What was asked of
20   Mr. Gonzalez and what did he answer?
21       A.   I believe the question was what do you
22   recall about the decision to close down Home

---

**31**

1    Infusion Services.  And Mr. Gonzalez answered
2    that, as he remembered it, Home Infusion Services
3    was a small component of the Hospital Products
4    Division, that in the later years as he looked at
5    the business and when it was fully burdened with
6    the full cost of the division and corporate
7    overhead, that it wasn't profitable.  So he made a
8    decision to close it down.
9        Q.   And that was Mr. Gonzalez's decision?
10       A.   Yes.
11       Q.   When was that decision made?
12       A.   I believe it was in 1997.
13       Q.   I appreciate this might be in your
14   personal capacity, but do you know what position
15   Mr. Gonzalez held in 1997?
16       A.   He was the president of the Hospital
17   Products Division.
18       Q.   What else did Mr. Gonzalez discuss
19   concerning closure of Home Infusion?
20       A.   That was it.
21       Q.   Is there anything else that was
22   discussed in this conversation with Mr. Gonzalez?

---

**32**

1        A.   No.
2        Q.   Sir, other than what you've testified to
3    so far, did you do anything else to prepare for
4    today's deposition?
5        A.   No.  I don't believe so.
6        Q.   What happened when the change in
7    reporting relationship occurred in 2000 for
8    Alternate Site Contract Marketing?
9            MS. TABACCHI:  Object to the form.
10           THE WITNESS:  What happened?
11   BY MS. ST. PETER-GRIFFITH:
12       Q.   Sure.  Well, let me ask you, from a
13   personnel standpoint what happened?  Was there a
14   change in -- first, what was the change in terms
15   of the reporting relationships?  Who reported to
16   who and what change occurred in that reporting
17   relationship?
18       A.   Lynn Leone and her Contract Marketing
19   organization, which was probably around eight
20   people that reported to her, if I remember right,
21   that organization prior to the change, as I said
22   before, reported to the general manager of Product

---

**33**

1    Sales, Pete Baker.  There was no physical movement
2    of people.  So they remained where they were prior
3    to the change.
4            The difference was that Lynn and
5    her group became a part of the overall Contract
6    Marketing group.  And instead of Pete reviewing
7    what Lynn and her folks were doing, I took over
8    that responsibility.
9        Q.   In addition, were there any other
10   changes with regard to the day-to-day
11   responsibilities of the individuals in Contract
12   Marketing and Alternate Site that occurred as a
13   result of this change?
14       A.   Nothing other than, you know, we
15   established periodic meetings between me and Lynn
16   as well as myself meeting with her team so they
17   understood who I was, what we were trying to do.
18       Q.   What did you discuss with them during
19   those meetings?
20           MS. TABACCHI:  Object to the form.
21           THE WITNESS:  Typically, with all of my
22   managers I would have what I would call a

---

**34**

1 one-on-one monthly where they would update me with
2 what they were doing, and it would give me the
3 opportunity to kind of probe at what was going on
4 and keep in touch with all the different segments
5 of my organization.
6 BY MS. ST. PETER-GRIFFITH:
7  Q. Did you discuss anything with regard to
8 pricing in these meetings?
9      MS. TABACCHI: Object to the form.
10      THE WITNESS: Most everything we
11 discussed was with regard to pricing.
12 BY MS. ST. PETER-GRIFFITH:
13  Q. What did you discuss with regard to
14 pricing?
15      MS. TABACCHI: Object to the form.
16      THE WITNESS: Again, these were monthly
17 meetings, they were operational meetings, you
18 know. Whatever were the operational issues, it
19 was primarily with regard to, obviously with
20 Alternate Site, it was with regard to contract
21 price.
22      Some of our discussions might have

**35**

1 been regarding customers, some of it might have
2 been regarding what the business unit wanted to
3 do, what promotions were coming up. So it was
4 very much very tactical discussions, day-to-day
5 tactical discussions.
6 BY MS. ST. PETER-GRIFFITH:
7  Q. Was there any discussion concerning
8 catalog prices and list pricing?
9  A. No, not with Lynn.
10  Q. Prior to this change in structure, were
11 there discussions between Lynn Leone's group and
12 Pete Baker or the other Product Sales manager
13 concerning catalog prices and list pricing?
14      MS. TABACCHI: Object to the form.
15      THE WITNESS: I can't speak to that.
16 BY MS. ST. PETER-GRIFFITH:
17  Q. You indicated not with Lynn. Did you
18 discuss catalog pricing and list pricing with
19 anyone else in your capacity as manager of
20 Contract Marketing?
21      MS. TABACCHI: Object to the form.
22      THE WITNESS: As I've testified before,

**36**

1 the setting of catalog prices was usually an
2 annual process and it was a process led by the
3 Hospital Business Sector part of Contract
4 Marketing in concert with the various marketing
5 teams on the hospital side.
6 BY MS. ST. PETER-GRIFFITH:
7  Q. When you say "marketing teams," do you
8 mean the product line marketing teams?
9  A. Yes.
10  Q. With regard to the establishment or
11 setting of catalog prices, where did the final
12 authority to establish the pricing rest?
13      MS. TABACCHI: Object to the form.
14      THE WITNESS: Again, I think it was
15 attempted to be as consensus as possible on each
16 particular product price. The over --
17
18 BY MS. ST. PETER-GRIFFITH:
19  Q. I'm sorry. When you say "consensus," I
20 just want to make sure I get this. Consensus
21 among who?
22  A. Among Contract Marketing and the various

**37**

1 product marketing teams.
2  Q. I'm sorry. Continue.
3  A. Subsequent to each of the teams or each
4 of everybody coming together and deciding what we
5 wanted to do, the aggregate result was reviewed
6 with the management of the division.
7      So the final okay on what we were
8 going to do on an aggregate point of view was done
9 by both Guy Wiebking, who was the vice president
10 of commercial operations, and, wait a minute, I'm
11 sorry, vice president of commercial services and
12 the division president.
13  Q. Mr. Gonzalez for a period of time?
14  A. For a period of time.
15  Q. Okay. In prepping for today's
16 deposition, did you do any inquiry to find out
17 what the involvement was of Tom Hodgson in any of
18 the topics that are at issue in today's 30(b)(6)
19 deposition?
20      MS. TABACCHI: Object to the form.
21      THE WITNESS: No.
22 BY MS. ST. PETER-GRIFFITH:

42

1    was the president's office of the Hospital
2    Products Division.  And I can't remember where
3    the, the March meeting may have been over in Rick
4    Gonzalez's corporate area.
5         Q.   Did anyone else other than those five
6    individuals have input into the decision to make
7    the 2001 price change?
8         A.   No.
9              MS. TABACCHI:  Object to the form.
10
11   BY MS. ST. PETER-GRIFFITH:
12        Q.   What were your thoughts, and I
13   appreciate you're testifying in your personal
14   capacity, but what were your thoughts on whether
15   the 2001 price change occurred?
16             MS. TABACCHI:  Object to the form,
17   beyond the scope of the Notice, and the witness
18   has already testified about this in a previous
19   deposition taken by you in this case.
20             THE WITNESS:  It was a consensus
21   decision to make the change.
22   BY MS. ST. PETER-GRIFFITH:

43

1         Q.   Did you agree with it?
2         A.   Yes.
3         Q.   Did you have any reservations about the
4    2001 price change?
5              MS. TABACCHI:  Object to the form,
6    beyond the scope, asked and answered previous
7    testimony.
8              THE WITNESS:  Early on I probably did,
9    but later in the process I agreed with it.
10   BY MS. ST. PETER-GRIFFITH:
11        Q.   Why early on did you have reservations?
12             MS. TABACCHI:  Again, all of these
13   questions have been posed already to Mr. Sellers
14   in his individual deposition.
15             MS. ST. PETER-GRIFFITH:  No, they
16   haven't.
17             MS. TABACCHI:  I'm going to object to
18   the line of questioning, beyond the scope.
19             THE WITNESS:  I think initially I had
20   some concern with regard to the fact that it might
21   be used against us and seen as agreeing with the
22   claims being made.

44

1    BY MS. ST. PETER-GRIFFITH:
2         Q.   What claims being made?
3              MS. TABACCHI:  Objection, same
4    objections.
5              THE WITNESS:  That we had manipulated
6    price.
7    BY MS. ST. PETER-GRIFFITH:
8         Q.   And you said eventually you changed your
9    view on that?
10             MS. TABACCHI:  Same objections.
11             THE WITNESS:  As I said, as we went
12   through the analysis I agreed with the end result.
13   BY MS. ST. PETER-GRIFFITH:
14        Q.   Did anyone else have reservations about
15   the 2001 price changes?
16             MS. TABACCHI:  I'm going to caution the
17   witness not to reveal the substance of any
18   communications between anyone at any meeting in
19   which counsel was present.
20             MS. ST. PETER-GRIFFITH:  I'm going to
21   have to ask you, Tina, whether you intend to rely
22   upon advice of counsel.

45

1              MS. TABACCHI:  We've been through this
2    before.  Mr. Sellers is not going to waive any
3    privilege today in his testimony.
4              THE WITNESS:  I don't know of anybody
5    else.
6    BY MS. ST. PETER-GRIFFITH:
7         Q.   Sir, were the two meetings that you
8    testified the only meetings regarding the proposed
9    price change in 2001?
10             MS. TABACCHI:  Object to the form.
11             THE WITNESS:  They were the only
12   meetings with that team.
13   BY MS. ST. PETER-GRIFFITH:
14        Q.   Were other meetings held?
15        A.   I worked with Laura Schumacher on the
16   analysis --
17             MS. TABACCHI:  I'm going to caution the
18   witness not to reveal the substance of any
19   communications with Ms. Schumacher.
20             THE WITNESS:  And there were a number of
21   meetings that I held with her.
22   BY MS. ST. PETER-GRIFFITH:

166

1    Q.    Well, who within Abbott, and I don't
2    want you to limit it necessarily to HPD, I'm
3    talking Abbott-wide, who within Abbott had an
4    understanding of the relationship between the
5    prices reported by Abbott to the pricing compendia
6    and the pricing compendia's calculations of AWP?
7            MS. TABACCHI:  I'm going to object to
8    the form.  Also it's beyond the scope of the
9    Notice.
10           To the extent that Mr. Sellers is
11   aware of communications among divisions on this
12   topic, that would be one thing.  But he's not here
13   to testify with respect to any other division
14   other than the Hospital Products Division.
15           I understand you're seeking
16   corporate testimony, but he can't testify on
17   behalf of the Pharmaceutical Products Division for
18   example.
19   BY MS. ST. PETER-GRIFFITH:
20   Q.    Well, if any division, let me ask you
21   this, sir:  If any division in Abbott had an
22   understanding of what AWP was, would that

167

1    understanding be different in another division?
2            MS. TABACCHI:  Object to the form.  I
3    don't know how he can answer that.
4            THE WITNESS:  I can't answer it if I
5    don't have any knowledge of what others might have
6    known.
7    BY MS. ST. PETER-GRIFFITH:
8    Q.    Well, my question to you is what did
9    Abbott as a corporation know about the correlation
10   between prices reported to the pricing compendia
11   and the pricing compendia's calculations of AWP?
12           MS. TABACCHI:  Object to the form,
13   beyond the scope of the Notice.
14           THE WITNESS:  Again, I can only speak to
15   the segment of Abbott which is the Hospital
16   Products Division that I was part of and that as I
17   understood was part of this proceedings.
18   BY MS. ST. PETER-GRIFFITH:
19   Q.    Well, you understand that Abbott
20   Corporation is a defendant; don't you, sir?
21   A.    I do.
22   Q.    And it's not Abbott Corporation as

168

1    segmented into the Hospital Products Division,
2    it's Abbott Corporation.
3    A.    Yes.
4            MS. ST. PETER-GRIFFITH:  If you read
5    that prior question back, please.
6            (WHEREUPON said record was read
7            back as requested.)
8            MS. TABACCHI:  Object to the form.
9            Mr. Sellers can provide testimony
10   on behalf of what the Hospital Products Division
11   knew.
12           MS. ST. PETER-GRIFFITH:  He's here as
13   Abbott's corporate rep.
14           MS. TABACCHI:  He is testifying on
15   behalf of the corporation.  But it's overly broad
16   to have expected him to go research fifteen years
17   of history in other divisions that are not related
18   to the issues in this case or the drugs that were
19   named in the Complaint.
20   BY MS. ST. PETER-GRIFFITH:
21   Q.    Sir, can you answer the question?
22   A.    No.

169

1    Q.    How come?
2    A.    I can talk about the Hospital Products
3    Division.  I can't venture to speculate on what
4    other parts of Abbott knew or didn't know.
5    Q.    Well, if other parts of Abbott knew that
6    there was a correlation between the calculation of
7    AWP and the reporting of prices to the price
8    reporting compendia by Abbott, don't you think
9    that's something that should have been known
10   throughout the corporation?
11           MS. TABACCHI:  Object to the form,
12   beyond the scope.
13           THE WITNESS:  No.
14   BY MS. ST. PETER-GRIFFITH:
15   Q.    Why not?
16           MS. TABACCHI:  Same objections.
17           THE WITNESS:  For one thing, within the
18   Hospital Products Division AWP had no significance
19   to anybody.  So it wasn't something that was
20   relevant to what we did day-to-day.
21   BY MS. ST. PETER-GRIFFITH:
22   Q.    Was it relevant to the Home Infusion

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

44  (Pages 170 to 173)

---

170

1   Business unit?
2           MS. TABACCHI: Object to the form.
3           THE WITNESS: Remotely.
4   BY MS. ST. PETER-GRIFFITH:
5       Q.   How so?
6       A.   **Because it didn't necessarily define**
7   **reimbursement for Home Infusion customers.**
8           **It was a factor in some cases for**
9   **some payors for some period of time. It's a very**
10  **fragmented component.**
11          **Even within the Home Infusion**
12  **Services, I don't think anybody spent a lot of**
13  **time wondering about whether AWP had any**
14  **mathematical relationship to other numbers.**
15      Q.   For those individuals that did have an
16  understanding of the relationship between the
17  prices reported by Abbott to the pricing compendia
18  and the calculation of AWP by the pricing
19  compendia, what was that understanding?
20          MS. TABACCHI: Object to the form.
21          THE WITNESS: As I have been able to
22  piece together from both my working experience as

---

171

1   well as reviewing depositions and documents, there
2   were maybe a handful of people that understood
3   again beginning in the early 1990s that AWP was
4   some function of our list price.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   Who were those individuals?
7           MS. TABACCHI: Object to the form.
8           THE WITNESS: Probably Jerrie Cicerale,
9   Harry Adams. I mean it was a pretty small list
10  that I would think might have known that.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   So it's Abbott's position that it's only
13  aware that Harry Adams and Jerrie Cicerale may
14  have known of the correlation between the list
15  prices reported by Abbott to the pricing compendia
16  and the pricing compendia's calculations of AWP?
17          MS. TABACCHI: Object to the form,
18  beyond the scope of the Notice.
19          THE WITNESS: You asked me for some
20  specific people. I can't, I don't have a roster
21  of people to go through.
22  BY MS. ST. PETER-GRIFFITH:

---

172

1       Q.   Well, is Abbott aware of anyone else who
2   had this information?
3           MS. TABACCHI: Object to the form,
4   beyond the scope.
5           THE WITNESS: Again, I've not talked to
6   either one of those people. I can't give you a
7   list of people that might have known something.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.   Well, sir, what did you do to prepare
10  for today's deposition to educate yourself
11  concerning the company's understanding of the
12  relationship between AWP and the prices reported
13  by Abbott to the pricing compendia?
14          MS. TABACCHI: What topic are you on,
15  Ann?
16          MS. ST. PETER-GRIFFITH: I'm on a
17  variety of topics. I'm on 12, I'm on 11, I'm on
18  9, I'm on 8.
19          MS. TABACCHI: Object as beyond the
20  scope, object to the form.
21          THE WITNESS: Again, I've done a number
22  of depositions, this subject has come up before

---

173

1   I've looked at documents in the past. I've also
2   looked at, as I said, I've looked at depositions.
3   And I can tell you that I have not seen a
4   prevalence of knowledge with regard to this
5   subject.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   Well, what was Abbott's understanding of
8   the correlation between AWP and Medicare or
9   Medicaid reimbursement?
10          MS. TABACCHI: Object to the form,
11  beyond the scope.
12          THE WITNESS: I think Virginia Tobiason
13  and Lynn Leone have both testified that across
14  that time period AWP was one component of the
15  reimbursement for Home Infusion, and it was a
16  factor. It wasn't absolute.
17          Across that time period the
18  functions of what was getting reimbursed may have
19  gone from AWP plus to AWP minus in terms of
20  percentage. And it varied by state and it may
21  have even varied by Medicare payor or carrier. I
22  don't know. But it definitely varied by

---

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

45 (Pages 174 to 177)

174

1    commercial payor.
2            So it was one component for a few
3    payors. And primarily that information resided in
4    the Home Infusion Services reimbursement area.
5    BY MS. ST. PETER-GRIFFITH:
6        Q.   Is it your testimony that the Alternate
7    Site division did not have any knowledge or
8    awareness of the impact of AWP or the importance
9    of AWP to their customer's reimbursement?
10           MS. TABACCHI:  Object to the form,
11   beyond the scope.
12           THE WITNESS:  No --
13           MS. ST. PETER-GRIFFITH:  It's not beyond
14   the scope. Tina, it's the bulk of the documents.
15   BY MS. ST. PETER-GRIFFITH:
16       Q.   Go ahead, sir.
17       A.   No.  I'm not telling you that.
18           I'm telling you that there was a
19   small group of people within Home Infusion
20   Services reimbursement that had regional
21   information with regard to whether AWP or list
22   price or WAC price, any number of which might have

175

1    been the factors that the case managers or the
2    reimbursement agents that they were dealing with
3    were using in the calculation of what they
4    eventually got paid to our clients.
5            So yes, there was a small number of
6    people that had more detailed information, but
7    they did not have national information in any one
8    particular person, other than maybe Ginny Tobiason
9    who everything reported to.  And even hers, as I
10   read her deposition, was somewhat fracture.
11       Q.   Sir, as Abbott sits here today, for the
12   period from 1991 to 2003, and if the understanding
13   changed over time please feel free to tell me
14   that, what was Abbott's understanding of the
15   relationship between AWP and Medicare/Medicaid
16   reimbursement?
17           MS. TABACCHI:  Object to the form,
18   beyond the scope, asked and answered.
19           THE WITNESS:  If you're defining Abbott
20   as any particular person within Abbott --
21   BY MS. ST. PETER-GRIFFITH:
22       Q.   I'm talking about Abbott the

176

1    corporation. What did Abbott the corporation
2    understand?
3        A.   When I look at Abbott the corporation, I
4    look at seventeen thousand people in the Hospital
5    Products Division, I look at the people that were
6    making operative decisions within the Hospital
7    Products Division.  And if I look at those and
8    give you an objective response, the objective
9    response was AWP was not an important factor to
10   the majority of them.  So they had no need to
11   know, nor do I think they had acquired the
12   knowledge of what the relationship between list
13   price or WAC price and AWP was.
14           Now, it evolved over time because,
15   as you brought up, subpoenas were issued for
16   information in 1996, 1997, and wherever in
17   between, at least another one in 2000, that
18   brought to light a number of issues with regard to
19   AWP.
20           So starting in the late 1990s, AWP
21   for the management of the Hospital Products
22   Division became more of an understanding.  But

177

1    even then prior to say 2000 there was an
2    understanding that there may have been a
3    mathematical formula to calculate AWP.
4            When we entered 2001, we continued
5    to think that that was based on list.  Subsequent
6    later in 2001, we were notified by First Databank
7    that they in fact were driving it off wholesale
8    acquisition costs.
9            So our knowledge may have been
10   erred in some way.  And it just wasn't a number
11   that we kept track of and monitored.
12       Q.   Prior to 2001, did Abbott have an
13   understanding of the relationship between AWP and
14   Medicare and Medicaid reimbursement?
15           MS. TABACCHI:  Objection, asked and
16   answered, beyond the scope.
17           THE WITNESS:  I think specifically in
18   terms of what I have seen, I have seen documents
19   that were in I believe 1996 or 1997 which talked
20   about a mathematical relationship to list price to
21   AWP that was attributed to First Databank.  And I
22   think that became, for the few people that

---

178

1 understood it, that was known in the latter part
2 of the 1990s.
3        And, like I said, in 2001 it
4 changed. And we wouldn't have known it changed.
5 In fact, it changed before we knew it changed, and
6 we were finally notified I believe in May of 2001
7 by First Databank as to what their calculation
8 was.
9        I don't believe I have ever seen
10 anything that tells us what Red Book's calculation
11 was.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  I'm not asking about the calculation,
14 sir.
15        Is it your testimony that beginning
16 in the early '90s when this information became
17 known to the select few individuals that Abbott
18 understood that there was a relationship between
19 AWP and Medicare/Medicaid reimbursement?
20        MS. TABACCHI:  Object to the form, asked
21 and answered, beyond the scope.
22        THE WITNESS:  Mid '90s there were a few

---

179

1 people that understood or thought they understood
2 that there was a relationship.
3        That knowledge expanded primarily
4 due to these, the litigation in the late 1990s.
5 BY MS. ST. PETER-GRIFFITH:
6    Q.  Did Abbott at any time make any inquiry
7 of any government official, state or federal, to
8 seek clarification of the relationship between its
9 price reporting or AWPs and Medicare or Medicaid
10 reimbursement?
11        MS. TABACCHI:  Object to the form.
12        Would you mind reading that back.
13        (WHEREUPON said record was read
14        back as requested.)
15        MS. TABACCHI:  Object to the form,
16 beyond the scope of the Notice.
17        THE WITNESS:  I don't believe that was,
18 I'm not aware of any communication to that effect.
19        I am aware that there was ongoing
20 communication between the reimbursement folks and
21 the carriers to understand what they could about
22 what we were getting paid for our clients, but I

---

180

1 don't think that's what you're asking about.
2 BY MS. ST. PETER-GRIFFITH:
3    Q.  No.  I'm not asking about individual
4 reimbursement questions posed by the reimbursement
5 department within Home Infusion, unless they made
6 the inquiry to Medicare and Medicaid about the
7 relationship between Abbott's AWPs or Abbott's
8 reported pricing and Medicare and Medicaid
9 reimbursement.  Are you aware of any inquiry by
10 Home Infusion to that effect?
11        MS. TABACCHI:  Object to the form.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  Or is Abbott aware of any -- I want to
14 make clear, sir, that I'm expecting that you're
15 answering on behalf of Abbott.
16    A.  I would expect that to be a natural
17 communication to either the Medicaid agency.  If
18 you had any questions about how you got
19 reimbursed, that would be a natural question to
20 inquire as to why the reimbursement was high, low,
21 in between.
22        So I don't doubt that there were

---

181

1 communications to Medicaid payors.  I don't think
2 there was, or to Medicare carriers, but I'm not
3 aware of any communications to CMS or HCFA, as it
4 was known back then.
5    Q.  What about to any state officials, are
6 you aware of any communications or any inquiries
7 concerning the relationship between Abbott's, and
8 again, I'm talking from the time period 1991
9 through to 2001, are you aware of any, through to
10 the time of the price change, are you aware of any
11 inquiries to state Medicaid officials concerning
12 the relationship between AWPs or Abbott's price
13 reporting or WACs to Medicaid reimbursement?
14        MS. TABACCHI:  I'll object to the form.
15        THE WITNESS:  Again, I would say that it
16 was a natural communications for our reimbursement
17 folks on a claim-by-claim basis or as a general
18 question about claim reimbursement from a
19 particular state or a particular carrier.
20        None of them would necessarily be
21 speaking for Abbott, and it would be mainly, you
22 know, have you changed your formula for

---

182

1   reimbursement would probably be a common question.
2         Again, as I said, my experience is
3   that the 1990s were a pretty dynamic time period
4   for reimbursement adjustments within terms of case
5   management, in terms of per diem, in terms of plus
6   or minus against whatever price index they wanted
7   to use, list price, WAC, AWP.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.   Okay.  You identified the inadvertent
10  disparities before as a basis for the decision in
11  2001 to reduce Abbott's list prices; right?  You
12  had identified that there was noted, you had
13  observed or had identified inadvertent disparities
14  for some drugs between catalog price and list
15  price; is that fair?
16        MS. TABACCHI: No.
17        THE WITNESS: No.
18        MS. TABACCHI: Sorry.  Object to the
19  form.
20        MS. ST. PETER-GRIFFITH: I'm sorry.
21  Between contract price and list price.
22        THE WITNESS: Yes.

183

1         MS. ST. PETER-GRIFFITH: That's okay,
2   Tina.  Any time you can speed things up, please
3   feel free.  (Laughter.)
4         MS. TABACCHI: I knew that's not what
5   you meant to ask.
6         MS. ST. PETER-GRIFFITH: That is not
7   what I meant to ask.  Thank you.
8   BY MS. ST. PETER-GRIFFITH:
9      Q.   When did Abbott first notice those
10  disparities?
11        MS. TABACCHI: Objection, asked and
12  answered.
13        THE WITNESS: I can only tell you that
14  we looked at a number of products in the fall of
15  2000.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   At any time prior to 2001 for the time
18  period from '91 through 2001, did Abbott ever
19  notify any state or federal official about these
20  inadvertent disparities?
21        MS. TABACCHI: Object to the form,
22  beyond the scope of the Notice.

184

1         MS. ST. PETER-GRIFFITH: It's not beyond
2   the scope of the Notice.
3         THE WITNESS: No.
4   BY MS. ST. PETER-GRIFFITH:
5      Q.   How come?
6         MS. TABACCHI: Same objections.
7         THE WITNESS: We would have seen no
8   reason to involve a government agency in what we
9   considered to be internal issues.
10  BY MS. ST. PETER-GRIFFITH:
11     Q.   Well, did you have an understanding as
12  to whether what you've called inadvertent
13  disparities caused overpayments or false claims to
14  be submitted, overpayments to be made by or false
15  claims to be submitted by the Medicare and
16  Medicaid programs?
17        MS. TABACCHI: Object to the form,
18  beyond the scope of the Notice, calls for a legal
19  conclusion.
20        THE WITNESS: Again, I can't rule on
21  false claims.
22  BY MS. ST. PETER-GRIFFITH:

185

1      Q.   Well, did you have an understanding that
2   for drugs where there was a large disparity, or a
3   larger disparity, let's say a hundred percent or
4   more or fifty percent or more between the list
5   price and the contract price, that Abbott's
6   customers and their provider customers, or I'm
7   sorry, that Abbott's provider customers were being
8   reimbursed by Medicare and Medicaid at a price
9   well above the average wholesale price?
10        MS. TABACCHI: Object to the form of the
11  question, beyond the scope of the Notice.
12        THE WITNESS: One, Abbott's major
13  customer, the hospital, AWP was an irrelevant
14  number.
15  BY MS. ST. PETER-GRIFFITH:
16     Q.   Fair enough.  We'll limit it to
17  Alt. Site customers.
18     A.   And with regard to Alt. Site customers,
19  what the government decided to use as an index for
20  their reimbursement was their decision.
21        I think throughout the 1990s we
22  felt that it was widely known in the industry and

238

1    Q.   There's a chart and it says Medicare
2  11.7 percent of net sales.  And then there's
3  another figure, it says $2,306,414.  Do you see
4  that?
5    A.   Uh-huh.
6    Q.   What net sales are being referenced
7  there?
8         MS. TABACCHI:  Objection, beyond the
9  scope, object to the form.
10         THE WITNESS:  I think what, and, again,
11  she covers that in the front of her document, she
12  says for Medicare I assumed 11.7 percent of total
13  sales, removed the nutritionals because of the TPN
14  reimbursement, which left an impact of 1.74.
15         Basically to do this analysis we
16  had to make some assumption as to of the products
17  that we sold what percent would end up being used
18  for what patient population.  Because when you
19  sold a product to Coram, for instance, you didn't
20  know whether they were going to use that product
21  on a commercial paying patient, a no-pay patient,
22  a Medicaid or a Medicare patient.  You didn't

239

1  know.  So, again, this was quite a high level
2  analysis.
3         So what she was saying is of the
4  total impacted product sales, and, again, this
5  would be drugs, not devices, the total impacted
6  product sales 11.7 percent of those impacted
7  product sales we were just making that as an
8  assumption of what would be used for a Medicare
9  patient, 12.6 for Medicaid, and thirty percent for
10  managed care.
11         So they were just percentages that
12  she picked out, and I'm not totally sure exactly
13  where she got them from, whether she got them from
14  some old trends that we had in Home Infusion or
15  whether she got them from some other document.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Was Abbott --
18    A.   But the 11.7 and the 12.6 seemed in the
19  ballpark to me.
20    Q.   Well, they also seem pretty precise;
21  don't they?
22         MS. TABACCHI:  Objection, beyond the

240

1  scope, object to the form.
2         THE WITNESS:  They leave the impression
3  of precision, yes.  Whether they were or not, I
4  don't think they were that precise.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   For the time period of 1991 through
7  2001, was Abbott able to identify what percentage
8  of its products that it sold in the Alt. Site unit
9  were reimbursed by Medicare and what percentage
10  were reimbursed by Medicaid?
11    A.   No.
12         MS. TABACCHI:  Objection, beyond the
13  scope.
14         (WHEREUPON Exhibit Sellers 014
15         was marked as of 3/16/2008.)
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   Sir, do you recognize this document?
18  (Document tendered to the witness.)
19    A.   It actually looks like it's a couple of
20  different documents, to be honest with you.
21    Q.   Okay.
22    A.   But I recognize the components, yes.

241

1    Q.   Well, let me ask you, this appears to be
2  an interoffice correspondence from you?
3    A.   Yes, the cover is.
4    Q.   It says "To:  Meeting Attendees."
5         Which meeting are you referencing
6  there?
7    A.   It's in Rick Gonzalez's office.  So I
8  believe it was the second of the two meetings that
9  we talked about earlier.
10    Q.   With regard --
11    A.   Which I think I said was over in Rick's
12  corporate area.
13    Q.   That concerned the 2001 price change?
14    A.   Yeah, yeah.
15    Q.   And the attendees were Mr. Gonzalez,
16  yourself, Mr. Wiebking, Ms. Schumacher --
17    A.   Mr. Begley.
18    Q.   And Mr. Begley.
19         Did you distribute this information
20  to the attendees?
21         MS. TABACCHI:  Object to the form.
22  BY MS. ST. PETER-GRIFFITH:

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

62 (Pages 242 to 245)

242

1    Q.   I guess let me ask you which page was
2  the actual attachment?
3    A.   **This page to the attendees.**
4  **(Indicating.)**
5        **The others are pretty much the same**
6  **document. And they were prepared for Laura**
7  **Schumacher to give her some background on --**
8        MS. TABACCHI: I'm going to caution the
9  witness not to reveal any communications between
10  yourself and Ms. Schumacher.
11        THE WITNESS: -- prices.
12
13  BY MS. ST. PETER-GRIFFITH:
14    Q.   Prices or pricing terms; is that it?
15    A.   **Yes.**
16    Q.   That's the last page, which appears to
17  also be the second page with a line through it;
18  right?
19    A.   **Yeah. The first page, or the second**
20  **page, did not have the last paragraph.**
21    Q.   The parameter pricing, okay.
22    A.   **Yeah.**

243

1    Q.   Now, let's go to Page 3. It says "Per
2  directions from last meeting, discussed price
3  adjustment with other divisions."
4        Who did you talk to?
5    A.   **I only recall talking to Joe Fiske in**
6  **PPD. I may have talked to Ross and SPD, but**
7  **that's not in my memory.**
8    Q.   Is RPD Ross Products Division?
9    A.   **Yes.**
10    Q.   And SPD is --
11    A.   **At that time it was called Specialty**
12  **Products Division. It was animal health and**
13  **agricultural products.**
14    Q.   On your PPD discussion it says "Standard
15  WAC prices at five percent below list." Do you
16  see that?
17    A.   **Uh-huh.**
18    Q.   What did that mean?
19    A.   **This has been a few years.**
20        **I think basically that their**
21  **wholesale acquisition cost was five percent below**
22  **what they publish as their list price, yes.**

244

1    Q.   Then it says "Potential exposure on Ery
2  products which are sold at forty to sixty percent
3  below list." Do you see that?
4    A.   **Yes.**
5    Q.   What did that mean?
6        MS. TABACCHI: Objection, beyond the
7  scope.
8        THE WITNESS: Erythromycin was a drug
9  that had gone off patent by 2001. It had been off
10  patent for in fact a number of years prior.
11  Abbott was the innovator of that drug.
12        So because there were other generic
13  companies in competition with our pharmaceutical
14  brethren in Abbott, they had seen a price decline,
15  as we would have expected, on their products in
16  order to remain competitive with the generics.
17        So I think what I was reflecting on
18  there is the same kind of disparity that we were
19  talking about was probably in existence on
20  erythromycin products. They had not reduced their
21  list price, at least as of this.
22  BY MS. ST. PETER-GRIFFITH:

245

1    Q.   Do you know why they didn't reduce their
2  list price?
3        MS. TABACCHI: Object to the form,
4  beyond the scope.
5        THE WITNESS: I was just asked to go
6  find out.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Now, if you could look further down
9  beyond "Proposed Implementation Schedule" where it
10  says "Definite Impact. Price Lost Due to
11  Reduction." Do you see that?
12    A.   **Yes.**
13    Q.   It says "List Price and Special Price
14  Sales," for 2001, $0.9 million. And is that
15  "Annualized"?
16    A.   **Yes.**
17    Q.   $1.8 million.
18        What does that line mean?
19    A.   **That means that, that goes back to what**
20  **we were talking about before. When you reduce**
21  **your list price, any sales that you would have**
22  **anticipated making at a noncontract sales are**

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

63  (Pages 246 to 249)

---

246

1  going to come in at a lower price than what you
2  would have historically seen versus our 2001
3  expectation, making the price adjustments that we
4  were talking about we could expect that we'd get
5  $900,000 less revenue in 2001 than we were
6  planning.  And that was definite because that
7  would happen.
8       Q.  Does that refresh your recollection from
9  before as to the impact analysis that you had
10  referenced?
11      A.  Yeah.  I said it was a few million.  I
12  overstated it slightly originally.
13      Q.  Let me ask you this:  What was wrong
14  with keeping your catalog prices or Abbott keeping
15  its catalog prices where they were, meaning not
16  doing the catalog price reduction, but just
17  reporting lower prices to the pricing compendia
18  that were utilized for AWP purposes?
19      MS. TABACCHI:  Object to the form,
20  beyond the scope of the Notice.
21      THE WITNESS:  As far as we saw it, we
22  had one set of published prices.  So what you give

---

247

1  to the compendia is what you publish.  So if
2  you're going to report lower prices, you lower the
3  published prices.
4  BY MS. ST. PETER-GRIFFITH:
5       Q.  With regard to where it says "Inability
6  to raise FSS prices" --
7       A.  Yes.
8       Q.  -- $0.1 million and then 0.2 million?
9       A.  Yes.
10      Q.  What does that mean?
11      A.  FSS is Federal Supply Schedule.  It's
12  our contract that we had with, it was actually
13  administered by the Veterans' Administration.  It
14  was available for I think all federal government
15  entities to purchase from, both Department of
16  Defense as well as VA as well as a bunch of other
17  agencies.
18      That contract had a provision that
19  said if you raise your catalog prices and you
20  raise your contract prices, you can qualify for
21  raising your FSS prices.
22      It was still a negotiable issue on

---

248

1  a year-to-year basis with the contracting officer,
2  but per the terms of the agreement we could have
3  increased our FSS prices --
4       Q.  With regard to --
5       A.  -- if we took an inflationary increase
6  on the catalog.
7       Q.  Okay.  Where it says "Potential Impact -
8  Volume Lost Due to Reimbursement Reductions."  Do
9  you see that?
10      A.  Yes.
11      Q.  It says "Alt. Site Product Sales
12  $2.9 million, Annualized $8.8 million."
13      A.  Yes.
14      Q.  First, let me ask you, what do you mean
15  by "volume lost due to reimbursement reductions"?
16      A.  Well, when you're doing something like
17  this, especially if you're reviewing something of
18  a significant change to past practices with
19  management, I always tried to walk in saying these
20  are the impacts, this is what could result from a
21  decision to do this or that, whatever we were
22  talking about at the time.

---

249

1       What we were saying here is on a
2  worst case basis if in fact the theory that AWP
3  drove product purchase decisions, worst case, this
4  is how Alternate Site Product Sales would be
5  impacted by us reducing our list price.
6       Q.  How did you arrive at that calculation,
7  or those two calculations, of $2.9 million and
8  $8.8 million?
9       A.  Some of it was we looked at a rehash of
10  Lynn Leone's analysis, and by this time we had a
11  little more specific knowledge of what products we
12  were going to change and so on and so forth.  So
13  that's how we did it.
14      We said, okay, if all of a sudden
15  now our list prices are going down significantly
16  and we would assume that we would have the lowest
17  list prices for products, then the theory that the
18  highest list, highest AWP, if it in fact was a
19  function of list, we would lose those sales to our
20  competitor.  That's what we did.
21      Q.  So there was a recognition then that the
22  higher AWP in the market would get the business?

---

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

64  (Pages 250 to 253)

---

250

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  No.  This was a worst case
3  analysis.
4          What we said is okay, if you look
5  at it and you say let's assume that everybody
6  makes the decision based on the differential
7  between our AWP and somebody else's AWP or our
8  list price and somebody else's list price, if
9  that's the case what would happen if we reduce our
10  list prices.
11          So it wasn't based on what we
12  thought was going to happen.  It was based on what
13  could happen if, like we said, the worst were to
14  come to be.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   From 1991 to 2001 did Abbott have an
17  appreciation that the higher AWP on products in
18  the Alt. Site market generally meant that the
19  manufacturer with the higher AWP on that generic
20  product got the business?
21          MS. TABACCHI:  Object to the form,
22  beyond the scope.

---

251

1          THE WITNESS:  No.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Why not?
4          MS. TABACCHI:  Same objections.
5          THE WITNESS:  If that premise had been
6  in place, take vancomycin for instance, we would
7  have had a hundred percent of the vancomycin
8  market.  We didn't.
9          In addition, through any of these
10  bids we didn't get every award.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   As Abbott's AWP for vancomycin
13  increased, did Abbott's market share for the
14  vancomycin market increase?
15          MS. TABACCHI:  Objection, beyond the
16  scope, object to the form.
17          THE WITNESS:  I don't know.  I've never
18  made a comparison to that.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   Abbott has never evaluated that?
21      A.   Uhn-uhn.
22      Q.   How did you quantify the $2.9 million

---

252

1  and $8.8 million?  How were you able to come up
2  with those figures?
3          MS. TABACCHI:  Objection, asked and
4  answered.
5          THE WITNESS:  Again, it was very similar
6  to what we just looked at.  It was a very gross
7  analysis of, okay, if in fact we reduce that, how
8  much of those sales that we're getting today will
9  go away.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   So you just assumed that if you lowered
12  the AWP and someone else had a higher AWP, that
13  you would lose that business?
14          MS. TABACCHI:  Object to the form.
15          THE WITNESS:  That was the analysis we
16  went through.
17
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   The next item says --
20      A.   That's why it still says "Potential."
21  It doesn't say, it doesn't say definite.  It says
22  "Potential."  It says could happen.

---

253

1      Q.   After the publication of the DOJ AWPs,
2  did Abbott experience a loss in its Alt. Site
3  Product Sales approximating what you estimated?
4      A.   No.
5      Q.   What was the loss?
6          MS. TABACCHI:  Object to the form.
7          THE WITNESS:  We in fact did not take on
8  a loss.
9  BY MS. ST. PETER-GRIFFITH:
10      Q.   Then it says "Home Infusion Revenue
11  Sharing."  Do you see that?
12      A.   Yes.
13      Q.   $0.6 million and $1.8 million.
14      A.   Yes.
15      Q.   What did you mean when you put in Home
16  Infusion revenue sharing $0.6 million and
17  $1.8 million?
18      A.   Again, it was a look at potential loss
19  due to the fact that our reimbursement would go
20  down.
21      Q.   When you say your reimbursement, do you
22  mean Abbott Home Infusion's share in its customers

---

Henderson Legal Services, Inc.

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

65  (Pages 254 to 257)

| 254 | 256 |
|---|---|
| 1  Medicare and Medicaid reimbursement? | 1  we offered them.  And we had our products that |
| 2      MS. TABACCHI:  Object to the form. | 2  were available to them. |
| 3      THE WITNESS:  Abbott Home Infusion's | 3      Q.   Other than the collection of |
| 4  customers' reimbursement would go down on | 4  reimbursement that Abbott shared in for its Home |
| 5  products, and therefore, our share would go down. | 5  Infusion business all these services that you |
| 6  BY MS. ST. PETER-GRIFFITH: | 6  described and the products that Abbott provided, |
| 7      Q.   So Abbott shared in the higher | 7  those were provided free of charge? |
| 8  reimbursements that were caused by Abbott's higher | 8      MS. TABACCHI:  Object to the form. |
| 9  list prices which in turn created higher AWPs? | 9      THE WITNESS:  No. |
| 10      MS. TABACCHI:  Object to the form, | 10  BY MS. ST. PETER-GRIFFITH: |
| 11  beyond the scope. | 11      Q.   Were there individual prices that were |
| 12      THE WITNESS:  Abbott had a share in the | 12  charged to the Home Infusion clients for the |
| 13  agreements that we had that we would get a share | 13  products that were consigned to them? |
| 14  of the collections for those contracts.  That | 14      MS. TABACCHI:  Object to the form. |
| 15  involved risk sharing on both our sides, both the | 15      THE WITNESS:  No. |
| 16  client as well as Abbott. | 16  BY MS. ST. PETER-GRIFFITH: |
| 17  BY MS. ST. PETER-GRIFFITH: | 17      Q.   Were there individual charges for the |
| 18      Q.   What do you mean by "risk sharing"? | 18  services that Abbott provided incident to the |
| 19      **A.   Well, when you go into a business** | 19  contractual agreement? |
| 20  **there's always risk.  When you go into a business,** | 20      **A.   No.** |
| 21  **you risk whether you're going to get, especially** | 21      Q.   Abbott simply shared in the collection |
| 22  **in a Home Infusion business, whether you're going** | 22  of revenues that the Home Infusion partners were |

| 255 | 257 |
|---|---|
| 1  **to get the patient load that you need to keep** | 1  reimbursed from third-party payors? |
| 2  **going.  There's risk as to what mix of patients** | 2      MS. TABACCHI:  Object to the form. |
| 3  **you get, both in terms of therapy and in terms of** | 3      THE WITNESS:  Well, I'm not sure I would |
| 4  **the payors that are involved.** | 4  agree with "simply." |
| 5      **So each of us documented within our** | 5  BY MS. ST. PETER-GRIFFITH: |
| 6  **agreements with our clients contributed to each of** | 6      Q.   Okay. |
| 7  **those businesses and got some share of the revenue** | 7      **A.   There was a detailed contract between** |
| 8  **from both of those businesses.** | 8  **both parties that detailed what each party was** |
| 9      Q.   How did Abbott contribute? | 9  **going to do to guarantee the success of the** |
| 10      **A.   Abbott contributed through services,** | 10  **business.  And for that there was an agreement by** |
| 11  **getting the customer started, setting up** | 11  **both parties that there would be a revenue split** |
| 12  **procedures and practices.** | 12  **by therapy so that each party was compensated** |
| 13      **We helped the ones that wanted to** | 13  **appropriately.** |
| 14  **open their own pharmacy by designing their** | 14      Q.   Well, what would Abbott charge as the |
| 15  **pharmacy and using our engineers to help them** | 15  arm's length transactional price for the products |
| 16  **complete the projects.  We trained them in running** | 16  consigned to its revenue share partners? |
| 17  **that pharmacy.  We shared with them the** | 17      MS. TABACCHI:  Object to the form. |
| 18  **experiences that we had in our own pharmacies.  We** | 18      THE WITNESS:  We didn't have a price |
| 19  **also shared with them marketing training for their** | 19  between us. |
| 20  **salespeople.** | 20  BY MS. ST. PETER-GRIFFITH: |
| 21      **We also had reimbursement services** | 21      Q.   Sir, what would Abbott charge as the |
| 22  **that we offered them.  We had the CHIP system that** | 22  arm's length fair market value of the services it |

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

66  (Pages 258 to 261)

258

1    provide incident to the revenue share agreements?
2         MS. TABACCHI:  Object to the form.
3         THE WITNESS:  We didn't value those
4    services separately.
5    BY MS. ST. PETER-GRIFFITH:
6         Q.   How did you come up with the figures of
7    $0.6 million and $1.8 million?
8         A.   I don't recall.  But it was a similar,
9    if the assumption is correct, extending the logic
10   of that assumption, this is the impact we would
11   see.
12        Q.   Well, under Annualized it has
13   $1.8 million.  What did you mean by "Annualized"?
14        A.   For a full year.
15        Q.   So just it was 2001 only that at that
16   point in time in 2001 that you were estimating
17   that?
18        MS. TABACCHI:  Object to form.
19   BY MS. ST. PETER-GRIFFITH:
20        Q.   I'm sorry.  Under 2001, you're just
21   talking about that that's the risk for the
22   remainder of 2001?

259

1         A.   That was our estimate of a potential
2    risk for the remainder of the year, yes.
3         Q.   When was the decision made to close the
4    Home Infusion business unit?
5         A.   You've switched gears on me.
6         Q.   It has a relationship.
7         MS. TABACCHI:  Asked and answered.
8         THE WITNESS:  1997 I believe.
9    BY MS. ST. PETER-GRIFFITH:
10        Q.   And when was the decision made to
11   finally close the doors?
12        MS. TABACCHI:  Object to the form.
13
14   BY MS. ST. PETER-GRIFFITH:
15        Q.   Meaning what years would the doors be
16   closed on Home Infusion?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  I think it was either, I
19   think it was the end of 2001 or the, it was end of
20   2001 or end of 2002, something in that range.
21        I think we had a five-year
22   agreement in place or more when we made the

260

1    decision to close.  So we planned it to tail out
2    at some point.
3    BY MS. ST. PETER-GRIFFITH:
4         Q.   Was the closure expedited because of the
5    projected potential impact of the reductions of
6    list prices contemplated in 2001?
7         MS. TABACCHI:  Object to the form.
8         THE WITNESS:  No.
9    BY MS. ST. PETER-GRIFFITH:
10        Q.   How much money did Home Infusion make on
11   an annual basis?
12        MS. TABACCHI:  Object to the form.
13        THE WITNESS:  It depends on the year.
14   BY MS. ST. PETER-GRIFFITH:
15        Q.   Well, in 2000 how much did they make?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  I don't have those numbers
18   in front of me.
19        MS. TABACCHI:  Beyond the scope of the
20   Notice.
21        THE WITNESS:  Maybe $25 million.
22        (WHEREUPON Exhibit Sellers 015

261

1         was marked as of 3/16/2008.)
2    BY MS. ST. PETER-GRIFFITH:
3         Q.   Sir, do you recognize this document?
4    (Document tendered to the witness.)
5         A.   Yes.
6         Q.   Who drafted it?
7         A.   I believe I did.
8         Q.   Why was this document drafted?
9         MS. TABACCHI:  I'll caution the witness
10   not to reveal communications with counsel.
11        THE WITNESS:  It was documented to, it
12   was intended to document how we intended on
13   managing list price adjustments going forward from
14   2001.
15   BY MS. ST. PETER-GRIFFITH:
16        Q.   So was this sort of a plan of action for
17   what would occur once the 2001 price changes were
18   made?
19        MS. TABACCHI:  Object to the form.
20        THE WITNESS:  Yes.
21   BY MS. ST. PETER-GRIFFITH:
22        Q.   Sir, can you explain under definition of

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

72 (Pages 282 to 285)

---

**282**

1  appear at your depositions near the end of the
2  day, I'm putting before you what's previously been
3  marked as, using the Texas sequence, as Deposition
4  Exhibit 940. (Document tendered to the witness.)
5     A.  Right.
6     Q.  Do you recognize this document, sir?
7     A.  Yes.
8     Q.  Who drafted this document?
9     A.  I believe I did.
10    Q.  Why did you draft this document?
11       MS. TABACCHI: I caution the witness not
12  to reveal the substance of any communications with
13  counsel.
14       THE WITNESS: Actually, looking at this
15  document I may have misspoken before.
16       This is the document, or at least
17  this was a draft, as it says here, of the
18  attachments that I think would have been discussed
19  in the last meeting with Rick Gonzalez.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Okay.  In terms of the –
22    A.  So the other document may have been an

---

**283**

1  earlier draft of this, but I think this was the
2  document that would have been attached to that
3  cover letter that we talked about before.
4     Q.  The one that says Rules of the Road?
5     A.  Yes.
6     Q.  Okay.  Who was this document published
7  to?
8       MS. TABACCHI: Object to the form.
9       THE WITNESS: It was published to the
10  audience that we had in that Rick Gonzalez
11  meeting.
12  BY MS. ST. PETER-GRIFFITH:
13    Q.  Anyone else?
14    A.  No.
15    Q.  At the top it says "Proposal: Reduce
16  the catalog price of all Hospital Products
17  Division products to better correlate with the
18  actual national market selling price range."  Do
19  you see that?
20    A.  Yes.
21    Q.  What did you mean by that?
22       MS. TABACCHI: Objection, asked and

---

**284**

1  answered.
2       THE WITNESS:  What we were proposing is
3  to take our list prices down to more relevant
4  position to the prevailing market prices.
5  BY MS. ST. PETER-GRIFFITH:
6     Q.  What do you mean by "prevailing market
7  price"?
8     A.  Basically the only measure we had of
9  prevailing market price was our contract prices
10  since we're not privy to our competitor's pricing.
11       So basically it's bringing our list
12  price down to be more in a relevant position to
13  our current contract prices.
14    Q.  And it says the "reduction would be
15  predicated on the current wholesaler acquisition
16  prices plus a fixed differential, plus five
17  percent."
18    A.  Yes.
19    Q.  Is that the policy that we just saw
20  before?
21    A.  Yes.  The policy we just saw before was
22  kind of a result of this.

---

**285**

1     Q.  Going to where it says Background, if
2  you could look at the second sentence of that
3  paragraph where it says "Since 1986."  Do you see
4  that?
5     A.  Yes.
6     Q.  It says "the HPD net average selling
7  prices have declined year over year due to this
8  highly competitive market environment."
9       Is that accurate?
10       MS. TABACCHI: Object to the form.
11       THE WITNESS: I think in aggregate, yes,
12  that's true.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  The next sentence says "the HPD catalog
15  (a/k/a suggested manufacturer's list price) for
16  these products has remained unadjusted despite
17  significant erosion in the actual selling price."
18  Do you see that?
19    A.  Yes.
20    Q.  When you say "unadjusted," do you mean
21  that they stayed exactly the same?
22       MS. TABACCHI: Object to the form.

---

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

73  (Pages 286 to 289)

286

1      THE WITNESS: I think what I was saying
2  here is unadjusted down.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay.  So that doesn't mean that there
5  weren't inflationary increases that were taken, as
6  you've already testified to?
7      A.  No.  I think we cover that in a later
8  sentence.
9      Q.  Okay.  Which sentence?
10     A.  The sentence that says "increases that
11  generally approximated," that it exacerbated the
12  differential.
13     Q.  Just the sentence before that says "due
14  to other considerations related to contractual and
15  government regulatory demands, HPD prior to 2000
16  published annual increases once a year on the
17  catalog prices."  Do you see that?
18     A.  Uh-huh.
19     Q.  What government regulatory demands
20  caused the publication of annual increases of the
21  catalog prices?
22     MS. TABACCHI: Object to the form,

287

1  beyond the scope.
2      THE WITNESS:  The only thing I can think
3  of is, again, the requirement in the Federal
4  Supply Schedule, that to take an increase you have
5  to take an increase in your published price.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  What were the contractual considerations
8  that led to the published annual increases once a
9  year on catalog prices?
10     A.  Basically a number of our contracts
11  allowed us to take inflationary increases.  It
12  would have been very difficult to justify taking
13  an inflationary increase if I hadn't taken it on
14  my list prices.  So that connection is what I was
15  alluding to.
16     Q.  The next sentence reads "increases that
17  generally approximated the change in Consumer
18  Price Index change for the urban market basket
19  exacerbating any differentials to real prices in
20  the marketplace."
21         What are real prices in the market?
22     MS. TABACCHI: Object to the form.

288

1      THE WITNESS:  Again, I think I was
2  reflecting back on the actual national market
3  selling price ranges that I used up in the first
4  paragraph.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  The next sentence reads "though a
7  majority of eventual sales dollars are processed
8  at steep discounts to the catalog pricing under
9  contractual commitments, there continues to be a
10  small portion of sales, less than one percent,
11  which are processed at these elevated levels."  Do
12  you see that?
13     A.  Yes.
14     Q.  Does that refresh your recollection as
15  to what the annual sales volume was for
16  noncontractual sales at list price?
17     MS. TABACCHI:  Objection, beyond the
18  scope.
19     THE WITNESS:  Yes.
20  BY MS. ST. PETER-GRIFFITH:
21     Q.  What's now your recollection?
22     A.  It says less than one percent, so I have

289

1  no reason to doubt that that was true.
2      Q.  Was that true from 1991 through to 2001?
3      MS. TABACCHI:  Same objection.
4      THE WITNESS:  I don't believe so.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Why not?
7      MS. TABACCHI:  Same objection, asked and
8  answered.
9      THE WITNESS:  I don't have a number but
10  I believe that that number was higher back in
11  1991.
12         Plus, I had said before the
13  quantity of noncontract sales actually could
14  fluctuate annually based on what our competitors
15  did or what they couldn't do that would force
16  their customers to buy products from us.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.  The next paragraph concerns the
19  published pricing for wholesalers and
20  distributors, wholesaler acquisition price, WAC.
21         Now, is it "wholesale" acquisition
22  price or "wholesaler" acquisition price?

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL          March 16, 2008

74  (Pages 290 to 293)

### 290

1      MS. TABACCHI:  I can't even object to
2  the question.
3      THE WITNESS:  I don't know.  Yes.
4  (Laughter.)
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Well, let me tell you why I ask the
7  question.
8    A.   Okay.
9    Q.   Because if you look at Exhibit 15, your
10  definition that you put on that document is
11  "wholesale" acquisition cost.  That's why I'm --
12    A.   I considered that synonymous.  We only
13  did business with one wholesale function.
14    Q.   So whether it was called "wholesaler" or
15  "wholesale," were the two terms interchangeable?
16    A.   In my mind they are, yeah.
17      MS. TABACCHI:  I'm glad we cleared that
18  up.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.   And were they for Abbott?
21    A.   Yes.
22    Q.   Then it says that, well, "WAC is

### 291

1  adjusted annually to reflect the erosion of final
2  sales prices independent of the catalog price."
3  What does that mean?
4    A.   Actually, what I'm writing about here,
5  we've come through all of these depositions to
6  redefine that term.  It really was the RxLink
7  acquisition cost that was adjusted annually by a
8  review of market prices between accounting and
9  Contract Marketing.  So that's what I was
10  referring to here.
11    Q.   So in this first sentence when you
12  reference WAC, you're really talking about RxLink
13  acquisition cost?
14    A.   Yes.
15      MS. TABACCHI:  Object to the form.
16  BY MS. ST. PETER-GRIFFITH:
17    Q.   What is RxLink acquisition cost?
18    A.   It's a contract price that we gave to
19  wholesalers that signed our RxLink agreement.
20      Our RxLink agreement was introduced
21  in the early 1990s.  For signing an agreement with
22  us and honoring our RxLink program, among other

### 292

1  things, they got improved payment terms and they
2  got lower acquisition prices on some products, not
3  all products but on some products.
4    Q.   When you published WAC to the pricing
5  compendia, did you publish the RxLink acquisition
6  cost?
7    A.   No.
8      MS. TABACCHI:  Object to the form.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.   What did you publish?
11    A.   We published our --
12      MS. TABACCHI:  Object to the form.
13      THE WITNESS:  -- wholesale/wholesaler
14  acquisition cost.
15  BY MS. ST. PETER-GRIFFITH:
16    Q.   Which was the, as I had previously
17  testified when we went over these definitions the
18  noncontract price charged by wholesalers --
19    A.   Yes.
20    Q.   -- to wholesalers and distributors?
21    A.   Yes.
22    Q.   Okay.  Now, the next sentence reads "WAC

### 293

1  is evaluated annually by Accounting and Contract
2  Marketing to adjust for market price trends."
3      Which WAC are you referencing
4  there?
5    A.   RxLink acquisition cost is what was
6  effectively reduced.
7    Q.   Then it says "And once per year new
8  pricing is published to Abbott's trading
9  partners."  What does that mean?
10    A.   For those RxLink contracted wholesalers,
11  we published their acquisition costs too.
12    Q.   What is the difference between the
13  RxLink acquisition cost and the noncontract price
14  charged to wholesalers and distributors?  Is it
15  that RxLink is a contract price?
16    A.   Yes.
17    Q.   So the RxLink price would be published
18  to the trading partners, but the RxLink price
19  would not be published to the pricing compendia?
20    A.   Correct.
21    Q.   That would be, prior to 2001, the
22  noncontract price charged to wholesalers and

294

1    distributors?
2        A.   Yes.
3        Q.   How did you arrive at the noncontract
4    price charged to wholesalers and distributors
5    before the implementation of the policy for list
6    price adjustment?
7        A.   You know, I don't know exactly how that
8    was done.  It appears that it was, that over the
9    years it's been equivalent to some reduction
10   versus the list price.  So if the list price took
11   an inflationary increase, more likely than not the
12   published WAC price took an inflationary increase.
13       Q.   Now, the RxLink acquisition price is the
14   contract price?
15       A.   Yes.
16           MS. TABACCHI:  Object to the form.
17   BY MS. ST. PETER-GRIFFITH:
18       Q.   The pre 2001 WAC was the noncontract
19   price to wholesalers and distributors.
20           Was there a price that wholesalers
21   and distributors could buy at that was lower than
22   the RxLink acquisition cost?

295

1           MS. TABACCHI:  Object to the form.
2           THE WITNESS:  No.
3    BY MS. ST. PETER-GRIFFITH:
4        Q.   The next paragraph reads, the first
5    sentence, "a wide disparity in catalog prices and
6    average market prices as currently configured is
7    not supported by sufficient financial or market
8    factors to survive scrutiny of public opinion."
9           What did you mean by that sentence,
10   sir?
11          MS. TABACCHI:  Objection, beyond the
12   scope.
13          THE WITNESS:  Again, as written in 2001,
14   we had identified fairly large discrepancies, or
15   disparities, and there wasn't any justification
16   that we could develop based on less than one
17   percent of the volume for having those kind of
18   disparities.
19          In the past maybe there was a
20   larger contract range in prices, but the contract
21   price ranges had shrunk as well.  So we just
22   didn't think that as you looked at that it was

296

1    something that we wanted to leave out there.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   Well, prior to 2001 what financial or
4    market factors supported or justified the wide
5    disparity?
6           MS. TABACCHI:  Object to the form, asked
7    and answered.
8           THE WITNESS:  I don't know that anybody
9    ever tried to look at it and justify it.  In fact,
10   I would say they probably had not looked at it in
11   its entirety and tried to objectively justify it.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.   If someone had looked at it prior to
14   2001 and went through the process that you went
15   through through this analysis prior to 2001, do
16   you think that Abbott would have reduced its, or
17   would have Abbott reduced its list prices?
18          MS. TABACCHI:  Objection to the form.
19   This is an improper hypothetical, beyond the scope
20   of the Notice.
21          THE WITNESS:  I don't know.
22   BY MS. ST. PETER-GRIFFITH:

297

1        Q.   The last phrase of this particular
2    sentence reads "to survive scrutiny of public
3    opinion."
4           What scrutiny of public opinion?
5           MS. TABACCHI:  Objection, beyond the
6    scope.
7           THE WITNESS:  I think what I was
8    referring to is having someone view it that was
9    not familiar with our marketplace, nor our
10   history.
11   BY MS. ST. PETER-GRIFFITH:
12       Q.   Was there any other public opinion that
13   Abbott was concerned about in making its decision
14   to drop its prices in 2001, list prices in 2001?
15          MS. TABACCHI:  Objection, beyond the
16   scope, object to the form.
17          THE WITNESS:  Again, this was just
18   background with regard to the findings.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.   But was there any other public opinion?
21          MS. TABACCHI:  Same objections.
22          THE WITNESS:  Not that I'm aware.  I

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                 March 16, 2008

76  (Pages 298 to 301)

298

1   don't delineate public opinions.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   Well, the next sentence reads "this was
4   voiced in December 2000 in a letter from U.S.
5   Representative Pete Stark to Miles White." Do you
6   see that?
7       A.   Yes.
8       Q.   Other than Congressman Stark's letter
9   to -- well, let me ask you this:  Did Congressman
10  Stark's letter have any impact upon Abbott's
11  decision to move forward with its list price
12  reductions?
13          MS. TABACCHI:  Objection, asked and
14  answered.
15          THE WITNESS:  I think, as I said before,
16  there was quite a bunch of discourse with regard
17  to the issue both from Congress and from others.
18  It was one specific example that was out there.
19  BY MS. ST. PETER-GRIFFITH:
20      Q.   And by "others" do you mean the
21  Department of Justice?
22          MS. TABACCHI:  Object to the form.

299

1           THE WITNESS:  The Department of Justice
2   subpoenas, there was, as I said, I believe in the
3   second half of 2000 there were budget discussions
4   and so on going on in Congress about reimbursement
5   rates and what was equitable and what was not, so
6   on and so forth.
7           So there was any number of
8   discussions with regard to that.
9   BY MS. ST. PETER-GRIFFITH:
10      Q.   Why would the budget discussions in
11  Congress create a concern for Abbott such that it
12  would make a decision to lower its list price?
13          MS. TABACCHI:  Object to the form,
14  beyond the scope.
15          THE WITNESS:  I think if you've reviewed
16  anything that comes through Congress, anything is
17  fair game in a congressional discussion.
18          So what they talked about was more
19  than just budget. As you monitor those things,
20  there was a whole list as I remember, and I can't
21  tell you exactly what they were, but I remember a
22  heightened sense of the fact that more and more

300

1   people were talking about the price issue.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.   When you say "more and more people," do
4   you mean more and more Congressmen or political
5   figures?
6       A.   Congressmen, cabinet members, press.
7       Q.   What other public opinion can you think
8   of that might have impacted or influenced the
9   decision by Abbott to reduce its list prices in
10  2001?
11          MS. TABACCHI:  Object to the form,
12  beyond the scope.
13          THE WITNESS:  I don't have any specific
14  population to define that we were concerned about.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Have we covered your recollection that
17  the public opinion or the pressures that did, or
18  the external pressures, that did drive the
19  decision to make the 2001 price change?
20      A.   Yes.
21      Q.   The next sentence says "the revenue
22  impact of making this change may be affordable by

301

1   the corporation in 2001."
2           What did you mean by that?
3       A.   Meaning that if we make the change, it
4   could be absorbed and we could still make our
5   financial plans.
6       Q.   If the change had been made prior to
7   2001, would that have been true?
8           MS. TABACCHI:  Object to the form,
9   beyond the scope.
10          THE WITNESS:  I don't know.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   Finally, it says "the establishment of a
13  process to annually define changes to the catalog
14  price would avoid this type of public relations
15  exposure in the future." Do you see that?
16      A.   Yes.
17      Q.   What public relations exposure were you
18  referencing?
19          MS. TABACCHI:  Objection, beyond the
20  scope.
21          THE WITNESS:  Any.
22  BY MS. ST. PETER-GRIFFITH:

302

1    Q.   What types of public -- well, was Abbott
2  experiencing public relations exposure in 2001?
3    A.   No.
4        MS. TABACCHI:  Objection.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Then why was there a concern about
7  public relations exposure?
8        MS. TABACCHI:  Objection, beyond the
9  scope, object to the form, asked and answered.
10       THE WITNESS:  Abbott was very concerned
11 about the image of, Abbott's corporate image.
12       That really, I wasn't thinking of
13 any specific exposure at that point in time, but,
14 you know, anybody could have tried to make an
15 issue out of our prices.
16 BY MS. ST. PETER-GRIFFITH:
17   Q.   Sir, if we could go down to Division
18 Impact.  The first two sentences, the first begins
19 "Making the proposed adjustment," and the second I
20 believe begins "Additionally, lowering the
21 catalog," can you explain what you meant by those
22 two sentences?

303

1    A.   The first sentence basically is what we
2  talked about before in terms of the definite price
3  impact.  It would reduce the opportunistic sales
4  historically made to list price purchasers, and it
5  would have eliminated an opportunity for price
6  increases on the Federal Supply Schedule that we
7  had planned for later in 2001.  And it would say
8  that on an annual basis that would cost us about
9  $1.7 million.  For 2001 based on I think this
10 proposed, making the change April 1st, the impact
11 would only be $1.2 million.
12   Q.   And the next sentence, what did you mean
13 by that sentence?
14   A.   Here in the next sentence I was talking
15 about the, if you accept the premise that AWP
16 affects customers' decisions in buying products,
17 reducing the list price, and therefore, reducing
18 the AWP may have caused people to move away from
19 our products.
20   Q.   But you didn't predicate the sentence
21 upon "if you accept the premise."  Doesn't it just
22 indicate that by lowering the catalog prices you

304

1  could lose sales?
2    A.   It says may, may result in lost sales.
3    Q.   You may lose sales.
4    A.   Yes.
5        To your point, we knew the AWP
6  would go down.
7    Q.   The sentence after that reads "A pending
8  reduction of AWP proposed by the Department of
9  Justice in several major Alt. Site products would
10 force some portion of this impact for government
11 reimbursed care regardless of Abbott's actions."
12 Do you see that?
13   A.   Yes.
14   Q.   What did you mean by that?
15   A.   Basically if the DOJ AWPs were accepted
16 and put into place, and it would basically have
17 the same impact of us reducing our list prices.
18       So what I was saying there is if
19 they are accepted, we're going to lose those sales
20 anyway if there is a linkage between AWP and
21 product selection by our customers.
22   Q.   So if Abbott didn't make the 2001 price

305

1  reductions, you're saying that this loss of sales
2  would come anyway because of the implementation of
3  the DOJ AWPs?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  Again, if the DOJ AWPs
6  were implemented.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.   Do you know when the DOJ AWPs were
9  implemented?
10       MS. TABACCHI:  Object to the form.
11       THE WITNESS:  I don't believe they were
12 ever implemented.  By "implemented" I mean used by
13 payors.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.   How did the proposed DOJ AWPs influence
16 Abbott's decision to reduce its list price in
17 2001?
18       MS. TABACCHI:  Objection, asked and
19 answered.
20       THE WITNESS:  I don't believe they did.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.   Well, you included reference to them in

30(b)(6) Abbott (Sellers, Michael)  CONFIDENTIAL                    March 16, 2008

78  (Pages 306 to 309)

306

1   your memo.
2       MS. TABACCHI:  Object to the form, asked
3   and answered.
4       THE WITNESS:  Again, when I review
5   something with upper management, I try to include
6   everything that I know about that that could
7   happen, and that contributes to the worst case
8   scenario. It's always good to look at the worst
9   case scenario and then look at what do you think
10  is going to happen.
11      In this case I was trying to define
12  these as the worst things that could happen with
13  regard to this issue.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.   Is it Abbott's testimony that the
16  potential publication, proposed publication, of
17  the DOJ AWPs played no role in its decision to
18  lower its list prices in 2001?
19      MS. TABACCHI:  Asked and answered.
20      THE WITNESS:  I can just tell you it was
21  not part of our analysis.
22  BY MS. ST. PETER-GRIFFITH:

307

1       Q.   When you say "our," who are you
2   referencing?
3       A.   Maylene and I.
4       Q.   But did it factor into the decision
5   making by the senior management who ultimately
6   decided to lower the AWPs?
7       MS. TABACCHI:  Object to the form, asked
8   and answered.
9       THE WITNESS:  As I said before, I don't
10  believe it was a contributing factor.
11  BY MS. ST. PETER-GRIFFITH:
12      Q.   Why wouldn't it be?
13      I mean if the Department of Justice
14  thought your AWPs on some of your products were so
15  high that they wanted to implement changes,
16  wouldn't that be of concern for Abbott?
17      MS. TABACCHI:  Object to the form,
18  beyond the scope of the Notice.
19      It is ten after 5:00.  You are
20  asking questions now that have been asked
21  repeatedly of this witness. I suggest that you
22  move on if you intend to complete this deposition

308

1   today.
2       MS. ST. PETER-GRIFFITH:  We're not
3   completing this deposition today.
4       MS. TABACCHI:  There's no reason why it
5   shouldn't be completed today. You've spent
6   forever reviewing correspondence and e-mails back
7   and forth to the pricing compendia. You choose to
8   use your time as you wish. You've asked the same
9   question repeatedly. I do suggest that you move
10  on.
11      MS. ST. PETER-GRIFFITH:  I have not
12  asked the same question repeatedly.
13      MS. TABACCHI:  Well, the transcript will
14  speak for itself. You have. This question has
15  been posed to this witness by you in other
16  depositions repeatedly. He's been deposed
17  repeatedly.
18      MS. ST. PETER-GRIFFITH:  He's sitting
19  here as Abbott. He can answer the question.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.   Sir, can you answer the question and
22  then we'll move on.

309

1       MS. TABACCHI:  It's a hypothetical
2   question. I object to the form, it's beyond the
3   scope of the Notice.
4       If you'd like to read back the
5   question.
6       THE WITNESS:  Would you repeat the
7   question.
8       (WHEREUPON said record was read
9       back as requested.)
10      MS. TABACCHI:  Same objections.
11      THE WITNESS:  Abbott was not singularly
12  selected in the DOJ AWP changes. And nobody was,
13  within Abbott, understood how they had defined the
14  AWPs they proposed.
15      In fact, their AWPs that they had
16  proposed were inconsistent on the same product for
17  different manufacturers, which seemed at least in
18  my mind that it wasn't well conceived.
19      So after reviewing it we didn't see
20  the need to look at it from that point. We were
21  looking at it from the point of view of where was
22  our market prices and where should our list price

310

1  be.
2  BY MS. ST. PETER-GRIFFITH:
3     Q.   If you could move on -- oh, let me ask
4  you, at any time from 1991 until 2001 did Abbott
5  ever notify any state or federal official about
6  what its actual contract prices were that it was
7  charging its customers?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope of the Notice.
10         MS. ST. PETER-GRIFFITH:  No, it's not.
11         THE WITNESS:  It was not our
12  understanding that that was a requirement of any
13  entity.
14         We thought the government had a
15  good picture of our nonlist price prices.  They
16  had quarterly publications of our AMP, they had
17  our Federal Supply Schedule prices, we had prices
18  negotiated with the DOD.
19         So we thought if a government
20  agency needed it, it was within the government
21  agency's purview already.
22  BY MS. ST. PETER-GRIFFITH:

311

1     Q.   Were the DOD prices or the Federal
2  Supply Schedule prices that you charged to the
3  United States in line with Abbott's Alternate Site
4  catalog prices?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Alternate Site did not
7  have a catalog.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   HPD catalog prices.
10         MS. TABACCHI:  Object to the form,
11  beyond the scope of the Notice.
12         MS. ST. PETER-GRIFFITH:  It is not
13  beyond the scope of the Notice.
14         THE WITNESS:  Federal Supply Schedule
15  prices were contractually negotiated prices that
16  were below our published prices.
17  BY MS. ST. PETER-GRIFFITH:
18     Q.   But were they in line with your contract
19  prices that you were charging to your HPD
20  customers, including your Alt. Site customers?
21         MS. TABACCHI:  Object to the form.
22         THE WITNESS:  I think if you were to ask

312

1  the VA contracting officers, they would tell you
2  yes, they were, because we actually had to
3  disclose across, whenever we either changed the
4  price or renegotiated prices or negotiated a new
5  contract, we had to disclose actual sales in that
6  negotiation.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   So you disclosed --
9     **A.   Our lowest price.**
10    Q.   Your lowest price, which is your lowest
11  HPD price that you charged your contractors --
12    **A.   Uh-huh.**
13    Q.   -- or your customers?
14    **A.   Yes.**
15    Q.   What indicated to the United States that
16  your Federal Supply Schedule prices or your DOD
17  prices were in line with your actual contract
18  prices that you were charging customers?
19         MS. TABACCHI:  Object to the form.
20         THE WITNESS:  I just went through that.
21  BY MS. ST. PETER-GRIFFITH:
22    Q.   Okay.  So it's the fact that DOD and the

313

1  VA received your lowest price?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  Yes.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   And what is it about the quarterly --
6     **A.   Well, let me go back.**
7          **They may or may not have been given
8  on a contract our lowest price, but our disclosure
9  to them had to include the lowest prices that we
10  had billed for the products.**
11    Q.   Did Abbott at any time ever go to the
12  United States and say hey, you know, our catalog
13  prices are much higher than the prices that we're
14  charging under the Federal Supply Schedule or the
15  DOD prices?
16         MS. TABACCHI:  Object to the form, asked
17  and answered.  He just testified about
18  communications with the government.
19         MS. ST. PETER-GRIFFITH:  Counsel, don't
20  coach the witness.  If you can just let him answer
21  the question, please.
22         MS. TABACCHI:  If you can stop asking

314

1  the same question that he just answered.
2       MS. ST. PETER-GRIFFITH: It's a
3  different question. If the answer is the same,
4  then let him say that. Don't testify for him,
5  please.
6          Can you read back the question.
7          (WHEREUPON said record was read
8          back as requested.)
9       MS. TABACCHI: Object to the form.
10       THE WITNESS: Again, I'm not totally
11  familiar with the submissions that were made with
12  regard to the FSS prices or any special DOD
13  prices, but usually we had to attach a price
14  catalog.
15       I do know that they were on the
16  mailings for any new price catalogs that were
17  published. So they had in their possession our
18  list prices. We didn't feel like we needed to do
19  the analysis for them.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Was that a conscious decision made by
22  Abbott?

315

1       MS. TABACCHI: Object to the form,
2  beyond the scope.
3       MS. ST. PETER-GRIFFITH: It's not beyond
4  the scope.
5       THE WITNESS: No. We didn't want to
6  think on behalf of the contracting officer.
7  BY MS. ST. PETER-GRIFFITH:
8    Q.  Now, with regard to the quarterly
9  publication of the or the quarterly provision of
10  the AMP data --
11    A.  Yes.
12    Q.  -- what is it about that provision of
13  AMP data that leads Abbott to believe that the
14  United States should have known what its contract
15  prices were within HPD?
16       MS. TABACCHI: Object to the form.
17       THE WITNESS: The AMP is calculated by a
18  formula that's defined originally by HCFA, now by
19  CMS. It's a very definitive definition, and it is
20  intended to be the average price, net of
21  discounts, net of charge-backs, for products sold
22  to a nonhospital entity.

316

1          So AMP is the best aggregate view
2  of our contract prices in the Alternate Site
3  market.
4  BY MS. ST. PETER-GRIFFITH:
5    Q.  Didn't Abbott have a problem with its
6  AMPs, that it ultimately went back to the United
7  States and asked for assistance in revising?
8       MS. TABACCHI: Object to form, beyond
9  the scope of the Notice.
10       THE WITNESS: AMP was a term that was
11  introduced in I think '91, '92, that's when the
12  reporting started. It started as a very general
13  definition and it evolved over the years into a
14  more specific definition.
15       It still in a lot of people's minds
16  is not specific enough, and there is a fair amount
17  of interpretation that each company has to go to
18  to fit the general rules into their exact view,
19  their exact market, and how they participate in
20  that market.
21       I believe we may have gone back to
22  them a couple of times saying that we're trying to

317

1  improve the calculation that we're doing, and our
2  market has changed, and therefore, we'd like to
3  make some changes.
4       I know of at least one that we
5  submitted to CMS that was of that nature.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  What was the request made to CMS?
8       MS. TABACCHI: Object to the form,
9  beyond the scope.
10       THE WITNESS: It was a pretty complex,
11  but there was one made I believe in the 2000, 2001
12  timeframe.
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  Didn't Abbott indicate to CMS that its
15  AMPs might have been incorrect in that it was
16  undercalculating?
17       MS. TABACCHI: Object to the form,
18  beyond the scope.
19       THE WITNESS: I'm not aware of that.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  How could the United States be expected
22  to rely upon Abbott's AMP data to determine its

318

1  actual contract prices that it was charging its
2  HPD Alt. Site customers if its AMP data was
3  inaccurate that it reported to the government?
4        MS. TABACCHI:  Object to the form,
5  beyond the scope of the Notice.
6        MS. ST. PETER-GRIFFITH:  It's not beyond
7  the scope.
8        THE WITNESS:  Your question presumes
9  that the AMP data was erroneous, and I'm not
10  buying into that presumption.
11  BY MS. ST. PETER-GRIFFITH:
12     Q.   Well, Abbott notified the United States
13  that it was erroneous.
14        MS. TABACCHI:  Objection, beyond the
15  scope of the Notice.
16        THE WITNESS:  Do you have it?  Can I
17  look at it?
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   I don't have that notice, we're not
20  going to look at that notice right now.
21     A.   I can't respond to it then.
22     Q.   Well, we can take that up when we

319

1  reconvene.  Let's go on to Page 2.
2        Sir, the top paragraph with the
3  analysis, is that the analysis that we went
4  through before in the Rules of the Road draft
5  attachment that you referenced earlier?
6     A.   I believe this was the third page.  I
7  think these are the same numbers.
8     Q.   Okay.
9     A.   They look awfully close.
10     Q.   So what we discussed before in terms of
11  your analysis, that's what occurred here?
12     A.   Yes.
13     Q.   The next item down indicates that, or
14  you provide some product examples.
15     A.   Yes.
16     Q.   Why did you choose these examples?
17     A.   The first three I believe we chose
18  because they were on a subpoena, and we wanted to
19  specifically address products that were
20  highlighted on a subpoena.
21        In the others we were just trying
22  to reflect some other product segments.  I mean

320

1  these were six products out of two hundred.
2     Q.   So they were two hundred products that
3  had list prices that you reduced?
4        MS. TABACCHI:  Object to the form.
5        THE WITNESS:  I believe it was two
6  hundred some odd prices were changed in 2001.
7        MS. ST. PETER-GRIFFITH:  We're at the
8  end of this document.  Do you want to end for the
9  day?
10        MS. TABACCHI:  I'd like to finish the
11  deposition today.
12        MS. ST. PETER-GRIFFITH:  We're not going
13  to finish the deposition today.  I mean we can go
14  until midnight if you wanted, but --
15        MS. TABACCHI:  What other topics do you
16  need to address that you don't think --
17        MS. ST. PETER-GRIFFITH:  We have Home
18  Infusion, we have the Vanco price change in 1995.
19        MS. TABACCHI:  Let's finish those topics
20  then.
21        MS. ST. PETER-GRIFFITH:  Do you want to
22  go all night, Tina?

321

1        MS. TABACCHI:  Well, we're not going to
2  go all night.
3        There's no reason why, you have
4  ample testimony on both topics.  I don't know why
5  you need additional testimony on it.  But if you
6  care to ask Mr. Sellers on those topics, I think
7  you can finish those topics in an hour.
8        MS. ST. PETER-GRIFFITH:  Well, I
9  disagree with you.
10        Tina, you've designated Mr. Sellers
11  for three quarters of the topics that the United
12  States has.  We're not going to finish today.  I
13  think it's better to choose another date and to
14  come back another date.
15        MS. TABACCHI:  We can discuss whether we
16  can reconvene the deposition at another time then.
17  I'm not going to agree today that we're going to
18  reconvene.  We can discuss this offline.
19        MS. ST. PETER-GRIFFITH:  We get fourteen
20  hours at least with this witness.  You've
21  designated him for a variety of topics.
22        I mean if you want me to go on

30(b)(6) Sellers Deposition
3/31/08

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re: PHARMACEUTICAL          )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

_____   Volume II


                Continued Videotaped Rule 30(b)(6)

                Deposition of MICHAEL SELLERS, at

                77 West Wacker Drive, Chicago,

                Illinois, commencing at 9:00 a.m.

                On Monday, March 31, 2008, before

                Donna M. Kazaitis, RPR, CSR

                No. 084-003145.

Page 333

1   APPEARANCES OF COUNSEL:
2
3       FOR THE UNITED STATES:
4       U.S. DEPARTMENT OF JUSTICE
5       CIVIL DIVISION
6       BY:  MS. ANN ST. PETER-GRIFFITH
7       99 N.E. 4th Street
8       Miami, Florida 33132
9       (305) 961-9003
10      ann.st.peter-griffith@usdoj.gov
11
12      FOR THE RELATOR VEN-A-CARE OF THE FLORIDA
13      KEYS, INC.:
14          ANDERSON LLC
15          BY:  MR. C. JARRETT ANDERSON
16          208 West 14th Street, Suite 3-B
17          Austin, Texas 78701
18          (512) 469-9191
19          jarrett@anderson-llc.com
20
21
22

Page 334

1   APPEARANCES OF COUNSEL:
2
3       FOR ABBOTT LABORATORIES:
4           JONES DAY
5           BY:  MS. TINA TABACCHI
6           77 West Wacker Drive
7           Chicago, Illinois 60601-1692
8           (312) 782-3939
9           ttabacchi@jonesday.com
10
11  ALSO PRESENT:
12      Anthony Micheletto, Videographer
13
14
15
16
17
18
19
20
21
22

Page 335

1                    I N D E X
2
3   Monday, March 31, 2008
4
5   WITNESS                    EXAMINATION
6
7   MICHAEL SELLERS
8       (By Ms. St. Peter-Griffith)      339
9       (By Mr. Anderson)                505
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 336

1                INDEX OF EXHIBITS       PAGE
2   Exhibit Sellers 016, 9/30/99 DOJ letter    355
3   Exhibit Sellers 017, ABT 212051 - 055      357
4   Exhibit Sellers 018, ABT 212056 - 076      367
5   Exhibit Sellers 019, ABT-DOJ-E 0048483       377
6   Exhibit Sellers 020, MHA007852 - 859       380
7   Exhibit Sellers 021, TXABT 38667           386
8   Exhibit Sellers 022, ABT 001002 - 010      389
9   Exhibit Sellers 023, BR 02391 - 440       391
10  Exhibit Sellers 024, ABT-DOJ 0150044        449
11  Exhibit Sellers 025, ABT 00661          450
12  Exhibit Sellers 026, TXABT 675824 - 112      497
13  Exhibit Sellers 027, ABT-DOJ-E 0396008 - 011 525
14  Exhibit Sellers 028, TXTABT-E 0621602 - 604  527
15  Exhibit Sellers 029, ABT-DOJ 0233994        530
16  Exhibit Sellers 030, ABT 006248          543
17  Exhibit Sellers 031, TXABT 50057           548
18  Exhibit Sellers 032, TXABT 158513          620
19  Exhibit Sellers 033, TXABT 674736, 741, 742,
20              738              630
21  Exhibit Sellers 034, TXABT 674725 - 726      658
22  Exhibit Sellers 035, TXABT 674744          662

                              2 (Pages 333 to 336)

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

---

Page 337

INDEX OF EXHIBITS          PAGE

Exhibit Sellers 036, TXABT 61252 - 254        662

---

Page 339

1   like to put on the record that Jarrett Anderson
2   will be here for the realtor.  He's flying in this
3   morning and he'll be a little late.
4         THE VIDEOGRAPHER:  The Court Reporter
5   today is Donna Kazaitis from Henderson Legal
6   Services of Washington, D.C.
7         Please swear in the witness.
8         MICHAEL SELLERS,
9   having been duly resworn, was examined and
10  testified as further follows:
11        EXAMINATION
12        (Resumed)
13  BY MS. ST. PETER-GRIFFITH:
14    Q.   Good morning, Mr. Sellers.
15    A.   Good morning.
16    Q.   On this fine March 31st day.
17    A.   Always the best weather for these.
18    Q.   Mr. Sellers, since we were here the last
19  time, have you done anything to prepare for your
20  30(b)(6) testimony?
21    A.   I did review a few of the transcripts of
22  other depositions, and I spent some time preparing

---

Page 338

1         THE VIDEOGRAPHER:  This is Anthony
2   Micheletto representing Henderson Legal Services.
3   I am the operator of this camera.  This is the
4   videotaped deposition of Mike Sellers as being
5   taken pursuant to Federal Rules of Civil Procedure
6   on behalf of the plaintiffs.
7         We are on the record on March 31,
8   2008.  The time is 9:08 a.m. as indicated on the
9   video screen.
10        We are at the offices of Jones Day,
11  77 West Wacker Drive, Chicago, Illinois.  The case
12  is captioned In Re: Pharmaceutical Industry
13  Average Wholesale Price Litigation, Case No.
14  01-12257-PBS.
15        Will the attorneys please identify
16  themselves for the video record.
17        MS. ST. PETER-GRIFFITH:  Ann
18  St. Peter-Griffith, United States Attorney's
19  Office on behalf of the United States.
20        MS. TABACCHI:  Tina Tabacchi on behalf
21  of the defendant.
22        MS. ST. PETER-GRIFFITH:  And I'd just

---

Page 340

1   with my attorney.
2     Q.   How long did you prepare -- is that
3   Ms. Tabacchi?
4     A.   Yes.
5     Q.   How long did you spend preparing with
6   her?
7     A.   A couple of hours.
8     Q.   When was that?
9     A.   I believe it was last Thursday.
10    Q.   Did you confer with anyone other than
11  Ms. Tabacchi?
12    A.   No.
13    Q.   Which deposition transcripts did you
14  review?
15    A.   Well, I take that back.  Carol Geisler
16  from Jones Day was also in there for a short
17  period of time.
18        I'm sorry.  Your question was?
19    Q.   You indicated that you also reviewed a
20  few transcripts.
21    A.   Yes.
22    Q.   Whose transcripts did you review?

---

3  (Pages 337 to 340)

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 341

1     A.   Harry Adams, Mike Heggie, Deborah
2  Longley.  There was one other one.
3          MS. ST. PETER-GRIFFITH:  Go ahead, if
4  you want to help him out, Tina.
5          MS. TABACCHI:  Dennis Walker.
6          THE WITNESS:  Dennis Walker, yes.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Did you review the entire transcripts?
9     A.   I went through sections of them, yes.
10  But I had the whole transcripts available to me.
11     Q.   Why did you choose to go through the
12  sections that you went through?
13     A.   Again, I was trying to touch on all the
14  subjects that were listed for my corporate
15  testimony.
16     Q.   Did you do that by going back to the
17  index, as you testified before you did with prior
18  transcripts?
19     A.   Yes.  I began with the index, and then I
20  may have read on beyond just the specific
21  paragraphs that had the keywords in them.
22     Q.   Understood.

Page 342

1          Did you review any exhibits to
2  these transcripts?
3     A.   I reviewed a few documents, but I don't
4  recall exactly which ones they were.
5     Q.   Were they exhibits to these transcripts?
6     A.   Yes, yes.
7     Q.   Do you remember whose transcripts they
8  were exhibits to?
9     A.   No, because I jumped around as we were
10  looking at exhibits.
11     Q.   When did you do these reviews?
12     A.   I looked at some of the documents last
13  Thursday with the attorneys and then I reviewed
14  the transcripts this past weekend.
15     Q.   Did you review your transcript of the
16  first day of this deposition?
17     A.   No.  I did not.
18     Q.   As you sit here today, sir, is there any
19  testimony that you gave on the first day of your
20  30(b)(6) deposition that you would like to clarify
21  or change or expand upon?
22     A.   There is one thing, that is we talked

Page 343

1  about my conversation with Rick Gonzalez.
2     Q.   Okay.
3     A.   And I believe I talked about covering
4  three subjects.  There were in fact four subjects
5  covered in that conversation that I was reminded
6  of as I went through this process.
7          The fourth subject was did Rick
8  have any recollection of the DOJ AWPs, and his
9  response was no, he had no recollection of those
10  at all.
11     Q.   Was that a question that you asked him
12  or that Ms. Tabacchi asked him?
13          MS. TABACCHI:  Object to the form.
14          THE WITNESS:  It was a question asked by
15  a Jones Day attorney.  It was not Ms. Tabacchi.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.   Who was the Jones Day lawyer?
18     A.   Jim Daly.
19     Q.   When you were on the phone with
20  Mr. Gonzalez, who was present?
21     A.   Rick Gonzalez, myself --
22     Q.   On the phone?

Page 344

1          MS. TABACCHI:  Object to the form.  Go
2  ahead.
3          THE WITNESS:  Yeah, on the phone.
4  BY MS. ST. PETER-GRIFFITH:
5     Q.   Okay.
6     A.   Myself, Rick Gonzalez, Jim Daly from
7  Jones Day, and Sara Lyke from Abbott Laboratories.
8     Q.   Anybody else?
9     A.   No.
10     Q.   Did you personally ask any questions of
11  Mr. Gonzalez?
12     A.   I did not.
13          Jim Daly asked me at the end of the
14  conversation if I had any questions for Rick, I
15  said I did not.
16     Q.   Why didn't you have any questions?
17     A.   Because I thought he had answered all of
18  the issues that were relevant to this, my
19  testimony.
20     Q.   So you didn't see any need to ask any
21  further questions of him?
22     A.   No.

                          4 (Pages 341 to 344)

Page 345

1      Q.   Do you know what Mr. Gonzalez's role was
2  in setting prices, either contract prices or
3  catalog list prices?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  Starting in I believe '97,
6  '98, I'm not sure when he took over as the
7  president of Hospital Products Division, he was
8  responsible for the whole division.  He was
9  responsible for approving any catalog price
10  changes, but he wasn't involved in the actual
11  setting of the prices themselves.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.   Did you see the need to discuss with
14  Mr. Gonzalez anything else concerning his
15  involvement with the Hospital Products Division?
16          MS. TABACCHI:  Object to the form.
17          THE WITNESS:  No.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Why not?
20          MS. TABACCHI:  Objection, asked and
21  answered.
22          THE WITNESS:  I had personal knowledge

Page 346

1  of a number of things.  And what I was looking for
2  in the conversation with Mr. Gonzalez was his
3  perspective on a few items, not necessarily the
4  details of the transactions that were going on or
5  whatever.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Well, how about just the subject matters
8  that are at issue in today's deposition, did you
9  feel the need to review with him the various
10  topics set forth in your deposition Notice?
11          MS. TABACCHI:  Object to the form.
12          THE WITNESS:  Again, I thought the
13  questions that were asked touched on the subjects
14  that we needed to talk about.
15  BY MS. ST. PETER-GRIFFITH:
16      Q.   Do you think it would have been
17  important as the president of HPD to get
18  Mr. Gonzalez's perspective on the topics that are
19  at issue in this 30(b)(6) lawsuit?
20          MS. TABACCHI:  Object to the form,
21  beyond the scope of the Notice.
22          THE WITNESS:  Again, I thought we

Page 347

1  covered the topics adequately with him.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Sir, when we left off at your last
5  deposition, we were still working through Topic 8
6  and pricing.
7      A.   Okay.
8      Q.   I'd like to go back to that.
9          Before I show you some documents,
10  I'd like to ask in terms of setting of pricing,
11  either list pricing or contract pricing, either
12  or, okay, so any pricing that impacted the
13  Alternate Site customers or the nonDRG reimbursed
14  customers.
15      A.   Okay.  For Alternate Site.
16      Q.   For HPD customers who are not DRG
17  reimbursed.  Does that make sense?
18      A.   Okay.
19      Q.   What role, if any, did factors like
20  dispensing fees or copays or other risks that the
21  provider might have impact Abbott's pricing
22  decisions?

Page 348

1          MS. TABACCHI:  Object to the form.
2          THE WITNESS:  I don't believe that any
3  of those affected or were factors in our pricing
4  decisions.
5
6  BY MS. ST. PETER-GRIFFITH:
7      Q.   Why not?
8          MS. TABACCHI:  Object to the form.
9          THE WITNESS:  Again, as I think I said
10  the last time, we marketed our products on the
11  basis of quality, breadth of portfolio, breadth of
12  delivery systems available, dependability of
13  supply, and on competitive prices.
14          So we were more intent on looking
15  at what our competitors were offering, not
16  necessarily what happened with the drugs after
17  they were procured.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   Well, as part of the competitive
20  pricing, would it have been important to
21  understand for those end users, those end
22  providers, would it have been important for Abbott

5  (Pages 345 to 348)

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 393

1    A.   I can tell you I'm not familiar with any
2  convention with regard to usual and customary.
3        Usual and customary rates for
4  therapies were set by each of our clients as we
5  worked through those. Home Infusion had some
6  usual and customary rates for any services that we
7  provided directly, but that was a minority of the
8  work that we did from '92 on when I was involved
9  with it.
10   Q.   As part of its services that it provided
11 to clients, did Abbott assist them in helping set
12 their usual and customary rates?
13   A.   There were discussions between as we set
14 up a new client, particularly those clients that
15 had no experience in the home infusion business,
16 there were discussions between our reimbursement
17 folks and their operating personnel talking about
18 what things they might want to consider in the
19 U&Cs.
20   Q.   Well, were you aware of any manuals that
21 were put together that were utilized by Abbott's
22 Home Infusion business unit and its customers in

Page 394

1  helping establish what the usual and customaries
2  were?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  I'm not familiar with the
5  details of a manual. We did have a reimbursement
6  implementation manual, if I remember right. What
7  in specifics were covered within that manual I'm
8  not familiar with.
9  BY MS. ST. PETER-GRIFFITH:
10   Q.   How important was AWP to Abbott's Home
11 Infusion business unit pricing?
12       MS. TABACCHI:  Object to the form.
13       THE WITNESS:  It wasn't important.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.   How was it utilized by Abbott's Home
16 Infusion business unit in its pricing?
17       MS. TABACCHI:  Object to the form.
18       THE WITNESS:  The only place AWP was
19 used was when it was requested by either a case
20 manager or a payor, whether they requested that on
21 the claim form or whether they requested it in the
22 per diem negotiations that we went through. Those

Page 395

1  are the only times that I'm familiar that AWP came
2  into play.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   What about for pricing for therapies
5  that were going to be provided or drugs that were
6  going to be provided as part of therapies, did AWP
7  factor into that pricing?
8        MS. TABACCHI:  Object to the form.
9        THE WITNESS:  I don't know.
10       MS. ST. PETER-GRIFFITH:  Before we jump
11 into the document, we've got five minutes left on
12 the tape. Why don't we take a quick break.
13       THE WITNESS:  Okay.
14       THE VIDEOGRAPHER:  We are off the record
15 at 10:23 a.m. with the end of Tape 1.
16       (WHEREUPON a recess was taken.)
17       THE VIDEOGRAPHER:  We are back on the
18 record at 10:37 a.m. with the start of Tape No. 2.
19       THE WITNESS:  ST. PETER-GRIFFITH:
20   Q.   Mr. Sellers, before we dive into the
21 document that's in front of you, did Abbott's Home
22 Infusion business unit provide to its consignment

Page 396

1  partners Ross products and TAP products such as
2  Lupron?
3        MS. TABACCHI:  Object to the form.
4        THE WITNESS:  In our consignment
5  program, we included Ross enteral solutions as
6  well as enteral feeding products or devices. We
7  did not include any products from TAP.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.   What's the basis for your statement that
10 you didn't include any products from TAP?
11   A.   TAP is a joint venture between Takada
12 and Abbott Laboratories, Takada Abbott
13 Pharmaceuticals, that's where the "TAP" came from.
14 And as such, TAP operated at an arm's length
15 relationship with Abbott and Takada. So we did
16 not have access to the TAP products.
17   Q.   But did Abbott Home Infusion dispense
18 Lupron to its consignment partners?
19       MS. TABACCHI:  Object to the form.
20       THE WITNESS:  Typically, Lupron is, as I
21 understand it, is not dispensed at home. It's
22 primarily dispensed in a physician's office.

17  (Pages 393 to 396)

Page 397

1          However, we may have dispensed
2  Lupron based on physician prescriptions.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Through the Home Infusion business unit?
5          MS. TABACCHI:  Object to the form.
6          THE WITNESS:  Through the Home Infusion
7  pharmacies, or any of our clients may have
8  dispensed Lupron as well.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.   And when they dispensed Lupron, would
11  Abbott Home Infusion be responsible for providing
12  the Lupron product to either the Home Infusion
13  pharmacies or to the clients, Home Infusion
14  clients?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  When our clients dispensed
17  Lupron, they would be responsible for purchasing
18  the Lupron.
19  BY MS. ST. PETER-GRIFFITH:
20     Q.   I'm sorry.  I misspoke.
21         In terms of distributing the Lupron
22  to the Home Infusion clients for dispensation,

Page 398

1  would Abbott do that?
2          MS. TABACCHI:  Object to the form.
3          THE WITNESS:  It was not included in any
4  of our consignment programs with our clients.  So
5  if they needed Lupron, they would have to purchase
6  Lupron from a wholesaler or directly from TAP.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.   Did Abbott Home Infusion have a group
9  purchasing organization that it worked with to
10  assist its consignment partners in procuring
11  product?
12         MS. TABACCHI:  Object to the form.
13         THE WITNESS:  We were a member of an
14  Alternate Site group purchasing organization
15  called Purchase Connection.  That GPO was used by,
16  used nationally, by a number of Alternate Site
17  companies and facilities.  And we were a member
18  just like Coram would be a member.  I don't know
19  whether Coram was, but if they were --
20  BY MS. ST. PETER-GRIFFITH:
21     Q.   I understand.
22     A.   As an example.

Page 399

1      Q.   Sir, if former Home Infusion business
2  unit employees such as Bruce Rodman or Karla
3  Kreklow or Lynn Leone have testified in this case
4  that Abbott's Home Infusion division did in fact
5  dispense or provide Lupron to its clients, Home
6  Infusion clients to dispense, would that surprise
7  Abbott?
8          MS. TABACCHI:  Object to the form,
9  beyond the scope.
10         THE WITNESS:  It was not within our
11  consignment program.
12  BY MS. ST. PETER-GRIFFITH:
13     Q.   Is there some stated policy or document
14  that reflects that that you're aware of?
15         MS. TABACCHI:  Object to the form.
16         THE WITNESS:  Not that I could produce,
17  no.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.   If Abbott Home Infusion was dispensing
20  Lupron, would that be violative of any Abbott
21  policy or procedure?
22         MS. TABACCHI:  Object to the form.

Page 400

1          THE WITNESS:  No.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   How come?
4          MS. TABACCHI:  Object to the form.
5          THE WITNESS:  We dispensed drugs
6  manufactured by whatever drug company was needed,
7  not just Abbott Labs.  And we, just like Walgreens
8  or any other retail pharmacy, were dictated by the
9  physician's prescription.  So if the physician
10  prescribed a particular gentamicin for instance,
11  that wasn't our gentamicin, we were required to
12  dispense that gentamicin.  We would go out and
13  procure that gentamicin and dispense that drug.
14  BY MS. ST. PETER-GRIFFITH:
15     Q.   You're talking about Abbott's Home
16  Infusion pharmacies themselves; right?
17     A.   Yes.
18     Q.   With regard to its consignment partners,
19  was there any policy or procedure that prohibited
20  Abbott's Home Infusion department from consigning
21  Lupron to them?
22         MS. TABACCHI:  Object to the form.

18  (Pages 397 to 400)

Page 417

1    for a period of time.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   So you have that firsthand experience.
4        A.   I have some knowledge.  Though, again, I
5    didn't process claims.  So I do have that bit of
6    knowledge.  I have testified with regard to these
7    subjects before.  So I've got that background.
8            But specifically for this, other
9    than reading Lynn Leone's testimony and reading
10   Shelley Bronson's testimony, which I think we
11   talked about last time, and I believe I went
12   through Bruce Rodman's testimony in pieces.
13       Q.   What is the 50?
14       A.   We had a couple of AS/400 computers.
15   One we processed our pharmacies through, the other
16   one we used as a timeshare for a lot of our
17   clients.  So I don't know which one, but the 50
18   refers to one of them.
19       Q.   So it's one of the computer databases --
20       A.   Yes.
21       Q.   -- essentially?
22       A.   Yes.

Page 418

1        Q.   Sir, if you could flip a few pages
2    before that to BR02430.  It's the June 13th
3    memorandum from Lynn Leone to all reimbursement
4    personnel.  Do you see that?
5        A.   Uh-huh.
6        Q.   Can you take a few minutes and look at
7    this, please.
8        A.   Okay.
9        Q.   Sir, do you recognize this document?
10       A.   No.
11       Q.   Does it refresh Abbott's recollection as
12   to whether or not it distributed to its revenue
13   share partners in the Home Infusion business unit
14   Lupron?
15           MS. TABACCHI:  Object to the form.
16           THE WITNESS:  No.  It does indicate that
17   we dispensed Lupron to patients, but it doesn't
18   have any statement in here that we consigned
19   Lupron to our --
20   BY MS. ST. PETER-GRIFFITH:
21       Q.   Revenue share partners?
22       A.   -- contract partners.

Page 419

1        Q.   So when Abbott billed Lupron to Medicare
2    and Medicaid or third-party providers, would it do
3    so utilizing the Lupron AWP?
4            MS. TABACCHI:  Object to the form.
5            THE WITNESS:  Again, I think this is
6    talking about our list price which in terms of
7    Home Infusion it's not the list price we've been
8    talking about in terms of catalog.  So I want to
9    make sure that's the difference.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.   Oh, okay.  Can you clarify what you mean
12   by that, sir?  So list price for Home Infusion was
13   different than list price for HPD?
14           MS. TABACCHI:  Object to the form.
15           THE WITNESS:  I think the context of
16   this is list price is our usual and customary
17   price.
18   BY MS. ST. PETER-GRIFFITH:
19       Q.   Okay.
20       A.   So for Home Infusion dispensing a drug
21   per a prescription, our usual and customary was
22   referred to as our list price.  So that's what

Page 420

1    this is talking about is the definition of our
2    usual and customary.
3        Q.   Okay.  Well, let me ask you this:  In
4    the middle of the first paragraph it says "Because
5    of these increases, our list price on the 50
6    should be adjusted."  Do you see that?
7        A.   Yes.
8        Q.   Was Abbott's Home Infusion list price
9    for the products that its pharmacies dispensed on
10   the 50?
11           MS. TABACCHI:  Object to the form.
12   BY MS. ST. PETER-GRIFFITH:
13       Q.   Is that where it was kept or maintained?
14       A.   I would infer that from here.
15       Q.   Well, do you know based upon your
16   experience from running Home Infusion?
17       A.   I remember there were two.  I don't
18   remember the terminology between them and which
19   one housed what.  But I would infer that since
20   she's talking about the 50 and it's going to our
21   pharmacists as well as our reimbursement
22   personnel, that was where we housed anything that

23  (Pages 417 to 420)

Page 457

BY MS. ST. PETER-GRIFFITH:

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Did anyone within Abbott understand
3  that?
4         MS. TABACCHI:  Objection, asked and
5  answered.
6         THE WITNESS:  There may have been a few
7  people within Home Infusion reimbursement that had
8  an understanding of how AWP might or might not
9  have been a factor, either plus or minus or an
10 average AWP, whatever, for a specific payor to a
11 specific provider.  But as far as Abbott and as
12 far as Abbott HPD is concerned, there wasn't
13 necessarily that understanding.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   Well, someone within Abbott -- well,
16 Home Infusion is within Abbott HPD; is it not?
17        MS. TABACCHI:  Object to the form.
18        THE WITNESS:  Home Infusion was a very
19 small discreet business unit within HPD.  It
20 operated differently than any other business
21 segment.  So the vast majority of the HPD sales
22 were to hospitals.

Page 458

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   But Abbott --
3     A.   So the vast majority of Abbott HPD
4  personnel understood hospitals.  Very, very few
5  even were aware that we were selling to anybody
6  other than hospitals.
7         MS. ST. PETER-GRIFFITH:  Why don't we
8  take a break at this point in time.  Why don't we
9  take a brief lunch break.
10        MS. TABACCHI:  Sure.  What time do you
11 want to come back?
12        MS. ST. PETER-GRIFFITH:  If we can come
13 back at 12:30, that would be great.
14        MS. TABACCHI:  Okay.
15        THE VIDEOGRAPHER:  We are off the record
16 at 11:55 with the end of Tape 2.
17           (WHEREUPON a lunch recess was
18            taken, and said deposition
19            continued as follows:)
20
21
22

Page 459

1         THE VIDEOGRAPHER:  We are back on the
2  record at 12:34 p.m. with the start of Tape No. 3.
3            MICHAEL SELLERS,
4  having been previously duly sworn, was examined
5  and testified further as follows:
6              EXAMINATION
7             (Continuing)
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   Mr. Sellers, I'd like to move on to the
10 Home Infusion operations.
11    A.   Okay.
12    Q.   Just in your personal capacity, how long
13 were you involved with Abbott's Home Infusion?
14    A.   I was the general manager from sometime
15 in 1992, I believe probably May or June, I can't
16 remember which, through to February of 2000.  And
17 then subsequent to Don Robertson retiring, I
18 picked up Home Infusion again I think sometime in
19 2001 through to its shutdown.
20    Q.   What were the business models for
21 Abbott's Home Infusion business unit from 1991
22 until its closure?

Page 460

1         MS. TABACCHI:  Object to the form.
2         THE WITNESS:  Our predominant business
3  model was a contract with hospitals which helped
4  them get into the Home Infusion business.  It was
5  intended to be an evolutionary program where
6  upfront we might have provided more services
7  because of the novelty of the program to the
8  hospital entity, and then over time the hospital
9  would gradually take on more and more of those
10 services, and we would take a lesser and lesser
11 role.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.   Was that the revenue share business
14 model?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  I've heard it referred to
17 as revenue share.
18 BY MS. ST. PETER-GRIFFITH:
19    Q.   Under the revenue share business model,
20 what would Abbott provide as part of the
21 contractual relationship?
22    A.   I believe that we offered a pretty broad

33  (Pages 457 to 460)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

30(b)(6) Abbott (Sellers, Michael) - Vol II                        March 31, 2008

Page 461

1  menu of services and options that could be
2  negotiated into those arrangements.
3         Again, since we were talking about
4  in a number of cases taking an organization who
5  wasn't really familiar with what we called
6  high-tech home care or the running of a pharmacy
7  for home care, we might begin by offering our
8  pharmacy services out of our own pharmacies.  We
9  would definitely offer training using our pharmacy
10 managers or our pharmacy staff to train our
11 hospital clients on the operation, the
12 development, and the procedures needed to operate
13 a pharmacy that was JCAHO accredited.
14        We provided engineering assistance
15 in the development of their home infusion
16 facility, if they were going to build a home
17 infusion facility.
18    Q.   Let me stop you right there.  Would
19 Abbott ever build out the home infusion facility
20 for them?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  No.

Page 462

1  BY MS. ST. PETER-GRIFFITH:
2     Q.   Okay.  Go ahead.
3     A.   We would have, you know, we might be
4  the, might provide the lead engineering interface
5  for building it out, but it wasn't our practice to
6  fund the build-out of a pharmacy.
7         We provided reimbursement services,
8  we provided training with regard to reimbursement,
9  with regard to case management handling, with
10 regard to contracting with payors.  We offered
11 them an ability to come together with other
12 clients so that they could share their experiences
13 with one another and give them some peer
14 relationships in the industry.
15        We provided consigned inventory of
16 Abbott product.  And we provided the CHIP system
17 which they could operate in a number of ways in
18 terms of a timeshare, in terms of if they wanted
19 to run it on their own computers, whatever.
20        So it was quite a flexible menu of
21 services that all had to be comprehended in the
22 arrangement.

Page 463

1     Q.   In providing the consigned inventory
2  that Abbott provided under this particular
3  business model, how did it document or reflect the
4  fair market value for the inventory that it
5  consigned?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  We never communicated to
8  our clients, to my knowledge, a valuation of the
9  inventory.
10 BY MS. ST. PETER-GRIFFITH:
11    Q.   Would Abbott provide the consigned
12 inventory at Abbott's factory cost and delivery
13 cost, factory and delivery cost, to the revenue
14 share partner?
15        MS. TABACCHI:  Object to the form.
16        THE WITNESS:  It was consigned
17 inventory.  So it was comprehended in the
18 arrangement.
19        So the product was moved into the
20 warehouse, into the client's warehouse, as they
21 needed it.  We inventoried it annually, and any
22 shrinkage that was not explainable by pharmacy

Page 464

1  utilization would be reconciled with the client,
2  and --
3  BY MS. ST. PETER-GRIFFITH:
4     Q.   In that reconciliation what charge would
5  be paid?
6         MS. TABACCHI:  Object to the form.
7  BY MS. ST. PETER-GRIFFITH:
8     Q.   Or what charge would be charged?
9         MS. TABACCHI:  Same objection.
10        THE WITNESS:  I believe it was a
11 negotiable process, as I remember it, but our
12 baseline, we would have chosen a GPO agreement
13 that we would have called representative.  And
14 that may have varied year to year, but we would
15 have picked a known market price.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.   At any time for the consigned
18 inventory -- let me ask you this:  For the
19 consigned inventory, did that also include Ross
20 and Abbott devices?
21        MS. TABACCHI:  Object to the form.
22        THE WITNESS:  Yes.

34  (Pages 461 to 464)

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

|   | Page 465 |
|---|---|
| 1 | BY MS. ST. PETER-GRIFFITH: |
| 2 | Q.   When the revenue share partner utilized |
| 3 | the consigned product or device, would there be a |
| 4 | separate charge for that particular product item |
| 5 | or particular device that would be charged |
| 6 | separately to the revenue share partner, or would |
| 7 | there just be an aggregate collection of a |
| 8 | percentage of revenue? |
| 9 | MS. TABACCHI: Object to the form. |
| 10 | THE WITNESS: There was no line item |
| 11 | charge to the client. |
| 12 | BY MS. ST. PETER-GRIFFITH: |
| 13 | Q.   For the services that were provided that |
| 14 | you described, engineering, pharmacy, training |
| 15 | procedures, reimbursement services, access to the |
| 16 | CHIP system, would Abbott document or reflect the |
| 17 | fair market value for those services that it |
| 18 | rendered to the revenue share partner? |
| 19 | MS. TABACCHI: Object to the form. |
| 20 | THE WITNESS: I'm not aware that we ever |
| 21 | did. |
| 22 | BY MS. ST. PETER-GRIFFITH: |

|   | Page 466 |
|---|---|
| 1 | Q.   What would the compensation be for those |
| 2 | services? |
| 3 | A.   It was all comprehended in the total |
| 4 | agreement.  So whatever our percentage of |
| 5 | collections on each of the therapies would |
| 6 | comprehend what other services we provided. |
| 7 | Q.   Would you charge separately for the |
| 8 | engineering services that I presume would be -- |
| 9 | well, let me ask you this.  Strike that. |
| 10 | Would the engineering services |
| 11 | generally be an upfront service because you're |
| 12 | getting the revenue share partner a facility and |
| 13 | up to speed, is that fair to say? |
| 14 | MS. TABACCHI: Object to the form. |
| 15 | THE WITNESS: Yeah.  There were a number |
| 16 | of startup costs, and that was one of them, that |
| 17 | would be one of them.  It would be an upfront |
| 18 | cost, but it was figured into the overall revenue |
| 19 | share for the term of the agreement that we |
| 20 | signed, whether it was a three-year contract or a |
| 21 | five-year contract, it amortized those upfront |
| 22 | charges across the full term. |

|   | Page 467 |
|---|---|
| 1 | BY MS. ST. PETER-GRIFFITH: |
| 2 | Q.   What other upfront charges would there |
| 3 | be? |
| 4 | A.   Training, warehouse setup, those kind of |
| 5 | things. |
| 6 | Q.   Would Abbott have any mechanism for |
| 7 | tracking the value of those upfront services that |
| 8 | were provided? |
| 9 | MS. TABACCHI: Object to the form. |
| 10 | THE WITNESS: We had an ability to |
| 11 | identify what our costs were for all of those |
| 12 | upfront, and we used that in determining what our |
| 13 | revenue share would be on future agreements. |
| 14 | So we did go back and look at some |
| 15 | of our startups to validate that we were |
| 16 | adequately burdening future agreements. |
| 17 | BY MS. ST. PETER-GRIFFITH: |
| 18 | Q.   Would the individual files for the |
| 19 | revenue share partners reflect the tracking of |
| 20 | those costs? |
| 21 | MS. TABACCHI: Object to the form. |
| 22 | THE WITNESS: Typically not, no. |

|   | Page 468 |
|---|---|
| 1 | BY MS. ST. PETER-GRIFFITH: |
| 2 | Q.   Under the revenue share model would |
| 3 | Abbott Home Infusion share in revenues collected |
| 4 | from Medicare and Medicaid? |
| 5 | MS. TABACCHI: Object to the form. |
| 6 | THE WITNESS: In all the cases that I |
| 7 | recall it was every payor. |
| 8 | BY MS. ST. PETER-GRIFFITH: |
| 9 | Q.   Would the payors be broken down on a per |
| 10 | patient basis?  For example, would you take a, |
| 11 | would Abbott be able to document that it's taking |
| 12 | a forty percent share, for example, in the |
| 13 | Medicare reimbursement attributable to Patient |
| 14 | John Smith? |
| 15 | MS. TABACCHI: Object to the form. |
| 16 | THE WITNESS: The system, the CHIP |
| 17 | system, kept track of whatever services and claims |
| 18 | were delivered on a patient.  That patient would |
| 19 | have been classified to a particular therapy or |
| 20 | multiple therapies because in a lot of cases a |
| 21 | nutritional patient got nutritional therapy, but |
| 22 | they also might have had times when they got |

35  (Pages 465 to 468)

Page 469

1  antibiotic therapy, or there might have been times
2  when they got hydration therapy.
3           So it was really, it was less
4  patient specific, it was more payor therapy
5  definition within the system which would then
6  define, the therapy would then define the revenue
7  share percentage.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.   If a particular patient was denied
10 reimbursement by Medicare or Medicaid, how would
11 Abbott, if at all, charge its revenue share
12 partner for the product that was utilized but for
13 which reimbursement was not paid by Medicare or
14 Medicaid?
15          MS. TABACCHI:  Object to the form.
16          THE WITNESS:  We wouldn't get, we would
17 get basically our revenue share of that collection
18 which was --
19 BY MS. ST. PETER-GRIFFITH:
20    Q.   Zero percent?
21    A.   -- our revenue share of zero would be
22 zero.

Page 470

1     Q.   Did the revenue share business model
2  change over time?
3     A.   Well, it changed per client.
4          Every client, as I said, might have
5  evolved from a more comprehensive array of
6  services and products that we delivered originally
7  to something less later on, or clients decided
8  early up that they wanted to do more, and so their
9  arrangement, the arrangements by client were
10 different.
11          The contract or the risk share
12 contract that we had, that general format, general
13 structure, didn't change.
14    Q.   When was this revenue share business
15 model first put into place?
16    A.   My recollection is '83 or '84.
17    Q.   From '91 to 2003 can you give a broad
18 overview, I'm not asking you for particular, you
19 know, to the penny dollar amounts, but a broad
20 overview of the profits and profit margins enjoyed
21 by the Home Infusion business unit?
22          MS. TABACCHI:  Object to the form,

Page 471

1  beyond the scope.
2          THE WITNESS:  You know, I don't have
3  specific numbers.  I think in general in the,
4  again, I can speak from '92 on, in general
5  division margin basis we were in the eighteen to
6  twenty percent division margin.  And that's prior
7  to corporate burdening.  So all the corporate
8  costs aren't put on that.  So net at the end of
9  the day, it was less whatever we paid for the big
10 corporate offices and so on.
11          That's what we reported to the
12 division was somewhere in the eighteen to
13 twenty-two percent range.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.   How did the reimbursement department
16 work?
17    A.   Very hard.
18    Q.   Can you describe the mechanics of how it
19 operated?
20    A.   Typically, our reimbursement team was
21 broken into subteams, and those teams were aligned
22 with our clients.  So our clients, when they were

Page 472

1  operating, had particular people that they could
2  get used to and our people could get used to our
3  clients, could understand our clients and our
4  clients could understand us.
5          So basically we were trying to work
6  as hand-in-hand as we could, and one way to do
7  that was to establish a small team that could work
8  with each of our clients and be responsible for
9  that.
10          Again, depending on what the client
11 wanted us to do, we might handle verification of
12 insurance, we definitely had to get assignment of
13 benefit paperwork in our hands --
14    Q.   Let me stop you right there.  Would
15 Abbott ever accept assignment of benefits on
16 behalf of its revenue share partners itself under
17 Abbott's name?
18          MS. TABACCHI:  Object to the form.
19          THE WITNESS:  It may have.  When we were
20 operating through our pharmacies, it may have.
21 BY MS. ST. PETER-GRIFFITH:
22    Q.   What about when you weren't operating

36 (Pages 469 to 472)

Page 473

1 through your pharmacies?
2     A.  No.  But you had to have via AOB.  So in
3 some cases the clients did all that.  In some
4 cases it was part of the services we offered.
5         Once the prescription was filled,
6 shipped, and accepted, then that team would
7 develop the claim and file the claim.  They would
8 be the contact person for the payor in the name
9 of, in most cases, in the name of our client, and
10 they would follow up on that claim.
11        So there was in general a timeframe
12 where we would expect a claim to be processed.  If
13 we had not gotten a response in that timeframe,
14 someone from that team would call the payor and
15 follow up on the claim, when, where is it, when do
16 you expect to pay it.
17        We would get data from our client's
18 lockbox as to payments that were made as well as
19 any documentation on claim payment.  Once we'd get
20 that back, we would bill for copays because then
21 we would know what the allowable was.  There would
22 be follow up on the copays.  And then if there was

Page 474

1 any adjudication of the claim itself, they would
2 handle that.  In other words, if we didn't agree
3 with payment for one reason or another, perhaps we
4 suspected they had not interpreted our claim data
5 correctly, that kind of follow up would be done as
6 well.
7     Q.  In terms of, I want to go back over
8 something you just said.  You said that you billed
9 for copays once you received the data from the
10 lockbox because at that point Abbott would know
11 what the allowable was.  What do you mean by that?
12    A.  Well, we could only bill customers, or
13 patients, once we knew what the allowable charge
14 was.  We couldn't bill the copays on what our
15 original claim was because the payor would come
16 back inevitably and say you're only allowed to
17 charge "X" amount, we're going to pay
18 seventy-five percent of it, or we're going to pay
19 eighty percent, whatever, and then they
20 would say the patient is liable for the
21 difference.
22        So you couldn't bill it early

Page 475

1 because you didn't know what your allowable was
2 going to be.
3     Q.  In terms of the claim process that you
4 described where you said you developed the claim,
5 filed the claim, followed up on the claim, did
6 that include claims submitted to Medicare and
7 Medicaid?
8     A.  Yes, all payors.
9     Q.  So you bill the patient, you follow up.
10        Now, if claims were disallowed,
11 would Abbott get involved with the process of
12 claims dispute, for lack of a better term?
13    A.  Yes.  If we didn't accept the
14 disallowance, or whatever you want to call it, we
15 would do the appeal.  And in some cases we'd do
16 it, we'd consult with the client before we did an
17 appeal.  And they may or may not support it, or we
18 might not support it and they would want us to do
19 it.  So it was really quite a close working
20 relationship between us and our clients.
21    Q.  If there was a dispute over whether or
22 not to pursue a disallowed claim, if there was a

Page 476

1 dispute between Abbott and the revenue share
2 partner, was there a contractual provision as to
3 whose opinion won out?
4     A.  No.
5     Q.  How would that dispute be resolved?
6     A.  Well, we'd continue to talk about it
7 until we came up with an agreement.
8         I would say that if it really came
9 down to a point of absolute disagreement, we would
10 operate under the same retail rule that everybody
11 else does, and that is the customer is always
12 right.
13    Q.  Okay.  Did the reimbursement staff have
14 any particular special handling that it utilized
15 for processing claims to Medicare or Medicaid?
16        MS. TABACCHI:  Object to the form.
17        THE WITNESS:  Not that I'm aware of.
18 Handling of every payor was unique, and, in fact,
19 handling each Medicaid state was unique, and in a
20 lot of cases handling each Medicare carrier was
21 unique.
22        And since we were operating

37 (Pages 473 to 476)

Page 477

1  nationally, we weren't just operating in one
2  specific region, each of the teams may have had
3  different processes for handling payor claims
4  regardless of whether it was other third parties
5  or Medicare/Medicaid.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.   Who within the reimbursement -- let
8  me strike that.
9         Who within Abbott Home Infusion
10 understood how Medicare and Medicaid reimbursed?
11       MS. TABACCHI:  Object to the form.
12       THE WITNESS:  Well, again, across this
13 whole time period it was the responsibility of the
14 reimbursement department to understand, for our
15 clients and for the regions we were billing in it
16 was their responsibility to understand how to
17 bill.
18       They may have also attempted to
19 understand how we got paid, but I can tell you it
20 varied across that time period and it varied by
21 carrier.
22       So I'm not sure there was any one

Page 478

1  person that knew what all the things we were
2  doing.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.   But certainly the reimbursement staff
5  understood the mechanics of the Medicare/Medicaid
6  reimbursement; is that fair?
7        MS. TABACCHI:  Object to the form.
8        THE WITNESS:  They understood the
9  mechanics of reimbursement and the claims, that
10 kind of process.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.   In your role with Home Infusion, did you
13 have an understanding as to how Medicare or
14 Medicaid reimbursed?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  Not specifically.  You
17 know, I may have been told.  I had monthly reviews
18 where the leaders of each team came in and
19 presented how things were going, what they
20 collected, what they billed, what their bad debt
21 percentage was, where they were running into
22 difficulties, and it was my attempt to understand

Page 479

1  at that time what kind of impacts were affecting
2  them.
3        So from that standpoint, I may have
4  been told in that time period.  But I didn't have
5  a detailed understanding of what specifically each
6  area was doing with regard to Medicare and
7  Medicaid.
8        My main management process at that
9  time was to look at the percentage of collections
10 that or percentage of U&Cs that we were getting
11 and was that going up or was that going down, were
12 we getting better reimbursement or were we getting
13 worse.  And that was really one of the metrics
14 that I remember talking to reimbursement about.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.   Over the period from 1991 until the time
17 of the Home Infusion business unit's closure, what
18 were the annual revenues?  We talked about profit
19 a little while ago, but what were the annual
20 revenues?
21       MS. TABACCHI:  Object to the form,
22 beyond the scope.

Page 480

1        THE WITNESS:  I believe that when I
2  started in '92, as I recall, we were about 32 to
3  $34 million, either around $32 million in
4  billings.  In or around '95 or '96, we hit our
5  maximum of I believe a little over $42 million in
6  revenue, and then it kind of plateaued.  And then
7  after we made the decision to close down, it
8  started to tail off because we didn't renew
9  agreements.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.   When was the decision made to close the
12 business unit?
13   A.   I recall it being made sometime in late
14 1997.
15   Q.   Who made the decision?
16   A.   It was a, Don Robertson and I consulted
17 on the recommendation, we took the recommendation
18 forward to Rick Gonzalez, who was the president of
19 HPD at the time, and then it was reviewed with
20 corporate, and then we were given the go-ahead.
21   Q.   Who within corporate reviewed it?
22   A.   It was reviewed in a meeting with Miles

38  (Pages 477 to 480)

30(b)(6) Sellers Deposition
Exh. 14

 *contract marketing*

FROM:   Mike Sellers
        General Manager, Contract Marketing

INTEROFFICE CORRESPONDENCE          DEPT: 0361   BLDG: AP30   EXT:   7-1776

TO:   Meeting Attendees                 DATE: March 7, 2001

RE:   Rules of The Road

Attached is for discussion at the 10 AM meeting in Rick Gonzalez office.

MIKE



TXABT 674736
Highly Confidential

Prepared for L. Schumacher          Attorney Work Product          3/2/01

# PUBLISHED PRICES FOR HPD

**CATALOG LIST PRICE** – Manufacturer's suggested list price last published in a catalog April 19, 1999. May include price breaks based upon single-order case volume purchases.

**WHOLESALER ACQUISITION COST (WAC)** – Price charged to drug wholesalers on the initial purchase transaction for product moved into their inventory. This price is the basis for chargebacks. Typically offered with a "2% 30 Net 31" payment terms. This price is also used for Radiology Supply distributors with regard to the Berlex products marketed by HPD.

**JIT PRICE** – Price charged to med-surg distributors on the initial purchase transaction for product moved into their inventory. This price is the basis for chargebacks. The payment terms are "1.5% 30 Net 31". This price was established in the late 80's as we responded to Baxter's ValueLink just-in-time distribution initiative on large volume IV solutions and administration equipment. Due to the bulk and weight of these products, drug wholesalers were not interested in distributing these products.

**DISTRIBUTOR ACQUISITION COST (DAC)** – Price charged to oncology distributors for product moved into their inventory. This price was initially defined by Gensia, the manufacturer of products sold and distributed by HPD within the Oncology franchise, prior to establishment of the Abbott marketing agreement. When Abbott assumed the marketing responsibility on these products, we established WAC prices at levels above the market ASP for drug wholesalers. In the three (3) years since the initiation of the Gensia agreement, we have tried to align DAC with WAC, but have not done so to date due to the financial impact of the inventory cost adjustment that would be experienced in such an alignment.

**RxLINK** – In 1991, HPD recognized a market opportunity in the chargeback process that would facilitate the full documentation of all drug wholesaler sales (without paying for sales tracings) and would gain our products some preference in the non-contract sales process within the wholesalers. An agreement was developed and sold to wholesalers under which they could qualify current non-contract sales at prices below WAC and in return gain a 2% revenue from Abbott in the form of a quarterly rebate. RxLink is purely an opportunistic sale made to small buyers and to our competition's contract purchasers during periodic competitive supply interruptions.

TXABT 674737
Highly Confidential

Developed at the direction of Laura Schumacher                    Attorney Work Product

03/07/01

## POLICY IMPLEMENTATION:

Per directions from last meeting:
1. Discussed price adjustment with other Divisions:
   **PPD** – Standard WAC prices at 5% below List; potential exposure on Ery products which are sold at 40% to 60% below List; some sales volume risk with lower List price.
   **RPD** – No exposure anticipated; distributor prices at 30% off List.
   **SPD** – Animal Health prices higher than HPD ASP, currently making comparisons; no major risk anticipated.

2. Evaluated the impact of using lower JIT prices. List Price billings erosion increased $1.5 million to $1.8 million.

3. Evaluated the impact of DAC adjustments for Oncology drugs. Few drugs are impacted since many co-marketed products remain sold at List Price. No direct sales for these items.

### Proposed Implementation Schedule:

A) **First 45 Days** – Finalize WAC prices with Accounting verification and Business Unit approvals.

B) **Next 45 Days** – Announce changes to WAC, JIT and DAC prices to trading partners.

C) **Next 30 Days** – Announce catalog price change and publish new List Prices to RedBook and First Data Bank.

| | 2001 | ANNLZD |
|---|---|---|
| **Definite Impact - Price Lost Due to Reduction** | | |
| • List Price & Special Price Sales | $ 0.9 million | $ 1.8 million |
| • Inability to Raise FSS Prices | $ 0.1 million | $ 0.2 million |
| **Potential Impact - Volume Lost due to Reimbursement Reductions** | | |
| • Alternate Site Product Sales | $ 2.9 million | $ 8.8 million |
| • Home Infusion Revenue Sharing | $ 0.6 million | $ 1.8 million |
| **Total Potential Impact** | $ 4.5 million | $ 12.6 million |

Assuming July 1, 2001 catalog price date.

TXABT 674738
Highly Confidential

Prepared for L. Schumacher          Attorney Work Product          3/2/01

# PUBLISHED PRICES FOR HPD

**CATALOG LIST PRICE** – Manufacturer's suggested list price last published in a catalog dated April 19, 1999. Usually defined as one price level, but it may include price breaks based upon single-order case volume purchases (e.g. Calcijex).

**WHOLESALER ACQUISITION COST (WAC)** – Price charged to drug wholesalers on the initial purchase transaction for product moved into their inventory. This price is the basis for chargebacks. Typically offered with a "2% 30 Net 31" payment term. This price is also used for Radiology Supply Distributors for Berlex products marketed by HPD (e.g. Magnevist).

**JIT PRICE** – Price charged to Medical Distributors (e.g. General Medical, Allegiance) on the initial purchase transaction for product moved into their inventory. This price is the basis for chargebacks. The payment terms are "1.5% 30 Net 31". This price was established in the late 80's as Abbott's response to Baxter's ValueLink just-in-time distribution initiative on large volume IV solutions and administration equipment. Due to the bulk and weight of these products, drug wholesalers were not interested in distributing them. On IV solutions, this price is usually lower than WAC.

**DISTRIBUTOR ACQUISITION COST (DAC)** – Price charged to alternate site Oncology Distributors (e.g. Oncology Supply) for product moved into their inventory. This price was initially defined by Gensia (the manufacturer of oncology products sold and distributed by HPD) prior to establishment of the Abbott marketing agreement. When Abbott assumed the marketing responsibility on these products, HPD established WAC prices at levels above the market ASP for drug wholesalers. In the three (3) years since the initiation of the Gensia agreement, we have tried to align DAC with WAC on new product introductions, but have not done so on the original products (about 17 list numbers).

**RxLINK** – In 1991, HPD recognized a market opportunity in the chargeback process that would facilitate the full documentation of all drug wholesaler sales (without paying for sales tracings) and would gain our products some preference in the non-contract sales process within the wholesalers. An agreement was developed and sold to wholesalers under which they could qualify current non-contract sales at prices below WAC and in return gain a 2% revenue from Abbott in the form of a quarterly rebate. RxLink is purely an opportunistic sale made to small buyers and to our competition's contract purchasers during periodic competitive supply interruptions.

**PARAMETER PRICES** – In 1995/6 due to the implementation of HPD's main pricing system (CAS), a policy was established to manually override any non-contract direct purchases with Parameter Prices. This was done to assure evaluation of all "list priced" billings before invoicing, and to minimize the magnitude and disruption of billing adjustments that might occur with the new system. Parameter Prices were set above the Group High price and at or below RxLink prices. This policy has remained in effect through today.

TXABT 674739
Highly Confidential

30(b)(6) Sellers Deposition
Exh. 34 (former Texas Exh. 940)

01/18/01                    Attorney Work Product                    ✓

*** DRAFT ***
# CATALOG PRICE ADJUSTMENT

**PROPOSAL:** Reduce the catalog price of all Hospital Products Division Products to better correlate with the actual national market selling price range. A reduction would be predicated on the current Wholesaler Acquisition Prices (WAC) plus a fixed differential (+5%). This change would become effective April 1, 2001.

**BACKGROUND:** The product portfolio actively marketed by the Hospital Products Division (HPD) of Abbott Laboratories Inc. contains a significant number of product categories where we compete in hospital and alternate site health care arenas on a generic equivalency basis with other companies' offerings. Since 1986, the HPD net average selling prices have declined year over year due to this highly competitive market environment. The HPD catalog (a.k.a. suggested manufacturer's list price) price for these products has remained unadjusted despite significant erosion in actual selling prices. Due to other considerations related to contractual and government regulatory demands, HPD, prior to the year 2000, published annual increases once a year on the catalog prices. Increases that generally approximated the change in Consumer Price Index change for the Urban market basket (CPI-U), exacerbating any differential to "real" prices in the market. Though the majority of eventual sales dollars are processed at steep discounts to the catalog pricing under contractual commitments, there continues to be a small portion of sales (less than 1%) which are processed at these elevated levels. These higher priced sales are mainly from customers who order too infrequently to warrant contract coverage or are forced to use Abbott products due to intermittent shortages of a competitor's supplies.

The published pricing for wholesalers and distributors (Wholesaler Acquisition Price – WAC) is adjusted annually to reflect the erosion of final sale prices independent of the catalog price. WAC is evaluated annually by Accounting and Contract Marketing to adjust for market price trends. And once per year, new pricing is published to Abbott's trading partners.

The wide disparity in catalog prices and average market prices as currently configured is not supported by sufficient financial or market factors to survive scrutiny of public opinion. This was voiced in December 2000 in a letter from U.S. Representative Pete Stark to Miles White. The revenue impact of making this change may be affordable by the Corporation in 2001. The establishment of a process to annually define changes to the catalog pricing would avoid this type of public relations exposure in the future.

**DIVISION IMPACT:** Making the proposed adjustment to catalog prices would reduce the opportunistic sales historically made by HPD at the higher price level, and would eliminate the opportunity for price increases across the Federal Supply Schedule contract planned in 2001; for a guaranteed impact of $1.7 million per year and $1.2 million in 2001. Additionally, lowering the catalog price will reduce the Average Wholesale Price (AWP) published by the market clearinghouses and may result in lost sales due to alternative sourcing of products by customers away from Abbott in the alternate site markets where both government and commercial reimbursement to providers is based upon a function of AWP. A pending reduction of AWP proposed by the Department of Justice (DOJ) in several major alternate site products would force some portion of this impact for government-reimbursed care regardless of Abbott's actions. The potential volume loss is estimated at $10.6 million annually and $5.3 million in 2001.

**TXABT 674725**
**Highly Confidential**

DEPOSITION
EXHIBIT
940

01/18/01                    Attorney Work Product

The sales dollar losses noted below reflect only the impact of changes to drug prices.  No estimate has been made for a commensurate change to non-drug items (administration equipment and other med/surg items) which should also be considered in this process.  Making this change effective April 1, 2001, will allow time for the full HPD organization to review all necessary products.

|   | 2001 IMPACT | ANNLZD IMPACT |
|---|---|---|
| **Definite Impact - Price Lost Due to Reduction** | | |
| • List Price & Special Price Sales | $ 1.0 million | $ 1.5 million |
| • Inability to Raise FSS Prices | $ 0.1 million | $ 0.2 million |
| **Potential Impact - Volume Lost due to Reimbursement Reductions** | | |
| • Alternate Site Product Sales | $ 4.4 million | $ 8.8 million |
| • Home Infusion Revenue Sharing | $ 0.9 million | $ 1.8 million |
| **Total Potential Impact** | **$ 6.4 million** | **$ 12.3 million** |

Does not include price changes on Critical Care products and products not manaufactured,but sold by Abbott; such as products from Berlex, SKB, Gensia, HMR, etc.

## PRODUCT EXAMPLES:

| NDC # | DESCRIPTION | LIST PRICE | WAC | ASP | NEW PRICE |
|---|---|---|---|---|---|
| 4332-01 | Vancomycin, 500mg. Fliptop Vial | $32.18 | $ 6.34 | $ 2.26 | $ 6.66 |
| 4452-01 | Acyclovir, 1gm. Fliptop Vial | $176.40 | $61.22 | $11.12 | $64.28 |
| 7983-09 | Sodium Chloride, 1000ml. IV bag | $ 10.61 | $ 1.02 | $ 0.77 | $ 1.44 |
| 5855-03 | Aminosyn 8.5%, 500ml. | $78.54 | $ 8.13 | $ 4.45 | $ 8.53 |
| 7808-24 | Dopamine in D5W, 500ml. | $34.62 | $14.53 | $ 7.6 | $15.26 |
| 9094-25 | Fentanyl (0.5mg/ml) 5ml. Fliptop | $14.33 | $ 0.93 | $ 0.77 | $ 1.13 |

**TXABT 674726**
**Highly Confidential**

30(b)(6) Abbott (Sellers, Michael) - Vol II                    March 31, 2008

Page 661

1   price adjustment project.
2        MR. ANDERSON:  But I'm talking about the
3   substance of the information contained in Exhibit
4   34, is there any claim of privilege on that
5   document?
6        MS. TABACCHI:  We don't have a claim of
7   privilege on the document.
8        MR. ANDERSON:  All right.
9        MS. TABACCHI:  I don't understand your
10  question beyond that.
11  BY MR. ANDERSON:
12    Q.  Sir, do you believe that the information
13  that you've provided in Exhibit 34 is true and
14  correct?
15       MS. TABACCHI:  Object to the form.
16       THE WITNESS:  I believe at the time I
17  drafted that it was as accurate a representation
18  as I knew at the time.
19  BY MR. ANDERSON:
20    Q.  Do you have any reason to distrust the
21  accuracy of Exhibit 34?
22       MS. TABACCHI:  Object to the form.

Page 662

1        THE WITNESS:  No, I don't.
2        (WHEREUPON Exhibit Sellers 035
3        and Exhibit Sellers 036 were
4        marked as of 3/31/2008.)
5   BY MR. ANDERSON:
6    Q.  Now, if you could, take a look at what's
7   been marked as Exhibit 35 and Exhibit 36.
8   (Documents tendered to the witness.)
9        MS. ST. PETER-GRIFFITH:  While the
10  witness is reviewing that, I'd just like to note
11  that Exhibit 34 is the same document that we
12  discussed the last time around beginning on
13  Page 282 of his transcript.
14       MS. TABACCHI:  Did you identify it in
15  some way for the record?
16       MS. ST. PETER-GRIFFITH:  I did.  I gave
17  the Texas deposition Exhibit 940.
18       MS. TABACCHI:  Okay.
19       MS. ST. PETER-GRIFFITH:  I have the
20  Texas number.  I didn't have it marked.
21       MS. TABACCHI:  Okay.
22  BY MR. ANDERSON:

Page 663

1    Q.  Did you write Exhibit 35, sir?
2        MS. TABACCHI:  Objection, beyond the
3   scope.
4        THE WITNESS:  I believe I did author 35.
5   I believe it was sent out as a voicemail, not as a
6   hard copy document.
7   BY MR. ANDERSON:
8    Q.  In the second paragraph you write
9   "Yesterday we were made aware by several customer
10  calls into Alternate Site that First Databank
11  recently published revised AWPs for HPD drugs."
12       Did I read that correctly?
13    A.  Correct.
14    Q.  Is that a true statement?
15       MS. TABACCHI:  Object to the form,
16  beyond the scope.
17       THE WITNESS:  Yes.
18  BY MR. ANDERSON:
19    Q.  Why were you as the head of HBS Contract
20  Marketing interested in calls concerning AWP to
21  Alternate Site?
22       MS. TABACCHI:  Objection, beyond the

Page 664

1   scope.
2        THE WITNESS:  This was in 2001.  This
3   was, as the message goes on and talks about, this
4   was at a time where we were preparing the price
5   adjustments to be published.  We were looking at I
6   believe a May date.  May 7th, if my memory serves
7   me right, was the date that the prices were to be
8   official.
9        So we were, you know, what I was
10  saying here to the addressees was that First
11  Databank had published the prices sooner than we
12  had anticipated.  Back at that time it was the
13  practice to give the compendia a forty-five day
14  notice on price changes, and we expected them to
15  take forty-five days to update their system, which
16  is what they told us that they needed.
17       This was just a heads-up saying
18  they're out there earlier.  And we were notified
19  by some customers who had seen it on their latest
20  update.
21  BY MR. ANDERSON:
22    Q.  Why would customers care about decreased

84  (Pages 661 to 664)

e038b3c0-d0a3-46fc-babc-a9296c2d1018

Part of 30(b)(6) Sellers
Exhibit 23
at p. BR02430



FROM:  Lynn E. Leone
       **Managed Care Specialist**
DEPT:  **OH59  BLDG: AP34-2  EXT: 7-0704**

**TO:**  All Reimbursement Personnel
     All Pharmacists Personnel

**DATE:**  June 13, 1996

**CC:**  Shellie Bronson
     Keith Harper
     Phil Hollenbeck
     John Kelton
     Robert Martin
     Kathy Riddle

**Re:**  LUPRON

Effective June 13, 1996, the price on all Lupron products has been increased.  The last time prices for Lupron were adjusted was in September, 1994.  Since that time, there have been increases in AWP for these drugs.  Because of these increases, our list price on the 50 should be adjusted.  The new pricing is the same incremental increase over AWP that our prices were when they were adjusted in 1994

Below is a list of the new prices by Lupron product:

| Product | AWP | List Price |
|---|---|---|
| Lupron Depot Ped 7.5mg | 496.25 | 570.69 |
| Lupron Depot 3.75mg kit | 396.87 | 456.40 |
| Lupron Ped 11.25mg kit | 893.12 | 1027.09 |
| Lupron Ped 15mg kit | 992.50 | 1141.38 |
| Lupron 5mg/ml 2.8ml 2 wk kit | 278.12 | 319.84 |
| Lupron 7.5mg 1.5ml kit | 496.25 | 570.69 |

Although the number of patients receiving Lupron is not large, the change in usual and customary may be noticable to patients.  As previously stated, this increase is incremental based on changes in average wholesale price in the last two years.

If you have any questions, please let me know.


Lynn

*up charge 1.1*

MEMO96.DOC/19

**BR 02430**

**HIGHLY
CONFIDENTIAL**