COMPOSITE EXHIBIT C

Renick Deposition

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


In re:  PHARMACEUTICAL INDUSTRY   )  MDL DOCKET NO.

AVERAGE WHOLESALE PRICE           )  CIVIL ACTION

LITIGATION.                       )  01CV12257-PBS

-------------------------------   )


          The videotaped deposition of ANNE MARIE

RENICK, called by the United States for examination,

taken pursuant to subpoena and pursuant to the Federal

Rules of Civil Procedure for the United States District

Courts pertaining to the taking of depositions, taken

before Rachel F. Gard, Certified Shorthand Reporter, at

11 South LaSalle Street, Suite 1200, Chicago, Illinois,

commencing at 9:08 a.m. on the 17th day of March, A.D.,

2008.

Renick, Anne Marie                                    March 17, 2008

---

Page 2

1  APPEARANCES:
2
3      U.S. DEPARTMENT OF JUSTICE
4      CIVIL DIVISION
5      MS. ANN ST. PETER-GRIFFITH
6      99 N.E. 4th Street
7      Miami, Florida  33132
8      Phone:  (305) 961-9003
9      Email:  ann.st.peter-griffith@usdoj.gov
10        On behalf of the United States;
11
12     STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
13     BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE
14     MR. RAYMOND LIDDY
15     110 West A Street
16     Suite 1100
17     San Diego, California 92101
18     Phone:  (619) 688-6043
19     Email:  raymond.liddy@doj.ca.gov
20        Telephonically on behalf of the State of
21        California;
22

---

Page 3

1  APPEARANCES:  (Continued)
2
3      ANDERSON, LLC
4      MR. C. JARRETT ANDERSON
5      208 West 14th Street
6      Suite 3-B
7      Austin, Texas  78701
8      Phone:  (512) 469-9191
9      Email:  jarrett@anderson-llc.com
10        Telephonically on behalf of the Relator
11        Ven-A-Care of the Florida Keys, Inc.;
12
13     JONES DAY
14     MS. TARA FUMERTON
15     77 West Wacker Drive
16     Chicago, Illinois  60602
17     Phone:  (312) 782-3939
18     Email:  tfumerton@jonesday.com
19        On behalf of Abbott Laboratories;
20
21
22

---

Page 4

1  APPEARANCES:  (Continued)
2      STETLER & DUFFY, LTD.
3      MR. DAVID J. STETLER
4      11 South LaSalle Street
5      Suite 1200
6      Chicago, Illinois  60603
7      Phone:  (312) 338-0200
8        On behalf of the deponent.
9
10
11  ALSO PRESENT:  Anthony Micheletto, videographer
12
13
14         *   *   *   *   *   *
15
16
17
18
19
20
21
22

---

Page 5

1                 I N D E X
2  WITNESS                            PAGE
3  ANNE MARIE RENICK
4      Examination by Ms. St. Peter-Griffith     8
5      Examination by Mr. Anderson            189
6
7                 E X H I B I T S
8  RENICK EXHIBIT                        PAGE
9  Exhibit Renick 001 AR 00001 - AR 00003       15
10 Exhibit Renick 002 Anne Renick produced documents 88
11        retained by Mr. Stetler
12 Exhibit Renick 003 ABT-DOJ 026779 -         106
13        ABT-DOJ 0267790
14 Exhibit Renick 004 TXABT 158511            108
15 Exhibit Renick 005 ABT-DOJ 0233926 -        111
16        ABT-DOJ 0233987
17 Exhibit Renick 006 ABT-DOJ 0228282 -        127
18        ABT-DOJ 0228287
19 Exhibit Renick 007 ABT-DOJ-E 0047744 -      132
20        ABT-DOJ-E 0047756
21 Exhibit Renick 008 ABT-DOJ-E 0047520 -      136
22        ABT-DOJ-E 0047525

---

2 (Pages 2 to 5)

Renick, Anne Marie                                    March 17, 2008

---

**Page 26**

1    concerning units?
2        A.  No.
3        Q.  And then you said you'd look at recent
4    trends; is that right?
5        A.  Correct.
6        Q.  Or current trends.  What -- What would
7    you do to look at current trends?
8        A.  We'd run the numbers, look, see how we're
9    tracking, you know, on annual basis versus
10   forecasted basis.
11       Q.  Okay.
12       A.  And then depending upon where we were,
13   positive, negative, apply that to the forecasts as
14   well.
15       Q.  And you indicated that you'd look at
16   changes in awards?
17       A.  Yes.
18       Q.  What does that mean?
19       A.  So if you have a contract with someone
20   and there's bid cycles, so you may get -- you know,
21   win new business, lose business; so we'd look at
22   that aspect of it.

---

**Page 27**

1        Q.  Did anything else other than what you've
2    just testified to go into putting together the
3    plans or the April updates?
4        MS. FUMERTON:  Objection, form.
5    BY THE WITNESS:
6        A.  Yes.  Occasionally someone would want to
7    see a bigger number and you'd just put in a larger
8    forecast because that's what they wanted you to
9    achieve.  So a stretch goal, you could call it.
10       Q.  And who would request the stretch goal?
11   Would that be Mr. Ward?
12       A.  Would he request it?  Generally, no.  He
13   was generally given a number that you have to
14   achieve.
15       Q.  Who was he given a number by?
16       A.  It could have been Don Robertson.  It
17   could have been Chris Kringle.  It could have been
18   the CEO, whoever at the time was running the
19   company.
20       Q.  Was the CEO involved in the evaluation of
21   plans and plan updates?
22       A.  Was he involved in the evaluation?  I

---

**Page 28**

1    don't know if it was the CEO, but it was -- I don't
2    know the name of the position that did the ultimate
3    reviews of it.
4        Q.  But certainly Mr. Robertson reviewed
5    them, the plans and the plan updates?
6        A.  Yes.
7        Q.  Did he have input into them?
8        MS. FUMERTON:  Objection, form.
9    BY THE WITNESS:
10       A.  I'm not sure -- I don't recall being in a
11   meeting where he did it.  I'm sure John Ward
12   reviewed it with him.
13       Q.  Okay.  And who is Mr. Kringle?
14       A.  He was the president of the Hospital
15   Products Division at the time.
16       Q.  Okay.  Would the HPD president be
17   involved in the review of the plan and plan update?
18       A.  Yes.
19       Q.  Now, were you the one who physically did
20   the forecasting and put -- collated all the -- or
21   assimilated all the information?
22       A.  Yes.

---

**Page 29**

1        Q.  What was Mr. Ward's involvement in that
2    process?
3        A.  Reviewing the data to make sure it met
4    where he wanted to go with the business or it
5    looked like what he wanted, but not the -- he
6    looked at it from a consolidated standpoint.
7        Q.  Okay.  Did you keep copies of the plans
8    and plan updates in any particular area?
9        A.  There was binders.
10       Q.  Where were the binders located?
11       A.  I would have had binders in my office.
12   Pretty much everyone who deemed appropriate was
13   given a binder.
14       Q.  Okay.  When you left this particular
15   position, what happened to the binders?
16       A.  Stayed there.
17       Q.  And who was your successor?
18       A.  Don't recall.
19       Q.  Did you ever produce the binders incident
20   to or pursuant to a -- receiving a litigation hold
21   memorandum?
22       A.  I don't recall if there was one during

---

                                    8 (Pages 26 to 29)

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

dee0c0c9-a197-46e8-9784-045f67f6b49f

Robertson Deposition

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION                     )   MDL No. 1456
_____)   Civil Action No. 01-12257
                               )
THIS DOCUMENT RELATES TO:      )   Judge Patti B. Saris
_____)
                               )
United States of America,      )
ex res. Ven-A-Care of the      )
Florida Keys, Inc. v. Abbott   )
Laboratories, Inc.             )
CIVIL ACTION NO. 06-11337-PBS  )
                               )
                               )


VIDEO DEPOSITION OF DONALD C. ROBERTSON


    DATE TAKEN:    Thursday, September 13, 2007

    TIME:          8:54 a.m. to 4:28 p.m.

    BEHALF OF:     The United States

    PLACE TAKEN:   United States Attorney's Office
                   2110 First Street,
                   Fort Myers, Florida

    REPORTER:      Lisa L. Rios, Court Reporter,
                   and Notary Public, State of
                   Florida at Large


MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida  33901
(239) 334-6545
FAX  (239) 332-2913

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 2

```
 1
 2        A P P E A R A N C E S
 3
 4   ANN ST. PETER-GRIFFITH, Attorney at Law,
     Special Attorney for the Attorney General
 5   99 N.E. 4th Street, 3rd Floor,
     Miami, Florida 33132
 6   representing the United States Attorney,
     Southern District of Florida
 7
 8   DONALD E. HAVILAND, JR., Attorney at Law,
     The Haviland Law Firm, LLC,
 9   740 S. Third Street, Third Floor
     Philadelphia, Pennsylvania 19147
10   representing the Commonwealth of Pennsylvania
11
     TONI-ANN CITERA, Attorney at Law,
12   Jones Day,
     222 East 41st Street
13   New York, New York 10017-6702
     representing Abbott Laboratories, Inc.
14
15   DAVID J. STETLER, Attorney at Law,
     Stetler & Duffy, Ltd.,
16   11 South LaSalle Street, Suite 1200
     Chicago, Illinois 60603;
17   representing the Witness, Donald C. Robertson
18
     C. JARRETT ANDERSON, Attorney at Law,
19   Anderson, LLC
     1300 Guadalupe, Suite 103
20   Austin, Texas 78701
     representing the Relator, Ven-A-Care of the Florida
21        Keys, Inc.
22
23   ELISEO SISNEROS, Deputy Attorney General,
     State of California Department of Justice
24   110 West A Street, #1100
     San Diego, California 92101
25
```

Page 4

```
 1            I N D E X (Continued)
 2
            E X H I B I T S
 3
 4   ROBERTSON        DESCRIPTION              PAGE
 5    1     One-page Interoffice Correspondence
            dated March 21, 1991 from Mark Gorman
 6          stamped ABT22027              165
 7    2     23-page document with first page being an
            Interoffice Correspondence dated June 1,
 8          1991 from Donald C. Robertson stamped
            ABT212056                     169
 9
      3     Five-page document with first page being an
10          Interoffice Correspondence dated June 11,
            1991 from Virginia Tobiason stamped
11          ABT212051                     177
12    4     32-page document with first page being an
            Interoffice Correspondence dated June 13,
13          1996 from Lynn E. Leone stamped BR 02430   245
14    5     One-page Interoffice Correspondence dated
            December 22, 1994 from Chris Snead stamped
15          TXABT249849                   248
16    6     One-page Interoffice Correspondence dated
            February 9, 1995 from Tim Harris previously
17          marked as Sebree Exhibit No. 2 stamped
            CA ABT 07895                  251
18
      7     Four-page document previously marked
19          Sellers #362 stamped CA ABT 08044      255
20    8     One-page memo from dated May 26, 1994 from
            Steve Kipperman previously marked Lotz
21          Exhibit No. 61 stamped ABT006333       273
22    9     44-page document with first page being a
            memo dated May 26, 1994 from Steve Kipperman
23          previously marked Kipperman Exhibit No. #480
            stamped ABT006333             280
24
     10     51-page document with first page being a
25          memo dated July 14, 1995 from John V. Ward
            stamped ABT 278110            282
```

Page 3

```
 1
 2        A P P E A R A N C E S (Continued)
 3
 4   Appearing via Telephone:
 5
 6     Gejaa T. Gobena, Attorney at Law,
       Department of Justice,
 7     P.O. Box 261
       Ben Franklin Station
 8     Washington, D.C. 20044;
       representing the United States
 9
10     AMBER NESBITT, Attorney at Law,
       Wexler, Toriseva, Wallace,
11     55 West Monroe Street, Suite 3300
       Chicago, Illinois 60603;
12     representing MDL and the State of Arizona
13
14   Also Present:
15
16   Mike Sturdevant, Videographer
17   John Lockwood, Ven-A-Care of the Florida
     Keys, Inc., Relator
18
19
20
21            I N D E X
22                      PAGE
23
24   Direct Examination by Ms. St. Peter-Griffith    6
25
```

Page 5

```
 1        VIDEOGRAPHER:  We are here today, September 13,
 2   2007, at 8:54 a.m. for the videotape deposition of Don
 3   Robertson, located at the United States Attorney's
 4   Office, 2110 First Street, Fort Myers, Florida, in the
 5   case styled, United States of America versus Abbott
 6   Laboratories.
 7        The videographer is Mike Sturdevant; the reporter is
 8   Lisa Rios, both from Martina Reporting.
 9        Would counsel please state their appearances for the
10   record.
11        MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith from
12   the United States Attorney's Office, Southern District
13   of Florida on behalf of the United States.
14        MR. ANDERSON:  Jarrett Anderson, counsel for the
15   Relator.
16        MR. SISNEROS:  Eliseo Sisneros, Deputy Attorney
17   General, State of California.
18        MR. LOCKWOOD:  John Lockwood with Ven-A-Care of the
19   Florida Keys, and I'm not an attorney.
20        MR. HAVILAND:  Don Haviland, the Haviland Law Firm,
21   for the Commonwealth of Pennsylvania.
22        MS. CITERA:  Toni Citera for the Defendants from
23   Jones Day.
24        MR. STETLER:  Dave Stetler for the Witness.
25        MR. GOBENA:  Gejaa Gobena, Department of Justice on
```

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 86

1   marketing department?
2       A    Yes; we had a small contracting group. I don't
3   remember how many people were there.
4           One of the things that was important was that the
5   pricing would be proper for customers or you couldn't get
6   business - as I said before - with multi-source injectable
7   pharmaceuticals.
8       Q    Okay.
9           In terms of the Home Infusion sales force, would
10  they just make cold calls upon hospitals to discuss
11  developing the home infusion --
12      A    Home infusion services?
13      Q    Yes.
14      A    No.  They -- How they prospected, I don't really
15  recall.  You know, obviously you go to the big dogs, the big
16  hospitals that don't have their own home infusion business
17  and they're sending out to others and approach them on it.
18      Q    Do you recall whether there were some clients that
19  were like that?
20      A    Oh, yeah.  We did that.
21      Q    Do you remember the names of the hospitals?
22      A    I don't -- I'm sure many of the large hospitals.  I
23  remember going on calls - Lahey Clinic in Boston was in, you
24  know, many large customers wanted to do this.
25          But, once again, my concern was getting the

Page 87

1   profitability, that business up, and getting our customers
2   to do their own stuff - you know, their own ancillary
3   services.
4       Q    Let me circle back to an issue that we just touched
5   upon.
6           Do you recall whether Abbott either Home Infusion
7   or Abbott's Home Infusion pharmacies would dispense Lupron?
8           MS. CITERA:  Objection to form.
9           THE WITNESS:  I believe TAP had an organization
10  named TAP Care which did that.  We didn't do that.
11      Q    Okay.
12          Would Abbott Home Infusion work with TAP Care?
13      A    Not my knowledge.
14      Q    Do you know whether Abbott Home Infusion would seek
15  reimbursement for Lupron?
16          MS. CITER:  Objection to form.
17          THE WITNESS:  Seek reimbursement for Lupron?  I
18  can't imagine a reason why.
19          No, ma'am; I don't think so.
20      Q    Okay.
21          With regard to the Alt Site pharmacies - the
22  pharmacies, themselves, who were the Home Infusion Services
23  clients for those pharmacies?
24      A    Hospitals.
25      Q    Okay.

Page 88

1           Just hospitals?
2       A    Generally just hospitals; yes, ma'am.
3       Q    Would you ever have a situation where physicians
4   would, you know, have patients work directly with Abbott's
5   pharmacies?
6       A    The only patients I recall dealing directly with
7   were those whose lifetime benefit had expired, and we had
8   several of those.  Specifically, those were total parenteral
9   nutrition patients; their lifetime benefits had expired and
10  we couldn't get paid any longer, so we continued to do it
11  pro bono, and we dealt directly with them.
12      Q    When you say, "lifetime benefits had expired," what
13  do you mean?
14      A    That means a lifetime benefit, what their insurance
15  companies would pay - it may be $200,000, it may be $250,000
16  and their lifetime benefit expired - they had surpassed that
17  number and the insurance company would no longer pay; well,
18  we would deal directly with the patient and continue to
19  provide the product.
20      Q    Okay.
21          Do you recall whether there were sales plans or
22  marketing plans for the Alt Site Home Infusion business?
23      A    Yes, ma'am, there were.
24      Q    There were?
25          Were those similarly reviewed by you - developed by

Page 89

1   the general manager and then reviewed by you?
2       A    The sales plans?  Yes; that would be how we would
3   do it.
4       Q    Did you keep copies in your office?
5       A    Of their sales plans?
6       Q    Yes.
7       A    Yeah.
8       Q    Okay.
9           Sir, do you ever remember receiving memoranda,
10  either a memorandum or memoranda asking you to retain
11  documents because litigation was ongoing?
12      A    I may have - I don't specifically remember, but I
13  may have.
14      Q    If you did receive that, what would you do with
15  your records or documents?
16          MS. CITERA:  Objection to form.
17          THE WITNESS:  If I had received that?
18          MS. ST. PETER-GRIFFITH:  Yeah.
19          THE WITNESS:  I'd retain them.
20          MS. ST. PETER-GRIFFITH:  Okay.
21          THE WITNESS:  Compliance with the requests of my
22  supervisor at Abbott was not optional.
23          MS. ST. PETER-GRIFFITH:  Okay.
24          THE WITNESS:  If they were to be retained, they were
25  retained.

9d08c905-b265-4985-b6be-b8c9e568b1fc

Page 90

1   BY MS. ST. PETER-GRIFFITH:
2     Q   Okay.
3         What about do you recall as you sit here today
4   furnishing any documents to - incident to one of those
5   memos?
6     A   Any -- No, ma'am, I don't.  But any document that I
7   had with regard to a sales plan are - my supervisor would
8   also have had.
9     Q   Oh, okay.
10        So do you send all the sales plans up to the
11  president?
12    A   Well, he would have had copies of those; yes,
13  ma'am.
14    Q   Okay.
15        So Mr. Kringel, initially, and then Mr. Gonzalez?
16    A   Yes; they would have had copies of our sales plans.
17    Q   Would you discuss the sales plans with either
18  Mr. Kringel or Mr. Gonzalez?
19    A   Either Mr. Kringel or Mr. Gonzalez would approve
20  our sales plan and then we would present it to the
21  corporation, and after corporate approval it would become
22  cast in stone as our sales plan.
23    Q   Okay.
24        Who would -- And would this be done on an annual
25  basis?

Page 91

1     A   The sales plan would be done on an annual basis and
2   it would be updated.
3     Q   How frequently would it be updated?
4     A   In April and August.
5     Q   In April and August?
6         And who in corporate would sign off on the sales
7   plans for your business units?
8     A   As I recall, Hodgson, the president of the
9   corporation.
10    Q   Mr. Hodgson would?
11    A   Mr. Hodgson, yes.
12    Q   Okay.
13        And who else was the president of the corporation
14  while you were there?
15    A   While I worked for the corporation?  Boy, there
16  must have been - there were a lot of them; Kirk Robb, Jim
17  Vincent, Jack Schuler - there were at least four.
18    Q   Okay.
19        Did you ever work with Miles White?
20    A   No.
21    Q   Okay.
22        Did you work with Mr. White when you were in
23  Diagnostics at all?
24    A   No -- Oh - hold on - yes; I made a sales call with
25  Mr. White probably in 1983 on the largest customer we had -

Page 92

1   he was in national accounts then and I had Physiological
2   Diagnostics - we made a sales call on MetPath in Teterboro,
3   New Jersey, and Mr. White accompanied me on that call.
4     Q   Okay.
5         Do you recall when Mr. White took over as president
6   of the company?
7     A   Probably in 1999 or --
8     Q   Okay.
9     A   -- 2000.
10    Q   Do you remember who preceded him?
11    A   Who preceded him as president?  It may have been
12  Jack Schuler - I don't even remember - Mr. Schuler as
13  president?
14    Q   Okay.
15        So when Mr. White --
16    A   No - excuse me - Tom Hodgson was president.
17    Q   Tom Hodgson; okay.
18    A   Yeah.
19    Q   So when Mr. White took over in '99 and 2- --
20    A   Mr. White is CEO.
21    Q   Is CEO.
22    A   Right.
23    Q   Okay.
24        Would he sign off on the plans?
25    A   I don't know if he dealt in the level of detail

Page 93

1   that would include a business like Alternate Site Product
2   Sales or Home Infusion Services.
3         I am sure that, as president -- Well, the president
4   was a gentleman named Bob Parkinson - Mr. White was
5   chairman.  Mr. Parkinson, I'm sure would -- But whether
6   Mr. White as chairman would sign off at that level of
7   detail, I doubt -- I don't know.
8     Q   Okay.
9         What about you talked earlier about trying to phase
10  out of the Home Infusion Business Unit --
11    A   Yes, ma'am.
12    Q   -- would that be a decision that would need to be
13  made above you?
14    A   Yes, it would.
15    Q   Who would you expect would need to be consulted and
16  conferred with and ultimately make that decision?
17    A   Mr. Kringel or Mr. Gonzalez, and then probably
18  Mr. Hodgson or Mr. Parkinson.
19        COURT REPORTER:  Give me one second.
20        MS. ST. PETER-GRIFFITH:  Okay.
21        Why don't we take a brief break.
22        VIDEOGRAPHER:  Going off the record.
23        (Whereupon, a brief recess was taken)
24        VIDEOGRAPHER:  We're back on the record.
25  BY MS. ST. PETER-GRIFFITH:                          -

30(b)(6) Klaus Deposition
2/8/08

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------x

IN RE:   PHARMACEUTICAL INDUSTRY   )

AVERAGE WHOLESALE PRICE            )

LITIGATION,                        )

_____   )

                                   ) 01 CV 12257-PBS

                                   )

THIS DOCUMENT RELATES TO ALL       ) Judge Patti B.

ACTIONS:                           ) Saris

                                   ) Magistrate Judge

                                   ) Marianne B. Bouler

----------------------------------x


        Deposition of ELLEN KLAUS, taken before

CHRISTINE LIUBICICH, CSR, pursuant to the provisions

of the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, at 77 West Wacker Drive, Suite 3500,

Conference Room I, Chicago, Illinois, commencing at

9:27 a.m. on the 8th day of February, 2008.

2 (Pages 2 to 5)

---

2

| 1 | ATTENDANCE: |
| 2 | THE BREEN LAW FIRM |
| 3 | BY:MR. JARRETT ANDERSON |
| 4 | 5755 North Point Parkway |
| 5 | Suite 39 |
| 6 | Alpharetta, Georgia 30022 |
| 7 | (770)961-9419 |
| 8 | |
| 9 | on behalf of Venacare, Relators; |
| 10 | |
| 11 | and |
| 12 | |
| 13 | UNITED STATES ATTORNEY'S OFFICE SOUTHERN |
| 14 | DISTRICT OF FLORIDA |
| 15 | BY: MS. ANN M. ST. PETER-GRIFFITH |
| 16 | Assistant U.S. Attorney |
| 17 | 99 N.E. Fourth Street |
| 18 | Miami, Florida 33132 |
| 19 | (305)961-9419 |
| 20 | |
| 21 | on behalf of Plaintiffs; |
| 22 | |

---

3

| 1 | JONES DAY |
| 2 | BY: MR. JASON G. WINCHESTER |
| 3 | 77 West Wacker Drive |
| 4 | Suite 3500 |
| 5 | Chicago, Illinois 60601-1592 |
| 6 | |
| 7 | on behalf of Defendant, |
| 8 | Abbott Laboratories; |
| 9 | |
| 10 | BUREAU OF MEDI-CAL FRAUD & ELDER ABUSE |
| 11 | BY: MR. ELISEO SISNEROS |
| 12 | DEPUTY ATTORNEY GENERAL |
| 13 | 110 West A Street |
| 14 | #1100 |
| 15 | San Diego, California 92101 |
| 16 | (619)688-6043 |
| 17 | |
| 18 | on behalf of The State of California; |
| 19 | |
| 20 | ALSO PRESENT: |
| 21 | ANTHONY MICHELETTO, |
| 22 | Legal Videographer. |

---

4

| 1 | I N D E X | |
| 2 | WITNESS | PAGE |
| 3 | ELLEN KLAUS | |
| 4 | Examination By Ms. St. Peter-Griffith ........6 | |
| 5 | | |
| 6 | E X H I B I T S | |
| 7 | | |
| 8 | | MARKED |
| 9 | NUMBER | FOR ID |
| 10 | ELLEN KLAUS Deposition Exhibits | |
| 11 | Exhibit Klaus 00017 ................................21 | |
| 12 | Exhibit Klaus 00018 ................................82 | |
| 13 | Exhibit Klaus 00019 ................................82 | |
| 14 | Exhibit Klaus 00020 ................................110 | |
| 15 | Exhibit Klaus 00021 ................................147 | |
| 16 | Exhibit Klaus 00022 ................................147 | |
| 17 | Exhibit Klaus 00023 ................................147 | |
| 18 | Exhibit Klaus 00024 ................................236 | |
| 19 | Exhibit Klaus 00025 ................................342 | |
| 20 | | |
| 21 | | |
| 22 | | |

---

5

| 1 | THE VIDEOGRAPHER: This is Anthony Micheletto |
| 2 | representing Henderson Legal Services. I am the |
| 3 | operator of this camera. This is the videotaped |
| 4 | deposition of Ellen Klaus as being taken pursuant |
| 5 | to Federal Rules of Civil Procedure on behalf of |
| 6 | the Plaintiff. We're on the record on February 8, |
| 7 | 2008; the time is 9:27 a.m. as indicated on the |
| 8 | video screen. We are at the offices of Jones Day, |
| 9 | 77 West Wacker Drive, Chicago, Illinois. The case |
| 10 | is captioned In Re: Pharmaceutical Industry |
| 11 | Average Wholesale Price Litigation, case No. 01 |
| 12 | 12257 PBS. |
| 13 | Will the attorneys please identify |
| 14 | themselves for the video Record? |
| 15 | MS. ST. PETER-GRIFFITH: Ann St. |
| 16 | Peter-Griffith from the United States Attorney's |
| 17 | Office, Southern District of Florida, on behalf of |
| 18 | the United States. |
| 19 | MR. SISNEROS: Eliseo Sisneros, Deputy |
| 20 | Attorney General, State of California, on behalf of |
| 21 | California. |
| 22 | MR. ANDERSON: Jarrett Anderson, counsel for |

---

Abbott 30(b)(6) Ellen Klaus - Vol. I                     February 8, 2008
Chicago, IL

61  (Pages 238 to 241)

238
1    Q.  Okay.
2    A.  -- list, whatever this is called.
3    Q.  And what has Abbott done to search for
4  those August plan and April updates that are not
5  listed on the attachment to Miss Brooker's letter?
6    A.  Well, let me tell you what we did do to
7  search for these maybe --
8    Q.  Okay.
9    A.  When we undertook the -- our document
10  searches from a few years back all the way up to
11  the present.  When we went to the -- um, in 2005 we
12  did a document search at Hospira for Hospital
13  Products Division related documents and we
14  contacted -- um, for the finance documents, first
15  off, we went to the finance area and collected any
16  documents that they had plan and update books,
17  finance related information.  We went to the Abbott
18  corporate records facility that may have documents
19  for this time frame and collected anything there.
20  And then as we went around to the various business
21  people at the Hospira company, but to collect the
22  former HPD documents, we also asked if they had any

239
1  financial plan books or updates or financial
2  documents in general relating to anything.  So we
3  did our sweep that way.  And then we also gone to
4  the Abbott side on the Abbott finance area and
5  asked them for the same thing related to the
6  Hospital Products Division.  And then recently --
7  and it may have been shortly after this letter, I
8  don't know -- we did another search to see if we
9  missed anything, went to the same people, same
10  groups again, same corporate records and provided
11  anything that we found to Jones Day in both
12  instances, in all instance -- instances.
13    Q.  Okay.  Well, you'll see on this chart
14  that the first plan, August plan or April update
15  that is produced -- and there is only one of them
16  for 1998 occurs in 1998 -- where the plan -- August
17  plan and April updates from 1991 through 1998?
18  Let's start there.
19    A.  Um, we -- we located everything that we
20  could find and we provided that to Jones Day.  So
21  if it wasn't included, then we didn't -- there was
22  nothing.

240
1    Q.  Meaning it doesn't exist at Abbott
2  anymore?
3    A.  We -- there was nothing.  Yeah.  We could
4  find nothing.
5    Q.  Okay.  So has Abbott exhausted its search
6  for all of the August plan and April updates that
7  are not listed in Miss Brooker's letter?
8    A.  Yes, for the relevant time period.
9    Q.  So if you didn't find them and they
10  haven't been produced to date, then they don't
11  exist?
12    A.  Correct.
13    Q.  Did Abbott do anything to ascertain why
14  those August plan and April updates may have been
15  spoliated?
16    MR. WINCHESTER:  Objection.  Argumentative.
17    THE WITNESS:  Well, I can't say what happened
18  to those books.  I've never seen them, so I don't
19  know if they were in existence.
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Well, we have testimony from executives,
22  including divisional vice presidents, testifying

241
1  that for every year they were required to produce
2  the August plan and April updates.  Would you
3  dispute that?
4    A.  No.
5    Q.  Okay.  Then do you know -- do you -- does
6  Abbott have any knowledge as to why it is -- no
7  longer has possession of the August plan and April
8  updates for '91 through '98, or the ones that are
9  missing as reflected on this chart?
10    MR. WINCHESTER:  Object to the form.
11    THE WITNESS:  We've searched for everything in
12  every area that would potentially have these
13  documents and more.  I don't know if the document
14  -- I -- I -- I don't know.  There is noplace else
15  to search.  We've searched every place.  We've
16  provide everything that they found.
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Where would they normally be maintained,
19  the August plan and the April updates?
20    A.  I believe it's within the finance area of
21  the division.
22    Q.  And what was done within the finance area