# EXHIBIT D

# 30(b)(6) Buck Deposition

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE:  PHARMACEUTICAL          )
INDUSTRY AVERAGE WHOLESALE      )
PRICE LITIGATION                ) MDL No. 1456
-------------------------------) Civil Action
This document relates to:       ) No. 01-12257-PBS
United States of America,       )
ex. rel. Ven-a-Care of the      )
Florida Keys, Inc.,             ) Hon. Patti Saris
    vs.                         )
Abbott Laboratories, Inc.,      ) Magistrate Judge
CIVIL ACTION NO. 06-11337-PBS   ) Marianne Bowler
-------------------------------X


VIDEOTAPED DEPOSITION OF

ALEXANDRA GRIGORAS BUCK

MARCH 13, 2008

CHICAGO, ILLINOIS

**Page 2**

1  Videotaped deposition of ALEXANDRA
2  GRIGORAS BUCK, called by the Plaintiffs for
3  examination, taken pursuant to notice, agreement and
4  by the provisions of the Rules of Civil Procedure
5  for the United States District Courts pertaining to
6  the taking of depositions, taken before DEBORAH
7  HABIAN, a Notary Public within and for the County of
8  Cook, State of Illinois, and a Certified Shorthand
9  Reporter of said State, at the offices of Jones Day,
10 77 West Wacker Drive, 35th Floor, Chicago, Illinois,
11 on the 13th day of March, 2008, at 9:10 a.m.
12
13
14 APPEARANCES:
15
16 On behalf of the United States:
17    U.S. DEPARTMENT OF JUSTICE
18    COMMERCIAL LITIGATION, FRAUD
19    BY: ANN ST. PETER-GRIFFITH, ESQ.
20    99 N.E. 4th Street
21    Miami, Florida 33132
22    (305) 961-9001

**Page 3**

1  APPEARANCES: (CONTINUED)
2
3  On behalf of the Relator, Ven-a-Care:
4     ANDERSON, LLC
5     BY: C. JARRETT ANDERSON, ESQ.
6     208 West 14th Street
7     Suite 3-B
8     Austin, Texas 78701
9     (512) 469-4549
10
11 On behalf of the Defendants:
12    JONES DAY
13    BY: JASON G. WINCHESTER, ESQ.
14    77 West Wacker Drive
15    Chicago, Illinois 60601-1692
16    (312) 782-3939
17
18
19 ALSO PRESENT:
20
21    STEPHAN HOOG, VIDEOGRAPHER
22

**Page 4**

1                    INDEX
2
3  WITNESS: ALEXANDRA GRIGORAS BUCK           PAGE
4     EXAMINATION BY MS. ST. PETER-GRIFFITH..... 006
5     EXAMINATION BY MR. ANDERSON............... 295
6
7
8                   EXHIBITS
9
10 NUMBER       DESCRIPTION              PAGE
11 Exhibit Buck 001, Notice of Deposition......... 011
12 Exhibit Buck 002, Witness's list of individuals
13    interviewed in dep
14    preparation.................. 046

**Page 5**

1                  PROCEEDINGS
2
3     THE VIDEOGRAPHER: This is Stephan Hoog
4  for Henderson Legal Services. I'm the operator
5  of this camera. We're on record March 13th,
6  2008. The time is 9:10 a.m., as indicated on the
7  video screen.
8     This is the videotaped deposition of
9  Alexandra Buck. It's being taken pursuant to
10 Federal Rules of Civil Procedure. We are at 77
11 West Wacker Drive, Chicago, Illinois. This case
12 is captioned In Re: Pharmaceutical Industry AWP,
13 Case No. 01-12257-PBS.
14    Will the attorneys please identify
15 themselves for the video record?
16    MS. ST. PETER-GRIFFITH: Ann St. Peter-
17 Griffith from the United States Attorney's
18 Office, Southern District of Florida on behalf of
19 the United States.
20    MR. ANDERSON: Jarrett Anderson,
21 counsel for the Relator.
22    MR. WINCHESTER: Jason Winchester for

**230**

1     A. Our attorneys reviewed the documents.
2     Q. Did Abbott at all participate in
3 identifying what documents may or may have been
4 responsive -- may or may not have been
5 responsive?
6     A. I don't know.
7     MR. WINCHESTER: You got to let her get
8 the question out.
9     THE WITNESS: Sorry.
10    MR. WINCHESTER: That's okay.
11 BY MS. ST. PETER-GRIFFITH:
12    Q. And do you have an approximate time
13 frame as to when that search took place?
14    A. I do not.
15    Q. When did Abbott provide the AHD shared
16 drive electronic information to Jones Day?
17    A. I don't know the date.
18    Q. Do you know the year?
19    A. I don't.
20    Q. Do you know what else was involved in
21 the search of the shared drive of AHD?
22    A. I don't think there was anything else

**231**

1 involved.
2    Q. Okay, so we've exhausted what you know
3 about that?
4    A. Yes.
5    Q. Okay. Next. You searched the AHD
6 drive?
7    A. Correct.
8    Q. Okay, what else?
9    A. I believe we -- I stated earlier that
10 we searched Mr. Tootell's hard drive.
11   Q. Okay.
12   A. You want me to keep going?
13   Q. Yeah.
14   A. Okay.
15   Q. Well, let me tell you, who -- and let
16 me ask, who searched Mr. Tootell's hard drive?
17   A. Jones Day.
18   Q. Was that, again, you've provided that -
19 - the electronic information to them?
20   A. Correct. We took a ghost image, which
21 is a bit-by-bit image of the hard drive and
22 provided it to Jones Day.

**232**

1    Q. And when was that?
2    A. I don't know. Probably around the same
3 time that we took his e-mail file, which was I
4 believe Mr. Winchester said late last year. I'm
5 sorry --
6    MR. WINCHESTER: That was Gonzalez.
7    THE WITNESS: -- that was Gonzalez.
8 I'm sorry. I don't know.
9 BY MS. ST. PETER-GRIFFITH:
10   Q. Okay. Do you know whether it was
11 before or after Mr. Tootell's deposition?
12   A. I don't know.
13   MS. ST. PETER-GRIFFITH: Jason, do you
14 have the criteria that was used to search the
15 shared drive for AHD?
16   MR. WINCHESTER: I guess I'm not sure
17 what you're asking about, "criteria."
18   MS. ST. PETER-GRIFFITH: Meaning what
19 it was that was searched, what the search terms
20 were for pulling responsive documents.
21   MR. WINCHESTER: Oh. I don't know that
22 there were search terms on that one. I think

**233**

1 that literally it was a document-by-document
2 review that was, you know, culled just for
3 responsiveness according to the Court's rulings
4 and, you know, however you would look through a
5 box of paper. It was done that way with this
6 stuff on the shared drives.
7    MS. ST. PETER-GRIFFITH: Okay.
8    MR. WINCHESTER: I don't believe it was
9 done by way of hits from key terms. It was
10 literally reviewed --
11   MS. ST. PETER-GRIFFITH: Yeah, that's
12 my question more.
13   MR. WINCHESTER: Yes.
14   MS. ST. PETER-GRIFFITH: So it was just
15 a pure --
16   MR. WINCHESTER: Review.
17   MS. ST. PETER-GRIFFITH: -- Jones Day
18 attorney sitting there or paralegal or somebody
19 sitting there reviewing.
20   MR. WINCHESTER: Yes, pure staff
21 reviewing what was on the share drive.
22 BY MS. ST. PETER-GRIFFITH:

**290**

1  your knowledge?
2     A. I don't know.
3     Q. What types of databases existed within
4  or for the Home Infusion Business Unit?
5     A. I am not aware. I don't know.
6     Q. What about for the Alt Site Business
7  Unit?
8     A. I don't know.
9     Q. HBS?
10    A. I don't know.
11    Q. Is there any way to capture or was
12 there any way for Abbott to capture from 1991
13 through 2003 -- and I don't necessarily mean
14 historically. I'm just talking about the -- in
15 1991, for that time period from '91 to 2003, was
16 there any way to capture and preserve or save
17 historical price lists?
18    A. I don't know if they were contained in
19 a database. It is virtually impossible to
20 capture data or preserve data in a database
21 because it's relational and constantly changing.
22 So it's -- it's one of the sort of thorns in e-

**291**

1  discovery's side, trying to figure out how to do
2  that.
3     Q. Okay. Well, incident to lit hold
4  memoranda, was any effort made to -- because of
5  the changing nature of price lists -- of price
6  list database or price lists, was any initiative
7  undertaken to electrically preserve that
8  information?
9     A. I guess what I'm saying is that there
10 is no way that I'm aware of to preserve database
11 information on an ongoing basis, and I don't know
12 whether any steps were taken to preserve the data
13 that you're you referring to or whether it
14 existed in a database at all.
15    Q. Well, is it possible to implement a
16 system where, you know, on a weekly basis a
17 snapshot of what the price list was for that
18 particular week or that particular month was
19 captured?
20    A. I am not aware of a system that you can
21 take snapshots of databases that you would be
22 able to then use that data subsequently. That's

**292**

1  the problem with databases.
2     Q. Before the price lists were put on
3  databases --
4     A. I don't know that they were.
5     Q. Okay. Does Abbott -- what did -- did
6  Abbott do anything to search for price lists that
7  might have existed on an individual's computer
8  other than the lit hold?
9     A. I mean certainly if an individual was
10 looking for documents, I -- price lists would be
11 included. I don't know if there was some
12 database search or even database containing such
13 lists. I really don't know about the price
14 lists.
15    Q. Other than what we've discussed, are
16 you aware of any initiative to -- and I'm now
17 talking about the current initiative to search
18 desktops.
19       Are you aware of -- from '96 when
20 Abbott first started receiving, you know,
21 information from the government concerning its
22 investigation until the time of the Hospira spin,

**293**

1  was any initiative undertaken to search desktops
2  other than what was expected through the Ellen
3  Klaus initiative?
4     A. There is something that I want to
5  clarify that I'm not sure if I mentioned earlier.
6  At the time that we pulled Mr. Gonzalez's e-mail,
7  we did also take a ghost image of his computer,
8  reviewed every document document-by-document and
9  found that no documents were responsive, and I'm
10 not sure that I made that clear earlier.
11    Q. And who did that search?
12    A. Jones Day. And just to be clear, it
13 was a review. There was no search terms. It
14 was, again, a review of the entire drive.
15    Q. Okay. And was that his computer as it
16 -- from his term as President of HPD or as
17 Chairman term or some other -- when he was in --
18 held some other position?
19    A. I --
20       MR. WINCHESTER: Objection, form.
21       THE WITNESS: I believe it -- well,
22 actually, I don't know the time frame.

294

1  BY MS. ST. PETER-GRIFFITH:
2  Q. Okay, was any initiative undertaken to
3  search Rick Gonzalez's computer that he utilized
4  when he was President of HPD?
5  A. I don't know.
6  Q. Have we exhausted your knowledge or
7  recollection of the searches undertaken for
8  electronic information by Abbott in response to
9  the United States's request for production?
10 A. I believe we have.
11 Q. Is there anything that you would like
12 to clarify or, as you sit here today, think back
13 about that you want to either expand upon or
14 clarify?
15 A. No.
16    MS. ST. PETER-GRIFFITH: Okay. Jason,
17 I want -- as I indicated before, one of the
18 questions that we had was who exactly it was that
19 the lit -- responded to the lit hold memoranda,
20 which is really -- Ms. Buck has referenced it
21 here today, but that's really a question that was
22 presented with Ellen Klaus.

295

1    MR. WINCHESTER: Um-hum.
2    MS. ST. PETER-GRIFFITH: Subject to
3  getting more information concerning that, at this
4  time, the United States passes the witness.
5    MR. ANDERSON: Good afternoon, Ms.
6  Buck.
7    THE WITNESS: Good afternoon.
8    MR. ANDERSON: My name is Jarrett
9  Anderson. I don't have many questions, but I do
10 have a few.
11    THE WITNESS: Okay.
12
13    DIRECT EXAMINATION
14 BY MR. ANDERSON:
15 Q. Leaving off where you just were, if I
16 understand your testimony correctly, Mike
17 Tootell's hard drive and Rick Gonzalez's hard
18 drive were duplicated and then, in turn, reviewed
19 by Abbott's counsel, correct?
20 A. That is correct.
21 Q. Why were those two individuals selected
22 for that review?

296

1  A. I don't know. It was a decision, I
2  believe, made by our attorneys.
3  Q. Were there any other individuals whose
4  hard drives were reviewed by Abbott or its
5  counsel?
6  A. In the same manner that Mike Tootell
7  and Mr. Gonzalez's computer were reviewed?
8  Q. Let's limit it to that for now, and
9  then we'll broaden it.
10 A. Not that I am aware of.
11 Q. Okay, were other Abbott employees' hard
12 drives reviewed by individuals other than the
13 particular employee who actually possessed the
14 hard drive?
15 A. Sure. So I think as I testified
16 earlier and Miss Klaus referenced, there were
17 numerous occasions where the paralegal would sit
18 with the individual and go through their hard
19 drive document-by-document and decide what to
20 print out.
21 Q. Okay, and there's been some testimony
22 about this kind of over-the-shoulder review

297

1  process. How would the -- well, strike that.
2     With what frequency has Abbott or
3  Abbott's attorneys conducted a process where a
4  paralegal or some other Abbott representative
5  would physically sit with an Abbott employee and
6  search the Abbott employee's electronic records?
7  A. So my understanding is that every time
8  there was a collection, that process was
9  followed. And there were collections responsive
10 to either numerous subpoenas over this period of
11 time or document requests, et cetera. So I can't
12 say for certain with what frequency per
13 individual, but I know it was done repeatedly.
14 Q. And is it true that the individuals
15 which were identified for this level of over-the-
16 shoulder review were the 39 individuals that were
17 identified in the class action case?
18 A. That, I don't know. Like I said
19 earlier, I don't know the specific names of the
20 individuals.
21 Q. Do you know of records that would
22 reveal which persons have been subjected to this

### 330

1  records of its employees other than asking
2  individual employees to do so themselves?
3       MR. WINCHESTER: Objection, form.
4       THE WITNESS: No, I absolutely
5  disagree. And continually minimizing the effort
6  that our paralegals and our attorneys did to go
7  to computers with individuals and search,
8  electronically look at -- physically, personally
9  look at those files I think is a
10 mischaracterization.
11      Additionally, I've testified at length
12 about the share drive searches, again, about the
13 Medi-Cal searches, about the AHD share drives and
14 other things that I'm sure I'm missing now in
15 this summary of my testimony all day.
16 BY MR. ANDERSON:
17    Q. Well, I'm not trying to argue with you
18 about the merits of the kind of the over-the-
19 shoulder review. I'm just trying to understand
20 whether Abbott did any type of organizational
21 electronic search of its employees' records other
22 than the over-the-shoulder type review and the

### 331

1  Medi-Cal body of information that was reviewed
2  and the 2002 and post-2002 body of information
3  that was reviewed?
4       MR. WINCHESTER: Objection, asked and
5  answered.
6       THE WITNESS: It's just a
7  mischaracterization of what I've been testifying
8  about all day.
9       The share drive for the HPD was
10 absolutely not limited to 2002. The PSTs were
11 searched for, as we -- as I testified, and we
12 produced close to 18,000 e-mails that dated back
13 to much previous to 2002. We also searched the
14 AHD share drive without any date limitation on
15 that except through 2003, and again, I've
16 testified for hours today on other repositories.
17 And I'm not going to resummarize again. Other
18 than what I've testified today, I don't have
19 anything else to add to that.
20 BY MR. ANDERSON:
21    Q. Well, with respect to the categories of
22 information that you just rattled off, you'll

### 332

1  agree though that, while there may not have been
2  a date limitation placed on the search, those
3  sources inherently were limited because the
4  historic reach of those bodies of electronic
5  information was limited?
6       MR. WINCHESTER: Objection, form.
7       THE WITNESS: I do not agree.
8  BY MR. ANDERSON:
9     Q. You don't?
10    A. Nope.
11    Q. Despite your testimony about the 30-day
12 deleter or the minimum inbox size or other
13 functional limits on the historic retention of
14 documents?
15    A. That is absolutely correct. The --
16 it's actually -- especially because the 30-day
17 deleter wasn't implemented until the very end of
18 2003. The practice was if you were going to
19 reach your limit, it was to save those e-mails
20 and those PST files.
21      We've conducted thorough searches of
22 those PSTs, we've conducted searches of the sbare

### 333

1  drives and of each individual computer prior to
2  the time. So I'm just -- I disagree.
3     Q. Do you know of any reasons why Abbott
4  would not search the computer records of Mike
5  Sellers?
6     A. What do you mean "computer records"?
7     Q. Well, if I understand correctly, for
8  instance, when Mr. Tootell or Mr. Gonzalez left
9  the employ of Abbott, their hard drives were
10 saved and then, in turn, reviewed, correct?
11    A. That's my understanding.
12    Q. Do you -- do you know a gentleman by
13 the name of Mike Sellers?
14    A. I do not.
15    Q. Okay, I'll represent to you that he's
16 retired --
17    A. Okay.
18    Q. -- fairly recently, and I'm wondering
19 why his hard drive was not also retained and
20 searched similar to the procedure followed by Mr.
21 Tootell and Mr. Gonzalez.
22    A. I don't know.