# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF THE ASTRAZENECA CLASS 1 SETTLEMENT

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY OF THE CASE...............................................................................2

     A.    Plaintiffs' Allegations .................................................................................2

     B.    Plaintiffs' Prosecution of the Case............................................................2

     C.    AstraZeneca's Response to the Litigation .................................................3

     D.    Summary of the Settlement Negotiations With AstraZeneca ...................3

III.  DESCRIPTION OF THE PROPOSED SETTLEMENT ......................................4

     A.    Total Settlement Amount and Distribution................................................4

          1.    The Settlement Amount and Claim Form.....................................4

          2.    The distribution model and claims experience ............................5

          3.    The *cy pres* floor ........................................................................8

     B.    Attorney's Fees and Expenses and Compensation Awards.....................8

     C.    Notice Was Given to the Class ..................................................................9

IV.  ARGUMENT.......................................................................................................12

     A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and
          23(b)(3) for Purposes of Settlement........................................................13

          1.    The requirements of Rule 23(a) have been satisfied..................13

               a.    Numerosity........................................................................14

               b.    Commonality and typicality..............................................14

               c.    Adequate representation....................................................17

          2.    The requirements of Rule 23(b)(3) have been satisfied.............18

               a.    Questions of law or fact common to Class Members predominate
                    over any questions affecting only individual members .................19

001534-16  233999 V1

b.      A class action is superior to other available methods for the fair and efficient adjudication of this matter ........................................20

V.     THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED..................21

    A.     The Standard for Approval of Class Settlement:  A Presumption in Favor of Settlement ..........................................................................................21

    B.     Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement ..........................................................23

         1.     Comparison of proposed settlement with the likely result of litigation ....................................................................................24

              a.      Risks of establishing liability...........................................25

              b.      Risks of proving damages.............................................25

              c.      Other risks of continuing the litigation ..........................26

              d.      The amount recovered..................................................27

         2.     Stage of the litigation and the amount of discovery completed.................29

         3.     Quality of counsel .......................................................................30

         4.     Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel ....................................................................31

         5.     Prospects of the case, including risk, complexity, expense and duration ....................................................................................32

         6.     Reaction of the Class ...................................................................33

    C.     The Objection.............................................................................................33

         1.     Persons who incurred enforceable obligations to make co-payments are eligible to make a claim.......................................33

         2.     Class Members like Mrs. Howe will not receive a "shortfall" .................34

         3.     Expanding the certified class is in the interests of all Medicare Part B beneficiaries who were administered Zoladex® ...........................36

         4.     Sending checks to all would compensate non-Class Members, as well as those who were not damaged, when all that is needed is for Class Members to identify themselves through a simplified claims process.....................................................................................36

001534-16 233999 V1

5.      A "reverter" is not unfair ...........................................................................38

6.      The fee amount was agreed to only after agreement on the
        Settlement Amount was obtained ..............................................................40

7.      Lead Counsel and Mr. Townsend support the Settlement ........................42

8.      The Track 2 Proposed Settlement does not adversely reflect on the
        Settlement proposed here .........................................................................44

VI.     CONCLUSION...................................................................................................46

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*In re "Agent Orange" Prods. Liab. Litig.,*
  597 F. Supp. 740 (E.D.N.Y. 1984) ........................................................27, 31

*Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines,*
  455 F.2d 101 (7th Cir. 1972) ........................................................................10

*In re Airline Ticket Comm'n Antitrust Litig.,*
  953 F. Supp. 280 (D. Minn. 1997)................................................................44

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997)........................................................................9, 12, 19

*Andrews v. Bechtel Power Corp.,*
  780 F.2d 124 (1st Cir. 1985)....................................................................14, 17

*In re Brand Name Prescription Drugs Antitrust Litig, ,*
  1994 U.S. Dist. Lexis 16658 (N.D. Ill. Nov. 15, 1994)..................................17

*Bussie v. Allmerica Fin., Corp.,*
  50 F. Supp. 2d 59 (D. Mass. 1999) .............................................................30

*In re Cardizem CD Antitrust Litig.,*
  200 F.R.D. 297 (E.D. Mich. 2001) ..............................................................16

*Carlough v. Amchem Prods., Inc.,*
  158 F.R.D. 314 (E.D. Pa. 1993)....................................................................9

*In re Cendant Corp. Litig.,*
  264 F.3d 201 (3d Cir. 2001).........................................................................26

*City of Philadelphia v. Chas. Pfizer & Co., Inc.,*
  345 F. Supp. 454 (S.D.N.Y. 1972)...............................................................41

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship,*
  100 F.3d 1041 (1st Cir. 1996) ............................................................ *passim*

*Collazo v. Calderon,*
  212 F.R.D. 437 (D.P.R. 2002) .....................................................................15

*In re Compact Discount Minimum Advertised Price Antitrust Litig.,*
  216 F.R.D. 197 (D. Me. 2003) ............................................................ *passim*

001534-16 233999 V1

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ........................................................................30

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................27

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005) ..............................................................17, 20

*Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ..........................................................................27

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
    236 F. Supp. 2d 445 (E.D. Pa. 2002) ..........................................................38

*Donovan v. Estate of Fitzsimmons*,
    778 F.2d 298 (7th Cir. 1985) ........................................................................22

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    177 F.R.D. 54 (D. Mass. 1997) ................................................15, 17, 25, 30

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    183 F.3d 1 (1st Cir. 1999) ..............................................................................21

*Durrett v. Housing Auth. of Providence*,
    896 F.2d 600 (1st Cir. 1990) ...............................................................9, 21, 22

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ....................................................................21, 22

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ......................................................................................10

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) ..........................................................................12

*Evans v. Jeff D.*,
    475 U.S. 717 (1986) ................................................................................39, 40

*In re Fleet/Norstar Sec. Litig.*,
    935 F. Supp. 99 (D.R.I. 1996) ......................................................................24

*Flinn v. FMC Corp.*,
    528 F.2d 1169 (4th Cir. 1975) ................................................................31, 42

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ...................................................................................24, 30

*General Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982) .............................................................................................14, 15

*George Lussier Enters. v. Subaru of New Eng. Inc.*,
    2001 U.S. Dist. Lexis 12054 (D.N.H. Aug. 3, 2001) ...............................................15

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) ....................................................................................24

*Giusti-Bravo v. United States Veterans Admin.*,
    853 F. Supp. 34 (D.P.R. 1993) ......................................................................... *passim*

*Greenspun v. Bogan*,
    492 F.2d 375 (1st Cir. 1974) ..............................................................................10, 24

*Grunin v. International House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ...................................................................................10

*Hawkins ex rel. Hawkins v. Commissioner of New Hampshire*
*Department of Health & Human Servs.*,
    2004 U.S. Dist. Lexis 807 (D.N.H. Jan. 23, 2004) ..................................... *passim*

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ...................................................................................22

*Kincade v. General Tire & Rubber Co.*,
    635 F.2d 501 (5th Cir. 1981) ...................................................................................43

*Lazy Oil, Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) ........................44

*In re Linerboard Antitrust Litig.*,
    2004 U.S. Dist. Lexis 10532 (E.D. Pa. June 2, 2004)...............................................27

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001) ...................................................................................16

*In re Lucent Techs., Inc. Sec. Litig.*,
    307 F. Supp. 2d 633, 646 (D.N.J. 2004) ..................................................................26

*In re Lupron Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005) ................................................................................16

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
    671 F. Supp. 819 (D. Mass. 1987) ............................................................................22, 24

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.,*
    834 F.2d 677 (7th Cir. 1987) .......................................................................................31

*Mathewson Corp. v. Allied Marine Indus., Inc.,*
    827 F.2d 850 (1st Cir. 1987).........................................................................................32

*Maywalt v. Parker & Parsley Petroleum Co.,*
    155 F.R.D. 494 (S.D.N.Y. 1994) .................................................................................43

*Maywalt v. Parker & Parsley Petroleum Co.,*
    864 F. Supp. 1422 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995) .........................44

*McAdams v. Massachusetts Mut. Life Ins. Co.,*
    2002 U.S. Dist. Lexis 9944 (D. Mass. May 15, 2002)................................................12, 14

*McCuin v. Secretary of Health & Human Servs.,*
    817 F.2d 161 (1st Cir. 1987).........................................................................................14

*McLaughlin v. Liberty Mut. Ins. Co.,*
    224 F.R.D. 304 (D. Mass. 2004)....................................................................15, 16, 17, 18

*In re Michael Milken & Assocs. Sec. Litig.,*
    150 F.R.D. 46 (S.D.N.Y. 1993) ...................................................................................27

*Molski v. Gleich,*
    318 F.3d 937 (9th Cir. 2003) .......................................................................................24

*Mowbray v. Waste Mgmt. Holdings, Inc.,*
    189 F.R.D. 194 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000).............................18

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306 (1950).....................................................................................................10

*In re NASDAQ Market-Makers Antitrust Litig.,*
    169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................................19

*In re NASDAQ Market-Makers Antitrust Litig.,*
    187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................25

*Parker v. Anderson,*
    667 F.2d 1204 (5th Cir. 1982) .....................................................................................44

*Patterson v. Stovall*,
　　528 F.2d 108 (7th Cir. 1976) ...................................................................................22

*Payne v. Goodyear Tire & Rubber Co.*,
　　216 F.R.D. 21 (D. Mass. 2003)...................................................................15, 16, 19

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　230 F.R.D. 61 (D. Mass. 2005)..............................................................2, 16, 20, 21

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　233 F.R.D. 229 (D. Mass. 2006).................................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　263 F. Supp. 2d 172 (D. Mass. 2003) ........................................................................2

*In re Pharm. Indus. Average Wholesale Price Litig.*,
　　431 F. Supp. 2d 98 (D. Mass. 2006) ..........................................................................2

*In re Polymedica Corp. Sec. Litig.*,
　　224 F.R.D. 27 (D. Mass. 2004), *vacated on other grounds*,
　　432 F.3d 1 (1st Cir. 2005)................................................................................15, 16

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
　　962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)...............................22

*In re Prudential Sec., Inc. L.P. Litig.*,
　　1995 U.S. Dist. Lexis 22103 (S.D.N.Y. Nov. 20, 1995) ....................................................27

*In re Relafen Antitrust Litig.*,
　　218 F.R.D. 337 (D. Mass. 2003).............................................................................14

*In re Relafen Antitrust Litig.*,
　　221 F.R.D. 260 (D. Mass. 2004).............................................................................16

*Reppert v. Marvin Lumber & Cedar Co.*,
　　359 F.3d 53 (1st Cir. 2004).....................................................................................9

*Ressler v. Jacobson*,
　　822 F. Supp. 1551 (M.D. Fla. 1992).................................................................24, 26

*Rodrigues v. Members Mortg. Co., Inc.*, ,
　　226 F.R.D. 147 (D. Mass. 2005) ......................................................................15, 18

*Rolland v. Cellucci*,
　　191 F.R.D. 3 (D. Mass. 2000)........................................................................23, 29, 30

*In re Screws Antitrust Litig.*,
 91 F.R.D. 52 (D. Mass. 1981)................................................................18

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
 323 F.3d 32 (1st Cir. 2003)................................................................13

*Sosna v. Iowa*,
 419 U.S. 393 (1975)................................................................17

*Stanton v. Boeing Co.*,
 327 F.3d 938 (9th Cir. 2003) ................................................................15

*In re Synthroid Mktg. Litig.*,
 188 F.R.D. 295 (N.D. Ill. 1999)................................................................16

*In re Terazosin Hydrochloride Antitrust Litig.*,
 220 F.R.D. 672 (S.D. Fla. 2004)................................................................16

*In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*,
 718 F. Supp. 1099 (S.D.N.Y. 1989)................................................................27

*United States v. DiBiase*,
 45 F.3d 541 (1st Cir. 1995)................................................................32

*In re Warfarin Sodium Antitrust Litig.*,
 212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)................................16

*In re Warfarin Sodium Antitrust Litig.*,
 391 F.3d 516 (3d Cir. 2004)................................................................26, 27, 32

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
 208 F.3d 288 (1st Cir. 2000)................................................................19, 20

## STATUTES

18 U.S.C. § 1964................................................................2

# I.   INTRODUCTION

Class Counsel respectfully submit this Memorandum in support of the Joint Motion for Entry of an Order Granting Final Approval of the AstraZeneca Class 1 Settlement (the "Joint Motion").  The Settlement encompassed by the parties' Settlement Agreement provides for AstraZeneca to pay Class Members who file valid claims up to an aggregate total of $24,000,000, with up to $10,000,000 going to mutually acceptable charitable organizations funding cancer research or patient care if valid claims total less than $24,000,000.  In addition to the foregoing, AstraZeneca will pay the full costs of notice and administration of the Settlement, as well as attorneys' fees and costs of $6,500,000 and $2,100,000, respectively, and compensation to the two Class Representatives of $100 per hour for time spent providing documents and testimony in connection with the case.

The Claims Process has yielded almost 10,000 claims and will likely result in several millions being paid collectively to Class Members who submitted valid claims, at amounts roughly equal to double the actual damages that they suffered as a result of AstraZeneca's unlawful conduct.  Only a single objection to this Settlement has been filed, and it is brought by Plaintiff Joyce Howe and her attorney, Don Haviland, relying on arguments made in their opposition to preliminary approval.  As before, those arguments are not well taken, and, as the Court may recall, it has already disqualified Mr. Haviland from participating as Class Counsel due to his conduct detrimental to the Class.

Class Counsel believe that the Settlement is fair, reasonable and adequate.  It was reached after years of litigation, a Class 2 and 3 trial, and on the eve of the Class 1 trial.  The Settlement involved months of arms-length, intensely fought negotiations, all of which were conducted under the auspices of the Court appointed mediator, Eric Green.  And the Settlement provides

real relief to Class Members.  Accordingly, the Court should grant final approval to the

Settlement.

## II.    SUMMARY OF THE CASE

### A.    Plaintiffs' Allegations

Plaintiffs allege that AstraZeneca implemented a fraudulent scheme used to manipulate

and inflate the monetary spread between the AWP and the cost to doctors and other providers of

Zoladex® in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

§ 1964 ("RICO"), and various state consumer protection laws, directly causing damage to

Plaintiffs and the Class.[1]

### B.    Plaintiffs' Prosecution of the Case

Plaintiffs have aggressively prosecuted their claims since 2001.  Numerous cases were

consolidated before this Court by the Judicial Panel on Multi-District Litigation on April 30,

2002.  Plaintiffs overcame motions to dismiss and briefed and argued dozens of discovery

motions and more than one motion for class certification.

In discovery, Plaintiffs reviewed, analyzed, coded and loaded into a database millions of

pages of documents produced by AstraZeneca, the other defendants and third parties.  Plaintiffs

also undertook a detailed analysis of AstraZeneca transactional data for Zoladex®, covering a

period of time in excess of ten years.

Plaintiffs also took over 40 depositions of AstraZeneca's current and former employees,

including senior managers, consultants, and contractors, as well as relevant third-parties,

including reimbursement consultants and doctors targeted by AstraZeneca's Zoladex® sales

---

[1] The Court is well aware of the extensive facts and claims alleged in this action.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 431 F. Supp. 2d 98 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229 (D. Mass. 2006); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172 (D. Mass. 2003). Accordingly, we will not repeat all of those allegations here.

team.  The depositions resulted in nearly 700 marked deposition exhibits.  AstraZeneca also proffered two expert witnesses who focused on AstraZeneca alone, one of which Plaintiffs cross-examined at trial.

As the Court is well aware, the Class 2 and 3 Plaintiffs tried their claims against AstraZeneca.  After a trial lasting several weeks, those Plaintiffs ultimately prevailed, although the Court did not award the full measure of damages sought.

## C.      AstraZeneca's Response to the Litigation

AstraZeneca has denied, and continues to deny, that it has committed any violation of law or any wrongdoing, and further denies that it has any liability with respect to any claims asserted in the Complaint.  AstraZeneca filed extensive motions to dismiss, vigorously opposed Plaintiffs' Motion for Class Certification of a litigation Class, hotly contested the Class 2 and 3 trial and is currently pursuing an appeal in the First Circuit of the trial ruling against AstraZeneca.  Not surprising given this track record, AstraZeneca has indicated that if the case proceeds, it would continue to vigorously oppose Plaintiffs' claims through a Class 1 trial.

## D.      Summary of the Settlement Negotiations With AstraZeneca

The settlement negotiations among the parties, although always courteous, were long and contentious.  At least two mediation sessions were held prior to the Class 2 and 3 trial.  As the Court is aware, these attempts were unsuccessful.  Thereafter, mediator Eric Green periodically made inquiries in an attempt to restart a dialogue, but these efforts were unfruitful.  In March 2007, and as the AstraZeneca Class 1 trial drew nearer, renewed efforts at mediation began to gain traction.  Many negotiations via telephone transpired, leading up to daily calls during the first week of May.  The negotiations continued in a formal mediation session in Boston on May 4, where an agreement was finally made.

Throughout this entire process, the parties exchanged information and debated the other's evidence and interpretations.  Both sides made detailed presentations to Eric Green and presented extensive analysis and conclusions of experts, and noted their positions on legal theories, evidence and possible damages.

### III.    DESCRIPTION OF THE PROPOSED SETTLEMENT

**A.    Total Settlement Amount and Distribution**

**1.    The Settlement Amount and Claim Form**

AstraZeneca agreed to pay up to an aggregate amount of $24,000,000 in a claims-based settlement process administered by CCS (the "Settlement Amount").  Agreement, ¶ 4.  As approved by the Court, Class Members were required to complete a Claim Form included with the settlement Notice and submit proof of a Zoladex® payment.  Submission of just one of the following items will satisfy this proof:

> (1) a receipt, cancelled check, or credit card statement that shows a payment for Zoladex®;
>
> (2) a letter from a doctor saying that he or she prescribed Zoladex® and the class member paid part of the cost of Zoladex® at least once; or
>
> (3) a statement under penalty of perjury saying that he or she made a co-pay or cash payment for Zoladex® during the Class Period.

Agreement, ¶ 10.  If the Class Member has died, any of the foregoing may be executed by a spouse of a deceased Class Member or a legal representative of a deceased Class Member's estate.

The Claim Form asked the Class Member for basic information, including name and address; relationship to the Class Member if the Claim Form is being submitted by someone on behalf of the Class Member; Zoladex® purchase information; and whether the Class Member

- 4 -

had supplemental insurance and, if so, during what time period.  The Claim Form also instructed the Class Member to sign under penalty of perjury.

Each Claim Form was customized for each Class Member, using data supplied by CMS. More specifically, the Claim Form listed the date of each Zoladex® administration and asked the Class Member to check a box specifying whether he or she made a full or partial percentage co-pay for each particular administration.  As the Court may recall, this procedure was necessary to identify those Medicare Part B beneficiaries who were administered Zoladex® and actually made a partial or full co-payment.  CMS is unable to determine whether a particular Medicare Part B beneficiary who was administered Zoladex® actually made a co-payment, so each beneficiary was required to provide that information.  Indeed, if the beneficiary did not make a partial or full co-payment, or otherwise have not remained liable for the payment thereof, they are not considered a Class Member under the Settlement.

### 2.      The distribution model and claims experience

The amount that a Class Member will be eligible to receive will be based on the number of months that he or she was prescribed Zoladex®.  Dr. Hartman has calculated estimated overcharges associated with the alleged price inflation for Zoladex®.  The alleged overcharge varies based on the year and whether the Class Member had supplemental insurance that paid part of the Medicare Part B co-pay.  The amount a Class Member who filed a valid Claim Form will be entitled to receive is to be calculated by taking the number of months that the Class Member took Zoladex® and multiplying that number by the alleged overcharge that applies for that year. ***The total amount would then be doubled***.  Agreement, ¶ 10.

The tables below, with data extracted from the April 23, 2007 Hartman Analysis of Consumer Damages as set forth in Exhibit D to the Settlement Agreement, will be used in the foregoing calculation:

**Table 1:  Monthly Amounts, Including Interest, by Year for Class Members Who Made Medicare Part B Co-Payments for Zoladex® and Did Not Have Private Third-Party Supplemental Insurance**

| | | | |
|---|---|---|---|
| 1991: $23.88 | 1992: $22.92 | 1993: $18.97 | 1994: $19.41 |
| 1995: $32.86 | 1996: $37.89 | 1997: $50.48 | 1998: $67.43 |
| 1999: $72.15 | 2000: $67.94 | 2001: $65.56 | 2002: $62.81 |
| 2003: $61.30 | 2004: $59.73 | | |

**Table 2:  Monthly Amounts, Including Interest, by Year for Class Members Who Made Partial Medicare Part B Co-Payments because They had Private Supplemental Insurance Polices that Covered Part of the Co-Payment**

| | | | |
|---|---|---|---|
| 1991: $4.78 | 1992: $4.58 | 1993: $3.79 | 1994: $3.88 |
| 1995: $6.57 | 1996: $7.58 | 1997: $10.10 | 1998: $13.49 |
| 1999: $14.43 | 2000: $13.59 | 2001: $13.11 | 2002: $12.56 |
| 2003: $12.26 | 2004: $11.95 | | |

By way of example, a Class Member without MediGap insurance who took Zoladex® for the entirety of 2002, 2003 and 2004 would be eligible to receive $4,408 calculated as follows:

| | | | |
|---|---|---|---|
| 2002 overcharge per month | $62.81 | = | $753 annually |
| 2003 overcharge per month | $61.30 | = | $735 annually |
| 2004 overcharge per month | $59.73 | = | $716 annually |
| Total Recognized Claim | | = | $2,204 |
| Total Claim Would be Doubled | | = | $4,408 |

Another, "real life" example is provided by Class Representative Leroy Townsend.  Mr. Townsend received Zoladex® injections every three months from January 1997 to March 2004. He had supplemental insurance but is unable to identify the months during which supplemental

insurance covered a co-payment.  This means that Table 1 will govern the calculation used to

determine Mr. Townsend's payout for each year.  If $24 million is sufficient to cover all class

claims, meaning no pro rata reduction (and it appears that, indeed, there will be no pro rata

reduction based on the claims experience), Mr. Townsend is projected to receive $11,102.46,

calculated as follows:

$$
\begin{array}{lll}
1997 & \$50.48 * 12 = & \$ 605.76 \\
1998 & \$67.43 * 12 = & \$ 809.16 \\
1999 & \$72.15 * 12 = & \$ 865.80 \\
2000 & \$67.94 * 12 = & \$ 815.28 \\
2001 & \$65.56 * 12 = & \$ 786.72 \\
2002 & \$62.81 * 12 = & \$ 753.72 \\
2003 & \$61.30 * 12 = & \$ 735.60 \\
2004 & \$59.73 * 3 \ = & \underline{\$ 179.19} \\
& & \$5551.23 * 2 = \$11,102.46
\end{array}
$$

These payouts are far better than the recoveries in other cases.

CCS has received 9,984 Claim Forms.  Declaration of Eric P. LaChance Regarding Status

of Claims Administration Activities Related to Settlement with Defendant AstraZeneca

("LaChance Decl.") at ¶ 11.  In addition, CCS received approximately 6,710 calls from Class

Members, of which 4,278 were answered by a live operator, and 399 calls from Spanish-

speaking Class Members, of which 279 were answered by a live Spanish-speaking operator.

LaChance Decl. at ¶ 18.

At this time, and based on the claims experience to date, CCS estimates the aggregate

amount that AstraZeneca is forecast to pay to Class Members will likely be in the range of

$8,560,130 to $9,091,920.  LaChance Decl. at ¶ 16.  As noted, almost 10,000 claims were filed,

of which about 6,840 are initially determined to be valid.  The value of these valid claims, using

the foregoing distribution calculations and making a rough forecast based on only a small

sample, is approximately $7,673,830.  LaChance Decl. at ¶ 16.  This value will only increase, as

CCS sends letters to Class Members asking them to cure various deficiencies in the Claim Forms and as claims are more fully adjudicated and audited.  We hope to provide the Court with updated figures at the Fairness Hearing.

      **3.**      **The *cy pres* floor**

If more than $10,000,000 of the Settlement Amount remains after all authorized claims of Class Members are paid, and it appears that more than $10,000,000 will indeed remain, AstraZeneca will pay a $10,000,000 *cy pres* amount, and the amount of valid claims, but will not be obligated to make any further payments to Class Members or in *cy pres*.  Agreement, ¶ 5.  If the Parties are unable to agree on an acceptable organization or organizations, Eric Green will mediate the issue, subject to the Court's final determination and approval.

**B.**      **Attorney's Fees and Expenses and Compensation Awards**

Class Counsel is submitting herewith a fee petition for an award of fees, reimbursement of costs and expenses, and award of compensation to appropriate Plaintiffs or Class Representatives.  Understanding that the award of attorneys' fees is a matter committed to the sole discretion of this Court, subject to Court approval AstraZeneca has agreed to pay attorneys' fees of $6,500,000 and costs of $2,100,000.  ***These amounts will not come out of the Settlement Amount that AstraZeneca agreed to pay the Class***.  Agreement, ¶ 3(d).  Attorneys' fees and costs were agreed to only after agreement on the Settlement Amount was obtained.

The Settlement Agreement also provides for compensation in the amount of $5,000 to Class Representatives Mr. Townsend and Mrs. Howe, if approved by the Court for services rendered to the Class by these Class Representatives, Agreement, ¶ 3(c), although the Court has modified this provision such that the Class Representatives are eligible to receive $100 per hour for time spent providing documents and testimony in connection with the case  These payments also will not serve to reduce the Settlement Amount.

- 8 -

C.     **Notice Was Given to the Class**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement.  *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs."  In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Fed. R. Civ. P. 23(c)(2) and 23(e).  *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause).  Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997); *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56 (1st Cir. 2004).

The MANUAL FOR COMPLEX LITIGATION sets forth several elements of the "proper" content of notice.  If these requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2) and 23(e), and due process, and binds all members of the Class. The Notice must:

1.     Describe the essential terms of the Settlement;

2.     Disclose any special benefits or incentives to the class representatives;

3.     Provide information regarding attorneys' fees;

4.     Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.     Explain the procedures for allocating and distributing Settlement funds; and

6.     Prominently display the address of class counsel and the procedure for making inquiries.

MANUAL FOR COMPLEX LITIGATION § 1-30.212 (3d ed. 1995); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974). The notice program proposed by the parties and approved by the Court clearly meets this standard.

Class Counsel complied with the Court's directives concerning Class notice. The contents of the Notice met the foregoing requirements. Among other things, the Notice described why the Class Member received the Notice and what the lawsuit is about; advised that the recipient could be a member of the Class; described the terms and benefits of the Settlement, including compensation provided to the Class Representatives and Class Counsel; gave instructions for making a claim by completing a Claim Form, which was included with the Notice, as well details on how the Settlement would be distributed; and provided instructions for commenting on the Settlement and appearing at the final Fairness Hearing. A second version of the Notice, containing a description of opt-out rights, was mailed only to Class Members residing in the states of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana and Virginia (residents in these states were not included in the litigation Class 1 initially certified by the Court and, therefore, were never previously given an opportunity to request exclusion).

To distribute the Notice, Class Counsel employed, and the Court appointed, Complete Claims Solutions, Inc. ("CCS"), which specializes in the administration of class actions, to oversee the administration of the Class and execute the Notice Plan. The Notice provided to the Class is summarized as follows:

- The Centers for Medicare and Medicaid Services, via its subcontractor Acumen, LLC, provided CCS with 455,550 records on disk consisting of the names and addresses of Medicare beneficiaries who had been administered Zoladex® during the Class Period. LaChance Decl. at ¶ 5.

- CCS printed the Notice in the form approved by the Court and mailed it to these beneficiaries. LaChance Decl. at ¶ 6.

- Pursuant to the Preliminary Approval Order, Class Members residing in Alabama, Alaska, Georgia, Louisiana, Kentucky, Louisiana, Mississippi, Montana, and Virginia had the right to exclude themselves. As such, a different Notice Packet with instructions for requesting exclusion (the "9-State Motion Packet") was mailed to Class Members from these states. LaChance Decl. at ¶ 7. CCS received 116 timely Requests for Exclusion. LaChance Decl. at ¶ 21.

- CCS mailed an additional 38 Notice Packets to those potential Class Members who requested it by phone or in writing. LaChance Decl. at ¶ 8.

- The United States Postal Service ("USPS") returned 1,265 Notice Packets as undeliverable with a forwarding address. CCS subsequently re-mailed Notice Packets to the addresses provided by the USPS. The USPS returned 70,648 Notice Packets as undeliverable without forwarding addresses. CCS utilized the services of Accurint, an address database service to which CCS subscribes, seeking updated addresses for Class Members whose Notice Packets were returned as undeliverable. As a result, CCS received those Class Members updated addresses from Accurint and CCS subsequently re-mailed Notice Packets. Of the 21,828 Class Members to whom Notice Packets were remailed, 9,053 were subsequently returned by the USPS as undeliverable for a second time. LaChance Decl. at ¶¶ 9-10.

- A total of 468,700 Notice Packets were mailed. LaChance Decl. at ¶ 19.

- CCS also created and published a website containing links to the approved Notices, as well as a claim form. As of April 14, 2008, the Settlement

website's home page had been visited 2,082 times.  LaChance Decl. at ¶ 20.
Notices were also placed on the web sites of Class Counsel.[2]

## IV.   ARGUMENT

A class action cannot be compromised or settled without the approval of the Court.  Fed. R. Civ. P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, the Court must determine whether the plaintiff class, as agreed to by the parties, may be certified for purposes of the Settlement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health & Human Servs.*, 2004 U.S. Dist. Lexis 807, at *2 (D.N.H. Jan. 23, 2004).  Further, the decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  To that end, when analyzing a motion to certify, "district courts in this circuit have frequently recognized that 'Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.'"  *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 U.S. Dist. Lexis 9944, at *7 (D. Mass. May 15, 2002) (quoting *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984)).  Consistent with this rule, "when a court is in doubt as to whether to certify a class action, it should err in favor of allowing a class."  *McAdams*, 2002 U.S. Dist. Lexis, at *8 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a

---

[2] Among other things, the Summary Notice provided the salient terms of the Settlement, described the definition of the Settlement Class and directed the reader to obtain more information from the Claims Administrator by calling a toll-free line, visiting the website, or sending a letter.

- 12 -

doubtful case[,] any error, if there is to be one, should be committed in favor of allowing a class action.").

Certification of the Settlement Class is appropriate in this case because the requirements of Rule 23(a) and Rule 23(b) are satisfied.

## A.    The Court Should Certify the Proposed Class Pursuant to Rules 23(a) and 23(b)(3) for Purposes of Settlement

The parties filed their Joint Motion for Preliminary Approval of the Settlement on May 21, 2007.  In an Order dated November 1, 2007, this Court preliminarily certified a Settlement Class defined as "all natural persons nationwide who made a co-payment based on AWP for Zoladex® under the Medicare Part B Program during the period from January 1, 1991 through December 31, 2004, or who incurred an enforceable obligation to make such a co-payment." Order Granting Preliminary Approval of the AstraZeneca Class 1 Settlement, Directing Notice to the Class and Scheduling Fairness Hearing (Dkt. No. 4879) ("Prelim. Approval Order") at 2. Excluded from the Class "are those who made flat co-payments, who were reimbursed fully for any co-payments, or who have the right to be fully reimbursed, as well as AstraZeneca and its officers, directors, management, employees, subsidiaries, and affiliates." *Id.*[3]

### 1.    The requirements of Rule 23(a) have been satisfied

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem*, 521 U.S. at 613).  In this case, all four requirements of Rule 23(a) have been met.

---

[3] The proposed Settlement Class differs in one respect from the litigation Class 1 previously certified by the Court, in that the Settlement Class includes residents of the states of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana and Virginia, who were not included in the certified Class.

### a.      Numerosity

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Although there is no magic number of Class Members that will qualify for class certification, numerosity "is not a difficult burden to satisfy." *McAdams*, 2002 U.S. Dist. Lexis 9944, at \*9 (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 303 (E.D. Mich. 2001)).  Courts have generally found groups of more than forty to satisfy the numerosity requirement.  *Id*. at \*10; *see also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (broadly drawn class definition "suggests that members of the class, once identified, will be 'so numerous and widely dispersed that joinder . . . is impracticable'").  Precise quantification of Class Members is not necessary, and a court may make common sense assumptions to support a finding of numerosity.  *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985) (court can consider economy, geographic dispersion and ability of individual members to bring suit); Alba Conte & Herbert Newberg, 6 NEWBERG ON CLASS ACTIONS ("NEWBERG") § 18:2-18:4 (4th ed. 2002).

In this case, the numerosity requirement is not in doubt.  Notice was mailed to over 445,000 Medicare beneficiaries nationwide, a large subset of which are Class Members, and over 9,900 Class Members have filed claims.  A class of this size makes joinder of all members impracticable.

### b.      Commonality and typicality

The commonality requirement is met if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Typicality, on the other hand, requires that the claims of the named plaintiffs be typical of the claims of the class.  Fed. R. Civ. P. (23)(a)(3).  Often, the requirements of Rule 23(a)(2) and (3) are considered together.  *See General Tel. Co. of the*

*Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Rodrigues v. Members Mortg. Co., Inc.*, 226 F.R.D. 147, 151 (D. Mass. 2005).  The crux of both requirements is to ensure that "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13.

To satisfy the commonality requirement, the named plaintiffs' claims must share at least one common question of law or fact with the class' claims.  *See, e.g., McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309 (D. Mass. 2004) (While requiring that "questions of law or fact be shared by the prospective class," Rule 23(a)(2) does not require that "every question be common."); *Stanton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D.P.R. 2002).  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted).  It requires only that there be a single question of law or fact that is common to all class members.  *George Lussier Enters. v. Subaru of New Eng. Inc.*, 2001 U.S. Dist. Lexis 12054, at *11 (D.N.H. Aug. 3, 2001).  The commonality requirement "does not require that class members' claims be identical."  *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003) (quoting *Mack v. Suffolk Cty.*, 191 F.R.D. 16, 23 (D. Mass. 2000)).

With respect to typicality, "[t]he central inquiry in determining whether a proposed class has typicality is 'whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class.'"  *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004) (quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin*, 224 F.R.D. at

310; *see also* 1 NEWBERG § 3.13 (the typicality requirement is usually met "when it is alleged

that the same unlawful conduct was directed at or affected both the named Plaintiffs and the class

sought to be represented").  Furthermore, the plaintiff does not need to show "substantial identity

between [his] claims and those of absent class members," but only that "[his] claims arise from

the same course of conduct that gave rise to the claims of the absent members."  *In re

Polymedica*, 224 F.R.D. at 36 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass.

1988) (internal quotation marks omitted)); *see Payne*, 216 F.R.D. at 26 (typicality requires "the

same essential characteristics" among claims).

Both commonality and typicality are present here.  As the Court has already ruled in

certifying litigation classes in this case, "there are numerous common factual issues:  whether the

AWPs and/or WACs for the AWPIDs were misrepresented, whether that misrepresentation was

intentional, whether it was done with a fraudulent intent, and whether it proximately caused harm

to consumers."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D.

Mass. 2005).  As to typicality, Plaintiffs' claims arise out of the same course of conduct and are

based on the same legal theories as those of the absent Class Members.  Plaintiffs and Class

Members were all harmed by AstraZeneca's unlawful scheme.  Accordingly, the named

Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and

easily satisfy Rule 23(a)(3).[4]

---

[4] Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar
to those alleged in this case.  *See In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005); *In
re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) (certifying class of persons and entities who
"purchased" a drug); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other
courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging
overpayment for prescription drugs."), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Lorazepam & Clorazepate Antitrust
Litig.*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid
Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to
protect generic drug competition); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 703 (S.D. Fla.
2004) (certifying class of persons and entities who "paid" all or part of the purchase price for a drug); *In re
Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 332 (E.D. Mich. 2001) (class of "purchasers" of Cardizem); *In re

c.      **Adequate representation**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This inquiry is satisfied if: (i) the plaintiff's counsel is qualified, experienced, and able to prosecute the action on behalf of the class vigorously, and (ii) the interests of the representative parties do not conflict with the interests of any class members. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *McLaughlin*, 224 F.R.D. at 310, *Andrews*, 780 F.2d at 130; *Hawkins*, 2004 U.S. Dist. Lexis 807, at *10; *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197 (D. Me. 2003). It is well established that "in complex litigations . . . a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected." *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005) (quoting *In re AM Int'l Inc., Secs. Litig.*, 108 F.R.D. 190, 196-97 (S.D.N.Y. 1985)).

Class Counsel include some of the most qualified and experienced lawyers in the United States in the successful prosecution of class actions. These firms have vigorously pursued the rights of the Class Members in this case for over six years, conducted discovery, prepared countless filings and memoranda in this action, tried and prevailed on the Class 2/3 Massachusetts claims, and have engaged in extensive settlement negotiations with AstraZeneca. Further, these firms and their co-counsel continue to stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible

---

*Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *3-4 (N.D. Ill. Nov. 15, 1994) (class of "purchasers" of "brand name prescription drugs"). Indeed, Courts in this District have approved closely analogous classes in a variety of circumstances. *See, e.g.*, *Duhaime*, 177 F.R.D. at 54 (class was ascertainable because it was defined to include persons who purchased life insurance policies from one time period through another).

- 17 -

resolution, if the Settlement is not approved, and the Court has repeatedly found that Class

Counsel were adequate.[5]

Neither the Plaintiffs nor Class Counsel have any interests that are antagonistic to those

of the Class Members who now stand to benefit from the Settlement.  The central issues in this

case – the existence, unlawfulness and effect of AstraZeneca's scheme to improperly manipulate

the AWP of Zoladex® – are common to the claims of Plaintiffs and the other members of the

Class.  The representative Plaintiffs, like each absent Class Member, have a strong interest in

proving AstraZeneca's scheme, establishing its unlawfulness, and demonstrating how the Class

was affected by the illegal conduct.  Plaintiffs have submitted to discovery and worked with his

counsel for the protection of the Class.  There is no conflict between the Plaintiffs and the Class

Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

### 2.      The requirements of Rule 23(b)(3) have been satisfied

In addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies

those of Rule 23(b)(3), namely, (i) questions of law or fact common to Class Members

predominate over any questions affecting only individual members, and (ii) the class action is

superior to other available methods for the fair and efficient adjudication of this matter.

*McLaughlin*, 224 F.R.D. at 311; *Rodrigues*, 226 F.R.D. at 152; *In re Compact Disc*, 216 F.R.D.

at 204; *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*,

208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981).

---

[5] The Court has found counsel adequate when issuing its original class certification opinion; issuing its class certification order; preliminarily approving the proposed GSK settlement; granting preliminary approval to the AstraZeneca Proposed Class 1 Settlement; and approving the final GSK settlement.  The resumes of the Class Counsel whose approval is sought, Hagens Berman Sobol Shapiro LLP, Spector, Roseman & Kodroff, P.C., Wexler Toriseva Wallace LLP, and Edelson & Associates, LLC, have been previously submitted to the Court but will be provided again upon request.

In this case, all the specific and general issues – Defendants' liability under RICO and various state consumer protection acts; the formation and fulfillment of the scheme; liability evidence showing improper promotion of the spread and its effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action. A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

### a. Questions of law or fact common to Class Members predominate over any questions affecting only individual members

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996). This inquiry, however, does not require "uniformity of claims across the entire class." *Payne*, 216 F.R.D. at 26 (citing *Amchem*, 521 U.S. at 623-25). In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000) ("single, central issue" as to the defendant's conduct vis-à-vis class members can satisfy predominance requirement even when other elements of the claim require individualized proof).

Individual issues in this case will not overwhelm the common questions of law or fact because the central question is whether AstraZeneca illegally manipulated the published AWP for Zoladex® and improperly marketed the spread.  There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme at any trial of this matter, much as was done in the Massachusetts Class 2 and 3 trial.  Moreover, in the litigation context, the Court has already found that common factual issues predominate:

> Here, common factual issues predominate since a typical consumer by statute simply pays a percentage of AWP as a co-pay.  There is therefore no separate factual issue regarding the knowledge and reliance of each class member.

*In re AWP*, 230 F.R.D. at 82.  The Court also found that common legal issues predominated via the application of the consumer protection laws of the many states.  *Id.* at 85.

### b. A class action is superior to other available methods for the fair and efficient adjudication of this matter

With respect to the superiority requirement, a court considers:  (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).  As to the last of these factors, where a Court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d at 298 (citing *Amchem*, 521 U.S. at 620); *Denney*, 230 F.R.D. at 326.

Analyzing the three remaining factors under the superiority requirement, it is clear that a class action would provide the fairest and most efficient method of adjudication.  First, Class

Members, who are elderly Medicare beneficiaries, have losses too small to pursue through individual cases, even though those losses are significant to them.  The large size of the Class, the relatively small potential recovery of each individual Class Member, the complexity of the litigation, the cost of the litigation and similar issues all make a class action the superior method of adjudicating the claims of Class Members.  The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism.  It would be a waste of judicial and the parties' resources to require thousands of separate prosecutions.  Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.  As the Court has already recognized, "[w]ith respect to Medicare Part B consumer patients making co-payments, it is cost effective to focus the litigation in one forum, and one case will promote a uniformity of results appropriate for a nationwide reimbursement program."  *In re AWP*, 230 F.R.D. at 85.

## V.    THE SETTLEMENT IS REASONABLE AND SHOULD BE APPROVED

**A.    The Standard for Approval of Class Settlement:  A Presumption in Favor of Settlement**

In determining whether to approve a settlement, the First Circuit, as required by Rule 23(e)(1)(C), has held that "[a] district court can approve a class action settlement only if it is fair, adequate and reasonable."  *City P'ship Co.*, 100 F.3d at 1043.  The Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation and the proposed settlement.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durrett*, 896 F.2d at 604; *Hawkins*, 2004 U.S. Dist. Lexis 807, at *14.

The First Circuit has given great deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion."  *City P'ship Co.*, 100 F.3d at

1043-44; *Durrett*, 896 F.2d at 603.  A court reviewing a settlement "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement."  *City P'ship Co.*, 100 F.3d at 1043-44.[6]

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length."  *City P'ship Co.*, 100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453. And the law has long favored settlement of litigation.  This is particularly true in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost and rigors of prolonged litigation.  In addition, there is an overriding public interest in favor of settlement of complex class action suits, especially where the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established."  *See*, *e.g.*, *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985). By supporting the settlement of complex, class action disputes, the judicial system can help minimize litigation expenses on both sides, reduce the strain on scarce judicial resources, and avoid the risk of trial to both parties.  MANUAL FOR COMPLEX LITIGATION, §§ 23, 30.4 (3d ed. 1995).

---

[6] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  Accordingly, the Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial.  *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case...and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side.  *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

These concerns apply with particular force in a case such as this, where thousands of Medicare beneficiaries throughout the country were subject to allegedly deceptive and unfair practices in connection with the marketing and sale of Zoladex®.  Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by each individual consumer, it likely would be available only to those wealthy and sophisticated enough to retain their own lawyers.  The proposed Settlement is the best and only vehicle to assure that all Class Members, regardless of their means, receive the relief to which they are entitled in a prompt and efficient manner.

This Settlement was the result of intense litigation and arms-length negotiations between counsel.  The litigation was hard fought and the negotiations were lengthy and detailed.  There was no collusion, and all the negotiations were conducted at arms length.  Therefore, the Settlement should be presumed to be fair.

**B.      Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement**

There is no single test in the First Circuit for determining whether a proposed class action settlement is fair.  As one court has explained, "[t]he fairness determination is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."  *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000).

Other Circuits generally have considered "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial."  *In re Compact Disc*, 216 F.R.D. at 206.  Among the factors that other courts have employed are the following:

(1)      comparison of the proposed settlement with the likely result of litigation;

- 23 -

(2)      stage of the litigation and the amount of discovery completed;

(3)      quality of counsel;

(4)      conduct of the negotiations; and

(5)      prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.[7] Applying these six factors to the proposed Settlement in this case clearly indicates that the Settlement is more than adequate and should be approved.

### 1.       Comparison of proposed settlement with the likely result of litigation

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense." *In re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13 (4th ed. 2004) ("The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions." *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d at 381 (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement"). Also, the

---

[7] *See also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003); *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785(3d Cir. 1995); *Giusti-Bravo*, 853 F. Supp. at 36; *M. Berenson Co.*, 671 F. Supp. at 822-23; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim.  Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation." *Duhaime*, 177 F.R.D. at 68.

As part of their settlement negotiations, and the ultimate decision to accept the Settlement, Plaintiffs analyzed various risks of continuing litigation.  These included risks related to establishing liability at trial and risks relating to the amount of damages that could be recovered at trial.  A consideration of all the various risk factors and potential recovery reveals that the Settlement is more than adequate.

### a.   Risks of establishing liability

The Plaintiffs recognize that they faced substantial risks in establishing their case at trial. While the Court in a bench trial had ruled against AstraZeneca, a jury could very well rule differently.[8]  Plaintiffs knew they would face some difficulty in presenting their case to a jury in a streamlined, easily comprehensible fashion given the complexity of the subject matter.  While Plaintiffs knew they would present strong evidence on the issues, there was always the risk that the jury would accept, or at least be confused by, AstraZeneca's numerous defenses.

### b.   Risks of proving damages

A substantial risk of establishing damages at trial was a battle of experts between Plaintiffs' experts, who would opine that, but-for AstraZeneca's improper marketing conduct, Plaintiffs would have paid considerably less for Zoldex®, and defense experts, who would opine that that Zoldex® spreads were not outside industry expectations.  "In the 'battle of experts,' it is impossible to predict with any certainty which arguments would find favor with the jury."

---

[8] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced."  *Id.* at 475 (citation omitted).

*Ressler v. Jacobson*, 822 F. Supp. at 1554; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) (recognizing risks associated with jury being confronted with competing damage expert opinions) and *In re Lucent Techs., Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004) ("The outcome of such battles is never predictable, and the Court recognizes the very real possibility that a jury could be swayed by defense experts, who would seek to minimize the Class Members' losses or to show that the losses were attributable to factors other than the alleged [misconduct]").

Class Counsel are also mindful of the Court's Class 2 and 3 trial ruling that limit damages to the time period 1998 through 2002.  The jury could have found the same limitation, which would deprive Class Members of compensation for other time periods.  In contrast, the Settlement opens claims to Class Members who were administered Zoladex® outside of this time period.

### c.      Other risks of continuing the litigation

Another important factor considered by the Class Plaintiffs in evaluating the reasonableness of the Settlement was the value to Class Members of receiving payment as soon as possible, as opposed to litigating through trial and the almost certain appeals.  Many of the Consumer Class Members are elderly and ill, and the prospect of an increased payment years in the future is of little value to them.  Of course any victory at trial would be subject to many months of appeals to the First Circuit and the Supreme Court.  *See In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The

Settlement will provide Class Members with "benefits fully commensurate with any results reasonably attainable after protracted litigation." *Giusti-Bravo*, 853 F. Supp. at 38. Weighing all of the risks the Plaintiffs faced, the Settlement is reasonable.

### d.     The amount recovered

Many courts have cautioned that the overall percentage of recovery by itself is not telling; what must be considered are the risks of proceeding towards trial. The court in *In re Union Carbide Corp. Consumer Prods. Business Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989), recognized that "[t]he dollar amount of the settlement by itself is not decisive in the fairness determination . . . Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *Id.* at 1103. Other Courts have approved settlements which provide only a small percentage of the recovery sought. *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984); *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

Many other courts have approved settlements providing a recovery of 10-12% of potential damages where substantial risks exist. *See In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. Lexis 10532, at *15-17 (E.D. Pa. June 2, 2004). Similarly, in *Warfarin*, the Third Circuit noted that "typical recoveries in securities class actions range from 1.6% to 14%." *Warfarin*, 391 F.3d at 539 (citing *Cendant*, 264 F.3d at 241); *see also In re Prudential Sec., Inc. L.P. Litig.*, 1995 U.S. Dist. Lexis 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages) and *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages).

The recovery obtained here is a substantial amount of the aggregate Class damage and, on an individual claims-made basis, well exceeds the damages incurred by claiming Class Members.  Coming on the heels of the Class 2 and 3 trial, and on the eve of the Class 1 trial, Plaintiffs were very well acquainted with the prospective strengths and risks of the case. Notwithstanding these risks, with which the Court is also well acquainted, Plaintiffs were able to garner a Settlement Amount of $24,000,000, with AstraZeneca's agreement to pay notice and administration costs and attorneys' fees and costs on top of the Settlement Amount, in a case with estimated damages, including pre-judgment interest, of approximately $57,000,000.  *See* Exhibit D to the Settlement Agreement, Row 8 for each Table ($39,089,780 plus $18,581,809). The Settlement Amount thus represents approximately 42% of total damages, and about 62% if estimated Notice and administration costs and attorneys' fees and costs are included (Notice and administration costs are estimated to be about $3,000,000).

But, more importantly, the recovery is even greater when evaluated at the level of each Class Member.  At the time that it was negotiated, the Proposed Settlement was structured so that all Class Members making claims would receive *at least* their out-of-pocket damages, including prejudgment interest.  Indeed, depending on how many Class Members filed claims, Class Counsel expected that Class Members would receive *more* than their out-of-pocket damages plus interest since Class Counsel structured the distribution plan on the basis of *double* the damages calculated by Dr. Hartman under the proposed distribution plan.  Concerned with the consumer payouts and claims rates in prior cases, we crafted this distribution plan in order to create an incentive to submit claims.  Declaration of Steve W. Berman in Support of Class 1 AstraZeneca Settlement and in Response to the Haviland Declaration (Dkt. No. 4511), ¶ 14.

- 28 -

To reiterate, a Class Member without MediGap insurance who took Zoladex® for the entirety of 2002, 2003 and 2004 will be eligible to receive $4,408, even though he or she incurred $2,204 in damage under Dr. Hartman's methodology.  If the Class Member had private, supplemental insurance coverage during the entire three-year period, the Class Member will be entitled to the lower, yet still substantial amount of $882.48, based on damages incurred of $441.24.  Again, this would be more than the damages actually incurred by this Class Member. Thus, these are fabulous recoveries under any damages theory.  Indeed, Class Represented Leroy Townsend, who was administered Zoladex® for over 7 years, should receive $11,102.46 under the Settlement.

And the Settlement is even better now than it was at the time it was negotiated.  At the time of the negotiations and mediation, the Court had not yet issued its Class 2/3 trial ruling, in which the Court rejected the "0% threshold" damages theory and instead adopted the 30% "yardstick."  Why is this significant?  ***Dr. Hartman's recovery table for the AstraZeneca settlement is based on a 0% yardstick***.  Since the Court now views damages through the 30% yardstick lens, and given the claims experience to date, most Class Members will receive ***triple*** the actual damages that they have sustained.

In sum, the amount recovered militates heavily in favor of approving the Settlement.

### 2.     Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through discovery is sufficient to determine the settlement's adequacy.  *Giusti-Bravo*, 853 F. Supp. at 38 (finding that although it is probable substantial discovery still remains, the amount of discovery already conducted was sufficient to permit "an accurate assessment of each party's chances at trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a

- 29 -

voluminous amount of information at the time as well as the advice and reports of their experts).[9]

In addition, courts have taken into consideration the stage of litigation at which settlement is

reached "because it indicates how fully the district court and counsel are able to evaluate the

merits of plaintiffs' claims." *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*,

616 F.2d 305, 325 (7th Cir. 1980)); *In re GMC*, 55 F.3d at 783 (trial court should consider

whether counsel participating in the settlement negotiations "had access to sufficient information

to appreciate the merits of the class's case").

      Sufficient discovery has been conducted in this matter to allow Class Counsel to fairly

investigate the pertinent legal and factual issues.  The parties exchanged written discovery,

conducted over hundreds of depositions, and obtained extensive discovery from third-party

sources such as other pending litigation, trade associations, physicians and the federal

government.  Defendants produced millions of documents, and Class Counsel spent more than

four years reviewing said documents, organizing documents for use, creating an electronic

database and making determinations on utilization of important documents, additional discovery

and general assistance in the litigation of this matter.  Trial was held on two Classes, and trial

was imminent for Class 1.  In sum, Class Counsel were fully aware of the value of the Class

claims before the case was settled.

### 3.      Quality of counsel

      As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about

the facts and claims, their representations to the court that the settlement provides class relief

which is fair, reasonable and adequate should be given significant weight."  *Rolland*, 191 F.R.D.

at 10; *Bussie v. Allmerica Fin., Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).  With respect to

---

[9] Settlements have been supported with far less discovery.  *See, e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and leadings was deemed adequate).

the quality of counsel, the Court has looked at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation."  *Giusti-Bravo*, 853 F. Supp. at 40.  This Court has already repeatedly found that Class Counsel are qualified to represent the Class.  Class Counsel have been involved in this case from the beginning, having created and filed the original Class Action Complaint in this Court, even prior to the creation of an MDL.  As detailed in the previously-submitted resumes of Class Counsel, the firms have been appointed lead counsel in numerous class actions.

**4.     Conduct of the negotiations:  the proposed Settlement is the result of arduous, arms-length negotiations conducted by highly experienced counsel**

There is a presumption of correctness attached to a Class settlement reached in arms-length negotiations between experienced, capable counsel.  *City P'ship Co.*, 100 F.3d at 1043; *see also Hawkins*, 2004 U.S. Dist. Lexis 807, at *15; *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG § 11.41 at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation. . . .  The proof of the pudding was indeed in the eating."  *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987); *see also In re "Agent Orange"*, 597 F. Supp. at 762 (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

In the instant action, the parties actively engaged in many rounds of negotiations, for many months.  The parties negotiated arduously and at arms-length with the Court-appointed

Mediator.  The negotiations involved submissions of proposals, counter-proposals, evaluation of all discovery and factual arguments.  The parties have worked long and hard to reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best interests of the Class Members.

  **5.**  **Prospects of the case, including risk, complexity, expense and duration**

  The last factor outlined in *Compact Disc* captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation."  *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs."); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 13.22 (4th ed. 2004) ("One of the major incentives to settle is to avoid the cost and burden of further discovery.").  Without question, in a "complex class action involving prolonged litigation" such as this, "settlements are strongly favored by the courts because they represent the easiest, and quickest, way of disposing of the case."  *Giusti-Bravo*, 853 F. Supp. at 35-36.[10]

  It has been a substantial undertaking for the Plaintiffs and their counsel to prosecute this case.  If this case proceeded further, significant additional resources would have been expended by Class Counsel at trial and beyond, as AstraZeneca would have appealed any adverse judgment against it, as it is now doing with respect to the Class 2 and 3 trial verdict.  It is reasonable to assume that, absent settlement, a final result would not be reached for several more years.

---

[10] In the *Warfarin Sodium Antitrust Litig.*, the Court stated "[w]e agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial.  Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class. In a class action of this magnitude . . . the time and expense leading up to trial would have been significant."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 536.

### 6.      Reaction of the Class

Some courts also consider the reaction of the Class and opposition to the settlement.

*Hawkins*, 2004 U.S. Dist. Lexis 807, at *15 (citing *In re General Motors Corp. Pick-Up Truck*

*Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995)).  Here, there is only a ***single*** objector, and, as

described more particularly below, the objection has little merit.

## C.      The Objection

Through attorney Don Haviland, Class Representative M. Joyce Howe has objected to the

Settlement.  Rather than submitting additional briefing to the Court, Mr. Haviland has merely

incorporated by reference the many briefs and declarations that he filed in objecting to

preliminary approval.  Class Counsel, too, incorporate their prior briefing on this issue,[11] but will

pinpoint and respond below to the salient objections made by Mrs. Howe.

### 1.      Persons who incurred enforceable obligations to make co-payments are eligible to make a claim

Mrs. Howe contends that the Settlement abandons Medicare Part B beneficiaries who,

despite never making their co-payments for Zoladex®, remain liable to do so.  Memorandum of

Named Class Representative M. Joyce Howe in Opposition to the Joint Motion for Preliminary

---

[11] Class Counsels' Response to Motion for Amendment of Case Management Order No. 1 and Consolidated Order re: Motion for Class Certification (Dkt. No. 3993); Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AZ (Dkt. No. 4285); Declaration of Jeffrey L. Kodroff (Dkt. No. 4286); Declaration of Kenneth A. Wexler (Dkt. No. 4287); Declaration of Marc H. Edelson (Dkt. No. 4288); Declaration of Leroy Townsend (Dkt. No. 4289); Response of Plaintiffs' Court Appointed Co-Lead Counsel to Renewed Motion for Amended Case Management Order No. 1 (Dkt. No. 4290); Class Counsel's Response to the Declaration of Donald E. Haviland, Jr. in Response to Court Directive Concerning AstraZeneca Settlement (Dkt. No. 4510); Declaration of Steve W. Berman (Dkt. No. 4511); Declaration of Jeffrey L. Kodroff (Dkt. No. 4512); Declaration of Kenneth A. Wexler (Dkt. No. 4513); Declaration of Marc H. Edelson (Dkt. No. 4514); Class Counsel's Submission Regarding Mr. Haviland's Participation as Co-Lead Counsel (Dkt. No. 4723); Declaration of Steve W. Berman in Support of Class Counsel's Submission Regarding Mr. Haviland's Participation as Co-Lead Counsel (Dkt. No. 4726); Plaintiffs' Motion for Leave to File Under Seal (re: Ex. 1 to Berman Decl.) (Dkt. No. 4724); Class Counsel's Response to the Misrepresentations Contained in the Supplemental Memorandum of the Haviland Law Firm, LLC in Support of Motion for Appointment as Class Counsel for the Track 2 Consumer Sub-Classes Pursuant to Fed. R. Civ. P. 23(g) (Dkt. No. 4783); Notice of Filing [Proposed] Case Management Order No. 34 (Dkt. No. 4976).

Approval of Proposed Nationwide Settlement with AstraZeneca (Dkt. No. 4250-1) ("Opp"). at 8.

This is false.  To the contrary, the Settlement expressly provides these consumers with an

opportunity to participate in the claims process once they pay their debts and demonstrate that

they have done so.  As both the Notice and Claim Form explained:

> If, **after** receiving this Notice, you make a percentage co-pay for
> Zoladex® under Medicare Part B based on a bill that you received
> from a doctor or clinic related to taking Zoladex® from January 1,
> 1991 through December 31, 2004, you may submit a claim.  With
> your claim, you **must** submit a receipt, cancelled check, or credit
> card statement showing that the payment was for Zoladex® taken
> between January 1, 1991 and December 31, 2004, or your claim
> will not be valid.

Thus, Class Members who have incurred a legally enforceable obligation to make a co-payment

for Zoladex® are eligible to participate in the substantial fruits of the Settlement.

### 2.    Class Members like Mrs. Howe will not receive a "shortfall"

Mrs. Howe also objects to the Settlement on the basis that she will purportedly receive a

"shortfall" when compared to Class Members who did not have supplemental insurance.  Opp. at

13.  But this contention once again betrays a fundamental misunderstanding of the Settlement.

Class Members who had private supplemental insurance policies that covered a portion of

the Class Members' Medicare Part B co-pay do receive less under the Proposed Settlement than

those without supplemental insurance coverage and for good reason:  *they paid less to begin*

*with and therefore have incurred a lesser amount of damage*.  Mrs. Howe concludes that this

"penalizes" those Class Members who had insurance, Opp. at 4, but this is not the case.

Recognizing that Class Members, like Mrs. Howe, who have supplemental insurance coverage

pay only a portion of the 20% Medicare Part B co-pay, Dr. Hartman's damages model did not

include payments made by the private insurance carriers, *who are members of another Class*

(Class 2).  Therefore, Dr. Hartman's Table 2 does not include over-payments that a Class Member with supplemental insurance ***never*** made.

Because the most common form of supplemental Medicare Part B insurance pays 80% of the 20% Medicare Part B co-pay, Dr. Hartman's damages model (and Table 2) assumes that Class Members covered by supplemental insurance made an out-of-pocket co-payment of 20% of 20%.  While there may be some Class Members, like Mrs. Howe, who had supplemental coverage that required them to pay more than 20% of 20%, Dr. Hartman utilized a standardized formula that would apply to ***most*** Class Members with supplemental coverage instead of attempting to divine slight variations that may or may not apply.

Even though the Howes paid more than 20% of the 20% under the terms of Mr. Howe's private supplemental insurance policy, because the Settlement predicates recovery on a doubled amount (or actually triple amount given the Court's damages ruling in the Class 2/3 trial), it is very likely that Mrs. Howe will nonetheless receive back ***all*** of the Howes' out-of-pocket co-payments if not more.  Seen in this light, then, Mrs. Howe is really objecting to not being eligible to recover co-payments ***that she never made*** because her supplemental insurer made them for her.  This hardly makes the Settlement unfair.  The Settlement is fair, reasonable and will provide substantial monies – if not more than a full recovery – to all Class Members.

Citing the collateral source rule, Mrs. Howe points out that tort law provides her with the legal right to recover that portion of the damage incurred by her supplemental insurer.  Opp. at 9-12.  Even if this were true, Plaintiffs' damages model focuses only on out-of-pocket payments.  Furthermore, Mrs. Howe expresses concern that she and others may be exposed to subrogation claims from supplemental insurers, Opp. at 2, but it is difficult to see how this could ever happen given that the Settlement does not provide Class Members with compensation for co-payments

that they did not make and that were, instead, made by their supplemental insurance coverage. In fact, the risk of a subrogation claim would actually increase substantially if Mrs. Howe were to prevail with her argument for recovering money incurred by her supplemental insurer.  This argument is a red herring.

> **3.     Expanding the certified class is in the interests of all Medicare Part B beneficiaries who were administered Zoladex®**

Mrs. Howe, who seeks to be the watchdog for all consumers and previously sought certification of a nationwide class, objects to inclusion of consumers from nine states in the Settlement Class, contending that they were not previously included in the certified class and should remain excluded.  Opp. at 8.  While it is true that more money would be available for distribution to Class Members if residents of nine states that were excluded from membership in the litigation class were likewise excluded from the Settlement Class, as is common in nationwide class actions, AstraZeneca bargained for "total peace."  This was a negotiated term that was agreed to in the give-and-take and will provide the greatest number of Zoladex® users with an opportunity to participate in the Settlement.  Again, Class Counsel struck the best bargain that they believed could be obtained, one that is fair, reasonable and provides substantial benefits to all Class Members.  And given the claims experience to date, including Class Members from the nine states did not reduce the recovery of a single Class Member from the originally certified states.

> **4.     Sending checks to all would compensate non-Class Members, as well as those who were not damaged, when all that is needed is for Class Members to identify themselves through a simplified claims process**

Mrs. Howe objects to the use of the Claim Form and contends that the Settlement should require AstraZeneca to simply send a payment to each Class Member.  Opp. at 16-17.  Would it be simpler if AstraZeneca just cut checks to all Class Members?  Sure it would.  Would it be

fairer?  No, and in fact, it would be much less fair when a mechanism is available for Class Members to identify themselves.

The first problem with this proposal is that it pays most of the Settlement Amount to Medicare Part B beneficiaries who did not make a partial or full co-payment for Zoladex®, that is, beneficiaries who are not even Class Members.  Class Counsel cannot identify individual Class Members without the use of a Claim Form.  This is because CMS and Plaintiffs do not have access to data indicating which Class Members had supplemental insurance and which did not.  Put another way, we cannot determine without the use of a Claim Form which Medicare Part B beneficiaries who received Zoladex® made partial or full co-payments and are, therefore, members of the certified Class.  Thus, simply distributing checks to everyone on the CMS list would result in non-Class Members being paid at the expense of Class Members who were out-of-pocket.  As an example, if the $24 million Settlement Amount were simply distributed equally among all 445,550 Medicare Part B beneficiaries identified in CMS records as having been administered Zoladex® during the Class Period, each beneficiary would receive $53.86.  In other words, **all** Class Members would receive less – and, in most instances, **much** less (including Mrs. Howe herself) – under Mrs. Howe's proposal.  It is highly likely that Mrs. Howe does not understand this.

The second problem with Mrs. Howe's proposal is that, notwithstanding the foregoing problem, it would treat all Class Members equally, even though some made higher co-payments than others.  For instance, Mrs. Howe's proposal would result in those, like Mrs. Howe, who did not have a standard policy covering 80% of the co-payment, to receive more than those who had no coverage and who, therefore, incurred more damage.  In light of this observation, which was considered by the parties during the negotiations, Mrs. Howe is suggesting that one settlement

that treats Class Members differently but roughly equal based on out-of-pocket damages (as the
instant Settlement does) be scrapped in favor of one that treats them all the same, even though
Class Members with supplemental insurance would have incurred less damage. In other words,
Mrs. Howe is advocating a result that favors her more narrow interests over those of the Class
Members at large.

Given these concerns, among others including the risks of the impending trial, Class
Counsel ultimately concluded that a claims-made settlement within the parameters and
incentives agreed to was in the best interests of the Class. Indeed, even the Court itself
envisioned that a claims process would follow any trial judgment in favor of the Class. *See* April
11 Pre-Trial Conference Hearing Tr. at 14-15.[12]

**5.      A "reverter" is not unfair**

Although Mr. Haviland supported the claims process in the GSK settlement, he now
insists that the claims-made settlement here is "completely different from the process of 'claims
administration'" that he supported *vis-à-vis* the GSK settlement merely because there is the
possibility of a reverter. Haviland Decl. at 4 n.6. This is a distinction without a difference. A
claims-made settlement is just that: one which requires the Class Member to file a claim form in
order to participate in the monetary benefits provided by the settlement. The process proposed to
be employed in the AstraZeneca settlement is similar to that used in the GSK settlement, but

---

[12] Mr. Haviland decries the claims-made process here as "unprecedented in similar drug pricing litigation . . . ." Declaration of Donald E. Haviland, Jr., in Response to Court Directive Concerning the AstraZeneca Settlement (Dkt. No. 4660) ("Haviland Decl."), ¶ 8. This is false. As the Court is aware, a very similar claims process was employed for the GSK settlement that the Court just approved. And as Special Master McGovern concluded in reporting to the Court on the fairness of the GSK settlement, a claims process involving proof of payment is "typical of this type of consumer settlement." Report of the Special Master to the Court at 5; *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 236 F. Supp. 2d 445 (E.D. Pa. 2002) (utilizing claims process in which claim had to be certified by a cardiologist or cardiothoracic surgeon); MANUAL FOR COMPLEX LITIGATION (FOURTH) at 331 (4th ed. 2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . . Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (*e.g.*, through invoices, confirmations, or brokers' records).").

simplified here.  And Mr. Haviland ultimately accepted a claims process in the *Lupron* action

that allowed for the possibility of some reversion.  The fact remains that Haviland supported a

claims-made settlement in this very litigation and a related case before and is now taking an

inconsistent position.  It is also worth noting that even Mr. Haviland, who now decries the

possibility of a reverter to AstraZeneca, was in favor of a reverter provided that there was no cap

on a claims made settlement.[13]

And Class Counsel submit that the claims process here is eminently reasonable and fair.

In addition to basing claims on double damages in order to encourage Class Members to make

claims, Class Counsel went to great pains to recommend a proposed Notice that is simple,

concise and written in plain English.  We obtained AstraZeneca's agreement to a simplified

claims process in which the Class Member, at a bare minimum, need only represent that he or

she made a co-payment for Zoladex® at some point during the Class Period.  Thus, if the Class

Member cannot locate paperwork for treatments that may, in many cases, have been

administered a *very* long time ago, he or she can still participate in the Settlement.  And for those

consumers who incurred a co-pay obligation but did not yet pay it, the Settlement provides them

with an opportunity to participate in the claims process once they pay their debts and

demonstrate that they have done so.  These features of the proposed Settlement – the easy claims

process and the ability for those incurring obligations to still participate – and more are very

consumer friendly and represent major concessions on AstraZeneca's part.

Moreover, the proposed Claim Form itself is incredibly simple to complete.  The Class

Member need only provide his or her contact information; identify those Zoladex®

administrations (which were pre-printed on the Claim Form), if any, for which the Class Member

---

[13] *See* May 3, 2007 Haviland e-mail, found at Exhibit I to the Haviland Declaration.

had supplemental insurance coverage; sign the Claim Form; and provide acceptable proof of a percentage co-payment for Zoladex®, if such proof can be obtained.

These simplified procedures no doubt played a role in encouraging almost 10,000 Class Members to submit claims. And the aggregate value of those claims, projected by CCS to range from approximately $8.5 million to just over $9 million (*see* LaChance Decl. at ¶ 16), coupled with the $10 million *cy pres* payment, means that any reverter to AstraZeneca will be but a small percentage of the $24 million Settlement Amount.

### 6. The fee amount was agreed to only after agreement on the Settlement Amount was obtained

Subject to Court approval, AstraZeneca has agreed to pay attorneys' fees of $6,500,000 and costs of $2,100,000. These amounts, which were negotiated after the $24,000,000 Settlement Amount was agreed to, will not come out of the Settlement Amount.

Mr. Haviland claims that the Settlement was "tainted" by fee negotiations. Opp. at 17-18. This assertion is false, both as a matter of procedure and substance.

First, the Class will achieve a greater recovery by having AstraZeneca pay the fees and costs agreed to separately from the Settlement Amount. Second, discussing fees as part of the overall settlement package is appropriate. While it is true that fee discussions should not drive the settlement negotiations, discussing fees is not prohibited. In *Evans v. Jeff D.*, 475 U.S. 717 (1986), the Ninth Circuit had reversed the district court's approval of a settlement, holding that negotiations as to the settlement of class member claims should not be simultaneous with negotiations over the payment of attorneys' fees. The Supreme Court reversed, explaining "that when the parties find such negotiations conducive to settlement, the public interest, as well as that of the parties, is served by simultaneous negotiations." *Id.* at 738 n.30.

And although Mr. Haviland cites NEWBERG in support of his position, he neglects to point out that NEWBERG recognizes that simultaneous merits and fee settlement negotiations are proper cases, like the instant one, which involve statutes that authorize an award of attorneys' fess and costs.  NEWBERG § 15:32 at 109.[14]  Moreover, NEWBERG recognizes that obtaining a defendant's agreement to pay reasonable attorneys' fees "gives the defendant a predictable measure of exposure of total monetary liability for the judgment and fees in a case [and] facilitates completion of settlements . . . ."  *Id.* at 112.

In any event, as other counsel present during the mediation attest, the specific amounts of attorneys' fees and costs were not discussed at the mediation until ***after*** an agreement in principle on the $24,000,000 Settlement Amount was achieved.  Declaration of Kenneth A. Wexler in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AstraZeneca (Dkt. No. 4287) ("Wexler Decl."), ¶ 7; Declaration of Jeffrey L. Kodroff in Support of Class Counsel's Opposition to Motion of Named Class Representative M. Joyce Howe for Reconsideration of Preliminary Approval of Proposed Nationwide Settlement with AstraZeneca (Dkt. No. 4286) ("Kodroff Decl."), ¶ 6.  To be sure, in the week leading up to the mediation, the parties exchanged fee numbers in an effort to see whether expectations were in the "ballpark."  Wexler Decl., ¶ 7.  There was nothing improper about doing so as AstraZeneca sought to determine what its total outlay under a potential deal would be.  Fee negotiations simply did not drive or taint the Settlement.  And, finally, although Mr. Haviland had objected to fees being discussed during settlement negotiations (and, again, there is no such bar), he never

---

[14] Mrs. Howe also cites *City of Philadelphia v. Chas. Pfizer & Co., Inc.*, 345 F. Supp. 454 (S.D.N.Y. 1972). However, that case was decided before the Supreme Court's decision in *Evans.*

objected during the Mediation session once the topic turned to fees after the Settlement Amount was determined.

### 7.    Lead Counsel and Mr. Townsend support the Settlement

Mr. Leroy Townsend, the original named plaintiff for an AWP complaint against AstraZeneca filed in 2002, was kept fully informed of the settlement discussions and approves of the Proposed Settlement.  Declaration of Leroy Townsend (Dkt. No. 4289), ¶¶ 6-12.

In addition, Class Counsel enthusiastically support the Settlement.  Indeed, when preliminary approval papers were filed, we believed that Mr. Haviland and his client, Mrs. Howe, also supported the Proposed Settlement given that Mr. Haviland expressly declared that his client agreed to the Settlement terms at the very mediation where the deal was struck, which was attended by Mr. Haviland.  Even if Mr. Haviland had declared to Class Counsel at the end of the mediation that he did not support the Proposed Settlement, Class Counsel would have agreed to the Settlement nonetheless given the very substantial benefits that the Proposed Settlement provides to the Class Members, who have been waiting years for redress, and the assent of plaintiff Townsend to the Proposed Settlement.

There is a presumption of correctness attached to a Class settlement reached in arms-length negotiations between experienced, capable counsel.  *City P'ship Co.*, 100 F.3d at 1043; *see also Hawkins*, 2004 U.S. Dist. Lexis 807, at *15; *Flinn v. FMC Corp.*, 528 F.2d at 1173 ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also* NEWBERG, § 11.47, at 145-47.  As the MANUAL FOR COMPLEX LITIGATION explains:

> In evaluating the settlement, the judge should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy, and reasonableness may attach to a class settlement

> reached in arms-length negotiations between experienced, capable
> counsel after meaningful discovery.

MANUAL FOR COMPLEX LITIGATION, § 30.42 (3d ed 1995).

While the views of the class representatives are taken into account, they do not trump

those of class counsel, who owe a duty to the Class as a whole.  As one court has explained, "the

compelling obligation of class counsel in class action litigation is to the group which makes up

the class. . . .  To that end, Class Counsel must act in a way which best represents the interests of

the 'entire class and is not dependent on the special desires of the named plaintiffs.'"  *Maywalt v.*

*Parker & Parsley Petroleum Co.*, 155 F.R.D. 494, 496 (S.D.N.Y. 1994) (quoting *Parker v.*

*Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982)).  As another court has observed:

> Because the "client" in a class action consists of numerous
> unnamed class members as well as the class representatives, and
> because "[t]he class itself often speaks in several voices . . ., it may
> be impossible for the class attorney to do more than act in what he
> believes to be the best interests of the class as a whole . . . ." . . .
> Because of the unique nature of the attorney-client relationship in a
> class action, the cases cited by appellants holding that an attorney
> cannot settle his individual client's case without the authorization
> of the client are simply inapplicable.

*Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981).

These views are embodied in the Comments to the 2003 Amendments to Rule 23:

> [T]he primary responsibility of class counsel, resulting from
> appointment as class counsel, is to represent the best interests of
> the class.  The rule [Rule 23(g)] establishes the obligation of class
> counsel, an obligation that may be different from the customary
> obligations of counsel to individual clients.  Appointment as class
> counsel means that the primary obligation of counsel is to the class
> rather than to any individual members of it.  The class
> representatives do not have an unfettered right to "fire" class
> counsel.  In the same vein, the class representatives cannot
> command class counsel to accept or reject a settlement proposal.
> To the contrary, class counsel must determine whether seeking the
> court's approval of a settlement would be in the best interests of
> the class as a whole.

- 43 -

Numerous courts have approved class action settlements notwithstanding objections from the named class representatives.  *See*, *e.g.*, *Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 333 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 282 n.3 (D. Minn. 1997).  Thus, "agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable."  *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) (affirming approval of a class settlement opposed by all but one of the eleven named plaintiffs in the suit).  In approving a class settlement despite objections by four of five class representatives, the court in *Maywalt* warned of granting a class representative veto power:

> To empower the Class Representatives with what would amount to an automatic veto over the Proposed Settlement does not appear to serve the best interests of Rule 23 and would merely encourage strategic behavior "designed to maximize the value of the veto rather than the settlement value of their claims."

*Maywalt v. Parker & Parsley Petroleum Co.*, 864 F. Supp. 1422, 1430 (S.D.N.Y. 1994), *aff'd*, 67 F.3d 1072 (2d Cir. 1995) (quoting *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1366 (2d Cir. 1991)).

Although Mrs. Howe has changed her mind and no longer approves of the Settlement, her personal desires should not serve to trump the professional judgment of Class Counsel, who enthusiastically believe that the Proposed Settlement is in the best interest of all Class Members.

### 8.    The Track 2 Proposed Settlement does not adversely reflect on the Settlement proposed here

Without providing any supporting argument, the Objection asserts that the proposed Track 2 settlement "appears to provide a greater recovery for consumers" than the Settlement here and that, therefore, "paying Class 1 consumers more for their weaker Track 2 claims demonstrates that the claims process and amounts in AstraZeneca [sic] settlement are patently

- 44 -

unfair, unreasonable and inadequate." Objection at 3. The Objection fails to explain precisely how the Track 2 settlement is more generous and, for that reason alone, should be rejected. Nonetheless, there is no basis for claiming that the Track 2 recovery is, in fact, more generous. The Track 2 recovery is based on the concept of reimbursing Track 2 Class Members their out-of-pocket costs associated with the Subject Drugs; the recovery formula is not linked to a specific damage model per Class Member.

The reason that Class Counsel employed a different approach in Track 2 is the difficulty associated with attempting, for settlement purposes, to craft a distribution model based a per month overcharge for each of the approximately 190 Subject Drugs at issue in Track 2. The factors affecting the Track 2 distribution are substantially more complex than those affecting the AstraZeneca Class 1 Settlement given, among other things, (i) the need to allocate across different Classes; (ii) the much greater number of drugs; and (iii) the need to weight the distribution based on dates of administration and whether the drug at issue was brand or generic. These factors made it very difficult to develop a drug-specific monthly overcharge model like that employed in the AstraZeneca Class 1 Settlement. Moreover, these factors highlight the need to make the Track 2 distribution model simple so that it can be effectively communicated to Track 2 Class Members and encourage them to file claims. Thus, Class Counsel decided to recommend a different approach for Track 2. Having done so, we doubt that the Track 2 model is more generous than the AstraZeneca model. Although the focus in the Track 2 proposed settlement is on reimbursing out-of-pocket payments, which can be greater than the actual damages incurred by the Class Member, the AstraZeneca model also pays out greater than actual damages given that the Settlement doubles the per-Class Member calculation of damage.

## VI.    CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation.  The

Settlement provides an excellent result.  The Court should certify the Settlement Class and grant

final approval to the Settlement Agreement.

DATED:  April 17, 2008.

By____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16  233999 V1

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on April 17, 2008, I caused copies of **CLASS COUNSEL'S MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF THE ASTRAZENECA CLASS 1 SETTLEMENT** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

 **/s/ Steve W. Berman**
Steve W. Berman