**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| *In re*: PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of* | ) | Magistrate Judge Marianne Bowler |
| *the Florida Keys, Inc. v. Abbott Laboratories,* | ) | |
| *Inc.* | ) | |
| CIVIL ACTION NO. 06-11337-PBS | ) | |

**MEMORANDUM  BY THE UNITED STATES IN OPPOSITION**
**TO ABBOTT'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

Abbott Laboratories, Inc., (Abbott) has moved to compel the production of six categories

of documents.  (Dkt. 5173).   Abbott's motion should be denied in its entirety.  With respect to

each category, Abbott's motion is directed at privileged or irrelevant material, material which has

been produced, or material for which Abbott has as much access as counsel for the United States.

The United States will address the categories of material covered by Abbott's motion in the same

order in which they are set out in Abbott's brief.

**1.  2002 "Decision" Memorandum**

Abbott has asked for an order requiring the Government to produce an unredacted version

of a 2002 internal memorandum from the Centers for Medicare and Medicaid Services which

related to the review of Medicaid State Plan Amendments.  Although a final version of the

memorandum has been produced to Abbott, sections of the memorandum have been redacted

based on the deliberative process privilege.  Abbott states three arguments in support of its

demand for access to the full version of the document.  Abbott argues that (1) the Government

cannot assert the deliberative process privilege given its status as a litigant in this action, (2) that the document is not privileged, and (3) that any privilege associated with the document at issue has been waived.  Abbott is wrong on all three points.

Before responding to Abbott's arguments, however, the United States will address the circumstances surrounding the Government's inadvertent production of an unredacted copy of a draft version of the memorandum at issue.  The draft version was first produced by the United States in the MDL in 2004 in response to a subpoena served on the Government prior to its intervention against Abbott and prior to transfer of the Ven-A-Care *qui tam* action from another district to this Court.  When counsel for Abbott used the draft memorandum as an exhibit during a deposition last year, a CMS official, entirely on his own initiative, raised privilege concerns about the document.  After conferring with the witness, Government counsel advised defendants that the draft memorandum would be tentatively recalled while the issue of whether the document should be formally recalled was discussed with CMS.  Although the copy of the memorandum introduced at the deposition is a draft which laid out recommendations that, in final form, would be subject to approval by the Administrator of CMS, the Government ultimately elected not to recall the document in light of the practical considerations deriving from the fact that the document had been released generally to all litigants in the MDL in 2004 and also prior to the parties here being subject to the recall provisions in the protective orders applicable to the transferred *qui tam* cases.

According to Abbott, the Government, as plaintiff in this action, should not be allowed to "evade discovery of material that a private plaintiff would have to turn over."  Abbott has been unsuccessfully arguing this point for almost a year and a half in successive briefs filed with both

the Magistrate and District Court Judges.[1]  Both jurists have consistently rejected Abbott's arguments.  With respect to material to which the deliberative process privilege has been asserted, the only material for which the Court has required *in camera* submissions are those "documents relating to Abbott's marketing the spread or the drugs at issue in this litigation." Electronic Order of March 12, 2008.  *See also* Dkt. 4885 (Nov. 9 2007 Order Re: [Abbott's] Objections to August 13, 2007 Order by Magistrate Judge Bowler.  The document at issue relates to neither subject.  Moreover, the document is from 2002 – after the claims period in the Government's case against Abbott.  Abbott's fundamental challenge to the Government's ability as a litigant to assert the deliberative process privilege is no different now, at the close of discovery, than during its repetition over the past eighteen months.

With respect to Abbott's challenge to the Government's particular assertion of privilege for the final version of the memorandum, Abbott's main argument is that because some *parts* of the document reflecting a decision by the Administrator are not privileged, none of the other sections of the document can be privileged.  This argument is at odds with the structure of the document.  The final document, like the version which Abbott already has in draft form, is a binary document.  *See* Exhibit "A" (*in camera* submission).  On the one hand, it is a memorandum from the Director of CMS's Center for Medicaid and State Operations which lays out options and recommendations for the Administrator of CMS.  The document, however, is also a transmittal back to CMS staff communicating the Administrator's decision in response to the options that were placed before him – i.e. the unredacted "decision" portion of the memorandum.  The document contains both recommendations to the Administrator and his

---

[1]  *See* Dkt 5144, at 3-8 for a synopsis of the parties' litigation over the Government's assertion of the deliberative process.

decision on the options before him.  Consistent with the principles which apply to the deliberative process privilege, the Government released that part of the document which sets out the Administrator's decision (*see* Exhibit "B," attached) and asserted the deliberative process privilege with respect to the recommendations from CMS staff.  *See* Declaration (Exhibit "C," attached ).

Finally, the Court should not deem the privilege as having been waived.  According to Abbott, the Government's decision not to recall the draft version of the memorandum after it was introduced at a deposition reflects "a conscious decision to relinquish a claim of privilege [and] clearly constitutes waiver."  Abbott Brief at 5 (citing *Texaco Puerto Rico, Inc. v. Department of Consumer and Regulatory Affairs,* 60 F.3d 867, 885 n.8 (1st Cir. 1995).  In the *Texaco* case, the First Circuit noted that the issue of waiver in the context of the deliberative process privilege is "unsettled" and cited cases from two other circuits which reached opposite conclusions.  *Texaco Puerto Rico*, 60 F.3d at 885 n.8.  Of the two cases cited by the First Circuit, only one deals with the issue of waiver by inadvertent production.  In that case, the Third Circuit rejected a waiver argument for the deliberative process privilege.  *See Redland Soccer Club, Inc. v. Dept. of Army*, 55 F.3d 827, 855-56 (3rd Cir. 1995).  The Third Circuit decision appears to be the prevailing view in the case law.  *See City of Virginia Beach v. United States Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir.1993) (Government may waive privilege by *authorized* release of privileged material); *Florida House of Representatives v. United States Dept. of Commerce*, 961 F.2d 941, 946 (11th Cir.)("where an authorized disclosure is voluntarily made to a non-federal party, the government waives any claim that the information is exempt from disclosure under the deliberative process privilege"); *Dipace v. Goord,* 218 F.R.D. 399, 406-7 (S.D.N.Y., 2003) (no

4

waiver will be found  unless that disclosure was "authorized" by the governmental agency and "voluntary"); *Scott v. PPG Industries, Inc.*, 142 F.R.D. 291, 294 (N.D.W.V. 1992) (rejecting waiver argument where Government was not aware of release of privileged document until deposition and " reacted reasonably promptly thereafter").

The case cited in the First Circuit's *Texaco* decision, which found waiver, did not involve the issue of inadvertent production. *See Clark v. Township of Falls*, 124 F.R.D. 91, 93-94 (E.D. Pa. 1988).  Rather, in a decision issued seven years prior to the Third Circuit opinion in *Redland Soccer Club,* a Pennsylvania district court found that a municipality had waived the privilege by disseminating a relatively small number of putatively privileged documents to several individuals and organizations, including a local newspaper.  *Id.*  Nothing remotely like the situation involved in *Township of Falls* is present in this case.  To the contrary, the Government's conduct with respect to the draft version of the memorandum at issue has been fully consistent with maintaining the confidentiality of information in the document while at the same time attempting to adopt a practical position with respect to whether the document could effectively be recalled in light of its 2004 production in the broader MDL.  The circumstances associated with production of a draft version of the memorandum at issue here simply do not give rise to a colorable claim of waiver.  *See, e.g., In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*; 348 F.3d 16, 24 (1st Cir. 2003) (explaining that generally privilege waivers "are almost invariably premised on fairness concerns" and that "courts have identified a common denominator in waiver by implication: in each case, the party asserting the privilege placed protected information in issue for personal benefit through some affirmative act, and the court found that to allow the privilege to protect against disclosure of that information would have been unfair to the opposing

party" (internal quotations and citations omitted)).  The Government has not attempted at any

time to use deliberative communications in building or arguing its case against Abbott.

Accordingly, there will be no unfairness to Abbott if the Court rejects defendant's waiver

argument.

The Government submits that inadvertent waiver is the issue implicated here given that

Abbott premises its waiver argument on the production of the draft version of the decision memo

– the production of which was inadvertent.  Given the circumstances of the production of the

draft document to the entire MDL in 2004, the Government's decision to refrain from attempting

to recall the document in 2008 can hardly be deemed a "conscious decision to relinquish a claim

of privilege" as Abbott asserts.  Rather, it was a decision that simply recognized the practical

implications of the situation.

**2.  The United States Has Already Produced the Claims Information to Abbott**

Abbott seeks to compel the production of additional documents in response to request

number One of its Second Set of Requests for the Production of Documents.[2]  Abbott's motion is

rife with misleading statements to the effect that the United States is withholding data and has

barely produced any of the requested information.  Abbott's suggestion on that point is easily put

---

[2]  Abbott's request for production sought:
> 1.  A copy of each and every claim that you allege constitutes a "false claim" that Abbott submitted or caused to be submitted, as alleged in Paragraph 103 of the Complaint, including specifically each and every claim as to which you seek damages or penalties under the False Claims Act. To the extent that you object to this request and require Abbott to move to compel, produce in the interim a representative sample of claims (e.g., an individual HCFA 1500 form for physician administered drugs) for each year, each drug and each category of claims for which you seek damages or penalties under the False Claims Act

to rest.  The United States has produced to Abbott over 1,500 data files, containing over 33 billion bytes of data, comprising over 225 million records and over 30 million claims.  It is difficult to fathom what else Abbott needs, and providing a sample of that data, when the data itself has been produced, makes little sense.

In addition, Abbott is well aware of the United States' theory of the case and has understood for a long time that the false claims in this case include the claims submitted by its customers to Medicare and Medicaid.  The Government has also made clear that practically every claim submitted to Medicaid and Medicare for the subject drugs was false.  The reason for this is the mega-spreads[3] on Abbott's drugs which averaged over 1000% and sometimes exceeded 2000%.  For example, Abbott's average selling price for one of its bags of water was approximately seventy-seven cents, at the same time that it was reporting an AWP of $17.50 – a spread of almost 2,300%.  The falsity is patent.  A precise determination of the scope of the false claims requires the completion of the analysis of Abbott's transactional data by the United States' experts, a process which has been delayed by Abbott's failure to produce its data until nearly the end of fact discovery.  However, it is clear that Abbott itself has the information to understand the case, the nature of the false claims, and to conduct discovery.

In its motion, Abbott also asks that the Government be required to produce a representative sample of false claims covering every J-code, every NDC, every Government health care program, every year and every carrier or fiscal intermediary at issue in this case.

---

[3] "Mega spread" is a term used by Judge Saris to describe situations where the spread created by drug manufacturers for their products was between 150 and 900 percent (the "spread" being the difference between the actual price at which a drug could be purchased and the amount paid on a claim for the same drug by government programs and private insurers).  *See In Re Average Wholesale Price Litig.,* 491 F. Supp. 2d 20, 40-41 (D. Mass. 2007).

Abbott's motion should be denied because the United States has already produced, not just a sample of the data as sought by Abbott, but as noted above – the underlying data from which the sample would be drawn.

Abbott's motion proceeds from three fundamentally flawed premises.  First, Abbott's demand for the production of claim forms as opposed to claims data appears to arise from a misunderstanding of the nature of the claims information retained by the Government.  Second, the United States has particularly identified the claims which it alleges were false.  To the extent Abbott wants to examine a discrete grouping or "sample" of those claims, it can generate its own sample from the claims information which the Government has produced.  Third, Abbott's legal argument in support of the demand for claims forms proceeds from an incorrect description of the proof necessary to support a finding of liability under the False Claims Act.

   a.  The Claims are the Data

Abbott's motion wrongly complains that the United States created confusion by equating claims data with claims forms.  Motion to Compel, at 7.  There is no confusion on this issue, except perhaps on the part of Abbott, which apparently does not understand that Medicare has entered the electronic age.  What Abbott misapprehends is that the claims data is one and the same as the claim forms.  If information regarding the provision of a health care service is typed into a computer by a health care provider, transmitted electronically to the United States over a telephone line where it is saved onto a computer, then the only form of the claim is electronic.  Production of the computer containing the transmitted data is not requested or required.  Nor can the Government produce a hard copy document that was never created.  Rather, a copy of the electronic data is all that can be produced.  Such data comprise the "claims" in the possession of

8

the United States and has been produced.

In this case, both Medicare and Medicaid data (and other related information) has been produced to Abbott.  That data is the claims.  *United States ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135 (D.D.C. 2007)("If Defendant submitted claims to Medicare electronically, then the 'claim' for purposes of the Act might, it seems, be the electronic file sent to Medicare or Defendant's Medicare carrier.")  There is no sense in producing a sample of data when the universe from which the sample would be drawn has already been produced.

In addition, the United States has produced a large amount of other information related to the claims process as well, especially as to the Medicaid Program.  For example, the United States has produced Financial Management Reports ("FMR") from 1990 through 2005.  The FMR files summarize all of the information contained on the various CMS-64 forms.  The CMS-64 forms, in turn, summarize the Medicaid expenditures of each state for which reimbursement was made by the Federal Government to the state during the prior calendar quarter, including all expenditures related to pharmaceuticals.  These submissions potentially constitute additional false claims and have been in Abbott's possession since being produced on or about October 7, 2007.

Admittedly, there is one critically important set of claims in this case which the United States has not produced to Abbott.  However, that information originated with Abbott, has yet to be produced by Abbott, and is the subject of a pending motion to compel by the United States. These missing claims reflect Abbott's own submissions to Medicare and Medicaid.  These claims demonstrate how Abbott stands apart from other manufacturers in this MDL and their importance

cannot be over emphasized.  Abbott did not just cause the publication of inflated AWPs to benefit its pharmaceutical customers.  Rather, Abbott also billed for, and collected, its "spread" through its own home infusion pharmacy, which submitted claims to Medicare and Medicaid both on behalf of Abbott and on behalf of Abbott home infusion customers.  Critically, Abbott has only produced an incomplete portion of the data related to its own submission of claims, which failed to include the necessary information to identify to whom the claims were billed.  The critical point is that only Abbott has the complete data reflecting those false claims, Abbott itself is in the best position to identify its home infusion pharmacy false claims and has concomitantly made it impossible for the United States to do so by not producing that data in the absence of a court order.

In sum, Abbott is wrong to differentiate between claim forms and claims data.  The United States has already produced the data to Abbott, along with other substantial pieces of related information.  Additionally, Abbott itself is in possession of the data showing the false claims submitted directly by its home infusion pharmacy to Medicare and Medicaid.  Thus, the United States has sufficiently complied with the request to produce.

b. The *False* Claims are the Data

A second part of Abbott's demand pertains to whether the United States has produced the "false" claims in this case.  The answer is an unequivocal yes.  As noted, in large part, the false claims at issue in this case are the very same claims contained in the data provided to Abbott.  That claims data shows when a claim for one of the subject drugs was processed and paid by Medicare or Medicaid.  Because of the magnitude of Abbott's mega-spreads, practically all of the claims for the subject drugs were false.

It may be that Abbott seeks to have the United States specifically parse through the claims and indicate which are false and which are not false.  However, that is not an issue appropriate or capable of resolution in connection with a request to produce, certainly not in a case of this magnitude.  Moreover, because the vast majority of claims for the subject Abbott drugs were false, the exercise would serve no purpose.  The United States' preliminary analysis has shown that the average spreads on the subject Abbott drugs are over 1,000%.  Some spreads exceed 2000%, and even the smallest spreads in the range of 300% are well into mega-spread territory.  Thus, Abbott is well aware of the nature of the false claims at issue in this case.

One consequence of Abbott's delay in providing its transactional data, is that it has prevented the United States from finishing its analysis of the falsity of the claims.  Abbott's transactional data will reveal the actual prices at which products were sold, thereby allowing the United States to evaluate the full nature of Abbott's mega-spreads.  It is the precise size of those mega-spreads, combined with other evidence, which will enable the United States to conclusively determine which claims are false and which are not.  Abbott did not complete the production of transactional data until February 14, 2008.  Thus, while the United States has been diligently working on the data since then, it has not been able to finish this analysis due to Abbott's substantial delay in production.  The details of this analysis will be completed during the expert discovery phase of this case which is not yet complete.

In sum, the false claims are included within the data and other information that has already been produced.  Furthermore, Abbott has delayed the United States' analysis of the false claims by failing to timely produce transactional data.

c.  <u>The Claims Data Is Sufficient to Prove False Claims</u>

Abbott's legal argument in support of the demand for claim forms proceeds from an incorrect description of the proof necessary to support a finding of liability under the False Claims Act.  At the heart of Abbott's motion to compel is the assertion that the claims data produced by the Government "is patently insufficient."  As to the sufficiency of the type of claims information necessary to support an FCA case, the U.S. District Court for the District of Columbia recently issued a comprehensive decision regarding the legal principles relating to the sufficiency of the evidence that may be entered at trial.  *See United States ex rel. El-Amin v. George Washington Univ.*, 522 F. Supp. 2d 135.  "[N]othing in the language of the FCA requires [plaintiff] to possess (and present to the factfinder) the actual claim form, whether it be paper or electronic, submitted to the government."  *Id*. at 141-42.  In fact, "Medicare billing documentation . . . may serve as circumstantial evidence that a claim was submitted to Medicare" and "is not only sufficient, but may also be more certain, satisfying, and persuasive than direct evidence."  *Id.* at 143.

Abbott cites a decision from the Northern District of California for the proposition that the claims information must, at a minimum disclose "the nature and number of the false claims" in the case.  That case, *San Francisco Bay Area Rapid Transit Dist. v. Spencer*, 2007 WL 421336, (N.D. Cal. Feb. 5, 2007), involving the interpretation of the California False Claims Act in connection with an issue raised during trial, is inapplicable here.  One critical difference is that the "claims" data in this case has been front and center in this case since the United States intervened.  The "claims" are not being raised on the eve of trial as in the *San Francisco Bay* case.  Abbott has understood from the outset that the false claims in this case are the claims

submitted by its customers to Medicare and Medicaid.

In sum, the United States has produced to Abbott the underlying universe of false claims submitted, or caused to be submitted, by Abbott.  A duplicative production of a lesser portion of those claims in the form of a sample is unnecessarily burdensome to the Government and makes no sense.  Moreover, the evidence which can be used to prove false claims is substantially broader than suggested by Abbott.

### 3.  Provider "Look-up" Table

According to Abbott, it "has repeatedly asked [the Government] for a provider look-up file or database..." and "Government counsel have repeatedly ignored Abbott's request."  *See* Abbott Brief at 9.  Abbott's assertion is not accurate.  After receiving Abbott's request for a provider look-up table, government counsel responded, explaining that she was

> writing in response to [Abbott's] September 6, 2007 letter regarding a provider table for the MSIS data produced by the United States. My understanding is that CMS has a public use file known as the Provider of Services or POS file. It contains data regarding the provider certification and status, including facility and service characteristics, provider type and location.  The description is on the CMS web site if you need further clarification.

Ltr from L. Oberembt to D. Torborg dated Jan. 24, 2008 (Ex. "D").

The CMS web site lays out information regarding Provider of Services files at http://www.cms.hhs.gov/NonIdentifiableDataFiles/04_ProviderofServicesFile.asp, including forms and instructions for ordering the electronic file on CD-ROM.  Notwithstanding that the information which is the subject of Abbott's Motion to Compel is, and has been, readily available to Abbott on a publicly accessible website, the Government will provide Abbott with the CD-ROM described on the web page referenced above.  In light of the foregoing, an order compelling production of a publicly available document would not be appropriate.

4.  **Workpapers for Two HHS-OIG Reports from 2007 and 2008**

Abbott has moved to compel the production of workpapers related to two reports issued by the Office of Evaluations and Inspection, which is part of the Department of Health and Human Service's Office of Inspector General (OIG) in 2007 and 2008.  The time frame covered by the claims of the United States against Abbott is 1991 to 2001.  The reports for which Abbott seeks workpapers relate to issues arising from statutory developments that occurred well after the time period at issue in this case.  Moreover, but just as importantly, neither report concerns specifically any of the drugs in this litigation, or the marketing of the spread by Abbott.  Any relevance to claims in the case against Abbott is nonexistent or extremely attenuated.  Finally, the reports are by an arm of the OIG and not by CMS, which is the component which administers the drug benefits which are the focus of this case.  In any event, the findings and recommendations by OIG, as well as any response by CMS to those findings and recommendations, are part of the final reports which are available on OIG's website.  There is no reason to impose on the Government the burden of reviewing and producing the internal workpapers relating to those reports.

The points stated above regarding the content of the reports are evident from the face of the reports - which are, of course, publicly available.[4]  With respect to the OIG report entitled, "State's Use of New Drug Pricing Data in the Medicaid Program," the objective stated in the report was to "provide an early assessment of whether States are considering using **new pricing data** for Medicaid prescription drug reimbursement."  The developments which occasioned OIG

---

[4]  Copies of the reports are attached to Abbott's brief in support of its Motion to Compel as Exhibits 12 and 15.

to study this issue are also set out in the report:

> Pursuant to the Deficit Reduction Act *of 2005* (DRA), [CMS] is providing States with sales-based drug pricing information that *was previously not available for their use.*
>
> * * * * *
>
> *In July 2006,* CMS began sending States average manufacturer price information monthly.

Abbott Ex. 12 at i (Executive Summary).

In short, the report examines an issue that arises wholly in the context of the Deficit Reduction Act of 2005, a law which directed CMS to provide AMP (average manufacturer price) data to the States - something that was not done prior to passage of the 2005 Act.  Any relevance to the claims at issue in the case against Abbott, which run only until 2001, are attenuated, at best.  In any event, the findings by the OIG, which include descriptions of comments and information obtained during the OIG inspection, are set out in the report itself.  Finally, the report makes no mention of any of the drugs at issue in this case, or of Abbott's marketing of the spread.

The other report for which Abbott seeks workpapers – "Review of the Relationship Between Medicare Part D Payments to Local, Community Pharmacies and the Pharmacies' Drug Acquisition Costs" –  is similarly irrelevant given that its focus is Medicare Part D - a program that came into existence with the passage of the Medicare Prescription Drug Improvement and Modernization Act of 2003.  The report does not focus on specific drugs or on specific manufacturers.  There is no reason to compel the production of the workpapers for this report.

## 5. Document Preservation and Collection Memoranda

Abbott has moved to compel the production of memoranda sent by Government counsel to CMS personnel regarding document preservation and collection efforts undertaken in this

15

case.  The documents sought by Abbott are both privileged and irrelevant and Abbott has

obtained the information it wants through deposition testimony.

Abbott's motion is directed at both preservation and collection memoranda.  Abbott,

correctly concedes, however, that the Government's collection efforts generally, and specifically

the redaction of privileged information from preservation memoranda that have been produced, is

already the subject of a previously-filed motion by Abbott.  *See* Dkt. 4711.  Notwithstanding the

pendency of that motion, this opposition brief will address both categories of documents.

Although most of the information sought by Abbott is not relevant to the issues in this

case, the United States has provided extensive discovery, both regarding the subject matter of

this case and the preservation and collection of documents relating to that subject matter,

including through Rule 30(b)(6) and Rule 30(b)(1) depositions.  The United States has also

identified privileged documents in privilege logs.

With respect to the depositions, Abbott has taken extensive testimony regarding CMS's

preservation and collection of documents.  Abbott's Rule 30(b)(6) depositions of CMS have

covered: (1) preservation of documents; (2) preservation, location, and collection of electronic

documents; (3) search and collection of documents in response to Lupron MDL and AWP MDL

subpoenas in 2003 and 2004 before the United States' actions had been transferred to the MDL;

(4) search and collection of documents in response to Abbott's Requests to Produce in 2006 and

2007.  Abbott has also taken Rule 30(b)(1) depositions of the head of CMS's Information

Systems, and of individuals who participated in the search and collection of documents.  In

addition, Abbott has asked numerous current and former CMS witnesses, including high level

officials, about the preservation and collection of documents, from their own files and within the

divisions, offices and bureaus under their authority.  Furthermore, Abbott has taken Rule 30(b)(6) depositions of Abbott's Medicare contractors.  Such depositions included the topic of the preservation and collection of documents in connection with the 2003 and 2004 MDL subpoenas as well as Abbott's Requests to produce in this case.

In addition, to the extent possible without revealing privileged communications, the United States has produced CMS emails and memoranda regarding preservation and collection. To the extent CMS documents were privileged, they have been listed on privilege logs.  Abbott has used documents which were produced as exhibits at the Rule 30(b)(6) depositions by Abbott regarding CMS's preservation and collection of documents.  For example, Abbott has documents from CMS such as: 1992 and 1997 emails regarding a freeze placed on Medicare claims records; 2003 memos sent to Medicare contractors instructing them to preserve documents subpoenaed by defendants in the Lupron and AWP MDLs; a February 2004 memo to all of CMS regarding preservation and collection of documents relating to subpoenas from defendants in the Lupron and AWP MDLs; April 2007 emails to all of CMS regarding preservation and collection of documents and circulating Abbott's Requests for the Production of Documents.  The United States is producing a few a additional documents and log entries as it completes its document production today.

Accordingly, the United States has provided Abbott with extensive discovery regarding CMS' preservation and collection of documents, notwithstanding the fact that the documents sought by Abbott have little or no relevance to the issues in this case.  Certain guidance is protected by privilege and  has been included on privilege logs.  Communications from legal counsel to client personnel regarding the "mechanics of [a party's] document collections efforts"

are "core attorney-client privilege material." *Prudential Ins. Co. of America v. Massaro,* 2000

WL 1176541 (D. N.J 2000), at 7.  *Accord, Kintera, Inc. v. Convio, Inc.,* 219 F.R.D. 503, 515

(S.D. Cal. 2003) (communications between employees regarding document collection efforts

made prior to filing of suit "were made in anticipation of lawsuit and were relayed for the

purpose of obtaining legal advice").  Likewise, an attorney's preservation instructions to a client

are privileged communications.  *See Gibson v. Ford Motor Company*, 510 F. Supp. 2d 1116,

1123 (N.D. Ga. 2007).

>    In light of the foregoing, Abbott's motion to compel regarding preservation and collection
memoranda should be denied.

## 6.  <u>Deposition Transcripts</u>

>    Abbott has moved to compel "AWP-related deposition transcripts" that may be in the

Government's possession.  It is not clear from Abbott's brief whether Abbott's motion is directed

at all transcripts in the Government's possession or certain categories of transcripts.  The United

States does not object to Abbott's request for transcripts of the depositions of state Medicaid

officials or of third parties such as pharmaceutical wholesalers and suppliers.  Such transcripts

may be relevant in the case against Abbott.  As noted by Abbott, the United States has requested

such transcripts from Abbott.  Moreover, the United States suggested to Abbott that by

exchanging transcripts from the depositions of Medicaid officials and certain other third parties,

the litigants in this case might avoid further burdening the state agencies and other entities.

>    Abbott's Motion to Compel, however, seems more particularly focused on transcripts

from the depositions of employees of other pharmaceutical companies which are defendants in

civil actions.  The United States opposes Abbott's motion to compel this category of transcripts

on four grounds.  First, the depositions relating to other pharmaceutical companies are irrelevant.

Second, to the extent that other pharmaceutical companies are engaged in litigation, Abbott can

seek transcripts generated in those cases directly from the parties involved in the depositions.

Third, protective orders in the cases in which the depositions were taken may prevent the

unauthorized disclosure of transcripts by the United States.  Fourth, the information sought by

Abbott is protected by the attorney work product doctrine and law enforcement investigative files

privilege.

With respect to the relevancy of the depositions of persons employed by drug companies

other than Abbott, clearly there is none.  This case involves Abbott's conduct.  Previous orders

by Judge Saris indicate that the relevant scope of discovery in this case relates to the Abbott

drugs in the First Amended Complaint and Abbott's marketing of the spreads.  Abbott's request

does not appear reasonably calculated to discover evidence relating to either of those two issues.

Second, Abbott's motion to compel seems particularly directed at the litigation files of

the Department of Justice.  It does not seek to obtain documents that were created by CMS or

even in the agency's possession during the claim period covered by the case against Abbott.  To

the extent that Abbott wishes to obtain evidence relating to other drug companies, it could have

done so during the discovery period by serving subpoenas on the other drug companies.

The third argument against compelled production is closely related to the second.  In light

of the irrelevancy of the transcripts relating to other drug companies, there is no reason to impose

the burden of resolving protective order issues on the Government.  As indicated in Abbott's

brief, the Government believes that Abbott should resolve those issues for itself, directly with the

other drug companies.  Abbott claims that requiring it to "canvas the entire pharmaceutical

industry in a directionless quest" would be impractical.  The United States suggests that this MDL provides a potential, and fairly obvious,  mechanism for accomplishing what Abbott wants in a straightforward manner.  Every filing in this case is served on all the parties to the broader MDL.  It does not appear that Abbott has ever attempted to use the MDL as a vehicle to gain access to the deposition transcripts of other pharmaceutical companies in the MDL.  The interests of those other companies are clearly implicated by Abbott's discovery requests.  If Abbott wanted the deposition transcripts relating to other companies, it should have sought them directly from the other drug companies.

Finally, in light of the foregoing, the main result that Abbott's motion would accomplish if granted, is that Abbott would be able to determine which drug companies are of interest to the Government, as revealed by the identities of the individuals whose transcripts the Department of Justice elected to obtain as part of its investigations.  That type of information is protected by both the attorney work product doctrine and investigative files privilege. *See, e.g. In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980) ("[w]ork product consists of tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions").

## Conclusion

For all the foregoing reasons, Abbott's motion to compel the production of documents should be denied.

For the United States,

MICHAEL J. SULLIVAN                         JEFFREY S. BUCHOLTZ
UNITED STATES ATTORNEY                      ACTING ASSISTANT ATTORNEY
                                            GENERAL

George B. Henderson, II
Assistant U.S. Attorney                      /s/ Justin Draycott
John Joseph Moakley U.S. Courthouse         Joyce R. Branda
Suite 9200, 1 Courthouse Way                Daniel Anderson
Boston, MA 02210                            Renée Brooker
Phone: (617) 748-3272                       Justin Draycott
Fax: (617) 748-3971                         Gejaa T. Gobena
                                            Rebecca Ford
                                            Civil Division
R. ALEXANDER ACOSTA                         Commercial Litigation Branch
UNITED STATES ATTORNEY                      P. O. Box 261
SOUTHERN DISTRICT OF FLORIDA                Ben Franklin Station
                                            Washington, D.C.  20044
/s/ Mark A. Lavine                          Phone:  (202) 307-1088
Mark A. Lavine                              Fax: (202) 307-3852
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for
  the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101


Dated: April 25, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day caused an electronic copy of the above MEMORANDUM  OF THE UNITED STATE IN OPPOSITION TO ABBOTT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Date: April 25, 2008

/s/ _____
Justin Draycott