# COMPOSITE
# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel.<br><br>    VEN-A-CARE OF THE FLORIDA<br>    KEYS, INC., a Florida corporation, by<br>    and through its principal officers and<br>    directors, ZACHARY T. BENTLEY and<br>    T. MARK JONES,<br><br>                Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, INC. and<br>HOSPIRA, INC.,<br><br>                Defendants. | Case No.: 06-CV-21303-ASG<br><br>Hon. Alan S. Gold |

**DEFENDANT ABBOTT LABORATORIES INC.'S FIRST SET OF REQUESTS
FOR PRODUCTION OF DOCUMENTS AND TANGIBLE
THINGS TO PLAINTIFF UNITED STATES OF AMERICA**

Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 34 of the Federal Rules

of Civil Procedure, requests that Plaintiff the United States of America produce the documents

requested herein by making them available for inspection and copying at the offices of Jones

Day, 51 Louisiana Ave., NW, Washington, DC 20001, or at such other place and in such manner

as may be mutually agreed upon between counsel for the parties, within thirty (30) days from the

date of service of these Requests.

### DEFINITIONS

1.    "Abbott" means Abbott Laboratories, Inc. and Abbott Laboratories and any of
their past or present officials, officers, representatives, agents, assigns, attorneys, employees,
divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or
purporting to act on their behalf or under their control.

1

2.       "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3.       "Arkansas HHS Medicaid Determination" means and refers to a determination by HHS to disapprove of Amendment 88-05 to the Arkansas state Medicaid plan (*see* 53 Fed. Reg. 45,587 (Nov. 10, 1988), and subsequent proceedings before and decisions of the HHS Department Appeals Board on August 22, 1991 (Decision No. 1273) and April 29, 1992 (Decision No. 1329)).

4.       "AWP" or "Average Wholesale Price" shall have the meaning ascribed in paragraphs 44 and 50 of the Complaint.

5.       "Best Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(c)(1)(C).

6.       "Between," when used in regard to the transmittal of information, shall mean any communication by, to, from, among, and for any individual(s) or entity(ies) specified in a particular request.

7.       "CHAMPUS" means Civilian Health and Medical Program of the Uniformed Services and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

8.       "CMS" means "Centers for Medicare and Medicaid Services," its predecessor agencies and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

9.       "Communication" means any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise.  All such communications in writing shall include, without limitation, printed, typed, handwritten, or other readable documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

10.       "Complaint" means and refers to the Complaint filed on or around March 17, 2006 by which the United States of America intervened in certain portions in Case No. 95-1354-CIV-GOLD (severed to a new case number, 06-CIV-21303), pending in the United States District Court for the Southern District of Florida.

11.       "Concern," "concerning," "relating to," or "relate to" means refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly,

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 95-1354-CIV-GOLD

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. | ) <br> ) <br> ) | **FILED IN CAMERA AND UNDER<br>SEAL PURSUANT TO<br>31 U.S.C. § 3730** |
| VEN-A-CARE OF THE<br>FLORIDA KEYS, INC.<br>a Florida Corporation,<br>by and through its principal<br>officers and directors,<br>ZACHARY T. BENTLEY and<br>T. MARK JONES,<br>Plaintiff, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| vs. | ) <br> ) | |
| ABBOTT LABORATORIES, INC., | ) <br> ) | |
| Defendant. | ) | |

## COMPLAINT

The United States brings this fraud action against Abbott Laboratories, Inc. and Hospira,

Inc. (collectively "Abbott") to recover losses sustained by the Medicare and Medicaid programs.

Over the course of several years, Abbott reported inflated pharmaceutical prices that it knew

Medicare and Medicaid relied upon to set reimbursement rates for Abbott's pharmaceutical

products. Abbott's actual sales prices for its pharmaceutical products were far less than the

prices reported by Abbott. By knowingly reporting inflated prices – often 1000% higher than

Abbott's actual prices – Abbott ensured its customers received inflated reimbursement and

profits from Medicare and Medicaid. Abbott then used the public fisc as a marketing tool,

actively promoting government-funded "spreads" between (1) its fraudulently inflated prices and

(2) its actual sales prices as an inducement to its customers. These efforts allowed Abbott to

increase its profits by boosting sales for its drugs.

C.      requiring the drug companies to certify prices directly in writing to the

Medicaid program in response to state requests for particular pricing information.

42.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler

sells a drug to a retail Customer who then administers it to a patient.  WAC is used to refer to the

price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell

it to a retail Customer.

43.     While the majority of states use published AWPs to calculate reimbursement,

approximately nine states (Alabama, Arkansas, Colorado, Florida, Maryland, Massachusetts,

Ohio, Rhode Island, and Texas) use the wholesale acquisition cost ("WAC") to set the EAC.

44.     The AWPs and WACs relied upon by the State Medicaid programs have generally

been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other

price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price

publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the

Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc.

are hereafter referred to as the "Publishers" and their various publications and data services are

hereinafter referred to as "Price Publications."

45.     In addition to relying on the manufacturers' reported prices as published in the

Price Publications, some State Medicaid programs also received price representations directly

from manufacturers, and relied on these representations to confirm the accuracy of the figures

they use to determine state reimbursement amounts.  For example, the State of Texas required

drug companies to submit their prices directly to the Texas Medicaid program in a signed

14

CIVIL ACTION NO: 95-1354-CIV-GOLD

certification attesting to the accuracy of the price information.

### E.    Medicare Reimbursement Formulas

46.    From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug. 42 C.F.R. § 405.517 (1992-1998). In general, Medicare relied on median AWPs to set reimbursement rates.

47.    From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug. Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1998).

48.    From 1999 through 2004, Medicare based its reimbursement for all generic forms of a drug at the lower of (1) 95% of the median published AWP for the drug; or (2) the AWP of the least expensive brand-name drug. 42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).

49.    After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment. If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

50.    Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium known as the *Drug Topics Red Book* ("*Red Book*"), as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

15