## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL DOCKET NO. 1456 ) ) Civil Action No. 06-CV-11337 ) Lead Case No. 01-CV-12257 |
| _____ | ) |
| THIS DOCUMENT RELATES TO: *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.* | ) Judge Patti B. Saris ) ) Magistrate Judge Marianne B. Bowler |

## ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DOCUMENTS AND DEPOSITION TESTIMONY

The United States' motion to compel seeks two types of relief, both of which should be denied. *First*, the Government demands a variety of documents that it claims have been withheld by Abbott. As discussed below, however, the Government's arguments with respect to several of the categories of documents at issue are grounded on misconceptions, or outright misstatements of fact and law. Abbott has complied in all respects with the orders of Magistrate Judge Bowler and the mandates of Rule 26, and it will continue to do so. The Government has no legitimate complaint with respect to document production.

*Second*, the Government returns yet again requesting the depositions of Duane Burnham (Abbott's former CEO and Chairman of the Board of Directors) and Thomas Hodgson (Abbott's former President and COO). Of course, this issue already has been fully vetted through multiple rounds of briefing and an argument before Magistrate Judge Bowler, who granted a protective order preventing these depositions, which order was upheld by this Court over the Government's objections. The only thing that has changed since the first time the Government lost this issue is that Abbott has provided extensive 30(b)(6) testimony covering all of the issues that the Government seeks to discuss with Messrs. Burnham and Hodgson, thus making their individual depositions even less appropriate. Beyond the desire to harass Abbott and its former senior

executives, the Government has not and cannot provide any justification for deposing these gentlemen. The Court's prior ruling barring these depositions should stand.

## I. THE GOVERNMENT'S MOTION TO COMPEL DOCUMENTS SHOULD BE DENIED.

### A. As to Several Categories of Documents Identified by the Government, There Is No Dispute That Requires the Court's Intervention.

Perhaps because this motion was filed without any effort to confer with Abbott about its precise contents, the Government complains of disputes over certain categories of documents where no legitimate dispute actually exists.

#### 1. Personnel and Working Files of the Former Alternate Site Sales Force.

Abbott has agreed to produce responsive documents from the personnel and working files of all persons who served in the field sales force (meaning sales people distributed in territories across the country) of the Alternate Site business sector of Abbott's former Hospital Products division at any time between 1991 and 2003. This time-consuming task involves collection of files relating to over 75 individuals, only 4 of whom remain in Abbott's employ today.

Abbott has completed its production of all responsive personnel files in its possession, custody or control. As for the so-called "working files," Abbott has agreed to produce responsive materials within its possession, custody, or control from the former sales force members, and has gone to great lengths both to collect and produce these materials and to keep the Government informed of the progress of this effort (as ordered by Magistrate Judge Brown). (*See* Ex. A; *see also* 1/31/08 Tr. of Proceedings, attached as Ex. B, at 101-103).) There is no reason for Court intervention on this subject, as Abbott has not refused to produce the requested information.

### 2. Alternate Site Share Drive.

The Government suggests that, after the creation of Hospira in 2004, Abbott and Hospira had joint access to a share drive used to store electronic information. (Mot. at 5.) That is false. The "share drive" in question was accessible by Alternate Site employees while they were in Abbott's employ, and the server containing the share drive was transported to Hospira after the formation of that company. It was never jointly used by Abbott and Hospira. (*See* Declaration of Alexandra G. Buck ("Buck Decl.," attached as Ex. C at ¶ 10-11; *see also* 3/13/08 Deposition of Alexandra G. Buck ("Buck Tr."), attached as Ex. D, at 134-135.) Regardless, Abbott has worked with Hospira to collect responsive emails and other electronic documents from that share drive relating to the core group of custodians relevant to this action, and Abbott already has produced those materials to the United States. (Buck Decl. ¶ 11.) Abbott also has agreed to collect documents from the share drive for additional custodians (expanding the original list to encompass all current and former Abbott personnel deposed in this case), and to produce responsive documents, if any, to the Government. (*Id.* ¶ 12; Buck Tr. at 207.) Abbott is currently working to complete that effort as quickly as possible. (Buck Decl. ¶ 12.) There is no dispute here.

### 3. CHIP Data.

The Government's arguments with respect to CHIP data are a complete red herring. The CHIP (Comprehensive Homecare Information Prescription) system was a proprietary computer system utilized by the former Home Infusion Services department at Abbott. CHIP assisted Home Infusion pharmacy customers with pharmacy management, inventory control, patient medical records management, reimbursement services, and various other management and pharmacy tools. When the Home Infusion Services department was closed down in 2002, the

CHIP system was decommissioned, and the information from that system exists today only on data tapes.

To be clear, Abbott has not in any way resisted the Government's attempts to secure relevant information from the CHIP tapes. It is important to bear in mind, however, that the vast majority of the CHIP data relates to matters like inventory records and the like, and has nothing whatsoever to do with this case. Accessing the tapes is a significant undertaking, both in terms of expense and sheer technological process. In order to restore data from the tapes, Abbott has to acquire specialized hardware compatible with the software utilized by CHIP. Since this is a long-decommissioned program, such hardware is difficult to find. Additionally, the mainframe data must be copied to a PC format so that the Government can use it. The restored data cannot be read by a personal computer without this step and, given the volume of data at issue, this process takes considerable time. Finally, the data must be put into a text format for actual production, another step that takes considerable time. Thus, the Government's requests must be balanced against these practical burdens.

The Government all along has stated that its interest in the CHIP data is (i) to determine the full extent of the claims submitted through Home Infusion to Medicare and Medicaid; and (ii) to determine the amount that Abbott was paid for the Home Infusion services provided. To meet this request, Abbott restored (at significant expense) the complete claims and accounts receivable files from the CHIP system and produced that data to the Government in July 2007. These files contain all of the information about the claims submitted and Abbott's revenues. This data production was not limited by drug, by payor, or by time period; all data contained in those two files was produced. Due to the extensive size of this production, 62 CDs were

required to transmit the data. Abbott also produced all of the data dictionaries associated with the system.

Now, however, the Government seeks 28 additional files from this defunct system based, in many cases, on no more than the name of the file. For example, the Government seeks the Item Rx Data Physical file, which contains descriptions of product labels for the drugs prescribed (all of which are publicly available) and the Medicare Fee Schedule file, which simply contains a download from CMS's own website (and is thus already within the Government's possession). To buttress its unreasonable demand for this host of additional files, the Government laces its brief with snippets of testimony taken out of context from the deposition of Jerry Goldson, a 30(b)(6) witness proffered by Abbott to explain the CHIP data. (Mtn. at 6.) Fairly viewed, Mr. Goldson's testimony lends no support to the Government's claims.

He testified repeatedly that Abbott does not have an operational CHIP system; the only thing that remains is data contained on tapes. With respect to files outside of the claims and accounts receivable files already produced, Mr. Goldson testified that, in an effort to organize the data in a meaningful way, Abbott made several attempts to query various other files and produce the data in spreadsheet format. He made clear that these other files were merely considered as "candidates to be included" in the production and may have been "potentially relevant," but that this entire exercise was eventually scrapped to avoid any suggestion by the Government that Abbott had in any way manipulated or limited its data production. (*See* 3/6/08 Deposition of Jerry Goldson, attached as Ex. E, at 233.) The Government attempts to twist this testimony into some sort of admission that every file on the list of potential "candidates" is actually relevant, which is not consistent with Mr. Goldson's testimony.

Finally, in an effort to avoid an unnecessary dispute, Abbott offered to provide the Government with information about the amount of data contained in the additional 28 files in question (which Abbott anticipates will be enormous). The Government initially indicated that it would then determine whether it actually wants the data files or not. Abbott's processing of the data is well underway, but, despite its best efforts, Abbott is not yet in a position to be able to provide complete information about the file sizes. Abbott expects to be able to provide such information within the next 10 days. If the Government determines that it wishes to have all or part of the additional data at issue, Abbott will complete the processing and the PC conversion discussed above, and will provide the data. Again, however, Abbott believes that the data in these additional fields will be largely, if not completely, irrelevant to the issues in this case. Thus, there is no reason to entertain the Government's request for an extension of time to submit its expert reports. If necessary, the Government can always seek leave to supplement its reports later.

> **B.     As to the Remaining Categories of Documents, the Government's Motion Should Be Denied.**
>
>> **1.     The Government Is Not Entitled to Non-Responsive Documents from Former Alternate Site Field Sales Representatives.**

The Government has issued document subpoenas to several persons who formerly worked in the Alternate Site sales force, but who are no longer in Abbott's employ. Each of these persons worked with counsel to collect potentially responsive documents, and then counsel reviewed the documents and produced those that were actually responsive to the Government's subpoenas. As one would expect, this process of culling out non-responsive documents sometimes resulted in production to the Government of fewer documents than were initially collected. Now, based as usual on nothing more than its own say-so, the Government demands that *all* of the documents collected be produced. (Mot. at 4-5.)

This is overreaching, and it should be rejected. The Government is entitled to documents responsive to its subpoenas, consistent with the numerous orders of this Court prescribing the metes and bounds of permissible discovery, but nothing more. It has no evidence whatsoever that responsive materials have been withheld. The mere fact that individuals may not have produced every single document in their possession is hardly a surprise; they may have collected a host of documents that have absolutely nothing to do with this case. The Government has no right to such irrelevant materials, and it cites no authority to suggest otherwise. Indeed, the Government in its own productions routinely refuses to produce documents collected by its custodians but that Government counsel determines to be irrelevant or not responsive. It cannot impose a different standard upon Abbott.

### 2. The Government Has No Valid Complaint With Respect to Email Preservation and Production.

Without factual support, the Government argues that Abbott has failed to preserve and produce responsive emails created prior to 2002, and requests that Abbott immediately be forced to (a) provide some sort of accounting for how and why relevant emails have been destroyed; (b) produce a collection of about 18,000 pre-2002 emails; and (c) restore email back-up tapes from 1997. (Mot. at 2.) These arguments are demonstrably false as a matter of fact, and are completely at odds with the law. The Government's request for relief, grounded on such unstable foundations, should therefore be denied.

#### (a) Quite Unlike the Government, Abbott Has Made Substantial and Continuous Efforts to Preserve Relevant Emails.

The Government asserts that "Abbott was obligated to preserve all relevant documents, including emails, as early as 1996 (when Abbott was first put on notice of the government's investigation)." (Mot. at 2 n.1.) As an initial matter, it is important to note that this is not at all the lens through which the Government views its own preservation obligations. To the contrary,

despite obviously knowing of its own investigation of Abbott at least as early as 1996, and despite being directly asked in 2000 to preserve relevant documents (*see* Ex. F), the Government made no effort whatsoever to tell employees at CMS and other critical agencies not to destroy documents relevant to this matter until January 2007 – months after this case was unsealed and more than a decade after it was filed. (*See* 03/20/2007 Deposition of Victoria Robey, Ex. G, at 77.)[1] Even to this day, it appears that the Government (which is bringing claims in this case for recovery of payments made through state Medicaid programs) has done nothing to ask the various state Medicaid agencies to preserve relevant documents. (*See, e.g.,* 03/14/2008 Deposition of Cody Wiberg, Ex. H, at 57 (Minnesota Medicaid representative not aware of any instruction from DOJ to preserve relevant documents); 03/12/2008 Deposition of Leo Sullivan, Ex. I at 27 (Tennessee Medicaid representative never asked to retain documents relating to AWP).) Suffice it to say that, with respect to document preservation, the Government casts stones from a very thin glass house. (*See* Dkt. No. 4711.)

Abbott, on the other hand, *has* made systematic and continuous efforts to preserve documents relevant to this case. Within days of receiving the first subpoena from the Department of Justice in 1996, Abbott instructed its employees to preserve all potentially responsive documents (including emails or other electronic documents). (*See* Ex. J.) This written instruction has been repeated and reinforced dozens of times over the ensuing years as Abbott received new subpoenas or was named in lawsuits relating to AWP.[2] (*See* Buck Decl. ¶ 8.) Employees were specifically instructed by Abbott to print or to folder responsive electronic

---

[1] Not coincidentally, this directive from the Government issued within days after Abbott served notice on the Government of its intention to conduct a Rule 30(b)(6) deposition regarding the Government's record retention practices.

[2] With nothing to hide, Abbott has produced to the Government unredacted versions of its litigation hold notices relating to AWP matters. The Government dont has refused to do the same.

documents, including emails, so that those materials were preserved. (*Id.*; *see also* Buck Tr. at 18, 49, 77, 87; 02/08/2008 Deposition of Ellen Klaus ("Klaus Tr."), Ex. K, at 205, 263.) Abbott enforced this preservation directive by issuing it multiple times, and by dispatching its in-house paralegals to meet with relevant custodians in the organization to secure any responsive information and to reinforce the obligation to preserve and collect such material. (Buck Decl. ¶ 8; Buck Tr. at 85-86, 107, 296; Klaus Tr. at 173-175, 203.)

Through this consistent effort over the course of more than a decade, Abbott has more than met its preservation obligations. *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("In recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished."). In light of these extensive measures put in place to preserve emails by printing and/or foldering them electronically, Abbott was certainly not required, as the Government appears to contend, to go to the extraordinary length of suspending its practice of regularly recycling disaster-recovery email back-up tapes starting in 1996. *See e.g., Oxford House, Inc. v. City of Topeka,* No. 06-4004, 2007 WL 1302539, *4 (D. Kan. Apr. 27, 2007) ("even if [the disputed] back up tapes were conclusively shown to possess the deleted e-mail communications, 'as a general rule, a party need not preserve all backup tapes even when it reasonably anticipates litigation.' When parties put a litigation hold policy on destruction of documents in response to pending litigation, 'that litigation hold does not apply to inaccessible back-up tapes (e.g., those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy.' The record in this case indicates that the back-up tapes are used for disaster recovery purposes.") *(citing Zubulake v. UBS Warburg LLC,* 220 F.R.D. 212, 217 (S.D.N.Y. 2003))[3]; *id.* at 216

---

[3] The HPD back-up tapes at issue here were utilized by Abbott for disaster recovery purposes, not for archiving and retrieving information. (Buck Decl. ¶ 2, 7.)

(organizations need not preserve "every shred of paper, every e-mail or electronic document, and every back-up tape"); *Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1997 WL 33352759, at *4 (E.D. Ark. Aug. 29, 1997) ("[T]o hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail."); *Wiginton v. CB Richard Ellis, Inc.*, No. 02 C 6832, 2003 WL 22439865, at *4 (N.D. Ill. Oct. 27, 2003) (noting that a litigant need not "preserve every single scrap of paper in its business"). Indeed, the burden to Abbott of pursuing such a course would have been astronomical; just the cost of tapes and storage alone to preserve all back-up tapes from 1996 to 2006 (without regard to associated costs for necessary hardware and the like) would have been about $18,000,000. (Buck Decl. ¶ 3.) That is unreasonable on its face, particularly where the record plainly shows that Abbott was able to preserve relevant email by other means, making the back-up tapes, at best, redundant. (*Id.* ¶ 8-10.)

It is beyond dispute that Abbott put in place procedures to preserve and collect relevant emails, and that its procedures were effective. There is simply no evidentiary support for the Government's claim that a "large amount" of "relevant pre-2002 emails" were destroyed by Abbott. (Mot. at 3.) To the contrary, the record shows that hundreds of such emails – stretching back to 1996 and even before – have in fact been collected and produced in this case. (*Id.* ¶ 9; *see also* Ex. L (group exhibit of 10 representative emails from 1995 through 2002.) If any party should be called to submit a "sworn accounting" about the destruction of relevant documents, it is the Government, not Abbott.

### (b) Abbott Is Not Withholding 18,000 Pre-2002 Emails.

The Government asserts in its motion that Abbott has in its possession a collection of 18,000 pre-2002 emails that it has not yet produced. (Mot. at 2-3.) The Government is correct that Alex Buck, Abbott's 30(b)(6) designee with respect to electronic document discovery,

testified that Abbott had produced to the Government about 18,000 emails collected from an electronic source. (Buck Tr. at 37-38.) The Government disputed this contention at the time of the deposition, however, stating that it had received fewer than 18,000 emails in the production in question, so Abbott agreed to look into this issue. After the deposition, Abbott conducted a further investigation, and concluded that Ms. Buck's initial understanding about the volume of responsive emails produced to the Government was mistaken. About 18,000 emails were indeed *collected* from the electronic source, but many of those emails were not responsive to the Government's requests, and thus the subset of documents actually produced was less than 18,000. (Buck Decl. ¶ 11.) Abbott regrets the confusion on this issue, but the bottom line for purposes of this motion is that Abbott is not withholding 18,000 responsive emails. The initial collection of about 18,000 emails has been reviewed and all responsive documents from that collection have already been produced to the Government. (*Id.*)

### (c) The Government Has No Right to Discovery of Inaccessible Back-Up Tapes.

Finally, the Government urges the Court to force Abbott to undertake the expense of restoring and reviewing back-up tapes that cover a one-month period in the fall of 1997, in order to determine whether those tapes contain any responsive emails. (Mot. at 2-3.) There is no legitimate basis for the Government's request.

Rule 26(b)(2)(B) specifically instructs that "a party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." Courts have recognized that back-up tapes utilized for disaster recovery purposes are not "reasonably accessible" under Rule 26. *See*, *e.g.*, *Quinby v. WestLB AG*, 2006 WL 2597900 at *7 (S.D.N.Y. Sept. 5, 2006) ("Backup tapes are considered an inaccessible format"); *see also Quinby v. West LB AG*, 2005 WL 3453908 at *7 &n.8 (S.D.N.Y.

Dec. 15, 2005) (back-up tapes are "inaccessible"); *Hagemeyer N.A. Corp. v. Gateway Data Sci. Corp.*, 222 F.R.D. 594, 600 (E.D. Wis. 2004) (noting "unique burden" of producing back-up tapes).

Before filing this motion, the Government was well aware that the 1997 back-up tapes in question were maintained by Abbott for disaster recovery purposes. (Buck Tr. at 54.) When Abbott was served with a subpoena from the Department of Health and Human Services in 1997, Abbott decided to put on hold the back-up tapes of relevant servers from that specific point in time, in addition to taking various other preservation measures as described above. (Buck Decl. ¶ 6; Buck Tr. at 65-66.) Thus, the back-up tapes at issue contain a snapshot of data from September 1997 to October 1997 that was backed up for disaster recovery purposes. (*Id.*) In response to the Government's demands, Abbott initially cataloged the tapes and determined that approximately 40 tapes may contain email files (though this cannot be confirmed without undertaking the expense of actually restoring the tapes). (*Id.*) Based upon the volume of data, the cost to restore, process, de-duplicate, review and produce material from these back-up tapes relating just to a discrete group of 72 former Abbott HPD employees (a group that would comprise all former HPD employees who have been deposed in this matter and several others) would be approximately $3,300,000. (*Id.* ¶ 5-6.) Were Abbott required to expand this effort to include *all* former HPD personnel, the cost would be exponentially higher. (*Id.* ¶ 6.) The Court need look no further to conclude that Abbott has fully met its burden of showing that these tapes are not "reasonably accessible," because of undue burden or cost, and accordingly Abbott is not obligated to produce them under Rule 26(b)(2)(B).

Despite its awareness that the 1997 back-up tapes were kept for disaster recovery purposes, the Government fails even to argue that good cause exists for the Court to order the

restoration of these tapes. That is just as well, because no such finding can be made. The tapes at issue contain, at most (and, again, even this is unclear), emails that were on the Abbott servers during a one-month period from September to October 1997. As discussed above, however, methods to preserve emails, independently of backup tapes (i.e., printing and foldering), had been put in place as of this time period, and the effectiveness of those methods is manifested by the fact that responsive emails from 1997 and before have been collected and produced in this litigation. (*See* Ex. L.)

Against this backdrop, the factors set forth in Rule 26(b)(2)(C)(i) – (iii) clearly counsel against the restoration of these inaccessible back-up tapes: the discovery sought can be and has been obtained from less burdensome and less expensive sources, such as the emails that already have been preserved, collected and produced; the Government has had ample opportunity to obtain any possible information that may be contained in whatever email correspondence might be on these tapes through the depositions (now more than 80) of Abbott employees; and the expense of this proposed exercise, at least $3.3 million, outweighs any possible benefit to this case. Particularly where there is no evidence to suggest that these tapes actually contain emails that have not otherwise been captured and produced to the Government, this extraordinary burden simply cannot be justified. *Concord*, 1997 WL 33352759, at *9 (refusing to order a defendant to restore and search back-up tapes that might contain deleted email because "the limited gains from a search of such tapes would be outweighed by the substantial burden and expense of conducting the search")[4]

---

[4] If the Court is at all inclined to order the restoration of these tapes (and it should not do so), then it should order that the costs of this exercise be borne by the Government. Rule 26(b)(2)(B) provides that the Court may "specify conditions for the discovery" of inaccessible material, and it is uniformly recognized that an appropriate condition is the shifting of costs of production to the requesting party. *See, e.g., Medtronic Sofamor Danek, Inc. v. Michelson*, 229 F.R.D. 550, 558, 562 (W.D. Tenn. 2003); *Quinby v. WestLB AG*, 245 F.R.D. 94, 111 (S.D.N.Y. 2006).

## II. THE GOVERNMENT'S MOTION TO COMPEL DEPOSITION TESTIMONY FROM MESSRS. BURNHAM AND HODGSON SHOULD BE DENIED, AGAIN

The Government's latest request to depose Duane Burnham (Abbott's former CEO and Chairman of the Board of Directors) and Thomas Hodgson (Abbott's former President and COO) should seem familiar, for the Court just ruled on this very same issue barely one month ago – upholding, over the Government's objections, Magistrate Judge Bowler's issuance of a protective order barring these depositions. (*See* 03/12/08 Electronic Endorsement.) The Government did not seek reconsideration of the Court's decision, and yet it now files a motion to compel, arguing that the depositions should go forward. This is pure harassment, and it should be stopped.

In its previous briefing, Abbott has addressed in detail the uncontrovertable fact that these depositions should not proceed because Messrs. Burnham and Hodgson do not possess any unique personal knowledge relevant to this matter that cannot be obtained by the Government in some less burdensome fashion. (*See* Dkt. Nos. 4692, 4782.) Magistrate Judge Bowler agreed and ordered that these depositions not be had. This Court upheld that ruling, and that alone should end this inquiry. The Government certainly has not offered any new evidence that compels a different ruling. To the contrary, the Government's demands are, if anything, even more frivolous now than when they were made initially.

As to Mr. Burnham, the Government states (again) that it wishes to question him about his lobbying activities on behalf of Abbott in 1997 in conjunction with certain proposed legislation that would affect Medicare drug reimbursement rates. (Mot. at 7-12.) Mr. Burnham already has stated in a declaration that he has no recollection of ever participating in this or any

other lobbying relating to drug reimbursement.  (*See* Burnham Declaration, Ex. M, ¶ 3.)[5] Beyond dropping needless, pejorative references to this as a "know nothing" declaration – the same tactic the Government employed in its first losing effort to compel this deposition,[6] the Government offers absolutely nothing to controvert Mr. Burnham's statements.  Mr. Burnham has averred that he does not recall the alleged lobbying activities, and thus there is no basis to force him to appear for a deposition.

Moreover, the Government cannot credibly argue that Mr. Burnham has some unique, relevant information about Abbott's lobbying efforts that the Government has not been able to explore in some other way.  Abbott witnesses (including the person who headed Abbott's lobbying group in 1997 and his supervisor, as well as the persons who currently direct Abbott's lobbying) have provided *six days* of testimony dedicated to Abbott's lobbying activities.  This included a corporate designee who testified, pursuant to Rule 30(b)(6), as to Abbott's lobbying, specifically including all positions that Abbott took in conjunction with the 1997 legislation that the Government wishes to discuss with Mr. Burnham.  Abbott has been more than reasonable in accommodating the Government's endless requests for information about lobbying – particularly given the fact that Abbott's lobbying efforts are privileged under the First Amendment, and thus could never be the source of any liability in this case. See U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances"); *see also Eastern R.R. Presidents Conf. v Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) (the First Amendment right to petition covers lobbying efforts, and no civil or

---

[5] The Government's assertion that Mr. Burnham's declaration "contains no information on his direct lobbying efforts in 1997" (Mot. at 11) is demonstrably false.  Mr. Burnham addresses this issue squarely and declares that he has no recollection of any such activities.  (Ex. M ¶ 3.)

[6] The Government was specifically cautioned by Magistrate Judge Bowler about the impropriety of these same accusations during oral argument, but apparently sees fit to continue making them.  (*See* Ex. B at 123.)

other liability can be based on such efforts); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) (same).  The Government has harassed Abbott about its privileged lobbying efforts for months – securing Abbott's documents and deposing numerous personnel about these issues.  There is no basis for adding Mr. Burnham's deposition to this discovery pile, especially when he already has averred that he has no memory of the alleged events.

The Government's case is no better with respect to Mr. Hodgson.  The sole basis for the Government's request to depose Mr. Hodgson is that he was offered as a corporate designee in another case.  (Mtn. at 7.)  The Government conveniently omits that this other action related exclusively to Lupron® (a drug not at issue in this case, and which the Court already has recognized as irrelevant), and, more importantly, that Mr. Hodgson was only made corporate designee as to the issue of the nature of the organizational relationship between Abbott and TAP and, relatedly, Abbott's knowledge of certain of TAP's Lupron®-related business practices.  (*See* Dkt. No. 4782 at 5.)  He was not offered as a designee for any subject related to AWP.

After well more than a year of expansive discovery, the Government still has no evidence whatsoever to contradict Mr. Hodgson's declaration attesting that he has no unique personal information relevant to this case.  (*See* Ex. N.)  Indeed, the Government has not offered a shred of evidence in this motion to suggest that Mr. Hodgson has *any* information relevant here.  There is no basis to force Mr. Hodgson, whose responsibilities include serving on the Board of Directors of two public and numerous private companies (*id.*), to submit to a deposition based on such a scant record.

### III.  CONCLUSION

For these reasons, Abbott respectfully requests that the Court deny the Government's motion to compel in its entirety.

Dated:  April 25, 2008                                Respectfully submitted,

/s/  Brian J. Murray
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories Inc.*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on April 25, 2008, the foregoing **ABBOTT LABORATORIES INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL DOCUMENTS AND DEPOSITION TESTIMONY** was served upon all counsel of record in this action electronically by posting a true and correct copy of same via Lexis-Nexis.

/s/ Carol P. Geisler

CHI-1644091v1