UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) THIS DOCUMENT RELATES TO ) *U.S. ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, ) No. 06-CV-11337-PBS ) | MDL NO. 1456  CIVIL ACTION: 01-CV-12257-PBS  Judge Patti B. Saris  Chief Magistrate Judge Marianne B. Bowler |

### DECLARATION OF ALEXANDRA G. BUCK

1. My name is Alexandra G. Buck. I am above the age of twenty-one (21), of sound mind, and capable of making this declaration. I have been employed by Abbott Laboratories ("Abbott") since May of 2007. I am the Senior Counsel and Director of e-discovery and Records Management. I have personal knowledge of the facts set forth below. I am authorized by Abbott to give this declaration, and verify that the facts below are true and correct to the best of my knowledge.

2. From a review of the United States' *Motion to Compel Documents and Deposition Testimony*, I understand that the United States suggested that Abbott should have ceased its practice of regularly overwriting data back-up tapes containing email and other electronic documents in 1996, and should have preserved every back-up tape through to the present time. That suggestion is extraordinary. The practice at Abbott, and every other company I am aware of that maintains electronic data, is to overwrite back-up tapes at some regular interval, such as every 30 days. Within Abbott, back-up tapes are not a means of archiving data; they are instead generally utilized for disaster recovery purposes, so that if a system failure occurs, a company has a means of recovering its contemporaneous data. Consistent with this purpose (and the fact

that maintaining such tapes is very expensive), back-up tapes are routinely recycled, or overwritten, at regular intervals.

3. After an investigation, I have determined that, if Abbott were to have suspended its practice of recycling back-up tapes in 1996, it would have cost approximately $18,000,000 just to maintain and store all of the back-up tapes for Abbott's Lake County servers (which would cover the corporate headquarters, including the former Hospital Products Division ("HPD")) through 2006. This estimate only includes the cost of purchasing new tapes for every cycle, rather than overwriting existing tapes, and storage. It does not include other significant costs that Abbott would have had to incur under the United States' theory, such as the cost of maintaining hardware capable of reading the back-up tapes and payments for associated service agreements. Since back-up hardware and software has changed repeatedly during this 10-year period, it would have been necessary for Abbott to maintain several hardware systems, as well as the maintenance service agreements, in order to restore and read these back-up tapes. These incidental costs would increase the cost to Abbott substantially.

4. The only HPD back-up tapes that exist at Abbott for the period 1996-2006 are (i) certain tapes covering the period 2002-2004; and (ii) certain tapes covering a brief period in 1997.

5. The 2002-2004 back-up tapes were restored by Abbott pursuant to a court order in the MDL Litigation (Case No. 01-12257PBS). Abbott and plaintiffs in that action agreed on a list of 39 custodians – all former HPD employees, the majority of whom I understand have been deposed in this matter as well – and Abbott restored information on the back-up tapes for that group of custodians. The emails restored from these 2002-2004 back-up tapes that were responsive to document requests served by the United States in this matter were produced to the Department of Justice on February 29, 2008.

6.  The 1997 back-up tapes have never been restored. In 1997, Abbott requested that a snapshot of its HPD back-up tapes be placed on hold in response to a subpoena issued by the Department of Health and Human Services. These back-up tapes contain a snapshot of data from September 1997 to October 1997 and were for disaster recovery purposes. After initially cataloging the tapes, it appears that approximately 40 tapes may contain email files (though this cannot be confirmed without undertaking the expense of actually restoring the tapes). After consulting with Abbott's outside vendors, I have determined that the cost to restore, process, de-duplicate, review and produce material from these back-up tapes solely relating to 72 former Abbott HPD employees (the original 39 custodians, plus all other former HPD employees who have been deposed in this matter) would be approximately $3,300,000. Were Abbott required to expand this effort to include *all* former HPD personnel, the cost would be exponentially higher.

7.  There is no justification for restoring these back-up tapes, for there is no reason to believe that these tapes contain any responsive emails that have not otherwise been preserved and produced to the United States. It is important to remember that back-up tapes are kept for purposes of disaster recovery; they are not a reasonable means of preserving and collecting emails for purposes of litigation. These important tasks are accomplished in other ways.

8.  In terms of preservation, Abbott has been proactive. Within days of receiving the first subpoena from the Department of Justice in 1996, Abbott instructed its employees to preserve all potentially responsive documents (including emails or other electronic documents). This written instruction has been repeated and reinforced dozens of times over the ensuing years as Abbott received new subpoenas or was named in lawsuits relating to AWP. Employees were specifically instructed by Abbott to print or to folder responsive electronic documents, including emails, so that those materials were preserved. Abbott enforced this preservation directive by issuing it multiple times, and by dispatching its in-house paralegals to meet with relevant

custodians in the organization to secure any responsive information and to reinforce the obligation to preserve and collect such material.

9.  Although the United States claims in its motion that a "large amount" of "relevant pre-2002 emails" were destroyed, there is no evidence to support that assertion. To the contrary, there is no doubt that Abbott employees followed the directive and preserved emails, including those created pre-2002. Although email was not nearly as widely used within HPD in the late 1990's as it was after 2000, I am informed that hundreds of pre-2002 emails (including dozens from as early as 1996 and 1997) have been produced to the United States in this case. Abbott has no reason to believe that any relevant emails have been destroyed.

10. As mentioned above, employees were instructed to preserve emails either by printing them out or by foldering them electronically. Printed emails were collected by Abbott in paper form and those that were responsive have been produced in this case. Emails also could be foldered electronically on a share drive accessible to HPD employees (the "HPD Share Drive").

11. At the time Hospira was created in 2004, the HPD Share Drive was moved to Hospira (it was never jointly used by Abbott and Hospira employees, as the United States incorrectly asserts). To respond to document requests in this case, Abbott worked with Hospira to search the HPD Share Drive for the original 39 custodians, and has produced to the Department of Justice all responsive emails from the time period 1991-2003. As a point of clarification, I testified at my deposition on March 13, 2008, based upon information provided to me, that this effort led to approximately 18,000 emails being produced to the Department of Justice. After the deposition, and upon further investigation, I have determined that this is not correct. I now understand that approximately 18,000 emails total were *collected* from the HPD Share Drive for the 39 custodians, but that not all of those emails were responsive to document requests from plaintiffs. After a review by counsel for responsiveness, a smaller subset of

documents was produced. Thus, contrary to the assertions in the United States' motion, Abbott is not withholding "18,000 pre-2002 emails." All responsive emails from the HPD Share Drive for the 39 custodians have been produced.

12. In addition to this search, Abbott has agreed to expand its collection effort by working with Hospira to collect material from the HPD Share Drive relating to all other current and former Abbott employees (HPD or otherwise) who have been deposed in this case beyond the original group of 39. This is a substantial exercise, and Abbott is making every effort to complete it as quickly as possible.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Alexandra G. Buck

SWORN TO AND SUBSCRIBED BEFORE ME
This 25th day of April, 2008.

_____
NOTARY PUBLIC
STATE OF ILLINOIS

"OFFICIAL SEAL"
TRACY CAROLLO
Notary Public, State of Illinois
My Commission Expires 04/14/09