Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) |
| PRICE LITIGATION | ) MDL No. 1456 |
| ---------------------------------) | Civil Action |
| This document relates to: | ) No. 01-12257-PBS |
| United States of America, | ) |
| ex. rel. Ven-a-Care of the | ) |
| Florida Keys, Inc., | ) Hon. Patti Saris |
|      vs. | ) |
| Abbott Laboratories, Inc., | ) Magistrate Judge |
| CIVIL ACTION NO. 06-11337-PBS | ) Marianne Bowler |

---------------------------------X

VIDEOTAPED DEPOSITION OF

ALEXANDRA GRIGORAS BUCK

MARCH 13, 2008

CHICAGO, ILLINOIS

Buck, Alexandra Grigoras                            March 13, 2008
                    Chicago, IL

Page 18

1   A.  Nothing else specifically.
2   Q.  What's Miss Campbell's position?
3   A.  She's a parallel in our Litigation
4   Group at Abbott.
5   Q.  Okay, did you discuss anything else
6   with Miss Campbell?
7   A.  No.
8   Q.  Okay. Miss Klaus, what did you discuss
9   with Miss Klaus?
10  A.  We discussed generally with Miss Klaus
11  her efforts to collect and preserve documents for
12  this litigation.
13  Q.  And what did she tell you?
14  A.  She told me that she -- with respect to
15  custodians related to this litigation, that she
16  met with such custodians and collected documents
17  from such custodians, helped them -- helped some
18  custodians search their computers to print out
19  documents.
20  Q.  Okay, anything else?
21  A.  Nothing else specific, no.
22  Q.  Did she identify the custodians, who

Page 19

1   she helped?
2   A.  No.
3   Q.  Did you ask?
4   A.  No.
5   Q.  How long was your conversation with
6   Miss Klaus?
7   A.  Probably about an hour.
8   Q.  When was it?
9   A.  It was either the 11th or the 12th.
10  Q.  Of this month?
11  A.  Yes, Monday or Tuesday.
12  Q.  Okay. And when was your conversation
13  with Miss Campbell?
14  A.  Same, either Monday or Tuesday of this
15  week.
16  Q.  And with Mr. Anderson?
17  A.  Same answer, Monday or Tuesday of this
18  week.
19  Q.  Okay. Were those the same days that
20  you were also meeting with counsel?
21  A.  That's correct.
22  Q.  Did counsel participate on these calls?

Page 20

1   A.  Yes, they did.
2   Q.  Okay. And with Miss Klaus -- I might
3   have asked you this before, but did you speak
4   with her over the phone?
5   A.  Both over the phone and in person.
6   Q.  In total for an hour or --
7   A.  Yeah, I would say an hour, maybe two
8   hours.
9   Q.  Okay, when did you meet with her in
10  person?
11  A.  Well, she works right below me, so I
12  would --
13  Q.  Okay.
14  A.  -- I would see her sporadically
15  throughout the two days.
16  Q.  Oh, throughout the 11th and 12th?
17  A.  Correct.
18  Q.  Okay. So it occurred in -- both the
19  telephonic conversation and the meeting in person
20  occurred sometime on the 11th and 12th?
21  A.  Correct.
22  Q.  Okay. Did Miss Klaus tell you anything

Page 21

1   else?
2   A.  No.
3   Q.  Is there anything else that you can
4   remember about the specifics that she discussed
5   with you in this one to two-hour period?
6   A.  Miss Klaus?
7   Q.  Yes.
8   A.  No.
9   Q.  Okay, do you remember what you asked of
10  her?
11  A.  I asked for general background on her
12  collection efforts in this case.
13  Q.  Okay. Anything else?
14  A.  Not that I can recall.
15  Q.  Okay. Mr. Julian?
16  A.  Yes, Mr. Julian.
17  Q.  Who is Mr. Julian?
18  A.  Tim Julian is a current Hospira
19  employee, and he was -- I don't know his title
20  exactly, but he was the head of IT for HPD just
21  prior to the spin.
22  Q.  And how long did you speak with him?

Buck, Alexandra Grigoras                              March 13, 2008
                       Chicago, IL

Page 38

1  17,000, 18,000 e-mails.
2      Q.  Is that their recent production that
3  we've received over the past couple of weeks, do
4  you know?
5      A.  That, I don't know.
6      Q.  When was this search conducted?
7      A.  I don't know.
8      Q.  Do you know what the earliest e-mail
9  was -- the earliest e-mail -- the date of the
10 earliest e-mail that was produced?
11     A.  I don't know.
12     Q.  Okay, going back to Miss Markasey, do
13 you know what the exact six dates were that were
14 searched for this '02 through 2004 search?
15     A.  Unfortunately, I don't.
16     Q.  Okay.  Now, what is de-dupe?
17     A.  De-dupe means de-deduplication.  So if
18 one exact copy of a file exists, we would take
19 that out, and you find that by comparing what is
20 called an MD5 hash ID.  Every electronic document
21 has its own unique MD5 hash ID.  Therefore, if
22 two documents have the same MD5 hash, they're

Page 39

1  absolutely the same 1s and 0s in every way, shape
2  and form.
3      Q.  So you can just take out the duplicate?
4      A.  Correct.
5      Q.  Okay.  And is that what you meant by
6  comparing the MD5 hash identifier?
7      A.  Correct.
8      Q.  Okay, so as part of the -- when you
9  said "MD5" -- and is it M or N?
10     A.  M as in Mary.
11     Q.  Okay.  That's the process of culling
12 out the duplicate document?
13     A.  Correct.
14     Q.  Okay, and what does it mean when you
15 de-duped by custodian as opposed to some other --
16 whatever you said?
17     A.  Sure.  The most conservative way of de-
18 duping is de-duping by custodian, meaning I'm
19 only going to look at this one person and take
20 out his or her duplicates.
21        You can also de-dupe across the matter,
22 where if Custodian A, B and C each had that same

Page 40

1  document, you would take out all of those
2  instances except for one.  CompuLit did not do
3  that.  They just did it by custodian.  So if that
4  exact document was in three custodian's bins, it
5  remained in three custodian's bins.
6      Q.  Okay.  Is the same true not just for e-
7  mail, but also attachments to e-mail?
8      A.  It is.
9      Q.  Okay.  Is there -- what else -- what
10 else did you discuss with Miss Markasey?  It
11 sounds like a lot in ten minutes.
12     A.  Well, that's actually it.
13     Q.  Okay, were there any other
14 specifications used to cull and process the
15 electronic data?
16     A.  I'm sure there were, but it was not
17 what I asked about.
18     Q.  Okay, did you learn -- outside of your
19 conversation with Miss Markasey, did you learn
20 anything more about the specifications used to
21 cull and process electronic data?
22     A.  That's a very broad question.

Page 41

1      Q.  Oh.  Well, can we parse it down to --
2  well, let me -- did you speak with anyone else
3  about the specifications used to cull and process
4  the e-mail data?  Let's start there.
5      A.  Yes.
6      Q.  Okay.
7      A.  I --
8      Q.  What did you learn?
9      A.  Well, I spoke to my attorneys, so Carol
10 and Jason.
11     Q.  Okay.
12     A.  So I'm not sure --
13     Q.  Well, what -- well, let me ask you.
14 What did Abbott do in its -- to -- what the
15 specifications -- you know what?  We'll get into
16 that in a second.  Why don't we finish these
17 individuals.
18     A.  Okay.
19     Q.  Is there anything else that you can
20 recall about your conversation with Miss
21 Markasey?
22     A.  No.

                                11 (Pages 38 to 41)

Buck, Alexandra Grigoras                         March 13, 2008
                    Chicago, IL

Page 46

1  issued to them.
2     Q. At all? At any time?
3     A. Correct, at any time. And she -- we
4  also asked her in response to your deposition
5  notice whether she was aware of any log
6  containing the information about acquisitions or
7  deployment of computers, desktops, and she said
8  she was not aware of any such log.
9     Q. Okay, what -- you have a document in
10 front of you. Can we mark that as the next
11 exhibit, please?
12    A. Sure.
13          (Exhibit Buck 002 was marked for
14 ID)
15    MS. ST. PETER-GRIFFITH: If I could see
16 -- oh, okay.
17 BY MS. ST. PETER-GRIFFITH:
18    Q. Ma'am, what is that document that's in
19 front of you?
20    A. This is a list of the people that I
21 spoke to in preparation for my deposition.
22    Q. Is this the same list that you just

Page 47

1  recited to me before?
2     A. It is.
3     Q. Okay. It seems you did that from
4  memory, right?
5     A. Yeah, that would have been impressive.
6     Q. Okay, so you learned that at no time
7  did Abbott ever provide its sales -- field sales
8  service personnel with computers?
9     A. Correct.
10    Q. Okay, were the field sales personnel at
11 any time ever required to have a computer and
12 communicate with that computer via e-mail or
13 otherwise?
14    A. Never.
15    Q. If the field salespeople needed to use
16 a computer then for purposes of their position
17 within HPD, it would need to be one that they
18 supplied?
19    A. That's my understanding.
20    Q. Okay. What was Abbott's position
21 regarding the ownership of any electronic or
22 stored information of -- on the field sales reps'

Page 48

1  individual computers? Who owned that -- that
2  information?
3          MR. WINCHESTER: Objection, form,
4  outside the scope.
5          THE WITNESS: I'm not sure that any
6  such policy existed.
7  BY MS. ST. PETER-GRIFFITH:
8     Q. Okay, do you recall anything else about
9  your conversation with Ms. Norris?
10    A. No.
11    Q. Okay, is it Mr. Rivera?
12    A. Yes, Jose Rivera.
13    Q. Okay. And when did you speak with Mr.
14 Rivera?
15    A. Monday or Tuesday.
16    Q. Okay, the 11th or 12th?
17    A. Yeah.
18    Q. And how long?
19    A. Fifteen minutes.
20    Q. Telephonically?
21    A. No, in person.
22    Q. Okay, who's Mr. Rivera?

Page 49

1     A. Mr. Rivera is the head of Abbott's IP
2  Litigation Group.
3     Q. Is that IP, Intellectual Property?
4     A. Correct.
5     Q. For all those non-lawyers out there.
6     A. Sorry.
7     Q. That's okay. There are a lot of
8  letters and computer speak, and I want to make
9  sure I'm just -- that this is actually the lawyer
10 speak IP.
11    A. It is.
12    Q. Why did you speak with Mr. Rivera?
13    A. Mr. Rivera was in-house counsel and
14 handled at the time the 1997 HHS subpoena --
15    Q. Okay.
16    A. -- and we wanted to speak to him about
17 that.
18    Q. And what did you learn from him?
19    A. We learned that, upon receipt of the
20 subpoena, he issued a Litigation Hold Memorandum
21 to preserve data on documents related to anything
22 asked for in the '97 subpoena.

Buck, Alexandra Grigoras                                    March 13, 2008
Chicago, IL

Page 54

1  Q. Why not?
2  A. That's not how back-ups work.
3  Q. Okay. Well, what's the point of having
4  the back-up if you can't access the data?
5  A. Well, that is the point. It's disaster
6  recovery. Should our entire systems fall apart
7  and the company were to go under, then they might
8  consider paying millions of dollars to restore
9  data that would be crucial information, but
10 otherwise --
11 Q. But otherwise, if you're involved in
12 litigation and it's been requested and you're on
13 notice of the hold, it's not important enough to
14 preserve the information?
15     MR. WINCHESTER: Objection, form.
16     THE WITNESS: The information was
17 actually preserved. We have the back-up tapes.
18 BY MS. ST. PETER-GRIFFITH:
19 Q. Okay, but if it's inaccessible, how can
20 it be considered to be preserved?
21 A. I believe the federal rules call it
22 "inaccessible," and it is preserved. It's just

Page 55

1  not accessible.
2  Q. Okay. Well, if it's accessible, then
3  what's the problem with Abbott providing the
4  information?
5  A. It's not accessible. I said it was
6  inaccessible.
7  Q. If data's inaccessible, it's -- that
8  means that it's -- you're -- we're not able to
9  get it, right?
10 A. If we are able to get it, and I don't
11 know whether we are, it would be unbelievably
12 costly.
13 Q. What has Abbott done to ascertain how
14 much it would cost to make these back-up -- or to
15 access the information on the back-up tapes?
16 A. Well, we've confirm that we no longer
17 have an MS Mail environment in-house, and we also
18 know how much it would cost us to restore much
19 more recent back-up tapes, and the cost to
20 restore these much older back-up tapes would,
21 again, be expedientially higher.
22 Q. You keep saying that, but how did you

Page 56

1  determine that it would be expedientially higher?
2  What steps did you take to determine the cost?
3  A. I just told you that. I don't have an
4  exact cost for you.
5  Q. Okay, so Abbott has done nothing to
6  ascertain what the costs would be associated with
7  accessing these back-up tapes?
8      MR. WINCHESTER: Objection, form.
9      THE WITNESS: That's not what I said.
10 BY MS. ST. PETER-GRIFFITH:
11 Q. Okay, well, then how did you determine
12 that it would be expedientially more expensive?
13 A. Because we currently don't have the
14 environment in-house to restore those back-up
15 tapes.
16 Q. So it's based upon your subjective
17 opinion?
18 A. No. We currently have no way in-house
19 to access the data.
20 Q. Okay, so what have you done to evaluate
21 how much it would cost to find a way to make the
22 data accessible?

Page 57

1  A. I have personally have done nothing to
2  other than checking in-house whether or not we
3  have the capabilities.
4  Q. Did any one at Abbott -- you say you
5  personally haven't. Has anyone at Abbott done
6  that evaluation?
7  A. I don't know.
8  Q. What back-up tapes are available for
9  Abbott data predating 2001 -- or, I'm sorry,
10 2002? And when I say "data," I mean e-mail or,
11 you know, other information stored on the HPD
12 computer system.
13 A. Can you repeat the question? I'm
14 sorry, could you read back the question?
15 Q. Sure. Let me, actually, break it up,
16 and we'll go back to your conversations --
17 actually, you know what? Let's finish up your
18 conversations, and we'll get into this.
19     And did you have any other
20 conversations with Mr. Rivera?
21 A. No, that was it.
22 Q. Okay. And then is it Mr. Tierney?

Buck, Alexandra Grigoras                                    March 13, 2008
                          Chicago, IL

Page 62

1  an e-mail option?
2      A.  No.
3      Q.  Okay.  Was there an expectation at any
4  point in time or requirement at any point in time
5  that the field sales reps establish an e-mail
6  account?
7      A.  No, she was very clear it was optional.
8      Q.  Okay.  Do you know -- did she or do you
9  know how many field sales reps opted for this
10 personal e-mail with AT & T Net?
11     A.  I don't know.
12     Q.  Was there a list someplace or was there
13 a way it identify --
14     A.  No, it didn't sound like there was.
15     Q.  Okay, would she be the person who would
16 know?
17     A.  I suppose.
18     Q.  Okay.  Well mwas there anyone else that
19 you spoke with --
20     A.  No.
21     Q.  -- that had that information?  Okay.
22 What else did you discuss with Miss Tierney?

Page 63

1      A.  That's it.
2      Q.  Did you ask her any questions about
3  that e-mail system or about Alt Site's access to
4  HPD computers?
5      A.  Yeah, I believe I already said --
6      Q.  We already covered that?
7      A.  Yes.  (Continuing) -- that she
8  confirmed that they did not have access to
9  computers.
10     Q.  Okay, did you discuss anything else
11 with her?
12     A.  No.
13     Q.  Okay, and then is it Van Bol Lise?
14     A.  Van Bol Huis, correct, Jim.
15     Q.  Geez.  And who is Mr. Van Bol Huis?
16     A.  I think he currently works for Hospira,
17 and he was the desktop support person within HPD,
18 again, sometime between '91 and '03, '04.
19     Q.  And did you speak with him again on
20 Monday or Tuesday?
21     A.  One or the other.
22     Q.  Okay.  Over the phone?

Page 64

1      A.  Correct.
2      Q.  For how long?
3      A.  Fifteen minutes.
4      Q.  And what did you learn from Mr. Van Bol
5  Huis?
6      A.  Well, again, in response to the e-
7  deposition notice, we wanted to make sure that
8  there wasn't some sort of inventory or log of
9  what employee received what computer or the
10 disposition of computers.
11     Q.  Okay, and what did you learn?
12     A.  He confirmed that there, indeed, was no
13 such log and they in fact didn't associate a
14 computer with a specific person.
15     Q.  If Abbott didn't associate a computer
16 with a specific person, how could it ensure that
17 those individuals who were subject to lit hold
18 memoranda provided all of their electronic
19 information?
20          MR. WINCHESTER:  Objection, form.
21          THE WITNESS:  Because they would be
22 asked to print it and produce it.

Page 65

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Weren't they also asked to store it
3  electronically?
4      A.  They were asked to preserve it,
5  absolutely.
6      Q.  Okay.  Were they asked to -- weren't
7  they asked to, according to Ms. Klaus's
8  testimony, also download it from their computer
9  where they preserved it?
10     A.  Where would they download it if it was
11 already in their computer?
12     Q.  On a disk.
13     A.  I believe Miss Klaus testified that
14 there were some instances where certain employees
15 downloaded things to disk, but in most cases,
16 they would print out the relevant documents.
17     Q.  For Abbott -- for those individuals who
18 were subject to lit hold memos, when they moved
19 on and their computer didn't move with them, did
20 Abbott do anything to search their computer for
21 responsive documents?
22     A.  Well, certainly, Abbott collected

Page 66

1  documents that were responsive prior to them
2  leaving. There was no IT measure in place to
3  search the computers.
4      Q. So Abbott relied upon the individual
5  employees to preserve their information, print it
6  and provide it, and that's how it collected
7  documents stored electronically or created
8  electronically on computers?
9      A. That's correct.
10     Q. Did Abbott keep a log of everybody from
11 whom it collected information that was derived
12 from their computers?
13     A. That would be a question for Miss
14 Klaus. I think she testified at length about
15 that.
16     Q. So you defer to Ms. Klaus's answer on
17 that?
18     A. I think she already answered that, and
19 I don't believe that's what I'm here to testify
20 about.
21     Q. Well, you're aware -- are you aware of
22 -- well, you're here to testify about the

Page 67

1  collection of electronic information. And my
2  question to you is are you aware of anything
3  different than what Miss Klaus testified to?
4      A. I'm not aware of anything different.
5      Q. Okay, did you have any other
6  conversations -- or what else did you discuss
7  with Mr. Bol Huis -- Van Bol Huis?
8      A. I think that's it.
9      Q. Is it Mr. Fabian?
10     A. It is, David Fabian.
11     Q. Who's Mr. Fabian?
12     A. He is currently at Hospira.
13     Q. Okay. And do you recall -- I don't
14 mean this to be a memory exercise, but do you
15 recall his position?
16     A. Um -- I'm thinking. I believe he was
17 in charge or managed the e-mail systems at HPD in
18 -- sometime between '91 and '03, '04.
19     Q. And why did you call him? Or, I'm
20 sorry. Did you speak with him telephonically?
21     A. Yes.
22     Q. For how long?

Page 68

1      A. Half -- twenty minutes, half an hour
2  maybe.
3      Q. Okay. And was that on Monday or
4  Tuesday again?
5      A. Yep, one -- one or the other.
6      Q. And what did you discuss with him?
7      A. I honestly cannot remember
8  specifically.
9      Q. Do you remember anything standing out
10 in your mind as information that he imparted to
11 you in preparation for today's deposition?
12     A. I don't specifically.
13     Q. Okay, do you remember why you were
14 calling him?
15     A. I think probably to -- to confirm the
16 different e-mail systems.
17     Q. Was he able to do that, to your
18 recollection?
19     A. Yes.
20     Q. And that -- when you say "the different
21 e-mail systems," you mean the two that you spoke
22 about before?

Page 69

1      A. Correct, MS Mail and MS Exchange.
2      Q. Do you feel pretty comfortable after
3  your investigation that those are the two
4  systems?
5      A. Very comfortable.
6      Q. Okay, and there wasn't any other
7  system?
8      A. From '92 to 2004?
9      Q. Okay, from --
10     A. Correct.
11     Q. Okay. Do you recall anything else
12 about your discussions with Mr. Fabian?
13     A. I don't.
14     Q. Okay, and is it Mr. Gott?
15     A. Yes, Jeff Gott.
16     Q. Okay, and who is Mr. Gott?
17     A. Mr. Gott is currently one of the
18 directors of our Corporate IT Department. By
19 "ours," I mean Abbott.
20     Q. Okay, and what did you -- how long did
21 you speak with him?
22     A. About five minutes.

Buck, Alexandra Grigoras                                     March 13, 2008
                                    Chicago, IL

Page 74

1  just want to folder it and preserve it and save
2  it.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay.  What has Abbott done to search
5  for e-mail that have been foldered or saved on
6  the shared drive?
7      A.  Well, we conducted a search of the
8  share drive for any PSTs, and PSTs are --
9  Microsoft Exchange e-mail files is the only type
10 of e-mail that would be subject to this, and we
11 searched those PSTs and produced documents
12 responsive in this case.
13     Q.  When did you do that?
14     A.  I don't know the exact date when that
15 search was conducted.
16     Q.  Is that -- the overall production that
17 has been produced to your knowledge of e-mail,
18 the 500,000 pages in August and then the more
19 recent production, is that the sum total of the
20 e-mail production?
21         MR. WINCHESTER:  Objection, form.  Are
22 you talking about electronic?

Page 75

1          MS. ST. PETER-GRIFFITH:  Yes,
2  electronic.
3          THE WITNESS:  I know the share drive e-
4  mails that we were just referencing were produced
5  in electronic form.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  Yep.
8      A.  And that is what I'm referencing, and I
9  believe there is 17 to 18 thousand e-mails
10 produced.
11     Q.  What e-mail -- what e-mails have not
12 been produced by Abbott to date?
13     A.  There are no accessible e-mails that
14 have not been produced.
15     Q.  What do you mean by that, "no
16 accessible e-mails"?
17     A.  As we mentioned earlier, there's this
18 small snapshot, this two month's snapshot from
19 1997 that may, we don't know, may contain e-
20 mails, but, again, those -- that data is not
21 readily accessible.
22     Q.  Are there back-up tapes for other e-

Page 76

1  mail other than that -- the e-mail stored on the
2  share -- well, let me ask you this.  Strike that.
3          The e-mail served on the shared drives
4  --
5      A.  Yes.
6      Q.  -- okay, which shared drives are we
7  talking about?
8      A.  The HPD shared drives, and I think,
9  gosh, it contains the, I think, contract
10 marketing share drive, and I'm not sure of any --
11 of what other groups were maintained.  But any of
12 the share drives that existed in HPD were
13 searched for PSTs, if that makes sense.
14     Q.  Did you search for PSTs in any drives
15 outside of HPD like, for example, Abbott
16 Corporate?
17     A.  Abbott Corporate doesn't use PSTs.
18 They use Lotus Notes.
19     Q.  Okay.
20     A.  And where -- Abbott Corporate is
21 prohibited from saving Lotus Notes files
22 anywhere, so that would be a fruitless effort.

Page 77

1      Q.  Was there any effort undertaken to
2  preserve Lotus Notes e-mails that may have been
3  responsive to either the '96 CID, the '97
4  subpoena, or any subpoena served by HHS OIG or
5  any discovery request propounded in this case?
6          MR. WINCHESTER:  Objection, form.
7          THE WITNESS:  Yes.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  What efforts were made to preserve
10 those Lotus Notes files?
11     A.  There were many, many efforts made.
12     Q.  Okay, what were they?
13     A.  The -- there are numerous Lotus Notes
14 files that are being preserved.  They're not the
15 30-day deleters for people who have been turned
16 off.  I know, for example, we collected Mike
17 Tootell's Lotus Notes file in search of that
18 file.
19     Q.  Do you -- have those been produced, do
20 you know?
21     A.  Yes.  Yes, they have.  And, again, all
22 employees are instructed to preserve, folder

Buck, Alexandra Grigoras                                          March 13, 2008
                         Chicago, IL

Page 78

1  and/or print any e-mails, which would include
2  Lotus Notes e-mails.
3      Q.  And you would defer to what Miss Klaus
4  had to say as to who those individuals were?
5      A.  Absolutely.
6      Q.  Okay.  Other than searching Mike
7  Tootell -- for Mike Tootell's Lotus Notes, has --
8  have any other Lotus Notes been searched for and
9  produced?
10     A.  For this case?
11     Q.  For this case.
12     A.  I believe they have.  I do not know the
13 specific individuals.
14     Q.  And you don't know which production
15 they might have come in?
16     A.  Uh, no.
17     Q.  Okay, now, what did Abbott do -- or I
18 can tell you that the United States has searched
19 exhaustively for electronic production of e-mail
20 that predates 2002.
21         Prior to the most recent production
22 which we've received in the past couple of weeks

Page 79

1  or so, there was no production that predate -- of
2  e-mail electronically that produced -- that
3  predated 2002.  The recent e-mail production has
4  less than a thousand, probably less than a couple
5  hundred e-mails that predate 2002.
6         Why hasn't Abbott produced e-mail that
7  predates 2002 or 2000?
8         MR. WINCHESTER:  Objection, form,
9  misstates.
10        MS. ST. PETER-GRIFFITH:  What does it
11 misstate?
12        MR. WINCHESTER:  Well, your question
13 was just why hasn't Abbott produced e-mail prior
14 to 2002.  You've just said that we have.
15        MS. ST. PETER-GRIFFITH:  I said "2002
16 or 2000."
17        MR. WINCHESTER:  Okay.  Well, I dispute
18 your count.  So are you testifying -- are you
19 saying as part of your question that the 17 or 18
20 thousand e-mails we just gave do not include any
21 electronic e-mails prior to 2000?
22        MS. ST. PETER-GRIFFITH:  Yeah, I am.

Page 80

1         MR. WINCHESTER:  Is that the basis of
2  your -- well, that's just false.  I know that's
3  false.
4         MR. ANDERSON:  What years do they go --
5  do they cover?
6         MR. WINCHESTER:  They certainly go back
7  prior to 2000.  The part of the PST files that
8  were just given to you, that's absolutely true.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay, in the most recent production
11 that was produced to the United States, what's
12 the date range for the production of e-mail,
13 ma'am, and what did you do to prepare for that?
14     A.  1991 through 2003.
15     Q.  You produced e-mail from 1991, dating
16 back to 1991?
17     A.  That was the search that was --
18     Q.  Okay, what has been produced?
19     A.  I don't know.
20     Q.  You didn't prepare to identify what has
21 and has not been produced, have you -- did you,
22 ma'am, in coming to today's deposition?

Page 81

1         MR. WINCHESTER:  Objection, form.
2         THE WITNESS:  I certainly didn't review
3  everything that we produced, no.
4  BY MS. ST. PETER-GRIFFITH:
5      Q.  Okay, what hasn't been produced for e-
6  mail?
7      A.  There is nothing that is accessible
8  that has not been produced to the government.
9      Q.  Okay, what have you done to ascertain
10 what is inaccessible?
11     A.  We, I think I testified earlier there
12 is a snapshot of back-up tapes dating back to
13 1997 which we have no capability of restoring at
14 this time, and it includes a two-month snapshot.
15 Additionally, anything on those '97 back-up tapes
16 is redundant in terms of e-mail because those
17 individuals, in response to the HHS subpoenas of
18 '96, '97, were asked to print out their e-mails.
19     Q.  And how do you know that they did?
20     A.  There's no fact ever that has arisen to
21 make us think differently.
22     Q.  Okay, to make you think differently.

                                     21 (Pages 78 to 81)

                Henderson Legal Services, Inc.
202-220-4158                         www.hendersonlegalservices.com

Buck, Alexandra Grigoras                                    March 13, 2008
                         Chicago, IL

Page 82

1  What did Abbott do to verify that everyone who
2  received a lit hold memo printed off or
3  downloaded to a disk their e-mail?
4      A.  We collected documents from those
5  individuals and then, thus, verified that anyone
6  who was instructed to hold and that had relevant
7  e-mails actually produced e-mails to us.
8      Q.  And what did you do to verify that they
9  were producing everything responsive to the
10 requests?
11     A.  Well, I don't believe we received your
12 request until 2006, but --
13     Q.  Well, you received a CID and you
14 received a subpoena in '97, right?
15     A.  Correct.
16     Q.  Okay.
17     A.  I'm sorry, what was the question?
18     Q.  What did you do to verify that those
19 individuals who were subject to lit hold memos
20 and asked to preserve and provide their
21 information actually did it?
22     A.  Based on Ellen Klaus's testimony, she

Page 83

1  and the Legal staff repeatedly went back to
2  people, and as the requests became broader or the
3  universe of documents became broader, they
4  continually went back and asked for more
5  documents.  They sat with them sometimes at their
6  computers while they printed out documents.  There
7  -- there's nothing else that we reasonably could
8  have done to verify.
9      Q.  Except keep a list of individuals that
10 you did that for and verify that everyone who was
11 supposed to receive a lit hold memo actually did
12 that, right?
13     A.  Is there a question?
14        MR. WINCHESTER:  Objection, form.
15 BY MS. ST. PETER-GRIFFITH:
16     Q.  Yes, that's a question.  You didn't do
17 that, did you?
18     A.  You'd have to repeat that.  I'm sorry,
19 I lost it.
20        (Record read.)
21        MR. WINCHESTER:  Objection, form.
22        THE WITNESS:  I'm not sure I

Page 84

1  understand.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay.  Would you defer completely to
4  Ms. Klaus's testimony on what was done and what
5  was not done to verify that individuals subject
6  to lit hold memos produced their electronic
7  production?
8      A.  No, I believe I just testified that we
9  verified that documents were produced because we
10 collected electron -- documents that were printed
11 from electronic form from custodians that were
12 supposed to have received the lit hold memo.
13     Q.  Okay, how did you verify that they
14 received the lit hold memo?
15     A.  Because they produced documents and
16 they also had -- some of them had the lit hold
17 memo in their files.
18     Q.  Okay, and what did you do to verify
19 which electronic production came from which
20 employee who received -- who was supposed to
21 receive a lit hold memo?
22     A.  That, I do not know.

Page 85

1      Q.  Okay.  What was done to verify that
2  those individuals who did not produce documents,
3  but who were supposed to receive a lit hold memo,
4  produced documents, electronic documents that
5  they were supposed to preserve?
6         MR. WINCHESTER:  Object to the form.
7         THE WITNESS:  What?  I don't
8  understand.
9  BY MS. ST. PETER-GRIFFITH:
10     Q.  Okay.  What did Abbott do to verify
11 that those individuals who did not produce
12 documents, electronic documents --
13     A.  Okay.
14     Q.  -- but who received a lit hold memo did
15 what they were supposed to do?
16     A.  Again, the paralegals spoke to them and
17 would go to their desktops and help them search.
18 So I assume that the paralegals would look and
19 see that there's nothing responsive if nothing
20 was produced.
21     Q.  What did you do to verify that every
22 single individual who received the lit hold memo

22 (Pages 82 to 85)

Buck, Alexandra Grigoras                                           March 13, 2008
                              Chicago, IL

Page 86
1  was visited by a paralegal and that their
2  electronic information was preserved? Is that
3  Abbott's testimony that that's what happened?
4     A.  That is not my testimony. I'm not
5  aware of any sort of log or system that verified
6  that every single individual was personally
7  visited by an Abbott paralegal.
8     Q.  Okay, so it's possible that there are
9  individuals who should have preserved their
10 documents pursuant to a lit hold memo, but
11 didn't?
12       MR. WINCHESTER: Objection, form.
13       THE WITNESS: I don't know if that's
14 possible.
15 BY MS. ST. PETER-GRIFFITH:
16    Q.  What did Abbott do to back up its e-
17 mail after it received the '96 CID?
18    A.  I don't understand the question.
19    Q.  Okay. Well, you know in 1996 that
20 Abbott received a Civil Investigative Demand from
21 JOD in MDL --
22    A.  Right.

Page 87
1     Q.  -- right? What --
2        MR. WINCHESTER: Ann, let me object to
3  the line of questions about this as being outside
4  the scope. There's nothing in your notice asking
5  this witness to testify about response those
6  subpoenas.
7        MS. ST. PETER-GRIFFITH: Well, I'm
8  trying to -- this is responsive. I'm trying to
9  ascertain what they did to preserve their
10 documents and why we don't have e-mail
11 production.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  What was done by Abbott to preserve its
14 electronic documents after receipt of the '96
15 CID?
16    A.  We immediately sent out a preservation
17 notice to any employee who may have had relevant
18 documents. We further asked those managers and
19 employees to -- to identify any other employees
20 that may have relevant or responsive documents.
21 Then we instructed all of those employees to
22 retain, save, folder, and print any electronic

Page 88
1  documents, any e-mail, any hard copy documents,
2  and they did so.
3     Q.  How do you know -- how does Abbott know
4  that each and every individual who was supposed
5  to receive an electronic -- a lit hold memo
6  received it and did what they were supposed to
7  do?
8     A.  Because we actually got documents from
9  the people that we were supposed to.
10    Q.  You got documents from each and every
11 person who was supposed to receive a lit hold
12 memo?
13    A.  I don't know if it was each and every
14 person.
15    Q.  Okay, so it's possible that there are
16 some people who didn't follow the instructions or
17 who might not have even received the lit hold
18 memos; is that right?
19       MR. WINCHESTER: Objection, form.
20       THE WITNESS: I don't know if it's
21 possible.
22 BY MS. ST. PETER-GRIFFITH:

Page 89
1     Q.  Did you do anything to research it?
2     A.  To research whether it's possible?
3     Q.  To research whether or not each and
4  every individual who was supposed to receive a
5  lit hold memo preserved their electronic data.
6     A.  I spoke to Miss Klaus, I read Ms.
7  Klaus's testimony.
8     Q.  So you would defer to Ms. Klaus's
9  testimony on that?
10    A.  I don't believe that's what I said.
11 You asked me what I did to prepare.
12    Q.  Okay. And now my question to you is
13 would you defer to Ms. Klaus's testimony?
14    A.  On what specifically?
15    Q.  On whether or not -- on -- on the
16 preservation of electronic information by
17 individuals who should have received lit hold
18 memos?
19    A.  No, I believe I answered that. I defer
20 to Miss Klaus as to whether there's any specific
21 log that details what we received.
22    Q.  Okay. Do you defer -- okay. Then

23 (Pages 86 to 89)

Henderson Legal Services, Inc.
202-220-4158                                    www.hendersonlegalservices.com

645c921c-7f82-4193-93d4-b682149739b7

Buck, Alexandra Grigoras                               March 13, 2008
                          Chicago, IL

Page 106

1   information that Abbott can go to to
2   electronically produce e-mail for the '91 through
3   2003 time frame?
4       A.  The -- the only effort I'm aware of,
5   and this is just a belt and suspenders, is to
6   double check with the custodians who've already
7   produced e-mail whether they have any e-mails
8   saved on their desktop.
9       Q.  Has Abbott done that?
10      A.  We're in the process of doing that now.
11      Q.  When will that process be complete?
12      A.  I do not know.
13      Q.  And which custodians are you going to?
14      A.  I believe -- I don't know.
15      Q.  And in terms of the desktops that might
16  be in existence, are those currently with
17  Hospira?
18      A.  Yes.
19      Q.  Okay.  What was done to check the
20  desktops of personal computers at the time that -
21  - of the Hospira spin?
22      A.  So that's why I said it was a belt and

Page 107

1   suspenders.  We've already asked the custodians
2   to go through all the desktops and all those e-
3   mails, and many times a paralegal was there with
4   those custodians as they were pulling them up,
5   but we want to do just one last check of whatever
6   is on their desktop currently.
7       Q.  Okay.
8       A.  Just to clarify, those desktops went
9   with them to Hospira.  So they -- they have --
10      Q.  So the hardware didn't stay?
11      A.  Correct, correct.
12      Q.  Now, in terms of -- what searches have
13  been made, if any, of the desktops of personal
14  computers that were maintained by the sales
15  force?
16      A.  Other than requesting the sales force
17  to print out and produce or electronically give
18  us any responsive documents and their PCs, I'm
19  not aware of anything we did electronically.
20      Q.  Which sales force members were
21  requested to do that?
22      A.  Gosh, I don't know.

Page 108

1       Q.  Well, let me ask you this.  Would you
2   defer to Ms. Klaus's testimony on that?
3       A.  I would.
4       Q.  Okay.  You're not aware of any other
5   efforts, other than what she testified to, to go
6   back to former sales reps and see what documents
7   they might have, either electronic or otherwise?
8       A.  Correct.
9       Q.  So in terms of Abbott's e-mail
10  production, I want to make sure I'm clear on the
11  sources for -- or what was searched for and what
12  was provided.
13      A.  Okay.
14      Q.  Before we get there though, we talked
15  about Abbott's MS Mail system and then its
16  Outlook Microsoft Exchange?
17      A.  Correct.
18      Q.  What about Lotus?  Other than searching
19  for Mr. Tootell's e-mail -- actually, let me go
20  back.
21          What is the system for backing up the
22  Lotus systems, e-mail systems?

Page 109

1       A.  Well, it -- it depends on what part of
2   Abbott we are referencing.
3       Q.  Okay, that's fair enough.  Let's do
4   this.  Corporate?
5       A.  Okay.  Abbott Corporate --
6       Q.  Abbott Corporate as it --
7       A.  -- as it currently sits today?
8       Q.  Or as it sat, you know, at any point in
9   time from '91 through 2003.
10          MR. WINCHESTER:  So if you're going to
11  say that, then do I -- I need to ask the
12  clarification sometimes we talk about Corporate
13  as being the same term as this AHD.
14          MS. ST. PETER-GRIFFITH:  Oh.
15          MR. WINCHESTER:  Is that how you're
16  using it or are you talking about a different --
17          MS. ST. PETER-GRIFFITH:  No, that's not
18  how I'm using it.  I'm talking about General
19  Counsel's Office, President's Office.
20          THE WITNESS:  Okay.
21          MR. WINCHESTER:  Okay, corporate
22  Corporate.

                                  28 (Pages 106 to 109)

Page 134

1  Q. When you say "negotiated," what do you
2  mean?
3  A. It was under that court order that we
4  talked about earlier. There were 39 individuals
5  identified with the attorneys in the MDL as the
6  key folks who would have data related to AWP.
7  Q. Do you know who negotiated this?
8  A. Our attorneys, Jones Day.
9  Q. But who were they negotiating with?
10  A. The MDL attorney, plaintiffs'
11  attorneys.
12  Q. Do you know which case --
13  A. I don't.
14  Q. -- which MDL case?
15  A. I don't.
16  Q. Other than doing that search for that
17  list of 39 names for PST files on the Hospira
18  server --
19  A. On the share drive, right?
20  Q. On the share drive. (Continuing) --
21  what else has been done to search the shared
22  drive of the Hospira -- well, let me ask you this

Page 135

1  first. Is the Hospira server the former HPD
2  server?
3  A. It is.
4  Q. Okay.
5  A. Well, it contains the data from HP.
6  I'm not sure if it's physically the exacte same
7  server.
8  Q. Okay, but it contains the data?
9  A. Correct.
10  Q. Okay. Other than searching for this
11  list of -- well, first, you don't have the list
12  of 39 names?
13  A. I do not.
14  MS. ST. PETER-GRIFFITH: Jason, can we
15  get that?
16  MR. WINCHESTER: Sure.
17  BY MS. ST. PETER-GRIFFITH:
18  Q. The --
19  MR. WINCHESTER: You won't have any
20  surprises.
21  MS. ST. PETER-GRIFFITH: Okay. And I'm
22  assuming when she's talking about negotiations --

Page 136

1  Jason, you know this better than I. I am not
2  aware of any negotiations. Is this a different
3  MDL plaintiff?
4  MR. WINCHESTER: This was -- and it was
5  well before my time.
6  MS. ST. PETER-GRIFFITH: Oh, okay.
7  Then it was before my time too.
8  MR. WINCHESTER: It was -- this was as
9  a part of the process by which the Court ordered
10  -- and I believe it was the original MDL 1456 --
11  MS. ST. PETER-GRIFFITH: Okay.
12  MR. WINCHESTER: -- case --
13  MR. ANDERSON: Class.
14  MR. WINCHESTER: -- class case --
15  MS. ST. PETER-GRIFFITH: Okay.
16  MR. WINCHESTER: -- in which the Court
17  order to restore the tapes came out. There was a
18  negotiation and a determined list of custodians
19  for whom the search would be made in the context
20  of backing up -- of restoring those back-up
21  tapes.
22  MS. ST. PETER-GRIFFITH: Okay.

Page 137

1  MR. WINCHESTER: That's -- don't quote
2  me on any of that. It was well before my time,
3  but that is -- that is the sum -- sum and
4  substance of my understanding of what happened.
5  MS. ST. PETER-GRIFFITH: Okay.
6  BY MS. ST. PETER-GRIFFITH:
7  Q. Other than searching for that list of
8  39 on the former HPD server or server information
9  that is now with Hospira --
10  A. Right.
11  Q. -- what has been done to search the
12  former HPD server information at Hospira for
13  response -- documents responsive to the United
14  States's request for production?
15  A. So prior to the spin, the managers and
16  individuals that were subject to the record hold
17  also searched that server for all the PST files
18  on there and printed out the e-mails, the same
19  process that we talked about earlier. So, again,
20  it's sort of a redundant process, but, again,
21  sort of belt-and-suspenders sort of search. So
22  those e-mails should have been printed or

Buck, Alexandra Grigoras                                  March 13, 2008
                              Chicago, IL

Page 206

1  we can take a look to see what PST files reside
2  on the share drives. The only issue is like, for
3  example -- my e-mail log-in, for example, is
4  "buckag," okay? So if -- if I was in an Outlook
5  world and I saved a PST, you'd like to think that
6  my PST file was buckag.pst.
7      Q.  Okay.
8      A.  People could manipulate that. So they
9  could call it "ronaldmcdonald.pst."
10     Q.  Okay.
11     A.  So if the naming conventions work out
12 and you can sort of trace back and say, okay, who
13 -- okay, that identifier relates to that person,
14 I can tell who that person is, I suppose you
15 could figure out who has PST files on that share
16 drive.
17     Q.  Has Abbott undertaken that initiative
18 to date?
19     A.  To compile a list of --
20     Q.  Let's start with compiling a list, and
21 then --
22     A.  I don't know.

Page 207

1      Q.  Has Abbott undertaken anything to
2  search for those PST files that individuals
3  subject to lit hold memos may have moved to the
4  shared drive?
5      A.  Yes. So we've already done the search
6  for the 39 custodians, which we've already
7  produced.
8      Q.  Okay.
9      A.  And we're actually in the process of
10 doing a search for any other people outside those
11 39 who have been deposed in this particular case
12 to see if they have had any PST files out on the
13 share drive.
14         Again, the majority is going to be, if
15 not all, is going to be duplicative of what we've
16 already produced in paper form, but we are -- we
17 are undertaking that effort.
18     Q.  Okay, other than individuals who have
19 deposed in this case --
20     A.  Okay.
21     Q.  -- and other than the 39 individuals
22 that were subject to -- the list of names that

Page 208

1  you restored for the Med -- Med --
2      A.  Medi-Cal.
3      Q.  -- Medi-Cal, what other initiatives is
4  Abbott undertaking to search the -- search for
5  PST files on the shared drives? And I'm assuming
6  this is all taking place either at Hospira or in
7  conjunction with Hospira.
8      A.  That is correct.
9      Q.  Okay, what -- other than searching for
10 the deponents and searching for those 39
11 individuals, what other searches either has
12 Abbott undertaken or does -- that Abbott intends
13 to undertake?
14     A.  For PST files on the --
15     Q.  For PST files on the shared drives.
16     A.  That -- those are the only efforts of
17 which I'm aware at this time.
18     Q.  How do you know that the PST files'
19 production will likely be duplicative of the
20 earlier production?
21     A.  Because these -- all these individuals
22 were already instructed to print out the relevant

Page 209

1  e-mails, and they were foldering and either
2  giving them to us electronically or printing
3  them. So those folders will be duplicative of
4  what they printed or Ellen printed or the
5  paralegal printed.
6      Q.  Okay, so then, again, you're deferring
7  to what Ellen's testimony is as to what occurred
8  before on that?
9      A.  Right.
10     Q.  Okay. Why isn't Abbott undertaking any
11 other searches for PST files on the shared
12 drives?
13     A.  Abbott does not believe other PST files
14 are likely to have non-duplicative, relevant,
15 responsive information in this case.
16     Q.  Why not?
17     A.  Because the duplicative issue, I
18 believe we've -- I have testified to at length.
19 Because the people were already requested to
20 print out the responsive e-mails, and the 39
21 people represent the individuals most likely to
22 have responsive or relevant information to this

Henderson Legal Services, Inc.
202-220-4158                                www.hendersonlegalservices.com

645c921c-7f82-4193-93d4-b682149739b7

Buck, Alexandra Grigoras                                    March 13, 2008
                          Chicago, IL

Page 294

1  BY MS. ST. PETER-GRIFFITH:
2      Q.  Okay, was any initiative undertaken to
3  search Rick Gonzalez's computer that he utilized
4  when he was President of HPD?
5      A.  I don't know.
6      Q.  Have we exhausted your knowledge or
7  recollection of the searches undertaken for
8  electronic information by Abbott in response to
9  the United States's request for production?
10     A.  I believe we have.
11     Q.  Is there anything that you would like
12 to clarify or, as you sit here today, think back
13 about that you want to either expand upon or
14 clarify?
15     A.  No.
16         MS. ST. PETER-GRIFFITH: Okay. Jason,
17 I want -- as I indicated before, one of the
18 questions that we had was who exactly it was that
19 the lit -- responded to the lit hold memoranda,
20 which is really -- Ms. Buck has referenced it
21 here today, but that's really a question that was
22 presented with Ellen Klaus.

Page 295

1          MR. WINCHESTER: Um-hum.
2          MS. ST. PETER-GRIFFITH: Subject to
3  getting more information concerning that, at this
4  time, the United States passes the witness.
5          MR. ANDERSON: Good afternoon, Ms.
6  Buck.
7          THE WITNESS: Good afternoon.
8          MR. ANDERSON: My name is Jarrett
9  Anderson. I don't have many questions, but I do
10 have a few.
11         THE WITNESS: Okay.
12
13         DIRECT EXAMINATION
14 BY MR. ANDERSON:
15     Q.  Leaving off where you just were, if I
16 understand your testimony correctly, Mike
17 Tootell's hard drive and Rick Gonzalez's hard
18 drive were duplicated and then, in turn, reviewed
19 by Abbott's counsel, correct?
20     A.  That is correct.
21     Q.  Why were those two individuals selected
22 for that review?

Page 296

1      A.  I don't know. It was a decision, I
2  believe, made by our attorneys.
3      Q.  Were there any other individuals whose
4  hard drives were reviewed by Abbott or its
5  counsel?
6      A.  In the same manner that Mike Tootell
7  and Mr. Gonzalez's computer were reviewed?
8      Q.  Let's limit it to that for now, and
9  then we'll broaden it.
10     A.  Not that I am aware of.
11     Q.  Okay, were other Abbott employees' hard
12 drives reviewed by individuals other than the
13 particular employee who actually possessed the
14 hard drive?
15     A.  Sure. So I think as I testified
16 earlier and Miss Klaus referenced, there were
17 numerous occasions where the paralegal would sit
18 with the individual and go through their hard
19 drive document-by-document and decide what to
20 print out.
21     Q.  Okay, and there's been some testimony
22 about this kind of over-the-shoulder review

Page 297

1  process. How would the -- well, strike that.
2          With what frequency has Abbott or
3  Abbott's attorneys conducted a process where a
4  paralegal or some other Abbott representative
5  would physically sit with an Abbott employee and
6  search the Abbott employee's electronic records?
7      A.  So my understanding is that every time
8  there was a collection, that process was
9  followed. And there were collections responsive
10 to either numerous subpoenas over this period of
11 time or document requests, et cetera. So I can't
12 say for certain with what frequency per
13 individual, but I know it was done repeatedly.
14     Q.  And is it true that the individuals
15 which were identified for this level of over-the-
16 shoulder review were the 39 individuals that were
17 identified in the class action case?
18     A.  That, I don't know. Like I said
19 earlier, I don't know the specific names of the
20 individuals.
21     Q.  Do you know of records that would
22 reveal which persons have been subjected to this

                                    75 (Pages 294 to 297)