Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------x

IN RE:   PHARMACEUTICAL INDUSTRY   )

AVERAGE WHOLESALE PRICE            )

LITIGATION,                        )

_____   )

                                   ) 01 CV 12257-PBS

                                   )

THIS DOCUMENT RELATES TO ALL       ) Judge Patti B.

ACTIONS:                           ) Saris

                                   ) Magistrate Judge

                                   ) Marianne B. Bouler

---------------------------------x


        Deposition of ELLEN KLAUS, taken before

CHRISTINE LIUBICICH, CSR, pursuant to the provisions

of the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, at 77 West Wacker Drive, Suite 3500,

Conference Room I, Chicago, Illinois, commencing at

9:27 a.m. on the 8th day of February, 2008.

b520a334-58ab-4208-8e0c-cf929ce71d12

Page 170

1     MS. ST. PETER-GRIFFITH:  There is a 20.
2     MR. WINCHESTER:  Oh, there is.
3     MS. ST. PETER-GRIFFITH:  She just gave me two
4  22s.
5     MR. WINCHESTER:  Got it.  So if I have it
6  right, 21 are your requests, 22 are our responses,
7  and then 23 is a stack of other stuff?
8     MS. ST. PETER-GRIFFITH:  Right.  And the stack
9  -- yeah, the stack of other stuff is a -- I'll
10 represent to you is a collection of correspondence
11 and E-mail to and from Jones Day and various
12 attorneys for the United States concerning document
13 production issues.
14 BY MS. ST. PETER-GRIFFITH:
15    Q.  Miss Klaus, when your paralegal staff or
16 the lawyers that you worked with searched for
17 records within Abbott, did they search based upon
18 the individual requests set forth in the United
19 States' request for production as reflected in
20 Exhibit 21 -- or 20 -- yeah 21?
21    A.  We -- the document requests are made kind
22 of usually in a lump sum to our -- to the business

Page 171

1  people, so whenever the document request come in,
2  we'll go through them to determine -- Abbott will
3  go through them to determine, have we collected
4  these before, because as I mentioned before, there
5  is other ongoing AWP litigation, so we may have
6  collected these documents already and Jones -- and
7  provided them to Jones Day, so we may have already
8  collected them, which means we're not going to go
9  back to the same people and collect them again.  So
10 we'll go through the document request, review them,
11 and then identify those areas that we need to start
12 with to start collecting the documents, interview
13 people within those areas, so like, for example, if
14 we're looking for contracts, we go to the contracts
15 and pricing area, we'll talk to that person, go
16 through what we need; if that individual says, you
17 need to talk to these three people or, you know,
18 you're done here, we'll conduct our review
19 accordingly.
20    Q.  Did you ever give any of the requests for
21 production or Abbott's responds to the request for
22 production to anyone outside of legal searching for

Page 172

1  documents?
2     A.  I don't think we've given the exact
3  replica copy, but we have taken questions verbatim
4  when we are looking for things and forward those on
5  to people or have them look at the document request
6  as we are sitting there with them going through it.
7     Q.  What about -- so do they take the
8  document request with them when they go looking for
9  documents after they have been interviewed by you?
10    A.  Um, well, I guess it depends.  If they
11 are sent the request like in an E-mail or given a
12 memo or something, yes, they have that for their
13 files.  If it's me sitting with them collecting
14 documents at that point in time, there is no reason
15 for them to take this with them, we're collecting
16 documents right then and there.
17    Q.  What about for Hospira, did you -- would
18 you provide the request for production that was
19 served upon Abbott by the United States to Hospira
20 to assist in their searches for records and
21 documents?
22    A.  Yes.  I mean the exact same process that

Page 173

1  I just spoke about, we would follow it whether it
2  was Abbott or Hospira.  So if I went to Hospira and
3  met with somebody in the contracts and pricing area
4  because I was looking for contracts, I would sit
5  with them and tell them, this is what I am looking
6  for, here's the request; are you the right person,
7  do you have the documents, let's collect them, and
8  then is there anybody else that I need to talk to.
9     Q.  Okay.  Would they then have -- would the
10 individuals who physically were searching Abbott's
11 files for the actual records, would they receive
12 copies of the requests for production?
13    A.  Do you mean the paralegals?
14    Q.  Not the paralegals, the people who the
15 paralegals actually physically went out to search
16 for their records?
17    MR. WINCHESTER:  Objection.  Asked and
18 answered.
19    THE WITNESS:  Well, I think as I -- as I had
20 said, we may have -- we either would provide the
21 questions in a different format, you know, this is
22 what I need instead of giving them an entire

44 (Pages 170 to 173)

Page 174

 1  document request here, because there may be things
 2  on here that don't pertain to people.  Um, somebody
 3  in contracts and pricing might not have all the
 4  documents that are relevant.  Or if we know we
 5  collected documents already and there is just one
 6  question on here we know we haven't collected
 7  anything because that's new, we'll show them that.
 8  BY MS. ST. PETER-GRIFFITH:
 9      Q.  How did you go about updating your
10  document collection if, for example, you collected
11  documents back in 2000 pursuant to an AWP document
12  request; what would you do to make sure that when
13  you get a request like the request from the United
14  States that the individuals who you would -- whose
15  files you previously searched didn't have updated
16  information?
17      A.  Depending on the time frame of the
18  document request we determine if we collected
19  documents for that time frame or not.  If we need
20  to go back to people, we go back to the same people
21  and get updated information.
22      Q.  So is it accurate to say that every

Page 175

 1  person who went out and was actually physically
 2  looking for files or documents in their files had a
 3  copy of the production request that pertained to
 4  their particular area that was served by the United
 5  States?
 6          MR. WINCHESTER:  Objection to form.
 7          THE WITNESS:  The paralegals?
 8  BY MS. ST. PETER-GRIFFITH:
 9      Q.  No, the individuals who actually -- well,
10  did the paralegals actually physically go through
11  the files of the various -- excuse me -- various
12  employees whose files were searched?
13      A.  Yes, sometimes.
14      Q.  Okay.  Would they have -- would the
15  paralegals have the requests for production in hand
16  when they would do that?
17      A.  Yes.
18      Q.  Okay.  Would the -- for those individuals
19  who you sent the request out and expected them to
20  send you documents back -- well, were there
21  circumstances like that; you would sent out -- you
22  would say, hey, we've got a request, can you search

Page 176

 1  your files?
 2      A.  Yes.
 3      Q.  For those individuals, would they get a
 4  copy of the actual production request that was
 5  served by the United States?
 6      A.  Um, they may have gotten the questions,
 7  but in a different -- on a different -- in a
 8  different form.  So we might not have sent them the
 9  entire document request, but maybe a page or two or
10  the section that pertained to them.
11      Q.  Well, how do you know that other sections
12  didn't pertain to them?
13      A.  Well, we may have talked to them on the
14  phone going through it already to determine what
15  areas of the documents request they would
16  reasonably have documents for.  Once we determined
17  that, there is really no reason -- after we've got
18  through everything, there is no reason to send them
19  the entire request.  We might just sent them couple
20  of pages from the area that they are responsible
21  for.
22      Q.  Okay.  Did you do that for each and every

Page 177

 1  person, or were there some individuals who you sent
 2  requests out to that were -- and expected documents
 3  sent back?
 4      A.  There were people that we just sent
 5  requests out to.
 6      Q.  And when you sent the request out, would
 7  you send the complete request for production?
 8      A.  Probably not.
 9      Q.  How would you then be able to verify
10  whether or not they had documents responsive to any
11  or all of the requests for production?
12          MR. WINCHESTER:  Objection.  Form.
13          THE WITNESS:  Well, again, if -- if we're
14  looking for -- we may have talked to them on the
15  phone already and go through document request to
16  determine what area they have documents for.  For
17  example, again, if I am looking for contracts, I go
18  to the contracts and pricing area.  I won't go
19  there, for example, to look for, I don't know,
20  research and development documents.
21      Q.  I understand that, and I understand that
22  for some people you spoke on the phone and you

45 (Pages 174 to 177)

Page 202

1  folks to see -- to ascertain what records they had
2  and to discuss with them what searches they could
3  undertake, would the business individuals then go
4  search their files and actually do the sort for
5  responsive documents, or would they just bring
6  their files to the paralegals and have the
7  paralegals do the sort?
8      A.  The business -- well, the business people
9  would either bring their files to the paralegal and
10 then the paralegal -- as I had mentioned before, we
11 did a very broad overinclusive search when we
12 searched for documents --
13     Q.  Uh-huh.
14     A.  -- so we wouldn't even go through page by
15 page and say this is relevant, we just take
16 everything; or the paralegal would go through the
17 business person's drawers after talking with them
18 if they said, my stuff is in here, the paralegal
19 would actually go through and pull out the files
20 themselves.
21     Q.  Would it always be the paralegal who is
22 doing the pulling of the files?

Page 203

1      A.  No.  The business person could pull files
2  as well.
3      Q.  Um, and when the business person pulled
4  files would they just give their files wholesale
5  over to the paralegal, or would they do the pulling
6  of the individual documents that may be responsive?
7      A.  In most cases it was giving over the
8  whole files.  If we were asking for a very
9  specific, I need customer A contract, it would be a
10 -- here -- you know -- it could be a here's
11 customer A contract, for example.  Generally it was
12 everything.
13     Q.  Would the paralegal similarly get on the
14 individual desktops of the computers for the
15 individual business folks who you went to, or would
16 the business folks have the responsibility for
17 searching their own desktop computer files?
18     MR. WINCHESTER:  Object to the form.
19     THE WITNESS:  Um, the paralegal would work
20 with the business person for, you know, documents
21 stored in other locations than files to pull that.
22 Some -- sometimes the paralegal would -- may get on

Page 204

1  there and actually look at some electronic
2  documents.
3      MS. ST. PETER-GRIFFITH:  Jason, is it my
4  understanding that you are going to produce a
5  separate 30(b)(6) to address all of the E-mail
6  production issues?
7      MR. WINCHESTER:  We will, yes.
8      MS. ST. PETER-GRIFFITH:  Is that true for all
9  the electronic data, including the chip system?
10     MR. WINCHESTER:  Yes.
11     MS. ST. PETER-GRIFFITH:  Okay.
12     MR. WINCHESTER:  Well, the stuff you've
13 requested. It's E-mail, chips, transactional sales
14 data.
15     MS. ST. PETER-GRIFFITH:  Right, the electronic
16 stuff that we've requested.
17     MR. WINCHESTER:  Yes.
18     MS. ST. PETER-GRIFFITH:  We just had covered
19 some of the E-mail issues with Miss Klaus before,
20 and I just want to make sure before I --
21     MR. WINCHESTER:  Uh-huh.
22     MS. ST. PETER-GRIFFITH:  You know, as I'm

Page 205

1  deciding what we're going to talk about here for
2  the rest of the day that I -- if I'm taking out the
3  E-mail I just want to make sure that we're going to
4  have someone else who's going to put up to address
5  those issues.
6      MR. WINCHESTER:  You are getting somebody for
7  specifically for E-mail.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.  I just want to confirm one thing though:
10 When you sent -- Miss Klaus, concerning E-mail,
11 when you sent out the lit hold requests, or when
12 you spoke with the individuals you also made a
13 request for retention of E-mail as well, right?
14     A.  The documents -- the document holds that
15 went out to folks required them to hold E-mail as
16 well as paper -- anything -- anything that was
17 related to the litigation, yes.
18     Q.  And I realize this might not be in your
19 30(b)(6) capacity but I just want to confirm:  Do
20 you recall who it was that also went to the IT
21 department and asked that the -- I guess the 30-day
22 deleters were taken off the computers?  I believe

52 (Pages 202 to 205)

Page 262

1   Q.  I will tell you exactly what he testified
2   to: That they were these types of documents and
3   they were in his file cabinet in his office, and
4   presumably his successor took over his office,
5   right?
6       MR. WINCHESTER: Objection. Scope.
7   BY MS. ST. PETER-GRIFFITH:
8   Q.  Is that fair?
9   A.  I would assume so.  I don't know.
10  Q.  Is it possible that there are some areas
11  within HPD that were missed as part of your search?
12      MR. WINCHESTER: Objection. Form.
13      THE WITNESS: We identified individuals that
14  would reasonably likely have documents, and as I
15  mentioned before, would interview people and obtain
16  information from them to ascertain whether we
17  needed to go talk to other people and went and did
18  that if we received additional names.  So we did a
19  pretty exhaustive search of the Hospital Products
20  Division files.
21      MS. ST. PETER-GRIFFITH: Okay.  Jason, I'm
22  going to ask her some questions about E-mail.  I

Page 263

1   understand that she might not be the designee, and
2   I'll represent to you that I'm asking them to in
3   her in personal capacity, because I kind of want to
4   get this information out before we take the
5   30(b)(6).
6   BY MS. ST. PETER-GRIFFITH:
7   Q.  Ma'am, do you recall whether the --
8   whether when you sent out directives for -- to
9   retain records whether those directives included
10  the retention of E-mail?
11      MR. WINCHESTER: Objection. Asked and
12  answered.
13      THE WITNESS: The record holds?
14  BY MS. ST. PETER-GRIFFITH:
15  Q.  Yes.
16  A.  The record preservation memos?  The
17  record preservation memos, yes, would indicate
18  documents regardless of form.
19  Q.  Do you recall having folks produce to you
20  E-mail?
21  A.  Um, yeah.
22  Q.  Okay.

Page 264

1   A.  You're asking me personally?
2   Q.  You -- you --
3   A.  As Ellen.
4   Q.  You, as Ellen, in your capacity as
5   supervisory paralegal in the legal department?
6   A.  Okay.
7   Q.  Do you recall people giving you E-mail?
8   A.  Yes.
9   Q.  Okay.  Do you remember who did?
10  A.  No.
11  Q.  Do you remember the time frame of the
12  E-mail that they provided to you?
13  A.  It would have been in -- within the
14  relevant time frame of whatever I was collecting
15  for.
16  Q.  Okay.  Do you know whether other
17  counterparts, other either paralegal or lawyers who
18  were collecting documents similarly received
19  E-mail?
20  A.  I don't know.
21  Q.  What was your -- what was the expectation
22  for someone who received a lit hold memo, what was

Page 265

1   the expectation with regard to their preservation
2   of their electronic E-mail?
3       MR. WINCHESTER: Objection. Form.
4       THE WITNESS: Um, just that, that they would
5   preserve their electronic -- their E-mail.
6
7
8   BY MS. ST. PETER-GRIFFITH:
9   Q.  Was there any indication or policy
10  concerning in what format or what form?
11      MR. WINCHESTER: Objection. Form.
12      THE WITNESS: E-mail is E-mail.  I don't know
13  what you mean by form.
14  BY MS. ST. PETER-GRIFFITH:
15  Q.  So in electronic format, or would they be
16  expected to print out their E-mail, or could they
17  printout their E-mail and then delete their
18  electronic version, so that if they provided a hard
19  copy that was sufficient?
20      MR. WINCHESTER: Objection. Form.
21      THE WITNESS: Um, I don't recall there being
22  any -- I don't remember what the instructions said