# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------X

IN RE: PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE       )

PRICE LITIGATION                 ) MDL No. 1456

-------------------------------) Civil Action

This document relates to:        ) No. 01-12257-PBS

United States of America,        )

ex. rel. Ven-a-Care of the       )

Florida Keys, Inc.,              ) Hon. Patti Saris

    vs.                          )

Abbott Laboratories, Inc.,       ) Magistrate Judge

CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler

-------------------------------X


VIDEOTAPED DEPOSITION OF

ALEXANDRA GRIGORAS BUCK

MARCH 13, 2008

CHICAGO, ILLINOIS

Buck, Alexandra Grigoras  March 13, 2008
Chicago, IL

2

1      Videotaped deposition of ALEXANDRA
2  GRIGORAS BUCK, called by the Plaintiffs for
3  examination, taken pursuant to notice, agreement and
4  by the provisions of the Rules of Civil Procedure
5  for the United States District Courts pertaining to
6  the taking of depositions, taken before DEBORAH
7  HABIAN, a Notary Public within and for the County of
8  Cook, State of Illinois, and a Certified Shorthand
9  Reporter of said State, at the offices of Jones Day,
10 77 West Wacker Drive, 35th Floor, Chicago, Illinois,
11 on the 13th day of March, 2008, at 9:10 a.m.
12
13
14 APPEARANCES:
15
16 On behalf of the United States:
17      U.S. DEPARTMENT OF JUSTICE
18      COMMERCIAL LITIGATION, FRAUD
19      BY:  ANN ST. PETER-GRIFFITH, ESQ.
20      99 N.E. 4th Street
21      Miami, Florida  33132
22      (305) 961-9001

                                                                    45

1      A.    If my memory serves, she was -- she was
2  not too familiar with the back-up procedures
3  regarding e-mail, and in terms of other Abbott
4  policies, I don't remember getting into specifics
5  with her.
6      Q.    Okay.  Did she tell you anything about
7  the network shared drives?
8      A.    No, simply that some of the groups had
9  share drives that they could access.
10     Q.    What is a shared drive?
11     A.    A share drive is a piece of memory or
12 space on the corporate network that can be
13 accessed by multiple people.
14     Q.    And did HPD have shared drives?
15     A.    Certain groups within HPD had access to
16 shared drives, yes.
17     Q.    Which groups?
18     A.    I don't know specifically.
19     Q.    Did she tell you anything about
20 desktops?
21     A.    I believe we confirmed with her that
22 the field salespeople did not get computers

74

1  just want to folder it and preserve it and save
2  it.
3  BY MS. ST. PETER-GRIFFITH:
4      Q.   Okay.  What has Abbott done to search
5  for e-mail that have been foldered or saved on
6  the shared drive?
7      A.   Well, we conducted a search of the
8  share drive for any PSTs, and PSTs are --
9  Microsoft Exchange e-mail files is the only type
10 of e-mail that would be subject to this, and we
11 searched those PSTs and produced documents
12 responsive in this case.
13     Q.   When did you do that?
14     A.   I don't know the exact date when that
15 search was conducted.
16     Q.   Is that -- the overall production that
17 has been produced to your knowledge of e-mail,
18 the 500,000 pages in August and then the more
19 recent production, is that the sum total of the
20 e-mail production?
21         MR. WINCHESTER:  Objection, form.  Are
22 you talking about electronic?

1          MS. ST. PETER-GRIFFITH:  Yes,
2   electronic.
3          THE WITNESS:  I know the share drive e-
4   mails that we were just referencing were produced
5   in electronic form.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.   Yep.
8       A.   And that is what I'm referencing, and I
9   believe there is 17 to 18 thousand e-mails
10  produced.
11      Q.   What e-mail -- what e-mails have not
12  been produced by Abbott to date?
13      A.   There are no accessible e-mails that
14  have not been produced.
15      Q.   What do you mean by that, "no
16  accessible e-mails"?
17      A.   As we mentioned earlier, there's this
18  small snapshot, this two month's snapshot from
19  1997 that may, we don't know, may contain e-
20  mails, but, again, those -- that data is not
21  readily accessible.
22      Q.   Are there back-up tapes for other e-

1  in the process of searching that HPD share drive
2  for non-e-mail documents.
3       Q.   Okay, so not only are you looking for
4  the e-mails --
5       A.   Of the --
6       Q.   -- of PST files --
7       A.   Of the deponents, right, because we've
8  already looked for the 39.
9       Q.   Okay, 39, the deponents, that's the e-
10 mail PST files?
11      A.   Correct.
12      Q.   Okay, what else are you doing to search
13 the former HPD shared drive?
14      A.   So we are looking for documents on that
15 share drive, which, again, would be duplicative
16 because everybody was already supposed to print
17 them out.
18      Q.   But you're relying upon Ellen Klaus's
19 testimony with regard to that, right?
20      A.   Correct.
21      Q.   Okay.
22      A.   So we're doing, again, the belt and

1  know, ages ago?
2      A.   Because we've already exhausted that
3  HPD share drive.  We're again doing it as a belt
4  and suspenders.  We expect it all to be
5  duplicative of what was already produced in paper
6  format.
7      Q.   But you're basing that expectation upon
8  the Ellen Klaus search?
9      A.   Yes.  I mean I'm basing it on what I
10 know our employees have done and what we
11 reasonably did throughout this time frame.
12     Q.   Well, when you say that you know your
13 employees have done, what do you know the
14 employees did?
15     A.   Again, I'm -- that they printed out or
16 gave to us in electronic format any document that
17 had to do with any of our record hold orders.
18     Q.   Okay, which employees did that?
19     A.   I think we've already been through
20 this.  I'd go back to my, right, answer that I've
21 had earlier.
22          MS. ST. PETER-GRIFFITH:  I think we've

1   got an outstanding request, Jason, from the Ellen
2   Klaus deposition to identify who those were. I
3   think Miss Klaus was going to go back and search
4   for lists, and if we could renew that request.
5   BY MS. ST. PETER-GRIFFITH:
6       Q.   Ms. Buck, you said you've already
7   exhausted. Do you mean -- when you say you've
8   already exhausted the search, do you mean the
9   efforts that Miss Klaus undertook?
10      A.   What are you talking about?
11      Q.   Okay, when -- in testifying just now,
12  you had said in explaining why you had -- why
13  you'd not previously gone to the Hospira former
14  HPD --
15      A.   Right.
16      Q.   -- database, you'd said that you'd
17  already exhausted the search.
18      A.   Correct.
19      Q.   All right, I meant does that mean --
20  when you saw you've already exhausted the search,
21  are you referencing the physical collection that
22  Miss Klaus did?

244

1           MR. WINCHESTER: Objection, form.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.   Okay, when will this search of the
4    Hospira database be complete?
5        A.   I don't know.
6        Q.   Do we have any sense as to how large
7    this shared drive or -- yeah, this shared -- is
8    that fair, shared drive?
9        A.   Yeah.
10       Q.   Do we know how large it is in terms of,
11   I don't know, memory or is there a way to
12   quantify how large it is?
13       A.   I don't know how large it is.
14       Q.   Did you do anything to determine how
15   large it was --
16       A.   No.
17       Q.   -- prior to testifying? Now, Hospira
18   was served with a subpoena by the United States.
19   Is Abbott undertaking any initiatives to help
20   Hospira search for documents electronically
21   maintained that are responsive to that subpoena?
22           MR. WINCHESTER: Objection, outside the

1      Q.    Has Abbott ever used encrypted e-mail?

2      A.    **Yes, the corporation Abbott has in its existence used encrypted e-mail.**

4      Q.    Was that within HPD?

5      A.    **I don't know.**

6      Q.    Other than the Ellen Klaus initiative pursuant to the lit hold memos, has Abbott done anything else to identify e-mail users who may have generated e-mail that are subject to the lit hold memos?

11           MR. WINCHESTER:  Objection, form.

12           THE WITNESS:  What?  I don't -- I don't understand the question.

14  BY MS. ST. PETER-GRIFFITH:

15     Q.    Sure.  Other than the physical collection --

17     A.    **Okay.**

18     Q.    -- by Ellen Klaus of e-mails that might have been generated by the people she worked with, okay --

21     A.    **Okay.**

22     Q.    -- did Abbott undertake any other

1   initiative to identify e-mail users who might
2   have generated e-mail that was subject to a
3   litigation hold memorandum?
4        A.   Well, I think that's a
5   mischaracterization.  Ellen Klaus did not work
6   with every custodian that was identified as a
7   recipient of litigation hold, and I think that
8   the identification and the continuing expansion
9   of litigation hold recipients is Abbott's effort
10  to identify anybody who generated any sort of
11  data, e-mail or otherwise, that could be
12  responsive to any matter in this litigation.
13       Q.   Okay, let me ask you this.  When
14  litigation hold memoranda were expanded --
15       A.   Yes.
16       Q.   Okay?  So some folks -- you know, for
17  example, Don Robertson received one in '96, but
18  someone else might not have received one until
19  2001.  Do you understand what I mean?
20       A.   Correct.
21       Q.   Okay, there was -- some of the lit hold
22  memoranda had much longer lists than the original

Buck, Alexandra Grigoras                               March 13, 2008
Chicago, IL

271

1   ones that went out.
2       A.   Correct.
3       Q.   For electronic information, what was
4   done by those individuals who didn't receive
5   earlier lit hold memoranda to go back and
6   retrieve their electronic information?
7       A.   Well, there's nothing to retrieve.  At
8   the point where you identify a person who is
9   likely to have information relevant to any
10  litigation, you can preserve everything that you
11  have from that point in time moving backward and
12  from that point in time moving forward.
13      Q.   Okay.
14      A.   Certainly nobody's under an obligation
15  to see into the future and see absolutely
16  everybody who could possibly be subject to any
17  litigation ever.  So we can only do it as issues
18  arise.
19      Q.   Okay.  So there's a possibility then
20  that if someone didn't receive a lit hold
21  memoranda until 2000 and -- or until 2000 and
22  they may have had electronic documents that they

                                                              272

1   stored, but subsequently deleted prior to
2   receiving the lit hold memorandum, it's possible
3   that they didn't produce that electronic
4   information then?
5        A.   **That's a lot of speculation.**
6             MR. WINCHESTER:   Object to the form.
7             THE WITNESS:   I'm not comfortable
8   answering either way on that.
9   BY MS. ST. PETER-GRIFFITH:
10       Q.   Well, how does Abbott know that for
11  those individuals who might have had responsive
12  documents in 1996, 1997 and 1998, but didn't
13  receive a lit hold memo until 2000, that it
14  captured the responsive documents from '96 to
15  '98?
16            MR. WINCHESTER:   Objection, form.
17            THE WITNESS:   Abbott has no duty to put
18  people that it doesn't reasonably expect to have
19  relevant data on hold until we reasonably expect
20  that those people have relevant data to a
21  litigation.  So I don't know how we could have
22  known whether people who were not subject to a

1  hold had data or deleted it prior to receiving
2  the hold.
3  BY MS. ST. PETER-GRIFFITH:
4       Q.   Okay.  So it's possible that they
5  deleted it?
6       A.   I don't know.
7       Q.   Okay.  Well, if it's -- if not everyone
8  got captured or not everyone saved their
9  information until they started getting the lit
10 hold memoranda, doesn't it make sense to go back
11 and search the Hospira drive or shared drive to
12 see what information is there for everybody?
13      A.   We're doing that.
14      Q.   Okay, why didn't you do that before
15 2008?
16      A.   Because anything that resided on the
17 Hospira share drive at the time -- so if a person
18 was added in 2001 and they had data on the shared
19 drive from 1996, it would have been printed out
20 at any number of the collections because many
21 eyes were looking at the share drives, many
22 employees were referencing the share drives for

1   documents relevant.  It's not just my documents.
2   It's everyone's documents that everyone can
3   access.  So those documents were printed and
4   reprinted by any employee from 1996 to 2001
5   probably a gazillion times before -- they were
6   printed by any employee who identified one
7   particular document as relevant over and over and
8   over each collection.
9       Q.   Okay, but were they -- when they
10  received a lit hold memo, were they expected to
11  go back and retrieve their electronic information
12  that predated the date of the electronic -- the
13  date of the lit hold memo?
14      A.   So -- a shared drive has data on it
15  that everybody has access to.  So let's say even
16  if Joe Schmoe who is not on the lit hold until
17  2001 created something in 1997 and put it on the
18  share drive, and we had 30 people looking to the
19  share drive to print any document relevant to
20  this request, they would have printed Joe
21  Schmoe's document.
22      Q.   Okay.

1       A.   So I don't see what -- where you're
2  getting at.
3       Q.   Well, let me just tell you where I'm
4  getting at.  How do you know that the individuals
5  who received lit hold memorandas all did searches
6  of the shared drive information?
7       A.   Because they were instructed to search
8  their share drive, their computers, their e-mail
9  and their paper files.
10      Q.   Okay, for their documents or for every
11 --
12      A.   For any, any documents responsive.  The
13 share drive does not only contain their
14 documents.
15      Q.   Okay.  So it was the expectation of
16 Abbott that, if someone received a lit hold
17 memoranda, that they would go to the shared drive
18 and search not only for documents that they might
19 have had, but for any other documents that were
20 responsive to the lit hold memoranda?
21      A.   I think that is a fair assertion, that
22 the employees were looking on the share drives,

1    and any documents that they saw that would be
2    responsive, would then be printed and turned
3    over.
4         Q.   How do you know that they did that?
5         A.   Because we got production of documents,
6    as expected.
7         Q.   But did you ask them whether or not
8    they went -- did you verify what they -- what
9    each of the individuals did in terms of their
10   electronic search?
11        A.   I don't know whether we verified with
12   every single individual.
13        Q.   In terms of the preservation of
14   documents for electronically preserved documents,
15   other than the individuals identified in lit hold
16   memoranda and the 39 individuals listed who you
17   searched for pursuant to the Medi-Cal and Mike
18   Tootell, who are the other custodians that Abbott
19   has searched?  And when I say "custodians," I
20   mean individuals who created and maintained
21   electronic information.
22        A.   I don't know specifically the other