# EXHIBIT 10



**U.S. Department of Justice**

Civil Division
Commercial Litigation Branch
Fraud Section

*601 D Street, NW*
*Ninth Floor*
*Washington, D.C. 20004*

*Telephone:  (202) 616-3797*
*Telecopier:  (202) 616-3085*

September 17, 2007

*Via Electronic Transmission*

James R. Daly
Jason G. Winchester
Carol P. Geisler
Jones Day
77 West Wacker
Chicago, Illinois 60601-1692

Re:    *United States ex rel. Ven-a-Care of the Florida Keys Inc. v. Abbott Laboratories, Inc.,*
       06–CV–11337-PBS, *In re Pharmaceutical Industry Average Wholesale Price Litigation*,
       MDL No. 1456/Civil Action No. 01-12257

Dear Counsel:

We write regarding Abbott's document production in this case.

This case, as pled, is about Abbott's particular abuse of government reimbursement systems. Consequently, the vast majority of relevant documents in this case are in Abbott's possession. Despite this fact, Abbott's document production has not proceeded at a pace sufficient to meet the fact discovery deadline in this case, currently set for December 31, 2007. We have sent Abbott counsel numerous letters and e-mails pertaining to our outstanding document requests. If Abbott counsel respond at all, it is to provide vague promises of production which rarely materialize. Our discovery requests have been outstanding for 10-13 months, and the close of fact discovery is rapidly approaching. Abbott's failure to produce documents timely in this case has severely prejudiced the United States' ability to complete discovery by the current deadline. Unless we receive Abbott's full production of all outstanding discovery no later than October 1, 2007, we will have no choice but to compel production.

In addition, we note, as we have on previous occasions, that Abbott has overly designated as "Confidential" or "Highly Confidential" documents and deposition testimony in this case. Going forward, we request that, consistent with the Court's September 7, 2007 Order (Dkt. No. 4701), Abbott provide the basis of any confidentiality assertions it makes on documents produced

-2-

during the remainder of discovery. We further request that Abbott remove the designations from materials previously marked as confidential or highly confidential that do not meet the standards set forth in the Protective Order (Dkt. No. 3804) governing this case. The details regarding the United States' requests for Abbott's outstanding discovery and regarding our requests relating to Abbott's use of confidentiality designations are set forth in great detail below.

The United States served a first and second set of document requests upon Abbott on July 19, 2006, and November 17, 2006. We then filed two separate motions to compel certain categories of documents on January 9, 2007 and April 9, 2007. Dkt Nos. 3529, 4047. For many additional categories of documents, rather than move to compel, we have relied on Abbott's representations that documents would be forthcoming. It appears that without court intervention, Abbott does not intend to produce numerous categories of documents relevant to the claims or defenses in this case sufficiently in advance of the fact discovery deadlines. Moreover, we believe Abbott even has failed to produce certain categories of documents Magistrate Judge Bowler ordered it to produce on May 22, 2007, within thirty (30) days of that date.

Abbott has repeatedly represented that its document production was substantially completed on August 9, 2006, pursuant to its initial disclosures, and before the United States served any of its document requests in this case. The United States has and continues to strongly disagree with that position. We have learned that Abbott removed documents relevant to this case from its prior productions to parties in other cases before making its initial disclosures to the United States. We were informed about this "cherry picking" through the process leading up to the Relator's April 27, 2007 filing of a Motion to Compel Abbott to Produce or Consent to Access To and Sharing of All Discovery Produced by Abbott in Other False Price Report Litigation. As a result of that motion, Judge Saris eventually ordered the production of the documents. *See* Judge Saris's 08/21/07 Order, and 09/06/2007 electronic Order denying Abbott's Emergency Motion to Stay the Effect of and Motion to Reconsider the Court's August 21, 2007 Order.

As a recent example, the former Abbott supervisor responsible for reimbursement, Bruce Rodman, was deposed on August 29, 2007. He possessed tens of thousands of pages of documents from Abbott's Alternate Site that Abbott never produced to the United States. These are documents created by Abbott that are highly relevant. Indeed, many of these materials demonstrate that Abbott was very familiar with the concept of average wholesale price ("AWP") and the importance of AWP to reimbursement for Abbott's products by third parties, contrary to the testimony of Alternate Site employee Virginia Tobiason, who was Abbott's government reimbursement expert. For example, it appears from the Rodman production that Alternate Site had entire chapters of manuals dealing with how to complete HCFA 1500 forms. *See e.g.*, "CHIP Reimbursement A-Z Class Materials" (BR 02698 – 02906) and "Reimbursement Implementation Manual" (BR 01407 – 01505).

In addition to prejudicing the United States' ability to prepare its case for trial, Abbott's selective approach to document discovery has impeded coordination among plaintiffs with the result of (1) adding more cost and expense for Abbott (which is continually parsing through hundreds of thousands of pages of documents to shield evidence from one plaintiff or another), and (2) impeding the efficient depositions of Abbott's own current and former employees. We request

-3-

a complete production of the following categories of documents by October 1, 2007.  We also request that Abbott notify us by that date which of the specific Requests for Production ("RFP") in the United States' first two sets of RFPs are complete, and to produce any documents responsive to the RFPs not specifically identified in this letter by October 1, 2007.

## Court Ordered Sales and Marketing Documents

On May 22, 2007, Magistrate Judge Bowler ordered Abbott to produce in thirty (30) days (by June 21, 2007):  (1) all documents that mention the four – and now five – subject drugs;[1] (2) all documents that relate to the subject drugs including, general sales and (across the board) marketing information that would encompass the subject drugs; and (3) all documents that reflect any alleged effort on the part of Abbott to market the spread or manipulate the published AWP for any drug within Abbott's former Hospital Products Division ("HPD").  As to the second and third categories, Magistrate Judge Bowler ordered that they include, *inter alia,* all documents regarding other drugs marketed and sold by HPD to the extent such documents pertain to how Abbott "put together the spread," as well as all cross cutting sales documents inclusive of broad based marketing documents.  Abbott was further ordered to produce, "consistent with its statements at the May 16, 2007 hearing," all documents that show a pattern or practice with respect to the subject drugs.  Magistrate Judge Bowler recognized that the categories may overlap, and that the temporal period shall be through 2003 (consisent with Judge Saris's previous ruling that discovery shall be at least through 2003).

Evidence has come to light that Abbott has failed to comply with the Court's May 22, 2007 Order.  For example, former Abbott employee Bruce Rodman produced pursuant to subpoena numerous training manuals and modules that are clearly covered by this Court's Order of May 22, 2007, and that we have repeatedly requested.  *See e.g.,* "Guide to Sales Training & Development" (BR 01217 – 01406) and "Alternate Site Sales Training – Account Assessment Strategies & Contract Marketing Guidelines for a Proposal" (ABT AWP/MDL 197141 – 197162; CMOAL 232492 – 232513).  To date, Abbott has not produced these materials or others like them, nor has Abbott informed us that these materials ever existed or were missing and/or possibly destroyed.  To the contrary, Abbott counsel represented to the Court and to the United States that Abbott has fully complied with the Court's May 22, 2007 Order.  06/19/07 Hrg. Tr. before Magistrate Judge Bowler at 21:2-14, 22:14-23:25, 24:14-25:3, 27:14-28:8.

In addition, we have repeatedly requested in meet and confer sessions and written correspondence that Abbott provide copies of all marketing plans for the subject drugs.  Abbott counsel has represented that the only marketing plans created and maintained by Abbott for the subject drugs are called "August Plan/April Update" documents.  07/25/07 letter from R. Ford to J. Winchester; 08/31/07 letter from R. Brooker to J. Winchester.  We also understand from Abbott counsel's representations that there are "August Plan/April Update" documents for the time period from January 1991 through 2003.  On August 31, 2007, we sent a letter documenting the handful of plans we were able to locate from the Abbott hard copy production to which Abbott counsel

---

[1]        With the filing of the United States' First Amended Complaint, there are now five drugs at issue in this case.

-4-

directed us to locate these materials, and requested once again that we be provided copies of all such documents. We understand from the August 13, 2007 deposition of former Abbott employee Don Robertson, that he maintained copies of all the April/August plans and updates until the time of his departure from Abbott. Specifically, during the morning portion of his deposition, Mr. Robertson testified that he kept August Plan/April Update documents in a file cabinet in his office and that if he received a litigation hold memorandum, he would have retained the documents since, as he testified, "not following" a directive from his superiors "was not an option." 09/13/07 Dep. of Don Robertson. He further testified that all Vice Presidents for Alternate Site would have similarly maintained copies of August Plan/April Update documents. Still further, Mr. Robertson testified that he received litigation hold instructions in connection with this case as early as 1997. 09/13/07 Dep. of Don Robertson. Accordingly, the August Plan/April Update documents maintained by Mr. Robertson, and presumably other Alternate Site Vice Presidents, should have been preserved and subsequently produced to the United States. Despite Abbott's counsel's representations and the testimony of Mr. Roberston, a large number of Abbott's August Plan/April Update documents have yet to be produced to the United States. Finally, we understand that Abbott launched its version of Acyclovir Sodium in April 1997. Please provide all launch, sales and marketing plans for Abbott's Acyclovir by October 1, 2007.

Further, at the deposition of Dr. Perri, counsel for Abbott repeatedly suggested through his cross examination that Dr. Perri did not have access to Abbott's relevant marketing plans, policies, or other marketing materials, and specifically, marketing documents other than ones that showed that Abbott marketed the spread. *See* 08/21/07 Dep. of Dr. Matthew Perri at 425:11-435:23 (plaintiffs' counsels' request on the record for the expert be provided the missing marketing documents referenced over the course of two days at his deposition); at 619-620 (Dr. Perri's concern that "...you [counsel for Abbott] have implied to me over the last two days that there are something else I need to know, [] I'm available to review that material"); at 645-648 (Abbott's counsel's suggestions that there are documents that show that Abbott had in place and implemented a policy not to market the spread to customers); at 452-455 (Abbott's counsel's suggestions that there are relevant marketing documents that show Abbott did not market the spread); at 613 (Abbott's counsel's statement that "you don't know whether the documents provided to you gives you a complete picture of how Abbott interacted with its customers, sold its drugs, or ran its business, do you?"); at 201-202 (Abbott's counsel's suggestion that there is some evidence that Abbott had a policy "prohibiting affirmative marketing of the spread, but allowing [the] sales force to answer questions posed by a customer"); at 399-400 (Abbott's counsel's statement that ". . . there may be Abbott policies or charts, manuals, or other guidance which would make very clear what the lines of authority are for various functions that you haven't reviewed, correct?"); at 402-403 (Abbott's counsel's statement that, "Abbott may have a policy attempting to prevent that employee from speaking about the spread, correct?"); at 617-620 (counsel references "trip reports" and "significant events reports," which were created by Abbott on a monthly basis, yet not produced by Abbott, but that may contain further discussions of spreads than those documents produced by Abbott).

First, we have seen none of the documents referenced in Abbott's counsel's questioning of Dr. Perri, notwithstanding our document requests for the same. Second, Abbott counsel has

repeatedly represented to the Court that the latter types of materials (marketing documents that do not show that Abbott marketed the spread) were not relevant in this case and, on that basis, Abbott therefore refused to produce such materials. *E.g.*, 06/19/07 Hrg. Tr. before Magistrate Judge Bowler at 26:7-15. In addition, Abbott counsel has represented to the United States and to the Court, as shown above, that Abbott has produced all relevant marketing documents. We are seriously concerned that Abbott may be withholding relevant documents from the United States and its experts, given that one of Abbott's counsel's representations to the United States and the Court are inconsistent with his co-counsel's overt suggestions or statements directed to Dr. Perri in a formal deposition proceeding.

Once again, we request by October 1, 2007, that Abbott either comply with Magistrate Judge Bowler's May 22, 2007 Order compelling the production of all relevant marketing materials, and produce all other marketing materials that Abbott has suggested are relevant to this case at the recent deposition of Dr. Perri. In addition, we request all of the "August Plan/April Update" documents, trip reports and significant events reports for the time period from January 1991 through 2003.

Finally, in light of Judge Saris's September 7, 2007 Order regarding third party discovery (Dkt. No. 4701), requiring the production of "all documents which refer or relate to Abbott's marketing a spread on a drug involving AWP no matter what drug or what year," we ask that Abbott comply with the Court's recent Order and expand its production to remove any limitations it has placed on drugs or year in question. There is absolutely no reason to believe the Court would not apply the same discovery rule to Abbott as it has applied to third parties in this instance, and it would be wasteful of the parties' and the Court's time to re-litigate the issue.

## Court Ordered Personnel Files of ASPS Field Sales Force

At a hearing on May 16, 2007 (Tr. at 56), Magistrate Judge Bowler granted the United States' Second Motion to Compel Documents pertaining to the production of personnel files. (Dkt. No. 4047).

While Magistrate Judge Bowler did not give a date for Abbott's compliance with her Order, simply because it did not come up at the hearing, she clearly intended for these materials to be produced at least within thirty (30) days from her Order, as she has done with other deadlines on the parties' motions to compel. Abbott has repeatedly promised production by certain deadlines and missed those deadlines without notification to the United States. During our July 6, 2007 meet and confer, Abbott counsel stated that he planned to begin production of this category of materials by the following week, and to complete production within three to four weeks, which would have ended approximately the first week of August 2007. To date, Abbott has not produced any of these materials, nor has it offered any reason for its complete silence or its failure to even begin production.

In the July 6, 2007 meet and confer, Abbott counsel made the following additional specific representations regarding this court ordered production. There were 90 members of the Alternate Site Product Sales ("ASPS") field sales force for the period from 1991-2003, including Field Sales Representatives and District Managers. As of 2003, 67 of these individuals still worked for Abbott

-6-

or Hospira; 23 had left. No single personnel file exists. For each member of the 90 ASPS sales force, Abbott counsel indicated that Abbott would be gathering the contents of the files from various places and producing the following information for each of the 90 employees: (1) salary and bonus information; (2) performance evaluations and written goals; and (3) any personnel information related to drug pricing, reimbursement, AWP, or spread. In addition to conducting a search of corporate records, Abbott counsel indicated that current Abbott and Hospira employees were being asked by counsel to send their personnel files to an Abbott attorney for review, including those files that the sales force may maintain in their home offices. Abbott counsel further stated that Abbott would not request former employees to produce files in their personal possession.

Finally, Abbott counsel promised during our July 6, 2007 meet and confer to send a follow-up letter describing the documents Abbott planned to produce in response to this request. Again, we have received nothing further from Abbott counsel on this subject. Magistrate Judge Bowler stated that a copy of an employee's degree was not relevant to the United States' request. 05/16/07 Hrg. Tr. at 56:14-15. We agreed. However, to the extent that Abbott is withholding any other employee information other than copies of degrees, we expect that Abbott counsel will notify us of any categories of documents being withheld by October 1, 2007.

## Court Ordered Documents re Alternate Site 20% Customers

Abbott counsel represented early in the discovery process that Abbott agreed to produce all documents related to its largest Alternate Site customers, which represented 80% of its customers. Abbott refused to produce the files for the remaining 20% of its customers, which presumably included thousands of customers, based on the claim that it was burdensome. Abbott failed to provide any supporting information about the burdensome nature of such a production. As a result, the United States moved to compel the production of these "20% Alt Site customer files." *See* 05/16/07 Hrg. Tr. 67:17-24. At the hearing on May 16, 2007, the United States offered to accept a stipulation that Abbott would not present evidence at trial related to the 20% Alternate Site customers in lieu of the documents being produced. Magistrate Judge Bowler ordered that Abbott had fourteen (14) days to consider the stipulation. *See* 05/16/07 Hrg. Tr. 68:19-23.

During our conversations after the May 16, 2007 hearing, Abbott counsel stated that Abbott would not agree to the stipulation. Abbott counsel indicated also that there were approximately 225 boxes of documents containing files of the 20% of Alternate Site customers, and that the boxes were being sent to a vendor for scanning on May 29, 2007. Abbott counsel further stated that once they were scanned, they would be reviewed by attorneys before production. Abbott counsel estimated production approximately four to six weeks after May 29, 2007, which would have resulted in a late June to early July production to the United States.

We heard nothing further and wrote to Abbott counsel on June 16, 2007 to confirm that we would begin to receive production shortly. We requested a meet and confer session due to our concern that production was not forthcoming on numerous categories of discovery including this one. It was not until that meet and confer session on July 6, 2007, that Abbott counsel represented for the first time that it appeared that many of the 20% of Alternate Site customer files had already been produced to the United States. We expressed concern over Abbott counsel's earlier

-7-

representations to the United States and to Magistrate Judge Bowler that production of these files
would be burdensome, in light of this new information.  Nonetheless, we had no choice but to
accept Abbott counsel's further promises on July 6, 2007 that:  (1) Abbott would provide a list of
the Bates ranges of the 20% Alternate Site customer files already produced, and (2) Abbott would
produce in the following two to three weeks, or by the end of July, 800 additional documents it had
located.  We have not received the 800 documents or the list of Bates ranges for the 20%  of
Alternate Site customer files that Abbott counsel now represents have been previously produced.
We request that Abbott counsel provide this information as promised back in early July 2007, no
later than October 1, 2007.

     Moreover, Abbott counsel represented directly to Magistrate Judge Bowler at a hearing in
June that Abbott had produced documents relating to all prices paid for the drugs at issue in this
case without limiting the representation to large or small customers.  Specifically, Abbott counsel
represented to Magistrate Judge Bowler that Abbott had produced to the United States "every
transaction based price that was charged for [the Subject Drugs] for the entire claim period,"
stating "they [the United States] literally have every time Abbott sold one of [the Subject Drugs]
the price at which it was sold." 06/19/07 Hrg. Tr. at 32:8-25.  On the one hand, counsel for Abbott
represented that Abbott has not produced all documents related to the 20% of Alternate Site
customers, and, on the other hand, counsel represented to the Court that it produced all prices paid
by any customer.  We request that you explain by October 1, 2007, how you reconcile these
inconsistent representations that Abbott counsel has made.

## Pricing Documents

     We have asked Abbott to produce all documents relating to its pricing committee ("or
whatever name Abbott gives to its committee(s) or internal group(s) that consider pricing issues
and /or makes pricing decisions"), including but not limited to, pricing committee meeting minutes
and decision-making documents.  *See* 04/23/07 letter from R. Ford to J. Winchester.  These
documents are responsive to numerous requests for production of documents.  Abbott counsel has
represented in our numerous meet and confer sessions where we requested pricing committee
minutes or documents, that while Abbott did not utilize pricing committees, Abbott produced all
documents otherwise related to pricing decisions.  It appears, however, that there were several
groups involved in pricing, even though none had any formal or specific title such as "pricing
committee."

     For example, Harry Adams testified about participating in several different pricing
committees.  *See* 07/18/07 Dep. of Harry Adams at 96-97, 115, 125, 142, 162, 166, 192-194.
Similarly, David Brincks testified that list prices were set for his former Home Infusion business
unit by the Contract Marketing Department of the Hospital Business Sector ("HBS").  *See*
06/12/07 Dep. of David Brincks at 49-54,106, 212, 222-223.  Peter Karas testified that he was
responsible for pricing decisions routinely reached through an annual collaborative process, and
that he meet on several occasions with Mr. Sellers and Mr. Baker concerning pricing issues.
Corporate Vice-President Loreen Mershimer (*see* 8/23/07 Dep. of Loreen Mershimer at 79-81),
and former Hospital Business Sector Vice-President Guy Wiebking (*see* 8/22/07 Dep. of Guy
Wiebking at 73-88) also testified that the general managers of the product lines and the HBS

-8-

Contract Marketing Department would confer regarding the setting of prices and annual increases taken. We request confirmation by October 1, 2007, that Abbott has produced all such responsive documents related to these committees or groups, and other price setting mechanisms.

We further request confirmation by October 1, 2007, that Abbott is not interpreting the United States' request for pricing committee documents as requiring any or all of those words to appear on the documents. Abbott solely possess the information about how Abbott referred to individuals and groups that made pricing decisions. It should be clear that "pricing committee" refers to any meeting, conference, discussion, or exchange of two or more persons within HPD concerning or relating to pricing of drugs, including but not limited to, prices Abbott referred to as list, catalog, wholesale, WAC, Parameter, RX Link Acquisition Cost, RX Link Customer, or any other pricing term. *See* 04/23/07 letter from R. Ford to J. Winchester. We ask that you verify that Abbott has indeed produced all documents relating to these groups involved in pricing, regardless of the name given by Abbott to such groups.

Finally we ask that Abbott comply with Judge Saris's September 7, 2007 Order on third party discovery (Dkt. No. 4701), namely that Abbott expand its search and production to include, for example: (1) "with respect to the particular named drugs at issue in this litigation, [] all documents related to pricing that drug regardless of the time period generated;" and (2) "documents relating to Abbott's reporting AWP to the publication compendia (like First Data Bank) during the 1991 to 2003 time period." As to the latter category of materials, Abbott counsel emphasized to Magistrate Judge Bowler that, with respect to the four subject drugs,[2] that Abbott had "given [the government] every communication with the pricing compendia about prices for these drugs.....[] That's what we did. We've given them those documents....[] What did we tell the pricing compendia about the prices? Here are our communications with the pricing compendia. They have those." Judge Saris's September 7, 2007 Order, however, did not limit the production of documents pertaining to Abbott's reporting AWP to pricing publications to the subject drugs. Even accepting Abbott counsel's representation that Abbott has produced all of its communications with pricing compendia as to the four subject drugs, pursuant to Judge Saris's recent Order, a larger category of documents (*i.e.,* those pertaining to communications to pricing compendia on all of Abbott's drugs) should be produced.

Please also notify us no later than October 1, 2007 whether Abbott intends to comply with Judge Saris's September 7, 2007 Order.

## Home Infusion Documents

The United States has repeatedly requested an update on the status of the Home Infusion documents. In May 2007, Abbott counsel represented that Abbott had isolated these documents, and thereafter determined that approximately 80 boxes of responsive documents existed. Abbott counsel further represented at our meet and confer session on July 6, 2007, that Abbott would

---

[2]       Since that hearing, the United States has amended its Complaint to add a fifth drug, Acyclovir Sodium.

produce the documents in early August.  To date, Abbott has failed to produce these documents. We request that Abbott immediately produce all responsive documents from, or relating to, the Abbott Hospital Products Division, Alternate Site Home Infusion business unit, or identify those documents that have been lost or destroyed, and explain the circumstances related to the loss or destruction of those documents.

        The Abbott employees deposed to date have identified a variety of documents that should exist for this business unit.  Based upon that testimony, we expect that the Home Infusion production will include, but certainly not be limited to, the following information:  (1) all Home Infusion contracts; (2) all internal and external communications regarding the Home Infusion business unit and its billing or pricing; (3) all pricing information data, including specific pricing data used by the Home Infusion Contract Marketing Department in evaluating contract proposals, and all pricing information retained or maintained by Abbott for use in providing reimbursement services to its customers; (4) all marketing plans for Home Infusion; (5) all resource files used by the Home Infusion business unit; (6) all documents concerning Abbott's own Home Infusion pharmacies, including documents pertaining to and/or reflecting the decision to close the pharmacies; (7) all Medicaid and Medicare claims, collection and reimbursement information for Abbott's pharmacies and customers, including provider number and billing information, as well as all HCFA 1500 forms, or comparable electronic forms submitted to Medicaid or Medicare; (8) all training materials and manuals, including any manuals from other business units that were utilized or maintained by Home Infusion; (9) all communications with customers, including any and all proposals for contract terms or revenue share models or pricing information; (10) "item file" information concerning customer pricing; (11) all pricing information used by Abbott to determine what charges its Reimbursement Department would report to Medicare or Medicaid officials on HCFA 1500 forms (or electronic claims forms); (12) all compliance materials; (13) all reconciliations with revenue share customers, including information concerning all Medicaid or Medicare funds collected by customers and Abbott's retention of the percentage of those collections; (14) all customer invoices and/or documents reflecting all drugs and products consigned by Abbott to any Home Infusion customer; (15) all worksheets, rough plans, or projections generated by the Home Infusion Contract Marketing Department; (16) all CHIPs information, including any contracts and information concerning Abbott's licensure of the CHIPs program; (17) documents reflecting the revenues taken in by Home Infusion for the relevant time frame; and (18) all documents that reflect, refer, relate or pertain to the decision to close the Home Infusion business unit, the decision making behind that decision, and/or communications concerning the decision to close the Home Infusion business unit.  We request that Abbott produce all of these highly relevant materials by October 1, 2007.

        Further, as set forth above, former employee Bruce Rodman produced and testified about numerous manuals, procedures, samples, training materials and protocols that were either created or made available to the Alternate Site Home Infusion business unit.  Examples of these types of documents were plentiful within the nearly 5,800 pages of hard copy materials that Mr. Rodman produced pursuant to subpoena.  We request that by October 1, 2007, Abbott produce for all years from 1991 through 2003, all copies of all manuals produced by Mr. Rodman.