**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 06-CV-11337-PBS | ) | |

**ABBOTT LABORATORIES, INC.'S REPLY IN SUPPORT OF ITS MOTION TO
COMPEL PRODUCTION OF DOCUMENTS FROM THE UNITED STATES**

Abbott respectfully files this reply memorandum in support of its Motion to Compel

Production of Documents from the United States (Dkt. No. 5173).  In response to Abbott's

motion, the Government filed an opposition brief ("Opp.") that omitted or misstated important

facts, cited inapplicable precedent, and failed to provide legitimate grounds to resist the

important discovery sought by Abbott.  This reply addresses these concerns.

1.      **"Decision Memorandum"**

The Government's ability to extensively redact the key October 22, 2002 "decision

memorandum" from Abbott requires it to clear three separate hurdles.[1]  First, the Government

must show that it has not already waived the deliberative process privilege over the subject

matter it seeks to redact.  Second, the Government must show that the redacted portions of the

document are covered by the deliberative process privilege.  Finally, under a balancing test, the

Government must convince the Court that its interest in shielding the redacted language in this

particular document outweighs Abbott's interests in obtaining a full, unredacted version of the

document.  The Government cannot get over the first hurdle, let alone the other two.

---

[1] The document in question has been marked as Abbott Ex. 487 and was attached as Exhibit 3 to Abbott's
opening brief (Dkt. No. 5173).

Even under a narrow view of subject-matter waiver, there can be no reasonable dispute that the Government has waived any deliberative process privilege over the redacted contents of this "decision memorandum."  Indeed, the Government does not, and cannot, dispute that it has already produced and allowed extensive questioning about a draft version of the very same (or at least very similar) language it seeks to redact.[2]  The Government instead argues that "inadvertent waiver is the issue implicated here" (Opp. at 6), characterizing its deliberate *choice not to recall* the draft version of the document as compelled by "practical considerations."  (*Id.* at 2.)  To support its claim, the Government contends that the draft was inadvertently produced in 2004 and then points this Court to a line of caselaw on "inadvertent waiver."

Even if the Court agreed that the United States inadvertently produced the draft memorandum in 2004, its deliberate and much-vetted decision *not* to recall the draft earlier last year amounts to a waiver of the privilege.  Indeed, the Government's own brief admits that it "elected not to recall the document."  (*Id.* at 2.)  This is a voluntary relinquishment of the privilege.  *See, e.g.*, 26A Fed. Pract. & Proc. Evid. §5692 ("True waiver of the governmental privileges is accomplished in the same fashion as waiver of other privileges; *i.e.*, by voluntary disclosure of a significant portion of the information claimed to be privileged.") (footnotes omitted).

The cases cited by the Government are inapposite, as they deal with situations where the Government had inadvertently produced documents *and was actually attempting to recall or prevent questioning on those documents*.  *See, e.g.*, *Scott v. PPG Industries, Inc.*, 142 F.R.D. 291, 294 (N.D. W. Va. 1992) (EEOC moved for a protective order to prevent questioning on a document that was inadvertently produced).  Here, by contrast, the Government's deliberate and

---

[2] The draft of the "decision memorandum" has been marked as Abbott Ex. 328 and was attached as Exhibit 4 to Abbott's opening brief (Dkt. No. 5173).

knowing "decision to refrain from attempting to recall the document" (Opp. at 6) is unquestionably a conscious choice to relinquish a claim of privilege.  It is irrelevant whether that decision was driven, as DOJ argues, by practical considerations, or by altruism, concern, or some other motivation; there can be no argument that it was a conscious, deliberate choice.  A knowing disclosure of this sort waives protection over the information contained in the memorandum.  *See Melendez-Colon v. U.S.*, 56 F. Supp.2d 142, at 145 (D. Puerto Rico 1999) (finding that Department of the Navy waived deliberative process privilege over an investigative report because the report had been previously disclosed to a third party insurance appraiser).

The *Texaco* case noted that the question of *inadvertent waiver* of the deliberative process privilege was "unsettled."  *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F. 3d 867, 885 n.8 (1st Cir. 1995).  It does not address the notion of voluntary waiver at issue here.  In any event, Abbott's citation to the *Texaco* footnote was meant to emphasize that if the First Circuit was open to recognizing waiver *even where* production might have inadvertent, then *a fortiori* it would certainly recognize waiver in a situation such as this.

On the question of whether the document even qualifies for deliberative process privilege, the Government argues that the final memorandum is a "binary document" that can be separated into privileged (recommendations from CMS staff) and non-privileged sections (the Administrator's decision).  (Opp. at 3-4.)  The Government contends that it should be permitted to redact that part of the document containing recommendations from CMS staff.  The Government's argument should be seen for what it is:  an attempt to strip the final "decision" of its context so that the jury will have a more difficult time understanding what CMS approved and why.  *See* Dkt. No. 5173 at 2-4; Dkt. No. 4759.

Finally, on the balancing test, the Government makes little effort to support its need to assert the deliberative process privilege over some contents of this document. The Declaration submitted by Herb B. Kuhn contains no discussion of why providing an unredacted version of the final memorandum would harm CMS—particularly since the contents CMS is attempting to redact have already been disclosed in the draft memorandum. The harm alleged in the Declaration has no connection to the document at issue.[3] Abbott has set forth in prior briefing (Dkt. No. 5173, Dkt. No. 4759) why the decision memoranda marked as Abbott Exhibits 328 and 487 are highly relevant to this case. The Government's response that "the document is from 2002 – after the claims period in the Government's case against Abbott," is easily dismissed. CMS's own witnesses have testified that the facts and circumstances that led these decision memoranda arose prior to 2002, within the claims period in this case.[4]

By asserting privilege over this document, the Government is not trying to uphold the principles of the deliberative process privilege. The Government is merely trying to keep evidence unfavorable to it from reaching the jury. The Court should put an end to this gamesmanship and order production of an unredacted version of the October 22, 2002 decision memorandum.

---

[3] *See, e.g.*, *Resolution Trust Corp. v. Diamond*, 773 F. Supp. 597, 604 (S.D.N.Y. 1991) (rejecting assertion of deliberative process privilege when Government's affidavits provide "merely a paraphrase of the rationale for the deliberative-process privilege described in the case law"); *See Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 6 (N.D.N.Y. 1983) (Government is required to articulate "precise and certain reasons for preserving the confidentiality of the requested information").

[4] *See, e.g.*, Reed 30(b)(6) Dep. at 208-09 ("Q. Well, we went through some documents earlier today in the late '90s, 2000 and 2001 where you were involved in discussions with the states where you were trying to get them to provide documentation to support the discount levels. And in a couple instances you even pointed to OIG studies that would call for a higher discount, correct? A. I can remember at least in one instance I reference OIG discount in my e-mail note. Q. And that's the type of thing that's being talked about here [in Abbott Ex. 328], right? A. I believe so.") (excerpt attached as Ex. 1).

### 2.      Representative Sample of Allegedly False Claims

The Government's attempt to avoid producing even a representative sample of actual claim submissions in this False Claims Act displays a fundamental misunderstanding of the legal question at issue here.  It is also is replete with factual inaccuracies.  The Government would have this Court believe (1) that Abbott contends the United States has not produced any *data* (Opp. at 6); (2) that Abbott does not understand that some providers submit claims to Medicare electronically (*id.* at 8); and, most importantly, (3) "that the claims data is one and the same as the claims forms."  *Id.*  These contentions are all inaccurate.

First, while Abbott has numerous complaints regarding the inadequacy of the Government's production of claims *data* in this case, that is a topic for another day.  At issue in this motion is Abbott's request for a representative sample of the claims *submissions*—what the providers submitted to obtain payment.  Contrary to the Government's assertion, these claims submissions are not "one and the same" as the claims *data* it has produced to date.

Initially, the Government implies that, because "Medicare has entered the electronic age," none of the claims at issue in this case would have been submitted through hard-copy forms. (*See also id.* at 8:  "Nor can the Government produce a hard copy document that was never created.").  But the Government well knows that at least some of the claims submissions at issue exist (or once existed) in paper form.  Rena Clark, the 30(b)(6) witness for the Medicare carrier Wisconsin Physician Services, testified that carriers received and processed hard-copy HCFA 1500 forms during the 1990s.  *See* Clark Dep. at 41-42 ("Most of it was automated already [by 1999]. . . . [T]he electronic claims came in electronically through whatever means they come in . . . . [T]he paper claims went through an OCR, an optical scanner reader, and were put into the

system by 1999.") (excerpts attached as Ex. 2).[5]  The decision in *U.S. ex rel. El-Amin v George Washington University*, 522 F. Supp.2d 135 (D.D.C. 2007), cited by the Government, also evidences this fact.  That court noted that the defendant had submitted HCFA 1500 claims forms in paper during the first half of the 1990s.  *Id.* at 147 ("Even for the time period 1990 to 1996, it appears that Defendant submitted HCFA 1500 claim forms in two different formats.  Some HCFA 1500 claim forms were submitted electronically, and others were submitted in hard copy format.").

What is more, unlike the Government here, the relator in *El-Amin* engaged in a diligent search for hard-copy claims submissions.  The relator began by serving a subpoena for the claims forms upon HCFA; much like Abbott's efforts, however, its efforts were stymied:

> The government did nothing.  When the government failed to respond to the subpoena, counsel for Relators traveled to the Federal Records Center in Dayton, Ohio, where the HCFA 1500 claims forms were supposedly stored.  Counsel for Relators 'hired numerous temporary staff' and spent 'many weeks reviewing millions of pages and thousands of boxes of Medicare records.'  In spite of this lengthy manual search, Relators were only able to locate a few hundred HCFA 1500 claim forms.

*Id.* at 146 (citations omitted).[6]  The court deemed this a "reasonable effort" to locate hard-copy claims forms and did not require the relators to introduce originals at trial.  *Id.*  No remotely comparable reasonable effort has been undertaken here by the Government.  For example, there is no indication that it has tried to locate or produce the scanned versions of paper claims described by Ms. Clark, or the purely electronic claims forms that have been entered in more recent years.

---

[5] In fact, Ms. Clark's testimony indicates that paper claims forms are still accepted today by Medicare carriers.  *Id.* at 23 ("[O]n a claim form the background is red, all of the lines and the bars and the fill in the blanks are red, because when it's scanned by an optical scanner, the red disappears and leaves what you've printed on the claim. So that's input into the computer.  The computer knows to ignore the red and pick up the black, and that makes an electronic version of the claim. . . .  That's current years.").

[6] The *El-Amin* court also noted that HCFA "routinely stores HCFA-1500 claim forms for a set period of time."  *Id.*

Even for those claim submissions that were submitted electronically, the claims data is *not*, as the Government confusedly asserts, "one and the same as the claims forms."  (Opp. at 8.)  As was the case in *El-Amin*, and what is presumably the case here, "[s]ome HCFA 1500 claims forms were submitted electronically, and others were submitted in hard copy format."  522 F. Supp.2d at 147.  The claims *data* that the Government has produced is simply *not* "one and the same" as the HCFA 1500 electronic or hard-copy claims forms.

The Government's contention about what is "sufficient to prove false claims" at trial (*see* Opp. at 12-13) misunderstands the question posed by this motion.  The question is not what evidence the Government needs to prove its case but, rather, whether Abbott is entitled as a matter of discovery to get a representative sample of the actual claims submissions at issue in this case.  Abbott is entitled to see the exact same information that was recorded on an individual claim—who submitted what claim, when, for what type and quantity of subject drug, and the method of payment that was determined by the Medicare carrier or state Medicaid agency who processed the claim.  It is entitled to see if the claims data upon which the Government apparently intends to rely is, in fact, reliable.

Finally, a patent contradiction in the Government's position in this case bears mention.  For months, the Government has insisted that Abbott produce the actual claims submitted by Abbott's Home Infusion business—despite the fact that the Government already has in its possession the underlying claims data for these submissions.  (*See* Opp. at 9.)  If the claims submissions requested of Abbott's Home Infusion business really are "one and the same" as the claims data, as the Government maintains, there would be nothing for Abbott to produce.  For many of the same reasons the Government wants the actual claims submissions from Abbott, Abbott seeks at least a representative sample of submissions for the claims at issue in this case.

### 3.      Provider Look-Up Table

In its opposition, the Government finally agrees to produce the material necessary to make sense of data produced from CMS's information system, and to identify which providers submitted which false claims in this matter.  The Government disingenuously suggests that it has provided Abbott with this information all along by identifying a "public use file known as the Provider of Services or POS file."  (Opp. at 13.)  The Government identifies a web address with "forms and instructions for ordering" the Provider of Services files, and then asserts that the information requested by Abbott "is, and has been, readily available to Abbott on a publicly accessible website."  (*Id.*)  The Government neglects to mention that, as indicated at its identified web address, the data costs $100 per quarter.

It is unfortunate that ordinary channels of discovery could not achieve the same result short of motions practice.  If this information will actually allow Abbott to link individual claims forms to the names of specific providers, Abbott's motion would indeed become moot.

### 4.      Work Papers for April 2007 and January 2008 OIG Reports

In its opening brief, Abbott set forth particular reasons why it sought the workpapers for two recent OIG reports.  (*See* Dkt. No. 5173, at 9-12.)  The Government's response ignores those reasons, instead arguing that the work papers for these reports cannot be relevant because the reports were issued outside of the claims period in this case and do not specifically mention the drugs at issue in this litigation.  (*See* Opp. at 14-15.)  The Government raises no claims of privilege; nor does it raise any serious questions of burden to produce these documents.

The Government's timing argument ignores the glaring fact that the Government has produced the workpaper support files for numerous—and much less relevant—OIG reports dated after 2001 (all the way to 2006).  The very fact that the Government has elected to withhold the workpapers for these two particular post-2001 reports by itself admits the work papers contain

relevant evidence the Government is trying to shield.  There most logical reason the Government has balked at producing them is that they contain information harmful to its case.

The Government contends that the 2007 report is irrelevant because it examined state Medicaid agencies' choices on whether to use "new pricing information" in their drug payment methodologies that had not previously been available to them for that purpose.  (*See* Opp. at 14-15.)  But the Government's entire case rests on the very questionable premise that state Medicaid programs "would have" reduced drug payments to actual acquisition cost if only those states had more accurate pricing information.  Abbott contends (with extensive evidentiary support) that this assumption is flawed, and that states have deliberately paid margins on drug costs for a variety of reasons.  Evidence of the states' reactions to "new pricing information" is relevant to what they allegedly "would have done" had that information been provided earlier.

Likewise, the Government barely musters a response to Abbott's request for the 2008 report, protesting that Medicare Part D is "irrelevant" because it did not exist prior to 2003.  (*See* Opp. at 15.)  This ignores obvious similarities between the Part D drug benefit described in the 2008 report and the federal entitlements at issue in this litigation.  (*See* Dkt. No. 5713, at 11 n.5 ("With its focus on prescription drugs dispensed at retail pharmacies, Medicare Part D is quite similar to the prescription drug benefits that have been provided by state Medicaid programs for decades and are at issue in this litigation.").)  The Government's argument papers over what is probably the real reason the Government does not want to produce the workpapers for this report, namely, that they are likely to contain other statements by federal officials praising Medicare's "align[ment]" of "incentives" that encourage the use of generic drugs by paying for them at spreads comparable to those allegedly paid for Abbott's drugs in this case.

Finally, the Government advances a novel theory that it need not produce these reports because they were authored "by an arm of the OIG and not by CMS, which is the component which administers the drug benefits which are the focus of this case."  (Opp. at 14.)  This bizarre *non sequitur* ignores the fact that both parties and the Court have operated throughout discovery on the premise that OIG reports are highly relevant to Abbott's defense.  The relevance of OIG reports, and their accompanying work papers, can hardly be in doubt.

### 5.      Document Preservation and Collection Memoranda

The Government contends that Abbott's request for document preservation and collection memoranda is unwarranted because Abbott already has had the opportunity to question witnesses on spoliation issues.  But it cannot be the case that a party who produces witnesses for depositions on a particular subject is somehow relieved of its obligation to produce documents on that same subject.  Abbott highly doubts that the Government would accept such reasoning from Abbott.  Simply put, compliance with one type of discovery request does not relieve a party of its obligation to comply with a request seeking another type.  Indeed, not only must the Government produce its preservation and collection memoranda, Abbott, upon receiving them, would be well within its rights to request the re-opening of depositions where extensive testimony was provided on spoliation-related subjects without the benefit of having all relevant documents.

Abbott does not dispute that, as the Government points out, some portions of its document preservation and collection memoranda may contain privileged information.  Abbott requests only that the Government confirm it has produced all such memoranda or logged those

documents that it has decided to redact or withhold in full on privilege grounds. This is a basic discovery obligation which the Government has thus far shirked.[7]

### 6.    Deposition Transcripts

The Government spends several pages complicating what it knows Abbott is really after when it comes to the topic of AWP-related transcripts in the Government's possession. It complains that Abbott's ulterior motive is to obtain the Government's work product, that cases brought by the Government against other drug manufacturers on similar issues have no relevance, and that Abbott should obtain transcripts from other AWP cases from the manufacturers themselves.

To be clear, Abbott does not seek work product from the litigation files of the Department of Justice. All Abbott wants is the ability to identify and obtain copies of relevant transcripts from other AWP cases where its representatives were not present. As noted in its motion, Abbott is willing to seek consent for the production of these transcripts from interested pharmaceutical companies that might have outstanding protective orders preventing disclosure. What Abbott does not think it should be forced to do is survey the entire pharmaceutical industry by sending broad-based requests to every single MDL party, as the Government suggests.

A much simpler solution is at hand. The Government need only reciprocate the good-faith gesture Abbott made when it produced a seven-page chart listing all the AWP-related depositions transcripts in their possession. (*See* Ex. 19 to Dkt. No. 5173.) If the Government supplies Abbott with a comparable chart of relevant depositions, Abbott can then seek consent for production of the transcripts it cares about from interested parties. It is noteworthy that the Government's three-page response on this issue never acknowledged Abbott's gesture. Instead,

---

[7] After Abbott filed the instant motion to compel, and the day before filing its opposition brief, the Government produced "Material pertaining to CMS's 2004 preservation and search efforts in response to subpoena request."

the Government chose to obscure what should be a basic matter of returning a favor.  This Court

should require the Government to provide Abbott with a list of the AWP-related depositions in

its possession.

Dated:  May 2, 2008                        Respectfully submitted,

                                           /s/ David S. Torborg
                                           James R. Daly
                                           Tina M. Tabacchi
                                           Brian J. Murray
                                           JONES DAY
                                           77 West Wacker Drive, Suite 3500
                                           Chicago, Illinois  60601
                                           Telephone:  (312) 782-3939
                                           Facsimile:   (312) 782-8585

                                           R. Christopher Cook
                                           David S. Torborg
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, D.C.  20001-2113
                                           Telephone:  (202) 879-3939
                                           Facsimile:  (202) 626-1700

                                           *Counsel for Defendant Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Sean P. Malone, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM THE UNITED STATES to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 2nd day of May 2008.

/s/ Sean P. Malone
Sean P. Malone