# EXHIBIT 1

Reed 30(b)(6), Larry                              March 19, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

    v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -

          (captions continue on following pages)


                    Washington, D.C.

                    Thursday, March 19, 2008

                    9:00 a.m.


   Videotaped deposition of LARRY REED as 30(b)(6)

     witness for the UNITED STATES OF AMERICA

fef1f307-e60c-47f5-8d59-435a26e44354

Reed 30(b)(6), Larry                                      March 19, 2008

Page 206

1  reimbursement would be based, it could have been by a
2  greater percentage than those proposed in the state
3  plan amendment.
4      Q.   And the next sentence says "The lesser
5  level of discount is generally the result of
6  negotiations that occur between the state and pharmacy
7  representatives after the survey results are known.
8  In other cases the states legislature have responded
9  to the escalating costs of Medicaid drugs by enacting
10  legislation that increases the discount in the
11  ingredient cost or the dispensing fee of these drugs.
12  Legislation usually does not address why these rates
13  are the best estimates or are reasonable."  Do you see
14  that?
15      A.   I see that part of the program.
16      Q.   And was that consistent with your
17  experience at or around the time that this memorandum
18  was prepared?
19      A.   I believe it was.
20      Q.   In the next paragraph it says "It is
21  proving increasingly difficult to require the states
22  to establish payment rates in adherence to regulatory

Page 207

1  requirements."  Do you see that?
2      A.   I see that sentence.
3      Q.   Do you have an understanding of what that
4  means?
5      A.   I believe I do.
6      Q.   Okay.  Can you tell us your understanding?
7      A.   That the states themselves are having a
8  more difficult time establishing their payment rates
9  here.
10      Q.   Is it saying -- what's it talking about
11  when it says "difficult to require states to establish
12  payment rates in adherence to regulatory
13  requirements"?  What's being discussed there?
14      A.   In this case it would be the EAC and a
15  dispensing fee.
16      Q.   And why was it proving increasingly
17  difficult to require states to establish payment rates
18  in adherence to EAC and dispensing fees?
19          MS. MARTINEZ:  Objection to form.
20      A.   I think at this point in time that there
21  were, again, as we were becoming more aware of
22  differences between AWPs and the appropriate discounts

Page 208

1  through the OIG and other information that might have
2  become available, states were having a more difficult
3  time basing their payment rates on those -- on that
4  data.
5      Q.   Okay.  And this was a phenomena that had
6  started prior to 2001; is that fair to say?
7          MS. MARTINEZ:  Objection, form.
8      A.   I don't know what time period that would
9  cover.  I know what time period -- I mean, I know
10  approximately what time period this memo was
11  drafted -- or I'm sorry.  I don't know what time
12  period it was drafted, but I know when it was done in
13  final.  So I know that time frame.
14      Q.   Well, we went through some documents
15  earlier today in the late '90s, 2000 and 2001 where
16  you were involved in discussions with the states where
17  you were trying to get them to provide documentation
18  to support the discount levels.  And in a couple
19  instances you even pointed to OIG studies that would
20  call for a higher discount, correct?
21      A.   I can remember at least in one instance I
22  reference OIG discount in my e-mail note.

Page 209

1      Q.   And that's the type of thing that's being
2  talked about here, right?
3      A.   I believe so.
4      Q.   It says "Accordingly" -- the memo continues
5  "Accordingly we believe an analysis and an acceptance
6  of other factors states are now using to establish
7  payment rates should be considered in looking at the
8  EAC and the dispensing fee."  Do you have an
9  understanding what that means?
10      A.   I do.
11      Q.   Could you tell us what that means?
12      A.   Again, there's a number of ways to do a
13  best estimate.  Within the context of this memo, I
14  believe that this was for the final version of this
15  memo this was where that responsibility was shifted
16  for review of the state plans from the regional office
17  to the central office.  And within this sentence we
18  were looking for the bases to establish these payment
19  rates.
20      Q.   What other factors were states using to
21  establish payment rates that CMS believed it should be
22  considering in looking at the EAC and the dispensing

53 (Pages 206 to 209)