Chicago, IL

Page 362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
----------------------------------x
 In re:  PHARMACEUTICAL INDUSTRY   )   MDL DOCKET NO.
                                   )
 AVERAGE WHOLESALE PRICE           )   CIVIL ACTION
                                   )
 LITIGATION.                       )   01CV12257-PBS
-------------------------------    x
```

VOLUME II

The videotaped 30(b)(6) deposition of ABBOTT (DAVID FISHMAN), called by the United States for examination, taken pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Rachel F. Gard, Certified Shorthand Reporter, at 77 West Wacker Drive, Suite 3500, Chicago, Illinois, commencing at 8:35 a.m. on the 20th day of March, A.D., 2008.

Page 599

1   MS. ST. PETER-GRIFFITH: We have less than
2   five minutes left on the tape. I'm done with this
3   document. Why don't we take a break.
4   THE VIDEOGRAPHER: Going off the record at
5   2:15 p.m.
6           (A short break was had.)
7           (Exhibit Fishman 017
8           marked as requested.)
9   THE VIDEOGRAPHER: Beginning of Videotape No.
10  5, the deposition of Mr. Fishman. We're back on
11  the record at 2:29 p.m.
12  BY THE WITNESS:
13     A.  They look like they're both the same
14  document.
15     Q.  Oh, yes, they are. I'm sorry. I think
16  that -- I'm only interested in the first page.
17     A.  Oh, I'm sorry. I should keep both of
18  them?
19     Q.  Because they're two different versions
20  the same --
21     A.  One is a copy, one is the sendee.
22     Q.  Correct.

Page 600

1   MS. CITERA: You know, this to me seems to be
2   privileged. And so I'm just wondering if -- I
3   don't know why it was produced.
4   MS. ST. PETER-GRIFFITH: Do you want -- Do you
5   want to make an inquiry, and I'll defer it to a
6   later point in time?
7   MS. CITERA: Sure. Has this been used as an
8   exhibit in another deposition? Can you tell me
9   that?
10  MS. ST. PETER-GRIFFITH: I don't think so
11  because I'm pretty sure the only person we would
12  have used it for would have been Tobiason, and this
13  wasn't produced then. We didn't have this
14  production then. I'm assuming, Toni, that Gorman
15  -- I know Riddle is internal. Is Gorman internal
16  as well?
17  THE WITNESS: Yes.
18  MS. CITERA: I'm assuming by the number, yeah.
19  THE WITNESS: Yes, he's an internal -- he was
20  an internal Abbott person.
21  MS. ST. PETER-GRIFFITH: Okay. We can -- why
22  don't we --

Page 601

1   MS. CITERA: Table this. I'm going to send
2   this email.
3   THE WITNESS: Give it back?
4   MS. ST. PETER-GRIFFITH: Hold it in front of
5   you because it's already been marked, but we will
6   --
7           (Exhibit Fishman 018
8           marked as requested.)
9   MS. ST. PETER-GRIFFITH: I believe, Toni, that
10  those are the only two versions that we found of
11  that document.
12  MS. CITERA: Okay.
13  BY THE WITNESS:
14     A.  I'm assuming you would like me to read
15  this?
16     Q.  Yes, please. Yes. That will give Toni
17  time to text, too.
18  MS. CITERA: I'm done typing, so ... Are we
19  on?
20  MS. ST. PETER-GRIFFITH: Yes.
21  MS. CITERA: Sorry.
22  MS. ST. PETER-GRIFFITH: That's Exhibit 18,

Page 602

1   Toni.
2   BY THE WITNESS:
3      A.  Okay.
4      Q.  Sir, Exhibit 18, is a May 19th, 1993
5   letter from Christopher Herden, Contract Marketing
6   analyst, within Abbott Home Infusion to Gerald
7   Clouse, executive director of Kettering Healthcare.
8   Do you see that?
9      A.  I do.
10     Q.  In the general -- We're not necessarily
11  going to go line by line of this letter. But the
12  general substance of the letter seems to be that
13  Midwest Home Infusion Services has a concern about
14  -- or apparently raised by Midwest legal counsel's
15  concern about percentage of collections and the
16  possible implication under Safe Harbor rules. Do
17  you see that in the second paragraph?
18     A.  I do.
19     Q.  The next -- First of all, approximately
20  how many of Abbott's Home Infusion partners raised
21  concerns about the legality or the compliance
22  implications of the percentage of collection

61 (Pages 599 to 602)

Page 603

1  arrangements?
2      A.  I don't know.
3      MS. CITERA:  Object to the form, outside the
4  scope.
5      THE WITNESS:  Sorry.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  The second sentence in that second
8  paragraph reads, "Although Abbott is very
9  comfortable with the structure of a percentage of
10 collections agreement, Abbott nonetheless was
11 willing to modify our agreement to follow a
12 fee-for-service approach as requested by Midwest
13 counsel."  Do you see that?
14     A.  I do.
15     Q.  What's the difference between a
16 percentage of collection and fee-for-service
17 approach?
18     MS. CITERA:  Object to form, outside the
19 scope.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  Well, let me ask it this way:  Is
22 fee-for-service a particular type of arrangement

Page 604

1  that Abbott Home Infusion was willing to offer to
2  customers?
3      MS. CITERA:  Same objections.
4      THE WITNESS:  I'm sorry.  Did you get your
5  objection?
6      MS. CITERA:  She got it.
7  BY THE WITNESS:
8      A.  Okay.  I don't have personal knowledge.
9  The term "fee-for-service" suggests that a payment,
10 there's a negotiated payment for a -- for a service
11 provided.
12     Q.  Okay.  Going back to when we earlier on
13 in the day discussed your understanding of the
14 different structures, would that be the type of
15 arrangement which you indicated was one of the
16 possible Home Infusion arrangements whereby the
17 customer would buy the product and then pay for
18 services --
19     MS. CITERA:  Same objections.
20 BY MS. ST. PETER-GRIFFITH:
21     Q.  -- as opposed to receiving it on a
22 consignment basis?

Page 605

1      A.  Correct.  I think there might be -- I had
2  provided products and/or services.  This seems to
3  differentiate products versus services.  It looks
4  at the end of this document, they're talking about
5  a product sales agreement, which may mean -- again,
6  I don't know, in this particular instance -- may
7  mean just the sale of products versus a
8  fee-for-service, appears to talk about payment for
9  services.
10     Q.  Okay.
11     A.  And I suppose you could have four, you
12 know, just fees, just products, just services, or
13 both.
14     Q.  Got you.
15     A.  And the other one, and the percentage of
16 collections.
17     Q.  In terms of this second sentence where it
18 says although Abbott was very comfortable with the
19 structure of a fee-for -- or percentage of
20 collections agreement, other than what you've
21 testified today, do you understand why Abbott was
22 very comfortable with the percentage of collections

Page 606

1  agreements?  And if you want to rely upon your
2  prior testimony, that's fine.
3      MS. CITERA:  Objection to form, outside the
4  scope.
5  BY THE WITNESS:
6      A.  I don't have anything to add to my prior
7  testimony.
8      Q.  Okay.
9           (Exhibit Fishman 019
10           marked as requested.)
11     MS. CITERA:  I'm sorry.  I'm going to have to
12 do the same thing.  I don't understand why this was
13 produced.  I'm going to have to ask about it.
14 We're going to have to table it as well.
15     MS. ST. PETER-GRIFFITH:  Okay.  Toni, I just
16 want to point out that -- just the -- its Bates
17 numbers are sequential.  So I believe this may have
18 been the memorandum that was sent out to Gerald
19 Clouse, or at least this set is sequential.
20     MS. CITERA:  Yeah, I understand what you're
21 saying. 18 and 19?
22     MS. ST. PETER-GRIFFITH:  Yeah.

Page 607

1   MS. CITERA:  Let me just read this in more
2   detail, but you may be correct.
3   MS. ST. PETER-GRIFFITH:  Sure.
4   MS. CITERA:  I'm going to let you go into it
5   because it appears that you may be right.  I'm
6   going to obviously reserve my right to snap it back
7   once I'm able to do further analysis and also to --
8   I mean, I don't know that I can snap back the
9   testimony -- but, you know, to assert a privilege
10  over this.  But, you know, based on the Bates range
11  and the date of the memo that is written by Mr.
12  Taylor and the date of the letter that is written
13  by Mr. Herden, and the fact it's Mr. Herden on both
14  memos, it would appear to be the same as the one
15  referred to in 18.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Mr. Fishman, have you had an opportunity
18  to review this document?
19      A.  Yes, I have.
20      Q.  And as we've just discussed, it appears
21  to be the memorandum that was attached to Exhibit
22  18.  Sir, I'd like to go over some of what is

Page 608

1   contained in Mr. -- this appears to be a memo from
2   the Office of General Counsel signed by Brian S.
3   Taylor.  Do you see that?
4       A.  I do.
5       Q.  -- attorney, dated May 18, 1993 to C.
6   Herden regarding Midwest Home Infusion Services,
7   right?
8       A.  Correct.
9       Q.  Did you discuss any of these memoranda
10  with Mr. Taylor when you spoke with him?
11      A.  I did not.
12      Q.  The first paragraph appears to sort of
13  discuss the issue with --
14      A.  Can I add, I didn't because I didn't know
15  they existed.
16      Q.  Okay.  The first sentence of the second
17  paragraph indicates as background, Abbott used a
18  percentage of collections approach in a number of
19  contracts and is comfortable with the legality of
20  the structure.
21      Again, I'm going to ask you the same
22  question I asked you about a similar statement in

Page 609

1   the letter.  Other than what you've testified, are
2   you -- to already, are you aware of any other bases
3   for Abbott's comfort level with the legality of the
4   structure?
5       A.  I am not.
6       Q.  The next sentence reads, "After the Safe
7   Harbor was issued in 1991, we had a more complex
8   percentage of calculations contract reviewed by
9   Washington, D.C., counsel, specializing in the
10  Medicare area."  Right?
11      A.  I see that.
12      Q.  Why did Abbott undertake such a review
13  after the publication of the Medicare Safe Harbors
14  issued in 1991?
15      MS. CITERA:  Objection to the form, outside
16  the scope.  I also would caution you not to reveal
17  any privileged communications.
18  BY THE WITNESS:
19      A.  I don't know precisely, but I also don't
20  know that the reference to review by Washington
21  counsel was also part of the Ingalls analysis.  And
22  it talks about a more complex percentage of

Page 610

1   collections contract which might have been that
2   contract.
3       Q.  Okay.
4       A.  So the clause after the Medicare Safe
5   Harbors issued in 1991 might be just a reference
6   point for where in the regulatory world an analysis
7   occurred.
8       Q.  Okay.  Who was that Washington, D.C.
9   counsel?
10      A.  I understand it to be Hogan & Hartson.
11      Q.  Who were the two partners who were former
12  senior staff to OIG, Office of Inspector General?
13      A.  I can't answer that, nor do I know the
14  name I mentioned is one of those two.  I don't know
15  her background to know whether Liz Dunst was a
16  senior staff -- prior senior staffer on OIG.
17      Q.  Why did these lawyers or did these
18  counsel provide a basis for their conclusion that
19  they saw no basis for the transaction under
20  Medicare law?
21      MS. CITERA:  Objection to the form, outside
22  the scope.

Page 611

1  BY THE WITNESS:
2      A.  I'm sorry.  Can you repeat the question?
3      MS. ST. PETER-GRIFFITH:  Sure.  Can you read
4  it back.
5          (Record read as requested.)
6      MS. CITERA:  Same objections, and I also
7  caution you not to reveal any privilege.
8  BY THE WITNESS:
9      A.  Any basis -- any basis for their
10 conclusion and any conclusion they reached would
11 have been privileged.
12     MS. ST. PETER-GRIFFITH:  Are you instructing
13 him not to answer?
14     MS. CITERA:  I am.
15     MS. ST. PETER-GRIFFITH:  Okay.  I mean, it's
16 our position that this issue is waived.  I'd like
17 to discover the predicate for the statement that
18 they saw no problem for this transaction under the
19 Medicare law.
20     MS. CITERA:  Obviously we disagree with that
21 statement, and I'm instructing him not to answer.
22 BY MS. ST. PETER-GRIFFITH:

Page 612

1      Q.  The next sentence reads, "The Safe
2  Harbors recognize percentage arrangements have a
3  place in healthcare -- in healthcare business; but
4  from a concern that a percentage arrangement could
5  be devised to mask referral payments, the Safe
6  Harbors require more than a superficial review to
7  substantiate the legitimacy of the percentage
8  figure."  Do you see that?
9      A.  I do.
10     Q.  What measures did Abbott undertake, did
11 Abbott Home Infusion undertake to ensure that it
12 did more than a superficial review to substantiate
13 the legitimacy of the percentage figure?
14     MS. CITERA:  Objection to form, outside the
15 scope. I also caution you not to reveal any
16 privileged communications.
17 BY THE WITNESS:
18     A.  Yeah, I don't know what efforts the Home
19 Infusion business took to establish their
20 contractual terms, financial contractual terms.
21     Q.  Did -- For purposes of ensuring
22 compliance with the Safe Harbors, did Abbott Home

Page 613

1  Infusion undertake routine or regular reviews to
2  ensure that it did more than a superficial --
3  superficial review to substantiate the legitimacy
4  of the percentage figure?
5      MS. CITERA:  Same objections, caution.
6  BY THE WITNESS:
7      A.  I don't know.
8      Q.  The next sentence reads, "The attorneys
9  asked questions concerning the elements that went
10 into the percentage figures and were satisfied with
11 answers and rationale for this approach."  Do you
12 see that?
13     A.  I do.
14     Q.  What questions were asked?
15     MS. CITERA:  Same objections, same caution.
16 BY THE WITNESS:
17     A.  I don't know what the questions asked
18 were or the answers given, but I think any
19 communication with counsel would have been
20 privileged.
21     MS. ST. PETER-GRIFFITH:  Well, Toni, I know he
22 doesn't know.  But it's our position that this is

Page 614

1  discoverable and has been waived.  And also to the
2  extent that Abbott intends to rely upon an advice
3  of counsel, we're entitled to get into it.
4      MS. CITERA:  Obviously we disagree.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  Now, in the third paragraph, the second
7  sentence reads, "First, in this uncertain
8  environment of collection payments, this approach
9  fosters a sense of partnership and commitment
10 between companies through a risk -- through a
11 sharing of risk."  Do you see that?
12     A.  I do.
13     Q.  The next sentence reads, "It lets the
14 other company know that Abbott is prepared to
15 accept a portion of risk of nonpayment."  Do you
16 see that?
17     A.  I do.
18     Q.  Is that the risk of nonpayment that we
19 were discussing before?
20     MS. CITERA:  Same objections and instruction.
21 BY THE WITNESS:
22     A.  I don't know precisely what they're

30(b)(6) Abbott (Fishman, David) - Vol II                                   March 20, 2008
Chicago, IL

| Page 615 | Page 617 |
|---|---|
| 1  referring to; but it would be in a collection of | 1  for Exhibit 17 back. |
| 2  payments agreement, it would be nonpayment from any | 2       MR. ANDERSON:  That's got some notes on it. |
| 3  patient. | 3  We'll destroy that one. |
| 4       Q.  Okay. | 4       MS. CITERA:  Sure. |
| 5       A.  Medicare or otherwise. | 5       MR. ANDERSON:  Here's a clean copy. |
| 6       Q.  Okay. | 6       MS. ST. PETER-GRIFFITH:  That's Page 2. |
| 7       MS. CITERA:  Ann, I'm just going to stop you | 7       MR. ANDERSON:  You can do that just state |
| 8  here because I think I want to take a break.  I | 8  you'll destroy it. |
| 9  appreciate you're asserting there was a waiver.  I | 9       MS. ST. PETER-GRIFFITH:  There we go, Toni. |
| 10 don't think there was.  I'd like to try to get a | 10      MS. CITERA:  Obviously any other copies that |
| 11 little more information about this document before | 11 are at either of your offices, we would ask that |
| 12 we proceed. | 12 you destroy. |
| 13      MS. ST. PETER-GRIFFITH:  Okay.  Well, we're | 13      MS. ST. PETER-GRIFFITH:  You know what?  At |
| 14 running a little short on time if you want to | 14 the end of the day, I need to get the Bates numbers |
| 15 finish before 4:30.  Can we make it quick? | 15 of that. |
| 16      MS. CITERA:  At least let me make the inquiry | 16      MS. CITERA:  Okay.  Okay. |
| 17 and see what I can do. | 17 BY MS. ST. PETER-GRIFFITH: |
| 18      MS. ST. PETER-GRIFFITH:  Okay.  Why don't we | 18      Q.  Sir, if we could -- Where did we leave |
| 19 go off the record briefly then. | 19 off on this document? |
| 20      THE VIDEOGRAPHER:  Going off the record at | 20      A.  Are we on Exhibit 19 still? |
| 21 2:51 p.m. | 21      Q.  Yes. |
| 22      (A short break was had.) | 22      A.  Okay. |

| Page 616 | Page 618 |
|---|---|
| 1       (Enter Mr. Anderson.) | 1       Q.  We were discussing the portion, I |
| 2       THE VIDEOGRAPHER:  We're back on the record at | 2  believe, of this memorandum concerning the |
| 3  3:00 p.m. | 3  uncertainty of collection of payments and the risk |
| 4       MS. CITERA:  I'm going to let the deposition | 4  of nonpayment, right? |
| 5  and the questioning continue.  You know, obviously | 5       A.  Oh, the second -- you were reading the |
| 6  as I said before, we reserve the right to snap this | 6  second sentence in the third paragraph? |
| 7  document back at a later time.  Right now it | 7       Q.  Yes. |
| 8  appears that it is a memo that was sent along with | 8       A.  Okay.  I'm sorry.  Was there an |
| 9  the letter, Exhibit 18.  But we are reserving our | 9  outstanding question pending? |
| 10 rights.  We obviously do not agree with you that | 10      Q.  Sure, sure.  I just wanted to first say, |
| 11 any privilege was waived.  But we will continue | 11 was that your recollection of where we left off? |
| 12 with the deposition. | 12      A.  Yeah.  I was reading -- I don't know if |
| 13      I will also add on a separate note that | 13 it was the second and third sentence or just the |
| 14 Exhibit 17, we are snapping back. | 14 second sentence? |
| 15      MS. ST. PETER-GRIFFITH:  Okay.  Toni, do you | 15      Q.  Well, I'd like to direct your attention |
| 16 just want to take custody, then, of the actual | 16 to the third sentence.  I mean, we spent some time |
| 17 marked exhibit? | 17 earlier today going over Abbott's risk of |
| 18      MS. CITERA:  Uh-huh. | 18 nonpayment. |
| 19      MS. ST. PETER-GRIFFITH:  We'll just let the | 19      Is the risk of nonpayment to Abbott |
| 20 record reflect counsel for Abbott has possession of | 20 two-fold:  First, the cost of its product and, |
| 21 that document. | 21 second, the cost of the services provided with |
| 22      MS. CITERA:  And then we would obviously ask | 22 regard to a particular patient who may not be |

65 (Pages 615 to 618)

0f08cf8d-8dfa-4007-81db-29f9710803e3