# Exhibit A

Vladeck, Ph.D., Bruce C.                          May 4, 2007
                        New York, NY

| Page 2 | Page 4 |

**Page 2**

1  STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2  ----------------------------------X
3  STATE OF WISCONSIN,         : CASE NO.
4          Plaintiff,      : 04-CV-1709
5      v.            :
6  AMGEN INC., et al.,          :
7          Defendants.     :
8  ----------------------------------X
9
10           IN THE COURT OF COMMON PLEAS
11              FIFTH JUDICIAL CIRCUIT
12  ----------------------------------X
13  STATE OF SOUTH CAROLINA, and   :   STATE OF
14  HENRY D. McMASTER, in his official :  SOUTH CAROLINA
15  capacity as Attorney General for  :   COUNTY OF
16  the State of South Carolina,   :   RICHLAND
17          Plaintiff,      :
18      v.           : CIVIL ACTION:
19  MYLAN LABORATORIES, INC.     : 07-CP-40-0283
20          Defendant.      :
21  ----------------------------------X
22

**Page 3**

1       IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2           IN AND FOR LEON COUNTY, FLORIDA
3  THE STATE OF FLORIDA
4  ex rel.
5  - - - - - - - - - - - - - - - - - -x
6  VEN-A-CARE OF THE FLORIDA    :
7  KEYS, INC., a Florida     :
8  Corporation, by and through its  :
9  principal officers and directors,  :
10  ZACHARY T. BENTLEY and     :
11  T. MARK JONES,        :
12          Plaintiffs,    :
13      vs.       : Civil Action
14  MYLAN LABORATORIES, INC.; MYLAN   : No.: 98-3032G
15  PHARMACEUTICALS INC.; NOVOPHARM   : Judge:
16  LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17  TEVA PHARMACEUTICAL INDUSTRIES   : Gary
18  LTD., TEVA PHARMACEUTICAL USA;   :
19  and WATSON PHARMACEUTICALS, INC.  :
20          Defendants.    :
21  - - - - - - - - - - - - - - - - - -x
22

**Page 4**

1       IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2              STATE OF MISSOURI
3  - - - - - - - - - - - - - - - - - -x
4  STATE OF MISSOURI, ex rel.,    :
5  JEREMIAH W. (JAY) NIXON,     :
6  Attorney General,       :
7  and            :
8  MISSOURI DEPARTMENT OF SOCIAL    :
9  SERVICES, DIVISION OF MEDICAL   : Case No.:
10  SERVICES,       : 054-1216
11          Plaintiffs,   : Division
12           : No. 31
13      vs.       :
14  DEY INC., DEY, L.P., MERCK KGaA,  :
15  EMD, INC., WARRICK       :
16  PHARMACEUTICALS CORPORATION,    :
17  SCHERING-PLOUGH CORPORATION, and  :
18  SCHERING CORPORATION,      :
19          Defendants.    :
20  - - - - - - - - - - - - - - - - - -x
21
22

**Page 5**

1                New York, New York
2                Friday, May 4, 2007
3
4
5            Videotaped Deposition of BRUCE C.
6  VLADECK, Ph.D., a witness herein, called for
7  examination by counsel for Abbott Laboratories in
8  the above-entitled matter, pursuant to Subpoena,
9  the witness being duly sworn by JOMANNA DEROSA, a
10  Notary Public in and for New York, taken at the
11  offices of Jones Day, 222 East 41st Street, New
12  York, New York, at 8:38 a.m. on Friday, May 4,
13  2007, and the proceedings being taken down by
14  Stenotype by JOMANNA DEROSA, and transcribed under
15  her direction.
16
17
18
19
20
21
22

2 (Pages 2 to 5)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

Page 142

1    Q.  And for a brand name drug, would you --
2  at the time, did you expect that there would be
3  much variation between various purchasers based
4  upon volume purchases of the brand name drug?
5    A.  I believe we had a perception that the
6  bigger the purchaser, the larger the discount
7  they were likely to be able to achieve; that the
8  very largest pharmacy chains, for instance, or
9  hospital group purchasing operations, probably
10 received the most favorable prices, but that that
11 would be -- and that some small independent
12 pharmacies might actually pay average wholesale
13 price as described in the compendia; that there
14 would be a range below that in which most of the
15 prices would actually occur.
16   Q.  Turning to generic drugs for a minute,
17 what do you understand to be the differences
18 between the market for brand name drugs and the
19 market for generic drugs?
20       MS. BROOKER:  Objection.  Form.
21   A.  If we're going back to 1997 --
22   Q.  Correct.

Page 143

1    A.  -- I think it's fair to say that I had
2  really only a very limited understanding of the
3  marketplace for generic drugs and an even more
4  limited understanding of the difference between
5  the market for generic drugs and for brand drugs.
6       And, again, my perception at the time
7  was that that was likely more like a commodity
8  market in which there was probably more
9  purchasing power on the part of the large
10 purchasers, but not the same ability to raise
11 prices on the up-side to small purchasers that
12 prevailed on the brand name side.
13   Q.  I'd like to focus you just for a
14 minute, before we turn to a specific document,
15 about a particular generic drug.  I think you
16 mentioned commodities.  Are you familiar with
17 sodium saline solution?
18   A.  Yes.
19   Q.  It's a bag of salt water, essentially.
20 Correct?
21   A.  That's correct.
22   Q.  Would you agree with me that you can't

Page 144

1  get much more commoditized in a bag of salt water
2  in the drug market?
3    A.  The only quibble I would provide to
4  that question is I never really thought of it as
5  classically being part of the pharmaceutical
6  market.  It was such a -- it was really a
7  hospital supply kind of market.  It was such a
8  standard product that even though it was FDA
9  regulated and -- and sterility issues were so
10 forth, it tended to be -- hospitals tend to stock
11 it, for example, in sterile supplies, put it on
12 their cost report as part of sterile supplies
13 rather than through their pharmacies.
14   Q.  But a home infusion provider reimbursed
15 under Part B, for example, might be reimbursed
16 for sodium saline solution.
17       Was that your understanding in '97?
18       MS. BROOKER:  Objection.  Form.
19   A.  Yes, but whether that was as a supply
20 or a drug, I honestly couldn't tell you.  I would
21 have thought of it as a supply.
22   Q.  Turning to the market of it, whether we

Page 145

1  call it a drug or -- or a supply, did you have an
2  understanding, in 1997, of what the market would
3  look like for a product such as sodium saline
4  solution?
5       MS. BROOKER:  Objection.  Form.
6       MR. BREEN:  Objection.  Form.
7    A.  Yes, I did.
8    Q.  And what was your understanding?
9    A.  Well, I actually -- in the 1980s, I
10 believe, when I was first becoming involved in
11 some of these issues in health care economics was
12 the first development of hospital group
13 purchasing operations, and I recall -- and the
14 first widespread circulation of the -- of "Modern
15 Healthcare," the magazine, and I recall monthly
16 headlines in "Modern Healthcare" about group
17 purchasing operations being -- achieving
18 discounts of 98 and 99 percent in their purchase
19 of basic infusion products and sterile supplies.
20       So, my perception was that on the
21 supply market, which, again, I understood and
22 still would contend is actually a separate market

37  (Pages 142 to 145)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

---

Page 146

1  from the pharmaceutical market that list prices,
2  are essentially entirely meaningless and that
3  only the weakest and smallest scale buyers pay
4  anything close to it.
5      Q.  And so, as of 1993, for example, would
6  you be surprised if a single bag of sodium saline
7  solution sold to a provider who bought maybe five
8  would pay $10 per bag, and a large purchaser who
9  bought a very large volume would pay less than a
10 dollar?
11     MS. BROOKER:  Objection.  Form.
12     A.  I would not have been surprised.
13     Q.  Okay.  So, to that extent that --
14 President Clinton referring to a 10-to-1 ratio is
15 something that would be consistent with your
16 understanding of that particular market.
17 Correct?
18     MS. BROOKER:  Objection.  Form.
19     Q.  I'm sorry.  You have to verbalize.
20     A.  Again, I would have thought that market
21 was a subset of the supplies market rather than
22 the drug market.

Page 147

1      Q.  That was my question.  But you would
2  have distinguished between the drug market, where
3  10-to-1 would not -- you would not expect to see.
4  Correct?
5      A.  That's correct.
6      Q.  And the supply market, where sodium
7  saline solution would be found, where there could
8  be a huge variation between a small purchaser
9  purchasing at list price and a very large
10 purchaser purchasing at 99 percent off of list
11 price?
12     MS. BROOKER:  Objection.  Form.
13     A.  I would have made such a distinction,
14 and I would not have been surprised to see those
15 sorts of differentials of the supply market.
16     Q.  And in between the commodities supply
17 market of sodium saline and the patent-protected
18 market of a brand name drug, would you expect
19 generic drugs to be somewhere between those two
20 extremes?
21     MS. BROOKER:  Objection.  Form.
22     MR. BREEN:  Objection.  Form.

Page 148

1      A.  That would be a question I never
2  thought about before today.  But today I would
3  say that we always made the distinction between -
4  - between drugs and -- and supplies.  And, again,
5  I would fall back on the Medicare green eyeshade
6  distinction between what's sterile supplies and
7  what's pharmacy.
8      MR. COOK:  Let's take a break.
9      THE VIDEOGRAPHER:  The time is 11:28
10 a.m.  We're going off the record, concluding Tape
11 No. 2 in the deposition of Dr. Bruce Vladeck in
12 the matter of In re Pharmaceutical Average
13 Wholesale Price Litigation.
14     (Recess taken.)
15     THE VIDEOGRAPHER:  The time is 11:46
16 a.m.  We're going back on the record, starting
17 Tape No. 3 of the deposition of Dr. Bruce Vladeck
18 in the matter of In re Pharmaceutical Average
19 Wholesale Price Litigation.
20     Q.  Doctor, based upon what we were talking
21 about just before the break, would it be fair to
22 say that while you were administrator of HCFA,

Page 149

1  you did not understand published average
2  wholesale price to be the average of prices at
3  which wholesalers were selling their drugs to
4  their customers?
5      A.  It would -- it would be fair to say
6  that I did not believe it was, in fact, an
7  empirical estimate, that rather it was a -- an
8  amount reported by the manufacturer to -- of the
9  compendium compilers or whatever, yes.
10     Q.  And, again, akin to a sticker price?
11     A.  That's correct.
12     Q.  Where did you get that understanding?
13     A.  I believe that was probably what my
14 staff explained to me when I first encountered
15 the concept sometime after I took office.
16     Q.  Do you recall anybody within HCFA who
17 was under the belief that average wholesale price
18 was an average of prices at which wholesalers
19 sold drugs to customers?
20     MS. BROOKER:  Object to form.  And I
21 would just instruct the witness, just, you know,
22 be mindful of not disclosing deliberations,

38  (Pages 146 to 149)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                               May 4, 2007
                        New York, NY

Page 166

1  facts from OIG in the form of an OIG report?
2        MS. BROOKER: Objection. Form.
3        A.  You'll have to ask -- I don't know
4  quite how to answer that question. I don't know
5  if you want to rephrase it, but --
6        Q.  I'm happy to. It -- it was -- it was a
7  bad question. I can break it up into little --
8  little bites.
9        HCFA would receive facts from OIG,
10 correct, in the form of these reports?
11       MS. BROOKER: Objection. Form.
12       A.  Yes.
13       Q.  As the administrator of HCFA, you had
14 an expectation that your employees would consider
15 facts presented to the agency for what they were;
16 whether true or -- or false. Correct?
17       MS. BROOKER: Objection. Form.
18       A.  Yes, absolutely.
19       Q.  Okay. Did you rely upon the OIG, in
20 its reports, to represent accurate facts to your
21 agency?
22       A.  We -- we had a moderate degree of

Page 167

1  confidence in the reliability of the information
2  they presented.
3        Q.  So, sometimes the information would be
4  inaccurate. Correct?
5        A.  That's correct.
6        Q.  And you expected your staff to at least
7  attempt to distinguish between the good data and
8  the bad data that came from OIG in these reports.
9  Correct?
10       MS. BROOKER: Objection. Form.
11       A.  I -- I think it would be more -- more
12 usual to object by -- to the methodology by which
13 the facts were presented or the facts were
14 obtained or presented than arguing about a
15 specific number or something of that sort.
16       Q.  To the extent that the facts appeared
17 to be reliable as they were presented to HCFA,
18 did you have an expectation of whether or not
19 your staff would consider those facts in
20 developing policy within the administration?
21       MS. BROOKER: Objection. Form.
22       A.  Well, that's -- that's the complicated

Page 168

1  part of your earlier question of this one because
2  the Inspector General demonstrated a pretty
3  consistent proclivity to document instances in
4  which policy was producing untoward results or
5  excess expenditures or so forth, even though we
6  believed, and they were aware that we had no
7  discretion to make any changes in them.
8        Q.  Okay. So, to the extent that you were
9  able to make policy changes, did you expect your
10 staff to take into consideration those facts in
11 formulating policy changes?
12       A.  Absolutely. Yes, sir.
13       Q.  And to the extent the policy changes
14 required legislation from Congress, did you
15 expect your staff to take these facts and factor
16 them into recommendations to Congress for policy
17 changes and legislation?
18       A.  Yes.
19       Q.  In that context, I'd like to look at
20 the particular purported facts at least that are
21 reported in Appendix 2 of Exhibit Abbott 082.
22 You'll see it's a -- it's a table with a fairly

Page 169

1  large number of numbers on it.
2        Now, it says:
3        "Invoice Price For Selected Drugs At
4  the Dialysis Facilities Reviewed."
5        And in the left-hand column, can you
6  see it has three drugs, Calcigex, Inferon, and
7  vancomycin?
8        A.  Yes.
9        Q.  Do you know what Calcigex, Inferon, and
10 vancomycin are?
11       A.  I know what vancomycin is. I'm not
12 familiar with the other two.
13       Q.  Okay. Tell me, what is vancomycin?
14       A.  Vancomycin is a fourth generation
15 broad-spectrum antibiotic.
16       Q.  And in 1992 it was a multiple-source
17 product. Correct?
18       A.  I don't know.
19       Q.  If you can see on this chart, at least
20 OIG purports to represent, under each of Calcigex
21 and Inferon, the "S" in parentheses, and then
22 with vancomycin there's an "M" in parentheses.

Henderson Legal Services
202-220-4158

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                 May 4, 2007

New York, NY

Page 170

1   And in the footnotes, the "S" indicates,
2   according to the OIG, that Calcigex and Inferon
3   are single-source drugs, and that the vancomycin
4   is a multiple-source drug.
5         Do you see that?
6      A.  Yes, I do.
7      Q.  Okay.  Leaving aside knowing exactly
8   when vancomycin went generic -- well, let me stop
9   for a minute.
10        Is it your understanding that today
11  vancomycin is generic?
12     A.  Yes.
13     Q.  Okay.  And it's just a question -- you
14  don't know when it went generic and when it went
15  off patent.  Correct?
16     A.  That's correct.
17     Q.  Okay.  The array to the right of each
18  of these drugs purports to be per-unit cost.
19        Correct?
20     A.  That's my understanding of the table,
21  yes.
22     Q.  And it lays out a number of numbers.

Page 171

1   To the right-hand side there are two other
2   columns or three other columns, but two in
3   particular labeled "EAC" and "AWP."
4         Do you see that?
5      A.  I do.
6      Q.  EAC, at the bottom, is defined as:
7         "The estimated acquisition cost
8   calculated using the median invoice price,
9   according to OIG."
10        Right?
11     A.  Right.
12     Q.  And AWP is defined as:
13        "The average wholesale price being the
14  median Red Book price for the generic form of the
15  drug, or to the extent there's not a generic
16  form, presumably the AWP for the only form of the
17  drug."
18        Do you see that?
19     A.  Yes.
20     Q.  I'd like to focus first just on
21  vancomycin.
22        You understand vancomycin is one of the

Page 172

1   drugs at issue in -- in this case.  Correct?
2      A.  Yes.
3      Q.  And did you have an understanding of
4   that before meeting with the Department of
5   Justice or did you only obtain that when you
6   first -- when you first started preparing for
7   this deposition?
8      A.  I only became aware --
9         MS. BROOKER:  I would just instruct you
10  to be mindful not to disclose any conversations
11  you've had with counsel in this case.  You can
12  state what your understanding is.
13     A.  I -- I became aware that vancomycin was
14  involved in this case within the last few weeks.
15     Q.  Thank you.  Do you see that the AWP for
16  vancomycin is reported by the OIG to be $19.17?
17     A.  Yes.
18     Q.  And the EAC has reported it to be $5.
19  Correct?
20     A.  That's what they reported, yes.
21        MR. BREEN:  Objection.  Form.
22     Q.  So, that would appear to be a -- a

Page 173

1   ratio of about four -- just under 4-to-1 between
2   what the OIG is reporting as the estimated
3   acquisition cost and the AWP for vancomycin in
4   1992?
5      A.  That's --
6         MS. BROOKER:  Objection.  Form.
7      A.  -- that's what it shows, yes.
8      Q.  And -- and, again, I realize that this
9   is not a report that -- that you -- that -- that
10  you saw or you prepared, but just to round out
11  laying out the facts as they're relevant now and
12  -- and later in the deposition, if you'll look
13  for me at the array of prices for vancomycin in
14  1992, according to the OIG, you'll see that -- am
15  I correct that the lowest invoice price
16  discovered by the OIG in this report for
17  vancomycin was $3.45?  Correct?
18     A.  That appears to be the case, yes.
19     Q.  And the highest that the OIG reported
20  to HCFA in 1992 was $26.61.
21        Correct?
22        MS. BROOKER:  Objection.  Form.

44  (Pages 170 to 173)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                          New York, NY

Page 174

1    A.   That's correct.
2    Q.   We were talking a little bit earlier
3  about the -- the range of prices that a -- a
4  commodity, a supply such as sodium chloride
5  solution might have, being as much as 100-to-1.
6        Correct?  You recall that?
7    A.   Yes.
8    Q.   Okay.  As to generic drugs, would it be
9  consistent with your understanding, between 1993
10  and 1997, that a generic drug such as vancomycin
11  could have a market range of prices as wide as
12  that reflected in this chart?
13       MS. BROOKER:  Objection.  Form.
14    A.   I am -- I think the most accurate way
15  to answer that was I am surprised, as of today,
16  to see that kind of data, and I think I would
17  have been even more surprised, during the '93 to
18  '97 period, to see that kind of data.
19    Q.   But this is data that was reported to
20  your agency.  Correct?
21    A.   That's -- that's my understanding, yes.
22    Q.   And you would have expected members of

Page 175

1  your staff to have taken this data into account
2  in either a -- and let's start with establishing
3  Medicaid or Medicare reimbursement policy.
4        MS. BROOKER:  Objection.  Form.
5    A.   I would have expected, given the nature
6  of this report then, to have been much more
7  influenced by the bolded section in the box on
8  Page 2.
9    Q.   And what aspect of that would you
10  expect them to be influenced by?
11    A.   Again, the finding that -- that most
12  prices were, in fact, below the AWP, but that in
13  two of the cases the differential was 15 to 20
14  percent.
15    Q.   And that would refer, presumably, going
16  back to Appendix 2, to the Calcigex and Inferon?
17    A.   I -- presumably, yes.
18    Q.   Because those were the single-source
19  drugs.  Correct?
20    A.   Yes.
21    Q.   And to the extent that Medicare
22  reimbursed for the multiple-source drug here,

Page 176

1  vancomycin, would you expect your staff to take
2  into account the difference between single-source
3  drug prices and multiple-source drug prices in --
4  in considering changes to Medicare payment
5  policies?
6        MS. BROOKER:  Objection.  Form.
7    A.   The only thing I can observe
8  empirically is that I don't recall, in our
9  conversations over the years about changing
10  Medicare drug pricing policy, the distinction
11  between brand and generics arising very often, if
12  at all.
13    Q.   At the time this report was -- was
14  written, am I correct that Medicare was
15  reimbursing at undiscounted AWP for Part B drugs?
16       Correct?
17       MS. BROOKER:  Objection.  Form.
18    A.   I -- I believe that's correct.
19    Q.   It was either EAC, according to survey
20  --
21    A.   Right.
22    Q.   -- or AWP.  Right?

Page 177

1    A.   The only reason I hesitate in response
2  to your question is trying to remember whether
3  dialysis drugs were treated separately from other
4  Part B drugs, but I don't believe they were.
5    Q.   To the extent that -- that dialysis
6  drugs were reimbursed pursuant to 405.517, they
7  were being reimbursed by Medicare at 100 percent
8  of AWP.  Correct?
9    A.   That is correct.
10    Q.   And to the extent that the data on the
11  chart at Appendix 2 is -- is accurate, that would
12  indicate that for Calcigex, for example, if it
13  were reimbursed under that methodology, am I
14  correct that every single one of the providers
15  surveyed would be reimbursed at an amount in
16  excess of their acquisition cost?  Correct?
17    A.   That is correct.
18    Q.   And for Inferon, all but two of the
19  providers would have been reimbursed at above
20  their acquisition cost.  Correct?
21       MS. BROOKER:  Objection.  Form.
22    A.   That's what it shows, yes.

45  (Pages 174 to 177)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                New York, NY

---

Page 178

1      Q.  And for vancomycin, at least one
2  provider would have had a cost of $3.45 and a
3  reimbursement amount of $19.17.  Correct?
4      A.  That's what the charge shows, yes.
5      Q.  I'm getting a little bit ahead of
6  myself, but did you ever have discussions within
7  HCFA about whether to change that reimbursement
8  methodology for drugs such as this?
9          MS. BROOKER:  I'm going to instruct you
10  to be mindful of not discussing internal pre-
11  decisional deliberations on the record.
12      A.  We proposed, a number of times, to
13  change the methodology, and, in fact, the
14  proposal cited by the President, in his speech
15  that we discussed earlier, was one that we had
16  been advocating for -- within the administration
17  since, I believe, about 1995.
18          I think it is fair to say as well that
19  I believed, as -- as far back as '95, that 85
20  percent of average wholesale price as a payment
21  method was inferior to something closer than
22  average acquisition cost, but that the

---

Page 179

1  administrative difficulties, and the potential
2  administrative burden on physicians as a
3  political issue, if not a real issue, made it
4  likelier that we would be able to succeed with
5  the legislative proposal still tied to AWP than
6  one that went all the way back to its acquisition
7  costs.
8      Q.  Now, as I understand it, from '91 --
9  strike that.
10          As I understand it, during the time you
11  were a HCFA administrator, from 1993 until 1997,
12  reimbursement for Part B drugs under Medicare,
13  under the regulation 405.517, was made pursuant
14  to HHS regulation.  Correct?
15      A.  That is correct.
16      Q.  And that could have been changed
17  without legislation.  Correct?
18          MS. BROOKER:  Objection.  Form.
19      A.  Theoretically, yes.  We were -- it was
20  my perception, during that period, that the
21  statute -- the statute offered us the alternative
22  of an acquisition price-based methodology, but

---

Page 180

1  that the Office of Management and Budget, and
2  perhaps the Department of Health and Human
3  Services themselves, would not authorize us to
4  undertake the data collection to determine
5  acquisition costs, and that we -- our perception
6  was we did not believe we had the authority to go
7  to a percentage of AWP as an alternative
8  methodology without legislation.
9      Q.  Well, the -- the regulation that was
10  promulgated in 1991 providing for estimated
11  acquisition cost according to a survey or average
12  wholesale price as published in the Red Book, was
13  promulgated by the Department of Health and Human
14  Services.  Correct?
15      A.  That is correct.
16      Q.  And an alternative regulation changing
17  that rule also could have been promulgated by the
18  Department of Health and Human Services any time
19  prior to the enactment of the Balanced Budget Act
20  of 1997.  Correct?
21          MS. BROOKER:  Objection.  Form.
22      A.  I -- I'd have to check, but it was my

---

Page 181

1  perception at the time that our legal authority
2  pretty much left us with those -- in the absence
3  of further legislation, pretty much left us with
4  those two alternatives; in other words, 100
5  percent of AWP or actual acquisition price.
6          My -- I don't recall whether that was
7  because of a perception that Congress would
8  object to any effort to use a fraction of AWP or
9  -- I don't -- the opinion that we had only those
10  two alternative -- let me restate that.
11          It was my belief, at the time, that the
12  -- having only those two alternatives was an
13  unavoidable reality.  Whether that was legal or
14  political, I'm not sure I was clear at the time,
15  and I'm certainly not clear now.
16      Q.  So, as I understand it, between 1993
17  and 1997, according to regulation, HCFA could
18  reimburse based upon two methodologies.
19          Correct?
20      A.  That's correct.
21      Q.  One was the published average wholesale
22  price.  Correct?

---

46  (Pages 178 to 181)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
New York, NY

Page 234

1   Correct?
2       A.  That's correct.
3       Q.  Do you have a memory of reviewing this
4   report in 1997?
5       A.  No.
6       Q.  If you look at the page Roman Numeral
7   II of the executive summary, the first sentence
8   of the -- at the top of the page with the first
9   paragraph?  Do you see it indicates that Medicare
10  allowed between two and ten times the actual
11  average wholesale prices offered by drug
12  wholesalers and group purchasing organizations
13  for eight of the 22 drugs that were reviewed?
14      A.  That's what it says, yes.
15      Q.  That would be consistent, wouldn't it
16  be, with President Clinton's radio address
17  shortly after the issuance of this report about
18  prices being -- AWP being up to ten times up to
19  acquisition costs.  Correct?
20          MS. BROOKER:  Objection to form.
21      A.  I guess it would be.
22      Q.  If you can turn to Page B-3.  It's

Page 235

1   Appendix B of the report and the last page of the
2   Appendix B.  It's a chart entitled "Summary of
3   wholesale prices and estimated savings for 1996"?
4       A.  I see that, yes.
5       Q.  The very last drug discussed here is J
6   3370, along the bottom left-hand corner there?
7       A.  Yes.  I see that.
8       Q.  And that's HCPCS code.  What's a HCPCS
9   code, Dr. Vladeck?
10      A.  It's the system by which HCFA assigned
11  unique billing numbers for most of the services
12  that were billable under Medicare.  Unfortunately,
13  there wasn't already a standard industry
14  nomenclature somewhere.
15      Q.  If you turn the page to Page C-2?  It's
16  another chart with HCPCS codes in the left-hand
17  column and "drug description" immediately to the
18  right?
19      A.  Yes, sir.
20      Q.  Do you see what at least this OIG
21  report attributes to be the drug associated with
22  Code J 3370?

Page 236

1       A.  That's vancomycin.
2       Q.  And that's the same drug as we talked
3   about earlier with respect to the 1992 report on
4   dialysis related drugs?
5       A.  Yes.
6       Q.  And the same drug that's involved, in
7   part at least, in this lawsuit against Abbott?
8       A.  So I understand.
9       Q.  If you turn back to Page B-3.
10          This chart shows various points,
11  according to OIG, across the top, the fourth of
12  which is the lowest wholesale price found,
13  according to the OIG, for this drug.
14          Could you tell me, what is the lowest
15  wholesale price found that the OIG reported for
16  vancomycin in 1996 in this report?
17      A.  $3.45.
18      Q.  If you recall, that's the same price
19  that OIG reported as the lowest invoiced price
20  for vancomycin in its 1992 report on dialysis
21  related drugs; wasn't it?
22          MS. BROOKER:  Objection.  Form.

Page 237

1       A.  I'm sorry.  Could you repeat the
2   question?
3       Q.  Sure.  You and I looked earlier at a
4   1992 report on dialysis related drugs?
5       A.  That's correct.
6       Q.  And it showed a number of invoice
7   prices for vancomycin in an array?
8       A.  Right.
9       Q.  And the highest price was just over
10  $26, you'll recall?
11      A.  That's correct.
12      Q.  And the lowest invoice price that OIG
13  found for vancomycin in 1992 was $3.45.
14          Correct?
15          MS. BROOKER:  Objection to form.
16      A.  That's correct.
17      Q.  And so in 1997 OIG is reporting to HCFA
18  again that the lowest price available for
19  vancomycin, according to their review, was $3.45?
20          MS. BROOKER:  Objection to form.
21      A.  Yes, sir.
22      Q.  If you turn to Nancy-Ann Min DeParle's

60  (Pages 234 to 237)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                    May 4, 2007
                    New York, NY

Page 238

1   October 1, 1997, response memo, as with the
2   earlier agency response that went out over your
3   name that we reviewed for the -- for the report
4   on generic drugs reimbursable by Medicaid, the
5   first line indicates:
6        "We reviewed the above-referenced
7   report."
8        Would you expect staff within HCFA to
9   have reviewed this particular report as indicated
10  in this memo?
11       A. I'm sorry. I think I need about a
12  five-minute break to regain my concentration.
13       THE VIDEOGRAPHER: The time is 2:29
14  p.m. We're going off the record with Tape No. 4.
15       (Recess taken.)
16       THE VIDEOGRAPHER: The time is 2:43
17  p.m. We're going back on the record, continuing
18  with Tape No. 4.
19       Q. Dr. Vladeck, I'd like to move to a
20  completely different subject. We had talked
21  earlier about whether AWP represented acquisition
22  costs for manufacturers. You were aware, were

Page 239

1   you not, when you were administrator of HCFA,
2   that manufacturers were publishing prices.
3   Right?
4        MS. BROOKER: Objection. Form.
5        A. You'll have to elaborate on your
6   question a little bit more.
7        Q. Sure. We had talked before about
8   published prices that manufacturers would publish
9   to the world as a list price, for example?
10       A. That's correct.
11       Q. And you're aware that manufacturers
12  would have, on the one hand, a published price?
13       Correct?
14       MS. BROOKER: Objection. Form.
15       A. When you say "on the one hand," that
16  implies there's another hand.
17       Q. There will be another hand.
18       A. Yes. Right.
19       My understanding at the time was that
20  manufacturers would have a published price which
21  would be taken as the average wholesale price.
22       Q. And but there would be various market

Page 240

1   prices that would be represented by, for example,
2   contract sales with individual customers?
3        A. That was my understanding, yes.
4        Q. And that there were various discount
5   structures and rebates and chargebacks that went
6   into whatever the final price would be to a
7   particular customer.
8        MS. BROOKER: Objection. Form.
9        MR. AZORSKY: Objection.
10       A. I don't know that I was sophisticated
11  enough at the time to know about rebates and
12  chargebacks, but certainly in the sense that
13  there were discounts of differential amounts from
14  those published prices I was aware of.
15       Q. At any time did HCFA communicate with
16  manufacturers about what HCFA expected the
17  published prices to reflect?
18       MS. BROOKER: Objection. Form.
19       A. I do not recall any specific
20  instructions of which I was aware. I don't
21  recall any such.
22       Q. I'd like to contrast that, please, with

Page 241

1   the Medicaid rebate program. Are you familiar
2   with the Medicaid rebate program?
3        A. In general terms, yes.
4        Q. Okay. Could you give me your general
5   understanding of what the Medicaid rebate program
6   is?
7        A. My understanding of the Medicaid rebate
8   program was that in -- manufacturers had the
9   opportunity to enter into agreements with state
10  Medicaid programs in which the state programs
11  would forego from the creation of a formulary or
12  an approved drug list in exchange for which they
13  would provide the program with a rebate relative
14  to the price that Medicaid was paying for the
15  ingredient cost of the drugs.
16       Q. And so under the Medicaid rebate
17  program if I'm a drug manufacturer and I want my
18  drug to be reimbursed under a particular state's
19  Medicaid program, I would have to enter into an
20  agreement with the state. Correct?
21       A. That's correct.
22       Q. And the agreement would provide that I

61 (Pages 238 to 241)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Scully, Thomas A.                                        May 15, 2007

Washington, DC

| Page 10 | Page 12 |
|---|---|
| 1  Videotaped Deposition of THOMAS A. | 1  APPEARANCES (continued): |
| 2  SCULLY, a witness herein, called for examination by | 2 |
| 3  counsel for Abbott Laboratories in the above-entitled | 3     On behalf of the U.S. Department of |
| 4  matter, pursuant to subpoena, the witness being duly | 4  Health and Human Services: |
| 5  sworn by SUSAN L. CIMINELLI, a Notary Public in and | 5        TROY A. BARSKY, ESQ. |
| 6  for the District of Columbia, taken at the offices of | 6        U.S. Department of Health and Human Services |
| 7  Jones Day, 51 Louisiana Avenue, Northwest, | 7        CMS Division |
| 8  Washington, D.C., at 8:49 a.m. on Tuesday, May 15, | 8        C2-05-23 |
| 9  2007, and the proceedings being taken down by | 9        7500 Security Boulevard |
| 10  Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and | 10        Baltimore, MD 21244-1850 |
| 11  transcribed under her direction. | 11        (410) 786-8873 |
| 12 | 12        troy.barsky@hhs.gov |
| 13 | 13 |
| 14 | 14     On behalf of the State of California: |
| 15 | 15        NICHOLAS N. PAUL, ESQ. |
| 16 | 16        Supervising Deputy Attorney General |
| 17 | 17        Civil Prosecutions Unit |
| 18 | 18        P.O. Box 85266 |
| 19 | 19        110 West A Street, #1100 |
| 20 | 20        San Diego, CA 82186 |
| 21 | 21        (619) 688-6099 |
| 22 | 22        nicholas.paul@doj.ca.gov |

| Page 11 | Page 13 |
|---|---|
| 1  APPEARANCES: | 1  APPEARANCES (continued): |
| 2 | 2 |
| 3     On behalf of the United States of America: | 3     On behalf of the State of Alabama: |
| 4        GEJAA T. GOBENA, ESQ. | 4        ROGER BATES, ESQ. |
| 5        JOHN K. NEAL, ESQ. | 5        Hand Arendall, L.L.C. |
| 6        ANDREW MAO, ESQ. | 6        1200 Park Place Tower |
| 7        U.S. Department of Justice | 7        2001 Park Place North |
| 8        Civil Division | 8        Birmingham, AL 35203 |
| 9        601 D Street, Northwest | 9        (205) 502-0105 |
| 10        PHB - 9028/P.O. Box 261 | 10        Rbates@handarendall.com |
| 11        Washington, D.C. 20044 | 11 |
| 12        Gejaa.Gobena@usdoj.gov | 12     On behalf of the State of Florida: |
| 13        (202) 307-1088 | 13        MARY S. MILLER, ESQ. |
| 14 | 14        Office of the Attorney General of Florida |
| 15 | 15        PL-01, The Capitol |
| 16 | 16        Tallahassee, FL 32399-1050 |
| 17 | 17        (850) 414-3600 |
| 18 | 18        Mary_Miller@oag.state.fl.us |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |

4 (Pages 10 to 13)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 186

1    Q.   Pardon me?
2    A.   I'll give you an example of how that
3  works. If you got Calcijex or Zemplar, that's a
4  fairly complicated fighter of vitamin D
5  reimbursement. And what the AWPs were and what the
6  relevant AWPs were in that context when I was at CMS.
7        So carriers had the discretion, for
8  example, in that case to pay Calcijex and Zemplar the
9  same thing and they were different drugs. They
10 calculate AWP based on different things. So the
11 carriers have a lot of discretion when CMS doesn't
12 give them a national coverage decision what to cover
13 and in many cases what to pay.
14   Q.   At the -- at the bottom of the page of the
15 first page, it says that "on May 1st, 2000, First
16 Data Bank provided these new average wholesale prices
17 to state Medicaid programs." Do you see that?
18   A.   Yes.
19   Q.   And is it your understanding that the,
20 these DOJAWPs were made available to state Medicaid
21 programs?
22        MR. GOBENA: Object to the form.

Page 187

1        THE WITNESS: I wasn't aware at the time.
2  I've heard of it since.
3        BY MR. DALY:
4    Q.   Okay. And did -- during your tenure or at
5  any other time, are you aware of CMS directing that
6  the states utilize the DOJAWPs for Medicaid
7  reimbursement?
8        MR. GOBENA: Object to the form.
9        THE WITNESS: If they were, I'm not aware
10 of it.
11       BY MR. DALY:
12   Q.   And during your tenure with CMS, did you
13 have any meetings with any representatives of DOJ or
14 NAMFCU where the DOJ's AWPs were discussed?
15       MR. GOBENA: Object to the form.
16       THE WITNESS: Not that I'm aware of. I'm
17 sure -- I'm fairly sure I did not.
18       BY MR. DALY:
19   Q.   Did not. Okay. Are you aware of the
20 drugs that the United States is suing Abbott for in
21 this litigation?
22   A.   You know, I read the pleading a while

Page 188

1  back, Vancomycin is the only one I remember. I think
2  there's another one.
3    Q.   Have you seen anything suggesting that the
4  drugs are Vancomycin, as you indicated, various forms
5  of sodium chloride, dextrose and water? Is that
6  consistent with your understanding?
7    A.   From what I remember yes. Generally.
8    Q.   And you were aware of the existence of the
9  DOJAWPs while you were CMS administrator?
10       MR. GOBENA: Object to the form.
11       THE WITNESS: Yes. I was aware that they
12 had been collected, and suggested to CMS. And at
13 some point later, they would have been sent to the
14 states.
15       BY MR. DALY:
16   Q.   And if you turn to the attachments, the
17 charts, I guess it would be page 6 of the document.
18 Do you see --
19   A.   The attachments or --
20   Q.   The attachments. The charts. There is
21 like -- there is little numbers up in the upper
22 right-hand corner. I think those are the page

Page 189

1  numbers.
2    A.   On the bottom.
3    Q.   If you go to page 6, you see --
4    A.   I don't see them on mine. Which chart is
5  it?
6        MR. GOBENA: This exhibit. Wrong exhibit.
7        THE WITNESS: I'm sorry. I pulled that
8  the wrong one. Too many charts of excessive drug
9  prices. Yes.
10       BY MR. DALY:
11   Q.   Okay. And in the -- on page 6, you see a
12 variety of Abbott products. Do you see these various
13 dextrose products?
14   A.   These are all Abbott. I wasn't aware of
15 that. But yes, I see it.
16   Q.   And in terms of charts of excessive drug
17 prices that you referred to, these are -- this is a
18 chart that shows what the actual prices for some of
19 those drugs were, correct?
20       MR. GOBENA: Object to the form.
21       THE WITNESS: I'm not aware of that. I
22 assume so from the fact that it's a CMS carrier

48  (Pages 186 to 189)

Scully, Thomas A.                              May 15, 2007
                    Washington, DC

---

Page 190

1   directive. That's correct.
2        BY MR. DALY:
3        Q.   And during your tenure, did you ever, if I
4   asked this forgive me, but did you ever have any
5   discussions with DOJ about the AWPs that they came up
6   with in this document?
7        MR. GOBENA: I'm going to object and
8   instruct the witness, you can answer the question
9   whether you had them, but I'm going to instruct him
10  not to answer about the substance of any
11  conversations as being covered by the attorney-client
12  privilege.
13       THE WITNESS: That's easy since I didn't
14  have any.
15       MR. GOBENA: It took me more words to say
16  my objection than for you to answer.
17       THE WITNESS: That's our goal for the rest
18  of the day.
19       BY MR. DALY:
20       Q.   And do you have any information as to why
21  the United States and the Department of Justice
22  waited six years after putting forth the true AWPs on

---

Page 191

1   this chart that the DOJ waited six years to unseal
2   the case against Abbott?
3        MR. GOBENA: Object to the form.  Instruct
4   the witness not to answer to the extent the answer
5   goes into attorney-client communications.
6        THE WITNESS: I was unaware that it was
7   the case until I was called about the deposition.
8        BY MR. DALY:
9        Q.   Now, on page 2 of the document, CMS
10  directed the carriers to consider some of the drugs
11  in setting reimbursement levels, but then with
12  respect to the drugs in attachment 2, the carriers
13  were directed that "you are not to consider at this
14  time using the DOJ data for these drugs." Do you see
15  that?  The top paragraph?
16       A.   Yes. Yes.
17       Q.   And attachment 2 are 14 chemotherapy drugs
18  in three clotting factors.  And my question is, do
19  you know why CMS directed that the carriers should
20  not consider the DOJAWPs for those drugs?
21       MR. GOBENA: Object to the form.
22       THE WITNESS: I do not -- I don't know

---

Page 192

1   why. I'm presuming that it was politics. I'm trying
2   to avoid the ones that created the greatest political
3   sensitivities which were the cancer drugs.
4        BY MR. DALY:
5        Q.   Down further on page 2, the second to last
6   paragraph, there was a direction to the carriers that
7   essentially said that -- and you're welcome to read
8   it, either before or after I summarize it -- but
9   essentially says that if you get complaints from
10  providers about -- that these DOJAWPs are too low and
11  that the provider X can't get the drug for that
12  price, that they should either call one of the
13  wholesalers at the 800 number provided or call one of
14  the manufacturers.  Do you see that language there?
15       A.   Uh-huh.  Yes.
16       Q.   And would that have been a way to solve
17  the provider access problem?
18       MR. GOBENA: Object to the form.
19       THE WITNESS: Could have been a haphazard
20  way if you're giving the carriers discretion to
21  figure out to pay a reasonable price in their
22  judgment, which happens in many cases based on local

---

Page 193

1   pricing, and make sure that providers can access the
2   drugs in a reasonable margin, I think it probably
3   would be one way to do it.  But it's certainly not an
4   efficient way to do it.
5        There are other examples where I try to
6   figure out what the right price to charge is not an
7   easy process. So I mean, when I approved drug
8   eluting stents a few years back, I had my physicians
9   call around Europe to find out what companies were
10  charging there.  Which was not a particular popular
11  way to do it, but it's the only place in the world
12  they were being sold, so it's not an easy -- if it
13  was easy to figure out the right price to pay, you
14  wouldn't be here.
15       BY MR. DALY:
16       Q.   One of the problems that you had raised in
17  some of your testimony that we'll get to is that you
18  know if you simply reduce AWP to -- or I'm sorry, if
19  you reduce the reimbursement to, you know, 85 percent
20  or 80 or 75 percent of AWP or 50 percent of AWP, if
21  that's what the data is showing is the actual
22  acquisition costs on average, the problem with doing

---

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                      May 15, 2007
                        Washington, DC

Page 214

1  actually came out a couple days before you testified
2  on September 21st, is that your recollection?
3     A.   In the Finance Committee.
4     Q.   Pardon me?
5     A.   In the Senate Finance Committee, that's
6  right. I'd have to look, but yes. After this, the
7  other testimony was in May.
8     Q.   And if you'll turn to the second to last
9  page of this exhibit, you'll see a memorandum from
10 you to Laura Dummit. Do you see that?
11    A.   Yes.
12    Q.   And this is a memorandum indicating that
13 you received and had reviewed the report?
14    A.   Yes.
15    Q.   And in the narrative of your email -- or
16 I'm sorry, not email, but your memorandum to Laura
17 Dummit, you indicate that "the GAO confirms the
18 findings of its previous reports along with the
19 previous reports from the Office of the Inspector
20 General that Medicare payments for drugs are
21 substantially higher than the actual cost to
22 physicians and other providers acquiring these

Page 215

1  drugs." Do you see that language?
2     A.   Yes.
3     Q.   And that's a reference to some of the
4  other reports that we have looked at and discussed
5  today, correct?
6     A.   Yes.
7     Q.   And so flipping back to the report itself
8  then, do you recall generally the findings of the
9  GAO, that coincided with your testimony?
10    A.   Generally.
11    Q.   Tell me.
12    A.   I mean, I haven't read it in many years,
13 but I'm sure that they found it.
14    Q.   It's summarized actually under results in
15 brief on page 4 of the document.
16    A.   Yes.
17    Q.   And in the first paragraph, about six or
18 seven lines down, it says, "for most physician
19 administered drugs, the average discount from AWP
20 ranged from 13 to 34 percent, two physician
21 administered drugs had discounts of 65 and 86
22 percent," do you see that?

Page 216

1     A.   Yes.
2     Q.   And that was consistent with earlier
3  reports that you had seen, correct?
4          MR. GOBENA: Object to the form.
5          THE WITNESS: Yes.
6          BY MR. DALY:
7     Q.   And then on page 9, if you'll turn to
8  that.
9     A.   Okay.
10    Q.   And this section is halfway down the page,
11 it's -- the caption is Medicare payments for drugs
12 are based on published AWPs. Do you see that?
13    A.   Yes.
14    Q.   And in the text, it says, "Medicare bases
15 its reimbursement to physicians and other providers
16 of drugs on AWP which is often described as a list
17 price, sticker price, or suggested retail price
18 reflecting the fact that AWP is not necessarily the
19 price paid by a purchaser or a consistently low or
20 wholesale price." Do you see that language?
21    A.   Yes.
22    Q.   And you agree with that, do you not?

Page 217

1     A.   Yes.
2     Q.   If you turn to page 19 of the document,
3  Mr. Scully, I just wanted to ask a question. In the
4  middle of the -- or towards the end of the first full
5  paragraph, see the language that says, "we did not
6  analyze the costs of infusion therapy drugs provided
7  in the home setting because they do not account for a
8  substantial share of Medicare drug spending or
9  volume." Do you see that?
10    A.   Yes.
11    Q.   And what are infusion therapy drugs?
12    A.   In the home setting.
13    Q.   In the home setting. Yes.
14          MR. GOBENA: Object to the form.
15          THE WITNESS: Infusion therapy drugs, I'm
16 not sure what the most common ones are in the home
17 setting. But probably a small piece of the drugs. I
18 mean, in the home health setting, there are some
19 patients that go home and still have Lincare or
20 somebody deliver home health infusion drugs.
21          Vancomycin might be one of the higher
22 ones, I would think. Sometimes people go home from

                                      55 (Pages 214 to 217)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                              May 15, 2007
                        Washington, DC

Page 218

1  the hospital and have antibiotics. So that might be
2  an example of that, but that's probably a much
3  smaller volume than nutritional outpatient drugs.
4  Maybe not for Vancomycin, but it would be for most
5  drugs. Certainly Procrit and some of the other
6  higher -- Remicade are generally done in a
7  physician's office or hospital outpatient
8  departments.
9       BY MR. DALY:
10      Q.   And do you agree with the statement of the
11  GAO here that these drugs do not account for a
12  substantial share of Medicaid drug spending or
13  volume?
14      MR. GOBENA: Object to the form.
15      THE WITNESS: I don't know about volume,
16  but the biggest chunk of the -- by pure proportion is
17  oncology drugs, which is why the focus was oncology
18  and to a lesser degree rheumatology. In a reform
19  effort, but I'm not sure about volume and certainly
20  pure dollars spent, oncology is the dominant factor.
21      BY MR. DALY:
22      Q.   On page 28 of the document, sir, GAO

Page 219

1  states at the very top that "in conducting this
2  study, we interviewed officials at CMS, VA, HHS, OIG
3  and DOJ." Do you see that?
4       A.   Yes.
5       Q.   Did they meet with you at all?
6       A.   I don't remember that they did, and my
7  guess is that I probably wasn't in office confirmed
8  by the time they actually finished doing the research
9  on this. If they put it out in September and I came
10  in May. But I don't remember meeting with them.
11      Q.   And back to the business of the home --
12  the home infusion drugs, I mean what -- I just want
13  to understand how that part of the business operates.
14  Home infusion is for folks who are able to be treated
15  at home for whatever it is that they are suffering
16  from?
17      A.   Yes.
18      Q.   And there are home infusion companies, for
19  example?
20      A.   Yes. The two biggest are probably Lincare
21  and Aprea.
22      Q.   And what's the second one?

Page 220

1       A.   Lincare and Aprea I would say are probably
2  the two biggest companies. They do home delivery of
3  oxygen and respiratory supplies and home infusion.
4  So yes, if you're capable of going home and you need
5  some medications at home, they will deliver the
6  therapies at home.
7       Q.   And the home infusion business serves an
8  important purpose within the health care world
9  because it keeps people out of hospitals, correct?
10      MR. GOBENA: Object to the form.
11      THE WITNESS: Spend a couple of hours on
12  that. Yes, in theory, when it's run right, there is
13  a massive home health reform going on right during
14  this time, because home health itself had had some
15  pretty significant reimbursement issues. And
16  probably the biggest set of provider enforcements of
17  the '90s were home health providers. So there was
18  certainly a lot of inappropriate behavior going on in
19  home health certainly in the early '90s.
20      BY MR. DALY:
21      Q.   But in theory, I think you said one of the
22  advantages of being able to provide care for people

Page 221

1  in their homes is that they don't have to have the
2  burden of being in the hospital and the costs
3  associated with hospitalization, correct?
4       A.   In theory.
5       MR. GOBENA: Object to the form.
6       BY MR. DALY:
7       Q.   In theory, yes?
8       A.   In theory, that's probably correct, yes.
9  And that the patients prefer it.
10      MR. GOBENA: Same objection.
11      (Exhibit Abbott 187 was
12      marked for identification.)
13      BY MR. DALY:
14      Q.   Mr. Scully, I've handed you what we've
15  marked as Exhibit Abbott 187, which is a copy of your
16  live testimony before the Committee on Energy and
17  Commerce September 21, 2001. Is that what you
18  recognize it to be?
19      A.   Yes.
20      Q.   If you turn to page 83 -- I mean, this
21  document starts on 82, but page 83 of this particular
22  record, it's the second page of the document. Do you

Scully, Thomas A.                                           May 15, 2007
                        Washington, DC

Page 338

1    Q.   I'm not complaining or criticizing what
2  you did.
3    A.   When I started trying to fix this, the
4  vast bulk of people told me I was on a suicide
5  mission and that it was crazy.  And I did get it
6  fixed, and it was largely because we operated in the
7  political milieu that we had.
8    Q.   And my question was simply that you had
9  access to AMP information, right?
10   A.   Yes.
11   Q.   And in fact, CMS had had access to AMP
12 information ever since the Medicaid rebate program
13 went into effect in 1991 or 1992, right?
14       MR. GOBENA:  Objection to form.
15       BY MR. DALY:
16   Q.   True?
17       MR. GOBENA:  Objection to form.
18       THE WITNESS:  Yes.  In the format it was
19 coming in which was somewhat flawed.
20       BY MR. DALY:
21   Q.   And your view was that while not perfect,
22 AMP information approximated ASP, correct?

Page 339

1    A.   The concept was similar.
2    Q.   Okay.  And my only question was whether
3  you or any of your predecessors at CMS ever went to
4  the manufacturers and said, hey, I got your AMP, we
5  know that your AWP is substantially higher or vastly
6  higher, or as you put in your testimony, pretty much
7  air.  And we all know that, and what we'd like you to
8  do is to report a lower AWP.  Did you or any of your
9  predecessors ever do that?
10       MR. BREEN:  Objection to form.
11       MR. GOBENA:  Objection, form.
12       BY MR. DALY:
13   Q.   Go ahead.
14   A.   I think the record shows that both the
15 Clinton Administration tried through various
16 mechanisms to do surveys, get reports, get the
17 carriers to lower their prices.  And they
18 consistently got, I believe from an undereducated
19 Congress, a lot of push back.  And they consistently
20 dropped those efforts.  Including a moratorium for
21 one year from Congress on doing anything.
22   Q.   So the answer to my question, to your

Page 340

1  knowledge, the manufacturers were never asked to
2  report something lower than AWP that would be used
3  for reimbursement?
4        MR. GOBENA:  Objection to form.
5        BY MR. DALY:
6    Q.   Correct?  During the 1990s and into at
7  least through the end of your administration?
8        MR. GOBENA:  Same objection.  Asked and
9  answered.
10       THE WITNESS:  I'm not aware of any efforts
11 specifically like that outside of surveys.
12       BY MR. DALY:
13   Q.   Let's turn to -- what exhibit are we on
14 now?  Exhibit Abbott 191.  Turn to page 14.
15   A.   Okay.
16   Q.   And 14 is, I believe, a letter or some
17 other submission that you made to the committee, is
18 that correct?
19   A.   I assume.  I haven't seen this before.
20   Q.   Well, if you take a look at pages 14 and
21 15, there is -- it's dear Chairman Johnson, and then
22 it's signed on page -- not signed, but indicates that

Page 341

1  it's from you on page 15.  Do you see that?
2    A.   Yes.
3    Q.   And you know you can take a moment to look
4  at it, but is this a written submission that you made
5  to Chairman Johnson?
6    A.   It certainly looks like it.
7    Q.   And on the page 14, and you talk under the
8  heading form of administration, you say, "22 of the
9  35 drugs, accounting for 38 percent of carrier
10 spending are administered by intravenous infusion."
11 Do you see that?
12   A.   Yes.
13   Q.   And this would include all of the drugs
14 that are administered through intravenous infusion
15 correct?
16       MR. GOBENA:  Object to the form.
17       BY MR. DALY:
18   Q.   All of the drugs covered by Medicare Part
19 B.  Go ahead.
20   A.   That's what -- yes.  Intravenous infusion.
21 Part B only covers drugs that are not usually
22 self-injected, is the definition.

86  (Pages 338 to 341)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

---

Page 342

1     Q.   And we had looked at this earlier, in the
2   context of the GAO report that came out in September
3   of '01, there was that indication on page 19 that the
4   GAO had not researched the infusion drugs because
5   they were a small part of the Medicare Part B pie.
6   Do you recall that?
7          MR. GOBENA:  Objection.
8          THE WITNESS:  Home infusion.
9          BY MR. DALY:
10    Q.   Home infusion.  And when you talk about
11  intravenous infusion here, that would include the
12  home infusion drugs as well, wouldn't it?
13    A.   I don't know, to be perfectly honest with
14  you.  The bulk of the drugs and the bulk of the
15  spending is physician office and outpatient infusion.
16  So home health infusion, which is usually the same
17  drugs, may or may not be.  I'm not sure.
18    Q.   And are you aware of whether or not for
19  home infusion that Medicare provides any kind of
20  service fee for the administration of home infusion
21  drugs?
22          MR. BREEN:  Objection.  Form.

---

Page 343

1          THE VIDEOGRAPHER:  I'm sorry.  Who made
2   that objection?
3          MR. BREEN:  Breen.
4          MR. GOBENA:  You can answer.
5          THE WITNESS:  Prior to --
6          MR. DALY:  If they just object on form,
7   just go right ahead.
8          THE WITNESS:  Prior to the CMS change
9   after they went did the AWP reform, I don't believe
10  there was any service fee for home infusion or home
11  inhalation delivery.  And I believe there is now.
12  But there was no service fee at the time.
13          BY MR. DALY:
14    Q.   And I'm just looking at your answer here
15  on the screen.  Prior to CMS change, after they went
16  to the AWP form -- I'm not sure if I'm understanding.
17  Can you just expand on that a little bit?
18    A.   After we changed the AWP to ASP plus 6 in
19  the 2003 bill, there was very little to zero
20  discussion and/or thought about any of the home
21  health drugs.  It was generally not a discussion of
22  the vast bulk of the spending was in oncology and

---

Page 344

1   rheumatology and other physician office drugs.
2     Q.   So does that mean you don't --
3     A.   So after I left, and after the bill went
4   into effect, the home health providers came in and
5   raised quite a ruckus about the lack of dispensing
6   fee mainly for inhalation drugs, but also I believe
7   for home health infusion.  And CMS did in fact
8   basically create a home -- at least for respiratory
9   drugs, and I assume it was for infusion as well, a
10  dispensing fee for those drugs, which again similar
11  to oncology, was a small -- the increase they created
12  for dispensing the drugs was a small piece of the AWP
13  drug savings in that arena, I believe.
14    Q.   So it's your understanding that prior to
15  the MMA, there was no separate service fee for home
16  infusion?
17    A.   I may be wrong, but I don't think there
18  was.
19    Q.   Okay.  And when the MMA was instituted,
20  you know, as a result of your efforts, there was no
21  provision in that act for a service fee for home
22  infusion either, is that what you're saying?

---

Page 345

1     A.   I'm pretty sure there was not.
2     Q.   And that subsequent to the institution of
3   the MMA, that's when the home health providers came
4   forward and something was done to rectify that?
5     A.   And it was done on --
6          MR. GOBENA:  Objection to form.  Sorry.
7   Go ahead.
8          THE WITNESS:  I know it was done for
9   respiratory drugs.  I believe it was for infused
10  drugs as well.  I'm not sure, but I'm pretty -- I
11  know respiratory drugs it was.  And I was actually --
12  it was just something that was not considered in
13  2003.  And CMS, I think, decided that was an
14  inadvertent error and they put in a dispensing fee
15  for infusion drugs -- I mean, for respiratory drugs.
16  I'm not sure -- I'm fairly certain it covered
17  infusion as well.
18          BY MR. DALY:
19    Q.   And prior to something being done about
20  that after the MMA was put into effect, is it your
21  understanding that the home infusion care providers
22  were relying on the spread between their acquisition

87  (Pages 342 to 345)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

Page 346

1   costs and AWP to fund the services that they were
2   providing?
3         MR. GOBENA: Objection. Form.
4         THE WITNESS: I assume that that was part
5   of how they paid for the cost of delivering the
6   services. Yes.
7         (Exhibit Abbott 192 was
8         marked for identification.)
9         BY MR. DALY:
10    Q.   Mr. Scully, I've handed you what we've
11  marked as Exhibit Abbott 192, bearing Bates stamp
12  numbers HHC 0030446 through 0449, which is a letter
13  from the -- excuse me, Long-Term Care Pharmacy
14  Alliance to you. And do you recognize this letter?
15    A.   No.
16    Q.   In the first paragraph, it says, "I am
17  writing," this is a letter dated July 22, 2002. And
18  it is, it says in the first sentence, "I am writing
19  to thank you for taking the time to meet with us on
20  June 27." Do you see that?
21    A.   Yes.
22    Q.   Do you have any recollection of meeting

Page 347

1   with representatives of the LTCPA in June of -- or
2   the summer of 19 -- or of 2002?
3     A.   No.
4     Q.   No. You meet with a lot of people,
5   though?
6     A.   I met with a lot of people.
7     Q.   Have you ever heard of the LTCPA?
8     A.   Vaguely.
9     Q.   Okay. And you understand them to be some
10  sort of trade association for home infusion?
11    A.   I thought it was a trade association for
12  nursing home pharmacists, so there may be home
13  infusion people in it, but I think it's nursing home
14  pharmacists. Maybe I'm wrong about that, but I think
15  that's what it is. The trade association for most of
16  the home infusion people is AA Home Care, I think, a
17  different group.
18    Q.   The bottom of the first page, they say in
19  their letter to you, "right now, most of the
20  reimbursement for the special services provided by
21  long-term care pharmacies is implicit. That is to
22  say, we find our reimbursement in the spread between

Page 348

1   the prices at which we purchase a drug and the
2   average wholesale price of the drug." Do you see
3   that language?
4     A.   Yes.
5     Q.   And do you have an understanding that that
6   is a correct statement?
7         MR. GOBENA: Objection to form.
8         THE WITNESS: Yes. I mean, I think the
9   issue is a matter of proportion. It's similar to the
10  oncologists, which is they clearly made money on the
11  spread and how much of that -- what measurement
12  appropriately should have been paid to deliver the
13  service, some portion of it. I don't know enough
14  about the nursing home issue here to know how much
15  there was. This is a small -- you know, nursing
16  homes are similar to home infusion, where they have
17  Part B Medicare patients in the home, and they
18  provide the service and they get paid for it.
19        So how much did they make on AWP spread
20  and how much of that would have measurably been put
21  back in if they had a more rational policy into a
22  servicing fee? I'm not sure, but my guess is much

Page 349

1   like oncology, it probably wouldn't be all of it.
2   And I don't have all the facts to tell you that. I
3   mean, I did know on the dialysis side, it probably
4   was appropriate to put all of it back in. In many
5   other settings, it was not.
6         BY MR. DALY:
7     Q.   I'm going to hand you what's been
8   previously marked as Exhibit Abbott 018, which
9   is testimony that was submitted at the hearing that
10  we've been talking about on October 3, 2002 that you
11  attended by the National Alliance for Infusion
12  Therapy and the National Home Infusion Association.
13  And do you recall the presentation that these
14  entities made at the hearing on 10-3-02?
15    A.   No. I'm sure I wasn't there.
16    Q.   Well, you were there for your part. This
17  is the same hearing you were at.
18    A.   I traditionally left as soon as I was
19  done.
20    Q.   As soon as possible.
21    A.   As did every other administrator.
22    Q.   Now, did you ever have any meetings or

88  (Pages 346 to 349)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

Page 350

1   correspondence with either of these entities
2   concerning their concerns relating to proposed
3   amendments to the Medicare reimbursement structure?
4       A.   Not that I remember.  They were not major
5   players.
6       Q.   And if you drop down to the, on the first
7   page under Medicare coverage and payment for home
8   infusion drug therapy, do you see that?
9       A.   Yes.
10      Q.   In the first sentence, they say,
11  "providers and suppliers of infusion drug therapies
12  in the home setting are not paid separately by
13  Medicare for the critical services and practice
14  expenses described above."  Do you see that?
15      A.   Yes.
16      Q.   And that's, I take it, having discussed it
17  with you earlier, that's consistent with your
18  understanding, that they were not receiving a
19  separate reimbursement for services on the home
20  infusion front, is that correct?
21           MR. GOBENA:  Objection to form.
22           THE WITNESS:  I don't believe -- I do not

Page 351

1   believe they were getting a separate payment for
2   services.  Yes.
3            BY MR. DALY:
4       Q.   And as they say here, continuing in that
5   paragraph, the only items that we -- "the only items
6   that are explicitly covered and reimbursed under this
7   limited benefit are the drugs, equipment and
8   supplies," do you see that?
9       A.   Yes.
10      Q.   And that, based on your recollection of
11  the circumstances, appears to be a correct statement,
12  right?
13           MR. GOBENA:  Objection to form.
14           THE WITNESS:  Yes.  And I would say while
15  I'm not qualified to do it here and obviously we
16  completely ignored these guys in the legislation,
17  there was a thorough discussion on the oncology side
18  that the AWP margins were far more than needed on the
19  practice expense add back by whatever I said, 1 to 20
20  or 1 to 5.  On dialysis, it was 1 to 1.  And for
21  these guys, it was never discussed.
22           So what's the appropriate -- what were

Page 352

1   their AWP margins, and how big were they, and were
2   they appropriate or not, and what should have been
3   added back as far as I know, it never came up.
4            BY MR. DALY:
5       Q.   So the -- as you said, these -- this group
6   was this group being the home infusion caregivers,
7   they were ignored in the legislation you were working
8   on, correct?
9            MR. GOBENA:  Objection.  Asked and
10  answered.
11           THE WITNESS:  On AWP, I would say that is
12  correct.  They had other -- some of the members and
13  manufacturers had other issues.  And the noise from
14  the oncologists was very loud.  And obviously this is
15  part of the Medicare drug benefit, which is a very
16  big, very controversial bill.  And I don't think any
17  of us really thought about these guys, to be
18  perfectly honest, until after the bill passed.
19           BY MR. DALY:
20      Q.   Now --
21      A.   In four months in the Medicare conference
22  committee, and I don't think I missed any of it, or

Page 353

1   whatever you want to call it, the quasi conferences,
2   it was, you know, Senator Baucus and Senator Roe and
3   Republican members on both sides.  I don't remember
4   this ever coming up.
5       Q.   And what you said earlier is that you
6   believe that with respect to home infusion, that the
7   situation was addressed after the MMA was put into
8   place and after you had left the administration,
9   correct?
10           MR. GOBENA:  Objection to form.
11           THE WITNESS:  I should know this, but
12  there was -- I don't know on home infusion.  I assume
13  it was.  I know on respiratory therapy drugs, there
14  was a dispensing fee created administratively by CMS
15  the following year on the argument, for the
16  respiratory drugs, that there was no margin left, and
17  the service wouldn't be provided.
18           So CMS created a dispensing fee, which I
19  believe was 55 bucks or something for the first 60
20  days, and then it went down from there.  I think it's
21  now down to 28, it was phased down.  But for
22  respiratory therapy, there was a dispensing fee

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                           May 15, 2007

Washington, DC

Page 354

1    created by CMS in 2004 by regulation, to deal with
2    this. I assume it was done for infusion as well, but
3    I don't know, to be honest with you.
4           BY MR. DALY:
5       Q.   As part of the MMA, were some drugs kept
6    at 95 percent of AWP? When I say kept at, was
7    reimbursement kept at 95 percent of AWP?
8       A.   I think I may be wrong, but I think maybe
9    some IVIG. Something was. I can't remember what.
10      Q.   And what would that stand for?
11      A.   Intravenous immune suppressant, I forget
12   what the G is, but it's a -- it's a fairly widely
13   used immune deficiency set of -- I guess they are
14   theoretically drugs or biological therapies. I think
15   that's the only one, IVIG. I may be wrong. You may
16   be aware of it. I'm not sure. There were a couple
17   of carveouts. I can't remember exactly what.
18           (Exhibit Abbott 193 was
19           marked for identification.)
20           BY MR. DALY:
21      Q.   And the court reporter is handing --
22      A.   Which reminds me my law firm does work for

Page 355

1    CLB, which is an IVIG company. Just remembered when
2    I answered your question. They have a very narrowly
3    tailored series of drugs.
4       Q.   I've handed you what the court reporter
5    has marked Exhibit Abbott 193, and it's a CMS manual
6    system document that's entitled some sort of change
7    request. And without going into the details of this
8    particular document, Mr. Scully, what is, what is
9    this CMS manual system?
10      A.   What is the manual system? It's a
11   subregulatory director -- directive to carriers and
12   fiscal intermediaries and CMS contractors just how to
13   carry out.
14      Q.   So this is going out to carriers telling
15   them what to do?
16      A.   It's generally available to providers as
17   well depending on their area.
18      Q.   And if you'll turn to -- well, turn to the
19   second page of the document, it's talking about the
20   MMA, and appears to be talking about certain drugs
21   that are going to be kept at 95 percent of AWP for
22   reimbursement purposes.

Page 356

1           And if you flip over to subparagraph five
2    on the third page of the document, it states that
3    "payment limits for infusion drugs furnished through
4    a covered item of durable medical equipment on or
5    after January 1, 2004 are 95 percent of the AWP
6    reflected in the published compendia as of October 1,
7    2003, regardless of whether or not the durable
8    medical equipment is implanted." Do you see that
9    language?
10      A.   Yes.
11      Q.   And do you recall working on a carveout
12   from the ASP plus 6 or the 85 percent of AWP that was
13   part of the MMA in January of 2004?
14      A.   I was gone.
15      Q.   Well, this, this -- well, I'm asking you,
16   did you work on this?
17      A.   2004. I was gone.
18      Q.   This is like a few weeks after you left.
19      A.   Yes. No. I don't. I pretty much -- the
20   bill passed and I was -- you know, the bill passed in
21   December and I was pretty -- declared to be heading
22   for the exits. I had basically stayed to get the

Page 357

1    bill passed probably six months longer than I
2    originally planned. So no, I don't remember this.
3    It does appear if there was a carveout -- so what
4    you're saying is for DME drugs, infused home drugs,
5    there was a carveout for 95 percent of the bill.
6       Q.   That's what I'm asking. That's what it
7    looks like to me. I'm asking you.
8       A.   I don't remember that. But it appears
9    that there was in the statute, but I just don't
10   recall. It may have been, we had many issues in the
11   bill.
12      Q.   So this carveout was not something that
13   you would have discussed with staff in December or
14   November or October of 2003?
15      A.   I don't remember. It was in the
16   legislation? It must have been if it's in here.
17   There was a carveout of the legislation for home
18   infused drugs?
19      Q.   That's what it suggests. Yes.
20      A.   Well, I just don't have the legislation in
21   front of me, but I'm sure if that was, it was done
22   for a reason. And I'm -- I just don't remember if

90  (Pages 354 to 357)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                          May 15, 2007
                        Washington, DC

Page 358

1   there was a carveout. If it was, they probably
2   carved it out for the reasons I discussed because
3   there was no dispensing fee.
4       Q.   Because of what?
5       A.   I'm assuming if there is a carveout for
6   home infusion drugs, it was done largely for that
7   reason.
8       Q.   Because there was no dispensing fee is
9   that what you said?
10      A.   But I was not aware of that until you
11  showed it to me. If I was -- I may have been aware
12  at the time, but I had forgotten. It's not something
13  that I discussed widely with the staff at the time.
14          MR. GOBENA: I'm going to object to this
15  line of questioning, to the extent you're saying
16  there was a carveout beyond December 31st, 2004. If
17  you look at the second page, it covers the time
18  period for which this memorandum is operative.
19          BY MR. DALY:
20      Q.   When did you leave?
21      A.   January 4th was my last day, 2004.
22      Q.   That's when you left CMS. Correct?

Page 359

1       A.   Yes. I believe that's the right final
2   day.
3       Q.   And if you look at the, if you look at the
4   attachments, there is the addendum F, which is the
5   list of drugs, are you saying you have no
6   recollection of this during your tenure with CMS?
7       A.   It's vaguely coming back to me that we did
8   some carveouts for blood -- for clotting factors. I
9   wasn't aware we did it for home infusion drugs. If
10  there is a home infusion carveout in the bill, I have
11  just forgotten. There may have been. I knew we
12  did one for clotting factors, and just looking at
13  this rule, it was largely Senator Grassley's staff
14  that was doing this. So I should be aware of it, but
15  I just -- was it a one-year provision or a permanent
16  one? I just don't remember.
17      Q.   Well, I mean, I think this thing changed
18  over time, but certainly this is talking about it
19  being in effect for -- effective January 1, 2004
20  according to the addendum.
21      A.   Yes.
22          MR. GOBENA: Through December 31, 2004.

Page 360

1          BY MR. DALY:
2       Q.   Well, at least for a year.
3       A.   I think there was a one-year transition
4   for a few things. I just don't remember which --
5   clotting factor, I know, was one. If we did it for
6   home infusion drugs, I forgot.
7       Q.   And it would appear based on Exhibit
8   Abbott 193 that it was also at least a one-year
9   carveout for infusion drugs that are delivered
10  through DME, correct?
11          MR. GOBENA: Object to the form.
12          THE WITNESS: If I remember for that
13  entire one year, we also had 85 percent of AWP. We
14  didn't get ASP plus 6 until a year later either.
15          BY MR. DALY:
16      Q.   Right.
17      A.   Right? So there was a one-year modest cut
18  from AWP and then a transition to ASP plus 6, right?
19      Q.   I believe that was the sequence. And so
20  for this first year, according to this, these drugs
21  issued in a home care setting through a DME, durable
22  medical equipment, would stay at 95 percent of AWP

Page 361

1   for the reimbursement, correct?
2       A.   As the clotting factor and the rest went
3   to 85? You remember -- I had forgotten, but I guess
4   that's right.
5       Q.   Okay. And that would be with knowledge
6   that the ASP for these drugs was much lower than 95
7   percent of AWP, correct?
8          MR. GOBENA: Object to the form.
9          THE WITNESS: Obviously, I don't have a
10  great recollection of this particular issue and how
11  it was treated legislatively. It was not -- it was
12  not one of the top 200 issues I was dealing with.
13          BY MR. DALY:
14      Q.   But you knew, for example, that -- you
15  know, I think you use it in your -- as an example in
16  some of your testimony, that the AWP for Vancomycin,
17  for example, was higher than the ASP for Vancomycin,
18  correct?
19      A.   Yes.
20      Q.   And so if this exception was going to
21  treat Vancomycin and allow it to be reimbursed at 95
22  percent, it would -- of AWP, it would be, that would

91  (Pages 358 to 361)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 362

1  be a level that was much higher than the ASP for
2  Vancomycin, correct?
3       MR. GOBENA: Objection. Form. Also going
4  to object to the previous question. I didn't get a
5  chance to get in there. Object to the form on that.
6  You can answer the question.
7       THE WITNESS: Yes. My guess would be
8  obviously it was a transition for one year to 85
9  percent of AWP for all drugs, 95 percent for clotting
10 factor and some other drugs. And I'm sure they
11 didn't go through drug by drug and look at the
12 margins. I assume there were other home health
13 infusion drugs, for which they felt the margins for
14 that one year may have been sensitively narrow, and
15 so they kept it at 95 percent.
16       I'm just guessing -- just remember, my
17 testimony for Vancomycin, the spread was pretty big
18 and there probably wasn't a whole lot of worry about
19 85 percent not being big enough to cover it, so it's
20 probably not the reason that drove the policy.
21       (Exhibit Abbott 194 was
22       marked for identification.)

Page 363

1       BY MR. DALY:
2    Q.   And Mr. Scully, I've handed you what the
3  court reporter has marked as Exhibit Abbott 194,
4  which is a copy of at least portions of the MMA
5  itself. And I would ask you to turn to page 23 of
6  that document. And you had asked whether this was a
7  carveout in the legislation itself, and I just want
8  to direct you to page 23 at the bottom, subparagraphs
9  D-1 and 2.
10   A.   Okay.
11   Q.   And does that appear to be the legislative
12 carveout for the rule that we were just looking at?
13   A.   Refreshing my memory, I had forgotten we
14 did that. Yes.
15       MR. GOBENA: While Mr. Daly is getting his
16 exhibit out, I'll note the first page, it says that
17 this piece of legislation was effective December 8,
18 2003 to December 31, 2004.
19       MR. DALY: Anything else you want to point
20 out?
21       THE WITNESS: Yes. This was a one-year
22 transition. It went to ASP plus 6 in 2004, is that

Page 364

1  right?
2       BY MR. DALY:
3    Q.   I believe that's right.
4       (Exhibit Abbott 195 was
5       marked for identification.)
6       THE WITNESS: Good heavy one. I can take
7  care of the rest of those if you like.
8       BY MR. DALY:
9    Q.   And you mentioned that, you know, this
10 might have been a one-year carveout. And Mr. Gobena
11 seems anxious to point that out. Taking a look at
12 Exhibit Abbott 195, which I've handed you, this is
13 certain amendments that went into effect with respect
14 to the MMA effective December 20, 2006. Do you see,
15 do you see that?
16   A.   Yes.
17   Q.   And if you would turn to page 21 of this
18 document, and subparagraphs D-1 and D-2. Do you see
19 that the carveout that we identified that was in
20 effect for 2004 remains in effect today?
21       MR. GOBENA: Object to the form. Excuse
22 me.

Page 365

1       THE WITNESS: Yes. I wasn't aware of
2  that, so there is still -- they're still 95 percent
3  of AWP today?
4       BY MR. DALY:
5    Q.   That's what the statute says, isn't it?
6    A.   Yes. I wasn't aware of that. That's what
7  the statute says.
8       MR. BREEN: Just for clarification,
9  Mr. Daly, are you referring to subparagraph D little
10 I, which ends with 95 percent of the average
11 wholesale price for such drug in effect on October 1,
12 2003?
13       MR. DALY: And D-2.
14       MR. BREEN: Say again?
15       MR. DALY: And the next paragraph, D
16 Romanette i and D Romanette ii.
17       THE WITNESS: Until they froze it at the
18 date of passage, October -- they picked the -- 95
19 percent of the AWP in place in October 2003, and
20 froze it. I had forgotten that.
21       BY MR. DALY:
22    Q.   And so at least for the drugs that are

92  (Pages 362 to 365)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

Page 366

1   subject to this carveout in the home infusion
2   setting, Congress has kept the reimbursement of those
3   drugs at 95 percent of AWP as of --
4       A.   As of October 2003.
5       Q.   That's correct, isn't it?
6       A.   I guess it is. That's what the statute
7   says. Another piece of sausage. I have just
8   forgotten that we did that, to be honest with you,
9   which I assume is why they don't have a dispensing
10  fee for anything but respiratory drugs, because they
11  didn't do that for respiratory drugs.
12      Q.   So it would appear that Congress, at least
13  for these drugs and in that setting of home infusion,
14  has determined to continue to subsidize the provision
15  of the services by overpaying for the drugs, correct?
16          MR. GOBENA: Object to the form. The
17  legislation speaks for itself.
18          MR. BREEN: Objection to the form.
19      BY MR. DALY:
20      Q.   You can go ahead.
21      A.   Yes. I was surprised to see this. I
22  forgot we did it. It was certainly never discussed

Page 367

1   by members. I'm sure the staff -- staff person who
2   wrote it works with me at Alston & Bird, so I'll go
3   back and ask him, but I'm sure that it's probably,
4   they froze it to freeze it, and some level of
5   cross-subsidy apparently. I'm not sure what the
6   congressional intent there was, but I think it was
7   Senator Grassley's staff that did that provision. So
8   I had totally forgotten we did it. That it was in
9   the bill. It wasn't something that was widely
10  discussed at all.
11      Q.   And are you aware of whether the drugs
12  that DOJ is suing Abbott for, many of those drugs are
13  used in the home infusion context and using DME?
14          MR. GOBENA: Objection to form.
15          THE WITNESS: As of today, I'm aware of
16  it. I wasn't aware of it before.
17          BY MR. DALY:
18      Q.   But as of today, you are?
19      A.   Yes. Obviously looking at the drug list.
20      Q.   Page 27 of Exhibit Abbott 191, which is
21  your 10-3 -- yes, your October 3 -- excuse me,
22  October 3, 2002 testimony. I just want to direct you

Page 368

1   to page 27.
2       A.   27?
3       Q.   Yes.
4       A.   Okay.
5       Q.   And in your testimony in response to
6   Mr. English, you indicate that you think -- well, you
7   state, "I think there are a lot of different provider
8   areas that may have small impacts from AWP, and we
9   are certainly willing to work with the committee to
10  identify those." And then you mentioned oncology
11  as -- oncology and dialysis and hematology being sort
12  of the big three, right?
13      A.   Yes.
14      Q.   And then you say, "I think almost every
15  physician who administers drugs
16  probably has some beneficial cost shifting benefit
17  from AWP, I think those are the three big areas," you
18  see that language?
19      A.   Yes.
20      Q.   And that was a true statement, correct?
21      A.   Yes.
22      Q.   On page 31, I just want to get a fix for

Page 369

1   -- and we may have covered this in some part in the
2   sort of background section that we did at the
3   beginning, but you state at the bottom of the page,
4   "I had been working on Medicare for over 20 years and
5   there has never been any law passed more complicated
6   than this one." How far back does your work on
7   Medicare go?
8       A.   In a minor way, probably 1982. But in a
9   full time way, 1989.
10      Q.   And what were you doing with respect to
11  Medicare in 1982?
12      A.   Not much. Occasional staff work for
13  Senator Gorton, but very, you know, minor.
14      Q.   And '89 would have started your work with
15  the Bush Administration?
16      A.   And OMB. Yes.
17      Q.   And if you would turn to page 34. If you
18  -- actually, if you look at 33, the page before, it
19  looks like you finished up your testimony, and then
20  George Reeb, R-E-E-B, got in the hot seat. And began
21  to talk a little bit about Medicare and Medicaid.
22  And on page 34 of Mr. Reeb's testimony, he states

93 (Pages 366 to 369)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                            May 15, 2007

Washington, DC

Page 370

1  that "this occurs largely because Medicare and
2  Medicaid base reimbursement to physicians and
3  suppliers on inflated average wholesale prices."  Do
4  you see that language?
5      A.   Where is that?  I'm sorry.
6      Q.   I'm sorry?
7      A.   Where is it, second --
8      Q.   I think it's the second full sentence on
9  page 34.
10     A.   Oh, yes.  Okay.
11     Q.   Do you see that language?
12     A.   Yep.  I'm getting tired so --
13     Q.   And in the -- I know the feeling.  And in
14  the Medicaid world, as we talked briefly earlier,
15  Medicaid state agencies are reimbursed typically on
16  some formula of AWP minus a certain percent or
17  sometimes, for example, WAC plus a certain percent,
18  is that your general understanding?
19           MR. GOBENA:  Objection to the form.
20           THE WITNESS:  Yes.  It is.
21           BY MR. DALY:
22     Q.   And here, in the -- in this next

Page 371

1  paragraph, there is discussion of Medicare
2  reimbursing physicians at 95 percent of AWP.  That
3  was the law prior to the institution of the MMA,
4  correct?
5           MR. GOBENA:  Object to the form.
6           THE WITNESS:  Yes.
7           BY MR. DALY:
8      Q.   Okay.  And in the next sentence, it says,
9  "similarly, state Medicaid agencies reimburse
10  pharmacies at AWP minus an average of 10.3 percent."
11  Do you see that?
12     A.   Yes.
13     Q.   And is that consistent with your
14  understanding of the discounts that states were
15  typically reimbursing their pharmacy purchases at?
16           MR. GOBENA:  Object to the form.
17           THE WITNESS:  I don't recall.  I'm
18  guessing GAO must be -- or the IG must be close to
19  correct.  That's probably a wide average.
20           BY MR. DALY:
21     Q.   Couple paragraphs down, maybe three
22  paragraphs down the statement, it says, "although

Page 372

1  this hearing pertains to Medicare, I would also like
2  to mention our work on Medicaid because it
3  confirms that AWP is not a realistic basis for drug
4  reimbursement."  Do you see that language?
5      A.   Yes.
6      Q.   And do you agree with that statement, in
7  the Medicaid context?
8      A.   Yes.  For the most part.  I would add the
9  state situation is much more complex, because of
10  rebates which doesn't happen in Medicare.  The states
11  get rebates on Medicaid and so the price they
12  actually pay is complicated by the rebates they get
13  back.
14     Q.   In the next sentence, it states, "in
15  Medicaid, we found that there was a significant
16  difference between the pharmacy acquisition costs for
17  drugs and their published AWPs.  In our latest report
18  we found that pharmacy acquisition costs ranged from
19  17 to 72 percent below published AWPs."  Do you see
20  that?
21     A.   Yes.
22     Q.   And was that a caution of concern for you?

Page 373

1           MR. GOBENA:  Object to the form.
2           THE WITNESS:  Yes.  As I said, as I
3  explained earlier today, you know, we could help
4  share information with the states, but Medicaid is a
5  state managed program.  And the states had the right
6  to negotiate whatever price they thought was
7  appropriate.
8           BY MR. DALY:
9      Q.   Within reason, right?
10     A.   Within reason.
11     Q.   And did you think discounts of 72 percent
12  below published AWPs were within reason?
13           MR. GOBENA:  Object to the form.
14           THE WITNESS:  I think we pushed the states
15  to negotiate more aggressively the lower prices and
16  gave them as much information as we could.  And we
17  also -- you know, they obviously had rebates that
18  were impacted below this.  So yeah, but I mean, the
19  reality is it was my direct responsibility to fix
20  Medicare.  It was not my direct responsibility to fix
21  56 different Medicaid programs.
22           BY MR. DALY:

94  (Pages 370 to 373)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 374

1    Q.   And to do so -- well, I mean, I take it
2    that fixing 50 state Medicaid programs would be, you
3    know, versions of trying to fix Medicare times 50.
4    Is that fair?
5    A.   Yes.
6    Q.   Because each state would have its own
7    political issues, for example, correct?
8         MR. GOBENA: Object to the form.
9         THE WITNESS: Yes. Medicaid is 54
10   territories, 55 different programs that are all
11   complex and all different payment rates and different
12   politics and makes Medicare reform look simple.
13        BY MR. DALY:
14   Q.   And for example, you would have, you know,
15   providers within each state, this time including
16   pharmacies, for example, that would be complaining to
17   state governments if reimbursement levels attempted
18   to be reduced, be reduced, is that true?
19        MR. GOBENA: Objection. Form.
20        THE WITNESS: Yes. Every state had
21   different pharmacy politics with the providers and
22   what the dispensing fees were and what the

Page 375

1    acquisition costs were. Yes.
2         BY MR. DALY:
3    Q.   But it was your view, it was CMS's view
4    that if a state wanted to pay to reimburse pharmacies
5    at AWP minus, say, 10 percent, for example, even
6    though the actual acquisition cost of the drug might
7    be AWP minus 72 percent, you did not find that to be
8    unreasonable?
9         MR. GOBENA: Objection to the form. This
10   witness is not here as a 30(b)(6) testifying about
11   CMS's views.
12        BY MR. DALY:
13   Q.   Go ahead.
14        MR. GOBENA: You can answer.
15        THE WITNESS: My personal view was that it
16   was -- was it unreasonable? Yes. I mean, I spent a
17   lot of time complaining to states about trying to
18   make sure that they paid the lower cost for drugs,
19   and some did. And I pushed on a lot of states to
20   hire third party PBMs which a lot of them did, to buy
21   their drugs and lower their acquisition costs and
22   come up with a market-based pricing, which

Page 376

1    increasingly some did.
2         And I authorized the number multi-state
3    purchasing groups which were controversial for states
4    to go ahead and use private PBMs to lower their cost.
5    So it was a concern. For me it was more direct and
6    immediate concern for the Medicare program, which I
7    was directly responsible for. But when states asked
8    me what to do on Medicaid drug pricing, my general
9    advice, which a lot of them did, was to hire a PBM to
10   go out, put them at risk, and drive prices down,
11   which a number of them did.
12        BY MR. DALY:
13   Q.   In your testimony in 2003, you testified
14   that Medicaid has actually become a larger program
15   than Medicare. Do you recall that testimony?
16   A.   Yes.
17   Q.   And so why do you say that you didn't have
18   direct responsibility for trying to reduce the
19   federal government's Medicaid payments?
20        MR. GOBENA: Object to the form.
21   Mischaracterizes the witness's testimony. You can
22   answer.

Page 377

1         THE WITNESS: I did have responsibility
2    for Medicaid. The federal government runs and
3    manages Medicare day-to-day. And when you had a
4    situation like you did for Medicare, I felt it was
5    probably next to prescription drug reform, which was
6    my number one priority going back in the government.
7    And number two was probably fixing AWP, because it
8    was a big fiscal and management and policy problem
9    for the agency.
10        So I spent a lot of time trying to fix it.
11   On Medicaid, I had equal interest but the single
12   biggest Medicaid policy fiscal issue that we had was
13   if -- was the states scamming reimbursement matches
14   which I mentioned earlier, which was a multibillion
15   dollar problem, state by state, with the states
16   because they had a fiscal partnership between the
17   federal and state governments. The single biggest
18   policy problem there that I spent most of my time on
19   was to trying to prevent the states from putting up
20   air to match federal, and drawdown federal dollars
21   without putting out state dollars.
22        Once we got to the point where we're

95  (Pages 374 to 377)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

| Page 394 |
| --- |

1  that's -- I realize no time is good for you for this,
2  but we'd certainly work with you on your schedule to
3  find the best possible time to continue.
4       MR. HAAS: I object strenuously to the use
5  of the transcript without having the opportunity to
6  cross-examine or redirect on behalf of my client.
7  There has been a number of comments made, testimony
8  made with respect to Johnson & Johnson and its
9  products. And clarification is needed. And absent
10 that opportunity, I strenuously object to his
11 testimony and will proceed accordingly.
12      BY MR. DALY:
13      Q.   What's an FUL?
14      A.   Federal upper payment limit.
15      Q.   And do you have a working understanding of
16 when it is that an FUL is supposed to be created for
17 a drug?
18      A.   I did three years ago. I'm not sure I can
19 remember exactly how it's -- how it works, but it's
20 essentially an upper payment limit for usually I
21 believe a multisource generic drug. But I can't
22 remember exactly what the rule is, but it used to be

| Page 395 |
| --- |

1  --
2       Q.   Three or more?
3       A.   Yes. I think it was 250 percent or I
4  can't -- 250 percent or whatever the, I can't
5  remember the rule.
6       Q.   Do you remember what triggered the
7  creation of FULs in terms of if there are three or
8  more different drugs that are functional equivalents
9  that CMS would then prepare or create an FUL for
10 that, those three drugs?
11      MR. GOBENA: Object to the form.
12      BY MR. DALY:
13      Q.   Is that -- I'm just trying to see if that
14 jogs your memory?
15      A.   I just can't remember precisely how it
16 works. It's been three years.
17      Q.   Well, you remember that it was something
18 to do with if there are a number of drugs that can be
19 full substitutes for each other within a basically
20 the same drug?
21      A.   Yes. It's the maximum amount CMS will pay
22 for any of them.

| Page 396 |
| --- |

1       Q.   Right. And that that's something that CMS
2  was going to do?
3       A.   Yes.
4       MR. GOBENA: Object to the form.
5       THE WITNESS: Yes. CMS had that
6  regulation in place and I think they put out a new
7  one this year as a matter of fact.
8       BY MR. DALY:
9       Q.   And do you know why -- or do you know
10 whether FULs were ever created for any of the drugs
11 that the DOJ has sued Abbott for in this litigation?
12      A.   I don't know. I assume so, but I don't
13 know. I mean, Vancomycin is a generic, I think. So
14 I assume there was an FUL, but I'm not familiar, I'm
15 not specifically familiar with it.
16      Q.   And sodium chloride is certainly a
17 generic, right?
18      A.   Yes. So I assume there is an FUL for all
19 of them.
20      Q.   Well, let me represent to you that there
21 are not, and then my question would be, do you know
22 why?

| Page 397 |
| --- |

1       MR. GOBENA: Object to the form.
2       THE WITNESS: No. I don't. I think
3  before you get off that, I should clarify, I assume
4  it's because they are infused drugs, and the FULs are
5  generally pharmacy dispensed drugs for the most part.
6  I assume that's the reason.
7       BY MR. DALY:
8       Q.   Okay. But you don't know?
9       A.   I don't know.
10      (Exhibit Abbott 196 was
11      marked for identification.)
12      BY MR. DALY:
13      Q.   Mr. Scully, I've handed you what we've
14 marked as Exhibit Abbott 196 which is an August 10,
15 2001 memorandum to you from Michael Mangano, who is
16 the principal deputy inspector general attaching an
17 OIG report from August 2001. And did you receive a
18 copy of this memorandum from Mr. Mangano?
19      A.   I don't recall, but I'm certain I did.
20      Q.   In the -- this document is entitled
21 Medicaid pharmacy actual acquisition cost of brand
22 name prescription drug products, is that correct?

100  (Pages 394 to 397)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 414

1  sure I probably agreed with it.
2      Q.  Well, do you agree with it now?
3      A.  Yes.
4      Q.  If you just flip to the very end of this
5  and maybe this will refresh your recollection, maybe
6  it won't, but the last couple of pages are a letter
7  from you to Janet Rehnquist.  Do you see that?
8      A.  Yes.
9      Q.  And is that your signature up by the from
10 box?
11     A.  It looks like it might be.
12     Q.  Okay.  So it would appear that you got
13 this and sent Ms. Rehnquist back a response?
14     A.  Yes.  But since I probably saw 4 or 500
15 documents a night before I went home sometimes,
16 whether or not I read it or not is another question.
17 But I'm sure I agree with the conclusion in there.
18     Q.  Well, in a lot of cases, you relied on
19 your staff to prepare letters and review things and
20 work on responsive letters with you, correct?
21     A.  Yes.
22     Q.  And when you wrote a letter such as this,

Page 415

1  to Miss Rehnquist, you were speaking on behalf of
2  CMS, correct?
3      A.  Yes.
4      Q.  In the last part of the response, in the
5  very last page of the document, you indicate that it
6  was your intent to follow up with the states and
7  strongly encourage them to review their estimates of
8  acquisition costs, do you see that?
9      A.  Yes.
10     Q.  And to follow up with them to ensure that
11 their actions take those findings into account.  Do
12 you see that?
13     A.  Yes.
14     Q.  Did CMS in fact do that?
15     A.  I'm sure we did.  I talked to many states
16 about paying more reasonably for drugs.  As I said
17 earlier, my general approach was not to have states
18 pay fee for service amounts for drugs, because in
19 many cases, the political pressure was not easy to
20 get that done.  It was always more effective in my
21 opinion to hire a third party at-risk PBM, because
22 they are much more likely to get lower prices for

Page 416

1  states for drugs.  And states increasingly did that.
2      Q.  On the -- if you go back to the letter
3  from Ms. Rehnquist to you on the second page, do you
4  see she indicates that in the second -- in the first
5  full paragraph, last sentence, "unlike brand name
6  drugs where reimbursement is predominantly based on a
7  discounted AWP, reimbursement of generic drugs can be
8  limited by a federal upper limit amounts that are
9  established by CMS." Do you see that?
10     A.  Yes.
11     Q.  And was it your understanding that CMS was
12 charged with responsibility to create FULs for drugs
13 that met the requirements of an FUL?
14         MR. GOBENA: Object to the form.
15         THE WITNESS: I believe so. Yeah, Larry
16 Reed who I mentioned earlier today is the guy who did
17 that.
18         BY MR. DALY:
19     Q.  And is it your experience that setting an
20 FUL for a drug that qualified to be given an FUL had
21 the effect of reducing reimbursement for that drug?
22         MR. GOBENA: Object to the form.

Page 417

1          THE WITNESS:  You know, I do not -- it was
2  never one of my primary policy issues to get involved
3  in the process for setting FULs, so my general
4  recollection is it was pretty wide range and there
5  wasn't usually a big reduction as a result of FULs.
6          BY MR. DALY:
7      Q.  Mr. Scully, I'm going to hand you what has
8  been marked previously as Exhibit Abbott 108, which
9  is an OIG report relating to omission of drugs from
10 the federal upper limit list in 2001.  And I would
11 direct your attention to the last few pages which
12 contained the CMS response signed by you, is that
13 correct?
14     A.  Yes.  That is my signature.  Yep.
15     Q.  I wanted to direct your attention to
16 Romanette number i of the report, which is the third
17 page in.  Under the executive summary.  And I want to
18 direct your attention to the second paragraph, which
19 talks about the requirements for when CMS is to
20 prepare an FUL for a given group of drugs.  And I
21 just ask you to read that to yourself, and then ask
22 you if that's consistent with your understanding of

105  (Pages 414 to 417)

Henderson Legal Services
202-220-4158

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 418

1  the requirements for a creation of an FUL.
2          MR. GOBENA: Object to the form.
3      BY MR. DALY:
4      Q.  Have you had a chance to look at that
5  paragraph?
6      A.  Yes.
7      Q.  Is that consistent with your understanding
8  of when CMS was to create an FUL?
9          MR. GOBENA: Object to the form.
10         THE WITNESS: Yes. I forgot the 150
11  percent number, yeah, earlier.
12     BY MR. DALY:
13     Q.  Okay. And then what you just referenced
14  in your earlier testimony, you said maybe it was 250
15  percent?
16     A.  CMS came out with a new rule this year
17  that it was 250 percent of a different calculation
18  that I can't remember exactly how it worked.
19     Q.  And in terms of when you were at CMS, the
20  rule was 150 percent of the published price for the
21  least costly therapeutically equivalent product plus
22  a reasonable dispensing fee, right?

Page 419

1      A.  I believe that's right.
2      Q.  And again, did you -- you don't know why
3  the drugs that DOJ has sued Abbott on in this case
4  were not FULed is that correct?
5          MR. GOBENA: Objection. Asked and
6  answered.
7          THE WITNESS: I don't know. I'm guessing
8  because they were infused drugs, they were not in the
9  calculations somehow.
10     BY MR. DALY:
11     Q.  Is there some exception to the FUL
12  calculation for infused drugs?
13     A.  I don't know. I don't remember.
14  Generally, in Medicare, there is a differential
15  between infused drugs and, you know, outpatient drugs
16  delivered to pharmacy. And I assume maybe there is
17  some differentiation in Medicaid I wasn't aware of.
18     Q.  But you're not aware of any exception from
19  the requirement that CMS create an FUL for a drug
20  that qualifies that's based on it being an infused
21  drug, are you?
22         MR. GOBENA: Objection to the form.

Page 420

1          THE WITNESS: No. I'm not. I was
2  minimally involved in this process as you can tell.
3          MR. DALY: Let's do this one here, Exhibit
4  Abbott 095.
5      BY MR. DALY:
6      Q.  Let me hand you what's been previously
7  marked as Exhibit Abbott 095. And this is a
8  September 2001 OIG report relating generally to the
9  -- what we've called the DOJAWPs. And I wanted to
10  direct your attention to the CMS comments at the end,
11  they are the last couple of pages. And we talked
12  about Ruben King-Shaw. That's somebody -- he was
13  your deputy administrator?
14     A.  Yes.
15     Q.  And he obviously prepared the response
16  here?
17     A.  Yes.
18     Q.  And did you have any discussions with him
19  about the technical correction that he made in the
20  last paragraph?
21     A.  Last paragraph of his response?
22     Q.  Yes.

Page 421

1      A.  On this page or where? Oh, I see, "we
2  appreciate the effort."
3      Q.  The very last page of the response, page 2
4  of his letter. I'll read it.
5      A.  I see it. No. I don't recollect having a
6  discussion with him.
7      Q.  Well, do you see that he says that the
8  original report stated that the inflated AWPs have
9  caused Medicare to overpay for these products. Do
10  you see that?
11     A.  Yes.
12     Q.  And he asked that the overpayment language
13  be removed. Do you see that?
14     A.  I'm sorry. What have I missed? I thought
15  he was correcting it.
16     Q.  It's the second page. It's this paragraph
17  here. Had you looked at that paragraph when I asked
18  you those other questions, Mr. Scully?
19     A.  No. The earlier question?
20     Q.  Right.
21     A.  No. I didn't see this, but Ruben had just
22  come from being two weeks before the Secretary of

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007

Washington, DC

Page 422

1  Health in Florida, so I'm assuming since I don't
2  discuss it with him, he probably didn't like the --
3  probably, he always felt this way, didn't like the IG
4  taking shots at states, so he probably asked to
5  remove it.
6       But we didn't discuss it, but it's very
7  Rubenesque. I would guess that was the intent of the
8  tone is he just didn't like the IG suggesting states
9  are overpaying, so much more than any other factual
10 basis. Much more than any other policy based factor.
11 I think he probably just didn't like the comments
12 about accusing the states of overpaying.
13    Q.  Because CMS had approved their plans to
14 pay whatever it was that they were paying, right?
15       MR. GOBENA: Object to the form.
16       THE WITNESS: Because it implies the
17 states are making errors or overpaying, and Ruben had
18 just been a state Medicaid administrator and was
19 probably as aggressive as anybody in the country
20 about trying to reduce drug prices. So I'm sure he
21 resented that. Probably took it out for that result
22 -- for that reason.

Page 423

1       BY MR. DALY:
2    Q.  He resented the implication that the
3  states were doing anything wrong, is that what you're
4  saying?
5    A.  The states were not effectively trying to
6  negotiate the lowest prices, at least in his state,
7  which is the way he thought, so I'm guessing this was
8  a much more personal thing than a policy
9  consideration at CMS.
10   Q.  Although when he wrote this letter, he was
11 speaking on behalf of --
12   A.  He was.
13   Q.  CMS, right?
14   A.  I'm just saying that he had been -- I'm
15 guessing from our previous letters with Mike
16 McMullen, he had been deputy administrator for about
17 two weeks, and I know from dealing with him as my
18 deputy for two and half years, he had strong feelings
19 about what the states -- states rights to run their
20 own programs.
21       MR. DALY: Well, I've got probably three
22 or four more areas to cover with you. It's not going

Page 424

1  to be all day or half a day or anything like that,
2  but I'm not going to be able to finish it tonight, so
3  I'm thinking that at 6 o'clock, I know a lot of
4  people have to go. I know I have to catch a plane,
5  so you know, subject to your prior comments, I think
6  this might be a good time to conclude.
7       THE WITNESS: Is there any reason why
8  other people can't stay longer, I mean, given the
9  issue of -- I mean, it would be convenient for
10 everybody's time, but it's extremely inconvenient for
11 my time to come back for any more than I have to
12 obviously. And if you have to catch a plane, is
13 there any reason why other people can't ask
14 questions, with the other counsel, co-counsel here?
15       MR. GOBENA: Why don't we go off the
16 record.
17       MR. DALY: Off the record.
18       THE VIDEOGRAPHER: The time is 6:04 p.m.
19 Off the record with videotape number 7.
20       (Recess.)
21       THE VIDEOGRAPHER: The time is 6:08 p.m.
22 We are continuing with tape number seven.

Page 425

1       BY MR. DALY:
2    Q.  Mr. Scully, I just wanted to follow up on
3  something you gave in one of your last few answers
4  which was when we were talking about average
5  discounts below AWP that pharmacies for example and
6  others were able to acquire drugs under the Medicaid
7  program. We were talking about the averages and you
8  said that there were a lot of high volume, low cost
9  drugs which might skew that average. Do you recall
10 that testimony?
11   A.  Yes.
12   Q.  And those are high volume, low cost drugs,
13 that's where you would expect the larger spreads to
14 be?
15   A.  I just generally recollect that was the
16 case. Some of the higher, the higher spreads were in
17 low cost drugs.
18   Q.  Okay. And the low cost drugs would
19 include sodium chloride, dextrose and water?
20       MR. GOBENA: Object to the form.
21       THE WITNESS: I'd have to look. I don't
22 remember those particular. I remember ipratropium

107  (Pages 422 to 425)

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 426

1  bromide and Albuterol being the two kind of poster
2  children for that.
3         BY MR. DALY:
4    Q.  Do you recall sodium chloride, dextrose
5  and water being low cost drugs under the Medicaid
6  program?
7         MR. GOBENA:  Object to the form.
8         THE WITNESS:  I don't.  I'd have to look
9  at the pricing.  I assume they are, but I'm --
10        MR. DALY:  All right.  I just wanted to
11 get that.  And did you have anything you wanted to
12 say after your meeting?
13        MR. GOBENA:  Yes.  As Mr. Scully has
14 indicated, he is prepared to proceed as long as
15 possible tonight to get as much of the questioning
16 done.  So what I want to do is go around the room and
17 ask each one of the defense counsel here representing
18 various drug companies whether or not they are
19 willing to continue going tonight, even though I
20 understand Mr. Daly has to catch a plane, Mr. Cook is
21 here.  He could ask questions for Abbott if Abbott
22 has additional areas of inquiry.  But I'll let all of

Page 427

1  you speak for yourselves to state on the record
2  whether you're willing to stay further tonight, so we
3  can continue and complete as much of his testimony as
4  possible.
5         MR. DALY:  I mean, you can ask anybody
6  whatever you want to ask them.  I just have two
7  things to say.  One, there was no indication from you
8  that this would be a one-day deposition.  Number two,
9  the court reporter has informed us they are not going
10 to stay here all night.  They have been at this now
11 for however many hours it's been, and it's just not
12 reasonable that folks, you know, have to continue and
13 work 14 hours straight, or 15 or 16 or 18, or however
14 --
15        THE WITNESS:  Well, that's a
16 misrepresentation by my counsel, then, because I
17 very, very, very clearly and very directly told them
18 that I want to start as early today as I could and go
19 -- excuse me, and go as long as I possibly could
20 today.
21        MR. GOBENA:  It's no misrepresentation.
22 Look, we don't know how long a deposition is going to

Page 428

1  take until you actually get into it.  There's been a
2  lot of, frankly, in our opinion, repetitive,
3  redundant questioning going on today.  But you know,
4  there might be a disagreement about that.
5         But leaving that aside, we are willing to
6  continue.  We are not talking about going all night
7  long until tomorrow morning.  We can go for hopefully
8  a few more hours at least, try and get some of the
9  questioning in from Dey's counsel, from Roxane's
10 counsel, you know, and try and get as much of it done
11 as possible.
12        MR. ESCOBAR:  Let me ask you this.  Why is
13 it that you're saying that?  Is there no day in the
14 next six months where we can all reconvene and do
15 this in an orderly way?
16        MR. GOBENA:  I'm not saying that, I'm just
17 asking whether or not --
18        MR. ESCOBAR:  Excuse me, are you saying
19 that there is no day --
20        MR. GOBENA:  Let me answer your question,
21 Mr. Escobar.  I'm saying -- what I'm asking right now
22 is a different question.  Are you willing to ask some

Page 429

1  questions now.  I'm not saying there is no day or
2  anything.  I'm not taking a position on that.
3         MR. HAAS:  But it's a moot point.  We
4  don't have a court reporter.  I mean, correct me if
5  I'm wrong, but there is no notice that this was going
6  later than the standard number of hours today.
7  People have their plans based upon that.  We don't
8  have a court reporter, and I don't understand the
9  point.
10        MR. GOBENA:  What are the standard number
11 of hours.  In our case, it says 14 --
12        MR. HAAS:  There is nothing about going 14
13 hours a day.
14        MR. GOBENA:  It doesn't say anything about
15 going 8 hours or not.
16        MR. HAAS:  In this case, have you gone 14
17 hours?
18        MR. GOBENA:  No one's talking about going
19 14 --
20        MR. HAAS:  I'm asking you.  There is none.
21        MR. BREEN:  Let me just interject here.
22 Let's not get all hot under the collar.  The bottom

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Wiberg, Cody                                    March 14, 2008

Page 50

1  A. Oh, yes, yes, indeed.
2  Q. We'll get to that in detail later, but could
3  you describe that work at a high level of
4  generality?
5  A. Well, basically, again, under federal law,
6  states are allowed to set reimbursement rates for
7  pharmaceuticals. And so since we managed the fee
8  for service pharmacy program, we obviously had a
9  lot to say about what those rates should be.
10  Q. And you -- did you work with the legislature
11  and the legislature's passing of laws that related
12  to dispensing fees and reimbursement formula?
13  A. That's correct. Unlike some other states,
14  where Medicaid reimbursement rates can be set by
15  the agency, by rule, in Minnesota, unless things
16  have changed, and at least in the pharmacy area,
17  and I think in most areas, the legislature
18  establishes the rates.
19      MR. COOK: Mr. Wiberg, let me hand you
20  what we have marked in previous depositions as
21  Exhibit Abbott 19.
22      THE WITNESS: It's a copy of the

Page 51

1  complaint in this case.
2      MR. BLACK: I just want to see which
3  case.
4      MR. COOK: It is the complaint that was
5  originally filed or the complaint and intervention
6  filed by the Department of Justice. And it's
7  Abbott.
8      MR. BLACK: Intervention?
9      MR. COOK: It's the complaint and
10  intervention. And for the record -- it was filed
11  in March of 2006.
12  BY MR. COOK:
13  Q. Just as an initial matter, Mr. Wiberg, have
14  you ever seen this document before, to your
15  knowledge?
16  A. I'm not sure. Unless you've -- folks sent it
17  to me, then I don't believe that I have, no.
18  Q. Okay. Well, actually what I'd like to turn
19  your attention to is the very last two pages of the
20  document that are labeled Exhibit 1. And it's a
21  list of drugs.
22  A. Uh-huh.

Page 52

1  Q. And could you take a look at those drugs and
2  tell me if you -- if you recognize those drugs?
3  A. The top one appears -- the top two appear to
4  be cut off. But otherwise, yes.
5  Q. And does this appear to be a -- to describe
6  them at a -- at a higher level of generality?
7  Sodium saline solution, dextrose solution,
8  vancomycin, and water.
9  A. Uh-huh.
10  Q. What kinds of drugs are-- are those?
11  A. At a high level, I think what you want to
12  know is they're injectable drugs. They're drugs
13  that are commonly used in -- in IV therapy.
14  Q. These wouldn't be the types of pills, for
15  example, that you were dispensing when you were --
16  a community -- community pharmacist, right?
17  A. That's correct.
18  Q. And as we go along, and happy to have you --
19  you keep a copy of that. When I refer to the
20  subject drugs in the federal case, I'm referring to
21  the drugs that are here on Exhibit 1. These are
22  the ones that are the subject of the government's

Page 53

1  lawsuit against -- against Abbott.
2  A. Uh-huh.
3  Q. Do you know what the allegations are that
4  have been made by the Department of Justice in this
5  case against Abbott?
6  A. In this particular case, no. Because I have
7  not read this document.
8  Q. Are you familiar generally with the AWP
9  litigation that's been going on for so many years
10  in the country?
11  A. Yes, I have.
12      MR. FAUCI: Objection, form.
13  BY MR. COOK:
14  Q. What is your understanding of what that AWP
15  litigation relates to?
16      MR. FAUCI: Objection to form.
17  A. I think my understanding is that the basic
18  allegation is that pharmaceutical manufacturers
19  either falsely reported information or withheld
20  information about the true cost of pharmaceuticals
21  that they, in fact, inflated average wholesale
22  prices in an effort to win market share for their

14  (Pages 50 to 53)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Page 78

1  cost of dispensing prescription medications to
2  Medicaid recipients." Do you see that?
3    A. Yes, I do.
4    Q. And that would be consistent with your
5  general understanding of what Myers and Stauffer
6  was doing for various state Medicaid programs,
7  right?
8    A. Correct. I know that's one of their -- the
9  things that they -- they did. I don't know what
10 else they might have done.
11   Q. And then if you look down under Summary of
12 Findings in this 2002 report, at the first bullet
13 point there, it's in bold, on the very first page
14 of the Executive Summary. "Myers and Stauffer
15 indicates what it finds as the statewide median
16 cost of dispensing weighted by Medicaid volume to
17 be, right"?
18   A. Correct.
19   Q. And in here it shows it to be $5.95, right?
20   A. Correct.
21   Q. And that is almost mathematically in the
22 middle of what you were saying earlier the

Page 79

1  Minnesota Pharmacy Association was pegging as -- as
2  its cost of dispensing, right?
3    A. Yes. As I recall, they -- that's the -- the
4  general range they were talking about. They may
5  have even had a specific amount. But somewhere in
6  that range is what I recall them claiming it to be.
7    Q. If I could turn your attention to page 23,
8  and on pages 23 through 25, what I'd like to do is
9  turn your attention to aspects of this report that
10 looked specifically at the cost of dispensing for
11 I.V. and infusion pharmacies as opposed to retail
12 pharmacies. Do you understand that distinction?
13   A. Yes.
14   Q. Before looking at this, could you tell me,
15 what's your understanding of the difference between
16 an I.V. or infusion pharmacy and a -- and a retail
17 community pharmacy?
18   A. Well, a -- sometimes there is no distinction,
19 actually. Some pharmacies do both. But there are
20 specialty pharmacies that are referred to as home
21 health care pharmacies, or home infusion pharmacies
22 that are closed-door pharmacies. They don't have

Page 80

1  customers walking in from the street. They don't
2  fill prescriptions for oral medications, typically.
3  Instead, they fill injectable drugs, basically.
4  Normally, they actually have to prepare or compound
5  these drugs. And these are dispensed to patients
6  who are receiving intravenous therapy at home.
7    Well over a decade ago, maybe close to two
8  decades ago now, as just a general part of
9  cost-saving efforts, some of the -- the procedures
10 that used to be done, first in doctors' offices or
11 hospitals, then in outpatient clinics or -- or
12 outpatient areas of hospitals, were gradually
13 shifted to the home. So patients who were thought
14 to be not so critically ill that they needed to be
15 in a home were -- would get treat -- or excuse me,
16 in a hospital, would get treatment at a home.
17   Q. Now, this move from hospital to home for
18 these infusion therapies, first as a subjective
19 matter, is it your experience that patients would
20 rather be at home than in a hospital?
21   A. I think that depends on the patient. I -- I
22 never worked in home infusion pharmacy. So --

Page 81

1    Q. From the Medicaid point of view --
2    A. Yep.
3    Q. -- as a pure question of economics, however,
4  did you have an understanding of whether it was
5  cheaper or generally more expensive for Medicaid to
6  pay for infusion in the home as opposed to
7  admission into the hospital?
8    A. To tell you the truth, if you look at the
9  totality of costs, no. I -- I wasn't -- I really
10 don't know for sure. One would assume that it's
11 cheaper to pay for the nondrug costs outside of the
12 ho -- you know, outside of the hospital. That the
13 hospitalization would be more expensive than
14 treating someone in the home. That would be the
15 assumption I would make, although I did not do
16 hospital rates, so I don't know.
17   Q. Well, do you know if within Medicaid there
18 was any policy considerations of preferring out of
19 hospital treatment because to the program as a
20 whole, it would save money over in-patient
21 admissions? Or have other policy benefits, such as
22 lack of infection, comfort to the patient?

21  (Pages 78 to 81)

Wiberg, Cody                                    March 14, 2008

Page 82

1    A. I would assume that's the case, but I can't
2  say that for certainty, because, again, I didn't
3  work on -- on the policy issues involving
4  hospitalization versus home care when it went to
5  those costs.
6    Q. So to the extent there was someone within
7  either the legislature or the agency that was
8  looking to -- to try to move patients from -- into
9  hospitals or out of hospitals or into home care or
10 out of home care, that would have been some other
11 aspect of the agency?
12   A. Correct.
13   Q. Okay. Could you describe for me the -- well,
14 let me back up. When one dispenses a drug in a
15 retail pharmacy, it's typically pills, right?
16   A. It's oral medications, typically with a few
17 injectables.
18   Q. All right. So -- and so it might include,
19 like, the liquids that I would give my kids with
20 the Tylenol suspension.
21   A. Liquids, capsules, suppositories, gels,
22 ointments, emulsions, creams.

Page 83

1    Q. What generally goes into dispensing those
2  types of oral medications?
3    A. The typical process would be that a -- for a
4  new prescription, let's say, the patient presents
5  at the pharmacy with a prescription -- well, back
6  in those days. More and more, actually, the
7  prescription is being electronically transmitted to
8  -- from the clinic to the pharmacy.
9       But back in those days still, most of it was
10 the patient would walk into the pharmacy with a
11 prescription from a doctor, someone at the pharmacy
12 would enter the data. That could be a pharmacist,
13 it could be a pharmacy technician. Once the data
14 was entered into the system, if the person was on
15 some sort of insurance or managed care, and
16 therefore had a pharmacy benefit, a claim would be
17 transmitted to -- either directly to the payer, in
18 the case of our program, or more commonly, to
19 something called a Pharmacy Benefit Manager. That
20 Pharmacy Benefit Manager would do the sort of
21 things I talked about before in terms of editing
22 the claim. If everything was fine, the claim gets

Page 84

1  paid. The label gets printed, along with a
2  receipt. If it is a cap -- excuse me, tablets,
3  capsules, solid dosage forms, oral dosage forms,
4  somebody counts it out, somebody labels it.
5       The pharmacist in -- in this state, and I'm
6  sure all states then, by law, has to certify the
7  accuracy of the prescription, particularly if
8  somebody else entered the information. And once
9  the -- and that involves comparing the actual
10 written prescription with what's printed on the
11 label and what's in the bottle to make sure that
12 everything is correct.
13      Once that's done, the medication is bagged,
14 the receipt's put onto it. And, again, if
15 pharmacists are following the law in this state,
16 when the patient comes into the pharmacy for new
17 prescriptions, the pharmacist is supposed to go out
18 and counsel them on their medication. That's --
19 that a typical process.
20      The only significant difference between that
21 and the other sort of things out there is,
22 obviously, for prepackaged creams and ointments

Page 85

1  that come that way from the manufacturers, bottles
2  of eyedrops, there's no counting. The label just
3  goes directly on the container.
4    Q. And when we talk about the -- you know, the
5  -- $5.50 to $6.50 or $5.95 cost of dispensing the
6  product to the pharmacy, are you referring to that
7  process, plus whatever overhead is involved?
8    A. Correct.
9    Q. All right. I know that you never worked in
10 an infusion or I.V. pharmacy, but do you have an
11 understanding of how the dispensing process is
12 different for an I.V. or infusion pharmacy?
13   A. I would have a basic understanding, primarily
14 because you can't graduate from pharmacy school
15 without having done a hospital pharmacy internship.
16 And I did work in the hospital pharmacy, and I was
17 involved in compounding I.V. preparations as part
18 of my training as a pharmacist.
19   Q. And did that process of compounding and
20 preparing infusion or I.V. products to be
21 dispensed, was it typically more involved, or less
22 involved than dispensing oral medications?

22  (Pages 82 to 85)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                                    March 14, 2008

Page 86

1    A. It's more involved.
2    Q. All right. Could you describe for me at a
3  high level of generality how it's more involved, or
4  what more is involved in that process?
5    A. Well, for example, drugs that are meant to be
6  administered by I.V. infusion, in some cases, can
7  be prepared directly by a manufacturer. There are
8  certain drugs that, because of the way that they're
9  handled, or because of preservatives or whatever,
10  are stable. And then they can actually be
11  dispensed pretty much directly, maybe with some
12  minor reconstitution; adding something like normal
13  saline into the drug. Other drugs are much more
14  complex. So, for example, a -- what's known as a
15  TPN or Total Parental Nutrition Therapy. These are
16  very large volume I.V. bags in which multiple
17  different ingredients are mixed together.
18  Basically a source of protein, a source of sugar,
19  multiple vitamins, different vitamins, like what
20  are called electrolytes. So you could have many
21  different things that go into one bag.
22    Now, what I'm not going to be able to do is

Page 87

1  tell you the advances in the last 25 years.
2  Because when I did this, we did everything by hand.
3  My understanding now is that the home I.V. infusion
4  pharmacies and hospital pharmacies that do this for
5  in-patients have automated devices that essentially
6  you -- my understanding, having not actually seen
7  these, is that you load the manufactured
8  containers, and you do the calculations, and the
9  device does the mixing.
10    Q. From a business point of view for the
11  pharmacy, presumably the cost of dispensing would
12  also include, I guess, the cost of that sort of
13  machine, right?
14    A. Yes.
15    Q. And it would be -- I guess a typical business
16  question to decide whether it's cheaper to pay for
17  a pharmacist to do it by hand, or cheaper to go out
18  and buy the machine for whatever it costs and have
19  it done more efficiently, and perhaps more
20  accurately.
21    A. To tell you the truth, the business
22  consideration is probably whether or not to have a

Page 88

1  pharmacy technician do it. Pharmacists, in some
2  places, probably directly do this themselves. But
3  actually, pharmacy technicians probably do most of
4  the actual mixing and compounding, and then the
5  pharmacist is certifying for accuracy.
6    Q. Okay. Well, if I could turn your attention
7  to page 23 of Exhibit 21, this is the August 2002
8  Myers and Stauffer report for Texas.
9        MR. COOK: And, again, just for the
10  record, so somebody watching it or reading the
11  transcript knows what we're talking about, I'm
12  going to read just the second to the last paragraph
13  there. And then ask you questions about it.
14    A. Uh-huh.
15  BY MR. COOK:
16    Q. Quote, The two most significant
17  characteristics that affected pharmacy dispensing
18  cost, were the provision of intravenous or home
19  infusion solutions, and the provision of
20  pharmaceutical compounding services. Our analysis
21  revealed significantly higher cost of dispensing
22  associated with the 53 pharmacies in the sample

Page 89

1  that provided these services, close quote.
2    Given your experience as the manager of the
3  Minnesota Medicaid Pharmacy Program, and as a
4  pharmacist, does that conclusion by Myers and
5  Stauffer surprise you?
6    A. No.
7    Q. In fact, you would expect that I.V. and home
8  infusion provision and compounding services would
9  increase the cost of dispensing to a pharmacy,
10  right?
11    A. Yes.
12    Q. And then if you turn to page 24, the next
13  page over, there are three bullet points there
14  where Myers and Stauffer, would you agree with me,
15  lays out the reasons that pharmacists with whom
16  they spoke gave for these costs being higher for a
17  home infusion or I.V. pharmacy. Do you see that?
18    A. I do.
19    Q. And would you agree with me that summarizing
20  these, Myers and Stauffer was told by these
21  pharmacists, according to the report, that the cost
22  of special equipment for mixing and storing the

23  (Pages 86 to 89)

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                      March 14, 2008

---

Page 90

1   I.V. solutions was one factor, correct?
2      A.  The costs of special equipment?  That would
3   make sense, yes.
4      Q.  And then second is they're higher direct
5   labor costs, because of mixing and manual
6   activities to fill the I.V. -- I.V. prescriptions?
7      A.  That would make sense as well.
8      Q.  And that's the second factor named in the
9   report, right?
10     A.  Yes.
11     Q.  And then the third was that -- and I'll just
12  read this.  Quote, A pharmacy may mix and deliver
13  many dispensings of a daily intravenous solution
14  from a single prescription, thus incurring
15  additional costs spread over a smaller number of
16  prescriptions, close quote.
17     Does that factor also make sense to you?
18     A.  It does.
19     Q.  Okay.  And then if we go down to table 3.3,
20  which is just a little bit farther down on the page
21  on page 24?
22     A.  Uh-huh.

---

Page 91

1      Q.  -- do you see that Myers and Stauffer reports
2   the unweighted mean cost of dispensing
3   prescriptions for three different types of
4   pharmacies.
5      A.  I see that, yes.
6      Q.  And then down at the bottom, they first refer
7   to pharmacies that do not dispense intravenous or
8   compounded prescriptions, right?
9      A.  Correct.
10     Q.  And Myers and Stauffers reports -- you
11  obviously don't know if it's correct, but Myers and
12  Stauffers reports an unweighted mean cost of $6.96,
13  right?
14     A.  That's what they report here, yep.
15     Q.  Right.  And then the next up, they report
16  pharmacies dispensing compounded prescriptions but
17  not intravenous prescriptions as $9.13, right?
18     A.  That's correct.
19     Q.  And then they report the unweighted mean cost
20  for pharmacies dispensing intravenous and home
21  infusion prescriptions is $41.75, right?
22     A.  That's correct.

---

Page 92

1      Q.  Now, compounded prescriptions as opposed to
2   I.V. prescriptions, what do you understand the
3   difference between those two types of prescriptions
4   to be?
5      A.  Well, many I.V. prescriptions are, in fact,
6   compounded prescriptions, so I.V. prescriptions are
7   often a subset of the general term, compounded
8   prescriptions.  I believe what they're probably
9   referring to here would be -- well, they actually
10  state it.  They're referring to prescriptions that
11  are compounded, but that aren't for I.V. use.  So
12  that could be anything, again, from ointments,
13  creams, oral solutions.  Some pharmacies even do
14  capsules.  Some that specialize in compounding
15  pharmacy will even press out tablets.  So there's a
16  -- suppositories.  There is a whole wide range of
17  different types of products that can be compounded.
18     Q.  All right.  The magnitude of -- of these
19  conclusions that Myers and Stauffer reached, are
20  they consistent with your understandings when you
21  were the manager of the Minnesota Pharmacy Program
22  for the Medicaid?

---

Page 93

1      A.  I'm not quite sure what you mean by that.
2      Q.  Sure.  Do these findings surprise you at all?
3      A.  Well, I don't think I'd speak to the exact
4   amounts here.  Because again, we never did a cost
5   of dispensing study.  If the question is framed
6   more, does it surprise me that -- that I.V. home
7   infusion pharmacies have a higher cost of
8   dispensing, and that compound -- that pharmacies
9   that specialize in compounding other preparations
10  have a somewhat lower cost of dispensing, then at
11  the lowest costs of dispensing are pharmacies that
12  don't do a substantial amount of I.V. or compounded
13  prescriptions.  That hierarchy doesn't -- does not
14  surprise me.
15     Q.  But the exact numbers for -- you know $41.75
16  or $6.96, you can't say whether it's right or
17  wrong, because you didn't have the data, right?
18     A.  We -- we didn't do that sort of study.
19     Q.  The last column on that chart shows standard
20  deviation.
21     A.  Uh-huh.
22     Q.  Now, I'm not a statistician, but do you have

---

24  (Pages 90 to 93)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Page 94

1  an understanding of what standard deviation refers
2  to?
3    A. The only thing I can surmise -- I'm not a
4  statis -- statistician either. Well, no, it
5  wouldn't make any sense with the first one. No, I
6  really don't. I don't know what they mean.
7    Q. As a general matter, do you understand
8  standard deviation to refer to the range of --
9    A. Yes.
10   Q. -- of data within that set?
11   A. That's correct.
12   Q. And would it also not surprise you that
13 pharmacies dispensing I.V. and home infusion
14 prescriptions would have the widest range of costs,
15 as opposed to retail pharmacies, which have a more
16 narrow range of costs?
17   A. Well, given that they have a higher cost to
18 begin with, I would expect to see a larger
19 deviation, yes. There's just less room to deviate
20 from $6.96, that they have reported here, compared
21 to $41.75. What I don't understand is the $72.59.
22 Is that supposed to be a range around $41.75? I

Page 95

1  don't know.
2    Q. All right. And would it surprise you that
3  I.V. and home infusion pharmacies would have a -- a
4  wider range of the types of things that one does as
5  opposed to another does, as opposed to a community
6  pharmacy, where most of them do about the same
7  thing?
8    A. Yeah, that's -- that's a possibility. I
9  guess, you know, it doesn't surprise me that there
10 might be, again, a wider range of costs for -- for
11 I.V. pharmacies, I guess. It would depend on
12 exactly what -- what they're doing. There may be
13 specialty -- or maybe you would call them
14 subspecialty I.V. infusion pharmacies that deal
15 with very critically ill people that have drugs
16 that are more difficult to handle and to store and
17 that sort of thing.
18   Q. And, of course, from a policy perspective at
19 Medicaid, that sort of range presents a difficult
20 policy question if you're trying to set a single
21 price that fits everybody, right?
22   A. It would.

Page 96

1    Q. If you turn to the next page, at the very
2  first paragraph, the second sentence, and I'll just
3  read it for the record. "Based on our cost
4  findings, it must be concluded that the costs
5  incurred to dispense intravenous or compounded
6  prescriptions are not representative of the costs
7  incurred by a general pharmacy." Close quote. Is
8  that also consistent with your experience?
9    A. Yes.
10   Q. And then if we turn to the -- to the
11 footnote, you see footnote 11 on page 25? And I'll
12 just read that for the record. Quote, Although
13 typical dispensing fees reimburse less than the
14 dispensing costs of intravenous pharmacies, they're
15 generally able to break even, based on the margin
16 allowed on ingredient cost reimbursement.
17 Compounding pharmacies predominantly market their
18 services to self-pay customers, and do not solicit
19 Medicaid reimbursement for most compounding
20 services, close quote.
21     Focusing your attention on the first sentence
22 of that footnote, relating to I.V. pharmacies. Is

Page 97

1  that consistent with your experience as the direct
2  -- as the Manager of Pharmacy Program at Minnesota
3  Medicaid?
4    A. Actually, no.
5    Q. How so?
6    A. Well, one of the things I didn't mention
7  earlier, because, you know, again, I've been out of
8  this for a while. And I was thinking more in terms
9  of -- of general -- our general reimbursement rate.
10 We did not -- the rate that I used before for
11 dispensing fees, $3.65, is not what we paid I.V.
12 infusion pharmacies.
13   Q. What did you pay I.V. infusion pharmacies?
14   A. We paid them substantially more. And I
15 inherited this. It was actually something I -- I
16 personally thought we may have been paying them too
17 much. And actually, tried to have a it changed.
18 And rather than it being changed, it ended up being
19 embedded in law. It had been something that one of
20 my predecessors, I don't know how far back, had put
21 into place. When I became aware of this, I
22 actually asked the -- the person who was doing the

25  (Pages 94 to 97)

Wiberg, Cody                                        March 14, 2008

Page 98

1   pricing for compounded I.V. drugs where this
2   reimbursement rate came from, and where it was in
3   statute. She was a retired pharmacist that
4   manually did these. And she said, well, that's the
5   way we've always done it. And I went actually to
6   get this -- tried to get this in law, so that we
7   would have a statutory basis for making these
8   payments. And my suggestion was to reduce that
9   rate. But the legislature decided not to do that.
10  Q. Do you know what the rate was?
11  A. I am going to probably not get it exactly
12  right. But it really depended on what was being
13  compounded. We had one rate for what you might
14  call standard I.V. drugs, which would include a
15  drug like vancomycin, a relatively simple
16  antibiotic. We had another rate for drugs that
17  were used for chemotherapy in cancer patients
18  because of the hazards associated with that and the
19  extra difficulty in compounding those. We had the
20  highest rate for the TPN solutions, those drugs
21  that I mentioned before -- or excuse me, those
22  nutritional solutions I mentioned before that are

Page 99

1   in large-volume bags, and where many things have to
2   be mixed in there. I believe, and I may be wrong,
3   but I believe we paid $8 per bag for the simpler
4   products. We paid $13 per bag for chemotherapy
5   products. We paid 30 -- something in the 30s, 33
6   is sticking in my mind here, for TPN products that
7   were one liter or less, and 40 -- per bag. And we
8   paid $44 per bag for TPN solutions that were
9   greater than one liter.
10  Q. And you learned this how long after you
11  became the Manager of this Pharmacy Program?
12  A. I don't know exactly. See, first when I
13  worked for the Department, I was actually the Drug
14  Utilization Review Coordinator. I'm pretty sure I
15  didn't know then, because I wasn't involved in --
16  in the pricing issues at that point. So I don't
17  know exactly -- I think probably sometime within
18  the first year that I took over as the manager.
19  Q. And who was the person that explained to you
20  this differential dispensing fee for these
21  services?
22  A. Her first name is Marie, and -- Perreault, P-

Page 100

1   e- r- r- e- a- u- l- t-.
2   Q. Do you recall what Miss Perreault told you
3   was the rationale for having a different dispensing
4   fee for these pharmacies?
5   A. Well, the rationale was basically because
6   there are increased costs for compounding I.V.
7   solutions. I might add, in addition, we -- in
8   addition to the dispensing fee, my understanding
9   was that we paid separately for certain special
10  containers that -- and I'm not an expert in I.V.
11  home infusion pharmacy, but there -- in addition to
12  the -- the sort of plastic bags you might see on a
13  television medical show, there are special
14  containers in which these preparations can be
15  prepared. And some of those are much more
16  expensive than just a simple plastic or vinyl bag.
17  And so we paid extra for those, in addition. I
18  don't know exactly how much we paid for those.
19  Q. And, as I understand it, you proposed that
20  that be changed.
21  A. I had discussions with my management about
22  that, basically saying -- the basic thrust of it

Page 101

1   is, look, we really need this in statute. I don't
2   feel comfortable making these payments when, you
3   know -- at one point, I think the department did --
4   I think that's where these came from. I never was
5   able to track this down, other than what Marie told
6   me. But I think at one point the Department had
7   the authority -- authority itself to set rates, and
8   it didn't have to go through the legislature. At
9   some point, the legislature stopped allowing the
10  agency to do that. And I think what happened is,
11  when the rates were established in statute, nobody
12  looked at this. That's what I think happened. And
13  so Marie kept pricing them out at that level. And
14  so most of my discussion with management was, this
15  really needs to be part of our -- the governor's
16  proposal this year, whatever year that was, because
17  we really ought to have something on the books that
18  authorizes us to make these payments.
19  Q. And what was the proposal?
20  A. Well, the proposal was just to -- to put it
21  into statute, is what senior management decided to
22  do.

26 (Pages 98 to 101)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 102

1    Q. But you said that you had proposed going to
2  the -- the regular --
3    A. No.
4    Q. Okay.
5    A. I -- I actually never got to the point where
6  I made a specific proposal to management.  It was
7  more general discussions about, I think we're
8  paying too much.  And --
9    Q. Now, why did you think you were paying too
10  much?
11    A. Well, again, we're paying at that rate, just
12  for the simplest things, not $8 per dispensing, as
13  we're talking about here.  We're talking about $8
14  per bag.  Which gets at -- I think one of the
15  comments that you referred to earlier.  Where there
16  might be multiple dispensings that might drive up
17  their costs.
18    What I actually wanted to do at that point was
19  -- was to try to convince management we needed to
20  look more closely at it.  That's why I really
21  hadn't gotten to a specific amount, because we
22  needed to look at whether that was realistic.  I

Page 103

1  just had the sense, and maybe I would have been
2  proved wrong, if we had studied it.  But I had the
3  sense that $8 per bag, and then especially with the
4  TPNs, $44, $33 per bag was a lot.  And plus, we did
5  know, you know, even back then, that there was a
6  spread between AWP and what the pharmacies were
7  covering.  So my thought was that if we have -- we
8  don't know exactly what it is, because there is no
9  pricing transparency, but the assumption is,
10  they're -- they're making money on the ingredient
11  side, and now we're turning around and we're paying
12  them dispensing fees per bag, and in some cases,
13  we're paying for extra, you know, special
14  packaging.  And I -- I had a general sense that
15  that might be too much.
16    One of the reasons I believe -- remember I
17  said before, I was not involved in -- I was
18  involved in the pharmacy area.  Someone else
19  managed the home health services.  And I did have
20  some discussions with the woman, and I -- I will
21  not be able to remember her name, because --
22    Q. You knew my next question was whether you

Page 104

1  remembered her name.
2    A. She -- she left the department not too long
3  afterwards.  But we did have some discussions, and
4  I think one of the reasons senior management
5  decided, yeah, we better get this in statute right
6  now, until we figure out what to do, because you're
7  right, this really ought to be in law if we're
8  paying this out.  But one of the reasons I think
9  they didn't want to at that point cut reimbursement
10  rate is, we had talked -- this other woman who had
11  policy for home health care and myself, had started
12  to have discussions about bundling.  In other
13  words, we would pay a per diem to the home
14  healthcare companies, and out of that per diem,
15  they would have to pay for nursing services, the
16  pharmacy services, and any other ancillary
17  services, as a bundled package.  And that kept
18  getting pushed to the back burner, first because
19  that woman left and her replacement had to be
20  trained.  And then by the -- you know, the budget
21  problems we had 2002 and 2003 hit, and there were,
22  quite frankly, much easier ways to save money than

Page 105

1  -- than working on that, which was a very difficult
2  issue to try to figure out.
3    Q. And so to bring it back to Exhibit 21, in the
4  Myers and Stauffer report, where they were speaking
5  to Texas I.V. pharmacists --
6    A. Right.
7    Q. -- where the Texas I.V. pharmacists may have
8  told Myers and Stauffer, I'm not making a
9  dispensing fee but I'm making more profit on the
10  ingredient cost, in Minnesota you found out that
11  the I.V. pharmacists were making it on both ends.
12    A. That was my impression.
13    Q. Okay.
14    A. Yep, indeed.
15    Q. What was the ultimate legislative resolution
16  of this?
17    A. As I mentioned before, they simply took the
18  rates we were paying, and put them in statute.
19    Q. And the I.V. pharmacists continued to be paid
20  based upon the regular formula for ingredient cost,
21  correct?
22    A. That is correct.

27  (Pages 102 to 105)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 106

1   Q. So that would be AWP minus some percent.
2   A. Yeah, which varied during the time I was
3   there.
4   Q. Did you have an understanding that that
5   formula, AWP minus whether it's 9 percent or 12
6   percent or some other amount, resulted in a higher
7   profit for I.V. pharmacists than it did for
8   community pharmacists?
9   A. At the time I was working there, no, I
10  didn't. Because, again -- well, for a couple of
11  reasons, I think. First of all, as I mentioned
12  before, we had no authority to ask people what they
13  were actually paying for drugs. We had no idea
14  whether or not home infusion pharmacies might be
15  getting discounts from manufacturers or from
16  wholesalers. So, no. I really don't know if they
17  were -- if they were liable to make more of a
18  profit than a community pharmacy would, based on
19  that formula.
20  Q. Okay. To the extent that the I.V. pharmacies
21  were using more generics than branded products --
22  for example, sodium saline solution is probably

Page 107

1   about as generic as you can get, right?
2   A. Right.
3   Q. Would it be your understanding that the
4   spreads as a percentage would be higher for those
5   I.V. pharmacies than for a community pharmacy
6   dispensing branded pharmaceuticals.
7   A. Assuming that we -- assuming that we didn't
8   put a MAC on the product. And I don't recall if we
9   put MACs on -- on saline or not, to tell you the
10  truth. But if -- had we put a MAC on the product,
11  then presumably, the amount that they were making
12  relative to what they were paying would not have --
13  would have -- yeah, would have been -- the spread
14  would have been reduced.
15  Q. How did you decide which drugs to MAC?
16  A. Well --
17  Q. If I can turn that word into a verb.
18  A. Yes. No, we use it as a verb. In fact,
19  since we -- it's a state MAC. We sometimes talk
20  about SMACing.
21      Anyway, the -- and certainly, pharmacies
22  accused us of SMACing them with our reimbursement

Page 108

1   policies. But, anyway, the -- our primary focus was
2   probably more on -- not on -- on infusion therapy.
3   The primary reason being, remember, I managed the
4   Fee for Service Pharmacy Program. And in
5   Minnesota, the 200 or slightly over 200,000 people
6   that were in that program, the ones that were left
7   in Fee for Service were primarily disabled people.
8   And of those, the -- by far, the predominant sort
9   of disability was mental illness. So the amount of
10  money that we paid on I.V. infusion drugs compared
11  to what we paid on antipsychotics was -- I don't
12  want to use the term minimal, because we paid a lot
13  of money for those, as well, although I don't
14  remember the exact amount. But we certainly paid
15  collectively a lot more for other drugs. And so
16  when you are managing a program, and you have to
17  produce savings like we had to do in 2001, 2002 --
18  well, actually, right through today, I think
19  they're still doing it. You -- you -- you target
20  those drugs that -- where most of the money gets
21  spent. So what we looked at -- again, were mainly
22  the -- I would say the oral medications. And we --

Page 109

1   exactly how we did that depended on when I was
2   there. When I started there, we had very simple
3   language that essentially allowed us to establish a
4   Maximum Allowable Cost on any drug that had at
5   least one generic product available. My
6   predecessor, in order to -- he was asked to come up
7   with a 1 percent savings. So his proposal had been
8   to do more retrospective drug utilization review.
9   And as he put it, to re-establish the MAC program,
10  although one had been in existence. I think he
11  wanted to reinvigorate it, you might say. His idea
12  was that in order to do that, you really had to
13  have something in statute. So you had to have some
14  sort of legislative proposal, and quite frankly, by
15  the time certain individuals that were representing
16  lobbyists that were representing brand name
17  manufacturers got through with the legislative
18  process, we ended up with less authority to
19  establish MACs.
20      So at that -- so from -- I think that was done
21  in '99. So from then until I could get that
22  reversed in 2002, we could not establish a MAC for

Henderson Legal Services, Inc.

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                      March 14, 2008

Page 110

1   any drug that was already on the federal upper
2   limit list. And there -- and CMS took a long time
3   after generics became available to put those
4   generics on the federal upper limit list. So that's
5   one thing we couldn't do. We also had to have the
6   brand name, plus at least two generics.
7       After 2002, when I got that language reversed,
8   we went -- we again had the authority to establish
9   a MAC on anything that had at least one generic.
10  And so that's what we did. As drugs went off
11  patent and generics were introduced, as soon as
12  those drugs were out in the market, we would MAC
13  the products.
14      Q. We'll come to it in more detail in a little
15  bit, but you refer to the legislature and influence
16  from affected constituencies affecting eventually
17  legislation, right?
18      A. Yes.
19      Q. Was it a political policy decision in
20  Minnesota how much it was that Minnesota Medicaid
21  was paying for prescription drugs?
22      A. A political -- what's a political policy

Page 111

1   decision?
2       Q. You're right.
3           MR. BLACK: Good question.
4   BY MR. COOK:
5       Q. I can ask that better. The amount that
6   Minnesota Medicaid was paying for drugs at the end
7   of the day was the result of the political process.
8   Is that a fair summary?
9           MR. FAUCI: Objection.
10      A. Well, it was set by the legislature. The
11  legislature consists of politicians. That's the
12  way it worked in Minnesota. It was not a
13  regulatory or bureaucratic decision. The rates for
14  all Medicaid payments were set by the legislature.
15      Q. Is this a good time for a short break --
16      A. Yeah.
17      Q. -- since we're coming to the end of another
18  tape?
19      A. Sure.
20          MR. COOK: We can go off the record.
21          VIDEOGRAPHER: We are going off the video
22  record at 11:19 a.m.

Page 112

1       (A brief recess was held.)
2       VIDEOGRAPHER: We are now back on the
3   record. This is the continuing videotaped
4   deposition of Cody Wiberg, taken on March 14th,
5   2008. Time now is approximately 11:26 a.m.
6   BY MR. COOK:
7       Q. Mr. Wiberg, if I could turn your attention
8   back to Exhibit 19, it's the -- the complaint with
9   the list of subject drugs on it.
10      A. Okay.
11      Q. In what circumstances -- we started to touch
12  on this a minute ago with the managed care versus
13  the fee for service. But in what circumstances
14  would the fee for service portion of Minnesota
15  Medicaid pay for these products?
16      A. Well, directly -- there would be two ways.
17  It would be direct and indirect. To the extent
18  that the Medicaid program paid for anyone who was
19  hospitalized as an inpatient, that would be one
20  way, which I had nothing to do with, because that's
21  all essentially a capitated arrangement based on
22  what are called DRGs.

Page 113

1       In terms of the outpatient setting, we would
2   pay for these -- probably primarily to home I.V.
3   infusion pharmacies, or at least they would be the
4   pharmacies that would be most likely to dispense
5   these sort of products.
6       As I believe I mentioned earlier on, there are
7   some pharmacies that are a hybrid. I mean, there
8   are some pharmacies, particularly in outstate
9   Minnesota, where the -- the larger home I.V.
10  infusion pharmacies may not have a presence, or
11  where the pharmacist thought that they could
12  compete locally because of the local reputation, or
13  whatever reason. There's a combination. They run a
14  community pharmacy, and they also have facilities
15  to do home I.V. infusion. But my -- my guess would
16  be, and it is a guess, but -- because I didn't look
17  at these specific products to see who exactly --
18  which pharmacies exactly we paid for, but it would
19  make more sense that we paid for more of these for
20  home I.V. infusion pharmacies.
21      Q. Would there also be circumstances in which
22  those particular products would be paid in a

29 (Pages 110 to 113)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                      March 14, 2008

Page 114

1  physician-administered setting?
2     A. Oh, yes. Indeed.
3     Q. Starting first with the hospital setting.
4  Again, just to exclude it, you mentioned DRGs,
5  diagnosis-related groups?
6     A. Right.
7     Q. Do I understand that correctly to be a single
8  payment that a hospital would receive, based upon
9  the diagnosis of the patient?
10    A. That's my general understanding. Again, I
11 was not an expert in that, but that's my general
12 understanding, is they get essentially a per diem
13 amount based on the diagnosis of the patient.
14    Q. And so if Mr. Black here went to the hospital
15 because had he had had a heart attack, and he got a
16 bag of saline as part of that, the hospital
17 wouldn't be paid anymore or separately because he
18 got one bag of saline or two or three, right?
19    A. That's my understanding.
20    Q. All right. Now, the I.V. pharmacy we've
21 talked about already, right --
22    A. Uh-huh.

Page 115

1     Q. -- is a closed pharmacy that would prepare it
2  and dispense it to whether it's a home health
3  agency or nursing home or some other entity that
4  would administer the drug. Do I have that correct?
5     A. Basically. My understanding is some of the
6  home health care businesses really own both
7  components. They -- they own the nursing component
8  and the pharmacy component. So it may all be
9  within one corporate umbrella, I guess.
10    Q. And the same might be true, say, for a
11 nursing home.
12    A. Possibly. Possibly. It's a possibility. I
13 think it's more common -- well, these days, there
14 are -- in Minnesota, there are several large
15 nursing home pharmacy chains. I don't know if
16 they're owned by corporations that also own nursing
17 homes or not. But there are several large chains
18 that have -- national chains that have a presence
19 in Minnesota that -- that do a lot of nursing home
20 business in this state. How much of the I.V.
21 infusion business they do for nursing homes, I'm
22 not quite sure about that.

Page 116

1     Q. And then the final context was being
2  administered by a physician. Could you explain
3  that method of paying for products like this?
4     A. Yeah, that -- that is different. The -- in
5  certain circumstances, at least when I was there,
6  and this possibly may have changed since I was
7  there. But when I was there, we did pay
8  physicians, outpatient surgical centers, facilities
9  like that, if they were administering drug -- and
10 emergency rooms. If they were administering drugs
11 in an outpatient setting, they could bill
12 separately for the drugs. When I got there, and,
13 again, I'm not quite sure how this was established.
14 It was before I was there. We were paying flat
15 AWP. And, again, we were looking for cost-cutting
16 measures. So what I proposed at the time, or --
17 well, there were two different proposals over the
18 years. The first proposal I had -- I'm guessing
19 2001, 2002, was to go to AWP minus 5 percent. That
20 was selected, because at that time, I believe
21 that's what Medicare was paying. Now, my mistake
22 in crafting that bit of -- of legislation was

Page 117

1  actually specifying AWP minus 5 percent. What I
2  should have done then, and what we later did do, is
3  reference the federal rate. So right now, the --
4  unless it's changed since I've been there, right
5  now, the language basically says, Medicaid will pay
6  for the outpatient administration of drugs at
7  whatever rate Medicare pays for.
8     Q. And you understand that now to be average
9  sales price plus 6 percent, plus some sort of a
10 professional fee.
11    A. Now that you mention it, that -- that is the
12 formula. I -- I wouldn't have been able to recall
13 that, but yes, I do recall ASP plus 6 plus a fee.
14    Q. Now, when one of these products, one of the
15 subject drugs was dispensed by a pharmacy, what
16 sort of a form would Minnesota Medicaid receive in
17 order to pay the claim?
18    A. When it's dispensed by a pharmacy?
19    Q. Yes, sir.
20    A. A pharmacy claims -- well, that evolved, too,
21 at the time I was there.
22       When I first started, I think most of those

Henderson Legal Services, Inc.

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 118

1   claims came in on paper. And it was a pharmacy
2   claim, basically. We -- we did our own in-house
3   billing. We did not hire a fiscal intermediary or
4   whatever to process our claims. When the pharmacy
5   world in general moved to a new claims processing
6   standard that's called NCPDP 5.1, NCPDP 5.1 has --
7   has a provision in it so that pharmacies submitting
8   a claim can indicate that it's a compounded claim,
9   and there are multiple lines where -- NDC or the
10  drug code for each drug can be listed. And on each
11  of those lines, you can list the NDC, you can list
12  the quantity you used if you're compounding, and
13  then our system was able then to look line by line,
14  and calculate, yes, we'll pay for this product,
15  because it's -- it's made by a rebating
16  manufacturer. No, we won't pay for the next
17  ingredient. Yes, we'll pay for the final three.
18  And --
19     Q. Or it's MACed.
20     A. Or it's MACed -- well, at whatever rate we
21  paid. Either at the normal rate or a MAC rate,
22  whatever. It calculated the ingredient

Page 119

1   reimbursement, line by line, including -- you know,
2   there were some lines that would be rejected. If
3   we paid for everything, if we paid for every drug
4   in every line, it would add those all up. It was
5   sophisticated enough to know how many bags were
6   submitted, so it could properly do the 8, the 13 or
7   those other fees I mentioned. And it would simply
8   pay the claim. If we rejected one line, we would
9   pend or stop the claim. The pharmacy, in essence,
10  would get a message back that would say, this is
11  what we're willing to pay. If that was some
12  ingredient, like normal saline, that was relatively
13  cheap in a small quantity, like maybe they only
14  added 100 milliliters, they might actually decide
15  -- cheap for them to purchase. They might actually
16  decide, we're fine with the rest of the
17  reimbursement. And then they could send a code
18  back that said, yeah, pay us. If it was a more
19  expensive ingredient, they might say, wait, well,
20  we're gonna lose money, and then they would not
21  send a claim back and it would become a noncovered
22  service. So that's how it evolved over time.

Page 120

1      Once that happened, we also covered a much
2   broader range of compounded products.
3      Q. And these pharmacy claims forms, they're the
4   forms that would have the usual and customary
5   charge, and the description of the product
6   dispensed by NDC, National Drug Code, correct?
7      A. Correct.
8      Q. When a physician administered a product such
9   as those listed on Exhibit 19, what sort of form
10  would -- would he send in?
11     A. My understanding would be what -- when I
12  started, was called a HCFA 1500, now called a CMS
13  1500, so -- since HCFA is now called CMS.
14     Q. What sort of information would be included on
15  that form about the drug that was administered?
16     A. What would be there are what are known as
17  HCPCS codes.
18     Q. What are HCPCS codes?
19         MR. COOK: And for the court reporter,
20  that's all caps, H-C-P-C-S.
21     A. You know what the acronym stands for, I don't
22  know anymore. But HCPCS codes are codes that

Page 121

1   physicians, outpatient facilities, a wide variety
2   of nonpharmacy providers, use in their billing.
3   There are a huge number of HCPCS codes. I mean,
4   the HCPCS manual is at least that big (indicating.)
5   The ones in pharmacy that we were most concerned
6   about were called J codes, because they started
7   with J. There were some other drugs that weren't J
8   codes, but most of them were J codes. J codes, or
9   HCPC codes in general, at that time were not --
10  they're not tied to a specific product. What they
11  are -- as an example, using your list of drugs
12  here, they're made -- and I'm not sure if this is
13  true, because I haven't looked at a HCPCS manual in
14  two-and-a-half years. But there may be a code, you
15  know, J something or other, J 1251 or whatever,
16  that says, for 100 milliliters of dextrose
17  solution, for that quantity, the HCPCS code is for
18  that quality, 100 milliliters dextrose Liposyn
19  solution. And so that would be a HCPCS code.
20     Q. Now for the NDC claim on the pharmacy side,
21  you could go look up the published AWP for that NDC
22  at First DataBank, right?

31  (Pages 118 to 121)

HENDERSON Legal Services, Inc.

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                                    March 14, 2008

Page 122

1    A. We -- we could look it up. That's not how we
2    did it, but we could look it up.
3        Q. How did you do it?
4        A. When I started there, we received -- was it
5    monthly or biweekly? I think it was monthly. We
6    received monthly data tapes from First DataBank.
7        Q. So the computer would go look it up.
8        A. The computer would go look it up.
9        Q. Okay. With the ND -- with the J codes, with
10   the HCPCS codes, how would the program go about
11   determining what the payment amount would be for a
12   particular J code?
13       A. Well, there were actually -- although we were
14   involved in the policy setting, there were -- there
15   was another unit, again, with -- within DHS, that
16   did rate settings, that were responsible for
17   actually entering the -- the rates data.
18   Presumably, what they were doing, what they should
19   have been doing, in the case of pharmaceuticals
20   when I started, is they would have been trying to
21   determine what AWP was. I think, actually, as I
22   recall what they were doing, though, is they --

Page 123

1    even before it became part of statute, they were
2    looking at what Medicare was paying and trying to
3    figure out what Medicare was paying, and how, since
4    Medicare, I think, was taking AWP minus 5 percent
5    off, I -- I assume they were adding that 5 percent
6    back in, because we were paying a flat AWP. So I
7    think they were relying -- for their data, I think
8    they were relying on -- on Medicare, I think.
9        Q. But a single J code would include drugs from
10   several manufacturers, right?
11       A. It could. Or it could be one to one.
12       Q. Right. For a drug such as sodium saline
13   solution or dextrose, would it be your
14   understanding that a physician would get the same
15   payment, regardless of which manufacturer's --
16       A. That's correct.
17       Q. -- self solution he used.
18       A. That's correct. At that time.
19       Q. Well, has it since changed?
20       A. I'm not sure if it has changed, but the
21   systems are getting sophisticated enough in -- we
22   had discussions -- actually, they were national

Page 124

1    discussions among my counterparts at meetings we'd
2    attend about having physicians, to the extent
3    possible, bill by NDC code. For the primary
4    reason, as I mentioned before, one of the things we
5    did is we collected rebates. And prior to the time
6    that I started, maybe even for the first year or so
7    -- oh, definitely in our state for maybe a year or
8    two, or maybe even a little bit more after I
9    started, we weren't collecting rebates for drugs
10   that were administered by physicians and billed by
11   HCFA, or CMS 1500 forms. And my understanding is,
12   prior to becoming involved with the Medicaid, most
13   states didn't do that. Then some states took a
14   closer look at the federal language. And what the
15   federal language talks about is collecting rebates
16   on outpatient drugs. It doesn't say outpatient
17   drugs dispensed by a pharmacy. So some other states
18   first started collecting rebates for those drugs,
19   and that's actually one of the proposals that I
20   came to our legislature with. And we started doing
21   that. And at first, what we had to do is, we had
22   to build what we called a crosswalk, which meant

Page 125

1    that we only collected rebates for those drugs
2    where there was a one-to-one match between the NDC
3    and a HCPCS or J code.
4        Q. That might be a J code that has only one drug
5    in it.
6        A. Correct.
7        Q. So you know that --
8        A. That had to be from that manufacturer,
9    correct.
10       Q. Got it.
11       A. I think there were other states, and I don't
12   recall if they did it or not. I think there may
13   have been other states that were trying to -- based
14   on claims that they did get, sort of proportionally
15   assign the rebates to the various manufacturers.
16   Minnesota never -- never did that. But that was
17   one of the reasons why Medicaid pharmacy managers,
18   like myself, were very interested in seeing the --
19   the billing standard change so that physicians,
20   other outpatient facilities, would have to bill by
21   NDC so we could collect the rebates in those
22   products, as well.

32  (Pages 122 to 125)

Henderson Legal Services, Inc.

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                          March 14, 2008

Page 138

1    copies of Red Book, but actually, we typically
2    would -- we might look to that to make sure that
3    there were still multiple generics available. We
4    might look at that just to look up an NDC number,
5    if we were doing clinical research, and we want the
6    to look up something about the drug or something
7    like that. But we relied on the data we got from
8    First DataBank. This -- this data was
9    automatically loaded into the computer, goes in at
10   the end of the day, runs overnight. And the --
11   what -- that First DataBank does not provide just
12   pricing data. All of the data that's needed to do
13   those clinical pharmacy edits I mentioned comes
14   from them, as well. The drug, drug interactions,
15   that sort of thing. So, again, there -- there was
16   some consideration of doing something like maybe
17   Texas did, but the trade-off in that is, you would
18   have to hire a small Army of people to recreate
19   what First DataBank did.
20       Q. Were you aware at the time you were Manager
21   of the -- the Pharmacy Program in Minnesota that
22   manufacturers had reported direct prices that would

Page 139

1    be published in some of these compendia?
2        A. I -- now that you mention the term "direct
3    price," yes.
4        Q. Did you have an understanding of what direct
5    price was?
6        A. To tell you the truth, no.
7        Q. Did you have any understanding that it was
8    similar to the usual and customary rate; the amount
9    that a person with whom you have no contract, no
10   negotiations, a cash purchase for a single unit
11   would pay for that product?
12          MR. BLACK: Objection to form.
13       A. No, not really.
14   BY MR. COOK:
15       Q. Okay.
16       A. It's not a -- it's not a price figure that we
17   used in any of our payment methodologies, so --
18       Q. All right. Did you have any understanding
19   about the difference between what manufacturers
20   were charging for a product such as sodium saline
21   between a single bag of saline sold directly to a
22   customer versus 20,000 units sold to a hospital or

Page 140

1    a large infusion pharmacy?
2        A. Specific knowledge, no. But the assumption
3    would be that there would be volume discounts.
4        Q. And you're familiar with the -- the term,
5    "the commodity," right?
6        A. Uh-huh.
7        Q. Would sodium saline, dextrose, would those --
8    water, would those be products you would consider
9    to be commodities?
10       A. Well, we sure -- we didn't really think of
11   drugs of any sort, if they were approved as drugs,
12   as commodities, per se. That's not the way we
13   looked at them.
14       Q. All right. Certainly closer to a commodity
15   than a branded, patent-protected drug, correct?
16       A. Well, no, I wouldn't -- I wouldn't say that's
17   necessarily correct. I mean, the one time I
18   actually heard them use -- the word "commodity"
19   used, because that's not a word I used in
20   connection with administering the Pharmacy Program.
21   The one time I actually heard someone refer to a
22   drug as a commodity actually came from a brand-name

Page 141

1    manufacturer. It was a manufacturer of one of a
2    group of drugs that are known as proton pump
3    inhibitors, the most famous of which is the little
4    purple pill, Nexium, that's advertised ad nauseam
5    on TV for nausea, among other things. But proton
6    pump inhibitors was the first category of drugs --
7    before we started doing a preferred drug list, it
8    was actually the first category of drugs that
9    showed us the potential for significant savings if
10   we did a preferred drug list. And, I'll admit, we
11   sort of stumbled into it.
12       Q. How did that happen?
13       A. Well, I inherited a prior authorization
14   program from my predecessors that was basically
15   ineffective. The one group of drugs where my
16   predecessors had made an attempt to do prior
17   authorization was failing, and that was with proton
18   pump inhibitors. The Drug Formulary Committee,
19   both before I started there, and for the first year
20   or two after I was there, insisted that physicians
21   be allowed to prescribe a proton pump inhibitor
22   without prior authorization for the first four to

36  (Pages 138 to 141)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 170

1  considerations at the time.
2      So if you wanted to make it -- and you would
3  have three choices, basically. You could either
4  make it -- try to make it as close as you could to
5  revenue-neutral. You could try to recoup savings.
6  And therefore, you -- you're going to set the
7  dispensing fee maybe not as high as you would if
8  you were going make it revenue-neutral. Or you
9  could try to actually pay providers more money
10  then, and you would set it a little bit higher.
11  But I basically -- when this came out, and at that
12  conference I mentioned, where -- where Mr. Lup --
13  Mr. Lupinetti and I both were presenters at a
14  conference. We were talking about different
15  issues, and I was not talking about this particular
16  issue, per se. But he was talking about this
17  issue. And I did basically bring up that, you
18  know, you really have to understand how the
19  pharmacy reimbursement system works. You can't --
20  you have to understand that there's two sides of
21  the equation, that the dispensing fees are kept
22  artificially low. That if you just reduce the

Page 171

1  ingredient reimbursement to actual acquisition
2  cost, and don't do anything with the dispensing
3  fee, there's at least the possibility that you're
4  going to have access problems for patients, because
5  pharmacies at that point might drop out of the
6  system.
7      Now, there's an argument that it really
8  wouldn't make much difference, because the very
9  large national pharmacy chains don't necessarily
10  make their money on the prescriptions. They make
11  the money on what you buy in the front end of the
12  store. And if they use pharmacy sales or
13  prescription sales as a loss leader, they'll still
14  sign up for Medicaid.
15    Q. There will be a retail pharmacy, correct?
16    A. Yeah.
17    Q. Not a closed pharmacy like an infusion
18  pharmacy.
19    A. No, no. So there's that argument. But
20  anyway, the argument I made is that you can't --
21  you can't look at one side of the equation. You
22  have to look at both sides of the equation. You

Page 172

1  have to understand that we know, and this is a
2  serious aspect of ain't what paid -- "ain't what's
3  paid." We know AWP, "ain't what's paid." But if we
4  move towards more transparency and we get closer to
5  reimbursing on the ingredient side at what
6  providers actually pay, then we have to look at the
7  dispensing fee side in the case of pharmacies,
8  because we've always kept that below what we think
9  the true cost of dispensing is to make up for the
10  fact that there is some money being made on the
11  ingredient side. So to the extent, again, that you
12  start paying people a dispensing fee or a total
13  reimbursement that does not even get back the cost
14  of the drugs, plus the cost of labor and the
15  computer systems and the lights and all that, you
16  could have providers stop -- you know, start
17  dropping out of Medicaid. And then this creates an
18  access issue for very poor people. So -- yeah.
19      MR. BLACK: Objection, form.
20  Nonresponsive.
21  BY MR. COOK:
22    Q. And so would it be your understanding that if

Page 173

1  we were -- if one were to go to this ideal world in
2  which AWP actually represented acquisition costs,
3  the Medicaid programs would no longer use an AWP
4  minus a percentage.
5    A. To the extent that -- that whatever was used,
6  revamped AWP or an ASP or an AMP, whatever you use
7  as a basis of a cost reimbursement, or -- or excuse
8  me, ingredient reimbursement to the extent that
9  that closely reflected the average actual price the
10  providers paid, then you would -- right. You would
11  no longer be taking percentages off.
12    Q. And, in fact, are you familiar with the
13  manner in which the federal legislation has changed
14  the calculation of federal upper limits to be
15  two-and-a-half times the Average Manufacturer's
16  Price?
17    A. If that's a recent change within the last
18  two-and-a-half years, I wouldn't know.
19    Q. And we've already talked about Medicare
20  paying ASP plus some percentage, correct?
21    A. 6 percent, I believe it is, yep.
22    Q. Once you learned what the actual amounts were

44  (Pages 170 to 173)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Page 174

1  that NAMFCU was distributing as these new AWPs, or
2  First DataBank was distributing, did you yourself
3  take any efforts to go and look at invoice pricing
4  to compare the new AWPs to invoice pricing?
5     A.  Yes, I did.
6     Q.  Could you tell me about that?
7     A.  As I mentioned, at the time I was still
8  moonlighting in the community pharmacy.  So the
9  next time I worked a weekend at the community
10  pharmacy, I took my list of 476 drugs and looked at
11  the prices that were at least listed as being the
12  prices that that pharmacy chain paid for the drugs.
13  Again, taking into account that they may have had
14  additional rebates that I was not aware of at all.
15  And just looking at -- at some of those drugs.
16  That's why I became concerned.  Because the AWPs,
17  the so-called Medicaid AWPs that were reported did,
18  in fact, in many cases -- not all, but in many
19  cases, were about what this chain pharmacies
20  supposedly was paying for these drugs.  That's why
21  I became concerned about them now taking an
22  additional 9 percent off in terms of doing the

Page 175

1  reimbursement.
2     Q.  Do you recall receiving any complaints from
3  home infusion or I.V. providers about --
4     A.  No.
5     Q.  -- these new AWPs?
6     A.  Not specifically.  There were complaints, as
7  I recall.  There were a smattering of complaints,
8  I'd characterize it as, from pharmacy providers.
9  But I don't recall which individual ones they were.
10     Q.  Let me hand you what we've marked in a
11  previous deposition as Exhibit 492.
12        If you would give me just a moment.
13        And for the record, Exhibit 492 is an email
14  from David Shepherd in Virginia --
15     A.  Uh-huh.
16     Q.  -- to Martha McNeill in Texas, dated June 23,
17  2000, forwarding an email from you from the prior
18  day.
19     A.  Okay.
20     Q.  It looks like it was sent to the National
21  Medicaid Pharmacy Administrators LISTSERV.  Do I
22  have that correct?

Page 176

1     A.  That's probably correct, yeah.
2     Q.  And if you look at the end, it indicates,
3  NMPAA-talk.
4     A.  Uh-huh.
5     Q.  Was that the LISTSERV that you were referring
6  to?
7     A.  Yeah, I believe so.  Yeah.
8     Q.  And it's at ListBot.com.
9     A.  Uh-huh.  Again, I never paid attention to
10  actually what the LISTSERV was called.  I'm not
11  even actually sure who exactly ran it.  But yeah.
12     Q.  And did you know David Shepherd and Martha
13  McNeill?
14     A.  Yes.
15     Q.  Who were they?
16     A.  David Shepherd is, as the email indicates,
17  worked for Virginia.  And my understanding is he
18  was my counterpart in Virginia.  Martha McNeill
19  worked for Texas.  I don't know if she was actually
20  the Pharmacy Program Manager in charge of all of
21  that, but she certainly was heavily involved.  She
22  was a pharmacist that worked for Texas Medicaid on

Page 177

1  pricing -- on doing the same sort of things that I
2  did.
3     Q.  And David Shepherd also was a pharmacist?
4     A.  I think so.  I'm not quite as sure.  But --
5     Q.  Did you find Mr. Shepherd and Miss McNeill to
6  be as knowledgeable as you were about the issues
7  relating to drug pricing we've been discussing here
8  today?
9        MR. FAUCI:  Objection.
10        MR. BLACK:  Objection, form.
11     A.  Well, you know, my interaction with them was
12  on a LISTSERV in Massachusetts like this,
13  occasionally seeing them at national meetings, and
14  things like that.  In casual conversations, they --
15  they -- I could converse with them.  They seemed to
16  understand what I was saying.  Their actual level of
17  expertise I don't think I can judge.
18  BY MR. COOK:
19     Q.  If you look to the text of your email, you're
20  forwarding the text of an email that you had sent
21  to First DataBank the prior week, correct?
22     A.  Well, can I read this?

45  (Pages 174 to 177)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                    March 14, 2008

Page 178

1   Q. Oh, please. Take your time. Take your time.
2   A. Yeah, this is from 2000.
3   Q. Yes, sir.
4   A. I don't remember emails that long. I don't
5   remember them eight weeks ago, let alone eight
6   years ago. 420 -- 476. I could be wrong. I was
7   probably more accurate back then.
8   Q. In fact, Mr. Wiberg, why don't I give you
9   Exhibit 380, also --
10   A. All right.
11   Q. -- which is a copy of an email that you
12   appear to have sent. And I'll give you time to
13   read both of those at your leisure.
14   A. Okay. I've read this first document.
15   Q. That's Exhibit 492, correct?
16   A. Yes.
17   Q. Do you recall that email?
18   A. Now that I've read it, yes, I do.
19   Q. All right. And do you recall having those
20   thoughts and expressing them to your fellow
21   Medicaid pharmacy administrators at the time?
22   A. I did send the email.

Page 179

1   Q. Yes.
2   A. And I --
3   Q. But it was a fair reflection of what you
4   thought at the time.
5   A. It's a fair reflection of what I thought at
6   the time, it's a fair reflection of what I still
7   think.
8   Q. The first thing I would like to point you to
9   in this email is the -- on the very first page, and
10   the first paragraph of your email to First
11   DataBank.
12   A. Uh-huh.
13   Q. It begins, "since early May."
14     Do you see that?
15   A. Let's see.
16   Q. It's about five minutes down.
17   A. Yes.
18   Q. And I'll just -- for the record, it reads,
19   quote, Since early May, FDB has been reporting to
20   state Medicaid agencies, quote, AWPs, close quote,
21   for approximately 428 NDCs that are the different
22   than the real AWP that is really being reported to

Page 180

1   your commercial customers. Close quote.
2     When you referred to real AWPs, you were
3   referring to the AWPs that had traditionally been
4   published in First DataBank, correct?
5   A. Right.
6   Q. And in the next sentence, you indicate that
7   you've discovered that these new AWPs that are
8   being reported are at or below actual acquisition
9   costs, right?
10   A. Correct. That's what I put in the -- the
11   email, yes.
12   Q. Right. And you -- and you abbreviate that
13   with the all caps AAC.
14   A. Uh-huh, correct.
15   Q. Was that an understood term, AAC, for Actual
16   Acquisition Cost at the time?
17   A. I used it. I -- I think it was fairly
18   commonly used.
19   Q. And it was distinguished from AWP, correct?
20   A. Yes.
21   Q. Would it be fair to say that AAC is what AWP
22   would be if AWP really were an average of wholesale

Page 181

1   prices to pharmacists?
2   A. Assuming that AWP was an average of the
3   actual net costs to the pharmacy, net any sort of
4   discounts that they -- they received, yes. You
5   know, AWP, in -- when you put it in those terms,
6   yes. It would be actual acquisition cost.
7   Q. And if you go down just a little bit farther,
8   you indicate to First DataBank, or you indicated to
9   First DataBank that there were pharmacies that had
10   told you that they would stop supplying some of
11   these 428 products if the new AWPs remained in
12   effect, correct?
13   A. Correct.
14   Q. And was that true?
15   A. As far as I know, it was true. Again, the
16   specifics of which pharmacies or which type of
17   pharmacies, I don't know. I do recall getting
18   calls from both pharmacy providers and also from
19   organizations like the Minnesota Pharmacists'
20   Association that represented pharmacies. And I do
21   recall individuals telling me that, you know, they
22   were losing money, and they could not continue

46 (Pages 178 to 181)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Page 182

1  supplying the products at that price.
2     Q. And then if you go down just a little bit
3  farther, you write, quote, While the legislators
4  did not define AWP, we believe that their intent
5  was it use AWP to mean a single estimate of
6  wholesale price as published in a compendia, such
7  as Red Book or by First DataBank, closed quote.
8     Do you see that?
9     A. Yes, I do.
10    Q. Did you understand the legislators' intent of
11 using the word "AWP" to refer to the published AWP
12 in the compendia?
13    A. That was my understanding of what the intent
14 probably would be.
15    Q. If you turn to the next page, you indicate in
16 the first full paragraph that the providers who had
17 contacted you ranged from independents to chains to
18 specialty infusion pharmacies who were complaining.
19 Do you see that?
20    A. I do.
21    Q. Do you recall any of the details of any of
22 the complaints you received from any of those

Page 183

1  pharmacies?
2     A. No. Just as I've just mentioned, I recall
3  getting complaints. If I wrote that, I believe it
4  to be true.
5     And -- but remembering the details of what may
6  have been five-minute phone conversations eight
7  years ago, sorry, I just don't.
8     Q. And in the next paragraph, you indicate that,
9  as you put it, almost everyone who is familiar with
10 pharmacy reimbursement knows that AWP is "ain't
11 what's paid," right?
12    A. Yes.
13    Q. And back then also, almost everybody who is
14 familiar with pharmacy reimbursement knew that AWP
15 was "ain't what's paid," right?
16    A. Yes.
17    Q. Okay. And then at the end of that paragraph,
18 you indicate that the spread between AAC and AWP is
19 taken into account when determining what to pay for
20 a dispensing fee, right?
21    A. That's correct.
22    Q. And that's what we've just been discussing

Page 184

1  for a couple hours, right?
2     A. Well, for -- after -- after the lunch break
3  here, yes. I went through this, yeah.
4     Q. And if you look down at the next paragraph
5  after the block quote, you state that, quote, In
6  fact, when pharmacy organizations have sought an
7  increase in dispensing fees, the AWP spread has
8  been pointed out to legislators, closed quote.
9     Do you recall that in negotiations with the
10 legislature about dispensing fees, the fact that
11 there was profit on the ingredient cost was pointed
12 out as a reason not to increase dispensing fees?
13    A. Yes. This is back in 2000. And I don't
14 recall so much the discussions back then, because
15 that was before we were trying to lower fees. And
16 I don't recall if there were efforts to try to
17 increase fees. I know there had been. And there
18 may have been, I just simply don't recall.
19    And there -- there may have been -- there were
20 -- and, again, exactly when all these legislative
21 proposals came into place -- it's hard to remember
22 now, because the time I was there, every year there

Page 185

1  were a half a dozen to a couple dozen
2  pharmacy-related bills. So it's very possible that
3  some legislator in 1999 and 2000 was trying to get
4  reimbursement increased. There was one effort -- I
5  don't remember exactly what it was, where one
6  legislator wanted every independent rural pharmacy
7  in the state to get an increase.
8     But -- so exactly when the discussions
9  happened, I don't know. But we had numerous
10 discussions with the key -- health care-related
11 legislators about this issue.
12    Q. And you advised those legislators that
13 pharmacies had a profit margin built into the
14 ingredient cost of the reimbursement formula that
15 made up for the fact that the dispensing fee was
16 not sufficient to cover costs plus a profit,
17 correct?
18    A. That would be correct.
19    Q. If you go down to the -- a little bit
20 farther, at the very last two sentences of that
21 paragraph, it reads, quote, If the AWP spread
22 disappears, the dispensing fee may have to be

47  (Pages 182 to 185)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Wiberg, Cody                                March 14, 2008

Page 186

1   increased, especially for many of the 428 drugs
2   currently in question. Many of these drugs require
3   some type of compounding or other preparation,
4   close quote.
5       Do you recall, whether, in fact, many of the
6   drugs on the NAMFCU list were infusion drugs that
7   required compounding?
8    A. I believe many of them were. I don't recall
9   -- the specific details. Obviously, I got the
10  number incorrect. I thought it was 476. But, as I
11  recall, there were a lot of drugs that would have
12  been used in I.V. compounding.
13   Q. In fact, I'm going to hand you a copy of
14  Exhibit 587, which is from a related program. It's
15  a Medicare program memorandum. Do you recall that
16  Medicare at the time was also looking to go to use
17  these new DOJ AWPs?
18   A. I may have been aware of it. I didn't focus
19  as much on -- on Medicare and -- I mean, this
20  particular document doesn't look familiar
21  immediately. But I -- I may have seen it. But I
22  was obviously more concerned with Medicaid than

Page 187

1   Medicare.
2    Q. And if you look at attachment 1 to Exhibit
3   487, it's a list of drugs with an Average Wholesale
4   Price listed for each of them.
5    A. Where is that? Started on page 4?
6    Q. Yes, sir.
7    A. Yes, I see that.
8    Q. Does that look familiar -- does that look
9   similar to the list of DOJ or NAMFCU AWPs that you
10  received back in 2000?
11   A. I'll just take a look at this. It -- I guess
12  it -- there's some drugs I recognize as being on
13  here, like the acyclovir.
14   Q. Uh-huh.
15   A. So it -- it might be. But, you know -- I
16  haven't seen that list in many years.
17   Q. Do you -- do you recall sodium chloride,
18  dextrose and vancomycin being among the types of
19  drugs that were included on the NAMFCU list?
20   A. Not specifically.
21   Q. Certainly, those would be drugs that would
22  fall within the category of drugs that required

Page 188

1   compounding or other preparation before being
2   dispensed, correct?
3    A. Typically. And there are -- sometimes,
4   depending on exactly what it is, you can do some of
5   these drugs. For example, dextrose with sodium
6   chloride. On page 9, the fourth drug down appears
7   to -- or the fourth product down appears to be
8   dextrose sodium chloride, 5 percent dextrose,
9   sodium chloride, 0.9 percent. And, again, if
10  you're watching those medical shows on TV, and you
11  see the doctor tell the nurse, hang a bag of D5W
12  with normal saline, that's what that would be
13  commonly referred to as. And that sometimes is
14  hung by itself, which means it doesn't require any
15  sort of compounding. It's just given by itself.
16      But certainly some of the products in here
17  that do contain dextrose or just sodium chloride
18  might be used in compounding other products in
19  various ways. They might be used as a basis for the
20  total parental nutrition products -- the compounded
21  products I mentioned. They might be used as the
22  diluent if you were going to reconstitute, say, an

Page 189

1   antibiotic, and put it into another solution to run
2   an infusion over half an hour or an hour or
3   something. You might reconstitute the antibiotic,
4   draw it up into a syringe and direct -- and put it
5   into a bag of normal saline, for example, depending
6   on what the product is.
7    Q. And that process would be compounding,
8   correct?
9    A. That process could be compounding.
10   Q. At the bottom of the second page of your
11  email that we have marked as Exhibit 492, you
12  suggest two approaches for resolving the issue
13  being addressed by NAMFCU. That is the difference
14  between AAC and AWP, correct?
15   A. Yes.
16   Q. Okay. And the first of the suggestions you
17  have is for the state Medicaid agencies to be
18  allowed to work out their own solution by either
19  increasing the discounts off of AWP, adjusting the
20  dispensing fee, establishing MACs or some other
21  method, correct?
22   A. Correct.

48  (Pages 186 to 189)

81611bd8-50cd-41b9-a7df-1572c1f4c1ba

Sullivan, Harry Leo                    March 12, 2008
                    Nashville, TN

Page 1

            UNITED STATES DISTRICT

        FOR THE DISTRICT OF MASSACHUSETTS


--------------------------X

IN RE:  PHARMACEUTICAL      )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  )  CIVIL ACTION

PRICE LITIGATION            )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO    )

U.S. ex rel. Ven-a-Care of  )

of the Florida Keys, Inc.   )

     v.                     )  No.06-CV-11337-PBS

ABBOTT LABORATORIES, INC.,  )

--------------------------X


    (cross captions appear on following pages)


        Deposition of HARRY LEO SULLIVAN

                Volume I

            Nashville, Tennessee

        Tuesday, March 12, 2008

                9:05 a.m.

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008

Nashville, TN

Page 118

1  things like saline or be it for, you know,
2  sterile irrigation or injection or as a hydration
3  solution or as an add mixture or whatever
4  component to -- whatever service was being
5  delivered in home health, we wanted that to come
6  through the pharmacy program as well and be MACed
7  because those products typically were very cheap.
8  And --
9  BY MR. TORBORG:
10  Q.  Were you --
11  A.  And in a, in a, you know, home health
12  agency is not doing anything slick or illegal by
13  billing whatever their usual and customary charge
14  is to Medicaid.  But those -- if you're care --
15  if you're not careful and people are not
16  cognizant of the costs of those drugs, you might
17  dramatically over-pay.
18  Q.  And when you say very cheap, do you
19  mean there are large discounts off of AWP?
20  A.  Well, again from my point of view, look
21  at the net acquisition cost, most -- a lot of
22  those things were multi-source items available

Page 119

1  from multiple manufacturers.  And I didn't care
2  which manufacturer they used, but I wasn't going
3  to pay more than X.
4  Q.  And how would you determine X?
5  A.  Again, similar to what we were talking
6  about earlier with, like solid oral dosage forms
7  that become available generically.  Find out what
8  the cost is.
9  And, and, and, and in those
10  environments, you know, you might talk to some
11  other different types of providers some people in
12  the home infusion or the home health agency
13  business, and you just say, you know, I'm
14  thinking about putting a MAC on this and this,
15  what do you think?  And get, get some kind of
16  feedback.
17  Q.  Just show you another document that
18  we've marked previously.  I don't want to ask you
19  a whole lot of questions on it.  Justice Exhibit
20  84.
21  MR. DRAYCOTT:  Pardon me?
22  MR. TORBORG:  84, in the binders.

Page 120

1  BY MR. TORBORG:
2  Q.  Take this one back.
3  For the record, this is a cover letter
4  dated August 13th, 1996, from June Gibbs Brown to
5  Bruce Fladdock, attaches an OIG report titled
6  Review of pharmacy acquisition costs for drugs
7  reimbursed under the Medicaid prescription drug
8  program at the Florida Agency for Health Care
9  Administration.
10  And then it attaches some comments that
11  Florida provided to the report, which is -- the
12  questions I'm going to be asking you about, Mr.
13  Sullivan, is the last two pages of the document.
14  And I'll ask you some questions in a bit --
15  A.  The last two pages of the OIG document?
16  Q.  Yeah, the last two pages of the
17  exhibit.
18  A.  Okay.
19  Q.  Yeah, the very last two pages.
20  A.  All right.
21  Q.  There is a letter here from Douglas
22  Cook, appears to be the Director of the State of

Page 121

1  Florida for Health Care Administration.
2  A.  Um-hum.
3  Q.  Did you ever meet Mr. Cook?
4  A.  No, I have not.
5  Q.  Did you ever meet Mr. Jerry Wells?
6  A.  Oh, absolutely.
7  Q.  And have you talked to him a number of
8  times?  It sounds like you're pretty familiar
9  with him.
10  A.  Yes.
11  Q.  And how is that?
12  A.  He was, he was one of the deans of the
13  Medicaid pharmacy administrators, very smart,
14  very sharp, in a very dynamic, difficult-to-
15  manage state from a Medicaid standpoint.  Very
16  outspoken, very knowledgeable.  Somebody that
17  you, you'd bounce things off of.  Maybe not
18  always agree, but bounce things off of.
19  Q.  In the second page of Mr. Cook's
20  letter, first paragraph, I'll read it into the
21  record, if you would follow along, Mr. Cook
22  wrote, In general products and associated

31  (Pages 118 to 121)

Sullivan, Harry Leo                          March 12, 2008
                          Nashville, TN

Page 122

1  intravenous fluids also continue to be
2  problematic. Manufacturers offer contracts to
3  most vendors providing very favorable pricing and
4  terms, but manufacturers continue to market small
5  quantities of those, of these through
6  conventional sources and report single-unit
7  pricing through the national data sources. Any
8  assistance your office might offer in
9  standardizing pricing in this market would be
10 beneficial.
11     Do you see that?
12  A.  Yes.
13  Q.  Do you have an understanding of what
14 Mr. Cook is saying?
15  A.  He's wanting the federal government to,
16 to MAC these things instead of take the heat for
17 MACing them himself.
18  Q.  Okay.
19  A.  I don't mean to -- that's what it
20 appears to me. I don't mean to call him chicken,
21 but -- and it's not necessarily a bad approach to
22 take. It's easier, if you're -- for example, if

Page 123

1  your home health agencies in your state, you
2  know, are very politically connected, have a
3  strong lobby, and will go to war over you
4  implementing this policy, then having the federal
5  government do it for you and you being able to
6  say, I'm going to lose state match if I don't
7  comply, really shifts a lot of the fire to
8  another source.
9      MR. DRAYCOTT: Dave, I didn't want to
10 interrupt the witness, but I need to interpose an
11 objection at the end of your question.
12     MR. TORBORG: Okay.
13  A.  And I'm just -- you know, I'm just
14 guessing, the way this is written. I don't know
15 what he was -- his motivation was.
16 BY MR. TORBORG:
17  Q.  And he talks about reporting single-
18 unit pricing.
19     Do you understand what he means by
20 that?
21  A.  Yes.
22  Q.  What's he mean by that?

Page 124

1      MR. DRAYCOTT: Objection.
2  BY MR. TORBORG:
3  Q.  What's your understanding of what he
4  means by that?
5  A.  Well, it could be -- well, again I
6  think he's leaving it up to the, to the Feds to
7  determine whether -- and there is -- this has
8  always been a, a point of confusion in claims
9  processing systems, does a, you know, a 500 ML
10 bottle of normal saline solution count as $10
11 divided by one or $10 divided by 500? A
12 reconstitutable antibiotic like Rocephin counts
13 as one. What does the dilutant that you put in
14 there, the 200 cc's or whatever it is that you
15 put in there to dilute that powdered antibiotic,
16 is it one or, or 20? And do -- so does the
17 provider bill me 20 units or one unit? If I set
18 up in my system divided by 500, then they bill me
19 one unit, because they're billing by the bottle,
20 they're shorted, I'm to the good. In the office
21 it could happen. I could get, if I set the units
22 up wrong and they bill 500 and I've got it priced

Page 125

1  as one, then they'll be paying 500 times that.
2      So I think this, this gets at not only
3  the question of pricing and a MAC, as what he's
4  asking for, but also gets it and you tell me what
5  the units should be.
6  Q.  Do you know what he is talking about
7  when he talks about manufacturers reporting
8  single-unit pricing?
9      MR. DRAYCOTT: Objection.
10     You can answer.
11  A.  Well, I, I just -- no, I don't know
12 what he's saying. I could guess but I don't know
13 what he means by that.
14     Again I think he's asking for clarity
15 on units and MAC and he's wanting somebody else
16 to do it for him.
17 BY MR. TORBORG:
18  Q.  Were you aware when you were the
19 director of pharmacy services of Tennessee that
20 manufacturers were offering very favorable
21 pricing for injectable products in IV fluids?
22     MR. DRAYCOTT: Objection.

32 (Pages 122 to 125)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 126

1    A. Ah, yes.
2        MR. TORBORG: I would like to mark this
3  as the next exhibit.
4        (Exhibit Abbott 575 marked.)
5        MR. DRAYCOTT: What's the number,
6  please?
7        THE REPORTER: 575.
8  BY MR. TORBORG:
9    Q. For the record, what I have marked as
10 Abbott Exhibit 575 bears Bates Nos. ACMDL 77735
11 through 36.
12       Mr. Sullivan, I'm sure you're probably
13 not aware of this document, but I wanted to ask
14 you some questions about it, nonetheless.
15       Let me verify that you are not familiar
16 with this document, relates to Kansas?
17   A. That's correct.
18   Q. Okay. There is a contact person that's
19 listed there on this document, Gene Stevens. Do
20 you know who that is? Have you had contact with
21 him?
22   A. Yes.

Page 127

1    Q. Okay. Is he a pharmacy administrator
2  for the State of Kansas?
3    A. Yes.
4    Q. And have you met Joyce Sugrue? Does
5  that name sounds familiar?
6    A. No.
7    Q. S-U-G-R-U-E?
8    A. No, I don't recognize that name.
9    Q. Okay. Under -- there, the very last
10 part of the page, there is a final policy where
11 it states, Effective of dates of service 1/1/95,
12 all sterile irrigation solutions and all large
13 volume parenteral and small volume parenteral
14 fluid replacement in vehicles for intravenous
15 drug administration which are billed as pharmacy
16 claims will be reimbursed at AWP less 50 percent.
17   A. Right.
18   Q. Paren, inhalation solutions are not
19 included in this reimbursement change, end paren.
20 And then there is -- the next page -- let me ask
21 you if you understand what they're saying there.
22 Does that make sense to you?

Page 128

1    A. Yes. Yes.
2    Q. The next page, rationale for the
3  change, it states, Discounts from the referenced
4  pharmaceutical pricing schedule, known as average
5  wholesale price, vary by product class.
6        Were you aware of that?
7    A. Yes.
8    Q. Okay. And when they use the word
9  product class, do you know what they're talking
10 about there?
11   A. Drug class, I assume.
12   Q. What is that?
13   A. Well, not necessarily drug --
14   Q. What different drug classes are there?
15   A. No, I, I -- well, it's a very broad
16 statement. It, it could be -- it then talks
17 about IV vehicles and irrigation solutions, so I
18 would assume that the first sentence is talking
19 about those type of products rather than specific
20 drugs.
21   Q. Then it goes on to say, Generally
22 intravenous vehicles and irrigation solutions are

Page 129

1  available at much greater discounts than are
2  other pharmaceuticals. This is one of the three
3  methods used to reduce expenditures in the
4  pharmacy program.
5        Were you aware that generally
6  intravenous solutions and irrigation solutions
7  were available at much greater discounts than
8  other drugs?
9    A. Um, generally, yes. Because -- but it
10 would depend on are you a, a hospital? A
11 doctor's office? An outpatient surgery clinic? A
12 home health company? Or a retail pharmacy.
13   Q. Those different customers pay different
14 amounts?
15   A. Or a nursing home, even.
16       Yes.
17   Q. And could the amounts paid be, in your
18 experience, radically different?
19       MR. DRAYCOTT: Objection.
20   A. Yes.
21 BY MR. TORBORG:
22   Q. And when you had situations like that,

33  (Pages 126 to 129)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008

Nashville, TN

Page 130

1   when -- let me step back.
2          All of those type of companies could
3   file claims to the Tennessee Medicaid program;
4   right?
5      A.  Yeah, there's an enrollment process for
6   providers, but pretty much open to anybody who,
7   who wanted to enroll.
8      Q.  And all of those companies could
9   potentially file claims for reimbursement for
10  drugs; is that right?
11     A.  You talking about providers now?
12     Q.  Providers.
13     A.  Yes.
14     Q.  And some of those providers paid more
15  than other providers for drugs; right?
16     A.  Yes.
17     Q.  And sometimes, as we talked about, --
18     A.  However, let me -- I did mention
19  hospital, so, yeah.
20     Q.  Okay.  Let's take hospitals out of the
21  equation.
22     A.  Yeah, let's take them out.  There's a

Page 131

1   per diem.
2      Q.  But the others ones you mentioned.
3      A.  Yeah.
4      Q.  They would all file payments -- file
5   claims for payment; correct?  For pharmacy
6   claims.
7      A.  Yes.  But there may be -- yes.  But
8   there may be situations where, you know, the home
9   health agency may subcontract with a pharmacy who
10  is, so -- yeah, but eventually, yes.
11     Q.  And they could pay different prices for
12  drugs.
13     A.  Yes.
14     Q.  How would you deal with that from a
15  policy perspective in trying to decide how much
16  to pay?
17     A.  Well, you know, we took a pretty hard
18  line, and, and again tried to be fair when you
19  set a MAC, and take into account all the
20  different provider -- the ripple effects of
21  setting that MAC.
22         Um, but I'm sure -- and I'm sure that,

Page 132

1   you know, dealing with a Medicaid program, this
2   is not a, not a new concept, but I'm sure in a
3   lot of instances those sorts of products are
4   eaten by the provider, if -- or the difference
5   between the MAC and their cost is eaten.  And
6   they have to make a determination if it's worth
7   it to, to provide that service.
8      Q.  Sometimes the pharmacy --
9      A.  And typically, typically.
10     Q.  And sometimes they don't.
11     A.  You could have a laundry list of things
12  you're billing for.
13     Q.  Um-hum.
14     A.  You're just not billing for one sterile
15  solution or little IV solu -- there is drugs it
16  in, there's services in it, there is supplies,
17  there's bandages, and, you know, all that.
18         And, you know, you may just figure a
19  little hit on the difference between the MAC and
20  whatever you're -- you pay.  But again, by and
21  large the MAC's set, so it's not a disincentive.
22     Q.  You would look at the big picture.

Page 133

1      A.  Try to.
2      Q.  And you referred earlier to the
3   National Pharmaceutical Council reports?
4      A.  Yes.
5      Q.  And those, among other things, would
6   set forth the state's payment methodology for
7   drugs.
8      A.  They would -- yeah, they would report
9   what those --
10     Q.  What the state's told them --
11     A.  Yes.
12     Q.  -- it was?
13     A.  Yes.
14     Q.  And do you know if a methodology
15  specific to IV drugs such as we see in Kansas
16  would be put in there?
17     A.  I don't know.  I don't know if that was
18  part of the survey or not.  I --
19     Q.  But if it was in there, everyone who
20  reviewed the NPC reports could see what Kansas --
21     A.  Sure.
22     Q.  -- had done?

34  (Pages 130 to 133)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Page 134

1    A.  Sure.
2        MR. TORBORG:  Why don't we take a
3    break.
4        VIDEOGRAPHER:  Going off record. End
5    of tape 2. Time now is 11:31.
6        (Recess.)
7        (Exhibit Abbott 576 marked.)
8        VIDEOGRAPHER:  Back on record.
9    Beginning of Tape 3. Time now is 11:49.
10   BY MR. TORBORG:
11       Q.  Welcome back, Mr. Sullivan.
12       A.  Yeah.
13       Q.  I have marked and handed you as Abbott
14   Exhibit 576 a document that bears the Bates Nos.
15   VAC-MDL 75533 through 66.
16       For the record, and so that you know,
17   this is a document that was produced by the
18   relator in this case, a company called Ven-A-Care
19   of the Florida Keys, Inc., and particularly these
20   were documents that were looks like contained in
21   a folder titled Tennessee.  And as you were the
22   director of pharmacy services at Tennessee, I

Page 135

1    thought I might ask you about some documents
2    contained therein.
3        A.  Okay.
4        Q.  In particular I would like to start
5    with the Bates page ending 539. This is an
6    October 24th, 1994 letter from Zachary Bentley to
7    Leo Sullivan regarding state policy and
8    methodology for reimbursement of intravenous
9    solutions and injectable drugs. Do you see that?
10       A.  Yes, sir.
11       Q.  If you would take a look at that
12   document. Let me know if you recall it and then
13   I'll have some questions for you about it.
14       A.  Okay.
15       Okay.
16       Q.  Mr. Sullivan, do you recall this, this
17   particular page?
18       A.  I really don't.
19       Q.  Do you recall ever having any
20   correspondence or communications with Zachary
21   Bentley or anyone else that you understood to be
22   affiliated with Ven-A-Care of the Florida Keys?

Page 136

1    A.  I honestly do not remember.
2    Q.  Have you ever heard of the company Ven-
3    A-Care?
4    A.  No, I really -- the logo looks
5    familiar, but I don't know by what context I
6    would know them.
7    Q.  Do you recall that some company was
8    working on a project, a continuing education
9    project --
10   A.  No.
11   Q.  -- concerning these kind of drugs?
12   A.  No.
13       You, you have to know that during the
14   course of a week you'll get, in a position like
15   that, you'll get all kinds of requests for
16   surveys and stuff like this.
17   Q.  If we go to the page preceding this
18   page, page ending 538, there is a document titled
19   Response to National State Medicaid Reimbursement
20   Survey. Contact person is -- that's you; right?
21   A.  Yes.
22   Q.  And then it appears as though you gave

Page 137

1    him some information relating to Tennessee's
2    reimbursement for IV drug reimbursement and TPN
3    reimbursement. Do you see that?
4    A.  Yes.
5    Q.  And in particular IV reimbursement was
6    AWP minus 8 percent plus a $3.91 dispensing fee
7    per ingredient.
8        And was that the standard, from your
9    recollection, was that the standard reimbursement
10   rate that Tennessee used for drugs at that time?
11   A.  No.
12       Oh, this, this information is not
13   accurate at all.
14       Based on the date 11/29/94 we're almost
15   a year into TennCare. I wasn't paying for any,
16   any of these products. The MCOs, through their
17   PBMs, or however they set up reimbursement, for
18   paying for this. So somebody, sounded like
19   somebody just got an old NPC book and wrote this
20   down. I don't remember talking to them. I may
21   have. But this is not accurate information.
22       The state didn't have a policy for IV

35  (Pages 134 to 137)

Sullivan, Harry Leo

March 12, 2008

Nashville, TN

Page 138

1  drug reimbursement during this time period. We
2  paid capitated fees to MCOs.
3      Q.  Do you believe it's possible that you
4  never even had a discussion with anyone else from
5  Ven-A-Care?
6      A.  I -- you know, you have so many calls
7  and so many -- I mean all day long, every day, I,
8  I'm not going to say that I absolutely did not
9  talk to these people.  It looks like, too, on
10  number 3 it says price negotiated with various
11  provider of TennCare system.  Somebody's writing
12  something down here that didn't, didn't even
13  understand TennCare.  I mean these prices --
14  whatever, whatever reimbursement there was in
15  this time period, 11/29/94, was strictly between
16  the MCO and their provider network and it would
17  vary from MCO to MCO.
18      I mean at this point in time there were
19  12 different MCOs in TennCare.  Nobody could fill
20  out this form for TennCare.  There would be 12
21  forms, and it wouldn't be me as the contact
22  personal, it would be the medical director of the

Page 139

1  MCO or the pharmacy director of that MCO or the
2  PBM.
3      Q.  Did the MCOs in TennCare, did they have
4  different methodologies for reimburse -- for
5  paying for drugs, or did they all use the same
6  one?
7      A.  Right out of the gate in January, I
8  think they all pretty much piggybacked what we
9  had in place at December 31, 1993, but by midyear
10  -- and the, and the reason that is is because the
11  waiver wasn't even approved until November 22nd.
12      Q.  Of '94?
13      A.  Of '93.
14      Q.  '93?
15      A.  And we went live January 1st, '94, you
16  know, a month and a half later.
17      What we had done prior to whatever
18  approval, the whole 1993, was identify potential
19  MCOs, give them contracts that outlined their
20  responsibilities and even actuarial information
21  on capitation rates, but we couldn't fully
22  execute the contracts with those 12 MCOs until

Page 140

1  HFCA approved the waiver.
2      The -- we could negotiate, we could
3  have it all set and ready to go when HFCA did
4  give that approval, consequently, then, the MCOs
5  were unable to fully execute provider contracts
6  with physicians, hospitals or anybody else, until
7  they had a contract with TennCare.
8      So it was a cascade of events that
9  started on 11/22/93, implement and go live a
10  month and a half later with 1.4 million lives.
11  Just ridiculous implementation schedule.
12      But it, but it happened that way.  So
13  what happened on day one with the pharmacy
14  program was just, just fill claims.  Just pay
15  claims.  I mean pharmacists, the whole first
16  couple of months of TennCare, were filling
17  prescriptions on faith, not even know who to
18  submit the claim to or if and when or what the
19  amount of reimbursement would be.
20      By mid '94 and on into early '95, we
21  eventually evolved into a situation where there
22  were still at that time maybe 12 MCOs, with six

Page 141

1  different PBMs handling those, and then later on
2  it evolved to, you know, some of these MCOs went
3  bust or quit or whatever, and you had eight,
4  maybe eight MCOs dealing with two or three PBMs
5  and 95 percent of the enrollment was actually
6  under one PBM by the way the enrollment fell with
7  those eight MCOs, so it -- this is somebody,
8  somebody fudged this to just get a report done is
9  what it looks like to me.
10      Q.  Under the state policy for DPM
11  reimbursement AWP plus 33 percent, do you recall
12  if that was a policy that Tennessee had before
13  TennCare was implemented?
14      A.  I don't know where they would have
15  gotten that.  TPM reimbursement was MACed.  At
16  some point in time it became MACed, TPM Solutions
17  did.  But it certainly was not AWP plus 33
18  percent.  You know, cost plus 33 is closer to it.
19      Q.  Do you recall ever discussing at the
20  meetings you had with other state Medicaid
21  representatives, pharmacy representatives, the
22  subject of any lawsuit relating to average

36  (Pages 138 to 141)

Sullivan, Harry Leo                                March 12, 2008
                        Nashville, TN

Page 146

1    Q.  Mr. Sullivan, I have handed you what we
2  have marked as Abbott Exhibit 577.  It has the
3  Bates Nos. HHC 002-0423 through 30.
4        If you would take a look at that just
5  to see if that's a publication that you're aware
6  of.
7    A.  Yes, it is.  I got these.
8    Q.  Okay.  Can you tell, can you tell us
9  what this, what this document is.
10   A.  Um, just -- I think -- well, let's see.
11  Appears, I don't know, every couple of months, I
12  guess.  Just news.  There were some of my peers
13  on an advisory board who would send in various
14  information, updates or particular issues that
15  are going on in different states, Medicaid
16  pharmacy programs.  It was Medicaid specific.
17   Q.  And do you know who all received these
18  pharmacy or Medicaid pharmacy --
19   A.  I think all the --
20       MR. DRAYCOTT:  Objection.
21   A.  -- pharmacies directors.
22  BY MR. TORBORG:

Page 147

1    Q.  And what, what makes you think that?
2    A.  Because that's -- I believe that was
3  pretty much the -- one of the audiences targeted
4  with it.
5    Q.  And this particular bulletin is dated
6  January-February of 1990.
7    A.  Um-hum.
8    Q.  Correct?
9    A.  Yes.
10   Q.  And that's when you would have been the
11  director of pharmacy services you would have been
12  director of pharmacy services of Tennessee at
13  that time.
14   A.  Yes.
15   Q.  And this has an article titled
16  Revisiting Medicaid reimbursement for home IV
17  drug therapy.  Do you see that?
18   A.  Yes.
19   Q.  And in particular I have a few
20  questions for you on this.
21   A.  Okay.
22   Q.  The first column, first page, the

Page 148

1  bulletin notes, reimbursing -- well, let me, let
2  me back up.
3        Do you know who wrote these articles,
4  generally speaking?
5    A.  No, I didn't -- there is editor on
6  here.  I don't know her and I -- I know -- I
7  certainly knew or got to know, after this time
8  period, most of these people on the advisory
9  panel.  They're all Medicaid pharmacists.
10   Q.  On page 454.
11   A.  On page 2, yeah.
12   Q.  Do you have any idea where the editor,
13  listed here as Karen Nardi, how she obtained her
14  information for articles of this magazine?
15   A.  I, I assume -- no, I don't know.  I
16  would assume she interviewed folks.
17   Q.  Did you -- were you ever interviewed
18  for this publication?
19   A.  I might have been.
20       I -- certainly not at this time period.
21       I had just started work for the state
22  at this time, but I might have been, in

Page 149

1  subsequent issues.
2    Q.  Here, first column, first page, it
3  says, Reimbursing adequately and efficiently for
4  home IV drug therapy has been a continuing
5  problem for many Medicaid pharmacy
6  administrators.  Do you see that?
7    A.  Um-hum, yes.
8    Q.  Was this a problem that you were, that
9  you were confronting, or not?
10   A.  Yeah, I think, because there's so many
11  inlets to the system from the provider side that
12  you have to be very vigilant of, you know, how
13  many claims get in the system.  And whether or
14  not they're paid or rerouted or denied or how
15  they're handled.
16   Q.  Then later on in that paragraph it
17  states, a number of states are concerned that
18  their current reimbursement methodology for home
19  IV therapy is inadequate and are trying to
20  develop improved systems which will permit them
21  to pay providers more quickly while avoiding
22  overpayment.  Was that -- did you ever have

                          38  (Pages 146 to 149)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo

Nashville, TN

March 12, 2008

---

Page 142

1    wholesale price.
2        A.   The only thing I remember vaguely is,
3    and it didn't really -- it didn't really impact
4    me, and I don't recall if Tennessee was a part of
5    it, but it was some suit that did involve I
6    believe Abbott and maybe some other folks, maybe
7    TAPP, but I'm not sure about that, where there
8    was an allegation, and I don't know, ultimately
9    the -- you know, it may have been settled in some
10   settlement, and I don't know about blame or guilt
11   or any of that, but my memory is that it involved
12   selling injectable type drugs or products to
13   physicians to be administered in the physician's
14   office.
15       And I guess the allegation was that the
16   AWP was either inflated or well above the actual
17   cost to the physician for the product.
18       And personnel for the manufacturer were
19   instructing physicians on, you know, if you buy
20   my product, we sell way below AWP, Medicare or
21   Medicaid or whoever is reimbursing based on
22   hundred percent of AWP, or whatever it was, and

Page 143

1    you'll make a killing using my drug, and it was -
2    -
3        Q.   Have you heard the term marketing to
4    spread?
5        A.   Yes.
6        Q.   Is that what you're talking about?
7        A.   Yes.
8        Q.   Okay. I'm sorry.  I think I may have
9    cut you off.
10       A.   But I don't know if the, but I don't
11   know if the allegations were just that the price
12   had been lowered so much or if the AWP had been
13   finagled or -- with the publishers of AWP or
14   both, I don't know what the outcome was or the
15   real allegations.  I was just aware of some --
16   and it, and it had to do with physician's offices
17   is my recollection.
18       Q.   Did it relate to Lupron?  Does that
19   ring a bell?
20       A.   That certainly was one.  And also
21   injectable other solutions, I think, as well.
22   But I don't, I don't -- like I said, I never got

Page 144

1    involved in that case.  I just remember hearing
2    about it.
3        Q.   When did you first start hearing about
4    it?
5        A.   Oh, gosh, I don't know.  Sometime in
6    the Nine -- mid Nineties, I would guess.  I'm not
7    sure.
8        Q.   Was it something that you recall being
9    discussed at the national symposium --
10       A.   No.
11       Q.   -- meetings?
12       A.   No.  Again this is, this had to do with
13   physician offices or --
14       Q.   Where did you learn about it?
15       A.   Through -- I, I would -- you know,
16   trade journals, you know, news.  I had no direct
17   involvement in it.  The industry.  I remember
18   just rumblings through the industry that -- it
19   seems to me there was a significant settlement.
20   I don't, I don't know what it was.
21       Q.   Did you -- what types of news,
22   periodicals, did you review in your work as the

Page 145

1    director of pharmacy services?
2        A.   Um, you know, everything from clinical
3    journals to trade, trade journals.
4        Q.   Do you recall any particular ones?
5        A.   Oh, gosh.
6        You know, managed care pharmacy things.
7    Pharmacy, I'm sorry, drug topics, you know, stuff
8    from the APHA.  Regular news, CBS, NBC, CB -- or
9    ABC.
10       Q.   Did you -- did your office have a
11   subscription to any of these?
12       A.   Yes.  Probably -- well, all the
13   pharmacy journals, I think most of those -- well,
14   I'll say all the ones that are free.  Most of
15   them were free.  But all the ones that are free,
16   we -- I don't think I ever paid anything, could
17   get the state to pay for anything, but --
18       Q.   Okay.
19       MR. TORBORG:  Going to mark this as
20   another exhibit.
21          (Exhibit Abbott 577 marked.)
22   BY MR. TORBORG:

37  (Pages 142 to 145)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

---

Page 150

1   concerns on whether or not the payment for these
2   kind of therapies was, was adequate?
3       A.   Well, my opinion, particularly in the,
4   in the home health arena, was -- and during this
5   specific time period, the growth in Tennessee was
6   such of those type of providers that it wouldn't
7   -- that wouldn't -- not lead you to believe that
8   the reimbursement for Medicaid was inadequate.
9           When people are hollering and screaming
10  or you have trouble getting providers to take
11  care of your patients is when that was more
12  likely a concern.
13      Q.   Well, do you know when the home
14  infusion business really started taking off?
15      A.   Well, it certainly took off in the
16  early Nineties.  And I can't remember -- and
17  Tennessee was a little bit different because we
18  very purposely avoided expansion of home
19  community based services under the Medicaid
20  program because the vast majority of the patients
21  who would receive those services were dual
22  eligibles, which meant they had Medicaid and

Page 151

1   Medicare.  And Medicare home health was, was
2   truly exploding.  We had hundreds of providers in
3   Tennessee of home health services.  I dare say
4   there's, you know, maybe 20 now.  Because there
5   was, there was indeed a bonanza on the Medicare
6   side in Tennessee.  Other states didn't face it
7   quite as -- if they had chosen to expand or had
8   very aggressive home community-based services
9   through Medicaid, might have had a little bit
10  different policy issues.  We purely shifted to
11  Medicare, cost shifted to Medicare, with the
12  duals.  And so it wasn't maybe not as, as intense
13  on a Medicaid issue in Tennessee as it might be
14  elsewhere is what I'm saying.
15      Q.   The page starting with -- at 425 and
16  then going over to 426, there is a discussion of
17  what some states are doing in the home IV
18  reimbursement area, Minnesota indicates
19  compounding or a dispensing fee of $8 for IV
20  drugs, and then Washington indicates that they're
21  paying a compounding amount, Ohio as well.
22          Do you have an understanding of what

Page 152

1   they're talking about when they talk about a
2   compounding fee?
3       A.   Yes.
4       Q.   And what, what is that?
5       A.   Well, certain, be it -- I mean you can
6   compound IV drugs if you have the right equipment
7   and filters and hoods to keep it, make it a
8   sterile product.
9           And you can compound drugs for
10  inhalation.  If you have, again, the right
11  equipment, similar to what would be in a
12  hospital, to, to handle sterile products.
13          And you take the raw ingredient and
14  mimic whatever, generally, the brand name or the
15  innovator product was.
16      Q.   And do you know in Tennessee, either
17  before TennCare or after TennCare was paying a
18  compounding fee for IV?  Do you know if that was
19  something that was being paid?
20      A.   Ah, no.  But there's, there's ways to
21  pay it without, without having a separate -- you
22  know, I noticed on here that one form is for

Page 153

1   payment, one form is for reimbursement of
2   supplies, one form is for -- you know, they're,
3   they're making a variety to submit multiple
4   forms.  And I wouldn't -- I can't tell you a
5   specific product or specific time period, but one
6   of my strategies was in issues like this, where
7   compounding was involved, I didn't want to go
8   down the road, at least in the early Nineties, of
9   getting into paying for compounded prescriptions,
10  because that can -- that could range from a
11  sterile product all the way down to an ointment,
12  okay?
13          And, and our claims reimbursement
14  system hadn't evolved to the current NCPDP
15  sophistication of today.  So it was very hard to
16  put in a, set compounding fee for what, what
17  products?
18          One may take a minute to make, one may
19  take an hour and a half.
20          So getting back to, to the MAC issue,
21  some, sometimes for certain products in this
22  arena, you would take that into account for the

39  (Pages 150 to 153)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                            Nashville, TN

Page 154

1    MAC.
2         For example, I might say, I'm not
3    paying for the tape that you use to hold the IV
4    needle into place. I'm not paying for the IV
5    needle or the tube set. I'm not going to -- I
6    don't want bills for that. I know you've got to
7    do it to administer this drug. So we're going to
8    add on the cost of this drug X, because I know
9    this, this and this always goes with it, and I
10   know there is a fixed cost for that, but I don't
11   want five bills. I want 10 different places.
12   Bill me for the drug. And I'll make sure that
13   the -- whatever the MAC is incorporates all your
14   other costs. And you have to talk with providers
15   and know what that is. I mean, you know.
16        Q.  So, in short, you would use the payment
17   for the drug itself to cross-subsidize other
18   things that might need to be paid to fairly --
19        A.  And that would include compounding.
20        Q.  And it may include nursing services
21   that were not included, things of that nature?
22        A.  (Nodding yes.)

Page 155

1         Q.  Did anyone in the federal government
2    ever tell you that you were not allowed to do
3    that?
4         A.  No.
5         Q.  And if they had told you that, what
6    would you have said?
7         A.  That I wasn't allowed to pay for
8    compounding or --
9         Q.  That you weren't allowed to use the
10   payment for the drug to cross-subsidize those
11   other services or supplies.
12        A.  If they had told me I couldn't do it,
13   what would I do?
14        Q.  Yes.
15        A.  I would have had to have found another
16   way to, to handle the billing.
17        Q.  But they never told you that.
18        A.  No.
19        Q.  Do you know if other states were doing
20   -- were adopting similar type strategies to run
21   the programs?
22        A.  No, I don't -- I mean it may be

Page 156

1    addressed in this letter. I don't know. It
2    seems to talk about different states, but I'm
3    sure there were varying levels of complexity in
4    the billing process, and what was and wasn't
5    billable and what was and wasn't included, but I
6    don't know it and I didn't discuss it with folks.
7         Q.  Have you heard the term cross-subsidy
8    or cross-subsidization in the context of pharmacy
9    reimbursement?
10        A.  No, not -- no, I haven't.
11        Q.  I'm going to show you another, another
12   -- going to mark that as another exhibit.
13        MR. TORBORG: I think this is 578.
14            (Exhibit Abbott 578 marked.)
15   BY MR. TORBORG:
16        Q.  For the record, what we have marked as
17   Exhibit 578 bears the Bates numbers HHC 002-0400
18   through 407. It's another Medicaid pharmacy
19   bulletin. This one dated January-February of
20   1988.
21            Mr. Sullivan, if I could ask you to go
22   to Bates page ending in 402. In particular the

Page 157

1    discussion on the first full paragraph about
2    Montana Medicaid. Do you see that?
3         A.  Yes.
4         Q.  Where it says, Similarly, Montana
5    Medicaid compensates for the additional time and
6    expense of dispensing compounded drugs by
7    allowing the provider's usual and customary
8    charge up to 2.5 times the cost of ingredients,
9    paren, reimbursement for other outpatient drugs
10   is a lower of AWP minus 10 percent, or the cost
11   of the drug, end paren. Do you see that?
12        A.  Yes.
13        Q.  Is that the, the type of thing that
14   Tennessee was doing?
15        A.  It's a different approach to -- yeah.
16   Make -- paying the provider for the, for the
17   compounding without -- and setting a limit on
18   what I will pay up to two and a half percent.
19   It's just a different, different twist.
20        Q.  Does it -- does this refresh your
21   recollection about any other types of approaches
22   like this that other states were using?

40  (Pages 154 to 157)

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                    March 12, 2008
                          Nashville, TN

Page 190

1   -- there is a cost to dispense.  It's kind of
2   like AWP, it's inflated.  Because there's so many
3   factors come into the light switch, the --
4   whether or not your little drugstore and you
5   offer health insurance to your six employees.
6   Heck, if you offer health insurance to six
7   employees, it's going to be very expensive.  And
8   that's figured into the cost to dispense.  So
9   it's very variable.
10      Q.  Let me ask you about one more document
11  before we break for lunch, if that's all right.
12      A.  Sure.
13      Q.  Do one more?
14      A.  I'm good.
15      Q.  Let me ask you about Exhibit 21 in this
16  binder.
17          For the record, this is a document
18  dated in 2002, August 2002, titled Determination
19  of the Cost of Dispensing Pharmaceutical
20  Prescriptions for the Texas Vendor Drug Program.
21  It's prepared for the Texas Health and Human
22  Services Commission.

Page 191

1          In particular I'd like to ask you to go
2   to the third page of this exhibit under Summary
3   of Findings.
4          The last bullet there states, Average
5   dispensing costs at certain pharmacy specialties
6   was observed to be higher than dispensing at,
7   quote, typical, end quote, retail pharmacies.  In
8   particular, we noted higher dispensing costs
9   associated with pharmacies that provide services
10  related to the dispensing of intravenous, home
11  infusion and compound prescriptions.
12          Do you see that?
13      A.  Yes.
14      Q.  Did you become aware, Mr. Sullivan,
15  that intravenous, home infusion and compounded --
16  I'm sorry.  Strike that.
17          Did you become aware that pharmacies
18  providing services relating to intravenous, home
19  infusion and compounded prescriptions had a
20  higher cost to dispense?
21      A.  Yes.  I wouldn't say become aware.  I
22  mean it's -- a pharmacist has to do compounding,

Page 192

1   pretty much hands on, and the normal rate paid a
2   pharmacist drives up that cost when -- as opposed
3   to a technician filling a prescription for some
4   tablets.
5       Q.  If I could ask you to go to page 43 of
6   this study.  The third full paragraph starts
7   with, Although the analysis.  Do you see that?
8       A.  Yes.
9       Q.  The last sentence of that paragraph
10  states, It is therefore possible that some
11  pharmacies could very well have dispensing costs
12  in excess of $40 per prescription.  And then the
13  next paragraph states, Under current policies the
14  Health and Human Services Commission reimburses
15  for intravenous prescriptions and a dispensing
16  fee plus ingredient reimbursement formula for
17  traditional retail prescriptions.
18          Although dispensing costs at
19  intravenous pharmacies appears to be in excess of
20  the current base dispensing fee of $5.27, this
21  reimbursement methodology has been accepted by
22  these pharmacies likely due to the inventory

Page 193

1   management add-on to expense dispensing fee,
2   paren, which can be significant on the expensive
3   drugs traditionally dispensed in intravenous
4   forms, end paren, and the margin on ingredient
5   reimbursement, which has allowed pharmacies to
6   offset a shortfall from a base dispensing fee.
7           Do you see that?
8       A.  Yes.
9       Q.  Do you have an understanding of what
10  they're talking about there?
11      A.  Yes.
12      Q.  And did you have any experience talking
13  with providers of intravenous therapy, home
14  infusion therapy, that they were accepting an
15  insufficient dispensing fee because of the margin
16  allowed on the ingredient reimbursement?
17      A.  I wouldn't say specifically in those
18  terms, but I, but I certainly had discussions
19  with these types of providers on how much I've
20  got in it and how much you're paying me.
21          And not specific numbers, but that --
22  and disparities, too, I think were one of the

49  (Pages 190 to 193)

Henderson Legal Services, Inc.

0c585b6a-88d2-47d8-bc26-289a064ea87e

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL

INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

MDL NO. 1456

NO. 01-CV-12257-PBS

JUDGE PATTI SARIS

MAG. MARIANNE BOWLER

THIS DOCUMENT RELATES

TO U.S. EX REL.

VEN-A-CARE OF THE FLORIDA

KEYS, INC. V. ABBOTT

LABORATORIES, INC., ET AL.,

NO. 06-CV-11337-PBS

VIDEOTAPED DEPOSITION OF MARY

JULIA TERREBONNE, 6080 ESPLANADE AVENUE,

BATON ROUGE, LOUISIANA 70806, TAKEN IN THE

OFFICES OF LOUISIANA DEPARTMENT OF HEALTH &

HOSPITALS, BIENVILLE BUILDING, 628 N. FOURTH

STREET, BATON ROUGE, LOUISIANA 70806, ON THE

31ST DAY OF MARCH, 2008.

Page 30

1  claims data, that kind of thing?
2      A.  Right.
3      Q.  How about if you had an e-mail from a
4  provider or a provider had a question concerning
5  payment rates in, say, the mid-1990s.  Is that the
6  kind of thing that you would keep?
7      A.  I would probably keep it if it were
8  related to some type of state plan that we may be
9  submitting, but just to keep it, if it doesn't
10  pertain to anything, I wouldn't keep it.
11      Q.  Do you know if the department has a
12  formal document retention policy?
13      A.  I do not.
14      Q.  Do you have a general understanding of
15  what it is that the United States government, as
16  the plaintiff in this action, alleges that Abbott
17  did wrong?
18      A.  I do not.
19      Q.  Is it your understanding that the case
20  relates to the subject of average wholesale price?
21      MR. FAUCI:  Object to the form.
22      THE WITNESS:  It is my understanding.

Page 31

1  BY MR. TORBORG
2      Q.  How did you obtain that understanding?
3      A.  I think I saw it on the document that you
4  sent.
5      Q.  Okay.  Do you have an understanding of
6  the nature of the damages that the United States is
7  seeking against Abbott?
8      A.  I do not.
9      Q.  And do you have an understanding of the
10  types of drug products that are at issue in the
11  case?
12      A.  I do not.
13      Q.  To your left, Ms. Terrebonne, are a
14  couple of boxes that have documents.  I'm not going
15  to ask you about all of those.  Those are copies of
16  exhibits that we have used with people who came
17  before you.  From time to time, I would ask you to
18  take out Exhibit X.  There are tabs in those orange
19  binders that indicate where you would find such
20  exhibits.
21      The first one I would like to go to, it
22  should be in the first volume at tab 19.  If you

Page 32

1  would be so kind as to take that out.  I have
2  copies for you and counsel.
3      Okay.  It looks like you have
4  successfully managed to get Abbott Exhibit 19.  That
5  puts you ahead of others we have done before.
6      Abbott Exhibit 19 is a copy of the United
7  States' complaint against Abbott Labs in this case.
8  I take it, given your responses so far, you have
9  never seen this document.  Would that be fair to
10  say?
11      A.  Yes.  That's correct.
12      Q.  If I could ask you to go to page 10 of
13  the complaint, in particular, paragraph 31, there
14  is a listing of drugs and their corresponding NDC
15  numbers that are at issue in the case, that is at
16  the bottom of page 10, carrying over to page 11.  Do
17  you see that?
18      A.  Yes.
19      Q.  And you are familiar with what a National
20  Drug Code is, correct?
21      A.  Yes.
22      Q.  If we look through the listing of the

Page 33

1  drugs, I think you will see that the drug products
2  fall into a few categories, including sodium
3  chloride injection, sodium chloride irrigation,
4  sterile water injection, sterile water irrigation,
5  vancomycin, then a number of dextrose solutions.  Do
6  you see that?
7      A.  Yes.
8      Q.  Are you familiar with these drug
9  products?
10      A.  Yes.
11      Q.  Are you familiar with the term "large
12  volume parenterals"?  Am I pronouncing that right?
13      A.  Yes.
14      Large volume parenterals, no.
15      Q.  How about parenterals?
16      A.  I'm familiar with that.
17      Q.  What are those?
18      A.  Those are used IV.
19      Q.  Have you come across, in your work, these
20  drugs?
21      A.  Yes.
22      Q.  And do you know how they are dispensed to

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 34

1  Medicaid beneficiaries?
2     A.  How they are dispensed?  Through a
3  pharmacy.
4     Q.  But these are not the type of -- these
5  are not pills, correct?
6     A.  Correct.
7     Q.  They appear to be drugs that are supplied
8  either through home IV or through some sort of
9  infusion?
10    A.  Correct.
11    Q.  Do you have an understanding of the types
12 of pharmacies in Louisiana who would have dispensed
13 these drugs to Medicaid beneficiaries?
14    A.  Probably IV pharmacies.
15    Q.  Any other types?
16    A.  Well, it is not your normal retail
17 pharmacy, so --
18    Q.  Would you agree that dispensing these
19 types of drugs to Medicaid beneficiaries is a more
20 cost-intensive procedure than pills?
21    MR. FAUCI:  Objection, form.
22    THE WITNESS:  I know there are -- it is

Page 35

1  different than dispensing pills, I am aware of
2  that.
3  BY MR. TORBORG
4     Q.  How is it different?
5     A.  These pharmacies have IV hoods and they
6  have certain packing that they have to adhere to,
7  and the sterility and those kinds of things.
8     Q.  Is it your understanding that it
9  typically costs more for pharmacies to dispense
10 these drugs to Medicaid beneficiaries, than say, a
11 pill?
12    MR. FAUCI:  Objection, form.
13    THE WITNESS:  I'm not familiar with the cost
14 involved, I just know it is a different set of
15 circumstances.
16 BY MR. TORBORG
17    Q.  I would like to back up a little bit and
18 walk through your educational background and work
19 history briefly.
20       Did you attend college?
21    A.  I did.
22    Q.  And where did you attend college?

Page 36

1     A.  Nicholls State University and Northeast
2  Louisiana University in Monroe.
3     Q.  And did you receive a degree from either
4  of those institutions?
5     A.  From Northeast.
6     Q.  What was your degree in?
7     A.  Pharmacy.
8     Q.  I think I have seen somewhere that you
9  are a registered pharmacist.  Is that right?
10    A.  Correct.
11    Q.  What does it take to become a registered
12 pharmacist in the State of Louisiana?
13    A.  You have to have your degree in pharmacy,
14 and you have to pass your board and get your board
15 -- your certificate renewed every year.
16    Q.  Are you still an active registered
17 pharmacist?
18    A.  I am.
19    Q.  What types of continuing education
20 courses does one have to take as a registered
21 pharmacist in Louisiana, if any?
22    A.  You have to have 15 hours.

Page 37

1     Q.  Have you taken any courses on the subject
2  of -- the broad subject of payment rates for
3  pharmacies?
4     A.  Not that I recall.
5     Q.  Have the courses focused more on the
6  medical side of pharmacy?
7     A.  The clinical side.
8     Q.  Clinical side?
9     A.  (Witness nods head affirmatively.)
10    Q.  And do you have any advanced degrees?
11    A.  I do not.
12    Q.  What year did you graduate from
13 Northeastern University?  I'm sorry, Nicholls --
14 give that one to me?
15    A.  Nicholls is the pre-pharmacy, and
16 Northeast is where I received my pharmacy degree in
17 1978.
18    Q.  That's called Northeast University?
19    A.  It is now called the University of
20 Louisiana in Monroe.
21    Q.  UL Monroe?
22    A.  Uh-huh.

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 98

1  aware of other states who calculated their maximum
2  allowable cost in this fashion?
3      A.  I am not.
4      Q.  Do you recall discussing Louisiana's
5  method for establishing maximum allowable costs
6  with other states?
7      A.  Not that I recall.
8      Q.  Were you aware that the Louisiana method
9  for calculating maximum allowable cost limits was
10  similar to the way which Medicare calculated its
11  reimbursement for drugs using a median AWP?
12      MR. FAUCI:  Object to the form.
13      THE WITNESS:  I do not.
14  BY MR. TORBORG
15      Q.  The last sentence of that paragraph that
16  I was referring to states, "LMAC limits may be
17  adjusted by Medicaid of Louisiana based on changes
18  in availability and EAC of the drugs."
19          Do you see that?
20      A.  Yes.
21      Q.  What is meant by "changes in availability
22  of drugs"?

Page 99

1      A.  Occasionally, providers would contact us
2  and say they were not able to purchase the drugs at
3  a price that would be reasonable for the LMAC
4  limit. So we would call the wholesaler and ask
5  them if it was available at that price, and they
6  would tell us yes or no, and we would adjust it
7  accordingly.
8      Q.  Do you recall this happening where some
9  generic -- manufacturers of generic products, these
10  products would not be available, do you recall this
11  happening?
12      A.  Right.
13      Q.  Do you recall any specific drugs this
14  happened with?
15      A.  I don't.
16      Q.  Do you recall this issue ever arising
17  with the drug vancomycin?
18      A.  Not to my knowledge.
19      Q.  Do you know what kind of drug vancomycin
20  is?
21      A.  I do.
22      Q.  What is it?

Page 100

1      A.  An antibiotic.
2      Q.  Do you believe there are issues with the
3  availability of vancomycin from some manufacturers?
4      A.  Not that I recall.
5      Q.  May have happened, you just don't recall?
6      A.  Right.
7      Q.  You can't recall any particular drugs for
8  which there was an availability issue. Is that
9  fair to say?
10      A.  Not by name. I don't recall. My staff
11  may know, I may not know.
12      Q.  Second paragraph under the LMAC section
13  of the state plan notes that an LMAC cost listing
14  would be distributed periodically and a provider
15  could get one at least annually?
16      A.  Yes.
17      Q.  What type of form would that document be
18  in?
19      A.  It was a hard copy listing of the drugs
20  that were payable under our program, and we listed
21  the LMAC on the listing.
22      Q.  And do you recall sending providers

Page 101

1  copies of the LMAC?
2      A.  Yes.
3      Q.  Something they were particularly
4  concerned about, right, from --
5      A.  Yes.
6      Q.  And what you were telling them in this
7  document from the State of Louisiana was we will
8  pay you this much in ingredient cost reimbursement
9  for these drugs, correct?
10      A.  We didn't tell them we'd pay them, we
11  said these are the LMACs and the FULs for these
12  drugs.
13      Q.  And you expected them to rely on that
14  information in deciding whether or not to
15  participate in the program, correct?
16      MR. FAUCI:  Objection, form.
17      THE WITNESS:  I don't know that they relied on
18  the drug prices listed on the information we sent
19  to them. I think they used it for information.
20  BY MR. TORBORG
21      Q.  Information for what purpose?
22      A.  For determining whether they needed to

26  (Pages 98 to 101)

Page 170

1  for generic drugs in the compendia, AWP prices,
2  were a reliable indication of how much providers
3  were paying for drugs, net of chargebacks,
4  discounts and rebates?
5      MR. FAUCI: Objection, form.
6      THE WITNESS: I didn't know that because I
7  didn't know what the chargebacks or the discounts
8  were.
9  BY MR. TORBORG
10     Q. Did you think, for example, that you
11 could just take off 20 percent from those prices
12 and get to a number that would be the acquisition
13 cost?
14     MR. FAUCI: Objection, form.
15     THE WITNESS: No.
16 BY MR. TORBORG
17     Q. And why is that?
18     A. Because I didn't know what the actual
19 acquisition costs were.
20     Q. Did you have reason to believe that you
21 could not just simply discount the AWP numbers by a
22 certain percentage, say, 20 percent, and get to a

Page 171

1  reliable actual acquisition cost?
2      MR. FAUCI: Objection, form.
3      THE WITNESS: What I have been familiar with
4  is to conduct a survey so you would have that
5  document to represent what the average discount
6  was.
7  BY MR. TORBORG
8      Q. Why don't we take a look at Abbott
9  Exhibit 1051, one of the exhibits we marked here
10 today. It will be in that stack right in front of
11 you. It is the survey of dispensing costs, Myers
12 and Stauffer. There it is.
13     In particular, I will direct your
14 attention to page 6. The last bullet before the
15 section "General" states, "The discounts from AWP
16 for multiple source drugs exhibited much greater
17 variation but averaged 32.6 percent for drugs
18 without full pricing and 69.6 percent for drugs
19 with full pricing."
20     Do you see that?
21     A. Yes.
22     Q. Does that refresh your recollection at

Page 172

1  all on whether you believed you could take a
2  discount, a set discount, say, of 20 percent and
3  get to a reliable actual acquisition cost for
4  multi-source drugs?
5      MR. FAUCI: Objection, form.
6      THE WITNESS: On the average.
7  BY MR. TORBORG
8      Q. Just for individual drugs?
9      A. Well, what this is saying is the average
10 discount is that. For individual drugs, I know it
11 varies.
12     Q. And did you know that varied -- there was
13 a wider variation for generic drugs?
14     A. Yes.
15     Q. And Myers and Stauffer wasn't telling you
16 anything in 1999 that you didn't already know about
17 that?
18     MR. FAUCI: Objection, form.
19     THE WITNESS: They documented it, yes.
20 BY MR. TORBORG
21     Q. But would you have known that before
22 1999?

Page 173

1      MR. FAUCI: Objection, form.
2      THE WITNESS: Based on reports that we had
3  received from the OIG and that kind of thing. I
4  did not conduct any surveys.
5  BY MR. TORBORG
6      Q. Going back to Abbott Exhibit 84, this is
7  the Florida report. The last page of the exhibit,
8  second page of Mr. Cook's response, he states at
9  the top of that page, first paragraph, "Injectable
10 products and associated intravenous fluids also
11 continue to be problematic. Manufacturers offer
12 contracts to most vendors providing very favorable
13 pricing, but manufacturers continue to market small
14 quantities of these through conventional sources
15 and report single unit pricing through the national
16 data sources. Any assistance your office might
17 offer in standardizing pricing in this market would
18 be beneficial."
19     Do you see that?
20     A. Yes.
21     Q. Do you recall, Ms. Terrebonne, becoming
22 aware that the discounts on intravenous fluids and

44 (Pages 170 to 173)

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 174

1 injectable products tended to be large?
2     MR. FAUCI: Objection, form.
3     THE WITNESS: I do not recall.
4 BY MR. TORBORG
5     Q. Something you may have been aware of, but
6 you just don't recall as you sit here today?
7     A. It is not something that distinctly I
8 would recall, no.
9     Q. And do you have an understanding of what
10 Mr. Cook is saying when he notes that
11 "manufacturers continued to market small quantities
12 of these" -- and he is referring to injectable
13 products and associated intravenous fluids --
14 "through conventional sources and report single
15 unit pricing for the national data sources."
16     A. I do not.
17     Q. Do you have an understanding of what
18 single unit pricing means?
19     A. I do not. I would assume that is
20 something that is broken down on a single unit
21 rather than a bulk.
22     Q. If I could ask you to go next to Abbott

Page 175

1 Exhibit 575. Ms. Terrebonne, this is a document
2 that was produced by Ven-A-Care from the Kansas
3 Medicaid program, I believe.
4     Q. If you will go to the last paragraph on
5 the first page, under "Final Policy," do you see
6 that?
7     A. Yes.
8     Q. They wrote: "Effective dates of service
9 1-1-95, all sterile irrigation solutions and all
10 large volume parenteral and small volume parenteral
11 fluid replacement vehicles for intravenous drug
12 administration which are billed as pharmacy claims
13 will be reimbursed at AWP less 50 percent (inhalation
14 solutions are not included in this reimbursement
15 change)."
16     Do you see that?
17     A. Yes.
18     Q. Did you become aware that Kansas had at
19 some point changed or had a special reimbursement
20 methodology for large and small volume parenterals?
21     A. No, I did not.
22     Q. Go to the next page, "The rationale for

Page 176

1 change: States discount from the referenced
2 pharmaceutical pricing schedule shown as average
3 wholesale price vary by product class."
4     Is that also something that you knew, Ms.
5 Terrebonne, that discounts from AWP could vary by
6 product class?
7     A. I would think that, yeah, AWPs could vary
8 by product class.
9     Q. Is that something you knew about from
10 1991 through 2001?
11     A. In relation to this?
12     Q. Just generally speaking.
13     A. No. No. And I think our documents
14 supported that one of the items that they could not
15 purchase at the discount was immunosuppressant
16 drugs. So there is variation there.
17     Q. And in this document, the author also
18 noted, "Generally, intravenous vehicles and
19 irrigation solutions are available at much greater
20 discounts than are other pharmaceuticals."
21     Do you see that?
22     A. Yes.

Page 177

1     Q. Is that something you became aware of at
2 some point in time from 1991 through 2001?
3     A. No.
4     Q. Do you recall having discussions with
5 Ven-A-Care of the Florida Keys?
6     A. I did not have any discussions with
7 Ven-A-Care.
8     Q. Did you have any communications via a fax
9 or document with people from Ven-A-Care?
10     A. I do not recall.
11     Q. Does the name Zachary Bentley ring a
12 bell?
13     A. No.
14     (Exhibit Abbott 1054 was marked.)
15     MR. TORBORG: For the record, what I have
16 marked as Abbott Exhibit 1054 bears Bates No. VAC
17 MDL 77742 through 63.
18 BY MR. TORBORG
19     Q. Ms. Terrebonne, for the record, these are
20 some more materials produced by Ven-A-Care of the
21 Florida Keys related to this case. In particular,
22 this was a collection of documents produced in a

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 178

1  file titled "Louisiana."
2        I would ask you to take a look at that if
3  you would.
4        Ms. Terrebonne, do any of these pages
5  look familiar to you?
6     A.  I see my name on it, but I don't recall.
7     Q.  Look at Bates page ending 77759. Do you
8  see that?
9     A.  Yes.
10    Q.  This is a -- appears to be, at least, a
11 fax from M. J. Terrebonne to Zachary Bentley at
12 Ven-A-Care dated January 30 of 1998. Do you see
13 that?
14    A.  Yes.
15    Q.  Is that your handwriting?
16    A.  Yes.
17    Q.  So it appears you had sent a fax to Mr.
18 Bentley. Is that fair to say?
19    A.  Yes.
20    Q.  Does that refresh your recollection at
21 all regarding communications that you had with
22 Ven-A-Care?

Page 179

1     A.  No.
2     Q.  If you look at the next page there, it
3  appears to be next to the -- this appears to list
4  NDCs and then reimbursement. Do you see that?
5     A.  Yes.
6     Q.  Do you recall providing Mr. Bentley with
7  information regarding how much the State of
8  Louisiana reimbursed for ingredients for a set of
9  drugs?
10    A.  I do not.
11    Q.  If we go to the next page there, it
12 appears to be part of the same fax. Is that right?
13    A.  Yes.
14    Q.  Is that your handwriting?
15    A.  Yes.
16    Q.  And did you write, "Zachary, Louisiana
17 Medicaid reimburses the lower of 1, usual and
18 customary charge, or 2, AWP minus 10.5 percent,
19 plus a fee (the maximum fee is $5.77). I have
20 listed the AWP for the drugs," which you listed.
21 Then you wrote -- is that what you wrote?
22    A.  Yes.

Page 180

1     Q.  And then you wrote, "I would appreciate,"
2  can you read that to me and into the record?
3     A.  "If you could send me the information on
4  the definition which exempts IV pharmacies from
5  retail class of trade. Also, your findings of the
6  states' analyses compared to the average
7  acquisition price. Thanks."
8     Q.  Do you recall why you were asking Mr.
9  Bentley to provide information both on the
10 definition of IV pharmacies and the findings of
11 states' analyses?
12    A.  I would only say we were probably looking
13 at ingredient cost at that time.
14    Q.  Does reading this refresh your
15 recollection at all about conversations you may
16 have had with Mr. Bentley or others at Ven-A-Care?
17    A.  No.
18    Q.  And it has been almost ten years since
19 you actually -- more than ten years since you faxed
20 this. Is that right?
21    A.  Yes.
22    Q.  So, it's fair to say there are a lot of

Page 181

1  communications you may have had with Ven-A-Care
2  that you don't recall given the passage of time?
3     MR. FAUCI:  Objection.
4     THE WITNESS:  It is possible, yes.
5  BY MR. TORBORG
6     Q.  And if we look at the charts that are on
7  Bates pages 756 and 57, does it appear as though --
8  you did not prepare this document, right, the
9  charts?
10    A.  I did not.
11    Q.  Does it appear as though --
12    A.  I don't think I did.
13    Q.  Do you recall receiving these charts?
14    A.  No, I don't.
15    Q.  Do you have any reason to believe that
16 you did not receive them?
17    A.  I don't recall. I really don't.
18    Q.  But if you did receive these, does it
19 appear as though you are being advised of the
20 differences for certain drugs between the brand
21 name AWP and what Louisiana Medicaid was
22 purportedly reimbursing?

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 234

1    Q.   Where should the profit be, in the
2    dispensing fee or the ingredient cost?
3        A.   I think that is dependent on how you
4    structure your reimbursement methodology.
5        Q.   It could come in, in your view, either
6    way and not violate any law?
7        MR. FAUCI: Objection.
8        THE WITNESS: Well, I think CMS charges you to
9    have a reasonable reimbursement, so whether you pay
10   low on the dispensing fee side and you put your
11   profits on the ingredient cost side, or vice versa,
12   they have a final say on approving that.
13   BY MR. TORBORG
14       Q.   Has there been tension between Louisiana
15   and HCFA on where the profit should be, whether on
16   the ingredient side or the dispensing fee side?
17       MR. FAUCI: Objection.
18       THE WITNESS: No.
19   BY MR. TORBORG
20       Q.   If I could ask you to take out Abbott
21   Exhibit 1051 again. It is this one here, the 1999
22   Myers and Stauffer report. In particular, I would

Page 235

1    like to direct your attention to page 5 of the
2    report, under "Summary of Findings." There is a
3    footnote 1 at the bottom of the page that states,
4    "The cost reported for pharmacies dispensing
5    intravenous prescriptions is not representative of
6    routine Medicaid prescription dispensing cost and
7    therefore is excluded from this media."
8        Do you see that?
9        A.   Yes.
10       Q.   If we go to page 20 of the 1999 Myers and
11   Stauffer report, on the ingredient cost and
12   dispensing fees, pages 20 and 21, do you see there
13   is additional discussion of the additional costs
14   involved in dispensing IV prescriptions?
15       A.   Yes.
16       Q.   On page 20, the report notes "The most
17   significant characteristic which affected pharmacy
18   dispensing costs was the provision of intravenous
19   solutions. Our analysis revealed significantly
20   higher cost of dispensing is associated with the 28
21   pharmacies in the sample that provided this
22   service."

Page 236

1        Do you see that?
2        A.   Yes.
3        Q.   And the drugs that are at issue in this
4    case that we saw in the complaint, those are
5    intravenous solutions, correct?
6        A.   Yes.
7        Q.   If we go to page, the next page, page 21
8    of the report, there is a chart that calculates the
9    unweighted mean total cost for pharmacies
10   dispensing IV prescriptions and then pharmacies not
11   dispensing IV prescriptions, right?
12       A.   Correct.
13       Q.   Cost being $18.57 for the IV prescription
14   pharmacies, and $5.55 for the pharmacies not
15   dispensing IV prescriptions. Do you see that?
16       A.   Yes.
17       Q.   Do you recall becoming aware of the fact
18   that pharmacies which dispensed IV prescriptions
19   had a higher cost to dispense?
20       A.   I would say I was somewhat aware just
21   because their setting is different than the normal
22   retail setting.

Page 237

1        Q.   And this is something that Myers and
2    Stauffer advised you of in this, correct?
3        A.   Correct.
4        Q.   And then at the bottom of the page, there
5    is a footnote that says, "Although typical
6    dispensing fees reimburse less than dispensing cost
7    of IV pharmacies, they are generally able to break
8    even based on the margin allowed on ingredient cost
9    reimbursement."
10       Do you see that?
11       A.   Yes.
12       Q.   Do you understand what it is saying?
13       A.   They are saying there is profit on the
14   ingredient side.
15       Q.   Was that something that you were aware of
16   for the time period of 1991 through 2001, as the
17   pharmacy consultant and pharmacy director in
18   Louisiana Medicaid?
19       MR. FAUCI: Objection.
20       THE WITNESS: As stated in this document.
21   BY MR. TORBORG
22       Q.   Well, did you become aware of the fact

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 238

1 that, in essence, the profit on the ingredient side
2 was subsidizing insufficient dispensing fees?
3     MR. FAUCI: Objection.
4     THE WITNESS: I would say no, I was not -- I
5 had an understanding of it, but I did not know it
6 until they documented it.
7 BY MR. TORBORG
8     Q. And Louisiana did not have a separate
9 dispensing or -- dispensing fee or compounding fee
10 for home IV providers. Is that right?
11     A. Correct.
12     Q. Some states did, correct?
13     A. Yes.
14     Q. Why didn't Louisiana?
15     A. I would say the secretary at the time was
16 interested in formulating a discount in totality on
17 ingredient costs and dispensing fee across the
18 board.
19     Q. Was consideration of the profit being
20 made on the ingredient side a factor in not
21 increasing or providing a separate fee for home IV
22 services?

Page 239

1     A. I don't know the answer to that.
2     Q. Well, here you are told in this document
3 that Louisiana is not paying a dispensing fee that
4 is anywhere close to the cost of dispensing found
5 by Myers and Stauffer for home IV prescriptions. Is
6 that right?
7     A. Yes.
8     Q. So, fair to say that you were underpaying
9 those pharmacies?
10     MR. FAUCI: Objection.
11     THE WITNESS: Based on the report on the
12 dispensing side.
13 BY MR. TORBORG
14     Q. What do you mean by "on the dispensing
15 side"?
16     A. On the dispensing cost side.
17     Q. How about on the ingredient cost side?
18     A. Well, based upon what is stated here, it
19 looks like they were getting a margin on the
20 ingredient cost side.
21     Q. So, if someone wanted to determine how
22 much Louisiana Medicaid overpaid pharmacy providers

Page 240

1 for providing home IV drugs to Medicaid
2 beneficiaries, would the uncompensated higher cost
3 to dispense home IV prescriptions be something you
4 would look at?
5     MR. FAUCI: Objection.
6     THE WITNESS: I would say we paid it in
7 accordance with our state plan.
8 BY MR. TORBORG
9     Q. But if you were looking at the situation
10 today, as an informed observer who was there at the
11 time from 1991 to 2001, and you were asked to
12 determine how much Louisiana Medicaid overpaid, if
13 at all, providers for dispensing home IV solutions,
14 would you consider Myers and Stauffer's findings
15 that there was a much higher cost to dispense?
16     MR. FAUCI: Objection.
17     THE WITNESS: I would say we did not overpay.
18 We paid it in accordance with our state plan.
19 BY MR. TORBORG
20     Q. So, you would say any payment consistent
21 with the state plan is not an overpayment. Is that
22 right?

Page 241

1     MR. FAUCI: Objection.
2     THE WITNESS: I would say you have to look at
3 it, do a survey, conduct a survey and resubmit your
4 state plan.
5     (Exhibit Abbott 1062 was marked.)
6     MR. TORBORG: For the record, what I have
7 marked as Abbott 1062 is a series of e-mails, most
8 of which or all of which are copied to Ms.
9 Terrebonne and others, KYDMSPL-0111755 through 809.
10     They were produced to us in connection
11 with another litigation. That's my understanding.
12 BY MR. TORBORG
13     Q. Ms. Terrebonne, were you on an e-mail
14 list that included other state pharmacy
15 administrators?
16     A. Yes.
17     Q. What was that called?
18     A. What was the e-mail list called? I don't
19 know what it was called. Probably the National
20 Pharmacy Benefits Association -- the National
21 Pharmacy --
22     Q. Not Medicaid Pharmacy Administrators, or

Page 242

1  something like that?
2      A. Yes.
3      Q. When did you start on that e-mail
4  distribution?
5      A. Oh, it's been several years.
6      Q. Do you still have those e-mails on your
7  computer?
8      A. I have some e-mails.
9      Q. Now, this collection of documents was
10  produced in sequential order. All appear to be
11  different e-mails concerning reimbursement for
12  compounding home IV-type issues of the type we were
13  just talking about. I would like to ask you to go
14  to the Bates page ending 768. Are you there?
15      A. Yes.
16      Q. The bottom of the page is an e-mail from
17  Rachel Broussard. She was on your staff?
18      A. Yes.
19      Q. Is on your staff?
20      A. (Witness nods head affirmatively.)
21      Q. She e-mailed a distribution to the state
22  Medicaid administrators; is that right?

Page 243

1      A. Yes.
2      Q. Do you recognize those names?
3      A. Yes.
4      Q. And she asked, "We are interested in
5  information regarding policies in reimbursement of
6  compound prescriptions. Are other states
7  reimbursing pharmacy providers for compound
8  prescriptions? If so, what is your policy for
9  reimbursing compounds, what is your reimbursement
10  methodology and do you reimburse a compound fee?"
11      Do you see that?
12      A. Yes.
13      Q. Do you recall Ms. Broussard seeking
14  information from other states concerning
15  reimbursement of compound prescriptions?
16      A. Yes.
17      Q. What motivated that? Was it the Myers
18  and Stauffer report?
19      A. No. Occasionally, we will get calls on
20  compounding scrips, and we don't have any policies
21  so we were looking at other states' policies.
22      Q. Do you know what, if anything, Louisiana

Page 244

1  did with the information it received?
2      A. We haven't done anything yet.
3      Q. Why is that?
4      A. Probably because we have lots of other
5  things to do, so it is still on our to-do list.
6      Q. If reimbursement were cut on the
7  ingredient side, the actual acquisition cost, is
8  that something you think would go to the top of
9  your list and re-create a separate fee for
10  compounding?
11      MR. FAUCI: Objection.
12      THE WITNESS: I don't know, it's a kind of
13  whatever-is-on-top-of-the-list sort of day here.
14  BY MR. TORBORG
15      Q. And what runs the agenda on what is at
16  the top of the list?
17      A. The secretary of the department.
18      Q. And the secretary of the department gets
19  calls from providers?
20      A. Yes. Mostly we get calls from providers.
21      Q. Do you recall getting phone calls from
22  providers concerning the need for a compounding

Page 245

1  fee?
2      A. We have gotten a few calls, yes.
3      Q. Do you recall what you have told them
4  about why it is Louisiana is not paying one?
5      A. Rachel answers those calls primarily. We
6  try to work with the pharmacist to, under our
7  existing policy, to go ahead and provide those
8  drugs.
9      Q. Well, how about the payment of a separate
10  higher dispensing fee for compound prescriptions?
11      A. That has not been addressed.
12      Q. Okay. If I could ask you to get out
13  Abbott Exhibit 292, which is one of the -- should
14  be on the top right underneath the stack there. I
15  think I put it in order. This is a document titled
16  "Medicaid Pharmacy Bulletin," dated
17  January/February 1997, titled "Medicaid
18  Reimbursement for the Pharmacy Component of Home IV
19  Therapy."
20      Do you see that?
21      A. Yes.
22      Q. And you recall getting these bulletins.

62  (Pages 242 to 245)

Page 246

1  Is that right?
2      A. Yes.
3      Q. And you were at some point a member of
4  the editorial staff. Is that right?
5      A. Yes. For a short tenure.
6      Q. And did you retain copies of these
7  bulletins?
8      A. I don't believe I have them anymore.
9      Q. If I wanted to get my hands on these,
10 what is the best way to get them, other than the
11 ones I have? If I wanted to get all of the copies
12 of these, what is your -- do you have any guidance
13 for me about how I might do that?
14     A. I do not, other than you would get a
15 pharmacy director that retained them all.
16     Q. Was it your understanding that this was a
17 publication that was widely recognized in the state
18 Medicaid pharmacy administrator universe?
19     A. Yes.
20     Q. And do you recall when you were on the
21 advisory panel of this publication, that there were
22 annual meetings that were associated with this

Page 247

1  publication?
2      A. I do not recall.
3      Q. I would like to ask you to go to the
4  second page of Abbott Exhibit 92, under the Section
5  1, "The Development of Pricing Mechanisms for Home
6  IV Medications," it states, "The establishment of a
7  fair and reasonable pricing methodology for home IV
8  products is a major concern of most state Medicaid
9  programs. One of the major obstacles to the
10 development of adequate home IV pricing
11 methodologies is the fact that the dispensing of
12 home IV medications is more complex than the
13 dispensing of other outpatient drugs."
14         Do you see that?
15     A. Yes.
16     Q. And was that something that you were
17 aware of throughout the time 1991 through 2001?
18     A. I do not recall.
19     Q. Do you recall when you started receiving
20 these bulletins?
21     A. I do not.
22     Q. Do you have any basis to disagree with

Page 248

1  the notion that dispensing home IV medications is
2  more complex than dispensing of other outpatient
3  drugs?
4      A. I agree it is more complex.
5      Q. Let me ask you to go to the next page. We
6  are on page 390. It says, "Providers and
7  pharmacist consultants concur that it is not
8  appropriate to apply the same ingredient-based
9  pricing mechanisms to home IV medications as those
10 that apply to other outpatient drugs."
11         Do you see that?
12     A. Yes.
13     Q. Did you agree with that?
14     A. I don't know that I agree with it. I
15 would say you would have to survey to determine
16 what is the appropriate structure of the pricing
17 mechanism that you utilize for home IV, although it
18 should probably be different than normal retail
19 business.
20     Q. And if we go to the second paragraph
21 under that section, it states, "Home IV treatments
22 are frequently a combination of multiple drug

Page 249

1  entities dispensed in varying doses and dispensed
2  several times daily. Although it may be minimal to
3  moderate in quantity over an entire treatment,
4  large volumes of medications are generally
5  administered. It is therefore difficult to
6  estimate based on a single daily or even weekly
7  administration the purchase price these providers
8  are paying with volume and trade discounts. These
9  discounts are generally not revealed in drug
10 publications such as Red Book, Blue Book, and
11 DataBank. Consequently, programs are reluctant to
12 increase reimbursement for home IV medications,
13 suspecting that reported costs for these substances
14 may already be exaggerated."
15         Do you see that?
16     A. Yes.
17     Q. Do you have an understanding of what that
18 last sentence is saying?
19     A. What I think it is saying is that the
20 programs -- and that would be the Medicaid programs
21 -- are reluctant to increase the reimbursement for
22 home IV based upon the increase in cost of the

2d9d517a-cf38-41c8-9c65-0424823ff391

Page 250

1    ingredients for those substances.
2        Q.   Was that consistent with the experience
3    in Louisiana?
4        MR. FAUCI:  Objection.
5        THE WITNESS:  I do not recall that.
6    BY MR. TORBORG
7        Q.   May have been, but you don't recall?
8        A.   I wouldn't know without doing an
9    analysis, which I did not do.
10       Q.   Are you familiar, Ms. Terrebonne, with
11   something called findings and assurances under the
12   federal regulations for reimbursement of
13   prescription drugs, under the federal regulations?
14       A.   There are assurances.  I believe you
15   submit a letter to CMS assuring that you will
16   adhere to your state plan.
17       Q.   If I could ask you to go to Abbott
18   Exhibit 284 in that same binder there.  This is a
19   copy of a federal regulation.  In particular, I
20   would like to ask you to go to the last page of the
21   exhibit.  The second column, "447.333, State Plan
22   Requirements, Findings and Assurances."  Do you see

Page 251

1    that?
2        A.   Yes.
3        Q.   Under "B, Findings and Assurances," it
4    states, "Upon proposing a significant state plan
5    change in payments for prescription drugs and at
6    least annually for multiple source drugs and
7    triannually for all other drugs, the agency must
8    make the following findings and assurances."
9            And it lists that and goes on.  Are you
10   familiar with this regulation?
11       A.   Somewhat.  I haven't seen it in a while.
12       Q.   Do you know if Louisiana, when was the
13   last time Louisiana provided the annual findings
14   and assurances for multiple source drugs?
15       A.   I do not.
16       Q.   Is it something that you think you would
17   be familiar with if it was done?
18       A.   The policy section, our policy section
19   would submit that to CMS.
20       Q.   Do you recall Louisiana, in the period
21   1991 to 2001, providing the findings and assurances
22   called for in 477.333?

Page 252

1        A.   I would answer that saying yes, I have
2    seen that within that time period.
3        Q.   At some point in that time period, did
4    that quit happening?
5        MR. FAUCI:  Objection.
6        THE WITNESS:  I don't know.  I don't know.
7    BY MR. TORBORG
8        Q.   Well, are you doing them today?
9        A.   I am not doing them today.
10       Q.   Do you know of anyone who is?
11       A.   I don't know.
12       Q.   Who would know whether or not Louisiana
13   is doing that today, providing those findings and
14   assurances called for by the statute?
15       A.   Probably someone in our policy section.
16       Q.   If I could ask you to go to Abbott
17   Exhibit 137.  This is a letter dated February 16,
18   2000, from the office of Attorney General, Medicaid
19   Fraud Control Unit, State of New York, from Patrick
20   Lupinetti.  Also at the top are Elliott Spitzer and
21   Jose' Maldonado.  This is to a pharmacy director in
22   Cheyenne, Wyoming.  Take a look at that document,

Page 253

1    Ms. Terrebonne, and let me know if you are familiar
2    with this type of document.
3            Ms. Terrebonne, do you recall this type
4    of document?
5        A.   I recall some of the names but I don't
6    recall the document.
7        Q.   Which names do you recall?
8        A.   Mary Reardon, Caroline McElroy.
9        Q.   Do you recall those individuals making a
10   presentation at a national conference of state
11   Medicaid personnel about this topic of using
12   revised average wholesale prices?
13       A.   I don't recall.
14       Q.   Do you recall that an effort was made in
15   1999, 2000 and 2001 time frame where the Department
16   of Justice spearheaded an effort to get new
17   information on certain injection, intravenous and
18   inhalation drugs?
19       A.   I know they were involved in something to
20   do with that, yes.  I recall reading it.
21       (Exhibit Abbott 1067 was marked.)
22       MR. TORBORG:  For the record, what I have

2d9d517a-cf38-41c8-9c65-0424823ff391