# Exhibit B

Scully, Thomas A.                                          May 15, 2007

Washington, DC

|  | Page 10 |
|---|---|
| 1 | Videotaped Deposition of THOMAS A. |
| 2 | SCULLY, a witness herein, called for examination by |
| 3 | counsel for Abbott Laboratories in the above-entitled |
| 4 | matter, pursuant to subpoena, the witness being duly |
| 5 | sworn by SUSAN L. CIMINELLI, a Notary Public in and |
| 6 | for the District of Columbia, taken at the offices of |
| 7 | Jones Day, 51 Louisiana Avenue, Northwest, |
| 8 | Washington, D.C., at 8:49 a.m. on Tuesday, May 15, |
| 9 | 2007, and the proceedings being taken down by |
| 10 | Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and |
| 11 | transcribed under her direction. |

Page 12

1   APPEARANCES (continued):
2
3        On behalf of the U.S. Department of
4        Health and Human Services:
5            TROY A. BARSKY, ESQ.
6            U.S. Department of Health and Human Services
7            CMS Division
8            C2-05-23
9            7500 Security Boulevard
10           Baltimore, MD 21244-1850
11           (410) 786-8873
12           troy.barsky@hhs.gov
13
14       On behalf of the State of California:
15           NICHOLAS N. PAUL, ESQ.
16           Supervising Deputy Attorney General
17           Civil Prosecutions Unit
18           P.O. Box 85266
19           110 West A Street, #1100
20           San Diego, CA 82186
21           (619) 688-6099
22           nicholas.paul@doj.ca.gov

Page 11

1   APPEARANCES:
2
3        On behalf of the United States of America:
4            GEJAA T. GOBENA, ESQ.
5            JOHN K. NEAL, ESQ.
6            ANDREW MAO, ESQ.
7            U.S. Department of Justice
8            Civil Division
9            601 D Street, Northwest
10           PHB - 9028/P.O. Box 261
11           Washington, D.C. 20044
12           Gejaa.Gobena@usdoj.gov
13           (202) 307-1088

Page 13

1   APPEARANCES (continued):
2
3        On behalf of the State of Alabama:
4            ROGER BATES, ESQ.
5            Hand Arendall, L.L.C.
6            1200 Park Place Tower
7            2001 Park Place North
8            Birmingham, AL 35203
9            (205) 502-0105
10           Rbates@handarendall.com
11
12       On behalf of the State of Florida:
13           MARY S. MILLER, ESQ.
14           Office of the Attorney General of Florida
15           PL-01, The Capitol
16           Tallahassee, FL 32399-1050
17           (850) 414-3600
18           Mary_Miller@oag.state.fl.us

4  (Pages 10 to 13)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                        Washington, DC

Page 394

1  that's -- I realize no time is good for you for this,
2  but we'd certainly work with you on your schedule to
3  find the best possible time to continue.
4        MR. HAAS: I object strenuously to the use
5  of the transcript without having the opportunity to
6  cross-examine or redirect on behalf of my client.
7  There has been a number of comments made, testimony
8  made with respect to Johnson & Johnson and its
9  products. And clarification is needed. And absent
10 that opportunity, I strenuously object to his
11 testimony and will proceed accordingly.
12       BY MR. DALY:
13   Q.   What's an FUL?
14   A.   Federal upper payment limit.
15   Q.   And do you have a working understanding of
16 when it is that an FUL is supposed to be created for
17 a drug?
18   A.   I did three years ago. I'm not sure I can
19 remember exactly how it's -- how it works, but it's
20 essentially an upper payment limit for usually I
21 believe a multisource generic drug. But I can't
22 remember exactly what the rule is, but it used to be

Page 395

1  --
2    Q.   Three or more?
3    A.   Yes. I think it was 250 percent or I
4  can't -- 250 percent or whatever the, I can't
5  remember the rule.
6    Q.   Do you remember what triggered the
7  creation of FULs in terms of if there are three or
8  more different drugs that are functional equivalents
9  that CMS would then prepare or create an FUL for
10 that, those three drugs?
11       MR. GOBENA: Object to the form.
12       BY MR. DALY:
13   Q.   Is that -- I'm just trying to see if that
14 jogs your memory?
15   A.   I just can't remember precisely how it
16 works. It's been three years.
17   Q.   Well, you remember that it was something
18 to do with if there are a number of drugs that can be
19 full substitutes for each other within a basically
20 the same drug?
21   A.   Yes. It's the maximum amount CMS will pay
22 for any of them.

Page 396

1    Q.   Right. And that that's something that CMS
2  was going to do?
3    A.   Yes.
4        MR. GOBENA: Object to the form.
5        THE WITNESS: Yes. CMS had that
6  regulation in place and I think they put out a new
7  one this year as a matter of fact.
8        BY MR. DALY:
9    Q.   And do you know why -- or do you know
10 whether FULs were ever created for any of the drugs
11 that the DOJ has sued Abbott for in this litigation?
12   A.   I don't know. I assume so, but I don't
13 know. I mean, Vancomycin is a generic, I think. So
14 I assume there was an FUL, but I'm not familiar, I'm
15 not specifically familiar with it.
16   Q.   And sodium chloride is certainly a
17 generic, right?
18   A.   Yes. So I assume there is an FUL for all
19 of them.
20   Q.   Well, let me represent to you that there
21 are not, and then my question would be, do you know
22 why?

Page 397

1        MR. GOBENA: Object to the form.
2        THE WITNESS: No. I don't. I think
3  before you get off that, I should clarify, I assume
4  it's because they are infused drugs, and the FULs are
5  generally pharmacy dispensed drugs for the most part.
6  I assume that's the reason.
7        BY MR. DALY:
8    Q.   Okay. But you don't know?
9    A.   I don't know.
10       (Exhibit Abbott 196 was
11        marked for identification.)
12       BY MR. DALY:
13   Q.   Mr. Scully, I've handed you what we've
14 marked as Exhibit Abbott 196 which is an August 10,
15 2001 memorandum to you from Michael Mangano, who is
16 the principal deputy inspector general attaching an
17 OIG report from August 2001. And did you receive a
18 copy of this memorandum from Mr. Mangano?
19   A.   I don't recall, but I'm certain I did.
20   Q.   In the -- this document is entitled
21 Medicaid pharmacy actual acquisition cost of brand
22 name prescription drug products, is that correct?

100  (Pages 394 to 397)

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                    May 15, 2007
                    Washington, DC

Page 414

1  sure I probably agreed with it.
2     Q.  Well, do you agree with it now?
3     A.  Yes.
4     Q.  If you just flip to the very end of this
5  and maybe this will refresh your recollection, maybe
6  it won't, but the last couple of pages are a letter
7  from you to Janet Rehnquist.  Do you see that?
8     A.  Yes.
9     Q.  And is that your signature up by the from
10 box?
11    A.  It looks like it might be.
12    Q.  Okay.  So it would appear that you got
13 this and sent Ms. Rehnquist back a response?
14    A.  Yes.  But since I probably saw 4 or 500
15 documents a night before I went home sometimes,
16 whether or not I read it or not is another question.
17 But I'm sure I agree with the conclusion in there.
18    Q.  Well, in a lot of cases, you relied on
19 your staff to prepare letters and review things and
20 work on responsive letters with you, correct?
21    A.  Yes.
22    Q.  And when you wrote a letter such as this,

Page 415

1  to Miss Rehnquist, you were speaking on behalf of
2  CMS, correct?
3     A.  Yes.
4     Q.  In the last part of the response, in the
5  very last page of the document, you indicate that it
6  was your intent to follow up with the estimates of
7  strongly encourage them to review their estimates of
8  acquisition costs, do you see that?
9     A.  Yes.
10    Q.  And to follow up with them to ensure that
11 their actions take those findings into account.  Do
12 you see that?
13    A.  Yes.
14    Q.  Did CMS in fact do that?
15    A.  I'm sure we did.  I talked to many states
16 about paying more reasonably for drugs.  As I said
17 earlier, my general approach was not to have states
18 pay fee for service amounts for drugs, because in
19 many cases, the political pressure was not easy to
20 get that done.  It was always more effective in my
21 opinion to hire a third party at-risk PBM, because
22 they are much more likely to get lower prices for

Page 416

1  states for drugs.  And states increasingly did that.
2     Q.  On the -- if you go back to the letter
3  from Ms. Rehnquist to you on the second page, do you
4  see she indicates that in the second -- in the first
5  full paragraph, last sentence, "unlike brand name
6  drugs where reimbursement is predominantly based on a
7  discounted AWP, reimbursement of generic drugs can be
8  limited by a federal upper limit amounts that are
9  established by CMS."  Do you see that?
10    A.  Yes.
11    Q.  And was it your understanding that CMS was
12 charged with responsibility to create FULs for drugs
13 that met the requirements of an FUL?
14       MR. GOBENA:  Object to the form.
15       THE WITNESS:  I believe so.  Yeah, Larry
16 Reed who I mentioned earlier today is the guy who did
17 that.
18       BY MR. DALY:
19    Q.  And is it your experience that setting an
20 FUL for a drug that qualified to be given an FUL had
21 the effect of reducing reimbursement for that drug?
22       MR. GOBENA:  Object to the form.

Page 417

1        THE WITNESS:  You know, I do not -- it was
2  never one of my primary policy issues to get involved
3  in the process for setting FULs, so my general
4  recollection is it was pretty wide range and there
5  wasn't usually a big reduction as a result of FULs.
6        BY MR. DALY:
7     Q.  Mr. Scully, I'm going to hand you what has
8  been marked previously as Exhibit Abbott 108, which
9  is an OIG report relating to omission of drugs from
10 the federal upper limit list in 2001.  And I would
11 direct your attention to the last few pages which
12 contained the CMS response signed by you, is that
13 correct?
14    A.  Yes.  That is my signature.  Yep.
15    Q.  I wanted to direct your attention to
16 Romanette number i of the report, which is the third
17 page in.  Under the executive summary.  And I want to
18 direct your attention to the second paragraph, which
19 talks about the requirements for when CMS is to
20 prepare an FUL for a given group of drugs.  And I
21 just ask you to read that to yourself, and then ask
22 you if that's consistent with your understanding of

105  (Pages 414 to 417)

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 418

1  the requirements for a creation of an FUL.
2       MR. GOBENA: Object to the form.
3       BY MR. DALY:
4   Q.  Have you had a chance to look at that
5  paragraph?
6   A.  Yes.
7   Q.  Is that consistent with your understanding
8  of when CMS was to create an FUL?
9       MR. GOBENA: Object to the form.
10       THE WITNESS: Yes. I forgot the 150
11  percent number, yeah, earlier.
12       BY MR. DALY:
13   Q.  Okay. And then what you just referenced
14  in your earlier testimony, you said maybe it was 250
15  percent?
16   A.  CMS came out with a new rule this year
17  that it was 250 percent of a different calculation
18  that I can't remember exactly how it worked.
19   Q.  And in terms of when you were at CMS, the
20  rule was 150 percent of the published price for the
21  least costly therapeutically equivalent product plus
22  a reasonable dispensing fee, right?

Page 419

1   A.  I believe that's right.
2   Q.  And again, did you -- you don't know why
3  the drugs that DOJ has sued Abbott on in this case
4  were not FULed is that correct?
5       MR. GOBENA: Objection. Asked and
6  answered.
7       THE WITNESS: I don't know. I'm guessing
8  because they were infused drugs, they were not in the
9  calculations somehow.
10       BY MR. DALY:
11   Q.  Is there some exception to the FUL
12  calculation for infused drugs?
13   A.  I don't know. I don't remember.
14  Generally, in Medicare, there is a differential
15  between infused drugs and, you know, outpatient drugs
16  delivered to pharmacy. And I assume maybe there is
17  some differentiation in Medicaid I wasn't aware of.
18   Q.  But you're not aware of any exception from
19  the requirement that CMS create an FUL for a drug
20  that qualifies that's based on it being an infused
21  drug, are you?
22       MR. GOBENA: Objection to the form.

Page 420

1       THE WITNESS: No. I'm not. I was
2  minimally involved in this process as you can tell.
3       MR. DALY: Let's do this one here, Exhibit
4  Abbott 095.
5       BY MR. DALY:
6   Q.  Let me hand you what's been previously
7  marked as Exhibit Abbott 095. And this is a
8  September 2001 OIG report relating generally to the
9  -- what we've called the DOJAWPs. And I wanted to
10  direct your attention to the CMS comments at the end,
11  they are the last couple of pages. And we talked
12  about Ruben King-Shaw. That's somebody -- he was
13  your deputy administrator?
14   A.  Yes.
15   Q.  And he obviously prepared the response
16  here?
17   A.  Yes.
18   Q.  And did you have any discussions with him
19  about the technical correction that he made in the
20  last paragraph?
21   A.  Last paragraph of his response?
22   Q.  Yes.

Page 421

1   A.  On this page or where? Oh, I see, "we
2  appreciate the effort."
3   Q.  The very last page of the response, page 2
4  of his letter. I'll read it.
5   A.  I see it. No. I don't recollect having a
6  discussion with him.
7   Q.  Well, do you see that he says that the
8  original report stated that the inflated AWPs have
9  caused Medicare to overpay for these products. Do
10  you see that?
11   A.  Yes.
12   Q.  And he asked that the overpayment language
13  be removed. Do you see that?
14   A.  I'm sorry. What have I missed? I thought
15  he was correcting it.
16   Q.  It's the second page. It's this paragraph
17  here. Had you looked at that paragraph when I asked
18  you those other questions, Mr. Scully?
19   A.  No. The earlier question?
20   Q.  Right.
21   A.  No. I didn't see this, but Ruben had just
22  come from being two weeks before the Secretary of

934268fd-66d9-4c40-b8d6-725605bc72fb

Gaston, Sue

January 24, 2008

Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )  CIVIL ACTION

PRICE LITIGATION              )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    )  Judge Patti B. Saris

the Florida Keys, Inc.        )

       v.                     )  Chief Magistrate

Abbott Laboratories, Inc.,    )  Judge Marianne B.

No. 06-CV-11337-PBS           )  Bowler

- - - - - - - - - - - - - - -

     (cross captions appear on following pages)

          Videotaped deposition of SUE GASTON

                   Volume I

                 Washington, D.C.

                 Thursday, January 24, 2008

                 9:00 a.m.

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

| Page 118 |
| --- |

1  Baltimore meeting in 1995?
2       MS. ALBEE: Objection, form.
3   A.  No.
4   Q.  So as far as you know, Ven-A-Care was
5  correct that no meaningful action had been either
6  proposed or implemented by your agency to deal with
7  these issues?
8       MS. MARTINEZ: Objection, form.
9   A.  I can't say that.
10  Q.  But you as you sit here today don't know
11  of any meaningful action that had been taken?
12  A.  I personally don't know, but that doesn't
13  mean that it didn't occur.
14  Q.  Sure. And I'm just asking for your
15  personal knowledge as one of the two Medicaid
16  officials that was at the meeting?
17       MS. MARTINEZ: Objection, form.
18  Q.  Do you recall discussing the possibility
19  of establishing federal upper limits for specific
20  drugs that Ven-A-Care had identified there being a
21  large difference between AWP and their cost?
22       MS. MARTINEZ: Objection, form.

| Page 119 |
| --- |

1   A.  No, not on those specific drugs. No.
2   Q.  Do you know why not?
3       MS. MARTINEZ: Objection, form.
4   A.  I don't recall that being discussed.
5   Q.  Regarding Ven-A-Care's comment that "We
6  find this fact" -- the fact that no meaningful
7  action had been taken -- "not only disconcerting,
8  but potentially the source of a major embarrassment
9  to both your agency and to the administration," do
10  you recall that being a discussion within HCFA that
11  the Medicare and Medicaid programs paying above
12  acquisition cost could be a major source of
13  impairment for HCFA?
14       MS. MARTINEZ: Objection, form.
15  A.  Do I recall a specific comment or -- is
16  that what you're saying?
17  Q.  Generally speaking do you recall that
18  sentiment being expressed ever?
19  A.  No, I don't.
20  Q.  I'd like to ask you to go to 483. The
21  first full paragraph in the middle of the page
22  states "The drug manufacturers are further

| Page 120 |
| --- |

1  exploiting their ability" --
2   A.  I'm sorry. Where are you.
3   Q.  I'm at page 483?
4       MS. MARTINEZ: It's page 5 of the letter
5  and he's referring to the Bates label at the bottom
6  that says 483.
7       THE WITNESS: Thank you. Okay.
8   Q.  The first full paragraph starts with "the
9  drug manufacturers." Are you with me?
10  A.  Uh-huh.
11  Q.  Ven-A-Care wrote "The drug manufacturers
12  are further exploiting their ability to falsify
13  pricing information by using their falsifications of
14  AWP as a marketing tool." Do you have an
15  understanding of what Ven-A-Care is saying there?
16       MS. MARTINEZ: Objection to form.
17       MS. ALBEE: Objection to the form.
18  A.  You're asking me to interpret this?
19  Q.  I'm asking if you have any understanding
20  of what they're getting at there?
21       MS. MARTINEZ: Objection, form.
22  A.  No.

| Page 121 |
| --- |

1   Q.  You have no understanding of what they're
2  saying about --
3   A.  Are you asking me what I feel this is
4  saying?
5   Q.  Yes. Your understanding as someone who
6  might read this letter.
7       MS. MARTINEZ: Objection, form.
8   A.  It's saying that they're falsifying their
9  AWP, their pricing, as a marketing tool. So, I
10  mean, I don't know what more --
11  Q.  Do you have an understanding of how
12  pricing information could be used as a marketing
13  tool?
14       MS. MARTINEZ: Objection, form.
15  Q.  Do you understand that concept?
16       MS. MARTINEZ: Objection, form.
17  A.  Are you saying for just general sales or
18  are you talking about for Medicare and Medicaid for
19  reimbursement?
20  Q.  Do you think I'm talking about general
21  sales or do you think I'm talking about pharmacy
22  issues?

31  (Pages 118 to 121)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008

Washington, DC

| Page 222 | Page 224 |
|---|---|

**Page 222**

1  state.
2            (Exhibit Abbott 461 was
3                  marked for
4                  identification.)
5        MR. TORBORG: I'm told that we have five
6  minutes left on the tape and it's within about an
7  hour. So let's go ahead and take a break here.
8        THE VIDEOGRAPHER: This is the end of
9  tape 4. Off the record at 3:17.
10       (Recess.)
11       THE VIDEOGRAPHER: This is the beginning
12 of tape 5 in the deposition of Ms. Gaston. On the
13 record at 3:43.
14       MR. TORBORG: Welcome back, Ms. Gaston.
15       THE WITNESS: Thank you.
16       MR. TORBORG: I wanted to cover
17 something, some housekeeping matters on the record
18 very quickly. I understand from Ms. Martinez that
19 there are some additional documents from Ms.
20 Gaston's files or legacy files that are yet to be
21 produced. Is that right?
22       MS. MARTINEZ: Yes.

**Page 223**

1        MR. TORBORG: And those are ones that
2  you're working on currently and we intend to
3  schedule a second day with Ms. Gaston so that we can
4  go over those documents.
5        MS. MARTINEZ: I believe what you told me
6  is that you'd look at them and see if you need an
7  additional day.
8        MR. TORBORG: That's true.
9        MS. MARTINEZ: But naturally --
10       MR. TORBORG: I will need an additional
11 day anyway.
12       MS. MARTINEZ: Okay. That's what I
13 thought.
14       MR. TORBORG: Okay.
15       BY MR. TORBORG:
16  Q.  Okay. Going back to the subject of
17 federal upper limits, Ms. Gaston, I want to ask just
18 a few very general background questions about how
19 the process worked at HCFA, who was involved in what
20 aspects and things of that nature. Earlier you
21 testified or you identified three people at CMS who
22 were involved in establishing the FULs. I believe

**Page 224**

1  you said from 1991 through 2003 when you were doing
2  that, correct?
3    A.  Correct.
4    Q.  And those three people were -- three
5  additional people were Peter Rodler, Cindy Bergin
6  and Gail Sexton?
7    A.  Gail Sexton worked on the FULs after
8  2003.
9    Q.  Did she have any involvement with FULs
10 prior to 2003?
11   A.  No.
12   Q.  What was she doing prior to 2003?
13   A.  I'm not sure. She was employed by CMS
14 around that time, but I don't know exactly when she
15 started.
16   Q.  And Mr. Rodler I understand was somebody
17 who had been at HCFA and the Medicaid Bureau prior
18 to you being there?
19   A.  Correct.
20   Q.  And then at some point he retired or
21 moved on?
22   A.  Correct.

**Page 225**

1    Q.  Do you know when he retired or moved on?
2    A.  No.
3    Q.  Can you give me a sense? Was it early
4  '90s, late '80s?
5    A.  I'm guessing it was in the '90s. Not in
6  the late '90s, but I'm not sure.
7    Q.  And Cindy Bergin, when did she work at
8  CMS on the FUL issues?
9    A.  She was hired -- I'm not sure exactly the
10 date -- probably eight or nine years ago. And I
11 mentioned here on the FULs until I left in 2003.
12   Q.  So she would have been someone that was
13 working on FUL issues starting in the mid to late
14 '90s; is that fair to say?
15   A.  That's fair to say.
16   Q.  And did you work with Mr. Rodler on the
17 federal upper limit issues or did you sort of
18 succeed his duties?
19   A.  He taught me how to handle the federal
20 upper limit program. And then when he left I took
21 it over.
22   Q.  And did Cindy Bergin take it over from

Henderson Legal Services, Inc.
202-220-4158                          www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 226

1   you --
2   A.   Yes.
3   Q.   And then at some point is it your
4   understanding that Gail Sexton took it over from
5   Cindy Bergin or were they both working on it?
6   A.   She -- Cindy trained Gail and then Gail
7   took it over when Cindy left the area.
8   Q.   So it sounds to me -- and please tell me
9   if I'm mischaracterizing this or misunderstanding
10  this -- that the mechanics of the FUL program were
11  handled primarily by one person, but there was some
12  overlap in training.  Is that right?
13          MS. MARTINEZ:  Objection, form.
14  A.   Generally speaking.  There were periods
15  when it was just one person.  And then when there
16  were two, even though one was training they were
17  both working on it.
18  Q.   And did you first get involved -- is it
19  your recollection that a transition between yourself
20  and Mr. Rodler happened in the early '90s; is that
21  fair to say?
22  A.   When Pete retired then I took it over.

Page 227

1   Q.   And was there anyone else working on the
2   FUL issues besides yourself from that point until
3   Cindy Bergin came on in the mid to late '90s?
4   A.   There was a period of time where I
5   trained Altamease Arnold, but --
6   Q.   Was she in your office?
7   A.   She was in our office.  But she was
8   never -- she never really worked on the program per
9   se.
10  Q.   When you say per se, what do you mean by
11  that?  Officially or what does that mean?
12  A.   She never really learned the program to
13  work on it.
14  Q.   What does it mean to learn the program?
15  A.   When you try to teach someone the program
16  but they choose not to absorb what you're teaching.
17  Q.   Got it.  Is she still working at CMS?
18  A.   No.
19  Q.   When did she leave CMS?
20  A.   She retired last year.
21  Q.   What was her position at CMS?
22  A.   Health insurance specialist.

Page 228

1   Q.   Was that the same position that you had?
2   A.   Yes.
3   Q.   So you were equals, so to speak?
4   A.   Most of the analysts in our area are all
5   health insurance specialists.
6   Q.   Okay.  And you indicated that Mr. Reed
7   would have some input into the FULs and I think you
8   used the word even the final say.
9   A.   Correct.
10  Q.   What does that mean?
11  A.   He's the division director.
12  Q.   So what would the extent of his
13  involvement be with FULs?  When would he get
14  involved?
15  A.   Throughout -- whenever necessary he was
16  there to discuss issues that might need to be
17  discussed.  The final publication he was aware of
18  and would have to give his okay in order to send it
19  through or any letters that would go through
20  generally were from an authority higher than me.
21  Q.   Can you tell me what kind of issues would
22  come up in the FUL program that would necessitate

Page 229

1   his involvement?
2   A.   Maybe just general discussion.
3   Especially when I was the only one working on the
4   FUL program, just a general discussion of maybe
5   particular drugs, the pricing just somebody to have
6   an open discussion about how we're setting the
7   prices, because there's manual review involved.
8   Q.   What do you mean when you say there's
9   manual review involved?  And we'll get into a little
10  bit more the mechanics, but generally speaking what
11  do you mean by that?
12  A.   Generally you have paper that you work
13  from.  You have the compendia with all the drug
14  numbers on it and the pricing.  And sometimes you
15  have to make determinations if it looks like a drug
16  is truly available or not, whether you should follow
17  up and see if it's available.  Sometimes it's better
18  to discuss it with someone to see that you're
19  looking at it the same way that they might be
20  looking at it.
21  Q.   When you say truly available, do you
22  remember is the product available from a particular

58  (Pages 226 to 229)

Gaston, Sue                                          January 24, 2008
                        Washington, DC

Page 230

1   manufacturer, whether it be because they quit making
2   the drug or they have a shortage of the drug?  Is
3   that what you're talking about?
4       A.   I think what I'm talking about, at least
5   preliminarily, is we have printouts from the
6   compendia.  And just looking at the printouts,
7   sometimes there might be pricing that looks like
8   it's not updated in the compendia source.  So you
9   might want to discuss and say does this look like
10  it's maybe old pricing, maybe we should follow up
11  and see if it's still available.  Has the pricing
12  been updated, is the drug still out there, because a
13  lot of times the compendia might not be totally up
14  to date.
15      Q.   How much of your time, if you could
16  estimate, in your position as a health insurance
17  specialist from '91 to 2003, roughly, did you spend
18  on the FUL program?
19      A.   I really can't say.  There was a period
20  of time when we were trying to get a publication out
21  where I could spend the majority of my time working
22  on it.  I had other duties, so the FULs couldn't

Page 231

1   take up all of my time every day.  It just depended
2   on what activity occurred.  You would stop.  You
3   would work on the FULs.  Then I would go back to my
4   other areas.
5       Q.   Did you work -- are you a five-day
6   employee every week or did you work part time during
7   this time?
8       A.   During the 2003 --
9       Q.   During the '91 through 2003 time period?
10      A.   I was an eight hour a day, five day --
11      Q.   Five day a week employee?
12      A.   Correct.
13      Q.   All right.  Could you walk me through
14  the -- let me see if it helps facilitate the
15  discussion to find a document here that might help
16  us talk about this a bit.
17                  (Exhibit Abbott 462 was
18                  marked for
19                  identification.)
20           BY MR. TORBORG:
21      Q.   For the record, what I've marked as
22  Abbott Exhibit 462 bears the Bates numbers HHC

Page 232

1   902-0446.  Ms. Gaston, if you would take a look at
2   that document and let me know if that's a document
3   that you're familiar with.
4       A.   Yes.  I am familiar with it.
5       Q.   Could you tell us what this document is?
6       A.   It looks like it's just an overview of
7   the federal upper limit program.
8       Q.   Did you play a part in drafting this
9   document?
10      A.   I may have.  I'm not sure.
11      Q.   Ms. Gaston, can you walk me through
12  basically what you did to establish federal upper
13  limits for drugs?  Can you just walk me through the
14  process?
15      A.   Do you want me to use this exhibit?
16      Q.   If it helps --
17      A.   Okay.
18      Q.   -- that would be fine.  I'm just trying
19  to have you -- put me back in your office back in
20  the mid-'90s or whenever you were working on this
21  and tell me what you did.
22      A.   Well, first of all we have an

Page 233

1   application.  I'm going to talk about it in
2   reference to the application that's used that houses
3   this information.  But our systems folks when it's
4   time to set a FUL or put out a new list of FUL
5   drugs, the system folks will obtain the FDA Orange
6   Book data and they'll pull that into their system.
7   And there are some standards within that program
8   that look for the criteria that's sort of detailed
9   in this handout here.
10           Once that criteria is met then the system
11  will pull in the latest compendia data and then
12  they'll merge the two.  And the compendia data,
13  there's some criteria in there too.  But they try to
14  match the compendia data to the drugs pulled from
15  the FDA.  And they match them together and then the
16  application -- and I'm simplifying this -- but the
17  application will have in there FUL groups, which
18  include like all NDC numbers, and it will have the
19  FUL group, the drug names, the NDC number and then
20  the compendia and the compendia pricing in there.
21           So it will have the source, if it's Red
22  Book, Blue Book, Medi-Span, and then it will have

59  (Pages 230 to 233)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                                    January 24, 2008
                              Washington, DC

---

Page 234

1   the prices.  It will have an AWP price, a direct
2   price or WAC price.  If there's not a price it'll
3   just be blank in any of those categories.  And then
4   the system, the application itself -- from my
5   recollection -- it's been a while since I've used
6   it.  But it will determine a FUL price where it can.
7         Then we apply some manual review just to
8   assure we have -- there's some edits and I can't
9   remember all of those.  But we want to make sure
10  that it's using -- because it's supposed to use the
11  lowest price in published compendia, and we want to
12  make sure that that lowest price is a true price,
13  that it's using a true price to establish a FUL.
14        So there's a manual review that's applied
15  to some of the drugs where the pricing might not
16  look right in there or there's missing pricing.  But
17  basically there's a lot of manual review that's
18  included before the final FUL listing will come out.
19    Q.   Okay.  I appreciate that.  I'm going to
20  try to follow up on each of those steps as best I
21  can.  You indicated that there was a system
22  involved.

---

Page 235

1    A.   It's an application.
2    Q.   I think I've seen some documents that
3   indicate the FUL process was computerized?
4    A.   Correct.
5    Q.   Right?  Is that what you're talking about
6   when you talk about the system?
7    A.   Yeah.  It's an application that they use.
8    Q.   And what kind of application is it?
9    A.   I'm not a techie person.  I don't know.
10  It's on the computer.  It's an application.  I don't
11  know what more -- how to describe it.
12    Q.   Was the application set up before you
13  started working on it or did you --
14    A.   No.
15    Q.   -- take part in setting it up?
16    A.   When I first started working on FULs it
17  was in our mainframe.  The activity would occur in
18  our mainframe.  They took it from the mainframe and
19  put it into an application that they can use on the
20  computer, if that helps.
21    Q.   And do you recall -- was there someone --
22  you mentioned systems folks.  Was there somebody at

---

Page 236

1   CMS in the systems department that was involved in
2   this?
3    A.   In the switch to the new application?
4    Q.   Yeah.  And basically the FUL program in
5   general.  Who was involved in loading data --
6    A.   The systems support was Dona Kaufman.
7   D-o-n-a.
8    Q.   Was there anyone else you recall or was
9   she the primary person?
10    A.   There was someone before her, but he no
11  longer works for CMS and I can't remember his name.
12  But she was the main one for the new application.
13    Q.   Do you know if she's still there today?
14    A.   Yes.
15    Q.   Do you recall when the new application --
16  when you moved from the mainframe to the new
17  application?
18    A.   Time?
19    Q.   Yes.  When that happened.
20    A.   After '95.
21    Q.   Prior to 1995 was the process still
22  computerized bringing in information from the

---

Page 237

1   compendia and that kind of information?
2    A.   It was brought into the mainframe.
3    Q.   Just brought into a different computer in
4   other words?  I'm not a techie either.
5    A.   I'm just saying mainframe because that's
6   what I know.
7    Q.   And do you know what the application is
8   called?
9    A.   FULs.
10    Q.   FULs.  Now, the Orange Book has a place
11  in this process, correct?
12    A.   Right.
13    Q.   And could you tell us what the Orange
14  Book is and what impact it had?
15    A.   The FDA Orange Book.  It lists the drugs
16  that are grouped by the FDA.  If you have an Orange
17  Book available, I think they have on the front
18  page -- yeah -- the Orange Book can explain it much
19  better than I can.  But -- yeah.
20    Q.   I'm handing you our only copy of the
21  Orange Book.
22    A.   But they get this electronically and it

---

60  (Pages 234 to 237)

Henderson Legal Services, Inc.

202-220-4158                          www.hendersonlegalservices.com

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 238

1  just has drugs by ingredient names. And they don't
2  have NDC numbers or anything in here. But they pull
3  data from the Orange Book where the criteria that's
4  in the regulation -- so it meets that criteria. And
5  they just pull what they can from there. There's
6  other type of system criteria in there that picks
7  the drugs that are selected for the FULs. But it
8  pulls it from the Orange Book first.
9      Q.   So they have an electronic version of the
10 Orange Book?
11     A.   They -- it's my understanding they do
12 now.
13     Q.   Do you know when they first started using
14 an electronic version of the Orange Book versus some
15 other method of getting the Orange Book data into
16 this computer?
17     A.   I really don't know.
18     Q.   Do you recall at some point somebody had
19 to go through the manual copy of the Orange Book --
20     A.   Oh, no. They wouldn't go through the
21 manual. They would just request the data from FDA.
22 I think the data now is available and they could go

Page 239

1  on the Web or someplace in FDA's website and obtain
2  the data now.
3      Q.   But it was all done to your knowledge --
4  as far as you can recall it was done electronically
5  in some way?
6      A.   Correct.
7      Q.   Somebody would set up a program that
8  would, say, identify the drugs that meet the FUL
9  criteria and then down those into a file, something
10 called Orange Book or something like that? Is that
11 how it worked?
12     A.   You would have to talk to our systems
13 folks. I just know that they would get -- they had
14 the criteria set in there and however it works, you
15 know. I mean, we're simplifying it, but I'm not a
16 data person. We just tell them what we need from
17 the Orange Book and they set up their criteria on
18 how they're going to get it and how it's selected.
19     Q.   And do you recall what the criteria was
20 for a drug to qualify for the FUL program?
21     A.   I'm going to read it from here. But it
22 says -- well, all the formulations of the drug

Page 240

1  products approved by the FDA are A-rated which are
2  therapeutically equivalent and then there must be
3  two rated A in the Orange Book. And then there's
4  another criteria where they can also allow a B-rated
5  drug when the A-rated drug products -- when there's
6  three A-rated drug products in the Orange Book.
7      Q.   Okay. So if not all the drugs within a
8  drug product group are rated A, then you have to
9  have three that are rated A?
10     A.   Correct, to allow a B-rated product.
11     Q.   Now, would the B-rated product or a
12 product that's not rated A, would that still be
13 governed by the FUL?
14     A.   If it's included in this, yes.
15     Q.   What involvement would you have in the
16 review of the Orange Book data and what gets on the
17 Orange Book lists in the computer?
18     A.   I have nothing to do with that.
19     Q.   Who was involved in that?
20     A.   If you're saying reviewing it --
21     Q.   Just who was involved in deciding which
22 drugs from the Orange Book, whether it be manual or

Page 241

1  electronic, get put into your FUL computer?
2      A.   The system folks would download the drugs
3  from the Orange Book. If further review is needed,
4  if some of the drugs are questionable, if they met
5  the criteria and maybe weren't on there before, then
6  we would look at those drugs to verify that they did
7  meet the criteria.
8      Q.   Let me ask you a specific question here.
9  And I'll give you my copy of this.
10         MR. TORBORG:  And Ms. Martinez, you can
11 look on with her if you'd like.
12         MS. MARTINEZ:  I'm going to try to stay
13 away from that videotape.
14         THE WITNESS:  Thanks.
15         BY MR. TORBORG:
16     Q.   Specifically, on this top page, the right
17 column is a drug under the prescription drug product
18 list by the name vancomycin hydrochloride.
19         MS. MARTINEZ:  Give me one second just to
20 glance at what it is.
21         Counsel, would you like to lay out a
22 little bit of foundation, like maybe the date of the

61  (Pages 238 to 241)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 242

1  book or something?
2         MR. TORBORG: I think it's dated on the
3  side 1996.
4         MS. MARTINEZ: Right. I'm just saying
5  for the record, we're not going to have an exhibit,
6  so --
7         MR. TORBORG: Sure. That's a good idea.
8  I'll do that.
9         BY MR. TORBORG:
10  Q.   Ms. Gaston, do you recognize that book?
11  A.   Yes.
12  Q.   Okay. Could you tell us what it is?
13  A.   It's the FDA Orange Book.
14  Q.   It's a hard copy version dated 1996?
15  A.   Correct.
16  Q.   And the FDA publishes its Orange Book
17  once every year; is that right?
18  A.   I'm not sure.
19  Q.   Okay. In any event, this one at the side
20  says it's 1996?
21  A.   Correct.
22  Q.   And is it your understanding that the

Page 243

1  Orange Book has different sections, one of which is
2  titled Product Drug Cost Listing or something like
3  that? If you look at the top page there.
4  A.   Are you talking about in here? It's been
5  years since we've I've looked at one of these books,
6  so --
7  Q.   If you look at the spot that I showed
8  you, where your finger is, what does the top of that
9  say? I can't remember exactly.
10  A.   "Prescription drug product list."
11  Q.   Do you know what that means?
12  A.   Prescription drug product list.
13  Q.   So that's a list of prescription products
14  in the Orange Book --
15  A.   Okay.
16  Q.   -- by alphabetical order? Is that what
17  it looks like?
18  A.   That's what it looks like.
19  Q.   And looking at vancomycin hydrochloride
20  there, there are a number of different manufacturers
21  listed; is that right?
22  A.   Correct.

Page 244

1  Q.   Which manufacturers are there?
2         MS. MARTINEZ: Excuse me. Just for the
3  record, could we have -- again, since we have no
4  exhibit, could we have the page that she's looking
5  at, page number for the record?
6         THE WITNESS: 3-302.
7  A.   Fujisawa, Lilly and I think that's it.
8  Q.   Can I take a look at that real quick?
9  A.   Mm-hmm.
10  Q.   Did you see one for Abbott?
11  A.   Oh, okay. You're over here too. It's
12  also on page 3-303. Is this a continuation over
13  here of this?
14  Q.   That's the way that I read it, but --
15         MS. MARTINEZ: Since we can't see what --
16  A.   Okay. Ledderle, it looks like they're in
17  here too. Abbott, Elkins. Okay. That's it.
18  Q.   Now, based on your understanding, are
19  there any of those vancomycin products that are not
20  rated A?
21  A.   It doesn't appear that way.
22  Q.   So under the regulatory and statutory

Page 245

1  criteria vancomycin hydrochloride would qualify as a
2  drug product that would satisfy the FUL criteria; is
3  that right?
4         MR. WINGET-HERNANDEZ: Objection, form.
5         MS. MARTINEZ: Objection, form.
6  A.   I would say no, because -- just because
7  it's A-rated. This is an injection.
8  Q.   Okay.
9  A.   So I don't know if this product -- if
10  this is an injectable, then there are certain
11  products that are in the included on the FUL.
12  Q.   And we'll talk about that in a bit. Why
13  don't we talk about it now. Why are not injectable
14  products included on the FUL?
15         MR. WINGET-HERNANDEZ: Objection, form.
16  A.   When I started to work on the FULs
17  injectable products were not included. And it's my
18  understanding that the purpose of the FUL program is
19  to set reimbursement rates on drugs that are
20  generally used by the Medicaid population in an
21  outpatient-type, like a pharmacy-type setting, most
22  commonly used products. And it's my understanding

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 246

1  that injectables and other products many times are
2  provided in a physician's office and other type of
3  settings where they might not be claimed separately.
4  They might be included in a payment, like a
5  physician payment.
6          Also, injectables, many times when
7  they're billed on the claim form they're not --
8  they're billed with codes rather than NDC numbers,
9  which means that the states may not be paying for
10 them through their pharmacy benefit but through
11 another means, such as a physician's visit or a
12 hospital or something like that.
13         So many times what we're trying to do
14 with the FULs is use most commonly used drugs and
15 covered outpatient drug type, so like tablets and
16 capsules.
17     Q.  Is there anything in the regulations or
18 statutes that limit the FUL program to tablets or
19 capsules or other drugs that are commonly
20 administered in the outpatient setting?
21     A.  Not that I know of.
22     Q.  That was just the -- when you started

Page 247

1  working on the FULs that was just the way that HCFA
2  approached it, you did not establish FULs on the
3  injectables?
4      A.  Correct.
5      Q.  And did you ever receive any explanation
6  about why that was?
7      A.  I can't say specifically there was an
8  explanation. I think you learn this as you work
9  with the program.
10     Q.  But you would agree with me that the
11 Orange Book page that I showed you does show that in
12 1996 there were at least two versions of vancomycin
13 that were rated A in the Orange Book?
14     A.  Correct.
15         MS. MARTINEZ: Objection, form.
16     Q.  And so -- I want to get back to this
17 computer business. Was the computer program
18 specifically designed to not include injectables or
19 how did that work?
20     A.  You'd have to talk to the data folks. We
21 were not including injectables. I don't know what
22 criteria they put in there.

Page 248

1      Q.  Because if the initial identification of
2  drugs that satisfied the criteria was just two or
3  more A-rated drugs or three or more A-rated drugs if
4  one of them was not A-rated, and that was done by
5  computer presumably that would bring in injectable
6  drugs like vancomycin, right?
7          MS. ALBEE: Objection.
8      A.  No. There are still more criteria. You
9  still have the Orange Book criteria, but there are
10 still criteria that the systems folks put in to look
11 for the type of drugs that the FUL prices are set
12 on.
13     Q.  So is it your understanding that HCFA
14 specifically set up the computer program to identify
15 and exclude injectable drugs?
16         MS. MARTINEZ: Objection, form.
17     A.  In one part of the process, yes.
18     Q.  And do you know in what part of the
19 process that was done?
20     A.  No, I don't.
21     Q.  Did you have any part in that process of
22 either manually excluding the injectables drugs or

Page 249

1  setting up a computer program such that those drugs
2  would be moved aside?
3      A.  The basic criteria for the system was
4  developed before I got there.
5      Q.  Who would be the best person to ask about
6  why it was that injectables were specifically
7  excluded from the FUL program?
8          MR. WINGET-HERNANDEZ: Objection, form.
9          MS. MARTINEZ: Objection, form.
10     A.  I don't know. Pete Rodler was the first
11 one I know that worked on FULs. That's the only
12 person I could think of.
13     Q.  Are these other -- now, we've talked a
14 little bit about Exhibit 462 that talks about the
15 Orange Book data. And we talked about the criteria
16 already, correct? And now you've identified I think
17 another criteria, which is to exclude injectable
18 drugs, right?
19         MS. MARTINEZ: Objection, form.
20     A.  Correct.
21     Q.  Is that criteria written down anywhere?
22         MR. WINGET-HERNANDEZ: Objection, form.

63  (Pages 246 to 249)

Gaston, Sue

January 24, 2008

Washington, DC

Page 250

1    A.   I don't know.
2    Q.   Have you ever seen a policy memorandum or
3  any other memorandum that discusses why injectables
4  are specifically excluded from the FUL program?
5          MS. MARTINEZ: Objection, form.
6    A.   I'm not aware of that.
7    Q.   Are you aware of any other criteria that
8  HCFA has used to eliminate drugs that might
9  otherwise satisfy the regulatory or statutory
10  criteria?
11   A.   I think unit dose.
12   Q.   Can you explain a little bit -- that unit
13  stuff always makes my head spin.
14   A.   Just the little individual unit dose
15  packets, like little individual blister tablets that
16  might be in the little blister pack that are
17  generally distributed within a hospital setting.
18   Q.   And why are those -- do you understand
19  why those are excluded?
20   A.   Here again, what I think they're trying
21  to focus on is what's the drugs that are commonly
22  used and dispensed by the pharmacies.

Page 251

1    Q.   Any other exclusion criteria that you're
2  aware of?
3    A.   They may not want to capture the infusion
4  bags because here again that's generally used in an
5  inpatient setting and not dispensed at the pharmacy.
6    Q.   Do you know if that's the fact that the
7  FUL program does not cover infusion bags?  Is that
8  something that you're aware of?
9    A.   As far as I know they don't.
10   Q.   And infusion bags would be what type of
11  products?
12   A.   I really can't say at this point.
13   Q.   Saline solution?
14   A.   Okay, fine.
15   Q.   Is that one?
16   A.   Yeah.
17   Q.   Dextrose-type solutions?
18   A.   That's my understanding.
19   Q.   And the rationale for exclusion of those
20  is the same as the rationale for excluding the
21  injectable drugs?
22   A.   Correct.

Page 252

1    Q.   Any other criteria you're aware of?
2    A.   That's all I can think of.
3    Q.   And do you know if the blister pack or
4  the infusion bag exclusions are written down
5  anywhere?
6    A.   I'm not aware of that.
7    Q.   Are -- I'm sorry.
8    A.   The systems folks, they might have
9  written criteria. I really don't know and I can't
10  speak for them.  But I'm not aware of any.
11   Q.   Do you recall any discussions about --
12  apart here today in the deposition, of course --
13  about why infusion bags, blister packs and
14  injectable drugs are not included in the FUL list?
15   A.   You mean specific discussions?
16   Q.   Or general discussions.  Anything you
17  recall.
18   A.   I'm sure that it was discussed over the
19  years just within the process of working on the
20  FULs.
21   Q.   Do you know if HCFA has since changed the
22  way that it does FULs so that any of those three

Page 253

1  categories' exclusions are no longer excluded?
2    A.   I have no idea.
3    Q.   Okay.  I think that the next step you
4  discussed was the pulling in of the compendia
5  data --
6    A.   Correct.
7    Q.   -- into the mainframe or later the
8  application, correct?
9    A.   Correct.
10   Q.   And was that done with electronic copies
11  of the compendia data?
12   A.   I don't know.  I don't know how they
13  obtained that data.  I would assume it's electronic,
14  but I don't know.
15   Q.   But you did not sit down with a copy of
16  the Red Book or the Blue Book, a manual copy, and
17  input things into a computer?
18   A.   No.
19   Q.   Right?  What you know is that by the time
20  you got involved somebody had already loaded the
21  data into the system?
22   A.   Correct.

64  (Pages 250 to 253)

Page 254

1  Q.  Is that fair to say?
2  A.  Yup.
3  Q.  Do you know which compendia they used?
4  A.  Red Book, Blue Book and Medi-Span.
5  Q.  They Would use all three?
6  A.  Correct.
7  Q.  Do you know if they used all three from
8  1991 when you got involved through 2003?
9  A.  I can't remember. I know there was a
10 time when I think Medi-Span and First Databank might
11 have merged. But I would still -- from my
12 recollection I think there was still separate
13 pricing under both of them. So from my recollection
14 it was always three.
15 Q.  Did you have a hard copy of the Red Book
16 or the Blue Book on your desk or in your cubicle?
17 A.  Red Book I would have a copy. Just
18 their -- I think it's a monthly publication.
19 Q.  Did you have a copy of the Orange Book?
20 A.  At times.
21 Q.  And then -- so you've got the Orange Book
22 data loaded. Is it fair to say that that's in one

Page 255

1  file or one spot on the computer but then you've got
2  the compendia data loaded in another spot?
3  A.  I can't speak for the systems aspect of
4  it. We just -- we see it -- in the application we
5  see the end result of the Orange Book and the
6  compendia merged together.
7  Q.  Okay. So there's a program that merges
8  the two together and automatically identifies drugs
9  that meet the Orange Book criteria, any other
10 criteria we've discussed and also have available
11 information in the compendia data; is that right?
12 A.  Correct.
13 Q.  And that's when you get involved; is that
14 fair to say?
15 A.  Correct.
16 Q.  You don't get involved before that?
17 A.  Correct.
18 Q.  Can you take me from that point in time
19 through the publication of the FUL list to the
20 public?
21 A.  From what I remember what we would do is
22 just go through the various groups. I think there

Page 256

1  were -- I can't remember exactly, but there were
2  certain drug groups that might show up that need to
3  be manually looked at because there might not be
4  enough suppliers or there might not be enough
5  pricing. And I can't remember what else might be
6  said in there.
7  But we would go through. And then when
8  instances like that would occur that what we would
9  do is sometimes print off that information and then
10 research to see if the information in the compendia
11 was incorrect or if it is correct then we can sort
12 of go in there and work with what -- you know, try
13 to make a decision whether it should be included or
14 not.
15 Q.  How did you become aware of potential
16 issues that may arise? Did people contact you and
17 you looked at things in response to their concerns
18 or was there a methodology that you followed to spot
19 issues?
20 MS. MARTINEZ:  Objection, form.
21 A.  Are you asking me -- when you say
22 potential issues, you mean raised by individuals

Page 257

1  or -- I don't know when you mean by potential
2  issues.
3  Q.  Well, we talked about there was a manual
4  review of this. You wouldn't just take whatever the
5  computer spat out and make that the FUL list?
6  A.  Correct.
7  Q.  There was a manual review involved to
8  identify some issues. I think you've talked about
9  some of them here today. Availability of the drug,
10 whether the pricing information was still correct.
11 Any other issues that you recall?
12 A.  They are the two main ones, yeah.
13 Q.  How would you go about identifying those
14 issues? Like how do you -- there's a lot of drugs
15 on the FUL list. How would you go about figuring
16 that stuff out?
17 A.  I can't remember exactly, because I
18 haven't dealt with the application for years. But
19 there was something in the application that would
20 alert us to certain drugs that needed the manual
21 review. Maybe it was the fact that the system
22 couldn't come up with a price because something

65  (Pages 254 to 257)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 258

1  wasn't right in the application itself, something
2  didn't look right, so then we would have to go
3  through and verify the information that we had in
4  our system.
5    Q.  The computer system that did this was all
6  housed within HCFA?
7    A.  CMS.
8    Q.  It's CMS.
9    A.  Yes.
10   Q.  And then the computer program would
11 select the lowest price of the reported prices in
12 there and then would it multiply it by 150 percent
13 and spit out a price?
14   A.  Correct.
15   Q.  And which prices in the compendia would
16 be included in that analysis that the computer did?
17   A.  Are you saying from the compendia
18 sources?
19   Q.  Yes.  Average wholesale price?
20   A.  Average wholesale price, direct price,
21 wholesale acquisition cost.
22   Q.  Are there any other prices that you're

Page 259

1  aware of?
2    A.  Not that I remember.
3    Q.  But the computer did all that and then
4  you came in and looked at some issues afterwards,
5  correct?
6    A.  Correct.
7        MR. WINGET-HERNANDEZ:  Objection, form.
8    Q.  Okay.  I handed you before Abbott
9  exhibit -- I forget the number of it.  It was a
10 document that has a handwritten notation at the top,
11 September 15, 1993.  Do you see that?
12   A.  461?
13   Q.  461, yes.
14       And I note that your name is listed at
15 the bottom of the document in a chart as well as at
16 the end of the document.  There's something that
17 says at Bates page 858, FME 32, Sue Gaston, 60488.
18   A.  Right.
19   Q.  Let me ask you first if you remember this
20 document?
21   A.  It looks familiar.
22   Q.  And what does that information on the

Page 260

1  last page mean?
2    A.  That was the document where it was
3  saved -- well, that I prepared it.  The FME was our
4  identification.  And then it has the typist and the
5  disk that the typist placed it on.
6    Q.  What does FME 32 mean?
7    A.  I'm not sure.
8    Q.  What does the 60488 number mean?
9    A.  My extension.
10   Q.  Your phone number?
11   A.  Yes.
12   Q.  So this indicates that you were the one
13 that prepared this memorandum?
14   A.  Correct.
15   Q.  The second paragraph -- let me ask you
16 also, if I could, the chart at the bottom of the
17 first page of this document, that little box next to
18 file copy, what does this mean?
19   A.  It's a sign-off for correspondence.
20   Q.  So your name is first.  That means I
21 guess you were the first one involved?  Is that what
22 that means?

Page 261

1    A.  Well, I was the one -- I prepared this,
2  the document.  Larry Reed approved it.
3    Q.  And then there's another name after that
4  which I can't read.
5    A.  Yeah.  I don't know who that is.
6    Q.  And the last one is Abato.
7    A.  Okay.
8    Q.  Rozanne Abato; is that correct?
9    A.  Correct.
10   Q.  What was her position?
11   A.  I don't know if we were Medicaid Bureau
12 then.  But I think she was the director.  And I'm
13 guessing at the title.
14   Q.  The second paragraph of this document you
15 wrote "Section 1927(e)(1) and (4) of the act as
16 amended by OBRA '93 mandates that HCFA establish a
17 federal upper limit for multiple source drugs that
18 meet specific criteria."  Do you see that?
19   A.  Yes.
20   Q.  What is the reference to the act?  Is
21 that the Social Security Act?
22   A.  Yes.

66  (Pages 258 to 261)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                    Washington, DC

Page 262

```
 1    Q.   And OBRA '93, that would be referencing
 2  what?
 3    A.   It's the Social Security Act.  It amended
 4  the Social Security Act, just like OBRA '90
 5  established section 1927, OBRA '93 made amendments
 6  to section 1927.
 7    Q.   OBRA was a statute passed by Congress?
 8    A.   Yes.
 9    Q.   Omnibus Reconciliation Act?
10    A.   Correct.
11         MS. MARTINEZ:  Maybe Omnibus Budget
12  Reconciliation Act?
13         MR. TORBORG:  Did I not say that?
14         MS. MARTINEZ:  It has OMB.
15         MR. TORBORG:  Oh.  I'm sorry.  Omnibus
16  Budget Reconciliation Act.
17         BY MR. TORBORG:
18    Q.   And was it your understanding that
19  Congress had mandated HCFA to establish federal
20  upper limits for any multiple source drugs that met
21  specific criteria?
22         MS. MARTINEZ:  Objection, form.
```

Page 263

```
 1    Q.   Right?
 2    A.   Correct.
 3    Q.   Congress had told HCFA you must do this?
 4         MS. MARTINEZ:  Objection, form.
 5    Q.   Is that right?
 6    A.   Congress amended the law to include this.
 7    Q.   But the mandates means that HCFA was
 8  mandated by law to establish federal upper limits
 9  for multiple source drugs that met specified
10  criteria, correct?
11         MS. MARTINEZ:  Objection to form.
12    A.   If that's what the legislation does, yes.
13    Q.   Have you ever reviewed the legislation?
14    A.   What do you mean reviewed?
15    Q.   Have you looked at it?
16    A.   Yes.
17    Q.   The actual statute itself?
18    A.   Yes.
19         (Exhibit Abbott 463 was
20            marked for
21            identification.)
22         BY MR. TORBORG:
```

Page 264

```
 1    Q.   Let me explain what this document is.
 2  This is a section of the Omnibus Budget
 3  Reconciliation Act of 1990.  And I've included a
 4  cover page which has the title as well as a section
 5  4401 titled Reimbursement of Prescribed Drugs.
 6  That's what this is.  I have not given you the
 7  entire OBRA 1990.
 8         I'd like you, if you would, to go eight
 9  more pages from the page you're at now.  I'm sorry
10  it doesn't have page numbers on this.  But it would
11  be a section F, pharmacy reimbursement.  Were you
12  able to find it?
13    A.   Yes.
14    Q.   And under section 2 it says establishment
15  of upper payment limits.  Do you see that?
16    A.   Yes.
17    Q.   And then it says "HCFA shall establish a
18  federal upper reimbursement limit for each multiple
19  source drug for which the FDA has rated three or
20  more products therapeutically equivalent and
21  pharmaceutically equivalent, regardless of whether
22  all such additional formulations are rated as such
```

Page 265

```
 1  and shall use only such formulations when
 2  determining any such upper limit."  Do you recall
 3  reviewing this language before?
 4    A.   Yes.
 5    Q.   Now, this statutory criteria does not
 6  discuss any criteria relating to injection drugs or
 7  infusion drugs; is that right?
 8    A.   It doesn't specify any drugs in
 9  particular.
10    Q.   It just says "all multiple source drugs
11  for which the FDA has rated three or more products
12  therapeutically and pharmaceutically equivalent,"
13  correct?
14         MR. WINGET-HERNANDEZ:  Objection to form.
15  You've misread it, Counsel.
16         MR. TORBORG:  I'm sorry.  I'll read it
17  again.
18         BY MR. TORBORG:
19    Q.   "HCFA shall establish a federal upper
20  reimbursement limit for each multiple source drug
21  for which the FDA has rated three or more products
22  therapeutically and pharmaceutically equivalent."
```

67  (Pages 262 to 265)

Gaston, Sue                                    January 24, 2008
                        Washington, DC

                                                      Page 266

1   Did I read that right?
2       A.   Yes, you did.
3       Q.   Now, this indicates that HCFA shall
4   establish it for each multiple source drug. And I
5   think we saw earlier in looking at a copy of the
6   1996 Orange Book that for vancomycin there were
7   three or more drugs that were therapeutically and
8   pharmaceutically equivalent, correct?
9          MS. MARTINEZ: Objection to form.
10      A.   Correct.
11      Q.   And you indicated that if that was an
12  injection drug it would not have met the -- it would
13  have been knocked out of the FUL process by the
14  computer; is that right?
15      A.   Correct.
16      Q.   And is that consistent with the statutory
17  language here?
18         MR. WINGET-HERNANDEZ: Objection, form.
19         MS. MARTINEZ: Objection, form.
20      A.   The language doesn't go into that type of
21  detail in the statute.
22      Q.   It doesn't talk about excluding injection

                                                      Page 267

1   or infusion drugs, does it?
2       A.   No, it doesn't.
3       Q.   Do you recall any discussions about that
4   issue while you were at HCFA, whether or not the
5   statutory or regulations governing the federal upper
6   limit allowed HCFA to exclude injectable or infusion
7   drugs?
8       A.   I don't -- no. I don't remember specific
9   discussions like that.
10      Q.   You just know that for as long as you've
11  been working on it it's just been something that's
12  been excluded at the outset?
13      A.   Exactly. Yes.
14      Q.   And you have some understanding of why
15  that is, but you weren't there originally when the
16  decision was made?
17      A.   Correct.
18      Q.   You've just been told about this
19  rationale over time?
20      A.   Right. I understand the rationale. It's
21  been explained to me.
22         MR. TORBORG: What time do people want to

                                                      Page 268

1   end today? We've been going for I think an hour or
2   more. I could continue to go until 5:00 if people
3   want to stop at 5:00. And that's what I would
4   recommend that we do, go another 25 minutes. Or
5   since we started a little bit late, if people want
6   to go past 5:00 I could take a break now.
7          MR. WINGET-HERNANDEZ: I would prefer to
8   go to 5:00 for what it's worth.
9          MR. TORBORG: I think that probably makes
10  more sense.
11         MS. MARTINEZ: Yeah. I vote for going to
12  5:00 and stopping, cutting out the break if
13  everybody can take it.
14         THE WITNESS: That's fine.
15         MR. TORBORG: Is that okay?
16         THE WITNESS: Mm-hmm.
17         MR. TORBORG: Okay.
18         THE VIDEOGRAPHER: I have 25 minutes
19  remaining.
20         MR. WINGET-HERNANDEZ: That's enough.
21  That takes us to 5:00.
22         MR. TORBORG: That will be perfect. All

                                                      Page 269

1   things are coalescing into a decision to go.
2          MS. MARTINEZ: Counsel, could I just
3   request that at some point you make a copy of the
4   pages that the witness looked at in the FDA drug
5   book and we can just --
6          MR. TORBORG: Mark it as an exhibit
7   maybe?
8          MS. MARTINEZ: Well --
9          MR. TORBORG: Let's talk about it and
10  deal with it at the end of the deposition.
11         MS. MARTINEZ: Yeah. But if you could
12  PDF that or something.
13         MR. TORBORG: Yes.
14         BY MR. TORBORG:
15      Q.   Now, is it your understanding that the
16  federal regulations for FULs had an aggregate test?
17  Do you understand what I mean by that?
18      A.   I do. The test part confuses me.
19      Q.   The states' compliance with federal upper
20  limits was measured in the aggregate, correct?
21      A.   Yes. Correct.
22      Q.   Could you explain to us as best you can

                                        68   (Pages 266 to 269)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                    January 24, 2008
                        Washington, DC

Page 270

1   in plain English what that means?
2       A.   The federal government sets prices on the
3   federal upper limit drugs.  And we release those
4   prices to the states.  The states have the
5   flexibility to adjust those prices so that in the
6   aggregate the same savings is achieved.  So they can
7   raise one price and lower another price.  But they
8   have to be able to validate doing that.
9       Q.   And what types of auditing does HCFA do
10  on the states' compliance with federal upper limits?
11          MS. MARTINEZ:  Objection, form.
12      A.   I'm not familiar with CMS's auditing.
13      Q.   You don't recall yourself doing any work
14  to see if states were actually complying with the
15  FUL regulations; is that fair to say?
16      A.   Correct.
17      Q.   Your involvement with the FULs was to
18  take the primary lead in getting the list published
19  in the first instance, but not necessarily -- or not
20  at all with dealing with whether or not the states
21  complied with the limits?
22          MS. MARTINEZ:  Objection to form.

Page 271

1       A.   Correct.
2       Q.   Do you know anyone that was involved in
3   doing that?
4       A.   No.
5          MR. TORBORG:  Okay.  I'd like to mark
6   this as our next exhibit, if we could.
7              (Exhibit Abbott 464 was
8              marked for
9              identification.)
10         BY MR. TORBORG:
11      Q.   For the record, what I've marked as
12  Abbott Exhibit 464 bears the Bates numbers
13  NYSHD-FOIL 01682 through 83, a document dated
14  October 2nd 1990.  I ask if you'd take a look at
15  that, Ms. Gaston, and tell me whether or not you
16  recall it.
17      A.   No.  I've never seen this before.
18      Q.   Let me ask you some questions about some
19  language in the document to see if you can help me
20  understand some things.  The second paragraph states
21  "Over the past year, several state operations
22  letters have been sent to you removing upper limits.

Page 272

1   This has been done for a variety of reasons.  The
2   most prevalent reason, however, is the discovery by
3   the FDA that a specific manufacturer of a generic
4   drug has not been totally accurate in its
5   formulation of the drug.
6          "When one of these inaccurately
7   formulated generics is discovered, HCFA is required
8   to remove all formulations of the generic from the
9   upper limits listing, primarily due to problems in
10  identifying the manufacturer of any particular
11  generic item."
12         Do you recall this issue at all?
13      A.   No, not at all.
14      Q.   Do you recall HCFA taking steps to
15  affirmatively remove items from the federal upper
16  limit list?
17      A.   During the period of time that I --
18      Q.   Yes.
19      A.   We would remove drugs if they didn't meet
20  the criteria.
21      Q.   Apart from not meeting that statutory
22  criteria, were there other reasons why drugs were

Page 273

1   removed?
2       A.   No.  I'm not aware of other reasons to
3   remove them.
4       Q.   One other -- well, were there instances
5   where you learned that there was an availability
6   problem with the drug?
7       A.   Correct.
8       Q.   And in those instances would a FUL be
9   removed?
10      A.   Yes.  So that maybe I should clarify.
11  When you said statutory, also regulatory and
12  statutory.  So --
13      Q.   Another background question I had was how
14  were drugs -- was there a code that was used to
15  group all generic drugs of the same type and dose
16  into one category so those can be put together for
17  establishing a FUL?
18      A.   We had FULs -- FUL groups.
19      Q.   FUL groups?
20      A.   Yeah.  That's in the application.  It
21  would be a FUL group.  But I can't go into exactly
22  what my recollection of establishing those FUL

69  (Pages 270 to 273)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

## Page 274

1    groups.  But that's what we would work with on the
2    application, the FUL group, and then it would have
3    all the NDC numbers and the compendia information.
4        Q.   Who established the FUL groups?
5        A.   It's in the system.  The system
6    establishes it.
7        Q.   Is it done electronically by a computer
8    without any manual review?
9        A.   The information that's pulled down from
10   the Orange Book in the compendia, once it's joined
11   together it has to be placed into a FUL group in
12   order to be into the application.  Once it's in the
13   application there may be some manual review
14   required.
15       Q.   But the FUL groups were set up in the
16   system and then drugs were taken from the Orange
17   Book list and the compendia list and put together
18   this FUL group list, right?
19       A.   Yeah.
20       Q.   And any FUL that was established for any
21   FUL group would then limit the reimbursement that
22   could be paid for any drug in that group; is that

## Page 275

1    right?
2            MS. MARTINEZ:  Objection, form.
3        Q.   The FUL --
4        A.   It applies to a FUL group.
5        Q.   Yeah.
6        A.   Yes.
7        Q.   Okay.
8        A.   That's my recollection.
9        Q.   And it may be that the FUL would apply
10   even if a particular drug was not rated A in Orange
11   Book?
12       A.   As long as it met the basic criteria then
13   that FUL price would apply to all of the drugs in
14   that group.
15       Q.   And the drugs in the group, would those
16   include drugs that were not rated A in Orange Book,
17   do you know?
18       A.   Correct.
19       Q.   It would?
20       A.   It would be my understanding.  As long as
21   it meets the basic criteria, then all the other
22   drugs would still be subject to the FUL.  That's my

## Page 276

1    recollection.
2        Q.   And what is the basic criteria?
3        A.   The criteria in the Orange Book that we
4    discussed earlier and the criteria in the compendia
5    for the suppliers.
6            (Exhibit Abbott 465 was
7            marked for
8            identification.)
9        BY MR. TORBORG:
10       Q.   Ms. Gaston, we've marked as Abbott
11   Exhibit 465 a document bearing the Bates number HHC
12   004-0054.  It appears to be an e-mail from Cindy
13   Pelter to a distribution that includes "C. Thompso,"
14   which I believe is Cheryl Thompson, and an
15   organization called the American Society of Health
16   Systems Pharmacists.  Do you see that?
17       A.   Yes.
18       Q.   If you could take a quick glance at that
19   document and tell me whether or not you recall it.
20       A.   I don't recall it.
21       Q.   Who was Cindy Pelter?
22       A.   That's Cindy Bergin.

## Page 277

1        Q.   That's Cindy Bergin?
2        A.   Yes.
3        Q.   That's what I suspected.  That why I
4    asked you earlier if she was still named -- what's
5    her current name?
6        A.   You didn't ask me if she was still --
7        Q.   It's Cindy Pelter now?
8        A.   No.  It's Cindy Bergin now.  It's Bergin
9    now.  It was Pelter when she was hired.  You're
10   confusing me.  This is the hardest question.
11       Q.   It's been a long day.  Cindy Pelter is
12   now Cindy Bergin?
13       A.   Correct.
14       Q.   And her name is spelled B-e-r-g-i-n?
15       A.   Correct.
16       Q.   I had that suspicion.  And who is Cheryl
17   Thompson?  Do you know her?
18       A.   No.
19       Q.   Do you know what the American Society of
20   Health Systems Pharmacists is?
21       A.   I'm really not familiar with them, no.
22       Q.   In any event, Cheryl Thompson asked

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue                                      January 24, 2008
                       Washington, DC

Page 278

1   Ms. Pelter a question on June 19th that was "Do the
2   prices listed in" -- this release which I won't read
3   into the record -- "reflected information recently
4   provided by First Databank." Do you see that?
5       A.  Right.
6       Q.  And then she responds saying "No. The
7   new federal upper limit prices do not reflect the
8   new AWP prices recently published by First Databank.
9   Those new AWP prices pertain mostly to injectable
10  drugs that are not subject to FUL prices at this
11  time. Therefore we do not need to consider the new
12  AWPs while we were compiling the new FUL list.  If
13  you have any more questions please feel free to
14  e-mail me."
15      Does this refresh your recollection at
16  all about any conversations that arose within HCFA
17  or elsewhere about the fact that there were no FUL
18  prices on injectable drugs?
19      MS. MARTINEZ:  Objection, form.
20      A.  I could be wrong.  And here again, this
21  isn't my e-mail.  But what was the period of time
22  when that MFCU thing occurred?

Page 279

1       Q.  I believe around 2000.
2       A.  This inquiry might have come about
3   because of the MFCU issue and they were probably
4   asking this question because of that.
5       Q.  And the MFCUs would have new -- they were
6   having First Databank publish new AWPs for certain
7   drugs?  Is that your recollection?
8       A.  Right.
9       MS. MARTINEZ:  Objection, form.
10      Q.  Which might impact the FULs that you were
11  setting at HCFA?
12      A.  I think that's what they were asking.
13      Q.  And Ms. Pelter was saying that is not
14  going to be an issue because these new AWP prices
15  pertain mostly to injectable drugs, correct?
16      A.  That's what she's saying.
17      Q.  Do you recall any other discussion about
18  this issue?
19      A.  There may have been.  I don't remember
20  any further discussion.
21              (Exhibit Abbott 466 was
22               marked for

Page 280

1           identification.)
2       BY MR. TORBORG:
3       Q.  For the record, what I've marked as
4   Abbott Exhibit 466 bears the Bates numbers HHD
5   006-0103 through 108.  And I can represent to you,
6   Ms. Gaston, that this was a document that was pulled
7   from the OIG working paper files for their work on
8   the DOJ AWP effort, the report we looked at earlier.
9       I would ask you just to look at the first
10  page and just let me know if you've seen this.  I
11  doubt you have.
12      A.  (Reading.)  And what was this pertaining
13  to again?
14      Q.  This was a document that we found in the
15  working paper files for the OIG report concerning
16  the DOJ AWP effort?
17      MS. MARTINEZ:  Objection, form.
18      A.  Is this the MFCU?
19      Q.  Yes.
20      A.  Okay.  I changed that term on you.
21      Q.  That's fine.  And my understanding,
22  deposing the individual who sent forth this

Page 281

1   document, this contains some comments that states
2   had made to OIG concerning those NAMFCU AWPs.
3       MS. MARTINEZ:  Objection, form.  Or
4   objection to your comment.  Let me ask you, this
5   hasn't been marked as an exhibit before, then, in
6   another deposition?
7       MR. TORBORG:  I think it may have been.
8   If it has, I don't have that.
9       BY MR. TORBORG:
10      Q.  In any event, I want to ask you about a
11  comment that's contained in the first page, the
12  third one down, the state NC.  I'm assuming it's
13  North Carolina.  The second line says "At a meeting
14  about the new prices, asked Larry Reed why not put
15  these prices on a FUL.  HCFA responded that they
16  couldn't do that."  Do you see that?
17      A.  Yes.
18      Q.  Do you recall attending any meetings
19  concerning the NAMFCU AWPs?
20      MR. WINGET-HERNANDEZ:  Objection, form.
21      Q.  In particular between the states and
22  HCFA.

71  (Pages 278 to 281)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Page 282

1        MR. WINGET-HERNANDEZ: I have to object,
2    Counsel, to your manner of taking. You are using
3    this document to imply that it is notes of a meeting
4    that occurred at which this witness might have
5    attended when you know full well exactly where this
6    document came from, who produced it and the fact
7    that this witness would not have had anything to do
8    with it. It's improper for you to use the document
9    in this way.
10       MR. TORBORG: How do you know that she
11   wasn't at the meeting?
12       MR. WINGET-HERNANDEZ: You've already
13   received sworn testimony about how this information
14   was obtained from David Tawes, from the Office of
15   the Investigator General with which she has
16   absolutely no connection.
17       MR. TORBORG: Well, we established that
18   she was at the exit conference for this report. So
19   clearly she has a connection.
20       MR. WINGET-HERNANDEZ: And you
21   established in sworn testimony that this information
22   was the result of a telephone survey that was

Page 283

1    conducted by Mr. Tawes in which he was on the line
2    with a state person from North Carolina.
3        MR. TORBORG: That doesn't mean that was
4    the only meeting that discussed this issue. It's
5    clear this document suggests otherwise.
6        MR. WINGET-HERNANDEZ: I'm not objecting
7    to your question in the abstract. I'm objecting to
8    the manner in which you've used this document in
9    this instance. I think it's outrageous.
10       MR. TORBORG: Okay.
11       BY MR. TORBORG:
12   Q.   Do you recall attending any meetings with
13   states concerning the NAMFCU AWPs?
14   A.   I don't remember attending a meeting with
15   states on the NAMFCU.
16   Q.   Do you recall any discussion of HCFA
17   stating that they could not put injectable drugs or
18   other drugs on the NAMFCU list on a FUL?
19       MS. MARTINEZ: Objection to form.
20   Q.   Do you recall that being an issue of
21   discussion at any time?
22   A.   No. I don't remember that being a

Page 284

1    discussion at that time.
2        Q.   We'll do one more document quickly. This
3    will be Abbott Exhibit 467.
4                    (Exhibit Abbott 467 was
5                     marked for
6                     identification.)
7        BY MR. TORBORG:
8    Q.   For the record, what I've marked as
9    Abbott Exhibit 467 is an interrogatory response that
10   was provided by the United States in response to an
11   interrogatory issued by Abbott Laboratories. And I
12   ask you to take a look at that and let me know if
13   you are familiar with this document.
14   A.   Yes, I am.
15   Q.   Have you reviewed this before today?
16   A.   Yes.
17   Q.   Now, this document has been signed or
18   what we call in legal terminology verified by
19   someone named William Lasowski?
20   A.   Yes.
21   Q.   Do you know who that is?
22   A.   He worked with Dennis Smith.

Page 285

1    Q.   How long has he been with HCFA? Do you
2    know?
3    A.   I have no idea.
4    Q.   Has he been there since you started?
5    A.   I'm not sure.
6    Q.   Do you know what his involvement has been
7    with the federal upper limit program?
8    A.   I would say no involvement. Unless it
9    was prior to my time.
10       MR. TORBORG: We have one minute left on
11   the tape so why don't we go ahead and take a break
12   here and we'll adjourn at a time and place to be
13   decided later. Thank you for your time.
14       THE WITNESS: Okay. You're welcome.
15       THE VIDEOGRAPHER: This deposition
16   adjourns at 5:01 and consists of five tapes.
17       (Whereupon, at 5:01 p.m. the statement of
18   counsel was concluded.)
19               * * * * *
20
21
22

72  (Pages 282 to 285)

c68935c6-4f35-4a4e-9ec1-be302bbe74cf

Gaston, Sue - Vol. II                          March 19, 2008
Washington, DC

Page 312

1        I'll try to take a break after an hour
2    or so. But let me know if you need to take a
3    break before that. Okay?
4        A.  Okay.
5        Q.  Okay. Since the last time that you
6    were deposed here in this case have you been
7    deposed in any other AWP-related litigation?
8        A.  No.
9        Q.  Have you met with counsel for the
10   United States or CMS since your last deposition?
11       A.  Yes.
12       Q.  Can you tell me about that?
13       A.  I met with Leslie and Jeff. Is it
14   Fauci? Last week, I think it was.
15       Q.  Was that an in-person meeting?
16       A.  What do you mean, in-person?
17       Q.  Was it in-person?
18       A.  Yes.
19       Q.  And how long was the meeting?
20       A.  Probably approximately two hours.
21       Q.  And did you review any documents at
22   that meeting?

Page 313

1        A.  Yes.
2        Q.  Did any of those documents refresh your
3    recollection at all about the subject matters
4    contained within those documents?
5        A.  Yes.
6        Q.  Tell me what documents refreshed your
7    recollection.
8        A.  They were sheets used when determining
9    federal upper limit prices. They were copies of
10   -- copies from the application, the federal upper
11   limit application.
12       Q.  Was it your understanding that those
13   documents were being produced in AWP-related
14   litigation?
15       A.  Yes.
16       Q.  And that you would be asked about them?
17   That was your expectation? That's why you were
18   reviewing them, I take it?
19       A.  Yes.
20       Q.  Any other conversations apart from this
21   morning that you've had with counsel?
22       A.  No.

Page 314

1        Q.  Have you had a chance to review your
2    deposition transcript from the first day of the
3    deposition?
4        A.  Yes.
5        Q.  Did you notice anything that needed
6    correcting?
7        A.  There were some typos, just minor
8    things that I annotated on the sheet.
9        Q.  But nothing substantive that you
10   recall?
11       A.  No.
12       Q.  Have you discussed anyone else's
13   testimony in AWP litigation?
14       A.  No.
15       Q.  Do you have on idea of who else from
16   your office, state Medicaid programs or
17   otherwise, has been deposed in the case?
18       A.  I understand that Larry and Deirdra and
19   Dennis Smith.
20       Q.  Anyone else?
21       A.  Not that I'm aware of, no.
22       Q.  I'd like to mark as the next exhibit,

Page 315

1    which I believe will be Abbott Exhibit 752 some
2    testimony that was provided in this case by an
3    individual by the name of Zachary Bentley. This
4    is for the record a copy of the rough transcript
5    because that's what I had available to me at this
6    time. It's pages 156 through 164 of that
7    transcript.
8            (Exhibit Abbott 752 was marked for
9    identification.)
10           MS. MARTINEZ:  Excuse me. Did you say
11   156?
12           MR. TORBORG:  Page 256 through 264.
13           MS. MARTINEZ:  Okay.
14   BY MR. TORBORG:
15       Q.  Ms. Gaston, I'd like you to read to
16   yourself the line that starts from page 256 lines
17   17 through the remainder of the exhibit and then
18   I'll have some questions for you.
19       A.  (Reading.)
20           MS. MARTINEZ:  Just for the record, I
21   object to the use of these rough transcripts as
22   well as the attachment as an exhibit to the case,

8  (Pages 312 to 315)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Page 316

1  or to the deposition.
2      MR. TORBORG:  What would you have me
3  do, Ms. Martinez?  Would you like me to question
4  about the testimony without providing her a copy
5  of it?  Would that be your preference?
6      MS. MARTINEZ:  No.  I'm going to object
7  to form either way.
8      MR. TORBORG:  Okay.  But would you ask
9  me to not show her that transcript because it's a
10 rough form?
11     MS. MARTINEZ:  No.  I'm just saying
12 both are improper.  So I'm going to object to
13 form.  The court can rule.  If you want to use
14 another approach just in case so you have the
15 opportunity to maintain whatever answers the
16 witness gives, you can use another approach.
17 It's your own judgment.
18     MR. TORBORG:  Is it your position that
19 -- would you have an objection if I showed her a
20 final copy of the transcript?
21     MS. MARTINEZ:  Yes.
22     MR. TORBORG:  Why?  I want to see if I

Page 317

1  can cure whatever the objection is.
2      MS. MARTINEZ:  I just don't think it's
3  a proper question.
4      MR. TORBORG:  It's not a proper
5  question to ask someone about a deposition
6  transcript?
7      MS. MARTINEZ:  I would object to the
8  form of your question when you ask one witness
9  about what another witness said.
10     MR. TORBORG:  You think that's
11 improper?
12     MS. MARTINEZ:  Yeah.  I would object to
13 it.
14     MR. TORBORG:  Okay.
15 BY MR. TORBORG:
16     Q.  You can go ahead and continue
17 reviewing.
18     A.  Do you want me to read the whole thing?
19     Q.  Yeah.  Through the end.
20     A.  Okay.  (Reading.)
21         Okay.  I'm finished.
22     Q.  Ms. Gaston, I believe we covered this

Page 318

1  last time, but you recall an individual by the
2  name of Zack Bentley, correct?
3      A.  Yes.
4      Q.  He's affiliated with the company called
5  Ven-A-Care?
6      A.  Yes.
7      Q.  And for the period 1991 through 2003
8  you were involved with the federal upper limit
9  program for Medicaid drugs; is that right?
10     A.  Correct.
11     Q.  And you recalled attending a meeting
12 with Ven-A-Care on or about -- you didn't
13 remember the exact date, but on or around the
14 date November 14th of 1995.  Is that fair to say?
15     A.  I don't remember the exact date.
16     Q.  You remember having a meeting with
17 representatives of Ven-A-Care in the mid-1990s;
18 is that fair to say?
19     A.  Yes.
20     Q.  That was a meeting in Baltimore that
21 was attended by a number of people, correct?
22     A.  Yes.

Page 319

1      Q.  Do you recall having conversations with
2  Mr. Bentley prior to that meeting?
3      A.  I know I had conversations with Zachary
4  Bentley.  I don't know if it was prior to the
5  meeting, after the meeting.  I don't know the
6  time period.
7      Q.  Do you recall what the substance of
8  those meetings was?
9      A.  The meetings or the calls?
10     Q.  I'm sorry.  The calls with Mr. Bentley.
11 Do you recall what was being discussed?
12     A.  I don't recall.
13     Q.  Do you recall Mr. Bentley advising you
14 of -- either in a meeting that you attended or in
15 a telephone call -- that there was a large
16 difference between acquisition costs and AWPs for
17 certain injectable and infusion drugs?
18     MS. MARTINEZ:  Objection, form.
19     A.  I don't remember Zachary Bentley
20 telling me that.
21     Q.  Do you recall becoming aware of that?
22     A.  Yes.

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                           March 19, 2008

Washington, DC

Page 320

1    Q.  How did you become aware of that?
2    A.  Because of the Ven-A-Care litigation.
3    Q.  And you recall becoming aware of the
4    Ven-A-Care litigation in the mid-1990s; is that
5    fair to say?
6    A.  Yes.
7    Q.  And you may have had conversations with
8    Mr. Bentley or others at Ven-A-Care prior to the
9    1995 meeting; is that fair to say?
10   A.  It's fair to say.
11   Q.  During the period in the mid-1990s --
12   or -- I'm sorry.  In the period from 1991 to,
13   say, 1997, did you have discretion on whether or
14   not to set a federal upper limit on drugs?
15         MS. MARTINEZ: Objection, form.
16   A.  Yes.
17   Q.  So if you wanted to set a federal upper
18   limit on the injectable and infusion drugs that
19   Ven-A-Care advised you of a large difference
20   between acquisition cost and AWP, you were able
21   to do so; is that fair to say?
22         MS. ALBEE: Objection, form.

Page 321

1    A.  No.
2    Q.  Why not?
3    A.  Because we didn't set federal upper
4    limit prices on injectable drugs or infusion
5    drugs.  We set them on drugs that were the most
6    commonly used such as tablets, capsules, creams.
7    Q.  But you're not aware of any written
8    statutory or regulatory guidance that prohibited
9    you from setting a FUL on infusion and injectable
10   drugs; is that right?
11   A.  That's right.
12   Q.  It was a policy of HCFA at the time you
13   started administering the FUL program not to set
14   FULs on those drugs; is that correct?
15         MS. MARTINEZ: Objection, form.
16   A.  I think I would rather say that it was
17   the criteria that was established before I
18   started doing the federal upper limit program.
19   Q.  And when you say criteria, could you
20   explain what you mean by that?
21   A.  The criteria is how they determined
22   what federal upper limit prices would apply to

Page 322

1    what type of drugs and the criteria basically was
2    drugs that were considered outpatient drugs,
3    generally dispensed at the pharmacy level.
4    Q.  And we talked about this last time.
5    But you were aware that you specifically took
6    steps to exclude infusion and injectable drugs
7    from the mechanism by which the FULs were
8    calculated, correct?
9          MS. MARTINEZ: Objection, form.
10   A.  Correct.
11   Q.  Do you recall any discussions about
12   perhaps changing the HCFA policy or criteria not
13   to establish FULs for injectable and infusion
14   drugs at any point in time?
15   A.  I know that the conversation was
16   probably discussed.  I don't know when.  But no
17   steps were taken to do that.
18   Q.  Can you tell me why not steps were
19   taken to do that?
20   A.  It's my understanding that the criteria
21   we were using is to set federal upper limit
22   prices on drugs that were most commonly used.

Page 323

1    When we stepped into the arena of injectable
2    drugs or other drugs that weren't most commonly
3    used, I think it was a little more difficult to
4    capture those drugs for various reasons.  So
5    that's why we stuck with the basic criteria that
6    we used.
7    Q.  But you believe that there were
8    discussions about possibly moving injectable
9    infusion drugs into the FUL program; is that fair
10   to say?
11   A.  I wouldn't say that specifically.
12   There could have been conversations.  I wouldn't
13   say that the conversations went as far as to say
14   let's move them into the FUL arena.  But the
15   conversations were there.  And I can only answer
16   that generally, because I only remember short
17   conversations maybe discussing the issue.
18   Q.  If there has been testimony from Mr.
19   Bentley that he -- his best recollection is that
20   he advised you of the large differences between
21   acquisition cost and AWPs for certain injectable
22   infusion drugs at least as early as 1990, could

10  (Pages 320 to 323)

Henderson Legal Services, Inc.

Gaston, Sue - Vol. II                    March 19, 2008
Washington, DC

Page 324

1  you say that Mr. Bentley's recollection is
2  incorrect?
3          MS. ALBEE: Objection, form.
4          MS. MARTINEZ: Objection, form.
5      A.  I can't answer to his statements.
6      Q.  You just -- it's your testimony that
7  the conversations may have happened; you just
8  don't recall?
9      A.  I don't recall conversations like that
10  with Zachary Bentley.
11      Q.  But you recall conversations with Mr.
12  Bentley?
13      A.  Correct.
14      Q.  You just don't recall one way or the
15  other what the substance of the conversations
16  was, correct?
17      A.  Correct.
18      Q.  What other types of conversations would
19  you have had with Mr. Bentley apart from the
20  federal upper limit program?
21      A.  I don't remember the conversations that
22  I had with Zachary Bentley.  Specifically the

Page 325

1  conversations, I don't remember.
2      Q.  And my question is a touch different.
3      A.  Okay.
4      Q.  And it's based on what you were doing
5  at HCFA, what your responsibilities were and your
6  knowledge of how Mr. Bentley fit into the story.
7      A.  Okay.
8      Q.  Do you have a sense for -- apart from
9  the federal upper limit program, what other
10  topics you would have been discussing with Mr.
11  Bentley?
12          MS. ALBEE: Objection, form.
13          MS. MARTINEZ: Objection, form.
14      A.  I worked on state plan amendments.  If
15  he had an issue about something that was
16  occurring in Florida or another state, he could
17  have called me about that, what was in the state
18  plan amendment.  I don't even know if I was
19  handling Florida at the time.  Or whatever states
20  he might have questioned.  He could have asked
21  any kind of general questions about the Medicaid
22  drug rebate program or any kind of pharmacy

Page 326

1  reimbursement issues.
2      Q.  Do you recall Mr. Bentley ever raising
3  issues about the Medicaid drug rebate program?
4      A.  I can't remember specifically what I
5  discussed with Zachary Bentley.
6      Q.  Do you have any -- what is your best
7  guess about the substance of the conversations
8  that you had with Mr. Bentley and yourself?
9          MS. MARTINEZ: Objection, form.
10      Q.  Do you believe it related to the FUL
11  program or something else?
12          MS. MARTINEZ: Objection, form.
13      A.  My best guess would say it probably
14  related to the FUL program.
15      Q.  Ms. Gaston, is it your testimony that
16  even though you became aware of the large
17  differences between acquisition costs and AWPs
18  for certain injectable and infusion products, you
19  did not believe you had the authority or
20  discretion to place FULs on those drugs?
21          MS. MARTINEZ: Objection, form.
22      Q.  Is that a fair summary of your

Page 327

1  testimony?
2          MS. MARTINEZ: Objection, form.
3      A.  We did not set FUL prices on those
4  types of drugs.  Is it would be a matter of
5  changing the criteria.  And that wouldn't be
6  strictly my place to do that.
7      Q.  Okay.  Fair point.  Who had the
8  authority or whose place was it to change the
9  criteria?
10      A.  Specifically, I don't know.  I know I
11  would have to go to Larry.  I don't know whether
12  he would have to get authority from someone else
13  to do that.
14      Q.  And Mr. Reed was in attendance in at
15  least one of the meetings you had with Ven-A-Care
16  where they discussed the large difference between
17  acquisition cost and AWPs with Ven-A-Care,
18  correct?
19          MS. MARTINEZ: Objection, form.
20      A.  He was present at the Ven-A-Care
21  meetings.
22      Q.  Do you recall any steps that were taken

11  (Pages 324 to 327)

Gaston, Sue - Vol. II                    March 19, 2008
                    Washington, DC

Page 328

1  at all to attempt to get FULs established for
2  infusion or injectable drugs?
3      A.  No, I don't.
4      Q.  Do you recall, Ms. Gaston, yourself
5  thinking in the mid-1990s when you were becoming
6  aware of the large differences between
7  acquisition cost and AWP for infusion and
8  injectable drugs why aren't we establishing FULs
9  for these drugs?
10         MS. MARTINEZ:  Objection, form.
11     Q.  Do you recall having that thought in
12  your head?
13     A.  I had the thought in my head.  But the
14  thought in my head is just trying to capture more
15  drugs for savings to the states.  Whether it was
16  injectables or unit dose or anything outside of
17  the basic criteria, I thought about trying to
18  expand it to include additional drugs just for
19  cost saving purposes.
20     Q.  Do you recall becoming aware of any
21  other classes of drugs outside of infusion and
22  injectable drugs where you were becoming aware of

Page 329

1  the large differences between acquisition cost
2  and AWPs?
3         MS. MARTINEZ:  Objection, form.
4         MS. ALBEE:  Objection, form.
5      A.  Here again, when I'm working with the
6  FUL program I'm looking at it just to try to
7  include more drugs.  I'm not looking at it -- at
8  a class of drugs and where there might be a
9  difference in the pricing.
10     Q.  You testified a second ago that you
11  were concerned or you wanted to try to achieve
12  more cost savings for Medicaid, correct?
13     A.  Correct.
14     Q.  And the FUL program was a tool that CMS
15  could use to do that, correct?
16     A.  Correct.
17     Q.  And you understood the purpose of the
18  FUL program was to mitigate against certain
19  manufacturers having high AWPs, correct?
20         MS. MARTINEZ:  Objection, form.
21     A.  Can you repeat that?
22     Q.  You understood that the purpose of the

Page 330

1  FUL program was to mitigate against certain
2  manufacturers having high AWPs on their drugs?
3         MS. MARTINEZ:  Objection, form.
4      A.  The purpose of the FUL program was to
5  set a reasonable reimbursement rate for states.
6      Q.  And do you have an understanding about
7  -- as the person who was in charge of the FUL
8  program from the early '90s through I think 2003,
9  2004 -- is that about --
10     A.  2003.
11     Q.  2003.  Do you have an understanding of
12  why was this program created?  Why not just take
13  the AWPs for each manufacturer's drugs straight
14  from the compendia?
15     A.  It was in regulations.  The FUL program
16  was in regulations.
17     Q.  But did you have an understanding of
18  the purpose behind it?
19     A.  Yes, I did.
20     Q.  And your understanding was what?
21     A.  It's to set -- the federal government
22  sets a reimbursement rate for states and is

Page 331

1  trying to achieve savings.  We're trying to set
2  reasonable reimbursement rates for certain
3  generic drugs.
4      Q.  Do you recall taking any steps, whether
5  it be merely a conversation with Mr. Reed or
6  someone else in your office to establish federal
7  upper limits for infusion and injectable drugs?
8      A.  The conversation could have come up.  I
9  know it was discussed about including those in
10  FULs, but it was just a conversation.
11     Q.  And the conversation, was that with Mr.
12  Reed?
13     A.  I can't say.  It probably included Mr.
14  Reed, because he was my supervisor.
15     Q.  Who else would have been included in
16  that?
17     A.  I don't know.  It depends on who I was
18  mentoring at the time.
19     Q.  Did you have conversations with anyone
20  outside of CMS about setting federal upper limits
21  for infusion and injectable drugs?
22     A.  I don't recall that, no.

12  (Pages 328 to 331)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                          March 19, 2008
                    Washington, DC

Page 332

1      Q.  For example, to see if it triggers your
2  memory, do you recall conversations with provider
3  advocacy groups about whether or not to set a FUL
4  on injectable or infusion drugs?
5      MS. MARTINEZ:  Objection, form.
6      A.  I don't remember that, no.
7      Q.  So what you recall is you believe there
8  were conversations that would have included Mr.
9  Reed about the possibility of putting a FUL on
10 injectable and infusion drugs, correct?
11     A.  Correct.
12     Q.  Where did it go from there?
13     A.  It didn't go any further.
14     Q.  Do you know why not?
15     A.  I think that from my
16 recollection to try to include those drugs was it
17 was -- it was more complicated because those
18 types of drugs aren't most commonly used
19 generally at the pharmacy level.  A lot of them
20 aren't identified by NDC numbers.  They would
21 have J codes or HCPCS codes.  So it made it much
22 more difficult to be able to identify.  And a lot

Page 333

1  of them, again, are not generic drugs.  A lot of
2  them are single-source drugs.
3      So it was, I think, an area that didn't
4  seem to work well for the federal upper limit
5  program.  And again, we go back to -- when we
6  decide not to include something in the FULs, we
7  still go back to the fact that the states can set
8  reimbursement rates that they feel are
9  reasonable.
10     Q.  Do you recall if Ven-A-Care actually
11 supplied you with NDC numbers for certain of the
12 injectable and infusion drugs for which they
13 informed you of a large difference between
14 acquisition cost and AWPs?
15     MS. ALBEE:  Objection, form.
16     A.  I can't remember that.  I know that
17 they brought materials when they met with us.
18 But I can't remember if NDC numbers were in the
19 materials they brought.
20     Q.  I'd like to ask you to take out Exhibit
21 453.
22     MS. MARTINEZ:  Do you know the binder?

Page 334

1      MS. ALBEE:  Could you give the Bates
2  numbers?
3      MR. TORBORG:  I do not.  VAC MDL 86162
4  through 175.
5  BY MR. TORBORG:
6      Q.  We looked at this document last time.
7  Do you recall that?  I asked you some questions
8  earlier.
9      A.  I can't remember.
10     Q.  Would you please go to the Bates page
11 ending 170?  This is a page titled "Generics more
12 expensive than brand."  Do you see that?
13     A.  Yes.
14     Q.  If you look down at the bottom of the
15 first column there's J 3370 Vancocin.  Do you see
16 that?
17     MR. WINGET-HERNANDEZ:  Could you repeat
18 the number, please?
19     MR. TORBORG:  Bates page ending 170.
20 BY MR. TORBORG:
21     Q.  I'm making you get out another pair of
22 glasses.

Page 335

1      A.  Yup.
2      MR. WINGET-HERNANDEZ:  Yeah.  That's
3  the part I was hoping you would tell us again.
4  Why don't you say exactly what's on the page
5  you're looking at.
6      MR. TORBORG:  The page I'm looking at?
7      MR. WINGET-HERNANDEZ:  Maybe I
8  misunderstood you.  I thought you were trying to
9  direct our attention to a particular part of this
10 page.
11     MR. TORBORG:  Yes.  Left column below J
12 3370.
13     MR. WINGET-HERNANDEZ:  I see.  Thank
14 you.
15 BY MR. TORBORG:
16     Q.  Do you recall that Lilly was the brand
17 name maker of Vancocin?
18     A.  I don't recall that.
19     Q.  And do you see that on the right-hand
20 side of the page there's a column for generic?
21 Do you see that?
22     A.  Correct.

13  (Pages 332 to 335)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Gaston, Sue - Vol. II                                      March 19, 2008
                          Washington, DC

Page 336

1      Q.  And then below toward the bottom of the
2   page there's a section that says "vancomycin
3   hydrochloride."  Do you see that?
4      A.  Yes.
5      Q.  And here does it appear as though Ven-
6   A-Care has provided you with specific NDC numbers
7   for vancomycin hydrochloride that fall under the
8   heading of instances where generics are more
9   expensive than brands?
10        MS. MARTINEZ:  Objection, form.
11     A.  I mean, I see NDC numbers, yes.  Okay,
12  under -- yes.
13     Q.  So is it a fair summary of your
14  testimony -- and please tell me if it's not.  I'm
15  not trying to put words in your mouth -- that
16  when it came to infusion and injectable drugs you
17  knew that there was an issue with there being a
18  large difference between acquisition cost and
19  AWP, correct?
20        MS. MARTINEZ:  Objection, form.
21     Q.  You learned that from Ven-A-Care?
22        MS. MARTINEZ:  Objection, form.

Page 337

1         MS. ALBEE:  Objection, form.
2      A.  That's what they're stating, yes.
3      Q.  And you had conversation -- you believe
4   you had conversations about moving those classes
5   of drugs into the FUL list, correct?
6         MS. MARTINEZ:  Objection, form.
7      A.  There was conversation, yes.
8      Q.  And you didn't do so because you
9   thought it would be too difficult?
10        MS. MARTINEZ:  Objection, form.
11     A.  I'm sure there were other reasons too.
12     Q.  What other reasons do you believe there
13  may have been?
14     A.  I can't think of those at this time.
15  But I'm sure that it was more than just that it's
16  too difficult.  It might not be reasonable.
17     Q.  Now, when you say might not be
18  reasonable, can you tell me when you mean by
19  that?
20     A.  What I mean by that is many of these
21  drugs -- or not many, but some of these drugs
22  could be single-source drugs, might not have

Page 338

1   generic versions.
2      Q.  Let's take apart the --
3      A.  Some of them could have HCPCS codes or
4   J codes and they don't have NDC numbers when
5   they're submitted on the claim form.  So they're
6   -- that complicates matters.
7      Q.  But you understand that for every drug
8   there's an NDC number, correct?
9      A.  Correct.
10     Q.  And you knew that there were infusion
11  and injectable drugs that were being reimbursed
12  through Medicaid pharmacy programs, correct?
13        MS. MARTINEZ:  Objection, form.
14     A.  Correct.
15     Q.  And you knew based on your experience
16  that generally speaking Medicaid pharmacy
17  reimbursement was tied to NDC codes, correct?
18     A.  Correct.
19     Q.  Would it be fair to say -- strike that.
20  I'm done with that.
21        I'd like to hand you what we marked
22  previously in this case as Abbott Exhibit 582.

Page 339

1         MR. TORBORG:  Ani, this is one of those
2   I showed Mr. Reed yesterday.  So it should be in
3   your stack.
4         MS. MARTINEZ:  Could you describe it
5   for a second to see if -- I don't have a number
6   on this one.
7         MR. TORBORG:  It is a document bearing
8   the Bates number HHD 021-0121 through 22.
9         MS. MARTINEZ:  I found it.  What's the
10  exhibit number?
11        MR. TORBORG:  582.
12  BY MR. TORBORG:
13     Q.  Ms. Gaston, if you would take a look at
14  that document?
15        MR. WINGET-HERNANDEZ:  Dave, is that
16  the one you borrowed from us?
17        MR. TORBORG:  It is.  Thank you for
18  letting me borrow it.
19        MR. WINGET-HERNANDEZ:  No problem.
20  BY MR. TORBORG:
21     Q.  For the record, this is a record of
22  discussion dated September 27 through 28, 1995

                                    14  (Pages 336 to 339)

96c95944-eee1-42b5-b77a-388fc0daf3d5

Reed, Larry - Vol. II                    September 27, 2007

Baltimore, MD

UNITED STATES DISTRICT COURT

OF THE DISTRICT OF MASSACHUSETTS

----------------------------x

IN RE: PHARMACEUTICAL      :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE  :   CIVIL ACTION

PRICE LITIGATION           :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO   :

U.S. ex rel. Ven-A-Care of  :   Judge Patti B.

The Florida Keys, Inc.,     :       Saris

             Plaintiff,     :

       vs.                  :

ABBOTT LABORATORIES, INC.,  :   Chief Magistrate

No. 06-CV-11337-PBS        :   Judge Marianne B.

             Defendants.    :       Bowler

----------------------------x

                         VOLUME II

                 Baltimore, Maryland

                 Thursday, September 27, 2007

Continued Videotape Deposition of:

                 LARRY REED,

the witness, was called for examination by counsel

for the Defendants, pursuant to notice, commencing

Henderson Legal Services
202-220-4158

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                        Baltimore, MD

Page 590

1  HCFA about the implications that generic drug
2  manufacturers like Abbott would face if they were
3  to lower the AWP or cause to be lowered the AWP
4  prices for their products?
5      MR. HERNANDEZ: Objection, form.
6      MS. MARTINEZ: Objection, form.
7      THE WITNESS: I think there were those
8  discussions.
9  BY MR. TORBORG:
10     Q.  Tell me about those discussions.
11     MS. MARTINEZ: Objection. You may
12  answer only to the extent that it would not
13  reveal internal deliberations within HCFA that
14  preceded either a decision of HCFA or their
15  calculation of policy by HCFA.
16     THE WITNESS: Okay. My brain is really
17  slowing down, if I could just have the question
18  again.
19     (The reporter read back the
20  record.)
21  BY MR. TORBORG:
22     Q.  And then tell me about those

Page 591

1  discussions.
2      A.  Yeah. I don't think I can go farther
3  than that in answering.
4      Q.  Mr. Reed, what involvement did you have
5  with the federal upper limit program?
6      A.  The federal upper limit program was in
7  our area of responsibility -- is in our area of
8  responsibility.
9      Q.  And what is your understanding
10  regarding HCFA's role in implementing the federal
11  upper limit program?
12     A.  Could you be more specific?
13     Q.  Was HCFA directed to -- it was HCFA who
14  created the federal upper limits for particular
15  drugs; am I right?
16     MS. MARTINEZ: Objection, form.
17     THE WITNESS: Are you --
18  BY MR. TORBORG:
19     Q.  Yes.
20     A.  Okay. CMS -- or, I'm sorry, at that
21  point, you're correct -- HCFA did publish a
22  regulation, a final regulation in 1987. I think

Page 592

1  that we've been -- no, I'm sure that's the right
2  one -- that we've been discussing that did
3  establish a federal upper limit program.
4      Q.  I'd like to ask you to take out Exhibit
5  Abbott 108. For the record, what has been marked
6  previously as Exhibit Abbott 108 is a February
7  2004 OIG report titled "Omission of Drugs from
8  the Federal Upper Limit List in 2001."
9      Mr. Reed, my first question will be
10  whether or not you recall this document.
11     A.  Yes.
12     Q.  Is this a document that you reviewed?
13     A.  Yes.
14     Q.  Did you attend the entrance or exit
15  conference for this particular report?
16     A.  I don't remember if I attended either
17  the exit or the entrance conference.
18     Q.  If I could direct you to page 1 under
19  the introduction, under the section "Objective,"
20  it states, "This inspection, (1), determined
21  whether drugs that met the criteria established
22  by federal laws and regulations were included on

Page 593

1  the federal upper limit list in 2001; and, (2),
2  calculated the potential savings that could have
3  resulted in 2001 if additional drugs that met the
4  established criteria had been included on the
5  federal upper limit list."
6      Did I read that right?
7      A.  That looks correct to me.
8      Q.  If I could direct you to the second
9  page under the section "Federal Upper Limit
10  List," the first paragraph references a
11  regulation established in 1987, correct?
12     A.  The second page?
13     Q.  Second page under the section "Federal
14  Upper Limit List." Second page of the report.
15  It's one more page after the page I just read
16  from.
17     A.  I'm sorry, I'm just missing where
18  you're at. You're on the second page. I think I
19  was reading incorrectly from the first page.
20  Okay, the same sentence in two different places.
21  Sorry.
22     Q.  That paragraph refers to a federal

                67  (Pages 590 to 593)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007
                    Baltimore, MD

Page 594

1  regulation established in 1987, does it not?
2      A.  That's correct.
3      Q.  And we looked at that Federal Register
4  page as Exhibit Abbott 284 before; is that right?
5      A.  That's my memory, yep.
6      Q.  The second paragraph states, "In the
7  regulation that required CMS to establish a
8  federal upper limit amount for a drug product,
9  (i.e., each specific dosage form and dosage
10  amount of the drug) when, (1), all versions of a
11  drug product have been classified as
12  therapeutically equivalent by the Food and Drug
13  Administration; and, (2), at least three
14  suppliers of the drug product are listed in
15  current editions (or updates) of published
16  compendia of cost information for drugs available
17  for sale nationally.
18      The Omnibus Budget Reconciliation Act
19  of 1990, however, changed this criteria by
20  requiring the federal -- requiring a federal
21  upper limit when three or more versions of a drug
22  product have been rated therapeutically and

Page 595

1  pharmaceutically equivalent by the FDA regardless
2  of the ratings of other versions."
3      And, Mr. Reed, is that consistent with
4  your understanding of the regulation that was
5  passed in 1987 as well as the statutory provision
6  established by the OBRA of 1990?
7      A.  That looks to be generally consistent.
8      Q.  And what OIG found in this particular
9  report was -- if you look at page ii, it would be
10  the fourth page in the exhibit, Exhibit Abbott
11  108, the finding was that --
12      A.  I'm sorry, could you give me that
13  again?
14      Q.  It's the two little i's, the fourth
15  page of the exhibit.
16      A.  Okay.
17      Q.  The finding is 90 drug products met the
18  established criteria but were not included on the
19  federal upper limit list in 2001.
20      Do you recall that there were some
21  products that met the established criteria to
22  establish a FUL that were not included on the

Page 596

1  federal upper limit list?
2      A.  I do recall that this was the OIG
3  finding.  I don't recall what our response to
4  that was at this point.
5      Q.  We have reviewed the federal upper
6  limit lists that were in place from 1990 to 2000,
7  and products that are at issue in this case are
8  not on that federal upper limit list, sodium
9  chloride solutions, for example, Dextrose
10  solutions, Vancomycin, sterile water.
11      Can you provide any insight as to why
12  that might be?
13      MS. MARTINEZ:  Objection, form.
14      THE WITNESS:  Certain products were put
15  on the list and certain products may not have
16  been put on the list, so --
17  BY MR. TORBORG:
18      Q.  And why would that be?
19      MS. MARTINEZ:  Objection, form.
20      THE WITNESS:  I believe that goes back
21  to a time frame before I was involved with the
22  federal upper limits program.  I don't recall

Page 597

1  what the original decision was for that, but it
2  was continued.
3  BY MR. TORBORG:
4      Q.  Do you know who we might ask at HCFA
5  who could provide an answer for why it would be
6  that products like salt water, a very commonly
7  manufactured product, were not on the federal
8  upper limit list?
9      A.  I think you'd have to go back to the
10  start of the federal upper limit program.  I
11  don't know of any people still at HCFA that
12  aren't retired that would have that information.
13      Q.  How would the process work?  How would
14  HCFA identify what products to put on the list?
15      A.  I think, as specified in here, they
16  would have looked for -- they would look for
17  products in the Orange Book, look for therapeutic
18  equivalence, they would look for suppliers.
19      Q.  So if, in fact, a drug met the
20  established criteria, a federal upper limit
21  should have been established for that, correct?
22      MS. MARTINEZ:  Objection, form.

68  (Pages 594 to 597)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. II                    September 27, 2007

Baltimore, MD

Page 598

1        THE WITNESS: I think I've already
2    indicated that for some drugs, we did not have a
3    federal upper limit.
4    BY MR. TORBORG:
5        Q.  But I'm asking you as a matter of law
6    under the statute that I just read or summarized,
7    as summarized by OIG, if a drug product met the
8    criteria for a FUL to be established, a FUL
9    should have been established under the law; is
10   that right?
11       MS. POLLACK: Objection as to form.
12       MS. MARTINEZ: Objection, form.
13       THE WITNESS: For a federal regulation,
14   I think the wording is such that a federal
15   regulation doesn't -- an agency doesn't regulate
16   itself, and I would have to go back and look at
17   that regulation to see what latitude that allowed
18   CMS or HCFA.
19   BY MR. TORBORG:
20       Q.  And do you recall that the Omnibus
21   Budget Reconciliation Act of 1990 was a statute,
22   correct?

Page 599

1        A.  Correct.
2        Q.  Passed by Congress, correct?
3        A.  Correct.
4        Q.  Directed HCFA to establish federal
5    upper limits for products that met the criteria
6    established in that statute?
7        MR. HERNANDEZ: Objection, form.
8        THE WITNESS: Yes.
9    BY MR. TORBORG:
10       Q.  Yes?
11       A.  Sorry.
12       Q.  And OIG found that there were some
13   drugs that met the criteria for which a FUL had
14   not been established; is that correct?
15       A.  They do have drugs that they contend
16   were not listed on the federal upper limits list.
17       Q.  Was it a matter of a resource
18   limitation at HCFA?  Was it a matter of
19   deliberate policy choice not to establish a FUL
20   for certain drugs or something else?
21       A.  I would have to go back and look at our
22   response at that point to see what we said.

Page 600

1        Q.  Okay.
2            Have you had a chance to review the
3    response?
4        A.  I've looked at part of it.
5        Q.  And does reviewing that allow you to
6    answer my question?
7            MS. MARTINEZ: For the record, the
8    response is three pages single-spaced.  I don't
9    think the witness has had a chance to look at it.
10           MR. TORBORG: I agree.  I thought he
11   looked up as though he had found what he wanted
12   to find.  So --
13           THE WITNESS: No, I wasn't aware that
14   you wanted me to do it at this point in time.
15   I don't see anything in there that
16   addresses that -- your question.
17           MR. TORBORG: We had several requests
18   to adjourn at 4:30, so why don't we do so and
19   then --
20           MR. DRAYCOTT: Principally from the
21   witness, too, by the way.
22           MR. TORBORG: Yeah, okay.  And then

Page 601

1    we'll continue with Mr. Reed's deposition at a
2    mutually agreeable time and place.
3            Thank you, Mr. Reed.
4            THE WITNESS: You're welcome.
5            THE VIDEOGRAPHER: This concludes
6    Volume II of the deposition of Larry Reed.
7            Going off the record.  The time is
8    16:36:36.
9            (Whereupon, signature not having
10   been waived, the deposition was adjourned at 4:36
11   p.m. to be continued at a later date and time.)
12
13
14
15
16
17
18
19
20
21
22

69 (Pages 598 to 601)

79c10215-cdc8-4745-9a2e-f995562fa54f

Reed, Larry - Vol. III                          March 18, 2008
                        Washington, DC

Page 837

1    other incentives like dispensing fees,
2    copayments, that type of thing.
3         Q.  Do you know who wrote the first draft
4    of this response?
5         A.  No, I don't.
6         Q.  Do you know -- if you had to guess who
7    on the Medicare side of the drug payment issue,
8    who would have wrote this?  Who the possible
9    candidates --
10        A.  Who the persons would be?
11        Q.  Yeah.
12        A.  No.  Other than the people that would
13   work with part D, which would be the Centers for
14   Medicare Management, I don't know.
15        Q.  Well, who are the people over there?
16   Surely you know who they are.
17        A.  I know some of the people over there.
18        Q.  Could you tell me who some of the
19   people are over there?
20        A.  Tracy McCutcheon, Alissa Deboy, Craig
21   Minor, Judy Geisler, Cynthia Tudor.  Off the top
22   of my head, that's what I remember.

Page 838

1         Q.  You indicated, Mr. Reed, that you
2    worked on an interrogatory related to the federal
3    upper limit program?
4         A.  That's correct.
5         Q.  And do you recall that the question
6    that Abbott asked of CMS was why there were not
7    federal upper limits established for the drugs at
8    issue in the case the United States has brought
9    against Abbott?
10        A.  That's correct.
11        Q.  And you reviewed that response?
12        A.  I did.
13        Q.  And we had the opportunity to depose
14   Ms. Gaston on issues relating to the FUL
15   program.  And my takeaway from that testimony, at
16   least -- correct me if it's inconsistent with
17   your recollection -- is that CMS took steps to
18   carve out infusion and intravenous drugs from
19   getting a FUL.
20             MS. MARTINEZ:  Objection to form.
21        A.  I don't know what her testimony was.
22   I'm sorry.

Page 839

1         Q.  Okay.  Do you know why CMS did not
2    establish federal upper limits for intravenous
3    and infusion drugs?
4         A.  I think for the reasons that we
5    responded to in the interrogatory.
6         Q.  Has it in your experience always been
7    the case that CMS did not have federal upper
8    limits on infusion and intravenous drugs?
9         A.  In my experience, I don't remember
10   there being federal upper limits on those drugs.
11        Q.  And do you know why that is?
12        A.  Again, for the reasons stated in the
13   interrogatory.
14        Q.  It's your testimony there wasn't, to
15   your knowledge, any specific steps taken to
16   exclude those drugs from the list of drugs that
17   would get a federal upper limit?
18             MR. WINGET-HERNANDEZ:  Objection, form.
19        A.  I mean, again, apart from the FULs in
20   the interrogatory, it was -- the federal upper
21   limits were what they were.
22        Q.  What participation did you have in

Page 840

1    deciding what drugs would get a federal upper
2    limit?
3         A.  I oversaw that area.
4         Q.  I'll ask you to go to Exhibit 466.
5    This is a set of comments that were prepared in
6    connection with an OIG report on the Medicaid
7    program's use of revised average wholesale
8    prices.  I wanted to ask you about the comment
9    apparently -- the comment included in the row
10   titled "NC" where they commented "DOJ did not do
11   this in the right way.  At a meeting about the
12   new prices ask Larry Reed why not put these
13   prices on a FUL.  HCFA responded that they
14   couldn't do that."
15             Do you recall making comments on why it
16   was that HCFA did not have -- or could not put
17   FUL prices on drugs that were under investigation
18   by the Department of Justice?
19             MS. MARTINEZ:  Objection, form.
20        A.  And I'm sorry.  When did you say this
21   occurred?
22        Q.  The testimony has been about this

                          60  (Pages 837 to 840)

8615aca3-c44e-4f74-a36a-79d28ca5988e

Reed, Larry - Vol. III                              March 18, 2008
Washington, DC

Page 841

1  document that this was prepared in connection
2  with an OIG report that concerned new AWP prices
3  for certain drugs that were under investigation
4  from the Department of Justice.
5      MS. MARTINEZ: Objection to form.
6      A. Do you know the date of that OIG
7  report?
8      Q. 2001.
9      Do you recall anyone, Mr. Reed, ever
10 asking you why federal upper limits were not
11 placed on intravenous and infusion drugs?
12     A. I think you have two different
13 questions to me. One would be if I made the
14 statement why did I make this statement, and the
15 second is why did we not put federal upper limits
16 on infusion drugs.
17     Q. Yeah. Let's take them one at a time.
18     A. Do you want the first one, my response
19 to this?
20     Q. Sure.
21     A. The federal upper limits need to be set
22 in response to the published compendia prices.

Page 842

1  That's the requirement in the regulation. I'm
2  not sure what these prices were. But if these
3  were prices that were computed by the DOJ -- and
4  again, the Bayer settlement comes to mind --
5  these would be prices that would be not part of
6  that system. We would then have lacked the
7  regulatory authority to base our reimbursement --
8  to base our federal upper limit on these prices.
9      Q. And the second question?
10     A. I don't know.
11     Q. Mr. Reed, I'd ask you to go to Exhibit
12 488, which I think would be in there.
13     A. I think that's the next one.
14     MR. WINGET-HERNANDEZ: 488?
15     MR. TORBORG: 488.
16     Q. Mr. Reed, there has been some testimony
17 from Ms. Duzor on this document. Do you recall
18 this particular document?
19     MS. MARTINEZ: Objection to form.
20     A. No. I don't recall this document.
21     Q. Do you recall having a meeting with the
22 National Association of Chain Drug Stores to

Page 843

1  discuss efforts that were going on in the states
2  to increase dispensing fees in the event that
3  average manufacturer prices would be used to set
4  FUL prices?
5      A. Yes.
6      Q. What do you recall about that?
7      A. In what regard? In regard to this
8  document?
9      Q. Or just generally.
10     A. I know that they raised a number of
11 concerns about the DRA and what the publication
12 of AMPs would mean be for pharmacy payment.
13     Q. Do you recall that there was a
14 discussion that many states were considering
15 increasing the dispensing fees if the FUL prices
16 were lowered?
17     A. Yes.
18     Q. Now, in connection with your position
19 at CMS you've worked on all matter of pharmacy
20 issues; is that fair to say?
21     A. I think a better statement might be
22 that I've worked on a number of Medicaid pharmacy

Page 844

1  payment and rebate issues.
2      Q. And you've worked extensively with your
3  colleagues within CMS who had experience with
4  Medicaid pharmacy issues, correct?
5      A. I think that would be generally
6  correct.
7      Q. And you've worked with a number and
8  spoken with a number of state pharmacy
9  administrators who handled Medicaid payments for
10 drugs, correct?
11     A. Correct.
12     Q. You've attended annual meetings with
13 them, correct?
14     A. On some occasions, correct.
15     Q. You've attended meetings with them on
16 the technical advisory group, correct?
17     A. Correct.
18     Q. You've worked with them on state plan
19 amendments, correct?
20     A. That's correct.
21     Q. Have you attended phone calls or
22 meetings with provider advocacy groups concerning

61  (Pages 841 to 844)