## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL. NO. 1456 |
| THIS DOCUMENT RELATES TO: | Civil Action No. 01-CV-12257-PBS |
| *State of Iowa* v. *Abbott Labs., Inc., et al.* S.D.IOWA 4:07-CV-00461-JAJ-CFB | Judge Patti B. Saris |

### STATE OF IOWA'S OMNIBUS SUR-REPLY TO VARIOUS DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS

Every argument set forth in the individual reply briefs has either already been addressed by the Court's prior rulings or is redundant of the arguments in the original individual moving briefs  to dismiss and therefore already addressed by the State of Iowa's Omnibus Opposition brief.  Defendant TAP did not file a reply brief and the State of Iowa resolved with GSK the issues underlying its motion to dismiss.[1]  All individual motions to dismiss should be denied.[2]

### AMGEN

In its reply brief, Amgen concedes *sub silentio* that Epogen is, in fact, used for other than chronic renal disease and therefore reimbursed based on AWP.  *See* Amgen Reply at 1.  Amgen argues however because it never "marketed" Epogen for any use other than chronic renal

---

[1] The State of Iowa and GSK have agreed that the State of Iowa will not pursue claims prior to August 10, 2006 relating to the five (5) NDCs of Kytril and Zofran identified and released in the 2006 GSK Settlement, thus mooting GSK individual motion to dismiss and obviating the need for GSK to file a Reply brief.

[2] Except as identified herein, all other causes against AstraZeneca, Amgen, Boehringer Ingelheim Corporation, Chiron, Endo Pharmaceuticals, Eli Lilly, GlaxoSmithKline, Purdue Group, Pfizer and Pharmacia/Greenstone are addressed by the State of Iowa in its Sur-Reply Memorandum of Law in further Opposition to Certain Defendants' Motion to Dismiss.  That brief is being filed contemporaneously.

disease, that Epogen does not fit into the State of Iowa's theories and should be dismissed. Amgen Reply at 2.

Amgen misses the point. If the State of Iowa reimbursed for Epogen based on false and inflated prices Amgen reported to the publishing compendia, and Iowa alleges that it did, then Epogen is properly part of this case. *See* Iowa Complaint at ¶¶73-82.

Amgen's individual motion should be denied in its entirety.

## ASTRAZENECA

In its reply brief, AstraZeneca contends that: (i) it was impossible for the State of Iowa to be defrauded by AstraZeneca's pricing practices because AstraZeneca has provided Average Sales Prices ("ASPs") to the State of Iowa as part of the 2003 Settlement; and (ii) that AstraZeneca was under no obligation under the 2003 Settlement to change the way it reported or calculated AWPs.

First, this Court has ruled that the preclusive effect of a settlement is to be read "within the four corners" of the release. *See* NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23. Based on the "four corners" of the 2003 Settlement release, the State of Iowa agrees that its Zoladex-related claims for the period prior to September 4, 2003 have been released. The Zoladex claims arising from misconduct thereafter have not been released.

Second, the fact that AstraZeneca has been reporting ASPs is not grounds for dismissal. This argument is fact-based and premature. The Court has already addressed and rejected similar arguments made by Bayer in connection with its Cipro settlement. *See Suffolk II*, 2004 WL 2387125 (D. Mass) at *2-3; NY Counties Case June 16, 2006 Oral Argument Transcript at 71:19-23. On a fuller record it will be determined how, whether and to what extent AstraZeneca's ASP reporting impacts Iowa's claims that AstraZeneca has manipulated the

Medicaid reimbursement scheme through, *inter alia*, its continued submission of false and inflated prices to the publishing compendia.

The State of Iowa agrees that its Zoladex claims prior to September 4, 2003 have been released. AstraZeneca's motion to dismiss as it relates to Zoladex claims after September 4, 2003 should be denied.

## BOEHRINGER INGELHEIM CORP.

In its reply brief, Boehringer Ingelheim Corporation ("BIC") contends that the State of Iowa: (i) does not meet the requirements of Fed. R. Civ. P. 9(b) by pleading allegations for the Boehringer Group; and, (ii) implicitly recognizes that BIC does not manufacture or sell pharmaceuticals products. *See* BIC Reply at 2. BIC further contends that the State of Iowa does not allege an alter ego theory and there is no basis to ignore separate corporate existences of the Boehringer Group companies. *Id.*

BIC's argument is betrayed by the facts and its own statements. The State of Iowa properly identified the Boehringer Group as consisting of BIC, Boehringer Ingelheim Pharmaceuticals Inc. ("BIPI"), Boehringer Ingelheim Roxane Inc. ("Roxane") and Ben Venue Laboratories, Inc. ("Ben Venue"). *See* Iowa Complaint at ¶30. Moreover, the State of Iowa specifically alleged that "at all times relevant and hereto, all acts committed by or on behalf of [BIPI] were also committed by or on behalf of [BIC]". *Id.*

In order to determine whether a subsidiary is the alter-ego of its parent, a court must examine, "factors that demonstrate whether corporate formalities have been observed" including "whether the parent corporation and its subsidiary were separately incorporated, had separate boards of directors, maintained separate financial records, and had separate facilities and operating personnel." *In re Lernout & Hauspie Securities Litigation*, 337 F.Supp.2d 298, 313-

314 (D.Mass. 2004) (quoting *Danton v. Innovative Gaming Corp. of America*, 246 F.Supp.2d 64, 72 (D.Me. 2003) (quoting *Russell v. Enterprise Rent-A-Car of Rhode Island*, 160 F.Supp.2d 239, 252 (D.R.I., 2001)).

First, BIC and BIPI maintain the same corporate headquarters and principle place of business located at 900 Ridgebury R., Ridgefield, Connecticut. *See* Iowa Complaint at ¶30.

Second, the Westlaw corporate and business registration records for Connecticut (updated March 2, 2006) identify the Ridgefield address as corporate headquarters for BIPI and J. Martin Carroll as the President of BIPI. *See* Westlaw state business records (attached hereto as Exhibit A). Similarly, the Westlaw corporate and business registration records for Nevada (updated April 10, 2006) identify the Ridgefield address as corporate headquarters for BIC, a Nevada corporation, and J. Martin Carroll as President of BIC. *Id.* Lastly, the Westlaw corporate and business registration records for Connecticut (updated March 2, 2006) identify J. Martin Carroll as the Chairman of the Board of Roxanne. *Id.* Thus, the leader and controlling person of BIC, BIPI and Roxanne in 2006 was the same person, J. Martin Carroll.

Third, a Westlaw search of Dun & Bradstreet lists both BIC's and BIPI's line of business as "manufacturing pharmaceuticals." *See* Westlaw Dun & Bradstreet records (attached hereto as Exhibit B). Also, like the state corporate records, Dun & Bradstreet identifies Werner Gerstenberg as the former President and CEO of both BIC and BIPI as of November 2, 2005. *Id.*

Fourth, other multi-tasking corporate executives between BIC and BIPI include: Hermann Tetzner (BIC Treasurer; BIPI Sr. VP of Finance & Treasury; Roxanne Treasurer) and Marla S. Persky, Esq. (BIC, BIPI & Roxanne – Corporate Secretary). *See* Exh. A & B.

Fifth, BIC holds itself out to the public as a company that manufactures and sells pharmaceuticals. There are websites for BIC, Roxane and Ben Venue, yet no website for BIPI.

The BIC website clearly shows that BIC and BIPI are enmeshed and intertwined. For example, the Introduction to the Code of Conduct and Corporate Integrity, available at the BIC website, is a letter from J. Martin Carroll, President and CEO of BIC to the employees of BIC.[3] The footnote to the letter states that references to "'Boehringer Ingelheim' or to 'the Company' in the Code [] are referring collectively to Boehringer Ingelheim Corporation and its subsidiaries in the United States." *Id.*

Sixth, BIC dedicates an entire page on its website to discussing its Sales and Marketing Corporate Compliance programs.[4] In fact, anyone who wants information about BIC drugs does so through the BIC website, not a BIPI website.[5] Again, there is no BIPI website.

Seventh, in 2001, the German parent of BIC, Boehringer Ingelheim GmbH, controlled all production decisions of the Boehringer entities. *See ICT Pharms. Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F.Supp.2d 268, 270 (D.Del. 2001).

The overlap of corporate control between BIC, BIPI and Roxanne is obvious. BIC unmistakeably manufacturers and sells pharmaceuticals and controls its subsidiaries. As such, BIC is properly included in the State of Iowa's "Boehringer Group" and subject to all allegations in the complaint.

Furthermore, determining alter ego status requires complex fact finding and is better left to summary judgment stage of the proceedings. *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d

---

[3] *See* Letter from J. Martin Carroll, President and Chief Executive Officer, Boehringer Ingelheim Corporation, dated January 2006. (Attached hereto as Exhibit C).

[4] "Sales and Marketing Compliance is one specific area in which the company has expended an enormous amount of effort and compliance resources. Under the guidance of the Sales and Marketing Compliance department, Boehringer Ingelheim has developed specific policies and procedures to address issues identified in the OIG Guidance document and the PhRMA Code. These policies and procedures are provided to the relevant employees in a variety of formats." (emphasis added). *See* http://us.boehringer-ingelheim.com/about-us/compliance/docs/compliance_program.html. (Attached hereto as Exhibit D).

[5] http://us.boehringer-ingelheim.com/products/prescription.html.

30, 46-47 (1st Cir. 1999)(*citing Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)). Should the Court deem the State of Iowa's showing insufficient, the State of Iowa hereby requests that it be permitted to explore in discovery any issues raised by BIC regarding its status as the controlling entity of BIPI, Roxane and Ben Venue and/or amend its complaint.

BIC's individual motion should be denied in its entirety.

## CHIRON

In its reply brief, Chiron now contends that the State of Iowa narrowed its action to only two products and has effectively amended out paragraphs 319-327 of its complaint. Chiron further contends that these paragraphs should also be stricken. Otherwise, Chiron's Reply merely regurgitates the same arguments as its individual motion to dismiss, to wit: (i) that spreads less than 30% require dismissal; (ii) the Court's rulings in *Suffolk* control and mandate dismissal; and (iii) Chiron should not have to guess at the "phantom" drug and the State of Iowa should be made to fix the deficiency in the pleadings, however, because the State of Iowa has the same counsel as other plaintiffs before the Court, the State of Iowa should not be afforded any leave to amend.

Chiron's Reply advances nothing. First, the State of Iowa did not narrow its action, nor did it effectively amend out any paragraphs in its complaint. The State of Iowa clearly identified all Chiron drugs for which it seeks relief in Exhibit B-10. *See* Iowa Complaint at ¶318 & Exh. B-10. Chiron's request to strike allegations because certain drugs in the body of the complaint do not also appear in Exhibit B is improper. The allegations in paragraphs 319-327 of the State of Iowa's Complaint: (i) identify the State of Iowa's claims (¶¶319-20); (ii) describe Chiron's knowledge of its pricing scheme and the fact it provided worksheets to its sales representatives to market spread (¶320-21); serve as relevant foundation for Chiron's business practice showing

with particularity that Chiron's pricing malfeasance is systemic throughout its business (¶¶ 322-26); and, allege that because of Chiron's pricing scheme and malfeasance its prices could not be "average" (¶327). Chiron does not dispute that the allegations discuss its business practice, only that certain drugs are identified in the paragraphs. *See* Chiron Reply at 1-2. Like the supposed CMO that supports striking these allegations (an argument Chiron made in its opening brief and which it has now, apparently, dropped), Chiron does not provide any support beyond Rule 12 for the proposition that the Court should strike Iowa's pleadings.

Second, Chiron knows full well from its participation in the New York AWP action that this Court has sustained claims for drugs with spreads greater than 20-25%, while merely staying discovery for drugs with spreads under 30%. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 WL 1051642 (D. Mass. April 2, 2007) ("*New York Counties I*") at *15, n.8; *In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007)("*New York Counties II*") at ¶4; CMO #33 at ¶¶2(c) & 4.

Third, as the foregoing indicates *Suffolk* is not the controlling precedent for pleading an actionable AWP Medicaid claim.

Fourth, the State of Iowa identified and resolved the supposed mystery behind the "phantom" drug in its Omnibus Opposition brief and will do so again here, to wit: the "phantom" drug is merely another price point for Proleukin 22 million IU Vial. The drug was entirely identifiable from the context of the exhibit. The State of Iowa identified at issue drugs by NDC in ascending order for all defendants via individualized Exhibit Bs. If alternative price points were available for a particular NDC, then that price point was provided in the lines below the identifying NDC. *See* Iowa Complaint Exh. B. Chiron was the only defendant that apparently had trouble understanding Complaint Exhibit B.

Finally, Chiron's request to bar an amendment and dismiss with prejudice because the State of Iowa has the same counsel as that in the New York AWP action is entirely improper and made without any foundation whatsoever. The State of Iowa, like all State Medicaid Programs, is entitled to its proper day in Court.

Chiron's motion to dismiss should be denied in its entirety.

## ELI LILLY

In its reply brief Eli Lilly ("Lilly") continues to argue that the pleading standard for an actionable spread is 30%. Lilly is wrong.

The Court has unequivocally stated that AWP claims are sufficiently pled and satisfy Fed. R. Civ. P. 8(a) and 9(b) particularity where the plaintiff alleges a spread greater than 20-25% using weighted averages of wholesaler transaction prices or McKesson ServAll prices (irrespective of whether pharmacies reimbursed by a state were members of McKesson ServAll). *See New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15, n.8; *New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also* CMO 33 at ¶¶2(c) & 4. Lilly is a defendant in the New York AWP action and is fully aware of these rulings. Lilly is also a party to the New York CMO #33, which specifically provides that claims associated with spreads of 25-30% have been sustained, though discovery is stayed. *See* CMO #33 at ¶¶2(c) & 4. Every spread in Iowa Complaint Exhibit B-12 for Lilly drugs exceeds the 20-25% pleading threshold set by the Court and is actionable.

It is Lilly or Lilly's counsel who knows or should know that the spreads related to Lilly drugs do exceed the 20-25% pleading threshold. Prices used by the State of Iowa are conservative and do not reflect off-invoice discounts, rebates, administrative fees, free goods and other incentives offered by Lilly to its customers. *See* Iowa Complaint at ¶¶127-28.

8

Lilly acknowledges that a temporal standard was not set by the Court, and instead contends that the State of Iowa's prices are not "typical" and calculated in good faith. Lilly Reply at 2. The State of Iowa, clearly in good faith calculated the spreads in its Complaint Exhibit B by averaging hundreds of thousands of wholesale transaction prices for time periods related to each First Databank published AWP. As the State of Iowa indicated in its Omnibus Opposition, increasing the time frame of the actionable spread is not a problem and any such temporal issue with the spreads can be cured with an amended Iowa Complaint Exhibit B-12 as indicated by Exhibit E attached hereto.

Lilly's individual motion to dismiss should be denied in its entirety.

### ENDO PHARMACEUTICALS

It its reply brief, Endo attempts to distract the Court with irrelevant arguments: (i) that the State of Iowa did not allege that each NDC was therapeutically equivalent in order to set the FUL; (ii) claims for FUL fraud can only exist for the most commonly available NDC that set the FUL for a particular drug and no other NDC; and, (iii) the State of Iowa failed to allege a specific false representation by only alleging that Endo provided false WACs to the reporting agencies and did not specifically allege examples of the false WACs.

Endo's efforts should be rejected. First, if a drug is subject to a FUL then by definition it is therapeutically equivalent to another. In addition to the clear allegations stating therapeutic equivalence, the State of Iowa asserts FUL-fraud claims for drugs that were subject to FULs, thus, by definition, all Endo drugs subject to FUL are therapeutic equivalents. Of note is the absence of arguments by Endo that its drugs were not therapeutic equivalents or that its drugs were not subject to FULs. Endo's argument fails.

Second, Endo admits, as it must, that if a FUL is in place then it applies to all NDCs for that drug. The State of Iowa has alleged the method of the FUL calculation, provided the FUL that was in place, identified weighted average prices from wholesaler transaction data (or McKesson ServAll prices) and showed that had Endo reported true prices for its drugs it would have set a lower FUL. Thus, the State of Iowa has met the prior rulings of this Court, which make plain that such allegations are sufficient for a claim of FUL fraud. *See New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *16. This is particularly true when all reasonable inferences are drawn in favor of the plaintiff at this stage of the litigation. *See New York Counties I*, 2007 WL 1051642 at *3 (D. Mass. April 2, 2007), citing *Coyne v. City of Somerville*, 972 F.2d 440, 442-43 (1st Cir.1992). Of note, again, is the absence of an argument by Endo that it does not sell a drug identified in Exhibit B-13 in the most commonly available size that sets the FUL. Endo's argument fails.

Third, Endo does not dispute that it reports AWPs. This Court has already ruled that a plaintiff need not identify a false WAC to establish an AWP-fraud claim. The Court has specifically held that Rule 9(b) is satisfied "with respect to those drugs (1) specifically identified in the complaint as (2) purchased by the [plaintiff] in any year subject to this lawsuit along with (3) an allegedly fraudulent AWP calculated on a good faith basis, together with a spread." *See New York City I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15. The allegations in the State of Iowa's complaint do exactly this. The State of Iowa has identified the Endo drugs and AWPs at issue and alleged that Endo's overall pricing fraud has resulted in false published prices that in turn have resulted in the State of Iowa's overpayment for Endo drugs. *See* Complaint at ¶¶95-97, 133-180, 367-368, Exh. B-13. Again, Endo's argument fails.

Endo's individual motion to dismiss should be denied in its entirety.

## PURDUE

In its reply brief, Purdue does not challenge that the Court has unequivocally stated that AWP fraud claims are pled with sufficient particularity where the plaintiff alleges a spread greater than 20-25% using weighted averages of wholesaler invoice prices or McKesson ServAll prices. *See New York Counties I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *15, n.8; *New York Counties II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007); *see also* CMO 33 at ¶¶2(c) & 4.

Instead, Purdue maintains that the Court should dismiss the State of Iowa's AWP fraud claims because three paragraphs concerning public statements by a Purdue employee, government investigations and co-promotion agreements do not meet the particularity requirements of Fed. R. Civ. P. 8(a) and 9(b). Purdue contends that the State of Iowa fails to address why any of the allegations are relevant and that it even concedes that the government investigations are irrelevant.

First, the State of Iowa has conceded nothing, nor should it. Second, every spread in Iowa Complaint Exhibit B-27 for Purdue drugs exceeds the 20-25% pleading threshold set by the Court and supports actionable claims of AWP fraud. *See* Complaint Exhibit B-27. Third, the State of Iowa addressed the relevance of the paragraphs as establishing a reasonable inference of Purdue's company-wide scheme of pricing malfeasance and knowledge thereof. *See* Omnibus Opposition at 10, fns 7 & 8.

Purdue also continues to tilt at windmills with the argument that the Court should dismiss the "FUL-based fraud claims" the State of Iowa supposedly asserted against it. As set forth in

Iowa's opening brief, Iowa has not asserted FUL fraud claims against Purdue. Nothing more need be said on this point.

Purdue's individual motion to dismiss should be denied in its entirety.

## PFIZER

Pfizer contends in its reply brief that the State of Iowa has abandoned its AWP fraud theory and instead relies on a theory of fraud relating to its WACs. *See* Pfizer Reply at 1. Pfizer further contends that the State of Iowa is asserting the same arguments that resulted in Pfizer's dismissal from the Illinois AWP action and as such it should be dismissed here. *Id.*

First, the State of Iowa has not abandoned any claims or theories regarding Pfizer's price reporting practices. Second, every spread in Iowa Complaint Exhibit B-26 for Pfizer drugs exceeds the 20-25% pleading threshold set by this Court – not that of an Illinois court -- and supports actionable claims. *See* Complaint Exhibit B-26. Moreover, Plaintiffs have also clearly asserted allegations consistent with this Court's prior definitive rulings that: (1) manufacturers are aware of the formulaic relationship between the prices it provided to the publishing compendia and the AWPs that get published; and (2) drug manufacturers knew third party payors, including government Medicaid agencies relied upon the published AWPs and that manufacturers did nothing to stop the publication of the AWPs.[6] *See* Complaint at ¶¶87-101.

Pfizer's individual motion to dismiss should be denied in its entirety.

## PHARMACIA/GREENSTONE

In their reply brief, Pharmacia/Greenstone contends that the State of Iowa is attempting to hold one defendant liable for another based on the prices reported by another. This is incorrect. The State of Iowa does not seek to tag one defendant with liability because of the price reporting

---

[6]*See New York City I*, 2007 WL 1051642 (D. Mass. April 2, 2007) at *6-7, *14, *15, n.8; *New York City II*, 498 F. Supp. 2d 402, 405 (D. Mass. July 30, 2007) at ¶4; *see also* CMO 33 at ¶¶2(c) & 4.

practices of another.  Rather, the State of Iowa alleges, *inter alia*, that had Pharmacia/Greenstone reported accurate prices for its drugs it would have, on occasion, set a lower FUL.  The State of Iowa asserts that this lower FUL would have resulted in a lower reimbursement by the State of Iowa.  *See* Iowa Complaint at ¶¶102-108.

The State of Iowa further alleges that to the extent it reimbursed based on Pharmacia/Greenstone's reported AWPs, the State was also defrauded and damaged in that context. *See id.* at ¶¶83-101, 488-506

Pharmacia/Greenstone's individual motion to dismiss should be denied in its entirety.

## CONCLUSION

For all the foregoing reasons, each of defendants' individual Motions to Dismiss the State

of Iowa's Complaint should be denied in its entirety.

Dated: May 9, 2008

Respectfully submitted,

KIRBY McINERNEY, LLP
*Special Counsel to the State of Iowa*

By: _____/s/_____
Joanne M. Cicala (JC 5032)
James P. Carroll Jr. (JPC 8348)
Aaron D. Hovan (AH 3290)
830 Third Avenue
New York, New York 10022
(212) 371-6600

THOMAS J. MILLER, ATTORNEY
GENERAL FOR THE STATE OF IOWA

C. Roderick Reynolds
J. Bradley Horn
Assistant Attorneys General
Iowa Department of Justice
1305 E. Walnut St.
Hoover Bldg., 2nd Floor
Des Moines, IA  50319
(515) 281-4055

## CERTIFICATE OF SERVICE

I, James P Carroll Jr, hereby certify that I caused a true and correct copy of the foregoing STATE OF IOWA'S OMNIBUS SUR-REPLY TO VARIOUS DEFENDANTS' INDIVIDUAL MOTIONS TO DISMISS, to be served on all counsel of record via electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by submitting a copy to Lexis/Nexis File & Serve for posting and notification to all parties.

Dated:  May 9, 2008                               ___ /s/ James P. Carroll Jr._____
                                                                    James P. Carroll Jr.

# EXHIBIT
# A

Westlaw.

11636672338                                                      Page 1

11636672338

## CORPORATE RECORDS & BUSINESS REGISTRATIONS

This Record Last Updated:    03/02/2006
Database Last Updated:       06-02-2006
Update Frequency:            MONTHLY
Current Date:                06/02/2006
Source:                      AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFI-
                             CIAL SOURCE

### COMPANY INFORMATION

Name:                        BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.
Address:                     900 RIDGEBURY ROAD
                             RIDGEFIELD, CT 06877
D&B DUNS:                    60-317-5944

### NAME INFORMATION

 Former Name:                BOEHRINGER INGELHEIM LTD.

### FILING INFORMATION

Identification Number:       0071684
Filing Date:                 02/09/1978
State of Incorporation:      DELAWARE
Status:                      ACTIVE
Corporation Type:            NOT AVAILABLE
Business Type:               CORPORATION
Address Type:                BUSINESS
Where Filed:                 SECRETARY OF STATE/CORPORATIONS DIVISION
                             30 TRINITY ST
                             HARTFORD, CT 06106

### REGISTERED AGENT INFORMATION

Name:                        C T CORPORATION SYSTEM
Address:                     ONE COMMERCIAL PLAZA
                             HARTFORD, CT

### PRINCIPAL INFORMATION

Name:                        J. MARTIN CARROLL
Title:                       PRESIDENT
Address:                     900 RIDGEBURY ROAD;
                             RIDGEFIELD, CT   06877

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

| | |
|---|---|
| Name: | PAUL R. FONTEYENE |
| Title: | EXEC. VICE PRES |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | HERMANN TETZNER |
| Title: | SENIOR VICE PRES. - FINANCE & TREAS. |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | MARLA S. PERSKY, ESQ |
| Title: | SENIOR VP, GENERAL COUNSEL & SECRETARY |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | FRANK A. POMER, ESQ. |
| Title: | ASSISTANT SECRETARY |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

**AMENDMENT INFORMATION**

| Amendments: | | |
|---|---|---|
| | 02/03/2006 MISCELLANEOUS | REPORT |
| | 02/07/2005 MISCELLANEOUS | REPORT |
| | 08/13/2004 MISCELLANEOUS | REPORT |
| | 02/25/2003 MISCELLANEOUS | REPORT |
| | 06/14/2002 MISCELLANEOUS | REPORT |
| | 05/14/2001 MISCELLANEOUS | REPORT |
| | 03/31/2000 MISCELLANEOUS | REPORT |
| | 02/16/1999 MISCELLANEOUS | REPORT |
| | 12/29/1997 MISCELLANEOUS | REPORT |
| | 02/25/1997 MISCELLANEOUS | REPORT |
| | 02/27/1996 MISCELLANEOUS | REPORT |
| | 05/07/1985 MISCELLANEOUS | AMENDED CERTIFICATE OF AU- |
| | THORITY | |
| | 05/30/1984 MISCELLANEOUS | CHANGE OF AGENT ADDRESS |
| | 02/09/1978 MISCELLANEOUS | CERTIFICATE OF AUTHORITY |

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE OFFICIAL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

RECORD.   CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15085754634

## CORPORATE RECORDS & BUSINESS REGISTRATIONS

This Record Last Updated:    04/10/2006
Database Last Updated:       05-26-2006
Update Frequency:            WEEKLY
Current Date:                05/28/2006
Source:                      AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFI-
                             CIAL SOURCE

### COMPANY INFORMATION

Name:                        **BOEHRINGER INGELHEIM** CORPORATION

### FILING INFORMATION

Identification Number:       C7122-1984
Filing Date:                 10/23/1984
State of Incorporation:      NEVADA
Date Incorporated:           10/23/1984
Status:                      ACTIVE
Corporation Type:            PROFIT
Business Type:               DOMESTIC CORPORATION
Where Filed:                 CORPORATION DIV
                             STATE CAPITOL
                             CARSON CITY, NV 89714

### REGISTERED AGENT INFORMATION

Name:                        CORPORATION TRUST COMPANY OF NEVADA
Address:                     6100 NEIL ROAD;STE 500
                             RENO, NV

### PRINCIPAL INFORMATION

Name:                        J MARTIN CARROLL
Title:                       PRESIDENT
Address:                     371 WILTON RD E
                             RIDGEFIELD, CT   06877

Name:                        MARLA S. PERSKY ESQ
Title:                       SECRETARY
Address:                     190 GEORGE WASHINGTON HWY
                             RIDGEFIELD, CT   06877

Name:                        HERMANN TETZNER

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Title:                          TREASURER
Address:                        95 MILL SPRING LN
                                STAMFORD, CT  06903

Name:                           WERNER GERSTENBERG
Title:                          DIRECTOR
Address:                        112 CHESTNUT HILL RD
                                STAMFORD, CT  06903

### AMENDMENT INFORMATION

Amendments:                     09/29/2005 MISCELLANEOUS   ANNUAL LIST-DOCUMENT ID:
                                20050451456-72
                                12/28/2004 MISCELLANEOUS   MERGER-DOCUMENT ID:
                                C7122-1984-009
                                09/22/2004 MISCELLANEOUS   ANNUAL LIST-DOCUMENT ID:
                                C7122-1984-002
                                10/10/2002 MISCELLANEOUS   ANNUAL LIST-DOCUMENT ID:
                                C7122-1984-010
                                04/24/2002 MISCELLANEOUS   AMENDMENT-DOCUMENT ID:
                                C7122-1984-008
                                10/29/1999 MISCELLANEOUS   RESIDENT AGENT ADDRESS
                                CHANGE-DOCUMENT ID: C7122-1984-007
                                07/11/1995 MISCELLANEOUS   AMENDMENT-DOCUMENT ID:
                                C7122-1984-006
                                12/31/1984 MISCELLANEOUS   AMENDMENT-DOCUMENT ID:
                                C7122-1984-005
                                12/20/1984 MISCELLANEOUS   AMENDMENT-DOCUMENT ID:
                                C7122-1984-004
                                12/14/1984 MISCELLANEOUS   AMENDMENT-DOCUMENT ID:
                                C7122-1984-003
                                10/23/1984 MISCELLANEOUS   ARTICLES OF INCORPORATION-DOCU-
                                MENT ID: C7122-1984-001

### STOCK INFORMATION

Stock:
        Dollar Value:
        Authorized        10,000
        Shares:
        Par Value:        $0.1

                Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
                to order copies of documents related to this or other matters.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

15085754634                                                                    Page 3

Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE OFFICIAL
RECORD.   CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

11636672338

## CORPORATE RECORDS & BUSINESS REGISTRATIONS

| | |
|---|---|
| This Record Last Updated: | 03/02/2006 |
| Database Last Updated: | 06-02-2006 |
| Update Frequency: | MONTHLY |
| Current Date: | 06/02/2006 |
| Source: | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFI-CIAL SOURCE |

### COMPANY INFORMATION

| | |
|---|---|
| Name: | BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. |
| Address: | 900 RIDGEBURY ROAD |
| | RIDGEFIELD, CT 06877 |
| D&B DUNS: | 60-317-5944 |

### NAME INFORMATION

| | |
|---|---|
| Former Name: | BOEHRINGER INGELHEIM LTD. |

### FILING INFORMATION

| | |
|---|---|
| Identification Number: | 0071684 |
| Filing Date: | 02/09/1978 |
| State of Incorporation: | DELAWARE |
| Status: | ACTIVE |
| Corporation Type: | NOT AVAILABLE |
| Business Type: | CORPORATION |
| Address Type: | BUSINESS |
| Where Filed: | SECRETARY OF STATE/CORPORATIONS DIVISION |
| | 30 TRINITY ST |
| | HARTFORD, CT 06106 |

### REGISTERED AGENT INFORMATION

| | |
|---|---|
| Name: | C T CORPORATION SYSTEM |
| Address: | ONE COMMERCIAL PLAZA |
| | HARTFORD, CT |

### PRINCIPAL INFORMATION

| | |
|---|---|
| Name: | J. MARTIN CARROLL |
| Title: | PRESIDENT |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

| | |
|---|---|
| Name: | PAUL R. FONTEYENE |
| Title: | EXEC. VICE PRES |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | HERMANN TETZNER |
| Title: | SENIOR VICE PRES. - FINANCE & TREAS. |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | MARLA S. PERSKY, ESQ |
| Title: | SENIOR VP, GENERAL COUNSEL & SECRETARY |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

| | |
|---|---|
| Name: | FRANK A. POMER, ESQ. |
| Title: | ASSISTANT SECRETARY |
| Address: | 900 RIDGEBURY ROAD; |
| | RIDGEFIELD, CT  06877 |

### AMENDMENT INFORMATION

| Amendments: | | |
|---|---|---|
| | 02/03/2006 MISCELLANEOUS | REPORT |
| | 02/07/2005 MISCELLANEOUS | REPORT |
| | 08/13/2004 MISCELLANEOUS | REPORT |
| | 02/25/2003 MISCELLANEOUS | REPORT |
| | 06/14/2002 MISCELLANEOUS | REPORT |
| | 05/14/2001 MISCELLANEOUS | REPORT |
| | 03/31/2000 MISCELLANEOUS | REPORT |
| | 02/16/1999 MISCELLANEOUS | REPORT |
| | 12/29/1997 MISCELLANEOUS | REPORT |
| | 02/25/1997 MISCELLANEOUS | REPORT |
| | 02/27/1996 MISCELLANEOUS | REPORT |
| | 05/07/1985 MISCELLANEOUS | AMENDED CERTIFICATE OF AU-THORITY |
| | 05/30/1984 MISCELLANEOUS | CHANGE OF AGENT ADDRESS |
| | 02/09/1978 MISCELLANEOUS | CERTIFICATE OF AUTHORITY |

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE OFFICIAL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

11636672338

RECORD.  CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# B

Westlaw.

**BUSINESS RECORD**

D&B Completed Analysis:04-21-2006
Database Last Updated:04-21-2006
Source:Copyright (c) 2002 by Dun & Bradstreet, Inc.
Current Date:05/28/2006

### COMPANY INFORMATION

DUNS:60-317-5944
Name:BOEHRINGER INGELHEIM
ADDRESS:900 RIDGEBURY RD
RIDGEFIELD, CT 06877
TELEPHONE:203-798-9988

YEAR STARTED:1971

### BUSINESS DESCRIPTION

LINE OF BUSINESS:MFG PHARMACEUTICALS

SIC CODE(S):
  2834PHARMACEUTICAL PREP

### EMPLOYEE INFORMATION

EMPLOYEES HERE:1,300
EMPLOYEES TOTAL:1,796

### COMPANY HISTORY/OPERATIONS/RELATIONSHIPS & OTHER INFORMATION

HISTORY 12/30/05 WERNER GERSTENBERG, CEO-PRES HOLGER HUELS, SR V PRES-FIN DIRECTOR(S): THE
OFFICER(S) BUSINESS STARTED 1971 BY THE PARENT COMPANY.
100% OF CAPITAL STOCK IS OWNED BY BOEHRINGER INGELHEIM CORP. WERNER GERSTENBERG BORN 1938.
1966 GRADUATE OF THE UNIVERSITY OF MUNICH, MUNICH, GERMANY, MBA. 1966-1983 C H BOEHRINGER
SOEHNE GMBH, INGELHEIM, GERMANY, FINANCIAL DEPARTMENT.
1983-PRESENT ACTIVE HERE.
HOLGER HUELS BORN 1951, NOT ACTIVE HERE.
ACTIVE WITH THE PARENT COMPANY.
5 AFFILIATES: THROUGH STOCK OWNERSHIP OF THE IMMEDIATE PARENT, BOEHRINGER INGELHEIM COR-
PORATION, ITS DIRECT PARENT, PHARMA INVESTMENT LTD AND THE TOP PARENT, BOEHRINGER INGEL-
HEIM INTERNATIONAL GMBH, THERE ARE NUMEROUS RELATED COMPANIES LOCATED WORLDWIDE WHICH MAN-
UFACTURE AND MARKET MEDICAL AND VETERINARY PHARMACEUTICAL PREPARATIONS, ACT AS CHEMICAL
COMMODITY TRADERS AND MANUFACTURE AND DISTRIBUTE INGREDIENTS USED IN THE MAKING OF BAKERY
PRODUCTS.
INTERCOMPANY RELATIONS: NONE.
6 OPERATION 12/30/05 SUBSIDIARY OF BOEHRINGER INGELHEIM CORPORATION, RIDGEFIELD, CT WHICH

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

OPERATES AS A HOLDING COMPANY.
PARENT COMPANY OWNS 100% OF CAPITAL STOCK.
PARENT COMPANY HAS NUMEROUS OTHER SUBSIDIARY(IES).
AS NOTED, THIS COMPANY IS A SUBSIDIARY OF BOEHRINGER INGELHEIM CORPORATION, DUNS NUMBER
072701865, AND REFERENCE IS MADE TO THAT REPORT FOR BACKGROUND INFORMATION ON THE PARENT
COMPANY AND ITS MANAGEMENT.
7 A CURRENT FINANCIAL STATEMENT IS NOT AVAILABLE.
BOEHRINGER INGELHEIM CORPORATION IS IN TURN A WHOLLY OWNED SUBSIDIARY OF PHARMA INVESTMENT
LTD, TORONTO, ONTARIO, CANADA, DUNS# 20-760-3200, STARTED 1938 WHICH OPERATES AS A HOLDING
COMPANY AND HAS NUMEROUS OTHER SUBSIDIARIES.
INTERCOMPANY RELATIONS: NONE.
THE ULTIMATE PARENT COMPANY IS BOEHRINGER INGELHEIM INTERNATIONAL GMBH, INGELHEIM, GER-
MANY, FORMED 1925 WHICH MANUFACTURES MEDICINES AND VETERINARY PHARMACEUTICAL PREPARATIONS,
ACT AS COMMODITY TRADERS AND 8 MANUFACTURES INGREDIENTS USED IN THE MAKING OF BAKERY
PRODUCTS.
THE TOP PARENT HAS NUMEROUS OTHER SUBSIDIARIES.
INTERCOMPANY RELATIONS: NONE. ( MANUFACTURER OF CARDIOVASCULAR AND BRONCHOPULMONARY PHAR-
MACEUTICALS AND THROUGH ITS DIVISION NATURAL DIETARY SUPPLEMENTS.
TERMS ARE 2% 30 NET 31 DAYS.
HAS 5000 ACCOUNT(S).
SELLS TO DRUG WHOLESALERS AND THROUGH ITS DIVISION PHARMACIES AND HEALTH PRODUCT RETAIL
STORES.
TERRITORY : UNITED STATES.
NONSEASONAL.
EMPLOYEES: 1,796 WHICH INCLUDES OFFICER(S).
1,300 EMPLOYED HERE.
FACILITIES: OWNS 1,326,000 SQ. FT. IN 3 MULTI STORY BRICK AND GLASS BUILDINGS.
LOCATED AT THIS ADDRESS ARE PRODUCTION, RESEARCH AND DEVELOPMENT AND AN ADMINISTRATIVE
BUILDING.
LOCATION: RESIDENTIAL SECTION ON WELL TRAVELED STREET.
BRANCHES: BRANCHES: DISTRIBUTION AND WAREHOUSE FACILITY MAINTAINED IN BROOKFIELD, CT AND A
SALES OFFICE A SALES OFFICE IN (CONT'D) SOUTHBURY, CT. DIVISION: BUSINESS MAINTAINS A DI-
VISION AT CAPTIONED ADDRESS UNDER THE NAME NATURAL HEALTH PRODUCTS DIVISION WHICH MANUFAC-
TURES AND 2 MARKETS DIETARY SUPPLEMENTS.
00-00(8T7 /016) 00000 072701865 068016016 H 3 4 5 6 7 8

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# C

# Introduction

January 2006

Boehringer Ingelheim Corporation and its subsidiaries[1] have experienced tremendous growth over the years, developing into a preeminent health care company. Our continued success depends upon our people and the work they do. Employees are valued for their differences and encouraged to use their unique perspectives to facilitate better decision making and problem solving. This diversity of thought and experience helps us keep a competitive advantage in teamwork, service, product quality and creativity.

As we strive to meet our goals in an environment of constant change, we will focus on delivering value to our customers. We will look for new and better ways to accomplish our goals by learning from each other and our customers. However, we can never compromise our ethical standards, compliance with the laws that govern our business, or our policies, procedures or other Company requirements. Honest, ethical and professional conduct remains fundamental to achieving the high goals we have set.

The Code of Conduct and Corporate Integrity is designed to help ensure that ethical compromises are never made. The Code, the Corporate Compliance Program and our policies and procedures are part of the systems and processes we have put in place to assure that we act in a way that is always honest, ethical, and meets the high standards of Boehringer Ingelheim Corporation and its subsidiaries. Ultimately, the principles of this Code help us make appropriate decisions and perform with confidence. It is your responsibility to understand and follow the Code of Conduct and Corporate

Integrity, which is accessible to you along with our policies and procedures in several different ways.

If you have a concern or suspect a violation of law, of the Code of Conduct and Corporate Integrity, or of any other Company policies or procedures, you should report it. You may contact your manager or the BI Compliance Helpline. The Helpline offers you access to the BI Compliance Department and you can make reports anonymously. Rest assured that when you raise a compliance concern – directly to management, to Human Resources, through the Compliance Helpline or to the Compliance or Legal Department – your report can be made *without fear of retaliation or reprisal.*

Since our business is constantly changing and presenting new challenges, we will periodically update our Code of Conduct and Corporate Integrity to address these changes.

Our success, and the growth that comes with it, presents many opportunities and challenges. Effective compliance is one of the most important of those challenges. I know that each of us will meet that challenge and continue to demonstrate our commitment to honest and ethical business practices.

Sincerely,

J. Martin Carroll

*President and Chief Executive Officer*
*Boehringer Ingelheim Corporation*

[1]When we refer to "Boehringer Ingelheim," or to "the Company" in the Code, we are referring collectively to Boehringer Ingelheim Corporation and its subsidiaries in the United States. In addition, when we refer to "policies and procedures" we are referring collectively to Boehringer Ingelheim Corporation corporate policies and subsidiary policies and procedures.

# EXHIBIT
# D

 Boehringer
Ingelheim

## Our Compliance Program

### Corporate Compliance Program

**Implementing Our Commitment to Performance
With Integrity**

Recognizing our long-standing commitment to compliance with the law, Boehringer Ingelheim has established a Corporate Compliance Program. The success of the program begins with our employees exercising good judgment and personal integrity, complying with our Code of Conduct and our policies and procedures, and by detecting and reporting any violations of laws or policies.

The Boehringer Ingelheim Corporate Compliance Program conforms with the principles and recommendations published in the Office of Inspector General, U.S. Department of Health and Human Services' Compliance Program Guidance for Pharmaceutical Manufacturers" and the PhRMA "Code on Interactions with Healthcare Professionals'. The Program consists of the following components:

- Chief Compliance Officer and Corporate Compliance Committee
- Corporate Policies and Procedures
- Code of Conduct Annual Certification
- Confidentiality
- Helpline
- Compliance Training and other Resources
- Audits and Investigations
- Corrective Action and Discipline
- No Retaliation Policy
- State and Local Compliance

### Chief Compliance Officer and
### Corporate Compliance Committee

The Boehringer Ingelheim Corporate Compliance Program is under the direction of the Chief Compliance Officer, who is a member of the Corporate Compliance Committee. The Corporate Compliance Committee is comprised of senior executives of the Boehringer Ingelheim Corporation and its subsidiaries. The Chief Compliance Officer also provides annual updates, and substantive matter updates as required, directly to the Board of Directors of Boehringer Ingelheim Corporation.

### Corporate Policies and Procedures

The company provides its employees guidance on certain legal issues as well as procedures for implementing business practices. This guidance can come in many forms. It may be in the form of corporate policies/procedures or individual subsidiary policies/procedures. It may also come from department-specific policies and procedures. Sometimes, it may come from more informal direction from management or other leaders in the company. The company continually evaluates and refines its policies and procedures to address specific and applicable legal, regulatory and business requirements. Policies and procedures are made available through employee manuals, department managers, and/or on the company's web sites.

Sales and Marketing Compliance is one specific area in which the company has expended an enormous amount of effort and compliance resources. Under the guidance of the Sales and Marketing Compliance department, Boehringer Ingelheim has developed specific policies and procedures to address issues identified in the OIG Guidance document and the PhRMA Code. These policies and procedures are provided to the relevant employees in a variety of formats. For example, our field based employees each receive a "Field Guide to Performance with Integrity." The Field Guide is a tool to assist field-based employees in meeting the high standards of Boehringer Ingelheim and provide them with a quick summary and description of the application of policy to key sales and marketing activities. Additionally, there is targeted training designed specifically for the field force on many of these same issues, policies and procedures.

Areas addressed through policy development, procedural implementation and training programs specifically for Sales and Marketing include some of the following:

- Code of Conduct
- Product Promotion
- Sample Management
- Grants and CME Support
- Promotional Speaker Programs
- Charitable Donations
- Local Exhibits & Displays
- Patient Assistance Programs

- Requests for Medical Discussions and Limitations on Interactions with Company Field-based Medical Personnel
- Business Intelligence
- Adverse Event Reporting

## Code of Conduct Annual Certification

All employees must carefully read and acquaint themselves with the Boehringer Ingelheim Code of Conduct. Under company policy, all employees are required to annually acknowledge and certify that they have read and understood the Code of Conduct. Failure to do so will subject the employee to disciplinary action.

## Confidentiality

For our Corporate Compliance Program to be effective, it is essential that employees feel confident and secure when raising compliance concerns and issues. Therefore, it is critical for employees to know that every effort will be made to ensure the confidentiality of the compliance process. To help achieve this, the company provides anonymous reporting capabilities through the Compliance Helpline or anonymous emailing through the company's Compliance Web site.

## Helpline

The Corporate Compliance Program maintains a company Helpline that all employees can call to ask for guidance on the Code of Conduct, clarification of policies or procedures or to report compliance concerns. The Helpline is a toll free telephone number that can be accessed 24 hours a day, 7 days a week. The Helpline is administered by an independent contractor whose employees are specially trained in interviewing callers and collecting pertinent information. The Helpline provider will send reports summarizing incoming calls to the Compliance department within one business day.

Employees have the option of providing their identification or making an anonymous report. We recognize that in some cases, employees may not feel comfortable identifying themselves when reporting a compliance concern. Whether made anonymously or not, the identity of the caller and the fact that a report has been made will be kept confidential to the extent possible while still allowing a thorough investigation to proceed.

## Compliance Training and other Resources

In addition to the Code of Conduct, employees may be required to take additional training designated by the Corporate Compliance Program and senior management. This training may be through an ethics and compliance on-line training program, other on-line or computer-based training programs specific to a department or organization, training on policies and procedures necessary to carry out individual job duties, and training required by the Human Resources department. This list is not exhaustive, and an employee's training requirements will likely vary over the course of employment. Any training assigned to employees is part of the company's overall compliance efforts to provide them with the information and guidance needed to meet Boehringer Ingelheim's ethical and business standards and its legal obligations.

In some areas of the company, employees may have access to a library of on-line training courses. The subjects of the courses cover a variety of business and legal issues that support any required training. The Compliance Web site also hosts various tools and resources about compliance related subjects.

## Audits and Investigations

Every concern, question and allegation of wrongdoing reported to the Corporate Compliance Program - whether via the Helpline, the Compliance Web site, or by directly contacting the Chief Compliance Officer, the Compliance Counsel a member of the Legal department or reported through management - shall be reviewed, evaluated and responded to promptly and professionally, in a manner that respects the rights of all parties concerned. Follow up will include remediation and corrective actions as necessary, as well as appropriate disciplinary action when warranted. Investigations shall, to the maximum extent possible, be conducted confidentially. All employees are expected to fully cooperate with any compliance investigation.

## Corrective Action and Discipline

Any violations of the Code of Conduct or company policies and procedures will be taken very seriously. When a violation is identified, prompt, thorough and appropriate corrective action will be taken in response to the violation. The response may include making changes to policies, procedures and/or other compliance processes to ensure that repeat or similar violations do not occur. Failure to comply with the Code of Conduct or any company policy or procedure will subject the employee to disciplinary action, up to and including termination of employment.

## Employee Responsibility to Report and Protection from Retaliation

In addition to acting in compliance with the Code of Conduct and our policies and procedures, every employee has the responsibility to report to the company any violations of the Code of Conduct, law, policy or procedure that he or she may discover. Employees are assured that they can report such violations without fear of retribution or retaliation. Any employee who threatens, retaliates against or harasses any person who has reported in good faith a compliance concern, or is considering reporting such a concern, shall be subject to disciplinary action, up to and including termination. Employees are encouraged to report such violations directly to management. They are also counseled to talk to someone in the Human Resources department. However, if employees believe concerns cannot be raised in either of these manners, they are strongly advised to use the Compliance Helpline or submit questions or concerns via the anonymous e-mail capability hosted on the Boehringer Ingelheim Compliance Web site.

**State and Local Compliance**

Click here to learn more about our compliance with specific state requirements.

Corporate Compliance department contact information:

Boehringer Ingelheim Pharmaceuticals, Inc.
P.O. Box 368
Ridgefield, CT 06877-0368

Corporate Compliance
☎ Phone: 203.798.4260
☎ Fax: 203.798.4408

To request a hard copy of the Boehringer Ingelheim Corporate Compliance Program or the annual public declaration of compliance
with our Corporate Compliance Program – please call☎ 1.800.243.0127.

© 2008 Boehringer Ingelheim Corporation or an affiliated company. All rights reserved. Use of this site is subject to the terms and conditions
set out in the Agreement to use the Boehringer Ingelheim Corporation and its U.S. affiliates' web sites. All content intended for U.S. residents
only. Terms of Use and Privacy Policy.

# EXHIBIT
# E

# [Proposed] Revised Exhibit B-12: Eli Lilly NDCs

## Revised Exhibit B

| DMG | Manufacturer | NDC | Drug Name | Start Date | End Date | Source | FDB FUL (pkg) | FDB AWP (pkg) | Weighted Average Market Price (pkg) | AWP to Market Price Spread |
|---|---|---|---|---|---|---|---|---|---|---|
| Eli Lilly | ELI LILLY & CO. | 00002762301 | ALIMTA 500 MG VIAL | 7/1/2004 | 9/30/2004 | McKesson | | $2,437.50 | $1,885.07 | 29.31% |
| Eli Lilly | ELI LILLY & CO. | 00002446330 | CIALIS 10MG TABLET | 5/26/2004 | 6/30/2004 | Cardinal | | $318.98 | $250.65 | 27.26% |
| Eli Lilly | ELI LILLY & CO. | 00002446430 | CIALIS 20MG TABLET | 5/26/2004 | 6/30/2004 | Cardinal | | $318.98 | $251.21 | 26.98% |
| Eli Lilly | ELI LILLY & CO. | 00002323560 | CYMBALTA 20 MG CAPSULE | 10/1/2004 | 12/31/2004 | Cardinal | | $190.50 | $151.23 | 25.97% |
| Eli Lilly | ELI LILLY & CO. | 00002324030 | CYMBALTA 30 MG CAPSULE | 8/4/2004 | 9/30/2004 | Cardinal | | $106.88 | $83.56 | 27.90% |
| Eli Lilly | ELI LILLY & CO. | 00002324033 | CYMBALTA 30 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $356.25 | $282.51 | 26.10% |
| Eli Lilly | ELI LILLY & CO. | 00002323730 | CYMBALTA 60 MG CAPSULE | 8/4/2004 | 9/30/2004 | Cardinal | | $106.88 | $83.77 | 27.58% |
| Eli Lilly | ELI LILLY & CO. | 00002323733 | CYMBALTA 60 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $356.25 | $283.87 | 25.50% |
| Eli Lilly | ELI LILLY & CO. | 00002080603 | DARVOCET-N 100 TABLET | 4/1/1999 | 6/30/1999 | McKesson | | $317.85 | $250.71 | 26.78% |
| Eli Lilly | ELI LILLY & CO. | 00002035102 | DARVOCET-N 50 TABLET | 4/1/2002 | 6/30/2002 | McKesson | | $46.56 | $36.09 | 29.01% |
| Eli Lilly | ELI LILLY & CO. | 00002080302 | DARVON 65MG PULVULE | 10/1/2002 | 12/6/2002 | McKesson | | $54.77 | $43.69 | 25.36% |
| Eli Lilly | ELI LILLY & CO. | 00002080303 | DARVON 65MG PULVULE | 10/1/2002 | 12/6/2002 | McKesson | | $261.45 | $202.69 | 28.99% |
| Eli Lilly | ELI LILLY & CO. | 00002080333 | DARVON 65MG PULVULE | 4/1/2002 | 6/30/2002 | McKesson | | $61.74 | $47.86 | 29.00% |
| Eli Lilly | ELI LILLY & CO. | 00002311102 | DARVON COMPOUND-65 PULVULE | 4/1/2002 | 6/30/2002 | McKesson | | $57.31 | $44.43 | 28.99% |
| Eli Lilly | ELI LILLY & CO. | 00002311103 | DARVON COMPOUND-65 PULVULE | 4/1/2002 | 6/30/2002 | McKesson | | $272.60 | $211.32 | 29.00% |
| Eli Lilly | ELI LILLY & CO. | 00002035302 | DARVON-N 100MG TABLET | 4/1/2002 | 6/30/2002 | McKesson | | $79.66 | $61.76 | 28.98% |
| Eli Lilly | ELI LILLY & CO. | 00002035303 | DARVON-N 100MG TABLET | 4/1/2002 | 6/30/2002 | McKesson | | $376.60 | $291.97 | 28.99% |
| Eli Lilly | ELI LILLY & CO. | 00002035333 | DARVON-N 100MG TABLET | 10/1/2002 | 12/6/2002 | McKesson | | $86.66 | $67.18 | 29.00% |
| Eli Lilly | ELI LILLY & CO. | 00002416502 | EVISTA 60 MG TABLET | 10/1/2004 | 12/31/2004 | Cardinal | | $301.44 | $236.34 | 27.54% |
| Eli Lilly | ELI LILLY & CO. | 00002416507 | EVISTA 60MG TABLET | 10/1/2003 | 12/15/2003 | McKesson | | $5,390.80 | $4,166.11 | 29.40% |
| Eli Lilly | ELI LILLY & CO. | 00002416530 | EVISTA 60MG TABLET | 4/1/2004 | 6/30/2004 | McKesson | | $84.91 | $66.69 | 27.32% |
| Eli Lilly | ELI LILLY & CO. | 00002897101 | FORTEO 750MCG/3ML PEN | 7/1/2003 | 9/3/2003 | Cardinal | | $583.34 | $459.81 | 26.87% |
| Eli Lilly | ELI LILLY & CO. | 00002750201 | GEMZAR 1G VIAL | 7/1/2003 | 9/30/2003 | McKesson | | $681.53 | $536.00 | 27.15% |
| Eli Lilly | ELI LILLY & CO. | 00002750101 | GEMZAR 200MG VIAL | 10/1/2003 | 12/31/2003 | Cardinal | | $136.30 | $107.12 | 27.25% |
| Eli Lilly | ELI LILLY & CO. | 0000280101 | GLUCAGON 1MG EMERGENCY KIT | 8/18/2004 | 9/26/2004 | McKesson | | $86.75 | $68.46 | 26.71% |
| Eli Lilly | ELI LILLY & CO. | 0000280501 | GLUCAGON 1MG KIT | 8/30/2002 | 9/30/2002 | McKesson | | $78.13 | $59.35 | 31.65% |
| Eli Lilly | ELI LILLY & CO. | 0000214500 | GLUCAGON 1MG VIAL | 4/1/1999 | 6/30/1999 | McKesson | | $48.00 | $32.77 | 46.48% |
| Eli Lilly | ELI LILLY & CO. | 0000272170 | HEPARIN SODIUM 10MU/ML VIAL | 1/1/2002 | 3/31/2002 | McKesson | | $30.42 | $24.28 | 25.28% |
| Eli Lilly | ELI LILLY & CO. | 0000275155 | HUMALOG 100 UNITS/ML CARTRIDGE | 10/1/2004 | 12/31/2004 | Cardinal | | $14.08 | $11.05 | 27.41% |
| Eli Lilly | ELI LILLY & CO. | 0000275165 | HUMALOG 100 UNITS/ML CARTRIDGE | 10/1/2004 | 12/31/2004 | Cardinal | | $28.16 | $22.32 | 26.18% |
| Eli Lilly | ELI LILLY & CO. | 0000287255 | HUMALOG 100U/ML PEN | 10/1/2003 | 12/31/2003 | Cardinal | | $25.86 | $20.36 | 27.00% |
| Eli Lilly | ELI LILLY & CO. | 0000275100 | HUMALOG 100U/ML VIAL | 11/21/2000 | 12/31/2000 | McKesson | | $41.77 | $31.42 | 32.95% |
| Eli Lilly | ELI LILLY & CO. | 0000287945 | HUMALOG MIX 75/25 PEN | 10/1/2003 | 12/31/2003 | Cardinal | | $25.86 | $20.38 | 26.90% |
| Eli Lilly | ELI LILLY & CO. | 0000275101 | HUMALOG MIX 75/25 VIAL | 4/1/2004 | 6/30/2004 | McKesson | | $69.96 | $55.10 | 26.96% |
| Eli Lilly | ELI LILLY & CO. | 0000280900 | HUMATROPE 12MG CARTRIDGE | 8/18/2004 | 9/26/2004 | Cardinal | | $669.38 | $504.82 | 32.60% |

Confidential

1

# [Proposed] Revised Exhibit B-12: Eli Lilly NDCs

| DMG | Manufacturer | NDC | Drug Name | Start Date | End Date | Source | FDB FUL (pkg) | FDB AWP (pkg) | Weighted Average Market Price (pkg) | AWP to Market Price Spread |
|---|---|---|---|---|---|---|---|---|---|---|
| Eli Lilly | ELI LILLY & CO. | 00002809101 | HUMATROPE 24MG CARTRIDGE | 10/1/2001 | 12/31/2001 | McKesson | | $1,058.40 | $664.85 | 59.20% |
| Eli Lilly | ELI LILLY & CO. | 00002733516 | HUMATROPE 5MG VIAL | 1/22/2002 | 3/31/2002 | McKesson | | $1,381.21 | $996.00 | 38.68% |
| Eli Lilly | ELI LILLY & CO. | 00002808901 | HUMATROPE 6MG CARTRIDGE | 1/22/2002 | 3/31/2002 | McKesson | | $276.24 | $198.80 | 38.95% |
| Eli Lilly | ELI LILLY & CO. | 00002951501 | HUMULIN 50/50 VIAL | 7/1/1997 | 9/30/1997 | Cardinal | | $19.84 | $14.68 | 35.12% |
| Eli Lilly | ELI LILLY & CO. | 00002277059 | HUMULIN 70/30 PEN | 7/1/2003 | 9/3/2003 | Cardinal | | $16.97 | $13.46 | 26.09% |
| Eli Lilly | ELI LILLY & CO. | 00002871501 | HUMULIN 70/30 VIAL | 4/1/2004 | 6/30/2004 | McKesson | | $30.50 | $24.10 | 26.55% |
| Eli Lilly | ELI LILLY & CO. | 00002841501 | HUMULIN L 100U/ML VIAL | 10/1/2003 | 12/31/2003 | Cardinal | | $30.50 | $24.16 | 26.27% |
| Eli Lilly | ELI LILLY & CO. | 00002873059 | HUMULIN N 100U/ML PEN | 11/21/2003 | 12/31/2003 | Cardinal | | $13.96 | $10.38 | 34.55% |
| Eli Lilly | ELI LILLY & CO. | 00002831501 | HUMULIN N 100U/ML VIAL | 4/1/2004 | 6/30/2004 | McKesson | | $30.50 | $24.12 | 26.46% |
| Eli Lilly | ELI LILLY & CO. | 00002821501 | HUMULIN R 100U/ML VIAL | 10/1/2003 | 12/31/2003 | Cardinal | | $30.50 | $24.11 | 26.49% |
| Eli Lilly | ELI LILLY & CO. | 00002850101 | HUMULIN R 500U/ML VIAL | 1/1/2004 | 3/31/2004 | Cardinal | | $219.46 | $174.02 | 26.11% |
| Eli Lilly | ELI LILLY & CO. | 00002861501 | HUMULIN U 100U/ML VIAL | 4/1/2002 | 6/30/2002 | Cardinal | | $26.56 | $14.29 | 85.84% |
| Eli Lilly | ELI LILLY & CO. | 00002831001 | ILETIN I NPH 100U/ML VIAL | 10/1/2000 | 12/31/2000 | Cardinal | | $28.25 | $20.01 | 41.18% |
| Eli Lilly | ELI LILLY & CO. | 00002701401 | KEFZOL 10GM VIAL | 10/1/2000 | 12/11/2000 | McKesson | | $61.20 | $9.05 | 576.24% |
| Eli Lilly | ELI LILLY & CO. | 00002704016 | NEBCIN 1.2GM VIAL | 4/1/1998 | 6/30/1998 | Cardinal | | $823.93 | $545.60 | 51.01% |
| Eli Lilly | DISTA LABS. | 00777310482 | PROZAC 10MG PULVULE | 5/1/2001 | 6/30/2001 | McKesson | | $1,812.76 | $1,414.20 | 28.18% |
| Eli Lilly | ELI LILLY & CO. | 00002406630 | PROZAC 10MG TABLET | 4/20/1999 | 6/30/1999 | Cardinal | | $75.72 | $60.24 | 25.69% |
| Eli Lilly | DISTA LABS. | 00777310507 | PROZAC 20MG PULVULE | 1/1/2002 | 3/31/2002 | Cardinal | | $6,225.60 | $4,955.53 | 25.63% |
| Eli Lilly | DISTA LABS. | 00777310533 | PROZAC 20MG PULVULE | 5/1/2001 | 6/30/2001 | McKesson | | $302.24 | $227.87 | 32.64% |
| Eli Lilly | DISTA LABS. | 00777310582 | PROZAC 20MG PULVULE | 5/1/2001 | 6/30/2001 | McKesson | | $1,858.88 | $1,445.13 | 28.63% |
| Eli Lilly | ELI LILLY & CO. | 00002300475 | PROZAC WEEKLY 90MG CAPSULE | 2/12/2003 | 3/31/2003 | Cardinal | | $88.48 | $69.30 | 27.68% |
| Eli Lilly | ELI LILLY & CO. | 00002202902 | SODIUM BICARB 650MG TABLET | 10/1/1998 | 12/31/1998 | McKesson | | $7.19 | $5.75 | 25.13% |
| Eli Lilly | ELI LILLY & CO. | 00002202402 | SODIUM CHLORIDE 1GM TABLET | 5/19/2003 | 6/30/2003 | McKesson | | $6.64 | $5.22 | 27.20% |
| Eli Lilly | ELI LILLY & CO. | 00002322730 | STRATTERA 10 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $103.36 | $81.65 | 26.58% |
| Eli Lilly | ELI LILLY & CO. | 00002323830 | STRATTERA 18 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $103.36 | $81.65 | 26.59% |
| Eli Lilly | ELI LILLY & CO. | 00002322830 | STRATTERA 25 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $103.36 | $81.58 | 26.70% |
| Eli Lilly | ELI LILLY & CO. | 00002322930 | STRATTERA 40 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $103.36 | $81.55 | 26.75% |
| Eli Lilly | ELI LILLY & CO. | 00002323930 | STRATTERA 60 MG CAPSULE | 10/1/2004 | 12/31/2004 | McKesson | | $103.36 | $81.56 | 26.73% |
| Eli Lilly | ELI LILLY & CO. | 00002323230 | SYMBYAX 12-25MG CAPSULE | 1/5/2004 | 3/31/2004 | McKesson | | $374.08 | $290.77 | 28.65% |
| Eli Lilly | ELI LILLY & CO. | 00002323430 | SYMBYAX 12-50MG CAPSULE | 1/5/2004 | 3/31/2004 | McKesson | | $374.08 | $295.45 | 26.61% |
| Eli Lilly | ELI LILLY & CO. | 00002323130 | SYMBYAX 6-25MG CAPSULE | 1/5/2004 | 3/31/2004 | Cardinal | | $246.10 | $192.87 | 27.60% |
| Eli Lilly | ELI LILLY & CO. | 00002323133 | SYMBYAX 6-25MG CAPSULE | 7/1/2004 | 8/31/2004 | McKesson | | $820.34 | $654.63 | 25.31% |
| Eli Lilly | ELI LILLY & CO. | 00002323330 | SYMBYAX 6-50MG CAPSULE | 1/5/2004 | 3/31/2004 | Cardinal | | $246.10 | $194.74 | 26.37% |
| Eli Lilly | ELI LILLY & CO. | 00002729025 | TAZIDIME 1GM ADD-VANTAGE | 7/1/1999 | 9/30/1999 | McKesson | | $367.68 | $208.05 | 76.72% |
| Eli Lilly | ELI LILLY & CO. | 00002723125 | TAZIDIME 1GM VIAL | 10/1/2001 | 12/11/2001 | McKesson | | $355.68 | $224.61 | 58.35% |
| Eli Lilly | ELI LILLY & CO. | 00002723410 | TAZIDIME 2GM VIAL | 4/1/2000 | 6/30/2000 | McKesson | | $284.54 | $138.87 | 104.90% |
| Eli Lilly | ELI LILLY & CO. | 00002724116 | TAZIDIME 6GM VIAL | 1/1/2000 | 3/3/2000 | McKesson | | $496.82 | $289.68 | 71.50% |

Confidential

## [Proposed] Revised Exhibit B-12: Eli Lilly NDCs

| DMG | Manufacturer | NDC | Drug Name | Start Date | End Date | Source | FDB FUL (pkg) | FDB AWP (pkg) | Weighted Average Market Price (pkg) | AWP to Market Price Spread |
|---|---|---|---|---|---|---|---|---|---|---|
| Eli Lilly | ELI LILLY & CO. | 00002735501 | VANCOCIN HCL 10GM VIAL | 10/1/1996 | 12/31/1996 | Cardinal | | $156.01 | $67.20 | 132.17% |
| Eli Lilly | ELI LILLY & CO. | 00002312542 | VANCOCIN HCL 125MG PULVULE | 10/1/2001 | 11/28/2001 | McKesson | | $128.64 | $99.28 | 29.57% |
| Eli Lilly | ELI LILLY & CO. | 00002729810 | VANCOCIN HCL 1GM ADD-VNTAGE | 10/1/2001 | 12/11/2001 | McKesson | | $160.81 | $66.06 | 143.43% |
| Eli Lilly | ELI LILLY & CO. | 00002732125 | VANCOCIN HCL 1GM VIAL | 7/1/2001 | 9/30/2001 | McKesson | | $390.01 | $116.03 | 236.12% |
| Eli Lilly | ELI LILLY & CO. | 00002312642 | VANCOCIN HCL 250MG PULVULE | 10/1/2001 | 12/31/2001 | McKesson | | $257.29 | $198.56 | 29.58% |
| Eli Lilly | ELI LILLY & CO. | 00002144425 | VANCOCIN HCL 500MG VIAL | 7/1/2002 | 8/1/2002 | McKesson | | $195.01 | $55.64 | 250.46% |
| Eli Lilly | AMERINET/LILLY | 00002896725 | VANCOMYCIN 1GM VIAL | 7/1/2002 | 8/1/2002 | McKesson | | $390.01 | $94.08 | 314.55% |
| Eli Lilly | ELI LILLY & CO. | 00002759701 | ZYPREXA 10 MG VIAL | 7/1/2004 | 9/30/2004 | McKesson | | $22.19 | $17.50 | 26.81% |
| Eli Lilly | ELI LILLY & CO. | 00002411704 | ZYPREXA 10MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $10,390.90 | $7,793.67 | 33.32% |
| Eli Lilly | ELI LILLY & CO. | 00002411733 | ZYPREXA 10MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $1,039.09 | $784.13 | 32.52% |
| Eli Lilly | ELI LILLY & CO. | 00002411760 | ZYPREXA 10MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $623.46 | $486.71 | 28.10% |
| Eli Lilly | ELI LILLY & CO. | 00002441530 | ZYPREXA 15MG TABLET | 4/1/2001 | 6/30/2001 | McKesson | | $402.96 | $318.48 | 26.52% |
| Eli Lilly | ELI LILLY & CO. | 00002445533 | ZYPREXA 15MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $1,558.64 | $1,179.70 | 32.12% |
| Eli Lilly | ELI LILLY & CO. | 00002441560 | ZYPREXA 15MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $935.19 | $729.48 | 28.20% |
| Eli Lilly | ELI LILLY & CO. | 00002411204 | ZYPREXA 2.5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $5,787.90 | $4,386.03 | 31.96% |
| Eli Lilly | ELI LILLY & CO. | 00002411233 | ZYPREXA 2.5MG TABLET | 4/1/2004 | 6/30/2004 | Cardinal | | $578.79 | $443.35 | 30.55% |
| Eli Lilly | ELI LILLY & CO. | 00002411260 | ZYPREXA 2.5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $347.28 | $269.83 | 28.71% |
| Eli Lilly | ELI LILLY & CO. | 00002442004 | ZYPREXA 20MG TABLET | 1/1/2004 | 3/31/2004 | McKesson | | $20,751.60 | $16,172.60 | 28.31% |
| Eli Lilly | ELI LILLY & CO. | 00002442033 | ZYPREXA 20MG TABLET | 4/1/2004 | 6/30/2004 | Cardinal | | $2,075.16 | $1,588.49 | 30.64% |
| Eli Lilly | ELI LILLY & CO. | 00002442060 | ZYPREXA 20MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $1,245.10 | $971.62 | 28.15% |
| Eli Lilly | ELI LILLY & CO. | 00002411504 | ZYPREXA 5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $6,835.90 | $5,149.42 | 32.75% |
| Eli Lilly | ELI LILLY & CO. | 00002411533 | ZYPREXA 5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $683.59 | $518.92 | 31.73% |
| Eli Lilly | ELI LILLY & CO. | 00002411560 | ZYPREXA 5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $410.16 | $319.94 | 28.20% |
| Eli Lilly | ELI LILLY & CO. | 00002411604 | ZYPREXA 7.5MG TABLET | 10/30/2003 | 12/31/2003 | McKesson | | $8,313.50 | $5,682.02 | 46.31% |
| Eli Lilly | ELI LILLY & CO. | 00002411633 | ZYPREXA 7.5MG TAB | 10/30/2003 | 12/10/2003 | Cardinal | | $831.35 | $612.75 | 35.68% |
| Eli Lilly | ELI LILLY & CO. | 00002411660 | ZYPREXA 7.5MG TABLET | 10/30/2003 | 12/10/2003 | Cardinal | | $498.81 | $382.33 | 30.47% |
| Eli Lilly | ELI LILLY & CO. | 00002445485 | ZYPREXA ZYDIS 10MG TABLET | 5/19/2004 | 6/30/2004 | Cardinal | | $348.50 | $269.81 | 29.17% |
| Eli Lilly | ELI LILLY & CO. | 00002445588 | ZYPREXA ZYDIS 15MG TAB | 5/19/2004 | 6/30/2004 | Cardinal | | $504.38 | $394.06 | 28.00% |
| Eli Lilly | ELI LILLY & CO. | 00002445685 | ZYPREXA ZYDIS 20MG TAB | 5/19/2004 | 6/30/2004 | Cardinal | | $659.25 | $515.06 | 27.99% |
| Eli Lilly | ELI LILLY & CO. | 00002445385 | ZYPREXA ZYDIS 5MG TABLET | 5/19/2004 | 6/30/2004 | Cardinal | | $241.88 | $187.85 | 28.76% |

Confidential