# Exhibit B



18261790

Jan 25 2008
10:13AM

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 CH 2474 |
| | ) | |
| v. | ) | The Honorable Peter Flynn |
| | ) | |
| ABBOTT LABORATORIES, *et al.*, | ) | Calendar 4 |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

TO:   All counsel of record

PLEASE TAKE NOTICE that on Friday, January 25, 2008, the undersigned filed with the Clerk of the Circuit Court, County Department, Chancery Division, the attached The State of Illinois' Response to Defendants' Corrected Joint Motion to Dismiss, a copy of which is served upon you herewith.

LISA MADIGAN
Attorney General of the State of Illinois

By:   Robert S. Libman
Special Assistant Attorney General
of the State of Illinois

Judson H. Miner
Charles Barnhill, Jr.
George F. Galland, Jr.
Jeffrey I. Cummings
Robert S. Libman
Benjamin J. Blustein
Special Assistant Attorneys General
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170
Atty. No. 21402

Brent D. Stratton
Daniel F. Buysse
Assistant Attorneys General
100 W. Randolph St.
Chicago, IL 60601
(312) 814-6141

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

THE PEOPLE OF THE STATE OF ILLINOIS,          )
                                              )
                      Plaintiff,              )  No. 05 CH 2474
                                              )
              v.                              )  The Honorable Peter Flynn
                                              )
ABBOTT LABORATORIES, *et al.*,                )
                                              )
                      Defendants.             )

THE STATE OF ILLINOIS' RESPONSE TO
DEFENDANTS' CORRECTED JOINT MOTION TO DISMISS

Judson H. Miner
Charles Barnhill, Jr.
George F. Galland, Jr.
Benjamin Blustein
Robert S. Libman
Special Assistant Attorneys General
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170
Atty No. 21402

Brent D. Stratton
David F. Buysse
Assistant Attorneys General
100 W. Randolph St.
Chicago, IL 60601
(312) 814-6141

This case is one of over 30 similar "AWP" cases brought by Attorneys General around the country, by the United States Department of Justice, and by private payers. Likewise, the present Joint Motion to Dismiss is an Illinois "recycling" of joint motions that defendants have made in most of these cases. Every court to decide such a motion has denied it.[1] Since key factual issues in all states' AWP cases are the same, discovery is being conducted nationwide on a coordinated basis through cooperation between counsel and case management orders that minimize discovery duplication. As of now (January 2008), that discovery is far advanced; Alabama's case is nearing trial; and trial dates have been set in several others.

In these circumstances, defendants' insistence on pursuing their Joint Motion in Illinois resembles an attempt to make a train that long since left the station return and repeat the trip. As they have done elsewhere, defendants have filed an evidentiary appendix and ask the Court to find, on a motion to dismiss, that the State was aware of what they were doing and therefore cannot recover. This argument has now lost some 20 consecutive times. It has no more merit here in Illinois. Nor do the defendants' other arguments, most of which have failed multiple times when offered under the analogous statutes or legal doctrines of other jurisdictions.

<u>STATEMENT OF FACTS</u>

On a §2-615 motion, all well-pled facts and all reasonable inferences from them are accepted as true. *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 499 (1991). The court must interpret the allegations in the light most favorable to the plaintiff. *Kolegas v. Heftel Broadcasting Corporation*, 154 Ill.2d 1, 9 (1992). The motion should not be granted unless it clearly appears that no set of facts could be proved under the pleadings entitling plaintiff to relief. *Urbaitis v. Commonwealth Edison*, 153 Ill.2d 458, 475 (1991).

Defendants' Joint Motion flouts these rules. Instead of accepting the State's allegations, defendants ask the court to assume the truth of factual assertions in defendants' appendix of

---

[1] The State is filing herewith Plaintiff's Appendix of Non-Illinois Authorities (cited "SA") reprinting non-Illinois authorities cited in this brief. Tabs 1 through 19 of that appendix reprint decisions and orders denying defendants' motions to dismiss in state AWP cases from Alabama, Alaska, Arizona, Arkansas, Florida, Hawaii, Idaho, Kentucky, Nevada, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, West Virginia, and Wisconsin. Tabs 20 through 29 contain federal district court decisions denying motions to dismiss AWP claims under various federal or state laws.

documents and to find that defendants' conduct failed to deceive the State.  As this brief will show, this tactic is improper.  The allegations of the Complaint, not the defendants' documents, control this motion.  Those allegations are the following.

A.  The complexity of the prescription drug market.

Defendants manufacture prescription drugs.  They sell them (generally through agents and intermediaries) to "providers" -- physicians, hospitals, and pharmacies -- who then provide the drugs to patients.  Most patients' drugs will be paid for in whole or part by a "payer," which, for Illinois Medicaid patients, is the State.  Amended Complaint (hereafter "AC"), ¶37.

The prescription drug market is enormously complex and nontransparent.  The U.S. Food and Drug Administration has given each drug made by each manufacturer a separate "National Drug Code" ("NDC").  There are over 65,000 NDCs.  The published wholesale price of any of the thousands of NDC numbered drugs might, and often does, change at any time.  As a consequence, just to track the current published prices of drugs utilized by a state's citizens requires resources and expertise that most states do not have.  AC ¶¶37, 59.

B.  Federal Medicaid law requires the State to estimate providers' actual acquisition costs.

The Illinois Medicaid program purchases over $610 million of drugs annually for the State's neediest citizens.  Although defendants' participation in Illinois Medicaid is voluntary, they have chosen to participate and sell drugs to Illinois Medicaid participants because of the size of the program.  Thus, Illinois Medicaid may at any given time have to reimburse a provider for one of many thousands of drugs.  AC ¶¶42-43.

Federal Medicaid regulations limit what Illinois can pay providers.  A state's Medicaid agency must pay for drugs at the lowest of (1) the provider's "estimated acquisition cost" ("EAC"), as set by the State, plus a reasonable dispensing fee; (2) the provider's "usual and customary" charges; or (3) the "Federal Upper Limit" ("FUL") for a particular drug, if such a limit has been set by the federal Centers for Medicare and Medicaid Services ("CMS").  *See* defendants' Joint Memorandum (hereafter "JM"), 4-5; 42 C.F.R. §447.512 (recently renumbered from 42 U.S.C. §447.331).  The regulations define "estimated acquisition cost" as the relevant

State agency's "best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers." 42 C.F.R. §447.502 (formerly 42 C.F.R. §447.301).

To comply with these regulations, Illinois must continually estimate what providers are paying to acquire each of a vast number of drugs whose acquisition costs are constantly changing. Defendants (as described below) have hidden the prices at which they sell their drugs to wholesalers and their knowledge of the prices at which wholesalers sell their drugs to providers. Because neither Illinois nor any other state has the resources or knowledge to compile complete and accurate lists of defendants' drug prices, businesses have grown up to provide pricing information to the states and others. These "compendia" purport to supply accurate price information on defendants' drugs through surveys of wholesalers and information obtained from defendants themselves. AC ¶¶45.

Like most states, Illinois has chosen First DataBank as its primary source of acquisition cost information. AC ¶46. First DataBank purports to supply accurate price information on the "average wholesale price" (AWP) of each of the defendants' drugs. It gets that information *from the defendants*. AC ¶46. For virtually the entire relevant time period, First DataBank has represented that its published AWPs reflect actual average wholesale prices. AC ¶47. When a pharmacy fills a prescription and dispenses a drug to a Medicaid patient, information about that prescription is electronically sent to the Illinois Department of Healthcare and Family Services ("HFS"), formerly known as the Department of Public Aid. On a weekly basis, First DataBank electronically sends its updated AWPs for the thousands of NDC-numbered drugs listed in its database to HFS. These AWPs become the basis for Illinois' reimbursements to providers. There is no other electronic source for this information. In short, Illinois depends on the accuracy of the data defendants supply to First DataBank to meet its obligation to pay providers no more than their actual acquisition cost for defendants' drugs. AC ¶49.

In estimating acquisition cost for a drug, Illinois, in light of certain information received from First DataBank, has paid the drug's published AWP minus a certain percentage (originally

7.5%; currently 12% for brand name drugs and 25% for generic drugs). Illinois also pays a separate dispensing fee to reimburse providers for the service provided in dispensing drugs to customers. Discounting from AWP in light of such information represented the only practical way for Illinois to estimate the average prices that providers were paying to acquire drugs. At no time did Illinois intend systematically to reimburse providers, on the average, at prices higher than the providers' average acquisition costs (plus the dispensing fee). Illinois was unaware until recently that discounting in this fashion was an ineffective method of achieving this goal. Like other states, Illinois did not appreciate until recently that defendants were reporting AWPs that were not only higher than actual acquisition costs, but were higher than any discount percentage that Illinois or any other state was using to estimate providers' acquisition costs. AC ¶48.

C. Defendants have engaged in a scheme to mislead the
   State into paying excessively for prescription drugs.

    Defendants have defeated the requirement to pay providers no more than their acquisition cost by reporting false and inflated AWPs to First DataBank and/or by reporting prices that they knew, because of the manner of First DataBank's operations, would misrepresent true wholesale prices. AC ¶50. All of the defendants have inflated their drugs' reported AWPs to levels far beyond any real average wholesale price for their drugs. AC ¶52. Defendants reported AWPs that were not only higher than providers' real acquisition costs, but higher than any discounted percentage of AWP that Illinois or any other state was using to estimate those costs. AC ¶48.

    Exhibit C to the Amended Complaint illustrates, in detail, each defendant's false and inflated AWPs. For each defendant, Exhibit C identifies (1) the NDC number for each drug of that defendant for which Illinois Medicaid paid more than $100,000 between 1993 and 2005; (2) the name of the drug; (3) the false AWP published by First DataBank as of the end of each year from 2001 to 2003; (4) the average AWP published by First DataBank for each year from 2001 to 2003; (5) a market wholesale price for the NDC for each year from 2001 to 2003; and (6) the percentage spread between the market price and the AWP. The source of the market wholesale prices is AmerisourceBergen, one of the three largest national drug wholesalers. The State has similar data for years prior to 2001 and after 2003, which data will be produced to defendants

upon request during discovery.  The drugs identified in Exhibit C constitute most, but not necessarily all, of the drugs for which the State is seeking damages.  AC ¶56 and AC Ex. C.

Reporting inflated AWPs is just one part of defendants' scheme to lead states to overpay providers.  For example, through an elaborate and secret charge-back system, defendants have reported meaningless and inflated "Wholesale Acquisition Costs" (WAC's) -- the price at which defendants sell their drugs to wholesalers.  AC ¶¶57, 61.  Defendants have wrapped their sales agreements with providers in absolute secrecy to preclude providers from telling others the price they actually paid.  AC ¶62.  Some defendants -- for example, TAP and AstraZeneca -- have hidden their real drug prices by providing free drugs and phony grants to providers.  AC ¶64.

The Complaint states one reason *why* defendants have engaged in this scheme to have States overpay providers.  Defendants compete for the business of providers, not patients, because patients generally do not decide what drug will be prescribed or dispensed.  AC ¶39.  If a defendant can cause the State to pay the provider more than the price the provider paid to acquire the drug, there will be a "spread" between the reimbursement and the acquisition cost.  The provider will retain the "spread" as additional profit.  AC ¶41.  Thus, one purpose of defendants' scheme has been to create a spread between a drug's true wholesale price and the false and inflated AWP published by the pricing compendia, increasing providers' incentive to choose the drug for their patients or to counteract the same tactic used by a competitor.  AC ¶50.  Defendants often market their products by pointing out (explicitly and implicitly) that their drug's spread is larger than the spread of a competing drug.  AC ¶51.  This motive for inflated AWPs has emerged only recently through documents secured in other cases.  AC ¶65.

D.  Defendants' scheme has damaged the State and its citizens.

At all relevant times, each defendant was aware of the reimbursement formula used by the Illinois Medicaid program and the dependence of the program on defendants' reported AWPs.  AC ¶83.  By reporting false and inflated wholesale prices, and by keeping true wholesale prices secret, defendants have knowingly enabled providers to be paid false and inflated prices for these drugs, and have interfered with Illinois' ability to set reasonable reimbursement rates for these

drugs. AC ¶84.  As a consequence, Illinois Medicaid has paid more for prescription drugs than it would have if defendants had reported true prices.  AC ¶85.[2]

The scheme has also caused separate damage to both the State and those citizens who receive benefits under Part B of the federal Medicare program, which provides a limited benefit for certain covered drugs.  Typically, individuals become eligible for Medicare when they reach 65, or become disabled, or have end-stage renal disease.  Medicare Part B AC ¶88.

For Part B drugs, the federal government pays 80% of what it calculates as the "allowable cost."  From 1992 through January 1, 2005, Medicare calculated that allowable cost as a percentage (originally 100%, later declining to 85%) of the drug's announced AWP.  The remaining 20% of allowable cost is paid by the Medicare Part B beneficiary, or, for individuals eligible for Medicaid, by the Medicaid program.  AC ¶89.  Because the allowable cost is based on the published AWPs, and because defendants have published false and inflated AWPs for their drugs, Medicare Part B beneficiaries have paid substantially more for their co-payments than they would have if defendants had published their true wholesale prices.  With respect to at least some drugs, the 20% co-payment is greater than the entire true cost of the drug.  AC ¶90.

ARGUMENT

I. <u>THE COMPLAINT STATES VALID CLAIMS UNDER THE CFA</u>.

Count I of the Amended Complaint alleges violation of §2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"), 815 ILCS 505/2, which reads, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

Like the entire CFA, §2 should be "liberally construed to effect its remedial purposes." *Lee v. Nationwide Casel, L.P.*, 277 Ill.App.3d 511, 518 (1st Dist. 1995).

---

[2] The scheme has also led Illinois to pay excessively for the minority of defendants' drugs that are not paid for on the basis of a formula depending on published AWPs.  AC ¶82.  These allegations are discussed in the State's Response to the "Generic" defendants' motion to dismiss.

As its text states, §2 bars "unfair" *or* "deceptive" practices.  An act can be "unfair" under §2 regardless of whether it is "deceptive." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417 (2002).  As Section A below will show, the State pleads valid claims for both unfairness and deception.  Sections B through D will answer defendants' contrary arguments.

A.  The State pleads valid claims for both unfairness and deception.

**1. "Unfair" practices**.  In considering whether a practice is "unfair" within the meaning of §2, Illinois courts consider (a) whether the practice offends public policy; (b) whether it is immoral, unethical, oppressive, or unscrupulous; and (c) whether it causes substantial injury to consumers. *Robinson*, 201 Ill.2d at 417-18.  All three criteria need not be satisfied; a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id.* at 418.  However, Count I alleges all three factors.

**Violation of public policy**.  An act or practice violates "public policy" under *Robinson* if, "without necessarily having been previously considered unlawful, [it] offends public policy as it has been established by statutes, the common law, or otherwise -- whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *Griffin v. Universal Cas. Co.*, 274 Ill.App.3d 1056, 1069 (1st Dist. 1995), *quoting FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 (1972).  The public policy of providing public assistance at the least possible cost is built into the federal Medicaid statute itself, which requires that any state's Medicaid plan provide methods and procedures for care and services "as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care...." 42 U.S.C. §1396a(a)(30)(A).  Moreover, as described above, in reimbursing for providers' acquisition costs, the State is required to estimate providers' *actual payments*.  As described in Count I, defendants' scheme raises the State's Medicaid expenditures by causing the State to reimburse providers for defendants' drugs at levels far above what providers on average are paying.  This scheme is not just within the "penumbra" of conduct banned by statute, but at the heart of it.

**"Immoral, unethical, oppressive, or unscrupulous conduct."** Defendants know that Illinois is bound by federal law to seek to limit reimbursements for acquisition cost to the average *actual* amounts that providers are paying. Defendants likewise know that Illinois uses formulas based on published AWP to estimate those acquisition amounts. And defendants know that in practice, pricing compendia like First DataBank depend on *defendants' data* to determine the AWPs they publish. In short, defendants know the system places "the proverbial pharmaceutical fox in charge of the reimbursement chicken coop." *In re Pharmaceutical Industry AWP Litigation*, 491 F.Supp.2d 20, 95 (D.Mass. 2007). Knowing this, they report AWPs which are not only far higher than the real AWPs, but higher than the figures resulting from any discounts Illinois makes from the reported AWPs. Defendants never hint at what possible justification exists for this inflation. They suggest that their AWPs are "benchmark" prices (JM 12), but this is false, as their AWPs are *not* averages of any "benchmark" prices that wholesalers are charging. Rather, defendants report prices that will assure that reimbursements from public and private payers are to defendants' liking, even if those reimbursements are far greater than legal limits. That is "unscrupulous" and "unethical " conduct by any measure.

**Injury to consumers.** The State alleges two forms of such injury. First, instead of competing on price and medicinal value alone, defendants have created a financial incentive for providers to choose a drug based on the spread between its true price and its published AWP. Large price spreads on higher priced drugs encourage providers to choose more expensive drugs instead of their lower priced substitutes, and can influence providers to specify less efficacious drugs over ones with greater medicinal value. AC ¶68. Moreover, the excess payments to providers could have been used to expand or improve the services to Medicaid patients. Second, defendants' scheme has raised the co-payments of Medicare Part B beneficiaries. AC ¶90.

**2. "Deceptive" practices.** To plead an unlawful "deceptive" act or practice, a plaintiff "must show (a) a deceptive act or practice; (b) an intent by defendants that he rely on the deception; and (c) the deception occurred in the course of conduct involving a trade or commerce." *Crowder v. Bob Oberling Enterprises, Inc.*, 148 Ill.App.3d 313, 316 (4th Dist.

1986). As §2 itself states, the Attorney General need not plead that the act or practice *succeeds* in deceiving anyone; it is "unlawful whether any person has in fact been misled, deceived or damaged thereby." An act or practice is "deceptive" if "it has the tendency or capacity to deceive." *Harwood v. Piser Memorial Chapels*, 102 Ill.App.3d 514, 518 (1st Dist. 1981); *Williams v. Bruno Appliance & Furniture Mart, Inc.*, 62 Ill.App.3d 219, 222 (1st Dist. 1978). The "intent to rely on the deception" requirement does not require an allegation that defendants *knew* that their practice was deceptive. To the contrary, "[i]nnocent misrepresentations may be actionable." *Carl Sandburg Village Condo. Ass'n No. 1 v. First Condo. Development Co.*, 197 Ill.App.3d 948, 952-53 (1st Dist. 1990); *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill.App.3d 843, 859 (2nd Dist. 1991). Plaintiff alleges all three elements of a "deception" claim.

**A deceptive act or practice**. Defendants are alleged to provide price data to the compendia under the name "average wholesale price," knowing that (a) the compendia will use this data to determine their published AWPs; (b) states will use the published data to determine the "estimated acquisition cost" of defendants' drugs; and (c) states are required by law to estimate these costs at *actual* levels paid by providers to acquire the drugs. Knowing these things, the defendants provide AWPs to the compendia that are far higher than the true average wholesale prices and which more than override any discounts applied by the states to defendants' reported AWPs. This conduct has a "capacity or tendency to deceive," to put it mildly.

**Intent that the State rely on the deceptive practice**. The State explicitly alleges that defendants intend that it rely on their inflated AWPs. AC ¶100. The *purpose* of the compendia is to provide data to payers who are determining how much to pay providers of defendants' drugs. AC ¶45. Given this allegation, there can be no apparent purpose to defendants' providing price data to the compendia other than to influence the price that payers like the State will pay.

**Commerce**. There is no dispute that the defendants' scheme occurs in "commerce."

In sum, the State pleads valid claims for both "unfairness" and "deception" under CFA §2. The State will now turn to the arguments that defendants nonetheless make for dismissal.

B.  Defendants' "primary jurisdiction" argument has no merit.

In an argument applicable to all the State's claims, not just the CFA claims, defendants argue that the doctrine of "primary jurisdiction" requires the Court to dismiss or stay its claims until it has submitted them to the Illinois Department of Healthcare and Family Services ("HFS").  JM 6-10.  Defendants have occasionally tried this argument in other AWP cases (most recently in Alaska), but it has rightly gone nowhere.

The primary jurisdiction doctrine provides that "even when a court has jurisdiction over a matter, it should in some instances stay the judicial proceedings pending referral of the controversy, or a portion of it, to an administrative agency having expertise in that area." *Kellerman v. MCI Telecommun. Corp.*, 112 Ill.2d 428, 445 (1986).  A matter "should be referred to an administrative agency when it has specialized or technical expertise that would help resolve the controversy, or when there is a need for uniform administrative standards."  However, where the legal and factual issues involved are "standard fare for judges, the issues must be deemed to be within the conventional competence of the courts, and referral to an administrative body is not required." *Village of Itasca v. Village of Lisle*, 352 Ill.App.3d 847, 854 (2nd Dist. 2004).

Illinois courts have routinely found that administrative agencies do not have specialized expertise where allegations of deception are concerned.  In *Kellerman*, one of just two Illinois primary-jurisdiction cases cited by defendants, the Supreme Court concluded that the FCC had no specialized ability to resolve the plaintiffs' allegations that MCI falsely represented to customers that it billed customers only for completed calls.  112 Ill.2d at 446.  Many other cases hold the same.  *See, e.g., Village of Lisle*, 352 Ill.App.3d at 855 (rejecting referral to Illinois Department of Revenue of dispute over whether company was falsely representing the situs of its sales in its tax filings); *Crain v. Lucent Techs., Inc.*, 317 Ill.App.3d 486, 494-95 (5th Dist. 2000) (complaint which alleged violations of the CFA and common law "raise[d] no issue requiring the specialized or technical expertise of the FCC); *Speakers of Sport, Inc. v. U.S. Telephone, Inc.*, 149 Ill.App.3d 898, 903 (1st Dist. 1986) (FCC did not have primary jurisdiction over action by telephone company customers alleging that company failed to disclose that it billed customers for

10

uncompleted calls).  Notably, in *Kellerman*, *Village of Lisle*, and *Speakers of Sport*, the administrative agencies were required by law to review and approve prices proposed by the defendants.  Yet the courts refused to send the disputes to the agencies for initial consideration. Here, no law requires defendants to submit AWP data to any state agency and no state agency is charged by law with approving that data.  Thus the case for primary jurisdiction is even weaker.

Indeed, the subject matter here is "standard fare" for courts.  The Court will decide whether defendants reported accurate AWPs or false ones, and whether the State was injured by this conduct.  Not only does this task require no specialized expertise, but courts are better equipped for it than HFS.  As the State alleges, Illinois Medicaid lacks the resources to monitor the accuracy of defendants' reported AWPs.  Moreover, defendants point to no administrative procedure by which HFS could even consider this matter.

Defendants argue that this lawsuit seeks to "accomplish a change in Medicaid payment levels" and that this "change" should initially be done by HFS rather than a court.  JM 8.  This argument has no merit.  HFS is limited by federal law in what it can pay providers, and its formula for estimating providers' acquisition costs is required by law to comply with those limits. Regardless of what formula HFS sets, defendants corrupt the payment process by feeding phony data into that formula.  HFS has neither the procedures, the resources, nor the legal authority adequately to address this problem.  This Court does.

Defendants likewise argue that the relief the State seeks might disrupt the Medicaid program by achieving "inadequate reimbursement to providers."  JM 8.  Yet this Court need not make a policy judgment about the proper level of reimbursement.  If it finds in favor to the State, it will only be enforcing a policy judgment that has already been prescribed by regulations.[3]

---

[3] Bizarrely, defendants cite *Baptist Hospital v. Tennessee Dept. of Health*, 982 S.W.2d 339 (Tenn. 1998), and *Pennsylvania Dept. of Public Welfare v. River Street Associates*, 798 A.2d 260 (Pa. Commonw. Ct. 2002).  JM 9-10.  Neither case involved the primary jurisdiction doctrine.  In *Baptist Hospital*, the hospital alleged that a Tennessee regulation that decreased Medicaid reimbursements violated federal regulations, and argued that such a violation breached the hospital's contract with the state Medicaid agency.  If the claim was characterized as one for breach of contract, a Tennessee statute required that it be brought before the Tennessee Claims Commission (analogous to the Illinois Court of Claims).  If the claim was characterized as an attack on the validity of an administrative regulation, another Tennessee statute required such attacks to be brought in a declaratory judgment proceeding

(continued...)

C.  The "fact pleading" and "particularity" arguments have no merit.

Defendants offer 12 pages of variations on the theme that they cannot answer the State's complaint because it fails to plead enough facts and to plead them with sufficient particularity. JM 10-21.  They have made these arguments in virtually every AWP case.  As they note (JM 19-20), an occasional court has accepted the "particularity" argument to the extent of requiring minor repleading.  What defendants do not disclose is that the great majority of AWP decisions have rejected the argument altogether and made them answer.  Even at the start of the AWP litigation, the argument was counterintuitive, because defendants well understood what they were accused of doing wrong.  Their AWP practices had been investigated by Congress, the U.S. Department of Justice, the Inspector General of the U.S. Department of Health and Human Services, the National Association of Medicaid Fraud Units, and numerous state Attorneys General.  As time went on, the argument became even more anachronistic.  Defendants have now answered, without a hitch, nearly two dozen AWP complaints by the federal government, over 20 states, and private payers.  Massive discovery, coordinated on a national basis, has further defined the issues and flushed out relevant evidence.  Here in Illinois, as elsewhere, the arguments lumped under the heading of "fact pleading" or "particularity" have no merit.

1.  The "no representation about what AWP means" argument.

Defendants argue that the State fails to "specify how it contends Defendants' AWPs were 'false,'" because it "does not point to any statutory or regulatory definition for AWP, nor any representation about a definition made by any Defendant."  JM 11.  Defendants have made this

---

[3] (...continued)
conducted by the agency that had promulgated the statute.  (Illinois has no counterpart to this "administrative declaratory judgment" statute.)  The court characterized the claim as an attack on the regulation, not as a claim for breach of contract.  Hence, by statute, it had to be made before the Claims Commission.  982 S.W.2d at 341.  The concerns of the primary jurisdiction doctrine (administrative expertise and the like) had nothing to do with this decision.

*River Street Associates* is identical.  It decided that a dispute between a Medicaid provider and Pennsylvania over whether reimbursement regulations had been violated could not be characterized as a suit for breach of contract.  Hence the tribunal which by statute heard contract claims against Pennsylvania, the Board of Claim, had no jurisdiction.  798 A.2d at 263-64.  The court expressly *declined* to decide the "primary jurisdiction" argument.  *Id.* at 264 n.10.

argument in almost every AWP case.  Every court to rule on it has rejected it.  Defendants did not just report numbers.  They reported numbers under a name, consisting of ordinary English words that carry a plain meaning as to what the numbers represent.  Each time a defendant supplied price data to the compendia about a drug under the name "Average Wholesale Price," it represented that the data was *average* of *prices* charged by *wholesalers* for that drug.  Indeed, First DataBank stated that this is what these words meant.  AC ¶¶46-47 and AC Ex. A.

Of the many decisions that have rejected defendants' argument, no one has explained the matter better than Judge Saris, who presides over all federal AWP cases that have been consolidated in the federal Multi-District Litigation (MDL).  The MDL defendants argued that the term "average wholesale price" in the federal Medicare statute had no established meaning and hence they could report any prices they wanted as AWPs.  Judge Saris disagreed, and held that the plain meaning of "average wholesale price" is "the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies."  *In re Pharmaceutical Industry AWP Litigation*, 460 F.Supp.2d 277, 284-88 (D.Mass. 2006) (SA Tab 23).[4]

2. "The State only alleges misrepresentations by First DataBank" argument.

As they have done in many other AWP cases, defendants argue that the State pleads misrepresentations made by First DataBank, not by defendants.  Hence, argue defendants, the complaint alleges nothing worse than "knowingly receiving the benefits of another's fraud," which they claim is not actionable under the CFA.  JM 11-12, *citing Zekman v. Direct Am. Marketers, Inc.*, 182 Ill.2d 359, 369 (1998).  This argument deserves, and has gained, no traction with any court to consider it.  The State pleads that defendants supplied phony data to First DataBank, knowing that First DataBank would and did republish that data as defendants' AWPs.  The defendants cannot insulate themselves from liability from this misconduct simply because First DataBank was the pipeline through which defendants' data caused the State to overpay.

---

[4] *See also Federated Nationwide Wholesalers Service v. Federal Trade Commission*, 398 F.2d 253, 257 n.3 (2nd Cir. 1968) ("[t]he term `wholesale price' is generally defined as the price which a retailer pays to its source of supply when purchasing goods for resale to the ultimate consumer").

   3.  The argument that the State fails to allege that it understood
       defendants' AWPs to mean true average wholesale prices.

   The Joint Memorandum's main argument is that "the State has not and *cannot* allege that

it actually believed that reported AWPs reflected actual average wholesale prices."  JM 12

(emphasis in original).  Defendants cite what they call "public records" in which the authors of

those documents at various times have asserted that certain AWPs have been significantly

overstated.  Defendants demand that this Court, through "judicial notice," make a finding that the

State knew or should have known that AWPs on average were overstated.  JM 12-16.

Defendants then conclude that unless the State can plead that it understood announced AWPs to

reflect actual average wholesale prices to providers, it cannot prove any "foundation for any

claim grounded in fraud or deception based on a divergence between AWP and provider

acquisition cost."  JM 17.

   Defendants have made this argument in almost all AWP cases.  To date its batting

average is zero.  In Illinois, the argument fails as well.  First, it misuses the judicial-notice

doctrine.  Second, even if the Court could take "judicial notice" of the factual assertions cited by

defendants, those assertions would not entitle defendants to dismissal of the State's CFA claims.

Nor would those assertions negate the State's entitlement to monetary relief.

   **a.  The argument misuses the judicial-notice doctrine**.  Defendants appear to assume

that the doctrine entitling a court to take judicial notice of "public records" requires the court

conclusively to assume, on a motion to dismiss, the truth of all factual assertions contained in

those records.  No Illinois case supports this nonexistent rule.

   The bedrock Illinois principle of taking judicial notice of factual assertions is that

"judicial notice may be taken of factual evidence where the facts are capable of immediate and

accurate demonstration by resort to easily accessible sources of indisputable accuracy."  *Vulcan

Materials Co. v. Bee Const. Co.*, 96 Ill.2d 159, 165 (1983).  However, that a statement is

contained in a report issued by a governmental body does not mean that it is indisputably

accurate.  Writers of government reports can be as prone to error as writers of purely private

reports.  For example, in *People v. Williams*, 328 Ill.App.3d 879, 887 (2nd Dist. 2002), the court

14

noted a conflict between the Department of Corrections' records and other sources as to the fact that a defendant was taken into custody, and refused to credit either source.

None of the cases cited by defendants holds that a court must take *per se* judicial notice of factual assertions in government reports, much less apply that judicial notice to make a conclusive finding of fact on a motion to dismiss.  In *Finish Line Express, Inc. v. City of Chicago*, 72 Ill.2d 131, 136 (1978), the Supreme Court took judicial notice of a report of the Illinois Legislative Commission on problems raised by racetrack messenger services merely to help determine, in the course of determining the constitutionality of a ban on such services, "the circumstances and problems which prompted the General Assembly to exercise its police power and adopt the challenged statute." *Id.* at 136.  In *Nordine v. Ill. Power Co.*, 32 Ill.2d 421 (1965), the Supreme Court took judicial notice of Illinois Commerce Commission decisions approving utility sales to show that "between 1913 and 1960 at least 58 municipalities have sold municipal utility systems to private companies." *Id.* at 428-29.  *Acme Brick & Supply Co. v. Dept. of Revenue*, 133 Ill.App.3d 757 (2nd Dist. 1965), held merely that "a court may properly take judicial notice of administrative rules and regulations." *Id.* at 762.  None of these noncontroversial uses of public reports for judicial notice purposes is precedent for the very different use proposed by defendants -- to decide conclusively the accuracy of defendants' AWPs, and to draw conclusions about whether the State was or should have been deceived by those AWPs.

In addition, even where a court can take judicial notice of a factual assertion in a public report, the other party may choose to dispute that fact.  *In re Johnson*, 134 Ill.App.3d 365, 375 (4th Dist. 1985).  For that purpose, one need look no further on this motion than defendants' documents themselves.  Not only do these reports fall far short of demonstrating what defendants assert, but they contain material that contradicts defendants' basic premises.  For example, much material in these reports reflects that the accuracy of reported AWPs has been a matter of serious controversy, and that it is terribly difficult to draw general conclusions about the overall average accuracy of reported AWPs -- which is precisely what the State must do, since, as defendants

point out (JM 4 n. 5), its formula for determining estimated acquisition cost aims to keep those costs on an aggregate basis within the aggregate actual acquisition costs that providers as a group actually pay. Consider JM Ex. 7, a 1993 General Accounting Office study of "selected hospital outpatient and nursing home pharmacies." It found some AWPs to be higher what these pharmacies were paying. But it cautioned that its results "cannot be projected statewide or nationally. Because the study included selected pharmacies, differences between drug purchase costs and reimbursements may vary for other pharmacies in each state." JM Ex. 7, p. 2.

Another report cited by defendants illustrates that from the 1990s forward, differing federal agencies (and Congress) have done battle with each other on the degree of inflation in AWP and the appropriate measures to determine accurate AWP. In 2000, the federal Department of Justice gave state Medicaid programs what it considered to be accurate AWP information for "about 400 national drug codes." The intent of this transmittal was to enable states to enact special regulations to reduce their reimbursements as to these drugs, so as to comply with the federal requirement of paying no more than estimated acquisition cost. Illinois jumped on this data and passed special regulations using these asserted "real" AWPs for these drugs, rather than its usual formula of discounting from defendants' reported AWPs. *See* JM 16, *citing* 24 Ill. Reg. 10436, 10452 (July 1, 2000). But as defendants admit, two months later, another federal agency, the Health Care Finance Authority, suspended any such state action. JM 16, n. 12.

This same episode is at odds with defendants' fundamental defense -- the assertion that the State's policy was to use defendants' inflated AWPs to pay providers more than the legal limit of estimated acquisition cost, as a back-door means of giving pharmacists adequate incentives to participate in the Medicaid program. In this instance, when Illinois got data that would enable it to limit its reimbursements to real acquisition costs, it tried to use it to do just that.

Defendants have presented their "judicial notice" argument in virtually every other state AWP case and lost it, even though all these states have an analogous "public document" rule. Judge Krueger's reaction in the Wisconsin case was typical:

> Having to factor in lengthy agency reports and stacks of other information in deciding the sufficiency of the Amended Complaint creates more confusion than it

16

> resolves.  As a practical matter, for the uninitiated such as this writer, the world described in the Complaint is foreign, complicated and confusing.  Adding more information at this stage of the proceedings only magnifies that reaction, rather than aiding in its decision....Equally problematic is that the submissions do not appear to establish any clear factual conclusions.

*State of Wisconsin v. Amgen*, No. 04-CV-1709 (Cir. Ct. Dane Cty. 2005) (SA Tab 18), at 7-8.

*See also State of Nevada v. Abbott Labs.*, No. CV 02-00260 (Washoe Cty. Nev. 2004) (SA Tab 9), at 3 (finding that the "public record in this action is subject to reasonable dispute"); *State of Ohio v. Roxane Labs., Inc., et al.*, Civil No. A0409296 (SA Tab 14), at 2 ("Much of the attached material is not information the Court will take judicial notice of and will not consider on a motion to dismiss"); *Commonwealth of Pennsylvania v. TAP Pharmaceuticals et al.*, 885 A.2d 1127, 1138-39 (Commonwealth Ct. 2005) (SA Tab 15).

**b. The purported "facts" that defendants derive from their documents would not justify dismissal even if the Court took judicial notice of them**.  Even if this Court could find as a fact on this motion to dismiss that the State knew or should have known that defendants' announced Average Wholesale Prices were higher than the real AWPs, such a finding would not defeat the State's claims.

First, such a finding could not defeat a CFA "deception" claim.  Defendants' "judicial notice" argument asks the Court to find that the State either was not or should not have been deceived by defendants' annunciation of false AWPs.  This argument wrongly assumes that to state a "deception" claim, the State must plead that it was actually deceived by the defendants' conduct.  But as discussed above, CFA §2 makes deceptive conduct unlawful "whether any person has in fact been misled, deceived or damaged thereby."

Second, such a finding could not defeat the State's "unfairness" claim.  As discussed above, an act or practice can be "unfair" under the CFA regardless of whether it is deceptive. *Robinson*, 201 Ill.2d at 417.  Thus, even if the Court were justified in finding that the State knew or should have known that defendants' AWPs were false and inflated, and to that extent failed to be deceived by defendants' use of the term AWP, such a finding would have no bearing on the State's "unfairness" claim, much less justify dismissing it on the pleadings.

Third, if defendants are arguing that their documents show that the State cannot prove *monetary damage*, that argument is legally unavailing, since, as discussed above, CFA §2 makes defendants' conduct unlawful "regardless of whether any person...is damaged thereby."

In any case, the State *does* plead facts showing monetary damage, both under the "unfairness" claim and the "deception" claim. As to the unfairness claim, where deception is irrelevant, defendants knew that the State was required by law to estimate acquisition cost and that the State was using defendants' published AWPs to do so. Knowing those facts, defendants corrupted the scheme, choosing to provide phony prices. The damage to the State from this unfair conduct followed arithmetically: the State paid more than the law permitted it to pay.

The State equally alleges monetary damage under a "deception" theory. Defendants argue that they negate any deceptive impact on the State by showing, through their materials and the fact of the State's discounting from published AWPs, that the State knew or should have known that defendants' AWPs were "benchmark" prices. JM 13. Defendants never define the term "benchmark price," but the term clearly implies a real price that is subjected to discounting. The State will prove that defendants' AWPs were not averages of *any* real prices, much less averages of prices that were used as the basis for calculating discounts. Thus, if State Medicaid officials believed AWPs to be "benchmark prices," they did *not* understand the nature or extent of defendants' deception. It is small wonder that Illinois and other states, in the face of such deception, contented themselves with modest discounts from published AWP and fell far short of achieving the legal mandate of paying only actual acquisition cost to providers.

Still less were defendants' prices "sticker" prices, as defendants have also maintained. A "sticker" price is a suggestion, usually to a retailer, on what to charge. Defendants' AWPs were no such thing. Defendants want wholesalers to charge far less than these prices. They are alleged to reach agreements with wholesalers to assure that this will happen. AC ¶¶61-63. As one court, commenting on public reports offered by defendants referring to AWP as a "sticker price," acidly commented: "There is a difference between a sticker price and a sucker price." *In*

*re Lupron Marketing and Sales Practices Litig.*, 295 F.Supp.2d 148, 168 n.19 (D.Mass. 2003) (SA Tab 29) (emphasis added).[5]

More generally, any "government knowledge" defendants could prove of discrepancies between their published AWPs and what providers were really paying would not be a defense to damage liability in any event. This estoppel argument is invalid, as the State has explained in its pending Motion To Strike Affirmative Defenses.

### 4. The "no duty" argument.

Defendants argue that "there are no allegations demonstrating a duty by Defendants to report an AWP exceeding actual acquisition cost by no more than a particular State's payment discount." JM 17. This argument "reads into the Act a duty requirement that does not exist," since "the Act does not require a plaintiff to plead the existence of a common law duty." *White v. DaimlerChrysler Corp.*, 368 Ill.App.3d 278, 285 (1st Dist. 2006). The CFA prohibits "unfair" or "deceptive" practices in commerce, and the courts have articulated tests for both. Since the State adequately pleads them, no further allegations about "duty" are required.

### 5. The argument that defendants are impermissibly "lumped together."

Defendants argue that State "repeatedly lumps all forty-plus Defendants together in rote allegations of fraud, without specifying actual conduct by individual defendants." JM 18. Defendants have made this argument in almost all AWP cases and have lost it almost every time.

Almost all American jurisdictions have a particularity requirement for allegations of fraud, and for the same reasons: to protect against scurrilous pleading that harms a defendant's reputation, and to assure that defendants can meaningfully answer. *Board of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill.2d 428, 457 (1989) (Illinois requirement). Likewise, all jurisdictions apply this requirement with common sense. Thus, "where the alleged scheme of fraud is complex and far reaching, the pleading of every instance of fraud would be extremely

---

[5] Any argument that AWPs are akin to automobile "sticker prices" misses the mark. As the D.C. Circuit explained in *Giant Food, Inc. v. Federal Trade Commission*, 322 F.2d 977 (D.C. Cir. 1963), automobile manufacturers can attach a "manufacturer's suggested retail price" to their cars regardless of whether any sales are in fact made at that price because they are required to do so by a specific federal statute, 15 U.S.C. §1231, *et seq. Giant Food*, 322 F.3d at 982. The pharmaceutical industry enjoys no similar protection.

ungainly, if not impossible." *In re Pharmaceutical Industry Average Wholesale Price Litigation,*
*supra,* 307 F.Supp.2d 196, 208 (D.Mass.).  Likewise, overzealous application of the rule "may
permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis v.*
*First Penn. Mortg. Trust,* 717 F.2d 96, 99-100 (3d Cir. 1983).  And "plaintiff need not plead facts
with precision when the information needed to plead those facts is within the knowledge and
control of the defendant rather than the plaintiff....  Accordingly, in such cases, the plaintiff can
state the material facts in the complaint with less specificity than would normally be required."
*Bryson v. News America Publications, Inc.,* 174 Ill.2d 77, 110-11 (1996).

The Amended Complaint easily passes muster under these principles.  First, it is
implausible for defendants to argue that this Complaint jeopardizes their reputations or that they
cannot answer it.  Defendants have little "reputation" worth protecting with regard to their AWP
practices, which have been attacked by the U.S. Department of Justice or state Attorneys General
in over 20 complaints, and castigated in public reports, some of which are cited in the State's
Amended Complaint.  Nearly 20 different judges have overruled defendants' "particularity"
argument and made them answer, which they have done without noticeable trouble.

Second, the Amended Complaint alleges substantial "particulars" on all defendants.  It
alleges that *each* defendant reported false and inflated AWPs, and gives detailed data in Exhibits
B and C.  Contrary to defendants' argument, where all defendants have engaged in the same
behavior, there is nothing *per se* wrong with attributing that conduct to "all defendants" in a
pleading subject to the "particularity" requirement.  *See, e.g., Perona v. Volkswagen of America,*
*Inc.,* 292 Ill.App.3d 59, 65-68 (1st Dist. 1997).  Rather, it depends on the context.  For example,
in *Exchange Nat. Bank v. Farm Bureau Life Ins. Co.,* 108 Ill.App.3d 212 (3rd Dist. 1982), cited
by defendants, the plaintiffs alleged fraud not only by the corporate defendant but by eight of its
officers.  It made sense in that context to require the plaintiff to say something about each
officer's conduct.  But in the present case, the misrepresentation concerns a uniform *practice* by
each corporate defendant -- feeding false data to pricing compendia, including AWPs that are not
prices at all, much less averages of prices charged by wholesalers.  No purpose of the

"particularity" requirement is served by requiring the Complaint to repeat this allegation forty-plus times, with the name of a single defendant in each allegation.  Rather than engage in such pointless repetition, the Amended Complaint provides, in its Exhibits B and C, extensive examples, for each defendant over a major time period (2001-2003), of false AWPs.  And it adds specific examples, where applicable, of particularly egregious behavior by particular defendants.

Defendants quibble with Exhibit C's data.  First, they complain that there are occasional "missing values."  JM 20-21.  But Exhibit C is illustrative, not exhaustive.  To require the State to include every one of the tens of thousands of false AWPs that defendants have supplied over the years would conflict with the rule that "the plaintiff is not required to set out evidence." *Chandler v. Ill. Cent. R.R. Co.*, 207 Ill.2d 331, 348 (2003).

Second, defendants complain that Exhibit C fails to include examples from years other than 2001 through 2003.  JM 21.  But no purpose is served by requiring the State to extend this illustrative list over all possible years that defendants were inflating their AWPs -- particularly since, as the State alleges, defendants try to keep the actual wholesale prices of their drugs secret. AC ¶56. *See State v. Ill. Central R.R. Co.*, 246 Ill. 188, 236 (1910) ("whenever the enumeration of particulars would lead to great prolixity, a general statement is sufficient").

Third, defendants complain that the State fails to provide the same sort of detail about inflated "Wholesale Acquisition Costs" that Exhibits B and C provide about inflated AWPs.  JM 21; *see* AC ¶61.  This argument rings particularly hollow in that, as Judge Saris found after a recent trial, a manufacturer that provides a purported WAC for a drug to the pricing compendia knows that the compendia will simply mark up that WAC by 20 to 25% to produce the AWP figure that it publishes. *In re Pharmaceutical Industry Average Wholesale Price Litigation, supra*, 491 F.Supp.2d at 33.  Because of this relationship, an inflated AWP published by the pricing compendia means that the defendant in question supplied a correspondingly inflated WAC.

Fourth, defendants complain that the Amended Complaint lacks particularity about the State's *parens patriae* claims on behalf of Medicare participants who made greater co-payments

on account of defendants' inflation of AWP.  JM 21.  Again, as the State's allegations make clear, these participants' damages are formulaic in character.  They pay 20% of "allowable cost," as set by Medicare.  Where allowable cost is based on AWP, inflating AWP by X% means that the Medicare participant's co-payment is similarly increased.  AC ¶89.[6]

    D.  <u>Miscellaneous arguments directed at the State's CFA claims</u>.

    **1.  The "concealment" argument**.  In some CFA "deception" claims, the conduct attacked by the plaintiff is not a misrepresentation, but the failure to reveal a material fact.  Illinois courts have established requirements to determine when such failure is an actionable "deceptive practice" in a suit by a private plaintiff under CFA §10a.  *See White, supra*, 368 Ill.App.3d at 283-84 (reviewing the cases).  For such failure to disclose to be an actionable damage claim as a "deceptive" practice, a private plaintiff must allege knowing concealment of a material fact and that plaintiff would have acted differently had he known that fact.  *Id.* at 286.  Defendants argue that, to the extent this is a "concealment" case, the State does not adequately allege these elements.  JM 22-23.

    This argument has no merit.  This is a suit by the Attorney General under CFA §7, so the State need not allege it was actually deceived or damaged.  More fundamentally, this is a misrepresentations case, not a "concealment" case.  Defendants did not just fail to report truthful prices.  Instead, they affirmatively reported false prices which led arithmetically to higher reimbursements to providers than the State was permitted by federal regulations to make.  As Judge Stearns noted in *In re Lupron Marketing and Sales Practices Litig., supra*, 295 F.Supp.2d at 167 (SA Tab 29):

> But this is not a case of nondisclosure.  Defendants did not stand mute.  As alleged in the Amended Complaint, defendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud.

---

[6] Finally, defendants complain that some drugs on Exhibit C were or might have been reimbursed on the basis of data that did not use AWP.  JM 22.  As described in the State's separate Response to the "Generics" defendants' motions to dismiss, this makes no difference, because inflated AWPs are still alleged to have led to overpayments on these other drugs.  In any event, the way to handle wrinkles like this is not to insist on a complaint with thousands of pages of allegations and statistical exhibits, but to resolve such matters through the usual processes of discovery, as they are being resolved in all the other state AWP cases.

For the same reason, there is no force to defendants' observation that the State has not increased its discount from AWP since filing this lawsuit. JM 23. At most, this is an argument that the State is not properly mitigating its damages -- an affirmative defense rather than the basis for dismissal. When the time comes to respond to that defense, the State will show that the mitigation doctrine, if it applies at all in this case, only requires the State to take *reasonable* measures to mitigate. *See Jones v. Rallos*, 373 Ill.App.3d 439, 449 (1st Dist. 2006).

While the State now knows that defendants' AWPs are significantly inflated, and now has historical data regarding the true wholesale prices in the past, it still lacks current information regarding the true wholesale prices on tens of thousands of drugs. Meanwhile, the defendants, who do have this information, continue to report false prices. Under these circumstances, the State will show that it is reasonable to look to the defendants for the continuing damage they are causing, rather than thrash around in the absence of reliable and comprehensive information for a "better" discount rate to cancel out the continuing inflation in defendants' announced AWPs.

**2. The "intent that the plaintiff rely upon the deception" argument**. Defendants argue that the Amended Complaint fails to supply a sufficient "factual basis" to support this element of a "deception" claim. JM 23. As noted above, the State specifically alleges this intent (AC ¶100). Moreover, no elaborate "factual basis" is necessary to support this allegation, because the *purpose* of the compendia is to supply data to payers who are determining how much to pay providers of defendants' drugs (AC ¶45). It can be inferred that defendants' purpose in providing data to the compendia is to influence the price that payers like the State will pay. *See Walinksi v. Morrison & Morrison*, 60 Ill.App.3d 616, 619 (1st Dist. 1978) (it is unnecessary to specifically state facts that can be "inferred from the complaint when read as a whole").

**3. The "penalties" argument**. Defendants ask the Court to strike Count I's request for penalties under CFA §7(b) and (c). JM 23-24. First, defendants argue that under §7(b), any request for any civil penalty requires allegations of an "intent to defraud." This argument misreads the statute, which provides:

> ...the Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared

23

unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 *per violation*.

815 ILCS 505/7(b) (emphasis added).  The obvious meaning of this section is that (a) if the Court finds defendant liable, it can impose a penalty of up to $50,000 on the defendant; and (b) if the State proves intent to defraud, the penalty can be increased to up to $50,000 for *each violation* the State proves.  Thus, even if defendants were right that the State insufficiently alleges intent to defraud (they are not) there would be no basis for striking the request for penalties.

Second, defendants argue that the State inadequately alleges facts supporting its claim for penalties under the CFA §7(c).  JM 24.  That subsection allows a separate penalty not to exceed $10,000 for each violation if a practice unlawful under the CFA was committed "against a person 65 years or older."  The State's *parens patriae* claims on behalf of Medicare recipients by definition allege violations "against a person 65 years or older," since 65 is the general age of eligibility for Medicare.  Subsection 7(c) then provides a non-exclusive list of factors the court is to consider in deciding whether to impose the penalty and its amount.  To say the least, the State sufficiently alleges all these factors: that defendants' conduct was in "willful disregard of the rights" of persons 65 or older, or that defendants "knew or should have known" that their conduct was directed toward such persons, or that such persons were "substantially more vulnerable to [defendants'] conduct because of age [or] poor health...than other persons."

**4.  The argument based on CFA §2CC(b) (JM 24-25)**.  The State will agree to voluntarily dismiss Count II, which relies solely on §2CC(b) of the CFA.

**5.  The request to dismiss the State's claim for "actual damages."**  In seeking monetary relief, Count I uses the phrase "restitution and actual damages."  The phrase "actual damages" is used by CFA §10a as one form of relief authorized in suits by private plaintiffs.  However, CFA §7 (governing Attorney General suits) uses a different phrase:  the Court may "exercise all powers necessary, including, but not limited to...restitution."  In *A, C & S*, the Supreme Court held that bodies politic were not authorized to bring suit under CFA §10a, since

that remedial provision is limited to "persons" and bodies politic were not "persons." Hence, argue defendants, Count I's request for "actual damages" should be stricken. JM 26.

This is a purely semantic argument, since §7's authorization of "restitution" as well as of all other "powers necessary" authorizes the monetary relief the State seeks. Even though the State is not a "person" under the CFA, §7 authorizes relief for the State. In *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill.2d 473 (1992), the Court, distinguishing *A, C & S*, held that in a §7 suit, the Attorney General could pursue relief on behalf of government entities whether they were considered "persons" or "consumers" under the CFA. 153 Ill.2d at 487.

## II.  COUNT IV STATES A VIABLE CLAIM UNDER THE WHISTLEBLOWER REWARD AND PROTECTION ACT.

The Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3, provides, in relevant part that any person who:

> (1)  knowingly presents, or causes to be presented, to an officer or employee of the State...a false or fraudulent claim for payment or approval; [or]
> (2)  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;
> \* \* \*
> is liable to the State for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the State sustains because of the act of that person.  A person violating this subsection (a) shall also be liable to the State for the costs of a civil action brought to recover any such penalty or damages.

The Whistleblower Act closely tracks the federal False Claims Act ("FCA"), 31 U.S.C. §1329 *et seq.*, and decisions under the FCA are therefore instructive. *Scachitti v. UBS Fin. Serv.*, 215 Ill.2d 484, 507 (2005).

The State's claims under the Whistleblower Act are modeled on claims in other AWP cases under the FCA or comparable state false claims act.  To date, defendants' attempts to obtain dismissal of such claims have all failed.[7]  The same result is required under Illinois'

---

[7] *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F.Supp.2d 12 (D.Mass. 2007) (SA Tab 25) (refusing to dismiss Department of Justice's AWP claims against Abbott under the FCA); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 498 F.Supp.2d 389 (D.Mass. 2007) (SA Tab 26) (refusing to dismiss Department of Justice's FCA claims against Dey); *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 478 F.Supp.2d 164, 171-72 (D.Mass. 2007) (SA Tab 24) (refusing to dismiss California's claims under the California False Claims Act); *State of Hawaii v. Abbott Labs.*, Civil No. 06-1-0720-04 EEH (Cir. Ct. 1st Cir. Hawaii 2007) (SA 6) (refusing (continued...)

indistinguishable statute.  The State alleges that as a result of defendants' misrepresentations, providers submitted claims to the State to be paid, and were paid, amounts in excess of the limits of federal law.  As the above-cited decisions concluded, these allegations state claims for "knowingly caus[ing] a false...claim to be presented" in violation of subsection (1), and "knowingly [making or using]...a false...statement to get a false...claim paid or approved by the State" in violation of subsection (2).

Defendants first argue that the State "does not attach a single allegedly false claim [by a provider] to its complaint to illustrate to the Defendants and the Court what precisely on the claim form is itself 'false.'"  JM 28.  No such attachment is required.  The Amended Complaint clearly informs defendants that the falsity of the claims in question consisted in providers consistently being paid more than federal regulations allowed.  As Judge Saris held, these allegations sufficiently allege causing a "false claim" to be submitted.  *In re Pharmaceutical Industry Average Wholesale Price Litigation, supra*, 478 F.Supp.2d at 173 (SA Tab 24).

Second, defendants argue that there can be no "false claim" because "the party alleged to be deceived [the State] authorized the pricing or reimbursement utilized by the defendant."  JM 28.  This argument has no merit.  The State authorized the *formula* used to determine provider reimbursement, and knew the *amounts* paid to providers under that formula.  But nothing in the Amended Complaint alleges that the State authorized or approved of the defendants' vastly inflated AWPs.  As Judge Saris remarked:  "Defendants' interpretation that they have *carte blanche* to publish sky-high prices unmoored from the acquisition costs of providers leads to absurd results."  *Id*.

In all three cases defendants cite for their "authorized payment" argument, the courts determined that the claim in question was not false by rejecting the plaintiff's interpretation of the governing law or regulation and concluding that the payment had complied with that law or regulation.  *United States v. Bruno's, Inc.*, 54 F.Supp.2d 1252, 1260 (M.D.Ala. 1999); *U.S. ex*

---

[7] (...continued)
to dismiss Hawaii's claim under the Hawaii False Claims Act); *The Commonwealth of Massachusetts v. Mylan Laboratories, et al.*, 357 F.Supp.2d 314 (D.Mass. 2005) (refusing to dismiss Massachusetts' AWP claim under the Massachusetts False Claims Act) (SA 28).

*rel. Hochman v. Nackman*, 145 F.3d 1069, 1074-75 (9th Cir. 1998); *U.S. ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 608 (9th Cir. 1992). Here, in contrast, defendants are sufficiently alleged, through misrepresenting AWPs, to have knowingly caused Illinois to pay providers more than federal regulations allow.

Third, defendants argue that the State "does not sufficiently allege how each Defendant 'caused' pharmacies and doctors" to submit false claims. JM 29. Defendants argue: "At best, the State avers...that Defendants' false AWPs allowed others to submit false claims for payments from Illinois Medicaid." *Id.* Judge Saris rejected this "no causation" argument in the Department of Justice's FCA case against defendant Abbott. As she held, "a defendant may be liable if it operates under a policy that causes others to present false claims to the government...As most courts agree, the FCA covers indirect bilking of the federal government." *In re Pharm. Industry AWP Litigation, supra*, 491 F.Supp.2d at 16 (SA Tab 25), *quoting United States v. President & Fellows of Harvard Coll.*, 323 F.Supp.2d 151, 186-87 (D.Mass. 2004). She concluded: "[A]s alleged, the submission by doctors and pharmacists of false pharmaceutical claims to Medicare and Medicaid was not only a foreseeable and substantial factor in the government's loss, but also it was 'an intended consequence of the alleged scheme of fraud.'" 491 F.Supp. at 16, *quoting United States ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 53 (D.Mass. 2001).

The cases defendants offer for their "no causation" argument (JM 29) are unhelpful. *United States v. Borenstein*, 423 U.S. 303 (1976), confirmed that a defendant in a similar position to the present defendants *was* liable for "causing" submission of a false claim:

> When, however, United dispatched each shipment of falsely marked tubes to Model, it did so knowing that Model would incorporate the tubes into the radio kits it later shipped to the Government, and that it would ask for payment from the Government on account of those tubes. Thus, United's three shipments of falsely branded tubes to Model caused Model to submit false claims to the United States, and United is thus liable for three $2,000 statutory forfeitures representing the three separate shipments that it made to Model.

423 U.S. at 530. Similarly, when defendants reported false AWPs to First DataBank, they knew and intended that providers would ask for payment from Illinois in amounts determined by that false data. In *United States ex rel. Grynberg v. Ernst & Young LLP*, 323 F.Supp.2d 1152

(D.Wyo. 2004), a relator alleged that mistakes by an auditing firm of a natural gas producer ultimately led to the client's underreporting and underpayment of royalties due to the United States government.  The court dismissed this frivolous claim for a variety of reasons, including the fact that the complaint failed adequately to allege intent by the auditors to have a false report filed.  *Id.* at 1156.  Here, the defendants knowingly inflated AWP data, knowing that providers would be paid by Illinois on the basis of that data in unlawfully high amounts.

## III.  COUNT III STATES A VALID CLAIM FOR VIOLATION OF THE ILLINOIS PUBLIC ASSISTANCE FRAUD ACT.

Section 7(b) of the Illinois Public Assistance Fraud Act, 305 ILCS 5/8A-7(b), provides, in relevant part (emphasis added):

> Any person, firm, corporation, association, agency, institution or other legal entity, other than an individual recipient, that willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device *on behalf of himself or others*, obtains or attempts to obtain benefits or payments under this Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled, shall be liable for repayment of any excess benefits or payments received and, in addition to any other penalties provided by law, civil penalties consisting of (1) the interest on the amount of excess benefits or payments at the maximum legal rate in effect on the date the payment was made to such person, firm, corporation, association, agency, institution or other legal entity for the period from the date upon which payment was made to the date upon which repayment is made to the State, (2) an amount not to exceed 3 times the amount of such excess benefits or payments, and (3) the sum of $2,000 for each excessive claim for benefits or payments.

Pointing to the words "benefits or payments under this Code to which he or it is not entitled," defendants argue that (a) the words "he or it" refer to the person who makes the false statement or representation; (b) hence only persons who obtain Medicaid benefits or payments from the State can violate this section; and (c) since the providers, not defendants, obtained those benefits or payments, defendants cannot be liable under this provision.  JM 26-27.

A statute must be interpreted, if possible, to give effect to all its provisions.  *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 123 (1992).  Defendants' interpretation reads the phrase "on behalf of himself or others" out of the statute.  The only circumstance under which a person will make a false statement or misrepresentation "on behalf of...others" is if that person is trying to obtain benefits for *others*.  Thus, the phrase "to which he or it is not entitled"

must be construed to include "others," and the statute covers defendants' conduct as alleged in the complaint.

IV. DEFENDANTS' LIMITATIONS ARGUMENT HAS NO MERIT.

As defendants recognize, in Illinois governments have sovereign immunity from statutes of limitation defenses in actions involving public rights. *City of Shelbyville v. Shelbyville Restorium, Inc.*, 96 Ill.2d 457, 459 (1983). This doctrine distinguishes between rights belonging to the general public and rights belonging "only to the government or to some small and distinct subsection of the public at large." *Id.* at 462. If an action involves "public rights," then no statute of limitation applies to it unless that limitations provision contains "express language including governmental entities." *A, C & S, supra*, 131 Ill.2d at 477.

With one exception, the Joint Motion does not dispute that the claims the State asserts in this case are "public" rights, and therefore not subject to a statute of limitation. The exception, according to defendants, is the Attorney General's *parens patriae* claim brought on behalf of Illinois citizens who are Medicare Part B beneficiaries. Defendants argue that the claim on behalf of those citizens for statutory penalties are "private" and therefore subject to 735 ILCS 5/13-202's two-year limitations provision. JM 30. This argument has no merit.

First, Illinois Medicare recipients do not fit *Shelbyville*'s category of a "small and distinct" subsection of the public at large. They are an enormous and growing body of citizens.

Second, the claim based on inflated Medicare co-payments does not merely involve damage to private citizens. It also alleges damage to the "public revenues" -- a hallmark of a case involving "public" rights. *Clare v. Bell*, 378 Ill. 128, 131 (1943); *Shelbyville*, 96 Ill.2d at 465; *A, C & S*, 131 Ill.2d at 477. Specifically, if the Medicare recipients are also eligible for Medicaid, the State pays the co-payments and bears the damage of inflation in those payments. AC ¶89. And the penalties the State seeks under CFA §7(c) for violations against persons 65 or over are payable to the Attorney General's office for public purposes specified in that section.

Third, the *parens patriae* claim does not cease to involve a "public right" simply because it will monetarily benefit, among others, private citizens. Suits by public officers can assert

"public" rights even where they seek only to recover damages for private citizens. *See People ex rel. Dept. of Labor v. K. Reinke, Jr. et al.*, 319 Ill.App.3d 721, 746 (1st Dist. 2001) (suit to recover unpaid overtime compensation under the Minimum Wage Law for 27 private employees was "public" under *Shelbyville*); *People ex rel. Martin v. Lipkowitz*, 225 Ill.App.3d 980, 985 (3rd Dist. 1992) (suit to recover unpaid vacation benefits and statutory penalties under Illinois Wage Payment and Collection Act involved "public right" because of the public purpose of that statute). The statutes under which the State sues -- the CFA, the Whistleblower Act, and the Illinois Public Assistance Fraud Act -- have no less a public purpose, and importance, than the statutes involved in *K. Reinke, Jr.* and *Lipkowitz*. Moreover, co-payments are an integral part of Medicare, one of the country's largest and most important programs protecting public health. Defendants' inflation of co-payments interferes with the judgment of Congress on that part of the Medicare burden that will be shouldered by participants. Defendants' misconduct thereby implicates a public dimension that transcends the mere cost to private individuals.

In short, the Attorney General's *parens patriae* claim involves a "public right." Hence, under *A, C & S*, it is not subject to a statute of limitations unless the statute contains express language including the State in its coverage. The provision cited by defendants, 735 ILCSA 5/13-202, which governs, among other things, claims for statutory penalties, does not mention governmental entities. Hence it does not apply to the State's claims. As *Lipkovitz* held, since the suit in question pursues a "public right," no statute of limitations applies either to its claim for actual damages for the individuals in question or for statutory penalties under the relevant statute.

CONCLUSION

The State respectfully requests that the Joint Motion to Dismiss be denied.

Respectfully submitted,

LISA MADIGAN
Attorney General of the State of Illinois

By:   Robert S. Libman
      Special Assistant Attorney General
      of the State of Illinois

30

Judson H. Miner
Charles Barnhill, Jr.
George F. Galland, Jr.
Jeffrey I. Cummings
Robert S. Libman
Benjamin J. Blustein
Special Assistant Attorneys General
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170
Atty. No. 21402

Brent D. Stratton
Daniel F. Buysse
Assistant Attorneys General
100 W. Randolph St.
Chicago, IL 60601
(312) 814-6141

<u>CERTIFICATE OF SERVICE</u>

Lisa Mecca Davis certifies that she caused a copy of the foregoing Notice and Response be served upon all counsel of record, by LexisNexis File & Serve, as specified in this Court's June 2, 2006 Case Management Order No. 1, this 25th day of January, 2008.

*Lisa Mecca Davis*

Lisa Mecca Davis