Page 1

                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


    In Re:                          )
    PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
    AVERAGE WHOLESALE PRICE         ) MDL No. 1456
    LITIGATION                      ) Pages 1 - 40



                         SETTLEMENT HEARING

              BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE




                         United States District Court
                         1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts
                         May 1, 2008, 2:05 p.m.




                         LEE A. MARZILLI
                      OFFICIAL COURT REPORTER
                   United States District Court
                   1 Courthouse Way, Room 3205
                       Boston, MA  02210
                        (617)345-6787

1    A P P E A R A N C E S:

2    For the Plaintiffs:

3        STEVE W. BERMAN, ESQ. and SEAN R. MATT, ESQ.,
     Hagens Berman Sobol Shapiro LLP, 1301 5th Avenue, Suite 2900,
4    Seattle, Washington, 98101-1090.

5        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro
     LLP, One Main Street, Cambridge, Massachusetts, 02142.
6
         KENNETH A. WEXLER, ESQ. and JENNIFER FOUNTAIN CONNOLLY,
7    ESQ., Wexler Toriseva Wallace, 55 West Monroe Street,
     Suite 3300, Chicago, Illinois, 60603.
8
         MARC H. EDELSON, ESQ., Edelson & Associates, LLP,
9    45 West Court Street, Doylestown, Pennsylvania, 18901.

10       JOHN A. MACORETTA, ESQ., Spector, Roseman & Kodroff, PC,
     1818 Market Street, Philadelphia, Pennsylvania, 19103.
11
     For the Defendants:
12
         D. SCOTT WISE, ESQ. and KIMBERLEY D. HARRIS, ESQ.,
13   Davis, Polk & Wardwell, 450 Lexington Avenue, New York, New
     York, 10017, appearing for AstraZeneca.
14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3   Wholesale Price Litigation, Civil Action No. 01-12257, will

4   now be heard before this Court.  Will counsel please identify

5   themselves for the record.

6          MR. BERMAN:  Good afternoon, your Honor.  Steve

7   Berman on behalf of the class.

8          MR. MATT:  Sean Matt on behalf of the class.

9          MR. WEXLER:  Ken Wexler, your Honor, on behalf of

10  the class.

11         MR. NOTARGIACOMO:  Ed Notargiacomo on behalf of the

12  class.

13         MS. CONNOLLY:  Jennifer Connolly on behalf of the

14  class.

15         MR. EDELSON:  Marc Edelson on behalf of the class.

16         MR. MACORETTA:  Good afternoon, your Honor.  John

17  Macoretta on behalf of the class.

18         MR. WISE:  Scott Wise from Davis, Polk & Wardwell

19  for AstraZeneca.

20         MS. HARRIS:  Kim Harris from Davis, Polk & Wardwell

21  for AstraZeneca.

22         THE COURT:  Is there anyone here for Miss Howe, the

23  objector in this case?  Are we expecting anyone for her?

24         This morning we received a full-blown brief on the

25  objection.  I was in court most of the morning, so I've been

1   trying to read it, but I don't know if any of you have -- I

2   know you're all flying -- whether you've received a copy of

3   it.

4               MR. BERMAN:  We received a copy this morning, your

5   Honor.

6               THE COURT:  Have you all?

7               MR. WISE:  Yes, we have one this morning as well.

8               THE COURT:  And no one's heard from or expecting to

9   come?  Is Ms. Howe here herself?  Does anyone know what she

10  looks like?  All right, so why don't we go forward.

11              MR. BERMAN:  Thank you, your Honor.  With respect

12  to the filing that you mentioned that came in today, you know

13  we think it's untimely.  We're here, this has been set for

14  quite a while, and if your Honor is going to consider it,

15  we'd like an opportunity to respond.

16              THE COURT:  I am going to consider it, but it is

17  untimely.  That having been said, some of these issues have

18  been raised before and --

19              MR. BERMAN:  Yes, we'd only like to respond to new

20  issues.  I'll do some today, but if you want a brief from us,

21  we'd be glad to do it.

22              THE COURT:  You might want to, although we can at

23  least talk about some of them because, as I said, some of

24  them aren't crazy.  So while I was annoyed that I only

25  received it an hour ago or two hours ago because I've been in

1    court all morning, I want this to be as fair as possible.

2         MR. BERMAN:  Certainly, so we'll be glad to address

3    it.  But as I stand here today, I have to say that I'm pretty

4    proud to be here because usually I come in a class case and I

5    may have a recovery of 10 percent, 20 percent.  It's usually

6    some, you know, smaller number of the damages.  In this case

7    what we're talking about is a notice that went out to almost

8    a half million people in which we're telling people that

9    we're going to pay you double or triple the actual

10   overcharges that were incurred as a result of this case.  So

11   they're getting more than their damages.  I think that's

12   unheard of.  I'm not aware of a case where that's happened.

13   And we're faced with just one objection, and I'll talk about

14   each point of the objection.

15        THE COURT:  Can I ask you, on the double or triple,

16   I thought we were primarily talking double, even though I

17   understand your position is that because there's the

18   zero percent yardstick, it's closer to triple.

19        MR. BERMAN:  That's correct.

20        THE COURT:  I'm jumping the gun, as I tend to do.

21   One thought I had is, with respect to the cy pres amounts,

22   why didn't we just triple?

23        MR. BERMAN:  I'm not sure.

24        THE COURT:  Instead of, in other words, if there's

25   enough money left over -- you have about 10,000 claims,

1   something in that vicinity?

2           MR. BERMAN:  Right, correct.

3           THE COURT:  You believe that there's going to be a

4   huge amount left over out of the $24 million?

5           MR. BERMAN:  Correct, about $14 million.

6           THE COURT:  $14 million.  As I understand it --

7   what was the amount that you think in damages?  It's about

8   $10 million, right, of the claims that we know about?

9           MR. BERMAN:  About $10 million.

10          THE COURT:  Right.  Why don't we just provide

11  treble damages to everybody?  I don't like the idea of so

12  much money going to cy pres.  Just it feels uncomfortable.

13  And then whatever is left over from that we would use that

14  way.

15          MR. BERMAN:  I would like to get the class members

16  as much money as we can.  We negotiated, and the

17  double-damage --

18          THE COURT:  I know, but you don't care, right?  Why

19  would you care?

20          MR. WISE:  Well, we would have to think about

21  that.  I mean, the deal we negotiated is the settlement we

22  negotiated, your Honor.  And the terms are as they were

23  negotiated and as set forth in the agreement, and that's what

24  you're proposing is a different agreement.

25          THE COURT:  Right, but you're just liable, the two

1    of you -- not the two of you personally -- for the

2    $24 million, so is it relevant to you at all what that goes

3    to?

4              MR. WISE:  I'd have to discuss it with my client.

5    I think, I mean, they were willing to agree to the deal that

6    we negotiated that had this minimum of $10 million going to

7    charities, which they know and approve of.

8              THE COURT:  I just --

9              MR. WISE:  And I'm not sure, you know, an even

10   greater windfall for class members is --

11             THE COURT:  It wouldn't.  It would be trebling,

12   which is permitted under statute and which I've provided for

13   in other litigation.  Another possibility is to treble only

14   with respect to those in the heartland, which we've done in

15   Track Two.  By heartland, I mean the 1998 to 2002 group,

16   which have by far the strongest claim, as we all know now, or

17   at least as I believe.

18             MR. WISE:  I would guess that the group of

19   claimants probably is predominantly in that category,

20   although I don't know, but I would think so.

21             THE COURT:  But I am here to approve it or not, and

22   I have no problem with the $24 million.  As you say, it's

23   quite good.  And I'm thinking in terms of a discomfort, which

24   I articulated last time, of having such a huge amount go to

25   charity.  That's not my job.  My job is to give as much as

1    possible, if it's justified.  And I'm thinking in terms of,

2    now that we know there's enough money -- so it was a moot

3    issue before because we didn't know how many people were

4    going to come in -- we could treble and make it consistent

5    with what we've done in the other track with respect to

6    people in the heartland.

7              MR. BERMAN:  Certainly you have better negotiating

8    efforts than I do, and if you want to do that, we have no

9    objection.  It's up to AstraZeneca.

10             THE COURT:  But I'm not sure why it would matter so

11   much to them.  I would rather give it to people who paid and

12   are consumers and elderly and sick than I would to a

13   charity.  It would still leave some left over for the

14   charity; a lot of money, actually, left over for a charity.

15   But what I'd like to know, and I don't know if there's a way

16   of spinning it out, if you could treble for everyone versus

17   trebling for people in the heartland.

18             MR. BERMAN:  We could do that.  We have the

19   information.

20             THE COURT:  So maybe come back to me on that, and

21   you discuss that with your client, because I have concerns

22   about -- I don't know -- I've never, let me put it that

23   bluntly, I've never approved a class settlement where I knew

24   up front so much was going into charity.  I mean, it's hard

25   for me to be against charity, I'm very much for philanthropy,

1  but I don't think I've ever given where I've known at the

2  point of approval that it was going to be at this point more

3  to charity than goes to the class, right?

4          MR. BERMAN:  It's close probably.

5          THE COURT:  It's $14 million to charity and

6  $10 million for the class.  I've got great concerns about

7  whether that is appropriate.

8          MR. BERMAN:  Well, it's actually going to be

9  $10 million.  There's a cap on the charitable part, so --

10         THE COURT:  I see.  So it would be $10 million to

11 the class, $10 million to charity.  All right, thank you for

12 that clarification.

13         MR. WISE:  Let me just interrupt for a second

14 because you're not suggesting, if I understand what you're

15 saying, that the financial liability of the defendant would

16 change in any way --

17         THE COURT:  No.

18         MR. WISE:  -- in aggregate amount --

19         THE COURT:  No.

20         MR. WISE:  -- under what you're suggesting?

21         THE COURT:  My theory would be -- and I'm not

22 wedded to this -- either we treble the amount for people in

23 the heartland with the strongest claims, or, if there was

24 enough money, treble for everybody.  And then whatever was

25 left over --

c794f022-297f-4699-8314-817ae6410b0f

1          MR. BERMAN:  We can run the numbers and see what

2     they give us and report back to the Court.

3          THE COURT:  Now, I think what you're trying to say,

4     I'm hearing now, which I'm thinking about for the first time,

5     is, well, right now you're capped at $20 million instead of

6     $24 million.

7          MR. WISE:  Right, it depends on the amount of

8     claims, right.

9          THE COURT:  So that's why maybe what you could do

10    is just look at what the numbers teach you, because actually

11    there would be a $4 million difference, now that I'm focusing

12    on what you just said and I'm understanding the economic

13    layout.  But at least to the extent, I would rather give the

14    additional $10 million, let's view it that way, to the --

15         MR. WISE:  Well, if what you're saying is, without

16    increasing the aggregate exposure, the mix as between

17    claimants and charities you would like to see rebalanced?

18         THE COURT:  Yes, right, right, but that I think you

19    can do.

20         MR. BERMAN:  We will do that and report back to

21    you.

22         THE COURT:  And while on that particular issue, am

23    I remembering correctly that we did something like the

24    heartland group for Track Two?

25         MR. BERMAN:  Correct.

1          THE COURT:  So the overall issue is -- and maybe

2     I'm getting older -- a lot of what the complaints were with

3     Mr. Haviland were, "Well, you did this for one and not for

4     another."  And I remember having some concerns when you did a

5     chart for me last time.  Mr. Notargiacomo did up a whole

6     chart for me.  I don't always remember what I've done for --

7     every single one seems to have this little twist that's

8     different, and I can see why people looking backwards at it

9     might say, "Well, why did Track Two get this and not

10    Track One?"  And part of it has to do legitimately with, they

11    were negotiated at different points in the process and there

12    were different risks involved.  That having been said, if

13    there's enough money and it doesn't tip the deal, it's on

14    balance better to treat people similarly.  So that's the

15    thought process.

16         MR. BERMAN:  Okay, we understand that.  We'll run

17    those numbers.  This was done a little bit differently than

18    all other settlements, which we are kind of proud of.  And

19    one reason why we think the claims are higher than in other

20    settlements is, we had Dr. Hartman calculate what we call the

21    "monthly overcharge," and then we went to CCS, and we got

22    not only the names of the folks but we got the dates that

23    they received administration of the drug, and we sent that to

24    them.  If you look at the claim --

25         THE COURT:  CCS means what?

1          MR. BERMAN:  CMS gave us the --

2          THE COURT:  CMS I know, Center for Medicare and

3     Medicaid Services.  All right, CMS I know.

4          MR. BERMAN:  And what we sent people, I think it's

5     instructive if you look at -- I have some claim forms in the

6     packet I gave you.  I want to just put it up on the screen.

7     It should be the first claim at Claimant 18.

8          Now, one of the things that I think we tried to

9     reach for your Honor is that the claim form is simple

10    enough.  This one was filled out by the spouse of a deceased

11    class member, so she was able to complete the paperwork and

12    make a claim that netted her $12,500, subject to further

13    adjustment perhaps.  And if you look at the next page, what

14    she got was preprinted, the date that her husband got the

15    injections; and that's all she had to do was check the box

16    that they made a full copay, and this claim sailed through.

17         Now, this was the first time that I know of in any

18    drug litigation that this was done where rather than having

19    to dig through your records, the claim form told you the days

20    that you received the drug, and you just had to check it.  So

21    we've had a lot of claims.

22         The next one is a claim for a copay, the people who

23    made the partial copay.  Now, those claims are lower because

24    they're out of pocket lower.  And this person filled out the

25    claim form.  This was a class member.  There were four

c794f022-297f-4699-8314-817ae6410b0f

1   injections.  She said, "I made a partial pay," and she got

2   paid $285.  So we think the claim form here worked in the

3   sense that it generated lots of claims, and it was easy for

4   people, and it's going to result in their getting paid some

5   real money.

6           Now, you asked often how things compare to what's

7   happened in the past, so I did a chart.  It's on Page 10.

8   And you can see, comparing this case with the GSK case, that

9   there were almost five times as many notices mailed in GSK,

10  but the number of claims here is much higher.

11          THE COURT:  So where are you now?

12          MR. BERMAN:  I'm on Page 10.  It should be on your

13  screen, I hope.

14          THE COURT:  My Page 10 doesn't look like your

15  Page 10.  I see.

16          MR. BERMAN:  It has GSK in the title.

17          THE COURT:  I see, all right.

18          MR. BERMAN:  So you see that we sent out many more

19  notices, but the actual claims rate here is much higher

20  because I think we're just doing a better job.

21          THE COURT:  Doing the math, what is it?

22          MR. BERMAN:  Doing the math, the number of claims

23  into the number of notices mailed?

24          THE COURT:  Yes, it's --

25          MR. BERMAN:  Well, we can't do that comparison

1    because on the Form 45, a lot of those people aren't really

2    class members because we don't know if they made an insurance

3    payment.  And just the point of this slide was to just show

4    you that relative to the amount of notices that went out,

5    we're having a much greater success in getting claims filed

6    than we did in the GSK settlement.

7              THE COURT:  Okay, thank you.

8              MR. BERMAN:  Now, your Honor, there is about seven

9    or eight factors that courts are supposed to consider in

10   deciding whether a settlement is fair.  You're familiar with

11   them.  You're familiar with many and how they apply to this

12   case.  I'm only going to talk about one, and that is the

13   post-settlement compared to the likely result of litigation.

14   I think we've already gone over this, the amount of damages,

15   so I don't need to belabor that.

16             And then I'll just skip right to and discuss the

17   objections that have been raised.  And so I go to Page 17 and

18   start with the reaction of the class.  As I mentioned,

19   there's only been one objector out of the 455,000 notices, so

20   I think the class is obviously overwhelmingly in favor of the

21   settlement.

22             Once we got Mrs. Howe's latest brief, we went and

23   pulled her claim.  She's going to receive $507 under the

24   settlement.  We believe that she wrote checks -- we counted

25   up the dollars in the checks that are attached to her claim

1   form, and they come out to $347.  So Mrs. Howe is objecting

2   to a settlement in which she's getting paid more than her

3   damages.  I've never heard of that in litigation in this

4   country, where a class member objects to something and

5   they're getting more than their damages.  And I'm not saying

6   that we shouldn't discuss her objections, but it's kind of an

7   extraordinary situation here.

8           THE COURT:  I was confused about something.  Is she

9   still getting at your request the compensation for the time

10  she spent on the case?

11          MR. BERMAN:  Yes.  We're asking for that.

12          THE COURT:  When it says that she somehow isn't --

13  there's a footnote that says that she was not going to be

14  getting it anymore, that you'd withdrawn your request for

15  money.  Is that a different --

16          MR. BERMAN:  Not in our brief.

17          THE COURT:  No, in Mr. Haviland's.  Do you know,

18  does that respond to maybe another one of the tracks?

19          MR. BERMAN:  No, I think he believes that

20  AstraZeneca may take the position today that she's not

21  entitled to --

22          THE COURT:  Will you be?

23          MS. HARRIS:  Well, your Honor, she's technically

24  not a class representative for the settlement class.  She is

25  not listed as a class representative in the preliminary

1    approval order.  That was as a result of the fact that she

2    objected to the settlement and was no longer represented by

3    class counsel, was represented by Mr. Haviland instead.  So

4    the term of the settlement agreement that allowed for those

5    payments was for the class representatives to get payments

6    for their time.

7              In addition, the terms --

8              THE COURT:  So is the bottom line, yes, you're

9    objecting?

10             MS. HARRIS:  I think the bottom line is, your

11   Honor, the settlement only provides for a $5,000 payment.

12   Her claim is 78 hours at $100 an hour for $7,800.  So her

13   claim for payment as a class representative really should be

14   capped at $5,000, since that's the terms of the settlement

15   agreement, to the extent she's going to get a payment, even

16   though she's no longer listed as a class representative in

17   the preliminary approval order.

18             THE COURT:  Well, I'll hear from you later on that.

19   But, in any event, is that true, she's no longer a class

20   representative?

21             MR. BERMAN:  That's what the order says, yes, but

22   we're not -- she spent time on the case.  We're not

23   quarreling with that.  We don't object to her getting paid

24   any amount the Court thinks is appropriate.

25             THE COURT:  Is that because it's out of their

1    pocket?

2         MS. HARRIS:  Yes, your Honor.  And we agree that

3    she has spent time on the case.  It's just that her amount

4    should be capped at the amount agreed in the settlement,

5    which is $5,000.

6         THE COURT:  Is that true for the other guy too?

7         MR. WISE:  Yes.

8         MS. HARRIS:  That's exactly correct.  At the time

9    that he submitted, it was actually slightly below the $5,000

10   amount because your Honor said they could only get $100 per

11   the hours that they spent on the case.

12        MR. BERMAN:  Yes, all right.  All right, we'll get

13   to that in a minute.

14        MR. BERMAN:  So it was a little hard to figure out

15   what objections Mr. Haviland was pressing because they're

16   incorporated in, like, 30 pleadings that he filed.

17        THE COURT:  Skip that.  Just go to his memo.

18        MR. BERMAN:  Okay, I'll go to his memo.

19        THE COURT:  I mean, it's quite clear that he's

20   setting it up for an appeal, but as far as I'm concerned, the

21   only ones that have been fully vetted are the ones that he

22   briefed to me.  He can't just string cite and expect me to

23   know anything, so I think the rest are waived.  But he has

24   sent the memo in, and, albeit untimely, we should address it.

25        MR. BERMAN:  Okay, so he says a couple of things.

1   Number one, he says that we did not properly settle for

2   people who make a partial copay.  So you have people who make

3   the full copay, and you have people who make a portion of the

4   copay.  Dr. Hartman is the only expert who opined on this.

5   He did his work and did research and concluded that the

6   average partial copay was 20 percent, and the damage model

7   and the overpayment model was calculated on the averages.

8   That's what you do when you aggregate damages.  Mr. Haviland

9   says, well, you have someone like Ms. Howe who has a

10  50 percent copay in their policy; it's not fair.  You know,

11  she's the only person that he's been able to identify who is

12  in that situation --

13          THE COURT:  Although he says that United Health

14  typically has that.

15          MR. BERMAN:  But he doesn't have any -- it's not

16  backed up by anything.

17          THE COURT:  So you're just saying it's an assertion

18  of counsel?

19          MR. BERMAN:  It's an assertion without fact, and

20  we've gone back to the expert numerous times and said, "Is

21  Mr. Haviland right?  Is there anything to this?"  And he

22  says, "No.  I stand by my opinion.  This is the typical

23  partial copay."

24          And as we pointed out, even under the settlement,

25  Ms. Howe is actually getting more than her damages, even

Page 19

1    though she's in the partial copay class.

2           THE COURT:  Yes, although you've just persuaded me

3    that you really probably should paper that piece of it.  We

4    should probably have something in the record to support what

5    you're responding to.

6           MR. BERMAN:  Okay, yes, we will do that.

7           Okay, so then Mr. Haviland raises again today that

8    we should send checks to every class member without use of a

9    claim form.  We can't do that because there's 445,000 people

10   who are identified by CMS.  We don't know which of those

11   people are in the class, whether they made a copayment of any

12   kind.  If we sent out checks to each class member, it would

13   amount to $53 per class member, so we would be compromising a

14   claim worth $12,000, like I illustrated to you in that

15   Claim 18 that I just went through a few moments ago, we would

16   be compromising that down to $53 just because Mr. Haviland

17   wants to pay everyone without identification of whether

18   they've been injured.  We as class counsel have the duty to

19   try to ferret out who was injured and pay those people.

20   That's who we represent.

21          THE COURT:  So remind me.  Why did we do it

22   differently in another case?

23          MR. BERMAN:  We've only done it differently in one

24   case, and that is the Track Two settlement.  And in the

25   Track Two settlement -- let me take you to Slide 27 --

1          THE COURT:  Which was primarily generic.

2          MR. BERMAN:  Actually Slide 29.  In Track Two, your

3     Honor, we would have liked to do the AstraZeneca type

4     settlement where we were able to match the actual damages to

5     each individual consumer.  The problem is, we can't do it.

6     You have both generic and brand-name drugs that have multiple

7     regimes.  In other words, they're not standardized like

8     Zoladex.  People take them in different dosages.  They start

9     them and they stop them.  It was impossible for us to do the

10    overcharge analysis that we did in Zoladex.  So what we wound

11    up doing is to say:  Okay, we're going to pay people out of

12    pocket.  It's not a measure of their damages.  We're just

13    going to take the total out-of-pocket expenditures, put them

14    in the fund, and they'll get a portion.  They may get paid

15    less.  In other words, if --

16         THE COURT:  You know, I don't remember.  Track Two

17    was generics, but it was self-administered primarily, or was

18    it doctor-administered?

19         MR. BERMAN:  It was doctor-administered.

20         THE COURT:  So the generics were doctor-

21    administered?

22         MR. BERMAN:  Correct.

23         THE COURT:  So why is the information so different

24    between the AstraZeneca and the --

25         MR. BERMAN:  Okay, so Zoladex has a standard dosage

1    that people get, and they get it at a specified time, right?

2              THE COURT:  I see.

3              MR. BERMAN:  Take a drug like Taxol.  There's no

4    standard dosage that any Taxol patient gets.  It's up to the

5    doctor.  Some give a little less; some give a little more.

6    We couldn't come up with a standard overcharge formula by

7    month, just couldn't do it.  And if we tried to do it for 190

8    drugs, could you imagine the claim form we'd have to send

9    out?  It would be impossible.

10             THE COURT:  Taxol is Bristol-Myers, right?

11             MR. BERMAN:  That's right.

12             THE COURT:  So you're saying --

13             MR. BERMAN:  But there are other Taxols, other --

14   it's symbolic of the generic drugs.  I could pick any one in

15   Track Two.

16             So because there was no uniform dosing schedule,

17   because the time periods are all over the place in which

18   people take these drugs, we couldn't come up with a formula,

19   so we went to the out-of-pocket formula.  It's a rougher

20   measure of justice.  It's not as fair as the justice we're

21   giving out in this case, so we don't think it's like

22   comparing apples and oranges.

23             The other objection they raised that's a new one is

24   the subrogation issue.  He claims that there's something

25   wrong with the settlement because we haven't protected

c794f022-297f-4699-8314-817ae6410b0f

1    against subrogation.  There is no subrogation here, your

2    Honor.  The Class 1 members have made an out-of-pocket

3    payment.  They're not seeking any amount paid by the insurers

4    to which subrogation would be applicable.  So the Vioxx case

5    he cites was a mass settlement of personal injury claims in

6    which insurance companies paid out for those people, and

7    they're entitled to get some money back.  That didn't happen

8    here.  So the subrogation objection is without merit.

9            And I think I've covered his main objections.

10           THE COURT:  I think you're right to the settlement,

11   although he, and we should get to this, the issue of

12   attorneys' fees and --

13           MR. BERMAN:  I'm saving that for last.

14           THE COURT:  He also presses an objection to that.

15           MR. BERMAN:  Yes, so I'm done talking about the

16   settlement if you are, and I can go to fees.

17           THE COURT:  Yes.

18           MR. BERMAN:  Okay.  Now, on attorneys' fees, what

19   we've been trying to do throughout the case is to try to make

20   our fee application for each settlement come out about

21   30 percent because that's generally the percentage of

22   recovery that courts seem to focus on.

23           THE COURT:  What did I do in the Glaxo?  33, wasn't

24   it?

25           MR. BERMAN:  Yes.  I'll show you if you look at the

Page 23

1    very last chart.  So in Glaxo it came out at 33.  In BMS

2    we're going to seek 33.  In the Track Two global, we're going

3    to seek the same amount in every single class.  And that

4    would give you a total of fees, if we were awarded that,

5    $76 million.  The lodestar in the case right now is at

6    $67 million, so there would be a slight multiple if we

7    continue throughout, very slight multiple which --

8                THE COURT:  Well, it depends how you calculate the

9    lodestar, which you haven't really told me, so --

10               MR. BERMAN:  Right.  I'm not sure what you mean by

11   that.

12               THE COURT:  Lodestar is the number of hours

13   expended times the hourly rate, right?

14               MR. BERMAN:  And that's how we did it, correct.

15               THE COURT:  But all I have is a summary chart at

16   the end.

17               MR. BERMAN:  I understand.

18               THE COURT:  So, for example, one of your attorneys

19   in your office charged me, the last time I looked, like, $700

20   an hour, and I'd never approve a rate like that.  I mean, if

21   Fortune 500 wants to pay, it's one thing.  I wouldn't charge

22   a class that way, so we'd have to have that discussion

23   about --

24               MR. BERMAN:  Right.  But even if we adjust hours,

25   it's clear that there's not going to be a huge (Inaudible) in

1   this case.  And so what we did in calculating fees -- and I

2   tried to figure it out this way, if you look at Slide 30 --

3   is, we tried to demand a negotiation separate from the class,

4   about 30 percent.  So if you value the settlement, the way we

5   value the settlement is as follows:  There's $9 million in

6   projected claims.  There's $10 million --

7             THE COURT:  What page am I back to?

8             MR. BERMAN:  Back to Page 30.  The page numbers

9   must be different.  Sorry.

10            So we have $9 million in projected claims,

11  $10 million in cy pres, which may be adjusted; $1 million was

12  spent by defendant on notice; and $8.6 million would be spent

13  on fees and costs.  If you added all those up, like you would

14  in a normal case, we created a fund of $28 million, and the

15  fee request is 30 percent.  So we're right on track, and so

16  we think that the fee requested is a fair fee.  And unless

17  you have questions on that, that's all I have to say.

18            THE COURT:  Well, I do think one-third is

19  appropriate.  I might say that, for the record, I approved

20  that in the other case.  I think this was an incredibly risky

21  piece of litigation which was cutting-edge and no certainty

22  of success.  The pharmaceutical companies have done a

23  fabulous job defending it, and it was fought tooth and nail

24  the entire way along with the best firms in the country.

25            However, even if I'm to do -- and I also don't have

1    an easy way for me to allocate between the different suits.

2    I don't know how you charge off Hartman or Rosenthal or all

3    the others.  I don't know how you divide up that time.

4              MR. BERMAN:  Well, we did that for the experts.

5    When we came up with this expert number, we took about a

6    fifth of the time in that case.

7              THE COURT:  Well, maybe, maybe that's how you've

8    done it.  You haven't really explained that to me, and I

9    don't know how you -- and this is where I was going to ask --

10   I need to figure out how you think about fees and costs.

11   I've received nothing.  As a matter of fact, my poor law

12   clerk, I even pulled her back from going to lunch because I

13   wanted her to see if there was anything that I could find

14   anywhere to document fees and costs, and there isn't.

15             MR. BERMAN:  Okay, so you want us to submit our

16   time reports and expenses?

17             THE COURT:  Am I right?  I mean, we've got

18   thousands of entries.

19             MR. BERMAN:  Well, there is one declaration.

20             THE COURT:  Yes, but it's a bottom-line number.

21   How do I know that that's what's appropriate to allocate to

22   AstraZeneca?

23             MR. BERMAN:  Well, we don't think you need to get

24   into that because --

25             THE COURT:  Well, we do if you're going to be

1   adding that in.

2           MR. BERMAN:  I'm not sure I'm following you.

3           THE COURT:  If you're adding it in for one-third of

4   it as part of the value of the settlement.

5           MR. BERMAN:  Well, because whether you

6   characterize -- let's assume they didn't characterize it as

7   cost; they just characterize it as fees, right?  So we would

8   still be taking a third.

9           THE COURT:  I want to know how you figured out what

10  was allocable to this settlement --

11          MR. BERMAN:  Okay.

12          THE COURT:  -- because I guess the argument could

13  be -- I was trying to think about it -- that this is money

14  that could have gone to the class fund.  Now, as a practical

15  matter, you're either going to be paying out double or

16  treble, so I don't think any principled basis would get you

17  beyond treble for these people.  So I'm not sure that that --

18  and at some point -- has AstraZeneca audited this

19  $8 million?

20          MR. WISE:  No.

21          MR. BERMAN:  No, but, your Honor --

22          THE COURT:  So somebody's got to look at it.

23          MR. BERMAN:  Let me back up.  What we tried to do

24  was the following, okay?  We negotiated the best settlement

25  we could for the class.  They knew that they'd have to pay us

Page 27

1  fees.  They didn't know how much.  We ended that, okay?

2          THE COURT:  That was agreed upon in advance that it

3  would not be part of the fund?

4          MR. BERMAN:  Yes.  So we didn't dip into the class

5  members.  We got the class members the allocation that we've

6  talked about today.  And then we said, "AstraZeneca, now you

7  have to pay us fees separately."

8          We believe we've created a value of $24 million to

9  $30 million, and when lawyers create value, they're generally

10 entitled to a third of what they created.  That's how we got

11 that number $8 million.  We didn't try to sit down and say,

12 "Okay, we spent this much time in this case and that case,"

13 and so we didn't make those kind of allocation decisions

14 because we didn't have to.

15         THE COURT:  If I agree a third is correct, so the

16 question is how much money is paid by AstraZeneca into the

17 common fund, right?  So assume it's the $20 million.  Isn't

18 it a third of $20 million?  If it's $24 million, it's a third

19 of $24 million?

20         MR. BERMAN:  Well, not really because normally what

21 lawyers do is, they include the attorneys' fees in

22 negotiation; and then they come to you with that number and

23 say, "We want a third of that number."  So what we are doing

24 in valuing this is doing the same thing, because we could

25 have done it that way.  It probably would have been simpler

c794f022-297f-4699-8314-817ae6410b0f

1    in retrospect if we had.

2            THE COURT:  Yes, it would have been because I've

3    not seen it done this way.  What did we do in GSK?  We did a

4    third of the common fund, right?

5            MR. BERMAN:  Yes, we did.  We didn't do --

6            THE COURT:  Which wasn't so complicated.

7            MR. BERMAN:  It wasn't so complicated, but we did

8    it for this reason:  Because there was so much scrutiny on

9    what was going on with respect to the consumers, that we

10   wanted not anyone to say that we had compromised the

11   consumers for our fees.

12           THE COURT:  The natural way to have done this would

13   be to do a third of $24 million or a third of $20 million.  I

14   hadn't focused before on this difference.  So that's how I

15   think about it, as a proxy for value.  But let me just ask

16   you this:  How did you go about calculating the expenses?

17   How much in expenses is it?  It's -- I have a little thing

18   here.  You have $2 million in costs, okay, right?

19           MR. BERMAN:  Yes.

20           THE COURT:  How did you calculate this?

21           MR. BERMAN:  At that time in the case, it was

22   roughly 20 percent of the costs.  And here's the reason why

23   we segregated costs and fees, is that we've advanced costs

24   for the case, and rather than characterizing it as fees, what

25   I wanted to do was to get a cost award in this case and to

1    say that the lawyers in the case, we got $2.1 million, or

2    whatever we're asking for, in costs, those costs are going

3    back into the fund, litigation fund, so we're funded for the

4    rest of the defendants.  So that's why we broke it up.  It

5    was kind of force funding in litigation rather than lawyers

6    taking their fees and going home.  But, again, it doesn't

7    really matter --

8              THE COURT:  I don't understand.  See, this wasn't

9    explained to me.  So the $2 million goes back into where, the

10   litigation fund for --

11             MR. BERMAN:  Well, at that time for future -- well,

12   it's a repayment of our costs.  At the time that we were

13   doing that, we had all this stuff out there.  We were going

14   to take that money --

15             THE COURT:  It was costs as of what date?

16             MR. BERMAN:  As of the date that we negotiated

17   settlement.

18             THE COURT:  So I think this all has to be spelled

19   out.

20             MR. BERMAN:  We can do that if you want.

21             THE COURT:  We kept looking, and then all we found

22   was a footnote that said, "We'll provide more if you want."

23             MR. BERMAN:  We'll be glad to do that, but we were

24   trying to do the whole thing based on the principle of a

25   third, okay?  And then we would ask for fees --

1          THE COURT:  I don't have a problem with a third

2     because it's a risky case, important case, all the kinds of

3     reasons that we've talked about before.  The issue I have is

4     that it's usually a third of whatever the class recovers.

5          MR. BERMAN:  I understand that.  And usually the

6     fees and costs are included in that calculation.

7          THE COURT:  Right.

8          MR. BERMAN:  All right, so what we've done --

9          THE COURT:  So I don't know how to think about it.

10    This is rare, and when it gets rare, my red flags go up.

11         MR. BERMAN:  And here it's coming out of their

12    pocket, not the class.

13         THE COURT:  I understand, but I think I still need

14    to approve it.

15         MR. BERMAN:  All right, I understand.  What I was

16    trying to do was -- I understand it's rare, but we were

17    trying to so bulletproof us from criticism that we can

18    somehow settle the case and we were just interested in

19    attorneys' fees, that we settle the case and then we dealt

20    with fees.  I'm sorry it's made it more complicated, but we

21    were trying to do the right thing.

22         THE COURT:  So I'll think about it.

23         MR. BERMAN:  Okay.

24         THE COURT:  But in the meantime, I don't have a

25    problem with a third of whatever the recovery is for the

1    class.  Whether that's $20 million or $24 million, I don't

2    know, I have no problem with a third of that.  And I have no

3    problem with them paying for expenses.  And if 50 percent was

4    a reasonable benchmark, I don't have a problem with that.  So

5    what I'm having trouble thinking through is whether or not I

6    should include $24 million plus the fees.  That seems

7    unusual.

8            MR. BERMAN:  Okay, we'll get you some more

9    information on that.

10           THE COURT:  Have you ever done that before?

11           MR. BERMAN:  I have in some civil rights kinds of

12   cases where sometimes courts -- some courts think you have

13   to --

14           THE COURT:  Well, that's a burden-shifting thing.

15           MR. BERMAN:  Because there's fees -- you have to

16   negotiate settlement and then fees on top.

17           THE COURT:  I just at this point approved a lot,

18   and I just don't remember doing that.  I have done it in the

19   context of injunctive-relief-only classes, you know,

20   obviously agree separately, but, in any event, do you have

21   any experience with this?

22           MR. WISE:  Well, we don't have any objection to the

23   way Mr. Berman has described what he's done here.  It seems

24   you're right:  In the normal case, if a global fund is

25   created, the fees come off of that.  We didn't do that in

1  this case.  One reason from our point of view is, one of the

2  great uncertainties was the number of claims that we were

3  going to get here, and we really didn't have any idea whether

4  it would be very small or large, so we agreed to pay per

5  claim as the claims came in.  We didn't want to create a fund

6  that was not appropriate for the level of claimants.  So

7  there is no fund in a sense.  We are paying double every

8  claim that gets presented and verified, and we won't know how

9  much that financial exposure is until the claims process is

10  finished.

11         THE COURT:  I did have this come up once in a Sears

12  Roebuck national bankruptcy proceeding, and I think I

13  permitted it because there were no objections.

14         MR. BERMAN:  Well, there's no objections here.

15         THE COURT:  Yes, there is.

16         MR. BERMAN:  Oh, that's right.

17         MR. WISE:  But for what it's worth, I think the way

18  he has described it to your Honor is the correct way to

19  describe it.  That is, if you want to compare it to the case

20  in which a fund is created and fees are coming out of that

21  fund, it is proper to add in the fee component here to get to

22  a number in order to make that comparison apples to apples.

23         THE COURT:  But assuming that an attorney should

24  only be able to get what's fair compensation, which is a

25  third of the fund, there's a piece of me that says, "Why

1    should I care?  AstraZeneca is paying.  It's not coming out

2    of the common fund.  Who cares?"

3            MR. BERMAN:  There's a piece of me wishing you

4    would say that as well.

5            (Laughter.)

6            THE COURT:  I mean, there's a piece of me that says

7    that and would say, "Who cares?  They're getting either

8    double or treble what their actual damages are.  It's not as

9    if the class members are getting paid less than actual

10   damages."  There's a piece of me that says that.  And yet, on

11   the other hand, as we go down the line, if there was a gross

12   overpayment to class counsel, is it reasonable?  In other

13   words, if this is dramatically in excess of what's reasonable

14   after we get through Track Two and et cetera, because by

15   Track Two, I would have to say most of the expenses went into

16   Track One, and that's sort of a piggyback.  So maybe it's

17   something I worry about down the road.  I don't know.  How

18   did we talk about attorneys' fees there?  Is it percentage of

19   the common fund?

20           MR. BERMAN:  Yes.

21           THE COURT:  So we're not doing this fancy thing

22   there?

23           MR. BERMAN:  No.

24           THE COURT:  But at some point maybe that reduces

25   your percentage dramatically there.  I just will want to

c794f022-297f-4699-8314-817ae6410b0f

Page 34

1    understand -- you haven't been paid a penny yet, right?

2            MR. BERMAN:  Not a penny.

3            THE COURT:  And you've carried this for a while.

4            MR. BERMAN:  In fact, both of these gentlemen had

5    hair when the case started.

6            THE COURT:  That's right.  And I could see, so

7    there we go.

8            (Laughter.)

9            THE COURT:  Five or six years has taken a toll on

10   all of us, all right, so -- so I am trying to think about how

11   I should think about attorneys' fees when we talk about all

12   the cases together.

13           MR. BERMAN:  I understand.

14           THE COURT:  And that's my concern.  It's easy, if I

15   were to just do a third of the common fund, that's easy.  I

16   think you're entitled to it.

17           MR. BERMAN:  Here's what we're thinking, and I've

18   told you this before:  If everyone settled the case all at

19   once, like often happens in some cases, we would come in and

20   we'd have maybe $300 million, and we'd make a fee application

21   for a percentage.  And we're treating each settlement pretty

22   much the same way, a third.  At some point at the end, if you

23   say, okay, now if I add it all up and a third is too much, we

24   can have that discussion, but at this point we're not there

25   yet.

1          THE COURT:  But if you add in what the attorneys'

2     fees are --

3          MR. BERMAN:  I mean, at this point we're still

4     under water.  We're not making our lodestar.  I know you

5     haven't seen it yet, but we've summarized it for you.

6          THE COURT:  I know, so you have to give me the

7     lodestar, and I have to have a sense of that to see if this

8     is fair, and I think that will help me enormously.  And so

9     don't give me the $700 an hour -- I don't know what the

10    average amount is in the country -- but maybe something along

11    the lines of the top people $500, and the people under $400,

12    and not what the managing partners at Davis --

13         MR. BERMAN:  Not what his firm charges?

14         THE COURT:  Not $1,000 an hour.

15         MR. WISE:  Somehow I saw that coming, your Honor.

16         THE COURT:  Because that's their volition.  I mean,

17    I'm talking about -- it's serious money.  I mean, $500 an

18    hour is serious money.  But not the top rates that you can

19    get in the United States of America; you know, some

20    reasonable rates and how many hours went in and then divide

21    it by five.  You must have something like that, right?

22         MR. BERMAN:  We can do that for you, yes.

23         THE COURT:  And then why five?  Because --

24         MR. BERMAN:  We were litigating at that time

25    against five Track One defendants, or four Track One

1    defendants and Track Two, so we did five.

2            THE COURT:  So have we deleted out of all that the

3    hours that were spent on Track Two, so trading apples with

4    apples?

5            MR. BERMAN:  Right now I'm giving you -- the

6    $67 million is everything, so if you want me to break things

7    down, we can start breaking it down.

8            THE COURT:  Well, wouldn't it be fair, if we're

9    thinking about what's fair here, is at least Track One divide

10   by five because there were five in Track One?

11           MR. BERMAN:  Okay, that's fair.

12           THE COURT:  I think.  I'm trying to make sure I'm

13   thinking logically here.  But if you're thinking about the

14   expense, if everything is divided by five, we must only be

15   thinking about Track One.

16           MR. BERMAN:  Okay.

17           THE COURT:  And then see what's fair, what's

18   reasonable with reasonable rates.  And if that comes up

19   somewhere around here, that's fine.  And similarly with

20   expenses, it should be expenses just in Track One divided --

21   and then I don't have to worry about whether or not to give a

22   third on top of it to Track Two, that somehow I'm double

23   loading.  Am I thinking logically?  I've never -- there's so

24   many moving parts here.  I know you just want the -- this is

25   probably going to go up on appeal, right?  I have to go

Page 37

1    through the whole bond thing again, so --

2              MR. BERMAN:  Yes, we're going to ask for a bond.

3              THE COURT:  And I know this isn't immediate payment

4    but -- or is it?  If it goes up on appeal, I take it you

5    don't pay till it's resolved?  Is that right?

6              MR. WISE:  Yes.

7              THE COURT:  What's happening to the other one?

8              MR. BERMAN:  You know, we have a briefing date for

9    all the appeals now.  I think we sent that to you.

10             MR. NOTARGIACOMO:  Yes.

11             MR. BERMAN:  Yes, we did.

12             THE COURT:  "Sent" it to me means one of those

13   thousands of docket entries.

14             MR. BERMAN:  So the briefs open up in May.

15             THE COURT:  For everything?

16             MR. BERMAN:  Everything.

17             THE COURT:  You're a long way away from --

18             MR. BERMAN:  Yes.  On the GSK we've asked for an

19   expedited hearing, and they've put the bond issue up front,

20   because once you issued the bond order, the objector appealed

21   the bond order.  So we made a motion to enforce the bond

22   saying that if you can just appeal the bond order, the bond

23   order doesn't mean anything.  And the First Circuit wants to

24   hear that expeditiously, so there's an expedited hearing on

25   that.

1      THE COURT:  Good, okay.  All right, so is there

2  anything else we need to address here?

3      MR. BERMAN:  I don't think so.

4      THE COURT:  Well, let me just say, for the record,

5  I find that the $24 million is a fair and reasonable

6  settlement amount.  I don't want to spend that much on

7  charity, and so the parties can go back to the drawing board

8  and at least see if there's another proposal.  I think that

9  I'm going to check to make sure the lodestar somewhat

10  reflects the attorneys' fees, and if it does, I'm likely to

11  approve it.  If it doesn't, I may have to rethink how I think

12  of one-third.

13      MR. BERMAN:  Okay.

14      THE COURT:  You know, I want to think about that.

15  Similarly, you will provide more on expenses, and you want to

16  respond to Mr. Haviland's memo.

17      MR. BERMAN:  Correct.

18      THE COURT:  Is that on appeal too, my

19  disqualification of him?

20      MR. BERMAN:  He defaulted on -- he appealed, and

21  they issued a rule to show cause why it was not a timely

22  appeal because it's interlocutory, and he did not respond, so

23  that's in default.

24      THE COURT:  All right.  But for purposes of this,

25  actually, I think he didn't make crazy points, and I wanted

1   to address them, and you have addressed them.  And I think

2   you should put it in writing because what you said orally

3   made sense to me, so --

4           MR. BERMAN:  Thank you, your Honor.

5           THE COURT:  Now, with respect to the compensation

6   payments, if the settlement says $5,000, that's what we'll

7   stick at.

8           MS. HARRIS:  Thank you.

9           THE COURT:  But I do think that Ms. Howe was

10  involved, and I think every person shouldn't have to work for

11  free, so I have no problems with at least paying her what the

12  settlement amount is.

13          MS. HARRIS:  And we have no objection to that, your

14  Honor.

15          THE COURT:  Everybody is fine with this?

16          MR. BERMAN:  Yes, that's okay with us.

17          THE COURT:  Thank you.  See you for the next one,

18  which is when?

19          MR. BERMAN:  Well, it's either McKesson or -- we're

20  waiting for your class cert opinion on this case.

21          THE COURT:  And then there's another one,

22  Neurontin.

23          MR. BERMAN:  Thank you.

24          THE CLERK:  Court is in recess.

25          THE COURT:  Excuse me.  By the way, you've given me

c794f022-297f-4699-8314-817ae6410b0f

1   an order, a form order?

2           MR. BERMAN:  For approval?

3           THE COURT:  Yes, for approval?

4           MR. BERMAN:  Yes, we did.

5           THE COURT:  So It probably --

6           MR. BERMAN:  It might be revised once we --

7           THE COURT:  Yes.

8           MR. WISE:  Actually, we'll do another one, assuming

9   we make some modifications to the underlying arrangements.

10          THE COURT:  Yes, yes.  Okay, perfect.  Thank you.

11          MR. WISE:  Nice to see you, Judge.

12          THE COURT:  Nice to see you all.

13          (Adjourned, 2:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

c794f022-297f-4699-8314-817ae6410b0f

1                C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7

8          I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 40 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13 Industry Average Wholesale Price Litigation, and thereafter

14 by me reduced to typewriting and is a true and accurate

15 record of the proceedings.

16         In witness whereof I have hereunto set my hand this

17 9th day of May, 2008.

18

19

20

21         /s/ Lee A. Marzilli
           _____
22         LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
23

24

25