Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: ) | |
| PHARMACEUTICAL INDUSTRY ) | CA No. 01-12257-PBS |
| AVERAGE WHOLESALE PRICE ) | MDL No. 1456 |
| LITIGATION ) | Pages 1 - 53 |

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 26, 2007, 2:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

EXHIBIT A

1  class drugs, the counties spent over $180 million based on
2  AWP or FUL on the class drugs, not based on actual cost,
3  based on AWP or FUL.  We've done the research.  Every one of
4  the class drugs is in Exhibit B.
5          THE COURT:  When you say "class drug," what do you
6  mean?
7          MS. CICALA:  I'm saying the drugs -- I'm sorry --
8  the drugs that your Honor considered in the context of the
9  recent MDL class trial, those drugs were reimbursed on the
10 basis of AWP.
11         THE COURT:  So you're going to turn over to them
12 exactly what drugs that you're talking about are the
13 physician-administered drugs that are typically reimbursed
14 based on a different basis and you're alleging were
15 reimbursed out of a pharmacy based on AWP.
16         MR. TRETTER:  I would like to just put a practical
17 point on it, your Honor.  I would like to know for a
18 chemotherapy drug how much they're really contending was
19 issued out of retail pharmacies and whether the retail
20 pharmacist gets it at the doctor's price or --
21         THE COURT:  You know what, that's why you have
22 discovery.  I'm not doing that on a motion to dismiss.  So
23 you want that on automatic disclosure.  We should do that.
24 When can you do that by?
25         MS. CICALA:  I want to be clear what the automatic

1    disclosure is, your Honor, if I may.

2            THE COURT:  I think he's saying he doesn't know
3    which ones you're alleging are the physician-administered
4    drugs that are being reimbursed out of AWP.  Like, Vepesid
5    would be his example.

6            MS. CICALA:  I do not understand why we would need
7    to single out the physician-administered drugs as a subset of
8    the whole if our spread allegations are --

9            THE COURT:  I'm not dismissing the compliant.  I'm
10   just simply saying that it should be -- if you say you can do
11   it, do it.  It helps move it along, that's all.  I'm not
12   dismissing on that ground.

13           Now, let me jump back to you.

14           MS. CICALA:  Sure.

15           THE COURT:  Which is, I understand you're not bound
16   by what I did in my major trial.  You're not.  You don't have
17   to agree with Raymond Hartman, Dr. Hartman.  Maybe there's
18   some other guy out there who disagrees, okay?  On the other
19   hand, this case is massive.  As was just pointed out, it's a
20   gateway issue.  It's how much discovery has to be done.  It's
21   not like my typical case where I say, "Huh, manana, I'll
22   worry about it later."  If I say "Go ahead," then I'm opening
23   huge amounts of expensive discovery.  I have to have the
24   basis for believing that some expert somewhere disagrees with
25   what Raymond Hartman says because he was viewed as

1  problematic, even by them.  You notice I hedge.  There are
2  places they agree with him.  But that was supported by the
3  evidence at trial.
4         MS. CICALA:  Absolutely, we have tremendous respect
5  for Professor Hartman's conclusions in the class trial.  It
6  just seems to us he considered -- a two-part answer, your
7  Honor.  Professor Hartman considered the knowledge and
8  expectations of the plaintiffs that were before your Honor in
9  connection with the class trial.  Those were not Medicaid
10 payors, nor were they even government entities.  I'm not
11 sure, I don't think any of us as we sit here today --
12        THE COURT:  Well, there was overwhelming evidence
13 that the federal government understood that.  I would grant
14 you, I don't think we mentioned New York once, so I -- not
15 that I know that New York did, but I am simply saying, it was
16 uncontested and a pretty hard-fought battle with outstanding
17 lawyers, okay.  I'm not dealing with somebody who was being
18 overwhelmed or something.  Both sides were duking it out.
19        MS. CICALA:  Right, and we're not disputing
20 Professor Hartman's conclusions with respect to the
21 plaintiffs for whom he offered an opinion, and nor are we
22 even necessarily disputing his conclusions if they were
23 imported into this case.  What I'm saying, your Honor, is, he
24 has not offered an opinion on the knowledge or expectations
25 of government Medicaid and Medicare payors, and it would be

1  premature on the record we have before us to conclude that
2  his opinion regarding expectations automatically will apply.
3           THE COURT: I agree with you a hundred percent that
4  it doesn't automatically apply. On the other hand, I
5  heard -- there were many major battles going on in my trial,
6  but that wasn't one of them.
7           MS. CICALA: Understood, understood.
8           THE COURT: Okay? Of the many things we had, that
9  was the one piece that I would say was virtually undisputed.
10 That's why I never really understood the defendants' attack
11 on the reliability because that was pretty undisputed.
12          MS. CICALA: Right.
13          THE COURT: So this is what I'm going to do: We
14 are going to stay discovery on any drug that doesn't have a
15 30 percent --
16          MS. CICALA: Okay, all right.
17          THE COURT: What did we call it?
18          MR. TRETTER: Spread.
19          THE COURT: Spread, speed limit, whatever you want
20 to call it, we're going to stay discovery on it. And I would
21 need some really good-faith expert opinion as well as
22 affidavit evidence that there's a good-faith basis for me
23 jumping it down to the 20 to 25 percent. So I think at the
24 time we talked last, I don't think I'd issued my --
25          MS. CICALA: You hadn't.

1   THE COURT: I hadn't worked everything through. So
2   what you did was in good faith in reliance on what I had
3   said, but the issue really -- you're not bound by it.
4   MS. CICALA: I understand.
5   THE COURT: You just, in order to open up that
6   floodgate of additional new drugs -- how many would you say
7   are in the 30 percent range?
8   MR. TRETTER: Well, we have an actual slide on
9   that, and it depends.
10  THE COURT: You mean someone did this fabulous
11  layout, and I'm going too fast?
12  MR. TRETTER: Hoa did it all.
13  THE COURT: Who did it?
14  MR. TRETTER: Hoa.
15  MS. HOANG: Hi, your Honor.
16  THE COURT: Hi. Well, just put it on just so it
17  wasn't all for not.
18  MR. TRETTER: First, you have to break it into two
19  pieces. You've got the self-administered drugs at 30 percent
20  and the physician-administered drugs at 30 percent.
21  THE COURT: I believe you were always encouraging
22  me to say that they would be roughly the same, the
23  expectations in the industry.
24  MR. TRETTER: Yes, I think, I mean, I don't see any
25  reason to distinguish between the two. Just this happens to

1  be -- you have 1,448 NDCs that are out based on 30 percent,
2  as we see it. Assuming, of course, you take either price
3  that the plaintiffs used, either the McKesson ServALL or the
4  average that they calculated --
5           THE COURT: I'm not going to get into those weeds
6  for purposes of the motion to dismiss as to which class of
7  trade or how you calculate it. It can't be with the
8  pennies. That's where I'm --
9           MR. TRETTER: Right, I understand that. Then we're
10 going to have to work through some sort of way of deciding
11 what's stayed because you've got to say 30 percent of what?
12          THE COURT: Well, you want -- it's either a typical
13 price in McKesson or an average price. I'm not going to get
14 into what class of trade should be there. That's not motion
15 to dismiss material.
16          MR. TRETTER: All right, your Honor.
17          THE COURT: I don't know, and I'm not going to do
18 that, and I would need expert reports about what's fair. I
19 don't even remember, although you probably told me, what
20 Medicare is using as their classes of trade.
21          MR. TRETTER: You mean Medicaid or Medicare?
22          THE COURT: Medicare, when they're doing their
23 ASPs, I don't know how they're coming up with them.
24          MS. CICALA: They're different classes, your Honor.
25          MR. TRETTER: Yes, totally different classes of

1   trade because there's really not much of a retail class of
2   trade there.
3           THE COURT: I understand that, but for at least the
4   physician-administered drugs, which is why it's useful to
5   have the list, it should roughly reflect where Medicare is
6   going because they're the, you know, the big elephant in the
7   room. With respect to self-administered drugs, how is
8   Medicare deciding what to do under the new Part D?
9           MR. TRETTER: Oh, under Part D as in "dog"?
10          THE COURT: Are they doing anything like this?
11  This is why we need discovery. I can't address that here.
12  And so you take a typical price in good faith, and that's
13  going to be enough, and it's going to be 30 percent, and
14  everything else is stayed. And once I get further into this
15  case and I decide whether it's 30 or 24 or 25 percent, and
16  once I decide what classes of trade make sense according to
17  expert opinion, then I'll be able to start pruning down.
18          MR. TRETTER: All right. What I'm hearing, though,
19  your Honor, is, we're not engaging in nearly as much pruning
20  as the defendants hoped, because I think you'll get rid of
21  some NDCs here. But, you know, remember, we had 133 in the
22  MDL, and you have 11,000 here.
23          THE COURT: I understand that. I'm on the same
24  page with you, but -- so I'm limiting you to 30 percent, and
25  it's a good-faith, whether it's median or average or typical

1   through some publication, excluding pennies or low fliers --
2   median maybe makes sense -- but whatever you want to use
3   that's in good faith --
4           MS. CICALA:  Yes, the weighted average, I mean, the
5   weighted average is in good faith.
6           THE COURT:  Well, get rid of the pennies, though.
7           MS. CICALA:  Yes, but I gave you the statistics on
8   what happens to the pennies with the weighted average.
9   There's very little impact on the NDC.
10          THE COURT:  What if I added 30 percent?
11          MS. CICALA:  It sounds like Mr. Tretter is
12  representing something like 1,400 NDCs would fall out.
13          MR. TRETTER:  Well, that's just on the pills, and
14  then a few more would end up out in the PADs.  But once you
15  take out the pennies, probably it would be a little bit more.
16  But that was with the pennies.
17          THE COURT:  All right, what you're just going to
18  do, we're not going to have a new complaint here.  We're just
19  going to have a new exhibit.
20          MS. CICALA:  Okay.
21          THE COURT:  And you don't have to answer it.  It's
22  going to be called a "substitute exhibit" because I can't
23  keep going through these rounds of motions to dismiss.
24          MS. CICALA:  Your Honor, I would like to include
25  the below 30s in the exhibit so the Court has a complete list

```
 1    of NDCs --
 2              THE COURT:  No.
 3              MS. CICALA:  -- even though discovery is stayed as
 4    to them.
 5              THE COURT:  Then do them as a separate exhibit.
 6              MS. CICALA:  Fine.  That's fine, your Honor.
 7              THE COURT:  All right, now --
 8              MR. TRETTER:  I think that leaves the FULs.
 9              THE COURT:  Okay, so that's the hard one.  All
10    right, go ahead.
11              MR. BUEKER:  And I guess, your Honor, if I might be
12    heard on that, I'm prepared, I have an example to talk
13    through that I think would help the Court even to further
14    appreciate the FUL --
15              THE COURT:  They say, though -- and I haven't sat
16    and walked through all these enormous charts -- they say
17    they've done what the federal government said; that they've
18    only taken drugs where the accurately stated published price,
19    not transactional price, published price would have brought
20    down the FUL.
21              MR. BUEKER:  Well, I guess I have trouble
22    understanding --
23              THE COURT:  You in your brief say that's not true,
24    and that's hard for me to resolve right here.
25              MR. BUEKER:  I mean, I guess I have trouble
```

1            THE COURT:  That's fine.

2            MS. CICALA:  I would like to ask on behalf of my

3   clients -- we are entirely open to participating in the

4   mediation, and we have the highest respect for

5   Professor Green.  My understanding of the order, and I

6   haven't even read it, is that your Honor asked that the

7   parties, if they're going to object to the process or file

8   any papers, do so within seven days of entry of the order.

9   Given that we've already lost two, I would like to ask your

10  Honor if we could have till a week from tomorrow.

11           THE COURT:  You've lost two?

12           MS. CICALA:  We've lost two.

13           THE COURT:  Two days?

14           MS. CICALA:  Yes.

15           THE COURT:  I haven't lost two states, right?

16           MS. CICALA:  No.

17           THE COURT:  See, I've been with this case since

18  2001.

19           MS. CICALA:  I'm only two years behind you.

20           THE COURT:  And the case is expanding because the

21  states are coming in and the federal government is coming in,

22  enormous expense to everyone.  And Professor Green has been

23  pretty successful in trying to reach some global resolutions,

24  which I think at least many of the -- I don't know who all

25  the 30 plus defendants were in this case, but, at the very

1  least, some have said that maybe we can wrap this up.  And
2  so --
3           MS. CICALA:  We're entirely open to participating,
4  but I would like to ask, if we could, your Honor, to have
5  until a week from tomorrow to respond to the order.
6           THE COURT:  Yes.
7           MS. CICALA:  And also I conferred with counsel for
8  Ven-A-Care and for the State of California who also wanted to
9  join in that request because all of us just learned of entry
10 of the order today.
11          THE COURT:  Fine.
12          MS. CICALA:  Thank you, your Honor.
13          THE COURT:  And you probably -- has Professor Green
14 set up a date yet?
15          MR. TRETTER:  I don't think so, your Honor.  He
16 just knows about it, and we're supposed to work with him over
17 the next fourteen days to get dates.  I mean, he's a very
18 busy individual, and he's got a tremendous number of
19 defendants and parties being thrown at him now, and so it's
20 going to take a little sorting, given his schedule.
21          THE COURT:  I like to think of it as throwing
22 themselves at him.  In any event, I understand it's huge.  On
23 the other hand, if there's a chance at it, I've never
24 scripted the issues in FUL, so there's no guidance, and I
25 don't plan to give any at this point; but certainly some of

1   the other issues, there's at least a template for thinking
2   about it. You disagree with some of it. I'm sure class
3   plaintiffs disagree with some of it.
4           MR. TRETTER: Did you finish your thought, though,
5   on statute of limitations? Did we finish that thought?
6           THE COURT: With respect to knowledge about AWPs,
7   I've put my stake in the ground. So the question that's
8   going to be a problem for you is, if you should have known
9   that the AWPs should have been a lot lower, doesn't that by
10  definition pull down the FULs?
11          MR. TRETTER: They're a formulaic relationship, as
12  your Honor noted many times.
13          THE COURT: The problem really is that many of the
14  FULs are predicated on WAC.
15          MR. TRETTER: Which are formulaically related to
16  the AWPs.
17          THE COURT: Sometimes.
18          MS. CICALA: Sometimes, yes. We can talk about
19  that --
20          THE COURT: I don't want to go there. It's very
21  complicated, but I am simply saying, you both -- you have an
22  excellent argument that's likely to win on AWP, although I
23  haven't thought about the 2001 as opposed to the 1997, but
24  with respect to 2001 sounds also like a good date for you
25  anyway. And you've got to deal with --

1          MS. CICALA:  In what respect, your Honor?  If I
2    may, I'm sorry.
3          THE COURT:  With respect to AWP.
4          MS. CICALA:  In respect to the perfect storm of
5    knowledge, right, but we're not talking --
6          THE COURT:  You know, for purposes of statute of
7    limitations.
8          MS. CICALA:  Fair enough.  Our first case was filed
9    in '03.  I have no problems with that.  But for purposes of
10   the FUL analysis that your Honor is describing, I'm not yet
11   clear on what the range is --
12         THE COURT:  I haven't ruled at all.
13         MS. CICALA:  Okay, I'm sorry.
14         THE COURT:  I'm thinking about it for the first
15   time right now.
16         MS. CICALA:  Okay.
17         THE COURT:  I didn't even understand it until the
18   government sent in its brief, and my guess is, a lot of
19   people in the room were in the same position.
20         So you're going to let us know in a week about
21   settlement.  And you're just going to file a substitute.  I
22   don't expect you to respond.  It's not a new complaint.  This
23   was the fifth time already.  All drugs that have never been
24   mentioned before are out.  I'm permitting new NDCs, and if
25   it's a previously mentioned drug, I will allow it to be added