# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc., Zachary T. Bentley, and T. Mark Jones* | ) | |
| *v. Abbott Laboratories, Inc.,* | ) | |
| No. 07-CV-11618-PBS | ) | |

**ABBOTT LABORATORIES INC.'S REPLY IN SUPPORT OF ITS REQUEST FOR
CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(B)**

With misleading rhetoric and an inaccurate depiction of the facts, the Government

contends that Abbott's request for certification of interlocutory appeal of the Court's rulings on

the deliberative process privilege relate to nothing more than an "ancillary discovery dispute."

(*See* Dkt. No. 5286, at 1.)  The Government employs conclusory phrases ("overpay") and straw

man arguments ("Abbott's theory" is that there was an "Abbott-government collaborative effort"

to establish drug payments "at a level of Abbott's choosing") (*id.* at 2) to support its continuing

effort to shield damaging evidence.  At bottom, the Government asks the Court to simply accept

its self-serving (and, according to its own witnesses, inaccurate) assertions about "government

policy," and blindly conclude that rulings on the disputed documents could not possibly be

important enough to warrant immediate appellate review.  The Court should reject the

Government's latest ploy, and certify the issue for immediate appeal.

## ARGUMENT

## I.   THE COURT'S RULINGS CONCERN MUCH MORE THAN AN "ANCILLARY DISCOVERY DISPUTE."

To be clear, Abbott does not suggest that there was "an Abbott-government collaborative

effort" whereby Abbott would supply "inflated pricing information" that would reimburse

Abbott's customers "at a level of Abbott's choosing."  (Dkt. No. 5286, at 2.)  The notion that Abbott was "manipulating" list prices for the Subject Drugs to exacerbate the spread and dictate payment levels is not supported by the facts,[1] and such straw man arguments should not impede important discovery in this case.

An important, far from "ancillary" question to this litigation is whether the Medicare and Medicaid programs, either through Congress or the executive branch, established and followed policies or practices that allowed some margin on ingredient cost or otherwise altered payments to providers because of that margin.  The question in this fraud case is not whether those policies or practices were wise or unwise.  It is not whether those policies were officially stated, external, and conscious, or unstated, internal, and subconscious.  And it is not whether those policies and practices led to perfect payment amounts.  It is whether those polices and practices existed, and the impact they had on the margins the Government now seeks to recoup from Abbott.  This question will never be fairly addressed so long as the Government is permitted to withhold the contemporaneous, unbiased evidence of its decision-making process.

Even the Government does not argue that evidence of deliberate or implicit cross-subsidization is irrelevant.  It instead takes a absolutist approach, boldly declaring that "the government did **not** have a policy of overpaying drug ingredient costs to subsidize practice costs or profit margins."  (Dkt. No. 5286, at 2.)  But Abbott, this Court, and other litigants are not obliged to simply take the Government's word for it.  The Government cannot be permitted to make these types of statements—either now or during trial—if it is not willing to subject those statements to the scrutiny of *all* of the evidence, especially contemporaneous documents immune

---

[1] The list prices set by Abbott for the Subject Drugs were, like all products in Abbott's Hospital Products Division, subject to yearly increases that approximated inflation.  (*See* G. Eichhorn Dep. Tr. at 73-74, 77-79, 95, 226 (excerpts attached as Ex. 1).)

from bias or memory loss.  Indeed, by making the assertion in its brief that it lacked a policy to

subsidize practice costs, the Government has waived its right to withhold documents that might

suggest otherwise.[2]

Notably, neither past CMS Administrators, key CMS policy officials, the President of

the United States, state Medicaid officials, nor even the Federal Register share the Government's

current litigation position that there was "no government policy" to cross-subsidize.  Thomas

Scully, a former CMS Administrator who was adamant about the need to change Medicare's use

of AWP, could not have been clearer that there *was* such a policy:

> Q.  And while people might be able to debate how much—how
> many dollars it would take to provide appropriate services
> reimbursement, your testimony under oath to Congress was that it
> was a legitimate concern for the providers, correct?
>
> MR. GOBENA: Object to the form.
>
> THE WITNESS: Certainly it's a legitimate concern to the
> providers because they were going to lose reimbursement.  Was
> their existing level of reimbursement correct?  I would argue not.
> Was it their fault, on the physician side?  *They were following what*
> *I consider to be stupid policy that was in place.*

(T. Scully Dep. at 227-28 (excerpts attached at Ex. 2).)  *See also id.* at 117-18 (regarding cross-

subsidization policy: "The government creates stupid policy and providers follow . . . ."), 122

(physicians relying on AWP to subsidize expenses was "the way the system was operating at the

time"); B. Vladeck Dep. at 189-90 (former CMS Administrator: "I had a growing feeling . . . of

frustration that we were significantly overpaying for Part B drugs, and that because of some

combination, frankly, of political and legal constraints, we were unable to change it."), 538

---

[2]  *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996) ("[O]ne traditionally recognized form of waiver is found when a privilege holder makes assertions in a litigation context that, in fairness, call for the revelation of privileged communications. . . . The waiver may be found even if the privilege holder does not attempt to make use of the privileged communications; he may waive the privilege if makes factual assertions the truth of which can only be assessed by examination of the privileged communication.") (citing *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987)).

(stating information in 1996 *Barron's* article showing generic drugs selling at 60-85% below AWP was "irrelevant to Medicare payment policy" because "Medicare was required by law to pay the average wholesale price.") (excerpts attached at Ex. 3).  Mr. Scully further testified that CMS kept drug administration fees low because of the spread made on the drug.  (*See id.* at 228-29, 295 ("I think there was a subconscious movement for a couple of years to probably not be as concerned about giving them more money in the practice expense pocket").)

Indeed, as Mr. Scully testified, by maintaining AWP-based reimbursement for infusion drugs, Medicare is *still* under the MMA of 2003 following a policy to "overpay" for drugs in order to subsidize practice costs:

> Q.  So it would appear that Congress, at least for these drugs and in that setting of home infusion, has determined to continue to subsidize the provision of the services by overpaying for the drugs, correct?
>
> A.  Yes. . . .

(*See id.* 366.)

Statements made by the President of the United States, and by HCFA in the Federal Register, further evidence a government policy to "overpay" on the ingredient side.  (*See* Ex. 4 (12/13/97 Remarks by President Clinton:  "Sometimes the waste and abuses aren't even illegal; they're just embedded in the practices of the system.  Last week, the Department of Health and Human Services confirmed that our Medicare program has been systematically overpaying doctors and clinics for prescription drugs . . . ."); Medicare Program; Medicare Coverage of Prescription Drugs Used in Immunosuppressive Therapy, 60 Fed. Reg. 8951, 8953 (Feb. 16, 1995) (Final Rule) ("Payment for functions furnished by pharmacists is included in the amount that Medicare pays for the drugs.") (excerpts attached at Ex. 5).)

Kathleen Buto, who served as HCFA's Director of the Bureau of Policy Development and HCFA's Associate Administrator of Policy during the claims period, gave testimony directly contrary to the Government's assertion that any "policy" to permit cross-subsidization would necessarily be spelled out in some public document.  (*See* Dkt. No. 5286, at 2.)  When asked if HCFA's 1991 regulation establishing Medicare Part B drug payments at 100% of AWP (instead of at 85% of AWP as initially proposed) was meant to cross-subsidize practice costs, Ms. Buto admitted this was the case even though HCFA's final rule did not explicitly state that.  (*See* K. Buto Dep. at 308-09 ("It looks to me as if we dodged the question. . . . As a general matter, not related per se to this issue, the government doesn't like to pay for some things under one mechanism that was intended for one use and sort of ***overpay*** there in order to compensate for other costs.  In reality it happens.") (excerpts attached at Ex. 6) (emphasis added).)

Despite Government efforts to hide it, evidence shows that the Government has also permitted what it now calls "overpayment" for drugs in the Medicaid program.  For example, the Government has withheld the final version of a document that shows CMS did (and still does) have a policy to allow Medicaid programs to reimburse providers more than the states' best estimate of estimated acquisition costs—for generic drugs, at levels the Government would call "mega-spreads."  (*See* Dkt. No. 5174, at 2-6; Dkt. No. 4759; D. Duzor Dep. at 177, 192 (Ex. 7) ("We knew that for generic drugs that AWP minus 13 was a generous payment based upon the IG's findings.").)[3]  Had it not been for CMS's alleged inadvertent production of a draft of this "decision memo" in defendants' earlier third-party discovery of CMS in MDL 1456, Abbott

---

[3] Abbott has moved the Court to compel the Government to turn over a complete, unredacted copy of the final version of this document.  (*See* Dkt. No. 5173.)

would never have learned of this policy.[4]  The draft document shows that states were not setting reimbursement formulas (*e.g.*, AWP – 10%) at levels supported by the empirical data, and that the "lesser level of discount [wa]s generally the result of negotiations that occur between the state and pharmacy representatives after the survey results are known."  (*See* Ex. 8.)  The document shows that CMS made a deliberate and much-vetted policy decision *not* to force states to reduce payments to levels called for by the data:

> We think it is also helpful to strongly consider approval where the direction of the state's proposed level of reimbursement represents a program savings that does not appear to affect pharmacy participation.  Finally, we think EAC needs to include a broader measure of factors that would result in a state agency's best estimate.  *We could consider the actions of the legislature or negotiations that result in a lower payment rate, even if that rate may differ from other documentation, such as a state survey.*

(*Id.* at 2) (emphasis added).

Whether the Government admits it or not, the decision reflected in this memorandum represents a "policy" of the agency.  And it is a policy that directly impacted the level of payments that the Medicaid program made for the Subject Drugs.[5]  There is no legal support for

---

[4] If this document "fell through the cracks" of the Government's privilege review, Abbott can only imagine what other exculpatory information has been withheld.

[5] Regardless of whether the federal government had a formal policy of subsidizing practice expenses with margins on ingredient cost, it appears that many states did.  (*See, e.g.*, H. Sullivan Dep. at 154 (former Tennessee pharmacy director:  "Q. So, in short, you would use the payment for the drug itself to cross-subsidize other things that might need to be paid to fairly -- A.  And that would include compounding.  Q. And it may include nursing services that were not included, things of that nature?  A. (Nodding yes.)") (excerpts attached at Ex. 9); C. Wiberg Dep. at 172 (former Minnesota pharmacy director:  "You have to look at both sides of the equation. . . .  [I]f we move towards more transparency and we get closer to reimbursing on the ingredient side at what providers actually pay, then we have to look at the dispensing fee side in the case of pharmacies, because we've always kept that below what we think the true cost of dispensing is to make up for the fact that there is some money being made on the ingredient side. . . .") (excerpts attached at Ex. 10); M. J. Terrebonne Dep. at 198-99 (Louisiana pharmacy director:  "Q. Did Louisiana want to pay a margin between . . . reimbursement for ingredient cost and what providers pay?  MR. FAUCI: Object to the form.  THE WITNESS: I would say yes.") (excerpts attached at Ex. 11).)

It appears these policies were particularly common for the type of intravenous drugs at issue in this case.  (*See* Myers & Stauffer *Survey of Dispensing and Acquisition Costs of Pharmaceuticals in the Commonwealth of Kentucky*, October 2003, at 35-36 ("In the case of intravenous prescriptions, the typical ingredient reimbursement per prescription is much higher than for traditional retail prescriptions.  Margins realized on the ingredient portion of reimbursement have traditionally been sufficient to subsidize the difference between dispensing costs and dispensing

the Government's apparent view that it can knowingly allow payments to providers at rates above acquisition cost (*see, e.g.*, Dkt. No. 5041, at 9-12, 14 n.9; Dkt. No. 5115, at 10-13), but then seek to recover those payments from drug companies in a fraud lawsuit simply because it (allegedly) did not have an "official policy" sanctioning the practice.

Even the Government's lone attempt to support its assertion that there was no government policy to "overpay" on the ingredient side to subsidize practice costs, a snippet from a CMS comment to a 2001 OIG report, undermines its position.  Read in its entirety, the CMS comment demonstrates that there *was* a practice and policy of overpaying on the ingredient side, and that at least some of the margin was necessary to cover practice costs:

> Indeed, some practitioners have come to rely on inflated drug payments to subsidize associated, non-reimbursed costs, such as storage and administration, and, in some cases, to provide other important services *that are not adequately compensated.* Consequently, the administrative actions we take to reduce the price of a drug need to take such expenses into account.

(Ex. 1 to Dkt. No. 5286.)

In sum, contrary to the Government's contentions, there is every reason to believe that materials withheld under the deliberative process privilege contain evidence highly relevant to the Government's claims.  Abbott should not have to wait any longer to obtain this evidence.  If Abbott and other defendants are forced to proceed to trial without such crucial evidence, there is a significant chance that the efforts of the parties and courts to prepare for and complete trials will have to be repeated  Resolution of these issues through an immediate appeal will advance finality in this and other cases, and avoid the prospect of multiple trials of complex cases.

---

(continued…)

reimbursement.") (Ex. 12); T. Hansen Dep. at 300-01, 310-12 (Myers & Stauffer auditor) (recalling conversations with Kentucky Medicaid officials regarding the use of margins on ingredient cost payments to subsidize the high cost of dispensing intravenous drugs) (excerpts attached at Ex. 13).)

## II. THE GOVERNMENT'S CONTENTIONS ABOUT THE RELEVANCE OF GOVERNMENT DOCUMENTS ARE WRONG.

The Government's claim that "this case is about the pricing and marketing of the drugs identified in the United States' complaint," and its obviously incomplete recitation of "the elements to be litigated," should be seen for what it is: a continuing attempt to distort the law to avoid producing damaging evidence.[6]  The Government has run this argument—that evidence of "government knowledge" is irrelevant—since the inception of discovery in this case, and the Court has never endorsed the proposition.  Rule 26 allows for discovery of matters "relevant to any party's claim *or defense*."  Fed. R. Civ. P. 26(b)(1).  Rule 26 does not limit discovery to those subject matters the plaintiff would like to present at trial.  The documents withheld under the deliberative process privilege are potentially relevant to multiple defenses listed in Abbott's Answer and Defenses to the United States' First Amended Complaint, including lack of falsity, reliance, materiality, and causation; damages; public disclosure; Abbott's compliance with all applicable regulations; estoppel; and laches to name a few.  (*See* Dkt. No. 5188, at 36-46.)

Furthermore, the Government's assertion that "Abbott was never prevented from inquiring of government witnesses whether such deliberate overpayment policy existed during depositions" (Dkt. No. 5286, at 5) is both incorrect and overly simplistic.  As both Mr. Scully and Ms. Buto testified, like all organizations, not all government decisions or policies are "deliberate," made official, or evidenced externally.  (*See supra* at 406.)  As demonstrated in

---

[6] *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1015 (N.D. Ill. 2000) (suggesting that the plaintiff "may well be unable to prove causation" because the plaintiff may have paid the defendant's rate "for reasons of speed, reliability, security, or convenience, even though they were aware that [d]efendants charged more than some competitors"); *Francis v. Bankcard Am., Inc.*, No. 93 C 5510, 1999 WL 1289110, *8 (N.D. Ill. Jan. 4, 1999) ("The former inquiry into fraudulent intent focused on the defendants' actions.  This inquiry into justifiable reliance focuses on **plaintiff's** actions.") (emphasis added); *Dept. of Econ. Dev. V. Arthur Anderson & Co.*, 139 F.R.D. 295, 299 (S.D.N.Y. 1991) ("By asserting the claims of fraud against AA, the British Government necessarily places at issue questions of knowledge, justifiable reliance and causation … [A]t issue is the British Government's knowledge of DeLorean's activities, the extent of the knowledge, whether they justifiably relied upon AA's reports or whether, as the defendants contend, the government chose to ignore certain information it had before it and nonetheless approve the grants for political issues.").

Abbott's Motion to Compel Testimony of Government Witnesses, the Government has actively
impeded Abbott's efforts to probe witnesses' recollections of less salient, but no less important,
policies.  (*See* Dkt. No. 5115, at 3-8, Ex. 1.)  Among other things, the Government refused to let
its witness testify about the need to draw a distinction in the AWP debate between intravenous
drugs and self-administered pills (*see id.* at 4-5, 7); the larger percentage differences between
AWP and acquisition cost for generic drugs (*see id.* at 5-6); what a reasonable profit margin
should be on drugs (*see id.* at Ex. 1, at 1); the Government's concerns about access to care if the
AWP methodology was changed (*see id.* at Ex. 1, at 8); and whether the Government considered
taking action to reduce reimbursement for Vancomycin after a 1992 report showed large
percentage spreads for the drug (*see id.* at Ex. 1, at 10).  In short, on numerous occasions when
Abbott got close to eliciting something interesting, the Government asserted the privilege to halt
the testimony and hide damaging evidence.

Equally important, time and again the depositions taken in this case have shown that the
Government's inordinate delay in prosecuting this case has made it all but impossible to piece
together what the Government knew, when it knew it, and the policies and practices it had in
place during times relevant to the complaint.[7]  Abbott should have full and immediate access to

---

[7] *See, e.g.*, L. Reed Dep. at 656, 665, 691-92 ("Q. Mr. Reed, would it be fair to say that you can't tell me
one way or the other whether you knew in 1993 that state Medicaid programs were using excess payments of
ingredient costs to subsidize insufficient dispensing fees?  A. It would be fair to say that. I don't recall that memory.  Q.
You don't recall one way or the other whether or not you had that knowledge?  A. I don't recall.  That's correct. I
don't recall.  Q . And it's been 15 years since 1993, correct?  A. Correct.  Q. Your memory has faded over time, I
take it?  A. Yeah.") (excerpts attached at Ex. 14); R. Niemann Dep. at 70 (key CMS Medicare official) ("Q. With the
in person meetings or the face-to-face meetings [with Congressional representatives], my question is, would you
work with the legislative office ahead of time to prepare for these communications?  A. I mean, that's such a general
question, I'm sure we had discussions.  Q. Right.  A. And they are not always—they weren't always specific, you
know, we didn't know what the staffer was going to ask. But there would—yes, we would have, we would have
discussions.  Q. And you indicated to me that you can't remember any specifics of any of these conversations?  A.
No. Not really.  Q. And why is that?  A. Well, it's—it's because I've moved on.  Q. And it's been a long time?  A.
Yes. It's been a long time. I don't, I  don't think about this stuff.") (excerpts attached at Ex. 15); B. Vladeck Dep. at
258-59 (former CMS Administrator) ("Q. Was there any record kept of the issues that were discussed at these
meetings [with State Medicaid officials], do you know?  A. I know there were formal agendas.  I don't recall
whether or not there were minutes.  Q. Do you recall whether any of these meetings addressed drug pricing and drug

what documentation remains, and an interlocutory appeal will ensure that the documents sought by Abbott and other defendants are not destroyed or misplaced.

## III.    THE GOVERNMENT'S OPPOSITION IGNORES THE FUNDAMENTAL ISSUE.

By arguing that the "Court's rejection of Abbott's waiver argument is consistent with other deliberative process case law" (Dkt. No. 5286, at 7), the Government misconstrues the fundamental legal issue.  Abbott does not seek to certify the Court's rulings on the deliberative process privilege simply because the Court did not find a "blanket waiver" of all documents the Government might withhold under the deliberative process privilege.

As set forth in the first question that Abbott asked to be certified, the basic error in the Court's approach was the incomplete, formulaic approach used in the balancing test.  (*See* Dkt. No. 5256, at 1.)  In particular, as noted in Abbott's opening brief (at 11), the Court's rulings have subjugated three of the five factors of the balancing test to a formulaic test that depends on whether a document (which may be critical in substance) mentions the right words.  This approach deviates substantially from authority strictly construing the deliberative process privilege against the Government when it acts as the plaintiff in a civil case.  (*See* Dkt. No. 5256, at 10-11.)  Despite Abbott's invitation for the Government to support this approach (*see id.* at 12), its opposition avoided the issue altogether.

Abbott strongly believes that the Court's approach (and the Government's interpretation of the Court's approach) is inconsistent with the case law, and that there are substantial grounds for difference of opinion on whether that approach was appropriate.

---

(continued…)

reimbursement?  A. I don't recall a discussion of drug pricing or drug reimbursement. I'm sure a guess would be that they must have at some point because the agendas were relatively extensive, but I have no firsthand knowledge one way or the other.") (excerpts attached at Ex. 16).)

## CONCLUSION

For the foregoing reasons, as well as those set forth in Abbott's opening brief, the Court should grant Abbott's motion for certification of interlocutory appeal.

Dated:  May 30, 2008

Respectfully submitted,

/s/ James R. Daly_____
James R. Daly
Jason G. Winchester
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Torborg, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES' REPLY IN SUPPORT OF ITS REQUEST FOR CERTIFICATION OF INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(B) to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 30th day of May 2008.

/s/ David S. Torborg_____ _____