**EXHIBIT 2**

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 1

```
          UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL         :  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION

PRICE LITIGATION               :  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       :

U.S. ex rel. Ven-a-Care of     :  Judge Patti B. Saris

the Florida Keys, Inc.         :

      v.                       :

Abbott Laboratories, Inc.,     :  Chief Magistrate

No. 06-CV-11337-PBS            :  Judge Marianne B.

- - - - - - - - - - - - - - -x    Bowler
```

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 114

1  incentive to use more, which you can read about in
2  the front page of the paper this week.
3          BY MR. DALY:
4      Q.   Can you think of a drug during this time
5  period where you have a sole source branded drug
6  where it was discounted in such a way as to increase
7  utilization?
8      A.   I wouldn't say discounted, but the primary
9  ones that I would -- the thing that drove this,
10 ipratropium bromide/albuterol were one on the generic
11 side.  The other two were probably Remicade on the
12 rheumatoid arthritis side, which I believe was sole
13 source, was high volume for rheumatology.  And the
14 other two were Procrit, and then once Aranesp came on
15 the market, they competed with each other
16 theoretically, but they really competed over the
17 spread, which is the thing that got my attention, I
18 spent probably the most time on, because the highest
19 volume, highest cost drugs, which was you could
20 roughly -- and I may be wrong on the numbers -- buy a
21 two week dose of Procrit.  And similar, even though
22 it's a one dose shot for Aranesp for 600 dollars

Page 115

1  every two weeks, and the markup -- they were
2  competing in their markups between 1200 and 1700 to
3  drive utilization for physicians.
4          And you could watch the utilization change
5  depending on how much they marked up their AWP.  And
6  I -- that was probably the thing that got me most
7  stoked up about changing this policy, because they
8  were adjusting their AWPs by generate more market
9  volume by creating incentives for physicians, which
10 was as clear as the sun come up in the morning.
11         MR. GOBENA:  Tom, you're going to have to
12 speak a little bit more slowly because the court
13 reporter is having a tough time keeping up with you.
14         BY MR. DALY:
15     Q.   Lost some people.
16     A.   It was probably the Aranesp and Procrit
17 people dropping off.  But I would add, those views
18 were extremely clear in all my testimony and public
19 statements for years.
20     Q.   And Procrit is a drug that is used by what
21 kind of practice area?
22     A.   Procrit and Epo are the identical drug.

Page 116

1  Procrit is a J&J drug licensed to use for oncology,
2  and Epo is an Amgen drug.  It's identical, it's
3  licensed -- it's manufactured to use for dialysis.
4      Q.   And the --
5      A.   Aranesp is an extended version from
6  Procrit.  I think it's once every two-week dosage,
7  but functionally equivalent, as I pointed out in
8  prior lives.
9      Q.   And this was a drug used by oncologists,
10 or those were two drugs --
11     A.   Procrit and Aranesp were used by
12 oncologists to raise red blood cell counts in cancer
13 patients.  And the identical drug, Epo, is used for
14 dialysis to raise red blood cell counts for dialysis
15 patients.
16         MR. BREEN:  Is that Epogen?
17         THE WITNESS:  Epogen, Epo.
18         BY MR. DALY:
19     Q.   And what the oncologists were doing with
20 that drug was they would keep the spread that they
21 got between, say, 95 percent of AWP that they put in
22 the reimbursement for, and what they paid for it, the

Page 117

1  oncologists would keep the spread, correct?
2          MR. GOBENA:  Object to the form.
3          THE WITNESS:  Yes.  If you could buy
4  Procrit, hypothetically, for 600 dollars for a
5  two-week course of treatment, which I think is six
6  treatments, then you could -- the AWP would vary
7  because it moved, but let's say it was roughly
8  anywhere from 12 to 1700 dollars, I think, while I
9  was at CMS.  And so if you were an oncologist, it's
10 an attractive spread.
11         BY MR. DALY:
12     Q.   And the spread would be -- so the
13 oncologist would keep the spread, correct?
14     A.   Yes.
15     Q.   And what the oncologists had been telling
16 you, and had been telling Congress and CMS over the
17 years was that they needed that spread to make up for
18 inadequate service fees, correct?
19         MR. GOBENA:  Object to the form.
20         THE WITNESS:  That was their contention.
21         BY MR. DALY:
22     Q.   And the oncologists did, in fact, use that

30 (Pages 114 to 117)

Page 118

1 to make up for inadequate service fees, is that
2 correct?
3      MR. GOBENA: Object to the form.
4      THE WITNESS: That was their contention.
5 My view of this testimony from the -- and I said
6 repeatedly was the savings per year that we
7 calculated because -- because of this, I don't think
8 was the oncologists' fault. The government creates
9 stupid policy and providers follow, like oncologists.
10      I'm not certain I blame the oncologists,
11 but the fact is their income spiked enormously during
12 the '90s and the early 2000s, due to this drug
13 churning and reimbursement.
14      And their view was that they should get
15 some of that to be kept for practice expenses. I
16 think in this testimony, the rough savings estimates
17 in the beginning were -- depending on who you believe
18 -- 800 million to a billion dollars a year from
19 fixing AWP.
20      And the -- I believe that our original
21 staff estimates, both at GAO and CMS, were roughly 48
22 to 52 million a year to give that back. So was there

Page 119

1 some little piece of it that could go back in the
2 practice expenses and paying the oncologists more? I
3 think they had a credible argument for that. Was it
4 one for one? It was probably more like one for 20.
5      Now, in the end, because of politics, I
6 believe we ended up after a two year process, and I
7 think it worked out right -- appropriately in the
8 long run, but we basically ended up adding in, I
9 think, roughly 5 or 600 million the first year out of
10 a billion dollars of savings, because we had a -- it
11 was the single biggest political issue in the passing
12 of the Medicare prescription drug bill.
13      Believe it or not, at the end, the passing
14 of that rather large Medicare reform, the single
15 biggest issue to passing and getting the final votes
16 was average wholesale price reform in this sub area,
17 which was totally unrelated to the Medicare
18 prescription drug benefit. But we couldn't have
19 passed the bill without it, because there was violent
20 opposition from a lot of providers.
21      So we put more money back in than I would
22 say at the time was justified. But it was still not

Page 120

1 one to one. It was probably one to two in the first
2 year and one to 10 in the out years. But clearly the
3 abuse of AWP generated revenue far outstrips any
4 arguable underpayment, if there was that.
5      And the reason that happened which I think
6 I read one of my testimonies the other night that I
7 said was, subconsciously, you have a $70 billion pot
8 of money with physicians. And the physicians in
9 something called the RUC sit down every year and
10 reallocate money. CMS almost always takes their
11 recommendations 95 percent of the time.
12      When you're sitting with pediatricians,
13 and internists and gastroenterologists, and they were
14 all aware that certain categories of people were
15 getting enormous revenues out of manipulation of Part
16 B drugs, they subconsciously probably said, are we
17 going to worry about bringing up the oncology rates,
18 the rheumatology base practice rates, when they got
19 this huge volume of revenue and income coming on this
20 other side? They didn't.
21      So for a couple of years, arguably within
22 the RUC and with CMS, they may have been -- gotten

Page 121

1 less in their practice expenses. But it was far,
2 far, far less than any redistribution from what they
3 got on drugs.
4      So when we fixed the drugs, we took the
5 drug reimbursement down and put some of it back in,
6 largely to quell political screaming, back into the
7 -- but I would argue that I don't think anybody would
8 argue that the practice expenses remotely came close
9 to what the churning of the drugs came up -- produced
10 in the late '90s and 2000s. Again, I'm not trying to
11 blame on oncologists for that. They followed the
12 incentives that were there, for better or worse, as
13 did rheumatologists to a lesser degree.
14      BY MR. DALY:
15   Q.  Let's sort of take that apart a little bit
16 and talk about a couple of different things that you
17 said. First of all, you said it twice, once earlier
18 and then once right at the end, you don't feel that
19 oncologists or anybody else involved in the system
20 was doing anything wrong with these spreads, do you?
21      MR. GOBENA: Object to the form.
22      MR. BREEN: Objection. Form.

31 (Pages 118 to 121)

Page 122

1    THE WITNESS: In my opinion, I think a lot
2  of oncologists weren't comfortable with it, and I
3  think -- were they doing something wrong? I think it
4  was outrageous behavior, much like hospital outliers
5  were by Tenet. You can debate, it's not my place to
6  say whether it was -- whether the physician behavior
7  was appropriate or not.
8    I think most physicians knew what was
9  going on, and much like coming into debate with
10 foreign programs are occasionally oversubsidized, I
11 mean, the behavior was outrageous and I knew many
12 oncologists and other physicians were uncomfortable
13 with it.
14   And as we were going through these
15 reforms, I had many of them tell me that. But on the
16 other hand, that's the way the system was operating
17 at the time. So you can debate the physician
18 behavior or not, but clearly the results and the
19 policy were as insane as anything I've run across in
20 many years of government service.
21   BY MR. DALY:
22   Q. But that was the system that was in place,

Page 123

1  correct?
2    A. That was the system that was in place.
3    Q. And you mentioned the RUC or the RUC, I
4  believe it's R-U-C?
5    A. It's misspelled in here.
6    Q. And just for the record, explain what that
7  is and give the right initials?
8    A. It's the R-U-C, and I think it's the -- I
9  should know this -- Resource Utilization Committee, I
10 think it is. It's basically run through the AMA, and
11 it's theoretically an advisory group to CMS on
12 physician payments. But in practice, over the years,
13 unless they come up with something really foolish,
14 CMS lock stock and barrel generally -- it's sort of
15 the UN of physician groups. They all come in and
16 argue over the relative pot of allocation of money
17 going to physicians.
18   They make a recommendation to CMS every
19 year in the annual CMS payment rule, but if the
20 gastroenterologists are underpaid or internists, or
21 surgeons, and they try to balance the relative
22 weighting. And in most cases, CMS takes the vast

Page 124

1  bulk of the recommendations and puts it in the
2  physician fee schedule.
3    Q. You said it's kind of like the UN of
4  providers, is that what you said?
5    A. Of physicians.
6    Q. Physicians. Okay. Now, you mentioned --
7  well, you mentioned that in the, in the first year at
8  least, you had -- you being CMS -- and strike that.
9    In the year of the MMA, CMS, you had
10 estimated that the additional money that would be
11 needed to put into the oncology and other provider
12 pot to increase service fees was 48 to 52 million,
13 right?
14   MR. GOBENA: Object to the form. This
15 witness is not here as a 30(b)(6) to testify on
16 behalf of CMS's position on anything.
17   THE WITNESS: I believe that was in
18 testimony, the initial recommendation both, roughly,
19 of CMS and of GAO.
20   BY MR. DALY:
21   Q. And then you said that, you know, politics
22 got involved and it ended up being 500 to 600

Page 125

1  million, is that correct?
2    A. You could have a very rational policy
3  debate about what the appropriate level was, but I
4  would say the 5 to 600 million clearly represented --
5  a large chunk of that was politics.
6    Q. And so that we are clear, what we are
7  talking about is that under the MMA, when it went
8  into effect, drug reimbursement was reduced by a
9  certain amount, and at the same time, service fees to
10 providers were increased, correct?
11   A. Yes.
12   Q. And the increase on the service fees to
13 providers was in the range of 500 to $600 million?
14   MR. GOBENA: Object to the form.
15   BY MR. DALY:
16   Q. Is that right?
17   MR. GOBENA: Mischaracterizes the
18 witness's testimony.
19   THE WITNESS: Yes. In the RUC, or in the
20 normal process of roughly $70 million of Part B
21 payments, if you're going to raise oncologists, you
22 have to cut somebody else. It's a budget neutral

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 226

1    And it was just a flat-out political
2  calculation that I had already discussed with all the
3  staff and all the members about how do we get from
4  here to there, without -- because the general
5  community screaming about this generally far
6  outweighed the substance of understanding of members.
7    So I think I congratulated the members of
8  this hearing for having it, and raising the
9  awareness.  I also realized the only way to get this
10 thing done, because it was a fairly obscure technical
11 issue, was to send a message early on that we were
12 sensitive to all parties and that we were not just
13 going to cut drugs, that we would try to find some
14 way to put some money back in.
15    But I also said from the beginning that we
16 were looking at 50 million out of a billion and
17 certainly it wasn't a one for one cross-subsidy.  We
18 were also trying to say that, you know -- I said from
19 the very first day, if I have to do this myself,
20 there is no money back in it for practice expenses.
21 I'm just going to cut the drugs.  If we work with
22 Congress, we can cut the drugs and put some money

Page 227

1  back in for practice expenses.
2    So you know, that was the issue.  And from
3  the very beginning, I was trying with the very
4  tightly coordinated discussion with the members of
5  Congress, at least the chairman and the ranking
6  member, to send a signal we were going to reform
7  this, but we talked to all parties and tried to do it
8  correctly.
9    Q.   And while people might be able to debate
10 how much -- how many dollars it would take to provide
11 appropriate services reimbursement, your testimony
12 under oath to Congress was that it was a legitimate
13 concern for the providers, correct?
14       MR. GOBENA:  Object to the form.
15       THE WITNESS:  Certainly it's a legitimate
16 concern to the providers because they were going to
17 lose reimbursement.  Was their existing level of
18 reimbursement correct?  I would argue not.  Was it
19 their fault, on the physician side?  They were
20 following what I consider to be stupid policy that
21 was in place.  But it was clearly very little
22 argument and zero argument in my opinion to take the

Page 228

1  money out of the drugs and put it all back in the
2  practice expenses.
3       BY MR. DALY:
4    Q.   That's why I said you could debate how
5  much money was involved, but what you're telling
6  Congress is that there is a legitimate concern on
7  behalf of the providers here when it comes to
8  cross-subsidization?
9    A.   Overwhelmed by the legitimate concern on
10 behalf of the taxpayers and the program that we are
11 paying way too much.
12   Q.   Well, what I'm trying to get to is when
13 you told Congress here under oath in this hearing, it
14 is a legitimate concern for the providers, I just
15 want -- you were telling the truth there, right?
16   A.   It is a legitimate concern for providers
17 that the reimbursement was going to go down on the
18 drug side.  Yes.  As I discussed earlier with the
19 RUC, there was a general awareness that because
20 oncologists in particular and rheumatologists and
21 others had done so well compensation-wise, I mean the
22 average oncologist salary was probably going up --

Page 229

1  income, 25 to 30 percent all during the '90s because
2  of this drug churn, there had probably been
3  subconsciously in the RUC and other mechanism in
4  Medicare an effort to kind of say, they are making so
5  much money on drugs, why do we keep paying them money
6  on practice expenses.  So if you're going to take the
7  money away from drugs, at least they would look at
8  other side as a matter of equity, which we tried to
9  say we were willing to do here.
10   Q.   If we come down a couple of paragraphs,
11 the one that begins "I'm not saying."  But at the
12 last sentence of that paragraph states that "I do
13 think it's appropriate to make sure that to the
14 extent we can set prices right for drugs, then for
15 practice expenses then for practice patterns, we
16 should set them right.  And I think there is very
17 little doubt they are not right now."  Do you see
18 that language?
19   A.   Yes.
20   Q.   And by that, you mean it's very -- there
21 is very little doubt that the practice expenses were
22 not set at the appropriate level, correct?

58 (Pages 226 to 229)

934268fd-66d9-4c40-b8d6-725605bc72fb

Page 294

1  say, this is you, you say, "everybody has
2  acknowledged for years that oncologists have a
3  significant cross-subsidy through AWP, so I think
4  there was a subconscious effort within the RUC to not
5  fully and completely consider all of the practice
6  expenses for oncologists because of the acknowledged
7  cross-subsidy from AWP's overpricing."  Do you see
8  that?
9      A.   Yes.
10     Q.   And everyone includes CMS, correct?
11          MR. GOBENA:  Object to the form.
12          THE WITNESS:  I think the staff that
13 oversaw the RUC, when they sat down with the RUC
14 every year to figure out which physicians needed more
15 and which physicians didn't, they probably -- I'm
16 fairly certain, which is the argument I made all
17 along, consciously were trying to put more money into
18 the other places because the oncologists had this
19 other stream of income from very high drug margins.
20          So do I think people were excited about
21 that policy or supportive of it?  No.  It's just a
22 fact of life.  So when you're sitting there trying to

Page 295

1  equitably treat all physician groups, from a 70
2  billion pot, and you know the oncologists have this
3  side stream of income, I think there was a
4  subconscious movement for a couple of years to
5  probably not be as concerned about giving them more
6  money in the practice expense pocket.
7       BY MR. DALY:
8       Q.  Because CMS knew that they were making so
9  much money on the drugs, correct?
10          MR. GOBENA:  Objection to the form.  The
11 witness is not here as a 30(b)(6) for CMS.
12          THE WITNESS:  As I said repeatedly, it was
13 nowhere near one to one, it was more like a 1 to
14 20 -- you can debate whether it was 1 to 5 or 1 to
15 20, but the amount of money that perceived to be
16 coming as income from drug margins was significantly
17 higher than I think anybody would credibly argue was
18 any perceived or real shortfall on the practice
19 extension side.
20          Then again, a lot of this was politics.
21 I'm testifying, trying to get this passed, trying to
22 send the signal to the oncology world that we feel

Page 296

1  your pain, we are sensitive.  As we reform this,
2  we're going to take concerns into the mind, because I
3  had watched all previous efforts crash on the rocks.
4       BY MR. DALY:
5       Q.  I'm not sure the court reporter got your
6  response, but because it was interfered with by the
7  objection, but for just in terms of her being able to
8  type it.  But my question was, well, go back to my
9  other question, would you, go back to my last
10 question.
11          MR. GOBENA:  Maybe it would be help, Tom,
12 if you would wait a beat before I object and then we
13 won't talk over each other.
14          THE WITNESS:  Sorry.
15          MR. GOBENA:  That's okay.  Certainly
16 wasn't an interference, though.
17          BY MR. DALY:
18     Q.   You had in your -- one of your prior
19 answers talked about how there had been maybe a
20 subconscious effort not to put more money into the
21 service side for oncology because everybody knew that
22 they were making profits on the drugs, is that

Page 297

1  correct?
2          MR. GOBENA:  Object to the form.
3          MR. BREEN:  Objection.  Form.
4          MR. GOBENA:  You can answer.
5          THE WITNESS:  Yes.  I would say on
6  rheumatology probably to a lesser degree as well
7  because there was a general knowledge in some
8  practice areas these physicians had a second income
9  stream from margins on drugs that other providers did
10 not.  And so you're sitting around trying to figure
11 out whether surgeons need more on a relative basis.
12         Well, that's what the whole RUC process is
13 about.  Internists, surgeons, cardiac surgeons making
14 an adjustment to find that pot of money when you know
15 the oncologists have a second pot of money, you're
16 generally not as concerned in making sure their
17 practice expense goes up in a budget neutral pot as
18 somebody else's.
19         On the other hand, if you knew that some
20 of that drug revenue was going to go away, you might
21 make a certain calculation but it certainly wasn't in
22 my estimation a one to one swap, whereas on the

75 (Pages 294 to 297)

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 366

1  subject to this carveout in the home infusion
2  setting, Congress has kept the reimbursement of those
3  drugs at 95 percent of AWP as of --
4      A.   As of October 2003.
5      Q.   That's correct, isn't it?
6      A.   I guess it is.  That's what the statute
7  says.  Another piece of sausage.  I have just
8  forgotten that we did that, to be honest with you,
9  which I assume is why they don't have a dispensing
10 fee for anything but respiratory drugs, because they
11 didn't do that for respiratory drugs.
12     Q.   So it would appear that Congress, at least
13 for these drugs and in that setting of home infusion,
14 has determined to continue to subsidize the provision
15 of the services by overpaying for the drugs, correct?
16          MR. GOBENA:  Object to the form.  The
17 legislation speaks for itself.
18          MR. BREEN:  Objection to the form.
19          BY MR. DALY:
20     Q.   You can go ahead.
21     A.   Yes.  I was surprised to see this.  I
22 forgot we did it.  It was certainly never discussed

Page 367

1  by members.  I'm sure the staff -- staff person who
2  wrote it works with me at Alston & Bird, so I'll go
3  back and ask him, but I'm sure that it's probably,
4  they froze it to freeze it, and some level of
5  cross-subsidy apparently.  I'm not sure what the
6  congressional intent there was, but I think it was
7  Senator Grassley's staff that did that provision.  So
8  I had totally forgotten we did it.  That it was in
9  the bill.  It wasn't something that was widely
10 discussed at all.
11     Q.   And are you aware of whether the drugs
12 that DOJ is suing Abbott for, many of those drugs are
13 used in the home infusion context and using DME?
14          MR. GOBENA:  Objection to form.
15          THE WITNESS:  As of today, I'm aware of
16 it.  I wasn't aware of it before.
17          BY MR. DALY:
18     Q.   But as of today, you are?
19     A.   Yes.  Obviously looking at the drug list.
20     Q.   Page 27 of Exhibit Abbott 191, which is
21 your 10-3 -- yes, your October 3 -- excuse me,
22 October 3, 2002 testimony.  I just want to direct you

Page 368

1  to page 27.
2      A.   27?
3      Q.   Yes.
4      A.   Okay.
5      Q.   And in your testimony in response to
6  Mr. English, you indicate that you think -- well, you
7  state, "I think there are a lot of different provider
8  areas that may have small impacts from AWP, and we
9  are certainly willing to work with the committee to
10 identify those."  And then you mentioned oncology
11 as -- oncology and dialysis and hematology being sort
12 of the big three, right?
13     A.   Yes.
14     Q.   And then you say, "I think almost every
15 physician to some degree that administers drugs
16 probably has some beneficial cost shifting benefit
17 from AWP, I think those are the three big areas," you
18 see that language?
19     A.   Yes.
20     Q.   And that was a true statement, correct?
21     A.   Yes.
22     Q.   On page 31, I just want to get a fix for

Page 369

1  -- and we may have covered this in some part in the
2  sort of background section that we did at the
3  beginning, but you state at the bottom of the page,
4  "I had been working on Medicare for over 20 years and
5  there has never been any law passed more complicated
6  than this one."  How far back does your work on
7  Medicare go?
8      A.   In a minor way, probably 1982.  But in a
9  full time way, 1989.
10     Q.   And what were you doing with respect to
11 Medicare in 1982?
12     A.   Not much.  Occasional staff work for
13 Senator Gorton, but very, you know, minor.
14     Q.   And '89 would have started your work with
15 the Bush Administration?
16     A.   And OMB.  Yes.
17     Q.   And if you would turn to page 34.  If you
18 -- actually, if you look at 33, the page before, it
19 looks like you finished up your testimony, and then
20 George Reeb, R-E-E-B, got in the hot seat.  And began
21 to talk a little bit about Medicare and Medicaid.
22 And on page 34 of Mr. Reeb's testimony, he states

93 (Pages 366 to 369)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb