**EXHIBIT 6**

Buto, Kathleen                                         September 12, 2007
                           Washington, DC

Page 1

                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

IN RE:   PHARMACEUTICAL           ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE        ) CIVIL ACTION

PRICE LITIGATION                  ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO          )

U.S. ex rel. Ven-a-Care of        ) Judge Patti B.

the Florida Keys, Inc.            ) Saris

     v.                           ) Chief Magistrate

Abbott Laboratories, Inc.,        ) Judge Marianne B.

No. 06-CV-11337-PBS               ) Bowler

- - - - - - - - - - - - - - - - -

          (captions continue on following pages)




          Videotaped deposition of Kathleen Buto

                        Volume I


                     Washington, D.C.

              Wednesday, September 12, 2007

                        9:00 a.m.

Buto, Kathleen                                                September 12, 2007
Washington, DC

Page 238

1  say that the physician can charge an excess of
2  the cost for the drug and it will be covered as
3  long as they meet other requirements of coverage,
4  one of which is that they actually incur the cost
5  of the drug. And here this is in part trying to
6  get at the issue of drugs that are provided for
7  free so you can't charge --
8      Q.  For a sample?
9      A.  -- for a sample or for some drug that's
10 provided at no cost. So that in part gets to the
11 issue of if it's an expense then it's eligible
12 for reimbursement.
13     Let's see. Would that answer the first
14 question? Did that answer your question or
15 should we go on with the rest of the answer?
16 Because the rest of the question goes to is there
17 a limit on what should be applied.
18     Q.  Correct.
19     A.  And here the response refers to a limit
20 that was put in the law which was called the
21 limiting charge, I think. It went into effect
22 January 1st 1991 and put a limit of 125 percent

Page 239

1  of the Medicare payment amount for the drug. So
2  what that refers to is a doctor can charge a
3  beneficiary over and above what Medicare
4  reimburses.
5      So then the next point is that there --
6  a fee schedule put in place and we're going to be
7  separating out drugs and biologicals from
8  physician payment, paying those separately, and
9  so they will not be under the fee schedule. And
10 so there won't be a limitation on drugs after
11 1991.
12     However, the response goes on to point
13 out that we feel that we should be paying less
14 and we're proposing to pay 85 percent of AWP.
15 And then we go on to cite the IG studies, the
16 inspector general studies. And then we also
17 point out that "Durable medical equipment
18 furnished by a physician not accepting assignment
19 is not subject to any charge restrictions." So I
20 guess we tried to answer all the questions.
21     Q.  What was the answer to Mr. Deutsch's
22 question about whether physician is permited to

Page 240

1  profit on the resale of the drug or biological
2  which he administers?
3      A.  We didn't answer the question.
4      Q.  Didn't answer the question?
5      A.  Did not answer the question.
6      Q.  Did you deliberately not answer the
7  question at the time or --
8      A.  We deliberately stuck to the payment
9  methodology and did not address the question
10 directly. I think that's pretty clear.
11     Q.  And do you know why you did not answer
12 the question directly?
13     A.  I don't know. But often when you don't
14 want to answer a question directly you stick
15 strictly to the methodology and explain what it
16 is you do do and let people draw other
17 conclusions. But we clearly did not address that
18 directly.
19     Q.  Could I read your response as stating
20 they could profit because the carriers are
21 reimbursing based upon average wholesale price
22 and that was the policy?

Page 241

1      A.  What was your -- you're asking me if
2  you could have read my response that way?
3      Q.  Yeah. I'm trying to understand your
4  response to the extent you did answer the
5  question.
6      A.  But I clearly didn't answer the
7  question in the response. And I think -- you
8  know, we also didn't say no they can't profit.
9  We just didn't answer the question.
10     Q.  Was that a sensitive issue at the time?
11     A.  I think government regulators don't
12 like to talk about where there's profit or not
13 profit. Even in the DRG system, the hospital
14 system, the idea is Medicare will pay a flat
15 amount per admission and if the hospital can
16 produce the service for less they can keep the
17 difference, but it's not called profit. It's
18 called efficiency.
19     So there's sort of an avoidance of the
20 notion of profit. You know, again, the bedrock
21 principles are pay fairly and in a sense try not
22 to overregulate and let market forces sort of --

61 (Pages 238 to 241)

Henderson Legal Services
202-220-4158

6d424235-0f61-4f68-bb27-bd89de0f8093

Page 275

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL              ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE          ) CIVIL ACTION

PRICE LITIGATION                    ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO            )

U.S. ex rel. Ven-a-Care of          ) Judge Patti B.

the Florida Keys, Inc.              ) Saris

      v.                            ) Chief Magistrate

Abbott Laboratories, Inc.,          ) Judge Marianne B.

No. 06-CV-11337-PBS                 ) Bowler

- - - - - - - - - - - - - - - - -

        (captions continue on following pages)



        Videotaped deposition of Kathleen Buto

                      Volume II


                   Washington, D.C.

              Thursday, September 13, 2007

                      9:00 a.m.

Page 308

the physician did not incur any costs for the drug."
    Was there any connection between the removal of the 15 percent discount on AWP to concerns about shortfalls in administrative payments and the need to cover other costs associated with the administration of drugs?
    A.  I'm looking at -- if you'd give me a couple seconds here, I'm looking at the response. Because I don't recall that that was the reason. But let me just look and see what we said in response to that comment.  (Reading).
    It looks to me as if we dodged the question.  In other words, they didn't respond one way or the other to whether that was at a reason for going to the alternative methodology. And I'm sure we discussed it.  As a general matter, not related per se to this issue, the government doesn't like to pay for some things under one mechanism that was intended for one use and sort of overpay there in order to compensate for other costs.

Page 309

    In reality it happens.  It looks to me as if what we decided to do is avoid that whole issue, but try to say, okay, here's a compromise approach that we think will address general concerns about the 85 percent but also get us where we want to go, which is to pay accurately for drugs that Medicare is paying for.  And that would be the survey approach that the carriers would use and the estimated acquisition cost or the actual acquisition cost.
    Q.  You stated in your answer that you thought you dodged the question, right?
    A.  Yup.
    Q.  Is it your experience during your time at HCFA that there were times when HCFA did not put its -- all of its rationales in its decision-making in a published document such as a regulation?
    A.  No, I wouldn't say that.  I would say that if we thought the response and the change in the regulation addressed the concern we would basically put that out there as the overall

Page 310

response to a range of comments on an issue.  So basically what the oncologists were saying was this was an unfair cut.
    Our response, we're going to go back to 100 percent of AWP and for high volume drugs we're going to look at a methodology for going after actual acquisition costs.  So that was believed to be a valid response to the overall concerns about the cut.
    Q.  Are HCFA's determinations and rationales for decisions that they make or don't make always in a published document?
    A.  Well, you know, I can only speak to my experience.  We would try to to the best of our ability respond to the comments that were raised. It may not be every specific, but the rationale for taking the position is what we tried to put in responses to comments.  So always?  You know, I can only speak from my own experience.
    Q.  But this was a situation where the oncologists, perhaps others, had raised the issue that the 15 percent was perhaps too much of a

Page 311

cut. And those were concerns that you heard, correct?
    A.  Right.
    Q.  And you responded to?
    A.  Right.  In the final policy.
    Q.  And you would agree with me that this particular regulation -- and I think you said earlier by using the word "dodge" -- doesn't exactly articulate that rationale?
    MR. DRAYCOTT:  Objection.  You can answer.
    A.  My reason for using that word was we didn't directly answer the question, but we answered the question.
    Q.  By the policy?
    A.  By the policy.
    Q.  So the policy itself sort of demonstrated what HCFA's thinking was itself?
    A.  Yes.  The policy responded to the range of comments we got, in our view.
    Q.  If I could ask you to go back to Exhibit Abbott 299.  That was the public comment

10 (Pages 308 to 311)