**EXHIBIT 7**

Duzor, Deirdre                                                October 30, 2007
                              Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE: PHARMACEUTICAL          ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     ) CIVIL ACTION

PRICE LITIGATION               ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     ) Judge Patti B. Saris

the Florida Keys, Inc.         )

    v.                         ) Chief Magistrate

Abbott Laboratories, Inc.,     ) Judge Marianne B.

No. 06-CV-11337-PBS            ) Bowler

- - - - - - - - - - - - - - - -

    (cross-captions on following pages)


                      Washington, D.C.

                      Tuesday, October 30, 2007

                      9:00 a.m.


    Videotaped deposition of DEIRDRE DUZOR

            Volume I

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Page 174

1   Q.  Was it your understanding that WAC was a
2   price that represented the actual price that
3   wholesalers purchased drugs from manufacturers?
4   A.  It was my understanding that that was the
5   original intent of WAC, not necessarily that that is
6   what WAC truly represented at the point that I
7   became involved in these issues.
8               (Exhibit Abbott 372 was
9               marked for
10              identification.)
11      BY MR. TORBORG:
12  Q.  For the record, what I've marked as
13  Exhibit Abbott 372 is a September 16th 2002 letter
14  from Janet Rehnquist to Thomas Scully attaching a
15  September 2002 report from OIG entitled Medicaid
16  pharmacy additional analysis of the actual
17  acquisition cost of prescription drug products.
18      If you would take a look at that, Ms.
19  Duzor, to the extent necessary to tell me if you
20  recall this document.
21  A.  (Reading.)  Yes, I do remember this
22  document.

Page 175

1   Q.  And the first sentence of Ms. Rehnquist's
2   letter, the first page of the exhibit, indicates
3   that it's a follow-up to the previous work, two
4   reports; is that right?
5   A.  Yes, it does.
6   Q.  Do you know why it is that OIG did this
7   additional report?
8   A.  Well, in this analysis the IG looked at
9   whether drugs -- it separately evaluated drugs for
10  which there was a FUL established and those that did
11  not have -- multiple drugs without those.  So I
12  think that was the distinction.  They were looking
13  at categorizing drugs by whether they have a FUL or
14  not.
15  Q.  Did CMS request that OIG prepare this
16  report?
17  A.  Not to my knowledge.
18  Q.  Do you know if this report was shared
19  with state Medicaid program?
20  A.  As a fact, no, I don't recall.
21  Q.  Generally speaking in your time at CMS in
22  the division of pharmacy has it been the practice

Page 176

1   that OIG reports relating to Medicaid payment for
2   drugs have been shared with states?
3   A.  Yes.
4       MR. TORBORG:  What do you think?  Should
5   we remark this document or keep the original exhibit
6   number?  I know you guys recalled it at one point
7   and then changed your mind.  So do you have any
8   thoughts of whether we should mark it as a new
9   exhibit?
10      MS. MARTINEZ:  No.  I mean, the exhibit
11  number --
12      MR. TORBORG:  328?
13      MS. MARTINEZ:  -- does not seem to be an
14  issue.
15      BY MR. TORBORG:
16  Q.  Ms. Duzor, I've handed you a copy of what
17  we've marked previously as Exhibit Abbott 328, a
18  document entitled Review of Medicaid Drug State Plan
19  Amendments.  I ask you to take some time and look at
20  that document.
21  A.  Okay.  (Reading.)
22  Q.  Ms. Duzor, have you had a chance to look

Page 177

1   at that document?
2   A.  Yes, I have.
3   Q.  Can you tell us what this document is?
4   A.  This document --
5   Q.  Let me strike that.  Are you familiar
6   with this document first?
7   A.  Yes.  I recall the document.
8   Q.  Can you tell us what it is?
9   A.  I believe it is a draft of a decision
10  memo seeking guidance from policymakers in CMS on
11  approaches to reviewing state plan amendments that
12  were proposing to revise either the ingredient cost
13  payment for drugs or the dispensing fees.
14  Q.  What is a decision memo?
15  A.  A decision memo is an issue paper with
16  recommendations to take to policy decision makers.
17  Options and recommendations generally.
18  Q.  Who are the policy decision makers to
19  which this document would go?
20  A.  Certainly to Dennis Smith and perhaps
21  beyond him.  Dennis reports to the administrator.
22  So it could be for Dennis or it could be something

Page 190

1  legislatures were talking up the issue of pharmacy
2  reimbursement.  And we commonly did not have
3  documentation as to what their reasoning was in
4  picking a particular figure or rate.
5          So we were getting state plan amendments
6  that would say we'd like to go to AWP minus 13
7  without any solid documentation that that did --
8  that that was a good estimate of acquisition cost.
9  And yet it was determined by the elected body, you
10 know, of the people of the state.  So that gave it
11 some legitimacy.
12     Q.   And CMS had every reason to believe that
13 a reimbursement methodology like AWP minus 13 would
14 not result in a payment by the state for generic
15 drugs that was the price generally and currently
16 paid by providers; isn't that right?
17          MR. WINGET-HERNANDEZ:  Objection to form.
18          MS. MARTINEZ:  Objection to form.
19     A.   Could you state that again?
20     Q.   Sure.  CMS had every reason to believe
21 that a reimbursement methodology like AWP minus 13
22 percent would not result in a payment by a state for

Page 191

1  generic drugs that was the price generally and
2  currently paid by providers; isn't that right?
3          MS. MARTINEZ:  Objection to form.
4     A.   I'm sorry.  I'm still having trouble with
5  the question.
6     Q.   I'll try it again.  CMS had every reason
7  to believe that a reimbursement methodology like AWP
8  minus 13 percent would not result in a payment by a
9  state for generic drugs that was the price generally
10 and currently paid by providers; isn't that right?
11          MS. MARTINEZ:  Objection to form.
12     A.   Okay.  So can I restate the question to
13 see if I understand it?
14     Q.   Okay.
15     A.   That CMS could have concluded that AWP
16 minus 13 was not a good estimate of estimated
17 acquisition cost?  Is that what you're saying?  Is
18 that what you're asking?
19     Q.   What did you believe on a national level
20 was the rate of discounts from AWP for generic
21 drugs?
22          MS. MARTINEZ:  Objection to form.

Page 192

1     A.   We knew that for generic drugs that AWP
2  minus 13 was a generous payment based upon the IG's
3  findings.
4     Q.   OIG had found on a national level that
5  generic drugs were selling at AWP minus 66 percent?
6     A.   Based on their sample, that's what they
7  showed.
8     Q.   And did you have any reason to believe
9  that sample was not representative of the price the
10 generic drugs were generally selling in the
11 marketplace?
12          MR. BATES:  Object to the form.
13     A.   I didn't know enough about their sample.
14 I certainly again would not say that their
15 conclusion was the right answer for all generic
16 drugs.  Most states were doing AWP minus across the
17 board not differentiating between generic and
18 non-generic.  So they were not giving us the state
19 plan amendments that we could align neatly with the
20 OIG report.  They were proposing it in a different
21 way.
22     Q.   And do you recall having discussions

Page 193

1  about that problem at CMS about the need to
2  differentiate between -- about the need to have a
3  reimbursement methodology that was different for
4  brand name drugs than for generic drugs?
5     A.   We didn't have a role or a policy that
6  states had to do that.  That was an approach they
7  could have followed and that was suggested by the
8  inspector general's reports.  But it wasn't an
9  agency policy that states should be doing that.
10 They could do a blended average.  That was not -- it
11 was not inconsistent with anything we had said.
12     Q.   Did you have any reason to believe that a
13 reimbursement methodology like AWP minus 10, AWP
14 minus 15 percent, could serve as a best estimate of
15 the blended average at which generic and branded
16 drugs were selling in the marketplace?
17          MS. MARTINEZ:  Objection to form.
18     A.   To my knowledge we never did the analysis
19 that would really be necessary to come to that
20 conclusion.
21     Q.   If you would go to the next paragraph on
22 Exhibit Abbott 328, it states "It is proving