**EXHIBIT 10**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY    ) MDL NO. 1456

AVERAGE WHOLESALE PRICE           )

LITIGATION                        ) CIVIL ACTION:

                                  ) 01-CV-12257-PBS

                                  ) Judge Patti B. Saris

                                  ) Magistrate Judge

                                  ) Marianne B. Bowler

THIS DOCUMENT RELATES TO

U.S. ex rel. Ven-A-Care of the

Florida Keys,Inc., v.

Abbott Laboratories, Inc., et al.

No. 06-CV-11337-PBS

(Caption continues on next page.)

_____

VIDEOTAPED DEPOSITION OF

CODY WIBERG

Taken March 14, 2008

Commencing at 9:13 a.m.

Page 170

1  considerations at the time.
2       So if you wanted to make it -- and you would
3  have three choices, basically.  You could either
4  make it -- try to make it as close as you could to
5  revenue-neutral. You could try to recoup savings.
6  And therefore, you -- you're going to set the
7  dispensing fee maybe not as high as you would if
8  you were going make it revenue-neutral. Or you
9  could try to actually pay providers more money
10 then, and you would set it a little bit higher.
11 But I basically -- when this came out, and at that
12 conference I mentioned, where -- where Mr. Lup --
13 Mr. Lupinetti and I both were presenters at a
14 conference.  We were talking about different
15 issues, and I was not talking about this particular
16 issue, per se.  But he was talking about this
17 issue.  And I did basically bring up that, you
18 know, you really have to understand how the
19 pharmacy reimbursement system works.  You can't --
20 you have to understand that there's two sides of
21 the equation, that the dispensing fees are kept
22 artificially low.  That if you just reduce the

Page 171

1  ingredient reimbursement to actual acquisition
2  cost, and don't do anything with the dispensing
3  fee, there's at least the possibility that you're
4  going to have access problems for patients, because
5  pharmacies at that point might drop out of the
6  system.
7       Now, there's an argument that it really
8  wouldn't make much difference, because the very
9  large national pharmacy chains don't necessarily
10 make their money on the prescriptions.  They make
11 the money on what you buy in the front end of the
12 store.  And if they use pharmacy sales or
13 prescription sales as a loss leader, they'll still
14 sign up for Medicaid.
15    Q.  There will be a retail pharmacy, correct?
16    A.  Yeah.
17    Q.  Not a closed pharmacy like an infusion
18 pharmacy.
19    A.  No, no.  So there's that argument.  But
20 anyway, the argument I made is that you can't --
21 you can't look at one side of the equation.  You
22 have to look at both sides of the equation.  You

Page 172

1  have to understand that we know, and this is a
2  serious aspect of ain't what paid -- "ain't what's
3  paid."  We know AWP, "ain't what's paid."  But if we
4  move towards more transparency and we get closer to
5  reimbursing on the ingredient side at what
6  providers actually pay, then we have to look at the
7  dispensing fee side in the case of pharmacies,
8  because we've always kept that below what we think
9  the true cost of dispensing is to make up for the
10 fact that there is some money being made on the
11 ingredient side.  So to the extent, again, that you
12 start paying people a dispensing fee or a total
13 reimbursement that does not even get back the cost
14 of the drugs, plus the cost of labor and the
15 computer systems and the lights and all that, you
16 could have providers stop -- you know, start
17 dropping out of Medicaid.  And then this creates an
18 access issue for very poor people.  So -- yeah.
19       MR. BLACK:  Objection, form.
20 Nonresponsive.
21 BY MR. COOK:
22    Q.  And so would it be your understanding that if

Page 173

1  we were -- if one were to go to this ideal world in
2  which AWP actually represented acquisition costs,
3  the Medicaid programs would no longer use an AWP
4  minus a percentage.
5    A.  To the extent that -- that whatever was used,
6  revamped AWP or an ASP or an AMP, whatever you use
7  as a basis of a cost reimbursement, or -- or excuse
8  me, ingredient reimbursement to the extent that
9  that closely reflected the average actual price the
10 providers paid, then you would -- right.  You would
11 no longer be taking percentages off.
12    Q.  And, in fact, are you familiar with the
13 manner in which the federal legislation has changed
14 the calculation of federal upper limits to be
15 two-and-a-half times the Average Manufacturer's
16 Price?
17    A.  If that's a recent change within the last
18 two-and-a-half years, I wouldn't know.
19    Q.  And we've already talked about Medicare
20 paying ASP plus some percentage, correct?
21    A.  6 percent, I believe it is, yep.
22    Q.  Once you learned what the actual amounts were

44 (Pages 170 to 173)