EXHIBIT "E"
TO THE UNITED STATES' OPPOSITION
TO ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

1

                    IN THE UNITED STATES DISTRICT COURT

                     FOR THE DISTRICT OF MASSACHUSETTS

        IN RE:  PHARMACEUTICAL         )

        INDUSTRY AVERAGE WHOLESALE     )

        PRICE LITIGATION               )   MDL No. 1456

        -----------------------------)   Civil Action

        This document relates to:     )   No. 01-12257-PBS

        United States of America,     )

        ex. rel. Ven-a-Care of the    )

        Florida Keys, Inc.;           )   Hon. Patti Saris

            vs.                       )

        Abbott Laboratories, Inc.,    ) Magistrate Judge

        CIVIL ACTION NO. 06-11337-PBS ) Marianne Bowler


                    Videotaped 30(b)(6) deposition of DAVID S.

        FISHMAN, called by the Plaintiffs for examination,

        taken pursuant to notice, agreement and by the

        provisions of the Rules of Civil Procedure for the

        United States District Courts pertaining to the

        taking of depositions, taken before DEBORAH HABIAN, a

        Notary Public within and for the County of Cook,

        State of Illinois, and a Certified Shorthand Reporter

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

Page 14

```
 1       Q.  I just wanted to make sure we were using
 2  the same terminology.
 3       A.  Yes.
 4       Q.  What about Alternate Site?
 5       A.  I did a little bit of work with Alternate
 6  Site.
 7       Q.  What work did you do with Alt Site?
 8       MS. CITERA:  I'm just going to caution you to
 9  obviously not to reveal any privileged discussions.
10       THE WITNESS:  Okay.
11            I served as legal counsel for Alter
12  Site in the contracting arena.
13
14  BY MS. ST. PETER-GRIFFITH::
15       Q.  And when you say "in the contracting
16  arena," what do you mean?
17       A.  Reviewing contracts.  Providing legal
18  advice with respect to contracts.
19       Q.  Did you provide any legal advice
20  concerning compliance matters to HPD?
21       A.  Yes.
22       Q.  Okay, and what advice did you provide?
```

Page 15

```
 1       A.  That would be privileged.
 2       MS. CITERA:  I'm going to caution the witness
 3  that would be privileged.
 4       MS. ST. PETER-GRIFFITH:  Okay, I just want to
 5  confirm, you're not asserting any advice of counsel
 6  defense in this case, right?
 7       MS. CITERA:  I'm not going there, but what --
 8       MS. ST. PETER-GRIFFITH:  Well, what --
 9       MS. CITERA:  His -- I mean if you want to ask
10  what type of compliance activities he did with or if
11  he did any compliance activities with HPD or Alternate
12  Site, that's fine, but what advice he gave, that would
13  be privileged.
14       MS. ST. PETER-GRIFFITH:  What's the distinction
15  between the two?
16       MS. CITERA:  Well, I mean one is his legal
17  advice.  The other is what -- you know, what types of,
18  you know, training or things like that, that that's
19  the distinction.  What types of training he did versus
20  what type of legal advice he may have gave to a -- to
21  his client is not appropriate and is not, you know,
22  what he's here to do.
```

Page 16

```
 1       MS. ST. PETER-GRIFFITH:  So you're instructing
 2  him not to answer?
 3       MS. CITERA:  Yes.
 4       MS. ST. PETER-GRIFFITH:  Okay.  Well, we
 5  disagree with that instruction.  I mean, obviously,
 6  you've proffered a lawyer as a 30(b)(6) rep.  I'm
 7  entitled to inquire into this area, but you've given
 8  your instruction.
 9       MS. CITERA:  I mean I just to want add he's
10  here to testify about facts.  He's not here to testify
11  about any legal advice he gave.  He's not here, you
12  know -- any privileged conversations, that's not what
13  he's here for.  He's here to testify about, you know,
14  subject to our limitations and objections, the topics
15  that you've set forth.
16
17  BY MS. ST. PETER-GRIFFITH:
18       Q.  Sir, what did you -- oh, did you work with
19  the Home Infusion Business Unit?
20       A.  Yes.
21       Q.  Okay, what work did you do with them?
22       A.  I provided training and legal advice
```

Page 17

```
 1  regarding contract drafting and consulting on contract
 2  matters.
 3       Q.  Do you remember which contracts you
 4  consulted on?
 5       A.  No.
 6       Q.  What training did you provide to Home
 7  Infusion?
 8       A.  I provided a series of training on fraud
 9  and abuse -- the fraud and abuse laws and on antitrust
10  laws and generally on the code of conduct, Code of
11  Business Conduct.
12       Q.  Did you participate in the drafting of any
13  materials concerning the Code of Business Conduct or
14  fraud and abuse laws?
15       MS. CITERA:  Objection.
16       THE WITNESS:  That's two questions.  I did not
17  participate in the drafting of the Code of Business
18  Conduct.  I did participate in drafting language on
19  fraud and abuse compliance matters.
20
21  BY MS. ST. PETER-GRIFFITH:
22       Q.  And is that true for Alt Site as well?
```

5 (Pages 14 to 17)

30(b)(6) Abbott (Fishman, David S.)                          March 12, 2008

---

**Page 18**

1       A.  They wouldn't have been --
2       MS. CITERA:  Objection to form.
3       THE WITNESS:  They wouldn't have been
4   directed -- the types of things that I drafted
5   wouldn't have been directed solely to Alternate Site
6   other than a presentation I may have given.
7
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  Okay, do you recall a presentation to Alt
10  Site?
11      A.  Yes.
12      Q.  What presentations did you give to Alt
13  Site?
14      A.  I gave them a presentation on fraud and
15  abuse laws and antitrust laws generally.
16      Q.  And when was that?
17      A.  I don't recall.
18      Q.  Do you recall what decade it was?
19      A.  '90s.
20      Q.  Early '90s, late '90s?
21      A.  It would have been after 9 -- since I
22  didn't support that business until after the fall of

---

**Page 19**

1   '95, it would have been between the fall of '95 and
2   when they stopped having a business.
3       Q.  Okay.  Now, the training on fraud and
4   abuse and antitrust, was that the same training that
5   you gave to the Home Infusion Business Unit?
6       MS. CITERA:  Objection to form.
7       THE WITNESS:  That's -- I thought -- I'm
8   confused by the question.  I think that you asked that
9   question already.
10
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Sure.  Did you -- let me break this down.
13  You provided training to both Alt Site and Home
14  Infusion, is that right, on fraud and abuse?
15      A.  No, Alt Site -- Home Infusion was part of
16  Alt Site.
17      Q.  Okay.
18      A.  So and in that regarded, I'd say it
19  limited to Home Infusion for presentations.
20      Q.  So you only gave presentations to Home
21  Infusion?
22      A.  That I recall, yes.

---

**Page 20**

1       Q.  Okay.  You didn't -- you don't recall any
2   to the Alt Site group itself?
3       MS. CITERA:  Objection to form.
4       THE WITNESS:  I do not recall.
5
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  What is your experience or what was the
8   bases of your information for your pre -- the
9   presentation that you gave on fraud and abuse and
10  antitrust matters to the Home Infusion Business Unit?
11      A.  What was the basis?
12      Q.  Yes.
13      MS. CITERA:  Objection to form.
14      THE WITNESS:  The antikickback statutes and
15  safe harbor regulations.
16
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Did you personally review those?
19      A.  Yes.
20      Q.  Did you -- what sources did you use for
21  the presentation, just the stat -- the statutes
22  themselves?

---

**Page 21**

1       MS. CITERA:  Objection to the form.
2       THE WITNESS:  The presentations that we have --
3   that are stacked in front of me now, I don't recall
4   being an initial, original drafter of them.  They are
5   very similar in content.  So the -- I think it was
6   more of a template that existed.
7       MS. ST. PETER-GRIFFITH:  Okay, you say that
8   that's in front of you.  Why don't we mark the
9   composite exhibit as Exhibit 1 that's in front of you.
10  That way, the record is clear.
11      THE REPORTER:  Do you want the witness's name
12  on it or just No. 1?
13      MS. ST. PETER-GRIFFITH:  Yeah, I think we
14  need --
15      MS. CITER:  Put the witness's name on.
16      MS. ST. PETER-GRIFFITH:  Yeah.
17      THE REPORTER:  Okay.
18          (Exhibit Fishman 001, containing
19          Sub Nos. 1 through 40 inclusive,
20          was marked for ID)
21
22  BY MS. ST. PETER-GRIFFITH:

---

6 (Pages 18 to 21)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

**Page 22**

1     Q.  And, Mr. Fishman, what I have in front of
2   you I will represent is Abbott's production to us of
3   Abbott-DOJ Bates Numbers 0394762 through 0395345, and
4   these are a stack of documents that were produced to
5   our -- my office on March 7th, very recently, and you
6   referenced them.  Are you familiar with these
7   documents, sir?
8     A.  Yes.
9     Q.  Have you reviewed them?
10    A.  I have looked at them, yes.
11    Q.  Did any of these documents come from your
12  file?
13    A.  Several of them did, yes.
14    Q.  Okay, when did you provide them?
15    A.  Earlier -- early this month.  I couldn't
16  tell -- I couldn't give you a specific date.
17    Q.  Early the month of March?
18    A.  Yes.
19    Q.  Prior to your provision of these in the
20  month of March, had you otherwise preserved them and
21  produced them to Abbott legal counsel who was
22  collecting responsive documents --

**Page 23**

1     MS. CITERA:  Objection to form.
2
3   BY MS. ST. PETER-GRIFFITH:
4     Q.  (Continuing) -- or to Jones Day directly?
5     MS. CITERA:  Objection to form.
6     THE WITNESS:  I was not --
7     MS. CITERA:  And I'm just going to object
8   outside the scope.
9         Go ahead.
10    THE WITNESS:  I was not asked to -- I was not
11  asked to produce anything.
12
13  BY MS. ST. PETER-GRIFFITH:
14    Q.  So you never had previously received
15  either a litigation hold memo or a document collection
16  memo concerning these materials?
17    A.  Not to my recollection.
18    MS. CITERA:  Same objection.
19
20  BY MS. ST. PETER-GRIFFITH:
21    Q.  Okay.  Sir, backing up, were there --
22  other than the -- how many presentations did you give

**Page 24**

1   to Home Infusion on fraud and abuse and antitrust from
2   this -- after this 1995 time period?
3     A.  I believe two.
4     Q.  Do you know, were they -- it was in the
5   '90s, so somewhat -- sometime in between '95 and '99?
6     A.  I believe that would be correct.
7     Q.  Do you remember who attended these
8   particular presentations?
9     A.  Just the manager of the Contract Marketing
10  Group, Kathy Riddle, and then her staff.  And I -- I
11  don't recall who was on her staff.
12    Q.  Did anyone from the Reimbursement
13  Department within Home Infusion attend?
14    MS. CITERA:  Objection, form.
15    THE WITNESS:  I don't know.
16
17  BY MS. ST. PETER-GRIFFITH:
18    Q.  Was there an attendance sheet that was
19  signed?
20    A.  I don't know.
21    Q.  Why did you give the presentations?
22    MS. CITERA:  Objection to the form.

**Page 25**

1     THE WITNESS:  We gave presen -- we, the Legal
2   Division, the Commercial Attorneys representing the
3   divisions, all of the divisions regularly or
4   periodically gave training to all -- many groups
5   within the legal -- within the business sectors.
6
7   BY MS. ST. PETER-GRIFFITH:
8     Q.  Did your presentation have anything to do
9   with the AWP spread or spread marketing?
10    A.  No.
11    MS. CITERA:  Objection to form.
12
13  BY MS. ST. PETER-GRIFFITH::
14    Q.  Why did you give a presentation on these
15  two particular topics, fraud and abuse and antitrust?
16    MS. CITERA:  Objection to the form.
17    THE WITNESS:  Abbott had compliance -- we also
18  gave presentations on the Code of Business Conduct,
19  and we identified areas that were relevant to the
20  businesses and were important to, you know, obtaining
21  scrutiny within -- within the industry.
22

7 (Pages 22 to 25)

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

52 (Pages 202 to 205)

---

202

1    Q.   Yeah, thank you for clarifying that. What
2  was the role -- let me rephrase the question.
3    A.   Yeah.
4    Q.   What was the role -- from '91 through
5  2003, what was the role of either the President or the
6  CEO in compliance matters?
7    A.   Well, as -- as Chief Exec -- as Chief --
8  or as senior management of the corporation, they --
9  they would have been responsible for seeing that the
10 compliance -- you know, everything that happens in the
11 company, ultimately it is -- it would be something
12 that they would be -- you know, take general, you
13 know, responsibility, kind of the buck stops here.
14         In terms of specific activity, as I
15 said before, I don't believe the CEO sat on the
16 Business Conduct Committee.  I believe the Business
17 Conduct Committee made recommendations to the CEO.  I
18 know that Charlie Brock as the newly-constituted Chief
19 Compliance Officer, when he did report directly to the
20 CEO, had regular meetings with him and sat on his
21 senior staff.
22    Q.   Do you have any information about the

---

203

1  specifics of those meetings?
2    A.   I do not.
3    Q.   Okay.  Do you have any information
4  concerning the specifics of compliance decisions made
5  by the CEO or President from '91 through 2003?
6    MS. CITERA:  Objection to form.
7    THE WITNESS:  Boy, that's a very broad
8  question. I'm -- by compliance, again, I'm assuming
9  you're referring to fraud and abuse?
10
11 BY MS. ST. PETER-GRIFFITH:
12    Q.   Medicare and Medicaid fraud and abuse,
13 yes.  And when I say that, just to clarify, whenever I
14 say that, you know, all statutes concerning Medicare
15 and Medicaid fraud and abuse, all regulations
16 including the anti-kickback statute, the False Claims
17 Act, Stark, any state False Claims Act, you understand
18 the background?
19    A.   Yes, I understand that --
20    MS. CITERA:  Objection to form.
21    THE WITNESS:  I understand that phrase now.
22    MS. CITERA:  Objection to form.

---

204

1    MS. ST. PETER-GRIFFITH:  Okay.
2    THE WITNESS:  I am not -- I am not
3  personally -- I'm not aware of any decision that the
4  CEO made specifically about compliance.
5  BY MS. ST. PETER-GRIFFITH:
6    Q.   Okay, when you say you're not aware,
7  meaning you Mr. Fishman or you Abbott are not aware?
8    A.   Me Abbott through the diligence that I
9  conducted.
10    Q.   And what did you do to determine that?
11    A.   I did not ask that question specifically
12 to anybody.
13    Q.   Then how do you know whether or not the
14 CEO or the President was involved in compliance
15 matters, fraud -- Medicare/Medicaid fraud and abuse?
16    A.   Because I know they were -- they were
17 ad -- they were advised by the organization who was
18 responsible for compliance matters, but then what
19 decisions they made -- and subsequent decisions that
20 were made I can't articulate at what level they were
21 made and by whom and when.
22    Q.   So they may have been made by the

---

205

1  President or CEO, but you just don't know?
2    A.   That's correct.  I said I didn't -- I'm
3  not aware of any specific decisions that they made.
4    Q.   Okay.  Prior to Mr. Brock serving in his
5  role --
6    A.   Um-hum.
7    Q.   -- how was either the Business Conduct
8  Committee or the CEO or President advised of
9  compliance matters -- on compliance matters?
10    A.   The chief compliance person within the --
11 within Abbott, prior to having a designated Chief
12 Compliance Officer, would have been the General
13 Counsel.
14    Q.   Okay.  And what --
15    A.   And --
16    Q.   What communications did the General
17 Counsel have with the President or CEO concerning
18 Medicare and Medicaid fraud and abuse matters?
19    MS. CITERA:  I'm going to just, obviously,
20 object to the extent --
21    THE WITNESS:  I would say that any
22 conversations --

---

Henderson Legal Services, Inc.

30(b)(6) Abbott (Fishman, David S.)                                    March 12, 2008

53  (Pages 206 to 209)

206

1        MS. CITERA:  Yeah.
2        THE WITNESS:  -- that General Counsel would
3    have had would have been privileged.
4    BY MS. ST. PETER-GRIFFITH:
5        Q.  Well, I mean I'm asking you he -- how
6    can -- the General Counsel was also the Compliance
7    Officer, right?
8        A.  It was -- not -- it served a compliance
9    function.  I don't know that it was designated a
10   Compliance Officer.  Like I said, Charlie Brock was
11   the first by name compliance officer in -- compliance
12   was a function of Legal.  So it went through -- so it
13   came through the General Counsel's office even after
14   the OEC came into play.
15       Q.  What communications prior to Mr. Brock
16   coming onboard did the Chief Compliance Officer have
17   with the Chief -- CEO or President of the company from
18   '99 to 2003 concerning -- or, yeah, to 2001 concerning
19   Medicare/Medicaid fraud and abuse?
20       MS. CITERA:  I'm just going to object and
21   caution you not to reveal any privileged
22   conversations.

207

1        THE WITNESS:  Yeah.
2
3    BY MS. ST. PETER-GRIFFITH:
4        Q.  Why --
5        A.  First --
6        Q.  Hold on, sir.  Why do you maintain that
7    that is privileged?  It's a communication concerning
8    compliance matters.
9        MS. CITERA:  The General Counsel is advising
10   the CEO on -- it's providing legal advice.  Yes, it
11   has to do with compliance, but it's also legal advice.
12
13   BY MS. ST. PETER-GRIFFITH:
14       Q.  How was the determination made that it was
15   legal advice as opposed to compliance advice
16   concerning policies and practices of the company?
17       MS. CITERA:  Well, I -- again, I have cautioned
18   him -- now, if it's a question of, you know, what
19   policy is in place -- I mean I think he -- he has to
20   testify -- he can only testify as to non-privileged
21   discussions.
22       If there was a non-privileged

208

1    discussion that the General Counsel had with the CEO,
2    then he can testify as to that.  If it's privileged,
3    I'm instructing him not to testify about that.
4        So I'm not saying all conversations
5    are privileged.  I'm saying that if it was a
6    privileged discussion, that he cannot disclose it; if
7    it wasn't a privileged discussion, then he can
8    disclose it.
9        MS. ST. PETER-GRIFFITH:  Okay.
10
11   BY MS. ST. PETER-GRIFFITH:
12       Q.  What communications did the Chief -- the
13   CEO or President of Abbott have from 1991 until 2001
14   with the Corporate Compliance Officer?
15       A.  I don't believe there was -- I believe it
16   was General Counsel serving as the head of the
17   function of compliance within his purview as General
18   Counsel, and I do not know what communications about
19   compliance that they may have had.
20       Q.  Okay, what communications did the CEO or
21   President of the company, Miles White, have with the
22   corporate compliance officer concerning the

209

1    Congressman Stark letter?
2        MS. CITERA:  Object to the form, outside the
3    scope.
4        THE WITNESS:  I don't -- I don't have any
5    knowledge of that.
6
7    BY MS. ST. PETER-GRIFFITH:
8        Q.  Are you aware that a letter was sent by
9    Congressman Stark raising Medicare and Medicaid fraud
10   and abuse matters?
11       A.  I am not.
12       MS. CITERA:  Objection to the form, outside the
13   scope.
14       MS. ST. PETER-GRIFFITH:  It is not outside the
15   scope.  It is directly on point.
16
17   BY MS. ST. PETER-GRIFFITH:
18       Q.  Sir, what did you do to evaluate the
19   involvement -- strike that.
20       What specific involvement did the
21   Business Conduct Committee have in setting particular
22   policies -- in reviewing and approving particular

222

1    information to customers.
2        Q.   If HPD employees provided AWP information
3    or AWP spread information to customers, would that
4    have violated any Abbott policy that was in place from
5    1991 to 2000?
6        MS. CITERA:  Objection to the form, outside the
7    scope.
8        MS. ST. PETER-GRIFFITH:  It's not outside the
9    scope.  It's directly on point.
10       THE WITNESS:  '91 to 2000?  What time frame did
11   you --
12
13   BY MS. ST. PETER-GRIFFITH:
14       Q.   '91 to 2000.
15       MS. CITERA:  Same objections.
16       THE WITNESS:  There -- to my knowledge, there
17   was not a formal policy pertaining to AWP.  There was
18   a practice.  And whether or not they violated it, it
19   sounds like a violation is a conclusion of reviewing
20   facts in relation to -- in relation to legal analysis.
21
22   BY MS. ST. PETER-GRIFFITH:

223

1        Q.   Well, if some -- if someone within HPD
2    during the time frame from 1991 to 2000 provided
3    spread marketing information, AWP information, AWP
4    spread information to customers, would that violate
5    Medicare and Medicaid fraud and abuse statutes?
6        MS. CITERA:  Objection.
7        THE WITNESS:  You're asking me for a legal
8    conclusion.
9        MS. CITERA:  He's not here to talk -- he's not
10   here to give legal conclusions.
11   BY MS. ST. PETER-GRIFFITH:
12       Q.   I want to know, from Abbott's viewpoint,
13   was that -- was that a violation of any statute?
14       A.   That's a legal conclusion --
15       MS. CITERA:  Objection to form, outside the
16   scope.
17       THE WITNESS:  -- that I'm not prepared to
18   answer today.
19
20   BY MS. ST. PETER-GRIFFITH:
21       Q.   Okay.  Did Abbott have a concern that it
22   might have violated --

224

1        MS. CITERA:  Objection.  Are you done?
2
3    BY MS. ST. PETER-GRIFFITH::
4        Q.   -- that it might have violated
5    Medicare/Medicaid fraud and abuse abuse statutes?
6        MS. CITERA:  Objection to the form, outside the
7    scope.
8        THE WITNESS:  Abbott had -- took compliance
9    very seriously and evaluated its -- its activities
10   regularly, and conduct that may have raised concerns
11   or questions about their legality would have caused
12   Abbott to be concerned.
13
14   BY MS. ST. PETER-GRIFFITH:
15       Q.   Okay, was Abbott concerned?
16       MS. CITERA:  Objection to the form, outside the
17   scope.
18       MS. ST. PETER-GRIFFITH:  It's not outside the
19   scope, but go ahead.
20       MS. CITERA:  You're asking him to give
21   opinions.
22       MS. ST. PETER-GRIFFITH:  I am not asking him --

225

1    I am asking him about Abbott's concerns.  He is here
2    to testify today on behalf of Abbott.
3        MS. CITERA:  Not as to this area.
4        THE WITNESS:  Abbott was generally con -- was
5    generally concerned and took very -- and worked very
6    hard at addressing fraud and abuse issues.
7
8    BY MS. ST. PETER-GRIFFITH:
9        Q.   Okay, what did Abbott do -- let's start
10   there.  You said that Abbott took compliance
11   seriously.
12       A.   (Witness nodding).
13       Q.   What did Abbott do for the time period
14   from 1991 to 2001 to ensure that Medicaid and Medicare
15   statute -- fraud and abuse statutes were not violated
16   and regulations?
17       MS. CITERA:  Objection to, form.
18       THE WITNESS:  Multiple -- what time frame
19   again, '91 to when?
20
21   BY MS. ST. PETER-GRIFFITH:
22       Q.   2001.

226

1          A.   2001. There were multiple approaches to
2     the subject matter. From the highest level, there
3     was -- the broadest level, there was the Code of
4     Business Conduct, which required all Abbott employees
5     to comply with laws. To the extent the fraud and
6     abuse laws were involved in our activities, they would
7     have been expected to adhere to those.
8          Q.   Okay.
9          A.   The way in which they learned of those
10    laws was through Legal Department presentations, which
11    we have multiple copies of, given over a wide range of
12    time. And as part of that presentation, we always
13    advised the participants, and this would be true
14    generally, if anybody -- and it was certainly part of
15    the legal -- the Business Code of Conduct, if anybody
16    had any questions, there was the General Counsel's
17    number to call and inves -- and if there was something
18    being called in, that would be investigated.
19              Separate from that, all clients --
20    this is internal Abbott clients of the Legal
21    Department, when we spoke with them, would have as
22    part of our presentation advised them, If you ever

227

1     have any -- you know, here's -- here's the law as we
2     see it, here are some issues you should be looking at,
3     if you have any concerns or any questions at any time
4     about any of this or any subject matter, contact us.
5     And so we worked -- we worked closely with those
6     clients across all the businesses.
7              In addition, we prepared the
8     divisional operating guidelines for program funding
9     that addressed subject matters dealing with
10    interactions with healthcare professionals. We
11    prepared a 2000 a handbook, fraud and abuse handbook.
12             Is that end of the time line you had
13    asked me about?
14         Q.   Through 2001.
15         A.   Through 2001? I'm losing track. 2001?
16    Pharma came out in 2002. So that would have been --
17    that would be a summary of the activities taken by the
18    multitude of Commercial Attorneys within the Legal
19    Division.
20         Q.   Was there anything else that was done
21    within the Hospital Products Division other than what
22    you've just testified to?

228

1          A.   Specifically regarding training on
2     compliance? Not that I'm aware of.
3          Q.   Okay, and when we say "compliance," we're
4     talking about Medicare and Medicaid fraud and abuse on
5     that?
6          A.   I am, yes.
7          Q.   I have deposed a lot of business
8     individuals, and they have a different -- they use a
9     different term for compliance.
10             THE WITNESS:   Yeah. I would add to that and
11    which I -- I started my -- I started my discussion of
12    compliance, what we would have done, the Code of
13    Business Conduct as -- if you've looked at it, is
14    broader than just -- substantially broader than just
15    compli -- healthcare compliance.
16
17    BY MS. ST. PETER-GRIFFITH::
18         Q.   Sure. Sure, I understand.
19         A.   So it would have been in that context as
20    well,.
21         Q.   Well --
22         A.   So, you know, we gave the antitrust

229

1     presentations, we gave the insider trading
2     presentations, but I don't think that's the scope of
3     what we're talking about today.
4          Q.   Let's look at Tab 23. Why don't we start
5     there?
6          A.   Okay.
7          Q.   Sir, if you can turn to Page 16?
8          A.   Yes.
9          Q.   Actually, before you turn, let me ask you
10    what is this document?
11         A.   This is the 1999 -- a copy of the 1999
12    Abbott Laboratories Code of Business Conduct.
13         Q.   And if you -- if you turn to the very last
14    page, it appears to be dated 10/1/99; is that right?
15         A.   That is what it says, yes.
16         Q.   Okay. If you could turn to Page 16? And
17    let me ask you, sir, is this the portion of the Code
18    of Business Conduct dealing with Medicare/Medicaid
19    fraud and abuse laws?
20         A.   It is. Specifically, yes.
21         Q.   When was this added to the Code of
22    Business Conduct?

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

78 (Pages 306 to 309)

---

**306**

1. if you're adhering to it, arguably, there's no
2. liability. To the extent you're not adhering to it,
3. an evaluation of whether you're not and whether
4. there's liability would have been raised to Legal and
5. there would have been a legal analysis.
6. BY MS. ST. PETER-GRIFFITH:
7.     Q. Okay, my question though, sir, is did you
8. do anything to verify that you didn't -- that, in
9. interacting with customers and providing information
10. to them, Abbott HPD was not violating the False Claims
11. Act?
12.     MS. CITERA: Same objections and same
13. instruction.
14.     THE WITNESS: Right.
15.     The conclusion of whether it was
16. violating the False Claims Act would not have been
17. something that a businessperson would have -- any
18. conclusion a businessperson would have reached and to
19. the extent they ever reached a conclusion wouldn't
20. have been meaningful within Abbott or the Legal
21. Department that we would have reached. We would have
22. done a separate legal analysis as lawyers of whether

---

**307**

1. or not there was a violation of the law.
2.     Verification that there's no
3. violation of the law, I think gets back to my other
4. answers, How do you verify compliance? If you believe
5. your people are acting with -- in accordance with the
6. direction and principles that you operate a business
7. by, then -- then that's -- that's how you verify it.
8. If you find someone's messing up and if someone messed
9. up, it would have been brought to the Legal
10. Department --
11.
12. BY MS. ST. PETER-GRIFFITH:
13.     Q. How --
14.     A. -- for evaluation.
15.     Q. How did Abbott verify whether someone was
16. messin' up?
17.     MS. CITERA: Same objections and instruction.
18.     THE WITNESS: To the -- again, I said, to the
19. extent it happened, it would have been -- had to have
20. been determined at the managerial level, at some
21. managerial level or a co-worker raising it.

---

**308**

1. BY MS. ST. PETER-GRIFFITH:
2.     Q. How would the managers know or how would
3. the co-workers know that there was a violation?
4.     A. Because they had --
5.     MS. CITERA: Objection to form.
6.     THE WITNESS: The managers and co-workers had
7. job descriptions, and they performed their job
8. descriptions in accordance with -- with the law, and
9. they would have been trained on doing their job.
10.     How does anyone get trained on the
11. job? They come into the job, and they learn for --
12. they learn the job by someone instructing them how to
13. do the job.
14.
15. BY MS. ST. PETER-GRIFFITH:
16.     Q. What training did Abbott's HPD employees
17. receive concerning Medicare and Medicaid fraud and
18. abuse compliance?
19.     MS. CITERA: Objection to the form.
20.     THE WITNESS: The Legal Department provided
21. training, periodic training to a large number of
22. different business organizations within the HPD

---

**309**

1. Business Division regarding fraud and abuse issues.
2.
3. BY MS. ST. PETER-GRIFFITH:
4.     Q. If the Legal Department did not provide
5. training on a particular topic, would you expect that
6. the employees within HPD would be familiar with it or
7. would know not to violate a particular provision that
8. they didn't receive instruction on?
9.     MS. CITERA: Objection to form, outside the
10. scope.
11.     THE WITNESS: You're asking for a spec --
12. you're asking me to speculate.
13.     MS. ST. PETER-GRIFFITH: No I'm not.
14.     MS. CITERA: Yes, you are.
15.     THE WITNESS: I think you are.
16.     MS. ST. PETER-GRIFFITH: Can you read the
17. question back, please?
18.     THE REPORTER: Sure.
19.     (Record read.)
20.     MS. CITERA: Same objections.
21.     THE WITNESS: I never gave anybody training not
22. to smoke marijuana on this job. Would I expect them

---

310

1  to know that?  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  Okay, but what about -- I'm not --
5      A.  Again, the breadth -- the breadth of your
6  question is there's no --
7      Q.  Sir, I'm talking about -- I'm talking
8  about in the context of Medicare and Medicaid fraud
9  and abuse.  I'm not talking about, you know, smoking
10  drugs.  There's a big difference.
11         You testified earlier that part of
12  your com -- part of Abbott's ensurance of its
13  compliance with Medicare and Medicaid statutes was its
14  training through its Legal Department, right?
15      A.  Yes.
16      Q.  Okay.  If its Legal Department did not
17  give training on a particular Medicaid or Medicare
18  fraud and abuse statute or issue, would you expect
19  that Abbott's HPD employees would be required to
20  comply with that statute, having no training on it?
21      MS. CITERA:  Objection to the form, outside the
22  scope.

311

1      THE WITNESS:  I would expect that if the
2  statute required them to provide accurate information
3  in reports they submitted to customers and if that
4  training wasn't provided directly by Legal, that that
5  would be something that was innately part of the job,
6  that would have -- would have been -- and whether that
7  manager ever got that training or the manager's
8  manager or the predecessor to the manager, where that
9  knowledge first became -- where that first
10  knowledge -- where that knowledge first resided, I'm
11  not sure I can answer that.
12
13  BY MS. ST. PETER-GRIFFITH:
14      Q.  Well, if Abbott's Legal Department didn't
15  give training on pricing or price reporting and the
16  implications of pricing and price reporting in the
17  Medicare or Medicaid fraud and abuse context, would
18  you expect the HPD employees to comply with federal
19  and state Medicare and Medicaid statutes that
20  implicate -- that were implicated by pricing and price
21  reporting?
22      MS. CITERA:  Same objections.

312

1      THE WITNESS:  Yes.
2
3  BY MS. ST. PETER-GRIFFITH:
4      Q.  How would they know and learn the
5  information that they needed to ensure their
6  compliance?
7      MS. CITERA:  Same objections.
8      THE WITNESS:  In certain -- being familiar with
9  AMP and best price calculations, the statute
10  regulates -- I don't know if it's -- the statute
11  regulations describes the manner in which you do a
12  calculation, and it's a detailed calculation that
13  provides a description of things that you include or
14  don't include in your calculation, certain discounts,
15  GPO fees.  I don't know what -- early pay discounts
16  are included.  There's a litany of different things.
17  They -- and part of their job, they would -- they
18  would know -- they would read that and do it.  They
19  wouldn't look to Legal to train them on how to do that
20  calculation.  If there was concerns or questions, they
21  would -- they could come to Legal and would come to
22  Legal and ask questions.

313

1
2  BY MS. ST. PETER-GRIFFITH:
3      Q.  Okay, you're talking about AMP and best
4  price?
5      A.  Yes.
6      Q.  What about AWP and price reporting to
7  pricing compendia that resulted in the creation of
8  spreads on Abbott products in excess of fifty, a
9  hundred, a thousand percent?
10      A.  Okay, like I said --
11      MS. CITERA:  Object to form, outside the scope.
12      THE WITNESS:  Like I said before, there was a
13  practice that the HPD employees were not to provide
14  spread information, and that's how they would know not
15  to do it.
16
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay, and let -- let me -- I think you
19  might be confused.  I'm not talking about the
20  provision of spread information or AWP information to
21  customers.  I'm talking about the actual creation of
22  the spread and the reporting of false list price

30(b)(6) Abbott (Fishman, David S.)                    March 12, 2008

80  (Pages 314 to 317)

314

1   information to Abbott's -- no, to -- or to the
2   reporting compendia by Abbott.
3        MS. CITERA: I'm just going to object to the
4   characterization as "false list prices."
5        THE WITNESS: To my understanding, Abbott --
6   the third party created the spread.
7
8   BY MS. ST. PETER-GRIFFITH:
9        Q. But they created the spread based upon
10  information provided to them by Abbott, right?
11       MS. CITERA: Objection to the form, outside the
12  scope.
13       THE WITNESS: To my understanding, we would
14  have provided information to the compendia.
15
16  BY MS. ST. PETER-GRIFFITH:
17       Q. Okay. And what did Abbott do to ensure
18  that the information provided to the compendia did not
19  violate the Federal False Claims Act or Medicaid and
20  Medicare fraud and abuse statutes?
21       A. To the extent --
22       MS. CITERA: Object, to the form.

315

1        THE WITNESS: To the extent those laws
2   specifically defined those terms and addressed what
3   was expected of participants operating under the
4   statute, they would have complied with the law.
5   BY MS. ST. PETER-GRIFFITH:
6        Q. How do you know that?
7        A. Because they're instructed to comply with
8   the law.
9        Q. What instructions were they given?
10       MS. CITERA: Objection to the form.
11       THE WITNESS: I don't have a specific
12  instruction.
13
14  BY MS. ST. PETER-GRIFFITH:
15       Q. Okay. Because you testified earlier that
16  there was no training on pricing and AWP --
17       A. Legal training.
18       Q. No legal training?
19       A. (Witness nodding.)
20       Q. Okay. Was there another resource that HPD
21  employees had available to them to -- that they could
22  go to to ensure that their practices concerning

316

1   pricing and price reporting didn't violate federal or
2   state Medicare or Medicaid fraud and abuse laws?
3        A. They should not have gone to any source
4   other than Legal.
5        Q. Okay, did they go to Legal with questions
6   concerning pricing and Medicare or Medicaid fraud and
7   abuse statutes?
8        MS. CITERA: Objection to the form, outside the
9   scope. I also caution you not to reveal any
10  privileged discussions.
11       THE WITNESS: Did they come -- again, the
12  breadth of the question, Did they come to Legal to
13  talk about Medicare or Medicaid pricing questions,
14  yes.
15
16  BY MS. ST. PETER-GRIFFITH:
17       Q. Okay, who came to Legal and discussed it?
18       MS. CITERA: Same objections, same instruction.
19       THE WITNESS: I don't -- I don't -- I don't
20  know specific names. It would have been part of --
21  anytime that people working within HPD had a question
22  that they felt raised legal questions in their mind or

317

1   were uncertain as to what the legal call was as to how
2   you did something, they would have called Legal. It
3   would have been part of everyday, and whether there
4   was a call everyday on pricing, the answer is no. Was
5   there -- well, again, you're describing a time frame
6   '91 to 2002 or 2001. The Legal Department served as
7   the legal advisor to the division and would have
8   answered questions on a periodic basis.
9
10  BY MS. ST. PETER-GRIFFITH:
11       Q. At any time did anyone within the Hospital
12  Products Division raise a question with Abbott Legal
13  Division about its pricing conduct and the compliance
14  of its pricing conduct with Medicare and Medicaid
15  fraud and abuse statutes?
16       MS. CITERA: Same objections and instructions.
17       THE WITNESS: Not to my knowledge. I can't
18  speak to what Litigation might have known.
19
20  BY MS. ST. PETER-GRIFFITH:
21       Q. What did you do to investigate whether or
22  not any such inquiry was made?

362

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------------------x

In re:  PHARMACEUTICAL INDUSTRY    )   MDL DOCKET NO.

                                   )

AVERAGE WHOLESALE PRICE            )   CIVIL ACTION

                                   )

LITIGATION.                        )   01CV12257-PBS

-------------------------------    x

VOLUME II


        The videotaped 30(b)(6) deposition of ABBOTT

(DAVID FISHMAN), called by the United States for

examination, taken pursuant to subpoena and pursuant

to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before Rachel F. Gard,

Certified Shorthand Reporter, at 77 West Wacker

Drive, Suite 3500, Chicago, Illinois, commencing at

8:35 a.m. on the 20th day of March, A.D., 2008.

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

3 (Pages 367 to 370)

| | 367 |
|---|---|
| 1 | whether or not those laws |
| 2 | require Abbott to publish |
| 3 | catalog or list prices that |
| 4 | reflect the prices paid by |
| 5 | providers?                 692 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | 369 |
|---|---|
| 1 | Rachel Gard from Henderson Legal Services. Can you |
| 2 | please swear in the witness. |
| 3 | (Witness sworn.) |
| 4 | MS. ST. PETER-GRIFFITH: Before we get |
| 5 | started, Mr. Fishman, I have some statements to put |
| 6 | on the record. First, the United States at the end |
| 7 | of this deposition on Wednesday, the 12th, |
| 8 | requested time for a second day with this witness. |
| 9 | The United States was not notified until |
| 10 | Tuesday of this week, less than two days ago, via |
| 11 | email, while she was -- counsel was notified while |
| 12 | she was in a deposition that Jones Day knew she was |
| 13 | going to be in that the only day that was going to |
| 14 | be offered for Day 2 of Mr. Fishman was the 20th, |
| 15 | which has caused considerable problems for the |
| 16 | United States given the short notice of this date. |
| 17 | We are here today, but it has been very |
| 18 | difficult to get here; and it has been at |
| 19 | considerable expense to the United States given the |
| 20 | short notice. |
| 21 | Additionally, documents were furnished |
| 22 | after Mr. Fishman's original deposition date that |

| | 368 |
|---|---|
| 1 | THE VIDEOGRAPHER: This is Stephan Hoog |
| 2 | representing Henderson Legal Services. I'm the |
| 3 | operator of this camera. |
| 4 | This is the videotaped deposition of |
| 5 | David Fishman. It's being taken pursuant to the |
| 6 | Federal Rules of Civil Procedure on behalf of the |
| 7 | plaintiffs. We are on record March 20th, 2008. |
| 8 | The time is 8:34 a.m. as indicated on the video |
| 9 | screen. We are at the offices of Jones Day, 77 |
| 10 | West Wacker Drive, Chicago, Illinois? |
| 11 | This case is captioned, Re: |
| 12 | Pharmaceutical Industry Average Wholesale Price |
| 13 | Litigation, Case No. 01-12257-PBS. |
| 14 | Will the attorneys please identify |
| 15 | themselves for the video record. |
| 16 | MS. ST. PETER-GRIFFITH: Ann St. |
| 17 | Peter-Griffith, United States Attorney's Office for |
| 18 | the Southern District of Florida on behalf of the |
| 19 | Unites States. |
| 20 | MS. CITERA: Toni Citera from Jones Day on |
| 21 | behalf of the defendant and the witness. |
| 22 | THE VIDEOGRAPHER: The court reporter today is |

| | 370 |
|---|---|
| 1 | are additional compliance documents. And what I'd |
| 2 | like to do is have the court reporter mark this |
| 3 | next, this stack of exhibits as the next exhibit. |
| 4 | And the next number in order is 8. |
| 5 | (Exhibit Fishman 008 |
| 6 | marked as requested.) |
| 7 | |
| 8 | |
| 9 | WHEREUPON: |
| 10 | DAVID FISHMAN, called as a witness |
| 11 | herein, having been first duly sworn, was examined |
| 12 | and testified as follows: |
| 13 | EXAMINATION |
| 14 | BY MS. ST. PETER-GRIFFITH: |
| 15 | Q. If I could have the -- Good morning, Mr. |
| 16 | Fishman. I'm sorry. |
| 17 | A. Good morning. Sorry. |
| 18 | Q. Mr. Fishman, I'll represent to you that |
| 19 | those are exhibits that were FedEx'd to my office |
| 20 | on Monday of this week. And if I could just have |
| 21 | you look at them, they've been represented as |
| 22 | additional Abbott compliance documents. If you |

30(b)(6) Abbott (Fishman, David) - Vol II                                March 20, 2008
Chicago, IL

4  (Pages 371 to 374)

371

1    could just briefly look them over and see if that's
2    your understanding of what these documents are.
3         A.   This is not part of this (indicating).
4    It looks like a stand-alone document.
5         Q.   I believe it is.  Mr. Fishman, I will
6    have to tell you, they produced it to me so --
7         A.   Okay.
8         Q.   And each blue sheet represents a separate
9    document that was produced to us.
10        A.   Okay.  Could you repeat the question?
11        Q.   Sure.  Do those all appear to be
12   documents either memorializing compliance policies
13   or practices or issues or representing
14   presentations concerning the same?
15        A.   Yes.
16        Q.   And, Mr. Fishman, I'll represent to you
17   that also a DVD was produced together with these --
18   with those documents.  And I'm going to have this
19   marked, this file --
20        MS. ST. PETER-GRIFFITH:  I'll just represent,
21   Toni, it's just what we printed off the disk.
22   Could I have this file folder, which does not have

372

1    Bates labels on them --
2         MS. CITERA:  The disk did.
3         MS. ST. PETER-GRIFFITH:  The disk did, yes.
4    And I'm sorry.  I don't have that.  And if I could
5    --
6         MS. CITERA:  We can get a Bates number on the
7    break?
8         MS. ST. PETER-GRIFFITH:  Okay.  Why don't we
9    do that.  If I could just represent that Exhibit --
10   what's going to soon-to-be-marked as Exhibit 9
11   represents our print-off of the documents that were
12   on that disk.
13        MS. CITERA:  Do you have a copy of that for
14   me?
15        MS. ST. PETER-GRIFFITH:  I don't.
16        MS. CITERA:  Okay.
17        (Exhibit Fishman 009
18        marked as requested.)
19   BY MS. ST. PETER-GRIFFITH:
20        Q.   Mr. Fishman, if I could just have you
21   flip through those pages and see if you can
22   identify what they might be and confirm that they

373

1    are additional compliance-related materials from
2    Abbott or within Abbott.
3         A.   Without going -- Yes, generally it
4    appears to be a compliance document.
5         Q.   Okay.
6         A.   Or documents reflecting compliance on a
7    disk.
8         Q.   Well, I'll tell you that that's what they
9    were represented to us as being.  So I just wanted
10   you to confirm.  And, sir, for Exhibit 10, which is
11   soon to be marked --
12        A.   Excuse me.
13        Q.   -- which have a Bates range of 039704 --
14   104, I'm sorry -- through 0398285.  I'm going to
15   represent to you that these are what was identified
16   to me as being additional compliance documents
17   produced by Abbott.  They were produced to the
18   United States via hand delivery at about 10:00
19   o'clock last night to my hotel.  Oh, she's got to
20   mark it, sir.
21        MS. CITERA:  Is that this pile?
22        MS. ST. PETER-GRIFFITH:  Yes.

374

1         (Exhibit Fishman 010
2         marked as requested.)
3    BY THE WITNESS:
4         A.   Yes, these appear to be additional
5    compliance, generally compliance documents.
6         Q.   Sir, can you tell me from your exhibits
7    which I will put in front of you, these are not the
8    originals that were marked but I'll represent to
9    you they were copied, from the materials that we
10   went over at your last deposition and then
11   including these materials, can you today represent
12   that all of the documents that are compliance
13   materials, Exhibits 1, that have been produced to
14   the United States, Exhibit 1 from last week's
15   deposition, and Exhibits 8, 9, and 10, do those
16   represent for the period from 1991 until 2003 the
17   sum total of Abbott's compliance policies and
18   materials?
19        MS. CITERA:  Objection to the form, outside
20   the scope.
21   BY THE WITNESS:
22        A.   I can't say with certainty that it's the

30(b)(6) Abbott (Fishman, David) - Vol II                           March 20, 2008

Chicago, IL

5 (Pages 375 to 378)

375

1   sum total.
2       Q.   What additional documents do you think
3   might be out there?
4       MS. CITERA:  Objection to the form, outside
5   the scope.
6   BY THE WITNESS:
7       A.  I wouldn't -- I wouldn't know which
8   additional documents existed.
9       Q.   What has Abbott done to undertake a
10  search for its compliance materials?
11      MS. CITERA:  Same objections.
12  BY THE WITNESS:
13      A.  I understand there was -- there was a
14  document hold through litigation as part of this
15  litigation.  And people, numerous people were
16  identified through that and files were reviewed and
17  documents like this were identified through the
18  file, through reviewing the files.
19      Q.   How can the United States know what
20  additional compliance materials are out there?  Is
21  there a way to identify that?
22      MS. CITERA:  Objection to the form, outside

376

1   the scope.
2   BY THE WITNESS:
3       A.  Not to my knowledge.
4       MS. ST. PETER-GRIFFITH:  Toni, another matter
5   that I need to take up with you and I'd like to do
6   it on the record and ask you to follow up on it so
7   that we can hopefully make a record of it at some
8   point today, but I notice that for all of the
9   compliance materials that have been produced, they
10  were identified as being highly confidential.  And,
11  you know, consistent with Magistrate Judge Bowler's
12  most recent order, it was my understanding that
13  Jones Day had previously indicated that it was not
14  going to be designating items highly confidential
15  unless they fell within the parameters of what
16  Judge Saris had previously held was appropriate.
17      Can you find out at some point today
18  whether or not we can de-designate -- you know, I
19  don't know whether it is inadvertent, you know,
20  someone just had the stamp or what the situation
21  was.  But can you identify so we can find out by
22  the end of the day and put on the record as to

377

1   whether or not Abbott still considers these to be
2   highly confidential documents.
3       MS. CITERA:  Okay.
4   BY MS. ST. PETER-GRIFFITH:
5       Q.   Okay.  Now, Mr. Fishman, preliminary
6   matters out of the way, can you tell me what you've
7   done in between now and your -- and the last time
8   we were here, last Wednesday, to prepare for
9   today's deposition?
10      A.  I had three additional brief
11  conversations.  The first was with Brian Taylor,
12  with Rick Matea, and with Virginia Tobiason.
13      Q.   Okay.  And what did you discuss with Mr.
14  Taylor?
15      A.  I had a brief conversation over the phone
16  that lasted less than ten minutes --
17      Q.   Okay.  You're anticipating my questions.
18      A.  Should I not?
19      (Continuing.) -- pertaining to the
20  compliance activities that he would have known
21  about or been involved in from '91 through '95
22  specifically with respect to the Home Infusion

378

1   business within HPD.
2       Q.   Okay.
3       A.  He advised me that either in '91 or '92,
4   he recalled specifically in Arizona giving a fraud
5   and abuse presentation to the combined Alternate
6   Site/Home Infusion businesses, thought there were
7   roughly 40 people there, a large audience.  He was
8   estimating the numbers in that he did not have a
9   copy of that presentation but recalled that it, as
10  we discussed, is consistent with the general
11  subject matter and format of the multiple
12  presentations that have already been produced.
13      Q.   Sir, can you tell me whether or not --
14  You said it was in '91 or '92?
15      A.  Correct.
16      Q.   Scrap that question.  Did he tell you who
17  might have those presentations?
18      A.  He did not.
19      Q.   Did he tell you what the substance was in
20  more detail?
21      A.  In more detail, no.  It was generally
22  fraud and abuse.  And, again, it was consistent

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

6  (Pages 379 to 382)

<table>
<tr><td>

379

1  with the type of information that is contained in
2  many of the -- or if not most of the presentations
3  that have already been produced.
4      Q.   Was there anything -- is there anything
5  unique about fraud and abuse compliance with regard
6  to Home Infusion given their slightly different
7  business model than, say, the rest of Abbott or
8  HPD?
9      A.   No, we --
10     MS. CITERA:  Objection to form.
11  BY THE WITNESS:
12     A.   We gave fraud and abuse presentations to
13  many of the businesses, including Home Infusion.
14     Q.   Okay. But my question is, are there --
15  given Home Infusion's business model, were there
16  additional fraud and abuse issues that perhaps
17  touched upon them that might not be applicable for,
18  you know, HBS's DRG reimbursement model or even Alt
19  Site's?
20     A.   They would be --
21     MS. CITERA:  Objection to form.
22     THE WITNESS:  Sorry.

</td><td>

381

1      Q.   In your sort of additional research for
2  today's deposition, nobody told you that Abbott's
3  reimbursement department submitted claims on behalf
4  of Abbott's pharmacies?
5      A.   No.
6      Q.   Did anyone tell you that Abbott's
7  pharmacies -- well, actually Abbott itself had a
8  provider number with -- or provider numbers with
9  Medicaid and Medicare for purposes of submitting
10  claims on behalf of its pharmacies?
11     MS. CITERA:  Objection to the form, outside
12  the scope.
13  BY THE WITNESS:
14     A.   I'm not aware of that.
15     Q.   Do you think if Abbott -- or is it
16  Abbott's position if it did submit claims to
17  Medicaid and Medicare on its own behalf, that that
18  would create a situation where they would need to
19  have heightened scrutiny on Medicaid and Medicare
20  fraud and abuse?
21     MS. CITERA:  Objection to the form, outside
22  the scope.

</td></tr>
<tr><td>

380

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Go ahead.
3      A.   They would be -- they would be -- Their
4  business model and activities would be subject to
5  the same compliance regulations and rules and laws
6  that all the other businesses would be subject to.
7      Q.   Would the fact that Abbott's Home
8  Infusion business unit actually submitted claims,
9  either on behalf of Abbott's pharmacies or on
10  behalf of customers or consignment partners, would
11  that fact necessitate a need to look at additional
12  compliance measures?
13     MS. CITERA:  Objection to the form.
14  BY THE WITNESS:
15     A.   As I stated last time, I was not and am
16  not aware that Abbott submitted reimbursement
17  claims in its own name for itself. I'm aware that
18  as part of the services it provided to certain Home
19  Infusion customers, it would have -- it would have
20  done billing. It would have compiled billing
21  information and submitted it on behalf of
22  customers.

</td><td>

382

1  BY THE WITNESS:
2      A.   To the extent they filed claims for --
3  under its own provider number and in its own name,
4  they would have to comply with the regulations in
5  the -- to the same extent they would comply with
6  regulations as a service provider or product
7  provider.
8      Q.   For their consignment partners?
9      A.   For their consignment partners or any of
10  their businesses, quite frankly.
11     Q.   Okay. Did you discuss anything else with
12  Mr. Taylor?
13     A.   I did not.
14     Q.   What about Mr. Matea?
15     A.   With Mr. Matea, I had a phone
16  conversation that was less than five minutes. And
17  he confirmed my testimony the first -- on last
18  Wednesday. I speculated or assumed that in the
19  composition of the business conduct committee, that
20  Rick Gonzalez, in his capacity as president of
21  Abbott, was, in fact, on the business conduct
22  committee but, in fact, as I suggested in that

</td></tr>
</table>

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

7 (Pages 383 to 386)

---

383

1  testimony, he did not sit on that committee in his
2  capacity or as a president of the committee.  It
3  was a -- There was no hierarchy.  It was Charlie
4  Brock's committee.  So he, Rick Gonzalez, as
5  president, was a member of that committee equally
6  as a president of the division or the internal
7  auditor of the general counsel.
8      Q.  Did he tell you about Mr. Gonzalez's
9  participation on that committee?
10     A.  He did not.
11     Q.  Did you discuss anything else with Mr.
12  Matea?
13     A.  That's all I discussed with him.
14     Q.  Now, Ms. Tobiason, what did you discuss
15  with her?  Well, first, how long did you talk to
16  her?
17     A.  To her, less than 5 minutes.
18     Q.  Okay.
19     A.  Which was this morning in response to a
20  document that, while you saw it at 10:00 o'clock
21  last night, I saw it at 8:00 o'clock this morning.
22  The -- I don't recall the name of it.  The Home

---

384

1  Infusion --
2      Q.  Is it this, sir?
3      A.  Quite correct.
4      Q.  Why don't you pull it out?
5      A.  Which pile is it in?
6      MS. CITERA:  Exhibit 10.
7      MS. ST. PETER-GRIFFITH:  That, yeah, No. 10.
8  Or No. 9.
9      MS. CITERA:  It's the last document.
10     BY MS. ST. PETER-GRIFFITH:
11     Q.  If you could just read the Bates range at
12  the bottom, sir, so we have a record of what
13  document you're referring.  See where it says
14  ABT-DOJ?
15     A.  Oh, 0398240 through 0398249.
16     Q.  Okay.
17     A.  It's titled, "Abbott Laboratories, Inc.,"
18  it shouldn't have a comma there, "Home Infusions
19  Services, Reimbursement Operations, Compliance
20  Program."
21     Q.  Curiously, should there not be a comma?
22     A.  There should not be a comma.

---

385

1      Q.  Okay.  Sir, what did you learn from Ms.
2  Tobiason?
3      A.  I learned that -- we asked -- talked with
4  her, asked her if she was familiar with this
5  document.  She was not.  I indicated that it had a
6  date of July 15th, 1999.  She indicated that in
7  July of '99, she was no longer with HPD but rather
8  with ADD and that she had no familiarity with this
9  document.
10     Q.  Okay.
11     A.  We also tried to reach Daju Vicarria who
12  had found the document yesterday.  She -- We could
13  not locate her this morning.  We will try to reach
14  her during the break.
15     Q.  Sounds good.
16         Sir, have you had a chance to look at
17  these documents if you just saw them this morning
18  at 8:00?
19     A.  I am familiar with some of these
20  documents generally, yes, some.
21     Q.  Okay.  We're going to get into them a
22  little bit later.  Did you do anything else to

---

386

1  prepare for today's deposition?
2      A.  I did.  I reviewed the full deposition
3  transcript of the depositions that I had indicated
4  previously that I had seen excerpts from.
5      Q.  So you read the entire transcripts?
6      A.  I reviewed them.  I actually -- I was not
7  -- like you, was not aware that the deposition
8  would be going forward today.  So between late
9  Tuesday and this morning, I reviewed as many -- as
10  much of the testimony as I could.  I did not get to
11  Don Robertson's testimony or Ginnie Tobiason.
12     Q.  Okay.  Are those the only two that you
13  didn't get to?
14     A.  My recollection, yes, of the ones I had
15  seen excerpts from, yes.
16     Q.  Okay.  Did you review any other
17  deposition transcripts?
18     A.  I did not.
19     Q.  How about your own from Day 1?
20     A.  Oh, I did.  I reviewed that quickly as
21  well.
22     Q.  Probably not as quickly as I did, sir.

---

---

**387**

1        Sir, when we last were here, we ended
2    with a series of questions concerning some
3    documents that I showed you which had spread
4    information.  You indicated that you hadn't -- that
5    you weren't -- were not aware of the existence of
6    those documents?
7        A.  Correct.
8        Q.  Have you done anything to follow up and
9    learn more about whether or not Abbott HPD or
10   employees therein provided AWP or spread
11   information to Abbott customers?
12       A.  I did not.
13       MS. CITERA:  Objection, outside the scope.
14   BY THE WITNESS:
15       A.  I did not.
16       MS. ST. PETER-GRIFFITH:  Toni, I'll just have
17   -- I mean, I know you want to make the record of
18   outside the scope.
19       MS. CITERA:  I know you disagree.
20       MS. ST. PETER-GRIFFITH:  I disagree.  So we'll
21   just agree to disagree.
22       MS. CITERA:  We can agree to disagree.  I was

---

**389**

1    sodium chloride, acyclovir, Vancomycin, sterile
2    water, and dextrose -- Abbott knew, did it not,
3    that it was reporting list prices to the price
4    reporting compendia for those particular drug
5    products that most of the time or almost nearly all
6    the time from the '91 through 2001 time period
7    exceeded the actual contract prices by a hundred
8    percent or more?
9        MS. CITERA:  Objection to the form.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.  Correct?
12       MS. CITERA:  Outside the scope.
13   BY THE WITNESS:
14       A.  I don't know that -- the detail with
15   which you phrased the question, I can say I don't
16   know.
17       Q.  Okay.
18       MS. CITERA:  Just for the record, I don't
19   think we did give him a list of the drugs.
20       MS. ST. PETER-GRIFFITH:  They were in the
21   first amended complaint.
22       MS. CITERA:  I don't think we marked the first

---

**388**

1    actually going to suggest that the last time, I
2    guess, since you don't agree with me.
3    BY MS. ST. PETER-GRIFFITH:
4        Q.  Sir, as a matter of policy, why didn't
5    Abbott lower its list prices reported to the
6    pricing compendia?
7        MS. CITERA:  Objection, outside the scope.
8        MS. ST. PETER-GRIFFITH:  Hold up.  That one, I
9    will tell you, I asked that question of Mr. Sellers
10   and they told me to ask it of Mr. Fishman.  So
11   that's why we're asking this series of questions
12   that were raised at the Sellers' deposition.  I was
13   told Mr. Fishman is here to discuss the policy, the
14   policies.
15   BY THE WITNESS:
16       A.  Okay.  Could you repeat the question,
17   please?
18       Q.  Sure.  Why, as a matter of policy --
19   Well, first, let me ask you, Abbott was aware, was
20   it not, that it had on the products that are at
21   issue in this lawsuit, the subject drugs, which we
22   saw the list at the last deposition, right --

---

**390**

1    amended complaint.
2        MS. ST. PETER-GRIFFITH:  You know what?  Maybe
3    we didn't.  I'm sorry.
4        MS. CITERA:  We've been at a lot of
5    depositions.
6    BY MS. ST. PETER-GRIFFITH:
7        Q.  Let me, sir, I mean, I can write up a
8    list of the subject drugs we're talking about
9    whenever I say "subject drugs."  I was going to
10   say, I did have a copy of the amended complaint.
11   But I gave it to Chris Cook to use at his
12   deposition.
13       MS. CITERA:  I'm just going to object that
14   acyclovir is a subject drug.  As I understand it,
15   the judge didn't allow it to relate back and --
16       MS. ST. PETER-GRIFFITH:  It's still the
17   subject of this case.  She's ruled that you folks
18   need to produce discovery on it, so ...
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Mr. Fishman, when I refer to the subject
21   drugs, those are the drugs that are at issue in the
22   federal lawsuit, okay?

---

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

9 (Pages 391 to 394)

391

1    A. Okay. I understand that now.
2    Q. And, you know, I'll represent to you as
3    pled in the complaint that from '91 through 2001,
4    Abbott reported list prices -- and we went over
5    this, in part, at the Sellers' deposition -- Abbott
6    reported list prices to the price reporting
7    compendia for these products that were 50, 75, a
8    hundred percent to a thousand percent in excess of
9    the contract prices that it was charging its
10   customers, okay?
11       MS. CITERA: Objection to the form.
12       MS. ST. PETER-GRIFFITH: That's the predicate
13   for the following series of questions, okay?
14       MS. CITERA: Okay.
15       MS. ST. PETER-GRIFFITH: And, Toni, I'll
16   represent to you that, you know, Mike Sellers, we
17   went through a whole series of documents and he
18   represented that they're accurate and that's what
19   those documents reflect, okay.
20   BY MS. ST. PETER-GRIFFITH:
21       Q. Why as a matter of policy did Abbott not,
22   from the '91 through 2001 time period, why as a

392

1    matter of policy did Abbott not lower its list
2    prices reporting to the pricing compendia for the
3    subject drugs?
4        MS. CITERA: Object to the form, outside the
5    scope.
6    BY THE WITNESS:
7        A. I do not know that Abbott's actions with
8    respect to providing list price information to the
9    compendia, regardless of what the percentage
10   increase may have been over a contract price -- and
11   there probably were multiple contract prices would
12   be my expectation -- that it was done as a matter
13   of policy.
14       Q. Okay. Are you prepared, sir, to testify
15   today or did you prepare to testify today about
16   Abbott's -- the policies concerning Abbott's
17   creation or setting of list prices or the reporting
18   of list prices to the pricing compendia?
19       A. To my knowledge, Abbott did not have a
20   policy pertaining to reporting price information to
21   the compendia.
22       Q. Well, were there any checks and balances

393

1    placed upon Abbott's price reporting activities to
2    the compendia to ensure compliance with state and
3    federal Medicaid and Medicare fraud and abuse
4    statutes?
5        MS. CITERA: Object to the form.
6    BY THE WITNESS:
7        A. What do you mean by -- "checks and
8    balances" is kind of a broad, vague term. What do
9    you mean by "checks and balances"?
10       Q. Well, were there any policies governing
11   the -- how Abbott went about reporting its prices
12   to the price reporting compendia to ensure that
13   when it did, it was in compliance with federal and
14   state Medicaid and Medicare fraud and abuse
15   statutes?
16       MS. CITERA: Object to the form.
17   BY THE WITNESS:
18       A. As a -- as a general position of policy
19   and compliance, Abbott had as a policy, a stated
20   policy within its code of business conduct, to
21   comply with all laws and regulations and statutes,
22   which would have included and did include the

394

1    Medicare and Medicaid fraud and abuse, False Claims
2    Act, and other Medicare-related compliance
3    statutes.
4        So as a policy, they would have complied
5    with that. They would have been expected -- they,
6    Abbott, its employees would have been expected to
7    comply with those statutes and regulations.
8        Q. What did Abbott's employees do to ensure
9    that their price reporting to the pricing compendia
10   or their price reporting to the state Medicaid
11   agencies complied with those statutes?
12       MS. CITERA: Object to the form.
13   BY THE WITNESS:
14       A. Excuse me. With respect to the price
15   compendia, to the extent the statute identified and
16   defined what the standards for providing such
17   information was, they would have complied with it.
18   We talked about ensuring compliance in some detail
19   in my last deposition. And my answer, I can repeat
20   my answer. But my answer is effectively the same as
21   what I gave last time.
22       Q. Okay. And, sir, we're going to go over

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

10 (Pages 395 to 398)

395

1  various, you know, different policies. So to the
2  extent that it is the same as to what you testified
3  before, just let me know that. Okay?
4     A.  Okay.
5     Q.  Fair enough?
6     A.  Certainly.
7     Q.  Did Abbott have a particular procedure to
8  ensure that when reporting its prices to the
9  pricing compendia, it was in compliance with
10  federal and state Medicare and Medicaid fraud and
11  abuse statutes?
12     MS. CITERA:  Objection to form.
13  BY THE WITNESS:
14     A.  I am not aware of any procedure, written
15  procedure.
16     Q.  How about just like you had testified
17  earlier, there was a practice about not providing
18  AWP information, right?
19     A.  To customers.
20     Q.  To customers, okay.  Was there -- Even
21  though there wasn't a written policy, was there a
22  practice with regard -- at Abbott with regard to

396

1  its price reporting to the price compendia that
2  Abbott, you know, expected its employees to follow
3  to ensure that when they reported prices, they were
4  in compliance?
5     MS. CITERA:  Objection to the form.
6  BY THE WITNESS:
7     A.  Compliance with what?
8     Q.  Federal and state Medicare and Medicaid
9  fraud and abuse statutes and regulations.
10     A.  Okay. Again, to the extent those -- that
11  that body of law defined what the -- our
12  requirements were for reporting, they would have
13  been in compliance. In terms of a practice, I
14  learned through reading Mike Sellers' deposition
15  testimony that the expectation of the compendia,
16  compendium or compendia, was that we provide -- the
17  information they sought was list price.
18     Q.  But you know that only from reading Mike
19  Sellers' deposition transcript?
20     A.  That's correct.
21     Q.  And just to be clear, which transcript
22  are we talking about?  Let me --

397

1     A.  I believe --
2     Q.  Let me clarify.
3     A.  Okay.
4     Q.  Is it -- Was it -- Did you read his
5  transcript from Sunday's deposition?
6     A.  No, I did not.
7     Q.  Okay. So it was from a prior deposition?
8     A.  It was from a prior deposition. I
9  understand it was the deposition he was a 30(b)(6)
10  witness.
11     MS. CITERA:  Texas.
12     MS. ST. PETER-GRIFFITH:  It's Texas? Okay.
13  BY THE WITNESS:
14     A.  I don't remember the date.
15     MS. CITERA:  It was February '07.
16     MS. ST. PETER-GRIFFITH:  February of last
17  year.
18  BY THE WITNESS:
19     A.  Okay.
20     Q.  How did Abbott know that its employees
21  who reported prices complied with federal and state
22  Medicare and Medicaid fraud and abuse statutes?

398

1     MS. CITERA:  Objection to form.
2  BY THE WITNESS:
3     A.  I would give the same answer regarding
4  compliance, a broad answer I gave regarding how
5  Abbott provided, you know, training information to
6  employees through the legal department and that as
7  a very large, multiple-thousand-person operation
8  and business, it relied on its managers to
9  supervise its direct reports.
10     Q.  Now, you testified last time that Abbott
11  did not undertake any initiative to contact federal
12  officials or state officials concerning its
13  compliance with Medicare and Medicaid fraud and
14  abuse statutes; is that right?
15     MS. CITERA:  Objection to the form.
16  BY THE WITNESS:
17     A.  I said to my knowledge, they did not.
18     Q.  Okay. Did you do anything to research
19  between your deposition and this deposition whether
20  Abbott did?
21     A.  I did not.
22     Q.  Did Abbott do anything to verify with any

427

1    MS. CITERA:  Same objections.
2    BY THE WITNESS:
3        A.  People within the litigation department.
4        Q.  Anyone in particular?
5    MS. CITERA:  Same objections.
6    BY THE WITNESS:
7        A.  Time frames?
8        Q.  '91 through 2003, entire period of this
9    case.
10       A.  Presumably the head of the department at
11   whichever time frame was involved would have likely
12   been aware of what matters were being evaluated
13   within his or her department.
14       Q.  Does Abbott recognize as a matter of
15   policy that high spreads may cause customers to
16   submit false claims?
17   MS. CITERA:  Objection to the form, outside
18   the scope.
19   BY THE WITNESS:
20       A.  I don't think Abbott is able to evaluate
21   motivations and what causes customers to do what
22   they do.

428

1        Q.  Okay.  Well, let's go to Abbott itself.
2    Did Abbott itself submit claims or false claims to
3    Medicaid and Medicare?
4    MS. CITERA:  Objection to the form, outside
5    the scope, asking for a legal analysis.
6    BY THE WITNESS:
7        A.  Can you repeat the question?
8        Q.  Sure.
9    MS. ST. PETER-GRIFFITH:  Can you read it back?
10       (Record read as requested.)
11   MS. CITERA:  Same objections.
12   BY THE WITNESS:
13       A.  I testified that I was unaware that
14   Abbott submitted any claims in its own name.  To
15   the extent it did submit claims in its own name and
16   to the extent it submitted claims as part of a
17   contractual service for a customer, it would have
18   submitted the claims.  To determine whether they
19   are false is a legal conclusion.
20       Q.  Well, did Abbott -- what measures did
21   Abbott undertake to ensure that it complied when it
22   submitted claims either on its own behalf or on

429

1    behalf of its consignment partners, what did Abbott
2    do to ensure that the claims it's submitting did
3    not contravene the False Claims Act or Antikickback
4    Statute?
5    MS. CITERA:  Objection to the form.
6    BY THE WITNESS:
7        A.  Back to my other answer, which is there
8    were many people involved in providing these
9    day-to-day services within the pricing and
10   reimbursement departments within Abbott, that they
11   would have had as their objective, compliance with
12   all laws and rules and regulations and that
13   managers would supervise them to seek to ensure
14   that compliance.
15       Q.  Well, I understand that that might have
16   been the objective.  My question, though, to you,
17   sir, is you're here to testify as to what Abbott
18   did.  What did Abbott do?
19   MS. CITERA:  Objection, form.
20   BY THE WITNESS:
21       A.  To my knowledge, they adhered to that
22   practice.

430

1        Q.  How do you know that, or how does Abbott
2    know that?
3    MS. CITERA:  Objection to the form, outside
4    the scope.
5    BY THE WITNESS:
6        A.  It appears that the question is almost
7    asking me to prove the negative.
8        Q.  No.  My question to you is, what did
9    Abbott do to ensure that its Home Infusion business
10   unit on behalf of its consignment partners or on
11   behalf of Abbott itself complied with federal and
12   state Medicare and Medicaid fraud and abuse
13   statutes including the False Claims Act and
14   Antikickback Statute?
15   MS. CITERA:  Object to form.
16   BY THE WITNESS:
17       A.  The employees were given presentations
18   from legal on the Medicare Medicaid fraud and abuse
19   laws generally.  They would be familiar with the
20   specific requests of -- the forms themselves would
21   have had instructions and they would read them
22   carefully and would seek to comply with the

**431**

1  requirements of the forms. My -- I suspect as -- I
2  don't know when and if this occurred, but there was
3  an internal audit organization within Abbott that
4  would perform audits of businesses.
5      And to the extent -- I can't state with
6  any certainty that that occurred within Home
7  Infusion and, if it did, when it did.  But there
8  was regular auditing functions within Abbott for
9  broad compliance matters, certainly not limited to
10 Medicare matters.
11     Q.  Okay.  What were they?
12     A.  I just described it.  The internal audit
13 function within Abbott was to see that its books
14 and records and activities were complying with law.
15     Q.  What did Abbott do to ensure that the
16 claims submitted by its Home Infusion business unit
17 complied with federal and state Medicare and
18 Medicaid fraud and abuse statutes?  Did it review
19 the claims that were submitted for such compliance?
20     MS. CITERA:  Objection to the form.
21 BY THE WITNESS:
22     A.  Who is "they"?

**432**

1      Q.  Abbott.
2      A.  You speak about Abbott as if it's a
3  person, meaning the people who were preparing the
4  forms is Abbott.  The person to whom that person
5  reported is Abbott.  The person whom they sat next
6  to and may have asked a question of, "Does this --
7  am I reading this instruction correctly?" is
8  Abbott.  So, again, you're talking about tens of
9  thousands of people.  I don't know how I can answer
10 that question to assure you that everybody within
11 Abbott was in full compliance with all laws or
12 specifically with the Medicare/Medicaid laws at any
13 given moment.
14     Q.  Sir, sir --
15     MS. CITERA:  Can you let him finish?
16 BY THE WITNESS:
17     A.  I'm done.
18     Q.  What did Abbott do?  I'm not talking
19 about tens of thousands of people.  I'm talking
20 about Abbott.  It had its Home Infusion business
21 unit, right?
22     A.  Correct.

**433**

1      Q.  And Abbott knew that its Home Infusion
2  business unit was submitting claims on behalf of
3  its consignment customers, correct?
4      MS. CITERA:  Objection to form, outside the
5  scope.
6  BY THE WITNESS:
7      A.  That was -- that was a -- in certain
8  contracts, that would have been a contractual
9  service being provided, yes.
10     Q.  And Abbott also knew that its Home
11 Infusion business unit was submitting claims to
12 Medicare and Medicaid on behalf of Abbott's
13 pharmacies, correct?
14     MS. CITERA:  Same objections.
15 BY THE WITNESS:
16     A.  I testified previously that I'm not aware
17 of that.
18     Q.  You might not personally be aware of
19 that.  But Abbott certainly knew that it had a
20 provider number and was submitting claims, didn't
21 it?
22     MS. CITERA:  Same objections.

**434**

1  BY THE WITNESS:
2      A.  I can't -- I'm not prepared to answer
3  that today because I don't have knowledge to say
4  yes.  I can accept your statement as being true to
5  the extent I'll assume your statement to be true.
6  Then I'll say yes.  I don't know -- I can't sit
7  here, sitting now in my individual capacity or in
8  my capacity as a witness for Abbott that that's
9  true.  I don't have that information.
10     Q.  What did you do, sir, to prepare for
11 today's deposition to review information reasonably
12 available to Abbott to determine whether or not
13 Abbott itself maintained a provider number and
14 submitted claims to Medicare or Medicaid?
15     A.  I did not --
16     MS. CITERA:  Objection to form.
17 BY THE WITNESS:
18     A.  I did not ask anybody that specific
19 question.
20     Q.  Do you review any of the thousands of
21 HCFA-1500 forms that have been produced in this
22 case?

30(b)(6) Abbott (Fishman, David) - Vol II                          March 20, 2008

Chicago, IL

20  (Pages 435 to 438)

|  | 435 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  What -- Well, let me -- Just for purposes |
| 3 | of these questions, sir, assume that we've had |
| 4 | testimony in this case and Abbott has produced |
| 5 | documents demonstrating that it submitted claims on |
| 6 | behalf of Abbott itself -- |
| 7 | A.  Okay. |
| 8 | Q.  -- through its Home Infusion business |
| 9 | unit, okay?  Fair enough.  For claims submitted on |
| 10 | behalf of its consignment partners or on behalf of |
| 11 | Abbott's pharmacies, what did Abbott personnel |
| 12 | within the Home Infusion business unit do to ensure |
| 13 | that when they submitted those claims, they were in |
| 14 | compliance with federal and state Medicare and |
| 15 | Medicaid fraud and abuse statutes? |
| 16 | MS. CITERA:  Object to the form. |
| 17 | BY THE WITNESS: |
| 18 | A.  They would have performed their job |
| 19 | responsibilities to the best of their abilities |
| 20 | seeking to comply with the laws and instructions of |
| 21 | any given state or federal statute and would have |
| 22 | worked to provide that information in compliance |

|  | 437 |
|---|---|
| 1 | MS. CITERA:  Object to the form. |
| 2 | BY THE WITNESS: |
| 3 | A.  Not to my knowledge. |
| 4 | MS. ST. PETER-GRIFFITH:  Okay.  We've got five |
| 5 | minutes left on the tape.  Why don't we take a |
| 6 | break now. |
| 7 | MS. CITERA:  Okay. |
| 8 | THE VIDEOGRAPHER:  Going off the record at |
| 9 | 9:49 a.m. |
| 10 | (A short break was had.) |
| 11 | THE VIDEOGRAPHER:  Beginning of Videotape No. |
| 12 | 2 in the deposition of Mr. Fishman.  We're back on |
| 13 | the record at 10:01 a.m. |
| 14 | BY MS. ST. PETER-GRIFFITH: |
| 15 | Q.  Mr. Fishman, you testified earlier that |
| 16 | the reason behind the written -- the establishment |
| 17 | of the written policy concerning the non-provision |
| 18 | of spread or AWP information to Abbott's customers |
| 19 | was predicated in part upon Abbott's better |
| 20 | understanding of the government's view of such |
| 21 | conduct; is that fair? |
| 22 | MS. CITERA:  Object to the form. |

|  | 436 |
|---|---|
| 1 | with those laws. |
| 2 | Q.  Anything else? |
| 3 | A.  Other than the broader topics which I've |
| 4 | addressed in terms of the compliance training and |
| 5 | supervision of managers and the opportunity to the |
| 6 | extent an employee was uncomfortable and thought he |
| 7 | or she or Abbott was acting out of compliance with |
| 8 | whatever regulation or statute they were involved |
| 9 | in complying with, there was the opportunity to |
| 10 | raise questions within his or her organization or |
| 11 | if there was discomfort doing that, there was hot |
| 12 | line information. |
| 13 | Q.  Okay.  Other than what you just testified |
| 14 | to, did Abbott undertake any other measures to |
| 15 | either provide guidance to its Home Infusion |
| 16 | reimbursement, you know, staff who was submitting |
| 17 | claims to Medicare or Medicaid; or did they do any |
| 18 | other compliance check, for lack of a better term |
| 19 | -- |
| 20 | MS. CITERA:  Objection. |
| 21 | BY MS. ST. PETER-GRIFFITH: |
| 22 | Q.  -- on their reimbursement staff? |

|  | 438 |
|---|---|
| 1 | BY THE WITNESS: |
| 2 | A.  I think I stated it was in response -- |
| 3 | partly in response to that, yes. |
| 4 | Q.  Okay.  Certainly by 2003, Abbott knew |
| 5 | that a Qui Tam action was pending; is that fair? |
| 6 | A.  Yes. |
| 7 | Q.  Why didn't Abbott in 1999 when it was |
| 8 | notified about the qui tam action that is the |
| 9 | predicate for this case undertake to change or |
| 10 | undertake to implement a formal written policy |
| 11 | concerning the provision of spread or AWP |
| 12 | information to customers? |
| 13 | MS. CITERA:  Objection to the form, outside |
| 14 | the scope. |
| 15 | BY THE WITNESS: |
| 16 | A.  Specifically as to that policy, I don't |
| 17 | know.  But there was not at that time -- there were |
| 18 | not formal policies in that general arena at that |
| 19 | time. |
| 20 | Q.  There weren't formal policies pertaining |
| 21 | to Medicare and Medicaid fraud and abuse -- what do |
| 22 | you mean by "general arena"? |

Chicago, IL

28   (Pages 467 to 470)

467

1   alarms. Whether he thought he was, it was not
2   perceived as having done so.  So no action was
3   taken regarding what was perceived as a typical
4   conversation.
5       Q.  That answers my question.
6       A.  Okay.
7       Q.  Is there anything else that you're aware
8   of or have we rounded out and exhausted your
9   testimony concerning the measures undertaken by
10  Abbott regarding Mr. Tutell's conversations with
11  his supervisor, in-house counsel?
12      A.  We've rounded out my knowledge on that
13  subject, yes.
14      Q.  Let's look at Item C.
15      A.  My testimony generally is completely
16  responsive to that.  I would say all training
17  undertaken, I did not and cannot articulate every
18  single presentation was made.  But I described the
19  practice over the long period of time, that
20  multiple presentations were made to multiple
21  business units.  So yes, it's consistent with -- I
22  have responded to this question in the best of my

469

1       MS. ST. PETER-GRIFFITH:  Seems like yesterday
2   to you.  I've had three intervening depositions
3   since then.  Four, actually.
4   BY THE WITNESS:
5       A.  I've had two transactions die, so ... I
6   believe my testimony from last Wednesday and today
7   is fully responsive to this item, to the best of my
8   knowledge.
9       Q.  Okay.  And, again, we'll get into some of
10  the specifics as we look at the documents.  But I
11  just wanted to generally, we've exhausted your
12  knowledge --
13      A.  Knowledge.
14      Q.  -- of the policies and procedures?
15      A.  We have.
16      Q.  Under Item E, if you could take a look at
17  that.
18      A.  Same answer.  We've exhausted my
19  knowledge on this subject and that my testimony is
20  responsive to this.
21      Q.  To this question?
22      A.  To this question.

468

1   ability.
2       Q.  And fully to the best of your ability?
3       A.  Fully to the best of my ability.
4       Q.  And to the extent that you -- there's
5   some presentations that you can't recall, you --
6   your testimony is you've testified to everything
7   you can recall?
8       A.  Correct.
9       Q.  Or that you're aware of?
10      A.  That's correct.
11      Q.  We're going to get into the specifics of
12  some of those presentations once we look at the
13  documents.  But I want to make sure there isn't
14  anything else that you recall or want to testify
15  about in general --
16      A.  No.
17      Q.  -- about the training?
18      A.  No, there's nothing further.
19      Q.  Let's go on to Item D.
20      A.  I believe my testimony both yesterday --
21  or yesterday -- seems like yesterday.
22      MS. CITERA:  Feels like yesterday.

470

1       Q.  Okay.  I did have a question, actually a
2   follow-up question on this.  With the onset of
3   "Safeguarding Trust" and the more formalized
4   procedures concerning reporting, I know that as
5   part of the Ross CIA, Abbott did its own reporting
6   and monitored either calls into the hot line or
7   reports that were made; is that fair?
8       A.  Yes.
9       Q.  Prior to the '01 through '03 time period
10  when those procedures were being implemented
11  incident to the Ross settlement and Ross CIA and
12  formalized, prior to that point in time, did Abbott
13  have a way of tracking either hot line complaints
14  or reports concerning noncompliance?  Was there a
15  log someplace, or was there a way to track historic
16  complaints?
17      MS. CITERA:  Objection to form.
18  BY THE WITNESS:
19      A.  My recollection is that in discussing the
20  matter with Charlie Brock, was prior to the
21  institution of a specific compliance hot line that
22  -- as reflected in presentations and in the Code of

---

**471**

1    Business Conduct, calls were to -- directed to the
2    Office of General Counsel and then triaged from
3    there. I am not aware that there are formal logs
4    reflecting that. I would not be surprised if there
5    are, but I don't know that there are.
6       Q. What was done to triage the calls? What
7    do you mean by "triage"?
8       A. Triage, if a call comes in and someone is
9    complaining that my boss isn't being fair to me --
10      Q. Okay.
11      A. -- and it's somebody on the factory floor
12   in Austin, Texas, then general counsel wouldn't
13   address that matter. The call would be directed to
14   an HR person Austin, Texas, to investigate the
15   matter and find out does this person have a
16   legitimate complaint or are they just unhappy with
17   they didn't get a promotion and someone else did.
18   Again, any number -- it could be any number of
19   matters. Again, it's a broad compliance matter.
20   So it certainly was not limited to only calls that
21   people had and concerns people had about healthcare
22   compliance matters.

---

**472**

1       Q. Prior to the implementation of the OEC
2    policies, was there a way to monitor compliance
3    complaints about violations of the practice that
4    we've -- that you've testified to at length
5    concerning Abbott's prohibition against the
6    provision of AWP or spread information to
7    customers?
8       MS. CITERA: Objection to form.
9    BY THE WITNESS:
10      A. The manner in which it could be monitored
11   would be the two manners in which I've described
12   already, which would be as a direct supervisor, you
13   see that your direct report is not complying with
14   the practice and identify that act at that time or
15   subsequent to it having occurred. Secondly would
16   be through the hot line.
17      Q. Okay. Now, do managers go out into the
18   field with sales reps, for example?
19      A. Managers is a -- I'm a manager. I don't
20   know what --
21      Q. Okay. For the sales force, their
22   superiors are the district managers, is that --

---

**473**

1       A. Correct.
2       Q. Okay. Do the district managers have a
3    way of monitoring compliance with the practice if
4    their field sales reps were sort of, you know,
5    spread out all over the country doing individual
6    sales calls?
7       MS. CITERA: Object to the form.
8    BY THE WITNESS:
9       A. I have not had a specific conversation
10   with anyone precisely about that. My
11   understanding, historic understanding of just
12   having worked with the business is that district
13   managers would work with sales reps. And I don't
14   -- I'm not aware of any procedure or policy or
15   practice that it was, but it would just be
16   managerial support and that they would -- they
17   would be out in the field with sales reps. Whether
18   it was every sales rep and how often, my guess is
19   it probably would depend on the size of the
20   territory, the number of sales reps, and the
21   practice of that particular manager.
22      Q. Well, if -- for those sales calls that

---

**474**

1    the managers were not in attendance, how
2    practically could the district managers monitor and
3    enforce the practice?
4       MS. CITERA: Objection to the form.
5    BY THE WITNESS:
6       A. There were detail logs that sales reps
7    prepared demonstrating who they called on and what
8    they did. The only way that I can think of that
9    would provide the blanket assurance that you're
10   asking about would be to tape-record every single
11   conversation. Otherwise, there's no way of assuring
12   compliance with thousands of sales reps out on the
13   street talking with doctors and healthcare
14   professionals.
15      Q. Okay. Are you aware of any monitoring
16   initiative other than what you've testified about
17   concerning the district managers, you know, working
18   with their sales reps?
19      A. Other than what I -- there were the
20   guidelines, operating guidelines that went into
21   greater detail and provided -- attempted to provide
22   clear guidance to the Abbott employees as to how to

---

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

49 (Pages 551 to 554)

| 551 |
| --- |

1    Q.  How does -- How did the semi-annual risk
2    analysis help monitor reimbursement activities for
3    compliance?
4        A.  I don't know.
5        MS. ST. PETER-GRIFFITH:  Toni, that's another
6    one of those questions that if we could learn more,
7    if you could augment Mr. Fishman's answer -- I
8    mean, I'll take a written letter augmenting it.
9        MS. CITERA:  Sure.
10       MS. ST. PETER-GRIFFITH:  That's fine.
11       MS. CITERA: I can also do it on the errata
12   sheet.
13       MS. ST. PETER-GRIFFITH:  Yeah, that's fine.
14   Toni, the other thing I would like to point out in
15   this document is that on Page 3, that first
16   paragraph, there are a whole series of documents
17   where it says, "Further, these policies and
18   procedures conform to all corporate and individual
19   policies of the company."  And then there's
20   reference to the basic operating procedures for
21   Home Infusion Services.  I'll tell you, we've never
22   received that document.

| 552 |
| --- |

1        MS. CITERA: Where are you looking?
2        MS. ST. PETER-GRIFFITH:  I'm looking in the
3    middle of the top paragraph.
4        THE WITNESS:  Top paragraph.
5        MS. CITERA:  Oh.
6        MS. ST. PETER-GRIFFITH:  And then the sentence
7    that reads, "These policies and procedures are
8    contained in several sources," we also don't have
9    any of those sources, other than I believe that Mr.
10   Rodman may have produced one or two of them and
11   Trudi Burchieri may have produced one of them.  But
12   we don't have any Abbott production on that.  If
13   you could check into those documents as well.
14   BY MS. ST. PETER-GRIFFITH:
15       Q.  Sir, I think we're going to move onto a
16   new document.
17       A.  Okay.
18       MS. CITERA: I have the Bates number for the
19   CD. It is ABT-DOJ 0395587.
20           (Exhibit Fishman 013
21           marked as requested.)
22   BY MS. ST. PETER-GRIFFITH:

| 553 |
| --- |

1        Q.  Sir, if you'd take a moment and read this
2    document.
3        A.  Okay.
4        Q.  Okay. Sir, do you see -- First of all,
5    do you recognize this document?
6        A.  No.
7        Q.  Have you ever seen it before?
8        A.  I have not.
9        Q.  Sir, this appears to be a letter dated
10   April 2nd, 1990, from Robert Mulcahey -- I'm sorry,
11   to Robert Mulcahey from James Albrecht; do you see
12   that?
13       A.  I do.
14       Q.  Who is James Albrecht?
15       A.  Jim was an attorney, commercial attorney
16   in the legal department.
17       Q.  Do you know whether this letter was ever
18   sent?
19       A.  I have no knowledge.
20       Q.  The letter appears to concern an inquiry
21   from Ingalls to Abbott about compliance with or the
22   -- whether the -- I guess regarding Medicare fraud

| 554 |
| --- |

1    and abuse pertaining to Abbott's Home Infusion
2    ventures; do you see that in the first paragraph?
3        A.  I'm sorry.  We're talking about -- I'm
4    not sure I understood a question to be there.
5        Q.  Okay.  Do you agree with me that this
6    appears to be a response to an inquiry from Ingalls
7    concerning Medicare fraud and abuse compliance
8    questions; is that fair?
9        A.  Yes.
10       MS. CITERA:  Objection to form.
11   BY THE WITNESS:
12       A.  I'm sorry.  Yes.
13       Q.  And in the middle of -- there's an
14   indented two paragraphs in the middle of this
15   letter that purports to be, according to the
16   letter, an excerpt from an opinion given by Gardner
17   Carton.  Do you see that?
18       A.  I do.  It doesn't say opinion.  It says
19   memorandum.
20       Q.  Okay.
21       A.  I don't know whether it was an opinion or
22   not.

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008

Chicago, IL

50 (Pages 555 to 558)

555

1    Q.  Well, do you see in the sentence before
2  where it says, "Therefore, we don't think it
3  appropriate to release the opinion to Ingalls"?
4    A.  Yes.
5    Q.  Does that suggest to you that perhaps
6  Gardner Carton provided legal opinion to Abbott?
7    MS. CITERA:  Objection to the form, outside
8  the scope.
9  BY THE WITNESS:
10    A.  It suggests that Gardner provided a legal
11  opinion, yes.
12    Q.  And the next sentence reads, "However,
13  Ms. Riddle asks that I provide you the following
14  quote from the Gardner Carton memorandum regarding
15  proposed contracts relationships."  Do you see
16  that?
17    A.  I do.
18    Q.  Does that suggest to you that the content
19  of this particular excerpted quotation from the
20  Gardner Carton memorandum may be part of their
21  legal opinion?
22    MS. CITERA:  Objection to the form, outside

556

1  the scope.
2  BY THE WITNESS:
3    A.  I don't know whether it was part of the
4  legal opinion.  It -- It clearly uses a different
5  word.  It doesn't say, quote, from Gardner Carton's
6  legal opinion. It says memorandum.  Whether this
7  was part of the legal opinion, back-up support for
8  the opinion, the opinion itself, I don't know.
9    Q.  Okay.  Fair enough.  But do you have any
10  doubt that the quoted language in there came from
11  Gardner Carton and pertained to advice regarding
12  the consignment arrangements or the revenue-share
13  agreements?
14    MS. CITERA:  Objection to form, outside the
15  scope.
16  BY THE WITNESS:
17    A.  They have a lot of facts in that.  I was
18  agreeing with some of what you said and not
19  agreeing with -- you reached some conclusions in
20  your question that I'm not sure I agreed with.
21    Q.  Okay.  What don't you agree with?
22    A.  Can you repeat -- There was multiple

557

1  parts to that question.  Can you repeat the
2  question, please?
3    (Record read as requested.)
4    MS. CITERA:  Objection, same objections.
5  BY THE WITNESS:
6    A.  I believe it states that it came from a
7  Gardner memorandum, so I don't question that.  It
8  talks back to the joint Home Infusion therapy
9  agreement and what I don't know is on April 2nd,
10  1990, what the structure of that Home Infusion,
11  joint Home Infusion therapy agreement was to know
12  whether it pertained specifically to consignment
13  and a revenue share.
14    Q.  Okay.  I can look at the break and see if
15  I have that but --
16    A.  Okay.  On the face of this document, I
17  can't say that for certain.
18    Q.  But on the face of this document,
19  whatever the relationship is between Ingalls and
20  Abbott, you would presume from the content of the
21  language that that's the type of relationship
22  that's being referenced?

558

1    MS. CITERA:  Objection to the form, outside
2  the scope.
3  BY THE WITNESS:
4    A.  It's referencing a joint -- some kind of
5  proposed joint relationship between the parties,
6  yes.
7    Q.  Now, the information from the Gardner
8  Carton memorandum reads, "It should be noted that
9  these contracts which the provider, not Abbott,
10  accepts assignments," excuse me, "then Abbott pays
11  for goods and services -- then pays Abbott for
12  goods and services according to a fixed-fee
13  schedule will be unlikely to be found to violate
14  the Medicare and Medicaid fraud and abuse laws."
15  Do you see that?
16    A.  I do.
17    Q.  The next sentence reads, "This statement
18  assumes that Abbott charges each provider an amount
19  which reflects the fair market value for goods and
20  services rendered."  Do you see that?
21    A.  I do.
22    Q.  Did Abbott document the fair market value

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

51  (Pages 559 to 562)

**559**

1  for goods and services that it rendered to its Home
2  Infusion customers?
3      MS. CITERA: Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  I believe in describing previously before
7  lunch and describing the revenue-share arrangements
8  generally without talking specifically about a
9  given contract, I stated that not knowing which
10  contract we were talking about, whether there was
11  back-up information provided that reflected detail
12  with respect to percentages of revenue share.
13      Q.  Okay.  But if Abbott's -- you know, I'll
14  tell you, sir, I've deposed most of the Home
15  Infusion witnesses in this case.  And they've never
16  -- no one has ever testified nor has Abbott
17  produced any documents reflecting that there's
18  back-up documentation to delineate the bases of the
19  percentages that are collected by Abbott other than
20  just in general as a percentage of particular
21  therapies.
22      So if no such back-up documentation

**560**

1  exists, how did Abbott reflect the fair market
2  value for the goods and services rendered?
3      MS. CITERA: Objection to the form, outside
4  the scope.
5  BY THE WITNESS:
6      A.  You're -- I believe you're relying on the
7  word "reflect" to mean that Abbott has to provide
8  the customer the information about fair market
9  value versus having information internally that
10  substantiates the percentage agreed to that would
11  be that back-up as to how you get to that
12  percentage.
13      Q.  Well, I'm not necessarily saying that it
14  has to reflect it to the customer, although I want
15  to know whether it reflects it to the customer.  I
16  just want to know what documents Abbott maintained
17  --
18      A.  I don't know.
19      Q.  If Abbott didn't -- is not able to
20  document the fair market value for the goods and
21  services rendered, doesn't that defeat the
22  assumption that is the predicate for the opinion in

**561**

1  the first sentence?
2      MS. CITERA: Object to the form, outside the
3  scope.
4  BY THE WITNESS:
5      A.  I don't think it's fair to conclude that
6  because you don't document it, that it isn't
7  necessarily a fair market value reflection.
8      Q.  Well, how would Abbott prove it's the
9  fair market value?
10      MS. CITERA: Object to the form, outside the
11  scope.
12  BY THE WITNESS:
13      A.  Abbott would have to evaluate market fair
14  value based on what the goods and services in
15  question are being charged in the market at that
16  point in time.
17      Q.  And how did Abbott do that to ensure that
18  its fixed-fee schedule did not violate the Medicare
19  fraud and abuse laws as delineated in that first
20  sentence by the -- from the Gardner Carton
21  memorandum?
22      MS. CITERA: Objection to the form.  Outside

**562**

1  the scope.
2  BY THE WITNESS:
3      A.  I don't know how Abbott arrived at its
4  percentage calculation for a fixed-fee arrangement.
5      Q.  Okay.  Did you know how it documented or
6  demonstrated the fair market value for the goods
7  and services rendered?
8      MS. CITERA: Same objections.
9  BY THE WITNESS:
10      A.  I do not.
11      Q.  The next sentence reads, "It is important
12  to recall that any unreasonably deep discount
13  offered by Abbott would indicate a lack of arm's
14  length negotiation and would cause further scrutiny
15  under this arrangement."  Do you see that?
16      A.  "Could cause."
17      Q.  "Could cause," I'm sorry.
18      Do you see that sentence?
19      A.  I do.
20      Q.  What did Abbott consider to be an
21  unreasonably deep discount?
22      MS. CITERA: Object to the form, outside the

52 (Pages 563 to 566)

563

1  scope.
2  BY THE WITNESS:
3     A.  I don't know.
4     Q.  Would the provision of products for free
5  subject to some future possible reimbursement,
6  percentage of reimbursement share at a later point
7  in time constitute an unreasonably deep discount?
8     MS. CITERA:  Object to the form, outside the
9  scope.
10 BY THE WITNESS:
11    A.  As I testified earlier, providing product
12 to a customer on consignment, when that customer
13 ultimately never gets paid for it, as between
14 Abbott and the customer, it's as if that
15 transaction never occurred because there's no --
16 they're not -- there's no benefit obtained by
17 anybody.
18    Q.  Well, other than Abbott provided them
19 product for free that they used for the therapies
20 for their patients, right?  That's consideration.
21    MS. CITERA:  Objection to the form, outside
22 the scope.

564

1  BY THE WITNESS:
2     A.  As I stated earlier, I don't believe it's
3  fair to characterize the arrangement on its face as
4  for-free product.
5     Q.  Well, if the patient -- if there's no
6  reimbursement for the patient and the customer
7  doesn't have to pay for the Abbott product that it
8  utilized in providing the therapy to the patient,
9  how is that not free?
10    MS. CITERA:  Objection to the form, outside
11 the scope.
12 BY THE WITNESS:
13    A.  For free to whom?
14    Q.  Free to the consignment partner who is
15 providing the therapy to the patient.
16    MS. CITERA:  Same objections.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  And free to the patient.
19    MS. CITERA:  Same objections.
20 BY THE WITNESS:
21    A.  There's so many variables in this fact
22 pattern, I don't even know how to start to address

565

1  them.  Again, the question assumes that if the
2  coverage was denied, that there wasn't an attempt
3  to collect -- collect payment by the customer some
4  other way.
5     Q.  Is that what Abbott did?
6     A.  We weren't the customer.
7     MS. CITERA:  Object to the form, outside the
8  scope.
9  BY MS. ST. PETER-GRIFFITH:
10    Q.  But you were collecting on behalf of the
11 customer, weren't you?
12    MS. CITERA:  Same objections.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.  Isn't that part of the services provided
15 by the reimbursement department?
16    MS. CITERA:  Same objections.
17 BY THE WITNESS:
18    A.  I understand in certain arrangements, we
19 were providing billing services.  Whether we were
20 providing collection services, I don't know.
21    Q.  Okay.  Who pays for the product, then, if
22 in the fact pattern we used before, Medicaid denies

566

1  reimbursement?  Who pays Abbott for the product?
2     MS. CITERA:  Objection to the form, outside
3  the scope.
4  BY THE WITNESS:
5     A.  Again, we're talking about a hypothetical
6  contract because I haven't seen the details of a
7  specific contract that has this type of arrangement
8  in place to know whether there was any additional
9  language that addressed denial of reimbursement,
10 nor do I know what the customer did with a given
11 patient if there was a denial of reimbursement,
12 whether they sought payment through another means
13 and obtained that payment through another means.
14    Q.  But if countless of these proposals that
15 are made through the Home Infusion Contract
16 Marketing and the contracts themselves say "Abbott
17 shares in your risk.  If you're not paid for a
18 patient, we're not paid" and if that's the
19 representation that's made and the Home Infusion
20 revenue-share partner is not paid for a particular
21 therapy for a patient and Abbott doesn't get paid,
22 doesn't Abbott provide the product, then, for free?

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
## Chicago, IL

53  (Pages 567 to 570)

---

**567**

1     MS. CITERA:  Object to the form, outside the
2  scope.
3  BY THE WITNESS:
4     A.  I don't accept the premise that it's free
5  product because it's being provided with -- on the
6  condition of getting paid, so there's an
7  expectation of payment.  So it's not being provided
8  for free.
9     Q.  Then where's the risk to Abbott in these
10  risk-share arrangements?
11     MS. CITERA:  Object to the form, outside the
12  scope. I'm just going to state again that he is not
13  here to provide any legal analysis.
14  BY THE WITNESS:
15     A.  I -- I'm asked to comment on an
16  arrangement that I don't have the contractual terms
17  in front of me to know what the arrangement is.
18     Q.  Well, you know generally about these
19  revenue-share arrangements, right?
20     A.  I know that one aspect of it.
21     MS. CITERA:  Same objections.
22  BY MS. ST. PETER-GRIFFITH:

---

**568**

1     Q.  Okay.  But in untold numbers of these
2  presentations that are made, it is made very clear
3  that if the Home Infusion revenue-share partner
4  doesn't get paid, Abbott doesn't get paid.  That's
5  almost a verbatim quote, sir.
6     And my question is, if there's no
7  reimbursement that the revenue-share partner
8  collects on behalf of a particular -- or from a
9  particular patient, doesn't Abbott then provide the
10  product utilized for services to that patient for
11  free?
12     MS. CITERA:  Same objections.
13  BY THE WITNESS:
14     A.  Abbott is not providing that product to
15  the user, so ...
16     Q.  No, it's providing it to the
17  revenue-share partner who in turn provides it to
18  the user, right?
19     MS. CITERA:  Objection, same objections.
20  BY THE WITNESS:
21     A.  Correct, that's correct.
22     Q.  Okay.  So if the revenue-share partner

---

**569**

1  does not collect reimbursement from the patient,
2  who bears the risk of Abbott's cost for the product
3  that it gives to the revenue-share partner that the
4  revenue-share partner, in turn, utilizes for the
5  patient?
6     MS. CITERA:  Objection to the form, outside
7  the scope.
8  BY THE WITNESS:
9     A.  It strikes -- it strikes me as you're
10  asking for a legal conclusion.
11     Q.  I'm not asking for a legal conclusion.
12  I'm asking who pays.
13     MS. CITERA:  I think you're asking for a legal
14  conclusion.
15  BY THE WITNESS:
16     A.  You asked me who bears the risk.
17     Q.  In terms of who's -- who's out the cost
18  of the product?
19     MS. CITERA:  Same objections.
20  BY THE WITNESS:
21     A.  Assuming there are no other contractual
22  terms that provide any other alternative than what

---

**570**

1  you're describing, Abbott would be out the cost of
2  that product.
3     Q.  Okay.  With regard to this particular
4  quotation from the Gardner Carton memorandum, what
5  did Abbott do -- what did Abbott or Abbott's Home
6  Infusion or its legal department or anyone within
7  Abbott do to ensure that Abbott's Home Infusion
8  business arrangements complied with the provisions
9  or the advice that is set forth from Gardner Carton
10  in those two paragraphs?
11     MS. CITERA:  Object to the form.
12  BY THE WITNESS:
13     A.  Can you repeat the question, please?
14        (Record read as requested.)
15     MS. CITERA:  Same objection.
16  BY THE WITNESS:
17     A.  I don't know.
18     Q.  Move on to a new document.
19        (Exhibit Fishman 014
20        marked as requested.)
21  BY MS. ST. PETER-GRIFFITH:
22     Q.  Sir, if you could take a moment, I'm just

---

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

54 (Pages 571 to 574)

|  | 571 |
|---|---|
| 1 | going to focus on the first page of this agreement, |
| 2 | although I just want to note, the second page, this |
| 3 | is produced -- this is actually the third page, but |
| 4 | I put it first because that's what we're going to |
| 5 | concentrate on. It's Abbott-DOJ 351271. The |
| 6 | following two pages are 351269 and 351270, which I |
| 7 | will represent that's the consequence they were |
| 8 | produced to the United States by Abbott. The |
| 9 | second page appears to be a cover sheet to |
| 10 | Northwestern Memorial Hospital, Office of the |
| 11 | General Counsel. And it's -- |
| 12 | **A. To or from?** |
| 13 | MS. CITERA: To or from? |
| 14 | BY MS. ST. PETER-GRIFFITH: |
| 15 | Q. I'm sorry, from. Gee. From Jackie |
| 16 | Darral to Carla Kreklow. And I'm not going to ask |
| 17 | you whether the documents relate to each other. |
| 18 | That's how they were produced to us. |
| 19 | **A. Okay. I'm sorry, do you want me to read** |
| 20 | **all of them?** |
| 21 | Q. No, no, no, I just want you to read the |
| 22 | first page. |

|  | 572 |
|---|---|
| 1 | **A. Okay. Dated -- titled "Abbott Home** |
| 2 | **Infusion Services Program and Medicare Law."** |
| 3 | Q. Correct. First, let me ask you, sir, do |
| 4 | you recognize that document? Or do you want to |
| 5 | read it first? |
| 6 | **A. Let me read it first.** |
| 7 | Q. Sure. |
| 8 | **A. Okay.** |
| 9 | Q. Sir, have you had a chance to read this? |
| 10 | **A. I did.** |
| 11 | Q. Do you recognize this document? |
| 12 | **A. I do not.** |
| 13 | Q. Have you ever seen it before? |
| 14 | **A. Not to my recollection.** |
| 15 | Q. Do you know why Abbott would create such |
| 16 | a document discussing Abbott's Home Infusion |
| 17 | Services program and Medicare law? |
| 18 | MS. CITERA: Objection to the form, outside |
| 19 | the scope. |
| 20 | BY THE WITNESS: |
| 21 | **A. No.** |
| 22 | Q. Who was this distributed to? |

|  | 573 |
|---|---|
| 1 | MS. CITERA: Objection to the form. |
| 2 | BY THE WITNESS: |
| 3 | **A. I don't know.** |
| 4 | Q. Sir, I'm going to go through certain |
| 5 | statements in here, okay. I'm going to start with |
| 6 | the second paragraph. It reads, "Abbott is |
| 7 | compensated for services and products it provides |
| 8 | through a payment of a percentage of collections by |
| 9 | client." Do you see that? |
| 10 | **A. I do.** |
| 11 | Q. And it says, "The percentage is |
| 12 | negotiated through arm's length discussions and is |
| 13 | based upon various services and products Abbott may |
| 14 | be asked to provide by the client." Do you see |
| 15 | that? |
| 16 | **A. "May provide their clients."** |
| 17 | Q. I'm sorry, "asked to provide the client." |
| 18 | Sir, what is the nature of the arm's length |
| 19 | discussions that are undertaken in negotiating the |
| 20 | percentage? |
| 21 | MS. CITERA: Object to the form, outside the |
| 22 | scope. |

|  | 574 |
|---|---|
| 1 | BY THE WITNESS: |
| 2 | **A. I don't know. I don't know.** |
| 3 | Q. Okay. The next paragraph reads, "In a |
| 4 | few instances, Abbott has been asked whether this |
| 5 | percentage of collection approach is consistent |
| 6 | with Medicare laws and Safe Harbors." Do you see |
| 7 | that? |
| 8 | **A. I do.** |
| 9 | Q. Who asked that? |
| 10 | **A. I don't know.** |
| 11 | Q. The next sentence says, "Abbott believes |
| 12 | this percentage approach is sound under the law." |
| 13 | Do you see that? |
| 14 | **A. I do.** |
| 15 | Q. What's the basis for that statement? |
| 16 | MS. CITERA: Object to the form, outside the |
| 17 | scope. |
| 18 | BY THE WITNESS: |
| 19 | **A. Based on the next sentence, it appears** |
| 20 | **that Abbott consulted with outside counsel and** |
| 21 | **obtained an opinion that helped it get comfortable** |
| 22 | **with this statement.** |

30(b)(6) Abbott (Fishman, David) - Vol II                          March 20, 2008
Chicago, IL

55  (Pages 575 to 578)

575

1    Q.  What was that opinion?
2        MS. CITERA:  I'm going to instruct you not to
3    answer.  And, obviously, I mean, you can ask him if
4    he even knows, but ...
5    BY THE WITNESS:
6        A.  Right.
7        Q.  Well, do you even know what the opinion
8    is?
9        A.  Based on the information here talking
10   about a Washington, D.C., counsel, I would believe
11   it would have been the discussions with Hogan &
12   Hartson.  But I don't know what the opinion was;
13   and if I did -- and the opinion, having been made
14   would be -- is privileged regardless of whether I
15   know it.
16       MS. ST. PETER-GRIFFITH:  Does Abbott intend to
17   rely upon an advice of counsel defense?
18       MS. CITERA:  As previously stated, I'm not
19   going to answer that question.
20       MS. ST. PETER-GRIFFITH:  Well, Abbott has not
21   identified advice of counsel as an affirmative
22   defense in this case.  So I think I'm entitled to

576

1    an answer.
2        MS. CITERA:  I'm not going to answer that
3    question.
4    BY MS. ST. PETER-GRIFFITH:
5        Q.  The next reads, "Medicare Safe Harbors do
6    not provide automatic protections for all
7    percentage arrangements, nor do they declare that
8    percentage arrangements are improper," and then
9    there's a footnote.  Do you see that?
10       A.  I do.
11       Q.  First of all, what's the relationship
12   between the IRS Safe Harbors and Medicare Safe
13   Harbors?
14       MS. CITERA:  Objection to the form, outside
15   the scope.
16   BY THE WITNESS:
17       A.  I don't know.  Plus you're asking me to
18   reach a legal conclusion, state a legal opinion
19   about two sets of laws.
20       Q.  I'm not asking you a legal opinion.  What
21   I'm asking you is why does Abbott in this doc- --
22   Let me ask it this way:  Why does Abbott in this

577

1    document identify some kind of nexus through this
2    footnote between Medicare Safe Harbors and IRS
3    guidelines?
4        MS. CITERA:  Same objections.
5    BY THE WITNESS:
6        A.  I don't know.
7        Q.  Okay.  Did Abbott have a concern that its
8    Home Infusion -- Home Infusion -- Home Infusion
9    arrangements may not have satisfied the Medicare
10   Safe Harbors?
11       MS. CITERA:  Object to the form, outside the
12   scope.  I'm also going to instruct you not to reveal
13   any privileged communications or analysis.
14   BY THE WITNESS:
15       A.  Not to my knowledge.
16       Q.  The last sentence reads, "Instead the
17   Safe Harbors provide that even though a large
18   majority of percentage arrangements may represent
19   legitimate compensation to a supplier, percentage
20   arrangement is inappropriate if it is intended to
21   disguise the payment of patient referrals."
22       A.  "As a disguise."

578

1        Q.  I'm sorry, "as a disguise for patient
2    referrals."  Do you see that?
3        A.  I do.
4        Q.  Why did Abbott include that in this
5    sentence or in this memorandum?
6        MS. CITERA:  Same objections and caution.
7    BY THE WITNESS:
8        A.  I don't know.
9        Q.  The next paragraph indicates that the
10   percentage compensation negotiated by Abbott is
11   wholly attributable to the delivery of services and
12   product to the client.  Do you see that?
13       A.  I do.
14       Q.  What's the basis for that statement?
15       MS. CITERA:  Same objections.
16   BY THE WITNESS:
17       A.  Not knowing anything about this document,
18   I don't know.
19       Q.  Okay.  I understand, sir, that you might
20   not have seen this before.  And to the extent that
21   you can, you know, identify an answer and
22   supplement it at a later point in time, I'd

30(b)(6) Abbott (Fishman, David) - Vol II            March 20, 2008

Chicago, IL

56 (Pages 579 to 582)

579

1  appreciate that.
2       MS. ST. PETER-GRIFFITH: If that's okay, Toni.
3  BY MS. ST. PETER-GRIFFITH:
4       Q.  The second-to-last sentence in this
5  paragraph reads, "Again, the percentage rate
6  charged by Abbott is a competitive one falling
7  within reasonable commercial range but does not
8  take into account any value of any business
9  referral." Do you see that?
10      A.  I do.
11      Q.  How did Abbott's -- how are -- were
12 Abbott's percentage rates charged to its Home
13 Infusion revenue-share customers competitive?
14      MS. CITERA: Objection to the form, outside
15 the scope.
16 BY THE WITNESS:
17      A.  I don't know how Home Infusion reached
18 their negotiated percentages.
19      Q.  For Medicare and Medicaid compliance, did
20 Abbott believe that maintaining competitive
21 percentage rates was important?
22      MS. CITERA: Objection to the form, outside

580

1  the scope.
2  BY THE WITNESS:
3       A.  I don't know what Abbott believed
4  important. They would believe important to comply
5  with the laws.
6       Q.  Okay. And did they ensure that they
7  maintained a competitive rate to comply with the
8  laws?
9       MS. CITERA: Same objections.
10 BY THE WITNESS:
11      A.  I don't know.
12      Q.  In addition to services and products, did
13 Abbott provide design build-out services as some of
14 its contractual arrangements?
15      MS. CITERA: Object to the form, outside the
16 scope.
17 BY THE WITNESS:
18      A.  Do you know what you mean by design
19 build-out services?
20      Q.  Of pharmacies. I'm sorry, of external
21 pharmacies. If you could look to the
22 second-to-last paragraph, it's referenced there.

581

1       A.  Oh, design services.
2       Q.  For, for example, clean rooms and
3  buildings designed for Home Infusion pharmacies.
4       MS. CITERA: Same objections.
5  BY THE WITNESS:
6       A.  I don't know. It states it as an example
7  of services.
8       Q.  Did they charge for that separately?
9       MS. CITERA: Objection to the form, outside
10 the scope.
11 BY THE WITNESS:
12      A.  Don't know.
13      Q.  If Abbott provided build-out -- if Abbott
14 helped its Home Infusion customers bear the upfront
15 cost of expenditures for facility design build-out
16 in exchange for, in part, Abbott's Home Infusion
17 partners entering into the Home Infusion
18 arrangements with Abbott, would that be a kickback?
19      MS. CITERA: Objection to the form, outside
20 the scope. He's not here to testify as to what the
21 law is.
22 BY THE WITNESS:

582

1       A.  I believe that question clearly asks for
2  a legal conclusion.
3       Q.  Did Abbott have concern that it
4  constituted a kickback?
5       A.  I don't know.
6       MS. CITERA: Same objections.
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Did Abbott ever evaluate whether or not
9  providing at no cost design build-out services for
10 its Home Infusion revenue-share partners was in
11 compliance with federal and state Medicare and
12 Medicaid laws?
13      MS. CITERA: Object to the form, outside the
14 scope. I also would instruct you not to reveal any
15 privileged communications or analysis.
16 BY THE WITNESS:
17      A.  As stated previously — As I stated
18 previously from my own knowledge and also as
19 reflected in the third paragraph of this document,
20 Abbott did consult outside legal counsel, I do not
21 know the scope of the arrangement in which the
22 consultation occurred. And if I did, any

30(b)(6) Abbott (Fishman, David) - Vol II                     March 20, 2008
Chicago, IL

57 (Pages 583 to 586)

583

1  communication would have been privileged.
2     Q. Well, Abbott's providing -- well, it says
3  at the bottom that this document is not a legal
4  opinion. It's providing an explanation of Abbott's
5  intent and view. Do you see that?
6     A. I do.
7     Q. What's the predicate for Abbott's intent
8  or factual basis for Abbott's intent and view as
9  set forth in this document?
10    MS. CITERA: Objection to form, outside the
11 scope.
12 BY THE WITNESS:
13    A. Can you repeat the question, please?
14    MS. ST. PETER-GRIFFITH: Sure. Can you read
15 it back?
16       (Record read as requested.)
17    MS. CITERA: Same objections.
18    THE WITNESS: Huh?
19    MS. CITERA: Same objections.
20 BY THE WITNESS:
21    A. I'm not sure -- I'm not sure I understand
22 how I can answer what their factual basis was for

584

1  an intent.
2     Q. Well, then, what's the basis for
3  describing this as Abbott's intent and view?
4     MS. CITERA: Same objections.
5  BY MS. ST. PETER-GRIFFITH:
6     Q. Let me ask the question a different way.
7  From Abbott's intentions and viewpoint, from what's
8  set forth in this memorandum, did it believe that
9  its Home Infusion Services program was in
10 compliance with Medicare and Medicaid fraud and
11 abuse laws?
12    MS. CITERA: Same objections.
13 BY THE WITNESS:
14    A. Did it believe? I believe this document
15 reflects Abbott's understanding of the law.
16    Q. Okay. And what is the bases for Abbott's
17 understanding of the law set forth in this
18 memorandum?
19    MS. CITERA: Same objections.
20 BY THE WITNESS:
21    A. Any basis on that would have been a
22 discussion with legal counsel, which would have

585

1  been a privileged communication.
2     Q. Which -- When was the communication?
3     A. Prior to whenever this document was
4  created, but I don't know when. I don't know when
5  the document was created.
6     Q. And who was -- who was the legal counsel
7  in D. C.?
8     A. To my knowledge, it was Hogan & Hartson.
9     Q. Who at Hogan & Hartson?
10    A. The same woman I said before, Liz Dunst.
11 I don't think that's D U N C E.
12    Q. I think it might be D U N S T, actually.
13    MS. CITERA: S T.
14    MS. ST. PETER-GRIFFITH: We can move on to the
15 next document.
16       (Exhibit Fishman 015
17       marked as requested.)
18 BY MS. ST. PETER-GRIFFITH:
19    Q. Sir, I'm going to focus on Page 2 of this
20 document. And primarily just at the top, but feel
21 free to take your time.
22    A. Okay.

586

1     Q. Okay. Sir, do you recognize this
2  document?
3     A. I do not.
4     Q. Okay. It appears on the front page to be
5  to Kathy Riddle from James Albrecht. Is that the
6  attorney that we discussed before?
7     A. Right. On 5/15/1990.
8     Q. 1990. And then the contract structure
9  options on Page 2, do you see that?
10    A. I do.
11    Q. Okay. It appears to be a -- at least a
12 -- I am not a transactional lawyer as you are, Mr.
13 -- so I don't want to identify this as a term
14 sheet. But at least it is -- it identifies options
15 for a fee-for-service arrangement with Healthcare
16 Services of New England. Do you see that?
17    A. I do.
18    Q. Okay.
19    A. Was there a question or just --
20    Q. No, I just wanted to confirm. Is that
21 your --
22    A. I wouldn't describe it as a term sheet,

58  (Pages 587 to 590)

---

**587**

1   no.
2       Q.  What would you describe it as?
3       A.  It looks like it could be kind of a
4   cafeteria-style statement of items that could serve
5   as a basis for a contractual relationship.
6       Q.  Okay.  The first --
7       A.  I don't know -- I don't know that this
8   was provided to Healthcare Services or whether this
9   was purely an internal evaluation between Abbott
10  counsel and Home Infusion.
11      Q.  Okay.  Well, do you know -- did Abbott
12  ever enter into a contract with Health Services of
13  New England?
14      A.  I have no idea.
15      MS. CITERA:  Objection to form.
16  BY THE WITNESS:
17      A.  Sorry.  I have no idea.
18      Q.  The first item at the top says, "Abbott
19  accepts assignment of benefits on patients."  Do
20  you see that?
21      A.  I do.
22      Q.  What does that mean?

---

**588**

1       MS. CITERA:  Object to the form, outside the
2   scope.
3   BY THE WITNESS:
4       A.  My understanding of those terms is that
5   Abbott would -- would bill on behalf of the
6   patients and take payment.
7       Q.  Under Abbott's own provider number?
8       MS. CITERA:  Objection to form, outside the
9   scope.
10  BY THE WITNESS:
11      A.  I don't know about under its own provider
12  number.  But, I mean, this also doesn't talk about
13  Medicare patients.  This talks about patients
14  generally.
15      Q.  Okay.  Well, would that be -- would it be
16  a problem for Medicare and Medicaid compliance if
17  Abbott accepted assignments of benefits on patients
18  of its -- patients who are treated by its
19  revenue-share partners or Home Infusion clients?
20      MS. CITERA:  Object to the form, outside the
21  scope.
22  BY THE WITNESS:

---

**589**

1       A.  I believe you're asking me to reach a
2   legal conclusion.
3       Q.  Well, I want to know whether it was
4   Abbott's understanding that it could engage in that
5   practice and still comply with federal and state
6   law.
7       MS. CITERA:  Object to the form, outside the
8   scope.
9   BY THE WITNESS:
10      A.  You're asking me to reach a legal
11  conclusion.
12      Q.  Was it permissible -- Let me ask you
13  this: Did Abbott engage in this conduct where it
14  accepted assignment of benefits on behalf of its
15  Home Infusion customers' patients?
16      MS. CITERA:  Object to the form, outside the
17  scope.
18  BY THE WITNESS:
19      A.  I've stated previously that, to my
20  knowledge, we did not.  This first bullet point
21  suggests otherwise.
22      Q.  Would that be a problem for Abbott?

---

**590**

1       MS. CITERA:  Object to the form, outside the
2   scope.
3   BY THE WITNESS:
4       A.  You're asking me to reach a legal
5   conclusion.
6       Q.  No, I'm just asking generally, would that
7   be a problem for Abbott?
8       MS. CITERA:  Same objections.
9   BY THE WITNESS:
10      A.  Problem -- Again, "problem" is, did they
11  have the space to do the work?  "Problem" is too
12  broad of a term for me to adequately answer that
13  question.
14      Q.  Okay.  Let me ask it this way:  You've
15  testified repeatedly and we've looked at a number
16  of documents that maintained that Abbott -- Abbott
17  personnel, including within their Home Infusion
18  unit, were required to comply with all federal and
19  state Medicare and Medicaid fraud and abuse laws?
20      A.  Yes.
21      Q.  If Abbott accepts assignment of benefits
22  on patients, could its Home Infusion reimbursement

---

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

59 (Pages 591 to 594)

591

1    employees do that?
2         MS. CITERA: Object to the form, outside the
3    scope.
4    BY THE WITNESS:
5         A. The response to that requires a legal
6    conclusion.
7         Q. How so?
8         A. Because it's the same -- it's the same
9    question worded differently in the last two times,
10   which is you've given me a fact pattern, which is
11   Abbott is accepting assignment of benefits on
12   patients, and does that -- does that adhere -- does
13   -- the employee that allows that, are they
14   complying with the law; if Abbott does it, are they
15   complying with the law. Whomever the party is in
16   between, you're asking me to evaluate a set of
17   facts against the terms of the healthcare
18   compliance laws and reach a conclusion as to
19   whether or not they've been violated or whether the
20   acts are in compliance with it, which is a legal
21   conclusion.
22        Q. Well, set aside legal conclusion. How

592

1    about just Abbott's policy you needed to comply
2    with the law?
3         MS. CITERA: Same objections.
4    BY THE WITNESS:
5         A. But the policy is predicated on complying
6    with the law. So if I said it didn't -- it did or
7    didn't adhere to the policy, I'd be reaching a
8    legal conclusion that the law -- that the act was
9    in compliance or not in compliance. So the bottom
10   line is, you're evaluating the underlying act in
11   relationship to a set of laws. And that's -- to
12   reach a conclusion, you're reaching a legal
13   conclusion.
14        Q. Did Abbott do any kind of evaluation as
15   to whether if it entered into arrangements whereby
16   Abbott would accept the assignment of benefits on
17   behalf of its Home Infusion clients' patients --
18   Strike that.
19            If Abbott entered into these types of
20   arrangements where it accepted assignment of
21   benefits on behalf of its Home Infusion clients'
22   patients, did it -- did Abbott consider or evaluate

593

1    whether or not it would comply with federal and
2    state Medicare and Medicaid fraud and abuse laws?
3         MS. CITERA: Same objection. I'm also going
4    to caution you not to reveal any privileged
5    communications or analysis.
6    BY THE WITNESS:
7         A. I don't know if they did because until
8    this -- I saw this document with this first bullet,
9    I was not aware that Abbott was directly accepting
10   assignment of benefits.
11        Q. Okay. Are you aware of any other
12   evaluations or compliance initiatives to monitor
13   what billing Abbott did utilizing its provider
14   number?
15        MS. CITERA: Object to the form.
16   BY MS. ST. PETER-GRIFFITH:
17        Q. And when I say "its," I mean Abbott's own
18   provider number.
19        MS. CITERA: Object to the form.
20   BY THE WITNESS:
21        A. Same answer, which is to answer that, I
22   had to know that they were using their own number,

594

1    meaning they were accepting assignment of benefits
2    and billing under its own name, which I, until at
3    least until the first bullet, I wasn't aware of.
4    The second bullet doesn't necessarily reach that
5    same conclusion.
6         Q. Okay. Well, I'm not asking about
7    necessarily the second bullet. I'm just asking
8    whether Abbott did any kind of evaluation regarding
9    how the Home Infusion reimbursement department
10   utilized Abbott's own provider number?
11        A. I don't know the answer to that.
12        Q. Okay. Do you see under the -- under --
13   hold on -- the seventh bullet point down, the
14   seventh little O down, do you see that?
15        A. "Healthcare Services of New England
16   assumes"?
17        Q. Yes. Oh, I'm sorry, no, eighth bullet
18   point down, "Abbott pays Healthcare Services of New
19   England a management fee of 2 percent of the net
20   revenue collected."
21        A. Yes.
22        Q. Did Abbott undertake any kind of

30(b)(6) Abbott (Fishman, David) - Vol II                     March 20, 2008
Chicago, IL

60  (Pages 595 to 598)

---

595

1    evaluation whether or not the payment of a
2    management fee to its Home Infusion clients or
3    revenue-share partners complied with federal and
4    state Medicare and Medicaid fraud and abuse
5    statutes?
6        MS. CITERA: Object to the form.  I also
7    caution you not to reveal any privileged
8    communications or analysis.
9    BY THE WITNESS:
10       A.  I don't know.  This is 1990 time frame as
11   well, right?
12       Q.  Right, it is.  It's early on.
13       A.  Okay.
14           (Exhibit Fishman 016
15           marked as requested.)
16   BY MS. ST. PETER-GRIFFITH:
17       Q.  Sir, do you recognize this document?
18       A.  Nope.  No, I do not.
19       Q.  It appears to be a personal and
20   confidential memorandum to Dave Brincks from Jeff
21   Shaw.  Do you see that?
22       A.  I do.

---

596

1        Q.  Who is Mr. Shaw --
2        A.  In 19- -- Abbott employee, or I assume in
3    1993 he was an Abbott employee.  I did not know
4    Jeff in 1993 to know what his position was.  I knew
5    him much later when he was in AHD.
6        Q.  Do you see that this pertains to Leahy
7    Clinic and an inquiry from Carol McCarthy; do you
8    see that?
9        A.  I do.
10       Q.  Do you know who Carol McCarthy is?
11       A.  I do not.  And quite honestly, I was
12   wondering if she was an Abbott person or Leahy
13   Clinic person.
14       Q.  That's part of the reason why I asked the
15   question.  The -- Jeff Shaw at the end of the first
16   paragraph says, "I expressed to Carol my personal
17   reservations regarding this request" and the
18   enumerated request is a request, do you see, it's
19   seeking a memorandum from an Abbott attorney
20   stating that in his or her judgment Abbott's
21   revenue-share structure for Home Infusion service
22   was not in violation of Medicare Safe Harbors.  Do

---

597

1    you see that?
2        A.  Yes, I do.
3        Q.  Now, Mr. Shaw, the memo indicates, agreed
4    to make an inquiry of Brian Taylor.  Do you see
5    that?
6        A.  I do.
7        Q.  Did you discuss with -- this issue with
8    Mr. Taylor?
9        A.  I did not.
10       Q.  The third-to-the-last paragraph reads,
11   "Brian said that Carol should tell the client that
12   Abbott legal counsel is comfortable with the
13   legality of these relationships."  Do you see that?
14       A.  I do.
15       Q.  What is the basis for asserting that
16   Abbott's legal counsel is comfortable with the
17   legality of these relationships?
18       MS. CITERA:  Objection to the form, outside
19   the scope, and also counsel you not to reveal any
20   privileged conversations or analysis.
21   BY THE WITNESS:
22       A.  I don't know specifically in 199- -- July

---

598

1    of 1993 what the basis of that was.  This
2    post-dates the inquiry made previously to the
3    Washington law -- or the Hogan & Hartson -- I think
4    it predates.  If I recall the Ingalls communication
5    was in '92.  So sometime in '92, an inquiry was
6    made to discuss with legal counsel -- outside legal
7    counsel about relationships generally.  I don't
8    know if that served as further foundation for that
9    or not.
10       Q.  You anticipated one of my next questions,
11   which is, do you know which legal counsel is being
12   referenced here?  Is it outside legal counsel, or
13   is it in-house?
14       A.  Abbott legal counsel would be in-house.
15       Q.  Okay.
16       A.  My use of that term, I would not describe
17   an outside attorney as Abbott legal counsel.  I
18   don't know how Jeff was using those terms, if he --
19   as a non-lawyer, he could have used it, you know,
20   all lawyers are the same, kind of interchangeably.
21   I would not interpret that, but I don't know what
22   he meant.

---

30(b)(6) Abbott (Fishman, David) - Vol II                March 20, 2008
Chicago, IL

61  (Pages 599 to 602)

<table>
<tr><td>

599

1    MS. ST. PETER-GRIFFITH: We have less than
2  five minutes left on the tape. I'm done with this
3  document. Why don't we take a break.
4       THE VIDEOGRAPHER: Going off the record at
5  2:15 p.m.
6            (A short break was had.)
7            (Exhibit Fishman 017
8            marked as requested.)
9       THE VIDEOGRAPHER: Beginning of Videotape No.
10  5, the deposition of Mr. Fishman. We're back on
11  the record at 2:29 p.m.
12  BY THE WITNESS:
13    A.  They look like they're both the same
14  document.
15    Q.  Oh, yes, they are. I'm sorry. I think
16  that -- I'm only interested in the first page.
17    A.  Oh, I'm sorry. I should keep both of
18  them?
19    Q.  Because they're two different versions
20  the same --
21    A.  One is a copy, one is the sendee.
22    Q.  Correct.

</td><td>

601

1       MS. CITERA: Table this. I'm going to send
2  this email.
3       THE WITNESS: Give it back?
4       MS. ST. PETER-GRIFFITH: Hold it in front of
5  you because it's already been marked, but we will
6  --
7            (Exhibit Fishman 018
8            marked as requested.)
9       MS. ST. PETER-GRIFFITH: I believe, Toni, that
10  those are the only two versions that we found of
11  that document.
12       MS. CITERA: Okay.
13  BY THE WITNESS:
14    A.  I'm assuming you would like me to read
15  this?
16    Q.  Yes, please. Yes. That will give Toni
17  time to text, too.
18       MS. CITERA: I'm done typing, so ... Are we
19  on?
20       MS. ST. PETER-GRIFFITH: Yes.
21       MS. CITERA: Sorry.
22       MS. ST. PETER-GRIFFITH: That's Exhibit 18,

</td></tr>
<tr><td>

600

1       MS. CITERA: You know, this to me seems to be
2  privileged. And so I'm just wondering if -- I
3  don't know why it was produced.
4       MS. ST. PETER-GRIFFITH: Do you want -- Do you
5  want to make an inquiry, and I'll defer it to a
6  later point in time?
7       MS. CITERA: Sure. Has this been used as an
8  exhibit in another deposition? Can you tell me
9  that?
10       MS. ST. PETER-GRIFFITH: I don't think so
11  because I'm pretty sure the only person we would
12  have used it for would have been Tobiason, and this
13  wasn't produced then. We didn't have this
14  production then. I'm assuming, Toni, that Gorman
15  -- I know Riddle is internal. Is Gorman internal
16  as well?
17       THE WITNESS: Yes.
18       MS. ST. PETER-GRIFFITH: I'm assuming by the number, yeah.
19       THE WITNESS: Yes, he's an internal -- he was
20  an internal Abbott person.
21       MS. ST. PETER-GRIFFITH: Okay. We can -- why
22  don't we --

</td><td>

602

1  Toni.
2  BY THE WITNESS:
3    A.  Okay.
4    Q.  Sir, Exhibit 18, is a May 19th, 1993
5  letter from Christopher Herden, Contract Marketing
6  analyst, within Abbott Home Infusion to Gerald
7  Clouse, executive director of Kettering Healthcare.
8  Do you see that?
9    A.  I do.
10    Q.  In the general -- We're not necessarily
11  going to go line by line of this letter. But the
12  general substance of the letter seems to be that
13  Midwest Home Infusion Services has a concern about
14  -- or apparently raised by Midwest legal counsel's
15  concern about percentage of collections and the
16  possible implication under Safe Harbor rules. Do
17  you see that in the second paragraph?
18    A.  I do.
19    Q.  The next -- First of all, approximately
20  how many of Abbott's Home Infusion partners raised
21  concerns about the legality or the compliance
22  implications of the percentage of collection

</td></tr>
</table>

30(b)(6) Abbott (Fishman, David) - Vol II                     March 20, 2008

Chicago, IL

62 (Pages 603 to 606)

---

603

1   arrangements?
2       A.  I don't know.
3       MS. CITERA:  Object to the form, outside the
4   scope.
5       THE WITNESS:  Sorry.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  The second sentence in that second
8   paragraph reads, "Although Abbott is very
9   comfortable with the structure of a percentage of
10  collections agreement, Abbott nonetheless was
11  willing to modify our agreement to follow a
12  fee-for-service approach as requested by Midwest
13  counsel."  Do you see that?
14      A.  I do.
15      Q.  What's the difference between a
16  percentage of collection and fee-for-service
17  approach?
18      MS. CITERA:  Object to form, outside the
19  scope.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  Well, let me ask it this way:  Is
22  fee-for-service a particular type of arrangement

---

604

1   that Abbott Home Infusion was willing to offer to
2   customers?
3       MS. CITERA:  Same objections.
4       THE WITNESS:  I'm sorry.  Did you get your
5   objection?
6       MS. CITERA:  She got it.
7   BY THE WITNESS:
8       A.  Okay.  I don't have personal knowledge.
9   The term "fee-for-service" suggests that a payment,
10  there's a negotiated payment for a -- for a service
11  provided.
12      Q.  Okay.  Going back to when we earlier on
13  in the day discussed your understanding of the
14  different structures, would that be the type of
15  arrangement which you indicated was one of the
16  possible Home Infusion arrangements whereby the
17  customer would buy the product and then pay for
18  services --
19      MS. CITERA:  Same objections.
20  BY MS. ST. PETER-GRIFFITH:
21      Q.  -- as opposed to receiving it on a
22  consignment basis?

---

605

1       A.  Correct.  I think there might be -- I had
2   provided products and/or services.  This seems to
3   differentiate products versus services.  It looks
4   at the end of this document, they're talking about
5   a product sales agreement, which may mean -- again,
6   I don't know, in this particular instance -- may
7   mean just the sale of products versus a
8   fee-for-service, appears to talk about payment for
9   services.
10      Q.  Okay.
11      A.  And I suppose you could have four, you
12  know, just fees, just products, just services, or
13  both.
14      Q.  Got you.
15      A.  And the other one, and the percentage of
16  collections.
17      Q.  In terms of this second sentence where it
18  says although Abbott was very comfortable with the
19  structure of a fee-for -- or percentage of
20  collections agreement, other than what you've
21  testified today, do you understand why Abbott was
22  very comfortable with the percentage of collections

---

606

1   agreements?  And if you want to rely upon your
2   prior testimony, that's fine.
3       MS. CITERA:  Objection to form, outside the
4   scope.
5   BY THE WITNESS:
6       A.  I don't have anything to add to my prior
7   testimony.
8       Q.  Okay.
9           (Exhibit Fishman 019
10          marked as requested.)
11      MS. CITERA:  I'm sorry.  I'm going to have to
12  do the same thing.  I don't understand why this was
13  produced.  I'm going to have to ask about it.
14  We're going to have to table it as well.
15      MS. ST. PETER-GRIFFITH:  Okay.  Toni, I just
16  want to point out that -- just the -- its Bates
17  numbers are sequential.  So I believe this may have
18  been the memorandum that was sent out to Gerald
19  Clouse, or at least this set is sequential.
20      MS. CITERA:  Yeah, I understand what you're
21  saying. 18 and 19?
22      MS. ST. PETER-GRIFFITH:  Yeah.

---

30(b)(6) Abbott (Fishman, David) - Vol II                    March 20, 2008
Chicago, IL

67 (Pages 623 to 626)

623

1    A.  I don't know.
2    Q.  If you could look under Item 2 on the
3  second page, do you see where it says, "The broader
4  program investments"?
5    A.  Footnote 2?
6    Q.  No, no, no I'm sorry.  Under -- In the
7  first paragraph, continuing from the last page --
8    A.  Oh, okay, "The case-by-case mix" --
9    Q.  "Mix of products and services makes
10  establishing separate charges administratively
11  difficult."  Do you see that?
12    A.  I do.
13    Q.  Is that a reason why Abbott did not
14  provide a separate breakout of charges for its
15  consigned products and its services to demonstrate
16  the fair market value for those products and
17  services?
18    MS. CITERA:  Objection to the form, outside
19  the scope.  And I caution you not to reveal any
20  privileged communications or analysis.
21  BY THE WITNESS:
22    A.  Based on the language that Mr. Taylor

624

1  provided, there's no correlation between that
2  explanation and not providing fair market value.
3    Q.  Okay.  But, I mean, you see that Mr.
4  Taylor's providing -- appears to be providing a
5  reason why Abbott does not break out separate
6  charges for product and services, is that fair, in
7  that paragraph?
8    MS. CITERA:  Object to the form, outside the
9  scope.
10  BY THE WITNESS:
11    A.  I believe the words state that we avoid
12  breaking out because of 1 and 2.
13    Q.  Okay.  Are those Abbott's -- Are those
14  two reasons the reasons why Abbott does not break
15  out the fair market value of services and the cost
16  of services and products to its consignment
17  partners?
18    MS. CITERA:  Objection to the form, outside
19  the scope, same caution regarding privilege.
20  BY THE WITNESS:
21    A.  I don't -- Again, I don't believe the
22  language addresses in the context of providing or

625

1  not providing fair market value information.
2    Q.  Well, I understand.  But it says, "We
3  avoid breaking out separate charges."  What charges
4  does Abbott avoid breaking out?
5    MS. CITERA:  Same objections and caution.
6  BY THE WITNESS:
7    A.  Not having written this, it would be the
8  charges associated with providing products and
9  services.
10    Q.  Okay.  And from the Gardner Carton
11  opinion before, we learned that it was important
12  for purposes of demonstrating Medicare and Medicaid
13  compliance to be able to demonstrate the fair
14  market value for services and product; is that
15  fair?
16    MS. CITERA:  Object to the form, outside the
17  scope.
18  BY THE WITNESS:
19    A.  In this whole line of question, I guess I
20  would look at the penultimate paragraph to respond
21  to your questions.
22    Q.  Okay.  The penultimate paragraph meaning

626

1  the one in the prior exhibit concerning --
2    A.  No, the penultimate paragraph on Exhibit
3  19.
4    Q.  Okay.
5    A.  "Finally."
6    Q.  Okay.  It says, "Finally, if there be any
7  concern of ensuring compliance with Medicare laws
8  from a cost reporting standpoint, we are always
9  willing to assist clients in providing any
10  information needed to prepare accurate cost
11  reports."
12    A.  Correct.
13    Q.  What does cost reporting have to do --
14  Well, let me ask you this:  What information did
15  Abbott Home Infusion provide to its clients to
16  assist them in preparing accurate cost reports?
17    MS. CITERA:  Objection to the form, outside
18  the scope.
19  BY THE WITNESS:
20    A.  I don't know that they were ever asked to
21  provide; and if they were asked to provide, what
22  they arguably would have provided would have been

**ABBOTT**

Abbott Laboratories
One Abbott Park Road
Abbott Park, Illinois 60064-3500


April 2, 1990


Robert W. Mulcahey
Vice President for
  Corporate Affairs
Ingalls Health System
One Ingalls Drive
Harvey, Illinois  60426

Dear Mr. Mulcahey:

Several weeks ago we discussed by phone the proposed joint home infusion
therapy agreement between Ingalls and Abbott.  Previous to that, Kathy Riddle
of Abbott HomeCare mentioned to you a legal opinion we received from Gardner,
Carton and Douglas regarding Medicare fraud and abuse.

As I suspected, the opinion she referred to dealt with a number of aspects of
the fraud and abuse statute and was specific to other Abbott customers and
contracts.  Therefore, we don't think it is appropriate to release the opinion
to Ingalls.  However, Ms. Riddle asked that I provide to you the following
quote from the Gardner, Carton memorandum regarding proposed contract
relationships.

> "It should be noted that contracts in which the provider, not Abbott,
> accepts assignment and then pays Abbott for goods and services according to
> a fixed fee schedule will be unlikely to be found to violate the Medicare
> anti-fraud and abuse laws.  This statement assumes that Abbott charges each
> provider an amount which reflects <u>fair market value</u> for the goods and
> services rendered.
> It is important to recall that any unreasonbly deep discount offered
> by Abbott would indicate a lack of arm's-length negotiation and could cause
> further scrutiny of the arrangement."

You may find the above helpful in evaluating the proposed contract between
Ingalls and Abbott.  If you wish to discuss this matter further, feel free to
call at (708) 937-5202.

Very truly yours,



James L. Albrecht
Senior Attorney

JLA/ksa
cc: K. Riddle

(01-3948y-43)



Fishman
DEPOSITION
EXHIBIT
13
3-20-08   RG
PENGAD 800-631-6989

Confidential

ABT-DOJ 316016
ABT278-6013 FL

> ### *Abbott's Home Infusion Services Program and Medicare Law*

Abbott's Home Infusion Services program is capable of providing a broad range of services and products in support of a client's home infusion therapy operation. Abbott has invested significant funds and resources to develop a comprehensive program we believe to be of superior quality and competitively priced in the market.

Abbott is compensated for the services and products it provides through payment of a percentage of collections made by the client. The percentage is negotiated through arms' length discussions and is based upon the various services and products Abbott may be asked to provide the client.

In a few instances, Abbott has been asked whether this percentage-of-collections approach is consistent with the Medicare laws and safe harbors. Abbott believes this percentage approach is sound under the law. Abbott has also reviewed this approach with outside legal counsel in Washington, D.C., who concurs with Abbott's view. Medicare safe harbors do not provide automatic protections for all percentage arrangements, nor do they declare that percentage arrangements are improper[1]. Instead, the safe harbors provide that, even though the large majority of percentage arrangements may represent legitimate compensation to a supplier, a percentage arrangement is inappropriate if it is intended as a disguise for the payment for patient referrals.

The percentage compensation negotiated by Abbott is wholly attributable to the delivery of services and products to the client, and the percentage-of-collections retained by the client is wholly attributable to the client's responsibilities under its home infusion therapy operation. No part of the percentage retained by the client is intended as a payment or reward for any business referral. Again, the percentage rate charged by Abbott is a competitive one, falling within a reasonable commercial range, but it does not take into account any value of any business referral. There is no requirement that any level of Abbott products be used in the client's operation.

Abbott has used a percentage-of-collections approach in our home infusion services contracts for a number of reasons. First, in an uncertain environment of collection of payments, this approach fosters a sense of partnership and commitment between companies through a sharing of risk. It lets the prospective client know Abbott is prepared to accept a portion of the risk of non-payment. Second, Abbott invests significant funds and efforts in establishing a comprehensive program offered to clients. The products and services are combined in an aggregate percentage charge by therapy because (1) the broader program investments (e.g., facility equipment, inventory) and services (e.g., facility design services) provided initially by Abbott represent substantial expenditures some clients would find very difficult to manage if they had to bear them up-front, and (2) the case-by-case mix of products and services makes establishing separate charges administratively difficult (and more expensive)[2].

While not a legal opinion for your organization, we hope this explanation of Abbott's intent and view is helpful.

---

[1] Notably, the Internal Revenue Service has issued guidelines expressly providing a safe harbor under the 501(c)(3) tax-exempt entity laws for percentage arrangements between non-profit hospitals and for-profit physician groups. *See* I.R.S. Rev. Proc. 93-19.

[2] Medicare-covered patients generally constitute less than fifteen percent (15%) of the patients on home infusion therapy. The structure of Abbott's proposal is not driven by Medicare business. The Medicare portion is incidental to the home infusion business and plays no real part in Abbott's desire to use a percentage-of-collections arrangement.

5/22/98



Fishman
**DEPOSITION**
**EXHIBIT**
14
3-20-08   RG

Confidential

ABT-DOJ 351271
ABT282-2828   FL

# ABBOTT

Office of
General Counsel

Abbott Laboratories
One Abbott Park Road
Abbott Park, Illinois  60064-3500
Telecopy No.:  (708) 937-9556

## FACSIMILE TELECOPY COVER SHEET

DATE: _5/15_

TO: _Kathy Riddle_

COMPANY: _Abbott HomeCare_

FROM: _Dennis Albrecht_

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET): _2_

PHONE NUMBER OF TELECOPY MACHINE: _70484_

** IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL AS SOON AS POSSIBLE --

(708) _937-5202_
      (Kim Andersen)

(1948y-24)



Fishman
**DEPOSITION**
**EXHIBIT**
15
3-20-08  PG

Confidential

ABT-DOJ 335485
ABT281-1490 FL

CONTRACT STRUCTURE OPTIONS

Health Care Services of New England
Braintree, Massachusettes

FEE-FOR-SERVICE

o   Abbott accepts Assignment of Benefits on patients.

o   Abbott provides all Reimbursement screening, billing and collection
    services.

o   Customer may elect to provide some or all of the following services to
    their patients:
    - Patient training
    - In-home follow-up nursing
    - Product compounding according to patient prescriptions
    - Delivery of compounded products and supplies to patient's home
    - Home inventory management of patient's supplies
    - Clinical Management services

o   Abbott provides back-up to customer on services listed above, on an as
    needed basis.

o   Abbott provides the products, supplies and equipment utilized by the
    Homecare patient.

o   Abbott pays customer for services provided as illustrated in Exhibit A.

o   Health Care Services of New England assumes responsibility for
    marketing and managing contracts to group member hospitals.

o   Abbott pays Health Care Services of New England a management fee of
    two percent (2%) of net revenue collected.

o   Health Care Services of New England will comply with the disclosure
    requirements of the Medicaid-Medicare Antifraud and Abuse Amendments
    of 1977, As Amended.  This disclosure shall include, among other
    things, reporting all management fees paid to Health Care Services of
    New England.

o   Abbott and Health Care Services of New England agree to mutually
    review and approve all contract proposals between Health Care Services
    of New England and Member Hospitals, prior to contract submission.

o   Abbott reserves the right to not accept a patient based on the
    patient's reimbursement profile for the stated diagnosis and intended
    treatment.

1081D/1

Confidential

ABT-DOJ 335486
ABT281-1491 F

HEALTH CARE SERVICES OF NEW ENGLAND
Braintree, Massachusettes

SCHEDULE OF FEE

FEE-FOR-SERVICE CONTRACT OPTION

FEES PAID TO ACCOUNT FOR SERVICES PERFORMED[1]:

| SERVICES | TPN | TEN | ANTI | CHEMO |
|---|---|---|---|---|
| Patient Training | $500.00[2]/patient | $200.00/patient | $100.00/patient | $150.00/patient |
| In-home Follow-up Nursing[4] | $ 3.50/day | $ 2.50/day | $ 20.00/day[3] | $ 2.50/day |
| Clinical Management[5] | $ 3.75/day | $ 2.00/day | $ 3.00/day | $ 2.50/day |
| Compounding[6] | $ 30.00[7] | N/A | $ 5.00/dose | $ 8.00/dose |
| Delivery/Inventory Management | $ 7.00/day | $ 1.75/day | $ 7.00/day | $ 7.00/day |

1. "Day" refers to the number of days a patient actually administers the therapy.

2. Training fee for pre-mix patient; self-mix would be $750.

3. Nursing fee for peripheral vein only, central line fee would be $8.00/day.

4. If the customer cannot bill third party payors directly, Abbott would reimburse the customer while in-home nursing follow-up continues to be required. Appropriate documentation of patient contact must be provided.

5. Includes review of pertinent clinical data and adjustment of therapy as needed. Abbott would reimburse the customer as long as these services are required.

6. In assuming responsibility for Compounding, the Customer must also provide ancillary supplies and perform Delivery and Inventory Management.

7. Compounding fee for up to 1 liter; up to 2 liters would be $35.00; compounding fee for over 2 liters would be $40.00.

Confidential

ABT-DOJ 335487
ABT281-1492 L

**PERSONAL AND CONFIDENTIAL**

TO: DAVE BRINCES

FROM: JEFF SHAW

SUBJECT: LEAHY CLINIC

On Tuesday, July 27, 1993 at approximately 11:45 AM I received a telephone call from Carol McCarthy regarding a request from a client (Leahy Clinic). The request was for a memorandum from an Abbott attorney stating that in his/her judgment, Abbott's revenue share structure for home infusion services agreements was not in violation of Medicare safe harbor regulations (i.e. that these arrangements were legal). I expressed to Carol my personal reservations regarding this request, but agreed to make an inquiry to Brian Taylor.

Brian expressed his desire not to provide such written judgments to non-Abbott parties for the following reasons:

　　　　1. Abbott attorneys act as counsel for Abbott not our potential clients or other third parties.

　　　　2. Clients should obtain legal opinions/advise from their own legal counsels. As Abbott could become a party to negotiations with Leahy Clinic, such attempts to provide legal advise could clearly give the appearance of a conflict of interest.

　　　　3. Such written judgments could be construed by outside (governmental) bodies as a marketing/sales tool, thus discouraging prospective clients from performing their own due diligence with regard to the legality of contracts and business arrangements (i.e. a "red flag" regarding these arrangements).

Brian said that Carol could tell the client that Abbott legal counsel is comfortable with the legality of these relationships; and that we currently a party to several of them. However it is best for all involved to consult with their own attorneys on these types of issues. I conveyed these comments to Carol.

Carol then expressed her frustration with this response and "offered" to provide the client with a written memorandum herself. I conveyed my strong recommendation that she not do that. After repeating her suggestion, I again counseled strongly against it. The situation then seemed to cool down a bit.

I have since left Carol a Voice Com stating that you may be able to provide her with a lead which may help to satisfy her clients request, while preserving Brian's wishes that we not engage in this practice.



Jeff,
Good job on this.
Keep me posted on this, and/or if
you feel I should get involved.

Dave
7/29



Fishman
DEPOSITION
EXHIBIT
16
3-20-09    26

ABT-DOJ 307075
ABT274-4555     FL



**ABBOTT**

*Home*
*Infusion*
*Services*

One Abbott Park Road
Abbott Park  Il   60064

May 19, 1993

Mr. Gerald M. Clouse, R.Ph., M.A.
Executive Director
Kettering Health Care, Inc.
1259 E. Dorothy Lane
Kettering, OH  45419

Dear Mr. Clouse:

We are writing to you to express, first and foremost, Abbott's ongoing
commitment to support Midwest Home Infusion Services. We believe you have
been pleased with the quality of support we have provided in the past and which
we continue to provide today. In looking to the future, however, we are
increasingly concerned about the difficulties we have encountered in working to
revise our agreement with Midwest.

As you'll recall, Midwest requested that our current agreement be revised due to
your legal counsel's concerns surrounding a "percentage of collections"
agreement and its possible implications under the safe harbor rules. Although
Abbott was very comfortable with the structure of a "percentage of collections"
agreement, Abbott nonetheless was willing to modify the agreement to follow a
"fee-for-service" approach as requested by Midwest's counsel. Midwest's
counsel drafted and sent us a proposed "fee-for-service" agreement. We
reviewed and responded in line with the parameters of that proposal. We are
now informed, however, that the proposed "fee-for-service" structure is no longer
acceptable to your outside counsel.

I asked Brian Taylor, from Abbott's legal department, to give me some
background on both "percentage of collections" and "fee-for-service"
agreements. A copy of his memo is enclosed. You will see that Abbott Home
Infusion Services has signed a number of agreements with clients across the
country. The forms of these agreements, which include both  structures, have
been subjected to legal review by both Abbott's counsel and client's counsel.



Fishman
DEPOSITION
EXHIBIT
18
3-20-08   RG

PENGAD 800-631-6989

ABT-DOJ 340984
ABT283-0539     F

Mr. Gerald M. Clouse, R.Ph., M.A.
May 19, 1993
Page 2.

Abbott has attempted in good faith to address the concerns put forth to us by
your outside counsel. Despite our efforts and the fact that there has been no
successful legal challenge to this type of agreement, we are potentially being
forced to withdraw valuable services from Midwest's program. We do not desire
this result, nor do we believe that it is in your best interests.

We remain optimistic that agreement and compromise will be reached.
However, in proceeding with our discussions, it may be helpful to remember
some of the special services Abbott provides to Midwest - services which
Midwest would have to assume or replace if our relationship were ever to
terminate. As examples, Abbott currently provides all of your non-Abbott
products, all reimbursement services, access to our proprietary home infusion
software system, computer hardware to access the system, product support, and
product/nursing in-services upon request. Although Abbott could partially
support midwest with a Product Sales Agreement should Midwest take over
those special activities, the terms of a Product Sales Agreement are typically
more restrictive (e.g., 30-day payment terms and no nursing/therapy in-service).

Mr. Clouse, our relationship with you, your organization, and program has
developed significantly over the years through the hard work of both parties. We
are and will continue to work very hard to reach an agreement that maintains a
solid relationship between Midwest Home Infusion Services and Abbott Home
Infusion Services. I hope that we can resolve this matter quickly and move
forward with our business.

Thank you for your time and attention to this situation. If you have any
questions, please do not hesitate to contact me at (708) 937-1774.

Sincerely,

Christopher W. Herden
Contract Marketing Analyst

cc: Barry Stegall
bcc: Tom Olinger
      Craig George
Enc.  David Brindts
      Bill Purp

Herden/lbr.doc

Confidential

ABT-DOJ 340985
ABT283-0540      L

 **ABBOTT**

FROM:   OFFICE OF GENERAL COUNSEL

**INTEROFFICE  CORRESPONDENCE**

DEPT. NO. 322,  BLDG. AP6D,  EXT.  75202

TO:   C. Herden                                   DATE:  May 18, 1993

RE:   Midwest Home Infusion Services

You asked for my thoughts concerning Kettering/Midwest's request for revision of the
Home Infusion Services Agreement.  As you know, the Agreement is currently
structured for Abbott to provide a range of products and services in support of Midwest's
home care program, in return for which Midwest pays us a percentage of collections.
Midwest requested the Agreement be revised to move away from a percentage of
collections arrangement.  Despite our position that a percentage arrangement is both
legally sound and more sensible from a business standpoint, we stated our willingness
to convert to a fee-for-service arrangement.  Midwest sent us a proposed fee-for-service
agreement, and we made a few changes we felt were necessary.  Now, however, I
understand Midwest wishes to back away from its own fee-for-service approach.  This
has caused some confusion and frustration.

As background, Abbott has used a percentage of collections approach in a number of
contracts and is comfortable with the legality of this structure.  After the Medicare Safe
Harbors issued in 1991, we had a more complex percentage of collections contract
reviewed by Washington, D.C., counsel specializing in the Medicare area.  Indeed, two
partners who were former senior staff of the Office of Inspector General reviewed the
contract.  They saw no problem with the transaction under the Medicare law.  They
pointed out the Safe Harbors do not restrict percentage arrangements - the Safe Harbors
just do not provide a universal safe harbor for all of them.  The Safe Harbors recognize
percentage arrangements have a place in health care business but, from a concern that
a percentage arrangement could be devised to mask referral payments, the Safe Harbors
require more than a superficial review to substantiate the legitimacy of the percentage
figure.  The attorneys asked questions concerning the elements that went into the
percentage figures and were satisfied with the answers and the rationale for this
approach.[1]

Abbott has used a percentage of collections approach in our home infusion contracts for
a number of reasons.  First, in an uncertain environment of collection of payments, this
approach fosters a sense of partnership and commitment between companies through a
sharing of risk.  It lets the other company know Abbott is prepared to accept a portion of
the risk of non-payment.  Second, Abbott invests significant funds and efforts in
establishing a comprehensive program offered in its entirety to customers, a program
which we believe is of superior quality and competitively priced in the market.  We avoid

---

[1]    I note, incidentally, that the Internal Revenue Service recently issued guidelines
expressly providing a safe harbor under the 501(c)(3) tax-exempt entity laws for percentage
arrangements between non-profit hospitals and for-profit physician groups.  While the IRS is not
the OIG, the IRS has not been known to be one of the more liberal agencies in Washington.

---

Confidential


Fishman
**DEPOSITION
EXHIBIT**
19
03-20-08

ABT-DOJ 340986
ABT283-0541        F

Interoffice Correspondence
May 18, 1993
Page 2

breaking out separate charges because (1) the broader program investments (e.g., facility equipment) and services (e.g., facility design services) provided initially by Abbott represent substantial expenditures some customers would find very difficult to manage if they had to bear them up-front, and (2) the case-by-case mix of products and services makes establishing separate charges administratively difficult (and more expensive!).[2]

While Abbott prefers the percentage of collections approach, we have used and are willing to use a fee-for-service approach. In structuring our fees for products and services, however, we still avoid breaking out separate charges for the same reasons described in the preceding paragraph. Nonetheless, some clients feel this fee-for-service approach represents a more predictable cost structure (although it does eliminate risk sharing).

Finally, if there be any concern of ensuring compliance with the Medicare laws from a cost reporting standpoint, we are always willing to assist our clients in providing any information they need to prepare accurate cost reports.

I hope this background is helpful. Please call me if you have any questions.


Brian S. Taylor
Senior Attorney


BST:ka

---

2       Medicare-covered patients constitute less than fifteen percent (15%) of the patients on home infusion therapy. The structure of Abbott's proposal is not driven by Medicare business. The Medicare portion is incidental to the home infusion business and plays no real part in Abbott's desire to use a percentage of collections or fee for service arrangement.

Confidential



ABBOTT LABORATORIES

CODE OF
BUSINESS
CONDUCT



EXHIBIT No.
Sub# 23
FISHMAN

ABT-DOJ 0395124
Highly Confidential

Dear Colleague:

Please take the time to read this publication, our "Code of Business Conduct," which outlines Abbott's expectations for conducting business in a legal and ethical manner, consistent with our company's high standards.

Since Abbott Laboratories was founded, more than 110 years ago, we've adhered to a set of principles and values, at the center of which is integrity. As we move toward our goal of being the world's premier health care company, it's more important than ever that we maintain our commitment to these principles and to maintaining the integrity of our company.

To avoid any misunderstanding about our expectations, we've provided guidelines that clearly spell out the kinds of activities considered inappropriate for Abbott employees. As you would expect, we have no tolerance for illegal or unethical behavior. Your adherence to these guidelines is essential. You are expected to read the Code, become familiar with its contents and abide by its standards.

We can be proud of the high ethical standards that Abbott has always embodied. Our work as a provider of health care products and services does much good, and our individual conduct must reflect our high purpose as an organization. Our reputation is precious, and each of us must do our part to protect it.

I thank you for helping to uphold the standards and the good name of Abbott Laboratories.

*Miles White*

Miles White
Chairman of the Board and
Chief Executive Officer

ABT-DOJ 0395125
Highly Confidential

# TABLE OF CONTENTS

INTRODUCTION ..............................................................1

COMPLIANCE WITH THE LAW ...........................2

CONFLICTS OF INTEREST ..................................2

CONFIDENTIAL INFORMATION ......................4

GIFTS AND ENTERTAINMENT ...........................5

ACCURACY AND INTEGRITY
OF BOOKS AND RECORDS .................................6

POLITICAL CONTRIBUTIONS ............................7

UNITED STATES GOVERNMENTAL PAYMENTS...........8

FOREIGN GOVERNMENTAL PAYMENTS ...........8

EQUAL EMPLOYMENT OPPORTUNITY/
WORKPLACE HARASSMENT ...........................9

FOOD AND DRUG LAWS .................................10

SAFETY, HEALTH AND ENVIRONMENT ......................11

ANTITRUST LAWS ...........................................11

INSIDER TRADING IN SECURITIES ................12

ELECTRONIC MEDIA USE.................................14

ANTIBOYCOTT, ANTIMONEY LAUNDERING,
EMBARGO AND TRADE CONTROL LAWS ...................15

MEDICARE/MEDICAID FRAUD AND ABUSE LAWS ....16

IMPLEMENTATION OF THE CODE ..................17
    Corporate Compliance Officer .....................17
    Questions Regarding the Code .....................17
    Reporting of Violations ...............................17
    Code Helpline..............................................18
    Investigation of Violations ..........................19
    Discipline for Violations...............................19
    Acknowledgement .......................................20

ABT-DOJ 0395126
Highly Confidential

or exportation of goods, services, or funds or the transfer or disclosure of technology should be thoroughly familiar and comply with these laws.

# MEDICARE/MEDICAID FRAUD & ABUSE LAWS

Corporate Policy #34-14

It is the policy of the Company to comply, and all employees shall comply, with all applicable federal or state fraud and abuse or "anti-kickback" laws and regulations as well as with all applicable provisions of the Federal False Claims Act. The fraud and abuse laws prohibit, among other things, payment or receipt of kickbacks and other forms of improper "remuneration" in return for purchasing, leasing, ordering or recommending the purchase, lease or ordering of any goods, facilities, services or items covered under the benefits of state or federal healthcare programs. Common business practices such as providing discounts, rebates, or services to customers may have potential fraud and abuse law implications if the Company does not document and structure these practices properly. The Federal False Claims Act prohibits submission or causing the submission of fraudulent claims to Medicare and other federal and state programs. Employees should consult the Legal Division for an overview of these laws.



# IMPLEMENTATION OF THE CODE

Corporate Compliance Officer

The General Counsel is the Corporate Compliance Officer responsible for implementation of the Company's compliance program, including the Code.

Questions Regarding the Code

An employee who has a question regarding the applicability or interpretation of the Code should direct the question to:

- his or her manager,
- another managerial employee, or
- an employee relations representative, who will consult as may be appropriate with the Legal Division.

Questions may also be directed to the General Counsel or any Corporate/Divisional Vice President in the Legal Division, either in person, in writing, or by calling 1-847-937-8905. (See also "Code Helpline" on page 18.)

Reporting of Violations

If an employee knows of a violation or possible violation of the Code, the employee must immediately report it to:

- his or her manager,
- another managerial employee, or
- an employee relations representative, who will consult as may be appropriate with the Legal Division.

An employee may also report a violation or possible violation of the Code directly to the General Counsel or any Corporate/Divisional Vice President in the Legal Division. (See also "Code Helpline" on page 18.)



**ABT-DOJ 0395135**
**Highly Confidential**

Any manager or employee relations repre-
sentative receiving such a report must,
when appropriate, immediately advise the
General Counsel or any Corporate/Divisional
Vice President in the Legal Division.

Written reports to the General Counsel
should be addressed to Abbott Laboratories,
100 Abbott Park Road, Department 364,
Abbott Park, Illinois 60064-6020 USA, and
marked "CONFIDENTIAL – TO BE
OPENED BY THE GENERAL COUN-
SEL." Telephone reports to the General
Counsel or any Corporate/Divisional Vice
President in the Legal Division should be
directed to 1-847-937-8905.

There shall be no reprisals for good faith
reporting of actual or possible violations of
the Code.

### Code Helpline

Under ordinary circumstances, employees
are encouraged to direct questions regard-
ing the applicability or interpretation of the
Code, or to report violations or possible
violations of the Code, to the persons listed
above. An employee may also call the
Code Helpline, which is available 24 hours
a day, 7 days a week. The Code Helpline is
staffed during normal business hours at the
Company's Abbott Park headquarters and
offers the opportunity to leave a recorded
message at all other times. At the election
of the employee, the call may be made
anonymously.

The following procedure should be fol-
lowed to access the Code Helpline:

- From any telephone in the U.S.
  (including Puerto Rico) or Canada,
  dial 1-800-449-8404.



- In all other countries, please contact your
  local AT&T USA Direct Operator and
  then dial or request the operator to dial
  1-800-449-8404.

- If you experience any problems reaching
  the 800 number, please place a collect
  call to 847-935-4748.

### Investigation of Violations

All reported violations of the Code will be
promptly investigated by the Company and
will be treated confidentially to the extent
consistent with the Company's interests and
its legal obligations.

All investigations by the Company of
wrongdoing will be directed by the General
Counsel. Employees are expected to coop-
erate in the investigation of an alleged vio-
lation of the Code. If the result of the
investigation indicates that corrective action
is required, the Company will decide what
steps it should take, including legal pro-
ceedings, when appropriate, to rectify the
problem and avoid the likelihood of its
recurrence.

### Discipline for Violations

Disciplinary actions may be taken for:
- Authorization or participation in actions
  that violate the Code.
- Failure to report a violation of the Code.
- Refusal to cooperate in the investigation
  of a violation of the Code.
- Failure by a violator's supervisor(s) to
  detect and report a violation of the Code,
  if such failure reflects inadequate super-
  vision or lack of oversight.
- Retaliation against an individual for
  reporting a violation of the Code.



**ABT-DOJ 0395136**
**Highly Confidential**

Disciplinary action may, when appropriate, include dismissal. With respect to disciplinary action, principles of fairness will apply, including, when appropriate, review of a disciplinary decision.

Acknowledgment

The Company requires that certain supervisory employees sign an acknowledgment confirming that they have received and understand the Code, and are complying with it.

Code Bus. Conduct 10/01/99



ABT-DOJ 0395137
Highly Confidential