EXHIBIT "G"
TO UNITED STATES' OPPOSITION TO
ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) |
| PRICE LITIGATION | ) MDL No. 1456 |
| | ) Civil Action |
| THIS DOCUMENT RELATES TO: | ) #01-12257-PBS |
| United States of America, | ) |
| ex rel. Ven-A-Care of the | ) Judge Patti B. Saris |
| Florida Keys, Inc., v. | ) |
| Abbott Laboratories, Inc., | ) |
| and Hospira, Inc. | ) |
| CIVIL ACTION NO. 06-11337-PBS) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL

Videotaped deposition of PETER D. BAKER

JANUARY 18, 2008

(CAPTIONS CONTINUE ON FOLLOWING PAGE)

**306**

1  Q. I'm reading from the third paragraph.
2  Quote: "Federal law (Section 11 28B of the
3  Social Security Act) regulates business
4  transactions relating to Medicare, Medicaid and
5  other publicly supported patients. These laws
6  prohibit the payment of fees to the referral
7  source or anyone in a position to recommend the
8  utilization of a particular provider for a
9  referral. Payment of fees for services provided,
10 at a fair value, negotiated in the open market,
11 and outlined in a contract, is a legitimate
12 business practice."
13     Did I read that correctly?
14     A. Yes.
15     Q. Is that your understanding of the
16 federal law?
17        MS. TABACCHI: Object to the form.
18        THE WITNESS: I -- I don't recall. But
19 I assume it's accurate.
20 BY MR. ANDERSON:
21     Q. Did Ingalls or any providers ever show
22 concern that the home infusion agreements they

**307**

1  had entered with Abbott violated that or any
2  other federal law?
3        MS. TABACCHI: Object to the form.
4        THE WITNESS: Not that I recollect,
5  although there was obviously an issue in this
6  that I read.
7  BY MR. ANDERSON:
8      Q. Right. You're referring to the -- a
9  correspondence --
10     A. Yes.
11     Q. -- at the back of Exhibit 30?
12     A. Yes.
13     Q. Other than the correspondence you see
14 at the back of Exhibit 30, did any other
15 providers ever voice concerns about their
16 business relationship with Abbott potentially
17 being in violation of federal law?
18     A. Not that I recall.
19     Q. Do you have an understanding of what it
20 was exactly that the provider -- in this case,
21 Ingalls -- felt violated federal law?
22        MS. TABACCHI: Object to the form.

**308**

1        THE WITNESS: No. I mean, I'd have to
2  go back and study this and then try to understand
3  it. Cursory review, I'm not sure I understand
4  completely what the issue was, and it was a long
5  time ago.
6  BY MR. ANDERSON:
7      Q. Yes. Let's move forward. Golly.
8  Might be best to work from the back. If you
9  could go to the first document after the
10 proposal, which is a letter dated April 2nd,
11 1990.
12        Are you there?
13     A. Yes.
14     Q. And this appears to be a letter on
15 Abbott letterhead from an attorney named James
16 Albrecht, correct?
17     A. Yes.
18     Q. To Ingalls Health Systems, correct?
19     A. Yes.
20     Q. And he, Mr. Albrecht, quotes some
21 language from a memo that reads, quote: "It
22 should be noted that contracts in which the

**309**

1  provider, not Abbott, accepts assignment and then
2  pays Abbott for goods and services according to a
3  fixed fee schedule will be unlikely to be found
4  to violate the Medicare anti-fraud and abuse
5  laws. This statement assumes that Abbott charges
6  each provider an amount which reflects fair
7  market value for the goods and services rendered.
8       "It is important to recall that any
9  unreasonably deep discount offered by Abbott
10 would indicate a lack of arm's-length negotiation
11 and could cause further scrutiny of the
12 arrangement."
13        Did I read that correctly?
14     A. Yes.
15     Q. Does that language refresh your memory
16 at all about what Ingalls considered to be a
17 potential violation of federal law in its
18 dealings with Abbott?
19        MS. TABACCHI: Object to the form.
20        THE WITNESS: I'm still not
21 specifically -- I'm still -- I'm still trying to
22 work through it.

Page 310

1  BY MR. ANDERSON:
2     Q. Do you know what --
3     A. Not completely.
4     Q. Okay. Do you know what's meant by the
5  word "assignment" in the first sentence, that
6  refers to accepting assignment?
7     A. My -- my impression today is that that
8  meant that the difference between if it was
9  assigned to Abbott to represent them or whether
10 that was from Ingalls themselves.
11    Q. Is it what's known as an assignment of
12 benefits?
13    A. Yes.
14       MS. TABACCHI: Object to the form.
15 BY MR. ANDERSON:
16    Q. And do you know how those assignment of
17 benefits work?
18       MS. TABACCHI: Object to the form.
19       THE WITNESS: Not specifically, no.
20 BY MR. ANDERSON:
21    Q. Is it a situation where a provider has
22 the authority to file a claim on a patient's

Page 311

1  behalf?
2       MS. TABACCHI: Object to the form.
3       THE WITNESS: That sounds accurate.
4  BY MR. ANDERSON:
5     Q. If -- if Abbott were not actually
6  accepting an assignment, what authority would
7  Abbott have to file a claim for reimbursement on
8  behalf of a provider?
9       MS. TABACCHI: Object to the form.
10      THE WITNESS: I'm not sure I completely
11 understand the question.
12 BY MR. ANDERSON:
13    Q. In -- let's take a situation where
14 Abbott's doing business with a home infusion
15 provider. And Abbott's filing the claim in the
16 provider number of the home infusion partner
17 because that partner's dispensed the product.
18    A. Yes.
19    Q. Would it be appropriate, in your view,
20 for Abbott to file that claim without Abbott
21 having received an assignment of benefit?
22       MS. TABACCHI: Object to the form.

Page 312

1       THE WITNESS: Well, I -- you know,
2  you're probably getting in deeper than I would
3  understand.
4  BY MR. ANDERSON:
5     Q. You're not sure?
6     A. I -- I don't think that's -- I don't
7  know that that's how that worked. But no, I'm
8  not sure.
9     Q. You're not sure how it was done, and
10 you're not sure about the legalities of how it
11 was done?
12    A. Correct.
13    Q. Okay. Now if you could flip to the
14 next page of Exhibit 30. Does that appear to be
15 a memo from Sue Sweeney to yourself concerning
16 Ingalls? Strike that. It's getting late in the
17 day. I'll rephrase.
18       Does that appear to be a memo from
19 Kathy Riddle to Sue Sweeney, with a copy to you,
20 concerning Ingalls?
21    A. Yes.
22    Q. And this is dated November 11th, '91,

Page 313

1  correct?
2     A. Yes.
3     Q. And it shows the program billings on
4  the Ingalls account at 963,000. Is that right?
5     A. Yes.
6     Q. And then the collections are 698,000
7  basically, correct?
8     A. Yes.
9     Q. And Abbott's share of those collections
10 is 415,000, correct?
11    A. Yes.
12    Q. And then the actual margin that Abbott
13 was realizing per year was roughly 244,000. Is
14 that correct?
15    A. Yes.
16    Q. Would you consider that financial
17 information to indicate that Ingalls was a pretty
18 major account?
19       MS. TABACCHI: Object to the form.
20       THE WITNESS: I don't know how you
21 classify major. They were an account, a good
22 one, it looks like, or that it was --

**314**

1  BY MR. ANDERSON:
2    Q. Well, that's what I'm really getting
3  to, sir. I don't know. Is $244,000 a year in
4  margin on a home infusion account considered a
5  large account in home infusion parlance?
6       MS. TABACCHI: Object to the form.
7       THE WITNESS: You know, I don't know.
8  I've been away from that so long that at the time
9  I don't know whether that would have been
10 considered a big home infusion or not.
11 BY MR. ANDERSON:
12   Q. Is Ingalls a pretty major health care
13 provider in Illinois?
14      MS. TABACCHI: Object to the form.
15      THE WITNESS: You know, I don't know
16 how to evaluate that, I guess.
17 BY MR. ANDERSON:
18   Q. Well, I'm not familiar with Harvey,
19 Illinois.
20   A. Yeah.
21   Q. Is that a suburb of Chicago?
22   A. Yeah, it's a -- I'm not sure I'm

**315**

1  familiar with Harvey either. Yeah, I don't think
2  it's -- it's not a large acute care hospital, to
3  my knowledge.
4    Q. I've seen a reference in the documents
5  to how Ingalls was trying to be the South Side
6  cancer center. Is Ingalls like here on the south
7  side of Chicago?
8       MS. TABACCHI: Object to the form.
9       THE WITNESS: I'm not sure where -- I
10 don't remember where it is, really.
11 BY MR. ANDERSON:
12   Q. Did you ever visit the Ingalls
13 facility?
14   A. You know, I don't know that I have.
15   Q. Do you know where Harvey, Illinois, is?
16   A. No. I could get there if I had to, I'm
17 sure. But no, I don't.
18      MS. TABACCHI: I don't either.
19      MR. ANDERSON: I'm going to have to do
20 MapQuest, I guess.
21      THE WITNESS: Thank you.
22 BY MR. ANDERSON:

**316**

1    Q. If you could flip to the next page,
2  please, which is a letter from Tom Herzog,
3  president of Ingalls, to Bill Dempsey at Abbott
4  Labs. Do you see that?
5    A. Yes.
6    Q. That's dated July 31st, '92, correct?
7    A. Yes.
8    Q. And at this point Mr. Dempsey was the
9  general manager of home infusion, correct?
10   A. Yes.
11   Q. And is it true that Mr. Herzog is
12 informing Mr. Dempsey that Ingalls is concerned
13 the business relationship between Ingalls and
14 Abbott may violate federal laws?
15      MS. TABACCHI: Object to the form.
16      THE WITNESS: There was a potential, it
17 looked like --
18 BY MR. ANDERSON:
19   Q. And specific --
20   A. In his mind.
21   Q. Yes, sir.
22      Specifically, he writes that he wants

**317**

1  to terminate the agreement. And in stating so,
2  he says, quote: "As you are aware, it was
3  originally our intent to renegotiate this
4  contract in an effort to bring the Agreement
5  within Safe Harbors published by the Office of
6  Inspector General relative to Medicare Fraud and
7  Abuse Regulations."
8       Did I read that correctly?
9    A. Yes.
10   Q. Were you at all involved in any efforts
11 to renegotiate the Ingalls agreement?
12   A. I don't recall.
13   Q. Do you have any understanding
14 whatsoever about Medicare fraud and abuse
15 regulations?
16      MS. TABACCHI: Object to the form.
17      THE WITNESS: No.
18 BY MR. ANDERSON:
19   Q. Do you understand what's meant by safe
20 harbor?
21      MS. TABACCHI: Object to the form.
22      THE WITNESS: I have a -- a broad -- a

**Page 318**

1  broad knowledge.
2  BY MR. ANDERSON:
3  Q. What's -- what's the broad knowledge
4  you have about safe harbors?
5  A. **A safe harbor says that you are working**
6  **within an approved or -- an approved regulation.**
7  Q. Do you have any understanding of the
8  safe harbor provisions with respect to
9  discounting of drug prices or disclosing
10 discounts of drug prices?
11     MS. TABACCHI: Object to the form.
12     THE WITNESS: No, I do not.
13 BY MR. ANDERSON:
14 Q. Do you recall that Abbott provided
15 inventory of drug products to Ingalls on a
16 consignment basis?
17     MS. TABACCHI: Object to the form.
18     THE WITNESS: I -- I don't remember
19 that.
20 BY MR. ANDERSON:
21 Q. Well, is it true that it was a standard
22 practice at Abbott Home Infusion to provide

**Page 319**

1  Abbott drug products to home infusion partners on
2  a consignment basis?
3      MS. TABACCHI: Object to the form.
4      THE WITNESS: Yeah, I'm struggling with
5  the word "consignment." You could use that, I
6  think, we supplied the product until -- until it
7  was actually compounded or used. So if that's
8  your definition of consignment, then -- then yes.
9  BY MR. ANDERSON:
10 Q. Okay. When the -- in your scenario
11 where you provide the product and there's no
12 charge until it's dispensed, what was the charge
13 for the drug from Abbott to the home infusion
14 partner when the partner dispensed the product?
15     MS. TABACCHI: Object to the form.
16     THE WITNESS: I'm -- I'm not sure. In
17 this program, my recollection was that there
18 wasn't a price for the individual product that
19 was even charged at that time.
20 BY MR. ANDERSON:
21 Q. There was no price?
22 A. There was no price.

**Page 320**

1  Q. So can you see --
2  A. **My understanding --**
3  Q. -- how that would be considered a
4  really deep discount?
5      MS. TABACCHI: If you could allow Mr.
6  Baker to complete his answer before you start
7  your next one.
8      MR. ANDERSON: Well, come on, Tina. I
9  wasn't stepping on him. He hesitated; I thought
10 he was through.
11     MS. TABACCHI: Okay. But I don't know
12 what he was saying there, and then you asked
13 another question. So...
14 BY MR. ANDERSON:
15 Q. All right. Please continue, Mr. Baker.
16 A. **Oh. The cost of the products, the --**
17 **all of the components of which Abbott**
18 **participated in were all part of that overall**
19 **cost to the Ingalls system. So the price of the**
20 **product I wouldn't say was a discount at all; I**
21 **would say that was -- that was calculated within**
22 **the -- the other components of which we**

**Page 321**

1  **participated.**
2  Q. Were --
3  A. **So product was just one aspect, as well**
4  **as it could have been pharmacy design and build-**
5  **out and all the other attributes that you'd seen**
6  **in that proposal.**
7  Q. Were the -- were the prices or value of
8  the drug products themselves ever itemized or
9  somehow accounted for in the overall compensation
10 to Abbott through the fee sharing arrangement?
11     MS. TABACCHI: Object to the form.
12     THE WITNESS: I don't recall.
13 BY MR. ANDERSON:
14 Q. Do you recall that Ingalls was
15 concerned that there was no way to account for
16 what the price of the drug products was?
17     MS. TABACCHI: Object to the form.
18     THE WITNESS: I don't recall if that
19 was a specific issue.
20 BY MR. ANDERSON:
21 Q. Now, looking at the next page of
22 Exhibit 30, there appears to be a letter dated

**Page 322**

1  August 10th, 1992, from you to Mr. Herzog.
2  Correct?
3      A. Yes.
4      Q. And you're, in essence, responding to
5  his July 31st, 1992, letter, correct?
6      A. Yes.
7      Q. My notes from this morning reflect that
8  by 1992, you were no longer the area business
9  manager for home infusion. Is that correct?
10         MS. TABACCHI: Object to the form.
11         THE WITNESS: No.
12  BY MR. ANDERSON:
13      Q. Does -- does reviewing the
14  documentation in Exhibit 30 indicate to you, sir,
15  that you were still the area business manager in
16  home infusion back, at least, in 1992?
17      **A. Yes. I think I did tell you I**
18  **struggled a little bit with the timing of each of**
19  **these.**
20      Q. I know. I realize that.
21      A. Okay.
22      Q. That's why I'm asking you --

**Page 323**

1      A. Yes.
2      Q. -- what's the correct time.
3         Do you have a better feel now when you
4  left the home infusion business and moved on to
5  the director of marketing, Abbott Health Systems?
6      **A. No. I'm sure it was relatively soon**
7  **after this.**
8      Q. Looking at this letter that you've
9  written to Mr. Herzog, you write: "Abbott and
10  Ingalls Home Care entered into a five-year Home
11  Infusion Therapy Agreement" -- I'm in the second
12  paragraph -- "on June 29th, 1990. The Agreement
13  calls for Ingalls (who has assignment of
14  benefits) to pay Abbott a percentage of program
15  collections as compensation for the products and
16  services Abbott provides under the agreement."
17         Did I read that correctly?
18      A. Yes.
19      Q. If -- if -- strike that.
20         Do you recall that -- that Ingalls was,
21  in fact, the party that had the assignment of
22  benefits?

**Page 324**

1      A. I -- I don't remember that.
2      Q. Does that statement in your letter
3  refresh your memory that Ingalls was the party
4  that had the assignment of benefits?
5      **A. No. I assume that that's accurate,**
6  **though.**
7      Q. Okay. If Ingalls had the assignment of
8  benefits, was Abbott authorized to file claims on
9  Ingalls' behalf?
10         MS. TABACCHI: Object to the form.
11         THE WITNESS: Well, that's a very
12  technical question. That's almost --
13  BY MR. ANDERSON:
14      Q. Little bit out of your --
15      **A. -- 20 years old and out of my realm. I**
16  **-- I don't know.**
17      Q. Do you remember consulting with anybody
18  about Mr. Herzog's concerns?
19         MS. TABACCHI: I'm going to caution the
20  witness not to reveal the substance of any
21  communications with counsel.
22         THE WITNESS: No. I would tell you it

**Page 325**

1  would be common practice that this would not be
2  something that I would have responded to without
3  at least having had it reviewed by legal counsel.
4  BY MR. ANDERSON:
5      Q. You cc Sue Sweeney, who was a business
6  person, correct?
7      A. Yes.
8      Q. And then you -- also there's a
9  handwritten note there, I think it's Jean
10  LaRoche. Is that right?
11      A. Okay.
12      Q. Is that -- is that -- do you recognize
13  that handwriting?
14      **A. No, I do not.**
15      Q. Do you know who Jean LaRoche or whoever
16  that is there? Do you know a person by that
17  name?
18      **A. I don't remember Jean LaRoche.**
19      Q. Do you know anybody by the last name of
20  LaRoche?
21      **A. I don't remember.**
22      Q. Is it your testimony, sir, that most

326

1  likely an Abbott attorney drafted this letter as
2  opposed to you that's dated August 10th, 1992?
3        MS. TABACCHI: Object to the form.
4        THE WITNESS: Or that I had -- that it
5  was at least reviewed by some legal counsel.
6  BY MR. ANDERSON:
7     Q. Looking at the next letter, which is
8  dated August 18th, 1992, from Mr. Herzog back to
9  you. Is that your handwriting there that reads
10 "file"?
11    A. No, it's not.
12    Q. Do you recall that Ingalls did
13 ultimately choose to terminate their agreement
14 with Abbott?
15    A. I don't remember, but -- I don't
16 remember.
17    Q. Do you agree that that's what appears
18 to be the case given the letter's attached to
19 Exhibit 30?
20    A. It appears that he's stated it again,
21 yes.
22    Q. And you wrote back on September 8th,

327

1  '92, and tried to persuade him to reconsider,
2  correct?
3     A. It looks that way, yes.
4     Q. I see that Jean LaRoche there
5  typewritten.
6     A. She's copied. She was probably our --
7  a sales representative or somebody. I --
8     Q. Just don't remember, yeah.
9     A. Sorry. I apologize to Jean as well. I
10 don't remember.
11    Q. Did Abbott have some procedures or
12 policies in place to ensure that its home
13 infusion arrangements did not violate any
14 pertinent federal laws?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: Well, I think, if I -- I
17 don't know if there were policies and procedures.
18 I think the ability to develop a program like
19 that was reviewed at Abbott, and there was a
20 comfort level. Whether that -- from -- I would -
21 - I'm assuming from a business perspective and
22 from a legal perspective that that was something

328

1  that Abbott could participate in.
2  BY MR. ANDERSON:
3     Q. Do you know how that was done?
4     A. No, I do not.
5     Q. Your -- but your understanding was that
6  there had been some review of home infusion
7  business arrangements?
8        MS. TABACCHI: Object to the form.
9        THE WITNESS: My assumption is that was
10 done.
11 BY MR. ANDERSON:
12    Q. You're assuming that it was done, but
13 you're not personally aware of any such review?
14    A. No, I'm not.
15       MR. ANDERSON: At this point I will
16 pass the witness. I realize it's late in the
17 day.
18       Ann?
19       MS. ST. PETER-GRIFFITH: Well, that's
20 fine. Tina, would you like to adjourn for today
21 and just start fresh on our new date?
22       MS. TABACCHI: I cannot agree today

329

1  that we are going to produce Mr. Baker for a
2  fourth day of deposition. I don't know how much
3  time you think you -- this would be the third
4  deposition he's given in the AWP litigation. You
5  have transcripts for the others.
6        How much time do you have, Ann?
7        MS. ST. PETER-GRIFFITH: At least half
8  a day.
9        MS. TABACCHI: Well, we're --
10       MS. ST. PETER-GRIFFITH: Again, we have
11 14 hours under our case management order, Tina.
12 So, you know, this is -- this is the first day of
13 the AWP deposition in the MDL case. So we have
14 14 hours under the case management order. I
15 requested this deposition in November.
16       When the deposition originally took
17 place for the Texas case, we didn't -- we had
18 next to no documents from Abbott.
19       MR. ANDERSON: I will --
20       MS. ST. PETER-GRIFFITH: You've since
21 provided -- Abbott has since provided some
22 production, not all of its production, but some

INGALLS MEMORIAL HOSPITAL
HARVEY, IL.

1/90

Baker DEP. EX. NO. 30
FOR ID., AS OF 1/18/08

Confidential

ABT-DOJ 315967
ABT278-5964 F

# INGALLS



Ingalls Home Care
2640 West 183rd Street
Homewood, IL 60430
708-206-1496

August 18, 1992

Mr. Peter D. Baker
Area Business Manager
Abbott Home Infusion Services
900 North Shore Drive
Lake Bluff, IL 60044

Dear Mr. Baker:

I appreciate your interpretation of the Office of Inspector General's Safe Harbor Regulations and of the Internal Revenue Service's Guidelines for Not-for-Profit Entities. However, I must rely on the advice of my counsel and consequently provided you with the termination notice in my letter of July 31, 1992, to Mr. Bill Dempsey.

Sincerely,

Thomas P. Herzog
President

cc: Mr. Bill Dempsey
   Abbott Home Infusion Services
   Kevin J. Egan, Esq.
   Winston & Strawn



**ABBOTT**

*Home Infusion Services*

900 North Shore Drive
Lake Bluff, IL 60044

August 10, 1992

Mr. Thomas Herzog
Ingalls Home Care
2640 West 183rd St.
Homewood, IL 60430

Dear Mr. Herzog:

The purpose of this letter is to express our concern and confusion regarding your letter of July 31, 1992 stating Ingalls Home Care's intention to terminate its Home Infusion Services Agreement with Abbott Laboratories.

Abbott and Ingalls Home Care entered into a five-year Home Infusion Therapy Agreement on June 29, 1990. The Agreement calls for Ingalls (who has assignment of benefits) to pay Abbott a percentage of program collections as compensation for the products and services Abbott provides under the Agreement. The conditions for termination within this contract require the breach of a material provision in the Agreement, and we do not believe that such a condition exists. It is Abbott's intent to better understand your specific concerns, and to work with you to address them.

It appears that Ingalls' concerns focus on Ingalls' characterization of our relationship as a joint venture. Despite the spirit of joint cooperation and needs described in the Agreement, the Agreement does not create a joint venture. The Agreement contains no language providing for a sharing of losses, liability or risk - an important element in the existence of any joint venture. Instead, Abbott is acting as an independent contractor in providing a variety of products and services in return for an arm's length negotiated compensation to cover those items and a reasonable profit to Abbott. Thus, Abbott does not see the investment interest Safe Harbor or the joint venture subject of the IRS audit guidelines as being pertinent. Moreover, the structure of the contract has been reviewed and found sound by both internal and outside legal counsel of Abbott.

BL2223/1

Confidential

ABT-DOJ 315939
ABT278-5936 F

Page Two
August 10, 1992

We note the Medicare fraud and abuse and 501(c)(3) issues were also raised by Ingalls prior to entering into the Agreement two years ago and that Ingalls consulted with Winston & Strawn at that time. Ingalls rightly concluded the Agreement was legal and entered into it. Nothing has changed in the Agreement or our relationship since that time. Neither the Safe Harbors nor the IRS audit guidelines make anything in the Agreement illegal.

Based on the above, Abbott is concerned that Ingalls is confused as to the nature of our relationship and that, in seeking to terminate the Agreement, Ingalls unilaterally plans to take an action which it is not authorized to take under the Agreement. We consider Ingalls to be a valued customer and look forward to resolving any confusion Ingalls may have concerning our relationship.

If you have any additional questions or concerns, please do not hesitate to contact me at 937-1777.

Sincerely,

*[signature]*

Peter D. Baker
Area Business Manager

cc: Sue Sweeney
    Jean LaRoche

bcc: Bill D.
     Don R.
     Wait B.

BL2223/2

Confidential

ABT-DOJ 315940
ABT278-5937 L

# ABBOTT

Abbott Laboratories
One Abbott Park Road
Abbott Park, Illinois 60064-3500

April 2, 1990

Robert W. Mulcahey
Vice President for
 Corporate Affairs
Ingalls Health System
One Ingalls Drive
Harvey, Illinois  60426

Dear Mr. Mulcahey:

Several weeks ago we discussed by phone the proposed joint home infusion therapy agreement between Ingalls and Abbott. Previous to that, Kathy Riddle of Abbott HomeCare mentioned to you a legal opinion we received from Gardner, Carton and Douglas regarding Medicare fraud and abuse.

As I suspected, the opinion she referred to dealt with a number of aspects of the fraud and abuse statute and was specific to other Abbott customers and contracts. Therefore, we don't think it is appropriate to release the opinion to Ingalls. However, Ms. Riddle asked that I provide to you the following quote from the Gardner, Carton memorandum regarding proposed contract relationships.

> "It should be noted that contracts in which the provider, not Abbott, accepts assignment and then pays Abbott for goods and services according to a fixed fee schedule will be unlikely to be found to violate the Medicare anti-fraud and abuse laws. This statement assumes that Abbott charges each provider an amount which reflects <u>fair market value</u> for the goods and services rendered.
> It is important to recall that any unreasonbly deep discount offered by Abbott would indicate a lack of arm's-length negotiation and could cause further scrutiny of the arrangement."

You may find the above helpful in evaluating the proposed contract between Ingalls and Abbott. If you wish to discuss this matter further, feel free to call at (708) 937-5202.

Very truly yours,


James L. Albrecht
Senior Attorney

JLA/ksa
cc: K. Riddle

(01-3948y-43)

Confidential

ABT-DOJ 316016
ABT278-6013 FL

File




September 8, 1992

Mr. Thomas Herzog
President
Ingalls Home Care
2640 West 183rd St.
Homewood, IL  60430

Dear Mr. Herzog:

We are in receipt of your letter dated August 18, 1992, restating your intention to terminate the agreement between Ingalls Home Care and Abbott Laboratories, effective September 1, 1992. Let me reiterate that Abbott considers Ingalls a valued customer, and desires to resolve this situation to the benefit of both parties.

Abbott has taken considerable time to evaluate the Ingalls/Abbott agreement. Although we feel very comfortable with the structure of our existing relationship we would be willing to work with your legal council towards a restructuring of the agreement.

Due to the timing and severity of the situation, we must request a response from Ingalls within five business days.

If you have any questions please do not hesitate to call me at (708) 937-1777.

Sincerely,

Peter Baker
Area Business Manager

cc: Sue Sweeney
    Jean LaRoche

BL2252

Confidential

ABT-DOJ 315937
ABT278-5934 L

# INGALLS



Ingalls Home Care
2640 West 183rd Street
Homewood, IL 60430
708-206-1496

July 31, 1992

Mr. Bill Dempsey
Abbott Laboratories
Abbott Home Infusion Services                                AUG 04 1992
900 North Shore Drive
Lake Bluff, IL 60044

Dear Mr. Dempsey:

The purpose of this letter is to provide you with notice of Ingalls Home Care's intention to terminate its Agreement with Abbott Laboratories at the earliest possible date, but not later than September 1, 1992.

As you are aware, it was originally our intent to renegotiate this contract in an effort to bring the Agreement within Safe Harbors published by the Office of Inspector General relative to Medicare Fraud and Abuse Regulations. This was pursuant to a directive by the Board of Directors to restructure all Ingalls-related joint ventures so that there would be no risk of violating any federal or state laws. Subsequently, the Internal Revenue Service has issued new audit guidelines for 501(c)(3) corporations. These guidelines are the most detailed yet published by the Service and put additional focus on joint venture activities by 501(c)(3) corporations. Essentially, should the Service make a determination that any of the activities of a 501(c)(3) corporation violate of any federal law, then the tax exempt status of the 501(c)(3) organization could be revoked.

The publication of these guidelines by the Internal Revenue Service has caused the Board to once again revisit the issue of involvement in joint ventures between Ingalls and for profit entities. The result of this review is the directive by the Board to unwind all such joint ventures by year-end.

Please contact Jean LaRoche to work out the details.

Sincerely,

Thomas P. Herzog
President

cc: Susan Sweeney

Confidential                                                ABT-DOJ 315942
                                                            ABT278-5939 FL

To:   Sue Sweeney

cc:   Pete Baker

From: Kathy Riddle

Date: November 11, 1991

Re:   Ingalls Home Care, Harvey, Il.

Per your request a P & L has been run utilizing the April – September Ingalls program data that you provided. The highlights include:

Program Billings, annualized:  $963M

Program Collections, annualized:  $698.3M

Abbott Revenue, annualized:  $415M

Abbott Contribution Margin, annualized:  $244.5M

Abbott Contribution Margin as a % of sales:  57.4% against a target of 60% for a program of this size.

Based on this profile, adjustments to the current contract percentages would need to be reviewed relative to other account concerns. As you suggested, the easiest way to justify changing the percentages would be to revise the alignment of program responsibilities, (e.g. Ingalls purchase non-Abbott product, etc.).

Let's plan to review this in the near future, and to determine what the next step should be.

Kathy

Confidential

ABT-DOJ 315943
ABT278-5940 FL

# ABBOTT LABORATORIES HOME INFUSION THERAPY PROPOSAL

## OVERVIEW OF ABBOTT LABORATORIES

Abbott Laboratories, initiating operations in 1888, is a broad-based, diversified, global healthcare company. Worldwide sales in 1989 totaled $5.38 billion. Abbott employs nearly 41,000 people worldwide, including a broad spectrum of both business and clinical professionals. In 1989, research and development expenditures exceeded 500 million dollars. Business segments of Abbott include Hospital Products, Nutritional Products, Pharmaceutical Products and Laboratory Products, with each division dedicated to meeting the needs of health care providers.

Confidential

ABT-DOJ 315968
ABT278-5965