EXHIBIT "H"
TO UNITED STATES' OPPOSITION TO
ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL            )   MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE        )   CIVIL ACTION
PRICE LITIGATION                  )   01-CV-12257-PBS
                                      Volume II

Continued Videotaped Rule 30(b)(6) Deposition of MICHAEL SELLERS, at 77 West Wacker Drive, Chicago, Illinois, commencing at 9:00 a.m. On Monday, March 31, 2008, before Donna M. Kazaitis, RPR, CSR No. 084-003145.

465

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  When the revenue share partner utilized
3  the consigned product or device, would there be a
4  separate charge for that particular product item
5  or particular device that would be charged
6  separately to the revenue share partner, or would
7  there just be an aggregate collection of a
8  percentage of revenue?
9        MS. TABACCHI: Object to the form.
10       THE WITNESS: There was no line item
11 charge to the client.
12 BY MS. ST. PETER-GRIFFITH:
13    Q.  For the services that were provided that
14 you described, engineering, pharmacy, training
15 procedures, reimbursement services, access to the
16 CHIP system, would Abbott document or reflect the
17 fair market value for those services that it
18 rendered to the revenue share partner?
19       MS. TABACCHI: Object to the form.
20       THE WITNESS: I'm not aware that we ever
21 did.
22 BY MS. ST. PETER-GRIFFITH:

466

1     Q.  What would the compensation be for those
2  services?
3     **A.  It was all comprehended in the total**
4  **agreement. So whatever our percentage of**
5  **collections on each of the therapies would**
6  **comprehend what other services we provided.**
7     Q.  Would you charge separately for the
8  engineering services that I presume would be --
9  well, let me ask you this. Strike that.
10       Would the engineering services
11 generally be an upfront service because you're
12 getting the revenue share partner a facility and
13 up to speed, is that fair to say?
14       MS. TABACCHI: Object to the form.
15       THE WITNESS: Yeah. There were a number
16 of startup costs, and that was one of them, that
17 would be one of them. It would be an upfront
18 cost, but it was figured into the overall revenue
19 share for the term of the agreement that we
20 signed, whether it was a three-year contract or a
21 five-year contract, it amortized those upfront
22 charges across the full term.

467

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  What other upfront charges would there
3  be?
4     **A.  Training, warehouse setup, those kind of**
5  **things.**
6     Q.  Would Abbott have any mechanism for
7  tracking the value of those upfront services that
8  were provided?
9        MS. TABACCHI: Object to the form.
10       THE WITNESS: We had an ability to
11 identify what our costs were for all of those
12 upfront, and we used that in determining what our
13 revenue share would be on future agreements.
14       So we did go back and look at some
15 of our startups to validate that we were
16 adequately burdening future agreements.
17 BY MS. ST. PETER-GRIFFITH:
18    Q.  Would the individual files for the
19 revenue share partners reflect the tracking of
20 those costs?
21       MS. TABACCHI: Object to the form.
22       THE WITNESS: Typically not, no.

468

1  BY MS. ST. PETER-GRIFFITH:
2     Q.  Under the revenue share model would
3  Abbott Home Infusion share in revenues collected
4  from Medicare and Medicaid?
5        MS. TABACCHI: Object to the form.
6        THE WITNESS: In all the cases that I
7  recall it was every payor.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  Would the payors be broken down on a per
10 patient basis? For example, would you take a,
11 would Abbott be able to document that it's taking
12 a forty percent share, for example, in the
13 Medicare reimbursement attributable to Patient
14 John Smith?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: The system, the CHIP
17 system, kept track of whatever services and claims
18 were delivered on a patient. That patient would
19 have been classified to a particular therapy or
20 multiple therapies because in a lot of cases a
21 nutritional patient got nutritional therapy, but
22 they also might have had times when they got

### 469

1  antibiotic therapy, or there might have been times
2  when they got hydration therapy.
3       So it was really, it was less
4  patient specific, it was more payor therapy
5  definition within the system which would then
6  define, the therapy would then define the revenue
7  share percentage.
8  BY MS. ST. PETER-GRIFFITH:
9    Q.  If a particular patient was denied
10 reimbursement by Medicare or Medicaid, how would
11 Abbott, if at all, charge its revenue share
12 partner for the product that was utilized but for
13 which reimbursement was not paid by Medicare or
14 Medicaid?
15      MS. TABACCHI: Object to the form.
16      THE WITNESS: We wouldn't get, we would
17 get basically our revenue share of that collection
18 which was --
19 BY MS. ST. PETER-GRIFFITH:
20   Q.  Zero percent?
21   A.  -- our revenue share of zero would be
22 zero.

### 470

1    Q.  Did the revenue share business model
2  change over time?
3    A.  Well, it changed per client.
4        Every client, as I said, might have
5  evolved from a more comprehensive array of
6  services and products that we delivered originally
7  to something less later on, or clients decided
8  early up that they wanted to do more, and so their
9  arrangement, the arrangements by client were
10 different.
11       The contract or the risk share
12 contract that we had, that general format, general
13 structure, didn't change.
14   Q.  When was this revenue share business
15 model first put into place?
16   A.  My recollection is '83 or '84.
17   Q.  From '91 to 2003 can you give a broad
18 overview, I'm not asking you for particular, you
19 know, to the penny dollar amounts, but a broad
20 overview of the profits and profit margins enjoyed
21 by the Home Infusion business unit?
22       MS. TABACCHI: Object to the form,

### 471

1  beyond the scope.
2       THE WITNESS: You know, I don't have
3  specific numbers. I think in general in the,
4  again, I can speak from '92 on, in general
5  division margin basis we were in the eighteen to
6  twenty percent division margin. And that's prior
7  to corporate burdening. So all the corporate
8  costs aren't put on that. So net at the end of
9  the day, it was less whatever we paid for the big
10 corporate offices and so on.
11      That's what we reported to the
12 division was somewhere in the eighteen to
13 twenty-two percent range.
14 BY MS. ST. PETER-GRIFFITH:
15   Q.  How did the reimbursement department
16 work?
17   A.  Very hard.
18   Q.  Can you describe the mechanics of how it
19 operated?
20   A.  Typically, our reimbursement team was
21 broken into subteams, and those teams were aligned
22 with our clients. So our clients, when they were

### 472

1  operating, had particular people that they could
2  get used to and our people could get used to our
3  clients, could understand our clients and our
4  clients could understand us.
5       So basically we were trying to work
6  as hand-in-hand as we could, and one way to do
7  that was to establish a small team that could work
8  with each of our clients and be responsible for
9  that.
10      Again, depending on what the client
11 wanted us to do, we might handle verification of
12 insurance, we definitely had to get assignment of
13 benefit paperwork in our hands --
14   Q.  Let me stop you right there. Would
15 Abbott ever accept assignment of benefits on
16 behalf of its revenue share partners itself under
17 Abbott's name?
18      MS. TABACCHI: Object to the form.
19      THE WITNESS: It may have. When we were
20 operating through our pharmacies, it may have.
21 BY MS. ST. PETER-GRIFFITH:
22   Q.  What about when you weren't operating

**477**

1  nationally, we weren't just operating in one
2  specific region, each of the teams may have had
3  different processes for handling payor claims
4  regardless of whether it was other third parties
5  or Medicare/Medicaid.
6  BY MS. ST. PETER-GRIFFITH:
7    Q.  Who within the reimbursement -- let
8  me strike that.
9        Who within Abbott Home Infusion
10 understood how Medicare and Medicaid reimbursed?
11       MS. TABACCHI: Object to the form.
12       THE WITNESS: Well, again, across this
13 whole time period it was the responsibility of the
14 reimbursement department to understand, for our
15 clients and for the regions we were billing in it
16 was their responsibility to understand how to
17 bill.
18       They may have also attempted to
19 understand how we got paid, but I can tell you it
20 varied across that time period and it varied by
21 carrier.
22       So I'm not sure there was any one

**478**

1  person that knew what all the things we were
2  doing.
3  BY MS. ST. PETER-GRIFFITH:
4    Q.  But certainly the reimbursement staff
5  understood the mechanics of the Medicare/Medicaid
6  reimbursement; is that fair?
7        MS. TABACCHI: Object to the form.
8        THE WITNESS: They understood the
9  mechanics of reimbursement and the claims, that
10 kind of process.
11 BY MS. ST. PETER-GRIFFITH:
12   Q.  In your role with Home Infusion, did you
13 have an understanding as to how Medicare or
14 Medicaid reimbursed?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: Not specifically. You
17 know, I may have been told. I had monthly reviews
18 where the leaders of each team came in and
19 presented how things were going, what they
20 collected, what they billed, what their bad debt
21 percentage was, where they were running into
22 difficulties, and it was my attempt to understand

**479**

1  at that time what kind of impacts were affecting
2  them.
3        So from that standpoint, I may have
4  been told in that time period. But I didn't have
5  a detailed understanding of what specifically each
6  area was doing with regard to Medicare and
7  Medicaid.
8        My main management process at that
9  time was to look at the percentage of collections
10 that or percentage of U&Cs that we were getting
11 and was that going up or was that going down, were
12 we getting better reimbursement or were we getting
13 worse. And that was really one of the metrics
14 that I remember talking to reimbursement about.
15 BY MS. ST. PETER-GRIFFITH:
16   Q.  Over the period from 1991 until the time
17 of the Home Infusion business unit's closure, what
18 were the annual revenues? We talked about profit
19 a little while ago, but what were the annual
20 revenues?
21       MS. TABACCHI: Object to the form,
22 beyond the scope.

**480**

1        THE WITNESS: I believe that when I
2  started in '92, as I recall, we were about 32 to
3  $34 million, either around $32 million in
4  billings. In or around '95 or '96, we hit our
5  maximum of I believe a little over $42 million in
6  revenue, and then it kind of plateaued. And then
7  after we made the decision to close down, it
8  started to tail off because we didn't renew
9  agreements.
10 BY MS. ST. PETER-GRIFFITH:
11   Q.  When was the decision made to close the
12 business unit?
13   A.  **I recall it being made sometime in late**
14 **1997.**
15   Q.  Who made the decision?
16   A.  **It was a, Don Robertson and I consulted**
17 **on the recommendation, we took the recommendation**
18 **forward to Rick Gonzalez, who was the president of**
19 **HPD at the time, and then it was reviewed with**
20 **corporate, and then we were given the go-ahead.**
21   Q.  Who within corporate reviewed it?
22   A.  **It was reviewed in a meeting with Miles**