EXHIBIT "I"
TO UNITED STATES' OPPOSITION TO
ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

559

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL | ) | |
| INDUSTRY AVERAGE WHOLESALE | ) | |
| PRICE LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action |
| THIS DOCUMENT RELATES TO: | ) | #01-12257-PBS |
| United States of America, | ) | |
| ex rel. Ven-A-Care of the | ) | Judge Patti B. Saris |
| Florida Keys, Inc., v. | ) | |
| Abbott Laboratories, Inc., | ) | |
| and Hospira, Inc. | ) | |
| CIVIL ACTION NO. 06-11337-PBS | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

HIGHLY CONFIDENTIAL

DEPOSITION OF VIRGINIA TOBIASON - VOLUME III

JANUARY 22, 2008

(CAPTIONS CONTINUE ON FOLLOWING PAGES)

692

1   MS. TABACCHI: Object to the form.
2   THE WITNESS: Well, I followed any
3   policies and procedures that we had, and I also
4   conformed with anything that I was told.
5   BY MS. ST. PETER-GRIFFITH:
6   Q. Okay. When you say you followed any
7   policies and procedures, what policies and
8   procedures?
9   A. Well, we did have policies and
10  procedures on how to submit claims.
11  Q. Okay. How do you know that they were
12  in compliance with state or federal anti-kickback
13  fraud and abuse -- or anti-kickback or fraud and
14  abuse laws or the federal False Claims Act?
15  MS. TABACCHI: Object to the form.
16  THE WITNESS: Well, our legal
17  department was involved with.
18  BY MS. ST. PETER-GRIFFITH:
19  Q. Were they involved with developing
20  those policies and procedures?
21  A. Well, a lot of policies and procedures
22  were involved with just how -- how often you did

693

1   follow up, a lot of the just operational issues.
2   But I don't know how this would apply
3   to -- the legal department approved all the
4   arrangements that we had.
5   Q. Okay. But how did you as the manager
6   of reimbursement services know that your staff
7   was not violating fraud and abuse laws or anti-
8   kick -- the anti-kickback statutes or the federal
9   False Claims Act?
10  MS. TABACCHI: Object to the form.
11  THE WITNESS: Can you be more specific?
12  BY MS. ST. PETER-GRIFFITH:
13  Q. Sure. Did you have any way of
14  monitoring whether or not the policies and
15  practices within your home infusion unit complied
16  with state and federal fraud and abuse, anti-
17  kickback statutes, or the federal False Claims
18  Act?
19  MS. TABACCHI: Object to the form.
20  THE WITNESS: Well, we made sure that
21  we followed medical necessity. There were rules
22  and regulations regarding medical necessity, that

694

1   -- that the physician had to fill in the CMNs --
2   we weren't allowed to fill in the CMNs -- that we
3   put the correct information on the claim form
4   regards to the diagnosis and the products. We
5   made sure that what the pharmacy dispensed was
6   what we put on the claim form.
7   We put a lot of emphasis on making sure
8   that we got the patient's permission to bill and
9   that we followed appropriate claims submission
10  rules.
11  BY MS. ST. PETER-GRIFFITH:
12  Q. Well, how did you know that -- what was
13  appropriate claims submission rules in term --
14  how did you know that those rules complied with
15  the anti-kickback laws or fraud and abuse laws
16  and the False Claims Act?
17  MS. TABACCHI: Object to the form.
18  THE WITNESS: Well, we -- if we had any
19  -- I don't remember any specific questions. But
20  we would have used our legal department.
21  BY MS. ST. PETER-GRIFFITH:
22  Q. Did your legal department review your

695

1   policies, practices, and procedures within home
2   infusion to ensure that you were not violating
3   any fraud and abuse laws or the federal False
4   Claims Act?
5   MS. TABACCHI: Object to the form.
6   You can answer that question without
7   revealing the substance --
8   THE WITNESS: Mm-hmm.
9   MS. TABACCHI: -- of any communications
10  with counsel, if there are any.
11  MS. ST. PETER-GRIFFITH: Well, hold on.
12  Tina, are you taking the position that Abbott
13  will not be relying upon any advice-of-counsel
14  defense with regard to such compliance?
15  MS. TABACCHI: I -- I only am
16  cautioning the witness that to the extent that
17  she can answer yes or no or some similar answer
18  without revealing the substance of any specific
19  conversation she had with counsel that that's my
20  preference. I'm not instructing her not to
21  answer the question.
22  I just don't want her to reveal the

**Page 696**

1  substance of a specific conversation until I have
2  a chance to discuss that with her. I don't know
3  what privileged conversations might be triggered
4  by your inquiry.
5      MS. ST. PETER-GRIFFITH: Can you read
6  back the question, please?
7      (Record read.)
8      THE WITNESS: I don't remember
9  specifically if -- what -- what policies or
10 procedures legal looked at. And I don't know --
11 I can't say if they looked at them regards to the
12 -- the fraud and abuse statutes. I just don't
13 know.
14 BY MS. ST. PETER-GRIFFITH:
15     Q. Well, then how do you know that the
16 policies, practices, and procedures within the
17 home infusion reimbursement department didn't
18 violate fraud and abuse laws or the False Claims
19 Act?
20     MS. TABACCHI: Object to the form.
21     THE WITNESS: We tried to bill as
22 accurately as possible. We put -- our -- our

**Page 697**

1  concern was getting the information correctly and
2  putting it on the claim form. Medical necessity,
3  we worried about that, and we also wanted to make
4  sure that what we -- what products were used,
5  what was actually dispensed to the -- to the
6  patient.
7  BY MS. ST. PETER-GRIFFITH:
8      Q. How did you ensure that your actual
9  billing, meaning the charges that you charged to
10 Medicare and Medicaid, did not violate fraud and
11 abuse laws, the anti-kickback statute, or the
12 False Claims Act?
13     MS. TABACCHI: Object to the form.
14     THE WITNESS: That wasn't my decision
15 to the charges.
16 BY MS. ST. PETER-GRIFFITH:
17     Q. Whose decision was it?
18     A. The customer's.
19     Q. Whose responsibility was it to ensure
20 that the billing and the claims submitted by
21 Abbott on behalf of the customer complied with
22 fraud and abuse laws, the anti-kickback statute,

**Page 698**

1  and the federal False Claims Act?
2      MS. TABACCHI: Object to the form.
3      THE WITNESS: I think that's a very
4  hard question to answer. The customers were
5  ultimately responsible.
6  BY MS. ST. PETER-GRIFFITH:
7      Q. But did Abbott have a role in making
8  decisions regarding claims submission --
9      MS. TABACCHI: Object to the form.
10 BY MS. ST. PETER-GRIFFITH:
11     Q. -- on behalf of the customer?
12     A. In what regard?
13     Q. In any regard.
14     MS. TABACCHI: Object --
15     THE WITNESS: Well, I mean, there's a
16 lot of things with claims submission. As I
17 mentioned, in terms of policies and procedures on
18 medical information, we would review these
19 procedures with the customer. We would review
20 all our policies and procedures with the
21 customer. So we tried to adhere to what the
22 customer wanted.

**Page 699**

1      We did not set prices. The prices was
2  the customer's responsibility.
3  BY MS. ST. PETER-GRIFFITH:
4      Q. Did you have an understanding that
5  causing a false claim to be submitted violated
6  the anti-kickback statute or the federal False
7  Claims Act?
8      MS. TABACCHI: Object to the form.
9      THE WITNESS: Well, my understanding is
10 that, you know, there -- there is a False Claims
11 Act, yes.
12 BY MS. ST. PETER-GRIFFITH:
13     Q. Okay. And how did the home infusion
14 unit ensure that when it submitted claims on
15 behalf of its home infusion clients that it was
16 not violating any state fraud and abuse laws or
17 the anti-kickback statute?
18     MS. TABACCHI: Object to the form.
19 Asked and answered.
20     THE WITNESS: It was we followed any
21 legal re -- legal -- if legal had requirements,
22 we followed them.

Page 768

1  Q. Okay. Did that pertain to Medicaid and
2  Medicare fraud and abuse?
3      MS. TABACCHI: Object to the form.
4      THE WITNESS: It was pertaining to the
5  information we provided to customers about
6  reimbursement and the support services we
7  offered. Whether that was involved with the
8  fraud and abuse, I -- you'd have to ask legal.
9  BY MS. ST. PETER-GRIFFITH:
10 Q. Okay. Well, did you work with legal on
11 the policies?
12     MS. TABACCHI: Object to the form.
13     THE WITNESS: Yes.
14 BY MS. ST. PETER-GRIFFITH:
15 Q. What do you recall about the content
16 concerning Medicaid and Medicare fraud and abuse?
17     MS. TABACCHI: Object to the form.
18     THE WITNESS: I don't remember specific
19 discussions about how it connected to fraud and
20 abuse. But I -- that -- I -- I'm not as familiar
21 with the fraud and abuse statute as -- I'm just -
22 - I'm not a lawyer.

Page 769

1  BY MS. ST. PETER-GRIFFITH:
2  Q. Okay. But as a reimbursement
3  individual, did you have concerns about ensuring
4  that the company that you worked for with regard
5  to reimbursement practices and procedures
6  complied with federal and state Medicaid and
7  Medicare fraud and abuse statutes?
8      MS. TABACCHI: Object to the form.
9      THE WITNESS: I was concerned that
10 Abbott comply with all regulations.
11 BY MS. ST. PETER-GRIFFITH:
12 Q. Okay. And what did you do to ensure
13 that they were in compliance with federal and
14 state Medicare and Medicaid fraud and abuse
15 statutes?
16     MS. TABACCHI: Object to the form.
17     THE WITNESS: I -- we -- we discussed
18 with legal certain things that we felt were
19 appropriate and not appropriate.
20     MS. TABACCHI: I want to just caution
21 the witness not to reveal the substance of any --
22     THE WITNESS: Right.

Page 770

1      MS. TABACCHI: -- communications
2  between you and the lawyers.
3      MS. ST. PETER-GRIFFITH: Okay. In
4  making that instruction, are you making a
5  representation at this time, Tina, that Abbott
6  does not intend to rely upon an advice-of-counsel
7  defense in this case?
8      MS. TABACCHI: I don't understand what
9  your question is. I'm just trying to make sure
10 that we don't waive privilege as to some specific
11 communication that she had with a lawyer. It
12 sounded like that's where you were headed with
13 her.
14     MS. ST. PETER-GRIFFITH: Well, to the
15 extent that the development of a policy or
16 procedure with Abbott counsel might be relied
17 upon at a later point in time as a defense in
18 this matter, I think I've got the right to
19 inquire as to the substance of those
20 communications unless you're willing to represent
21 to me right now that you don't -- that Abbott
22 does not intend to assert an advice-of-counsel

Page 771

1  defense.
2      MS. TABACCHI: I don't understand your
3  question.
4      If you have a question for Ms.
5  Tobiason, go ahead.
6      MS. ST. PETER-GRIFFITH: Are you
7  prepared to make that representation, Tina?
8      MS. TABACCHI: No, I'm not making that
9  representation.
10     MS. ST. PETER-GRIFFITH: But you're
11 instructing her not to answer --
12     MS. TABACCHI: I didn't instruct her
13 not to answer.
14     MS. ST. PETER-GRIFFITH: Could you read
15 back the question, please?
16     (Record read.)
17     THE WITNESS: That was the legal
18 responsibility.
19 BY MS. ST. PETER-GRIFFITH:
20 Q. When you say that was the legal
21 responsibility, what do you mean? What do you
22 mean? That was the responsibility of the legal

Tobiason, Virginia - Vol. III.txt

1  MS. TABACCHI: -- communications
2  between you and the lawyers.
3  MS. ST. PETER-GRIFFITH: Okay. In
4  making that instruction, are you making a
5  representation at this time, Tina, that Abbott
6  does not intend to rely upon an advice-of-counsel
7  defense in this case?
8  MS. TABACCHI: I don't understand what
9  your question is. I'm just trying to make sure
10  that we don't waive privilege as to some specific
11  communication that she had with a lawyer. It
12  sounded like that's where you were headed with
13  her.
14  MS. ST. PETER-GRIFFITH: Well, to the
15  extent that the development of a policy or
16  procedure with Abbott counsel might be relied
17  upon at a later point in time as a defense in
18  this matter, I think I've got the right to
19  inquire as to the substance of those
20  communications unless you're willing to represent
21  to me right now that you don't -- that Abbott
22  does not intend to assert an advice-of-counsel

771

1  defense.
2  MS. TABACCHI: I don't understand your
3  question.

Tobiason, Virginia - Vol. III.txt

4        If you have a question for Ms.
5  Tobiason, go ahead.
6        MS. ST. PETER-GRIFFITH:  Are you
7  prepared to make that representation, Tina?
8        MS. TABACCHI:  No, I'm not making that
9  representation.
10       MS. ST. PETER-GRIFFITH:  But you're
11  instructing her not to answer --
12       MS. TABACCHI:  I didn't instruct her
13  not to answer.
14       MS. ST. PETER-GRIFFITH:  Could you read
15  back the question, please?
16       (Record read.)
17       THE WITNESS:  That was the legal
18  responsibility.
19  BY MS. ST. PETER-GRIFFITH:
20    Q.  When you say that was the legal
21  responsibility, what do you mean?  What do you
22  mean?  That was the responsibility of the legal

772

1  department?
2    A.  Well, if there was a policy written
3  that they would review it to make sure it was in
4  compliance with the statutes.
5    Q.  What discussions did you have with
6  counsel concerning that?

Tobiason, Virginia - Vol. III.txt

10        THE WITNESS: About that. Well, I
11   don't remember any specific conversations with
12   counsel about fraud and abuse. We were creating
13   a policy regarding reimbursement information and
14   support.
15   BY MS. ST. PETER-GRIFFITH:
16        Q.   Okay. What do you recall about your
17   conversation -- or let me ask you. Did you have
18   any conversations with anyone at Abbott about
19   whether in formulating these reimbursement
20   policies Abbott needed to look at or disclose its
21   AWP spreads, either historically or current?
22        MS. TABACCHI: Object to the form.

774

1         THE WITNESS: AWP spreads. I don't
2    recall any discussions.
3    BY MS. ST. PETER-GRIFFITH:
4         Q.   Were you ever advised that maintaining
5    high AWP spreads may contravene the False Claims
6    Act or anti-kickback statutes?
7         MS. TABACCHI: Object to the form.
8         I'm going to caution the witness not to
9    reveal the substance of communications with
10   counsel.
11        THE WITNESS: I'm not aware of any
12   conversations, no.

Page 195

```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


IN RE:   PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE           ) MDL No. 1456
PRICE LITIGATION                     ) Civil Action No.
                                     )    01-12257-PBS
                                     )
THIS DOCUMENT RELATES TO:            )
                                     )
United States of America,            ) Hon. Patti Saris
ex rel. Ven-a-Care of the            )
Florida Keys, Inc., v.               )
Abbott Laboratories, Inc.,           )
and Hospira, Inc.                    )
CIVIL ACTION NO. 06-11337-PBS        )


*********************************************************

              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS


IN RE:   PHARMACEUTICAL              )
INDUSTRY AVERAGE WHOLESALE           ) MDL No. 1456
PRICE LITIGATION                     ) Civil Action No.
                                     )    01-CV-12257-PBS
                                     )
THIS DOCUMENT RELATES TO:            )
                                     ) Judge Patti B. Saris
State of Arizona v. Abbott           )
Labs., et al.                        )
Civil Action No. 06-CV-11069-PBS     )



*********************************************************
           ORAL AND VIDEOTAPED DEPOSITION OF
                    VIRGINIA TOBIASON

                   HIGHLY CONFIDENTIAL

                     May 15, 2007

                       Volume 2

*********************************************************
```

FREDERICKS-CARROLL REPORTING
AUSTIN (512) 477-9911 - HOUSTON (713) 572-8897 - SAN ANTONIO (210) 222-9161

19f65007-7725-477e-8aaf-c42cb2e35ae2

Page 247

1  Q. One of the Abbott attorneys in this case, a
2  guy by the name of Mark Haberberger. Do you know him?
3  A. That name is familiar, but I don't remember
4  him.
5  Q. He testified as to receiving that HIMA
6  newsletter and that's why I'm wondering if that ever
7  circulated its way to you.
8  A. I honestly don't remember it.
9  Q. Well, when you said that if -- you saw
10 information about reimbursement from outside sources,
11 and you said trade associations, and you specifically
12 identified HIMA. Can you tell me what specifically
13 you would have done in terms of seeking information
14 from HIMA?
15 A. Well, HIMA would have probably generated some
16 information on any regulations put out by the
17 government. That might have been an area where I --
18 if there was a specific notice in the Federal Register
19 about reimbursement issues, or perhaps if there was
20 any legislation that would have impacted our area.
21 Q. Okay. The area being what?
22 A. Infusion.
23 Q. All right. Anything else?
24 A. They would have done something if there was
25 an FDA. Any -- any -- any government, you know, area

Page 248

1  they would have notified, but I didn't -- I mean, I
2  wasn't involved with the FDA still. But there were --
3  you know, it would have been generally those things.
4  Q. Other then receiving information you just
5  described from HIMA, were there occasions when you
6  actually reached out to anyone at HIMA to answer
7  questions you had?
8  A. Not that I -- not that I recall.
9  Q. Okay.
10 A. No.
11 Q. You're thinking about it. My question is
12 whether or not there was anyone you specifically ever
13 contacted at HIMA.
14 A. Well, Marsha Nescart handled, as I -- as I
15 recall I think during this time period, it could have
16 been Marsha if I had contacted HIMA.
17 Q. Okay. Do you know what her title was?
18 A. No. Probably vice president for something.
19 Q. Okay. She was within the HIMA organization?
20 A. Yes.
21 Q. Do you know for how long she held that title?
22 A. No.
23 Q. You say you probably would have contacted
24 her. Over what time frame would that have been?
25 A. I think it might have been in -- in the early

Page 249

1  to mid-'90s.
2  Q. Okay. Anyone else you can think of having
3  contacted at HIMA about any questions you might have
4  had on reimbursement?
5  A. No, not that I recall.
6  Q. You also testified previously that you had
7  occasion to speak to outside counsel when you had
8  questions about reimbursement. I think you
9  specifically identified Gordon Schatz at Reed Smith?
10 A. Yes.
11 Q. Okay. Are you aware that Reed Smith put out
12 a newsletter for some of its pharmaceutical customers
13 or clients that dealt with reimbursement issues?
14 A. I have seen their newsletter recently.
15 Q. Okay.
16 A. I don't recall a newsletter during that time
17 period.
18 Q. It's possible they had one, you just don't
19 recall as you sit here today?
20 A. Exactly.
21 Q. You do get their newsletter today?
22 A. I do.
23 Q. All right. Can you tell me what subject
24 matters it covers today?
25 A. Well, I think the latest one covered HIPAA,

Page 250

1  FDA issues. They cover a broad range for all their
2  clients. I don't recall specifics.
3  Q. And knowing that you're getting it today, can
4  you tell me how far back in time you can remember
5  getting those newsletters from Reed Smith?
6  A. I -- I can't give a time. I don't remember.
7  Q. Okay. Do you recall that Reed Smith had a
8  newsletter that addressed the OBRA amendments and in
9  particular the anti-kickback statute?
10       MS. TABACCHI: Object to the form.
11 A. OBRA -- which OBRA?
12 Q. (BY MR. HAVILAND) OBRA '90.
13 A. OBRA -- no, I don't recall.
14 Q. All right. It's possible you just don't
15 remember the year?
16 A. Oh, it's possible. I just don't remember.
17 Q. Well, let me go back to what you testified
18 about -- you had a specific recollection of having
19 reached out at times to Gordon Schatz. Can you tell
20 me what you recall about those occasions when you
21 reached out to Mr. Schatz?
22       MS. TABACCHI: I'm going to caution the
23 witness not to reveal any attorney-client
24 communications.
25       THE WITNESS: Okay.