EXHIBIT "J"
TO UNITED STATES' OPPOSITION TO
ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

335

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


IN RE PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

                                ) Civil Action

THIS DOCUMENT RELATES TO:       ) #01-12257-PBS

United States of America,       )

ex rel. Ven-A-Care of the       ) Judge Patti B. Saris

Florida Keys, Inc., v.          )

Abbott Laboratories, Inc.,      )

and Hospira, Inc.               )

CIVIL ACTION NO. 06-11337-PBS)


******************************************************


HIGHLY CONFIDENTIAL

Videotaped deposition of PETER D. BAKER - Volume II

FEBRUARY 28, 2008


(CAPTIONS CONTINUE ON FOLLOWING PAGE)

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

8  (Pages 360 to 363)

360

1    responsibilities, developed the relationships.
2    What would happen once you developed the
3    relationship? Would someone else be responsible
4    for writing up the contract with the -- with the
5    customer?
6        A.  Yes. Our contracting team would --
7    would put together an appropriate document, yes.
8        Q.  Would you have input into that?
9        A.  Possibly, yes.
10       Q.  Did anyone, to your knowledge, ever
11   raise any concerns about the legality of these
12   consignment arrangements or joint-venture
13   arrangements that may -- that Abbott may have
14   entered into with its home infusion partners?
15       MS. TABACCHI: Object to the form.
16       THE WITNESS: No.
17   BY MS. ST. PETER-GRIFFITH:
18       Q.  Do you recall any customer or any
19   consignment partner or joint-venture partner
20   raising a concern about these relationships
21   possibly violating either the safe harbor
22   provisions or any Medicare or Medicaid statute or

361

1    regulation?
2        MS. TABACCHI: Object to the form.
3        THE WITNESS: No. My recollection is
4    that -- and we always involved legal counsel --
5    is all -- if there were any questions, it would
6    be on how that arrangement was set up and to make
7    sure that there -- there was an appropriate
8    relationship between Abbott and whoever we were
9    working with.
10   BY MS. ST. PETER-GRIFFITH:
11       Q.  How did you, as someone who was
12   developing this relationship, have peace of mind
13   that the relationships that you were fostering or
14   developing and that ultimately were memorialized
15   in contracts complied with federal and state
16   Medicare statutes and regulations?
17       MS. TABACCHI: Object to the form.
18       THE WITNESS: Well, I was very
19   comfortable that anything that would have gone
20   out would have been worked on and supported by
21   our legal counsel to make sure that it was
22   something that -- that Abbott Laboratories was

362

1    comfortable with.
2    BY MS. ST. PETER-GRIFFITH:
3        Q.  Okay. So you essentially relied upon
4    legal counsel?
5        A.  Yes, very much so.
6        Q.  Was there a separate compliance person?
7    When I say "compliance," I don't mean contract
8    compliance. I mean compliance with fraud and
9    abuse statutes and regulations.
10           Was there a compliance person during
11   this period of time, '91 through '95, that you
12   would consult?
13       MS. TABACCHI: Object to the form.
14       THE WITNESS: I -- I don't recall. I
15   don't know that there was. I know, again, we
16   relied on legal counsel. Whether there was legal
17   -- whether they reviewed with other people within
18   the legal organization, I don't know.
19   BY MS. ST. PETER-GRIFFITH:
20       Q.  Okay. My question is more just your
21   personal interaction outside of legal counsel.
22   Do you recall there being any person designated

363

1    that you could go to with compliance questions?
2        MS. TABACCHI: Object to the form.
3        THE WITNESS: Well, compliance can be
4    very broad. I'm not sure I understand exactly
5    what you're saying.
6    BY MS. ST. PETER-GRIFFITH:
7        Q.  Fraud and abuse compliance. Not -- not
8    contract compliance, but compliance with state
9    and federal Medicare and Medicaid statutes?
10       A.  No, but I was very comfortable, I
11   guess, that our legal counsel, if there were
12   issues in that regard, that would have been
13   contemplated in what we were putting together.
14       Q.  Why were you comfortable with that?
15       A.  I guess I also had no reason not to
16   believe that that was taking place, and -- nor
17   did we have questions or concerns on that nature
18   from the majority of our customers.
19       Q.  Okay. Did you have any from any of
20   your customers?
21       A.  I don't recall.
22       Q.  Okay. Is there any other reason that

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL        February 28, 2008
Chicago, IL

28  (Pages 440 to 443)

```
                                    440
1   contracting department.
2        Q.  Anyone else?
3        A.  I -- I don't know.
4        Q.  Did the buck stop with your contracting
5   department on ensuring that Abbott's Hospital
6   Products Division was complying with state and
7   federal Medicare and Medicaid statutes and
8   regulations?
9            MS. TABACCHI:  Object to the form.
10           THE WITNESS:  Yeah, that -- you're
11   asking me a personal question, on whether I felt
12   that -- you know, again, you're asking me to
13   determine something that I wasn't part of, and
14   then where it -- where ownership should be.
15           I think our -- between our legal
16   counsel and the contracting department, that they
17   had a -- probably had the best feel for that.
18           Where they shared that information and
19   how high it went up into the organization, I -- I
20   can't tell you, so --
21   BY MS. ST. PETER-GRIFFITH:
22        Q.  But it didn't filter up to you?
```

```
                                    441
1            MS. TABACCHI:  Object to the form.
2            THE WITNESS:  Not in the role that I
3    was in, no.
4    BY MS. ST. PETER-GRIFFITH:
5         Q.  At any time when you were within the
6    Hospital Products Division?
7         A.  Well, no.
8         Q.  Okay.  What role -- you indicated that
9    you had a liaison role for compliance.  What did
10   that role entail?
11        A.  Working with the corporate compliance
12   group in -- if there was a training program, to
13   see that it was administered within the Hospital
14   Products Division.
15           If there was information to be passed
16   on or they wanted to -- or if they were
17   publishing a document, to make sure that it was
18   getting sent to the entire organization or that
19   we were participating in what we needed to do as
20   a division.
21        Q.  Do you recall discussing with anyone in
22   this liaison role issues pertaining to compliance
```

```
                                    442
1    with federal and state Medicare and Medicaid
2    statutes and regulations?
3         A.  No, I don't.
4         Q.  Do you recall at any time during your
5    tenure within the Hospital Products Division
6    discussing issues concerning Medicare, Medicaid
7    statutes or compliance with state and federal
8    Medicaid and Medicare statutes and regulations?
9            MS. TABACCHI:  Object to the form.
10           THE WITNESS:  No, I don't.
11   BY MS. ST. PETER-GRIFFITH:
12        Q.  Would the responsibility for ensuring
13   that the Hospital Products Division complied with
14   state and federal statutes and regulations rest
15   with your superiors or with your subordinates?
16           MS. TABACCHI:  Object to the form.
17           THE WITNESS:  Well, it's an interesting
18   question.  I'm not sure I know how to answer you.
19           It's kind of like, it can't be -- it
20   could be one or the other.  It could be both,
21   depending on what it is.
22           I mean, I don't --
```

```
                                    443
1    BY MS. ST. PETER-GRIFFITH:
2         Q.  Okay.  Well, let's start with
3    subordinates.  How would your subordinates know
4    whether or not their practices and how they were
5    conducting business violated state or federal
6    law?
7         A.  I guess I -- I don't know that they
8    ever did, so -- but at the same time if there was
9    something that, again, review of our legal
10   counsel said there was a practice that should be
11   changed, then that would have been identified and
12   the subordinates would have been responsible for
13   either modifying or changing that behavior.
14        Q.  Who would bring it to the attention of
15   the legal department?
16           MS. TABACCHI:  Object to the form.
17           THE WITNESS:  Well, it could be in any
18   number of different ways, I would imagine.  If
19   there was an individual that had that concern,
20   they would have shared that, and it would have
21   gone through, and legal may have done it that
22   way.  There may have been a legal interpretation
```

444

1   that could have also done that. There were any -
2   - any number of ways, I would imagine, that they
3   could become aware of something, and if they were
4   -- felt there was an issue, then it would be
5   dealt with and responded to.
6   BY MS. ST. PETER-GRIFFITH:
7       Q.  So would this all be up to the
8   subjective consideration of your subordinates, as
9   to whether or not a question might arise
10  concerning state and federal Medicare, Medicaid
11  statute compliance?
12      THE WITNESS:  I don't --
13      MS. TABACCHI:  Object to the form.
14      THE WITNESS:  I don't think that's what
15  I said. I think it's up to whoever had knowledge
16  or was uncomfortable with something --
17  BY MS. ST. PETER-GRIFFITH:
18      Q.  Okay.
19      A.  (Continuing) -- at any level.
20      Q.  But how do you know that what you were
21  doing and what your subordinates were doing
22  complied with state and federal Medicare,

445

1   Medicaid statutes and regulations?
2       MS. TABACCHI:  Object to the form,
3   asked and answered.
4       THE WITNESS:  Yeah, I don't know -- I
5   don't think that's a -- a question that I'll -- I
6   can really answer for you.
7   BY MS. ST. PETER-GRIFFITH:
8       Q.  Well, did you --
9       A.  As I say, I don't know if a rep is --
10  is speeding today, so I don't -- I don't think I
11  have a magic answer for you that will please you
12  at this point, because there are -- we, again,
13  have a -- a code of conduct we try to follow as
14  best we can, and what we know at the time, and we
15  work within that, so --
16      Q.  Did the code of conduct that you
17  referenced identify practices that were not in
18  compliance with state and federal Medicare and
19  Medicaid regulations and statutes?
20      MS. TABACCHI:  Object to the form.
21      THE WITNESS:  I don't know.
22  BY MS. ST. PETER-GRIFFITH:

446

1       Q.  What do you recall about this code of
2   conduct?
3       A.  I don't think there was anything that
4   was that specific. It was more on the
5   professionalism and -- and making sure that you -
6   - you worked with integrity and that you -- but,
7   again, you're asking some very specific questions
8   that I don't know were -- were ever covered.
9       Q.  Okay.  Well, let me ask it this way.
10      You have a -- a sales force, right?
11  You've got a sales force, district managers,
12  national account managers, and they come into an
13  already existing system within the Hospital
14  Products Division; this is how we do business.
15  Is that fair? They come in as a new employee?
16      A.  To some degree, yes.
17      Q.  And they -- Abbott has a procedure in
18  place for communications with customers, contact
19  with customers, et cetera? Is that fair?
20      A.  That's fair.
21      Q.  Okay. And at the same time it also has
22  its -- Abbott also has its catalog prices, the

447

1   contract marketing division does what it does
2   with regard to pricing; is that fair?
3       A.  Okay.
4       Q.  Okay. How would someone within -- who
5   comes into that system have assurances that that
6   system that was in place complied with state and
7   federal Medicare and Medicaid statutes and
8   regulations?
9       MS. TABACCHI:  Object to the form.
10      THE WITNESS:  Well, again, you're
11  asking something that's incredibly specific, I
12  guess, in my mind. When a new person comes into
13  a responsibility, there is certain training that
14  is conducted. It is conducted at a divisional
15  manager level. It would be conducted at the --
16  the training level and the product level and
17  everything else.
18      Whether -- again, you're asking
19  something very specific, I think. The
20  understanding of how we -- how we work and within
21  what guidelines are part of any of those or could
22  be part of those.

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

46 (Pages 512 to 515)

512

1  up.
2  BY MS. ST. PETER-GRIFFITH:
3      Q.   Okay.  And it appears that Mr. Sellers'
4  overall goal performance was 103.75 percent.  Do
5  you see that?
6      A.   Yes.
7      Q.   Would that have been -- would that
8  performance rating have been something that you
9  would have signed off on?
10     A.   Yes.
11     Q.   And did you feel that Mr. Sellers
12 deserved that high of a rating?
13     A.   Yes.
14         (Whereupon Exhibit Baker 041 was
15 marked for identification.)
16 BY MS. ST. PETER-GRIFFITH:
17     Q.   Mr. Baker, do you recognize this
18 document?
19     A.   No.
20     Q.   Do you recall a PowerPoint presentation
21 or attending a presentation on the Hospital
22 Products Division Financial Planning and Analysis

513

1  Contract Marketing Forum?
2      A.   I don't remember it, no.
3      Q.   Would this have been something that you
4  would have attended, this particular forum?
5      A.   Well, based on the timing when they're
6  showing the organization, this was right about
7  the time that Mr. Weibking was getting ready to
8  retire and I was going to assume that role.  So I
9  may have been announced, but I don't know if I
10 was participating yet as I was moving from my
11 responsibilities from Alternate Site.  So I don't
12 remember attending a meeting where this was done,
13 but...
14     Q.   Okay.  If you could turn to page 5 of
15 this document, it should say what does contract
16 marketing do.  Do you see that?
17     A.   Yes.
18     Q.   Then it says pricing strategies?
19     A.   Yes.
20     Q.   And there are 1, 2, 3, 4 items under
21 that develop with business units.  Do you see
22 that?

514

1      A.   Yes.
2      Q.   What was your understanding of what HBS
3  contract marketing did in terms of developing
4  with business units?
5      A.   They would look at -- work with the
6  goals and objectives of the marketing teams to
7  determine what products they wanted to highlight.
8  Are there pricing goals that they wanted to make
9  for that year? Were there -- is there competitive
10 information?  Did you know, for example, in at --
11 the business units always have -- you know, is
12 there going to be a new competitor?  Do you have
13 new products that are being introduced by us?
14 And how would you then put those into your
15 portfolio?  And those types of things.  So it was
16 just basically working with the business unit to
17 determine their goals and objectives and then how
18 we would work with them to price that.
19     Q.   What about implementing pricing
20 strategies? What did contract marketing do?
21     A.   Well, once we talked about it, it was
22 then making sure that over the course of the year

515

1  that we actually participated and worked in
2  trying to achieve it.
3      Q.   And what was contract marketing's
4  involvement with pricing strategies concerning
5  GPOs?
6      A.   Well, a lot of this business is
7  developed based on those group purchasing
8  organization relationships, and so depending on
9  the timing of bids we would implement those
10 strategies across, like a GPO bid.
11     Q.   And then it's -- the last item is
12 pricing strategies, compliance and fraud and
13 abuse.  Do you see that?
14     A.   Yes.
15     Q.   What does that mean?
16     A.   Well, I think as we talked earlier, as
17 our counsel looked at different potential issues
18 or potential modifications, the way that we
19 structured our agreements or worked within the
20 guidelines of our contracting that we would make
21 sure that those were being upheld or modified
22 based on input from counsel.

Baker, Peter D. - Vol. II HIGHLY CONFIDENTIAL          February 28, 2008
Chicago, IL

47 (Pages 516 to 519)

516

1      Q.  And what recollections do you have
2  about communications with counsel concerning
3  that?
4          MS. TABACCHI:  I'm going to caution the
5  witness not to reveal the substance of any
6  communications with counsel.
7  BY MS. ST. PETER-GRIFFITH:
8      Q.  Does Abbott intend to rely upon any
9  advice of counsel's defense?
10         MS. TABACCHI:  We have this
11  conversation every time.  In the course of this
12  deposition I will not allow Mr. Baker to reveal
13  the substance of communications with counsel and
14  waive any privilege that there may be.  To the
15  extent that he has a recollection of a specific
16  substantive communication with counsel, I don't
17  want that to be revealed in his response.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.  Do you have any recollection of
20  communications with counsel?
21      A.  No, other than I think training
22  obviously went on.  We tried to work within --

517

1  that team did at that time --
2      Q.  Okay.  Go ahead.
3      A.  -- to make sure that they were -- if
4  there were modifications needed that they were
5  implemented.
6      Q.  Well, what training do you recall was
7  being conducted concerning, you know, fraud and
8  abuse, compliance matters?
9          MS. TABACCHI:  Object to the form.
10         THE WITNESS:  I don't -- as I say, I
11  think I was transitioning into that role.  You'd
12  have to ask probably Mr. Sellers.  But again, I
13  don't know if this was his document either.  But
14  I don't know that I can tell you what was being
15  done at the time.
16  BY MS. ST. PETER-GRIFFITH:
17      Q.  Do you recall whether there was any
18  training done by anyone within the general
19  counsel's office?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't know.
22         MS. ST. PETER-GRIFFITH:  Is now a good

518

1  time to take a break?
2          MS. TABACCHI:  Sure.
3          THE VIDEOGRAPHER:  We are off the
4  record at 2:08 p.m.  (Recess taken.)
5          THE VIDEOGRAPHER:  We are back on the
6  record at 2:16 p.m.
7          MS. ST. PETER-GRIFFITH:  Mark this as
8  the next exhibit.
9          (Whereupon Exhibit Baker 042 was
10  marked for identification.)
11  BY MS. ST. PETER-GRIFFITH:
12      Q.  Mr. Baker, as you look at this next
13  exhibit, I will tell you that my focus is going
14  to be on the first page under the heading
15  "Government Significant Events," but certainly
16  take your time and review it as you deem
17  necessary.
18      A.  Okay.
19      Q.  Mr. Baker, do you recognize this
20  document?
21      A.  Not specifically, no.
22      Q.  It appears to be a significant events

519

1  report for September of 2002 from Mr. Sellers
2  directed to you.  Do you see that?
3      A.  Yes, I do.
4      Q.  Do you have any doubt that you received
5  this?
6      A.  No.
7      Q.  My question concerning this document --
8  well, first let me ask you:  How often did Mr.
9  Sellers provide you with significant events
10  reports?
11      A.  They were done on a monthly basis.
12      Q.  Under that first subheading where it
13  says government significant events, do you see
14  that?
15      A.  Yes.
16      Q.  The last bullet point references the
17  CARS/Many Medicaid rebate payment system has been
18  implemented in HPD, PPD and TAP.  Do you see
19  that?
20      A.  Yes.
21      Q.  What is the CARS/Many Medicaid rebate
22  payment system?

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action No. |
| | )       01-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| United States of America, | ) Hon. Patti Saris |
| ex rel. Ven-a-Care of the | ) |
| Florida Keys, Inc., v. | ) |
| Abbott Laboratories, Inc., | ) |
| and Hospira, Inc. | ) |
| CIVIL ACTION NO. 06-11337-PBS | ) |

*******************************************************

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL | ) |
| INDUSTRY AVERAGE WHOLESALE | ) MDL No. 1456 |
| PRICE LITIGATION | ) Civil Action No. |
| | ) 01-CV-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) Judge Patti B. |
| | ) Saris |
| State of Arizona v. Abbott | ) |
| Labs., et al. | ) |
| Civil Action No. 06-CV-11069-PBS | ) |

*******************************************************

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID E. BRINCKS
JUNE 12, 2007

*******************************************************

1   third-party payer, Abbott would share in that
2   reimbursement, right, as part of the revenue share?
3            MS. CITERA: Objection to form.
4   A.       Yes.
5   Q.       Okay.  Do you know what the range of
6   percentage of the share was?  Was it 15 percent,
7   70 percent?
8   A.       Again, it varied by therapy.
9   Q.       Okay.
10  A.       And I don't -- Again, in the total
11  parenteral nutrition -- in that arena, it would have
12  been on the higher end of what you described.  So
13  50 percent.  I -- I don't remember the specifics, but
14  it would have been more like 50 or 60.  And in
15  chemotherapy, it might have been 15.  It -- It would
16  have ranged.
17  Q.       And why -- What was -- would be the reason
18  for such the -- a large range?
19  A.       The variation in product that could be
20  provided.
21  Q.       Okay.  So the more product that was
22  provided by Abbott, is it fair to say the higher the
23  reimbursement percentage?
24  A.       Correct.  That would be fair to say.
25  Q.       Okay.  And would that higher reimbursement
                                                    Page 66

1   percentage be triggered by a higher cost to Abbott or
2   a higher reimbursement?
3            MS. CITERA: Objection to form.
4   A.       It's all based on value of what you're
5   providing to the supportive price to a client.  So it
6   was based on between a combination of the products
7   and the services was taking 50 percent of total
8   parenteral nutrition a reasonable value.  And that's
9   how that process would go.
10  Q.       As part of the total parenteral nutrition,
11  what were the types of products that were provided on
12  a consignment basis by Abbott to its consignment
13  partners?
14  A.       Well, you have the bags.  There would be
15  tubes.  There might be poles.  There might be the
16  variety of the things that you had to do as well as
17  the actual solution itself.  So you would have to
18  send them -- They'd have the bag.  So they would hang
19  the bag and then it would be all the other stuff that
20  would be required to actually get the site prepared
21  and then deliver the total parenteral nutrition.
22  Q.       Okay.  Would Ross products be involved?
23  A.       Ross?  I don't recall Ross being directly
24  involved.  The parenteral nutrition -- You know, I
25  don't remember how that -- how that process went.
                                                    Page 67

1   But I don't recall any direct relationship with Ross
2   at all in home infusion.
3   Q.       Do you recall whether under these revenue
4   share agreements there was a contractual provision
5   for the consignment of Ross products in addition to
6   Abbott Home Infusion products?
7   A.       Some of the pumps may have been Ross
8   pumps, but they were all Abbott products.  So in that
9   regard, it was a more corporate view of the pump.  So
10  the actual total parenteral pumps would have been
11  part of this consignment arrangement.
12  Q.       Okay.  What about the fluid products that
13  were provided; do you remember which fluid products
14  were provided?
15  A.       Fluid products?  Can you --
16  Q.       Dextrose, sodium chloride.
17  A.       I don't -- I don't recall the specifics,
18  but there would have been -- because you're
19  delivering home infusion, there would have been
20  diluents and other IV solutions that would have been
21  part of it.
22  Q.       Okay.  I'd like to go back to an earlier
23  question about what your responsibilities were as
24  the -- Actually, I'm not even sure I've asked this
25  question.
                                                    Page 68

1            What were your responsibilities as the
2   manager of contract marketing?
3   A.       Well, I had, again, the -- the
4   administrative assistant, the two analysts working
5   for me and the case -- the case managers.  The
6   primary focus was in working with the analysts and
7   ensuring that we were supporting the -- A lot of our
8   time was in supporting the proposals and working with
9   the field sales force and putting them together
10  properly, highlighting what our -- our service
11  capabilities were and then supporting them in the
12  process of that negotiation.
13  Q.       Okay.  As the contract manager, did you
14  work with the legal department?
15  A.       Yes.
16  Q.       What was your involvement with the legal
17  department?
18           MS. CITERA: And, again, I'm just going to
19  instruct you not to reveal any substance of the
20  conversations with the legal department.
21           THE WITNESS: Sure.
22  A.       I'll just characterize the nature of what
23  we did.  We had a standard agreement that was used as
24  a structure for these revenue share agreements.  We
25  made certain in working with our legal department
                                                    Page 69

                                18  (Pages 66 to 69)

```
 1   that that was appropriate legal structure to use and
 2   if we -- therefore, had a standard in place and if
 3   there were any adjustments made to it in a
 4   negotiation, we also went through that process every
 5   step of the way.
 6   Q.      Would you generate any documents
 7   concerning this process?
 8   A.      Documents concerning the process?
 9   Q.      Like memoranda or discussions.  How -- How
10   would the -- Let me backtrack.
11          How would your -- How would you interact
12   with the legal department?  Would it be in writing?
13   Would you meet with them?
14   A.      It was -- Face-to-face is what --
15   predominantly what -- what we did.
16   Q.      And who were the lawyers that you met with
17   face-to-face?
18   A.      The one for sure that I remember was Brian
19   Taylor.  There may have been some others, but I don't
20   recall the names.  Brian for sure.  In the time
21   period that I was there, it would have been Brian
22   Taylor.
23   Q.      Okay.  What were the types of documents
24   that you would generate when you were in your role as
25   a contract marketing analyst?
```
Page 70

```
 1   A.      What were the documents?  Again, it was --
 2   A lot of those were the proposals that we talked
 3   about where we would create actual documents
 4   highlighting what services we could provide.  Part of
 5   it was a -- a projection of the home infusion
 6   operation.  So there was also a financial projection
 7   of what the operation was based on projected patient
 8   demographics that the clients would provide.  And so
 9   that would -- that would lay out a rough idea of what
10   the operation might look like for them.  So those
11   were the -- the key pieces.
12   Q.      Okay.  How were those documents
13   maintained?
14   A.      What do you mean by "maintained"?
15   Q.      Well, did you -- Did you keep those
16   contracts in files -- in hard copy files, on
17   computers?
18   A.      Yes.  It probably would have been a
19   combination of those things.
20   Q.      Do you have a recollection of how that
21   worked?
22   A.      Beside just the -- You know, having a file
23   with, you know, the information and perhaps keeping
24   some electronic copies, there was not anything more
25   elaborate than that.
```
Page 71

```
 1   Q.      What about correspondence with your
 2   clients?
 3   A.      Like a retention policy?  Is that what
 4   you're --
 5   Q.      Yeah.
 6   A.      I don't -- I don't recall having --
 7   Documents I'm sure would have gone into the file if
 8   they were appropriate, but there -- there was not any
 9   process beyond that.
10   Q.      Okay.  And did each individual analyst
11   maintain his or her own files or was there a central
12   file area?
13   A.      I don't -- I don't recall.  I believe we
14   had a centralized file, but I don't remember how we
15   would do that.  Obviously we would each have certain
16   files as we were working on them, but there would
17   have been a central file.  I don't recall the details
18   of it, though.
19   Q.      What about when you were an analyst; did
20   you have your own files?
21   A.      Certainly work papers, things you would
22   have been working on.
23   Q.      And when you were promoted, what happened
24   to those files?
25   A.      Typically we left them where they were for
```
Page 72

```
 1   the person that was coming in behind and you might
 2   just come alongside and talk with them and train them
 3   and walk them through what they needed to know.
 4   Q.      Okay.  So you wouldn't take those files
 5   with you; you'd leave them for the person who assumed
 6   your role after your promotion?
 7   A.      Oh, yeah.  I was glad to leave most of the
 8   files behind.
 9   Q.      Okay.  What about did you have a computer
10   when you were a contract marketing analyst?
11   A.      Yes.
12   Q.      Okay.  And what about -- What -- What
13   documents did you maintain on the computer?
14   A.      What documents?  I'm -- Just the -- some
15   of the proposal documents perhaps for a period of
16   time.  I mean, we would get to a point where you
17   would run out of space on your computer and might
18   clean it off, but I -- I don't -- I don't recall, I
19   mean, beyond the -- the -- the analysis documents and
20   the things that were part of the proposals.  That
21   would have been what was on the computer.
22   Q.      Okay.  Do you -- Did you take your
23   computer with you when you were promoted, or did you
24   get a new computer?
25   A.      New computer.
```
Page 73

19  (Pages 70 to 73)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION                     )   MDL No. 1456
_____)   Civil Action No. 01-12257
                               )
THIS DOCUMENT RELATES TO:      )   Judge Patti B. Saris
_____)
                               )
United States of America,      )
ex res. Ven-A-Care of the      )
Florida Keys, Inc. v. Abbott   )
Laboratories, Inc.             )
CIVIL ACTION NO. 06-11337-PBS  )
                               )
                               )


        VIDEO DEPOSITION OF DONALD C. ROBERTSON


        DATE TAKEN:     Thursday, September 13, 2007

        TIME:           8:54 a.m. to 4:28 p.m.

        BEHALF OF:      The United States

        PLACE TAKEN:    United States Attorney's Office
                        2110 First Street,
                        Fort Myers, Florida

        REPORTER:       Lisa L. Rios, Court Reporter,
                        and Notary Public, State of
                        Florida at Large


        _____


                MARTINA REPORTING SERVICES
                Courtney Building, Suite 201
                     2069 First Street
                Fort Myers, Florida  33901
                      (239) 334-6545
                   FAX  (239) 332-2913

Page 130

1   A   No, ma'am.
2       (Continuing) -- and it wouldn't make sense just to
3   go every time if there were certain parameters we could
4   arrange, so. But I'm sure that they would have copies of
5   our contracts and that they would have to grant their
6   blessing to these contracts before we could implement them,
7   I mean.
8   Q   Are you aware of anyone else who would need to
9   review the contr- - the Alt Site contracts?
10  A   Not to my knowledge.
11  Q   Would the general counsel's office need to review
12  them?
13  A   Oh, absolutely.
14  Q   Was there someone in particular that you worked
15  with in Alt Site for contract review?
16  A   Each of the business units was assigned an
17  individual, and I can see the faces but can't recall the
18  names.
19  Q   Okay.
20      Do you have any recollection whatsoever as to
21  identifying information?
22  A   I don't know --
23      MS. CITERA:  Wait a second.
24      I just want to instruct you to the extent - I'm not
25  sure about your question, but not to reveal any

Page 131

1   conversations that you had with counsel.
2       I'm not sure that that what you're asking, but I
3   just want to make that clear.
4       THE WITNESS:  Yes, ma'am.
5       MS. CITERA:  Okay.
6   BY MS. ST. PETER-GRIFFITH:
7   Q   Do you recall any identifying features about the --
8   A   There was a young -- Is that -- There's a young,
9   curly-haired fellow who was very cooperative and hard
10  working and - I mean, the division had a person and her name
11  was Honey Lynn Goldberg - I remember that - I remember her -
12  she also worked in Diagnostics for a year, so I remembered
13  name, we'd work with her all the time. I can't remember the
14  name of the young man who - with whom we dealt.
15      But, yeah, it was important to us that the
16  contracts have the approval of our legal department.
17  Q   Lorene Mershimer --
18  A   Yes, ma'am.
19  Q   Who is Miss Mershimer?
20  A   Miss Mershimer is - oh, I don't know what she does
21  now. Miss Mershimer was general manager of the renal
22  business.
23  Q   Okay.
24      And she succeeded Mr. Sellers?
25  A   She succeeded --

Page 132

1       MS. CITERA:  Objection to form.
2       THE WITNESS:  -- Mike King.
3   Q   Oh, Mike King. I'm sorry.
4   A   Mr. Sellers was never involved in Renal.
5   Q   Right. Okay.
6       And so you were her direct supervisor?
7   A   Yes, ma'am.
8   Q   For how many years?
9   A   Two or three; I can't recall.
10  Q   And did Miss Mershimer then move on to something
11  else after?
12  A   She was promoted into the Hospital Products
13  Division in responsibility there.
14  Q   How was your interaction with Miss Mershimer?
15  A   She reported to me.
16  Q   Okay.
17      How often would she report to you?
18  A   I saw Miss Mershimer daily. We would have
19  conversations probably weekly.
20  Q   How was she as an employee?
21  A   As an employee?
22      MS. CITERA:  Objection to form.
23      MS. ST. PETER-GRIFFITH:  Yes.
24      THE WITNESS:  As a colleague -- Do you -- I cannot
25  answer, you know, as an employee.

Page 133

1       As a colleague --
2       MS. ST. PETER-GRIFFITH:  Okay.
3       THE WITNESS:  -- she was bright, articulate,
4   aggressive, smart, and I believe she did very well in
5   the Renal Care business.
6   BY MS. ST. PETER-GRIFFITH:
7   Q   Virginia Tobiason, is that a name that rings a
8   bell?
9       We had already talked about her earlier.
10  A   Yeah, I know Miss Tobiason.
11  Q   How do you know Miss Tobiason?
12  A   She worked in Home Infusion Services.
13  Q   Okay.
14      And did she work there during part of your tenure?
15  A   Oh, yes.
16  Q   Okay.
17      For how many years, do you recall?
18  A   It may have been five or six. It was quite a
19  while.
20  Q   What was her role in Home Infusion?
21  A   She administratively (sp.) the part of Home Infusion
22  that did the billing and reimbursement piece, I believe.
23  Q   Did Miss Tobiason have any other responsibilities
24  beyond that reimbursement area in Home Infusion?
25  A   She may have, but I don't recall them.

Page 134

1    Q   Okay.
2        Do you recall whether she had any particular
3    expertise with regard to reimbursement issues?
4        MS. CITERA: Objection to form.
5        THE WITNESS: She was in charge of the department.
6    I would have to assume that she was competent.
7    Q   Okay.
8        Was she consulted on reimbursement issues that
9    transcended or that went beyond the Home Infusion area?
10       MS. CITERA: Objection to form.
11       THE WITNESS: I think she may have been; yes.
12   Q   Okay.
13       Did you rely upon her for those, for reimbursement
14   issues --
15   A   I personally -- I relied on her --
16       COURT REPORTER: Did you rely on her --
17       MS. ST. PETER-GRIFFITH: For reimbursement issues
18   beyond or outside of Home Infusion?
19       MS. CITERA: Object to the form.
20       THE WITNESS: I personally do not recall ever having
21   done that; no.
22   BY MS. ST. PETER-GRIFFITH:
23   Q   Okay.
24       How was Miss Tobiason as an employee?
25       MS. CITERA: Objection to form.

Page 135

1        THE WITNESS: As a colleague, as a person that
2    worked there, I saw her infrequently but I heard no
3    complaints about her competence, her performance.
4    Q   How about her interaction with her colleagues or
5    subordinates, were there any problems?
6    A   Any problems?
7        Serious problems that I recall, no. But that
8    doesn't mean they didn't exist but I just don't know of
9    them.
10   Q   Do you know whether she was well liked by her
11   staff?
12       MS. CITERA: Object to the form.
13       THE WITNESS: I don't know that. I don't know
14   whether she was or was not.
15       I know that no one came to complain to me about
16   her - I don't believe anybody came - I don't recall
17   anybody ever coming to me to complain, so.
18   Q   Did you hear any complaints about her at all?
19   A   No.
20   Q   Okay.
21   A   No.
22   Q   We touched upon a little bit earlier litigation
23   hold memos.
24       Do you recall that I asked you whether you received
25   memos?

Page 136

1    A   And I think my answer was I may have received them;
2    if I received them I would have complied.
3        I have no specific recollection of having received
4    them.
5    Q   If the memo directed you to distribute the memo to
6    others within your business unit, would you have done that?
7        MS. CITERA: Objection to form.
8        THE WITNESS: Yes, ma'am. I believe we've covered
9    this ground; that compliance with directives of my
10   superior was not optional.
11   Q   Okay.
12       Do you recall for Alt Site - for products that Alt
13   Site sold whether annual price increases were taken?
14       MS. CITERA: Objection to form.
15       THE WITNESS: Whether annual price increases were
16   taken.
17       Our objective was, once again, to fulfill our
18   responsibility to the shareholders and get as high an
19   average unit selling price for the product as we could;
20   that was our responsibility --
21       MS. ST. PETER-GRIFFITH: Okay.
22       THE WITNESS: -- similar to anyone's responsibility
23   to be as productive as possible for their employer.
24   BY MS. ST. PETER-GRIFFITH:
25   Q   Do you recall whether average unit selling prices

Page 137

1    would go down?
2    A   It would depend upon the level of competition.
3        Do I remember specific products going down? No,
4    but it would depend upon the level of competition, the
5    numbers of competitors.
6        I do have a specific example; isoflorane, we went
7    from one competitor to four and the prices in that one
8    specifically went down.
9        When you get generic competition, the prices
10   invariably go down.
11   Q   Sir, how much interaction did you have with
12   Abbott's legal department?
13   A   As needed.
14   Q   Okay.
15       And what --
16   A   I mean, they --
17   Q   -- would be the nature - I don't want you to
18   discuss with me the discussions you had with the legal
19   department, but what were the general natures of your
20   interaction with --
21   A   As I recall, the legal department at Abbott wanted
22   to make sure our contracts were correctly written, that we
23   followed all legal requirements.
24       I found them to be cooperative, I found them to be
25   professional, and my relationship to them is what they said

Page 138

1   went - there really was no discussion after a decision was
2   made; they made a decision, this is the way it's going to be
3   done, end of story --
4       Q   Okay.
5       A   -- and I have no complaints with that. I mean, we
6   want to comply.
7       Q   What Abbott - the Abbott corporate office, what
8   would your interaction with them be?
9       MS. CITERA: Objection to form.
10      THE WITNESS: The corporate -- Do you mean Mr. -- Do
11  you mean specific individuals, which specific functions?
12      Q   Well, let me ask you this: Would there be an area
13  in Abbott called Abbott Corporate?
14      A   No, ma'am.
15      Q   No?
16          Okay.
17      A   Not -- Not to -- Abbott Corporate, someone may use
18  that term. To me, the term is meaningless.
19          Does it mean that all the chiefs sitting around in
20  their offices up in AP6? Does it mean everyone in that
21  building? Does it comprehend everybody who works for a
22  corporate department? It's sort of a - to me, a meaningless
23  term.
24          If you'd talk about a specific department, I'd be
25  happy to relate my relationship with that department.

Page 139

1       Q   Okay.
2           Well, I wanted to ask you whether you had an
3   understanding as to whether there was a corporate
4   department.
5       A   Oh, there was corporate. We used to get the
6   allocations.
7       Q   Okay.
8           And would you interact with anyone in what you
9   perceive to be the corporate department?
10      A   As needed.
11          For example, Mr. Hodgson, who would approve our
12  plans and updates was corporate --
13      Q   Okay.
14      A   -- corporate is - let's use for this context anyone
15  who's not part of a division, does that work?
16      Q   Okay.
17      A   Sure. Our contacts would be frequent. The legal
18  people were corporate - they may assigned to a division, but
19  they were corporate.
20          So in that context, yes, ma'am.
21      Q   What about Hospital HBS; that was another division
22  within the Hospital Products Division or Business Unit?
23      A   HBS, is that the acronym that you were given, HBS?
24      Q   Yeah.
25      A   Do you know what the words are?

Page 140

1           Does that mean --
2       Q   The Hospital Business Sector.
3       A   Okay. That would be - yeah. That would be
4   Mr. Begly's responsibility --
5       Q   Okay.
6       A   -- HBS.
7       Q   Did you have interaction with HBS?
8       A   Sure. They were part of our division. We were in
9   their updates, they were in ours. We knew their results,
10  their activities and their plans.
11      Q   Go ahead.
12      A   But I just remembered the name of the person whom I
13  replaced - and this was very early on in the conversation -
14  the person's name is Joy Amundson.
15      Q   Okay.
16      A   That's why it's so frustrating to have these
17  conversations after such a long time; you can't remember the
18  names of some people.
19      Q   Sir, what I'd like to do right now is go over with
20  you some terms that have come up in this litigation --
21      A   Mm-hmm.
22      Q   -- and I'd like to get your understanding of the
23  terms.
24      A   Mm-hmm.
25      Q   They're primarily related to pricing, okay?

Page 141

1       MS. CITERA: Objection to the form.
2       Q   What --
3       MS. ST. PETER-GRIFFITH: Well, I haven't asked the
4   question.
5       MS. CITERA: Well, I mean or objection to the
6   commentary, I should say.
7       MR. STETLER: Object to what you're thinking about
8   asking.
9   BY MS. ST. PETER-GRIFFITH:
10      Q   Sir, have you ever heard the term "WAC"?
11      A   I've heard the term WAC, yes, ma'am.
12      Q   What is WAC?
13      A   The term, as I understand it, mean Wholesale
14  Acquisition Cost.
15      Q   And how did that -- What did you understand the
16  purpose of WAC?
17      A   I have absolutely no idea.
18      Q   Would it be something that you would be familiar
19  with or interact with on a day-to-day basis?
20      A   No.
21      Q   Do you know whether WAC was important to Alt Site
22  at all?
23      A   No --
24      MS. CITERA: Objection to form.
25      THE WITNESS: -- I don't remember it as being

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE        )
LITIGATION                     )      MDL No. 1456
                               )      Civil Action No. 01-12257
_____)
                               )
THIS DOCUMENT RELATES TO:      )      Judge Patti B. Saris
                               )
_____)
                               )
United States of America,      )
ex res. Ven-A-Care of the      )
Florida Keys, Inc. v. Abbott   )
Laboratories, Inc.             )
CIVIL ACTION NO. 06-11337-PBS  )      **CONFIDENTIAL**
                               )
                               )


CONTINUED VIDEO DEPOSITION OF DONALD C. ROBERTSON


        DATE TAKEN:    Tuesday, October 9, 2007

        TIME:          9:06 a.m. to 4:58 p.m.

        BEHALF OF:     The United States

        PLACE TAKEN:   United States Attorney's Office
                       2110 First Street,
                       Fort Myers, Florida

        REPORTER:      Lisa L. Rios, Court Reporter,
                       and Notary Public, State of
                       Florida at Large

_____

MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida  33901
(239) 334-6545
FAX  (239) 332-2913



Page 297

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE )
LITIGATION          ) MDL No. 1456
_____ ) Civil Action No. 01-12257
                )
THIS DOCUMENT RELATES TO:  ) Judge Patti B. Saris
_____ )
                )
United States of America,    )
ex rel. Ven-A-Care of the    )
Florida Keys, Inc. v. Abbott )
Laboratories, Inc.           )
CIVIL ACTION NO. 06-11337-PBS )
                )
                )

CONTINUED VIDEO DEPOSITION OF DONALD C. ROBERTSON

DATE TAKEN:  Tuesday, October 9, 2007
TIME:       9:06 a.m. to 4:58 p.m.
BEHALF OF:  The United States
PLACE TAKEN:  United States Attorney's Office
            2110 First Street,
            Fort Myers, Florida
REPORTER:   Lisa L. Rios, Court Reporter,
            and Notary Public, State of
            Florida at Large

MARTINA REPORTING SERVICES
Courtney Building, Suite 201
2069 First Street
Fort Myers, Florida 33901
(239) 334-6545
FAX (239) 332-2913

CONFIDENTIAL

---

Page 296

1
2      A P P E A R A N C E S
3
4   ANN ST. PETER-GRIFFITH, Attorney at Law,
    Special Attorney for the Attorney General
5   99 N.E. 4th Street, 3rd Floor,
    Miami, Florida  33132
6   representing the United States Attorney,
    Southern District of Florida
7
8   DONALD E. HAVILAND, JR., Attorney at Law,
    The Haviland Law Firm, LLC,
9   740 S. Third Street, Third Floor
    Philadelphia, Pennsylvania 19147
10  representing the Commonwealth of Pennsylvania
11
    TONI-ANN CITERA, Attorney at Law,
12  Jones Day,
    222 East 41st Street
13  New York, New York  10017-6702
    representing Abbott Laboratories, Inc.
14
15  DAVID J. STETLER, Attorney at Law,
    Stetler & Duffy, Ltd.,
16  11 South LaSalle Street, Suite 1200
    Chicago, Illinois  60603;
17  representing the Witness, Donald C. Robertson
18
    C. JARRETT ANDERSON, Attorney at Law,
19  Anderson, LLC
    1300 Guadalupe, Suite 103
20  Austin, Texas  78701
    representing the Relator, Ven-A-Care of the Florida
21          Keys, Inc.
22
23  ELISEO SISNEROS, Deputy Attorney General,
    State of California Department of Justice
24  110 West A Street, #1100
    San Diego, California  92101
25

---

Page 298

1
2      I N D E X (Cont'd)
3      E X H I B I T S
4
    ROBERTSON    DESCRIPTION          PAGE
5
    11   One-page Interoffice Correspondence
6    dated June 22, 1994 from Virginia
     Tobiason stamped ABT212120      306
7
    12   One-page Interoffice Correspondence
8    dated December 3, 1993 from Jeff Hamlin   313
9  13   Two-page document with first page being
     an Interoffice Correspondence dated
10   December 6, 1993 from R. Emmet Harrigan   316
11 14   two-page document with first page being an
     Interoffice Correspondence dated December
12   21, 1993 from Jeffrey L. Hamlin   317
13 15   16-page Interoffice Correspondence dated
     March 8, 1999 from Marianne Sutcliffe   319
14
    16   30-page document with first page stamped
15   ABT006588           323
16 17   33-page composite exhibit with first page
     dated January 26, 2000 from Michelle
17   Scarpelli and Jim Watson       328
18 18   45-page composite exhibit with first page
     dated February 20, 1997 from Jack Miller   330
19
20 19   16-page document with first page dated
     September 25, 1997 from Lynn E. Leone   334
21
    20   21-page document with first page being a
22   facsimile cover sheet to Chuck Santora
     from Lynn Leone           338
23
    21   Five-page document from Jack Miller
24   with first page dated December 8, 1997   340
25 22   Two-page Unanimous Consent dated
     September 13, 2001         366

---

1
2      A P P E A R A N C E S (Continued)
3
4   Appearing via Telephone:
5
6      AMBER NESBITT, Attorney at Law,
       Wexler, Toriseva, Wallace,
7      55 West Monroe Street, Suite 3300
       Chicago, Illinois  60603;
8      representing MDL and the State of Arizona
9      SHARON LAHEY, Attorney at Law,
       Goodwin, Proctor
10     representing TAP Pharmaceutical Products, Inc.
11
12  Also Present:
13
    Mike Sturdevant, Videographer
14
    John Lockwood, Ven-A-Care of the Florida
15  Keys, Inc., Relator
16
17  _____
18      I N D E X
19              PAGE
20
21  Cont'd Direct Examination by Ms. St. Peter-Griffith   305
22  Cross-Examination by Mr. Haviland       348
23  Cross-Examination by Mr. Anderson       434
24
25

Page 343

1   A   Okay.
2   Q   Give me two minutes here.
3   A   Sure.
4   Q   Sir, do you ever remember any of your business
5   units, either Alternate Site, Renal or Home Infusion having
6   a Medicare, Medicaid fraud and abuse compliance guidelines
7   publication or operating guidelines?
8   A   Not specifically, no.
9   Q   Could they have existed, you just don't recall?
10  A   It would certainly be our policy to comply with all
11  appropriate legislation; yes.
12  Q   Well, my question is more geared towards do you
13  remember any written policy?
14  A   Not specifically, no.
15  Q   If other divisions at Abbott had a written policy,
16  would it seem likely that your business units would?
17      MS. CITERA: Objection to form.
18      THE WITNESS: That's an assumption I can't make
19  because I don't know.
20  Q   Do you recall any written or -- Well, do you recall
21  any written information concerning compliance with the False
22  Claims Act?
23  A   I don't remember the False Claims Act specifically.
24      No.
25  Q   Do you recall anyone with either -- Well, do you

Page 344

1   recall whether anyone at Abbott ever raised with you
2   compliance with the False Claims Act as an issue?
3       MS. CITERA: I'm going to object to the form and
4   also give you the same caution that to the extent yo had
5   any conversations with Abbott inside or outside counsel
6   that you not reveal the substance of those
7   conversations.
8       THE WITNESS: Okay.
9   Our policy was to comply with all legislation.
10  If I did have any of those conversations, which I
11  don't specifically recall, the conversation would have
12  been about complying with the legislation.
13  Q   Let me ask you - you testified to that at your at
14  the earlier part of your deposition, as well.
15      How do you know whether or not your staff was
16  complying or those who were subordinate to you were
17  complying with Federal and State Medicaid and Medicare
18  statutes or any Federal and State statutes and regulations
19  that governed your business?
20      MS. CITERA: Objection to form.
21      THE WITNESS: Their instructions were to comply. We
22  had a contracting department. All the terms and
23  conditions of our contracts were clearly articulated.
24  They were vetted by legal people.
25      After doing that, I assume that if we're complying

Page 345

1   with the contract terms and conditions that we're in
2   compliance with all appropriate legislation.
3       Beyond that, I didn't have any, you know - I didn't
4   have any dealings with the matter.
5   Q   Would there be a way for you to verify whether or
6   not?
7   A   Personally, no.
8   Q   Would there be somebody that you would go to to ask
9   about compliance issues or to ask that compliance be
10  verified?
11  A   Once again, my assumption is that once the
12  contracts were - the contracts we had where the terms and
13  conditions were clearly articulated, were approved by the
14  division group, which was, you know, the Hospital Contract
15  Marketing group, that they were in compliance with all
16  appropriate legislation that we were doing the right things.
17  Q   What about with regard to your drug pricing?
18      MS. CITERA: Objection to form.
19      THE WITNESS: I don't remember specifically dealing
20  with that issue.
21  Q   Okay.
22  A   Well, who would you go to to rely upon to verify
23  that what your business unit was doing with regard to
24  pricing of its products was in compliance with Federal and
25  State law and regulations?

Page 346

1       MS. CITERA: Objection to form and also the same
2   caution.
3       THE WITNESS: With regard to how our product were
4   priced?
5       You know, I don't remember dealing with these issues
6   specifically. The price we charged the customer, that
7   was determined by the market and was pretty
8   straightforward.
9   Q   What about prices that were reported to the pricing
10  compendia?
11      MS. CITERA: Objection to form.
12      THE WITNESS: We didn't establish those prices.
13  Those prices were established by the marketing group
14  within the division.
15  Q   Okay.
16      Which market would that be --
17  A   Hospital Products Contract Marketing.
18  Q   Okay.
19      Would that be in the hospital business sector?
20  A   Yeah. That's where that group reported.
21  Q   Okay.
22  A   Once again, as I said, we were a smaller part of
23  the business and the businesses were different, the product
24  mixes were different and we utilized their services to
25  ensure that our strategy made sense for our customers.

Leone, Lynn E.                                    January 17, 2008

Chicago, IL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


--------------------------------X

In re:  PHARMACEUTICAL INDUSTRY   )   MDL DOCKET NO.

AVERAGE WHOLESALE PRICE           )   CIVIL ACTION

LITIGATION.                       )   01CV12257-PBS

--------------------------------X


DEPOSITION OF LYNN E. LEONE

JANUARY 17, 2008


        The videotaped deposition of LYNN E.

LEONE, called by the United States for examination,

Taken pursuant to subpoena and pursuant to the

Federal Rules of Civil Procedure for the United

States District Courts pertaining to the taking of

depositions, taken before Rachel F. Gard, Certified

Shorthand Reporter, at 77 West Wacker Drive, Suite

3500, Chicago, Illinois, commencing at 9:05 a.m. on

the 17th day of January, A.D., 2008.

Leone, Lynn E.                                    January 17, 2008
Chicago, IL

34  (Pages 130 to 133)

---

**130**

1      A.  So is the question did Abbott think
2  they committed fraud or do I know that Abbott
3  thought they committed fraud; is that the
4  question you're asking?
5      Q.  You're free to answer both questions.
6         MS. CITERA:  Objection to the form.
7  BY THE WITNESS:
8      A.  I don't understand the question that
9  you're asking me to answer.
10     Q.  Okay.  Well, then, that's fine.  Let me
11  try and ask it this way:  During your tenure as
12  an Abbott employee, were you aware of any
13  violations of the Medicare or Medicaid statutes
14  or regulations while you were at Abbott?
15         MS. CITERA:  Object to the form.  I'd
16  also counsel you not to reveal any discussions
17  you had with counsel.
18  BY THE WITNESS:
19     A.  I was not aware that there was -- that
20  Abbott did that, that Abbott could have done
21  that.
22     Q.  That Abbott could have done what?

---

**131**

1      A.  However you phrased that.
2      Q.  Okay.  Violated the Medicare or
3  Medicaid statutes or regulations?
4      A.  Yeah, I don't know that Abbott did
5  that, violated any of the fraud and abuse
6  statutes.
7      Q.  That's based on your knowledge and
8  experience with Abbott?
9         MS. CITERA:  Object to the form.
10  BY THE WITNESS:
11     A.  Yeah, I do not believe -- Well, I do
12  not know that Abbott or -- there was never
13  anything -- See, I'm not sure what I'm answering.
14     Q.  Okay.  It's very simple.  Let me --
15         MS. CITERA:  It's actually not.
16  BY MS. ST. PETER-GRIFFITH:
17     Q.  Let me try and simplify it, I should
18  say.  Are you aware of Abbott at any time during
19  your tenure as an employee at Abbott violating
20  any Medicare or Medicaid statutes or regulations?
21         MS. CITERA:  Objection to form.  Also
22  the same caution.

---

**132**

1  BY THE WITNESS:
2      A.  I am not aware Abbott violated any of
3  those regulations.
4      Q.  And that's based upon your personal
5  experience with Abbott; is that correct?
6      A.  Yeah, that's strictly based on my
7  personal experience and understanding, yes.
8      Q.  Are you aware of any measures that
9  Abbott undertook to ensure that it did not
10  violate Medicare or Medicaid statutes or
11  regulations?
12         MS. CITERA:  Objection to the form.
13  Also the same instruction.
14  BY THE WITNESS:
15     A.  Abbott had -- No, I am not aware of
16  that.
17     Q.  You're not aware of any measures that
18  Abbott undertook to ensure that it did not
19  violate the Medicare Medicaid statutes or
20  regulations?
21         MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

---

**133**

1      A.  I'm sorry.  I misunderstood the
2  question.
3      Q.  That's why I asked it again.
4      A.  Yes.  We had -- Abbott had in place
5  operating -- policies, corporate policies that
6  were created and developed with our legal
7  department and our Office of Ethics and
8  Compliance that were the policies that we
9  operated under as Abbott employees.  And there
10  were the corporate policies, and then there were
11  divisional procedures for -- for each one of the
12  divisions to make sure that they acted within
13  those -- make sure that they acted within those
14  corporate policies.
15     Q.  Okay.  Let me --
16     A.  So we did have that.
17     Q.  -- let me start with the corporate
18  policies -- First let me start with the Office of
19  Ethics and Compliance.  When did the Office of
20  Ethics and Compliance within Abbott, when was it
21  formulated?
22     A.  I don't know.

---

Leone, Lynn E.                                      January 17, 2008
Chicago, IL

35 (Pages 134 to 137)

---

134

1    Q.  Do you recall whether it existed prior
2  to 2000?
3    A.  I don't know when it -- when it was
4  initiated.
5    Q.  Okay.  If you had a question concerning
6  ethics or compliance matters prior to 2001, who
7  would you take those concerns to?
8    A.  We would probably start with our
9  counsel, go to our counsel and work with them;
10  and then based on direction from them, we would
11  take it from there.
12    Q.  Okay.  When you say "counsel," do you
13  mean in-house counsel?
14    A.  Yes.
15    Q.  Do you know whether the Abbott in-house
16  lawyer was also during -- prior to 2001 the
17  corporate ethics officer?
18    MS. CITERA:  Object to the form.
19  BY THE WITNESS:
20    A.  I do not recall within our in-house
21  counsel who had responsibility for what during
22  that period of time.

---

135

1    Q.  Okay.  What about after 2001?  Who
2  would you take your concerns about or your
3  questions about ethics and compliance -- And when
4  I say "compliance," I mean compliance with state
5  and federal statutes -- who would you take those
6  concerns to?
7    MS. CITERA:  Objection to the form.
8  BY THE WITNESS:
9    A.  I think again at that point, we
10  probably still would have started with our
11  counsel, in-house counsel, and then they would
12  have directed us to someone else.
13    Q.  Was there someone within your in-house
14  counsel's office you were familiar with that you
15  could take these questions to?
16    MS. CITERA:  Object to the form.
17  BY THE WITNESS:
18    A.  I think we would take them to -- If I
19  recall correctly, we probably started with Honey
20  Lynn Goldberg at the time and then somebody else
21  -- and then whoever she would designate for us to
22  work with after that.

---

136

1    Q.  Okay.  Do you recall taking questions
2  concerning ethics and compliance to Honey Lynn
3  Goldberg?
4    MS. CITERA:  I object to the form.  I'm
5  also going to caution you that's a yes or no, not
6  to reveal what you discussed, if you did discuss
7  anything.
8  BY THE WITNESS:
9    A.  What I meant to say was if we had
10  questions, the person we would probably start
11  with would be Honey Lynn or someone in her
12  organization.
13    Q.  Okay.  And my question, though, is, do
14  you ever recall taking any questions to her?
15    A.  I did not take any questions to her.
16    Q.  Do you recall whether any of your
17  employees within Alt Site who were under your
18  supervision took questions to her?
19    A.  I don't recall that that ever happened
20  during my tenure in Alternate Site Product Sales.
21    Q.  And as --
22    A.  As the manager.

---

137

1    Q.  As the manager, do you think that you
2  would have learned if a concern had been taken?
3    A.  Yes.
4    Q.  What about when you were in Alt Site?
5  Do you recall taking any ethics and compliance
6  questions to in-house counsel?
7    A.  That was what I was just addressing,
8  was Alt Site.
9    Q.  I'm sorry, Home Infusion.  When you
10  were in Home Infusion, do you recall having any
11  ethics or compliance questions that you took to
12  in-house counsel?
13    A.  I would have probably taken it to my
14  manager, and I don't recall ever having any
15  questions regarding that.
16    Q.  Okay.  What about after, in '03 when
17  you were in Contract Marketing?  Do you recall
18  taking any ethics and compliance questions to in-
19  house counsel?
20    A.  I don't recall taking any questions to
21  them because, at that point, I was more focused
22  on our internal activities.

---

Leone, Lynn E.                                      January 17, 2008
                        Chicago, IL

62  (Pages 242 to 245)

|  | 242 |
|---|---|
| 1 | MS. CITERA:  Objection to the form, |
| 2 | same caution. |
| 3 | BY THE WITNESS: |
| 4 | A.  I don't know that -- I was never |
| 5 | involved in any discussions that indicated that |
| 6 | the Hospital Products Division had any concerns |
| 7 | related to activities that could have been |
| 8 | comparable to what TAP was -- the TAP situation. |
| 9 | Q.  Were you aware of any spread marketing |
| 10 | activities within the Hospital Products Division? |
| 11 | MS. CITERA:  Objection to the form. |
| 12 | BY THE WITNESS: |
| 13 | A.  I do not believe that we marketed our |
| 14 | products based on the spread or that -- it was |
| 15 | not the way the hospital products business -- |
| 16 | Hospital Products Division and Alternate Site |
| 17 | product sales ever did its business. |
| 18 | Q.  What is the genesis of your belief? |
| 19 | Why do you believe that? |
| 20 | A.  Going back to when I first went into |
| 21 | Alternate Site Product Sales, it was always our |
| 22 | business practice to not market against the |

|  | 244 |
|---|---|
| 1 | there were some discussions with the sales force |
| 2 | -- I don't know when and I don't know who had |
| 3 | those discussions, and I don't -- that our |
| 4 | business practice was not to sell against the |
| 5 | spread or to discuss AWP with our customers. |
| 6 | Q.  Well, wouldn't your sales force know |
| 7 | that if that's their business practice?  Why |
| 8 | would you need to have a discussion with them? |
| 9 | MS. CITERA:  Object to the form. |
| 10 | BY THE WITNESS: |
| 11 | A.  Mostly to reiterate that is our policy |
| 12 | and to remind them that our business practices |
| 13 | were to sell based on our entire portfolio of |
| 14 | products. |
| 15 | Q.  Well, why did you have a need to remind |
| 16 | them of that if they were not engaging in those |
| 17 | practices -- |
| 18 | MS. CITERA:  Objection to the form. |
| 19 | BY MS. ST. PETER-GRIFFITH: |
| 20 | Q.  -- marketing practices? |
| 21 | A.  Just as a reminder to let people know. |
| 22 | New people were always coming into the |

|  | 243 |
|---|---|
| 1 | spread and -- the AWP spread, and we marketed our |
| 2 | products based upon the depth and breadth of the |
| 3 | product line and what the entire portfolio of |
| 4 | products and a relationship with Abbott could |
| 5 | bring to those customers and not based on the |
| 6 | spread for a few individual products. |
| 7 | Q.  Was that a published policy someplace? |
| 8 | MS. CITERA:  Objection to the form. |
| 9 | BY THE WITNESS: |
| 10 | A.  I do not know or recall if there was a |
| 11 | published policy related to that. |
| 12 | Q.  Then how do you know that that was what |
| 13 | was followed within the Alternate Site business |
| 14 | unit? |
| 15 | A.  The -- Our business practice was to |
| 16 | sell on the products and the portfolio and not to |
| 17 | sell on the spread. |
| 18 | Q.  But how do you know as a matter of fact |
| 19 | that that's what your sales force was doing? |
| 20 | MS. CITERA:  Objection to the form. |
| 21 | BY THE WITNESS: |
| 22 | A.  They were -- At some point I believe |

|  | 245 |
|---|---|
| 1 | organization.  You wanted to make sure everybody |
| 2 | was aware of what our policies were and our |
| 3 | processes as an organization and how to sell, how |
| 4 | to sell those products. |
| 5 | Q.  Ms. Leone, as the Contract Marketing -- |
| 6 | as the former Contract Marketing manager, do you |
| 7 | know as a fact that during your tenure in |
| 8 | Alternate Site none of the sales force marketed |
| 9 | the spread? |
| 10 | MS. CITERA:  Object to the form. |
| 11 | BY THE WITNESS: |
| 12 | A.  I can only tell you that it was not our |
| 13 | business practice to do that.  If it happened, I |
| 14 | don't know about it. |
| 15 | Q.  How did you verify whether or not the |
| 16 | sales force was or was not marketing the spread |
| 17 | or was complying with Abbott's policy? |
| 18 | MS. CITERA:  Objection to form. |
| 19 | BY THE WITNESS: |
| 20 | A.  I don't recall that we had anything in |
| 21 | place in the late -- mid to late '90s -- well, |
| 22 | late '90s to identify that. |

Leone, Lynn E.

January 17, 2008

Chicago, IL

63 (Pages 246 to 249)

246

1    Q.   Okay.  What about in early 2000, in the
2  early 2000s?
3    A.   When we -- When we did all of those
4  policies and procedures that we worked on, we --
5  there was company-wide training on the Federal
6  Healthcare Program Guidelines.  And although I
7  can't remember specifically, I believe that there
8  was discussion in that training about the --
9  those types of guidelines.
10    In addition, our legal department in
11  the -- in early 2000 did training sessions with
12  whole groups of employees across the Hospital
13  Products Division talking about the general --
14  general fraud and abuse guidelines.  And they
15  were some -- they did do some sessions with our
16  entire sales force at different times.  They did
17  each district separately.  And then they also had
18  sessions with people in home office.
19    Q.   Okay.  Let's break that down a little
20  bit.  With regard to the -- before the 2000
21  meetings with legal, you were talking about a
22  policy -- or you were talking about the policies.

247

1  Those are the ones developed in 2003, correct?
2    A.   Correct.
3    Q.   Okay.  That you helped work on?
4    A.   Yes.
5    Q.   And in terms of the training, is that
6  the "Safeguarding Trust" program.
7    A.   Yes.
8    Q.   And wasn't the "Safeguarding Trust"
9  program developed incident to Abbott's entry into
10  a corporate integrity agreement with the United
11  States?
12    MS. CITERA:  Objection to the form.
13  BY THE WITNESS:
14    A.   I believe that that was part of it,
15  yes.
16    Q.   Okay.  So prior to 2003, other than
17  this meeting with legal, you have -- it's your
18  testimony that you're unaware of any way of
19  verifying whether or not sales force members out
20  in the field engaged in spread marketing?
21    MS. CITERA:  Objection to the form.
22  BY THE WITNESS:

248

1    A.   All I can say is that it was our
2  business practice not to do that.  And if it
3  happened, I was not aware of it.
4    Q.   Okay.  But it could have happened; you
5  just weren't aware of it?
6    MS. CITERA:  Objection to form.
7  BY THE WITNESS:
8    A.   Again, I don't know whether it did or
9  not.
10    Q.   But it could have happened?
11    MS. CITERA:  Objection to form.
12  BY THE WITNESS:
13    A.   It could have happened.
14    Q.   Okay.  If this was an important policy
15  to Abbott, why didn't Abbott Alternate Site
16  implement some kind of methodology to ensure that
17  its sales force was not marketing the spread?
18    MS. CITERA:  Objection to form.
19  BY THE WITNESS:
20    A.   I don't know.
21    Q.   Okay.  If you could turn to --
22    MS. ST. PETER-GRIFFITH:  Have we marked

249

1  the next exhibit, Jarrett, No. 32?
2    MR. ANDERSON:  No, but I will.  Hold on
3  one second.
4    MS. ST. PETER-GRIFFITH:  Actually what
5  I'd like to do is skip No. 32 and move on to No.
6  54, please.
7    MR. ANDERSON:  Okay.
8    MS. ST. PETER-GRIFFITH:  And, Jarrett,
9  could you just look at that and ensure that
10  that's not a prior exhibit?
11    MR. ANDERSON:  Sure.  Hold on.  I'm
12  marking as Exhibit 14 a two-page document.  Ann,
13  it appears similar to some past exhibits but not
14  identical.
15    MS. ST. PETER-GRIFFITH:  Okay.
16    (Deposition Exhibit Leone 014
17  marked as requested.)
18  BY MS. ST. PETER-GRIFFITH:
19    Q.   Ma'am, if you could just take this two-
20  page document and take a look at it.
21    A.   Okay.
22    Q.   Do you recognize this document?

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


----------------------------X

In re:  PHARMACEUTICAL        )   MDL No. 1456

INDUSTRY AVERAGE WHOLESALE    )   CIVIL ACTION

PRICE LITIGATION              )   No. 01-12257-PBS

----------------------------X


HIGHLY CONFIDENTIAL


VIDEOTAPED DEPOSITION OF KARLA KREKLOW

FEBRUARY 7, 2008

CHICAGO, ILLINOIS


Videotaped Deposition of KARLA KREKLOW,

at 77 West Wacker Drive, 35th Floor, Chicago,

Illinois, commencing at 9:00 a.m. on Thursday,

February 7, 2008, before Donna M. Kazaitis, RPR,

CSR No. 084-003145.

Kreklow, Karla          HIGHLY CONFIDENTIAL          February 7, 2008
Chicago, IL

26 (Pages 98 to 101)

---

**98**

1  directorship?
2      A.  Yes.
3      Q.  Let me back up a little bit because I
4  don't think, once you assumed the directorship
5  what were your responsibilities within Home
6  Infusion, other than obviously to shepherd it
7  along to closure I assume?
8      A.  Right.  All of the managers reported to
9  me.
10     Q.  And it was at that time that you
11 learned for the first time that AWP had an impact
12 on reimbursement?
13     A.  It was the first time that I learned
14 that there was a formula for payment that
15 included AWP.  I might have heard it before, but
16 I did not understand it.
17     Q.  Well, would it have been important to
18 understand how Abbott's Home Infusion clients
19 were reimbursed as part of your sales
20 responsibilities?
21         MR. WINCHESTER:  Objection,
22 speculation.

**99**

1          THE WITNESS:  It would be important for
2  me only in the sense that we wouldn't want to
3  necessarily take on a client that was very risky
4  as far as payment.
5  BY MS. ST. PETER-GRIFFITH:
6      Q.  When you say "very risky as far as
7  payment," what do you mean?
8      A.  A heavy Medicaid population.
9      Q.  Why would that be risky?
10     A.  Because many times you're not paid.
11     Q.  How do you know that?
12     A.  I remember hearing that.
13     Q.  How did you monitor the risk levels of
14 various clients and their reliance upon Medicaid
15 reimbursement or Medicare reimbursement?
16     A.  Can you rephrase that please so I
17 understand what you're looking for?
18     Q.  Sure.  Let me rephrase this.
19         You indicated that a client's heavy
20 reliance upon a Medicaid population posed a risk
21 or they were a riskier client.
22     A.  Correct.

**100**

1      Q.  Would you not take on those clients?
2      A.  We would take them on, we certainly
3  would take them on.  We wouldn't go out and seek
4  to have a relationship with a client that had a
5  large risk to us.
6      Q.  How would you know when you're seeking
7  out clients whether or not they're heavily
8  dependent upon a riskier reimbursement method
9  like Medicaid reimbursement?
10     A.  They would tell us that.
11     Q.  Would it have been important to you in
12 your business manager function to understand how
13 Medicaid and Medicare reimbursed your clients?
14         MR. WINCHESTER:  Objection, form.
15         THE WITNESS:  No.
16 BY MS. ST. PETER-GRIFFITH:
17     Q.  How come?
18     A.  Because that was handled by our
19 reimbursement department.  All I was responsible
20 for knowing was the payor mix.
21     Q.  Were you responsible for knowing
22 whether the contract arrangements that your sales

**101**

1  force worked on and that you ultimately assisted
2  in negotiating complied with state and federal
3  law?
4          MR. WINCHESTER:  Objection, form.
5          THE WITNESS:  It's important, yes.
6  BY MS. ST. PETER-GRIFFITH:
7      Q.  How did you know that the consignment
8  arrangements within Home Infusion complied with
9  state and federal law?
10         MR. WINCHESTER:  I would instruct you
11 not to answer that question to the extent it
12 would require you to reveal the substance of any
13 conversations that you might have had with
14 counsel for Abbott or the substance of any legal
15 advice that was received from counsel for Abbott.
16         THE WITNESS:  I decline.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.  What do you mean you decline?
19     A.  To answer.
20     Q.  Why do you decline to answer?
21     A.  My counsel recommended I did.
22     Q.  Let me ask you this:  Did you have any

---

102

1   conversations with anyone within the legal
2   department concerning whether or not -- strike
3   that.
4           Have you had any conversations, don't
5   necessarily tell me the substance, but have you
6   had any conversations with anyone within the
7   legal department when you were within Home
8   Infusion?
9       A.   I never did, no.
10      Q.   How did you know that the contracts
11  that you were negotiating complied with state and
12  federal law?
13          MR. WINCHESTER:  Again, I'd instruct
14  you not to answer the question if it would
15  require you to reveal the substance of advice
16  that you know came from counsel for Abbott.
17          THE WITNESS:  I decline to answer.
18  BY MS. ST. PETER-GRIFFITH:
19      Q.   He hasn't instructed you not to answer.
20  Why are you declining not to answer?
21          MR. WINCHESTER:  I have instructed her
22  not to answer if it would require her to reveal

103

1   the substance of communications that she know
2   came from counsel.
3           MS. ST. PETER-GRIFFITH:  Jason, this is
4   a basic question in this case concerning
5   compliance.  Are you telling me that Abbott is
6   going to be relying upon an advice of counsel
7   defense?
8           MR. WINCHESTER:  I'm telling you that
9   you're not entitled in this deposition to
10  question this witness about the advice that was
11  received from counsel.  That's it.
12          You don't get to do that in any dep.
13  You know this.
14          MS. ST. PETER-GRIFFITH:  She hasn't
15  spoken with counsel.
16          MR. WINCHESTER:  That doesn't matter.
17  That's why I phrased my objection the way that I
18  did.  If she knows information, she may not have
19  heard it directly from counsel, you haven't
20  covered that, my objection is if she knows
21  information that you're seeking would require her
22  to reveal the substance of communications and

104

1   legal advice that she knows was received from
2   counsel, you are not entitled to discover that.
3           MS. ST. PETER-GRIFFITH:  Are you
4   relying upon an advice of counsel defense?  Are
5   you telling me that you are or are not relying
6   upon an advice of counsel defense?
7           MR. WINCHESTER:  I'm not staking that
8   position out, nor do I need to.
9           I am telling you right now you are not
10  going to inquire into the substance of
11  communications with legal counsel.  That's basic.
12  You know this.
13          MR. ANDERSON:  Jason, if I might
14  interject.  She hasn't had any communications
15  with counsel.
16          MR. WINCHESTER:  I just covered that,
17  Jarrett.
18          MR. ANDERSON:  How can she have an
19  attorney-client communication if she's not
20  communicating with attorneys?
21          MR. WINCHESTER:  I will allow you to
22  close this out.

105

1           My objection was if she knows that the
2   communications that she's aware of came from
3   counsel, it doesn't necessarily matter that she
4   got them directly herself from counsel --
5           MS. ST. PETER-GRIFFITH:  Absolutely it
6   does.
7           MR. WINCHESTER:  No, it doesn't.
8           MS. ST. PETER-GRIFFITH:  Yes, it does,
9   Jason.
10  BY MS. ST. PETER-GRIFFITH:
11      Q.   Have you had any communications with
12  anyone concerning the compliance of these
13  consignment arrangements with federal and state
14  law?
15      A.   Have I had or, yes.
16      Q.   Who have you had those communications
17  with?
18      A.   I've seen something.
19      Q.   You've seen something.
20      A.   Uh-huh.
21      Q.   What have you seen?
22      A.   A letter.

Kreklow, Karla            HIGHLY CONFIDENTIAL            February 7, 2008
Chicago, IL

28  (Pages 106 to 109)

---

106

1    Q.  And what letter is this?
2    A.  It's a letter from Abbott legal.
3    Q.  A letter from Abbott legal.
4        Have you had any communications about
5    this letter?
6    A.  No.
7    Q.  What is the date of this letter?
8    A.  I have no idea.  It's old.
9    Q.  Who is the letter to?
10   A.  I don't remember.
11   Q.  Do you remember whether it was someone
12   outside of Abbott?
13   A.  I don't remember that.
14   Q.  Could it have been a communication with
15   a third party?
16   A.  I don't know.
17   Q.  Then what was the substance of this
18   letter that you had?
19       MR. WINCHESTER:  No, I'm sorry.  She's
20   not going to testify to that.  I will instruct
21   you not to answer that question.
22       MS. ST. PETER-GRIFFITH:  What's the

---

107

1    basis of your instruction?
2        MR. WINCHESTER:  The basis of the
3    instruction is I haven't seen this document, I
4    don't know what it is, but it's quite possible
5    the document is an attorney-client communication.
6    It came from Abbott counsel.
7        You certainly haven't laid a record
8    that it was distributed to anybody outside of
9    Abbott.  So on that basis until at least I can
10   satisfy myself that this letter was not
11   privileged, I have to instruct her not to answer
12   the question.
13   BY MS. ST. PETER-GRIFFITH:
14   Q.  Who was the letter to and from, ma'am?
15   A.  I don't remember.
16   Q.  When did you see it?  Under what
17   circumstances did you see it?
18       MR. WINCHESTER:  Objection, form.
19       THE WITNESS:  Probably in a file that I
20   assumed when I took other.
21   BY MS. ST. PETER-GRIFFITH:
22   Q.  A file that you assumed?

---

108

1    A.  Uh-huh.
2    Q.  A client file?
3    A.  No, not a client file.  I had many,
4    many files when I assumed the business, many
5    personnel files, many office files in general.
6    Q.  How do you know it was from counsel?
7    A.  It said the person, it came on Abbott
8    letterhead.
9    Q.  So it came on Abbott letterhead.  How
10   do you know it was advice from counsel?
11   A.  It was signed by an attorney.
12   Q.  Who was the attorney?
13   A.  I don't know.
14   Q.  Do you remember when you saw this?
15   A.  No.
16   Q.  Do you know why Abbott would be
17   maintaining privileged attorney-client, do you
18   have any reason to know why Abbott would be
19   maintaining privileged attorney-client
20   communications in files that you were
21   maintaining?
22       MR. WINCHESTER:  Objection, form,

---

109

1    speculation.
2        THE WITNESS:  I don't really even
3    understand what "privileged attorney-client
4    communication" means.
5    BY MS. ST. PETER-GRIFFITH:
6    Q.  Do you have any reason to know why a
7    letter that was supposed to be a privileged
8    communication between Abbott and its counsel
9    would be in your files?
10       MR. WINCHESTER:  Objection, form,
11   speculation.
12       THE WITNESS:  No.  I don't know why
13   it's in there.  I didn't put it in there.
14   BY MS. ST. PETER-GRIFFITH:
15   Q.  What was the substance of the letter?
16       MR. WINCHESTER:  Objection.  She's not
17   going to answer that question.
18       MS. ST. PETER-GRIFFITH:  Jason, if
19   you're maintaining, if you're maintaining —
20       MR. WINCHESTER:  Ann, c'mon, c'mon,
21   c'mon, it's a letter from Abbott counsel.
22       MS. ST. PETER-GRIFFITH:  So what?

---

Kreklow, Karla          HIGHLY CONFIDENTIAL          February 7, 2008
Chicago, IL

29 (Pages 110 to 113)

---

110

1       MR. WINCHESTER: She doesn't have to be
2   able to lay that.
3       MS. ST. PETER-GRIFFITH: She doesn't
4   even know who it's to.
5       MR. WINCHESTER: Neither do you.
6       You have not established the basis that
7   would allow you to get to this letter because you
8   have not established that it went to anybody
9   outside of Abbott or that it wasn't communication
10  from legal counsel, legal advice from legal
11  counsel.
12      I'd have to see this letter. I haven't
13  seen it. I can't let her testify about it.
14      MS. ST. PETER-GRIFFITH: Well, we
15  certainly expect you to search for it --
16      MR. WINCHESTER: Well, that would be
17  great.
18      MS. ST. PETER-GRIFFITH: -- because
19  it's not on a privilege log.
20      MR. WINCHESTER: That's great. And we
21  can. But you have not established the basis to
22  inquire about the substance of the letter from

---

111

1   the witness, and she's not going to answer those
2   questions.
3   BY MS. ST. PETER-GRIFFITH:
4       Q.  What file did you find it in, ma'am?
5       MR. WINCHESTER: It's asked and
6   answered. Object.
7       MS. ST. PETER-GRIFFITH: No. She
8   hasn't answer that.
9       MR. WINCHESTER: She did.
10      THE WITNESS: I don't remember which
11  file it was. It was a file I assumed.
12  BY MS. ST. PETER-GRIFFITH:
13      Q.  When you say a file you assumed, was it
14  located in any particular place?
15      A.  In a file drawer.
16      Q.  Who did you assume it from?
17      A.  I don't remember exactly because I
18  don't remember when I first saw it.
19      Q.  Where was this file drawer located?
20      MR. WINCHESTER: Objection,
21  mischaracterizes.
22      THE WITNESS: Either in the office, one

---

112

1   of the offices I assumed. It was in the office.
2   BY MS. ST. PETER-GRIFFITH:
3       Q.  Did you move around from office to
4   office?
5       A.  I did.
6       Q.  Did you move around from office to
7   office when you were within Home Infusion?
8       A.  I did.
9       Q.  Did you assume someone else's files?
10  Did you take over someone else's files when you
11  would move from office to office?
12      A.  I did.
13      Q.  Whose files did you take over when you
14  became business manager in Home Infusion?
15      A.  Chris George.
16      Q.  And who is Mr. George?
17      A.  An area, a former area business
18  manager.
19      Q.  Did you assume anybody else's files?
20      A.  Mike Sellers.
21      Q.  Do you have any recollection as to
22  whether or not the file that you assumed in which

---

113

1   you saw this letter came from either Mr. George
2   or Mr. Sellers?
3       A.  I don't remember.
4       Q.  Do you remember anybody else's files
5   that you assumed at any other time when you were
6   within Home Infusion?
7       A.  Not that I assumed, no.
8       Q.  So is it safe to say that these files
9   which contained this particular letter that you
10  remember came from either Mr. George or Mr.
11  Sellers?
12      A.  Yes.
13      Q.  Where was the file physically located?
14      A.  In one of the offices.
15      Q.  In one of the offices that you took
16  over?
17      A.  Yes.
18      Q.  Do you remember which office number it
19  was?
20      A.  No.
21      Q.  Do you know what happened to the files
22  in that office?

---

Kreklow, Karla         HIGHLY CONFIDENTIAL         February 7, 2008
Chicago, IL

30 (Pages 114 to 117)

---

114

1    A.  They were all sent to corporate
2  records.
3       MR. WINCHESTER:  Can I ask again before
4  you leave this what's the first name of George?
5       THE WITNESS:  Chris.
6       MR. WINCHESTER:  Chris.  Thanks.
7  BY MS. ST. PETER-GRIFFITH:
8       Q.  Do you remember anything else about the
9  letter?
10       A.  No.
11       Q.  Do you know whether or not Abbott's
12  Home Infusion consignment arrangements were in
13  compliance with state and federal law?
14       MR. WINCHESTER:  Objection, calls for a
15  legal conclusion.
16       THE WITNESS:  I can't say.
17  BY MS. ST. PETER-GRIFFITH:
18       Q.  It has nothing to do with the letter.
19       I want to know do you know whether
20  Abbott's consignment arrangements complied with
21  state and federal law?
22       MR. WINCHESTER:  Same objection, calls

---

115

1  for a legal conclusion.
2       THE WITNESS:  I can't answer that.
3  BY MS. ST. PETER-GRIFFITH:
4       Q.  Why can't you answer that?
5       A.  Because I can't tell you, I'm not an
6  attorney and I did not review it.
7       Q.  Would you expect that Abbott's
8  consignment arrangements were in compliance with
9  state and federal law?
10       MR. WINCHESTER:  Objection, form.
11       THE WITNESS:  I expect that everything
12  that Abbott does is within all guidelines.
13  BY MS. ST. PETER-GRIFFITH:
14       Q.  Who would you rely upon to ensure that
15  the work that you were doing and the contracts
16  that you were negotiating within Home Infusion
17  were in compliance with state and federal law?
18       A.  I rely on my superiors.
19       Q.  Who was that when you were in Home
20  Infusion?
21       A.  Mike Sellers.
22       Q.  What about when you were at Alt. Site,

---

116

1  the activities that you undertook when you were
2  at Alt. Site, how do you know that they complied
3  with state and federal law?
4       MR. WINCHESTER:  Again, I'd instruct
5  you not to answer if it would require you to
6  reveal the substance of any communications that
7  you received or you know were received from
8  Abbott counsel.
9       If you can answer the question without
10  revealing that sort of information, go ahead.
11       THE WITNESS:  I'm not aware of any
12  communication.
13       Again, being a long-time Abbott
14  employee, I assume that everything that Abbott
15  does is within all guidelines.
16  BY MS. ST. PETER-GRIFFITH:
17       Q.  At any time during your tenure within
18  Alt. Site or Home Infusion or within HPD, did you
19  ever have cause to question whether or not any of
20  your activities for any division or business unit
21  that you worked in complied with state and
22  federal law?

---

117

1       A.  I've never had --
2       MR. WINCHESTER:  I think I know your
3  answer, but I would instruct you that you are not
4  to answer the question if it would require you to
5  reveal the substance of any communication you had
6  with counsel for Abbott.
7       If you can answer it without revealing
8  that sort of communication, go ahead.
9       THE WITNESS:  When I was in -- I'm
10  sorry.  Would you --
11       MS. ST. PETER-GRIFFITH:  Sure.  Can you
12  read back the question, please.
13       (WHEREUPON said record was read
14  back as requested.)
15       THE WITNESS:  When I was in Alternate
16  Site product sales, I never had any reason to
17  question and never saw any documents.  I did see
18  a document when I was in Home Infusion.
19  BY MS. ST. PETER-GRIFFITH:
20       Q.  And was this that letter that you were
21  referencing?
22       A.  Yes.

---

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


IN RE:  PHARMACEUTICAL INDUSTRY  )

AVERAGE WHOLESALE PRICE          )

LITIGATION,                      )   Case No.

      Plaintiffs,            )   0112257-PBS

                                   )

   vs.                           ) HIGHLY CONFIDENTIAL

                                   )

ABBOTT LABORATORIES, INC., and  )

HOSPIRA,                         )

      Defendants.            )

--------------------------------x


      The oral and videotaped deposition of

MICHAEL W. SELLERS, called by the Plaintiffs for

examination, taken pursuant to the Federal Rules of

Civil Procedure of the United States District Courts

pertaining to the taking of depositions, taken before

Janice M. Kocek, CSR, a Notary Public within and for

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL   November 1, 2007
Chicago, IL

Page 170

1 Abbott its business?
2        MS. TABACCHI: Object to the form, asked
3 and answered.
4        THE WITNESS: I did, I did not think that
5 that was a major consideration for the decision to
6 purchase Abbott product.
7 BY MS. ST. PETER-GRIFFITH:
8    Q.  Do you recall hearing from any sales
9 force or sales managers or Contract Marketing
10 managers about the importance of AWP and spreads to
11 Abbott's customers?
12        MS. TABACCHI: Object to the form.
13        THE WITNESS: I've seen documents that
14 relate to that based -- from this document
15 accumulation.
16 BY MS. ST. PETER-GRIFFITH:
17    Q.  Including some that were directed to you,
18 right, sir?
19        MS. TABACCHI: Object to the form.
20        THE WITNESS: I don't, I don't remember.
21 But I've seen documents that relate to that. Was I
22 aware of it in, in June of 2000? I -- I may have

Page 171

1 been. I don't know.
2
3
4 BY MS. ST. PETER-GRIFFTH:
5    Q.  You may have been. How early may have
6 you -- how early was it that you may have been
7 aware of that information?
8        MS. TABACCHI: Object to the form.
9        THE WITNESS: Well, it wouldn't, it
10 wouldn't have been important for me to be aware of
11 it until I came into my job in Contract Marketing
12 the second time.
13 BY MS. ST. PETER-GRIFFITH:
14    Q.  Well, if it was, if spreads and AWP
15 reimbursement was important to Home Infusion or
16 Alt. Site, wouldn't it have been important for you
17 to understand that when you worked in those, within
18 those business units?
19        MS. TABACCHI: Object to the form.
20        THE WITNESS: As I said before, when I
21 was responsible for Alternate Site product sales it
22 was not an issue. When I was in Home Infusion

Page 172

1 Services it, it wasn't -- it wasn't -- it wasn't a
2 controlling factor, but it's not something that we
3 worked on.
4 BY MS. ST. PETER-GRIFFITH:
5    Q.  How do you know it wasn't a controlling
6 factor when you were in Home Infusion?
7    A.  Because when you look -- when you look at
8 at how we got reimbursed, very rarely did we get
9 reimbursed for a drug. We got reimbursed for a
10 compounded drug.
11        And there were -- as I said, as many
12 payers as there were, there were that many
13 different formulas for how they were going to
14 reimburse us. So I'm not sure that we ever drew
15 that string that says it's, it's a vital piece.
16 It, it varied over the time period; and AWP was not
17 the consistent factor over that time period, that I
18 remember.
19    Q.  Did you have an understanding when you
20 were within Home Infusion that usuals and
21 customaries were calculated in large measure for
22 many payers based in part upon an AWP formulary?

Page 173

1        MS. TABACCHI: Object to the form, asked
2 and answered.
3        THE WITNESS: Well, one, usual and
4 customaries were not calculated by the payer. But
5 how the payer -- how the payer calculated what they
6 decided to pay you at the end of the day, I, I was
7 aware that there were all kinds of formulas and it
8 varied by payer, it varied by, by, by therapy.
9 BY MS. ST. PETER-GRIFFITH:
10    Q.  Well, you understood, sir, did you not,
11 that when either Abbott's joint venturers or Abbott
12 Home Infusion submitted claims to Medicare and
13 Medicaid, they had to be accurate and not submit
14 false claims on their billing?
15        Is that -- did you have that
16 understanding, sir?
17        MS. TABACCHI: Object to the form.
18        THE WITNESS: Yes. We were -- and we
19 were very diligent to make sure that all of our
20 claims were accurate.
21 BY MS. ST. PETER-GRIFFTH:
22    Q.  Okay. How do you know that?

44  (Pages 170 to 173)

76d9cdbf-edbf-4a35-a63c-c665a8432da9

Sellers, Michael W.  HIGHLY CONFIDENTIAL      November 1, 2007
Chicago, IL

---

Page 174

1     A.  Because I ran the business.
2     Q.  Okay.  And how did you when you were
3  running the business verify that Abbott's Home
4  Infusion Unit was not submitting false claims to
5  the United States or to any of the state Medicaid
6  programs?
7         MS. TABACCHI:  Object to the form.
8         THE WITNESS:  We challenged what we, what
9  we billed versus what we got paid.  Anything
10  outside of that we, we, we would look at it, Ginny
11  looked at it.  So I -- you know, we've, we never
12  had any problem with any, with any payer wanting to
13  audit something. And we were very diligent in
14  training our folks that it was essential that they
15  stay to the letter.
16  BY MS. ST. PETER-GRIFFTH:
17     Q.  Okay.  How did you verify that they
18  stayed to the letter?
19     A.  I just told you.
20     Q.  Okay.  What did you, what did -- what
21  were the policies and procedures in place within
22  Abbott Home Infusion to ensure that the

Page 175

1  reimbursement staff did not submit false claims to
2  Medicare or to any state Medicaid program?
3         MS. TABACCHI:  Object to the form.
4         THE WITNESS:  Virginia and our finance
5  people did periodic audits of claims, as I
6  remember.
7  BY MS. ST. PETER-GRIFFTH:
8     Q.  Okay.  And was there a policy concerning
9  doing periodic audits of claims to ensure against
10  submission of false claims?
11         MS. TABACCHI:  Object to the form.
12         THE WITNESS:  I would expect there to be.
13  I don't know that there was one.  I don't remember
14  -- I don't remember.
15  BY MS. ST. PETER-GRIFFTH:
16     Q.  Who was responsible within Abbott Home --
17  let's start with Abbott Home Infusion for ensuring
18  compliance with Medicare or state Medicaid laws and
19  regulations?
20     A.  The reimbursement department.
21     Q.  Okay.  Who specifically?
22     A.  Virginia Tobiason and the department.

Page 176

1     Q.  Okay.  Who within Hospital -- who within
2  Alt. Site was responsible for ensuring compliance
3  with state and Medicaid or Medicare -- I'm sorry,
4  Medicare or state Medicaid statutes and
5  regulations?
6         MS. TABACCHI:  Object to the form.
7         THE WITNESS:  Virginia.
8  BY MS. ST. PETER-GRIFFITH:
9     Q.  So her position transcended outside of
10  Home Infusion and extended into Alt. Site?
11     A.  No, there was no other claims being made
12  by the other segments of Alternate Site.
13     Q.  Okay.  How did you ensure that Alt. Site
14  was not causing false claims to be submitted to
15  Medicare or Medicaid?
16         MS. TABACCHI:  Object to the form.
17         THE WITNESS:  Wasn't my job.
18  BY MS. ST. PETER-GRIFFITH:
19     Q.  Whose job was it?
20     A.  I assume it would have been John Ward's
21  and Pete Baker's and Don Robertson's over that time
22  period.

Page 177

1     Q.  In 2001 when the price changes were made,
2  what formula was adopted for determining what the
3  list price would be?
4         MS. TABACCHI:  Object to the form.
5         THE WITNESS:  I don't remember a, a, a
6  specific formula.
7  BY MS. ST. PETER-GRIFFTH:
8     Q.  You don't remember whether there was a
9  formula that was adopted in terms of identifying
10  what list prices would be reported to the reporting
11  agencies?
12     A.  I, I don't --
13         MS. TABACCHI:  Object to the form.
14         THE WITNESS:  I don't recall a specific
15  formula.
16  BY MS. ST. PETER-GRIFFTH:
17     Q.  Okay.  Why weren't the price changes that
18  occurred in 2001 taken earlier by Abbott Hospital
19  Products Division?
20         MS. TABACCHI:  Object to the form.
21         THE WITNESS:  I don't know.
22  BY MS. ST. PETER-GRIFFITH:

45  (Pages 174 to 177)