# EXHIBIT "L"
# TO UNITED STATES' OPPOSITION TO
# ABBOTT'S MOTION TO ENFORCE (D.E. 5276)

332

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL            )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE        )   CIVIL ACTION

PRICE LITIGATION                  )   01-CV-12257-PBS

                                      Volume II

       Continued Videotaped Rule 30(b)(6)

       Deposition of MICHAEL SELLERS, at

       77 West Wacker Drive, Chicago,

       Illinois, commencing at 9:00 a.m.

       On Monday, March 31, 2008, before

       Donna M. Kazaitis, RPR, CSR

       No. 084-003145.

### 465

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   When the revenue share partner utilized
3  the consigned product or device, would there be a
4  separate charge for that particular product item
5  or particular device that would be charged
6  separately to the revenue share partner, or would
7  there just be an aggregate collection of a
8  percentage of revenue?
9          MS. TABACCHI: Object to the form.
10         THE WITNESS: There was no line item
11 charge to the client.
12 BY MS. ST. PETER-GRIFFITH:
13     Q.   For the services that were provided that
14 you described, engineering, pharmacy, training
15 procedures, reimbursement services, access to the
16 CHIP system, would Abbott document or reflect the
17 fair market value for those services that it
18 rendered to the revenue share partner?
19         MS. TABACCHI: Object to the form.
20         THE WITNESS: I'm not aware that we ever
21 did.
22 BY MS. ST. PETER-GRIFFITH:

### 466

1      Q.   What would the compensation be for those
2  services?
3      A.   **It was all comprehended in the total**
4  **agreement. So whatever our percentage of**
5  **collections on each of the therapies would**
6  **comprehend what other services we provided.**
7      Q.   Would you charge separately for the
8  engineering services that I presume would be --
9  well, let me ask you this. Strike that.
10         Would the engineering services
11 generally be an upfront service because you're
12 getting the revenue share partner a facility and
13 up to speed, is that fair to say?
14         MS. TABACCHI: Object to the form.
15         THE WITNESS: Yeah. There were a number
16 of startup costs, and that was one of them, that
17 would be one of them. It would be an upfront
18 cost, but it was figured into the overall revenue
19 share for the term of the agreement that we
20 signed, whether it was a three-year contract or a
21 five-year contract, it amortized those upfront
22 charges across the full term.

### 467

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   What other upfront charges would there
3  be?
4      A.   **Training, warehouse setup, those kind of**
5  **things.**
6      Q.   Would Abbott have any mechanism for
7  tracking the value of those upfront services that
8  were provided?
9          MS. TABACCHI: Object to the form.
10         THE WITNESS: We had an ability to
11 identify what our costs were for all of those
12 upfront, and we used that in determining what our
13 revenue share would be on future agreements.
14         So we did go back and look at some
15 of our startups to validate that we were
16 adequately burdening future agreements.
17 BY MS. ST. PETER-GRIFFITH:
18     Q.   Would the individual files for the
19 revenue share partners reflect the tracking of
20 those costs?
21         MS. TABACCHI: Object to the form.
22         THE WITNESS: Typically not, no.

### 468

1  BY MS. ST. PETER-GRIFFITH:
2      Q.   Under the revenue share model would
3  Abbott Home Infusion share in revenues collected
4  from Medicare and Medicaid?
5          MS. TABACCHI: Object to the form.
6          THE WITNESS: In all the cases that I
7  recall it was every payor.
8  BY MS. ST. PETER-GRIFFITH:
9      Q.   Would the payors be broken down on a per
10 patient basis? For example, would you take a,
11 would Abbott be able to document that it's taking
12 a forty percent share, for example, in the
13 Medicare reimbursement attributable to Patient
14 John Smith?
15         MS. TABACCHI: Object to the form.
16         THE WITNESS: The system, the CHIP
17 system, kept track of whatever services and claims
18 were delivered on a patient. That patient would
19 have been classified to a particular therapy or
20 multiple therapies because in a lot of cases a
21 nutritional patient got nutritional therapy, but
22 they also might have had times when they got

**469**

1   antibiotic therapy, or there might have been times
2   when they got hydration therapy.
3           So it was really, it was less
4   patient specific, it was more payor therapy
5   definition within the system which would then
6   define, the therapy would then define the revenue
7   share percentage.
8   BY MS. ST. PETER-GRIFFITH:
9       Q.  If a particular patient was denied
10  reimbursement by Medicare or Medicaid, how would
11  Abbott, if at all, charge its revenue share
12  partner for the product that was utilized but for
13  which reimbursement was not paid by Medicare or
14  Medicaid?
15          MS. TABACCHI: Object to the form.
16          THE WITNESS: We wouldn't get, we would
17  get basically our revenue share of that collection
18  which was --
19  BY MS. ST. PETER-GRIFFITH:
20      Q.  Zero percent?
21      A.  -- our revenue share of zero would be
22  zero.

**470**

1       Q.  Did the revenue share business model
2   change over time?
3       A.  Well, it changed per client.
4           Every client, as I said, might have
5   evolved from a more comprehensive array of
6   services and products that we delivered originally
7   to something less later on, or clients decided
8   early up that they wanted to do more, and so their
9   arrangement, the arrangements by client were
10  different.
11          The contract or the risk share
12  contract that we had, that general format, general
13  structure, didn't change.
14      Q.  When was this revenue share business
15  model first put into place?
16      A.  My recollection is '83 or '84.
17      Q.  From '91 to 2003 can you give a broad
18  overview, I'm not asking you for particular, you
19  know, to the penny dollar amounts, but a broad
20  overview of the profits and profit margins enjoyed
21  by the Home Infusion business unit?
22          MS. TABACCHI: Object to the form,

**471**

1   beyond the scope.
2           THE WITNESS: You know, I don't have
3   specific numbers. I think in general in the,
4   again, I can speak from '92 on, in general
5   division margin basis we were in the eighteen to
6   twenty percent division margin. And that's prior
7   to corporate burdening. So all the corporate
8   costs aren't put on that. So net at the end of
9   the day, it was less whatever we paid for the big
10  corporate offices and so on.
11          That's what we reported to the
12  division was somewhere in the eighteen to
13  twenty-two percent range.
14  BY MS. ST. PETER-GRIFFITH:
15      Q.  How did the reimbursement department
16  work?
17      A.  Very hard.
18      Q.  Can you describe the mechanics of how it
19  operated?
20      A.  Typically, our reimbursement team was
21  broken into subteams, and those teams were aligned
22  with our clients. So our clients, when they were

**472**

1   operating, had particular people that they could
2   get used to and our people could get used to our
3   clients, could understand our clients and our
4   clients could understand us.
5           So basically we were trying to work
6   as hand-in-hand as we could, and one way to do
7   that was to establish a small team that could work
8   with each of our clients and be responsible for
9   that.
10          Again, depending on what the client
11  wanted us to do, we might handle verification of
12  insurance, we definitely had to get assignment of
13  benefit paperwork in our hands --
14      Q.  Let me stop you right there. Would
15  Abbott ever accept assignment of benefits on
16  behalf of its revenue share partners itself under
17  Abbott's name?
18          MS. TABACCHI: Object to the form.
19          THE WITNESS: It may have. When we were
20  operating through our pharmacies, it may have.
21  BY MS. ST. PETER-GRIFFITH:
22      Q.  What about when you weren't operating