UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 01-CV-12257-PBS<br><br>Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,*<br>Civil Action No. 05-11084-PBS |  |

### MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR EXPEDITED CLARIFICATION OF THE GOVERNING CASE MANAGEMENT ORDERS AND IN SUPPORT OF DEY, INC., DEY, L.P., AND DEY, L.P., INC.'S CROSS MOTION FOR MODIFICATION OF THE JUNE 22, 2007 CASE MANAGEMENT ORDER

Defendants Dey, Inc., Dey L.P., and Dey L.P., Inc. (collectively, "Dey"), submit this memorandum of law in opposition to the Government's Motion for Expedited Clarification of the Governing Case Management Orders and in Support of Dey's Cross-Motion for Modification of the June 22, 2007 Case Management Order.

In this case, Plaintiff the United States of America (the "Government") seeks damages from Dey in excess of $100 million dollars. The Government alleges Dey defrauded the federal Medicare and Medicaid programs over a sixteen year time period. State officials in each of the fifty states separately administered the Medicaid program in their states, which were ultimately supervised and independently approved by the federal agency, the Centers for Medicare and Medicaid Services ("CMS"). Each of the fifty states has a separate reimbursement formula overseen and administered by state regulatory authorities; nearly every one of the fifty states has modified its reimbursement formula multiple times during this period. *See*

1

Reimbursement Formulas attached as Exhibit A to the Declaration of Neil Merkl. Each state pays its own claims differently using a different claims system. Each state relies on different information in deciding which drugs to reimburse and the amount at which to reimburse the drugs. Dey must conduct individualized discovery in each state because the Government alleges Dey misled each of these fifty state programs for 16 years. The position taken by the Government in their Motion essentially prevents Dey from taking this necessary discovery by restricting Dey to a single 30(b)(6) deposition of each state effectively determined by the Government. Not only does Dey disagree with the Government's position, but Dey requests that the June 22 CMO be modified to allow for additional state discovery beyond a single deposition per state.

The Court entered a Case Management Order on June 22, 2007 (the "June 22 CMO"). See Dkt. 4406.[1] The June 22 CMO provides in part that:

1. The parties are limited to "one deposition per state as well as 10 additional depositions per side" See Paragraph 19; and

2. The parties may cross-notice depositions "in another Average Wholesale Price (AWP) case (e.g., state or federal AWP litigation)." See Paragraph 15.

Dey needs individualized discovery from each state that will demonstrate that the state Medicaid programs were not misled by Dey and that Dey did not submit any false claims. One deposition per state is not sufficient for Dey to defend its case because each state Medicaid program is different; each state relied on different information; and each state has individualized

---

[1] Since the entry of the June 22 CMO almost a year ago, Dey has requested a two-month extension for fact discovery on May 9, 2008, which was granted on June 2, 2008. Dey has not filed any other motions to modify the June 22 CMO or any other discovery motion in this case.

reimbursement methodologies. Discovery taken to date confirms that the states do not have a single witness that can answer all the relevant questions.

To some extent the Government itself has acknowledged the need for multiple depositions from each state by identifying multiple Medicaid witnesses from the states on its witness lists. Dey, therefore, also requests that apart from any court-ordered limits, the Court permit Dey to take depositions of all witnesses identified by the Government in its discovery responses and disclosures.

Dey respectfully requests that the Court modify the June 22 CMO to:

1. allow Dey to take fifty state Medicaid depositions without limitations to one deposition per state;

2. allow Dey to depose the witnesses listed on the Government's Second Supplement to Initial Disclosures to Defendants Pursuant to Fed. R. Civ. P. 26(a)(1), as well as on any future witness lists or initial disclosures;

3. allow Dey and the Government to cross-notice depositions for use at trial, including state Medicaid Depositions, now and after the fact-discovery cut-off, without having them count against the deposition limit.

## I.
## STATE BY STATE DISCOVERY IS NEEDED BECAUSE OF THE RELEVANT EVIDENCE POSSESSED BY THE STATE MEDICAID AGENCIES

The United States' Complaint alleges four causes of action against Dey: (i) presentation of false claims in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1); (ii) making false statements to cause claims to be paid in violation of 41 U.S.C. § 3729(a)(2); (iii) unjust enrichment; and (iv) common law fraud. The Government alleges Dey published the "AWP" and "WAC" prices of Dey drugs that were higher than the actual acquisition cost of Dey's drugs. Dey's drugs at issue in this action are Albuterol, Cromolyn Sodium and Ipratropium Bromide (the "Dey Generics"). The Medicaid claims allege that CMS and the States relied on these purportedly overstated AWP and WAC prices to pay more for the

Dey Generics than they otherwise would have and should have paid, and seeks to recover the federal share of the amounts of these alleged overpayments under the FCA. The Government also asserts claims for unjust enrichment and fraud.

The following are some examples of the liability related questions of fact that will be left for summary judgment or trial and for which discovery is needed from each of the states:

1. The state's knowledge of providers' acquisition costs as compared to the amounts at which they reimbursed the providers and the published AWPs and WACs for the Dey Generics. *See, e.g., California, ex rel. Ven-A-Care of the Fla. Keys., Inc. v. Abbott Labs., Inc.*, 478 F. Supp. 2d 164, 174 (D. Mass. 2007);

2. The states' use of the difference between providers' acquisition costs and the reimbursement amounts for the ingredient portion (i.e. the acquisition of the drug) to cross-subsidize inadequate dispensing fees. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 32, 38 (D. Mass. 2007);

3. How each state defined usual and customary charge and compared this charge to AWP, WAC, or other reimbursement benchmarks;

4. How each state determined the Maximum Allowable Cost ("MAC") and how MACs were applied to Dey's drugs;

5. Whether and how each state utilized the "DOJ AWPs" created and disseminated by the Department of Justice in 2000;

6. The influence of political factors on how each state set its reimbursement methodologies;

7. The states' intentional encouragement of the use of generic products through the knowing use of the spread; and

8. How each state used the Federal Upper Limit ("FUL").

These issues do not even touch on damages and the extensive discovery that is needed at the state level to explain claims data and the reimbursement used on a claim by claim basis for the Dey Generics. State Medicaid depositions are they only way to get the necessary evidence for these issues of fact. All fifty state Medicaid programs are different. As illustrated below, the

4

discovery that has taken place demonstrates that such evidence does in fact exist. The June 22 CMO should be modified to allow Dey to continue to obtain this diverse and relevant evidence from all state Medicaid agencies.

A.     **State Medicaid depositions provide evidence of states' knowing use of spread**

As this Court has previously held, a state's knowledge of providers' acquisition costs as compared to the amounts at which they reimbursed the providers and the published AWPs and WACs is a relevant issue of fact. *See, e.g., California, ex rel. Ven-A-Care of the Fla. Keys., Inc.*, 478 F. Supp. 2d at 174. State Medicaid depositions provide evidence of this knowledge and approval. For example, Dorothy Poulsen, the Pharmacy Program Director for Montana Medicaid from 1996 to June 2001, testified that Montana Medicaid understood that "AWP didn't reflect the average wholesale price." Poulsen Tr. at 122:17-19. Leo Sullivan, the former Pharmacy Director of the Tennessee Medicaid program, testified that he and other states knew that AWP was not an actual acquisition cost:

> Q. During the entirety of the time that you were the director of pharmacy services for Tennessee Medicaid, did you believe that the AWPs in the compendia were a reliable source of information regarding what pharmacies or physicians actually paid for drugs?
>
> A. No.
>
> Q. And from your interactions with other state pharmacy administrators, in your view did other state pharmacy administrators believe that AWPs were a reliable source for what pharmacies and physicians actually paid for drugs?
>
> MR. DRAYCOTT: Objection.
>
> A. Again, I don't ever remember such a specific discussion with, with those peers, because it just wouldn't come up. I -- everybody knows the sky's blue. I mean it is that basic to me. . . .

5

Sullivan Tr. at 98:4-99:9. Dey is entitled to state Medicaid depositions to show that states did not believe what the Government alleges in its Complaint.

Dey also seeks to depose state Medicaid witnesses to demonstrate the states' understanding of the terms AWP and WAC and their belief that Dey's prices were properly reported. Beginning in early 1999, Dey sent price notification letters to Medicaid officials that explained what Dey's AWP and WAC represented. With respect to AWP, Dey informed Medicaid officials:

> As you know, the AWP listed here does not represent the actual price, which will be or has been charged or paid for this product. Dey believes this to be clearly understood by state and federal Medicaid regulators.

With respect to WAC, Dey informed Medicaid officials:

> As you know, WAC is referred to by data reporting services and government agencies as an "estimate," and Dey believes that WAC generally means the actual <u>invoice</u> price charged by a pharmaceutical manufacturer to its drug wholesalers. As you also know, WAC does <u>not</u> include the net effect of discounts from invoice price (based on volume of purchases, speed of payment and other factors), rebates, chargebacks, administration fees and other such cost adjustments which are well-known and commonplace in the pharmaceutical industry and can affect, to a greater or lesser degree, the actual "final" cost to each purchaser. These discounts may not be determined until some months after the date of invoice. Therefore, we remind you that <u>WAC may well not be representative of actual market costs to those entities which you are reimbursing under Medicaid</u>.

*See* Price Notification Letter attached as Exhibit D to the Declaration of Neil Merkl (emphasis added). Dey should be allowed to depose the recipients of these letters at state Medicaid agencies to discover what they did with the information provided by Dey. For example, when asked about Dey's letters, Dr. Wiberg, former Pharmacy Director for Minnesota Medicaid, testified that he agreed with Dey's definition of AWP: "The statements about AWP, where it says, 'AWP listed here does not represent any actual price, which will or has been charged or

6

paid for this product,' that would have been my understanding, as I have testified earlier." Wiberg Tr. at 249:10-14.

### B. State Medicaid depositions provide relevant evidence of cross-subsidization

This Court has also held that the issue of cross-subsidization is a relevant issue of fact. In the class action case, *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 38 (D. Mass. 2007), the Court found that "there was no evidence" of cross-subsidization. Dey is entitled to seek this evidence in this case through depositions of state Medicaid officials. In fact, several state witnesses have already provided evidence of cross-subsidization. For example, Tennessee Medicaid took the spread into account when setting the dispensing fee: "the dispensing fee in and of itself is not compensation for what some calculated cost to dispense, that the portion of profit built into the ingredient cost is also a factor in that." Sullivan Tr. at 241:4-241:8. In Minnesota, Dr. Wiberg testified that "if the AWP, on average, was what you would expect most providers to be actually paying for the drug when they purchase it, you would end up raising the dispensing fee, to a certain extent." Wiberg Tr. 169:17-21. Dey should be allowed to continue deposing state Medicaid officials to obtain additional evidence of cross-subsidization.

### C. State Medicaid depositions are relevant to the setting of MACs

Dey is also entitled to depose state Medicaid officials to determine how they set their MACs because these prices may not bear any relationship to the published AWPs and WACs for the Dey Generics. *In California, ex rel. Ven-A-Care of the Fla. Keys., Inc.*, 478 F. Supp. 2d 164 (D. Mass. 2007), this Court dismissed California's claims as they related to drugs reimbursed on the Maximum Allowable Ingredient Cost ("MAIC"), California's equivalent of the MAC because "plaintiff admits that MAIC pricing ceased to be based on prices falsely reported by defendants because California obtained the prices it used to determine MAIC

7

directly from wholesalers." All states set their MACs differently, and by presenting evidence as to how the states set their MACs, Dey can demonstrate that state claims paid on MAC should be excluded.

For example, Theodore Collins, a consultant to Wisconsin Medicaid who determines the Wisconsin MAC pricing for multisource drugs, testified that Wisconsin Medicaid investigated the actual purchase prices available to the retail pharmacy providers and set a MAC for drugs with two A-rated equivalents at the lowest acquisition price available to pharmacies plus an additional 10 to 25% markup. Collins Tr. at 16:3-19:14, 74:9-18. Wisconsin also requested AMP information to help it set MAC prices. Collins Dep at 193:8-194:22. Paul Jeffrey, Director of Pharmacy for the Massachusetts Medicaid program ("MassHealth"), testified that MassHealth establishes MAC at a rate equivalent to 130 percent of the lowest published price of two or more generic equivalents and uses the First DataBank pricing field to populate the field for MAC using 130 percent of the lowest published wholesale net unit price, which is First DataBank's terminology for WAC. Jeffrey 6/14/2007 Tr. at 91:12-93:13.

**D.      State Medicaid depositions provide relevant evidence on the use of the DOJ AWPs**

The state Medicaid depositions sought by Dey also provide evidence relating to the states' choice on whether to implement the lower prices provided by the National Association of Medicaid Fraud Control Units and the DOJ (the "DOJ AWPs"). David Tawes of the Office of Inspector General testified that 19 states did not use the Revised AWPs. Tawes Dep at 454:9-19. The reasons for this choice varied from state to state, and Dey should be allowed to take discovery as to why states chose not to use lower prices. For example, Debra Bahr, former Medicaid Pharmacy Director of Kentucky Medicaid, testified that Kentucky DMS implemented to DOJ AWPs but stopped using them after two weeks because "the reimbursement that the pharmacies were receiving was below their cost. In order to verify that, we did look at invoices,

and we did contact the wholesalers that the DOJ had indicated were able to supply the medications for those costs, and found that our pharmacists were not able to purchase the medications as such." Bahr Tr. at 458:5-458:12; 457:12-459:10.

E.   **State Medicaid depositions provide relevant evidence on the politics of reimbursement**

States took many factors other than providers' acquisition costs into consideration when setting their reimbursement rate. One factor was political pressure. In Kentucky, Ms. Bahr testified as follows:

> Q.   Okay. So, as a result of these conflicting pressures, sometimes the relationships with pharmacists can become strained or they can be intense discussion about appropriate reimbursement, correct?
>
> A.   Yes.
>
> Q.   And that's one of the local political factors that Medicaid agencies around the country have to consider when striking the appropriate balance in terms of what reimbursement methodology they're going to use, right?
>
> A.   Yes.
>
> Q.   Now, in Kentucky, do pharmacists have advocacy groups or -- or pressure groups?
>
> A.   Yes.
>            * * *
> Q.   So, for example, when issues of reimbursement or dispensing fees are under discussion, those associations will often mobilize and communicate to you, the DMS, on behalf of their members, right?
>
> A.   Yes.
>
> Q.   And they will often be one source of bringing to bear the local political strength that those groups have in advocating for what

9

>they view as appropriate reimbursement, right?
>
>A. Correct.

Bahr Tr. at 569:18-571:17. Dey should be allowed to depose state Medicaid officials to determine the role politics played in reimbursement in other states.

**F.    State Medicaid depositions provide relevant evidence as to the encouragement of generics**

All of the drugs at issue in the Complaint are generic drugs, and Dey seeks testimony from state Medicaid officials as to how they encouraged providers to dispense generic drugs. For example, state Medicaid officials have testified that the Medicaid program intentionally allowed spreads in their reimbursement of generics. Gary Gilmore of MassHealth testified that the spread was "essential for [providers] to get to stay in the program and make money." Gilmore Tr. at 296:11-15, 295:4-297:5. He also testified that a "35 percent mark-up to the pharmacist" was a good idea for generics. Gilmore Tr. at 289:7-15. Susan McLeod of Florida Medicaid testified that she was aware that "the difference between AWP and pharmacy acquisition costs is significantly greater for generic drugs than for brand name drugs." McLeod Deposition 53:18-54:4.

**G.    State Medicaid depositions are relevant to the use of FULs**

This Court has held that evidence relating to FULs is relevant. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 402, 405 (D. Mass. 2007). Dey seeks evidence on how states applied the FUL in order to determine what payment bases were used in each state. For example, in Hawaii, the FUL was applied even if the state MAC was lower. *See* Donovan Tr. at 174:4-188:14. In contrast, MassHealth rarely reimburses at FUL because it will reimburse at the state MAC when the MAC is lower. Jeffrey Tr. at 86:19-87:12.

Such evidence from all fifty states is relevant to the alleged damages and the states' reimbursement choices.

## II.
## MULTIPLE DEPOSITIONS FROM STATE MEDICAID WITNESSES ARE NECESSARY TO DEY'S DEFENSES

A single deposition per state will not provide Dey with sufficient evidence to present its case in each of the fifty states at issue in the Dey Action. In the pending state AWP actions, numerous Medicaid officials have been deposed. For example:

1. In *State of Montana v. Abbott Labs., Inc.*, et al., Cause No. CV-02-09-H-DWM, over 20 state Medicaid officials were deposed.

2. In *State of Nevada v. American Home Prods. Corp., et al.,* Cause No. CV-N-02-0202-ECR, over 13 state Medicaid witnesses testified as to the practice and policies of the agency.

3. In *The Commonwealth of Massachusetts v. Mylan Laboratories Inc., et al.*, Civil Action No. 03-CV-11865-PBS, over 11 state Medicaid witnesses have been deposed.

Dey also wants to avoid taking 10 or more depositions per state, and is not asking to. But, each state is different. Multiple depositions of state Medicaid officials are needed in some states, however, because witnesses with personal knowledge of relevant issues often were only employed by the state Medicaid Agency for short periods of time. In addition, several individuals also may have shared responsibility for key pricing duties. Multiple witnesses may be named on key documents produced by the Government or the states. Many witnesses had limited areas of responsibility. For example, the official responsible for MAC pricing might know nothing about claims payment. The officials who determined the reimbursement for the Dey Generics often disclaim knowledge of evidence necessary to determine damage evidence. If a cap per state is essential, it should be limited by time, i.e., 20-24 hours per state. Even the United States has recognized the difficulty in picking a single witness from each state. It has

11

named multiple witnesses from six states in its Second Supplement to Initial Disclosures to Defendants Pursuant to Fed. R. Civ. P. 26(a)(1) (the "Government's Second Supplemental Disclosures"). A single 30(b)(6) notice is insufficient.

Therefore, Dey seeks a modification of Paragraph 19 of the June 22 CMO which limits the parties to "one deposition per state as well as 10 additional depositions per side" to allow Dey the flexibility to take more than one deposition in certain states. Dey does not intend to select deponents without good reason, and does not plan to waste any time in scheduling duplicative or unnecessary depositions. At this time, Dey believes it will not need more than a total of fifty state Medicaid witness depositions provided it can use the depositions taken in the state cases and is able to cross-notice future depositions in the state cases without limitation.

In addition, Dey should be allowed to depose the 22 Medicaid witnesses named in the Government's Second Supplemental Disclosures.[2] The Government's Second Supplemental Disclosures include multiple witnesses for six states: two witnesses from Tennessee, two witnesses from New York, two witnesses from Massachusetts, three witnesses from Michigan, and two witnesses from Virginia.[3] It is necessary that Dey be allowed to depose the remainder of the Government's potential witnesses before trial.

### III.
### BECAUSE OF THE NECESSITY OF MULTIPLE STATE DEPOSITIONS, CROSS-NOTICES SHOULD BE PERMITTED

The most efficient way for Dey to obtain much of the testimony it needs from state Medicaid witnesses is through cross-noticed depositions because of the similar facts at issue

---

[2] These witnesses are from 15 states.

[3] Six of the 22 state Medicaid witnesses listed in the Government's Second Supplemental Disclosures were deposed in connection with the Abbott action, and Dey does not plan to re-depose those witnesses. The depositions taken in the Abbott action included the depositions of: Kevin Gorospe (California); James Kenyon (Michigan); Sandy Kramer (Michigan); Maryanne Paccione (Virginia); Leo Sullivan (Tennessee); and Mary Julia Terrebonne (Louisiana).

in these cases and because cross-notices are specifically provided for by Paragraph 15 of the June 22 CMO. This benefits both Dey and the Government because counsel for other parties with similar interests will share in much of the work. The witnesses whose depositions are cross-noticed are represented by counsel for the state Medicaid programs. Because the states run the Medicaid programs for the Government, the appearance of state counsel protects the Government's interests.

The Government's action against Dey is one of three similar false claims cases brought by the Department of Justice which are pending in this Court: *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, Civil Action No. 06-11337-PBS (the "Abbot Action"); *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Dey, Inc.*, et al., Civil Action No. 05-11084-PBS; and *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corp., et al.*, Civil Action No. 07-10248-PBS (the "Roxane Action"). These three actions are a part of *In re Pharmaceutical Average Wholesale Price Litigation*, MDL 1456.

Dey has been coordinating the depositions of the Government's witnesses pursuant to Paragraph 9 of the June 22 CMO, which states in part that "Dey shall . . . use reasonable efforts to coordinate deposition discovery of current and former employees of the United States government with defendants Abbott and Roxanne." Through coordination with the Abbott Action, Dey has participated in over fifty depositions, primarily depositions of CMS and OIG witnesses. By coordinating with Abbott and Roxane, the parties minimized the burden on the Government, eliminated duplicative questioning, and efficiently conducted discovery.

This principle can and should be applied to state Medicaid depositions. In addition to the three cases brought by the Government, there are over 80 other cases alleging

identical claims for Medicaid fraud. The Medicaid federal share funds sought by the Government in the Dey case are the same funds sought in the state AWP cases. Allowing cross-notices of depositions of state Medicaid officials is a logical and efficient means of conducting state discovery, because it allows the parties the benefit of the discovery conducted in the state AWP actions without duplicating depositions or interfering with the discovery deadlines at issue in those state cases.

Indeed, the Government has agreed with Dey's position on non-state depositions. There is no reason for a different rule on state Medicaid depositions because the June 22 CMO sets limits for both state and non-state depositions.

In addition to clarifying Paragraph 19 of the June 22 CMO to exclude cross-notices of all depositions from the deposition limits in Paragraph 19, Dey requests that the Court allow Dey to cross-notice depositions in state AWP actions after the fact-discovery cut off. The state AWP actions are moving on their own discovery schedules and tracks. It is more efficient for Dey to let discovery in these actions continue on their course and to cross-notice depositions as they are scheduled by the parties in those actions rather than to interject itself in those state AWP cases prematurely. By scheduling depositions in states that have active AWP cases when there have not been document productions or where discovery is not underway, the goals of the MDL are overlooked. As an example, the deposition of Kevin Gorospe of California Medicaid was noticed in the California Action prior to the noticing of any other depositions because he had been named as a witness in the Abbott action. Counsel for Abbott examined Mr. Gorospe, and the deposition will be continued by counsel in the California action at a later date. Similarly, Dey has had discussions with Plaintiff's counsel in the Illinois action about deposing the Illinois Medicaid witnesses named on the Government's Second Supplemental Disclosures. Counsel for

Illinois has indicated a preference that these individuals be deposed only once in connection with the DOJ and Illinois action. Allowing cross-notices after the discovery cut-off will eliminate this inefficiency and avoid duplicative depositions.

## IV.
## DEY SHOULD BE PERMITTED TO TAKE 30(B)(6) AND 30(B)(1) DEPOSITIONS OF STATE MEDICAID WITNESSES

Dey should be allowed to depose witnesses with personal knowledge and not be restricted to a single witness selected and prepared to testify by our adversary. Dey seeks to depose the state Medicaid employees who wrote certain documents, who attended particular meetings, and who have unique firsthand knowledge, rather than depose only 30(b)(6) witnesses who may lack firsthand knowledge and whose testimony has been informed by counsel for the state Medicaid agency or for the Government.

The 30(b)(6) deposition of Hawaii, the only 30(b)(6) state Medicaid deposition cross-noticed in this case thus far, exemplifies the need for 30(b)(1) depositions as well as the need for multiple depositions per state.[4] Ms. Hiramatsu used the phrase "I don't know" over 175 times during her two day deposition. For example, Ms. Hiramatsu had no knowledge of the policy by which the State of Hawaii would apply FUL rather than the MAC even in cases when the FUL was higher than the MAC.[5] Hirarmatsu Tr. at 369:21-370:15. On the other hand, 30(b)(1) deponent Lynn Donovan, the Pharmacy Consultant and Medicaid Drug Program Administrator, was deposed several days earlier and had testified that she was part of the team that developed the state MAC and that she was familiar with the FUL override. Donovan Tr. at

---

[4]   The Hawaii 30(b)(6) deposition of Aileen Hiramatsu took place on May 1 and 2, 2008. Counsel for the Government and Dey attended this deposition telephonically.

[5]   This question was covered by 30(b)(6) topic No. 3, which sought: "Plaintiff's knowledge, consideration, understanding or use of AMP, MAC, FUL, EAC, Direct Price, Best Price, Federal Supply Schedule prices, VA prices, or any other possible price, cost, or reimbursement amount or benchmark, metric, or methodology for Subject Drugs."

174:4-188:14. Ms. Donovan's firsthand knowledge enabled her to testify in much greater detail regarding the actual process employed by Hawaii Medicaid, rather than what was stated in the rules and regulations. *See* Hiramatsu Tr. at 373:17-22. This difference set forth in the deposition of Ms. Hiramatsu and Ms. Donovan demonstrates the need for particular 30(b)(1) witnesses with first hand knowledge for relevant time periods.

## V.
## THERE IS NO UNFAIR HARDSHIP ON THE GOVERNMENT AS COMPARED TO DEY

In the Government's Memo, the Government points to "a significant additional burden to discovery" caused by the cross-notices without offering any specifics. (the Government's Memo at 6). Dey has targeted specific deponents in Hawaii and Kentucky. Since the entry of the June 22 CMO, there have been numerous depositions of state Medicaid witnesses. Dey's filing of three cross-notices of state Medicaid depositions during that time is not an abuse of the cross-notice, and is not a significant burden on the Government given the scope of the litigation they have chosen to file.

Furthermore, the Government' interests are well-represented in the state AWP actions and the Government need not attend additional depositions as a result of any cross-notice. The state Medicaid agencies run the day to day Medicaid programs, and their interests are aligned with the Government. In many of the state actions, such as Florida, California, and Texas, Ven-A-Care is a party, and the Government's interests are represented by Ven-A-Care's counsel. There are also a number of private law firms that have been hired to represent the state interests, and the state Attorneys General are also adequately representing the Government's interests in the state AWP actions. As a result, any burden on the Government is minimal.

In contrast to the relatively minimal burden on the Government in prosecuting the claims it chose to bring, were this Court to continue to limit the state Medicaid depositions

16

available to Dey and to effectively allow the Government to determine which witnesses would be deposed by requiring 30(b)(6) depositions only, Dey would be unable to defend its claims. This action was unsealed against Dey on September 7, 2006. It was originally commenced against Dey on August 13, 1997. During the eleven year interval, the United States obtained unilateral discovery from Dey through five subpoenas served by the OIG and the DOJ pursuant to which Dey produced millions of pages of documents and emails. Dey was not able to take any discovery of the Government during this period.

The Government has the advantage of over 10 years of interviews and discovery regarding Dey and its practices while this case was under seal. Dey, on the other hand, is trying to catch up with its discovery. And, while Dey does not plan to notice unnecessary depositions of state Medicaid witnesses, these depositions will prove to be a large part of Dey's defenses and the issues of facts listed in Point 1 by way of an example. Dey therefore requests that this Court reject the Government's request and clarify the June 22 CMO as permitting cross-notices of depositions in state AWP actions as well as allow more than one deposition per state with a cap of fifty depositions.

## VI.
## GOOD CAUSE EXISTS FOR A MODIFICATION OF THE JUNE 22 CMO

The parties have been diligent in taking discovery in six general categories:

1. <u>CMS Witnesses</u>: These depositions cover former and current federal Medicare and Medicaid officials.

2. <u>OIG Witnesses</u>: These depositions include analysts and administrators from various offices of the CMS Office of Investigator General.

3. <u>State Medicaid Witnesses</u>: These depositions of current and former State Medicaid Officials from the fifty states.

4. <u>Carrier/DMERC Witnesses</u>: These depositions include the entities that perform pricing analysis on behalf of Medicare.

5. <u>Dey Witnesses</u>: These witnesses include current and former Dey employees.

6. <u>Wholesaler and Customer Witnesses</u>: These depositions include various entities that purchase drugs directly from manufacturers.

Millions of pages of documents have been produced. Dey has coordinated discovery with Abbott and Roxane in order to minimize the burden on all actions, and has participated in over fifty depositions noticed in the Abbott Action. The completed depositions have primarily focused on CMS witnesses, OIG witnesses, and Carrier and DMERC witnesses. Dey has served subpoenas *duces tecum* on numerous states and is waiting for the production of documents prior to scheduling depositions.

The majority of the outstanding depositions are those of state Medicaid witnesses. It is Dey's belief that, with the discovery of CMS and the OIG that has been taken in the Abbott action, the number of outstanding CMS and OIG witnesses is comparatively small.[6] However, Dey intends to depose the remaining state Medicaid witnesses identified in the Government's Second Supplemental Disclosures, any individuals later named in supplemental disclosures, key Medicaid officials who participated in certain meetings of the National Association of State Medicaid Directors, and witnesses who participated in studies and surveys performed by the OIG.

Federal Rule of Civil Procedure 16(b)(4) states, "A schedule may be modified only for good cause and with the judge's consent." This Court has wide discretion in determining good cause. *See, e.g., U.S. v. Charles George Trucking, Inc.*, 34 F.3d 1081, 1090 (1st Cir. 1994) (trial court has broad discretion to modify a case management order); *see also* 3

---

[6] Some depositions which were begun in the Abbott Action also need to be completed, such as the deposition of Larry Reed.

James Wm. Moore, Moore's Federal Practice § 16.14[1][b] (4th ed. 2008). As shown above, Dey can demonstrate good cause for the modification of the June 22 CMO.

## VII.
## CONCLUSION

For the foregoing reasons, Dey respectfully requests that the Court reject the Government's interpretation of the June 22 CMO and grant Dey's Cross-Motion to: (1) allow Dey to take fifty state Medicaid depositions without limitations to one deposition per state; (2) allow Dey to depose the witnesses listed on the Government's Second Supplement to Initial Disclosures to Defendants Pursuant to Fed. R. Civ. P. 26(a)(1), as well as on any future witness lists or initial disclosures; and (3) allow Dey and the Government to cross-notice depositions for use at trial, including State Medicaid Depositions, now and after the fact-discovery cut-off, without having them count against the deposition limit.

Dated: June 13, 2008

Respectfully Submitted,

KELLEY DRYE & WARREN LLP

By: /s Neil Merkl
    Paul F. Doyle (BBO # 133460)
    Sarah L. Reid *(pro hac vice)*
    William A. Escobar *(pro hac vice)*
    Neil Merkl *(pro hac vice)*

101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Defendants Dey, Inc.*
*Dey, L.P., and Dey, L.P., Inc.*

## CERTIFICATE OF SERVICE

        I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on June 13, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                            /s Neil Merkl