# Exhibit F

```
                                                                    Page 1
 1   STATE OF WISCONSIN: CIRCUIT COURT: DANE COUNTY

 2   _____

 3   STATE OF WISCONSIN,

 4              Plaintiff,

 5         -vs-                    CASE NO. 04-CV-1709

 6   AMGEN, INC., et al.,

 7              Defendants.

 8   _____

 9

10              VIDEOTAPE DEPOSITION OF THEODORE M.

11   COLLINS, was taken at the instance of the

12   Defendants, under and pursuant to the provisions of

13   Chapter 804.05 of the Wisconsin Statutes and athe

14   applicable Hawaii Statutes, and the acts amendatory

15   thereof and supplementary thereto, before me, KATHY

16   HALMA, Registered Professional Reporter and Notary

17   Public in and for the State of Wisconsin, at the

18   offices of the Attorney General of the State of

19   Wisconsin, 17 West Main Street, Madison, Wisconsin,

20   on the 30th day of October, 2007, commencing at 9:30

21   o'clock in the forenoon.

22
```

```
                                                            Page 2
  1                    A P P E A R A N C E S

  2

  3              ARCHIBALD CONSUMER LAW OFFICE, 1914

  4    Monroe Street, Madison, Wisconsin, 53711, by MR P.

  5    JEFFREY ARCHIBALD, appeared on behalf of the

  6    Plaintiff.

  7

  8              ROPES & GRAY, LLP, One International

  9    Place, Boston, Massachusetts, 02110-2624, by MR.

 10    JOHN P. BUEKER and MS. AMANDA L. LYDON, appeared on

 11    behalf of the Defendants Schering-Plough Corporation

 12    and Warrick Pharmaceuticals Corporation.

 13

 14              HOGAN & HARTSON, LLP, 111 South

 15    Calvert Street, Baltimore, Maryland, 21231, by MS.

 16    JENNIFER WALKER, appeared on behalf of the Defendant

 17    Amgen Inc.

 18

 19              WHITE & CASE, LLP, 1155 Avenue of the

 20    Americas, New York, New York, 10036-2787, by MR.

 21    THOMAS M. BIESTY, appeared on behalf of the

 22    Defendant Asandoz, Inc.
```

```
                                                                  Page 3
 1              A P P E A R A N C E S   (CONTINUED)

 2

 3              STAFFORD ROSENBAUM, LLP, 222 West

 4   Washington Avenue, Suite 900, P.O. Box 1784,

 5   Madison, Wisconsin, 53701-1784, by MS. BARBARA A.

 6   NEIDER, appeared on behalf of the Defendant

 7   Astrazeneca.

 8

 9   ALSO PRESENT VIA TELEPHONE:

10

11              Mr. Richard Cutler, Dechert, on

12   behalf of GlaxoSmithKline.

13

14              Ms. Antonia Giuliana, Kelley Drye,

15   on behalf of Dey and Mylan.

16

17              Ms. Eden Heard, Dickstein Shapiro,

18   on behalf of Baxter Healthcare.

19

20

21

22
```

```
                                                                  Page 4
 1                         I N D E X

 2

 3   WITNESS:  THEODORE M. COLLINS                                 PAGE

 4      Examination By Mr. Bueker....................  007

 5

 6

 7                        E X H I B I T S

 8   NUMBER                 DESCRIPTION                            PAGE

 9   Exhibit Collins 001, Curriculum Vitae..........  026

10   Exhibit Collins 002, Notice of Deposition......  049

11   Exhibit Collins 003, WI-Prod-AWP-111648 to 673

12                        and 118602................  071

13   Exhibit Collins 004, WI-Prod-AWP-111831 to 889.  115

14   Exhibit Collins 005, WI-Prod-PDF-046560 to 585.  125

15   Exhibit Collins 006, WI-Prod-AWP-065311........  133

16   Exhibit Collins 007, WI-Prod-AWP-051607 to 608.  140

17   Exhibit Collins 008, WI-Prod-AWP-059706........  151

18   Exhibit Collins 009, WI-Prod-AWP-059707........  151

19   Exhibit Collins 010, WI-Prod-AWP-055471........  155

20   Exhibit Collins 011, WI-Prod-AWP-090070 to 071.  161

21   Exhibit Collins 012, WI-Prod-AWP-065305........  168

22   Exhibit Collins 013, WI-Prod-AWP-065306........  168
```

```
                                                                    Page 5
 1             E X H I B I T S   (CONTINUED)

 2    NUMBER              DESCRIPTION                        PAGE

 3    Exhibit Collins 014, WI-Prod-AWP-089153 to 179.  171

 4    Exhibit Collins 015, WI-Prod-AWP-055473........  178

 5    Exhibit Collins 016, WI-Prod-AWP-070458........  185

 6    Exhibit Collins 017, WI-Prod-AWP-069104 to 108.  189

 7    Exhibit Collins 018, WI-Prod-AWP-069100........  196

 8    Exhibit Collins 019, WI-Prod-AWP-069099........  199

 9    Exhibit Collins 020, WI-Prod-AWP-068456 to 459.  202

10    Exhibit Collins 021, WI-Prod-AWP-068433........  220

11    Exhibit Collins 022, WI-Prod-AWP-068432 to 432.  222

12    Exhibit Collins 023, WI-Prod-AWP-076866 to 867.  228

13    Exhibit Collins 024, WI-Prod-AWP-076867 to 868.  228

14    Exhibit Collins 025, WI-Prod-AWP-061530........  236

15    Exhibit Collins 026, WI-Prod-AWP-1-4545-546....  241

16

17

18

19

20

21

22
```

1   program," others might not.  What is that
2   program?
3        A.   In Wisconsin any drug that has two or
4   more -- any A-rated drugs, in other words, under
5   the FDA Orange Book the A-rated drugs who have
6   two or more sources that are routinely and
7   customarily available, I establish an upper limit
8   for reimbursement based on a variety of sources
9   of drug information.
10       Q.   What are those sources?
11       A.   Well, they vary, and at the moment the
12  only source I have of drug information, of
13  wholesale drug information, is from Cardinal.  I
14  have in the past used a variety of sources.
15  Originally it was the F. Dohman Company, which is
16  a wholesaler based in I think it's West Bend,
17  Wisconsin where the wholesaler was generous
18  enough to give me access to microfiche, and then
19  for a brief period of time I had access on line
20  to a buying group who put many of their prices on
21  line called IPC based in Sun Prairie, and then
22  when Dohman chose not to share pricing --

```
 1   microfiche pricing information with us anymore,
 2   the Department of Administration, which purchases
 3   pharmaceuticals for the Department of Corrections
 4   and the Department of Health and Family Services,
 5   institutions, was able to give me access to
 6   Cardinal's.  I also used -- it's a very difficult
 7   -- No one wants to share information, price
 8   information with us, so it's difficult.
 9             In the past I, frankly, relied on a
10   veterinary Internet site call vetnet.com, it was
11   vetnetpurchasing.com, which no longer exists for
12   whatever reason, but it was a source of pricing
13   for human pharmaceuticals for veterinarians, and
14   so that was another source.
15        Q.   So there have been a variety of sources
16   over the years, and I actually have some e-mails
17   we can look at as we go through and maybe it will
18   help to nail down some of the timeframes, but
19   generally speaking it sounds like in establishing
20   these upper limits you looked at whatever source
21   you can for an actual wholesale price?
22        A.   Well, correct.  It's the most
```

Page 18

```
 1    perplexing -- Given the limited time I had, it
 2    was a very perplexing activity in that many times
 3    the prices weren't similar when I had more than
 4    one source, and I was never really fully sure
 5    whether those prices were available to everyone
 6    or whether there were additional discounts that
 7    were available beyond what was available to me.
 8         Q.    Let's just back up.  You used the term
 9    "A-rated." What does that mean?
10         A.    Well, it's an FDA rating that assures
11    that the products have met some FDA standards
12    that say the products are interchangeable and
13    have met some assurance that they can be freely
14    substituted.
15         Q.    Okay.  And as I understand it, whenever
16    there are two or more of those A-rated drugs,
17    then Wisconsin Medicaid institutes a MAC?
18         A.    That's correct.  If there are two or
19    more drugs, they are routinely available and
20    there's differences, they aren't priced the same,
21    I will establish an upper limit.
22         Q.    You have used the term "routinely
```

Page 19

1  available" a couple of times. What does that
2  mean?
3      A.  Well, there are times when the products
4  may not be -- may not be available due to
5  production problems, due to lawsuits in which
6  companies have a limited supply. Generic Plavix
7  was a product in which the manufacturer had been
8  directed to stop manufacturing, but they had a
9  lot of supply, but some pharmacies may have
10 bought large quantities and were able to continue
11 to supply, others weren't and they didn't
12 purchase, so in those cases we don't establish a
13 MAC because we can't guarantee people have ready
14 access to it.
15     Q.  I see. So the reason it's important to
16 look and see whether something is routinely
17 available is one of access?
18         MR. ARCHIBALD: I will object to the
19 form of the question.
20 BY MR. BUEKER:
21     Q.  Why is it important in establishing a
22 MAC to look at whether or not a drug is routinely

```
 1    purchasing drugs?
 2         A.    That was my best guess.
 3         Q.    Well, that was your working assumption
 4    in terms of when you set MAC prices for the
 5    Wisconsin Medicaid program?
 6         A.    I knew that that was maybe the ceiling,
 7    but I don't know what the actual net price may
 8    have been.
 9         Q.    The bullet goes on to say, "Prices are
10    set at approximately 10 to 20 percent -- 10 to 25
11    percent more than the lowest acquisition price?"
12         A.    Right.
13         Q.    Do you agree with that?
14         A.    That's true.  I basically took the
15    lowest acquisition and the sources I had and then
16    added a few pennies to the price to assure that
17    everybody -- assure that I didn't get 800 phone
18    calls saying, "I can't buy it for that price."
19         Q.    So you may have answered this, but why
20    add the 10 to 25 percent?
21         A.    Well, I think it was because I was
22    taking the lowest acquisition price from any
```

Page 193

1    report to the federal government under the
2    Medicaid program, is that correct?
3           MR. ARCHIBALD:  Objection, foundation.
4           THE WITNESS:  They are required -- To
5    my knowledge they are required to report it to
6    CMS, yes.
7    BY MR. BUEKER:
8       Q.   And on some occasions when you were
9    trying to determine what was going on in the
10   marketplace, you made a specific request for that
11   AMP information?
12      A.   Yes.
13      Q.   Why request AMP information?  What did
14   you think it would tell you about what was going
15   on in the marketplace?
16      A.   Well, as I indicated, it was a rare
17   occurrence and it was usually just to try to see
18   if what I saw in the marketplace reflected what
19   the distributor, manufacturer, whatever indicated
20   to CMS that they were actually getting for the
21   product.
22      Q.   And you understood in making that

1   request AMP to be an average selling price to the
2   retail class of trade; correct?
3              MR. ARCHIBALD:  Objection, foundation.
4              THE WITNESS:  I understood all the
5   limitations of the AMP.  Well, I shouldn't say I
6   understood all the limitations.  I'm only now
7   finding out all the limitations of AMP, since
8   class of trade has a big impact on price.  To me
9   it was only another source of information.  I in
10  this whole process have forever had to deal with
11  the ambiguities of a limited source of price
12  information that in some cases didn't appear to
13  jive with one another or with what I believed the
14  marketplace was like.
15       Q.   And over time you think you have done a
16  pretty good job in handling those ambiguities?
17  You have set reasonable MACs for the Wisconsin
18  program?
19       A.   I think so, and usually when I sought
20  rebate information was on those rare occasions
21  when I was confused by what I new, what I saw in
22  the market.

Page 250

1    JEFFREY ARCHIBALD, appeared on behalf of the
2    Plaintiff.
3              ROPES & GRAY, LLP, One International
4    Place, Boston, Massachusetts, 02110-2624, by MR.
5    JOHN P. BUEKER and MS. AMANDA L. LYDON, appeared on
6    behalf of the Defendants Schering-Plough Corporation
7    and Warrick Pharmaceuticals Corporation.
8              HOGAN & HARTSON, LLP, 111 South
9    Calvert Street, Baltimore, Maryland, 21231, by MS.
10   JENNIFER WALKER, appeared on behalf of the Defendant
11   Amgen Inc.
12             WHITE & CASE, LLP, 1155 Avenue of the
13   Americas, New York, New York, 10036-2787, by MR.
14   THOMAS M. BIESTY, appeared on behalf of the
15   Defendant Asandoz, Inc.
16             STAFFORD ROSENBAUM, LLP, 222 West
17   Washington Avenue, Suite 900, P.O. Box 1784,
18   Madison, Wisconsin, 53701-1784, by MS. BARBARA A.
19   NEIDER, appeared on behalf of the Defendant
20   Astrazeneca.
21             ALSO PRESENT VIA TELEPHONE:
22             Mr. Richard Cutler, Dechert, on

Page 251

1   behalf of GlaxoSmithKline.

2              Ms. Antonia Giuliana, Kelley Drye, on

3   behalf of Dey and Mylan.

4              Ms. Eden Heard, Dickstein Shapiro, on

5   behalf of Baxter Healthcare.

6

7              That said deponent, before

8   examination, was sworn to testify the truth, the

9   whole truth, and nothing but the truth relative to

10  said cause.

11             That the foregoing is a full, true

12  and correct record of all the proceedings had in the

13  matter of the taking of said deposition, as

14  reflected by my original machine shorthand notes

15  taken at said time and place.

16

17

18  _____

19  KATHY A. HALMA, RPR

20

21  Dated this 2nd day of November, 2007,

22  Milwaukee, Wisconsin