# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Master File No. 01-CV-12257-PBS

Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO:

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS | ) ) ) ) ) ) ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE REQUESTS BY THE DEY DEFENDANTS FOR DEPOSITIONS UNDER RULE 30(B)(6)

Defendants Dey, Inc., Dey L.P., and Dey L.P., Inc. (collectively, "Dey"), submit this memorandum of law in opposition to the Plaintiff the United States of America (the "Government")'s Motion for a Protective Order Relating to the Requests by the Dey for Depositions Under Rule 30(b)(6).

Through this motion, the Government seeks a protective order relieving it from producing a witness under Rule 30(b)(6) of the Federal Rules of Civil Procedure to provide testimony as to topics 29, 32-38, 40-42, 51 and 60-62 proposed by Dey (the "Topics")  (*See* Declaration of Sarah L. Reid in Opposition to the Government's Motion for a Protective Order ("Reid Declaration" or "Reid Decl.") at Exhibit A).  The Government contends that these Topics are either irrelevant (Topics 29, 51, 61, and 62), seek matters protected by various privileges (Topics 32, 33, 40, 42, 61, and 62), seek the Government's legal conclusions (Topics 60 and 62), or lack sufficient particularity (Topics 34-38, 41 and 60).  These contentions are lacking in merit and do not warrant the protective order the Government seeks.  First, the Topics at issue are

1

highly relevant to the Government's claims in this action.  Second, the Government's attempts to

establish privilege are premature and unsupported by any facts in the record.  Even if these

attempts were supported, Dey has a compelling need for testimony on those topics that

overcomes the privileges asserted.  Third, the Government's arguments concerning a lack of

particularity are really complaints about the burden of educating a witness to provide 30(b)(6)

testimony where the Government has not submitted any evidence that this burden exists, let

alone that it is undue.  Finally, the purported "legal conclusions" actually seek the facts

underlying contentions the Government sets forth in its complaint and are proper areas for

deposition.  This memorandum will treat each challenged Topic in turn and demonstrate why the

testimony sought should be allowed.

The Government references the "extensive" discovery that it has already provided in an

attempt to make these Topics appear superfluous or cumulative. (*See* United States'

Memorandum In Support of its Motion For a Protective Order Relating to the Requests By the

Dey Defendants For Depositions Under Rule 30(b)(6), ("Government Brief") at 2).  In fact, most

of the discovery the Government refers to was produced in a separate action the Government has

brought against Abbott Laboratories.  While Dey has had the right to participate in depositions

noticed by Abbott in that action and has received documents through that action, Dey has not yet

been able to depose of any Government witness it has requested.  In fact, the Government has

only agreed to produce witnesses on five of the 64 Topics Dey initially proposed.  (*See* Reid

Decl., Ex. B.)  None of the Topics at issue in the Government's motion are duplicative of

testimony given by the Government in response to Abbott 30(b)(6), and the Government should

not be relieved of its discovery obligations to Dey simply because it has produced discovery in

other actions.

## ARGUMENT

### I.     TOPICS 29 AND 51 SEEK TESTIMONY THAT IS CENTRAL TO THIS CASE

Contrary to Plaintiff's contentions, these Topics are directly relevant to the claims at issue in this action.  Topic 29 seeks testimony regarding "[t]he investigation, preparation, drafting, approval and circulation of the OIG report titled 'Cost Containment of Medicaid HIV/AIDS Drug Expenditures' (OEI-05-99-00611 (July 2001)) [the "Report"], including but not limited to the preparation and drafting of the chart on page 7 of that report titled 'Chart 1: Pharmaceutical Industry.'"  In discussing how Medicaid can contain costs for antiretroviral drugs, the Report examines the pricing structure of the pharmaceutical industry in general, as well as the history of the OIG's examination of drug pricing in the 1990's.  As part of its examination, the report includes a chart entitled "Chart I, Pharmaceutical Industry," (Reid Decl., Ex. C, at 7.) which is annexed to this brief at Exhibit A.  This schematic demonstrates an accurate understanding of how pricing worked within the pharmaceutical industry, including the recognition that AWP was not an actual price.  The Report examines all price points available to the government in 2001, including Federal Supply Schedule prices, 340(B) prices, and Federal ceiling prices, and compares them to reimbursement payments for Medicaid drugs in general. (*Id.* at 11-14.)  Finally, the report makes three recommendations for revising Medicaid reimbursement calculations, all of which discuss the interrelation between list prices such as AWP and WAC and transactional prices such as AMP.  The Report notes in the context of discussing low dispensing fees that "[i]n the past CMS has expressed concern about fair pharmacy compensation for serving Medicaid clients and has stated that one means to ensure access was to permit pharmacies to profit from sales to Medicaid clients." (*Id.* at 23.)

Thus this Report is directly relevant to showing the Government's understanding of pharmaceutical pricing within the industry, and CMS' actions in the light of that understanding.

3

It refutes essential elements of the Government's claims, namely that the Government reasonably relied on the prices Dey supplied to pricing compendia or that Dey was the cause of any overpayment by the Government to the providers, and Dey is entitled to develop the evidentiary record on these points.  The Government's only basis for challenging this Topic is that the Report relates to HIV/AIDS drugs (Government Brief at 6), but that argument misses the point that the Report analyzes drug pricing as a whole and has equal applicability to all drugs being reimbursed by Medicaid at that time.

Topic 51 seeks testimony regarding "CMS's comments contained in the October 4, 2007 letter by Kerry Weems in response to the OIG's January 2008 report entitled 'Review of the Relationship between Medicare Part D Payments to Local Community Pharmacies and the Pharmacies' Drug Acquisition Costs' [the "Weems Letter]."  Again the Government seeks to impose an overly-narrow relevance objection.  In the Weems Letter, Kerry Weems, the acting administrator for CMS, comments on the OIG's report on Medicare Part D reimbursement and acquisition costs:

> The report found that pharmacies almost always acquired drugs for less than the reimbursement amounts.  Although we do not collect comparable data, *this observation is expected as it is one method for pharmacies to support the expense of dispensing costs*.  These findings are also consistent with our experience with the Part D program in that we do not receive complaints from pharmacies with respect to negotiated prices not covering acquisition costs.

> The report also found that the percentage differences between Part D payments and drug acquisition costs were more than nine times higher for generic drugs than for brand-name drugs.  Clinically appropriate generic prescribing is one of the key ways in which the Part D program is able to provide high quality coverage at a reasonable cost to both beneficiaries and the government.  We fully encourage the use of generic drugs since their use provides good value to both the beneficiary and the taxpayer, and *we note that incentives are aligned to encourage promotion of generics by community pharmacies*.

 (Reid Decl., Ex. D) (Emphasis added).  This letter indicates that, as of October 4, 2007, CMS continued to use the spreads between reimbursement payments and providers' actual acquisition costs as a means of addressing inadequate dispensing fees and to promote the use of generic drugs.  The Government is seeking Medicaid-related damages against Dey to the current date. The CMS Administrator's statements and understanding of the interrelationship between the spread and dispensing fees is clearly relevant, and Dey is entitled to develop the record on this point as well.

The Government's contention that these two reports are not relevant because government knowledge "is not generally a defense under the FCA" misses the mark as well.  (Government's Brief at 8).  These reports are relevant to the Government's FCA claims as they refute the causation and scienter elements of the Government FCA claims.  "If the government knows and approves of the particulars of a claim before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.  In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA."  *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (Saris, J.) (citing *Durcholz*). Indeed, the Government concedes in its brief that government knowledge is relevant to the issue of scienter under the FCA.  (Government's Brief at 8.)  Nonetheless, the Government argues that government knowledge is irrelevant because there is "no evidence" that the government knew of, and approved of, Dey's practices with regard to reporting AWP.  (*Id.*)  Setting aside the Government's unsupported contention that Dey must make an evidentiary showing that it is entitled to discovery, the reports themselves constitute evidence that the Government both knew

of the existence of spreads between AWP and providers' actual acquisition costs, and used those spreads for its own policy reasons.

Moreover, the Government completely ignores that, in addition to its FCA claims, it has brought a claim for common law fraud for which its knowledge of Dey's purported misrepresentation is directly relevant. It is a well settled that, when a plaintiff has knowledge that an allegedly false statement is in fact false, the plaintiff cannot reasonably rely on that statement, thus negating the reasonable reliance element of a fraud cause of action. *See Carroll v. Xerox Corp.*, 294 F.3d 231, 243 (1st Cir. 2002) (dismissing plaintiff's fraud claim where plaintiff knew that the allegedly fraudulent statements made by the defendant were not true). The crux of the Government's fraud claim is that Dey's AWPs did not represent the prices providers actually paid wholesalers for Dey's drugs. Therefore, Dey is entitled to seek discovery of the Government's knowledge of the nature of AWP to determine whether the Government's alleged reliance was in fact reasonable.

## II. THE OIG GUIDELINES ARE CENTRAL TO THE GOVERNMENT'S CASE AND THE GOVERNMENT SHOULD NOT BE ALLOWED TO BLOCK DISCOVERY CONCERNING THEM

Topics 61 and 62 seek testimony regarding a set of compliance guidelines set forth by the Department of Health and Human Services' Office of Inspector General concerning pharmaceutical manufacturers. Topic 61 seeks testimony concerning:

> The drafting, approval, circulation, and publication of the Office of Inspector General, OIG Compliance Program Guidance for Pharmaceutical Manufacturers, April 18, 2003 (hereinafter "OIG Compliance Guidelines"), including but not limited to (a) the individuals involved in the process; (b) when the OIG Compliance Guidelines were first proposed; and (c) comments and changes to the OIG Compliance Guidelines.

(Reid Decl., Ex. A, Topic 61). Topic 62 seeks testimony concerning:

> The definition of AWP as used in the OIG Compliance Guidelines
> that state: "Average Wholesale Price (AWP) is the benchmark
> often used to set reimbursement for prescription drugs under the
> Medicare Part B program.  For covered drugs and biologicals,
> Medicare Part B generally reimburses at '95 percent of average
> wholesale price.'  42 U.S.C. 1395u(o)  Similarly many state
> Medicaid programs and other payers base reimbursement for drugs
> and biologicals on AWP.  Generally, AWP or pricing information
> used by commercial price reporting services to determine AWP is
> reported by pharmaceutical manufacturers."

(Reid Decl., Ex. A, Topic 62).  In addition to the definition of AWP listed in Topic 62

the OIG Compliance Guidelines contain the following discussion of AWP:

> The "spread" is the difference between the amount a customer pays
> for a product and the amount the customer receives upon resale of
> the product to the patient or other payer.  In many situations under
> the federal programs, pharmaceutical manufacturers control not
> only the amount at which they sell a product to their customers, but
> also the amount those customers who purchase the product for
> their own accounts and thereafter bill the federal health care
> programs will be reimbursed.  To the extent that a manufacturer
> controls the "spread," it controls its customer's profit.

(Reid Decl., Ex. E at 23736.)

The 2003 OIG Compliance Guidelines is a key document in this case.  The Guidelines

represent efforts by the Government to give guidance to pharmaceutical manufacturers on

potential violations of the federal anti-kickback statute.  One section deals with AWP

exclusively.  (*Id.* at 23736-37.)  Clearly Dey is entitled to discovery relating to the Government's

efforts to give guidance as to AWP, including finding out the identity of the individuals involved

in preparing the Guidelines, their knowledge concerning AWP and their understanding of what

AWP means.

The Government asserts two bases to support its claim for a protective order as to these

two topics: relevance and privilege.  The relevance objection again is based on the Government's

narrow view that apparently no knowledge by CMS is relevant to this case.  That is clearly not the law.  *See supra* at I, pp 5-6.

Furthermore, the Government's assertion that the definition of AWP "speaks for itself" and that no discovery on it is necessary misses the point.  The issue is not so much the definition itself, although it is highly suggestive that, prior to filing this lawsuit, the Government had promulgated a definition of AWP that does not indicate an understanding that AWP was equal to the prices actually paid by providers, but who in the Government had this understanding of AWP and on what it was based, whether it be industry reports, OIG reports, or communications within CMS.  The one case the Government cites to support this point, *United States v. Lachman*, 387 F.3d 42 (1st Cir. 2004), is not on point.  In that case, the agency's understanding of a regulation was raised in connection with a legal question regarding the interpretation of a regulation.  *Id*. at 50.  Here, the OIG's understanding of AWP goes to the factual issue of the Government's knowledge.

The Government also argues that it is entitled to a protective order as to Topics 61 and 62 because they seek matters covered by the attorney-client privilege and the deliberative-process privilege.  However, the Government has failed to meets its burden of demonstrating that either privilege exists.  "As a general matter, the party asserting an applicable privilege has the burden of establishing that it applies.  The privilege's applicability must be demonstrated by a fair preponderance of the evidence."  *In re Grand Jury Subpoena*, 220 F.R.D. 130, 140 (D. Mass. 2004) (internal citations omitted).  The Government has failed to meet its burden here.  Apart from the Government's unsupported statement that "the Office of Counsel to the IG was primarily responsible for drafting these guidelines" (Government Brief at 7), the Government offers no specific showing that these Topics implicate privileged areas, and instead relies only on

vague and conclusory allegations.  Such conclusory allegations, however, are not sufficient to support assertions of privilege.  "That burden [of establishing the privilege] is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonano*, 344 F.2d 830, 833 (2nd Cir. 1965).

Even assuming, *arguendo*, that the Government did establish that Topics 61 and 62 touch on privileged matters , the Government's assertion of the privilege is premature.  Courts routinely reject attempts to assert privileges as grounds for protective orders quashing deposition notices and subpoenas.  For instance, in *United States v. Motorola, Inc.*, No. Civ. A. 94-2331TFH/JMF, 1999 WL 552558, *2 (D.D.C. May 27, 1999), the Government sought a protective order in response to a defendant's 30(b)(6) notice, arguing that the topics noticed would lead to the discovery of information protected by the attorney-client and deliberative process privilege.  The Court rejected the Government's request, holding:

> The pleadings filed raise only the possibility that these privileges may apply to the questions to be asked during the deposition.  It would be a gross abuse of my responsibilities to say on this record that it is impossible for Nextel to ask questions that will not be covered by either or both privileges.  Instead, I am obliged on the application of each privilege on a question by question basis…

*Id.*  Similarly, in *Evans v. City of Chicago*, 231 F.R.D. 302, 320 (N.D. Ill. 2005), the Court denied a request to quash a subpoena on privilege grounds simply because the questions asked may cover areas covered by privilege.  As the Court held, "We cannot say that Mr. Ryan would be unable to give any testimony…that would fall outside of an applicable privilege." *Id.* [1]  Here,

---

[1]  The one case the Government cites where the court granted a protective order prior to a deposition, *Federal Trade Comm'n v. U.S. Grant Resources, LLC*, No. Civ. A. 04-596, 2004 WL 1444951 (E.D. La. June 25, 2004), is readily distinguishable from the present case.  In that case, the factual information sought through a 30(b)(6) notice was available from sources other than the Government and its attorneys.  *See id.* at *10.  Here, the

the paucity of a factual basis for the Government's assertion of privilege makes clear that the assertion is premature.  Without any questions on the record, the Government cannot set forth the specific factual basis for its assertions of privilege, much less can Dey be in a position to challenge those assertions.  Clearly, the proper course is to allow the deposition to proceed and to let the Government assert its privileges on a question by question basis.  Then Dey will be in a position to assess the merits of each claim of privilege against its need for an answer to a particular question and challenge only those assertions where it deems it has a compelling need for an answer and the assertion lacks merit.  This approach is preferable, both in terms of fairness and judicial economy, to the issuance of a blanket protective order based solely on the Government's speculation that would foreclose inquiry into a central area of the case.

## III.   TOPICS 32, 33, 40 AND 42 SEEK PERMITTED DISCOVERY AS TO THE REASONS FOR THE LENGTHY DELAY IN UNSEALING THE COMPLAINT AS WELL AS THE ORIGINAL SOURCES FOR THE ALLEGATIONS

The Government also seeks a protective order as to Topics 32, 33, 40, and 42, claiming that these Topics cover areas that are protected by the attorney-client privilege, the work-product doctrine, the deliberative process privilege and the common interest privilege.  These Topics primarily relate to the delay between the filing of the *qui tam* complaint in this case and its unsealing some 9 years later.  In its decision on Dey's motion to dismiss, this Court recognized the constitutional concerns raised by the Government's delay, but found that the record was insufficient at the time to address those concerns.  *In re Pharm. Indus. Average Wholesale Pricing Litig.*, 498 F. Supp. 2d 389, 399 (D. Mass. 2007).  Dey is entitled to develop that record now.

---

Topics Dey seeks discovery on, namely the promulgation of the OIG Compliance Guidelines and specifically the definition of AWP contained therein, are within the exclusive control of the Government and it is impossible for Dey to obtain them from another source.

Topic 32 seeks testimony regarding:

> The extensions of time to intervene in the *qui tam* complaint filed
> by Ven-A-Care of the Florida Keys in the Southern District of
> Florida which were granted to the United States under 31 U.S.C. §
> 3730 (b)(3) of the False Claims Act, including but not limited to
> the reasons given for the delay, the number of extensions granted,
> the legal bases for those extensions, and the United States' conduct
> of its investigation into the allegations in the *qui tam* complaint.

(Reid Decl., Ex. A, Topic 32).  Topic 33 seeks similar testimony regarding the *qui tam* complaint

filed in the District of Massachusetts.  (*Id.*, Topic 32).  Topic 40 seeks testimony regarding

"[h]ow and when the United States learned of the facts underlying the allegations in paragraphs

52 through 80 of the complaint." (*Id.*, Topic 40).  Topic 42 seeks testimony regarding "[t]he

dates, facts and circumstances describing when and how the Government learned of the fraud

alleged in the complaint with respect to each of the Dey NDC numbers alleged in the complaint."

(*Id.*, Topic 42).  These four Topics all seek testimony regarding when the Government learned of

the conduct it alleges in its complaint against Dey and the extraordinary delay in unsealing the

complaint.

As it did with Topics 61 and 62, the Government asserts that Topics 32, 33, 40, and 42

are protected from discovery because they implicate matters which may be privileged.  And as

with the Government's privilege argument for Topics 61 and 62, the Government has failed to

meet its burden of demonstrating by a preponderance of the evidence that Topics 32, 33, 40, and

42 are protected by privilege.  Instead, the Government's assertion of the privilege for these

Topics is based on the Government's speculation in its brief that the Topics cover

communications between the Department of Justice and CMS, and that such communications are

"at the heart of the attorney-client privilege and the word product doctrines."  (Government Brief

at 11).  However, this conclusory assertion is not sufficient to establish the privilege.  Instead of

citing to any facts in the record or giving particulars as to the individuals involved in such

supposed conversations, the Government gives a string cite of cases wherein courts quashed interrogatories that sought the names of witnesses attorneys had interviewed. *See Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 154 (D. Mass. 1986); *B'd of Ed. Of Evanston T.P. v. Admiral Heating*, 104 F.R.D. 23, 32 (N.D. Ill. 1984); *Uinta Oil Ref. Co. v. Cont'l Oil Co.*, 226 F. Supp. 495, 506 (D. Utah 1965). Setting aside that none of the Topics mentions seeking the names of individuals the Government's attorneys interviewed, this string cite does not take the place of the Government's burden to establish the these Topics are protected by privilege by a fair preponderance of the evidence. Indeed, the Government's inability to set forth anything more than conclusory allegations about why these Topics are privileged again indicates that the Government's assertion is, again, premature. The better course is to allow the depositions to proceed and assert the privilege as to specific questions, rather than foreclose entire areas of questioning. *See supra* at II, pp 8-10.

Even if the Government had established that some of the privileges apply to these Topics, which it has not, Dey has a compelling need for discovery on these Topics that would override any assertion of the work-product doctrine and the deliberative process privilege. Rule 26(b)(3)(A) of the Federal Rules provides for the discovery of attorney work product materials when "(i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Similarly, the deliberative process privilege has a similar qualification. "The [deliberative process] privilege 'is a qualified one.' Thus in determining whether to honor an assertion of the privilege, a court must weigh competing interests…. In deciding how to exercise its discretion, an inquiring court should consider, among

other things, the interests of the litigants.…" *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995) (citations omitted).

As discussed above, Dey has a compelling need for discovery on  Topics 32 and 33. They seek information relating to the reasons the Government delayed nine years in intervening and its conduct between the time Dey was added to the *qui tam* complaint in Florida in 1997 and the time of the Government's ultimate intervention in this action in 2006, which delay raises serious due process concerns for Dey.  It would be impossible for Dey to obtain this information from other sources because the Government's conduct of its investigation and its reasons for the delay are exclusively within its own control.  Finally, any interest the Government may have in keeping the reasons for its delay confidential cannot outweigh Dey's constitutional rights to due process.

The Government contends that its *ex parte* applications to extend the seal period contain its reasons for seeking extensions and that no further testimony is needed on this matter.  These memoranda indicate that the Government subpoenaed and reviewed documents, interviewed witnesses, and subpoenaed and analyzed data to develop its damages calculations.  In short, they demonstrate that the Government engaged in a nine-year period of one-sided, pre-litigation discovery all of which it is now attempting to cloak under the rubric of privilege.  During this time, Dey was unable to obtain any discovery from either the Government or any third-parties. If anything, these memoranda indicate that the Government used the delay to gain a tactical advantage over Dey, since the passage of time necessarily dims witnesses recollections as well as leads to the loss of other evidence.  The true extent of the prejudice this advantage will cause Dey cannot be known absent the requested discovery.

In addition to the important constitutional issues discussed above, Topics 32, 33, 40 and 42 seek testimony generally regarding when and how the Government learned of the alleged conduct that forms the basis of its complaint.  These issues are particularly important in this case, since the Government is relying on Ven-A-Care's original *qui tam* complaint as a statute of limitations place holder.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d at 399-400.  The False Claims Act prohibits *qui tam* actions based on publicly disclosed matters.  *See* 31 U.S.C. § 3730(e)(4)(A).  Thus, if Ven-A-Care based its original *qui tam* complaint on publicly disclosed material of which it was not the original source, then there was never any jurisdiction over that complaint and the Government's complaint cannot now relate back to it for statute of limitations purposes.  Given that the Government itself published a report describing significant spreads between costs and Medicare reimbursement for albuterol sulfate – one of the subject drugs in this action – more than a year before Ven-A-Care filed its complaint (*see* HHS-OIG, "A Comparison of Albuterol Sulfate Prices" (OEI-03-94-00392) (June 1996)), Dey is entitled to discovery from the United States to learn when and how it first learned of the conduct alleged in this complaint.

## IV.  TOPICS 60 AND 62 SEEK FACTS, NOT LEGAL CONCLUSIONS

The Government argues that certain of Dey's Topics improperly seek to learn the Government's "legal positions," but identifies only two topics, Nos. 60 and 62, as allegedly improper in this regard.[2]  Topic 60 seeks testimony regarding whether the Government "contend[s] that the Usual and Customary price submitted by any provider to Medicare or Medicaid for any Dey Subject Drug is false or fraudulent."  Leaving aside whether asking a deponent if an act is fraudulent is a "legal position," it is plain that asking a deponent whether

---

[2]   See *supra* at II, pp.6-10, for discussion of Topic 62.

something is "false" does not pose a legal question or seek a legal position.  In any event, Dey

does not seek "legal positions" in either topic but rather the facts and factual interpretations of

events which is the very purpose of a 30(b)(6) deposition.  A 30(b)(6) designee "must not only

testify about facts within the corporations' knowledge, but also its subjective beliefs and

opinions." *U.S. v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996).  The designee is required to

provide the agency's interpretation of documents and events, much like an individual plaintiff

would give such interpretation at deposition.  *Id*.  Thus, "[t]he attorney for the corporation is not

at liberty to manufacture the corporation's contentions. Rather, the corporation may designate a

person to speak on its behalf and it is this position which the attorney must advocate." *Id*.

       The cases relied upon by the Government are inapposite.  The testimony at issue in *Goss

Intern. Americas, Inc. v. MAN Roland, Inc.*, No. Civ. 03-CV-513-SM, 2006 WL 1134930, *1

(D.N.H. April 28, 2006) related to claim construction in a patent case, an issue that is purely

legal in nature.  Similarly, the party seeking deposition testimony in *SmithKline Beecham Corp.

v. Apotex Corp.*, No. 99-CV-4304 *et al*., 2004 WL 739959 (E.D. Pa. March 23, 2004), sought

contentions regarding legal issues in a patent case.  Both Courts ruled that such information was

discoverable, but in the context of those litigations, could be more appropriately addressed

through interrogatories.  The cases follow a line of  decisions in patent cases where Courts,

considering the complex essentially quasi-legal status of even the "facts" in such cases, have

instructed litigants to discover parties' legal contentions through interrogatories. *See, e.g.,

McCormick-Morgan, Inc. v. Teledyne Indus.*, 134 F.R.D. 275, 287 (N.D. Cal. 1991); *see also* 8A

WRIGHT MILLER & MARCUS, FEDERAL PRACTICE & PROCEDURE § 2167 (noting courts'

reluctance to allow contention discovery in patent cases). *But see AMP Inc. v. Molex Inc.*, No. 84

C 2815, 1985 WL 2284, at *1 (N.D. Ill. Aug. 9, 1985) ("plaintiff's interpretation of the patent is

the basis of this lawsuit, and questions thereon are allowed" in 30(b)(6) deposition).[3]

*Protective National Insurance Co. of Omaha v. Commonwealth Insurance Co.*,  137

F.R.D. 267 (D. Neb. 1989) is on point.  In that case, the plaintiff in a reinsurance case sought an

order compelling answers to questions posed in the 30(b)(6) deposition of the defendant

concerning, *inter alia*, "the factual basis of [the defendant's] allegations in its answer and

counterclaim." *Id*. at 270.  The Court ordered the plaintiff to produce its 30(b)(6) designee to

provide the factual basis for its contentions, *inter alia*, that "certain representations were *false

and misleading*[,]" explaining:

> There is nothing purely legal about these types of allegations; a
> Federal Rule of Civil Procedure 30(b)(6) spokesperson, who is a
> qualified accountant, and who has experience handling reinsurance
> matters, should have no difficulty in explaining the facts
> underlying such allegations. It is one thing to ask a defendant why
> an affidavit is "invalid" under the "Trade-Mark Act of 1946" and
> quite another thing to ask an accountant, who deals with
> reinsurance issues on an everyday basis, what facts she has in her
> possession upon which her employer relied when it alleges that
> "efforts to bill and recover deductibles and salvage were highly
> sporadic, resulting in enormous costs to the reinsurers."

*Id.* at 282-83 (emphasis added).  The Government should be ordered to do the same here.

## V.   TOPICS 34-38, 41 AND 60 ARE SET FORTH WITH REASONABLE PARTICULARITY AND PROPERLY SEEK THE FACTS UNDERLYING THE GOVERNMENT'S ALLEGATIONS IN ITS COMPLAINT

The Government seeks a protective order as to Topics 34 through 38, 41 and 60 on the

grounds that these Topics fail to set forth the matters sought with reasonable particularity.  These

---

[3]    The government's reliance on *In re Independent Service Organizations Antitrust
Litigation*, 168 F.R.D. 651, 654 (D. Kan. 1996) is also misplaced.  In that case, the Court
conceded that CSS, the party seeking discovery, had "a right to discover the facts upon
which Xerox will rely for its defense and counterclaims."  However, the Court denied
CSS the opportunity to seek that information via a Rule 30(b)(6) deposition because
Xerox had "offered a reasonable compromise by agreeing to provide CCS with a
summary of the underlying facts supporting Xerox's allegations and defenses[.]"

Topics seek testimony concerning the allegedly false or fraudulent statements or actions underlying the Government's claims against Dey in the complaint.  Topic 34 calls for testimony on the "allegedly false or fraudulent statements or actions made or taken by Dey that relate in any way to [the Governments] claims in the Complaint."  (Reid Decl., Ex. A, Topic 34.)  Topic 35 seeks testimony regarding "[a]ll instances of Dey 'actively promoting' the spread as alleged in paragraph 1 or the complaint."  (*Id.*, Topic 35.)  Topic 36 seeks testimony regarding "[t]he facts forming the basis for the allegation that 'Dey knew that its false price reporting and marketing efforts would cause customers to submit claims for fraudulently inflated … reimbursement' as alleged in paragraph 4 of the complaint."  (*Id.*, Topic 36.)  Topic 37 seeks testimony regarding "each and every instance in which Dey marketed the 'spread' to any provider as alleged in Paragraph 3 of the Complaint…"  (*Id.*, Topic 37.)  Topic 38 seeks testimony regarding the "allegation in the complaint that Dey reported prices on an annual basis and that these prices were false as alleged in paragraph 34 of the complaint."  (*Id.*, Topic 38.)  Topic 41 seeks testimony regarding "the specific prices You contend Dey should have reported to Publishers or others and the basis for Your contention that Dey should have reported each of those prices to Medicare Part B or Medicaid."  (*Id.*, Topic 41.)  Topic 60 seeks testimony regarding "[w]hether [the Government] contend[s] that the Usual and Customary price submitted by any provider to Medicare or Medicaid for any Dey Subject Drug is false or fraudulent."  (*Id.*, Topic 60.)  These Topics are essential for Dey to discover the grounds of the Government's claims and to test their sufficiency.

The Government has failed to demonstrate that Topics 34 through 38, 41 and 60 are not set forth with "reasonable particularity."  Nowhere in its memorandum does the Government argue that its does not understand the scope of these Topics.  Rather, the Government argues that

it would be burdensome to prepare witnesses to testify to these Topics (*see infra* at VI, pp. 19-20), and that Dey is attempting to conduct a "miniature trial" in the form of a 30(b)(6) deposition.  Whatever merits there are to these arguments, they plainly have nothing to do with whether the Topics are set forth with reasonable particularity.[4]

The Government neither explains the term "miniature trial" nor cites any authority in this regard.  Indeed, the Government points to no authority that holds that depositions of corporate designees should be limited to anything less than the evidence relevant to the action.  Rather, parties are required to make the sort of broad reaching and thorough preparation into matters relevant to the action that the Government now seeks to avoid:

> Rule 30(b)(6) explicitly requires [a company] to have persons testify on its behalf as to *all matters* known or reasonably available to it and, therefore, implicitly requires persons to review all matters known or reasonably available to it in preparation for the 30(b)(6) deposition. *This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before trial. This would totally defeat the purpose of the discovery process.*

*Berwind Prop. Group Inc. v. Envtl. Mgmt. Group, Inc.*, 233 F.R.D. 62, 65 (D. Mass. 2005) (emphasis added).  The *Berwind* Court explained that "[t]he burden on the designee is significant but appropriate given that he/she speaks for (and binds) the corporation." *Id*.

Indeed, the Government itself has requested similar "mini-trial" testimony in many of the Rule 30(b)(6) topics it has served on Dey.  For instance, the Government seeks testimony regarding:

---

[4]   The United States' reliance on *Alexander v. FBI*, 188 F.R.D. 111, 121 (D.D.C. 1998) is misplaced.  As the United States notes, the *Alexander* court held that a deposition notice calling for testimony on "any other matters relevant to this case, or which may lead to the discovery of relevant evidence" did not comply with the reasonable particularity requirement.  The topics noticed by Dey that are the subject of this motion delineate the specific areas on which Dey seeks testimony.  *See, e.g.,* Reid Decl., Ex. A, Topic 34.

Dey's belief, if any, that the United States Government (or any agency or agent thereof) had knowledge of Dey's practice of causing the publication of AWPs for Dey's products that were higher than actual average wholesale prices or WACs that were higher than actual wholesale acquisition costs, including:

a       The identity of each employee (current and former) of Dey who held such a belief concerning such industry practice;

b       The time period when such person held that belief;

c       Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

d       All other information that formed the basis for the belief.

(Reid Decl., Ex. F, Topic 9; *see also id.*, Topics 8, 10, 11).  Such Topics pose significant burdens on Dey but, rather than move, Dey has produced and continues to produce 30(b)(6) witnesses to respond to them.

## VI.   <u>THE GOVERNMENT HAS MADE NO SHOWING OF UNDUE BURDEN</u>

The Government peppers its brief with vague complaints about the "significant burden" and "substantial burden" associated with providing Rule 30(b)(6) testimony.  (Government Brief at 6, 7.)  To obtain a protective order on burden grounds, the Government must demonstrate that the burden is undue.  *See* FED. R. CIV. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense…").  Moreover, the Government must support its claim of undue burden with specific facts and substantiate its claims with affidavits or other evidence. *See Berwind Prop. Group Inc. v. Envtl. Mgmt. Group, Inc.*, 233 F.R.D. 62, 65-66 (D. Mass. 2005) (finding 30(b)(6) deponent's post-deposition claim of undue burden "unsupported and therefore unpersuasive" as deponent failed to substantiate by reference to "affidavits or other evidence" its claimed burden of reviewing "thousands of files, located in archives nationwide, going back 6 to 9 years"); *see also St. Hilaire and Assoc. Inc. v. Fed. Deposit Ins. Co.*, No. CIV. 92-511-SD, 1994 WL 575773,

*2  (D. N.H. Oct. 13, 1994) (denying protective order where movant failed to support its claim of undue burden with any specific facts or a showing of actual harm).  Here, the Government has made no showing of an actual burden in preparing a witness to testify on these topics.  Moreover, even if it had demonstrated some burden, the fact the burden is significant or substantial is not enough to warrant a protective order.  Rather, the Government must demonstrate that the burden is undue. As discussed above, these topics are clearly relevant and indeed central to the claims at issue in this action.  That the Government may have to expend time and effort preparing a witness is not a sufficient basis to relieve the Government of its discovery obligations.

## **CONCLUSION**

For the foregoing reasons, Dey respectfully requests that the Court deny the Government's motion to for a protective order relating to Topics 29, 32, 33, 40, 42, 51, 60, 61, and 62 of Dey's proposed Rule 30(b)(6) Topics and award any other further relief the Court may deem proper.

Dated: June 19, 2008

Respectfully Submitted,

KELLEY DRYE & WARREN LLP

By:  /s Sarah L. Reid
    Paul F. Doyle (BBO # 133460)
    Sarah L. Reid *(pro hac vice)*
    William A. Escobar *(pro hac vice)*
    Neil Merkl *(pro hac vice)*
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile:  (212) 808-7897

*Attorneys for Defendants Dey, Inc.*
*Dey, L.P., and Dey, L.P., Inc.*

## <u>CERTIFICATE OF SERVICE</u>

        I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on June 19, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                 _____/s Sarah L. Reid_____