# Exhibit D



DEPARTMENT OF HEALTH & HUMAN SERVICES                Centers for Medicare & Medicaid Services

*Office of the Administrator*
Washington, DC 20201

**DATE:** OCT 0 4 2007

**TO:** Daniel R. Levinson
Inspector General

**FROM:** Kerry Weems
Acting Administrator

**SUBJECT:** Office of Inspector General (OIG) Draft Report: "Review of the Relationship between Medicare Part D Payments to Local, Community Pharmacies and the Pharmacies' Drug Acquisition Costs" (A-06-07-00107)

Thank you for the opportunity to review and comment on the above OIG draft report evaluating community pharmacy ingredient cost payments in relation to acquisition costs in the Part D program. We are interested in and pleased by the findings of the OIG report that the private market competitive contracting model in Part D provides margins to community pharmacies with respect to their acquisition costs.

OIG Recommendation

The OIG recommends that Congress and the Centers for Medicare & Medicaid Services (CMS) consider the results of its review, including the data provided, in any deliberations regarding Medicare Part D reimbursement.

CMS Response

The CMS concurs with the recommendation. In general, we concur with the findings of this study. The report found that pharmacies almost always acquired drugs for less than the reimbursement amounts. Although we do not collect comparable data, this observation is expected as it is one method for pharmacies to support the expense of dispensing costs. These findings are also consistent with our experience with the Part D program in that we do not receive complaints from pharmacies with respect to negotiated prices not covering acquisition costs.

The report also found that the percentage differences between Part D payments and drug acquisition costs were more than nine times higher for generic drugs than for brand-name drugs. Clinically appropriate generic prescribing is one of the key ways in which the Part D program is able to provide high quality coverage at a reasonable cost to both beneficiaries and the government. We fully encourage the use of generic drugs since their use provides good value to both the beneficiary and the taxpayer, and we note that incentives are aligned to encourage promotion of generics by community pharmacies.

Page 2 – Daniel R. Levinson

The study found that Group Purchasing Organization (GPO) members appear to have received greater rebates compared to non-members. This trend is also expected as purchasing at greater volumes drives down drug acquisition costs, which is one of the reasons why GPOs formed. We were pleased to note that your comparison of rural and non-rural pharmacies showed that payments from Part D plans were nearly identical, which demonstrates that Part D plans are not discriminating between rural and urban pharmacies.

We do have a few methodological questions regarding this report:

- Various results are provided including or excluding rebates. It is unclear how pharmacies' rebate estimates were attributed to the audited Part D claims. The report also did not discuss how the use of self-reported un-audited rebate data may impact its margin estimates. Specifically, if rebates were under-reported, then the actual margins may be higher than those presented in the paper.

- We also note that the methodology for determining drug acquisition costs is unclear when referring to using costs of a drug with the same clinical formulation identification [page 4 - 4th bullet, item (3)].

- The methodology section does not describe the auditing process that was used to calculate average Part D dispensing fees. This omission presents a significant limitation in understanding the estimate.

Our primary concern with this report remains the inclusion of self-reported numbers on dispensing costs. Although the draft report addresses the subject of estimated dispensing costs in an "Other Matters" section following the main findings and recommendation, and is not included in the Executive Summary, we are disappointed in OIG's decision to include these estimates in the report at all. We believe the inclusion of these unvalidated and potentially non-representative figures may obscure the ongoing Medicare Part D pharmacy debate.

The report specifically states that auditing dispensing costs was beyond the scope of this project. However, despite this disclaimer, the report goes on to provide an estimate of dispensing costs based on selected, self-reported data and also cites estimates derived from two pharmacy industry sponsored studies. While the report acknowledges that the accuracy of the self-reported data or the underlying data from the two referenced studies was not reviewed, we strongly suggest that these caveats are insufficient safeguards against readers taking these numbers at face value – especially given the apparent exact correspondence between the calculated margin between Part D payments and drug acquisition costs including rebates ($9.13) and the "average" selectively reported and estimated cost to dispense ($9.13).

Thank you for your efforts to help gain an understanding of community pharmacy payment rates in relation to acquisition costs in the Medicare Part D program.

VAC TXABT EXP MARM012713