# Exhibit E

Dated: April 18, 2003.
Elizabeth M. Duke,
*Administrator.*
[FR Doc. 03-10934 Filed 5-2-03; 8:45 am]
BILLING CODE 4165-15-P

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of Inspector General**

**OIG Compliance Program Guidance for Pharmaceutical Manufacturers**

AGENCY: Office of Inspector General (OIG), HHS.

ACTION: Notice

SUMMARY: This Federal Register notice sets forth the recently issued Compliance Program Guidance for Pharmaceutical Manufacturers developed by the Office of Inspector General (OIG). Through this notice, the OIG is setting forth its general views on the value and fundamental principles of compliance programs for pharmaceutical manufacturers and the specific elements that pharmaceutical manufacturers should consider when developing and implementing an effective compliance program.

FOR FURTHER INFORMATION CONTACT: Mary E. Riordan or Nicole C. Hall, Office of Counsel to the Inspector General, (202) 619-2078.

SUPPLEMENTARY INFORMATION:

### Background

Compliance program guidance is a major initiative of the OIG in its effort to engage the health care community in preventing and reducing fraud and abuse in federal health care programs. The purpose of the compliance program guidance is to encourage the use of internal controls to efficiently monitor adherence to applicable statutes, regulations and program requirements. In the last several years, the OIG has developed and issued compliance program guidance directed at the following segments of the health care industry: the hospital industry; home health agencies; clinical laboratories; third-party medical billing companies; the durable medical equipment, prosthetics, orthotics and supply industry; Medicare+Choice organizations offering coordinated care plans; hospices; nursing facilities; individual and small group physician practices; and ambulance suppliers.

Copies of these compliance program guidances can be found on the OIG Web site at *http://oig.hhs.gov/fraud/ complianceguidance.html.*

### Developing the Compliance Program Guidance for Pharmaceutical Manufacturers

On June 11, 2001, the OIG published a solicitation notice seeking information and recommendations for developing compliance program guidance for the pharmaceutical industry (66 FR 31246). In response to that solicitation notice, the OIG received eight comments from various outside sources. We carefully considered those comments, as well as previous OIG publications, such as other compliance program guidances and Special Fraud Alerts. In addition, we have taken into account past and ongoing fraud investigations conducted by the OIG's Office of Investigations and the Department of Justice, and have consulted with the Centers for Medicare and Medicaid Services (CMS) (formerly known as the Health Care Financing Administration). In an effort to ensure that all parties had a reasonable opportunity to provide input into a final product, draft compliance program guidance for the pharmaceutical industry was published in the **Federal Register** on October 3, 2002 (67 FR 62057) for further comments and recommendations.

### Elements for an Effective Compliance Program

This compliance program guidance for pharmaceutical manufacturers contains seven elements that have been widely recognized as fundamental to an effective compliance program:

• Implementing written policies and procedures;
• Designating a compliance officer and compliance committee;
• Conducting effective training and education;
• Developing effective lines of communication;
• Conducting internal monitoring and auditing;
• Enforcing standards through well-publicized disciplinary guidelines; and
• Responding promptly to detected problems and undertaking corrective action.

These elements are included in previous guidances issued by the OIG. As with previously issued guidances, this compliance program guidance represents the OIG's suggestions on how pharmaceutical manufacturers can establish internal controls to ensure adherence to applicable rules and program requirements. The contents of this guidance should not be viewed as mandatory or as an exclusive discussion of the advisable elements of a compliance program. The document is intended to present voluntary guidance to the industry and not to represent binding standards for pharmaceutical manufacturers.

### Office of Inspector General's Compliance Program Guidance for Pharmaceutical Manufacturers

**I. Introduction**

The Office of Inspector General (OIG) of the Department of Health and Human Services is continuing in its efforts to promote voluntary compliance programs for the health care industry. This compliance guidance is intended to assist companies that develop, manufacture, market, and sell pharmaceutical drugs or biological products (pharmaceutical manufacturers) in developing and implementing internal controls and procedures that promote adherence to applicable statutes, regulations, and requirements of the federal health care programs[1] and in evaluating and, as necessary, refining existing compliance programs.

This guidance provides the OIG's views on the fundamental elements of pharmaceutical manufacturer compliance programs and principles that each pharmaceutical manufacturer should consider when creating and implementing an effective compliance program. This guide is not a compliance program. Rather, it is a set of guidelines that pharmaceutical manufacturers should consider when developing and implementing a compliance program or evaluating an existing one. For those manufacturers with an existing compliance program, this guidance may serve as a benchmark or comparison against which to measure ongoing efforts.

A pharmaceutical manufacturer's implementation of an effective compliance program may require a significant commitment of time and resources by various segments of the organization. In order for a compliance program to be effective, it must have the support and commitment of senior management and the company's governing body. In turn, the corporate leadership should strive to foster a culture that promotes the prevention, detection, and resolution of instances of problems. Although an effective compliance program may require a reallocation of existing resources, the long-term benefits of establishing a compliance program significantly outweigh the initial costs.

In a continuing effort to collaborate closely with the pharmaceutical industry, the OIG published a notice in

---

[1] (Endnotes appear at end of document)


EXHIBIT
Abbott-149
4-25-07 mkm
PENGAD 800-631-6989

23732    Federal Register / Vol. 68, No. 86 / Monday, May 5, 2003 / Notices

the Federal Register soliciting comments and recommendations on what should be included in this compliance program guidance.[2] Following our review of comments received in response to the solicitation notice, we published draft compliance guidance in the Federal Register in order to solicit further comments and recommendations.[3] In addition to considering the comments received in response to that solicitation notice and the draft compliance guidance, in finalizing this guidance we reviewed previous OIG publications, including OIG advisory opinions, safe harbor regulations (including the preambles) relating to the federal anti-kickback statute,[4] Special Fraud Alerts, as well as reports issued by the OIG's Office of Audit Services and Office of Evaluation and Inspections relevant to the pharmaceutical industry. (These materials are available on the OIG Web page at *http://oig.hhs.gov.*) In addition, we relied on the experience gained from investigations of pharmaceutical manufacturers conducted by OIG's Office of Investigations, the Department of Justice, and the state Medicaid Fraud Control Units. We also held meetings with four groups of industry stakeholders—Pharmaceutical Research and Manufacturers of America (PhRMA) and pharmaceutical manufacturer representatives; health plan and health plan association representatives; representatives of pharmacy benefit managers (PBMs) and representatives of the American Medical Association (AMA) and its member organizations.

*A. Benefits of a Compliance Program*

The OIG believes a comprehensive compliance program provides a mechanism that addresses the public and private sectors' mutual goals of reducing fraud and abuse; enhancing health care provider operational functions; improving the quality of health care services; and reducing the cost of health care. Attaining these goals provides positive results to the pharmaceutical manufacturer, the government, and individual citizens alike. In addition to fulfilling its legal duty to avoid submitting false or inaccurate pricing or rebate information to any federal health care program or engaging in illegal marketing activities, a pharmaceutical manufacturer may gain important additional benefits by voluntarily implementing a compliance program. The benefits may include:

• A concrete demonstration to employees and the community at large of the company's commitment to honest and responsible corporate conduct;

• An increased likelihood of preventing, or at least identifying, and correcting unlawful and unethical behavior at an early stage;

• A mechanism to encourage employees to report potential problems and allow for appropriate internal inquiry and corrective action; and

• Through early detection and reporting, minimizing any financial loss to the government and any corresponding financial loss to the company.

The OIG recognizes that the implementation of a compliance program may not entirely eliminate improper conduct from the operations of a pharmaceutical manufacturer. However, a good faith effort by the company to comply with applicable statutes and regulations as well as federal health care program requirements, demonstrated by an effective compliance program, significantly reduces the risk of unlawful conduct and any penalties that result from such behavior.

*B. Application of Compliance Program Guidance*

Given the wide diversity within the pharmaceutical industry, there is no single "best" pharmaceutical manufacturer compliance program. The OIG recognizes the complexities of this industry and the differences among industry members. Some pharmaceutical manufacturers are small and may have limited resources to devote to compliance measures. Conversely, other companies are well-established, large multi-national corporations with a widely dispersed work force. Some companies may have well-developed compliance programs already in place; others only now may be initiating such efforts. The OIG also recognizes that pharmaceutical manufacturers are subject to extensive regulatory requirements in addition to fraud and abuse-related issues and that many pharmaceutical manufacturers have addressed these obligations through compliance programs. Accordingly, the OIG strongly encourages pharmaceutical manufactures to develop and implement or refine (as necessary) compliance elements that uniquely address the areas of potential problems, common concern, or high risk that apply to their own companies (or, as applicable, to the U.S. operations of their companies).

For example, although they are not exhaustive of all potential risk areas, the OIG has identified three major potential risk areas for pharmaceutical manufacturers: (1) Integrity of data used by state and federal governments to establish payment; (2) kickbacks and other illegal remuneration; and (3) compliance with laws regulating drug samples. The risk areas are discussed in greater detail in section II.B.2. below. The compliance measures adopted by a pharmaceutical manufacturer should be tailored to fit the unique environment of the company (including its organizational structure, operations and resources, as well as prior enforcement experience). In short, the OIG recommends that each pharmaceutical manufacturer should adapt the objectives and principles underlying the measures outlined in this guidance to its own particular circumstances.[5]

**II. Compliance Program Elements**

*A. The Basic Compliance Elements*

The OIG believes that every effective compliance program must begin with a formal commitment by the pharmaceutical manufacturer's board of directors or other governing body. Evidence of that commitment should include the allocation of adequate resources, a timetable for the implementation of the compliance measures, and the identification of an individual to serve as a compliance officer to ensure that each of the recommended and adopted elements is addressed. Once a commitment has been undertaken, a compliance officer should immediately be chosen to oversee the implementation of the compliance program.

The elements listed below provide a comprehensive and firm foundation upon which an effective compliance program may be built. Further, they are likely to foster the development of a corporate culture of compliance. The OIG recognizes that full implementation of all elements may not be immediately feasible for all pharmaceutical manufacturers. However, as a first step, a good faith and meaningful commitment on the part of the company's management will substantially contribute to the program's successful implementation. As the compliance program is implemented, that commitment should filter down through management to every employee and contractor of the pharmaceutical manufacturer, as applicable for the particular individual.

At a minimum, a comprehensive compliance program should include the following elements:

(1) The development and distribution of written standards of conduct, as well as written policies, procedures and protocols that verbalize the company's commitment to compliance (*e.g.,* by including adherence to the compliance

program as an element in evaluating management and employees) and address specific areas of potential fraud and abuse, such as the reporting of pricing and rebate information to the federal health care programs, and sales and marketing practices;

(2) The designation of a compliance officer and other appropriate bodies (e.g., a corporate compliance committee) charged with the responsibility for developing, operating, and monitoring the compliance program, and with authority to report directly to the board of directors and/or the president or CEO;

(3) The development and implementation of regular, effective education and training programs for all affected employees;

(4) The creation and maintenance of an effective line of communication between the compliance officer and all employees, including a process (such as a hotline or other reporting system) to receive complaints or questions, and the adoption of procedures to protect the anonymity of complainants and to protect whistleblowers from retaliation;

(5) The use of audits and/or other risk evaluation techniques to monitor compliance, identify problem areas, and assist in the reduction of identified problems;

(6) The development of policies and procedures addressing the non-employment or retention of individuals or entities excluded from participation in federal health care programs, and the enforcement of appropriate disciplinary action against employees or contractors who have violated company policies and procedures and/or applicable federal health care program requirements; and

(7) The development of policies and procedures for the investigation of identified instances of noncompliance or misconduct. These should include directions regarding the prompt and proper response to detected offenses, such as the initiation of appropriate corrective action and preventive measures and processes to report the offense to relevant authorities in appropriate circumstances.

## B. Written Policies and Procedures

In developing a compliance program, every pharmaceutical manufacturer should develop and distribute written compliance standards, procedures, and practices that guide the company and the conduct of its employees in day-to-day operations. These policies and procedures should be developed under the direction and supervision of the compliance officer, the compliance committee, and operational managers.

At a minimum, the policies and procedures should be provided to all employees who are affected by these policies, and to any agents or contractors who may furnish services that impact federal health care programs (e.g., contractors involved in the co-promotion of a manufacturer's products).

### 1. Code of Conduct

Although a clear statement of detailed and substantive policies and procedures is at the core of a compliance program, the OIG recommends that pharmaceutical manufacturers also develop a general corporate statement of ethical and compliance principles that will guide the company's operations. One common expression of this statement of principles is the code of conduct. The code should function in the same fashion as a constitution, i.e., as a document that details the fundamental principles, values, and framework for action within an organization. The code of conduct for a pharmaceutical manufacturer should articulate the company's expectations of commitment to compliance by management, employees, and agents, and should summarize the broad ethical and legal principles under which the company must operate. Unlike the more detailed policies and procedures, the code of conduct should be brief, easily readable, and cover general principles applicable to all employees.

As appropriate, the OIG strongly encourages the participation and involvement of the pharmaceutical manufacturer's board of directors, CEO, president, members of senior management, and other personnel from various levels of the organizational structure in the development of all aspects of the compliance program, especially the code of conduct. Management and employee involvement in this process communicates a strong and explicit commitment by management to foster compliance with applicable federal health care program requirements. It also communicates the need for all employees to comply with the organization's code of conduct and policies and procedures.

### 2. Specific Risk Areas

This section is intended to help prudent pharmaceutical manufacturers identify areas of their operations that present potential risk of liability under several key federal fraud and abuse statutes and regulations.[6] This section focuses on areas that are currently of concern to the enforcement community and is not intended to address all potential risk areas for pharmaceutical manufacturers. Importantly, the identification of a particular practice or activity in this section is not intended to imply that the practice or activity is necessarily illegal in all circumstances or that it may not have a valid or lawful purpose underlying it.

This section addresses the following areas of significant concern for pharmaceutical manufacturers: (1) Integrity of data used by state and federal governments to establish payment amounts; (2) kickbacks and other illegal remuneration; and (3) compliance with laws regulating drug samples.

This guidance does not create any new law or legal obligations, and the discussions that follow are not intended to present detailed or comprehensive summaries of lawful and unlawful activity. Rather, these discussions should be used as a starting point for a manufacturer's legal review of its particular practices and for development of policies and procedures to reduce or eliminate potential risk.

a. Integrity of Data Used To Establish or Determine Government Reimbursement. Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A pharmaceutical manufacturer may be liable under the False Claims Act[7] if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly (as defined in the False Claims Act) failed to generate or report such information completely and accurately. Manufacturers may also be liable for civil money penalties under various laws, rules and regulations. Moreover, in some circumstances, inaccurate or incomplete reporting may be probative of liability under the federal anti-kickback statute.

Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or

other price concessions or similar benefits offered to some or all purchasers. Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products (and could potentially raise anti-kickback issues). Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements.

Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks (such as the 340B Program [8]), manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs.[9]

In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.

b. Kickbacks and Other Illegal Remuneration—*A. General Considerations.* Pharmaceutical manufacturers, as well as their employees and agents, should be aware of the federal anti-kickback statute and the constraints it places on the marketing and promotion of products reimbursable by the federal health care programs, including, but not limited to, Medicare and Medicaid. In the health care sector, many common business activities, including, for example, sales, marketing, discounting, and purchaser relations, potentially implicate the anti-kickback statute. Pharmaceutical manufacturers and their employees and agents should be aware that the anti-kickback statute prohibits in the health care industry some practices that are common in other business sectors. In short, practices that may be common or longstanding in other businesses are not necessarily acceptable or lawful when soliciting federal health care program business.

The anti-kickback statute is a criminal prohibition against payments (in any form, whether the payments are direct or indirect) made purposefully to induce or reward the referral or generation of federal health care business. The anti-kickback statute addresses not only the offer or payment of anything of value for patient referrals, but also the offer or payment of anything of value in return for purchasing, leasing, ordering, or arranging for or recommending the purchase, lease, or ordering of any item or service reimbursable in whole or part by a federal health care program. The statute extends equally to the solicitation or acceptance of remuneration for referrals. Liability under the anti-kickback statute is determined separately for each party involved. In addition to criminal penalties, violators may be subject to civil monetary sanctions and exclusion from the federal health care programs. Under certain circumstances, a violation of the anti-kickback statute may give rise to liability under the False Claims Act.

Although liability under the anti-kickback statute ultimately turns on a party's intent, it is possible to identify arrangements or practices that may present a significant potential for abuse. Initially, a manufacturer should identify any remunerative relationship between itself (or its representatives) and persons or entities in a position to generate federal health care business for the manufacturer directly or indirectly. Persons or entities in a position to generate federal health care business include, for example, purchasers, benefit managers, formulary committee members, group purchasing organizations (GPOs), physicians and certain allied health care professionals, and pharmacists. The next step is to determine whether any *one* purpose of the remuneration may be to induce or reward the referral or recommendation of business payable in whole or in part by a Federal health care program. Importantly, a lawful purpose will not legitimize a payment that also has an unlawful purpose.

Although any arrangement satisfying both tests requires careful scrutiny from a manufacturer, the courts have identified several potentially aggravating considerations that can be useful in identifying arrangements at greatest risk of prosecution. In particular, manufacturers should ask the following questions, among others, about any problematic arrangements or practices they identify:

• Does the arrangement or practice have a potential to interfere with, or skew, clinical decision-making? Does it have a potential to undermine the clinical integrity of a formulary process? If the arrangement or practice involves providing information to decision-makers, prescribers, or patients, is the information complete, accurate, and not misleading?

• Does the arrangement or practice have a potential to increase costs to the federal health care programs, beneficiaries, or enrollees? Does the arrangement or practice have the potential to be a disguised discount to circumvent the Medicaid Rebate Program Best Price calculation?

• Does the arrangement or practice have a potential to increase the risk of overutilization or inappropriate utilization?

• Does the arrangement or practice raise patient safety or quality of care concerns?

Manufacturers that have identified problematic arrangements or practices can take a number of steps to reduce or eliminate the risk of an anti-kickback violation. Detailed guidance relating to a number of specific practices is available from several sources. Most importantly, the anti-kickback statute and the corresponding regulations establish a number of "safe harbors" for common business arrangements, including personal services and management contracts, 42 CFR 1001.952(d), warranties, 42 CFR 1001.952(g), discounts, 42 CFR 1001.952(h), employment, 42 CFR 1001.952(i), GPOs, 42 CFR 1001.952(j), and certain managed care and risk sharing arrangements, 42 CFR 1001.952(m), (t), and (u). *Safe harbor protection requires strict compliance with all applicable conditions set out in the relevant safe harbor.* Although compliance with a safe harbor is voluntary and failure to comply with a safe harbor does not mean an arrangement is illegal, many arrangements can be structured to fit in safe harbors, and we recommend that pharmaceutical manufacturers structure arrangements to fit in a safe harbor whenever possible. Other available guidance includes special fraud alerts and advisory bulletins issued by the OIG identifying and discussing particular practices or issues of concern and OIG advisory opinions issued to specific parties about their particular business arrangements. Parties may apply for an OIG advisory opinion using the procedures set out at 42 CFR part 1008. The safe harbor regulations (and accompanying **Federal Register** preambles), fraud alerts and bulletins, advisory opinions (and instructions for obtaining them), and other guidance are available on the OIG web site at *http://oig.hhs.gov.*

*B. Key Areas of Potential Risk.* The following discussion highlights several known areas of potential risk. The propriety of any particular arrangement can only be determined after a detailed examination of the attendant facts and circumstances. *The identification of a given practice or activity as "suspect" or as an area of "risk" does not mean it is necessarily illegal or unlawful, or that it*

Federal Register/Vol. 68, No. 86/Monday, May 5, 2003/Notices      23735

cannot be properly structured to fit in a safe harbor. Nor does it mean that the practice or activity is not beneficial from a clinical, cost, or other perspective. Rather, the areas identified below are those areas of activity that have a potential for abuse based on historical law enforcement experience and that should receive close scrutiny from manufacturers. The discussion highlights potential risks under the anti-kickback statute arising from pharmaceutical manufacturers' relationships with three groups: purchasers (including those using formularies) and their agents; persons and entities in a position to make or influence referrals (including physicians and other health care professionals); and sales agents.

(1) Relationships with Purchasers and their Agents—(a) Discounts and Other Remuneration to Purchasers. Pharmaceutical manufacturers offer purchasers a variety of price concessions and other remuneration to induce the purchase of their products. Purchasers include direct purchasers (e.g., hospitals, nursing homes, pharmacies, some physicians), as well as indirect purchasers (e.g., health plans). Inducements offered to purchasers potentially implicate the anti-kickback statute if the purchased products are reimbursable to the purchasers, in whole or in part, directly or indirectly, by any of the federal health care programs. Any remuneration from a manufacturer provided to a purchaser that is expressly or impliedly related to a sale potentially implicates the anti-kickback statute and should be carefully reviewed.

Discounting arrangements are prevalent in the pharmaceutical industry and deserve careful scrutiny particularly because of their potential to implicate the Best Price requirements of the Medicaid Rebate Program. Because the Medicaid Rebate Program in many instances requires that states receive rebates based on the Best Price offered by a pharmaceutical manufacturer to other purchasers, manufacturers have a strong financial incentive to hide *de facto* pricing concessions to other purchasers to avoid passing on the same discount to the states. Because of the potential direct and substantial effect of such practices on federal health care program expenditures and the interest of some manufacturers in avoiding price concessions that would trigger rebates to the states, any remuneration from a manufacturer to a purchaser, however characterized, should be carefully scrutinized.

*Discounts.* Public policy favors open and legitimate price competition in health care. Thus, the anti-kickback statute contains an exception for discounts offered to customers that submit claims to the federal health care programs, if the discounts are properly disclosed and accurately reported. *See* 42 U.S.C. 1320a–7b(b)(3)(A); 42 CFR 1001.952(h). However, to qualify for the exception, the discount must be in the form of a *reduction in the price* of the good or service based on an arms-length transaction. In other words, the exception covers only reductions in the product's price. Moreover, the regulations provide that the discount must be given at the time of sale or, in certain cases, set at the time of sale, even if finally determined subsequent to the time of sale (*i.e.*, a rebate).

Manufacturers offering discounts should thoroughly familiarize themselves, and have their sales and marketing personnel familiarize themselves, with the discount safe harbor at 42 CFR 1001.952(h) (and, if relevant, the safe harbors for price reductions in the managed care context, 42 CFR 1001.952(m), (t), and (u)). In particular, manufacturers should pay attention to the discount safe harbor requirements applicable to "sellers" and "offerors" of discounts. Under the safe harbor, sellers and offerors have specific obligations that include (i) informing a customer of any discount and of the customer's reporting obligations with respect to that discount, and (ii) refraining from any action that would impede a customer's ability to comply with the safe harbor. To fulfill the safe harbor requirements, manufacturers will need to know how their customers submit claims to the federal health care programs (*e.g.*, whether the customer is a managed care, cost-based, or charge-based biller). Compliance with the safe harbor is determined separately for each party.

*Product Support Services.* Pharmaceutical manufacturers sometimes offer purchasers certain support services in connection with the sale of their products. These services may include billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to support of the purchased product. Standing alone, services that have no substantial independent value to the purchaser may not implicate the anti-kickback statute. However, if a manufacturer provides a service having no independent value (such as limited reimbursement support services in connection with its own products) in tandem with another service or program that confers a benefit on a referring provider (such as a reimbursement guarantee that eliminates normal financial risks), the arrangement would raise kickback concerns. For example, the anti-kickback statute would be implicated if a manufacturer were to couple a reimbursement support service with a promise that a purchaser will pay for ordered products only if the purchaser is reimbursed by a federal health care program.

*Educational Grants.* Pharmaceutical manufacturers sometimes provide grant funding for a wide range of educational activities. While educational funding can provide valuable information to the medical and health care industry, manufacturer grants to purchasers, GPOs, PBMs and similar entities raise concerns under the anti-kickback statute. Funding that is conditioned, in whole or in part, on the purchase of product implicates the statute, even if the educational or research purpose is legitimate. Furthermore, to the extent the manufacturer has any influence over the substance of an educational program or the presenter, there is a risk that the educational program may be used for inappropriate marketing purposes.

To reduce the risks that a grant program is used improperly to induce or reward product purchases or to market product inappropriately, manufacturers should separate their grant making functions from their sales and marketing functions. Effective separation of these functions will help insure that grant funding is not inappropriately influenced by sales or marketing motivations and that the educational purposes of the grant are legitimate. Manufacturers should establish objective criteria for making grants that do not take into account the volume or value of purchases made by, or anticipated from, the grant recipient and that serve to ensure that the funded activities are *bona fide*. The manufacturer should have no control over the speaker or content of the educational presentation. Compliance with such procedures should be documented and regularly monitored.

*Research Funding.* Manufacturers often contract with purchasers of their products to conduct research activities on behalf of the manufacturer on a fee-for-service basis. These contracts should be structured to fit in the personal services safe harbor whenever possible. Payments for research services should be fair market value for legitimate, reasonable, and necessary services. Post-marketing research activities should be especially scrutinized to ensure that they are legitimate and not simply a pretext to generate prescriptions of a drug. Prudent manufacturers will develop contracting procedures that

23736	Federal Register / Vol. 68, No. 86 / Monday, May 5, 2003 / Notices

clearly separate the awarding of research contracts from marketing. Research contracts that originate through the sales or marketing functions—or that are offered to purchasers in connection with sales contacts—are particularly suspect.

Pharmaceutical manufacturers sometimes provide funding to their purchasers for use in the purchasers' own research. In many cases, the research provides valuable scientific and clinical information, improves clinical care, leads to promising new treatments, promotes better delivery of health care, or otherwise benefits patients. However, as with educational grants, if linked directly or indirectly to the purchase of product, research grants can be misused to induce the purchase of business without triggering Medicaid Best Price obligations. To reduce risk, manufacturers should insulate research grant making from sales and marketing influences.

*Other remuneration to purchasers.* As already noted, any remuneration from a manufacturer provided to a purchaser that is expressly or impliedly related to a sale potentially implicates the anti-kickback statute and should be carefully reviewed. Examples of remuneration in connection with a sale include, but are not limited to, "prebates" and "upfront payments," other free or reduced-price goods or services, and payments to cover the costs of "converting" from a competitor's product. Selective offers of remuneration (*i.e.*, offers made to some but not all purchasers) may increase potential risk if the selection criteria relate directly or indirectly to the volume or value of business generated. In addition, manufacturers may contract with purchasers to provide services to the manufacturer, such as data collection services. These contracts should be structured whenever possible to fit in the personal services safe harbor; in all cases, the remuneration should be fair market value for legitimate, reasonable, and necessary services.

(b) Formularies and Formulary Support Activities. To help control drug costs while maintaining clinical appropriateness and quality of patient care, many purchasers of pharmaceutical products, including indirect purchasers such as health plans, have developed drug formularies to promote rational, clinically appropriate, safe, and cost-effective drug therapy. Formularies are a well-established tool for the effective management of drug benefits. The formulary development process—typically overseen by a committee of physicians, pharmacists, and other health care professionals—determines the drugs that are covered and, if tiered benefit levels are utilized, to which tier the drugs are assigned. So long as the determination of clinical efficacy and appropriateness of formulary drugs by the formulary committee precedes, and is paramount to, the consideration of costs, the development of a formulary is unlikely to raise significant issues under the anti-kickback statute.

Formulary support activities, including related communications with patients and physicians to encourage compliance, are an integral and essential component of successful pharmacy benefits management. Proper utilization of a formulary maximizes the cost-effectiveness of the benefit and assures the quality and appropriateness of the drug therapy. When provided by a PBM, these services are part of the PBM's formulary and benefit management function—a service provided to its customers—and markedly different from its purchasing agent/price negotiator role. Most importantly, the benefits of these formulary support activities inure directly to the PBM and its customers through lower costs.

To date, Medicare and Medicaid involvement with outpatient drug formularies has been limited primarily to Medicaid and Medicare managed care plans. In light of the safe harbors under the anti-kickback statute for those managed care arrangements, the financial arrangements between health plans and pharmaceutical manufacturers or, where the pharmacy benefit is managed by a PBM, the arrangements among the three parties, have received relatively little scrutiny. However, as federal program expenditures for, and coverage of, outpatient pharmaceuticals increase, scrutiny under the anti-kickback statute has also increased. Several practices appear to have the potential for abuse.

• *Relationships with formulary committee members.* Given the importance of formulary placement for a manufacturer's products, unscrupulous manufacturers and sales representatives may attempt to influence committee deliberations. Any remuneration from a manufacturer or its agents directly or indirectly to person in a position to influence formulary decisions related to the manufacturer's products are suspect and should be carefully scrutinized. Manufacturers should also review their contacts with sponsors of formularies to ensure that price negotiations do not influence decisions on clinical safety or efficacy.

• *Payments to PBMs.* Any rebates or other payments by drug manufacturers to PBMs that are based on, or otherwise related to, the PBM's customers' purchases *potentially* implicate the anti-kickback statute. Protection is available by structuring such arrangements to fit in the GPO safe harbor at 42 CFR 1001.952(j). That safe harbor requires, among other things, that the payments be authorized in advance by the PBM's customer and that all amounts actually paid to the PBM on account of the customer's purchases be disclosed in writing at least annually to the customer. In addition, arrangements with PBMs that assume risk may raise different issues; depending on the circumstances, protection for such arrangements may be available under the managed care safe harbors at 42 CFR 1001.952(m), (t) and (u).

• *Formulary placement payments.* Lump sum payments for inclusion in a formulary or for exclusive or restricted formulary status are problematic and should be carefully scrutinized.

In addition, some manufacturers provide funding for purchasers' or PBMs' formulary support activities, especially communications with physicians and patients. While the communications may indirectly benefit the manufacturer, the primary economic beneficiary is typically the formulary sponsor. In other words, the manufacturer's dollars appear to replace dollars that would or should be spent by the sponsor. To the extent the manufacturers' payments are linked to drug purchases directly or indirectly, they potentially implicate the anti-kickback statute. Among the questions that should be examined by a manufacturer in connection with these activities are: Is the funding tied to specific drugs or categories? If so, are the categories especially competitive? Is the formulary sponsor funding similar activities for other drug categories? Has funding of PBM activities increased as rebates are increasingly passed back to PBM customers?

(c) Average Wholesale Price. The "spread" is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer. In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed. To the extent that a manufacturer controls the "spread," it controls its customer's profit.

Average Wholesale Price (AWP) is the benchmark often used to set reimbursement for prescription drugs under the Medicare Part B program. For covered drugs and biologicals, Medicare Part B generally reimburses at "95 percent of average wholesale price." 42 U.S.C. 1395u(o). Similarly many state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP. Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

In the light of this risk, we recommend that manufacturers review their AWP reporting practices and methodology to confirm that marketing considerations do not influence the process. Furthermore, manufacturers should review their marketing practices. The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute. Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product.

(2) Relationships with Physicians and Other Persons and Entities in a Position to Make or Influence Referrals. Pharmaceutical manufacturers and their agents may have a variety of remunerative relationships with persons or entities in a position to refer, order, or prescribe—or influence the referral, ordering, or prescribing of—the manufacturers' products, even though the persons or entities may not themselves purchase (or in the case of GPOs or PBMs, arrange for the purchase of) those products. These remunerative relationships potentially implicate the anti-kickback statute. The following discussion focuses on relationships with physicians, but the same principles would apply when evaluating relationships with other parties in a position to influence referrals, including, without limitation, pharmacists and other health care professionals.

Manufacturers, providers, and suppliers of health care products and services frequently cultivate relationships with physicians in a position to generate business for them through a variety of practices, including gifts, entertainment, and personal services compensation arrangements. These activities have a high potential for fraud and abuse and, historically, have generated a substantial number of anti-kickback convictions. There is no substantive difference between remuneration from a pharmaceutical manufacturer or from a durable medical equipment or other supplier—if the remuneration is intended to generate any federal health care business, it potentially violates the anti-kickback statute.

Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals. For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (*i.e.*, have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer. Moreover, under the anti-kickback statute, neither a legitimate purpose for an arrangement (*e.g.*, physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (*i.e.*, the purposeful inducement of business).

In light of the obvious risks inherent in these arrangements, whenever possible prudent manufacturers and their agents or representatives should structure relationships with physicians to fit in an available safe harbor, such as the safe harbors for personal services and management contracts, 42 CFR 1001.952(d), or employees, 42 CFR 1001.952(i). *An arrangement must fit squarely in a safe harbor to be protected.* In addition, arrangements that do not fit in a safe harbor should be reviewed in light of the totality of all facts and circumstances, bearing in mind the following factors, among others:

• *Nature of the relationship between the parties.* What degree of influence does the physician have, directly or indirectly, on the generation of business for the manufacturer? Does the manufacturer have other direct or indirect relationships with the physician or members of the physician's group?

• *Manner in which the remuneration is determined.* Does the remuneration take into account, directly or indirectly, the volume or value of business generated (*e.g.*, is the remuneration only given to persons who have prescribed or agreed to prescribe the manufacturer's product)? Is the remuneration conditioned in whole or in part on referrals or other business generated? Is there any service provided other than referrals?

• *Value of the remuneration.* Is the remuneration more than trivial in value, including all gifts to any individual, entity, or group of individuals? [10] Do fees for services exceed the fair market value of any legitimate, reasonable, and necessary services rendered by the physician to the manufacturer?

• *Potential federal program impact of the remuneration.* Does the remuneration have the potential to affect costs to any of the federal health care programs or their beneficiaries or to lead to overutilization or inappropriate utilization?

• *Potential conflicts of interest.* Would acceptance of the remuneration diminish, or appear to diminish, the objectivity of professional judgment? Are there patient safety or quality of care concerns? If the remuneration relates to the dissemination of information, is the information complete, accurate, and not misleading?

These concerns are addressed in the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code"), adopted on April 18, 2002, which provides useful and practical advice for reviewing and structuring these relationships. (The PhRMA Code is available through PhRMA's Web site at *http://www.phrma.org*.) Although compliance with the PhRMA Code will not protect a manufacturer as a matter of law under the anti-kickback statute, it will substantially reduce the risk of fraud and abuse and help demonstrate a good faith effort to comply with the applicable federal health care program requirements.

The following paragraphs discuss in greater detail several common or problematic relationships between manufacturers and physicians, including "switching" arrangements, consulting and advisory payments, payments for detailing, business courtesies and other gratuities, and educational and research activities.

• *Switching"* arrangements. As noted in the OIG's 1994 Special Fraud Alert (59 FR 65372; December 19, 1994), product conversion arrangements (also known as "switching" arrangements) are suspect under the anti-kickback statute. Switching arrangements involve pharmaceutical manufacturers offering physicians or others cash payments or other benefits each time a patient's prescription is changed to the manufacturer's product from a competing product. This activity clearly implicates the statute, and, while such programs may be permissible in certain managed care arrangements, manufacturers should review very carefully any marketing practices utilizing "switching" payments in connection with products reimbursable by federal health care programs.

*Consulting and advisory payments.* Pharmaceutical manufacturers frequently engage physicians and other health care professionals to furnish personal services as consultants or advisers to the manufacturer. In general, fair market value payments to small numbers of physicians for *bona fide* consulting or advisory services are unlikely to raise any significant concern. Compensating physicians as "consultants" when they are expected to attend meetings or conferences primarily in a passive capacity is suspect.

Also of concern are compensation relationships with physicians for services connected directly or indirectly to a manufacturer's marketing and sales activities, such as speaking, certain research, or preceptor or "shadowing" services. While these arrangements are potentially beneficial, they also pose a risk of fraud and abuse. In particular, the use of health care professionals for marketing purposes—including, for example, ghost-written papers or speeches—implicates the anti-kickback statute. While full disclosure by physicians of any potential conflicts of interest and of industry sponsorship or affiliation may reduce the risk of abuse, disclosure does not eliminate the risk.

At a minimum, manufacturers should periodically review arrangements for physicians' services to ensure that: (i) The arrangement is set out in writing; (ii) there is a legitimate need for the services; (iii) the services are provided; (iv) the compensation is at fair market value; and (v) all of the preceding facts are documented prior to payment. In addition, to further reduce their risk, manufacturers should structure services arrangements to comply with a safe harbor whenever possible.

*Payments for detailing.* Recently, some entities have been compensating physicians for time spent listening to sales representatives market pharmaceutical products. In some cases, these payments are characterized as "consulting" fees and may require physicians to complete minimal paperwork. Other companies pay physicians for time spent accessing web sites to view or listen to marketing information or perform "research." All of these activities are highly suspect under the anti-kickback statute, are highly susceptible to fraud and abuse, and should be strongly discouraged.

*Business Courtesies and Other Gratuities.* Pharmaceutical companies and their employees and agents often engage in a number of other arrangements that offer benefits, directly or indirectly, to physicians or others in a position to make or influence referrals. Examples of remunerative arrangements between pharmaceutical manufacturers (or their representatives) and parties in a position to influence referrals include:

• Entertainment, recreation, travel, meals, or other benefits in association with information or marketing presentations; and

• Gifts, gratuities, and other business courtesies.

As discussed above, these arrangements potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business for the pharmaceutical company. While the determination of whether a particular arrangement violates the anti-kickback statute depends on the specific facts and circumstances, compliance with the PhRMA Code with respect to these arrangements should substantially reduce a manufacturer's risk.

*Educational and Research Funding.* In some cases, manufacturers contract with physicians to provide research services on a fee-for-service basis. These contracts should be structured to fit in the personal services safe harbor whenever possible. Payments for research services should be fair market value for legitimate, reasonable, and necessary services. Research contracts that originate through the sales or marketing functions—or that are offered to physicians in connection with sales contacts—are particularly suspect. Indicia of questionable research include, for example, research initiated or directed by marketers or sales agents; research that is not transmitted to, or reviewed by, a manufacturer's science component; research that is unnecessarily duplicative or is not needed by the manufacturer for any purpose other than the generation of business; and post-marketing research used as a pretense to promote product. Prudent manufacturers will develop contracting procedures that clearly separate the awarding of research contracts from marketing or promotion of their products.

In addition, pharmaceutical manufacturers also provide other funding for a wide range of physician educational and research activities. Manufacturers should review educational and research grants to physicians similarly to educational and research grants to purchasers (described above). As with grants to purchasers, the OIG recognizes that many grant-funded activities are legitimate and beneficial. When evaluating educational or research grants provided by manufacturers to physicians, manufacturers should determine if the funding is based, in any way, expressly or implicitly, on the physician's referral of the manufacturer's product. If so, the funding plainly implicates the anti-kickback statute. In addition, the manufacturer should determine whether the funding is for *bona fide* educational or research purposes. Absent unusual circumstances, grants or support for educational activities sponsored and organized by medical professional organizations raise little risk of fraud or abuse, provided that the grant or support is not restricted or conditioned with respect to content or faculty.

Pharmaceutical manufacturers often provide funding to other sponsors of continuing medical education (CME) programs. Manufacturers should take steps to ensure that neither they, nor their representatives, are using these activities to channel improper remuneration to physicians or others in a position to generate business for the manufacturer or to influence or control the content of the program.[11] In addition, manufacturers and sponsors of educational programs should be mindful of the relevant rules and regulations of the Food and Drug Administration. Codes of conduct promulgated by the CME industry may provide a useful starting point for manufacturers when reviewing their CME arrangements.

(3) Relationships with Sales Agents. In large part, a pharmaceutical manufacturer's commitment to an effective fraud and abuse compliance program can be measured by its

Federal Register / Vol. 68, No. 86 / Monday, May 5, 2003 / Notices          23739

commitment to training and monitoring its sales force. A pharmaceutical manufacturer should: (i) Develop a regular and comprehensive training program for its sales force, including refresher and updated training on a regular basis, either in person or through newsletters, memoranda, or the like; (ii) familiarize its sales force with the minimum PhRMA Code standards and other relevant industry standards; (iii) institute and implement corrective action and disciplinary policies applicable to sales agents who engage in improper marketing; (iv) avail itself of the advisory opinion process if it has questions about particular practices used by its sales force; and (v) establish an effective system for tracking, compiling, and reviewing information about sales force activities, including, if appropriate, random spot checking.

In addition, manufacturers should carefully review their compensation arrangements with sales agents. Sales agents, whether employees or independent contractors, are paid to recommend and arrange for the purchase of the items or services they offer for sale on behalf of the pharmaceutical manufacturer they represent. Many arrangements can be structured to fit in the employment or personal services safe harbor. Arrangements that cannot fit into a safe harbor should be carefully reviewed. Among the factors that should be evaluated are:
- The amount of compensation;
- The identity of the sales agent engaged in the marketing or promotional activity (e.g., is the agent a "white coat" marketer or otherwise in a position of exceptional influence);
- The sales agent's relationship with his or her audience;
- The nature of the marketing or promotional activity;
- The item or service being promoted or marketed; and
- The composition of the target audience.

Manufacturers should be aware that a compensation arrangement with a sales agent that fits in a safe harbor can still be evidence of a manufacturer's improper intent when evaluating the legality of the manufacturer's relationships with persons in a position to influence business for the manufacturer. For example, if a manufacturer provides sales employees with extraordinary incentive bonuses and expense accounts, there may well be an inference to be drawn that the manufacturer intentionally motivated the sales force to induce sales through lavish entertainment or other remuneration.

c. Drug Samples. The provision of drug samples is a widespread industry practice that can benefit patients, but can also be an area of potential risk to a pharmaceutical manufacturer. The Prescription Drug Marketing Act of 1987 (PDMA) governs the distribution of drug samples and forbids their sale. 21 U.S.C. 353(c)(1). A drug sample is defined to be a unit of the drug "that is not intended to be sold * * * and is intended to promote the sale of the drug." 21 U.S.C. 353(c)(1). Failure to comply with the requirements of PDMA can result in sanctions. In some circumstances, if the samples have monetary value to the recipient (e.g., a physician) and are used to treat federal health care program beneficiaries, the improper use of samples may also trigger liability under other statutes, including the False Claims Act and the anti-kickback statue.

Pharmaceutical manufacturers should closely follow the PDMA requirements (including all documentation requirements). In addition, manufacturers can minimize their risk of liability by: (i) Training their sales force to inform sample recipients in a meaningful manner that samples may not be sold or billed (thus vitiating any monetary value of the sample); (ii) clearly and conspicuously labeling individual samples as units that may not be sold (thus minimizing the ability of recipients to advertently or inadvertently commingle samples with purchased product); and (iii) including on packaging and any documentation related to the samples (such as shipping notices or invoices) a clear and conspicuous notice that the samples are subject to PDMA and may not be sold. Recent government enforcement activity has focused on instances in which drug samples were provided to physicians who, in turn, sold them to the patient or billed them to the federal health care programs on behalf of the patient.

C. Designation of a Compliance Officer and a Compliance Committee

1. Compliance Officer

Every pharmaceutical manufacturer should designate a compliance officer to serve as the focal point for compliance activities.[12] This responsibility may be the individual's sole duty or added to other management responsibilities, depending upon the size and resources of the company and the complexity of the task. If the individual has additional management responsibilities, the pharmaceutical manufacturer should ensure that the individual is able to dedicate adequate and substantive time and attention to the compliance functions. Similarly, if the compliance officer delegates some of the compliance duties, he or she should, nonetheless, remain sufficiently involved to fulfill the compliance oversight function.

Designating a compliance officer with the appropriate authority is critical to the success of the program, necessitating the appointment of a high-level official with direct access to the company's president or CEO, board of directors, all other senior management, and legal counsel. The compliance officer should have sufficient funding, resources, and staff to perform his or her responsibilities fully. The compliance officer should be able to effectuate change within the organization as necessary or appropriate and to exercise independent judgment. Optimal placement of the compliance officer within the organization will vary according to the particular situation of a manufacturer.[13]

Coordination and communication with other appropriate individuals or business units are the key functions of the compliance officer with regard to planning, implementing or enhancing, and monitoring the compliance program. The compliance officer's primary responsibilities should include:
- Overseeing and monitoring implementation of the compliance program;[14]
- Reporting on a regular basis to the company's board of directors, CEO or president, and compliance committee (if applicable) on compliance matters and assisting these individuals or groups to establish methods to reduce the company's vulnerability to fraud and abuse;
- Periodically revising the compliance program, as appropriate, to respond to changes in the company's needs and applicable federal health care program requirements, identified weakness in the compliance program, or identified systemic patterns of noncompliance;
- Developing, coordinating, and participating in a multifaceted educational and training program that focuses on the elements of the compliance program, and seeking to ensure that all affected employees and management understand and comply with pertinent federal and state standards;
- Ensuring that independent contractors and agents, particularly those agents and contractors who are involved in sales and marketing activities, are aware of the requirements of the company's compliance program with respect to sales and marketing activities, among other things;
- Coordinating personnel issues with the company's Human Resources/

Personnel office (or its equivalent) to ensure that the List of Excluded Individuals/Entities [15] has been checked with respect to all employees and independent contractors;
• Assisting the company's internal auditors in coordinating internal compliance review and monitoring activities;
• Reviewing and, where appropriate, acting in response to reports of noncompliance received through the hotline (or other established reporting mechanism) or otherwise brought to his or her attention (e.g., as a result of an internal audit or by corporate counsel who may have been notified of a potential instance of noncompliance);
• Independently investigating and acting on matters related to compliance. To that end, the compliance officer should have the flexibility to design and coordinate internal investigations (e.g., responding to reports of problems or suspected violations) and any resulting corrective action (e.g., making necessary improvements to policies and practices, and taking appropriate disciplinary action) with various company divisions or departments;
• Participating with the company's counsel in the appropriate reporting of any self-discovered violations of federal health care program requirements; and
• Continuing the momentum and, as appropriate, revision or expansion of the compliance program after the initial years of implementation.[16]

The compliance officer must have the authority to review all documents and other information relevant to compliance activities. This review authority should enable the compliance officer to examine interactions with government programs to determine whether the company is in compliance with federal health care program reporting and rebate requirements and to examine interactions with health care professionals that could violate kickback prohibitions or other federal health care programs requirements. Where appropriate, the compliance officer should seek the advice of competent legal counsel about these matters.

2. Compliance Committee

The OIG recommends that a compliance committee be established to advise the compliance officer and assist in the implementation of the compliance program.[17] When developing an appropriate team of people to serve as the pharmaceutical manufacturer's compliance committee, the company should consider a variety of skills and personality traits that are expected from the team members. The company should expect its compliance committee members and compliance officer to demonstrate high integrity, good judgment, assertiveness, and an approachable demeanor, while eliciting the respect and trust of company employees. These interpersonal skills are as important as the professional experience of the compliance officer and each member of the compliance committee.

Once a pharmaceutical manufacturer chooses the people who will accept the responsibilities vested in members of the compliance committee, the company needs to train these individuals on the policies and procedures of the compliance program, as well as how to discharge their duties. The OIG recognizes that some pharmaceutical manufacturers (e.g., small companies or those with limited budgets) may not have the resources or the need to establish a compliance committee. However, when potential problems are identified at such companies, the OIG recommends the creation of a "task force" to address the particular issues. The members of the task force may vary depending upon the area of concern. For example, if the compliance officer identifies issues relating to improper inducements to the company's purchasers or prescribers, the OIG recommends that a task force be organized to review the arrangements and interactions with those purchasers or prescribers. In essence, the compliance committee is an extension of the compliance officer and provides the organization with increased oversight.

D. Conducting Effective Training and Education

The proper education and training of officers, directors, employees, contractors, and agents, and periodic retraining of personnel at all levels are critical elements of an effective compliance program. A pharmaceutical manufacturer must take steps to communicate effectively its standards and procedures to all affected personnel by requiring participation in appropriate training programs and by other means, such as disseminating publications that explain specific requirements in a practical manner. These training programs should include general sessions summarizing the manufacturer's compliance program, written standards, and applicable federal health care program requirements. All employees and, where feasible and appropriate, contractors should receive the general training. More specific training on issues, such as (i) the anti-kickback statute and how it applies to pharmaceutical sales and marketing practices and (ii) the calculation and reporting of pricing information and payment of rebates in connection with federal health care programs, should be targeted at those employees and contractors whose job requirements make the information relevant. The specific training should be tailored to make it as meaningful as possible for each group of participants.

Managers and employees of specific divisions can assist in identifying specialized areas that require training and in carrying out such training. Additional areas for training may also be identified through internal audits and monitoring and from a review of any past compliance problems of the pharmaceutical manufacturer or similarly situated companies. A pharmaceutical manufacturer should regularly review its training and, where appropriate, update the training to reflect issues identified through audits or monitoring and any relevant changes in federal health care program requirements. Training instructors may come from outside or inside the organization, but must be qualified to present the subject matter involved and sufficiently experienced in the issues presented to adequately field questions and coordinate discussions among those being trained. Ideally, training instructors should be available for follow-up questions after the formal training session has been conducted.

The pharmaceutical manufacturer should train new employees soon after they have started working. Training programs and materials should be designed to take into account the skills, experience, and knowledge of the individual trainees. The compliance officer should document any formal training undertaken by the company as part of the compliance program. The company should retain adequate records of its training of employees, including attendance logs, descriptions of the training sessions, and copies of the material distributed at training sessions.

The OIG suggests that all relevant personnel (i.e., employees as well as agents of the pharmaceutical manufacturer) participate in the various educational and training programs of the company. For example, for sales representatives who are responsible for the sale and marketing of the company's products, periodic training in the anti-kickback statute and its safe harbors should be required. Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities.

Case 1:01-cv-12257-PBS   Document 5395-6   Filed 06/19/08   Page 12 of 14

The OIG recognizes that the format of the training program will vary depending upon the size and resources of the pharmaceutical manufacturer. For example, a company with limited resources or whose sales force is widely dispersed may want to create a videotape or computer-based program for each type of training session so new employees and employees outside of central locations can receive training in a timely manner. If videos or computer-based programs are used for compliance training, the OIG suggests that the company make a qualified individual available to field questions from trainees. Also, large pharmaceutical manufacturers may find training via the Internet or video conference capabilities to be a cost-effective means of reaching a large number of employees. Alternatively, large companies may include training sessions as part of regularly scheduled regional meetings.

The OIG recommends that participation in training programs be made a condition of continued employment and that failure to comply with training requirements should result in disciplinary action. Adherence to the training requirements as well as other provisions of the compliance program should be a factor in the annual evaluation of each employee.

### E. Developing Effective Lines of Communication

#### 1. Access to Supervisors and/or the Compliance Officer

In order for a compliance program to work, employees must be able to ask questions and report problems. Supervisors play a key role in responding to employee concerns and it is appropriate that they serve as a first line of communications. Pharmaceutical manufacturers should consider the adoption of open-door policies in order to foster dialogue between management and employees. In order to encourage communications, confidentiality and non-retaliation policies should also be developed and distributed to all employees.[18]

Open lines of communication between the compliance officer and employees are equally important to the successful implementation of a compliance program and the reduction of any potential for fraud and abuse. In addition to serving as a contact point for reporting problems and initiating appropriate responsive action, the compliance officer should be viewed as someone to whom personnel can go to get clarification on the company's policies. Questions and responses should be documented and dated and, if appropriate, shared with other staff so that compliance standards or polices can be updated and improved to reflect any necessary changes or clarifications. Pharmaceutical manufacturers may also consider rewarding employees for appropriate use of established reporting systems as a way to encourage the use of such systems.

#### 2. Hotlines and Other Forms of Communication

The OIG encourages the use of hotlines, e-mails, newsletters, suggestion boxes, and other forms of information exchange to maintain open lines of communication. In addition, an effective employee exit interview program could be designed to solicit information from departing employees regarding potential misconduct and suspected violations of company policy and procedures. Pharmaceutical manufacturers may also identify areas of risk or concern through periodic surveys or communications with sales representatives about the current marketing environment. This could provide management with insight about and an opportunity to address conduct occurring in the field, either by the company's own sale representatives or those of other companies.

If a pharmaceutical manufacturer establishes a hotline or other reporting mechanism, information regarding how to access the reporting mechanism should be made readily available to all employees and independent contractors by including that information in the code of conduct or by circulating the information (e.g., by publishing the hotline number or e-mail address on wallet cards) or conspicuously posting the information in common work areas. Employees should be permitted to report matters on an anonymous basis.

Reported matters that suggest substantial violations of compliance policies or applicable Federal health care program requirements should be documented and investigated promptly to determine their veracity and the scope and cause of any underlying problem. The compliance officer should maintain a detailed log that records such reports, including the nature of any investigation, its results, and any remedial or disciplinary action taken. Such information, redacted of individual identifiers, should be summarized and included in reports to the board of directors, the president or CEO, and compliance committee. Although the pharmaceutical manufacturer should always strive to maintain the confidentiality of an employee's identity, it should also make clear that there might be a point where the individual's identity may become known or need to be revealed in certain instances. The OIG recognizes that protecting anonymity may be infeasible for small companies. However, the OIG believes all employees, when seeking answers to questions or reporting potential instances of fraud and abuse, should know to whom to turn for a meaningful response and should be able to do so without fear of retribution.

### F. Auditing and Monitoring

An effective compliance program should incorporate thorough monitoring of its implementation and an ongoing evaluation process. The compliance officer should document this ongoing monitoring, including reports of suspected noncompliance, and provide these assessments to company's senior management and the compliance committee. The extent and frequency of the compliance audits may vary depending on variables such as the pharmaceutical manufacturer's available resources, prior history of noncompliance, and the risk factors particular to the company. The nature of the reviews may also vary and could include a prospective systemic review of the manufacturer's processes, protocols, and practices or a retrospective review of actual practices in a particular area.

Although many assessment techniques are available, it is often effective to have internal or external evaluators who have relevant expertise perform regular compliance reviews. The reviews should focus on those divisions or departments of the pharmaceutical manufacturer that have substantive involvement with or impact on federal health care programs (such as the government contracts and sales and marketing divisions) and on the risk areas identified in this guidance. The reviews should also evaluate the company's policies and procedures regarding other areas of concern identified by the OIG (e.g., through Special Fraud Alerts) and federal and state law enforcement agencies. Specifically, the reviews should evaluate whether the: (1) Pharmaceutical manufacturer has policies covering the identified risk areas; (2) policies were implemented and communicated; and (3) policies were followed.

### G. Enforcing Standards Through Well-Publicized Disciplinary Guidelines

An effective compliance program should include clear and specific disciplinary policies that set out the consequences of violating the law or the pharmaceutical manufacturer's code of

conduct or policies and procedures. A pharmaceutical manufacturer should consistently undertake appropriate disciplinary action across the company in order for the disciplinary policy to have the required deterrent effect. Intentional and material noncompliance should subject transgressors to significant sanctions. Such sanctions could range from oral warnings to suspension, termination or other sanctions, as appropriate. Disciplinary action also may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Each situation must be considered on a case-by-case basis, taking into account all relevant factors, to determine the appropriate response.

### H. Responding to Detected Problems and Developing Corrective Action Initiatives

Violation of a pharmaceutical manufacturer's compliance program, failure to comply with applicable federal or state law, and other types of misconduct threaten the company's status as a reliable, honest, and trustworthy participant in the health care industry. Detected but uncorrected misconduct can endanger the reputation and legal status of the company. Consequently, upon receipt of reasonable indications of suspected noncompliance, it is important that the compliance officer or other management officials immediately investigate the allegations to determine whether a material violation of applicable law or the requirements of the compliance program has occurred and, if so, take decisive steps to correct the problem.[19] The exact nature and level of thoroughness of the investigation will vary according to the circumstances, but the review should be detailed enough to identify the root cause of the problem. As appropriate, the investigation may include a corrective action plan, a report and repayment to the government, and/or a referral to criminal and/or civil law enforcement authorities.

### Reporting

Where the compliance officer, compliance committee, or a member of senior management discovers credible evidence of misconduct from any source and, after a reasonable inquiry, believes that the misconduct may violate criminal, civil, or administrative law, the company should promptly report the existence of misconduct to the appropriate federal and state authorities[20] within a reasonable period, but not more than 60 days,[21] after determining that there is credible evidence of a violation.[22] Prompt voluntary reporting will demonstrate the pharmaceutical manufacturer's good faith and willingness to work with governmental authorities to correct and remedy the problem. In addition, reporting such conduct will be considered a mitigating factor by the OIG in determining administrative sanctions (e.g., penalties, assessments, and exclusion), if the reporting company becomes the subject of an OIG investigation.[23]

When reporting to the government, a pharmaceutical manufacturer should provide all information relevant to the alleged violation of applicable federal or state law(s) and the potential financial or other impact of the alleged violation. The compliance officer, under advice of counsel and with guidance from the governmental authorities, could be requested to continue to investigate the reported violation. Once the investigation is completed, and especially if the investigation ultimately reveals that criminal, civil or administrative violations have occurred, the compliance officer should notify the appropriate governmental authority of the outcome of the investigation, including a description of the impact of the alleged violation on the operation of the applicable federal health care programs or their beneficiaries.

### III. Conclusion

In today's environment of increased scrutiny of corporate conduct and increasingly large expenditures for prescription drugs, it is imperative for pharmaceutical manufacturers to establish and maintain effective compliance programs. These programs should foster a culture of compliance that begins at the executive level and permeates throughout the organization. This compliance guidance is designed to provide assistance to all pharmaceutical manufacturers as they either implement compliance programs or re-assess existing programs. The essential elements outlined in this compliance guidance can be adapted to the unique environment of each manufacturer. It is the hope and expectation of the OIG that the resulting compliance programs will benefit not only federal health care programs and their beneficiaries, but also pharmaceutical manufacturers themselves.

Dated: April 23, 2003.

**Janet Rehnquist,**
*Inspector General.*

### Endnotes

1. The term "Federal health care programs," as defined in 42 U.S.C. 1320a–7b(f), includes any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States government or any state health plan (e.g., Medicaid or a program receiving funds from block grants for social services or child health services). In this document, the term "federal health care program requirements" refers to the statutes, regulations and other rules governing Medicare, Medicaid, and all other federal health care programs.

2. See 66 FR 31246 (June 11, 2001), "Notice for Solicitation of Information and Recommendations for Developing a Compliance Program Guidance for the Pharmaceutical Industry."

3. See 67 FR 62057 (October 3, 2002), "Draft OIG Compliance Program Guidance for Pharmaceutical Manufacturers."

4. 42 U.S.C. 1320a–7b(b).

5. In addition, the compliance program elements and potential risk areas addressed in this compliance program guidance may also have application to manufacturers of other products that may be reimbursed by federal health care programs, such as medical devices and infant nutritional products.

6. In addition, pharmaceutical manufacturers should be mindful that many states have fraud and abuse statutes—including false claims, anti-kickback and other statutes—that are not addressed in this guidance.

7. The False Claims Act (31 U.S.C. 3729–33) prohibits knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval. Additionally, it prohibits knowingly making or using (or causing to be made or used) a false record or statement to get a false or fraudulent claim paid or approved by the federal government or its agents, like a carrier, other claims processor, or state Medicaid program.

8. The 340B Program, contained as part of the Public Health Services Act and codified at 42 U.S.C. 256b, is administered by the Health Resources and Services Administration (HRSA).

9. 42 U.S.C. 1396r–8. Average Manufacturer Price and Best Price are defined in the statute at 42 U.S.C. 1396r–8(k)(1) and 1396r–8(c)(1), respectively. CMS has provided further guidance on these terms in the National Drug Rebate Agreement and in Medicaid Program Releases available through its Web site at *http://www.hcfa.gov/medicaid/drugs/drug.mpg.htm*.

10. In this regard, pharmaceutical manufacturers should note that the exception for non-monetary compensation under the Stark law (42 U.S.C. 1395nn; 42 CFR 411.357(k)) is not a basis for protection under the anti-kickback statute.

11. CME programs with no industry sponsorship, financing, or affiliation should not raise anti-kickback concerns, although tuition payments by manufacturers (or their representatives) for persons in a position to influence referrals (e.g., physicians or medical students) may raise concerns.

12. It is also advisable to designate as a compliance officer an individual with prior experience or knowledge of compliance and

operational issues relevant to pharmaceutical manufacturers.

13. The OIG believes it is generally not advisable for the compliance function to be subordinate to the pharmaceutical manufacturer's general counsel, or comptroller or similar financial officer. Separation of the compliance function helps to ensure independent and objective legal reviews and financial analysis of the company's compliance efforts and activities. By separating the compliance function from the key management positions of general counsel or chief financial officer (where the size and structure of the pharmaceutical manufacturer make this a feasible option), a system of checks and balances is established to more effectively achieve the goals of the compliance program.

14. For companies with multiple divisions or regional offices, the OIG encourages coordination with each company location through the use of a compliance officer located in corporate headquarters who is able to communicate with parallel compliance liaisons in each division or regional office, as appropriate.

15. As part of its commitment to compliance, a pharmaceutical manufacturer should carefully consider whether to hire or do business with individuals or entities that have been sanctioned by the OIG. The List of Excluded Individuals and Entities can be checked electronically and is accessible through the OIG's Web site at: http://oig.hhs.gov.

16. There are many approaches the compliance officer may enlist to maintain the vitality of the compliance program. Periodic on-site visits of regional operations, bulletins with compliance updates and reminders, distribution of audiotapes, videotapes, CD ROMs, or computer notifications about different risk areas, lectures at management and employee meetings, and circulation of recent articles or publications discussing fraud and abuse are some examples of approaches the compliance officer may employ.

17. The compliance committee benefits from having the perspectives of individuals with varying responsibilities and areas of knowledge in the organization, such as operations, finance, audit, human resources, legal, and sales and marketing, as well as employees and managers of key operating units. The compliance officer should be an integral member of the committee. All committee members should have the requisite seniority and comprehensive experience within their respective departments to recommend and implement any necessary changes to policies and procedures.

18. In some cases, employees sue their employers under the False Claims Act's *qui tam* provisions after a failure or apparent failure by the company to take action when the employee brought a questionable, fraudulent, or abusive situation to the attention of senior corporate officials. Whistleblowers must be protected against retaliation, a concept embodied in the provisions of the False Claims Act. *See* 31 U.S.C. 3730(h).

19. Instances of noncompliance must be determined on a case-by-case basis. The existence or amount of a *monetary* loss to a federal health care program is not solely determinative of whether the conduct should be investigated and reported to governmental authorities. In fact, there may be instances where there is no readily identifiable monetary loss, but corrective actions are still necessary to protect the integrity of the health care program.

20. Appropriate federal and state authorities include the OIG, the Criminal and Civil Divisions of the Department of Justice, the U.S. Attorney in relevant districts, the Food and Drug Administration, the Federal Trade Commission, the Drug Enforcement Administration and the Federal Bureau of Investigation, and the other investigative arms for the agencies administering the affected federal or state health care programs, such as the state Medicaid Fraud Control Unit, the Defense Criminal Investigative Service, the Department of Veterans Affairs, HRSA, and the Office of Personnel Management (which administers the Federal Employee Health Benefits Program).

21. In contrast, to qualify for the "not less than double damages" provision of the False Claims Act, the provider must provide the report to the government within 30 days after the date when the provider first obtained the information. 31 U.S.C. 3729(a).

22. Some violations may be so serious that they warrant immediate notification to governmental authorities prior to, or simultaneous with, commencing an internal investigation. By way of example, the OIG believes a provider should report misconduct that: (1) Is a clear violation of administrative, civil, or criminal laws; (2) has a significant adverse effect on the quality of care provided to federal health care program beneficiaries; or (3) indicates evidence of a systemic failure to comply with applicable laws or an existing corporate integrity agreement, regardless of the financial impact on federal health care programs.

23. The OIG has published criteria setting forth those factors that the OIG takes into consideration in determining whether it is appropriate to exclude an individual or entity from program participation pursuant to 42 U.S.C. 1320a–7(b)(7) for violations of various fraud and abuse laws. *See* 62 FR 67392 (December 24, 1997).

[FR Doc. 03–10949 Filed 5–2–03; 8:45 am]
**BILLING CODE 4152–01–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Substance Abuse and Mental Health Services Administration**

### Agency Information Collection Activities: Submission for OMB Review; Comment Request

Periodically, the Substance Abuse and Mental Health Services Administration (SAMHSA) will publish a summary of information collection requests under OMB review, in compliance with the Paperwork Reduction Act (44 U.S.C. Chapter 35). To request a copy of these documents, call the SAMHSA Reports Clearance Officer on (301) 443–7978.

*National Evaluation of the Comprehensive Community Mental Health Services for Children and Their Families Program: Phase Three*—(OMB No. 0930–0209, revision)—SAMHSA's Center for Mental Health Services is conducting Phase III of the national evaluation of the Comprehensive Community Mental Health Services for Children and Their Families Program. Phase III collects data on child mental health outcomes, family life, and service system development and performance. Data are being collected on 22 funded systems of care, and approximately 5,100 children and families. Data collection for this evaluation will be conducted over a 5½-year period.

The core of service system data are currently collected every 18 months throughout the evaluation period. Service delivery and system variables of interest include the following: Maturity of system of care development, adherence to the system of care program model, and client service experience. The length of time that individual families will participate in the study ranges from 18 to 36 months depending on when they enter the evaluation.

Child and family outcomes of interest will be collected at intake and during subsequent follow-up sessions at six-month intervals. The outcome measures include the following: Child symptomatology and functioning, family functioning, material resources, and caregiver strain. In addition, a treatment effectiveness study will examine the relative impact of an evidence-based treatment within one system of care.

The average annual respondent burden is estimated below. The estimate reflects the average number of respondents in each respondent category, the average number of responses per respondent per year, the average length of time it will take for each response, and the total average annual burden for each category of respondent, and for all categories of respondents combined.

This revision to the currently approved information collection activities involves: (1) Extension of the data collection period for an additional 18 months to cover an additional sixth year of grant funding in the 22 currently funded systems of care (and a six-month no-cost extension for the evaluation), (2) the addition of a family-driven study to assess the extent of family involvement in service planning, (3) the elimination of the longitudinal comparison study and the addition of a treatment effectiveness study in two sites