IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                        )
PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE       ) MDL No. 1456
LITIGATION                    ) Pages 1 - 64



MOTIONS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
June 26, 2008, 2:30 p.m.







LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2        JOANNE M. CICALA, ESQ. and JAMES P. CARROLL, JR., ESQ.,
     Kirby McInerney, LLP, 101 College Street, Dripping Springs,
3    Texas, 78620, for the State of Iowa.

4        AARON HOVAN, ESQ., Kirby McInerney, LLP,
     825 Third Avenue, New York, New York, 10022,
5    for the State of Iowa.

6        WILLIAM L. BRAUCH, ESQ., Special Assistant Attorney
     General, Consumer Protection Division, 1305 E. Walnut Street,
7    Hoover State Office Building, Des Moines, Iowa, 50319.

8        J. ANDREW JACKSON, ESQ., Dickstein Shapiro, LLP,
     1825 Eye Street, N.W., Washington, D.C., 20006-5403,
9    for Baxter International.

10       PETER E. GELHAAR, ESQ., Donnelly, Conroy & Gelhaar, LLP,
     One Beacon Street, Boston, Massachusetts, 02108,
11   for Baxter International.

12       JONATHAN L. STERN, ESQ., Arnold & Porter, LLP,
     555 Twelfth Street, N.W., Washington, D.C., 20004-1206,
13   for Endo Pharmaceuticals.

14       SARAH COOLEYBECK, ESQ., Foley Hoag, LLP,
     Seaport World Trade Center West, 155 Seaport Boulevard,
15   Boston, Massachusetts, 02210-2600, for AstraZeneca
     Pharmaceuticals
16
         MELISSA T. AOYAGI, ESQ., Davis Polk & Wardwell,
17   450 Lexington Avenue, New York, New York, 10017,
     for AstraZeneca Pharmaceuticals LP.
18
         TINA M. TABACCHI, ESQ., Jones Day,
19   77 West Wacker, Chicago, Illinois, 60601,
     for TAP Pharmaceutical Products, Inc.
20
         ERICA SMITH-KLOCEK, ESQ., Morga, Lewis & Bockius, LLP,
21   1701 Market Street, Philadelphia, Pennsylvania, 19103-2921,
     for Pfizer, Inc., Pharmacia Corp., and Greenstone Ltd.
22
         WILLIAM A. DAVIS, ESQ., Mintz Levin Cohn Ferris Glovsky
23   and Popeo, Inc., 701 Pennsylvania Avenue, N.W., Washington,
     D.C., 20004, for Eli Lilly and Company.
24
         DAVID E. MELAUGH, ESQ., Morrison & Foerster, LLP,
25   425 Market Street, San Francisco, California, 94105-2482,

1

A P P E A R A N C E S: (Continued)

2

3      JOSEPH H. YOUNG, ESQ., Hogan & Hartson, LLP,
111 South Calvert Street, Suite 1600, Baltimore, Maryland,
21202, for Amgen, Inc.

4

5      D. JACQUES SMITH, ESQ. and JACKSON DAVID TOOF, ESQ.,
Arent Fox, LLP, 1050 Connecticut Avenue, N.W., Washington,
D.C., 20036-5339, for Chiron Corp.

6

7      NATHAN COHEN, ESQ., Kaye Scholer, LLP,
425 Park Avenue, New York, New York, 10022-3598,
for Novartis Corporation.

8

9      PHILIP D. ROBBEN, ESQ. and MICHAEL T. MALONEY, ESQ.,
Kelley Drye & Warren, LLP, 101 Park Avenue, New York,
New York, 10178-0002, for Dey Laboratories and Mylan

10     Corporation.

11     CYNTHIA L. EBBS, ESQ., Dornbush, Schaeffer, Strongin &
Venaglia, 747 Third Avenue, New York, New York, 10017, for

12     Forest Pharmaceuticals, Inc. and Forest Laboratories, Inc.

13     JOHN M. TOWNSEND, ESQ., Hughes Hubbard & Reed, LLP,
1775 I Street, N.W., Washington, D.C., 20006-2401,

14     for Merck & Co., Inc

15     JOHN P. BUEKER, ESQ., Ropes & Gray, LLP,
One International Place, Boston, Massachusetts, 02110,

16     for Schering-Plough, Schering, and Warrick Pharmaceuticals.

17     RICHARD D. RASKIN, ESQ., Sidley Austin,
One South Dearborn, Chicago, Illinois, 60603,

18     for Bayer Corporation.

19     KATY E. KOSKI, ESQ., Sherin and Lodgen, LLP,
101 Federal Street, Boston, Massachusetts, 02110,

20     for Watson Pharmaceuticals.

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry Average

3    Wholesale Price Litigation, Civil Action No. 01-12257, will

4    now be heard before this Court.  Will counsel please identify

5    themselves for the record.

6          MS. CICALA:  I'm Joanne Cicala from the firm of

7    Kirby McInerney, special counsel to the state of Iowa in this

8    matter; and with me is Mr. Bill Brauch, Special Assistant

9    Attorney General from the state of Iowa's Attorney General's

10   office and Director of the Consumer Protection Division of

11   the Iowa AG's office.

12         THE COURT:  Thank you.

13         MR. CARROLL:  James Carroll from Kirby McInerney on

14   behalf of the state of Iowa.

15         MR. HOVAN:  Aaron Hovan, also from Kirby McInerney

16   and also on behalf of the state of Iowa.

17         MR. JACKSON:  Good afternoon, your Honor.  Andy

18   Jackson representing Baxter International, and we've been

19   asked to address the crosscutting issues.

20         MR. GELHAAR:  And Peter Gelhaar for Baxter.

21         MR. STERN:  Good afternoon, your Honor.  Jonathan

22   Stern for Endo Pharmaceuticals.

23         MS. COOLEYBECK:  Sarah Cooleybeck, Foley Hoag, for

24   AstraZenica.

25         MS. AOYAGI:  Melissa Aoyagi, Davis Polk & Wardwell,

abea5014-9fe5-400f-8e17-da5525717f42

1    for AstraZenica.

2              MS. TABACCHI:  Tina Tabacchi from Jones Day for

3    TAP.

4              MS. SMITH-KLOCEK:  Erica Smith-Klocek from Morgan

5    Lewis for Pfizer, Pharmacia, and Greenstone.

6              MR. DAVIS:  William Davis, Mintz Levin, for

7    Eli Lilly.

8              MR. MELAUGH:  David Melaugh, Morrison Foerster,

9    Purdue.

10             MR. YOUNG:  Hank Young, Hogan & Hartson, for Amgen.

11             MR. SMITH:  Your Honor, Jacques Smith, Arent Fox,

12   Chiron Corporation.

13             MR. TOOF:  Jackson Toof, Arent Fox, Chiron

14   Corporation.

15             MR. COHEN:  Nathan Cohen, Kaye Scholer, Novartis

16   Pharmaceuticals Corporation.

17             MR. ROBBEN:  Good afternoon.  Philip Robben from

18   Kelley Drye & Warren for the Dey and Mylan defendants.

19             MR. MALONEY:  Michael Maloney from Kelley Drye &

20   Warren on behalf of Dey and Mylan.

21             MS. EBBS:  Cynthia Ebbs, Dornbush, Schaeffer,

22   Strongin & Venaglia, for Forest Pharmaceuticals and Forest

23   Laboratories.

24             MR. TOWNSEND:  May it please the Court, John

25   Townsend from Hughes Hubbard & Reed on behalf of Merck &

1  Company.

2       MR. BUEKER:  Good afternoon, your Honor.  John

3  Bueker from Ropes & Gray on behalf of Schering-Plough,

4  Schering, and Warrick.

5       MR. RASKIN:  Good afternoon, Judge.  Richard Raskin

6  on behalf of Bayer Corporation.

7       MS. KOSKI:  Katy Koski from Sherin and Lodgen for

8  the Watson defendants.

9       THE COURT:  Okay.  So as we've done in many of

10  these previous suits, we'll start with the crosscutting

11  issues.  I have received numerous individual motions.  Some

12  of them are quite repetitive of the crosscutting, but many

13  involve unique issues.  So essentially what I'm going to do

14  is only hear from individuals on the unique issues, not the

15  crosscutting issues.  I've also ruled on multiple of these

16  issues before, and I don't know that I'm going to change my

17  mind on any, so I'd like to just deal with the new issues.  A

18  couple of them have to do with Iowa law.

19       So essentially, just to make it clear, I'm going to

20  be consistent with my prior decisions in allowing the motion

21  to dismiss on Count 1, which is basically saying there's no

22  private right of action under 42 U.S.C., Section 1396.  I

23  want to address the issue of whether the complaint is pled

24  with sufficient particularity, et cetera, but the basic

25  bottom line is, I do think that the state is a third-party

1    beneficiary.  I do need to at least deal with the pleading

2    issues, but I am going to stick with that prior ruling.

3           I think an open question is whether the Iowa

4    Consumer Fraud Act authorizes, includes, or defines, however

5    you want to say the word, "person" to include the state.

6    That's the open question I'd like to spend some time on.

7           I'm not going to change my mind on the issue of

8    unjust enrichment.

9           And last, but not least, I think issues of

10   knowledge and reliance are typically not resolved on a motion

11   to dismiss.  However, I think the state offered a good

12   solution on the 30 percent yardstick, which is essentially to

13   start -- I mean, the appendix is just overwhelming in what

14   we're talking about, but at least to start with anything over

15   30 percent in terms of discovery.  And I wanted you to think

16   about whether we should do that for both sides in terms of

17   the statute of limitations and things predating what I

18   discussed in my big order.  I don't think that my rulings

19   with respect to knowledge and tolling and all of yardsticks

20   are binding on all the parties under the doctrines of issue

21   preclusion or -- but they certainly inform the way I think

22   about the case in terms of case management and the like, so I

23   think we need to talk about that here today.

24          So the big issues have to do with, in my view,

25   especially since the SMAC has been dropped, is, we're going

1   to start with Iowa law, and then I'd like to sort of revisit

2   Federal Upper Limits and what's happened since the last time

3   we talked about this in the New York case.  I feel as if I've

4   never really vetted that issue, and it may get to be time to

5   do that.

6            All right, so you're the moving party.

7            MR. JACKSON:  Yes, your Honor.

8            THE COURT:  Your name again is?

9            MR. JACKSON:  Andy Jackson for Baxter.  Let me try

10  to address some of those prior decisions that you've made,

11  just to try to help you when you go back and start writing.

12  We think that the best price claims that are included in

13  Counts 2, 3, 4, and 5 you've ruled on, that they don't meet

14  the particularity requirements.

15           THE COURT:  Well, wait.  That was in the context of

16  the New York cases.  I want someone, and this is what I'm

17  going to ask you to do is, walk me through these complaints

18  to tell me whether these are any different from what I've

19  seen before.  I mean, the complaint and the appendix look

20  like this, and I have not read it other than little snippets

21  here and there.  I did not sit and read this over the

22  weekend.  So you can't just simply say, because I said it in

23  another case, I'm going to say it again.  I need to be sure

24  they're the same.

25           MR. JACKSON:  Well, I think they've agreed, the

1   plaintiffs have agreed that the allegations on best price are

2   the same in both, so I think your prior analysis applies,

3   your Honor.  And I don't think they concede that.  I think

4   they would say that as to best price, it shouldn't be

5   dismissed with prejudice.  But we've argued that the best

6   price claims don't satisfy the analysis that you required in

7   the New York cases, and that same analysis should apply here,

8   the same counsel for both, your Honor.

9          The SMAC claims, as you recognized, the state

10  maximum allowable cost claims should be dismissed, and the

11  plaintiffs have conceded that.  I do think it's important to

12  note, your Honor, that the reason, or maybe the principal

13  reason, that they should be dismissed is because since 2001,

14  the state has had actual information of pharmacy and provider

15  acquisition cost.  So the notion that they were somehow

16  misled or confused about what AWP meant or didn't mean or

17  that they just recently learned that it equated to an actual

18  acquisition price can't be true.

19         THE COURT:  Right, but they've agreed to it, so we

20  don't have to -- you've won without having argued, so let's

21  just move.  We have so much to do today, so much, I just

22  really don't want to -- they've dropped SMAC, it's gone.

23         MR. JACKSON:  I just wanted to emphasize that point

24  for one additional argument, and I'll get to it.

25         THE COURT:  But that's after 2001.

1          MR. JACKSON:  That's after 2001.  They make

2     something called WAC and WAC equivalent claims.  There is no

3     particularity regarding those claims whatsoever.  And that's

4     the phrase in the complaint, "WAC and WAC equivalents."  They

5     have not done what you had ordered previously as it relates

6     to AWPs.

7          THE COURT:  So you're saying they're not pleading

8     specifically fraudulent wholesale acquisition costs in these

9     appendices?

10         MR. JACKSON:  Correct.

11         THE COURT:  Okay.

12         MR. JACKSON:  Now, as to the Iowa-specific issues,

13    I first want to talk about knowledge.  And I appreciate your

14    many prior decisions regarding knowledge defense and that

15    that's not appropriate for motions to dismiss, and that it

16    might be more appropriate for summary judgment, except for

17    one substantial difference here.  And I'm not going to rely

18    solely upon all of the knowledge evidence that you have heard

19    about in trial and motion.  Instead, in Iowa, in 1986 Iowa

20    changed its reimbursement statute and specifically said,

21    "We're going --"

22         THE COURT:  Excuse me.  You know what?  I'm not

23    going to do this as a matter on a motion to dismiss.  I

24    understand you may have a good argument.  You may win the

25    day.  It is one thing to know about the fact that AWP isn't

1   accurate and that there's some spread going on, we all know,

2   20 to 25 percent, right?  It may be 30 percent.  But what

3   there is no evidence of is that they knew that it was going

4   up to 100 percent, 600 percent, 1,000 percent, at least not

5   on this record.

6           MR. JACKSON:  Okay, your Honor, but I do think for

7   this case, which was filed in October, 2007, it is

8   appropriate for you to consider all of the things that you've

9   ruled on in terms of what people, sophisticated participants

10  like the state -- you know, I don't think there could be any

11  more sophisticated participant in a Medicare/Medicaid, say

12  for possibly the federal government, than a state that's had

13  a --

14          THE COURT:  I would say a pharmacy benefit manager

15  would be more sophisticated than the state.

16          MR. JACKSON:  Well, I disagree with your Honor, but

17  for this case, based upon what you've ruled about the

18  knowledge in 1997, and certainly about the knowledge in 2000,

19  I think you should cut the case off.  Their damages in the

20  present complaint, they calculate damages up to 2005.  They

21  reserve in footnotes --

22          THE COURT:  You know, statute of limitations are

23  usually handled on summary judgment motions.  It may just be

24  that it might make sense for settlement purposes or just to

25  move it along to focus discovery, and I'll ask them about

1   that, but I'm not going to do it as a matter of law because

2   I'd have to import all my findings from other cases, which

3   would be inappropriate because they weren't litigating those

4   other cases.  You know, they weren't involved, so --

5           MR. JACKSON:  Okay, your Honor, but your rulings

6   regarding the knowledge in 2000 and 2001 was not limited to

7   those cases.  It was all-encompassing.

8           THE COURT:  They are likely to lose.

9           MR. JACKSON:  Okay, your Honor.

10          THE COURT:  But -- but I can't do it on a motion to

11  dismiss.

12          MR. JACKSON:  I understand.

13          THE COURT:  All right?  So maybe they're going to

14  persuade me why Iowa didn't know about the filing of the suit

15  when there was a perfect storm of information, when this big

16  suit was filed and all the newspaper articles happened.

17  Maybe.  And it also doesn't deal with the unfair prong

18  because sometimes a legislature has to change.  So, I mean,

19  you've got a good argument.  Would you just get to the one

20  I'm interested in, which is, can the AG even sue?

21          MR. JACKSON:  And the answer is "no."

22          THE COURT:  All right, so now this is the new issue

23  for me.

24          MR. JACKSON:  It is.  The Consumer Fraud Act of

25  Iowa specifies that the AG can sue on behalf of persons under

1   their Consumer Fraud Act.  And keep in mind here, the state

2   is not suing on behalf of Medicaid beneficiaries.  They're

3   not suing on behalf of the old and the sick or those folks

4   who are Medicare beneficiaries because they pay a flat fee,

5   no relationship to WAC or AWP or any of those pricing

6   issues.  They're flat fee, so they're not suing on behalf of

7   beneficiaries.  They're suing on behalf of themselves.

8          The statute defines "person."  It does not include

9   the state or a state governmental entity.  Other Iowa

10  statutes do also for those particular statutes include a

11  definition of "person" in which the state and governmental

12  entities are included.  Not in this.

13          THE COURT:  So I was having a debate with my staff

14  about what the word "include" means.  And if you look it up

15  in a dictionary, which we did -- we looked it up in three

16  this morning -- while there's some ambiguity about the term,

17  it's generally open-ended.

18          MR. JACKSON:  Your Honor, in light of how this

19  statute is worded and written and the statute in Illinois

20  upon which it was based, I don't think that "includes" versus

21  "makes" versus "is" --

22          THE COURT:  Well, the two distinctions here are

23  "includes" versus "means" because when you go through that

24  statutory section, sometimes the legislature uses the word

25  "includes," and sometimes it uses the word "means," right,

1    if you go through all the statutory definition section?  I

2    think there's some ambiguity here, I'd have to agree with

3    that.  But we had this debate, what does it mean if you

4    include fifteen people and then don't have a sixteenth

5    there?  On the other hand, they could have used the word

6    "means" as they said in so many of the other definitions.

7          Am I right in understanding that the Iowa courts

8    have not ruled on this one way or another?

9          MR. JACKSON:  That is correct, your Honor.  And the

10   plaintiff, the state seems to make a big deal of the fact

11   that we didn't raise, show you any cases that said, like in

12   Illinois, consumer fraud, Consumer Fraud Act, the state can't

13   sue on behalf of itself.  I think that supports our

14   argument.  I would have expected in response to our motion to

15   dismiss the state to bring in truckloads and wheelbarrows

16   full of prior cases in which the Attorney General, under the

17   Iowa Consumer Fraud Act, had sued and recovered damages on

18   behalf of itself.  They did none of that.  I think that's

19   better evidence of our argument that the state has never

20   believed, the Attorney General has never believed that it

21   could use a consumer fraud statute to sue for damages that it

22   suffered.

23          THE COURT:  Let me ask you this.  There was some

24   debate about the Illinois case and a judge denying the motion

25   to dismiss the parallel case.  Was there an opinion written?

1          MR. JACKSON:  The answer is "no."  There was an

2     order.  I was sitting at counsel table.  I was prepared to

3     argue a motion that didn't get argued that day.  Judge Flynn

4     and the Boehringer lawyer who was doing what I'm doing now --

5          THE COURT:  The who?

6          MR. JACKSON:  Helen Witt was arguing.  Most of the

7     argument -- and, again, I'm sitting there, I've read the

8     transcript -- most of the argument focused on the Supreme

9     Court case in 2007, Twombly, about pleading requirements, and

10    then a very complicated discussion about an Illinois

11    Procedural Rule 619 and whether certain arguments were more

12    appropriately under 619 or 615.

13          Now, I confess, your Honor, it went right over my

14    head, but I can tell you that there was no discussion during

15    that argument about whether the Illinois Consumer Fraud Act

16    permitted the state of Illinois to sue under that and seek

17    damages.

18          THE COURT:  For its own harm?

19          MR. JACKSON:  For its own harm, and we --

20          THE COURT:  So that was what was denied.  It was

21    for its own harm, not as parens patriae?

22          MR. JACKSON:  Correct, for its own harm, and it was

23    denied in a one-sentence handwritten order.

24          THE COURT:  I love them.  As a colleague of mine on

25    the court, I should follow his advice:  And what is it about

1  the word "denied" you don't understand?  So --

2           MR. JACKSON:  Well, I understand, your Honor, but I

3  don't think you could -- you should interpret such a

4  handwritten one-line denial to overrule what we say is

5  applicable Illinois Supreme Court law and Illinois appellate

6  Division law that says the state can't use the Illinois

7  statute to sue on behalf of its own damages.  So I can't

8  explain to you what Judge Flynn was thinking.  I can only

9  tell you that there was no analysis, no discussion during the

10 hearing, and it's certainly not reflected in that one-page

11 order.  But I think you should look to the Illinois case law

12 that we cite that says they can't use the CFA, and in

13 Illinois, for the state to sue for damages.  That's what the

14 Iowa statute --

15          THE COURT:  But does that essentially leave the

16 state without any remedy at all?

17          MR. JACKSON:  Oh, no, your Honor.

18          THE COURT:  Well, what else is there?

19          MR. JACKSON:  Well, I'll tell you what the state

20 could have done here and --

21          THE COURT:  Is there a False Claims Act?

22          MR. JACKSON:  I'm not sure, your Honor, but I can

23 tell you, they could have done what they did back in 1986,

24 which was change the legislation.  They have a remedy.

25          THE COURT:  But they may not take that well from a

1    Federal Judge in Boston to order the legislature to change --

2          MR. JACKSON:  Well, your Honor, I also don't think

3    a Federal Judge in Boston wants to make a decision

4    necessarily of, yes, there is this cause of action, when

5    you've not seen a single Iowa case that says it exists.

6          THE COURT:  Well, I haven't seen a case one way or

7    another.  I'm just looking at the statute basically.

8          MR. JACKSON:  No, I understand that, your Honor.

9    Nor do I think a judge in Boston necessarily wants to be

10   involved in issuing injunctions.  You didn't want to do that

11   in the First DataBank discussion about enjoining the

12   marketplace, and I don't think you should do that here.

13         THE COURT:  Thank you.

14         So let me ask you this.  Who's from the Attorney

15   General's office?  Welcome.  Where are you from, Des Moines?

16         MR. BRAUCH:  I am from Des Moines.  I'm the

17   Director of the Consumer Protection Division there.  My name

18   is Bill Brauch, your Honor.

19         THE COURT:  Well, welcome to Boston.

20         MR. BRAUCH:  Thank you.

21         THE COURT:  So has the Attorney General ever sued

22   before to recoup damages to the state?

23         MR. BRAUCH:  Yes.  In the tobacco case in the mid

24   to late 1990s, the Attorney General's office filed a number

25   of claims against the tobacco companies, including consumer

1    fraud in Count 1 of the state's -- we call them petitions in

2    state court there.

3              THE COURT:  And it would be for harm that the state

4    suffered rather than as parens patriae for the citizens?

5              MR. BRAUCH:  Correct.

6              THE COURT:  And was there motion practice?

7              MR. BRAUCH:  There was motion practice.  In fact,

8    there is a ruling of the Iowa Supreme Court, but it does not

9    go to that issue.  There were other claims that were made

10   that were denied by the district court.  They were dismissed

11   by the district court.  That went up on appeal to the Iowa

12   Supreme Court, and the Supreme Court affirmed the dismissal

13   of those claims, but the consumer fraud claim remained.

14             THE COURT:  All right.  Was there a motion to

15   dismiss the consumer fraud claim?

16             MR. BRAUCH:  Yes, there was.  That was made at the

17   district court, and it was denied.

18             THE COURT:  The district court of the state of

19   Iowa?

20             MR. BRAUCH:  The state district court.

21             THE COURT:  And it was denied?

22             MR. BRAUCH:  Yes, your Honor.

23             THE COURT:  Is that the equivalent of our superior

24   court here, do you know, like the court of general trial

25   jurisdiction?

1          MR. BRAUCH:  Yes.

2          THE COURT:  Okay.  But that one was not appealed?

3          MR. BRAUCH:  Correct.

4          THE COURT:  And it's not a precedential opinion

5     that I can read or even an unpublished opinion?

6          MR. BRAUCH:  We could probably locate that trial

7     court opinion.

8          THE COURT:  That would be useful.  While it's not

9     precedential, it would be useful at least to know what the

10    thinking was on it.

11         So let me ask the second question:  Am I right to

12    say that there's no case on point?

13         MR. BRAUCH:  There is no reported case on point,

14    your Honor, but it is our position that the state can file an

15    action on behalf of the state.  In fact, in twenty-one years

16    doing this work at the Attorney General's office, my client

17    has always been the state of Iowa, not individual persons.

18    Every action we bring is on behalf of the state of Iowa.

19         THE COURT:  Although, you know, when I started

20    reading the cases you cited, true, but you tended to bring

21    them on behalf of consumers who were injured.  I mean, most

22    of those cases -- I was reading them this morning, you know,

23    trying to -- you know, they were -- the recovery may have

24    been to the state, but it was on behalf of, you know, natural

25    persons who were injured.

1          MR. BRAUCH:  That's not how we do it.

2          THE COURT:  All right, how do you do it?

3          MR. BRAUCH:  And how I view the Consumer Fraud Act

4    and how the rest of my staff does and the Attorney General

5    itself is, it is a tool there to prevent fraud and deception

6    in the marketplace.  When you read the statute and you go

7    right to the section which is the heart of the statute, which

8    is Subsection 2(a), it says the act, use, or employment by a

9    person in the marketplace of deception, unfair practices,

10   fraud, false pretense, misrepresentation, intentional

11   omissions, is unlawful if it's in connection with the sale,

12   lease, or advertisement of merchandise, whether in fact the

13   person is damaged.

14          It focuses on the actor.  It focuses on the action,

15   or in the case of omissions, lack of action.  It does not

16   focus on who the victim is.  It is what we refer to as a

17   civil law enforcement statute, and it's designed to prevent

18   fraud.

19          THE COURT:  I agree with that, and certainly the

20   Attorney General, as I read the statute, can seek injunctive

21   and equitable relief.  At the very least, you get to do

22   that.  But when it talks about injury to persons, I still

23   think I have to decide what "persons" means.  In terms of

24   monetary damages?

25          MR. BRAUCH:  Well, in addition to the injunctive

1   relief, there's also civil penalties.  That stands out

2   separately, as does the injunctive relief, as does the

3   restoration of moneys.

4        There are a couple of other types of relief we can

5   get.  One is costs and fees, if we prevail in an action.  And

6   there's also a provision, a general directive that says, "The

7   court may make orders or judgments as necessary to prevent

8   the use or employment by a person of any prohibited

9   practices."  All of that's consistent with being in equity,

10  and every action we file, according to Subsection 7, which is

11  the cause of action, is by equitable proceedings.

12       The language that they are challenging goes to one

13  aspect of the relief here and one only, and that has to do

14  with the ability to get damages for someone who is a victim.

15  And the language there talks about being able to restore to

16  any person in interest moneys or property that has been

17  obtained by the defendant through the unlawful practice.

18  "Persons in interest" is a phrase.  It does in fact employ

19  the use of the word "person."  We believe in fact it probably

20  is broader.  But we also believe, as you were stating, the

21  debate that you had in chambers about "includes" versus

22  "means," we believe that it is an all-inclusive definition;

23  and that in fact you take a look at the original definition

24  of "person" that's in the general section of the Code,

25  Section 4, which does include government and --

1        THE COURT:  Are there any Iowa cases defining the

2   word "include" in other contexts?  Have you looked for that?

3        MR. BRAUCH:  I did before this hearing.  I did not

4   find anything on that.

5        One thing that is telling here, and the defendants

6   have attempted to distinguish it, but I think it's important,

7   is the statement of the Iowa Supreme Court and the analysis

8   they did in the Santa Rosa case.

9        THE COURT:  I read that.  It was just so off point.

10       MR. BRAUCH:  Well, not really, in this sense:  It

11  had to do with an enacted appropriations bill that said, "The

12  expenditure of funds appropriated under this subsection is

13  contingent upon the receipt by the general fund of the state

14  of damages awarded to the state by a civil consumer fraud

15  judgment."

16       Now, the Iowa Supreme Court in Santa Rosa said,

17  "Attorney General, you can't take the money that was set

18  aside for consumers in this case and put it in that fund,"

19  even though it was under Section 714.16, the civil consumer

20  fraud law, because it was not damages awarded to the state;

21  it was damages awarded for consumers.  We have to presume,

22  under the rules of statutory construction, the legislature

23  meant something by saying "damages awarded to the state by

24  civil consumer fraud judgment."

25       THE COURT:  Well, how do things work there?  I

1    mean, in some states, when there's a parens patriae judgment

2    to the state, the state then redistributes it.  So, I mean,

3    it's hard to figure out whether -- when you're collecting

4    parens patriae, it's often the injury to the consumer rather

5    than the injury to the state, and it was hard for me to parse

6    what they were talking about there.

7              MR. BRAUCH:  Well, what they were talking about

8    there, according to the Supreme Court, was when damages are

9    awarded to the state as opposed to when they are awarded to

10   the state to distribute.  In every case they're awarded to

11   the state.  The consumers are not parties before the court.

12             THE COURT:  All right, so you're saying that that

13   is not a good distinction under your statute because --

14             MR. BRAUCH:  That's correct.

15             THE COURT:  Because you --

16             MR. BRAUCH:  And in fact the legislature had to

17   mean something here.

18             THE COURT:  One last thing is, is it true that your

19   statute is patterned after the Illinois statute?

20             MR. BRAUCH:  Well, there are a number -- the Iowa

21   Supreme Court has said Illinois was one of the models.  The

22   actual model for all of them is the Federal Trade Commission

23   Act, which was enacted in the early part of the last century

24   and then had provisions relating to deception and unfair

25   practices added to it.

abea5014-9fe5-400f-8e17-da5525717f42

1          THE COURT:  Well, how does the FTC define

2   "person"?  Do you know?

3          MR. BRAUCH:  I do not.  I do not know.  It is

4   modeled after the Illinois act, yes, and there are a few

5   other states that have statutes that they call consumer fraud

6   acts.  We call them all UDAP statutes generally, unfair and

7   deceptive acts and practices, but there is one model called

8   the Consumer Fraud Act model, and ours is one.  I believe

9   Delaware, New Jersey, Arizona, Illinois are all Consumer

10  Fraud Act model states.

11         THE COURT:  So say that again.  Delaware,

12  New Jersey --

13         MR. BRAUCH:  Delaware, New Jersey --

14         THE COURT:  Illinois.

15         MR. BRAUCH:  Illinois, Arizona, Iowa, and there may

16  be a couple of others out there.

17         THE COURT:  Do you have a False Claims Act statute

18  in Iowa?

19         MR. BRAUCH:  I believe that we do, yes.  We don't

20  generally use it in the context of work in my division.

21         THE COURT:  I see.  And is there any other statute

22  that includes the attorney being able to sue for things like

23  this?

24         MR. BRAUCH:  I'm not aware of it, but it is

25  important to note, this is a very broad statute.  We have a

1  couple of statutes that we enforce that are specifically for

2  losses incurred in connection with items purchased or

3  services purchased for personal, family, or household

4  purposes.  The Iowa Consumer Credit Code, Chapter 537, the

5  Door to Door Sales Act, Chapter 555(a), that we enforce, both

6  limit it to items purchased for personal, family, or

7  household purposes.  That's not the focus here.  That's not

8  referenced in this law and by omission.  This law is much

9  broader.  This covers the marketplace and intends to deter

10 deceptive and unfair conduct in the marketplace, and it does

11 not depend upon who the victim is.

12         THE COURT:  Not that it's dispositive here, but

13 most of the states that have been suing have been suing under

14 their False Claims Act statutes.  I mean, they pick up common

15 law fraud and the like.  But you're pressing forward under

16 this, as I understand it, exclusively, other than the common

17 law causes of action.

18         MR. BRAUCH:  That is correct.  Ms. Cicala might be

19 able to provide a little more information about their

20 analysis of false claims and whether that was --

21         THE COURT:  Well, it's quite clear you have a right

22 to sue for certain equitable relief.  I mean, really what

23 they're challenging is the right to -- for compensatory, as I

24 understand it.  So the real issue is, does your Supreme Court

25 take certification of questions?

1          MR. BRAUCH:  Yes.

2          THE COURT:  From Federal District Court judges?

3          MR. BRAUCH:  Yes.

4          THE COURT:  Some courts won't.

5          MR. BRAUCH:  Yes, they have in the past.  I haven't

6     seen that for quite a while, but --

7          THE COURT:  Have you thought about whether that

8     makes sense here?

9          MR. BRAUCH:  I think we can certainly be open to

10    that.

11         MS. CICALA:  We would have no objection whatsoever

12    to that approach, your Honor.

13         MR. JACKSON:  Your Honor, I personally on behalf of

14    Baxter, I'd like to obviously discuss the issue with the rest

15    of my colleagues, and we'll get to the state and get back to

16    you on that issue of certification.

17         THE COURT:  Let me just tell you what my sense is.

18    I looked up in the dictionary, not too brilliant, right, what

19    "include" means, and there's some ambiguity, but the primary

20    definition seems to be more open-ended.  And the Supreme

21    Court in Sutherland, in statutory construction and the like,

22    distinguished between what "means" means and what "includes"

23    means.  There was a recent case, Burgess V. United States in

24    2008, where they literally, the Supreme Court said, "The word

25    'includes' is usually a term of enlargement and not a term

1    of limitation," all right?  So it's obviously an incredibly

2    different statute in that light, but it's --

3            So the question that I really -- I'm thinking I'm

4    going to let this go forward, but I'm also thinking, as you

5    said, I'm a court sitting in diversity very far away from

6    Des Moines.  I'd hate to have everyone spend a fortune on

7    this case if I'm wrong.  And I think it's part of comity,

8    really, to let the Iowa Supreme Court be the one who decides,

9    but I'm willing to hear from you on it, whether you think

10   this makes sense or not.  And you should coordinate with your

11   folks and you with yours.  I mean, even without this, of

12   course, the AG -- we maybe don't need to do it at this stage

13   of the proceeding -- the Attorney General has the right to go

14   forward with equitable causes of action, and they have a

15   common law fraud, although that has a much tighter leash on

16   it as to what you have to prove.  And I think unjust

17   enrichment is an uncomfortable fit here, and I don't know

18   where I'll end up at the end of the day, whether I'd let

19   those go forward.

20           So what do you think makes sense, to get back to me

21   within, let's say, a week?

22           MR. JACKSON:  I think that would be fine, your

23   Honor.

24           THE COURT:  I know it's July 4.  Do you want to say

25   two weeks because a lot of people go away?  They may not be

1    thinking this on the beach. So just let me know what you

2    think of it, and maybe a model as to how judges in the past

3    have certified?

4              MR. JACKSON:  Will do.

5              MS. CICALA:  We can provide that, your Honor.

6              THE COURT:  I just think it's better justice where

7    there's no case law on point and what I actually probably

8    have is a plain reading of the statute which better favors

9    the Attorney General.  But my hesitation is, Illinois seems

10   to be going the other way, despite that one Federal District

11   Court thing, and apparently one court likes to model itself

12   after another.  So those point in different directions.  I'd

13   like to do that, but I'll hear from you, and if you all think

14   it's a terrible idea, I'll back down.  And even if we don't

15   do it now, we could do it later, you know.  But my view is,

16   we're probably seeing lots of possible expenses in

17   discovery.  I mean, why go forward really on --

18             MR. JACKSON:  Absolutely.

19             THE COURT:  You may not be able to prove reliance

20   and knowledge, and that may not be required under your

21   statute.  So if you're only going under common law fraud, the

22   case has a different value than it does under the broader

23   Unfair and Deceptive Trade Practices Act, so think about that

24   and let me know.

25             The one other area on the crosscutting that I

abea5014-9fe5-400f-8e17-da5525717f42

1  wanted to deal with was the issue of Federal Upper Limits.  I

2  understand it a little better now than I think -- who first

3  raised that?  Was it the New York case?  I said, "What on

4  earth are you talking about?"

5       MR. JACKSON:  That's correct.  Your Honor, John

6  Bueker is here, but as I understand it, under CMO 33, we are

7  closely, very rapidly getting to the end of fact discovery on

8  that FUL issue.  I think there will be experts and I think

9  there will be summary judgment motions soon-ish.  And it

10  seems to me that if that's true and the FUL is based upon the

11  lowest published price, then we should let that New York

12  litigation go to conclusion, and let's not spend time, money,

13  and effort litigating FUL here.

14       THE COURT:  You're the same lawyers in that case,

15  right?

16       MS. CICALA:  Yes, we are, your Honor.

17       THE COURT:  Is that satisfactory to you?

18       MS. CICALA:  It seems the efficient approach, and

19  Iowa has no objection to that approach.  I had a few remarks

20  on the --

21       THE COURT:  So I should reserve on FUL?

22       MS. CICALA:  Yes.  What your Honor did in the New

23  York case was deny the defendants' motion to dismiss the FUL

24  claims, and then entered CMO 33, which called for expedited

25  discovery on a handful of FUL-designated drugs.  And that's

1    the discovery which counsel is alluding to right now, which

2    is coming to a close on Monday, June 30.

3           THE COURT:  What I don't want to do is spend a ton

4    of money doing discovery on it in Iowa if I think it's not

5    going to fly.

6           MS. CICALA:  Understood, your Honor.

7           THE COURT:  So everyone's in agreement there.

8           The next issue I thought was a very good

9    suggestion, at least.  I don't know what your experts -- do

10   you have an expert sitting there that says that a 20 to

11   25 percent spread would be unconscionable?

12          MS. CICALA:  New York will be submitting expert

13   affidavits and documentary evidence in support to address

14   whether a 30 percent threshold is appropriate for the --

15          THE COURT:  Right, you're not bound by what

16   Dr. Hartman agreed on.

17          MS. CICALA:  We understand.

18          THE COURT:  That having been said, I heard such a

19   huge amount of evidence at the last trial that --

20          MS. CICALA:  I understand, your Honor, and there's

21   a slight frustration on our part because the time -- you

22   know, notwithstanding that defendants attached all that

23   extraneous material to their motions, which they should not

24   have done under the rules --

25          THE COURT:  I didn't read it, so don't worry about

1    it.  It was all I could do to get through the basic

2    arguments, so --

3            MS. CICALA:  There are contemporaneous materials

4    received by the state Medicaid agencies which counter the

5    sort of information the Court has seen thus far in the

6    context of the private class case.  We're eager to share that

7    information with your Honor --

8            THE COURT:  Sure.  I mean, you're not bound by it.

9    I'm just simply saying it was a very -- and in fairness to

10   them, though, in the interim what's happened -- you just

11   alerted me to the fact you know about it -- is this whole

12   case involving McKesson and First DataBank, which took me by

13   surprise, the unilateral jack-up of the 20 to 25.  So that's

14   something no one knew about or dreamed about.  In fact, it

15   happened after the case was filed.  So I don't know whether

16   at least by 5 percent it alters the equation, but I'm not

17   going to rule on it.  It's quite clear that everyone knew

18   that there was some markup.

19           MS. CICALA:  Yes, and Iowa has pleaded to that

20   effect, your Honor.  And the Iowa complaint also addresses

21   the McKesson First DataBank 5 percent markup in the context

22   of the Iowa AWP case, because your Honor is exactly right:

23   There's a nexus there, and there's a question how that

24   unilateral conduct impacts defendants' liability for that

25   percentage, if at all.

1          THE COURT:  It's, of course, more complicated than

2     that because at the time, as I'm sure you all know, some of

3     them were at 20 percent and some of them were at 25 percent.

4          MS. CICALA:  That's right.

5          THE COURT:  And then there was a unilateral markup

6     of the ones at 20 up to 25.  So while it may be relevant to

7     the McKesson case, it's not clear that that goes to

8     unconscionable conduct on the part of the manufacturer.  So,

9     I mean, it's just complicated.  I am not going to bar you.

10    I'm just simply saying, I think discovery should start at the

11    30 percent and up drugs.

12          And, also, it's going to be hard for you to

13    persuade me that the statute of limitations shouldn't at

14    least be 1997.

15          MS. CICALA:  Understood, your Honor.

16          THE COURT:  And so why don't we just --

17          MS. CICALA:  If I may, if I may?

18          THE COURT:  Yes.

19          MS. CICALA:  A few points, and I'm going to circle

20    back to the comment your Honor just made regarding the

21    statute of limitations, but I did want to be heard for just a

22    brief moment on the Iowa Consumer Fraud Act?

23          THE COURT:  Oh, all right.  I'm sorry.

24          MS. CICALA:  No, it's fine.  But, you know,

25    important to keep in mind that defendants' assault on that

1    particular claim is not on the claim as a whole, but is

2    rather, as your Honor did note, on the actual damages.  So

3    the claim may proceed generally.  The question would be, what

4    relief would be available at the end of the day?  There is no

5    statute of limitations running against -- the statute of

6    limitations cannot be invoked against the state under that

7    particular cause of action.

8              THE COURT:  It sounds sweet from your point of

9    view, right?  I never heard of a statute with no statute of

10   limitations.

11             MS. CICALA:  It is one of the aspects of the

12   statute that plaintiffs enjoy, your Honor, and it is a

13   critical point.

14             And then in addition --

15             THE COURT:  I would think so.

16             MS. CICALA:  And, indeed, the other critical points

17   are, where the allegation sounds in deception and unfair

18   practice --

19             THE COURT:  There must be something, though.  You

20   couldn't go back and sue on something in the 1950s, right?

21             MS. CICALA:  We needn't ask that question.

22             THE COURT:  All right.

23             MS. CICALA:  The other aspect, your Honor, where

24   the claim sounds in deception and unfair practices, as Iowa's

25   complaint does, there is no reliance requirement, as you

1    pointed out, there is no intent requirement, other aspects of

2    the statute that Iowa feels particularly important in light

3    of when they filed their case.

4            THE COURT:  In light of?

5            MS. CICALA:  In light of the timing of the action,

6    which has been alluded to by the Court and defendants here

7    today.

8            THE COURT:  You agree there's no statute of

9    limitations?

10           MS. CICALA:  It's not been briefed, your Honor, I

11   will say that.  We haven't litigated the point.  The

12   defendants have not raised it, and so we did not raise it,

13   but I agree that --

14           THE COURT:  Well, but it's relevant to me for case

15   management because I was going to cut it off; and if there's

16   no statute of limitations, there's no reason to do that.

17           MS. CICALA:  If I may conclude my remarks, with

18   regard to Illinois, what counsel said regarding oral argument

19   may in fact be true, but the issue of actual damages and

20   whether they were recoverable by the Illinois Attorney

21   General in the Illinois state AWP case was fully briefed.

22   And we can supply those briefs to the Court if you're

23   interested.  I think we have actually attached two of them to

24   our surreply.  So it may not have been part of the oral

25   argument, but it was squarely before the Court when the Court

1    issued its --

2              THE COURT:  You've already given them to me?

3              MS. CICALA:  Yes, we have.  They're exhibits to our

4    surreply.

5              THE COURT:  Thank you.

6              MS. CICALA:  Thank you.

7              THE COURT:  So at this point, unless you wanted a

8    brief reply, I think we need to get to the individual -- a

9    lot of people have come in from all over the country, so I

10   want to make sure I get to them.

11             MR. JACKSON:  That's fine, your Honor.

12             THE COURT:  By the way, realistically, I'm going to

13   have to go through this brief by brief by brief, so you've

14   briefed it, and I don't want anybody -- as soon as someone

15   starts rearguing one of these points, I'll tell them to sit

16   down.  So please just focus on your drug, your company.  Who

17   wants to start?

18             MS. TABACCHI:  I'll begin, your Honor.  Tina

19   Tabacchi on behalf of TAP.  I promise not to reargue, and I

20   will also promise to be brief.

21             Your Honor, we only have two drugs at issue in this

22   case, Lupron and Prevacid.  There is a 2001 settlement

23   agreement, your Honor, between TAP and the United States and

24   all fifty states, including the state of Iowa.  The goal of

25   that settlement agreement, your Honor, was to achieve

abea5014-9fe5-400f-8e17-da5525717f42

1    complete peace.  We achieved retrospective peace, your Honor,

2    with a release for all Lupron claims, and in fact in the

3    papers, Iowa has now conceded that they have no Lupron claims

4    through the date of the agreement, which is December 3,

5    2001.

6                We have achieved prospective peace, or we hoped to,

7    your Honor, through an agreement with the United States that

8    applies across the board, and it's been characterized in the

9    complaint as a sweeping corporate integrity agreement, where

10   TAP agreed to provide to the government any pricing

11   information it wanted.  And lest you think I'm about to step

12   outside of the complaint, your Honor, I'll refer you to

13   Paragraph 556 where the state of Iowa has alleged that the

14   corporate integrity agreement, TAP's corporate integrity

15   agreement, insures that TAP will report to the Medicare and

16   Medicaid programs the true average sale price for drugs

17   reimbursed by those programs.  That is both Lupron and

18   Prevacid, your Honor, the drugs in this case.

19               There is no allegation in the complaint, your

20   Honor, that TAP did not fulfill its obligations.  There is

21   no --

22               THE COURT:  So stop just so I understand.  So as I

23   understand it, is Prevacid included in the settlement

24   agreement?

25               MS. TABACCHI:  Your Honor, Prevacid is included

1    insofar as TAP's obligations to report pricing going

2    forward.  Prevacid was not released, there were no claims

3    with respect to Prevacid, so there's no release for Prevacid

4    going back in time.  But there is an obligation on behalf of

5    TAP to provide sales price information to the federal

6    government and all states, including Iowa, with respect to

7    Prevacid in addition to Lupron.

8            The state of Iowa has alleged that we've done

9    that.  They have not alleged that we have not done it

10   properly.  They have not alleged that the independent review

11   organization that reports to the OIG, who is charged with

12   auditing TAP, has found any problems, that they themselves

13   have ever asked any questions or found any problems with

14   those reports, your Honor.

15           THE COURT:  So are you pressing the TAP case?

16           MS. CICALA:  We're pressing it with regard to what

17   the significance of the ASPs are, your Honor.  The state of

18   Iowa's position is that TAP's provisions of the ASPs,

19   whatever they meant, in no way mooted TAP's obligations to

20   report accurate pricing to the government, particularly in

21   light of the 2003 OIG compliance requirement.

22           THE COURT:  Well, I thought that -- do you have any

23   allegations that the ASPs they're providing are inaccurate?

24           MS. CICALA:  No.  No, we do not, your Honor, nor do

25   we know yet what --

1        THE COURT:  So you're only looking for Prevacid for

2   2001 to whenever that agreement was?

3        MS. CICALA:  The state's position, your Honor, is

4   that there's a question of fact what Iowa should have done

5   with those ASPs and whether the ASPs relieved TAP of its

6   obligations otherwise to report accurate average wholesale

7   prices.

8        THE COURT:  Well, this is what I'm going to do:

9   I'm going to stay all discovery having to do with TAP.  I

10  think there's a really serious threshold issue there, and I'm

11  not sure we can do it on a motion to dismiss.

12       MS. CICALA:  I think there's a fact question --

13       THE COURT:  It sounds like a law question.

14       MS. CICALA:  Well, in the other cases where your

15  Honor has been presented with settlements where the

16  defendants have argued that they have preclusive effect based

17  on the provision of average sales prices going forward, the

18  Court has acknowledged it is a question of fact as to what

19  the payor should have been doing with those ASPs, whether

20  they should have imported them into their reimbursement

21  formula --

22       THE COURT:  Well, I don't remember, but we're going

23  to stay all discovery having to do with TAP until I work out

24  that issue.  Maybe you're right.  I don't remember.  You

25  know, I've been doing this case now for seven years.

1          MS. CICALA:  Fair enough.

2          THE COURT:  And settlements come in at different

3    times.  So what you're saying is, as soon as Prevacid was

4    launched, you started providing ASPs?

5          MS. TABACCHI:  No, your Honor.  We provided ASPs

6    for the fourth quarter of 2001 going forward.  There was a

7    release up to 2001 for Lupron.  There's no release for

8    Prevacid before 2001.

9          THE COURT:  So was there like three months of

10   liability in there or something like that?

11         MS. TABACCHI:  Well, we don't believe there's any

12   liability, your Honor.  We have 90 percent of our sales at

13   WAC, but that's not an issue I'll trouble you with here on a

14   motion to dismiss.

15         THE COURT:  Well, let's figure out the settlement

16   thing.  So it sounds like the primary one would be Prevacid,

17   right?

18         MS. TABACCHI:  Your Honor, all claims with respect

19   to Lupron should be out of the case.  We also have argued in

20   our papers that Judge Stearns entered a class settlement

21   agreement in 2005, and the state of Iowa did not opt out of

22   that settlement.  So for that additional reason, there's

23   another release that goes through 2005.

24         THE COURT:  I think you've got big problems on

25   Lupron.  That's been litigated to death.  On Prevacid, there

1    may be a window of time before the ASPs were turned over but

2    you launched it where there may be a problem.

3            MS. CICALA:  If your Honor were inclined at this

4    point to stay discovery as to TAP on the basis of the ASPs, I

5    would still maintain, just as your Honor has pointed out,

6    that there's no release as to any claims other than Lupron

7    and any claims in that 2001 settlement.  So those claims, at

8    least at a minimum, should be allowed to proceed.

9            THE COURT:  But as soon as the ASPs are disclosed,

10   you've got the difficult case --

11           MS. CICALA:  Possibly, your Honor, possibly.

12           THE COURT:  -- as far as deception or unfairness or

13   anything.  And the whole world knew at some point,

14   literally.  Congress passed a bill in 2003.

15           MS. CICALA:  Right, correct.

16           THE COURT:  So I don't know why Iowa didn't change

17   its standard.  But, in any event, you've got big problems

18   going forward.

19           So why don't I refine what I just said.  I'm going

20   to ban all discovery, anything having to do with Lupron.  You

21   know what?  This takes forever for me.  I don't want to do

22   this, I don't want to spend my time on Lupron if there's a

23   good-faith settlement claim.  So I want you to think

24   seriously about whether you want to press it because it's

25   going to stay stayed until.

1          Now, on Prevacid, there is a window there.  There

2    is a window on Prevacid, so I won't stay discovery on

3    Prevacid before you started providing the ASPs.  I think

4    that's a better refinement, okay?

5          MS. TABACCHI:  Very good.  Thank you, your Honor.

6          MS. CICALA:  Thank you, your Honor.

7          THE COURT:  What's the next one?

8          MS. AOYAGI:  My name is Melissa Aoyagi.  I'm from

9    law firm of Davis Polk & Wardwell on behalf of AstraZeneca,

10   and I apologize for interjecting, but as our motion is

11   somewhat related to TAP's motion, I thought now would be an

12   appropriate time to address our papers.

13         THE COURT:  Okay.

14         MS. AOYAGI:  We similarly have a settlement

15   agreement that's dated in 2003.  We also have a corporate

16   integrity agreement, and our settlement agreement, again, is

17   with the state of Iowa dated September 4, 2003.  As of

18   quarter three, 2003, AstraZeneca was reporting ASPs on the

19   drug, for which we moved to dismiss, Zoladex, with which your

20   Honor is aware.

21         THE COURT:  Oh, Zoladex.

22         MS. AOYAGI:  It sounds like you're quite familiar.

23   And we would ask for similar relief from the Court.

24         THE COURT:  But that only starts in 2003, right?

25         MS. AOYAGI:  Correct.  The state has already

1    conceded that it has no Zoladex claims predating the

2    settlement agreement for anything predating --

3              THE COURT:  So is this just barred as well?

4              MS. CICALA:  Well, given your Honor's ruling

5    moments ago with regard to the provision of ASPs, then

6    perhaps we're looking at another stay at a minimum with

7    regard to the Zoladex claim.

8              THE COURT:  Yes, stay on Zoladex.  And is there

9    another?  And what other drugs do you have?

10             MS. CICALA:  Well, there are other AstraZeneca

11   drugs at issue in the Iowa case that are not covered in any

12   way by the Zoladex settlement, nor do I understand --

13             THE COURT:  So you're only talking Zoladex?

14             MS. AOYAGI:  Correct.  We obviously join in the

15   joint motion.

16             THE COURT:  Sure.  Good, okay, everything with

17   respect to Zoladex is stayed.

18             MS. AOYAGI:  Thank you, your Honor.

19             MR. DAVIS:  Good afternoon, your Honor.  William

20   Davis for Eli Lilly.  One narrow issue:  With respect to your

21   instructions to plaintiff's counsel previously that the

22   prices alleged should be typical or median, they alleged a

23   13-day period is the only drug we had over 30 percent in this

24   case.  I just want some guidance from the Court that where

25   you cherry-pick 13 days out of more than a decade of data,

1   that's not a good-faith attempt at a typical or median

2   price --

3            THE COURT:  Is that one of your drugs or all of

4   your drugs?

5            MR. DAVIS:  The only drug in this case in their

6   exhibit that's over 30 percent is the one they cherry-picked

7   13 days, and so --

8            THE COURT:  And everything else is under

9   30 percent?

10           MR. DAVIS:  Everything else is under and --

11           THE COURT:  Well, why don't we do this:  We're

12  going to include that in the stay until they present evidence

13  to me that under 30 percent is unfair, deceptive, or

14  whatever; but it's without prejudice to that being reopened

15  because --

16           MR. DAVIS:  Thank you, your Honor.

17           THE COURT:  Fine.

18           MS. CICALA:  Your Honor, in our surreply opposition

19  to Eli Lilly's motion, we supplied the Court with an exhibit

20  that provided longer periods of time spreads for the Lilly --

21           THE COURT:  Like how long?

22           MS. CICALA:  A quarter, your Honor.

23           THE COURT:  Excuse me?

24           MS. CICALA:  A quarter.

25           THE COURT:  One quarter where it went to where?

Page 44

1        MS. CICALA:  One quarter . . . well, your Honor --
2        THE COURT:  In other words, Johnson & Johnson -- I
3    mean, I have to inform myself based on it -- there were
4    certain quarters where they went to 31 percent or something.
5        MS. CICALA:  We have dozens of Lilly drugs in our
6    case, your Honor, and we have dozens of spreads over
7    30 percent for the Lilly drugs, so I don't want the Court to
8    have a misimpression with regard to --
9        THE COURT:  You're only talking about one drug,
10   right?
11       MR. DAVIS:  Your Honor, there's a misunderstanding
12   there.  They're talking about a new proposed exhibit in a
13   surreply, not the complaint.  This is something they're
14   saying if you wanted to let them amend.
15       THE COURT:  Hold it, hold it, chill.  How many
16   drugs are we talking about from your point of view?
17       MS. CICALA:  There are approximately fifteen Lilly
18   drugs at issue in the Iowa case.
19       THE COURT:  Have you put those in the complaint?
20       MS. CICALA:  Yes, we have, your Honor.
21       THE COURT:  All right, so where?
22       MS. CICALA:  It's in Exhibit B.
23       THE COURT:  Okay, I've got it.  I brought this here
24   because I --
25       MR. DAVIS:  I've got the exhibit, your Honor.

abea5014-9fe5-400f-8e17-da5525717f42

1        MS. CICALA:  Your Honor --

2        THE COURT:  Hold on.  Let her show me.  It's her

3   complaint.

4        MS. CICALA:  Your Honor, our Lilly exhibit in the

5   complaint that we filed addresses four Lilly drugs.  Counsel

6   is exactly correct that only one of them has a spread over

7   30 percent.

8        THE COURT:  I'm not sure I even see the Lilly.

9   Okay, there we are.  So --

10       MR. DAVIS:  It's Exhibit B-12, your Honor.

11       THE COURT:  And is that the Humalog?

12       MR. DAVIS:  Yes, your Honor, Humalog.

13       THE COURT:  Humalog?  What is that?

14       MR. DAVIS:  It's an insulin drug.

15       THE COURT:  And that goes to 38 percent, and they

16   say only for a few days, is that right?

17       MS. CICALA:  Yes.  Counsel is absolutely right,

18   your Honor, absolutely right, your Honor.

19       THE COURT:  So that's all we've got.

20       MS. CICALA:  Well, that's all we had, your Honor.

21       THE COURT:  No, no, you can't amend through a

22   surreply.

23       MS. CICALA:  No, no, we're not seeking to amend

24   through a surreply, your Honor.  We're seeking to respond to

25   defendants' arguments that the claim should be dismissed for

1    the drug by demonstrating --

2            THE COURT:  Hold on, hold on.  We're not dismissing

3    anything.  I'm staying it until you come up with some

4    evidence as to why it would be unfair and unconscionable

5    within that yardstick that Hartman -- I'm not dismissing it.

6    I'm just staying it.

7            MS. CICALA:  Now, your Honor, may I ask the Court's

8    position.  In the light of the additional discovery that we

9    now obtained, we're able to plead longer spreads for these

10   Lilly products, which is in fact the case.  We have spreads

11   now of at least a quarter for the Lilly products, and the

12   chart we attached to our surreply --

13           THE COURT:  I know, but all I've got is this.

14           MS. CICALA:  Indeed, your Honor, so we could file a

15   motion for leave to amend our Lilly exhibit to include the

16   additional drugs.

17           THE COURT:  Maybe, but right now this is what I've

18   got, all right?

19           MS. CICALA:  Okay, fair enough, your Honor.

20           THE COURT:  All right, so what's the next one?

21           MR. SMITH:  Your Honor, Jacques Smith for Chiron.

22   We have a similar situation to the Lilly spread.  We're left

23   with two drugs now, Exhibit B-10, Page 132.  The spreads on

24   our drugs are 26 percent and 27 percent.  There was a

25   four-month period that was cherry-picked that exceeds

1  30 percent, 30.48 percent, your Honor, so we'd ask for a stay

2  as well.

3          THE COURT:  Allowed.

4          MR. SMITH:  Thank you, your Honor.

5          MS. SMITH-KLOCEK:  Your Honor, Erica Smith-Klocek

6  for Pfizer.  I just want to make two very brief points.  One

7  is, there has been some discussion about the Illinois case

8  and the Illinois decision.  Pfizer was dismissed from

9  Illinois because the state acknowledged that it could not

10 plead that Pfizer either reported, set, or established an

11 AWP.  Instead, all the state can say is that Pfizer reported

12 a WAC to First DataBank.  And to the extent that the state is

13 relying on a theory of WAC fraud, Pfizer asserts that the

14 complaint needs to set forth all elements of fraud as to WAC,

15 which the current complaint does not.  In Exhibit B there are

16 no allegations as far as which WACs were fraudulent or how

17 much they were inflated, and there's also no allegations as

18 far as whether Pfizer --

19         THE COURT:  So Pfizer doesn't report an AWP?

20         MS. SMITH-KLOCEK:  That's correct, your Honor.

21         THE COURT:  But it does report a WAC?

22         MS. SMITH-KLOCEK:  That's correct.

23         THE COURT:  Well, let me just ask you this.  I

24 mean, obviously I've learned a lot in seven years.  There are

25 many companies that only report a WAC but know that they're

1   typically marked up 20 to 25 percent by the publishing

2   companies.  Is that what happened to your company?

3           MS. SMITH-KLOCEK:  Well, your Honor, if that is the

4   theory on fraud, that Pfizer is somehow on the hook for fraud

5   because if it new that First DataBank was marking up by

6   25 percent, then in the complaint they need to allege that

7   there was some duty to bring this to Iowa's attention,

8   because for fraud, if the misrepresentation is by omission,

9   there needs to be a duty to report that, and there's no such

10  allegation in the complaint.

11          THE COURT:  Let me just say this:  You have not

12  pled a fraudulent WAC with respect to Pfizer.

13          MS. CICALA:  No, your Honor, nor should we have.

14  What we pled, your Honor, is that all the recorded prices the

15  defendants submit to the publishing compendia that are at

16  issue in this case were inflated.  Iowa reimburses on the

17  basis of the lower of AWP, usual and customary, SMAC, and

18  FUL.  We have included in Exhibit B fraudulent AWPs for every

19  one of the Pfizer drugs that are at issue in this case.  Your

20  Court's prior rulings make plain, particularly on the brand

21  side, given the formulaic relationship between WAC and AWP,

22  this is what the pleadings should look like to satisfy 9(b).

23          Obviously, from your Honor's experience in the

24  class trial, looking at BMS, just to cite one example, BMS

25  submitted a list price or a direct price with the knowledge

1    that it would be marked up.  Everyone knew that, including

2    Pfizer.  So that is the approach Iowa took in light of your

3    Honor's past rulings.

4            THE COURT:  I think your argument is more

5    appropriately dealt with not on a motion to dismiss but on a

6    motion for summary judgment.

7            MS. SMITH-KLOCEK:  Your Honor, thank you, but we

8    are just requesting that the elements of fraud be pleaded as

9    to the WAC, so --

10           THE COURT:  All right, thank you.

11           How many people need to speak still?  About two or

12    three, is that it?

13           MR. YOUNG:  Your Honor, Hank Young on behalf of

14    Amgen.  Amgen's motion is limited to dismissal of claims with

15    respect to one product only, Epogen, which is a product that

16    the state in its papers acknowledges in the ESRD and chronic

17    kidney disease market, the treatment of those two conditions

18    is reimbursed not based upon AWP but based upon a statutory

19    rate set by the federal government.

20           There are really just two simple parts to this:

21    One is, the Iowa regulation is set forth in our papers, but

22    the regulation, and I don't think there's any dispute about

23    this, states that for products or services provided in

24    treatment of chronic kidney disease, you look to how it's

25    reimbursed under Medicare rather than the typically

1    applicable state Medicaid regulations.  The Court may recall

2    from the MDL class cases that with respect to Epogen, there

3    is a specific statutory rate under Medicare Part B of $10 per

4    1,000 units.  It's not based upon AWP at all but based upon

5    that statutory rate.

6           The second part of this argument or the second

7    piece of it then has to do with what Amgen's market is for

8    Epogen.  And, again, as the Court may recall from the

9    Track One case, Johnson & Johnson and Amgen had sort of split

10   it, and Amgen has retained the chronic disease/ESRD side, and

11   Johnson & Johnson Ortho has the everything else, which are

12   the uses that the state identifies in its papers as possibly

13   being reimbursed under AWP.  So they're separated out at that

14   point.

15          You put the two pieces together, the Epogen part of

16   the puzzle is not being reimbursed based upon AWP but is

17   being reimbursed based upon that federal statutory rate.  It

18   really doesn't have any role or function in this case.

19          THE COURT:  So AWP has nothing to do with it or

20   WAC?

21          MR. YOUNG:  Correct, for the reimbursement.

22   Reimbursement is based solely on that $10 per 1,000 units.

23          THE COURT:  Is that true?

24          MS. CICALA:  When Epogen is used in connection with

25   chronic renal disease, your Honor, that's absolutely true.

1    That's not in dispute.  Iowa agrees with counsel.

2              However, the Iowa claims data shows that Epogen is

3    reimbursed on occasion by Iowa Medicaid on the basis of AWP.

4    I cannot at this time explain when that occurs or why that

5    occurs, but it does occur.  Iowa Medicaid does reimburse for

6    Epogen on the basis of AWP on occasion outside of the chronic

7    renal context, obviously.

8              THE COURT:  One thing that's ringing a bell, that

9    even though there was this market division, they sometimes

10   competed in one another's markets.

11             MS. CICALA:  That's right, your Honor.  That's

12   right.

13             THE COURT:  But is it so random that it's worth the

14   effort?  How much money is involved?

15             MS. CICALA:  Enough money that it is worth the

16   effort at this stage, your Honor.

17             THE COURT:  So what do you say to that?  I mean --

18   you know, the truth is, we'll carve off the renal care.

19             MS. CICALA:  Right.  We're not seeking damages in

20   connection with the expenditures made by the state of Iowa

21   when Epogen was used for chronic renal disease.  We agree

22   with that.  The statute says what it says regarding how those

23   reimbursements are to be calculated.  Our point is simply

24   that it appears in the claims data on the basis of AWP on

25   occasion, and to the extent it does and we've alleged the

1    AWPs were inflated and caused an overpayment, we think it's

2    appropriately in the case.

3          MR. YOUNG:  My response, your Honor, is that it's

4    nowhere alleged in the complaint.  And if we're talking about

5    some de minimis amount, which is, from what I hear, on

6    occasion, the bang is not worth the buck, and we have to go

7    through discovery on that drug.  And it's a significant drug.

8    The Court may recall that for Amgen --

9          THE COURT:  There's nothing I can do at this point

10   if some of it was reimbursed based on AWP.  I mean, I know

11   that drug because, you probably don't know this, but I had

12   the patent case on that drug in 1986.

13         MR. YOUNG:  I did know that.

14         THE COURT:  Did you know that?  I know all about

15   Epo.  But that having been said, there's nothing I can do on

16   a pleadings stage.  If she says that some was reimbursed at

17   AWP, she's given the number and it's way above it -- I mean,

18   maybe that's something that the two of you can carve off and

19   either figure out an expedited way of resolving it or

20   settling it if it's really not big money.  It may not be

21   worth the discovery cost.

22         MR. YOUNG:  But as I understand, the Court's ruling

23   would, though, include carving out that part that's related

24   to the renal disease?

25         THE COURT:  Absolutely, you're absolutely right on

1   that.

2           MS. CICALA:  And, your Honor, we can style it

3   however the Court wishes.  It's not a carve-out.  We're not

4   seeking damages for those payments in our case.  So that the

5   record is clear, we're only seeking damages in connection

6   with the AWP-based reimbursements for Epogen.

7           THE COURT:  Okay.

8           MR. YOUNG:  And I guess by extension then, there

9   shouldn't be discovery with respect to the marketing.

10          THE COURT:  Absolutely not, not with respect to the

11   renal care.

12          All right, who else?

13          MR. MELAUGH:  David Melaugh for Purdue, your

14   Honor.  We're content to rest on our papers.

15          THE COURT:  Okay.  Am I that scary, or is it just

16   everyone's getting tired?  All right.

17          MR. MELAUGH:  Not at all, your Honor.

18          MR. STERN:  I wish I could make the Court that

19   happy, your Honor.  Jonathan Stern for Endo Pharmaceuticals.

20   Your Honor, we raised two arguments in our individual motion

21   to dismiss.  I would ask to submit on the second argument,

22   which has to do with Rule 9(b).  The Court, I'm sure, will

23   address those --

24          THE COURT:  Tell me what it is.

25          MR. STERN:  Our argument, your Honor, is that the

1    state has failed to plead with specificity the false WAC that

2    they allege that we have reported.

3              THE COURT:  So that's similar to Pfizer, right?

4              MR. STERN:  In part, your Honor.  The allegation

5    against Endo is that false WACs were reported, not that false

6    AWPs were reported.  I understand the state's theory on

7    that.

8              THE COURT:  Oh, I see.  All right, all right, it's

9    the same thing then.  Okay.

10             MR. STERN:  I believe it is, your Honor.  The only

11   distinction between Endo and the other companies is that with

12   respect to all of the other defendants, the state did allege

13   at least one specific fraudulent AWP in the body of the

14   complaint.  They didn't do that with Endo.  I really am

15   submitting on papers, however.

16             THE COURT:  Okay.

17             MR. STERN:  I would like to address the other

18   argument that we made, but I do that with some trepidation,

19   your Honor, because it does relate to the Federal Upper

20   Limit.  I endorse Mr. Jackson's agreement with the Court's

21   proposal that the joint defendants' arguments be deferred.

22   I'm familiar, of course, with the Court's order in the

23   counties case and the mechanism for dealing with FUL

24   arguments in that case.  All of that --

25             THE COURT:  It's a excellent pun.

Page 55

1        MR. STERN:  I'm sorry, your Honor?

2        THE COURT:  It's a good pun.

3        MR. STERN:  Not intended, your Honor.  All of that

4   said, it's our respectful submission that the FUL, or F-U-L

5   for our Court Reporter, that the FUL issue that we've raised

6   in our individual submission is a pleading issue, and I'd ask

7   the Court's indulgence to address it for just a few minutes,

8   if I could.

9        THE COURT:  Okay.

10        MR. STERN:  Your Honor, the state alleges FUL fraud

11   generally as to twenty-three Endo NDCs which represent twelve

12   drugs.  And as the Court knows, through Exhibit A, the state

13   has pled FUL fraud by NDC.  So we start with that universe of

14   NDCs and drugs.

15        THE COURT:  Exhibit A or Exhibit B?

16        MR. STERN:  Well, your Honor, Exhibit A is the list

17   of companies that just identifies by a number how many NDCs

18   are the subject of FUL fraud allegations.

19        Your Honor, it's our submission that in order to

20   properly state a claim for FUL fraud, the state has to allege

21   facts sufficient to show that if Endo had reported a

22   so-called "true price," that that price would have affected

23   the FUL.  And I'm not hear venturing into the morass of the

24   other issues that are related to that concept, but as a

25   matter of law -- and I don't think this is in dispute -- that

abea5014-9fe5-400f-8e17-da5525717f42

1    in order to state a claim for FUL fraud, the state has to

2    allege facts sufficient to believe that if Endo had published

3    a so-called "true price," it would have affected the FUL.

4    The Court has acknowledged as much in its July 30 order.  The

5    complaint acknowledges as much.  We respectfully submit

6    that's clear.

7                THE COURT:  Which one is my July 30 order?

8                MR. STERN:  I'm sorry, your Honor.  That is the --

9                THE COURT:  Do you know how --

10               MR. STERN:  I apologize, your Honor.

11               THE COURT:  Do you know, the biggest challenge for

12   the Federal Court right now is, we're trying to disaggregate

13   this docket, people will be happy to know, so someone can

14   find things that relate to the other things in like the New

15   York case or the Iowa case.  We are trying to disaggregate

16   because it's now unusable.  So all I'm saying is, I don't

17   remember what the July 30 order is.

18               MR. STERN:  This is the order in which the Court,

19   as Ms. Cicala earlier alluded, denied the defendants' motion

20   in the counties case with respect to FUL fraud, and deferred

21   further consideration of those issues pending the discovery

22   period that the Court has ordered on a limited number of --

23               THE COURT:  My problem is, I don't understand FUL

24   well enough even to evaluate the particularity question, so

25   maybe what I should just do is defer deciding your issue

1    until I've seen it vetted through New York.

2              MR. STERN:  Can I give it a try, your Honor, since

3    this particular issue was not raised in New York.  And if I

4    fail, I will fail.  Your Honor, I start with the proposition

5    that I did that I don't think is disputed.  The next step in

6    the analysis is that in order to plead that the FUL would

7    have been affected by a given Endo price, the state has to

8    allege that that price was eligible to affect the FUL, and

9    the question whether a given price is eligible to affect the

10   FUL is the question whether the drug associated with that NDC

11   meets the requirements of 42 CFR 331.  And that's a fairly

12   simple regulation.  Again, it's a matter of law, your

13   Honor -- I don't believe it's in dispute -- that in order for

14   a drug, or an NDC related to a drug, to affect the FUL, to be

15   eligible to set the FUL, that drug has to, A, be a

16   therapeutic equivalent, and, B, be sold in quantities of 100,

17   or if not in 100, the commonly available packet size.  I'd

18   like to focus on the first of those two elements, your

19   Honor.  The definition of what --

20             THE COURT:  You attach that whole like a memo that

21   goes through hundreds of drugs and what are therapeutic

22   equivalents, right?  Is that what you're saying?

23             MR. STERN:  Yes, your Honor, that's the Orange

24   Book.

25             THE COURT:  Yes, the Orange Book.

1           MR. STERN:  That's right, and the Court anticipates

2      where I'm going next, which is to say that whether or not a

3      given drug counts as a therapeutic equivalent and is

4      therefore -- at least that's a necessary, if not sufficient,

5      condition to be eligible to set the FUL, in order for that

6      drug to count, it has to be evaluated as a therapeutic

7      equivalent in the Orange Book.  That means --

8           THE COURT:  Okay, so before I go through, I read

9      that actually.  I tried to read it.  I thought that the

10     Red Book and the Blue Book --

11          MR. STERN:  These are our colors, your Honor.

12          THE COURT:  -- and now I know about the Orange

13     Book.  So let me just, so this isn't an academic exercise,

14     are there some in there that you say aren't?

15          MR. STERN:  Yes, your Honor.  It's not an academic

16     exercise.

17          THE COURT:  So are all of yours -- how many drugs

18     do you have at stake, ballpark, ballpark?

19          MR. STERN:  We have for FUL fraud, your Honor,

20     twelve drugs, twenty-three NDCs.

21          THE COURT:  So how many of those do you say

22     aren't?

23          MR. STERN:  I'm looking for my list, your Honor.  I

24     can tell the Court from my memory that of the -- now I'll

25     look at my notes -- of the twelve drugs, twenty-three NDCs,

1    there are only two drugs with one NDC apiece that are in the

2    current publicly available Orange Book dated December 1,

3    2007, as supplemented by the May, 2008 supplement.

4            THE COURT:  So you think you can narrow this case

5    down in a pretty quick way to the two drugs?

6            MR. STERN:  Well, two points, your Honor.  First,

7    with respect to FUL fraud allegations -- and there are other

8    allegations against Endo.  We've asked for those claims to be

9    dismissed, both through our joinder in the joint motion and

10   the rest of our individual motion, but with respect to FUL

11   fraud allegations, your Honor, to flesh that out just a

12   little bit, we start again with twenty-three NDCs, twelve

13   drugs on this FUL fraud list.  There are five drugs, eight

14   NDCs, that are listed in the Orange Book as discontinued.

15   They're not listed as therapeutic equivalents.  They're

16   listed as discontinued.  I'm --

17           THE COURT:  How can I do this on a motion to

18   dismiss?

19           MR. STERN:  Your Honor, here's how the Court can do

20   it on a motion to dismiss:  I don't believe it's necessary

21   for the Court to make findings or reach conclusions.

22           THE COURT:  You know what, if I have them amend,

23   then I have a new motion to dismiss.  It's paperwork.  What I

24   want you to do is, you list the ones that you think aren't

25   eligible, and I'll do like what I did with these settlements,

1   because I don't want to go through the motion to amend, and

2   then there's an opposition, and I get a thousand new

3   pleadings, and now we're up to eight thousand docket things.

4   So what I want you to do is, you tell them what you think

5   isn't listed.

6           You check.  And I don't want to go through -- I

7   have too much to do, you know.  So if they're not in there,

8   you don't want to spin your heels on it either.

9           MS. CICALA:  Obviously, your Honor, and I think

10  this is a tempest in a teapot, but --

11          THE COURT:  Why is it a tempest in a teapot?  If

12  they're not there, they're not there.  It should be a matter

13  of going through like this.

14          MS. CICALA:  Because, your Honor, we've got

15  twenty-three NDCs subject to FUL fraud in the complaint, not

16  twenty, first of all.  We've got allegations -- the 100-count

17  package size is represented by sixteen of the twenty-three,

18  so the numbers that are being thrown out here are simply

19  inaccurate.

20          THE COURT:  Right, he's not pressing it.  He's

21  pressing therapeutic equivalent.

22          MS. CICALA:  Fair enough, your Honor.  Obviously,

23  if the drug is subject to a FUL, it's a therapeutic

24  equivalent, so there's a certain typology there.

25          MR. STERN:  We disagree with that, your Honor.

1    It's our submission that whether or not it's a therapeutic

2    equivalent for purposes of these allegations is a question of

3    whether or not it's evaluated as a therapeutic equivalent in

4    the Orange Book.  That's what the regulation says.

5              THE COURT:  Yes, but let me put it this way:  This

6    is why I wanted to have this briefed first.  I don't really

7    have this in my gut, all right?  You know, no one did.

8    Truthfully, the only solace I have that I didn't get it is, I

9    think not one attorney in this room understood it, and we

10   basically all came up with this alternative way of actually

11   trying to figure out what it was and how it applied.  If

12   you've got something where, slam dunk, they're wrong, file a

13   motion to strike those particular drugs, rather than have me

14   go through the whole motion to amend, and then I have another

15   set of these things or something like that.

16             And then you look in good faith under Rule 11 and

17   work it out.

18             MS. CICALA:  Absolutely, your Honor.

19             THE COURT:  I think that's a good solution.  And

20   then you may agree to disagree, and then I'll fully take it

21   up once I understand it a little better.

22             MR. STERN:  That's fine, your Honor, and I

23   appreciate the Court's directing what is an eminently

24   practical solution.  We cast our argument this way so that it

25   would be appropriately cast for the pleadings stage, but

1    we're certainly prepared, both through informal and formal

2    means, to try to work this out, your Honor.

3              THE COURT:  Because they have specifically alleged

4    what the drug is and what is subject to the FUL.  You're

5    essentially saying they've made mistakes, and I think this is

6    such a massive case, they don't need to be spending the money

7    on stuff that's going nowhere as well.  And I'm sure they

8    have made some mistakes.  I mean, it's just too huge.  So you

9    just communicate and try and work that out.  Otherwise, I'll

10   reserve the thing until I've understood it a little bit

11   better.

12             MR. STERN:  Understood, your Honor.

13             THE COURT:  All right, thank you very much.  Is

14   this it?  We're all done?  Now, let's talk.  I haven't set a

15   scheduling conference yet, have I?

16             MS. CICALA:  No, you haven't, your Honor.

17             THE COURT:  Have you talked with one another about

18   what makes sense here?

19             MR. JACKSON:  No, your Honor.

20             THE COURT:  Well, we could do one of two things:

21   You could go out and propose one jointly, or I could set one,

22   and then you could --

23             MR. JACKSON:  I might suggest maybe we'd get

24   together in the same two-week period of time, and we'll see

25   if we can propose something jointly.

Page 63

1          THE COURT:  Does that make some sense?

2          MS. CICALA:  Yes.  Yes, it does, your Honor.  I was

3    interested in falling lockstep in with the other government

4    cases so the case is not lagging behind; and if Iowa can

5    avail itself to the discovery that's been had in the other

6    cases in the MDL, then there's no reason for this case to lag

7    on a slower schedule than anything else your Honor is hearing

8    on the Medicaid front.

9          THE COURT:  Okay.  I mean, my goal eventually, you

10   know, I've been remanding cases where possible.  So Utah just

11   went home.  I'm eager to get all these cases to a place where

12   they're either settled or back in the home district.

13         MS. CICALA:  Well, our understanding, your Honor,

14   is we're here for --

15         THE COURT:  For trial.  In other words, I'm not

16   going to try these.

17         MS. CICALA:  No.  Iowa filed in Federal Court, and

18   we're here for pretrial purposes, and we look forward to

19   going back to Iowa to try the case in front of an Iowa jury.

20         THE COURT:  I couldn't agree more.  So you two work

21   on a case management order.  Do you want to say by July 15

22   you come up with a --

23         MS. CICALA:  Your Honor, if we could roll it a bit,

24   I have some time scheduled in July that I'd rather my

25   family --

1          THE COURT:  You don't want to do this on the beach?

2          MS. CICALA:  For the happiness of my family, if we

3     can put it to the end of July.

4          THE COURT:  The 22nd?

5          MS. CICALA:  I would appreciate that, your Honor.

6          THE COURT:  Okay, the 22nd, just come up with a

7     joint case management order.  Now, let me go off the record

8     for a minute.

9          (Discussion off the record.)

10         THE COURT:  Have a nice summer, and if there's a

11    difference of opinion on case management orders -- have we

12    followed this protocol before? -- you'll put your version in

13    brackets, and you'll put yours in parentheses, and then I'll

14    just sort of pick and choose.

15         MS. CICALA:  Yes, your Honor.

16         THE COURT:  Great.  Have a wonderful summer.

17         MR. JACKSON:  Thank you, your Honor.

18         (Adjourned, 3:50 p.m.)

19

20

21

22

23

24

25

1                 C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 64 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13  Industry Average Wholesale Price Litigation, and thereafter

14  by me reduced to typewriting and is a true and accurate

15  record of the proceedings.

16           In witness whereof I have hereunto set my hand this

17  30th day of June, 2008.

18

19

20

21               /s/ Lee A. Marzilli
                 _____
22               LEE A. MARZILLI, CRR
                 OFFICIAL FEDERAL COURT REPORTER
23

24

25