# UNITED STATES' SUR-REPLY TO ABBOTT'S REPLY TO THE UNITED STATES' OPPOSITION TO ABBOTT'S MOTION TO ENFORCE

## "EXHIBIT 1"

Page 1

IN THE UNITED STATES

DISTRICT OF MASSACHUSETTS


IN RE:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                ) MDL No. 1456

                                ) Civil Action No.

THIS DOCUMENT RELATES TO:       ) 01-CV-12257-PBS

                                )

ALL CASES                       )

                                ) Judge Patti B. Saris

**************************************************

ORAL AND VIDEOTAPED DEPOSITION

OF RICHARD A. GONZALEZ

June 3, 2008

HIGHLY CONFIDENTIAL

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF RICHARD A.

GONZALEZ, taken in the above-entitled cause pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts, pertaining to the taking of

depositions, taken before ROBIN M. CHIMNIAK, a Notary

3c509184-e618-4b95-92f3-806269e22351

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 100

 1    manufacturing responsibility to make sure that, you

 2    know, our plants were operating efficiently; you know,

 3    all the typical operating functions that you'd have in

 4    a division.

 5           Certain regulatory; and what I mean by

 6    regulatory is FDA regulatory responsibilities.  And,

 7    you know, I spent a fair amount of time on that;

 8    oversight of medical affairs, pharmacovigilance.

 9       Q.   Did you have any responsibility for

10    overseeing compliance of the federal and state

11    Medicare, Medicaid fraud and abuse statute and

12    regulations and guidance?

13       A.   I mean, that was a -- depending upon the

14    time frame, that was a -- a program that was developed

15    at corporate and implemented at corporate.

16       Q.   When was that?

17       A.   With the creation of the office of ethics

18    and compliance.  I don't recall a specific date.

19       Q.   Do you recall in or around late 2001, early

20    2002?

21       A.   As bad as I've been at guessing the dates

22    here, I'd be afraid to tell you the dates.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

```
 1        Q.    Okay, that's fine.

 2              Prior to the implementation of the office

 3   of ethics and compliance, how did you, as the man who

 4   stood -- "the buck stopped with me" for Hospital

 5   Products Division, how did you know that your

 6   employees within the Hospital Products Division were

 7   complying with Medicare and Medicaid fraud and abuse

 8   statutes?

 9        A.    We had a system in place where lawyers were

10   available to provide guidance to all of the

11   businesses, in the business units within those

12   businesses, and, you know, the senior commercial

13   managers in those areas had oversight responsibility

14   to ensure that -- you know, that that mechanism was in

15   place to utilize, you know, attorneys when they felt

16   it was necessary to review various ideas or issues

17   that came up.

18        Q.    What issues compliance -- when I say

19   compliance, I mean Medicaid and Medicare --

20        A.    I understand.

21        Q.    (Continuing) -- or federal and state

22   regulatory and statutory compliance.  What issues came
```

Case 1:01-cv-12257-PBS  Document 5423-3  Filed 07/02/2008  Page 5 of 50

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 102

1   up when you were serving in your role as senior vice

2   president of Hospital Products Division that you can

3   recall?

4        A.   Well, the only one I specifically recall is

5   this meeting that I had in 1999 with the legal team

6   around this issue or the precursor of this issue

7   maybe.

8        Q.   And was that spawned by the lit hold memo

9   that you received?

10       A.   Yes.

11       Q.   Okay.  Do you recall receiving -- or do you

12  recall that Abbott received a letter from the

13  Department of Justice in 1999 authored by Mark Lavine

14  or T. Reed Stephens?

15       A.   No.

16       Q.   Did anyone bring that to your attention?

17       A.   Not that I recall.

18       Q.   If regulatory or -- if significant

19  compliance with Medicare and Medicaid matters were

20  being raised in a letter from the Department of

21  Justice concerning the Hospital Products Division's

22  practices, would you, in your capacity as vice

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 113

1    amount of responsibilities, yes.

2        Q.    Would you have expected that if the United

3    States and the Department of Justice was investigating

4    the Hospital Products Division, that your subordinate

5    employees should have brought that to your attention?

6        A.    That presumes they were aware of it.

7        Q.    Okay.  Can you think of any reason why a

8    civil investigative demand and a 1997 subpoena from

9    the HHS-OIG would not have been brought to the

10   attention of the Hospital Products Division?

11       A.    Like I said, I'm not familiar with it, so

12   it's difficult for me to have a -- a point of view on

13   it.

14       Q.    Well, would you, in your capacity as the

15   president of HPD, have expected that if there was a

16   problem, it should have been brought to the attention

17   of the Hospital Products Division?

18       A.    I mean, again, that assumes there -- there

19   is a problem, and it assumes that it was properly

20   vetted right through the legal department to determine

21   whether or not it was relevant at the time.

22             I mean, it assumes a lot of things that are

3c509184-e618-4b95-92f3-806269e22351

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                  June 3, 2008

Page 114

1   difficult for me to -- to answer the question in a

2   very black-and-white way.

3        Q.   Well, setting aside whether Abbott agreed

4   or disagreed with the subject matter of the

5   investigation, just the very fact that the Department

6   of Justice is investigating Abbott's Hospital Products

7   Division pricing, do you think that that fact is

8   something that should have been made known -- made

9   known to the Hospital Products Division?

10       A.   Well, again -- and -- and I just want to

11  make sure I'm careful about how I answer your

12  questions.  But it depends upon -- first of all,

13  depends upon who knows, and then it depends upon what

14  they're trying to do to validate the information.

15            I mean, I could -- I could theorize a

16  scenario, and it's nothing more than a theory, where

17  if the legal department wanted to do an investigation

18  of the Hospital Products Division, they probably

19  wouldn't want to inform everybody.

20       Q.   Okay.  But do you think they would have --

21  or should have informed management at least?

22       A.   They may not want to in certain instances.

Henderson Legal Services, Inc.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

Page 115

1     Q.    Do you know how the legal department could

2  get information incident to its review without

3  contacting the Hospital Products Division?

4     A.    Well, they could gather information.

5          But, again, I'm -- I'm doing what I'm not

6  supposed to do, speculate.

7     Q.    I don't want you to speculate.

8     A.    And so --

9     Q.    Okay.  My question is more to what your

10  expectations would be --

11    A.    Mm-hmm.

12    Q.    (Continuing) -- first with regard to your

13  subordinates.  If your subordinates were aware of the

14  investigation, would you have expected them to bring

15  it to your attention?

16    A.    Yeah.  I think if -- if they were aware and

17  they believed it was -- it was an issue that had it

18  been surfaced to them as a significant issue, yes, I

19  would have expected them to bring it to my attention.

20    Q.    Were you aware that in -- strike that.

21         Were you ever involved in decision-making

22  concerning the setting of list price with regard to

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 116

1     the Hospital Products Division?

2          A.    No.

3          Q.    What about the decision to change list

4     pricing or reported list pricing that was made by

5     Abbott Hospital Products Division in 2001?  Were you

6     involved in that?

7          A.    Yes.

8          Q.    Okay.  What was your involvement?

9          A.    My involvement was part of a team of legal

10    and business people that were evaluating the situation

11    and asked to come back with recommendations -- review

12    the situation, asked to come back with

13    recommendations.

14         Q.    Okay.  Who -- who did -- who did the

15    asking?  Who initiated this team?

16         A.    I did the asking.

17         Q.    Okay.  Why?

18         A.    Well, it was really an evolutionary process

19    out of that 1999 request.  That late 1999 request.

20         Q.    Why did it take so long for Abbott to

21    decide to change its list prices, from 1999 until

22    2001?

3c509184-e618-4b95-92f3-806269e22351

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                June 3, 2008

1      A.   Well, as I said, it was an evolutionary

2   process where we had a series of interactions to

3   evaluate the situation and then to determine what

4   would be the right course of action.  And, I mean,

5   when you say it took a long time, it was probably,

6   what, about a year?

7      Q.   Okay.  What -- well, why -- why didn't

8   Abbott change its list pricing -- Abbott Hospital

9   Products Division -- strike that, jeez.

10          Why didn't Abbott Hospital Products

11   Division change its list pricing prior to 2001?

12      A.   Now you're getting into an area where I'm

13   not sure I can answer you because of privilege.

14      Q.   Well, I don't want to -- I don't want you

15   to tell me what your communications were --

16      A.   Mm-hmm.

17      Q.   (Continuing) -- with counsel, at least not

18   at this point in time.  And I will put on the record

19   that this is an issue that we are reserving to come

20   back on because the United States does challenge some

21   of the privilege assertions.

22          But I want you, Mr. Gonzalez -- what was

Henderson Legal Services, Inc.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 118

1    your understanding as to why it did not -- why, prior

2    to 2001, Abbott did not change its list prices?

3              MR. REIDY:  Is that decision based on the

4    legal advice you received?

5              THE WITNESS:  It is.

6              MR. REIDY:  Then you shouldn't answer.

7              THE WITNESS:  Okay.

8              MS. ST. PETER-GRIFFITH:  Are you

9    instructing him not to answer?

10             MR. REIDY:  Yes.

11             MS. ST. PETER-GRIFFITH:  Okay.  Well, I

12   want to know what the decision was though.  I mean,

13   that that's the business decision.

14             MR. REIDY:  You're asking -- you're

15   asking -- you're asking about a nondecision.

16             MS. ST. PETER-GRIFFITH:  Well, I'm asking --

17             MR. REIDY:  If you want to ask about the

18   decision, go ahead.

19             MS. ST. PETER-GRIFFITH:  Fair enough.

20             MR. REIDY:  But you're asking -- you're

21   asking during the entire time period.

22             MS. ST. PETER-GRIFFITH:  Let me ask --

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                 June 3, 2008

Page 119

1          MR. REIDY:  Let me finish, as long as you
2     asked me, you're asking about a nondecision; during an
3     entire time period when you did nothing, what was your
4     reason for doing nothing?  He's indicated he had a
5     certain amount of legal advice with respect to that,
6     and that's what he said.  So that's what you're asking
7     about.
8     BY MS. ST. PETER-GRIFFITH:
9          Q.   Prior to 1999 and your -- your interaction
10    with the legal division, why didn't Abbott change --
11    Abbott Hospital Products Division change its list
12    pricing?
13         A.   Well, it's for all the reasons I described
14    to you before.
15              One, I don't think we thought there was an
16    issue, okay?  Not -- not to say we thought there was
17    an issue going forward.
18              And No. 2, the mechanism by which we were
19    operating, particularly the hospital side of the
20    business, there was a rational approach to why we
21    would increase slightly list price.
22         Q.   Do you think a civil investigative demand

Page 123

1      Q.   And you said you looked at whether there

2  were any recommendation changes.

3      A.   (Shakes head.)

4      Q.   Were there any recommendation changes?

5           MR. REIDY:  Did you get recommendations

6  from the lawyers in connection with that?

7           THE WITNESS:  We did.

8           MR. REIDY:  Okay.  So stay away from the

9  recommending -- whatever recommendations came out of

10  the lawyers that were specific.  And if there are

11  other -- if there are recommendations that came to you

12  as far as changes and procedures, you can describe

13  those.

14           THE WITNESS:  Okay.

15           Well, maybe the best way to characterize it

16  is this.  Is I came to understand through this process

17  four or five key pieces of information.

18           One was as we looked at the practices, was

19  there any -- was there any legal issue that we believe

20  was problematic for us.  And I came to the

21  understanding out of that review that the answer was

22  no.  I -- I came to the understanding that sales and

Gonzalez, Richard A. HIGHLY CONFIDENTIAL                    June 3, 2008

Page 124

1    marketing practices, or activities I should say, that

2    those that were looked at also didn't appear to be

3    anything that had a legal concern associated with it.

4         I came to understand that this is the

5    practice that basically the entire industry was using

6    in this marketplace.  And I came to understand through

7    this process that the government was fully aware of

8    how this system worked.

9         And so based on all of that, we had to look

10   at it also in the backdrop of the environment that was

11   out there.  And I'd say the environment, over the

12   period of, let's say, late '99 to 2001, particularly

13   in the press and to some extent at the congressional

14   level, there continued to be a lot of -- a lot of

15   angst around this reimbursement system.

16        And, you know, there were some articles

17   that were published.  We had received a letter from

18   Congressman Stark in and around that same period of

19   time.

20        And so as you step back and you looked at

21   it, the conclusion and the recommendation, but the

22   conclusion that we ultimately came to is, look, we

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 125

1    never set this up in a way to create any kind of a

2    reimbursement issue, No. 1.

3              Number 2, it's a very small piece of our

4    business compared to the rest of the Hospital Products

5    business.  You know, represents 5 percent, 6 percent

6    of our total revenues in the business.

7              And in the backdrop of, you know, negative

8    publicity that ultimately could have -- whether

9    correct or not -- an impact on Abbott's image, it

10   might be easier to just make the problem go away.  And

11   the way to make the problem go away, at least the most

12   practical way I think the team came back was to take

13   down the prices.  And that was the recommendation that

14   came back, and I ultimately approved it.

15   BY MS. ST. PETER-GRIFFITH:

16        Q.    Who made the recommendation?

17        A.    This team made the recommendation.

18        Q.    So Mr. Begley, Mr. Sellers, Ms. Schumacher,

19   and other lawyers?

20        A.    Correct.

21        Q.    How was that communicated to you?

22        A.    In a meeting.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 126

1     Q.    With who?

2     A.    Well, that's what I was describing in the

3     group that I described a moment ago.

4     Q.    Okay.

5     A.    All right.

6     Q.    Did -- did you have one or two meetings

7     with this group; do you know?

8     A.    I only recall one.

9     Q.    Let's go back to -- over these key pieces

10    of information you described.

11          In terms of the legal issues that -- you

12    said that the issue was raised as to whether there

13    were legal issues that Abbott believed was

14    problematic, and the conclusion was no.  Why?

15          MR. REIDY:  No, is -- did your

16    understanding of that analysis come from the legal

17    advice you received?

18          THE WITNESS:  Yes.

19          MR. REIDY:  Then don't answer the question.

20          MS. ST. PETER-GRIFFITH:  Well, just to let

21    you know, Dan, and I understand that you might give a

22    series of instructions, we do object to that because

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

                                                        Page 127

1    we believe there has been a subject matter waiver on

2    that.

3    BY MS. ST. PETER-GRIFFITH:

4         Q.   Was there any business component to that

5    suggestion that there were no legal issues?

6         A.   No.

7         Q.   With regard to the decision or the

8    suggestion that there was no legal concern over

9    Abbott's sales and marketing practices, was there

10   any -- why did you reach that conclusion?

11        A.   It's the same reason.  It was legal advice

12   that I received.

13        Q.   And just to be clear, was it Ms. Schumacher

14   who was communicating the legal advice?

15             MR. REIDY:  Yes, you've already identified

16   who was present in the meeting from the legal

17   department; right?

18             THE WITNESS:  Yes.

19             MR. REIDY:  And so any communications you

20   had about legal matters were with Ms. Schumacher, as

21   far as you recall?

22             THE WITNESS:  Yes.

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 157

1    counsel to do is to walk me through not only what the

2    subpoena said, but also --

3              MR. REIDY:  Don't go into any more what you

4    asked counsel to do and what counsel did.

5              THE WITNESS:  Mm-hmm.

6              MR. REIDY:  So if your answer -- the

7    question is no, you didn't have any independent

8    understanding of spread; is that right?

9              THE WITNESS:  Yes, it is.

10   BY MS. ST. PETER-GRIFFITH:

11       Q.    Did you do anything to ascertain what

12   spread meant to Abbott HPD alt site marketing?

13       A.    Other than that, that I did to the legal

14   process, no.

15       Q.    Have you heard the term "marketing the

16   spread"?

17       A.    Through that same process.

18       Q.    Do you know whether Abbott engaged in the

19   practice of marketing the spread, Abbott HPD?

20       A.    Not to my knowledge.

21       Q.    Do you know what types of acts would

22   constitute marketing the spread?

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 158

1      A.   I mean, again, not that I didn't learn

2  through this process.

3      Q.   Well, did you -- do you have an independent

4  understanding as to whether the provision of AWP

5  information incident to, for example, a bid would

6  constitute marketing the spread?

7      A.   Ask the question again.

8      Q.   Sure.  Incident to providing information in

9  response to a -- an RFP or some kind of bid, if Abbott

10 provided AWP or spread information, do you have an

11 understanding as to whether that constitutes marketing

12 the spread or not?

13     A.   I mean, again, other than what I discussed

14 with counsel, no.

15     Q.   If Abbott HPD was engaged in marketing the

16 spread, do you think that's something that you should

17 have known about as the president of HPD?

18     A.   It's a hypothetical answer -- question I

19 can't answer.  I mean --

20     Q.   Well, I'll represent to you, sir, that it's

21 the government's position that Abbott HPD, prior to

22 '99 and thereafter, was engaged in marketing the

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 179

1      Q.   I'd like to jump to the alternate site

2   product sales business model.

3      A.   Mm-hmm.

4      Q.   Did you have an understanding as to the

5   reimbursement considerations that factored into the

6   market segments, meaning alt site product sales

7   customers' decision-making in terms of whether or not

8   to buy Abbott's products?

9      A.   No, I wouldn't say I'd have a close

10  understanding of that.

11     Q.   Did you have any understanding?

12     A.   No.

13     Q.   Did you have -- do you have any

14  understanding, for that particular market segment, as

15  to how reimbursement worked, the non-DRG

16  reimbursement?

17     A.   Yeah.  I mean, again, this is this issue of

18  prior to '99 the answer is no.  After '99 through this

19  process, the answer is yes.

20     Q.   Okay.  So prior to the subpoena issue and

21  everything that -- that resulted after that, prior to

22  that point in time you had no understanding as to how

Gonzalez, Richard A. HIGHLY CONFIDENTIAL          June 3, 2008

Page 180

1    the customers for the alt site product sales business

2    segment were reimbursed by third-party payers?

3          A.    That is correct.

4          Q.    What was your understanding after '99?

5          A.    Well, as part of this legal review process,

6    I was walked through how the mechanism worked, and so

7    I certainly had a high-level understanding of how it

8    worked.

9          Q.    And what was that understanding?

10         A.    Well, again, I'm not sure I can walk you

11   through that, based on where I received the

12   information.

13         MR. REIDY:  If you have an understanding on

14   how reimbursement worked, if you have a present

15   understanding of it, you can answer.

16         THE WITNESS:  Okay.

17         I mean, it's basically what I described to

18   you earlier.  That there is some relationship between

19   list price and AWP, and the customer is compensated at

20   some level of AWP.  And I can't tell you much more

21   than that.

22   BY MS. ST. PETER-GRIFFITH:

Page 181

1      Q.    Okay.

2            As part of the plan and plan review, or

3      plan -- the plan and plan update process --

4      A.    Mm-hmm.

5      Q.    (Continuing) -- would it have been

6      important for you, as the president of HPD, to

7      understand how the alt site product sales market

8      segment was reimbursed?

9      A.    I'd say typically no.

10     Q.    Okay.  Is that just because it's -- or why

11     do you say that?

12     A.    Well, because as we do financial planning,

13     what we're really measuring is net sales.  And so at

14     the end of the day what the customer is reimbursed or

15     anything else doesn't really matter, because what

16     we're really tracking is what the revenue coming into

17     the business is, and that's net.  So I don't

18     believe -- and I don't recall -- any reimbursement

19     information in any of our plan books --

20     Q.    Well, as --

21     A.    (Continuing) -- you know, on the financial

22     planning process.

Page 307

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL | ) | |
| INDUSTRY AVERAGE WHOLESALE | ) | |
| PRICE LITIGATION | ) | MDL No. 1456 |
| | ) | Civil Action |
| THIS DOCUMENT RELATES TO: | ) | #01-CV-12257-PBS |
| | ) | |
| ALL CASES | ) | Judge Patti B. Saris |

**************************************************

ORAL AND VIDEOTAPED DEPOSITION

OF RICHARD A. GONZALEZ

June 4, 2008

HIGHLY CONFIDENTIAL

**************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

RICHARD A. GONZALEZ, Volume II, taken in the

above-entitled cause pursuant to the Federal Rules

of Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 308

1    taken before LAURA R. RENKE, RDR, CRR, Certified

2    Shorthand Reporter of the State of Illinois, taken

3    at 77 West Wacker Drive, Suite 3500, Room C,

4    Chicago, Illinois, on the 4th day of June, 2008,

5    at the hour of 9:04 a.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

64e5fedb-778b-41d3-a207-8cd7afff033e

Page 341

1    yesterday I wasn't familiar with it until late in

2    1999.  When you specifically said HPD and AHD, we

3    did take action that I've already described when I

4    was the EVP over HPD.

5         Q.   Well, what did you do to ensure that

6    Abbott's practices prior to taking that action

7    didn't violate Medicare or Medicaid law?

8              MR. REIDY:  Object to the question.

9              THE WITNESS:  I did what I would always

10   do in any case where there's complicated legal or

11   regulatory issues at stake.  I ended up getting

12   legal counsel involved and giving me advice on the

13   situation.

14   BY MS. ST. PETER-GRIFFITH:

15        Q.   Did you have an understanding, sir, that

16   TAP entered into a criminal plea agreement and

17   also a civil settlement for this exact same

18   conduct?

19             MR. REIDY:  Object.  Premise.

20             THE WITNESS:  I mean, I generally know

21   TAP had an issue.  I don't know the details of

22   that issue.

Page 348

1        A.    I don't know.

2        Q.    Going back to your earlier comment.  My

3    question -- I understand that it's your testimony

4    that you took action and made price changes in

5    2001.  Did you do anything else to go back and

6    evaluate prior conduct to see if there was

7    exposure in terms of Medicare or Medicaid

8    compliance for Abbott's pricing -- Abbott HPD's

9    pricing conduct before that point in time when you

10   made the price change?

11       A.    I don't know that I understand your

12   question.  Can you rephrase it maybe?

13       Q.    Okay.  Let me see if I can clarify.

14       A.    Yeah.

15       Q.    You make the decision in '01 to make

16   the -- to adjust the list price, and you have a

17   set list price policy on an ongoing basis.  Fair?

18       A.    Fair.

19       Q.    Okay.  Did you do anything to evaluate

20   whether or not Abbott's prior conduct in its

21   pricing before '01 complied with Medicare or

22   Medicaid fraud and abuse statutes, regulations,

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 349

1    and guidance?

2         A.    I don't think I can answer that

3    question.

4              MR. REIDY:  Because it involves --

5              THE WITNESS:  Lawyers, mm-hmm.

6              MR. REIDY:  -- the conduct of lawyers

7    and lawyers' communication with you?

8              THE WITNESS:  Yes.

9              MR. REIDY:  Okay.  So don't answer it.

10   BY MS. ST. PETER-GRIFFITH:

11        Q.    Other than the communications with

12   lawyers?

13        A.    Other than the communications with

14   lawyers, no.

15        Q.    Did you undertake any initiative to

16   specifically identify whether or not Abbott's

17   price reporting conduct complied with the False

18   Claims Act or the anti-kickback statute?

19        A.    That falls into that same category.

20        Q.    Okay.  So the only -- the only way that

21   you can answer it is by disclosing --

22        A.    Yes.

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL            June 4, 2008

Page 358

1    wasn't a very good business for us to be in.

2              Nothing ever surfaced that said there

3    was any kind of a legal problem.  I didn't go

4    through details of how they operated their --

5    their business.  I had a review of their

6    financials.  We talked about where the business

7    could go.  And guess what?  It didn't look like a

8    very good business to be in, and so I started

9    discussing with them how would we get out of it.

10        Q.   Well, did you have an interest in

11   whether or not Abbott's home infusion business

12   model was submitting false claims to the United

13   States Medicare program or to state Medicaid

14   programs?

15        A.   First of all, I wasn't knowledgeable of

16   them doing anything like that, nor do I know if

17   they were doing anything like this.  If you're

18   asking me if I knew that and I knew it was

19   factually correct would I want to know it, the

20   answer is yes.

21        Q.   Okay.  And what would you do?

22        A.   I'd go get legal advice.

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 359

1       Q.    Where did the compliance buck stop

2   within HPD?

3       A.    What do you mean by the compliance buck?

4       Q.    Meaning where did the ultimate

5   responsibility for ensuring compliance within the

6   Hospital Products Division stop?  Who -- who had

7   the ultimate responsibility for ensuring that?

8       A.    I -- I mean, ultimately every employee

9   who works in the division, every employee who

10  works in Abbott has that possibility.  If you're

11  asking me did I have that responsibility, of

12  course.  I'm accountable.  But I'm accountable

13  through a whole group of management that implement

14  all of those activities.

15      Q.    And what was your understanding as to

16  how the compliance was implemented?

17      A.    It depends on the time frame that you're

18  referring to.  I'd say in the time frame that

19  we're talking about here, we had in place code of

20  conduct activities that we had employees

21  understand, and each of the businesses understood

22  that there were -- there was legal staff that was

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL                    June 4, 2008

1  assigned to the division -- in some cases assigned

2  to specific parts of the business -- that whenever

3  they had a question or an issue or they had an

4  unknown concern -- a concern of an unknown area

5  that they weren't familiar with that they should

6  run that by the legal department.

7       Q.   Okay.  Including for compliance

8  questions?

9       A.   Correct.

10      Q.   Sir, did you have an understanding as

11 to -- did you have an understanding that Abbott

12 products were reimbursed by Medicare and Medicaid?

13      A.   I mean, I testified to that yesterday.

14      Q.   Okay.

15      A.   And I clearly had an understanding the

16 hospital market was a DRG market, and after 1999 I

17 had a better understanding of how the Alternate

18 Site products were reimbursed.  I wouldn't

19 describe myself as an expert.

20      Q.   Okay.  Well, I'm not going to ask you

21 detailed questions about Medicare and Medicaid.

22 But I just want to get an understanding as to

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 361

1    whether you understood if Medicare and Medicaid

2    reimbursement was important to Abbott's Hospital

3    Products Division clients.

4        A.    I would say to the bulk of our clients,

5    and clearly to our business strategy, Medicare and

6    Medicaid reimbursement was not very important

7    because most of it was DRGs.

8        Q.    Okay.  Do you think that it would have

9    been -- that it was important for Abbott's

10   Hospital Products Division in undertaking its

11   price reporting, either to the price -- either to

12   the compendia or to the individual state Medicaid

13   programs, that in doing -- that in so reporting,

14   its Hospital Products Division reported

15   information accurately about Abbott's pricing?

16            MR. REIDY:  I have an objection.  That's

17   asked and answered.  You are replowing the same

18   ground you went over yesterday, and you've been

19   doing it for 30 minutes.

20            MS. ST. PETER-GRIFFITH:  Okay.

21   BY MS. ST. PETER-GRIFFITH:

22       Q.    Can you answer the question, sir?

Page 377

1   March 1st, 1998, had you been provided with any

2   training or guidelines or guidance in how to deal

3   with a serious government compliance issue in a

4   business unit over which you were the lead person,

5   in this case the president of HPD?

6        A.   I mean, there would have been legal

7   training sessions around various kinds of topics

8   that, you know, most Abbott managers would go

9   through.  So there were clearly those kinds of

10  training programs or seminars and presentations

11  that occurred to give you a good idea of where to

12  go when you ran into an issue you weren't sure of.

13       Q.   Now, you've had business courses in your

14  training -- in your educational background,

15  correct?

16       A.   No business courses.

17       Q.   No business courses?

18       A.   No.

19       Q.   How about leadership?

20       A.   I've had leadership courses at Abbott.

21       Q.   And is it -- would it be your knowledge

22  and experience that most leaders have to work with

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL                June 4, 2008

Page 378

1    and deal with lawyers advising them?

2          A.    That is my experience, yes.

3          Q.    President has the Attorney General,

4    right?

5          A.    Yes.

6          Q.    Military commanders have their staff

7    judge advocates, correct?

8          A.    Mm-hmm.

9          Q.    And corporate officers and officials

10   have their in-house corporate counsel, correct?

11         A.    Yes.

12         Q.    But at the end of the day, who is

13   ultimately responsible for making business and

14   leadership decisions that involve a company's

15   compliance with government requirements, the

16   lawyer or the leader?

17         A.    The ultimate business decision would be

18   the leader.

19         Q.    Okay.  Now, when you testified in

20   response to Ms. St. Peter-Griffith's questions

21   that after your review of the situation regarding

22   the government concerns over Abbott's reporting of

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL                    June 4, 2008

1    acquisition cost to their Medicaid programs?

2         A.    I don't recall that.

3         Q.    Did you ever become aware at any time

4    during your tenure at Abbott, including your

5    presidency of the company, that the Medicare

6    program, the federal Medicare program, could

7    potentially pay more for Abbott's products if

8    Abbott increased its list price representations?

9         A.    The topic of our meeting was around that

10   reimbursement structure.

11        Q.    The Medicare reimbursement structure?

12        A.    Correct.

13        Q.    Okay.  So, again, I'll leave the lawyers

14   aside.  I just want to ask you as the leader,

15   ultimately, eventually the president of Abbott

16   Laboratories.  Did you as the president of Abbott

17   Laboratories, after having been the president of

18   HPD and after having dealt with this government

19   investigation of pricing issue, believe that it

20   was okay for Abbott to report increasing list

21   prices when true prices are falling, knowing it

22   could cause Medicare to pay more for its products?

                                                    Page 417

1          MR. REIDY:  Object to the form.

2          MR. BREEN:  What's wrong with that

3    form -- question, Counsel?

4          MR. REIDY:  I think it has a compound

5    nature to it.

6          MR. BREEN:  Okay.  Thanks.

7          MR. REIDY:  Sure.

8          THE WITNESS:  Can you read it back to

9    me?

10         MR. BREEN:  Please do.

11               (Record read.)

12         THE WITNESS:  Based on what I came to

13   understand out of that legal review, I believed

14   that the legality around this issue was not a

15   problem, but other factors came into effect that

16   ultimately made it logical to make the changes we

17   made, which ultimately impacted the issue you're

18   describing.

19   BY MR. BREEN:

20     Q.    Okay.  And I -- I understand and respect

21   from your testimony yesterday that the

22   environmental issues that were nonlegal were bad

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 418

1    press in the newspapers and other media --

2    correct?

3        A.    Correct.

4        Q.    -- and upset Congressmen, including Pete

5    Stark.  Correct?

6        A.    Correct.

7        Q.    All right.  But aside from the bad PR

8    and the bad congressional relationships, the

9    leaders at Abbott, including yourself, all the way

10   through your presidency of the company, were of

11   the view in making leadership decisions that if

12   they wanted to report higher list prices and cause

13   Medicare to pay more for their products, it was

14   okay to do that.  Even though it might not be a

15   good idea, it was okay.

16            MR. REIDY:  I object to the form and to

17   his testifying about the leaders at Abbott other

18   than himself.

19   BY MR. BREEN:

20       Q.    Just you.  You were -- including the

21   time you were president of Abbott.  I'll modify

22   the question to only include you.

Henderson Legal Services, Inc.

202-220-4158                    www.hendersonlegalservices.com

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 419

1        A.    I mean, as I've stated, based on the

2   legal department's evaluation of the activities

3   that we had in place and based on the structure at

4   which the Medicare program reimbursed, that our

5   activity was legal.

6            And as a leader, I rely on legal

7   judgment calls there, not my own intuition.

8        Q.    Okay.  Now, I'm going to -- again, I'm

9   respecting counsel's assertion of the

10  attorney-client privilege.  I think we have a

11  disagreement on some issues on that, but it's not

12  for here; it's for someplace else.  So I'm going

13  to keep trying to separate the issues between what

14  the lawyers told you and what you did as a leader.

15  And I appreciate your working with me on this.

16           Did you ever become aware in any of your

17  positions at Abbott Laboratories that Abbott had

18  reported -- HPD -- in response to a specific

19  inquiry by the State of Texas in 2000 for truthful

20  WAC prices a $38 WAC for Abbott's vancomycin

21  1 gram when, in fact, Abbott's WAC was $14?

22  Anybody ever tell you that?

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                June 4, 2008

Page 420

1          A.    Not that I recall.

2          Q.    Now, as the president of HPD and later

3     the president of Abbott Laboratories, did you

4     believe that it was okay for Abbott to report WACs

5     to state Medicaid programs that were substantially

6     higher than the prices they were actually

7     invoicing the wholesalers for?

8          A.    I don't know.

9          Q.    That's not a topic that was covered by

10    your review of the government pricing

11    investigation?

12         A.    Not that -- not that I specifically

13    recall, no.

14         Q.    But would you agree with me that if

15    Abbott was invoicing all of its wholesalers $14

16    for 1 gram of vancomycin and the states asked them

17    for what the WAC was, they should tell them 14 and

18    not 38?

19         A.    I don't know enough about the

20    methodology to know.

21         Q.    What methodology?

22         A.    Whatever methodology they're asking to

Henderson Legal Services, Inc.

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                June 4, 2008

Page 433

1    list prices were higher than the contract prices,

2    correct.

3         Q.   And every year they were being

4    increased, weren't they?

5         A.   I don't know that it happened every

6    single year, but there -- there was a -- there was

7    a difference that over many, many years had

8    occurred.

9         Q.   Okay.  And until --

10        A.   That would have been my understanding.

11        Q.   And until you changed things, that

12   difference was they were being increased every

13   year -- or over the years, correct?

14        A.   Well, there were some increases.  I just

15   don't know that it was every year.

16        Q.   Okay.  All right.  So my question is:

17   Since you were aware that at least for some drugs

18   for some years list prices were being increased

19   while actual prices were going down, and you knew

20   that that list price had something to do with the

21   AWPs that were being reported, and you knew

22   government was reimbursing for Medicare and

Henderson Legal Services, Inc.

64e5fedb-778b-41d3-a207-8cd7afff033e

Case 1:01-cv-12257-PBS Document 5423-3 Filed 07/02/2008 Page 40 of 50

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 434

1    Medicaid somehow on the basis of those AWPs, did

2    you also think it was okay for the -- for the

3    salespeople to use that increasing variance as a

4    marketing tool?

5         A.    As I indicated, one of the conclusions

6    out of the legal review was that the sales and

7    marketing practices that were evaluated were

8    legal.  Yes.  That's the best way for me to

9    characterize it.

10        Q.    I understand that.  To sell -- but

11   you're talking about the sales and marketing

12   practices that occurred on the day that the legal

13   review was given to you, correct?  Because you

14   didn't any historical analysis, correct?

15        A.    Well, no.  I mean, this occurred over a

16   period of about a year.  So there would have been

17   collection of data, historical data, as well as

18   current data.

19        Q.    Okay.  And you saw the GeriMed documents

20   that were shown to you yesterday where -- where

21   GeriMed was buying Abbott's products and was

22   induced by the better spreads on Abbott's

Page 435

1    products.  You saw that, right?

2        A.   Yeah, except that --

3             MR. REIDY:  Object to the

4    characterization.

5             Go ahead.

6             THE WITNESS:  I -- I didn't draw that

7    conclusion.  I draw the conclusion that that was

8    something GeriMed wanted.

9    BY MR. BREEN:

10       Q.   Okay.  And you understand that spread is

11   affected by these list price reports going up and

12   Abbott's actual prices going down for certain

13   products, correct?

14       A.   I understand the calculation that they

15   laid out in that document.

16       Q.   Right.

17       A.   Generally how it's calculated.

18       Q.   Right.  So you know that Abbott's the

19   one that's making the reports that's resulting in

20   a spread that GeriMed likes, correct?

21       A.   I don't know that.

22       Q.   You don't know that.

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 436

1       A.    No.

2       Q.    Okay.  So -- well, do you know that

3    that's not the case?  Do you think that somebody

4    else is creating these spreads that GeriMed likes,

5    some other entity?

6       A.    Well, you're characterizing GeriMed

7    likes it; we're doing it.  I know none of that.  I

8    never even interacted with GeriMed.

9       Q.    But you ran an investigation, though --

10   didn't you? -- into past marketing behavior

11   historically.  You just said so.

12      A.    I had a legal evaluation of our

13   practices.

14      Q.    All right.  And what I'm trying to

15   figure out is -- again, I don't want you to talk

16   about what the lawyers told you.  But you

17   testified that you've determined that your

18   practices were -- that there was no legal reason

19   to change your practices, correct?

20      A.    That is correct.

21      Q.    And did that include, to your

22   understanding, a practice that would have involved

Case 1:01-cv-12257-PBS Document 5424-3 Filed 07/02/2008 Page 43 of 50

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                    June 4, 2008

Page 437

1    salespeople going to customers and saying, "Here.

2    Buy our product instead of Baxter's because we've

3    got a better spread"?

4         A.    I'm not aware of that occurring.

5         Q.    Okay.  So you don't think the legal

6    review auth -- said it was okay to engage in that

7    kind of marketing practice, correct?

8         A.    No, I didn't say that.  You asked me

9    whether or not I -- you basically asked me whether

10   or not I knew or there was evidence of salespeople

11   selling the spread.  And -- and I'm saying to you,

12   no, I don't believe that was true.

13        Q.    Okay.  But did you conclude after the

14   investigation that there was no legal impediment

15   to salespeople selling the spread?

16             MR. REIDY:  If that's based on legal

17   advice --

18             THE WITNESS:  Yeah, that is.

19             MR. REIDY:  -- don't answer it.

20             THE WITNESS:  Okay.

21             MR. BREEN:  Well, he's testified that he

22   made a conclusion about legal impediments or no

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL                June 4, 2008

Page 438

1    legal impediments, and he said that -- that "We
2    concluded that our marketing practices, there were
3    no legal impediments."  I want to know if that's
4    one of the marketing practices he's talking about.
5             MR. REIDY:  He's just told you --
6             MR. BREEN:  He's already testified.
7             MR. REIDY:  He's just told you he didn't
8    know about -- he didn't have any information about
9    that marketing practice.  That's what he's told
10   you.  So you're now asking him about the lawyers
11   and that's what the lawyers are saying.
12             So what you wanted in this deposition,
13   as I understood it, was somebody to talk about the
14   decision.  But given that, it's a very delicate
15   matter to deal with the legal privilege.  He's
16   told you what his understandings are at the time
17   he made the decision.  You can't have the legal
18   advice.  That's the way it works.
19             MR. BREEN:  I don't want it.
20             MR. REIDY:  Good.  Ask another question.
21             MR. BREEN:  I'm trying.
22   BY MR. BREEN:

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL          June 4, 2008

Page 439

1          Q.   All right.  Let's try this way.  Let's

2     try and break it down a little bit further.

3               MR. REIDY:  And by the way, the fact

4     that we're going all over this again after she

5     went all over it again is really outrageous.  But

6     go ahead and ask your question.  But we are now in

7     like hour God knows what of the tag team of her

8     going over it in excruciating detail both in the

9     morning and in the afternoon and today and then

10    you coming back to it.

11              MR. BREEN:  Okay.

12              MS. ST. PETER-GRIFFITH:  First of all --

13              MR. REIDY:  This is --

14              MS. ST. PETER-GRIFFITH:  -- the United

15    States --

16              MR. REIDY:  This is uncoordinated.

17              MS. ST. PETER-GRIFFITH:  -- disagrees

18    with your characterization.

19              MR. REIDY:  I'm sure that -- and I

20    appreciate that you speak for the United States.

21    So I'm glad to hear that.

22              MR. BREEN:  Are you done, Mr. Reidy?

Gonzalez, Richard A. - Vol. II  HIGHLY CONFIDENTIAL                    June 4, 2008

                                                            Page 440

1              MR. REIDY:  Am I talking anymore?

2              MR. BREEN:  I just don't want to

3       interrupt.

4              MR. REIDY:  Just ask your questions.

5              MR. BREEN:  Okay.

6              MR. REIDY:  I entered my objection.

7              And we're going to talk about it some

8       more if this keeps up.  But go ahead and ask

9       questions.

10      BY MR. BREEN:

11             Q.   This determination that you made after

12      getting this legal review and your doing your

13      review of the government pricing investigation

14      issue, did you conclude that it was okay for

15      salespeople to go to -- to speak to customers and

16      in doing so compare Abbott's AWP with a

17      competitor's AWP?

18             A.   I based that on dialogue I had with the

19      lawyers.

20             Q.   Well, when you say you concluded that

21      Abbott's marketing practice was okay or was not --

22      there was no legal impediment to Abbott's

                  Henderson Legal Services, Inc.

202-220-4158                        www.hendersonlegalservices.com

64e5fedb-778b-41d3-a207-8cd7afff033e

Gonzalez, Richard A. - Vol. II   HIGHLY CONFIDENTIAL                    June 4, 2008

                                                                    Page 441

1    marketing practices, when you say marketing

2    practices, do they include salespeople going to

3    customers and comparing Abbott's AWP with a

4    competitor's AWP?

5            MR. REIDY:  He's already answered that,

6    but I'll let him answer it again.

7            MR. BREEN:  He hasn't answered that

8    question.

9            MR. REIDY:  Yes, he has, several times.

10           THE WITNESS:  The discussion around that

11   was all done with lawyers.

12   BY MR. BREEN:

13       Q.   Well, my question is:  You're the one

14   that testified and told me that Abbott's marketing

15   practices were determined to have no legal

16   impediment to them.  Okay?

17           MR. REIDY:  Look.

18   BY MR. BREEN:

19       Q.   So based upon that testimony, I'm asking

20   you if one of those marketing practices included

21   salespeople comparing Abbott's AWP with a

22   competitor's AWP.  Was that one of those marketing

Case 1:01-cv-12257-PBS Document 5423-3 Filed 07/02/2008 Page 48 of 50

Gonzalez, Richard A. - Vol. II HIGHLY CONFIDENTIAL                June 4, 2008

Page 442

1      practices that were determined to be okay?

2          A.    And I can't answer that.

3          Q.    All right.  But you can tell me that the

4      marketing -- you can't answer that because you

5      don't know or because it divulges advice of

6      counsel?

7          A.    Advice of counsel.

8          Q.    But you can tell me that the lawyers

9      said all your marketing practices were okay, but

10     you can't tell me what those marketing practices

11     were.  Is that what you're saying?

12         A.    Yes.

13             MR. BREEN:  Okay.  I think it's a good

14     time to take a break for lunch.

15             MR. REIDY:  When do you want to come

16     back?

17             MR. BREEN:  45 minutes?

18             MR. REIDY:  Good.

19             THE VIDEOGRAPHER:  We are off the record

20     at 12:06 p.m. with the end of Tape No. 2.

21                     (Lunch recess taken.)

22     ///

Page 475

1    the question.

2              Did you base your conclusion that

3    Abbott's price reporting behavior and related

4    marketing conduct was okay in part on your belief

5    that the government knew what you just testified

6    to?

7         A.    I base my understanding on that our

8    conduct was not illegal, on the total feedback

9    given to me by the legal team.

10        Q.    I understand that.  But part of the

11   conclusion was based upon your belief that the

12   government was aware the drug companies were

13   reporting prices that were higher than prices in

14   the marketplace, correct?

15        A.    That was one fact given to me.

16        Q.    Okay.  But in having that belief, you

17   had absolutely no understanding or knowledge of

18   how much higher the government thought prices were

19   being reported than were actually being paid in

20   the marketplace, did you?

21        A.    I don't recall that.

22        Q.    So you never had the belief that the

64e5fedb-778b-41d3-a207-8cd7afff033e

Page 476

1    United States government or any state, including

2    California, knew that Abbott was reporting prices

3    that were two times, three times, four times, five

4    times, ten times or more the prices that were

5    actually paid in the marketplace, did you?

6        A.    No, what I said was I don't recall that

7    information specifically.

8        Q.    Could you please see if Exhibit 15 is in

9    front of you there?

10       A.    Sure.

11       Q.    From yesterday.

12       A.    It's this document (indicating)?

13       Q.    Yes, sir, the one from Dennis Walker to

14   John Ward, Donald Robertson, and Jeff Yablon,

15   dated December 20th, 1995.

16             Do you recall looking at this yesterday?

17       A.    I do.

18       Q.    Now, I understand that you have no

19   recollection of who GeriMed is, correct?

20       A.    Correct.

21       Q.    Do you know whether the long-term care

22   market was important to HPD's business?