# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | | |
|---|---|---|
| THE STATE OF IOWA, ex. rel. THOMAS J. MILLER, in his capacity as ATTORNEY GENERAL OF THE STATE OF IOWA, | ) ) ) ) | CL COC 71048 |
| **Plaintiff,** | ) ) | Law No. _____ |
| v. | ) ) | |
| R.J. REYNOLDS TOBACCO COMPANY, RJR NABISCO, INC., THE AMERICAN TOBACCO COMPANY, AMERICAN BRANDS, INC., BROWN & WILLIAMSON TOBACCO CORPORATION, B.A.T. INDUSTRIES, PLC, BATUS HOLDINGS, INC., BRITISH AMERICAN TOBACCO COMPANY, LTD., BRITISH-AMERICAN (HOLDINGS) LTD., PHILIP MORRIS, INCORPORATED (PHILIP MORRIS U.S.A.), PHILIP MORRIS COMPANIES, INC., LIGGETT & MYERS, INC., LIGGETT GROUP, INC., THE BROOKE GROUP, LIMITED, LORILLARD TOBACCO COMPANY, LORILLARD INCORPORATED, LOEWS CORPORATION, UNITED STATES TOBACCO COMPANY, UST, INC., THE COUNCIL FOR TOBACCO RESEARCH, THE TOBACCO INSTITUTE, INC., HILL & KNOWLTON, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PETITION** |
| **Defendants.** | ) ) ) | |



## TABLE OF CONTENTS

I.     INTRODUCTION ..........................................................

II.    SUBJECT MATTER JURISDICTION ....................................... 4

III.   PERSONAL JURISDICTION ............................................. 5

IV.    VENUE ............................................................. 5

V.     THE PARTIES ....................................................... 5

    A.  The Plaintiff .................................................... 5
    B.  The Defendants ................................................... 5

VI.    CONDUCT ALLEGATIONS ............................................... 6

    A.  Generally ....................................................... 14
    B.  The Cigarette Companies ......................................... 14
        1.  The composition of the cigarette industry in the United States ....... 19
        2.  Congressional testimony by cigarette manufacturers ......... 19
        3.  The 1953 "Big Scare" and the joint industry response ............. 20
        4.  Creation of the Tobacco Industry Research Committee ......... 22
            a.  TIRC Control ............................................. 24
            b.  The Industry's public response .......................... 25
        5.  History of Industry knowledge that smoking is harmful .......... 26
        6.  Health Risks of Nicotine ................................... 28
        7.  Repeated false promises to the public ...................... 33
        8.  The Gentlemen's Agreement .................................. 35
        9.  Role of CTR as a "Front" ................................... 38
        10. The example of Dr. Freddy Homburger ........................ 39
        11. Special projects ........................................... 42
        12. Clearing the "Deadwood" .................................... 43
        13. "Mouse House" Massacre ..................................... 44
        14. "Safer" cigarettes ........................................ 45
        15. Liggett's safer cigarette: XA .............................. 46
        16. Liggett, Dr. James Mold and the XA research ................ 49
        17. Liggett's safer cigarette patent ........................... 51
        18. The role of nicotine in smoking ............................ 53
            a.  Industry knowledge about the addictiveness of nicotine ... 54
            b.  Suppression and concealment of research on nicotine addiction ................................................ 55
            c.  The industry's interest in nicotine ..................... 57
             .......................................................... 60

2

        d. Light cigarettes: a marketing hoax .......................... 63
        e. Industry control and manipulation of nicotine .............. 67
        f. Other methods of nicotine manipulation .................. 68
      19. Targeting of Minors ........................................ 75
   C. The role of the Tobacco Industry Attorneys .................. 80

VII.     SUMMARY ............................................................ 85

VIII.    ASSERTED CAUSES OF ACTION ...................................... 85

    Count I:  Iowa Consumer Fraud Act .............................. 85

    Count II:  Civil Liability for Deception ........................ 85

    Count III: Voluntary Assumption of A Special Duty ............ 88

    Count IV: Unjust Enrichment/Restitution ...................... 90

    Count V:  Civil Conspiracy ...................................... 91

    Count VI:  Aiding and Abetting .................................. 92

    Count VII:  Indemnity ............................................ 94

    Count VIII:  Nuisance ............................................ 95

    Count IX: Injunction .............................................. 96
    .................................................................. 97

# I. INTRODUCTION

**THE STATE OF IOWA,** by Thomas J. Miller, Attorney General of Iowa, with offices located at the Hoover Building, Des Moines, 50319, by way of this Petition, states:

1.    The State of Iowa brings this action pursuant to the State's constitutional, statutory, common law, and/or equitable authority to protect the public interest and the public health of the citizens of Iowa, for the purposes, *inter alia*, of obtaining damages, civil penalties, punitive damages, declaratory and injunctive relief, restitution, and other equitable relief against the Defendants for their unlawful actions in connection with the marketing and sale of tobacco products to Iowa citizens.

2.    The State of Iowa through this action seeks restitution and damages from the Defendants for all of the expenses and costs that the State has incurred, and continues to incur, in providing health care and other services to the citizens and employees of the State who suffer, who have suffered, and who will suffer in the future, from tobacco-related injuries, diseases and illnesses as a result of the Defendants' wrongful conduct and unlawful activities. Such sums have been expended, and will continue to be expended in the future, in order to pay for health care costs and other related services resulting, in whole or in part, from use by Iowa citizens of tobacco products. The State of Iowa has expended, continues to expend, and will expend in the future, such sums pursuant to various State programs. Additionally, the State of Iowa, pursuant to the Iowa Consumer Fraud Act, (Iowa Code § 714.16) and other statutory, common law and equitable remedies, seeks to disgorge from the Defendants all monies which they acquired through their unlawful practices and to restore said monies to the consumers of Iowa from whom

4

it was unlawfully acquired.  Finally, the State of Iowa by this action seeks, through various forms of equitable relief, including, without limitation, injunctive relief, to curtail the promotion and sale of tobacco products to minors in Iowa.

3.        This action sounds in equity, statutory and common law, and, unless otherwise noted, each and every count alleged applies to each and every Defendant.

## II.  SUBJECT MATTER JURISDICTION

4.        Jurisdiction over the subject matter of this litigation is proper in this Court, pursuant to Iowa Code §§ 13.2, 249A.4, 453A.2 and 714.16(7).

## III.  PERSONAL JURISDICTION

5.        Personal jurisdiction over each and every Defendant is proper pursuant to Iowa Code § 617.3.

## IV.  VENUE

6.        Venue is proper in Polk County pursuant to Iowa Code Chapter 616, and Iowa Code § 714.16(10).

## V.  THE PARTIES

### A.  The Plaintiff

7.        The State of Iowa is a sovereign state of the United States.  Iowa Attorney General Thomas J. Miller (hereinafter the Attorney General) brings this action for relief as Plaintiff, on behalf of the State of Iowa, pursuant to  statutory and common law, in order to discharge his obligation of protecting the public interest and property, and of enforcing

5

public duties, through the institution of appropriate legal proceedings. In addition, the Attorney General brings this action pursuant to his statutory authority to act as legal counsel for the Governor and all State of Iowa officers, departments, boards, bodies, commissions and instrumentalities in all legal proceedings in which they have an interest, as provided in Iowa Code § 13.2, and pursuant to his other statutory and common law powers. The Attorney General also brings this action in order to protect the public interest, pursuant to Iowa Code § 453A.2 to protect the children of the State of Iowa targeted by the Defendants' marketing and promotional efforts. The Attorney General also brings this action to protect the State's proprietary interest in enforcing the State's right to collect damages for injuries to the State and its citizens which were caused by the unlawful actions of the Defendants.

## B. The Defendants

8.     R.J. Reynolds Tobacco Company (hereinafter "R.J. Reynolds") is a New Jersey corporation whose principal place of business is located at 400 Raritan Center Parkway, Edison, New Jersey 08837, with a mailing address at 4th & Main Street, Winston-Salem, North Carolina 27102. R.J. Reynolds is a wholly-owned subsidiary of RJR Nabisco, Inc. At times pertinent to this Petition (including through the present date), Defendant R.J. Reynolds designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

9.     RJR Nabisco Inc. (hereinafter generally "Nabisco" but occasionally, collectively as "R.J. Reynolds") is a Delaware corporation whose principal place of business is 1301 Avenue

6

of the Americas, New York, New York 10015. Nabisco is the parent corporation of R.J. Reynolds. At times pertinent to this Petition (including through the present date), Defendant Nabisco individually and/or through its agents, alter ego, subsidiary, and/or division, Defendant R.J. Reynolds, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

10.     The American Tobacco Company (hereinafter "American Tobacco") is or was a Delaware corporation whose principal place of business is or was located at 6 Stamford Forum, Stamford, Connecticut 06904. On information and belief, Plaintiff asserts that American Tobacco was sold and merged into Defendant Brown & Williamson Tobacco Corporation, and that Brown and Williamson Tobacco Corporation has assumed all liabilities of American Tobacco. At times pertinent to this Petition (including through the present date), Defendant American Tobacco designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

11.     American Brands, Inc. (hereinafter generally "American Brands" but occasionally, collectively as "American Tobacco") is a Delaware corporation whose principal place of business is located at 6 Stamford Forum, Stamford, Connecticut 06904. Defendant American Brands is the parent corporation of, or successor in interest to, American Tobacco. At times pertinent to this Petition (including through the present date), Defendant American Brands individually and/or through its agent, alter ego, subsidiary

7

and/or division, Defendant American Tobacco, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

12.     Brown & Williamson Tobacco Corporation (hereinafter "Brown & Williamson") is a Delaware corporation whose principal place of business is located at 1500 Brown & Williamson Tower, Louisville, Kentucky 40202. Defendant Brown & Williamson is or was an agent, alter ego, subsidiary and/or division of Defendants Batus Holdings, Inc., Defendant British American Tobacco Company, Ltd., Defendant British-American Tobacco (Holdings), Ltd., and/or Defendant B.A.T. Industries, PLC. At times pertinent to this Petition (including through the present date), Defendant Brown & Williamson designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

13.     B.A.T. Industries, PLC (hereinafter generally "BAT" but occasionally, collectively as "Brown & Williamson") is a British corporation whose registered office is located at Windsor House, 50 Victoria Street, London, SW1 ONL, United Kingdom. Defendant BAT is or was the parent corporation of Defendant Brown & Williamson and Defendant Batus Holdings, Inc. At times pertinent to this Petition (including through the present date), Defendant BAT, individually and/or through its agents, alter egos, subsidiaries and/or divisions, (Defendants American Tobacco, Brown & Williamson, and Batus Holdings, Inc.), designed, tested, manufactured, marketed and sold cigarettes for use in

the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

14.   Batus Holdings, Inc. (hereinafter generally "Batus" but occasionally, collectively as "Brown & Williamson") is a Delaware corporation whose principal place principal place of business is located at 1500 Brown & Williamson Tower, Louisville, Kentucky 40202. Defendant Batus is or was an agent, alter ego, subsidiary and/or division of Defendant BAT, Defendant British-American Tobacco (Holdings), Ltd., and/or Defendant British American Tobacco Company, Ltd. Defendant Batus is a parent corporation of Defendant Brown & Williamson. At times pertinent to this Petition (including through the present date), Defendant Batus individually and/or through its agent, alter ego, subsidiary and/or division, Defendant Brown & Williamson, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

15.   British American Tobacco Company, Ltd. (hereinafter generally "British American" but occasionally, collectively as "Brown & Williamson") is a British corporation whose registered office is at Millbank, Knowle Green, Staines, Middlesex TW18 1DY, United Kingdom. Defendant British American is or was a parent corporation of Defendants Brown & Williamson and Batus. At times pertinent to this Petition (including through the present date), Defendant British American, individually and/or through its agent, alter ego, subsidiary and/or division, Defendant Brown & Williamson designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially

9

participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

16.    British-American Tobacco (Holdings), Ltd., (hereinafter generally "British Holdings" but occasionally, collectively as "Brown & Williamson") is a British corporation whose registered office is at Millbank, Knowle Green, Staines, Middlesex TW18 1DY, United Kingdom. Defendant British Holdings is or was a parent corporation of Defendant Brown & Williamson and Defendant Batus. At times pertinent to this Petition (including through the present date), Defendant British Holdings individually and/or through its agents, alter egos, subsidiaries and/or divisions, Defendants Brown & Williamson and Batus, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

17.    Philip Morris Incorporated (Philip Morris U.S.A.) (hereinafter "Philip Morris USA") is a Virginia corporation whose principal place of business is located at 120 Park Avenue, New York, New York 10016. Defendant Philip Morris USA is a subsidiary of Defendant Philip Morris Companies, Inc. At times pertinent to this Petition, (including through the present date) Defendant Philip Morris USA designed, tested, manufactured, marketed and sold cigarettes tobacco for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

18.    Philip Morris Companies, Inc. (hereinafter generally "Philip Morris" but occasionally, collectively as "Philip Morris USA") is a Virginia corporation whose principal place of

10

business is located at 120 Park Avenue, New York, New York 10016.  Defendant Philip Morris is the parent corporation of Defendant Philip Morris USA.  At times pertinent to this Petition (including through the present date), Defendant Philip Morris individually and/or through its agent, alter ego, subsidiary, and/or division, Defendant Philip Morris USA, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

19.    Liggett & Myers, Inc. (hereinafter "Liggett & Myers") is a Delaware corporation whose principal place of business is located at 700 West Main Street, Durham, North Carolina 27701.  Defendant Liggett & Myers is a wholly-owned subsidiary or division of Defendant Liggett Group, Inc.  At times pertinent to this Petition (including through the present date), Defendant Liggett & Myers designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

20.    Liggett Group, Inc. (hereinafter generally "Liggett" but occasionally, collectively as "Ligett & Myers") is a Delaware corporation whose principal place of business is located at 300 North Duke Street, Durham, North Carolina, 27701.  Defendant Liggett is the parent corporation of Defendant Liggett & Myers.  At times pertinent to this Petition (including through the present date), Defendant Liggett individually and/or through its agent, alter ego, subsidiary and/or division, Defendant Liggett & Myers, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially

11

participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

21.   The Brooke Group, Limited (hereinafter generally "Brooke Group" but occasionally, collectively as "Liggett & Myers") is a Delaware corporation with its principal place of business located at 300 North Duke Street, Durham, North Carolina. Defendant Brooke Group is the parent corporation of Defendant Liggett. At times pertinent to this Petition (including through the present date), Defendant Brooke Group individually and/or through its agent, alter ego, subsidiary and/or division, Defendant Liggett, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

22.   Lorillard Tobacco Company (hereinafter "Lorillard") is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York 10016. At times pertinent to this Petition (including through the present date), Defendant Lorillard designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

23.   Lorillard, Incorporated (hereinafter "LI") is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York 10016. LI is an intermediary company of Lorillard and Loews. At times pertinent to this Petition (including through the present date), Defendant LI designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated,

12

conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

24.   Loews Corporation (hereinafter generally "Loews" but occasionally, collectively as "Lorillard") is a Delaware corporation whose principal place of business is located at 1 Park Avenue, New York, New York 10016.  Defendant Loews is the parent corporation of Defendants Lorillard and LI.  At times pertinent to this Petition (including through the present date), Defendant Loews individually and/or through its agents, alter egos, subsidiaries and/or divisions, Defendants Lorillard and LI, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

25.   United States Tobacco Company (hereinafter "US Tobacco") is a Delaware corporation whose principal place of business is located at 100 West Putnam Avenue, Greenwich, Connecticut.  At times pertinent to this Petition (including through the present date), US Tobacco designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

26.   UST, Inc. (hereinafter generally "UST" but occasionally, collectively as "US Tobacco") is a Delaware corporation whose principal place of business is located at 100 West Putnam Avenue, Greenwich, Connecticut.  Defendant UST is the parent corporation of Defendant US Tobacco.  At times pertinent to this Petition (including through the present date), UST, individually and/or through its agent, alter ego, subsidiary and/or division,

13

US Tobacco, designed, tested, manufactured, marketed and sold cigarettes for use in the State of Iowa and/or materially participated, conspired, assisted, encouraged and otherwise aided and abetted one or more of the Defendants in doing so.

27.     The Council for Tobacco Research - U.S.A., Inc. (hereinafter "CTR") is a corporation organized under the laws of the State of New York whose principal place of business located at 900 3rd Avenue, New York, New York 10022. CTR is the successor in interest to Defendant The Tobacco Institute Research Committee (hereinafter "TIRC"). At times pertinent to this Petition (including through the present date), Defendant, CTR acted individually and as an agent, employee and/or co-conspirator of the Defendants.

28.     Tobacco Institute, Inc. (hereinafter "TI") is a corporation organized under the laws of the State of New York with its principal place of business located at 1875 "I" Street NW, Suite 800, Washington, D.C. 20006. At times pertinent to this Petition (including through the present date), Defendant TI acted individually and as an agent, employee, and/or co-conspirator of the Defendants.

29.     Hill & Knowlton, Inc., (hereinafter "Hill & Knowlton") is a Delaware corporation with its principal place of business located at 420 Lexington Avenue, New York, New York 10070. At times pertinent to this Petition (including through the present date), Defendant Hill & Knowlton acted individually and as an agent, employee and/or co-conspirator of the Defendants.

## VI. CONDUCT ALLEGATIONS

### A. Generally

30.     Each of the following Allegations of this Petition are based upon information and belief

14

and contain material, facts, beliefs and allegations which are not meant to be exclusive or limited by the language thereof.

31.     The headings and subheadings in this Petition and the Table of Contents are included for the Court's and the Parties' convenience, only. They are not intended, nor should they be read, as restricting any of the causes of action being pled.

32.     Defendants R.J. Reynolds, Nabisco, American Tobacco, American Brands, Brown & Williamson, BAT, Batus, British American, British Holdings, Philip Morris USA, Philip Morris, Liggett & Myers, Liggett, Brooke Group, Lorillard, LI, Loews, U.S. Tobacco and UST are referred to occasionally, collectively herein as the "tobacco industry," the "cigarette industry," the "cigarette manufacturers," the "tobacco manufacturers" and/or "the industry." Defendants CTR and TI are occasionally referred to herein as "industry lobbying group(s)" and/or "trade associations."

33.     At all pertinent times, Defendants acted individually and by and through their duly authorized agents, servants and employees who were then acting in the course and scope of their employment and in furtherance of the business of the Defendants.

34.     Defendants, and/or their predecessors and successors in interest, themselves and/or through their agents, servants, employees and instrumentalities, performed such acts as were intended to, and did, result in, assist in and/or contribute to, the design, testing, manufacture, marketing or sale of cigarettes for use in the State of Iowa. In connection with these acts, Defendants, and/or their predecessors and successors in interest, transacted business within the State of Iowa, committed the acts complained of herein within the State of Iowa, owned, used or possessed real estate in the State of Iowa, contracted to insure persons, property or risk located within the State of Iowa, entered

15

into express or implied contracts to be performed in whole or in part in the State of Iowa, and/or caused injury and continue to cause injury to persons or property within the State of Iowa. The conduct complained of herein was intended to be directed, both generally and specifically, at the State of Iowa. In fact, such conduct has had and will continue to have a significant impact on the State of Iowa.

35.    Each and every Defendant is alleged to have been a member of, or participant in, the conspiracy described herein, and each and every act of the conspiracy was directed toward, and accomplished in whole or in part in, the State of Iowa. Each and every act of the conspiracy also had, and will continue to have, a substantial impact on the State of Iowa. One of the goals of the conspiracy was to create a false controversy regarding the health hazards of tobacco use in order to protect the market for cigarette sales and the profits of the tobacco industry.

36.    The cigarettes for which these Defendants are responsible are substantially interchangeable.

37.    Substantially similar issues, both legal and factual, are involved in determining the liability of each of these Defendants.

38.    At all pertinent times, Defendants purposefully and intentionally engaged in the above described activities, and continue to do so, knowing full and well that when the consumers used those cigarettes as they were intended to be used, the State of Iowa's citizens and employees would be substantially certain to suffer injury, disability, disease, and illness, including cancer, emphysema, heart disease and other illnesses, as well as death, and that the State of Iowa itself would be injured thereby.

39.     The health consequences are and have been devastating to Iowans and the State of Iowa, and will continue to be devastating to Iowans and the State of Iowa in the future. Tobacco-related heart disease actually results in more deaths than lung cancer. Tobacco use is responsible for approximately one-fourth of all cancer deaths. In terms of average life expectancy, tobacco-related disease victims die more than 20 years prematurely, when compared with those who do not use tobacco products.

40.     Tobacco use is associated with, but not limited to: coronary heart disease; cerebrovascular disease (stroke); aortic aneurysm; peripheral vascular disease; chronic obstructive bronchopulmonary disease (COPD); cancers of the lung, lip, larynx, oral cavity, esophagus, urinary bladder, and pancreas; and gastrointestinal disorders such as peptic ulcer disease. In addition, smoking during pregnancy and/or with children in the home, retards fetal and overall childhood growth and health.

41.     At all pertinent times, Defendants purposefully and intentionally engaged in these activities, and continue to do so, knowing full and well that the State of Iowa would unofficiously confer a benefit upon Defendants by providing or paying for health care and other necessary medical goods and services for certain of the State of Iowa's citizens and employees thus harmed by the intended use of Defendants' cigarettes, and in the absence of performance of such duty by Defendants, that the State of Iowa itself would thereby be harmed.

42.     Cigarette-related disease has killed, and continues to kill, untold millions of Americans. The Center for Disease Control ("CDC") has estimated that more than 400,000 persons die each year from smoking. Approximately one in five deaths is attributable to smoking. Thousands of citizens of the State of Iowa die each year as a result of smoking

17

cigarettes. Each day, more than 3,000 young people begin to smoke. That represents more than one million beginning smokers each year. Most of the new smokers who replace the smokers who quit or die prematurely from smoking-related disease are children or teens. About 90% of smokers born since 1935 started smoking before age twenty-one (21) and almost 50% started before age eighteen (18).

43.   The Iowa Department of Health recently determined that there are currently more than 500,000 smokers in Iowa, more than 33% of whom are under the age of 35. Approximately 5,000 Iowans died in 1995 from smoking-related illnesses, and Iowa smokers, on average, have a 12 year shorter life expectancy than non-smokers. The result is that, last year alone, more than 60,000 years of life was lost due to smoking-related illnesses in Iowa. The estimated economic impact to Iowa's citizens, and the State, is demonstrated by the dollars paid for current and former smokers' hospital and nursing home care, doctors' and other professionals' services, drugs and medical equipment, which are "direct medical costs." In 1990, the estimated total direct cost for Iowa of smoking-related diseases was $319 million.

44.   The monetary consequences of smoking cigarettes are staggering. In May of 1993, the Office of Technology Assessment advised the United States Congress that, in 1990, smoking-related illnesses cost United States taxpayers a total of approximately $68 billion, broken down as follows: $20.8 billion in direct costs; $6.9 billion in indirect costs for morbidity; $40.3 billion in indirect costs for mortality.

45.   The State of Iowa spends hundreds of millions of dollars each year to provide or pay for health care and other necessary facilities and services on behalf of indigents and other

eligible residents and employees whose said health care costs are caused by tobacco-related diseases.

46.    According to the federal Center for Disease Control (CDC), 53,602 of Iowa smokers who begin smoking before age 18 will die prematurely from smoking-related illnesses.

### B. The Cigarette Companies

47.    The Defendants have known for decades of the lethal dangers of smoking their cigarettes. By the late 1930's, based on published research, Defendants had notice of the potential health hazards presented by smoking cigarettes.  In 1946, Defendants' chemists themselves reported concern for the health of smokers.  And, Dr. Ernst L. Wynder, in 1953, reported to the scientific community, and to Defendants, that there was a definitive link between cigarette smoking and cancer.

### 1. The composition of the cigarette industry in the United States

48.    R.J. Reynolds, American Tobacco, Brown & Williamson, Philip Morris, Liggett, Lorillard, and U.S. Tobacco have together controlled virtually 100% of the cigarette market in the United States and Iowa from their inception to the present date.

49.    The cigarette industry is one of the most profitable industries in the United States. Annual industry profits from domestic sales alone is in the billions of dollars.

50.    The unusual concentration of companies involved in the cigarette industry has facilitated the planning, implementation and funding of a decades-long conspiracy by the cigarette manufacturers, their trade associations and attorneys relating to the issues of smoking, health and addiction.

## 2. *Congressional testimony by cigarette manufacturers*

51.    The basic terms of the industry strategy of deception are intact today.  For example, on

April 14, 1994, seven tobacco company chief executives testified under oath before the

Subcommittee on Health and the Environment, a Subcommittee of the U.S. House of

Representatives' Committee on Energy and Commerce, which was chaired by

Congressman Waxman. (hereinafter "Waxman Subcommittee").  Each of these

executives knowingly made material misrepresentations and/or omissions to the Waxman

Subcommittee.

a.    For example, Chairman Waxman and Andrew Tisch, CEO of Lorillard, had the
following exchange about smoking and cancer:

Mr. Waxman:  In a deposition last year you were asked whether cigarette smoking
causes cancer.  Your answer was "I don't believe so." Do you stand
by that answer today?

Mr. Tisch:    I do, sir.

Mr. Waxman:  Do you understand how isolated you are in the belief from the
entire scientific community?

Mr. Tisch:    I do, sir.

Mr. Waxman:  You're the head of manufacturing of a product that's been accused
by the overwhelming scientific community to cause cancer.  You
don't know?  Do you have an interest in finding out?

Mr. Tisch:    I do, sir, yes.

Mr. Waxman:  And what have you done to pursue that interest?

Mr. Tisch:    We have looked at the data and the data that we have been able to
see has all been statistical data that has not convinced me that
smoking causes death.

20

52.  Philip Morris President and CEO William I. Campbell gave the following testimony about nicotine and addiction:

    a.  "Philip Morris does not manipulate nor independently control the level of nicotine in our products."

    b.  "Cigarette smoking is not addictive."

    c.  "Philip Morris research does not establish that smoking is addictive."

53.  R.J. Reynolds, in its written statement to the Subcommittee claimed that: "smoking is no more addictive than coffee, tea, or Twinkies."

54.  These assertions are contradicted by overwhelming scientific evidence which unequivocally demonstrates that smoking kills, and that nicotine is addictive.

55.  These representations were also made despite a substantial body of evidence developed by the cigarette manufacturers themselves which indicates that nicotine is not only addictive, but is the reason why people smoke.

56.  While the tobacco manufacturers continue to deny that nicotine is addictive and instead use various misleading euphemisms to describe the role of nicotine, such as "satisfaction," "impact," "strength," "rich aroma" and "pleasure," there is widespread agreement in the medical and scientific communities that nicotine's primary, if not sole, function is to make tobacco products addictive.

57.  Nicotine is recognized as an addictive substance by such major medical organizations as the office of the U.S. Surgeon General, the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Medical Research

Council in the United Kingdom. All of these organizations acknowledge that tobacco use is a form of drug dependence or addiction with severe adverse health consequences.

58.    The American Medical Association (hereinafter AMA) has stated that it "maintains an unequivocal stance against tobacco. . . [and] reminds physicians, the public, and politicians that damning evidence against tobacco makes opposition to its use a pressing, nonpartisan public health issue. . . . The AMA will not relent in its opposition to tobacco use."

59.    The testimony of the cigarette manufacturers that smoking is not a proven cause of disease and death, and that nicotine is not addictive, is also contradicted by their own internal documents. Numerous documents, many marked "confidential," describe industry studies which show that the cigarette manufacturers have known for decades that nicotine is addicting, and that their products cause cancer, other diseases, and death. The cigarette manufacturers have made every effort to hide this research from the public, to misrepresent the facts about smoking and health, and addiction, and to create a false controversy regarding the hazards of tobacco use. The testimony of the cigarette executives before Congress in 1994 is only a recent example of an ongoing pattern of deception and suppression that began more than 40 years ago.

### 3. The 1953 "Big Scare" and the joint industry response

60.    In December, 1953, Dr. Ernest L. Wynder of the Sloan-Kettering Institute published the results of a study in which he painted the shaved backs of mice with cigarette smoke condensate residue. Malignant tumors grew in 44% of the mice in Dr. Wynder's study, providing biological evidence that cigarette smoke caused cancer. The previous year, a

British researcher, Dr. Richard Doll, published a statistical analysis showing that lung

cancer was more common among people who smoked than among non-smokers, and that

the risk of lung cancer was directly proportional to the number of cigarettes smoked. The

widespread reporting of these studies caused what cigarette company officials later called

the "Big Scare."

61.  The cigarette industry responded quickly to the mounting adverse publicity regarding the

link between smoking and cancer. The Chief Executive officers of the leading cigarette

manufacturers met on December 15, 1953, at the Plaza Hotel in New York City. Also in

attendance were representatives of the public relations firm of Hill & Knowlton which

was to play a central role in formulating and executing the industry's response.

62.  According to a Hill & Knowlton memorandum summarizing the meeting, cigarette

industry executives viewed the problem as "extremely serious, and worthy of drastic

action." The document continues, "officials stated that salesmen in the industry are

frantically alarmed and that the decline in tobacco stocks on the market has caused grave

concern, . . ."

63.  The participants in the meeting agreed that a strong public relations response from the

industry was necessary. Apparently, the emerging research linking smoking and cancer

was viewed by the Defendants as a public relations problem, not a public health issue.

According to the Hill & Knowlton memorandum summarizing the meeting:

   a.  The Chief Executive officers of all the leading companies, including U.S.
       Tobacco, but excepting Liggett, "have agreed to go along with a public relations
       program on the health issue." Liggett decided not to participate at this point
       because it "feels that the proper procedure is to ignore the whole controversy."

23

b.  "They feel that they should sponsor a public relations campaign which is positive in nature and is entirely 'pro-cigarettes.'"

c.  "They are also emphatic in saying that the entire activity is a long-term, continuing program, since they feel that the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future.  Each of the company presidents attending emphasized the fact that they consider the program to be a long-term one."

d.  The role of Hill & Knowlton in executing the plan was also discussed.  "The current plans are for Hill and Knowlton to serve as the operating agency of the companies, hiring all the staff and disbursing all funds."

### 4. Creation of the Tobacco Industry Research Committee

64.  Nine days after the above described December 15, 1953 meeting, Hill & Knowlton presented a detailed recommendation to the cigarette manufacturers.  The recommendation recognized the importance of gaining the public trust, and of avoiding the appearance of bias, if the tobacco industry's "pro-cigarette" strategy was to be successful.  According to the memorandum:

> Because of the grave nature of a number of recently highly publicized research reports on the effects of cigarette smoking, widespread public interest has developed, . . . . these developments have confronted the industry with a serious problem of public relations.
>
> It is important that the industry do nothing to appear in the light of being callous to considerations of health or of belittling medical research which goes against cigarettes.
>
> The situation is one of extreme delicacy.  There is much at stake and the industry group, in moving into the field of public relations, needs to exercise great care not to add fuel to the flames.

65.  As a result of the meeting of December 15, 1953, and the recommendations of Hill & Knowlton, five of the six cigarette companies attending said meeting agreed to create an industry trade group called the Tobacco Industry Research Committee. (TIRC).  Liggett,

the company which initially chose not to participate in the public relations effort, joined

the industry trade group in 1964, the same year the Surgeon General issued his first

report on smoking, which concluded that cigarette smoking was a cause of lung cancer.

Also in 1964, TIRC changed its name to the Council for Tobacco Research (CTR). A

second trade group, the Tobacco Institute (TI), was formed by cigarette manufacturers in

1958.

### a. TIRC Control

66. As had been proposed at, and following, the December 15, 1953 meeting, the cigarette

manufacturers (except Liggett), through the tobacco attorneys and Hill & Knowlton,

operated and effectively controlled TIRC.

67. TIRC was physically established in the Empire State Building, one floor below the Hill

& Knowlton offices.  Internal documents confirm that Hill & Knowlton, and not the

independent scientists, actually ran TIRC.  A "highly confidential" internal memo

reported:

> Since the [TIRC] had no headquarters and no staff, Hill and Knowlton,
> Inc. was asked to provide a working staff and temporary office space.  As
> a first organizational step, public relations counsel assigned one of its
> experienced executives, W.T. Hoyt, to serve as account executive and
> handle as one of his functions the duties of executive secretary for the
> TIRC.

68. The confidential memorandum also states that Hill & Knowlton "provided assistance in

selecting" the TIRC Scientific Advisory Board; originally "proposed" the Scientific

Director; and through Hill & Knowlton's executive, W.T. Hoyt, "handled liaisons,

agendas, organizational plans, business affairs, reports, and materials for meetings of the

Tobacco Industry Research Committee, the Scientific Advisory Board . . . in addition to developing operating procedures for the research program. . . ."

69.     In 1954, 23 staff members of Hill & Knowlton worked full or part time for TIRC. The 1955 budget which was proposed for TIRC provided for an increase to 35 Hill & Knowlton staff members. In that year, TIRC spent $477,955 on payments to Hill & Knowlton, as well as on advertising. This added up to more than 50% of TIRC's entire budget.

### b. The Industry's public response

70.     Shortly after creating TIRC, Defendants made an unambiguous pledge to the public, including the people of Iowa. Defendants represented that, through TIRC, they would conduct and report objective and unbiased research regarding smoking and health. When they made this representation, Defendants intended that the public and government regulators would both believe it and rely upon it, and they knew or should have known that consumers would consider those representations as material to their decisions to purchase and smoke cigarettes. Defendants also intended that government regulators would consider those representations as material to their decisions to regulate cigarettes. At that time, and continuing to the present, Defendants knew or should have known that their failure to fulfill the duty they undertook would directly increase the State of Iowa's health care costs.

71.     On January 4, 1954, Defendants announced the formation and purpose of TIRC with a full page newspaper advertisement entitled "A Frank Statement to Cigarette Smokers." The statement appeared in 448 newspapers across the nation, reaching a circulation of

26

43,245,000 in 258 cities.  The advertisement ran in daily newspapers across the country,

including the *Des Moines Register* (whose motto is "The Newspaper Iowa Depends On"),

the *Sioux City Journal*, the Davenport *Daily Times*, and the Cedar Rapids *Gazette*.

72.    The "Frank Statement to Cigarette Smokers" stated in part:

a.    "Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings."

b.    "Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research."

c.    "[T]here is no proof that cigarette smoking is one of the causes [of lung cancer.]"

d.    "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business."

e.    "We believe the products we make are not injurious to health."

f.    "We always have and always will cooperate closely with those whose task it is to safeguard the public health."

g.    "We are pledging aid and assistance to the research effort into all phases of tobacco use and health."

h.    "For this purpose we are establishing a joint industry group consisting initially of the undersigned.  The group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE."

i.    "In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute.  In addition there will be an Advisory Board of scientists disinterested in the cigarette industry.  A group of distinguished men from medicine, science, and education will be invited to serve on this Board.  These scientists will advise the Committee on its research activities."

j.    "This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it."

73. By the spring of 1955, the self-defense strategy recommended by Hill & Knowlton and implemented by the industry through the "Frank Statement" was largely successful. Hill & Knowlton reported to TIRC:

   a. "[P]rogress has been made. . . . The first 'big scare' continues on the wane."

   b. "The research program of the TIRC has won wide acceptance in the scientific world as a sincere, valuable and scientific effort."

   c. "Positive stories are on the ascendancy."

### 5. History of Industry knowledge that smoking is harmful

74. Even before Defendants represented in the "Frank Statement" that "[t]here is no proof that cigarette smoking is one of the causes [of lung cancer]," an industry researcher had reported the contrary.

75. As early as 1946, Lorillard chemist H.B. Parmele, who later became Vice President of Research and a member of Lorillard's Board of Directors, wrote the following to his company's manufacturing committee: "Certain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption."

76. After the 1954 "Frank Statement," the cigarette industry's breach of its assumed duty to report objective facts on smoking and health was virtually immediate. As evidence mounted, both through industry research and truly independent studies, that cigarette smoking causes cancer and other diseases, the cigarette industry continued publicly to represent that nothing was proven against smoking. Internal documents show that the

28

truth was very different. The cigarette companies knew and acknowledged among

themselves the veracity of scientific evidence confirming the health hazards of smoking,

and at the same time suppressed such evidence where they could, and attacked it when it

did appear.

77. Internal cigarette industry documents reveal the following examples of the tobacco

industry's knowledge about the scientific evidence of the hazards of smoking:

    a.   A 1956 memorandum from the Vice President of Philip Morris' Research and
Development Department to top executives at the company regarding the
advantages of "ventilated cigarettes" stated that: "Decreased carbon monoxide
and nicotine are related to decreased harm to the circulatory system as a result of
smoking. . . . Decreased irritation is desirable . . . as a partial elimination of a
potential cancer hazard."

    b.   Brown & Williamson's British affiliate, which conducted much of the health
research for Brown & Williamson, began in 1957 to use the code name "Zephyr"
in its internal documents to identify cancer. The use of a code name in internal
documents suggests the explosive nature of the link between cancer and tobacco
use from an industry perspective. By March 1957, the British affiliate stated that
"[a]s a result of several statistical surveys, the idea has arisen that there is a causal
relation between zephyr and tobacco smoking, particularly cigarette smoking."

    c.   A 1958 memorandum sent to the Vice President of Research at Philip Morris,
who later became a member of its Board of Directors, from a company researcher,
stated "the evidence . . . is building up that heavy cigarette smoking contributes to
lung cancer either alone or in association with physical and physiological factors .
. . ."

    d.   A 1961 document presented to the Philip Morris Research and Development
Committee by the company's Vice President of Research and Development
included a section entitled "Reduction of Carcinogens in Smoke." The document
stated, in part:

> To achieve this objective will require a major research effort, because . . .
> 1. carcinogens are found in practically every class of compounds in
>    smoke.
> 2. This fact prohibits complete solution of the problem by eliminating one
>    or two classes of compounds. The best we can hope for is to reduce a
>    particularly bad class, i.e., the polynuclear hydrocarbons, or phenols.

* * * *

      3. Flavor substances and carcinogenic substances come from the same classes, in many instances."

e.    A 1961 "Confidential" memorandum from the consulting research firm hired by Liggett to do research for the company states:

"There are biologically active materials present in cigarette tobacco. These are:
a)    cancer causing
b)    cancer promoting
c)    poisonous
d)    stimulating, pleasurable, and flavorful."

f.    By 1962, a transcript of a meeting at Brown & Williamson's London-based parent company reveals that one research executive "thought we should adopt the attitude that the causal link between smoking and lung cancer was proven because then at least we could not be any worse off."

g.    A 1963 memorandum to Philip Morris' President and CEO from the company's Vice President of Research describes a number of classes of compounds in cigarette smoke which are "known carcinogens." The document goes on to describe the link between smoking and bronchitis and emphysema. "Irritation problems are now receiving greater attention because of the general medical belief that irritation leads to chronic bronchitis and emphysema. These are serious diseases involving millions of people. Emphysema is often fatal either directly or through other respiratory complications. A number of experts have predicted that the cigarette industry ultimately may be in greater trouble in this area than in the lung cancer field."

h.    A 1963 memorandum from the Liggett consulting research firm states: "Basically, we accept the inference of a causal relationship between the chemical properties of ingested tobacco smoke and the development of carcinoma, which is suggested by the statistical association shown in the studies of Doll and Hill, Horn, and Dorn with some reservations and qualifications and even estimate by how much the incidence of cancer may possibly be reduced if the carcinogenic matter can be diminished, by an appropriate filter, by a given percentage."

i.    In a 1963 analysis, Addison Yeaman, general counsel for Brown & Williamson, wrote that:
1.    "[N]icotine is addictive;"
2.    "We are, then, in the business of selling nicotine, an addictive drug;"

30

3.   Cigarettes "cause, or predispose, lung cancer;"

4.   Cigarettes "contribute to certain cardiovascular disorders;" and that

5.   Cigarettes "may well be truly causative in emphysema, etc."

Yeaman suggested to Brown & Williamson that it "accept its responsibility" by disclosing these cigarette-related hazards to the United States Surgeon General. Yeaman's suggestions for full disclosure were flatly rejected by Brown & Williamson.

78.   These internal tobacco industry documents sharply contrast with the information Liggett

provided to the Surgeon General in 1963.  The industry withheld from the Surgeon

General the views of its researchers and consultants that the evidence shows cigarette

smoking causes human disease.  Further evidence is found in Liggett's "Draft of an

Outline for a Background Paper on the Smoking Problem to be Used in Connection with

a Presentation of Arguments Before the Surgeon General's Committee." That draft states:

a.   "All types of Smoking are Associated with Increased Mortality from all causes combined. . . ."

b.   "For cigarette smokers who smoke regularly, excess mortality increases with current number of cigarettes smoked. . . ."

c.   "Lung cancer [is] extremely rare among nonsmokers."

d.   As "reported by Hammond . . . Excess Mortality [is] (1) higher for cigarette smokers than for others, and (2) increases with daily cigarette consumption."

e.   "For both sexes, all chronic respiratory diseases, chronic bronchitis, irreversible obstructive lung diseases . . . increased in prevalence with increasing amount of smoking." (Emphasis in original).

79.   Liggett's report to the Surgeon General did not contain any of these conclusions, and

instead, focused on alternative causes of disease, such as air pollution, coffee and alcohol

consumption, diet, lack of exercise, and genetics.  Liggett criticized the known statistical

31

association between smoking and mortality and various diseases as "unreliably conducted" and "inadequately analyzed." The Liggett report concluded that the association between smoking and disease was inconclusive, and was in fact due to other factors coincidentally associated with smoking.

80.    Philip Morris also concealed from the public its actual views regarding the research which had been conducted outside the influence of the industry. A 1971 memorandum written by Dr. H. Wakeham, then Vice President of Research and Development, discussed a recent study which found cigarette smoke inhalation caused lung cancer in beagles:

> 1970 might very properly be called the year of the beagle. Early in the year, the American Cancer Society announced that they had finally demonstrated the formation of lung cancer in beagles by smoke inhalation in the now infamous Auerbach and Hammond study. I am sure all of you have read extensively about this in the newspapers, how the industry asked to have an independent panel of pathologists review the histological sections showing cancer, how the Society refused, how generally the ACS was put on the defensive, how publication was refused by two medical journals and how the story was changed somewhat by the time it was published . . . .

81.    The memorandum goes on to describe how the industry publicly dismissed the mice cancer studies, such as the 1953 Wynder research. Dr. Wakeham explains that "mouse skin is not human lung tissue;" that "smoke condensate has different chemical composition from inhaled smoke;" and that "painting is not the method of application practised *[sic]* by human smokers."

82.    In contrast to the mice studies, however, Dr. Wakeham continued:

> The logical extension of these objections is that an inhalation test in which an animal breathed smoke like a human would be a better model system. Presumably, in such a test, the formation of lung cancers in the test animal

32

would be strong evidence for the cigaret causation hypothesis. That is why the beagle test was a critical one. . . . So the test was not conclusive. But it was a lot closer than skin painting.

The strong opposition in the industry to the beagle test is indicative of a new, more aggressive stance on the part of the industry in the smoking and health controversy. We have gone over from what I have called the "vigorous denial" approach, the take it on the chin and keep quiet attitude, to the strongly voiced opposition and criticism. I personally think this counter-propaganda is a better stance than the former one.

83.     Taken together with the tobacco industry's internal acknowledgments that cigarette

smoking is a cause of human disease, this memorandum from a senior Philip Morris

researcher demonstrates that the 1954 "Frank Statement" representations were

deceptions, and that the cigarette industry promptly breached the duties it had

undertaken. Far from "accept[ing] an interest in people's health as a basic responsibility,

paramount to every other consideration in our business" and "cooperat[ing] closely with

those whose task it is to safeguard the public health," the cigarette industry's approach

was to deny and attack with "counter-propaganda" the mounting evidence that smoking

caused human disease -- evidence that the industry plainly viewed internally as accurate.

### 6. Health Risks of Nicotine

84.     Not only did the cigarette manufacturers know that cigarette smoking caused cancer and

other diseases, they knew that nicotine was toxic to the heart. In a 1963 memorandum,

Philip Morris's Wakeham stated that "[t]he cardiovascular effects in smoke are believed

to be mainly due to nicotine and have been thoroughly explored in literature and

conference. We do not believe this will be a specific area of attack. If forced to, we

could produce a fairly tasty low nicotine product."

85.   As alleged in more detail below, in 1980 Philip Morris hired Dr. Victor DeNoble with the specific mission of researching and developing nicotine analogues -- compounds that would mimic nicotine's effect on the brain, but without the cardiovascular effects, such as rapid heartbeat.

86.   Brown & Williamson and its British parent(s) researched the health effects of nicotine and were aware early on, as reported at a BAT Group Research Conference in November 1970, that "the possibility that nicotine may be implicated in the etiology of cardiovascular disease was discussed. . . ."

87.   A memorandum from Dr. S.R. Evelyn of BAT, dated May 30, 1974, reported: "Nicotine: The reported correlation of nicotine with tumorigenicity was considered to be of the utmost importance to the industry."

88.   Again, in February 1979, BAT held a group research and development conference to review the activities of its laboratories located throughout the world. Notes from the conference reveal that research conducted at a BAT laboratory found that high nicotine cigarettes are more likely to cause tumors, and may be more likely to cause those tumors to be cancerous. The notes also indicated that the laboratory was continuing work on nicotine analogues.

89.   At a 1984 research conference held in the United Kingdom, Brown & Williamson and BAT were informed of the harmful effects of nicotine. As a report from that conference stated: "The role of nicotine in cardiovascular disease was outlined, in particular the role of smoke in decreasing prostacyclin and increasing thromboxane levels." Researchers at

34

the conference also recommended that the company perform additional studies or a review of the role of nicotine in heart disease, and its effect on developing fetuses.

### 7. Repeated false promises to the public

90.     Despite increasing internal knowledge about the dangers of cigarette smoking (which they did not disclose), the Defendants continued, renewed and repeated the representations and undertakings of the 1954 "Frank Statement." The tobacco industry continued to pursue its two-pronged strategy of: (1) falsely representing the objectivity of industry research to the public in order to gain credence; and then (2) misrepresenting, distorting, and suppressing information in order to support its pro-cigarette position.

91.     For example, in 1964, R.J. Reynolds Chairman Bowman Gray told Congress that "[i]f it is proven that cigarettes are harmful, we want to do something about it regardless of what somebody else tells us to do. And we would do our level best. It's only human."

92.     Additional representations were made in 1970 when the cigarette industry, through its lobbying group, TI, placed a number of advertisements similar to the 1954 "Frank Statement." These advertisements stated in part:

    a.    "After millions of dollars and over 20 years of research: The question about smoking and health is still a question."

    b.    "[N]o particular ingredient, as it occurs in cigarette smoke, has been demonstrated as the cause of any particular disease."

    c.    "[A] major portion of this scientific inquiry has been financed by the people who know the most about cigarettes and have a great desire to learn the truth . . . the tobacco industry. And the industry has committed itself to this task in the most objective and scientific way possible."

    d.    That the tobacco industry's scientific inquiry would be so extensive that it would be "[a] $35,000,000 program"

    e.    "In the interest of absolute objectivity, the tobacco industry has supported totally independent research efforts with completely non-restrictive funding."

    f.    "In 1954, the Industry established what is now known as CTR, the Council for Tobacco Research -- U.S.A., to provide financial support for research by independent scientists into all phases of tobacco use and health. Completely autonomous, CTR's research activity is directed by a board of ten scientists and physicians who retain their affiliations with their respective universities and institutions. This board has full authority and responsibility for policy, development and direction of the research effort."

    g.    "The findings are not secret."

    h.    "From the beginning, the tobacco industry has believed that the American people deserve objective, scientific answers."

    i.    "[T]he tobacco industry stands ready today to make new commitments for additional valid scientific research that offers to shed light on new facets of smoking and health."

93.    Another 1970 advertisement stated that the industry "believes the American public is entitled to complete, authenticated information about cigarette smoking and health. . . . The tobacco industry recognizes and accepts a responsibility to promote the progress of independent scientific research in the field of tobacco and health."

94.    Yet another advertisement co-sponsored by TIRC and TI, entitled "A Statement about Tobacco and Health," stated:

    We recognize that we have a special responsibility to the public -- to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use. We accepted this responsibility in 1954 by establishing the [TIRC], which provides research grants to independent scientists. We pledge continued support of this program of research until the facts are known.

36

* * * *

> Scientific advisors inform us that until much more is known about such diseases as lung cancer, medical science probably will not be able to determine whether tobacco or any other single factor plays a causative role -- or whether such a role might be direct or indirect, incidental or important.
>
> We shall continue all possible efforts to bring the facts to light. In that spirit we are cooperating with the Public Health Service in its plan to have a special study group review all presently available research."

95.   In 1972 TI President Horace Kornegay testified before Congress:

> Let me state at the outset that the cigarette industry is as vitally concerned or more so than any other group in determining whether cigarette smoking causes human disease, whether there is some ingredient as found in cigarette smoke that is shown to be responsible and if so what it is.
>
> That is why the entire tobacco industry . . . since 1954 has committed a total of $40 million for smoking and health research through grants to independent scientists and institutions.

96.   In 1984, R.J. Reynolds placed an editorial style advertisement in the *New York Times* stating that "[s]tudies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary. These scientific findings come from research completely independent of the tobacco industry."

97.   Each of the Defendants' representations to the public that the tobacco industry, through the CTR, was sponsoring independent objective research, that it was endeavoring to bring the truth to light, and that the public could therefore rely upon the tobacco industry's statements, was false and deceptive. These misrepresentations were designed to gain the trust of the public in order to better distort and suppress substantive information about smoking and health, and to create and perpetuate a false controversy about smoking and health.

98.     This nationwide industry strategy depended for its success on joint and concerted action

        by the Defendants.  Upon information and belief, each of the Defendants agreed not to

        reveal to the public the true nature of the TIRC, and later the CTR, in order to protect

        continued cigarette sales.

                        **8. The Gentlemen's Agreement**

99.     Each company also agreed not to perform research on smoking and health on their own.

        This agreement was referred to by the tobacco manufacturers as the "gentlemen's

        agreement." A 1968 internal Philip Morris draft memorandum entitled, "Need for

        biological research by Philip Morris research and development," and prepared by the

        company's Vice President of Research and Development, states:

                We have reason to believe that in spite of gentlemans *[sic]* agreement from the
                tobacco industry in previous years that at least some of the major companies have
                been increasing biological studies with their own facilities.

100.    Also in 1968, a memo addressed to the CEO of Liggett regarding a meeting of the

        "scientific directors" of Defendants American Tobacco, Brown & Williamson, R.J.

        Reynolds, Philip Morris USA, Lorillard and Liggett & Myers, stated on the topic of

        smoking and health "a general feeling that an industry approach as opposed to an

        individual company approach was highly desirable."

101.    As set forth in the 1968 Philip Morris "gentlemen's agreement" memo, it was believed

        within the industry that individual companies were performing certain research on their

        own, in addition to the joint industry research.  But the fundamental understanding and

        agreement remained intact: that harmful information and activities would be restrained,

        suppressed, and/or concealed.  This included restraining, suppressing, and/or concealing

                                    38

research on the health effects of smoking (including the addictive qualities of cigarettes), and restraining, concealing, and/or suppressing any research on, and marketing of, safer cigarettes.

### 9. Role of CTR as a "Front"

102. Internal documents demonstrate that the joint industry research efforts undertaken through TIRC, and later through CTR, were neither disinterested nor objective. Rather, they were designed and used to promote "favorable" research, to suppress negative research where possible, and to attack negative research where it could not be suppressed, all -- according to a 1978 Philip Morris memorandum to its public relations department -- in order to convince the public that the "case against smoking is not closed."

103. For example, on information and belief, CTR funded a secret research project which resulted in a 1974 report that concluded that, based on present knowledge, cigarettes with either reduced tar or reduced gas vapor constituents could not be considered safe, and that these cigarettes did not eliminate health risks such as lung cancer. This information was concealed from the public.

104. A 1974 report to the CEO of Lorillard provides a retrospective look at some of the true purposes of the joint industry research effort. Contrary to the public representations of joint industry research which was designed to examine and resolve smoking and health questions, the author, a Lorillard research executive, described the actual criteria for CTR's selection of scientific projects:

39

> Historically, the joint industry funded smoking and health research programs have not been selected against specific scientific goals, but rather for various purposes such as public relations, political relations, position for litigation, etc. Thus, it seems obvious that reviews of such programs for scientific relevance and merit in the smoking and health field are not likely to produce high ratings. In general, these programs have provided some buffer to public and political attack of the industry, as well as background for litigious strategy. . . .

105.   Another internal document (from a TI official to the group's president) described the importance of using joint industry research to maintain public doubt about evidence linking smoking with disease:

> For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts -- litigation, politics, and public opinion.
>
> While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not -- nor was it intended to be -- a vehicle for victory. On the contrary, it has always been a holding strategy, consisting of
>
> --   creating doubt about the health charge without actually denying it
>
> --   advocating the public's right to smoke, without actually urging them to take up the practice
>
> --   encouraging objective scientific research as the only way to resolve the question of the health hazard
>
> * * *
>
> As an industry, therefore, we are committed to an ill-defined middle ground which is articulated by variations on the theme that, "the case is not proved. . . ."
>
> In the cigarette controversy, the public --especially those who are present and potential supporters (e.g. tobacco state congressmen and heavy smokers) -- must perceive, understand, and believe in evidence to sustain their opinions that smoking may not be the causal factor.
>
> As things stand, we supply them with too little in the way of ready-made credible alternatives.

40

106.   A 1978 memo, addressed to the CTR file from a Philip Morris official, provides another

description of the history and role of the joint industry research effort, a role very

different from that represented to the public:

> CTR began as an organization called Tobacco Industry Research Council (TIRC).
> It was set up as an industry "shield" in 1954.  That was the year statistical
> accusations relating smoking to diseases were leveled at the industry; litigation
> began; and the Wynder/Graham reports were issued.  CTR has helped our legal
> counsel by giving advice and technical information, which was needed at court
> trials.  CTR has provided spokesmen for the industry at Congressional hearings.
> The monies spent on CTR provides a base for introduction of witnesses.
>
> . . . [T]he "public relations" value of CTR must be considered and continued. . . .
> It is extremely important that the industry continue to spend their dollars on
> research to show that we don't agree that the case against smoking is closed. . . .
> There is a "CTR basket" which must be maintained for "PR" purposes. . . .

107.   A former 24-year employee of CTR confirmed in public statements that the joint industry

research efforts were never objective.  A woman who wrote summaries of grantee

research for CTR until 1989 stated: "When CTR researchers found out that cigarettes

were bad and it was better not to smoke, we didn't publicize that. . . .The CTR is just a

lobbying thing.  We were lobbying for cigarettes."  She continued, "In the '60s, there was

so much bad news about smoking that there really wasn't much the CTR could put out,

but anything they could find they would use."

108.   This evidence demonstrates that the role and purpose of the TIRC and the CTR in the

cigarette manufacturers' strategy was to gain the public's trust, and then to use that trust

to propagate pro-cigarette propaganda.  A tobacco industry official wrote in his personal

notes describing a meeting which included high level officials from the various  tobacco

companies that: "CTR is the best & cheapest insurance the tobacco industry can buy and

without it the industry would have to invent CTR or would be dead."

### 10. The example of Dr. Freddy Homburger

109.   Most CTR sponsored research projects were directed away from research that might add to the evidence against smoking.  Nonetheless, when CTR sponsored research reached negative results, the information was either distorted or simply suppressed.  For example, Dr. Freddy Homburger, a researcher in Cambridge, Massachusetts, received a grant from CTR to study the effects of smoke exposure on hamsters.  Halfway through the study, CTR changed his funding from a grant to a contract.  Dr. Homburger states that the CTR changed his funding "so they could control publication -- they were very open about that."  As a consequence, Dr. Homburger was required to send CTR a draft of his proposed publication of the research results.  Dr. Homburger found that when Syrian hamsters were exposed to inhaled smoke twice a day for 59 to 80 weeks, 40% of those of a cancer-susceptible strain and 4% of a resistant strain developed malignant tumors.

110.   The Scientific Director of the CTR, Dr. Robert Hockett, and a CTR lawyer, Edwin Jacob of Jacob, Medinger & Finnegan, then visited Dr. Homburger.  Dr. Homburger has testified that "[t]hey didn't want us to call anything cancer. . . .They wanted it to be pseudo epitheliomatous hyperplasia, and that is a euphemism for lesions preceding cancer.  And we said no, this isn't right.  It is a cancer."  Dr. Homburger also stated that the lawyer told him that he would "never get a penny more" if the paper was published without making the demanded changes.  Dr. Homburger compromised, and changed the paper to read "micro invasive" cancer.

111.   Dr. Homburger apparently then considered making public the events leading to the change in his paper.  Internal CTR documents describe how Dr. Homburger attempted to

call a press conference, and how CTR stopped it. Leonard Zahn, CTR's publicist reported in a memo that Dr. Homburger was planning "to tell the press that the tobacco industry was attempting to suppress important scientific information about the harmful effects of smoking. He was going to point specifically at CTR. . . ." In response, Zahn "arranged later that evening for it to be cancelled. . . . Homburger was given a cordial welcome and 'nicely' hastened out the door." Zahn ended the memo with the postscript: "P.S. I doubt if you or Tom will want to retain this note."

### 11. Special projects

112.  Another mechanism that the tobacco industry used to suppress research results which implicated smoking with disease was to involve lawyers, and then invoke the attorney/client privilege to prevent the disclosure of harmful information. CTR used the term "special projects" to mean a project which carried a risk of a negative result that might subsequently have to be suppressed. So-called "special projects" were selected for monitoring by industry lawyers to prevent disclosure.

113.  Notes prepared at a 1981 meeting of the cigarette industry's Committee of General Counsel state:

> When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyers' special project.
>
> . . . [W]e were afraid of discovery for FTC and Aviado, we wanted to protect it under the lawyers. We did not want it out in the open.
>
> * * * *
>
> Difference between CTR and Special Four (lawyers' projects). Director of CTR reviews special projects -- if project was problem for CTR, use Special Four.

43

Also, if there are work-product claims, need the lawyers' protection, . . . e.g. motivational research that was done during the FTC investigation was done through Special Four because of possibility that CTR would be subpoenaed.

114.   A memorandum addressed to CTR from a Philip Morris official characterizes CTR as a "front" for performing "special projects:" " '[S]pecial projects' are the best way that monies are spent. On these projects, CTR has acted as a 'front'; however, there are times when CTR has been reluctant to serve in that capacity. . . . "

115.   The industry's use of lawyers, and the claim of attorney/client privilege in order to insulate research projects from disclosure to the public, and to government officials, demonstrates that each of the industry representations about jointly funded objective research and about reporting the results of that research to the public, was utterly false.

### 12. Clearing the "Deadwood"

116.   Brown & Williamson went to even greater lengths to suppress and avoid disclosure of its internal research on smoking and disease. A memorandum from Brown & Williamson's general counsel, J. Kendrick Wells, recommended that much of the company's biological research be declared "deadwood" and shipped out of the country to England. He recommended that no notes, memos or lists be made about the "deadwood" materials. Wells stated, "I explained I had marked certain of the document references with an X. The X designated documents which I suggested were deadwood in the behavioral and biological studies area. I said that the 'B' series are 'Janus' series studies and should also be considered as deadwood." ("Janus" was a name of a project which attempted to isolate and remove the harmful elements of tobacco.) Wells further recommended that the

44

research, development and engineering department also "should undertake to remove the deadwood from its files."

### 13. "Mouse House" Massacre

117.    As indicated in an internal tobacco company memorandum, in contravention of the industry's "gentlemen's agreement," many of the Defendants began to perform biological research through their own facilities. In sharp contrast to the research usually sponsored by CTR, some of this research was actually directed toward examining the link between smoking and disease. When this research revealed or suggested that cigarette smoking is harmful, the cigarette manufacturers suppressed it rather than reporting it to the public, as they had undertaken and represented .

118.    One example of this practice occurred at R.J. Reynolds. In the 1960s, R.J. Reynolds established a facility in Winston-Salem, North Carolina, at which it performed research on the health effects of smoking using mice. Nicknamed the "Mouse House," R.J. Reynolds' scientists used one of their laboratories where research was conducted to perform studies of the actual smoking-related mechanism which causes emphysema in the lungs.

119.    The R.J. Reynolds lab researchers made significant progress toward understanding the role of substances known as pulmonary surfactants (meaning the lung air sacks were damaged at the cellular level) in smoking-related lung disease. R.J. Reynolds' researchers learned that smoking damages the pulmonary surfactants, and made progress in learning how that lung damage can lead to emphysema. Despite this progress, R.J.

Reynolds disbanded the entire research division in one day, and fired all 26 of its research scientists without notice.

120.   Several months before the 1970 closure and firings, R.J. Reynolds' attorneys had collected dozens of research notebooks from the scientists. The notebooks have still not been disclosed.

121.   One of the researchers later stated about R.J. Reynolds's executives and lawyers: "They like to take the position that you can't prove harm because you don't know mechanism . . . And sitting right under their noses is evidence of mechanism. What are they going to do with this stuff? They decided to kill it."

122.   R.J. Reynolds later conducted a confidential study resulting in a 1985 report in which the "Mouse House" emphysema work was "favorably" described. This report states that the work is "the more important of the smoking and health research effort because it comes close to determining what was thought to be the underlying pathology (mechanism) of emphysema." None of the work done at the "Mouse House" was disclosed to the public.

### 14. "Safer" cigarettes

123.   One of the reasons R.J. Reynolds and other cigarette companies began to do internal biological research appears to have been to attempt to develop a cigarette with reduced health risks. In order to reduce the health risks, studies were needed to discover how cigarette smoking causes disease. Once this connection had been established, attempts could be made to remove or modify the harmful agents in cigarettes. Several companies performed research of this kind by dividing cigarette smoke into its different chemical constituents, or "fractions," to discover which part of the cigarette smoke caused disease.

46

Several companies were successful in discovering which specific constituents in tobacco smoke were either carcinogenic, or linked with other diseases. This research was kept secret and never reported to the public.

124.   Even more shocking, industry documents reveal that a number of companies successfully removed certain harmful constituents from cigarette smoke, and developed prototype cigarettes with reduced health effects, yet these products were never marketed. The reason was that any such marketing effort would undermine the industry's conspiracy to represent a unified position that there is no proven scientific link between smoking and disease.

125.   A memorandum written by an attorney at the firm of Shook, Hardy & Bacon, long-time lawyers for the cigarette industry, confirmed that there was an industry-wide position regarding the issue of a safer cigarette. The 1987 memorandum referred to R.J. Reynolds' marketing of a smokeless cigarette, Premier, which heated rather than burned tobacco. The Shook, Hardy attorney wrote that the smokeless cigarette could "have significant effects on the tobacco industry's joint defense efforts" and that "[t]he industry position has always been that there is no alternative design for a cigarette as we know them." The attorney also noted that, "[u]nfortunately, the Reynolds announcement . . . seriously undercuts this component of industry's defense."

126.   As early as 1958, a memorandum from a Philip Morris researcher to the company's Vice President of Research and Development proposed that the company attempt to make a safer cigarette which could enable it to "jump on the other side of the fence . . . on the issue of tobacco smoking and health. . . ."

47

127.   Philip Morris did perform the research and development for such a product.  However,

the company never released the research results, and never informed the public that

existing cigarettes were unsafe, or that a safer cigarette was possible.  A 1964 Philip

Morris research and development presentation to its Board of Directors stated:

> Two years ago, in anticipation of a health crisis to be precipitated by the
> Smoking and Health Report of the Surgeon General's Committee, we
> undertook to develop a physiologically superior product.
>
> [W]e did put together a charcoal filter product with performance superior
> to anything in the market place.  That product was known as Saratoga.
> Physiologically it was an outstanding cigarette.  Unfortunately then after
> much discussion we decided not to tell the physiological story which
> might have appealed to a health conscious segment of the market.  The
> product as test marketed didn't have good "taste" and consequently was
> unacceptable to the public ignorant of its physiological superiority.

128.   The research and development department at Philip Morris nonetheless continued to

perform research on smoking and health, including research into safer cigarettes.  The

company viewed this as necessary in order to compete if another cigarette company

marketed a safer cigarette.  This was viewed as less likely, because work was being done

through joint, industry-sponsored research abroad.  The presentation to the Philip Morris

Board of Directors continued:

> In England a research laboratory sponsored by the industry has been
> established at Harrogate to do biomedical research.  On the Continent
> individual companies and monopolies have agreed to pool research on the
> health question, thereby reducing it as a basis for competition.  Technical
> researchers meet to share information and plan future work.  All these
> efforts underscore the broad and serious attempt to eliminate what are
> generally believed to be harmful aspects of cigarette smoke.
>
> In short, the Research and Development Department is working to
> establish a strong technological base with both defensive and offensive
> capabilities in the smoking and health situation.  Our philosophy is not to
> start a war, but if war comes, we aim to fight well and to win.

48

### 15. Liggett's safer cigarette: XA

129.   Liggett also developed a safer cigarette.  Company researchers believed that they had

discovered which cigarette smoke constituents were carcinogens, and believed that they

had found a way to remove them.  And, unlike the Philip Morris product, Liggett officials

believed the Liggett product was commercially marketable.  Nonetheless, in violation of

the company's representations and duty to the public, Liggett never marketed the

cigarette, and suppressed the research which led to its development.

130.   Despite the industry's public position attacking the validity of Dr. Ernest Wynder's

mouse painting experiments, Liggett began its own research by repeating Dr. Wynder's

condensate painting studies.  Through a contract with Arthur D. Little, Inc., Liggett

sought "to determine the validity of Wynder's results when the appropriate smoking

conditions were used, and to determine the effect of different types of tobacco on the

response level.  An extensive program was also directed toward defining the nature of the

material responsible for the tumorigenic effect."

131.   This work began soon after Dr. Wynder's study was published in 1953, and was

successfully completed.  A Liggett document discussing the history of the project states:

> Wynder's findings were confirmed and all commercial cigarette types
> produced virtually identical mouse skin tumor incidences.  The
> tumorigenic initiating effect was found to reside in a relatively small
> smoke fraction containing the polycyclic aromatic hydrocarbons.

Of course, this validation of Dr. Wynder's efforts was never released to the public.

132.   As a result of these discoveries, in 1968, Liggett began "a tobacco additive program

designed to reduce or eliminate the tumorigenic activity of cigarette smoke." Company

49

researchers discovered that palladium metal and magnesium nitrate, when added to

cigarette tobacco, acted as catalysts in the burning process which removed carcinogenic

compounds from the cigarette smoke.  Liggett performed animal studies which indicated

that "[c]igarette tar has been neutralized" and that there was no evidence of any "new or

increased hazard to the smoker."

133.   By 1977, Liggett had declared the work a success.  Company documents state:

    a.    Briefly, as a result of 20 years effort in cooperation with ADL [Arthur D. Little], we have developed a cigarette system which produces smoke of reduced biological activity. . . . tumorigenicity of smoke on the skin of the mouse.

    b.    Cigarette smoke contains a number of promoters which act in concert with other true carcinogens to enhance the production of mouse skin tumors. . . . [T]here can be no argument that the use of the additives has resulted in a product with lower carcinogenic effects. . . .

134.   Liggett concluded that it had isolated some carcinogens in cigarette smoke and had found

a way to reduce them in cigarettes of commercial quality.

135.   Despite these findings, Liggett decided not to market the new product, and decided,

instead, to abandon the XA project.  On information and belief, Liggett did so for two

reasons.  One was the danger that any disclosure that a safer cigarette was possible would

also require the admission that all existing cigarettes were not safe.  One Liggett

executive wrote that "[a]ny domestic activity will increase risk of cancer litigation on

existing products.  US manufacture for export will be less risky."  The other reason was

the apparent threat of retaliation by the largest cigarette company, Philip Morris, if

Liggett violated the industry agreement not to disclose negative information on smoking

and health.  Dr. James Mold, the Assistant Research Director at Liggett during the

development of the XA safer cigarette, has testified that: "Mr. Dey who was the . . . who

at that time, and I guess still is the president of Liggett Tobacco, made the statement that

he was told by someone in the Philip Morris Company that if we tried to market such a

product that they would clobber us."

### 16. Liggett, Dr. James Mold and the XA research

136.    The testimony of Dr. Mold, a central Liggett researcher on the safer cigarette project,

provides additional insight into what Liggett discovered, and how the company

suppressed that information from the public (whom it had pledged to inform), and why it

did not market the XA cigarette.  Dr. Mold also stated:

> [W]e'd been able to find specific materials or groups of materials which
> did produce carcinogenic effect on mouse skin.  This is what we'd started
> out to try to do.  And, in addition to that, we had found things which
> promoted activity . . . carcinogen activity on the mouse skins.
>
> We produced a cigarette which was, we felt, was commercially acceptable
> as established by some consumer tests, which eliminated the carcinogenic
> activity on the mouse skin as carried out by various workers in the field,
> and decreased the level of a number of gaseous components which had
> been pointed to as problems in . . . possible problems, lets say, in cigarette
> smoking.  We felt that the cigarette was certainly in the direction of one
> containing less hazardous materials.

137.    During the XA project, Liggett used its company lawyers in an attempt to insulate the

research from disclosure.  Dr. Mold stated that, after 1975:

> [A]ll meetings that we had regarding this project were to be attended by a
> lawyer . . . .  All paper that was generated, reports, research progress
> reports, memoranda, were to be directed to the Law Department, someone
> in the Law Department.

Dr. Mold stated that Liggett's lawyers even collected all the notes after each meeting:

> In other words, the Law Department was maintaining a confidential
> client/lawyer privilege state on all action on the project from that point
> forward.

138.    Dr. Mold also testified that the company lawyers ultimately succeeded in stopping the

project.  In the process, they ordered him not to publish the results of the research which

led to the development of a safer cigarette.  Dr. Mold stated:

> Whenever any problem came up in the project, the Legal Department
> would pounce upon that in an attempt to kill the project, and this happened
> time and time again.  So at this point in time when they say, "Well, you
> can't publish a paper," we didn't ask why.  We knew why. . . .  That they
> had no intention of making this any more public than they had to.

139.    Thus, despite the significance of the research, and Dr. Mold's requests to publish a

scientific paper on the results, Liggett suppressed the work, and ordered Dr. Mold to

neither publish nor present the findings to a scientific forum.  Dr. Mold got as far as

preparing a paper for publication and presentation, but according to his testimony:

> Before the paper was presented, I got a frantic call from Mr. Greer, our ...
> at that time, the legal counsel of Liggett, not . . . to not distribute the press
> release and not hold a press conference, that they had changed their mind.
>
> It was my understanding that Liggett did not want to be associated in
> public with this development.

140.    Dr. Mold stated that he had requested permission to publish the paper in *Science* or in the

*Journal of Preventative Medicine*.  He stated that the Liggett legal department had

ordered him not to submit the paper.  Dr. Mold also stated that the legal department had

instructed him not to attend a conference on smoking and health.

141.    Ultimately, only an abstract of the paper was published, and Dr. Mold was not allowed to

attach his name to the publication.  Rather, after changes by the legal department, the

abstract was published by the consulting firm, Arthur D. Little.

142.    When asked why Liggett never marketed the safer XA cigarette, Dr. Mold explained:

52

> Well, I can't give you, you know, a positive statement because I wasn't in
> the management circles that made the decision, but I certainly had a pretty
> fair idea why. . . .

> Well, my feeling was that they, as was stated in terms of our appearing on
> publications and our presenting the information to the Cold Springs
> Harbor symposium and other public pronouncements, that they felt that
> such a cigarette if put on the market would seriously indict them for
> having sold other types of cigarettes that didn't contain this, for example.
> Or that they were carrying on this biological research at the same time
> saying it meant nothing.

### 17. Liggett's safer cigarette patent

143.   Before deciding not to market the XA cigarette, Liggett obtained a patent for the process

it had discovered to produce the safer cigarette.  The patent application describes the

reduction in cancer in mouse studies.  Subsequent stories in the media regarding the

patent application characterized Liggett as the first cigarette company to admit that

smoking caused cancer.  In 1978 Liggett reacted by circulating an advertisement called

the "Liggettgram" which stated:

> Liggett and the cigarette industry continue to deny, as they have
> consistently, that any conclusions can be drawn relating to such test results
> on mice in laboratories to cancer in human beings.  It has never been
> established that smoking is a cause of human cancer.

> The laboratory experiments reported in the patent were conducted for
> Liggett by an independent researcher, The Life Sciences Division of
> Arthur D. Little, Inc.

144.   At the time Liggett made these statements, including the statement that no conclusions

regarding human cancer can be drawn from mouse studies, Dr. Mold estimates that

Liggett, either directly or through its consultant, Arthur D. Little, had spent a total of $10

million on research involving smoking and health (research involving mice), in part to

53

develop the safer XA cigarette.  Liggett's internal reports on the benefit of the XA, and

the absence of any increased risk of harm from the additives used, specifically cited to

animal studies as reliable indicators of the health effect of that product on humans.

145.    Despite overwhelming scientific evidence, and the confirmation of this evidence by their

own internal research, the cigarette manufacturers and their trade associations continue to

this day to repeat again and again, in a unified voice, that there is no causal connection

between cigarette smoking and human disease.  These representations are fraudulent,

misleading, deceptive and untrue.  They rest at the heart of the tobacco industry's

ongoing conspiracy to market, and profit from, a product which it knows is deadly.

### 18.  The role of nicotine in smoking

146.    The other truth which the cigarette industry has made every effort to suppress, deny and

misrepresent is that nicotine is a powerfully addictive substance.  While carefully

studying nicotine's addictive character, and acting upon that knowledge to maintain

cigarette sales, the cigarette manufacturers have uniformly denied that nicotine is

addictive.

147.    According to the statements issued by the Surgeon General's office at hearings before the

Waxman Subcommittee, then-Surgeon General C. Everett Koop announced that:

> The determination that cigarettes and other forms of tobacco are addicting is
> based on standard criteria used to define drugs as addicting.  All of these criteria
> are met by tobacco just as they are met by other addicting drugs such as heroin
> and cocaine.

148.    According to the Addiction Research Center of the National Institute on Drug Abuse,

nicotine in tobacco has an addictive potential which is similar to that of heroin, cocaine

and amphetamines. Furthermore, Dr. Jack E. Henningfield, Pharmacologist and Chief of

the Biology of Dependence and Abuse Potential Assessment Laboratory of the National

Institute on Drug Abuse's Addiction Research Center, testified before the Waxman

Subcommittee that:

> [T]he results [of studies] with animals and humans show nicotine is a potent and
> powerful psychoactive drug that affects the brain, thereby altering mood and
> behavior. In fact, the potency [of nicotine] is more than 1,000 times more potent
> than alcohol, and 5-10 times more potent than cocaine and morphine in producing
> like-effects.

149.   The cigarette manufacturers' public deception as to the addictiveness of nicotine, and the

cigarette industry's secret manipulations of nicotine, were and are critically important to

the cigarette industry. As truly objective researchers increased their warnings about the

health dangers of cigarettes, nicotine addiction kept people smoking. This second front

in the war against the public health (maintaining that nicotine is not an addictive agent)

allows the cigarette manufacturers to continue to sell their dangerous products. And if a

new consumer is fooled by "pro-cigarette" disinformation on health, it may well be too

late. Instead of a simple decision not to purchase a product, the consumer must grapple

with an addiction.

### a. Industry knowledge about the addictiveness of nicotine

150.   The cigarette companies have, for a long time, known of the addictive properties of the

nicotine contained in the cigarettes they manufacture and sell. The following illustrates

such knowledge:

    a.    In 1962, Brown & Williamson's parent company, BAT, held a meeting of its
        worldwide subsidiaries in Southampton, England. During that meeting, Brown &
        Williamson and BAT executives were told by Sir Charles Ellis, scientific advisor

to the BAT board of directors , that "smoking is a habit of addiction" and that "[n]icotine is not only a very fine drug, but the techniques of administration by smoking has considerable psychological advantages." Sir Charles Ellis declared again in a 1967 Brown & Williamson document that the company "is in the nicotine rather than the tobacco industry."

b.    A report dated May 30, 1963, and prepared under contract by researchers in Switzerland for BAT and Brown & Williamson -- and deliberately withheld by Brown & Williamson from the U.S. Surgeon General-- explained the physiological basis of nicotine addiction. The report shows that tobacco industry research on the addictive properties of nicotine was years ahead of non-industry research on the same subject. Brown & Williamson, and other tobacco companies, have never admitted conducting this research.

c.    A 1972 "confidential" company memo written by William L. Dunn, Jr. of the Philip Morris Research Center, concludes:

> Without nicotine, the argument goes, there would be no smoking. Some strong evidence can be marshalled to support this argument. . . . No one has ever become a cigarette smoker by smoking cigarettes without nicotine.

d.    Additional internal reports prepared by Dunn in 1972, and by the Philip Morris Research Center in March 1978, demonstrate Philip Morris' understanding of the role of nicotine in tobacco use:

> We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking. When the smoker quits, he foregoes [sic] his accustomed nicotine. The change is very noticeable, he misses the reward, and so he returns to smoking.

> The cigarette should be conceived not as a product but as a package. The product is nicotine. . . . Think of the cigarette pack as a storage container for a day's supply of nicotine. . . . Think of the cigarette as a dispenser for a dose unit of nicotine.

e.    Philip Morris scientists confirmed these early research findings with direct anecdotal evidence. In 1971, they interviewed people from Greenfield, Iowa eight months after those Iowans had quit smoking "cold turkey." A report of the interviews, called "Bird-I A Study of the Quit-Smoking Campaign in Greenfield, Iowa in Conjunction with the Movie Cold Turkey," and distributed to top Philip Morris executives concluded:

56

This is not the happy picture painted by the Cancer Society's anti-smoking commercial which shows an exuberant couple leaping in the air and kicking their heels with joy because they've kicked the habit. A more appropriate commercial would show a restless, nervous, constipated husband bickering viciously with his bitchy wife, who is nagging him about his slothful behavior and growing waistline.

f.   American Tobacco also conducted its own research on nicotine. From 1940 to 1970, American Tobacco funded, in whole or in part, more than 90 studies on the pharmacological and other effects of nicotine and related alkaloids on the body. Of the 111 biologic studies funded by American Tobacco over this period, more than 80% were related to the effects of nicotine. American Tobacco even test marketed a nicotine-enriched cigarette in Seattle, Washington in 1969.

### b.   Suppression and concealment of research on nicotine addiction

151.   Defendants, rather than fulfilling their promise to the public to disclose material

information about smoking and health, chose a course of suppression, concealment, and

disinformation about the true properties of nicotine and the addictiveness of smoking.

152.   Philip Morris' professed interest in discovering and disclosing the truth to the public was

proven to be a lie. Philip Morris hired Victor DeNoble in 1980 to study nicotine's effects

on the behavior of rats, and to research and test potential nicotine analogues. DeNoble,

in turn, recruited Paul C. Mele, a behavioral pharmacologist. DeNoble and Mele

discovered that nicotine met two of the hallmarks of potential addiction: (1) self-

administration (rats would press levers to inject themselves with a nicotine solution); and

(2) tolerance (a given dose of nicotine over time had a reduced effect).

57

153.    However, Philip Morris instructed DeNoble and Mele to keep their work secret, even from fellow Philip Morris scientists.  Test animals were delivered at dawn and brought from the loading dock to the laboratory under cover.

154.    DeNoble was later told by lawyers for the company that the data he and Mele were generating could be dangerous.  Philip Morris executives began talking about either killing the research or moving it outside of the company so that Philip Morris would have more freedom to disavow the results.  DeNoble recalled Philip Morris officials discussing several possible scenarios, including taking DeNoble and Mele off of the company payroll, continuing their service on an independent contract basis, and then moving their work overseas to a lab in Switzerland.

155.    In August 1983, Philip Morris ordered DeNoble to withdraw from publication a research paper on nicotine which had already been accepted for publication after full peer review by the journal, *Psychopharmacology*.  According to DeNoble, the company changed its mind because it did not want its own research to compromise the company's defense in litigation recently filed against it. (*Cippolone v. Liggett Group, Inc., et al.,* Docket No. 83-28645A, (D.C. N.J. 1983)).  DeNoble subsequently told Jack Henningfield, Ph.D., Chief of the Clinical Pharmacology Branch of the National Institute on Drug Abuse's Addiction Research Center, that Philip Morris officials had interpreted the *suppressed* nicotine studies as showing that "nicotine looked like heroin," in terms of drug "self-administration."

156.    In April 1984, Philip Morris officials, apparently to ensure that DeNoble and Mele's nicotine research remained suppressed and concealed, told DeNoble and Mele that the

58

lab was being closed. DeNoble and Mele were abruptly forced to halt their studies, turn off all of their instruments, and turn in their security badges by morning. Philip Morris executives threatened them with legal action if they published or talked about their nicotine research. According to DeNoble, the lab literally vanished overnight. The animals were killed, the equipment was removed and all traces of the former lab were eliminated. DeNoble recalled, "the lab was gone, everything was gone. The equipment was gone, the cages were gone, the animals were gone, all the data was gone. It was empty rooms."

157.   DeNoble testified before the Waxman Subcommittee that "senior research management in Richmond, Virginia, as well as top officials of the Philip Morris Company in New York, continually reviewed our research and approved our research."

158.   Brown & Williamson also chose to suppress and conceal its own substantial body of research on nicotine. Potentially damaging and sensitive research was undertaken to a large degree at a Brown & Williamson British affiliate's lab called Harrogate. Research was conducted at Harrogate for a number of cigarette manufacturers, and some of this research was disseminated among the various manufacturers and shared with the TI.

159.   By 1963, Brown & Williamson had also chosen to conceal material information from the Surgeon General. The company debated internally about whether to disclose to the Surgeon General, who was preparing his first official report on smoking and health, what the company knew about the addictiveness of nicotine and the adverse effects of smoking on health.

59

160. Addison Yeaman, general counsel at Brown & Williamson, stated in a 1963 report that "[w]e are, then, in the business of selling nicotine, an addictive drug . . ." Yeaman advised Brown & Williamson to "accept its responsibility" and disclose its findings to the Surgeon General. He said that such disclosure would then allow the company to openly research and develop a safer cigarette.

161. Brown & Williamson rejected Yeaman's advice to make full disclosure to the Surgeon General. A series of six letters and Telexes exchanged by Yeaman and senior BAT official A.D. McCormick between June 28 and August 8, 1963, document the company's decision not to disclose the company's research findings to the Surgeon General.

### c. The industry's interest in nicotine

162. The cigarette companies also understood early on that nicotine played a pivotal role in the success of the tobacco industry. A chronology of the industry's research and development activities leaves no doubt about the cigarette companies' conviction that nicotine was the key to their success.

163. The results of research undertaken by Brown & Williamson more than 30 years ago for a study called "Project Hippo" were finally disclosed by the company in May 1994. Documents from this study show that, sometime before 1963, the tobacco industry was actively studying the physiological and pharmacological effects of nicotine.

164. In a 1968 internal report, BAT noted that "[i]n view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review. . . ."

165. Again, in 1972, a BAT report noted:

It has been suggested that a considerable proportion of smokers depend on the pharmacological action of nicotine for their motivation to continue smoking. If this view is correct, the present scale of the tobacco industry is largely dependent on the intensity and nature of the pharmacological action of nicotine. A commercial threat would rise if either an alternative product became acceptable or the effect of nicotine was changed.

166.    To this day, the cigarette manufacturers have deliberately decided not to disclose to the public, or to public health officials, their extensive knowledge about the addictive properties of nicotine, and about its critical role in smoking. They have also chosen not to use that knowledge to reduce or eliminate nicotine from their products. Instead, upon information and belief, the cigarette manufacturers have chosen to develop new and more sophisticated methods of hooking smokers, and keeping them hooked, in order to boost cigarette sales.

167.    The cigarette industry's intense interest in the pharmacology of nicotine led to industry efforts to find an artificial nicotine that would have the psychopharmacological and addictive properties of nicotine without nicotine's dangerous effects on the heart.

168.    For example, one of Dr. DeNoble's primary functions at Philip Morris was to research and develop a nicotine analogue. DeNoble testified before the Waxman Subcommittee that he did, in fact, discover a nicotine analogue which caused animals to behave as if they were getting a nicotine high but which did not cause any indication of the heart distress which accompanies nicotine ingestion.

169.    Philip Morris, however, chose not to pursue a nicotine analogue which could be used to make a safer cigarette. On information and belief, Philip Morris decided not to pursue nicotine analogues in order to avoid:  (1) the risk of adverse publicity;  and  (2)

61

compromising the industry's consistent position that there was no alternative design for cigarettes.

170.    Brown & Williamson also understood that, for purposes of maintaining cigarette sales, nicotine was the essential ingredient in tobacco.  The company attempted to develop a "safer" cigarette, which internal documents described as "a device for the controlled administration of nicotine." "Project Ariel," the project dedicated to making that determination, focused on heating, rather than burning tobacco, and according to company documents, was "a nicotine delivery device."

171.    R.J. Reynolds' efforts to develop a safer cigarette also focused on delivering nicotine to the consumer without the harmful constituents of tobacco smoke.  In the late 1980's, R.J. Reynolds developed and test marketed Premier, a nicotine-based, smokeless and virtually tobacco-free cigarette; in essence, a nicotine delivery system.  R.J. Reynolds conducted human studies to determine whether the nicotine from Premier could be absorbed, metabolized and excreted from blood at the same rate as a standard cigarette.

172.    Former head of Defendant Nabisco, F. Ross Johnson, a driving force behind the development of Premier, said about tobacco, "Of course, it's addictive.  That's why you smoke the stuff."

173.    R.J. Reynolds, like the other cigarette manufacturers, concealed and suppressed its findings on the addictiveness of smoking, and continued to misrepresent to the public that it was committed to determining whether smoking was harmful.

174.    The cigarette companies have affirmatively misrepresented to consumers and to Congress the role of nicotine in tobacco use. Even today, the cigarette industry continues to claim that nicotine is important in cigarettes solely for flavor.

175.    A substantial body of evidence refutes that claim. For example, tobacco industry patents specifically distinguish nicotine from flavorants. Also, R.J. Reynolds' book on flavoring tobacco, while listing approximately a thousand flavorants, fails to include nicotine as a flavoring agent.

176.    In fact, the cigarette industry has concentrated on developing technologies which actually mask the bitter flavor which results from increased levels of nicotine in cigarettes. According to the Merck Index, an internationally recognized listing of drugs, nicotine has "an acrid, burning taste." U.S. Patent 4,620,554 even goes so far as to describe the taste of nicotine as "hazardous." The role of nicotine in tobacco products is pure and simple: to hook smokers and keep them hooked in the face of mounting evidence that smoking causes human disease. The cigarette industry has focused tremendous energy and substantial resources on developing a technology to ensure that smokers become and remain addicted to the industry's cigarettes.

### d. Light cigarettes: a marketing hoax

177.    The cigarette industry's conspiracy to deceive the public about the dangers of smoking was not confined to suppressing and concealing its own findings and discrediting or dismissing the findings of outside researchers. The conspiracy also extended to efforts to retain that segment of the smoking market which was becoming increasingly concerned about health. As one company researcher reported to Philip Morris executives:

> If the industry's introduction of acceptable low-nicotine products does
> make it easier for dedicated smokers to quit, then the wisdom of the
> introduction is open to debate.

178.   The cigarette industry's research indicated that low-tar cigarettes with correspondingly

low levels of nicotine were likely to be rejected by consumers. Therefore, the tobacco

manufacturers attempted to determine the extent to which a smoker's craving for nicotine

will override other considerations, including health.

179.   BAT, for example, commissioned a study called "Project Wheat," in which more than

1,000 British male smokers were questioned about their smoking habits, about nicotine,

and about their attitudes toward smoking and health.  Among "Project Wheat's" findings

were that: (1) reductions in nicotine delivery resulted in a corresponding decrease in

desire for cigarettes;  (2) a large group of smokers had both a high "inner need" for

nicotine and a high concern for health; and (3) concern for the possible health risks of

smoking "influenced smokers' willingness to try low tar brands, but there is evidence of

a conflict between their concern for health and their desire for a satisfying cigarette."

180.   On information and belief, a restricted report on "Project Wheat" by Group Research &

Development Centre, a subsidiary of BAT, shows that the cigarette industry's promotion

and marketing of low-tar cigarettes was a deliberate attempt to deceive health-conscious

smokers into believing that these so-called "light" cigarettes were less addictive:

> Concern for the possible health risks of smoking was shown in the earlier
> report to have an important influence on consumers in the direction of
> trying low tar brands, and to be independent of Inner Need.  It was also
> shown that, in many instances, smokers' concern for health evidently
> conflicted with their desire for a satisfying cigarette.

64

181.   The report pointed out the substantial market potential of a cigarette with lower tar and
higher nicotine delivery for those smokers with an "inner need" for nicotine but a
concern for health.  Upon information and belief, Brown & Williamson's introduction of
Barclay -- a low tar, high nicotine cigarette -- was a result of the findings from "Project
Wheat".

182.   The cigarette industry has cultivated that health-conscious segment of the smoking
market by promoting and selling "light" cigarettes with reduced tar and added nicotine.
National Gallup polls indicate that smokers actually believe that so-called "light"
cigarette brands  are less hazardous to their health and less addictive because they deliver
less tar and less nicotine. This widely-held belief -- although false -- has been promoted
by the cigarette companies through several misleading strategies.

183.   First, the cigarette industry has consistently told the public and the FDA that -- in the
words of Dr. Alexander Spears, Vice Chairman of Lorillard, in his 1994 testimony before
the Waxman Subcommittee -- "[n]icotine [level] follows the tar level," and that the
correlation between the two is "near perfect."

    a.    Spokesmen for another Defendant, American Tobacco, made similar
representations to the Waxman Subcommittee in an October 14, 1994 letter that
"nicotine follows 'tar' delivery, i.e. high 'tar' -- high nicotine, low 'tar' -- low
nicotine . . . . Nicotine is neither adjusted nor altered to compensate for losses
inherent in the manufacturing process."

    b.    Internal company documents reviewed by the Waxman Subcommittee, however,
show that American Tobacco experimented with adding nicotine to its tobacco
extensively.  Perhaps knowing that a public revelation of his company's
experimentation with nicotine "spiking" would be detrimental, American Tobacco
executive John T. Ashworth instructed employees by way of a confidential
memorandum: "In the future, our use of nicotine should be referred to as
'Compound W' in our experimental work, reports, and memorandums, either for
distribution within the Department or for outside distribution."

c.  Moreover, recent tests conducted at the direction of the FDA show that the low-tar brands actually have more nicotine than the non-"light" brands.  Because even the cigarette industry concedes that nicotine levels follow tar levels, any unexpectedly high level found in lower tar cigarettes renders the industry's claim of "a near perfect correlation" completely false.  And, based on the aforementioned Gallup Poll, the industry's falsehoods have seriously misled consumers.

184.  Second, the cigarette manufacturers have knowingly misled consumers by knowingly misleading the Federal Trade Commission (hereinafter "FTC") about tobacco industry nicotine delivery systems.  The cigarette manufacturers know that the significant changes they have made in cigarette design renders the FTC's current method of measuring nicotine and tar deliveries highly inaccurate.  Cigarette manufacturers know that the FTC's machine measurements of nicotine delivery understate the amount of nicotine and tar actually ingested by human smokers.  As Philip Morris Senior Scientist William L. Dunn, Jr., noted in a 1972 internal report:

> The smoker has wide latitude in further calibration: puff volume, puff interval, depth and duration of inhalation.  We have recorded wide variability in intake among smokers.  Among a group of pack-a-day smokers, some will take in less than the average half-pack smoker, some will take in more than the average two-pack-a-day smoker

185.  Third, cigarette manufacturers add various ammonia compounds during the cigarette manufacturing process which increase the efficiency of nicotine delivery to the smoker and which, thereby, increase the smoker's absorption of the drug.  In April 1994, the industry disclosed the 599 ingredients added to tobacco.  Among them were several ammonia compounds which, according to FDA Commissioner Kessler, as well as tobacco industry internal documents, increase the delivery of nicotine and almost double the transfer efficiency of nicotine in cigarettes.

66

186.    Fourth, on information and belief, the cigarette industry also misleads consumers by
        fortifying the tobacco which is used in so-called "light" cigarettes with additional
        nicotine in order to ensure that the nicotine content of the low-tar cigarettes remains at
        addictive levels.  The cigarette industry thereby maintains a continuing market for what
        consumers are misled to believe is a lower tar, lower nicotine, and thus healthier, product.
        For example, a 1981 study by Dr. Spears, (who would testify 13 years later, under oath,
        about the "near perfect" correlation between tar and nicotine levels) states explicitly that
        low-tar cigarettes use special blends of tobacco to retain high levels of nicotine: "The
        lowest tar segment [of product categories] is composed of cigarettes utilizing a tobacco
        blend which is significantly higher in nicotine."

187.    In March 1994, FDA Commissioner Kessler summarized the FTC data on nicotine levels.
        He testified to the Waxman Subcommittee that nicotine's correlation with tar was most
        disproportionate in ultra low tar cigarettes, despite the industry's representation that low
        tar means low nicotine.  Dr. Kessler made the following observation to Congress:

> It has often been said that tar and nicotine travel together in the cigarette
> smoke.  The disparities in the nicotine/tar ratios among these varieties
> raise the question as to how this can occur.

188.    Dr. Kessler's question appears to have been answered by the compelling evidence of
        tobacco industry nicotine manipulation which was recently made public by the Waxman
        Subcommittee.

### e. Industry control and manipulation of nicotine

189.    The cigarette manufacturers' control and manipulation of cigarette nicotine levels goes
        well beyond fortifying low-tar (or "light") cigarettes with nicotine.  Recent evidence

shows that the cigarette manufacturers, in fact, manipulate the amount of nicotine in *all* of their cigarettes.

190.   The cigarette manufacturers have developed, and use, highly sophisticated technologies designed to deliver nicotine in precisely calculated quantities -- quantities which are more than sufficient to create and sustain addiction in the vast majority of individuals who smoke regularly.

### *f. Other methods of nicotine manipulation*

191.   The story of Brown & Williamson's development of a new tobacco plant, dubbed "Y-1", is one of the more egregious examples of the cigarette industry's outright lies about its control and manipulation of nicotine levels in its products.

192.   On June 21, 1994, FDA Commissioner Kessler testified before the Waxman Subcommittee that Brown & Williamson had developed a super-high nicotine tobacco plant, which the company called "Y-l." The FDA's discovery followed Brown & Williamson's May 3, 1994 flat denial to the FDA of engaging in "any breeding of tobacco for high or low nicotine levels."

193.   The four FDA investigators who visited the Brown & Williamson tobacco facility in Macon, Georgia on May 3, 1994 swore in affidavits that company officials had denied that Brown & Williamson was involved in breeding tobacco for the specific purpose of manipulating nicotine levels in cigarettes. Only after the FDA investigators had learned of the development of "Y-1" and had confronted company officials with proof of their discovery, did the company admit that it was both growing and using the high-nicotine plant.

68

194.    In fact, in a decade-long project, Brown & Williamson secretly developed a genetically-engineered tobacco plant with a nicotine content more than twice the average found in naturally flue-cured tobacco.  Brown & Williamson took out a Brazilian patent (written in the Portugese language) for the new plant.  Brown & Williamson, and a Brazilian sister company, Souza Cruz Overseas, grew "Y-1" in Brazil and shipped it to the United States for use in five Brown & Williamson cigarette brands sold in Iowa, including three brands which had been labeled "low-tar."  When the company's deception was uncovered, company officials admitted that close to four million pounds of "Y-1" were stored in the company's United States warehouses.

195.    As part of its massive cover-up, Brown & Williamson even went so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had developed "Y-1," to tell FDA investigators that "Y-1" had "never been commercialized."  Only after the FDA discovered two United States Customs Service invoices indicating that "more than a half-million pounds" of "Y-1" tobacco had been shipped to Brown & Williamson on September 21, 1992, did the company admit that it had developed the high-nicotine tobacco.

196.    The substantial number and pattern of tobacco industry patents show that the cigarette industry has developed the capability to manipulate nicotine levels in cigarettes to an exacting degree.  The following excerpts from tobacco company patents demonstrate the industry's manipulation of nicotine levels:

    a.    "[P]rocessed tobaccos can be manufactured under conditions suitable to provide products having various nicotine levels;"

b. "[T]he present invention . . . is particularly useful for the maintenance of the proper amount of nicotine in tobacco smoke;" and

c. A Philip Morris patent application discusses an invention that "permits the release into tobacco smoke, in controlled amounts, of desirable flavorants, as well as the release, in controlled amounts and when desired, of nicotine into tobacco smoke."

197. FDA Commissioner Kessler testified in detail before the Waxman Subcommittee about the various forms of nicotine manipulation practiced by the tobacco industry. These include: (a) manipulating the rate at which nicotine is delivered in the cigarette; (b) transferring nicotine from one material to another; (c) increasing the amount of nicotine in cigarettes; and (d) adding nicotine to any part of a cigarette.

198. Commissioner Kessler's disclosures show that nicotine is not an inevitable or unavoidable component in tobacco products. In fact, cigarette manufacturers have the capability to remove all, or virtually all, of the nicotine from their products using present-day technology.

199. Other revealing evidence of the cigarette companies' manipulation and control of nicotine levels includes the emergence of a cottage industry, specializing in the manipulation of nicotine, which is currently dealing directly with tobacco manufacturers. On information and belief, Philip Morris uses or has previously used a process called "tobacco reconstitution" which controls nicotine levels in cigarettes. The process was patented and marketed by LTR Industries, a subsidiary of the Kimberly-Clark Corporation.

200. "Reconstituted tobacco" is made from stalks, stems and other waste which, at one time, was considered garbage and was previously discarded by cigarette manufacturers. On information and belief, ordinarily, "reconstituted tobacco" contains 25% or less nicotine

adjustments will not affect the other important properties of customized reconstituted tobacco produced at LTR Industries: low tar delivery, high filling power, high yield and the flexibility to convey organoleptic modifications. We can help you control your tobacco.

204.    Furthermore, the tobacco industry's own trade literature explains that the Kimberly-Clark

process enables manufacturers to triple or even quadruple the nicotine content of

"reconstituted tobacco," thereby increasing the nicotine content of the final manufactured

product.

205.    Another enterprise, which does business under the name "The Tobacco Companies of the

Contraf Group," quite explicitly specializes in the manipulation of nicotine as an

additive. An advertisement run by the Contraf Group in the international trade press

states: "Don't Do Everything Yourself! Let us do it More Efficiently!" Calling itself

"The Niche Market Specialist," Contraf lists among its areas of specialization "Pure

Nicotine and other special additives."

206.    The cigarette industry has also used a process called "denaturing" to add nicotine to

cigarettes. Nearly-pure nicotine is combined with alcohol and then applied to tobacco

during the manufacturing process. Trucking records show that Philip Morris, for

example, received thousands of gallons of this nicotine/alcohol mixture during the 1980s.

207.    Against this mounting body of evidence regarding the cigarette industry's manipulation

and control of nicotine levels in cigarettes, the cigarette manufacturers continue to

publicly deny manipulating and controlling nicotine levels. Under oath, its CEOs made

the following denials to the Waxman Subcommittee:

    a.    William I. Campbell, President and CEO of Defendant Philip Morris, testified on
           April 14, 1994 that "Philip Morris does not manipulate nor independently control

72

the level of nicotine in our products. . . . Cigarettes contain nicotine because it occurs naturally in tobacco."

b.   James W. Johnston, President and CEO of Defendant Nabisco, told Congress: "We do not add, or otherwise manipulate nicotine to addict smokers."

c.   Andrew J. Schindler, President and Chief Operating Officer of Defendant R.J. Reynolds, told Congress that "We do not restore any nicotine anywhere in our process. . . . We lose nicotine, for example, in the reconstituted sheet process . . . . [N]o where in that process is any nicotine being incrementally added into the process." Contradicting Johnston's and Schindler's statements, Dr. Robert Suber, a toxicologist with R.J. Reynolds, admitted that R.J. Reynolds controls nicotine levels in its products. He told CNN that "[i]n order to deliver to the consumer a product that he wants, a consistent level of nicotine, we have to blend the tobaccos accordingly. So we do control it."

d.   Andrew H. Tisch, Chairman and CEO of Defendant Lorillard, told Congress that "Lorillard does not take any steps to assure a minimum level of nicotine in our products. Lorillard does not add nicotine to cigarette tobacco for the purpose of manipulating or spiking the amount of nicotine received by the smoker."

e.   Edward A. Horrigan, Jr., Chairman and CEO of Defendant Liggett, told Congress: "In all of my years in this business worldwide, I have never known of a product-designed objective or goal that included even the notion of spiking the amount of nicotine in a cigarette to achieve a level that would hook or addict smokers." Despite this sworn testimony, on information and belief, Horrigan had -- in his previous capacity as Chairman and CEO of R.J. Reynolds -- participated in the development and marketing of Premier and other R.J. Reynolds cigarette brands whose manufacturing process included the manipulation of nicotine content and delivery.

f.   On June 23, 1994, Thomas E. Sandefur, Jr., CEO of Defendant Brown & Williamson, in the face of overwhelming evidence to the contrary, testified under oath that his company was being "set up" for the assertion that it failed to disclose information about Y-1. He admitted that the company controlled nicotine, but in a shop-worn and now familiar refrain, stated that the company did so only for "taste."

g.   T.F. Riehl, Vice President for Research and Development at Defendant Brown & Williamson, joined in the industry's denial chorus by testifying that the Barclay cigarette's tobacco was only mixed to improve flavor, and by denying that the company mixed the tobacco for the Barclay cigarette to have a higher concentration of nicotine. "No, sir," he swore. "We blend for taste, not nicotine." However, internal documents from Brown & Williamson indicate that Riehl

73

than regular tobacco. A former R.J. Reynolds manager, who demanded anonymity, told the ABC news program "Day One" that, on the average, currently marketed, brand-name cigarettes contain about 22% reconstituted tobacco. So-called "cut rate," or generic, brands, he said, typically contain about twice that amount.

201. A laboratory analysis commissioned by "Day One," and apparently conducted by the American Health Foundation, confirmed the industry's heavy use of "reconstituted tobacco." One R.J. Reynolds brand contained 25%, and another consisted of about 33%, reconstituted tobacco. Yet, tested samples of the reconstituted tobacco tested in R.J. Reynolds brands Winston, Salem, Magna and Now had up to 70% of the nicotine that would be found in regular tobacco, thereby indicating that R.J. Reynolds had "fortified" the "reconstituted" tobacco with additional nicotine.

202. On information and belief, because "reconstituted tobacco" has inferior taste and less nicotine, the cigarette manufacturers or their agents apply a powerful tobacco extract, either alone or as part of a solution of flavorings, to the "reconstituted tobacco." R.J. Reynolds and the other cigarette manufacturers have the technology to add flavorings with or without nicotine, so the addition of nicotine to "reconstituted tobacco" is purely at the manufacturers' discretion.

203. The Kimberly-Clark tobacco reconstitution process is believed to be used throughout the world-wide tobacco industry. A Kimberly-Clark advertisement published in tobacco industry trade publications states:

> Nicotine levels are becoming a growing concern to the designers of modern cigarettes, particularly those with lower "tar" deliveries. The Kimberly-Clark tobacco reconstitution process used by LTR Industries permits adjustments of nicotine to your exact requirements. These

71

himself, conducted research which focused on the adjustment of nicotine and tar levels without regard to taste. In fact, ten years prior to testifying before the Waxman Subcommittee, Riehl presented Project Aries, Brown & Williamson's safer cigarette project, at the 1984 Smoking Behavior-Marketing Conference. Riehl's presentation emphasized tar reduction and nicotine enrichment in later puffs, but never addressed the issue of taste.

208.   The cigarette industry's "taste" argument is belied by health policy expert Clifford E.

Douglas, who asked the following rhetorical question during testimony before the FDA's

Drug Abuse Advisory Committee: "[W]hy [do] so many smokers who have endured

tracheotomies due to throat cancer find it necessary to continue to smoke through the

holes in their throats, where they cannot taste a thing?"

209.   The aforementioned, newly discovered evidence of the tobacco industry's manipulation

of nicotine levels in cigarettes, and recent disclosures made to the Waxman

Subcommittee about nicotine addiction and manipulation, have not deterred the industry

from its campaign of concealment and disinformation. As recently as April 1994, R. J.

Reynolds placed advertisements across the country denying that it "spikes" cigarettes

with nicotine, and denying that it believes cigarette smoking is addictive. Obviously, this

public relations blitz was designed to mislead the public about whether cigarette

companies deliberately control nicotine levels in their products.

210.   An advertisement placed by Philip Morris in newspapers across the country in April 1994

denied that Philip Morris manipulates nicotine levels and stated that "the nicotine level in

the finished cigarette is lower than the nicotine level of the original, natural tobacco

leaf."

211.   R.J. Reynolds placed a similar advertisement in newspapers across the United States in

1994, mischaracterizing the "recent controversy" as focusing on R.J. Reynolds' "various

techniques that help us reduce the 'tar' (and consequently the nicotine) yields of our products."

212. These advertisements deliberately create the false impression that the "recent controversy" they refer to is about whether "reconstituted" and reduced-tar tobaccos have less nicotine than the original tobacco leaves. The controversy these advertisements so carefully avoid, however, is in regard to the fact that the nicotine levels in both "reconstituted" and tar-reduced tobacco do not follow the claimed "near perfect" correlation with tar levels. In fact, the nicotine levels in reconstituted and low tar tobacco products have proven to be disproportionately higher than tar levels. The discrepancy is not in the correlation, but in the story the industry has told the public about how it manufactures cigarettes. That story has carefully and deliberately omitted the industry's addition of nicotine in the form of tobacco extract, which ensures that cigarettes contain enough nicotine to keep them at addictive levels.

### 19. Targeting of Minors

213. Every day, more than 1,200 cigarette smokers die of cigarette-related diseases. Others manage to break their addiction to nicotine and quit. In order to prevent a precipitous decline in cigarette sales, the big cigarette manufacturers must attract more than 3,000 new smokers a day. These new smokers are drawn almost entirely from the ranks of America's youth. In the words of one R.J. Reynolds official: "Realistically, if our Company is to survive and prosper, over the long term we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market. . . . " The tobacco companies have devoted considerable research efforts to creating and

75

marketing brands to attract these new, youthful tobacco users. Consequently, despite the best efforts of parents, educators, medical professionals and the State of Iowa, tobacco use among young people in Iowa persists.

214.   The Substance Abuse and Mental Health Services Administration estimates that, each day, "6,000 young persons try a cigarette and approximately 3,000 become daily smokers." According to the U.S. Department of Health and Human Services, among persons who have ever smoked daily, 82% began smoking before their eighteenth birthday.

215.   The U.S. Surgeon General has determined that "[n]early all first use of tobacco occurs before high school graduation. This finding suggests that if adolescents can be kept tobacco-free, most will never start using tobacco."

216.   Tobacco products and advertising are used to create a mental image associating tobacco use with good health, sexual attractiveness, glamorous and athletic lifestyles, and success. One R.J. Reynolds memo describes in detail "what qualities and image a new brand aimed at the youth market should have."

217.   This type of youth-oriented advertising increases demand for cigarettes among young people. Within a short period of time, the young tobacco user becomes physiologically and emotionally dependent on, or in other words, addicted to, tobacco. Later, as the maturing tobacco user begins to wish he or she could quit, advertising reinforces tobacco use and seeks to minimize health concerns. The advertising creates doubt, confusion and mistake which tobacco addicts then use as excuses to avoid the pain and discomfort of

breaking -- or at least attempting to break -- their addiction to nicotine.  This is the vicious cycle of fraudulent tobacco industry advertising regarding its products.

218.  The advertising imagery used to promote tobacco use among young people particularly appeals to those with low self-esteem and emotional insecurity.  Once the young person has been predisposed toward tobacco use, a variety of factors can precipitate actual experimentation.  For many young people, precipitating factors include being given a free pack of cigarettes by an industry representative, or purchasing tobacco products in exchange for attractive tee shirts, baseball caps, or other gimmicks used to promote tobacco use.

219.  The cigarette brands most frequently purchased by adolescents are Philip Morris' Marlboro, R.J. Reynolds' Camel and Lorillard's Newport.  These brands were the three most heavily advertised brands in 1993 and all have advertising imagery designed to appeal to young people.

220.  For instance, Philip Morris repositioned Marlboro from at one time being a red-tipped cigarette aimed toward adult women, to the cigarette for the macho cowboy.  By changing advertising imagery, Philip Morris was able to tap into a wholly new and different market.  The wild spirit of the Marlboro man captured the adolescent imagination.

221.  Just as Marlboro was repositioned from the women's market to the macho male market by a new advertising campaign, R.J. Reynolds repositioned its Camel brand from older, adult males, to the "children's market."  When R.J. Reynolds began the "Joe Camel" cartoon campaign in 1987, Camel's share of the "children's market" was only 0.5%.  In

just a few years, Camel's share of this illegal market has increased to 32.8%, representing sales estimated to be nearly $500 million per year. Aside from the aforementioned boost in Camel's market share since the introduction of Joe Camel, recent surveys show that 91% of America's six-year olds could correctly match Joe Camel with a picture of a cigarette, and both the silhouette of Mickey Mouse and the image of Joe Camel were nearly equally well-recognized by almost all children surveyed.

222.   Lorillard's campaign promoting Newport cigarettes is another successful advertising campaign targeted at young people. Newport ads frequently show men and women in sexually suggestive positions, always having fun. The Newport ad even uses the health-oriented slogan "Alive With Pleasure."

223.   Other brands targeted to, and playing on, the vulnerabilities of young smokers include R.J. Reynolds' Vantage ("The Taste of Success") and Philip Morris' Virginia Slims ("You've Come A Long Way, Baby").

224.   Both the themes and the location of tobacco advertising betray youth as the industry's intended target. During the 1980s, there was a steady migration of tobacco advertising into youth-oriented publications. Magazines with sexually-oriented themes, and those concerning entertainment and sporting activities, had the highest concentration of tobacco ads. For many of these magazines, teenagers comprise a quarter or more of the total readership. Tobacco ads in these youth-oriented magazines were frequently multi-page, pop-up ads which are significantly more costly -- but also more attention-grabbing -- than conventional ads. News magazines, like *Time* and *Newsweek*, which have older audiences, had relatively few tobacco ads, and those ads tended to emphasize implicit

health promises concerning tar and nicotine rather than glamorous images.  On information and belief, certain tobacco companies place point of purchase advertising in places where minors are likely to frequent, i.e., near schools.

225.   The cigarette manufacturers sell more than one billion packs of cigarettes per year to minors under the age of 18.  In 1988, these sales accounted for about $1.25 billion in sales.  Approximately 3% of the total tobacco industry profits ($221 million in 1988) are derived directly from the sale of cigarettes to children under the age of 18, an activity which is illegal in 43 states, including Iowa.

226.   Over the years, Defendant TI has, on behalf of the tobacco industry, undertaken public relations campaigns designed to convince the public that the industry discourages young people from smoking.  Several tobacco manufacturers have also undertaken their own public relations campaigns along those same lines.  These campaigns are nothing more than pro-smoking subterfuge and fraud.  Instead of conveying the best reason for not starting to smoke -- that it kills -- the industry portrays smoking as a permissible "adult" custom and decision -- like getting married or having children.  This message is thus part of the problem, not the solution.

227.   If the youth-oriented advertising and deceptive "anti-smoking" campaigns were not enough, the tobacco industry has also targeted children with its decades-long fraudulent "unresolved health controversy" campaign.  In January 1990, R. J. Reynolds' manager of public relations wrote the following to a public school principal:

> The tobacco industry is also concerned about the charges being made that
> smoking is responsible for so many serious diseases. Long before the
> present criticism began, the tobacco industry, in a sincere attempt to
> determine what harmful effects, if any, smoking might have on human

health, established the Council for Tobacco Research--USA. The industry has also supported research grants directed by the American Medical Association. Over the years the tobacco industry has given in excess of $162 million to independent research on the controversies surrounding smoking -- more than all the voluntary health associations combined.

Despite all the research going on, the simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to the many unanswered controversies surrounding smoking -- and the fundamental causes of the diseases often statistically associated with smoking -- we believe can only be determined through much more scientific research. Our company intends, therefore, to continue to support such research in a continuing search for answers.

We would appreciate your passing this information along to your students. (Emphasis added)

228. The targeting of minors, while unquestionably wanton, reckless and unethical, was, and

continues to be, vitally important to the tobacco industry. Yet, industry officials

cynically deny that they do it. Despite those denials, the industry officials have devoted

considerable resources to targeting tobacco advertising toward minors because minors

enticed into smoking provide a guaranteed market for a product which kills the industry's

customers by the hundreds of thousands every year.

### C. The role of the Tobacco Industry Attorneys

229. Shook, Hardy & Bacon, L.L.P. (hereinafter generally "Shook, Hardy," but occasionally,

collectively as "the tobacco industry attorneys") is a law firm located at One Kansas City

Place, 1200 Main Street, Kansas City, Missouri 64105. Jacob, Medinger & Finnegan

(hereinafter generally "Jacob, Medinger," but occasionally, collectively as "the tobacco

industry attorneys") is a law firm located at 1270 Avenue of the Americas, Rockefeller

Center, New York, New York 10020. Chadbourne & Park, L.L.P. (hereinafter generally

80

"Chadbourne & Park", but occasionally, collectively as "the tobacco industry attorneys")

is a law firm located at 30 Rockefeller Plaza, New York, New York 10112.

230.    The above described tobacco industry attorneys at times pertinent to this Petition

(including through the present date) acted individually and as agents and/or co-

conspirators of some or all of the Defendants.

231.    Each of the tobacco industry attorneys has engaged in unlawful conduct in their

orchestration, perpetration and management of: (1) the false controversy regarding

smoking and health; (2) the related corruption of the scientific process; and (3) abuse of

the attorney-client privilege and work product protections.  This unlawful conduct has

been facilitated, in part, by the tobacco industry attorneys' close association with each

tobacco company's general counsel, as well as their deep involvement in the CTR and the

TI, their control of key CTR and TI committees and appointments, and their direct

contacts with researchers and the research community.

232.    As already noted, the CTR holds itself out, and has been held out by the tobacco

companies and the tobacco industry attorneys, as an independent research body which

performs objective research regarding the health effects of smoking for the public's

benefit.  In the words of Shook, Hardy partner Bill Shinn, however, the TIRC

(predecessor to the CTR), was set up as an industry "shield," and the CTR has acted as a

"front" for the tobacco companies' litigation and public relations goals.  The tobacco

industry attorneys have been knowingly instrumental in perpetuating this fraud.

233.    A 1978 memorandum from Shook, Hardy partner, Donald Hoel, captures the tobacco

industry attorneys' intentional manipulation of the CTR:

> After some further discussion, Janet [Brown of Chadbourne & Park] and Arnie Henson expressed American Tobacco Company's view that CTR must be maintained but needed new people. It must be more politically oriented. They felt that CTR must look at what is happening and what others are doing to see what questions can be raised, etc. The approach must be steady, slow and conservative. They must find skeptical scientists. . . .   The staff at CTR also needed to be more tobacco oriented with a skeptical view.

234.   In managing the CTR fraud, the tobacco industry attorneys became deeply involved in the screening, selection, funding, supervision and ultimate disposition of research projects. They channeled sensitive (i.e. potentially damaging) research into "special projects" and "special accounts."  Jacob, Medinger partner Ed Jacob, is quoted in a 1981 internal tobacco industry document as saying: "When we started the CTR Special Projects, the idea was that the scientific director of CTR would review a project. If he liked it, it was a CTR special project. If he did not like it, then it became a lawyer's special project."

235.   As to research which was progressing "satisfactorily" -- that is turning up no potentially damaging results -- the tobacco industry attorneys recommended providing it with additional funding. For example, a 1980 letter from attorney Shinn to the various general counsel of the various tobacco companies, recommends a grant to a Dr. Aviado. Although Shinn states that "[t]his would be a no-strings attached grant and Dr. Aviado would be free to publish," the role of Shook, Hardy in supervising and ultimately controlling Dr. Aviado's research is clear:

> We would anticipate a brief report toward the end of this year concerning the project. Providing the project is progressing satisfactorily, I anticipate recommending a renewal for a second year and, thereafter, with the same proviso, for a third year.

Research which was troubling, either in its direction or in its results, was redirected by the tobacco industry attorneys, not renewed or quickly terminated

236.   Indeed, "satisfactory" progress in research has always been the touchstone for the tobacco industry attorneys. A telling 1981 memorandum between industry General Counsel J. Kendrick Wells and Ernest Pepples of Defendant Brown & Williamson speaks of a visit by Timothy Finnegan, a partner in Jacob, Medinger: "It was a cordial meeting and Tim believes he has persuaded them to take a new thrust with their research. The new thrust will have questionable value, but no negative."

237.   Similarly, Jacob, Medinger wrote a letter to the various general counsel of the tobacco industry urging them to approve a grant to Dr. Henry Rothschild, who was doing a study on possible genetic links to lung cancer. Although CTR had rejected Dr. Rothschild's request to renew his grant, Finnegan urged funding on the ground that "[h]is research has evolved to a point where his primary focus was on a possible genetic factor rather than environmental occupational factors."

238.   The breadth of the involvement of the tobacco industry attorneys in the selection of research projects to be funded, including those funded by and through CTR, is reflected in the excerpts from the following letter written by attorney Shinn:

> The Research Liaison Committee has not had a meeting since July 1976. I have had discussion with individual members of the committee about calling a meeting. It has been suggested that the views of the companies with respect to the future activities of this committee should first be explored through the Committee of Counsel. . . . We may want to discuss research in a larger context, i.e., what are the industry's present needs? This, of course, involves consideration of the role of institutional type projects (tobacco, e.g., Harvard, and non-tobacco, e.g., Washington University); the role of CTR; and the need for specific areas of research with due regard for the politics of science, the importance of developing

83

witnesses and the need for a responsive mechanism to meet unfounded
claims made about tobacco.

239.    In fact, Shook, Hardy attorneys chaired the Research Liaison Committee, a committee

comprised of tobacco industry representatives, "to study the research programs funded by

our industry, both through CTR and independent projects that are brought to us from time

to time." This committee "directed its primary attention to the question of how industry

research should be recommended, decided upon, and supervised in order to accomplish

the objective of an efficient and coordinated program which would best serve the needs

and objectives of the industry." In addition to tobacco industry attorney involvement in

the Research Liaison Committee, tobacco industry attorneys also sat on the CTR

Committee of Counsel and the CTR Ad Hoc Committee. Attorney Janet Brown of

Chadbourne & Park was also often in attendance at various CTR meetings, and was a

member of the CTR Board of Directors.

240.    In addition, the tobacco industry attorneys used the attorney-client privilege and work

product protections to shield "special projects" and "special accounts" documents from

both the public and government regulators. For example, in notes of a 1981 CTR

Committee of Counsel meeting, attorney Jacob is quoted as saying: "With Spielberger,

we were afraid of discovery for FTC and Aviado, we wanted to protect it under the

lawyers. We did not want it out in the open." And, another set of notes from the same

meeting states:

> E.J. [Attorney Ed Jacobs]: Difference between CTR and Special Four (lawyers
> projects). Director of CTR reviews special projects -- if project was problem for
> CTR, use Special Four. Also, if there are work-product claims, need the lawyers'
> protection, e.g., CTR's past director, Bill Gardiner, didn't think much of Rowe's
> work; Special Four financed him and he is now published, e.g. motivational

research that was done during the FTC investigation was done through Special Four because of possibility that CTR would be subpoenaed. E.g. Joe Janus' current study of cohort effect (those born in 1890-1910) is a full CTR project -- Special Four gave interim support.

241.   These actions were directed, generally and specifically, at the State of Iowa, and were intended to, and did, and continue to have an impact on the State of Iowa.

## VII.  SUMMARY

242.   Plaintiff asserts that the above facts mandate the conclusions, best articulated as follows by the AMA in its July, 1995 *Journal of the American Medical Association (JAMA)* editorial:

> [W]e would have seen a very different picture of tobacco use today if the group knowing the most about the dangers of tobacco use, the industry, had been honest with its customers. The [Brown & Williamson] documents and the [July 15, 1995] JAMA articles show us in a stark way that some of those who speak for the tobacco industry dissemble, distort and deceive, despite the fact that the industry's own research is consistent with the scientific community's conclusion that continued use of their product will endanger the lives and health of the public at home and abroad. . . . These papers show us how little the tobacco industry is to be trusted when they speak on health issues and that the "evidence" they put before regulatory and legislative bodies at the national, state, and local level is highly suspect.

> * * * *

> In summary, the evidence is unequivocal -- the US public has been duped by the tobacco industry. No right-thinking individual can ignore the evidence.

## VIII.  ASSERTED CAUSES OF ACTION

### Count I:  Iowa Consumer Fraud Act

COMES NOW the State and, for Count I of its claim against the Defendants and each of them, states as follows:

85

243.   Paragraphs 1 through 242 above are incorporated by reference as if fully set forth herein.

244.   The Iowa Consumer Fraud Act, Iowa Code § 714.16, states in part:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise..., whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

Iowa Code § 714.16(2)(a).

245.   The Defendants have violated and continue to violate the Iowa Consumer Fraud Act

by engaging in the unlawful practices specified in Iowa Code § 714.16(2)(a) in

connection with the sale of tobacco products, including, without limitation and by way of

example only, the following:

a.   repeatedly and systematically misleading the public about the extent to which there was genuine controversy and uncertainty among scientists and health officials regarding whether smoking cigarettes is addictive;

b.   repeatedly and systematically misleading the public about the extent to which there was genuine controversy and uncertainty among scientists and health officials regarding whether smoking cigarettes is the cause of serious and life-threatening disease;

c.   falsely claiming that Defendants were conscientiously undertaking joint and individual research efforts involving disinterested, independent researchers, intended to discover the truth regarding the health consequences of smoking;

d.   falsely promising that Defendants would freely share all data and results obtained through tobacco industry research into issues of smoking and health to enable the public to make decisions regarding cigarettes based on the best available information;

e.   failing to disclose specific facts known to the Defendants regarding the various diseases which tobacco use caused or to which it contributed and the addictive properties of nicotine;

86

f.   failing to disclose to consumers ingredients Defendants added to cigarettes, including but not limited to ammonia, and the known health risks associated with such additives;

g.   failing to pursue product modifications which were known to hold considerable promise for reducing the dangers of smoking and, in some instances, actively suppressing efforts to develop safer cigarettes;

h.   suppressing research projects that "threatened" to result in important discoveries regarding smoking and health which might jeopardize the profitability of cigarette sales or the tobacco industry's position in litigation;

i.   actively concealing scientific findings of vital interest to health officials and others concerned with the health effects of use of cigarettes because disclosure would disadvantage the tobacco industry;

j.   manipulating nicotine levels in order to ensure delivery of that drug to smokers in quantities which ensured physiological impact and promoted continuing dependency and failing to disclose such manipulation; and

k.   engaging in marketing practices oriented toward sales to minors, including but not limited to, selling cigarettes through promotional methods and techniques known to appeal to minors and known to result in increased smoking by children and adolescents.

l.   engaging in activities which have resulted in sales to minors in violation of Iowa Code § 453A.2.

246.   Pursuant to Iowa Rule of Civil Procedure 9, no security is required if the State is seeking injunctive relief.

247.   No application for injunctive relief in connection with the subject matter of this Petition has previously been presented by the State and denied by any court.

WHEREFORE, the State asks the Court to:

A.   Issue an injunction pursuant to Iowa Code § 714.16(7) (1996) enjoining Defendants and their officers, directors, agents, employees, representatives, successors, assigns, and all other persons acting in concert with or participating with Defendants, who have actual or constructive notice of the Court's injunction, from engaging in any unfair or unlawful practices with respect to the sales of cigarettes to minors;

87

B. Issue an injunction pursuant to Iowa Code § 714.16(7) (1996) enjoining the Defendants and their officers, directors, agents, employees, representatives, successors, assigns and all other persons acting in concert with or participating with Defendants, who have actual or constructive notice of the Court's injunction, from engaging in any of the unlawful practices specified in Iowa Code § 714.16(2)(a).

C. Order Defendants to restore to consumers all money they have acquired by means declared unlawful;

D. Order Defendants to disgorge all money acquired through the unlawful practices alleged herein to the extent consumers entitled to reimbursement cannot be located or the costs of administering reimbursement outweigh the benefits to consumers;

E. Order Defendants to undertake reasonable and effective measures to prevent the distribution and sale of cigarettes to minors;

F. Order the Defendants to pay the State the costs of this court action and all investigation, including reasonable attorneys' fees, pursuant to Iowa Code § 714.16(11);

G. For each violation of the Iowa Consumer Fraud Act, impose on each Defendant a civil penalty in an amount not to exceed $40,000, pursuant to Iowa Code § 714.16(7);

H. Award the State interest as allowed by law;

I. Award such further relief as is warranted by the facts and the law; and

J. Order such additional relief as the Court deems equitable.

### *Count II: Civil Liability for Deception*

COMES NOW the State and, for Count II of its claim against the Defendants and each of them, states as follows:

248. The State realleges paragraphs 1 through 242 as if fully set forth herein.

249. Iowa Code § 714.1 defines theft as including circumstances where a person "obtains the ...ownership of the property of another...by deception."

88

250.   Iowa Code § 702.9 defines deception as knowingly doing any of the following:

    a.   Creating or confirming another's belief or impression as to the existence or nonexistence of a fact or condition which is false and which the actor does not believe to be true.

    b.   Failing to correct a false belief or impression as to the existence or nonexistence of a fact or condition which the actor previously has created or confirmed.

    c.   Preventing another from acquiring information pertinent to the disposition of the property involved in any commercial or noncommercial transaction or transfer.

    d.   Promising payment, the delivery of goods, or other performance which the actor does not intend to perform or knows the actor will not be able to perform. Failure to perform, standing alone, is not evidence that the actor did not intend to perform.

251.   The Defendants have violated Iowa Code §§ 714.1 and 702.9, and such violations give rise to liability for civil damages under the doctrine announced in *Hall v. Montgomery*, 252 N.W.2d 421 (Iowa 1977).

252.   The Defendants have acted knowingly or with reckless disregard for the rights of the State.

253.   The State has been damaged by the acts and omissions of the Defendants.

WHEREFORE, the State asks the Court:

    A.   To enter judgment, jointly and severally, against each and every Defendant;

    B.   To award Plaintiff damages as may be proved by the evidence;

    C.   To award the Plaintiff punitive damages;

    D.   To enter an order enjoining the Defendants from future violations; and

    E.   For such further relief as is warranted by the facts and the law; and

    F.   For such further relief as the Court deems equitable.

## *Count III: Voluntary Assumption of A Special Duty*

COMES NOW the State and, for Count III of its claim against the Defendants and each of them, states as follows:

254.   The State realleges paragraphs 1 through 242 above, as if fully set forth herein.

255.   The Defendants through their own actions have voluntarily assumed the duty to report honestly and completely on all research regarding smoking and health through their public pronouncements.

256.   Defendants breached their duty and responsibility to report such research, and also suppressed unfavorable research data and perpetuated a false "controversy" regarding the human health consequences of smoking.

257.   The Defendants knew or should have known that the State and its citizens would rely upon their public pronouncements.

258.   The Defendants knew or should have known that such reliance would result in injury to the State.

259.   As a direct consequence of the Defendants' negligent performance of their voluntary undertaking, the State has been unable to take appropriate regulatory and other action and citizens of the State have suffered injuries in the form of addiction; cancer and other illnesses and diseases. Many of these citizens of Iowa are publicly-funded health care recipients. The State thus has borne massive costs of these illnesses and diseases by providing the necessary medical care, facilities, and services.

260.   The violations of the Defendants were knowing and undertaken with reckless disregard for the rights of citizens of Iowa and the State.

WHEREFORE, the State asks this Court:

    A.   For entry of judgment, jointly and severally, against each and every Defendant;

    B.   For an award of damages as may be shown by the evidence;

    C.   For punitive damages;

    D.   For the costs of this action;

    E.   For such further relief as is warranted by the facts and the law; and

    F.   For such additional relief as the Court deems equitable.

### Count IV: Unjust Enrichment/Restitution

COMES NOW the State and, for Count IV of its claims against the Defendants and each of them, states as follows:

261.    Paragraphs 1 through 242 are incorporated by reference as if fully set forth herein.

262.    Defendants, through their wrongful conduct, as described in the foregoing allegations and all of the Counts of this Petition, have reaped substantial and unconscionable profits from the sale of cigarettes in Iowa. Further, in addition to reaping unjust rewards for their wrongful conduct, the Defendants have caused the State, as a result of the sale of cigarettes to consumers, to suffer substantial health care and other costs directly attributable to diseases caused by the use of cigarettes.

263.    In equity and good conscience, it would be unjust for Defendants to enrich themselves at the expense of the State and its citizens. Further, in equity and in fairness, the Defendants, and not the State, should bear the cost of tobacco related diseases and have a duty to do so. By avoiding their own duties to stand financially responsible for the harm

91

done by their tobacco products, Defendants have wrongfully forced the State to perform

such duties and pay the health care costs of tobacco-related disease.

264. Defendants' unlawful conduct will continue unless the relief prayed for is granted.

WHEREFORE, the State asks this Court to:

A.  Enter judgment, jointly and severally, against each and every Defendant;

B.  Order the Defendants to disgorge all unjust amounts retained by the Defendants
    through the sales of cigarettes in Iowa and pay such amounts to the State as
    damages for their wrongful conduct;

C.  Provide restitution to the State of all amounts expended in the past and to be
    expended in the future by the State as a result of tobacco related illnesses and
    Defendants' wrongful conduct;

D.  Order Defendants to pay the costs of this action;

E.  To provide such other and further relief as is warranted by the facts and the law;
    and

F.  For such additional relief as the Court deems equitable.

### Count V: Civil Conspiracy

COMES NOW the State and, for Count V of its claim against the Defendants and each of

them, states as follows:

265. The State realleges paragraphs 1 through 242 above, as if fully set forth herein.

266. The Defendants intentionally and willfully combined, conspired and agreed with one

another for the purpose of accomplishing the unlawful ends alleged or accomplishing

lawful ends unlawfully as alleged in all other Counts of this Petition, including, without

limitation, the specifications set forth in Count I, all of which are incorporated by this

reference, and for the purposes of performing the acts, among others, set forth above in the Conduct Allegations.

267.   In addition, the Defendants intentionally and willfully combined, conspired and agreed with one another for the purpose and effect of, but not limited to:

    (a)   Suppressing scientific, medical and other information concerning the harmful health effects of smoking cigarettes  and the addictive effect of nicotine;

    (b)   Creating doubt about the scientific studies linking smoking to adverse health consequences and the addictive nature of nicotine and creating a false controversy regarding the health hazards of tobacco use;

    (c)   Manipulating and concealing the tobacco industry's manipulation of the level of nicotine in cigarettes;

    (d)   Avoiding competition based on the development, production, sale and marketing of a safer cigarette;

    (e)   Asserting false statements concerning the safety of cigarettes and the adverse health effects of smoking and tobacco and the addictive effect of nicotine;

    (f)   Preventing the loss of sales revenues that would have resulted if the information on the harmful effect of cigarette use and the addictive effects of nicotine had been made public;

    (g)   Preventing the assumption by the tobacco industry of the health care costs associated with cigarette use; and

    (h)   Shifting the costs of health care and medical services and products associated with the adverse health effects from the use of cigarettes and the addictive nature of nicotine to the State, which costs would otherwise have to be borne by the tobacco industry as a cost of the cigarette products market.

268.   The acts alleged above in the Conduct Allegations, among others, were intentionally committed by or participated in by the Defendants in furtherance of the purposes of the conspiracy.

269.   As a direct result of the Defendants' conduct, the State has suffered and will continue to suffer injury and damages as set forth above.

270.   The Defendants acted with malice and with willful, wanton, and reckless disregard for the rights or safety of others to the extent that punitive damages are justified and appropriate.

WHEREFORE, the State asks this Court:

   A.   For entry of judgment, jointly and severally, against each and every Defendant;

   B.   For an award of damages as may be shown by the evidence;

   C.   For punitive damages;

   D.   For such further relief as is warranted by the facts and the law;

   E.   For the costs of this action; and

   F.   For such additional relief as the Court deems equitable.

### COUNT VI: Aiding and Abetting

COMES NOW the State and, for Count VI of its claim against the Defendants and each of them, states as follows

271.   The State realleges paragraphs 1 through 242 as if fully set forth herein.

272.   The Defendants knowingly aided and abetted each other in the law violations described in all other counts of this Petition.

273.   The State has been damaged by the conduct of the Defendants.

274.   The actions of the Defendants were intentional and in reckless disregard of the rights of the State and its citizens.

WHEREFORE, the State asks this Court:

94

A.   For entry of judgment, jointly and severally, against each and every Defendant;

B.   For an award of damages as may be shown by the evidence;

C.   For punitive damages;

D.   For the costs of this action;

E.   For the granting of such other legal or equitable relief to the State as the Court
     deems just and equitable; and

F.   For such further relief as is warranted by the facts and the law.

## *COUNT VII: INDEMNITY*

COMES NOW the State and, for Count VII of its claim against the Defendants and each

of them, states as follows:

275.   The State realleges paragraphs 1 through 242 of this Petition as if fully set forth herein.

276.   As a direct and proximate result of the breaches of duty and omissions of the Defendants

       as alleged above and described in the Counts of this Petition, the State was obligated to

       pay and has paid hundreds of millions of dollars in the past for the provision of necessary

       medical care, facilities and services for certain of those aforementioned citizens and/or

       employees of the State injured by Defendants' cigarettes.

277.   The State was legally obligated to pay the aforementioned sums and did not conduct

       itself in any wrongful manner in being so obligated to pay and in paying the

       aforementioned sums.

278.   Defendants have been unjustly enriched as a result.

279.    In all fairness and justice and to prevent unjust enrichment, Defendants should indemnify the State for the provision of necessary medical care, facilities and services for those aforementioned citizens and employees injured by Defendants' cigarettes.

WHEREFORE, the State asks this Court:

    A.   To enter a judgment, jointly and severally, against each and every Defendant, awarding damages in an amount equal to the costs of all medical care, facilities, and services paid for by the State as a result of injuries caused by the Defendants' cigarettes;

    B.   To enter a declaratory judgment that the Defendants, jointly and severally, are liable through indemnity to the State for the costs of all future medical care, facilities and services provided to citizens of Iowa and employees of the State as a result of injuries caused by Defendants' cigarettes;

    C.   For the costs of this action;

    D.   For such further relief as is warranted by the facts and the law; and

    E.   For such additional relief as the Court deems equitable.

### COUNT VIII: NUISANCE

COMES NOW the State and, for Count VIII of its claim against the Defendants and each of them, states as follows:

280.    The State realleges paragraphs 1 through 242 as if fully set forth herein.

281.    The repeated unlawful, antisocial, and unreasonable conduct of the Defendants has been injurious to the health of substantial numbers of Iowa citizens and has interfered with the administration of state government.

282.    The conduct of the Defendants involves significant interference with the public health.

283.    As a proximate result of Defendants' conduct, the State has been damaged as a result of the expenditure of hundreds of millions of dollars for medical services, facilities, and

96

services provided to citizens and/or employees of the State injured through use of the
Defendants' cigarettes.

284.   The conduct of the Defendants was willful and in reckless disregard of the rights of the
State and its citizens.

WHEREFORE, the State asks this Court:

A.   To enter a judgment, jointly and severally, against each and every Defendant,
awarding damages as a result of the nuisance in the amount of all of the costs the
State has expended as a direct result of injuries caused by the Defendants'
cigarettes;

B.   To award punitive damages against the Defendants;

C.   To enter an injunction prohibiting the Defendants from engaging in activities
harmful to the public health through the sale of cigarettes;

D.   To issue an injunction enjoining Defendants and their officers, directors, agents
employees, representatives, successors, assigns, and all other persons acting in
concert with or participating with Defendants, who have actual or constructive
notice of the Court's injunction, from engaging in any unfair or unlawful practices
with respect to the sales of cigarettes to minors;

E.   To issue an injunction enjoining the Defendants and their officers, directors,
agents, employees, representatives, successors, assigns and all other persons
acting in concert with or participating with Defendants, who have actual or
constructive notice of the Court's injunction, from engaging in any of the
unlawful practices alleged in all other counts of this Petition;

F.   For the costs of this action;

G.   For such further relief as is warranted by the facts and the law; and

H.   For such additional relief as the Court deems equitable.

## COUNT IX: INJUNCTION

COMES NOW the State and, for Count IX of its claim against the Defendants and each
of them, states as follows:

97

285.    The State realleges paragraphs 1 through 242 as if fully set forth herein.

286.    The State will suffer irreparable injury as a direct and proximate result of the wrongful

        conduct detailed in the foregoing allegations and Counts of this Petition in that the

        children of the State will start using cigarettes without adequate knowledge of these

        products' harmful and addictive effects.  Thus, the children will become addicted to

        cigarettes and subsequently will become ill and in need of treatment for tobacco-related

        illnesses and diseases.  Many of these addicted children will become Medicaid- and/or

        otherwise publicly-funded health care recipients, thereby causing the State to bear the

        massive costs related to their illnesses and diseases.

287.    There is no adequate remedy at law which will protect the State from this irreparable

        injury.

288.    As a result of the Defendants' conduct, the State has suffered and will continue to suffer

        substantial injuries and damages for which the State is entitled to relief.

        WHEREFORE, the State asks the Court to:

        A.    Issue an injunction enjoining Defendants and their officers, directors, agents,
              employees, representatives, successors, assigns, and all other persons acting in
              concert with or participating with Defendants, who have actual or constructive
              notice of the Court's injunction, from engaging in any unfair or unlawful practices
              with respect to the sales of cigarettes to minors;

        B.    Issue an injunction enjoining the Defendants and their officers, directors, agents,
              employees, representatives, successors, assigns and all other persons acting in
              concert with or participating with Defendants, who have actual or constructive
              notice of the Court's injunction, from engaging in any of the unlawful practices
              alleged in all other counts of this Petition;

        C.    Award the costs of this action;

        D.    Award such further relief as is warranted by the facts and the law; and

        E.    Order such additional relief as the Court deems equitable.

ATTORNEY GENERAL OF Iowa

By: _____

Thomas J. Miller

Attorney General

Walker Law Firm, P.C.

_____

E. Ralph Walker #PK0006346
2501 Grand Avenue, Suite E
Des Moines, IA 50312
PH: (515) 281-1488
FAX: (515) 281-1489

Dickinson, Mackaman, Tyler & Hagan, P.C.

_____

Brent R. Appel #4796885 37
699 Walnut, 1600 Hub Tower
Des Moines, IA 50309
PH: (515) 244-2600
FAX: (515) 246-4550

Wandro & Gibson, P.C.

_____

Steven P. Wandro, #484762548
2501 Grand Ave., Suite B
Des Moines, IA 50312
PH: (515) 281-1475
FAX: (515) 281-1474

Hawkins & Norris

_____

Glenn Norris #PK0004035
2501 Grand Ave., Suite C
Des Moines, IA 50312
PH: (515) 288-6532
FAX: (515) 288-9733

Simmons, Perrine, Albright & Elwood, P.L.C.

_____

Roger W. Stone, #LI0005358
115 3rd St. S.E., Suite 1200
Cedar Rapids, IA 52401-1266
PH: (319) 366-7641
FAX: (319) 366-1917