# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ASTRAZENECA CLASS 1 SETTLEMENT | Judge Patti B. Saris |

**CLASS COUNSEL'S POST-HEARING SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT WITH ASTRAZENECA**

# TABLE OF CONTENTS

**PAGE**

I.     AMENDMENT TO THE SETTLEMENT TO INCREASE PAYOUTS
       TO CLASS MEMBERS WITH CLAIMS FALLING WITHIN THE
       "HEARTLAND" PERIOD ................................................................................1

II.    RESPONSE TO HAVILAND .........................................................................4

       A.     Haviland's "Just Send Checks" Proposal is Not any More
              Reasonable or Fair than the Proposed Allocation......................................5

       B.     The Allocation Plan Here Differs from that Proposed for Track 2
              Due to Differences in Damages Modeling and the Drugs at Issue .........................7

       C.     Haviland's "Subrogation" Argument is Also a Red Herring.................................8

III.   SUPPLEMENTAL INFORMATION IN SUPPORT OF PETITION FOR
       ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES ................................8

       A.     The Requested Fee and Expense Award is Fair and Reasonable as a
              Percentage of the Benefits Achieved for the Class....................................9

              1.     The primacy of the percentage-of-the-fund approach ................................9

              2.     An award of approximately 30 percent is reasonable...............................11

       B.     The Percentage Award for the AstraZeneca Class 1 Settlement is
              Consistent with Class Counsel's Intention to Seek a Fee of
              Approximately One-Third of the Value of All Settlements...............................14

       C.     A Cross-Check With the Lodestar Confirms the Reasonableness
              of the Requested Fee and Expense Award............................................16

IV.    CONCLUSION............................................................................23

001534-16  238655 V1

# TABLE OF AUTHORITIES

**PAGE**

## FEDERAL CASES

*In re Activision Sec. Litig.*,
　　723 F. Supp. 1373 (N.D. Cal. 1989) ............................................................12

*In re Aetna Inc. Sec. Litig.*,
　　2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ........................................17

*Brewster v. Dukakis*,
　　3 F.3d 488 (1st Cir. 1993) ...........................................................................17

*In re Buspirone Antitrust Litig.*,
　　2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) .................................11

*In re Compact Discount Minimum Advertised Price Antitrust Litig.*,
　　216 F.R.D. 197 (D. Me. 2003) ...............................................................11, 16

*Conley v. Sears, Roebuck & Co.*,
　　222 B.R. 181 (D. Mass. 1998) .....................................................................11

*In re Continental Illinois Secs. Litig.*,
　　962 F.2d 566 (7th Cir. 1992) ........................................................................21

*Cosgrove v. Sullivan*,
　　759 F. Supp. 166 (S.D.N.Y. 1991)................................................................17

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
　　989 F. Supp. 375 (D. Mass. 1997) ...............................................................11

*In re Fidelity/Micron Sec. Litig.*,
　　167 F.3d 753 (1st Cir. 1999) ........................................................................10

*In re Fidelity/Micron Secs. Litig.*,
　　1998 U.S. Dist. LEXIS 21698 (D. Mass. June 5, 1998), *vacated on other grounds*,
　　167 F.3d 735 (1st Cir. 1999) ........................................................................10

*In re Fleet/Norstar Sec. Litig.*,
　　935 F. Supp. 99 (D.R.I. 1996)...........................................................10, 11, 18

*Gaskill v. Gordon*,
　　160 F.3d 361 (7th Cir. 1998) ........................................................................11

*Goldenberg v. Marriott PLP Corp.*,
    33 F. Supp. 2d 434 (D. Md. 1998) .................................................................................16

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)...........................................................................................17, 19

*Lipsett v. Blanco*,
    975 F.2d 934 (1st Cir. 1992) ...................................................................................9, 18

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    2003 U.S. Dist. LEXIS 12344 (D.D.C. June 16, 2003) ....................................................11

*In re Lupron Mktg. & Sales Practices Litig.*,
    2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) ............................................7, 10

*In re Merry-Go-Round Enters., Inc.*,
    244 B.R. 327 (Bankr. D. Md. 2000) ...............................................................................12

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................................16

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ............................................................................................11

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    106 F. Supp. 2d 721 (D.N.J. 2000) ................................................................................13

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    148 F.3d 283 (3d Cir. 1998)...................................................................10, 15, 17, 18

*In re RJR Nabisco Sec. Litig.*,
    1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) ................................................17

*Rabin v. Concord Assets Group*,
    1991 U.S. Dist. LEXIS 18273 (S.D.N.Y. Dec. 19, 1991) .................................................16

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005)................................................................................10, 11

*In re Rite Aid Corp. Secs. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) .............................................................................16

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997)..................................................................................16

*In re Sumitomo Copper Litig.*,
    74 F. Supp. 2d 393 (S.D.N.Y. 1999)................................................................16

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995)......................................................... *passim*

*In re Vitamins Antitrust Litig.*,
    2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001).................................12, 13

*Vizcaino v. Microsoft Corp.*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001)........................................................17

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ........................................................................12

*Weiss v. Mercedes-Benz of N. Am.*,
    899 F. Supp. 1297 (D.N.J. 1995), *aff'd*, 66 F.3d 314 (3d Cir. 1995)...............16

## STATE CASES

*Branch v. FDIC*,
    No. 91-CV-13270, 1998 WL 151249 (D. Mass. Mar. 24, 1998)................................10, 11

*Triangle Indus., Inc. Shareholders Litig.*,
    1991 Del. Ch. LEXIS 203 (Del. Ch. Dec. 19, 1991) ........................................17

001534-16  238655 V1

Class Counsel respectfully submit this memorandum addressing the Court's May 1, 2008, request for additional information relating to the AstraZeneca Class 1 Settlement.

## I.   AMENDMENT TO THE SETTLEMENT TO INCREASE PAYOUTS TO CLASS MEMBERS WITH CLAIMS FALLING WITHIN THE "HEARTLAND" PERIOD

On May 1, 2008, the Court heard oral argument on the Joint Motion for Entry of an Order Granting Final Approval of the AstraZeneca Class 1 Settlement (Dkt. No. 5218).  At the hearing, the Court requested that the parties alter the proposed allocation formula so that Class Members receiving Zoladex® administrations during what the Court referred to as the "Heartland" of the Class Period receive a larger multiplier on their estimated damages than Class Members who received Zoladex® injections outside of this period.[1]  The Court had previously requested a similar amendment to the proposed Track 2 "global" settlement during the Track 2 preliminary approval hearing held on March 14, 2008, and the parties subsequently amended the Track 2 settlement agreement accordingly.

Class Counsel and AstraZeneca have agreed to the Court's request.  The Amendment to the Settlement Agreement and Release of AstraZeneca being submitted herewith (the "Amendment") revises the original agreement to reflect a distribution formula under which damages calculated from the Hartman Analysis of Consumer Damages for administrations falling within the Heartland Period December 1, 1998 through December 31, 2003 will be tripled instead of doubled as originally called for under the original Settlement Agreement and Release of AstraZeneca (the "Agreement"), as long as this adjustment remains "financially neutral" to AstraZeneca (that is, this change does not alter the aggregate amount that AstraZeneca originally agreed to pay under the Agreement).

---

[1] The Court has referred to the period December 1, 1997 through December 31, 2003 as the "Heartland" period. The Court believes Class members receiving administrations during this period have the strongest claims.  *See*, *e.g.*, May 1, 2008 Hearing Tr. at 7.  This period is henceforth referred to as the "Heartland Period."

As the Court may recall, AstraZeneca agreed to pay (i) double the valid claims of Class members ("Total Claims Payment") and then (ii) up to $10 million to mutually acceptable charitable organizations funding cancer research or patient care, subject to a total maximum Settlement Amount of $24 million ("Settlement Amount").  Agreement at ¶¶ 4-5.  Based on the claims experience to date, Complete Claims Solutions ("CCS") estimates that the Total Claims Payment will likely be in the range of $8,560,130 to $9,091,920.  Declaration of Eric P. LaChance Regarding Status of Claims Administration Activities Related to Settlement with Defendant AstraZeneca (Dkt. No. 5220).  Under this forecast, and without the Amendment being presented to the Court, AstraZeneca would pay to mutually acceptable charitable organizations funding cancer research or patient care the full $10 million provided for under paragraph 5 of the Settlement Agreement and Release of AstraZeneca (Dkt. No. 4227) ("Settlement Agreement").

In order to address the Court's concern regarding the allocation of payments between Class members and various charities, the parties have agreed to a new allocation process as follows, in the event that the entire Settlement Amount is not used to pay valid claims:

1.     For each valid claim, the Total Recognized Claim will be determined and then doubled according to the formula set forth in paragraph 10 of the Settlement Agreement (in the aggregate, "Total Claims Payment").

2.     For each valid claim reflecting administrations of Zoladex® within the Heartland Period, an "Additional Allocation" will then be determined equal to the sum of the applicable alleged overcharges for the administrations of Zoladex within the time period December 1, 1998 through December 31, 2003 (as set forth in Exhibit D to the Agreement), prior to doubling, as determined by paragraph 10 of the Agreement.  In this step, the payment of all Additional Allocations will be capped at the amount that would

- 2 -

have been paid to mutually acceptable charitable organizations funding cancer research or patient care pursuant to paragraph 5 of the original Settlement Agreement ("Original Charitable Payment").

3.     If the sum of all Additional Allocations is less than the Original Charitable Payment, then AstraZeneca will pay an Additional Allocation to Class members with eligible valid claims and pay the difference between the Original Charitable Payment and the sum of all Additional Allocations to mutually acceptable charitable organizations funding cancer research or patient care as originally contemplated by paragraph 5 of the Agreement.  If the sum of all Additional Allocations equals the Original Charitable Payment, AstraZeneca will pay each Additional Allocation, but will not be obligated to pay any amounts to mutually acceptable charitable organizations funding cancer research or patient care.  If the sum of all Additional Allocations exceeds the Original Charitable Payment, each Additional Allocation will be reduced proportionately, and AstraZeneca will not be obligated to pay any amounts to mutually acceptable charitable organizations funding cancer research or patient care.[2]

Thus, unless the cap is invoked, estimated damages for Zoladex® administrations falling within the Heartland Period will be trebled as the Court wished.  Indeed, that is what the parties expect will occur.  The parties believe, based on projections run by the CCS, that the aggregate value of the Additional Allocations provided for by the Amendment will range from $3,644,840.10 to $3,871,269.22, depending on the cure rate for deficient claims, making the average claim amount increase from $1,121.91 to $1,599.60.  *See* Second Declaration of Eric P. LaChance Regarding Status of Claims Administration Activities Related to Settlement with

---

[2] Notwithstanding this two-step process, claimants falling within the Heartland Period will receive a single check from the Claims Administrator.

Defendant AstraZeneca, ¶¶ 5-6 & Exh. 1.  This would result in approximately $6.2 million to $6.8 million being paid by AstraZeneca to mutually acceptable charitable organizations funding cancer research or patient care.

In addition to the Amendment, Class Counsel are also filing herewith a [Second Revised Proposed] Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement with AstraZeneca, Approving Proposed Allocation of Settlement Funds, and Approving Class Counsel's Application for Attorneys' Fees, Reimbursement of Litigation Expenses and Compensation Awards to Class Representatives.  Revisions have been made to this Second Revised Proposed Final Order to accommodate the foregoing Amendment and the Court's decision regarding compensation to the Class Representatives and to reflect the Court's rejection of the sole objection to the Proposed Settlement filed by M. Joyce Howe and her counsel, Donald Haviland.

Class Counsel and AstraZeneca jointly request that the Court enter the accompanying Second Revised Proposed Order so that the Claims Administrator can begin preparing for the distribution to Class members.

## II.     RESPONSE TO HAVILAND

Class Counsel briefly respond to the assertions contained in the Reply Brief in Support of Objection of Named Class Representative, M. Joyce Howe, to the Final Approval of Proposed Nationwide Settlement with AstraZeneca, and Objection to Petition for Attorneys' Fees, Reimbursement of Expenses, and Compensation to the Named Class Representatives (Dkt. No. 5265) (the "Haviland Reply Brief").  As the Court recognized at the May 1 hearing, the Haviland Reply Brief, filed on the very morning of the hearing, was untimely.  May 1 Hearing Tr. at 4. Nonetheless, Class Counsel respond briefly to the points contained in that filing.

- 4 -

**A.    Haviland's "Just Send Checks" Proposal is Not any More Reasonable or Fair than the Proposed Allocation**

Haviland's original argument that the $24 million Settlement Amount should be allocated to all Medicare Part B beneficiaries who were administered Zoladex® has now morphed into a newly-minted view that the proceeds should be divided equally among the approximate 10,000 Class Members who filed claims.  Haviland Reply Br. at 4-5.  "Just send checks" is Haviland's refrain.  While this resolves the problem of sending checks to all of the 445,550 Zoladex® beneficiaries identified by CMS – most of whom are not Class Members because they had full supplemental insurance coverage – as Haviland originally proposed, it still results in inequities due to the wide disparity in the amount of damages suffered by Class Members.

At the May 1 hearing, Class Counsel highlighted for the Court the claims of three Class Members in order to provide the Court with a snapshot of the range of recoveries that Class Members will receive under the Proposed Settlement.  More specifically, we reviewed the claims of the following three Class Members:

- Johnnie, Claim No. 18.  Johnnie, who received 32 Zoladex® administrations and made full co-pays, is projected to receive a $9,759.96 distribution.  Declaration of Steve W. Berman in Support of Class Counsel's Supplemental Memorandum in Support of Motion for Final Approval of Class Action Settlement with AstraZeneca ("Berman Decl.") at ¶ 3 & Ex. A.

- Steven, Claim No. 71.  Steven, who received four Zoladex® administrations and made partial co-pays, is projected to receive a $286.80 distribution.  *Id.*

- Robert, Claim No. 73.  Robert, who received eight Zoladex® administrations and made full co-pays, is projected to receive $4,240.59.  *Id.*

Because the allocation model is based on the individual amount of damage that each Class Member incurred, the foregoing demonstrates that Class Members with no supplemental insurance coverage (like Johnnie and Robert) were damaged to a much greater extent than those with partial coverage (like Steven).  Therefore, they receive a greater recovery under the

proposed settlement.  Yet, under the "Haviland Model," all Class Members would be treated equally.  For example, should Haviland and Mrs. Howe prevail, Johnnie would receive about $2,400 ($24 million divided by 10,000), a reduction of almost $10,000.  Steven would also receive about $2,400, even though his damages are much, much less (about $143.40 using Dr. Hartman's damages tables).  Similarly, Mrs. Howe – who unlike most Class Members with partial supplemental insurance coverage – did not have a standard policy covering 80% of the co-payment, would receive much more than her damages.  Therefore, Mrs. Howe is suggesting that one settlement that treats Class Members differently but roughly equal based on out-of-pocket damages (as the instant Settlement does) be scrapped in favor of one that treats them all the same, even though Class Members with supplemental insurance would have incurred less damage.  In other words, Mrs. Howe is advocating a result that favors her more narrow interests over those of the Class Members at large.  She would compromise the recovery of folks like Johnnie who would recover *less* than his damages so that someone like Mrs. Howe can receive ***much more*** than her damages even though, as shown below, she will already recover more than the damage incurred.  Class Counsel submit that this is not a fair result.

The unfairness is further highlighted by the fact that the Howes will already receive more than their damages under the currently proposed distribution model.  Mrs. Howe's deceased husband, Robert Howe, received three quarterly injections of Zoladex® with partial co-pays in 2003, and four quarterly injections with partial co-pays in 2004.  Under the recovery formula, Mrs. Howe will be entitled to receive $617.82.  Berman Decl. at ¶ 4.  This amount is greater than the Howes' damages, even if Mr. Howe's supplemental coverage was less generous than the "20% of 20%" standard co-pay mechanism upon which the partial co-pay table is based.  Indeed, the co-pay checks that Mrs. Howe filed with the claim form total $347.81.  *Id.*

- 6 -

The Settlement is fair, reasonable and will provide substantial monies – indeed more than a full recovery – to all Class Members.[1]  Haviland does not advocate for a more just distribution. To the contrary, the "Haviland Model" would not be fair as applied to AstraZeneca Class 1.

**B.    The Allocation Plan Here Differs from that Proposed for Track 2 Due to Differences in Damages Modeling and the Drugs at Issue**

Haviland also insists that the allocation model here should mimic that proposed for the Track 2 Settlement.  Haviland Reply Br. at 4.  The argument rests on the mistaken assumption that the Track 2 Settlement will provide a greater recovery for consumers, when, in fact, this is not the case.

The Track 2 recovery is based on the concept of reimbursing Track 2 Class Members their out-of-pocket costs associated with the Subject Drugs; the recovery formula is not linked to specific damage per Class Member.  Why?  Because it is not possible to apply the AstraZeneca Class 1 recovery formula to Track 2 since there are too many drugs at issue (190), different categories of drug (both brand and generic, with a different distribution weighting assigned to each), three different classes, disparate time periods and, perhaps most significantly, no uniform dosing schedule.  Unlike Zoladex®, the many drugs at issue in Track 2 do not have uniform dosing schedules and, therefore, are not amenable to the same type of monthly overcharge analysis that Dr. Hartman did for Zoladex®.

The out-of-pocket measure of recovery for Track 2 is a rougher measure of justice than the more precise model for AstraZeneca Class 1, and the AstraZeneca Class 1 Members will likely fare better than their Track 2 counterparts.  Nonetheless, Class Counsel believe that the

---

[1] Now that Haviland apparently accepts the need for a claims-made process, he continues to decry the charitable contribution aspect of the Settlement, notwithstanding his prior support for a reverter back to the actual wrongdoers in the *Lupron* action.  It is also noteworthy that Haviland previously favored a reverter to AstraZeneca provided that there was no cap on a claims made settlement, *see* May 3, 2007 Haviland e-mail, found at Exhibit I to the Haviland Declaration (Dkt. No. 4660), a view that is hard to reconcile with his new-found zeal against monies donated to further fund cancer research and patient care.

- 7 -

Track 2 model is a fair and reasonable way of allocating the Track 2 settlement proceeds. The many factors that complicate the Track 2 case demonstrate that the Track 2 distribution model should be as uncomplicated as possible so that it can be effectively communicated to Track 2 Class Members and, thereby, encourage Track 2 Class Members to make claims.

### C.      Haviland's "Subrogation" Argument is Also a Red Herring

Haviland continues to maintain that the Settlement leaves Class Members exposed to "potential claims for subrogation by their insurance carriers." Haviland Reply Br. at 7-8. Haviland fails to provide any legal support for this novel argument, and there is none. Simply put, the members of Class 1 are not seeking amounts paid by the insurers to which subrogation would apply. The recovery is based on co-payments made by the Class Members and not by supplemental insurance coverage. Although Haviland attaches a complaint from the unrelated *Vioxx Products Liability Litigation* which, apparently, seeks to preserve various TPPs' rights to collect money in subrogation from a class action personal injury settlement fund, that case is inapposite since the TPP class members there are presumably entitled to receive monies that, in the first instance were paid by the TPPs for the treatment for personal injuries. Again, this proposed Class 1 Settlement does not involve Zoladex® overcharges paid by TPPs, and, indeed, the claims against AstraZeneca on behalf of TPPs are being pursued by different classes – Classes 2 and 3 – and their claims are still being litigated. Haviland's subrogation argument remains a "red herring" and should be rejected.[2]

### III.      SUPPLEMENTAL INFORMATION IN SUPPORT OF PETITION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

During the May 1, 2008 final approval hearing, the Court requested additional information on the nature of a percentage attorneys' fee and cost award, as well as more detail

---

[2] Haviland also lodges additional and unsupported objections to the requested attorneys' fees and costs, which Class Counsel discuss below.

relating to the lodestar and expenses incurred by Class Counsel for a "cross-check" of the percentage approach.  The following information responds to the Court's request.  It also responds briefly to the fee-related assertions contained in the Haviland Reply Brief.

To review, in addition to paying the valid claims of Class Members and, if necessary, an amount to mutually acceptable charitable organizations funding cancer research and patient care, AstraZeneca has agreed to pay Class Counsel $6,500,000 for attorneys' fees and $2,100,000 for litigation expenses, or a total of $8.6 million, subject to the Court's approval.  These amounts will not come from the money set aside to pay the claims of Class Members.  In other words, they are paid directly by AstraZeneca "on top" of the Settlement Amount.

**A.      The Requested Fee and Expense Award is Fair and Reasonable as a Percentage of the Benefits Achieved for the Class**

**1.      The primacy of the percentage-of-the-fund approach**

In the First Circuit, the trial court has the discretion to apply either the lodestar or percentage-of-the-fund ("POF") method or a combination of the two to award attorneys' fees.  *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995).  Although the trial court's latitude in fashioning a fee award is "extremely broad," *id.* at 309 (quoting *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992)), the First Circuit recognized that POF should be favored in common fund cases and that POF is the prevailing method because it has distinct advantages in complex cases.  *Id.* at 307.  It is less burdensome to administer, reduces the possibility of collateral disputes, enhances efficiency throughout the litigation, better approximates the workings of the marketplace and saves the Court from having to delve into the details of the lodestar.  *See In re Thirteen Appeals*, 56 F.3d at 307-08; *see also*

*In re Fidelity/Micron Sec. Litig.*, 167 F.3d 753, 737 (1st Cir. 1999).[3]  As the First Circuit

commented:

> Rather than forcing the judge to review the time records of a
> multitude of attorneys in order to determine the necessity and
> reasonableness of every hour expended, the POF method permits
> the judge to focus on "a showing that the fund conferring a benefit
> on the class resulted from" the lawyers' efforts.

*In re Thirteen Appeals*, 56 F.3d at 307 (quoting *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d

768, 774 (11th Cir. 1991)).

Another circuit favors the POF method where the number of Plaintiffs' law firms and

lawyers involved would make a lodestar calculation time-consuming and burdensome.  *In re

Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 331 (3d Cir. 1998).  And as yet

another court commented in adopting the POF approach and rejecting the lodestar method:  "In

light of the extraordinarily large number of attorneys and support staff involved in the

representation of the class and the extraordinary number of hours of legal work for which

counsel seek compensation – over 7,300 – the task of administering the lodestar method of

calculation is both overwhelming and wasteful."  *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99,

108 (D.R.I. 1996).

Many district courts within the First Circuit have indicated their preference for the POF

method over the lodestar method.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D.

Mass. 2005); *In re Lupron Mktg. & Sales Practices Litig.*, 2005 U.S. Dist Lexis 17456, at *9 (D.

Mass. Aug. 17, 2005); *In re Fidelity/Micron Secs. Litig.*, 1998 U.S. Dist. Lexis 21698 (D. Mass.

June 5, 1998), *vacated on other grounds*, 167 F.3d 735 (1st Cir. 1999); *Branch v. FDIC,* No. 91-

---

[3] The trend in this Circuit is consistent with the decisions nationwide awarding fees in common fund cases based on a percentage of the total recovery.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (4th ed. 2004) ("The vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common fund cases").

CV-13270, 1998 WL 151249, at *2-4 (D. Mass. Mar. 24, 1998); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003) (describing the method as determining whether the "total fee [is] reasonable when examined as a percentage of recovery"); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998); *In re Fleet/Norstar Secs. Litig.*, 935 F. Supp. at 108.

 In this case in particular, where there are multiple Defendants and the Court is considering only the fee related to settlement of a single Defendant, use of the POF method saves the Court and the parties from the daunting task of allocating the particular hours of the many attorneys involved to a particular Defendant.  Indeed, this Court has already used the POF approach in awarding fees associated with the GSK Settlement, thereby establishing a laudable precedent for its continued use.

### 2.    An award of approximately 30 percent is reasonable

Courts have approved fee awards in common fund cases in the range of 25-45%.  *See*, *e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (awarding class counsel $22,311,000 in fees or 33% of class fund of $67,000,000, plus a separate award of litigation expenses in the amount of $1,297,301); *In re Fleet/Norstar*, 935 F. Supp. at 109; *Conley*, 222 B.R. at 187; *In re Compact Disc*, 216 F.R.D. at 216 n.45; *Gaskill v. Gordon*, 160 F.3d 361, 363-64 (7th Cir. 1998) (affirming award of 38% of class action settlement fund); *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. Lexis 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding fees of 33⅓% of $220 million common fund to Direct Purchaser Plaintiff's Class Counsel); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. Lexis 12344 (D.D.C. June 16, 2003) (awarding class counsel 30% of the common fund);  *In re Vitamins*

*Antitrust Litig.*, 2001 U.S. Dist. Lexis 25067, at *57 (D.D.C. July 13, 2001) (determining that the one-third award was reasonable and granting class counsel fee petition in the amount of $123,188,032 plus interest, or approximately 34% of the total estimated settlement amount, in antitrust price fixing litigation); *In re Activision Sec. Litig.*, 723 F. Supp 1373, 1375 (N.D. Cal. 1989) (awarding a 32.8% fee and adopting a "policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case," as "well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable…").[4]

The Court approved a $33^{1/3}$% fee and cost award in association with the GSK Settlement and has recognized that a similar award is appropriate here given the risks incurred by Class Counsel and the results achieved for the Class:

> Well, I do think one-third is appropriate.  I might say that, for the record, I approved that in the other case [GSK].  I think this was an incredibly risky piece of litigation which was cutting-edge and no certainty of success.  The pharmaceutical companies have done a fabulous job defending it, and it was fought tooth and nail the entire way along with the best firms in the country.

May 1, 2008 Hearing Tr. at 24.  We appreciate the Court's recognition of the challenges faced by Class Counsel.  Lead counsel have devoted tremendous time and labor to this case for almost seven years; drug pricing fraud cases, by their nature, are highly complex; this case was especially large and complicated, involving almost every major pharmaceutical company selling into the United States market; the risk of the litigation was very high and the prospect for

---

[4] In *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.4 (9th Cir. 2002), the court included an exhaustive table of 34 cases generating revenues ranging from $54 million to $185 million, all of which generated fees of 30% or more, including the case at the high end of the scale (45%), the $185 million settlement in *In re Merry-Go Round Enters., Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000).  *See also* Frederick C. Dunbar, Todd S. Foster, Vinita M. Juneja, Denise N. Martin, *Recent Trends III:  What Explains Settlements in Shareholder Class Actions?* (NERA, June 1995) (finding that "[r]egardless of case size, fees average approximately 32 percent of the settlement"); *see also* MANUAL FOR COMPLEX LITIGATION § 14.121 ("Attorney fees awarded under the percentage method are often between 25% and 30% of the fund.").

- 12 -

recoupment of fees and expenses uncertain; and we have been achieving extraordinary results for the litigation and settlement classes, including AstraZeneca Class 1.

During the hearing, Class Counsel explained that a fee and cost award of $8.6 million represents about 30% of the forecasted value of the settlement as follows:

$19.0 million in projected claims and *cy pres*
  1.0 million in estimated notice and administration costs
  <u>8.6</u> million in fees and costs
$28.6 million Total Value

30% of $28.6 million is $8,580,000

Even though AstraZeneca has agreed to pay the notice and administration costs, as well as attorneys' fees and costs separately so that they are not deducted from the recovery available to Class members, courts **include** these payments in the value of the settlement for purposes of evaluating fees under the POF approach. *See, e.g.*, *In re: Vitamins Antitrust Litig.*, 2001 U.S. Dist. Lexis 25067, at *56 ("Courts . . . have recognized that in constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, that the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 106 F. Supp. 2d 721, 730 (D.N.J. 2000) ("the benefit that Class Counsel created for the Class must also include the requested attorneys' fees and expenses of $90 million" (paid separately by defendant) as well as costs of notice and administration).

In sum, the $8.6 million fee and cost award is reasonable under the POF approach. It represents approximately 30% of the properly calculated total value of the Settlement and is well within the norm for POF awards.[5] Given the benefits of the settlement to the Class, the time and labor expended by counsel, the complexity and duration of the litigation, the risk of nonpayment

---

[5] Haviland claims that this would be "well above the norm." Haviland Reply Br. at 8. As the foregoing authorities demonstrate, Haviland is wrong.

of fees and expenses and the skill and efficiency displayed by Class Counsel, an even larger
award would be warranted.

**B.    The Percentage Award for the AstraZeneca Class 1 Settlement is Consistent with
        Class Counsel's Intention to Seek a Fee of Approximately One-Third of the Value of
        All Settlements**

As Class Counsel explained at the May 1st hearing, our goal is to request approximately
one-third of the value of each settlement in order to ensure that Plaintiffs' attorney compensation
is, at the end of all settlements, in the "ballpark" of the one-third benchmark.  We believe that
this responds to the Court's earlier expressed concern that attorneys' fee awards remain
reasonable across all settlements.

Class Counsel could wait until all settlements are fully administered before requesting
their fee.  This is not practical, however, given the long duration of this litigation and the fact
that Class Counsel have not yet received any attorneys' fees under any settlement due to pending
appeals.[6]  Nonetheless, applying for a consistent fee percentage at each settlement stage will not
lead to the award of more fees than would be obtained had Class Counsel chosen to wait until
resolution of all claims.  The end result will be the same, even if the timing will differ.

The table below projects Class Counsel's fee recovery in the AWP litigation should the
Court grant final approval to the pending Settlements:

| Result | Actual/Projected Fees and Costs | How Derived |
|---|---|---|
| GSK Global Settlement | $ 21,615,000 | $33^{1/3}\%$ |
| Astra Class 1 Settlement | 8,600,000 | Agreed Amount (approx. 30% of value) |
| BMS Class 1 Settlement | 4,332,900 | $33^{1/3}\%$ |
| Track 2 Global Settlement | 41,662,500 | $33^{1/3}\%$ |
| Total | **$ 76,210,400** | |

---

[6] Alternatively, Class Counsel could have suggested that distribution of monies to Class Members could await
resolution of all settlements so that a single, aggregate distribution was made of both class recoveries and attorneys'
fees and costs, but this was not realistic given the advancing age and high mortality rate of the Class Members.

Comparing the actual and projected fee and cost recovery in this case against Plaintiffs' counsel's collective lodestar accentuates the reasonableness of the percentage approach recommended by Class Counsel:

- The total projected fee and cost award of $76,210,400 barely exceeds the May 31, 2007 lodestar and cost figure of $75,897,509, even though the results achieved in the AWP litigation warrant a substantial multiplier.[7]

- And, of course, this lodestar amount has increased substantially over the course of the past year, as Class Counsel continued to expend resources on, among other things, prosecuting the Class 2/3 case against AstraZeneca and BMS as well as the Track 2 litigation, working on numerous appeals in the First Circuit of the GSK settlement and the Massachusetts trial verdict, and administering the various settlements. We estimate that the lodestar has grown by over $4.5 million in the past twelve months to over $71.5 million, and that we have incurred added expenses of almost $1.5 million, for a total lodestar and expense estimate of over $82 million. Berman Decl. at ¶ 6.

Thus, counsel will remain "under water" with respect to fee and cost recovery, even after receipt of the foregoing anticipated awards, if the Court chooses to approve them. And lodestar and expenses will continue to expand as the case progresses.[8]

An award of approximately one-third of the value of each settlement at each step along the way will lead to a reasonable, overall fee and cost award to Class Counsel. In addition, employing the POF approach in this manner will be easier to administer, reduce the possibility of

---

[7] Class Counsel previously reported to the Court a total lodestar of $67,041,387.12 (using historical billing rates) and total costs expended of $8,856,122.87 (both numbers are as of May 31, 2007, shortly after the Settlement Agreement was executed). Declaration of Marc H. Edelson in Support of Class Plaintiffs' Joint Petition for Attorneys' Fees and Reimbursement of Expenses in Relation to Settlement with AstraZeneca (Dkt. 5222) ("Edelson Decl.") at ¶¶ 5-6. These numbers remain unaudited, and it is possible that we have not received complete information from all counsel. Consequently, the lodestar and expense information may change once a final accounting is done. Nonetheless, Class Counsel believe that these figures are a reasonable approximation of the hours and expenses incurred by counsel in the AWP class litigation through May 31, 2007. Edelson Decl. at ¶ 9. For present purposes, these reasonable approximations suffice given that the Court is applying the POF method and using the lodestar approach as a cross-check. *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 332 n.107 (3d Cir. 1998).

[8] There is still the potential that counsel will receive a fee multiplier if Plaintiffs prevail on their Class 2 and 3 claims that are the subject of the pending class certification motion, and additional fees will be due under Chapter 93A as a result of the trial win in Massachusetts.

collateral disputes, enhance efficiency and a better approximate the workings of the marketplace, as anticipated by the First Circuit.  *In re Thirteen Appeals*, 56 F.3d at 307-08.

**C.    A Cross-Check With the Lodestar Confirms the Reasonableness of the Requested Fee and Expense Award**

As noted, the First Circuit also provides the Court with the discretion to employ the lodestar approach as a "cross-check" in combination with the POF approach, although it is not required.  *In re Thirteen Appeals*, 56 F.3d at 307 (describing lodestar as reasonable hours spent times reasonable hourly rated, subject to a multiplier or discount for special circumstances, plus reasonable disbursements); *In re Compact Disc*, 216 F.R.D. at 215-16.  As the MANUAL FOR COMPLEX LITIGATION § 14.122 explains, "the lodestar is . . . useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant.  The total lodestar estimate is then divided into the proposed fee calculated under the percentage method.  The resulting figure represents the lodestar multiplier to compare to multipliers in other cases."

Multipliers of between 3 and 4.5 have been common.  *See, e.g., In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998); *Goldenberg v. Marriott PLP Corp.*, 33 F. Supp. 2d 434, 439 n.6 (D. Md. 1998); *Rabin v. Concord Assets Group*, 1991 U.S. Dist. Lexis 18273 (S.D.N.Y. Dec. 19, 1991); *In re Rite Aid Corp. Secs. Litig.*, 146 F. Supp. 2d 706, 736 (E.D. Pa. 2001) (recognizing that a "lodestar multiple in the range of 4.5 to 8.5" is "unquestionably reasonable" under the cross-check approach); *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee that resulted in a multiplier of 9.3 times hourly rate), *aff'd*, 66 F.3d 314 (3d Cir. 1995); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (awarding a 5.5 multiplier); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (awarding a

- 16 -

multiplier of 3.97); *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1305-06 (W.D. Wash. 2001) (approving multiplier of 3.67); *In re Aetna Inc. Sec. Litig.,* 2001 U.S. Dist. Lexis 68 (E.D. Pa. Jan. 4, 2001) (awarding a multiplier of 3.6); *Triangle Indus., Inc. Shareholders Litig.,* 1991 Del. Ch. Lexis 203 (Del. Ch. Dec. 19, 1991) (awarding fee equal to 6.6 multiplier on $70 million recovery); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) (awarding fee equal to a multiplier of 8.84); *In re RJR Nabisco Sec. Litig.*, 1992 U.S. Dist. Lexis 12702, at *16 (S.D.N.Y. Aug. 24, 1992) (6 multiplier).

In employing the lodestar cross-check, as in determining the POF amount *supra*, the Court should be mindful that fee requests should not spawn a second litigation.  *See*, *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  The Court is "not obliged to convene an evidentiary hearing as a means of resolving every attorneys' fee dispute," *In re Thirteen Appeals*, 56 F.3d at 301-02 (citation omitted), and "fee disputes, unlike Jack's beanstalk or Pinocchio's nose, cannot be permitted to grow and grow and grow."  *Brewster v. Dukakis*, 3 F.3d 488, 493 (1st Cir. 1993).  When used as a cross-check, the lodestar calculation can be based on time and expense summaries in lieu of detailed records.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 332 n.107.  In other words, the Court's inquiry into the lodestar is not as focused as it would otherwise be for an award primarily determined under a lodestar method.

In the aggregate, dividing the total May 31, 2007 loadstar of $67,041,387.12 into the requested fee and expense award of $8,600,000 yields a "negative" multiplier of approximately 0.13.  Adding the GSK award of $21,615,000 to the $8,600,000, the "negative" multiplier that results – .45 – is still low and much lower to what Class Counsel should be entitled to given the effort expended and results achieved (which easily justify a multiplier of two or three or more).

And, as noted, the lodestar has continued to grow over the last year as Class Counsel have continued to prosecute the litigation, resulting in an even lower "negative" multiplier.[9]

At the May 1 hearing, the Court asked how time can be divided to isolate efforts related to specific defendants or even specific classes. This would be a daunting task. More than 250 attorneys have spent time working on this case for the plaintiffs, a testament to the breathtaking scope and complexity of this litigation. Berman Decl. at ¶ 7. Indeed, attorneys and paralegals had collectively billed over ***198,000*** hours as of May 31, 2007. Edelson Decl. at ¶ 5. The sheer number of work hours underpinning the lodestar highlights how time-consuming and burdensome a detailed lodestar inquiry would be and demonstrates why the POF approach works best for this litigation. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 331; *In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. at 108. It is difficult to apportion those 198,000 hours by Defendant given the breadth of common issues and the number of tasks completed over the last six-and-a-half years. As the Supreme Court has recognized in addressing multiple claims based on a core of common facts:

> In other cases the plaintiff's claims for relief will involve a "common core of facts" or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be reviewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

---

[9] Furthermore, the lodestar calculation here is based on each law firm's historic rate (those in effect when the work was done, over the six and a half years this case has been pending). Class Counsel are providing this historic rate calculation for present purposes because it is more conservative, even though the First Circuit has noted the appropriateness of calculating the lodestar on current hourly rates (*i.e.*, in this case, those in effect in 2008 at each firm) because of the delay in payment of the fees to the firms performing the work, as well as other factors. *See Lipsett v. Blanco*, 975 F.2d 934, 942-43 (1st Cir. 1992). Given this precedent, it would be appropriate to calculate the lodestar of all firms at current rates, which would yield a higher total lodestar and a correspondingly lower multiplier.

> Where a plaintiff has obtained excellent results, his
> attorneys should recover a fully compensatory fee.

*Hensley*, 461 U.S. at 434-35.[10]

The same concept applies here to claims against multiple defendants where common issues are inextricably intertwined.  An immense amount of work was done on common issues, work that cannot be segregated from other aspects of the prosecution.  This work includes researching and drafting complaints; working on issues related to the initial MDL motions; a panoply of issues related to the use of AWP as a benchmark in the Medicare program and in the private insurance market; legal research and drafting of briefs on the joint motions to dismiss, joint motions for summary judgment, and briefing associated with class certification; coordination with experts regarding same; motions and discovery related to many third parties, including governmental organizations, trade associations and the hundreds of insurers, pharmacies and other market participants subpoenaed by defendants; discussions with class representatives and class members; and general trial preparation.  Berman Decl. at ¶ 7.

Consequently, there was no effort to tie the $8,600,000 fee/cost award to work specifically done for Class 1 or even defendant AstraZeneca.  As Class Counsel explained at the May 1 hearing, the total $8,600,000 fee/cost award sought was arrived at as roughly one-third of the negotiated $24 million Settlement Value; this was the justification made to AstraZeneca during the fee part of the negotiation (although, at the time, a more realistic measure would key off $32.6 million, which is the fee and cost recovery added to $24 million Settlement Amount).  Because of the challenges outlined above, and because the amount of fees and costs were undoubtedly reasonable under the POF method, no effort was made to determine the precise

---

[10] In urging an allocation of fees by defendant and, even, by class (*see* Haviland Reply Brief at 9), Haviland overlooks important authority like *Hensley* and fails to make any suggestion whatsoever about how the massive hours expended in prosecuting the AWP litigation can be effectively apportioned by defendant.

amount of fees and costs that would be specifically attributable to AstraZeneca Class 1.  Berman Decl. at ¶ 8.

Notwithstanding the difficulty of apportioning time by defendant, some simple "common sense" tests reveal the reasonability of the lodestar cross-check employed here.  For example, even if just one-tenth of the May 31, 2007 total lodestar – or $6.7 million – was assigned to the AstraZeneca Class 1 proceedings, the combined $8.6 million fee and cost award would be reasonable.  Indeed, if one assigned just *one-twentieth* of the May 31, 2007 total lodestar – or $3,350,000 – to AstraZeneca Class 1, a multiplier of about 2.6 would result and be well within the realm of reasonableness.  Class Counsel are not taking the position that only one-twentieth of the work in this case was done for AstraZeneca Class 1; we are merely highlighting the reasonableness of the fee request as viewed through a lodestar cross-check lens.

The Court has also requested that Class Counsel provide more information on the billing rates underpinning the lodestar calculation.  The exhibit attached to the Edelson Declaration summarizes the hours, lodestar and expenses incurred by each firm that has worked on the AWP litigation since inception.  This schedule was prepared from computerized records that were contemporaneously generated and maintained by each firm in the ordinary course of business and reported to Class Counsel periodically.  Edelson Decl. at ¶ 4.  It reflects the nationwide scope of the effort to represent plaintiffs and the Class in this long-tenured case.  The rates underpinning the lodestar calculations by firm range from a low of $165 per hour for junior associate attorneys to a high of $650 per hour for the most experienced partners and reflect the firms' hourly rates paid by hourly-billed clients and, separately, approved for payment by other courts in class and derivative litigation.  Berman Decl. at ¶ 9 (summarizing ranges by firm).  As an example, the rates customarily charged by attorneys at Hagens Berman Sobol Shapiro LLP

- 20 -

who have worked on the AWP litigation range from a low of $250 for less-experienced associate attorneys to a high of $600, which is Steve Berman's rate as Managing Partner and senior litigator in the firm. *Id.* This range is well within the market norm as demonstrated by *The National Law Journal*'s 2007 survey of law firm billing rates. *See Id.* at ¶ 10 & Exh. B. Some of the firms appearing for defendants in this very litigation have partner rates that top out well above $600 per hour, including Covington & Burling ($800), Dickstein Shapiro ($825), Hogan & Hartson ($850), Kelley Drye & Warren ($800), Morgan Lewis & Bockius ($850), and Perkins Coie ($805). *Id.*

Rates as high as $700, which the Court noted would cause concern, are not included in the lodestar calculation. However, such rates would be justified given market prices and the value obtained for the Class. As Judge Posner postulated in discussing the award of fees *In re Continental Illinois Securities Litig.*, 962 F.2d 566 (7th Cir. 1992), courts should not place caps on hourly rates of lawyers for the class and should instead "determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Id.* at 568.; *see also In re Thirteen Appeals*, 56 F.3d at 307 (citing *Continental* with approval and noting that the POF method better approximates the workings of the marketplace since "the market pays for the result achieved").

In any event, capping rates, for the sake of argument, would not substantially modify the lodestar here. Lowering the rate for a senior partner like Steve Berman to, for example, $575 from $600 in order to keep the top rates closer to $500 as the Court suggested at the May 1 hearing, has a negligible effect on the overall lodestar for purposes of using the lodestar as a cross-check for the POF award. For example, reducing Mr. Berman's rate to $575 reduces the overall lodestar by $112,303.75. Berman Decl. at ¶ 11. In short, this closer examination of the

- 21 -

lodestar and the rates behind it once again demonstrates the reasonableness of the 30% POF award.[11]

The Court has also inquired about the expenses allocated specifically to the AstraZeneca portion of the AWP litigation.  Like splitting attorney and paralegal time by defendant, splitting expenses by defendant is very difficult to do given the existence of so many common issues.  Moreover, the very nature of the expenses themselves makes allocation by defendant extremely difficult.  Counsel did not track expenses by defendant and, with some limited exceptions, we are unable to go back and re-assign expenses by defendant.  These include expenses incurred for expert work, including the development of Dr. Rosenthal and Dr. Hartman's many reports and the rendering of their testimony; Court fees (including fees incurred for use of the Court's electronic filing system); subpoena costs; technology services, including maintaining and servicing computer stations for document review; mail and fax charges; computer research charges (*e.g.*, Lexis/Nexis); photocopy expenses; and some travel expenses.  Berman Decl. at ¶ 12.  All of the expenses incurred were reasonable and necessary for the prosecution of this litigation, even though they are not readily amenable to division by particular defendant.  *Id.*  It may be possible to construct an expense allocation model taking into consideration reasonable assumptions based on the number of defendants, but this would be very time consuming and not necessary where the lodestar is used as a cross-check to the POF approach.  It was not done to arrive at the $2.1 million in costs.  The $8.6 million fee and cost amount was disaggregated into a fee and cost portion at Mr. Berman's suggestion as a means of laying the foundation for requesting counsel to inject the $2.1 million cost "piece" back into the AWP litigation fund on a

---

[11] It was unclear from the May 1 hearing whether the Court wanted to review detailed time and expense records. Because of the volume of paper that this would add to an already weighty record, and because the Court is only reviewing the lodestar as a rough reasonability check, Class Counsel are not now burdening the Court with lengthy submissions of each firm's time and expense records.  If, however, the Court would like even more detail, Class Counsel can collect from each firm declarations attaching more detailed time and expense reports.

going forward basis.  Berman Decl. at ¶ 13.  It just so happened that $2.1 million was about one-fourth of the total costs incurred to date, and there were four defendants effectively left in Track 1 at the time.  *Id*.[12]

Given the "***extremely broad***" discretion that the Court has in evaluating an attorneys' fee and cost petition in class litigation, *In re Thirteen Appeals*, 56 F.3d at 309 (emphasis added), the foregoing lodestar and expense information suffices for purposes of a rough cross-check on the reasonableness of the POF fee and cost award.

## IV.    CONCLUSION

For the reasons set forth above, as well as the reasons articulated at the May 1 hearing and in Class Counsel's Memorandum of Law in Support of Joint Motion for Final Approval of the AstraZeneca Class 1 Settlement and Class Counsel's Memorandum of Law in Support of Petition for Attorneys' Fees, Reimbursement of Expenses, and Compensation to the Class Representatives in Association with the AstraZeneca Class 1 Settlement, Class Counsel respectfully request that the Court approve this settlement and the fee and expense petition and enter the Second Revised Proposed Final Order.

---

[12] Haviland suggests that the fee amount reached was $8,000,000, and that subsequent discussion of expenses yielded a figure of $600,000 for expenses.  Haviland Reply Br. at 10.  As "support" for this proposition, Haviland cites to a May 4, 2007 email from Steve Berman to the AWP team.  *See* Exhibit L to the Declaration of Donald E. Haviland, Jr. In Response to Court Directive Concerning the AstraZeneca Settlement.  As is so often the case with Haviland's assertions, the evidence does not match Haviland's claim.  In fact, the e-mail cited refers to fees and costs in the aggregate as $8.6 million.

DATED:  July 15, 2008.

By_____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

001534-16 238655 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on July 15, 2008, I caused copies of **CLASS COUNSEL'S NOTICE OF FILING OF (1) AMENDMENT TO ASTRAZENECA CLASS 1 SETTLEMENT AGREEMENT AND (2) SECOND REVISED FINAL ORDER AND JUDGMENT GRANTING FINAL APPROVAL TO CLASS ACTION SETTLEMENT WITH ASTRAZENECA** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


**/s/ Steve W. Berman**
Steve W. Berman