UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL NO. 1456 ) ) CIVIL ACTION: 01-CV-12257-PBS ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO U.S. ex rel. Ven-A-Care of the Florida Keys, Inc., Zachary T. Bentley, and T. Mark Jones v. Abbott Laboratories, Inc., No. 07-CV-11618-PBS | ) ) Magistrate Judge Marianne B. Bowler ) ) ) |

**ABBOTT LABORATORIES INC.'S SUPPLEMENTAL SUBMISSION REGARDING THE GOVERNMENT'S ABUSE OF THE DELIBERATIVE PROCESS PRIVILEGE**

In anticipation of the hearing set for Thursday, July 24, 2008 concerning Abbott's request for leave to appeal this Court's rulings on the Government's invocation of the deliberative process privilege, Abbott submits this short memorandum to bring to the Court's attention recent developments that bear on that issue.

As the Court is aware, the Government has thus far succeeded in withholding numerous documents relevant to the core issues in this case by asserting the deliberative process privilege. Perhaps emboldened by its success, the Government has now produced expert reports which offer opinions on why the Government did not alter its payment methodology for prescription drugs—*the very subject matter that is discussed in the documents that the Government has withheld as privileged.* It has thus become apparent that, at the same time the Government was telling the Court and Abbott that documents discussing the Government's decision to maintain an AWP-based payment methodology need not be produced because they are collateral or irrelevant to this case, it was working with its experts to opine *on that very issue* to support of its fraud and False Claims Act allegations. Adding insult to injury, the Government's experts even

*criticize Abbott* for not having adequate documentary evidence to contradict the experts' after-the-fact guesswork.

The Government is clearly trying to use the deliberative process privilege as both a sword and a shield. This will not do. This Government's affirmative use of these reports constitutes a waiver of the privileges that the Government has asserted to justify keeping evidence directly relevant to the subject matter and conclusions in the reports out of Abbott's hands. Given the content of these expert reports, the only way in which Abbott can possibly have a fair opportunity to defend itself is for the Government to produce these documents.

## BACKGROUND

### A. The Government Has Refused to Produce Evidence Relevant to the Assumptions and Conclusions in Its Experts' Reports

As this Court is well aware, this is a False Claims Act and common-law fraud case, in which the Government complains that it was defrauded into paying for certain Abbott drug products based on AWP, relying on Abbott's statements and conduct to its detriment. One of Abbott's defenses is that the Government purposefully adopted and implemented a drug reimbursement formula that used AWP *despite knowing* (or being provided with) overwhelming evidence that such prices were not a reliable indication of the acquisition costs of many drugs, and did so in furtherance of policy goals. That would, at a minimum, negate the fraud, falsity, reliance, and scienter elements of the Government's case.

To establish that defense, Abbott sought documents from the Government regarding its policies with respect to this range of drugs, including requests germane to (1) why the Government continued to use published AWPs for drug payment when it knew that published AWPs did not reflect acquisition costs, (2) the impact of using AWPs on other components of Medicare and Medicaid payments to providers, such as ensuring Medicare participation by

ensuring a certain profit level, or to compensate for low dispensing or infusion fees; and (3) the impact of these policies on the very margins that the Government now seeks to recover. After extensive briefing, the Court permitted the Government to withhold all such documents, without *in camera* review, unless a document "relate[d] to [the Government's] knowledge of a 'spread' for Abbott's drugs at issue in this litigation or its knowledge of Abbott's 'marketing the spread' for any its drugs." Abbott interpreted this order as including so-called "cross-cutting" evidence—documents referring to classes of drugs (*e.g.*, generic drugs, infusion or injectible drugs) that necessarily "relate to" the drugs named in this litigation—but after further briefing, the Court rejected this interpretation and allowed the Government to withhold documents that were relevant to the Government's policies and knowledge, but which did not by happenstance mention, by name, the drugs at issue or Abbott's own purported "marketing" of the spread.[1]

As a result of this ruling, the Government's objections to document requests seeking information crucial to Abbott's key defense have been sustained. Here are but a few examples of the requests to which the Government has objected and withheld documents:

- Abbott's Request for Production ("RFP") No. 118, which requests "all Documents concerning the efforts by the U.S. Government, any State Medicaid Program, or any Medicare Carrier or Medicaid Intermediary *to change the methodology for paying for drugs under Medicare Part B or Medicaid*." (emphasis added);

- Abbott's RFP No. 37, which requests "concerning the promulgation of any contemplated, proposed, or actual federal legislation, regulation, or policy concerning payment for drugs under Medicare and Medicaid, including comments, suggestions, [or] criticisms ... related to such [measures]."

- Abbott's RFP No. 38, which requests documents "relating to actions taken or considered by [the Government] to change the methodology to pay for drugs under Medicare Part B or Medicaid after becoming aware that AWP exceeded the average acquisition costs of Providers for drugs." (emphasis added).

---

[1] Consistent with that narrow order, the Government made two meager submissions, totaling a mere 42 documents, *in camera* to Magistrate Judge Bowler (one on December 4, 2007 and one on June 3, 2008). As yet the Court has not ruled on those submissions.

A few examples from one of the Government's privilege logs, in turn, confirm that the Government continues to withhold information responsive to these interrogatories, and crucial to Abbott's defense, based on the deliberative process privilege:

- HHC902-00010004, described on DOJ's privilege log as "Discussion of *alternative reimbursement mechanisms* for the Medicare Program's payment for drugs, and the *pros and cons of such policies*" (emphasis added);

- HHC902-00530055, described as a "Draft NPRM . . . on drug and biological pricing policy. *Discusses potential affects of alternative reimbursement mechanisms*" (emphasis added);

- HHC902-02140244, a 1999 Memo with attachments described on DOJ's privilege log as "Discussion of the issue regarding alternative reimbursement mechanisms and the use of DOJ data regarding one such alternative. *Presents an impact analysis of changes in reimbursement and its potential effect on the delivery of care*, includes different documents, including a memo, handwritten notes, and charts." (emphasis added).

*See* Gov't Privilege Log (Ex. 1). Thus, despite Abbott's requesting the information, and after submission of extensive briefing and argument, the Government has successfully thwarted Abbott from discovering almost anything on this key Abbott defense to this False Claims Act and common-law fraud case.

### B. The Government's Expert Reports Directly Address The Issues Raised In The Documents That The Government Has Withheld.

In litigating the Government's refusal, through its invocation of the deliberative process privilege, to turn over key evidence likely to help Abbott's case, Abbott repeatedly informed the Court that the withheld material would help demonstrate the reasons, other than alleged fraud by Abbott, that the Government continued to use an AWP-based payment methodology even though it understood that published AWPs were generally higher than the market prices for drugs.[2] The

---

[2] *See, e.g.*, Dkt. 4474 at 10 (Abbott explained that it needed discovery on the issue of "*Why* didn't the Government change the way Medicare and Medicaid reimbursed drugs when CMS *knew* the published prices bore little resemblance to the decreasing market prices for those drugs.") (emphasis in original); Dkt. 4698 at 13 (arguing that the Government's privilege objections would prevent testimony regarding "the real reasons the Government

-4-

Government resisted, arguing that analysis of the Government's decision making and policy choices was "collateral" or "irrelevant."[3] Imagine Abbott's surprise, then, when it received the Government's expert reports, and learned that these experts not only purported to opine on *why* the Government maintained AWP-based payment methodologies for Medicare and Medicaid, but harshly *criticized Abbott* for having *no evidence* as to why those methodologies were maintained, other than Abbott's alleged fraud.

Perhaps most egregious is Professor Marmor's report (attached as Ex. 2), which directly addresses the question on which Abbott sought discovery: Whether the Government knew that AWP was not a reliable indicator of acquisition costs, yet approved of or acquiesced in the continued use of AWP for policy reasons? Professor Marmor attempts to explain away the Government's continued use of an AWP-based drug payment methodology even after most, if not all, responsible Government officials became aware that published AWPs exceeded actual acquisition costs for drugs. Professor Marmor bolsters the conclusions in his report, including his rejection of the reasons offered by Abbott as to why the Government continued to use published AWPs in its pricing formulas, *by claiming that Abbott lacks evidence that contradicts his conclusions*—evidence which, of course, Abbott was precluded from exploring during discovery.

---

(continued...)

continued to use published prices, knowing full well that they far exceeded actual acquisition costs"); Dkt. 4791 at 2 (explaining that discovery would show "why Medicare and Medicaid continued to use AWP even though CMS knew the benchmark price exceeded providers' acquisition costs for prescription drugs"); Dkt. 4890 at 1-4 (arguing for discovery as to "why the Government acquiesced in or chose to continue using a payment system based upon published AWP"); Dkt. 5049 at 5 (explaining that the withheld documents would show "*why* CMS used an AWP-based system [and] the pros and cons of alternative methodologies that were considered and rejected.") (emphasis in original).

[3] *See, e.g.*, Dkt. 4904 at 4 (arguing that Government officials' conduct was irrelevant in this case because "[t]he case is *not* about whether the government 'was fooled into paying for drugs based on AWP' generally") (emphasis in original); Dkt. 4869 (arguing that the privileged documents were irrelevant to this case because this case "is ultimately about Abbott's conduct" not the Government's conduct or its payment system); Dkt. 4076 (same).

Clear examples of this shield/sword approach abound in Professor Marmor's report. For example, take Professor Marmor's discussion of his ultimate conclusion that the Government did not acquiesce in the drug pricing regime that it operated for over a decade. He grounds that conclusion on his assertion that "more direct, particular evidence of formal authoritative approval would be required" to show acquiescence. Marmor Report at ¶ 22. Similarly, he states, "[t]o substantiate acquiescence, informed officials in authoritative positions would have had to have decided—in a *bargaining discussion about competing options*—to change the regulatory standard and over time, to acknowledge such a policy position repeatedly." *Id.* at ¶ 23 (emphasis added). Yet, while Professor Marmor says that Abbott would need evidence of "a bargaining discussions about competing options" to substantiate a claim of Government acquiescence and prove his conclusions false, he fails to acknowledge that the Government has refused to turn over documents where precisely such discussions took place. *See supra* (identifying documents on the Government's privilege log that show "[d]iscussion of alternative reimbursement mechanisms for the Medicare Program's payment for drugs, and the pros and cons of such policies" and discussions of "potential affects of alternative reimbursement mechanisms").

Professor Marmor also opines on other subjects for which the Government continues to withhold documents under claims of privilege. With respect to evidence that the Government knew that a spread existed between published AWPs and market prices, Professor Marmor states that a "clear understanding" of such a spread "arrived much later" than Abbott claims. Marmor Report at ¶ 92; *see also id.* at ¶ 22 (describing the Government's "limited understanding" and "general lack of awareness" of price disparities). When discussing his attempts to determine "who knew what, when and where" about industry practices, he states, "[i]n the historical record, I found little, if any, recognition by HCFA or CMS officials of the changes in wholesale

margins." *Id.* at n.35. Finally, Professor Marmor opines that the reason that Ven-A-Care's "campaign" to convince Government officials that they were overpaying for drugs took so long before it inspired a change was because it is difficult to get the dispersed Government entities to take action and to "convince busy officials that this area ... should be the focus of reform effort." *Id.* at ¶ 88. The overall tenor of his opinion is that the Government either did not know about the problem or it was far too complicated to fix. Yet the Government has refused as a blanket matter to produce documents to permit Abbott to test these assertions, asserting the deliberative process privilege as a shield.

In explaining his theory that the Government is too complex or too easily swayed by lobbyists to change obviously flawed policies, Professor Marmor discusses the "political bargaining" that takes place when new regulations or laws are considered. In Professor Marmor's view, the pharmacy and drug manufacturers' lobbying efforts were one of the primary reasons that CMS did not move away from an AWP-based payment policy. *See* Marmor Report at ¶ 50 ("One phase of the political bargaining story was over. An effort to change the AWP standard was defeated—and with the explicit support of pharmacy and drug manufacturing trade associations."); *see also id.* at ¶ 53 ("HHS officials did not go ahead with any of these options. Intense objections by state governments, pharmacists, and drug manufacturers played a role."); *id.* at ¶¶ 80-83 (crediting lobbying efforts by patient groups, pharmacies, and drug manufacturers as one reason for the Government's failure to adequately change its payment methodology). The Government's expert uses Abbott's lobbying efforts affirmatively to explain, in part, why the Government failed to address the payment policy underpinning this lawsuit. But the Government still refuses to release non-public documents from the Office of Legislation that

would discuss such "political bargaining" or the impact of various lobbying efforts and CMS's consideration of differing attributes of different payment policies.

Professor Marmor further opines that the Government did not choose to pay more for drugs in order to offset inadequate (or non-existent) dispensing fees that providers received when participating in Medicare or Medicaid (*i.e.*, cross-subsidization). He states, "[t]he Medicaid program has never agreed to finance excess reimbursement for ingredient costs in order to make up for any shortfall in dispensing fees," and states that "[n]o 'cross-subsidy' policy ever existed." *Id.* at n.33. He also states that Abbott's claims that cross-subsidization took place are supported by "no evidence" and are "without empirical foundation." *Id.* at n.41. And he admits that it could be "legitimate to pay higher than estimated ingredient costs if lower than cost payments were made for dispensing fees," but qualifies this by saying that he "[has] seen no evidence that such a policy was ever implemented or that such criteria were ever used for evaluation." *Id.* at n.43. Yet again, despite Professor Marmor's willingness to opine on this topic, the Government has refused to produce documents that discuss this concept and has blocked testimony concerning cross-subsidization. *See, e.g.*, Vito Dep. at 611-612 (Ex. 3) (objecting to Abbott's question regarding "any conversation with HCFA relating to the Medicare side about whether or not the payment for ingredient cost would subsidize inadequate payment for [provider] services"); Reed Dep. at 492-494 (Ex. 4) (instruction from counsel blocked testimony regarding discussions that HCFA officials had regarding whether provider services would be reimbursed separate from ingredient costs and dispensing fees); Ragone Dep. at 479-484 (Ex. 5) (after the witness indicated that HCFA explained why it used the reimbursement strategy that it did during the claims period despite knowing that AWP exceeded acquisition costs, Government counsel instructed the witness not to give details regarding those discussions).

Finally, an overriding theme in Professor Marmor's report is his opinion regarding drug pricing policy and the politics that shaped that policy. Indeed, the core of his report is contained under the heading "Medicaid Drug Pricing Policy and Politics." Marmor Report at 22 (Ex. 2). To opine on these matters, Professor Marmor says that "one has to put together a historical understanding from quite varied sources." *Id.* at ¶ 41. In a line that could have been taken from one of Abbott's briefs, he professes that "[t]o understand what stakeholders were doing over time one has to investigate *what they said, what they claimed, what they thought they knew, what confused them, and what options for action they in fact had.*" *Id.* (emphasis added). But all of this is exactly what has been foreclosed to Abbott by the Government's assertion of the deliberative process privilege.

## ARGUMENT

The law is clear: As a matter of fundamental fairness, the Government may not invoke the deliberative process privilege to prevent Abbott from learning whether it approved of, or acquiesced in, the use of AWP for different policy rationales, and then disclaim any such approval or acquiescence through backward-looking expert reports. Nor may the Government assert that Abbott's defense fails for lack of evidence when the Government has withheld the very evidence which Abbott sought in support of its claims. Rather, because the Government has now placed its deliberative processes "at issue" through its expert reports, it has implicitly waived the privilege. The Government should thus be compelled to produce the withheld deliberative process documents to Abbott for review.

With respect to the deliberative process privilege in particular, where "the decision-making process is itself the subject of the litigation, it is inappropriate to allow the deliberative process privilege to preclude discovery of relevant information." *Velazquez v. City of Chicopee*, 226 F.R.D. 31, 34 (D. Mass. 2004) (quoting *Williams v. City of Boston*, 213 F.R.D 99 (D. Mass.

2003)) (internal quotation marks omitted). This rule is well-established and widely followed. *See* McCormick on Evidence § 108 (6th ed. 2006) (noting that the deliberative process privilege "does not protect communications . . . which are themselves the subject of litigation."); *see also, e.g., Children First Found. v. Martinez*, No. 1:04-CV-0927, 2007 WL 4344915, at * 7 (N.D.N.Y. Dec. 10, 2007) ("The historical and overwhelming consensus and body of law within the Second Circuit is that when the decision-making process itself is the subject of the litigation, the deliberative process privilege cannot be a bar to discovery.") (citing authorities).

Moreover, even if a privilege is deemed to apply at one stage of the litigation, "[i]t is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003). This "'at issue' implied waiver applies where the privilege-holder makes factual assertions, the truth of which can only be assessed by examination of privileged communications." *Jade Trading, LLC v. United States*, 65 Fed. Cl. 487, 496 (2005); *see also John Doe*, 350 F.3d at 302 (noting such waiver is known as "'at issue' waiver because it results from the party having placed a contention at issue"). As such, where the Government makes self-serving factual assertions about its deliberative processes, it waives the privilege as to such documents. *See Brown v. City of Detroit*, 259 F. Supp. 2d 611, 623-24 (E.D. Mich. 2003); *see also Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 512 (S.D. Cal. 2003) (noting that reasoning of "at issue" waiver doctrine applies to deliberative process privilege, among others).

Here, the Government was allowed to shield deliberative process documents that do not mention Abbott or the subject drugs by name. As described above, however, the Government's expert reports place *all* of the Government's deliberative processes regarding reimbursement

policy at issue, and the privilege over the non-Abbott, non-subject-drug documents must be considered waived. Indeed, the overriding theme in Professor Marmor's report is his opinion regarding drug pricing policy and the politics that shaped that policy. Marmor Report at ¶ 22. His report claims to be an analysis of "what stakeholders were doing over time … what they said, what they claimed, what they thought they knew, what confused them, and what options for action they in fact had." *Id.* at ¶ 41. This is nothing short of a description of the deliberative process—the very issue which the Government has repeatedly claimed to be irrelevant in this case, so as to justify their invocation of the deliberative process privilege.

The Government relies on these reports to refute and contradict, among other things: (1) Abbott's claims of government knowledge, approval, and acquiescence with respect to drug-pricing policy as a whole; (2) the Government's knowledge of the "spread"; (3) the political considerations impacting drug payment policy; and (4) the existence of cross-subsidization. By doing so, it has made its "decision-making process … itself the subject of the litigation," and as such, "it is inappropriate to allow the deliberative process privilege to preclude discovery of relevant information." *Velazquez*, 226 F.R.D. at 34. The privilege should thus be deemed waived, and the documents should be ordered produced to Abbott, so that in fairness, it may gather evidence to test the veracity of the experts' conclusions.

## CONCLUSION

The Government cannot have it both ways. It cannot make its own knowledge and deliberations key issues in this fraud case, then prevent Abbott from defending itself by cloaking all relevant information in the deliberative process privilege. The privilege should be deemed waived. At the very least, this Court should permit Abbott to pursue the matter in the Court of Appeals by granting its motion for certification under 28 U.S.C. § 1292(b).

Dated: July 22, 2008

Respectfully submitted,

/s/ R. Christopher Cook
James R. Daly
Jason G. Winchester
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories Inc.*

## **CERTIFICATE OF SERVICE**

    I, Louis P. Gabel, an attorney, hereby certify that I caused a true and correct copy of the foregoing motion to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 22nd day of July 2008.

                                                /s/ Louis P. Gabel