# EXHIBIT 5

Ragone, Linda - Vol. II                           April 18, 2007
                    Philadelphia, PA

Page 412

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
VOLUME II

----------------------------------X  MDL NO. 1456
IN RE: PHARMACEUTICAL INDUSTRY    :  CIVIL ACTION:
AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS
----------------------------------X
THIS DOCUMENT RELATES TO:         :
U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:
Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS
Laboratories, Inc.                :
----------------------------------X
          IN THE CIRCUIT COURT OF
          MONTGOMERY COUNTY, ALABAMA
----------------------------------X
STATE OF ALABAMA,                 :  CASE NO.
        Plaintiff,                :  CV-05-219
    v.                            :
ABBOTT LABORATORIES, INC.,        :  JUDGE
et al.,                           :  CHARLES PRICE
        Defendants.               :
----------------------------------X

Henderson Legal Services
202-220-4158

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Ragone, Linda - Vol. II                                April 18, 2007
                    Philadelphia, PA

Page 477

1  A. It goes -- right now it goes up on the
2  Internet, yes.
3  Q. And the purpose of that distribution
4  process is to put these reports in the hands of
5  policymakers, who can use this information in
6  making policy decisions?
7     MR. DRAYCOTT: Objection.
8     MR. COOK: What's the objection?
9     MR. DRAYCOTT: For one, you didn't, first
10 of all, establish that she would know what the
11 purpose for the distribution is when you asked her
12 what the distribution -- what the purpose is.
13 BY MR. COOK:
14 Q. If I ever ask you a question, Ms.
15 Ragone, and you don't know the answer, feel free to
16 say I don't know.
17    Can you tell me whether one of the purposes of
18 distributing these reports was to put it in the
19 hands of policymakers who can use this information
20 in making policy decisions?
21 A. I believe it is our hope that by putting
22 these findings and recommendations together and

Page 478

1  putting them in published reports, that the people
2  who this information would be germane to would read
3  it and have access to it.
4  Q. Now, this was in December 1997. Do you
5  know if anytime after December 1997, HCFA, later
6  CMS, abandoned AWP as the benchmark for reimbursing
7  Medicare Part B drugs?
8  A. I haven't been in the drug arena as much
9  at the end. I believe that they are using new
10 strategies now, reimbursement methodologies, in
11 Medicare.
12 Q. When was it that you left the
13 prescription drug -- was that 2004?
14 A. There were a few times I had been the
15 DRIG, and then a team leader, Dave Tawes, began
16 leading most of the drug work, and he would work
17 more often directly with our manager, Robert Vito,
18 so the actual pricing work, I haven't done in quite
19 some time.
20 Q. As of 2004, was Medicare still using AWP
21 to base its Medicare Part B drug reimbursement?
22 A. I don't remember what the time period

Page 479

1  was when it changed to --
2  Q. Can you give me a rough? After 2000?
3  A. Yes.
4  Q. After 2002? After 2001?
5  A. I think after 2002. I'm not quite sure
6  when the legislation was enacted.
7  Q. So whenever the legislation was enacted,
8  perhaps for as many as five years after receiving
9  the conclusions of this report, Medicare Part B
10 continued to pay, for the 22 drugs reviewed in this
11 report, based upon AWP, correct?
12    MR. DRAYCOTT: Objection.
13    THE WITNESS: Based upon, I guess,
14 starting in 1998, they paid AWP minus 5 percent.
15 BY MR. COOK:
16 Q. But still based upon the AWP?
17 A. Correct.
18 Q. Did you ever have an argument with
19 anybody at HCFA about the wisdom of doing that?
20    MR. DRAYCOTT: Objection.
21    THE WITNESS: I'm not -- I don't know if
22 I would call it an argument. We've certainly had

Page 480

1  discussions during exit conferences about the fact
2  that a different pricing methodology might be
3  appropriate.
4  BY MR. COOK:
5  Q. What do they say about that?
6     MR. DRAYCOTT: Objection.
7     Instruct you not to answer.
8  BY MR. COOK:
9  Q. I know you're going to be instructed not
10 to answer, but I do have to put the questions on
11 the record, Ms. Ragone.
12    So let me get this straight. You sit down in
13 a room, at a conference table like this with folks
14 from HCFA; you tell them that AWP exceeds
15 acquisition costs, as defined in the report, by up
16 to ten times, right?
17 A. Yes.
18 Q. You tell them that the OIG recommends
19 that they stop paying that high an amount for
20 prescription drugs, right?
21    MR. DRAYCOTT: Objection to the extent
22 that you're asking for the contents of her

18 (Pages 477 to 480)

Ragone, Linda - Vol. II                         April 18, 2007
                    Philadelphia, PA

Page 481

1  communications to HCFA during the exit conference.
2      MR. COOK: If you'd just instruct her not
3  to answer. Are you instructing her not to answer?
4      MR. DRAYCOTT: I am.
5  BY MR. COOK:
6      Q. So you make whatever communications you
7  do to HCFA in these exit conferences --
8      MR. DRAYCOTT: Objection.
9  BY MR. COOK:
10     Q. -- after giving them a copy of this
11 report, right?
12     MR. DRAYCOTT: Objection.
13     And you're instructed not to answer.
14 BY MR. COOK:
15     Q. And you make your recommendations,
16 correct?
17     MR. DRAYCOTT: You can answer that
18 question.
19     THE WITNESS: During the exit
20 conferences, we will tell them the findings and
21 recommendations.
22 BY MR. COOK:

Page 482

1      Q. And you encourage them, that is,
2  officials at HCFA, to reimburse prescription drugs
3  based upon something other than the published
4  average wholesale price?
5      MR. DRAYCOTT: Objection.
6      You're instructed not to answer.
7  BY MR. COOK:
8      Q. And, in fact, you do so heatedly,
9  correct?
10     MR. DRAYCOTT: Objection.
11     And you're instructed not to answer.
12 BY MR. COOK:
13     Q. And they respond?
14     MR. DRAYCOTT: You can answer whether or
15 not they responded.
16     THE WITNESS: If they have comments, they
17 will respond when we provide the findings and
18 recommendations.
19 BY MR. COOK:
20     Q. Did they explain why HCFA continued to
21 pay based upon AWP, notwithstanding the fact that
22 HCFA knew average wholesale price could exceed

Page 483

1  acquisition cost by as much as ten times?
2      MR. DRAYCOTT: You can answer as to
3  whether or not they responded without revealing the
4  response, if you remember.
5      THE WITNESS: I believe that they stated
6  why they were using the reimbursement strategy they
7  were using at that time.
8  BY MR. COOK:
9      Q. And what was their explanation?
10     MR. DRAYCOTT: Objection.
11     And you're instructed not to answer.
12 BY MR. COOK:
13     Q. Why do you believe HCFA continued to use
14 average wholesale price to pay for Medicare Part B
15 drugs after you issued this report in December
16 1997?
17     MR. DRAYCOTT: Objection.
18     And you're instructed not to answer to
19 the extent your belief is based on communications
20 from HCFA during an exit conference.
21 BY MR. COOK:
22     Q. I'll let you work out that metaphysical

Page 484

1  problem.
2      A. I -- I believe --
3      MR. DRAYCOTT: Well --
4      THE WITNESS: -- that the --
5      MR. DRAYCOTT: Let me ask you: Can you
6  answer that question without revealing the content
7  of communication from HCFA during the conference?
8      THE WITNESS: I believe I can. I believe
9  I can.
10     MR. DRAYCOTT: Okay.
11     THE WITNESS: I believe that the level of
12 people that we were talking to believed that the
13 regulations or legislations were set for payment at
14 a certain place and that's what Medicare was
15 bound to reimburse at.
16 BY MR. COOK:
17     Q. Who at HCFA is responsible for setting
18 Medicare Part B drug payment policy?
19     A. Policy?
20     Q. What the amount is that they would pay.
21     A. I believe that would be regulated or
22 legislated.

                              19 (Pages 481 to 484)

Henderson Legal Services
202-220-4158

1d6c6e27-b012-4f09-8e5b-80880a7fe603