UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 01-CV-12257-PBS<br><br>Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*,<br>Civil Action No. 05-11084-PBS | |

### DEY, INC., DEY L.P., AND DEY L.P., INC.'S OBJECTION TO THE PLAINTIFF'S PROPOSED SCHEDULING ORDER AND PROPOSED CASE MANAGEMENT ORDER

Defendants Dey, Inc., Dey L.P., and Dey L.P., Inc. (collectively, "Dey"), object to the Proposed Scheduling Order and the Proposed Supplemental Case Management Order, as attached as Exhibits B and D to the Plaintiff United States of America's (the "Government") Report in Advance of the July 24, 2008 Status Conference, Docket 5454 (the "Government's Report"), filed with the Court on July 21, 2008.

The parties appeared at a status conference before the Court on June 18, 2008 (the "June 18, 2008 Hearing") concerning joint discovery of state Medicaid issues going forward in the case. At the June 18, 2008 Hearing, the Court directed as follows:

(1) Fact discovery deadline in the Dey and Roxane actions is to be extended to October 31, 2008 (June 18, 2008 Hearing Tr. at 27:17-20);

(2) Parties are permitted to take one 30(b)(6) and one 30(b)(1) deposition per each state (June 18, 2008 Hearing Tr. at 9:08-21; 11:17-21; 27:18-22); and

1

(3) Additional status conferences on joint discovery issues are set for July 24, 2008 and November 13, 2008. (June 18, 2008 Hearing Tr. at 30:18-23; 31:17-19.)

The parties met and conferred since the June 18, 2008 Hearing, and Dey and the Government have worked out the pre-trial schedule dates consistent with the Court's directive. Consistent with the discussions among the parties pursuant to the Court's directives from the June 18, 2008 Hearing, Dey respectfully submits the accompanying proposed First Joint Case Management Order, attached hereto as Exhibit A, to govern future discovery in this case.

The dates in Dey's First Joint Case Management Order are the same as those in the Government's Proposed Joint Scheduling Order, with the only difference that the Abbott dates and summary judgment briefing dates are excluded.

As discussed below, the remaining issues raised in the Government's Report are outside the scope of the upcoming hearing and premature.

## I. THE GOVERNMENT AND DEY HAVE REACHED AN AGREEMENT IN PRINCIPLE REGARDING PRE-TRIAL SCHEDULING DATES

Consistent with the Court's directives, the Government and Dey have agreed in principle to the following pre-trial schedule dates, as set forth in the proposed First Joint Case Management Order and reflected in the Government's Proposed Joint Scheduling Order:

| DEADLINE | ACTION |
| --- | --- |
| October 31, 2008 | All fact discovery shall be completed. |
| November 13, 2008 | Status conference, 3:00 p.m. |
| December 10, 2008 | Plaintiffs in the Dey Action shall serve expert reports and other materials in compliance with Fed. R. Civ. P. 26(a)(2)(B). |
| December 22, 2008 | Plaintiffs in the Roxane Action shall serve expert reports and other materials in compliance with Fed. R. Civ. P. 26(a)(2)(B). |

2

| January 26, 2009 | Defendants in the Dey Action shall serve expert reports and other materials in compliance with Fed. R. Civ. P. 26(a)(2)(B). |
|---|---|
| February 9, 2009 | Defendants in the Roxane Action shall serve expert reports and other materials in compliance with Fed. R. Civ. P. 26(a)(2)(B). |
| April 9, 2009 | Close of expert discovery. |
| May 30, 2009 | Opening briefs for Summary Judgment shall be filed. Summary judgment briefing schedule to be determined at November 13, 2008 conference. |

(*See* Proposed First Joint Case Management Order, at ¶ 3, attached hereto as Exhibit A.) Dey objects to the Government's attempt to prescribe a consolidation of Dey's summary judgment motions with that of Abbott and Roxane at this time before these issues are identified.

## II. THE GOVERNMENT'S PROPOSED LIMITS ON STATE MEDICAID DEPOSITIONS ARE UNREASONABLE AND CONTRADICT THE COURT'S DIRECTIVES FROM THE JUNE 18, 2008 HEARING

The Government's proposed supplement to the case management order (the "Government's Proposed CMO"), submitted as Exhibit D to the Government's Report, seeks to unilaterally impose limits upon state Medicaid discovery by precluding depositions in 18 of the 50 states. This was never agreed to by the parties nor authorized by this Court. (June 18, 2008 Hearing Tr., attached to Declaration of Neil Merkl as Exhibit A, at 11:17-21; 27:18-22.) The Government's Proposed CMO would preclude the parties from taking any 30(b)(6) or 30(b)(1) depositions from 12 of the 50 states and any 30(b)(1) depositions from 6 additional states. Testimony from state Medicaid witnesses from all 50 states is relevant because while the broad scope of the state Medicaid discovery from state to state is similar, the substance is not. Larry Reed of CMS testified to the relationship between CMS and the state Medicaid programs as follows:

> [T]here is a structure in place, again, of how we relate to state Medicaid agencies. There are parts of the prescription drug

3

> program where we direct the states how to pay for drugs, or a maximum in aggregate to pay for drugs. There are other parts where the states make their determination of prescription drug payment policies – of prescription drug payment methodologies.

(Larry Reed Dep. Tr., at 532:9-17, attached to Merkl Dec. as Ex. B.) For the parts of Medicaid where the states make their own determinations, such determinations vary widely. Cody Wiberg of Minnesota's Medicaid program, a former state Medicaid official deposed in the Abbott Action, testified that "[n]ow, one of the things you have to understand is, in addition to AWP being 'ain't what's paid,' another common saying that we have was if you've seen one Medicaid Pharmacy Program, you've seen one Medicaid Pharmacy Program." (*See* Wiberg Dep. Tr., at 199:5-10, attached to Merkl Dec. as Ex. C.) The point made by Mr. Wiberg is one that is evident after taking several depositions in different states. No two Medicaid programs are the same, and therefore the discovery conducted in one state may very well not apply to the state right next to it. Some states use AWP for reimbursement while others use WAC. Some states have extensive MAC lists and others conduct surveys of actual acquisition costs. Because the regulations allow each state to set up its own reimbursement methodology within the confines provided by CMS, each Medicaid program looks different, reimburses differently, and legislates differently.

Thus, as set forth in Dey's proposed First Joint Case Management Order and consistent with the Court's directive, the parties should be permitted to take at least one 30(b)(6) and one 30(b)(1) deposition per each state until the close of discovery. (June 18, 2008 Hearing Tr. at 9:08-21.)

### III.    THE GOVERNMENT'S PROPOSED CONSOLIDATION OF SUMMARY JUDGMENT BRIEFING FOR ABBOTT, DEY AND ROXANE IS PREMATURE

The Government's proposal for a consolidated summary judgment briefing for Abbott, Roxane and Dey, as set forth in the Government's Proposed Scheduling order, is premature. Dey requests that the Court adhere to its original intention to revisit the scheduling of

4

dispositive motions and any outstanding discovery matters until early November after discovery is completed in this case. (*See id.*, at 30:18-23.) Consolidating the briefing of dispositive motions in the Abbott, Roxane and Dey actions need not be and should not be decided at this time. Although there may be cross-cutting issues that arise, it is too early determine what those issues will be.

While the three cases bear some similarity, as an initial matter, the Abbott drugs at issue in the federal False Claims Act ("FCA") actions brought by the Government and separately by Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care") are different in kind than those at issue against Dey in this case. For example, the Abbott drugs at issue are primarily physician-administered intravenous drugs, most of which did not have a federal upper limit ("FUL") in place during the relevant time period. In contrast, Dey's drugs at issue in this case are self-administered inhalation drugs which were subject to FULs and/or state maximum allowable costs ("MAC") at some point during, if not all throughout, the relevant time period.

Moreover, Dey's disclosure to the federal Medicare program and state Medicaid agencies concerning the nature of the reported prices for its drugs raise government knowledge issues that may not be common or shared by Abbott and Roxane. The Government also concedes in its report that the relevant time periods alleged against Abbott, Dey and Roxane are substantially different and, consequently, the focus of discovery in each of the cases, since "in the Abbott case the United States seeks damages only through 2001" whereas "in the Dey and Roxane cases the United States seeks damages through the present." (Government's Report, at 5 fn. 6.)

## IV. THE GOVERNMENT'S ATTEMPT TO "STREAMLINE" DISCOVERY ON CAUSATION AND GOVERNMENT KNOWLEDGE IS SELF-SERVING AND IMPROPER

The Government devotes over half of its 7-page "report" to reargue and improperly seek to preclude Dey from taking necessary and targeted factual discovery bearing on the central elements of the claims and defenses in this case – *i.e.*, causation and government knowledge. The Court has already rejected the Government's overly narrow view of discovery on these matters. (*See id.*, at 5:13-22.) In short, the Government's Report amounts to a thinly veiled attempt to reargue these very same issues. The Government's argument has no basis in fact and, more to the point, is not a proper subject for this hearing and should not affect scheduling and discovery issues before the Court.

### A. Causation

To briefly address the arguments raised by the Government in its report, however, it is worth noting that the Government's proffer of state Medicaid plans and its own expert's analysis of state reimbursement claims data is merely a self-serving attempt to advance its own position on causation in this case and foreclose any further discovery that would call its view into question.[1] As the Court recognized in the case of Massachusetts, for example, mere observation of a state's Medicaid plan does not show whether the state Medicaid officials properly implemented its federally approved reimbursement methodology. (*See id.*, at 5:14-21.)

Also, in Massachusetts, where the definition of "usual and customary" price was specifically defined to be the lowest price point at which Medicaid providers would be reimbursed, analysis of its state plan, reimbursement claims data or even a 30(b)(6) deposition

---

[1] The Government refers the Court and the parties to materials submitted by the Government's expert in the Abbott action, which presumably contain an analysis of claims data on Abbott drugs only and not that of Dey's drugs. As such, there is no basis to assume at this time that the Government can establish causation with respect to Dey's drugs through the work and the materials relied upon in the Government's expert report.

6

testimony alone may not uncover whether Medicaid providers in Massachusetts had complied with the Medicaid program's guidelines in submitting accurate claims for reimbursement. Dr. Paul Jeffrey testified, as an individual fact witness, that after reviewing state audit reports of Massachusetts providers, he realized that pharmacies were not submitting their "true" usual and customary charges for reimbursement purposes to Massachusetts Medicaid in about 25% of the time. (Jeffrey Dep. Tr., at 101:21-102:11, attached to Merkl Dec. as Ex. D.) Nearly every one of the 50 states' reimbursement methodologies have adopted at some point in time a "usual and customary charge" as a reimbursement benchmark, along with a separate definition of that term in each state. Thus, evidence of pervasive non-compliance by Medicaid providers may be relevant not only to Massachusetts but to other states. Failure of a state Medicaid program's implementation of its federally-approved reimbursement methodology, as well as the failure of Medicaid providers to comply with the Medicaid program's regulations in submitting claims for reimbursement (in addition to the Medicaid program's knowledge and failure to remedy such violations) is directly relevant to the issue of causation and can serve to break the causal chain that the Government hopes and needs to demonstrate to prevail in this case.

**B.    Government Knowledge**

The Government mistakenly states that Dey bears the burden of "demonstrating a sufficient factual basis" for seeking state-by-state discovery pertaining to the government knowledge defense, while at the same time conceding that government knowledge is relevant to the issue of scienter under the FCA. Contrary to the Government's contention, evidence of government knowledge is also relevant to establishing the falsity and causation elements of an FCA cause of action. "If the government knows and approves of the particulars of a claim before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the

7

fraud or falsity required by the FCA." *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). As this Court has previously held, a state Medicaid agency's knowledge of providers' acquisition costs, as compared to the amounts at which they reimbursed the providers and the published AWPs and WACs, is also a relevant issue of fact. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (Saris, J.) (*citing* Durcholz).

The relevance of government knowledge to the issue of whether a statement is false or fraudulent was perhaps best stated by the Wisconsin court in its decision and order on Plaintiff's motions for partial summary judgment in the Wisconsin AWP litigation:

> Plaintiff's argument that "[a]n untrue statement is untrue regardless of whether the listener knows it is untrue" begs the question. How is a statement "untrue" in the first place, if the speaker and the listener are using terms they mutually understand because they have agreed on their meaning – that is, they have together developed the definitions, either expressly or tacitly, such that they have a common understanding? If two parties agree that the term "cat" shall be defined to include a "dog," is the definition "untrue" under §100.18(1)? With such agreed terminology, it seems self-evident that representing a "dog" to be a "cat" cannot, years later, expose one party to a legitimate misrepresentation charge by the other, under §100.18(1) or otherwise.

(Decision and Order on Plaintiff's Motions for Partial Summary Judgment (May 20, 2008), at 6, attached to Merkl Dec. as Ex. E.)

The Government also overlooks the fact that, in addition to its FCA claims, it has brought a claim for common law fraud for which its knowledge of Dey's AWPs and WACs is directly relevant. Indeed, the Government's knowledge of whether Dey's reported prices represented providers' actual acquisition costs when it approved each state's Medicaid plan, and each state's knowledge of Dey's reported prices when it submitted for approval and implemented such plans bears directly on whether the Government and/or the states reasonably relied. *See*

*Carroll v. Xerox Corp.*, 294 F.3d 231, 243 (1st Cir. 2002) (dismissing plaintiff's fraud claim where plaintiff knew that allegedly fraudulent statements were not true).

Contrary to the Government's contention, moreover, defendants have developed a *prima facie* record in certain states that already demonstrate the state Medicaid agencies both knew of and approved of the existence of alleged "spreads" between reported prices and providers' actual acquisition costs, and in fact used those spreads for its own policy reasons. (*See e.g.* Poulsen Dep. Tr., at 122:17-19, attached to Merkl Dec. as Ex. F; Sullivan Dep. Tr., at 98:04-99:09, attached to Merkl Dec. as Ex. G.) For example, Tennessee Medicaid took the spread into account when setting the dispensing fee: "the dispensing fee in and of itself is not compensation for what some calculated cost to dispense, that the portion of profit built into the ingredient cost is also a factor in that." (Id., at 241:04-08.) In Minnesota, Dr. Wilberg testified that "if the AWP, on average, was what you would expect most providers to be actually paying for the drug when they purchase it, you would end up raising the dispensing fee, to a certain extent." (Wilberg Dep. Tr., at 169:17-21.) In Massachusetts, Deputy Director of Pharmacy Gary Gilmore testified that the Massachusetts Medicaid reimbursement system would not have functioned if providers were reimbursed at actual acquisition cost plus a $3 dispensing fee. (*See* Gilmore Dep. Tr., at 303:17-304:02, attached to Merkl Dec. as Ex. H.) Dey should be allowed to pursue state Medicaid discovery to obtain additional evidence on such cross-subsidization issues.

## V.    **CONCLUSION**

For the foregoing reasons, Dey respectfully requests this Court deny entry of the Government's Proposed Scheduling Order and the Government's Proposed CMO, and enter instead the proposed First Joint Case Management Order, attached hereto as Exhibit A, to govern future discovery in this case.

Dated: July 22, 2008

                    Respectfully Submitted,

                    KELLEY DRYE & WARREN LLP

                    By: /s/ Neil Merkl
                        Paul F. Doyle (BBO # 133460)
                        Sarah L. Reid *(pro hac vice)*
                        William A. Escobar *(pro hac vice)*
                        Neil Merkl *(pro hac vice)*
                    101 Park Avenue
                    New York, NY 10178
                    Telephone: (212) 808-7800
                    Facsimile: (212) 808-7897

                    *Attorneys for Defendants Dey, Inc.*
                    *Dey, L.P., and Dey, L.P., Inc.*

**CERTIFICATE OF SERVICE**

    I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on July 22, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                /s/ Neil Merkl