# Exhibit A

```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
     In Re:                          )
 4   PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE         ) CA No. 07-10248
 5   LITIGATION                      ) Pages 1 - 35
 6
 7
 8                       MOTION HEARING
 9         BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
10
11
12
13
                             United States District Court
14                           1 Courthouse Way, Courtroom 19
                             Boston, Massachusetts
15                           June 18, 2008, 2:20 p.m.
16
17
18
19
20
21
22
                       LEE A. MARZILLI
23                  OFFICIAL COURT REPORTER
                 United States District Court
24               1 Courthouse Way, Room 3205
                      Boston, MA   02210
25                     (617)345-6787
```

Page 2

1  APPEARANCES:
2    BARBARA HEALY SMITH, ESQ. and JAMES F. FAUCI, ESQ.
   Assistant United States Attorneys, Office of the United
3  States Attorney, 1 Courthouse Way, Boston, Massachusetts,
   02210, for the Government.
4
   NEIL MERKL, ESQ., Kelly Drye & Warren, LLP,
5  101 Park Avenue, New York, New York, 10178, for Dey, L.P.
6    ERIC GORTNER, ESQ., Kirkland & Ellis, LLP,
   200 East Randolph Drive, Chicago, Illinois, 60601,
7  for Roxane Laboratories, Inc.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            PROCEEDINGS
2    THE CLERK: In Re: Pharmaceutical Industry Average
3  Wholesale Price Litigation, Civil Action No. 01-12257 and
4  Civil Action No. 07-10248, will now be heard before this
5  Court. Will counsel please identify themselves for the
6  record.
7    MS. SMITH: Barbara Healy Smith for the United
8  States.
9    MR. FAUCI: Jeff Fauci for the United States.
10   MR. GORTNER: Eric Gortner from Kirkland & Ellis in
11 Chicago on behalf of Roxane Laboratories.
12   MR. MERKL: Neil Merkl from Kelly Drye in New York
13 on behalf of Dey.
14   THE COURT: Yes, you both have filed numerous
15 discovery motions directed at the same issue, cross-motions
16 really, an issue that I hadn't really foreseen, and I think
17 it was worth seeing you, and also getting a big-picture view
18 of where you think this is going at this point before I bog
19 us down in endless discovery on fifty states' Medicaid laws.
20 So maybe you can start.
21   MS. SMITH: Yes, Judge.
22   THE COURT: Where do you see this going? Am I
23 going to have to do summary judgment motions for fifty
24 states? Yes.
25   MS. SMITH: Oh, I don't think any of us anticipated

Page 4

1  that.
2    THE COURT: I'm being very serious. Let me back
3  up. Yesterday I had a hearing on a case called Mylan
4  Laboratories -- I don't know if anyone sat through that.
5    MR. MERKL: Yes, your Honor. We represent Mylan as
6  well, and we were here.
7    THE COURT: -- where it turned out, as I'm sure you
8  know as well, that the complexities of Massachusetts state
9  Medicaid law, just taking my own state for starters, turn out
10 to be very difficult and are going to require a lot of
11 thought from me, by no means a slam dunk. In fact, I believe
12 that when the case started, there were certain assumptions,
13 even by the state, that turned out not to be completely the
14 way it developed over time; you know, so what do you do with
15 a state that doesn't actually publish a WAC, you know, what
16 happens?
17     And so as I sat through that yesterday, I was
18 thinking, "So do I have to do this for all fifty states?"
19 Maybe Kansas started off with an AWP and then changed to a
20 WAC, and will I have to do what I did with Mylan yesterday
21 for all fifty states?
22    MS. SMITH: There are variations on a few themes.
23 It's not fifty unique sui generis systems, that there are a
24 small number of approaches that may have changed over time.
25 So there is fact-specific discovery that the parties would

Page 5

1  engage in, but the bulk of that is going to come from state
2  plan amendments, Medicaid claims data, which is being
3  produced on a rolling basis. And for an explanation of the
4  reimbursement methodology that was followed, a 30(b)(6)
5  deposition should capture that.
6      In terms of then what happens if defendants think,
7  "Ooh, but there are five states or six states that under no
8  circumstances could the government make out an argument for
9  liability, given that they trotted down this other path --"
10    THE COURT: Well, but take Massachusetts. It's a
11 little unfair to you because, I mean, I --
12    MS. SMITH: Massachusetts is different.
13    THE COURT: No, but I'm just saying, are all fifty
14 states different? So take Massachusetts where there was a
15 state plan that said you reimburse for these drugs based on
16 the lowest of four prices, but it turns out that in some
17 circumstances there was almost an unwritten policy that if
18 you didn't produce one of these prices, we would do it this
19 other way. All right, so I got concerned, after seeing that,
20 that that may be true in other states too because the pricing
21 is unbelievably opaque, unclear, and complex -- unbelievably.
22 I mean, I think we all wish we never heard of it, right?
23 So --
24    MS. SMITH: Are we off the record or on the
25 record?

Page 6

1  THE COURT: So that's what's got me so worried, and
2  that's why I didn't resolve these motions on the record. I
3  mean, what do you anticipate? I'm not going to do ten or
4  fifteen depositions per state because that would sink us, so
5  I'm trying to come up with some compromise.
6  MR. MERKL: Well, that was our view as well. Our
7  view is -- and I'm not trying to make it sound too
8  apocalyptic -- is that this case really is Massachusetts
9  times fifty.
10  THE COURT: That's a very depressing statement.
11  And I don't believe it. So, I mean, at least I'm not going
12  to start there.
13  MR. MERKL: All right, and I'm not suggesting that
14  your Honor should, all right? That is our ultimate view, but
15  we also agree with the Court, and we've been working with the
16  other side to try and do this in increments to avoid ten
17  depositions per state because our clients don't want to pay
18  for that either. What is apparent to us, though, is, one
19  deposition per state really is not workable on the state of
20  affairs for reasons you just alluded to: Each state has its
21  own formula. Some use WAC. I think seven or eight use WAC.
22  Others use AWP. Delaware used to use actual acquisition cost
23  with surveys. They then during this time period changed and
24  went to AWP. Today Washington state, AWP minus 50; another
25  state, AWP minus 30 for bought products; minus 50 for

Page 7

1  generics; and minus 10 for brand names.
2  THE COURT: Yes, but her point is that much of that
3  can be done based on a 30(b)(6) and documents. So the
4  question really is, is there a way of, instead of my giving
5  you a blanket order, you can have as much as you want, which
6  I'm not going to do --
7  MR. MERKL: I didn't think you were.
8  THE COURT: And I understand your point that some
9  states, one per state may not be appropriate. Is there a way
10  of just being more specific in terms of, well, we need in
11  Delaware another deposition of the person who actually did
12  the surveys?
13  MR. MERKL: That was our thought, your Honor, and
14  that if we took a 30(b)(6) per state that they would agree on
15  with Abbott, with input from the federal government, if
16  that's what they want, we serve a blanket 30(b)(6), they
17  under its existing order also has a right to take a
18  deposition, we were then going to take the position that Dey
19  could take one beyond that, if necessary, if there was, say,
20  a former employee that had knowledge.
21  THE COURT: Sure, like Mr. Shapiro -- I think that
22  was the name -- in the state.
23  MR. MERKL: Yes.
24  THE COURT: Yes, yes.
25  MR. MERKL: For instance, he wouldn't be available

Page 8

1  in Massachusetts.
2  THE COURT: I understand that. So I'm just saying,
3  so that would give you two per state as a practical matter.
4  MR. MERKL: And our view is that that's what we
5  kind of had to do to begin with, although the government has
6  taken a different view on that.
7  MS. SMITH: If I may, your Honor? There are two
8  sets of issues. They're not exactly the same issue raised in
9  the cross-motions. There is a single issue to be resolved in
10  the government's motion for clarification, and that is, if
11  there are -- if Dey and Roxane can compel the government to
12  attend lots of other extra 30(b)(1) depositions that have
13  been noticed in state cases --
14  THE COURT: No. All right, I'll go with you on
15  that. No. On the other hand, they can use all those
16  depositions. You can use all of them in this case.
17  MR. MERKL: Okay.
18  THE COURT: But there's a more serious question
19  here, much more serious, which is, is this fair? Because
20  I've been so taken with the Massachusetts experience in terms
21  of the number of depositions and the amount of complexity for
22  our own state statute, that I am worried that one 30(b)(6)
23  for each state may be enough, but it may not. And how do I
24  get at that issue?
25  MS. SMITH: Well, I think there's a number of ways,

Page 9

1  and this is not something we've talked about in specifics.
2  There have been a lot of depositions of state witnesses in
3  state cases and in Abbott. So there's a baseline. We're not
4  starting from zero. In most instances, a 21-hour 30(b)(6)
5  deposition with a detailed list, that may not be one
6  witness. If the topics cover the areas that are most
7  critical, it might be three important witnesses.
8  THE COURT: I agree, it may be. What we're going
9  to do is, we're going to stay with the 30(b)(6) one per
10  state, per whatever, and if you want a second one -- I never
11  said it was going to be the same for both of them. I didn't
12  rule on that, right? Maybe there's a second person who's
13  essential. But if something comes up where someone says,
14  "Back in the day, the key guy was Joe Schmoe," that person
15  should be deposed.
16  MS. SMITH: That seems reasonable.
17  THE COURT: I mean, you know, because a 30(b)(6) is
18  always someone who's currently there, right?
19  MS. SMITH: Yes.
20  THE COURT: And this goes back sixteen years.
21  MS. SMITH: Yes.
22  THE COURT: So in Massachusetts, for example, there
23  was one guy who was Mr. Medicaid. He lived, died, and
24  breathed the whole thing, but he's no longer with the
25  agency. So that kind of person should be deposed. And so I

Page 10

1  think what we should do is -- are you almost done with the
2  30(b)(6)s for every state?
3       MR. MERKL: No.
4       MR. GORTNER: No, your Honor. They have yet to
5  begin the 30(b)(6)s per state.
6       THE COURT: Why? Isn't the discovery almost over?
7       MR. GORTNER: Well, discovery actually in the
8  Roxane will go to the end of October of this year.
9       THE COURT: Yeah, but that's fifty states between
10 now and the end of October.
11      MR. GORTN. I understand, your Honor, but because
12 of the way the CMOs were set up, as you know, Abbott's DOJ
13 case has just ended discovery at the end of March, and we
14 climbed aboard and wanted to make sure that we were not
15 duplicating, doing anything extra than what Abbott was
16 doing. We anticipated in fact that Abbott might be able to
17 do some of these 30(b)(6)s. Because as this case has
18 developed, it has got broader and much more complicated, as
19 your Honor mentioned in the Massachusetts case, Abbott simply
20 ran out of time to do these state 30(b)(6)s. So that's next
21 on our agenda.
22      But you're anticipating exactly what we're
23 concerned about, which is, as you dig into sixteen years of
24 regulatory administrative politics, change in reimbursement
25 methodology history -- even in Hawaii where we had one

Page 11

1  30(b)(6), for instance, in the 30(b)(6) on the federal
2  government, it has proven extremely difficult to even find a
3  host of current Medicaid personnel who can cover the broad
4  range of topics over this period of years. And we're finding
5  situations like the federal government's implementation of
6  Federal Upper Limits. There may be particular policies that
7  the agency is aware of, but then there's a particular
8  individual who applies the Federal Upper Limits in
9  idiosyncratic or unique ways that are outside of issues that
10 might even be captured by the 30(b)(6).
11      Now, I agree with your Honor that --
12      THE COURT: Well, the Federal Upper Limit is
13 established by the federal government, so, I mean, that isn't
14 even going to be a case for you. But I understand that
15 sometimes there were state upper limits, so essentially I
16 know too much about this at this point.
17      But let me do this: Why don't we proceed on the
18 theory that you will take one 30(b)(6) per state, and you
19 will try to agree on whether there's a key person and there's
20 a second deposition that you still would have a right to
21 take --
22      MR. MERKL: That we would have a right to take,
23 right.
24      THE COURT: -- ideally at the same time, if it's
25 not someone produced under 30(b)(6), so that you're not out

Page 12

1  there for a second time, although going to Hawaii twice
2  doesn't sound so terrible to me. But if the second person
3  doesn't do it and there are still others, you would try and
4  agree; and otherwise you'd file motions for cause to take the
5  extra deposition. I was not going to give you the open-ended,
6  "You can take as many as you want," because that would kill
7  everyone in this room.
8       MR. MERKL: Your Honor, I guess on the plus side of
9  this, a lot of this stuff has been done, in the sense, for
10 instance, in Massachusetts, there really should be no need to
11 go back and do Massachusetts. From our perspective, that's
12 done. I believe Alabama and Wisconsin, Kentucky is going on,
13 so some of these states I think are done if we can use these
14 transcripts. So I guess I would suggest --
15      THE COURT: So doesn't it make sense for us to do
16 this: You'll do all fifty by October -- it just seems
17 huge, but all fifty by October, maybe minus the four you just
18 talked about, which we're down to forty-six, and the District
19 of Columbia, right? Do you go into the territories? Will
20 you be doing Guam and --
21      MR. MERKL: No. They're not in the case.
22      THE COURT: All right, good. So --
23      MR. MERKL: Am I correct?
24      MR. GORTNER: I don't believe they are.
25      MS. SMITH: I don't believe they are, but I'd like

Page 13

1  to reserve on that. I don't believe they are.
2       THE COURT: I mean, seriously, I mean, I don't
3  know, but whatever you're going to do by the end of October.
4  And then you get your second one because I don't think I said
5  it was -- I said it was one per piece. I don't think I said
6  it was --
7       MS. SMITH: I don't think so at all, but I think
8  there was certainly a message in both of the CMOs that there
9  would be coordination, and we certainly wouldn't want the two
10 parties to insist they each had a right to depose the same
11 person at different times. The burden on states is what our
12 concern was.
13      THE COURT: Sure, it will be a coordinated
14 deposition. And if you want to use up the second one on a
15 person like, say, some old-timer who's not being designated
16 as 30(b)(6), ideally you'll do it at the same time. If not,
17 you know, you'll coordinate. But the real issue is -- I
18 don't know how many depositions were taken in Massachusetts.
19 I actually don't.
20      MR. MERKL: There were ten that were, strictly
21 speaking, state Medicaid-type people.
22      MS. SMITH: Or eleven.
23      MR. MERKL: Eleven?
24      MS. SMITH: I think eleven.
25      THE COURT: I just don't know whether that was

Page 14

1 needed, or whether the complexities that we've flagged would
2 have come out with the first one. I actually don't know.
3 But why don't we start with the 30(b)(6)s plus the one extra
4 one. You'll be done in the vicinity of October. And if
5 there are disagreements on a few extra people that you need,
6 that's what we're here for. You'll file motions to compel or
7 whatever. When do we have summary judgment set up for?
8     MR. MERKL: Right now we're on different schedules,
9 your Honor. Dey's discovery --
10     MS. SMITH: Ends in August.
11     MR. MERKL: -- ends on August 31, but our expert
12 discovery then goes through the end of October. So if we
13 can --
14     THE COURT: Does it make sense just to have the
15 same schedule for both?
16     MS. SMITH: Here is our concern, your Honor,
17 because we discussed this among ourselves at the point where
18 Abbott's discovery was ending, and both Dey and Roxane said,
19 "We're going to need more time," and we agreed. If we were
20 on identical schedules, we would have to have our experts on
21 the same schedule, and that's not going to work. The reports
22 are going to be different on the different drugs. It is an
23 enormous amount of work. They can't be doing reports on Dey
24 and Roxane at the same time, so we liked having the two
25 additional months on Roxane.

Page 15

1     THE COURT: On the other hand, how are you going to
2 finish all fifty states by August?
3     MS. SMITH: I don't know. I mean, a number of
4 states have been deposed.
5     THE COURT: It's not going to happen unless you --
6 I mean, I don't even think you could physically do it unless
7 you had people simultaneously from the Justice Department and
8 from your law firms doing it. So I suggest you put them on
9 the same -- if anything, make it October and December, if
10 that's the -- I would just work that out and give me joint
11 dates. I don't think it's possible.
12     MS. SMITH: I think you're probably right, and
13 given that it hasn't started, that the 30(b)(6) notices for
14 most states haven't been issued --
15     THE COURT: But let me just say, I've learned
16 hugely by doing these cases over the last seven years -- I
17 actually know something about it now -- there are going to be
18 some threshold crosscutting issues: How do I define WAC?
19 How do I define AWP under a particular state's law? What is
20 the significance of knowledge on the part of the government?
21 Does it have any legal significance, or it only goes to the
22 affirmative defense, like statute of limitations? I mean, I
23 don't know that my vetting it and my ruling on it for
24 Massachusetts is necessarily going to mean the same thing for
25 another state. Not necessarily. It might be informative,

Page 16

1 but it's not dispositive, right?
2     MS. SMITH: Correct.
3     THE COURT: Ruling on what WAC means under a
4 Massachusetts regulation is not going to necessarily help me
5 as to what does AWP mean under a Kansas regulation or what
6 WAC means under what, Alabama?
7     MR. MERKL: The meaning of WAC is the way the state
8 defined it.
9     THE COURT: Was any state wise enough to actually
10 write a definition up?
11     MR. MERKL: We haven't found one for WAC.
12     THE COURT: Okay, so --
13     MS. SMITH: We wish.
14     THE COURT: Are there state cases on it in any
15 state?
16     MS. SMITH: No.
17     MR. MERKL: WAC we looked for and haven't found. I
18 can't be certain on AWP, though.
19     THE COURT: In any event, it may be the same --
20 well, let me put it this way: It may be that I'm just simply
21 going to say -- and I'm just making this up -- average
22 wholesale price as incorporated into a state regulation is
23 meant to say the same thing as what I said it was for the
24 federal statute. It's possible I'm just going to say that.
25 And that may knock out how many states? How many states use

Page 17

1 AWP? Do we even know?
2     MS. SMITH: We don't know the answer to that yet.
3     THE COURT: So then the question is, well, how many
4 states use AWP, how many states use WAC, and how many states
5 use some other standard?
6     MS. SMITH: It's safe to say the majority use AWP,
7 a large majority; and then there are some variations, a
8 minority.
9     MR. MERKL: Although even there, your Honor, you're
10 still left with the issue that it's the lower of the
11 statute. So even if they use AWP for the EAC piece, you
12 still have the state MAC, and you still have the state usual
13 and customary, which are separately defined for each state.
14 The Massachusetts usual and customary, you're looking at the
15 state --
16     THE COURT: Does anybody else use the "most favored
17 nation" status?
18     MR. MERKL: I think some do. I think some do.
19     MR. GORTNER: But that's the scope of the discovery
20 we have to do.
21     THE COURT: My point is only that short of there
22 being any case law on it, it will primarily be a question of
23 regulatory and statutory interpretation for me, with some use
24 of the Chevron doctrine, and especially if it was not for
25 purposes of litigation but some internal memorandum, right?

Page 18

1  But I'm going to have to do it for fifty states. I mean,
2  ultimately that's what I'm going to have to do, right?
3      MS. SMITH: There are state plan amendments.
4      THE COURT: But I don't want you --
5      MS. SMITH: I mean, there is a starting point where
6  by law, states are required to have spelled-out
7  methodologies. Those are going to be a starting point.
8  Those are the formal position of the state on much of this.
9      THE COURT: But wouldn't it make sense for me to,
10 not that I'm looking forward to doing fifty state surveys,
11 but at least to deal with some of the crosscutting issues
12 before you did the damages and expert? I don't want you to
13 waste your money if I'm going to rule against you on an
14 issue, let's say causation. Let's say you had a particular
15 state that has it, the certain lowest of?
16     MS. SMITH: So you're suggesting, or what you've
17 said might lead to the suggestion, that we do a kind of
18 interim report when we finish the state depositions to say,
19 here's how this lines up?
20     THE COURT: Yes. Let's figure out what makes
21 sense. Take three or four key states which would be
22 indicative of different ways of my ruling on things. I think
23 it doesn't make sense for us to do full-blown discovery of
24 the fifty state Medicaid laws. I think that may end up
25 happening at some point, but I think there are going to be

Page 19

1  crosscutting issues. For example, defense has always argued
2  that you define wholesale acquisition cost in terms of what
3  the industry understood it to be. The industry has made that
4  argument for AWP too, right? "Basically, this is what the
5  industry understood it to be." The regulatory agencies and
6  the federal government have said, "Give me a break. We
7  couldn't possibly have meant that, and we didn't mean that,
8  and it means something else. It means an actual market-type
9  price." You say, "No. It's just an invoice price." But
10 can't I rule on a bunch of those kinds of issues?
11     MR. MERKL: The reason it wouldn't, I think, solve
12 the problem out of the box is because each state's
13 understanding is different. Recently in Wisconsin, the judge
14 in Wisconsin ruled on a summary judgment motion where the
15 state of Wisconsin made similar arguments about, you don't
16 really need to get into what we understood by me; and the
17 judge's holding was effectively, look, if defendants can come
18 in and prove that the state understood AWP to mean what they
19 claim it means, which is this benchmark price, and they can
20 show you knew that and that was the understanding, that's a
21 defense.
22     THE COURT: Sure it is. I mean, I haven't ruled on
23 that. I mean, A, it's a question of when the statute of
24 limitations starts, but, B, it potentially -- it's under the
25 False Claims Act somewhat of an open issue as to how much you

Page 20

1  had to know before you crossed the line into accepting versus
2  mere knowledge alone as a defense. So there's that issue.
3  There's an issue.
4      MR. MERKL: Exactly, but --
5      MS. SMITH: And it's also an issue of how you get
6  at that discovery, whether you do it with anecdotal, informal
7  evidence from somebody who worked in the agency in a 30(b)(1)
8  deposition, or whether that's a topic you get at through a
9  30(b)(6) deposition and the plan amendments.
10     THE COURT: That's exactly right. And the other
11 issue is, like, I could rule as a matter of law -- it wasn't
12 even pressed in the Massachusetts case -- that simply because
13 some agency that purchases for Mass. mental hospitals knew
14 what the price was for a drug for schizophrenia doesn't
15 necessarily mean that's what MassHealth knew. So, I mean,
16 there are certain -- on the other hand, if the head of the
17 Medicaid agency knew, that at least would create an issue for
18 statute of limitations.
19     MR. MERKL: Right, your Honor.
20     THE COURT: But hurting you would be is if the
21 statute says that that's the standard anyway, there's a limit
22 to what he can do, even if he knew.
23     MR. GORTNER: But it is a fact -- the issue that
24 you're raising, your Honor, these are fact-intensive
25 discovery issues, because what we're finding, just in the

Page 21

1  preliminary discovery, is that some states, like Kentucky,
2  for instance, were very sophisticated. They hired Myers &
3  Stauffer. They hired third-party auditors to do actual
4  surveys and studies of what generics versus brandeds were,
5  found things like the generics often were AWP minus
6  80 percent; and by statute they were required to submit that
7  report to the state Medicaid agency. But you only find that
8  kind of information out, which is highly relevant and
9  pertinent --
10     THE COURT: Was it a statutory standard so they
11 couldn't change anyway?
12     MR. GORTNER: Well, again, in Medicaid, the
13 statute, they had to enter it by statute through that
14 political negotiation process of entering it by statute; but
15 by statute, they were required to actually hire folks to do
16 surveys so they could understand what AWP really was and
17 really wasn't.
18     THE COURT: Yes, but were they required to
19 reimburse based on AWP nonetheless?
20     MR. GORTNER: Yes.
21     THE COURT: See, so it's not clear to me that
22 knowledge would make a difference. I'm just saying it may
23 make a difference for statute of limitations purposes. So it
24 is going to be case by case, and it's going to be ugly. But
25 we're going to do it, right? I can't see how I'm going to

## Page 22

shortcut it. That's why I wanted the big picture here. So I'm looking to you -- that's why I called you in here, actually, and I didn't do it on the papers -- as to how we could take --

MR. MERKL: If we could start with your Honor's proposal --

THE COURT: Next October, you finish most or all of the 30(b)(6)s, maybe a few others, like, you have the extra ones; and then you come up with a plan for me to take three or four poster child states and make a few rulings.

MS. SMITH: A couple of things, your Honor. One, it seems to me the same issues are present in Abbott, in the Abbott case, which is certainly ahead of us in terms of discovery, experts, and summary judgment deadlines. But this is something that --

THE COURT: So tell me about Abbott. What do you mean?

MR. FAUCI: I think the same issues are before Abbott insofar as the United States is seeking damages on behalf of all the state Medicaid programs, and so the issues of how exactly each state processed it, those are all before the Court in Abbott.

MS. SMITH: In all three cases.

MR. FAUCI: And Abbott's fact discovery is --

THE COURT: Is what?

## Page 23

MR. FAUCI: -- is closed, and their expert reports are moving quickly.

THE COURT: So I may be vetting these earlier, is that it?

MS. SMITH: Well, possibly their summary judgment schedule is -- well, I don't know the deadlines, but it's all ahead of us, of these two cases, so the issues are going to come before you in that case before they come to you in this case.

MR. FAUCI: So to the extent we set up a few poster child states, I don't know what impact that has on Abbott.

THE COURT: This is why I called you in here. So remind me, on the Abbott schedule, what are you doing?

MR. FAUCI: The United States is finishing its expert -- it's getting its expert disclosures out.

THE COURT: Is that you, or is that Main Justice?

MS. SMITH: That's Main Justice and the U.S. Attorney's office in Florida.

THE COURT: In Florida. So you're not involved in that or just --

MS. SMITH: I mean, yes, in some things, to the extent that it's trying to conserve resources and it's one team; but our office has not entered an appearance in Abbott, and we're not --

THE COURT: Okay, so I got a little -- who's doing

## Page 24

it from the U.S. Attorney's office locally, Bunker Henderson?

MS. SMITH: Yes.

THE COURT: All right. So I thought, I'm sorry, you were all working as one big team. That's not accurate. The Justice Department speaks with many voices, right?

MS. SMITH: It is somewhat accurate, your Honor.

THE COURT: All right, well, then let me back up for a minute. Have you already done the 30(b)(6)s in the Abbott in every state?

MS. SMITH: Abbott's fact discovery closed. It did what it could do.

THE COURT: Is anyone here from Abbott?

MR. FAUCI: No.

MS. SMITH: No.

MR. GORTNER: No, but --

THE COURT: Are you two in coordination with the Abbott attorney?

MR. MERKL: Yes. For instance, the discovery we have done, the fifty depositions we did do we coordinated with Abbott. I believe at the end of discovery, Abbott did notice several states. I mean, they have different drugs and different issues, so I don't know that they view the Medicaid case exactly the same as we do. But, for instance, there was a Hawaii 30(b)(6).

## Page 25

MR. GORTNER: There was a Hawaii 30(b)(6) in the Abbott DOJ case, your Honor.

THE COURT: So you'll just incorporate all those. Those you won't redo, right?

MR. GORTNER: Right.

THE COURT: Except to the extent that they uniquely involve your drugs.

MR. MERKL: Unless we feel we need an extra one, and we'll ask you. But they did Michigan, I think. They did Minnesota --

MR. GORTNER: But they did specific individuals in those states. They did specific individuals rather than --

THE COURT: Does it make sense --

MR. GORTNER: -- 30(b)(6)s.

THE COURT: I don't know what the schedule is in that case. I had somehow assumed -- I'm sorry -- that you were sort of a point person for all three cases. I hadn't realized it was divided within your office as to who was handling what. Does it make sense to touch base with them about this discussion?

MS. SMITH: Yes. I need to point out, based on the conversation that just took place, counsel for the government asked Abbott to notice the state depositions as 30(b)(6). Abbott refused and said, "We're doing these as 30(b)(1)s of people that you identified in supplemental disclosure." Dey

Page 26

1  and Roxane, when they cross-noticed, cross-noticed as a
2  30(b)(1), and the depositions went forward. And the
3  government kept saying, "You really need a 30(b)(6), but
4  that's not what this witness is here for." We believe those
5  should count as that state's deposition. It was a choice
6  that all the defendants made.
7      MR. GORTNER: I'd like to interject. That wasn't a
8  choice that we made, your Honor.
9      MR. MERKL: We just said, "If you're doing this guy
10 in Minnesota, we'll show up so you don't have to bring him
11 back again."
12     MR. GORTNER: Our approach all along has been,
13 given that there are all these other AWP cases going on,
14 where possible, because we also have limited resources, our
15 client doesn't want to spend --
16     THE COURT: I'm happy to have you use that but as
17 the 30(b)(6). You're not going to go back and do a second
18 one.
19     MS. SMITH: Of the same people.
20     THE COURT: Of the same people. You're just not
21 going to do it. I mean, that's what's not going to happen.
22 If you want to take that as your deposition, then they only
23 have to go out once. That's their big concern, that they
24 don't want to do it twice.
25     MR. GORTNER: Oh, I understand that, your Honor.

Page 27

1  What's potentially confusing or it would be a help for us to
2  clarify is that what's going on in, for instance, the state
3  AWP cases is, they are noticing up several 30(b)(1)
4  witnesses. In some situations it's often because there's
5  such a changeover in the Medicaid agency.
6      THE COURT: Sure.
7      MR. GORTNER: It's the former Medicaid director.
8      THE COURT: I understand that.
9      MR. GORTNER: Our view is that we should
10 cross-notice that deposition so that that testimony which is
11 directly relevant goes to that state, should come into this
12 case, and it's a minimum burden --
13     THE COURT: I have no problems with that as long as
14 it counts against your number, or it's the 30(b)(6) that
15 counts for everybody. I mean, we're just not doing it
16 twice. That's what makes no sense whatsoever.
17     But let me get to the big thing. Would you do
18 this: Right now we're going to assume a 30(b)(6) for every
19 state. We're going to assume it's going to be done by
20 October, and we're going to have a status conference. At
21 that point you'll know who else you want that you weren't
22 able to agree on. We'll come back here.
23     But you're now reminding me -- because I thought
24 that this would have been a coordinated thing, and it turns
25 out it's really not so much -- that in the Abbott case, I may

Page 28

1  be reaching this earlier.
2      MS. SMITH: They're on two different time frames.
3  Abbott is several months ahead of us.
4      THE COURT: I just had assumed, because it was the
5  Justice Department, that it would all be coordinated at some
6  level; and it is to some extent but not entirely. Maybe you
7  could talk to them and maybe set up a scheduling conference
8  for everyone? What is the intent in Abbott? Are you going
9  to be essentially briefing fifty states' Medicaid laws? What
10 if I ruled in Abbott? Then I come along with these guys; I'm
11 going to have to do it all again a second time? I'm not.
12 Stop. I'm not going to do it twice. And it would be silly
13 because the Justice Department would get a second bite at it,
14 or they'd be estopped. I mean, I'm just human. I'm not
15 going to want to redo the -- that's crazy. It makes no
16 sense.
17     MR. GORTNER: And it wouldn't be based on the same
18 evidentiary record because Abbott has not done all these
19 30(b)(6)s of the states.
20     THE COURT: I don't know what to do. I'm standing
21 here and telling you that I'm glad I've had this hearing
22 because this makes no sense at all.
23     MS. SMITH: Part of this might be answered by
24 expert reports coming in in the Abbott case where the United
25 States has an expert who has looked at the state plan

Page 29

1  amendments, the claims data, you know, and is going to be
2  opining about that for each state.
3      THE COURT: This is what you persuaded me, is that
4  I need some global big picture with respect to all three
5  cases, because I have to make rulings on Medicaid law.
6  There's no way I can ditch this, right? There's no way I can
7  send this back to each state, right? This is here. It's not
8  like the state multidistrict litigation. Okay, so --
9      MR. MERKL: Actually, I don't know if it's true for
10 Abbott, your Honor.
11     MR. GORTNER: Abbott believes it can go back to
12 Florida for summary judgment.
13     THE COURT: No, but I'm going to have to -- I do
14 this anyway, right? I have to do it up through summary
15 judgment under a multidistrict?
16     MR. GORTNER: I don't believe you have to on the
17 dispositive motions, your Honor. I think it's up through the
18 close of discovery, but the summary judgment can be sent
19 back.
20     MR. MERKL: We don't know what Abbott's view is.
21     MS. SMITH: But you're talking about the federal
22 case going to a different judge in Florida.
23     MR. GORTNER: Yes.
24     MS. SMITH: You're not talking about the fifty
25 states going to --

Page 30

1  MR. MERKL: Oh, no, there's one case.
2  MS. SMITH: -- you were hoping to appeal on.
3  MR. GORTNER: No, one case, your Honor. I can't
4  obviously speak for Abbott, but my understanding is that it's
5  potential that they, because they initially --
6  THE COURT: But your two cases were initially
7  brought where?
8  MR. GORTNER: Roxane's was brought in 2000 in
9  Massachusetts.
10 MR. MERKL: Part of Dey was brought in Florida.
11 Part of Dey was in 2000. We were before Judge Lasker. It
12 was a big --
13 THE COURT: Yes, all right. So I've got you two
14 anyway.
15 MR. MERKL: Yes.
16 THE COURT: All right. So let's do this. Robert,
17 I have a sentencing, and I want to speak to this group for a
18 few minutes, so why don't we do this: Why don't we set a
19 status conference, a massive status conference in November,
20 early November after you finished all the 30(b)(6)s. And
21 you'll come up with proposed, both of you ideally, maybe
22 competing plans on how I go about addressing these issues,
23 and possibly any outstanding discovery matters. In the
24 meantime, you'll talk to your counterparts in the Justice
25 Department, and really talk through, how does it make sense

Page 31

1  from the Justice Department's point of view to progress on
2  this? And talk about my concern that I'm not going to do it
3  twice. So it may be that we're just going to at some
4  point -- we're within months of each other, not years -- so
5  just creating one big coordinated schedule.
6  MS. SMITH: For the three?
7  THE COURT: For the three. And even if it puts me
8  off by three or four months, it still makes more sense
9  timewise than to do two separate sets of fifty state
10 surveys.
11 MS. SMITH: Why don't we plan to get back to you on
12 that earlier rather than November.
13 THE COURT: Yes, I was going to suggest that too,
14 so --
15 MS. SMITH: I mean, just in terms of how that might
16 impact the scheduling --
17 THE COURT: So why don't we do just a plain old
18 status conference sometime in July. Does that make sense?
19 MS. SMITH: Yes, yes.
20 THE COURT: So in the meantime, I'm not holding up
21 these 30(b)(6)s. Go to it. We at least have to know what
22 the big issues are out there.
23 MR. GORTNER: Your Honor, regarding Roxane's cross-
24 motion, I --
25 THE COURT: So, wait, can we do this? When in July

Page 32

1  and when in November?
2  THE CLERK: July 24 at 3:00 p.m., November 13 at
3  3:00 p.m.
4  THE COURT: And hopefully we'll get -- notice both
5  cases to come in and try and maybe -- you know, a couple of
6  days beforehand file proposals, big-picture proposals, what's
7  going to happen here. You know, really, what do you think
8  I'm going to be doing? Is this a jury trial?
9  MR. MERKL: Yes, your Honor.
10 MR. GORTNER: Yes, your Honor.
11 THE COURT: Good. I don't have to write.
12 MR. GORTNER: And it has False Claims Act and
13 common law fraud claims in it as well.
14 THE COURT: One thing I found very useful in the
15 AWP case was just having a bellwether trial, take one state
16 and see how it plays out. But I couldn't possibly try fifty
17 cases to a jury, fifty states.
18 MS. SMITH: I mean, I envisioned that being done by
19 expert testimony in --
20 THE COURT: Intent to deceive by expert testimony?
21 MS. SMITH: Well, I mean, I think much of that
22 evidence is going to be the same for Medicare as Medicaid,
23 the evidence of what was out there. The evidence of what
24 states did with that is going to be individual, but the
25 evidence of --

Page 33

1  THE COURT: All right, well, we'll get to that at
2  the time. I mean, whenever you have intent to deceive, you
3  have a problem. But let me go off the record for one minute,
4  since there are so many people here. I just want to talk to
5  you for one second at side bar. Then I'll talk to you, and
6  then I have the sentencing people here.
7  (Side-bar discussion off the record.)
8  THE COURT: Well, what's the quick issue on the
9  record?
10 MR. GORTNER: The quick issue, your Honor, is, the
11 government has listed twenty-two state Medicaid witnesses
12 that we would like permission to be able to depose. If they
13 turn out to be different than the witnesses that show up at
14 the state 30(b)(6) --
15 THE COURT: We'll decide that afterwards.
16 MR. GORTNER: Okay.
17 THE COURT: And especially you have a second one,
18 so if there's a key one --
19 MR. MERKL: Yes, so, your Honor, going forward, we
20 will start with the 30(b)(6)s immediately, and one if
21 necessary.
22 THE COURT: Yes, and we'll see where we are at the
23 end of this.
24 MR. MERKL: And we'll see where we are.
25 MS. SMITH: Just to point out, there is an

Page 34

1  outstanding, I think filed yesterday or today, assented-to
2  motion to extend the time to respond to Roxane's motion to
3  compel production of the relator's disclosure statement,
4  which would be due tomorrow. I just --
5      THE COURT: Allowed.
6      MR. GORTNER: And, your Honor, what do we do with,
7  as these states continue to have -- the state AWP cases --
8      THE COURT: Oh, apparently I've already -- I can't
9  allow it. I just disallow the "allowed." I've already
10 referred it to Judge Bowler.
11     MS. SMITH: For a two-week continuance of a brief
12 that's due tomorrow?
13     THE CLERK: The motion to compel was referred to
14 Judge Bowler.
15     MS. SMITH: Oh.
16     THE COURT: So it's all been referred, so --
17     MS. SMITH: So she has to rule on the motion for an
18 extension.
19     THE COURT: Sorry.
20     MR. GORTNER: What do we do, as these other state
21 AWP cases continue to depose state Medicaid witnesses, I
22 understand that if we cross-notice them, it will count
23 against our 30(b)(6).
24     THE COURT: Against you, yes.
25     MR. GORTNER: So our response, I suppose, is not to

Page 35

1  cross-notice those witnesses. But there will be some
2  duplication because we'll then go to 30(b)(6) on those same
3  topics.
4      THE COURT: What do you want me to do?
5      MR. GORTNER: Well, our view is that it would be
6  the most efficient thing to cross-notice them.
7      THE COURT: Well, then cross-notice and have it
8  count. What's the big deal?
9      MR. GORTNER: Because they're often deposing five
10 and ten witnesses per state, so we don't know which
11 particular witness to take after --
12     THE COURT: When you cross-notice, you come up with
13 your own list too, right?
14     MR. GORTNER: Okay, we could try that.
15     THE COURT: Good, all right.
16     MR. GORTNER: Thank you, your Honor.
17     (Adjourned, 3:00 p.m.)

CERTIFICATE

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS   ) ss.
CITY OF BOSTON              )

     I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 35 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.
     In witness whereof I have hereunto set my hand this 19th day of June, 2008.


     /s/ Lee A. Marzilli
     _____
     LEE A. MARZILLI, CRR
     OFFICIAL FEDERAL COURT REPORTER