**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **STATE OF OHIO,** | ) | |
| **by Attorney General Jim Petro** | ) | |
| **Antitrust Section** | ) | |
| **140 East Town Street, 12ᵗʰ Floor** | ) | **CIVIL ACTION NO.** |
| **Columbus, OH  43215** | ) | **02-CV-01080** |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF MARYLAND,** | ) | |
| **Office of the Attorney General** | ) | |
| **Antitrust Division** | ) | |
| **200 St. Paul Street** | ) | **JUDGE EMMET G. SULLIVAN** |
| **Baltimore, MD  21202** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF FLORIDA,** | ) | |
| **by Attorney General Charles J. Crist, Jr.** | ) | |
| **Antitrust Section** | ) | |
| **PL-01, The Capitol** | ) | |
| **Tallahassee, FL  32399-1050** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF ALABAMA,** | ) | **FIRST AMENDED COMPLAINT** |
| **by Attorney General Bill Pryor** | ) | |
| **Consumer Affairs/Antitrust Section** | ) | |
| **11 South Union Street** | ) | |
| **Montgomery, AL  36130** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **STATE OF ALASKA,** | ) | |
| **by Attorney General Gregg D. Renkes** | ) | |
| **1031 W. 4ᵗʰ Avenue, Suite 200** | ) | |
| **Anchorage, AK  95501** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |

1

**STATE OF ARIZONA,**                                    )
**by Attorney General Terry Goddard**                    )
**1275 West Washington Street**                          )
**Phoenix, AZ  85007**                                   )
                                                         )
      **and**              )
                                                         )
**STATE OF ARKANSAS,**                                   )
**by Attorney General Mike Beebe**                       )
**Antitrust Division**                                   )
**323 Center St., Suite 200**                            )
**Little Rock, AR  72201**                               )
                                                         )
      **and**              )
                                                         )
**STATE OF CALIFORNIA,**                                 )
**by Attorney General Bill Lockyer**                     )
**300 S. Spring Street, Suite 1702**                      )
**Los Angeles, CA  90013**                               )
                                                         )
      **and**              )
                                                         )
**STATE OF COLORADO,**                                   )
**by Attorney General Ken Salazar**                      )
**Consumer Protection Section**                          )
**1525 Sherman Street, 5th Floor**                       )
**Denver, CO 80203**                                     )
                                                         )
      **and**              )
                                                         )
**STATE OF CONNECTICUT,**                                )
**by Attorney General Richard Blumenthal**               )
**110 Sherman Street**                                   )
**Hartford, CT  06105**                                  )
                                                         )
      **and**              )
                                                         )
**STATE OF DELAWARE,**                                   )
**by Attorney General M. Jane Brady**                    )
**Department of Justice, Antitrust Section**             )
**820 N. French Street, 6th floor**                      )
**Wilmington, DE  19801**                                )

<table>
<tr><td></td><td>)</td></tr>
</table>

           **and** )

)

**DISTRICT OF COLUMBIA,** )
**by Interim Corporation Counsel Arabella W. Teal** )
**Office of the Corporation Counsel** )
**441 4th Street, N.W.** )
**Washington, D.C.  20001** )

)

           **and** )

)

**STATE OF GEORGIA** )
**By Attorney General Thurbert E. Baker** )
**40 Capitol Square, S. W.** )
**Atlanta, GA  30334** )

)

           **and** )

)

**TERRITORY OF GUAM,** )
**by Attorney General Douglas Moylan** )
**Suite 2-200E, Judicial Center Bldg.** )
**120 West O'Brien Dr.** )
**Hagatna, Guam  96910** )

)

           **and** )

)

**STATE OF HAWAII,** )
**By Attorney General Mark J. Bennett** )
**425 Queen Street** )
**Honolulu, HI  96813** )

)

           **and** )

)

**STATE OF IDAHO,** )
**by Attorney General Lawrence G. Wasden** )
**Office of the Attorney General** )
**Len B. Jordan Building** )
**650 W. State St., Lower Level** )
**Boise, ID  83720-0010** )

)

           **and** )

)

**STATE OF ILLINOIS,**                                )
**by Attorney General Lisa Madigan**                  )
**100 West Randolph Street, 13th Floor**              )
**Chicago, IL  60601**                                )
                                                      )
                    **and**                           )
`STATE OF INDIANA,`                                   )
`by Attorney General Steve Carter`                    )
`Consumer Protection Division`                        )
`302 W. Washington St., IGCS 5th Floor`               )
`Indianapolis, IN  46204`                             )
                                                      )
                    **and**                           )
                                                      )
**STATE OF IOWA,**                                    )
**by Attorney General Thomas J. Miller**              )
**Iowa Department of Justice**                        )
**Hoover State Office Building**                      )
**1305 E. Walnut Street**                             )
**Des Moines, IA  50319**                             )
                                                      )
                    **and**                           )
                                                      )
**STATE OF KANSAS,**                                  )
**by Attorney General Phill Kline**                   )
**120 SW 10th Avenue, 2nd Floor**                     )
**Topeka, KS  66612-1597**                            )
                                                      )
                    **and**                           )
                                                      )
**COMMONWEALTH OF KENTUCKY,**                         )
**by Attorney General Albert B. Chandler III**        )
**1024 Capitol Center Drive**                         )
**Frankfort, KY  40601**                              )
                                                      )
                    **and**                           )
                                                      )
**STATE OF LOUISIANA,**                               )
**by Attorney General Richard P. Ieyoub**             )
**301 Main Street, Suite 1250**                       )
**Baton Rouge, LA  70801**                            )
                                                      )

and                                                          )
                                                             )
**STATE OF MAINE,**                                          )
**by Attorney General G. Steven Rowe**                       )
**Six State House Station**                                  )
**Augusta, ME  04333**                                       )
                                                             )
and                                                          )
                                                             )
**COMMONWEALTH OF MASSACHUSETTS,**                           )
**by Attorney General Thomas F. Reilly**                     )
**One Ashburton Place**                                      )
**Boston, MA  02108**                                        )
                                                             )
and                                                          )
                                                             )
**STATE OF MICHIGAN,**                                       )
**by Attorney General Mike Cox**                             )
**Antitrust Section**                                        )
**G. Mennen Williams Building, 6th Floor**                   )
**525 W. Ottawa Street**                                     )
**Lansing, MI  48913**                                       )
                                                             )
and                                                          )
                                                             )
**STATE OF MINNESOTA,**                                      )
**by Attorney General Mike Hatch**                           )
**Health/Antitrust Division**                                )
**1200 NCL Tower**                                           )
**445 Minnesota Street**                                     )
**St. Paul, MN  55101-2130**                                 )
                                                             )
and                                                          )
                                                             )
**STATE OF MISSISSIPPI,**                                    )
**by Attorney General Mike Moore**                           )
**Consumer Protection Division-Antitrust**                   )
**Post Office Box 22947**                                    )
**Jackson, MS  39225**                                       )
                                                             )
and                                                          )

5

STATE OF MISSOURI,    )
by Attorney General Jeremiah W. (Jay) Nixon    )
P.O. Box 899    )
Jefferson City, MO  65102    )
    )
and    )
    )
STATE OF MONTANA,    )
by Special Assistant Attorney General Cort Jensen )
Consumer Protection Office    )
Department of Administration    )
1219 8th Ave.    )
Helena, MT 59620    )
    )
and    )
    )
STATE OF NEBRASKA,    )
by Attorney General Jon Bruning    )
2115 State Capitol    )
Lincoln, NE  68509    )
    )
and    )
    )
STATE OF NEVADA,    )
by Attorney General Brian Sandoval    )
Bureau of Consumer Protection    )
Antitrust Unit    )
1000 E. Williams Street, Suite 200    )
Carson City, NV  89701    )
    )
and    )
    )
STATE OF NEW HAMPSHIRE,    )
by Attorney General Peter Heed    )
33 Capitol Street    )
Concord, NH  03301-6397    )
    )
and    )
    )

**STATE OF NEW JERSEY,**                             )
**By Acting Attorney General Peter C. Harvey**       )
**Richard J. Hughes Justice Complex**                )
**P. O. Box 085**                                    )
**Trenton, NJ 08625**                                )
                                                     )
   **and**                            )
                                                     )
**STATE OF NEW MEXICO,**                             )
**by Attorney General Patricia A. Madrid**           )
**111 Lomas  Boulevard NW, Suite 300**               )
**Albuquerque, NM  87102**                           )
                                                     )
   **and**                            )
                                                     )
**STATE OF NEW YORK,**                               )
**by Attorney General Eliot Spitzer**                )
**Antitrust Bureau**                                 )
**120 Broadway, Suite 26-01**                        )
**New York, NY  10271**                              )
                                                     )
   **and**                            )
                                                     )
**STATE OF NORTH CAROLINA,**                         )
**by Attorney General Roy A. Cooper, III**           )
**P.O. Box 629**                                     )
**Raleigh, NC  27602**                               )
                                                     )
   **and**                            )
                                                     )
**STATE OF NORTH DAKOTA,**                           )
**by Attorney General Wayne Stenehjem**              )
**600 East Boulevard Avenue**                        )
**Bismarck, ND  58505-0040**                         )
                                                     )
   **and**                            )
                                                     )
**COMMONWEALTH OF THE NORTHERN**                     )
**MARIANA ISLANDS,**                                 )
**by Attorney General Ramona V. Manglona**           )
**Civil Division**                                   )
**Caller Box 10007, Capitol Hill**                   )
**Saipan, MP  96950**                                )

and )
)
)
**STATE OF OKLAHOMA,** )
**by Attorney General W.A. Drew Edmondson** )
**4545 N. Lincoln Boulevard, Suite 260** )
**Oklahoma City, OK  73105** )
)
and )
)
)
**STATE OF OREGON,** )
**by Attorney General Hardy Myers** )
**Department of Justice** )
**Justice Building** )
**1162 Court Street NE** )
**Salem, OR  97310** )
)
and )
)
)
**COMMONWEALTH OF PENNSYLVANIA,** )
**by Attorney General D. Michael Fisher** )
**Antitrust Section** )
**14th Floor, Strawberry Square** )
**Harrisburg, PA  17120** )
)
and )
)
)
**COMMONWEALTH OF PUERTO RICO,** )
**by Secretary of Justice Anabelle Rodriguez** )
**Department of Justice** )
**PO Box 9020192** )
**San Juan, PR  00902-0192** )
)
and )
)
)
**STATE OF RHODE ISLAND,** )
**by Attorney General Patrick C. Lynch** )
**150 South Main Street** )
**Providence, RI  02903** )
)
and )
)
)
**STATE OF SOUTH CAROLINA,** )

by Attorney General Henry D. McMaster )
Rembert C. Dennis Building )
1000 Assembly Street, Suite 501 )
Columbia, SC  29211-1549 )
)
and )
)
STATE OF SOUTH DAKOTA, )
By Attorney General Lawrence E. Long )
500 E. Capitol )
Pierre, SD  57501-5070 )
)
and )
)
STATE OF TENNESSEE, )
by Attorney General Paul G. Summers )
425 Fifth Avenue, North )
P. O. Box 20207 )
Nashville, TN  37202-0207 )
)
and )
)
STATE OF TEXAS, )
by Attorney General Greg Abbott )
P.O. Box 12548 )
Austin, TX  78711 )
)
and )
)
STATE OF UTAH, )
by Attorney General Mark L. Shurtleff )
Antitrust Section )
160 East 300 South )
Salt Lake City, UT  84111 )
)
and )
)
STATE OF VERMONT, )
by Attorney General William H. Sorrell )
Antitrust Unit )
109 State Street )
Montpelier, VT  05609-1001 )

|  |  |
|---|---|
| **and** | ) |
|  | ) |
| **TERRITORY OF THE UNITED STATES** | ) |
| **VIRGIN ISLANDS,** | ) |
| by Iver A. Stridiron, Attorney General | ) |
| 48B-50C Kronprindsens Gade | ) |
| GERS Building, 2nd Floor | ) |
| St. Thomas, U.S. VI  00802 | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **U. S. TERRITORY OF AMERICAN SAMOA,** | ) |
| by Attorney General Fiti A. Sunia | ) |
| P. O. Box 7 | ) |
| Pago Pago, AS  96799 | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **COMMONWEALTH OF VIRGINIA,** | ) |
| by Attorney General Jerry W. Kilgore | ) |
| Antitrust and Consumer Litigation Section | ) |
| 900 East Main Street | ) |
| Richmond, VA  23219 | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **STATE OF WASHINGTON,** | ) |
| by Attorney General Christine O. Gregoire | ) |
| Antitrust Division | ) |
| 900 Fourth Avenue, Suite 2000 | ) |
| Seattle, WA  98164 | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **STATE OF WEST VIRGINIA,** | ) |
| by Darrell V. McGraw, Jr. | ) |
| 812 Quarrier Street, 4th Floor | ) |
| Post Office Box 1789 | ) |
| Charleston, WV  25326 | ) |
|  | ) |
| **and** | ) |

|  |  |
|---|---|
| **STATE OF WISCONSIN,** | ) |
| **by Attorney General Peggy A. Lautenschlager** | ) |
| **17 West Main Street** | ) |
| **Madison, WI  53702** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **STATE OF WYOMING** | ) |
| **by Attorney General Patrick J. Crank** | ) |
| **123 Capital Building** | ) |
| **Cheyenne, WY 82002** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **BRISTOL-MYERS SQUIBB CO.** | ) |
| **345 Park Avenue,** | ) |
| **New York, NY  10154** | ) |
|  | ) |
| **Defendant.** | ) |
|  | ) |

Plaintiffs, the States, Commonwealths, and Territories of Ohio, Maryland, Florida and Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, U. S. Territory of American Samoa, Utah, Vermont, Virgin Islands, Virginia, Washington, West Virginia, Wisconsin, Wyoming and the District of Columbia (the "Plaintiff States" or "States"), by their Attorneys General, bring this action

against defendant Bristol-Myers Squibb Co. ("Bristol") to secure damages, injunctive and other equitable relief for defendant's violations of federal and state antitrust laws, and allege as follows:

1.      This case arises out of Bristol's unlawful maintenance of a monopoly over the United States market for paclitaxel based anticancer drugs and conspiracy to further its monopoly.  In 1992 Bristol obtained approval from the U.S. Food and Drug Administration of its New Drug Application ("NDA") for Taxol®, the brand name for a medication for treating certain cancers, the active ingredient of which is the naturally occurring substance paclitaxel. FDA approval of the Taxol® NDA gave Bristol five years marketing exclusivity for the drug under the Hatch-Waxman Act, 21 U.S.C. § 355.

2.      In an unlawful effort to extend the statutory five-year exclusivity period and wrongfully maintain its monopoly, Bristol fraudulently procured patents from the United States Patent and Trademark Office ("PTO"), improperly listed these invalid patents in the FDA's "Approved Therapeutic Equivalence Evaluations," ("the Orange Book"), and prosecuted numerous baseless lawsuits and regulatory procedures against the market entry of competitive, FDA approved generic bioequivalents to Taxol® ("generic Taxol®").

3.      Bristol's scheme included a conspiracy with co-conspirator American Bioscience, Inc. ("ABI") to restrain competition from generic Taxol® through collusive litigation between Bristol and ABI that resulted in a contrived settlement under which Bristol, with knowledge of its invalidity, listed ABI's United States Patent No. 6,096,331 (the "'331 patent") in the Orange Book.  This listing further precluded market entry by producers of generic Taxol®.

4.     Bristol's misconduct interfered with and raised the costs of production and regulatory approval for generic Taxol® producers after December 29, 1997, and caused the FDA to delay its review and approval, after December 29, 1997, of pending Abbreviated New Drug Applications ("ANDAs") for generic Taxol® bioequivalents.  Bristol's unlawful scheme blocked Plaintiffs' access to a generic Taxol® bioequivalent until October, 2000, and further restricted the supply of generic Taxol® available to the product of a single competitor until April 2001.

5.     As a result of Bristol's conduct, from December, 1997 to October 23, 2000, Plaintiffs and their citizens were required to purchase Taxol® and pay Medicaid and other reimbursements at monopoly prices.  Bristol's unlawful conduct further caused Plaintiffs and their citizens to pay and reimburse higher than competitive prices for Taxol® and its generic bioequivalents after October 23, 2000.  Absent Bristol's violation of the antitrust laws, patients would have been treated with generic Taxol® earlier in time, at a savings of millions of dollars to the Plaintiffs and their citizens.

### JURISDICTION AND VENUE

6.     Subject matter jurisdiction is proper pursuant Section 2 of the Sherman Act, 15 U.S.C. § 2 and Sections 4, 4C, 12 and 16 of the Clayton Act, 15 U.S.C. §15, 15c, 22 and 26 and under 28 U.S.C. §1331, 1337.  In addition to pleading violations of federal antitrust law, the States also allege violations of state antitrust, consumer protection and/or unfair competition statutes and related state laws, as set forth below, and seek damages, civil penalties and/or equitable relief under those state laws.  All claims under federal and state law are based upon a common nucleus of operative facts, and the entire action commenced by this Complaint

constitutes a single case that would ordinarily be tried in one judicial proceeding.  This Court has

jurisdiction of the non-federal claims under 28 U.S.C. § 1367(a), as well as under the principles

of supplemental jurisdiction.  Supplemental jurisdiction will avoid unnecessary duplication and

multiplicity of actions, and should be exercised in the interests of judicial economy, convenience,

and fairness.

7.     Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22

because: (i) Bristol transacts business, and is found within this district; and (ii) a substantial

portion of the affected trade and commerce described below has been carried out in this judicial

district.

## PARTIES

8.     Plaintiff States bring this action by and through their Attorneys General (a) in

their proprietary capacities on behalf of their agencies, instrumentalities, colleges, universities

and hospitals as direct and indirect purchasers of, and reimbursers for, paclitaxel based drugs,

and as assignees of the antitrust causes of action of intermediate purchasers through which they

procured such drugs; (b) in their sovereign capacities, as representatives of,  and/or as *parens*

*patriae* on behalf of, or for the benefit of, natural persons under federal or state law; (c) in their

sovereign and quasi-sovereign capacities as common law *parens patriae* on behalf of their

respective states' general economies; (d) in their capacities as enforcers of state law to enjoin

violations, to disgorge unjust profits, and to provide relief for injuries incurred in their states by

securing damages and/or restitution, injunctions and other equitable remedies;  and/or (e) in

those Plaintiff States where such class actions are asserted by Attorneys General, pursuant to

Rules 23 (a) and 23 (b) of the Federal Rules of Civil Procedure, on behalf of all natural persons residing in the Plaintiff States who purchased paclitaxel based antitumor drugs January 1, 1999 through January 31, 2003.

9.      Defendant Bristol is a Delaware corporation with its principal place of business in New York, New York.  Bristol is a leading U.S. pharmaceutical company and the manufacturer of several top-selling brand-name prescription drugs, including Taxol®.  In 1999, Bristol's net sales worldwide were approximately $20 billion.  In part Bristol carried out its sales of Taxol® through, and under the names of, its Mead Johnson division and its wholly owned and controlled subsidiary, Oncology Therapeutics Network.  Throughout the period alleged, Bristol manufactured, marketed, distributed and sold substantial quantities of Taxol® in a continuous flow of interstate trade and commerce, and Bristol's activities complained of herein were within the flow of and substantially affected interstate trade and commerce.

## CO-CONSPIRATOR

10.      Co-conspirator ABI, not made a party hereto, is a California corporation with its principal place of business in Santa Monica, California.  ABI conspired with Bristol and performed various acts as alleged hereinafter in furtherance of Bristol's scheme to monopolize and restrain trade.

## CONSUMER REPRESENTATION

11.      The States bring this action by and through their Attorneys General on behalf of all natural persons residing in the Plaintiff States who purchased or paid in part for infusions of Taxol® or generic equivalent paclitaxel based anticancer drugs from January 1, 1999 through

January 31, 2003: (a) in their sovereign capacities, as representatives of, and/or as *parens patriae* on behalf of, or for the benefit of, natural persons under federal or state law; (b) in their sovereign and quasi-sovereign capacities as common law *parens patriae* on behalf of their respective states' general economies; (c) in their capacities as enforcers of state law to enjoin violations, to disgorge unjust profits, and to provide relief for injuries incurred in their states by securing damages and/or restitution, injunctions and other equitable remedies; and/or (d) in those Plaintiff States (Alaska, Alabama, Arkansas, Connecticut, Kansas, Kentucky, Mississippi, Massachusetts, North Carolina, North Dakota, Oklahoma, Rhode Island, South Carolina, and Wisconsin) where such class actions are asserted by Attorneys General, pursuant to Rules 23 (a) and 23 (b) of the Federal Rules of Civil Procedure.

12.     There are thousands of consumers who purchased or paid in part for infusions of Taxol® and paclitaxel based anticancer drugs at hospitals, oncology clinics and oncologists across the country at supra-competitive levels due to the conduct of Defendants.

13.     Joinder of all consumers who purchased or paid in part for infusions of Taxol® and paclitaxel based anticancer drugs would be impracticable.

14.     There are questions of law and fact common to natural person consumers who purchased or paid in part for infusions of Taxol® and paclitaxel based anticancer drugs, including:

    a)      Whether Bristol unlawfully maintained its monopoly for

            paclitaxel based anticancer drugs in the United States by

            fraudulently procuring the '537 and the '803 patents from the

United States Patent and Trademark Office ("PTO"), improperly

listing these invalid patents in the FDA's "Approved Therapeutic

Equivalence Evaluations," ("the Orange Book"), and prosecuting

baseless lawsuits and regulatory procedures against the market

entry of competitive, FDA approved generic bioequivalents to

Taxol® ("generic Taxol®") under Section 2 of the Sherman Act,

15 U.S.C. § 2, and thereby delayed market entry by producers of

generic Taxol®;

b)      Whether Bristol unlawfully conspired with American

Bioscience, Inc. ("ABI") to restrain competition from generic

Taxol® and thereby delayed market entry by producers of generic

Taxol®.

c)      The period and extent of Defendant's illegal conduct

alleged herein; and,

d)      The suitable measure of damages suffered by natural

person Consumers residing in the Plaintiff States resulting from

Defendant's illegal conduct.

15.     The prosecution of separate actions by individual consumers would create a risk

of inconsistent or varying adjudications, potentially establishing incompatible standards of

conduct for the Defendants.

16.     Common questions of law and fact predominate over any questions affecting only

individual consumers, including legal and factual issues relating to liability and damages. *Parens patriae* and class representation by the State Attorneys General is superior to other available methods for the appropriate and efficient adjudication of this controversy, the State Attorneys General are the best qualified representatives and will fairly and adequately protect the interests of consumers, whether pursuant to *parens patriae* or class representation, and this action will eliminate the possibility of repetitious litigation, while also providing a remedy for claims too small to make practicable the expense of individual, complex litigation.

## BACKGROUND

Bristol Played No Role In the Discovery or Development Of Paclitaxel as an Anticancer Agent

17.     Paclitaxel is the term designated by the U.S. Food and Drug Administration ("FDA") for an anticancer agent derived initially from the bark of the Pacific yew tree through a process that necessarily destroyed the tree.  Paclitaxel is a naturally occurring compound.  Its anticancer properties were discovered and developed by researchers at the National Cancer Institute ("NCI"), a U.S. government research institute of the National Institutes of Health ("NIH").  Taxol® is a United States trademark registered in May 1992 to Bristol.  Taxol® has been sold by Bristol since 1992 as a medication for treating certain cancers, and in particular ovarian and breast cancers.

18.     Paclitaxel's antitumor qualities were discovered in the 1960s in studies performed and/or funded by the NCI.  Bristol played no role in these studies.  The NCI also performed extensive screening and toxicological studies on paclitaxel.  Bristol played no role in these studies either.  Without any involvement by Bristol, the federal government spent more than $32

million to develop economically feasible techniques to extract paclitaxel from yew tree bark and to create a clinically acceptable formulation for treating cancer-stricken humans.

19.     NCI's clinical trials showed great promise for paclitaxel in treating refractory, *i.e.* unresponsive to previous treatment, ovarian cancers.  The promising trials led the NCI to seek a commercial partner to submit and obtain FDA approval of a New Drug Application ("NDA") for a paclitaxel drug for indications of ovarian cancer, to develop and expand the sources of paclitaxel, and to manufacture and distribute the drug.  At this point, 30 years after the discovery of paclitaxel, Bristol came into the picture.

<u>The CRADA</u>

20.     The Federal Technology Transfer Act ("FTTA"), 15 U.S.C. § 3710, creates a procedure for the federal government to license its technology to a private party under a Cooperative Research and Development Agreement ("CRADA").  The CRADA sets forth in writing the terms under which the private party is granted access to government research and technology.

21.     In 1991, the NCI and Bristol entered into a CRADA for the development of a paclitaxel based drug to treat refractory ovarian cancer, and for the development of alternative sources of paclitaxel.  In the CRADA, the NCI agreed to collaborate with Bristol on the design and implementation of clinical trials to permit Bristol to file an NDA with the FDA.  Under the CRADA, the NCI gave Bristol exclusive use of existing and future data necessary for FDA approval of paclitaxel, sponsored clinical trials for Bristol's benefit, and granted Bristol exclusive access to the NCI's Investigative New Drug registration.  In return, Bristol was

required only to investigate and establish alternative natural and synthetic sources of paclitaxel,

develop clinical and commercial supplies of paclitaxel, supply formulated paclitaxel for

government sponsored clinical trials and compassionate distribution, assist in those trials for

eighteen months, and prepare and file an NDA.

22.     On July 22, 1992, Bristol filed an NDA seeking approval to market Taxol® for

the treatment of ovarian cancer.  The FDA approved Bristol's application on December 27, 1992,

automatically triggering Bristol's five-year exclusive rights to market and sell Taxol® in the

United States.

23.     Bristol believed that its Taxol® exclusivity was limited to the five years granted

under the Hatch-Waxman Act.  In 1990, Bristol understood that paclitaxel was not patentable as

either a composition of matter or as an antitumor agent in view of prior public use, public

knowledge, and written publications regarding the drug.

24.     In 1993 Bristol described its understanding of its Taxol® exclusivity to Congress:

> Taxol was never patented and no patent is even possible.  The only
> exclusivity or protection afforded the company [Bristol] is the five
> years of protection from generic competition (Abbreviated New
> Drug Applications) granted under Hatch-Waxman to every new
> chemical entity.

Prepared Statement of Zola Horovitz, PhD., vice president, Business Development and Planning,

Bristol-Myers Squibb Pharmaceutical Group, submitted January 25, 1993 to Hearing before the

Subcommittee on Regulation, Business Opportunities and Technology of the Committee on

Small Business, House of Representatives, attachment "Background: Taxol® and the CRADA

Process," p. 4, (emphasis in original).  Bristol further represented to Congress that:

> In addition, near-term generic competition for TAXOL is a
> certainty because TAXOL® is not a patented product.  This
> absence of patent protection means that BMS only has protection
> against Abbreviated New Drug Application (ANDA) filings for
> five years from the date of approval as provided under the Hatch
> Waxman Act.

*Id*., attachment "Taxol® (paclitaxel): Key Considerations in Determining a Fair and Reasonable

Price," p.6.

## BRISTOL'S MONOPOLIZATION OF THE RELEVANT MARKET

### Bristol's Invalid Taxol® Patents

25.     On August 3, 1992, Drs. Renzo M. Canetta, Elizabeth Eisenhauer and Marcel

Rozencweig filed patent application 07/923,628 (the "'628 application") in the United States

Patent and Trademark Office ("PTO") as co-inventors for a variety of methods of administering

paclitaxel as an antitumor drug.  They assigned their patent rights to Bristol.

26.     After the '628 application was rejected, on June 24, 1993, Bristol filed

continuation application 08/109,331 (the "'331 application"), which it eventually abandoned.  On

October 18, 1995, as a continuation of the '331 application, Bristol filed patent application

08/544,594 (the "'594 application"), which issued on June 24, 1997 as U.S. Patent No. 5,641,803

(the "'803 patent").  On September 19, 1996, as a continuation of the '594 application, Bristol

filed application 08/715,914 (the "'914 application"), which issued on September 23, 1997 as

U.S. Patent No. 5,670,537 (the "'537 patent").

27.     Bristol obtained the '537 and '803 patents by: (a) knowingly and willfully making

numerous material fraudulent omissions and misrepresentations to the PTO; (b) with clear intent

to deceive the patent examiner; and (c) which material misrepresentations and omissions were

the efficient, inducing and proximate cause of the issuance of the '803 and '537 patents.

28.     Bristol fraudulently withheld from the PTO various public and private statements

and documents reporting the information that Taxol was unpatentable as a compound and for use

as an antitumor agent, including the following:

>    (a)     A July, 1990, Executive Staff Memorandum from Bristol's
>    Director of Licensing, Dr. M.D. DeFuria, informed Dr. Canetta
>    and others that "Taxol is unpatentable, both for composition of
>    matter and use as an antitumor agent, due to prior disclosures made
>    years ago."
>
>    (b)     Bristol, in a January, 1991 Collaborative Research and
>    Development Agreement with the National Cancer Institute
>    negotiated by Marcel Rozencweig agreed that "Taxol is not
>    patentable....[t]he absence of such exclusive marketing rights may
>    impair Bristol-Myers Squibb's ability to recover the substantial
>    drug development costs it incurs pursuant to this CRADA."
>
>    (c)     In January, 1993, Bristol, through its vice president for
>    Business Development and Planning, Zola Horowitz, Ph.D.
>    presented evidence to Congress asserting that a standard
>    "reasonable pricing clause" was not included in Bristol's CRADA
>    with the NCI because "taxol is not patentable." Statement of Zola
>    Horowitz before the Committee on Small Business, United States
>    House of Representatives, January 25, 1993; Hearing Transcript at
>    96.  A Bristol report submitted with Dr. Horowitz' testimony
>    claimed: "near term generic competition for Taxol is a certainty
>    because Taxol is not a patented product....[T]his absence of patent
>    protection means that BMS only has protection against
>    Abbreviated New Drug Application (ANDA) filings for five years
>    from the dated of approval as provided under the Hatch-Waxman
>    Act." Taxol: Key Considerations in Determining a Fair and
>    Reasonable Price; Hearing Transcript at 138.  Other Bristol
>    evidence submitted to Congress claimed: "Taxol was never
>    patented and no patent is even possible.  The only exclusivity or
>    protection afforded the company is the five years of protection
>    from generic competition (Abbreviated New Drug Applications)
>    granted under Hatch-Waxman to every new chemical entity."
>    (emphasis original).  Background: Taxol and the CRADA Process,

Hearing Transcript at 109.

29.     These statements, documents and testimony, individually and together are
information material to the prosecution of the '803v and '537 patents because they refute and are
is inconsistent with positions Bristol took before the PTO in asserting patentability and in
overcoming the Examiner's objections.  Bristol intentionally withheld this information from the
PTO in its prosecution of the '803 and '537 patents.

30.     But for Bristol's intentional withholding of these material statements, documents
and testimony reporting the unpatentability of the claims at issue, the '803 and '537 patents
would not have issued.

31.     Bristol fraudulently withheld from the PTO a document it distributed publicly at a
meeting of the National Cancer Institute of Canada in April 1991 (the "*OV.9 abstract*").  The
*OV.9 abstract* described a study to be undertaken which would administer Taxol® in doses of
135 mg/m$^2$ and 175 mg/m$^2$ over durations of three hours and twenty-four hours to premedicated
patients.  Bristol and Dr. Elizabeth Eisenhauer knew of the existence of the *OV.9 abstract* and of
its dissemination.  Further, Dr. Eisenhauer publicly discussed the *OV.9 abstract* at the April 1991
conference.

32.     Bristol withheld the *OV.9 abstract* with the clear intent to deceive the PTO.
Bristol and Dr. Eisenhauer appreciated the *OV.9 abstract* as a complete written description of
their alleged inventions of the '803 and '537 patents.  Due to its dissemination more than one
year prior to Bristol's patent application, the *OV.9 abstract* constituted an anticipatory reference
against all claims of the '803 and '537 patents.  Thus, the *OV.9 abstract* was material because it

constituted a *prima facie* case of unpatentability that Bristol and its attorneys knowingly and intentionally failed to disclose to the PTO.

33.     Bristol's withholding of the *OV.9 abstract* was an efficient, inducing and proximate cause for the issuance of the '803 and '537 patents.  The *OV.9 abstract* would have been considered important and material by the patent examiner before whom the patents were prosecuted ("Examiner") under 37 C.F.R. 1.56(b) because it establishes, by itself or in combination with other references, a *prima facie* case of unpatentability as to the '803 and '537 patents.  The *OV.9 abstract* constitutes "a printed publication [of the invention] in this or a foreign country . . . more than one year prior to the date of the application for [a] patent in the United States...", as provided in 35 U.S.C. 102(b).  But for Bristol's fraudulent withholding of the material *OV.9 abstract*, the '803 and '537 patents would not have issued.

34.     Bristol also fraudulently withheld a 59-page document detailing the protocol (the "*OV.9 protocol*") for the study described in the *OV.9 abstract*.  The *OV.9 protocol* is dated no later than January 20, 1991.  The principal authors of the *OV.9 protocol* were Drs. Canetta and Eisenhauer.  The *OV.9 protocol* was distributed for approval to ethics review boards of institutions participating in the OV.9 study.  The *OV.9 protocol* included data from studies of Taxol® that took place prior to the invention dates of the '537 and '803 patents, many of which were undisclosed to the PTO.  Statements in the *OV.9 protocol* directly contradicted statements made by Bristol to the PTO during prosecution of the '803 and '537 patents, specifically:

>     (a)     "significant tumor shrinkage was observed in Phase I trials of Taxol® using 1 to 6 hour infusions."  *OV.9 protocol* at 33.

>     (b)     "Given prior results and the patient selection for the trial,

an objective response rate of 35% can be expected." *OV.9 protocol* at 34.

(c)      "There is no evidence to suggest that higher doses yield better rates of tumor regression, nor is there data to conclude that the more cumbersome 24-hour infusion (which is currently considered the "standard" recommended by NCI) is any safer than a shorter, more convenient infusion preceded by premedication." *OV.9 Protocol* at 13.

35.      In this manner, Bristol and the named inventors informed the OV.9 participating institutions that they should expect the administration of paclitaxel in doses between 135-175 mg/m$^2$ over a 3-hour period to be successful because the prior art so indicated.  Indeed, Dr. Eisenhauer testified in litigation on the '803 and '537 patents that statements in the *OV.9 protocol* regarding the efficacy of Taxol® were being provided as evidence to the participating institutions that Taxol® seemed to be effective, and that there was no reason not to expect short infusions to be effective.

36.      The *OV.9 protocol* contradicts sworn statements by Dr. Canetta to the PTO in *Canetta Supp Decl.* at 2 and 6 that he was:

"thoroughly familiar with the literature in the art related to the use of Taxol® .... I have carefully studied the references...[t]hey all teach that short duration (i.e. < 6 hrs) Taxol® infusion protocols are ineffective in that they produce no observable tumor regression, and that they are unduly hazardous."

37.      Bristol and the inventors withheld the *OV.9 protocol* and underlying studies with intent to deceive the PTO into issuing the '803 and '537 patents.  Bristol and the inventors were not only aware of the detailed 59-page document, they authored it and discussed it with institutions participating in their Taxol® study.  Nonetheless, Bristol failed to disclose to the

PTO their own statements in the *OV.9 protocol*, as well as several studies apparently underlying the premises of the *OV.9 protocol* that flatly contradict Bristol's statements to the PTO. The *OV.9 protocol* also contradicts arguments by Bristol, through their attorneys, to the Examiner that Dr. Canetta's declarations "establish that the art taught that Taxol® infusion durations of less than six hours were unduly toxic and produced no observable tumor regression." Bristol's failure to point out to the PTO its own inconsistent material statements regarding the teachings of prior art, the expected response rates, and the safety and efficacy of the administration of 135-175 mg/m$^2$ of Taxol® over 3-6 hours, evidences Bristol's intent to deceive the PTO into issuing the '803 and '537 patents.

38.     Bristol's withholding of the *OV.9 protocol* and some of its underlying studies was an efficient, inducing and proximate cause for the issuance of the '803 and '537 patents. The *OV.9 protocol* and underlying studies would have precluded Bristol from arguing the alleged novelty and unexpected results of its alleged inventions, arguments that ultimately overcame the Examiner's rejections of the applications and led to the grant of the '803 and '537 patents. Had the Examiner been provided with the *OV.9 protocol* and underlying studies, Bristol could not have stated that its results were "entirely unexpected", nor could Bristol have represented to the PTO, as it did, that its discovery that administering Taxol® in doses of 135 mg/m$^2$ over three hours was safe and efficacious constituted a "truly astonishing" and "surprising discovery." October 18, 1995 Continuation Application at 11: 16 and 25, and 12: 5 and 18. The *OV.9 protocol* would have provided the Examiner with direct evidence, authored by the alleged inventors, that was contrary to Bristol's misrepresentations. Thus, but for Bristol's intentional

withholding of the material *OV.9 protocol* and underlying studies, the '803 and '537 patents would not have issued.

39.    Bristol made further knowing, willful and fraudulent material misrepresentations to the PTO regarding a prior art reference which was before the PTO entitled *McGuire et al., Taxol: A Unique Antineoplastic Agent With Significant Activity In Advanced Ovarian Epithelial Neoplasms*, 111 Annals of Internal Medicine 273-279 (1989) ("*McGuire*"), while simultaneously fraudulently withholding from the PTO the following five material references:

    (a)    Bristol's Final Study of the McGuire Trial (June 1992);

    (b)    Rowinski et al., "Taxol: The First of the Taxanes, an Important New Class of Antitumor Agents," 19 Seminars in Oncology 646 (1992) (co-authored by Dr. Canetta) ("*Rowinski*");

    (c)    Eisenhauer et al., "European-Canadian Randomized Trial of Paclitaxel in Relapsed Ovarian Cancer," 12 Journal of Clinical Oncology 2654 (1992) ("*Eisenhauer*");

    (d)    Trimble et al., "Paclitaxel for Platinum-Refractory Ovarian Cancer," 11 Journal of Clinical Oncology 2405 (1993) (co-authored by Dr. Canetta), ("*Trimble*"); and

    (e)    Arbuck et al., "Clinical Development of Taxol," J. Nat'l Cancer Inst., Monographs No. 15 (1993), (co-authored by Dr. Canetta) ("*Arbuck*").

40.    Nearly three years prior to Bristol's August 3, 1992 initial Taxol® patent application, *McGuire* taught efficacy in the treatment of ovarian cancer with paclitaxel. *McGuire* reported on a completed Phase II trial conducted with 47 drug-refractory ovarian cancer patients who were first premedicated to avoid hypersensitivity reactions and then administered the drug in doses from 110 mg/m$^2$ to 250 mg/m$^2$ over 24 hours, every 22 days.

*McGuire* noted a 30% response rate, either partial or complete, and because a complete responder was administered only 110 mg/m$^2$, concluded "[t]here appeared to be no correlation between the actual average dose of taxol and the likelihood for response." *McGuire* at 278.

41.     Bristol and Dr. Canetta fraudulently misrepresented *McGuire*: (a) by arguing to the PTO that no prior art, including *McGuire*, taught that Taxol® was effective to treat ovarian cancer, stating: "[T]here is no teaching or suggestion that Ohnuma's, or anyone else's, method of administration of taxol would be effective in the treatment of ovarian cancer", August 16, 1993 Amendment and Response to 37 C.F.R. 1.111 and 1.115; and, (b) by stating to the PTO, "the outstanding rejection relies upon the unsupported premise that at the time the present invention was made, taxol was known to be clinically effective…[t]his is not true, and so the premise fails." Response Pursuant to 37 C.F.R. 1.116 in the 08/232,404 application ("'404 Application") dated March 23, 1995 at 2.

42.     Bristol misrepresented to the PTO that, in contrast to *McGuire* and other researchers' work, its inventors demonstrated an effective method of administering Taxol® at low doses of 135 mg/m$^2$ over 24 hours. January 25, 1994 Response Pursuant to 37 C.F.R. 1.116 at 2. Simultaneously, Bristol repeatedly misrepresented to the PTO that *McGuire* predicted that doses over 250 mg/m$^2$ would be required to achieve efficacy. Bristol's repeated misrepresentations to the PTO regarding *McGuire* included the following:

> (a)     *McGuire* "predicted that higher doses of taxol (250 mg/m$^2$) would yield better response rates...." January 25, 1994 Response Pursuant to 37 C.F.R. 1.116 at 4;

> (b)     *McGuire* "expected that higher doses of taxol would be required for an effective therapeutic response." *Id.* at 5;

(c)    "In view of these reports [including *McGuire*], workers studying taxol's application had accepted that taxol doses much higher than those initially recommended by Ohnuma et al. [135-170 mg/m$^2$] would be required." *Id.* at 6;

(d)    *McGuire* "predicted that even higher doses of taxol (>250 mg/m$^2$) would be required to achieve the desired response." Preliminary Amendment in '404 Application filed May 25, 1994 at 4;

(e)    "*McGuire* et al. surmised that higher doses of taxol (i.e., .250 mg/m$^2$) would be required." *Id.*

43.    Bristol also knowingly misrepresented that it achieved higher objective response

rates than were achieved in the prior art, asserting, for example, that:

> Applicants have shown an increase of 16% in the overall objective response rate; up from the prior art's 0%!  Applicants' results are all the more surprising by the fact that all of the patients in the Applicants' study were considered drug refractory, and thus unlikely to respond to such therapy.

Response and Amendment under 37 C.F.R. § 1.111 in the 08/559,890 Application, dated May

21, 1996.  In 1989 *McGuire* had reported a 30% response rate.

44.    Bristol's foregoing misrepresentations of *McGuire* to the PTO were knowingly

and willfully fraudulent.  Prior to filing its patent applications for Taxol®, Bristol made the

following representations to the FDA in connection with its New Drug Application for Taxol®:

(a)    *McGuire* was the first to demonstrate the efficacy of Taxol®;

(b)    *McGuire* was the first to demonstrate the efficacy of Taxol® in treating ovarian cancer;

(c)    *McGuire* was the first to document that Taxol® was active after platinum failure, i.e., in refractory patients;

(d)     *McGuire* had a response rate of 22%, which "clearly showed" that taxol was an "important new agent..."; and,

(e)     *McGuire* demonstrated successful treatment at low doses of 135 mg/m$^2$ and 175 mg/m$^2$, and could be used for those patients who could not tolerate higher doses.

June 1992 "Final Study Report" on the McGuire trial, at 126-127.

45.     To further misrepresent and conceal from the PTO the significance of *McGuire*, Bristol fraudulently withheld the *Rowinski, Eisenhauer, Trimble* and *Arbuck* references, each of which was co-authored by the alleged inventors.  Like the June 1992 Final Study Report on the McGuire Trial, they contain praise and acknowledgment for the groundbreaking nature of the work represented in the 1989 *McGuire* reference.  For example:

(a)     In *Rowinski*, Dr. Canetta and his co-authors explain that McGuire taught both efficacy and safety (i.e., acceptable toxicity) of Taxol® at low dosages (from 110 mg/m$^2$ to 135 mg/m$^2$). *Rowinski* at 651.

(b)     Dr. Eisenhauer "heralded" *McGuire* "as being of major significance, since responses were seen in both platinum-refractory and platinum-non-refractory patient groups.  The finding of a new agent that was active for [refractory patients] was thought to be important..." and thus acknowledged that *McGuire* demonstrated the efficacy in both refractory and non-refractory patients.  See *Eisenhauer* at 2655.

(c)     In *Trimble*, Dr. Canetta and his co-authors again paid tribute to the 1989 McGuire reference as the first to demonstrate efficacy of Taxol® to treat refractory ovarian cancer in 1989. *Trimble* at 2405.

(d)     In *Arbuck*, Dr. Canetta acknowledged and praised *McGuire* as being the first to show efficacy of paclitaxel and: [T]he first important indication of clinical activity in a Phase II trial ever reported in women with recurrent and refractory ovarian cancer. [Citation to *McGuire* omitted] *Arbuck* at 15.

46.     Bristol fraudulently and materially misrepresented *McGuire*, and knowingly, willfully, fraudulently withheld the Final Study Report on *McGuire*, as well as *Rowinski, Eisenhauer, Trimble* and *Arbuck*, with clear intent to deceive the Examiner into issuing the '803 and '537 patents.  Bristol had a duty to point out and explain inconsistent statements in the fraudulently withheld references.  Bristol could not have made the arguments and misrepresentations it did to the PTO about *McGuire* had the Final Study Report on *McGuire*, as well as *Rowinski, Eisenhauer, Trimble* and *Arbuck*, been disclosed.  Bristol's misrepresentations and omissions are material within the meaning of 37 C.F.R. 1.56.

47.     Bristol's fraudulent and material misrepresentations regarding *McGuire*, combined with its fraudulent withholding of the Final Study Report on *McGuire*, *Rowinski, Eisenhauer, Trimble* and *Arbuck*, were efficient, inducing and proximate causes of the issuance of the '803 and the '537 patents.  But for Bristol's misrepresentations and omissions, the Examiner would have known that McGuire, not Bristol or Bristol's employees, discovered that administering low doses of Taxol® was safe and effective, and would not have allowed the patents to issue to Bristol.

48.     During prosecution of the '803 and '537 patents and the applications from which they descended, Bristol deliberately withheld from the PTO a scientific abstract written by O'Connell et al., "Phase I Trial of Taxol Given as a Three Hour Infusion Every Three Weeks," published at 26 Proceedings of AACR, 169 (671) (1985) ("*O'Connell*").  *O'Connell* reported the results of the administration of three courses of Taxol® at each of the following dosages: 15, 30, 45, 75, 100, 135 and 160 mg/m$^{2.}$  The Taxol® was administered over a 2-3 hour infusion period

every three weeks.  *O'Connell* concluded and reported that paclitaxel "can be safely given as a 3 hour infusion every 3 weeks…".  *O'Connell* observed no hypotension and reported "no evidence of acute hypersensitivity reactions during the infusions".  Prior to the dates of invention for the '803 and '537 patents, a person of ordinary skill in the art would have appreciated *O'Connell* as demonstrating a reduced hematologic effect compared with protocols for administering paclitaxel that included higher dosages and/or longer duration administration periods.

49.     Bristol's withholding of *O'Connell* from the PTO was knowingly and willfully fraudulent because *O'Connell* directly refutes, or is at least inconsistent with, Bristol's assertions of patentability and its arguments opposing unpatentability that were relied on by the PTO.  In particular, *O'Connell* refutes Bristol's assertions to the PTO in the June 20, 1996 Supplemental Declaration of Renzo M. Canetta Pursuant to 37 C.F.R. 1.133 at 5 ("*Canetta Supp. Decl.*"), and the February 29, 1996 Declaration of Renzo M. Canetta Pursuant to 37 CFR 1.132 at 6 ("*Canetta Decl.*"), that available prior art taught that 3-hour infusions of paclitaxel in the claimed ranges of 135-175 mg/m$^2$ were "unsafe" and "would be unduly hazardous."  The O'Connell reference is therefore material within the definition of materiality in 37 C.F.R. 1.56(b), and Bristol knew it had a duty to disclose it.  Further, because the PTO would have understood *O'Connell's* administration protocol as teaching reduced hematologic effect compared to administration schedules requiring longer duration infusions, Bristol would not have been able to assert that its own claimed Taxol® treatment regimen "substantially reduces hematologic toxicity," as it did in *Canetta Supp. Decl*. at 5.

50.     Bristol withheld *O'Connell* with intent to deceive the PTO.  Bristol could not

have made the arguments for patentability (i.e., that prior to its alleged invention, paclitaxel was "unduly hazardous" at the claimed doses over a 3 hour infusion period, and that Bristol's alleged invention substantially reduces hematologic toxicity), if it had disclosed *O'Connell*. Bristol had a duty to disclose and explain to the PTO prior art statements in *O'Connell* that were contradictory to statements made by Bristol in support of its patent application. Bristol breached that duty.

51. Bristol's fraudulent withholding of *O'Connell* was an efficient, inducing and proximate cause of the issuance of the '537 and '803 patents. If provided to the Examiner, *O'Connell* would have directly refuted the characterizations of the prior art by Bristol's Dr. Renzo Canetta as being "unsafe" and "unduly hazardous," and as teaching away from the claimed invention in *Canetta Supp. Decl.* at 5 and in *Canetta Decl.* at 6. Disclosure of *O'Connell* would further have barred Bristol from arguing to the Examiner, as it did in its July 25, 1995 Response Pursuant to 37 C.F.R. 1.111 at 3, that its own discovery of the safe administration of Taxol® was "entirely unexpected in view of the prevailing teachings in the art at the time the invention was made". In addition, the Examiner would have appreciated the materiality and importance of *O'Connell*, in that it contains each and every element of the claims of the '803 patent, and all elements except the premedication element of the claims of the '537 patent. In consequence, the Examiner would have concluded that *O'Connell* anticipated the '803 patent, or least rendered obvious the claims of the '803 and '537 patents. Accordingly, but for Bristol's deceptive and material fraudulent withholding of *O'Connell*, the '803 and '537 patents would not have issued.

52.     Bristol also knowingly and willfully made fraudulent misrepresentations to the

PTO about *Kris et al., Phase I Trial Of Taxol Given As A 3-Hour Infusion Every 21 Days*, 70

Cancer Treatment Reports 605-607 (1986) ("*Kris*").  *Kris* reported on precisely the same courses

reported in *O'Connell*, plus one additional course at 160 mg/m$^2$, three courses at 190 mg/m$^2$ and

one course at 230 mg/m$^2$.  Bristol misrepresented to the PTO that *Kris* demonstrated that Taxol®

was ineffective and unsafe, claiming:

> [o]ne of ordinary skill in the art would conclude, based upon the
> *Kris et al*. reference, that a 3-hour duration of infusion for the
> administration of paclitaxel would be unduly hazardous.
> Moreover, since *Kris et al*. observed no antitumor activity,
> virtually any toxicity manifestation would invalidate the treatment
> regimen used by *Kris et al*.  Accordingly, one of ordinary skill in
> the art would conclude, consistent with the conclusions expressed
> by the authors themselves, that further investigation of the short
> duration infusion regimen of the *Kris et al*. regimen was not
> indicated.

*Canetta Decl*. at 6.  Bristol failed to explain to the PTO that of the courses of Taxol administered

in the Kris study, all administered at dosages of 160 mg/m$^2$ and below were safe in that they did

not cause hypersensitivity reactions despite the lack of premedication.  Bristol also failed to

inform the PTO that of the only three courses that resulted in hypersensitivity reactions, the

dosages were 190 mg/m$^2$ or 230 mg/m$^2$.

53.     Years earlier, in its July, 1992 request for FDA approval of its New Drug

Application for Taxol®, Bristol asserted to the FDA that *Kris* demonstrated that paclitaxel was

safe.  Specifically, Bristol asserted, "[d]oses of taxol up to 160 mg/m$^2$ over 3 hours were well

tolerated with no severe toxicity…".  June 1992 Final Study Report on *Kris* at 28.  Bristol also

asserted to the FDA that *Kris* taught that further investigation of Taxol® was warranted, and that

the work of Kris and others, "led to the introduction of routine antihypersensitivity prophylaxis prior to taxol therapy."  *Id.*

54.     Bristol's fraudulent withholding of its Final Study Report on *Kris* from the PTO, its fraudulent statements to the PTO about *Kris*, and its intentional failure to submit and point out its earlier inconsistent statements on the import of the Kris study demonstrate Bristol's clear intent to deceive the PTO into issuing the '803 and '537 patents.

55.     Bristol's misrepresentations of *Kris* and its omission of its Final Study Report on *Kris* were an efficient, inducing and proximate cause leading to the issuance of the '803 and '537 patents.  These misrepresentations and omissions were material in that, had Bristol disclosed to the Examiner the Final Study Report on *Kris*, the Examiner would have been aware of Bristol's appreciation and true interpretation of *Kris* as teaching the precise invention for which Bristol was seeking patent protection.

56.     *Kris* has been held to invalidate by anticipation all claims in the '803 patent and all claims of the '537 patent, except claims 6 and 9, by the Federal Circuit Court of Appeals in *Bristol-Myers Squibb Co. v. Ben Venue Laboratories, Inc., et al.*, reported at 246 F.3d 1368 (2001).

57.     With respect to the '537 patent, the district court in *Bristol-Myers Squibb Co. v. Boehringer Ingelheim Corp., et al*, 86 F. Supp.2d 433 (D.N.J. 2000), found that *Kris* "explicitly references all of the ['537] patent's limitations," *id*. at 441; that "one skilled in the art would have known exactly what *Kris's* premedication 'suggestion' entailed and would not have had to engage in further experimentation to gain possession of the patented ('537) invention," *id*.; and

finally, that "Kris's direct suggestion to premedicate would enable one skilled in the art to follow the steps to create the patented method of administering Taxol®," *id*. at 442. The court concluded that claims 1, 2, 5, 6, 8 and 9 of the '537 patent were invalid as anticipated by *Kris*. The court had no occasion to rule on the remaining claims of the '537 patent because Bristol had not alleged that they were infringed. In a decision on April 20, 2001, the Federal Circuit reviewed the district court's findings and affirmed them as to claims 1, 2, 5 and 8. The Federal Circuit remanded as to claims 6 and 9 for the district court to determine whether, "perhaps even as a matter of law," there were sufficiently few suitable premedicants that *Kris'* premedication suggestion would have been understood by one skilled in the art to suggest the particular premedicants described in these claims. 246 F.3d 1368 (Fed. Cir. 2001) at 1380.

58.     Because the major difference between the '537 patent and the '803 patent is that the latter lacks the premedication step, the district court also found that the "claimed steps of the '803 patent (1-3 and 6) are explicitly present in *Kris*," and held those claims to be invalid as well. 86 F. Supp 2d at 443. Again, the Court did not rule on the other '803 patent claims because Bristol had not alleged their infringement. The Federal Circuit affirmed all the district court's findings as to the '803 patent.

59.     Bristol also made fraudulent statements to the PTO regarding two additional publications, both relating to the same Phase I study: Longnecker et al., Phase I and Pharmacokinetic Study Of Taxol In Patients With Advanced Cancer, 4 Proceedings Of ASCO 32 (C-119) (1985) ("*The Longnecker Abstract*"), and Donehower et al., Phase I Trial of Taxol In

Patients With Advanced Cancer, Cancer Treatment Reports Vol. 71, No. 12, at 1171, December 1987 ("*Donehower*").

60.     *The Longnecker Abstract* is a preliminary report on the first 20 evaluable courses of Taxol® administered to the first 14 patients in the study.  *The Longnecker Abstract* reports that Taxol was given over one hour every 21 days, starting at 15 mg/m$^2$ (7 courses), and escalating to 30 mg/m$^2$ (3 courses), 60 mg/m$^2$ (4 courses), 90 mg/m$^2$ (7 courses, 5 evaluable), and 135 mg/m$^2$ (1 course).  *The Longnecker Abstract* did not report any hypersensitivity reactions, but rather only "mild hematologic suppression," and stated that the study was "ongoing" with "[i]nvestigations at higher dosage levels continuing."  *The Longnecker Abstract* does not mention or suggest the need for a longer infusion period, nor does it suggest that the study was unsuccessful, abandoned or a failure.

61.     At the time *The Longnecker Abstract* was published in March of 1985, the Phase I study was still underway, as *The Longnecker Abstract* explicitly stated.  It continued with 16 more patients who were given 51 more courses of Taxol® until August 23, 1985.  As planned in the original study protocol, the investigators continued to escalate the Taxol® dosages from 135 mg/m$^2$ to 170 mg/m$^2$, 212 mg/m$^2$ and 265 mg/m$^2$, or until the maximal tolerated dose was achieved.  The goals of the study were to: (1) determine the maximum tolerated dose which could be given intravenously every 21 days; (2) describe and quantitate the clinical toxic effects of taxol; and (3) seek preliminary evidence of therapeutic activity in patients with advanced cancer.

62.     After the Phase I study was completed, *Donehower* reported the results of the

entire study.  Specifically, *Donehower* included data on the same 20 courses reported by *The Longnecker Abstract*, plus five more courses at 135 mg/m$^2$, nine courses at 170 mg/m$^2$, 30 courses at 212 mg/m$^2$ and five courses at 265 mg/m$^2$, for a total of 71 courses, 67 evaluable, administered over 1 or 6 hours every three weeks.  *Donehower* reported five hypersensitivity reactions in the first 27 courses, including one near fatal reaction.  Consequently, for the final 43 courses, a three drug premedication regimen was routinely used and the infusion duration was lengthened to six hours.  With this adjustment, *Donehower* reported "only three minor reactions" in the final 43 courses.  *Donehower* at 1176.  Significantly, despite being a Phase I trial, *Donehower* reported "evidence for antitumor effect in two patients[,]" one with lung cancer, and one with ovarian cancer.  *Id*.  *Donehower* did not mention or suggest that the infusion duration should be extended beyond six hours.  Rather, *Donehower* concluded that its premedication regimen and six hour infusion duration made, "further clinical development of this drug more realistic and worthwhile based on the antitumor activity seen." *Id*.

63.    Bristol acknowledged and appreciated the antitumor activity discovered by *Donehower*, especially in the ovarian cancer patient.  In its Taxol® NDA, based on Phase I trials, including the one which was the basis of *The Longnecker Abstract* and *Donehower*, Bristol told the FDA:

> (a)    During the phase I clinical trials of taxol [including Kris and Donehower] an unusual level of antitumor activity was observed..," including in ovarian cancer and refractory patients. N.D.A. at 113.

> (b)    "During the course of the phase I clinical studies of taxol (Ref. 164-172), hints of antitumor activity were observed in several patients with solid tumors and acute leukemias (Table 16

[which illustrates all phase I trials and their results]). *The main goal of these trials was the identification of the maximum tolerated dose (MTD) and not the accurate definition of response rates in a given tumor type. Still, it was encouraging that the drug could present signs of biological effectiveness, even if limited, in different tumor types.*" *Id at 137.* (emphasis added).

(c)     "The observation of a decrease in the size of multiple peritoneal masses and the disappearance of gross ascites in a patient with epithelial ovarian cancer raised the interest of the investigators at the Johns Hopkins Cancer Center.  This patient had a tumor, which was refractory to platinum therapy; her clinical response lasted for 5 months and was accompanied by a marked improvement of her general condition.  On this basis, the first phase II trial of taxol was planned by that institution." (referring to the ovarian cancer patient in the *Donehower* study).  *Id.*

64.     In its Final Study Report on *Donehower*, co-authored by Dr. Canetta, Bristol told the FDA that *Donehower* taught that Taxol was effective in two patients, that administering 170 mg/m$^2$ of Taxol over six hours with premedication would be safe even for heavily treated chemotherapy patients, that *Donehower* recommended doing so, and, most significantly, that an entire broad-based Phase II study was premised on the successful antitumor effect in the Donehower study, specifically reporting that:

(a)     In two patients there was evidence of antitumor activity....  One patient with lung cancer...and another, a woman with ovarian cancer refractory to cisplatin therapy had a shrinkage of abdominal masses, disappearance ascites and improvement in her performance status for a 5-month duration.  This was the only ovarian cancer patient in this phase I study, and her response led to a broader phase II study in ovarian cancer.  Final Study Report on *Donehower* at 19.

(b)     Based on these data, the recommended doses for heavily and minimally treated patients would be 170 and 212 mg/m$^2$ respectively.  Other toxicities were not a concern at these doses, i.e. the neurotoxicity was mild and apparently reversible and

hypersensitivity reactions not significant when using premedication and avoiding rapid [i.e., 1 hour] i.v. infusion.  *Id.* at 31.

65.    Three years after receiving FDA approval for Taxol® based on these representations, Bristol and Dr. Canetta told the PTO exactly the opposite, that *Donehower* taught that administering Taxol® in six hours or less was ineffective and unduly hazardous, and that even the six hour treatment regimen should be abandoned, stating:

> (a)    There is no teaching or suggestion that Ohnuma's, or anyone else's, method of administration of taxol would be effective in the treatment of ovarian cancer.  Amendment and Response to 37 C.F.R. 1.111 and 1.115, August 16, 1993 at 8.

> (b)    Donehower et al. fail to teach or suggest that paclitaxel has a clinically useful therapeutic index or possesses efficacious antitumor activity, even with this reportedly improved regimen of prolonged duration infusion.  *Canetta Decl.* at Paragraph 19.

> (c)    Taken together, Donehower et al. and Kris et al. fail to teach or suggest that paclitaxel is an efficacious antitumor agent. Kris et al. reported that no antitumor activity was observed, and that HSRs were treatment limiting for paclitaxel administered at doses of 15-230 mg/m$^2$/3hrs**.**"  *Id*. at Paragraph 20.  (emphasis added)

> (d)    [T]he prior art taken as a whole, particularly Donehower et al. and Kris et al. taken together with Wiernik et al., unambiguously teach that 1 - 6 hr. duration infusion schedules did <u>not</u> warrant further investigation or usage; and suggest that even the > 6 hour infusion schedule should be abandoned in favor of a 24 hour infusion schedule.  Notwithstanding, Applicants have investigated a short duration infusion regimen; and have shown that the regimen is both efficacious and particularly advantageous in reducing hematologic toxicity.  *Id* at Paragraph 23.

66.    After receiving Canetta's Declaration, the Examiner rejected Bristol's application over *The Longnecker Abstract*, stating that:

> Longnecker teaches a one-hour infusion with mild hematologist [sic.
> hematologic] suppression.  In view of this, one of ordinary skill would be
> motivated to employ Taxol for three hours to get reduced hematologic response,
> in the absence of a side-by-side comparison.  Canetta's declaration does not
> discuss Longnecker.

Office Action 10/18/95.

67.    Neither Bristol nor Dr. Canetta had discussed *The Longnecker Abstract* prior to

the Examiner's October 18, 1995 rejection because Bristol failed to submit it to the PTO.  In

response to this rejection, Bristol and Dr. Canetta, submitted several responses and declarations

asserting repeatedly that *The Longnecker Abstract* was a "failed[,]" "abandoned[,]" and

"unsuccessful" experiment, rather than a report on the beginning stage of a successful trial.  *See*

responses Pursuant to 37 CFR 1.111 of June 3, 1996, June 24, 1996, and Supplemental

Declaration of Renzo M. Canetta Pursuant to 37 CFR 1.132, dated June 20, 1996.  Further, Dr.

Canetta stated that:

> The Longnecker reference contributes nothing relevant to the art that is not taught
> by Kris et al. or Donehower et al. and addressed in my earlier Declaration.
> Indeed, Longnecker is consistent with those references in that they all teach that
> short duration (i.e., < 6 hrs) Taxol infusion protocols are ineffective in that they
> produce no observable tumor regression, and that they are unduly hazardous.

Supp. Canetta Decl. at Paragraph 15.  Neither Dr. Canetta nor Bristol addressed the Examiner's

concern about *The Longnecker Abstract's* reference to "mild hematologic suppression."  Instead,

they portrayed the *Longnecker Abstract* as abandoned, even at low doses, because it was

purportedly "unduly hazardous."

68.    Bristol fraudulently concealed from the PTO that the "mild hematologic

suppression" relative to other administration schedules reported in *The Longnecker Abstract* was

precisely the "reduced hematologic toxicity" Bristol claimed in the '803 and '537 patents, which it had described to the PTO as "unexpected."  Bristol fraudulently withheld from the PTO its Final Study Report on *Donehower* to the FDA, in which Dr. Canetta and his co-authors explained that *Donehower* demonstrated efficacy even in ovarian cancer, and recommended the safe and efficacious administration of Taxol at 170 mg/m$^2$ and 212 mg/m$^2$ with premedication over six hours.

69.     Bristol's and Dr. Canetta's fraudulent statements to the PTO about *The Longnecker Abstract* and *Donehower,* and withholding from the PTO its Final Study Report on *Donehower*, co-authored by Dr. Canetta, which contained inconsistent, and thus material, statements on the import of both publications, demonstrate Bristol's clear intent to deceive the PTO into issuing the '803 and '537 patents.

70.     Bristol's misrepresentations of *The Longnecker Abstract* and *Donehower* and its omission of its Final Study Report on *Donehower* were an efficient, inducing and proximate cause leading to issuance of the '803 and '537 patents.

71.     Bristol and inventors Canetta, Eisenhauer and Rozencweig also fraudulently withheld their best mode of practicing the '803 and the '537 patents from the PTO.  Prior to filing the '628 application on August 3, 1992, the inventors understood that there was a method of practicing their invention better than any other method, and they deliberately withheld it from the '628 application, and during the entire prosecution of the '803 and '537 patents.

72.     At the time of filing the '628 application, the inventors and Bristol understood that the best method of administering paclitaxel parenterally was to dissolve it in "cleaned," i.e.,

purified, polyoxyethylated ("POE") Castor Oil and dehydrated alcohol.  To produce what it sometimes referred to as "BMS purified POE Castor Oil," Bristol purchased a POE Castor Oil product sold by BASF under the trademark "Cremophor® EL," and used a proprietary process to further "clean" or "purify" it before using it in solution with paclitaxel to manufacture Taxol®.

73.     As early as 1990, Bristol's Taxol Team, of which Dr. Canetta was a member, recognized the importance of the source and composition of the cremophor used in formulating Taxol®, and worked with the NCI to discover or develop the specific cremophor formulation that was safe and effective for use in the manufacture of Taxol®.

74.     On July 21, 1992, thirteen days prior to filing the '628 application at the PTO, Bristol informed the FDA that its commercial method of manufacturing Taxol® begins with "Cremophor® EL (cleaned)," and that the final composition of each 5 milliliter vial of Taxol® contained 527 milligrams of "Polyoxyethylated castor oil (cleaned)."  Bristol further assured the FDA that "[T]he drug product composition used in the clinical studies is identical to that disclosed in this NDA submission."  Each of these clinical studies was the subject of an in-depth Final Study Report co-authored by Dr. Canetta and submitted to the FDA.

75.     Later in 1992, in response to Bristol's representations about its method of manufacturing Taxol®, the composition of Taxol®, and the formulation of Taxol® used in the clinical trials, the FDA specifically acknowledged the role of BMS-purified Cremophor® EL as a solvent in the formulation of Taxol®.

76.     In contrast to Bristol's emphasis to the FDA on its proprietary "purified" Cremophor® EL, and its deliberate and consistent decision to use only BMS-purified

Cremophor® EL in its clinical trials, Bristol and the inventors fraudulently concealed from the PTO their belief that "purified" or "cleaned" Cremophor® EL was the best mode of practicing either the '803 or the '537 patents.  Instead, it disclosed only that:

> Each 5 ml vial contained 6-mg/ml taxol in polyethoxylated[sic] castor oil (Cremophor EL) 50% in dehydrated alcohol, USP 50%. While an emulsion of taxol in polyethoxylated[sic] caster oil in dehydrated alcohol is utilized as a vehicle in a preferred embodiment, it is contemplated that other pharmaceutically acceptable vehicles for taxol may be used.

The '803 patent at Col. 6:57-63; and the '537 patent at Col. 6:61-67.  Bristol withheld its preference for purified POE from the PTO.

77.    Information about BMS-purified POE Castor Oil and about Bristol's proprietary process to produce it would have material to the PTO because it affects patentability.  In prosecuting the '628 application with the PTO, Bristol, Canetta, Eisenhauer and Rozencweig, like all inventors, were under an absolute duty to have disclosed their best mode at the time the patent application was filed.  When Bristol and the inventors failed to disclose the best mode of which they were aware at the time of filing the application, the resulting '537 and '803 patents, were rendered invalid.  35 USC § 112.

78.    Bristol's and the inventors' clear intent to deceive the Examiner into issuing the '803 and '537 patents without disclosure of their best mode can be inferred by contrasting the language used in the '628 application with Bristol's Taxol® NDA, filed 13 days earlier.  The '628 application omits all language about "purified" Cremaphor® EL and about Bristol's proprietary purification process, while Bristol's NDA is replete with references to "clean" Cremaphor® EL.  Bristol intended to keep its purified Cremophor® EL, and its process for

producing it, a secret from the PTO and the public.

79.    The Examiner would not have issued the '803 or the '537 patent had he known that Bristol and the inventors fraudulently withheld their best modes of practicing those inventions.

Bristol's Use of Baseless, Sham Litigation and Predatory
Regulatory Procedures and Exclusive Licensing to Exclude
Competition and Maintain its Monopoly

80.    Upon obtaining the '537 and '803 patents, Bristol promptly listed them in an FDA publication, *Approved Drug Products With Therapeutic Equivalence Evaluations*, commonly known as the "Orange Book."  The FDA requires each NDA holder to list in the Orange Book each patent for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale of the [NDA holder's] drug." 21 U.S.C. §355(b)(1) and (c)(2).  Bristol's listing of the '537 and '803 patents in the Orange Book was knowingly baseless because Bristol knew that these patents were invalid, had been procured by inequitable conduct and fraud, and could not form a reasonable basis for patent infringement action against a person not licensed by Bristol engaged in the manufacture, use or sale of Taxol® or its generic bioequivalent.

81.    Pursuant to Section 5050(2)(B) of the Federal Food, Drug and Cosmetic Act ("FFDCA"), a pharmaceutical company seeking approval of an Abbreviated New Drug Application ("ANDA") for a generic version of an FDA-approved drug must provide the company holding the approved NDA with notice of a certification in the ANDA that the manufacture, use and sale of the generic drug will not infringe patents listed in the Orange Book.

82.    Beginning on July 30, 1997, various pharmaceutical companies filed ANDAs with the FDA for generic paclitaxel products and provided Bristol with notice of certifications under Section 505(j) of the Hatch-Waxman Act as to Bristol's Taxol® patents.  The

certifications claimed that the '803 and '537 patents were invalid and that U.S. Patent No.

5,496,804 (the "'804 patent"), a government patent licensed exclusively to Bristol, did not claim

any of the proposed indications for which the generic companies sought approval.

83.     In response to each of these notices, Bristol brought actions against Boehringer

Ingelheim Corp., Ben Venue Laboratories, Inc. ("Ben Venue"), Bedford Laboratories, Immunex

Corporation, Pharmachemie B.V., Zenith Goldline Pharmaceuticals, Inc. ("Zenith"), IVAX,

Pharmaceuticals, Inc. ("IVAX"), Mylan Pharmaceuticals, Inc., Marsam Pharmaceuticals, Inc.

and Schein Pharmaceuticals, Inc., in the United States District Court for the District of New

Jersey alleging infringement of the '803, '537 and '804 patents.

84.     Simply by filing these patent infringement actions within 45 days of receiving the

notice of Section 505(j) certification, Bristol automatically obtained an additional market

exclusivity by staying FDA approval of the relevant ANDAs for the lesser of 30 months or a

final non-appealable determination regarding the invalidity of the patent.  Had Bristol not

obtained this additional market exclusivity, these generic competitors intended and were

prepared to enter the market upon receipt of FDA approval.

85.     To gain this additional exclusivity, Bristol asserted patent infringement

allegations based on patents it knew or should have known were invalid or that did not claim any

of the proposed indications.  Bristol's patent infringement claims were brought in bad faith and

were objectively baseless.

86.     Ben Venue, IVAX and IVAX subsidiaries, Zenith, and Baker Norton

Pharmaceuticals, Inc. ("BNP"), asserted counterclaims against Bristol based on allegations

similar to those asserted in this complaint.  These companies moved for summary judgment on

certain aspects of their counterclaims.  As alleged above, on March 2, 2000, the district court

ruled that all claims asserted in the '537 and '803 patents (other than those directed specifically to the treatment of ovarian cancer) were invalid on the ground of anticipation.

87.     On April 5, 2000, the New Jersey court signed a stipulation and order in which, *inter alia*, Bristol agreed to permanently disclaim two claims (claims 4 and 5) of the '803 patent and four claims (3, 4, 7 and 10) of the '537 patent that had not been invalidated, so that a final judgment could be entered under Federal Rule of Civil Procedure 54(b) on the issue of patent validity.  In the stipulation, Ben Venue agreed to delete from its pending ANDA any recommendations to administer paclitaxel with granulocyte-colony stimulating factor (the subject of the '804 patent), and Bristol agreed not to sue Ben Venue or its customers on a claim of infringing the '804 patent.  The court entered judgment in accordance with the stipulation and order on June 30, 2000.

88.     On August 31, 2000 as part of its ongoing effort to delay generic market entry, Bristol filed another lawsuit against BNP in a Florida State Court, seeking discovery to determine the precise composition of BNP's paclitaxel product.  The pretext for this new lawsuit was Bristol's assertion that it needed to determine whether IVAX and BNP were infringing Bristol's patent No. 5,504,102 (the '102 patent) and whether BNP's generic paclitaxel product had the same inactive ingredients as Taxol®.  The suit was objectively baseless and was brought for the purpose and with the effect of restraining the entry of IVAX and BNP as competitors in the market for paclitaxel based drugs.

89.     On September 12, 2000, Bristol filed yet another lawsuit in the United States District Court for the Southern District of New York ostensibly asking, by way of a declaratory judgment action, for an interpretation of its obligations to list a patent for certain dosage forms of Taxol® which had been issued to ABI – the '331 patent.  The suit named ABI, IVAX, and BNP as defendants.  On September 15, 2000, BNP received final FDA approval of its ANDA, and on

October 18, 2000 Bristol voluntarily dismissed the case.  Because a California Court had previously ruled that ABI could not sue Bristol under any colorable legal theory for failing to have the '331 patent listed in the Orange Book, this lawsuit was objectively baseless from its inception.

90.     Such objections and misrepresentations included claims that ANDA applicants must demonstrate that the POE Castor Oil used as a solubilizing agent in their formulations was identical to the POE Castor Oil Bristol advertised as "further purified by a BMS proprietary process", or undergo new safety and efficacy trials.

91.     Bristol further sought to and did delay and restrain entry of generic Taxol® to the market and raise the costs of generic Taxol development and production by acquiring in 1990, and maintaining thereafter, exclusive licenses on patented processes for the semi-synthetic production of paclitaxel for the purpose of excluding generic competitors to Taxol®.

92.     Absent Bristol's unlawful conduct, the FDA would, on information and belief, have approved a generic Taxol® product and that product would have been produced and marketed in the United States at least as early as January 1,1999.

<u>Bristol's Collusion With ABI To Perpetuate Its Monopoly</u>

93.     Commencing at least as early as August 2000, Bristol engaged in a combination and conspiracy with ABI, the purpose and effect of which was to maintain Bristol's monopoly in the market for paclitaxel based drugs and further foreclose market entry by generic Taxol® by means of the baseless assertion of invalid claims related to ABI's '331 patent.

94.     On August 1, 2000, the PTO issued U.S. Patent No. 6,096,331 (the "'331 patent") to ABI.  The '331 patent claims certain dosage forms of Taxol®.  Both ABI and Bristol knew that any infringement claim under the '331 patent would be baseless and invalid if based upon the dosage forms long utilized by Bristol under its 1992 NDA, or by a generic producer under an ANDA for a generic Taxol®,  because Bristol's own practice and labeling of the drug, along with numerous printed publications, had anticipated those patent claims.

95.     Before August 11, 2000, Bristol knew that the '331 patent was invalid and that any claims that Taxol® or generic Taxol® infringed the '331 patent would be baseless.  Bristol was also aware that its listing of the '331 patent in the Orange Book would confront any manufacturer submitting an ANDA for generic Taxol® with further procedural delay and costs as well as the prospect of an infringement action.  Such a dispute would result in a stay of up to thirty months in the FDA's approval process, an unwarranted extension of Bristol's monopoly.

96.     On August 11, 2000, ABI filed suit against Bristol in the U.S. District Court for the Central District of California.  On the same day, Bristol and ABI collusively stipulated to entry of a temporary restraining order under which Bristol agreed to list the '331 patent in the FDA Orange Book.  Bristol and ABI agreed to this order with knowledge that there was no legal basis for the order or for the underlying suit.  Based upon Bristol and ABI's misleading activity in the form of a pretense of a justiciable controversy, the Court entered the requested temporary restraining order.  In truth, there was no legal controversy.  Bristol and ABI were simply collaborating in order to obtain a court order which would require Bristol to list the '331 patent in the Orange Book.

97.     Within hours after the parties' sham court action, Bristol filed the '331 patent for listing in the Orange Book knowing that it had no reasonable basis for doing so.

98.     On August 28, 2000, the FDA sent a letter to IVAX tentatively approving its pending ANDA for generic Taxol®.  In this letter and in reliance on Bristol's baseless listing of the '331 patent in the Orange Book, the FDA explicitly withheld final approval and informed IVAX that it could not receive final approval "…until all legal and regulatory issues surrounding [IVAX's] challenge of the '331 patent have been satisfactorily resolved."

99.     But for Bristol's conspiracy and agreement with ABI to secure an unwarranted listing of the '331 patent in the Orange Book through baseless and collusive litigation, IVAX would have received final FDA approval to manufacture and market generic Taxol® in competition with Bristol on or before August 28, 2000.

100.     On September 7, 2000, the Central District of California dismissed ABI's lawsuit against Bristol, holding that there was no private right of action to enforce the provisions of the FFDCA.  The Court ordered that Bristol "shall use its best efforts to cause the delisting of [the] '331 patent from the Orange Book" and further that "ABI shall cooperate with [Bristol] in its efforts to delist the '331 patent pursuant to the [agreed temporary restraining order]."

101.     In furtherance of its conspiracy with Bristol, on September 7, 2000, ABI filed a baseless patent infringement suit in the U. S. District Court for the Central District of California against Baker Norton Pharmaceuticals Inc., Zenith Goldline Pharmaceuticals, Inc. and IVAX Corporation, all of which had pending ANDAs to produce and market generic Taxol® in

competition with Bristol.  The next day, Bristol informed the FDA of the lawsuit, claiming that the litigation barred the FDA from approving those pending ANDAs for thirty more months.

102.     On September 11, 2000, Bristol again submitted the '331 patent to the FDA for Orange Book listing.  Three days later, on September 14, 2000, Bristol sent a letter to the FDA to undo its original listing of the '331 patent only "to the extent it was compelled by the [temporary restraining order]."  Bristol maintained to the FDA that its actions should not be construed as withdrawing its second listing of the '331 patent.

103.     On September 15, 2000, the FDA determined that Bristol's September 11th Orange Book listing was untimely because it was received more than 30 days after the '331 patent was issued, *see* 21 U.S.C. § 355(c)(2).  On this same day, the FDA granted BNP final approval to market its paclitaxel product.  BNP's final FDA approval was subsequently vacated on November 6, 2001, when the United States Court of Appeals for the District of Columbia Circuit ruled that the FDA had acted contrary to the Administrative Procedure Act in connection with the Orange Book listing of the '331 patent.

104.     Meanwhile, on September 20, 2000, IVAX began promotion of its paclitaxel product and announced that it would begin shipping the product in no more than three weeks.  However, because ABI's California litigation had caused IVAX's contract drug manufacturer to shift its production focus to another medicine, IVAX was not able to begin shipping its product until October 23, 2000, and the shipments were in smaller quantities than they would have been in the absence of Bristol's listing of the '331 patent in the Orange Book.

105.    IVAX's commercial marketing of generic Taxol® began on October 23, 2000.
For 180 days thereafter, Ivax was the only generic manufacturer permitted to market generic
paclitaxel because of the exclusivity incentives contained in the Hatch-Waxman Act.  This
delayed market entry and limitation to only one competitor for a period of 180 days was caused
by Bristol's knowing, fraudulent, and willful procurement of the '803 and '537 patents, its acts in
causing these patents (with knowledge they were procured by fraud) to be listed in the Orange
Book, its collusion with ABI, and its initiation and prosecution of sham infringement litigation
related to these patents, and its baseless and sham listing of ABI's '331 patent in the Orange
Book.

106     On January 11, 2002 the U.S. District for the Central District of California ruled
that all claims of the '331 patent asserted against the ANDA applicants for generic Taxol® were
invalid.

107.    Bristol did not withdraw its baseless listing of the '331 patent until January 17,
2002.

<u>Relevant Market</u>

108.    One relevant product market is the United States market for paclitaxel based
drugs.  Sellers that desire to manufacture, market, or sell paclitaxel based drugs in the United
States must receive FDA approval.  Such approval limits the treatment indications that may
appear on the label and labeling for which the drug may be advertised or promoted.  Without
regard to the FDA's limitations on labeling and marketing, however, once a paclitaxel based
drug is approved, those making the decisions whether to purchase and/or utilize such drugs or
how to fill a prescription for a paclitaxel based drug are free to substitute one therapeutically

equivalent paclitaxel based drug for another.  Taxol® and generic Taxol® are substitutes in the eyes of such decision-makers and belong in the same relevant product market.  For those situations where paclitaxel based drugs are purchased or prescribed, there is no reasonable substitute for paclitaxel based drugs in the eyes of those making the decision to purchase and/or use paclitaxel based drugs.

109.    The relevant geographic antitrust market is the United States (50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Territory of the United States Virgin Islands and other United States commonwealths, territories and protectorates).  To manufacture, sell, or market paclitaxel based drugs in the United States, one must receive approval from the FDA.

110.    Until October 23, 2000, Bristol was the sole manufacturer selling paclitaxel based drugs in the United States.  For the period October 23, 2000 to April, 2001 Bristol was one of two manufacturers selling paclitaxel based drugs in the United States.

### COUNT I

Monopolization in Violation of Section 2 of the Sherman Act

111.    Plaintiffs incorporate by reference the preceding allegations.

112.    Bristol has monopoly power in the market for paclitaxel based drugs in the United States.  Pursuant to the Hatch-Waxman Act, Bristol was given a lawful monopoly over sales of Taxol® from December 1992 to December 1997.  Through various unlawful means, including those alleged above, Bristol sought to and did unlawfully extend and maintain its monopoly from December 1997 until at least April 2001.

113.    Bristol has maintained its monopoly power in the relevant market since its five-year period of marketing exclusivity expired, in violation of Section 2 of the Sherman Act, 15

U.S.C. § 2, through willful, anticompetitive, exclusionary conduct as described above and not through superior skill, foresight, industry or an historical accident, or through legitimate competitive activities.  As alleged above, Bristol has secured patents through inequitable conduct and fraud on the PTO, has caused these patents to be listed in the Orange Book without any objective basis for doing so and with knowledge of their invalidity, has initiated and prosecuted a pattern of sham and baseless regulatory procedures and infringement and other litigation based upon patents it knew to be invalid and procured by fraud, has secured exclusive patent licenses to processes for the semi-synthetic production of the essential active ingredient paclitaxel, foreclosing its competitors use of that technology, has caused the listing of the '331 patent in the Orange Book with knowledge that it could not form the basis for a good faith infringement action and colluded with ABI to create the pretext that such a basis for alleging infringement could exist, all for the purpose and with the effect of interfering with and delaying the availability of generic paclitaxel based drugs in the United States and of excluding and restraining competition in the market for such drugs.

114.    Bristol's anticompetitive conduct alleged herein has injured competition in the relevant market by maintaining Bristol's power to exclude competitors, reduce output, charge monopoly prices, reap monopoly profits and otherwise thwart competition in the relevant market.

115.    Bristol's conduct in unlawfully maintaining its monopoly in the paclitaxel market has injured Plaintiffs in their business and property.  Through its wrongful conduct, Bristol was able to maintain monopoly prices on its Taxol® products and deprive the Plaintiffs of access to

lower-priced generic paclitaxel products during a period commencing at least as early as January 1, 1999.

## COUNT II

### Conspiracy in Violation of Section 2 of the Sherman Act

116.    Plaintiff States incorporate by reference the preceding allegations.

117.    Beginning no later than August 2000 and continuing at least through October 2000, Bristol and ABI engaged in a continuing contract, combination and conspiracy to monopolize sales, restrict output and exclude generic competition in the United States market for the manufacture and sale of paclitaxel based drugs in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

118.    In furtherance of this contract, combination and conspiracy, Bristol and ABI did those things that they conspired and combined to do, including:

(a)    ABI filed a baseless lawsuit against Bristol in federal court alleging that Bristol improperly failed to list the '331 patent in the Orange Book;

(b)    Bristol and ABI jointly sought a temporary restraining order compelling Bristol to list the '331 patent in the Orange Book;

(c)    Bristol and ABI collaborated in preparing the complaint and briefs necessary to commence the lawsuit and obtain the temporary restraining order;

(d)    Bristol and ABI "settled" their fabricated "dispute" and asked the court to sign a proposed Final Order and Judgment which would have required

Bristol to maintain the '331 patent listing in the Orange Book and made a specific

factual finding that the '331 patent was properly listed; and

      (e)    Bristol agreed to compensate ABI for its participation in the

conspiracy.

119.    As a result, in part, of the unlawful conspiracy between Bristol and ABI, Bristol

was able to maintain and extend its monopoly power in the U.S. market for paclitaxel based

anticancer drugs during and after August 2000.

120.    The contract, combination and conspiracy between Bristol and ABI has injured

Plaintiffs in their business and property beginning at least as early as August 2000, by restraining

and delaying the entry into the market of producers of generic Taxol®, thereby depriving

Plaintiffs of the opportunity to purchase paclitaxel based anticancer drugs in a competitive

market and restraining Plaintiffs' access to lower-priced generic paclitaxel based products.  As a

result Plaintiffs have purchased millions of dollars worth of paclitaxel based drugs at artificially

high, anticompetitive prices.

### SUPPLEMENTAL STATE LAW CLAIMS

121.    Plaintiff State of Alabama repeats and realleges each and every allegation

contained in paragraphs 1 through 120.

122.    Defendant's acts violate, and Plaintiff State of Alabama is entitled to relief under

the Deceptive Trade Practices Act, Section 8-19-1, *et seq.*, Code of Alabama 1975.  Section 8-

19-11, Code of Alabama 1975 provides for civil penalties and reasonable attorney fees.

123.    Plaintiff State of Alaska repeats and realleges each and every allegation contained in paragraphs 1 through 120.

124.    Defendant's acts violate, and Plaintiff State of Alaska is entitled to relief under, AS 45.50.471(a), AS 45.50.495, AS 45.50.501, AS 45.50.551, and AS 45.50.562-.596.

125.    Plaintiff State of Arizona repeats and realleges each and every allegation contained in paragraphs 1 through 120.

126.    Defendant's acts violate, and Plaintiff State of Arizona is entitled to relief under, Arizona's Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq.*

127.    Plaintiff State of Arkansas repeats and realleges each and every allegation contained in paragraphs 1 through 120.

128.    Defendant's acts violate, and Plaintiff State of Arkansas is entitled to relief under, the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*

129.    Plaintiff State of California repeats and realleges each and every allegation contained in paragraphs 1 through 120.

130.    Defendant's acts violate, and Plaintiff State of California is entitled to relief under, The Cartwright Act, California Business & Professions Code sections 16700 *et seq.*, the Unfair Practices Act, California Business & Professions Code sections 17000 *et seq.*, and the Unfair Competition Law, California Business & Professions Code section 17200, *et seq.*

131.    Plaintiff State of Colorado repeats and realleges each and every allegation contained in paragraphs 1 through 120.

132.    Defendant's acts violate, and Plaintiff State of Colorado is entitled to relief under, the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat.  Plaintiff State of Colorado is also entitled to such relief on behalf of the University of Colorado Hospital Authority, and on behalf of the Denver Health and Hospital Authority.

133.    Plaintiff State of Connecticut repeats and realleges each and every allegation contained in paragraphs 1 through 120.

134.    Defendant's acts violate, and Plaintiff State of Connecticut is entitled to relief under, the Connecticut Antitrust Act, Conn. Gen. Stat.§ 35-24 *et seq.*, and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

135.    Plaintiff State of Delaware repeats and realleges each and every allegation contained in paragraphs 1 through 120.

136.    Defendant's acts violate, and Plaintiff State of Delaware is entitled to relief under, Delaware Antitrust Act, 6 Delaware Code § 2101 *et seq.*, the Freedom of Information Act, 29 Delaware Code § 10001 *et seq.*, and the Delaware Deceptive Trade Practices Act, 6 Delaware Code § 2501 *et seq.*

137.    Plaintiff District of Columbia repeats and realleges each and every allegation contained in paragraphs 1 through 120.

138.    Defendant's acts violate, and Plaintiff District of Columbia is entitled to relief under, the District of Columbia Antitrust Act, D.C. Code, 2001 Ed. § 28-4501 *et seq.*, including, without limitation, D.C. Code, 2001 Ed. § 28-4507, pursuant to which plaintiff District of Columbia seeks threefold the damages sustained by natural persons.

139.    Plaintiff State of Florida repeats and realleges each and every allegation contained in paragraphs 1 through 120.

140.    Defendant's acts violate, and Plaintiff State of Florida is entitled to relief under, the Florida Antitrust Act of 1980,    542.15 Florida Statutes, *et seq*., and the Florida Deceptive and Unfair Trade Practices Act,    501.201 Florida Statutes, *et seq*.

141.    Plaintiff Territory of Guam repeats and realleges the allegations contained in paragraphs 1 through 120.

142.    Defendant's acts violate, and Plaintiff Territory of Guam is entitled to relief under the Deceptive Trade Practice – Consumer Protection Act, Chapter 32 of Title 5 of the Guam Code Annotated, §32102 *et seq*. and under Chapter 69 of Title 9 (unlawful to restrain or monopolize trade or commerce) of the Guam Code Annotated § 69.10 *et seq*.

143.    Plaintiff State of Georgia repeats and realleges each and every allegation contained in paragraphs 1 through 120.

144.    Defendant's acts violate, and Plaintiff State of Georgia is entitled to relief under, OCGA Section 13-8-2 and Georgia Constitution Article III, Section VI, Paragraph 5 (1983).

145.    Plaintiff State of Hawaii repeats and realleges each and every allegation contained in paragraphs 1 through 120.

146.    Defendant's acts violate, and Plaintiff State of Hawaii is entitled to relief under, Haw. Rev. Stat. Chapter 480, Monopolies; Restraint of Trade.

147.    Plaintiff State of Idaho repeats and realleges each and every allegation contained in paragraphs 1 through 120.

148.    Defendant's acts violate, and Plaintiff State of Idaho is entitled to relief under, the Idaho Competition Act, Idaho Code § 48-101 *et seq.*, and the Idaho Consumer Protection Act, Idaho Code § 48-601 *et seq.*

149.    Plaintiff State of Illinois repeats and realleges each and every allegation contained in paragraphs 1 through 120.

150.    Defendant's acts violate, and Plaintiff State of Illinois is entitled to relief under the Illinois Antitrust Act, 740 ILCS 10/1 et seq., including without limitation 740 ILCS 10/3(3).

151.    Plaintiff State of Indiana repeats and realleges each and every allegation contained in paragraphs 1 through 111.

152.    The practices of Defendants were in violation of Indiana Code § 24-1-1-1, *et seq.*, and the Deceptive Consumer Sales Act, Indiana Code § 24-5-0.5-1, *et seq.*

153.    Plaintiff State of Iowa repeats and realleges each and every allegation contained in paragraphs 1 through 120.

154.    Defendant's acts violate, and Plaintiff State of Iowa is entitled to relief under, the laws of the State of Iowa, alleging violations of the Iowa Competition Act, Iowa Code sections 553 et seq., the Iowa Consumer Fraud Act, Iowa Code section 714.16, and a claim for unjust enrichment under Iowa common law.

155.    Plaintiff State of Kansas repeats and realleges each and every allegation contained in paragraphs 1 through 120.

156.    Defendant's acts violate, and Plaintiff State of Kansas is entitled to relief under, the laws of the State of Kansas, including, without limitation: the Kansas Restraint of Trade Act,

Kansas Statutes Annotated 50-101 *et seq.* and its predecessor; the Kansas Consumer Protection Act, Kansas Statutes Annotated 50-623 *et seq.* and its predecessor; the common laws of Kansas including, without limitation: the common law of fraud, unconscionable acts or practices, deceptive acts and practices, unfair methods of competition, and unjust enrichment.

157.    Plaintiff Commonwealth of Kentucky repeats and realleges each and every allegation contained in paragraphs 1 to120.

158.    Defendant's acts violate, and Plaintiff Commonwealth of Kentucky is entitled to relief under, the Kentucky Antitrust Law, KRS 367.175, the Kentucky Consumer Protection Act KRS 367.110 *et seq.*, and the common law of Kentucky.

159.    Plaintiff State of Louisiana repeats and realleges each and every allegation contained in paragraphs 1 through 120.

160.    Defendant's acts violate, and Plaintiff State of Louisiana is entitled to relief under, the Louisiana Antitrust Act, La. R.S. 51: 121, *et seq.* and La. R.S. 51:1401, *et seq.*

161.    Plaintiff State of Maine repeats and realleges each and every allegation contained in paragraphs 1 through 120.

162.    Defendant's acts violate, and Plaintiff State of Maine is entitled to relief under, the Maine Monopolies and Profiteering Law, 10 MRSA § 1102, and the Maine Unfair Trade Practices Act, 5 MRSA § 207 and 10 MRSA § 1101.

163.    Plaintiff State of Maryland repeats and realleges each and every allegation contained in paragraphs 1 through 120.

164.    Defendant's acts violate, and Plaintiff State of Maryland is entitled to relief under, the Maryland Antitrust Act, Md. Com. Law Code Ann. § 11-201, *et seq.* (2000).

165.    Plaintiff Commonwealth of Massachusetts repeats and realleges each and every allegation contained in paragraphs 1 through 120.

166.    Defendant's acts violate, and Plaintiff Commonwealth of Massachusetts is entitled to relief under, the Massachusetts Consumer Protection Act, G.L. c.93A s.2, *et seq.*

167.    Plaintiff State of Michigan repeats and realleges each and every allegation contained in paragraphs 1 to 120.

168.    Defendant's acts violate, and Plaintiff State of Michigan is entitled to relief under, the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.776 *et seq.*, the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et seq.*, the common law of Michigan, and Mich. Comp. Laws Ann. § 14.28 and § 14.201.

169.    Plaintiff State of Minnesota repeats and realleges each and every allegation contained in paragraphs 1 through 120.

170.    Defendant's acts violate, and Plaintiff State of Minnesota is entitled to relief under the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49-.66, Minn. Stat. § 8.31, and the common law of Minnesota.

171.    Plaintiff State of Mississippi repeats and realleges each and every allegation contained in paragraphs 1 through 120.

172.   Defendant's acts violate, and Plaintiff State of Mississippi is entitled to relief under its Consumer Protection Act found at Miss. Code Ann. § 75-24-1, *et seq.* (1972, as amended) and its Antitrust Act found at Miss. Code Ann. § 75-21-1, *et seq.* (1972, as amended).

173.   Plaintiff State of Missouri repeats and realleges each and every allegation contained in paragraphs 1 through 120.

174.   Defendant's acts violate, and Plaintiff State of Missouri is entitled to relief under, the Missouri Merchandising Practices Act, Mo. Rev. Stat. Section 407.010 *et seq.*, the Missouri Antitrust Law, Mo. Rev. Stat. Section 416.011 *et seq.*, and the common law of Missouri.

175.   Plaintiff State of Montana repeats and realleges each and every allegation contained in paragraphs 1 through 120.

176.   Defendant's acts violate, and Plaintiff State of Montana is entitled to relief under, MCA 30-14 part

177.   Plaintiff State of Nebraska repeats and realleges each and every allegation contained in paragraphs 1 through 120

178.   Defendant's act violate, and Plaintiff State of Nebraska is entitled to relief under, Nebraska's Junkin Act, Neb. Rev. Stat. § 59-801 through 59-831 (1998, Cum. Supp. 2002) and the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 through 59-1623 (1998, Cum. Supp. 2002).

179.   Plaintiff State of Nevada repeats and realleges each and every allegation contained in paragraphs 1 through 120.

180.   Defendant's acts violate, and Plaintiff State of Nevada is entitled to relief under,

Nevada's Unfair Trade Practices Act, NRS 598A.010, *et seq*.

181.    Plaintiff State of New Hampshire repeats and realleges each and every allegation contained in paragraphs 1 through 120.

182.    Defendant's acts violate, and Plaintiff State of New Hampshire is entitled to relief under, NH Rev. Stat. Ann. 356 *et seq*., the Combinations and Monopolies Act, and NH Rev. Stat. Ann 358-A *et seq*., the Consumer Protection Act.

183. Plaintiff State of New Jersey repeats and realleges each and every allegation contained in paragraphs 1 through 120.

184.    Defendant's acts violate, and Plaintiff State of New Jersey is entitled to relief under, N.J.S.A. 56: 9-1 *et seq*., the New Jersey Antitrust Act.

185.    Plaintiff State of New Mexico repeats and realleges each and every allegation contained in paragraphs 1 through 120.

186.    Defendant's acts violate, and Plaintiff State of New Mexico is entitled to relief under, the New Mexico Antitrust Act, Section 57-1-1 *et seq*., N.M.S.A.1978 and the New Mexico Unfair Practices Act, Section 57-12-1 *et seq*., N.M.S.A. 1978.

187.    Plaintiff State of New York repeats and realleges each and every allegation contained in paragraphs 1 through 120.

188.    Defendant's acts violate, and Plaintiff State of New York is entitled to relief under, New York General Business Law § 340-347, 349 and also constitute fraudulent or illegal acts under New York Exec. Law § 63(12).

189.    Plaintiff State of North Carolina repeats and realleges each and every allegation contained in paragraphs 1 through 120.

190.    Defendant's acts violate, and Plaintiff State of North Carolina is entitled to relief under, N.C. Gen. Stat. §§ 75-1, 75-1.1, 75-2 and 75-2.1.

191.    Plaintiff State of North Dakota  repeats and realleges each and every allegation contained in paragraphs 1 through 120.

192.    Defendant's acts violate, and Plaintiff State of North Dakota is entitled to relief under, the North Dakota State Antitrust Act, N.D.C.C Sec. 51-08.1-01 *et seq.*, and North Dakota's Consumer Protection Act, N.D.C.C. Sec. 51-15-01, *et seq*.

193.    Plaintiff Commonwealth of the Northern Mariana Islands  repeats and realleges each and every allegation contained in paragraphs 1 through 120.

194.    Defendant's acts violate, and Plaintiff Commonwealth of the Northern Mariana Islands is entitled to relief under, the common law.

195.    Plaintiff State of Ohio repeats and realleges each and every allegation contained in paragraphs 1 through 120

196.    Defendant's acts violate, and Plaintiff State of Ohio is entitled to relief under, Ohio's Antitrust Law, Ohio Revised Code, § 109.81 and 1331.01, *et seq*., §§1345.02 and 1345.03 of Ohio's Consumer Sales Practices Act, Ohio Rev. Code § 1345.01, *et seq*., and the common law of Ohio.

197.    Plaintiff State of Oklahoma repeats and realleges each and every allegation contained in paragraphs 1 through 120.

198.    Defendant's act violate, and Plaintiff State of Oklahoma is entitled to relief under, the Oklahoma Antitrust Reform Act, 79 O.S. § 201 *et seq.*, and the Oklahoma Consumer Protection Act, 15 O.S. § 751, *et seq*.

199.    Plaintiff State of Oregon repeats and realleges each and every allegation contained in paragraphs 1 through 120.

200.    Defendant's act violate, and Plaintiff State of Oregon is entitled to relief under, the Oregon Antitrust Act, ORS 646.705, *et seq.*

201.    Plaintiff Commonwealth of Pennsylvania repeats and realleges each and every allegation contained in paragraphs 1 through 120.

202.    Defendant's acts violate, and Plaintiff Commonwealth of Pennsylvania is entitled to relief under, Pennsylvania common law doctrines against monopolies, fraudulent misrepresentation and unjust enrichment and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201, *et seq.*, and an action may be brought by the Attorney General and relief granted under 71 P.S. § 732-204 (c), 71 P.S. § 732-204 (d), 71 P.S. § 201-4, 201-4.1 and 201-8.

203.    Plaintiff Commonwealth of Puerto Rico repeats and realleges each and every allegation contained in paragraphs 1 through 120.

204.    Defendant's acts violate, and Plaintiff Commonwealth of Puerto Rico is entitled to relief under, Act No. 77 of June 25, 1964, "Act to Prohibit Monopolistic Practice and Protect Fair and Free Competition in Trade and Commerce", 10 P.R. Laws Ann. § 257-276, and Act No. 118 of June 25, 1971, "Class Suit for Consumers of Goods and Services", 32 P.R. Laws Ann. §

3341-3344.  The laws of the Commonwealth of Puerto Rico are included in the term "state law" as used in this complaint.

205.    Plaintiff State of Rhode Island repeats and realleges each and every allegation contained in paragraphs 1 through 120.

206.    Defendant's acts violate, and Plaintiff State of Rhode Island is entitled to relief under, Rhode Island Code of Laws § 6-36 *et seq.*

207.    Plaintiff State of South Carolina repeats and realleges each and every allegation contained in paragraphs 1 through 120.

208.    Defendant's acts violate, and Plaintiff State of South Carolina is entitled to relief under, South Carolina Unfair Trade Practices Act, § 39-5-10 *et seq.*

209.    Plaintiff State of South Dakota repeats and realleges each and every allegation contained in paragraphs 1 through 120.

210.    Defendant's acts violate, and Plaintiff State of South Dakota is entitled to relief under, South Dakota Codified Laws ch. 37-1.

211.    Plaintiff State of Tennessee repeats and realleges each and every allegation contained in paragraphs 1 through 120.

212.    Defendant's acts violate, and Plaintiff State of Tennessee is entitled to relief under, Tenn. Code Ann. sec. 47-25-101, *et seq.* and Tenn. Code Ann. sec. 47-18-101, *et seq*.

213.    Plaintiff State of Texas repeats and realleges each and every allegation contained in paragraphs 1 through 120.

214.    Defendant's acts violate, and Plaintiff State of Texas is entitled to relief under, Texas Business and Commerce Code § 15.01 *et seq.*

215.    Plaintiff State of Utah repeats and realleges each and every allegation contained in paragraphs 1 through 120.

216.    Defendant's acts violate, and Plaintiff State of Utah is entitled to relief under, the Utah Antitrust Act, Utah Code Ann. Sec. 76-10-911 *et seq.* and the common law of Utah.

217.    Plaintiff State of Vermont repeats and realleges each and every allegation contained in paragraphs 1 through 120.

218.    Defendant's acts violate, and Plaintiff State of Vermont is entitled to relief under, the Vermont Consumer Fraud Act, 9 Vermont Statutes Annotated, Chapter 63, and the common law of Vermont.

219.    Plaintiff State of Vermont repeats and realleges each and every allegation contained in paragraphs 1 through 120.

220    Defendant's acts violate, and Plaintiff Territory of American Samoa is entitled to relief under the common law.

221.    Plaintiff Territory of the United States Virgin Islands repeats and realleges each and every allegation contained in paragraphs 1 through 120.

222.    Defendant's acts violate, and Plaintiff Territory of the United States Virgin Islands is entitled to relief under, Territory of the United States Virgin Islands Code of Laws 11 V.I.C. § 1503 & 1507, *et seq.*

223.     Plaintiff Commonwealth of Virginia repeats and realleges each and every allegation contained in paragraphs 1 through 120.

224.     Defendant's acts violate, and Plaintiff Commonwealth of Virginia is entitled to relief under, the Virginia Antitrust Act, § 59.1-9.1, *et seq*., Va. Code Ann. 2001.  Sections 59.1-9.15(a) and 59.1-9.11 provide for civil penalties and reasonable attorney fees.

225.     Plaintiff State of Washington repeats and realleges each and every allegation contained in paragraphs 1 through 120.

226.     Defendant's acts violate, and Plaintiff State of Washington is entitled to relief under, Wash. Rev. Code 19.86 RCW.

227.     Plaintiff State of West Virginia repeats and realleges each and every allegation contained in paragraphs 1 through 120.

228.     Defendant's acts violate and Plaintiff State of West Virginia is entitled to relief under the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*

229.     Plaintiff State of Wisconsin repeats and realleges each and every allegation contained in paragraphs 1 through 120.

230.     Defendant's acts violate, and Plaintiff State of Wisconsin is entitled to relief under, § 133.03 Wis. Stats. and § 133.16-18 Wis. Stats.

231.     Plaintiff State of Wyoming repeats and realleges each and every allegation contained in paragraphs 1 through 120.

232.     Defendant's acts violate, and Plaintiff State of Wyoming is entitled to relief under, Wy. Stat. §§ 40-12-106 and 40-12-107, and Wy. Stat. Ann. § 40-12-105.

**PRAYER FOR RELIEF**

Accordingly, the Plaintiff States pray that this Court:

1.      Adjudge and decree that Bristol engaged in conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

2.      Adjudge and decree that Bristol engaged in conduct in violation of each of the state statutes and common law enumerated in this Complaint;

3.      Enjoin and restrain, pursuant to federal and state law, Bristol, its affiliates, assignees, subsidiaries, successors and transferees, and the officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from engaging in any conduct and from adopting any practice, plan, program or device having a similar purpose or effect to the anticompetitive actions set forth above;

4.      Award to Plaintiff States such other equitable relief, including, but not limited to, restitution and disgorgement, as the Court finds appropriate to redress Bristol's violations of state law;

5.      Award to the Plaintiff States all damages sustained by and permitted to be recovered by the States (as direct purchasers, assignees of direct purchasers, or as indirect purchasers) and on behalf or for the benefit of their consumers, and for all additional damages, penalties and other monetary relief provided by applicable law, including but not limited to treble damages;

6.      Award to each Plaintiff State the maximum civil penalties allowed by law;

7.      Award to each Plaintiff State its costs of this action, including

reasonable attorneys' fees, and where applicable, expert fees; and,

8.      Direct such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues triable of right by jury.

Dated: April 24, 2003

Respectfully submitted,

PLAINTIFF STATES:

STATE of OHIO
JIM PETRO
Attorney General

Alan Witten
Assistant Attorney General
Mitchell L. Gentile
Principal Attorney General
Beth A. Finnerty
Deputy Attorney General
Antitrust Section
140 East Town Street, 12th Floor
Columbus, OH  43215
Phone:  (614) 466-4328
Fax: (614) 995-0266

STATE of MARYLAND
CARMEN M. SHEPARD
Deputy Attorney General


_____
Meredyth Smith Andrus
Assistant Attorney General
Ellen S. Cooper
Chief, Antitrust Division
 200 St. Paul Street
Baltimore, MD 21202
Phone:  (410) 576-6470
Fax: (410) 576-7830

STATE of FLORIDA
CHARLES J. CRIST, JR.
Attorney General


_____
George LeMieux
Deputy Attorney General
Patricia A. Conners
Chief, Antitrust Section
Nicholas J Weilhammer
Craig S. Farringer
Assistant Attorneys General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Phone:  (850) 414-3600
Fax: (850) 488-9134

STATE of ALABAMA
BILL PRYOR
Attorney General
Jeff Long
Assistant Attorney General
Consumer Protection/Antitrust Division
11 South Union Street
Montgomery, AL  36130
Phone:  (334) 242-7333
Fax: (334) 242-2433

STATE of ALASKA
Gregg D. Renkes
Attorney General
Clyde E. Sniffen, Jr.
Assistant Attorney General
1031 W. 4th Avenue, Suite 200
Anchorage, AK  95501
Phone:  (907) 269-5100

STATE of ARIZONA
TERRY GODDARD
Attorney General
James P. Walsh
Antitrust Unit Chief
1275 West Washington Street
Phoenix, AZ 85007
Phone:  (602) 542-7752
Fax: (602) 542-9088

STATE of ARKANSAS
MIKE BEEBE
Attorney General
Teresa Brown
Deputy Attorney General
Public Protection Department
323 Center St., Ste. 200
Little Rock, AR 72201
Phone:  (501) 682-3561

STATE of CALIFORNIA
BILL LOCKYER
Attorney General
Peter Siggins
Chief Deputy Attorney General
Richard M. Frank
Chief Assistant Attorney General
Kathleen E. Foote
Acting Senior Assistant Attorney General
Barbara M. Motz
Supervising Deputy Attorney General
Paula Lauren Gibson
Deputy Attorney General

300 S. Spring Street
Suite 1702
Los Angeles, CA  90013
Phone:  (213) 897-0014

STATE of COLORADO
KEN SALAZAR
Attorney General
Devin M. Laiho
Assistant Attorney General
Maria E. Berkenkotter
First Assistant Attorney General
Consumer Protection Section
1525 Sherman Street, 5th Floor
Denver, Colorado 80203
Phone:  (303) 866-5079
Fax: (303) 866-5443

STATE of CONNECTICUT
RICHARD BLUMENTHAL
Attorney General
Steven M. Rutstein
Department Head, Antitrust Department
Arnold B. Feigin
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Phone:  (860) 808-5540
Fax: (860) 808-5585

STATE of DELAWARE
M. JANE BRADY
Attorney General
Michael Undorf
Deputy Attorney General
Department of Justice, Antitrust Unit
820 N. French Street, 6th floor
Wilmington, DE 19801
Phone:  (302) 577-5180
Fax: (302) 577-6630

DISTRICT of COLUMBIA
ARABELLA W. TEAL
Interim Corporation Counsel
Don Allen Resnikoff
Assistant Corporation Counsel
441 4th Street, N.W., Suite 450-N
Washington, D.C. 20001
Phone: (202) 727-4170
Fax: (202) 727-6546

STATE OF GEORGIA
THURBERT E. BAKER
Attorney General
Isaac Byrd
Deputy Attorney General
Sidney R. Barrett, Jr.
Senior Assistant Attorney General
40 Capitol Square, S.W.
Atlanta, GA  30334
Phone: (404) 656-3202
Fax: (404) 656-0677

TERRITORY OF GUAM
ROBERT H. KOMO
Attorney General, Acting
Suite 2-200E, Judicial Center Bldg.
120 West O'Brien Dr.
Hagatna, GU 96910
Phone:  (671) 475-3324
Fax: (671) 472-2493

STATE of HAWAII
MARK J. BENNETT
Attorney General
Deborah Day Emerson
Rodney I. Kimura
Michael L. Meaney
Deputy Attorneys General
425 Queen Street
Honolulu, Hawaii  96813
Phone:  (808) 586-1180

STATE of IDAHO
LAWRENCE G. WASDEN
Attorney General
Brett T. DeLange
Deputy Attorney General
Consumer Protection Unit
Office of the Attorney General
Len B. Jordan Building
650 W. State St., Lower Level
P. O. Box 83720
Boise, ID 83720-0010
Phone:  (208) 334-2424
Fax: (208) 334-2830

STATE of ILLINOIS
LISA MADIGAN
Attorney General
Robert W. Pratt
Chief, Antitrust Bureau
100 West Randolph St., 13th Floor
Chicago, IL 60601
Phone:  (312) 814-3722

STATE of INDIANA
STEVE CARTER
Attorney General
Terry Tolliver
Deputy Attorney General
302 West Washington St., IGCS 5th Floor
Indianapolis, IN  46204
Phone: (317) 233-3300
Fax:    (317) 233-4393

STATE of IOWA
THOMAS J. MILLER
Attorney General
Tam B. Ormiston
Deputy Attorney General
Layne Lindebak
Assistant Attorney General
John F. Dwyer, Attorney
Iowa Department of Justice
Hoover State Office Building
1305 East Walnut Street

Des Moines, Iowa 50319
Phone:  (515) 281-7054

STATE of KANSAS
PHILL KLINE
Attorney General
Rex G. Beasley
Assistant Attorney General
Shelley King
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Phone:  (785) 296-3751
Fax: (785) 291-3699

COMMONWEALTH of KENTUCKY
ALBERT B. CHANDLER III
Attorney General
David R. Vandeventer
Assistant Attorney General
Consumer Protection Division
1024 Capital Center Dr.
Frankfort, KY 40601
Phone:  (502) 696-5389

STATE of LOUISIANA
RICHARD P. IEYOUB
Attorney General
Jane Bishop Johnson
Assistant Attorney General
Louisiana Department of Justice
301 Main Street, Suite 1250
Baton Rouge, LA  70804
Phone:  (225) 342-2754
Fax: (225) 342-9637

STATE of MAINE
G. STEVEN ROWE
Attorney General
Francis Ackerman
Christina Moylan
Assistant Attorneys General

Six State House Station
Augusta, ME 04333
Phone:  (207) 626-8800
Fax: (207) 624-7730

COMMONWEALTH of MASSACHUSETTS
THOMAS F. REILLY
Attorney General
Judith M. Whiting
Assistant Attorney General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, MA 02108
Phone:  (617) 727-2200
Fax: (617) 727-5765

STATE of MICHIGAN
MIKE COX
Attorney General
Paul F. Novak
Michelle M. Rick
Assistant Attorneys General
Consumer Protection Division
Antitrust Section
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, MI  48913
Phone:  (517) 241-2060
Fax: (517) 335-1935

STATE of MINNESOTA
MIKE HATCH
Attorney General
Ann Beimdiek Kinsella
Julie A. Casserly
Assistant Attorneys General
1200 NCL Tower
445 Minnesota Street
St. Paul, Minnesota 55101-2130
Phone:  (651) 296-9412
Fax: (651) 282-5437

STATE OF MISSISSIPPI
MIKE MOORE
Attorney General
Sondra Simpson
Special Assistant Attorney General
Post Office Box 22947
Jackson, MS 39225
Phone:  (601) 359-4230

STATE OF MISSOURI
JEREMIAH W. (JAY) NIXON
Attorney General
Erwin O. Switzer
Special Chief Counsel
Wainwright State Office Building
111 North Seventh Street, Suite 204
St. Louis, MO 63101
Phone:  (314) 340-6816
Fax: (314) 340-7957

STATE of MONTANA
CORT JENSEN
Special Assistant Attorney General
Consumer Protection Office
Department of Administration
1219 8th Ave.
Helena, MT 59620
Phone: (406) 444-5439
Fax:  (406) 444-9680

STATE of NEBRASKA
JON BRUNING
Attorney General
Dale A. Comer
Assistant Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone:  (402) 471-2682
Fax: (402) 471-3835

STATE of NEVADA
BRIAN SANDOVAL
Attorney General

Timothy Hay
Chief Deputy Attorney General
1000 E. William Street, Suite 200
Carson City, NV 89701-3117
Phone: (775) 687-6300
Fax: (775) 687-6304

STATE of NEW HAMPSHIRE
PETER W. HEED
Attorney General
David A. Rienzo
Assistant Attorney General
Consumer Protection and Antitrust Bureau
33 Capitol Street
Concord, New Hampshire 03301
(603) 271-3643

STATE of NEW JERSEY
PETER C. HARVEY
Acting Attorney General
Robert J. Donaher
Richard J. Hughes Justice Complex
P. O. Box 085
Trenton, NJ 08625
Phone:  (609) 292-8740
Fax: (609) 984-7237

STATE of NEW MEXICO
PATRICIA A. MADRID
Attorney General
Deyonna Young
Assistant Attorney General
Special Consumer Projects Division
111 Lomas Boulevard NW, Suite 300
Albuquerque, New Mexico 87102
Phone:  (505) 222-9089
Fax: (505) 222-9006

STATE of NEW YORK
ELIOT SPITZER
Attorney General
Jay Himes (JH 7714)
Chief, Antitrust Bureau

Richard L. Schwartz (RS 7913)
John A. Ioannou (JI 8338)
Assistant Attorneys General
Antitrust Bureau
120 Broadway, Suite 26-01
New York, NY 10271
Phone:  (212) 416-8284, (212) 416-8268
Fax: (212) 416-6015, (212) 416-8475

STATE of NORTH CAROLINA
ROY A. COOPER, III
Attorney General
K.D. Sturgis
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Phone:  (919) 716-6000
Fax: (919) 716-6050

STATE of NORTH DAKOTA
WAYNE K. STENEHJEM
Attorney General
Todd A. Sattler
Assistant Attorney General
Consumer Protection and Antitrust Division
600 E. Boulevard Ave., Dept. 125
Bismarck, ND  58505-0040
Phone:  (701) 328-2811
Fax: (701) 328-3535

COMMONWEALTH of the
NORTHERN MARIANA ISLANDS
RAMONA V. MANGLONA
Attorney General
Brian R. Caldwell
Assistant Attorney General – Civil Division
Caller Box 10007, Capitol Hill
Saipan, MP 96950
Tel:  (670) 664-2338
Fax: (670) 664-2349

STATE of OKLAHOMA
W.A. DREW EDMONDSON
Attorney General
Julie A. Bays
Assistant Attorney General
Consumer Protection Unit
4545 N. Lincoln Boulevard, Suite 260
Oklahoma City, OK  73105
Phone:  (405) 521-4274
Fax: (405) 528-1867

STATE of OREGON
HARDY MYERS
Attorney General
Michelle Teed
Assistant Attorney General
Oregon Department of Justice
1162 Court Street, NE
Salem, OR  97310
Phone:  (503) 378-4732
Phone:  (503) 229-5725
Fax: (503) 378-5187

COMMONWEALTH of PENNSYLVANIA
D. MICHAEL FISHER
Attorney General
James A. Donahue III
Chief Deputy Attorney General
Andrea J. Myers
Tracy W. Wertz
Deputy Attorneys General
Antitrust Section
14th Floor, Strawberry Square
Harrisburg, PA 17120
Phone  (717) 787-4530
Fax: (717) 705-7110

COMMONWEALTH of PUERTO RICO
ANABELLE RODRIGUEZ
Secretary of Justice
Irma Rodriguez-Justiniano
Deputy Attorney General
Office of Monopolistic Affairs

PO Box 9020192
San Juan, PR 00902-0192
Phone:  (787) 723-9583
Fax: (787) 725-2475

STATE of RHODE ISLAND
PATRICK C. LYNCH
Attorney General
Maureen G. Glynn
Assistant Attorney General
  & Health Care Advocate
150 South Main Street
Providence, RI  02903
Phone:  (401) 274-4400
Fax: (401) 222-3015

STATE of SOUTH CAROLINA
HENRY D. McMASTER
Attorney General
C. Havird Jones, Jr.
Senior Assistant Attorney General
Office of the Attorney General
P. O. Box 11549
Columbia, SC 29211
Phone:  (803) 734-3680
Fax: (803) 734-3677

STATE OF SOUTH DAKOTA
LAWRENCE E. LONG
Attorney General
Jeffrey P. Hallem
Assistant Attorney General
500 E. Capitol
Pierre, South Dakota 57501-5070
Phone: (605) 773-3215
Fax: (605) 773-4106

STATE of TENNESSEE
PAUL G. SUMMERS
Attorney General
Michael K. Bassham
Senior Counsel
Antitrust Division

425 Fifth Avenue North
P. O. Box 20207
Nashville, TN 37202-0207
Phone:  (615) 741-6421
Fax:  (615) 741-1026

STATE of TEXAS
GREG ABBOTT
Attorney General
Barry R. McBee
First Assistant Attorney General
Jeffrey S. Boyd
Deputy Attorney General for Litigation
Paul D. Carmona
Chief, Consumer Protection Division
William J. Shieber
Assistant Attorney General
P. O. Box 12548
Austin, Texas 78711-2548
Phone:  (512) 463-1710
Fax: (512) 320-0975

STATE of UTAH
MARK L. SHURTLEFF
Attorney General
Wayne Klein
Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140872
Salt Lake City, UT 84114-0872
Phone:  (801) 366-0358

STATE of VERMONT
WILLIAM H. SORRELL
Attorney General
David Borsykowsky
Assistant Attorney General
Julie Brill
Assistant Attorney General and
Director of Antitrust Unit
109 State Street
Montpelier, VT 05609-1001
Phone:  (802) 828-1057

Fax: (802) 828-5341

TERRITORY of the UNITED STATES
VIRGIN ISLANDS
IVER A. STRIDIRON
Attorney General
48B-50C Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. VI 00802
Phone:  (340) 714-9610
Fax: (340) 774-9710

U. S. TERRITORY of AMERICAN SAMOA
FITI A. SUNIA
Attorney General
Martin McCarthy
Assistant Attorney General
P. O. Box 7
Pago Pago, American Samoa 96799
Phone:  011 (684) 633-4163
Fax: 011 (684) 633-1838

COMMONWEALTH of VIRGINIA
JERRY W. KILGORE
Attorney General
Sarah Oxenham Allen
Assistant Attorney General
Gregory C. Fleming
Assistant Attorney General
Antitrust and Consumer Litigation Section
900 East Main Street
Richmond, VA  23219
Phone:  (804) 786-2116
Fax: (804) 786-0122

STATE of WASHINGTON
CHRISTINE O. GREGOIRE
Attorney General
Donivan R. Irby
Assistant Attorney General
Tina E. Kondo
Senior Assistant Attorney General
Chief, Antitrust Division

900 Fourth Avenue, Suite 2000
Seattle, WA 98164
Phone:  (206) 464-7589

STATE of WEST VIRGINIA
DARRELL V. McGRAW, JR.
Attorney General
Jill L. Miles
Deputy Attorney General
Douglas L. Davis
Assistant Attorney General
Consumer Protection/Antitrust Division
Post Office Box 1789
Charleston, WV 25326
Phone:  (304) 558-8986
Fax: (304) 558-0184

STATE of WISCONSIN
PEGGY A. LAUTENSCHLAGER
Attorney General
Cynthia R. Hirsch
Assistant Attorney General
17 West Main Street
Madison, WI 53702
Phone:  (608) 266-3861
Fax: (608) 267-2778

STATE of WYOMING
PATRICK J. CRANK
Attorney General
N. Denise Burke
Senior Assistant Attorney General
Director, Medicaid Fraud Unit
123 Capitol Building
Cheyenne, WY 82002
Phone:  (307) 635-3597
Fax: (307) 635-6196

CERTIFICATE OF SERVICE

This is to certify that on April _____, 2003, the undersigned served copies of the First

Amended Complaint via U. S. mail to:

> **Cravath, Swaine & Moore**
> Evan R. Chesler
> Richard J. Stark
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019-7475
> (212) 474-1000
>
> **Fitzpatrick, Cella, Harper & Scinto**
> Thomas J. O'Connell
> Lawrence A. Stahl
> 1900 K Street N. W.
> Suite 1000
> Washington, D. C. 20006-1110
> (202) 530-1010

_____
Alan C. Witten

Dated: April_____2003