UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 **[LEAVE TO FILE GRANTED 7/22/08]** |
| THIS DOCUMENT RELATES TO: TRACK 1 TRIAL – DAMAGES | CIVIL ACTION: 01-CV-12257-PBS Judge Patti B. Saris |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF AN AWARD OF TREBLE
DAMAGES IN CONNECTION WITH THE CLASS 2/3 TRIAL**

# TABLE OF CONTENTS

**PAGE**

A.   AstraZeneca Committed Willful and Knowing Violations of
     Chapter 93A ....................................................................................................1

     1.   The Court has Already Rejected All of AstraZeneca's
          Arguments in Finding that AstraZeneca's Actions were Unfair ...............1

     2.   Dr. Hartman's Damages Methodology is Sound .........................................7

B.   BMS Committed Willful and Knowing Violations of Chapter 93A ......................9

     1.   BMS's So-Called List Price Defense does not Immunize BMS
          from Multiple Damages ..............................................................................9

     2.   The Court has Already Found that BMS's Spread Marketing
          was Not Isolated .......................................................................................13

     3.   The Court has Already Rejected the "Blame The Government"
          Defense .....................................................................................................14

     4.   Like AstraZeneca BMS Increased the Spread in the Face of
          Governmental/Congressional Concerns....................................................16

     5.   Treble Damages are also Necessary Because BMS has Caused
          Damages Well Beyond What it is Being Called upon to Account
          for Here .....................................................................................................17

C.   Chapter 93A Caselaw Mandates the Award of Multiple Damages Here .............18

D.   Conclusion .........................................................................................................21

- i -

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Cambridge Plating Co. v. Napco, Inc.*,
  85 F.3d 752 (1st Cir. 1996).........................................................................20

*Computer Sys. Eng'g, Inc. v. Qantel Corp.*,
  571 F. Supp. 1365 (D. Mass. 1983) ...........................................................18

*Datacomm Interface, Inc. v. Computerworld, Inc.*,
  489 N.E.2d 185 (Mass. 1986) .....................................................................20

*Helbros Watch Co. v. FTC*,
  310 F.2d 868 (D.C. Cir. 1962) ....................................................................11

*International Fid. Ins. Co. v. Wilson*,
  443 N.E.2d 1308 (Mass. 1983) ...................................................................18

*International Totalizing Sys., Inc. v. PepsiCo, Inc.*,
  560 N.E.2d 749 (Mass. App. Ct. 1990) ......................................................20

*Kansallis Fin. Ltd. v. Fern*,
  659 N.E.2d 731 (Mass. 1996) .....................................................................18

*McEvoy Travel Bureau, Inc. v. Norton Co.*,
  563 N.E.2d 188 (Mass. 1990) .....................................................................20

*Shaw v. Rodman Ford Truck Ctr., Inc.*,
  477 N.E.2d 413 (Mass. App. Ct. 1985) ......................................................20

*Terrie v. Crosbie*,
  1990 Mass. App. Div. 188, 1990 Mass. App. Div. Lexis 95
  (Mass. App. Ct. Nov. 5, 1990) ....................................................................20

*VMark Software, Inc. v. EMC Corp.*,
  642 N.E.2d 587 (Mass. App. Ct. 1994) ................................................19, 20

## STATUTES

16 C.F.R. § 233.3 .........................................................................................11

001534-16  188848 V1

AstraZeneca and BMS would have the Court believe that their violations of Chapter 93A were relatively innocent. But the Court's Trial Ruling and the record clearly demonstrate that both of these defendants committed willful or knowing violations of the statute such that an award of double or treble damages is appropriate.

## A.       AstraZeneca Committed Willful and Knowing Violations of Chapter 93A

AstraZeneca claims that it at all times acted in "good faith" under difficult competitive conditions and that, consequently, it should not have to pay multiple damages. As mitigating circumstances, AstraZeneca points to the government debates about AWP, AstraZeneca's provision of AMP data to Medicaid, the Managed Acquisition Program ("MAP"), the purported availability of IMS data for Zoladex and Zoladex's status as a lower cost alternative to Lupron. But none of these factors, placed in the proper context of AstraZeneca's intentional misconduct, are mitigating or exculpatory in any way. The Court's findings and the record evidence paint a much different picture, one of a company that intentionally and unscrupulously chose to game the system – just like TAP – and thereby caused substantial damages to Medicare Part B, its beneficiaries and insurers. AstraZeneca's knowing and willful conduct warrants the imposition of treble damages under Chapter 93A.

### 1.       The Court has Already Rejected All of AstraZeneca's Arguments in Finding that AstraZeneca's Actions were Unfair

#### a.       Spreads on Zoladex were unknown

AstraZeneca argues that the government did not intend AWP to be an average and that AMPs and IMS data were widely available, thus leading AstraZeneca to purportedly believe that the government and insurers knew about spreads. AstraZeneca Br. at 4-6. However, the Court appropriately ruled that AMP data is confidential to Medicaid and unavailable to TPPs and consumers, and that "IMS data did not provide a clear representation of spreads on Zoladex."

Trial Ruling at 162.  The Court has also ***explicitly*** rejected the assertions made by all Defendants

that the government knew about the large spreads:

> The manufacturers have emphasized that both the government and TPPs understood that AWP was a fictitious number and were not deceived by the published AWP.
>
> It is true that by the late 1990's most sophisticated TPPs and the government understood that AWP did not represent a true average of wholesale prices, but that there was a spread of 20 or 25 percent between the AWP and wholesale list (or acquisition) price. However, this knowledge does not exonerate defendants.
>
> I find that the defendants unfairly and deceptively caused to be published false AWPs (or their formulaic counterparts:  false WACs or WLPs) ***knowing that TPPs and government did not understand the extent of the mega-spreads between published prices and true average provider acquisition costs***.  Moreover, ***defendants knew that neither the government nor the TPPs could do much to change the AWP reimbursement benchmark because they were locked into the nationwide reimbursement scheme established by statute or contract***.
>
> Unscrupulously taking advantage of the flawed AWP system for Medicare reimbursement by establishing secret mega-spreads far beyond the standard industry markup was unethical and oppressive.  It caused real injuries to the insurers and the patients who were paying grossly inflated prices for critically important, often life-sustaining, drugs. . . .  This is exactly the sort of false and misleading information for which Chapter 93A is intended to provide relief.

Trial Ruling at 144-45 (emphasis added).

Another blow to AstraZeneca's assertion that the government knew was Steve

Buckanavage's testimony that AstraZeneca's activities were not disclosed to Medicare:

> Q:    Okay.  And another choice that you could have made, instead of playing the same game as Lupron, would have been going to the federal government and reporting what was going on the in the marketplace, and seeing if the federal government wanted to make some changes, correct?
>
> A:    That's a possibility.

> Q:    Not one that you pursued or your team recommended?
>
> A:    No, we didn't.[1]

Furthermore, the Court found that "[w]hile it is true that some data regarding the acquisition costs of Zoladex was leaking into the public domain, this did not mitigate the unfairness of using a grossly inflated AWP."  Trial Ruling at 163.  The Court also noted that "TPPs faced significant structural impediments to changing the reimbursement system for a single drug" and that, because Medicare reimbursement was statutorily based, "TPPs were stuck paying for Zoladex based on the inflated AWP provided by AstraZeneca."  *Id*. at 163.

Regarding AstraZeneca's provision of ASP-like data to some large TPPs, the Court found that "[i]nformation about the pricing of physician-administered drugs was far more opaque," that contracts required all pricing terms to be kept confidential, and  that, unlike the self-administered context where PBMs may have facilitated industry pricing knowledge, no such "industry experts" existed in the physician-administered world.  *Id*. at 25.  Therefore, while AstraZeneca may have provided limited ASP-like information to some entities, AstraZeneca knew it could provide that information without consequence and without effect on its physician customers because "knowledge about discounts given to bulk purchasers like HMS did not provide a transparent picture of average prices charge to other classes of trade like physicians or physician groups."  *Id*. (citations omitted).[2]

---

[1] Plaintiffs' Post-Trial Proposed Findings of Fact ("PFOF"), ¶ 22 (citing Trial Tr. Day 5 at 51).

[2] In support of its "government knowledge" claim, AstraZeneca also relies on HCFA's instructions to Grant Steffen, the Medicare carrier for the State of Colorado, to discontinue conducting surveys of actual acquisition cost. However, AstraZeneca ignores the contrary evidence in the record that HCFA gave Mr. Steffen this instruction because AstraZeneca heavily lobbied the government to keep AWP-based reimbursement in place.  *See* PFOF at 11 n.44.

The Court has already rejected AstraZeneca's defenses relating to knowledge of spreads. Those same defenses do not exonerate AstraZeneca from paying treble damages for its willful and knowing misconduct.

### b. The Managed Acquisition Program is not a mitigating circumstance

AstraZeneca asserts that the Court somehow wished to credit AstraZeneca for establishing the MAP and associated programs, which offered Zoladex to TPPs at prices not based on AWP.  However, when describing AstraZeneca's establishment of its MAP and affiliated programs, the Court found that "[i]n 1999 or 2000, . . . AstraZeneca decided not to continue marketing the MAP program because it feared a backlash from physicians."  Trial Ruling at 57 (citing PX 4024 and PX 4025).  Furthermore, the Court did *not* adopt AstraZeneca's bare assertion that "AstraZeneca affirmatively informed third-party payors of the discounted prices being paid by physicians, as well as the comparisons being made to the competing product."  AstraZeneca Br. at 6.  The Court merely noted that "***AstraZeneca says*** it discussed the spreads with TPPs to persuade TPPs to use this system."  *See* Trial Ruling at 162 (emphasis added).  The Court's findings with regard to the MAP program are therefore restricted to findings that AstraZeneca developed the program only to subsequently abandon it because it conflicted with its overall marketing plan to provide return to practice to physicians.[3]  These are not grounds to refuse to order treble damages.

---

[3] *See* PX 4024 at AZ0413740 (Oncology Contracting Director writing that "[t]hese types of transactions generally tend to upset the providers because of the deletion of a return to practice opportunity.  Historically, since the former Zeneca decided not to proactively offer such contracts (*i.e.*, Zoladex Managed Acquisition Program …. MAP) several years ago, we have decided NOT to pursue arrangements that shift the RTP away from the physicians."); PX 4025 at AZ0431325 ("[L]et me say that there is NO contract strategy currently in place being offered to MCOs!  This past summer, a decision was made internally by the product team not to pursue contracts with MCOs due to the concern that we might alienate our physicians in the community.").

- 4 -

###### c.      AstraZeneca marketed the spread "with gusto"

It is clear that the government was not aware of, and did not approve of, AstraZeneca's

spread marketing.  As the Court found, "AstraZeneca actively marketed the spread to physicians

by repeatedly emphasizing the 'Return to Practice' that could be obtained by prescribing

Zoladex."  *Id*. at 162 (citing "letters, emails, spreadsheets, and call notes from several years to

document this campaign to sell Zoladex based upon profitability"); *see also id.* at 54-55

(discussing "DO THE MATH!" return to practice letters sent to accounts and return to practice

spreadsheets utilized by sales representatives to demonstrate spreads).  And, as the Court

explained, AstraZeneca took these actions recognizing that it was "crossing over ethical or legal

boundaries":

> In the course of these actions, there was some concern at
> AstraZeneca that this spread marketing was crossing over ethical
> or legal boundaries.  In 1996, when AstraZeneca was proposing
> increasing the WAC and AWP while increasing discounts, an
> internal memo warned that the "challenge in this instance is to
> come up with a scenario which . . . minimizes any perceived risk
> from a regulatory/legal/public relations perspective."  (DX 2127 at
> AZ0024480.)  Similarly, another pricing strategy memo cautioned
> that "there is a possible, however likely, risk of a reaction from
> Medicare.  It is feasible that HCFA may see through this strategy
> and take offense."

*Id*. at 55.  Thus, AstraZeneca knew it was crossing the line and knew that the government, had it

been aware of AstraZeneca's manipulations and spread marketing, would disapprove.

Nonetheless, AstraZeneca plowed ahead with its "competitive response" to Lupron.

###### d.      In the face of government and congressional concern, AstraZeneca secretly increased the spreads

AstraZeneca increased the spreads at the same time the government was investigating the

AWP issue.  Thus, although Defendants put into evidence a series of government reports about

"excessive payment" spanning the period 1991 to 2003, AstraZeneca increased its spreads from

- 5 -

25% to 162% during the same time period those reports were issued.[4]  It did so while the OIG

was promulgating rules prohibiting return to practice marketing.

> e. **That Zoladex cost less than Lupron is not mitigating:  "one fraud does not excuse another"**

AstraZeneca's lower cost alternative argument (*see* AstraZeneca Br. at 7) fares no better.

As the Court has found, AstraZeneca made an affirmative choice to respond to Lupron by

enacting a "total return to practice" pricing and marketing strategy marked by offering discounts

to physicians while continuing to make increases in the WAC price and the corresponding

published AWP to the point where the AWP for Zoladex "was drifting farther and farther away

from the actual selling price of the drug."  Trial Ruling at 53.  Indeed, the Court deplored

AstraZeneca's conduct in, from 1996 through 1999, "continu[ing] to increase WAC and the

corresponding AWP such that beneficiaries and TPPs were forced to pay higher amounts despite

the falling sales price of Zoladex."  *Id*. at 161-62.  Thus, the Court hardly condoned

AstraZeneca's practices and instead was skeptical of AstraZeneca's rationalizations.  Moreover,

the Court deplored AstraZeneca's cynicism:  "Despite understanding that patients and payors

were paying for Zoladex based upon these inflated AWPs, ***AstraZeneca seemed unconcerned***."

*Id*. at 54 (emphasis added); *see also id*. 20 (finding that manufacturers, including AstraZeneca's

Steve Buckanavage, "understood well the harmful impact that publishing inflated AWPs had on

the elderly cancer patient.").  Ultimately, the Court concluded that

> ***one fraud does not excuse another***.  While AstraZeneca may
> initially have tried to do the right thing, it soon entered the fray by
> manipulating and marketing the spread with gusto.

*Id*. at 163 (emphasis added).

---

[4] Hartman Attachment G.1.c.

The Court also resoundingly condemned AstraZeneca's bad-faith maneuver to neutralize the government's attempt to lower costs in 1998:

> It is ***particularly troubling*** that AstraZeneca raised AWP in 1998 in order to ***torpedo*** Medicare's attempt to reign in costs by reducing reimbursement to 95% of AWP in the BBA.

*Id*. at 162 (emphasis added).  AstraZeneca also torpedoed the government's attempts to reduce costs by allowing the system to continue to be based on grossly inflated prices.  AstraZeneca took these actions, knowing that it would cost the government, insurers and individual patients more money.  PFOF, ¶¶ 28-29.[5]  This is precisely the type of intentional, knowing and just plain unethical conduct for which treble damages were crafted to penalize.

The Court "***easily***" found that AstraZeneca's conduct was unfair to consumers and TPPs.  Trial Ruling at 164.  Based on those same findings, it should be easy for the Court to award treble damages against AstraZeneca.  Indeed, Plaintiffs respectfully submit that the record evidence mandates such an award.

### 2.    Dr. Hartman's Damages Methodology is Sound

In what amounts to a motion to reconsider, AstraZeneca once again challenges Dr. Hartman's aggregate damages methodology.  AstraZeneca Br. at 8-10.  The Court has already rejected AstraZeneca's challenge on ***at least four occasions***:  (i) when it certified the Classes; (ii) in denying motions to strike Hartman during the trial; (iii) after the trial, in the Court's opinion (*see* Trial Ruling at 140:  "Given my adoption of Dr. Hartman's basic methodology for determining liability and damages, I further find that his calculation of aggregate damages for the class is sufficiently reliable and reject defendants' argument that

---

[5] *See*, *e.g.*, Trial Tr. Day 5 at 49 (Buckanavage) ("Q:  Well, you understood that the government reimbursed in the Medicare Part B formula based on AWP, correct?  A:  Yes, that's correct."); Brennan Dep. at 15:10-14 (Current CEO of AstraZeneca former President of AstraZeneca L.P. and now CEO of AstraZeneca PLC:  "Q. All right.  So now it is your understanding, right, that AWP was the benchmark for reimbursement under Medicare Part B for Zoladex, correct?  A. That's right, yes.").

aggregate damages are inappropriate on this record."); and (iv) in denying AstraZeneca's Motion *in Limine* to Exclude Testimony and Evidence Concerning Aggregate Damages filed prior to the AstraZeneca Class 1 trial.  There is no reason for the Court to reverse itself now.[6]

AstraZeneca next criticizes Dr. Hartman for relying on the McArdle *Health Affairs* article to support the conclusion that 60% of employer-sponsored supplemental insurance plans require beneficiaries to pay a 20% coinsurance.  AstraZeneca Br. at 9.  Tellingly, AstraZeneca does not submit any information, supported by expert opinion, rebutting this figure.  In any event, Hartman's reliance on McArdle is sound.  Originally, Dr. Hartman had been asked to calculate damages to Class 1 (consumers) defined to include only those Medicare beneficiaries *without* supplemental Medicare insurance who paid the 20% co-pay out-of-pocket.  Hartman was then asked to include in Class 1 those consumers *with* Medicare supplemental insurance who still had to pay a copay (20%) on the Medicare supplemental insurance covering the 20% Medicare coinsurance.  The damages involved on these units were originally part of Class 2 (TPPs paying the 20% coinsurance under Medicare supplemental).  Under this direction, Dr. Hartman pulled these damages out of Class 2 and allocated them into Class 1.  *See* Figure 2, page 43 of Hartman December 15, 2005 Declaration, Note D.

There is nothing arbitrary or prejudicial about this change.  It is a normal analytic refinement.  In fact, this refinement helps AstraZeneca because it removes those damages from the double or treble damage award.  A supplemental estimate of the number of insureds within Class 2 who were insured by plans with a 20% coinsurance requirement on Medicare supplemental payments was required in order to refine the calculations for Class 1 consumer

---

[6] AstraZeneca is simply rehashing its stale arguments about the necessity of undertaking individual damage inquiries rather than proceeding with the calculation of aggregate damages.  Its arguments have failed in the past, as this Court has decided.  Dr. Hartman uses standard methodologies and data to calculate aggregate Class-wide damages.  Dr. Hartman fully documented the sources for his yardstick analysis.  Yardstick analyses are standard in economics; the sources of his analysis are explicit and substantial.  The Court has found them relevant and reliable.

reimbursements subject to damages.  That estimate was provided by the survey research

conducted and reported by the McArdle, *et. al* article.  *Health Affairs* is a reliable journal, and

Dr. Berndt has published in this journal.  Rather than use an arbitrary number or guess,

Dr. Hartman looked to an estimate supported by survey work published in a peer-reviewed

journal article.

**B.      BMS Committed Willful and Knowing Violations of Chapter 93A**

**1.      BMS's So-Called List Price Defense does not Immunize BMS from Multiple
Damages**

As it did at trial, BMS continues to assert that, because it made some sales at list price, it

could not have committed a willful or knowing violation of Chapter 93A.  BMS Br. at 2-4.  The

defense plays no better here than it did at trial, where the Court largely rejected it.

**a.      BMS ignores its blatant manipulation of AWPs**

As an initial matter, BMS ignores the detailed findings that the Court made regarding

BMS's tight control of its AWPs and knowledge of their falsehood.  From directing the *Red

Book* to charge a certain markup factor, to its active involvement in approving AWP before

publication, "BMS knew, expected, and intended that when it reported a price, the publications

would predictably calculate an AWP that was 20 to 25 percent higher than WLP."  Trial Ruling

at 69-70.  And BMS knew that this AWP was false:  "BMS knew that AWP was an 'artificially

inflated number.'"  *Id*. at 74 (citing PX 195).  BMS's knowledge of inflated AWPs alone is

sufficient to establish a knowing and willing violation of Chapter 93A.  As the Court highlighted:

> Yet despite these understandings [that AWP was used as a
> reimbursement mechanism under both Medicare Part B and private
> reimbursement plans and that AWP was artificially inflated], there
> was very little concern, if any, about payors and cancer patients
> overpaying for their drugs.  Sales Representative Douglas Soule
> best summed up the attitude of BMS when he said, "it's just the
> system." . . . .  When asked if it ever bothered him that people were
> paying a percentage of a phony price, he finally responded, "No."

*Id*. at 74 (citations omitted).

The Court's conclusion is correct and hammers home the appropriateness of awarding treble damages against BMS.  BMS did not take any action to correct the AWPs that it and others were publishing for BMS Subject Drugs.[7]  Furthermore, BMS never provided any specific information to the Publishers about the level of discounts offered on BMS oncology products.[8]  Instead, BMS was content to let Medicare and private insurers rely on its false AWPs, even though BMS viewed AWP as an "artificially inflated number" (PX 195) that "can confuse the understanding of pricing within the US pharmaceutical system" (PX 196).  Indeed, BMS recognized that it "need[ed]to be wary of using AWPs *because the name is misleading*," *id*., yet BMS itself continued to publish AWPs.  (Emphasis added.)  Moreover, Frank Pasqualone, Senior Vice President of BMS Oncology, testified that BMS Oncology sales and marketing operations never considered the impact of AWPs on Medicare beneficiaries, notwithstanding BMS's knowledge that 20 percent co-pays were based on AWP.[9]  He also had no qualms about causing fictitious AWPs to be published for BMS Subject Drugs.[10]

BMS was not required to volunteer its WLPs to pricing compendia.  But once BMS chose to do so – knowing fully that the resulting AWPs were "artificially inflated," that payors would be reimbursing at those inflated prices and that AWP can confuse the understanding of pricing within the US pharmaceutical system – BMS became obligated to ensure that its representations were accurate.  BMS used list prices to set up AWPs, but it did not use list prices to cause the reporting of lower AWPs when it offered mega price cuts on its products, which widened the

---

[7] Emblematic of BMS's disdain for the truth, prior to directing the Publishers to use a 25% mark-up factor on BMS oncology drugs, Ms. Kaszuba and her department conducted *no* research to determine that wholesalers in fact were marking up BMS oncology drugs by 25%.  Trial. Tr. Day 4 at 65 (Kaszuba).

[8] Trial Tr. Day 4 at 130-31 (Kaszuba).

[9] Trial Tr. Day 14 at 14 (Pasqualone).

[10] Trial Tr. Day 14 at 34-36 (Pasqualone).

- 10 -

spreads well beyond what the market had come to expect – even though BMS could have reported an accurate AWP in addition to its WLP.  The reason it did not:  revenues would have dropped.[11]  Had BMS done so, AWP-based reimbursements would have been dramatically lower.[12]

> **b.     The FTC pricing guidelines that BMS violated were well established**

BMS also contends that it could not foresee that its list pricing policies might have violated FTC Guidelines.  BMS Br. at 3.  This is untrue.  Again, BMS itself acknowledged internally that AWPs are misleading and "can confuse the understanding of pricing within the US pharmaceutical system."  PX 196.  BMS also well knew that Medicare and private health insurers relied upon the BMS AWPs for reimbursement purposes.[13]  Yet, BMS continued to control AWPs, itself publish AWPs, all while keeping contract prices strictly confidential.  Moreover, the FTC rule cited by the Court for the proposition that list prices must correspond to prices at which a substantial number of sales are made, has been in effect for over 40 years (*see* 16 C.F.R. § 233.3), as well as the FTC ruling that prohibited "fictitious pricing" occurs where 40% of all sales are made at prices substantially less than list.  *Helbros Watch Co. v. FTC*, 310 F.2d 868, 870 (D.C. Cir. 1962).  Thus, not only can BMS not claim surprise, courts have imposed liability on defendants for making sales at list in percentages much lower than the conservative 50% benchmark chosen by the Court.

---

[11] Trial Tr. Day 5 at 165 (Marré); Trial Tr. Day 15 at 38 (Bell).

[12] Trial Tr. Day 14 at 33-34 (Pasqualone).

[13] Answer, ¶ 3 (Dkt. No. 800); *see also* PX 196 (BMS/AWP/01088191-202) (recognizing that Managed Health Care companies and Medicare reimbursed based on AWP); Trial Tr. Day 5 at 142 (Marré); Marré Trial Aff., ¶ 10; Trial Tr. Day 4 at 62-64 (Kaszuba); Akscin Dep. at 26-27; Ihling Dep. at 90-93, 117-18.

- 11 -

### c. The Court has already found that, for the time periods during which liability was imposed, BMS made few sales at list

Turning to an examination of specific drugs, the Court has cited the plunging ASP for Taxol, which dropped by 25-50% during 2001, the first year that it faced generic competition. Trial Ruling at 79. Spreads were over 500% by 2002, with BMS providing some discounts as high as 80% off WLP. *Id.* As the Court acknowledged, "in 2002, hardly anyone was paying the list price" with less than 0.5% of sales within 5% of WLP and over 46% of sales made at a price less than half of WLP. *Id.* at 79. Taxol is not a case where substantial sales were being made at list during the periods for which the Court has found liability (2001-2002). The WLP for Taxol was a complete ruse, and the corresponding AWP a total fiction, with very detrimental impacts on Medicare Part B and its beneficiaries. Indeed, the impact is particularly significant vis-à-vis an expensive drug like Taxol. For instance, BMS sales representative Doug Soule confirmed that the AWP-based Medicare co-pay for six cycles of Taxol to treat breast cancer approximates $1,000.[14]

The story line was the same for other drugs. For Vepesid injectable, the Court found discounts as high as 94% off WLP and mega-spreads of 1000%, with virtually all sales, excluding 2000, at prices lower than 50% of WLP. Trial Ruling at 83-84. For injectable Cytoxan, spreads ranged from 100% to 500%, with the majority of sales after 1995 made at prices well less than 50% of WLP, "and in certain years, as little as 6% of Cytoxan sales were made within 5% of WLP." *Id.* at 86. Likewise, only 6% to 15% of Blenoxane sales were made within 5% of WLP, with discounts from 1996 forward resulting in spreads of over 100%. *Id.* at 87. And for Rubex, discounts were as high as 94% off of WLP, with spreads at over 400%. *Id.* at 89. The Court was appropriately shocked by the mega-spreads on Cytoxan and Vepesid:

---

[14] Trial Tr. Day 16 at 72-73 (Soule).

> After hearing all the evidence in this trial, I find that these mega-spreads are shocking and on their own prove a sufficient degree of unfairness and deception to impose Chapter 93A liability because they are so oppressive and injurious to the insurers and patients who must pay such inflated prices.

*Id*. at 172.

Thus, the concrete conclusions ***already*** reached by the Court are directly at odds with the picture that BMS wishes to portray of a company merely maintaining a WLP at which substantial sales were made.  For the periods for which the Court has found liability, BMS was not making sales anywhere near WLP.  As the Court summarized:

> For list prices, like WLP, it is expected that there may be some discounting, but that most customers are paying at or about the list price.  . . . .  [W]hen discounting became so prevalent that the list price no longer reflected the price that most people paid, it became unfair and deceptive to continue publishing such a list price upon which the AWP is based.

*Id*. at 168.

BMS did not innocently violate Chapter 93A.  Nor did it do so through dumb luck.  BMS knowingly wrought substantial damage on the Medicare program, Medicare beneficiaries and the private insurance markets.

### 2.     The Court has Already Found that BMS's Spread Marketing was Not Isolated

BMS contends that it did not market the spread, BMS Br. at 4-5, but the Court has already concluded – correctly – that "plaintiffs presented ***substantial*** evidence suggesting that BMS was marketing the spread" even though BMS had a policy against it.  Trial Ruling at 73-74 (emphasis added).  The Court cited compelling evidence that BMS educated its OTN and BMS sales representatives about the importance of reimbursement to office-based oncologists ("OBOs").  *Id*. at 72-73.  And for all drugs at issue, the Court highlighted in particular the OTN "Cost Differential" report which would calculate spreads.  *Id*. at 74.  Incredibly, BMS offers as a

- 13 -

*mitigating* circumstance the fact that OTN offered the spread calculator to all customers for use with any company's drugs, and not just the BMS Subject Drugs.  BMS Br. at 4-5.  Far from mitigating, this conduct **heightens** the willful and knowing nature of the violation since OTN was contributing to the damage caused by all **other** Defendants in addition to BMS.  And linking that conduct to BMS is easy, as the Court has found that BMS and OTN had a very close relationship.  Trial Ruling at 67-68.

The Court also cited to widespread instances of specific spread marketing for Paraplatin and Taxol.  *Id.* at 76-77.  For instance, "BMS carefully educated its sales force on the reimbursement system, the existence of the spread, and the subsequent profitability for a doctor administering Taxol. . . .  Sales representatives were therefore fully prepared to discus the spread and profitability."  *Id.* at 80 (citing PX 221, 222, 225 & Keighley Dep.).[15]  The Court then found that sales call notes reflected pervasive spread marketing for Taxol.  *Id.* at 80-82.

In sum, BMS's spread marketing was not limited to a few, isolated instances, as BMS would have us believe.  As the Court has already concluded, it was pervasive, with management educating the sales force on spreads and the sales force translating those signals into action. BMS's violations of Chapter 93A were done willfully and knowingly.

### 3.     The Court has Already Rejected the "Blame The Government" Defense

Like AstraZeneca, BMS proclaims that it believed that HCFA was aware of the mega-spreads and that "the decision of manufacturers to continue to compete within the constraints of a system created by others is hardly evidence of willfulness."  BMS Br. at 6-7.  As noted above, the Court has already **explicitly** rejected this defense, explaining that all Defendants caused false AWPs to be published "**knowing that TPPs and government did not understand the extent of**

---

[15] Recall, the sales mantra of OTN "Top Three OBO Concerns – Reimbursement Today, Reimbursement Tomorrow, Reimbursement!"

*the mega-spreads between published prices and true average provider acquisition costs*."  Trial

Ruling at 144-45 (emphasis added).

Furthermore, if the federal government knew, why did BMS keep its contract pricing

secret?  As Senior Vice President of BMS Oncology Frank Pasqualone confirmed, even though

he was aware of OIG concerns about Medicare beneficiaries making potentially excessive

payments for some drugs, BMS never provided confidential average sales price data for BMS

drugs to Congress in reaction to that concern.[16]  Indeed, in 1997, BMS lobbied the federal

government to maintain AWP-based reimbursement for Part B drugs:

> Continued Medicare Part B Battle.  This past year, we worked closely with
> Oncology on the Medicare Part B Reimbursement Issue with a very
> favorable outcome (instead of Oncology drug reimbursement being based
> on actual acquisition cost, which was proposed by the Administration,
> reimbursement will be based on 95% of the AWP.  While this was a major
> success, the 95% number could be easily lowered in subsequent sessions
> of Congress.  At the same time, Oncologists are enjoying larger margins
> on generic oncolytics, which gives them strong incentives to use generics
> instead of branded products.  We need to actively manage this issue.[17]

During 1992, when Congress was evaluating whether to amend the Medicare

reimbursement statute, BMS actively sought to *mislead* the federal government about the actual

prices that physicians were paying for BMS Part B drugs.  As BMS explained to a physician in

an oncology-hematology medical group:

> The earliest draft of these regulations – and even the President's proposed
> budget for 1992 – would have set the drug allowable at 15 percent <u>below</u>
> AWP.  We were as active as possible to change this very low level, which
> would ideally have been set above AWP.  Included in our efforts was a
> formal meeting with the Inspector General's staff, which was evaluating
> the proposed regulations.  There we outlined our understanding of the fact
> that most oncologists and hematologists would not be able to procure
> cancer chemotherapy products at a lower payment level.  We know that

---

[16] Trial Tr. Day 14 at 26 (Pasqualone).

[17] PFOF 135 (citing PX 201).  The memo closes with a request to add personnel to the Policy Department given that "[a]ll of these issues have huge financial implications for Bristol-Myers Squibb."  *Id.*

similar strong arguments were made at the Health Care Financing
Administration (HCFA) and on Capitol Hill.[18]

Despite emphasizing to the federal government that most oncologists could not purchase drugs at
less than AWP, in the very next paragraph of the letter, BMS explained that, in fact, "all AWPs
listed are higher than the price at which Bristol-Myers pharmaceuticals can be purchased
directly." *Id.* Thus, far from HCFA understanding BMS's actual sales prices, the evidence
demonstrates that, from early on, BMS was telling government officials that discounts were not
readily available.

As the Court has already concluded, "[t]hroughout the class period, the pharmaceutical
industry understood that if the size of the spreads and the marketing of the spreads became
public, a public relations nightmare would ensue. As such, the manufacturers insisted on
confidentiality in physician contracts and lobbied to undermine government surveys." Trial
Ruling at 147. HCFA was not aware of the mega-spreads and was not aware of BMS's spread
marketing. The Court should quickly reject BMS's attempt to resurrect the long-dead
"government knowledge" defense.

4.   **Like AstraZeneca, BMS Increased the Spread in the Face of
Governmental/Congressional Concerns**

And like AstraZeneca, BMS was aware of a stream of governmental/congressional
concerns yet it chose to create mega spreads anyway. *See*, *e.g.*, *Taxol* spread in 2001-2002
increases to 128%. And its sales force, either knowing or ignoring the impact on a typical breast
cancer patient, marketed the new Taxol spread anyway. *See* PFOF ¶ 162.

---

[18] PFOF 136 (citing PX 4027 at 0403272).

**5.     Treble Damages are also Necessary Because BMS has Caused Damages Well Beyond What it is Being Called upon to Account for Here**

The Court has made a global finding of causation worth repeating here: "Several pharmaceutical witnesses confirmed causation by testifying that they knew that TPPs and consumers were paying more for a drug every time the AWP was raised. Plaintiffs' damages were not only foreseeable, defendants were well aware of them throughout the class period." Trial Ruling at 148. Yet, as the Court has emphasized, it "was remarkable . . . how few of the pharmaceutical witnesses at trial were concerned about the impact of an inflated AWP on old and sick people making co-payments based on a percentage of AWP." *Id*. at 22.

The damages that BMS has caused are far-reaching, yet, even under the Court's liability ruling here, BMS is not being held fully responsible for the damages it wrought. As the Court recognized, had BMS "reported a true AWP for its branded multi-source drugs, Medicare would have reimbursed based on that branded drug's AWP, rather than the inflated median, and plaintiffs' would have paid less. . . . Thus, when BMS reported an inflated AWP for a branded multi-source drug, it caused a higher reimbursement rate to be used. ***This resulted in injury to every plaintiff who purchased <u>any</u> version of its multi-source drug, regardless of the manufacturer.***" *Id.* at 152 (footnote omitted) (emphasis added). Nonetheless, the Court is not awarding damages against BMS for raising the reimbursements paid for all other drugs under the same J-Code as the BMS drug. In light of this undisputed fact, it would be an injustice ***not*** to award treble damages against BMS. The damages that it has caused go well beyond just the BMS drugs at issue.

- 17 -

### C.        Chapter 93A Caselaw Mandates the Award of Multiple Damages Here

AstraZeneca urges a standard for the award of multiple damages that is too stringent. *See* AstraZeneca Br. at 3.[19]  An award of multiple damages under Chapter 93A can be made when the defendant knew that facts represented were not true (the "knowing" prong) or where representations were made in "willful disregard for truth or falsity of the fact represented" (the "willful" prong). *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1374-75 (D. Mass. 1983).  To be sure, "a higher degree of culpability than that sufficient to ground simple liability" must exist before awarding multiple damages, *Kansallis Fin. Ltd. v. Fern*, 659 N.E.2d 731, 738 (Mass. 1996), so that those "who have committed relatively innocent violations of the statute's substantive provisions" are not sanctioned. *International Fid. Ins. Co. v. Wilson*, 443 N.E.2d 1308, 1375 (Mass. 1983).

As the Court has already recognized, a higher degree of culpability exists here.  Again, the Court has used strong language to condemn these Defendants' actions (as it should), calling their conduct "unscrupulous[]", "unethical," "oppressive," "egregious" and "particularly outrageous and unethical."  *See* Trial Ruling at 145-46.  The Court has found that Defendants were well aware that they gamed a system into which insurers and their beneficiaries were locked, *id*. at 144, 146, and that Defendants "well understood" and "knew" that TPPs and sick patients were paying more for drugs as a result of Defendants' scheme.  *Id*. at 147-48.  These Defendants did not commit "relatively innocent violations," *see International Fid. Ins. Co. v. Wilson*, 443 N.E.2d at 1375, and instead devised and enacted a plan to increase the sales of their drugs unethically, causing substantial damage.

---

[19] For its part, BMS understandably ignores any discussion of case law interpreting willful or knowing violations of Chapter 93A.

Furthermore, the Court's findings go well beyond those necessary to find liability under Chapter 93A.  As the court explained in *VMark Software, Inc. v. EMC Corp.*, 642 N.E.2d 587 (Mass. App. Ct. 1994), "[t]o be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness."  *Id*. at 595.  Yet the Court's careful choice of words to condemn Defendants' conduct shows that the Court found that conduct to be of "antiheroic proportions" – that is, the degree of misconduct was greater than that necessary to meet the bare minimum requirements of a violation of Chapter 93A.  Defendants were simply callous.  *See*, *e.g.*, Trial Ruling at 22 ("What was remarkable . . . was how few of the pharmaceutical witnesses at trial were concerned about the impact of an inflated AWP on old and sick people making co-payments based on a percentage of AWP."); *id*. at 55 (Court finds that AstraZeneca marketed the spread even though it acknowledged internally that doing so would "cross[] over ethical or legal boundaries"); *see also id*. at 20 (finding that manufacturers, including AstraZeneca's Steve Buckanavage, "understood well the harmful impact that publishing inflated AWPs had on the elderly cancer patient."); *id*. at 74 (finding that there was very little concern, if any, at BMS about payors and cancer patients overpaying for their drugs); *id*. at 176 (Warrick continued its practice of creating mega-spreads "despite knowing that patients were overpaying for the drug").  Consequently, treble damages are due.

AstraZeneca's cases do not help it.  This is not a case of "dogged bumbling" by a company that had a good faith belief that its product would work and made continuing efforts to correct the software's shortcomings, as in *VMark Software, Inc. v. EMC Corp.*, 642 N.E.2d at

595-96,[20] or a case where willful or intentional conduct was absent, *International Totalizing Sys., Inc. v. PepsiCo, Inc.*, 560 N.E.2d 749, 757 (Mass. App. Ct. 1990). Nor is this a "marginal[]" case of willful repudiation of warranty where the defendant did not stand to profit by its actions as in *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 770 (1st Cir. 1996).[21] Again, at issue here is intentional conduct that Defendants knew would harm others.

As Plaintiffs highlighted in their opening brief, courts have awarded multiple damages to sanction conduct much less egregious and of more limited effect than the conduct at issue here. *See Qantel*, 571 F. Supp. at 1372, 1377 (misrepresentations regarding software in a transaction between two commercial entities); *Shaw v. Rodman Ford Truck Ctr., Inc.*, 477 N.E.2d 413, 413 (Mass. App. Ct. 1985) (misrepresentations in private transaction relating to the sale of a truck); *Terrie v. Crosbie*, 1990 Mass. App. Div. 188, 189, 1990 Mass. App. Div. Lexis 95, at *5 (Mass. App. Ct. Nov. 5, 1990) (misrepresentations relating to flooring of home in private transaction); *see also McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E.2d 188 (Mass. 1990) (awarding double damages in dispute between two business involving misrepresentations made in the process of contracting); *Datacomm Interface, Inc. v. Computerworld, Inc.*, 489 N.E.2d 185 (Mass. 1986) (misrepresentations made in unfair competition action between two commercial entities). If multiple damages were warranted in these circumstances, which included isolated business transactions, such damages are certainly appropriate here given the level of willful and knowing conduct that caused damages nationwide.

---

[20] *See also id.* at 596 ("As a seasoned user of computer systems . . . [plaintiff] had to have realized that such complex, customized technology typically requires a period of adjustment and 'debugging' after delivery to perfect.").

[21] AstraZeneca also argues that citing to multiple damages awards in cases involving consumers is unhelpful, AstraZeneca Br. at 4 n.1, yet the standards governing such awards are the same whether the plaintiffs at issue are consumers or businesses. Furthermore, the seminal case in this District awarded double damages in a dispute between two commercial entities involving misrepresentations associated with a software product. *Qantel*, 571 F. Supp. at 1378.

- 20 -

**D.      Conclusion**

Nothing in the BMS or AstraZeneca briefs detracts from the Court's omnibus finding that these Defendants' actions were "egregious," that they "unscrupulously took advantage of [the] flawed AWP system," and caused substantial injuries to the government and all Class Members. Trial Ruling at 5.  The level of Defendants' culpability in the Court's own words is thus higher than merely making a finding of unfairness under Chapter 93A, and the Court's ruling more than justifies a follow-on finding that Defendants' conduct was knowing and willful for purposes of awarding treble damages.  For the foregoing reasons and for those set forth in Plaintiffs' opening memorandum, Plaintiffs respectfully request that the Court treble the amount of damages awarded against Track 1 Defendants AstraZeneca, BMS and Warrick.


DATED:  August 13, 2007.                    By___/s/ Steve W. Berman_____
                                                 Thomas M. Sobol (BBO#471770)
                                                 Edward Notargiacomo (BBO#567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

                                            **LIAISON COUNSEL**

                                            Steve W. Berman
                                            Sean R. Matt
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Elizabeth Fegan
                                            Hagens Berman Sobol Shapiro LLP
                                            820 North Boulevard, Suite B
                                            Oak Park, IL  60302
                                            Telephone: (708) 776-5600
                                            Facsimile: (708) 776-5601

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  188848 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

      I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 13, 2007, I caused copies of **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF AN AWARD OF TREBLE DAMAGES IN CONNECTION WITH THE CLASS 2/3 TRIAL** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

                    **/s/ Steve W. Berman**
                    Steve W. Berman

001534-16  188848 V1