1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     _____

4     IN RE:  PHARMACEUTICAL
      INDUSTRY AVERAGE WHOLESALE
5     PRICE LITIGATION,              Civil Action
                                     No. 01-12257-PBS
6                                    MDL No. 1456

7                                    July 24, 2008, 3:55p.m.
      _____
8

9

10                        TRANSCRIPT OF

11          MOTION FOR CERTIFICATION OF APPEALABILITY

12           BEFORE THE HONORABLE PATTI B. SARIS

13             UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                 1 COURTHOUSE WAY

16                BOSTON, MA   02210

17

18

19

20                DEBRA M. JOYCE, RMR, CRR
21                Official Court Reporter
             John J. Moakley U.S. Courthouse
22             1 Courthouse Way, Room 5204
                   Boston, MA  02210
23                   617-737-4410

24

25

```
 1   APPEARANCES:

 2   FOR THE DEFENDANTS:

 3   JAMES R. DALY, ESQ.
     Jones Day
 4   77 West Wacker
     Chicago, IL  60601-1692
 5   312-782-3939

 6

 7   FOR THE UNITED STATES OF AMERICA:

 8   GEORGE B. HENDERSON, ESQ.
     BARBARA HEALY SMITH, ESQ.
 9   United States Attorney's Office
     1 Courthouse Way
10   Suite 9200
     Boston, MA 02210
11   617-748-3272

12   GEJAA T. GOBENA, ESQ.
     United States Department of Justice
13   601 D Street NW
     Patrick Henry Building, Room 9028
14   Washington, DC 20004
     202-307-1088
15
     ANN M. ST. PETER-GRIFFITH, ESQ.
16   United States Attorney's Office
     99 N.E. Fourth Street
17   Miami, FL  33132
     305-961-9419
18
     JUSTIN DRAYCOTT, ESQ.
19   United States Department of Justice
     P.O. Box 261
20   Ben Franklin Station
     Washington, DC  20044
21   202-305-9300

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2          (The following proceedings were held in open
 3  court before the Honorable Patti B. Saris, United States
 4  District Judge, United States District Court, District
 5  of Massachusetts, at the John J. Moakley United States
 6  Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
 7  July 23, 2008.)
 8          THE COURT:  Now, on the deliberative process
 9  privilege, who's arguing that?
10          MR. HENDERSON:  Mr. Gobena will argue.
11          THE COURT:  And you're for Abbott?
12          MR. DALY:  Yes, judge.
13          THE COURT:  Here's the issue.  I did not fully
14  understand what the dispute was until I read the request
15  for interlocutory appeal.  Maybe I missed it in the
16  earlier papers.  I went back and read them.  I think you
17  all didn't tee it up for me as much as I needed in order
18  to understand it.  So can I back up for a minute?
19          I've already got seven years under my belt on
20  this case, so I understand a lot of things or think I
21  understand a lot of things.
22          In the first trial that I held, which did not
23  involve the United States, so it's not binding on you,
24  but in the first trial, the plaintiffs, the defense, the
25  independent expert, and every expert in that room agreed
```

1    to something called the 30 percent yardstick.  Everybody

2    agreed that the whole world knew, the the government and

3    industry, that AWP did not equal average wholesale price

4    did not equal actual acquisition cost.  What they all

5    said was that there was a built-in buffer zone, for want

6    of a better word, to help subsidize for inadequate fees

7    to doctors for administration of the drugs and, to some

8    extent, the same was true with pharmacies.  No one -- as

9    I was told, that the entire world believed that AWP --

10   that's not accurate.  No sophisticated player in the

11   entire world, some of the third-party payers, the little

12   ones did, but no sophisticated party in the health care

13   world believed that AWP equaled actual acquisition cost.

14       What was the whole dispute in my first seven

15   years of this case were these, what I will call, mega

16   spreads, these huge spreads where there was never any

17   good information that the government or the third-party

18   payers, certainly not the consumers, understood how big

19   the spread had become.

20       So now, as I'm understanding it -- and I didn't

21   understand it until the request for interlocutory

22   appeal, I just want to make sure I'm understanding --

23   the government's taking the position I was wrong or that

24   everybody in the first trial was wrong, and that you

25   didn't know about or acquiesce in or understand that

PDF created with pdfFactory trial version www.pdffactory.com

1    there was at least a 20 to 30 percent spread, you know,

2    take your pick.

3             MR. GOBENA:  I think our position is basically

4    this:  There are reports out there, as your Honor is

5    well aware of, where there are studies done, you know,

6    of whether acquisition cost -- whether AWP reflected AWP

7    cost in certain circumstances based on certain limited

8    bits of information that was accumulated, whether by OIG

9    or whether by CMS.

10            I can't stand here today and represent to you,

11   you know, that the government knew what the spread was

12   in every single drug.  And our case really isn't about

13   that.  Our case is about what the particular spreads

14   were on drugs at issue --

15            THE COURT:  No, but are you claiming as damages

16   everything that's different from actual acquisition

17   cost?  Are you building in the 30 percent yardstick?

18            MR. GOBENA:  I don't believe we -- I don't

19   believe we built in the 30 percent yardstick, but let

20   me --

21            THE COURT:  Their argument to me, which was

22   incredibly persuasive when I read it, instead of the

23   broad brush, we're entitled to everything in the world.

24   They were very focused this time around, and they said

25   you are claiming as damages -- do I have this

PDF created with pdfFactory trial version www.pdffactory.com

1  correctly -- every amount of money that -- above actual

2  acquisition cost.  And if that's the case, your

3  knowledge becomes paramount; and therefore, when you go

4  through the balancing on the deliberative process

5  privilege, my balance comes out different.

6          And I actually called Judge Bowler because I was

7  so taken by this.  And I said, was this pressed before

8  you?  And she said, no, this particular argument wasn't.

9  I went back and read the papers, actually, about spreads

10  in general.

11          I just want to make sure I'm understanding this.

12  You are not conceding the 30 percent yardstick.  That's

13  fair, you're allowed to do that.  But then they're

14  allowed to discovery to understand it better.

15          MR. GOBENA:  Well, with respect to their

16  particular drugs or --

17          THE COURT:  No, in general.

18          MR. GOBENA:  Across the board?

19          THE COURT:  Because it was well-known in the

20  industry, at least I made those findings that are up on

21  appeal right now -- actually, that's one of the few

22  things that's not disputed, that everyone in government

23  and industry knew that AWP did not equal the actual

24  acquisition cost by the providers.

25          MR. GOBENA:  Well, your Honor, I think this is

```
 1    more of sort of a damages question, because -- in some

 2    respects -- sorry.

 3          THE COURT:  It's not just a damages issue,

 4    it's -- let's -- I don't even know what the spreads are

 5    on their drugs, but if they're like the spreads on the

 6    drugs I've dealt with before, they vary by quarter, they

 7    vary by NDC -- I don't know if that's true here, too, I

 8    haven't done this, I'm not in the weeds yet -- but it

 9    actually mattered a lot in the last trial as to whether

10    or not you counted it.

11          Now, I have another trial, one of these

12    gazillion, where they're not conceding 30 percent and

13    they say it's 20 or 25 percent, but no one's actually

14    ever taken the position that they believed all along

15    that it was actual acquisition cost.

16          MR. GOBENA:  I mean, there's -- this case is a

17    mega spread case.  This isn't a 30 percent, you know,

18    speed bump or however it was characterized in the trial

19    in that case.  So I think really at issue here is

20    whether or not these mega spreads rise to the level of a

21    violation of False Claims Act or common law --

22          THE COURT:  So are you willing to waive the

23    first 30 percent?

24          MR. GOBENA:  I can't respond to that now.

25    Certainly I'm willing to consult with other folks on my
```

1  team.

2       THE COURT:  But let me be clear.  Your

3  knowledge, your briefing is inconsistent with what

4  you're just saying.

5       MR. GOBENA:  In terms of this being a mega

6  spread case?

7       THE COURT:  In other words, when they petitioned

8  for interlocutory appeal, I rejected it because I didn't

9  think it had merit, and I wrote a little something.  But

10  I was stopped because you didn't deny what they were

11  saying when you opposed their motion for interlocutory

12  appeal.

13       MR. GOBENA:  Well, because the issue that

14  they're raising on interlocutory appeal was, I guess,

15  the question that the Court properly exercised

16  discretion under Rule 26(b)(2), so deliberative process

17  --

18       THE COURT:  But I was wrong if your legal

19  position is -- in other words, I did a balancing when I

20  did that last time, and I don't think whether there's a

21  mega spread for the AstraZeneca drug or the

22  Bristol-Meyers drug is necessarily relevant.  You take

23  it drug by drug.  But if you're claiming that you had no

24  knowledge that AWP was anything different from actual

25  acquisition cost, then -- or -- and that you didn't

```
 1    approve that, then they have the right to -- the balance
 2    shifts, let me put it this way, big time.
 3          MR. GOBENA:  Your Honor, we hadn't really had a
 4    chance to consider this issue.  Is what your Honor
 5    saying that if we conceded the 30 percent within our
 6    damages, for example, and didn't seek damages on that 30
 7    percent above actual acquisition cost, that would
 8    resolve the issue in terms of --
 9          THE COURT:  I'd have to think about it, but it's
10    really clear to me right now what I think.
11          MR. GOBENA:  Okay.
12          THE COURT:  Let me just ask -- there's a second
13    argument that they just supplemented with respect to
14    which had to do with the --
15          MR. GOBENA:  The rebuttal expert report that we
16    provided.
17          THE COURT:  The rebuttal expert report.  I
18    didn't get too far past Graham Allison, I expected to
19    read about the Cuban Missile Crisis, but I went
20    organizational --
21          MR. GOBENA:  Right, theories.
22          THE COURT:  -- theories, but I waded my way
23    through.  I wasn't really sure exactly what he was
24    saying, but to the extent that he was saying the
25    government -- actually, I'm not sure what he said,
```

1    whether it's relevant beyond the 30 percent.

2          MR. GOBENA:  Well, I don't think it's really --

3    relates to the 30 percent issue I think your Honor is

4    raising.

5          His whole report -- and it's a rebuttal report,

6    we don't know whether we're ever going to call him to

7    trial, whether we're ever going to need him ultimately.

8    He's certainly not part of our case in chief.  But his

9    point to say the extent they want to point to government

10   inaction and say that was somehow acquiescing to the

11   reporting --

12         THE COURT:  That's more like a legal argument,

13   right?  There were no factual things, right?

14         MR. GOBENA:  What he did is go through the

15   historical record in order to show that the way the

16   government -- inaction can't be viewed through the lens

17   of a government acting like a military person.  You

18   know, he said it's much more --

19         THE COURT:  Can I just say, I didn't read it in

20   detail, but I doubt that's the kind of thing you would

21   let go to the jury.  That's a legal -- but in any event,

22   he's obviously the man.  He teaches at Yale Law School,

23   was one of the authors of the Medicare Act.  I'm just --

24   he seemed to be talking in terms of organizational

25   behavior.  I'm not sure --

1          MR. GOBENA:  Right.  Again, he's a rebuttal

2    witness to the extent we needed him to explain a way --

3    government inaction, in effect.

4          THE COURT:  Can I turn back to you again?  I

5    really found the briefing on that persuasive because it

6    was focused.  The other one was so broad brushed, we're

7    entitled to every draft of the OIG, and I'm not going to

8    make some magistrate judge go through 600 documents.

9          Assume for the moment your very strong point is

10   with respect to knowledge, when you were talking about

11   cross-cutting knowledge with respect to that particular

12   issue, but that was the primary issue you raised, so if

13   they waived that, what else would there be?

14         MR. DALY:  Judge, they go beyond denying

15   knowledge of 30 percent.  They say they didn't know --

16   basically, Marmor comes in, this expert --

17         THE COURT:  That's not --

18         MR. DALY:  But he says he's reviewed the record

19   and there's no empirical evidence at all that supports

20   our theory.  So far from being a rebuttal expert, I

21   mean, this guy comes in and says he's reviewed the

22   record, he's reviewed all the stuff, and there's nothing

23   in it.  None of this stuff that we point to, he says, is

24   empirical evidence that the government knew or

25   acquiesced or made a policy decision.

1          THE COURT:  Right.  And I completely agreed with

2     that up to the 30 percent.  What you need to rethink,

3     which I'm not going to make you do right this second, is

4     if they gave away the 30 percent -- and I'm not saying

5     I'm weighted to 30 percent, 20 -- they built in an extra

6     five percent because of the Pompeii discounts, as we all

7     know 20 percent was the routine everyone knew about in

8     the world, as far as I can tell, and then there was the

9     20 -- McKesson bumped a lot of them to 25, and then

10    there were the Pompeii discounts.  So I think basically

11    the plaintiff rounded at 30.  That seemed to be

12    supported by the record and not that hotly disputed.

13         So with respect to any mega spreads, let's say,

14    of Abbott, obviously anything having to do with

15    knowledge of that has to be produced.  Beyond that, I'm

16    not sure the mega spreads at Bristol-Myers or

17    AstraZeneca are relevant.

18         MR. DALY:  Here's the problem, Judge.  When we

19    look at OIG reports, the stuff we have from the public

20    record, the government and the CMS, they never talked

21    about manufacturer Abbott or Dey or AstraZeneca.  They

22    don't talk about NaCL, sodium chloride; they talk about

23    infusion drugs or generics.  So there's all kinds of

24    discussion within CMS about spreads on generics, spreads

25    on infusion drugs, spreads on injectables, that because

1    they don't happen to mention Abbott or --

2         THE COURT:  I agree with that --

3         MR. DALY:  -- that we're not getting it.

4         THE COURT:  Once again, you're both benefiting

5    and the victim of seven years of experience, all right?

6    So you benefited from it here.  I've never seen any

7    evidence that the government understood that there were

8    spreads at the levels that we're talking about.  And so

9    I've required them to produce it.  Other than these OIG,

10   the reports we all know about --

11        MR. DALY:  Right.

12        THE COURT:  -- I've required them to produce any

13   knowledge about your drugs.

14        You think, you're speculating, if you will,

15   there was somehow some memo somewhere that reflected

16   knowledge of the mega spreads of infusion products

17   generally.  Is that what you're looking for?  Is that

18   it.

19        MR. DALY:  Yes, the idea that we know there's

20   very large spreads out there, but the overall basis that

21   we overpaid for the drugs in order to subsidize the

22   inadequate dispensing fee some.

23        THE COURT:  So we're paying a thousand percent

24   more in order to subsidize for the extra 350 we didn't

25   pay the doctor?

PDF created with pdfFactory trial version www.pdffactory.com

1        MR. DALY:  Well, you know, a thousand percent on

2    a drug that only costs a penny is not very much.

3        THE COURT:  Let me ask, are there any documents?

4        MR. GOBENA:  That reflect a desire to

5    cross-subsidize?

6        THE COURT:  No, no.

7        MR. GOBENA:  Okay.

8        THE COURT:  Well, that reflect knowledge of mega

9    spreads in a class of drugs?

10       MR. GOBENA:  I think, actually, your Honor, if

11   you look at the OIG reports, there are some reports that

12   show, you know, that there are --

13       THE COURT:  Apart from the OIG reports, internal

14   reports, the term "knowledge," not the deliberate back

15   and forth, but knowledge of mega spreads in the class of

16   drugs that they -- what are we talking about here,

17   again?

18       MR. DALY:  Infusion drugs.

19       THE COURT:  Infusion drugs.

20       MR. GOBENA:  I mean, I think it's helpful if I

21   explain exactly what we withheld and why, and it's

22   important to understand that.

23       Let's take, for example, these OIG reports.

24   These OIG reports, underneath the reports themselves,

25   yes, there is processing materials, some notes on draft

1    reports and things of that nature, but beneath that

2    there are all the work papers that are involved, all the

3    information that's gathered by the OIG auditors,

4    collected in order to evaluate what the pricing is for a

5    drug.  That was produced.

6            THE COURT:  Right.  I'm not going to make them

7    do the notes on the drafts; I think the balancing would

8    go your way.

9            MR. GOBENA:  Right.

10           THE COURT:  But any knowledge that they --

11   that's in any of these documents that you've withheld

12   about the fact that there are mega spreads on infusion

13   drugs, if that's what we're talking about, should be

14   produced.

15           MR. GOBENA:  If there was just a memo that

16   wasn't delivered processed --

17           THE COURT:  No, no, we're not going to do it all

18   or nothing.  Just redact the pros and cons and give them

19   the part that shows knowledge.

20           MR. GOBENA:  Our point is that they have that.

21           THE COURT:  Well, then write that in writing so

22   we're not in this whole thing.

23           MR. GOBENA:  Okay.

24           THE COURT:  But the big issue is I will go

25   through -- not me, poor -- someone will have to go

1    through these if you don't give up this 30 percent,

2    because that is totally contrary to my understanding of

3    what was going on.  And somebody needs to go through

4    those and with that in mind, because, otherwise, it's

5    almost like -- I think there is a genuinely -- if you

6    don't -- they have the right to prove up, and based on

7    what I've seen, they would have expert testimony to

8    support it of not only knowledge of the 30 percent

9    yardstick, but affirmative acquiescence in it.  Clinton

10   said it at some point.

11        MR. HENDERSON:  Judge, we have a 25 percent

12   yardstick, essentially.

13        THE COURT:  I'm not wedded to the 30 percent,

14   I'm not, but essentially an understanding that AWP did

15   not equal AAC, and I'm just -- I will require

16   document-by-document review if that isn't -- and you may

17   be right, but they have a right because -- at least to

18   have somebody look at that to make sure it's not in

19   there.

20        MR. GOBENA:  Okay.  So just to clarify, again, I

21   ask your Honor, could we have some time, maybe until

22   Monday, to confer with our folks?

23        THE COURT:  I think Monday -- I don't want

24   anyone spending the weekend on it.  What do you want,

25   two weeks?

```
 1          MR. GOBENA:  Two weeks.  Two weeks is plenty of

 2    time to go back, and I just want to make sure I

 3    understand --

 4          THE COURT:  I want some lawyer who knows

 5    something about this case to do two things:  One is,

 6    figure out whether or not -- you might want to contest,

 7    I could have been dead wrong, you're not bound by any

 8    motions of res judicata or collateral estoppel, you're

 9    not, you're not part of that.  It could be we were wrong

10    about our assumptions about the government, all the

11    experts in the world were just dead wrong, but they're

12    pretty fancy schmancy experts.

13          If that's so, though, they have the right

14    because I sort of -- there's plenty of evidence in their

15    camp to have someone make a judge go through those

16    documents and make sure there's nothing in there.

17          All right.  Now, the second piece is he's

18    claiming that they want to argue that there was some

19    sort of government knowledge and acquiescence in our

20    approval of -- depending on how you phrase the standard,

21    in a mega inflation of infusion drugs, and that I

22    shouldn't limit it to words Abbott and the specific

23    drugs.  So someone needs to look through those to see if

24    any of that knowledge is reflected in there.

25          With respect to Professor -- what's his name?
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. DALY:  Marmor.
 2            THE COURT:  I mean, it was interesting to read
 3      actually, and it put me in Kennedy School mode, but it's
 4      just -- I wasn't sure that that would even be
 5      admissible, and I hate to make that the basis for any of
 6      my decisions.
 7            MR. DALY:  For us, Judge, it goes a little
 8      beyond that, in the sense that this guy -- and he is a
 9      fairly degreed individual --
10            THE COURT:  I mean, he's just obviously the guy
11      in health policy.
12            MR. DALY:  What he says in his report, and --
13            THE COURT:  But it's not admissible.
14            MR. DALY:  But it's their expert.
15            THE COURT:  Excuse me, excuse me.  Not if I
16      don't let him be his expert.
17            MR. DALY:  We haven't got that far.
18            THE COURT:  I don't want to hold -- when I get
19      to that, if I let it in, then maybe I'll open this all
20      up.  Right now, it seemed it was just him talking
21      about -- like Max Weber, what bureaucracy is doing.  It
22      was real interesting, I'm just not sure I would let it
23      go to a jury.
24            MR. DALY:  What he's saying, he looked into the
25      record, the existing record, and we don't have enough to
```

1   make our case on these points because, paragraph 41, to

2   understand what stakeholders were doing over time, one

3   has to investigate what they said, what they claimed,

4   what they thought they knew, what confused them, and

5   what options for action they, in fact, had.  That's what

6   the government won't give us.

7           MR. GOBENA:  That's actually not true, your

8   Honor.

9           MR. DALY:  It is, it's very true.

10          THE COURT:  Excuse me.  I'm not sure I'm going

11  to go based on Professor Marmor's report.  It was really

12  interesting to read, maybe there's some piece of it that

13  could be admitted, but at least right now it's tenuous

14  enough that I'm not going to make a decision based on

15  that.

16          However, what needs to happen is you need to

17  make decisions based on the 30 percent, and there's

18  someone sitting in this room -- there's 600 documents?

19          MR. GOBENA:  There's more than that.

20          THE COURT:  How many are there?

21          MR. DRAYCOTT:  There's a great deal more than

22  600.

23          THE COURT:  How many?

24          MR. DRAYCOTT:  The total number on the privilege

25  log is going to exceed a thousand.

```
 1          THE COURT:  A thousand.  Let me just be clear.
 2  Somebody needs to go through that and see if there are
 3  any pieces of those that reflect knowledge about --
 4  first, figure out whether you're -- the 30 percent
 5  thing, because, if not, I'm going to go through them,
 6  because that's -- but if there's any knowledge about
 7  mega spreads on infusion drugs -- is that yours -- about
 8  infusion drugs --
 9          MR. MERKL:  Inhalation drugs.
10          THE COURT:  -- inhalation drugs or the word
11  "cross-subsidization" or the like shows up.
12          MR. DALY:  Or the like.
13          THE COURT:  Somebody needs to do that.  It may
14  be only a paragraph gets reported because some of it
15  isn't that inner angst that you're supposed to protect,
16  but I will at least want to look at any document that
17  reflects that knowledge.
18          MR. DRAYCOTT:  Just to be clear, we have been
19  very precise in terms of how we tried to invoke the
20  privilege and not revoked with respect to just factual
21  information that came into the government, that our
22  privilege assertion really does -- is key to just the
23  deliberative.  So if there's information, for example,
24  in the OIG work papers that supports the reports, that
25  all would have been produced.  I just want to give that
```

1    assurance.

2         THE COURT:  Suppose there is some bright young

3    person from the Kennedy School who writes a whole memo

4    and says for the first three pages, here's the facts

5    that I found, infusion and inhalation drugs have

6    thousand percent spreads; then there's the

7    recommendation section, here's what I recommend we do.

8    Do you produce the first three pages to the factual --

9         MR. DRAYCOTT:  My understanding that the way the

10   agency operates is that the Office of Evaluations and

11   Inspections is that entity within the Department of

12   Health and Human Services that has the particular

13   mission for doing the type of analytical work, and as

14   your Honor no doubt well knows at this point, is the

15   agency that did the analytical report on price

16   reporting.  So the answer is absolutely yes, your Honor.

17   If the OEI did that work, not only was the work

18   produced, but all the work papers supporting that work

19   was produced.

20        THE COURT:  Then it will be easy for you, you'll

21   be able to report that you've gone through it and there

22   are no documents that refer to the knowledge of

23   government with respect to inhalation and infusion drugs

24   of mega spreads or cross-subsidization or words that

25   sound like cross-subsidization of the providers' cost.

1          So if you say that as an attorney in the court,

2     I will do it.

3          If, however, there are reflections of those

4     concepts, I will personally review those documents if

5     you still say that they're subject to deliberative

6     process privilege.  I'm not going to go through a

7     thousand, that's for sure.

8          MR. DRAYCOTT:  I think I have a very clear idea

9     of what your Honor needs, and I think we will do this on

10    the same schedule.

11         THE COURT:  If you can, you can.  It's summer,

12    people have family plans.  If you need more time, we're

13    not in such a rush here.

14         But the most important thing -- I know I'm

15    repeating myself, I'm so struck -- I mean, I read

16    everything you all submit to me -- at whoever refined

17    the issue, it was one that I didn't catch and Judge

18    Bowler didn't catch last time, that that 30 percent

19    yardstick was being disputed.

20         MR. DRAYCOTT:  I think the reason, perhaps, that

21    we didn't, your Honor, is, is when we're dealing with a

22    1,500 percent spread, the 30 percent part of that was

23    not what's been the focus of, really, the government's

24    claims.  And I am certainly going to address it now,

25    your Honor, but I think that's the background as to how

1    we've approached this case is because we've been looking

2    at spreads that are vastly more than that.

3            THE COURT:  Fair enough.  I'm just simply saying

4    when they teed it up, they focused, naturally, on that

5    point, and it was well taken.  Okay?

6            MR. DALY:  Point of clarification.

7            THE COURT:  Just in retrospect because I went

8    back and read all the beginning papers.  I think both

9    papers were like ships passing in the night, just too

10   broad claims for the documents and too narrow a

11   response, and now I understand why you need it.  Now I

12   understand.

13           MR. DALY:  Judge, just a point of clarification,

14   and there's a tendency to be literal sometimes.

15   "Infusion drugs," there's other words, there's

16   "injectables" and "solutions," that's what our sort of

17   family of water and dextrose and -- I just don't want

18   it -- we get into a magic word problem.

19           THE COURT:  So say it.  I don't want anymore

20   briefing.  Say the words.

21           MR. DALY:  Infusion, solutions, injectables.

22           MR. DRAYCOTT:  Those are enormously broad

23   classes of drugs.

24           MR. DALY:  And generics.

25           THE COURT:  No, not generics.  Now you're going

```
 1  beyond --
 2          MR. GOBENA:  When you're talking about
 3  injectables, there are hundreds and hundreds of
 4  injectables.  Solutions I think made sense, water-based
 5  solutions.
 6          MR. DALY:  Okay.
 7          MR. GOBENA:  And, what, powdered antibiotics?  I
 8  think we need to be specific about the drugs as opposed
 9  to these large categories.  Infusion drugs or injectable
10  drugs, that's a massive universe of drugs.
11          MR. DALY:  But that's my point.
12          THE COURT:  Generic, this is where you're get me
13  worried; I'm not doing it with generics.  Of course --
14  I'm just not doing it with generics.
15          MR. DALY:  What if the documents say we sit
16  around the table, here's my notes of the meeting,
17  everybody in the room, all 50 of us, are fully aware
18  that in the generic world that we have spreads up to
19  5,000 percent and there are many of them.  I don't get
20  that document, yet, they get to come into Court and say
21  we didn't know about the mega spreads when there's a
22  document that says they do.  That's what concerns me.
23          THE COURT:  Knowledge and approval are two
24  different things, but let me just -- if there are any
25  documents that say that they know about mega spreads --
```

1    do you know whether that -- whether there are any

2    such --

3           MR. DRAYCOTT:  Your Honor, if such a document

4    existed, that knowledge has to come from some place, and

5    to -- the only documents that have been withheld are

6    those which are deliberative.  So all the work papers

7    for all those OIG reports --

8           THE COURT:  Skip the OIG reports.

9           MR. DRAYCOTT:  Any other source that's coming

10   in --

11          THE COURT:  I'm not going to require every draft

12   of every OIG report, that's ridiculous.  That's classic

13   big firm litigation.

14          But what they are entitled is knowledge of mega

15   spreads in the specific kind of drugs that these people

16   manufacture, infusion drugs, inhalation drugs.

17          MR. DALY:  Solution-based.

18          THE COURT:  Solutions, waters --

19          MR. GOBENA:  I said water-based solutions.

20          THE COURT:  Water-based solutions.

21          MR. GOBENA:  Saline solutions, dextrose.

22          MR. DRAYCOTT:  I think, again, I have an idea of

23   what your Honor is looking for.  I think I'm probably

24   most of the way toward being able to answer that almost

25   off the top of the cuff, but I think I'm going to take

PDF created with pdfFactory trial version www.pdffactory.com

1       the time that's available to me and make sure --

2               THE COURT:  If there are such drug -- err on the

3       side of, obviously, showing anything, and if we're down

4       to, you know, 30 documents that have such things and

5       you're still pressing the process, I'll look at it.  If

6       we're talking about 500, you both will have to pick a

7       master, because I couldn't ask Judge Bowler to do that.

8               One of the things that struck me about the

9       original set of motions was how broad it was.  I'm not

10      going to require some judge to look at every draft of

11      every OIG report.  I think it's just a waste of time.

12      Recently, how they've explained what they want, it's a

13      much narrower focus and it makes sense and the balance

14      tips back.

15              MR. DRAYCOTT:  Just so it's clear, I think your

16      Honor used the term "mega spread."

17              THE COURT:  All right, I guess I don't want to

18      you be -- large spreads, big spreads, gigantic spreads.

19              MR. DRAYCOTT:  Because I'm going to be very

20      precise in trying to isolate this, and I may be

21      misconstruing what your Honor has written on this, but I

22      think you're talking -- generally, when you use the term

23      "mega spreads," is spreads over 150 percent, or do you

24      put a bottom limit on it for me?  I'm going to try to be

25      very diligent in making sure I get my hands around the

1    potential universe that we're talking about.

2         THE COURT:  In my earlier order I was pretty

3    nuanced, I said if every once in a while it went to 32

4    percent, I wasn't going to hit the company.  I didn't

5    cut it off at 150 because many of the claims I think

6    were 68 percent spreads and 50 -- I can't remember, they

7    weren't -- so just anything where it reflected a large,

8    huge, unexpected, unacceptable --

9         MR. DRAYCOTT:  Could I use the -- the lowest

10   spread that we related to a drug that's in our

11   complaint?

12        MR. DALY:  I don't know what that means, Judge.

13        MR. GOBENA:  Well, when you take all the spreads

14   for the different drugs, there's a range of spreads,

15   depending on the drug and year, it could be anywhere

16   from as low as 300, it could be anywhere as high as

17   1,700.  I think what my colleague is suggesting is the

18   definition of mega spread, as we're going to interpret

19   in terms of looking at these documents, make a

20   determination to use that 300 percent as a baseline,

21   that 300 percent and up is a baseline.

22        THE COURT:  I'm not prepared right now to put a

23   number on it.  I'm not prepared -- I think if it's close

24   enough -- suppose you say consistent -- let's take an

25   Abbott drug that you consistently thought that it was 80

```
 1    percent, and, in fact, it was 300 percent, I don't know

 2    what I do with that legally.

 3          Let's assume -- I know it doesn't exist -- but

 4    let's assume there's a document that says we know

 5    Abbott's drugs are 80 percent and we're not going to do

 6    anything about it and we're just going to go along with

 7    it because at this point which we think it's important

 8    to encourage doctors in the infusion --

 9          MR. DALY:  To use generics.

10          THE COURT:  I don't know that it's legally

11    significant that you thought it was 80 percent rather

12    than 300 percent.  I just don't know.

13          The gist of what you should be looking for is we

14    know this is big in that area of drugs and we're going

15    to go along with it anyway.  Any such document should be

16    turned over to them -- to me, at least, for an in-camera

17    review.

18          MR. HENDERSON:  And HHS documents you're

19    referring to, I presume, not Department of Justice or

20    some other agency.

21          THE COURT:  All your work papers -- no, I'm

22    talking about --

23          MR. HENDERSON:  I've got lots in my personal

24    file.

25          THE COURT:  I mean documents that are either HHS
```

1    documents or from -- or -- I don't know whether there's

2    a related government agency, maybe from some state

3    Medicaid agency that was sent to them.  I'm just saying

4    reasonably in the custody and control of the HHS.

5         MR. DALY:  Among those, Judge, that we've talked

6    about, there's rule making files and legislative files

7    that are part of CMS, I believe, would be included in

8    this that they have not given us.  There would be stuff

9    in there.

10        THE COURT:  They just claimed a thousand, so

11   they'll go through those thousand, and my guess -- do

12   you have paralegals that know these cases or is it you

13   personally?

14        MR. DRAYCOTT:  I'm afraid the work you describe

15   probably falls to me, your Honor, but I'll try to get

16   some help.

17        THE COURT:  Take whatever time you feel you

18   need.  I'm not here to destroy your summer.

19        MR. DRAYCOTT:  Well, thank you, your Honor.

20        THE COURT:  Do you prefer shorter or longer

21   leash?  Give me a timetable.

22        MR. DRAYCOTT:  My colleagues urge me to take

23   four weeks.

24        THE COURT:  Fine.

25        And then I'll or Judge Bowler -- she's already

PDF created with pdfFactory trial version www.pdffactory.com

1    looked at a bunch.

2            MR. DALY:  Judge, I was going to raise that as a

3    housekeeping matter.  Last November, the government

4    submitted 21 documents that either mentioned Abbott or a

5    particular drug of Abbott's, and then June of this year

6    submitted some more to Judge Bowler, I believe.  We

7    don't have those, I don't believe.

8            THE COURT:  I can't do anything --

9            MR. DALY:  I don't know if those are in front of

10   you.

11           THE COURT:  I have not seen them.

12           MR. GOBENA:  They're still in in-camera review.

13           THE COURT:  How many documents?

14           MR. DALY:  Forty documents.

15           THE COURT:  So I might just give a call.

16           MR. DALY:  Okay.

17           THE COURT:  You might want to mention it, we're

18   trying to wrap it up, and see whatever is there within

19   four weeks.  It probably wasn't a front-burner issue, my

20   guess is, right?

21           Okay.  Now, is there anything -- I wanted to

22   ask -- I guess nobody here is really -- is there

23   anything else that I have outstanding with respect to

24   the Vena-A-Care's?  I don't think so, right?

25           MR. HENDERSON:  I can't think of anything, your

1    Honor.

2              THE COURT:  Before you find something, I'm going

3    to leave.

4              MR. DALY:  I have a list, Judge.

5              MR. HENDERSON:  Wait, wait --

6              MR. DALY:  Thanks for your time today, Judge.

7              (Court adjourned at 4:30 p.m.)

8                     - - - - - - - - - - - -

9                          CERTIFICATION

10             I certify that the foregoing is a correct

11   transcript of the record of proceedings in the

12   above-entitled matter to the best of my skill and

13   ability.

14

15

16

17   /s/Debra M. Joyce                    _____
     Debra M. Joyce, RMR, CRR            Date
18   Official Court Reporter

19

20

21

22

23

24

25