1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

3      _____

4      IN RE:  PHARMACEUTICAL
       INDUSTRY AVERAGE WHOLESALE
5      PRICE LITIGATION,            Civil Action
                                    No. 07-10248-PBS
6                                   MDL No. 1456

7                                   July 24, 2008, 3:16 p.m.
       _____
8

9

10             TRANSCRIPT OF STATUS CONFERENCE

11          BEFORE THE HONORABLE PATTI B. SARIS

12             UNITED STATES DISTRICT COURT

13          JOHN J. MOAKLEY U.S. COURTHOUSE

14                 1 COURTHOUSE WAY

15               BOSTON, MA   02210

16

17

18

19
                   DEBRA M. JOYCE, RMR, CRR
20                 Official Court Reporter
               John J. Moakley U.S. Courthouse
21              1 Courthouse Way, Room 5204
                   Boston, MA   02210
22                    617-737-4410

23

24

25

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    JAMES J. BREEN, ESQ.
      The Breen Law Firm, P.A.
 4    3562 Old Milton Parkway
      Alpharetta, GA 30005
 5    770-740-0008

 6
      FOR THE DEFENDANTS:
 7
      NEIL MERKL, ESQ.
 8    SARAH L. REID, ESQ.
      Kelley Drye & Warren LLP
 9    101 Park Avenue
      New York, NY 10178
10    212-808-7800

11    ERIC GORTNER, ESQ.
      Kirkland & Ellis LLP
12    200 East Randolph Drive
      Suite 7400
13    Chicago, IL 60601
      312-861-2285
14
      JAMES R. DALY, ESQ.
15    Jones Day
      77 West Wacker
16    Chicago, IL  60601-1692
      312-782-3939
17
      FOR THE UNITED STATES OF AMERICA:
18
      GEORGE B. HENDERSON, ESQ.
19    BARBARA HEALY SMITH, ESQ.
      United States Attorney's Office
20    1 Courthouse Way
      Suite 9200
21    Boston, MA 02210
      617-748-3272
22

23

24

25
```

1    GEJAA T. GOBENA, ESQ.
     United States Department of Justice
2    601 D Street NW
     Patrick Henry Building, Room 9028
3    Washington, DC 20004
     202-307-1088
4
     ANN M. ST. PETER-GRIFFITH, ESQ.
5    United States Attorney's Office
     99 N.E. Fourth Street
6    Miami, FL  33132
     305-961-9419
7
     JUSTIN DRAYCOTT, ESQ.
8    United States Department of Justice
     P.O. Box 261
9    Ben Franklin Station
     Washington, DC  20044
10   202-305-9300

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Patti B. Saris, United States
 4    District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
 7    July 23, 2008.)
 8              THE CLERK:   In re: Pharmaceutical Industry
 9    Average Wholesale Price Litigation, 07-10248 will now be
10    heard before this Court.
11              Will counsel please identify themselves for the
12    record.
13              MR. HENDERSON:   George Henderson, Assistant US
14    Attorney for United States, your Honor.  With me is
15    Barbara Healy Smith, also of the U.S. Attorney's Office.
16              MR. BREEN:   Jim Breen, Ven-A-Care, one of the
17    plaintiffs, your Honor.
18              MR. GOBENA:   Gejaa Gobena from the Department of
19    Justice for the United States.
20              MS. ST. PETER-GRIFFITH:   Ann St. Peter-Griffith,
21    United States Attorney's Office Southern District of
22    Florida on behalf of the United States.
23              THE COURT:   You flew up for this?
24              MS. ST. PETER-GRIFFITH:   I was at deposition in
25    New York, so I took a train over.
```

```
 1            THE COURT:  All right.
 2            MR. DRAYCOTT:  Justin Draycott, civil division,
 3    DOJ.
 4            THE COURT:  Washington.
 5            MR. DRAYCOTT:  Correct.
 6            MR. GORTNER:  Good afternoon, your Honor.  Eric
 7    Gortner from Kirkland and Ellis in Chicago representing
 8    Boehringer.
 9            MR. MERKL:  Neil Merkl, your Honor, with my
10    partner Sarah Reid from Kelly Drye, and we represent
11    Dey.
12            MR. DALY:  Good afternoon,  your Honor.  Jim
13    Daly representing Abbott Labs.
14            THE COURT:  All right.  So what I would like to
15    try do is get all the Vena-A-Care cases on a coordinated
16    schedule to minimize discovery, duplication and
17    redundancy, and to actually try and deal with the
18    cross-cutting issues at one time rather than at three
19    separate times because I won't probably give each one a
20    fresh look otherwise.
21            On the other hand, I don't know very much about
22    the merits of all the cases yet or even what the
23    differences are, so it may be some of them are
24    physician-administered drugs in somebody's office as
25    opposed to self-administered and they may be so
```

1    different that this is not a worthwhile goal.

2         So let me ask, everybody agrees they should be

3    on the same track, except Abbott; is that right?

4         MR. DALY:  That's right.

5         THE COURT:  Tell me why you're different?  What

6    are your drugs all about?

7         MR. DALY:  Our drugs are all

8    physician-administered.  They're all solutions,

9    dextrose, sodium chloride, salt water, regular water,

10   and Vanco, which is Vancomycin, which is also an

11   injection.  So all of our drugs are

12   physician-administered, all -- as I understand it, all

13   of Dey and Roxanne's drugs are self-administered.  So

14   the issues that come in there are very different, in our

15   view.  Also, the time periods are very different.

16        THE COURT:  So you all know this by heart, but I

17   have so many aspects to this multidistrict litigation

18   that I actually I don't remember.  Where are we on

19   Abbott?

20        MR. DALY:  We are in the expert discovery phase.

21   The United States has produced its expert reports, we

22   are in the process of this month and through August 21

23   deposing their folks.  We're going to be filing our

24   expert reports on the 21st.

25        THE COURT:  Are you completely done with --

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. DALY:  Fact discovery.

2          THE COURT:  -- fact discovery?

3          MR. DALY:  Yes, except we do have some motions

4     that do remain pending in front of Magistrate Judge

5     Bowler that have yet to be ruled on.

6          THE COURT:  So when we would be doing motions

7     for summary judgment?

8          MR. DALY:  We have a schedule that your Honor

9     just entered about two weeks ago, which puts us at

10    completing our summary judgment briefing, I think, on

11    December 23, just before the holiday.

12         THE COURT:  As far as you know, are there --

13    what's the primary defense?

14         MR. DALY:  In my case?

15         THE COURT:  Yeah, I mean -- I phrased that

16    incorrectly.

17         What would be the primary ground for motions for

18    summary judgment?  Can you tell that yet?

19         MR. DALY:  Judge, I think we would want to be

20    talking about some time period, some statute of

21    limitations issues, some government knowledge issues.

22         THE COURT:  I'm just trying -- to be more

23    precise, I'm just trying to figure out how much is

24    overlapping with what the other two cases are going to

25    involve.

1          MR. DALY:  I'm not as familiar with the Dey and

2    Roxanne cases, obviously.  I do know we have different

3    drugs, I do know we have different time periods.

4          For example, my case, Judge, you may recall,

5    they're suing my client from 1991 to 2001, the

6    government cuts off their liability with some price

7    changes that Abbott did in 2001.

8          My understanding of Dey and Roxanne, it's like

9    1995 or 1996 up to the present.  So even the -- and as

10   the Court is aware, I think when we get up into the

11   present, the issues are very different.

12         THE COURT:  Very different.

13         MR. DALY:  So we are heading towards trial in my

14   case, Judge.  I think this came up -- we weren't at the

15   last hearing because we weren't supposed to be here.

16         THE COURT:  You're absolutely right, I'm not

17   faulting anyone, that's why I wanted everyone in the

18   same room.

19         MR. DALY:  This case, my case came out of the

20   Southern District of Florida with Judge Gold.  So under

21   the rules of the MDL, my case is going to be sent back

22   at some point to Judge Gold for trial.

23         THE COURT:  We all agree, at least for purposes

24   of this MDL, that I'll at least get summary judgment,

25   right?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          MR. DALY:  Well, Judge, I would throw out to

 2    your Honor that Judge Gold has no familiarity with this

 3    case as things stand now, and I don't know why --

 4          THE COURT:  I think I would be hated by every

 5    judge in America if I started taking this state by

 6    state.  Right now there's only one miserable judge.

 7          So you think I should stay here through summary

 8    judgment.  Is everyone sort of in agreement at this

 9    point?  And if it survives to that, then I send it back

10    to Florida?

11          MR. HENDERSON:  It's certainly our agreement,

12    your Honor, that you should keep the cases through

13    summary judgment.

14          THE COURT:  And then afterwards, it, for sure,

15    goes back there, right?

16          MR. DALY:  For sure.

17          THE COURT:  At least the way --

18          MR. HENDERSON:  That's what the statute

19    provides, your Honor.

20          THE COURT:  That's right.

21          MR. HENDERSON:  I think there's some discretion

22    in the original transfer of the court to make a request.

23          THE COURT:  I have no idea if everyone can agree

24    to the contrary, but short of agreement, I think I send

25    it back.
```

1         So help me -- that's not as important to me to

2    figure out whether it's worth slowing you down and

3    putting you on the same track as the others.  I'm just

4    trying to understand it.

5         So will I be going -- my fear is do I have to go

6    through a 50-state analysis of the Medicaid statutes?

7         MR. DALY:  Judge, in the Abbott case, here's

8    what happened:  In the initial 26(a)(1) disclosures, the

9    government said they didn't think they needed any

10   Medicaid witnesses and there wouldn't be any.

11        In November of last year, just before -- like a

12   month before discovery closed, they added 23 witnesses

13   from state Medicaid.  We came in and tried to get your

14   Honor to strike them because it was too late with only a

15   month left.  The Court disagreed with us, and we took

16   discovery of those 23 people or those of them that we

17   felt we needed to, case done, case over.

18        Our problem now is that what's being suggested

19   is kind of -- even though we're done and we spent

20   millions of dollars and based our defense on what the

21   government said was going to be their witnesses and was

22   going to be their issues, the suggestion of the

23   government is that we just kind of reopen discovery for

24   Abbott and all of a sudden we've got a hundred

25   depositions when discovery has actually been closed for

PDF created with pdfFactory trial version www.pdffactory.com

1   two or three months and we're working on our expert

2   reports.

3           THE COURT:  So you're one step ahead of me.

4   You're viewing what the proposed new schedule is as to

5   opening up discovery with respect to you, too.

6           MR. DALY:  That's what's suggested by the papers

7   that's filed by the government.

8           THE COURT:  Is he right?

9           MR. HENDERSON:  With respect to state discovery,

10  we are suggesting that Abbott be on the same track as

11  state discovery.  Abbott did take --

12          THE COURT:  Can I just say this -- based on what

13  we've got now, this is important for me -- do you

14  anticipate that I am going to have to construe the

15  statutes and practices of 50 states' Medicaid programs?

16          MR. HENDERSON:  I can't answer that, your Honor,

17  right now.  I think in general the answer is no.

18          We haven't seen definitions in states of average

19  wholesale price.  So we haven't seen anything to change

20  the plain meaning analysis amongst the states.  We

21  haven't seen any state that has a definition of average

22  wholesale price.

23          THE COURT:  So discovery is closed.  Let me ask

24  you this.  Were you planning on moving state by state?

25          MR. DALY:  Judge, part of our position is that

PDF created with pdfFactory trial version www.pdffactory.com

1    they didn't get the discovery from a bunch of the

2    states.  We tried to move our expert reports by a month

3    like two weeks ago.

4           THE COURT:  Tell me what your motion for summary

5    judgment is going to be.  These are Medicaid claims,

6    right?

7           MR. DALY:  In part, and Medicare.

8           THE COURT:  Medicare is easy, I can do Medicare,

9    Medicare I know -- I don't know, but I at least think

10   it's national and it's one body of law and I can do it.

11          So were you planning on moving separately on

12   each of the 50 states?

13          MR. DALY:  Not as a separate motion, Judge, no.

14   I think what we would do --

15          THE COURT:  Well, under Nebraska, AWP has been

16   construed this way and then Idaho the practice is to do

17   it on usual and customary.  Am I going to get those kind

18   of motions?

19          MR. DALY:  There will be -- not motions so much,

20   but each state does it different when it comes to

21   Medicaid.

22          THE COURT:  I don't want to do it twice, that's

23   the key here.

24          If you told me -- I don't want to hold you

25   hostage here to the other two cases.  If you told me,

PDF created with pdfFactory trial version www.pdffactory.com

1   no, there were some cross-cutting issues that weren't

2   going to be specific to each different state's Medicaid

3   statute, I am happy to do that on a different track that

4   are unique to your drugs, that are unique to your

5   statute of limitations, that are unique to maybe

6   specific knowledge with your drugs.  I'll do that

7   differently, I don't need to wait for the other two.

8   But if what you're telling me is I have to do that and

9   master 50 state Medicaid statutes and then do it again

10  for Dey and then do it again for Boehringer, I'm not

11  going to do it.  I'm going to do that all at once.  I'm

12  going to learn the statutes at once.

13          MR. DALY:  I would say -- and just to be clear,

14  I do suggest we go back to Judge Gold even for summary

15  judgment -- but I hear what you're saying.

16          I want to separate the summary judgment

17  schedule --

18          THE COURT:  Would Judge Gold have to do what I

19  have to do?  That's what MDL is all about.  Would Judge

20  Gold have to go through all 50 Medicaid statutes?

21          MR. DALY:  At least some of them.

22          THE COURT:  I'm not going to do that to someone

23  else.  Although I could be persuaded.

24          MR. DALY:  You certainly have to do it once, you

25  only have to do it for Dey and Roxanne.

```
 1           But let me separate, if I can, the summary
 2   judgment schedule from discovery being opened up out of
 3   nowhere.  I mean, my client has spent millions of
 4   dollars on this, and the federal government has, too.  I
 5   mean, this has been to get this done -- we're done,
 6   we've been done for months.  The suggestion that we're
 7   going to have to do a hundred more depositions when the
 8   United States government never --
 9           THE COURT:  I'm not faulting you, I'm simply
10   saying what I don't want -- I want to hear what you're
11   going to move on.
12           MR. DALY:  Okay.
13           THE COURT:  Tell me the case.  Do you know yet?
14           MR. DALY:  Well, as a general proposition,
15   Judge, when you get to the states, you have a couple of
16   things.  You have kind of a mini federal government.  In
17   other words, some of the states you have situations
18   where the Medicaid people knew a lot, they understood a
19   lot, they made decisions.  Some of them use AWP, some of
20   them don't use AWP.  Some of them do AWP minus 5, 10,
21   15, 20, 25 percent.  Some of them have documents that
22   show that they were actively cross-subsidizing, in other
23   words, purposely overpaying their pharmacists for drugs
24   because their dispensing fees were low.
25           So it's very similar on the state level to what
```

PDF created with pdfFactory trial version www.pdffactory.com

1    we see at the federal level on the Medicare side.

2         THE COURT:  But it's going to have to be state

3    by state.

4         MR. DALY:  To a certain extent, if the federal

5    government, you know, puts on evidence.  In other words,

6    it's their burden.  They have to prove what happened in

7    each state and that we're liable in each state.

8         THE COURT:  Absolutely.  But I don't want to do

9    it twice.  See, that's where I'm trying to balance the

10   equities here.  In other words, if they -- I doubt --

11   tell me if I'm wrong -- I doubt we're going to have this

12   information with respect to Abbott but not with respect

13   to Dey.  My guess is it's going to be a more generalized

14   set of practices, right?

15         MR. DALY:  Certainly some of the information

16   would be common, Judge, I can't say it wouldn't be, but

17   there may be specific things about each defendant which

18   may be very different, including our drugs.

19         THE COURT:  Can I just say, one way of doing

20   this would be essentially take your motions for summary

21   judgment on non-Medicaid kinds of issues in terms of --

22   so I can do that in a coordinated way with all three,

23   but take the things that are unique to your drugs on the

24   schedule that we have set.

25         MR. DALY:  That would work.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  And then with respect to additional

2     discovery, if -- let me get to them in a minute, you

3     won't have to do it, but if they want to take the

4     laboring oar and go state by state, it will be in the

5     record when I get to all three of you.

6          MR. DALY:  That's where I have a problem, Judge,

7     in the sense that --

8          THE COURT:  I wouldn't require that, I'm just

9     simply saying you could -- I'm not going to do it twice.

10         MR. DALY:  I hear you on that, Judge, I give up

11    on that.

12         THE COURT:  And you can understand that.

13         So maybe what we do is we stay -- let me hear

14    you on this -- we stay with the Abbott schedule on

15    everything other than things -- issues that are unique

16    to an individual state's governance of its Medicaid

17    system, what Nebraska knew or didn't know.

18         (Discussion off the record.)

19         MR. HENDERSON:  I don't think we have any

20    problem in principle.  The devil is in the detail, of

21    course, and it seems that, for example, the government

22    knowledge issue, I think, is going to be common to all

23    three cases to the extent -- certainly the great thrust

24    of the defendants' discovery of states goes to the

25    government knowledge issue.  And we haven't seen -- I

PDF created with pdfFactory trial version www.pdffactory.com

1    don't think we've seen anything in particular that

2    differentiates one defendant from another.  These are

3    all generic drugs, and --

4         THE COURT:  But I have to do that state by state

5    factually.

6         MR. HENDERSON:  State by state, but not

7    defendant by defendant.

8         THE COURT:  The law is pretty -- did they know

9    and approve of -- I forget exactly how it's worded.

10        MR. HENDERSON:  Correct, my point is --

11        THE COURT:  That I have to do state by state,

12   it's not like there's such an elaborate legal standard.

13        MR. HENDERSON:  That's right, but not defendant

14   by defendant, because I really think these issues are

15   common to all three defendants.

16        THE COURT:  I don't know if any of these

17   particular companies had particular relationships

18   with -- but assume for a minute you're right.  But

19   otherwise, they have statute of limitations issues, as

20   I've learned it's pill by pill, company by company.

21        There are things probably unique to your company

22   having to do with statute of limitation, right?  Would

23   that be unique to every state?

24        MR. DALY:  I think it would be, Judge, from our

25   perspective.  Also, in addition --

```
 1            THE COURT:  It would or wouldn't be?

 2            MR. DALY:  I think it would be different because

 3   different conduct, as I said, the time period we're

 4   being sued for are different by years and years and

 5   years.

 6            THE COURT:  Hear me out.  Do you think the

 7   statute of limitations argument would vary depending on

 8   whether you were in North Dakota or Nebraska?

 9            MR. DALY:  Yes, Judge, because in some states,

10   statute of limitations are held to apply to the state

11   and some of them they don't, and then you'd have to

12   actually get into each state's statute of limitation.

13            MR. HENDERSON:  I don't think we would agree

14   with that, your Honor.  There's a federal statute of

15   limitations.

16            THE COURT:  So you're just proceeding under the

17   federal False Claims Act.

18            MR. HENDERSON:  That's right.

19            THE COURT:  You haven't asserted the state

20   causes of action, have you?

21            MR. HENDERSON:  No.

22            THE COURT:  You're Uncle Sam.

23            MR. DALY:  Common law fraud is Count II in this

24   case, let's be clear, Judge.  They've sued us for common

25   law fraud.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. HENDERSON:  And I think the question is not

2     state reliance but the reliance of the United States.

3          THE COURT:  No -- well, that's a legal question.

4     But you do have to rely on the fraud statute of the

5     individual state, right?

6          MR. HENDERSON:  No, no, it's a federal common

7     law.

8          THE COURT:  You would say federal common law.

9          MR. HENDERSON:  Yes.

10         THE COURT:  Would you disagree with that?

11         MR. DALY:  I'm not sure, Judge.

12         THE COURT:  But those are the kinds of things we

13    can vet.  And if I decide to take it and wait for

14    theirs, so be it.  We'll keep them on that schedule but

15    with the knowledge -- and we'll get to the discovery

16    issues in a minute -- that I'm not going to do the 50

17    state survey twice.  I sort of want to know when that is

18    going to happen because I'm going to beg for another

19    law clerk because that's going to be huge.

20         Let's get to you all.

21         Do you agree roughly on the schedule but not the

22    discovery limitations?

23         MR. HENDERSON:  Correct.  We agree generally on

24    the schedule.  I think defendants would not schedule out

25    anything after the initial briefing on summary judgment,

PDF created with pdfFactory trial version www.pdffactory.com

 1    whereas our proposal completes the scheduling on the

 2    briefing in large part to have dates in place, but also

 3    to make it clear that there should be some common

 4    coordinated briefing.

 5            THE COURT:  Say it again.  Where do you

 6    disagree?

 7            MR. HENDERSON:  The United States is proposing

 8    for scheduling on the -- for the state discovery and

 9    summary judgment proceedings, our schedule goes out

10    through the completion of the summary judgment briefing.

11    Dey and Roxanne are in agreement except that they would

12    propose to have the schedule -- the Court enter a

13    schedule that simply goes up to the submission of the

14    initial briefs, the principal briefs on summary

15    judgment.

16            THE COURT:  Have you conferred on that?  You

17    can't work that out?

18            So when would your -- cross-motions for summary

19    judgment, or not?

20            MR. HENDERSON:  Yes.

21            THE COURT:  Is that what's being anticipated?

22            MR. HENDERSON:  It's not a big deal, your Honor.

23    I just thought --

24            THE COURT:  Well, you can confer and work out a

25    complete schedule, just give it to me, the motions, the

PDF created with pdfFactory trial version www.pdffactory.com

1    opposition, the sur-reply.  You can't agree on that?

2              MR. MERKL:  We can, your Honor.

3              THE COURT:  You haven't conferred with the

4    defendants?

5              MR. HENDERSON:  We did, your Honor, except I

6    think I understood the defendants didn't want to have

7    any schedule beyond that first briefing, they wanted to

8    leave it open.

9              THE COURT:  We're not going to do that.  When is

10   the first motion for summary judgment, set of motions?

11             MR. MERKL:  It's in the --

12             MR. GORTNER:  I believe it's May 30, 2009.

13             In terms -- to clarify what the potential

14   disagreement was, in our view it makes sense -- we have

15   a status schedule for December for close of discovery in

16   the Dey and Roxanne cases, and the view was to figure

17   out what the joint briefs on cross-cutting issues would

18   look like once we had taken that discovery and

19   understand a little bit more.  Our disagreement wasn't

20   dates --

21             THE COURT:  You can always change it.

22             May 30th.  We'll do 6/30 for the oppositions,

23   then we'll have 7/15 for the replies, 7/30 for the

24   sur-reply, and then we'll have hearings in early

25   September 2009.

PDF created with pdfFactory trial version www.pdffactory.com

1              So, Robert, why don't we do that.

2              MR. HENDERSON:  That's fine.

3              THE COURT:  So a new set of law clerks come in.

4              MR. HENDERSON:  So then I think the big issue is

5    limitations on discovery.

6              THE COURT:  Yes, we'll get to that in a minute.

7              THE CLERK:  September 17th at 2:00 p.m.

8              THE COURT:  What limitation do you want to put

9    on?

10             MR. HENDERSON:  What we did, your Honor, was we

11   looked at the states where discovery has taken place,

12   and we divided them into two classes -- this is in --

13   Exhibit D is our proposed order -- and one class

14   consists of states where there has been litigation and a

15   lot of discovery, multiple depositions.  And in that we

16   provided -- we propose that the parties are allowed one

17   Rule 30(b)(6) -- I'm sorry, in those states discovery is

18   completed.

19             THE COURT:  Has there already been a 30(b)(6)

20   and one -- I think we gave the possibility of one

21   regular deposition?

22             MR. MERKL:  No, your Honor.

23             MR. HENDERSON:  In the states that we have

24   already laid out, I don't think any party knows for sure

25   in every single state whether there has been a 30(b)(6)

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   deposition, some of these have been multiple 30(b)(1)s.
 2         THE COURT:  What I'll do is I'll issue an order
 3   to incorporate all of those so there may be less of a
 4   need for something, but I can't stop them from having
 5   any that are unique to this case.  I don't know in what
 6   context all those depositions took place in.
 7         MR. HENDERSON:  Well, I'm not sure I understand
 8   your concern.
 9         Alabama, for example, they're trying their cases
10   now.  There have been 30-odd days of depositions in
11   Alabama.  Virtually every person with any involvement in
12   Medicaid reimbursement in that state has been deposed.
13         THE COURT:  Maybe you can agree on Alabama with
14   one cleanup day or something like that.  They're not out
15   to spend money --
16         MR. MERKL:  Exactly, your Honor.  What we've
17   proposed are certainly on these we're not going to go
18   ahead and notice them up right now.  An example would be
19   Massachusetts, your Honor.  Massachusetts, I know from
20   the other case has been -- is as done as you can do just
21   about.  On the other hand, they settled out very early.
22   If there's Dey-specific matters, such as did Dey
23   correspond with Massachusetts about Albuterol, that
24   could be a topic we might need the claims, things like
25   that --
```

1          THE COURT:  I'll incorporate all those

2    depositions, but I will not preclude them from doing at

3    least one 30(b)(6) in every state.  I mean, that's --

4    and it's limited by the rules to eight hours or whatever

5    it is, ten hours, whatever it is.

6          MR. HENDERSON:  Even in states where there have

7    already been 30(b)(6) -- Hawaii, for example.

8          THE COURT:  If they've already taken a 30(b)(6),

9    you don't get a second one.  We're going to do, I think,

10   one 30(b)(6), at least, and it's got to be coordinated.

11   If there's a huge amount of discovery, that will be

12   incorporated by reference.

13          Now, what they were upset about was I was

14   limiting it to one deposition, so then they argued for,

15   I think -- I think the compromise was one additional

16   deposition, right?

17          MR. MERKL:  Yes, your Honor.

18          THE COURT:  So maybe that's where if you think

19   it's repetitive, you can come in for a protective order.

20   We've got two defendants, eight hours every state, it's

21   expensive, but aren't you looking for billions and

22   billions of dollars from these people?

23          MR. HENDERSON:  I wouldn't put it in the

24   billions.

25          THE COURT:  How much?

1          MR. HENDERSON:  A few hundred million.

2          THE COURT:  All right.  A few hundred million.

3   It's a lot of money.

4          MR. HENDERSON:  Small change, your Honor.

5          I guess the devil is in the details.  There are

6   some states there have been 30(b)(6) depositions

7   already, some states, a few states where, for example,

8   the parties -- all parties, United States included, have

9   already participated in a 30(b)(6) deposition.  So it

10  seems to me, certainly in those states, there shouldn't

11  be yet another one.

12         THE COURT:  These guys are the ones that took

13  them?

14         MR. HENDERSON:  In --

15         THE COURT:  If they took them, they don't get a

16  second one.

17         MR. HENDERSON:  Hawaii, for example.  The United

18  States can --

19         THE COURT:  You don't want to go back to Hawaii?

20         MR. HENDERSON:  I'm saying no.

21         MR. GORTNER:  That's the only case I'm aware of,

22  what counsel is referring to states where 30(b)(6) may

23  have been taken years ago.  For instance, Montana,

24  Nevada is a case Roxanne wasn't even involved in.

25         THE COURT:  The general rule of thumb is one

PDF created with pdfFactory trial version www.pdffactory.com

1    30(b)(6) and one other deposition in every state be

2    coordinated.  So that doesn't make two 30(b)(6)s or

3    two -- two depositions per state.  If there was a huge

4    amount of discovery done, those are incorporated by

5    reference, and you can't be repetitive, why bother?  It

6    costs too much money.  To the extent you want to do

7    more, you think you have good cause to do more 30(b)(1),

8    regular depositions, that's what you mean by a regular

9    Notice of Deposition.

10            MR. GORTNER:  Yes.

11            THE COURT:  So if you want to do more, you've

12   got to ask leave of the Court, after you confer.  You

13   think there's 30(b)(6) to death and there's nothing else

14   to be said and they start going over new ground, you can

15   come in for a protective order.  But I'm hoping they

16   won't do that.  At most you're talking about two days

17   per state.  I've got six U.S. attorneys here, you've got

18   six, exclude Massachusetts for a minute -- maybe not

19   even excluding Massachusetts.  So 50 divided by six,

20   that's not undoable.  You don't need six people at every

21   deposition.  Okay?

22            MR. HENDERSON:  No, it's -- for these

23   depositions, it would pretty much be one attorney per

24   deposition.

25            THE COURT:  So that's nine depositions.

```
 1              MR. HENDERSON:  We'll be pretty busy in
 2     September and October, your Honor.
 3              THE COURT:  But it's a lot of money, and one
 4     thing I did learn from Massachusetts cases is that each
 5     Medicaid program -- it's not what first meets the eye.
 6     Each one is very complicated with its own culture,
 7     traditions, practices, policies.  I just can't, with the
 8     amount of money we're talking about, say they can't take
 9     depositions.  I think I've limited it fairly, and
10     they're not thrilled because I've limited it to one
11     30(b)(1), unless they prove why a second one is
12     necessary.  So that's what we'll do.
13              Now, the briefing on the Medicaid stuff, I need
14     to have Abbott be able to jump into that.  So how do you
15     want to handle that?  I'm assuming whatever I get come
16     the following year is going to be huge and extensive,
17     almost like I would have to assume, at least, what,
18     five-page brief per state almost, right?  At least,
19     right?
20              MR. DALY:  I would think so.
21              THE COURT:  That's huge.  I'd like a coordinated
22     brief.  What I'd like is one cross-cutting brief per
23     state, and then, ideally speaking, once I've resolved
24     the legal issues, I can go drug by drug, company by
25     company.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          You've thought about the issues, how can I do

 2    this?  Can I group them?  Are there certain states that

 3    are going to be identical?

 4          MR. HENDERSON:  It all depends on the issues,

 5    your Honor.

 6          From the United States perspective, there are

 7    sort of two broad categories of issues, one is the

 8    government's prima facie case to prove causation and

 9    liability.  In that regard, we don't think we need a

10    huge amount of information per state.  As our submission

11    indicated, Judge, the state's methodology, reimbursement

12    methodology, over time is memorialized in an official

13    state plan amendment, and we provided an example to you.

14          THE COURT:  You're doing huge spans of time.

15    You're putting huge, huge workload on me.  I'm not -- it

16    will take me a half a year to get through this.

17          MR. HENDERSON:  Let me show you how we've done

18    it, your Honor, for our -- in the Abbott case.

19          THE COURT:  Do you think it would make sense to

20    send each summary judgment motion out to each state?  In

21    other words, I'll just organize it all --

22          MR. HENDERSON:  No, I don't think so.

23          If I may, your Honor, can I give you just a very

24    brief picture of what we're going to do?

25          THE COURT:  Sure.
```

1          MR. HENDERSON:  If you wouldn't mind, your

2     Honor, start by looking at -- if you have it --

3          THE COURT:  I haven't brought them all down

4     so --

5          MR. HENDERSON:  Okay.

6          THE COURT:  Just describe it to me.

7          MR. HENDERSON:  Well, can I show you a summary

8     of one example state?  This was part of our attachment.

9     And this is a summary of the state methodology over

10    time -- I'm sorry, this is for Massachusetts, which

11    was -- I just gave you the wrong thing, I meant to give

12    you one that was attached.  But this has Massachusetts

13    so it's okay.

14         This is a summary -- it's a bad example because

15    it relies a lot on declarations that were filed in the

16    Massachusetts case.

17         Most of our summaries rely on Medicaid state

18    plan amendment information.  Those state plan

19    amendments, each amendment shows the date of approval,

20    the effective date, and identifies the prior state plan

21    amendment that was superseded.  So it can be followed

22    over time.  And each state plan amendment regarding

23    reimbursement spells out the reimbursement methodology.

24    Myers & Stauffer, a consultant working under the

25    direction of our damages expert, Professor Duggan, has

PDF created with pdfFactory trial version www.pdffactory.com

1   summarized the state plan amendments, supplemented them

2   with some additional information when there are gaps in

3   the state plan amendments because there are some --

4           THE COURT:  That's where you say the devil is in

5   the details.  That's where they're going to want to take

6   the deposition of whoever is filling in those gaps.

7           MR. HENDERSON:  I'm not denying, your Honor,

8   that there might be -- that there may be some details

9   that have to be filled in, but what we have found out is

10  that overall, the state plan amendments and some

11  supplemental information consisting of pharmaceutical

12  benefit surveys, which are surveys that were done by --

13          THE COURT:  I have another hearing right behind

14  this one.

15          MR. HENDERSON:  In any event, I think these

16  summaries, they will be part of our case in chief, will

17  spell out over time the state methodology and the

18  state's use of AWP or WAC, the amount to which it was

19  discounted, AWP minus ten percent, the date which it

20  changed.  We have the dispensing fee, we have different

21  treatment of generics versus brands, whether or not they

22  relied on FULs or state max, and the dates.  It's all in

23  here.

24          Now, I'm not saying, your Honor, that there are

25  no states where there's going to be any issue about any

1   of this stuff, but what I am saying is you're not going

2   to have to try each state, because I think, in large

3   part, these summaries of information will not be

4   disputed.

5           THE COURT:  Okay.  And you're going to --

6           MR. MERKL:  We anticipate there will be

7   substantial disputes.

8           THE COURT:  About what?

9           MR. MERKL:  Well, for instance, in this document

10  here --

11          THE COURT:  Forget Massachusetts, that's unique.

12          So you're going to say each one is unique

13  because you have the usual and customary issue.

14          MR. MERKL:  Exactly.  You don't have that.  For

15  instance, the formula here they're showing where they

16  paid based on WAC, we learned in Massachusetts, that

17  even if you have a WAC, sometimes they don't use WAC,

18  they use AWP for reasons that are unclear.

19          THE COURT:  Right, right.  You're saying you're

20  going to find that in every state, many states.

21          MR. MERKL:  I think many, certainly.  And we

22  don't really know until we look at the claim's data.

23          THE COURT:  In any event, we need Abbott coming

24  into this.  They're going to be going across the country

25  doing depositions, they've done some already.  How do

1   you want to be involved?

2          MR. DALY:  Can I ask the Court a question?

3          If I'm going to be on the same schedule,

4   cross-cutting issues -- and is all this evidence from

5   these other states that the government never decided to

6   make part of their case against my client -- going to

7   come in against my client?  Sounds like that's what you

8   have in mind.

9          THE COURT:  What I have in mind is that I am not

10  going to do this twice.

11         MR. DALY:  I hear you loud and clear, Judge.

12         THE COURT:  I'm not going to require you -- let

13  them spend the money --

14         MR. DALY:  But is this work -- in my case, the

15  government decided, you know what, we're not going to do

16  any state discovery, they didn't do any of the work --

17         THE COURT:  But don't you understand, they can

18  just put in affidavits that he's talking about -- like

19  this.  I wouldn't preclude them from doing that.

20         MR. DALY:  Okay.

21         THE COURT:  All right.  So then you're in a

22  position of saying, no, it's not so without the

23  discovery.

24         MR. DALY:  Right, so that -- so if this --

25         THE COURT:  I could play your game because they

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    haven't done it.  I have each one of them done now,
 2    they'll just go and get the affidavits from each of
 3    these people, they'll support -- just as Mr. Brennan
 4    just spun it out, and you won't have the discovery
 5    rules.  I'm not going to stop them from doing that.
 6              MR. DALY:  If we're in for a penny, we need to
 7    be in for a pound.
 8              THE COURT:  I don't know.  They can spend the
 9    money.
10              MR. DALY:  What they propose in their paper -- I
11    don't know if your Honor had a chance to study it --
12    they have all these restrictions on Abbott because
13    Abbott --
14              THE COURT:  No, no, that's not fair.  What's
15    sauce for the goose is sauce for the gander.  If we're
16    going to open up the state discovery, we're going to do
17    it.  If you want to proceed, fair enough.  I'm happy to
18    do it right now, but I'm not going to stop them from
19    putting in affidavits from their state Medicaid people.
20              MR. DALY:  I hear you, Judge.  So, therefore --
21    we just don't -- we want to be the same footing as Dey
22    and Roxanne.  If this evidence is going to come in
23    against us on summary judgment; it seems fair.
24              THE COURT:  Same footing is true.  I don't see
25    how you can argue against that.
```

1          MR. DALY:  Now, the other thing, Judge, is

2     that --

3          THE COURT:  It's one 30(b)(6) and one 12(b)(1)

4     for the three of you.

5          MR. DALY:  And we would participate or not or be

6     able to use it.  I don't think we're going to go to them

7     all, Judge.

8          THE COURT:  You just divvy it up between the

9     three of you.  Look it, you've got all the government

10    here and --

11         MR. DALY:  So many.

12         Schedule, Judge.  If -- as I said, we're in the

13    midst of expert land.  The schedule that they're

14    proposing with Dey and Roxanne puts their expert stuff

15    out.  Why should I have to file my expert report in

16    three weeks when I'm going so have a hundred depositions

17    that I have to assume?

18         THE COURT:  You don't.  You're the one that

19    wanted a schedule for issues unique to you.  Are you

20    changing that?

21         MR. DALY:  No.  I'm saying my expert reports are

22    due August 21, but there's going to be all this

23    discovery.

24         THE COURT:  What do you want?

25         MR. DALY:  I want to be on the same expert

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    discovery they have.

 2          THE COURT:  All right.  So now you're back on

 3    the train.

 4          MR. GOBENA:  Your Honor, if we do that, it might

 5    effect the motions practice with respect to the unique

 6    issues that Abbott has.

 7          THE COURT:  Yes.  I wanted to just go through

 8    this thought process.  So why don't we do this.  You all

 9    submit a massive case management order with everybody on

10    it subject to what we just said and that's what we're

11    going to do.

12          MR. BREEN:  Your Honor, we have another Abbott

13    Ven-A-Care case, the erythromycin case, which your Honor

14    denied the motion to certify the appeal, and we're in

15    discussions of case management.  You said all Ven-A-Care

16    cases.  Are you suggesting we try to incorporate that

17    discovery on that also?

18          THE COURT:  Yes.  I don't know if there's

19    anything unique there.

20          MR. DALY:  We haven't started that case.  I

21    think trying to put that on the same track at this -- we

22    don't have a CM out yet.

23          THE COURT:  All right.  You should confer and

24    come up with a separate case management order.  I will

25    say I'm not going to redo these issues state by state
```

1    with erythromycin.

2              MR. DALY:  I hear you.

3              MR. BREEN:  That's all I was talking about.

4              THE COURT:  Just within two weeks you can give

5    me a case management order for all three and then

6    another case management order just for erythromycin.

7              Now what I want to do is move into deliberative

8    process privilege.  We're done with this particular

9    thing, are we?  Who's arguing this?

10             MR. DALY:  I am.

11             MR. HENDERSON:  Just one addition -- on the

12   Abbott case, your Honor --

13             THE COURT:  Which one are we talking about now?

14             MR. HENDERSON:  It's part of the scheduling --

15             THE COURT:  Okay.

16             MR. HENDERSON:  -- overall.  I think Abbott's

17   expert disclosures with regard to things other than

18   state discovery, they should finish up that on the

19   original schedule.

20             THE COURT:  Why don't you try and negotiate

21   this, but I feel not strongly at all about that.

22             MR. HENDERSON:  Okay.

23             THE COURT:  Because what I need to do is have

24   this on a coordinated schedule because it became crystal

25   clear to me last time I've got all these cases going off

PDF created with pdfFactory trial version www.pdffactory.com

1   on their own and it made no sense.

2           MR. HENDERSON:  I think a lot of Abbott's expert

3   disclosures are really going to relate to damages

4   issues, issues that are unique to their drugs.

5           THE COURT:  Then maybe they should stay on track

6   but give them a little bit of breather because he's also

7   got to jump on this stuff.  So just negotiate something.

8           MR. DALY:  We will talk.

9           (Court adjourned at 3:55 p.m.)

10

11                - - - - - - - - - - - -

12                     CERTIFICATION

13           I certify that the foregoing is a correct

14   transcript of the record of proceedings in the

15   above-entitled matter to the best of my skill and

16   ability.

17

18

19

20   /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR              Date
21   Official Court Reporter

22

23

24

25