

19816219
May 13 2008
4:59PM

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*The City of New York v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 04-CV-06054)<br>*County of Suffolk v. Abbott Labs., et al.*<br>(E.D.N.Y. No. CV-03-229)<br>*County of Westchester v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 03-CV-6178)<br>*County of Rockland v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 03-CV-7055)<br>*County of Dutchess v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 05-CV-06458)<br>*County of Putnam v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 05-CV-04740)<br>*County of Washington v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00408)<br>*County of Rensselaer v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00422)<br>*County of Albany v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00425) |  |

[Caption Continues on Next Page]

**SCHERING CORPORATION'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR PROTECTIVE ORDER</u>**

| | |
|---|---|
| *County of Warren v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00468) | ) |
| *County of Greene v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00474) | ) |
| *County of Saratoga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00478) | ) |
| *County of Columbia v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00867) | ) |
| *Essex County v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00878) | ) |
| *County of Chenango v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00354) | ) |
| *County of Broome v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00456) | ) |
| *County of Onondaga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00088) | ) |
| *County of Tompkins v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00397) | ) |
| *County of Cayuga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00423) | ) |
| *County of Madison v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00714) | ) |
| *County of Cortland v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00881) | ) |
| *County of Herkimer v. Abbott Labs. et al.* | ) |
| (N.D.N.Y. No. 05-CV-00415) | ) |
| *County of Oneida v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00489) | ) |
| *County of Fulton v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00519) | ) |
| *County of St. Lawrence v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00479) | ) |
| *County of Jefferson v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00715) | ) |
| *County of Lewis v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00839) | ) |
| *County of Chautauqua v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06204) | ) |
| *County of Allegany v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06231) | ) |
| *County of Cattaraugus v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06242) | ) |

| | |
|---|---|
| *County of Genesee v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06206) | ) |
| *County of Wayne v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06138) | ) |
| *County of Monroe v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06148) | ) |
| *County of Yates v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06172) | ) |
| *County of Niagara v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06296) | ) |
| *County of Seneca v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06370) | ) |
| *County of Orleans v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06371) | ) |
| *County of Ontario v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06373) | ) |
| *County of Schuyler v. Abbott Labs, et al.* | ) |
| (W.D.N.Y. No. 05-CV-06387) | ) |
| *County of Steuben v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06223) | ) |
| *County of Chemung v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06744) | ) |
| AND | ) |
| *County of Nassau v. Abbott Labs., et al.* | ) |
| (E.D.N.Y. No. 04-CV-5126) | ) |
| | ) |

**PRELIMINARY STATEMENT**

The Rule 30(b)(6) Notice of Deposition to Schering Corporation ("Schering"), which seeks discovery about Schering's sales and marketing practices for its brand-name drugs, should be quashed, and the City of New York and certain New York Counties (hereafter, "the Counties") should be barred from taking discovery of Schering at this time. The discovery that the Counties seek contravenes this Court's clear Orders that discovery proceed only with respect to drugs for which the "spread" between AWP and a "good faith" average of wholesaler prices exceeds 30%. The Counties have flouted these clear instructions, seeking to take discovery with regard to Schering-brand drugs on the basis of "spreads" calculated by comparing AWP to wholesaler data that hardly can be characterized as an average of anything. As a basis for comparison, the Counties cherry-pick irrelevant classes of trade and calculate "averages" over irregular periods of time, randomly selecting sometimes a few days, a few weeks, or longer for no apparent reason other than to artificially inflate the purported "spread" so that the Counties can justify proceeding with discovery. When analyzed in accordance with this Court's prior rulings, however, it is clear that the Counties cannot establish liability with regard to any of the Schering-brand drugs allegedly at issue. Thus, all discovery as to Schering should be stayed at least for now.

**BACKGROUND**

This Court's Orders that the Counties be permitted to proceed with discovery only if they are able to make "good faith" allegations of spreads in excess of 30% have a long history. In 2004, the Court considered Suffolk County's complaint against a number of defendants. In the course of evaluating Defendants' motion to dismiss, the Court directed Suffolk to explain the basis for its spread calculation so that the Court could determine whether Suffolk's allegations of

spread were in good faith. *See* Mem. & Order, Oct. 26, 2004 at 4 [Docket No. 1115]. When Suffolk disclosed its methodology for calculating the spreads, the Court dismissed its claims. *See* Mem. & Order, April 8, 2005 at 2-3 [Docket No. 1482].

Thereafter, Suffolk consolidated its action with several other counties and served a Consolidated Complaint. In dismissing some, but not all, of the Counties' claims asserted in that Consolidated Complaint, the Court wrote that the Counties' claims survived the motion to dismiss only to the extent that the Counties had alleged an "AWP calculated on a good faith basis, together with a spread." *See* Mem. & Order, Apr. 2, 2007 at 36. The Court's Order further explained that only those drugs for which the Counties could allege a spread in excess of a "20-25% mark up between WAC and AWP survive." *Id.* at 37 n.9. So limited, the Counties returned to the Court with a First Amended Consolidated Complaint that calculated spreads on a completely new basis, using a spread between AWP and the lowest price paid *by any provider* to *one* of three national wholesalers *at any point in time*. *See* First Amended Consolidated Complaint [Docket No. 4302].

Once more, the Defendants moved to dismiss. At the hearing on the Defendants' motions to dismiss, the Court yet again made clear to the Counties that they could proceed only with respect to drugs for which a spread in excess of 30% was alleged, that spread having been calculated in "good faith." *See* Declaration of Bryan R. Diederich ("Diederich Decl.") Ex. A. (7/26/2007 Hr'g Tr. 22:24-23:3). Adding emphasis to what it had already said during the hearing, the Court issued an Order on July 30, 2007 dismissing the Counties' First Amended Consolidated Complaint in part and ordering that: (1) the Counties must calculate the "spread" for drugs by comparing the AWP to a "weighted average, or typical, price for each drug calculated on a reasonable, good faith basis . . ."; and (2) discovery be stayed as to "all drugs

with spreads lower than 30%." *See* Order, Jul. 30, 2007 [Docket No. 4540]. The Court reaffirmed both of these directives in its Case Management Order governing this action. *See* Case Management Order No. 33, Sept. 14, 2007 [Docket No. 4745].

Despite these many, clear directives, the Counties now seek discovery from Schering with regard to its brand drugs on the basis of spreads that were not calculated in good faith. On February 11, 2008, despite being urged to re-examine their spread calculations before seeking discovery regarding the Schering-brand drugs allegedly at issue, the Counties served on Schering a Rule 30(b)(6) Notice of Deposition (the "Notice"). *See* Diederich Decl. Ex. B. That Notice seeks deposition testimony regarding Schering's pricing, sales, and marketing practices for its brand drugs – none of which is properly the subject of discovery. *See id.* On February 13, 2008, the Counties were again informed that, when properly calculated, the "spreads" between the AWPs published by the pricing compendia for Schering's brand drugs and the Average Manufacturer Prices or AMPs that Schering reported to Medicaid pursuant to federal statute and its Medicaid Rebate Agreement were regularly 30% or less. *See id.* Ex. C.[1] Since then, the parties have been unable to resolve their disagreement about whether the Counties are allowed to proceed with discovery where the spread between the AWP and AMP for a drug does not regularly exceed 30%.

**ARGUMENT**

The Court should not permit the Counties' continued defiance of its Orders. When calculated in "good faith," it is clear that the spreads alleged by the Counties have been inflated to create a case where none exists. Because the deposition testimony sought is not reasonably

---

[1] In those instances in which the spread for a "subject drug" identified in the Notice exceeded 30%, other evidence – such as sufficient sales at the drug's list price – precludes the possibility of a finding of liability. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp.2d 20, 105, 108 (D. Mass. 2007). The Counties were so informed. *See* Diederich Decl. at Ex. C.

calculated to lead to the discovery of relevant evidence, good cause exists for the Court to issue a protective order preventing the Counties from proceeding with the deposition and with further discovery against Schering absent a showing by the Counties that, at the very least, the spread between the AWP and AMP for a drug regularly exceeds 30%.  *See* Fed. R. Civ. P. 26(c); *Church of Scientology of Boston* v. *IRS*, 138 F.R.D. 9, 10 (D. Mass. 1990).  As the Affidavit of Sumanth Addanki submitted in support of this motion makes clear, such a showing is not possible here.

I.  **THE COUNTIES SHOULD NOT BE ALLOWED TO TAKE DISCOVERY FROM SCHERING BECAUSE OF THEIR FAILURE TO ALLEGE SPREADS IN GOOD FAITH.**

The Court has the inherent authority to regulate the terms and conditions of discovery. *See In re Puerto Rico Elec. Power Auth.*, 687 F.2d 501, 508 n.2 (1st Cir. 1982).  Consistent with that authority, the Court has directed that the Counties may proceed with discovery only on the basis of spreads calculated in good faith.  Even a casual review of the Counties' Revised First Amended Consolidated Complaint ("RFACC" or "the Complaint") reveals unmistakable evidence of an effort to manipulate the wholesaler data to invent a cause of action against Schering where none exists.

A.  **The Counties' Alleged Spreads Are Not Calculated in Good Faith.**

Even though they were ordered to amend their Complaint and calculate spreads in good faith, the Counties continue to play games.  The Counties allege that the spreads listed in Exhibit B to their Complaint are calculated by comparing AWP to "Actual Acquisition Cost" or "AAC." *See* RFACC ¶ 145.  The Counties further allege, without explanation, that the AAC is "a weighted average of actual prices paid to wholesalers by providers in the *relevant* classes of trade."  *See* RFACC Ex. B-32.  Yet, the Counties' AAC-based spread calculations are

11077989_1.DOC                                                      4

inconsistent at best and fall well-short of the mark set by the Court when it required that the Counties allege a good faith "weighted average or typical" price when calculating spreads.

First, the Counties opportunistically select from among the various data sets that they have collected from the national wholesalers, intermittently choosing to rely on Cardinal, McKesson, or AmerisourceBergen data when it suits their purposes to do so.  *See* RFACC Ex. B-32.  And even within the datasets collected from these national wholesalers, the Counties admit that they have calculated their spreads by selecting certain classes of trade that they deem relevant while excluding those that they, without explanation, deem irrelevant.  *See* Declaration of Joanne M. Cicala ¶¶ 10-11 [Docket No. 4454].  Thus, the Counties routinely avoid calculating spreads based on transactions to the *retail* class of trade – *i.e.*, the predominant class of trade reimbursed by Medicaid for outpatient drugs.  Instead, included in the Counties purportedly relevant classes of trade are physicians, clinics, and warehouses, whose drug pricing has nothing to do with retail pharmacies.  *See id.*

Second, the Counties also gerrymander the time periods over which they calculate spreads apparently to achieve a particular result.  While one might expect to see spreads calculated on an annual basis (as was the case in the MDL action) or for periods defined by the beginning and end dates of an AWP (a methodology also used and accepted by this Court in the MDL action), the Counties have chosen to calculate spreads over a variety of non-uniform periods, occurring at different, isolated points in time, and never for the entire relevant time period.  For example, although using only the transactions of a single payor, in the case of one Claritin NDC (00085-061202), the Counties have done as one might expect and calculated a spread for a full calendar year.  *See* RFACC Ex. B-32.  In contrast, for other drugs, the Counties have calculated spreads over a few months (*e.g.*, 00085-064705 – Intron-A), a few weeks (*e.g.*,

00085052503 – Eulexin), a few days (*e.g.*, 00085-125401 – Intron-A), or even a *single day* (*e.g.*, 00085056701 – Elocon).  *See id.*  In some instances, the Counties have even calculated a spread for a period of time occurring *outside* of the 1997 to 2005 period that this Court has set for purposes of discovery.  *Id.* (*e.g.*, 00085004106 – Vancenase).

The result is that the spreads alleged by the Counties are inconsistent with the spreads that this Court found to exist for the very same drugs at the conclusion of the Track 1 MDL trial.  For example, following the Track 1 trial, the Court concluded, based on the work of Plaintiffs' expert, Dr. Raymond Hartman, that "all spreads [for Temodar] are below 30%."  *See In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 491 F. Supp. 2d 20, 108 (D. Mass. 2007).  And yet, the Counties manage to manipulate the wholesaler data to a point where they allege a spread that is just great enough (32%, they say) to justify seeking discovery with regard to Temodar.  *See* RFACC Ex. B-32.  The same result attains for Intron-A.  *See id.*  Despite the Court's conclusion following the MDL trial that the evidence showed that, for the Intron-A NDCs at issue there, the "spread exceeded 30% in only three years" and then "[t]he highest spread is 32.6%," the Counties allege spreads as high as 71% for NDCs associated with Intron-A.  *Compare In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 491 F. Supp. 2d at 108 *with* RFACC Ex. B-32.  Stated simply, the Counties' spread calculations fail to satisfy the Court's "good faith" requirement.

**B.    A "Discovery Screen" Based on AMP Provides A Fair and Readily Available Solution.**

Rather than continue to tolerate the Counties' data manipulation, this Court should evaluate the viability and scope of the Counties' case against Schering using "spreads" calculated against a baseline of Average Manufacturer Price or AMP, and should limit discovery to drugs with spreads between AWP and AMP that regularly exceed 30%.  Schering does not

11077989_1.DOC                                                        6

intend, by making this suggestion, to imply that any liability should result from a pattern of spreads between AWP and AMP that are greater than 30%, but simply to suggest that the use of AMP as a screen would remove from contention drugs as to which no liability could possibly attach.

  As a "discovery screen," AMP has at least three virtues: (1) AMP is a measure that is defined by statute and one that the Medicaid program has used consistently since 1991 to collect millions and millions of dollars in rebates, so that it cannot be manipulated for purposes of discovery in this case by either side; (2) because it is a measure of the manufacturer's average selling price to wholesalers (not of a Medicaid provider's average acquisition cost, which would in most cases be higher because of, among other things, wholesaler mark-ups), AMP is conservative, so that no drug whose spread could possibly require good-faith scrutiny would be excluded from discovery; and (3) moreover, because of its prolonged use by the Medicaid program, AMP should be readily available for most defendant manufacturers. Using AMP as a baseline and applying this Court's prior rulings, this Court has the ability to "screen" out drugs that can't possibly have patterns of spreads over 30% and to appropriately narrow discovery. By Plaintiffs' calculations, more than 7,800 NDCs purportedly remain at issue in this case. *See* RFACC Ex. B-32.

  ***AMP Is Statutorily Defined and Has Been Consistently Used By Medicaid Since 1991.*** As a condition of participation in the Medicaid program, for purposes of calculating rebates, drug manufacturers are obligated (and have been obligated since 1991) to calculate and report to CMS, at an NDC-level, the "Average Manufacturer Price" or AMP for all drugs reimbursed by Medicaid. *See* 42 U.S.C. § 1396r-8(b)(3)(A). CMS has, over time, provided some guidance on how to calculate AMPs. *See* CMS Drug Manufacturer Releases Nos. 1-79 (at

http://www.cms.hhs.gov/MedicaidDrugRebateProgram/03_DrugMfrReleases.asp). Although differences persist in the methodologies employed by different manufacturers,[2] AMP is a measure that the Medicaid program has used for seventeen years now. Over that extended period, Medicaid has relied on AMP to calculate Schering's and other manufacturers' rebate payments. More specifically, states, including New York, have used Unit Rebate Amounts (formulaically derived from AMP) to bill and collect rebates from the manufacturers, including Schering. *See* 42 U.S.C. § 1396r-8(c)(1) and (3). Simply put, AMP is Medicaid's statutorily defined measure of the discounted, "average price" that a *manufacturer* receives for selling those drugs (usually to wholesalers) that are reimbursed by Medicaid programs. *See* 42 U.S.C. § 1396r-8(k)(1)(defining AMP to include discounts). Because AMP measures what the manufacturer (not the wholesaler) is paid on average, it does not reflect mark-ups that wholesalers typically charge to providers such as retail pharmacies.

***For Present Purposes, AMP Provides A Conservative Baseline.*** For use as a "discovery screen," AMP is conservative. As an initial matter, AMP is an average of the amount, after discounts and rebates, paid to a manufacturer by wholesalers for drugs distributed to the retail class of trade. *Id.* Medicaid providers, on average, would – as a matter of basic economic principles – pay more to acquire the drugs at issue because many (if not most) purchase drugs through wholesalers, which typically add a mark-up to the price at which they acquire the drug from the manufacturer or at least do not pass along the customary prompt pay discount extended by the manufacturer, which, during the relevant time, would have been reflected in the manufacturer's AMP. Although it would be more precise to calculate spreads using *providers'* average acquisition cost as a baseline, for purposes of a "discovery screen," AMP's worst fault

---

[2] *See, e.g.,* United States Government Accountability Office, Medicaid Rebate Program: Inadequate Oversight Raises Concerns about Rebates Paid to States, GA0-05-102 (Feb. 2005), at pp. 15-19.

might be that it is too conservative and generally overstates spreads. It is also worth noting that no manufacturer would have had a historic incentive to inflate its AMP (thus reducing the spread percentage) because that would have meant that the manufacturer would have been obligated to pay a higher rebate amount to the states and federal government. *See* 42 U.S.C. § 1396r-8(c)(1) and (3).

      *AMP Is Readily Available.*  As noted above, AMP has a third virtue as a "discovery screen." Drug manufacturers have been reporting AMPs quarterly to CMS since 1991, so AMPs should be readily available for most defendants. Plaintiffs in these cases, including the consolidated New York Counties, routinely request AMP data from the defendant manufacturers as a part of their standard panoply of discovery requests. In this case, Schering has provided the requested AMP data to the Counties as a part of its discovery responses to date, but the Counties have simply chosen not to use that AMP data in calculating their alleged spreads.

      Schering has paid literally hundreds of millions of dollars in rebates to the Medicaid program and, in particular, to the states, including New York, over the last seventeen years – all based on the AMPs that it has calculated and reported to CMS. These AMPs provided a standardized measure, defined by Medicaid, and one on which everyone has relied for years. At least for purposes of a "discovery screen," the Court should accept AMP as a conservative baseline for calculating spreads. Using AMP in this way should end the bickering about what constitutes a "good faith" spread calculation and provide a consistent and well-defined parameter for narrowing the scope of this case. As explained below, when judged by this standard, Plaintiffs simply cannot meet their burden for pursuing any further discovery from Schering.

II. **WHEN SPREADS ARE CALCULATED IN GOOD FAITH, IT IS CLEAR THAT THE COUNTIES HAVE NO BASIS FOR PROCEEDING WITH DISCOVERY REGARDING THE SCHERING-BRAND DRUGS.**

Indeed, evident in the Counties' continued efforts to manipulate spread data is the recognition that, under any good faith calculation of spreads, there is little point in proceeding with discovery with respect to the Schering-brand drugs. *See Kleinerman* v. *U.S. Postal Serv.*, 100 F.R.D. 66, 68 (D. Mass. 1983) (recognizing that discovery can be stayed where no valid theory of recovery can be pled). As this Court has recognized, while its rulings in the Track 1 trial are not necessarily binding in the Counties' case, *see* Diederich Decl. Ex. D (7/26/2007 Hr'g Tr. 17:15-18:3), the Court's rulings in that trial and elsewhere in this litigation can provide a useful "template" for analyzing the matters at issue. *See id.* at 36:21-37:3; Ex. E (7/3/2007 Hr'g Tr. 11:1-23). The Court's guidance following the MDL Track 1 trial makes clear that the Counties cannot in good faith make a claim that they are entitled to proceed to take discovery from Schering with regard to its branded drugs. Viewed objectively, there is simply no indication of a pattern of "AWP fraud" with respect to the Schering-brand drugs.

This Court has held, in the context of brand drugs, that there existed in the pharmaceutical industry an expectation of a spread of approximately 30% between a drug's published AWP and the average selling price to retailers for that drug. *See In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 491 F. Supp. 2d at 101-02. Accordingly, although this Court has declined to establish any bright-line test, it has declined to impose liability in instances where the spread is 30% or less. *Id.* Indeed, this Court has expressly stated that, an "isolated, anomalous occurrence" of a spread in excess of 30%, even one of a "significant magnitude," does not necessarily give rise to liability. *Id.* at 108. "Also relevant to [its] analysis," this Court has held, "is the legitimacy of the list price from which the markup is derived: Is it a real list price at which substantial sales were made or an unfair and deceptive price used to jack up the

AWP?" *Id.* at 102.  In instances were "50 percent of all sales were made at or about the list price,"[3] this Court has determined that the list price "will not be deemed [to be] fictitious." *Id.* at 105.

      Whether or not Defendants agree entirely with the standards announced by this Court, and in particular their application to multi-source, generic drugs (and they do not), when this "template" is applied to the Schering-brand drugs allegedly at issue, it quickly becomes clear that Plaintiffs' cannot possibly meet their burden of proof.  For most of the Schering-brand drugs, the "spreads" between AWP and AMP are below 30% of AMP, and those that are not show no particular pattern and are, moreover, generally only modestly higher.  *See* Affidavit of Sumanth Addanki, at ¶ 9 & Ex. 3.  Furthermore, a substantial portion of Schering's sales of the branded pharmaceutical products at issue – over 85% – were made at or very near WAC.  *Id.* at  ¶ 10 & Ex. 4.  When sales are analyzed by drug, many of the brands have over 90% of their sales made at or very near WAC.  *Id.*  ¶ 10 & Ex. 5.  The same results obtain when the sales data are analyzed on an annual basis at the NDC-9 level (as AMP is reported).  *Id.* at ¶ 10 & Ex. 6.  Simply put, with respect to the Counties' claims against Schering, there is no need for discovery of any sort because there is no plausible case for the Counties to make.

---

[3] For these purposes, this Court has defined "at or about the list price" as "within 5% of the list price" or WAC.  *See In re Pharm. Indus. Avg. Wholesale Price Litig.*, 520 F. Supp.2d 267, 272 (D. Mass. 2007).

## CONCLUSION

For all the foregoing reasons, Schering's Motion for Protective Order should be GRANTED.

                    Respectfully submitted,

                    Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation Complaint

                    /s/ John P. Bueker
                    John T. Montgomery (BBO#352220)
                    John P. Bueker (BBO#636435)
                    Bryan R. Diederich (BBO#647632)
                    Kim B. Nemirow (BBO# 663258)

                    ROPES & GRAY LLP
                    One International Place
                    Boston, Massachusetts 02110-2624
                    (617) 951-7000

Dated: May 13, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2008, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

                    /s/ Renée A. Coshin
                    Renée A. Coshin