

Pa
May 21 2008
11:25 AM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 1 - 53

MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
July 26, 2007, 2:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

**EXHIBIT**

**A**

1    class drugs, the counties spent over $180 million based on

2    AWP or FUL on the class drugs, not based on actual cost,

3    based on AWP or FUL.  We've done the research.  Every one of

4    the class drugs is in Exhibit B.

5              THE COURT:  When you say "class drug," what do you

6    mean?

7              MS. CICALA:  I'm saying the drugs -- I'm sorry --

8    the drugs that your Honor considered in the context of the

9    recent MDL class trial, those drugs were reimbursed on the

10   basis of AWP.

11             THE COURT:  So you're going to turn over to them

12   exactly what drugs that you're talking about are the

13   physician-administered drugs that are typically reimbursed

14   based on a different basis and you're alleging were

15   reimbursed out of a pharmacy based on AWP.

16             MR. TRETTER:  I would like to just put a practical

17   point on it, your Honor.  I would like to know for a

18   chemotherapy drug how much they're really contending was

19   issued out of retail pharmacies and whether the retail

20   pharmacist gets it at the doctor's price or --

21             THE COURT:  You know what, that's why you have

22   discovery.  I'm not doing that on a motion to dismiss.  So

23   you want that on automatic disclosure.  We should do that.

24   When can you do that by?

25             MS. CICALA:  I want to be clear what the automatic

1    disclosure is, your Honor, if I may.

2         THE COURT:  I think he's saying he doesn't know

3    which ones you're alleging are the physician-administered

4    drugs that are being reimbursed out of AWP.  Like, Vepesid

5    would be his example.

6         MS. CICALA:  I do not understand why we would need

7    to single out the physician-administered drugs as a subset of

8    the whole if our spread allegations are --

9         THE COURT:  I'm not dismissing the compliant.  I'm

10   just simply saying that it should be -- if you say you can do

11   it, do it.  It helps move it along, that's all.  I'm not

12   dismissing on that ground.

13        Now, let me jump back to you.

14        MS. CICALA:  Sure.

15        THE COURT:  Which is, I understand you're not bound

16   by what I did in my major trial.  You're not.  You don't have

17   to agree with Raymond Hartman, Dr. Hartman.  Maybe there's

18   some other guy out there who disagrees, okay?  On the other

19   hand, this case is massive.  As was just pointed out, it's a

20   gateway issue.  It's how much discovery has to be done.  It's

21   not like my typical case where I say, "Huh, manana, I'll

22   worry about it later."  If I say "Go ahead," then I'm opening

23   huge amounts of expensive discovery.  I have to have the

24   basis for believing that some expert somewhere disagrees with

25   what Raymond Hartman says because he was viewed as

1    problematic, even by them.  You notice I hedge.  There are

2    places they agree with him.  But that was supported by the

3    evidence at trial.

4            MS. CICALA:  Absolutely, we have tremendous respect

5    for Professor Hartman's conclusions in the class trial.  It

6    just seems to us he considered -- a two-part answer, your

7    Honor.  Professor Hartman considered the knowledge and

8    expectations of the plaintiffs that were before your Honor in

9    connection with the class trial.  Those were not Medicaid

10   payors, nor were they even government entities.  I'm not

11   sure, I don't think any of us as we sit here today --

12           THE COURT:  Well, there was overwhelming evidence

13   that the federal government understood that.  I would grant

14   you, I don't think we mentioned New York once, so I -- not

15   that I know that New York did, but I am simply saying, it was

16   uncontested and a pretty hard-fought battle with outstanding

17   lawyers, okay.  I'm not dealing with somebody who was being

18   overwhelmed or something.  Both sides were duking it out.

19           MS. CICALA:  Right, and we're not disputing

20   Professor Hartman's conclusions with respect to the

21   plaintiffs for whom he offered an opinion, and nor are we

22   even necessarily disputing his conclusions if they were

23   imported into this case.  What I'm saying, your Honor, is, he

24   has not offered an opinion on the knowledge or expectations

25   of government Medicaid and Medicare payors, and it would be

1  premature on the record we have before us to conclude that

2  his opinion regarding expectations automatically will apply.

3         THE COURT:  I agree with you a hundred percent that

4  it doesn't automatically apply.  On the other hand, I

5  heard -- there were many major battles going on in my trial,

6  but that wasn't one of them.

7         MS. CICALA:  Understood, understood.

8         THE COURT:  Okay?  Of the many things we had, that

9  was the one piece that I would say was virtually undisputed.

10  That's why I never really understood the defendants' attack

11  on the reliability because that was pretty undisputed.

12         MS. CICALA:  Right.

13         THE COURT:  So this is what I'm going to do:  We

14  are going to stay discovery on any drug that doesn't have a

15  30 percent --

16         MS. CICALA:  Okay, all right.

17         THE COURT:  What did we call it?

18         MR. TRETTER:  Spread.

19         THE COURT:  Spread, speed limit, whatever you want

20  to call it, we're going to stay discovery on it.  And I would

21  need some really good-faith expert opinion as well as

22  affidavit evidence that there's a good-faith basis for me

23  jumping it down to the 20 to 25 percent.  So I think at the

24  time we talked last, I don't think I'd issued my --

25         MS. CICALA:  You hadn't.

d1ba5861-cb8e-43e4-a176-a44af5531b9c

1        THE COURT:  I hadn't worked everything through.  So

2   what you did was in good faith in reliance on what I had

3   said, but the issue really -- you're not bound by it.

4        MS. CICALA:  I understand.

5        THE COURT:  You just, in order to open up that

6   floodgate of additional new drugs -- how many would you say

7   are in the 30 percent range?

8        MR. TRETTER:  Well, we have an actual slide on

9   that, and it depends.

10        THE COURT:  You mean someone did this fabulous

11   layout, and I'm going too fast?

12        MR. TRETTER:  Hoa did it all.

13        THE COURT:  Who did it?

14        MR. TRETTER:  Hoa.

15        MS. HOANG:  Hi, your Honor.

16        THE COURT:  Hi.  Well, just put it on just so it

17   wasn't all for not.

18        MR. TRETTER:  First, you have to break it into two

19   pieces.  You've got the self-administered drugs at 30 percent

20   and the physician-administered drugs at 30 percent.

21        THE COURT:  I believe you were always encouraging

22   me to say that they would be roughly the same, the

23   expectations in the industry.

24        MR. TRETTER:  Yes, I think, I mean, I don't see any

25   reason to distinguish between the two.  Just this happens to

1    be -- you have 1,448 NDCs that are out based on 30 percent,

2    as we see it.  Assuming, of course, you take either price

3    that the plaintiffs used, either the McKesson ServALL or the

4    average that they calculated --

5          THE COURT:  I'm not going to get into those weeds

6    for purposes of the motion to dismiss as to which class of

7    trade or how you calculate it.  It can't be with the

8    pennies.  That's where I'm --

9          MR. TRETTER:  Right, I understand that.  Then we're

10   going to have to work through some sort of way of deciding

11   what's stayed because you've got to say 30 percent of what?

12         THE COURT:  Well, you want -- it's either a typical

13   price in McKesson or an average price.  I'm not going to get

14   into what class of trade should be there.  That's not motion

15   to dismiss material.

16         MR. TRETTER:  All right, your Honor.

17         THE COURT:  I don't know, and I'm not going to do

18   that, and I would need expert reports about what's fair.  I

19   don't even remember, although you probably told me, what

20   Medicare is using as their classes of trade.

21         MR. TRETTER:  You mean Medicaid or Medicare?

22         THE COURT:  Medicare, when they're doing their

23   ASPs, I don't know how they're coming up with them.

24         MS. CICALA:  They're different classes, your Honor.

25         MR. TRETTER:  Yes, totally different classes of

1  trade because there's really not much of a retail class of

2  trade there.

3         THE COURT:  I understand that, but for at least the

4  physician-administered drugs, which is why it's useful to

5  have the list, it should roughly reflect where Medicare is

6  going because they're the, you know, the big elephant in the

7  room.  With respect to self-administered drugs, how is

8  Medicare deciding what to do under the new Part D?

9         MR. TRETTER:  Oh, under Part D as in "dog"?

10        THE COURT:  Are they doing anything like this?

11  This is why we need discovery.  I can't address that here.

12  And so you take a typical price in good faith, and that's

13  going to be enough, and it's going to be 30 percent, and

14  everything else is stayed.  And once I get further into this

15  case and I decide whether it's 30 or 24 or 25 percent, and

16  once I decide what classes of trade make sense according to

17  expert opinion, then I'll be able to start pruning down.

18        MR. TRETTER:  All right.  What I'm hearing, though,

19  your Honor, is, we're not engaging in nearly as much pruning

20  as the defendants hoped, because I think you'll get rid of

21  some NDCs here.  But, you know, remember, we had 133 in the

22  MDL, and you have 11,000 here.

23        THE COURT:  I understand that.  I'm on the same

24  page with you, but -- so I'm limiting you to 30 percent, and

25  it's a good-faith, whether it's median or average or typical

1    through some publication, excluding pennies or low fliers --

2    median maybe makes sense -- but whatever you want to use

3    that's in good faith --

4              MS. CICALA:  Yes, the weighted average, I mean, the

5    weighted average is in good faith.

6              THE COURT:  Well, get rid of the pennies, though.

7              MS. CICALA:  Yes, but I gave you the statistics on

8    what happens to the pennies with the weighted average.

9    There's very little impact on the NDC.

10             THE COURT:  What if I added 30 percent?

11             MS. CICALA:  It sounds like Mr. Tretter is

12   representing something like 1,400 NDCs would fall out.

13             MR. TRETTER:  Well, that's just on the pills, and

14   then a few more would end up out in the PADs.  But once you

15   take out the pennies, probably it would be a little bit more.

16   But that was with the pennies.

17             THE COURT:  All right, what you're just going to

18   do, we're not going to have a new complaint here.  We're just

19   going to have a new exhibit.

20             MS. CICALA:  Okay.

21             THE COURT:  And you don't have to answer it.  It's

22   going to be called a "substitute exhibit" because I can't

23   keep going through these rounds of motions to dismiss.

24             MS. CICALA:  Your Honor, I would like to include

25   the below 30s in the exhibit so the Court has a complete list

1   of NDCs --

2           THE COURT:  No.

3           MS. CICALA:  -- even though discovery is stayed as

4   to them.

5           THE COURT:  Then do them as a separate exhibit.

6           MS. CICALA:  Fine.  That's fine, your Honor.

7           THE COURT:  All right, now --

8           MR. TRETTER:  I think that leaves the FULs.

9           THE COURT:  Okay, so that's the hard one.  All

10  right, go ahead.

11          MR. BUEKER:  And I guess, your Honor, if I might be

12  heard on that, I'm prepared, I have an example to talk

13  through that I think would help the Court even to further

14  appreciate the FUL --

15          THE COURT:  They say, though -- and I haven't sat

16  and walked through all these enormous charts -- they say

17  they've done what the federal government said; that they've

18  only taken drugs where the accurately stated published price,

19  not transactional price, published price would have brought

20  down the FUL.

21          MR. BUEKER:  Well, I guess I have trouble

22  understanding --

23          THE COURT:  You in your brief say that's not true,

24  and that's hard for me to resolve right here.

25          MR. BUEKER:  I mean, I guess I have trouble

1          THE COURT:  That's fine.

2          MS. CICALA:  I would like to ask on behalf of my

3     clients -- we are entirely open to participating in the

4     mediation, and we have the highest respect for

5     Professor Green.  My understanding of the order, and I

6     haven't even read it, is that your Honor asked that the

7     parties, if they're going to object to the process or file

8     any papers, do so within seven days of entry of the order.

9     Given that we've already lost two, I would like to ask your

10    Honor if we could have till a week from tomorrow.

11          THE COURT:  You've lost two?

12          MS. CICALA:  We've lost two.

13          THE COURT:  Two days?

14          MS. CICALA:  Yes.

15          THE COURT:  I haven't lost two states, right?

16          MS. CICALA:  No.

17          THE COURT:  See, I've been with this case since

18    2001.

19          MS. CICALA:  I'm only two years behind you.

20          THE COURT:  And the case is expanding because the

21    states are coming in and the federal government is coming in,

22    enormous expense to everyone.  And Professor Green has been

23    pretty successful in trying to reach some global resolutions,

24    which I think at least many of the -- I don't know who all

25    the 30 plus defendants were in this case, but, at the very

d1ba5861-cb8e-43e4-a176-a44af5531b9c

1    least, some have said that maybe we can wrap this up.   And

2    so --

3            MS. CICALA:   We're entirely open to participating,

4    but I would like to ask, if we could, your Honor, to have

5    until a week from tomorrow to respond to the order.

6            THE COURT:   Yes.

7            MS. CICALA:   And also I conferred with counsel for

8    Ven-A-Care and for the State of California who also wanted to

9    join in that request because all of us just learned of entry

10   of the order today.

11           THE COURT:   Fine.

12           MS. CICALA:   Thank you, your Honor.

13           THE COURT:   And you probably -- has Professor Green

14   set up a date yet?

15           MR. TRETTER:   I don't think so, your Honor.   He

16   just knows about it, and we're supposed to work with him over

17   the next fourteen days to get dates.   I mean, he's a very

18   busy individual, and he's got a tremendous number of

19   defendants and parties being thrown at him now, and so it's

20   going to take a little sorting, given his schedule.

21           THE COURT:   I like to think of it as throwing

22   themselves at him.   In any event, I understand it's huge.   On

23   the other hand, if there's a chance at it, I've never

24   scripted the issues in FUL, so there's no guidance, and I

25   don't plan to give any at this point; but certainly some of

1    the other issues, there's at least a template for thinking

2    about it.  You disagree with some of it.  I'm sure class

3    plaintiffs disagree with some of it.

4             MR. TRETTER:  Did you finish your thought, though,

5    on statute of limitations?  Did we finish that thought?

6             THE COURT:  With respect to knowledge about AWPs,

7    I've put my stake in the ground.  So the question that's

8    going to be a problem for you is, if you should have known

9    that the AWPs should have been a lot lower, doesn't that by

10   definition pull down the FULs?

11            MR. TRETTER:  They're a formulaic relationship, as

12   your Honor noted many times.

13            THE COURT:  The problem really is that many of the

14   FULs are predicated on WAC.

15            MR. TRETTER:  Which are formulaically related to

16   the AWPs.

17            THE COURT:  Sometimes.

18            MS. CICALA:  Sometimes, yes.  We can talk about

19   that --

20            THE COURT:  I don't want to go there.  It's very

21   complicated, but I am simply saying, you both -- you have an

22   excellent argument that's likely to win on AWP, although I

23   haven't thought about the 2001 as opposed to the 1997, but

24   with respect to 2001 sounds also like a good date for you

25   anyway.  And you've got to deal with --

d1ba5861-cb8e-43e4-a176-a44af5531b9c

1          MS. CICALA:  In what respect, your Honor?  If I

2    may, I'm sorry.

3          THE COURT:  With respect to AWP.

4          MS. CICALA:  In respect to the perfect storm of

5    knowledge, right, but we're not talking --

6          THE COURT:  You know, for purposes of statute of

7    limitations.

8          MS. CICALA:  Fair enough.  Our first case was filed

9    in '03.  I have no problems with that.  But for purposes of

10   the FUL analysis that your Honor is describing, I'm not yet

11   clear on what the range is --

12         THE COURT:  I haven't ruled at all.

13         MS. CICALA:  Okay, I'm sorry.

14         THE COURT:  I'm thinking about it for the first

15   time right now.

16         MS. CICALA:  Okay.

17         THE COURT:  I didn't even understand it until the

18   government sent in its brief, and my guess is, a lot of

19   people in the room were in the same position.

20         So you're going to let us know in a week about

21   settlement.  And you're just going to file a substitute.  I

22   don't expect you to respond.  It's not a new complaint.  This

23   was the fifth time already.  All drugs that have never been

24   mentioned before are out.  I'm permitting new NDCs, and if

25   it's a previously mentioned drug, I will allow it to be added

d1ba5861-cb8e-43e4-a176-a44af5531b9c

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **MDL No. 1456**<br>**Master File No. 01-12257-PBS**<br><br>**Judge Patti B. Saris** |
| **THIS DOCUMENT RELATES TO:**<br><br>*City of New York, et al.*<br>*v.*<br>*Abbott Laboratories, et al.* | |

## 30(b)(6) NOTICE OF DEPOSITION OF SCHERING CORPORATION

PLEASE TAKE NOTICE THAT, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs will take the deposition, by oral examination on the following date of defendant Schering Corporation ("Schering"), regarding the issues identified herein and the subject drugs of the litigation. Defendant Schering shall designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. The deposition shall be taken before a notary public or other person authorized to administer oaths and shall be recorded by stenographic means. The deposition will commence on March 10, 2008 at 9:30 a.m. at a location in the State of New Jersey to be agreed upon by plaintiffs and Schering, and will continue day to day until completed.

As used herein the term "subject drugs" refers to the drugs and NDCs listed in Revised Exhibit B to the First Amended Consolidated Complaint filed on June 8, 2007, with spreads of 30% or greater. Pursuant to CMO 33, the time period covered by the topics identified in this Notice of Deposition is 1997 through 2005. To the extent they are relevant, this notice



EXHIBIT

B

incorporates by reference the definitions and rules of construction delineated in Plaintiffs' First Request for Production of Documents to All Defendants dated October 18, 2007.

Schering shall designate a person or persons to testify under oath about the following topics:

1.     The reason(s) Schering signed Medicaid rebate agreements pursuant to 42 U.S.C. §1396r(a)(1).

2.     Schering's knowledge of the federal Medicaid program's laws, regulations, and rules including 42 C.F.R. 447.331 and 42 C.F.R. 447.301, specifically, Schering's knowledge that Medicaid reimbursements to providers are based on or derived from the prices published by pricing compendia such as First Databank.

3.     Schering's knowledge of the New York Medicaid program's laws, regulations, and rules including Schering's knowledge that the New York Medicaid program's reimbursement formula for prescription drugs uses the reported Average Wholesale Price ("AWP") and the Federal Upper Limit ("FUL").

4.     The customers who purchase the subject drugs from Schering, and the competitive environment in which the subject drugs were marketed and sold.

5.     The sales made to and prices charged to customers for the subject drugs pursuant to contracts with Schering.

6.     Chargebacks for the subject drugs, whether bundled or not, and the implementation of Schering's chargeback system.

7.     All rebates, discounts, free goods, administrative fees, and off-invoice allowances for the subject drugs, whether bundled or not.

8.     Who determines what Schering's customers pay for the subject drugs.

2

9.      How Schering determined what customers paid for subject drugs, including but not limited to the initial prices offered to prospective customers and the final net cost or price of the subject drugs to the purchaser.

10.     How Schering informed customers of price and price changes for the subject drugs, and who was involved in those communications.

11.     The rebates, discounts, incentives, fees or any other consideration of any kind offered to Schering's customers who purchase, dispense, or award formulary placement to the subject drugs.

12.     The net prices paid by Schering customers for direct or indirect purchases from Schering of the subject drugs.

13.     How Schering measures and records the profitability of the subject drugs sold by Schering.

14.     How Schering tracks sales and revenue for the subject drugs.

15.     Whether Schering calculates a net price for the subject drugs after taking into account any and all rebates, discounts, incentives, fees or other consideration paid by Schering, and if so, what the methodology is for such calculation.

16.     Schering's net revenue for the subject drugs as a percentage of Schering's reported prices.

17.     Schering's marketing and sales policies, strategies, and practices regarding the subject drugs.

18.     Who at Schering is/was responsible for developing marketing or sales policy and marketing or sales strategies regarding the subject drugs.

3

19.     The structure of Schering's marketing and sales force or department as it relates to the subject drugs.

20.     The training, marketing, promotional, informative and/or other sales materials supplied to Schering's sales force for the subject drugs.

21.     How Schering compensates its sales force for sales related to the subject drugs.

22.     Whether, and to what extent Schering ever considers/ed a customer's reimbursement for the subject drugs when marketing or selling the subject drugs.

23.     Whether Schering ever made reference, either orally or in writing, to published prices, reimbursement prices, reimbursement methodology, AWP, WAC or FUL for the subject drugs.

24.     The prices Schering reports for the subject drugs to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

25.     Who at Schering determines the prices reported to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

26.     How Schering determines what prices to report to the publishing compendia, including but not limited to First DataBank, Medispan and Redbook.

27.     How the pricing compendia, use the prices Schering reports.

28.     Any communications between Schering and the publishing compendia, regarding how they use the prices reported by Schering.

29.     Communications between Schering and the publishing compendia.

30.     Schering's reasons for supplying pricing information to the publishing compendia.

4

31.     Whether Schering ever communicated to First DataBank, the Redbook, or Medispan that the AWP or WAC or WAC equivalent that Schering reported to these entities was not the price actually charged by wholesalers to providers or paid by wholesalers to Schering for the subject drugs and, if so, when such communications took place and of what they consisted.

32.     Whether Schering ever communicated to anyone in the New York Medicaid Program that the AWP, WAC or WAC equivalent that Schering reported to First DataBank, the Redbook, or Medispan was not a price actually charged by wholesalers to providers or paid by wholesalers to Schering for subject drugs and, if so, when such communications took place and of what they consisted.

33.     Any effort made by Schering to determine the formulary status or reimbursement status of the subject drugs.

34.     Any effort made by Schering to determine when the subject drugs were reimbursed based on FUL, or the level of any such FUL.

35.     Any effort made by Schering to determine which company's reported price(s) for the subject drugs were being used by CMS to set a FUL.

Dated: February 11, 2008

**KIRBY McINERNEY LLP**

By: _____/s/_____
Joanne M. Cicala, Esq.
James P. Carroll Jr., Esq.
Aaron D. Hovan, Esq.
830 Third Avenue
New York, New York 10022
(212) 371-6600

*On behalf of the Captioned Counties, other than the Counties of Nassau and Orange*

5

Ross B. Brooks, Esq.
**MILBERG WEISS LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*


Stanley J. Levy
Theresa A. Vitello
**LEVY PHILLIPS &**
**KONIGSBERG, LLP**
800 Third Ave. 13th Floor
New York, New York 10022
Telephone:  (212) 605-6200
Facsimile:  (212) 605-6290

*Counsel for the County of Orange*

6

## CERTIFICATE OF SERVICE

I, James P Carroll Jr, hereby certify that I caused a true and correct copy of the foregoing Notice of Deposition, to be served on counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated:  February 11, 2008

                                          /s/
                              James P. Carroll Jr.



**ROPES & GRAY**

ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    TOKYO    WASHINGTON, DC    www.ropesgray.com

February 13, 2008

Bryan R. Diederich
617-951-7042
bryan.diederich@ropesgray.com

**BY E-MAIL**

Joanne M. Cicala
Kirby McInerney LLP
830 Third Avenue
New York, New York 10022

Re:    *City of New York, et al. v. Abbott Labs. et al.*, MDL 1456

Dear Ms. Cicala:

You had requested a reply to your letter of January 29, 2008 to my colleague Kim Nemirow. I write to address the several issues raised in your letter.

The first issue raised in your January 29 letter relates to the production of data regarding 9 drugs subject to FULs. We were surprised by your decision to file a motion to compel against Schering Corporation and Warrick Pharmaceuticals Corporation in light of the fact that we had already agreed to provide you with the data you requested. In any event, all of the data have now been produced. On February 8, 2008, we asked you to confirm that you would withdraw your motion to compel as to Schering and Warrick. We have not heard back from you, and our reply to your motion will be due on Friday. We again ask that you advise us promptly that you will withdraw your motion as to Schering and Warrick. Local Rule 7.1 requires that you confer prior to filing such a motion. Because no Rule 7.1 conference was held, if Warrick and Schering are obligated to file responses to your motion, we will ask the Court for the costs of preparing those responses.

Second, we have now received Plaintiffs' notice of 30(b)(6) deposition directed to Schering Corporation. In light of the Court's orders in this matter and the larger AWP Multidistrict Litigation, we do not believe that Plaintiffs have a good faith basis for seeking further discovery from Schering. As you know, the Court has stayed discovery in this matter for all drugs in which (when calculated in good faith) the difference between the AWP and the "weighted average, or typical wholesale price alleged by plaintiffs . . . is 30% or less." Case Management Order No. 33 ¶¶ 2(c) & 4 [Docket No. 4745]. The 30(b)(6) notice issued to Schering violates this order. Not only does the notice purport to cover several drugs for which Plaintiffs' calculated AWP is 30%, but as Plaintiffs now know with receipt of Schering's AMP data, there are virtually no drugs for which the properly calculated spread is greater than 30%. Were that not enough, the handful of instances in which spreads for the "subject drugs" identified in the 30(b)(6) notice exceed 30%

10909843_2.DOC



EXHIBIT C

ROPES & GRAY LLP

Joanne M. Cicala                           - 2 -                        February 13, 2008

are insufficient to support a finding of liability.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 105, 108 (D. Mass. 2007).

Because there are no drugs for which, when the data are properly alleged, your client could hope to recover against Schering, there is no point in proceeding with discovery on the ancillary topics raised in the 30(b)(6) notice.  Moreover, we continue to be puzzled by your claim that you need information regarding the "methodology" used in calculated AMPs.  AMP calculations are made in accordance with federal regulations and relevant statutes which define, among other things, the classes of trade to be included in the AMP calculation.  We therefore request that you withdraw your notice as to Schering Corporation.

Likewise, with respect to the notice that you have served for Schering-Plough Corporation, as we have explained previously, Schering-Plough is a holding company that does not manufacture, market or sell any drugs.  We, therefore, do not understand the purpose of your 30(b)(6) notice seeking testimony on sales and marketing practices from that entity.  We request that you withdraw the notice.

Very truly yours,

Bryan R. Diederich

BRD:brd

cc:    John Bueker, Esq.
       Kim Nemirow, Esq.

10909843_2.DOC

07-03-2007 1003 Tuesday.txt

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3   --------------------------------
    IN RE:                    :    Civil Action
4                             :    No. 01-12257-PBS
    PHARMACEUTICAL INDUSTRY   :    Courtroom No. 19
5   AVERAGE WHOLESALE PRICE   :    1 Courthouse Way
    LITIGATION                :    Boston, MA 02210
6                       ..    :    10:00 a.m., Tuesday
                              :    July 3, 2007
7   --------------------------------:

8                          HEARING

9

10  Before:        THE HONORABLE PATTI B. SARIS,
                   UNITED STATES DISTRICT JUDGE
11

12

13  APPEARANCES:

14  Hagens Berman Sobol Shapiro LLP, (by Steve W. Berman, Esq.)
       1301 5th Avenue, Seattle, WA 98101-1090,
15     on behalf of the Plaintiffs.

16  Hagens Berman Sobol Shapiro LLP,
       (by Edward Notargiacomo, Esq.),
17     One Main Street, Cambridge, MA 02142,
       on behalf of the Plaintiffs.

18
    The Haviland Law Firm, LLC, (by Donald E. Haviland, Esq.)
19     740 S. Third Street, Philadelphia, PA 91912,
       on behalf of the Plaintiffs.

20
    Hogan & Hartson, (by Steven J. Edwards, Esq. and Lyndon M.
21     Tretter, Esq.), 875 Third Ave., New York, NY 10022,
       on behalf of the Defendant Bristol-Myers Squibb.

22

23                    Marie L. Cloonan
                    Federal Court Reporter
24            1 Courthouse Way - Room 7200
             Boston, MA  02210- 617-439-7086
25     Mechanical Steno - Transcript by Computer

2

1
    APPEARANCES CONTINUED:
2
    Dwyer & Collora, LLP, (by Thomas E. Dwyer, Jr., Esq.),
3      600 Atlantic Avenue, Boston, MA 02210-2211,
       on behalf of the Defendant Bristol-Myers Squibb.
4
    Kirkpatrick & Lockhart Preston Gates Ellis, LLP,
                          Page 1

EXHIBIT

D

07-03-2007 1003 Tuesday.txt



9       THE COURT:  I thought it was not a footnote.

10   I thought I went on and on about it.  I think I went on

11   and on about everything.  So, maybe I ought to look at

12   it again.

13       MR. BERMAN:  I don't think you did --

14       THE COURT:  I think I said that I rejected

15   plaintiffs' position that the per se liability for Class

16   1 and that I thought that the 30 percent speed limit

17   should apply to Class 1 as well.  And, that would be, I

18   thought applicable to all of the defendants.

19       So, why is that not clear?

20       MR. BERMAN:  Well, I didn't see that in the

21   order, your Honor.

22       THE COURT:  They've got it.

23       MR. BERMAN:  At the time we negotiated the --

24   via that settlement, both sides thought that was a risk

25   that could go either way.  And, we discussed that with

10

1   the mediator.  The mediator didn't think it was clear

2   either.

3       THE COURT:  Well --

4       MR. BERMAN:  It's clear now.

5       THE COURT:  It's clear now.  And, I will look

6   at it again.  If it wasn't clear, it is clear.  The 30

7   percent speed limit applies to Class 1.

8       I rejected a per se position.  And, I have to

9   go look through it again, because I thought it was

10   clear.  That's why I essentially had the expert go back

11   and calculate the damages again.  Because, the way he

12   did it was he aggregated all the years when he did it

13   with the 30 percent speed limit.  He didn't back out

Page 8

07-03-2007 1003 Tuesday.txt



14      the -- it might have been statute of limitations and on
15      the specific NDCs.  That's why I needed a root
16      calculation.
17                  Otherwise, I could have done it.  Right?  On
18      the per se.  Because, he did it year by year.
19                  MR. BERMAN:  Correct, you could have, yeah.
20                  THE COURT:  I could have done that.  I mean
21      ...
22                  MR. BERMAN:  But, we felt it was a different
23      issue with the consumers, because there's no evidence
24      that they had any knowledge of the so-called industry
25      norm of 20, 25 percent.

                                                                11

1                  THE COURT:  Well, I ruled to the contrary and
2       I don't accept that position.  And, I thought it was
3       clear.  If not, I'm making it clear now.
4                  Now, I want to know what -- I'm ready, at this
5       point, to deal with Montana and Nevada and move them
6       back to their home states.  I've waited because I
7       thought I would give someone the template so that
8       someone else wouldn't have to relive this entire piece
9       of it.  And, the question only is, from my point of
10      view, whether or not you all want to talk to them about
11      -- before I ship it off -- whether it's worth using
12      Eric Green's expertise to try and settle it before I do
13      that or whether I should just send it.
14                  MR. BERMAN:  From our perspective, your Honor,
15      we are already in discussion with some of the
16      defendants.  So, if you want to get Mr. Green involved,
17      the plaintiffs would not -- we think that's a good
18      idea.

                              Page 9

07-03-2007 1003 Tuesday.txt

19          THE COURT:  I know I've only got one of you

20     here and not everybody.  But, what do you think?

21          I mean, once I've got a template, does this

22     make sense?  I know I've got this Medicaid and it's not

23     -- the TPPs and the Medicare statute.  But, Mr. Green

24     knows so much about it right now that I'd hate to ship

25     it back to the MDL and have them ship it up to the

                                                              12

1      courts in Montana and Nevada.

2          Do you want to consult with everyone and see

3      what you want to do?

4          MR. EDWARDS:  We could certainly do that, your

5      Honor.  But, let me just make two observations.

6          The issues on the Medicaid cases are a little

7      bit different because you have the state actually

8      determining the reimbursement formula, paying the

9      reimbursement formula, and there's a real issue as to

10     state knowledge and state policy.

11          All of that being said, we're always happy to

12     talk to Mr. Green.  Mr. Green has been very helpful.

13     And, I would anticipate that, you know, to the extent

14     that our adversaries in any case want to mediate, if

15     they would agree to use Mr. Green to mediate, we would,

16     too.

17          THE COURT:  I think he's on vacation, or, at

18     least he said he was going on vacation when he called me

19     a week ago.

20          So, when do you anticipate -- I've got the

21     opinion, basically drafted, sending the case back.  So,

22     the question really is:  How long do you think before

23     you could talk to your colleagues?

                        Page 10