# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO:<br><br>*The City of New York v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 04-CV-06054)<br>*County of Suffolk v. Abbott Labs., et al.*<br>(E.D.N.Y. No. CV-03-229)<br>*County of Westchester v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 03-CV-6178)<br>*County of Rockland v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 03-CV-7055)<br>*County of Dutchess v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 05-CV-06458)<br>*County of Putnam v. Abbott Labs., et al.*<br>(S.D.N.Y. No. 05-CV-04740)<br>*County of Washington v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00408)<br>*County of Rensselaer v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00422)<br>*County of Albany v. Abbott Labs., et al.*<br>(N.D.N.Y. No. 05-CV-00425) | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

[Caption Continues on Next Page]

**SCHERING'S OPPOSITION TO PLAINTIFFS' OBJECTIONS TO THE AUGUST 20, 2008 RULING BY MAGISTRATE JUDGE BOWLER GRANTING SCHERING CORPORATION'S MOTION FOR A PROTECTIVE ORDER OR, IN THE ALTERNATIVE, PLAINTIFFS' REQUEST FOR CLARIFICATION AS TO WHAT CONSTITUTES GOOD FAITH WHEN ALLEGING <u>SPREADS BASED ON WEIGHTED AVERAGES</u>**

11293065_1.DOC

| | |
|---|---|
| *County of Warren v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00468) | ) |
| *County of Greene v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00474) | ) |
| *County of Saratoga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00478) | ) |
| *County of Columbia v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00867) | ) |
| *Essex County v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00878) | ) |
| *County of Chenango v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00354) | ) |
| *County of Broome v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00456) | ) |
| *County of Onondaga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00088) | ) |
| *County of Tompkins v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00397) | ) |
| *County of Cayuga v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00423) | ) |
| *County of Madison v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00714) | ) |
| *County of Cortland v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00881) | ) |
| *County of Herkimer v. Abbott Labs. et al.* | ) |
| (N.D.N.Y. No. 05-CV-00415) | ) |
| *County of Oneida v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00489) | ) |
| *County of Fulton v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00519) | ) |
| *County of St. Lawrence v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00479) | ) |
| *County of Jefferson v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00715) | ) |
| *County of Lewis v. Abbott Labs., et al.* | ) |
| (N.D.N.Y. No. 05-CV-00839) | ) |
| *County of Chautauqua v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06204) | ) |
| *County of Allegany v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06231) | ) |
| *County of Cattaraugus v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06242) | ) |

| | |
|---|---|
| *County of Genesee v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06206) | ) |
| *County of Wayne v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06138) | ) |
| *County of Monroe v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06148) | ) |
| *County of Yates v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06172) | ) |
| *County of Niagara v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06296) | ) |
| *County of Seneca v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06370) | ) |
| *County of Orleans v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06371) | ) |
| *County of Ontario v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06373) | ) |
| *County of Schuyler v. Abbott Labs, et al.* | ) |
| (W.D.N.Y. No. 05-CV-06387) | ) |
| *County of Steuben v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06223) | ) |
| *County of Chemung v. Abbott Labs., et al.* | ) |
| (W.D.N.Y. No. 05-CV-06744) | ) |
| AND | ) |
| *County of Nassau v. Abbott Labs., et al.* | ) |
| (E.D.N.Y. No. 04-CV-5126) | ) |
| | ) |

**PRELIMINARY STATEMENT**

Magistrate Judge Bowler was correct when she allowed Schering Corporation's Motion for Protective Order seeking to defer discovery on Schering's brand drugs. Schering's motion presented a question concerning the appropriate scope and timing of discovery – not a question of "pleading" as Plaintiffs' Objections suggest. In granting Schering's motion, Magistrate Judge Bowler faithfully applied this Court's prior rulings to reach the unremarkable conclusion that Plaintiffs had made an "insufficient showing of compliance with Judge Saris' July 30, '07 order." *See* 8/20/08 Tr. of Mot. Hr'g, at 62:7-9 (Bowler, J.). In fact, Plaintiffs submitted no competent evidence at all to rebut an expert affidavit establishing that (i) the spreads on the Schering-brand drugs allegedly at issue satisfy the 30% test, and (ii) more than 85% of the transactions on the Schering-brand drugs occurred within 5% of WAC.

In their Objections to Magistrate Judge Bowler's ruling, Plaintiffs rely on yet another iteration of purported "spread" calculations, sponsored only by counsel, that again fail to meet the standards that this Court has already announced. Plaintiffs' "Exhibit C" – the fourth such incarnation of purported spread calculations that they have invented since filing their First Consolidated Amended Complaint – is different from each of the prior versions. More importantly, it is no better. It still sets forth purported spread calculations for no more than one quarter out of the entire eight-year discovery period for each NDC allegedly at issue; it bases those spreads on a variety of different data sources (sometimes combining two or more different data sources to calculate a single spread for a three month period, calling that combination of time periods and data sources a "quarter"); and it does so at random and unpredictable intervals throughout the discovery period or sometimes even reaches back before 1997 – the beginning of the discovery period – to find a single "quarter" during which the spread is sufficiently large so as to purportedly "justify" proceeding with discovery. Simply put, notwithstanding Plaintiffs'

request for "clarification as to what constitutes good faith," Plaintiffs have made no effort to comply with this Court's prior guidance.

Quite apart from Plaintiffs' efforts to gerrymander the data, one quarter is insufficient to demonstrate the potential pattern of supposed "mega-spreads" necessary to subject Schering to millions of dollars in discovery costs. Counsel in this case, who also represents the State of Iowa, does not need any additional "clarification" to know that counsel has ignored this Court's rulings at the Iowa motion to dismiss hearing deferring discovery where allegations were based on only one quarter of data. *See*, *e.g.*, 6/26/08 Tr. of Mot. Hr'g, at 42:19-47:3 (Saris, J.) (staying discovery as to certain Eli Lilly and Chiron drugs where the asserted basis for proceeding with discovery was a spread for a single quarter).

As this Court has noted on several prior occasions, with 7,800 NDCs allegedly at issue, this case is unmanageable for all involved. *See*, *e.g.*, 7/26/07 Tr. of Mot. Hr'g at 7:9-14 (Saris, J.). All Schering's motion asks the Court to do is exercise its sound discretion to stay discovery as to its brand drugs – many of which are familiar to the Court – for now, while discovery proceeds as to other drugs, because Plaintiff have failed to meet the burden imposed on them by this Court to allege on a good faith basis spreads in excess of 30% for such drugs over any reasonable time period. Such a request might have been improvident seven years ago, but this Court (and hopefully the parties) has learned much from seven years of litigation, a 21-day bench trial, a 183-page opinion, and countless other rulings.

Against this backdrop, it hardly seems extraordinary to ask the Court to apply a conservative "discovery screen" along the lines Schering describes in its motion to stage discovery in an efficient and cost effective manner for the Court and all parties involved. Doing so is not only consistent with the benefits of a consolidated MDL proceeding, as this Court has repeatedly recognized, but it should also help the parties to focus their efforts, sooner rather than

later, on the issues that should be at the heart of this litigation (*e.g.*, so-called "FUL fraud allegations").

Equally importantly, requiring good faith spreads would begin to address another problem: Plaintiffs appear to be incapable of producing complete or adequate claims data supporting their allegations that they paid claims on the basis of AWP. On September 3, 2008, defendants convened a deposition to explore the "reverse engineering" of the basis of payment that the NYDOH had added to the claims data that had been produced, only to learn that the reverse engineering methodology was seriously flawed and the resulting errors in the basis of payment analysis favored Plaintiffs. In other words, Plaintiffs erroneously described more claims as having been paid on the basis of AWP than they now admit were paid on that basis. Moreover, the deposition revealed that the NYDOH had relied on data in performing the reverse engineering analysis that had never been produced to defendants, and other data existed that is necessary to accurately reverse engineer the basis of payment that has never even been gathered. Because of the sheer number of NDCs allegedly at issue, and thus the extraordinary volume of data, defendants still have not even been told when that claims data might be available. Among other things, a "discovery screen" – even a conservative one – could help to appropriately order priorities in this case.

## ARGUMENT

I.  **Magistrate Judge Bowler Correctly Ruled, After Evaluating Plaintiffs' Bases for Seeking Discovery as to the Schering-Brand Drugs Allegedly at Issue, that Plaintiffs Had Failed to Comply with this Court's Prior Orders and Discovery as to These Drugs Should Be Stayed.**

As this Court well knows, this discovery dispute has a long history. At the pleading stage, the Court twice dismissed the complaint, each time admonishing Plaintiffs that, to state a claim, they needed to allege spreads in "good faith" that exceeded the "20-25% mark up between

WAC and AWP" (equivalent to a 30% spread) that is known and standard in the industry for brand drugs. *See* Mem. & Order, Apr. 2, 2007, at 36-37, n.9 [Docket No. 3979]. But, the dispute finally came to a head when Plaintiffs filed their First Amended Consolidated Complaint supported by spread calculations based on "penny prices" and single sales, typically sales involving the lowest price paid by any provider (regardless of class of trade) to one of the three national wholesalers at any point in time. In view of such flawed allegations, defendants again moved to dismiss the complaint, Defs.' Joint Mot. to Dismiss Pls' First Amended Consolidated Complaint, June 22, 2007 [Docket No. 4377], Plaintiffs opposed that motion with yet another set of spread calculations, Pls' Opp. to Defs.' Joint Mot. to Dismiss, July 11, 2007, at Ex. B [Docket No. 4454-2], and the dispute culminated with this Court's entering its July 30, 2007 Order to which Magistrate Judge Bowler referred in her ruling. In relevant part, that Order says that discovery shall be stayed as to "all drugs with spreads lower than 30%" and requires that spreads be calculated in "good faith," comparing AWPs to a "weighted average, or typical price for each drug" allegedly at issue. *See* July 30, 2007 Order, at ¶ 5 [Docket No. 4540].

As a result of successfully defending claims with regard to its brand drugs in the MDL Track 1 trial, Schering has an in-depth understanding of the limited degree to which spreads exist on its brand drugs. That understanding is, in fact, consistent with the work of the MDL plaintiffs' expert, Dr. Raymond Hartman, and the rulings of this Court in its MDL bench trial opinion. Thus, when Plaintiffs began seeking discovery as to the Schering-brand drugs allegedly at issue, Schering questioned the spread calculations on which Plaintiffs purported to proceed and, ultimately, filed the Motion for Protective Order that Magistrate Judge Bowler allowed on August 20, 2008. As explained more fully in Section I.A. of Schering's Memorandum in Support of its Motion, the spreads presented by Plaintiffs were based on wholesaler data opportunistically and intermittently selected from a variety of different sources, and sometimes

for entirely irrelevant classes of trade.  Schering's Mem. in Support of Its Mot. for Protective Order, May 13, 2008, at 4-5 [Docket No. 5297].  More importantly, the single spread calculation proffered for each NDC allegedly at issue spanned only a very small fraction of the eight-year discovery period – oftentimes only a few months (*e.g.*, 00085-064705 – Intron-A), a few weeks (*e.g.*, 00085052503 – Eulexin), a few days (*e.g.*, 00085-125401 – Intron-A), or even a *single day* (*e.g.*, 00085056701 – Elocon).  *Id.* at 5-6.  The result was "spreads" that were different (and often significantly higher than) the spreads that this Court had found to exist for some of the very same drugs at the conclusion of the Track 1 MDL trial.  *Id.* at 6.

Presented with such obviously gerrymandered calculations that did not remotely comply with this Court's prior direction as to how spreads ought to be calculated in good faith to support a claim, Magistrate Judge Bowler correctly found Plaintiffs' showing wanting.  Consequently, she granted Schering's motion and ordered discovery stayed as to these drugs at this time.

This ruling was not clearly erroneous, and Plaintiffs' Objections suggest no compelling reason to think that it was.  As noted above, Plaintiffs' Objections are premised almost entirely on their new "Exhibit C."  *See* Counties' Objections, Ex. C, filed Sept. 4, 2008 [Docket No. 5546-13].  However, Exhibit C is no better than previous incarnations of Plaintiffs' "spread" calculations.  The new Exhibit C does not contain a single spread calculated for a period of more than three months and several spreads are cobbled together from different data sources.[1]  *Id.*  In some cases, Exhibit C even depends on spreads from a quarter before 1997 – the beginning of the discovery period.[2]  *Id.*  To make matters worse, in blatant disregard of this Court's order at

---

[1] For example, Exhibit C has two lines for K-DUR (NDC 00085-0787-06), one containing AmerisourceBergen data from 1/1/2004 through 1/5/2004 with a spread of 32.15% and the second containing McKesson data from 1/6/2004 through 3/31/2004 with a spread of 30.66%.

[2] For the following NDCs, Exhibit C only provides data from 1996, which is outside the relevant time period: 00085-887-11 (Gyne-Lotrimin 1% Cream); 00085-0670-04 (Gyne-Lotrimin Insert); 00085-0689-01 (Intron A 18 MMU Vial); 00085-0041-06 (Vancenase 42 MCG Inhaler).

11293065_1.DOC                  5

the July 26, 2007 hearing that the Counties add no new drugs, July 26, 2007 Hearing Tr. at 11:7-8 & 12:5-6, Exhibit C includes seven new NDCs that do not appear anywhere in Exhibit B-32 to the First Consolidated Amended Complaint.[3]  *See* Ex. C.  Exhibit C also mixes in "spreads" for 109 Warrick generic NDCs for no apparent reason other than to possibly confuse the Court.  *See id.*  Schering's motion is limited exclusively to its brand drugs.  Discovery is proceeding as to the Warrick generic drugs allegedly at issue in the case, and neither Schering, nor Warrick contend that it should not be.

Magistrate Judge Bowler correctly perceived that Plaintiffs had failed to follow this Court's directions to calculate spreads in good faith on the basis of data that cover a large enough time period so as not to base an expensive and intrusive discovery program on sporadic or anomalous results.  Nothing in Plaintiffs' submission objecting to her Order cures that deficiency, and the Objections should be overruled.

**II.    Schering's Submissions to Magistrate Judge Bowler Established Conclusively that Plaintiffs Could Not in Good Faith Derive Spreads in Excess of 30% for the Schering-Brand Drugs Allegedly at Issue.**

Magistrate Judge Bowler's analysis of Plaintiffs' failure to comply with this Court's prior directions alone would support her conclusion.  But, the record on this motion demonstrated not only that Plaintiffs had failed to meet their burden, but also that they more than likely never will be able to do so.  Schering's evidentiary submissions established that, even using the most conservative of tools to measure spreads, the spreads for the drugs at issue fall within the 30% safe harbor recognized by the Court.  Specifically, Schering's motion proposed – as one method

---

[3] The following seven NDCs appear in Exhibit C but were not listed in Exhibit B-32 to the First Consolidated Amended Complaint:  00085-0942-05 (Celestone 0.6 MG/5 ML Syrup); 00085-0689-01 (Intron A 18 MMU Vial); 00085-0647-03 (Intron A 3 MMU Vial); 00085-1258-02 (Rebetron 1000 Therapy Pack); 00085-1236-03 (Rebetron 600 Therapy Pack); 00085-1258-03 (Rebetron 600 Therapy Pack); and 00085-0649-02 (Vancenase 42 MCG Pockethale).

11293065_1.DOC                                                  6

of regulating discovery – a reasonable and conservative "discovery screen" based on readily available AMP data that could not be manipulated by either side. *Id.* at 6-9.

As Schering's Memorandum in Support of its Motion explains, at least as a "discovery screen," AMP to AWP spreads have several virtues:  (1) AMP is defined by statute to include the classes of trade that are relevant to the Medicaid program, and since it has been filed with CMS consistently since 1991 and used to collect millions of dollars in rebates, AMP cannot be manipulated for purposes of discovery in this case; (2) because it is a measure of the manufacturer's average selling price to wholesalers (not of a Medicaid provider's average acquisition cost, which would in most cases be higher because of, among other things, wholesaler mark-ups), AMP is conservative in that the AMP to AWP spread will almost always be greater than the actual spread between a retailer's acquisition cost and AWP, such that no drug whose spread could possibly require good-faith scrutiny would be excluded from discovery presently; and (3) finally, because of its prolonged use by the Medicaid program, AMP should be readily available for most defendant manufacturers and enable analysis on a year-by-year basis for the entire discovery period.[4]  *Id.*

Moreover, whether or not Schering agrees entirely with each of the standards that this Court has announced in the course of this consolidated MDL proceeding, in particular as they have been applied to multi-source, generic drugs (and it does not), the "discovery screen" that Schering proposed in its motion seemed to follow directly from this Court's prior rulings.  It is consistent with the directive in this Court's July 30, 2007 Order to calculate spreads in "good faith" by comparing AWPs to a "weighted average" of the "typical" prices for that drug.  AMPs, after all, are Medicaid's measure of a weighted average selling price to wholesalers.  It takes into

---

[4] Indeed, AMPs are something Plaintiffs in these cases routinely request in discovery, and Schering produced its AMP data to the New York Counties in December 2007.

account each of the various factors that the Court considered in assessing liability in the MDL private payor proceeding and focuses on appropriate classes of trade. *See In re Pharmaceutical Indus. Avg. Wholesaler Price Litig.*, 491 F. Supp. 2d 20, 101-02 (D. Mass 2007) (identifying "three salient factors" relevant to assessing liability). Most importantly, the Schering calculations examine potential liability, as the Court has, from the perspective of patterns across the entire relevant time period. *Id.* at 108 (finding "isolated, anomalous" occurrences of spreads in excess of 30% will not give rise to liability). It examines each drug on a "year-by-year" basis which this Court has suggested is more "helpful" than looking at them across long periods of time or, presumably, at a single moment in time that may or may not be (and probably is not) representative of the entire liability period. *Id.* at 108 n.88. And, it even anticipated this Court's later ruling in the Iowa case that one quarter is not enough. *See, e.g.*, 6/26/08 Tr. of Mot. Hr'g, at 42:19-47:3 (Saris, J.).

The Affidavit submitted by Dr. Addanki in support of Schering's motion clearly demonstrates that there is no good faith basis for proceeding with discovery regarding the Schering-brand drugs allegedly at issue, at least not for now. For most of the Schering-brand drugs, the spreads between AWP and AMP are below 30% of AMP, and those that are not show no particular pattern and are, moreover, generally only modestly higher. *See* Aff. of Sumanth Addanki, at ¶ 9 & Ex. 3 [Docket Nos. 5297 & 5299]. Furthermore, a substantial portion of Schering's sales of the branded pharmaceutical products at issue – more than 85% – were made at or very near WAC. *Id.* at ¶ 10 & Ex. 4. When sales are analyzed by drug, many of the brands have over 90% of their sales made at or very near WAC. *Id.* ¶ 10 & Ex. 5. The same results obtain when the sales data are analyzed on an annual basis at the NDC-9 level (as AMP is reported). *Id.* at ¶ 10 & Ex. 6. Simply put, with respect to the Counties' claims against Schering, there is no need for discovery of the sort sought here – at least for now – because there is no

plausible case for the Counties to make.  *See Kleinerman* v. *U.S. Postal Serv.*, 100 F.R.D. 66, 68 (D. Mass. 1983) (recognizing that discovery can be stayed where no valid theory of recovery can be pled).

Dr. Addanki's affidavit was essentially unrebutted.  In opposition to Schering's motion, Plaintiffs submitted only a memorandum of law that had attached to it three unsworn and largely unexplained exhibits – only one of which set forth any "spread" calculations and then for only three of the twenty-five Schering-brand drugs that Plaintiffs claim are at issue in this case.  These back-of-the-envelope calculations made by counsel and unsupported by an affidavit do not constitute a sufficient opposition.  On this record, Magistrate Judge Bowler was well within her rights to conclude, as she did, that Plaintiffs had made an "insufficient showing of compliance with Judge Saris' July 30, '07 order."  *See* 8/20/08 Tr. of Mot. Hr'g, at 62:7-9 (Bowler, J.).

Plaintiffs' other "objections" ring equally hollow.  Plaintiffs complain, for example, that Schering is suggesting that "this Court's conclusions from the MDL Class trial concerning spreads . . . can be used by defendants to bar discovery here."  *See* Pls.' Objections, at 5.  That is just not so.  In support of Schering's Motion, Dr. Addanki calculated spreads between AWP and AMP – Medicaid's measure – for each of the Schering NDCs allegedly at issue, and proffered them along with sales at list analyses in a sworn affidavit.  *See* Aff. of Sumanth Addanki [Docket Nos. 5297 & 5299].  To be sure, Schering used this Court's prior rulings as a "template" in constructing its arguments, and the spreads that Dr. Addanki proffers in support of Schering's motion are entirely consistent with (sometimes a little higher and sometimes a little lower, but generally the same as) the spreads that Dr. Hartman derived for some of the exact same drugs and that this Court credited in its MDL bench trial opinion.[5]  But, completely apart from this

---

[5] Exhibit A contains a side-by-side comparison of Dr. Hartman's spreads from the MDL and the spreads set forth in the Affidavit of Dr. Sumanth Addanki.

11293065_1.DOC                                            9

Court's findings in the MDL, Magistrate Judge Bowler had before her a full and complete record when deciding Schering's motion. Further, while Plaintiffs complain that they were not "given the opportunity" to depose Dr. Addanki on his methodology, *see* Pls.' Objections, at 4, the Counties neglect to mention that they never took any steps to do so.[6]

### III. No Additional Guidance Is Necessary At this Time.

As described above, this Court's prior rulings provide a "template" for appropriately staging discovery in this case. Although the Court has declined to establish any bright-line test for liability, in its MDL bench trial opinion, it did identify "three salient factors" relevant to assessing liability. In the first instance, the Court has said that it will look at whether "there were egregious spreads above the 30% yardstick expected in the industry?" *See In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 491 F. Supp. 2d at 101-02. In making this determination in the private class action proceeding, the Court looked at whether the spreads evidenced a pattern of "fraud" over the entire time period and, in fact, held that an "isolated, anomalous occurrence" of an annual spread in excess of 30% does not necessarily give rise to liability. *See id* at 108. This Court has also said that it will consider the "legitimacy of the list price" in assessing liability, *id.* at 102, and found that, where "50% of all sales were made at or about the list price," the list price "will not be deemed fictitious." *Id.* at 105. In considering these factors, the Court has instructed that "year-by-year" calculations are more "helpful" than a single average across the entire time period or, presumably, a single snap-shot at a moment in time. *Id*. at 108 n.88. Finally, in the context of ruling on various individual manufacturers' motions to dismiss in the Iowa case, this Court has said that one quarter out of an eight year discovery period will not be enough to justify discovery. *See, e.g.*, 6/26/08 Tr. of Mot. Hr'g, at 42:19-47:3 (Saris, J.).

---

[6] Plaintiffs also fail to acknowledge that Dr. Addanki filed a similar affidavit in support of a pending summary judgment motion in Wisconsin and, when Wisconsin asked, Dr. Addanki was deposed on his methodology in that case.

Judged by these standards, Dr. Addanki's affidavit clearly demonstrates that Schering is entitled to a stay of discovery for its brand drugs at least for now. Schering's motion required discrete factual determinations as to its drugs, which Magistrate Judge Bowler made on the record presented to her – that is, an uncontested, sworn affidavit from Dr. Sumanth Addanki analyzing the AMP to AWP spreads and percentages of sales at WAC for each of Schering's brand drugs allegedly at issue here. In accordance with guidance that this Court communicated in the context of the MDL bench trial, those spreads and sales at list calculations were presented on an annual basis for each of the eight years in the discovery period to look at the pattern of spreads over the entire relevant timeframe. Armed with these facts, this Court's MDL opinion, and its rulings in the Iowa AWP case, Magistrate Judge Bowler had a sufficient framework within which to assess whether discovery is warranted as to these drugs at this time.

Were it the case that Plaintiffs had made some genuine attempt to comply with this Court's prior guidance, Plaintiffs' request for additional guidance might deserve some credence. But, whereas here, Plaintiffs opposed Schering's well-supported motion with a different (from Exhibit C) set of incomprehensible, unexplained, and never-before-seen spread calculations, sponsored only by counsel, that were so obviously jerry-rigged on their face, it is hard to image what additional guidance might have been necessary to decide the motion. Simply put, Schering's motion was not a close call. There undoubtedly will be other (and better) occasions on which to provide additional guidance, if any is even necessary. Accordingly, this Court should decline Plaintiffs' invitation to do so for now and wait for an opportunity to set addition parameters (if at all) in a concrete, factual context that is more likely to be instructive to other litigants.

If there are other defendants who conclude that Plaintiffs' spread calculations for their drugs do not justify discovery, Schering expects that they will proceed as Schering has done –

prepare an expert affidavit and file a motion for protective order seeking an appropriately tailored request for relief.  Given the Counties' persistent reliance on flawed spread calculations, such a process may be the most efficient way for this Court (and the parties) to whittle down the 7,800 NDCs allegedly still at issue and to identify the drugs that should be at the core of this case.

## CONCLUSION

For all of the foregoing reasons, Magistrate Judge Bowler's August 20, 2008 Order allowing Schering's Motion for a Protective Order should be affirmed.

                Respectfully submitted,

                Schering-Plough Corporation, Schering Corporation, and Warrick Pharmaceuticals Corporation

                /s/ John P. Bueker
                John T. Montgomery (BBO#352220)
                John P. Bueker (BBO#636435)
                Bryan R. Diederich (BBO#647632)
                Kim B. Nemirow (BBO#663258)

                ROPES & GRAY LLP
                One International Place
                Boston, Massachusetts 02110-2624
                (617) 951-7000

Dated:  September 17, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2008, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Renée A. Coshin
Renée A. Coshin
