UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| BMS CLASS 1 SETTLEMENT | Judge Patti B. Saris |

**CLASS COUNSEL'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO PRELIMINARILY APPROVE PROPOSED PLAN OF DISTRIBUTION FOR THE BMS CLASS 1 SETTLEMENT AND OPPOSITION TO BMS'S CROSS-MOTION FOR A CONFERENCE ON A DISTRIBUTION <u>PLAN AND OTHER SETTLEMENT ISSUES</u>**

## I.   INTRODUCTION

BMS's opposition brief confirms a simple fact: BMS has "buyer's remorse" and wishes to renegotiate the Class 1 settlement that it knowingly entered into after lengthy negotiations. In other words, BMS entered a deal that it now does not like, thinking that it overpaid. Tough luck. A deal is a deal, and the Court should enforce the MOU and preliminarily approve Class Counsel's proposed distribution plan. Once it does so, Class Counsel will then file a motion for preliminary approval, including proposed forms of notice, and the members of Class 1 will be closer to receiving the relief to which they are entitled.

## II.   ARGUMENT

**A.   The Proposed Distribution Plan Is Sufficiently Detailed.**

BMS complains that Class Counsel's proposed plan is too vague. BMS Br. at 1. This is not true. Class Counsel's opening brief described in sufficient detail a claims-made process that is a hybrid of the processes that the Court already approved in the AstraZeneca Class 1 Settlement and the Track 2 Global Settlement ("Track 2"). Under this plan:

- 1 -

- A notice and a claim card would be mailed to Medicare Part B beneficiaries who were administered a drug during the Class Period corresponding to the J-Codes for the relevant BMS drugs.

- An individual's recovery will be tied to their co-pay experience, as each beneficiary who submits a claim will be assigned a "Total Recognized Claim" calculated as the co-pay amounts owed for each administration during the Class Period, similar to the procedure preliminarily approved by the Court in Track 2. The co-pay amounts owed will be taken directly from the CMS data.

- The eligible BMS drugs are Paraplatin, Taxol, Vepesid, and Cytoxan. Blenoxane, Etopophos and Rubex administrations are not eligible for compensation under the proposal, because Dr. Hartman did not find any Medicare Part B reimbursements for Blenoxane, and the damages for Etopophos and Rubex are so minimal that notice and settlement administration costs associated with both drugs would exceed any proposed payout.

- The proposed Class Period is 1991 through 2004, the same period certified by the Court and used for the AstraZeneca Class 1 and Track 2 settlements.

- To encourage claims, the Total Recognized Claim amount is doubled except for administrations falling into the "Heartland Period" of December 1, 1997 through December 31, 2003, in which case the Total Recognized Claim amount is trebled. This proposal is a hybrid of the AstraZeneca Class 1 and Track 2 approaches. In both of those settlements, the Court's position was that claims falling in the Heartland Period should be valued more highly than those associated with other time periods.

- If total claims exceed what is left in the common fund after the payment of claims, then claims are reduced pro-rata. If total claims are less than the Net Recovery eligible for distribution – that is, there is a remainder – the remainder is distributed to charitable organizations funding cancer research and patient care to be determined later, as provided for in the AstraZeneca Class 1 settlement.

There are no further details to be provided at this time, including an estimate of the total amount that will be claimed, because we do not yet have the data from CMS. And to the extent that BMS is complaining that not all of the information customarily supporting a preliminary approval motion is now before the Court, Class Counsel respond that it is not necessary. We have not moved for preliminary approval at this time, believing that it is premature until the Court resolves the parties' fundamental disagreement on the distribution portion of the package. Moving for preliminary approval now, before the distribution plan is decided, will only result in multiple rounds of briefing and multiple proposals on notice and claim procedures. We believe that is more economical for the Court and the parties to have the distribution issue resolved first and then present a preliminary approval motion to the Court, including all of the details associated with the form and manner of Class notice at that time.

**B.     BMS Lost Its Opportunity To Craft Its Own Distribution Plan.**

Despite being fully aware that the memorandum of understanding accompanying the AstraZeneca Class 1 settlement set forth in great detail the parties' agreement on a distribution plan, BMS did not seek to include one in the MOU that it negotiated and signed. Indeed, BMS did not even discuss the specifics of a distribution plan during the negotiations, leaving it instead to Class Counsel. In contrast to the AstraZeneca Class 1 "model," BMS simply agreed to pay $13 million into a common fund. BMS did not bargain for, and did not receive, any right to veto a proposed distribution model. Had it wanted a voice in the manner in which the common fund

- 3 -

was distributed, it should have bargained for such a right.  Had the parties intended BMS to be able to guide the distribution plan, this would have been specified in the MOU but was not.  Declaration of Steve W. Berman in Support of Class Counsel's Motion to Preliminarily Approve Proposed Plan of Distribution for the BMS Class 1 Settlement ("First Berman Decl."), ¶ 3.  BMS should not now be allowed to go back and grant itself the right to impede a full distribution of settlement monies to the Class 1 members.

**C.     The "Mistake" That Has Been Made Is BMS's Mistake In Not Driving A Harder Bargain.**

In an argument never once raised with Class Counsel, BMS for the first time contends that the $13 million amount agreed to in the MOU was the product of a "mutual mistake" made by both sides in interpreting the Court's June 21, 2007 Trial Ruling.  BMS argues that the parties did not anticipate the Court later applying the 30% speed limit to Class 1, just as it did to Classes 2 and 3 in the Trial Ruling.  BMS Br. at 4-5.  This is a totally false assertion and, indeed, a ridiculous argument.

First, during the negotiations – the bulk of which were held before the Court's Trial Ruling was issued – BMS never indicated that any agreement to pay $13 million would be contingent upon the Court declining to apply the 30% speed limit to Class 1.  Declaration of Steve W. Berman in Support of Class Counsel's Reply Memorandum in Support of Motion to Preliminarily Approve Proposed Plan of Distribution for the BMS Class 1 Settlement ("Second Berman Decl."), ¶ 3.  And this did not change after the Trial Ruling was released and before the MOU was signed, even though the Trial Ruling was silent on the issue.  *Id.*  Indeed, it would have been absurd for BMS to insist upon such a condition since the Court's anticipated trial ruling only related to Class 2 and Class 3:  the only way BMS could have learned of which benchmark the Court intended to apply to Class 1 was to try the case, which the parties purposely

avoided by negotiating the settlement. Thus, BMS is attempting to, after the fact, conjure up a predicate that simply never existed.

Second, it was Class Counsel's position then, and it remains so now, that the 30% speed limit does <u>not</u> apply to Medicare beneficiaries. We have gone so far as to appeal the Court's ruling that the 30% speed limit applies to Class 1, and the issue is still pending before the First Circuit.

The Court has, of course, since made comments that it believes that 30% benchmark should be applied to Class 1. *See* Hearing tr. dated July 3, 2007 at 8:3-5 and 8:19-11:3. Thus, perhaps BMS made a mistake in its handicapping of the odds that confronted it, but Class Counsel did not in holding out for, and ultimately receiving, BMS's agreement to pay $13 million into a common fund for the benefit of Class 1 members – an agreement that was struck without any precondition on whether the 30% speed limit applied to Class 1.

Moreover, both sides thoroughly reviewed the Trial Ruling before executing the MOU. That ruling did not specifically make any findings vis-à-vis Class 1, the claims of which had not yet even been tried, although there were plenty of clues as to how the Court would view the prosecution of other claims against the same Track 1 defendants and the remaining defendants (including, for example, the Court's application of the plain meaning rule). It was incumbent on both sides to employ their judgment and skill and assess the risks of moving forward with a Class 1 trial, including the risk that the Court would apply – or not apply – the 30% speed limit to Class 1. As Steve Berman acknowledged at the July 3, 2007, status conference (and as cited by BMS at page 3), both sides expressly recognized that it faced risk on this issue; that is, both sides acknowledged that the Trial Ruling did not resolve whether the Court would view Class 1 similarly to Classes 2 and 3. Second Berman Decl., ¶ 4. Yet, both sides made their decisions to

settle despite this uncertainty.[1]  That subsequent events have now changed BMS's unilateral view of its liability exposure is its own tough luck.  A bargain cannot be amended based on subsequent events that did not turn out as hoped or predicted, absent an express reservation for such a contingency in the agreement (which BMS did not seek or obtain).[2]  If this were permitted, no agreement could ever be enforced.  Thankfully, this is not the law.

In an uncertain environment, the parties were called upon to decide whether to settle or to go to trial.  They chose to settle.  The bottom line is that BMS, facing a Class 1 trial just a month away from when it executed the MOU, signed on to the best deal that BMS believed that it could garner at the time.  That it now believes it made a bad bargain is immaterial.  BMS must pay the full $13 million to which it committed to pay for the benefit of Class 1.

**D.    BMS Wants A Reversion For Its Benefit, Yet No Reversion Was Ever Bargained For Or Included In The MOU.**

BMS takes issue with the fact that a substantial amount of the Net Recovery will be distributed to Class 1 members who were administered Paraplatin and Taxol even though spreads were less than 30% for these drugs for a significant portion of the Class Period.  BMS Br. at 5.  Again, had BMS wanted to control how the money would be distributed drug-by-drug, it should have bargained for that condition.  It did not.  In any event, BMS overlooks the Court's findings that BMS marketed the spread on Paraplatin, and that its conduct associated with the sale of Taxol in 2001 and 2002 was egregious, including spread marketing and massive spreads.  And it

---

[1] How BMS can turn this jointly acknowledged uncertainty into a mutual mistake of what the Court actually ordered in its Trial Ruling is beyond spin.

[2] *See Morales v. Hosp. Hermanos Melendez, Inc.*, 447 F. Supp. 2d 137, 143-44 (D.P.R. 2006) (upholding settlement agreement that included payment for minor's medical expenses, even though minor died after verbal agreement for settlement was reached, and holding "[a]lthough the timing of [minor's] death, just days after the parties had finally reached a settlement agreement, may have been surprising, it was not unforeseeable.  Defendants' willingness to enter into an agreement that did not include precautions in the case of such an event was the result of a voluntary decision in the course of the difficult settlement negotiations that took place in the case.  They are bound by that decision, as well as the others that ultimately led to their acceptance of the settlement agreement.").

overlooks Dr. Hartman's damages methodology establishing that almost 78% of the damages suffered by the Class are associated with these two expensive and widely-used chemotherapy drugs. Thus, if it turns out that the majority of Class 1 members who file claims do so for being administered Paraplatin and Taxol, then such a result will comport with Plaintiffs' damages model. Again, in the context of a settlement – and not a precise trial award – Class Counsel's proposal is more than fair and reasonable.

BMS also complains that some Medicare Part B beneficiaries who did not take the BMS version of their chemotherapy drug will be included in the proposed distribution, and BMS would require proof that they were administered BMS's version of the drug covered by the J-Code. BMS Br. at 1, 3, 6. Everyone knows that such a requirement will substantially drive down claims. Even a simplified claims process can be daunting for an elderly cancer survivor, and each additional requirement imposed makes it more difficult for them to respond, especially one that requires a class member to obtain from his or her physician written documentation of the specific drug administered. This runs counter to Class Counsel's and the Court's significant and innovative efforts to make the AWP settlement claims process as simple as possible. It would also be inconsistent with precedent associated with the AWP settlements; such proof was not required in the GSK and Track 2 settlements. To reiterate, this is a <u>settlement</u> distribution for which compromises can be expected. If BMS was so concerned about this issue – one that it should have recognized was inherent in the GSK settlement reached long ago – BMS should have made it a part of the bargain, It did not.

BMS does not believe that any doubling or trebling of co-pays should occur because Class members would only be damaged a portion of the co-pay. BMS Br. at 6. Again, this is a settlement in which strict damages rules do not apply. And the Court itself has endorsed

measures to encourage Class members to step forward and file claims.  Doubling and trebling is one such measure and is being utilized in the AstraZeneca and Track 2 settlements.  It also recognizes that many of the Class members would be entitled to treble damages under their respective consumer laws.

The foregoing limitations insisted upon by BMS are driven by the end-result that BMS seeks:  an un-bargained for reversion for BMS's benefit in paying a future judgment or settlement in favor of Classes 2 and 3.  BMS claims that it does not "seek a revision to it of money not claimed by Class 1 members" but a reversion <u>for its benefit</u> – that is, a credit – is <u>exactly</u> what it wants when admitting that "any unclaimed funds [should] be available to pay claims of Class 2 or 3 members should there be any future judgment or settlement affecting those Classes."  BMS Br. at 4.

There should be no reversion.  As pointed out in Class Counsel's opening brief, BMS failed to bargain for one.  Moreover, it had the opportunity to settle the Class 2 and 3 claims during the mediation leading to the Class 1 proposed settlement <u>but expressly declined to settle those claims</u>.  First Berman Decl., ¶ 6.  BMS does not deny this.  BMS quite clearly chose to settle <u>only</u> Class 1 for $13 million, there were no "strings" attached to the payment of the $13 million, and there was no settlement of Classes 2 and 3 despite final proposals being exchanged with respect to those two classes at the end of the mediation.  *Id*.  BMS should not now be permitted to inject itself into the Class 1 distribution process in a ploy to grab monies earmarked for Class 1 in an attempt to satisfy BMS's financial obligations to the other Classes.

If there is any remainder of monies after distribution to Class 1 members filing claims, such remainder should inure to the benefit of Class 1 as a distribution to charitable organizations funding cancer research and patient care just as Class Counsel proposes.

- 9 -

### E. There Is No Conflict.

Incredibly, BMS contends that Class Counsel have some sort of a conflict in seeking to maximize recovery for Class 1. BMS Br. at 6. This is silly; no conflict can be found in Class Counsel's aggressive negotiation to maximize the payout to Class 1. Class Counsel drove a hard bargain in obtaining BMS's capitulation to put up $13 million for Class 1. BMS cannot conjure a non-existent conflict now by insisting that some of the $13 million go towards a future judgment or settlement in favor of Classes 2 and 3.

BMS next complains that Class Counsel might get paid too much in fees. BMS Br. at 6. This is a curious argument indeed given that Class Counsel's fee application in association with the AstraZeneca Class 1 settlement demonstrates how expected AWP fee recoveries, including any potential award here, will be well under plaintiffs' counsels' collective lodestar. But more to the point, if BMS wanted to cap any fees going to Class Counsel it should have negotiated for it but, once again, BMS chose not to. In any event, it is premature to consider fee issues as Class Counsel have yet to make their fee application and will do so before the final approval hearing if the Court preliminarily approves the settlement. That will be the appropriate time for the Court to address fees, not now.

### III. PLAINTIFFS' OPPOSITION TO BMS'S CROSS-MOTION FOR A CONFERENCE ON A DISTRIBUTION PLAN

BMS has cross-moved "for a conference to discuss distribution and other settlement issues." Dkt. No. 5596 at 1. Plaintiffs oppose the motion on the basis that it is an effort by BMS to delay this process and further postpone recovery by Class 1. If the Court believes that oral argument on Class Counsel's motion would be helpful, so be it, and Class Counsel will be pleased to participate. But a separate conference as requested by BMS is unnecessary.

## IV.  CONCLUSION

For the reasons set forth above and in their opening brief, Class Counsel request that the Court (i) rule that BMS does not have a right under the MOU to veto Class Counsel's proposed distribution plan and (ii) adopt Class Counsel's proposed distribution plan, pending an order preliminarily approving the proposed settlement and the form and manner of class notice.  Once the Court rules on this discrete issue, the parties can consummate a final settlement agreement, confer on proposed forms of notice and present a preliminary approval motion to the Court.  BMS committed to paying $13 million to Class 1 and cannot now be permitted to back out of that obligation because BMS believes that it overpaid.

DATED:  September 24, 2008.            By     /s/ Steve W. Berman
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
John Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

- 12 -

## CERTIFICATE OF SERVICE

   I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS COUNSEL'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO PRELIMINARILY APPROVE PROPOSED PLAN OF DISTRIBUTION FOR THE BMS CLASS 1 SETTLEMENT AND OPPOSITION TO BMS's CROSS MOTION FOR A CONFERENCE ON A DISTRIBUTION PLAN AND OTHER SETTLEMENT ISSUES**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on September 24, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

             **/s/ Steve W. Berman**
              Steve W. Berman