UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti B. Saris |
| *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.,* CIVIL ACTION NO. 06–CV–11337-PBS | ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO REQUIRE DEFENDANT ABBOTT LABORATORIES, INC. TO COMPLY WITH ITS <u>DISCOVERY OBLIGATIONS AND RELATED COURT ORDERS</u>**

# EXHIBIT 21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CITIZENS FOR CONSUME, et al        .   CIVIL ACTION NO. 01-12257-PBS
          Plaintiffs               .
                                   .
          v.                       .   BOSTON, MASSACHUSETTS
                                   .   MAY 16, 2007
ABBOTT LABORATORIES, et al         .
          Defendants               .
.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the United States:    Rene Brooker, Esquire
                          Justin Draycott, Esquire
                          United States Department of Justice
                          601 D Street, NW
                          Patrick Henry Building, Room 9028
                          Washington, DC  20004
                          202-307-1088

For Ven-A-Care:           James J. Breen, Esquire
                          The Breen Law Firm, P.A.
                          3562 Old Milton Parkway
                          Alpharetta, GA 30005
                          770-740-0008

For Abbott Laboratories:  James Daly, Esquire
                          Jason Winchester, Esquire
                          Jones Day Reavis & Pogue
                          77 West Wacker Drive
                          Chicago, IL  60601-1692
                          312-782-3939

Court Reporter:

Proceedings recorded by digital sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1  circumstances be looking to the intent and how things were

2  used in industry parlance in the appropriate circumstances.  So

3  even if it were a statutory construction argument, it would

4  allow us to get into this.  And finally, all we want is for

5  them to identify somebody who can support this.  It's not a

6  moot issue.  If it were moot, why would Judge Saris be talking

7  about this on February 27th, the last time we were in front of

8  her.  I mean clearly, these issues are very much alive in the

9  case.

10            Thank you, Your Honor.

11            THE COURT:  All right.  Moving on to docket entry

12  4047, which is the government's second motion to compel.

13            MS. BROOKER:  Thank you, Your Honor.  Your Honor,

14  this is a fairly straight forward request for production of

15  documents in that the United States has outlined five specific

16  targeted categories of documents that we believe Abbott has not

17  yet produced and should produce in this case.  These five

18  categories are based directly on Abbott's defenses, testimony

19  that we've gotten already in the fairly short amount of time

20  that we've been taken deposition of, depositions of Abbott's

21  witnesses.  I will tell the Court that this is one in a long

22  series of motions to compel that are coming with respect to

23  Abbott.  We've got a whole bunch more in the pipeline.  After

24  Abbott produced its initial disclosures back in august, it has

25  bickered with us on just about every single category of

1   documents that we come across, again, either through witness

2   testimony or their defenses.  And again, we haven't really

3   gotten their answer yet, which makes their withholding

4   documents early on very problematic.  We know that they're

5   going to be filing an answer I think in the next six weeks

6   because Judge Saris did just deny their motion to dismiss, but

7   I will say, again, we set out and I have personally written

8   more than a dozen letters outlining these categories of

9   documents, trying to get Abbott to respond to the letters and

10  we have not hid the ball at all.  We tell them exactly why the

11  categories are relevant.  It's not a game we're engaged in.  we

12  have long discourse over why they're relevant, but they bicker

13  with every single category.  Some of it is downright silly.

14  And let me just say, the second thing besides wanting those

15  five categories of documents, we have not gotten a single

16  privilege log from Abbott in this case and we know they're

17  withholding documents on the basis of privilege.  We know that.

18          THE COURT:  Well, have they said it?

19          MS. BROOKER:  Yes.  I mean, we know it from the Texas

20  case.  We were just told very recently in our last phone call

21  with them that we would get a privilege log, but it's really

22  late in coming given that these are documents that should have

23  been disclosed to us like eight months ago when they made their

24  initial disclosures and long since past the deadline that Judge

25  Saris set for a CMO.  I mean, arguably, I guess--

1        THE COURT:  When are they going to get it, Mr.

2   Daly?  Mr. Winchester?

3        MR. WINCHESTER:  As we explained to counsel in our

4   last phone call and also by letter last night, they will have a

5   privilege log by this coming Monday.  It's not part of the

6   motion so I don't know why it's up, but they will have a

7   privileged log by this coming Monday.

8        MS. BROOKER:  Yes, it is part of our motion, but I

9   would ask is that going to include all documents to date for

10  all categories of documents we've requested that they're

11  withholding as privileged or is it some smaller subset of

12  privileged materials?

13       THE COURT:  Can you enlighten us on that?

14       MR. WINCHESTER:  I'm happy to, Judge, although we

15  just did have this out by way of conversation between us but

16  I'm happy to tell the Court as well.  As I told counsel, we are

17  crafting a privilege log for this case, so it will

18  be--

19       THE COURT:  In it's entirety.

20       MR. WINCHESTER:  Yes, for this case.  In other words,

21  there are four drug cases--

22       THE COURT:  Four drugs.

23       MR. WINCHESTER:  --and the additional documents that

24  I talked to you about, which are documents that don't

25  necessarily talk directly about these drugs but would relate to

1  them and documents that would arguably suggest some pattern

2  of practice relating to other drugs.  We will do our best to

3  make sure that the privilege log is current as of the time that

4  we turn it over.  We're working very hard to do that, obviously

5  understanding that we have an obligation to seasonably

6  supplement the log as other things come in.  I think what

7  counsel's question is is are we going to take their view of the

8  universe, which is every document Abbott has about any of its

9  products ever and do a privilege log on that?  No, we're not.

10  We are doing a privilege log for this case, which will cover

11  the documents that are the body of documents at issue at this

12  case and we will describe for them the documents that are being

13  withheld on grounds of privilege.

14          THE COURT:  All right. You are going to get it

15  Monday.

16          MS. BROOKER:  Yes.

17          THE COURT:  You'll look at it then and we'll go from

18  there.

19          MS.BROOKER:  All right, Your Honor.  At any rate, I

20  will just briefly go over because I think I thoroughly laid

21  this out in the motion, the five categories of documents and

22  why they are relevant and briefly address Abbott's responses to

23  them.   Average manufacturer price data or AMP data that we

24  refer to, it's all over Abbott's defenses.  It's disgusted in

25  their motion to dismiss.  They go to each government witness

1   deposition and ask this question about isn't it a fact that

2   you got our AMP data?  They are representing in depositions and

3   they are representing in their motion to dismiss, and I presume

4   we're going to see it in their answer as well, that their AMP

5   data was accurate and that the government could have relied

6   upon it.  Now, setting aside for the moment because I don't

7   think we need to resolve this here, we believe that issue is

8   irrelevant and it's a red herring, but nonetheless, it's

9   ridiculous for them to say that this is an issue in this case

10  and to be proceeding full speed ahead clearly intent to try and

11  get this issue before a jury and to tell the government, but

12  we're not going to give you our calculations on AMP.  As a

13  matter of fact, Abbott served us with requests for admission

14  and asked us to admit that their AMP data was accurate, which

15  is initially why we asked for their AMP data in addition to the

16  fact that it's all over their briefs and all over their

17  deposition question of witnesses.  Now, granted they've

18  withdrawn only the request for admission at the moment, they

19  have non pending.  They're obviously going to be reserving

20  them.  I don't know if that specific request will be in there

21  but it's even beside the point.  This is something that they

22  are putting forth.  They need to produce that AMP data to us.

23  It's not sufficient for them to say you already have it.  We

24  gave it to you and we don't have to have our underlying price

25  information or how we got that information or all of the

1   details which we do need for this case for their defenses at

2   the very least.  So that I put forth, Your Honor, as a

3   ridiculous basis to bicker with us over providing that AMP

4   data.  Also, I would submit to the Court that we've asked only

5   at this time for the AMP data for the subject drug.  So that's

6   not even an issue.  It should not be a burden for them to

7   produce that, and even if it is, there's going to be some

8   burden to defend it in this case for producing material.

9           The second category of documents--

10          THE COURT:  Well, let's do one at a time.

11          MS. BROOKER:  Okay.

12          MR. WINCHESTER:  Thank you, Your Honor.

13          There's I think a quality distinction that counsel is

14   glossing over here and I think misstating how we're using AMP.

15   Average manufacturer's price or AMP is a creature of statute

16   that Abbott and every other pharmaceutical company is required

17   to report to the government.  It is used by the government for

18   purposes of relating to calculation of Medicaid rebates.  So,

19   just so the Court has that background, it should also be

20   pointed out there is no claim in this case that relates in any

21   way to AMP or to Medicaid rebates.  The government has not

22   brought those claims.  It had every opportunity.  It has not

23   brought those claims.  They're not in the case, so under the

24   rules that have been in place since 2000, they are entitled to

25   discovery about their case.  This is not their case.  The

1  contention always has been that well, you, Abbott, put AMP

2  in play by, either through your request for admission or by

3  pointing out the fact that the government gets AMP data.  Both

4  of those are not true.  First of all as counsel states, there

5  is no request for admission.  That's just a red herring.  There

6  isn't one.  As to the I think more pertinent issue, which is,

7  has our defense somehow put this at issue, I think the answer

8  is unquestionably no.  Our defense and our use of AMP has

9  nothing to do with how the AMP gets calculated.  That's a

10 statutory calculation.  The use we make of AMP is simply to

11 say, look government, when you come to this court and say I was

12 defrauded in overpaying for drugs because I thought as we see

13 in their complaint and we've heard hear at least from the

14 lawyers and not from the actual people who ran the show, I

15 thought AWP was the actual price people were paying in the

16 marketplace.  When they come to the Court and say that, I think

17 it's relevant for us to show and we've said, wait a minute, you

18 were getting the AMP submissions that showed you for these

19 drugs and every other drug in every case that the average

20 manufacturer price was substantially below this AWP that you

21 were supposedly relying on as the street price of the drug.  So

22 it's what we liken to a hearsay statement that comes in to show

23 effect on a listener.  It doesn't matter how the statement was

24 made, whether it's true or anything else.  It matters for the

25 effect on the listener.  In this case, we haven't said, you,

1   government have an issue here because here's how we

2   calculate AMP.  We say, you have an issue in saying that you

3   thought AWP was the real price when you're sitting there

4   getting reported to you an average manufacturer's price that

5   was much lower, regardless of how it's calculated.  That's the

6   only issue we made of it.  So we have not put the calculation

7   in issue.  There's no claim in this case relating to

8   calculation and for that reason we would oppose their motion.

9          MS. BROOKER:  Your Honor, I would just briefly

10  respond.  Their AMP data, first of all their legal arguments on

11  AMP data we completely disagree with.  Again, I think that will

12  be briefed at a later time.  Their AMP data that they submit is

13  their actual prices, that's at the very heart of this case, and

14  again, as you will see, defendants bicker with every single,

15  solitary cat, this is a very discrete specific category of

16  documents.

17         THE COURT:  To be produced.

18         MS. BROOKER:  Thank you, Your Honor.

19         The next category of documents, again, very discrete

20  and finite.  The alternate site sales force, that particular

21  group within Abbott, hospital products divisions, there's no

22  doubt, there's no dispute I don't think at all between the

23  parties that the focus of that particular group is relevant.

24  We've been taking a lot of depositions in that area, and

25  there's a finite set of individuals.  We have been asking now

I - 53

1    for probably six months that Abbott tell us how many

2    individuals are in that group, in that sales force.  We have

3    not gotten a response.  I had to depose somebody to find out

4    the answer to that and learned recently a couple of weeks ago

5    at a deposition of Cliff Krajewski, who is in that particular

6    group for a number of years, that at any given point in time,

7    at least from 1990 to `96, and it suggests that this is

8    probably true for all the time period that we're talking about,

9    that there were no more than 30 field sales persons in here.

10   So we're talking about a small finite group of people, and from

11   among those materials at this time, all we're talking about are

12   specifically their written goals and evaluations that they

13   received in terms of how they received, you know, their

14   end-of-the-year evaluation, how they were compensated and so

15   forth.

16           THE COURT:  How many people are we talking about?

17           MS. BROOKER:  We're talking about, again, 30 sales

18   persons a year for over the course of at least, you know, a 10-

19   year time period for starters.  And it depends on what we see

20   in those documents whether we have to trouble shoot and, you

21   know, and ask for something broader than that.  Very finite.  I

22   also deposed two people, Cliff Krajewski and another person,

23   again both of these occurred two days in a row, a couple of

24   weeks ago.  Their testimony was very clear.  Even though

25   neither one of those are the sales people, they testified that

1   each of them in different parts of Abbott have written very,

2   very specific written goals that they must meet each year and

3   then they have an evaluation that is in writing.  Both of them

4   have those.  Of course people save their written evaluations.

5   One man testified that all the years he's been at Abbott, I

6   think it was 25 years, he has his whole stack sitting on his

7   desk.  So not necessarily, you know, bringing this to Your

8   Honor's attention to talk about those two individuals' files,

9   but the point is, clearly the documents exist.  Clearly they're

10  probably not that hard to obtain, and again, we've been very

11  specific with Abbott.  They're relevant to show what marketing

12  incentives the sales persons were offered to receive their

13  compensation and their evaluation.  Whether spread marketing

14  was encouraged or rewarded, whether there were any changes

15  during the relevant time period to the policy or practice in

16  Abbott's marketing its drugs, what their recognition was, and

17  it does matter and particularly Daryl Dorsey, granted he is a

18  lobbyist, but he testified his goals would be very specific,

19  that he would maintain, for example that he would see to it

20  that a particular law went into effect or didn't go into effect

21  and at the end of the year his performance would be measured

22  against that very specific goal.  Presumably, the sales persons

23  are going to have no more or less specific goals than the other

24  witnesses that we've deposed.

25          Now, the only real objection Abbott has to this, it

I-55

1  can't really realistically be burdensomeness.  First of all,

2  they never really undertook other than the deposition that I

3  took to find out what the burdensome nature of it was, they say

4  the documents are confidential personnel records, but I direct

5  the Court to the MDL protective order and the one that this

6  Court entered in this case, and the protective order expressly

7  anticipates that this type of information might be produced,

8  and it specifically allows for "past or current company

9  personnel or employee information."  Abbott produces almost

10  everything in this case as highly confidential or confidential.

11  So confidentiality, you know, is just not an issue in this

12  case.  And again, for Abbott to say that this is irrelevant is,

13  I would say another category that's ridiculous.  The only last

14  thing I will say is that what Abbott did offer to produce,

15  which we still haven't even gotten, are the policies.  They

16  think that's sufficient that we get whatever their policy was.

17  Of course we want to see what the policy was, but it doesn't

18  matter until we see how it was implemented with respect to any

19  one particular employee and the policy is going to presumably

20  say something broad such as employees will have goals and they

21  will be evaluated according to those goals.  It's not going to

22  tell us whether they met those goals and whether they had to do

23  with marketing incentives and marketing the spread and so

24  forth.  So I can see no reason at all that these materials do

25  not get searched for and produced in this case.

1    Thank you.

2         THE COURT:  To be produced.

3         MR. WINCHESTER:  Your Honor, could I inquire just

4    briefly about that.  Is it the Court's ruling that the

5    personnel files be produced in their entirety or simply that we

6    review them and produce any material that would be responsive?

7         THE COURT:  No, I think what is responsive to the

8    interrogatory because people have all other kinds of

9    information that's totally irrelevant.

10        MS. BROOKER:  Yeah, I mean, there may be, we don't

11   want irrelevant stuff, Your Honor, and we're happy to, it's a

12   document request, not an interrogatory, but we're happy to

13   specify that.

14        THE COURT:  You don't need copies of peoples' degrees

15   and--

16        MS. BROOKER:  Exactly.

17        THE COURT:  --things like that.

18        MR. WINCHESTER:  But to the extent if we review a

19   personnel file and there's absolutely nothing in there from

20   which you could possibly argue that somebody was talking about

21   marketing based on spread or compensated based on marketing,

22   based on spread, it wouldn't be the Court's view they'd be

23   entitled to that file, would it?

24        MS. BROOKER:  I'd like to respond to that and

25   Mr. Breen is saying he would like to respond.  Your Honor, I

1   would say we will be the judge of that.  It's a finite set

2   of materials.  How they were evaluated may be inculpatory or

3   exculpatory, but it is important to see whether there are

4   specific goals involved, reimbursement, AWP.  We don't want to

5   leave this.  This is Abbott's position throughout which is

6   making discovery like pulling teeth.

7          THE COURT:  I've ruled, that which is not relevant

8   should not be produced and if there is no information in the

9   file relating to the request, the file is not produced.

10         MR. WINCHESTER:  Thank you, Judge.

11         THE COURT:  The time is getting short, so--

12         MS. BROOKER:  Yes, Your Honor, the next category of

13  documents, again, finite discrete set of documents, and

14  specifically they are, there was a Tap settlement in this case.

15  Tap was a joint venture between Abbott and another entity.  We

16  are not asking that the Court require Abbott to produce

17  everything they produced in the Tap case or everything relevant

18  to the TAP case.

19         THE COURT:  the Tap case in this Court?

20         MS. BROOKER:  Yes, Your Honor.  Very specific, at the

21  time that the Tap settlement took place, Abbott, around that

22  same exact time changed dramatically its prices which is in

23  large part the reason for the cutoff of the year 2001 for this

24  lawsuit.  When we say okay your damages is stop, we believe

25  that the Tap settlement, which again it related to a different

1  drug, it was Lupron, but it was the same exact conduct, we

2  believe that there were high level discussions within Abbott

3  which caused them to start reporting accurate prices, which is

4  the very crux of this case.  So what we asked for, and I guess

5  there's generally two categories, but the first category, which

6  is specifically laid out, what we call Tap impact documents,

7  and all we mean by that are any, I don't want to mis-cite what

8  we wrote, but it was basically very specific, any documents

9  that relate to discussions within Abbott not limited to

10  hospital products division but among high level corporate

11  individuals anything from their Medicare working group or

12  wherever the documents come from that discuss how they reacted

13  basically to the Tap settlement because we do believe it may

14  have impacted the price reporting changes that they made in

15  this case which again is the crux of this--

16          THE COURT:  How are they reactive?  I mean, be a

17  little more specific than that, I'm afraid.

18          MS. BROOKER:  Yeah, I mean, Mr. Breen said he can

19  help with that if he's allowed, if he's permitted to respond to

20  that, but here's what, here's how we've drafted it, all

21  documents relating to or otherwise regarding the impact of the

22  2001 Tap pharmaceuticals criminal plea and civil settlement on

23  the prices or practices, excuse me, or pricing practices for

24  Abbott's pharmaceuticals.  So, you know, it's broad.  Abbott

25  has to interpret just like any document request.  We don't know

I-59

1  what they have internally so we can't be more specific than

2  that.  But again, it goes, we're not asking for everything that

3  was produced in Tap to be produced here.  We're asking for that

4  finite set.  And the second set of Tap documents that I will

5  mention relating back to the earlier argument that we had on

6  the first motion before the Court, there are documents produced

7  by Abbott and produced by Tap that other states have received

8  from Abbott or from another entity in the Tap litigation that

9  have very highly relevant witnesses in this case working for

10  Abbott, have their name on those documents.  One witness, Ms.

11  Tobiason, who was just deposed for a second time yesterday, and

12  she was shown Tap documents which show that Tap was consulting

13  with hospital product division personnel on reimbursement and

14  spread and average wholesale prices very relevant to this case.

15  So there's also another set of documents.  We're not asking

16  Abbott to go back and search for that set.  We're just asking

17  that they be again allowed to be shared, some of which are

18  being shared because they're used at depositions.  But

19  obviously at a deposition, you can't ask a witness about, you

20  know, 100 documents, because there's just no time.  We want all

21  the documents that they produced related to these issues that

22  impact our case to be shared with us.  Again, there's no burden

23  to Abbott, and I don't know if Mr. Breen--

24         MR. BREEN:  Just a quick point here, Judge, and it

25  shows, I know a lot about Tap from the other litigation, and we

1   know, and we've got a little bit of corroboration already

2   that we could get even with the documents we got from Abbott in

3   this case, that they restructured their entire way of doing

4   business on the heels of the Tap and Ross settlements.  They

5   paid well over a billion dollars already for the same kind of

6   conduct and to a great degree we're talking about here, but

7   also for example Abbott's former president, Thomas Hodgson,

8   went over to run Tap.  He gave me highly relevant deposition in

9   the Tap case.  We had to move to compel to get it in the Texas

10  case.  It talks about the spread and knowledge - (inaudible -

11  #3:29:58) - about it.

12          In this case, Abbott, I too the 30(b)(6) document

13  witness, Ellen Klauss, she says they hadn't even searched

14  Abbott's corporate hierarchy for documents responsive to the

15  government's request in this case ever.  She testified to that.

16  Now, Thomas Hodgson, I got his deposition in the Texas case.  I

17  can't turn, I can't show it to Ms. Brooker because it's

18  declared confidential in the Texas case.  It wasn't taken in

19  the Texas case.  We got it through a motion to compel in the

20  Texas case.  We've already been over that ground.  So the Tap

21  and Ross reactions, Miles White, their CEO, got a letter from

22  Pete Stark, the ranking member--

23          THE COURT:  We know who he is.

24          MR. BREEN:  Well, weighs and means, okay, there was

25  all kinds of reactions going on about that time where Abbott

I-61

1   changed their policy and they had to change it from

2   something and we all, you know, subsequent other measures may

3   not be admissible at trial but they're certainly discoverable

4   so that we can get a feel for and work back from what they did

5   to establish the truth and the facts in this case.  That's all

6   we're trying to do.

7            Thank you.

8            THE COURT:  Mr. Winchester.

9            MR. WINCHESTER:  Briefly, Your Honor.  Obviously

10  let's bring this back to what this case is and what it isn't.

11  Tap is not a defendant in this case.  Lupron is not a drug at

12  issue in this case.  The 2001 settlement that they want to talk

13  about is a criminal plea for Tap where it pled guilty, Tap, not

14  Abbott pled guilty to one single count having to do with--

15           THE COURT:  I remember this well.

16           MR. WINCHESTER:  Okay.  So this is the three samples

17  that were then billed for, not AWP.  Okay?  So this case is not

18  about Tap, it's not about Lupron.  I think Your Honor hit the

19  nail on the head.  There isn't anything even vaguely focused or

20  pointed about this request nor relevant to this case.

21  Mr. Breen talks about Texas, and I think that actually is

22  relevant because what they did in Texas was request this very

23  same information from Judge Jenkins.  We objected and he

24  sustained that objection.  They did not get a 30(b)(6) witness

25  to talk about--

I - 62

1          THE COURT:  This is what happens when you get to

2    4:00.  Everybody--

3          MR. BREEN:  That's right.  I'm sorry.

4          MR. WINCHESTER:  --but we attached those papers to

5    our response.  Your Honor can see that.  They asked to have

6    Abbott designate a 30(b)(6) witness to talk about this, what

7    impact did the Tap settlement have on Abbott, whatever that

8    means, and the judge said, no, you don't get that.  It's not at

9    issue in the case.  It's no more at issue here than it is

10   there.

11         In terms of I guess counsel's statements which is

12   well, Abbott may have changed the way it did business as a

13   result of seeing what happened in Tap, to the extent they're

14   trying to discovery things about this reduction of price in

15   2001, which by the way is where their complaint ends, then

16   we've already told them we're giving them all the non-privilege

17   documents that have to do with the reduction of prices for

18   these drugs that happen in 2001.  They're getting those

19   documents.  This class of things--

20         THE COURT:  All right.

21         MR. WINCHESTER:  --class of things they're talking

22   about is outside the case.

23         THE COURT:  Denied without prejudice at this time,

24   maybe to be renewed upon at further showing down the road.

25   Right now I don't see the relevance.

1          MS. BROOKER:  Okay.  Thank you, Your Honor.  I

2     appreciate that.

3          THE COURT:  How much more do we have?

4          MS. BROOKER:  Two more categories of documents and

5     then a motion to compel 20 interrogatories, which I hopefully

6     can summarize for you, interrogatory responses.

7          Okay.  The next category of documents are all

8     documents relating to the drug vancomycin, one of the four

9     subject drugs in this case.  We have gone around and around

10    with Abbott on this issue.  Frankly, Your Honor, we never feel

11    as though we have any firm representation from them that we

12    have received all the vancomycin documents.  The drug was first

13    marketed I believe around 1988, so we've asked for the

14    documents to be produced relative to vancomycin back to 1988.

15    It's not too far prior to 1991.  Obviously, you know, launch

16    documents and other types of documents would be relevant.  I

17    know that Abbott has represented most recently in its

18    opposition to this specific request what they've already

19    searched for and produced to us and that they searched for them

20    back in 1996 pursuant to the government's first civil

21    investigative demand, and if I understand, maybe I don't, but

22    if I understand correctly their position is that they're not

23    going back and searching again.  And I will say that their

24    corporate designee on this issue, Ellen Klauss, who just

25    testified in this case maybe four weeks ago, maybe a little bit

1  longer, my understanding of her testimony on this issues is

2  that at that time they did not search back as far as 1988.

3  Now, I know Abbott's counsel is going to stand up here and say,

4  for the group of documents we produced in other cases that we,

5  that relate to vancomycin back to 1998, we'll give you those,

6  and maybe they're going to represent they already have because

7  we just got a small number of documents in the last week or

8  two, but that's not a representation that they had searched for

9  and produced all those documents.  The other bit of testimony I

10 believe from Ms. Klauss is that they never searched for

11 documents relevant to that drug outside of the hospital

12 products division, and for Abbott to stand up here and say that

13 only documents in the hospital product division are relevant,

14 that's not true either.  We have seen in other cases where

15 Abbott's produced documents that, a lot of relevant documents

16 from corporate offices and not just that one single operating

17 division are relevant, so we want a representation that Abbott

18 either has or is going to produce to us and search again for

19 all documents relevant to the drug vancomycin, particularly

20 because it is one of the four subject drugs.

21          Thank you.

22          MR. WINCHESTER:  Judge, we're not sure why this

23 motion got filed for vancomycin.  They talk about back and

24 forth, but I've been clear in every letter, every conversation,

25 clear in our brief.  They've asked for documents on the

1  marketing, pricing and sale of vancomycin.  That is one of

2  the subject drugs.  We've agreed to give them those documents.

3  That's not at issue.  Why they moved, I have no idea other than

4  to reach this point of pre `91 documents.  For the pre `91 let

5  me state very briefly, if they serve a CIB on Abbott back in

6  1996 that requested documents dating back to 1986, Abbott

7  responded.  They have or if they don't have them already we've

8  agreed to give them, any document pre `91 on vancomycin that's

9  been produced in any other case.  They're going to get those.

10  They have documents pre `91.  I've been in depositions where

11  they've used documents pre `91.  The question is should we in

12  this case now have to go back and research again, and it isn't

13  as simple as just saying, oh, grab that box of pre `91 stuff.

14  It's literally going back and looking in every place we ever

15  looked before.  There's no reason to do it here.  Judge Saris

16  has set in the MDL discovery starting in `91 as far as we're

17  aware of all these 25 or so AWP related cases nobody has forced

18  discovery prior to 1991, that's years before the act on which

19  they're complaint is based was even enacted.  It's before the

20  time that they've alleged specifically in their complaint as

21  when the misconduct they've charge occurred.  There is no

22  reason to force Abbott to go back through this.  It's not an

23  easy undertaking.  The burden clearly outweighs the benefit of

24  getting these ancient documents, whatever additional ones there

25  might be that they don't already have, let me make that clear.

1          MS. BROOKER:  Your Honor, again, we--

2          THE COURT:  I'm inclined to agree with Abbott on this

3  one.

4          MS. BROOKER:  Your Honor, we have - I'm sorry.  Do

5  you want to say something, Jim, you should stand up, but we

6  have concerns about the testimony of their corporate designee.

7  We don't believe that the representations that were just made

8  are consistent with her testimony.  We do not believe that

9  there were ever thorough searches done, and I will tell the

10  Court that since we have been involved with Abbott in this

11  discovery, according to the corporate designee and frankly

12  according to the representations of counsel, Abbott has done

13  very little, if any, additional searches.  They are producing,

14  everything that we've gotten is pretty much by and large what

15  they said we should expect to get other than a few trickling

16  little documents, but we have new document requests.  We are

17  not bound by whatever we put in a CID at an investigative stage

18  in 1996.  Abbott is not spending very much time at all

19  searching for documents.  They say, look, whatever we gave

20  everyone else cherry picked, we're giving to you and hardly

21  any, and new searches were being done and that was confirmed by

22  Ms. Klauss.  We have sued Abbott on these drugs.  They are very

23  relevant.  They can't run from the fact that it's a subject

24  drug.  They have not stated any burden.  You can't just vaguely

25  state burden without more than that.  They should be in a

1   position to go back and search for documents, no different

2   than the government is having to search ancient files to

3   produce documents to Abbott even though we believe most of what

4   they're asking for is irrelevant.  You don't, you know, I have

5   to represent, Your Honor, you don't see Abbott here with a

6   bunch of motions against the government because we have been

7   running circles around ourselves trying to give them everything

8   that they ask for no matter how irrelevant it is, while on our

9   end they bicker with ever set of categories that we set forth

10  even though they're specific.  So I would say Abbott is

11  obligated in this litigation to go back and search for

12  vancomycin documents.

13          THE COURT:  Denied at this time.

14          Now, as to the next motion--

15          MS. BROOKER:  There's one last category--

16          THE COURT:  Is there one more?

17          MS. BROOKER:  Yes, alternate site customers, Abbott

18  has agreed, and I'm trying to shortcut this for Your Honor,

19  Abbott has agreed to produce documents with regard to its

20  largest customers, which is 80 percent of its customers, we

21  accept that representation they've made to us.  The 20 percent,

22  there are, granted thousands of customers, so we, without

23  knowing more Abbott has stated that that would be burdensome.

24  But again, Abbott is not giving us any detail about the burden.

25  We have always just like with respect to vancomycin and other

1 categories, made ourselves open to discussing and weighing

2 the burden, but for them to come forward and say we're not

3 doing any searches at all for specific categories because it's

4 burdensome without more, we need more than that.  If they're

5 going to tell us, well, we can search current files or we can

6 search, you know, this subset, we may be able to go back and

7 forth with them, but they just basically said no.  You're not

8 getting documents on the 20 percent of customers, and, you

9 know, we believe that those documents are relevant.  Now, the

10 one thing that I will say that we will accept here today, if

11 Abbott wants to stipulate, which I doubt seriously it's

12 prepared to do, that it is not going to be producing testimony

13 or evidence or seeking to do that at trial of any of those

14 customers that relate to the 20 percent that they say they're

15 not producing and that are not burdensome, and if they're

16 willing to stipulate that we're not going to hear from any of

17 those customers at trial, then we're willing to consider

18 withdrawing our document request, but as far--

19         THE COURT:  All right.  Denied without prejudice at

20 this time.  They're given 14 days to make a decision.

21         MS. BROOKER:  I'm sorry, Abbott is given 14 days to

22 make a decision about that stipulation?

23         THE COURT:  Exactly.

24         MS. BROOKER:  Okay.

25         MR. BREEN:  Can I just add one point to that, Your

I - 69

1    Honor?  The key thing in that stipulation too is not only

2    hearing from those customers but they're not going to put their

3    customer's prices into evidence.  That's critical because I

4    don't want to hear about some customer paid some high price

5    that I didn't know about before trial.

6              THE COURT:  All right.  I'm not going to get to 4060,

7    docket entry 4060 simply because it's after 4:00, and I have

8    some commitments upstairs.  That leaves at least four motions

9    for the next hearing.  What I suggest you do after we adjourn

10   here today is to confer with Mr. Duffy and see if you can pick

11   a mutually convenient date.

12             MS. BROOKER:  Thank you for that, Your Honor.

13             THE COURT:  I will take under advisement 3529, 3540,

14   3849 and on 4047, the ruling will reflect as ruled in open

15   court.

16             MR. DALY:  Your Honor, may I raise one important

17   issue as a result of one of your rulings?  On the AMP issue,

18   Judge, AMP is a very confidential thing.  It's not shared among

19   companies.  It's not shared, states don't have that

20   information.  Even when we give it to Medicaid or to CMS,

21   Medicaid doesn't share it with Medicare, the two divisions.

22   The problem I want to raise is that if we give it to them

23   pursuant to your order, remember you've ordered that the

24   government can then share that with everybody.  So boom, all of

25   our confidential AMP information goes out from the government

I - 72

CERTIFICATION

I, Maryann V. Young, court approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

_____          May 21, 2007_____

Maryann V. Young_____