UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti B. Saris |
| *United States of America, ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*, CIVIL ACTION NO. 06–CV-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO REQUIRE DEFENDANT ABBOTT LABORATORIES, INC. TO COMPLY WITH ITS DISCOVERY OBLIGATIONS AND RELATED COURT ORDERS**

# EXHIBIT 23



**U.S. Department of Justice**

Civil Division
Commercial Litigation Branch
Fraud Section

*601 D Street, NW*
*Ninth Floor*
*Washington, D.C. 20004*

*Telephone:  (202) 616-3797*
*Telecopier:  (202) 616-3085*

September 17, 2007

*Via Electronic Transmission*

James R. Daly
Jason G. Winchester
Carol P. Geisler
Jones Day
77 West Wacker
Chicago, Illinois 60601-1692

Re:     *United States ex rel. Ven-a-Care of the Florida Keys Inc. v. Abbott Laboratories, Inc.,*
        06–CV–11337-PBS, *In re Pharmaceutical Industry Average Wholesale Price Litigation,*
        MDL No. 1456/Civil Action No. 01-12257

Dear Counsel:

        We write regarding Abbott's document production in this case.

        This case, as pled, is about Abbott's particular abuse of government reimbursement systems. Consequently, the vast majority of relevant documents in this case are in Abbott's possession. Despite this fact, Abbott's document production has not proceeded at a pace sufficient to meet the fact discovery deadline in this case, currently set for December 31, 2007. We have sent Abbott counsel numerous letters and e-mails pertaining to our outstanding document requests. If Abbott counsel respond at all, it is to provide vague promises of production which rarely materialize. Our discovery requests have been outstanding for 10-13 months, and the close of fact discovery is rapidly approaching. Abbott's failure to produce documents timely in this case has severely prejudiced the United States' ability to complete discovery by the current deadline. Unless we receive Abbott's full production of all outstanding discovery no later than October 1, 2007, we will have no choice but to compel production.

        In addition, we note, as we have on previous occasions, that Abbott has overly designated as "Confidential" or "Highly Confidential" documents and deposition testimony in this case. Going forward, we request that, consistent with the Court's September 7, 2007 Order (Dkt. No. 4701), Abbott provide the basis of any confidentiality assertions it makes on documents produced

-2-

during the remainder of discovery. We further request that Abbott remove the designations from materials previously marked as confidential or highly confidential that do not meet the standards set forth in the Protective Order (Dkt. No. 3804) governing this case. The details regarding the United States' requests for Abbott's outstanding discovery and regarding our requests relating to Abbott's use of confidentiality designations are set forth in great detail below.

The United States served a first and second set of document requests upon Abbott on July 19, 2006, and November 17, 2006. We then filed two separate motions to compel certain categories of documents on January 9, 2007 and April 9, 2007. Dkt Nos. 3529, 4047. For many additional categories of documents, rather than move to compel, we have relied on Abbott's representations that documents would be forthcoming. It appears that without court intervention, Abbott does not intend to produce numerous categories of documents relevant to the claims or defenses in this case sufficiently in advance of the fact discovery deadlines. Moreover, we believe Abbott even has failed to produce certain categories of documents Magistrate Judge Bowler ordered it to produce on May 22, 2007, within thirty (30) days of that date.

Abbott has repeatedly represented that its document production was substantially completed on August 9, 2006, pursuant to its initial disclosures, and before the United States served any of its document requests in this case. The United States has and continues to strongly disagree with that position. We have learned that Abbott removed documents relevant to this case from its prior productions to parties in other cases before making its initial disclosures to the United States. We were informed about this "cherry picking" through the process leading up to the Relator's April 27, 2007 filing of a Motion to Compel Abbott to Produce or Consent to Access To and Sharing of All Discovery Produced by Abbott in Other False Price Report Litigation. As a result of that motion, Judge Saris eventually ordered the production of the documents. *See* Judge Saris's 08/21/07 Order, and 09/06/2007 electronic Order denying Abbott's Emergency Motion to Stay the Effect of and Motion to Reconsider the Court's August 21, 2007 Order.

As a recent example, the former Abbott supervisor responsible for reimbursement, Bruce Rodman, was deposed on August 29, 2007. He possessed tens of thousands of pages of documents from Abbott's Alternate Site that Abbott never produced to the United States. These are documents created by Abbott that are highly relevant. Indeed, many of these materials demonstrate that Abbott was very familiar with the concept of average wholesale price ("AWP") and the importance of AWP to reimbursement for Abbott's products by third parties, contrary to the testimony of Alternate Site employee Virginia Tobiason, who was Abbott's government reimbursement expert. For example, it appears from the Rodman production that Alternate Site had entire chapters of manuals dealing with how to complete HCFA 1500 forms. *See e.g.*, "CHIP Reimbursement A-Z Class Materials" (BR 02698 – 02906) and "Reimbursement Implementation Manual" (BR 01407 – 01505).

In addition to prejudicing the United States' ability to prepare its case for trial, Abbott's selective approach to document discovery has impeded coordination among plaintiffs with the result of (1) adding more cost and expense for Abbott (which is continually parsing through hundreds of thousands of pages of documents to shield evidence from one plaintiff or another), and (2) impeding the efficient depositions of Abbott's own current and former employees. We request

-3-

a complete production of the following categories of documents by October 1, 2007. We also request that Abbott notify us by that date which of the specific Requests for Production ("RFP") in the United States' first two sets of RFPs are complete, and to produce any documents responsive to the RFPs not specifically identified in this letter by October 1, 2007.

## Court Ordered Sales and Marketing Documents

On May 22, 2007, Magistrate Judge Bowler ordered Abbott to produce in thirty (30) days (by June 21, 2007): (1) all documents that mention the four – and now five – subject drugs;[1] (2) all documents that relate to the subject drugs including, general sales and (across the board) marketing information that would encompass the subject drugs; and (3) all documents that reflect any alleged effort on the part of Abbott to market the spread or manipulate the published AWP for any drug within Abbott's former Hospital Products Division ("HPD"). As to the second and third categories, Magistrate Judge Bowler ordered that they include, *inter alia*, all documents regarding other drugs marketed and sold by HPD to the extent such documents pertain to how Abbott "put together the spread," as well as all cross cutting sales documents inclusive of broad based marketing documents. Abbott was further ordered to produce, "consistent with its statements at the May 16, 2007 hearing," all documents that show a pattern or practice with respect to the subject drugs. Magistrate Judge Bowler recognized that the categories may overlap, and that the temporal period shall be through 2003 (consisent with Judge Saris's previous ruling that discovery shall be at least through 2003).

Evidence has come to light that Abbott has failed to comply with the Court's May 22, 2007 Order. For example, former Abbott employee Bruce Rodman produced pursuant to subpoena numerous training manuals and modules that are clearly covered by this Court's Order of May 22, 2007, and that we have repeatedly requested. *See e.g.,* "Guide to Sales Training & Development" (BR 01217 – 01406) and "Alternate Site Sales Training – Account Assessment Strategies & Contract Marketing Guidelines for a Proposal" (ABT AWP/MDL 197141 – 197162; CMOAL 232492 – 232513). To date, Abbott has not produced these materials or others like them, nor has Abbott informed us that these materials ever existed or were missing and/or possibly destroyed. To the contrary, Abbott counsel represented to the Court and to the United States that Abbott has fully complied with the Court's May 22, 2007 Order. 06/19/07 Hrg. Tr. before Magistrate Judge Bowler at 21:2-14, 22:14-23:25, 24:14-25:3, 27:14-28:8.

In addition, we have repeatedly requested in meet and confer sessions and written correspondence that Abbott provide copies of all marketing plans for the subject drugs. Abbott counsel has represented that the only marketing plans created and maintained by Abbott for the subject drugs are called "August Plan/April Update" documents. 07/25/07 letter from R. Ford to J. Winchester; 08/31/07 letter from R. Brooker to J. Winchester. We also understand from Abbott counsel's representations that there are "August Plan/April Update" documents for the time period from January 1991 through 2003. On August 31, 2007, we sent a letter documenting the handful of plans we were able to locate from the Abbott hard copy production to which Abbott counsel

---

[1]    With the filing of the United States' First Amended Complaint, there are now five drugs at issue in this case.

-4-

directed us to locate these materials, and requested once again that we be provided copies of all
such documents. We understand from the August 13, 2007 deposition of former Abbott
employee Don Robertson, that he maintained copies of all the April/August plans and updates
until the time of his departure from Abbott. Specifically, during the morning portion of his
deposition, Mr. Robertson testified that he kept August Plan/April Update documents in a file
cabinet in his office and that if he received a litigation hold memorandum, he would have
retained the documents since, as he testified, "not following" a directive from his superiors "was
not an option." 09/13/07 Dep. of Don Robertson. He further testified that all Vice Presidents for
Alternate Site would have similarly maintained copies of August Plan/April Update documents.
Still further, Mr. Robertson testified that he received litigation hold instructions in connection
with this case as early as 1997. 09/13/07 Dep. of Don Robertson. Accordingly, the August
Plan/April Update documents maintained by Mr. Robertson, and presumably other Alternate Site
Vice Presidents, should have been preserved and subsequently produced to the United States.
Despite Abbott's counsel's representations and the testimony of Mr. Roberston, a large number of
Abbott's August Plan/April Update documents have yet to be produced to the United States.
Finally, we understand that Abbott launched its version of Acyclovir Sodium in April 1997.
Please provide all launch, sales and marketing plans for Abbott's Acyclovir by October 1, 2007.

　　　Further, at the deposition of Dr. Perri, counsel for Abbott repeatedly suggested through his
cross examination that Dr. Perri did not have access to Abbott's relevant marketing plans, policies,
or other marketing materials, and specifically, marketing documents other than ones that showed
that Abbott marketed the spread. *See* 08/21/07 Dep. of Dr. Matthew Perri at 425:11-435:23
(plaintiffs' counsels' request on the record that the expert be provided the missing marketing
documents referenced over the course of two days at his deposition); at 619-620 (Dr. Perri's
concern that "...you [counsel for Abbott] have implied to me over the last two days that there are
documents that exist that would tell me a different story, and I am not aware of that. And if there's
something else I need to know, [] I'm available to review that material"); at 645-648 (Abbott's
counsel's suggestions that there are documents that show that Abbott had in place and implemented
a policy not to market the spread to customers); at 452-455 (Abbott's counsel's suggestions that
there are relevant marketing documents that show Abbott did not market the spread); at 613
(Abbott's counsel's statement that "you don't know whether the documents provided to you gives
you a complete picture of how Abbott interacted with its customers, sold its drugs, or ran its
business, do you?"); at 201-202 (Abbott's counsel's suggestion that there is some evidence that
Abbott had a policy "prohibiting affirmative marketing of the spread, but allowing [the] sales
force to answer questions posed by a customer"); at 399-400 (Abbott's counsel's statement that ".
. . there may be Abbott policies or charts, manuals, or other guidance which would make very
clear what the lines of authority are for various functions that you haven't reviewed, correct?"); at
402-403 (Abbott's counsel's statement that, "Abbott may have a policy attempting to prevent that
employee from speaking about the spread, correct?"); at 617-620 (counsel references "trip
reports" and "significant events reports," which were created by Abbott on a monthly basis, yet
not produced by Abbott, but that may contain further discussions of spreads than those
documents produced by Abbott).

　　　First, we have seen none of the documents referenced in Abbott's counsel's questioning of
Dr. Perri, notwithstanding our document requests for the same. Second, Abbott counsel has

-5-

repeatedly represented to the Court that the latter types of materials (marketing documents that do not show that Abbott marketed the spread) were not relevant in this case and, on that basis, Abbott therefore refused to produce such materials. *E.g.*, 06/19/07 Hrg. Tr. before Magistrate Judge Bowler at 26:7-15. In addition, Abbott counsel has represented to the United States and to the Court, as shown above, that Abbott has produced all relevant marketing documents. We are seriously concerned that Abbott may be withholding relevant documents from the United States and its experts, given that one of Abbott's counsel's representations to the United States and the Court are inconsistent with his co-counsel's overt suggestions or statements directed to Dr. Perri in a formal deposition proceeding.

Once again, we request by October 1, 2007, that Abbott either comply with Magistrate Judge Bowler's May 22, 2007 Order compelling the production of all relevant marketing materials, and produce all other marketing materials that Abbott has suggested are relevant to this case at the recent deposition of Dr. Perri. In addition, we request all of the "August Plan/April Update" documents, trip reports and significant events reports for the time period from January 1991 through 2003.

Finally, in light of Judge Saris's September 7, 2007 Order regarding third party discovery (Dkt. No. 4701), requiring the production of "all documents which refer or relate to Abbott's marketing a spread on a drug involving AWP no matter what drug or what year," we ask that Abbott comply with the Court's recent Order and expand its production to remove any limitations it has placed on drugs or year in question. There is absolutely no reason to believe the Court would not apply the same discovery rule to Abbott as it has applied to third parties in this instance, and it would be wasteful of the parties' and the Court's time to re-litigate the issue.

## Court Ordered Personnel Files of ASPS Field Sales Force

At a hearing on May 16, 2007 (Tr. at 56), Magistrate Judge Bowler granted the United States' Second Motion to Compel Documents pertaining to the production of personnel files. (Dkt. No. 4047).

While Magistrate Judge Bowler did not give a date for Abbott's compliance with her Order, simply because it did not come up at the hearing, she clearly intended for these materials to be produced at least within thirty (30) days from her Order, as she has done with other deadlines on the parties' motions to compel. Abbott has repeatedly promised production by certain deadlines and missed those deadlines without notification to the United States. During our July 6, 2007 meet and confer, Abbott counsel stated that he planned to begin production of this category of materials by the following week, and to complete production within three to four weeks, which would have ended approximately the first week of August 2007. To date, Abbott has not produced any of these materials, nor has it offered any reason for its complete silence or its failure to even begin production.

In the July 6, 2007 meet and confer, Abbott counsel made the following additional specific representations regarding this court ordered production. There were 90 members of the Alternate Site Product Sales ("ASPS") field sales force for the period from 1991-2003, including Field Sales Representatives and District Managers. As of 2003, 67 of these individuals still worked for Abbott

-6-

or Hospira; 23 had left. No single personnel file exists. For each member of the 90 ASPS sales force, Abbott counsel indicated that Abbott would be gathering the contents of the files from various places and producing the following information for each of the 90 employees: (1) salary and bonus information; (2) performance evaluations and written goals; and (3) any personnel information related to drug pricing, reimbursement, AWP, or spread. In addition to conducting a search of corporate records, Abbott counsel indicated that current Abbott and Hospira employees were being asked by counsel to send their personnel files to an Abbott attorney for review, including those files that the sales force may maintain in their home offices. Abbott counsel further stated that Abbott would not request former employees to produce files in their personal possession.

Finally, Abbott counsel promised during our July 6, 2007 meet and confer to send a follow-up letter describing the documents Abbott planned to produce in response to this request. Again, we have received nothing further from Abbott counsel on this subject. Magistrate Judge Bowler stated that a copy of an employee's degree was not relevant to the United States' request. 05/16/07 Hrg. Tr. at 56:14-15. We agreed. However, to the extent that Abbott is withholding any other employee information other than copies of degrees, we expect that Abbott counsel will notify us of any categories of documents being withheld by October 1, 2007.

## Court Ordered Documents re Alternate Site 20% Customers

Abbott counsel represented early in the discovery process that Abbott agreed to produce all documents related to its largest Alternate Site customers, which represented 80% of its customers. Abbott refused to produce the files for the remaining 20% of its customers, which presumably included thousands of customers, based on the claim that it was burdensome. Abbott failed to provide any supporting information about the burdensome nature of such a production. As a result, the United States moved to compel the production of these "20% Alt Site customer files." *See* 05/16/07 Hrg. Tr. 67:17-24. At the hearing on May 16, 2007, the United States offered to accept a stipulation that Abbott would not present evidence at trial related to the 20% Alternate Site customers in lieu of the documents being produced. Magistrate Judge Bowler ordered that Abbott had fourteen (14) days to consider the stipulation. *See* 05/16/07 Hrg. Tr. 68:19-23.

During our conversations after the May 16, 2007 hearing, Abbott counsel stated that Abbott would not agree to the stipulation. Abbott counsel indicated also that there were approximately 225 boxes of documents containing files of the 20% of Alternate Site customers, and that the boxes were being sent to a vendor for scanning on May 29, 2007. Abbott counsel further stated that once they were scanned, they would be reviewed by attorneys before production. Abbott counsel estimated production approximately four to six weeks after May 29, 2007, which would have resulted in a late June to early July production to the United States.

We heard nothing further and wrote to Abbott counsel on June 16, 2007 to confirm that we would begin to receive production shortly. We requested a meet and confer session due to our concern that production was not forthcoming on numerous categories of discovery including this one. It was not until that meet and confer session on July 6, 2007, that Abbott counsel represented for the first time that it appeared that many of the 20% of Alternate Site customer files had already been produced to the United States. We expressed concern over Abbott counsel's earlier

-7-

representations to the United States and to Magistrate Judge Bowler that production of these files would be burdensome, in light of this new information.  Nonetheless, we had no choice but to accept Abbott counsel's further promises on July 6, 2007 that:  (1) Abbott would provide a list of the Bates ranges of the 20% Alternate Site customer files already produced, and (2) Abbott would produce in the following two to three weeks, or by the end of July, 800 additional documents it had located.  We have not received the 800 documents or the list of Bates ranges for the 20% of Alternate Site customer files that Abbott counsel now represents have been previously produced. We request that Abbott counsel provide this information as promised back in early July 2007, no later than October 1, 2007.

Moreover, Abbott counsel represented directly to Magistrate Judge Bowler at a hearing in June that Abbott had produced documents relating to all prices paid for the drugs at issue in this case without limiting the representation to large or small customers.  Specifically, Abbott counsel represented to Magistrate Judge Bowler that Abbott had produced to the United States "every transaction based price that was charged for [the Subject Drugs] for the entire claim period," stating "they [the United States] literally have every time Abbott sold one of [the Subject Drugs] the price at which it was sold." 06/19/07 Hrg. Tr. at 32:8-25.  On the one hand, counsel for Abbott represented that Abbott has not produced all documents related to the 20% of Alternate Site customers, and, on the other hand, counsel represented to the Court that it produced all prices paid by any customer.  We request that you explain by October 1, 2007, how you reconcile these inconsistent representations that Abbott counsel has made.

**Pricing Documents**

We have asked Abbott to produce all documents relating to its pricing committee ("or whatever name Abbott gives to its committee(s) or internal group(s) that consider pricing issues and /or makes pricing decisions"), including but not limited to, pricing committee meeting minutes and decision-making documents.  *See* 04/23/07 letter from R. Ford to J. Winchester.  These documents are responsive to numerous requests for production of documents.  Abbott counsel has represented in our numerous meet and confer sessions where we requested pricing committee minutes or documents, that while Abbott did not utilize pricing committees, Abbott produced all documents otherwise related to pricing decisions.  It appears, however, that there were several groups involved in pricing, even though none had any formal or specific title such as "pricing committee."

For example, Harry Adams testified about participating in several different pricing committees.  *See* 07/18/07 Dep. of Harry Adams at 96-97, 115, 125, 142, 162, 166, 192-194. Similarly, David Brincks testified that list prices were set for his former Home Infusion business unit by the Contract Marketing Department of the Hospital Business Sector ("HBS").  *See* 06/12/07 Dep. of David Brincks at 49-54,106, 212, 222-223.  Peter Karas testified that he was responsible for pricing decisions routinely reached through an annual collaborative process, and that he meet on several occasions with Mr. Sellers and Mr. Baker concerning pricing issues. Corporate Vice-President Loreen Mershimer (*see* 8/23/07 Dep. of Loreen Mershimer at 79-81), and former Hospital Business Sector Vice-President Guy Wiebking (*see* 8/22/07 Dep. of Guy Wiebking at 73-88) also testified that the general managers of the product lines and the HBS

-8-

Contract Marketing Department would confer regarding the setting of prices and annual increases taken. We request confirmation by October 1, 2007, that Abbott has produced all such responsive documents related to these committees or groups, and other price setting mechanisms.

We further request confirmation by October 1, 2007, that Abbott is not interpreting the United States' request for pricing committee documents as requiring any or all of those words to appear on the documents. Abbott solely possess the information about how Abbott referred to individuals and groups that made pricing decisions. It should be clear that "pricing committee" refers to any meeting, conference, discussion, or exchange of two or more persons within HPD concerning or relating to pricing of drugs, including but not limited to, prices Abbott referred to as list, catalog, wholesale, WAC, Parameter, RX Link Acquisition Cost, RX Link Customer, or any other pricing term. *See* 04/23/07 letter from R. Ford to J. Winchester. We ask that you verify that Abbott has indeed produced all documents relating to these groups involved in pricing, regardless of the name given by Abbott to such groups.

Finally we ask that Abbott comply with Judge Saris's September 7, 2007 Order on third party discovery (Dkt. No. 4701), namely that Abbott expand its search and production to include, for example: (1) "with respect to the particular named drugs at issue in this litigation, [] all documents related to pricing that drug regardless of the time period generated;" and (2) "documents relating to Abbott's reporting AWP to the publication compendia (like First Data Bank) during the 1991 to 2003 time period." As to the latter category of materials, Abbott counsel emphasized to Magistrate Judge Bowler that, with respect to the four subject drugs,[2] that Abbott had "given [the government] every communication with the pricing compendia about prices for these drugs.....[] That's what we did. We've given them those documents....[] What did we tell the pricing compendia about the prices? Here are our communications with the pricing compendia. They have those." Judge Saris's September 7, 2007 Order, however, did not limit the production of documents pertaining to Abbott's reporting AWP to pricing publications to the subject drugs. Even accepting Abbott counsel's representation that Abbott has produced all of its communications with pricing compendia as to the four subject drugs, pursuant to Judge Saris's recent Order, a larger category of documents (*i.e.*, those pertaining to communications to pricing compendia on <u>all</u> of Abbott's drugs) should be produced.

Please also notify us no later than October 1, 2007 whether Abbott intends to comply with Judge Saris's September 7, 2007 Order.

## Home Infusion Documents

The United States has repeatedly requested an update on the status of the Home Infusion documents. In May 2007, Abbott counsel represented that Abbott had isolated these documents, and thereafter determined that approximately 80 boxes of responsive documents existed. Abbott counsel further represented at our meet and confer session on July 6, 2007, that Abbott would

---

[2]        Since that hearing, the United States has amended its Complaint to add a fifth drug, Acyclovir Sodium.

produce the documents in early August. To date, Abbott has failed to produce these documents. We request that Abbott immediately produce all responsive documents from, or relating to, the Abbott Hospital Products Division, Alternate Site Home Infusion business unit, or identify those documents that have been lost or destroyed, and explain the circumstances related to the loss or destruction of those documents.

The Abbott employees deposed to date have identified a variety of documents that should exist for this business unit. Based upon that testimony, we expect that the Home Infusion production will include, but certainly not be limited to, the following information: (1) all Home Infusion contracts; (2) all internal and external communications regarding the Home Infusion business unit and its billing or pricing; (3) all pricing information data, including specific pricing data used by the Home Infusion Contract Marketing Department in evaluating contract proposals, and all pricing information retained or maintained by Abbott for use in providing reimbursement services to its customers; (4) all marketing plans for Home Infusion; (5) all resource files used by the Home Infusion business unit; (6) all documents concerning Abbott's own Home Infusion pharmacies, including documents pertaining to and/or reflecting the decision to close the pharmacies; (7) all Medicaid and Medicare claims, collection and reimbursement information for Abbott's pharmacies and customers, including provider number and billing information, as well as all HCFA 1500 forms, or comparable electronic forms submitted to Medicaid or Medicare; (8) all training materials and manuals, including any manuals from other business units that were utilized or maintained by Home Infusion; (9) all communications with customers, including any and all proposals for contract terms or revenue share models or pricing information; (10) "item file" information concerning customer pricing; (11) all pricing information used by Abbott to determine what charges its Reimbursement Department would report to Medicare or Medicaid officials on HCFA 1500 forms (or electronic claims forms); (12) all compliance materials; (13) all reconciliations with revenue share customers, including information concerning all Medicaid or Medicare funds collected by customers and Abbott's retention of the percentage of those collections; (14) all customer invoices and/or documents reflecting all drugs and products consigned by Abbott to any Home Infusion customer; (15) all worksheets, rough plans, or projections generated by the Home Infusion Contract Marketing Department; (16) all CHIPs information, including any contracts and information concerning Abbott's licensure of the CHIPs program; (17) documents reflecting the revenues taken in by Home Infusion for the relevant time frame; and (18) all documents that reflect, refer, relate or pertain to the decision to close the Home Infusion business unit, the decision making behind that decision, and/or communications concerning the decision to close the Home Infusion business unit. We request that Abbott produce all of these highly relevant materials by October 1, 2007.

Further, as set forth above, former employee Bruce Rodman produced and testified about numerous manuals, procedures, samples, training materials and protocols that were either created or made available to the Alternate Site Home Infusion business unit. Examples of these types of documents were plentiful within the nearly 5,800 pages of hard copy materials that Mr. Rodman produced pursuant to subpoena. We request that by October 1, 2007, Abbott produce for all years from 1991 through 2003, all copies of all manuals produced by Mr. Rodman.

-10-

**Lobbying Documents**

We have made numerous specific requests since at least January 2007, that Abbott produce relevant lobbying documents. *See* 01/19/07 letter from G. Gobena to J. Winchester. Please confirm by October 1 that documents in the possession of either (1) Abbott's Washington/Federal Affairs' office or (2) any corporate offices with oversight of Abbott's lobbying activities, have been produced. Please further produce or confirm by that date whether all documents Abbott has produced include all monthly activity reports created by Abbott's in-house lobbyists, internal e-mails, lobbying time reports, and all other materials such as those described by Abbott's in-house state lobbyist, Darryl Dorcy, that are related to Abbott's national lobbying efforts. *See* letter of 04/28/07 from R. Brooker to J. Winchester.

In addition, Abbott counsel has represented that it does not believe that state lobbying documents in Abbott's possession are relevant. On that basis, Abbott counsel has stated that Abbott will not be producing them. Please confirm that this is your final position on state lobbying materials, including all materials set forth under the heading "Daryl Dorcy" in our April 28, 2007 letter to Abbott counsel.

Finally, Abbott counsel has not produced any lobbying materials relating to work done by consultants or firms hired by Abbott. For example, we have learned that an Abbott consultant, Nancy Taylor, was paid to provide assistance to Abbott's efforts to shape Medicare drug reimbursement reform efforts in 1997. There are documents on Abbott's amended privilege log that Abbott counsel has withheld under a claim of attorney-client privilege and in which she is named. *See* 07/20/07 Amended Abbott Privilege Log, Entry Nos. 39-42. To the extent there are documents from outside consultants or lobbyists regarding government drug reimbursement, please provide them by October 1, or inform us whether Abbott will be continuing to withhold these materials from production so that we may set up a date for a meet and confer session with you regarding these documents.

**Medicare Working Group**

Please confirm in writing that Abbott has produced all documents relating to the Medicare Working Group by October 1, 2007.

In addition, we have learned that there were other groups or task forces at Abbott that worked on government drug reimbursement issues. For example, we note from a 1991 document that Abbott had a Reimbursement Task Force. *See* June 1, 1991 Medicare Reform Paper (ABT-DOJ 0018754-775, marked as Highly Confidential). There may have been other groups or task forces at Abbott over the years that dealt with government (state or federal) or third party drug reimbursement issues. Please provide copies of all documents relating to any task force or group that dealt in any way with government or third party reimbursement issues. *See* United States' Second Request For Production, Nos. 37-38, 40, 42.

-11-

**Congressional Investigations and the October 31, 2000 Stark Letter to Miles White**

Please provide by October 1, 2007, copies of all documents reflecting analyses, discussions or any consideration of: (1) the October 31, 2000 letter from Representative Fortney Pete Stark to Miles White – or the issues raised therein generally – and (2) any Congressional consideration of AWP issues or investigations of Abbott from 1991 to the present. If Abbott asserts any claim of privilege over any such documents, the United States asks that Abbott's privilege log be updated to reflect those privilege claims by October 1, as well.

**2001 Price Adjustment Documents**

By October 1, 2007, please confirm that Abbott has produced all documents related to the 2001 price adjustment. In addition, please confirm by that date that Abbott's privilege log includes all documents related to the 2001 price change which Abbott is withholding from production based upon a claim of privilege.

**TAP Documents**

Magistrate Judge Bowler denied without prejudice our discovery requests relating to TAP pharmaceuticals – discovery that she expressly ruled could be renewed upon a "further showing down the road". *See* 05/16/07 Hrg. Tr. at 62. Since that ruling, witnesses have testified that TAP individuals were involved in Abbott working groups regarding government reimbursement issues. *See* 7/30/07 Dep. of James E. Miller at 231-232. Further Abbott employees have testified that Abbott engaged in lobbying efforts on TAP's behalf regarding government drug reimbursement issues for Lupron. *See* 07/12/07 Dep. of Cynthia Sensibaugh at 54-75, and 05/15/07 Dep. of Virginia Tobiason at 267-273, 311-313, 340-343. Further documents show that Abbott was involved in lawsuits filed by Lupron against the federal government relating to drug reimbursement policies. This additional evidence justifies further discovery into the relationship between TAP and Abbott on government drug reimbursement issues.

Moreover, Abbott, as a TAP joint venturer, was involved with the negotiations of the TAP criminal plea, civil settlement and corporate integrity agreement, and was very familiar with the issues therein as a letter signatory thereto. Critically, as Mr. Rodman's testimony (6/26/07 Dep. of Bruce Rodman at 120-124) and documents (*see e.g.,* BR 2422) reflect, components of Abbott's Hospital Products Division were involved with pricing Lupron and selling it outright to Alternate Site customers for the same operative period that TAP engaged in the criminal conduct for which it pled guilty. Judge Saris ruled on September 7, 2007, that third parties subpoenaed by the United States in this case "shall produce all documents related to pricing that drug regardless of the time period generated." Dkt. No. 4701. We see no reason why Judge Saris would require third parties to produce relevant TAP materials, but allow Abbott to continue to withhold clearly relevant materials as we set forth above.

Please let us know by October 1 whether Abbott will comport its discovery responses to Judge Saris's Order on third party discovery, or continue to withhold from production all TAP documents dealing with AWP or government drug reimbursement issues. In addition, please

-12-

confirm whether Abbott has complied with ¶ 5 of Judge Saris's September 7, 2007 Order regarding Hospira documents, as well as relevant TAP documents. We hope that Abbott will reconsider its prior positions in light of Judge Saris's ruling so that we can avoid burdening the Court with an issue on which it has previously ruled.

## MDL Electronic Mail Messages

With respect to e-mail messages previously produced by Abbott to other plaintiffs in the MDL, during our July 6, 2007 meet and confer session, Abbott counsel represented that Abbott would produce a subset of those messages which would be comprised of e-mails through 2003 that mention or relate to the subject drugs, AWP, spread marketing or other pattern and practice type conduct alleged in the United States' Complaint. *See* 07/25/07 letter from R. Ford to J. Winchester.

On August 22, 2007, Abbott produced 28 DVDs (ABT-DOJ-E 0008372 - 0545291) which were identified as containing "Abbott's e-mail production" and being "responsive to a number of the DOJ's requests". *See* 08/22/07 letter from C. Geisler to M. Lavine. Please confirm by October 1, 2007, that the August 22, 2007 production, in fact, contains the MDL e-mails previously requested. In addition, by October 1, please confirm that Abbott has searched for and produced all e-mails from 1991 to 2003 responsive to discovery requests made by the United States to date. Finally, by the same date, please provide a list, description and rationale for any e-mails withheld from Abbott's production of the MDL e-mails based upon temporal scope, or on grounds that the e-mails do not mention or relate to the subject drugs, AWP, spread marketing or other pattern and practice type conduct alleged in the United States' Complaint.

## Cliff Krajewski Documents

Following the deposition of longtime Abbott employee Cliff Krajewski, we made specific requests for materials about which he testified. *See* letter of 04/28/07 from R. Brooker to J. Winchester. Abbott has not responded to this request. Please produce all documents referenced in the letter by October 1, 2007.

## IMS Data, Documents, Inventory of Data and Documents and Contractual Language

The United States' Second Request For Production ("RFP2") served on November 17, 2006, required the production of all documents prepared by IMS in connection with any pharmaceutical sold by HPD (RFP2, Nos. 56 and 57). So far, Abbott has not produced any of these materials. Abbott's response to RFP2 specified that, "Abbott states that it will produce IMS data" once an agreement for confidentiality was reached between Abbott, the government and IMS. Of course, the Protective Order in this case protects the confidentiality of any materials designated as confidential or highly confidential. The Protective Order is fully applicable to third parties. In that regard, please inform us by October 1, whether Abbott counsel has ever asked IMS if the protections afforded by the Protective Order were adequate, and if so, provide us the response of IMS.

-13-

During our July 6, 2007 meet and confer, Abbott counsel represented for the first time that Abbott was withholding IMS information primarily on the basis of proprietary issues asserted by IMS rather than due to confidentiality issues. We asked to see the operative language on which you were relying. You represented that you would consider our request and get back to us. Our correspondence of July 23, 2007 repeated our request for "the agreements which Abbott counsel contends prevent Abbott from producing the data." *See* 07/23/07 letter from M. Lavine to C. Geisler. We also asked for an inventory of the data being withheld from production. We further summarized statements at the meet and confer session on this issue and reiterated our outstanding requests. Thereafter, in correspondence and e-mails dated August 3, 2007, August 10, 2007, and August 20, 2007, we repeated our requests for an inventory of the withheld IMS data and the contractual language. Abbott counsel has not responded to these requests. Finally, in an August 30, 2007 e-mail, we again asked for Abbott's position "regarding our requests for the basis for its claims of IMS confidentiality and an inventory of the data being withheld." We also requested in that letter that Abbott counsel tell us whether he was "pulling the information together and need more time, or [] refusing to provide the information." Again, we received no reply.

Moreover, our request in RFP2 is broader than only the IMS data. For example, we requested all materials derived from the IMS data that reflects the market share of Abbott's pharmaceuticals. Abbott has produced few documents of that type. Please either produce all IMS data and documents by October 1, 2007, or inform us by that date that Abbott has no intention of doing so. It remains our position that it is Abbott's obligation to make good faith efforts to identify and resolve any alleged confidentiality or proprietary concerns with IMS data or information, so that the data and all related documentation can be provided to us immediately. This was also Abbott's position on third party materials produced by the United States to Abbott. Given the established protocol in this case, please move expeditiously to secure approval for the production of this data.

In sum, despite at least seven good faith attempts to get the IMS data or the contracts which Abbott claims prevent the turnover of such data, Abbott has produced no information in response to our repeated requests. Please produce the requested IMS data and information by October 1, 2007.

**Transactional Sales Data**

Despite countless requests, Abbott still has failed to produce a complete and accurate set of data, which includes all of the transactions involving the subject NDCs. Each step in the process of pursuing the data has been slow and difficult. We have been obstructed by issues ranging from Abbott's production of blank CDROMs to its unexplained production of apparently superfluous CDROMs. After several months of our discovery period elapsed, we finally received what Abbott counsel has represented is the missing data. However, when we asked for simple confirmation that we had a full set of data, Abbott reversed direction and decided it needed to recreate the entire data set. That process was first promised to be completed in about two weeks. However, another two months have passed and we still do not have the data that we and our experts require to perform the necessary damages calculations in this case.

-14-

In addition, at the recent deposition of Bruce Stowell, Abbott's corporate designee on data production, Mr. Stowell testified that Abbott archived direct sales data back to 1991 (*see* 08/30/07 Dep. of Bruce Stowell at 327-328), yet Abbott has never produced any data to the United States for any period prior to 1994. Abbott's failure to timely produce its transactional data is seriously impeding the ability of our experts to complete their work within current deadlines. The situation is particularly confounding in light of recent testimony that it takes only approximately five days for Abbott to extract the data. *See* 08/30/07 Dep. of Bruce Stowell at 244.

Our efforts to obtain a complete and accurate set of transactional data from Abbott first intensified at the meet and confer session held over the course of three days in late December 2006 when we asked for the 1995 data that had been omitted from the original data made available to the United States. Counsel may remember that the issue originally appeared simply to be a case of an inadvertently omitted CDROM. We re-stated our request for that data in our correspondence of December 22, 2006, and in our e-mail of January 19, 2007. In an e-mail response that same day, Abbott counsel stated "I believe we have located it and I will send it along." On January 20, 2007, we received a CDROM described by Abbott as containing the data for 1995. Unfortunately, as we noted in an e-mail dated January 29, 2007, the CDROM was missing six months of data. Having heard no response from Abbott counsel, we sent a follow-up e-mail on February 5, 2007 asking "when you will provide us with a complete set of the Direct National Sales Data for 1995." Abbott counsel responded later that day to the effect that Abbott was looking into it and would provide an answer "soon." We sent another follow-up e-mail on February 22, 2007, noting that no response from Abbott so that the United States could move forward with related discovery. Abbott counsel's e-mail response later that day acknowledged the delay and noted that the missing data needed to be "gathered." In a letter dated February 23, 2007, we raised several other related data issues that seemed appropriate to address given that Abbott was "gathering" data, rather than just trying to locate a missing CDROM. In particular, we noted that no data at all had ever been produced by Abbott regarding NDC 00074-1966-07.

On March 8, 2007, Abbott unexpectedly provided us with *six* CDROMs labeled as containing Direct Sales Data for 1995 through 2000, rather than the single CDROM for 1995 that was anticipated. No new CDROMs were provided for 1994 or 2001. The cover letter from Abbott transmitting the CDROMs contained no explanation of the reason for the six CDROMs. Moreover, *not only was the 1995 CDROM blank, but two of the other five CDROMs were blank.* All of the forgoing was summarized in our letter to Abbott counsel dated March 12, 2007. On March 26, 2007, we engaged in a telephone call to explore various data issues at which time we clarified that sections of data were missing from other years as well. As confirmed in a letter of March 27, 2007, Abbott counsel estimated that the missing information would be available in approximately one month. Our letter of March 27, 2007 also asked that Abbott confirm "the completeness of Abbott's responses to paragraphs 7 and 11-19 of the United States' Second Request to Produce, all of which touch upon the data issues we have been discussing."

On April 6, 2007, Abbott counsel sent three new CDROMs which counsel represented as containing data for 1995, 1999 and 2000. On April 17, 2007, we wrote back reminding Abbott counsel that the data for NDC 00074-1966-07 was still missing. That letter also requested

-15-

confirmation that the United States had complete data for all of the transactions involving the identified NDCs and additionally requested instructions regarding the manner in which the various CDROMs should be combined to form a complete and accurate set of Abbott transactional data. During a telephone call held on May 8, 2007, Abbott counsel represented that we would receive the data for NDC 00074-1966-07 within "a day or two". In an e-mail on May 21, 2007, we reminded Abbott counsel that we had still not yet received the data for NDC 00074-1966-07. In an e-mail response sent by Abbott counsel that same day, Abbott counsel represented that the "remaining NDC data should (hopefully) be out to you today." We did, in fact, receive some data on May 22, 2007, and by e-mail immediately noted that the transmittal correspondence sent by Abbott counsel contained no explanations, and that if we were "to avoid the need to get a single download of all of the data, we need a precise explanation of the manner in which to combine the various discs so as to have a complete set of Abbott transactional data."

In an e-mail dated June 18, 2007, the United States again inquired about "an explanation of the manner in which the transactional data needs to be assembled to create a complete set." We noted that on May 23, 2007, Abbott counsel represented that would be forthcoming "shortly" and that we had also asked about this on June 6, 2007. On June 25, 2007, having received no response from Abbott counsel, we sent another e-mail asking if we should "interpret [counsel's] silence on the transactional data to mean that the data currently in our possession cannot be assembled into a complete set, or at least that there is no way to be sure of such?" That e-mail also noted that if Abbott needed "to produce a "clean" set of that data in order to be certain that we have everything, then we need it on an urgent basis so that our experts have time to properly analyze it." In conclusion, we asked "that you please respond directly to this particular request as [we] do not recall having received any substantive response from [counsel] on this subject to date." Again having heard nothing, on June 29, 2007, the United States sent another e-mail noting that we "have been waiting months for instructions on how to assemble the various transactional data CDROMs in a way that will result in one complete set of transactional data."

Finally, on June 29, 2007, Abbott counsel represented agreed with our suggestion of pulling a clean set of data, and that Abbott was "in the process of assembling this data and will provide it . . . as soon as possible." Abbott counsel also represented that there was "an inquiry in to the people responsible for pulling the data to ask for a time line," and that further information would be made available.

On July 6, 2007, at another meet and confer session, Abbott counsel represented that the clean set of transactional data would be produced to us on July 16, 2007. No such data was produced at that time. Our correspondence of July 23, 2007, again noted that we had not been provided with the transaction data and asked Abbott counsel to "commit to a specific date on which it would provide us with this information" because we "have been waiting far too long for this information, especially the transactional data." The United States also reminded Abbott counsel that it had first raised the urgent need for the transactional data in January 2007, and that our "need to analyze complete data is significantly more dire at this point with more than half of the discovery period having elapsed." On July 25, 2007, the United States sent another letter reminding Abbott counsel again that it had promised the transactional data by July 16. *See* 07/25/07 letter from R. Ford to J. Winchester. Again receiving no response from Abbott counsel,

-16-

we sent another follow-up letter on August 3, 2007, repeating that "our need for the foregoing data is critical." An e-mail on August 10, 2007 asked for an update on the transactional data, among other things.

As of this date, Abbott has still failed to produce the complete set of transactional data that is necessary to perform our damages calculations. Likewise, Abbott counsel has not kept us informed of the status of the data or even proffered an explanation for any of the delays and missed deadlines.

Abbott's failure to provide us with the transactional data appears consistent with its pattern of conduct in related cases. As Abbott counsel is aware, Abbott's production of electronic data in the State of Texas case has been deficient and resulted in the Court granting several motions to compel filed by Texas against Abbott, and the requirement of a Rule 11 agreement. In addition, as recently as two weeks ago, on the morning of Dr. Mark Duggan's expert deposition, Abbott announced that it provided erroneous data to the State of Texas that Dr. Duggan unwittingly relied upon in performing his damages calculations. *See* letter of 08/23/07 from R. Winter, Texas A.A.G., to E. Berlin. We understand that on September 10, 2007, after a hearing, the court in Texas imposed sanctions against Abbott as a result of its failure to produce the accurate data.

Further, the recent deposition of Mr. Stowell has raised serious questions about the quality of Abbott's data productions in Texas and in this case. In particular, it appears among other things from Mr. Stowell's deposition that the question of whether Abbott has included proper chargeback data will need to be addressed. *See* 08/30/07 Dep. of Bruce Stowell at 263- 270, 355.

In short, based upon the above, the United States has little to no confidence in the data being provided by Abbott for use in our case. Please confirm by October 1, 2007, that Abbott's responses to paragraphs 7 and 11- 19 of RFP2 are complete. We also expect Abbott's full production of accurate and complete transaction data as soon as it is available, but not later than October 1, 2007.

**Acyclovir Data**

A related data issue to which Abbott counsel has never directly responded is our request that the transactional data also include the two additional NDCs listed in the Amended Complaint which was filed by the United States on June 4, 2007 (Acyclovir Sodium 500 mg 00074 4427 01 and Acyclovir Sodium 1 gm  00074 4452). We first raised this issue as far back as July 6, 2007, at which time Abbott counsel stated that it would consider the request. In a July 2007 letter, we reminded Abbott counsel that the matter was still outstanding. We also noted that adding the two additional NDCs while Abbott was preparing a clean set of data appeared to be a prudent course of action, and that if Abbott was refusing to do so, it was likely to cause significant additional delay. On August 20, 2007, having still heard no response to the request, the United States again raised the issue in a letter asking if it was "correct that Abbott is refusing to produce any transactional data on the two new NDCs." The letter of August 20, 2007 additionally asked Abbott counsel to "please state your position thereon in writing so that we will

-17-

know where you stand and can proceed accordingly".

We understand that Abbott contends that the amendment of the Complaint, which added Acyclovir Sodium, required prior leave of court and should therefore be dismissed. However, we fail to see any difference between the current situation and that which has existed throughout this case. Discovery moved forward on the 44 NDCs listed in the original Complaint while Abbott pursued its original Motion to Dismiss, and discovery should similarly move forward on the 46 NDCs listed in the Amended Complaint while Abbott pursues its current Motion to Dismiss. If Abbott believes otherwise, it should ask the Court for a stay of discovery rather than engage in apparent self help. Regardless, if Abbott were to conduct itself in a prudent and cooperative fashion, it could still provide the data on those two new NDCs without waiving the right to continue to seek dismissal of the Amended Complaint. Moreover, at this point we cannot even be sure of the basis for Abbott's refusal to produce the data since Abbott has never directly responded to our request.

Abbott's continued failure to respond to our requests and state its position is exceedingly detrimental to the expeditious resolution of discovery matters. Accordingly, on or before October 1, 2007, we request that Abbott produce data for Acyclovir Sodium 500 mg 00074-4427 and Acyclovir Sodium 1 gm 00074-4452, or explain the basis for any refusal to do so.

## CHIPS Data

We understand from Abbott's counsels' representations that Abbott considers the production of all CHIPs data and information to be complete. Please confirm by October 1, 2007, whether all such information has been produced. Since the layout information regarding that data was only recently produced, we have not yet completed our preliminary review of that data.

## Court Ordered Privilege Log

On May 16, 2007, this Court ordered Abbott to produce to the United States a privilege log in its entirety no later than May 21, 2007. *See* 05/16/07 Hrg. Tr. 46:19-48:18. On May 21, 2007, Abbott did in fact produce such a log, however, the log contained only 33 entries. Despite the production of that log and a subsequent version of the log, we believe Abbott has failed to comply with the Court's Order, and continues to neglect to include materials on its log which it is withholding on the basis of privilege.

On July 20, 2007, Abbott produced an amended privilege log to the United States, adding entries for documents withheld on grounds of privilege or work product from Abbott productions made to the United States between May 21, 2007 and July 20, 2007. Accompanying the July 20, 2007 amended log, Abbott produced approximately 13 additional pages of documents (Bates labeled AFT-DOJ 0297552 - 0297564), which accounted for 7 documents previously listed on Abbott's privilege log, removed from the July 20, 2007 version of the log, and voluntarily produced by Abbott to the United States. In total, the current version of Abbott's privilege log contains 38 entries (excluding the 7 documents removed from the privilege log and voluntarily produced by Abbott on July 20, 2007). This log – covering 300,000 Abbott documents produced

-18-

to date – appears to understate the documents not being produced to the United States, whether on the basis of privilege, or other protection.

Further, to date the United States has yet to receive a privilege log reflecting productions made by Abbott to the United States since July 20, 2007, including Abbott's August 15, 2007 and August 22, 2007 productions. Moreover, the United States notes that the privilege logs produced to date do not include entries for documents produced by Abbott to the United States in redacted form, such as the Contract Marketing Basic Operating Procedures Manual (ABT-DOJ 0085415 - 0085704), despite at least two prior requests that Abbott either produce the redacted sections of that document or a privilege log containing entries for such redactions if Abbott claimed they were covered by a privilege, and despite a representation made by Abbott counsel nearly three months ago that Abbott would update its privilege log to contain appropriate entries for the redacted sections of the manual, such a log has yet to be produced. *See* 06/13/07 and 06/16/07 e-mail messages from R. Brooker to T. Fumerton; and 06/18/07 response from J. Winchester to R. Brooker. These failures are a clear violation of the Court's Case Management Order. *See* Case Management Order 29,¶ 6.

We understand that sections of a Contract Marketing Basic Operating Procedure Manual produced by Abbott to the State of Texas in *The State of Texas ex rel. Ven-A-Care of the Florida Keys v. Abbott Laboratories, et al.,* No. D-1-GV-04-001286, were similarly redacted. We further understand that on August 15, 2007, the Texas court ordered Abbott to produce certain previously withheld/redacted sections of the manual, including sections related to Contract Pricing, Medicare / Medicaid Fraud and Abuse and the "Contract Language Glossary," over Abbott's privilege objections. The United States requests that these and other portions of the manual, which were withheld from production to the United States based upon an improper or erroneous assertion of the attorney-client privilege or work product doctrine be formally produced to the United States by October 1, 2007.

Further still, deposition testimony taken in this case indicates that certain current and former Abbott employees have collected documents related to this litigation and forwarded the documents to Abbott's in-house counsel. *See* 03/14/07 Dep. of Ellen Klaus at 110-185. Despite such representations by Abbott witnesses, the corresponding documents the witnesses provided to Abbott, appear not to have been produced to the United States to date. Accordingly, please inform us whether documents from Abbott divisions are being held or withheld by Abbott's Legal Department, and if so, whether such documents are being searched for in the process of responding to the United States' discovery requests.

By October 1, 2007, please produce privilege logs reflecting all documents withheld by Abbott to date from production to the United States based upon assertions of the attorney-client privilege or work product doctrine, including entries related to Abbott's August 15, 2007 and August 22, 2007 productions to the United States, entries related to redactions made to Abbott's Contract Marketing Basic Operating Procedures Manual and other documents redacted on such grounds, and entries related to all documents contained in this letter for which the United States is renewing it requests for production and requesting production by October 1, 2007.

-19-

## De-Designate Improper Confidentiality Designations

As you are aware, Judge Saris recently issued two separate orders expressing her serious concern with the improper designations of materials produced in this litigation as "Confidential" or "Highly Confidential" and placed under seal in filings. *See* 09/05/2007 electronic Order re: Motion for Leave to File Under Seal Exhibits to the United States' Opposition to Abbott Laboratories Inc.'s Motion to Dismiss (Dkt. No. 4654). In the most recent Order of September 7, 2007, finding the assertion of confidentiality "frivolous," Judge Saris ruled that "[n]o further documents shall be sealed in this case unless counsel asserting confidentiality asserts the basis for the claim in a pleading subject to the sanction of Fed. R. Civ. P. 11." Dkt. No. 4701.

We agree with Judge Saris that many of Abbott's confidentiality designations have been frivolous. We have expressed serious concerns since the outset of this case with regard to Abbott's wholesale designation of virtually all documents produced in this litigation as "Confidential" or "Highly Confidential," (including, unacceptably, copies of federal regulations and publicly disseminated materials).[3] *See e.g.,* 09/15/06 United States' Motion for Protective Order. Dkt. No. 3105. We believe the vast majority of the documents designated by Abbott as "Confidential" or "Highly Confidential" are improperly designated as such.

We have seen some rather glaring examples of over designation of documents as "Confidential" or "Highly Confidential." Judge Saris had made clear that the time has come for Abbott to stop abusing the confidentiality provisions of the Protective Order in this case. Abbott's improper designations create inefficiencies and compromise the United States' ability to effectively prepare this case for trial. While the Court's recent orders have been in the context of a motion for leave to file under seal documents designated by Abbott as "Confidential" and/or "Highly Confidential," we believe Judge Saris's concern would extend to this wholesale designation, which leads to sealing motions like the ones recently denied. As a result, we ask that Abbott immediately de-designate all materials it previously marked and produced as "Confidential" or "Highly Confidential," except those that truly meet the standards set forth in the Protective Order (Dkt. No. 3804). We further request that Abbott provide the basis of any confidentiality assertions it makes on documents produced during the remainder of discovery. (*See* 09/06/07 and 09/07/07 Orders of Judge Saris, parties must provide a good faith basis for asserting any confidentiality designation). Please respond to our request no later than October 1, 2007.

## Conclusion

Many of the categories of documents outlined above, which Abbott still has not produced, were also responsive to the United States' 1996 Civil Investigative Demand, and subsequent HHS-OIG subpoenas. The United States has recently learned from a deposition of Abbott's corporate designee on document production that the ability of the United States to investigate this case in the early years was hindered by Abbott's apparent decision to withhold many of these documents. According to corporate designee, Ellen Klaus, Abbott litigation hold memoranda

---

[3]        We further note that Abbott's over designation of documents as Confidential or Highly Confidential has extended to documents produced by third parties, such as Mr. Rodman.

-20-

and document collection efforts took place as early as 1996.  *See* 03/14/07 Dep. of Ellen Klaus at 110 to 185.

At the outset of this case, Abbott insisted upon a short discovery deadline.  Given Abbott's insistence that this case should be on a fast track to trial, the decelerated pace of Abbott's document production is troubling.  In many instances, Abbott counsel has made promises that documents, or lists of documents, would be forthcoming, and they were not.  In others, Abbott selectively removed highly relevant documents from prior productions before producing documents to the United States.  Still, in others, our repeated requests for documents or more information have been ignored, as illustrated by the months (and a deposition) it took to learn simply the number of Abbott sales representatives.

Abbott's continuing conduct continues to prejudice severely the United States' ability to effectively depose Abbott employees or former employees about relevant documents.  It has also resulted in the United States' inability to complete or close any depositions.  It further seriously compromises the work of our experts who will necessarily need to rely upon documents, data and deposition testimony to render conclusions.  Overall, Abbott's document production delays – whether by design or lack of diligence –  have jeopardized the fact discovery deadline set by the Court, and prejudiced the United States' ability to prepare properly its case for trial.

We hope to receive by October 1, 2007, the actual production of all categories of documents outlined above or, in the alternative, a definitive answer from Abbott that it will not produce certain documents, so that we may seek appropriate remedies.

Sincerely,

/s/

Renée Brooker

Cc:     James Breen, Esq.