UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
IN RE: PHARMACEUTICAL INDUSTRY)      M.D.L. No. 1456
AVERAGE WHOLESALE PRICE        )     Civil Action No. 01-12257-PBS
LITIGATION                     )
                               )
THIS DOCUMENT RELATES TO:      )
                               )
PROPOSED NATIONWIDE CLASSES    )
AS TO ASTRAZENECA              )
AND BRISTOL-MYERS SQUIBB CO.   )
                                    )
```

**MEMORANDUM AND ORDER**

September 26, 2008

Saris, U.S.D.J.

## I. **INTRODUCTION**

Plaintiffs move for certification of two nationwide classes under the unfair and deceptive trade practice laws of more than thirty states.  This phase of a multi-year, multi-district litigation, which has generated multiple national settlements and a bellwether bench trial, involves claims that pharmaceutical manufacturers AstraZeneca[1] and BMS[2] grossly inflated the prices of branded physician-administered drugs by misstating the Average Wholesale Prices ("AWPs") of these drugs in industry

_____

[1]Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.

[2]Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.

1

publications.  For AstraZeneca, the drug at issue is Zoladex; for BMS, the drugs are Blenoxane, Cytoxan, Paraplatin, Rubex, Taxol and Vepesid.  These overstated AWPs allegedly caused the government, third-party payors ("TPPs") and consumers to overpay for prescription drugs.

The plaintiffs seek to certify two classes:  the Third-Party Payor MediGap Supplemental Insurance Class (the "Medigap Class"), under the statutes of thirty-one jurisdictions; and the Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context (the "Non-Medicare Class") under the statutes of thirty-nine jurisdictions.[3]   Defendants have both

---

[3]Specifically, plaintiffs propose certifying both classes under the following laws: (a) Ariz. Rev. Stat. § 44-1522, et seq.; (b) Ark. Code § 4-88-101, et seq.; (c) Cal. Bus. & Prof. Code § 17200, et seq., Cal. Civ. Code § 1760, et seq.; (d) Colo. Rev. Stat. § 6-1-105, et seq.; (e) Conn. Gen. Stat. § 42-110b, et seq.; (f) 6 Del. Code § 2511, et seq.; (g) Fla. Stat. § 501.201, et seq.; (h) Idaho Code § 48-601, et seq.; (I) 815 Ill. Comp. Stat. Ann. § 505/1, et seq.; (j) Me. Rev. Stat. Ann. tit. 5 § 205-A, et seq.; (k) Mich. Stat. § 445.901, et seq.; (l) Minn. Stat. § 325F.67, et seq.; (m) Mo. Rev. Stat. § 407.010, et seq.; (n) Neb. Rev. Stat. § 59-1601, et seq.; (o) Nev. Rev. Stat. § 598.0903, et seq.; (p) N.H. Rev. Stat. § 358-A:1, et seq.; (q) N.J. Stat. Ann. § 56:8-1, et seq.; ® N.M. Stat. Ann. § 57-12-1, et seq.; (s) N.Y. Gen. Bus. Law § 349, et seq.; (t) N.C. Gen. Stat. § 75-1.1, et seq.; (u) N.D. Cent. Code § 51-15-01, et seq.; (v) Or. Rev. Stat. § 646.605, et seq.; (w) S.C. Code Laws § 39-5-10, et seq.; (x) S.D. Code Laws § 37-24-1, et seq.; (y) Tenn. Code § 47-18-101, et seq.; (z) Tex. Bus. & Com. Code § 17.41, et seq. (but only to the extent the TPP has assets less than $25 million); (aa) Vt. Stat. Ann. tit. 9, § 2451, et seq.; (bb) Wash. Rev. Code § 19.86.010, et seq.; (cc) W. Va. Code § 46A-6-101, et seq.; (dd) Wis. Stat. § 100.18, et seq.; and (ee) Wyo. Stat. § 40-12-101, et seq.
Plaintiffs propose certifying a consumer subclass of the Non-Medicare Class under the following additional consumer protection acts, which plaintiffs allege do not afford a legal remedy to commercial entities like TPPs: (a) D.C. Code § 28-3901,

previously settled nationwide class actions involving identical claims on behalf of Medicare beneficiaries.  Plaintiffs seek certification for a class period from January 1, 1991 to January 1, 2005.  In support of their motion for certification, plaintiffs have submitted a summary of state unfair trade practice laws, proposed jury instructions on elements of claims, and a chart containing groupings of similar unfair and deceptive trade practice acts ("UDTPAs").

Defendants AstraZeneca and BMS primarily argue that class certification is inappropriate because application of the laws of so many jurisdictions will render trial unmanageable.  They assert that individualized factual issues predominate, particularly in jurisdictions that require plaintiffs to prove reliance.  They also attack the adequacy of several of plaintiffs' proposed class representatives.

After hearing and review of the briefing, I rule as follows: (1) I **ALLOW** the motion to certify the Third-Party Payor MediGap Supplemental Insurance Class; and (2) I **ALLOW** the motion to certify the Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context for claims under certain statutes that do not require plaintiffs to prove

---

et seq.; (b) Haw. Rev. Stat. § 480-1, et seq.; (c) Ind. Code Ann. § 24-5-0.5-1, et seq.; (d) Kan. Stat. § 50-623, et seq.; (e) Md. Com. Law Code § 13-101, et seq.; (f) Okla. Stat. tit. 15 § 751, et seq.; (g) 73 Pa. Stat. § 201-1, et seq.; and (h) R.I. Gen. Laws § 6-13.1-1, et seq.

reliance.  (See Appendices A and B).  The Court will hold a separate trial for each defendant.

## II.  <u>**THE BELLWETHER TRIAL**</u>[4]

In January 2006, this Court certified a Third-Party Payor MediGap Supplemental Insurance Class and a Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context for unfair and deceptive trade practice claims under Mass. Gen. Laws ch. 93A against AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), BMS (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.), and the Schering Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation).  <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 233 F.R.D. 229, 231 (D. Mass. 2006).  A bench trial was held in November 2006, and this Court entered a verdict against AstraZeneca and BMS.  <u>See In re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d 20, 109 (D. Mass. 2007).  This was a bellwether trial, which gave the Court the opportunity to understand the complex factual and legal

_____

[4]During the 2006 trial, the Court determined that Class 2 (the Medigap Class) and Class 3 (the Non-Medicare Class) included payments from December 1997 to December 2003; this is the "class period" referred to in this section.  <u>See In re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d 20, 31-32 (D. Mass. 2007).

disputes in this difficult area of drug pricing.  Both companies have appealed.  (Docket Nos. 4927 & 4935.)[5]

With respect to both classes, this Court in January 2006 denied without prejudice the motion to certify the classes under the UDTPAs of states other than Massachusetts because plaintiffs had not presented an adequate analysis of these statutes.  See In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. at 232; see also In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 90 (D. Mass. 2005).

### III.  FACTUAL BACKGROUND

The Court has issued multiple decisions explaining the complexities of drug pricing for physician-administered drugs, which in this phase of the litigation mostly include branded drugs for cancer treatment.  See In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20 (D. Mass. 2007); see also In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005).  The Court incorporates and relies on factual findings in those cases as the basis for this class certification opinion.  To facilitate understanding, I briefly summarize the relevant background below.

---

[5] The Court also ordered dismissal of Johnson & Johnson and Schering Plough (not including Warrick).  The Court subsequently entered judgment in favor of Warrick.  See In re Pharm. Indus. Average Wholesale Price Litig., 520 F. Supp. 2d 267, 273 (D. Mass. 2007).  Plaintiffs appealed the judgment in favor of Johnson & Johnson (Docket No. 4954) and Johnson & Johnson cross-appealed (Docket No. 4970).  The class action against SmithKline Beecham Corporation d/b/a GlaxoSmithKline settled.

a.  **AWP - Its Meaning**

Almost every brand-name and generic prescription drug sold
in the United States since the late 1960s has had an "average
wholesale price" that is published in commercial compendia, <u>see
In re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp.
2d at 32, such as the Drug Topics Red Book, the First DataBank
Blue Book, and the Medi-Span Master Drug Data Base.  <u>See</u> <u>In re
Pharm. Indus. Average Wholesale Price Litig.</u>, 230 F.R.D. at 67.
Throughout the class period, AWP was the pricing benchmark relied
on by Medicare and most TPPs.  <u>See</u> <u>In re Pharm. Indus. Average
Wholesale Price Litig.</u>, 491 F. Supp. 2d at 32.  The federal
government's Centers for Medicare and Medicaid Services ("CMS")
did not regulate or set the AWPs, but instead entrusted
pharmaceutical companies with the task of reporting AWPs to the
publications.  <u>See</u> <u>id.</u>

At first, AWP reflected the average price that wholesalers
charged to providers like doctors and pharmacies.  It was derived
from the markup wholesalers charged over their actual acquisition
cost, generally referred to as the Wholesale Acquisition Cost
("WAC").  Typically, AWP was a twenty percent markup over WAC.
Eventually, as wholesalers consolidated and competed with each
other, their actual margins on branded drugs were reduced to two
to three percent.  As a result, the actual average wholesale
price charged by wholesalers to providers was much lower than the
formulaic 20 percent markup (or, later in the class period, 25
percent markup) over WAC.  Nonetheless, most manufacturers

continued to report AWPs consistent with the historic 20 to 25 percent markup, even though they knew that wholesalers were not actually charging these prices to providers and thus that the AWP relied on by Medicare and the TPPs was not a true average price charged by wholesalers.  See id. at 33.

**b.  Medicare**

Medicare is the largest insurer of physician-administered drugs. The federal government pays 80 percent of the cost of a Medicare Part B covered drug, and 20 percent is paid by the party responsible for the co-payment.  Many individual Medicare recipients subscribe to private insurance policies that cover all or part of these 20 percent co-payments (often called Medigap or supplemental insurance).  TPPs that provide this supplemental Medicare insurance are the members of the proposed Medigap Class. See id.

Plaintiffs propose a class period from January 1, 1991 to January 1, 2005.  During this span of time, the methods for calculating reimbursement for Medicare physician-administered drugs varied significantly.  Before 1992, reimbursement for prescription drugs under Medicare Part B was based on the customary or prevailing charge among physicians in a geographic area.  See id. at 34.  Effective January 1, 1992, the government adopted a method for reimbursement for physician-administered drugs under Part B at the lower of AWP or estimated acquisition cost ("EAC") (plus an allowance for other costs).  See 56 Fed. Reg. 59,502, 59,507 (Nov. 25, 1991) ("We will base payment for a

drug on the lower of the estimated acquisition cost or the
national average wholesale price of the drug.  If a drug has
multiple sources, the median of the average national wholesale
generic prices will be used."). EAC was to be determined based on
a survey of physicians or actual invoice prices paid by
physicians for the drug, but Medicare carriers did not, in fact,
conduct such surveys and instead simply reimbursed based on AWP.
Effective January 1, 1998, pursuant to a statutory change, the
Medicare regulations were amended to provide reimbursement for
the lower of the billed charge or 95 percent of AWP.  <u>See</u> 42
C.F.R. § 405.517 (Department of Health and Human Services
("DHHS") Regulations); <u>see also</u> 42 U.S.C. § 1395u(o)(1)(A) ("the
amount payable for the drug or biological is equal to . . . 95
percent of the average wholesale price").  <u>See also</u> <u>In re Pharm.</u>
<u>Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d at 34.
This Court construed the statutory term according to its plain
meaning and held that AWP means "the average price at which
wholesalers sell drugs to their customers, including physicians
and pharmacies."  <u>In re Pharm. Indus. Average Wholesale Price</u>
<u>Litig.</u>, 460 F. Supp. 2d 277, 278 (D. Mass. 2006).

    Until 1998, multi-source drugs were reimbursed at the lower
of EAC or the "median price for all sources of the generic form
of the drug."  <u>In re Pharm. Indus. Average Wholesale Price</u>
<u>Litig.</u>, 491 F. Supp. 2d at 34 (citation omitted).  Since 1998,
multi-source drugs have been reimbursed at the lower of the
billed charge or 95 percent of an average wholesale price,

defined as the lesser of the median generic AWP and the lowest
brand name product AWP.  See id. (citations omitted).

AWP was the pricing benchmark used by the federal government
for Medicare reimbursement during the class period.  See id. at
32.  Congress changed the pricing of Medicare drugs with the
passage of the Medicare Prescription Drug, Improvement and
Modernization Act of 2003 (the "MMA"), with an effective date of
December 8, 2003.  See Pub. L. No. 108-173, 117 Stat. 2066.  The
MMA provided for a shift from 95 percent of AWP to 85 percent of
AWP in 2004 and then to 106 percent of "average sales price" in
2005.  See 42 U.S.C. § 1395u(o); see also In re Pharm. Indus.
Average Wholesale Price Litig., 491 F. Supp. 2d at 44.

     **c.**  **Perverse Incentives**

The AWP pricing model created perverse incentives for
pharmaceutical companies and prescribing physicians.  Certain
branded drugs, including some of those at issue in this
litigation, faced therapeutic competition from drugs that had
different chemical compositions, but could be used for the same
indications.  If a branded drug faced competition from a
therapeutic equivalent, drug manufacturers frequently manipulated
the spread between the actual selling price and the AWP-based
reimbursement in order to increase their drug's attractiveness to
prescribing physicians.  Pharmaceutical companies then "marketed
the spread" to physicians to increase sales and market share.
See In re Pharm. Indus. Average Wholesale Price Litig., 491 F.
Supp. 2d at 34-35.

Pharmaceutical companies were able to market the spread because of the way in which physicians purchased drugs during the class period.  Certain physician-administered drugs were sold directly by the manufacturer to the physician providers.  For these drugs, the physician purchased the drug directly from the manufacturer and then billed the TPP or Medicare, profiting to the extent of the difference between the actual acquisition cost and the reimbursement amount.  Certain drugs were sold to providers indirectly, first by the manufacturer to an intermediary, like a wholesaler or specialty distributor, and then by the intermediary to the provider.  While the wholesaler / intermediary in this case generally increased the price to the provider above the price at which the intermediary purchased the drug from the manufacturer, certain provider purchasers received discounts (often through a process of chargebacks or rebates) as an incentive to these providers to purchase a particular drug. See id. at 35.

During the class period, the government and TPPs generally reimbursed for whatever drugs physicians prescribed, in part because of the serious nature of most of the diseases targeted by the drugs at issue in this case.  In this pricing environment, physicians enjoyed significant leverage over the prices of certain drugs, including those with therapeutic competitors.  As a result, pharmaceutical manufacturers aggressively negotiated drug contracts with physicians, often emphasizing the spread between what the physician would pay for the drug and what he or

she would be reimbursed.  The manufacturers insisted that doctors keep these contracts confidential, and they were so kept.  See id. at 35-36.

Pharmaceutical companies could manipulate the relevant spreads in two distinct ways.  One option was to raise the AWP reported to the publishing companies, thereby increasing the spread.  This approach had the advantage of being cost-free to the manufacturer.  Pharmaceutical companies could also increase the spread by providing physicians with rebates, chargebacks, discounts or free samples, which decreased the actual acquisition cost to providers.  This approach had the disadvantage of decreasing the income to the manufacturer.  Regardless of the approach used, this spread could exist whether the particular drug was reimbursed by Medicare or TPPs because TPPs generally based their contractually-based reimbursements on AWP.  See id. at 36.

Medicare required that doctors charge Medicare recipients the 20 percent co-pay based on AWP.  See id.  Most of the patients who required the drugs at issue in this case were quite ill with life-threatening diseases like cancer.  The high stakes of treatment decisions and the corresponding trust patients had to place in their doctors rendered it highly unlikely that patients would switch physicians based on drug prices, further reducing any price-based competition.  Pharmaceutical manufacturers knew that this pricing system resulted in physicians deciding to prescribe drugs at least partly based on

their profitability, called "return to practice," instead of solely on the therapeutic effects of the drugs.  See id. at 36-37.  Physicians sometimes referred to "AWP" as "ain't what's paid."  Id. at 30.

   **d.  The Mega-Spreads**

   Plaintiffs' core claim is that the published AWPs for defendants' drugs are fictitious because they do not reflect the true average price charged by wholesalers to providers, such as doctors.  This Court has determined that most knowledgeable insiders knew that actual acquisition cost did not match the reported AWP because there was typically a 20 to 25 percent spread between WAC and AWP.  See id. at 40.  The evidence demonstrated that this spread was tolerated in part to ensure that doctors were adequately compensated for their services.  See id. at 37.  In addition, sophisticated observers understood that there were some "prompt pay discounts."  Id. at 41.  Accordingly, plaintiffs' expert concluded during the bellwether trial that there was liability whenever a drug exceeded a 30 percent spread between AWP and average sales price, sometimes called the 30 percent "yardstick."  See id. at 87.  In the 2006 trial, this Court was presented with evidence of the following spreads, including numerous "mega-spreads" (spreads substantially and persistently over the 30 percent yardstick), between the published AWP and the actual acquisition cost relevant to this motion:

| Defendant | Drug Name | Spread (Year) | Spread (Year) |
| --------- | --------- | ------------- | ------------- |

| | | | |
|---|---|---|---|
| AstraZeneca | Zoladex | 40.7% (1995) | 149.7% (2001) |
| BMS | Blenoxane | 72.8% (1998) | 85.9% (2002) |
| BMS | Taxol | 27.0% (1997) | 128.7% (2002) |
| BMS | Cytoxan | 257.7% (1997) | 676.8% (1999) |
| BMS | Rubex | 180.7% (1995) | 66.2% (2001) |
| BMS | Vepesid | 70.7% (1995) | 1131.7% (1999) |

See id. at 30.

### e. **AstraZeneca**

AstraZeneca's Zoladex is an injectable, physican-administered drug primarily used to treat prostate cancer. Zoladex was launched in January 1990 and was a single-source drug throughout the class period. AstraZeneca provided a WAC and a related AWP for Zoladex to First DataBank and Redbook. See id. at 50-51. Zoladex has been in competition with Lupron, generally viewed as a therapeutic equivalent, since its launch, and this competition generally drove AstraZeneca's pricing decisions. See id. at 51. In order to compete with Lupron, AstraZeneca began marketing the spread by offering discounts to physicians, while simultaneously increasing WAC and AWP. See id. at 52-53.

Based in part on these facts and the spread numbers, as well as other evidence presented in the 2006 trial, this Court found that AstraZeneca caused the publication of false and inflated

13

average wholesale prices for Zoladex, which prices grossly exceeded actual physician acquisition costs by as much as 169 percent. AstraZeneca proceeded to market these mega-spreads in an attempt to convince doctors to prescribe Zoladex because of its profitability. See id. at 31. At the conclusion of the 2006 trial, I found that:

> AstraZeneca engaged in unfair and deceptive conduct. First, from 1996 until 2002, spreads on Zoladex ranged from 40% to over 169%, exceeding the 30% yardstick in every year for both NDCs. Thus, the extent and duration of the spreads were significant. Second, from 1996 through 1999, AstraZeneca continued to increase WAC and the corresponding AWP such that beneficiaries and TPPs were forced to pay higher amounts despite the falling sales price of Zoladex. It is particularly troubling that AstraZeneca raised AWP in 1998 in order to torpedo Medicare's attempt to reign in costs by reducing reimbursement to 95% of AWP in the BBA. Finally, AstraZeneca actively marketed the spread to physicians by repeatedly emphasizing the "Return to Practice" that could be obtained by prescribing Zoladex. . . . AstraZeneca's conduct supports all of the factors I enumerated, and I therefore easily find that its actions were unfair to consumers and TPPs under Chapter 93A. Accordingly, I find liability for Zoladex during the years 1998-2002.

Id. at 102-03.

### f. BMS

The BMS Group has six brand name oncology drugs at issue in this case: Blenoxane, Cytoxan, Paraplatin (carboplatin), Rubex, Taxol and Vepesid. See id. at 59. Although BMS did not report an AWP to the publications, it did report a wholesale list price ("WLP"), to which the publications routinely applied a markup factor to determine AWP. BMS knew that the markup was occurring, but did not completely control the amount of the markup. Nonetheless, BMS did have a substantial influence on the ultimate

14

AWP.  See id. at 60-61.  BMS priced its drugs differently
depending on whether the drugs were single-source with no
competition, single-source with therapeutic competition, or
multi-source facing generic competition.  See id. at 61.
Paraplatin was a patent-protected, single-source drug throughout
the class period; Taxol, Vepesid, Cytoxan tablets and Blenoxane
began as single-source drugs, but had to face generic competition
during the class period; and Rubex was a branded multi-source
drug throughout the class period.  See id. at 62.  The spreads
remained fairly constant during the period of patent protection.
When its drugs did face competition, BMS offered various
discounts and rebates, resulting in an increasing spread as fewer
sales were made at the list price.  See id. at 61.

     With respect to BMS, this Court found liability for five
drugs, Taxol, Vepesid injectable, Cytoxan injectable, Blenoxane
and Rubex, having determined that BMS caused the publication of
false and inflated average wholesale prices for these drugs,
which prices sometimes grossly exceeded actual physician
acquisition costs, and, for certain of these drugs, proceeded to
market these mega-spreads.  See id. at 31.  At the conclusion of
the 2006 trial, I found that:

> [I]n 2001 the spreads [for Taxol] began to rise and
> less than 42% of sales were made near list price.  In
> 2002, less than 1% of sales were made at list price and
> spreads reached as high as 500%.  I therefore find that
> BMS's conduct in marketing and manipulating the spread
> for Taxol violated Chapter 93A for the years 2001 and
> 2002 . . .
>      . . . [With respect to Vepesid], [i]n 1998 and
> 1999 spreads reached over 1000%. . . .
>           . . . I find that these mega-spreads are shocking

and on their own prove a sufficient degree of
unfairness and deception to impose Chapter 93A
liability because they are so oppressive and injurious
to the insurers and patients who must pay such inflated
prices....[I] find liability for Vepesid injectable
from 1998-1999 and 2001-2002 . . .
        . . . [As for Cytoxan], the injectable form had
spreads of over 100% on certain NDCs in every single
year from 1993 until 2002, <u>peaking at 676% in 1999</u>.
Moreover, by 1999, virtually no sales were made at WLP,
and as early as 1996, the vast majority of sales were
made at prices less than 50% of WLP.  I find that these
mega-spreads alone are sufficient to find liability for
the injectable form of Cytoxan from 1998-2002. . . .
        . . . .
        . . . [With respect to Blenoxane,] [t]he highest
spreads ranged from 72% in 1998 to 199% in 2002. . . .
        . . . I therefore find that the manipulation of
these spreads was unfair under Chapter 93A, that WLP
was not a true price, and that there is liability for
Blenoxane from 1998 to 2002. . . .
        . . . [As for Rubex,] from 1994 until 2002,
spreads were consistently above 30% for at least two of
the six NDCs, with the highest spreads ranging from 55%
to 438%. . . . I therefore find liability for Rubex in
1998-2000, and 2002.

<u>Id.</u> at 106-08 (citations omitted).

    In support of their claim, Plaintiffs note that this Court

found scienter after the 2006 trial:

        Under the plain meaning canon of statutory
    construction, I have construed the statutory term AWP
    in 42 U.S.C. § 1395u(o) to mean the average price at
    which wholesalers sell drugs to their customers,
    including physicians and pharmacies. . . .
        . . . .
        . . . I find that the defendants unfairly and
    deceptively caused to be published false AWPs (or their
    formulaic counterparts: false WACs or WLPs) knowing
    that TPPs and the government did not understand the
    extent of the mega-spreads between published prices and
    true average provider acquisition costs.  Moreover,
    defendants knew that neither the government nor the
    TPPs could do much to change the AWP reimbursement
    benchmark because they were locked into the nationwide
    reimbursement scheme established by statute or
    contract.
        Unscrupulously taking advantage of the flawed AWP
    system for Medicare reimbursement by establishing

> secret mega-spreads far beyond the standard industry
> markup was unethical and oppressive. . . .
>            . . . .
>       . . . Significantly, the defendants well
> understood the devastating impact the mega-spreads had
> on old and sick patients required to make co-payments
> they could ill afford, and set up programs to help some
> needy patients by subsidizing their costs.  The
> spiraling drug costs incurred by third-party payors and
> the government, however, were never a concern.

Id. at 94-96.

## IV.   **RULE 23 STANDARD**

A class may be certified pursuant to Fed. R. Civ. P. 23 only

if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).  Plaintiffs seek to certify these classes

pursuant to Rule 23(b)(3),[6] which provides that an action may be

maintained only if, additionally,

> the court finds that the questions of law or fact
> common to class members predominate over any questions
> affecting only individual members, and that a class
> action is superior to other available methods for
> fairly and efficiently adjudicating the controversy.
> The matters pertinent to these findings include:
>       (A) the class members' interests in individually
> controlling the prosecution or defense of separate
> actions;
>       (B) the extent and nature of any litigation
> concerning the controversy already begun by or against
> class members;
>       (C) the desirability or undesirability of
> concentrating the litigation of the claims in the

---

[6]Plaintiffs also seek to certify the Non-Medicare Class
pursuant to Fed. R. Civ. P. 23(b)(2).  This is discussed further
below.

particular forum; and
        (D) the likely difficulties in managing a class
action.

Fed R. Civ. P. 23(b)(3).  I discussed the legal standards for

class certification in In re Pharm. Indus. Average Wholesale

Price Litig., 230 F.R.D. at 76-91, and do not repeat them here.

    Under the First Circuit's approach, a district court must

"conduct a rigorous analysis" of the Rule 23 requirements and

"formulate some prediction as to how specific issues will play

out[.]"  See In re New Motor Vehicles Canadian Exp. Antitrust

Litig., 522 F.3d 6, 25 (1st Cir. 2008) (internal quotation marks

omitted).  Courts are encouraged to look beyond the pleadings.

Id.  Although the First Circuit did not resolve whether

"findings" regarding the class certification criteria are ever

necessary, id. at 26, four circuits (the Second, Fourth, Fifth,

and Seventh) require district courts to make specific findings or

determinations that each Rule 23 criterion is met.  Id. at 24.

In In re Initial Public Offering Securities Litigation, 471 F.3d

24 (2d Cir. 2006), for example, the Second Circuit held:

> (1) a district judge may certify a class only after
> making determinations that each of the Rule 23
> requirements has been met; (2) such determinations can
> be made only if the judge resolves factual disputes
> relevant to each Rule 23 requirement and finds that
> whatever underlying facts are relevant to a particular
> Rule 23 requirement have been established and is
> persuaded to rule, based on the relevant facts and the
> applicable legal standard, that the requirement is
> met[.]

Id. at 41.  By contrast, the Third and Eighth Circuits do not

require that district courts make findings, although they

"sometimes require an inquiry into and preliminary resolution of

disputes." <u>New Motor Vehicles</u>, 522 F.3d at 24.  These fact findings at the certification stage pertain only to this stage and are not binding as to the ultimate merits of the case.  <u>See id.</u> at 24.

The bellwether trial, together with the seven years of presiding over this multi-district litigation, permits the Court to take a searching look at the critical fact disputes, to make fact-findings for purposes of class certification and to make grounded predictions as to how the key contested issues will play out.

Defendants argue strenuously that plaintiffs' proposed classes cannot meet the predominance / superiority requirements under Rule 23(b)(3) because: (1) the substantial differences in the requirements under the numerous states' consumer protection statutes would create overwhelming difficulties in managing this class action; (2) the different elements of these consumer protection statutes preclude a finding of predominance of common issues; and (3) the claims alleged involve a number of issues that require individualized determinations, such as scienter, reliance, causation and damages.  While they also dispute that plaintiffs have met the requirements of Rule 23(a), many of the adequacy and typicality challenges can be resolved only after addressing the Rule 23(b)(3) predominance issues.

## V.   <u>A MULTI-STATE CLASS</u>

a. **Esperanto**[7]

To find a common denominator for the various UDTPAs and address the manageability problems created by certification under multiple state laws, plaintiffs propose the use of a broad "intent to deceive" jury instruction.  From plaintiffs' vantage, a finding of fraud will constitute a violation of most state unfair trade practice statutes.  Plaintiffs' proposed fraud instruction is derived from the Restatement (Second) of Torts § 525.  Plaintiffs correctly argue that a jury finding of garden-variety fraud will violate most state UDTPAs.  Indeed, this is a tempting solution to iron out the wrinkles in the varying state UDTPA laws.

Defendants respond persuasively, though, that the use of amalgamated "Esperanto"-type instructions would violate the due process rights of absent class members who reside in states where they can recover under state UDTPAs that have less stringent requirements.  In In re Rhone-Poulenc Rorer Inc., 51 F.3d 1293 (7th Cir. 1995), the Seventh Circuit ordered decertification of a class, explaining that the district judge proposed "to substitute a single trial before a single jury instructed in accordance with no actual law of any jurisdiction - a jury that will receive a

---

[7]"Esperanto is an artificial language, created by Dr. L.L. Zamenhof in 1887, which combines word roots common to many European languages.  It was designed to help with the communication between people of different lands and cultures, and was meant to be a second language."  In re Prempro Prods. Liab. Litig., 230 F.R.D. 555, 564 n.71 (E.D. Ark. 2005).

kind of Esperanto instruction, merging the negligence standards
of the 50 states and the District of Columbia." Id. at 1300. The
court went on to explain, "[t]he voices of the quasi-sovereigns
that are the states of the United States sing negligence with a
different pitch." Id. at 1301.

"[D]ue process requires that in a class action based on the
laws of separate jurisdictions the adjudicating court must apply
to any particular claim the substantive law of a jurisdiction
having a significant interest in that claim." In re Sch.
Asbestos Litig., 977 F.2d 764, 797 (3d Cir. 1992) (citing
Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 814-23 (1985)).
"Courts may not simply apply the law of the forum state or,
presumably, a hybrid or composite of state laws." Sch. Asbestos,
977 F.2d at 797.  This dispute is not an academic one because, as
I found at the bellwether trial, plaintiffs were unable to prove
deceptive conduct in some of the class years although they did
prevail under the unfairness standard.  See In re Pharm. Indus.
Average Wholesale Price Litig., 491 F. Supp. 2d at 95.  As such,
"Esperanto" instructions will not provide the silver bullet for
the Tower-of-Babel problem here.

    **b.   Grappling with Grouping**

Alternatively, plaintiffs have proposed grouping similar
provisions under the various UDTPAs to address manageability
issues.  Differences among applicable state laws are not
necessarily fatal to certification of a proposed class action.
See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296-97,

21

(1st Cir. 2000) (involving eight different states' potentially
relevant statutes of limitations in a breach of contractual
warranty class action).  "[I]f a claim is based on a principle of
law that is uniform among the states, class certification is a
realistic possibility."  Klay v. Humana, Inc., 382 F.3d 1241,
1262 (11th Cir. 2004) ("Similarly, if the applicable state laws
can be sorted into a small number of groups, each containing
materially identical legal standards, then certification of
subclasses embracing each of the dominant legal standards can be
appropriate.").  Still "federal appellate courts have viewed
class actions governed by the law of multiple states with serious
skepticism."  In re Relafen Antitrust Litig., 221 F.R.D. 260, 276
(D. Mass. 2004) (certifying an exemplar class under the antitrust
and consumer protection laws of four states).

    While numerous courts have talked-the-talk that grouping of
multiple state laws is lawful and possible, very few courts have
walked the grouping walk.  "[W]hen district courts have faced the
problem of nationwide classes which seek to apply state consumer
protection laws, those courts have refused to certify a class, in
part because choice of law would require applying the consumer
protection law of each class member's home state."  Baker v.
Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414 (E.D.
Pa. 2006).  Some courts have rejected efforts to certify a class
under multiple state consumer protection laws, finding that the
variances in the substantive prerequisites of such laws render
certification too daunting.  See, e.g., S. States Police

Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 93 (D. Mass. 2007) (concluding, without much discussion, that the consumer protection laws of eight states varied, thus precluding certification under these laws); In re Prempro Prods. Liab. Litig., 230 F.R.D. 555, 565 (E.D. Ark. 2005) ("While a multitude of subgroups might solve the variation of laws problem, it would lead to monumental case management problems.  Plaintiffs must establish that the variances in state laws could be overcome in a reasonable way.  They have failed to meet this burden.").  Much of the time, courts have declined to certify multi-state class actions because plaintiffs' class counsel failed to do their homework.  See, e.g., Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 220 (E.D. Pa. 2000) (denying a motion for class certification where plaintiffs failed to do a "thorough and comprehensive" state-by-state analysis of consumer protection laws) (internal quotation marks omitted).

In proposing to certify a class requiring the application of the laws of numerous jurisdictions, plaintiffs must shoulder the herculean burden of conducting an extensive review of state law variances to demonstrate how grouping would work. "If the choice-of-law and subsequent analysis show little relevant difference in the governing law, or that the law of only a few jurisdictions applies, the court might address these differences by creating subclasses or by other appropriate grouping of claims." Manual for Complex Litigation, Fourth § 22.634, p. 412 (2004).  Thus, while certification of a class spanning multiple jurisdictions is

23

hen's-tooth rare, it is not verboten.

### c.  **The Little FTC Acts**

Plaintiffs primarily press for multi-state class certification under the laws of states that provide causes of action for unfair or deceptive trade practices, most of which are based on the Federal Trade Commission Act ("FTCA").  <u>See</u> 15 U.S.C. § 41 <u>et</u> <u>seq</u>.  The so-called "little FTC Acts" have now been enacted in all fifty states and the District of Columbia. Jack E. Karns, <u>State Regulation of Deceptive Trade Practices Under "Little FTC Acts": Should Federal Standards Control?</u>, 94 Dick. L. Rev. 373, 373 (1990).  They generally follow one of three statutory models, or include some combination thereof: (1) prohibition of "unfair methods of competition" and "unfair or deceptive acts or practices" in or affecting commerce, a formulation identical to the FTCA's prohibition; (2) prohibition of "false, misleading, or deceptive acts or practices;" and (3) the listing of specific trade practices deemed unlawful.  <u>See</u> <u>id.</u> at 376.  Twenty-six states "statutorily or judicially recognize a federal deference obligation" to Federal Trade Commission and federal court interpretations of the FTCA.  <u>Id</u>. at 379.  These states are: Alabama; Alaska; Arizona; Connecticut; Florida; Georgia; Idaho; Illinois; Louisiana; Maine; Maryland; Massachusetts; Montana; New Hampshire; New Mexico; North Carolina; Ohio; Pennsylvania; Rhode Island; South Carolina; Tennessee; Texas; Utah; Vermont; Washington; and West Virginia. <u>See</u> <u>id.</u> at 379 n.24,29.

Plaintiffs have proposed grouping state UDTPAs by the following prohibition-based categories: (1) state statutes broadly prohibiting unfair acts or practices; (2) state statutes broadly prohibiting deceptive acts or practices; (3) state statutes prohibiting "unconscionable" acts or practices; (4) state statutes prohibiting misrepresentations or omissions generally; (5) state statutes prohibiting misrepresentations regarding price; (6) state statutes prohibiting misrepresentations regarding the characteristics of goods; (7) state statutes prohibiting misrepresentations regarding the standards of goods; and (8) state statutes prohibiting false advertising.

With respect to the first proposed category, an analysis of the relevant state UDTPAs demonstrates that a significant number track, very closely or exactly, the language of section 5 of the FTCA proscribing "unfair or deceptive acts or practices in or affecting commerce[.]"  15 U.S.C. § 45(a)(1).  These states are listed in Appendix C.[8]

---

[8]This opinion does not discuss all states that track the FTCA because some states differ procedurally.  For example, some states do not permit class actions: Alabama, Alaska, Georgia, Kentucky, Louisiana, Mississippi, Montana and Tennessee.  The question of whether class actions can be brought pursuant to South Carolina's UDTPA appears to be unsettled.  South Carolina's UDTPA states that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages."  S.C. Code Ann. § 39-5-140(a).  However, plaintiffs contend, and cite some decisions in support of their contention, that this language is not intended to prevent class actions.  In light of the unsettled nature of the law, this Court

Although some other statutes are not clones, the Court also includes in this group the statutes that are substantially similar.  See Cal. Bus. & Prof. Code § 17200  ("As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising"); and Mo. Rev. Stat. § 407.020(1) ("The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice.").

With respect to the second proposed category, other state statutes broadly prohibit false, misleading or deceptive acts or practices as a general matter (or specifically with respect to prices), but do not prohibit "unfair" practices.   These state statutes are listed in Appendix D.

With respect to the third proposed category, several statutes, including some of those that fall into the first two groups, prohibit "unconscionable" conduct.  See Appendix E.

Plaintiffs also press for several additional categories, including separate groupings of states (including Cal. Civ. Code § 17.50, et seq.) that prohibit misrepresentations about price

---

declines to certify a class under the South Carolina UDTPA.  Iowa does not provide a private cause of action at all.  See Stepp v. State Farm Mut. Auto. Ins. Co., No. 06-CV-2027, 2006 WL 2038596, at *4 (N.D. Iowa July 19, 2006).  In addition, the Court already tried a case under Massachusetts law.  As such, it is not listed.

26

reductions, the characteristics of goods, the standards of goods and false advertising.  The Court rejects these proposed groupings for two reasons.  First, most of these statutory prohibitions do not encompass the alleged misrepresentation here. Plaintiffs allege that defendants misrepresented the "average wholesale price" or the "wholesale list price" of their drugs. These alleged misrepresentations about a pricing benchmark do not constitute misrepresentations about standards, characteristics, price reductions or advertising of goods.  Second, because these lists of prohibited practices generally vary from state to state, the differences in the legal issues would predominate over the common questions.

Plaintiffs have not sought to certify the classes under the UDTPAs of Ohio and Utah because of their "uniquely onerous elements."  (Docket No. 4903 4.)  Some other state statutes (Indiana and Wisconsin) contain different statutory language that would necessitate substantially different jury instructions and result in an unmanageable verdict form for a jury.[9]  Accordingly,

---

[9] See Ind. Code § 24-5-0.5-3(a) ("The following acts or representations as to the subject matter of a consumer transaction . . . by a supplier, are deceptive acts: . . . (6) That a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not."); Wis. Stat. § 100.18(1) ("No . . . corporation . . . with intent to sell...merchandise...to the public for sale . . . shall make, publish, disseminate, circulate or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public . . . in [another] publication . . . [a] representation of any kind to the public relating to such purchase . . . , which . . . representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.");

the Court declines to certify a multi-state class under these state statutes.  However, upon request, if appropriate class representatives are proposed and the other requirements of Fed. R. Civ. P. 23 are met, the Court will consider certifying a separate statewide class under these statutes and remanding each class to the appropriate federal district court.

### d. **Variations in the Requirements of the UDTPAs**[10]

Although the statutory language in each of the state UDTPAs in the three groups discussed above is substantially similar, the Court must next determine whether the variations in state case law construing the statutes and their affirmative defenses swamp common legal issues and defeat the predominance requirement. Defendants point to multiple areas of law where the legal standards do vary substantially, thereby potentially trumping predominance.

### 1. **Reliance**

Defendants argue that many state UDTPAs require plaintiffs to prove that they relied on an alleged misrepresentation in order to establish liability.  Pointing to the evidence that TPPs had very different levels of knowledge and sophistication with

---

Wis. Stat. § 100.18(10)(b) ("It is deceptive to represent the price of any merchandise as a manufacturer's or wholesaler's price, or a price equal thereto, unless the price is not more than the price which retailers regularly pay for the merchandise.").

[10] Defendants purport to incorporate whole-hog numerous previous filings by reference in their briefing.  The Court has not reviewed filings submitted by other parties and does not view these issues as preserved.

respect to AWP, defendants contend that grouping will not solve the core problem that individual fact issues would predominate in states for which the UDTPAs require plaintiffs to establish reliance.  In their view, many TPPs did not rely on the truthfulness of AWPs in making reimbursements, thus precluding findings of both reliance and causation.  This Court did not have to address reliance issues in its earlier certification decision and trial ruling because "Chapter 93A does not require a showing of reliance to state a claim."  See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 86.

    In fraud cases, many courts have held that the need for plaintiffs to prove the element of reliance implicates too many individual factual issues for proposed classes to satisfy predominance.  See, e.g., McLaughlin v. American Tobacco Co., 522 F.3d 215, 224-25 (2d Cir. 2008) (not "adopt[ing] the Fifth Circuit's blanket rule that a 'fraud class action cannot be certified when individual reliance will be an issue,' as some fraud actions do appear within the contemplation of Rule 23's drafters . . . [but finding that] in this case, reliance is too individualized to admit of common proof")(citations omitted); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996) (reversing certification of a class of nicotine-dependent persons who had purchased and smoked cigarettes in part because "a fraud class action cannot be certified when individual reliance will be an issue"); In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. 389, 395 (D. Mass. 2007) (Young, J.) ("Proving the element of

reliance will necessarily involve individual questions of fact, and the issuing banks will be unable to invoke a presumption of reliance on the part of class members."); LaBauve v. Olin Corp., 231 F.R.D. 632, 674 n.89 (S.D. Ala. 2005) ("Thus, an accurate summary of the law is that while fraud claims requiring individual proof of reliance are not per se barred from class certification, material differences in the representations made or the reliance of the addressee may render such claims unsuitable for class treatment.").

With respect to the proposed Medigap Class, this long string of cases is largely beside the point because the TPPs were contractually required to pay all or part of a Medicare beneficiary's co-payment, which is statutorily based on the AWP published in the industry publications.  In other words, the Medigap Class TPPs are required, by contract, to rely on the AWPs in reimbursing for the co-payments made by Medicare beneficiaries.  Individualized factual issues with respect to an individual Medigap Class TPP's knowledge of AWP inflation are irrelevant in proving liability.  Accordingly, the requirement that a plaintiff prove reliance does not preclude certifications of the Medigap Class under any of the proposed UDTPAs.

With respect to the Non-Medicare Class, the reliance analysis is different.  Based on the evidence submitted at the bench trial, for purposes of this class certification only, I find that the typical TPP did not know about the existence of the mega-spreads prior to 1997 when Congress issued a report on the

30

subject because manufacturers assiduously kept drug pricing
confidential and drug pricing practices were opaque and
confusing.  See In re Pharm. Indus. Average Wholesale Price
Litig., 491 F. Supp. 2d at 76-79.  I ruled that there was "a
perfect storm of information" by 2001 about the AWP pricing, and
find, for purposes of this class certification, that the typical
TPP knew about the grossly inflated prices by then.  See id. at
41.  Between 1997 and 2001, though, degrees of actual knowledge
varied significantly.  Various sophisticated TPP class members,
particularly those that ran health plans or specialty pharmacies,
may have acquired actual knowledge of the mega-spreads of the
drugs at issue in this litigation.  Moreover, unsophisticated
smaller TPPs that hired health care consultants or pharmacy
benefit managers may have learned about the grossly inflated
spreads before 2001.  See id. at 78-79.  See also Restatement
(Third) of Agency § 5.03 (2006) (imputing notice of a fact that
an agent knows or has reason to know to the principal "if
knowledge of the fact is material to the agent's duties to the
principal," in certain circumstances.).

Defendants argue persuasively that the misrepresentation
claims of plaintiffs who continued to make payments based on AWP
even after learning the truth about mega-spreads could be
undermined in jurisdictions requiring plaintiffs to prove the
element of reliance.  See generally, Restatement (Second) of
Torts § 541 (1977) ("The recipient of a fraudulent
misrepresentation is not justified in relying upon its truth if

31

he knows that it is false or its falsity is obvious to him."). Because many of the proposed class consumer members were beneficiaries of the TPP plans, the knowledge of the TPP is imputed to the consumer.  See Restatement (Third) of Agency § 5.03 (2006).  Accordingly, I decline to certify the Non-Medicare Class under the laws of states that require reliance.[11]

### 2. State-by-State Reliance Analysis

The parties agree that the following state statutes require plaintiffs to prove the element of reliance under at least certain UDTPA statutory provisions: Arizona (Ariz. Rev. Stat. § 44-1521, et seq.), North Carolina (N.C. Gen. Stat. § 75-1, et seq.), Oregon[12] (Or. Rev. Stat. § 646.605, et seq.), Pennsylvania (73 Pa. Cons. Stat. Ann. § 201-1, et seq.), and Wyoming (Wyo. Stat. Ann. § 40-12-101, et seq.).  I will not certify the Non-Medicare Class under these statutes.[13]

_____

[11] Defendants make a strained argument that Medicare's knowledge of mega-spreads should be imputed to the TPPs in the Medigap Class.  However, Medicare was not the agent of the TPPs that had contracts to reimburse beneficiaries, and Medicare did not set or approve drug prices.

[12] While plaintiffs did not identify Oregon as a state requiring reliance at the hearing, plaintiffs, in their summary of state unfair trade practice law, conceded that Oregon's UDTPA requires that a plaintiff prove reliance-in-fact when affirmative misrepresentations are alleged.  (Mem. Supp. Mot. Certify Ex. A at 78.)

[13] Michigan does not provide a cause of action when an item is purchased primarily for business or commercial purposes, rather than personal ones.  See Computer Network, Inc. v. AM Gen. Corp., 696 N.W.2d 49, 60 (Mich. Ct. App. 2005).  Similarly, Oregon provides a cause of action only for consumers.  See CollegeNET, Inc. v. Embark.Com, Inc., 230 F. Supp. 2d 1167, 1174 (D. Or. 2001).  TPPs do not have a cause of action under Missouri's UDTPA.  See In re Express Scripts, Inc., Pharmacy

The parties appear to agree that the following state statutes do not require the element of reliance: Arkansas (Ark. Code Ann. § 4-88-101, et seq.), Florida (Fla. Stat. § 501.201, et seq.), Idaho (Idaho Code Ann. § 48-601, et seq.), Maine[14] (Me. Rev. Stat. Ann. tit. 5 § 205-A, et seq.), Missouri (Mo. Rev. Stat. § 407.010, et seq.), Nevada (Nev. Rev. Stat. § 598.0903, et seq.), New Hampshire (N.H. Rev. Stat. Ann. § 358-A:1, et seq.), New Mexico (N.M. Stat. § 57-12-1, et seq.), New York (N.Y. Gen. Bus. Law § 349, et seq.), North Dakota (N.D. Cent. Code § 51-15-01, et seq.), Oklahoma (Okla. Stat. tit. 15, § 751, et seq.), Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.), and West Virginia (W. Va. Code § 46A-6-101, et seq.).

The parties disagree about whether the caselaw construing certain state statutes requires proof of individual reliance. As defendants contend, the analysis is complicated because some states apply a proximate causation standard that is arguably the

_____

Benefits Mgmt. Litig., No. 1672, 2006 WL 2632328, at *10 (E.D. Mo. Sep. 13, 2006) ("Although the Court can find no cases analyzing the phrase 'personal, family or household purposes,'. . . [t]he services were not purchased for [plaintiff trust fund]'s personal, family, or household purposes[;]. . . [u]nder a plain reading of the statute, the PBA Plan cannot bring suit under MMPA.").   As such, TPPs, in both the Medigap and Non-Medicare classes, do not have a cause of action in Michigan, Missouri or Oregon.   Because of the requirement that plaintiffs prove reliance, and my legal ruling that the knowledge of a TPP is imputed to its beneficiaries, consumer members of the Non-Medicare Class from Oregon are excluded as well.   Thus, plaintiffs are generally precluded from bringing suit under the UDTPA of Oregon.   However, consumer members of the Non-Medicare Class from Michigan and Missouri will not be excluded.

[14] Actually, the parties have never briefed the Maine statute perhaps because plaintiffs failed to include Maine in their initial list of relevant statutes.

functional equivalent of a reliance requirement.  Having reviewed
the statutes and caselaw in those states, one by one, I conclude
that the following state statutes probably do not require that
plaintiff prove individual reliance as a separate element under
all prongs of the statute: Colorado (Colo. Rev. Stat. § 6-1-101,
et seq.), Connecticut (Conn. Gen. Stat. § 42-110a, et seq.),
Delaware (Del. Code Ann. tit. 6, § 2511, et seq.), District of
Columbia (D.C. Code § 28-3901, et seq.), Hawaii (Haw. Rev. Stat.
§ 480-1, et seq.), Illinois[15] (815 Ill. Comp. Stat. § 505/1, et
seq.), Kansas (Kan. Stat. Ann. § 50-623, et seq.), Michigan[16]

---

[15]Defendants argue persuasively that the proximate cause
standard is so strict as to be the functional equivalent of
reliance when applied to deceptive acts or practices claims.
See, e.g., Price v. Philip Morris, Inc., 848 N.E.2d 1, 52 (Ill.
2005)("[T]o meet the causation element of a Consumer Fraud Act
claim, the members of the class must have actually been deceived
in some manner by the defendant's alleged misrepresentations of
fact."); Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801,
861 (Ill. 2005)  ("[T]he important legal principle . . .is that
in a case alleging deception under the Act, it is not possible
for a plaintiff to establish proximate causation unless the
plaintiff can show that he or she was, 'in some manner, deceived'
by the misrepresentation.  Proximate causation is an element of
all private causes of action under the Act.") (citation omitted).
Accord Barbara's Sales, Inc. v. Intel Corp., 879 N.E.2d 910, 919
(Ill. 2007).  Accordingly, this Court will preclude plaintiffs
from bringing deceptive acts or practices claims on behalf of
Non-Medicare Class members in Illinois.  However, plaintiffs have
the better argument that claims under the unfairness prong of the
Illinois UDTPA are not precluded.  The Supreme Court of Illinois
has cited the factors considered by the Federal Trade Commission
in determining unfairness: "(1) whether the practice offends
public policy; (2) whether it is immoral, unethical, oppressive,
or unscrupulous; (3) whether it causes substantial injury to
consumers."  Robinson v. Toyota Motor Credit Corp., 775 N.E.2d
951, 961 (Ill. 2002) (citing Fed. Trade Comm'n v. Sperry &
Hutchinson Co., 405 U.S. 233, 244, n.5 (1972)).

[16]Plaintiffs concede that the Michigan UDTPA requires proof
that a reasonable person would have relied on any representations
that were made, but maintain that Michigan's UDTPA does not

(Mich. Comp. Laws § 445.901, <u>et seq.</u>), Minnesota[17] (Minn. Stat. § 325F.68, <u>et seq.</u>), Nebraska (Neb. Rev. Stat. § 59-1601, <u>et seq.</u>), New Jersey (N.J. Stat. Ann. § 56:8-1, <u>et seq.</u>), Texas[18] (Tex. Bus. & Com. Code § 17.41, <u>et seq.</u>), Vermont (Vt. Stat. Ann. tit. 9, § 2451, <u>et seq.</u>) and Washington (Wash. Rev. Code § 19.86.010, <u>et seq.</u>).

I conclude that the following statutes probably do require plaintiffs to prove reliance, and I will not certify the Non-Medicare Class under the UDTPAs of the following states: Maryland (Md. Code Ann., Com. Law § 13-101, <u>et seq.</u>) and South Dakota

---

require proof of individual reliance.  <u>See</u> <u>Dix v. Am. Bankers Life Assurance Co. of Florida</u>, 415 N.W.2d 206, 209 (Mich. 1987) ("We hold that members of a class proceeding under the Consumer Protection Act need not individually prove reliance on the alleged misrepresentations.  It is sufficient if the class can establish that a reasonable person would have relied on the representations.") (footnote omitted).

[17]Plaintiffs acknowledge that, in the case where plaintiffs allege that damages were caused by deceptive, misleading or fraudulent statements or conduct in violation of the misrepresentations in sales laws, proof of reliance is necessary in order to demonstrate causation.  However, proof of individual reliance is not always required.  <u>See</u> <u>Group Health Plan, Inc. v. Philip Morris Inc.</u>, 621 N.W.2d 2, 14 (Minn. 2001) ("where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers, the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products.").

[18] Tex. Bus. & Com. Code § 17.50(a)(1), by the plain language of the statute, requires reliance. However, defendants have not cited cases that indicate that reliance is a necessary element to a claim under Tex. Bus. & Com. Code § 17.50(a)(3) which provides "[a] consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:. . . (3) any unconscionable action or course of action by any person"; plaintiffs will, therefore, be permitted to bring a claim pursuant to this provision.

(S.D. Codified Laws § 37-24-1, et seq.).  Because the caselaw in California is in a state of flux, I decline to certify the Non-Medicare Class under that statute.  One California appellate court concluded that, with respect to the requirement that "a plaintiff suffered 'injury in fact . . . as a result of' the fraudulent business practice or false advertising," the defendant had the better argument that "Proposition 64 added a reliance element to the [Unfair Competition Law] and the [False Advertising Law]."  Pfizer, Inc. v. Superior Court, 45 Cal. Rptr. 3d 840, 851 (Cal. Ct. App. 2006), review granted and opinion superseded by, 146 P.3d 1250 (Cal. 2006).  The Supreme Court of California granted review and has not yet issued its decision. See Pfizer, Inc. v. Superior Court, 146 P.3d 1250 (Cal. 2006). See also In re Tobacco II Cases, 47 Cal. Rptr. 3d 917 (Cal. Ct. App. 2006), review granted and opinion superseded by, 51 Cal. Rptr. 3d 707 (Cal. 2006).  Should the California appellate courts clarify the issue, I will revisit it.

### 3.  Scienter

Defendants contend that the scienter requirements under the UDTPAs vary, implicating both predominance and manageability concerns.

Several statutes require that plaintiffs prove that defendant made misrepresentations or behaved knowingly, intentionally or willfully.[19]  There is no scienter requirement

---

[19]  See, e.g., Idaho Code Ann. § 48-603 ("the following unfair methods of competition and unfair or deceptive acts or practices . . . are unlawful, where a person knows, or in the

under the "unfair" practices prong of many states' UDTPAs.   See

e.g., State ex rel. Ashcroft v. Mktg. Unlimited of Am., Inc., 613

S.W.2d 440, 447 (Mo. Ct. App. 1981) ("In the present case, it is

not the person's intent that is determinative of the

applicability of the remedial provisions of Chapter 407 but

rather that the defendants' conduct constituted unfair

practices.").  Other provisions require that plaintiffs prove an

intent that others rely on the misrepresentations.[20]

In the bellwether trial, plaintiffs primarily pressed two

theories: (1) that defendants knowingly and intentionally made

---

exercise of due care should know . . .."); Idaho Code Ann. 48-
603C; Kan. Stat. Ann. § 50-626(b)(2) (prohibiting "the willful
use, in any oral or written representation, of exaggeration,
falsehood, innuendo, or ambiguity as to a material fact"); Kan.
Stat. Ann. § 50-627(b) ("In determining whether an act or
practice is unconscionable, the court shall consider
circumstances of which the supplier knew or had reason to know");
Nev. Rev. Stat. § 598.0915 ("A person engages in a 'deceptive
trade practice' if, in the course of his business or occupation,
he: . . . (15) Knowingly makes any other false representation in
a transaction")) N.M. Stat. Ann. § 57-12-2(D) ("'unfair or
deceptive trade practice' means . . . a false or misleading oral
or written statement...knowingly made in connection with the
sale...of goods"); S.D. Codified Laws § 37-24-6(1) ("It is a
deceptive act or practice for any person to: (1) Knowingly and
intentionally act, use, or employ any deceptive act or practice,
fraud, false pretense, false promises, or misrepresentation");
and Wyo. Stat. Ann. § 40-12-105(a) ("A person engages in a
deceptive trade practice unlawful under this act when . . . he
knowingly . . .").

[20] See, e.g., Minn. Stat. Ann. § 325F.69 Subdivision 1
("The act, use, or employment by any person of any fraud, false
pretense, false promise, misrepresentation, misleading statement
or deceptive practice, with the intent that others rely thereon .
. . is enjoinable"); N.D. Cent. Code Ann. § 51-15-02 ("The act,
use, or employment of any...deceptive act or practice, fraud,
false pretense, false promise, or misrepresentation, with the
intent that others rely thereon . . . is declared to be an
unlawful practice."

false misrepresentations of AWP with the intent that the government, TPPs and consumers rely on them; and (2) that the creation of inaccurate mega-spreads between the reimbursement prices and the actual acquisition costs was unfair.  Plaintiffs do not assert that defendants negligently published an incorrect price.  This is not an omissions case.  AstraZeneca's and BMS's primary defense has been that the published "AWP" was not false because the TPPs and the government knew that the published AWP was nothing more than a sticker price, and not a true average. As such, it was not deceptive or unfair to publish an AWP that was not moored to any prices actually paid by providers in the marketplace and there could be no reasonable reliance on it as a true market price.  In a separate argument, BMS has also argued that it reported a truthful wholesale list price, not an average wholesale price.

In the context of plaintiffs' theory in this case, the varying standards governing a defendant's scienter do not pose insuperable management issues because the Court can ask the jury specific questions geared to the UDTPAs discussed above.

### 4. <u>Punitive Damages</u>

The next issue relates to the differing procedural and evidentiary requirements for imposing punitive damages.  See Appendix F.  Plaintiffs assert that the relevant jurisdictions that provide that juries award punitive damages are: Arizona, Arkansas, California, Delaware, District of Columbia, Minnesota and Nevada.  The court decides whether to award punitive damages

in Connecticut, Idaho, Illinois and Missouri.

As the standards for an award of punitive damages have
similar wording, it will not be difficult for the Court to
instruct a jury on the issue of punitive damages.  These minor
differences in the requirements for punitive damages do not
undermine predominance or manageability sufficiently to preclude
class certification.

**5.   <u>Causation</u>**

Pointing out the variations in the "nuances" (defendants'
word) of loss causation, defendants argue that individualized
fact issues predominate in the causation analysis.  They point
out that many TPPs learned that the AWPs were false, but
nonetheless continued to use AWPs as a benchmark.  In their view,
continued reimbursement or payment based on AWP after learning of
the alleged deception provides a compelling defense under the
applicable UDTPA.  The poster child for defendants' theory is
Blue Cross Blue Shield of Massachusetts, the class representative
in the bellwether trial, which continued to use AWP as its
pricing benchmark even after Congress discarded it for Medicare.
I found, "Remarkably, BCBSMA, the behemoth insurer in the
Massachusetts market, and other large TPPs, were not proactive in
adjusting to cost data once Medicare did the legwork for them in
devising more reasonable drug pricing and service fees. . . .
TPPs were worried that they risked either losing network
providers or pushing patients into the more expensive hospital
setting if they pressed for lower AWPs on individual specialty

drugs." <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 491
F. Supp. 2d at 46.   Thus, in defendants' view, many TPPs
continued with the AWP benchmark even after they knew about the
mega-spreads.   Consequently, class certification is
inappropriate, they argue,  because the jury would have to make
individualized causation findings with respect to each TPP as to
whether it would have changed its pricing benchmarks if it had
known of the mega-spreads.   This argument is a burnishment on
defendants' argument about reliance.

     With respect to the Medigap Class, individualized factual
issues concerning a TPP's knowledge of AWP spreads are irrelevant
because TPPs were contractually required to rely on AWP
regardless of any knowledge they had of falsity.

     With respect to the Non-Medicare Class, the argument has
more force.   It is true that, at the time of the bellwether trial
in 2006, most TPPs had not changed their pricing benchmarks even
after Medicare developed a new pricing standard -- the average
sales price ("ASP") --  the previous year in 2005.   <u>See</u> <u>id.</u> at
45-46.   However, defendants' argument erroneously conflates the
issue of reliance with the issue of causation.   In the pre-2005
time period, the undisputed evidence at the bench trial was that
TPPs did not have access to the confidential drug pricing data
necessary to calculate an alternative drug pricing benchmark even
if they had known about the spread.   <u>See</u> <u>id.</u> at 89-90 ("TPPs do
not seek cost data because, with respect to most of the drugs at
issue in the litigation, there was no readily available market

data providing physicians' costs that could be gleaned from
commercial services. . . . The pricing of specialty drugs was
complex, opaque, and confusing.") (footnote omitted).  Therefore,
even if TPPs had different degrees of knowledge about the mega-
spreads, they could not have changed the pricing paradigm
unilaterally.  In the bench trial, I found:

> The TPPs' failure to react when they received true data
> about actual acquisition costs is better explained by the
> insurmountable barrier to devising an alternative system.
> Even after it became clear . . . that there were mega-
> spreads . . ., it was not feasible for each TPP to devise
> its own ASP system either by doing its own survey of drug
> pricing, or by developing a pragmatic pricing methodology to
> handle the millions of annual drug transactions when there
> were different prices per NDC and per dose.  Significantly,
> it took three years for Medicare to devise an alternative
> pricing structure, because of the complexity of
> simultaneously increasing the prices paid for physician
> services.

Id. at 91.  With respect to the post-2005 time period, the
evidence at trial was sparse and evolving as to what adjustments
were made once true pricing data was available in the
marketplace.

Defendants also argue that causation standards differ,
noting that some jurisdictions distinguish between "but for" and
"proximate causation."  However, they have not demonstrated how
this distinction would make a difference in this case where the
classes are comprised of TPPs and consumers that reimbursed or
made payments based on AWP.  If the published AWPs had been
lower, there is no dispute that plaintiffs would have foreseeably
paid less in both classes.  Accordingly, individualized fact
issues regarding causation do not predominate in the relevant

time period.

**6. <u>Affirmative Defenses</u>**

Defendants argue there is substantial variation among the statutes of limitations under the various UDTPAs.  In addition, states vary with respect to the "discovery rule[21]" and the doctrines of "fraudulent concealment," "equitable tolling" and "equitable estoppel."[22]

This Court found after the 2006 trial that "in August of 1997 .

---

[21]Plaintiffs claim that some version of the discovery rule applies or likely applies in the following states: Arizona; Arkansas; Colorado; Delaware; D.C.; Hawaii; Illinois; Kansas; Maryland; Michigan; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; North Carolina; North Dakota; Oklahoma; Rhode Island; South Dakota; Texas; Vermont; Washington; West Virginia; and Wyoming.  For instance, New Hampshire's statute of limitations incorporates the discovery rule, prohibiting actions based on transactions "entered into more than 3 years prior to the time the plaintiff knew, or reasonably should have known, of the conduct alleged to be in violation of this chapter[.]"  N.H. Rev. Stat. Ann. § 358-A:3(IV-a).  Plaintiffs concede that the discovery rule does not apply or likely does not apply in the following states: Connecticut; Florida; Idaho; Minnesota; and New York.

[22]Plaintiffs claim that the following states recognize some form of fraudulent concealment, equitable tolling or equitable estoppel: Colorado; Idaho; Minnesota; New York; and Texas.  <u>See, e.g.</u>, <u>Wild v. Rarig</u>, 234 N.W.2d 775, 795 (Minn. 1975) ("[F]or most causes of action fraudulent concealment of the existence of a cause of action will toll the statute of limitations, postponing the commencement of the running of the statute until discovery or reasonable opportunity for discovery of the fact by the exercise of ordinary diligence.").  Some states recognize the related doctrine of equitable estoppel, which may be "applicable where the plaintiff knew of the existence of the cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit.  Equitable tolling . . . is applicable where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action."  <u>Kotlyarsky v. New York Post</u>, 757 N.Y.S.2d 703, 707 (N.Y. Sup. Ct. 2003) (citations omitted).

. . sufficient facts were available for [Blue Cross / Blue Shield of Massachusetts] and any similarly situated large TPP to discern the basis for both" the Medigap and Non-Medicare Class claims. In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d at 79.  There was evidence that some TPPs ran managed health plans or had consultants and therefore should reasonably have discovered that the actual acquisition cost of the physician-administered drugs for managed health plans was below the AWP before 1997.  However, it was hotly disputed during the first trial whether this knowledge put such TPPs on notice that individual physicians (as opposed to managed care plans) were getting such low prices for the drugs.  See id. at 40 ("While some TPPs had staff model HMOs which purchased [physician-administered drugs], knowledge about discounts given to bulk purchasers like HMOs did not provide a transparent picture of average prices charged to other classes of trade like physicians or physician groups.").

Because of the Massachusetts statute of limitations, the Court did not have to determine whether the reasonable discovery rule was triggered earlier for the most sophisticated TPPs.  Here, the Court must determine whether individual fact and legal issues are likely to predominate over common ones when the state statute of limitations is longer.  The following relevant states appear to have statutes of limitations longer than Massachusetts' four-year statute: Arkansas (five years); Maine (six years); Michigan (six years); Minnesota (six years); Missouri (five years); New Jersey

43

(six years); North Dakota (six years); Rhode Island (ten years);
and Vermont (six years).

"[W]hen one or more of the central issues in the action are
common to the class and can be said to predominate, the action
may be considered proper under Rule 23(b)(3) even though other
important matters will have to be tried separately, such as
damages or some affirmative defenses peculiar to some individual
class members."  7AA Charles Alan Wright, Arthur R. Miller & Mary
Kay Kane, <u>Federal Practice & Procedure</u> § 1778 (3d ed. 2005)
(footnotes omitted).  Individual issues that arise as a result of
affirmative defenses do not necessarily defeat class
certification.  <u>See</u> <u>Smilow v. Sw. Bell Mobile Sys., Inc.</u>, 323
F.3d 32, 39-40 (1st Cir. 2003).  "Although a necessity for
individualized statute-of-limitations determinations invariably
weighs against class certification under Rule 23(b)(3), we reject
any per se rule that treats the presence of such issues as an
automatic disqualifier. . . . As long as a sufficient
constellation of common issues binds class members together,
variations in the sources and application of statutes of
limitations will not automatically foreclose class certification
under Rule 23(b)(3)."  <u>Mowbray</u>, 208 F.3d at 296.  This Court must
consider affirmative defenses as relevant to the predominance
question and engage in a meaningful inquiry into their potential
applicability.  <u>See</u> <u>id.</u> at 297.

I agree with defendants that separate trials would be
necessary for the TPPs that had an HMO or specialty pharmacy in

order to determine when the statute of limitations began to run under the discovery rule in the pre-1997 time period. There is no record evidence as to how many TPPs would be affected. These issues took a huge amount of time and resources during the bellwether trial. When the factual issues relating to the affirmative defenses are combined with different legal standards for affirmative defenses and different statutes of limitations, I find that these individual factual and legal issues will predominate over the common ones, and decline to certify the classes prior to the start of the relevant state statute of limitations.

Defendants also assert other possible affirmative defenses, but poorly brief their applicability. The so-called voluntary payment doctrine seems inapplicable. See Randazzo v. Harris Bank Palatine, N.A., 262 F.3d 663, 667-68 (7th Cir. 2001). Defendants mention, in passing, comparative fault but do not explain how it is applicable in a deception case. Finally, defendants raise mitigation as a defense under some UDTPAs, but poorly develop the issue. See, e.g., Gunn Infiniti, Inc. v. O'Byrne, 996 S.W.2d 854, 857 (Tex. 1999) (holding that state law requires a claimant to mitigate damages if it could do so with "trifling expense or with reasonable exertions") (internal quotation marks omitted). While I agree mitigation would be a likely defense after the MMA passed and the ASPs were developed (and thus after the class period), defendants, who have the burden, have not shown how it is applicable before then.

45

**7.** **Damages**

Defendants also contend that whether or not each plaintiff suffered damages at all must be resolved by examining whether each such plaintiff reimbursed or paid based on AWP. This is a red herring as AWP was a virtually universal benchmark. While there were exceptions, they were atypical and could be carved out in the individualized damage calculus. These individualized issues, defendants claim, will overwhelm common issues if the class were to be certified. However, "[w]here common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain, for the individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)." In re Neurontin Mktg. & Sale Practices Litig., 244 F.R.D. 89, 108 (D. Mass. 2007) (internal quotation marks omitted). See generally New Motor Vehicles, 522 F.3d at 28 ("Predominance is not defeated by individual damages questions as long as liability is still subject to common proof. This is because the class action can be limited to the question of liability, leaving damages for later individualized determinations.") (citations omitted); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (affirming RICO class certification and suggesting procedural mechanisms available at a later stage to cope with individual damages issues).

Defendants argue that the Non-Medicare Class cannot be

certified because it is not possible to calculate aggregate damages for this class.  This Court concluded in the 2006 trial that certain damages could be reasonably calculated on a class-wide basis: "Given my adoption of Dr. Hartman's basic methodology for determining liability and damages, I further find that his calculation of aggregate damages for the class is sufficiently reliable and reject defendants' argument that aggregate damages are inappropriate on this record."  In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d at 93.

### VI.   CLASS CERTIFICATION FACTORS - RULE 23(a)

#### a.   Commonality/Numerosity

Now that the variations in the state UDTPAs have been analyzed and sorted, I return to the remaining class certification factors.  Plaintiffs easily satisfy the requirement of numerosity as there are more than 11,000 TPPs nationwide and substantially more consumers.  See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 65.  Defendants do not contest this point.  Plaintiffs also satisfy the non-onerous commonality requirement of Rule 23(a).  With respect to the Medigap Class, I have defined the term AWP under the statute, and it will be a common legal ruling that AstraZeneca's AWPs are not the actual average wholesale prices.  With respect to BMS, common factual issues include whether the AWPs and wholesale list prices for the subject drugs are false.  Other common questions in the Medigap Class include whether such misrepresentations were knowing and intentional; whether the reporting of the prices was

"unfair"; and whether these misrepresentations caused plaintiffs harm during the class period.  The question of reliance in the Medigap Class will involve the largely undisputed common question of whether the contracts for Medigap insurance are based on AWP. The common questions of fact and of law easily predominate.

With respect to the Non-Medicare Class, common questions include: whether there is a common meaning of AWP in the industry; whether the wholesale list prices were misrepresentations; whether the misrepresentations were knowing and intentional; whether the reporting of the prices was "unfair"; and whether these misrepresentations caused plaintiffs harm during the class period.  With the exception of the statutes that require individualized determinations of reliance, the common legal and individual issues predominate during the class period.

### b.  <u>Typicality/Adequacy</u>

Defendants argue that plaintiffs have not met the typicality or adequacy requirements.  Class representatives must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997).  In a multi-state class, the caselaw does not create a per se rule that the Court must appoint a separate representative for each state or even each group.  <u>See, e.g.</u>, <u>In re Relafen Antitrust Litig.</u>, 221 F.R.D. 260, 266-70 (D. Mass.

48

2004).  There is no substantial conflict of interest between the three state groupings which would necessitate a class representative from each group.

**1. BMS Challenges**

BMS argues that United Food and Commercial Workers Unions and Employees Midwest Health Benefits Fund ("UFCW") cannot be a class representative for the Medigap Class because it did not make co-payments under Medicare Part B.  However, plaintiffs have presented evidence that UFCW did make co-payments under Medicare Part B.  (Daniel W. Ryan Aff. ¶ 4, Docket. No. 1248.)  This Court has already addressed this issue in certifying the Massachusetts class of TPPs that pay MediGap supplemental insurance for co-payments made by Medicare Part B beneficiaries in 2005: "While defendants argue that UFCW does not pay the full 20% coinsurance payment in all cases, UFCW's underlying legal theory and its motivations are similar to those of the other TPP class members that make full payments.  Thus, I find that UFCW meets the typicality and adequacy requirements."  In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 86.  Accordingly, I find it is an adequate class representative for the Medigap Class.  UFCW is also a proposed representative with respect to the Non-Medicare Class.  As plaintiffs have produced evidence that it made payments based on AWP, I find it is an adequate class representative for the Non-Medicare Class for BMS drugs.

BMS argues that three of the six proposed Non-Medicare Class TPP representatives -- Board of Trustees of Carpenters and

Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV"),
Philadelphia Federation of Teachers Health and Welfare Fund
("PFTHWF") and Man-U-Service Contract Trust Fund ("Man-U") --
have failed to provide documentation to show that they made
payments for any drugs at issue.  Plaintiffs have withdrawn
PFTHWF and Man-U as proposed class representatives for claims
again AstraZeneca and BMS.  However, plaintiffs have produced
claims data showing CMHV payments for Cytoxan and Vepesid.
Although the Court did not find Non-Medicare Class damages for
these drugs in the Massachusetts-only bellwether trial,
plaintiffs contend there was sufficient evidence for a jury to
come to a different conclusion.  Although I reserve the right to
direct the verdict at the close of plaintiffs' case, I find CMHV
has a sufficient stake to be an adequate TPP class
representative.

     BMS also challenges the adequacy of Teamsters Health &
Welfare Fund of Philadelphia and Vicinity ("THWF") on the ground
that it produced a small amount of undated physician-administered
claims data that made it "impossible to tell if it made payments
for Taxol during the appropriate time period." (Docket No. 4979,
 20.)  Plaintiffs respond that THWF has produced claims data
showing that it paid for four of the BMS drugs at issue:  Taxol,
Vepesid, carboplatin and Cytoxan.  The claims data indicate that
THWF made payments for Vepesid, carboplatin and Cytoxan.
Defendants appear to concede that there is evidence that THWF did
pay for Taxol. (Docket No. 4979 20.)  As such, I find THWF is an

adequate class representative for the BMS drugs at issue.[23]

BMS challenges most of the 14 individual consumer Non-Medicare Class representatives who made payments for the BMS drugs at issue in this case (primarily Cytoxan and Rubex), explaining that this Court, after the bellwether trial, limited BMS' damages liability for the Non-Medicare Class to sales of Taxol for a six-month period in 2001.  BMS acknowledges that Joyce Dison did pay for a BMS drug for which damage liability was found.  However, BMS has presented evidence showing that Dison did not pay for the Taxol herself because her insurance covered it completely, which BMS claims undermines her adequacy as a class representative.  See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 80-81 ("Arguably, class representatives who were fully reimbursed suffered no injury.")  However, Ms. Dison appears to have paid for Cytoxan and Rubex, which are also at issue in this litigation.  In addition, the named TPPs that are found to be adequate representatives can also be adequate class representatives for the consumers who have made

_____

[23] In any event, there is no requirement that a class representative purchase all the drugs at issue to be adequate. See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 80 (with respect to a class of Medicare Part B beneficiaries, "[p]laintiffs must establish that there is an individual class representative with standing to sue each defendant."); see also In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. at 230 (with respect to the Medicare Part B Co-Payment Class, "[t]he Court certifies four Subclasses corresponding to each of the defendant groups. . . . The Court certifies the following plaintiffs as representatives of these Subclasses pursuant to Fed. R. Civ. P. 23(b)(3). . . . The representative of a Subclass need only have paid for one of the Subject Drugs manufactured or marketed by a defendant group.")

co-insurance payments.  Defendants have not shown any conflict of interest between the TPPs and consumers in the Non-Medicare Class, both of whom share the same stake in the issues.

Lastly, BMS challenges Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") on the ground that it has not demonstrated it made payments for Taxol based on AWP. Plaintiffs have submitted evidence that PMBT reimbursed for Taxol during the period that Taxol was a single source drug, (Docket No. 5034 Ex. 2) and that PMBT generally reimbursed based on AWP (Docket No. 1247 2).  The concern is that the affidavit saying that PMBT generally reimbursed based on AWP does not mention Taxol (Docket No. 1247 Ex. A), and the claims data submitted by plaintiffs are not completely clear.  Thus, BMS is correct that there does not appear to be documentation indicating or an affidavit expressly stating that PMBT reimbursed for Taxol based on AWP.  However, because there is evidence that PMBT paid for other drugs at issue (Docket No. 1247 Ex. A), I will not exclude PMBT as a class representative on this record.

Another problem with the designation of PMBT as a class representative is that the Supreme Court of Tennessee has recently determined that the Tennessee Consumer Protection Act "does not provide for class certification of claims brought thereunder." Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 313 (Tenn. 2008).  PMBT is therefore precluded from serving as a class representative unless it reimbursed for purchases out of state.  Plaintiffs may make a proffer on both

issues within 30 days if they press PMBT as a class representative.

Proposed Non-Medicare Class representative Regina Shoemaker is a resident of Indiana, residents of which are excluded from both classes.  Ms. Shoemaker is therefore precluded from serving as a representative of the Non-Medicare Class.

### 2.  **AstraZeneca Challenges**

AstraZeneca argues that UFCW and Sheet Metal Workers National Health Fund ("SMW Health Fund") are inadequate Medigap Class representatives for TPPs from states "with legal requirements of varying stringency."  (Docket No. 4981 18.) AstraZeneca has not persuasively demonstrated a conflict of interest between the relevant groupings based on the differences between various UDTPAs.  The main "stringency" difference highlighted by defendants involves the requirement in some state statutes that a plaintiff prove reliance as an element of the UDTPA.  The Court has declined to certify the Non-Medicare Class under these statutes.  As explained above, this Court has found that, as a matter of law, the TPP plaintiffs in the Medigap Class were required to rely on AWP.  For this reason, differing levels of "stringency" in the relevant statutes are largely irrelevant.

With respect to the Non-Medicare Class, AstraZeneca argues that Ms. Wessels is not typical because she paid for Zoladex no earlier than mid-2004 and is differently situated from plaintiffs with the stronger pre-2004 claims.  I agree and find that she is not an adequate class representative.

I find there are no conflicts between the TPPs and the consumers who are beneficiaries of TPP plans.   In circumstances similar to these, I have ruled that TPPs may represent the interests of consumers in the Non-Medicare Class.   See In re Pharm. Indus. Average Wholesale Price Litig., 233 F.R.D. at 231. In analyzing proposed class representatives in my prior certification decision, I noted, "Unlike in the Medicare Part B context, here the TPP serves as the intermediary for its plan beneficiaries in negotiating with providers over reimbursement rates, and no conflict is immediately apparent."   In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 87 n.25. Thus, TPPs can be adequate representatives for the consumer members of the Non-Medicare Class.

AstraZeneca challenges CMHV's adequacy because its third-party administrator knew that AWP was "only a benchmark" as early as 1993.   (Docket No. 4981 19.)   This argument is without merit. Plaintiffs concede that AWP was a near-universal benchmark for drug reimbursement and that the typical TPP understood there was up to a thirty-percent "yardstick" or "spread" between AWP and the actual acquisition cost.   However, AstraZeneca does not present evidence that CMHV, its third-party administrator or the typical TPP had any knowledge about the mega-spreads at issue in this litigation at this time.

A tougher challenge is to the adequacy of THWF, which paid for Zoladex.   The Court has declined to certify the Non-Medicare Class under Pennsylvania law, which requires proof of reliance,

but has certified this class under New Jersey law, which does
not.  A representative of THWF has represented, by affidavit
(Docket No. 1032 2), that THWF's participants and beneficiaries
made purchases of defendants' drugs in, among other states,
neighboring New Jersey and Delaware.  Accordingly, I find THWF to
be an adequate class representative.

AstraZeneca contends that not only have plaintiffs neither
briefed nor satisfied the requirements for injunctive relief, any
alleged need for injunctive relief has become moot.  This Court
agrees and declines to certify Health Care for All as the
representative for the Non-Medicare Class pursuant to Fed. R.
Civ. P. 23(b)(2).

### c. Class Timing

The class period ends on December 8, 2003.  See In re
Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d at
44 ("Congress took action with the passage of the Medicare
Prescription Drug, Improvement and Modernization Act of 2003 . .
. with an effective date of December 8, 2003. . . . The class
period ends the day the MMA went into effect.") (citations and
footnotes omitted).

The start date varies with the statute of limitations in each
state.  However, no start date will be earlier than 1992 when the
Medicare regulations first reimbursed based on AWP.  See id. at
34.

### VII.   PREDOMINANCE / SUPERIORITY

The Court finds that questions of law and fact common to

class members during the period of time and under the state laws specified above predominate over any questions affecting individual members.  I must now address superiority.  Pursuant to Fed. R. Civ. P. 23(b)(3), a class may be certified only if the Court finds "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Important factors to consider include: "(a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  "While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 617 (1997) (internal quotation marks omitted).

Three of the four superiority factors weigh in favor of a class certification.  With respect to the "extent and nature" of the litigation, this has been the seven years' war.  This hard-fought, costly multi-district litigation involves a highly complex system for reimbursement for drugs and some of the finest

lawyers in the country.  As a result of presiding over the MDL,
this Court has experience with these Kafka-esque and opaque drug
pricing issues that few other courts currently do.  In multi-
district litigation, "the transferee judge gains a solid
understanding of the case, and it makes sense for trial to be
conducted by the judge with the greatest understanding of the
litigation[.]"  Manual for Complex Litigation, Fourth § 20.132,
p. 223 (2004) (discussing the reasons behind the pre-1998 policy
of multi-district litigation proceedings often remaining in the
transferee district for trial).  A national class action under
state laws with similar standards is superior to the other
option: dividing up this monster case, certifying thirty-plus
separate class actions and forcing the same TPP plaintiffs,
defendants, expert and fact witnesses and multiple courts to try
this case over thirty times in states that have substantially
similar standards.  A national class action will save substantial
judicial and party resources.  In my view, it is desirable to
concentrate the litigation of these claims in one forum.

     The Court must also consider the class members' interests in
individually controlling the prosecution or defense of separate
actions.  This case involves approximately 11,000 TPPs, many of
which are small Taft-Hartley plans without the resources to
litigate in hard fought battles with the pharmaceutical
manufacturers.  It is true that many TPPs (such as Aetna, Cigna,
and the Blue Cross / Blue Shield companies) have the financial
resources and incentives to try this case on their own in

multiple states, but, in this Court's experience with this and
other pharmaceutical litigation, those TPPs that prefer to pilot
their own litigation tend to opt out and litigate or settle
independently, leaving the smaller TPPs to fend for themselves.

    That said, manageability of this case will be difficult.  It
is little wonder that the most courts have rejected efforts to
certify multi-state class actions because of the daunting and
time-consuming challenge of ensuring that each state's laws are
correctly and faithfully followed.  See, e.g., In re
Bridgestone/Firestone, Inc., 288 F.3d 1012, 1020 (7th Cir. 2002)
(pointing out that the so-called "central planning model keeps
the litigation far away from state courts.")  Reasonable minds
could differ on balancing the superiority factors in this case.
The "carve-up-the-monster" option would involve certifying a
separate statewide class under each state UDTPA and remanding
each class to the appropriate district court.  Obviously, this
approach would have the advantage of increasing the manageability
of the trial because the district court judge in each forum would
be better placed than I am to interpret the state's UDTPA.  For
example, the caselaw in Illinois and California on the reliance
issue is quite difficult and evolving.  This state-by-state
approach would also allow the unsettled questions of state law at
issue to be resolved by federal appellate courts more familiar
with these laws.

    In any event, having closely studied the statutes and weeded
out the ones with substantially different standards, and achieved

an understanding of the factual disputes involved here, I conclude that a class action is superior to individual actions, and that certifying a multi-state class action is superior to my other option of certifying more than thirty separate class actions.

### VIII.   DESPERANTO: THE SEVENTH AMENDMENT CHALLENGE

AstraZeneca raises a Seventh Amendment challenge to the Court's methodology of trying a bellwether bench trial under Mass. Gen. Laws ch. 93A, after the Court denied without prejudice the motion to certify national classes.  AstraZeneca laments: "If the national classes, triable by jury, were conceivably certifiable in 2005, then denying certification but sua sponte creating and trying the non-jury Massachusetts class structurally infringed upon AstraZeneca's right to have a jury's factual determinations control the Massachusetts class action."  (Docket No. 4981 1.)

The argument is fundamentally flawed. With respect to the Massachusetts class, there is no viable Seventh Amendment claim. Under Chapter 93A, it is well established that a judge's independent findings may be contrary to those found by the jury given the equitable nature of the relief.  See generally Prof'l Servs. Group, Inc. v. Town of Rockland, 515 F. Supp. 2d 179, 195-196 (D. Mass. 2007).

Moreover, in the context of multi-district litigation, the Manual for Complex Litigation describes some of the benefits resulting from bellwether trials.  See Manual for Complex Litigation, Fourth §§ 22.314, 22.315, p. 358-60 (2004).  Many

59

circuits now actually require a trial court to make non-binding findings regarding factual disputes in order to rule on class certification issues.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 24 (1st Cir. 2008).  Even in circuits where findings are not required, district courts may be required to conduct thorough inquiries regarding Rule 23 criteria when class criteria and merits determinations overlap.  See id. at 24-25.  I reject the Seventh Amendment challenge.

## ORDER

   I **ALLOW** the motion for class certification [Docket No. 4902] and  certify two classes consistent with this opinion under the state statutes listed in Appendices A and B.  Plaintiffs shall prepare a class certification order consistent with this decision.

                                        **S/PATTI B. SARIS**
                                        UNITED STATES DISTRICT JUDGE

60

## Appendix A

**Class 2: Third-Party Payor MediGap Supplemental Insurance Class:**

All Third-Party Payors who made reimbursements for drugs based on AWP for a Medicare Part B covered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.) or the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.).

This class is subdivided into two subclasses corresponding to each defendant group.

The class will be certified pursuant to the following statutes:

(a) Ariz. Rev. Stat. § 44-1521, _et seq._; (b) Ark. Code Ann. § 4-88-101, _et seq._; (c) Cal. Bus. & Prof. Code § 17200, _et seq._; (d) Colo. Rev. Stat. § 6-1-101, _et seq._; (e) Conn. Gen. Stat. § 42-110a, _et seq._; (f) Del. Code Ann. tit. 6, § 2511, _et seq._; (g) Fla. Stat. § 501.201, _et seq._; (h) Idaho Code Ann. § 48-601, _et seq._; (i) 815 Ill. Comp. Stat. § 505/1, _et seq._; (j) Me. Rev. Stat. Ann. tit. 5, § 205-A, _et seq._; (k) Minn. Stat. § 325F.68, _et seq._; (l) Neb. Rev. Stat. § 59-1601, _et seq._; (m) Nev. Rev. Stat. § 598.0903, _et seq._; (n) N.H. Rev. Stat. Ann. § 358-A:1, _et seq._; (o) N.J. Stat. Ann. § 56:8-1, _et seq._; (p) N.M. Stat. § 57-12-1, _et seq._; (q) N.Y. Gen. Bus. Law § 349, _et seq._; (r) N.C. Gen. Stat. § 75-1.1, _et seq._; (s) N.D. Cent. Code § 51-15-01, _et seq._; (t) S.D. Codified Laws § 37-24-1, _et seq._; (u) Tex. Bus. & Com. Code § 17.41, _et seq._ (but only to the extent the TPP has assets less than $25 million); (v) Vt. Stat. Ann. tit. 9, § 2451, _et seq._; (w) Wash. Rev. Code § 19.86.010, _et seq._; and (x) Wyo. Stat. Ann. § 40-12-101, _et seq._.

## Appendix B

**Class 3: Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context:**

All natural persons who made, or who incurred an obligation enforceable at the time of judgment to make, a payment for a physician-administered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.) or the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.); and all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard for a physician-administered Subject Drug that was manufactured by AstraZeneca or the BMS Group. Included within this Class are natural persons who paid coinsurance (i.e., co-payments proportional to the reimbursed amount) for a Subject Drug, where such coinsurance was based upon use of AWP as a pricing standard. Excluded from this Class are any payments or reimbursements for generic drugs that are based on MAC and not AWP.

This class is subdivided into two subclasses corresponding to each defendant group.

The class will be certified pursuant to the following statutes:

(a) Ark. Code Ann. § 4-88-101, <u>et</u> <u>seq.</u>; (b) Colo. Rev. Stat. § 6-1-101, <u>et</u> <u>seq.</u>; (c) Conn. Gen. Stat. § 42-110a, <u>et</u> <u>seq.</u>; (d) Del. Code Ann. tit. 6, § 2511, <u>et</u> <u>seq.</u>; (e) Fla. Stat. § 501.201, <u>et</u> <u>seq.</u>; (f) Idaho Code Ann. § 48-601, <u>et</u> <u>seq.</u>; (g) 815 Ill. Comp. Stat. § 505/1, <u>et</u> <u>seq.</u>; (h) Me. Rev. Stat. Ann. tit. 5, § 205-A, <u>et</u> <u>seq.</u>; (i) Minn. Stat. § 325F.68, <u>et</u> <u>seq.</u>; (j) Neb. Rev. Stat. § 59-1601, <u>et</u> <u>seq.</u>; (k) Nev. Rev. Stat. § 598.0903, <u>et</u> <u>seq.</u>; (l) N.H. Rev. Stat. Ann. § 358-A:1, <u>et</u> <u>seq.</u>; (m) N.J. Stat. Ann. § 56:8-1, <u>et</u> <u>seq.</u>; (n) N.M. Stat. § 57-12-1, <u>et</u> <u>seq.</u>; (o) N.Y. Gen. Bus. Law § 349, <u>et</u> <u>seq.</u>; (p) N.D. Cent. Code § 51-15-01, <u>et</u> <u>seq.</u>; (q) Tex. Bus. & Com. Code § 17.41, <u>et</u> <u>seq.</u> (but only to the extent the TPP has assets less than $25 million); (r) Vt. Stat. Ann. tit. 9, § 2451, <u>et</u> <u>seq.</u>; and (s) Wash. Rev. Code § 19.86.010, <u>et</u> <u>seq.</u>

In addition, a consumer subclass will be certified under the following consumer protection acts, which do not afford a legal remedy to commercial entities like TPPs: (a) D.C. Code § 28-3901, <u>et</u> <u>seq.</u>; (b) Haw. Rev. Stat. § 480-1, <u>et</u> <u>seq.</u>; (c) Kan. Stat. Ann. § 50-623, <u>et</u> <u>seq.</u>; (d) Mich. Stat. § 445.901, <u>et</u> <u>seq.</u>; (e) Mo. Rev. Stat. § 407.010, <u>et</u> <u>seq.</u>;  (f) Okla. Stat. tit. 15, § 751, <u>et</u> <u>seq.</u>; (g) R.I. Gen. Laws § 6-13.1-1, <u>et</u> <u>seq.</u>; and (h) W.

Va. Code § 46A-6-101, <u>et seq.</u>[24]

---

[24]There is language in West Virginia's UDTPA that indicates that West Virginia may need to be included in the consumer subclass because its UDTPA does not afford legal protection to commercial entities. <u>See</u> W. Va. Code § 46A-6-102(2) ("'Consumer' means a natural person to whom a sale or lease is made in a consumer transaction and a 'consumer transaction' means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose."). In light of this statutory language and the lack of caselaw that is directly on point, this Court will include West Virginia in the consumer subclass.

APPENDIX C

Connecticut (Conn. Gen. Stat. § 42-110b(a) ("No person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce.")); Florida (Fla. Stat. § 501.204(1) ("unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.")); Hawaii (Haw. Rev. Stat. § 480-2(a) ("unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.")); Illinois (815 Ill. Comp. Stat. § 505/2 ("unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful")); Maine (Me. Rev. Stat. tit. 5, § 207 ("unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.")); Maryland (Md. Code Com. Law § 13-303(1) ("A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale . . . of any consumer goods")); Md. Code Com. Law § 13-301 ("Unfair or deceptive trade practices include any: . . . (1) False, falsely disparaging, or misleading oral or written statement...(9) Deception, fraud, false pretense, false premise, misrepresentation...in connection with: (I) The . . . sale of any consumer goods")); Nebraska[25] (Neb. Rev. Stat. § 59-1602 ("unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.")); New Hampshire (N.H. Rev. Stat. § 358-A:2 ("It shall be unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state.")); North Carolina[26] (N.C. Gen. Stat. § 75-1.1(a) ("unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.")); Oklahoma (Okla. Stat. tit. 15, § 753(20) ("A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act . . . when, in the course of the person's business, the person: . . . (20) Commits an unfair or deceptive trade practice as defined in Section 752 of this title")); Rhode Island (R.I. Gen. Laws § 6-13.1-2 ("unfair or deceptive acts or practices in

_____

[25] Illinois and Nebraska require a bench trial on the UDTPA claims.

[26] Under North Carolina law, whether the defendant committed the alleged acts is a question of fact for the jury, but whether the proven facts constitute an unfair or deceptive trade practice is a question of law for the court. See United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 389 (N.C. 1988) ("under N.C.G.S. § 75-1.1, it is a question for the jury as to whether the defendants committed the alleged acts, and then it is a question of law for the court as to whether these proven facts constitute an unfair or deceptive trade practice.").

the conduct of any trade or commerce are declared unlawful.")); R.I. Gen. Laws § 6-13.1-1(6) ("'unfair or deceptive acts or practices' means any one or more of the following: . . . (xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding; (xiii) Engaging in any act or practice that is unfair or deceptive to the consumer; (xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect")); Vermont (Vt. Stat. Ann. tit. 9, § 2453(a) ("unfair or deceptive acts or practices in commerce, are hereby declared unlawful.")); Washington (Wash. Rev. Code § 19.86.020 ("unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.")); West Virginia (W. Va. Code § 46A-6-104 ("unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.")); and Wyoming (Wyo. Stat. § 40-12-105(a)(xv) ("A person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly: . . . (xv) Engages in unfair or deceptive acts or practices.")).

APPENDIX D

Arizona (Ariz. Rev. Stat. § 44-1522(A) ("The act, use or
employment by any person of any deception, deceptive act or
practice, fraud, false pretense, false promise, misrepresentation
. . . in connection with the sale or advertisement of any
merchandise . . . is declared to be an unlawful practice.""));
Arkansas (Ark. Code § 4-88-107(a)(10) ("Deceptive and
unconscionable trade practices made unlawful and prohibited by
this chapter include, but are not limited to: . . . (10) Engaging
in any other unconscionable, false, or deceptive act or practice
in business, commerce or trade"); Ark. Code § 4-88-108(1) ("When
utilized in connection with the sale or advertisement of any
goods, services, or charitable solicitation, the following shall
be unlawful: (1) The act, use or employment by any person of any
deception, fraud, or false pretense"); Colorado (Colo. Rev. Stat.
§ 6-1-105(1)(l) ("A person engages in a deceptive trade practice
when, in the course of such person's business, vocation, or
occupation, such person: . . . (l) Makes false or misleading
statements of fact concerning the price of goods, services, or
property or the reasons for, existence of, or amounts of price
reductions")); Delaware (Del. Code, tit. 6, § 2513(a) ("The act,
use or employment by any person of any deception, fraud, false
pretense, false promise, misrepresentation . . . in connection
with the sale, lease or advertisement of any merchandise . . . is
an unlawful practice.")); District of Columbia (D.C. Code § 28-
3904(e) ("It shall be a violation of this chapter . . . for any
person to: . . . (e) misrepresent as to a material fact which has
a tendency to mislead")); Idaho[27] (Idaho Code § 48-603(17) ("The
following . . . unfair or deceptive acts or practices in the
conduct of any trade or commerce are hereby declared to be
unlawful, where a person knows, or in the exercise of due care
should know, that he has in the past, or is: . . . (17) Engaging
in any act or practice which is otherwise misleading, false, or
deceptive to the consumer")); Kansas (Kan. Stat. § 50-626(a) ("No
supplier shall engage in any deceptive act or practice in
connection with a consumer transaction[;]" Kan. Stat. § 50-626(b)
("Deceptive acts and practices include, but are not limited to,
the following")); Michigan (Mich. Comp. Laws § 445.903(1)(bb)
("Unfair, unconscionable, or deceptive methods, acts, or
practices in the conduct of trade or commerce are unlawful and
are defined as follows: . . . (bb) Making a representation of
fact or statement of fact material to the transaction such that a
person reasonably believes the represented or suggested state of

---

[27]While Idaho's UDTPA refers to "unfair or deceptive acts or
practices[,]" its general prohibition refers to an enumerated
list of prohibited practices, instead of simply prohibiting all
unfair or deceptive practices.  For this reason, Idaho's UDTPA
has been excluded from the list of statutes that more closely
track the FTC Act.  <u>See</u> Idaho Code § 48-603.

affairs to be other than it actually is")); Minnesota (Minn. Stat. § 325F.69 subdiv. 1 ("The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice . . . in connection with the sale of any merchandise . . . is enjoinable as provided in section 325F.70.")); Nevada (Nev. Rev. Stat. § 598.0915 ("A person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he: . . . (13) Makes false or misleading statements of fact concerning the price of goods . . . for sale . . . (15) Knowingly makes any other false representation in a transaction")); New Jersey (N.J. Stat. Ann. § 56:8-2 ("The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice")); New Mexico (N.M. Stat. Ann. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful")); N.M. Stat. Ann. § 57-12-2(D) ('unfair or deceptive trade practice' means an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement . . . knowingly made in connection with the sale . . . of goods . . . which may, tends to or does deceive or mislead any person"); New York (N.Y. Gen. Bus. Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade or commerce. . . are hereby declared unlawful")); North Dakota (N.D. Cent. Code § 51-15-02 ("The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice.")); Oregon (Or. Rev. Stat. § 646.608(1)(s) ("A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods")); Pennsylvania (73 Pa. Cons. Stat. Ann. § 201-3 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (I) through (xxi) of clause (4) of section 2 of this act . . . are hereby declared unlawful.")); 73 Pa. Cons. Stat. Ann. § 201-2(4) ("'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following: . . . (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."); South Dakota (S.D. Codified Laws § 37-24-6(1) ("It is a deceptive act or practice for any person to:(1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise")).

APPENDIX E

Arkansas (Ark. Code § 4-88-107(10) ("Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following: . . . (10) "Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade")); Florida (Fla. Stat. § 501.204) ("unconscionable acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful.")); Idaho (Idaho Code § 48-603(18) ("The following . . . unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is: . . . (18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code")); Kansas (Kan. Stat. § 50-627(a) ("No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction.")); Kan. Stat. § 50-627(b) ("The unconscionability of an act or practice is a question for the court."); New Jersey (N.J. Stat. Ann. § 56:8-2) ("The act, use or employment by any person of any unconscionable commercial practice . . . in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice")); New Mexico (N.M. Stat. Ann. § 57-12-3 ("unconscionable trade practices in the conduct of any trade or commerce are unlawful")); N.M. Stat. Ann. § 57-12-2(E) ("'unconscionable trade practice' means an act or practice in connection with the sale . . . of any goods . . . which to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid."); and Texas (Tex. Bus. & Com. Code § 17.50(a)(3) ("A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (3) any unconscionable action or course of action by any person")); Tex. Bus. & Com. Code § 17.45(5) ("'Unconscionable action or course of action' means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.").

**APPENDIX F**

<u>Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn</u>, 907 P.2d
506, 518 (Ariz. Ct. App. 1995) (in a case involving legal
malpractice, setting forth the standard for punitive damages:
"[t]o recover punitive damages, a plaintiff must prove by clear
and convincing evidence that the defendant engaged in aggravated
and outrageous conduct with an evil mind.  A defendant acts with
the requisite evil mind when he intends to injure or defraud, or
deliberately interferes with the rights of others, consciously
disregarding the unjustifiable substantial risk of significant
harm to them." (citations and internal quotation marks omitted));
Ark. Code Ann. § 4-88-204 ("An elder or disabled person who
suffers damage or injury as a result of an offense or violation
described in this chapter has a cause of action to recover actual
damages, punitive damages, if appropriate, and reasonable
attorney's fees."); <u>Stein v. Lukas</u>, 823 S.W.2d 832, 834 (Ark.
1992) (in an action alleging deceit and breach of warranty,
"punitive damages are available in cases of misrepresentation or
deceit[;] . . . an award of punitive damages is justified only
where the evidence indicates that the defendant acted wantonly in
causing the injury or with such a conscious indifference to the
consequences that malice may be inferred." (citations omitted));
Cal. Civ. Code § 3294(a) ("In an action for the breach of an
obligation not arising from contract, where it is proven by clear
and convincing evidence that the defendant has been guilty of
oppression, fraud, or malice, the plaintiff, in addition to the
actual damages, may recover damages for the sake of example and
by way of punishing the defendant."); <u>Tackett v. State Farm Fire
& Cas. Ins. Co.</u>, 653 A.2d 254, 265 (Del. 1995) (in a case
involving a bad faith delay claim brought against insurer,
punitive damages should be imposed, in tort actions, "only after
a close examination of whether the defendant's conduct is
outrageous, because of evil motive or reckless indifference to
the rights of others. . . . Mere inadvertence, mistake or errors
of judgment which constitute mere negligence will not suffice.
It is not enough that a decision be wrong.  It must result from a
conscious indifference to the decision's foreseeable effect.")
(internal quotation marks omitted); <u>Stephenson v. Capano</u> <u>Dev.,
Inc.</u>, 462 A.2d 1069, 1076-77 (Del. 1983) ("If the fraud is gross,
oppressive, or aggravated, or where it involves breach of trust
or confidence, the plaintiff may recover punitive damages whether
he sues in tort or under the consumer fraud statute."); <u>Dist.
Cablevision Ltd. P'ship v. Bassin</u>, 828 A.2d 714, 725 (D.C. 2003)
("Punitive damages are...to be awarded only in cases of
outrageous or egregious wrongdoing where the defendant has acted
with evil motive, actual malice, or willful disregard for the
rights of the plaintiff."); Minn. Stat. Ann. § 549.20 Subdivision
1(a) (punitive damages are allowed "upon clear and convincing
evidence that the acts of the defendant show deliberate disregard
for the rights or safety of others."); and Nev. Rev. Stat. Ann. §
598.0977 ("If an elderly person or a person with a disability

suffers damage or injury as a result of a deceptive trade practice, he...may commence a civil action against any person who engaged in the practice to recover the actual damages suffered by the elderly person or person with a disability, punitive damages, if appropriate, and reasonable attorney's fees.").