| | | |
|---|---|---|
| **In re: Pharmaceutical Industry Average Wholesale Price Litigation** | : | MDL NO. 1456 |
| | : | Civil Action No. 01-12257-PBS |
| | : | |
| | : | |
| This Document relates to: | : | |
| | : | Judge Patti B. Saris |
| *The City of New York, et al* | : | |
| *v.* | : | |
| *Abbott Laboratories, Inc., et al.* | : | |
| | : | |
| | : | |

## RULE 26 STATEMENT OF HARRIS L. DEVOR

The following constitutes the Rule 26 Statement of Harris L. Devor (the "Statement") in the above-captioned litigation (the "Litigation").

## Table of Contents

| | | |
|---|---|---|
| I. | QUALIFICATIONS | 3 |
| II. | PRIOR TESTIMONY | 3 |
| III. | COMPENSATION | 3 |
| IV. | MATERIALS REVIEWED | 3 |
| V. | SCOPE OF ASSIGNMENT | 3 |
| VI. | SUMMARY OF FINDINGS | 4 |
| VII. | BACKGROUND | 5 |
| | Average Wholesale Price | 6 |
| | Wholesale Acquisition Cost | 6 |
| | Relationship between WAC and AWP | 7 |
| VIII. | DEFFENDANTS' PARTICIPATION IN THE STATE OF NEW YORK'S MEDICAID REIMBURSEMENT PROGRAM AND THE REPORTING OF WACs AND AWPs | 7 |
| | General Discussion Pertaining to the Transactional Data Provided by Defendants | 7 |
| | Summary of Defendant-Specific Discovery Relating to the Determination of WAC and AWP | 9 |
| | *Barr* | 9 |
| | *Dey* | 11 |
| | *Ethex* | 15 |
| | *Ivax* | 17 |
| | *Mylan* | 20 |
| | *Par* | 23 |
| | *Purepac* | 26 |
| | *Roxane* | 29 |
| | *Sandoz* | 31 |
| | *Warrick* | 34 |
| | *Teva* | 36 |
| | *Watson* | 40 |
| | *Wyeth* | 42 |
| IX. | COMPUTATIONS OF AWP AND WAC | 44 |
| | Data Obtained from Defendants | 44 |
| | Computation of Average WAC | 45 |
| | *Rolling 12-month Analysis* | 46 |
| | Computation of AWP | 48 |
| | *Rolling 12-month Analysis* | 49 |
| X. | AMP AND THE RELATIONSHIP TO FUL | 50 |

## I.   QUALIFICATIONS

1.      I am a Certified Public Accountant and a shareholder of the accounting firm of Shechtman Marks Devor PC ("SMD").   My professional experience since graduating from Temple University in 1973 has been as an accountant and auditor for large and small companies in a variety of industries.   I have lectured on various topics, including financial reporting to the Securities and Exchange Commission ("SEC"), accounting, auditing and statistical sampling, and have been retained by counsel and rendered opinions in a number of matters relating to the reporting of wholesale acquisition cost ("WAC") and average wholesale price ("AWP") by pharmaceutical manufacturers, for use by state Medicaid agencies.   A copy of my resume is attached to this Statement as Exhibit #1.

## II.   PRIOR TESTIMONY

2.      Expert testimony at trial or by deposition given by me in the past four years is described in Exhibit #2 to this Statement.

## III.   COMPENSATION

3.      SMD is compensated for services performed on an hourly basis at its applicable billing rates. My hourly rate is $550.

## IV.   MATERIALS REVIEWED

4.      As part of my analysis in connection with the preparation of this Statement, I, or my staff working under my supervision, have reviewed the data, documents and deposition testimony (either in their totality or for pertinent excerpts), including related exhibits, listed in Exhibit #3 to this Statement.

## V.   SCOPE OF ASSIGNMENT

5.      Counsel for Plaintiffs in the Litigation has asked that I compute, as of the end of each quarterly period beginning January 1, 1997 and ending December 31, 2005 (the "relevant timeframe"), an estimated measure of WAC and AWP that could have been computed and reported by Defendants for nine selected generic, non-innovator, multi-source pharmaceutical

products ("drugs"), based on transactional data provided to Counsel by Defendants. The prices I have computed represent estimated measures of average WACs and AWPs that, had similar computations been performed by Defendants using their own transactional data, could presumably have been used by Defendants for purposes of reporting supportable WACs and/or AWPs to the pharmaceutical pricing compendia that were used by state Medicaid agencies for purposes of claim reimbursement to pharmaceutical providers (to be described in more detail below).

6.     Accordingly, Counsel has also asked that I compute what is referred to as a Federal Upper Limit ("FUL"), a measure of the amount of reimbursement to be paid to a provider in connection with a particular drug and a measure that was used by, specifically, the State of New York and affiliated agencies for purposes of calculating reimbursement on Medicaid pharmacy claims during the relevant timeframe, for all drugs subject to a FUL.

7.     Additionally, Counsel has asked that I compute an estimate of FUL using Average Manufacturer Prices ("AMPs") data provided by the Defendants. Defendants were obligated, under federal statute and a governing Medicaid rebate agreement, to report AMPs to during the relevant timeframe.

VI.   **SUMMARY OF FINDINGS**

8.     Based upon the review of items listed in Exhibit #3 to this Statement and my analysis of the transactional data provided by Defendants, my computations of measures of WAC and AWP are summarized in Exhibits #5-17 to this Statement. Subject to the satisfactory completion of my testing procedures, the data demonstrates that the estimates of WAC and AWP I have computed, representing measures of WAC and AWP that could have been determined by the Defendants from their own transactional data and, accordingly, reported to the pricing compendia from which the Center for Medicare & Medicaid Services ("CMS"), the organization to which the State of New York looked for the prices at which it would reimburse Medicaid providers (to be described below), were lower than what was actually reported by Defendants and published by the pricing compendia during the relevant timeframe. Accordingly, the determination of a FUL by CMS would have been influenced, during the relevant timeframe, by what appear to have

4

been exaggerated prices, thereby having increased the cost of reimbursement incurred by the State of New York.

9.      I have also summarized my computations of FULs using the AMP data provided by Defendants in Exhibits to this Statement.

10.     I currently expect to present and explain the computations referred to above (and discussed and summarized both herein and in Exhibits #5-17 to this Statement) at trial. This Statement is based on evidence presented in the Litigation to date and provided to me by Counsel for the Plaintiffs.  Although computations of average prices have been performed, all of my testing of such has not been completed.  Thus, my analysis is ongoing and, to the extent additional discovery or facts become known to me or, if any errors are noted in my testing of the computations, I reserve the right to supplement and/or amend the computations discussed herein.

## VII.    BACKGROUND

11.     During the relevant timeframe, the State of New York maintained a program (the "New York Medicaid Reimbursement Program") for reimbursing "pharmacy providers," including all forms of licensed pharmacies such as retail pharmacies, chain pharmacies, specialty pharmacies, home infusion companies, long-term care pharmacies, out-patient clinic pharmacies, and any other enrolled pharmacy provider, for the dispensing and/or administering of drugs to Medicaid participants. (First Amended Consolidated Complaint ("FACC"), ¶ 107)

12.     The New York Medicaid reimbursement program employed a formula for reimbursing participant pharmacy providers at the FUL determined by CMS, whenever a FUL was in place. (N.Y. Soc. Serv. L. §367-a(9); FACC, ¶ 6)  CMS Regulations provided that the FUL was to be set at "150 percent of the published price for the least costly therapeutic equivalent (using all available national compendia) that can be purchased by pharmacist in quantities of 100 tablets or capsules (or, if the drug is not commonly available in quantities of 100, the package size commonly listed) or, in the case of liquids, the commonly listed size." (42 CFR § 447.332; FACC ¶13)  It is my understanding, however, based upon discovery in the Litigation, that CMS did not always set the FUL based on the lowest published price. (Gaston (January 24, 2008)

13.     During the relevant timeframe, that FUL was generally determined by CMS based upon the WACs and/or AWPs reported by Defendants and published by pricing compendia.[1]

14.     Each of the Defendants relating to whose products I have computed estimated measures of WAC and/or AWP participated in the New York Medicaid reimbursement program and, relating thereto, either directly or indirectly reported prices to the pricing compendia. As such, to the extent any, or each, of the Defendants manufactured a particular product and reported (and ultimately had published by the pricing compendia) a WAC or an AWP, the determination of a FUL or other measure for reimbursement by CMS for that drug was apparently impacted thereby.

**Average Wholesale Price**

15.     AWP is defined as an average price which a wholesaler (or distributor) would charge a pharmacy (or other provider) for a particular product. (FDB-AWP 28850)  The plain meaning definition of AWP proffered by the Honorable Patti B. Saris, United States District Judge (District of Massachusetts), in the Litigation, included recognition that the term "wholesale" (representing the middle word in the acronym) was defined as "of, relating to, or engaged in the sale of goods or commodities in quantity for resale." As noted above, AWP was considered by CMS in its determination of the FUL.

**Wholesale Acquisition Cost**

16.     WAC is defined as the price paid by a wholesaler (or distributor) to a manufacturer for the purchase of a particular product. (FDB-AWP 6290)  I have calculated a measure of WAC using the above definition and the Defendants' transactional data because, as noted above, WAC was considered by CMS in its determination of the FUL.

---

[1] It is my understanding, based upon discovery in the Litigation, that CMS did not always determine and set a FUL if, in certain instances, the calculated FUL would have been greater than all of the published AWPs for that drug. (Sexton (May 20, 2008), p. 59:16-22)

**Relationship between WAC and AWP**

17.   Because of the relationship between AWP and WAC, and the understanding that whereas WAC represents the price paid by wholesalers or distributors to the manufacturer for a particular product, AWP represents the price paid to the wholesaler or distributor by a provider of that product, normally AWP would be higher than WAC such that the wholesalers and distributors would profit from selling the products it had obtained from the manufacturers.  As indicated by my computations, however, the transactional data with which I was working did not always render an AWP that was greater than WAC for particular manufacturers and particular NDCs. [2] My computations, however, have been completed using nothing more than the data provided by Defendants and I have not, therefore, adjusted those calculations in any manner to reflect my presumed understanding of the relationship between WAC and AWP.

## VIII.   DEFENDANTS' PARTICIPATION IN THE STATE OF NEW YORK'S MEDICAID REIMBURSEMENT PROGRAM AND THE REPORTING OF WACs AND AWPs

### General Discussion Pertaining to the Transactional Data Provided by Defendants

18.   For each of the Defendants, I was provided electronic files, in various formats, constituting the transactional data for the particular NDCs addressed herein and for the relevant timeframe.  (Refer to Exhibit #4 to this Statement for a listing of the NDCs for which I have computed an estimated measure of WAC, AWP, and FUL.)  Once the data had been uploaded and adapted such that it was in a usable format, manufacturer-specific determinations and selections were made regarding particular transactions included therein, including consideration of the categories of customers, referred to as "classes of trade,"[3] with which the transactions had been effected.[4]  These factors were used in computing WAC and/or AWP, based on how the transactional data had been provided by each Defendant and other factors, to be discussed below.

---

[2] The acronym "NDC" is employed in the pharmaceutical industry and herein to represent a manufacturer-specific identifier of a particular drug product.

[3] The class of trade descriptions were unique to each manufacturer and to each manufacturer's transactional data, in some regard, but my understanding of the types of transactions that would be included in a determination of WAC allowed me to select, on a manufacturer-by-manufacturer basis, those classes of trade most pertinent to my computations.

[4] In certain instances, subsets of the Defendants' data was incomplete and/or inconsistent, both (a) internally within different transactional files provided by the Defendant and (b) when that data was compared externally to the data of other Defendants, with respect to class of trade designations on particular transactions,.  In those instances, I have used all of the data made available to me, from all Defendants, to determine the appropriate class of trade by which the subject transactions should have been classified for purposes of my computations, noting, specifically, that such steps were only necessary because of flaws and/or gaps in the data provided by Defendants.

Similarly, manufacturer-specific determinations and selections were made regarding how to treat sales/invoices, customer credits, customer rebates, and "chargebacks," a form of refund issued by the manufacturer to wholesalers and distributors that had sold the manufacturer's products at amounts less than that for which those wholesalers or distributors had purchased the product from the manufacturer, included within the transactional data. Again, subject to consideration of how the transactional data had been provided, each of those factors was considered such that each would properly be taken into consideration in computing average prices.[5]

19.    Many of the determinations made regarding which of the transactions presented in the Defendants' transactional data to include in my computations of WAC and AWP, and how to effect the impact of such transactions, were informed by my review of the discovery in this, or other similar and/or related, Litigation pertaining to the reporting of WACs and AWPs by drug manufacturers. Specifically, that discovery spoke to the Defendants' participation in the State of New York's Medicaid Reimbursement Program, how each Defendant determined WACs and AWPs during the relevant timeframe, and how that information was reported to the pricing compendia upon whom both CMS and, ultimately, the State of New York, relied for purposes of Medicaid reimbursement.

20.    I have computed average WACs or AWPs for NDCs from the following drug manufacturers, each of which participated in the New York Medicaid Reimbursement Program: Barr Pharmaceuticals, Inc. ("Barr"), Dey, Inc. ("Dey"), Ethex Corporation ("Ethex"), Ivax Corporation ("Ivax"), Mylan, Inc. ("Mylan"), Par Pharmaceutical Companies, Inc. ("Par"), Purepac Pharmaceutical Company (a division of Alpharma Pharmaceuticals, Inc.) ("Purepac"), Roxane Laboratories, Inc. (a division of Boehringer Ingelheim Pharmaceuticals, Inc.) ("Roxane"), Sandoz (a division of Novartis Pharmaceuticals, Inc.) ("Sandoz"), Warrick Pharmaceuticals, Inc. (a division of Schering AG) ("Warrick"), Teva Pharmaceutical Industries

---

[5] For example, based on the formula I have employed for purposes of computing average prices during the relevant timeframe, chargebacks were added to sales for purposes of my AWP computations, whereas credits and rebates were subtracted in the computation of both AWP and WAC. Because of that general formula, it was necessary, in certain instances, in order to capture the Defendants' transactional data fully and apply it properly, to adjust the positive/negative nature of particular fields to ensure that the formula was giving proper consideration to the data. Those adjustments were made on a manufacturer-by-manufacturer basis, dependent upon the orientation and nature (i.e., whether carried within the manufacturer's transactional data as a positive or a negative value) of the data provided.

Ltd. ("Teva"), Watson Pharmaceuticals, Inc. ("Watson") and Wyeth.[6] [Refer to Exhibit #4 to this Statement for a listing of the particular NDCs for which I have computed an estimated measure of WAC and AWP.]

## Summary of Defendant-Specific Discovery Relating to the Determination of WAC and AWP

21.     The following statements reflect testimony provided by representatives for the Defendants in the Litigation or in other, similar and related litigation, relating to matters at issue in the Litigation (for the relevant timeframe) and that impacted my computations of WAC and AWP, and the pertinence of those prices to reimbursement under the New York Medicaid reimbursement program, as discussed herein. The following does not reflect my opinions or my views relating to the determination of WACs or AWPs, or relating to how such prices were, or should have been, reported to the pricing compendia during the relevant timeframe. The discovery was used, instead, to arrive at, and then support, the methodology through which I have calculated estimated measures of WAC and AWP.

### *Barr*

#### *Reporting of WAC*

22.     Barr reported WAC to the pricing compendia. (Cunningham (February 2, 2007), p. 72:8-14, 24) Barr had only one WAC at any given time and reported the same WAC to each pricing compendium. (Catlett (May 7, 2008), p.) After reporting a WAC, the pricing compendia would send to Barr a "turnaround document" or other medium through which Barr could verify the WAC before it was published, which Barr would sign and return. (Catlett (May 7, 2008), pp. 73:6-1474:3-10, 24-15) Ultimately, all published WACs would reflect what Barr had submitted to the pricing compendia, without known exceptions. (Catlett (May 7, 2008), p. 78:5-20)

#### *Reporting of AWP*

23.     Barr would generally set its AWP at a price that was 10% below the reported brand AWP. (Catlett (May 7, 2008), pp. 61:6-13; 62:1-10)     Barr reported AWP to the pricing compendia, although, according to Barr, AWP had no connection whatsoever to actual prices

---

[6] I have not computed WACs for Ethex because Ethex did not report WACs during the relevant timeframe.

charged by Barr to any customers. (Catlett (May 7, 2008), pp. 70:18-71:2; 80:20 - 81:11)  Barr's definition of AWP was not consistent with the definition of AWP proffered by First Data Bank ("FDB"), one of the pricing compendia, or the National Pharmaceutical Council ("NPC"), an organization comprised of manufacturers of prescription drugs.  (Catlett (May 7, 2008), pp. 79:15-89:4)

24.     In March 1999, Barr began reporting Suggested Wholesale Price ("SWP") instead of AWP. (Catlett (May 30, 2007), p. 174:21)  Barr knew that SWP was, in essence, equal to AWP. (Catlett (May 30, 2007), p. 133:8-9)  After reporting an AWP, the pricing compendia would send to Barr a turnaround document or other medium through which Barr could verify the AWP before it was published, which Barr would sign and return.  (Catlett (May 7, 2008), p. 74:3-10) Barr had only one AWP at any given time and reported the same AWP to each pricing compendium. (Catlett (May 7, 2008), pp. 70:18-71:2)  Ultimately, all published AWPs reflected what Barr had submitted to the pricing compendia, without known exceptions.  (Catlett (May 7, 2008), pp. 78:5-20; 87:3-9)

*Contract Prices Generally*

25.     All customers who had contracts with Barr paid contract prices.  (Catlett (May 7, 2008, pp. 107:1-108:10; 225:4-9; 225 14-18; 226:10-20)  Contract prices were below WAC. (Catlett (February 19, 2008, pp. 109:11-110:6)  Contract prices were further reduced by subsequent rebates and credits.  (Catlett (May 7, 2008), p. 117:3-21)

*Transactions with Wholesalers*

26.     Barr sold products to wholesalers pursuant to contracts.  (Catlett (May 7, 2008), pp. 92:16-19; 120:6-7)   Some wholesaler contracts provided for product-specific pricing and incentives.  (Catlett (May 7, 2008), p. 115:12-19)  Product-specific pricing was below WAC. (Catlett (May 7, 2008), pp. 224:13-225:18)  Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product.  (Catlett (May 7, 2008), pp. 117:3-21; 154:4-156:12; 221:18-222:5)  Some wholesaler contracts, in fact, provided for "baseline" rebates (i.e. rebates to be applied across the board on all products).  (Catlett (May 7, 2008), p. 120:4-12)

27.     Baseline rebates reduced the wholesalers' dead net price for all products. (Catlett (May 7, 2008), pp. 120:20-121:16.  Chargebacks also reduced WAC. (Catlett (May 7, 2008), pp. 102:11-21.  It was typical, during the relevant timeframe, that the dead net price that was offered to, and paid by, the wholesalers was below WAC. (Catlett (May 7, 2008), pp. 224:13-225:18.

*Transactions with Retailers and Other Pharmacy Providers*

28.     Barr sold products to retailers and other pharmacy providers pursuant to contracts. Retailers' contract prices to purchase Barr products were below WAC. (Catlett (February 19, 2008), pp. 107:1-108:10)  Some retail contracts provided for product-specific pricing and incentives. (Catlett (May 7, 2008), p 183:12-16. Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for the relevant Barr product. (Catlett (May 7, 2008), pp. 180:11-181:2)

29.     Some retail contracts also provided for baseline rebates.  (Catlett (May 7, 2008), pp. 177:2-178:18)  Baseline rebates reduced the acquisition cost to the retailers for the relevant Barr products. (Catlett (May 7, 2008), pp. 177:2-178:18)  Retailers who had contracts with Barr and who purchased drugs directly from Barr were considered direct customers.  (Catlett (May 7, 2008), pp. 90:20-91:2)  Conversely, retailers who had contracts with Barr, but who obtained drugs through wholesalers, were considered indirect customers. (Cunningham (February 2, 2007), p. 17)  Indirect sales to retail customers would trigger the payment of chargebacks by Barr to wholesalers. (Catlett (May 7, 2008), pp. 101:13-102:21)

*Participation in the New York Medicaid Reimbursement Program*

30.     Barr's participation in the New York Medicaid Reimbursement Program was voluntary. (Catlett (May 7, 2008), pp. 41:21-42:14)

**Dey**

*Reporting of WAC*

31.     Dey reported WAC to the pricing compendia.  (Marrs (May 15, 2008), pp. 75:17-21; 136:12-18; Mozak (April 30, 2002), p. 291:14-25)  Dey had only one WAC at any given time,

and reported the same WAC to all agencies.  (Marrs, (May 15, 2008), p: 129:12-20; 141:4-8; Mozak (April 30, 2002), pp: 325:2-326:6)

32.     After reporting a WAC, the pricing compendia would send to Dey a turnaround document or other medium through which Dey could verify the WAC before it was published, which Dey would sign and return.  (Mozak (November 1, 2001), pp. 187:20-190:20; Mozak (November 6, 2002), pp. 509:01-513:20; Mozak (March 13, 2002), pp. 711:10-712:02) Ultimately, all published WACs reflected what Dey had submitted to the pricing compendia, without known exceptions.  (Mozak (November 6, 2002), pp. 494:5-513:20)

*Reporting of AWP*

33.     Dey set AWP for its generic products at a price that was 10% below the reported brand AWP.  (Marrs (May 15, 2008), pp. 129:22-132:4; Mozak (March 13, 2003), pp. 731:18-732:09) Dey reported AWP to the pricing compendia.  (Marrs (May 15, 2008), p: 75:17-21)  After reporting an AWP, the pricing compendia would send to Dey a turnaround document or other medium through which Dey could verify the AWP before it was published, which Dey would sign and return.  (Marrs, (May 15, 2008), pp. 133:16-136:10; Mozak (November 6, 2002), pp. 509:01-513:20)

34.     Dey had only one AWP at any given time and would report the same AWP to each pricing compendium.  (Marrs, (May 15, 2008), p: 139:16-141:3)  AWP had no connection whatsoever to actual prices Dey charged to any customers.  (Mozak (November 1, 2001), pp. 120:23-121:6; Mozak (March 13, 2002), p. 930:13-21) Ultimately, all published AWPs reflected what Dey had submitted to the pricing compendia, without known exceptions.  (Marrs (May 15, 2008), pp. 133:16-136:10; 141:14-143:21; Marrs (July 10, 2008), pp. 466:14-476:16; Rice (November 7, 2002), pp. 488:25-491:1)

*Contract Prices Generally*

35.     All customers who had contracts with Dey would pay contract prices.  (Marrs (May 15, 2008), p. 81:4-14)  Dey's contract prices were below WAC even before any rebates or credits were applied.  (Marrs (May 15, 2008), p: 82:13-16; Rice (October 30, 2001), pp. 199:19-205:2;

Exhibit 78; Mozak (November 1, 2001), pp. 69:11-70:12)  Contract prices were further reduced by subsequent rebates and credits. (Marrs, (May 15, 2008), pp. 107:6-111:18; Mozak (April 30, 2002), pp. 443:14-447:11)

*Transactions with Wholesalers*

36.     Dey sold products to wholesalers pursuant to contracts. (Marrs, (May 15, 2008), pp. 274:20-285:16; Walker (May 14, 2008), pp. 263:01-264:17; Exhibit 15)  All contract prices war below WAC. (Marrs, (May 15, 2008), p. 82:13-16)  Some wholesaler contracts provided for product-specific pricing and incentives.  Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant Dey product. (Marrs (July 10, 2008), pp. 541:8-542:9; 543:22-544:14; Rice (October 30, 2001), pp. 87:23-93:16)  Some wholesaler contracts provided for baseline rebates. (Marrs, (May 15, 2008), pp. 91:10-93:1; 274:20-279:8; Walker (May 14, 2008), p 268:5-20)  Baseline rebates reduced the wholesalers' dead net price for all relevant Dey products. (Marrs (July 10, 2008), pp. 541:8-542:9; 543:22-544:14; Rice (October 30, 2001), pp. 94:25-97:2).

37.     A high percentage of sales to wholesalers were subject to chargebacks. (Marrs, (May 15, 2008), pp. 89:5-90:10; (Mozak, (November 1, 2001), pp. 92:16-93:19)  Chargebacks also reduced the wholesalers' dead net price.  (Rice (October 30, 2001), pp. 75:11-79:12)  Accordingly, a low percentage of sales to wholesalers were ultimately at WAC. (Marrs, (May 15, 2008), pp. 99:6-100:20)

*Transactions with Retailers and Other Pharmacy Providers*

38.     Dey sold products to retailers and other pharmacy providers pursuant to contracts. (Walker (July 9, 2008), p. 319:2-20)  The prices at which retailers purchased Dey' products pursuant to such contracts were below WAC. (Walker (July 9, 2008), p. 319:2-20)  Some retail contracts also provided for product-specific pricing and incentives.  (Walker (May 14, 2008), pp. 237:15-22: 241:11-2)

39.     Product-specific pricing further lowered contract prices, where were already below WAC.    (Mozak (November 1, 2001), pp. 160:13-167:2; 170:14-173:18)  Product-specific

incentives (credits and/or rebates) reduced the acquisition cost to the retailers for the relevant Dey product.   (Mozak, (November 1, 2001), pp.   170:14-173:18) Some retail contracts also provided for baseline rebates.   (Mozak, (November 1, 2001), pp. 74:24-77:19; Walker (May 14, 2008), pp. 188:12-189:01)

40.     Retailers who had contracts with Dey and who purchased drugs directly from Dey were considered direct customers. (Marrs, (May 15, 2008), pp. 90:13-91:8) Conversely, retailers who had contracts with Dey but who obtained drugs through wholesalers were considered indirect customers. (Marrs (May 15, 2008), pp. 90:13-91:8; Walker (May 14, 2008), pp. 218:17-219:18) Every indirect sale through a wholesaler was pursuant to a contract. (Marrs (May 15, 2008), p. 99)   Indirect sales to retail customers would trigger payment of chargebacks by Dey to wholesalers.

41.     Dey sold products to other relevant pharmacy providers pursuant to contracts. (Marrs, (May 15, 2008), pp. 81:14-82:12)   As with retailers, some of these contracts provided for product-specific pricing and incentives.   (Rice (October 30, 2001), pp. 163:9-172:15; Exhibit 74; Mozak (April 30, 2002), pp. 438:5-440:11)   Product-specific pricing was below WAC. (Mozak (November 1, 2001), pp. 144:4-152:5)   Product-specific incentives reduced the acquisition cost to the other pharmacy providers for the relevant product.   (Walker (May 14, 2008), pp. 237:15-22; 241:11-22)

42.     As with retailers, contracts with the other pharmacy providers also provided for baseline rebates (i.e., rebates that were applied to all transactions). (Marrs (May 15, 2008), pp. 100:21-102:15) Sales to these other pharmacy providers who would buy products through wholesalers would also trigger the payment of chargebacks by Dey. (Marrs, (May 15, 2008), pp. 81:21-83:9; 90:13-91:1)

*Participation in the New York Medicaid Reimbursement Program*

43.     Dey understood that once it had signed a Medicaid rebate agreement with CMS that the New York Medicaid Reimbursement Program would be required to provide reimbursement on Dey's drugs.  (Marrs (July 10, 2008), p. 431)

### Ethex

*Reporting of WAC*

44.    Ethex did not report WACs to the pricing compendia.  (Keith (June 24, 2008), p. 70:6-14)  Ethex did, however, establish a WAC and had only one WAC at any given time.  (Keith (June 24, 2008), p. 49:17-20)

*Reporting of AWP*

45.    Ethex would set its AWP at a price that was 10% below the reported brand AWP.  (Keith (June 24, 2008), p. 136:20-22)  Ethex reported AWP to the pricing compendia.  (Keith (June 24, 2008), p. 135:19-21).  Ethex had only one AWP at any given time and reported the same to each pricing compendium.  (Keith (June 24, 2008), pp. 48:17-19; 136:4-6)   AWP, as reported, had no connection whatsoever to actual prices charged to any customers.  (Keith (June 24, 2008), p. 150:10-19)

46.    Ethex' definition of AWP was not consistent with the definition proffered by FDB or the NPC. (Keith (June 24, 2008), pp. 147:9-150:2)

47.    After reporting an AWP, the pricing compendia would send to Ethex a turnaround document or other medium through which Ethex could verify the AWP before it was published, which Ethex would sign and return.  (Keith (June 24, 2008), pp. 144:9-145:2)  Ultimately, all published AWPs reflected what Ethex had submitted to the pricing compendia, without known exceptions.  (Keith (June 24, 2008), pp. 142:16-143:1)

*Contract Prices Generally*

48.    All customers who had contracts with Ethex paid contract prices that were below WAC, even before any rebates or credits were applied.  (Keith (June 24, 2008), pp. 60:19-21; 78:16-19; 98:11-16; 171:19-172:2)  Contract prices were further reduced by subsequent credits and rebates. (Keith (June 24, 2008), pp. 171:19-172:5)

*Transactions with Wholesalers*

49.     Ethex sold products to wholesalers pursuant to contracts.    (Keith (June 24, 2008), pp. 98:11-13; 151:10-14; 207:7-19; 214:15-215:1; Exhibit 37)  Some wholesaler contracts provided for product-specific pricing and incentives.    (Keith (June 24, 2008), pp. 172:21-173:10; Exhibit 37)

50.     Product-specific pricing was below WAC.    (Keith (June 24, 2008), pp. 60:19-61:5) Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product.    (Keith (June 24, 2008), pp. 90:2-92:1; 199:18-22; Exhibit 37) Some wholesaler contracts provided for baseline rebates.    (Keith (June 24, 2008), pp. 155:18-156:5; Exhibit 37)  Baseline rebates reduced the wholesalers' dead net price for all relevant Ethex products.  (Keith (June 24, 2008), pp. 155:18-156:5; Exhibit 37)

51.     During the years 2000 through 2005, 50-75% of Ethex' sales of Isosorbide Mononitrate (60 MG) occurred through wholesalers.  (Keith (June 24, 2008), p. 64:5-19)   Chargebacks associated with such sales would reduce the wholesalers' acquisition cost.  (Keith (June 24, 2008), pp. 64:20-65:11; Chibnall (June 14, 2008), p. 50; colloquy at pp. 51-54; Exhibit 2) Exhibit 2 to the deposition of Mr. Chibnall, a document entitled *Analysis of Impact to Profitability from Changing WAC*, provides, specifically: "[the] [d]ifference between WAC price and net price was relatively large because many of the discounts we offer[ed], rebates particularly, and because all of our  - all of the items that we estimate[d] – returns, for example – [were] all done off a WAC price for the wholesaler."

*Transactions with Retailers and Other Pharmacy Providers*

52.     Ethex sold products to retailers (and other pharmacy providers) pursuant to contracts. (Keith (June 24, 2008), pp. 219:21-222:20.  Retailers' contract prices were below WAC. (Keith (June 24, 2008), pp. 57:18-59:6; Exhibit 5)  Some retail contracts also provided for product-specific pricing and incentives.  (Keith (June 24, 2008), pp. 219:21-222:15.  Product-specific pricing was below WAC.  (Keith, Exhibit )  Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for the relevant product.  (Keith (June 24, 2008), p. 53:6-13)

53.     Some retail contracts provided for baseline rebates.  (Keith (June 24, 2008), p. 53:6-22)  Baseline rebates reduced the acquisition cost to the retailers for all Ethex products.  (Keith (June 24, 2008), p. 53:6-22)  Retailers who had contracts with Ethex and who purchase drugs directly from Ethex were considered direct customers.     (Keith (June 24, 2008), p. 22:20-23:6.  Conversely, retailers who had contracts with Ethex but who obtained drugs through wholesalers were considered indirect customers.  Indirect sales to retail customers would trigger payment of chargebacks by Ethex to wholesalers.  (Keith (June 24, 2008), pp. 64:20-65:11)  Direct prices to retail customers were typically lower than indirect prices to retail customers.  (Keith, Exhibit 5)

54.     Ethex sold products to other pharmacy providers pursuant to contracts.  (Keith (June 24, 2008), pp. 217:15-219:1; Exhibit 35; Exhibit 38)  As with retailers, some of these contracts provided for product-specific pricing and incentives.     (Keith Exhibit 35)   Product-specific incentives reduced the acquisition cost to the other pharmacy providers for each relevant Ethex product.  (Keith Exhibit 35)

### Ivax

#### Reporting of WAC

55.     Ivax reported WAC to the pricing compendia.  (Shanks (February 22, 2008), pp. 286:16-287:15)  Ivax had only one WAC at any given time and reported the same WAC to each pricing compendium.  After reporting a WAC, the pricing compendia would send to Ivax a turnaround document or other medium through which Ivax could verify the WAC before it was published, which Ivax would sign and return.  (Hogan (June 17, 2008), p. 287:10-17)   The pricing compendia published the WACs that Ivax sent them.  (Hogan (June 17, 2008), p. 108:18-21)

#### Reporting of AWP

56.     Ivax would set its AWP at a price that was 10% below the reported brand AWP.  (Sarfas (August 22, 2007), p. 152:6-7; Hogan (June 17, 2008), pp. 56:6-9; 82:19-83:21; 91:14-17; Blake (January 24, 2008), p. 106:16-20; Shanks (February 22, 2008), pp. 199:11-17)  Ivax reported AWP to the pricing compendia.  (Shanks (February 22, 2008), pp. 66:9-15)  AWP, as reported, had no connection whatsoever to actual prices charged to any customers.  (Shanks (February 22,

2008), pp. 49:2-8;  Hogan (June 17, 2008), p. 61:4-6; Sarfas (August 22, 2007), p. 149:03-11) The pricing compendia published the AWPs that Ivax sent them. (Hogan (June 17, 2008), p. 108:18-21)

*Contract Prices Generally*

57.    All customers who had contracts with Ivax paid contract prices.  (Hogan (June 17, 2008), pp. 64:10-65:07; Sarfas (August 22, 2007), p. 228:4-9)  The contract prices at which retailers purchased Ivax products were below WAC even before any credits or rebates had been applied. (Hogan (June 17, 2008), pp. 89:14-20)

*Transactions with Wholesalers*

58.    Ivax sold products to wholesalers pursuant to contracts.   (Sarfas (August 22, 2007), pp. 228:4-9; 234:1-7; Hogan (June 17, 2008), pp. 295:6-296:20)  All of Ivax' contract prices were "underneath" WAC.  (Hogan (June 17, 2008), pp. 62:17-63:4)  Some wholesaler contracts provided for product-specific pricing and incentives.  Product-specific pricing was below WAC. Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product. (Sarfas (August 22, 2007), pp. 235:9-236:14; 310:10-18)

59.    Some wholesaler contracts provided for baseline rebates.  (Sarfas (August 22, 2007), pp. , 173:21-174:22; 310:10-18; Hogan (June 17, 2008), pp. 297:16-299:04; 306:17-307:01; 309:19-310:01)  Baseline rebates reduced the wholesalers' dead net price for all relevant products. (Hogan (June 17, 2008), pp. 297:16-299:04)  A high percentage of sales to wholesalers were subject to chargebacks.  (Sarfas (August 22, 2007), pp. 228:10-229:04; 220:7-16)  Chargebacks also reduced the wholesalers' dead net price.  (Hogan (June 17, 2008), pp. 32:9-12; 64:10-65:7) Less than 1% of Ivax customers paid WAC.  (Hogan (June 17, 2008), p. 81:3-11)

*Transactions with Retailers and Other Pharmacy Providers*

60.    Ivax sold products to retailers and other pharmacy providers pursuant to contracts. (Sarfas (August 22, 2007), p. 228:4-9; Hogan (June 17, 2008), pp. 64:10-65:7)  Retailers' contract prices were below WAC.   (Hogan (February 6, 2008), p. 89:14-20; Hogan (June 17, 2008), p. 81:13-16)  Some retail contracts provided for product-specific pricing and incentives.

(Sarfas (August 22, 2007), pp. 123:14-125:01)   Product-specific pricing was below WAC.
(Sarfas (August 22, 2007), pp. 123:14-125:01)   Product-specific incentives (credits and/or
rebates) reduced the acquisition cost to the retailers for the relevant product. (Hogan (June 17,
2008), pp. 100:16-102:02)

61.     Retailers who had contracts with Ivax who purchased drugs directly from Ivax were
considered direct customers. (Sarfas (August 22, 2007), pp.  211:08-15)     Retailers who had
contracts with Ivax but who obtained drugs through wholesalers were considered indirect
customers.  (Hogan (June 17, 2008), pp. 64:10-65:07)  Indirect sales to a retail customer would
trigger payment of chargebacks by Ivax to wholesalers.   (Hogan (June 17, 2008), pp. 64:10-
65:07)

62.     As with retailers, Ivax sold products to other pharmacy providers pursuant to contracts.
(Sarfas (August 22, 2007), pp.  212:19-213:2; 213:15-215:4; 228:4-9; Hogan (June 17, 2008),
pp. 64:10-65:07)  As with retailers, some of these contracts also provided for product-specific
pricing and incentives. (Sarfas (August 22, 2007), pp.  123:14-125:01)  Product-specific pricing
was below WAC. (Sarfas (August 22, 2007), pp. 123:14-125:01)  Certain of these contracts also
provided for baseline rebates.  (Sarfas (August 22, 2007), pp. 234:19-235:4)  Baseline rebates
would reduce the acquisition cost to the other pharmacy providers for all Ivax products.

63.     Other pharmacy providers who had contracts with Ivax and who purchased products
through wholesalers were indirect customers. (Hogan (June 17, 2008), pp. 64:10-65:7)  Indirect
sales to other pharmacy providers who purchased products through wholesalers would trigger
payment of chargebacks by Ivax. (Hogan (June 17, 2008), pp. 64:10-65:7)  Direct prices to other
pharmacy providers were typically lower than indirect prices to other pharmacy providers.

*Participation in the New York Medicaid Reimbursement Program*

64.     Ivax agreed to participate in the New York Medicaid Reimbursement Program so that its
drugs would be eligible for reimbursement. (Shanks (February 22, 2008), p. 199:11-17)

*Mylan*

*Reporting of WAC*

65.     Mylan reported WAC to the pricing compendia.  (Korman (November 26, 2007), pp. 53:3-18; Korman (MA 30b(6)) (November 26, 2007), p. 17:5-14; Roman (July 26, 2006), p. 49:3-13)  Mylan had only one WAC at any given time and reported the same WAC to each pricing compendium.    (Workman (NY 30(b)(6)) (June 26, 2008), pp. 35:12-36:20)   After reporting a WAC, the pricing compendia would send to Mylan a turnaround document or other medium through which Mylan could verify the WAC before it was published, which Mylan would sign and return.  (Workman (June 26, 2008), pp. 26:4-28:03)   All published WACs reflected what Mylan had submitted to the pricing compendia, without known exceptions. (Workman (NY 30(b)(6)) (June 26, 2008), pp. 35:12-36:20)

*Reporting of AWP*

66.     Mylan would set its AWP at a price that was 10% below the reported brand AWP. Korman (November 26, 2007) (Massachusetts), pp. 171:17-172:09; 173:6-13; Cunard (October 26, 2007), p. 65:14-22)  Mylan reported AWP to the pricing compendia.  (Korman (November 26, 2007), pp. 53:3-18; Korman (MA 30b(6)) (November 26, 2007), p. 17:5-14;   Roman (July 26, 2006), pp. 48:19-49:02; Workman (NY 30(b)(6)) (June 26, 2008), p. 18:4-7)   Mylan had only one AWP at any given time and reported the same AWP to each pricing compendium. (Workman (NY 30(b)(6)) (June 26, 2008), pp. 35:12-36:20)   AWP, as reported, had no connection whatsoever to actual prices charged to any customers.   (Mauro (June 27, 2008), pp. 88:1-18; 82:19-21; Korman (November 26, 2007), p.171:1-5; Krinke (September 25, 2007) (Massachusetts), pp. 157:8-158:2)

67.     After reporting an AWP, the pricing compendia would send to Mylan a turnaround document or other medium through which Mylan could verify the AWP before it was published, which Mylan would sign and return.  (Workman (NY 30(b)(6)) (June 26, 2008). pp. 26:4-28:3) All published AWPs reflected what Mylan had submitted to the pricing compendia, without known exceptions.  (Workman (NY 30(b)(6)) (June 26, 2008), pp. 35:12-36:20)

*Contract Prices Generally*

68.     All customers who had contracts with Mylan paid contract prices.     (Workman (NY 30(b)(6)) (June 26, 2008), pp. 35:12-36:20)  Contract prices were below WAC even before any credits and rebates had been applied.  (Cunard (October 26, 2007), pp. 303:08-304:01; 324:8-14) Contract prices were further reduced by subsequent credits and rebates.

*Transactions with Wholesalers*

69.     Mylan sold products to wholesalers pursuant to contracts.     (Workman (MA 30b(6)) (September 26, 2007), pp. 53:14-54:18; 54:14-55:04; 55:5-13)   Some wholesaler contracts provided for product-specific pricing and incentives.  (Roman (July 26, 2006), p. 71:06-21) Product-specific pricing was below WAC.  (Roman (July 26, 2006); pp. 74:04-75:12)  Product-specific incentives (credits and/or rebates) reduced the wholesalers' dead net price for the relevant product.  (Roman (July 26, 2006), pp. 74:04-75:12)

70.     A high percentage of sales to wholesalers were subject to chargebacks.  (Cunard (October 26, 2007), pp. 94:18-95:17;  303:8-304:1;  Korman (November 26, 2007) (Massachusetts), p. 25:7-21)  Chargebacks also reduced the wholesalers' dead net price.     (Cunard (October 26, 2007), pp. 239:21-240:8;  303:08-304:01;  Exhibit 16;  Roman (July 26, 2006) (Alabama), pp. 69:06-70:16;  Roman (August 2, 2007) (Massachusetts), pp. 90:12-91:10;  Roman (November 16, 2006) (Illinois), pp. 232:6-233:07;  Korman (November 26, 2007) (Massachusetts), pp. 173:15-174:16)  A low percentage of sales to wholesalers were at WAC.  (Korman (November 26, 2007) (Massachusetts), pp. 25:7-14;  191:2-193:16;  323:3-324:7;  Workman (MA 30b6) (September 26, 2007), pp. 53:14-54:18)

*Transactions with Retailers and Other Pharmacy Providers*

71.     Mylan sold products to retailers and other pharmacy providers pursuant to contracts. (Workman (MA 30b(6)) (September 26, 2007), pp. 53:14-55:04)  Retailers' contract prices were below WAC.  (Cunard (October 26, 2007), pp. 303:08-304:01; 324:8-14)  Retailers who had contracts with Mylan and who purchased drugs directly from Mylan were considered direct customers.     (Cunard (October 26, 2007), pp. 166:16-167:4)  Conversely, retailers who had contracts with Mylan but who obtained drugs through wholesalers were considered indirect

customers.  (Cunard (October 26, 2007), pp. 166:16-167:4; 239:1-240:1; Workman (MA 30b(6)) (September 26, 2007), pp. 53:14-55:04)

72.    Indirect retail customer sales would trigger payment of chargebacks by Mylan to wholesalers.  (Cunard (October 26, 2007), pp. 239:21-240:8; 324:8-14)

73.    Mylan sold products to other pharmacy providers pursuant to contracts.  (Workman (MA 30b(6)) (September 26, 2007), pp. 53:14-54:18; Krinke (September 25, 2007) (Massachusetts), pp. 239:20-22; 312:11-315:13; Exhibit 13)  As with retailers, some of these contracts provided for product-specific pricing and incentives.  Product-specific pricing was below WAC.  Product-specific incentives reduced the acquisition cost to the other pharmacy providers for each relevant Mylan product.

74.    As with retailers, some of these contracts provided for baseline rebates.  Baseline rebates reduced the acquisition cost to the other pharmacy providers for all relevant Mylan products. Other pharmacy providers who had contracts with Mylan and who purchased products through wholesalers were considered indirect customers.    (Cunard (October 26, 2007), p. 239:1-10; Workman (MA 30b(6)) (September 26, 2007), p. 55:5-13)  Indirect sales to other pharmacy providers who bought drugs through wholesalers would trigger payment of chargebacks by Mylan.  Direct prices to other pharmacy providers were typically lower than indirect prices to other pharmacy providers.

*Participation in the New York Medicaid Reimbursement Program*

75.    Mylan's participation in the New York Medicaid Reimbursement Program was voluntary.    (Roman (July 26, 2006) (Alabama), p. 58:2-17; Roman (November 16, 2006) (Illinois), p. 55:18-22; Krinke (March 28, 2008) (Texas), pp. 36:21-37:05)

### Par

*Reporting of WAC*

76.     Par did not report WAC to the pricing compendia because Par knew that its WACs would nevertheless appear in the pricing compendia.   (DiMaio (July 31, 2008), pp. 450:1-16; 464:3-468:12; 471:3-478:8; Exhibit 95;  DiMaio (May 6, 2008), pp. 83:9-85:12; 347:20-356:8; Exhibit 79; Exhibit 80; Exhibit 81; Exhibit 82)

77.     Par had only one WAC at any given time and reported the same WAC to each pricing compendium.   (DiMaio (May 6, 2008), p. 313:5-12)  Par acknowledged the accuracy of the WACs published by the pricing compendia by signing a turnaround document provided by the pricing compendia. (DiMaio (July 31, 2008), pp. 453:90-464:2; DiMaio (August 16, 2007), pp. 167:10-171:19)

78.     All published WACs for Par drugs reflected what Par had in place at the time of publication. (DiMaio, (May 6, 2008), pp. 162:22-166:5;  Andrus (October 16, 2007), pp. 197:21-202:20)

*Reporting of AWP*

79.     Par would set its AWP at a price that was 10% below the reported brand AWP. (DiMaio, (May 6, 2008), pp. 41:7-43:4)  Par reported AWP to the pricing compendia.  (DiMaio (July 31, 2008), p. 449:18-22; DiMaio, (May 6, 2008), pp. 82:3-83:8)  Par had only one AWP at any given time and reported the same AWP to each pricing compendium.  (DiMaio (July 32, 2008), p. 489:10-20; DiMaio (May 6, 2008), pp. 152:12-154:5)  Par's reported AWP had no connection whatsoever to actual prices charged to any Par customers.  (DiMaio (July 31, 2008), pp. 490:1-500:8; DiMaio (August 16, 2007), pp. 109:12-117:14; Andrus (October 16, 2007), pp. 23:3-9)

80.     After reporting an AWP, the pricing compendia would send to Par a turnaround document or other medium through which Par could verify the AWP before it was published, which Par would sign and return. (DiMaio (July 31, 2008), pp.  462:14-464:2; DiMaio (August

16, 2007), pp. 109:12-111:14; 165:6-167:7; Andrus (October 16, 2007), pp. 49:10-52:5; 63:4-64:2)

81. All published AWPs reflected what Par had submitted to the pricing compendia, without known exceptions.  (DiMaio (July 32, 2008), pp. 551:22-554:13)

*Contract Prices Generally*

82. All customers who had contracts with Par paid contract prices.  90% of Par's sales were pursuant to contracts. (DiMaio (May 6, 2008), pp. 47:3-54:2)  Contract prices were below WAC even before any credits and rebates had been applied.  (DiMaio (May 6, 2008), pp. 71:16-72:5 97:14-98:4)  Contract prices were further reduced by subsequent credits and rebates.  (DiMaio (May 6, 2008), pp. 113:9-116:3)

*Transactions with Wholesalers*

83. Par sold products to wholesalers pursuant to contracts.  (DiMaio (July 31, 2008), pp. 410:13-434:19)  In addition to below WAC prices, some wholesaler contracts also provided for product-specific pricing and incentives.   DiMaio (July 31, 2008), pp. 435:22-441:9; 444:5-445:16; 532:18-536:9; Andrus (October 16, 2007), pp. 20:12-21:22)

84. Product-specific pricing was below WAC.  (DiMaio (May 6, 2008), pp. 143:21-145:18; 197:19-198:19)  Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product. (DiMaio (May 6, 2008), pp. 319:9-322:19; 143:21-145:18; 332:14-337:4)

85. Some wholesaler contracts also provided for baseline rebates.  (DiMaio (July 31, 2008), pp. 443:4-444:3; DiMaio (May 6, 2008), pp. 125:11-128:16; 129:19-130:4; 315:7-317:7) Baseline rebates reduced the wholesalers' dead net price for all relevant products.  (DiMaio (May 6, 2008), pp. 99:11-101:18; Trendowicz (September 25, 2007), pp. 69:1-73:13)

86. A high percentage of sales to wholesalers were subject to chargebacks.  DiMaio (May 6, 2008), pp. 47:3-54:2; 311:11-312:5) Chargebacks also reduced the wholesalers' dead net price.

DiMaio (May 6, 2008), pp. 47:3-54:2; 329:21-332:9; Andrus (October 16, 2007), pp. 159:13-160:19. A low percentage of sales to wholesalers were at WAC. (DiMaio (May 6, 2008), pp. 47:3-54:2; Exhibit 3; DiMaio (August 16, 2007), pp. 203:19-204:20)

*Transactions with Retailers and Other Pharmacy Providers*

87.    Par sold products to retailers and other pharmacy providers pursuant to contracts.  . (DiMaio (July 31, 2008), pp. 410:13-434:19)  Retailers' contract prices were below WAC. (DiMaio (May 6, 2008), pp. 109:12-112:10; 187:14-189:21)  Some retail contracts provided for product-specific pricing and incentives. (DiMaio (May 6, 2008), pp. 113:9-116:117:17; 286:16-298:17)

88.    Product-specific pricing was below WAC.   (DiMaio (May 6, 2008), pp. 113:9-116:3) Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for the relevant product.   (DiMaio (May 6, 2008), pp. 113:9-116:3; 117:18-121:12; 298:18-300:3)  Some retail contracts also provided for baseline rebates.  (DiMaio (May 6, 2008), pp. 117:18-119:1; 121:17-123:13; 269:6-273:16)  Baseline rebates reduced the acquisition cost to the retailers for all relevant Par products.   (DiMaio (May 6, 2008), pp.  117:18-119:1; 121:17-123:13; Andrus (October 16, 2007), pp. 167:6-169:2)

89.    Retailers who had contracts with Par and who purchased drugs directly from Par were considered direct customers, including Walgreens, who was a direct purchaser.  (DiMaio (July 31, 2008), p. 412:4-16; DiMaio (May 6, 2008), 246:8-247:6; 249:17-252:3).   Conversely, retailers who had contracts with Par but who obtained drugs through wholesalers, were considered indirect customers.  (DiMaio (May 6, 2008), pp. 247:14-248:3; Andrus (October 16, 2007), pp. 17:10-18:4).  Indirect sales to retail customers would trigger payment of chargebacks by Par to wholesalers.   (DiMaio (August 16, 2007), pp. 196:17-198:18; Andrus (October 16, 2007), pp. 17:10-19:3; 169:3-173:5)  Direct prices to retail customers were typically lower than indirect prices to retail customers.   (DiMaio (August 16, 2007), pp. 236:8-239:11; Andrus (October 16, 2007), pp. 161:15-167:11; Trendowicz (September 25, 2007), pp. 21:21-22:9)

*Transactions with Non-retail Pharmacy Providers*

90.     Par sold products to other pharmacy providers pursuant to contracts. (DiMaio (May 6, 2008), pp. 275:17-278:9; DiMaio (August 16, 2007), pp. 68:6-71:8; 225:4-228:15; 240:17-242:11) As with retailers, some of these contracts provided for product-specific pricing and incentives. (DiMaio (July 31, 2008), pp. 545:18-548:1; 280:6-284:7)

91.     Product-specific pricing was below WAC. (DiMaio (May 6, 2008), pp. 278:10-280:5; Exhibit 68; Andrus (October 16, 2007), pp. 156:1-159:12)

*Participation in the New York Medicaid Reimbursement Program*

92.     Par's participation in the New York Medicaid Reimbursement Program was voluntary. (DiMaio (July 31, 2008), pp. 402:7-408:1; Draudt (July 31, 2008), pp. 31:6-32:9)

**Purepac**

*Reporting of WAC*

93.     Purepac reported WAC to the pricing compendia. (O'Malley (June 20, 2008), pp. 60:11-13; 62:19-63:1; 66:7-15) Purepac had only one WAC at any given time and reported the same WAC to each pricing compendium. (O'Malley (June 20, 2008), pp. 122:22-123:4) After reporting a WAC, the pricing compendia would send to Purepac a turnaround document or other medium through which Purepac could verify the WAC before it was published, which Purepac would sign and return. (O'Malley (September 19, 2007), pp. 214:9-215:4)

94.     All published WACs reflected what Purepac had submitted to the pricing compendia. (O'Malley (September 19, 2007), pp. 131:22-133:5; O'Malley (June 20, 2008), pp. 64:13-66:15)

*Reporting of AWP*

95.     Purepac would set its AWP at a price that was 10% below the reported brand AWP. (Cunningham (October 23, 2007), pp. 92:4-101:22; O'Malley (September 19, 2007), pp. 83:14-88:6; O'Malley (June 20, 2008), p. 58:13-17) Purepac reported AWP to the pricing compendia. (O'Malley (September 19, 2007), p. 81:7-17) Purepac had only one AWP at any given time and reported the same AWP to each pricing compendium. (O'Malley (June 20, 2008), pp. 62:19-

26

65:7; 122:10-21)  AWP, as reported, had no connection whatsoever to actual prices charged to any customers.  (O'Malley (September 19, 2007), pp. 83:14-88:6)

96.     Purepac's definition of AWP was not consistent with that which was proffered by FDB. (O'Malley (June 20, 2008), pp. 214:5-217:10)  In certain instances, Purepac reported a SWP.  If Purepac submitted an SWP, Purepac knew that SWP equaled AWP.     (O'Malley (June 20, 2008), pp. 36:19-38:16)  The pricing compendia (including FDB) published Purepac's SWP as AWPs.  (O'Malley (June 20, 2008), pp. 60:3-61:10; 111:22-112:18)

97.     After reporting an AWP, the pricing compendia would send to Purepac a turnaround document or other medium through which Purepac could verify the AWP before it was published, which Purepac would sign and return.  (O'Malley (September 19, 2007), pp. 214:9-215:4; O'Malley (June 20, 2008), pp. 39:11-43:14)  All published AWPs reflected what Purepac had submitted to the pricing compendia.  (O'Malley (September 19, 2007), pp. 131:22-133:5)

*Contract Prices Generally*

98.     All customers who had contracts with Purepac paid contract prices.  (O'Malley (June 20, 2008), pp. 216:19-217:4)   92 percent of sales to wholesalers were subject to chargebacks, indicating that 92 percent of Purepac sales through wholesalers were to customers who had contracts with Purepac. (O'Malley (June 20, 2008), pp. 90:14-94:13; 95:20-96:15)

99.     Contract prices were below WAC even before any credits or rebates had been applied. (O'Malley (June 20, 2008), pp. 84:22-85:11; 90:1-13)

*Transactions with Wholesalers*

100.     Purepac sold products to wholesalers pursuant to contracts.  (O'Malley (June 20, 2008), pp. 143:1-144:16; 175:11-178:9; 189:20-191:22)   Some wholesaler contracts provided for product-specific pricing and incentives.  (O'Malley (June 20, 2008), pp. 199:7-205:5)  Product-specific pricing was below WAC.   (O'Malley (June 20, 2008), pp.: 84:22-85:11)   Some wholesaler contracts also provided for baseline rebates.  (O'Malley (June 20, 2008), pp. 175:11-

181:15. Baseline rebates reduced the wholesalers' dead net price for all relevant Purepac products.

101. 92 percent of sales to wholesalers were subject to chargebacks. (O'Malley (June 20, 2008), pp. 95:20-96:15; 214:5-217:10) Chargebacks also reduced the wholesalers' dead net price. (Miranda (October 19, 2007), pp. 138:21-140:18; O'Malley (June 20, 2008), pp. 187:17-189:8) A low percentage of sales to wholesalers were at WAC (i.e., 8 percent of sales to wholesalers were not subject to a chargeback). (O'Malley (September 19, 2007), pp. 197:1-199:22; 232:4-13 13).

*Transactions with Retailers and Other Pharmacy Providers*

102. Purepac sold products to retailers and other pharmacy providers pursuant to contracts. . (O'Malley (June 20, 2008), pp. 85:21-86:1; 145:13-21; 192:18-193:17; 205:6-210:21) Retailers' contract prices were also below WAC. (O'Malley (June 20, 2008), pp. 85:6-11; 88:9-90:13) Some retail contracts provided for product-specific pricing and incentives. (O'Malley (June 20, 2008), pp. 97:6-98:8; 146:9-19; 192:18-197:6; 199:7-16; 210:22-213:20)

103. Product-specific pricing was below WAC. (O'Malley (June 20, 2008), pp. 97:6-98:8 8; 210:22-213:20). Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for all relevant Purepac products. (O'Malley (June 20, 2008), pp. 210:22-213:20)

104. Retailers who had contracts with Purepac and who purchased drugs directly from Purepac were considered direct customers. (O'Malley (June 20, 2008), pp. 100:7-14) Retailers who had contracts with Purepac but who obtained drugs through wholesalers were considered indirect customers. (O'Malley (June 20, 2008), pp.134:8-15) Indirect sales to retail customer would trigger payment of chargebacks by Purepac to wholesalers. (O'Malley (June 20, 2008), pp. 85:6-11; 95:17-96:15; 99:3-12; 187:17-189:8) Direct prices to retail customers were typically lower than indirect prices to retail customers. (O'Malley (June 20, 2008), pp.100:15-101:10)

*Transactions with Non-retail Pharmacy Providers*

105.    Purepac sold products to other pharmacy providers pursuant to contracts.   (O'Malley (June 20, 2008), pp.  146:20-147:11)  As with retailers, some of these contracts provided for product-specific pricing and incentives.    (O'Malley (June 20, 2008), pp.  146:20-147:15) Product-specific pricing was below WAC. (O'Malley (June 20, 2008), pp.  146:20-147:15)

*Participation in the New York Medicaid Reimbursement Program*

106.    Purepac's participation in the New York Medicaid Reimbursement Program was voluntary. (O'Malley (June 20, 2008), pp.  124:8-125:19)

**Roxane**

*Reporting of WAC*

107.    Roxane reported WAC to the pricing compendia.   (Waterer (May 9, 2007), pp.  70:3-15; 420:5-426:16; 446:20-447:3; 662:13-673:13; 712-714:13)  Roxane had only one WAC at any given time and reported the same WAC to each pricing compendium.   (Waterer (May 9, 2007), pp. 616:18-21; 650:13-23)

108.    After reporting a WAC, the pricing compendia would send to Roxane a turnaround document or other medium through which Roxane could verify the WAC before it was published, which Roxane would sign and return. (Waterer (May 9, 2007), pp. 211:21-215:20; 647:21-650:12)    All published WACs reflected what Roxane had submitted to the pricing compendia, without known exceptions.    (Waterer (May 9, 2007), pp. 211:21-215:20; 652:18-654:4)

*Reporting of AWP*

109.    Roxane would set its AWP at a price that was 10% below the reported brand AWP. (Waterer (May 9, 2007), pp. 69:1-23; 448:14-10; 604:1-18)   Roxane reported AWP to pricing compendia.    (Waterer (May 9, 2007), pp. 68:14-25; 446:10-19)   Roxane's reported AWP reported had no connection whatsoever to actual prices charged by Roxane to any customers. (Waterer (May 9, 2007), pp. 70:16-71:9; 72:17-20; 79:19-80:13; 112:5-119:14; 123:5-129:15; 447:9-20; 454:7-18; 843:18-846:14)

110.    After reporting an AWP, the pricing compendia would send to Roxane a turnaround document or other medium through which Roxane could verify the AWP before it was published, which Roxane would sign and return. (Waterer (May 9, 2007), pp. 62:10-63:21; 135:8-137:24; 454:19-458:7; 647:21-650:12)   All published AWPs reflected what Roxane had submitted to the pricing compendia. (Waterer (May 9, 2007), pp. 82:16-84:22)

*Contract Prices Generally*

111.    All customers who had contracts with Roxane paid contract prices. (Waterer (May 9, 2007), pp. 52:12-17; 581:23-582:7; 761:22-762:8)   Contract prices were below WAC even before any credits or rebates had been applied. (Waterer (May 9, 2007), pp. 72:21-73:8; 150:3-151:14; 584:2-10; 753:10-756:7)   Contract prices were further reduced by subsequent credits and rebates. (Waterer (May 9, 2007), pp. 788:17-792:1)

*Transactions with Wholesalers*

112.    Roxane sold products to wholesalers pursuant to contracts. (Waterer (May 9, 2007), pp. 48:21-49:17; 554:18-555:19; 558:15-559:23; 570:8-572:12) Some wholesaler contracts provided for product-specific pricing and incentives. (Waterer (May 9, 2007), pp. 585:18-590:10; 616:22-619:24; Exhibit 72) Product-specific pricing was below WAC. (Waterer (May 9, 2007), pp. 616:22-619:24)   Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant Roxane product. (Waterer (May 9, 2007), pp. 88:5-16; 788:17-792:1)

113.    Some wholesaler contracts provided for baseline rebates. (Waterer (May 9, 2007), pp. 784:2-785:21)   Baseline rebates reduced the wholesalers' dead net price for all relevant Roxane products. (Waterer (May 9, 2007), pp. 856:6-863:15.   Sales to wholesalers were subject to chargebacks.   Chargebacks also reduced the wholesalers' dead net price. (Waterer (May 9, 2007), pp. 84:23-86:25; 570:8-576:19; 577:12-580:9)

*Transactions with Retailers and Other Pharmacy Providers*

114.   Roxane sold products to retailers and other pharmacy providers pursuant to contracts. (Waterer (May 9, 2007), pp. 48:21-50:16; 551:2-552:17) The prices at which retailers purchased products from Roxane were below WAC.   (Waterer (May 9, 2007), pp. 172:4-180:18; 415:7-418:4)

115.   Retailers who had contracts with Roxane who purchased drugs directly from Roxane were considered direct customers.   (Waterer (May 9, 2007), pp. 194:14-195:21; 547:3-11) Retailers who had contracts with Roxane but who obtained drugs through wholesalers were considered indirect customers.   (Waterer (May 9, 2007), pp. 547:12-548:21)   Indirect sales to retail customer would trigger payment of chargebacks by Roxane to wholesalers.   (Waterer (May 9, 2007), pp. 577:12-580:9; 846:15-855:20)

116.   Roxane sold products to other pharmacy providers pursuant to contracts.   (Waterer (May 9, 2007), pp. 48:21-50:25; 584:2-585:11)   As with retailers, some of these contracts provided for baseline rebates.   (Waterer (May 9, 2007), pp. 87:1-88:4)   Baseline rebates reduced the acquisition cost to the other pharmacy providers' for all relevant Roxane products.   (Waterer (May 9, 2007), pp. 87:1-88:4) Other pharmacy providers who had contracts with Roxane and who purchased products through wholesalers were considered indirect customers.   (Waterer (May 9, 2007), pp. 85:12-86:9)

*Participation in the New York Medicaid Reimbursement Program*

117.   Roxane's participation in the New York Medicaid Reimbursement Program was voluntary.   (Waterer (May 9, 2007), pp. 40:7-42:21)

**Sandoz**

*Reporting of WAC*

118.   If Sandoz was the first manufacturer to market a generic product, Sandoz would set WAC at about 25% below the Sandoz AWP.   (Worrell (August 23, 2007), p. 85:7-13)   Sandoz would set WAC at the highest possible price in this scenario because Sandoz would have the only generic product in the market.   (Worrell (August 23, 2007), p. 85:17-23)   If Sandoz was

launching into a competitive market, however, it would set its WAC somewhat close to its competitors' prices.  (Worrell (August 23, 2007), p. 87:3-20)

119.    Sandoz reported WAC to the pricing compendia.   (Galownia (June 11, 2007), p. 264) Sandoz had only one WAC at any given time and reported the same WAC to each pricing compendium.  (Worrell (March 26, 2008), pp. 347-350)  After reporting a WAC, the pricing compendia would send to Sandoz a turnaround document or other medium through which Sandoz could verify the WAC before it was published, which Sandoz would sign and return. (Galownia (June 11, 2007), pp. 108-109, 133-134, 136-138,141-142)   All published WACs reflected what Sandoz had submitted to the pricing compendia, without known exceptions. (Kellum (January 25, 2007), pp. 56-57)

*Reporting of AWP*

120.    Sandoz would set its AWP at a price that was 10-15% below the reported brand AWP. (Worrell, March 26, 2008), pp. 465-466; Galownia (June 11, 2007), pp. 158, 161-163; Kellum (January 25, 2007), p. 79)  Sandoz reported AWP to the pricing compendia.   (Galownia (June 11, 2007), p. 264)  The AWP, as reported, had no connection whatsoever to actual prices charged to any customers.  (Galownia (June 11, 2007), pp. 114-118)  Sandoz' definition of AWP was not consistent with that proffered by FDB or the NPC.   (Galownia (June 11, 2007), pp. 116, 122, 127, 222)

121.    After reporting an AWP, the pricing compendia would send to Sandoz a turnaround document or other medium through which Sandoz could verify the AWP before it was published, which Sandoz would sign and return.  (Worrell (March 26, 2008), pp. 377-378)  Sandoz had only one AWP at any given time and reported the same AWP to each pricing compendium.   (Worrell, March 26, 2008), pp. 347-350)  All published AWPs reflected what Sandoz had submitted to the pricing compendia, without known exceptions.  (Galownia (June 11, 2007), pp. 264; Kellum (January 25, 2007), p. 56-57)

*Contract Prices Generally*

122.   All customers who had contracts with Sandoz paid contract prices.   (Pefley (April 30, 2008), pp. 112:14-19)  Contract prices were, in most cases, below WAC even before any credits or rebates had been applied.  (Pefley (April 30, 2008), p. 280:5-16; Galownia (June 11, 2007), pp. 261-262; Kellum (January 25, 2007), pp. 115:15-166:4.  Contract prices were further reduced by subsequent credits and rebates.  *(*Kellum (January 25, 2007), p. 101:9-17)

*Transactions with Wholesalers*

123.   Sandoz sold products to wholesalers pursuant to contracts.  (Galownia (June 11, 2007), pp. 84-85, 87; Pefley (April 30, 2008), pp. 99-101)  Some wholesaler contracts provided for product-specific pricing and incentives.  (Pefley (April 30, 2008), pp. 56:5-15)  Product-specific pricing was below WAC.     (Kellum (January 25, 2007), p. 115-116:4)    Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product.  (Galownia (June 11, 2007), p. 323)  Some wholesaler contracts provided for baseline rebates.  (Pefley (April 30, 2008), pp. 83-84)  Baseline rebates reduced the wholesalers' dead net price for all relevant Sandoz products.

124.   A high percentage of sales to wholesalers were also subject to chargebacks.   (Pefley (April 30, 2008), pp. 280-281)  Chargebacks also reduced the wholesalers' dead net price. (Pefley (April 30, 2008), pp. 259-261)

*Transactions with Retailers and Other Pharmacy Providers*

125.   Sandoz sold products to retailers and other pharmacy providers pursuant to contracts.  . (Worrell (August 23, 2007), p. 32; Galownia (June 11, 2007), pp. 84-87)  Retailers' contract prices were below WAC.  (Worrell, March 26, 2008), pp. 331-332, 334)  Some contracts with retailers provided for product-specific pricing and incentives.   Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for the relevant Sandoz product.  (Worrell, March 26, 2008), pp. 331-332, 334).

126.   Retailers who had contracts with Sandoz who purchased drugs directly from Sandoz were considered direct customers.  (Worrell, March 26, 2008), pp. 331-332, 334)  Retailers who had

contracts with Sandoz but who obtained drugs through wholesalers, were considered indirect customers. (Galownia (June 11, 2007), pp. 232-233; Worrell (August 23, 2007), pp. 32-33) Indirect sales to retail customers would trigger payment of chargebacks by Sandoz to wholesalers.

127.   As with retailers, Sandoz sold products to other pharmacy providers pursuant to contracts. (Galownia (June 11, 2007), pp. 86, 88; Pefley (April 30, 2008), pp. 54:22-56:15)

*Participation in the New York Medicaid Reimbursement Program*

128.   Sandoz's participation in the New York Medicaid Reimbursement Program was voluntary. (Hartman (January 25, 2007), pp. 32-33)

***Warrick***

*Reporting of WAC*

129.   Warrick reported WAC to the pricing compendia.   (Weintraub (2006), pp. 157:1-5; 557:22-562:25; 600:2-601:24; 644:7-13; 849:18-24) Warrick had only one WAC at any given time and reported the same AWP to each pricing compendium. After reporting a WAC, the pricing compendia would send to Warrick a turnaround document or other medium through which Warrick could verify the AWP before it was published, which Warrick would sign and return. (Weintraub (2006), pp. 584:19-588:16; 843:7-844:3)

*Reporting of AWP*

130.   Warrick would set its AWP at a price that was 10% below the reported brand AWP. (Weintraub (2006), pp.   147:14-149:11; 166:17-24) Warrick reported AWP to the pricing compendia.   (Weintraub (2006), pp. 751:5-10) Warrick had only one AWP at any given time and reported the same AWP to each pricing compendium. (Weintraub (2006), pp. 852:21-23) AWP, as reported, had no connection whatsoever to actual prices charged to any customers. (Weintraub (2006), pp.   134:19-135:1; 751:11-758:25; 760:16-761:15)

131.   After reporting an AWP, the pricing compendia would send to Warrick a turnaround document or other medium through which Warrick could verify the AWP before it was published, which Warrick would sign and return. (Weintraub (2006), pp. 843:7-844:3; 849:8-17)

*Contract Prices Generally*

132.   All customers who had contracts with Warrick paid contract prices. (Sherman (May 23, 2005), pp. 46:11-47:25)  Contract prices were below WAC even before any credits and rebates had been applied. (Sherman (May 23, 2005), pp. 46:11-47:25)  Contract prices were further reduced by subsequent credits and rebates. (Weintraub (2006), pp. 153:24-154:1)

*Transactions with Wholesalers*

133.   Warrick sold products to wholesalers pursuant to contracts. (Weintraub (2006), pp. 122:13-24; Graf (May 11, 2005), p. 33:12-15)  Some wholesaler contracts provided for product-specific pricing and incentives. (Weintraub (2006), pp. 125:7-10; Graf (May 11, 2005), pp. 127:9-134:3)  Product-specific pricing was below WAC. (Kapur (March 7, 2002), pp. 109:14-111:13)  Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant Warrick products. (Weintraub (2006), pp. 464:12-467:8; Graf (February 11, 2003) (Texas), pp. 187:20-190:19; Kapur (March 7, 2002), pp. 77:19-84:20; Sherman (May 23, 2005), pp. 43:13-45:2)  Some wholesaler contracts provided for baseline rebates. (Graf (February 11, 2003) (Texas), pp. 182:11-185:21; 190:18; Kapur (March 7, 2002), pp. 221:22-224:15)   Baseline rebates reduced the wholesalers' dead net price for all relevant Warrick products. (Graf (February 11, 2003) (Texas), pp. 182:12-185:21)

134.   A high percentage of sales to wholesalers were also subject to chargebacks. (Weintraub (2006), pp. 124:12-20)  Chargebacks also reduced the wholesalers' dead net price. (Weintraub (2006), pp. 122:13-24; Kapur (March 7, 2002), pp. 109:14-111:13; 228:2-231:2)   A low percentage of sales to wholesalers were at WAC.

*Transactions with Retailers and Other Pharmacy Providers*

135.   Warrick sold products to retailers and other pharmacy providers pursuant to contracts. . (Weintraub (2006), pp. 761:23-762:19; Kapur (March 7, 2002), pp. 238:3-241:21; Exhibit 153)

Retailers' contract prices were below WAC.   (Weintraub (2006), pp. 762:30-763:6)  Some retail contracts provided for product-specific pricing and incentives.   (Weintraub (2006), pp.  112:22-113:08; Sherman (May 23, 2005), pp. 59:2-64:17)

136.    Product-specific incentives (credits and/or rebates) reduced the acquisition cost to the retailers for all relevant Warrick products.    (Kapur (March 7, 2002), pp. 157:10-161:3;  Graf (May 11, 2005), pp. 73:9-79:23)   Some retail contracts also provided for baseline rebates.  (Weintraub (2006), pp. 111:18-112:21)  Baseline rebates reduced the acquisition cost to retailers for all products.  (Kapur (March 7, 2002), pp. 157:10-161:3)

137.    Retailers who had contracts with Warrick and who purchased drugs directly from Warrick were considered direct customers.  (Graf (May 11, 2005), pp. 135:24-142:8)  Retailers who had contracts with Warrick but who obtained drugs through wholesalers, were considered indirect customers.  (Graf (February 11, 2003) (Texas), pp. 278:12-23)  Indirect retail customer sales would trigger payment of chargebacks by Warrick to wholesalers.    (Kapur (March 7, 2002), pp. 109:11-111:13; Sherman (May 23, 2005), pp. 28:19-29:2)  Direct prices to retail customers were typically lower than indirect prices to retail customers.

138.    Warrick  sold  products  to  other  pharmacy  providers  pursuant  to  contracts.    Other pharmacy providers had contracts with Warrick.  (Weintraub (2006), pp.  477:08-478:10 (Vol. III).

*Participation in the New York Medicaid Reimbursement Program*

139.    Warrick's  participation  in  the  New  York  Medicaid  reimbursement  program  was voluntary.  (Weintraub (2006), pp. 159:11-160:7; 172:24-173:12; 186:9)

***Teva***

*Reporting of WAC*

140.    Teva  reported  WAC  to  the  pricing  compendia.    (DeNicola (January 25, 2008), pp. 114:14-115:18; Krauthauser (January 29, 2008), p. 57:12-20; Foster (February 20, 2008, pp. 117:1-118:3; 87:12-88:5; Cioschi (February 12, 2008), pp. 72:6-10; 99:15-101:3)  Teva had  only

one WAC at any given time and reported the same WAC to each pricing compendium. (Denman (April 16, 2008), pp. 76:21-78:11)   After reporting a WAC, the pricing compendia would send to Teva a turnaround document or other medium through which Teva could verify the WAC before it was published, which Teva would sign and return.  (Foster (February 20, 2008), pp. 126:18-128:2; 142:20-146:11)   All published WACs reflected what Teva had submitted to the pricing compendia, without known exceptions. (Foster (February 20, 2008), pp. 126:18-128:2; 142:20-146:11)

*Reporting of AWP*

141.   Teva would set its AWP at a price that was 10% below the reported brand AWP.  (Foster (February 20, 2008), pp. 73:10-77:5; Marth (May 28, 2008), pp. 103:11-15; 104:12-106:6; 160:9-162:6; Cioschi (February 12, 2008), pp. 42:10-43:18; 46:18-47:22; Nase (January 30, 2008), pp. 98:2-101:10)  Teva reported AWP to the pricing compendia. (DeNicola (January 25, 2008), pp. 114:14-115:18; Krauthauser (January 29, 2008), p. 57:12-20; Foster (February 20, 2008), pp. 117:1-118:3; 166:7-16; Marth (May 28, 2008), pp. 105:2-7; 154:20-158:6; Cioschi (February 12, 2008), pp. 72:6-10; 99:15 - 101:3) Teva had only one AWP at any given time and reported the same AWP to each pricing compendium. (Denman (April 16, 2008), p. 65:7-10)  If Teva submitted an SWP, Teva knew that the SWP equaled the AWP.   (Foster (February 20, 2008), pp. 85:2-87:6; Marth (May 28, 2008), pp. 154:20-258:6; Cioschi (February 12, 2008), pp. 73:7-85:3; Krauthauser (January 29, 2008), pp. 48:5-49:16)

142.   AWP, as reported, had no connection whatsoever to actual prices charged to any customers.  (DeNicola (January 25, 2008), pp. 116:5-8; Cioschi (February 12, 2008), pp. 72:6-85:3; Nase (January 30, 2008), pp. 95:11-97:16; Krauthauser (January 29, 2008), pp. 101:1-107:18; 277:5-281:2)  Teva's definition of AWP was not consistent with what was proffered by FDB or NPC.  (Denman (April 16, 2008), pp. 122:8-143:13)

143.   After reporting an AWP, the pricing compendia would send to Teva a turnaround document or other medium through which Teva could verify the AWP before it was published, which Teva would sign and return.  (Foster (February 20, 2008), pp 126:18-128:2; 142:20-146:11; Cioschi (February 12, 2008), pp. 117:12-120:16)  All published AWPs reflected what

Teva had submitted to the pricing compendia, without known exceptions. (Denman (April 16, 2008), pp. 117:9-118:13)

*Contract Prices Generally*

144.    All customers who had contracts with Teva paid contract prices. (Denman (April 16, 2008), p. 82:13-20)  Contract prices were below WAC even before any credits and rebates had been applied.    (Foster (February 20, 2008), pp 92:3-94:8; Marth (May 28, 2008), pp. 111:9-114:2; Nase (January 30, 2008), pp. 107:1-109:9; Krauthauser (January 29, 2008), pp. 177:4-178:21)  Contract prices were further reduced by subsequent credits and rebates. (Denman (April 16, 2008), p. 82:13-20)

*Transactions with Wholesalers*

145.    Teva sold products to wholesalers pursuant to contracts.  (Denman (April 16, 2008), pp. 213:21-214:15; 80:16-82:2; Wodarczyk (April 17, 2008), pp. 28:16-31:18)  Some wholesaler contracts provided for product-specific pricing and incentives.  Marth (May 28, 2008), p. 111:9-114:2; Krauthauser (January 29, 2008), pp. 172:17-173:3; Wodarczyk (April 17, 2008), pp. 21:7-31:18; 38:10-46:2; Denman, John 04/16/08: 213:21-229:30)  Product-specific pricing was below WAC.  Marth (May 28, 2008), p. 111:9-114:2

146.    Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant product.  (Denman (April 16, 2008), pp. 213:21-221:4)  Some wholesaler contracts provided for baseline rebates.   (Wodarczyk (April 17, 2008), pp. 21:7-23:18; Denman (April 16, 2008), pp. 80:16-85:9)  Baseline rebates reduced the wholesalers' dead net price for all products.  (Denman (April 16, 2008), pp. 80:16-86:10; Wodarczyk (April 17, 2008), pp. 67:9-68:14)   A high percentage of sales to wholesalers were subject to chargebacks.  (Krauthauser (January 29, 2008), pp. 173:5-175:12)  Chargebacks also reduced the wholesalers' dead net price.   (Krauthauser (January 29, 2008), pp. 171:10-15; Denman (April 16, 2008), pp.  225:8-13)  A low percentage of sales to wholesalers were at WAC.

*Transactions with Retailers and Other Pharmacy Providers*

147.    Teva sold products to retailers and other pharmacy providers pursuant to contracts.  .
(Krauthauser (January 29, 2008), pp. 169:10-13)  Retailers' contract prices were below WAC.
(Krauthauser (January 29, 2008), p.  169:10-17)  Some retail contracts provided for product-
specific pricing and incentives.  (Wodarczyk (April 17, 2008), pp. 47:8-51:9; 55:6-57:4)  Some
retail contracts also provided for baseline rebates.  (Wodarczyk (April 17, 2008, pp. 21:7-23:18;
57:8-59:5)

148.    Retailers who had contracts with Teva and who purchased drugs directly from Teva were
considered direct customers.    (Denman (April 16, 2008), p.  77:13-19)  Retailers who had
contracts with Teva but who obtained drugs through wholesalers, were considered indirect
customers.    (Marth (May 28, 2008), p.  108:2-12)  Indirect sales to retail customers would
trigger payment of chargebacks by Teva to wholesalers.    (Marth (May 28, 2008), pp.  108:2-
110:18; 114:18-116:5; Krauthauser (January 29, 2008), pp.  169:10-171:9)  Direct prices to retail
customers were typically lower than indirect prices to retail customers.  (Wodarczyk (April 17,
2008), pp. 63:7-66:19)

149.    Teva sold products to other pharmacy providers pursuant to contracts.  (Nase (January
30, 2008), pp.  107:1-108:15; Wodarczyk (April 17, 2008), pp. 51:17-52:21)  As with retailers,
some of these contracts provided for product-specific pricing and incentives.    (Wodarczyk
(April 17, 2008, pp. 51:17-54:20)  Indirect sales to other pharmacy providers who bought drugs
through wholesalers would trigger the payment of chargebacks to wholesalers by Teva.  (Nase
(January 30, 2008), pp.  107:1-109:13; Krauthauser (January 29, 2008), p.  172:2-16)

*Participation in the New York Medicaid Reimbursement Program*

150.    Teva's participation in the New York Medicaid Reimbursement Program was voluntary.
(Marth (May 28, 2008), p. 246:9-15; Wodarczyk (April 17, 2008), pp. 154:7-155:14)

*Watson*

*Reporting of WAC*

151.    Watson reported WAC or "WHLNET" to the pricing compendia.  (Recchia (October 11, 2007), pp. 37:19-38:6; Barclay (November 21, 2005), pp. 163:18-164:09; Boyer (July 14, 2004), pp. 97:13-99:10; Clark (December 1, 2005), pp. 22:21-23:07; Clark (June 27, 2007), pp. 28:22-30:05; 32:2-8; Exhibit 2)  Watson had only one WAC at any given time and reported the same WAC to each pricing compendium.  (Boyer (June 27, 2007), pp. 66:01-67:15; Exhibit 5)

152.    After reporting a WAC, the pricing compendia would send to Watson a turnaround document or other medium through which Watson could verify the WAC before it was published, which Watson would sign and return.  (Clark (June 28, 2007), pp. 194:07-197:15; Exhibit 30)  All published WACs reflected what Watson had submitted to the pricing compendia.  (Clark (December 1, 2005), pp. 154:02-155:08; Recchia (October 11, 2007), p. 36:03-16)

*Reporting of AWP*

153.    Watson would set its AWP at a price that was 10% below the reported brand AWP.  (Boyer (July 14, 2004), pp. 115:03-116:07; Clark (December 1, 2005), pp. 27:04-28:02; 40:04-08; Boyer (June 27, 2007), pp. 78:14-19)  Watson reported AWP to the pricing compendia.  (Callahan (July 14, 2004), pp. 86:11-87:04; Clark (June 27, 2007), pp. 28:22-30:05; 32:2-8; Recchia (October 17, 2007), pp. 35:10-13)  Watson had only one AWP at any given time and reported the same AWP to each pricing compendium.    (Callahan (July 15, 2004), pp. 160:14-161:22; Recchia (October 11, 2007), pp. 166:10-21; Boyer (June 27, 2007), pp. 66:01-67:15; Exhibit 5)

154.    At some point after 2000, Watson reported a SWP to the pricing compendia.  (Callahan (July 15, 2004), p. 60:2-21)  Watson knew the compendia would multiply this SWP by "1" to create an AWP to be published.  (Callahan, (July 14, 2004), pp. 86:11-88:16)

155.    After reporting an AWP or SWP, the pricing compendia would send to Watson a turnaround document or other medium through which Watson could verify the AWP before it

was published, which Watson would sign and return. (Clark (June 28, 2007), pp. 194:07-197:15; Exhibit 30) All published AWPs reflected what Watson had submitted to the pricing compendia, without known exceptions. (Clark (December 1, 2005), pp. 154:02-155:08)

*Contract Prices Generally*

156.   All customers who had contracts with Watson paid contract prices. Contract prices were below WAC even before any credits or rebates had been applied. Contract prices were further reduced by subsequent credits and rebates. (Callahan (July 14, 2004), p. 105:13-17)

*Transactions with Wholesalers*

157.   Watson sold products to wholesalers pursuant to contracts.   (Barclay (November 21, 2005), p. 37:08-12) Some wholesaler contracts provided for baseline rebates. Baseline rebates reduced the wholesalers' dead net price for all relevant products.

158.   A high percentage of sales to wholesalers were also subject to chargebacks. (Callahan (November 29, 2005), pp. 315:12-14; 314:03-05) Chargebacks also reduced the wholesalers' dead net price. (Recchia (October 11, 2007), pp. 116:04-117:09) A low percentage of sales to wholesalers were at WAC.

*Transactions with Retailers and Other Pharmacy Providers*

159.   Watson sold products to retailers and other pharmacy providers pursuant to contracts.   . (Barclay (November 21, 2005), p. 35:10-18) Retailers' contract prices were below WAC.

160.   Retailers who had contracts with Watson who purchased drugs directly from Wyeth were direct customers. (Barclay (November 21, 2005), pp. 272:04-274:10; 53:18-55:04) Conversely, retailers who had contracts with Watson but who obtained drugs through wholesalers, were considered indirect customers. (Barclay (November 21, 2005), pp. 272:04-274:10) Indirect sales to retail customers would trigger payment of chargebacks by Watson to wholesalers. Barclay (November 21, 2005), pp. 292:11-293:08; Boyer (July 14, 2004), pp. 93:10-94:01)

161.   Watson sold products to other pharmacy providers pursuant to contracts.  (Callahan (July 13, 2006), pp. 610:21-611:05; Barclay (November 21, 2005), pp. 35:10-36:10)

162.   Product-specific pricing was below WAC.  (Clark (December 1, 2005), p. 40:12-14) Other pharmacy providers who had contracts with Watson and who purchased products through wholesalers were considered indirect customers.  (Barclay (November 21, 2005), pp. 272:04-274:10; Exhibit 22)

*Participation in the New York Medicaid Reimbursement Program*
163.   Watson's participation in the New York Medicaid Reimbursement Program was voluntary.  (Barclay (November 21, 2005), p. 47:02-04)

**Wyeth**
*Reporting of WAC*
164.   WAC was not a net price, for it did not reflect credits and/or rebates.  (Bartone (May 23, 2008), pp. 175:14-177:11; Truex (June 19, 2008), pp. 77:21-78:7)  WAC could have been an invoice price; in the absence of a contract, the wholesaler paid a "direct price" which was sometimes the same as WAC.   (Bartone (May 23, 2008), p. 176:16-177:11) Wyeth reported WAC to the pricing compendia.  (Truex (June 19, 2008, pp. 77:21-78:11)  Wyeth had only one WAC at any given time and reported the same WAC to each pricing compendium.  (Truex (June 19, 2008), pp. 66:1-73:11)

165.   After reporting a WAC, the pricing compendia would send to Wyeth a turnaround document or other medium through which Wyeth could verify the WAC before it was published, which Wyeth would sign and return.   (Truex (June 19, 2008), pp. 66:1-73:11)

*Reporting of AWP*
166.   Wyeth would set its AWP relative to the competition.  (Truex (June 19, 2008), p. 60:16-61:6)  Wyeth reported AWP to the pricing compendia (in the form of SWPs).  (Truex (June 19, 2008), pp. 63:7-64:22; 108:6-114:11; 117:2-6)  If Wyeth reported SWPs, Wyeth knew the SWP would be published as an AWP.  (Truex (June 19, 2008), pp. 81:17-82:5)  Wyeth knew that SWP

essentially equaled AWP. (Truex (Jun 19, 2008), pp. 63:7-65:13; 81:17-82:5) Wyeth had only one AWP at any given time and reported the same AWP to each pricing compendium. (Truex (Jun 19, 2008), pp. 74:11-75:8; 112:16-22) Wyeth's definition of AWP was not consistent with that proffered by FDB or NPC. (Truex (June 19, 2008), pp. 60:9-62:8; 97:18-103:12; 105:12-107:10) AWP, as reported, had no connection whatsoever to actual prices charged to any customers. (Truex (June 19, 2008), pp. 60:9-61:10)

167.   After reporting an AWP, the pricing compendia would send to Wyeth a turnaround document or other medium through which Wyeth could verify the AWP before it was published, which Wyeth would sign and return. (Truex (Jun 19, 2008), pp.  66:1-73:11; 83:17-97:17; 117:7-22) All published AWPs reflected what Wyeth had submitted to the pricing compendia, without known exceptions. (Truex (Jun 19, 2008), pp. 81:17-82:5)

*Contract Prices Generally*

168.   All customers who had contracts with Wyeth paid contract prices.   (Bartone (May 23, 2008), pp. 65:18-22)  Contract prices were below WAC even before any credits or rebates had been applied.  (Bartone (May 23, 2008), pp. 125:8-126:14; Truex (Jun 19, 2008), pp.  77:21-78:1)  Contract prices were further reduced by subsequent credits and rebates.  (Bartone (May 23, 2008), pp. 137:14-138:5

*Transactions with Wholesalers*

169.   Pursuant to contracts with Wyeth, some wholesaler contracts provided for product-specific pricing and incentives.    (Bartone (May 23, 2008), pp. 89:9-90:12;  94:19-96:15) Product-specific pricing was below WAC. (Bartone (May 23, 2008), pp. 125:8-126:14;  Truex (Jun 19, 2008), pp.  77:21-78:1)  Product-specific incentives (credits and/or rebates) reduced the wholesalers' true acquisition cost for the relevant Wyeth product.  (Bartone (May 23, 2008), pp. 162:7-164:10)  Some wholesaler contracts provided for baseline rebates. (Bartone (May 23, 2008), pp. 126:15-138:5)  Baseline rebates reduced the wholesalers' dead net price for all relevant products.  (Bartone (May 23, 2008), pp. 162:7-164:10)  Chargebacks also reduced WAC. (Bartone (May 23, 2008), pp. 49:1-5; 116:5-14).

*Transactions with Retailers and Other Pharmacy Providers*

170.    Wyeth sold products to retailers and other pharmacy providers pursuant to contracts. (Bartone (May 23, 2008), pp. 64:9-14; 68:15-69:1)  Retailers' contract prices were below WAC. (Bartone (May 23, 2008), pp. 125:8-126:14;  Truex (Jun 19, 2008), pp.  77:21-78:1)  Some retail contracts provided for product-specific pricing and incentives.    (Bartone (May 23, 2008), pp. 89:9-90:12; 91:6-93:10; 96:16-100:11).

171.    Retailers who had contracts with Wyeth and who purchased drugs directly from Wyeth were considered direct customers.    (Bartone (May 23, 2008), pp. 11:12-14:18)  Conversely, retailers who had contracts with Wyeth but who obtained drugs through wholesalers, were considered indirect customers.    (Bartone (May 23, 2008), pp. 11:12-13:13)  Indirect sales to retail customers would trigger payment of chargebacks by Wyeth to wholesalers. (Bartone (May 23, 2008), pp. 151:21-152:20.  Direct prices to retail customers were typically lower than indirect prices to retail customers.

172.    Wyeth sold products to other pharmacy providers pursuant to contracts.    (Bartone (May 23, 2008), pp. 115:8-116:8)    As with retailers, some of these contracts provided for product-specific pricing. (Bartone (May 23, 2008), pp. 115:8-116:8)  Product-specific pricing was below WAC.    (Bartone (May 23, 2008), pp. 125:8-126:14;  Truex (Jun 19, 2008), pp.  77:21-78:1) Other pharmacy providers who had contracts with Wyeth and who purchased products through wholesalers were considered indirect customers. (Bartone (May 23, 2008), pp. 115:8-116:14)

*Participation in the New York Medicaid Reimbursement Program*

173.    Wyeth's participation in the New York Medicaid Reimbursement Program was voluntary.  (Truex (June 19, 2008), pp. 40:5-43:6)

## IX.    COMPUTATIONS OF AWP AND WAC

### Data Obtained from Defendants

174.    It is my understanding that, in the context of the Litigation, Defendants were asked to provide the entirety of data contained thereby relating to transactions, effected during the relevant timeframe, between the Defendants and all customers to which they sold particular

drugs. In order to perform my computations, I was provided this data for the NDCs discussed herein and for which I have summarized my computations in the Exhibits attached to this Statement.

175.    Because the data was provided individually by each of the defendants, the data came in many forms and required, therefore, efforts to standardize (as much as possible) and format the data in a manner that would be useful for computations and that would facilitate the types of queries and analysis needed for my computations. In formatting the transactional data, all of the information contained therein that would factor into my computations was retained; none of the data was altered in substance, in any way.

176.    The transactional data provided by defendants included information delineating sales (and, similarly, invoices), sales returns, customer credits, and customer rebates, among other things, as well as information relating to chargebacks. Each of the aforementioned fields of information, as provided by the Defendants, was considered in my computation of either average WAC or AWP.

## Computation of Average WAC

177.    As stated above, WAC is defined as the price paid by a wholesaler (or distributor) to a manufacturer for a particular product. As such, my computations relating to WAC for each of the NDCs in the Litigation centered on determining, from the transactional data, an estimate of the actual, net price paid by wholesalers and distributors in their transactions with the manufacturer Defendants. It was my determination that such a price would represent the best estimate of WAC and a price that Defendants could have determined, from their own transactional data, for purposes of reporting a price to the pricing compendia during the relevant timeframe.

178.    In arriving at an estimated, average net price, it was necessary to consider the impact of customer credits and rebates. As indicated above, that information was generally provided in the transactional data. Consideration of such an impact was appropriate, in my opinion, because, according to my experience with, and understanding of, the manner in which wholesalers and

distributors transacted with manufacturers in the pharmaceutical industry, as well as the information presented above, the majority, if not nearly all, of these credits and rebates were automatic and/or were applied to nearly each and every transaction effected between the two parties. Many customer credits and rebates did not need to be earned, nor were they unique to particular relationships or particular NDCs. Instead, the majority, if not nearly all, of the transactions between manufacturers and wholesalers or distributors were subject to a reduction of the sales/invoice price by such customer credits and/or rebates (similar to the baseline rebates discussed above).

179.    Ultimately, my determination of WAC reflected, in the best manner possible from the data available to me, an estimated measure thereof that reflected sales/invoice prices less any applicable, automatic credits and/or rebates.

### Rolling 12-month Analysis

180.    My computations included determining an estimated measure of an average WAC as of the end of each quarterly period during the relevant timeframe. Because of the nature of the data provided to me, including recognition of the differences in the temporal nature of the component transaction and, specifically, differences in the timing of when sales transactions might occur and, conversely, when customer credits or rebates might be processed by the manufacturer (i.e., at some point subsequent to the invoice date of the initial sale), I resolved to employ a 12-month rolling average in determining a WAC for any particular NDC. This average represented an estimated measure of WAC that could have been reported by Defendants to the pricing compendia. The 12-month rolling average was determined in the manner described below, the core of which remained consistent in my computations for each and every NDC, for each and every Defendant.

181.    For each NDC at issue in the Litigation, and for each quarterly period within the relevant timeframe for which relevant data was made available to me, I aggregated all of the sales of that NDC by the corresponding manufacturer to pertinent classes of trade, during the 12 months

preceding the end of the quarter.[7]  In computing WAC, only transactions to the wholesaler and distributor classes of trade were considered. I then aggregated all of the credits, rebates, and chargebacks processed between the manufacturer and customers in the pertinent classes of trade for the same 12 month period.

182.    Specifically, chargebacks (which occur only in the case of indirect sales from a wholesaler or distributor to the retail classes of trade), as described above, represent the amount paid by a manufacturer to a wholesaler or distributor to reimburse that party for having sold the manufacturer's product at an amount less than that for which it was purchased by the wholesaler or distributor, often because the manufacturer had previously agreed with particular customers in the retail classes of trade that its product could be purchased at a particular price (a price that may have been lower than the amount paid by the wholesaler or distributor).  In the simplest terms, the chargeback is intended to make the wholesaler or distributor "whole" in response to this scenario.  As such, I reduced applicable sales/invoice amounts by the entirety of chargebacks included in the transactional data when computing average WACs.

183.    Ultimately, reductions to sales in the form of customer credits, customer rebates and chargebacks were aggregated individually and subtracted from the aggregated sales amount.  The balance was divided by the aggregation of units sold on the related invoices over the same 12-month period to arrive at an average price, as of the end of a particular quarter.  This represented my estimated measure of average WAC, the computation of which was performed using only manufacturer-provided transactional data.

184.    Each manufacturer's transactional data presented particular peculiarities and/or characteristics which required special attention, potential modification of the average price formula, or other adjustments.  Any such adjustments were effected such that the integrity of the average price formula I was employing was maintained.  Similarly, in that regard, if particular data served to reduce my computation of an average WAC or AWP but was incomplete or unclear, or was immaterial to the transactional data, I elected to exclude such data in the interest

---

[7] For instance, for the quarterly period ended March 31, 2002, I aggregated all sales (and other) transactions for the period April 1, 2001 through March 31, 2002 for purposes of computing an average WAC as of (and for the rolling 12 months ended) March 31, 2002.

of conservatism.  My computations of average WACs for each NDC pertinent to the Litigation, as of the end of each quarter during the relevant timeframe for which I was provided sufficient transactional data, are summarized in Exhibits #5-17 to this Statement.

## Computation of AWP

185.   AWP was determined using, for each unique NDC, transactions between the corresponding manufacturer and those particular classes of trade deemed to represent retail, administering, or provider-level entities (hereinafter referred to as the "retail classes of trade"), as alluded to in the definition of AWP.  Because AWP is meant to reflect the price ultimately paid by retail classes of trade for particular products, my computations of AWP captured data relating to both direct (i.e., directly between the manufacturers and the retail classes of trade) and indirect (i.e., between wholesalers or distributors and the retail classes of trade) transactions from the manufacturers' transactional data.

186.   Determination of an estimated measure of AWP involved, therefore, similar consideration of the sales/invoices, customer credits and customer rebates utilized in determining an estimated measure of WAC.  Chargeback-related data, however, was afforded a different treatment in my computations of AWP.  Generally, the chargeback data provided by the Defendants included particular pertinent data regarding the amounts at which wholesalers and distributors had sold the selected manufacturer's products to end-users in the retail classes of trade.  Specifically, data identifying the number of units and the contract price at which the products were sold in the initial transaction that gave rise to a chargeback was available in the Defendants' transactional data.

187.   Through this information, despite recognizing that the sale had not occurred directly between the manufacturer and the customer in the retail class of trade, it was possible to determine the prices that had been ultimately paid by a provider, to the wholesaler or distributor, for the manufacturer's product – the very definition of AWP.  Those indirect sales were added to sales that occurred directly between the manufacturer and customers in the retail classes of trade to arrive at a total sales amount for any 12-month period.  Because chargebacks were commonplace within the industry during the relevant timeframe, and information pertaining

thereto was available in the Defendants' transactional data (albeit in many different forms), these transactions were necessarily considered in my computation of AWP.

### *Rolling 12-month Analysis*

188.   For each NDC at issue in the Litigation, and for each quarterly period within the relevant timeframe for which relevant data was made available to me, I aggregated all of the direct sales of that NDC by the corresponding manufacturer to the retail classes of trade during the 12 months preceding the end of the quarter, similar to the methodology used in my computations of average WAC. I then aggregated all of the indirect sales for the same 12-month period in the manner described above and added them to direct sales. I then aggregated customer credits and rebates processed between the manufacturer and customers in the pertinent classes of trade for the same 12 month period and subtracted those aggregated amounts from the aggregated (direct and indirect) sales amount. Ultimately, the balance was divided by the aggregation of units sold (for both direct and indirect sales, in total) over the same 12-month period to arrive at an average price, as of the end of a particular quarter. This represented my estimated measure of average AWP, the computation of which was performed using only manufacturer-provided transactional data.

189.   Each manufacturer's transactional data presented particular peculiarities and/or characteristics which required special attention, potential modification of the average price formula, or other adjustments. Any such adjustments were effected such that the integrity of the average price formula I was employing was maintained. Similarly, in that regard, if particular data served to reduce my computation of an average WAC or AWP but was incomplete or unclear, or was immaterial to the transactional data, I elected to exclude such data in the interest of conservatism. My computations of AWPs for each NDC pertinent to the Litigation, as of the end of each quarter during the relevant timeframe for which I was provided sufficient transactional data, are summarized in Exhibits #5-17 to this Statement.

### **Computation of FUL**

190.   In order to compute FULs consistent with the manner in which CMS calculated such a measure, for each of the drugs resident within the list of NDCs (as enumerated in Exhibit #4 to

this Statement), it was necessary, first, to sort the listing by drug name, for CMS would assign a FUL or other reimbursement amount on a drug-by-drug basis. Once the NDCs had been filtered by drug, I selected the lowest computed price (either AWP or WAC) for any NDC as of the end of each quarter during the relevant timeframe. I then multiplied that lowest price by 150%, as prescribed in the CMS formula, to arrive at an estimate of FUL for the subject drug and the corresponding quarters. My computed FULs are included in the NDC-level exhibits attached to this Statement.

X.      **AMP AND THE RELATIONSHIP TO FUL**

191.    All defendants for whom I have calculated WACs and AWPs for the relevant timeframe reported, during the relevant timeframe, AMPs as required by federal statute and the Medicaid rebate agreement. (42. U.S.C. § 1396-r(K)(A); Barr: *See* June 25, 2008 Letter from Barr Counsel Jennifer S. Atkins, Esquire to Counsel for Plaintiffs regarding Barr AMPs); Boehringer Ingelheim Roxane: Waterer (May 9, 2007), p. 892:2-12; Dey: Marrs, (May 15, 2008), pp. 168:6-169:9; Ethex: Chibnall (June 14, 2008), p. 26:18-20; Ivax: Hogan (June 17, 2008), pp. 318:06-15; 342:02-343:05; Mylan: Roman (July 26, 2006), pp. 81:7-82:05; Cunard (October 26, 2007), pp. 278:12-279:22; Par: DMaio (July 31, 2008), pp. 108:18-22; 427:10-14; Draudt (July 31, 2008), pp. 40:21-42:7; Purepac: O'Malley (June 20, 2008), pp. 222:22-225:2; Sandoz: Hartmann (April 24, 2008), p. 583; Worrell (August 23, 2007), p. 235; Kellum (January 25, 2007), pp. 252-253); Teva: Foster (February 20, 2008), pp. 129:1-132:7; Krauthauser (January 29, 2008), pp. 179:22-180:8; Wodarczyk (April 17, 2008), pp. 68:15-70:15; 191:7-192:10; Warrick: Weintraub (2006), pp. 382:6-17, 411:19-412:16; Watson: *See* September 18, 2008 e-mail from Watson Counsel James Matthews, Esquire to Counsel for Plaintiffs regarding Watson AMPs; Wyeth: Bartone (May 23, 2008), pp. 220:16-18; 224:6-12; Exhibit 14)

192.    AMPs are defined as "the average price paid to the manufacturer for the drug...by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customer prompt pay discounts." (42 U.S.C. §1396r-8(k)(1))   The standard form Rebate Agreement developed by CMS further defines AMP as "the average unit price paid to the [m]anufacturer for the drug...by wholesalers for drugs distributed to the retail pharmacy class of trade...AMP includes cash discounts allowed and all other price reductions...which reduce the actual price

paid."   Both the Rebate Statute and the Rebate Agreement require each manufacturer to report AMPs on a quarterly basis to CMS.  (42 U.S.C §1396r-8)

193.   Given the statutory definition of AMP and that each of the Defendants relating to whose data I have computed a WAC and an AWP as discussed herein reported AMPs during the relevant timeframe, I have included, in the corresponding exhibits to this Statement (wherever possible given the data produced by Defendants), an analysis of what the FUL for each at issue drug would have been had defendants reported AMP as their true WAC or true AWP.  That analysis appears in Exhibits #5-17 to this Statement..

September 30, 2008

51

EXHIBIT #1

# HARRIS L. DEVOR
## SHECHTMAN MARKS DEVOR PC

## EDUCATION

Bachelor of Business Administration, Temple University, 1973

Certified Public Accountant

## PROFESSIONAL EXPERIENCE

Shechtman Marks Devor PC, Shareholder, 1990
Laventhol & Horwath, Audit partner, 1981-90
Price Waterhouse, Audit manager, 1973-81

Experience includes 34 years of planning, organizing, administering and supervising all phases of audits and other financial engagements for large to small size clients in a variety of different industries including extensive involvement with publicly-held clients and SEC requirements, as well as providing litigation support and bankruptcy/insolvency/reorganization services.

Has performed a variety of litigation support services including retention as an expert in many cases involving accounting and auditing issues and/or financial statements, SEC issues, assisting in computation of damages, investigation of fraud allegations, etc. Experience includes performing these services in connection with securities violations actions involving **some of the largest companies in the world and their accounting firms.** Such services include participation in drafting or responding to complaint allegations involving accounting and auditing issues, review of documents and analyses, consulting with counsel regarding accounting and auditing issues and financial statement impact, assisting in counsel's preparation for deposition, drafting expert reports, assisting in computation of damages and providing expert testimony.

Has been retained by the **Department of Justice** (U.S. Attorney's Office) as the lead accounting expert, and testified, in the criminal fraud case against the senior management of **Rite Aid Corporation** in one of the largest accounting frauds in U.S. history.

Has been retained by the **Texas Attorney General** as the lead accounting and damages expert, and testified, in a case brought by the State of Texas against various international drug manufacturers accused of misreporting pricing to the Texas Medicaid program. Has been retained by various **other state attorneys general throughout the United States** in similar actions with alleged damages in excess of hundreds of millions of dollars.

Has been retained by Co-Counsel for the shareholder/bondholder plaintiffs and testified for 3 days at trial in the Southern District of New York as the sole accounting and auditing expert on behalf of the class action plaintiffs in the **WorldCom** securities fraud case, believed to be the largest accounting fraud in history.

Has been retained by Counsel for the shareholders in the **AOL-Time Warner/Ernst & Young** securities fraud case as the sole accounting and auditing expert for the class action plaintiffs.

Has been retained by co-counsel for the shareholders and testified in the **Sunbeam/Arthur Andersen/"Chainsaw" Al Dunlap** securities fraud case on behalf of the plaintiffs.

Was Laventhol & Horwath's primary resource with respect to counseling troubled companies (debtors), secured creditors, unsecured creditor committees and trustees on a variety of insolvency and bankruptcy issues.

**EXHIBIT #1 CONTINUED**
## HARRIS L. DEVOR
### SHECHTMAN MARKS DEVOR PC

**PROFESSIONAL EXPERIENCE (CONTINUED)**

During 1978, spent six months in Israel developing continuing education program for the Price Waterhouse correspondent firm there.

During 1981 and 1982 served on Laventhol & Horwath's committee charged with the responsibilities of developing a new approach to auditing by review of risks and objectives (ARRO).

Has instructed and lectured on various SEC, bankruptcy, closely-held business, not-for-profit, audit and statistical sampling subjects at PW, L&H and at the request of the PICPA.

**COMMUNITY SERVICES AND ORGANIZATIONS**

American Institute of Certified Public Accountants
Pennsylvania Institute of Certified Public Accountants
Member/Former Member of:

PICPA:
Ethics Committee
Executive Committee-Greater Philadelphia Chapter
Members' Consultation Committee
Report Review Committee
Cooperation with the Bar Committee
Insolvency and Reorganization Committee

Other:
Association of Insolvency Accountants
National Association of Accountants, Philadelphia Chapter
Temple University Downtown Club
Temple University Beta Alpha Psi Alumni Club
Temple University Department of Accounting Advisory Board
The Locust Club of Philadelphia, Finance Committee
Board of Directors, Gershman YM/YWHA, President
Board of Directors, Jewish Community Centers of Greater Philadelphia
Board of Directors, Auerbach Central Agency for Jewish Education
Temple Beth Zion-Beth Israel, Treasurer, Executive Committee
Germantown Cricket Club
Leslie Wexner Heritage Foundation Fellow
Jewish National Fund

## EXHIBIT #2
## HARRIS L. DEVOR
## LISTING OF TRIAL AND DEPOSITION TESTIMONY OF LAST FOUR YEARS

In re: Securities and Exchange Commission, Plaintiff, v. David C. Guenthner and Jay M. Samuelson, Defendants in the United States District Court for the District of Nebraska; Case No. 8:02CV10

In re: WorldCom, Inc. Securities Litigation in the United States District Court Southern District of New York; Master File No.: 02 Civ.3288 (DLC)

In re: Mercedes-Benz Antitrust Litigation in the United States District Court for the District of New Jersey; Master File No.: 99-4311 (WHW)

In re: State of West Virginia v. Abbott Laboratories, Warrick Pharmaceuticals, et al., Circuit Court Kanawha County, West Virginia

In re: CMS Energy Securities Litigation in the United States District Court for the Eastern District of Michigan; Master File No.: 02-CV-72004-DT

In re: Fredda Levitt, a limited partnership of Lipper Convertibles, L.P., on behalf of herself and all others similarly situated, Plaintiff v. PricewaterhouseCoopers, LLP, Defendant, in the United States District Court for the Southern District of New York.

In re: Omnicom Group Inc. Securities Litigation, in the United States District Court for the Southern District of New York; Case No. 02-CV-4483 (RCC)

In re: Tenet Healthcare Corporation Securities Litigation, in the United States District Court for the Central District of California Western Division; Case No. CV-02-8462-RSWL (RZx)

In re: Ryan v. Flowserve Corporation, et al., in the United States District Court Northern District of Texas; Master File No.: 3:03-CV-1769-B (N.D. Tex)

In re: WorldCom, Inc., et al., Debtors, in the United States Bankruptcy Court Southern District of New York; Chapter 11, Case No. 02-13533 (AJG) (Jointly Administered)

The State of Texas *ex rel.* Ven-A-Care of the Florida Keys, Inc, *Plaintiffs*, v. Abbott Laboratories Inc., *Defendants*, In the District Court of Travis County, Texas 201st Judicial District

In re: Lawrence E. Jaffe Pension Plans vs. Household International, Inc., et al, in the United Sates District Court Northern District of Illinois, Lead Case No. 02-C-5893

In re: State of Missouri. ex rel. Jeremiah W. (Jay) Nixon, Attorney General, and Missouri Department of Social Services, Division of Medical Services, Plaintiff, vs. Dey, Inc., et al and Warrick Pharmaceuticals Corporation, a Delaware corporation, Schering-Plough Corporation a New Jersey Corporation, Schering Corporation, a New Jersey corporation, Defendants. In the Circuit of the City of St. Louis; Case No: 054-1216; Division 31

In re: Winstar Communications Jefferson Insurance Company of New York v. Rouhana Jefferson Insurance Company of New York v. Rouhana; Master File No. 01 Civ. 3014 (GBD)

**EXHIBIT #3**
**HARRIS L. DEVOR**
**MATERIALS CONSIDERED**

A. **DEPOSITION TRANSCRIPTS (INCLUDING RELATED EXHIBITS)**
   **CONSIDERED, EITHER IN FULL OR IN RELEVANT PART**

| Deponent Name | Deposition Date(s) | Company |
|---|---|---|
| Catlett, Timothy | May 7, 2008, May 30, 2007 | Barr |
| Cunningham, Lauren | February 2, 2007 | Barr |
| Erick, Matthew | June 17, 2008, June 27, 2008 | Cardinal Health |
| Malham, Lawrence | June 18, 2008 | Cardinal Health |
| Gaston, Sue | January 24, 2008, March 19, 2008 | CMS |
| Sexton, Gail | May 20, 2008 | CMS |
| Marrs, Pamela | May 15, 2008, July 10, 2008 | Dey |
| Mozak, Robert Francis | November 1, 2001, April 30, 2002, November 6, 2002, March 13, 2003 | Dey |
| Rice, Charles | October 30, 2001, November 7, 2002 | Dey |
| Walker, Gary | May 14, 2008 | Dey |
| Walker, Gary | July 9, 2008 | Dey |
| Chibnall, Rich | June 24, 2008 | Ethex |
| Keith, Chris | June 24, 2008 | Ethex |
| Blake, Thomas | January 24, 2008 | Ivax |
| Hogan, Corrine | February 6, 2008, June 17, 2008 | Ivax |
| Sarfas, Trishia | August 22, 2007 | Ivax |
| Shank, Robert | February 22, 2008 | Ivax |
| Factor, Saul D. | June 20, 2008 | McKesson |
| Cunard, Robert G. | October 26, 2007 | Mylan |
| Korman, Harry | November 26, 2007 | Mylan |
| Krinke, Stephen | September 25, 2007, March 28, 2008 | Mylan |
| Mauro, Anthony | June 27, 2008 | Mylan |
| Roman, Brian | November 16, 2006, July 26, 2006, August 2, 2007 | Mylan |
| Workman, David | June 26, 2008, September 26, 2007 | Mylan |
| Andrus, Karen | October 16, 2007 | Par |
| DiMaio, Nick | August 16, 2007, July 31, 2008, May 6, 2008 | Par |
| Draudt, Jennifer | July 31, 2008 | Par |
| Trendowicz, Julie | September 25, 2007 | Par |
| Cunningham, Bradford | October 23, 2007 | Purepac |
| Grauso, James | October 19, 2007 | Purepac |

**EXHIBIT #3**
**HARRIS L. DEVOR**
**MATERIALS CONSIDERED**

| Deponent Name | Deposition Date(s) | Company |
|---|---|---|
| Grauso, James | October 19, 2007 | Purepac |
| Miranda, Roberto | October 19, 2007 | Purepac |
| Miranda, Roberto | October 19, 2007 | Purepac |
| O'Malley, Patricia | June 20, 2008, September 19, 2007 | Purepac |
| Ostrowski, William | July 13, 2007 | Purepac |
| Ostrowski, William | July 13, 2007 | Purepac |
| Pehlke, Lisa | October 23, 2007 | Purepac |
| Pehlke, Lisa | October 23, 2007 | Purepac |
| Alesio, Phyllis | March 3, 2005 | Roxane |
| Ciarelli, Gregg | July 25, 2007 | Roxane |
| Comston, Edwards | January 30, 2003 | Roxane |
| DiPaolo, Edward | March 10, 2005 | Roxane |
| Dougherty, Joseph | December 9, 2004 | Roxane |
| Hoffman, Teresa | March 9, 2005 | Roxane |
| Marsh, Christine | March 2, 2005, September 23, 2005 | Roxane |
| Paoletti, Lesli | March 8, 2005, March 9, 2005, September 20, 2005 | Roxane |
| Rowenhorst, James | April 3, 2003 | Roxane |
| Via, Thomas | April 2, 2003 | Roxane |
| Waterer, Judy | May 9, 2007, May 10, 2007, May 11, 2007, July 24, 2007 | Roxane |
| Coward, Teri | April 16, 2008 | Sandoz |
| Denman, John | June 3, 2008 | Sandoz |
| Galowin, Kevin | June 11, 2007, June 19, 2008 | Sandoz |
| Hartmanm, Ronald | January 25, 2007, April 24, 2008 | Sandoz |
| Kellum, Hector Armando | January 25, 2007 | Sandoz |
| Pefley, Warren | April 30, 2008 | Sandoz |
| Rogerson, Richard | June 5, 2008 | Sandoz |
| Worrell, Christopher | August 23, 2007, March 26, 2008 | Sandoz |
| Canova, Bonnie | January 25, 2008 | Teva |
| Cioschi, Eugene | February 12, 2008 | Teva |
| DeNicola, Steven | January 25, 2008 | Teva |
| Denman, John W R.Ph | April 16, 2008 | Teva |
| Foster, Richard | February 20, 2008 | Teva |
| Krauthauser, Paul | January 29, 2008 | Teva |

**EXHIBIT #3**
**HARRIS L. DEVOR**
**MATERIALS CONSIDERED**

| <u>Deponent Name</u> | <u>Deposition Date(s)</u> | <u>Company</u> |
|---|---|---|
| Marth, William S. | May 28, 2008 | Teva |
| Nase, Linda | January 30, 2008 | Teva |
| Wodarszyk, John G. | October 10, 2006, August 23, 2007, April 17, 2008 | Teva |
| Graf, Al | February 11, 2003 | Warrick |
| Graf, Alfred | May 11, 2005 | Warrick |
| Kapur, Ramen | May 7, 2002 | Warrick |
| Sherman, Jerome | May 23, 2005 | Warrick |
| Weintraub, Harvey | September 18, 2006, September 19, 2006, September 20, 2006, September 21, 2006, September 22, 2006 | Warrick |
| Barclay, Kathleen | November 21, 2005 | Watson |
| Boyer, Andrew | July 14, 2004, June 27, 2007 | Watson |
| Callahan, Timothy | July 13, 2004, July 14, 2004, July 15, 2004, November 29, 2005, July 13, 2006 | Watson |
| Canny, Joseph | December 2, 2005 | Watson |
| Clark, Napoleon | December 1, 2005, June 27, 2007, June 28, 2007 | Watson |
| Recchia, Lisa | October 11, 2007 | Watson |
| Bartone, Dominck | May 22, 2008 | Wyeth |
| Turex, Richard | June 19, 2008 | Wyeth |

**EXHIBIT #4**
**HARDAS L. DEVOOR**
**MATERIALS CONSIDERED**

NY FUL/AWP Litigation
Relevant NDCs, with Transactional Data

| Manufacturer | NDC | Drug Name |
|---|---|---|
| Barr | 00555058202 | CEFADROXIL 500 MG CAPSULE |
| | 00555058210 | CEFADROXIL 500 MG CAPSULE |
| Dey | 49502030317 | ALBUTEROL 90 MCG INHALER |
| | 49502033317 | ALBUTEROL 90 MCG INHALER |
| | 49502069703 | ALBUTEROL .83 MG/ML SOLUTION |
| | 49502069724 | ALBUTEROL .83 MG/ML SOLUTION |
| | 49502069728 | ALBUTEROL .83 MG/ML SOLUTION |
| | 49502069730 | ALBUTEROL .83 MG/ML SOLUTION |
| | 49502069733 | ALBUTEROL .83 MG/ML SOLUTION |
| | 49502069761 | ALBUTEROL .83 MG/ML SOLUTION |
| Ethex | 58177023804 | ISOSORBIDE MN 60 MG TAB SA |
| | 58177023808 | ISOSORBIDE MN 60 MG TAB SA |
| | 58177023811 | ISOSORBIDE MN 60 MG TAB SA |
| | 58177023812 | ISOSORBIDE MN 60 MG TAB SA |
| Ivax | 172405843 | CEFADROXIL 500 MG CAPSULE |
| | 172405848 | CEFADROXIL 500 MG CAPSULE |
| | 172405860 | CEFADROXIL 500 MG CAPSULE |
| | 172419810 | ENALAPRIL MALEATE 20 MG TAB |
| | 172419860 | ENALAPRIL MALEATE 20 MG TAB |
| | 172419864 | ENALAPRIL MALEATE 20 MG TAB |
| | 172419870 | ENALAPRIL MALEATE 20 MG TAB |
| | 172419880 | ENALAPRIL MALEATE 20 MG TAB |
| | 172435749 | RANITIDINE 150 MG TABLET |
| | 172435770 | RANITIDINE 150 MG TABLET |
| | 172439018 | ALBUTEROL 90 MCG INHALER |
| | 172640544 | ALBUTEROL .83MG/ML SOLUTION |
| | 172640549 | ALBUTEROL .83MG/ML SOLUTION |
| | 182180701 | LORAZEPAM 1 MG TABLET |
| | 182180705 | LORAZEPAM 1 MG TABLET |
| | 182180710 | LORAZEPAM 1 MG TABLET |
| | 182180789 | METOPROLOL 100 MG TABLET |
| | 182180810 | METOPROLOL 100 MG TABLET |
| | 182180828 | ISOSORBIDE MN 60 MG TAB SA |
| | 182801024 | ALBUTEROL .83MG/ML SOLUTION |
| | 182801026 | ALBUTEROL .83MG/ML SOLUTION |
| Mylan | 378004701 | METOPROLOL 100 MG TABLET |
| | 378004710 | METOPROLOL 100 MG TABLET |
| | 378045705 | LORAZEPAM 1 MG TABLET |
| | 378045710 | LORAZEPAM 1 MG TABLET |
| | 378105401 | LORAZEPAM 1 MG TABLET |
| | 378105405 | LORAZEPAM 1 MG TABLET |
| | 378191001 | ENALAPRIL MALEATE 20 MG TAB |
| | 378191010 | CLONAZEPAM 0.5 MG TABLET |
| | 378325201 | RANITIDINE 150 MG TABLET |
| | 378325205 | RANITIDINE 150 MG TABLET |
| | 378325291 | RANITIDINE 150 MG TABLET |

| Manufacturer | NDC | Drug Name |
|---|---|---|
| Par | 49884041301 | METOPROLOL 100 MG TABLET |
| | 49884041310 | METOPROLOL 100 MG TABLET |
| | 49884054401 | CLONAZEPAM 0.5 MG TABLET |
| | 49884054402 | RANITIDINE 150 MG TABLET |
| | 49884054405 | RANITIDINE 150 MG TABLET |
| | 49884054410 | RANITIDINE 150 MG TABLET |
| | 49884059401 | ENALAPRIL MALEATE 20 MG TAB |
| | 49884059410 | ENALAPRIL MALEATE 20 MG TAB |
| Purepac | 228205910 | LORAZEPAM 1 MG TABLET |
| | 228205950 | LORAZEPAM 1 MG TABLET |
| | 228206911 | ISOSORBIDE MN 60 MG TAB SA |
| | 228271111 | ISOSORBIDE MN 60 MG TAB SA |
| | 228271150 | ISOSORBIDE MN 60 MG TAB SA |
| | 228300311 | CLONAZEPAM 0.5 MG TABLET |
| | 228300350 | CLONAZEPAM 0.5 MG TABLET |
| Roxane | 54800313 | ALBUTEROL .83 MG/ML SOLUTION |
| | 54800511 | ALBUTEROL .83MG/ML SOLUTION |
| | 54800321 | ALBUTEROL .83MG/ML SOLUTION |
| | 54485325 | RANITIDINE 150 MG TABLET |
| | 54485329 | RANITIDINE 150 MG TABLET |
| | 54485321 | RANITIDINE 150 MG TABLET |
| Sandoz | 0078112801 | METOPROLOL 100 MG TABLET |
| | 0078112810 | METOPROLOL 100 MG TABLET |
| | 0078112813 | METOPROLOL 100 MG TABLET |
| | 0078112301 | ENALAPRIL MALEATE 20 MG TAB |
| | 0078112310 | ENALAPRIL MALEATE 20 MG TAB |
| | 0078113201 | METOPROLOL 100 MG TABLET |
| | 0078113210 | METOPROLOL 100 MG TABLET |
| | 0078114001 | LORAZEPAM 1 MG TABLET |
| | 0078114005 | LORAZEPAM 1 MG TABLET |
| | 0078114010 | LORAZEPAM 1 MG TABLET |
| | 0078114405 | LORAZEPAM 1 MG TABLET |
| | 0078118305 | RANITIDINE 150 MG TABLET |
| | 0078118313 | RANITIDINE 150 MG TABLET |
| | 0078118360 | RANITIDINE 150 MG TABLET |
| | 0078129301 | CEFADROXIL 500 MG CAPSULE |
| | 0078129320 | CEFADROXIL 500 MG CAPSULE |
| | 0078176037 | ALBUTEROL .83MG/ML SOLUTION |
| | 0078176207 | CEFADROXIL 500 MG CAPSULE |
| | 0078176227104 | CEFADROXIL 500 MG CAPSULE |
| Schering | 59930150006 | ALBUTEROL .83 MG/ML SOLUTION |
| | 59930150008 | ALBUTEROL .83 MG/ML SOLUTION |
| | 59930151701 | ALBUTEROL .83MG/ML SOLUTION |
| | 59930151702 | ALBUTEROL .83MG/ML SOLUTION |
| | 59930154091 | ALBUTEROL 20 MG INHALER |
| | 59930156001 | |

| Manufacturer | NDC | Drug Name |
|---|---|---|
| Teva | 00093002801 | ENALAPRIL MALEATE 20 MG TAB |
| | 00093002910 | ENALAPRIL MALEATE 20 MG TAB |
| | 00093007461 | METOPROLOL 100 MG TABLET |
| | 00093007410 | METOPROLOL 100 MG TABLET |
| | 00093083201 | CLONAZEPAM 0.5 MG TABLET |
| | 00093083325 | CLONAZEPAM 0.5 MG TABLET |
| | 00093083210 | CLONAZEPAM 0.5 MG TABLET |
| | 00093854401 | RANITIDINE 150 MG TABLET |
| | 00093854405 | RANITIDINE 150 MG TABLET |
| | 00093854406 | RANITIDINE 150 MG TABLET |
| | 00093854410 | RANITIDINE 150 MG TABLET |
| Watson | 0084283208 | ALBUTEROL 90 MCG INHALER |
| | 0084283301 | RANITIDINE 150 MG TABLET |
| | 0084283305 | RANITIDINE 150 MG TABLET |
| | 0084283306 | RANITIDINE 150 MG TABLET |
| | 00594073401 | ENALAPRIL MALEATE 20 MG TAB |
| | 00594073402 | ENALAPRIL MALEATE 20 MG TAB |
| | 00594054105 | RANITIDINE 150 MG TABLET |
| | 0059102101 | LORAZEPAM 1 MG TABLET |
| | 0059102105 | LORAZEPAM 1 MG TABLET |
| | 0059102410 | LORAZEPAM 1 MG TABLET |
| | 0059104830 | METOPROLOL 100 MG TABLET |
| | 0059104831 | METOPROLOL 100 MG TABLET |
| Wyeth | 0005317223 | LORAZEPAM 1 MG TABLET |
| | 0005317224 | LORAZEPAM 1 MG TABLET |
| | 0005317234 | LORAZEPAM 1 MG TABLET |
| | 0084140186 | LORAZEPAM 1 MG TABLET |
| | 0084140189 | LORAZEPAM 1 MG TABLET |
| | 59911581201 | LORAZEPAM 1 MG TABLET |
| | 59911581202 | LORAZEPAM 1 MG TABLET |