UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

IN RE: PHARMACEUTICAL INDUSTRY          MDL No.  1456
AVERAGE WHOLESALE PRICE LITIGATION
_____          Civil Action: 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:                Judge Patti B. Saris
ALL ACTIONS
_____

**MEMORANDUM IN SUPPORT OF MOTION FOR COURT REVIEW
OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD, FOR COURT
MONITORING OF CLASS COUNSEL TIME AND EXPENSE, AND FOR
COURT ALLOCATION OF ALL FUTURE FEE AWARDS TO CLASS
COUNSEL**

## I.      INTRODUCTION

This Court entrusted Hagens Berman Sobol & Shapiro, Hoffman & Edelson,

Spector, Roseman & Kodroff, and Wexler Toriseva Wallace & Terrell (collectively,

"Lead Counsel") with the task of appropriately allocating among participating firms the

$20 million attorneys fee and expense award from the settlement with the

GlaxoSmithKline Defendants (hereinafter the "GSK award" and the "GSK settlement").

Unfortunately, Lead Counsel abused this trust by paying a grossly disproportionate share

of the GSK award to themselves. Judicial review is now needed to address Lead

Counsel's misallocation of the funds and to curb future abuses by Lead Counsel.

In allocating the GSK award, Lead Counsel counted all time and expense incurred

as of July 31, 2008—nearly two years after the GSK settlement was reached—without

regard for whether the work in question benefited the GSK settlement class members or

had anything to do with the GSK Defendants at all. After reimbursing 20% of everyone's

expenses, Lead Counsel paid  $3,000,000 to counsel for the Independent Settling Health

Plans (hereinafter the "ISHPs") and counsel for objector Demra Jordan. With the remaining funds, Lead Counsel paid themselves $14,311,636 (83% of the remainder of the GSK award); they paid $1,730,677 (10% of the remainder) to two former lead firms who (in the words of Lead Counsel) "dropped out of the case;" and they paid $1,190,711 (7% of the remainder) to the remaining 21 firms.

There was no reasonable basis for Lead Counsel to use the GSK award to reimburse time and expense that had nothing to do with GSK, incurred years after the GSK settlement was reached. There was no reasonable basis for Lead Counsel to pay themselves *twelve times* what they paid other firms, when Lead Counsel incurred *four times* the time and expense of these firms. There was no reasonable basis for Lead Counsel to pay the two former lead firms collectively $500,000 more than the other 21 firms, when the former lead firms collectively devoted fewer hours to this case, had a smaller lodestar, incurred a comparable level of expenses, and ultimately abandoned their role as leads and "dropped out of the case" altogether.

Lead Counsel contend that allocating so much of the GSK fee to themselves was reasonable because they amassed a gigantic lodestar in relation to other firms, advanced far more in expenses, and directed the litigation. But in this case, the anticipated fees are increasingly unlikely to cover a massive collective lodestar that is within Lead Counsel's sole control and is growing exponentially. These circumstances raise the strong implication that Lead Counsel have failed in their obligation to manage this case efficiently and cost effectively. Thus, it was unfair for Lead Counsel to reward themselves with a multiplier that was essentially three times the multiplier applied to most other firms. Judicial review of the allocation, including an accounting of the time

reported and expense incurred, is needed to determine whether Lead Counsel adequately managed this case by minimizing duplicative, unnecessary, or unsuccessful work. Judicial review is also needed to determine whether the huge disparity in payment among firms is reasonable. The Court should also take steps to monitor any additional time and expense incurred in this case by Class Counsel (including Lead Counsel), and handle all future fee allocations itself.

## II.   FACTUAL BACKGROUND

### A.   Entry of Williams Law Firm Into the Litigation.

Mr. Williams and his firm, Williams Law Firm ("Movant"), became directly involved in this MDL in September of 2005. Prior to that time, Mr. Williams was a member of a group of law firms and attorneys led by the firm of Kline & Specter (collectively, "the Kline & Specter Group"), who were pursuing competing AWP litigation in New Jersey and Arizona, and who had been in a protracted struggle with Hagens Berman and other Lead Counsel over control over the related Lupron litigation. Although the Lupron dispute was largely resolved by the summer of 2005, there were still hard feelings between the Kline & Specter Group and Lead Counsel over the AWP litigation generally, with no plans by either group to collaborate with the other. *See* Declaration of Kent M. Williams ("Williams Decl.") ¶ 3.

This Court's August 16, 2005 class certification ruling, which suggested that a nationwide class of Medicare beneficiaries would be certified if suitable consumer class representatives were proposed within sixty days, changed the dynamic between the two groups. As Lead Counsel scrambled to find class representatives within the sixty-day deadline, Kline & Specter approached Lead Counsel with the offer of numerous potential

class representatives who had already retained Kline & Specter and had largely been vetted for purposes of the AWP litigation.  Thus, in September of 2005, the two groups agreed that Kline & Specter would provide representative consumer plaintiffs in exchange for a leadership role in the MDL.  Williams Decl. ¶ 4.  As part of the agreement, Mr. Williams, who had helped with client retentions and was a key member of the Kline & Specter Group, was invited to participate in the MDL. The parties further agreed that prior time and expense incurred by members of the Kline & Specter Group would be incorporated and included in this case.  Williams Decl. ¶ 5.

### B.       Work Performed by Williams Law Firm.

Mr. Williams and his firm undertook substantial work in connection with the MDL litigation.  Much of the early work in the summer and fall of 2005 involved vetting Medicare beneficiaries and other consumers as potential consumer class representatives. Among other things, along with other members of the Kline & Specter Group, Mr. Williams spoke with consumer clients on the telephone, obtained and analyzed medical records and insurance documents, and conducted other factual research to determine which drugs were purchased by particular consumer clients.  Mr. Williams was also substantially involved in drafting consumer-specific paragraphs for the Third Amended Consolidated Complaint adding Kline & Specter's consumer class representatives to the case.  Williams Decl. ¶ 6.

In late fall of 2005, Mr. Williams defended the depositions of Track I consumer class representatives Larry Young and Robert Howe. Among other things, Mr. Williams reviewed documents the two men had produced, met with each of them in person and on the telephone to prepare for their depositions, and attended their depositions. Mr.

Williams also assisted with the renewed motion to certify nationwide classes as to the Track I defendants, particularly with respect to specific transactions and other matters relevant to Messrs. Howe and Young.   Williams Decl. ¶ 7.

In the early spring of 2006, at the request of Lead Counsel, Mr. Williams served as one of the two consumer advocates who negotiated the allocation of GSK settlement funds between consumers and TPPs. Williams Law Firm also staffed the review of millions of pages of documents produced by Defendant Baxter.  This review, which took place at Hagens Berman's Chicago office, required the full-time effort of several attorneys and lasted over fourteen months, until February of 2007. Mr. Williams personally completed various other assignments in 2006 and 2007, including analyzing medical and insurance records for particular class representatives and substantially revising the supporting affidavit with respect to Track II class certification, attending third party insurer depositions, drafting plaintiffs' opposition to AstraZeneca's motion in limine to bar admission of its guilty plea at trial, and other matters.  Williams Decl. ¶ 8.

In the course of assisting with this litigation, Mr. Williams incurred substantial out of pocket expenses. Besides travel and other expenses, Lead Counsel periodically asked Mr. Williams to contribute to the litigation fund, especially as his time in the case grew.  Indeed, Lead Counsel specifically justified one such assessment—a request for $25,000 in April of 2007—because of the "significant time commitment" Mr. Williams had made to the case.  Williams Decl ¶ 9.

Mr. Williams is a sole practitioner, so these requests for time and capital necessarily came at the exclusion of other matters.  Nonetheless, Mr. Williams readily paid all requests by Lead Counsel for assessments, just as he performed all tasks assigned

to him.  Indeed, at no time did Mr. Williams turn down any assignment or request for funds.  Nor did Mr. Williams bill for any task that had not been authorized by Lead Counsel.

Williams Law Firm was not asked to contribute any additional time or capital to the case after May 31, 2007.  Williams Decl. ¶ 10.  At no time did Lead Counsel ever inform Mr. Williams that his work product was unacceptable or wanting in any way. Williams Decl. ¶¶ 10-11.

### C.   Allocation of GSK Award By Lead Counsel.

The Court granted final approval to the GSK settlement on August 7, 2007.  *See* Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement With the GlaxoSmithKline Defendants, Approving Proposed Allocation of Settlement Funds, And Approving Class Counsel's Application For Attorney's Fees, Reimbursement og Litigation Expenses And Compensation To Class Representatives (previously filed and docketed in this case as Document No. 4619) (hereinafter "Final Approval Order"). The Final Approval Order provided that "Co-Lead Counsel shall allocate fees to themselves and other Plaintiffs Class Counsel in their sole discretion, ***as appropriate***." Final Approval Order ¶ 14, at 9 (emphasis added).

In allocating the GSK award, Lead Counsel split the class counsel firms into three "tiers" comprised as follows:  themselves ("Tier I"), "former" Lead Counsel Heins Mills & Olson and Kline & Specter ("Tier II"), and the remaining 21 firms in the case (Tier III).  Williams Decl. ¶ 13.  After an interim portion of the GSK award was distributed in May of 2007 (as reimbursement for part of each firm's expenses), the total award

remaining to be distributed from the GSK settlement came to $20,290,865.50, including interest. Lead Counsel distributed this amount as follows:

1.     <u>One-fifth of unreimbursed expenses</u>.   According to Lead Counsel, as of July 31, 2008, total unreimbursed expenses claimed by class counsel were $8,973,764.63. Lead Counsel reimbursed each firm one-fifth of its unreimbursed expenses, for a total of $1,794,752.93.

2.     <u>Payment to Counsel for the ISHPs</u>.  Robins Kaplan Miller & Ciresi, the Rawlings Group, and Lowey Dannenberg, the three firms who represented the Independent Settling Health Plans, were each paid $985,792.50, for a total of $2,957,377.50. Apparently, this allocation was made pursuant to an agreement by Lead Counsel to pay ISHP counsel 15% of the GSK award.

3.     <u>Payment to Counsel for Demra Jordan.</u>  Counsel who represented objector Demra Jordan was paid $100,000, apparently pursuant to an agreement with Lead Counsel.

4.     <u>Payment to Lead Counsel</u>.  Collectively, Lead Counsel paid themselves $12,814,150.   With their expense reimbursement of $1,497,486, Lead Counsel paid themselves a total of $14,311,636—over 83% of the GSK award that was left after paying non-class counsel.

5.     <u>Payment to Former Lead Counsel</u>.   Heins Mills & Olson and Kline & Specter, two firms that (according to current Lead Counsel) used to be Lead Counsel but later "dropped out of the case," were paid $1,543,873.  With their $186,804 in expense reimbursement, the total paid to the Tier II firms was $1,730,677—about 10% of the GSK award left after paying non-class counsel.

6. <u>Payment to the Remaining Firms</u>. Lead Counsel paid the 21 remaining firms ("Tier III") $1,080,711. Lead Counsel paid seven of these firms "bonuses" for demonstrating a "higher level of dedication and quality of work." With the $110,464 Tier III expense reimbursement, the total paid to the Tier III firms was $1,191,175—about 7% of the GSK award left after paying non-class counsel.

Williams Decl. ¶ 14.

**D.   Collective Lodestar And Expense Reported By Lead Counsel.**

Information submitted by Lead Counsel provides some insight into the relative lodestars of the "tiers" Lead Counsel used to allocate the GSK funds.

1. <u>Lodestar and Expense Through August 10, 2006</u>.

The settlement between GSK and the plaintiffs was finalized on August 10, 2006. On June 22, 2007, Lead Counsel submitted firm-specific information to the Court showing lodestar time and expense information for each firm from inception through August 10, 2006. *See* Exhibit 1 to the June 22, 2007 Declaration of Marc Edelson ("June 22, 2007 Edelson Decl.") (previously filed and docketed in Case 1:01-cv-12257-PBS as Document No. 4399). Grouping all of the firm information into the allocation tiers used by Lead Counsel shows the following collective information as of August 10, 2006:

| Tier | Hours | Time | Expense | Total | % |
|------|-------|------|---------|-------|---|
| Tier I | 110,940 | $36,573,628 | $3,952,503 | $40,526,131 | 64.49 |
| Tier II | 27,719 | 8,829,342 | 999,879 | 9,829,221 | 15.64 |
| Tier III | 37,876 | 11,876,230 | 608,746 | 12,484,976 | 19.87 |

Williams Decl. ¶ 15(a).

In collecting and reporting this lodestar and expense information, Lead Counsel apparently made no effort to distinguish between work involving GSK directly, work involving GSK indirectly, and work having nothing to do with GSK at all.  Moreover, besides asking for monthly time reports showing individual time entries, Lead Counsel evidently made no effort to eliminate reported hours and expenses that were unnecessary, insufficiently documented, or otherwise inappropriate.

2.    Lodestar and Expense Through May 31, 2007.

Lead Counsel settled the Class One (Medicare beneficiary) claims against AstraZeneca in May of 2007.  On April 17, 2008, Lead Counsel submitted firm-specific information to the Court showing lodestar time and expense from inception through May 31, 2007.  *See* Exhibit 1 to the April 16, 2008 Declaration of Marc Edelson ("April 16, 2008 Edelson Decl.") (previously filed and docketed as Document No. 5222). Grouping all of the firm information into the tiers used by Lead Counsel for allocation purposes shows the following collective information as of May 31, 2007:

| Tier | Hours | Time | Expense | Total | % |
|------|-------|------|---------|-------|---|
| Tier I | 131,317 | $43,980,828 | $7,008,217 | $50,989,045 | 67.18 |
| Tier II | 27,840 | 10,268,745 | 1,203,486 | 11,472,231 | 15.11 |
| Tier III | 39,241 | 12,794,815 | 644,451 | 13,439,266 | 17.71 |

Williams Decl. ¶ 15(b).

Exhibit 1 to the April 16, 2008 Edelson Affidavit shows that in the nine months from August 10, 2006 to May 31, 2007, former Lead Counsel Kline & Specter expended no additional hours on the case, but its lodestar inexplicably grew by nearly $1.4 million,

and its expenses increased by over $200,000. Moreover, Lead Counsel's lodestar ballooned by over $7 million, and its expenses grew by over $3 million.

Presumably, the bulk of the post-GSK settlement time and expense was devoted to non-GSK matters (such as preparing for and attending the December 2006 bench trial involving the other Track I defendants). Lead Counsel, however, have made no effort to cull this non-GSK time and expense from consideration, even though much of it proved to be fruitless (e.g., time spent on discovery and trial preparation for the claims against Defendants Johnson & Johnson and Schering Plough). Nor have Lead Counsel made any attempt to identify and eliminate any excessive, redundant, or other inappropriate billing from the lodestar reported by each firm.

### 3. Lodestar and Expense Through July 31, 2008.

The only other substantive lodestar information has come from informal communications with Lead Counsel. In an October 13, 2008 email, Lead Counsel reported the following collective time and expense information as of July 31, 2008:

| Tier | Hours* | Time | Expense | Total | % |
|------|--------|------|---------|-------|---|
| Tier I | n/a | $49,208,132 | $7,487,421 | $56,695,553 | 69.80 |
| Tier II | 27,840 | 10,271,190 | 934,021 | 11,205,211 | 13.80 |
| Tier III | 39,241 | 12,773,203 | 552,321 | 13,325,524 | 16.40 |

*Hours for Tiers II and III are assumed to be approximately what they were as of May 31, 2007, since the lodestars for these two groups remained about the same.

Williams Decl. ¶ 15(c).

Thus, if the information provided by Lead Counsel is accurate, from June 2007 though July 2008 Lead Counsel's lodestar increased by another $5-1/2 million, while the lodestar of everyone else stayed about the same. Lead Counsel have indicated that some

of this time was spent on GSK-specific matters (such as the appeal by objector Demra Jordan), but most of it was likely not GSK-related.  Nonetheless, Lead Counsel gave all of their additional non-GSK, post-settlement lodestar and expense the same value as the GSK-specific lodestar and expense incurred prior to the GSK settlement.  And, it appears that no effort has been made to eliminate any excessive, redundant, or other inappropriate billing from the reported lodestar from each firm.

Comparing each tier's share of the GSK award to their respective lodestar shows as follows:  the $14,311,636 million payment to Lead Counsel (Tier I) represents about 25% of Lead Counsel's time and expense as of July 31, 2008 (35% of Lead Counsel's time and expense as of August 10, 2006).  The payment of $1,730,677 to the two former Lead Counsel firms (Tier II) represents about 15% of their time and expense as of July 31, 2008 (17.6% of their time and expense as of August 10, 2006). The $1,080,711 allocated to the 21 remaining firms (Tier III) reflects an average payment of about 9% of their collective time and expense, regardless of which date is used.  *See* Williams Decl. ¶ 16.

In sum, although Lead Counsel incurred about ***four times*** the time and expense of the firms in Tier III, they paid themselves over ***twelve times*** what they paid the firms in Tier III.  Moreover, they paid the Tier III firms substantially ***less*** than they paid the Tier II firms—despite the fact that the total time billed by the Tier III firms was substantially ***more*** than that of the Tier II firms (who, according to Lead Counsel, abandoned the case).

**E.    Time and Expense Reported, and Amount Received, By Williams Law Firm.**

For the work described in Section (B) above, the reported time and expense of Willams Law Firm was as follows:

11

| Date | Hours | Lodestar | Expense | Total |
|------|-------|----------|---------|-------|
| August 10, 2006 | 3,885 | $1,246,961 | $35,869 | $1,282,830 |
| May 31, 2007 | 4,909 | $1,834,287 | $64,308 | $1,898,595 |
| July 31, 2008 | 4,909 | $1,834,287 | $58,587 | $1,892,874 |

As the chart shows, the time and expense reported by the Williams Law Firm increased substantially from August 10, 2006 to May 31, 2007—a time when most other Tier III firms no longer contributed time or capital to the case. *Compare* June 22, 2007 Edelson Decl. Ex. 1 *with* April 16, 2008 Edelson Decl. Ex. 1. This was due largely to the Williams Law Firm's commitment to staffing the ongoing Baxter document review, briefing on AstraZeneca pretrial matters, and the additional capital demanded by Lead Counsel to help fund this litigation. Williams Decl. ¶¶ 15(a-c). After May of 2007, like other Tier III firms, Williams Law Firm was not asked to contribute any additional time or capital to the case. Williams Decl. ¶ 10.

On October 6, 2008, Williams Law Firm received $154,490.78 for time and expenses incurred through July 31, 2008. According to Lead Counsel, this amount includes 20% of unreimbursed expenses. Williams Del. ¶ 17. Williams Law Firm did not receive any Tier III "bonus." *Id.* Subtracting $11,717.40 (20% of $58,586.53 in unreimbursed expenses) leaves $142,773.38, or 7.78% of the lodestar reported by Williams Law Firm as of July 31, 2008. This is substantially less than the 25% of lodestar Lead Counsel paid to themselves, or the 15% paid to the Tier II firms. It is even less than the paltry 9% average paid to the other Tier III firms.

**F.     Lead Counsel Refused To Provide Additional Information.**

On or about October 14, 2008, Williams Law Firm questioned Lead Counsel's allocation methodology, and over the next few days asked for additional information to better evaluate the reasonableness of the allocation. Williams Law Firm asked for copies of the firm-specific time and expense reports that supported the GSK and AstraZeneca fee petitions, copies of the agreements Lead Counsel had with ISHP and objector counsel that led to the $3 million payment to these counsel, and the breakdown and amount of the "bonuses" paid to the seven unidentified Tier III firms. Williams Decl. ¶ 18.

Lead Counsel refused this request, and said they stood by their allocation. *Id*. Lead Counsel also took the position, for the first time, that some of the work performed by the Williams Firm was "unauthorized."   Williams Decl. ¶ 19.  When challenged to specify the work that was supposedly "unauthorized," Lead Counsel demurred and said they did not deduct for this work.  This motion followed.

## III.   <u>ARGUMENT</u>

"In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys fees are reasonable and divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008). While the district court may delegate the task of allocating a fee award among attorneys, the court should not simply defer to attorneys who have a direct interest in how the funds are to be distributed.  *Id*. at 234-35 (holding that "such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate"). Rather, the district court must utilize procedures that comport with "traditional judicial standards of transparency,

impartiality, procedural fairness, and ultimate judicial oversight" over the allocation. *Id.* at 234.  *See also In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 982 F.2d 603, 611 (1st Cir. 1992) (holding that an attorney with an interest in a common fund has a due process right to be heard on how the fund is to be distributed).

In this case, Lead Counsel were given responsibility for fairly allocating the GSK fee among counsel, including themselves. The resultant disparity in favor of Lead Counsel demonstrates that Lead Counsel were unduly influenced by their own financial interest in allocating the fee.  With the largest lodestar in the case, Lead Counsel made no effort to discount excessive or redundant work or undocumented expenses before allocating the fee.  Lead Counsel also counted all work as fully compensable regardless of whether it had anything to do with GSK, even if the work was performed years after the litigation against GSK had ended. Lead Counsel made substantial payments to non-class counsel and others who provided no benefits to the class. And, Lead Counsel rewarded their own inefficient case management by paying their own bloated lodestar in gross disproportion to the lodestar of other firms.

Because Lead Counsel refuse to provide time and expense information sufficient to determine whether the lodestar and expense reported by firms was reasonable and compensable, the Court should therefore conduct an accounting of time and expense records in this case, scrutinize Lead Counsel's allocation of the GSK award, and if necessary conduct its own allocation of the award (and of any future fee awards) to reasonably compensate class counsel for their time and expense. The Court should also monitor the hours and expenses that Lead Counsel continue to amass in this case, to

ensure that this case is litigated in a cost-effective manner.    And, the Court should conduct allocations of future fee awards itself, rather than delegate the task to counsel with a significant interest in the outcome.

> **A.    Lead Counsel Apparently Conducted No Inquiry Into Whether The Reported Hours and Expenses Were Properly Incurred And Fully Compensable In This Case.**

The starting point in allocating a fee is to ensure that the time and expense reported by each firm is accurate, necessary, properly incurred, documented, and otherwise appropriate.  In its opinion awarding fees to the prevailing class plaintiffs in *Guckenberger v. Boston University*, 8 F. Supp. 2d 91 (D. Mass. 1998), this Court discussed and applied standards to be used in making this determination.

The Court recognized that typically, a court needs to compute the lodestar for each firm by ascertaining the time counsel spent on the case and then "subtracting from that figure the hours which were duplicative, unproductive, excessive, or otherwise unnecessary."  *Guckenberger*, 8 F. Supp. 2d at 100 (citing *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992)).  The Court noted that even in a case requiring "herculean efforts by multiple counsel," a substantial deduction may be necessary to account for overstaffing, excessive conferencing, and other unnecessary work. *Id*. at 101. A reduction for excessive or unproductive effort becomes even more appropriate when "at some point 'there came a time of diminishing returns'" in the way the case was prosecuted. *Id*. (quoting *Ackerley Communications, Inc. v. City of Sommerville*, 901 F.2d 170, 172 (1st Cir. 1990)).

To properly account for redundant and other excessive time entries, the Court used First Circuit taxonomy to categorize work as "core" and "non-core," with the former

compensated at full rates, and the latter compensated at two-thirds rates.  The Court described "core" work as "'includ[ing] legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders.'"  8 F. Supp.2d at 101 (citation omitted).  "Non-core" work consists of less demanding tasks such as letter writing, telephone conferences, and "attendance at court hearings in a non-participatory capacity." *Id*.

The Court further noted that reductions may be appropriate for hours spent on claims that are ultimately unsuccessful, and for undocumented expenses.  *Id*. at 102; *see also Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 298 (1st Cir. 2001) ("When a plaintiff prevails on some, but not at all, of multiple claims, a fee reduction may be in order.  In such a situation, the court must filter out the time spent on unsuccessful claims and award the prevailing party fees related solely to time spent litigating the winning claim(s)") (*citing Hensley v. Eckerhart,* 461 U.S. 424, 434-35 (1983).  To account for work spent on unsuccessful claims in *Guckenberger*, the Court reduced the lodestar of plaintiffs' counsel by fifteen percent.  *Id*. at 109-11.  The Court also refused to reimburse plaintiffs' counsel for over $45,000 in expert fees that were not documented. *Id*.  at 111.

In this case, the lodestar amassed by Lead Counsel is four times that of the Tier III firms and still growing. The anticipated fees are unlikely to cover this lodestar.  Thus, in allocating fees, it is especially important to ensure that redundant, non-core work and undocumented or inappropriate expenses are properly discounted. With the largest lodestar in the case, however, Lead Counsel had no interest in discounting excessive or redundant hours, "non-core" work, or unsuccessful efforts. Likewise, with the highest

reported expenses in the case, Lead Counsel had no interest in scrutinizing expenses to see if they were appropriately incurred and properly documented. Instead, Lead Counsel's allocation began by giving full credit to every hour and expense incurred in the case, without any inquiry whatsoever.

This was inappropriate. Excessive or redundant activity such as non-participatory attendance at depositions and hearings should not be compensated at the same level as other work. Nor should full credit be given to lengthy telephone conferences and other inefficient, time-wasting effort. Expensive trips by persons who did not participate in any meaningful way should not be reimbursed. These and other examples of wasteful, non-compensable time and expense should be culled from time and expense reports and subtracted.

Since Lead Counsel failed to make any effort to ensure that only properly-incurred time and expense are compensated, the Court must now take the necessary steps to do so. The Court should appoint itself or some other disinterested party to conduct the necessary inquiry to ensure that class counsel's time and expense are properly compensated, with respect to the GSK fee and all future fees awarded in this case.

**B.      Lead Counsel Paid For Work And Expense That Did Not Benefit GSK Class Members.**

The Court authorized payment of the GSK award out of a "common fund" created by the GSK settlement. The common fund doctrine permits the Court to award fees from the fund to compensate an attorney for preserving or creating the fund for others besides the attorney's own clients. *Manual for Complex Litigation, Second,* § 24.11 (1985). The doctrine requires such awards to reflect the reasonable value of the attorneys' services

17

that resulted in the benefits conferred on the class. *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 165 (3d Cir.1973).

In separating this case into different plaintiff and defendant groups, this Court has recognized that the interests among plaintiffs vary depending upon, among other things, which Defendant's products they purchased.  In allocating the GSK award, however, Lead Counsel compensated counsel regardless of whether the work or expense benefited GSK settlement class members, or had anything to do with GSK at all.  The lodestar and expense amount Lead Counsel used for the allocation was not the $63 million lodestar and expense incurred as of the August 10, 2006 GSK settlement date, but the $81 million lodestar and expense incurred as of July 31, 2008—two years after the GSK settlement had been finalized. Although a portion of that additional effort may have been devoted to matters relevant to GSK, most of it almost certainly was not.  Indeed, much of that time was devoted to trying claims in December of 2006 against four other defendant groups— time that is compensable (if at all) under applicable fee-shifting statutes, rather than from a fee award from a settlement that took place four months earlier with a separate defendant. Nevertheless, Lead Counsel counted all of the post-settlement time and expense equally, regardless of when it was incurred or whether it provided any benefit whatsoever to GSK settlement class members.

Besides using the GSK award to pay for non-GSK work, Lead Counsel also paid substantial sums to non-class counsel.  For an attorney to be entitled to compensation from a common fund, he or she must have aided directly in creating, preserving or protecting the fund. *See Lindy,* 487 F.2d at 165.  Specifically, objectors are not ordinarily awarded attorneys fees from a class settlement, except where their efforts have conferred

benefits on class members generally, as distinguished from the objectors themselves. *Duhaime v. John Hancock Mutual Life Ins. Co.*, 2 F. Supp. 2d 175, 176 (D. Mass. 1998).

In its allocation, Lead Counsel showed little regard for whether the recipients benefited the class. Lead Counsel paid nearly $3 million to counsel for the ISHPs—insurance companies and other TPPs who were ***carved out*** of the TPP portion of the GSK settlement allocation. Lead Counsel paid another $100,000 to counsel for Demra Jordan, an ***objector*** who likewise provided no discernible benefit to the class.[1] Thus, the necessity and reasonableness of these substantial payments is very much open to question.

### C.    By Paying Themselves A Disproportionate Share Of Their Excessive Lodestar, Lead Counsel Rewarded Themselves For Failing To Efficiently Manage The Litigation.

By paying a much higher percentage of their lodestar than they paid on the lodestar of other firms, Lead Counsel essentially gave themselves a significant upward enhancement in relation to these other firms. Lead Counsel attempted to justify this enhancement because they led the case from inception, did most of the work, advanced the most expenses, shouldered most of the risk of nonpayment, were members of the "trial team," and "were the primary drivers of the results achieved." While each of these points may be true, they do not justify paying Lead Counsel twelve times more than the Tier III firms, for incurring four times the time and expense.

The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Upward enhancements for

---

[1]Although these payments were evidently made pursuant to agreements, none of those agreements have been made public, as required by Fed. R. Civ. P. 12(e)(3). Nor has Lead Counsel explained either the purpose for these payments or what benefit, if any, these counsel provided to the class, despite being asked to do so.

such factors as the "high quality" of representation, "complexity and/or novelty of the issues," amount of work performed, and "risk of nonpayment," are disfavored.  *See Blum v. Stenson,* 465 U.S. 886, 898-99 (1984) (holding that upward enhancement of a fee based on general assertions of "complexity" or "novelty of issues" was unjustified).  As the Supreme Court acknowledged in *Blum*, such considerations are fully reflected in the lodestar submitted by the attorney, which sets forth the number of billable hours recorded by counsel multiplied by his hourly rate.  *Id.*  Thus, an enhancement for a particular attorney is rarely appropriate, and must be supported by specific evidence. *Id.*; *see also In re Washington Public Power Supply System Securities Litigation*, 779 F. Supp. 1063, 1088-89 (D. Ariz. 1990) (discussing and applying *Blum* and its progeny).

Lead Counsel correctly observe that they are chiefly responsible for the overall result in this case. In a class action case, lead counsel have a responsibility "to act fairly, efficiently, and economically in the interests of all parties." *Manual for Complex Civil Litigation, Third* § 20.221 (2000).  This means Lead Counsel are responsible not only for the amount of funds obtained from defendants, but for managing the efficient expenditure of time and capital to obtain those funds.

Early in this case, this Court gave Lead Counsel responsibility for "major decisions on behalf of Plaintiffs' Counsel regarding the overall prosecution of the Consolidated Actions," for the "day-to-day management" of this case, and for "establishing working committees for the ***efficient*** prosecution of the litigation."  *See* Case Management Order No. 1 dated June 14, 2002 ("CMO 1") (previously filed and docketed as Document 100) at ¶¶ 11-12 (emphasis added).  To enable them to meet their case management responsibilities, Lead Counsel were given sole authority over virtually

every aspect of this case, including motions, discovery, court hearings, settlement negotiations, and all other matters. *Id.* at ¶ 12. This responsibility and authority has continued throughout the case. *See, e.g.*, Consolidated Order Re: Motion for Class Certification dated January 30, 2006 (previously filed and docketed as Document 2097-1) at ¶ 3; Case Management Order No. 34 dated January 4, 2008 (previously filed and docketed as Document 4987).

The results achieved by Lead Counsel do not support awarding them a higher proportionate share of their lodestar than other firms in this case. Over the past several years, under the leadership of Lead Counsel, the lodestar and expenses in this case have ballooned to over $80 million—two thirds of which is Lead Counsel's lodestar, and which continues to grow in excess of $350,000 per month. During this same time period several defendants have won dismissals and/or favorable judgments; Lead Counsel's retained expert has imposed substantial limitations on potential damages; and the Court has significantly reduced the list of actionable drugs. Thus, while there are current and pending settlements totaling approximately $250 million, the anticipated fees from these settlements are unlikely to cover the lodestar and expense amassed in this case.

Lead Counsel are responsible for this shortfall in anticipated fees, since they demanded—and received—sole authority and responsibility for how this case would be litigated. Allowing Lead Counsel to lessen the impact of this shortfall to themselves, by increasing their share of the GSK fee at the expense of other firms, essentially relieves Lead Counsel of their obligation to manage the case economically and expeditiously. Even worse, justifying this disparity on the ground that Lead Counsel "led the case" and "drove the result" rewards Lead Counsel with real dollars for a fictional outcome. A *pro*

*rata* payment of everyone's lodestar (after appropriate reductions have been made, as discussed above), forces everyone, including Lead Counsel, to experience the same negative percentage return on their lodestar.  This is more than adequate reward for Lead Counsel's leadership in this case. The allocation should therefore be adjusted accordingly.

### D.      The Court Should Monitor Lead Counsel's Efforts by Requiring Submission of Periodic Time and Expense Reports To The Court.

With Lead Counsel continuing to plug thousands of additional hours into this case and shutting out everyone else, the growing lodestar threatens to engulf any remaining fees to be awarded in settlement.  Some mechanism is needed to ensure that only necessary work is being done, and that it is being done efficiently.

To help prevent overbilling, excessive spending, and other problems, and to manage fee awards, courts are increasingly requiring attorneys for class action plaintiffs to submit periodic reports to the court for review *in camera*.  *See, e.g.*, *Gunter v. Ridgewood Energy Corp.*, 223 F.2d 190, 201 n.6 (3rd Cir. 2000).  *See also Rode v. Dellarciproto*, 892 F.2d 1177, 1191-92 (3rd Cir. 1990) (specifically requiring this approach as a means for monitoring plaintiffs' counsels' time and expense, and for managing future fee awards); *Manual for Complex Litigation, Fourth* § 14.214 (2008).  Perhaps this case is long past the point of "diminishing returns," but Movant nonetheless urges the Court to impose such a requirement in this case, to help prevent any further wasteful spending of time and money.

### E.      The Court Should Allocate All Future Fee Awards In This Case.

In light of the above, it probably goes without saying, but Movant respectfully requests that the Court not delegate allocation of future fee awards to Lead Counsel.

With over $50 million in reported time and expense in this case, Lead Counsel have too powerful an incentive to unfairly favor themselves over other firms.  Allowing Lead Counsel to continue allocating fees will perpetuate the conflict of interest inherent in such a process, and will open up Movant (or anyone else who challenges Lead Counsel's allocation) to the possibility of an arbitrarily-reduced payment for supposedly doing "unauthorized" work, or some other retribution by Lead Counsel.  In the alternative, if the Court still wishes to delegate the allocation task, it should delegate it to a disinterested third party.

### IV.   CONCLUSION

For the foregoing reasons, Williams Law Firm respectfully requests that the Court conduct a judicial review of the allocation made by Lead Counsel, including but not limited to the following:

-- an accounting and evaluation of the time and expense reported by Lead Counsel and the other firms in this matter;

-- a review of Lead Counsel's decision to count all time and expenses equally in determining lodestar, without regard to when they were incurred or whether they were related to GSK;

-- a review of Lead Counsel's decision to pay non-class counsel over $3 million of class funds;

-- a review of Lead Counsel's decision to pay themselves a significantly higher proportion of their lodestar than they paid other firms, where Lead Counsel controlled the management of this litigation, where Lead Counsel amassed a gigantic lodestar in comparison to that of other firms, and

where the anticipated fees are unlikely to pay the collective lodestar in this case;

--      reallocation of the GSK award, as deemed necessary by the Court; and

--      such other relief as the Court deems necessary in the interests of justice.

Williams Law Firm also respectfully requests that the Court monitor future time and expense by Class Counsel in this case, and either allocate future fee and expense awards to Class Counsel itself or delegate this task to an objective third party.

Dated:  October 24, 2008                    /s/ Kent M. Williams
                                            Kent M. Williams
                                            WILLIAMS LAW FIRM
                                            1632 Homestead Trail
                                            Long Lake, MN  55356
                                            (763) 473-1383

                                            ONE OF THE CLASS COUNSEL FOR
                                            PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **MEMORANDUM IN SUPPORT OF MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD, FOR COURT MONITORING OF CLASS COUNSEL TIME AND EXPENSE, AND FOR COURT ALLOCATION OF ALL FUTURE FEE AWARDS TO CLASS COUNSEL** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  October 24, 2008                    /s/ Kent M. Williams
                                            Kent M. Williams, Esq.