UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Judge Patti B. Saris |

**DECLARATION OF KENT M. WILLIAMS IN SUPPORT OF
MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF
GSK FEE AWARD, FOR COURT MONITORING OF CLASS COUNSEL TIME
AND EXPENSE, AND FOR COURT ALLOCATION OF ALL FUTURE FEE
AWARDS TO CLASS COUNSEL**

Kent M. Williams, being duly sworn, deposes and states as follows:

1.  I am the sole owner of Williams Law Firm, one of the Class Counsel in the above-captioned matter.  I submit this Declaration in support of my firm's Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, for Court Monitoring of Class Counsel Time and Expense, and for Court Allocation of All Future Fee Awards to Class Counsel.

2.  I am an attorney in good standing and duly licensed and admitted to practice in the bar of Minnesota.  The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open Court if called upon to do so.

3.  I was first invited by Hagens Berman Sobol & Shapiro, Hoffman & Edelson, Spector, Roseman & Kodroff, and Wexler Toriseva Wallace & Terrell (collectively, "Lead Counsel") to become directly involved in this MDL in September of 2005.  Prior to that time, my former firm, Giebel Gilbert Williams & Kohl, and I

belonged to a group of law firms and attorneys led by the firm of Kline & Specter (collectively, "the Kline & Specter Group"). The Kline & Specter Group was pursuing competing AWP litigation in New Jersey and Arizona, and had been in a protracted struggle with Hagens Berman Sobol & Shapiro, Hoffman & Edelson, Spector, Roseman & Kodroff, and others over control over the Lupron litigation before Judge Stearns in this District. Although the Lupron dispute was largely resolved by the summer of 2005, there were still hard feelings between the Kline & Specter Group and Lead Counsel over the AWP litigation generally, with no plans by either group to collaborate with the other.

4. On August 16, 2005, this Court issued a ruling on class certification which suggested that one or more nationwide classes of Medicare beneficiaries would be certified if suitable consumer class representatives were proposed within sixty days of the Court's ruling. Lead Counsel had trouble finding suitable Class I class representatives within the sixty-day deadline, so Kline & Specter offered to submit as potential class representatives some of its clients who had already retained Kline & Specter and had largely been vetted for purposes of the AWP litigation. Thus, in September of 2005, the two groups agreed that Kline & Specter would provide representative consumer plaintiffs in exchange for a leadership role in the MDL.

5. Because I had helped with client retentions and was a core member of the Kline & Specter Group, I was also invited to participate in the MDL. The parties further agreed that prior time and expense incurred by members of the Kline & Specter Group would be incorporated and included in this case.

6. My firm and I undertook substantial work in connection with the MDL litigation. Much of the early work in the summer and fall of 2005 involved vetting

Medicare beneficiaries and other consumers as potential consumer class representatives. Among other things, along with other members of the Kline & Specter Group, I spoke with potential consumer clients on the telephone, obtained and analyzed medical records and insurance documents, and conducted other factual research to determine which drugs were purchased by particular consumer clients. I was also substantially involved in drafting consumer-specific paragraphs for the Third Amended Consolidated Complaint adding Kline & Specter's consumer class representatives to the case.

7. In late fall of 2005 I defended the depositions of Track I consumer class representatives Larry Young and Robert Howe. Among other things, I reviewed documents the two men had produced, met with each of them in person and on the telephone to prepare for their depositions, and attended their depositions. I also assisted with the renewed motion to certify nationwide classes as to the Track I defendants, particularly with respect to specific transactions and other matters relevant to Messrs. Howe and Young.

8. In the early spring of 2006, at the request of Lead Counsel, I served as one of the two consumer advocates who negotiated the allocation of GSK settlement funds between consumers and TPPs. My firm also staffed the review of millions of pages of documents produced by Defendant Baxter. This review, which took place at Hagens Berman's Chicago office, required the full-time effort of several attorneys and lasted over fourteen months, until February of 2007. I personally completed various other assignments in 2006 and 2007, including analyzing medical and insurance records for particular class representatives and substantially revising the supporting affidavit with respect to Track II class certification, attending third party insurer depositions, drafting

3

plaintiffs' opposition to AstraZeneca's motion in limine to bar admission of its guilty plea at trial, and other matters.

9. In the course of assisting with this litigation, I incurred substantial out of pocket expenses. Besides travel and other expenses, Lead Counsel periodically asked me to contribute to the litigation fund, especially as my firm's lodestar in the case grew. Indeed, on April 3, 2007, Marc Edelson, one of the Co-Lead Counsel in this matter, specifically justified a request for $25,000 from my firm because of the "significant time commitment" my firm had made to the case.

10. As a sole practitioner, my compliance with these requests for time and capital necessarily came at the exclusion of other matters. Nonetheless, I readily paid all requests by Lead Counsel for assessments, just as I performed all of the tasks assigned to me. I do not recall ever turning down any assignment or any request for funds from Lead Counsel. After May of 2007, I was not asked to contribute any additional time or capital to the case.

11. To my knowledge, all of the tasks I completed and for which I reported time were done with the knowledge and authorization of one or more Lead Counsel. At no time did any Lead Counsel ever inform me that my work product was unauthorized, unacceptable, or wanting in any way.

12. This Court granted final approval to the GSK settlement on August 7, 2007. *See* Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement With the GlaxoSmithKline Defendants, Approving Proposed Allocation of Settlement Funds, And Approving Class Counsel's Application For Attorney's Fees, Reimbursement og Litigation Expenses And Compensation To Class Representatives

(previously filed and docketed in this case as Document No. 4619) (hereinafter "Final Approval Order").  The Final Approval Order provided that "Co-Lead Counsel shall allocate fees to themselves and other Plaintiffs Class Counsel in their sole discretion, *as appropriate*." Final Approval Order ¶ 14, at 9 (emphasis added).

13. On October 13, 2008, Sean Matt of Hagens Berman (one of the Co-Lead firms) informed me that, in allocating the GSK award, Lead Counsel split the class counsel firms into three "tiers" comprised as follows:  the four Lead Counsel firms ("Tier I"), former Lead Counsel Heins Mills & Olson and Kline & Specter ("Tier II"), and the remaining 21 firms in the case (Tier III).

14. Mr. Matt informed me that after an interim portion of the GSK award was distributed in May of 2007 (as reimbursement for part of each firm's expenses), the total award remaining to be distributed from the GSK settlement came to $20,290,865.50, including interest. Lead Counsel distributed this amount as follows:

    a. <u>One-fifth of unreimbursed expenses</u>.  According to Mr. Matt, as of July 31, 2008, total unreimbursed expenses claimed by class counsel were $8,973,764.63. Lead Counsel reimbursed each firm one-fifth of its unreimbursed expenses, for a total of $1,794,752.93.

    b. <u>Payment to Counsel for the ISHPs</u>. Robins Kaplan Miller & Ciresi, the Rawlings Group, and Lowey Dannenberg, the three firms who represented the Independent Settling Health Plans, were each paid $985,792.50, for a total of $2,957,377.50. Apparently, this allocation was made pursuant to an agreement by Lead Counsel to pay ISHP counsel 15% of the GSK award.

   c. <u>Payment to Counsel for Demra Jordan.</u> Counsel who represented objector Demra Jordan was paid $100,000, also apparently pursuant to an agreement with Lead Counsel.

   d. <u>Payment to Lead Counsel</u>. Collectively, Lead Counsel paid themselves $12,814,150. With their expense reimbursement of $1,497,486, Lead Counsel paid themselves a total of $14,311,636—over 83% of the GSK award that was left after paying non-class counsel.

   e. <u>Payment to Former Lead Counsel</u>. Heins Mills & Olson and Kline & Specter, two firms who used to be Lead Counsel but who (in Mr. Matt's words) "dropped out of the case and thereby minimized their risks," were paid $1,543,873. With their $186,804 in expense reimbursement, the total paid to the Tier II firms was $1,730,677—about 10% of the GSK award left after paying non-class counsel.

   f. <u>Payment to the Remaining Firms</u>. Lead Counsel paid the 21 remaining firms ("Tier III") $1,080,711. According to Mr. Matt, Lead Counsel paid seven of these firms "bonuses" for demonstrating a "higher level of dedication and quality of work." With the $110,464 Tier III expense reimbursement, the total paid to the Tier III firms was $1,191,175—about 7% of the GSK award left after paying non-class counsel.

15. Comparing these amounts to the reported lodestar and expense by all Class Counsel in this case shows that Lead Counsel paid themselves a disproportionate share of the GSK award.

   a. <u>Lodestar and Expense Through August 10, 2006</u>.

On June 22, 2007, Lead Counsel submitted firm-specific information to the Court showing lodestar time and expense information for each firm from inception through August 10, 2006, the date that settlement between GSK and the plaintiffs was finalized. *See* Exhibit 1 to the June 22, 2007 Declaration of Marc Edelson ("June 22, 2007 Edelson Decl.")  (previously filed and docketed in Case 1:01-cv-12257-PBS as Document No. 4399). Grouping the firm lodestar and expense information into the allocation tiers used by Lead Counsel shows the following collective information as of August 10, 2006:

| Tier | Hours | Time | Expense | Total | % |
|---|---|---|---|---|---|
| Tier I | 110,940 | $36,573,628 | $3,952,503 | $40,526,131 | 64.49 |
| Tier II | 27,719 | 8,829,342 | 999,879 | 9,829,221 | 15.64 |
| Tier III | 37,876 | 11,876,230 | 608,746 | 12,484,976 | 19.87 |

As shown on Exhibit I to the June 22, 2007 Edelson Declaration, my firm's reported time and expense as of August 10, 2006 was 3,885 hours for a lodestar of $1,246,961, which combined with expenses of $35,869, came to a total of $1,282,830. *Id.*

        b.      <u>Lodestar and Expense Through May 21, 2007</u>.

Lead Counsel settled the Class One (Medicare beneficiary) claims against AstraZeneca in May of 2007.  On April 17, 2008, Lead Counsel submitted firm-specific information to the Court showing lodestar time and expense from inception through May 31, 2007.  *See* Exhibit 1 to the April 16, 2008 Declaration of Marc Edelson ("April 16, 2008 Edelson Decl.") (previously filed and docketed as Document No. 5222). Grouping all of the firm information into the tiers used by Lead Counsel for allocation purposes shows the following collective information as of May 31, 2007:

| Tier | Hours | Time | Expense | Total | % |
|---|---|---|---|---|---|

| Tier I | 131,317 | $43,980,828 | $7,008,217 | $50,989,045 | 67.18 |
| Tier II | 27,840 | 10,268,745 | 1,203,486 | 11,472,231 | 15.11 |
| Tier III | 39,241 | 12,794,815 | 644,451 | 13,439,266 | 17.71 |

Exhibit I to the April 16, 2008 Edelson Declaration shows that my firm's reported time and expense as of May 31, 2007 was 4,909 hours for a lodestar of $1,834,287, which combined with expenses of $1,898,595, came to a total of $1,898,595. *Id.*

    c.  <u>Lodestar and Expense Through July 31, 2008</u>.

Mr. Matt has informed me of the following collective time and expense information as of July 31, 2008:

| Tier | Hours* | Time | Expense | Total | % |
|---|---|---|---|---|---|
| Tier I | n/a | $49,208,132 | $7,487,421 | $56,695,553 | 69.80 |
| Tier II | 27,840 | 10,271,190 | 934,021 | 11,205,211 | 13.80 |
| Tier III | 39,241 | 12,773,203 | 552,321 | 13,325,524 | 16.40 |

*Hours for Tiers II and III are assumed to be approximately what they were as of May 31, 2007, since the lodestars for these two groups remained about the same.

My firm's reported time and expense as of July 31, 2008 did not change from May 31, 2007. Therefore, it was still 4,909 hours for a lodestar of $1,834,287, which combined with expenses of $1,898,595, came to a total of $1,898,595.

    16.  Comparing each tier's share of the GSK award to their respective lodestar shows as follows: the $14,311,636 million payment to Lead Counsel (Tier I) represents about 25% of Lead Counsel's time and expense as of July 31, 2008 (35% of Lead Counsel's time and expense as of August 10, 2006). The payment of $1,730,677 to the two former Lead Counsel firms (Tier II) represents about 15% of their time and expense as of July 31, 2008 (17.6% of their time and expense as of August 10, 2006). The

$1,080,711 allocated to the 21 remaining firms (Tier III) reflects an average payment of about 9% of their collective time and expense, regardless of which date is used.

17.  On October 6, 2008, my firm received $154,490.78 for time and expenses incurred through July 31, 2008. According to Mr. Matt, this amount includes 20% of my firm's unreimbursed expenses.  My firm did not receive any Tier III "bonus." Subtracting $11,717.40 (20% of $58,586.53 in unreimbursed expenses) leaves $142,773.38, or 7.78% of the lodestar reported by my firm as of July 31, 2008. This is substantially less than the 25% of lodestar Lead Counsel paid to themselves, the 15% paid to the former co-Lead Counsel firms, or the 9% average paid to the twenty other firms in Tier III.

18.  On or about October 14, 2008, I questioned Lead Counsel's allocation methodology, and over the next few days asked Mr. Matt for additional information to better evaluate the reasonableness of the allocation. In particular, I asked for copies of the firm-specific time and expense reports that supported the GSK and AstraZeneca fee petitions, copies of the agreements Lead Counsel had with ISHP and objector counsel that led to the $3 million payment to these counsel, and the breakdown and amount of the "bonuses" paid to the seven unidentified Tier III firms.  Lead Counsel refused my request for additional information, and said they stood by their allocation.

19.  In the course of explaining the allocation, on October 16, 2008, Mr. Matt implied that some of the work performed by the Williams Firm was "unauthorized."  He went on to say, however, that Lead Counsel did not deduct for this "unauthorized" work. Because I had heard no such thing before that time, I asked Mr. Matt to specify the work the work in question.  I received no response, which confirmed my view that the

9

accusation about "unauthorized" work was a not-so-veiled threat not to challenge Lead Counsel's allocation. This motion followed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  October 24, 2008                          /s/ Kent M. Williams
                                                                  Kent M. Williams, Esq.

### CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **DECLARATION OF KENT M. WILLIAMS IN SUPPORT OF MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD, FOR COURT MONITORING OF CLASS COUNSEL TIME AND EXPENSE, AND FOR COURT ALLOCATION OF ALL FUTURE FEE AWARDS TO CLASS COUNSEL** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File and Serve for posting and notification to all parties.

Dated:  October 24, 2008                          /s/ Kent M. Williams
                                                                  Kent M. Williams, Esq.