**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | Subcategory Docket:  06-11337-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, No. 07-CV- | ) | |
| 11618-PBS; *U.S. ex rel. Ven-A-Care of the* | ) | |
| *Florida Keys, Inc. v. Dey, Inc. et al.*, No. 05- | ) | |
| 11084-PBS; *U.S. ex rel. Ven-a-Care of the* | ) | |
| *Florida Keys, Inc., et al. v. Boehringer* | ) | |
| *Ingelheim Corp., et al.*, No. 07-10248-PBS | ) | |

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR APPOINTMENT OF A SPECIAL MASTER**

On November 5, 2008, the Court ruled on the *twelve*-document production the

Government submitted on September 15, 2008 in response to the Court's effort to rein in the

Government's aggressive assertion of the deliberative process privilege.  The Court ordered

production of eight of those documents (two-thirds of the submission), finding the documents

either were *not even covered* by the privilege (a full fourth of the submission) or that the

qualified privilege should give way to the Defendants' need for the documents.  (Dkt. No. 5665

at 16-20.)[1]

The Court's recent *in camera* review and November 5 Order underscores the need for a

considerably more thorough review—by a special master—of the evidence the Government has

been shielding behind the deliberative process privilege, both to assure the documents fall under

---

[1] Neither the Court nor Magistrate Bowler has yet to rule on the 42 documents the Government submitted for *in camera* review on December 4, 2007 and June 3, 2008 in response to the Court's November 9, 2007 Order on the deliberative process privilege.  (*See* Dkt. No. 4920; Dkt. No. 5353.)  Unlike the documents contained in the September 15, 2008 submission already reviewed by the Court, these documents specifically refer to "Abbott" or the products at issue in the Abbott case.

the privilege at all and to conduct the balancing test in a fair and legally appropriate manner. (*See id.* 9-10) ("In conducting a balancing test, a court should conduct an individualized review of each piece of evidence to 'to insure that the balance between petitioners' claims of irrelevance and privilege and [the opposing party's] need for documents is correctly struck.'") (citing *Kerr v. U.S. Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 405 (1976)).  This is particularly true here, as it is readily apparent that the Government failed to submit critically important documents that fall within the Court's instructions at the July 24, 2008 hearing.  Given the Government's continued resistance to providing Defendants with a right to a defense, its recognized practice of shielding documents that are neither pre-decisional nor deliberative in nature, and the fact that the Court has found Abbott's interest in the documents strong enough to overcome the privilege in many cases, only a thorough *in camera* review of the withheld documents can serve the ends of justice here.

As the Court understandably lacks the time and resources necessary to conduct its own *in camera* review, defendants Abbott Laboratories, Inc., Dey, Inc. and the Roxane Defendants (collectively, "Defendants") respectfully request, pursuant to Rule 53, appointment of a special master to review certain key documents withheld by the Government.  *See* Fed. R. Civ. P. 53(a)(1) (appointment of special master appropriate to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge.") Appointment of a special master is common in situations, as here, where the Government has withheld large numbers of documents under the deliberative process privilege.[2]  To facilitate a timely yet reasonably thorough review of the withheld documents, Defendants would not request

---

[2] *See, e.g.*, *United States v. Phillip Morris USA Inc.*, 218 F.R.D. 312, 315-317 (D.D.C. 2003) (adopting special master's finding that Government improperly invoked deliberative process privilege with respect to certain documents); *Cobell v. Norton*, 213 F.R.D. 1, 7-9 (D.D.C. 2003) (directing special master to determine whether documents withheld by Government fell within the deliberative process privilege); *In re "Agent Orange" Product Liab. Litig.*, 97 F.R.D. 427, 429-30 (E.D.N.Y. 1983) (same).

that a special master review all of documents withheld from production (such as draft OIG

reports).  Rather, Defendants anticipate the review could be targeted to approximately 200-500

of the documents on the Government's logs that were never submitted for *in camera* review and,

potentially, allegedly deliberative documents the Government has never bothered to log.[3]  Should

the Court appoint a special master, it might also assign the special master to rule on the 42

outstanding documents which still require resolution (*see supra* footnote 1), as well as Abbott's

outstanding motion to compel deposition testimony of federal government witnesses blocked by

counsel under the deliberative process privilege.  (*See* Dkt. No. 5112).

By injecting a neutral third party into the process, the Court can provide reasonable

assurance that all evidence necessary for a full and fair resolution of these cases has been

produced and, most of all, avoid the possibility of reversible error.  *See United States v. Hooker*

*Chemicals & Plastics Corp.*, 114 F.R.D. 100, 103 (W.D.N.Y. 1987) ("it is crucial that some

neutral Special Master personally review the documents at issue so that the interests of justice

can be served" where the plaintiff Government invoked the privilege against a defendant who

"has an important right to discover any material" relevant to its defense).

Alternatively, the Court should extend its own *in camera* review to include around 200

additional documents—not yet submitted for *in camera* review—that are plainly relevant to the

Government's knowledge and response to so-called "mega-spreads" for the products at issue.

Those documents are listed on attached Schedule 1.  That these documents, whose privilege log

descriptions reveal their obvious significance, have not been produced or subjected to any sort of

*in camera* review is unconscionable.

---

[3] The Court's November 5, 2008 Order states that the Government's "privilege logs list[] 451 documents."  (Dkt. No. 5665, at 1.)  The Government, however, has produced more documents and accompanying privilege logs through supplemental submissions, and the total number of allegedly privileged documents is now over 2000.

## BACKGROUND

**July 24, 2008 Hearing.**  On July 24th, the Court heard oral argument on Abbott's motion to certify for interlocutory appeal the Court's prior rulings on the deliberative process privilege.[4] During that hearing, the Court made clear that evidence relating to the Government's knowledge and response to drug spreads was of "paramount" importance here.  (*See* July 24, 2008 Hrg. at 4-6.)  The Court, therefore, directed the Government to submit any document that might show "some sort of government knowledge and acquiescence in or approval" of mega-spreads for infusion and inhalation products, including any evidence of "cross-subsidization or the like."  (*Id.* at 17, 20.)  The Court told the Government that "[t]he gist of what you should be looking for is we know this is big in that area of drugs and we're going to go along with it anyway," and that it should "err on the side of, obviously, showing anything."  (*Id.* at 17, 26, 28.)

The Court also asked the Government whether it conceded a 30% "yardstick" developed in an earlier AWP case to account for widespread knowledge about AWPs and provide a buffer zone to subsidize inadequate administrative and dispensing fees.  (*See id.* at 3-9.)

**Response to the July 24 Hearing.**  The Government has filed two responses to the July 24 hearing.  First, the Government filed a paper indicating that its damage expert "added a 25% markup to Abbott's actual market prices when determining a substitute AWP."  (Dkt. No. 5492 at 1-2.)  Therefore, the Government would later state, its damage calculations "take into account the typical differential between a manufacturer's reported prices and AWP – or what the Court

---

[4] Among other things, Abbott argued that the Government's interpretation of the Court's orders—requiring *in camera* review only of documents which specifically referenced "Abbott" or the specific drugs at issue—was inconsistent with longstanding precedent strictly construing the deliberative process privilege when the Government acts as plaintiff in a civil case.  The word-matching approach substituted the typical balancing test with a formulaic test entirely dependant on whether a document (which may be critical in substance) mentions the right words.  As noted *infra*, the Court has not yet ruled on the 42 withheld documents that *do* specifically reference "Abbott" or the drugs at issue in the Abbott case.

(and the Court's expert) has referred to as the 'expectations yardstick.'"  (Dkt. No. 5551 at 7.)

Significantly, the Government's filing did not differentiate between branded and generic drugs.

Second, the Government filed a brief on the twelve documents submitted for *in camera*

review.  Relying primarily on a belated concession of a "25% markup" and prior rulings on the

interpretation of "average wholesale price" (rulings based on a decidedly different record than

has been developed in these cases), the Government argued it should not have to produce any of

the twelve documents, a claim that this Court has now rejected.  (*See* Dkt. No. 5551; Dkt No.

5565.)  As explained below, however, the Government's submission was provably incomplete,

and this Court should take additional steps to ensure Defendants' discovery rights.

## ARGUMENT

## I.  THERE IS NO EVIDENTIARY BASIS FOR THE GOVERNMENT'S 25% "EXPECTATIONS MARKUP" IN THESE CASES.

Defendants first address the Government's claim that its concession of a 25% markup

somehow lessens or eliminates the relevance of the documents it continues to withhold under the

deliberative process privilege.  (*See* Dkt. No. 5551 at 6-8.)  The Government contends that its

concession satisfies the Court's concern that it has withheld documents relevant to its knowledge

and acquiescence in drug spreads.  (*See id.* at 8.)  First, the Government claims that its 25%

markup accounts for its knowledge of drug spreads by providing an "expectations yardstick" of

the "typical differential" between reported prices and market prices.  (*See id.* at 7.)  And, second,

it argues that its 25% markup adequately accounts for any acquiescence of drug spreads

occasioned by cross-subsidization, access concerns, or any other policy reasons.  (*See id.* at 7-8.)

By conceding this buffer, the Government apparently seeks to eliminate the "'cross-

subsidization' issue" as a "red herring."  (*See id.* at 8.)

In truth, the Government's 25% markup—which translates to very little in dollars and cents—"accounts for" neither its expectations about drug spreads nor issues of cross-subsidization.  There is no evidentiary or logical basis for a 25% markup in cases involving generic drugs.  The 25% markup in no way lessens the relevance of the documents that continue to be masked under the deliberative process privilege.

**A.     The 25% Markup Is Not A Reasonable Expectations Markup For Generics.**

The Government's 25% markup is flawed for many reasons, not the least of which is the basic industry (and Government) understanding that market prices for generics fluctuate far below AWP and act very differently than prices for branded drugs.

Initially, the Government mischaracterizes its expert's 25% markup.  Dr. Duggan's 25% markup does not serve as an "expectations yardstick," as the Government suggests.  (*See id.* at 7.)  Dr. Duggan did not report on the Government's knowledge of drug spreads generally or for the products at issue.  And despite overwhelming evidence of the need to consider the adequacy of service payments and issues of access when analyzing ingredient cost payments, Dr. Duggan restricted his analysis to just the ingredient cost side of the equation.  (*See* Ex. A at 591:20-594:17.)  Dr. Duggan's 25% markup accounts for the "scaling factor that First Databank had in effect" (the amount that First Databank added to prices reported by Defendants), so as to not hold Defendants accountable for the markup added by the compendia.  (*See id.* at 614:8-615:15.)

The record in these three DOJ cases (which involve generic drugs) will be very different than the record that led to the Court's 30% speed limit (involving branded drugs, or drugs just beginning to face generic competition).  To put it bluntly: ***Medicare and Medicaid officials did not believe that 25% was the "typical differential" between market and compendia-reported prices.***  As depicted in the following bar graphs taken from a 2002 OIG report, a 20-30% yardstick might work for single-source drugs, but would not work for generics:

6





These charts, derived from a Government study of actual invoice prices, show what the industry and the Government has long understood: most generic drugs sell at discounts *far greater* than 20-30% off of reported prices.[5]  In fact, CMS expected discounts of up to ***99%*** on products at issue in these cases.  Bruce Vladeck, CMS Administrator from 1993 through 1997, testified that he knew since the 1980s that sterile infusion supplies such as saline solutions, dextrose, and sterile water (three of the four drugs at issue in the Abbott case) sold at discounts of up to 99%.  (Ex. B at 146:5-146:12; 182:16-183:21.)  As Dr. Vladeck testified, such discounts on infusion supplies were widely reported in the media as early as the 1980s.  (*Id.* at 145:9-19; Ex. W (Esther Kuntz, *Hospitals Play Into Hands of Vendors Who Try to Break Group Contracts*, Modern Healthcare, July 1980, at 14-16)).)  The other Abbott product at issue, Vancomycin, has been the subject of numerous OIG reports.  As early as 1992, OIG gathered invoices from providers and issued a report showing the drug had an estimated acquisition cost ($5.00) one-fourth of the median AWP ($19.17).[6]  In 1996, a widely-circulated *Barron's* article, "*Hooked on Drugs*," identified a "mega-spreads" for Vancomycin, and also for "intravenous nutritionals and solutions, a category dominated by Abbott Laboratories and Baxter."  (Ex. C at 3.)  *Barron's*

---

[5] *See* Off. of Insp. Gen., A-06-02-00041, *Medicaid Pharmacy-Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products* at 5, 7 (Sept. 2002).

[6] *See* Off. of Insp. Gen., No. A-01-91-00526, *Cost of Dialysis-Related Drugs* (Oct. 1992).

noted that "[c]catalog wholesale prices" for these products averaged "80%-93% below those companies AWPs."[7]  (*Id.*)

And perhaps no other drug has received more attention from OIG than albuterol sulfate, the drug primarily at issue in the Dey case.  In 1996, after an investigation that started at least as early 1994, OIG found that providers paid less than half (19¢ per ml) of Medicare's allowed payment for albuterol (40-43¢ per ml).  In 1998, OIG reported that Medicare's allowed payment for albuterol was 333% more than providers paid.  OIG told HCFA in 2000 that Medicare's allowable was seven times higher than VA's cost.[8]  Likewise, for ipratropium bromide, at issue in both the Dey and Roxane cases, the OIG published extensive reports documenting large spreads.  For instance, in 1998, the OIG told HCFA that Medicare's allowed payment was 155% higher than the VA's cost, and in 2002 the OIG documented average spreads of over 400% on ipratropium bromide.[9]

Government officials have long known that published AWPs do not reflect actual acquisition cost for generic drugs, and that spreads on generics vary dramatically for innocuous reasons unrelated to what is alleged in this case; *i.e.*, trying to cheat government programs.  For example, in a 1986 memorandum noting that a 25% discount off of retail price would not reduce payments to acquisition cost for generic drugs, a HCFA Regional Administrator explained:

---

[7] State Medicaid officials also knew of large percentage spreads for the Abbott products.  Alaska's pharmacy director, David Campana, learned of large variations in the published prices for different manufacturers' Vancomycin, dextrose, and other home IV solutions because he had manually priced those claims since the early 1990s.  (Ex. D at 177:11-181:12.)  In 1995, Kansas changed is reimbursement policy for IV fluids because it knew "intravenous vehicles and irrigation solutions are available at much greater discounts than are other pharmaceuticals."  (Ex. E at 2.)

[8] *See* Off. of Insp. Gen., OEI-03-94-00393, *Suppliers' Acquisition Cost for Albuterol Sulfate* (June 1996); Off. of Insp. Gen., OEI-03-97-00292, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (Aug. 1998); Off. of Insp. Gen., OEI-03-00-00311, *Medicare Reimbursement for Albuterol* (June 2000).

[9] *See* Off. of Insp. Gen., OEI-03-97-00293, *Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs* (Nov. 1998); Off. of Insp. Gen., OEI-03-01-0411, *Excessive Medicare Reimbursement for Ipratropium Bromide* (Mar. 2002).

> The mandatory discount of 25 percent off the retail price of brand name drugs for reimbursement of multi-source drugs is insufficient. . . . *The article states that mark-ups on both brand name and generic drugs are similar. This is not true. As stated above, reviews have shown that mark-ups on these drugs vary drastically.*

(Ex. F at 2) (emphasis added).  In other words, HCFA itself rejected a 25% expectations

yardstick for generics 22 years ago.  Numerous reports through the years repeated that sentiment:

- In 1989, OIG made clear that "generic drugs can be purchased at a greater discount than brand name drugs—the discounted AWP has less impact on generic drugs."

- In 1989, the Special Committee on Aging noted that the VA received average discounts of 67% off of AWP for generic drugs (a "spread" of over 200%).

- In 1991, HCFA acknowledged in the Federal Register that "many drugs could be purchased for considerably less than 85 percent of AWP— particularly multiple-source."

- In 1992, OIG's report on chemotherapy drugs showed drastically higher discounts for generic drugs (up to 83%, a "spread" of 488%) than branded drugs (up to 18%).

- In 1996, the *Hooked on Drugs* article noted much higher spreads on generic drugs:  "This sampling showed that for single-source drugs still enjoying patent protection . . . , true wholesale prices are generally 10%-20% below published AWPs.  But for generic drugs, nearly every manufacturer's price was 60%-85% below the published average wholesale price" ("spreads" of 150% to 567%).

- In 1996 and 1997, acknowledging differences between branded and generic marketplaces, the OIG reported *average* spreads for generic drugs that were more than three times greater than those for branded drugs (74% versus 20%, respectively).  OIG's work found spreads well over 500% on many particular drug products including on many of the products at issue in these cases.

- In a 1997 OIG report on Medicare drug payments, OIG reported spreads that on most generic drugs exceeded 150% (including albuterol sulfate at 177%, and Vancomycin at 150%); in one case, the spread exceeded 1000%.

- In a 1998 OIG report comparing Medicare drug payments with VA costs, OIG reported spreads that on most generic drugs exceeded 150% (including

albuterol sulfate at 292%, and ipratropium bromide at 155%); in many cases, the spreads exceeded 1000%.[10]

Government officials have confirmed that this was, in fact, the expectation of the CMS and the State Medicaid programs.  For example, Leo Sullivan, the Director of Tennessee's pharmacy program through the 1990s, testified:

> Q.  Did you believe that you could shave 20, 30 percent off of it and get a reliable number of what pharmacies and physicians actually paid for drugs.
>
> A.  Well, it would, *it would depend on – I mean, are we talking brand or generic*?
>
> Q.  Both right now.  Would you draw a distinction?
>
> A.  Oh, yeah.  Yeah. . . . The generic drugs, you know, *you could pay AWP minus 80 percent and still the pharmacist make money for some*, I assume.  But AWP minus 25 might be below cost for a brand name drug for a rural pharmacy that has a very small volume.  Okay?  So there is, there is a difference between brand and generic. . . . *But to say 20-30 percent, use that number, you would have to distinguish between brand and generic*.

(Ex. G at 100:13-101:18) (emphasis added).  Mr. Sullivan is not alone in acknowledging the distinction.  (*See also, e.g.*, Ex. D at 93:15-99:7 (Alaska's Director of Pharmacy, David Campana: knew before the 1990s that the "net cost to the pharmacy for generics that have been out for a long time was very low compared to the benchmark" of AWP); Ex. H at 82:4-87:5; 93:5-94:19 (Michigan Medicaid employee expected spreads in excess of 500% on generics); Ex. I at AWP-IL-00010042 (1995 Illinois Medicaid document:  "neither the FUL or AWP mean anything for generic drugs.").)

---

[10] *See*, respectively, Off. of Insp. Gen., No. A-06-89-00037, *OIG Management Advisory Report - The Use of Average Wholesale prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Catastrophic Coverage Act Prescription* (Oct. 1989); Majority Staff Report, Special Committee on Aging, United States Senate *Are We Getting Our Money's Worth?* (S. Rep. 101-49); 59 Fed. Reg. 59,524; *See* Off. of Insp. Gen., No. A-02-91-01049, *Physicians' Cost for Chemotherapy Drugs* (Nov. 1992); Off. of Insp. Gen., No. A-06-97-00011, *Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products* (Aug. 1997); *Excessive Medicare Payments for Prescription Drugs*, *supra*; Off. of Insp. Gen., No. OEI-03-97-00293, *Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs* (Nov. 1998).

Indeed, the Government expert who *does* opine on what the industry expected of AWPs, Dr. Stephen Schondelmeyer, draws a clear distinction between branded and generic drugs:

> Within the retail class of trade, AWP may have a consistent relationship with the actual acquisition cost for single source brand name (patented and exclusivity protected brands) drug products, but not for innovator multiple source (off-patent brands) or non-innovator multiple-source (generic) drug products.

(Ex. J at 25.)  In sum, the DOJ's claim that a 25% markup "accounts for" its expectations about the spreads for the products at issue is nothing short of absurd.

**B.**    **The Government's 25% Markup Does Not Render Documents Regarding Cross-Subsidization And Access Concerns Any Less Relevant.**

Quoting a previous ruling from this Court (in a different case with different drugs) that "there was no evidence that any margin over the 20 to 25 percent industry-wide formula was needed to compensate doctors for their costs of administration for these drugs," the Government proclaims that the "state of the evidence is no different with respect to the three defendants sued by the United States."  (Dkt. No. 5551 at 7-8.)  That, demonstrably, is not the case.

Several state Medicaid officials have made clear that they *wanted* to pay a margin on ingredient cost payments.[11]  And in deciding what margin would be acceptable, those officials did not simply deem any amount over 25% of market prices excessive or somehow unlawful. They cared about the actual dollar amount paid[12] and the nature of the drug therapy involved.

---

[11] *See, e.g.*, Ex. G at 154:16-19 (Tennessee: "Q. So, in short, you would use the payment for the drug itself to cross-subsidize other things that might need to be paid to fairly --  A.  And that would include compounding."); Ex. K at 198:20-199:2 (Louisiana: "Q.  Did Louisiana want to pay a margin between -- would it pay the reimbursement for ingredient cost and what providers pay? . . .  THE WITNESS: I would say yes.").

[12] For example, Mr. Sullivan testified that "the dollar difference is something that needs to be looked at first, because, you know, a thousand percent makes headlines but doesn't mean anything if you don't have a dollar amount affixed to it."  (Ex. G at 327:8-328:8.)  Similarly, Cody Wiberg, the head of Minnesota's pharmacy program, observed that "[p]eople don't spend percentages.  They spend dollars."  He agreed that $7 spread on a $1 bag of saline solution (*i.e.*, Abbott's alleged spread) would be "consistent with the goals of the Medicaid program."  (Ex. L at 357:14-361:12.)  *See also* Ex. M at 487:6-488:5 (Dierdre Duzor, co-leader of CMS Medicaid Pharmacy Team: "[I]f you have a prescription that's a dollar and you have a hundred percent markup, that's only another dollar.")

For example, intraveneous drugs like those at issue in the Abbott case cost considerably more to dispense than typical prescriptions.[13]  Since most states did not separately compensate for the increased dispensing cost, but rather paid the standard retail dispensing fee of $3.00 to $6.00 for intravenous drugs, evidence indicates that states used the margin on ingredient cost to provide the necessary additional compensation.  As stated in a Myers & Stauffer report for Kentucky:

> Although dispensing costs at intravenous pharmacies is well in excess of the current dispensing fee, this reimbursement methodology has been accepted by these pharmacies because the margin on ingredient reimbursement has allowed pharmacies to offset any shortfall from the dispensing fee. . . . *Margins realized on the ingredient portion of reimbursement have traditionally been sufficient to subsidize the difference between dispensing costs and dispensing reimbursement.*

(Ex. O at 35-36) (emphasis added).  Indeed, many states declined the DOJ's first attempt to institute payment of market prices for infusion and inhalation products (the "DOJ AWP" effort) for precisely these reasons.  (*See, e.g.*, Ex. P at 9) (Missouri document explaining state did not use DOJ pricing because the normal $4.09 dispensing fee "was not designed to cover these drugs" and "home infusion providers threatened to cease services due to insufficient dispensing fees").[14]

---

[13] *See, e.g.*, Ex. N at 24, 42 (2002 Myers & Stauffer for Texas report, stating "[i]n every dispensing cost survey performed by Myers & Stauffer in which data on the provision of intravenous services was collected, the provision of this service has been associated with higher dispensing costs," and finding mean cost to dispense intravenous prescriptions of $41.75).

[14] The Government is also wrong to suggest that the alleged "mega-spreads" at issue here render deliberative documents touching on subjects of cross-subsidizations of any less relevance.  (*See* Dkt. No. 5551 at 7-8.)  In practice, the Government's 25% markup amounts to very little.  For the vast majority of the products in the Abbott case, the Government's 25% markup yields a margin of *less than 25¢*. (Ex. Q) (Duggan Rpt., Ex. 1).  Moreover, the relevant "spread" is the difference between market prices and the amount actually paid.  Thus, for the bulk Vancomycin product mentioned in the Court's November 5th opinion (00074653501)—which contains *ten separate 1 gram vials* of the antibiotic—the relevant spread is not the difference between the alleged $67.95 market price for those ten vials and the $274.91 AWP.  Rather, the Government's expert found the "difference" between what most Medicare carriers did pay and what they allegedly "would have paid" for Vancomycin (HCPCS code J3370, 500MG injection) to be less than $5 per unit.  (*See* Ex. Q at 84-94.)

The Government's 25% markup does not adequately account for cross-subsidization issues in the Dey and Roxane cases, either.  Medicare substantially increased the dispensing fee for inhalation drugs—from $5 to $33 (30-day supply), $57 (initial 30-day fee), or $66 (90-day supply)—because of the Medicare Modernization Act of 2003's

## II. THE GOVERNMENT HAS IMPROPERLY WITHHELD FROM *IN CAMERA* REVIEW CRITICALLY IMPORTANT DOCUMENTS NECESSARY FOR A FULL AND FAIR RESOLUTION OF THESE CASES.

The Government's submission of just twelve additional documents after the July 24th hearing did not satisfy this Court's direction to "err on the side of" submitting documents for *in camera* review.  (July 24, 2008 Hrg. at 26.)  As a preliminary matter, it appears the Government did not actually review *the documents* on its logs but, rather, reviewed only *the logs* to identify documents that might fall within the Court's criteria.[15]  The Government obviously cannot fulfill its obligations by reviewing the scant descriptions on its privilege logs.

Such tip of the iceberg procedures may explain the Government's failure to produce obviously responsive documents.  Regardless, and despite overwhelming evidence that they fall squarely within the Court's instructions, Defendants do not believe the documents described below have been submitted to the Court in either the December 4, 2007 June 3, 2008, or September 15, 2008 *in camera* submissions.  As it did with the majority of the twelve documents the Government submitted on September 15, 2008, the Court would likely order that the privilege cannot justify their withholding.

### A. Entrance And Exit Conference Minutes.

As discussed above, the OIG has issued numerous reports which acknowledge the existence of so-called "mega-spreads" for infusion and inhalation drugs—including the specific products at issue in the DOJ cases—as well as generic drugs in general.  *See supra* at 6-9.  For

---

(continued…)

move to the ASP + 6% methodology.  *See Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2006*, 70 Fed. Reg. 70,116, 70,225, 70,228 – 70,231 (Nov. 21, 2005) (noting Congress set higher dispensing fees for inhalation drugs, and reduced ingredient payments, "to eliminate cross subsidization of services").  Here, the Government seeks to retroactively reduce ingredient payments with no increase whatsoever to dispensing fees or other service payments.

[15] Dkt. No. 5551, at 4 ("First, the Government reviewed all the entries on the privilege logs produced the United States and re-reviewed documents from the logs which fell within the criteria stated by the Court on July 24.").

each of these reports, OIG personnel would initially set an "entrance conference," where CMS

and OIG personnel would sit down and discuss their planned work.  Then, after completion of

the study, CMS and OIG personnel would again meet and discuss findings at so-called "exit

conferences."  These entrance and exit conferences were memorialized through meeting minutes.

Because these reports frequently addressed "mega-spreads," what CMS said when it was

repeatedly informed of such "mega-spreads" is crucial to determining, as the Court put it,

whether and why the Government was "going to go along with" paying AWP anyway.  (July 24,

2008 Hrg. at 28.)

It is impossible to believe that none of these minutes touch on cross-subsidization, access

to care, or other policy questions.  Indeed, OIG's Robert Vito, who attended many of these

conferences, testified that there *were* discussions at those meetings on the concepts of cross-

subsidization, such as whether providers had to rely on the drug margin to cover labor-intensive

home infusion and respiratory therapy (the situation in which most of products in these cases

were employed):

> Q.   Do you recall conversations that you were involved in where HCFA
> acknowledged that respiratory [and] infusion drug providers relied upon
> reimbursement rates for drugs to cover services?
>
> MR. DRAYCOTT:  Objection, you can answer to the extent it doesn't
> reveal the contents of communications and deliberations occurring at
> entrance or exit conferences with CMS.
>
> THE WITNESS:  Yes.
>
> * * *
>
> Q.   And do you recall having the conversations at the exit and entrance
> conversation at those meetings?
>
> A.   Yes.
>
> Q.   Can you tell me about those discussions?

MR. DRAYCOTT:  Objection.  I instruct you not to answer to the extent that it would reveal the communications and deliberations that occurred at those entrance and exit conferences.

* * *

Q. . . . Do you recall, Mr. Vito, having a discussion about the need to draw a distinction between infusion and inhalation drugs and outpatient drugs, such as pills and patches, in connection with the average wholesale price debate?

A.   Yes.

* * *

Q.   Do you recall having those conversations with HCFA?

A.   Yes.

Q.   Did you have any of those conversations outside of the exit and entrance conferences?

A.   I don't think so.

Q.   Will you tell me about the conversations that you had regarding that distinction with HCFA

MR. DRAYCOTT:  Objection.  I instruct you not to answer to the extent that those communications occurred in an entrance or exit conference.

(Ex. R at 652:12-21; 654:2-11; 687:11-17; 689:4-16.)[16]  Incredibly, *none* of the entrance and exit

conference minutes created by OIG have been submitted to the Court for *in camera* review,

despite their obvious and crucial importance to Defendants.  This is intolerable.  As this Court

recently noted, even where privilege is asserted, "a court should conduct an individualized

review of each piece of evidence to insure the balance between . . . privilege and plaintiff's

---

[16] Mr. Vito is not alone.  *See, e.g.*, Ex. S at 180:6-181:11; 224:8-227:2; 232:1-234:10; 266:3-269:1; 367:7-369:16; 395:8-396:15; 400:5-20 (OIG's D. Tawes:  recalling conversations about the cost of pharmacies to dispense drugs; the possible need to increase dispensing fees if CMS changed the way it reimbursed ingredient cost; provider assertions that service payments alone were inadequate to assure access to care; why federal upper limits were not established for certain drug products; and large spreads for generic products (including albuterol)); Ex. T at 478:20-484:15 (OIG's L. Ragone:  recalling conversations about why CMS continued "using the reimbursement strategy they were using" despite evidence that AWPs exceeded acquisition cost by over ten times).

asserted need for the documents is correctly struck."  (Dkt. No. 5665 at 9-10.)  No such review

has occurred here; a special master or an expanded *in camera* review is therefore appropriate.[17]

> **B.     Other Highly Relevant Documents.**

In addition to the meeting minutes, there is ample reason to believe the Government has

failed to submit other documents called for by the Court's instructions at the July 24th hearing.

For example, the Government failed to submit the final version of a critically important CMS

"decision memorandum."  The draft of this memorandum, which the Government claims that it

produced inadvertently, shows that CMS did (and still does) have a policy to allow Medicaid

programs to reimburse providers more than the States' best estimate of "estimated acquisition

cost"—for generic drugs, at levels the Government would call "mega-spreads." (*See* Dkt. No.

5174 at 2-6; Dkt. No. 4759.)

Furthermore, it is clear from the testimony of CMS witnesses—most of which was cut off

by the Government under the deliberative process privilege—that there was active discussion at

CMS regarding issues of cross-subsidization, the need to maintain access to care, and other

policy considerations.[18]  Yet the Government's production is remarkably thin.  Indeed, based on

---

[17] In addition to the reports identified above, Defendants believe the entrance and exit conferences for a handful of other OIG reports are likely to contain evidence responsive to the Court's instructions.  These include *Report, Title XIX of the Social Security Act, Limitation on Payment or Reimbursement for Drugs*, Medicaid Transmittal No. 84-12 (Oct. 1984); Off. of Insp. Gen., No. OEI-03-91-00470, *Comparison of Reimbursement Prices for Multiple-Source Prescription Drugs in the United States and Canada* (1991) (drugs at issue involved in report); Off. of Insp. Gen., No. OEI-02-92-00420, *Medicare Home Infusion Therapy* (Sept. 1993) (discussing the challenges Medicare faced in reimbursing providers for home infusion therapy, noting, for example, that "Medicare Part B . . . does not ever cover physician administrative or telephone consultation services"); Off. of Insp. Gen., No. OEI-03-94-00392, *A Comparison of Albuterol Sulfate Prices* (June 1996); Off. of Insp. Gen., No. OEI-03-96-00230, *Medicare Reimbursement for Parenteral Nutrition* (July 1997) (involving drug treatment area similar to home infusion); Off. of Insp. Gen., No. OEI-03-00-00310, *Medicare Reimbursement of Prescription Drugs* (Jan. 2001) (drugs at issue involved in report); Off. of Insp. Gen., No. OEI-03-01-00010, *Medicaid's Use of Revised Average Wholesale Prices* (Sept. 2001) (drugs at issue involved in report).

[18] *See, e.g.*, Ex. U at 228:4-229:9;  295:12-19; 366:12-367:10 (CMS Administrator Thomas Scully: noting CMS kept drug administration fees low because of the spread made on the drug, and agreeing Congress retained the AWP methodology for infusion drugs in the MMA of 2003 in order to "subsidize the provision of the services by overpaying for the drugs"); Ex. V at 202:1-205:22 (Charles Booth:  recalling conversations within CMS on whether to freeze the composite rate for dialysis facilities because of the drug margin).

the descriptions in its privilege logs, it appears that the Government has continued to withhold many documents relating to issues of cross-subsidization, the need to maintain access to care, and other policy considerations.  Moreover, the Government's track record, as highlighted by this Court's November 5, 2008 decision, should leave no confidence that the withheld documents are covered by any privilege at all.  Just a few examples of such documents include the following (all emphasis added):

- an April 5, 1993 document described as, "***Review of issues surrounding current Medicare coverage and payment of services related to Home Drug Infusion Therapy***; trends in utilization; overview of questions raised by current policies with some recommendations to approach certain issues; ***discussion of Medicare reimbursement/current payment methodology*** (Coverage Issue)" (HHC903-0641 – 0649);

- a 1999 document described as, "Discussion of the issue regarding ***alternative reimbursement mechanisms*** and the use of DOJ data regarding one such alternative.  Presents an ***impact analysis of changes in reimbursement and its potential effect on the delivery of care***.  Includes different documents, including a memo, handwritten notes and charts. (See also HHC902-0251 - 0258)" (HHC902-0214 – 0244);

- an undated summary described as, "***PROs and CONs of using federal supply schedule for Medicare Reimbursement***" (HHD923-1589); and

- an April 29, 1996 document described as, "Draft NPRM (BPD852PB.B, pp. B12-B29) on drug and biological pricing policy.  ***Discusses alternative reimbursement mechanisms and the pros and cons of such policies***.  (See also HHC902- 00010004, HHC902-00190034, HHC902-00810085)" (HHC902-0035-0052).

It is unconscionable that documents with titles (and substance) like these have neither been produced nor submitted to the Court (or a special master) for *in camera* review.  (*See also* attached Schedule 1.)

### C.     Rulemaking Support Files And Office Of Legislation Documents.

The record indicates that the Government has not adhered to the Court's direction to review all of its documents, including its Rulemaking Support Files (files the Government did

17

not separately log), and to submit any document for *in camera* review that falls within the Court's criteria.[19]   The Government admits that it has thus far reviewed the Rulemaking Support Files for just four regulations listed in Abbott's 2006 document requests.  (*See* Dkt. No. 5551 at 4-5.)  Notably, the Government fails to say if it reviewed those files for the important 1991 Medicare regulation at issue in the case (item 5 in Schedule B to Abbott's document requests).

In addition to each regulation identified in Schedule B to Abbott's 2006 document requests, the Government should be directed to review its Rulemaking Support Files for at least the following regulations (the Rulemaking Support Files for these regulations fall squarely within Defendants' document requests and are likely to contain highly relevant information):

- *Proposed Rule, Medicare Program; Payment for Covered Outpatient Drugs*, 54 Fed. Reg. 37,208 (Sept. 7, 1989) (relating to Medicare drug benefit under the 1998 Medicare Catastrophic Coverage Act);

- *Medicare Coverage of Prescription Drugs Used in Immunosuppressive Therapy*, 60 Fed. Reg. 8951 (Feb. 16, 1995) (where CMS acknowledged that "[p]ayment for functions furnished by pharmacists is included in the amount that Medicare pays for the drugs");

- *Unified Agenda, Proposed Rule Stage*, 67 Fed. Reg. 74,126 (Dec. 9, 2002) (where CMS proposed a "revised definition of AWP");

- *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2003 and Inclusion of Registered Nurses in the Personnel Provision of the Critical Access Hospital Emergency Services Requirement for Frontier Areas and Remote Locations*, 67 Fed. Reg. 79,996 (Dec. 31, 2002) (where, responding to comments that payment for infusion services were "woefully insufficient," CMS stated "Medicare pays for drugs based on 95 percent of AWP . . . [a] system has been widely criticized for paying physicians for drugs at far higher rates than prices paid to obtain them");

- *Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2006 and Certain Provisions Related to the Competitive Acquisition Program of Outpatient Drugs and Biologicals Under Part B*, 70 Fed. Reg. 70,116 (Nov. 21, 2005) (where CMS noted Congress established

---

[19] The Government's submission indicates that it will review the Rulemaking Support Files for two more regulations requested by Abbott, and provide a supplemental submission, if needed.  (*See* Dkt. No. 5551 at 4-5.)  It has not yet done so.

> ASP + 6% methodology for inhalation drugs "to pay appropriately for each service and to eliminate cross subsidization of services.")

The Court should likewise order the Government to separately log all of the Office of Legislation files so that they may be subjected to a reasonable review.  The Government has never placed these documents on a privilege log.  Indeed, six of the twelve documents recently submitted for *in camera* review were from the Office of Legislation, a full 50% of which were either not privileged at all, or else were sufficiently important to Abbott that the privilege was overcome.  Such a separate log would allow a much more focused *in camera* review, which benefits all parties involved.

### D.      Communications Outside the Agency

Finally, the privilege logs indicate the Government continues to withhold numerous documents which are communications outside of CMS or CMS and OIG.  The Court's November 5 ruling makes clear that such communications are not coved by the deliberative process privilege.  (*See* Dkt. No. 5665 at 20 (document prepared by Medicare carrier).  The Government continues to withhold over 40 documents in the files of Medicare carriers (documents on the "Carrier Privileged Documents Log"), as well as numerous communications between state Medicaid officials, Congress, or others.[20]  For this additional reason, appointment of a special master is appropriate and necessary here.

---

[20] *See, e.g.*, privilege log entries HHD920-1542 – 1619 ("file of communications between Rob Vito and Chuck Clapton (House Committee on Commerce) regarding Medicare payment methodology"); HHD968-0125 and HHD968-128 (communications between Benny Rideout, North Carolina Medicaid); HHD971-0532 (email from Indiana Medicaid employee re: "Discussion of OIG Drug Acquisition Study"); HHD919-0025 – 26 (2/13/95 memorandum from Medicare carrier employee Robert Zone re: "Draft memorandum on nebulizer drugs"); HHD920-2231 – 32 (3/23/95 draft letter from Medicare carrier employee Robert Zone re: "Medicare Drug Pricing-Use of AWP for the May 1995 TAC meeting"); HHD920-2218 (6/5/97 email from Congressional staffer Alex Vachon "Re calculations of prescription drug costs"); HHD926-0151 – 54 (2/17/94 memorandum to "Regional Carriers" described as "Proposed language, and payment rules relating to ESRD program"); HHD940-0012 – 13 (2/10/89 "Telephone Record" distributed to Arkansas Medicaid employee Ray Hanley re: "Summary of response to questions by state and presentation of options regarding Average Wholesale Price").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Appointment of a Special Master to oversee an expanded *in camera* review of the documents withheld by the Government under the deliberative process privilege.  In the alternative, the Court should order the Government to submit the approximately 200 documents listed on Schedule 1, and expand its own *in camera* review to include those documents.  Finally, the Court should rule upon the 42 additional documents that were submitted for *in camera* review on December 4, 2007 and June 3, 2008.

Dated:  November 11, 2008

/s/ James R. Daly _____
James R. Daly
Eric P. Berlin
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant Abbott Laboratories, Inc.*

/s/ Eric T. Gortner _____
Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale (BBO # 654645)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

*Counsel for Defendants Boehringer Ingelheim
Corp., Boehringer Ingelheim Pharmaceuticals,
Inc., Boehringer Ingelheim Roxane, Inc., and
Roxane Laboratories, Inc.*

/s/ Neil Merkl _____
Paul F. Doyle (BBO # 133460)
Sarah L. Reid
Neil Merkl
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Counsel for Defendants Dey, Inc., Dey L.P, Inc.
and Dey, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I, David S. Torborg, an attorney, hereby certify that I caused a true and correct copy of the foregoing to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 11th day of November 2008.

/s/ David S. Torborg _____