# Exhibit B

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                              New York, NY

```
                                                              Page 1

              UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

    ------------------------------X  MDL NO. 1456

    IN RE:  PHARMACEUTICAL INDUSTRY   :  CIVIL ACTION:

    AVERAGE WHOLESALE PRICE LITIGATION :  01-CV-12257-PBS

    ------------------------------X

    THIS DOCUMENT RELATES TO:         :

    U.S. ex rel. Ven-A-Care of the    :  CIVIL ACTION:

    Florida Keys, Inc. v. Abbott      :  06-CV-11337-PBS

    Laboratories, Inc.                :

    ------------------------------X



              IN THE CIRCUIT COURT OF

          MONTGOMERY COUNTY, ALABAMA

    ------------------------------X

    STATE OF ALABAMA,                 :  CASE NO.

              Plaintiff,              :  CV-05-219

         v.                           :

    ABBOTT LABORATORIES, INC.,        :  JUDGE

    et al.,                           :  CHARLES PRICE

              Defendants.             :

    ------------------------------X
```

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.  May 4, 2007
New York, NY

Page 2

```
1    STATE OF WISCONSIN   CIRCUIT COURT   DANE COUNTY
2    ---------------------------------X
3    STATE OF WISCONSIN,        : CASE NO.
4        Plaintiff,             : 04-CV-1709
5    v.                         :
6    AMGEN INC., et al.,        :
7        Defendants.            :
8    ---------------------------------X
9
10       IN THE COURT OF COMMON PLEAS
11           FIFTH JUDICIAL CIRCUIT
12   ---------------------------------X
13   STATE OF SOUTH CAROLINA, and    : STATE OF
14   HENRY D. McMASTER, in his official : SOUTH CAROLINA
15   capacity as Attorney General for   : COUNTY OF
16   the State of South Carolina,    : RICHLAND
17       Plaintiff,              :
18   v.                          : CIVIL ACTION:
19   MYLAN LABORATORIES, INC.    : 07-CP-40-0283
20       Defendant.              :
21   ---------------------------------X
22
```

Page 4

```
1    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
2            STATE OF MISSOURI
3    ------------------x
4    STATE OF MISSOURI, ex rel.,     :
5    JEREMIAH W. (JAY) NIXON,        :
6    Attorney General,               :
7    and                             :
8    MISSOURI DEPARTMENT OF SOCIAL   :
9    SERVICES, DIVISION OF MEDICAL   : Case No.:
10   SERVICES,                       : 054-1216
11       Plaintiffs,     : Division
12                       : No. 31
13   vs.                 :
14   DEY INC., DEY, L.P., MERCK KGaA, :
15   EMD, INC., WARRICK               :
16   PHARMACEUTICALS CORPORATION,     :
17   SCHERING-PLOUGH CORPORATION, and :
18   SCHERING CORPORATION,            :
19       Defendants.     :
20   ------------------x
21
22
```

Page 3

```
1        IN THE COURT OF THE SECOND JUDICIAL CIRCUIT
2            IN AND FOR LEON COUNTY, FLORIDA
3    THE STATE OF FLORIDA
4    ex rel.
5    ------------------x
6    VEN-A-CARE OF THE FLORIDA       :
7    KEYS, INC., a Florida           :
8    Corporation, by and through its :
9    principal officers and directors, :
10   ZACHARY T. BENTLEY and          :
11   T. MARK JONES,                  :
12       Plaintiffs,      :
13       vs.              : Civil Action
14   MYLAN LABORATORIES, INC.; MYLAN  : No.: 98-3032G
15   PHARMACEUTICALS INC.; NOVOPHARM  : Judge:
16   LTD., SCHEIN PHARMACEUTICAL, INC.; : William L.
17   TEVA PHARMACEUTICAL INDUSTRIES   : Gary
18   LTD., TEVA PHARMACEUTICAL USA;   :
19   and WATSON PHARMACEUTICALS, INC. :
20       Defendants.      :
21   ------------------x
22
```

Page 5

```
1                New York, New York
2                Friday, May 4, 2007
3
4
5            Videotaped Deposition of BRUCE C.
6    VLADECK, Ph.D., a witness herein, called for
7    examination by counsel for Abbott Laboratories in
8    the above-entitled matter, pursuant to Subpoena,
9    the witness being duly sworn by JOMANNA DEROSA, a
10   Notary Public in and for New York, taken at the
11   offices of Jones Day, 222 East 41st Street, New
12   York, New York, at 8:38 a.m. on Friday, May 4,
13   2007, and the proceedings being taken down by
14   Stenotype by JOMANNA DEROSA, and transcribed under
15   her direction.
16
17
18
19
20
21
22
```

2 (Pages 2 to 5)

a005168d-477f-4afb-97fe-d27a3af7b9a9

Vladeck, Ph.D., Bruce C.                                    May 4, 2007
                      New York, NY

Page 142

1    Q. And for a brand name drug, would you --
2  at the time, did you expect that there would be
3  much variation between various purchasers based
4  upon volume purchases of the brand name drug?
5    A. I believe we had a perception that the
6  bigger the purchaser, the larger the discount
7  they were likely to be able to achieve; that the
8  very largest pharmacy chains, for instance, or
9  hospital group purchasing operations, probably
10 received the most favorable prices, but that that
11 would be -- and that some small independent
12 pharmacies might actually pay average wholesale
13 price as described in the compendia; that there
14 would be a range below that in which most of the
15 prices would actually occur.
16   Q. Turning to generic drugs for a minute,
17 what do you understand to be the differences
18 between the market for brand name drugs and the
19 market for generic drugs?
20       MS. BROOKER: Objection. Form.
21   A. If we're going back to 1997 --
22   Q. Correct.

Page 143

1    A. -- I think it's fair to say that I had
2  really only a very limited understanding of the
3  marketplace for generic drugs and an even more
4  limited understanding of the difference between
5  the market for generic drugs and for brand drugs.
6       And, again, my perception at the time
7  was that that was likely more like a commodity
8  market in which there was probably more
9  purchasing power on the part of the large
10 purchasers, but not the same ability to raise
11 prices on the up-side to small purchasers that
12 prevailed on the brand name side.
13   Q. I'd like to focus you just for a
14 minute, before we turn to a specific document,
15 about a particular generic drug. I think you
16 mentioned commodities. Are you familiar with
17 sodium saline solution?
18   A. Yes.
19   Q. It's a bag of salt water, essentially.
20 Correct?
21   A. That's correct.
22   Q. Would you agree with me that you can't

Page 144

1  get much more commoditized in a bag of salt water
2  in the drug market?
3    A. The only quibble I would provide to
4  that question is I never really thought of it as
5  classically being part of the pharmaceutical
6  market. It was such a -- it was really a
7  hospital supply kind of market. It was such a
8  standard product that even though it was FDA
9  regulated and -- and sterility issues were so
10 forth, it tended to be -- hospitals tend to stock
11 it, for example, in sterile supplies, put it on
12 their cost report as part of sterile supplies
13 rather than through their pharmacies.
14   Q. But a home infusion provider reimbursed
15 under Part B, for example, might be reimbursed
16 for sodium saline solution.
17       Was that your understanding in '97?
18       MS. BROOKER: Objection. Form.
19   A. Yes, but whether that was as a supply
20 or a drug, I honestly couldn't tell you. I would
21 have thought of it as a supply.
22   Q. Turning to the market of it, whether we

Page 145

1  call it a drug or -- or a supply, did you have an
2  understanding, in 1997, of what the market would
3  look like for a product such as sodium saline
4  solution?
5        MS. BROOKER: Objection. Form.
6        MR. BREEN: Objection. Form.
7    A. Yes, I did.
8    Q. And what was your understanding?
9    A. Well, I actually -- in the 1980s, I
10 believe, when I was first becoming involved in
11 some of these issues in health care economics was
12 the first development of hospital group
13 purchasing operations, and I recall -- and the
14 first widespread circulation of the -- of "Modern
15 Healthcare," the magazine, and I recall monthly
16 headlines in "Modern Healthcare" about group
17 purchasing operations being -- achieving
18 discounts of 98 and 99 percent in their purchase
19 of basic infusion products and sterile supplies.
20       So, my perception was that on the
21 supply market, which, again, I understood and
22 still would contend is actually a separate market

                                37 (Pages 142 to 145)

Henderson Legal Services
202-220-4158

Vladeck, Ph.D., Bruce C.                                May 4, 2007
                  New York, NY

Page 146

1  from the pharmaceutical market that list prices,
2  are essentially entirely meaningless and that
3  only the weakest and smallest scale buyers pay
4  anything close to it.
5      Q.  And so, as of 1993, for example, would
6  you be surprised if a single bag of sodium saline
7  solution sold to a provider who bought maybe five
8  would pay $10 per bag, and a large purchaser who
9  bought a very large volume would pay less than a
10 dollar?
11     MS. BROOKER:  Objection.  Form.
12     A.  I would not have been surprised.
13     Q.  Okay.  So, to that extent that --
14 President Clinton referring to a 10-to-1 ratio is
15 something that would be consistent with your
16 understanding of that particular market.
17 Correct?
18     MS. BROOKER:  Objection.  Form.
19     Q.  I'm sorry.  You have to verbalize.
20     A.  Again, I would have thought that market
21 was a subset of the supplies market rather than
22 the drug market.

Page 147

1      Q.  That was my question.  But you would
2  have distinguished between the drug market, where
3  10-to-1 would not -- you would not expect to see.
4  Correct?
5      A.  That's correct.
6      Q.  And the supply market, where sodium
7  saline solution would be found, where there could
8  be a huge variation between a small purchaser
9  purchasing at list price and a very large
10 purchaser purchasing at 99 percent off of list
11 price?
12     MS. BROOKER:  Objection.  Form.
13     A.  I would have made such a distinction,
14 and I would not have been surprised to see those
15 sorts of differentials of the supply market.
16     Q.  And in between the commodities supply
17 market of sodium saline and the patent-protected
18 market of a brand name drug, would you expect
19 generic drugs to be somewhere between those two
20 extremes?
21     MS. BROOKER:  Objection.  Form.
22     MR. BREEN:  Objection.  Form.

Page 148

1      A.  That would be a question I never
2  thought about before today.  But today I would
3  say that we always made the distinction between -
4  - between drugs and -- and supplies.  And, again,
5  I would fall back on the Medicare green eyeshade
6  distinction between what's sterile supplies and
7  what's pharmacy.
8      MR. COOK:  Let's take a break.
9      THE VIDEOGRAPHER:  The time is 11:28
10 a.m.  We're going off the record, concluding Tape
11 No. 2 in the deposition of Dr. Bruce Vladeck in
12 the matter of In re Pharmaceutical Average
13 Wholesale Price Litigation.
14         (Recess taken.)
15     THE VIDEOGRAPHER:  The time is 11:46
16 a.m.  We're going back on the record, starting
17 Tape No. 3 of the deposition of Dr. Bruce Vladeck
18 in the matter of In re Pharmaceutical Average
19 Wholesale Price Litigation.
20     Q.  Doctor, based upon what we were talking
21 about just before the break, would it be fair to
22 say that while you were administrator of HCFA,

Page 149

1  you did not understand published average
2  wholesale price to be the average of prices at
3  which wholesalers were selling their drugs to
4  their customers?
5      A.  It would -- it would be fair to say
6  that I did not believe it was, in fact, an
7  empirical estimate, that rather it was a -- an
8  amount reported by the manufacturer to -- of the
9  compendium compilers or whatever, yes.
10     Q.  And, again, akin to a sticker price?
11     A.  That's correct.
12     Q.  Where did you get that understanding?
13     A.  I believe that was probably what my
14 staff explained to me when I first encountered
15 the concept sometime after I took office.
16     Q.  Do you recall anybody within HCFA who
17 was under the belief that average wholesale price
18 was an average of prices at which wholesalers
19 sold drugs to customers?
20     MS. BROOKER:  Object to form.  And I
21 would just instruct the witness, just, you know,
22 be mindful of not disclosing deliberations,

38 (Pages 146 to 149)

Vladeck, Ph.D., Bruce C.                                           May 4, 2007
                              New York, NY

Page 182

1   A.  That's correct.
2   Q.  One was EAC, established according to
3   survey.  Correct?
4   A.  That's correct.
5   Q.  We'll get to it later, but for whatever
6   reason, that was not available to you because the
7   surveys were not or could not be conducted?
8   A.  That's correct.
9       MS. BROOKER:  Objection to form.
10  Q.  And so, your understanding was that
11  pursuant to regulation, your only alternative
12  between '93 and '97, while you were administrator
13  of HCFA, was to pay based upon the published
14  average wholesale price.  Correct?
15  A.  That's correct.
16  Q.  And during the time that you were
17  paying the published average wholesale price, you
18  were aware that average wholesale price exceeded
19  acquisition cost.  Correct?
20      MS. BROOKER:  Objection.  Form.
21  A.  Yes.
22  Q.  You were aware that for generic drugs,

Page 183

1   the difference could be greater than for brand
2   name drugs.  Correct?
3       MR. BREEN:  Objection.
4   A.  I'm not certain I was aware of that.
5   Q.  But for supplies such as sodium
6   chloride, you were aware that the difference
7   could be as much as 99 percent.  Correct?
8   A.  Yes, I was.
9       MR. BREEN:  Objection.  Form.
10      MS. BROOKER:  Objection.  Form.
11  Q.  And the same would be true for other
12  commodity products similar to sodium chloride
13  such as, for example, dextrose in water.
14  Correct?
15      MR. BREEN:  Objection.  Form.
16  A.  Yes, that's correct.  Or sterile saline
17  or something of that sort.
18  Q.  Which are two of the other drugs at
19  issue in this case.  Correct?
20  A.  I wasn't aware that -- that they were,
21  but okay.
22  Q.  And during that time, you, as

Page 184

1   administrator of HCFA, considered alternatives to
2   100 percent of AWP.  Correct?
3       You, as administrator of HCFA,
4   considered alternatives to reimbursing at 100
5   percent of AWP.  Correct?
6   A.  I don't know if we're getting into
7   deliberative --
8       MS. BROOKER:  You should be mindful
9   that you should not disclose any pre-decisional
10  deliberative process.
11      MR. COOK:  I think it's going to be
12  easier if you either direct him not to answer or
13  let him answer, because I'm aware -- I'm a little
14  leery of having the witness put in the difficult
15  position of having to parse within his head --
16  A.  Well, let me -- I can say I was aware
17  that conceptually there were alternatives to 100
18  percent of AWP.
19      MS. BROOKER:  Let me say you can state
20  what your understanding was in your official
21  capacity, and you can certainly state what the
22  official policy was or the regulation, or what

Page 185

1   the statute was.  You just cannot discuss pre-
2   decisional deliberative conversations that you --
3   that you had with others.
4       THE WITNESS:  I think I got that.
5   Q.  All right.  Without revealing what the
6   deliberations were, were there deliberations
7   within HCFA about alternative methods for
8   reimbursing to undiscounted AWP?
9       MS. BROOKER:  Objection to form.
10  A.  Extensive discussion.
11  Q.  Who -- who was involved in those
12  extensive discussions?
13  A.  I don't know if that gets too
14  deliberative.
15      MS. BROOKER:  You can say who was
16  involved in deliberations.
17  A.  I would say that with the exception of
18  the Medicaid folks, the list of people I
19  enumerated earlier as experts I would have
20  consulted on these issues would have been
21  involved, whoever the deputy administrator was at
22  the time would have been involved.  And, again,

                                           47 (Pages 182 to 185)