# Exhibit G

Page 1

UNITED STATES DISTRICT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X
IN RE: PHARMACEUTICAL           )   MDL NO. 1456
INDUSTRY AVERAGE WHOLESALE      )   CIVIL ACTION
PRICE LITIGATION                )   01-CV-12257-PBS
THIS DOCUMENT RELATES TO        )
U.S. ex rel. Ven-a-Care of      )
of the Florida Keys, Inc.       )
        v.                      )   No.06-CV-11337-PBS
ABBOTT LABORATORIES, INC.,      )
-----------------------------X

    (cross captions appear on following pages)


        Deposition of HARRY LEO SULLIVAN

                 Volume I

          Nashville, Tennessee

        Tuesday, March 12, 2008

              9:05 a.m.

Sullivan, Harry Leo                                              March 12, 2008
                           Nashville, TN

Page 98

1  -- if, if actual acquisition costs is being used
2  as a reimbursement methodology, it still does not
3  get to net cost.
4      Q.  During the entirety of the time that
5  you were the director of pharmacy services for
6  Tennessee Medicaid, did you believe that the AWPs
7  in the compendia were a reliable source of
8  information regarding what pharmacies or
9  physicians actually paid for drugs?
10     A.  No.
11     Q.  And from your interactions with other
12 state pharmacy administrators, in your view did
13 other state pharmacy administrators believe that
14 AWPs were a reliable source for what pharmacies
15 and physicians actually paid for drugs?
16         MR. DRAYCOTT:  Objection.
17     A.  Again, I don't ever remember such a
18 specific discussion with, with those peers,
19 because it just wouldn't come up.  I -- everybody
20 knows the sky's blue.  I mean it is that basic to
21 me.  I couldn't imagine some -- one of your peers
22 in that situation sitting down and saying, Hey,

Page 99

1  Did you know pharmacists really aren't paying
2  AWP?
3  BY MR. TORBORG:
4      Q.  So just as the sky, just as everyone
5  knows the sky is blue, you think your peers knew
6  that average wholesale prices did not represent a
7  reliable source of the prices at which physicians
8  and pharmacies actually paid for drugs.
9      A.  That's correct.
10     Q.  During the entirety of the time that
11 you were the director of pharmacy services for
12 Tennessee, did you believe that the AWPs and the
13 compendia approximated what pharmacies or
14 physicians actually paid for drugs?
15         MR. DRAYCOTT:  Objection.
16     A.  No.
17         No.
18         And "approximate" is kind of a hard
19 term.  Well, I mean I guess you could say AWP
20 minus 22 approximates what their AWP, but I don't
21 know how you would define approximate.  But --
22 BY MR. TORBORG:

Page 100

1      Q.  Would that be --
2      A.  -- the way I would look at it, I would
3  answer no.
4      Q.  During the entirety of the time that
5  you were the director of pharmacy services for
6  Tennessee Medicaid, did you believe that there
7  was some consistent percentage by which average
8  wholesale prices exceeded actual acquisition
9  costs?
10     A.  Um --
11     Q.  Did you -- let me ask it a different
12 way.
13         Did you believe that you could shave
14 20, 30 percent off of it and get to a reliable
15 number of what pharmacies and physicians actually
16 paid for drugs?
17     A.  Well, it would, it would depend on -- I
18 mean, are we talking brand or generic?
19     Q.  Both right now.  Would you draw a
20 distinction?
21     A.  Oh, yeah.  Yeah.
22     Q.  All right.

Page 101

1      A.  The generic drugs, you know, you could
2  pay AWP minus 80 percent and still the pharmacist
3  make money for some, I assume.
4          But AWP minus 25 might be below cost
5  for a brand name drug for a rural pharmacy that
6  has a very small volume.  Okay?  So there is,
7  there is a difference between brand and generic.
8          In Tennessee, it wasn't as pronounced
9  because, you know, what I did as part of my job,
10 as soon as a drug became multi-source, and after
11 OBRA '90, as soon as that drug, the multi-source
12 version of a drug was cheaper than the brand name
13 net-net of Medicaid rebates, we MACed it.  So AWP
14 wasn't an issue on the generic side.
15     Q.  And why did you --
16     A.  But to say 20-30 percent, use that
17 number, you would have to distinguish between
18 brand and generic.
19     Q.  Would it be fair to say, Mr. Sullivan,
20 that during the entirety of the time that you
21 were the director of pharmacy services for the
22 State of Tennessee that you knew that the AWPs

Sullivan, Harry Leo  March 12, 2008
Nashville, TN

Page 154

1  MAC.
2      For example, I might say, I'm not
3  paying for the tape that you use to hold the IV
4  needle into place. I'm not paying for the IV
5  needle or the tube set. I'm not going to -- I
6  don't want bills for that. I know you've got to
7  do it to administer this drug. So we're going to
8  add on the cost of this drug X, because I know
9  this, this and this always goes with it, and I
10 know there is a fixed cost for that, but I don't
11 want five bills. I want 10 different places.
12 Bill me for the drug. And I'll make sure that
13 the -- whatever the MAC is incorporates all your
14 other costs. And you have to talk with providers
15 and know what that is. I mean, you know.
16     Q. So, in short, you would use the payment
17 for the drug itself to cross-subsidize other
18 things that might need to be paid to fairly --
19     A. And that would include compounding.
20     Q. And it may include nursing services
21 that were not included, things of that nature?
22     A. (Nodding yes.)

Page 155

1      Q. Did anyone in the federal government
2  ever tell you that you were not allowed to do
3  that?
4      A. No.
5      Q. And if they had told you that, what
6  would you have said?
7      A. That I wasn't allowed to pay for
8  compounding or --
9      Q. That you weren't allowed to use the
10 payment for the drug to cross-subsidize those
11 other services or supplies.
12     A. If they had told me I couldn't do it,
13 what would I do?
14     Q. Yes.
15     A. I would have had to have found another
16 way to, to handle the billing.
17     Q. But they never told you that.
18     A. No.
19     Q. Do you know if other states were doing
20 -- were adopting similar type strategies to run
21 the programs?
22     A. No, I don't -- I mean it may be

Page 156

1  addressed in this letter. I don't know. It
2  seems to talk about different states, but I'm
3  sure there were varying levels of complexity in
4  the billing process, and what was and wasn't
5  billable and what was and wasn't included, but I
6  don't know it and I didn't discuss it with folks.
7      Q. Have you heard the term cross-subsidy
8  or cross-subsidization in the context of pharmacy
9  reimbursement?
10     A. No, not -- no, I haven't.
11     Q. I'm going to show you another, another
12 -- going to mark that as another exhibit.
13         MR. TORBORG: I think this is 578.
14         (Exhibit Abbott 578 marked.)
15 BY MR. TORBORG:
16     Q. For the record, what we have marked as
17 Exhibit 578 bears the Bates numbers HHC 002-0400
18 through 407. It's another Medicaid pharmacy
19 bulletin. This one dated January-February of
20 1988.
21         Mr. Sullivan, if I could ask you to go
22 to Bates page ending in 402. In particular the

Page 157

1  discussion on the first full paragraph about
2  Montana Medicaid. Do you see that?
3      A. Yes.
4      Q. Where it says, Similarly, Montana
5  Medicaid compensates for the additional time and
6  expense of dispensing compounded drugs by
7  allowing the provider's usual and customary
8  charge up to 2.5 times the cost of ingredients,
9  paren, reimbursement for other outpatient drugs
10 is a lower of AWP minus 10 percent, or the cost
11 of the drug, end paren. Do you see that?
12     A. Yes.
13     Q. Is that the, the type of thing that
14 Tennessee was doing?
15     A. It's a different approach to -- yeah.
16 Make -- paying the provider for the, for the
17 compounding without -- and setting a limit on
18 what I will pay up to two and a half percent.
19 It's just a different, different twist.
20     Q. Does it -- does this refresh your
21 recollection about any other types of approaches
22 like this that other states were using?

40 (Pages 154 to 157)

0c585b6a-88d2-47d8-bc26-289a064ea87e

Sullivan, Harry Leo                                                March 12, 2008
                              Nashville, TN

Page 326

1    A.  No.
2        MR. KATZ:  Objection to form.
3    A.  Nor federal matching share either.
4        MR. DRAYCOTT:  That was my last
5    question.
6        THE WITNESS:  Outstanding.
7        MR. TORBORG:  I have a couple follow-up
8    questions.  If anyone -- see if anyone else on
9    the phone has any.  Anyone?
10       MS. LIEBERMAN:  Roxane would like to
11   reserve the right to ask questions at a later
12   date.
13       MR. DRAYCOTT:  I'm not representing
14   this witness, but I think the witness's
15   preference, and he can state it for himself,
16   would be to get this deposition finished today.
17       THE WITNESS:  That's correct.
18       MR. TORBORG:  Is there anybody else who
19   has questions today for Mr. Sullivan?  I have a
20   couple follow-ups, but I'll wait until everyone
21   else has had a chance to question.
22       MR. LYNN:  This is Paul Lynn.  I do not

Page 327

1    have any questions.
2        MR. JONES:  This is Scott Jones.  Go
3    ahead.
4        MR. TORBORG:  Okay.
5
6            REDIRECT EXAMINATION
7    BY MR. TORBORG:
8    Q.  Mr. Sullivan, I have just a couple
9    followup questions from the questions Mr.
10   Draycott had asked you.
11       First, Mr. Draycott asked you some
12   questions about a thousand percent spreads on
13   drugs; correct?
14   A.  Yes, sir.
15   Q.  And asked you if your testimony should
16   be seen by the jury in this case as endorsing or
17   not endorsing such spreads and whether or not
18   payment of a thousand percent spreads would be
19   appropriate.  Do you recall that?
20   A.  Yes.
21   Q.  Do you believe the better way to look
22   at the appropriateness of a Medicaid program

Page 328

1    paying a margin or spread on a drug is the dollar
2    value of the spread rather than the percentage?
3    A.  You know, at certain ends of the scale,
4    both need to be looked at, but I would agree that
5    the dollar difference is something that needs to
6    be looked at first, because, you know, a thousand
7    percent makes headlines but doesn't mean anything
8    if you don't have a dollar amount affixed to it.
9    Q.  And do you think expressing spreads in
10   terms of a percentage, like Mr. Draycott did, can
11   oftentimes --
12       MR. DRAYCOTT:  Objection.
13   BY MR. TORBORG:
14   Q.  -- misconvey the real spread that's
15   being paid by a Medicaid program?
16   A.  That's possible.
17   Q.  It may be that a spread of a thousand
18   percent might be an appropriate amount to pay,
19   depending on the facts and circumstances of both
20   the drug involved and the services involved in
21   paying those, dispensing those drugs?
22   A.  It gets back to partially this thought

Page 329

1    process of not wanting the drug to merely be a
2    commodity.  So if, for example, your dispensing
3    fee is limited to 2.50 and the drug -- and it is
4    a very inexpensive drug, and it does cost 6 bucks
5    to dispense that drug to a Medicaid patient,
6    ratcheting down reimbursement based on a
7    percentage of profit on the ingredients side may
8    make it prohibitive for that provider to dispense
9    the product.  If that makes sense.
10   Q.  It does.
11       If I could ask you to take out the
12   United States complaint once again, Tab 19.  It's
13   paragraph 42.  This is the point in the complaint
14   that states AWP is used to refer to the price at
15   which a pharmaceutical firm or a wholesaler sells
16   a drug to a retail customer who then administers
17   it to a patient; correct?
18   A.  Yes.
19   Q.  Mr. Draycott had asked you some
20   questions whether or not you were aware of the
21   legal definition of AWP; is that right?  Do you
22   recall that?

                                                83 (Pages 326 to 329)