# Exhibit R

Vito, Robert - Vol. III                            February 5, 2008
                        Philadelphia, PA

Page 616

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE: PHARMACEUTICALS        )   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    )   Civil Action

PRICE LITIGATION              )   01-CV-12257-PBS

-----------------------------X

THIS DOCUMENT RELATES TO:     )   Judge Patti

U.S. ex rel. Ven-A-Care       )    B. Saris

of the Florida Keys, Inc.     )

v. Abbott Laboratories,       )   Magistrate

Inc., et al,                  )   Judge Marianne B.

No. 06-CV-11337-PBS           )   Bowler

-----------------------------X

VOLUME THREE

    Continued Video Taped Deposition of ROBERT

VITO, was taken pursuant to notice at Morgan, Lewis,

1701 Market Street, Philadelphia, Pennsylvania, on

Tuesday, February 5, 2008, beginning at 9:00 a.m.,

before Jeanne Christian, Court Reporter-Notary

Public, and Richard Kanzinger, Jr., Video Tape

Operator, there being present.

Vito, Robert - Vol. III                     February 5, 2008
                Philadelphia, PA

Page 649

1   surveyed would remain profitable for revision of
2   home respiratory and infusion drug therapies to
3   Medicare and Medicaid patients, should the
4   proposed AWP reductions be implemented.
5          Do you see that?
6       A. Yes, sir.
7       Q. Is that a sentiment that you recall
8   being discussed in meetings that you attended?
9          MR. DRAYCOTT: Objection. You can
10  answer, if you can.
11         THE WITNESS: I don't understand your
12  question.
13  BY MR. TORBORG:
14      Q. Do you recall anyone ever expressing
15  the sentiment that if the AWP -- if the drug
16  payment was reduced, that providers of home
17  respiratory and infusion drug therapies to
18  Medicare and Medicaid beneficiaries would not be
19  profitable?
20         MR. DRAYCOTT: Objection. It is
21  extremely broad. To the extent that it is
22  intended to also encompass any information or

Page 650

1   discussion that occurred in the context of an
2   exit conference, we would ask the witness --
3   instruct the witness not to answer with respect
4   to that part of the question.
5   BY MR. TORBORG:
6       Q. Just so you understand, I think Mr.
7   Draycott's instruction is limited to
8   conversations you may have had at entrance and
9   exit conferences. So I guess my question then is
10  that -- I would like to know, were there
11  conversations first.
12         Did you have conversations at the
13  entrance and exit meetings about that issue?
14      A. I believe that's deliberative process.
15         MR. DRAYCOTT: You can answer if this
16  was a topic. Beyond that level of generality,
17  you shouldn't answer further. I think you can
18  answer yes or no as to whether or not it was
19  something that was ever discussed.
20         THE WITNESS: Yes.
21  BY MR. TORBORG:
22      Q. And you believe communicating those --

Page 651

1   the substance of those conversations to me would
2   impinge upon your deliberative process privilege?
3   Is that your position?
4       A. At those meetings, yes.
5       Q. Have you had any -- and because of
6   that, you are going to take your counsel's
7   instruction not to answer; is that correct?
8       A. Yes.
9       Q. Do you recall any other conversations
10  along those lines with anyone else and besides
11  the exit and entrance conferences?
12      A. I read them, but I don't recall
13  discussing.
14      Q. When you say you read them, what do you
15  mean by that?
16      A. In the articles that you just showed
17  me.
18      Q. If I could ask you to go back to the
19  article I just showed you, Abbott Exhibit 468,
20  that's the Eli's Home Care Week.
21         I would like to ask you, the second
22  column, third full paragraph there, do you see

Page 652

1   that? In response to the OIG report? Are you
2   there?
3       A. Yes, sir.
4       Q. In response to the OIG -- this is what
5   the document says: In response to the OIG
6   report, HCFA acknowledged that respiratory and
7   infusion drug providers rely on the reimbursement
8   rates to cover services for which Medicare does
9   not currently reimburse.
10         Do you see that?
11      A. Yes, sir.
12      Q. Do you recall conversations that you
13  were involved in where HCFA acknowledged that
14  respiratory infusion drug providers relied upon
15  reimbursement rates for drugs to cover services?
16         MR. DRAYCOTT: Objection. You can
17  answer to the extent it doesn't reveal the
18  contents of communications and deliberations
19  occurring at entrance or exit conferences with
20  CMS.
21         THE WITNESS: Yes.
22  BY MR. TORBORG:

Vito, Robert - Vol. III  February 5, 2008
Philadelphia, PA

Page 653

1  Q. Did you have those conversations in
2  connection with the entrance and exit conferences
3  for your reports?
4  A. Yes.
5  Q. Did you have conversations outside of
6  those meetings regarding that topic?
7  A. I'm not sure. It could have been also
8  when we were actually getting data for them or
9  discussing data or at an informational meeting.
10  Q. And would the them in your answer be
11  providers?
12  A. No, it would be HCFA.
13  Q. HCFA?
14  A. Now CMS.
15  Q. So it may have been that HCFA discussed
16  that issue with you apart from the formal
17  entrance and exit conferences; correct?
18  A. I'm not sure. I don't recall.
19  Q. You don't recall -- you think they may
20  have happened? You just don't recall them, given
21  the passage of time; is that fair to say?
22  A. I just don't recall in general, but it

Page 654

1  might have happened.
2  Q. And do you recall having the
3  conversations at the exit and entrance
4  conversation -- at those meetings?
5  A. Yes.
6  Q. Can you tell me about those
7  discussions?
8  MR. DRAYCOTT: Objection. I instruct
9  you not to answer to the extent that it would
10  reveal the communications and deliberations that
11  occurred at those entrance and exit conferences.
12  BY MR. TORBORG:
13  Q. Because of that, are you accepting the
14  instruction not to answer?
15  A. Yes, sir.
16  Q. Do you recall, Mr. Vito, attending a
17  set of committee hearings held by the House Ways
18  and Means Committee regarding Medicare and
19  Medicaid payments for drugs?
20  A. Which year was that, sir?
21  Q. Roughly 2001, I believe, September
22  2001.

Page 655

1  A. I don't know. I have been to a lot of
2  the hearings and testified at some, but I don't
3  know if that -- there was one in particular that
4  I did not attend, and I don't know if that was
5  the one.
6  Q. Do you recall which one you did not
7  attend, who was there?
8  A. Yeah, I believe it was either -- it
9  might have been Janet Rehnquist was the one who
10  testified, and I -- but I'm not certain, but I
11  know I wasn't at one of the hearings.
12  Q. But it was your practice to attend
13  those hearings?
14  A. If I was able to do so, I would like to
15  have done so, yes, sir.
16  Q. Did anyone else from your office attend
17  those?
18  A. Yes, sir.
19  Q. Who was that?
20  A. It varied. Usually, we tried to get
21  the team who worked on the review to -- if there
22  was a hearing, we would let them come down to

Page 656

1  attend the hearing.
2  Q. Can you give me any names?
3  A. Linda Ragone, David Tawes.
4  Q. Did you attend or did you see the
5  testimony provided by anyone from Ven-A-Care?
6  A. Did I see it? I'm sure I saw it.
7  Q. You recall attending a committee
8  hearing at which someone from Ven-A-Care spoke?
9  A. I'm not certain if I was there. I
10  believe I have seen some of their documents, I
11  think, but I don't remember. I'm sorry.
12  Q. When you say documents, what are you
13  talking about?
14  A. When you said -- when you go to the
15  hearing, whoever testifies, they all have their
16  written statement, and usually, I would try to
17  obtain all of the written statements from all the
18  people who had testified there. So if they had
19  ever testified, I would have obtained that
20  statement, if I was there.
21  Q. Let's defer that one, and at the break,
22  I will get copies of that made and ask you about

11 (Pages 653 to 656)

Page 685

1  instruction as the last time.
2      THE WITNESS: Right. It is based on
3  our discussions, right.
4  BY MR. TORBORG:
5      Q. So the topic was discussed in exit and
6  entrance conversations, but you are not going to
7  tell me about the discussion because of
8  deliberative process privilege; is that right?
9      MR. AZORSKY: Objection to form.
10     MR. WINGET-HERNANDEZ: Objection to
11 form.
12     MR. TORBORG: Why don't we take our
13 first break?
14     THE VIDEO TAPE OPERATOR: Off the
15 video, 10:34.
16     (Whereupon a short break was taken
17 at this time.)
18     THE VIDEO TAPE OPERATOR: We are back
19 on the record. The time is 10:50.
20 BY MR. TORBORG:
21     Q. Mr. Vito, I would like to hand you
22 another document. This one will be marked as

Page 686

1  Abbott Exhibit 473.
2      (Whereupon the court reporter
3  marked document as Exhibit Abbott 473 for
4  identification.)
5  BY MR. TORBORG:
6      Q. Earlier, you testified that you had a
7  practice of printing out the written statements
8  at congressional hearings that you attended; is
9  that right, Mr. Vito?
10     A. Yes, sir.
11     Q. I have handed you a document I printed
12 off the House Ways and Means -- I'm sorry, the
13 House and Energy Commerce Committee web site, a
14 documented dated September 24, 2001. This is a
15 statement from a Mr. Thomas Connaughton. And if
16 you would take a skim through that to tell me
17 whether or not you recall printing out and
18 reviewing this statement.
19     A. (Witness complies.) I think I saw this
20 document. I was at that hearing.
21     Q. Do you recall ever speaking with Mr.
22 Connaughton?

Page 687

1      A. I don't recall.
2      Q. In the fourth paragraph of this
3  statement, Mr. Connaughton wrote or stated: I
4  want to begin by making an important distinction
5  between infusion and inhalation therapies
6  administered to patients in their homes and
7  conventional outpatient drugs, such as pills and
8  patches. The key difference is that pills and
9  patches do not require professional services to
10 administer.
11     Do you recall, Mr. Vito, having a
12 discussion about the need to draw a distinction
13 between infusion and inhalation drugs and
14 outpatient drugs, such as pills and patches, in
15 connection with the average wholesale price
16 debate?
17     A. Yes.
18     Q. Can you tell me about those
19 conversations?
20     MR. DRAYCOTT: Objection. As on
21 previous instructions, you can answer it, except
22 to the extent it reveals deliberative

Page 688

1  communications occurring at an exit or entrance
2  conference.
3  BY MR. TORBORG:
4      Q. Is your testimony that you can't give
5  me the details, given the deliberative process
6  privilege?
7      A. If you -- I'm sorry again.
8      Q. Did you have conversations relating to
9  that distinction with anyone?
10     A. Yes.
11     Q. Did you have that conversation with
12 anyone outside of HCFA or OIG?
13     A. Yes.
14     Q. Tell me about those conversations.
15     A. I don't remember them, but I am sure
16 that we probably had them. If we had any
17 discussion with congressional staffers or
18 something, we would have probably said something
19 there.
20     Q. So you believe you had those
21 discussions, you just don't recall the specifics
22 about them at all? Do you recall anything about

Vito, Robert - Vol. III                    February 5, 2008
                  Philadelphia, PA

Page 689

1  the discussions, other than the fact that --
2     A.  I'm sorry, yes, I know that we had
3  them.
4     Q.  Do you recall having those
5  conversations with HCFA?
6     A.  Yes.
7     Q.  Did you have any of those conversations
8  outside of the exit and entrance conferences?
9     A.  I don't think so.
10    Q.  Will you tell me about the
11 conversations that you had regarding that
12 distinction with HCFA?
13       MR. DRAYCOTT: Objection. I instruct
14 you not to answer to the extent that those
15 communications occurred in an entrance or exit
16 conference.
17       THE WITNESS: Right, no.
18 BY MR. TORBORG:
19    Q.  Mr. Vito, was it your understanding
20 that HCFA set any policies in its administration
21 of the Medicare and Medicaid program relating to
22 that distinction between inhalation and infusion

Page 690

1  drugs and outpatient drugs such as pills or
2  patches?
3        MR. DRAYCOTT: Objection, but you may
4  answer the question, if you can.
5        THE WITNESS: I think it is better to
6  ask them.
7  BY MR. TORBORG:
8     Q.  Do you know of any?
9     A.  Do I know of any --
10    Q.  Do you know of any policies that HCFA
11 had with respect to infusion and inhalation drugs
12 and the reimbursement of those drugs?
13    A.  I know some of the policies, yes.
14    Q.  Which policies are you --
15    A.  I knew the inhalation drug policies.
16    Q.  Did you know of any policies that drew
17 a distinction between infusion and inhalation
18 reimbursement and reimbursement of pills or
19 patches?
20    A.  I don't recall.
21    Q.  Mr. Vito, would I like to hand you what
22 we have marked previously as Abbott Exhibit 381.

Page 691

1  I happen to have copies of this. I wasn't sure
2  if they were in the folders yet or not.
3        For the record, Abbott Exhibit 381 is a
4  report titled Medicaid and Medicare Drug Pricing,
5  Strategy to Determine Market Prices, Final
6  Report. It appears to be prepared by an
7  organization called Abt Associates.
8        Mr. Vito, if you would take a look
9  through that, let me know if you are familiar
10 with this document or anything connected to this
11 report or study.
12    A.  (Witness complies.)
13    Q.  Mr. Vito, have you had a chance to skim
14 the document?
15    A.  Yes, sir.
16    Q.  Do you recall this document?
17    A.  I think I saw this document, yes, sir.
18    Q.  I would like you to ask you to go to
19 Page 33 of the document, of this particular
20 document.
21    A.  (Witness complies.)
22    Q.  And then flip one more page to Appendix

Page 692

1  A, members of the panel?
2     A.  Yes.
3     Q.  You are listed there as an observer.
4        Do you see that?
5     A.  Yes.
6     Q.  Can you tell us what this report is?
7     A.  I think it was something that was
8  prepared by Abt to develop strategies to
9  determine how to arrive at the market price.
10    Q.  And Appendix A lists members of the
11 expert panel.
12       Do you recall if there was a meeting or
13 meetings that were held in connection with the
14 preparation of this report?
15    A.  There was one meeting, I believe.
16    Q.  Do you know where it was?
17    A.  In Washington, D.C.
18    Q.  And did you attend the meeting?
19    A.  Yes, I did.
20    Q.  Do you know why you were asked to be
21 one of the individuals to attend the meeting?
22    A.  I believe because they thought that I

                                20 (Pages 689 to 692)