# Exhibit S

Tawes, David - Vol. I                                April 24, 2007
                          Philadelphia, PA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X   MDL NO. 1456

IN RE:  PHARMACEUTICAL INDUSTRY      :   CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION   :   01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:            :

U.S. ex rel. Ven-A-Care of the       :   CIVIL ACTION:

Florida Keys, Inc. v. Abbott         :   06-CV-11337-PBS

Laboratories, Inc.                   :

------------------------------------X


IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                    :   CASE NO.

        Plaintiff,                   :   CV-05-219

    v.                               :

ABBOTT LABORATORIES, INC.,           :   JUDGE

et al.,                              :   CHARLES PRICE

        Defendants.                  :

------------------------------------X

Henderson Legal Services
202-220-4158

bcab4204-38f1-4b48-ab34-7037316b0f5a

Tawes, David - Vol. I                                             April 24, 2007
                        Philadelphia, PA

Page 178

1     And then using my highlighter, would you
2  highlight the ones that were -- that are
3  multiple-source, MS?
4     A. (Complies.)
5     Q. Now, as you review that schedule, does
6  anything pop out at you in the Percent Saved column
7  for the highlighted columns, multiple-source drugs?
8        MR. NEAL: Objection as to form.
9        THE WITNESS: That there is large
10 potential savings for almost all of the -- as far
11 as percent saved, for the multiple-source drugs.
12 BY MR. TORBORG:
13    Q. And does that mean there was a larger
14 difference between acquisition cost, as shown in
15 the market and shown in the pricing catalogs, and
16 the AWPs?
17       MR. NEAL: Objection as to form.
18       THE WITNESS: Yes.
19 BY MR. TORBORG:
20    Q. Okay. Do you recall discussions at OIG
21 relating to the fact that there were such large
22 differences between the catalog prices for

Page 179

1  multiple-source drugs and the AWPs for those drugs?
2     A. I don't recall talking about
3  multiple-source drugs specifically.
4     Q. How about generics?
5     A. Or -- or generics specifically. I mean,
6  obviously we did some specific studies on a few of
7  these projects because of the large spreads we
8  found in here.
9     Q. But fair to say that your -- as
10 reflected in this chart, which provides the detail
11 of your report, right, shows very large savings
12 potential for multiple-source drugs --
13       MR. NEAL: Objection to --
14 BY MR. TORBORG:
15    Q. -- right?
16       MR. NEAL: -- the form.
17       THE WITNESS: Again, large savings
18 potential as a -- as a percentage, not necessarily
19 as a total dollar figure.
20 BY MR. TORBORG:
21    Q. Do you think it's appropriate to
22 evaluate the differences between prices as a

Page 180

1  percentage?
2        MR. NEAL: Objection as to form.
3        THE WITNESS: I think it's certainly one
4  way to evaluate it.
5  BY MR. TORBORG:
6     Q. You -- do you recall any discussions at
7  any time at OIG with the fact that there was such
8  large spreads for generic multi-source drugs?
9     A. Not generic as a whole. Again, for a
10 couple particular products, we certainly discussed
11 it.
12    Q. And which products were those?
13    A. That would be Albuterol and Leucovorin
14 Calcium, I remember specifically.
15    Q. What do you recall about Leucovorin
16 Calcium?
17    A. That in later -- a couple later reports
18 that I worked on, it was a generic, I believe,
19 cancer drug that seemed to have AWPs that were
20 vastly out of line with actual acquisition costs.
21    Q. Did you have any discussions with
22 individuals at CMS about the large percentage

Page 181

1  differences in the -- in the prices for generic
2  drugs between actual acquisition cost, as shown in
3  catalogs, versus published AWPs?
4        MR. NEAL: I'm going to object to the
5  question.
6        I'll instruct you not to answer to the
7  extent that those -- your answer would reveal
8  communications that took place in the context of
9  entrance or exit conferences with CMS personnel.
10       THE WITNESS: Not outside of entrance or
11 exit conferences.
12 BY MR. TORBORG:
13    Q. Do you recall having the discussions at
14 all?
15       MR. NEAL: I'm going to instruct the
16 witness not to answer that question.
17       MR. TORBORG: Can I ask him whether,
18 without divulging specific communications, if he
19 recall the discussions happening at all?
20       MR. NEAL: The problem is, the
21 discussions you're talking about involve a specific
22 substance area.

                                         46 (Pages 178 to 181)

Tawes, David - Vol. I          April 24, 2007
Philadelphia, PA

Page 182

1  MR. TORBORG: That I think is important
2  to the case; that's why I'm asking about it.
3  MR. NEAL: That may be, but, you know,
4  that -- that doesn't play into our privilege --
5  privilege assertion, so...
6  MR. TORBORG: So what you're saying, in
7  essence, is regardless of how important it may be
8  to my defense, you're still going to assert the
9  privilege, no matter what?
10  MR. NEAL: You can characterize it
11  however you want to. I mean, the fact is, this is
12  an important governmental privilege, and we're
13  going to assert the privilege in this case. We
14  have motions pending on -- you know, on this matter
15  as we speak, and the Court will presumably resolve
16  it for us.
17  MR. TORBORG: Okay. Hopefully this will
18  be of assistance.
19  BY MR. TORBORG:
20  Q. If we go to Page 10 of your report,
21  Recommendations, what was the purpose for the
22  Recommendations section of the report?

Page 183

1  A. To make recommendations to CMS about how
2  they could impact or -- or implement some of the
3  changes that would be called for by the findings of
4  our report.
5  Q. Did you attend the exit conference for
6  this report?
7  A. I don't believe so.
8  Q. Do you recall any discussions with CMS
9  about this report?
10  A. No.
11  Q. If you look at page -- I'm sorry -- the
12  section under Discounted Wholesale Price, that
13  recommendation, the fifth sentence down, it starts
14  with, In addition. Are you with me?
15  A. Uh-huh.
16  Q. It says: In addition, the secretary
17  should be granted the authority to conduct sample
18  surveys of actual wholesale prices to determine the
19  amount of difference between actual average
20  wholesale prices and published AWPs. The
21  percentage difference found in the sample could
22  then be applied to all AWPs used by the program to

Page 184

1  determine drug reimbursement.
2  Do you have an understanding of what that
3  recommendation is -- is all about?
4  A. Yes.
5  Q. Do you recall discussing -- discussing
6  that recommendation with anyone at CMS at any time?
7  MR. NEAL: Objection.
8  You can answer that to the extent that
9  you don't reveal the substance of communications
10  that took place at exit or entrance conferences.
11  THE WITNESS: No.
12  BY MR. TORBORG:
13  Q. The second recommendation is Acquisition
14  Cost. It states: Medicare could base the payment
15  of drugs on either actual or estimated acquisition
16  costs. Although Medicare currently has the
17  authority to use EAC, carriers have yet to
18  successfully implement the option.
19  Do you recall any discussions about the
20  inability to use the estimated acquisition cost
21  approach in reimbursing Medicare Part B drugs?
22  A. No.

Page 185

1  Q. By the time you came in, in 1997,
2  estimated acquisition cost was sort of a
3  methodology of the past; is that fair to say?
4  MR. NEAL: I'll object to the form.
5  You can answer.
6  THE WITNESS: In Medicare, yes.
7  BY MR. TORBORG:
8  Q. How about for Medicaid?
9  A. In Medicaid, as far as I know, estimated
10  acquisition cost is still on the books, and it's up
11  to states to determine the definition -- or not the
12  definition, but it's up to states to determine what
13  estimated acquisition cost is.
14  Q. Okay. And do you recall any discussions
15  at OIG about whether or not states were
16  implementing that requirement in accordance with
17  the law?
18  MR. NEAL: Objection as to form.
19  THE WITNESS: I don't think the law gave
20  them specific instruction about how to implement
21  the requirement.
22  BY MR. TORBORG:

47 (Pages 182 to 185)

Page 222

1  certainly use to develop our educational efforts
2  with HCFA, end quote, Parver notes.
3       Does Medicare pay a dispensing fee for drugs?
4       MR. NEAL: Objection as to form.
5       You can answer.
6       THE WITNESS: For certain drugs, a
7  dispensing fee is paid.
8  BY MR. TORBORG:
9       Q. Which -- which drugs?
10      A. The durable medical equipment drugs,
11 such as Albuterol, Ipratropium Bromide, those types
12 of drugs. I'm not sure about any others.
13      Q. So you don't know if a dispensing fee is
14 paid to home-infusion providers, for example?
15      A. No. I'm not sure.
16      Q. Do you recall that ever being discussed?
17      A. No.
18      Q. When was the dispensing fee established
19 for durable medical equipment suppliers?
20      A. I'm not --
21      MR. NEAL: Objection as to form.
22      You can answer.

Page 223

1       THE WITNESS: I'm not sure.
2  BY MR. TORBORG:
3       Q. Well, do you think it was before you
4  started or during the time that you were at OIG?
5       MR. NEAL: I'll object to the form.
6       You can answer.
7       THE WITNESS: During the time I was at
8  OIG.
9  BY MR. TORBORG:
10      Q. Have you ever met with Mr. Tarver [sic]
11 --
12      A. No.
13      Q. -- who's quoted in here? If we skip a
14 paragraph, Mr. Quarver -- Mr. Parver is quoted
15 again as saying: It's unclear to me how, if an
16 entity is paid its acquisition cost for a drug, it
17 could possibly provide any services, Parver adds.
18 In the infusion area, that would probably make it
19 very difficult for a pharmacy to provide any
20 services.
21      In the past, Redmon claims -- and Redmon is a
22 reference to Tim Redmon, of the National Community

Page 224

1  Pharmacists Association -- Medicare officials would
2  argue that the service component was, quote, built
3  into the fee schedule, end quote, for prescription
4  drugs. Now that this component may be removed,
5  Medicare's insistence that it, quote, won't pay for
6  services, end quote, means that providers are left
7  unable to serve beneficiaries, he maintains.
8       Do you recall any discussions during your time
9  at OIG that the services associated with dispensing
10 drugs were built into the fee schedule for drugs?
11      A. I remember people in the provider
12 community saying that -- saying those types of
13 things. I never heard anyone within OIG or CMS say
14 that.
15      Q. Who do you recall from the provider
16 community making --
17      A. No.
18      Q. -- those statements?
19      A. It was general articles such as this
20 that would say that they needed the markup on drugs
21 to pay for services that -- that weren't being
22 reimbursed appropriately.

Page 225

1       Q. Did you have any personal opinion about
2  whether those statements were correct or not?
3       MR. NEAL: Objection as to form.
4       THE WITNESS: Without doing a review of
5  physician services and what the costs actually are,
6  I wouldn't have any way of knowing whether
7  physician services were being reimbursed
8  appropriately.
9  BY MR. TORBORG:
10      Q. Did you see a number of articles from
11 the provider community that were making assertions
12 like that?
13      A. Yes.
14      Q. Did you ever discuss the -- this general
15 issue at all with CMS?
16      MR. NEAL: Objection.
17      You can answer that to the extent you
18 don't reveal the contents of communications at
19 entrance or exit conferences.
20      THE WITNESS: All of the conversations
21 would have been in those situations.
22 BY MR. TORBORG:

Tawes, David - Vol. I                                   April 24, 2007
                      Philadelphia, PA

Page 226

1  Q. Okay. Did you have conversations along
2  those lines at the entrance and exit interviews?
3      MR. NEAL: I'm sorry. I'm going to
4  instruct you not to answer that question.
5      What are you referring to?
6      MR. TORBORG: I'm asking if he's had
7  discussions along the lines of services being built
8  into the payment for drugs with members of CMS.
9      MR. NEAL: The instruction is not to
10 answer to the extent that it would require you to
11 reveal communications that took place at entrance
12 and exit conferences.
13     MR. TORBORG: Can he answer yes or no,
14 whether he had them or not?
15     MR. NEAL: Why don't you go ahead and
16 repeat your question and I'll either assert a
17 privilege or...
18 BY MR. TORBORG:
19 Q. Have you had discussions with CMS along
20 the lines of services -- payment for services being
21 built into the payment for drugs?
22     MR. NEAL: You can answer that yes, no,

Page 227

1  or I don't remember.
2      THE WITNESS: No.
3  BY MR. TORBORG:
4  Q. How are -- I want to just trace through
5  your -- your current understanding about how
6  Medicare Part B pays for drugs. Do you have an
7  understanding of how Medicare Part B reimburses
8  physicians for drugs?
9  A. Yes.
10 Q. How's that?
11 A. Physicians are reimbursed at 95 percent
12 -- I'm sorry -- 106 percent of the average sale
13 price for the drug.
14 Q. Okay. And how are pharmacies reimbursed
15 under Medicare Part B today?
16 A. 106 percent ASP for the drug plus a
17 reasonable dispensing fee.
18 Q. Is it your understanding that all
19 pharmacies are paid 106 percent of ASP plus a
20 reasonable dispensing fee?
21 A. For Medicare?
22 Q. Yes.

Page 228

1  A. As far as -- as far as I know. There
2  might be certain drugs that aren't subject to the
3  ASP methodology, but most are.
4  Q. Do you know any drugs that are not
5  subject to ASP methodology?
6  A. Yes.
7  Q. Which ones?
8  A. The vacc -- certain vaccines, certain
9  blood products are typically excluded.
10 Q. Any other drugs?
11 A. Not that I know of.
12 Q. And how are those products reimbursed?
13 A. Typically based on AWP.
14 Q. Okay. Is it 85 percent of AWP; do you
15 know?
16 A. I think it's 95 percent of AWP.
17 Q. Is that part of a statute or a
18 regulation?
19     MR. NEAL: Objection as to form.
20     You can answer.
21     THE WITNESS: I believe that it's part of
22 the statute that certain drugs were exempted.

Page 229

1  BY MR. TORBORG:
2  Q. I'm going to hand you another document
3  we've marked previously. This is marked as Exhibit
4  Abbott 018.
5      MR. TORBORG: For the record, Exhibit
6  Abbott 018 is titled, Statement of the National
7  Alliance for Infusion Therapy and the National Home
8  Infusion Association, Alexandria, Virginia, and it
9  is a statement that was printed off the House of
10 Representatives Ways and Means Committee website at
11 the web address in the bottom of the page.
12 BY MR. TORBORG:
13 Q. And I suspect, Mr. Tawes, after you take
14 a look at it, you'll tell me that you've never seen
15 it before.
16 A. Not that I remember.
17 Q. Okay. If we look at the second page,
18 there's a section, Reliance on AWP to Calculate
19 Reimbursement. It says: NAIT and NHIA understand
20 the criticism expressed by the members of the
21 subcommittee as well as other members of Congress
22 regarding the current practice of relying on

Tawes, David - Vol. I  
Philadelphia, PA  
April 24, 2007

Page 230

1  average wholesale price as a basis for calculating
2  Medicare and Medicaid outpatient drug
3  reimbursement. The imperfections of the AWP
4  methodology are well-known and extensively
5  documented.
6     Did you think the imperfections of the AWP
7  methodology were well-known?
8        MR. NEAL: Objection as to form.
9        THE WITNESS: I thought it was well-known
10 among people that know that sort of things. I
11 mean, I don't think that, you know, most of my
12 friends knew anything about the AWP methodology.
13 BY MR. TORBORG:
14    Q. Nor did I until about nine months ago.
15    A. Right.
16    Q. But people in the -- people in the -- in
17 the industry knew that the imperfections of AWP
18 methodology were well-known?
19       MR. NEAL: Objection as to form.
20       THE WITNESS: Yes.
21 BY MR. TORBORG:
22    Q. If you go to the next page, a paragraph

Page 231

1  states: For the reasons stated above, at the
2  present time the drug payments for infusion therapy
3  subsidize other functions that the Medicare payment
4  methodologies do not reflect appropriately. The
5  costs of these services and functions far outweigh
6  the cost of the drug product, but these costs are
7  clearly lower than the charges that would be
8  incurred if the patient received treatment in an
9  alternative setting. For home-infusion drug
10 therapy, the drug payment is the only available
11 drug -- the only available payment mechanism for
12 the services that are essential to providing good
13 quality care. A longstanding use of AWP to
14 determine reimbursement has massive failure of the
15 Medicare and Medicaid payment policies to define
16 and account for the service component.
17    Do you agree with that statement?
18       MR. NEAL: Objection as to form.
19       THE WITNESS: I -- I don't know much
20 about the -- again, what the cost of services and
21 how Medicare reimbursed for those services.
22 BY MR. TORBORG:

Page 232

1    Q. Do you recall any discussions with
2  either OIG or CMS about the fact that reducing drug
3  payments may result in increased prices to the
4  Medicare system?
5    A. No.
6    Q. Do you recall any discussions with
7  anyone at OIG or CMS that reducing payments for
8  drugs may compromise access to care?
9       MR. NEAL: I'll object to the form.
10      THE WITNESS: There were conversations
11 that those were concerns of the industry. I don't
12 think that there were conversations about whether
13 that was, you know, likely to happen.
14 BY MR. TORBORG:
15    Q. Did you have conversations with anyone
16 at OIG and CMS about that issue?
17    A. About -- again, we had conversations
18 that, here is what the interest groups are saying
19 will happen. We didn't sort of analyze the
20 legitimacy of whether it was likely to happen or
21 not.
22    Q. Did OIG doubt the claims that were made

Page 233

1  by provider groups?
2       MR. NEAL: Objection as to form.
3       THE WITNESS: I think that in many of our
4  recommendations, especially in later reports,
5  you'll see that, you know, we recommend that
6  physicians or pharmacies need to be reimbursed
7  appropriately, and that means paying for the drugs
8  accurately and also reimbursing for the service
9  component fairly as well.
10      So I think that it was something that,
11 you know, we knew needed to be taken into account,
12 but how that needed to be taken into account and to
13 the extent that services weren't being reimbursed
14 appropriately, we didn't know. It was just a
15 statement that we continuously -- that we
16 continually made.
17 BY MR. TORBORG:
18    Q. But fair to say that you at OIG were
19 concerned about some of the statements that
20 providers were making?
21      MR. NEAL: Objection as to form.
22      THE WITNESS: Not necessarily concerned

Tawes, David - Vol. I                                          April 24, 2007
                              Philadelphia, PA

Page 234

1  about the -- the -- again, the accuracy of the
2  statements. We had no way of knowing whether they
3  were accurate or not. But just logically, it makes
4  sense that, you know, physicians or -- or whomever
5  needed to be reimbursed appropriately.
6  BY MR. TORBORG:
7     Q.  You didn't ignore their -- their claims;
8  is that fair to say?
9        MR. NEAL: Objection as to form.
10       THE WITNESS: Yes.
11 BY MR. TORBORG:
12    Q.  I'd like to hand you Exhibit Abbott 093.
13 Mr. Tawes, this is another document that we pulled
14 from the 1997 report working paper files. It bears
15 the Bates Nos. HHD009-0119 through 20. If you
16 would take a look at that article for me, and
17 specifically the article on the right side, Agency:
18 United States Paid Too Much for Drugs.
19    Now, this article was, again, one that I --
20 that we pulled out of the working paper files, and
21 I believe you said before that Ms. Ragone was
22 primarily responsible for maintaining the working

Page 235

1  paper files for the 1997 report?
2     A.  Yes.
3        MR. NEAL: Objection as to form.
4        THE WITNESS: Yes.
5  BY MR. TORBORG:
6     Q.  All right. And how -- based on your
7  work at OIG, how would it be that articles such as
8  the one marked as Exhibit Abbott 093 would get into
9  the working paper files?
10    A.  Someone in the office, whether it be the
11 regional inspector general, whether it be a -- a
12 team leader or just an analyst, could read
13 something in a paper -- in a newspaper or a -- some
14 other source, and probably either sent an e-mail
15 out or something like that, saying -- or make
16 photocopies for everyone, saying you should look at
17 this article, and the project leader would most
18 likely then put that in the follow-up file to the
19 -- to the inspection file.
20    Q.  And the follow-up file is what?
21    A.  Basically press reports or any -- any
22 mention of our work in -- in trade journals or

Page 236

1  requests for congressional testimony. Just
2  basically anything that happens that we feel should
3  go in the file once the report has been completed.
4     Q.  If we read the first three paragraphs of
5  this article, which are fairly short, it states:
6  Medicare and senior citizens who rely on it paid at
7  least $447 million too much for prescription drugs
8  last year, government -- government investigators
9  said yesterday. But this time it appears the
10 government has no one but itself to blame for the
11 problem. It agreed to pay retail prices instead of
12 taking advantage of its buying power to negotiate
13 discounts. Drug prices paid through the federal
14 health care program to, quote, bear little or no
15 resemblance to actual wholesale prices that are
16 available to the physician and supplier
17 communities, said June Gibbs Brown, Inspector
18 General of the Health and Human Services
19 Department.
20    Did you agree, Mr. Tawes, personally that the
21 government had no one but itself to blame for
22 paying too much for drugs?

Page 237

1        MR. NEAL: Objection as to form.
2        THE WITNESS: Well, I -- I guess I don't
3  see government as a single entity anyway. I mean,
4  whoever passed the law may not have had -- I -- I
5  can't say what their reasoning was for basing
6  prices on AWP, but it was in the law, so CMS was
7  sort of stuck paying that amount.
8  BY MR. TORBORG:
9     Q.  If Congress had all of the information
10 that you provided, OIG provided, that you've seen,
11 detailing the differences between the AWPs and the
12 actual acquisition costs and still decided to
13 reimburse based upon published AWPs, would you
14 agree that Congress had no one to blame but itself?
15       MR. NEAL: Objection as to form.
16       THE WITNESS: Again, it's -- it -- it's
17 difficult to say who -- what they -- what they took
18 out of the reports. I mean, I -- again, I don't
19 even know if -- if people that were making --
20 making the law read the reports.
21 BY MR. TORBORG:
22    Q.  But if they had read the reports the way

60 (Pages 234 to 237)

Tawes, David - Vol. I                                   April 24, 2007
                    Philadelphia, PA

Page 266

1  I'm going instruct him not to answer at this time.
2  BY MR. TORBORG:
3      Q. Other than a lack of resources, did HCFA
4  provide any other explanations as to why drugs were
5  not being added to the Federal Upper Limit List?
6      MR. NEAL: Objection.
7      You can answer that to the extent that
8  you don't reveal the substance of any
9  communications that took place during entrance or
10 exit conferences with CMS.
11     THE WITNESS: Outside of those
12 conferences, anything -- any explanations that they
13 came up with would have been in their comments to
14 the reports.
15 BY MR. TORBORG:
16     Q. Let me see if I can ask that again.
17 Other than a lack of resources at CMS, did HCFA
18 provide any other explanations as to why drugs were
19 not being added to the Federal Upper Limit List?
20     MR. NEAL: I'll object to the question.
21     And then you can answer that to the
22 extent that you don't reveal the substance of

Page 267

1  communications that took place at entrance or exit
2  conferences with CMS.
3      THE WITNESS: Again, without going back
4  to their official comments to the report, I mean,
5  that's the extent outside of entrance and exit
6  conferences.
7  BY MR. TORBORG:
8      Q. At the entrance and exit conferences,
9  did CMS provide any explanations, besides
10 resource-based reasons, why drugs were not being
11 added to the FUL List?
12     MR. NEAL: I'm going to instruct you not
13 to answer the question.
14     MR. TORBORG: Just a yes or no, he can't
15 answer that?
16     MR. NEAL: I'm going to instruct not to
17 answer, yeah, it's -- my objection stands.
18     MR. TORBORG: So there may be reasons why
19 CMS did not add specific drugs to the FUL List that
20 I'm not going to get to figure out?
21     MR. NEAL: I mean, your question
22 presupposes certain substantive communications from

Page 268

1  CMS and --
2      MR. TORBORG: That's why --
3      MR. NEAL: -- he's not --
4      MR. TORBORG: -- I'm asking --
5      MR. NEAL: -- going to disclose --
6      MR. TORBORG: -- yes or no.
7      MR. NEAL: He's not going to disclose
8  those communications.
9      MR. TORBORG: Well --
10     MR. NEAL: The objection stands. I'm not
11 --
12     MR. TORBORG: -- I'm not --
13     MR. NEAL: -- going to debate --
14     MR. TORBORG: -- trying to pre --
15     MR. NEAL: -- with you right now, but, I
16 mean, I -- the objection stands. You're asking
17 about the substance of communications that took
18 place and entrance and exit conferences, and, you
19 know, we've asserted a -- a fairly broad objection
20 over the substance of those communications. I
21 don't think he can answer that even yes or no
22 without disclosing the substance of the

Page 269

1  communication.
2      MR. TORBORG: I guess that answers the
3  question in itself, but --
4      MR. NEAL: I don't know --
5      MR. WINGET-HERNANDEZ: Objection to form.
6      MR. NEAL: -- what you're talking about,
7  but...
8      MR. HAVILAND: John, you're under oath
9  now.
10     MR. TORBORG: Yeah.
11 BY MR. TORBORG:
12     Q. The last paragraph of HCFA's response to
13 this report states: Furthermore, HCFA is
14 undertaking a more comprehensive review of drug
15 prices and how they affect the Medicaid program and
16 will issue future guidance to the states on this as
17 appropriate.
18     Do you recall HCFA taking a more comprehensive
19 review of drug prices?
20     A. No.
21     Q. Do you have any idea what they're
22 referring to there?

Tawes, David - Vol. II                              April 25, 2007
                        Philadelphia, PA

Page 296

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
VOLUME II

------------------------------------X   MDL NO. 1456
IN RE: PHARMACEUTICAL INDUSTRY      :   CIVIL ACTION:
AVERAGE WHOLESALE PRICE LITIGATION  :   01-CV-12257-PBS
------------------------------------X
THIS DOCUMENT RELATES TO:           :
U.S. ex rel. Ven-A-Care of the      :   CIVIL ACTION:
Florida Keys, Inc. v. Abbott        :   06-CV-11337-PBS
Laboratories, Inc.                  :
------------------------------------X
       IN THE CIRCUIT COURT OF
       MONTGOMERY COUNTY, ALABAMA
------------------------------------X
STATE OF ALABAMA,                   :   CASE NO.
        Plaintiff,                  :   CV-05-219
   v.                               :
ABBOTT LABORATORIES, INC.,          :   JUDGE
et al.,                             :   CHARLES PRICE
        Defendants.                 :
------------------------------------X

Tawes, David - Vol. II                                          April 25, 2007
                          Philadelphia, PA

Page 365

1   inadequate Medicare payments for services related
2   to furnishing the drug, such as the administration
3   of chemotherapy for cancer. We need to pay
4   appropriately for the drugs and the services
5   related to furnishing these drugs.
6       Do you recall any discussions about that with
7   CMS?
8       MR. NEAL: You can answer that question
9   to the extent that your answer doesn't implicate
10  any privileged communication.
11      MR. WINGET-HERNANDEZ: Objection to form.
12      THE WITNESS: I don't recall any specific
13  discussions outside of entrance or exit
14  conferences.
15  BY MR. TORBORG:
16      Q. Did you ever use the term "drug profits"
17  during your time at OIG?
18      MR. NEAL: Object to the form.
19      You can answer.
20      THE WITNESS: I -- I don't recall using
21  that specific term.
22  BY MR. TORBORG:

Page 366

1       Q. Did you ever use -- do you ever recall
2   using the term "cross-subsidize"?
3       A. I don't think I would have used that
4   specific term either.
5       Q. Do you recall anyone else using that
6   term?
7       A. Aside from -- that specific term, aside
8   from these comments, no.
9       Q. Do you recall any discussions within OIG
10  or CMS about the concept of the payment for the
11  drug making up for underpayment for physician
12  services?
13      MR. NEAL: You can answer that consistent
14  with my previous instruction on privileged
15  communication.
16      MR. WINGET-HERNANDEZ: Objection to form.
17      THE WITNESS: I recall those discussions.
18  However, again, I'm not sure that it was -- it was
19  more along the lines of this is what physicians
20  say. There was no real discussion of the validity
21  of -- of the physicians' claims.
22  BY MR. TORBORG:

Page 367

1       Q. Because OIG had never studied that
2   particular issue, right?
3       MR. NEAL: Objection as to form.
4       THE WITNESS: As far as I know, at least
5   OEI had not studied that issue.
6   BY MR. TORBORG:
7       Q. Do you recall CMS ever asking OIG to
8   study that issue?
9       MR. WINGET-HERNANDEZ: Objection to form.
10      THE WITNESS: I recall being asked to
11  look at the dispensing-fee issue. I don't
12  necessarily recall being asked to look into
13  physician service costs.
14  BY MR. TORBORG:
15      Q. What do you -- what do you recall about
16  being asked to look at the dispensing-fee issue?
17      A. In converse -- in conversations with
18  CMS, them asking how much it really cost physicians
19  -- I'm sorry -- how much it really cost the
20  pharmacies to dispense the drugs and what services
21  they're -- they're providing for those dispensing
22  fees.

Page 368

1       Q. And just to back up a step, what is a
2   dispensing fee?
3       A. A dispensing fee is a fee paid with each
4   prescription filled by a pharmacy.
5       Q. Is the dispensing fee supposed to
6   include a level of profit?
7       MR. NEAL: Objection as to form.
8       THE WITNESS: I am not sure about the --
9   about what it's supposed to include.
10  BY MR. TORBORG:
11      Q. With whom did you have these
12  conversations?
13      MR. NEAL: Let me just instruct you to
14  answer that question consistent with my previous
15  instruction. You can discuss this so long as you
16  don't implicate essentially privileged
17  communications at entrance and exit conferences.
18      THE WITNESS: I don't recall exactly who
19  was at the meeting. It would have been someone
20  that I mentioned earlier as folks that I had met
21  with, but I can't remember specifically who was
22  there.

19 (Pages 365 to 368)

Henderson Legal Services
202-220-4158

58feec2f-99ac-42be-8c4e-803a680a2c55

Tawes, David - Vol. II                                      April 25, 2007
                        Philadelphia, PA

Page 369

1  BY MR. TORBORG:
2     Q.  Do you recall if it was related to
3  Medicare or Medicaid?
4     A.  Actually, we've had discussions with
5  both sets of -- of -- of CMS staff about
6  dispensing-fee issues.
7     Q.  Did OIG ever conduct studies regarding
8  the appropriate dispensing fees to pay under
9  Medicare or Medicaid reimbursement?
10         MR. NEAL: I'll object to the form.
11        You can answer.
12        THE WITNESS: Our Boston office did a
13 study on Medicare dispensing fees that examined
14 what services were being provided by -- by
15 pharmacies or suppliers, but it didn't recommend a
16 specific fee.
17 BY MR. TORBORG:
18    Q.  Do you recall who in the Boston office
19 was involved in that?
20    A.  Ken Price, Ivan Troy, and Joyce
21 Greenleaf (ph).
22    Q.  Are those individuals still in the

Page 370

1  Boston office of OIG?
2     A.  Yes.
3     Q.  And is that -- are they in the Office of
4  Evaluations and Inspections or Office of Audit
5  Services?
6     A.  They're in OEI.
7     Q.  I meant to ask you yesterday. You
8  mentioned some individuals from the Office of Audit
9  Services that you worked with -- or met with with
10 respect to reimbursement of drugs?
11    A.  Yes.
12    Q.  Paul Chesser, William Shrigley, and
13 Gordon and Sato.  Where are they located?
14    A.  Paul and Bill were in Little Rock. I'm
15 not sure where Bill is now. And Gordon Sato was in
16 Dallas.
17    Q.  Do you know if they're still with OES
18 today?
19    A.  Bill Shrigley is not with OES.
20    Q.  Do you know where he is today?
21    A.  I'm not sure.
22    Q.  But the other two are --

Page 371

1     A.  Yes.
2     Q.  -- still there? When was the last time
3  that you've talked with them?
4     A.  Bill Shrigley, it's been -- I saw him at
5  a Medicaid -- the Medicaid Rebate Conference that I
6  mentioned yesterday, however -- two years ago.
7  Paul Chesser, I believe I ran into at CMS last
8  year. And Gordon Sato, it's been three or four
9  years.
10    Q.  Have you ever discussed litigation
11 relating to drug issues with them?
12    A.  I'm sure at -- at one of the mini
13 conferences that we had that I had mentioned
14 yesterday, that the lawsuits may have been brought
15 up, but more for informational purposes, just to
16 discuss what was going on in the -- in the topic
17 area, but I don't remember any specific
18 discussions.
19    Q.  What are -- what is Bill Shrigley's
20 position as compared to Paul as compared to Gordon;
21 like who's the highest in the ranking?
22    A.  I'm -- I -- I'm not sure. At the time I

Page 372

1  believe that Gordon -- I -- I don't know if Gordon
2  and Bill were equals as far as rank goes in the
3  organization, but Paul worked for Bill.  Since Bill
4  left OIG, Paul has assumed his position.
5     Q.  Do you re -- do you recall any other
6  studies that OIG has done with respect to
7  dispensing fees?
8     A.  No.
9     Q.  You're just aware of a study done by the
10 Boston office that evaluated the various services
11 involved in dispensing a drug, but never
12 recommended a specific fee, correct?
13    A.  Yes.
14        MR. NEAL: Is now a good time for a short
15 break?
16        MR. TORBORG: Yes, it is.
17        THE VIDEOGRAPHER: Off the video at 9:03.
18        - - -
19        (Whereupon, a recess was taken.)
20        - - -
21        THE VIDEOGRAPHER: We're back on the
22 record at 9:23.

                                          20 (Pages 369 to 372)

Tawes, David - Vol. II                                April 25, 2007
                     Philadelphia, PA

Page 393

1  worked with in the last year on Federal Upper Limit
2  topics.
3      Q.  Do you remember an individual named
4  William Scanlon (ph)?
5      A.  I've -- I've heard that name, but I
6  don't know exactly who he was.  I know I never --
7      Q.  That's not --
8      A.  -- spoke with him.
9      Q.  That's not one of the people that you --
10     A.  No.
11     Q.  -- talked with?  Okay.  In the bottom of
12 the first column, last paragraph, it states:
13 There's no doubt there are problems with AWP-based
14 payments, acknowledged Susan Winckler, group
15 director of policy and advocacy for the American
16 Pharmaceutical Association.  She agreed that AWP is
17 neither an average price nor a wholesale price.
18 But focusing on AWP distracts attention from the
19 real problem - payment for professional services.
20     Quote, if you want to base drug payments on
21 more accurate figures, fine, Winckler said, but
22 that must be coupled with an acknowledgment of all

Page 394

1  the costs involved in getting the product out the
2  door.  We can unbundle the costs of professional,
3  administrative, and distributive services, but we
4  cannot ignore -- but we can't ignore them.  No other
5  business is expected to sell products at cost or
6  lower.
7      Do you agree or disagree with the statements
8  made by Ms. Winckler as quoted in this article?
9          MR. NEAL:  Objection as to form.
10         MR. WINGET-HERNANDEZ:  Compound.
11         THE WITNESS:  In relation to pharmacies,
12 I don't disagree that businesses aren't expected to
13 sell products at cost or lower.  And I think that
14 in order to determine -- in -- in order to ensure
15 that providers are reimbursed fairly, that both
16 segments need to be considered.  That's why it --
17 you know, that's why those recommendations were
18 typically in our reports.
19 BY MR. TORBORG:
20     Q.  If we go to the -- to the third column,
21 there is a quote from John Rector, vice president
22 of the government affairs and general counsel for

Page 395

1  the National Community Pharmacists Association.
2  And the article states:  Focusing acquisition --
3  focusing on acquisition cost sounds good in
4  congressional testimony, but it's a recipe for
5  financial disaster.
6      Do you see that?
7      A.  Yes.
8      Q.  Do you recall any discussions with OIG
9  or HCFA of what would happen if CMS changed the way
10 it reimbursed for drugs?
11         MR. WINGET-HERNANDEZ:  Objection to form.
12         MR. NEAL:  I'll object to the form as
13 well.
14     You can answer that question to the
15 extent that your answer would not divulge any
16 privileged communication.
17         THE WITNESS:  In various conversations, I
18 know that especially in the pharmacy area, not
19 necessarily in the physician area, that there --
20 and that's why we had conversations about
21 dispensing fees -- that CMS wanted to ensure that
22 -- that beneficiary access wasn't inhibited based

Page 396

1  on any -- based on any cost reductions.
2  BY MR. TORBORG:
3      Q.  Do you recall who made those -- with
4  whom you had those conversations?
5      A.  No.
6      Q.  Do you have a recollection of when those
7  conversations occurred?
8      A.  They have occurred recently about the
9  Federal Upper -- the Federal Upper Limit work that
10 we've done.  They -- I don't recall earlier
11 conversations.  They were most likely done in
12 entrance or exit conferences, some of them, and
13 others during work planning meetings.
14     Q.  A fairly frequent topic of conversation?
15     A.  No.  I mean, maybe once a year at most.
16     Q.  With respect to the recent work you're
17 doing on Federal Upper Limits, you indicated that
18 you had discussions with CMS about what I'll call
19 the access issue; is that fair to say?
20         MR. NEAL:  I'll --
21         MR. PAUL:  Objection to --
22         MR. NEAL:  I'll object to the form.

                                        26 (Pages 393 to 396)

Tawes, David - Vol. II                                       April 25, 2007
                    Philadelphia, PA

Page 397

1      You can answer.
2          THE WITNESS: Yes.
3   BY MR. TORBORG:
4      Q. And with whom did you have
5   conversations; do you recall?
6      A. Larry Reid and Deirdre Duzor.
7      Q. And do you -- what can you recall about
8   those conversations?
9          MR. NEAL: You can answer that question
10  consistent with my previous instruction on
11  privileged communication.
12         THE WITNESS: It was simply based on
13  initial results from a draft report that we're
14  working on and how the new Federal Upper Limit
15  amounts related to actual acquisition costs for
16  pharmacies.
17  BY MR. TORBORG:
18     Q. And what stage is that report at right
19  now?
20     A. We're awaiting comments from CMS, so
21  it's a draft report.
22     Q. And so you've received some oral

Page 398

1   comments from CMS?
2      A. Yes.
3      Q. But not formal?
4      A. Correct.
5      Q. How long ago -- how long ago did you
6   receive the oral comments?
7      A. Two or three months ago.
8      Q. Is there any record of those oral
9   comments?
10     A. Yes.
11     Q. Did you take notes?
12     A. Yes.
13     Q. Where -- where are those notes today?
14     A. They would be part of the exit
15  conference notes.
16     Q. Anything else you -- you can recall
17  about the specifics of those conversations?
18         MR. NEAL: You can answer that question
19  consistent with my previous instructions.
20         THE WITNESS: No.
21  BY MR. TORBORG:
22     Q. Is CMS concerned that basing the Federal

Page 399

1   Upper Limits on AMP data may cause an access issue?
2          MR. NEAL: Objection as to form.
3          You can answer that question consistent
4   with my instruction on privileged communications.
5          THE WITNESS: Since I haven't seen their
6   official comments, I can't say what the official
7   position of CMS is.
8          Outside of exit conference, there have
9   been a couple conversations involving the data that
10  we have that does -- that -- where they did
11  indicate that there may be some small issues that
12  they're concerned with. You can also look at their
13  comments to the GAO report which -- and which
14  looked at the same issue that we're looking at in
15  this and -- and get a better idea of where they --
16  where they stand.
17  BY MR. TORBORG:
18     Q. Do you recall in other conversations
19  you've had with CMS relating to the Federal Upper
20  Limit issue and -- let me back up.
21         You've done other reports on Federal Upper
22  Limits --

Page 400

1      A. Yes.
2      Q. -- correct? Starting, I think, in about
3   2004?
4      A. It may have been earlier. I'm not sure.
5      Q. Have any of the conversations you've had
6   with CMS relating to those reports discussed the
7   access issue?
8          MR. NEAL: I'll instruct you not to
9   answer that question to the extent that it will
10  require you to divulge privileged communications
11  with CMS.
12         THE WITNESS: Outside of entrance and
13  exit conferences, there were a few discussions
14  about how Federal Upper Limits were calculated and
15  concerns that sometimes that the lowest price
16  available -- or the lowest price listed in
17  compendia wasn't accurate and not available to --
18  to all pharmacies, and, therefore, setting the
19  Federal Upper Limit amount based on that price
20  could lead to access issues.
21  BY MR. TORBORG:
22     Q. Do you recall with whom those

27 (Pages 397 to 400)

58feec2f-99ac-42be-8c4e-803a680a2c55