# Exhibit T

Page 412

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

------------------------------------X MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY      : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION  : 01-CV-12257-PBS

------------------------------------X

THIS DOCUMENT RELATES TO:           :

U.S. ex rel. Ven-A-Care of the      : CIVIL ACTION:

Florida Keys, Inc. v. Abbott        : 06-CV-11337-PBS

Laboratories, Inc.                  :

------------------------------------X

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

------------------------------------X

STATE OF ALABAMA,                   : CASE NO.

        Plaintiff,                  : CV-05-219

    v.                              :

ABBOTT LABORATORIES, INC.,          : JUDGE

et al.,                             : CHARLES PRICE

        Defendants.                 :

------------------------------------X

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Ragone, Linda - Vol. II                                     April 18, 2007
                            Philadelphia, PA

Page 477

1   A. It goes -- right now it goes up on the
2   Internet, yes.
3       Q. And the purpose of that distribution
4   process is to put these reports in the hands of
5   policymakers, who can use this information in
6   making policy decisions?
7           MR. DRAYCOTT: Objection.
8           MR. COOK: What's the objection?
9           MR. DRAYCOTT: For one, you didn't, first
10  of all, establish that she would know what the
11  purpose for the distribution is when you asked her
12  what the distribution -- what the purpose is.
13  BY MR. COOK:
14      Q. If I ever ask you a question, Ms.
15  Ragone, and you don't know the answer, feel free to
16  say I don't know.
17      Can you tell me whether one of the purposes of
18  distributing these reports was to put it in the
19  hands of policymakers who can use this information
20  in making policy decisions?
21      A. I believe it is our hope that by putting
22  these findings and recommendations together and

Page 478

1   putting them in published reports, that the people
2   who this information would be germane to would read
3   it and have access to it.
4       Q. Now, this was in December 1997. Do you
5   know if anytime after December 1997, HCFA, later
6   CMS, abandoned AWP as the benchmark for reimbursing
7   Medicare Part B drugs?
8       A. I haven't been in the drug arena as much
9   at the end. I believe that they are using new
10  strategies now, reimbursement methodologies, in
11  Medicare.
12      Q. When was it that you left the
13  prescription drug -- was that 2004?
14      A. There were a few times I had been the
15  DRIG, and then a team leader, Dave Tawes, began
16  leading most of the drug work, and he would work
17  more often directly with our manager, Robert Vito,
18  so the actual pricing work, I haven't done in quite
19  some time.
20      Q. As of 2004, was Medicare still using AWP
21  to base its Medicare Part B drug reimbursement?
22      A. I don't remember what the time period

Page 479

1   was when it changed to --
2       Q. Can you give me a rough? After 2000?
3       A. Yes.
4       Q. After 2002? After 2001?
5       A. I think after 2002. I'm not quite sure
6   when the legislation was enacted.
7       Q. So whenever the legislation was enacted,
8   perhaps for as many as five years after receiving
9   the conclusions of this report, Medicare Part B
10  continued to pay, for the 22 drugs reviewed in this
11  report, based upon AWP, correct?
12          MR. DRAYCOTT: Objection.
13          THE WITNESS: Based upon, I guess,
14  starting in 1998, they paid AWP minus 5 percent.
15  BY MR. COOK:
16      Q. But still based upon the AWP?
17      A. Correct.
18      Q. Did you ever have an argument with
19  anybody at HCFA about the wisdom of doing that?
20          MR. DRAYCOTT: Objection.
21          THE WITNESS: I'm not -- I don't know if
22  I would call it an argument. We've certainly had

Page 480

1   discussions during exit conferences about the fact
2   that a different pricing methodology might be
3   appropriate.
4   BY MR. COOK:
5       Q. What do they say about that?
6           MR. DRAYCOTT: Objection.
7           Instruct you not to answer.
8   BY MR. COOK:
9       Q. I know you're going to be instructed not
10  to answer, but I do have to put the questions on
11  the record, Ms. Ragone.
12      So let me get this straight. You sit down in
13  a room, at a conference table like this with folks
14  from HCFA; you tell them that AWP exceeds
15  acquisition costs, as defined in the report, by up
16  to ten times, right?
17      A. Yes.
18      Q. You tell them that the OIG recommends
19  that they stop paying that high an amount for
20  prescription drugs, right?
21          MR. DRAYCOTT: Objection to the extent
22  that you're asking for the contents of her

18 (Pages 477 to 480)

Henderson Legal Services
202-220-4158

1d6c6e27-b012-4f09-8e5b-80880a7fe603

Ragone, Linda - Vol. II                                April 18, 2007
                    Philadelphia, PA

Page 481

1   communications to HCFA during the exit conference.
2        MR. COOK: If you'd just instruct her not
3   to answer. Are you instructing her not to answer?
4        MR. DRAYCOTT: I am.
5   BY MR. COOK:
6        Q. So you make whatever communications you
7   do to HCFA in these exit conferences --
8        MR. DRAYCOTT: Objection.
9   BY MR. COOK:
10       Q. -- after giving them a copy of this
11  report, right?
12       MR. DRAYCOTT: Objection.
13       And you're instructed not to answer.
14  BY MR. COOK:
15       Q. And you make your recommendations,
16  correct?
17       MR. DRAYCOTT: You can answer that
18  question.
19       THE WITNESS: During the exit
20  conferences, we will tell them the findings and
21  recommendations.
22  BY MR. COOK:

Page 482

1        Q. And you encourage them, that is,
2   officials at HCFA, to reimburse prescription drugs
3   based upon something other than the published
4   average wholesale price?
5        MR. DRAYCOTT: Objection.
6        You're instructed not to answer.
7   BY MR. COOK:
8        Q. And, in fact, you do so heatedly,
9   correct?
10       MR. DRAYCOTT: Objection.
11       And you're instructed not to answer.
12  BY MR. COOK:
13       Q. And they respond?
14       MR. DRAYCOTT: You can answer whether or
15  not they responded.
16       THE WITNESS: If they have comments, they
17  will respond when we provide the findings and
18  recommendations.
19  BY MR. COOK:
20       Q. Did they explain why HCFA continued to
21  pay based upon AWP, notwithstanding the fact that
22  HCFA knew average wholesale price could exceed

Page 483

1   acquisition cost by as much as ten times?
2        MR. DRAYCOTT: You can answer as to
3   whether or not they responded without revealing the
4   response, if you remember.
5        THE WITNESS: I believe that they stated
6   why they were using the reimbursement strategy they
7   were using at that time.
8   BY MR. COOK:
9        Q. And what was their explanation?
10       MR. DRAYCOTT: Objection.
11       And you're instructed not to answer.
12  BY MR. COOK:
13       Q. Why do you believe HCFA continued to use
14  average wholesale price to pay for Medicare Part B
15  drugs after you issued this report in December
16  1997?
17       MR. DRAYCOTT: Objection.
18       And you're instructed not to answer to
19  the extent your belief is based on communications
20  from HCFA during an exit conference.
21  BY MR. COOK:
22       Q. I'll let you work out that metaphysical

Page 484

1   problem.
2        A. I -- I believe --
3        MR. DRAYCOTT: Well --
4        THE WITNESS: -- that the --
5        MR. DRAYCOTT: Let me ask you: Can you
6   answer that question without revealing the content
7   of communication from HCFA during the conference?
8        THE WITNESS: I believe I can. I believe
9   I can.
10       MR. DRAYCOTT: Okay.
11       THE WITNESS: I believe that the level of
12  people that we were talking to believed that the
13  regulations or legislations were set for payment at
14  a certain place and that's what Medicare was
15  bound to reimburse at.
16  BY MR. COOK:
17       Q. Who at HCFA is responsible for setting
18  Medicare Part B drug payment policy?
19       A. Policy?
20       Q. What the amount is that they would pay.
21       A. I believe that would be regulated or
22  legislated.

19 (Pages 481 to 484)

1d6c6e27-b012-4f09-8e5b-80880a7fe603