# Exhibit U

Scully, Thomas A.                                         May 15, 2007
                        Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

IN RE: PHARMACEUTICAL            : MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE       : CIVIL ACTION

PRICE LITIGATION                 : 01-CV-12257-PBS

THIS DOCUMENT RELATES TO         :

U.S. ex rel. Ven-a-Care of       : Judge Patti B. Saris

the Florida Keys, Inc.           :

     v.                          :

Abbott Laboratories, Inc.,       : Chief Magistrate

No. 06-CV-11337-PBS              : Judge Marianne B.

- - - - - - - - - - - - - - - -x   Bowler

Scully, Thomas A.                                              May 15, 2007
                        Washington, DC

Page 226

1   And it was just a flat-out political
2   calculation that I had already discussed with all the
3   staff and all the members about how do we get from
4   here to there, without -- because the general
5   community screaming about this generally far
6   outweighed the substance of understanding of members.
7       So I think I congratulated the members of
8   this hearing for having it, and raising the
9   awareness. I also realized the only way to get this
10  thing done, because it was a fairly obscure technical
11  issue, was to send a message early on that we were
12  sensitive to all parties and that we were not just
13  going to cut drugs, that we would try to find some
14  way to put some money back in.
15      But I also said from the beginning that we
16  were looking at 50 million out of a billion and
17  certainly it wasn't a one for one cross-subsidy. We
18  were also trying to say that, you know -- I said from
19  the very first day, if I have to do this myself,
20  there is no money back in it for practice expenses.
21  I'm just going to cut the drugs. If we work with
22  Congress, we can cut the drugs and put some money

Page 227

1   back in for practice expenses.
2       So you know, that was the issue. And from
3   the very beginning, I was trying with the very
4   tightly coordinated discussion with the members of
5   Congress, at least the chairman and the ranking
6   member, to send a signal we were going to reform
7   this, but we talked to all parties and tried to do it
8   correctly.
9   Q.  And while people might be able to debate
10  how much -- how many dollars it would take to provide
11  appropriate services reimbursement, your testimony
12  under oath to Congress was that it was a legitimate
13  concern for the providers, correct?
14      MR. GOBENA: Object to the form.
15      THE WITNESS: Certainly it's a legitimate
16  concern to the providers because they were going to
17  lose reimbursement. Was their existing level of
18  reimbursement correct? I would argue not. Was it
19  their fault, on the physician side? They were
20  following what I consider to be stupid policy that
21  was in place. But it was clearly very little
22  argument and zero argument in my opinion to take the

Page 228

1   money out of the drugs and put it all back in the
2   practice expenses.
3       BY MR. DALY:
4   Q.  That's why I said you could debate how
5   much money was involved, but what you're telling
6   Congress is that there is a legitimate concern on
7   behalf of the providers here when it comes to
8   cross-subsidization?
9   A.  Overwhelmed by the legitimate concern on
10  behalf of the taxpayers and the program that we are
11  paying way too much.
12  Q.  Well, what I'm trying to get to is when
13  you told Congress here under oath in this hearing, it
14  is a legitimate concern for the providers, I just
15  want -- you were telling the truth there, right?
16  A.  It is a legitimate concern for providers
17  that the reimbursement was going to go down on the
18  drug side. Yes. As I discussed earlier with the
19  RUC, there was a general awareness that because
20  oncologists in particular and rheumatologists and
21  others had done so well compensation-wise, I mean the
22  average oncologist salary was probably going up --

Page 229

1   income, 25 to 30 percent all during the '90s because
2   of this drug churn, there had probably been
3   subconsciously in the RUC and other mechanism in
4   Medicare an effort to kind of say, they are making so
5   much money on drugs, why do we keep paying them money
6   on practice expenses. So if you're going to take the
7   money away from drugs, at least they would look at
8   other side as a matter of equity, which we tried to
9   say we were willing to do here.
10  Q.  If we come down a couple of paragraphs,
11  the one that begins "I'm not saying." But at the
12  last sentence of that paragraph states that "I do
13  think it's appropriate to make sure that to the
14  extent we can set prices right for drugs, then for
15  practice expenses then for practice patterns, we
16  should set them right. And I think there is very
17  little doubt they are not right now." Do you see
18  that language?
19  A.  Yes.
20  Q.  And by that, you mean it's very -- there
21  is very little doubt that the practice expenses were
22  not set at the appropriate level, correct?

                                          58 (Pages 226 to 229)

Henderson Legal Services
202-220-4158

934268fd-66d9-4c40-b8d6-725605bc72fb

Scully, Thomas A.                                             May 15, 2007
                              Washington, DC

Page 294

say, this is you, you say, "everybody has acknowledged for years that oncologists have a significant cross-subsidy through AWP, so I think there was a subconscious effort within the RUC to not fully and completely consider all of the practice expenses for oncologists because of the acknowledged cross-subsidy from AWP's overpricing." Do you see that?
A.  Yes.
Q.  And everyone includes CMS, correct?
   MR. GOBENA: Object to the form.
   THE WITNESS: I think the staff that oversaw the RUC, when they sat down with the RUC every year to figure out which physicians needed more and which physicians didn't, they probably -- I'm fairly certain, which is the argument I made all along, consciously were trying to put more money into the other places because the oncologists had this other stream of income from very high drug margins.
   So do I think people were excited about that policy or supportive of it? No. It's just a fact of life. So when you're sitting there trying to

Page 295

equitably treat all physician groups, from a 70 billion pot, and you know the oncologists have this side stream of income, I think there was a subconscious movement for a couple of years to probably not be as concerned about giving them more money in the practice expense pocket.
   BY MR. DALY:
Q.  Because CMS knew that they were making so much money on the drugs, correct?
   MR. GOBENA: Objection to the form. The witness is not here as a 30(b)(6) for CMS.
   THE WITNESS: As I said repeatedly, it was nowhere near one to one, it was more like a 1 to 20 -- you can debate whether it was 1 to 5 or 1 to 20, but the amount of money that perceived to be coming as income from drug margins was significantly higher than I think anybody would credibly argue was any perceived or real shortfall on the practice extension side.
   Then again, a lot of this was politics. I'm testifying, trying to get this passed, trying to send the signal to the oncology world that we feel

Page 296

your pain, we are sensitive. As we reform this, we're going to take concerns into the mind, because I had watched all previous efforts crash on the rocks.
   BY MR. DALY:
Q.  I'm not sure the court reporter got your response, but because it was interfered with by the objection, but for just in terms of her being able to type it. But my question was, well, go back to my other question, would you, go back to my last question.
   MR. GOBENA: Maybe it would be help, Tom, if you would wait a beat before I object and then we won't talk over each other.
   THE WITNESS: Sorry.
   MR. GOBENA: That's okay. Certainly wasn't an interference, though.
   BY MR. DALY:
Q.  You had in your -- one of your prior answers talked about how there had been maybe a subconscious effort not to put more money into the service side for oncology because everybody knew that they were making profits on the drugs, is that

Page 297

correct?
   MR. GOBENA: Object to the form.
   MR. BREEN: Objection. Form.
   MR. GOBENA: You can answer.
   THE WITNESS: Yes. I would say on rheumatology probably to a lesser degree as well because there was a general knowledge in some practice areas these physicians had a second income stream from margins on drugs that other providers did not. And so you're sitting around trying to figure out whether surgeons need more on a relative basis.
   Well, that's what the whole RUC process is about. Internists, surgeons, cardiac surgeons making an adjustment to find that pot of money when you know the oncologists have a second pot of money, you're generally not as concerned in making sure their practice expense goes up in a budget neutral pot as somebody else's.
   On the other hand, if you knew that some of that drug revenue was going to go away, you might make a certain calculation but it certainly wasn't in my estimation a one to one swap, whereas on the

75 (Pages 294 to 297)

Scully, Thomas A.  May 15, 2007
Washington, DC

Page 366

1  subject to this carveout in the home infusion
2  setting, Congress has kept the reimbursement of those
3  drugs at 95 percent of AWP as of --
4      A.   As of October 2003.
5      Q.   That's correct, isn't it?
6      A.   I guess it is. That's what the statute
7  says. Another piece of sausage. I have just
8  forgotten that we did that, to be honest with you,
9  which I assume is why they don't have a dispensing
10 fee for anything but respiratory drugs, because they
11 didn't do that for respiratory drugs.
12     Q.   So it would appear that Congress, at least
13 for these drugs and in that setting of home infusion,
14 has determined to continue to subsidize the provision
15 of the services by overpaying for the drugs, correct?
16         MR. GOBENA: Object to the form. The
17 legislation speaks for itself.
18         MR. BREEN: Objection to the form.
19         BY MR. DALY:
20     Q.   You can go ahead.
21     A.   Yes. I was surprised to see this. I
22 forgot we did it. It was certainly never discussed

Page 367

1  by members. I'm sure the staff -- staff person who
2  wrote it works with me at Alston & Bird, so I'll go
3  back and ask him, but I'm sure that it's probably,
4  they froze it to freeze it, and some level of
5  cross-subsidy apparently. I'm not sure what the
6  congressional intent there was, but I think it was
7  Senator Grassley's staff that did that provision. So
8  I had totally forgotten we did it. That it was in
9  the bill. It wasn't something that was widely
10 discussed at all.
11     Q.   And are you aware of whether the drugs
12 that DOJ is suing Abbott for, many of those drugs are
13 used in the home infusion context and using DME?
14         MR. GOBENA: Objection to form.
15         THE WITNESS: As of today, I'm aware of
16 it. I wasn't aware of it before.
17         BY MR. DALY:
18     Q.   But as of today, you are?
19     A.   Yes. Obviously looking at the drug list.
20     Q.   Page 27 of Exhibit Abbott 191, which is
21 your 10-3 -- yes, your October 3 -- excuse me,
22 October 3, 2002 testimony. I just want to direct you

Page 368

1  to page 27.
2      A.   27?
3      Q.   Yes.
4      A.   Okay.
5      Q.   And in your testimony in response to
6  Mr. English, you indicate that you think -- well, you
7  state, "I think there are a lot of different provider
8  areas that may have small impacts from AWP, and we
9  are certainly willing to work with the committee to
10 identify those." And then you mentioned oncology
11 as -- oncology and dialysis and hematology being sort
12 of the big three, right?
13     A.   Yes.
14     Q.   And then you say, "I think almost every
15 physician to some degree that administers drugs
16 probably has some beneficial cost shifting benefit
17 from AWP, I think those are the three big areas," you
18 see that language?
19     A.   Yes.
20     Q.   And that was a true statement, correct?
21     A.   Yes.
22     Q.   On page 31, I just want to get a fix for

Page 369

1  -- and we may have covered this in some part in the
2  sort of background section that we did at the
3  beginning, but you state at the bottom of the page,
4  "I had been working on Medicare for over 20 years and
5  there has never been any law passed more complicated
6  than this one." How far back does your work on
7  Medicare go?
8      A.   In a minor way, probably 1982. But in a
9  full time way, 1989.
10     Q.   And what were you doing with respect to
11 Medicare in 1982?
12     A.   Not much. Occasional staff work for
13 Senator Gorton, but very, you know, minor.
14     Q.   And '89 would have started your work with
15 the Bush Administration?
16     A.   And OMB. Yes.
17     Q.   And if you would turn to page 34. If you
18 -- actually, if you look at 33, the page before, it
19 looks like you finished up your testimony, and then
20 George Reeb, R-E-E-B, got in the hot seat. And began
21 to talk a little bit about Medicare and Medicaid.
22 And on page 34 of Mr. Reeb's testimony, he states

93 (Pages 366 to 369)