# Exhibit V

Booth, Charles R.                                        April 23, 2007
                         Washington, DC

                                                                Page 1

                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
    - - - - - - - - - - - - - - -x
    IN RE: PHARMACEUTICAL          :  MDL NO. 1456
    INDUSTRY AVERAGE WHOLESALE     :  CIVIL ACTION:
    PRICE LITIGATION               :  01-CV-12257-PBS
    THIS DOCUMENT RELATES TO       :
    U.S. ex rel. Ven-a-Care of     :  Judge Patti B. Saris
    the Florida Keys, Inc. v.      :
    Abbott Laboratories, Inc.,     :  Chief Magistrate
    No. 06-CV-11337-PBS            :  Judge Marianne B.
    - - - - - - - - - - - - - - -x   Bowler
                  IN THE CIRCUIT COURT OF
                  MONTGOMERY COUNTY, ALABAMA
    - - - - - - - - - - - - - - -x
    STATE OF ALABAMA,              :
              Plaintiff,           :
              vs.                  :  Case No.: CV-05-219
    ABBOTT LABORATORIES, INC.,     :  Judge Charles Price
    et al.,                        :
              Defendants.          :
    - - - - - - - - - - - - - - -x

Booth, Charles R.  
Washington, DC  

April 23, 2007

Page 198

1  incorrectly.
2  Q. I apologize. What was the amount --
3  A. The facility would not be receiving 20 or
4  25 dollars. It would be paying 20 or 25 dollars for
5  the dosage of Epogen.
6  Q. I had it backwards.
7  A. And part of the 15 or 20 dollars would be
8  spoilage, administrative fees and so forth, but we
9  believed that most facilities would be all right.
10 Q. So just to clean up my switching it
11 around, it was your understanding that if an
12 appropriate amount of Epogen was administered to a
13 patient, the reimbursement would be $40, correct?
14 A. It was $40 regardless of the amount
15 administered unless it was more than 10,000 units.
16 Q. Right.
17 A. If they administered a thousand units,
18 they'd still get $40.
19 Q. And the cost to the facility you
20 understood for administering the appropriate amount
21 of Epogen would be 20 to 25 dollars, correct?
22    MR. GOBENA: Object to the form.

Page 199

1  A. The facility was going to pay, based on
2  what Amgen told us, something close to $10 per
3  thousand units.
4  Q. And so let's pick a particular patient. A
5  patient receives 2,500 units of Epogen, right?
6  A. Mostly it was administered in doses of a
7  thousand units. When you average and you have some
8  at 3,000 and some at 2,000, you get to 2,500.
9  Q. If you have a facility with a number of
10 patients and they average administering 2,500 units
11 per patient, am I correct in doing the math that
12 that facility would receive in reimbursement from
13 Medicare $40 per patient, assuming they were all
14 less than 10,000 units administered, correct?
15 A. Per dose.
16 Q. Per dose.
17 A. So it's $120 three times a week -- I mean
18 it's $120 a week based on three times a week.
19 Q. And for each of the doses that that
20 facility received $40, the average ingredient cost
21 to the facility would be $25, was your assumption,
22 correct?

Page 200

1  A. I don't know that we actually made that
2  assumption.
3  Q. Did you make an assumption about what the
4  cost to the facility would be?
5  A. Not specifically, and since we had to do
6  this before any Epogen was actually administered, it
7  was sort of a scientific guess.
8  Q. And your scientific guess was that the
9  cost of the Epogen to the facility if they
10 administered the appropriate dose, the ingredient
11 cost would be lower than the reimbursement amount.
12 A. That's correct.
13    MR. GOBENA: Object to the form.
14    BY MR. COOK:
15 Q. At the time, in 1989, were dialysis
16 centers reimbursed separately for other drugs other
17 than Epogen?
18 A. Some.
19 Q. And were any of those separately
20 reimbursed drugs reimbursed based upon AWP?
21 A. Some carriers may have been factoring AWP
22 into their pricing mechanisms.

Page 201

1  Q. After January 1 of 1992, however, it was
2  clear that those facilities were being reimbursed on
3  the basis of AWP for those other separately
4  reimbursable drugs, correct?
5     MR. BREEN: Object to the form.
6  A. Our instruction to the facilities was that
7  they were to reimburse on the basis of AWP. I
8  assumed they were following it, but I have no
9  independent method of verifying it, nor did I at the
10 time, nor did I try to.
11 Q. Of the drugs other than Epogen that were
12 being reimbursed presumably based upon AWP, was it
13 your understanding the facilities were making a
14 margin on the administration of those drugs?
15    MR. GOBENA: Object to the form.
16 A. I had no such understanding.
17 Q. As to the margin for Epogen, assuming the
18 provider was administering an appropriate amount of
19 Epogen, did you have an understanding of the use to
20 which that margin would be put?
21    MR. GOBENA: Object to the form.
22    BY MR. COOK:

51 (Pages 198 to 201)

Booth, Charles R.  April 23, 2007
Washington, DC

### Page 202

1  Q. Let me rephrase that. Why did HCFA
2  reimburse at an amount greater than what it
3  understood to be the ingredient cost for a provider
4  who administered an appropriate dose of Epogen?
5      MR. GOBENA: Object to the form.
6  A. I think you've mischaracterized my
7  remarks.
8  Q. You've indicated to me that the
9  reimbursement amount for Epogen in many instances
10 would exceed ingredient cost to the provider,
11 correct?
12 A. No.
13 Q. No? Their ingredient cost would be less?
14 A. I don't think I said many.
15 Q. All?
16 A. Not all. Actually, most.
17 Q. Most. For those providers where the
18 reimbursement amount exceeded the ingredient cost,
19 did HCFA have an understanding of what that excess
20 amount would be used to pay for?
21     MR. GOBENA: Object to the form. He's not
22 a 30(b)(6) witness. You can answer in your personal

### Page 203

1  capacity.
2  A. There was clearly going to be some
3  spoilage of the drug because particularly at the
4  beginning, it was difficult to make, difficult to
5  ship, difficult to store. There were clearly going
6  to be administration costs to administer the drug
7  even where there was a shunt, and in some cases
8  there wasn't, and we wanted to set the reimbursement
9  rate high enough that facilities would administer
10 Epogen to those patients who were receiving blood
11 transfusions. And obviously this is not an exact
12 science. We have only the clinical trials to base
13 the judgments on that we made, and we said at the
14 time that if it turned out that we had made
15 incorrect judgments, that we would make adjustments
16 in the price.
17 Q. After 1989, as I understand it, ESRD
18 facilities would be paid based upon a combination of
19 a composite rate in the separately billed drugs. Do
20 I have that correct?
21 A. Not just after 1989.
22 Q. Before 1989 also, correct?

### Page 204

1  A. From sometime in 1984, as I recall.
2  Q. So between 1989 and some point after 2001,
3  ESRD facilities received both a composite rate
4  payment and a payment for separately billable drugs,
5  correct?
6      MR. GOBENA: Object to the form.
7  A. At least through 19 -- June of 1997.
8  Q. Between 1989 and June of 1997, did HCFA
9  change the composite rate that ESRD facilities were
10 paid for treating Medicare beneficiaries?
11 A. I don't remember.
12 Q. Do you recall any discussions about
13 whether the composite rate should be changed in
14 light of profits the facilities were making on the
15 drug component?
16     MR. GOBENA: Chris, can I clarify? What
17 discussions? Discussions with agency officials
18 within the agency or --
19     MR. COOK: With anybody at all.
20     MR. GOBENA: Okay, I'll instruct you to
21 not answer the question on deliberative process
22 grounds the extent to which your answer would cover

### Page 205

1  discussions within the agency.
2      THE WITNESS: Then I can only tell you
3  that there were end-stage renal facilities that came
4  to see us and wanted an increase in the composite
5  rate.
6      BY MR. COOK:
7  Q. Do you recall what response you gave to
8  those facilities about whether you would give an
9  increase to the composite rate?
10 A. I recall very few increases in the
11 composite rate.
12 Q. Do you recall expressing to any of these
13 facilities the notion that the composite rate was
14 not being increased because of money being made on
15 the drug component?
16 A. Never.
17 Q. Do you recall internal discussions in
18 which the decision not to raise the composite rate
19 was tied to money being made on the drug component?
20     MR. GOBENA: I'm going to object and
21 instruct the witness not to answer on deliberative
22 process grounds.

52 (Pages 202 to 205)

Page 206

BY MR. COOK:
Q. Mr. Booth, I'll give you what we marked previously as Exhibit Abbott 081. For the record -- let me pull out our copy first. That's Exhibit Abbott 081?
A. That's what it says.
Q. Okay. For the record, this is the majority staff report, the special committee on aging of the United States Senate. It's dated August 1989. Mr. Booth, do you recognize this majority staff report of the special committee on aging?
A. No.
Q. Were you aware in 1989 that the special committee on aging was studying drug costs?
A. No.
Q. If you could turn to page 10 of that report --
A. To page numbered 10?
Q. Yes, sir. Finding number 7 of this report reads, "There are two markets in the United States for most big-selling prescription drugs," colon, "a

Page 207

price-competitive market characterized by deep discounts off the published list price, and a high-priced market where retail customers, Medicare and Medicaid purchase their prescription drugs." First of all, Mr. Booth, in 1989, do you remember seeing such a finding by the Senate subcommittee on aging?
A. No, this report was written with respect to the Catastrophic Coverage Act.
Q. But do you remember seeing this report in your role as the director of the Office of Payment Policy?
A. No, because it was irrelevant when it came out.
Q. And so you don't remember seeing the conclusions of this report, correct?
A. No. The report was on the Catastrophic Coverage Act and the potential impacts of the Catastrophic Coverage Act, which was passed in 1988 and repealed in 1989.
Q. Finding number 7 on page 10 that I read --
A. Yes.
Q. Does that represent a fair description of

Page 208

the market for prescription drugs in 1989 in your opinion?
A. I have no idea.
MR. GOBENA: Object to form.
A. I have no idea.
Q. Well, you were aware in 1989, were you not, that there was a price-competitive market for drugs in the United States?
A. No.
Q. You were not.
A. No.
Q. You were the director of the Office for Payment Policy and you were not aware in 1989 that there was a price-competitive market for prescription drugs in the United States?
MR. GOBENA: Object to form.
MR. BREEN: Objection to form.
MR. GOBENA: Asked and answered.
BY MR. COOK:
Q. Was anyone in your office to your knowledge aware of whether there was a price-competitive market for prescription drugs in

Page 209

1989?
MR. GOBENA: Object to form.
A. There may have been.
Q. But you personally did not know.
A. That is correct.
Q. Who in your office would you have expected to be knowledgeable about whether there was a price-competitive market for prescription drugs in the United States in 1989?
A. There was a person on Mr. Lovecchio's staff who I assume would have known that.
Q. Who is that?
A. I don't remember his last name. His first name I think was Peter.
Q. Had you been told by anyone by 1989 that there was a price-competitive market for prescription drugs in the United States?
MR. GOBENA: Object to form.
A. I do not recall any such conversation.
Q. Do you recall what your understanding was at all of the existence of price competition within the market for prescription drugs in 1989?

53 (Pages 206 to 209)