# Exhibit D

David L Campana and State of Alaska 30(b)(6)                    August 19, 2008
Anchorage, AK

Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT OF ANCHORAGE

------------------------------------X

STATE OF ALASKA,                          )

    Plaintiff,                        )

vs.                                       )

ALPHARMA BRANDED PRODUCTS DIVISION, )

INC., et al.,                             )

    Defendants.                       )

------------------------------------X

Case No. 3AN-06-12026 Civil          )

------------------------------------X

CAPTIONS CONTINUED ON FOLLOWING PAGE


VIDEOTAPED DEPOSITION OF DAVID L. CAMPANA

and STATE OF ALASKA 30(b)(6)

Taken August 19, 2008

Taken by the Defendants at

Captain Cook Hotel, Whitby Room

939 West 5th Avenue

Anchorage, Alaska

Reported by:  Mary A. Vavrik, RMR

81c181cd-f4a8-4675-90be-7bc59aa45575

David L Campana and State of Alaska 30(b)(6)                    August 19, 2008
Anchorage, AK

Page 90

1  competition have anything to do with patent
2  protection?
3      A.  Yes.
4          MR. BURNHAM:  Objection, foundation.
5  BY MR. MANGI:
6      Q.  What is the relationship between those
7  two things?
8          MR. BURNHAM:  Objection, foundation.
9          THE WITNESS:  A brand named drug, when
10 it's an innovator, comes out onto the market and
11 with its patent, there is a certain amount of
12 protection on that patent.  When that patent is
13 up, then a generic manufacturer can bring that
14 drug in.  And when they bring it in, they bring
15 it in at a discount off of the brand name's
16 selling price.
17 BY MR. MANGI:
18     Q.  Do you have an understanding as to why
19 they do that?
20     A.  Because of competition.
21     Q.  And when a generic manufacturer is able
22 to enter the market, in other words, when patent

Page 91

1  protection is expired, is it fair to say, sir,
2  that whoever wants to can enter that market
3  space?
4      A.  Well, what time period are you asking
5  about?
6      Q.  Well, let's talk about today, to begin
7  with.
8      A.  Okay.  Today there is a period of
9  exclusivity where it's given to one or two
10 manufacturers that they can produce that drug.
11 And that's about six months.
12     Q.  And that is to provide an incentive for
13 entry into the market, correct, sir?
14         MR. BURNHAM:  Objection, foundation.
15         THE WITNESS:  I don't know that.
16 BY MR. MANGI:
17     Q.  Fair enough.  After that period
18 expires, then any number of generic manufacturers
19 can enter the market space, correct?
20     A.  That's right.
21     Q.  And if you go back further in time,
22 similarly when generics enter the market and more

Page 92

1  than one enters, and then they start to compete
2  with each other, as well as with the brand
3  manufacturer if they remain in the space, right?
4      A.  Yes.
5          MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7      Q.  And it's that competition that results
8  in prices going down, right?
9          MR. BURNHAM:  Objection, foundation.
10         THE WITNESS:  That competition should
11 make prices go down.
12 BY MR. MANGI:
13     Q.  Now, throughout this time period, sir,
14 when you were in pharmacy school right up until
15 1990, was it generally your understanding that in
16 most cases generic drugs were going to be cheaper
17 than branded drugs?
18     A.  Yes.
19     Q.  Now, they will be cheaper for both a
20 cash paying-customer as well as for a third-party
21 payer, such as a private insurer or a Medicaid
22 entity, correct?

Page 93

1      A.  Yes.
2      Q.  Is it your understanding, sir, that
3  generally payers for drugs prefer the use of
4  generics versus branded drugs when clinically
5  appropriate?
6          MR. BURNHAM:  Objection, foundation.
7          THE WITNESS:  Yes.  They try to push
8  the generic drugs.
9  BY MR. MANGI:
10     Q.  Why is that?
11     A.  Because --
12         MR. BURNHAM:  Same objection.
13         THE WITNESS:  -- of a money saving.
14 BY MR. MANGI:
15     Q.  Now, we have spoken about benchmark
16 prices.  Did you come to an understanding, sir,
17 at any point during this time period, from 1960s
18 right up until 1990, whether the differential
19 between the benchmark price and the actual price
20 being paid by a pharmacy for drugs was greater
21 for generic drugs than it was for branded drugs?
22     A.  Yes, I've come across that information.

24  (Pages 90 to 93)

81c181cd-f4a8-4675-90be-7bc59aa45575

David L Campana and State of Alaska 30(b)(6)                         August 19, 2008
Anchorage, AK

Page 94

1      Q.  What is your understanding of what
2   happens in that area?
3          MR. BURNHAM: During what time period?
4   BY MR. MANGI:
5      Q.  Let's start with -- well, back up.
6   When you say you have come across that
7   information, when did you first become aware of
8   that phenomenon?
9      A.  I don't remember time period.
10     Q.  Would it be fair to say it's a long
11  time ago?
12     A.  Yeah.
13         MR. HENDERSON: Objection.
14  BY MR. MANGI:
15     Q.  In other words, would you say that's --
16  perhaps bucketed by decades, would it be fair to
17  say that's perhaps sometime in the '60s or the
18  '70s as opposed to the '80s or the '90s?
19     A.  It's hard to say when I became aware of
20  that.
21     Q.  Well, would it be fair to say it was
22  before 1990?

Page 95

1      A.  Yes.
2      Q.  And what generally did you become aware
3   of, sir?
4      A.  That the net cost to the pharmacy for
5   generics that have been out for a long time was
6   very low compared to the benchmark.
7      Q.  And benchmark that we are talking about
8   here, so the record is clear, is AWP, correct?
9      A.  Correct.
10     Q.  So in other words, at some point prior
11  to 1990, you became aware that when generics come
12  into the market, there is increased competition,
13  correct?
14         MR. BURNHAM: Objection, foundation.
15         THE WITNESS: There is increased
16  competition the longer the generic is available.
17  BY MR. MANGI:
18     Q.  And one manner in which that increased
19  competition manifests itself in the market is
20  increasing discounts, correct?
21         MR. BURNHAM: Objection, foundation.
22         THE WITNESS: Yes.

Page 96

1   BY MR. MANGI:
2      Q.  In other words, it's price competition
3   between the different manufacturers of the
4   generic product?
5      A.  Yes.
6      Q.  And as a result of that price
7   competition, there becomes a greater differential
8   between benchmark AWP and the actual price
9   that pharmacies are paying than exists for
10  branded drugs, correct?
11         MR. HENDERSON: Objection.
12         THE WITNESS: Yes, there is a greater
13  differential.
14  BY MR. MANGI:
15     Q.  And indeed, the extent of that
16  differential will depend on the number of
17  generics and the extent of competition, correct?
18         MR. HENDERSON: Objection.
19         THE WITNESS: The number of
20  manufacturers making that drug.
21  BY MR. MANGI:
22     Q.  Absolutely.  And to put it another way,

Page 97

1   then, if there is just one generic manufacturer
2   that's in the market competing only with the
3   manufacturer of the brand, that's a different
4   situation from where, let's say, there are five
5   generic manufacturers all putting the same drug
6   in the marketplace, correct?
7      A.  Correct.
8      Q.  In the latter situation where you have
9   many manufacturers selling what's essentially the
10  same drug, there will be a greater degree of
11  competition because they are all competing with
12  each other for the same market space, correct?
13     A.  Correct.
14     Q.  And in that situation, there will be
15  more discounts and a greater differential between
16  the published AWP and the actual price pharmacies
17  are paying than there would be where there is
18  little competition, correct?
19         MR. BURNHAM: Objection, foundation.
20         MR. HENDERSON: Objection.
21         THE WITNESS: Yes.
22  BY MR. MANGI:

25 (Pages 94 to 97)

81c181cd-f4a8-4675-90be-7bc59aa45575

David L Campana and State of Alaska 30(b)(6)                    August 19, 2008
Anchorage, AK

Page 98

1    Q.  And is it fair to say, sir, that the
2  extent of the differential, therefore, is a
3  product of and a function of marketplace
4  competition?
5        MR. BURNHAM:  Same objection.
6        THE WITNESS:  Yes.
7  BY MR. MANGI:
8    Q.  Is it fair to say, sir, that there is,
9  therefore, no predictable relationship between
10  the AWP of a generic drug and the actual price
11  that a pharmacy is paying to purchase that
12  generic drug?
13        MR. BURNHAM:  Objection, form.
14        MR. HENDERSON:  Objection.
15        THE WITNESS:  I have never seen a
16  formula to exactly determine that.
17  BY MR. MANGI:
18    Q.  In other words, you understand that
19  it's just something that's going to vary for
20  generic drugs depending on the extent of
21  competition, correct?
22        MR. BURNHAM:  Objection.

Page 99

1        THE WITNESS:  Yes.
2  BY MR. MANGI:
3    Q.  And you have understood that going back
4  a number of years.  You are not sure when
5  exactly, but certainly since before 1990 you have
6  had that understanding, correct?
7    A.  Yes.
8    Q.  Now, are you familiar, sir, with --
9  withdraw that.  Let's turn to the area of branded
10  drugs now and focus on that for a moment.  As you
11  have testified this morning, sir, AWP has played
12  different roles in the marketplace at different
13  times, correct?
14        MR. BURNHAM:  Objection, foundation,
15  misstates his testimony.
16  BY MR. MANGI:
17    Q.  Let me clarify the question.  When you
18  first came into the pharmacy area, indeed when
19  you were in pharmacy school, one function that
20  AWP served was as a benchmark or a starting price
21  from which discounts were applied to get to the
22  actual price that a pharmacy would pay to

Page 100

1  purchase drugs, correct?
2    A.  Yes.
3        MR. BURNHAM:  Objection, misstates his
4  testimony.
5        MR. HENDERSON:  Objection.
6  BY MR. MANGI:
7    Q.  I'm sorry.  I didn't hear your answer,
8  sir.
9    A.  Please rephrase the question or ask the
10  question.
11    Q.  Sure.  A lot of objections makes it
12  hard to hear.  Let's back up.
13        When you were in pharmacy school, as
14  you have testified this morning, you came to
15  understand that one function that AWP served in
16  the marketplace was to serve as a benchmark price
17  or a starting price from which discounts would be
18  applied to get to the actual price that a
19  pharmacy would pay to purchase a drug, correct?
20        MR. BURNHAM:  Objection, misstates --
21        MR. HENDERSON:  Objection.
22        MR. BURNHAM:  Misstates his testimony.

Page 101

1        THE WITNESS:  The average wholesale was
2  a benchmark and discounts were taken off of that.
3  BY MR. MANGI:
4    Q.  Then you -- you continued with your
5  career, you came out of pharmacy school, you went
6  to work in a few different pharmacies.  And --
7  sorry.  Let me rephrase that question.  You then
8  came out of pharmacy school; you went to work in
9  a few different pharmacies in Montana and in
10  Alaska; and you saw that in practice; whereas,
11  you saw that the actual price being paid was
12  different from and lower than the AWP, correct?
13    A.  Yes.
14    Q.  And of course, the degree of
15  information you had about that was different from
16  pharmacy to pharmacy, correct?
17    A.  Yes.
18    Q.  In other words, at Turner Drugs in
19  Montana, you saw the actual invoices.  At Pay-N-
20  Save, purchasing was done centrally and you only
21  knew about some of discounts; but generally you
22  understood that that basic fact remained true,

26 (Pages 98 to 101)

81c181cd-f4a8-4675-90be-7bc59aa45575

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456   Master File No. 01-CV-12257-PBS

-------------------------------------X

In re:  PHARMACEUTICAL INDUSTRY        )

AVERAGE WHOLESALE PRICE LITIGATION     )

-------------------------------------X

United States of America ex rel        )

Ven-A-Care of the Florida Keys,        )

Inc., et al. v. Dey, Inc., et al.,     )

Civil Action No. 05-11084-PBS          )

-------------------------------------X

United States of America ex rel        )

Ven-A-Care of the Florida Keys, Inc.,)

et al. v. Boehringer Ingelheim Corp.,)

et al., Civil Action No. 07-10248-PBS)

-------------------------------------X

30(b)(6) DEPOSITION OF THE STATE OF ALASKA

DEPARTMENT OF HEALTH AND SOCIAL SERVICES

DESIGNEE:  DAVID CAMPANA

Thursday, August 21, 2008

Anchorage, Alaska

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
Anchorage, AK

Page 174

1  reimbursement for nursing services, perhaps other
2  things, did you ever point out to them the margin
3  that they were making on the drug?
4      A.  I don't recall that.
5      Q.  Is it possible that you may have made
6  that comment?
7      A.  It's possible that I made that comment.
8      Q.  And the reason we don't know for sure
9  is because it's been some time since those
10  conversations took place, right?
11     A.  That is correct.
12     Q.  You knew that a margin was being paid
13  on the drugs, right?
14     A.  I don't know.
15         MR. HENDERSON:  Objection.
16     A.  I don't know that a margin was paid on
17  the drug.  I know that one manufacturer set their
18  average, or there was an average wholesale price
19  out there for one manufacturer that was five
20  times over the average wholesale price for
21  another manufacturer.
22     Q.  Do you know which manufacturer had the

Page 175

1  higher average wholesale price?
2      A.  Abbott.
3      Q.  Did you ever have any conversations
4  with anyone at Abbott to ask them about that?
5      A.  Not that I recall.
6      Q.  Did you have the ability to make that
7  phone call?
8      A.  I had the ability, but I don't recall
9  that I did make that.
10     Q.  And in this memo, you proposed as a
11  cost-saving measure applying a state MAC to
12  certain IV drugs, including Vancomycin, right?
13     A.  Correct.
14     Q.  Why did you do that?
15     A.  Because there was a difference between
16  the -- there was a variability between the
17  average wholesale price that we were basing our
18  reimbursement on among various manufacturers.
19     Q.  If we go to the last page of this
20  exhibit, Bates page ending 411, there is a
21  section that you put for final recommendations.
22  Do you see that?

Page 176

1      A.  Yes.
2      Q.  And there you recommended to Mr. Labbe
3  implementation of your cost-savings ideas one and
4  two; is that right?
5      A.  Correct.
6      Q.  Why did you not recommend
7  implementation of cost-saving measure three,
8  establishing a state MAC for certain IV drugs,
9  including Vancomycin?
10     A.  I don't recall.
11     Q.  Do you know what happened to the idea
12  of putting a state MAC on IV drugs, including
13  Vancomycin?
14     A.  Nothing happened as far as that.
15     Q.  Do you know why not?
16     A.  I don't know.
17     Q.  Do you have any speculation at all that
18  you can provide?
19     A.  I could speculate.
20         MR. HENDERSON:  Objection.
21     Q.  Okay.  I'll take your speculation.
22     A.  Well, that would be, in order to do

Page 177

1  that, we would have to have a regulation that
2  spelled that out.
3         That regulation would have to go out
4  for public comment, and if that regulation was
5  finally adopted, that would have to go through a
6  SPA, and that may or may not be approved.
7         It was not something that could happen
8  in a short period of time, and it would be taking
9  the longer look out as to when that would
10  actually be implemented.
11     Q.  Do you know how it was that you came to
12  learn of the variability for the certain IV
13  drugs?
14     A.  Yes.
15     Q.  AWPs?
16     A.  Yes.
17     Q.  How did you learn that?
18     A.  In the time period between 1990 and May
19  of -- well, actually, it was even later, December
20  of 2003, all infusion and -- actually, all
21  compound prescriptions came to me to be
22  adjudicated because the system could not

45 (Pages 174 to 177)

b402ad78-7827-456e-987c-3331b70c1138

State of Alaska (David Campana)                    August 21, 2008
                        Anchorage, AK

Page 178

1  differentiate more than one line of a
2  prescription claim at a time.
3         And since these items, all of these
4  compounds contained more than one ingredient,
5  they had to be done or adjudicated by hand,
6  provided a price or an allowed amount to the
7  system and then that put onto the system as a
8  claim payment.
9         In doing all of those by hand, I had
10 developed a little database, and in that
11 database, I put in several NDCs and put in their
12 costs.
13        As I went to look at each claim, I
14 input the NDC of the claim that was provided by
15 the pharmacy into this little database and it
16 would bring up the product and the price that was
17 on file for that product.
18        And I would push a little button and it
19 would calculate out what the allowable could be,
20 and then added a dispensing fee and compound to
21 that.
22        As I went through numerous of these

Page 179

1  claims, it became readily apparent that there was
2  a variability between different manufacturers of
3  Vancomycin at different prices, and that was also
4  true for Dobutamine and Morphine.
5     Q.  And this is something you started doing
6  and started realizing starting in 1990, right?
7     A.  Well, it was sometime after 1990.  When
8  I first did it, I would calculate it out all by
9  hand, sit there with a calculator, had a list of
10 NDCs and their prices on separate pages.
11        And as it went on and I took courses in
12 using first D-Base and then Microsoft Access, I
13 developed a way to automate the pricing of these
14 medications.
15        In fact, I used to work on this during
16 my lunch hour since it was kind of different than
17 my occupation to develop this database and make
18 this database work so that I could automate the
19 pricing of these compounds.
20        So anyway, at some point after 1990, I
21 had developed this, and used that right up until
22 December of 2003 when under the NCPDP 5.1 format

Page 180

1  it could accept a multi-ingredient compound with
2  all of the lines of all the drugs that are
3  supplied under that compound within the claim.
4     Q.  Okay.  Do you know -- you used the term
5  in this memo "certain IV drugs," and you give
6  some examples such as.
7         Were there more IV drugs apart from
8  these that would have been those that you
9  observed a high variability between acquisition
10 cost and AWPs for certain producers of those
11 products?
12    A.  Well, I notice that variability in only
13 average wholesale price.  There may have been
14 others, but these were the most glaring.
15    Q.  And did you not have the ability or did
16 not have the authority on your own to establish a
17 state MAC for these drugs; is that right?
18    A.  As far as the authority, I could have
19 assisted to write a regulation for that.  The
20 authority would have been with the department,
21 and as far as getting a regulation through at
22 some point in time, regulations or spaces for

Page 181

1  regulations were parceled out I think to
2  divisions, and trying to get in a new pharmacy
3  reg seemed to be lower on the priority level.
4     Q.  But the reason -- is it fair to say
5  that the reason that you did not follow-up with
6  your idea to assess a state MAC for Vancomycin,
7  Dextrose and other IV drugs was because it was
8  not a high enough priority?
9     A.  I can't say that.  It was -- yeah, I
10 don't know exactly why I didn't put that out
11 there.  Let me look at the effort.  Maybe that
12 will refresh my memory.
13    Q.  There you wrote, "The cost avoidance
14 for this effort will require a regulation change,
15 although at this time, a programming change will
16 not be required since IVs drugs are priced
17 manually.
18        I estimate we could avoid at least
19 $50,000 per year with this method."  Does that
20 refresh your recollection?
21    A.  Yes.
22    Q.  Okay.  And as refreshed, what is your

46 (Pages 178 to 181)

b402ad78-7827-456e-987c-3331b70c1138