# Exhibit H

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  PHARMACEUTICAL INDUSTRY | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE LITIGATION | Civil Action: |
| | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO U.S. | Judge Patti B. Saris |
| Ex rel. Ven-A-Care of the Florida | Magistrate Judge |
| Keys, No. 06-CV-11337-PBS | Marianne B. Blower |

/

The Videotaped Deposition of SANDRA KRAMER,

Taken at 2860 Eyde Parkway,

East Lansing, Michigan,

Commencing at 9:08 a.m.,

Tuesday, March 25, 2008,

Before Cynthia A. Chyla, CSR 0092.

Page 82

1  cost."
2      Do you see that?
3  A.  Um-hmm.  Yes.
4  Q.  What did you mean when you stated average
5  wholesale prices are generally inflated significantly
6  over pharmacy purchase costs?
7      MR. HENDERSON:  Objection.
8  A.  It was my understanding that for generic
9  drugs that the state would have to set maximum
10 allowable cost rates to represent pharmacy costs.
11 BY MR. GABEL:
12 Q.  And did you understand that AWPs did not
13 reflect pharmacy costs?
14 A.  I understood that they were frequently not
15 updated, and, yes, we would have to set maximum
16 allowable costs.
17 Q.  And, in fact, you stated they were inflated
18 significantly over pharmacy purchase costs; right?
19 A.  That's what it says, yes.
20 Q.  Is there anything that you see in this
21 affidavit today that you believe was inaccurate now?
22      MR. MATUS:  She hasn't had a chance

Page 83

1  to read the whole thing.  Are you asking her to verify
2  every word of this as accurate?
3      MR. GABEL:  Yes.
4  BY MR. GABEL:
5  Q.  Is there anything that you believe is
6  inaccurate about this document?
7      MR. MATUS:  If you need to look at
8  it, Sandy, go ahead.
9  A.  I think, you know, in the section -- in
10 point 9 are generally inflated significantly, and
11 looking back on it now my interpretation of
12 significant, you know, is that 25 percent, you know, 50
13 percent, you know, or is that 1000 percent.  I think at
14 the time I was thinking that it was greater than the 13
15 percent, 13.5 and the 15.1 that I was conveying in
16 point 8 related to the brand name drugs.
17 BY MR. GABEL:
18 Q.  Okay.  And that's something I'd like to
19 discuss.
20      Did you understand that the
21 difference -- well, let's back up.
22      The difference between what a

Page 84

1  pharmacy purchased a drug for and AWP, do you
2  understand that to be termed as the spread sometimes?
3  A.  I didn't at the time that this was written
4  or at the time when I was working for the Michigan
5  Medicaid program.
6  Q.  All right.  Do you now understand that --
7  A.  Yeah.
8  Q.  -- that sometimes is referred to as the
9  spread?
10 A.  Yes.
11 Q.  Can I refer to that in the deposition today
12 and you'll know what I'm talking about?
13 A.  Yes.
14 Q.  Okay.  Did you understand that the spread
15 for generics was larger than the spread for brand name
16 drugs?
17 A.  Yes.
18 Q.  Okay.  What was that understanding based
19 upon?
20 A.  Probably at the time that I was at Michigan
21 Medicaid, input from the pharmacists.
22 Q.  So you would discuss AWP with pharmacists?

Page 85

1  A.  Actually, I -- my responsibility included,
2  as we mentioned before, setting the MACs.
3  Q.  Um-hmm.
4  A.  The state MACs.  And as part of that I was
5  chair of what we called the Pharmacy Reimbursement
6  Advisory Committee, or they call it PRAC -- P-R-A-C --
7  for short.
8  Q.  Were pharmacists on PRAC?
9  A.  Yes.  So I would have gotten that
10 information from them --
11 Q.  Okay.
12 A.  -- is my best recollection of it.
13 Q.  And what was the source of information for
14 your statement that AWPs are generally inflated
15 significantly over pharmacy purchase costs?
16 A.  As I mentioned, setting the maximum
17 allowable cost prices and comparing those to the AWP
18 that was -- I guess we're using the term significant
19 spread.  And that's why I would have felt comfortable
20 putting that statement.
21 Q.  Now, this Affidavit was dated sometime in
22 2001.  But am I right to say that you understood that

Page 86

1  AWPs were inflated over a pharmacy's purchase cost well
2  before 2001?
3          MR. HENDERSON: Objection to the
4  form.
5          MR. MATUS: Well is a vague term.
6      A.   Yeah, I don't understand your well.
7  BY MR. GABEL:
8      Q.   You understood it before 2001; right?
9      A.   My understanding was that for brand name
10 drugs, AWP minus 13 1/2 for, you know, stores that had
11 one to four, and four -- I'm sorry, I'm forgetting the
12 policy, it's been so long. But if I had the bulletin
13 in front of me. What was issued in the bulletin would
14 be reflective of the pharmacy's cost.
15     Q.   Okay. We'll look at the bulletin in a
16 second, but I just want to finish up this document.
17          And you -- with respect to generics,
18 not brands?
19     A.   Oh, in respect to generics, because of --
20 can you rephrase your question again?
21     Q.   Sure. With respect to generics, you knew
22 before 2001 that AWPs for generics were inflated over

Page 87

1  what the purchasers were actually paying for the drugs?
2      A.   What I knew is that our maximum allowable
3  cost drug prices which I felt were representative of
4  the purchasing costs were definitely lower than the
5  AWPs reported by manufacturers.
6      Q.   And the MACs were for generic drugs; right?
7      A.   In the main.
8      Q.   I'm sorry?
9      A.   In the main.
10     Q.   What do you mean by that?
11     A.   Predominantly.
12     Q.   Okay. Were there other drugs besides
13 generics included on the MAC list?
14     A.   Yes.
15     Q.   So were some brand names on the MAC list?
16     A.   Yes.
17     Q.   What -- well, who determined which drugs
18 made it onto the MAC list?
19     A.   They were based on which drugs were the
20 highest volume and highest cost.
21     Q.   So regardless --
22     A.   It depends on the time period, you know,

Page 88

1  too, because the process while it was under my
2  responsibility continued to evolve.
3      Q.   Okay. So, regardless of whether a drug was
4  a generic or brand, if it was of a certain high volume
5  or cost, it made its way onto the MAC list?
6          MR. HENDERSON: Objection.
7      A.   No.
8  BY MR. GABEL:
9      Q.   Okay. Did the fact of whether it was a
10 generic or brand play into the decision on whether --
11     A.   Yes.
12     Q.   -- it went onto the MAC list?
13          How so?
14     A.   The MAC policy was predominantly geared
15 towards generic drugs. As I mentioned, there were --
16 there were some brand drugs that were also included in
17 the process.
18          Also, just by its very nature of
19 setting a MAC on a multi-source drug, you're limiting
20 the brand name that was the previous innovator.
21     Q.   Now, in your discussions with other state
22 Medicaid officials outside of Michigan, do you know if

Page 89

1  any of them believed that AWP reflected actual
2  acquisition costs for providers?
3          MR. HENDERSON: Objection to the
4  form.
5      A.   Yeah, I can't speak -- speak for them.
6  BY MR. GABEL:
7      Q.   Did any of them tell you that they believed
8  AWP was an accurate reflection of prices in the market?
9      A.   Not that I recall.
10     Q.   Place in front of you what I'm marking as
11 Abbott Exhibit Number 656. Ask you to take a look at
12 that and my first question will be: Have you ever seen
13 that document prior to today?
14     (EXHIBIT ABBOTT 656
15     November 30, 1992 Memorandum
16     WAS MARKED BY COUNSEL
17     FOR IDENTIFICATION.)
18     A.   Yes.
19 BY MR. GABEL:
20     Q.   Okay. And did you author this document?
21     A.   I signed it, yes.
22     Q.   Who's Vern Smith?

23 (Pages 86 to 89)

Kramer, Sandra                                                      March 25, 2008

Page 90

1   A.   At the time that this was written who was
2   he?
3   Q.   Yes.
4   A.   I'm uncertain. He probably was a bureau
5   director at the time.
6   Q.   Was he --
7   A.   Management to me.
8   Q.   So someone you reported to?
9   A.   Probably not directly.
10  Q.   But he was higher on the Michigan Medicaid
11  hierarchy?
12  A.   Yes.
13  Q.   And in your memos to Mr. Smith or others
14  higher on the Michigan Medicaid hierarchy, did you
15  attempt to be as accurate as possible?
16  A.   I would try to.
17  Q.   You see the subject of this is elimination
18  of actual acquisition costs reimbursement.
19       Do you see that?
20  A.   Yes.
21  Q.   What does that refer to?
22  A.   I think it would refer to switching the

Page 91

1   reimbursement technique from AAC to EAC.
2   Q.   And that switch was actually made in 1995;
3   right?
4   A.   Yes.
5   Q.   So this is approximately three years before
6   the switch was made?
7   A.   Yes.
8   Q.   Do you know why this was being discussed in
9   1992?
10  A.   It explains here that the pharmacy
11  association's newsletter published that there was going
12  to be a change from AAC reimbursement for Michigan
13  Medicaid.
14  Q.   And it's dated -- it actually states that
15  Mr. Smith agreed to move way from actual acquisition
16  costs; is that right?
17  A.   Yeah.
18  Q.   Did you have a discussion with him regarding
19  whether he did, in fact, agree to move away from AAC?
20  A.   I don't recall.
21  Q.   Did you ever have any discussions with
22  Mr. Smith about moving away from AAC to EAC?

Page 92

1   A.   Yes.
2   Q.   Okay. How many -- how many times did you
3   have discussions with him about that topic?
4   A.   I don't know how many times.
5   Q.   Do you recall ever discussing with him what
6   AWPs were meant to represent?
7   A.   Not really. Not -- no.
8   Q.   You state, and I'd like to focus here on the
9   second paragraph, the last sentence of that paragraph,
10  it states: "If such a proposal were adopted, there
11  could be tremendous cost implications for the program."
12       What did you mean by that?
13  A.   I meant that AWP minus 10 percent is --
14  would not have been what we were paying under AAC
15  reimbursement.
16  Q.   So fair to say that you thought there would
17  have to be a steeper discount off of AWP if you were
18  going to approximate AAC?
19  A.   Yes.
20  Q.   And when you say tremendous cost
21  implications, what did you mean by that phrase?
22       MR. HENDERSON: Objection.

Page 93

1   A.   I guess I was trying to get his attention.
2   BY MR. GABEL:
3   Q.   Did you get his attention?
4   A.   I don't remember him responding.
5   Q.   Okay. The next paragraph you say: "As an
6   example, I have attached the direct (or acquisition
7   cost) and AWP for several new products from a major
8   generic company. The price differentials are enormous
9   with AWP ranging from 13 percent to 500 percent above
10  acquisition cost!!!"
11       With the three exclamations, were
12  you also trying to get his attention?
13       MR. HENDERSON: Objection.
14  A.   I think it speaks for itself.
15  BY MR. GABEL:
16  Q.   Okay. Fair enough.
17       You state: "The price differentials
18  are enormous --" well, actually, strike that.
19       It's fair to say that as early as
20  1992 you realized that in some instances AWPs were
21  upwards of 500 percent above acquisition costs?
22  A.   For the generic.

Kramer, Sandra                                                March 25, 2008

Page 94

1  Q. For the generic specifically?
2  A. That's what I'm referring to here.
3  Q. Okay. And this is what you were conveying
4  to Mr. Smith in 1992?
5  A. Right. In looking at this documentation
6  when I pulled it together here, too, I noted that the
7  attachment just refers to the differential between AWP
8  and -- or the spread I guess is the term we're using,
9  direct price, and direct price is not necessarily what
10 the pharmacist would have been paying.
11 Q. Did you understand that the pharmacist could
12 be paying even less than direct price?
13 A. At the time it may not have been my
14 understanding, but looking back at this documentation,
15 the direct price I know was not necessarily what the
16 pharmacist was paying.
17 Q. They could have been paying lower than
18 direct price?
19 A. Yes.
20 Q. Okay. And let's look at this document that
21 you attach.
22      Well, first, let me make sure. Is

Page 95

1  this the document that you attached to the memo to
2  Mr. Smith?
3  A. I'm thinking it is. I'm uncertain --
4  Q. They were produced to us back to back, so
5  that's why I was putting them together.
6  A. Right. I notice a lot of my documents got
7  shuffled.
8  Q. Okay.
9  A. So ....
10 Q. Do you have any reason to believe that this
11 is not the document that you would have been forwarding
12 along to him?
13 A. I think it is. It's date stamped the 13th
14 and this was written November 30th.
15 Q. Okay. Thanks.
16      And you said it's date stamped
17 November 13th. That's 1992; right?
18 A. Correct.
19 Q. Okay. And this is from Geneva
20 Pharmaceuticals?
21 A. Yes.
22 Q. And did this come directly to you, or did

Page 96

1  you receive this from some other source?
2  A. I don't recall exactly. I assume if it was
3  in my possession, it came directly to me.
4  Q. Directly to you from Geneva?
5  A. Yeah. Dear sir or Madam.
6  Q. Okay. Did you ever have any discussions
7  with Mr. Ron Hartmann, the author of this?
8  A. I believe I have.
9  Q. Okay. Did you discuss in particular how AWP
10 compared to acquisition costs?
11 A. No.
12 Q. What were your discussions with Mr. Hartmann
13 about?
14 A. I don't recall exactly what form, but I
15 believe he attended meetings, public meetings that were
16 held by the MSA.
17 Q. And you see in this letter from
18 Mr. Hartmann, it lists AWP in one column and direct
19 prices in another column. And, in fact, there -- there
20 are spreads between those two prices; correct? And in
21 one instances -- in one instance you note that the
22 spread is approximately 500 percent; right?

Page 97

1  A. (Nods head.)
2  Q. Is that referring to the last drug on this
3  list?
4  A. I would have to do the math again.
5  Q. But overall, you see there --
6  A. It seems to be the biggest spread.
7  Q. Okay. Now, in your experience as a policy
8  analyst for Michigan Medicaid, would you, when looking
9  at spreads, be more concerned about the percentage
10 differential or the dollar differential? For instance,
11 there's a 500 percent spread on that final drug, but
12 it's less than a $20 spread when it's expressed in
13 dollars.
14      For the top drug, we see that
15 there's about $100 spread. Would you be more concerned
16 about the dollar issue or the percentage issue?
17      MR. HENDERSON: Objection to the
18 form.
19 A. I would be concerned about the percentage.
20 BY MR. GABEL:
21 Q. Percentage. Okay.
22      Although even with a lower

25 (Pages 94 to 97)

Henderson Legal Services, Inc.
202-220-4158                                    www.hendersonlegalservices.com