# Exhibit M

Duzor, Deidre - Vol. II                    February 27, 2008
                        Washington, DC

Page 250

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL         )  MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     )  CIVIL ACTION

PRICE LITIGATION               )  01-CV-12257-PBS

THIS DOCUMENT RELATES TO       )

U.S. ex rel. Ven-a-Care of     )  Judge Patti B. Saris

the Florida Keys, Inc.         )

     v.                        )  Chief Magistrate

Abbott Laboratories, Inc.,     )  Judge Marianne B.

No. 06-CV-11337-PBS            )  Bowler

- - - - - - - - - - - - - - - -

            (cross-captions on following pages)



                      Washington, D.C.

                      Thursday, February 27, 2007

                      9:00 a.m.



         Videotaped deposition of DEIRDRE DUZOR

                   Volume II

43d600b1-21ec-4511-a4d1-17012cd41147

Duzor, Deirdre                                    October 30, 2007
                        Washington, DC

| Page 174 | Page 176 |
|---|---|
| 1    Q.    Was it your understanding that WAC was a | 1    that OIG reports relating to Medicaid payment for |
| 2    price that represented the actual price that | 2    drugs have been shared with states? |
| 3    wholesalers purchased drugs from manufacturers? | 3        A.    Yes. |
| 4        A.    It was my understanding that that was the | 4            MR. TORBORG:  What do you think?  Should |
| 5    original intent of WAC, not necessarily that that is | 5    we remark this document or keep the original exhibit |
| 6    what WAC truly represented at the point that I | 6    number?  I know you guys recalled it at one point |
| 7    became involved in these issues. | 7    and then changed your mind.  So do you have any |
| 8                (Exhibit Abbott 372 was | 8    thoughts of whether we should mark it as a new |
| 9                marked for | 9    exhibit? |
| 10                identification.) | 10            MS. MARTINEZ:  No.  I mean, the exhibit |
| 11        BY MR. TORBORG: | 11    number -- |
| 12    Q.    For the record, what I've marked as | 12            MR. TORBORG:  328? |
| 13    Exhibit Abbott 372 is a September 16th 2002 letter | 13            MS. MARTINEZ:  -- does not seem to be an |
| 14    from Janet Rehnquist to Thomas Scully attaching a | 14    issue. |
| 15    September 2002 report from OIG entitled Medicaid | 15        BY MR. TORBORG: |
| 16    pharmacy additional analysis of the actual | 16    Q.    Ms. Duzor, I've handed you a copy of what |
| 17    acquisition cost of prescription drug products. | 17    we've marked previously as Exhibit Abbott 328, a |
| 18        If you would take a look at that, Ms. | 18    document entitled Review of Medicaid Drug State Plan |
| 19    Duzor, to the extent necessary to tell me if you | 19    Amendments.  I ask you to take some time and look at |
| 20    recall this document. | 20    that document. |
| 21    A.    (Reading.)  Yes, I do remember this | 21    A.    Okay.  (Reading.) |
| 22    document. | 22    Q.    Ms. Duzor, have you had a chance to look |

| Page 175 | Page 177 |
|---|---|
| 1    Q.    And the first sentence of Ms. Rehnquist's | 1    at that document? |
| 2    letter, the first page of the exhibit, indicates | 2    A.    Yes, I have. |
| 3    that it's a follow-up to the previous work, two | 3    Q.    Can you tell us what this document is? |
| 4    reports; is that right? | 4    A.    This document -- |
| 5    A.    Yes, it does. | 5    Q.    Let me strike that.  Are you familiar |
| 6    Q.    Do you know why it is that OIG did this | 6    with this document first? |
| 7    additional report? | 7    A.    Yes.  I recall the document. |
| 8    A.    Well, in this analysis the IG looked at | 8    Q.    Can you tell us what it is? |
| 9    whether drugs -- it separately evaluated drugs for | 9    A.    I believe it is a draft of a decision |
| 10    which there was a FUL established and those that did | 10    memo seeking guidance from policymakers in CMS on |
| 11    not have -- multiple drugs without those.  So I | 11    approaches to reviewing state plan amendments that |
| 12    think that was the distinction.  They were looking | 12    were proposing to revise either the ingredient cost |
| 13    at categorizing drugs by whether they have a FUL or | 13    payment for drugs or the dispensing fees. |
| 14    not. | 14    Q.    What is a decision memo? |
| 15    Q.    Did CMS request that OIG prepare this | 15    A.    A decision memo is an issue paper with |
| 16    report? | 16    recommendations to take to policy decision makers. |
| 17    A.    Not to my knowledge. | 17    Options and recommendations generally. |
| 18    Q.    Do you know if this report was shared | 18    Q.    Who are the policy decision makers to |
| 19    with state Medicaid program? | 19    which this document would go? |
| 20    A.    As a fact, no, I don't recall. | 20    A.    Certainly to Dennis Smith and perhaps |
| 21    Q.    Generally speaking in your time at CMS in | 21    beyond him.  Dennis reports to the administrator. |
| 22    the division of pharmacy has it been the practice | 22    So it could be for Dennis or it could be something |

45 (Pages 174 to 177)

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Duzor, Deirdre                                                    October 30, 2007
                              Washington, DC

| Page 190 | Page 192 |
|---|---|

**Page 190**

1  legislatures were talking up the issue of pharmacy
2  reimbursement. And we commonly did not have
3  documentation as to what their reasoning was in
4  picking a particular figure or rate.
5        So we were getting state plan amendments
6  that would say we'd like to go to AWP minus 13
7  without any solid documentation that that did --
8  that that was a good estimate of acquisition cost.
9  And yet it was determined by the elected body, you
10 know, of the people of the state. So that gave it
11 some legitimacy.
12      Q.  And CMS had every reason to believe that
13 a reimbursement methodology like AWP minus 13 would
14 not result in a payment by the state for generic
15 drugs that was the price generally and currently
16 paid by providers; isn't that right?
17          MR. WINGET-HERNANDEZ: Objection to form.
18          MS. MARTINEZ: Objection to form.
19      A.  Could you state that again?
20      Q.  Sure. CMS had every reason to believe
21 that a reimbursement methodology like AWP minus 13
22 percent would not result in a payment by a state for

**Page 192**

1        A.  We knew that for generic drugs that AWP
2  minus 13 was a generous payment based upon the IG's
3  findings.
4        Q.  OIG had found on a national level that
5  generic drugs were selling at AWP minus 66 percent?
6        A.  Based on their sample, that's what they
7  showed.
8        Q.  And did you have any reason to believe
9  that sample was not representative of the price the
10 generic drugs were generally selling in the
11 marketplace?
12          MR. BATES: Object to the form.
13      A.  I didn't know enough about their sample.
14 I certainly again would not say that their
15 conclusion was the right answer for all generic
16 drugs. Most states were doing AWP minus across the
17 board not differentiating between generic and
18 non-generic. So they were not giving us the state
19 plan amendments that we could align neatly with the
20 OIG report. They were proposing it in a different
21 way.
22      Q.  And do you recall having discussions

**Page 191**

1  generic drugs that was the price generally and
2  currently paid by providers; isn't that right?
3          MS. MARTINEZ: Objection to form.
4      A.  I'm sorry. I'm still having trouble with
5  the question.
6      Q.  I'll try it again. CMS had every reason
7  to believe that a reimbursement methodology like AWP
8  minus 13 percent would not result in a payment by a
9  state for generic drugs that was the price generally
10 and currently paid by providers; isn't that right?
11          MS. MARTINEZ: Objection to form.
12      A.  Okay. So can I restate the question to
13 see if I understand it?
14      Q.  Okay.
15      A.  That CMS could have concluded that AWP
16 minus 13 was not a good estimate of estimated
17 acquisition cost? Is that what you're saying? Is
18 that what you're asking?
19      Q.  What did you believe on a national level
20 was the rate of discounts from AWP for generic
21 drugs?
22          MS. MARTINEZ: Objection to form.

**Page 193**

1  about that problem at CMS about the need to
2  differentiate between -- about the need to have a
3  reimbursement methodology that was different for
4  brand name drugs than for generic drugs?
5      A.  We didn't have a role or a policy that
6  states had to do that. That was an approach they
7  could have followed and that was suggested by the
8  inspector general's reports. But it wasn't an
9  agency policy that states should be doing that.
10 They could do a blended average. That was not -- it
11 was not inconsistent with anything we had said.
12      Q.  Did you have any reason to believe that a
13 reimbursement methodology like AWP minus 10, AWP
14 minus 15 percent, could serve as a best estimate of
15 the blended average at which generic and branded
16 drugs were selling in the marketplace?
17          MS. MARTINEZ: Objection to form.
18      A.  To my knowledge we never did the analysis
19 that would really be necessary to come to that
20 conclusion.
21      Q.  If you would go to the next paragraph on
22 Exhibit Abbott 328, it states "It is proving

Henderson Legal Services
202-220-4158

f5f0cb67-5db5-4a19-acea-ff4afd75844b

Duzor, Deidre - Vol. II                    February 27, 2008
                    Washington, DC

Page 487

1     A.  Yes.
2     Q.  The next paragraph states, in part, the
3  two measures, the markup and the margin yield
4  very different pictures.  Do you see that?
5     A.  Yes, I do.
6     Q.  And then the next paragraph states
7  "Because pharmacies' cost of filling a
8  prescription is largely unrelated to the cost for
9  acquiring its ingredients or the size of the
10  prescription, the dollar markup is a better
11  indicator of the size or adequacy of Medicaid's
12  reimbursements to pharmacies than is the
13  percentage margin."  Do you see that?
14     A.  Yes, I do.
15     Q.  Do you agree with that?
16     A.  Yeah.  I think statistically you're
17  looking at numbers, yes.  It tells -- it's more
18  descriptive of the situation than a dollar
19  figure.
20     Q.  This is indicating that the dollar
21  markup is the better indicator.
22     A.  Oh, yeah.  Yes, I do understand that.

Page 488

1     Q.  And do you agree with that?
2     A.  Yes.  Because if you have a
3  prescription that's a dollar and you have a
4  hundred percent markup, that's only another
5  dollar.  That's all it is.
6     Q.  Pharmacies are paid in dollars, not
7  percentages; is that fair to say?
8     A.  That's fair to say.
9     Q.  If you could go to 476 -- it should be
10  the next one there.  For the record, 476 is a
11  document titled "CBO testimony: Statement of
12  Douglas Holtz-Eakin, the director, payments for
13  prescription drugs under Medicaid before the
14  Special Committee On Aging, United States Senate,
15  July 20, 2005."  Take a look at that and let me
16  know if you're familiar with this statement.
17     A.  No.  I don't recall seeing this
18  statement.
19     Q.  Do you know who Mr. Douglas Holtz-Eakin
20  is?
21     A.  No, I don't.
22     Q.  You never met with him?

Page 489

1     A.  No, I haven't.
2     Q.  If I could ask you to go to page 4,
3  there's a table 1 titled "Components of
4  Medicaid's Payments for Prescription Drugs"?
5     A.  Right.
6     Q.  And there's a column "Medicaid's
7  payments to pharmacies, acquisition costs,
8  markups," and then "percentage of prescriptions
9  dispensed."  Do you see that?
10     A.  Yes, I do.
11     Q.  Do you have an understanding of what
12  this chart reflects?
13     A.  Yes.
14     Q.  Is it showing that the average dollar
15  markup on a -- or difference between Medicaid's
16  payments to pharmacies and acquisition costs for
17  all drugs is $13.80?
18     A.  Yes.
19     Q.  And is it showing that for all generic
20  drugs the average is also $13.80?
21     A.  Yes.
22     Q.  And for brand-name drugs also $13.80.

Page 490

1  Do you see that?
2     A.  Yes, I do.  Amazing.
3     Q.  And then the next paragraph or the
4  second one under that chart notes "When the
5  amount a pharmacist retains on a generic drug is
6  higher than the amount retained on its brand-name
7  counterpart, the pharmacist has a clear incentive
8  to dispense the generic drug.  Thus, the higher
9  markups on newer generic drugs probably give
10  pharmacists a strong incentive, where possible,
11  to steer beneficiaries to those drugs.
12      "From the perspective of the system as
13  a whole, that outcome may be desirable because it
14  makes the total cost of the prescription much
15  lower than if the brand-name drug were used.
16  Maintaining such incentives might be an important
17  consideration in assessing Medicaid's payment
18  system for prescription drugs."  Do you see that?
19     A.  Yes, I do.
20     Q.  As the co-leader of CMS's pharmacy team
21  focusing on Medicaid payments for drugs, amongst
22  other issues, are these the kind of

61 (Pages 487 to 490)