# Exhibit S

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------X MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO: :

U.S. ex rel. Ven-A-Care of the : CIVIL ACTION:

Florida Keys, Inc. v. Abbott : 06-CV-11337-PBS

Laboratories, Inc. :

-----------------------------------X

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA, : CASE NO.

Plaintiff, : CV-05-219

v. :

ABBOTT LABORATORIES, INC., : JUDGE

et al., : CHARLES PRICE

Defendants. :

-----------------------------------X

bcab4204-38f1-4b48-ab34-7037316b0f5a

Page 178

And then using my highlighter, would you highlight the ones that were -- that are multiple-source, MS?
A. (Complies.)
Q. Now, as you review that schedule, does anything pop out at you in the Percent Saved column for the highlighted columns, multiple-source drugs?
MR. NEAL: Objection as to form.
THE WITNESS: That there is large potential savings for almost all of the -- as far as percent saved, for the multiple-source drugs.
BY MR. TORBORG:
Q. And does that mean there was a larger difference between acquisition cost, as shown in the market and shown in the pricing catalogs, and the AWPs?
MR. NEAL: Objection as to form.
THE WITNESS: Yes.
BY MR. TORBORG:
Q. Okay. Do you recall discussions at OIG relating to the fact that there were such large differences between the catalog prices for

Page 179

multiple-source drugs and the AWPs for those drugs?
A. I don't recall talking about multiple-source drugs specifically.
Q. How about generics?
A. Or -- or generics specifically. I mean, obviously we did some specific studies on a few of these projects because of the large spreads we found in here.
Q. But fair to say that your -- as reflected in this chart, which provides the detail of your report, right, shows very large savings potential for multiple-source drugs --
MR. NEAL: Objection to --
BY MR. TORBORG:
Q. -- right?
MR. NEAL: -- the form.
THE WITNESS: Again, large savings potential as a -- as a percentage, not necessarily as a total dollar figure.
BY MR. TORBORG:
Q. Do you think it's appropriate to evaluate the differences between prices as a

Page 180

percentage?
MR. NEAL: Objection as to form.
THE WITNESS: I think it's certainly one way to evaluate it.
BY MR. TORBORG:
Q. You -- do you recall any discussions at any time at OIG with the fact that there was such large spreads for generic multi-source drugs?
A. Not generic as a whole. Again, for a couple particular products, we certainly discussed it.
Q. And which products were those?
A. That would be Albuterol and Leucovorin Calcium, I remember specifically.
Q. What do you recall about Leucovorin Calcium?
A. That in later -- a couple later reports that I worked on, it was a generic, I believe, cancer drug that seemed to have AWPs that were vastly out of line with actual acquisition costs.
Q. Did you have any discussions with individuals at CMS about the large percentage

Page 181

differences in the -- in the prices for generic drugs between actual acquisition cost, as shown in catalogs, versus published AWPs?
MR. NEAL: I'm going to object to the question.
I'll instruct you not to answer to the extent that those -- your answer would reveal communications that took place in the context of entrance or exit conferences with CMS personnel.
THE WITNESS: Not outside of entrance or exit conferences.
BY MR. TORBORG:
Q. Do you recall having the discussions at all?
MR. NEAL: I'm going to instruct the witness not to answer that question.
MR. TORBORG: Can I ask him whether, without divulging specific communications, if he recall the discussions happening at all?
MR. NEAL: The problem is, the discussions you're talking about involve a specific substance area.

bcab4204-38f1-4b48-ab34-7037316b0f5a

Page 182

MR. TORBORG: That I think is important to the case; that's why I'm asking about it.

MR. NEAL: That may be, but, you know, that -- that doesn't play into our privilege -- privilege assertion, so...

MR. TORBORG: So what you're saying, in essence, is regardless of how important it may be to my defense, you're still going to assert the privilege, no matter what?

MR. NEAL: You can characterize it however you want to. I mean, the fact is, this is an important governmental privilege, and we're going to assert the privilege in this case. We have motions pending on -- you know, on this matter as we speak, and the Court will presumably resolve it for us.

MR. TORBORG: Okay. Hopefully this will be of assistance.

BY MR. TORBORG:

Q. If we go to Page 10 of your report, Recommendations, what was the purpose for the Recommendations section of the report?

Page 183

A. To make recommendations to CMS about how they could impact or -- or implement some of the changes that would be called for by the findings of our report.

Q. Did you attend the exit conference for this report?

A. I don't believe so.

Q. Do you recall any discussions with CMS about this report?

A. No.

Q. If you look at page -- I'm sorry -- the section under Discounted Wholesale Price, that recommendation, the fifth sentence down, it starts with, In addition. Are you with me?

A. Uh-huh.

Q. It says: In addition, the secretary should be granted the authority to conduct sample surveys of actual wholesale prices to determine the amount of difference between actual average wholesale prices and published AWPs. The percentage difference found in the sample could then be applied to all AWPs used by the program to

Page 184

determine drug reimbursement.

Do you have an understanding of what that recommendation is -- is all about?

A. Yes.

Q. Do you recall discussing -- discussing that recommendation with anyone at CMS at any time?

MR. NEAL: Objection.

You can answer that to the extent that you don't reveal the substance of communications that took place at exit or entrance conferences.

THE WITNESS: No.

BY MR. TORBORG:

Q. The second recommendation is Acquisition Cost. It states: Medicare could base the payment of drugs on either actual or estimated acquisition costs. Although Medicare currently has the authority to use EAC, carriers have yet to successfully implement the option.

Do you recall any discussions about the inability to use the estimated acquisition cost approach in reimbursing Medicare Part B drugs?

A. No.

Page 185

Q. By the time you came in, in 1997, estimated acquisition cost was sort of a methodology of the past; is that fair to say?

MR. NEAL: I'll object to the form.

You can answer.

THE WITNESS: In Medicare, yes.

BY MR. TORBORG:

Q. How about for Medicaid?

A. In Medicaid, as far as I know, estimated acquisition cost is still on the books, and it's up to states to determine the definition -- or not the definition, but it's up to states to determine what estimated acquisition cost is.

Q. Okay. And do you recall any discussions at OIG about whether or not states were implementing that requirement in accordance with the law?

MR. NEAL: Objection as to form.

THE WITNESS: I don't think the law gave them specific instruction about how to implement the requirement.

BY MR. TORBORG:

bcab4204-38f1-4b48-ab34-7037316b0f5a

certainly use to develop our educational efforts with HCFA, end quote, Parver notes.
Does Medicare pay a dispensing fee for drugs?
MR. NEAL: Objection as to form.
You can answer.
THE WITNESS: For certain drugs, a dispensing fee is paid.
BY MR. TORBORG:
Q. Which -- which drugs?
A. The durable medical equipment drugs, such as Albuterol, Ipratropium Bromide, those types of drugs. I'm not sure about any others.
Q. So you don't know if a dispensing fee is paid to home-infusion providers, for example?
A. No. I'm not sure.
Q. Do you recall that ever being discussed?
A. No.
Q. When was the dispensing fee established for durable medical equipment suppliers?
A. I'm not --
MR. NEAL: Objection as to form.
You can answer.

THE WITNESS: I'm not sure.
BY MR. TORBORG:
Q. Well, do you think it was before you started or during the time that you were at OIG?
MR. NEAL: I'll object to the form.
You can answer.
THE WITNESS: During the time I was at OIG.
BY MR. TORBORG:
Q. Have you ever met with Mr. Tarver [sic] --
A. No.
Q. -- who's quoted in here? If we skip a paragraph, Mr. Quarver -- Mr. Parver is quoted again as saying: It's unclear to me how, if an entity is paid its acquisition cost for a drug, it could possibly provide any services, Parver adds. In the infusion area, that would probably make it very difficult for a pharmacy to provide any services.
In the past, Redmon claims -- and Redmon is a reference to Tim Redmon, of the National Community

Pharmacists Association -- Medicare officials would argue that the service component was, quote, built into the fee schedule, end quote, for prescription drugs. Now that this component may be removed, Medicare's insistence that it, quote, won't pay for services, end quote, means that providers are left unable to serve beneficiaries, he maintains.
Do you recall any discussions during your time at OIG that the services associated with dispensing drugs were built into the fee schedule for drugs?
A. I remember people in the provider community saying that -- saying those types of things. I never heard anyone within OIG or CMS say that.
Q. Who do you recall from the provider community making --
A. No.
Q. -- those statements?
A. It was general articles such as this that would say that they needed the markup on drugs to pay for services that -- that weren't being reimbursed appropriately.

Q. Did you have any personal opinion about whether those statements were correct or not?
MR. NEAL: Objection as to form.
THE WITNESS: Without doing a review of physician services and what the costs actually are, I wouldn't have any way of knowing whether physician services were being reimbursed appropriately.
BY MR. TORBORG:
Q. Did you see a number of articles from the provider community that were making assertions like that?
A. Yes.
Q. Did you ever discuss the -- this general issue at all with CMS?
MR. NEAL: Objection.
You can answer that to the extent you don't reveal the contents of communications at entrance or exit conferences.
THE WITNESS: All of the conversations would have been in those situations.
BY MR. TORBORG:

bcab4204-38f1-4b48-ab34-7037316b0f5a

Page 226

Q. Okay. Did you have conversations along those lines at the entrance and exit interviews?
MR. NEAL: I'm sorry. I'm going to instruct you not to answer that question.
What are you referring to?
MR. TORBORG: I'm asking if he's had discussions along the lines of services being built into the payment for drugs with members of CMS.
MR. NEAL: The instruction is not to answer to the extent that it would require you to reveal communications that took place at entrance and exit conferences.
MR. TORBORG: Can he answer yes or no, whether he had them or not?
MR. NEAL: Why don't you go ahead and repeat your question and I'll either assert a privilege or...
BY MR. TORBORG:
Q. Have you had discussions with CMS along the lines of services -- payment for services being built into the payment for drugs?
MR. NEAL: You can answer that yes, no,

Page 227

or I don't remember.
THE WITNESS: No.
BY MR. TORBORG:
Q. How are -- I want to just trace through your -- your current understanding about how Medicare Part B pays for drugs. Do you have an understanding of how Medicare Part B reimburses physicians for drugs?
A. Yes.
Q. How's that?
A. Physicians are reimbursed at 95 percent -- I'm sorry -- 106 percent of the average sale price for the drug.
Q. Okay. And how are pharmacies reimbursed under Medicare Part B today?
A. 106 percent ASP for the drug plus a reasonable dispensing fee.
Q. Is it your understanding that all pharmacies are paid 106 percent of ASP plus a reasonable dispensing fee?
A. For Medicare?
Q. Yes.

Page 228

A. As far as -- as far as I know. There might be certain drugs that aren't subject to the ASP methodology, but most are.
Q. Do you know any drugs that are not subject to ASP methodology?
A. Yes.
Q. Which ones?
A. The vacc -- certain vaccines, certain blood products are typically excluded.
Q. Any other drugs?
A. Not that I know of.
Q. And how are those products reimbursed?
A. Typically based on AWP.
Q. Okay. Is it 85 percent of AWP; do you know?
A. I think it's 95 percent of AWP.
Q. Is that part of a statute or a regulation?
MR. NEAL: Objection as to form.
You can answer.
THE WITNESS: I believe that it's part of the statute that certain drugs were exempted.

Page 229

BY MR. TORBORG:
Q. I'm going to hand you another document we've marked previously. This is marked as Exhibit Abbott 018.
MR. TORBORG: For the record, Exhibit Abbott 018 is titled, Statement of the National Alliance for Infusion Therapy and the National Home Infusion Association, Alexandria, Virginia, and it is a statement that was printed off the House of Representatives Ways and Means Committee website at the web address in the bottom of the page.
BY MR. TORBORG:
Q. And I suspect, Mr. Tawes, after you take a look at it, you'll tell me that you've never seen it before.
A. Not that I remember.
Q. Okay. If we look at the second page, there's a section, Reliance on AWP to Calculate Reimbursement. It says: NAIT and NHIA understand the criticism expressed by the members of the subcommittee as well as other members of Congress regarding the current practice of relying on

Page 230

average wholesale price as a basis for calculating Medicare and Medicaid outpatient drug reimbursement. The imperfections of the AWP methodology are well-known and extensively documented.

Did you think the imperfections of the AWP methodology were well-known?

MR. NEAL: Objection as to form.

THE WITNESS: I thought it was well-known among people that know that sort of things. I mean, I don't think that, you know, most of my friends knew anything about the AWP methodology.

BY MR. TORBORG:

Q. Nor did I until about nine months ago.

A. Right.

Q. But people in the -- people in the -- in the industry knew that the imperfections of AWP methodology were well-known?

MR. NEAL: Objection as to form.

THE WITNESS: Yes.

BY MR. TORBORG:

Q. If you go to the next page, a paragraph

Page 231

states: For the reasons stated above, at the present time the drug payments for infusion therapy subsidize other functions that the Medicare payment methodologies do not reflect appropriately. The costs of these services and functions far outweigh the cost of the drug product, but these costs are clearly lower than the charges that would be incurred if the patient received treatment in an alternative setting. For home-infusion drug therapy, the drug payment is the only available drug -- the only available payment mechanism for the services that are essential to providing good quality care. A longstanding use of AWP to determine reimbursement has massive failure of the Medicare and Medicaid payment policies to define and account for the service component.

Do you agree with that statement?

MR. NEAL: Objection as to form.

THE WITNESS: I -- I don't know much about the -- again, what the cost of services and how Medicare reimbursed for those services.

BY MR. TORBORG:

Page 232

Q. Do you recall any discussions with either OIG or CMS about the fact that reducing drug payments may result in increased prices to the Medicare system?

A. No.

Q. Do you recall any discussions with anyone at OIG or CMS that reducing payments for drugs may compromise access to care?

MR. NEAL: I'll object to the form.

THE WITNESS: There were conversations that those were concerns of the industry. I don't think that there were conversations about whether that was, you know, likely to happen.

BY MR. TORBORG:

Q. Did you have conversations with anyone at OIG and CMS about that issue?

A. About -- again, we had conversations that, here is what the interest groups are saying will happen. We didn't sort of analyze the legitimacy of whether it was likely to happen or not.

Q. Did OIG doubt the claims that were made

Page 233

by provider groups?

MR. NEAL: Objection as to form.

THE WITNESS: I think that in many of our recommendations, especially in later reports, you'll see that, you know, we recommend that physicians or pharmacies need to be reimbursed appropriately, and that means paying for the drugs accurately and also reimbursing for the service component fairly as well.

So I think that it was something that, you know, we knew needed to be taken into account, but how that needed to be taken into account and to the extent that services weren't being reimbursed appropriately, we didn't know. It was just a statement that we continuously -- that we continually made.

BY MR. TORBORG:

Q. But fair to say that you at OIG were concerned about some of the statements that providers were making?

MR. NEAL: Objection as to form.

THE WITNESS: Not necessarily concerned

about the -- the -- again, the accuracy of the statements. We had no way of knowing whether they were accurate or not. But just logically, it makes sense that, you know, physicians or -- or whomever needed to be reimbursed appropriately.

BY MR. TORBORG:

Q. You didn't ignore their -- their claims; is that fair to say?

MR. NEAL: Objection as to form.

THE WITNESS: Yes.

BY MR. TORBORG:

Q. I'd like to hand you Exhibit Abbott 093. Mr. Tawes, this is another document that we pulled from the 1997 report working paper files. It bears the Bates Nos. HHD009-0119 through 20. If you would take a look at that article for me, and specifically the article on the right side, Agency: United States Paid Too Much for Drugs.

Now, this article was, again, one that I -- that we pulled out of the working paper files, and I believe you said before that Ms. Ragone was primarily responsible for maintaining the working

paper files for the 1997 report?

A. Yes.

MR. NEAL: Objection as to form.

THE WITNESS: Yes.

BY MR. TORBORG:

Q. All right. And how -- based on your work at OIG, how would it be that articles such as the one marked as Exhibit Abbott 093 would get into the working paper files?

A. Someone in the office, whether it be the regional inspector general, whether it be a -- a team leader or just an analyst, could read something in a paper -- in a newspaper or a -- some other source, and probably either sent an e-mail out or something like that, saying -- or make photocopies for everyone, saying you should look at this article, and the project leader would most likely then put that in the follow-up file to the -- to the inspection file.

Q. And the follow-up file is what?

A. Basically press reports or any -- any mention of our work in -- in trade journals or

requests for congressional testimony. Just basically anything that happens that we feel should go in the file once the report has been completed.

Q. If we read the first three paragraphs of this article, which are fairly short, it states: Medicare and senior citizens who rely on it paid at least $447 million too much for prescription drugs last year, government -- government investigators said yesterday. But this time it appears the government has no one but itself to blame for the problem. It agreed to pay retail prices instead of taking advantage of its buying power to negotiate discounts. Drug prices paid through the federal health care program to, quote, bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities, said June Gibbs Brown, Inspector General of the Health and Human Services Department.

Did you agree, Mr. Tawes, personally that the government had no one but itself to blame for paying too much for drugs?

MR. NEAL: Objection as to form.

THE WITNESS: Well, I -- I guess I don't see government as a single entity anyway. I mean, whoever passed the law may not have had -- I -- I can't say what their reasoning was for basing prices on AWP, but it was in the law, so CMS was sort of stuck paying that amount.

BY MR. TORBORG:

Q. If Congress had all of the information that you provided, OIG provided, that you've seen, detailing the differences between the AWPs and the actual acquisition costs and still decided to reimburse based upon published AWPs, would you agree that Congress had no one to blame but itself?

MR. NEAL: Objection as to form.

THE WITNESS: Again, it's -- it -- it's difficult to say who -- what they -- what they took out of the reports. I mean, I -- again, I don't even know if -- if people that were making -- making the law read the reports.

BY MR. TORBORG:

Q. But if they had read the reports the way

Page 266

I'm going instruct him not to answer at this time.
BY MR. TORBORG:
Q. Other than a lack of resources, did HCFA provide any other explanations as to why drugs were not being added to the Federal Upper Limit List?
MR. NEAL: Objection.
You can answer that to the extent that you don't reveal the substance of any communications that took place during entrance or exit conferences with CMS.
THE WITNESS: Outside of those conferences, anything -- any explanations that they came up with would have been in their comments to the reports.
BY MR. TORBORG:
Q. Let me see if I can ask that again. Other than a lack of resources at CMS, did HCFA provide any other explanations as to why drugs were not being added to the Federal Upper Limit List?
MR. NEAL: I'll object to the question.
And then you can answer that to the extent that you don't reveal the substance of

Page 267

communications that took place at entrance or exit conferences with CMS.
THE WITNESS: Again, without going back to their official comments to the report, I mean, that's the extent outside of entrance and exit conferences.
BY MR. TORBORG:
Q. At the entrance and exit conferences, did CMS provide any explanations, besides resource-based reasons, why drugs were not being added to the FUL List?
MR. NEAL: I'm going to instruct you not to answer the question.
MR. TORBORG: Just a yes or no, he can't answer that?
MR. NEAL: I'm going to instruct not to answer, yeah, it's -- my objection stands.
MR. TORBORG: So there may be reasons why CMS did not add specific drugs to the FUL List that I'm not going to get to figure out?
MR. NEAL: I mean, your question presupposes certain substantive communications from

Page 268

CMS and --
MR. TORBORG: That's why --
MR. NEAL: -- he's not --
MR. TORBORG: -- I'm asking --
MR. NEAL: -- going to disclose --
MR. TORBORG: -- yes or no.
MR. NEAL: He's not going to disclose those communications.
MR. TORBORG: Well --
MR. NEAL: The objection stands. I'm not --
MR. TORBORG: -- I'm not --
MR. NEAL: -- going to debate --
MR. TORBORG: -- trying to pre --
MR. NEAL: -- with you right now, but, I mean, I -- the objection stands. You're asking about the substance of communications that took place and entrance and exit conferences, and, you know, we've asserted a -- a fairly broad objection over the substance of those communications. I don't think he can answer that even yes or no without disclosing the substance of the

Page 269

communication.
MR. TORBORG: I guess that answers the question in itself, but --
MR. NEAL: I don't know --
MR. WINGET-HERNANDEZ: Objection to form.
MR. NEAL: -- what you're talking about, but...
MR. HAVILAND: John, you're under oath now.
MR. TORBORG: Yeah.
BY MR. TORBORG:
Q. The last paragraph of HCFA's response to this report states: Furthermore, HCFA is undertaking a more comprehensive review of drug prices and how they affect the Medicaid program and will issue future guidance to the states on this as appropriate.
Do you recall HCFA taking a more comprehensive review of drug prices?
A. No.
Q. Do you have any idea what they're referring to there?

bcab4204-38f1-4b48-ab34-7037316b0f5a

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

VOLUME II

-----------------------------------X MDL NO. 1456

IN RE: PHARMACEUTICAL INDUSTRY : CIVIL ACTION:

AVERAGE WHOLESALE PRICE LITIGATION : 01-CV-12257-PBS

-----------------------------------X

THIS DOCUMENT RELATES TO: :

U.S. ex rel. Ven-A-Care of the : CIVIL ACTION:

Florida Keys, Inc. v. Abbott : 06-CV-11337-PBS

Laboratories, Inc. :

-----------------------------------X

IN THE CIRCUIT COURT OF

MONTGOMERY COUNTY, ALABAMA

-----------------------------------X

STATE OF ALABAMA, : CASE NO.

Plaintiff, : CV-05-219

v. :

ABBOTT LABORATORIES, INC., : JUDGE

et al., : CHARLES PRICE

Defendants. :

-----------------------------------X

58feec2f-99ac-42be-8c4e-803a680a2c55

Page 365

inadequate Medicare payments for services related to furnishing the drug, such as the administration of chemotherapy for cancer. We need to pay appropriately for the drugs and the services related to furnishing these drugs.

Do you recall any discussions about that with CMS?

MR. NEAL: You can answer that question to the extent that your answer doesn't implicate any privileged communication.

MR. WINGET-HERNANDEZ: Objection to form.

THE WITNESS: I don't recall any specific discussions outside of entrance or exit conferences.

BY MR. TORBORG:

Q. Did you ever use the term "drug profits" during your time at OIG?

MR. NEAL: Object to the form.

You can answer.

THE WITNESS: I -- I don't recall using that specific term.

BY MR. TORBORG:

Page 366

Q. Did you ever use -- do you ever recall using the term "cross-subsidize"?

A. I don't think I would have used that specific term either.

Q. Do you recall anyone else using that term?

A. Aside from -- that specific term, aside from these comments, no.

Q. Do you recall any discussions within OIG or CMS about the concept of the payment for the drug making up for underpayment for physician services?

MR. NEAL: You can answer that consistent with my previous instruction on privileged communication.

MR. WINGET-HERNANDEZ: Objection to form.

THE WITNESS: I recall those discussions. However, again, I'm not sure that it was -- it was more along the lines of this is what physicians say. There was no real discussion of the validity of -- of the physicians' claims.

BY MR. TORBORG:

Page 367

Q. Because OIG had never studied that particular issue, right?

MR. NEAL: Objection as to form.

THE WITNESS: As far as I know, at least OEI had not studied that issue.

BY MR. TORBORG:

Q. Do you recall CMS ever asking OIG to study that issue?

MR. WINGET-HERNANDEZ: Objection to form.

THE WITNESS: I recall being asked to look at the dispensing-fee issue. I don't necessarily recall being asked to look into physician service costs.

BY MR. TORBORG:

Q. What do you -- what do you recall about being asked to look at the dispensing-fee issue?

A. In converse -- in conversations with CMS, them asking how much it really cost physicians -- I'm sorry -- how much it really cost the pharmacies to dispense the drugs and what services they're -- they're providing for those dispensing fees.

Page 368

Q. And just to back up a step, what is a dispensing fee?

A. A dispensing fee is a fee paid with each prescription filled by a pharmacy.

Q. Is the dispensing fee supposed to include a level of profit?

MR. NEAL: Objection as to form.

THE WITNESS: I am not sure about the -- about what it's supposed to include.

BY MR. TORBORG:

Q. With whom did you have these conversations?

MR. NEAL: Let me just instruct you to answer that question consistent with my previous instruction. You can discuss this so long as you don't implicate essentially privileged communications at entrance and exit conferences.

THE WITNESS: I don't recall exactly who was at the meeting. It would have been someone that I mentioned earlier as folks that I had met with, but I can't remember specifically who was there.

58feec2f-99ac-42be-8c4e-803a680a2c55

Page 369

BY MR. TORBORG:
Q. Do you recall if it was related to Medicare or Medicaid?
A. Actually, we've had discussions with both sets of -- of -- of CMS staff about dispensing-fee issues.
Q. Did OIG ever conduct studies regarding the appropriate dispensing fees to pay under Medicare or Medicaid reimbursement?
MR. NEAL: I'll object to the form. You can answer.
THE WITNESS: Our Boston office did a study on Medicare dispensing fees that examined what services were being provided by -- by pharmacies or suppliers, but it didn't recommend a specific fee.
BY MR. TORBORG:
Q. Do you recall who in the Boston office was involved in that?
A. Ken Price, Ivan Troy, and Joyce Greenleaf (ph).
Q. Are those individuals still in the

Page 370

Boston office of OIG?
A. Yes.
Q. And is that -- are they in the Office of Evaluations and Inspections or Office of Audit Services?
A. They're in OEI.
Q. I meant to ask you yesterday. You mentioned some individuals from the Office of Audit Services that you worked with -- or met with with respect to reimbursement of drugs?
A. Yes.
Q. Paul Chesser, William Shrigley, and Gordon and Sato. Where are they located?
A. Paul and Bill were in Little Rock. I'm not sure where Bill is now. And Gordon Sato was in Dallas.
Q. Do you know if they're still with OES today?
A. Bill Shrigley is not with OES.
Q. Do you know where he is today?
A. I'm not sure.
Q. But the other two are --

Page 371

A. Yes.
Q. -- still there? When was the last time that you've talked with them?
A. Bill Shrigley, it's been -- I saw him at a Medicaid -- the Medicaid Rebate Conference that I mentioned yesterday, however -- two years ago. Paul Chesser, I believe I ran into at CMS last year. And Gordon Sato, it's been three or four years.
Q. Have you ever discussed litigation relating to drug issues with them?
A. I'm sure at -- at one of the mini conferences that we had that I had mentioned yesterday, that the lawsuits may have been brought up, but more for informational purposes, just to discuss what was going on in the -- in the topic area, but I don't remember any specific discussions.
Q. What are -- what is Bill Shrigley's position as compared to Paul as compared to Gordon; like who's the highest in the ranking?
A. I'm -- I -- I'm not sure. At the time I

Page 372

believe that Gordon -- I -- I don't know if Gordon and Bill were equals as far as rank goes in the organization, but Paul worked for Bill. Since Bill left OIG, Paul has assumed his position.
Q. Do you re -- do you recall any other studies that OIG has done with respect to dispensing fees?
A. No.
Q. You're just aware of a study done by the Boston office that evaluated the various services involved in dispensing a drug, but never recommended a specific fee, correct?
A. Yes.
MR. NEAL: Is now a good time for a short break?
MR. TORBORG: Yes, it is.
THE VIDEOGRAPHER: Off the video at 9:03.
- - -
(Whereupon, a recess was taken.)
- - -
THE VIDEOGRAPHER: We're back on the record at 9:23.

58feec2f-99ac-42be-8c4e-803a680a2c55

worked with in the last year on Federal Upper Limit topics.

Q. Do you remember an individual named William Scanlon (ph)?

A. I've -- I've heard that name, but I don't know exactly who he was. I know I never --

Q. That's not --

A. -- spoke with him.

Q. That's not one of the people that you --

A. No.

Q. -- talked with? Okay. In the bottom of the first column, last paragraph, it states: There's no doubt there are problems with AWP-based payments, acknowledged Susan Winckler, group director of policy and advocacy for the American Pharmaceutical Association. She agreed that AWP is neither an average price nor a wholesale price. But focusing on AWP distracts attention from the real problem - payment for professional services.

Quote, if you want to base drug payments on more accurate figures, fine, Winckler said, but that must be coupled with an acknowledgment of all

the costs involved in getting the product out the door. We can unbundle the costs of professional, administrative, and distributive services, but we cannot ignore -- but we can't ignore them. No other business is expected to sell products at cost or lower.

Do you agree or disagree with the statements made by Ms. Winckler as quoted in this article?

MR. NEAL: Objection as to form.

MR. WINGET-HERNANDEZ: Compound.

THE WITNESS: In relation to pharmacies, I don't disagree that businesses aren't expected to sell products at cost or lower. And I think that in order to determine -- in -- in order to ensure that providers are reimbursed fairly, that both segments need to be considered. That's why it -- you know, that's why those recommendations were typically in our reports.

BY MR. TORBORG:

Q. If we go to the -- to the third column, there is a quote from John Rector, vice president of the government affairs and general counsel for

the National Community Pharmacists Association. And the article states: Focusing acquisition -- focusing on acquisition cost sounds good in congressional testimony, but it's a recipe for financial disaster.

Do you see that?

A. Yes.

Q. Do you recall any discussions with OIG or HCFA of what would happen if CMS changed the way it reimbursed for drugs?

MR. WINGET-HERNANDEZ: Objection to form.

MR. NEAL: I'll object to the form as well.

You can answer that question to the extent that your answer would not divulge any privileged communication.

THE WITNESS: In various conversations, I know that especially in the pharmacy area, not necessarily in the physician area, that there -- and that's why we had conversations about dispensing fees -- that CMS wanted to ensure that -- that beneficiary access wasn't inhibited based

on any -- based on any cost reductions.

BY MR. TORBORG:

Q. Do you recall who made those -- with whom you had those conversations?

A. No.

Q. Do you have a recollection of when those conversations occurred?

A. They have occurred recently about the Federal Upper -- the Federal Upper Limit work that we've done. They -- I don't recall earlier conversations. They were most likely done in entrance or exit conferences, some of them, and others during work planning meetings.

Q. A fairly frequent topic of conversation?

A. No. I mean, maybe once a year at most.

Q. With respect to the recent work you're doing on Federal Upper Limits, you indicated that you had discussions with CMS about what I'll call the access issue; is that fair to say?

MR. NEAL: I'll --

MR. PAUL: Objection to --

MR. NEAL: I'll object to the form.

You can answer.
THE WITNESS: Yes.
BY MR. TORBORG:
Q. And with whom did you have conversations; do you recall?
A. Larry Reid and Deirdre Duzor.
Q. And do you -- what can you recall about those conversations?
MR. NEAL: You can answer that question consistent with my previous instruction on privileged communication.
THE WITNESS: It was simply based on initial results from a draft report that we're working on and how the new Federal Upper Limit amounts related to actual acquisition costs for pharmacies.
BY MR. TORBORG:
Q. And what stage is that report at right now?
A. We're awaiting comments from CMS, so it's a draft report.
Q. And so you've received some oral

comments from CMS?
A. Yes.
Q. But not formal?
A. Correct.
Q. How long ago -- how long ago did you receive the oral comments?
A. Two or three months ago.
Q. Is there any record of those oral comments?
A. Yes.
Q. Did you take notes?
A. Yes.
Q. Where -- where are those notes today?
A. They would be part of the exit conference notes.
Q. Anything else you -- you can recall about the specifics of those conversations?
MR. NEAL: You can answer that question consistent with my previous instructions.
THE WITNESS: No.
BY MR. TORBORG:
Q. Is CMS concerned that basing the Federal

Upper Limits on AMP data may cause an access issue?
MR. NEAL: Objection as to form.
You can answer that question consistent with my instruction on privileged communications.
THE WITNESS: Since I haven't seen their official comments, I can't say what the official position of CMS is.
Outside of exit conference, there have been a couple conversations involving the data that we have that does -- that -- where they did indicate that there may be some small issues that they're concerned with. You can also look at their comments to the GAO report which -- and which looked at the same issue that we're looking at in this and -- and get a better idea of where they -- where they stand.
BY MR. TORBORG:
Q. Do you recall in other conversations you've had with CMS relating to the Federal Upper Limit issue and -- let me back up.
You've done other reports on Federal Upper Limits --

A. Yes.
Q. -- correct? Starting, I think, in about 2004?
A. It may have been earlier. I'm not sure.
Q. Have any of the conversations you've had with CMS relating to those reports discussed the access issue?
MR. NEAL: I'll instruct you not to answer that question to the extent that it will require you to divulge privileged communications with CMS.
THE WITNESS: Outside of entrance and exit conferences, there were a few discussions about how Federal Upper Limits were calculated and concerns that sometimes that the lowest price available -- or the lowest price listed in compendia wasn't accurate and not available to -- to all pharmacies, and, therefore, setting the Federal Upper Limit amount based on that price could lead to access issues.
BY MR. TORBORG:
Q. Do you recall with whom those

58feec2f-99ac-42be-8c4e-803a680a2c55