UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| GSK SETTLEMENT | Judge Patti B. Saris |

**CLASS COUNSEL'S RESPONSE TO WILLIAMS' MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD**

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION ...........................................................................................................1

II. THE FACTS ..................................................................................................................1

   A.  Lead Class Counsel and the GSK Settlement Fee Award. ...................................1

   B.  Lead Class Counsel's Allocation of the GSK Fee and Expense Award.................2

      1.  Payments to ISHP Counsel and objector. ...................................................2

      2.  Reimbursing advanced expenses. ...............................................................4

      3.  Allocating fees to Class Counsel. ...............................................................4

         a.  Lead Class Counsel identified the relevant jurisprudential
             factors bearing on each firm's contribution to the litigation............4

         b.  Lead Class Counsel applied the *Goldberger* factors to discern
             each firm's contribution to the litigation. .......................................5

            (1)  The Tier I contributions. .....................................................6

            (2)  The Tier II contributions......................................................7

            (3)  The Tier III contributions....................................................7

         c.  The specific fee allocations............................................................8

         d.  The role of unaudited lodestar. ......................................................8

III. ARGUMENT.................................................................................................................10

   A.  Courts Provide Lead Counsel Significant Discretion in Allocating
       Attorneys' Fees Awards......................................................................................10

   B.  Courts Review Lead Counsel's Attorney Fee Allocation under a "Fair and
       Reasonable" Standard. .......................................................................................12

   C.  Lead Class Counsel's Fee Allocation was Fair and Reasonable. .........................15

      1.  It is fair and reasonable to reward all efforts made by Class Counsel.......16

         a.  Taking an "all in" approach to Class Counsel's collective
             efforts is the most fair and reasonable manner of
             compensating all Class Counsel....................................................16

(1)     Obtaining final approval of the GSK settlement and resolving the appeal related thereto took two years...........17

(2)     Important litigation work on common issues and of benefit to all class members, including the GSK class members, continued. .........................................................19

b.     It is not possible to segregate "GSK-only" efforts, and any attempt to do so would result in an even greater payment to Lead Class Counsel at the expense of firms that did little or no work that is specifically identifiable to the case against GSK...........................20

2.     It was unnecessary for Lead Class Counsel to conduct a detailed inquiry into time and expense reports.........................................................22

3.     The ISHP Counsel payment and objection resolution were proper...........23

4.     The amounts allocated were proper. ...........................................24

5.     Williams overstates the importance of his involvement in this case. ........26

6.     Court monitoring of time and expense reports is unnecessary. .................29

7.     It is unnecessary for the Court to, in the first instance, allocate all future fee awards....................................................................................31

IV.     CONCLUSION....................................................................................32

001534-16  272128 V1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*In re Ampicillin Antitrust Litig.*,
    81 F.R.D. 395 (D.D.C. 1978)........................................................................................11

*Brewster v. Dukakis*,
    3 F.3d 488 (1st Cir. 1993).....................................................................................15, 32

*In re Copley Pharm., Inc.*,
    50 F. Supp. 2d 1141 (D. Wyo. 1999), *aff'd*,
    232 F.3d 900 (10th Cir. 2000) .......................................................................13, 14, 15

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000).....................................................................................1, 5, 25

*Guckenberger v. Boston Univ.*,
    8 F. Supp. 2d 91 (D. Mass. 1998) ...............................................................................23

*Gunter v. Ridgewood Energy Corp.*,
    223 F.3d 190 (3d Cir. 2000)..........................................................................................5

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)......................................................................................................14

*In re: High Sulfur Content Gasoline Prods. Liab. Litig.*,
    517 F.3d 220 (5th Cir. 2008) ......................................................................................14

*In re Horizon/CMS Healthcare Corp. Secs. Litig.*,
    3 F. Supp. 2d 1208 (D.N.M. 1998) .............................................................................11

*In re Indigo Secs. Litig.*,
    995 F. Supp. 233 (D. Mass. 1998) .........................................................................10, 12

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ......................................................................................14

*In re Linerboard Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) ...........................................10, 11

*Malanka v. de Castro*,
    1990 U.S. Dist. LEXIS 18171 (D. Mass. Nov. 20, 1990) .................................................10

001534-16  272128 V1

*In re Stocker Yale, Inc. Secs. Litig.*,
    2007 WL 4589772 (D.N.H. Dec. 18, 2007)......................................................................10

*Sylvester v. CIGNA Corp.*,
    401 F. Supp. 2d 147 (D. Me. 2005) ...........................................................................10

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995)....................................................................... *passim*

*In re Vitamin Cases*,
    2004 WL 5137597 (Cal. Super. Apr. 12, 2004)...............................................11, 12, 13

*In re Vitamins Antitrust Litig.*,
    398 F. Supp. 2d 209 (D.D.C. 2005) .......................................................................12, 13

*Wells v. Dartmouth Bancorp., Inc.*,
    813 F. Supp. 126 (D.N.H. 1993) .................................................................................10

## I.      INTRODUCTION

Courts delegate substantial discretion to lead counsel to allocate a fee award across participating counsel and will not disturb that allocation provided that is fair and reasonable. Lead Class Counsel here have gone to great pains to ensure the fairness and reasonability of their allocation.  Lead Class Counsel's fee allocation decision was guided by the factors that courts consider in awarding fees in class litigation, including the risks borne by counsel in litigating a complex case on a contingency fee basis, the quality of the representation provided, and the time and labor expended by counsel.  *See*, *e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  Lead Class Counsel applied this multi-factor analysis in an objective manner in allocating expenses and fees.  Because Lead Class Counsel's allocation was fair and reasonable, the Court should defer to Lead Class Counsel and uphold their allocation.

The Williams Law Firm, the vehicle through which Kent Williams practices law as a sole practitioner and one of 26 firms that comprise Class Counsel in this case, is the only firm challenging Lead Class Counsel's allocation of fees and expenses from the GSK fee and expense award approved by the Court.  Williams is not entitled to the relief that he seeks.

## II.      THE FACTS

### A.      Lead Class Counsel and the GSK Settlement Fee Award.

Case Management Order No. 1 (Dkt. No. 100), dated June 14, 2002, established the Lead Counsel Committee and gave it "sole authority" over:

> (a) the initiation, response, scheduling, briefing and argument of all motions; (b) the scope, order and conduct of all discovery proceedings; (c) such work assignments to other Plaintiffs' counsel as they may deem appropriate; (d) the retention of experts; (e) designation of which attorneys may appear at hearings and conferences with the Court; (f) the timing and substance of any settlement negotiations with Defendants; and (g) other matters concerning the prosecution or resolution of their respective cases.

- 1 -

CMO No. 1 at 7.  In addition, CMO No. 1 provided that the "Lead Counsel Committee shall have responsibility for major decisions on behalf of Plaintiffs' counsel regarding the overall prosecution of the Consolidated Actions and shall be responsible for the efficient prosecution of the litigation and the appointment of chair persons and members of such committees." *Id.*  The Lead Counsel Committee, herein referred to as "Lead Class Counsel," are presently comprised of the following firms:  Hagens Berman Sobol Shapiro LLP ("Hagens Berman"), Wexler Wallace LLP, Spector Roseman Kodroff & Willis, P.C., and Hoffman and Edelson LLC.

On August 7, 2007, the Court entered its Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement with the GlaxoSmithKline Defendants, Approving Proposed Allocation of Settlement Funds, and Approving Class Counsel's Application for Attorneys' Fees, Reimbursement of Litigation Expenses and Compensation to Class Representatives (Dkt. No. 4400, the "Final Approval Order").  Among other things, Court awarded Class Counsel $21,615,000 in attorneys' fees and directed that "Co-Lead Settlement Class Counsel shall allocate fees to themselves and other Plaintiffs Class Counsel in their sole discretion, as appropriate."  *Id.*, ¶ 14(k) at 9.[1]

**B.     Lead Class Counsel's Allocation of the GSK Fee and Expense Award.**

**1.     Payments to ISHP Counsel and objector.**

As the Court may recall, there exist various entities consisting of certain health insurance companies and health plans that are referred to as "Independent Settling Health Plans" or "ISHPs."  The ISHPs, which in the aggregate provide or administer prescription drug and health benefits to approximately sixty percent (60%) of the covered lives privately insured in the United

---

[1] The Final Approval Order is found at Exhibit 1 to the Declaration of Steve W. Berman in Support of Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award (the "Berman Decl.").

States (based on U.S. Census data published December 31, 2004), had claims against the GSK

Defendants that were identical to those brought herein the MDL Class actions.  Berman Decl.,

¶ 3 & Ex. 2 (Settlement Agreement and Release of the GlaxoSmithKline Defendants (Dkt. No.

2972, the "GSK Settlement Agreement")).  Counsel to the Independent Settling Health Plans

Group ("ISHP Counsel") are the firms of Robins, Kaplan, Miller & Ciresi, Rawlings &

Associates, and Lowey Dannenberg Bemporad & Selinger P.C.  ISHP Counsel participated in

the allocation mediation sessions, and, after substantial arms-length negotiations, the ISHPs

decided to join the settlement and signed the GSK Settlement Agreement.  Berman Decl., ¶ 4.

ISHP Counsel were first paid a total of $2,957,377.50.  Berman Decl., ¶ 5.  The GSK

Settlement Agreement, which the Court approved, specifically authorized the payment of fees to

ISHP Counsel:

> ISHP Group Counsel have agreed to forgo seeking (1) a separate
> counsel fee in the MDL Actions, and (2) any fee from GSK in
> connection with their work concerning any of the Released ISHP
> Claims, and in lieu thereof will accept as payment of ISHP
> Counsel Fees an amount negotiated between ISHP Group
> Members and Lead Class Counsel, in accordance with the
> conditions set forth in a separate agreement between Lead Class
> Counsel and ISHP Group Counsel, which agreement shall be
> identified to the MDL Court in accordance with Fed.R.C.P. 23(e).

GSK Settlement Agreement, ¶ 18(b) at 41-42.

Pursuant to an August 11, 2006, Agreement between Lead Class Counsel and ISHP

Counsel, ISHP Counsel were entitled to 15% of the total GSK fee awarded by the Court.

Berman Decl., ¶ 6 & Ex. 3.  But, with the assent of ISHP Counsel, we deducted one-fifth of the

expenses from the total award before we applied the 15% to obtain the total ISHP Counsel

payment which was then spilt in thirds among ISHP Counsel.  Berman Decl., ¶ 6.

In addition to the ISHP Counsel payment, Lead Class Counsel resolved the Demra Jordan

appeal and objection for $100,000.  Lead Class Counsel believed that the objection was without

merit, and we made every effort in this Court and with the First Circuit to have the issue quickly

resolved, but the First Circuit did not rule quickly on the appeal and failed to enforce the bond

requirement.  Given the passage of time and no schedule for resolution of that appeal, we

believed that it was in the best interests of the GSK Class members to resolve the Jordan

objection so that distributions to the class could begin.  Berman Decl., ¶ 7.

Reducing the ISHP Counsel payment and $100,000 from the $21,615,000 overall award

left $17,247,807.51 for distribution, including accrued interest.  Berman Decl., ¶ 8.

### 2.     Reimbursing advanced expenses.

As a first step, Lead Class Counsel decided to reimburse one-fifth of the total amount of

expenses that each firm advanced in the AWP litigation.  The aggregate amount of expenses

incurred and reported through July 2008 was $8,973,764.63, net of interim reimbursements made

out of the GSK fund last year.  One fifth of this number is $1,794,752.93.[2]  Deducting

$1,794,752.93 from $17,247,807.51 left $15,438,735.95 for further allocation as attorneys' fees.

Berman Decl., ¶ 9.

### 3.     Allocating fees to Class Counsel.

#### a.     Lead Class Counsel identified the relevant jurisprudential factors bearing on each firm's contribution to the litigation.

Lead Class Counsel's fee allocation decision was guided by the factors that courts

consider in awarding fees in class litigation, including the risks borne by counsel in litigating a

complex case on a contingency fee basis, the quality of the representation provided, and the time

and labor expended by counsel.  *See*, *e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50

(2d Cir. 2000); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  With

---

[2] In terms of calculating the expense portion of the allocation, we took the total amount of expenses reported for each firm, deducted the amount that each firm received last year as an interim reimbursement, and then multiplied by 20 percent.  Berman Decl., ¶ 8.

respect to the quality of representation factor, we primarily considered each firm's leadership position; its quality and volume of substantive work; whether the firm was an integral component of the trial team; the number, experience and quality of the partners and senior associates assigned to the case and whether and to what extent lower value contract lawyers were utilized; the consistency of the firm's commitment throughout the duration of the litigation, including work on appellate issues; and the importance of the firm's clients.  Berman Decl., ¶ 10.

With regard to risk, the Court recently highlighted this factor in discussing fees associated with the AstraZeneca Class 1 settlement.  *See* May 1, 2008 Hearing Tr. at 24; *see also Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement.").  In assessing risk profiles, Class Counsel considered the magnitude of advanced expenses and each firm's commitment of full-time firm personnel to the exclusion of other case opportunities.  This litigation has entailed, and continues to entail, an extraordinarily high level of risk.  It has involved novel and complex legal and factual issues, and the limited resources of Lead Class Counsel have been pitted against the seemingly infinite resources of defendants and their well-heeled defense counsel.  Berman Decl., ¶ 11.

> **b.      Lead Class Counsel applied the *Goldberger* factors to discern each firm's contribution to the litigation.**

Lead Class Counsel employed the foregoing factors and grouped the 26 plaintiffs' firms reporting time and expenses in the AWP litigation into three tiers based on their contributions to the litigation as follows:

| Tier | Firm |
|------|------|
| **I** | Hagens Berman Sobol Shapiro LLP<br>Wexler Toriseva Wallace LLP<br>Spector, Roseman & Kodroff, P.C.<br>Hoffman & Edelson, LLC |
|  |  |

| II | Heins, Mills & Olson, P.L.C.<br>Kline & Specter, P.C. |
|---|---|
| | |
| IIIA | Cuneo Gilbert & Laduca, LLP<br>RodaNast, P.C. |
| | |
| IIIB | Bolognese & Associates, LLC<br>Rossbacher Firm<br>Sheller, P.C.<br>Shepherd, Finkleman, Miller & Shah, LLC<br>Squitieri & Fearon, LLP |
| | |
| IIIC | Audet & Partners, LLP<br>Carey & Danis, LLC<br>Cohen, Milstein, Hausfeld & Toll, LLC<br>Freeman & Lorry, P.C.<br>Hanzman, Criden & Love, P.A.<br>Hulett Harper Stewart, LLP<br>Karmel Law Firm<br>Law Office of Adam S. Levy<br>Piper & Associates<br>Trujillo Rodriguez & Richards, LLC<br>Weller, Green, Toups & Terrell, L.L.P.<br>Williams Law Firm<br>Young, Pickett & Lee |

Berman Decl., ¶ 12.

### (1)     The Tier I contributions.

The Tier I firms led the case from inception to the present, did most of the work, advanced the most expenses, shouldered most of the risk of nonpayment and were the primary drivers of the results achieved thus far.  Among other work, Lead Class Counsel made the following contributions:  headed the litigation; comprised the trial team; spearheaded all substantive oral arguments and served as the primary "face" of the team in court; prepared most, if not all, of substantive briefing; conducted without assistance the expert work; were liaison counsel to the Court; handled almost all of the case filings for the Plaintiffs; led on all case management order and pre-trial order negotiations and drafting; coordinated and conducted third-party TPP discovery; covered the so-called "government knowledge" depositions; coordinated with the DOJ on federal issues; conducted wholesaler discovery; conducted

- 6 -

publisher discovery, with some help from a Tier III firm; and were responsible for discovery of all of the defendants (including GSK, BMS, SPW, Baxter, Amgen, Immunex, Pfizer, Pharmacia, Fujisawa, AstraZeneca, Abbott, Bayer, B. Braun, J&J, Aventis and Watson).  Berman Decl., ¶ 13.

### (2) The Tier II contributions.

The Tier II firms once participated in leadership roles and, for a time, shared some of the Tier I responsibilities.  The Tier II firms' former participation in leadership roles differentiates them from the Tier III firms.  However, the Tier II firms dropped out of the case and thereby minimized their risks.  This is in part reflected in expense and lodestar information highlighted below.  Berman Decl., ¶ 14.

### (3) The Tier III contributions.

The roles of the Tier III firms were primarily but not exclusively limited to participating in document review projects early in the litigation.  This work was important and necessary to filter the literally millions of documents produced by the defendants in this case.  The fact that many Plaintiffs' counsel participated in document review projects does not mean that time spent reviewing documents was duplicative.  To the contrary, all of the documents produced needed to be read, coded, and analyzed whether the case was litigated by few firms or many.  Lead Class Counsel instituted procedures designed to avoid duplication and inefficiency and divided document review responsibilities in a cogent manner.  Berman Decl., ¶ 15.

Some Tier III firms performed higher quality work and dedicated higher value attorneys to the effort.  Those firms are found in Tiers IIIA and B.  For example, Diane Nast is a nationally recognized authority in class action and antitrust law.  The Cuneo firm provided substantial assistance in discovery, as did the Tier IIIB firms, including Shepherd Finkelman, which assisted

with publisher discovery.  The firms of RodaNast and the Williams Law Firm acted as allocation counsel in the GSK settlement.  Berman Decl., ¶ 16.

The Tier III firms did not play a leadership role.  These firms either have no or minimal additional time and expenses in the case after 2006.  Berman Decl., ¶ 17.

### c.    The specific fee allocations.

In light of the foregoing factors, Lead Class Counsel decided that the Tier I firms deserved the bulk of the fee.  Accordingly, we allocated 83 percent of the fee to Tier I ($12,814,150.84), 10 percent to Tier II ($1,543,873.60), and 7 percent to Tier III ($1,080,711.52).  Berman Decl., ¶ 18.

We also applied the allocation factors outlined above to allocate the fee within each tier. Based on these factors, Tier III was sorted into three sub-tiers.  To account for a higher level of dedication and quality of work, Sub-tiers A and B received a 20 percent and 10 percent bonus on lodestar, respectively.  These bonuses were paid for by reducing the Sub-tier C's share of the overall Tier III allocation.  As regards Tier II, we believed that lodestar accurately reflected the efforts of the Tier II firms *vis-à-vis* each other and, therefore, allocated the Tier II share based on lodestar.  Berman Decl., ¶ 19.

The specific amount of expense reimbursement and fee allocation received by each firm is set forth in Exhibit 4 to the Berman Declaration.

As shown, Williams received $6,479.22 in expense reimbursement, and $148,011.56 in fees for a total of $154,490.79.  <u>This was the second highest payout of any Tier III firm and second only to the Sheller firm</u>.  Berman Decl., ¶ 21.

### d.    The role of unaudited lodestar.

Each firm's lodestar was a relevant factor considered by Lead Class Counsel in discerning each firm's contribution to the litigation.  But lodestar was <u>not</u> the sole or even

determinative factor in Lead Class Counsel's analysis, as is demonstrated by reviewing the other important *Goldberger* factors considered by Lead Class Counsel above.  As noted, the prime factors were the risks borne by counsel and the quality of representation and leadership provided. Berman Decl., ¶ 22.

Each firm's total expenses and lodestar as of July 31, 2008, are set forth in Exhibit 1 to the Declaration of Marc H. Edelson in Support of Lead Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award ("Edelson Decl."). These are <u>unaudited</u> numbers.  Lead Class Counsel collected and reviewed time and expense information on a periodic basis for all counsel, and reviewed hourly rates for reasonableness. But we did not conduct an audit of this information.  Lead Class Counsel do not believe that an audit is necessary given that (i) the Court has awarded and continues to award fees based on the percentage-of-the-fund method pursuant to First Circuit authority, and (ii) Lead Class Counsel did not make a lodestar-based allocation of fees across all counsel, although lodestar was a factor.  Edelson Decl., ¶¶ 3-4.  Lead Class Counsel did review hourly rates for reasonableness. Berman Decl., ¶¶ 24-25.

Total lodestar for Tier I through July 2008 is $49,208,132, which is 68.1% of total lodestar in the case.  Unreimbursed expenses advanced by Tier I are $7,487,421, which is 83.4% of total unreimbursed expenses.  Total lodestar for Tier II is $10,271,190 (14.2% of total lodestar) and total unreimbursed expenses is $934,021 (10.4% of total unreimbursed expenses). The total lodestar for Tier III is $12,773,881 (17.68% of total lodestar) and total unreimbursed costs of $552,321 (6.15% of total unreimbursed expenses).  Edelson Decl., ¶ 6.

- 9 -

# III.    ARGUMENT

**A.    Courts Provide Lead Counsel Significant Discretion in Allocating Attorneys' Fees Awards.**

District Courts in the First Circuit uniformly provide significant discretion to lead counsel in allocating attorneys' fee awards.  *See Stocker Yale, Inc. Secs. Litig.*, 2007 WL 4589772, at *6 (D.N.H. Dec. 18, 2007) ("The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion and sole discretion of Lead Plaintiffs' Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions to the prosecution of the Action."); *Sylvester v. CIGNA Corp.*, 401 F. Supp. 2d 147, 151 (D. Me. 2005) (Lead Counsel "in their sole discretion, shall allocate and distribute this award of attorneys' fees and expenses among counsel for the Class."); *In re Indigo Secs. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998) ("Any and all allocations of attorneys' fees and expenses among counsel for all class representatives shall be made by lead counsel for the class, who shall apportion the fees and expenses based upon their assessment of the respective contributions to the litigation made by each counsel."); *Wells v. Dartmouth Bancorp., Inc.*, 813 F. Supp. 126, 132 (D.N.H. 1993) (Attorneys' fees and reimbursement of expenses are to be apportioned among plaintiff's counsel and other class counsel "as Lead Counsel for the Class deems appropriate."); *Malanka v. de Castro*, 1990 U.S. Dist. LEXIS 18171, at *3-4 (D. Mass. Nov. 20, 1990) (Attorneys' fees and reimbursement of expenses "shall be paid to Lead Counsel, who shall distribute such sum to Class Counsel pursuant to Lead Counsel's assessment of each Class Counsel's contribution to this case.").

Courts outside of this region also provide lead counsel with significant discretion in allocating attorneys fees among interested plaintiffs' firms in class actions.  For example, in *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004), the court held

- 10 -

that "[l]iaison counsel has led the case from its inception and is the attorney 'better able to describe the weight and merit of each [counsel's] contribution[,]'" and that, "from the standpoint of judicial economy, leaving allocation to such counsel makes sense because it relieves the Court of the 'difficult task of assessing counsel's relative contributions.'"  *Id.* at *54 (quoting *In re Diet Drug Litig.*, 2002 U.S. Dist. LEXIS 19396 (E.D. Pa. Oct. 3, 2002); *In re Prudential*, 148 F.3d 283, 329 n.96 (3d Cir. 1998)).  *See also In re Horizon/CMS Healthcare Corp. Secs. Litig.*, 3 F. Supp. 2d 1208, 1212-13 (D.N.M. 1998) ("Given the expression of congressional intent that significant investors be preferred and the fact that even before the passage of the Act, lead counsel in such class actions exercised near plenary authority, the Court is reluctant to attempt a detailed, retroactive analysis of the work allocation made by lead counsel."); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978) (although the attorneys agreed that the court "should take no part in the ultimate division of any fee awarded," the court recognized that any allocation will be based on subjective factors of the relative contributions of the attorneys to the group effort, that it was "virtually impossible for the Court to determine accurately as can the attorneys themselves the internal distribution of work, responsibility and risk," and that, consequently, the Court would "defer to the attorneys' request that the fee award be made to the Committee of Counsel as a whole").

In *Vitamin Cases*, 2004 WL 5137597, at *8 (Cal. Super. Apr. 12, 2004), the court observed:

> Federal courts nationwide have recognized that lead counsel are generally better suited than the trial court to decide the weight and merit of the relative contributions made by those performing common benefit work – particularly in cases such as this litigation where many attorneys performed thousands of hours of widely varying professional services outside the direct observation of the Court and under the over supervision of lead counsel.

Thus, the court found it appropriate to allow lead counsel to allocate the attorneys' fees awarded "given the complexity of this litigation and [lead counsel's] unique knowledge of the relative contributions made by more than fifty plaintiff's firms." *Id.*  Nevertheless, the Court retained jurisdiction over the allocation in the event that it needed to "resolve any disputes that may arise." *Id.* at 8.

The discretion accorded lead counsel is the product of an understandable hesitancy to become embroiled in fee allocation decisions.  As Judge Young once explained in evaluating separate fee petitions made by lead plaintiffs' counsel and another group of plaintiffs' counsel that were unable to agree on a unified allocation of fees among the nineteen plaintiffs' firms:

> This Court is surprised and dismayed to be confronted with this unseemly controversy over attorneys' fees.  It is in no position to evaluate the relative merits of the lawyers' chosen litigation strategies, nor is it inclined to endorse one or another of the uncharitable versions of events that counsel have recited.  Judge Bartels made an order appointing lead counsel in this matter, and this Court has respected that order.  The Court sees no reason why it should not, as it has done in the past, award attorney fees and costs to all class counsel, to be distributed among the participating counsel based on their respective contributions to the litigation, according to the discretion of lead counsel.

*In re Indigo Secs. Litig.*, 995 F. Supp. at 235 (emphasis added).

In vesting Lead Class Counsel with the responsibility for the overall prosecution of this case generally in CMO No. 1, and in providing Lead Class Counsel with the "sole discretion" to allocate fees to co-counsel in the Final Approval Order, the Court ruled consistent with the foregoing authorities.

**B.    Courts Review Lead Counsel's Attorney Fee Allocation under a "Fair and Reasonable" Standard.**

Notwithstanding the broad discretion provided to lead counsel in allocating fees, courts will review the reasonableness of the allocation when called upon to do so.  *See, e.g., In re*

*Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (reviewing cases, applying abuse of discretion standard to lead counsel's fee allocation decision and upholding multiplier of 4 times lodestar for Executive Committee members as opposed to multiplier of 2.5 lodestar for all other firms).  The standard:  lead class counsel's allocation should be fair and reasonable, and it should reflect class counsel's relative contributions to the case.  *Id.*; *Vitamin Cases*, 2004 WL 5137597, at *9; *In re Copley Pharm., Inc.*, 50 F. Supp. 2d 1141, 1149 (D. Wyo. 1999), *aff'd*, 232 F.3d 900 (10th Cir. 2000); *cf. In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 312 (1st Cir. 1995) (applying fair and reasonable standard to fee allocations amongst plaintiffs lawyers outside of the class action context).

In *In re Copley Pharmaceutical*, the court approved an allocation of 37.57% of the fees to a single lead counsel based on that counsel's overall contribution to the case, even though it only logged 12.78% of the total hours submitted.  50 F. Supp. 2d at 1151-52.  In concluding that lead counsel was fair and reasonable in allocating fees in a complex MDL litigation, the court "necessarily gave substantial deference to Lead Counsel's proposed allocation" and recognized that lead counsel "was faced with an unenviable dilemma" given the difficulty of trying to obtain the agreement of 19 attorney groups.  *Id.* at 1149-50.  As the court further explained:

> In a case of this magnitude, the assistance of Lead Counsel on matters such as this is especially invaluable.  Accordingly, this Court, after reviewing the previous submissions of class counsel as to hours and expenses, relying on previous discussions with Lead Counsel as well as other members of class counsel, and weighing the relative responsibilities of class counsel members and their contribution to this litigation, as well as when respective attorneys became involved in this litigation, found Lead Counsel's allocation to be fair and reasonable.

*Id.* at 1149.  In response to objections to the court's endorsement, the court reiterated the primacy of lead counsel's role in illuminating the quantity and quality of the effort expended by all attorneys in obtaining the result:

> Even today, the Court should and must rely, to a degree, on the voice of Lead Counsel on the responsibilities of class counsel members, quality of their work, and novelty of issues involved.  It was Lead Counsel who managed the plaintiffs' case.  Furthermore, as previously discussed, it is well established that Lead Counsel must play an invaluable role on a variety of matters in a complex litigation case such as this.

*Id*. at 1149-50.  The Court also found persuasive the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) relevant in its review "to the extent they provide a useful framework for assessing the 'quality and quantity' of counsels' work." *Copley Pharm.*, 50 F. Supp. 2d at 1150.  The *Johnson* factors are:

> (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee – this is helpful but not determinative; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id*. at 1150 (quoting *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-55 (10th Cir. 1988)); *see also In re: High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008) (applying abuse of discretion standard along with the *Johnson* factors and holding that district court is responsible to ensure that fee allocation was fair and reasonable).[3]

Importantly, the Court should be mindful that fee requests should not spawn a second litigation.  *See*, *e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  The Court is "not obliged to convene an evidentiary hearing as a means of resolving every attorneys' fee dispute," *In re*

---

[3] Unlike the First Circuit, the Fifth Circuit requires district courts to use the lodestar method of assessing attorneys' fees in class actions.  *Id*. at 228.  In *High Sulfur Content*, the court ultimately reversed the district court's adoption of counsel's recommended allocation because the district court did not consider lodestar information or affidavits of counsel attesting to the accuracy or fairness of the proposed allocation, held only a perfunctory, *ex parte* hearing on the matter, sealed the record pertaining to fees, and placed a gag order on the attorneys.  *Id*.

*Thirteen Appeals*, 56 F.3d at 301-02 (citation omitted), and "fee disputes, unlike Jack's beanstalk or Pinocchio's nose, cannot be permitted to grow and grow and grow."  *Brewster v. Dukakis*, 3 F.3d 488, 493 (1st Cir. 1993).  The Court has broad discretion to forgo an evidentiary hearing and discovery on the issue, especially when the written record affords an adequate basis for a reasoned determination of the fee dispute, and the court possesses detailed knowledge of the litigation.  *In re Thirteen Appeals*, 56 F.3d at 302-03.

### C.    Lead Class Counsel's Fee Allocation was Fair and Reasonable.

As demonstrated in Section II above, Lead Class Counsel painstakingly reviewed the contributions of each firm to the results achieved thus far against the objective and well-accepted Second Circuit *Goldberger* fee award factors, which are similar to the *Johnson* factors used in the Fifth Circuit.  We focused on the risks borne by counsel in litigating a complex case on a contingency fee basis, the quality of the representation provided, and the time and labor expended by counsel.  The process took approximately three weeks as all members of the Lead Class Counsel team weighed in.  Lead Class Counsel believe that the resulting allocation is fair and reasonable.  Berman Decl., ¶ 20.

Allocating fees is never an easy process.  The court in *Copley Pharmaceutical* called it "an unenviable dilemma" and recognized the difficulty of getting many firms to agree on any issue, let alone a fee division.  50 F. Supp. 2d at 1150.  Of the 26 firms that comprise Class Counsel here, Kent Williams is the only one to file a formal objection.  Williams objects to (i) Lead Class Counsel's decision to include all AWP litigation efforts in the analysis, instead of just those pertaining specifically to GSK and cutting all efforts off as of the date of the GSK Settlement Agreement; (ii) the payment of fees to ISHP Counsel; and (iii) Lead Class Counsel's management of the case and the allocation of the bulk of the fee to the Tier I firms.  Williams' criticisms are unfounded.

- 15 -

1.      **It is fair and reasonable to reward all efforts made by Class Counsel.**

Williams assails Lead Class Counsel for taking an "all in" approach in weighing the

contributions of all counsel, including efforts made through July 31, 2008.  Br. at 17-18.

Williams believes that efforts should be judged as of August 10, 2006, when the GSK settlement

was initially reached, and no later.  *Id.*  He also believes that Lead Class Counsel should have

considered only work related specifically to GSK and nothing else, *id.*, although Williams

provides absolutely no guidance as to how that might be accomplished given the breadth of

common issues present in this litigation.  Neither of these positions is supportable.  Cutting

efforts off as of August 2006 and including only GSK-specific work would be unfair to most

counsel in this case, including Williams, who did no GSK-related work except for his role as

allocation co-counsel.

a.      **Taking an "all in" approach to Class Counsel's collective efforts is the
        most fair and reasonable manner of compensating all Class Counsel.**

Evaluating only those efforts made by Class Counsel prior to August 10, 2006, does not

make any sense.  It ignores (i) the reality that there was not a truly final GSK settlement until

August 2007 and that it could have unraveled at any time prior thereto, (ii) the substantial work

done specific to the GSK settlement after August 2006 and the appeal of that settlement, (iii) the

substantial work done generally in the case that benefitted all class members, including those

members of the class included in the GSK settlement classes, and (iv) the somewhat arbitrary

nature of assigning specific defendants to specific firms.  Berman Decl., ¶ 27.

Williams criticizes Lead Class Counsel for working diligently after the GSK Settlement

Agreement was inked (and thereby increasing the lodestar), but this criticism is easily dismissed.

The litigation did not freeze once the GSK settlement was reached.  It marched on, necessitating

substantial work on obtaining final approval of the GSK deal and on many common litigation issues.

**(1)     Obtaining final approval of the GSK settlement and resolving the appeal related thereto took two years.**

At the preliminary approval hearing on September 12, 2006, the Court requested clarification of many of the contours of this complex settlement.  Of particular concern for the Court was (i) the interplay between the various Participating States, who had also agreed to settle their claims, with the provisions of the agreement related to the Classes, and (ii) how the class proceeds would be distributed among the consumers, TPPs and ISHPs.  Class Plaintiffs provided this clarification on October 24, 2006.  *See* Class Plaintiffs' Supplemental Memo Concerning the Preliminary Approval of Proposed Nationwide GSK Class Settlement) (Dkt. No. 4209).  On November 11, 2006, the Court entered an Order preliminarily approving the settlement.  Berman Decl., ¶ 28.

As in any complex settlement of this nature, there is still much work to be done even after the Court has preliminarily approved the Settlement.  Invariably, Plaintiffs' counsel, in consultation with Defense counsel, must review and approve the various aspects of the Notice Plan, including authorizing the purchase of ad space, finalizing approval of text to be placed in national publications consistent with the Court approved notice, approving scripts and other materials to be used by personnel answering class member's inquiries, and approving the design of the settlement website.  These matters take sometimes daily attention.  Berman Decl., ¶ 29.

On November 15, 2006, the Court appointed Special Master James McGovern.  Professor McGovern was asked by the Court to provide advice on the adequacy and fairness of the settlement, particularly with respect to the net payment to the consumer class and the method of distribution of funds to class members.  Both Plaintiffs and Defendants worked with Professor

- 17 -

McGovern to provide him with information related to the settlement and to answer his inquiries about the proposed settlement agreement.  Berman Decl., ¶ 30.

As part of his evaluation of the settlement, Professor McGovern also became involved in issues related to the notice to consumers in the case.  As the Court may recall, notice and administration of the GSK settlement proved to be complicated, and at times it was unclear whether the original GSK settlement would even be approved.  By April 2007, the claims administrator had received approximately 10,000 consumer claims and over 20,000 requests for exclusion.  Lead Class Counsel spent considerable amount of time working with Professor McGovern on issues concerning the high number of potential consumer opt-outs.  This involved exploration of various ways of determining the reason for the high level of opt outs.  Lead Class Counsel worked with Professor McGovern and a survey expert consulting with Professor McGovern to help develop a survey instrument used to survey a sample of the consumers who had filed opt-outs.  Among the conclusions of that survey were that, of the thousands of consumers who had filed opt-out requests, only about 15% of them were actually class members. Some percentage of these consumers actually intended to file a claim rather than exclude themselves.  Professor McGovern, with the Court's permission, sent a letter to consumers who had filed exclusion requests giving them a chance to file a claim if they so chose.  Berman Decl., ¶ 31.

Professor McGovern, as a result of his close work on consumer claims issues and his evaluation of the fairness of the settlement, issued a report to the Court concluding that the Settlement was fair, adequate and reasonable with respect to all class members.  Report of Special Master to the Court (Dkt. No. 4466).  The information obtained from consumers as a result of Lead Class Counsel's work with Professor McGovern informed much of the proposals

- 18 -

for class notice that came later in the AstraZeneca Class 1 Settlement as well as the AWP Track Two Settlement.  Berman Decl., ¶ 32.

Once the Court granted final approval, Lead Class Counsel were called upon to defend the settlement against an objector, including briefing on appeal to the First Circuit.  This was only recently resolved.

> **(2)    Important litigation work on common issues and of benefit to all class members, including the GSK class members, continued.**

Apart from the GSK settlement, discovery continued into the business practices of the other defendants (many of whom supplied drugs to the GSK class members, who took anti-emetics along with chemotherapy drugs from other defendants) and third parties.  Detailed and complicated expert work was conducted into both liability and damage theories.  Class certification proceedings continued, with the Court ultimately certifying Massachusetts Classes 2 and 3 and declining, for the time being, to certify nationwide classes.  Lead Class Counsel prepared to try the claims of the Massachusetts Class 2 and 3 members and did so in a lengthy trial that began in November 2006, concluding in January 2007 and resulting in the Court's trial opinion issued in June 2007.  Berman Decl., ¶ 33.

Thus, the AWP litigation did not stand still when the GSK settlement agreement was reached.  To the contrary, there were a plethora of vital activities that continued to benefit all class members, including those in the GSK settlement class.  Indeed, the Court did not issue its Final Approval Order until August 17, 2007, two months after issuing its trial opinion.  At any point until then, there was no final settlement with GSK, and Lead Class Counsel were taking every effort to protect the GSK class members through these other aspects of the case.  Berman Decl., ¶ 34.

Williams' criticism of the lead team's intensive, ongoing fight that was required to protect the interests of all class members is bizarre and highlights Williams' strategy of casting about for a variety of fee litigation positions. Further, we strongly believe that taking an "all-in" approach by crediting efforts through July 2008, including total lodestar and costs, more accurately captures and rewards the total time and effort in the case and more fairly compensates for total risk taken. Berman Decl., ¶ 35.

> **b.     It is not possible to segregate "GSK-only" efforts, and any attempt to do so would result in an even greater payment to Lead Class Counsel at the expense of firms that did little or no work that is specifically identifiable to the case against GSK.**

Lead Class Counsel reviewed other ways of basing the allocation and found them problematic. For instance, attempting to link GSK-specific work to the GSK-specific settlement is very difficult and simply cannot be done on a global basis. As we have explained to the Court (and as the Court has echoed in its most recent opinion), time cannot be effectively divided to isolate efforts related to specific defendants given the breadth of common issues. More than 250 attorneys have spent time working on this case for the Plaintiffs. An immense amount of work was done on common issues, work that cannot be segregated from other aspects of the prosecution. This work includes researching and drafting complaints; working on issues related to the initial MDL motions; a panoply of issues related to the use of AWP as a benchmark in the Medicare program and in the private insurance market; legal research and drafting of briefs on the joint motions to dismiss, joint motions for summary judgment, and briefing associated with class certification; coordination with experts regarding same; motions and discovery related to many third parties, including governmental organizations, trade associations and the hundreds of insurers, pharmacies and other market participants subpoenaed by defendants; communicating with Plaintiffs; and general trial preparation. Berman Decl., ¶¶ 36-37. As the Court

- 20 -

appropriately recognized in evaluating the fee petition in association with the AstraZeneca

Class 1 settlement, "this multi-district litigation has many moving pieces with common issues

and it would be too difficult to calculate a fair lodestar for this piece of the litigation."

Memorandum and Order Re: Requested Final Approval of the AstraZeneca Class 1 Settlement

(Dkt. No. 5624), at 4.  The same is true for the GSK proceedings.

Moreover, had Lead Class Counsel attempted a more GSK-specific link, as Williams

suggests (even though he doesn't reveal exactly how that could be done), Lead Class Counsel

would have received a greater fee allocation than they did.  This is because the bulk of the work

on GSK-specific issues was done by Lead Class Counsel team member Hagens Berman, who

took over 20 GSK depositions, reviewed the 2.8 million documents from two separate companies

(Glaxo and SmithKline Beecham were two separate companies until 2002, after the case was

filed), prepared the liability analysis for over a dozen drugs, primarily negotiated the GSK

agreement, supervised the allocation, prepared the settlement papers, took the lead in all

settlement hearings and monitored the claims process.  Berman Decl., ¶ 39.

And a firm like Williams' would have received much less had non-GSK efforts been

removed from consideration.  For instance, a substantial portion of the total lodestar reported by

Williams involved work on the Baxter document review (approximately 36% of his lodestar) and

in a non-MDL case in Arizona (approximately 5.5% of his lodestar).  These efforts would not

have been credited under Williams' own ill-conceived proposal.  Indeed, based on a review of

Williams' time records, only about $87,498 of the Williams Law Firm lodestar – or 4.7% – can

be specifically linked to GSK, and almost all of that is in association with Williams' role as

allocation co-counsel on the settlement after a settlement-in-principle had been reached with

GSK.  Berman Decl., ¶ 40.

- 21 -

As this demonstrates, all Class Counsel performed work for the "common good" that benefitted all class members, including the GSK class members.  Firms should not be penalized just because they were randomly assigned a defendant that has not settled.  By recognizing the contribution of everyone's work to the benefits achieved on a class-wide basis in all settlements, the "all-in" approach will benefit firms who did no work on GSK, or, for that matter, AstraZeneca, BMS or the Track 2 Defendants when it comes time to distribute the fees associated with those settlements.  In the larger picture, the "all in" approach is simply a more fair and reasonable way of evaluating each firm's contributions.  Berman Decl., ¶ 41.

> **2.    It was unnecessary for Lead Class Counsel to conduct a detailed inquiry into time and expense reports.**

In allegations based purely on speculation and not evidence, Williams accuses Lead Class Counsel of engaging in "excessive and redundant" activity and failing "to make any effort to ensure that only properly-incurred time and expense are compensated."  Br. at 15-17.  There simply is no evidence backing up these accusations.  Indeed, Lead Class Counsel have made every effort to ensure that this case was and is prosecuted efficiently and without wasteful efforts.  Berman Decl., ¶ 26.

Lead Class Counsel collected fee and expense information from Class Counsel on a periodic basis.  Marc Edelson was responsible for doing this, and he reviewed all submissions for reasonability.  Edelson Decl., ¶ 3.  In his opinion, the information submitted reasonably reflected the efforts being made by each firm for the time periods covered, and there were no redundancies.  *Id*.  Although Williams declares that Lead Class Counsel "failed to make any effort to ensure that only properly-incurred time and expense are compensated," Br. at 17, this is simply untrue.

To the extent that Williams is now taking the position, or will, that full audits should have been done of this information (his position is unclear), such an effort was unnecessary. To reiterate, the Court's awards are properly based on the percentage-of-the-fund method and not the lodestar method (as expressly authorized by the First Circuit), and Lead Class Counsel did not make a lodestar-based allocation of fees across all counsel, although lodestar was a factor. Berman Decl., ¶ 22. Under these circumstances, we respectfully submit that the substantial expense and effort associated with an audit would likely reveal little and not change any of the allocation decisions that were made. And doing formal audits as the litigation progressed certainly would have distracted Lead Class Counsel from the massive task of actually litigating Plaintiffs' claims.

Williams relies heavily upon this Court's decision in *Guckenberger v. Boston Univ.*, 8 F. Supp. 2d 91 (D. Mass. 1998), but *Guckenberger* is a very different case. There, the Court was called upon to award fees against the defendant using the lodestar method applicable under the fee-shifting statute at issue. *Id*. at 99. And because the fees were being awarded against a defendant, the Court acknowledged authority supporting the necessity of conducting a detailed inquiry into the necessity and reasonableness of the hours expended. *Id*. at 100. But in *Guckenberger*, the Court did <u>not</u> allocate fees among class counsel after awarding aggregate fees under the percentage of the fund approach, as it did here. Conducting a detailed review of all counsel's time entries here would undoubtedly be a herculean task that, more importantly, is not necessary given the percentage-of-the-fund approach adopted by the Court in awarding the fees in the first instance. *Guckenberger* is thus inapposite.

### 3. The ISHP Counsel payment and objection resolution were proper.

Williams criticizes the payment of fees to ISHP Counsel, Br. at 18-19, yet the GSK Settlement Agreement expressly authorized the payment of attorneys' fees to ISHP Counsel.

- 23 -

GSK Settlement Agreement, ¶ 18(b) at 41-42.  Williams was allocation co-counsel and has long been aware of this provision and has never objected thereto until now, more than two years after the GSK Settlement Agreement was filed with the Court.  ISHP Counsel earned their 15% share of the fee and expense award by representing their clients, who comprise approximately 60 percent of the covered lives privately insured in the United States, and who agreed to forgo seeking a separate counsel fee in the MDL Actions.  The payment to the ISHP Counsel was proper and was properly disclosed.

So, too, was the resolution of the Demra Jordan objection.  As the appeal of Jordan's objection dragged on, with the First Circuit failing to enforce the bond requirement, Lead Class Counsel decided that it was in the best interests of the GSK Class members to resolve the Jordan objection so that distributions to the class could begin.  The payment was proper and has been properly disclosed.  Perhaps Williams would not have been willing to dig into his own pocket to accelerate the payout to the class and would instead have made a different decision had he been a lead, but that does not mean that Lead Counsel's decision was anything other than fair and reasonable.

### 4.    The amounts allocated were proper.

Williams agrees that Lead Class Counsel are "chiefly responsible for the overall result in this case," Br. at 20, yet he does not believe that Lead Class Counsel should receive the amount of fees that they did.  Williams also believes that Lead Class Counsel's fees – and no other's – should be cut on account of the fact that some things have actually not gone as anticipated or hoped in this case.  Br. at 21.  Both positions are unsupportable.

Williams focuses on what he believes is a multiplier for the Tier I firms at the expense of the others, but the fact is that no firm is even coming close to receiving a multiplier on the time in the case.  As we have explained, the Tier I lodestar is $49,208,132, and Tier I received a

$12,814,150 fee allocation.  Where is the multiplier?  Yes, Tier I received a much larger

allocation than Tier III, but that was justified by the preeminent role played and risk taken by the

Tier I firms.  Again, the Tier I firms led the case from inception to the present, did most of the

work, advanced the most expenses, shouldered most of the risk of nonpayment and were the

primary drivers of the results achieved.  Williams does not dispute this.  And the Tier I firms

have advanced over 13 times more than the Tier III firms in out-of-pocket costs, or $7.5 million

compared to slightly over $550,000 for Tier III.  Overall, the Tier I firms have advanced 83.4%

of the expenses in this case – another undisputed fact.  This single risk parameter difference

between Tier I and Tier III is terribly important and alone supports the divergence in the fees

awarded to each.

Williams' focus on lodestar information at the expense of all other factors also ignores

the reality that Lead Class Counsel were not even required to base their decision on a lodestar

analysis and could have, instead, applied a purely percentage approach that focused solely on

each firm's "relative contribution" to the result.  *In re Thirteen Appeals*, 56 F.3d at 308.  To

reiterate, Lead Class Counsel appropriately placed the focus on the risks borne by counsel in

litigating a complex case on a contingency fee basis, the quality of the representation provided,

and the time and labor expended by counsel as set forth in *Goldberger*, 209 F.3d at 50.  Lodestar

played a role, but it was not the pivot-point in Lead Class Counsel's analysis.

As for Williams's suggestion that Lead Class Counsel deserve a fee "haircut" for not

hitting a home run on every issue, this is silly.  As a threshold matter, it would be impossible to

match time expended with each issue that ultimately turned out not to be a "win" for plaintiffs.

Even if such an exercise was possible, there is no good reason why the "pain" shouldn't be

shared across all Class Counsel.  After all, counsel like Williams want to fully share in the gains

of the case, why shouldn't he and others take hits for the setbacks if others have to as well?  As is evident, these questions highlight the peril in trying to assign merits and demerits on an issue-by-issue basis which, in any event, cannot even be done.  Williams certainly offers no methodology for attempting to do so.

This case is close to what the First Circuit has called the "paradigmatic common fund case" in which "class counsel do virtually all the work, and other counsel piggyback on their efforts."  *In re Thirteen Appeals*, 56 F.3d at 310.[4]  Lead Class Counsel's work, effort and risks in this case compel this conclusion.  As the "heart and soul" of the team that has led the AWP MDL class action litigation for over seven years, and the lawyers who committed by far the most resources (both in the payment of actual costs and deployment of senior attorneys) and taken the greatest level of risk, Lead Class Counsel sincerely believe that we have a much better perspective than does Williams on the totality and importance of the work done in this case by all attorneys and the link between that work and the results achieved.  We stand by the allocation of the fee/cost award that we made and firmly believe that it was fair and reasonable.

**5.    Williams overstates the importance of his involvement in this case.**

Lead Class Counsel are grateful that Williams chose to help out on this case, but – having the benefit of directing and being involved in all aspects of this case – we disagree with Williams' assessment of the importance of his work.  Williams simply exaggerates the importance of his role.

As Williams admits, he is a sole practitioner.  Br. at 5.  He, along with Don Haviland of Kline & Specter, did not join the case until September 2005.  Br. at 3.  This is almost <u>four</u> years

---

[4] In *Thirteen Appeals*, the First Circuit explained that mass tort cases, where individual plaintiffs are acutely aware of their losses and typically require a "multitude of services," do not necessarily fit the paradigmatic common fund case.  *Id.*  Objecting counsel there had prepared for trial or actually tried many of the "representative" cases and did not, as here, play but a small role in the overall picture.

after the bulk of the cases consolidated into this MDL action were filed and three-and-a-half

years after the Court issued CMO No. 1 appointing lead counsel roles.  Although Williams

struggles to cast his role in this action as some continuation of the *Lupron* case, that is simply

untrue.  Williams (and Haviland) had no relationship to this MDL litigation or Lead Class

Counsel's role in it until the Fall of 2005, when Williams and Haviland threatened to intervene.

Berman Decl., ¶ 43.  Apparently, Williams was working with Haviland on AWP-related state

cases in New Jersey and Arizona, cases that we understand have accomplished little.

　　　　The work that Williams describes that he performed in this litigation cannot be

considered "stand out" tasks.  As he describes, Williams assisted with a handful of consumer

clients, speaking to them and gathering documents; defended two class representative

depositions; served as one of two consumer allocation counsel in the GSK settlement (along with

the firm of RodaNast); and staffed, through contract attorneys, part of the Baxter document

review.  Save for a handful of other miscellaneous tasks, that is it – this is the totality of

Williams' role in the case.  And it should be noted that some of the work that Williams

performed was, as he admits, done in conjunction with Don Haviland, and the individual

consumers that Williams claims he represented were also clients of record of Don Haviland and

his firm Kline & Specter.  Indeed, given that he is sole practitioner, Williams had limited

capacity.  It appears that he was a *de facto* member of the Don Haviland Kline & Specter team

on this case, even though Williams practiced under his own firm's name.  Berman Decl., ¶ 44.

　　　　Williams did not play any substantial role in briefing motions to dismiss (which were

decided well before he arrived on the scene).  He did not play any substantial role in the lengthy

class certification briefing or any other major motions; most of that work was done by Lead

Class Counsel.  He had no leadership role on any project or issue.  Williams was not part of the

trial team, did no work on the trial and little substantive work during the pretrial proceedings, although he worked on a single motion *in limine* relating to the Class 1 claims against AstraZeneca before those claims settled.  He has not worked on any of the many complex appellate issues.  Berman Decl., ¶ 45.

The purported "substantial" work that Williams contends he performed was minimal compared to that done by the Tier I and II firms, and his commitment did not even approach that of the Tier II firms.  Both Tier II firms served for a time as co-leads; Williams did not.  Reflective of their once co-lead status, the Tier II efforts (and their lodestars and expenses advanced) dwarf that of the Williams Firm.  Indeed, Williams' "substantial" work does not overshadow many other Tier III firms, such as Cuneo, Gilbert & Laduca, the Sheller firm and Shepherd, Finkelman, who assisted with reviewing the millions and millions of documents produced by numerous defendants and, in the case of Shepherd Finkelman, assisted with important publisher discovery.  Berman Decl., ¶ 46.

Moreover, Williams did not follow through as promised with Track 2 discovery work that he committed to perform.  While he paid for contract lawyers to review Baxter documents along with other team members, there were substantial problems with the performance and attendance of the initial contract attorneys.  Lead Class Counsel asked that they be removed from the project.  They were, and Williams – via Don Haviland – replaced them with $30 per hour contract attorneys from another source recommended by Hagens Berman.  Although Williams covered this cost, and the substitute contract attorneys continued their review, Williams never followed through with his commitment to cover one-third of the Baxter depositions, although he may have taken one or two of the depositions.  Instead, it was left to Lead Class Counsel member Hagens Berman to take the depositions of 15 Baxter witnesses.  Declaration of Elizabeth A.

Fegan in Support of  Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, ¶¶ 2-7.

An additional word on Williams' use of contract attorneys is in order.  Although Williams was paying $30 an hour or close thereto for these attorneys, he billed them out at much higher rates:  $275 per hour for four of them, and $190 per hour for one of them.  Thus, Williams' lodestar for this work already has a substantial multiplier built-in.  Based on a review of Williams Law Firm time records, approximately 36% of the Williams lodestar is attributable to five contract attorneys who participated in the Baxter document review.  Berman Decl., ¶ 47.

Even though Williams did not play a substantial role in this case, he was rewarded for his participation, including for those work items that Williams enumerates in his brief, by receiving the <u>second-highest allocation of all Tier III counsel</u>.  If Williams feels that he is being punished or retaliated against, that is certainly not the case.  In fact, other Tier III firms could probably argue that Williams' Tier III share is too generous in light of their contributions.  Williams will also be eligible to participate in future fee distributions pending completion of additional settlements even if he did no work on the defendants associated with those settlements (like, for example, BMS and Track 2 defendants besides Baxter).

### 6. Court monitoring of time and expense reports is unnecessary.

Williams exclaims that Lead Class Counsel have poured "thousands of additional hours into this case" and have wasted time and money, and he accuses Lead Class Counsel of "shutting out everyone else."  Therefore, Williams pleads, the Court should review periodic time and expense reports from Lead Class Counsel moving forward.  Br. at 22.  Williams' position is simply unsupported.

First, there is absolutely <u>no</u> evidence in this record that Lead Class Counsel have wasted time and money in prosecuting this case on behalf of all Plaintiffs and the classes – <u>not one</u>

shred.  To the contrary, we have managed this litigation as efficiently as possible, dividing up labor in a cogent manner.  We have implemented procedures to avoid duplication and inefficiency.  Berman Decl., ¶ 26.  Williams cannot demonstrate that any work in this case was unreasonably duplicative, excessive or unnecessary.  To be sure, Lead Class Counsel have devoted many, many hours to this litigation since the GSK Settlement Agreement was inked, but, as profiled above, the gargantuan amount of work necessary simply required it.  Had he led the classes, perhaps Williams would have engaged in some medieval level of triage that short-changed the classes in a manner befitting a resource-starved counsel team, but Lead Class Counsel were simply unwilling to do so.  The classes deserved better, and they received better from Lead Class Counsel.  But, again, Williams cannot point to any work that was unnecessary.

Second, Lead Class Counsel have not shut anyone out of participating in this case.  We have not received any complaints that Lead Class Counsel were hoarding all of the work, and Williams himself never lodged a single complaint along these lines until filing the instant motion and making the unfounded assertion.  Had this truly been an issue for Williams prior to making it a new-found fee litigation position, he should have spoken up years ago but did not.  Indeed, as is often the case, the longer that litigation endures with no distributions to show for it, many firms typically conserve their resources by curtailing their efforts and permitting others to continue the prosecution through the dedication of their scarce resources and at the cost of other opportunities.  With the benefit of hindsight, that is unfortunately what has happened in the AWP litigation as Lead Class Counsel were called upon to carry an increasingly heavy load as the litigation grew longer and longer.  Berman Decl., ¶ 49.  Certainly, Williams was by all appearances content to take a far back-seat role and let Lead Class Counsel shoulder a disproportionate share of the risks and burdens of leadership; he cannot now be heard to

- 30 -

complain about his own reticence to dedicate more resources to this cause now that some successes are finally accruing to the benefit of the classes and Class Counsel.

    **7.**    **It is unnecessary for the Court to, in the first instance, allocate all future fee awards.**

Williams' final request is that the Court itself undertake future fee allocations or, in the alternative, delegate such a task to some unspecified and "disinterested" third party.  Br. at 22-23.  While Lead Class Counsel welcome the Court's review of future allocations, the Court should not abandon the deference given to Lead Class Counsel to make fee allocation decisions based on their uniquely situated ability to evaluate the relative contributions of all counsel participating in the case.  Lead Class Counsel have acted in a fair and reasonable manner and assure the Court that they will continue to do so in future fee allocations, which the Court can review if requested to do so.

As for having an unspecified, disinterested third party make future fee allocation decisions, this is a very bad idea.  No third party possesses the knowledge required to play such a role.  No third party is even as remotely as familiar with the history of this litigation as this Court is.  It would be very expensive for such a party to review the course of this seven year endeavor and, even then, the party would not fully appreciate the herculean burden that Lead Class Counsel have shouldered in this risky and protracted litigation.  Likewise, no third party can gain insight into the details behind each firm's relative contributions to the results achieved for the plaintiff classes.  There simply is no substitute for the experience gained by Lead Class Counsel and the Court, and no third party can stand in the shoes of either.  Bringing in a third party in an effort to do so will add yet another layer of litigation, as firms make their respective cases to the third party, whose decisions will undoubtedly be appealed to this Court and beyond.  Thus, the procedure demanded by Williams will only serve "to multiply the[se] proceedings and turn the

fee dispute into a litigation of mammoth proportions," *In re Thirteen Appeals*, 56 F.3d at 303, a result that the First Circuit explicitly discouraged in both *Thirteen Appeals* and *Brewster v. Dukakis*, 3 F.3d 488, 493 (1st Cir. 1993).

## IV.    CONCLUSION

Lead Class Counsel made a fee allocation that was fair and reasonable, and the so-called "relief" that Williams seeks is unnecessary.  A reallocation of fees along the parameters of the Williams proposal would likely leave him with much less than he received under the present allocation and expand the amount of fees received by Lead Class Counsel, who did almost all of the work on the GSK Defendants.  Lead Class Counsel's allocation ensures that all counsel will be able to share in future fee distributions associated with each settlement on the horizon, whether or not each firm actually worked on a particular defendant.  This approach is much fairer than the Williams approach.  Consistent with prevailing case law, the Court should continue to defer to Lead Class Counsel's allocation decisions and review them only if called upon to do so.

DATED:  November 14, 2008.                By     /s/ Steve W. Berman
                                                                  Thomas M. Sobol (BBO#471770)
      Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
John Macoretta
Spector, Roseman Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **CLASS COUNSEL'S RESPONSE TO WILLIAMS' MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWAR**D, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on November 14, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

  **/s/ Steve W. Berman**
Steve W. Berman

001534-16  272128 V1