UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| GSK SETTLEMENT | Judge Patti B. Saris |

### DECLARATION OF STEVE W. BERMAN IN SUPPORT OF LEAD CLASS COUNSEL'S RESPONSE TO WILLIAMS' MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD

I, Steve W. Berman, duly declare under penalty of perjury as follows:

1. I am a partner of Hagens Berman Sobol Shapiro LLP, resident in its Seattle, Washington, office, and I am Co-Lead Counsel for the Plaintiffs in the above-captioned matter. I submit this declaration under penalty of perjury in support of Lead Class Counsel's response to Kent Williams' motion for court review of Lead Counsel's allocation of the GSK fee award.

2. A true and correct copy of the Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement with the GlaxoSmithKline Defendants, Approving Proposed Allocation of Settlement Funds, and Approving Class Counsel's Application for Attorneys' Fees, Reimbursement of Litigation Expenses and Compensation to Class Representatives (Dkt. No. 4400) is attached hereto at Exhibit 1.

**A.   Payments to ISHP Counsel and to Objector.**

3. As the Court may recall, there exist various entities consisting of certain health insurance companies and health plans that are referred to as "Independent Settling Health Plans" or "ISHPs." The ISHPs, which in the aggregate provide or administer prescription drug and

- 1 -

health benefits to approximately sixty percent (60%) of the covered lives privately insured in the United States (based on U.S. Census data published December 31, 2004), had claims against the GSK Defendants that were identical to those brought herein the MDL Class actions.  *See* Ex. 2 hereto (a true and correct copy of the Settlement Agreement and Release of the GlaxoSmithKline Defendants (Dkt. No. 2972, the "GSK Settlement Agreement")).

4.      Counsel to the Independent Settling Health Plans Group ("ISHP Counsel") are the firms of Robins, Kaplan, Miller & Ciresi, Rawlings & Associates, and Lowey Dannenberg Bemporad & Selinger P.C.  ISHP Counsel participated in the allocation mediation sessions, and, after substantial arms-length negotiations, the ISHPs decided to join the settlement and signed the GSK Settlement Agreement.

5.      ISHP Counsel were paid a total of $2,957,377.50.  The GSK Settlement Agreement, which the Court approved, specifically authorized the payment of fees to ISHP Counsel:

> ISHP Group Counsel have agreed to forgo seeking (1) a separate counsel fee in the MDL Actions, and (2) any fee from GSK in connection with their work concerning any of the Released ISHP Claims, and in lieu thereof will accept as payment of ISHP Counsel Fees an amount negotiated between ISHP Group Members and Lead Class Counsel, in accordance with the conditions set forth in a separate agreement between Lead Class Counsel and ISHP Group Counsel, which agreement shall be identified to the MDL Court in accordance with Fed.R.C.P. 23(e).

GSK Settlement Agreement, ¶ 18(b) at 41-42.

6.      Pursuant to an August 11, 2006, Agreement between Lead Class Counsel and ISHP Counsel, ISHP Counsel were entitled to 15% of the total GSK fee awarded by the Court. *See* Ex. 3 hereto (true and correct copy of this Agreement).  But, with the assent of ISHP Counsel, we deducted one-fifth of the expenses from the total award before we applied the 15% to obtain the total ISHP Counsel payment which was then spilt in thirds among ISHP Counsel.

- 2 -

7.      In addition to the ISHP Counsel payment, Lead Class Counsel resolved the Demra Jordan appeal and objection for $100,000. Lead Class Counsel believed that the objection was without merit, and we made every effort in this Court and with the First Circuit to have the issue quickly resolved, but the First Circuit did not rule quickly on the appeal and failed to enforce the bond requirement. Given the passage of time and no schedule for resolution of that appeal, we believed that it was in the best interests of the GSK Class members to resolve the Jordan objection so that distributions to the class could begin.

8.      Reducing the ISHP Counsel payment and $100,000 from the overall $21,615,000 award left $17,247,807.51 for distribution, including accrued interest.

**B.   Reimbursing Advanced Expenses.**

9.      As a first step, Lead Class Counsel decided to reimburse one-fifth of the total amount of expenses that each firm advanced in the AWP litigation. We took the total amount of expenses reported for each firm, deducted the amount that each firm received last year as an interim reimbursement, and then multiplied by 20 percent. The aggregate amount of expenses incurred and reported through July 2008 was $8,973,764.63, net of interim reimbursements made out of the GSK fund last year. One fifth of this number is $1,794,752.93. Deducting $1,794,752.93 from $17,247,807.51 left $15,438,735.95 for further allocation as attorneys' fees.

**C.   Allocating Fees to Class Counsel.**

10.     Lead Class Counsel's fee allocation decision was guided by the factors that courts consider in awarding fees in class litigation, including the risks borne by counsel in litigating a complex case on a contingency fee basis, the quality of the representation provided, and the time and labor expended by counsel. *See, e.g., Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 50 (2d Cir. 2000); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000). With respect to the quality of representation factor, we primarily considered each firm's leadership

position; its quality and volume of substantive work; whether the firm was an integral component of the trial team; the number, experience and quality of the partners and senior associates assigned to the case and whether and to what extent lower value contract lawyers were utilized; the consistency of the firm's commitment throughout the duration of the litigation, including work on appellate issues; and the importance of the firm's clients.

11. With regard to risk, the Court recently highlighted this factor in discussing fees associated with the AstraZeneca Class 1 settlement.  *See* May 1, 2008 Hearing Tr. at 24; *see also Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement.")).  In assessing risk profiles, Class Counsel considered the magnitude of advanced expenses and each firm's commitment of full-time firm personnel to the exclusion of other case opportunities.  This litigation has entailed, and continues to entail, an extraordinarily high level of risk.  It has involved novel and complex legal and factual issues, and the limited resources of Lead Class Counsel have been pitted against the seemingly infinite resources of defendants and their well-heeled defense counsel.

12. Lead Class Counsel employed the foregoing factors and grouped the 26 plaintiffs' firms reporting time and expenses in the AWP litigation into three tiers based on their contributions to the litigation as follows:

| Tier | Firm |
| --- | --- |
| I | Hagens Berman Sobol Shapiro LLP<br>Wexler Toriseva Wallace LLP<br>Spector, Roseman & Kodroff, P.C.<br>Hoffman & Edelson, LLC |
| II | Heins, Mills & Olson, P.L.C.<br>Kline & Specter, P.C. |
| IIIA | Cuneo Gilbert & Laduca, LLP<br>RodaNast, P.C. |

| **IIIB** | Bolognese & Associates, LLC<br>Rossbacher Firm<br>Sheller, P.C.<br>Shepherd, Finkleman, Miller & Shah, LLC<br>Squitieri & Fearon, LLP |
|---|---|
| **IIIC** | Audet & Partners, LLP<br>Carey & Danis, LLC<br>Cohen, Milstein, Hausfeld & Toll, LLC<br>Freeman & Lorry, P.C.<br>Hanzman, Criden & Love, P.A.<br>Hulett Harper Stewart, LLP<br>Karmel Law Firm<br>Law Office of Adam S. Levy<br>Piper & Associates<br>Trujillo Rodriguez & Richards, LLC<br>Weller, Green, Toups & Terrell, L.L.P.<br>Williams Law Firm<br>Young, Pickett & Lee |

**1.     The Tier I contributions.**

13.     The Tier I firms led the case from inception to the present, did most of the work, advanced the most expenses, shouldered most of the risk of nonpayment and were the primary drivers of the results achieved thus far.  Among other work, Lead Class Counsel made the following contributions:  headed the litigation; comprised the trial team; spearheaded all substantive oral arguments and served as the primary "face" of the team in court; prepared most, if not all, of substantive briefing; conducted without assistance the expert work; were liaison counsel to the Court; handled almost all of the case filings for the plaintiffs; led on all case management order and pre-trial order negotiations and drafting; coordinated and conducted third-party TPP discovery; covered the so-called "government knowledge" depositions; coordinated with the DOJ on federal issues; conducted wholesaler discovery; conducted publisher discovery, with some help from a Tier III firm; and were responsible for discovery of all of the defendants (including GSK, BMS, SPW, Baxter, Amgen, Immunex, Pfizer, Pharmacia, Fujisawa, AstraZeneca, Abbott, Bayer, B. Braun, J&J, Aventis and Watson).

### 2. The Tier II contributions.

14. The Tier II firms once participated in leadership roles and, for a time, shared some of the Tier I responsibilities. The Tier II firms' former participation in leadership roles differentiates them from the Tier III firms. However, the Tier II firms dropped out of the case and thereby minimized their risks. This is in part reflected in expense and lodestar information highlighted below.

### 3. The Tier III contributions.

15. The roles of the Tier III firms were primarily limited to participating in document review projects early in the litigation. This work was important and necessary to filter the literally millions of documents produced by the defendants in this case. The fact that many plaintiffs' counsel participated in document review projects does not mean that time spent reviewing documents was duplicative. To the contrary, all of the documents produced needed to be read, coded, and analyzed whether the case was litigated by few firms or many. Lead Class Counsel instituted procedures designed to avoid duplication and inefficiency and divided document review responsibilities in a cogent manner.

16. Some Tier III firms performed higher quality work and dedicated higher value attorneys to the effort. Those firms are found in Tiers IIIA and B. For example, Diane Nast is a nationally recognized authority in class action and antitrust law. The Cuneo firm provided substantial assistance in discovery, as did the Tier IIIB firms, including Shepherd Finkelman, which assisted with publisher discovery. The firms of RodaNast and the Williams Law Firm acted as allocation counsel in the GSK settlement.

17. The Tier III firms did not play a leadership role. These firms either have no or minimal additional time and expenses in the case after 2006.

001534-16 272868 V1

### 4. The specific fee allocations.

18. In light of the foregoing factors, Lead Class Counsel decided that the Tier I firms deserved the bulk of the fee. Accordingly, we allocated 83 percent of the fee to Tier I ($12,814,150.84), 10 percent to Tier II ($1,543,873.60), and 7 percent to Tier III ($1,080,711.52).

19. We also applied the allocation factors outlined above to allocate the fee within each tier. Based on these factors, Tier III was sorted into three sub-tiers. To account for a higher level of dedication and quality of work, Sub-tiers A and B received a 20 percent and 10 percent bonus on lodestar, respectively. These bonuses were paid for by reducing the Sub-tier C's share of the overall Tier III allocation. As regards Tier II, we believed that lodestar accurately reflected the efforts of the Tier II firms *vis-à-vis* each other and, therefore, allocated the Tier II share based on lodestar.

20. The specific amount of expense reimbursement and fee allocation received by each firm is set forth in Exhibit 4 hereto. Lead Class Counsel painstakingly reviewed the contributions of each firm to the results achieved thus far against the objective and well-accepted Second Circuit *Goldberger* fee award factors discussed above. We focused on the risks borne by counsel in litigating a complex case on a contingency fee basis, the quality of the representation provided, and the time and labor expended by counsel. The process took approximately three weeks as all members of the Lead Class Counsel team weighed in. Lead Class Counsel believe that the resulting allocation is fair and reasonable.

21. As shown, Williams received $6,479.22 in expense reimbursement, and $148,011.56 in fees for a total of $154,490.79. This was the second highest payout of any Tier III firm and second only to the Sheller firm.

### 5. The role of unaudited lodestar.

22. Each firm's lodestar was a relevant factor considered by Lead Class Counsel in discerning each firm's contribution to the litigation. But lodestar was not the sole or even determinative factor in Lead Class Counsel's analysis, as is demonstrated by reviewing the other important *Goldberger* factors considered by Lead Class Counsel above. As noted, the prime factors were the risks borne by counsel and the quality of representation and leadership provided.

23. We did not audit lodestar, although Lead Class Counsel member Marc Edelson collected and reviewed time and expense information on a periodic basis for all counsel, and reviewed hourly rates for reasonableness.

24. As I previously reported to the Court in association with the AstraZeneca Class 1 fee petition, I reviewed the rates underpinning the lodestar calculations by firm. Those rates range from a low of $165 per hour for junior associate attorneys to a high of $650 per hour for the most experienced partners and reflect the firms' hourly rates paid by hourly-billed clients and, separately, approved for payment by other courts in class and derivative litigation. The table below summarizes the rates by firm:

| Firm | Paralegal Hourly Rate Range | Attorney Hourly Rate Range |
|---|---|---|
| Audet & Partners, LLP | $100 | $325-475 |
| Bolognese & Associates, LLC | n/a | $175-475 |
| Carey & Danis, LLC | $150 | $250-400 |
| Cohen, Milstein, Hausfeld & Toll, LLC | $85-275 | $195-575 |
| Cuneo Gilbert & Lacua, LLP | $150-175 | $325-475 |
| Freeman & Lorry, P.C. | n/a | $225 |
| Hagens Berman Sobol Shapiro, LLP | $70-150 | $250-600 |
| Hanzman, Criden & Love, P.A. | $150 | $300-500 |
| Heins, Mills & Olson, P.L.C. | $130-175 | $165-650 |
| Hoffman & Edelson, LLC | $175 | $300-460 |
| Hulett Harper Stewart, LLP | n/a | $510 |
| Karmel Law Firm | n/a | $400 |
| Kline & Specter, P.C. | $125-135 | $250-525 |

| Law office of Adam S. Levy | n/a | $385 |
| --- | --- | --- |
| Milberg Weiss & Bershad, LLP | $155-170 | $260-495 |
| Piper & Associates | n/a | $350-500 |
| RodaNast, P.C. | $100-140 | $210-575 |
| Rossbacher Firm | $125 | $235-490 |
| Sheller, P.C. | $125-130 | $250-420 |
| Shepherd, Finkelman, Miller & Shah, LLC | $95 | $330-475 |
| Spector, Roseman & Kodroff, P.C. | $100-160 | $250-560 |
| Squitieri & Fearon, LLP | $325 | $595 |
| Trujillo Rodriguez & Richards, LLC | $105 | $220-490 |
| Weller, Green, Toups & Terrell, L.L.P. | $250 | $330-450 |
| Wexler Toriseva Wallace LLP | $100-160 | $226-550 |
| Williams Law Firm | n/a | $190-495 |
| Young, Pickett & Lee | n/a | $400-450 |

25. Attached as Exhibit 5 is a true and correct copy of *The National Law Journal*'s 2007 survey of law firm billing rates. As this survey reveals, the foregoing attorney rate ranges are well within the market norm. I note that some of the firms appearing for defendants in this very litigation have partner rates that top out well above $600 per hour, including Covington & Burling ($800), Dickstein Shapiro ($825), Hogan & Hartson ($850), Kelley Drye & Warren ($800), Morgan Lewis & Bockius ($850), and Perkins Coie ($805).

26. In allegations based purely on speculation and not evidence, Williams accuses Lead Class Counsel of engaging in "excessive and redundant" activity and failing "to make any effort to ensure that only properly-incurred time and expense are compensated." Br. at 15-17. There simply is no evidence backing up these accusations. Indeed, Lead Class Counsel have made every effort to ensure that this case was and is prosecuted efficiently and without wasteful efforts. We have managed this litigation as efficiently as possible, dividing up labor in a cogent manner. We have implemented procedures to avoid duplication and inefficiency.

**D. Taking an "All In" Approach to Class Counsel's Collective Efforts is the Most Fair and Reasonable Manner of Compensating all Class Counsel.**

27. Given the substantial amount of work conducted after the GSK agreement was reached and the fact that apportioning each firm's effort by defendant is difficult to do, we took an "all in" approach to allocating fees in which Lead Class Counsel recognized the efforts of all counsel across all defendants and through July 2008. Evaluating only those efforts made by Class Counsel prior to August 10, 2006, as Williams suggests, does not make any sense. It ignores (i) the reality that there was not a truly final GSK settlement until August 2007 and that it could have unraveled at any time prior thereto, (ii) the substantial work done specific to the GSK settlement after August 2006 and the appeal of that settlement, (iii) the substantial work done generally in the case that benefitted all class members, including those members of the class included in the GSK settlement classes, and (iv) the somewhat arbitrary nature of assigning specific defendants to specific firms.

28. Williams criticizes Lead Class Counsel for working diligently after the GSK settlement agreement was inked (and thereby increasing the lodestar), but this criticism is easily dismissed. The litigation did not freeze once the GSK settlement was reached. At the preliminary approval hearing on September 12, 2006, the Court requested clarification of many of the contours of this complex settlement. Of particular concern for the Court was (i) the interplay between the various Participating States, who had also agreed to settle their claims, with the provisions of the agreement related to the Classes, and (ii) how the class proceeds would be distributed among the consumers, TPPs and ISHPs. Class Plaintiffs provided this clarification on October 24, 2006. Class Plaintiffs' Supplemental Memo Concerning the Preliminary Approval of Proposed Nationwide GSK Class Settlement) (Dkt. No. 4209). On November 11, 2006 the Court entered an Order preliminarily approving the settlement.

001534-16 272868 V1

29. As in any complex settlement of this nature, there is still much work to be done even after the Court has preliminarily approved the Settlement. Invariably, Plaintiffs' counsel, in consultation with Defense counsel, must review and approve the various aspects of the Notice Plan, including authorizing the purchase of ad space, finalizing approval of text to be placed in national publications consistent with the Court approved notice, approving scripts and other materials to be used by personnel answering class member's inquiries, and approving the design of the settlement website. These matters take sometimes daily attention.

30. On November 15, 2006, the Court appointed Special Master James McGovern. Professor McGovern was asked by the Court to provide advice on the adequacy and fairness of the settlement, particularly with respect to the net payment to the consumer class and the method of distribution of funds to class members. Both Plaintiffs and Defendants worked with Professor McGovern to provide him with information related to the settlement and to answer his inquiries about the proposed settlement agreement.

31. As part of his evaluation of the settlement, Professor McGovern also became involved in issues related to the notice to consumers in the case. As the Court may recall, notice and administration of the GSK Settlement proved to be complicated, and at times it was unclear whether the original GSK settlement would even be approved. By April of 2007, the claims administrator had received approximately 10,000 consumer claims and over 20,000 requests for exclusion. Lead Class Counsel spent considerable amount of time working with Professor McGovern on issues concerning the high number of potential consumer opt-outs. This involved exploration of various ways of determining the reason for the high level of opt outs. Lead Class Counsel worked with Professor McGovern and a survey expert consulting with Professor McGovern to help develop a survey instrument used to survey a sample of the consumers who

had filed opt-outs. Among the conclusions of that survey were that, of the thousands of consumers who had filed opt-out requests, only about 15% of them were actually class members. Some percentage of these consumers actually intended to file a claim rather than exclude themselves. Professor McGovern, with the Court's permission, sent a letter to consumers who had filed exclusion requests giving them a chance to file a claim if they so chose.

32. Professor McGovern, as a result of his close work on consumer claims issues and his evaluation of the fairness of the settlement, issued a report to the Court concluding that the Settlement was fair, adequate and reasonable with respect to all class members. Report of Special Master to the Court (Dkt. No. 4466). The information obtained from consumers as a result of Lead Class Counsel's work with Professor McGovern informed much of the proposals for class notice that came later in the AstraZeneca Class 1 Settlement as well as the AWP Track Two Settlement.

33. Once the Court granted final approval, Lead Class Counsel were called upon to defend the settlement against an objector, including briefing on appeal to the First Circuit. This was only recently resolved. Apart from the GSK settlement, discovery continued into the business practices of the other defendants (many of whom supplied drugs to the GSK class members, who took anti-emetics along with chemotherapy drugs from other defendants), third parties and experts. Class certification proceedings continued, with the Court ultimately certifying Massachusetts Classes 2 and 3 and declining, for the time being, to certify nationwide classes. Lead Class Counsel prepared to try the claims of the Massachusetts Class 2 and 3 members and did so in a lengthy trial that began in November 2006, concluding in January 2007 and resulting in the Court's trial opinion issued in June 2007.

34. Thus, the AWP litigation did not stand still when the GSK settlement agreement was reached. To the contrary, there were a plethora of vital activities that continued to benefit all class members, including those in the GSK settlement class. Indeed, the Court did not issue its Final Approval Order until August 17, 2007, two months after issuing its trial opinion. At any point until then, there was no final settlement with GSK, and Lead Class Counsel were taking every effort to protect the GSK class members through these other aspects of the case.

35. Lead Class Counsel strongly believe that taking an "all-in" approach by crediting efforts through July 2008, including total lodestar and costs, more accurately captures and rewards the total time and effort in the case and more fairly compensates for total risk taken.

**E.   It is not Possible to Segregate "GSK-only" Efforts and any Attempt to do so Would Result in an Even Greater Payment to Lead Class Counsel at the Expense of Firms that Did Little or no Work that is Specifically Identifiable to the Case Against GSK.**

36. Lead Class Counsel reviewed other ways of basing the allocation and found them problematic. For instance, attempting to link GSK-specific work to the GSK-specific settlement is very difficult and simply cannot be done on a global basis.

37. As we have explained to the Court (and as the Court has echoed in its most recent opinion), time cannot be effectively divided to isolate efforts related to specific defendants given the breadth of common issues. More than 250 attorneys have spent time working on this case for the plaintiffs. The common issue work accomplished by counsel for plaintiffs includes researching and drafting complaints; working on issues related to the initial MDL motions; a panoply of issues related to the use of AWP as a benchmark in the Medicare program and in the private insurance market; legal research and drafting of briefs on the joint motions to dismiss, joint motions for summary judgment, and briefing associated with class certification; coordination with experts regarding same; motions and discovery related to many third parties, including governmental organizations, trade associations and the hundreds of insurers,

pharmacies and other market participants subpoenaed by defendants; discussions with class representatives and class members; and general trial preparation.

38.     As a result of this common work, there was no effort to counsel's individual efforts to each defendant.

39.     Had Lead Class Counsel attempted a more GSK-specific link, as Williams suggests, Lead Class Counsel would have received a greater fee allocation than they did.  This is because the bulk of the work on GSK-specific issues was done by Lead Class Counsel team member Hagens Berman, who took over 20 GSK depositions, reviewed the 2.8 million documents from two separate companies (Glaxo and SmithKline Beecham were two separate companies until 2002, after the case was filed), prepared the liability analysis for over a dozen drugs, primarily negotiated the GSK agreement, supervised the allocation, prepared the settlement papers, took the lead in all settlement hearings and monitored the claims process.

40.     And a firm like Williams' would have received much less had non-GSK efforts been removed from consideration.  For instance, a substantial portion of the total lodestar reported by Williams involved work on the Baxter document review (approximately 36% of lodestar) and in a non-MDL case in Arizona (approximately 5.5% of lodestar).  These efforts would not have been credited under Williams' own ill-conceived proposal.  Indeed, based on a review of Williams' time records, only about $87,498 of the Williams Law Firm lodestar – or 4.7% – can be specifically linked to GSK, and almost all of that is in association with Williams' role as allocation co-counsel on the settlement after a settlement-in-principle had been reached with GSK.  Attached as Exhibit 6 is a summary, by time entry, of the amounts that Williams billed to GSK allocation issues.

41.     As this demonstrates, all Class Counsel performed work for the "common good" that benefitted all class members, including the GSK class members. Firms should not be penalized just because they were randomly assigned a defendant that has not settled. By recognizing the contribution of everyone's work to the benefits achieved on a class-wide basis in all settlements, the "all-in" approach will benefit firms who did no work on GSK, or, for that matter, on AstraZeneca, BMS or the Track 2 Defendants when it comes time to distribute the fees associated with those settlements. In the larger picture, the "all in" approach is simply a more fair and reasonable way of evaluating each firm's contributions.

**F.      Williams Overstates the Importance of his Involvement in this Case.**

42.     Lead Class Counsel are grateful that Williams chose to help out on this case, but we disagree with Williams' assessment of the importance of his work. Williams exaggerates the importance of his role.

43.     As Williams admits, he is a sole practitioner. Br. at 5. He, along with Don Haviland of Kline & Specter, did not join the case until September 2005. Br. at 3. This is almost <u>four</u> years after the bulk of the cases consolidated into this MDL action were filed and three-and-a-half years after the Court issued CMO No. 1 appointing lead counsel roles. Although Williams struggles to cast his role in this action as some continuation of the *Lupron* case, that is simply untrue. Williams (and Haviland) had no relationship to this MDL litigation or Lead Class Counsel's role in it until the Fall of 2005, when Williams and Haviland threatened to intervene.

44.     The work that Williams describes that he performed in this litigation cannot be considered "stand out" tasks. As he describes, Williams assisted with a handful of consumer clients, speaking to them and gathering documents; defended two class representative depositions; served as one of two consumer allocation counsel in the GSK settlement (along with the firm of RodaNast); and staffed, through contract attorneys, part of the Baxter document

- 15 -

review. Save for a handful of other miscellaneous tasks, that is it – this is the totality of Williams' role in the case. And it should be noted that some of the work that Williams performed was, as he admits, done in conjunction with Don Haviland, and the individual consumers that Williams claims he represented were also clients of record of Don Haviland and his firm Kline & Specter. Indeed, given that he is sole practitioner, Williams had limited capacity. It appears that he was a *de facto* member of the Don Haviland Kline & Specter team on this case, even though Williams practiced under his own firm's name.[1]

45. Williams did not play any substantial role in briefing motions to dismiss (which were decided well before he arrived on the scene). He did not play any substantial role in the lengthy class certification briefing or any other major motions; most of that work was done by Lead Class Counsel. He had no leadership role on any project or issue. Williams was not part of the trial team, did no work on the trial and little substantive work during the pretrial proceedings, although he worked on a single motion *in limine* relating to the Class 1 claims against AstraZeneca before those claims settled. He has not worked on any of the many complex appellate issues.

46. The purported "substantial" work that Williams contends he performed was minimal compared to that done by the Tier I and II firms, and his commitment did not even approach that of the Tier II firms. Both Tier II firms served for a time as co-leads; Williams did not. Reflective of their once co-lead status, the Tier II efforts (and their lodestars and expenses advanced) dwarf that of the Williams Firm. Indeed, Williams' "substantial" work does not overshadow many other Tier III firms, such as Cuneo, Gilbert & Laduca, the Sheller firm and Shepherd, Finkelman, who assisted with reviewing the millions and millions of documents

---

[1] Several of Williams' time entries for April and May 2006 indicate that he even drafted one of the declarations submitted under Don Haviland's name. *Id.*

produced by numerous defendants and, in the case of Shepherd Finkelman, assisted with important publisher discovery.

47.     An additional word on Williams' use of contract attorneys is in order.  Although Williams was paying $30 an hour or close thereto for these attorneys, he billed them out at much higher rates:  $275 per hour for four of them, and $190 per hour for one of them.  Thus, Williams' lodestar for this work already has a substantial multiplier built-in.  Based on a review of Williams Law Firm time records, approximately 36% of the Williams lodestar is attributable to five contract attorneys who participated in the Baxter document review.

48.     Even though Williams did not play a substantial role in this case, he was rewarded for his participation, including for those work items that Williams enumerates, by receiving the <u>second-highest allocation of all Tier III counsel</u>.  If Williams feels that he is being punished or retaliated against, that is certainly not the case.

49.     Lead Class Counsel have not shut anyone out of participating in this case, as Williams suggests.  We have not received any complaints that Lead Class Counsel were hoarding all of the work, and Williams himself never lodged a single complaint along these lines until filing the instant motion.  As is often the case, the longer that litigation endures with no distributions to show for it, many firms typically conserve their resources by curtailing their efforts and permitting others to continue the prosecution through the dedication of their scarce resources and at the cost of other opportunities.  With the benefit of hindsight, that is unfortunately what has happened in the AWP litigation as Lead Class Counsel were called upon to carry an increasingly heavy load as the litigation grew longer and longer.

- 18 -

Executed this 14th day of November, 2008.

                                               **/s/ Steve W. Berman**
                                               STEVE W. BERMAN

- 19 -

## CERTIFICATE OF SERVICE

      I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF STEVE W. BERMAN IN SUPPORT OF LEAD CLASS COUNSEL'S RESPONSE TO WILLIAMS' MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on November 14, 2008, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                       /s/ Steve W. Berman
                                       Steve W. Berman

- 19 -