## EXHIBIT B-3

### SETTLEMENT NOTICE PROGRAM



KINSELLA NOVAK

# GlaxoSmithKline
# AWP Settlement Notice Program

## In Re: Pharmaceutical Industry Average Wholesale Price Litigation,

Case No. MDL No. 1456
(CA:01-CV-12257-PBS) (D.Mass.)

2122 L S E   S NW | S TE  235 | W SHING C N, DC 20037
PHONE: 202.686.4111 | FAX: 202.293.6961 | EMAIL: INF CASES  A S N VA  C M | R L: HTTP://WWW.KINSELLA NOVAK C M

THE  ART  &  SCIENCE  OF  LEGAL  NOTIFICATION

# TABLE OF CONTENTS

|                          | Page |
|--------------------------|------|
| Firm Overview            | 1    |
| Relevant Case Experience | 2    |
| Technical Approach       | 3    |
| Situation Analysis       | 5    |
| Product Background       | 6    |
| Class Definition         | 7    |
| Notice Plan Overview     | 8    |
| Direct Notice            | 9    |
| Paid Media Methodology   | 11   |
| Target Audience          | 12   |
| Demographics             | 13   |
| Paid Media Program       | 15   |
| Newspaper Supplements    | 16   |
| Consumer Magazines       | 17   |
| Trade Publications       | 21   |
| Print Readership         | 22   |
| National Media Delivery  | 23   |
| Notice Design            | 24   |

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

| | |
|---|---|
| Earned Media | 25 |
| Third-Party Notice | 26 |
| Informational Web Site | 27 |
| Toll-Free Telephone Support | 28 |

Exhibit 1 – GSK Covered Drugs

Exhibit 2 – Long Form Notices

> A: TPP Notice
> B: Consumer Notice

Exhibit 3 –Newspaper Supplements by Carrier Paper

Exhibit 4 – Notice schedule

Exhibit 5 - Publication Notice samples

Exhibit 6 – List of Third-Party Organizations

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# FIRM OVERVIEW

Kinsella/Novak Communications ("KNC") provides nationally recognized expertise in the design of media-based legal notification programs for class actions and bankruptcies.

The firm has designed, implemented or consulted on over 250 class actions and bankruptcies and specializes in the most complex and often precedent-setting notice efforts. National and statewide notification programs include asbestos, breast implants, consumer fraud, home siding products, infant formula, polybutylene plumbing, tobacco, antitrust securities and Holocaust claims. The firm has selected and placed over $135 million in paid legal advertising.

KNC develops advertisements, press materials, Web sites, and other notice materials bridging the gap between litigation complexities and the need for a clear and simple explanation of legal rights. In addition to designing and producing notices in "plain language", all KNC notice programs are fully compliant with Rule 23 of the Federal Rules of Civil Procedure and comparable state guidelines. The firm employs industry-recognized tools of media measurement to quantify the adequacy of the notice for the court.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# RELEVANT CASE EXPERIENCE

KNC has significant notification experience including consumer class actions involving pharmaceuticals.

## PHARMACEUTICAL CASES

- ➤ *State of Connecticut v. Mylan Laboratories, Inc.,*
  MDL 1290, Misc. No. 99-276 (TFH-JMF) (Lorazepam and Clorazepate)

- ➤ *In re Buspirone Antitrust Litigation,*
  MDL-1413 (S.D.N.Y.) (BuSpar)

- ➤ *In re Cardizem CD Antitrust Litigation,*
  99-MD-1278 (E.D. Mich.) (Cardizem)

- ➤ *State of Ohio v. Bristol-Myers Squibb, Co.,*
  1:02-cv-01080 (D.D.C.) (Taxol)

## OTHER SELECTED CASES

- ➤ *In re Nasdaq Market-Makers Antitrust Litigation,*
  No. M21-68 (RWS), 94 Civ. 3996 (RWS), MDL No. 1203 (S.D.N.Y.) (securities)

- ➤ *In re Compact Disc Minimum Advertised Price Antitrust Litigation,*
  MDL No. 1361 (D. Me.) (prerecorded music products)

- ➤ *In re Toys "R" Us Antitrust Litigation,*
  MDL No. 1211, Master File No. CV-97-5750 (E.D.N.Y.) (toys and other products)

- ➤ *Cox v. Shell Oil Co.,*
  No. 199,844 (Tenn. Ch. Ct., Obion County) (polybutylene pipe)

- ➤ *Naef v. Masonite,*
  No. CV-94-4033 (Ala. Cir. Ct., Mobile County) (hardboard siding)

- ➤ *In re Holocaust Victims Assets Litigation,*
  No. CV 96-4849 (Consolidated with CV-5161 and CV 97461) (E.D.N.Y.)

- ➤ *Ruff, et al. v. Parex, Inc.,*
  No. 96-CVS-0059 (N.C. Super. Ct., New Hanover County) (EIFS stucco)

- ➤ *Fettke v. McDonald's Corporation,*
  Case No. 044109 (Cal. Super. Ct., Marin County) (trans-fatty acids)

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# TECHNICAL APPROACH

KNC's technical approach is based on its expertise as a leading provider of notice in class actions, knowledge of court-approved notice programs at the state and federal levels and years of experience in designing and implementing legal notification programs both nationally and internationally.

KNC begins by conducting detailed research on the claim that is the subject of the class action and how it is related to a population, its location and temporal characteristics. This information identifies the demographic characteristics of class members – such as age, gender, income, and education level – and the geographic distribution of potential class members. This research provides the parameters for identifying and locating class members and shapes the scope of the notice program.

Specifically, KNC:

- ➤ Reviews demographic and product information provided by the client or independently researched and establishes a demographic profile of the target audience. All media selections are based on this profile in order to ensure the highest reach of potential class members and frequency of message exposure.

- ➤ Evaluates the effectiveness of media vehicles – consumer magazines, newspapers, specialty publications, broadcast television, radio and the Internet – in reaching the target audience.

- ➤ Analyzes publications using syndicated data sources and tools, such as the Audit Bureau of Circulation (ABC) statements, which certify how many readers buy or obtain copies of publications, and MediaMark Research ("MRI") which measures how many people open or read publications.

- ➤ Examines the geographic distribution of potential class members at the level of detail necessary to determine effective geographic coverage.

- ➤ Selects media available during the established notice period ensuring timely notice to class members.

- ➤ Creates and implements all notice communications, including: published notice, print, audio and video news releases, television and radio spots, Internet advertising and Web sites.

- ➤ Ensures that published notices and long form notices are written in "plain language."

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

➣ Uses established advertising relationships to negotiate the deepest available discounts on national advertising and secure optimum placement with respect to the media habits of the target audience.

➣ Designs and implements an "earned media" program to further supplement the published notice through print, audio and video news releases and non-paid media outreach. Tracks and verifies all media placements and press stories developed through "earned media."

➣ Designs and maintains a Web site to enable class members to access all relevant information including long form notices, claim forms and court documents. Provides registration and email capabilities on the site.

➣ Integrates all aspects of the notification program with selected claims administrators.

➣ Provides advice, affidavits, depositions and court testimony with respect to the design and implementation of the notification program.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# SITUATION ANALYSIS

The average wholesale price ("AWP") is a published price that is often used to establish reimbursement rates for drugs. Plaintiffs claim that the Defendant, GlaxoSmithKline ("GSK"), controlled the AWP for certain drugs and caused it to be artificially high. Defendant denies these allegations.

GSK has entered into a Proposed Settlement with the Class Plaintiffs and has agreed to pay $70 million to settle these and other related claims. A $4.5 million payment to certain State Attorneys General, as well as attorneys' fees and the costs of administering the Proposed Settlement, will be deducted from the Settlement Fund before distributions to Class Members.

- 30% of the remaining fund will be distributed in cash to consumers who paid for all or part of the cost of the GSK Covered Drugs and who submit a valid claim form.

- 70% of the remaining funds will be set aside to pay the claims of insurer class members who submit a valid claim and other insurers who are members of a separate and independent group of Third-Party Payors ("TPPs") (referred to as the "Independent Settling Health Plans" or "ISHPs") who have agreed to settle their claims against GSK for a portion of the Settlement funds.

GSK denies any wrongdoing. The Proposed Settlement is not an admission of wrongdoing or an indication that any law was violated. GSK has entered into the Proposed Settlement solely to avoid further expense, inconvenience, and the burden of these litigations and any other present or future litigation arising out of the facts that allegedly gave rise to these litigations.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# PRODUCT BACKGROUND

The Proposed Class Settlement covers certain specific drugs manufactured by GSK and covered by Medicare Part B. The drugs are broken into two categories under the Settlement Agreement, and the settlement awards Class Members who paid for "Category A" Drugs ten times as much as Class Members who paid for "Category B" Drugs. The GSK Category A Drugs are Kytril Injectables (Granisetron HCL) and Zofran Injectables (Ondansetron HCL). Both of these products are anti-emetics which are used to treat nausea and vomiting associated with chemotherapy. The GSK Category B Drugs include Zofran and Kytril in their non-injectable forms, as well as:

> Three other oncology products -- Alkeran (melphalan), Myleran (busulfan) and Navelbine (vinorelbine tartrate)

> Two Anti-Infective/anti-viral drugs – Retrovir (zidovudine), which treats HIV, and Zovirax (acyclovir)

> A cardiovascular drug, which treats heart failure -- Lanoxin (digoxin)

> A drug that treats the central nervous system, including migraines – Imitrex (sumatroptan)

> A drug that treats respiratory ailments, including asthma – Ventolin (albuterol); and

> A drug that treats gastrointestinal ailments, such as ulcers – Zantac (ranitidine HCL).

Attached as Exhibit 1 is a chart that shows the GSK Covered Drugs, by formulation, as well as their therapeutic classes.

# CLASS DEFINITIONS

The proposed Class Action Settlement includes three classes: The Medicare Part B Co-Payment Class ("Medicare Co-Payment Class"), the Third-Party Payor Medigap Supplemental Insurance Class ("Medigap TPP Class") and the Consumer and Third-Party Payor Class for Payments Made for Medicare Part B Drugs Outside the Medicare Context ("Private-Payor Class").

- The <u>Medicare Co-Payment Class</u> is an individual Consumer Class consisting of all natural persons in the United States who made, or who incurred a currently enforceable obligation to make, a co-payment based on AWP for a Medicare Part B drug manufactured by GSK and listed on the GSK Covered Drugs list during the Class Period of January 1, 1991 through January 1, 2005. It also includes heirs of such persons. Excluded from the class are persons who made flat co-payments, who were reimbursed in full for any co-payments, or who have the right to be fully reimbursed for any co-payments.

- The <u>MediGap TPP Class</u> is an "entity" class that consists of all Third-Party Payors in the United States who made reimbursements for a Medicare Part B drug manufactured by GSK and listed on the GSK Covered Drugs list during the Class Period of January 1, 1991 through January 1, 2005.

- The <u>Private-Payor Class</u> includes both individual consumers and entities. The individual consumers consist of all natural persons in the United States who made, or who incurred a currently enforceable obligation to make, a payment for a physician administered drug manufactured by GSK and listed on the GSK Covered Drug list, during the Class Period of January 1, 1991 through August 10, 2006. Excluded from the class are natural persons who made flat co-payments, who were reimbursed in full for any payments or co-payments, or who have the right to be fully reimbursed for any payments or co-payments. The Private-Payor Class also includes Third-Party Payors in the United States who made reimbursements based on contracts using AWP as a reimbursement standard for purchases of a physician administered drug manufactured by GSK and listed on the GSK Covered Drug list for this same class period.

For notice purposes, the individual consumers in the Medicare Co-Payment Class and the individual consumers in the Private-Payor Class are sometimes treated together, and are sometimes referred to as Consumer Class Members. Likewise, the entities in the Medigap TPP Class and the Private-Payor Class are sometimes treated together, and are sometimes referred to as the TPP Class.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

## NOTICE PLAN OVERVIEW

This plan is submitted by KNC in connection with *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, M.D.L. No. 1456 (CA: 01-CV-12257-PBS) in the District Court of Massachusetts. The plan outlines procedures to provide notice of the GSK Proposed Class Action Settlement consistent with the requirements set forth in Rule 23 of the Federal Rules of Civil Procedure. The Notice Program is directed to all members of the four Proposed Settlement Classes, including both Consumer Class Members and TPP Class Members.

Based upon information provided by Counsel, the results of research on Class Members and their response to media and the media habits of the target audiences, the following four-part notice program is recommended:

➢ Direct notice by first-class mail to:

- All Third-Party Payors ("TPP") whose names and addresses are readily identifiable.

- Medicare Part B Beneficiaries who purchased the GSK Covered Drugs during the Class Period, whose names and last known addresses can be identified by the Centers for Medicare and Medicaid Services ("CMS").

- All callers to the toll-free information line who request a *Notice of Proposed Class Action Settlement* as a result of seeing the Publication Notice.

➢ Broad published notice through the use of paid media, including consumer magazines and newspaper supplements. Trade publications will be used to supplement the direct notice to TPPs.

➢ Earned media notice through a press release sent to major national print and electronic outlets and third-party organizations.

➢ Electronic notice through a dedicated Web site.

The Notice Program calls for different long form and publication notices tailored to (a) the TPP Class Members and (b) the Consumer Class Members. The *Notice of Proposed Class Action Settlement* designed specifically for TPPs will be sent to them ("*TPP Notice of Proposed Class Action Settlement*"). The *Notice of Proposed Class Action Settlement* designed specifically for individual Consumers will be directed to them ("*Consumer Notice of Proposed Class Action Settlement*"). The Publication Notices will be similarly tailored.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# DIRECT NOTICE

## THIRD-PARTY PAYORS

Direct mail notice to TPPs will consist of mailing the *TPP Notice of Proposed Class Action Settlement* (Exhibit 2A) to appropriate identifiable TPP Class Members informing them of their legal rights and how they may participate in or opt-out of the class action. The *TPP Notice of Proposed Class Action Settlement* will be sent to:

➤ Appropriate entities likely to be Class Members, in the proprietary TPP Database compiled by Complete Claim Solutions ("CCS"), the class administrator. The Database includes insurance companies, healthcare and welfare funds, employee benefit funds, third-party administrators, pharmacy benefit managers and other record keepers for noticing purposes in TPP class actions. The Database was compiled from contacting, researching and accessing the records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc. as follows:

- Pharmacy Benefit Management Institute;
- Benefits SourceBook;
- Managed Care Information Centers;
- Judy Diamond Associates;
- AM Best Company;
- Association of Managed Care Providers;
- Society of Professional Benefit Administrators;
- American's Health Insurance Plans;
- Self-Insurance Institute of America; and
- National Association of Insurance Commissioners.

Included in the Database are

- Approximately 29,000 companies with 100 or more employees that have self-funded (fully or partially) plans, derived from Form 5500 filings;
- 1,356 Third-Party Claim Administrators; and
- 1,300 member companies of American Health Insurance Plans that provide or administer health insurance benefits to over 200 million Americans which represent 90 percent of the managed care market (HMOs, PPOs and POSs, etc.).

The Database is regularly updated with new entries from the above sources as well as TPPs identified through other class action litigations.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

## INDIVIDUAL MEDICARE PART B BENEFICIARIES AND DRUG CONSUMERS

All identifiable Medicare Part B Beneficiaries who, according to available CMS records, were prescribed the GSK Covered Drugs, will be mailed the *Consumer Notice of Proposed Class Action Settlement* (Exhibit 2B). Mail will be address corrected if returned and re-mailed, if possible.

## CALLERS TO THE TOLL-FREE NUMBER

All callers to a toll-free information line who request the either the *TPP Notice of Proposed Class Action Settlement* or the *Consumer Notice of Proposed Class Action Settlement* will be mailed the requested Notice.    A toll-free number for this information line will prominently appear in the Publication Notice.  Class Members may also download either Long Form Notice, in PDF format, from the Notice Web site.

## PAID MEDIA METHODOLOGY

KNC notice plans directed to unidentified class members (1) identify the demographics of class members and establish a target audience; (2) outline the methodology for selecting the media and other plan elements and how they relate to product usage or exposure; and (3) provide results that quantify for the court the adequacy of the notice based upon recognized tools of media measurement.

In the wake of the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999), the reliability of a notice expert's testimony should be tested against the standards developed within the media industry for determining whether, to what degree and at what frequency a target audience has been reached. In assessing the expert's reliability, the court must determine whether the testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," (526 U.S. at 152). That showing would likely require evidence that the expert's data and methodology are similar to that used by professionals in the relevant field.

In keeping with the *Daubert* and *Kumho* rulings, KNC employs the methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.

Choosing a target audience encompassing the characteristics of Class Members is the first step in designing the paid media program. Media vehicles are chosen based on their ability to provide effective and cost efficient reach among the target audience. The selected media vehicles are then measured against the target audience to establish the *reach* of the media program and the *frequency* of exposure to the media vehicles. *Reach* and *frequency* estimates are two of the primary measurements used to quantify the media penetration of a target audience.

- *Reach* is the estimated percentage of a target audience reached one or more times through a specific media vehicle or combination of media vehicles within a given period.

- *Frequency* is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message within a given period of time.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# TARGET AUDIENCES

To develop a profile of the demographics and media habits of Medicare Co-Payment Class Members and their heirs, as well as Private-Payor Class individual consumers of prescription drugs, KNC analyzed syndicated data available from the 2005 Doublebase Survey[1] from MediaMark Research, Inc. ("MRI").

MRI is the leading U.S. supplier of multimedia audience research. As a nationally accredited research firm, it provides information to magazines, television, radio, Internet and other media, leading national advertisers and over 450 advertising agencies -- including 90 of the top 100 in the United States. MRI's nationally syndicated data are widely used by these companies as the basis for the majority of the media and marketing plans written for advertised brands in the United States.

Specifically, MRI provides data on audience size, composition and other relevant factors pertaining to major media vehicles. MRI presents a single-source measurement of major media, products, services and in-depth consumer demographic and lifestyle characteristics.

Using MRI data, KNC selected three demographics that encompass Medicare Co-Payment Class Members, their heirs and consumers of prescription drugs:

➤ Individuals with medical insurance through Medicare ("Medicare Beneficiaries").

➤ Adults 18 years of age and older ("Adults 18+"), which encompasses any heirs of Medicare Beneficiaries.

➤ Individuals who used any branded or generic prescription drug in the last 12-months[2] ("Drug Consumers").

---

[1] The study, conducted since 1979, surveys persons 18 years of age and older in the contiguous 48 states. MRI conducts more than 26,000 personal interviews with consumers in two waves annually each lasting six months and consisting of 13,000 interviews. Produced annually by MRI, the Doublebase study consists of two full years of data drawn from over 50,000 respondents. Consumer information is recorded on 500 product/service categories, 6,000 brands and various lifestyle activities. Respondents are selected based on the ability to project their responses nationally.

[2] Although the Class Period extends beyond the past 12 months, the demographics of these consumers would not differ materially over the Class Period.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# DEMOGRAPHICS

The chart below outlines the overall demographics of the three target audiences:

| DEMOGRAPHICS | MEDICARE BENEFICIARIES | ADULTS 18+ | DRUG CONSUMERS |
|---|---|---|---|
| Male | 42.3% | 48.0% | 40.2% |
| Female | 57.7% | 52.0% | 59.8% |
| **Age** | | | |
| 18 - 24 | 2.6% | 13.0% | 9.6% |
| 25 - 34 | 2.9% | 18.4% | 14.8% |
| 35 - 44 | 4.1% | 20.7% | 19.8% |
| 45 - 54 | 6.3% | 19.0% | 20.2% |
| 55 - 64 | 10.3% | 12.8% | 15.7% |
| 65+ | 73.8% | 16.1% | 19.9% |
| **Education** | | | |
| Graduated/Attended College | 35.4% | 51.9% | 53.8% |
| Graduated High School | 25.9% | 16.4% | 14.2% |
| **Household Income** | | | |
| Under $10,000 | 10.5% | 6.2% | 5.8% |
| $10,000 - $29,999 | 43.2% | 21.7% | 20.8% |
| $30,000 - $49,999 | 23.3% | 20.9% | 20.5% |
| $50,000 - $74,999 | 12.4% | 20.2% | 20.1% |
| $75,000 - $99,999 | 10.6% | 31.1% | 37.2% |
| $100,000+ | 5.3% | 18.1% | 18.9% |
| **Ethnicity** | | | |
| Caucasian | 84.1% | 77.9% | 82.8% |
| African-American | 10.1% | 11.4% | 9.8% |
| Hispanic | 6.3% | 12.2% | 8.9% |
| Asian | 1.2% | 2.5% | 1.8% |
| **Location[3]** | | | |
| A & B Counties | 61.6% | 71.1% | 69.8% |
| C & D Counties | 38.4% | 28.9% | 30.2% |

[3] A Counties, as defined by A.C. Nielsen Company, are all counties belonging to the 25 largest metropolitan areas. These metro areas correspond to the MSA (Metropolitan Statistical Area) and include the largest cities and consolidated areas in the United States. B Counties, as defined by A.C. Nielsen Company, are all counties not included under A that are either over 150,000 population or in a metro area over 150,000 population according to the latest census. C Counties, as defined by A.C. Nielsen Company, are all counties not included under A or B that either have over 40,000 population or are in a metropolitan area of over 40,000 population according to the late census. D Counties are, essentially, rural counties in the Nielsen classification system of A, B, C, D counties.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

The demographics of Adults 18+ and Drug Consumers are similar in age, income and education. As indicated in the chart above:

### AGE

➢ Medicare Beneficiaries are considerably older than the general population of Adults 18+ and Drug Consumers. 73.8% of Medicare Beneficiaries are 65 years of age and older, while 83.9% of the general population and 80.1% of Drug Consumers consist of adults under 65 years of age.

### INCOME

➢ 15.9% of Medicare Beneficiaries have an income of $75,000+ while 49.2% of Adults 18+ and 56.1% of Drug Consumers have an income of $75,000+. 53.7% of Medicare Beneficiaries have an income under $30,000 as compared to 27.9% of Adults 18+ and 24.2% of Drug Consumers.

### EDUCATION

➢ Adults 18+ and Drug Consumers, as a whole, are more educated than Medicare Beneficiaries. 51.9% of Adults 18+ and 53.8% of Drug Consumers attended or graduated college while 35.4% of Medicare Beneficiaries attended or graduated college.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# PAID MEDIA PROGRAM

As indicated, direct notice will be provided to all identifiable TPPs, Medicare Co-Payment Class Members and their heirs. To supplement the TPP direct notice, ad placements in trade publications directed to TPPS will be used.

To reach unidentifiable Medicare Part B Beneficiaries, their heirs, and Private-Payor Class individual Drug Consumers, KNC recommends the use of measurable paid media. Paid media advertising is guaranteed to appear, allowing for control of the content, timing and positioning of the message, making it an invaluable part of any notice campaign. Newspapers, consumer magazines, television, radio and the Internet, among other sources, offer paid media opportunities.

In considering which media to use for this case, KNC evaluated the cost-effectiveness, exposure opportunities and reach potential of each media type. Television was not selected due to its high cost. Radio is a frequency medium best used locally. Print media was selected because of its widespread use, and its value as a credible and tangible information source which allows for extended body copy.

In choosing which placements would be best for this case, KNC reviewed all available consumer publications for the compatibility of the editorial and the creative message. Consumer magazines and newspaper supplements offer efficient and cost-effective vehicles for reaching all demographic segments of the population. Given the broad scope of the Class in this notice program and the demographics and media habits of the target audiences, consumer magazines and newspaper supplements are recommended.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# NEWSPAPER SUPPLEMENTS

*Parade* and *USA Weekend*, inserts known as newspaper supplements, are carried in weekend or weekly editions of 962 newspapers reaching every media major market in the country (eight newspapers carry more than one supplement). These magazines, published on newsprint, contain articles written for broad, general appeal and they encourage readership through brevity. Issues are typically less than 30 pages. For this Notice Program, newspaper supplements are recommended because of their broad geographic and demographic reach capability. They provide coverage in all 50 states and the District of Columbia. (See Exhibit 3.)

KNC recommends the following activity:



- ➤ A half-page ad (4-5/8" x 10-3/4") will be placed once in *Parade,* with an estimated circulation of 32,700,000.

- ➤ *Parade* is carried in the Sunday edition of 373 daily newspapers and is the highest circulating magazine in the world. Carrier newspapers serve major urban and suburban markets in the U.S.

- ➤ The average issue of *Parade* is read by 39.7% of Medicare Beneficiaries, 36.8% of Adults 18+ and 39.2% of Drug Consumers.

---



- ➤ A half-page ad (4-5/8" x 10-3/4") will be placed once in *USA Weekend*, with an estimated circulation of 22,700,000.

- ➤ *USA Weekend* is inserted in the weekend edition of 589 daily newspapers in major markets complementing the U.S. markets served by *Parade*.

- ➤ The average issue of *USA Weekend* is read by 27.3% of Medicare Beneficiaries, 28.0% of Adults 18+ and 25.3% of Drug Consumers.

---

## CONSUMER MAGAZINES

Thousands of consumer magazines offer national advertising opportunities. Most adults read one or more magazines during an average month and nearly three out of five adults read or look into a magazine daily. Additionally, magazines published weekly quickly accumulate readership and provide timely and efficient notice to readers. The specific consumer magazines listed below were chosen because collectively they provide excellent reach of consumers.

KNC recommends the following activity:

➤ A full-page ad (7-7/8" x 10-1/2") will be placed once in *Better Homes and Gardens,* with a circulation of 7,600,000.

➤ *Better Homes and Gardens* is published monthly and is the largest-circulation home service magazine, featuring a wide-range of home and family subjects such as food and decorating.

➤ The average issue of *Better Homes and Gardens* is read by 18.3% of Adults, 19.2% of Medicare Beneficiaries and 21.8% of Drug Consumers.

➤ A full-page ad (4-5/16" x 6-1/2") will be placed once in *Jet,* with an estimated circulation of 900,000.

➤ Published weekly, *Jet* is the leading newsweekly for the African-American community, combining national and global news with issues and information specific to the African-American community.

➤ Approximately 64% of *Jet* readers graduated college and approximately 46% of readers have a household income of $40,000+.

➤ The average issue of *Jet* is read by 3.1% of Medicare Beneficiaries, 3.8% of Adults 18+ and 3.3% of Drug Consumers.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*



- A full-page ad (5-3/4" x 9") will be placed once in *National Geographic*, with an estimated circulation of 5,000,000.

- *National Geographic* is published monthly and provides coverage encompassing people and places of the world. Major topics include culture, nature, geography, ecology, science and technology.

- *National Geographic* readers spend an average of 56 minutes with each issue and tend to be educated and upper-income.

- The average issue of *National Geographic* is read by 15.1% of Medicare Beneficiaries, 14.9% of Adults 18+ and 15.9% of Drug Consumers.



- A full-page ad (7" x 10") will be placed twice in *Newsweek*, with a circulation of 3,100,000.

- *Newsweek* is published weekly and edited to report on national and worldwide developments with news, commentary and analysis.

- The average issue of *Newsweek* is read by 9.1% of Medicare Beneficiaries, 9.2% of Adults 18+ and 9.8% of Drug Consumers.

- A full-page ad (7" x 10") will be placed three times in *People*, with an estimated circulation of 3,400,000.

- *People* covers contemporary personalities in entertainment, politics, business and other current events.

- Approximately 71% of *People* readers are female and approximately 71% are age 18-49.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

- ➤ The average issue of *People* is passed-along to 10.9 or more different people.

- ➤ The average issue of *Parade* is read by 39.7% of Medicare Beneficiaries, 36.8% of Adults 18+ and 39.2% of Drug Consumers.

# Reader's Digest

- ➤ A full-page ad (4-3/4" x 6-3/4") will be placed once *in Reader's Digest*, with an estimated circulation of 10,000,000.

- ➤ *Reader's Digest* is a monthly compendium of selected excerpts from other publications as well as original pieces.

- ➤ *Reader's Digest* readers skew female and older with 61% women readers and 52% over the age of 50.

- ➤ The average issue of *Reader's Digest* is read by 27.3% of Medicare Beneficiaries, 18.9% of Adults 18+ and 22.1% of Drug Consumers.

# Selecciones

- ➤ A full-page spread ad (4-3/4" x 6-3/4" – each page) will be placed once in *Selecciones*, with an estimated circulation of 375,000.

- ➤ *Selecciones* is the world's leading Spanish-language magazine that combines editorial written specifically for the Hispanic market with articles from *Reader's Digest*.

# Sports Illustrated

- ➤ A full-page ad (7" x 10") will be placed once in *Sports Illustrated*, with an estimated circulation of 3,150,000.

- ➤ *Sports Illustrated* is a weekly publication that covers sporting events and personalities through in-depth articles and stories.

➢ The average issue of *Parade* is read by 6.1% of Medicare Beneficiaries, 9.6% of Adults 18+ and 8.8% of Drug Consumers.

# TIME

➢ A full-page ad (7" x 10") will be placed twice in *Time*, with a circulation of 4,034,000.

➢ *Time* is a weekly news magazine covering national and international people, places, and events.

➢ The average issue of *Time* is read by 10.1% of Adults, 9.3% of Medicare Beneficiaries and 11.0% of Drug Consumers.

---



➢ A full-page ad (7-3/4" x 10-1/2") will be placed twice in *US News & World Report,* with an estimated circulation of 2,000,000.

➢ *US News & World Report* is a weekly news magazine covering national and international people, places, and events.

➢ The average issue of *Parade* is read by 5.5% of Medicare Beneficiaries, 5.1% of Adults 18+ and 5.1% of Drug Consumers.

---

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# TRADE PUBLICATIONS

Selected trade publications will be used to supplement the direct mail notice to TPPs as follows:



National Life & Health Underwriter

- ➢ A full-page ad (7" x 10") placed once in *National Underwriter Life & Health*, with an estimated circulation of 50,195.

- ➢ With a pass-along rate of 1.7 readers per copy, approximately 85,333 agents and brokers read the publication weekly. This includes 20,700 insurance company executives.

- ➢ *National Underwriter Life & Health* is the only weekly magazine serving the life, health and financial services market. It contains news and feature articles to help agents better understand products and markets, and insurance company executives identify new business opportunities. Topics covered include agency management, taxes, legislation, executive benefits, retirement planning and profitable sales ideas.

———————————

# HRMagazine

- ➢ A full-page ad (8" x 10-7/8") placed once in *HR Magazine*, with an estimated circulation of 195,528, and a readership of 547,478.

- ➢ *HR Magazine* is the official publication of the Society for Human Resource Management. It is written for human resources professionals and executives and to further the professional aims of both the Society and the human resource management profession. The publication features new approaches and innovative best practices in all areas of HR management and informs on new models of ways of thinking. It is designed as a forum for trends and legal issues as well as new concepts used by human resources management professionals. It has the highest readership of any human resources publication.

———————————

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation; GSK Settlement*

# PRINT READERSHIP

Readership includes both primary readers and pass-along readers. Primary readers purchased a publication or are members of a household where the publication was purchased. Pass-along readers are those who read the publication outside the home, in places such as a doctor's or dentist's office. The table below indicates the number of readers in each of the target audiences of an average issue of the magazine:

| PUBLICATION | INSERTIONS | MEDICARE BENEFICIARIES | ADULTS 18+ | DRUG CONSUMERS |
|---|---|---|---|---|
| *Better Homes and Gardens* | 1 | 4,210,000 | 39,005,000 | 19,107,000 |
| *Jet* | 1 | 670,000 | 8,134,000 | 2,923,000 |
| *National Geographic* | 1 | 3,311,000 | 31,774,000 | 13,952,000 |
| *Newsweek* | 2 | 1,994,000 | 19,668,000 | 8,605,000 |
| *Parade Carrier Newspapers* | 1 | 8,712,000 | 78,572,000 | 34,356,000 |
| *People* | 3 | 2,636,000 | 37,562,000 | 16,843,000 |
| *Reader's Digest* | 1 | 5,987,000 | 40,319,000 | 19,359,000 |
| *Selecciones\** | 1 | n/a | n/a | n/a |
| *Sports Illustrated* | 1 | 1,342,000 | 20,502,000 | 7,691,000 |
| *Time* | 2 | 2,048,000 | 21,564,000 | 9,610,000 |
| *USA Weekend Carrier* | 1 | 6,151,000 | 50,537,000 | 22,131,000 |
| *US News & World Report* | 2 | 1,209,000 | 10,888,000 | 4,466,000 |

*\*Selecciones* is not measured by MRI and cannot be estimated with a prototype. Therefore, its contribution to the overall reach of the media is not calculated.

# NATIONAL MEDIA DELIVERY

The paid media program outlined above is designed to deliver the following estimated reach and frequency measurements:[4]

- ➤ An estimated 79.6%[5] of Medicare Beneficiaries will be reached with an average estimated frequency of 2.8 times, delivering 48,794,000 gross impressions.[6]

- ➤ An estimated 78.8% of Adults 18+ will be reached with an average estimated frequency of 2.9 times, delivering 485,767,000 gross impressions.

- ➤ An estimated 82.0% of Drug Consumers will be reached with an average estimated frequency of 3.0 times, delivering 215,412,000 gross impressions.

The paid media program provides Class Members with multiple exposure opportunities to media vehicles carrying the Publication Notice.

| TARGET | % OF TARGET REACHED | AVERAGE FREQUENCY | GROSS IMPRESSIONS |
|---|---|---|---|
| Medicare Beneficiaries | 79.6% | 2.8 | 48,794,000 |
| Adults 18+ | 78.8% | 2.9 | 485,767,000 |
| Drug Consumers | 82.0% | 3.0 | 215,412,000 |

(The reach of *Selecciones* is not included in these estimates because it is not measured by MRI.)

The following reach and frequency estimates reflect the combined reach of the direct mail notice at two projected levels with the media notice:

| DIRECT MAIL PERCENTAGE | TARGET | % OF TARGET REACHED | AVERAGE FREQUENCY |
|---|---|---|---|
| 50% | Medical Beneficiaries | 89.8% | 2.8 |
| 75% | Medical Beneficiaries | 94.8% | 2.8 |

The proposed Notice Program Schedule is attached as Exhibit 4.

---

[4] MRI is a sample-based survey. Therefore, estimates of audience and/or demographics from these surveys are subject to sampling and non-sampling error. The use of mathematical values from those surveys should not be regarded as a representation that they are exact to the precise mathematical value stated.

[5] The readership estimates for *Parade* and *USA Weekend* are reflective of the broader readership measurement of the newspaper carrier groups into which these supplements are inserted. A recent custom study conducted by MRI indicates that the actual readership of the supplements is less than that of the carrier papers. While this study provided directional insight into the audience, the data provided is highly variable and insufficient for use in specific computation of reach and frequency. Therefore, the use of carrier paper readership for the newspaper supplements remains the accredited methodology and standard of the industry according to MRI and the Media Research Council.

[6] Gross impressions are the total number of times a media vehicle containing the Publication Notice is seen. This is a duplicated figure, as some viewers (readers) will see several media vehicles (publications) that contain the Publication Notice.

# NOTICE DESIGN

## PRINT DESIGN

The plain language Publication Notices, specifically tailored to either the TPPs or consumer Class Members, have been designed to alert Class Members to the Proposed Class Action Settlement through the use of a bold headline (Exhibit 5). This headline will enable Class Members to quickly determine if they are potentially affected by the Proposed Class Action Settlement. Plain language text provides important information regarding the subject of the Proposed Class Action Settlement, the Class definitions and the legal rights available to Class Members.

Each advertisement will prominently feature a toll-free number, Web site and mailing addresses for Class Members to obtain the Long Form Notice and other information. The design of the Publication Notice takes into account empirical research developed over the past 30 years about how people read and assimilate information.

Recent revisions to Rule 23(c)(2) of the Federal Rules of Civil Procedure require class action notices to be written in "plain, easily understood language." KNC drafts and places plain language ads fully compliant with this revision.  The firm maintains a strong commitment to adhering to the plain language requirement while drawing on its experience and expertise to draft notices that effectively communicate with class members.

Every Publication Notice in consumer magazines will be page dominant, increasing visibility to Class Members. Half-page ads will be used in newspaper supplements, two-thirds page and full-page ads will be used in consumer magazines and full-page ads will be used in trade publications. After reviewing the content and special sections of each publication, the best possible position will be negotiated for placement of the Publication Notice.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# EARNED MEDIA

The thrust of the earned media program is to amplify the notice to Class Members through the use of free media. The earned media portion of this notice program will augment the paid media plan developed to reach the Classes.   The third-party endorsement from reliable sources such as the news media can add immeasurable value to outreach efforts.

Outreach to print and electronic media will focus primarily on key daily newspapers, wire services, newspaper bureaus nationally and major television and radio outlets.

A press release will be distributed on US Newswire's Full National Circuit reaching over 2,000 media outlets.   The press release will highlight the toll-free telephone number and Web site address that Class Members can call or visit for complete information.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# THIRD-PARTY NOTICE

KNC identified a number of organizations that provide information on diseases and conditions for which the GSK Covered Drugs are used. Exhibit 6 lists the primary indicator categories for which we were able to locate viable third-party organizations, the name of the organization and their communication vehicles. These organizations have online newsletters, trade publications, magazines and Web sites.

A press release will be sent to these organizations requesting them to disseminate the notice information to their constituencies. Follow-up phone calls will be made to encourage their participation in the notice efforts.

*In Re Pharmaceutical Industry Average Wholesale Price Litigation: GSK Settlement*

# INFORMATIONAL WEB SITE

An informational interactive Web site is a critical component of the Notice campaign. The URL is a constant information source instantly accessible to millions. The informational Web site utilizes the Internet's ability to serve as a key distribution channel and customer service bureau. Combining clean site design, consistent site navigation clues and built-in flexibility, the Web site provides Class Members with easy access to the details of the Proposed Class Action Settlement.

### CLEAN DESIGN
The site is cleanly designed for ease of use and comprehension. Web pages on the site are simple, containing words, icons, documents and images.

A directory located in a column on the left-hand side of the page provides links to the information available on the Web site.    These can include "Court Documents," "Long Form Notice," and "Questions/Links." The Web site can also feature a "Frequently Asked Questions" section answering commonly asked questions.  If necessary, it will also provide a toll-free number for individuals seeking additional information and the address or email of Class Counsel,

### CONSISTENT NAVIGATION CUES
Wherever the user goes from the homepage to another part of the site, links to the homepage and subsections remain on the left side of all pages, while the case title and cite remains fixed on top.

### BUILT-IN FLEXIBILITY
Though simply designed, the Web site is not restrictive.  The site's basic architecture enables updates and new features to be added quickly.

© 2006 Kinsella/Novak Communications, Ltd.
Proprietary and Confidential.

# TOLL-FREE TELEPHONE SUPPORT

A toll-free interactive voice response system (IVR) will be established to service Class Members calling as a result of seeing the published notice. Callers requesting the *Notice of Proposed Class Action Settlement* will be prompted to input the telephone number of the residence where they would like to receive the Notice.

The system uses an address look-up database to locate the corresponding address of the resident. A portion of the address will be read back to the caller for address verification. For successful look-ups, the caller will be asked to speak the Class Member's full name and to spell the last name. If the look-up fails, is incorrect, or the call is placed from a rotary dial telephone, the caller will be prompted to speak the potential Class Member's name, address and telephone number.

The IVR system will provide an option for callers to speak to a live operator.

EXHIBIT C

[PROPOSED] FINAL APPROVAL ORDER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

MDL No. 1456

THIS DOCUMENT RELATES TO:

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

ALL ACTIONS

## [PROPOSED] FINAL ORDER AND JUDGMENT GRANTING
## FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT WITH THE
## GLAXOSMITHKLINE DEFENDANTS, APPROVING PROPOSED ALLOCATION OF
## SETTLEMENT FUNDS, AND APPROVING CLASS COUNSEL'S APPLICATION FOR
## ATTORNEYS FEES, REIMBURSEMENT OF LITIGATION EXPENSES AND
## INCENTIVE AWARDS TO CLASS REPRESENTATIVES

This Court having considered: (a) the Settlement Agreement and Release of the

GlaxoSmithKline Defendants dated _____, 2006, including all Exhibits thereto (the "

Agreement") between the Plaintiffs and Defendant SmithKline Beecham Corporation, d/b/a

GlaxoSmithKline ("GSK"), which is, along with GlaxoSmithKline, plc and Glaxo Wellcome,

Inc., a named defendant in the above-captioned matter (collectively the "GSK Defendants"); (b)

the proposed allocation and distribution of the Settlement Fund; and (c) Class Counsel's

application for attorneys' fees, reimbursement of litigation expenses and incentive awards for the

Class Representatives; and having held a hearing on _____, and  having considered

all of the submissions and arguments with respect thereto, and otherwise being fully informed,

and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.     This Final Order and Judgment incorporates herein and makes a part hereof, the

Agreement, including the Exhibits thereto. Unless otherwise provided herein, the terms defined

in the Agreement shall have the same meanings for purposes of this Final Order and Judgment.

      2.      The Court has personal jurisdiction over all Class Representatives, AWP Payor

Class Members and Defendant GSK for purposes of this settlement only, and has subject matter

jurisdiction to approve the Agreement.

      3.      Based on the record before the Court, including all submissions in support of the

Settlement set forth in the Agreement ("Settlement"), objections and responses thereto, as well as

the Agreement, the Court hereby incorporates the findings of its August 16, 2005 and January

30, 2006 *Order Re: Motion for Class Certification* and further certifies the following nationwide

Classes (the "AWP Payor Classes") for settlement purposes only:

A.     Medicare Part B Co-Payment Class ("Medicare Co-Payment Class")

        All natural persons in the United States who made, or who incurred
        a currently enforceable obligation to make, a co-payment based on
        AWP for a Medicare Part B covered drug manufactured by GSK
        set forth on Exhibit A hereto. Excluded from the class are persons
        who made flat co-payments, who were reimbursed in full for any
        co-payments, or who have the right to be fully reimbursed for any
        co-payments.

B.     Third-Party Payor MediGap Supplemental Insurance ("MediGap TPP Class")

        All Third-Party Payors in the United States who made
        reimbursements for a Medicare Part B covered drug manufactured
        by GSK and set forth on Exhibit A hereto, based on AWP, during
        the Class Period

C.     Consumer and Third-Party Payor Class for Payments Made for Medicare
        Part B Drugs Outside the Medicare Context ("Private Payor Class")

        All natural persons in the United States who made, or who incurred a
        currently enforceable obligation to make, a payment for, and all Third
        Party Payors in the United States who made reimbursements based on
        contracts expressly using AWP as a pricing standard for purchases of, a
        physician administered drug manufactured by GSK set forth on Exhibit A
        hereto, during the Class Period. Excluded from the class are natural

persons who made flat co-payments, who were reimbursed in full for any payments or co-payments, or who have the right to be fully reimbursed for any payments or co-payments.

The Class Period for the Medicare Co-Payment Class and the MediGap TPP Class is January 1, 1991 through January 1, 2005. The Class Period for the Private Payor Class is Janaury 1, 1991 through the date of the Agreement. Excluded from each of the AWP Payor Classes are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates. Excluded from the MediGap TPP Class and the Private Payor Class are: (1) the United States government and its agencies and departments, and all other governmental entities that made payments pursuant to any state's Medicaid program; (2) the Independent Settling Health Plans (ISHPs), as defined in Paragraph 2(w) of the Agreement; and (3) all federal, state or local governmental entities, *except for* the following, which are *not* excluded from the Medigap TPP or Private Payor Classes: (a) non-Medicaid state or local government entities that made AWP-based prescription drug payments as part of a health benefit plan for their employees, but only with respect to such payments, and (b) other non-Medicaid state government agencies or programs of the Participating States and of the Additional Participating States, if any, *except that* such agencies and programs in New York and Connecticut *are* excluded.

In so holding, the Court finds that the prerequisites of Rule 23(a) and (b)(3) have been satisfied for certification of the nationwide AWP Payor Classes for settlement purposes only: members of the nationwide AWP Payor Classes, numbering in the hundreds of thousands, are so numerous that joinder of all members is impracticable; there are questions of law and fact common to the nationwide AWP Payor Classes, such as whether Class Members were overcharged for GSK Covered Drugs; the claims and defenses of the Class Representatives are typical of the claims and defenses of the members of the nationwide AWP Payor Classes; the

Class Representatives have fairly and adequately protected the interests of the nationwide AWP Payor Classes with regard to the consolidated claims of the nationwide AWP Payor Classes; the common questions of law and fact predominate over questions affecting only individual nationwide AWP Payor Class Members, rendering the nationwide AWP Payor Classes sufficiently cohesive to warrant a nationwide class settlement; and the certification of the nationwide AWP Payor Classes is superior to individual litigation and/or settlement as a method for the fair and efficient resolution of the MDL Class Actions.

In making all of the foregoing findings, the Court has exercised its discretion in certifying nationwide settlement classes.

4.      The record shows that Notice has been given to the nationwide AWP Payor Classes in the manner approved by the Court in its Preliminary Approval Order of_____, 2006 [Docket No. ___]. The Court finds that such Notice: (i) constitutes reasonable and the best practicable notice; (ii) constitutes notice that was  reasonably calculated, under the circumstances, to apprise members of the nationwide AWP Payor Classes of the pendency of the MDL Class Actions, the terms of the Settlement, and nationwide AWP Payor Class Members' right to object to or exclude themselves from the nationwide AWP Payor Classes and to appear at the settlement fairness hearing held on _____ (the "Fairness Hearing"); (iii) constitutes due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and (iv) meets the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

5.      No individuals or entities, other than those listed on Exhibit A hereto, have excluded themselves from the nationwide AWP Payor Classes. This Order shall have no force or effect on the persons or entities listed on Exhibit A hereto.

6.     The Court finds that extensive arm's-length negotiations have taken place in good faith between Lead Class Counsel and Defendant GSK's Counsel resulting in the Agreement. Additionally the Court finds that extensive arm's-length negotiations have taken place on behalf of separate counsel appointed by Lead Class Counsel to represent the interests of Consumer Class Members and TPP Class Members in order to apportion the Settlement Fund between these constituencies and that these arm's-length negotiations afforded the structural protection required to ensure adequate representation of these constituencies.

7.     Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court hereby finally approves in all respects the Settlement set forth in the Agreement ("the Settlement") and finds that the Settlement, the Agreement, and the plan of distribution of the Settlement Fund as set forth in Paragraph 22 of the Agreement and Exhibit G to the Agreement, are, in all respects, fair, reasonable and adequate, and in the best interest of the nationwide AWP Payor Classes.

8.     The Court further approves the establishment of the Settlement Fund under the terms and conditions set forth in the Agreement and the Class Escrow Agreement submitted by the parties.  The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Agreement.  In addition, the parties are authorized to agree to and adopt such amendments and modifications to the Agreement as (i) shall be consistent in all material respects with this Final Order and Judgment, and (ii) do not limit the rights of nationwide AWP Payor Classes.

9.     The claims against the GSK Defendants in the MDL Class Actions are hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.

10.    Upon the Effective Date of the Agreement, the Class Releasors (as defined in Paragraph 2(g) of the Agreement) shall release and forever discharge the GSK Releasees (as

defined in Paragraph 2(v) of the Agreement) from the Released Class Claims (as defined in Paragraph 2(oo) of the Agreement).

11.    The Court finds that the Class Escrow Account is a "Qualified Settlement Fund" as defined in section 1.468B-1(a) of the Treasury Regulations in that it satisfies each of the following requirements:

(a)    The Class Escrow Account is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

(b)    The Class Escrow Account is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of an alleged violation of law; and

(c)    The assets of the Class Escrow Account are segregated from other assets of GSK, the transferor of payments to the Settlement Fund, and from the assets of persons related to GSK.

12.    Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

(a)    The Class Escrow Account met the requirements of paragraphs 12(b) and 12(c) of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

(b)    GSK and the "administrator" under section 1.468B-2(k)(3) of the Treasury Regulations may jointly elect to treat the Class Escrow Account as coming into existence as a "Qualified Settlement Fund" on the later of the date the Class Escrow Account

met the requirements of paragraphs 11(b) and 11(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 11 of this Order are met. If such relation-back election is made, the assets held by the Class Escrow Account on such date shall be treated as having been transferred to the Class Escrow Account on that date.

13.     Nothing in this Final Order and Judgment, the Settlement, or the Agreement is or shall be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by any of the Defendants.

14.     Class Counsel have moved pursuant to Rules 23(h), 54(d) and 52(a) of the Federal Rules of Civil Procedure for an award of attorneys' fees and reimbursement of expenses. Pursuant to Rule 23(h)(3) and 52(a) this Court makes the following findings of fact and conclusions of law:

(a)     that the Settlement confers a substantial benefit on the nationwide AWP Payor Classes;

(b)     that the value conferred on the nationwide AWP Payor Classes is immediate and readily quantifiable. Upon this Judgment becoming final, each nationwide AWP Payor Class Member who has submitted a valid proof of claim will receive a cash payment that represents a significant portion of the alleged financial harm alleged to have been incurred as a result of the GSK Defendants' alleged conduct;

(c)     that Class Counsel vigorously and effectively pursued the nationwide AWP Payor Class Members' claims before this Court in this highly complex case;

(d)     that the Settlement was obtained as a direct result of Class Counsel's skillful advocacy;

(e)     that the Settlement was reached following extensive negotiation between

Lead Class Counsel and Defendant GSK's Counsel, and was negotiated in good-faith and in the absence of collusion;

(f)     that during the prosecution of the MDL Class Actions as relates to the GSK Defendants, Class Counsel incurred expenses in the amount of $_____ which included costs for expert witnesses and other expenses which the Court finds to be reasonable and necessary to the representation of the nationwide AWP Payor Classes;

(g)     that nationwide AWP Payor Class Members were advised in the "Notice of Pendency of Class Action, Proposed Settlement and Class Certification for the Settlement" approved by the Court that Class Counsel intended to apply for an award of attorneys' fees in an amount up to 33 1/3% of the Settlement Fund (plus interest thereon), plus the opportunity to petition the Court for a fee on any amounts refunded to GSK as a result of TPP Opt Outs under the circumstances described in Paragraph 17 of the Agreement, plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

(h)     that _____ member(s) of the nationwide AWP Payor Classes has (have) submitted written objection(s) to the award of attorneys' fees and expenses;

(i)     that counsel who recover a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 866, 900 n.16 (1984);

(j)     that use of the percentage of the fund method in common fund cases is the prevailing practice in this Circuit for awarding attorneys' fees and permits the Court to focus on a showing that a fund conferring benefit on a class resulted from the lawyers' efforts. *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st

Cir. 1995); and

        (k)     the requested fee award is well within the applicable range of percentage awards in this Circuit; *In re Relafen Antitrust Litig.*, No. 01-12239 (D. Mass. April 9, 2004) [Doc. No. 297]; *Mowbray v. Waste Management Holdings*, No. 98-11534-WGY (D. Mass. Aug. 2, 2001); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, No. 94-11897-WGY (D. Mass. Feb. 8, 1996); *Wilensky v. Digital Equipment Corp.*, No. 94-10752-JLT (D. Mass. July 11, 2001). Accordingly, Class Counsel are hereby awarded $_____ from the balance of the Settlement Fund, as their fee award which the Court finds to be fair and reasonable, and which amount shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Agreement, with interest from _____ (the date of the funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. Further, Class Counsel are hereby awarded $_____ for their expenses which the Court finds to be fair and reasonable, and which amount shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Agreement. The attorneys' fees and expenses awarded by the Court shall be allocated among Class Counsel by Lead Class Counsel.

        15.    The Class Representatives and other appropriate parties, as identified in the Order Granting Preliminary Approval of the GlaxoSmithKline Settlement, Certifying Class for Purposes of Settlement dated _____, 2006, are hereby granted an incentive award of $ _____, to be divided among them by Lead Class Counsel, which amount is in addition to whatever monies the Class Representatives will receive from the Settlement Fund pursuant to the Agreement as members of the AWP Payor Classes.

        16.    Without affecting the finality of this Final Order and Judgment, the Court retains continuing and exclusive jurisdiction over all matters relating to administration, consummation,

enforcement and interpretation of the Agreement and of this Final Order and Judgment, to

protect and effectuate this Final Order and Judgment, and for any other necessary purpose.

Defendant GSK, Class Representatives and each member of the nationwide AWP Payor Classes

are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for

the purpose of any suit, action, proceeding or dispute arising out of or relating to the Agreement

or the applicability of the Agreement, including the Exhibits thereto, and only for such purposes.

Without limiting the generality of the foregoing, and without affecting the finality of this Final

Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action or

proceeding.  Solely for purposes of such suit, action or proceeding, to the fullest extent they may

effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived

and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that

they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper

venue or an inconvenient forum.

      17.     In the event that the Settlement does not become effective according to the terms

of the Agreement, this Order and Final Judgment shall be rendered null and void as provided by

the Agreement, shall be vacated and, all orders entered and releases delivered in connection

herewith shall be null and void to the extent provided by and in accordance with the Agreement.

      18.     No nationwide AWP Payor Class Member, either directly, representatively, or in

any other capacity (other than a nationwide AWP Payor Class Member who validly and timely

elected to be excluded from the Class), shall commence, continue or prosecute against any or all

GSK Releasees any action or proceeding in any court or tribunal asserting any of the Released

Claims defined in the Agreement, and are hereby permanently enjoined from so proceeding.

DATED:                 _____        _____

                                                        Hon. Patti B. Saris

## EXHIBIT A

INDIVIDUALS AND ENTITIES THAT HAVE PROPERLY EXCLUDED
THEMSELVES FROM THE NATIONWIDE AWP PAYRO CLASSES  IN
ACCORDANCEWITH THE ORDER OF _____, 2006 (Docket No. ___).

**[list all Consumer  and TPP Opt Outs by Class]]**

## EXHIBIT D

CLASS ESCROW AGREEMENT

Exhibit D

CLASS ESCROW AGREEMENT

This Class Escrow Agreement (this "Agreement") is made and entered into by Frontier Bank through its Trust Department (the "Escrow Agent"), SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") and Class Plaintiffs as defined in the Settlement Agreement and Release of the GlaxoSmithKline Defendants dated on or about August 10, 2006 ("GSK MDL Settlement Agreement"), in consideration of the following promises of each party. GSK and Class Plaintiffs are referred to collectively as the "Settling Parties" in the litigation entitled *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456 (the "MDL Class Action"). Unless otherwise provided herein, the terms defined in the GSK MDL Settlement Agreement shall have the same meaning in this Agreement

I.   **Terms and Conditions**

   1.   GSK and Lead Class Counsel hereby appoint the Escrow Agent to establish and administer an escrow account on the terms and conditions set forth herein, and the Escrow Agent hereby accepts such appointment on such terms and conditions.

   2.   GSK shall deliver to the Escrow Agent a settlement payment in the amount of $65,500,000.00 as required by Paragraph 3(a) of the GSK MDL Settlement Agreement in immediately available United States funds (the "Class Escrow Funds") pursuant to the wire transfer instructions provided in paragraph 1 of Section IV below. Escrow Agent shall confirm receipt of such funds in writing to the Settling Parties.

   3.   Until the Escrow Agent receives written notification from counsel for GSK and Lead Class Counsel that the GSK MDL Settlement Agreement has become effective, it shall invest and reinvest the Class Escrow Funds in United States Agency or Treasury Securities (or a mutual fund investing solely in such instruments) or other similar short-term United States government obligations as shall be directed in writing by Lead Class Counsel for the Class Plaintiffs and as shall be acceptable to the Escrow Agent. In the absence of written direction from the Settling Parties regarding the investment of the Class Escrow Funds, Escrow Agent will invest and reinvest the Escrow Funds in the STI Classic U.S. Treasury Money Market Fund. For the purposes of this Agreement, the date on which the GSK MDL Settlement Agreement shall become effective is as defined in Paragraph 13 of the GSK MDL Settlement Agreement.

   4.   All interest on or other income realized by investment of the Class Escrow Funds or any portion thereof shall be accumulated and added to the Class Escrow Funds.

1

Any investment losses realized by investment of Class Escrow Funds or any portion thereof shall be charged to the Class Escrow Funds.

5.  This Escrow Agreement and the Class Escrow Funds are subject to the supervision and control of the United States District Court for the District of Massachusetts (the "MDL Court"). Except as set forth in paragraph 6(a) and 6(b) of this Section I, the Class Escrow Funds shall be withdrawn or otherwise removed from the Escrow Account established pursuant to this Class Escrow Agreement only in accordance with the terms of an order of the MDL Court delivered to the Escrow Agent by Lead Class Counsel.

6.  The Escrow Agent shall deliver the Escrow Funds only as set forth below:

    (a)  Following receipt of written notice signed by counsel for GSK and Lead Class Counsel stating that the MDL Settlement Agreement has not been approved by the MDL Court or has been cancelled or terminated or has otherwise become null and void for any reason, the Escrow Agent shall disburse the Class Escrow Funds, including any interest or other income earned thereon, to GSK net of taxes paid or due with respect thereto, the fees and costs paid or incurred for the settlement notice, and any fees or costs paid or incurred for administration of the Escrow Account;

    (b)  Regardless of whether the GSK MDL Class Agreement has become effective, the Escrow Agent shall disburse funds as needed for

        (i)  payment of taxes or estimated taxes that become due on income earned by the Class Escrow Funds, as determined by Complete Claims Solutions, Inc. ("CCS"), the Class Administrator for the Settlement, with notice of such payments to Lead Class Counsel and GSK;

        (ii)  payment of the costs associated with claims administration including, but not limited to, settlement notice. Such payment will be made at the direction of Lead Class Counsel, with notice of such payments provided to GSK; and

        (iii)  all other payments contemplated by the GSK MDL Settlement Agreement and authorized by the MDL Court by court Order delivered to the Escrow Agent by Lead Class Counsel.

    (c)  After receipt of written notice signed by counsel for GSK and Lead Class Counsel stating that the MDL Settlement Agreement has become effective, the Escrow Agent shall, upon receipt of an order of the Court so directing

        (i) disburse any remaining amounts for reimbursement or payment of costs and expenses incurred in the provision of notice to the members of the

131728v2

Class and the administration and distribution of the settlement, in accordance with such order of the Court; and

(ii) distribute the remaining Escrow Funds, as ordered by the Court.

provided, however, that the Escrow Agent shall retain amounts in the Escrow Account necessary for the payment of taxes or estimated taxes and fees and expenses of the Escrow Agent, as directed by Lead Class Counsel.

7.   The Class Escrow Funds are intended by the parties hereto to be treated as a "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1 and to that end the parties hereto shall cooperate with each other and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment. At the request of the Settling Parties, a "relation back election" as described in Treas. Reg. § 1.468B-1(j) shall be made so as to enable the Class Escrow Funds to be treated as a qualified settlement fund from the earliest date possible, and the parties hereto shall take all actions as may be necessary or appropriate to this end.

8.   After the GSK MDL Settlement Agreement becomes effective, GSK shall no longer have any interest in the Class Escrow Funds, and shall no longer have any rights or obligations under this Class Escrow Agreement.

9.   All Counsel for all Settling Parties' each warrant to and agree with Escrow Agent that, unless otherwise expressly set forth in this Agreement, there is no security interest (as defined in the Uniform Commercial Code) in the Class Escrow Funds or any part of the Class Escrow Funds; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Class Escrow Funds or any part of the Class Escrow Funds; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Class Escrow Funds or any part of the Class Escrow Funds or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Class Escrow Funds or any part thereof.

## II.   Provisions as to Escrow Agent

1.   This Escrow Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Class Escrow Agreement against Escrow Agent.

2.   This Escrow Agreement constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this

3

escrow. Unless it is signed by the Escrow Agent as a party, no other agreement including the GSK MDL Settlement Agreement entered into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with Escrow Agent or the Escrow Agent may have knowledge thereof.

3.  Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

4.  Escrow Agent shall have the right to liquidate any investment held in order to provide funds necessary to make required payments under this Class Escrow Agreement. The Escrow Agent shall have no liability as a result of any liquidation of any investment prior to its maturity when that liquidation is necessary to provide funds to make required payments under this Class Escrow Agreement.

5.  Escrow Agent shall be protected in acting upon any document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, Court orders authorizing release, disbursement or retainage of the Class Escrow Funds.

6.  In the event of any disagreement between any of the parties to this Class Escrow Agreement, or between any of them and any other party, resulting in inconsistent claims or demands being made in connection with the matters covered by this Agreement, or in the event that Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and Escrow Agent shall be entitled to continue to refrain from acting until (i) the rights of all interested parties shall have been fully and finally adjudicated by the United States District Court for the District of Massachusetts, or (ii) all differences shall have been resolved and all doubt eliminated by agreement among all of the interested parties, and Escrow Agent shall have been notified thereof in writing signed by all such parties.

7.  Escrow Agent shall be indemnified and held harmless by the parties hereto from anything which it may do or refrain from doing in connection herewith, or for any claims, demands or losses, or for any damages made or suffered by any party to this Escrow Agreement, excepting such as may arise through or be caused by Escrow Agent's breach of this Escrow Agreement or any willful misconduct or gross negligence.

4

4.      The parties hereto irrevocably and unconditionally submit to the jurisdiction of the United States District Court for the District of Massachusetts for purposes of any suit, action or proceeding to enforce any provision of, or based upon any right arising out of this Class Escrow Agreement, and the parties hereto agree not to commence any such suit, action or proceeding except in such Court.

8.      The Escrow Agent will maintain a daily record of all transactions in the Class Escrow Account and will provide the Settling Parties with a periodic statement (at a frequency to be determined from time to time but no less often than annually) reflecting all such transactions and the property held in the account as of the end of the reporting period.

9.      The Escrow Agent shall have the authority to retain a subcustodian for any or all property for as long as it deems necessary.  The Escrow Agent shall also have the authority to retain other agents, including attorneys, to assist it in the performance of its duties.

**III.    Compensation of Escrow Agent**

1.      Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for its reasonable costs and expenses incurred in connection with the performance by it of services under this Class Escrow Agreement (including reasonable fees and expenses of Escrow Agent's counsel).  Lead Class Counsel is solely responsible for paying the Escrow Agent the amounts to which it is entitled, and such compensation shall be paid from the funds in the Class Escrow Account, after Court approval and subject to other provisions of this paragraph. The Escrow Agent is entitled to reimbursement for reasonable expenses for each year or any part thereof.

2.      The Escrow Agent shall not debit the Class Escrow Funds for any charge for its fees or its costs and expenses, until it shall have received a copy of an order issued by the Court, approving the amount of fees, costs and expenses to which it is entitled.  Fees and expenses of the Escrow Agent charged against the Escrow Funds shall, to the extent possible, be paid out of interest earned.

**IV.    Miscellaneous**

1.      Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when personally delivered to the party specified or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

        If to Escrow Agent:

5

131728v2

Frontier Bank
Corporate Trust Department

**Attn: Escrow Administration**
Wire:
ABA #:
Account:
Account name:
Attention:
Beneficiary Account:

If to Lead Class Counsel:

Edward Notargiacomo
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142Seattle, WA  98101
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

If to GSK

Frederick G. Herold
Dechert LLP
1117 California Avenue
Palo Alto, CA
94304-1106
Telephone:  (650) 813-4930
Facsimile:  (650) 813-4848

If to CCS:

Thomas R. Glenn
Complete Claims Solutions Inc.

_____
_____

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

2.   This Escrow Agreement is being made in and is intended to be construed according to the laws of the Commonwealth of Massachusetts.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns.  All representations, covenants, and indemnifications contained in this

6

Class Escrow Agreement shall survive the termination of this Class Escrow Agreement.

3.  The terms of this Class Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto.

4.  If any provision of this agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

5.  The Escrow Agent may resign at any time from its obligations under this Class Escrow Agreement by providing written notice to the parties hereto. Such resignation shall be effective not less than thirty (30) days after such written notice has been given. In the event no successor escrow agent has been appointed on or prior to the date such resignation becomes effective, Escrow Agent shall be entitled to tender into the custody of a court of competent jurisdiction all assets then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement. The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent. Unless otherwise provided in this Agreement, final termination of this Escrow Agreement shall occur when the Escrow Agent shall have released from the Escrow Account all amounts pursuant to Section I, paragraph 6 above.

6.  All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

7.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

8.  This Agreement shall be effective as of the date the last party to this Agreement fully and appropriately executes this document.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

7

Dated:   August _____, 2006

_____
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

For Lead Class Counsel

Dated:   August _____, 2006

_____
Frederick G. Herold
Dechert LLP
1117 California Avenue
Palo Alto, CA 94304-1106
Telephone:  (650) 813-4930
Facsimile:  (650) 813-4848

Counsel for SmithKline Beecham Corporation, d/b/a
GlaxoSmithKline

EXHIBIT E

PARTICIPATING STATE ESCROW AGREEMENT

Exhibit E

PARTICIPATING STATES' ESCROW AGREEMENT

This Participating States' Escrow Agreement (this "Agreement" or this "PSEA") is made and entered into by Frontier Bank through its Trust Department (the "Escrow Agent"), SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") and the Participating States, as defined in the Settlement Agreement and Release of the GlaxoSmithKline Defendants dated on or about August 10, 2006 ("GSK MDL Settlement Agreement"), in consideration of the following promises of each party.  GSK and the Participating States are referred to collectively as the "Settling Parties" in the litigation entitled *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456 (the "MDL Class Action").  Unless otherwise provided herein, the terms defined in the GSK MDL Settlement Agreement shall have the same meaning in this Agreement

## I.    Terms and Conditions

1.    GSK and the Participating States hereby appoint the Escrow Agent to establish and administer an escrow account on the terms and conditions set forth herein, and the Escrow Agent hereby accepts such appointment on such terms and conditions.

2.    GSK shall deliver to the Escrow Agent a settlement payment in the amount of $2,500,000.00 as required by Paragraph 3(b) of the GSK MDL Settlement Agreement in immediately available United States funds (the "Participating States' Escrow Fund") pursuant to the wire transfer instructions provided in paragraph 1 of Section IV below.  Escrow Agent shall confirm receipt of such funds in writing to the Settling Parties.

3.    Until such time as the Escrow Agent disburses the funds in the Participating States' Escrow Fund in accordance with Paragraph 5(c) of the GSK MDL Settlement Agreement it shall invest and reinvest the Participating States' Escrow Fund in United States Agency or Treasury Securities (or a mutual fund investing solely in such instruments) or other similar short-term United States government obligations as shall be directed in writing by the undersigned designated counsel for the Participating States and as shall be acceptable to the Escrow Agent.  In the absence of such written direction regarding the investment of the Participating States' Escrow Fund, Escrow Agent will invest and reinvest the Escrow Funds in the STI Classic U.S. Treasury Money Market Fund.

4.    All interest on or other income realized by investment of the Participating States' Escrow Fund or any portion thereof shall be accumulated and added to the Participating States' Escrow Fund.  Any investment losses realized by investment

1

of Participating States' Escrow Fund or any portion thereof shall be charged to the Participating States' Escrow Fund.

5.  Except as set forth in paragraph 6(a) and 6(b) of this Section I, the Participating States' Escrow Fund shall be withdrawn or otherwise removed from the Escrow Account established pursuant to this Agreement only in accordance with instructions provided by the undersigned designated counsel for the Participating States, Lead Class Counsel and counsel for GSK.

6.  The Escrow Agent shall deliver the Escrow Funds only as set forth below:

    (a)  Following receipt of written notice signed by counsel for GSK and Lead Class Counsel stating that the MDL Settlement Agreement has not been preliminarily approved by the MDL Court or has been cancelled or terminated or has otherwise become null and void for any reason, the Escrow Agent shall disburse the Participating States' Escrow Fund, including any interest or other income earned thereon, to GSK net of taxes paid or due with respect thereto and any fees or costs paid or incurred for administration of the Escrow Account;

    (b)  Regardless of whether the GSK MDL Class Agreement receives preliminary approval by the MDL Court, the Escrow Agent shall disburse funds as needed for payment of taxes or estimated taxes that become due on income earned by the Participating States' Escrow Fund, with notice of such payments to Lead Class Counsel and GSK.

    (c)  Within the time periods set forth in Paragraphs 5(c) of the GSK MDL Settlement Agreement the Escrow Agent shall make such payments from the Participating States' Escrow Fund as called for in Paragraph 5(c) of the GSK MDL Settlement Agreement.

    provided, however, that the Escrow Agent shall retain amounts in the Escrow Account necessary for the payment of taxes or estimated taxes and fees and expenses of the Escrow Agent, as directed by the undersigned designated counsel for the Participating States.

7.  The Participating States' Escrow Funds are intended by the parties hereto to be treated as a "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1 and to that end the parties hereto shall cooperate with each other and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment. At the request of the Settling Parties, a "relation back election" as described in Treas. Reg. § 1.468B-1(j) shall be made so as to enable the Participating States' Escrow Fund to be treated as a qualified settlement fund from the earliest date possible, and the parties hereto shall take all actions as may be necessary or appropriate to this end.

2

8.      All Counsel for all Settling Parties' each warrant to and agree with Escrow Agent that, unless otherwise expressly set forth in this Agreement, there is no security interest (as defined in the Uniform Commercial Code) in the Participating States' Escrow Fund or any part of the Participating States' Escrow Fund; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Participating States' Escrow Fund or any part of the Participating States' Escrow Fund; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Participating States' Escrow Fund or any part of the Participating States' Escrow Fund or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Participating States' Escrow Fund or any part thereof.

## II.     Provisions as to Escrow Agent

1.      This Escrow Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent.

2.      This Escrow Agreement, and the references herein to the GSK MDL Settlement Agreement, constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this escrow.  Unless it is signed by the Escrow Agent as a party, no other agreement including the GSK MDL Settlement Agreement entered into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with Escrow Agent or the Escrow Agent may have knowledge thereof.

3.      Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

4.      Escrow Agent shall have the right to liquidate any investment held in order to provide funds necessary to make required payments under this Escrow Agreement.  The Escrow Agent shall have no liability as a result of any liquidation of any investment prior to its maturity when that liquidation is necessary to provide funds to make required payments under this Escrow Agreement.

5.      Escrow Agent shall be protected in acting upon any document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, Court orders authorizing release, disbursement or retainage of the Participating States' Escrow Fund.

131728v2

6.      In the event of any disagreement between any of the parties to this Escrow Agreement, or between any of them and any other party, resulting in inconsistent claims or demands being made in connection with the matters covered by this Agreement, or in the event that Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and Escrow Agent shall be entitled to continue  to refrain from acting until (i) the rights of all interested parties shall have been fully and finally adjudicated by the United States District Court for the District of Massachusetts, or (ii) all differences shall have been resolved and all doubt eliminated by agreement among all of the interested parties, and Escrow Agent shall have been notified thereof in writing signed by all such parties.

7.      Escrow Agent shall be indemnified and held harmless by the parties hereto from anything which it may do or refrain from doing in connection herewith, or for any claims, demands or losses, or for any damages made or suffered by any party to this Escrow Agreement, excepting such as may arise through or be caused by Escrow Agent's breach of this Escrow Agreement or any willful misconduct or gross negligence.

4.      The parties hereto irrevocably and unconditionally submit to the jurisdiction of the United States District Court for the District of Massachusetts for purposes of any suit, action or proceeding to enforce any provision of, or based upon any right arising out of this Escrow Agreement, and the parties hereto agree not to commence any such suit, action or proceeding except in such Court.

8.      The Escrow Agent will maintain a daily record of all transactions in the Escrow Account and will provide the Settling Parties with a periodic statement (at a frequency to be determined from time to time but no less often than annually) reflecting all such transactions and the property held in the account as of the end of the reporting period.

9.      The Escrow Agent shall have the authority to retain a subcustodian for any or all property for as long as it deems necessary.  The Escrow Agent shall also have the authority to retain other agents, including attorneys, to assist it in the performance of its duties.

## III.   Compensation of Escrow Agent

1.      Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for its reasonable costs and expenses incurred in connection with the performance by it of services under this Escrow Agreement (including reasonable fees and expenses of Escrow Agent's counsel).  The Participating States are solely responsible for paying the Escrow Agent the amounts to which it

4

is entitled, and such compensation shall be paid from the funds in the Escrow Account, after Court approval and subject to other provisions of this paragraph. The Escrow Agent is entitled to reimbursement for reasonable expenses for each year or any part thereof.

2.      The Escrow Agent shall not debit the Participating States' Escrow Fund for any charge for its fees or its costs and expenses, until it shall have received written confirmation from counsel for GSK and the Participating States, approving the amount of fees, costs and expenses to which it is entitled. Fees and expenses of the Escrow Agent charged against the Escrow Funds shall, to the extent possible, be paid out of interest earned.

## IV.     Miscellaneous

1.      Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when personally delivered to the party specified or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to Escrow Agent:

> Frontier Bank
> Corporate Trust Department
>
> **Attn: Escrow Administration**
> Wire:
> ABA #:
> Account:
> Account name:
> Attention:
> Beneficiary Account:

If to Participating States and/or to Lead Class Counsel:

> Edward Notargiacomo
> HAGENS BERMAN SOBOL SHAPIRO LLP
> One Main Street, 4th Floor
> Cambridge, MA  02142Seattle, WA  98101
> Telephone: (617) 482-3700
> Facsimile: (617) 482-3003

If to GSK

> Frederick G. Herold
> Dechert LLP

5

1117 California Avenue
Palo Alto, CA
94304-1106
Telephone:  (650) 813-4930
Facsimile:  (650) 813-4848

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

2.    This Escrow Agreement is being made in and is intended to be construed according to the laws of the Commonwealth of Massachusetts.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns.  All representations, covenants, and indemnifications contained in this Escrow Agreement shall survive the termination of this Escrow Agreement.

3.    The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto.

4.    If any provision of this agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

5.    The Escrow Agent may resign at any time from its obligations under this Escrow Agreement by providing written notice to the parties hereto.  Such resignation shall be effective not less than thirty (30) days after such written notice has been given.  In the event no successor escrow agent has been appointed on or prior to the date such resignation becomes effective, Escrow Agent shall be entitled to tender into the custody of a court of competent jurisdiction all assets then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement.  The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent.  Unless otherwise provided in this Agreement, final termination of this Escrow Agreement shall occur when the Escrow Agent shall have released from the Escrow Account all amounts pursuant to Section I, paragraph 6 above.

6.    All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

7.    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

8.    This Agreement shall be effective as of the date the last party to this Agreement fully and appropriately executes this document.

131728v2

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.

Dated:  August ____, 2006

_____
Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

For Lead Class Counsel and Designated Counsel for the Participating States

Dated:  August ____, 2006

_____
Frederick G. Herold
Dechert LLP
1117 California Avenue
Palo Alto, CA 94304-1106
Telephone:  (650) 813-4930
Facsimile:  (650) 813-4848

Counsel for SmithKline Beecham Corporation, d/b/a GlaxoSmithKline

## EXHIBIT F

LITIGATING STATE ESCROW AGREEMENT

Exhibit F

LITIGATING STATES' ESCROW AGREEMENT

This Litigating States' Escrow Agreement (this "Agreement" or this "LSEA") is made and entered into by Frontier Bank through its Trust Department (the "Escrow Agent"), SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") and Class Plaintiffs, acting through and by Lead Class Counsel, as defined in the Settlement Agreement and Release of the GlaxoSmithKline Defendants dated on or about August 10, 2006 ("GSK MDL Settlement Agreement"), in consideration of the following promises of each party.  GSK and Class Plaintiffs are referred to collectively as the "Settling Parties" in the litigation entitled *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456 (the "MDL Class Action").  Unless otherwise provided herein, the terms defined in the GSK MDL Settlement Agreement shall have the same meaning in this Agreement

I.    **Terms and Conditions**

  1.    GSK and Lead Class Counsel hereby appoint the Escrow Agent to establish and administer an escrow account on the terms and conditions set forth herein, and the Escrow Agent hereby accepts such appointment on such terms and conditions.

  2.    GSK shall deliver to the Escrow Agent a settlement payment in the amount of $2,000,000.00 as required by Paragraph 3(c) of the GSK MDL Settlement Agreement in immediately available United States funds (the "Litigating States' Escrow Fund") pursuant to the wire transfer instructions provided in paragraph 1 of Section IV below.  Escrow Agent shall confirm receipt of such funds in writing to the Settling Parties.

  3.    Until the Escrow Agent receives written notification from counsel for GSK and Lead Class Counsel that one or more Litigating States has entered into a separate written agreement with GSK pursuant to Paragraph 6(b) of the GSK MDL Settlement Agreement or until the Escrow Agent receives written notification from counsel for GSK and Lead Class Counsel that one or more Litigating States has not timely entered into a separate written agreement pursuant to Paragraph 6(e) of the GSK MDL Settlement Agreement, and the Escrow Agent is directed by counsel for GSK and Lead Class Counsel to distribute the Litigating States' Escrow Fund in accordance with Paragraph 6 of the GSK MDL Settlement Agreement, it shall invest and reinvest the Litigating States' Escrow Fund in United States Agency or Treasury Securities (or a mutual fund investing solely in such instruments) or other similar short-term United States government obligations as shall be directed in writing by the Lead Class Counsel and GSK and as shall be acceptable to the Escrow Agent.  In the absence of written direction from the Settling Parties regarding the investment of the Litigating

States' Escrow Fund, Escrow Agent will invest and reinvest the Escrow Funds in the STI Classic U.S. Treasury Money Market Fund.

4.   All interest on or other income realized by investment of the Litigating States' Escrow Fund or any portion thereof shall be accumulated and added to the Litigating States' Escrow Fund.  Any investment losses realized by investment of Litigating States' Escrow Fund or any portion thereof shall be charged to the Litigating States' Escrow Fund.

5.   Except as set forth in paragraph 6(a) and 6(b) of this Section I, the Litigating States' Escrow Fund shall be withdrawn or otherwise removed from the Escrow Account established pursuant to this Agreement only in accordance with instructions provided by Lead Class Counsel and counsel for GSK.

6.   The Escrow Agent shall deliver the Escrow Funds only as set forth below:

  (a)   Following receipt of written notice signed by counsel for GSK and Lead Class Counsel stating that the MDL Settlement Agreement has not been preliminarily approved by the MDL Court or has been cancelled or terminated or has otherwise become null and void for any reason, the Escrow Agent shall disburse the Litigating States' Escrow Fund, including any interest or other income earned thereon, to GSK net of taxes paid or due with respect thereto and any fees or costs paid or incurred for administration of the Escrow Account;

  (b)   Regardless of whether the GSK MDL Class Agreement receives preliminary approval by the MDL Court, the Escrow Agent shall disburse funds as needed for payment of taxes or estimated taxes that become due on income earned by the Litigating States' Escrow Fund, with notice of such payments to Lead Class Counsel and GSK.

  (c)   After receipt of any separate written agreement between GSK and a Litigating State pursuant to Paragraph 6(b) of the GSK MDL Settlement Agreement, the Escrow Agent shall, within the time period prescribed in Paragraph 6(c) of the GSK MDL Settlement Agreement, make a payment to the Litigating State (also known as an Additional Participating State after execution of a written agreement with GSK) in an amount prescribed by Paragraph 6(c).

  (d)   Within the time period set forth in Paragraphs 6(e) and 6(f) of the GSK MDL Settlement Agreement the Escrow Agent shall make such payments from the Litigating States' Escrow Fund as called for in Paragraph 6(e) 6(f) of the GSK MDL Settlement Agreement.

         provided, however, that the Escrow Agent shall retain amounts in the Escrow Account necessary for the payment of taxes or estimated taxes and

2

fees and expenses of the Escrow Agent, as directed by Lead Class Counsel.

7.     The Litigating States' Escrow Funds are intended by the parties hereto to be treated as a "qualified settlement fund" for federal income tax purposes pursuant to Treas. Reg. § 1.468B-1 and to that end the parties hereto shall cooperate with each other and shall not take a position in any filing or before any tax authority that is inconsistent with such treatment. At the request of the Settling Parties, a "relation back election" as described in Treas. Reg. § 1.468B-1(j) shall be made so as to enable the Litigating States' Escrow Fund to be treated as a qualified settlement fund from the earliest date possible, and the parties hereto shall take all actions as may be necessary or appropriate to this end.

8.     All Counsel for all Settling Parties' each warrant to and agree with Escrow Agent that, unless otherwise expressly set forth in this Agreement, there is no security interest (as defined in the Uniform Commercial Code) in the Litigating States' Escrow Fund or any part of the Litigating States' Escrow Fund; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Litigating States' Escrow Fund or any part of the Litigating States' Escrow Fund; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Litigating States' Escrow Fund or any part of the Litigating States' Escrow Fund or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Litigating States' Escrow Fund or any part thereof.

## II.     Provisions as to Escrow Agent

1.     This Escrow Agreement expressly and exclusively sets forth the duties of Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against Escrow Agent.

2.     This Escrow Agreement, and the references herein to the GSK MDL Settlement Agreement, constitutes the entire agreement between the Escrow Agent and the other parties hereto in connection with the subject matter of this escrow. Unless it is signed by the Escrow Agent as a party, no other agreement including the GSK MDL Settlement Agreement entered into between the parties, or any of them, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with Escrow Agent or the Escrow Agent may have knowledge thereof.

3.     Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under

the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

4.     Escrow Agent shall have the right to liquidate any investment held in order to provide funds necessary to make required payments under this Escrow Agreement. The Escrow Agent shall have no liability as a result of any liquidation of any investment prior to its maturity when that liquidation is necessary to provide funds to make required payments under this Escrow Agreement.

5.     Escrow Agent shall be protected in acting upon any document which Escrow Agent in good faith believes to be genuine and what it purports to be, including, but not limited to, Court orders authorizing release, disbursement or retainage of the Litigating States' Escrow Fund.

6.     In the event of any disagreement between any of the parties to this Escrow Agreement, or between any of them and any other party, resulting in inconsistent claims or demands being made in connection with the matters covered by this Agreement, or in the event that Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, Escrow Agent shall not be or become liable in any way or to any party for its failure or refusal to act, and Escrow Agent shall be entitled to continue  to refrain from acting until (i) the rights of all interested parties shall have been fully and finally adjudicated by the United States District Court for the District of Massachusetts, or (ii) all differences shall have been resolved and all doubt eliminated by agreement among all of the interested parties, and Escrow Agent shall have been notified thereof in writing signed by all such parties.

7.     Escrow Agent shall be indemnified and held harmless by the parties hereto from anything which it may do or refrain from doing in connection herewith, or for any claims, demands or losses, or for any damages made or suffered by any party to this Escrow Agreement, excepting such as may arise through or be caused by Escrow Agent's breach of this Escrow Agreement or any willful misconduct or gross negligence.

4.     The parties hereto irrevocably and unconditionally submit to the jurisdiction of the United States District Court for the District of Massachusetts for purposes of any suit, action or proceeding to enforce any provision of, or based upon any right arising out of this Escrow Agreement, and the parties hereto agree not to commence any such suit, action or proceeding except in such Court.

8.     The Escrow Agent will maintain a daily record of all transactions in the Escrow Account and will provide the Settling Parties with a periodic statement (at a frequency to be determined from time to time but no less often than annually)

4

reflecting all such transactions and the property held in the account as of the end of the reporting period.

9.  The Escrow Agent shall have the authority to retain a subcustodian for any or all property for as long as it deems necessary.  The Escrow Agent shall also have the authority to retain other agents, including attorneys, to assist it in the performance of its duties.

## III.  Compensation of Escrow Agent

1.  Escrow Agent shall be entitled to reasonable compensation as well as reimbursement for its reasonable costs and expenses incurred in connection with the performance by it of services under this Escrow Agreement (including reasonable fees and expenses of Escrow Agent's counsel).  Lead Class Counsel is solely responsible for paying the Escrow Agent the amounts to which it is entitled, and such compensation shall be paid from the funds in the Class Escrow Account, after Court approval and subject to other provisions of this paragraph. The Escrow Agent is entitled to reimbursement for reasonable expenses for each year or any part thereof.

2.  The Escrow Agent shall not debit the Litigating States' Escrow Fund for any charge for its fees or its costs and expenses, until it shall have received written confirmation from counsel for GSK and Lead Class Cousnel, approving the amount of fees, costs and expenses to which it is entitled.  Fees and expenses of the Escrow Agent charged against the Escrow Funds shall, to the extent possible, be paid out of interest earned.

## IV.  Miscellaneous

1.  Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given when personally delivered to the party specified or when placed in the United States mail, registered or certified, with return receipt requested, postage prepaid and addressed as follows:

If to Escrow Agent:

> Frontier Bank
> Corporate Trust Department
>
> **Attn: Escrow Administration**
> Wire:
> ABA #:
> Account:
> Account name:

Attention:
Beneficiary Account:

If to Lead Class Counsel:

Edward Notargiacomo
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142Seattle, WA  98101
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

If to GSK

Frederick G. Herold
Dechert LLP
1117 California Avenue
Palo Alto, CA
94304-1106
Telephone:  (650) 813-4930

Any party may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party.

2.  This Escrow Agreement is being made in and is intended to be construed according to the laws of the Commonwealth of Massachusetts.  It shall inure to and be binding upon the parties hereto and their respective successors, heirs and assigns.  All representations, covenants, and indemnifications contained in this Escrow Agreement shall survive the termination of this Escrow Agreement.

3.  The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto.

4.  If any provision of this agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

5.  The Escrow Agent may resign at any time from its obligations under this Escrow Agreement by providing written notice to the parties hereto.  Such resignation shall be effective not less than thirty (30) days after such written notice has been given. In the event no successor escrow agent has been appointed on or prior to the date such resignation becomes effective, Escrow Agent shall be entitled to tender into the custody of a court of competent jurisdiction all assets then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement.  The Escrow Agent shall have no responsibility for the

131728v2

appointment of a successor escrow agent.  Unless otherwise provided in this Agreement, final termination of this Escrow Agreement shall occur when the Escrow Agent shall have released from the Escrow Account all amounts pursuant to Section I, paragraph 6 above.

6.   All titles and headings in this Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

7.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

8.   This Agreement shall be effective as of the date the last party to this Agreement fully and appropriately executes this document.


IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the date first above written.


Dated:  August ____, 2006            _____
                                     Steve W. Berman
                                     HAGENS BERMAN SOBOL SHAPIRO LLP
                                     1301 Fifth Avenue, Suite 2900
                                     Seattle, WA  98101
                                     Telephone: (206) 623-7292
                                     Facsimile: (206) 623-0594

                                     For Lead Class Counsel



Dated:  August ____, 2006            _____
                                     Frederick G. Herold
                                     Dechert LLP
                                     1117 California Avenue
                                     Palo Alto, CA 94304-1106
                                     Telephone:  (650) 813-4930
                                     Facsimile:  (650) 813-4848

                                     Counsel for SmithKline Beecham Corporation, d/b/a
                                     GlaxoSmithKline

EXHIBIT G

CLAIMS PROCESS EXPLANATION

<u>EXHIBIT G</u>

This exhibit is incorporated by reference in and made a part of the Settlement Agreement and Release of the GlaxoSmithKline Defendants in *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL. No. 1456 (the "GSK MDL Agreement").

A.    <u>Claims Documentation</u>

1. Consumer Class Members

In order to validate their claim for a payment under the GSK MDL Agreement for each GSK drug listed in Exhibit A to the GSK MDL Agreement (the "GSK Covered Drugs") with respect to which they are making a claim, Consumer Class Members must submit a claim form which attests that they are Class Members entitled to make a claim for each GSK Covered Drug payment subject to their claim, and must submit a proof of payment for each such claim.

Proof of payment may be in the form of any of the following: (1) a written prescription for the drug; (2) a receipt, cancelled check, or credit card statement that shows that they have paid for the drug; (3) an EOB (explanation of benefits) that shows they made or are obligated to make a percentage co-payment for the drug; (4) a letter from their physician stating that he or she prescribed and that the Class Member paid or is obligated to pay a percentage co-payment for the drug at least once and setting forth the amount of the co-payment; or (5) a written declaration by the Class Member attesting that they paid or are obligated to pay a percentage co-payment for the drug between January 1, 1991 through August 10, 2006, including the total of all percentage co-payments for the drug during that time period.

2. TPP Class Members

TPP Class members shall be required to submit a GSK AWP Third Party Payor Proof of Claim Form ("TPP Proof of Claim Form), in the form attached to the TPP Long Form Notice, which is Exhibit B-1 to GSK MDL Agreement. The TPP Proof of Claim Form shall set forth the amount of purchases of each GSK Covered Drug during the period of January 1, 1999 to December 31, 2003, net of co-pays, deductibles and co-insurance. This "proxy period" is substituted for claims associated with the full class period in recognition of the difficulty TPPs have in accessing claims data that is older and likely not kept electronically or on current electronic systems. This "proxy period" shall be used to determine the payments made to each TPP Class Member in accordance with the procedures set forth herein.

Each TPP Class Member shall be required to certify that they are a TPP Class Member (or an authorized representative of a TPP Class Member), and that they have not included claims on behalf of a TPP Class Member that are readily identifiable as having been based on a reimbursement standard other than AWP.

In order to validate their claim for payment associated with the GSK Covered Drugs for

1

which they seek payment from the Settlement, TPP Class Members with claimed purchases for all GSK Covered Drugs during the proxy period that exceed $300,000.00 in total shall be requested to submit electronic claims documentation with their claim. The form and data required to be submitted are delineated in the TPP Proof of Claim Form. Those TPPs whose claimed purchases are $300,000.00 or less need not submit electronic claims documentation with their claim but must furnish such claims documentation upon request of the Claims Administrator.

B.      Recognized Claim Amounts

        Pursuant to Paragraph 12 of the GSK MDL Agreement, Lead Class Counsel have established a "Recognized Claim Percentage" ("RCP") for each of the categories of GSK Covered Drugs listed on Exhibit A to the GSK MDL Agreement.

        The RCP for each category of GSK Covered Drugs subject to the settlement is a percentage of total payments that was negotiated between the parties and is consistent with Plaintiffs' assessment of liability and damages for each such Drug. A Class Member need not calculate its payments based on the RCPs, as set forth more fully below, they need only claim the total amount of their out-of-pocket expenses for each drug and the RCP will be applied by the Claims Administrator in order to determine their payment.

The Recognized Claim Percentage for each GSK drug subject to the settlement is listed below:

|  | Drug Name | Dosages | Recognized Claim Percentage |
|---|---|---|---|
| GSK Category A Drugs | Kytril Injection (granisetron HCL) | Injection: 1mg/ml | 50% |
| | Zofran Injection (ondansetron HCL) | Injection: 2mg/ml Injection (Pre-mixed): 32mg/50ml; 4mg/50ml | 50% |
| | | | |
| GSK Category B Drugs | Alkeran (melphalan) | Injection: 50mg Tablets: 2mg | 5% |
| | Imitrex (sumatriptan) | Injection: 12mg/1ml (6mg/0.5ml) | 5% |
| | Kytril Tablets (granisetron HCL) | Tablets: 1mg | 5% |

| | | | |
|---|---|---|---|
| | **Lanoxin**<br>**(digoxin)** | <u>Injection:</u> 0.5mg/2ml;<br>0.1mg/ml | **5%** |
| | **Myleran**<br>**(busulfan)** | <u>Tablets:</u> 2mg | **5%** |
| | **Navelbine**<br>**(vinorelbine**<br>**tartrate)** | <u>Injection:</u> 10mg/ml;<br>50mg/5ml | **5%** |
| | **Retrovir**<br>**(zidovudine)** | <u>IV Infusion:</u> 10mg/ml | **5%** |
| | **Ventolin**<br>**(albuterol)** | <u>Inhalation:</u> 0.083% 3ml;<br>0.5% 5mg/ml | **5%** |
| | **Zofran Orals**<br>**(ondansetron HCL)** | <u>Tablets:</u> 4mg; 8mg; 24mg<br><u>Solution:</u> 4mg/5ml<br><u>ODT:</u> 4mg; 8mg | **5%** |
| | **Zovirax**<br>**(acyclovir)** | <u>Powder for Injection:</u><br>500mg; 1000mg | **5%** |
| | **Zantac**<br>**(ranitidine HCL)** | <u>Injection:</u> 25 mg/ml<br><u>Injection (Pre-mixed):</u><br>50mg/50ml; 50mg/100ml | **5%** |

C.     <u>Application of the RCP to Calculate Payment to Consumer Class Members</u>

    1. Establishing a Recognized Claim

After the purchase amount for each GSK Covered Drug claimed by each Consumer Class Member submitting a valid claim has been accepted by the Claims Administrator as submitted in accordance with the requirements set forth on the Consumer Claim Form and this Exhibit G, the Claims Administrator shall apply the RCP associated with each drug to the purchase amount claimed by each Consumer Class Member for that particular drug. The sum of these figures is the Consumer Class Member's "Recognized Claim" used for purposes of calculating the payment made to each Consumer Class Member.

    2. Application of a Minimum Recognized Consumer Claim

In order to encourage Consumer Class Members to file claims, and subject to Court approval, Lead Class Counsel has established a Minimum Recognized Claim for Consumer Class Members. Any Recognized Claim which falls below $100.00 shall be assumed to equal $100.00 for the purposes of calculating the payment made to each Consumer Class Member.

    3. Determination of the Amount of Payment

If the sum of all Recognized Claims of all Consumer Class Members (including all Minimum Recognized Consumer Claims) is equal to or less than the Net Consumer Settlement Pool, each Consumer Class Member shall receive a payment equal to 100% of his or her Recognized Claim (or Minimum Recognized Consumer Claim, whichever is greater).

If the sum of all Recognized Claims of all Consumer Class Members (including all Minimum Recognized Consumer Claims) is greater than the Net Consumer Settlement Pool, each Consumer Class Member shall receive a pro-rata share of the Net Consumer Settlement Pool in proportion to his/her Recognized Claim or Minimum Recognized Consumer Claim.

3.   Sample Calculations of Hypothetical Consumer Claim

Consumer 1

Claimed Out-of-Pocket percentage co-payment expenses:

Kytril Injectible - $780.00  (RCP = 50%)
Myleran - $110.00 (RCP = 5%)

Calculation of Recognized Claim:

($780 X .50) +  ($110 X .05) = $390+ $5.50 = $395.50

Application of Minimum Recognized Consumer Claim:

$395.50 is greater than $100.00 minimum.  Minimum is inapplicable.

Consumer 2

Claimed Out-of-Pocket percentage co-payment expenses:

Zofran Injectible - $100 (RCP = 50%)
Lanoxin - $250 (RCP = 5%)

Calculation of Recognized Claim:

($100 X .50) + ($250 X .05) = $50.00 + $12.50 = $62.50

Application of Minimum Recognized Consumer Claim:

$62.50 is less than $100.00 minimum.  Minimum is applicable.
Recognized Claim = $100.00


D.   Application of the RCP to Calculate Payment to TPP Class Members and ISHP Group Members

1. Establishing a Recognized Claim

After the purchase amount for each GSK Covered Drug claimed by each TPP Class Member submitting a valid claim has been accepted by the Claims Administrator as submitted in accordance with the requirements set forth on the TPP Claim Form and this Exhibit G, the Claims Administrator shall apply the RCP associated with each such drug to the purchase amount claimed by each TPP Class Member for that particular drug. The sum of these figures is the TPP Class Member's "Recognized Claim" used for purposes of calculating the payment made to each TPP Class Member.

2. Determination of the Amount of Payment

If the sum of all Recognized Claims of all TPP Class Members is equal to or less than the Net TPP Settlement Pool, each TPP Class Member shall receive a payment equal to 100% of its Recognized Claim.

If the sum of all Recognized Claims of all TPP Class Member is greater than the Net TPP Settlement Pool, each TPP Class Member shall receive a pro-rata share of the Net TPP Settlement Pool in proportion to its Recognized Claim amount.

E.     Sample Calculation of the ISHP Group Reversion Amount

In order to illustrate the calculation of the ISHP Group Reversion Amount as contemplated in the Settlement Agreement and Release of the GlaxoSmithKline Defendants, two examples are set forth below:

Example 1

Assumptions:

ISHP Group Recognized Claim Percentage = 60%
Net Fees and Expenses = $17 million
GSK Refund = $3 million
Total Deposits to Class TPP Settlement Pool and ISHP Settlement Pool = $46 million

ISHP Group Reversion Amount Calculation:

ISHP Over/Underage = 60-37.5 = 22.5%

Fees and Expenses Attributable to TPPs and ISHPs = $17M X .70 = $11.9M

22.5% X ($46M - $11.9M - $3M) = $6,997,500

$6,997,000 due to be paid to ISHP Group Members first from the amount remaining in the ISHP Settlement Pool and the balance from TPP Settlement Pool at the conclusion of the claims process

Total payment to ISHP Group Members = $6,997,500 + $11,000,000 = $17,997,500

Example 2

Assumptions:

ISHP Group Recognized Claim Percentage = 40%
Net Fees and Expenses = $17 million
GSK Refund = $3 million
Total Deposits to Class TPP Settlement Pool and ISHP Settlement Pool = $46 million

ISHP Group Reversion Amount Calculation:

ISHP Over/Underage = 40-37.5 = 2.5%

Fees and Expenses Attributable to TPPs and ISHPs = $17M X .70 = $11.9M

2.5% X ($46M - $11.9M - $3M) = $777,500

$777,500 due to be paid from ISHP Settlement Pool to ISHP Group Members. Any funds remaining in ISHP Settlement Pool to be returned to TPP Settlement Pool at the conclusion of the claims process

Total payment to ISHP Group Members = $11,000,000 + $777,5000 = $11,777,500.00

## EXHIBIT H

ISHP GROUP MEMBERS LIST (with number of covered lives)

# EXHIBIT H

| ISHP Members for GSK AWP Settlement | Covered Lives as of 12/31/04 |
|---|---|
| Aetna | 13,656,000 |
| Arkansas Blue Cross and Blue Shield | 739,929 |
| BCBS Association | 4,362,284 |
| BCBS of Florida | 2,297,644 |
| BCBS of Kansas City | 831,017 |
| California Physicians' Service dba Blue Shield of California | 2,779,696 |
| CIGNA | 9,701,000 |
| Coventry Health Care, Inc. | 3,063,146 |
| Government Employees Hospital Assn. | 435,001 |
| Great-West Life & Annuity Ins. Co. | 1,794,146 |
| (The) Guardian Life Ins. Co. of America | 377,950 |
| Health Insurance Plan of Greater NY | 1,320,292 |
| Health Net, Inc. | 3,692,500 |
| HealthNow New York Inc. | 748,903 |
| Humana Health Plans | 3,305,000 |
| Inova Health Care Services | n/a |
| Inova Health System Employee Health Benefits Plan | 105,000 |
| Mid-Atlantic Medical Services | 1,951,211 |
| Noridian Mutual Insurance Co. | 440,000 |
| Oxford Health Plans | 1,462,528 |
| PacifiCare Health Systems, LLC | 3,074,353 |
| Tufts Health Plan | 707,478 |
| UnitedHealth Group (minus MAMSI and Oxford) | 16,645,862 |
| Wellpoint | 32,473,000 |
| BCBS Hawaii | 689,000 |
| BCBS Michigan | 4,704,157 |
| BCBS Minnesota | 2,632,799 |
| BCBS Tennessee | 2,557,909 |
| BCBS Vermont | 169,146 |
| Carefirst BCBS | 6,677,980 |
| Excellus Health Plan, Inc. | 1,792,270 |
| Federated Insurance Company | 112,832 |
| Healthfirst, Inc. | 252,194 |
| Medical Mutual of Ohio | 1,505,608 |
| Mutual of Omaha | 4,704,567 |
| Regence | 2,375,587 |
| Trustmark Insurance | 695,000 |
| WEA Insurance Corporation | 157,729 |
| Wellmark | 949,078 |
| **TOTAL** | **135,939,796** |

EXHIBIT I

ISHP CLAIMS DOCUMENTATION REQUIREMENTS

**Exhibit I**
to
**Settlement Agreement and Release**
**of the GlaxoSmithKline Defendants**
August 2006

**ISHP Claims Documentation**

On or before the deadline set for TPP Class Members to file claims pursuant to the Settlement Agreement and Release of the GlaxoSmithKline Defendants ("Settlement Agreement") as such date is set by the MDL Court in an order preliminarily approving the Settlement Agreement, each ISHP Group Member, or ISHP Group Counsel where indicated, shall submit the following claims documentation:

(1)     ISHP Group members shall be required to submit the amount of purchases of each GSK Covered Drug during the period of January 1, 1999 to December 31, 2003, net of co-pays, deductibles, and/or co-insurance.

(2)     Inclusion of the following data fields will facilitate the claims review process, and ISHP Group Members are therefore requested to provide it if practicable:

a.     J-Code or NDC Number

The applicable J-Code or NDC Number for each transaction. The applicable J-Codes for each GSK Covered Drug as well as a list of NDC numbers is attached hereto.

b.     Patient Identifier

A random encrypted patient identification number for each transaction, which can be used to track claims.

c.     Age

Age information (*i.e.* the difference between date of birth and date of service or date of fill, rounded down to the nearest year) for each transaction.

d.     Service and/or Fill Date

Service date will often be available for J-Code entries and fill date will be available for NDC entries. If both are available, please include.

e.     Group Number

The group number assigned to each transaction. As part of the auditing process, you may be asked to provide corresponding group name for each group number. Only the Settlement Administrator will have access to this

information.

f.   Amount Billed

The billed charges or the initial amount billed by the provider or providers before any adjustments.

g.   Units

If available, the units for each transaction should be provided.

(3)      Each ISHP Group Member shall provide a list of all self-funded healthcare plans ("SFP's") or other entities for which it is authorized to make a claim, including the identity of each entity on whose behalf the ISHP Group Member is authorized to act by name and by the Federal Employer Identification Number assigned to such entity by the United States Internal Revenue Service, if the ISHP Group Member has this information.

(4)      Each ISHP Group Member shall provide a declaration made by a duly authorized employee of each ISHP Group Member certifying:

(i)      the employee's authority to submit a claim on behalf of the ISHP Group Member;

(ii)      the ISHP Group Member's authority to settle the claims asserted in the MDL Class Actions and to release all claims related to purchases of the GSK Drugs at issue in the MDL Class Actions;

(iii)      the total net dollar amount of purchases of each of the GSK Covered Drugs by the ISHP Group Member during the period January 1, 1999 to December 31, 2003 ;

(iv)      that the ISHP Group Member has historically reimbursed for drugs based on AWPs and has not included claims that are readily identifiable as having been based on a  reimbursement standard other than AWP;

(v)      that the ISHP Group Member and each entity on whose behalf the ISHP Group Member is authorized to act waives any right it may have to receive any distribution as a TTP Class Member under the Settlement Agreement (except to the extent of an administered TPP's purchases of GSK Drugs which were not administered by an ISHP); and

(vi)      that the data and other information provided as part of the Claims Documentation submitted by the ISHP Group Member is true and accurate, based on records maintained by or otherwise available to the ISHP Group Member.

**All data and documents required hereunder must be submitted, by the deadline set by the MDL Court in the Preliminary Approval Order, to the Claims Administrator at the following address:**

[Address to be provided]

**Attachment 1 -- GSK Covered Drugs and HCPCS Codes**

| NDC | Drug | Description | HCPCS Code(s) |
|---|---|---|---|
| **GSK Category A Drugs** | | | |
| 00029414901 | Kytril | KYTRIL INJ SINGLE DOSE VIAL 1MG/ML | J1625, J1626 |
| 00029414975 | Kytril | KYTRIL INJ SGL DOSE VIAL 1MG/ML VHA | J1625, J1626 |
| 00029415201 | Kytril | KYTRIL 1MG/ML INJECTION 4ML VIAL | J1625, J1626 |
| 00173044200 | Zofran | ZOFRAN INJ 2MG/ML 20ML | J2405 |
| 00173044202 | Zofran | ZOFRAN INJ 2MG/ML 2ML 5S | J2405 |
| 00173046100 | Zofran | ZOFRAN INJ PRMXD 32MG/50ML | J2405 |
| 00173046200 | Zofran | ZOFRAN INJ PRMXD 4MG/50ML | J2405 |
| **GSK Category B Drugs** | | | |
| 00173004535 | Alkeran | ALKERAN TAB 2MG 50S | J8600 |
| 00173013093 | Alkeran | ALKERAN I.V. INJ 50 MG | J9245 |
| 00173044901 | Imitrex | IMITREX INJ 12MG/ML 0.5ML 2S PFLD SRNG | J3030 |
| 00173044902 | Imitrex | IMITREX INJ 0.5ML 12MG/ML 5S VIALS | J3030 |
| 00173044903 | Imitrex | IMITREX INJ 12MG/ML 0.5ML2S KIT,SELFDOSE | J3030 |
| 00173047800 | Imitrex | IMITREX INJ 12MG/ML STAT DOSE RFL 2'S | J3030 |
| 00173047900 | Imitrex | IMITREX INJ 12MG/ML STAT DOSE KIT | J3030 |
| 00029415105 | Kytril | KYTRIL 1 MG TABS 20'S SUP | Q0166 |
| 00029415139 | Kytril | KYTRIL 1MG TABS 2'S | Q0166 |
| 00173026010 | Lanoxin | LANOXIN INJ 0.5MG | J1160 |
| 00173026035 | Lanoxin | LANOXIN INJ 0.5MG 2ML 50S | J1160 |
| 00173026210 | Lanoxin | LANOXIN INJ PEDIATRIC 0.1MG/ML | J1160 |
| 00173071325 | Myleran | MYLERAN TAB 2MG 25S | J8510 |
| 00173065601 | Navelbine | NAVELBINE INJ 10MG 1ML | J9390 |
| 00173065644 | Navelbine | NAVELBINE INJ 50MG 5ML | J9390 |
| 00173010793 | Retrovir | RETROVIR IV INF 10MG/ML 20ML 10 | J3485 |
| 00173038558 | Ventolin | VENTOLIN SOL INH 0.5% 5MG/ML 20ML | J7618-19, J7620, J7625 |
| 00173041900 | Ventolin | VENTOLIN NEB SOL INH   0.083% 3ML 25S | J7618-19, J7620, J7625 |
| 00173044600 | Zofran | ZOFRAN TAB 4MG 30S | Q0179 |
| 00173044601 | Zofran | ZOFRAN TAB 4MG 100S | Q0179 |
| 00173044602 | Zofran | ZOFRAN TAB 4MG 100S UD | Q0179 |
| 00173044604 | Zofran | ZOFRAN TAB 4MG 3S | Q0179 |
| 00173044700 | Zofran | ZOFRAN TAB 8MG 30S | Q0179 |
| 00173044701 | Zofran | ZOFRAN TAB 8MG 100S | Q0179 |
| 00173044702 | Zofran | ZOFRAN TAB 8MG 100S UD | Q0179 |
| 00173044704 | Zofran | ZOFRAN TAB 8MG 3S | Q0179 |
| 00173048900 | Zofran | ZOFRAN ORAL SOL 4MG/5ML  50ML | Q0179 |
| 00173056900 | Zofran | ZOFRAN ODT 4MG 5X2 30S | Q0179 |
| 00173057000 | Zofran | ZOFRAN ODT 8MG 5X2 30S | Q0179 |
| 00173057004 | Zofran | ZOFRAN ODT 8MG 5X2 10'S | Q0179 |
| 00173068000 | Zofran | ZOFRAN TAB 24MG 1S | Q0179 |
| 00173095201 | Zovirax | ZOVIRAX FOR INJECTION 1000MG 20ML 10S (C | Q4075 |
| 00173099501 | Zovirax | ZOVIRAX FOR INJECTION 500MG 10ML 10S (C# | Q4075 |
| 00173036200 | Zantac | ZANTAC INJ 25MG/ML 2ML  PFLD SRNG | J2780 |
| 00173036238 | Zantac | ZANTAC INJ 25MG/ML 2ML 10S | J2780 |
| 00173036300 | Zantac | ZANTAC INJ 25MG/ML 40ML | J2780 |

| 00173036301 | Zantac | ZANTAC INJ 25MG/ML 6ML | J2780 |
| 00173036339 | Zantac | ZANTAC INJ 25MG/ML 10ML | J2780 |
| 00173040700 | Zantac | ZANTAC INJ PRMXD 50MG/100ML 24S | J2780 |
| 00173044100 | Zantac | ZANTAC INJ PRMXD 50MG/50ML 24S | J2780 |

EXHIBIT J

## Exhibit J

Pursuant to Fed. R. Civ. P. 23(e)(1)(c), Plaintiffs state that they have entered into an agreement with the IHSPs regarding allocation of attorneys fees to IHSP counsel out of any award made to Class counsel.