# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **MDL No. 1456**<br>**Master File No. 01-CV-12257-PBS**<br><br>**Hon. Patti B. Saris** |
| **THIS DOCUMENT RELATES TO:** | |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS, and *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS | |

## NOTICE OF VIDEOTAPED DEPOSITION OF NONPARTY
## STATE OF KANSAS HEALTH POLICY AUTHORITY

PLEASE TAKE NOTICE that, pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, Defendants Dey, Inc., Dey, L.P., Dey L.P., Inc. (collectively, "Dey") and Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc., (collectively, "Roxane"), by and through their undersigned counsel, hereby notice the Rule 30(b)(6) deposition upon oral examination of the representative(s) of the State of Kansas Health Policy Authority.

The deposition will begin at 9:00a.m. on October 27, 2008, and will continue from day to day until completed. The deposition will take place at the Capitol Plaza Hotel, 1717 SW Topeka Blvd, Topeka, KS 66612. The deposition will be conducted under oath by an officer authorized to take such testimony, and will be recorded by stenographic and/or sound and visual means. The deposition will be taken upon cross-examination. Arrangements will be made so that counsel may participate by telephone if they wish. The deposition is being taken for the

purposes of discovery, for use at trial, and for other such purposes as permitted under the Federal Rules of Civil Procedure.

The State of Kansas Health Policy Authority shall designate a person or persons to testify under oath about the subjects set forth in Schedule A of the attached Subpoena served by Defendants Dey and Roxane.

Dated: July 23, 2008

/s/ John W. Reale
Helen E. Witt, P.C.
Anne M. Sidrys, P.C.
Eric T. Gortner
John W. Reale (BBO #654645)
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

*Counsel for Defendants Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc.*

Respectfully Submitted

/s/ Neil Merkl (w/consent)
Paul F. Doyle (BBO # 133460)
Sarah L. Reid
Neil Merkl
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808 7800
Facsimile: (212) 808 7897

*Counsel for Defendants Dey, Inc., Dey L.P., Inc. and Dey, L.P.*

## CERTIFICATE OF SERVICE

I, John W. Reale, Esq., hereby certify that on this 23rd day of July, 2008, a true and correct copy of the foregoing was served on all counsel of record via LexisNexis File and Serve.

/s/ John W. Reale
John W. Reale
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

AO88 (Rev. 12/06) Subpoena in a Civil Case

# Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF          KANSAS

| | |
|---|---|
| In Re: Pharmaceutical Industry Average Wholesale Price Litigation <br><br> THIS DOCUMENT RELATES TO <br><br> *U.S. ex rel. Ven-A-Care v. Boehringer, et al., 07-10248-PBS* <br> *U.S. ex rel Ven-A-Care v. Dey, Inc., et al., 05-11084-PBS* | **SUBPOENA IN A CIVIL CASE** <br><br> Case Number:[1]   MDL No. 1456 <br> Civil Action No. 07-CV-10248-PBS <br> Lead Case No. 01-12257-PBS <br><br> PENDING IN: UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS |

TO:  Kansas Health Policy Authority, c/o Marcia J. Nielson, Room 900-N - Landon State Office Bldg 900 SW Jackson Street Topeka, Kansas 66612

☐ **YOU ARE COMMANDED** to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be conducted under oath by an authorized officer, and will be recorded by stenographic and/or sound and visual means.

| PLACE OF DEPOSITION   Capitol Plaza Hotel, 1717 SW Topeka Blvd., Topeka, KS 66612   [See attached Schedule A for Topics of Inquiry] | DATE AND TIME <br> 10/27/2008 9:00 am |
|---|---|

☐ **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) <br> *Miriam Lauren Lieberman*  Attorney for Defendant Boehringer Ingelheim Roxane, Inc. | DATE <br> 7/23/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Miriam L. Lieberman, Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601   (312) 469-7334

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Marcia J. Nielson | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## SCHEDULE A

Defendants in the above-captioned matters request, pursuant to Rules 26, 30, and 45 of the Federal Rules of Civil Procedure, that You designate in writing to counsel for Boehringer Ingelheim Roxane, Inc. one or more officers, officials, employees, or other representative to testify on Your behalf who are most knowledgeable about and will testify about matters known or reasonably available to You in regard to the Topics of Inquiry set forth below. You are further requested to set forth the matter or matters on which each such designated person will testify at least two days prior to each deposition.

### TOPICS OF INQUIRY

1.    Your knowledge of the terms "Average Wholesale Price" (also referred to as "AWP"), and "Wholesale Acquisition Cost" (also referred to as "WAC").

2.    Any efforts by the state to define, calculate, determine, investigate, understand or interpret AWP or WAC.

3.    Your knowledge, consideration, understanding or use of AMP, MAC, FUL, EAC, Direct Price, Best Price, Federal Supply Schedule prices, or any other price, cost, or reimbursement amount or benchmark, metric, or methodology for Subject Drugs.

4.    Your knowledge of actual acquisition costs for the Subject Drugs by any Provider, including but not limited to, pharmacies, physicians, wholesalers, PBMs, drug purchasing pools, or the state itself.

5.    All attempts by the state to ascertain Providers' actual acquisition costs for any prescription drugs reimbursed by the state Medicaid program.

1

6.      Communications between You and Providers regarding reimbursement for acquiring, dispensing, or administering Subject Drugs from January 1984 to the present.

7.      Information, including but not limited to the existence, nature, and location of Documents, relating to the following:

(a)    Your compliance with 42 U.S.C. § 1396a(a)(30), 42 U.S.C. § 1396a(a)(54), 42 C.F.R. §§ 447.201 et seq., or 42 C.F.R. § 447.512-518;

(b)    Any evaluations, audits, analyses, or reviews of any aspect of the state Medicaid program from January 1984 to the present;

(c)    Your procedures for the calculation, monitoring, processing, or payment of claims for Subject Drugs from January 1991 to the present;

(d)    Internal or external assessments, studies, analyses, reviews, or audits conducted by or on Your behalf regarding pricing or reimbursement amount or rates for prescription drugs from January 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(e)    Documents created by or received from any state entity concerning a change in the methodology for reimbursement of pharmacy-dispensed and physician-administered drugs;

(f)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to prices, costs, or reimbursements for prescription drugs from 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(g)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association of Medicaid Fraud Control Units, National Association of Attorneys General, HHS-OIG, CMS, and the Department of Health and Human Services, relating to prices, costs, or reimbursements for prescription drugs from January 1984 to the present;

(h)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(i)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

2

(j)    Communications between the state and either Dey or the Roxane Defendants concerning the pricing of prescription drugs;

(k)    Your potential or actual contractual relationships with PBMs, Third Party Administrators, Benefit Consultants, Auditors, Wholesalers, Manufacturers, Group Purchasing Organizations, Insurers, Independent Practice Associations, Retailers, Mail Order Pharmacies, Providers, Trade Associations, or Lobbyists, insofar as they cover reimbursement, purchasing, rebates, or expenditures concerning Subject Drugs;

(l)    Documents or data received from or published by a Publisher and the state's reliance on such data or Documents;

(m)    Your efforts to reduce or limit expenditures for Subject Drugs;

8.    The state's administration or oversight of the state Medicaid Program, including but not limited to the existence, nature, and location of data relating to the following:

(a)    The utilization of Subject Drugs by patients covered by the state Medicaid Program;

(b)    Your efforts to reduce or limit expenditures for Subject Drugs;

(c)    The expense to providers of acquiring and dispensing or administering Subject Drugs;

(d)    Manufacturer rebates received relating to Subject Drugs;

(e)    Information provided to or received from the federal government in connection with the state Medicaid Program relating to prescription drug pricing or dispensing fees;

(f)    Payments made by state or other entities, such as local agencies, to providers in connection with the state Medicaid Program;

(g)    Payments from the state to other entities, such as local agencies, in connection with the state Medicaid Program; and

(h)    The state budgetary source of the money used by the state to make payments in connection with the state Medicaid Program.

9.    The administration of reimbursement to providers for any Subject Drug in connection with the state Medicaid Program, including but not limited to the existence, nature, and location of Documents, relating to the following:

(a)    The manner in which claims for reimbursement of Subject Drugs are submitted and verified;

(b)   Calculation, monitoring, processing, and payment of claims for reimbursement to providers for Subject Drugs under the state Medicaid Program from January 1991 to present;

(c)   Your negotiation, authoring, or execution of any contract or memorandum of understanding or agreement, or contribution to any contract or memorandum of understanding or agreement, between the state and any Provider relating to AWP or WAC or the reimbursement of prescription drugs;

(d)   Your establishment, consideration, determination, calculation, or setting of the dispensing fees or fees for other professional services payable in connection with the supply or administration of pharmacy-dispensed and physician-administered drugs;

(e)   Subject HCPCS Codes;

(f)   All reports, meetings and other information relating to any analysis by the state of any change to the reimbursement formula (including dispensing fee) under Medicaid for the Subject Drugs from January 1984 to the present, and your adoption, rejection, or consideration of such proposal;

(g)   The circumstances surrounding each change or discussion of a potential change in the state Medicaid program reimbursement rates from January 1984 to the present;

(h)   Your reliance on Pricing Elements, including AWP, WAC and Direct Price, published for the Subject Drugs;

(i)   Your use or consideration of published price information, AMPs, URAs or other pricing information related to Subject Drugs, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program; and

(j)   Your use or consideration of any pricing information provided to the state directly by any drug manufacturer, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program.

10.   The manner in which Manufacturer rebates and Federal matching funds are applied for, calculated, received, processed, and allocated or distributed by the state, including, but not limited to:

(a)   Federal matching funds received relating to prescription drugs;

(b)   Your net costs, including but not limited to analyses or calculation of its net costs, for Subject Drugs under the state Medicaid Program after Manufacturer rebates and Federal matching funds;

(c)   The manner in which the state submits claims for manufacturer rebates and Federal matching funds in connection with the state Medicaid Program;

4

(d)   The manner in which the money received from manufacturer rebates and Federal matching funds is directed, allocated, or distributed upon its receipt by the state;

(e)   Your adoption, rejection, amendment to, consideration, or negotiation of any state supplemental rebate program; and

(f)   Any attempt by the state to calculate AMP for any Subject Drugs.

11.   Your adoption, rejection, or consideration of recommendations and information related to AWP, WAC, or other Pricing Element, received from any other state or the federal government including, but not limited to:

(a)   1968 Task Force on Prescription Drugs Background Papers, *The Drug Makers and the Drug Distributors* (December, 1968, Office of the Secretary, U.S. Department on Health, Education, and Welfare);

(b)   1974 Federal Register stating that "Most states use average wholesale price, Red Book data, Blue Book data, survey copies or similar standard costs. Such standard prices are frequently in excess of actual acquisition costs to the retail pharmacist. Thus. to achieve maximum savings to the Medicaid program, the proposal requires the use of actual acquisition cost." *See* 39 Fed. Reg. 41480, *Reimbursement of Drug Cost-Medical Assistant Program* (November 27, 1974);

(c)   HCFA's 1988 decision to disapprove state Medicaid plans that based reimbursement for prescription drugs on an undiscounted AWP;

(d)   1984 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 15.9%. *See* Department of Health & Human Services, Office of the Inspector General, *Changes to the Medicaid Prescription Drug Program Could Save Millions* (A-06-40216) (Sept. 1984);

(e)   1989 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 15.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program* (A-06-89-00037) (Oct. 1989);

(f)   1989 HCFA Medicaid Manual indicating that pharmacies buy prescription drugs at AWP – 10-20%;

(g)   1990 Pharmacy Reform Tag Meeting minutes;

(h)   1994 GAO Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, *Prescription Drugs: Companies Typically Charge More in the United States than in the United Kingdom* (January, 1994);

(i)    1996 CBO Papers, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry* (January 1996, Congressional Budget Office);

(j)    1996 OIG Report *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390) (Feb. 1996);

(k)    1996 HHS-OIG report indicating potential for significant Medicare savings. *See* Department of Health & Human Services, Office of the Inspector General, *Appropriateness of Medicare Prescription Drug Allowances* (03-95-00420) (May 1996);

(l)    1996 OIG Report *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) (June 1996);

(m)    1996 OIG Report *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392) (June 1996);

(n)    1997 OIG Report *Questionable Practices Involving Nebulizer Drug Therapy* (OEI-03-94-00391) (March 1997);

(o)    1997 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 18.3%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs* (A-06-96-00030) (Apr. 1997);

(p)    1997 HHS-OIG report indicating that on average, pharmacists buy generic drugs at AWP – 42.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products* (A-06-97-00011) (Aug. 1997);

(q)    1997 OIG Report *Excessive Medicare Payments for Prescription Drugs* (OEI-03-97-00290) (Dec. 1997);

(r)    1998 OIG Report *Are Medicare Allowances for Albuterol Sulfate Reasonable* (OEI-03-97-00292) (Aug. 1998);

(s)    The revised AWP prices provided by the United States Department of Justice and National Association of Medicaid Fraud Control Unit in 2000;

(t)    2000 OIG Report *Medicare Reimbursement of Albuterol* (OEI-03-00-00311) (June 2000);

(u)    2001 HHS-OIG report indicating that AWP bears little to no resemblance to actual wholesale prices. *See* Department of Health & Human Services, Office of the Inspector General, *Medicare Reimbursement of Prescription Drugs* (03-01-00310) (Jan. 2001);

(v)    2001 HHS-OIG report indicating that continued reliance on average wholesale prices as a reimbursement metric is flawed. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid's Use of Revised Average Wholesale Prices* (03-01-00010) (Sept. 2001);

(w)    2001 HHS-OIG report indicating that pharmacy actual acquisition cost was an average 21.84% below AWP. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products* (A-06-00-00023) (Aug. 2001);

(x)    2002 HHS-OIG report, Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (A-06-02-00041) (Sept. 2002); and

(y)    2005 GAO Report, Medicare: Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs (October 2004, GAO-05-72).

12.    The preparation of survey responses to, participation in, and interviews with the OIG or other originating entity regarding the reports referenced in paragraph 11 above.

13.    From January 1, 1991 to present, the organizational structure of the state Medicaid program, including but not limited to identifying which individuals held what positions, how long the individuals held those positions, and what were the job duties of those position.

14.    State Medicaid plan provisions and state Medicaid plan amendments relating to prescription drugs and the process by which such plan amendments are approved, amended, and implemented.

15.    The nature and purpose of the state's MAC program, if applicable, including but not limited to the procedure for setting and changing MACs, the criteria and information used to establish and change MACs, and the changes to the MAC program that were considered and/or implemented over time. If the state does not have a MAC program, the reason(s) no MAC program has been implemented.

16.    Communications concerning the budget and reimbursement processes between the state and CMS relating to reimbursement rates for prescription drugs for the period 1988 to the present.

17.    Communications between the state Medicaid program and any member of the state legislature concerning reimbursement rates for prescription drugs.

18.    Any pending or threatened litigation, claims, allegations, or charges that the state Medicaid Program is not in compliance with Federal or state law or otherwise violates Federal or state law.

19.    The sum and substance of Communications between the state and CMS concerning (i) the Average Manufacturer's Price or "AMP"; (ii) the Unit Rebate Amount or "URA"; (iii) the supplemental rebate program; (iv) Rebate Agreements; and (v) how the Rebate Program was implemented and run.

20.    Any audits and/or compliance efforts the state made to ensure that Providers were in compliance with their obligations to report Usual and Customary Charges pursuant to 42 C.F.R. § 512(b)(2), or any applicable state regulation.

21.    Communications between the state and other states or Federal Agencies concerning the reimbursement of prescription drugs, including but not limited to, Documents received from, or sent by the state to, the National Association of Medicaid Fraud Control Units ("NAMFCU") and the National Association of Attorneys General concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

22.     Communications between the state and either Dey or the Roxane Defendants, Ven-a-Care of the Florida Keys, or any other person concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

23.     Communications between NAMFCU and the state concerning: (i) prescription drug prices; (ii) AWP, WAC, or AMP; and (iii) price of the Subject Drugs.

24.     Communications, arrangements, contracts or other Documents reflecting a relationship between the state and any Publisher regarding the purchase of or access to information regarding prescription drug pricing.

25.     Your retention, destruction and public disclosure policies regarding Documents and Your compliance with those policies.

26.     Your computer systems, networks, or databases that might store or contain Documents, data, and Communications, including but not limited to e-mail, responsive to the subpoena *duces tecum* served upon the state in connection with this action.

## Definitions

1.     "Actual Acquisition Cost" shall mean the net price (after discounts, rebates, or chargebacks) that a Provider pays to purchase a prescription drug intended for resale.

2.     "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3.     "AWP" or "Average Wholesale Price" shall mean the pricing element as periodically published by any Publisher or pharmaceuticals industry compendia, including the

Drug Topics Red Book (the "Red Book"), American Druggist First Databank Annual Directory of Pharmaceuticals ("First DataBank"), Essential Directory of Pharmaceuticals (the "Blue Book"), and Medi-Span's Master Drug Database ("Medi-Span").

4.     "CMS/HCFA" shall mean "Centers for Medicare and Medicaid Services," its predecessor agencies, including the Health Care Financing Administration ("HCFA"), and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

5.     "Communication" shall mean any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise.  All such Communications in writing shall include, without limitation, printed, typed, handwritten, or other readable Documents, whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

6.     "Concern," "concerning," "relating to," or "relate to" shall mean refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly, as required by the context to bring within the scope of the requests in this request for production of Documents any Documents that might be deemed outside their scope by another construction.

7.     "Dey" shall mean Dey, Inc., Dey, L.P, and Dey, L.P., Inc. and any of their past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions,

departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on their behalf or under their control.

8.   "Documents" shall mean all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, Communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers.   A draft or non-identical copy is a separate Document within the meaning of this term.

9.   "EAC" or "Estimated Acquisition Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.502.

10.   "Each," "any," and "all" shall mean "each and every."

11.   "Federal government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, attorneys, or representatives of any of the foregoing.  The United States Government includes, but is not limited to, CMS/HCFA, Congress,

Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, Pharmacy Support Services Center, and the National Association of Medicaid Fraud Control Units, and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of the foregoing.

12.   "FUL" or "Federal Upper Limit" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.332 prior to January 2, 2008, and 42 C.F.R. § 447.514 as of January 2, 2008.

13.   "J-Code reimbursement basis" shall mean the reimbursement of drugs through use of a subset of the HCPCS code set with a high-order value of "J" (compare to "NDC reimbursement basis").

14.   "MAC" shall mean "Maximum Allowable Cost" and includes the meaning ascribed to that term in any state Medicaid plan, or as defined by any state Medicaid department or agency.

15.   "Manufacturer" shall mean a company that manufactures pharmaceutical products.

16.     "Medicaid" shall mean the jointly funded federal-state health insurance program enacted in 1965 under Title XIX of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

17.     "Medicaid Crossover Claim" shall mean claims for which Medicare is the primary payor and the state Medicaid agency is the secondary payor.

18.     "Medicaid Drug Rebate Program" shall mean and refers to the program established by the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396r-8, as amended by the Veterans Health Act of 1992, whereby drug manufacturers have national drug rebate agreements with HHS and a pricing agreement with HHS for the Public Health Service Section 340B Drug Pricing Program.

19.     "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

20.     "Meeting" shall mean any discussion between two or more persons either in person, telephonically, or through other electronic means.

21.     "MFCU" shall mean individual state Medicaid Fraud Control Units, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

22.     "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

23.    "Myers & Stauffer" shall mean Myers & Stauffer, L.C. and any of its representatives, agents, employees, or other person or entity acting or purporting to act on its behalf or under its control.

24.    "NAMFCU" shall mean National Association of Medicaid Fraud Control Units and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

25.    "NDC reimbursement basis" shall mean the reimbursement of drugs based on a Provider's submission of a National Drug Code ("NDC") (compare to "J-code reimbursement basis").

26.    "Person" shall mean any natural person or any firm, business, legal, or governmental agency or association, or any other organization or entity.

27.    "Point of Sale System" shall mean a computer-transmitted claims processing system used by Providers to submit claims to the state Medicaid agency.

28.    "Pricing Element" shall mean any of the following:

(a)     Average Wholesale Price or "AWP";
(b)     Blue Book Average Wholesale Unit Price;
(c)     Blue Book Average Wholesale Package Price;
(d)     Calculated Average Wholesale Package Price;
(e)     Wholesale Unit Price;
(f)     Wholesale Acquisition Cost or "WAC";
(g)     Maximum Allowable Cost or "MAC";
(h)     Suggested Wholesale Price "SWP";
(i)     Wholesale Net Price;
(j)     Direct Price;

14

(k)     List Price;

(l)     Actual Sale Price;

(m)     BaseLine Price;

(n)     BaseLine AWP Unit Price;

(o)     BaseLine Direct Price Unit Price;

(p)     BaseLine Net Wholesale Price Unit Price;

(q)     Estimated Acquisition Cost or "EAC";

(r)     Federal Maximum Allowable Cost (a/k/a Federal Upper Limit or "FUL");

(s)     Department of Justice Medicaid Average Wholesale Price;

(t)     Generic Price Indicator;

(u)     Generic Price Spread Indicator;

(v)     State Maximum Allowable Cost or "SMAC";

(w)     Usual and customary charge; or

(x)     Any pricing element created by the federal government or state Medicaid agencies.

29.     "Provider" or "Providers" shall mean any and all persons or entities that render health care services or products, including but not limited to pharmacists, institutional pharmacies, home health agencies, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

30.     "Publisher" or "Publishers" shall mean Red Book, First DataBank, Blue Book, and Medi-Span, their predecessors and successors, and all employees, agents, consultants, accountants, or attorneys of any of the foregoing.

31.     "Reimbursement" shall mean the amount of, or formula for calculating, the payment under Medicare, Medicaid, or a medical assistance program at which healthcare providers are reimbursed for administering or dispensing prescription drugs to a beneficiary.

32.    "Roxane Defendants" shall mean Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc., and any of their past or present officials, officers, representatives, agents, assigns, attorneys, or employeesand all other persons or entities acting or purporting to act on their behalf or under their control.

33.    "Subject Drugs" shall mean those drugs listed on attached Schedule 1.

34.    "Subject HCPCS Codes" shall mean those J-Codes and K-Codes associated with the Subject Drugs, including but not limited to those J-Codes and K-Codes identified in attached Schedule 2.

35.    "U.S. Government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.   U.S. Government includes but is not limited to CMS/HCFA, Congress, Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, and Pharmacy Support Services Center.

36.    "Ven-A-Care" shall mean Ven-A-Care of the Florida Keys, Inc., a corporation organized under the laws of Florida, and all predecessor or successor corporations, and any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees,

divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on its behalf or under its control.

37.     "WAC" shall mean "Wholesale Acquisition Cost" and refers to any price represented as a price to any entity that purchases pharmaceutical products from a Manufacturer, or any price as periodically published as WAC by a Publisher.

38.     "You" or "Your" shall mean the "State Medicaid Program" and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys and all other persons or entities acting or purporting to act on their behalf or under their control.

39.     "340B Provider" shall mean any provider described in Section 340B of the Public Health Act, 42 U.S.C. § 256(b).

40.     The terms "and" and "or" shall mean "and/or."

### SCHEDULE 1:  SUBJECT DRUGS

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 49502-0303-17 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| 49502-0333-17 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| 49502-0303-27 | ALBUTEROL INHALATION AEROSOL MDI REFILL, 17G |
| 49502-0196-20 | ALBUTEROL SULFATE INHALATION SOLUTION .5% 5MG/ML SIZE, 20ML MD |
| 49502-105-01 | ALBUTEROL SULFATE .5% (STERILE) 20ML MD |
| 49502-0697-03 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 25, 2.5 MG/3ML |
| 49502-0697-33 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 30, 2.5 MG/3ML |
| 49502-0697-60 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 60, 2.5 MG/3ML |
| 49502-0689-12 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 120S |
| 49502-0689-02 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 60S |
| 49502-0685-33 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 30S |
| 49502-0685-60 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 60S |
| 49502-0685-03 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 25S |
| 00054-4084-25 | AZATHIOPRINE USP 50MG TABLET 100S (10 X 10) |
| 00054-4221-25 | DICLOFENAC SODIUM 50MG TABLET 100S (10 X 10) |

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 00054-4222-25 | DICLOFENAC SODIUM 75MG TABLET 100S (10 X 10) |
| 00054-3294-46 | FUROSEMIDE 10MG/ML SOLUTION 60ML |
| 00054-3294-50 | FUROSEMIDE 10MG/ML SOLUTION 120ML |
| 00054-4297-25 | FUROSEMIDE 20MG TABLET 100S (10 X 10) |
| 00054-8297-25 | FUROSEMIDE 20MG TABLET 100S UD |
| 00054-4297-31 | FUROSEMIDE 20MG TABLET 1000S |
| 00054-4299-25 | FUROSEMIDE 40MG TABLET 100S (10 X 10) |
| 00054-8299-25 | FUROSEMIDE 40MG TABLET 100S UD |
| 00054-4299-31 | FUROSEMIDE 40MG TABLET 1000S |
| 00054-4301-25 | FUROSEMIDE 80MG TABLET 100S (10 X 10) |
| 00054-8301-25 | FUROSEMIDE 80MG TABLET 100S UD |
| 00054-4301-29 | FUROSEMIDE 80MG TABLET 500S |
| 00054-4392-25 | HYDROMORPHONE 2MG TABLET 100S (4 X 25) |
| 00054-4394-25 | HYDROMORPHONE 4MG TABLET 100S (4 X 25) |
| 00054-4790-25 | ORAMORPH SR 15MG TABLET 100S (4 X 25) |
| 00054-4805-19 | ORAMORPH SR 30MG TABLET 50S |
| 00054-4805-25 | ORAMORPH SR 30MG TABLET 100S (4 X 25) |
| 00054-4805-27 | ORAMORPH SR 30MG TABLET 250S |
| 00054-4792-25 | ORAMORPH SR 60MG TABLET 100S |
| 00054-4793-25 | ORAMORPH SR 100MG TABLET 100S |
| 00054-3751-44 | ROXANOL 20MG/ML SOLUTION 30ML |
| 00054-3751-50 | ROXANOL 20MG/ML SOLUTION 120ML |
| 00054-3751-58 | ROXANOL 100 20MG/ML SOLUTION 240ML |
| 00054-4658-25 | ROXICODONE 15MG TABLET 100S (4 X 25) |
| 00054-4665-25 | ROXICODONE 30MG TABLET 100S (4 X 25) |

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 00054-3805-63 | SODIUM POLYSTYRENE O/S 15G/60ML 500 ML |
| 00054-8816-11 | SODIUM POLYSTYRENE O/S 15G/60ML 60 ML 10S UD |
| 00054-8402-11 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 25S |
| 00054-8402-13 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 30S |
| 00054-8402-21 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 60S |

### SCHEDULE 2:  SUBJECT HCPCS CODES

| HCPCS CODE | DRUG DESCRIPTION |
|---|---|
| J3535 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| J7611, J7618, J7625 | ALBUTEROL SULFATE .5% (STERILE) 20ML MD |
| J7620, K0505 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 25, 2.5 MG/3ML |
| J7613, J7619 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 30, 2.5 MG/3ML; ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 60, 2.5 MG/3ML |
| J7631, J7630; K0503; K0511 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 120S; CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 60S |
| J7644, J7645, K0518 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 30S; IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 60S; IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 25S |
| J7500, K0119 | AZATHIOPRINE USP 50MG TABLET 100S (10 X 10) |