# EXHIBIT 6

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,           )
                            )
         Plaintiff,         )
                            )
v.                          )    Civil Action No. 2005-219
                            )
ABBOTT LABORATORIES, INC., et al., )
                            )
         Defendants.        )
                            )

### AFFIDAVIT OF GSK VICE PRESIDENT DAVID A. MOULES

David A. Moules, being duly sworn, deposes and says:

1.  I am Vice President, Strategic Pricing, Contracting and Marketing, for SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK"), Three Franklin Plaza, Philadelphia, PA 19101. In this capacity, and through review of documents produced in this litigation, I have become familiar with the matters set forth below.

2.  During my tenure at GSK (and before), GSK and its multiple corporate predecessors have sold a wide variety of prescription pharmaceuticals, and have employed a variety of price discounting practices, list price reporting methods, and marketing strategies.

3.  The U.S. operating entities of Glaxo Wellcome, Inc. ("GW") and SmithKline Beecham Corporation ("SB") merged in early 2001 to form GSK. GSK and its

corporate predecessors set, and periodically changed, the "list price" for the company's pharmaceuticals. The names used for these list prices have varied over time.

4. Prior to the merger that formed GSK in early 2001, Glaxo Wellcome, Inc. ("GW") reported a "Net Wholesale Price" ("NWP") for its pharmaceuticals, which was generally published by the pricing publications as the "Wholesale Acquisition Cost" ("WAC") or its equivalent. Prior to 2002, the pricing publications typically also published an AWP for GW products that was 1.20 times the NWP that GW reported. On a few occasions in the mid-1990s, GW also reported an AWP along with an NWP.

5. Prior to the merger that formed GSK in early 2001, SmithKline Beecham ("SB") reported a "Wholesaler Purchase Price" ("WPP"), which was generally published by the pricing publications as WAC (or its equivalent). SB also reported a "Suggested List Price" ("SLP"). The amount of the SLP was typically 1.25 times the WPP. Prior to 2002, the pricing publications generally published an AWP for SB products that was 1.25 times the WPP that SB reported.

6. Since shortly after the merger that formed GSK in 2001, GSK has reported a WAC for all of its prescription pharmaceuticals. GSK has specifically defined its reported "WAC" in its pricing communications as "The listed price to wholesalers and warehousing chains, not including prompt pay, stocking or distribution allowances, or other discounts, rebates, or chargebacks. Listed prices may not represent prices charged to other customers, including specialty distributors."

7. The AWPs that have been published for GSK products since 2002 differ between commercial price reporting publications. Redbook, for example, now generally

2

publishes an AWP for GSK products that is 1.20 times GSK's reported WAC, whereas First DataBank now generally publishes an AWP for GSK products that is 1.25 times GSK's reported WAC. These differing decisions concerning what AWPs to publish for GSK products, and what ratio should be applied to the WACs reported by GSK in order to derive the published AWPs, were made by the price reporting services, not by GSK.

8. GSK is a major researched-based "brand name" pharmaceutical manufacturer. Now, and historically, GSK (and its predecessors) have sold a variety of prescription pharmaceuticals. I have recently reviewed the Affidavit of Gregory K. Bell, Ph.D. in the above-captioned case, who has set forth six categories of drug types. Of those six categories, GSK has sold a significant volume of five of them, namely: (1) Single-source (brand-name) self-administered drugs sold primarily through pharmacies, and that do not have direct therapeutic competition, (2) Single-source (brand-name) self-administered drugs sold primarily through pharmacies, and that do have direct therapeutic competition; (3) Multi-source self-administered drugs sold primarily through pharmacies, which were launched as GSK brand-name products but lost patent protection; (4) Single-source (brand-name) drugs sold to and administered in physician clinics, and which have no direct therapeutic competition; and (5) Single-source (brand-name) drugs sold to and administered in physician clinics, and which do have direct therapeutic competition. Below I provide examples of GSK drugs that fall within each of these categories and discuss discounting practices for such drugs within the relevant markets, as well as GSK's list price reporting for such products and my understanding of Alabama Medicaid's reimbursement standards for such drugs.

3

9. GSK (and its predecessors) have developed, manufactured and sold a significant number of single-source (brand-name) self-administered drugs sold primarily through pharmacies, both with and without direct therapeutic competition (namely, drugs falling within the first two categories set forth in paragraph 8 above). Because neither GSK's discounting practices or list price reporting methods, nor the relevant Alabama Medicaid reimbursement standards for these types of products, have turned on whether there was therapeutic competition for them or not, I will discuss these first two categories of drugs together.

10. Examples of significant GSK products within these first two categories include Advair® (a respiratory product developed by GW), Imitrex® (a GW-developed product which treats migraines) Avandia® (an SB-developed product that treats diabetes) and Coreg® (an SB-developed cardiovascular product). All of these products have been (and still are) sold to the retail pharmacy market (primarily through major wholesalers) at WAC, minus the standard 2% prompt-payment discount, with little, if any, additional discounting to wholesalers or pharmacies. Since early 2001, GSK has reported the WAC list price for these products to the commercial price reporting services, along with the WAC definition described in paragraph 6 above. Prior to 2001, GW reported NWP (a WAC equivalent) for Advair and Imitrex, and SB reported WPP (a WAC equivalent), along with a "Suggested List Price," for Avandia and Coreg. These products were generally not marketed to retail pharmacies, because pharmacists did not make the prescribing decisions. It is my understanding that Alabama Medicaid has reimbursed for these products based on a formula that relied on the WACs reported by one of the commercial price reporting services (plus a certain percentage mark-up), which were generally the same as the WACs (or WAC equivalents) reported to those services by GSK.

4

11. GSK has also manufactured and sold products in the third category identified in paragraph 8 above -- namely, multi-source self-administered drugs sold primarily through pharmacies. GSK is not a "generic" manufacturer, but it has often sold products which were launched as GSK brand-name products but lost their patent protection and therefore became "multi source" products subject to generic competition. Examples of such products are certain formulations of Wellbutrin® (an anti-depressant) and Ventolin® (a respiratory product). For these products, GSK continued after their patents expired to sell them to the retail pharmacy market (primarily through major wholesalers) at WAC (minus the standard 2% prompt-payment discount), with little, if any, additional discounting to wholesalers or pharmacies -- even though generic competitors sold chemically equivalent products for substantially less. In contrast, certain formulations of one other GSK multi-source product of which I am aware, namely Amoxil, were discounted to the retail pharmacy market below WAC in order to compete with other amoxicillin products. For all three of these multi-source products, since early 2001 GSK has reported the WAC list price to the commercial price reporting services, along with the WAC definition described in paragraph 6 above. Prior to 2001, GW reported an NWP (a WAC equivalent) for Wellbutrin and Ventolin, and SB reported a WPP (a WAC equivalent) and a "Suggested List Price" for Amoxil. With respect to Alabama Medicaid reimbursement, it is my understanding that Alabama Medicaid has reimbursed for multi source products (whether sold at near WAC or substantially below WAC) based on a list of "Maximum Allowable Costs" ("MACs") that the program developed for such products.

12. In addition, GSK has made and sold drugs in the fourth category described above – namely, single-source (brand-name) drugs sold to and administered in physician clinics,

5

and which have no direct therapeutic competition. One example is Hycamtin®, an injectable chemotherapy product. Hycamtin is sold in the physician clinic market at or near WAC (with a customary 2% prompt-payment discount). GSK reported the WAC list price for Hycamtin to the commercial price reporting services, along with the WAC definition described in paragraph 6 above. It is my understanding that Alabama Medicaid has reimbursed for all single-source physician-administered products (whether subject to therapeutic competition or not) based on a formula that relied on the WACs reported by one of the commercial price reporting services (plus a certain percentage mark-up), which were generally the same as the WACs (or WAC equivalents) reported to those services by GSK.

13. Finally, GSK has sold drugs in the fifth category described above -- namely, single-source (brand-name) drugs sold to and administered in physician clinics, and which *have* direct therapeutic competition. Zofran® and Kytril® (in their injectable forms) fall into this fifth category. Zofran, an anti-emetic that treats nausea associated with chemotherapy, was developed by GW and has been sold in the clinic/physician market since the early 1990's. Kytril, also an anti-emetic, was developed and sold by SB in the clinic/physician market until it was divested in connection with the merger that formed GSK. Both products (unlike Hycamtin) have been sold in this market at discounts well below WAC. With respect to Zofran, GW reported the NWP (WAC equivalent) to the commercial reporting services and GSK reported the WAC list price, along with the WAC definition described in paragraph 6 above. With respect to Kytril, SB reported the WPP (WAC equivalent) and the "Suggested List Price" to the commercial price reporting services prior to its divestiture.

6

_David A. Moules_ (signature)
David A. Moules

Sworn before me this 25TH day
of September, 2006

_Lorraine M. Englert_ (signature)
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LORRAINE M. ENGLERT, Notary Public
City of Philadelphia, Phila. County
My Commission Expires January 21, 2010

7