## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No.1456 ) ) ) Master File No. 01-CV-12257-PBS ) Subcategory Case No. 06-11337-PBS |
| THIS DOCUMENT RELATES TO: *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al.*, Civil Action No. 07-10248-PBS | ) ) Judge Patti B. Saris ) ) Magistrate Judge Marianne B. Bowler ) ) |

### ROXANE'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR A PROTECTIVE ORDER RELATING TO ROXANE'S RULE 30(B)(6) REQUEST

Three months after Roxane served its initial request for Rule 30(b)(6) testimony from CMS Regional Offices, the Government now refuses to provide *any* testimony on *any* of the topics requested by Roxane, despite the plain relevance of such testimony to this case. Prior to 2002, the Regional Offices had exclusive authority for reviewing and approving State Health Plans ("Plans"), which are documents that states must submit to CMS outlining their proposed payment methodology for prescription drugs under the Medicaid program. CMS's review and approval of these payment formulas are a prerequisite for obtaining federal funds. Thus, for the majority of the time period at issue here, the Regional Offices – not the CMS Central Office – had primary responsibility for determining whether the states' proposed payment methodologies were indeed their "best estimate" of acquisition cost. Moreover, even today, the Regional Offices remain the front-line for communications between state Medicaid programs and the federal government on issues related to prescription drug payments.

Because there has been no discovery of Regional Office personnel to-date, Roxane served a timely Rule 30(b)(6) deposition notice more than three months ago seeking such discovery. *See* Ex. A. Roxane primarily requested testimony pertaining to the procedures and criteria that Regional Offices used to conduct reviews and approvals of state payment formulas. The Government, in response, flatly refuses to provide testimony on *any* topic requested by Roxane – irrespective of Roxane's willingness to clarify or narrow topics. Moreover, the Government provides no justifiable basis for this blanket refusal. Instead, it asserts a series of scattershot (and wholly unsupported) arguments that are frivolous and without support in the testimony to-date.

The Government initially provides an incredible argument that the testimony requested by Roxane is "irrelevant" because Regional Offices purportedly do not create "policy." Roxane's request, however, is not limited to issues of "policy," much less the excessively narrow definition that the Government imposes on that term. Instead, Roxane's request seeks testimony on the "criteria," "procedures," and "basis" upon which the Regional Offices reviewed and approved Plans. *See, e.g.,* Ex. A at Topics Nos. 5 & 6. In other words, Roxane is seeking discovery on the actual practices and procedures implemented by Regional Offices during the pertinent time period. There should be no dispute that Roxane is entitled to this testimony and, aside from its formalistic misreading of Roxane's request, the Government provides no reasonable basis for its wholesale refusal here.

The Government also raises an unsupported argument that the testimony Roxane seeks is duplicative of prior testimony. This is a perplexing contention given that there have been no depositions of any Regional Office personnel in this litigation. The Government ignores this and instead mentions the prior testimony of Larry Reed – but provides no citation to any of his

testimony.  Contrary to the Government's contention, Mr. Reed did not – and could not – testify about the practices and procedures of the Regional Offices because he worked only at the CMS Central Office.  As a result, he forthrightly conceded that Regional Offices personnel would be the best source of this information.  Indeed, Roxane's Rule 30(b)(6) request was a direct result of Mr. Reed's testimony in this case.

Finally, Roxane seeks limited testimony on the document preservation and collection efforts conducted by the CMS Regional Offices in response to Roxane's requests for documents. The productions from the Regional Offices in this case appear to be woefully inadequate, lacking many key documents and nearly devoid of emails and other electronic documents.   The Government does – and cannot – argue that such topics are irrelevant, but instead points to unspecified prior testimony that does not address the topics raised by Roxane here.   This unsupported claim should also be denied.

## BACKGROUND

### A.     Discovery In This Case Highlights The Key Role of Regional Offices In Reviewing and Approving Medicaid Payment Methodologies.

To be eligible for federal funds, each state Medicaid program is required to submit its proposed payment methodology for prescription drugs as part of its Plan, which is sent to CMS (formerly HCFA) for review and approval.  *See* Ex. B at 1529-37 (L. Reed 10/22/08 Dep.)  CMS must review the state's proposed methodology and determine whether it in fact represents the state's best estimate of acquisition cost, as well as whether the proposed methodology will meet the statutory access requirements for beneficiaries.   In addition, states are required to provide findings and assurances that their payment methodologies are in accordance with federal mandates.  *See id.*  Only after such review and approval may federal funds be disbursed to the state's Medicaid program.

Testimony in this case has revealed that different CMS offices had primary responsibility for reviewing and approving state plans, depending on the time period.  Prior to 2002, the ten Regional Offices (which are located in different geographic regions)[1] served this function.  *See* Ex. C. at 556, 562-64 (L. Reed 9/27/07 Dep.)  Because of inconsistent review and approval practices by the Regional Offices, CMS removed primary responsibility for reviewing and approving states' proposed payment methodologies from the Regional Offices in 2002 and shifted that responsibility to the Central Office (located in Baltimore). *Id.*  Nonetheless, even today, the Regional Offices remain the front-line for communications between the CMS and state Medicaid programs.  *See* Ex. D. at 890-94 (L. Reed 3/18/08 Dep.)

To-date, there have been no depositions of Regional Offices in the DOJ cases, nor has there been any testimony pertaining to the details of how Regional Offices actually reviewed and made determinations on whether to approve states' payment methodologies.  The sole testimony regarding CMS review of Plans has been from CMS Central Office employees, and their testimony has focused on the 2002-onward time period, after the review and approval process shifted from the Regional Offices to the Central Office.

**B.  Roxane's Rule 30(b)(6) Request For Regional Office Testimony**

Because no testimony had yet been taken of Regional Offices, on August 13, 2008, Roxane notified the Government by letter that it was seeking 30(b)(6) testimony regarding 17 topics.  *See* Ex. A.  These topics can be grouped into two categories.  The first category (Topics 1 through 4) pertains to document and electronic data retention and collection practices at the Regional Offices, and with particularity regarding the filing and storage of communications related to Plans, as well as efforts to collect and produce documents responsive to Roxane's

---

[1]    Each of the Regional Offices covered a distinct geographic area and was responsible for reviewing Plans for states within this area.

requests for production in this case.   The second category of topics (Topics 5 through 17) focused on the Regional Offices' Plan review process.   Specifically, Roxane requested testimony pertaining to the Regional Offices' "criteria, policies, and procedures" for reviewing and approving (or recommending disapproval of) Plans.  (Topic 5).  Roxane also requested testimony regarding the Regional Offices reviews and evaluations of Plan Amendments that sought to change the payment methodology for prescription drugs and the basis for which such Plan Amendments were approved or denied. (Topic 6).

After repeated requests from Roxane, the parties had a meet and confer approximately one month after Roxane served its Rule 30(b)(6) notice.   In response to the Government's concerns about the breadth of the topics and the fact that, according to the Government, the Regional Offices do not make "policy," Roxane responded that it was primarily interested in testimony responsive to Topic No. 6, which went to the actual practices and procedures that the Regional Offices employed in reviewing Plans.   Roxane clarified that its focus was on the Regional Offices' *application* of any criteria or policies, irrespective of which entity created them.  The Government responded that it would consult with internal CMS counsel to consider which (if any) witnesses might be appropriate.   The Government never proffered any witnesses on any of Roxane's topics, nor did it propose a narrowing of topics.   Instead, in mid-October (approximately two months after Roxane served its request), the Government informed Roxane that it refused to produce witnesses on any of the requested topics.

## ARGUMENT

### A.    The Government's Contention That Regional Office Testimony Is Irrelevant Is Frivolous And Should Be Rejected.

The testimony to-date reveals that up until 2002, the Regional Offices – not the CMS Central Office – had primary responsibility for determining whether states' proposed Medicaid

payment methodologies for prescription drugs should be approved.  Thus, during a majority of the pertinent time period in this case, the Regional Offices were the gatekeepers for determining whether the various Medicaid programs were eligible for the federal funds of which the Government now seeks partial recovery from Roxane.  In addition, the Regional Offices had the responsibility to determine whether states complied with the statutory mandate to provide "findings and assurances" that their aggregate payments for prescription drugs were in accordance with federal mandates.

During the pertinent time period of this case, numerous states proposed revisions to their payment methodologies that were approved by Regional Offices.   In most instances, the states proposed relatively minor adjustments to their payment formulas (*e.g.*, changing from AWP-10% to AWP-12%), even in the face of widespread reports from the OIG (and other entities) that average discounts off of AWP for generic drugs were substantially in excess of the states' proposed formula.  In virtually every instance, the Regional Offices (and later the CMS Central Office) approved each state's proposed methodology, apparently with few (if any) firm requirements that each state demonstrate that its proposed methodology was in fact its "best" estimate of acquisition cost.  *See, e.g.,* Ex. D at 882-93, 904-11.  Moreover, throughout the pertinent time period, Regional Offices routinely approved payment methodologies that varied widely from state to state, with some states paying significantly more for drugs than other states. Indeed, even today, the large majority of states continue to base payment methodologies on published AWPs prices, including many states involved in AWP litigation.  *See* Ex. E (chart of state Medicaid payment formulas).

All of these facts are fundamentally at odds with the Government's theory that it was defrauded into believing that published AWPs and WACs were actual average acquisition costs.

Thus, there should be no dispute that Roxane is entitled to discovery to understand the practices and procedures implemented by Regional Offices that allowed such discrepant payment methodologies to coexist.  Roxane is also entitled to discover the true reasons why Regional Offices continued to allow states to pay more than actual acquisition cost for prescription drugs. Furthermore, given the relative paucity of documents produced by either state Medicaid programs or the Regional Offices, this testimony is likely the best (if not the only) vehicle for Roxane to determine what the Regional Offices actually considered when they reviewed the Plans submitted by the various Medicaid agencies, and what they believed with respect to published AWPs and WACs when they approved the state Plans.

The Government, however, contends that this testimony is "irrelevant" because "Regional Offices do not make policies or have their own official interpretations of laws or regulations."  This is a flagrant misreading of Roxane's requested topics.  Specifically, Roxane's requests are not limited to official CMS "policies," much less to the narrow definition of policies that the Government selectively imports into Roxane's requests.  Instead, Roxane requested testimony about the "criteria" or "procedures" the Regional Offices used for approving or disapproving state Medicaid payment methodologies for prescription drugs.  *See, e.g.,* Ex. A. at Topic Nos. 5 & 6.  Significantly, the Government entirely ignores Roxane's Request No. 6, which asks nothing of policies, but instead requests testimony of Regional Offices' reviews and evaluations of any state's proposed changes to payment formulas for prescription drugs.  *See id.* at Topic No. 6.  Moreover, Roxane's counsel repeatedly clarified during the meet-and-confer with Government counsel that the *crux* of its request was to obtain testimony on how Regional Offices' *applied* any formal (or informal) policies for approving or disapproving proposed changes to Medicaid payment methodologies.

The Government's formalistic misreading of Roxane's request is insufficient to allow it to avoid *all* testimony on the various topics listed by Roxane. The Government cannot credibly contend that all testimony requested in Roxane's request is irrelevant, and it appears that the Government's motion is nothing more than a transparent attempt to prevent or delay Roxane's ability to obtain permissible discovery. Accordingly, it should be denied.

**B.    The Government's Unsupported Claim That Roxane's Request Is Duplicative Is Directly Contradicted By The Testimony In This Case.**

The Government also provides an unsupported argument that Roxane's request is duplicative because the Government has previously produced Larry Reed, who, according to the Government, "testified exhaustively about CMS' Medicaid payment policies and the review or approval of state plans or plan amendments." Gov. Mem. at 9. As an initial matter, the Government's argument should be rejected outright because it fails to cite any testimony in its memorandum to support its argument, nor does it even attach a portion of Mr. Reed's deposition transcript. Instead, the Government asks the Court to simply accept its bald assertion without proving *any* support. The Government must do much more than that to avail itself of a broad protective order that would eliminate any discovery of Regional Offices in this litigation.

In any event, the Government misstates the nature of Mr. Reed's testimony with respect to Roxane's request for Regional Office discovery. Specifically, Mr. Reed did not – and could not – testify in any detail about the Regional Offices' review and approval of Plans because his involvement in the review process was solely at the Central Office level. Indeed, Roxane issued its Rule 30(b)(6) request for Regional Office testimony precisely because Mr. Reed repeatedly testified that he could not testify with specificity or personal knowledge about what the Regional Offices did when reviewing and approving state plans. Not only did he forthrightly acknowledge that he had limited (if any) knowledge of the Regional Offices' actual practices and procedures

in reviewing Plans, but he also admitted that he knew nothing about their practices in requiring states to submit "findings and assurances" that their payment policies were in accordance with federal mandates.

For instance, the following colloquy illustrates Mr. Reed's limited knowledge about Regional Office review during the pre-2002 time period when these offices had primary responsibility for reviewing Plans:

Q: Well, again, prior to 2002, would it be your expectation that the regional office staff would be in contact to make sure that they had the type of supporting documentation necessary to support a plan change?

A: My expectation at that point, that *the regional office would have had authority for a state plan.  So how they would decide to view that documentation would be a different chain of command.*

Q: Well, within HCFA at the time wasn't there any kind of – would they expect to observe any kind of standards or anything about whether to approve these plans? Were they allowed to do whatever they wanted or was there some kind of uniform criteria?

A: I think your question was what was my expectation.  And my expectation would – *I guess I didn't have an expectation at that point because they were approved in the region.*  Certainly the regulations that were in existence were there and the region would act under those regulations.

Q:  So prior to 2002 a regional office could approve that plan without looking at anything?

A: *I guess what I'm saying is I don't know what documentation they looked at prior to 2002.*

Q: And my question is – I understand you don't actually know what they did in each regional office before 2002.  My understanding, though, is – just as a matter of prudence, general practice within CMS, was it your expectation that in fact that the regional offices would ask for some kind of documentation to support the plan changes?

A: And again, I can say what I did and I can say what my staff did or the persons I oversaw.  *I don't know exactly what the regions looked at for that time period.*

Q: Did your office prior to 2002 exercise any kind of oversight at all of the regional offices when it came to approving plans?

A: ***We didn't have direct oversight of the regional offices and we still don't have that oversight***.  We would look – we would assist the region if they have questions or there were a request for additional information.

*See* Ex. D at 892-894 (L. Reed 3/18/08 Dep.) (emphasis added).

Mr. Reed has similarly little to offer with respect to the Regional Offices' role in acquiring the types of "findings and assurances" that states were required to provide to CMS to certify that their prescription drug payments were within federal mandates.  For instance, the following colloquy illustrates the paucity of Mr. Reed's knowledge on this topic:

Q: Do you recall states raising concerns that they lacked guidance on the findings and assurances that they were to make?

A: Again, for this time period [pre-2002], these would have been finding and assurances that the regional offices would have been responsible for and would have been dealing with directly with the states.  Within that understanding, I don't recall any specific state complaints about that.  I just don't know if there were any or not.

Q: Are you familiar with what assurances would come in from the states in your position?

A: You mean these types of assurances?

Q: Yes.  Was that handled by the regional office?

A: For the most part, I believe – and again, I'm speaking for CMS.  So as speaking for CMS, while I may not personally have been aware of them, those would normally have been handled by the regional office.

Q: Do you know if state agencies are providing those assurances as called for by the regulations today?

A: I don't have personal knowledge of that, no.  I don't know.

Q: That's not – the issue, is it fair to say, Mr. Reed, that the findings and assurance subject is something upon which the central office was not involved?

A: For this period I think that, again, the central office would have normally not seen these findings and assurances.  They would have been handled by the RO, the regional office.

*See* Ex. F at 109-110 (L. Reed 3/19/08 Dep.)

Thus, the Government's argument that Roxane's requests are duplicative of Mr. Reed's testimony is perplexing, given that Mr. Reed repeatedly conceded that he could not testify about Regional Office practices generally, and certainly not in the pre-2002 time period.  No one from a Regional Office has been deposed in this litigation to-date, and therefore the Government's repeated invocation of "duplicative" testimony is equally puzzling given the discovery record. The Government does not – and cannot – contend that Roxane's discovery of Regional Offices is limited to whatever particular period with which Mr. Reed happens to have familiarity.[2]  Nor can the Government contend that Regional Office practices in the pre-2002 time period are irrelevant.  After all, the Government is seeking hundreds of millions of dollars from Roxane based upon Plans that were reviewed and approved by the Regional Offices in the 1996-2002 time period.  Accordingly, the Government's unsupported argument that Roxane's request is duplicative of prior testimony is frivolous and should be rejected.

### C.  The Government's Claim Of Undue Burden Is Unsupported And Should Be Rejected.

The Government also makes several passing references to the presumed burden entailed by Roxane's request, but provides no specific facts to support its claim of undue burden.  This is fatal to the Government's request for relief.  Although this Court has broad discretion in determining whether to grant a request for a protective order, *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 532 (1st Cir. 1993), the moving party carries the burden of first establishing "good cause" and "undue burden."  Fed. R. Civ. P. 26(c)(1).  To establish "good cause" under Rule 26(c)(1), "courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements."  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16

---

[2]    The Government also alludes to the testimony of Don Thompson in its brief.  But as with Mr. Reed, the Government fails to provide any citation to his testimony, and Roxane cannot locate any testimony from Mr. Thompson pertaining to Regional Office review of Plans.

(1981) (internal citations and quotations omitted).  Thus, "[s]uch an order is appropriate only where there has been a showing of a particularized need for protection." *St. Croix Renaissance Group, LLLP v. St. Croix Alumina, LLC*, No. 2004-CV-0067, 2008 WL 4365926, at *2 (D. Virgin Islands Sept. 17, 2008) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 788 (3d Cir. 1994)); *see also Berwind Prop. Group Inc. v. Envtl. Mgmt. Group, Inc.*, 233 F.R.D. 62, 65-66 (D. Mass. 2005) (finding claim of undue burden was "unsupported and therefore unpersuasive" where defendant failed to provide "affidavits or other evidence" to substantiate claimed burden of reviewing "thousands of files, located in archives nationwide, going back 6 to 9 years"); *Littman v. Walgreen Eastern Co.*, No. 96-30018, 1998 WL 812399, *2 (D. Mass. Nov. 6, 1998) (denying protective order where plaintiff failed to providing an affidavit or explanation supporting claims and therefore failed to "adequately demonstrate[] undue burden or expense").

Here, the Government makes no genuine effort to show particularized facts demonstrating undue burden – it does not provide an affidavit or any other evidence (or even argument) to support its bare assertions of burden.  It appears that the Government's primary complaint is that it would require substantial effort to interview past and present witnesses at the Regional Offices as well as review documents to prepare witnesses.  But this is no different than the discovery burdens that *every* party in large-scale litigation (including Roxane) must shoulder, and it certainly is not a sufficient argument to evade the requirements of Rule 30(b)(6) testimony. Courts widely acknowledge that the obligations of Rule 30(b)(6) are demanding and the "law is well-established that a 30(b)(6) deponent does have an affirmative obligation to educate himself as to the matters regarding the corporation." *Calzaturficio S.C.A.R.P.A. s.p.a. v. Fabiano Shoe Co.,* 201 F.R.D. 33, 36 (D. Mass. 2001).  In response to a request for testimony by the discovering party that is "sought with reasonable particularity," *AG-Innovations, Inc. v. United*

*States*, 82 Fed. Cl. 69, 81 (May 30, 2008), a responding party has an obligation to fully prepare its selected deponents.   This preparation necessarily requires review of prior deposition testimony, documents, deposition exhibits, conferring with past employees, and using other resources as necessary.  *See, e.g., Calzaturficio*, 201 F.R.D. at 37; *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 639 (D. Minn. 2000); *Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 60 (D. Mass 2005).  The responding party's obligation applies "[e]ven if the documents are voluminous and the review of those documents would be burdensome."   *Calzaturficio*, 201 F.R.D.at 37; *see also Prokosch*, 193 F.R.D. at 639 ("the burden upon the responding party, to prepare a knowledgeable Rule 30(b)(6) witness, may be an onerous one, but we are not aware of any less onerous means of assuring that the position of a corporation, that is involved in litigation, can be fully and fairly explored."); *AG-Innovations, Inc.*, 82 Fed. Cl. at 81 (noting that the preparation required for a Rule 30(b)(6) deposition "can be burdensome").

Nor is the Government's claim that a Rule 30(b)(6) deposition of Regional Offices might require multiple witnesses a cognizable basis to avoid Rule 30(b)(6) testimony.  The law requires a party to prepare and produce as many witnesses as necessary to cover the pertinent topics during the relevant time period, and thus the Government has no basis for protection here.  *See, e.g., Great American Ins. Co. of New York v. Vegas Const. Co.,* 251 F.R.D. 534, 538-39 (D. Nev. 2008) ("The designating party has a duty to designate more than one deponent if necessary to respond to relevant areas of inquiry on the noticed topics."); *Starlight International, Inc. v. Herlihy*, 186 F.R.D. 626, 638 (D. Kan. 1999) (responding party must produce "such number of persons as will satisfy the request").  And given that Roxane's request specifically targets the relatively few instances where states submitted proposed changes to their payment methodologies for prescription drugs, the potential number of documents and witnesses

presumably do not present an insurmountable obstacle.  In any event, the Government certainly does not make a sufficient showing to demonstrate otherwise.

Moreover, the equities strongly favor Roxane under these circumstances.  The Government chose to bring claims against Roxane seeking hundreds of millions of dollars based on submissions to the Medicaid program reaching back to 1996.  Although this complaint was initially filed over eight-and-a-half years ago (in April 2000), the Government affirmatively chose to keep it under seal for nearly seven years.  As a result, any grievance the Government now raises regarding its burdens in providing testimony about events that occurred years ago are the result of its own dilatory conduct – not Roxane's.  Had the Government elected to unseal the complaint against Roxane at a point closer to April 2000, it is likely that many of the pertinent witnesses would have been readily available.  Roxane should not be precluded from obtaining crucial testimony merely because of the Government's unreasonable delay in this case.

Finally, the Government also argues that Roxane can obtain the equivalent of testimony by reviewing the documents produced by the Government.  This, of course, is not a meaningful substitution for Rule 30(b)(6) testimony.  As an initial matter, as described more fully below, the Government's Regional Office document production appears to be seriously deficient.  That is partly the reason that Roxane requires deposition testimony here.  In addition, the Government does not cite any authority for the proposition that production of documents forecloses depositions that address issues raised by such documents.  Indeed, the Government's position here would turn the logical sequence of discovery on its head.  Depositions are an essential discovery tool – *particularly* under these circumstances, where the Government has produced few pertinent documents on the subject matter.  Because the Government provides no principled justification for eviscerating Roxane's discovery rights, its motion should be denied.

**D.    The Government Must Produce a Witness Regarding Regional Office Document Preservation and Collection Efforts.**

Roxane's Rule 30(b)(6) request also seeks testimony regarding the document preservation and collection efforts by Regional Offices in response to Roxane's requests for production.  Roxane also seeks testimony about the general filing and storage policies at the Regional Offices specifically related to Plan review so that it can terminate the types of documents that it believes are missing from the Government's production.  The Government has refused to produce a witness on *any* of these topics.  Rather than providing – as it must – detailed citations to prior testimony to show that these specific topics have already been covered, the Government instead simply alludes generally to testimony taken in the DOJ-Abbott case on different topics and many months before Regional Office productions even occurred.

Although the Government generally points to the depositions of Joseph Bryant and Victoria Robey, neither of these deponents addressed the topics that Roxane requested.  For instance, Mr. Bryant was unable to testify in any detail about the search, collection, and production efforts of the Regional Offices because those searches were still ongoing when Mr. Bryant was deposed over one year ago.  *See* Ex. G at 117 (J. Bryant 11/15/07 Dep.) (Government counsel noting that "[t]here's a search ongoing with respect to state plan amendments.")  In addition, Mr. Bryant was unprepared to testify even about those ongoing efforts.  *See id.* at 122 ("I cannot specifically tell you which [regional office] documents were produced at that time.")  Moreover, Government counsel indicated that contact personnel at the Regional Offices – not Mr. Bryant – had knowledge of the searches at the regional offices.  *See id.* at 125-26 (noting that "each regional office has a contact person . . . that  . . . would have been responsible for what was happening with respect to the searches at the regional offices").  Nor did Ms. Robey testify in any fashion about the Regional Offices' document preservation and collection efforts.  In

addition, the Government's Regional Office document productions continued through the summer of 2008, whereas Ms. Robey and Mr. Bryant were deposed in March and November 2007, respectively.  As a result, they could not have testified about collections and productions that occurred many months (or more than one year) after their depositions.

Once again, the Government is pointing to thin air in its claim that prior deponents have addressed the topics requested by Roxane.  As Roxane noted in its meet-and-confer with the Government, it specifically chose the topics enumerated in Exhibit A because prior deponents to-date had *not* been able to testify on these topics.  The Government continues to ignore this and instead impermissibly seeks to circumvent its discovery obligations.  Because the Government concedes (as it must) that Roxane is entitled to testimony on these issues, and because it has made no showing that prior testimony adequately addressed Roxane's requested topics, it should be required to produce a responsive Rule 30(b)(6) witness.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Roxane respectfully requests that the Government's motion be denied in its entirety.

Date:   November 25, 2008                    Respectfully submitted,


                                          _____/s/ Eric T. Gortner
                                          Helen E. Witt, P.C.
                                          Anne M. Sidrys, P.C.
                                          Eric T. Gortner
                                          Jared T. Heck
                                          KIRKLAND & ELLIS LLP
                                          200 East Randolph Drive
                                          Chicago, IL 60601
                                          Telephone: (312) 861-2000
                                          Facsimile: (312) 861-2200
                                          egortner@kirkland.com

                                          *On behalf of Defendants Boehringer Ingelheim
                                          Corp., Boehringer Ingelheim Pharmaceuticals,
                                          Inc., Boehringer Ingelheim Roxane, Inc., and
                                          Roxane Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on November 25th, 2008, a copy to LexisNexis File and Serve for posting and notification to all parties.

<div style="text-align: center; margin-left: 40%;">

_____/s/ Eric T. Gortner
Eric T. Gortner

</div>