# EXHIBIT B

1391

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x

IN RE:  PHARMACEUTICAL         :   MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE     :   CIVIL ACTION

PRICE LITIGATION               :   01-CV-12257-PBS

THIS DOCUMENT RELATES TO:      :

U.S. ex rel. Ven-a-Care of     :   Hon.  Patti B. Saris

the Florida Keys, Inc.         :

    v.                         :

Dey, Inc., et al.              :

No. 05-11084-PBS               :

- - - - - - - - - - - - - - - -x

(CROSS NOTICED CAPTIONS ON FOLLOWING PAGES)

Washington, D.C.

Wednesday, October 22, 2008

VOLUME VI


Videotaped Deposition of LARRY REED

1529

```
 1      Q.    What is the basis for your statement that
 2   you did work in this area, CMS did work in this area?
 3            MR. DRAYCOTT:  Objection.
 4            THE WITNESS:  I think this would be
 5   something that we could look at.  I don't think I did
 6   -- I said it's something we did look at specifically.
 7            BY MR. MERKL:
 8      Q.    Are you aware of whether anyone at CMS
 9   began work on studying how to safeguard against
10   manipulation of AWPs to maximize or minimize rebates?
11      A.    No, I'm not.
12      Q.    Are you aware of whether anyone at CMS did
13   any work to verify the accuracy of AWPs sometime
14   around 1998?
15      A.    Not that I recall.
16      Q.    Now, CMS periodically reviews state
17   amendments, is that correct?
18      A.    State plan amendments?
19      Q.    Yes.
20      A.    That's correct.
21      Q.    And the state must submit to CMS
22   supporting documentation for their requested changes
```

                                                                 1530

1   to their state Medicaid plans, is that correct?
2        A.   **Within the terms of the regulation.**
3   **That's correct.**
4        Q.   How is that material transmitted today to
5   CMS?  Is it electronic or hard copy?
6        A.   **We don't -- we don't get it directly.  The**
7   **regional offices get it directly from the states, if**
8   **I -- if I remember correctly.  So I don't know how**
9   **it's transmitted.  I just don't know.**
10       Q.   How is it transmitted from the regional
11  office to the central office?
12       A.   **There is another office there,**
13  **unfortunately, that gets it directly, so I don't -- I**
14  **don't know, I just don't know how that comes in.**
15       Q.   When you review a state plan proposal, is
16  it something that you receive in electronic form?
17       A.   **When we get a state plan proposal, I**
18  **believe that we generally get it in a written**
19  **document.**
20       Q.   And do you maintain files with respect to
21  state plan amendments at CMS in your central office?
22       A.   **Some files are, there are some information**

1531

1  on the state plans that we review, but it could be
2  maintained elsewhere as well.
3      Q.  How do you maintain that information.  Is
4  it by state or by year?  Or by other means?
5      A.  I don't know.  It's maintained by
6  individual analysts.
7      Q.  Do you personally maintain any files
8  related to state plan amendments in your central
9  office?
10     A.  No.
11     Q.  And who are the analysts that work in the
12 central office.
13     A.  At the present time?
14     Q.  Yes.
15     A.  Kim Howell, Marge Watchorn, Gail Sexton,
16 Madelyn Kruh, Yolanda Reese, and I think there is
17 probably one or two I'm forgetting.
18     Q.  Have you had the occasion to review any of
19 their files as they are maintained by those analysts?
20     A.  Not their files.  No.  Not specifically.
21 No.
22     Q.  Now, since 2002, CMS's central office has

1532

1  had the ultimate approval and disapproval for the --
2  over state plan amendments, is that correct?
3       A.   **Since about mid-2002, it has the approval**
4  **authority.  The disapproval authority is not**
5  **within -- it's a different, different process.**
6       Q.   Since May 2002, can you say that again?
7       A.   **Since May 2002, CMSO has authority for**
8  **approval or -- I'm sorry, for approval of the state**
9  **plan amendments.  Disapproval is a separate**
10 **regulatory process.**
11      Q.   Now, if I wanted to see how a particular
12 state -- or excuse me, strike that.  If I wanted to
13 see what a state submitted as its supporting
14 documentation to change its definition of estimated
15 acquisition cost in 2003, would that information be
16 maintained at CMS's central office?
17      A.   **I don't know.  No.**
18      Q.   Would you expect that the analysts who are
19 responsible for those states would maintain the
20 supporting documentation as it relates to state plan
21 amendments?
22      A.   **I don't know whether that would be in the**

1533

1  central office or in the regional office.

2       Q.   But it is the requirement that a state

3  submit supporting documentation for whatever aspect

4  of their state Medicaid plan they intend to change,

5  is that correct?

6       **A.   It's a requirement that they do their best**

7  **estimate for the EAC, and provide for a reasonable**

8  **dispensing fee, and we would evaluate that based on**

9  **what was in the plan.**

10      Q.   And they are required to submit supporting

11 documentation, is that correct?

12      **A.   It would depend on the specific state**

13 **plan, what information was in the state plan and what**

14 **information might not be in the state plan, whether**

15 **we would look for supporting documentation.**

16      Q.   If a state wanted to change its definition

17 of estimated acquisition cost, is it required under

18 the regulations to submit to CMS supporting

19 documentation?

20      **A.   I don't -- I don't remember that part of**

21 **the regulation specifically.**

22      Q.   Mark this as Roxane Exhibit 120.

1534

1              (Exhibit Roxane 120 was
2              marked for identification.)
3         BY MR. REALE:
4         Q.   Mr. Reed, you've just been handed a
5    document.  This is a copy of the federal regulations
6    42 CFR 447.518.  Do you recognize this document?
7         **A.   Yes.**
8         Q.   Now, it states in subparagraph A of
9    447.518 that "the state plan must describe
10   comprehensively the agency's payment methodology for
11   prescription drugs."  Did I read that correctly?
12        **A.   It appears so.**
13        Q.   It also says in subparagraph B that "upon
14   proposing significant plan changes and payments for
15   prescription drugs, the agency must make the
16   following finding and assurances."  Is that correct,
17   that upon proposing significant plan changes and
18   payments for prescription drugs, an agency must make
19   certain findings?
20        **A.   That's a regulatory requirement listed
21   here.  Correct.**
22             MR. DRAYCOTT:  Just a continuing objection

1535

1  to the lack of a time frame stated in the questions.
2  I'd like that to apply to the previous questions and
3  any questions going forward.
4           BY MR. REALE:
5       Q.    Now, is it correct that an agency, a state
6  Medicaid agency must make assurances with data that a
7  change to its payment methodology is that agency's
8  best estimate?
9           MR. DRAYCOTT:  Objection.
10          BY MR. REALE:
11      Q.    Of estimated acquisition cost?
12      **A.    And I'm sorry.  Was your question upon a**
13  **change in state plan methodology?**
14      Q.    Yes.  Specifically to payment of
15  prescription drugs?
16      **A.    And I'm sorry.  Your question was on**
17  **supporting documentation again, or have I forgotten**
18  **it?**
19      Q.    I'm asking you specifically about this
20  regulatory requirement.  What I'm asking you is, it's
21  correct, isn't it, that the agency must make
22  assurances satisfactory to CMS that the requirements

1536

1  set forth in the two previous paragraphs are met, is
2  that correct?
3              MR. DRAYCOTT:  Objection.
4              THE WITNESS:  Again, depending on the time
5  period, it does have to make assurances within the
6  regulatory requirements for 514.
7              BY MR. REALE:
8       Q.    Now, if a state wants to change its
9  payment methodology, is it your understanding that
10 the regulations require the state to provide certain
11 finding and assurances?
12             MR. DRAYCOTT:  Objection.
13             THE WITNESS:  And again, as it's stated in
14 the reg, that would be my understanding of that
15 process.
16             BY MR. REALE:
17      Q.    Okay.  Is that information, that is the
18 finding and assurances, is that information
19 communicated to CMS?
20      **A.    I don't know.**
21      Q.    Have you ever had the occasion to review
22 finding and assurances submitted by a state as part

1537

```
1   of its proposed change to a payment methodology?
2        A.    I don't recall specifically looking at
3   those findings or assurances.
4        Q.    You've been aware of the Abbott lawsuit
5   since the late 1990s, correct?
6        A.    Since some point in time, but I can't
7   pinpoint a date.
8        Q.    Well, you testified previously that you
9   became aware of the Abbott litigation in the late
10  1990s.  Do you recall that testimony?
11       A.    Not specifically.  No, I don't.
12       Q.    Would you like me to show you the page of
13  the transcript where you say you became aware of the
14  Abbott lawsuit in the late 1990s?
15       A.    Sure.
16       Q.    I'm just going to hand this to you to
17  refresh your recollection.  Let me know when you're
18  finished reading?
19       A.    I'm sorry.  Where am I reading from?
20       Q.    The highlighted portion of this
21  transcript, which is from your September 26th, 2007
22  deposition.  I believe it's page 156 to 157.
```