# EXHIBIT D

604

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

IN RE:  PHARMACEUTICAL        ) MDL NO. 1456

INDUSTRY AVERAGE WHOLESALE    ) CIVIL ACTION

PRICE LITIGATION              ) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO      )

U.S. ex rel. Ven-a-Care of    ) Judge Patti B. Saris

the Florida Keys, Inc.        )

     v.                       ) Chief Magistrate

Abbott Laboratories, Inc.,    ) Judge Marianne B.

No. 06-CV-11337-PBS           ) Bowler

- - - - - - - - - - - - - - - -

(captions continue on following pages)

Videotaped deposition of LARRY REED

Volume III

Washington, D.C.

Tuesday, March 18, 2008

9:00 a.m.

Reed, Larry - Vol. III                                         March 18, 2008
Washington, DC

882

1    to be approved.

2        Q.   You say they may.  Do you know if it's

3    ever happened?

4        A.   No.

5        Q.   Now, can you explain the approval

6    process? A state, for instance, makes a change to

7    the plan.  We're in the post 2002 period.  Okay?

8    What do they do?  Do they mail it in?  Do they e-

9    mail you?  Can you just take me through the

10   process?

11       A.   A state would -- it could do both.  It

12   could either e-mail the plan.  It would hard copy

13   probably the plan because there's signatures

14   required on a cover sheet to the plan.  It could

15   also fax a plan.  It would do so to the regional

16   office even today, even post 2002.

17            At that point then the plan would be

18   transmitted to us by the region.  The region

19   would keep a copy and would after approval keep

20   the official record of the state plan.  We would

21   review the state plan, probably talk to the

22   state.  If we had additional information that we

Reed, Larry - Vol. III                    March 18, 2008
                    Washington, DC

883

1    needed we may do a request for additional

2    information.

3              Either way we would look at the plan

4    and if we thought it approvable we would approve

5    it.  If we thought it disapprovable we would

6    probably have further conversation with the state

7    and if it came to that we would disapprove it --

8    we would recommend it for disapproval.  The CMS

9    administrator in consultation with the secretary

10   would disapprove the plan.

11        Q.   Now, to start at the beginning of the

12   process, I guess a package comes in, correct?

13        A.   A state plan amendment package, that's

14   correct.

15        Q.   And it would have the actual state plan

16   proposed amendment itself in it, right?

17        A.   That's correct.

18        Q.   Would it have any other kind of

19   information or data in it?

20        A.   At state option, depending on what it

21   was, and whether it was a rebate or a payment

22   plan it might have other information.  It might

Reed, Larry - Vol. III                                    March 18, 2008
Washington, DC

884

1    have other documentation.

2        Q.   What types of other documentation might

3    it include?

4        A.   It really is up to the state at that

5    point.  It could include documentation in support

6    of its dispensing fee in that were the change and

7    in support of its ingredient cost if it were an

8    EAC change, or if it was something on a rebate,

9    something to do with the rebate change.

10       Q.   In the case of an EAC change, is there

11   any type of supporting documentation that you

12   look for or require?

13       A.   Not a specific type.  There's

14   flexibility in the states on behalf of what types

15   of information it wants to submit.

16       Q.   Well, in the event a state wanted to

17   change its EAC, say, from AWP to WAC or wanted to

18   change its AWP from AWP minus 10 to AWP minus 20,

19   what are the types of information that you would

20   look for to support that change?

21       A.   It would need to -- just for instance

22   what information it based that decision on.

Reed, Larry - Vol. III                                    March 18, 2008
                        Washington, DC

885

1          Q.    Well, such as?   What kind of

2     information would you want to see?

3          **A.    It could be neighboring states' payment**

4     **rates, it could be third party payment rates.**

5     **There isn't in the regulation any definition of**

6     **how that needs to be submitted to us.   There**

7     **isn't a checklist of you must submit this and**

8     **this and this.**

9          Q.    Well, I understand there's not a reg.

10    But clearly you people have been doing this for

11    15 years, right?

12         **A.    As have the states.   That's correct.**

13         Q.    So over the course of that 15 years you

14    must kind of have in your mind certain things you

15    look for when someone wants to change their

16    benchmark, right?

17         **A.    No.   I don't think so.   We depend on**

18    **what the state wants to supply to us.   Again, we**

19    **don't have a prenotion of what they need to send**

20    **to us.**

21         Q.    So you don't require anything in

22    particular?

Reed, Larry - Vol. III                      March 18, 2008
Washington, DC

886

1       A.    We require that they substantiate how

2    they make that determination and that they

3    document that.

4       Q.    And what types of evidence do you view

5    in general as being sufficient to substantiate

6    what would document such a change?  Give me some

7    examples, please.

8       A.    It would vary by state.  It could be a

9    neighboring state.  It could be, again, a survey

10   that they have done.  It could be a number of

11   different things.

12      Q.    What do you mean by a survey?

13      A.    They could, for example, survey the

14   pharmacists as to what the costs were for

15   purchasing drugs to establish their payment

16   formula.

17      Q.    So you look at neighboring states,

18   surveys.  Anything else that you can recall ever

19   looking at?

20      A.    They might look at another third party,

21   what their payment rate was.

22      Q.    What does that mean, another third

Reed, Larry - Vol. III                           March 18, 2008
Washington, DC

887

1   party?

2       A.    Say, for example, what a large insurer

3   in the state might pay for those drugs.

4       Q.    So you've seen evidence of what

5   neighboring states do.  You've seen some surveys

6   on occasion, what third parties do.  Can you

7   think of any other --

8       A.    I don't think I said that.  I said

9   that's what they could do.  As what they might

10  do, it could be that or it could be something

11  else.

12      Q.    I'm asking -- well, let me try it again

13  then.  What type of information in your

14  experience over 15 years have you seen submitted

15  in support of state requests to change their EAC

16  reimbursement rates?

17      A.    It could be that information or, again,

18  it could be other information.  I don't think

19  there's a typical piece of documentation that

20  comes in with a state plan payment change or a

21  dispensing fee change.

22      Q.    Well, I understand that.  I mean,

Reed, Larry - Vol. III                    March 18, 2008
                Washington, DC

888

1   you've been pretty clear.  There's nothing that

2   you require.  And you've told me three examples:

3   What neighboring states do, the surveys and

4   perhaps pharmacist information about what third

5   parties pay.  And I'm asking you is there

6   anything else that comes to mind that you've ever

7   seen that's been submitted in support of a change

8   to a state plan?

9        **A.   Not that I recall.**

10       Q.   If you wanted to find out, what would

11   you look at?

12       **A.   You would need to look at the state**

13   **plan submission.**

14       Q.   Now, again, this package -- well, I'm

15   sorry.  One other thing.

16            If a state plan is, say, approved by a

17   state legislature -- that does happen -- I'm

18   sorry.  I'll withdraw that.

19            If the change in EAC is approved by a

20   state legislature -- that does happen from time

21   to time, right?

22       **A.   There might be enabling legislation for**

Reed, Larry - Vol. III                                    March 18, 2008
Washington, DC

889

1    a payment or a dispensing fee change.

2         Q.   So would you get that?

3         A.   Would we get the actual legislation?

4         Q.   Yeah.

5         A.   We may get it.  It depends on what the

6    state decides to send to us.

7         Q.   Well, if they told you they got some

8    legislation that changed it, would you ask to see

9    it?

10        A.   Depending on whether it impacted on the

11   payment rate.  In other words, did it have

12   documentation in there that would help us

13   determine if that were a determination of EAC.

14        Q.   What kind of documentation would that

15   be?

16        A.   What did they base that payment rate

17   on.  What was the basis for the legislature to

18   make a change to that payment rate.

19        Q.   So you would ask for that?

20        A.   If that were available.  I think your

21   question was would they submit it.

22        Q.   Now, when the package comes in does it

Reed, Larry - Vol. III                                    March 18, 2008
                    Washington, DC

890

1    invariably go to the regional office first?

2         A.   Yes.

3         Q.   So the starting point for any approval

4    from 1992 to today is always the regional office?

5         A.   Yes.

6         Q.   In your experience.

7         A.   Yes.

8         Q.   Now, does the regional office keep that

9    package or do they send the whole package up to

10   you today?  How does that work?

11        **A.   I don't know if the regional office**

12   **keeps a copy of that.  The official package would**

13   **come to us and they may well keep a copy of it.**

14        Q.   Okay.  So from 2003 on is it fair to

15   say that you would have the original copies of

16   everything that's been submitted at CMS at the

17   central office?

18        **A.   It would have been submitted at the**

19   **time.  I just don't know if we have all those**

20   **copies at this point in time or not.**

21        Q.   Well, let's assume that -- well, all

22   right.  From 2002 onward when the package came

Reed, Larry - Vol. III                          March 18, 2008
Washington, DC

891

1    in, the package always would end up in the

2    central office, right?

3         A.    The official copy of the package would

4    come to the central office.  That's correct.

5         Q.    The district office may or may not keep

6    a copy?

7         A.    That's correct.

8         Q.    Now, prior to 2002 did the package

9    always come to the central office or would it

10   stay in the district office?  I'm sorry.  The

11   regional office.

12        A.    Prior to 2002 the package would stay in

13   the regional office.  And again, we would see it

14   on occasion.

15        Q.    And would that occasion only be if you

16   were to disapprove it or if they asked for

17   assistance?

18        A.    Correct.

19        Q.    Now, prior to 2002 even in cases of

20   approval would there often be communications back

21   and forth between the regional office and the

22   states, questions about the plans and things like

Reed, Larry - Vol. III                                    March 18, 2008
                          Washington, DC

                                                              892

1    that?

2         A.    There might be questions.  There might

3    be -- at that point.  I don't recollect specific

4    questions.  But we would be normally in

5    communication with -- between the regional and

6    central office staffs.

7         Q.    Well, again, prior to 2002, would it be

8    your expectation that the regional office staff

9    would be in contact to make sure that they had

10   the type of supporting documentation necessary to

11   support a plan change?

12            MR. WINGET-HERNANDEZ:  Objection, form.

13        A.    My expectation at that point, that the

14   regional office would have had authority for a

15   state plan.  So how they would decide to view

16   that documentation would be a different chain of

17   command.

18        Q.    Well, within HCFA at the time wasn't

19   there any kind of -- would they expect to observe

20   any kind of standard or anything about whether to

21   approve these plans?  Were they allowed to do

22   whatever they wanted or was there some kind of

Reed, Larry - Vol. III                          March 18, 2008
                    Washington, DC

893

1    uniform criteria?

2        A.   I think your question was what was my

3    expectation.  And my expectation would -- I guess

4    I didn't have an expectation at that point

5    because they were approved in the region.

6    Certainly the regulations that were in existence

7    were there and the region would act under those

8    regulations.

9        Q.   So prior to 2002 a regional office

10   could approve the plan without looking at

11   anything?

12       A.   I guess what I'm saying is I don't know

13   what documentation they looked at prior to 2002.

14       Q.   And my question is -- I understand that

15   you don't actually know what they did in each

16   regional office before 2002.  My understanding,

17   though, is -- just as a matter of prudence,

18   general practice within CMS, was it your

19   expectation that in fact that the regional

20   offices would ask for some kind of documentation

21   to support the plan changes?

22       A.   And again, I can say what I did and I

Reed, Larry - Vol. III                                          March 18, 2008
                        Washington, DC

894

1    can say what my staff did or the persons I

2    oversaw.  I don't know exactly what the regions

3    looked at for that time period.

4         Q.   Did your office prior to 2002 exercise

5    any kind of oversight at all of the regional

6    offices when it came to approving plans?

7         A.   We didn't have direct oversight of the

8    regional offices and we still don't have that

9    oversight.  We would look -- we would assist the

10   region if they had questions or there were a

11   request for additional information.

12        Q.   So prior to 2002 plan changes were

13   really approved then independently of the central

14   office?

15        A.   Some plan changes could be approved

16   independently.  And again, we would assist on the

17   occasions I've mentioned.

18        Q.   And the only time the central office

19   would get involved is if the regional office for

20   some reason decided to disapprove them?

21        A.   If a region -- well, that's not the

22   only reason that we would get involved.  But

Reed, Larry - Vol. III                                    March 18, 2008
                        Washington, DC

895

1    **certainly if there were a disapproval we would be**

2    **involved with that state plan amendment.**

3         Q.   Well, it would be the only reason

4    unless the region actually asked for your help?

5         **A.   Those would be the two reasons.   A**

6    **request of additional information.**

7         Q.   Now, can you recall an instance of ever

8    overruling a regional office's decision to

9    disapprove a plan?

10            MS. MARTINEZ:   Objection to form.

11        **A.   I just -- I don't recall.**

12        Q.   You don't recall?

13        **A.   I don't recall that situation.**

14        Q.   Do you think that's something that

15   never, ever happened?

16        **A.   I just don't know.   I don't recall.**

17        Q.   Are there any records that would tell

18   us whether that had happened?

19        **A.   I don't know.**

20        Q.   Now, the records of these plans and

21   submissions and what supporting information, if

22   any, that was given to the regional offices

Reed, Larry - Vol. III                                          March 18, 2008
Washington, DC

904

1    the regional offices keep any records of why they

2    approved whatever it was they approved?

3         **A.    I don't know.**

4         Q.   And if I wanted to see those records

5    where would I have to go?

6         **A.    For any regional records you would have**

7    **to go to the region.**

8         Q.   Now, you mentioned that sometimes

9    states would survey pharmacists?

10        **A.    They could survey pharmacists.**

11        Q.   Do you know how they would do that?

12        **A.    A questionnaire could be done by a**

13   **contractor.  And these are all within the realm**

14   **of possibilities.**

15        Q.   Would it be fair to say the states had

16   discretion, they could do whatever they wanted to

17   by way of a survey?

18             MS. MARTINEZ:   Objection, form.

19        **A.    I'm not sure that their discretion was**

20   **unlimited.  Their discretion would need to**

21   **conform to federal regulations in the**

22   **determination of EAC.**

Reed, Larry - Vol. III                          March 18, 2008
Washington, DC

905

1        Q.    Does EAC require the states to do

2    surveys?

3        A.    No.

4        Q.    Does EAC say anything about how such a

5    survey should or should not be conducted?

6        A.    No.   Not the federal regulation.

7        Q.    Well, is there any protocol at all or

8    anything that explains when a survey might or

9    might not be required or how it should be

10   conducted?

11       A.    I don't know of any implementing

12   instructions in that federal regulation.  I don't

13   know if the regions had any individual

14   instructions or not.

15       Q.    Well, apart from the regulations

16   themselves, did you at HCFA, later CMS, have any

17   internal guidelines or standards that you would

18   look at if some state presented a survey?

19       A.    On how we would look at that state

20   plan, yes, we did.

21       Q.    What were they?   Could you describe

22   what they were?

Reed, Larry - Vol. III                                    March 18, 2008
Washington, DC

906

1      A.   It varied by plan.  And I think -- are

2  you referring to the -- I don't remember the date

3  of the memo.  The memo we talked about

4  previously?  Is that what you're referring to?

5      Q.   No.  Why don't you tell me what you're

6  talking about.

7      A.   I'll let you ask the question again

8  then.

9      Q.   You just mentioned a memo.  What are

10  you talking about?

11      A.   All right.  I'm asking you are you

12  making reference to any document?

13      Q.   No, no, no.  My question was broader

14  than that.  I wasn't trying to pin you down to

15  having a written procedure.  You just referred to

16  a document.  Would you please tell me what

17  document you were talking about.

18      A.   There was a document we discussed

19  during my previous period of deposition.

20      Q.   And what document was that?

21      A.   It was a document that described -- it

22  was an internal document that described how we

Reed, Larry - Vol. III                          March 18, 2008
                    Washington, DC

907

1    would look at state plans.

2        Q.   Okay.  Now, we'll get to that a little

3    later.  I know what you're talking about.

4        A.   Okay.

5        Q.   What I'm saying, though, is when you

6    came down to evaluate a plan and you were looking

7    at things like the data, were there any things

8    apart from that document, like informal criteria

9    you used or looked at?

10       A.   I don't think there was anything

11   preset.

12       Q.   Well, was there anything in general?

13       A.   Again, we would react to what the state

14   presented to us to document its approval.

15       Q.   Now, one of the things you mentioned

16   you'd look at in terms of deciding whether or not

17   to approve a state plan was what neighboring

18   states did?

19       A.   That could be one criteria.

20       Q.   Okay.  What was the basis for that

21   criteria?  Why would you -- why would it be

22   important what a neighboring state did?

Reed, Larry - Vol. III                                March 18, 2008
                        Washington, DC

908

1       A.   A neighboring state if it had an

2   approved state plan would be one that had

3   documented to us that that rate was a valid

4   determination of EAC.  We asked for a neighboring

5   state because the thought was that within the

6   same geographic region that might be the same

7   cost for drugs.

8       Q.   Well, you say the assumption was that a

9   neighboring state had in fact documented their

10  plan.  Why would you make that assumption?

11      A.   They couldn't use an unapproved state

12  plan.  So if a state were looking at a

13  neighboring state they would be looking at its

14  approved methodology.

15      Q.   And what I'm saying is why would you

16  think the methodology for one state would be a

17  methodology that would apply in another state?

18      A.   I think the thinking was that -- again,

19  if drugs could be purchased by a pharmacists at

20  AWP or whatever in a given state, that probably

21  those drugs would be purchased at that rate in

22  the neighboring state.

909

1      Q.   Is there any data or evidence you can

2  point to that supports that conclusion?

3      **A.   Not that I recall at this point.**

4      Q.   Well, was there ever any data or

5  evidence that you saw that supported that

6  conclusion?

7      **A.   I don't know.**

8      Q.   So it really is just kind of an

9  assumption?

10         MS. MARTINEZ:  Objection to form.

11     **A.   Again, it was something we used at some**

12 **point.  Whether it was based on data, I don't**

13 **know.  It would have been before my time.**

14     Q.   Well, yeah.  That was my question.  How

15 far back does the neighboring state approach go

16 that you recall?

17     **A.   If I recall correctly, it goes back to**

18 **discussions that go back to the '87 regs.**

19     Q.   The '87 regs?

20     **A.   Right.**

21     Q.   So when you got to Medicaid they were

22 using the neighboring state criteria as a

Reed, Larry - Vol. III                              March 18, 2008
                    Washington, DC

910

1    criteria to approve plans?

2         A.    I don't recall if they were using

3    specifically that criteria, but they were using

4    criteria of that nature for a time period before

5    I was there.

6         Q.    Okay.  So who told you that was a good

7    idea?

8         A.    Who told me?

9         Q.    Yeah.  How did you learn about it?

10        A.    Before I was there there were other

11   people there.  There were analysts that stayed

12   there after I started.

13        Q.    No doubt.  Who were they?

14        A.    At that point Pete Rodler would be

15   there.  Bill Hickman would have been the office

16   director back at that time period, for that time

17   period.

18        Q.    Other than the neighboring state rule

19   of thumb were there any other criteria that you

20   learned around 1987 that could be applied to

21   approving state plans?

22        A.    I don't even know that I learned that

911

1    criteria.  I know that there were criteria at

2    that point.  And I don't recall specifically what

3    they were.

4       Q.   So you think there were criteria

5    besides looking at what other states did, but you

6    don't remember what they were?

7       A.   I don't recall the criteria.

8       Q.   Were they written down at the time?

9       A.   At that point I don't recall.

10      Q.   At that point who was the most

11   knowledgeable people about approving plans at the

12   time you came and got involved?

13      A.   Those people would probably be the

14   regions.

15      Q.   Who were the people you worked with?

16      A.   When I got there, again, the persons

17   that worked in that section were Pete Rodler and

18   the office director was Bill Hickman.

19      Q.   Well, if you're going to approve things

20   because they're done in the neighboring states,

21   doesn't that suggest that sooner or later you're

22   going to arrive at the same plan for everyone?