# Exhibit A



## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE )
LITIGATION )  MDL No. 1456
_____ )  Civil Action No. 01-12257-PBS
 )
THIS DOCUMENT RELATES TO: )  Hon. Patti B. Saris
 )
*United States of America ex rel. Ven-a-* )
*Care of the Florida Keys, Inc., et al. v.* )
*Dey, Inc., et al, Civil Action No. 05-* )
*11084-PBS* )

**IMAGED**

### NOTICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, the attached subpoenas *duces tecum* will be served upon the following individuals:

1. Georgia Department of Community Health
  c/o Angela Branch.
  2100 East Exchange Place, Suite 200, Building 1
  Tucker, GA 30084-5336

Dated: July 16, 2008    Respectfully Submitted

         By: /s/ Neil Merkl
            Paul F. Doyle (BBO # 133460)
            Sarah L. Reid
            Neil Merkl
            KELLEY DRYE & WARREN LLP
            101 Park Avenue
            New York, NY 10178
            Telephone: (212) 808-7800
            Facsimile: (212) 808-7897

         *Counsel for Defendants Dey, Inc., Dey L.P., Inc.*
         *and Dey, L.P.*

## CERTIFICATE OF SERVICE

I, Neil Merkl, an attorney, hereby certify that I caused a true and correct copy of the foregoing NOTICE OF SUBPOENA to be served on upon all counsel of record electronically by causing same to be posted via LexisNexis, this 16th day of July, 2008.

/s/ Neil Merkl



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Master File No. 01-CV-12257-PBS Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS, and *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS | ) ) ) ) ) ) | **IMAGED** |

## CROSS-NOTICE OF DEPOSITION OF THE STATE OF GEORGIA DEPARTMENT OF COMMUNITY HEALTH

PLEASE TAKE NOTICE that, pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, Defendants Dey, Inc., Dey, L.P., Dey L.P., Inc. (collectively, "Dey") and Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc., (collectively, "Roxane") by and through their undersigned counsel, hereby cross-notice the Rule 30(b)(6) deposition of the representative of the State of Georgia Department of Community Health.

On July 11, 2008, attorneys for Plaintiffs the United States of America noticed the deposition of a representative of the State of Georgia Department of Community Health in the actions *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS, and *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS. A copy of the notice of deposition and subpoena are attached hereto as Exhibit A.

The deposition will begin at 9:00 a.m. on October 8, 2008, and will continue from day to day until completed. The deposition will take place at the offices of the United States Attorney's Office, 600 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, GA 30303-3309. The deposition will be conduced under oath by an officer authorized to take such testimony. The deposition may be used for any purpose, including trial.

The State of Georgia shall designate a person or persons to testify under oath about the subjects set forth in the Areas of Inquiry set forth in Exhibit 1 of the attached Subpoena.

Dated: July 16, 2008                           Respectfully Submitted

By:    /s/ Neil Merkl
       Paul F. Doyle (BBO # 133460)
       Sarah L. Reid
       Neil Merkl
       KELLEY DRYE & WARREN LLP
       101 Park Avenue
       New York, NY 10178
       Telephone: (212) 808-7800
       Facsimile: (212) 808-7897

       *Counsel for Defendants Dey, Inc., Dey L.P., Inc.*
       *and Dey, L.P.*

By:    /s/ John W. Reale
       Helen E. Witt, P.C.
       Anne M. Sidrys, P.C.
       Eric T. Gortner
       John W. Reale
       Kirkland & Ellis LLP
       200 East Randolph Drive
       Chicago, IL 60601
       Telephone: (312) 861-2000
       Facsimile: (312) 861-2200

       *Counsel for Defendants Boehringer Ingelheim*
       *Corp., Boehringer Ingelheim Pharmaceuticals, Inc.,*
       *Boehringer Ingelheim Roxane, Inc., and Roxane*
       *Laboratories, Inc.*

- 2 -

**CERTIFICATE OF SERVICE**

I, Neil Merkl, an attorney, hereby certify that I caused a true and correct copy of the foregoing to

be served on upon all counsel of record electronically by causing same to be posted via

LexisNexis, this 16 day of July, 2008.

/s/ Neil Merkl

A088 (rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA



United States of America ex rel. Ven-A-Care
of the Florida Keys, Inc., et al.
### V.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER:[1]  MDL NO. 1456
Civil Action No. 05-11084-PBS
Judge Patti B. Saris
Pending in U.S. District Court of
Massachusetts

Dey, Inc., et al.

**IMAGED**

TO:   Georgia Department of Community Health
c/o Angela Branch
2100 East Exchange Place, Suite 200, Building 1
Tucker, GA 30084-5336

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. *See Areas of Inquiry attached at Exhibit 1.* This deposition will be recorded by stenographic means.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| U.S. Attorney's Office, 600 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, GA 30303-3309 | October 8, 2008 at 9:00 a.m. |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
*See* Document Requests attached at Exhibit 2.

| PLACE | DATE AND TIME |
|---|---|
| 1230 Peach Tree Street, N.E., 19th Floor, Atlanta, GA 30309 | August 15, 2008 at 9:00 a.m. |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendants Dey, Inc., Dey L.P., Inc., and Dey L.P. | July 16, 2008 |
| ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER | |

Marisa Lorenzo, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (212) 808-7697

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1]  If action is pending in district other than district of issuance, state district under case number.

A088 (rev. 12/06) Subpoena in a Civil Case

---

# PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

# DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises – or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the

testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**EXHIBIT 1**

**AREAS OF INQUIRY**

1.      Your knowledge of the terms "Average Wholesale Price" (also referred to as "AWP"), and "Wholesale Acquisition Cost" (also referred to as "WAC").

2.      Any efforts by the state to define, calculate, determine, investigate, understand or interpret AWP or WAC.

3.      Your knowledge, consideration, understanding or use of AMP, MAC, FUL, EAC, Direct Price, Best Price, Federal Supply Schedule prices, or any other price, cost, or reimbursement amount or benchmark, metric, or methodology for Subject Drugs.

4.      Your knowledge of actual acquisition costs for the Subject Drugs by any Provider, including but not limited to, pharmacies, physicians, wholesalers, PBMs, drug purchasing pools, or the state itself.

5.      All attempts by the state to ascertain Providers' actual acquisition costs for any prescription drugs reimbursed by the state Medicaid program.

6.      Communications between You and Providers regarding reimbursement for acquiring, dispensing, or administering Subject Drugs from January 1984 to the present.

7.      Information, including but not limited to the existence, nature, and location of Documents, relating to the following:

    (a)     Your compliance with 42 U.S.C. § 1396a(a)(30), 42 U.S.C. § 1396a(a)(54), 42 C.F.R. §§ 447.201 et seq., or 42 C.F.R. § 447.512-518;

(b)    Any evaluations, audits, analyses, or reviews of any aspect of the state Medicaid program from January 1984 to the present;

(c)    Your procedures for the calculation, monitoring, processing, or payment of claims for Subject Drugs from January 1991 to the present;

(d)    Internal or external assessments, studies, analyses, reviews, or audits conducted by or on Your behalf regarding pricing or reimbursement amount or rates for prescription drugs from January 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(e)    Documents created by or received from any state entity concerning a change in the methodology for reimbursement of pharmacy-dispensed and physician-administered drugs;

(f)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to prices, costs, or reimbursements for prescription drugs from 1984 to the present, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(g)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association of Medicaid Fraud Control Units, National Association of Attorneys General, HHS-OIG, CMS, and the Department of Health and Human Services, relating to prices, costs, or reimbursements for prescription drugs from January 1984 to the present;

(h)    Documents created by, received from, or sent to, or Communications with other state governments, including other state Medicaid programs, relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(i)    Documents created by, received from, or sent to, or Communications with, the federal government or federal agencies, including the DOJ, National Association relating to the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.;

(j)    Communications between the state and either Dey or the Roxane Defendants concerning the pricing of prescription drugs;

(k)    Your potential or actual contractual relationships with PBMs, Third Party Administrators, Benefit Consultants, Auditors, Wholesalers, Manufacturers, Group Purchasing Organizations, Insurers, Independent Practice Associations, Retailers, Mail Order Pharmacies, Providers, Trade Associations, or Lobbyists, insofar as they cover reimbursement, purchasing, rebates, or expenditures concerning Subject Drugs;

(l)    Documents or data received from or published by a Publisher and the state's reliance on such data or Documents;

(m)    Your efforts to reduce or limit expenditures for Subject Drugs;

8.     The state's administration or oversight of the state Medicaid Program, including but not limited to the existence, nature, and location of data relating to the following:

(a)     The utilization of Subject Drugs by patients covered by the state Medicaid Program;

(b)     Your efforts to reduce or limit expenditures for Subject Drugs;

(c)     The expense to providers of acquiring and dispensing or administering Subject Drugs;

(d)     Manufacturer rebates received relating to Subject Drugs;

(e)     Information provided to or received from the federal government in connection with the state Medicaid Program relating to prescription drug pricing or dispensing fees;

(f)     Payments made by state or other entities, such as local agencies, to providers in connection with the state Medicaid Program;

(g)     Payments from the state to other entities, such as local agencies, in connection with the state Medicaid Program; and

(h)     The state budgetary source of the money used by the state to make payments in connection with the state Medicaid Program.

9.     The administration of reimbursement to providers for any Subject Drug in connection with the state Medicaid Program, including but not limited to the existence, nature, and location of Documents, relating to the following:

(a)     The manner in which claims for reimbursement of Subject Drugs are submitted and verified;

(b)     Calculation, monitoring, processing, and payment of claims for reimbursement to providers for Subject Drugs under the state Medicaid Program from January 1991 to present;

(c)     Your negotiation, authoring, or execution of any contract or memorandum of understanding or agreement, or contribution to any contract or memorandum of understanding or agreement, between the state and any Provider relating to AWP or WAC or the reimbursement of prescription drugs;

(d)     Your establishment, consideration, determination, calculation, or setting of the dispensing fees or fees for other professional services payable in connection with the supply or administration of pharmacy-dispensed and physician-administered drugs;

(e)     Subject HCPCS Codes;

(f)    All reports, meetings and other information relating to any analysis by the state of any change to the reimbursement formula (including dispensing fee) under Medicaid for the Subject Drugs from January 1984 to the present, and your adoption, rejection, or consideration of such proposal;

(g)    The circumstances surrounding each change or discussion of a potential change in the state Medicaid program reimbursement rates from January 1984 to the present;

(h)    Your reliance on Pricing Elements, including AWP, WAC and Direct Price, published for the Subject Drugs;

(i)    Your use or consideration of published price information, AMPs, URAs or other pricing information related to Subject Drugs, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program; and

(j)    Your use or consideration of any pricing information provided to the state directly by any drug manufacturer, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under the state Medicaid Program.

10.    The manner in which Manufacturer rebates and Federal matching funds are applied for, calculated, received, processed, and allocated or distributed by the state, including, but not limited to:

(a)    Federal matching funds received relating to prescription drugs;

(b)    Your net costs, including but not limited to analyses or calculation of its net costs, for Subject Drugs under the state Medicaid Program after Manufacturer rebates and Federal matching funds;

(c)    The manner in which the state submits claims for manufacturer rebates and Federal matching funds in connection with the state Medicaid Program;

(d)    The manner in which the money received from manufacturer rebates and Federal matching funds is directed, allocated, or distributed upon its receipt by the state;

(e)    Your adoption, rejection, amendment to, consideration, or negotiation of any state supplemental rebate program; and

(f)    Any attempt by the state to calculate AMP for any Subject Drugs.

11.    Your adoption, rejection, or consideration of recommendations and information related to AWP, WAC, or other Pricing Element, received from any other state or the federal government including, but not limited to:

(a)     1968 Task Force on Prescription Drugs Background Papers, *The Drug Makers and the Drug Distributors* (December, 1968, Office of the Secretary, U.S. Department on Health, Education, and Welfare);

(b)     1974 Federal Register stating that "Most states use average wholesale price, Red Book data, Blue Book data, survey copies or similar standard costs.   Such standard prices are frequently in excess of actual acquisition costs to the retail pharmacist.  Thus. to achieve maximum savings to the Medicaid program, the proposal requires the use of actual acquisition cost." *See* 39 Fed. Reg. 41480, *Reimbursement of Drug Cost-Medical Assistant Program* (November 27, 1974);

(c)     HCFA's 1988 decision to disapprove state Medicaid plans that based reimbursement for prescription drugs on an undiscounted AWP;

(d)     1984 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 15.9%. *See* Department of Health & Human Services, Office of the Inspector General, *Changes to the Medicaid Prescription Drug Program Could Save Millions* (A-06-40216) (Sept. 1984);

(e)     1989 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 15.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program* (A-06-89-00037) (Oct. 1989);

(f)     1989 HCFA Medicaid Manual indicating that pharmacies buy prescription drugs at AWP – 10-20%;

(g)     1990 Pharmacy Reform Tag Meeting minutes;

(h)     1994 GAO Report to the Chairman, Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, *Prescription Drugs: Companies Typically Charge More in the United States than in the United Kingdom* (January, 1994);

(i)     1996 CBO Papers, *How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry* (January 1996, Congressional Budget Office);

(j)     1996 OIG Report *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390) (Feb. 1996);

(k)     1996 HHS-OIG report indicating potential for significant Medicare savings. *See* Department of Health & Human Services, Office of the Inspector General, *Appropriateness of Medicare Prescription Drug Allowances* (03-95-00420) (May 1996);

(l)     1996 OIG Report *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) (June 1996);

(m)     1996 OIG Report *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392) (June 1996);

(n)   1997 OIG Report *Questionable Practices Involving Nebulizer Drug Therapy* (OEI-03-94-00391) (March 1997);

(o)   1997 HHS-OIG report indicating that on average, pharmacists buy prescription drugs at AWP – 18.3%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs* (A-06-96-00030) (Apr. 1997);

(p)   1997 HHS-OIG report indicating that on average, pharmacists buy generic drugs at AWP – 42.5%. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products* (A-06-97-00011) (Aug. 1997);

(q)   1997 OIG Report *Excessive Medicare Payments for Prescription Drugs* (OEI-03-97-00290) (Dec. 1997);

(r)   1998 OIG Report *Are Medicare Allowances for Albuterol Sulfate Reasonable* (OEI-03-97-00292) (Aug. 1998);

(s)   The revised AWP prices provided by the United States Department of Justice and National Association of Medicaid Fraud Control Unit in 2000;

(t)   2000 OIG Report *Medicare Reimbursement of Albuterol* (OEI-03-00-00311) (June 2000);

(u)   2001 HHS-OIG report indicating that AWP bears little to no resemblance to actual wholesale prices. *See* Department of Health & Human Services, Office of the Inspector General, *Medicare Reimbursement of Prescription Drugs* (03-01-00310) (Jan. 2001);

(v)   2001 HHS-OIG report indicating that continued reliance on average wholesale prices as a reimbursement metric is flawed. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid's Use of Revised Average Wholesale Prices* (03-01-00010) (Sept. 2001);

(w)   2001 HHS-OIG report indicating that pharmacy actual acquisition cost was an average 21.84% below AWP. *See* Department of Health & Human Services, Office of the Inspector General, *Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products* (A-06-00-00023) (Aug. 2001);

(x)   2002 HHS-OIG report, Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products (A-06-02-00041) (Sept. 2002); and

(y)   2005 GAO Report, Medicare: Appropriate Dispensing Fee Needed for Suppliers of Inhalation Therapy Drugs (October 2004, GAO-05-72).

12.   The preparation of survey responses to, participation in, and interviews with the

OIG or other originating entity regarding the reports referenced in paragraph 11 above.

13.     From January 1, 1991 to present, the organizational structure of the state Medicaid program, including but not limited to identifying which individuals held what positions, how long the individuals held those positions, and what were the job duties of those position.

14.     State Medicaid plan provisions and state Medicaid plan amendments relating to prescription drugs and the process by which such plan amendments are approved, amended, and implemented.

15.     The nature and purpose of the state's MAC program, if applicable, including but not limited to the procedure for setting and changing MACs, the criteria and information used to establish and change MACs, and the changes to the MAC program that were considered and/or implemented over time.  If the state does not have a MAC program, the reason(s) no MAC program has been implemented.

16.     Communications concerning the budget and reimbursement processes between the state and CMS relating to reimbursement rates for prescription drugs for the period 1988 to the present.

17.     Communications between the state Medicaid program and any member of the state legislature concerning reimbursement rates for prescription drugs.

18.     Any pending or threatened litigation, claims, allegations, or charges that the state Medicaid Program is not in compliance with Federal or state law or otherwise violates Federal or state law.

19.     The sum and substance of Communications between the state and CMS concerning (i) the Average Manufacturer's Price or "AMP"; (ii) the Unit Rebate Amount or "URA"; (iii) the supplemental rebate program; (iv) Rebate Agreements; and (v) how the Rebate Program was implemented and run.

20.     Any audits and/or compliance efforts the state made to ensure that Providers were in compliance with their obligations to report Usual and Customary Charges pursuant to 42 C.F.R. § 512(b)(2), or any applicable state regulation.

21.     Communications between the state and other states or Federal Agencies concerning the reimbursement of prescription drugs, including but not limited to, Documents received from, or sent by the state to, the National Association of Medicaid Fraud Control Units ("NAMFCU") and the National Association of Attorneys General concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

22.     Communications between the state and either Dey or the Roxane Defendants, Ven-a-Care of the Florida Keys, or any other person concerning prices, costs, or reimbursements for prescription drugs from January 1984 to the present.

23.     Communications between NAMFCU and the state concerning: (i) prescription drug prices; (ii) AWP, WAC, or AMP; and (iii) price of the Subject Drugs.

24.     Communications, arrangements, contracts or other Documents reflecting a relationship between the state and any Publisher regarding the purchase of or access to information regarding prescription drug pricing.

25. Your retention, destruction and public disclosure policies regarding Documents and Your compliance with those policies.

26. Your computer systems, networks, or databases that might store or contain Documents, data, and Communications, including but not limited to e-mail, responsive to the subpoena *duces tecum* served upon the state in connection with this action.

## EXHIBIT 2

### DOCUMENTS REQUESTED

1.      *State Plans and Supporting Data*. From January 1, 1991 to the present, all state

Medicaid plans filed by the state under 42 U.S.C. § 1396(a) and, to the extent they relate to the

reimbursement of drugs or the administration or dispensing of drugs, all proposed or actual

amendments to those plans, and all Communications with, or any records related to

administrative or judicial proceedings by, the U.S. Government concerning those state plans or

amendments.

2.      *Methods of Payment and Maximum Allowed Costs*. From January 1, 1991 to the

present, Documents sufficient to identify the methodologies or formulas used to determine the

State Medicaid Program's reimbursement for the Subject Drugs and the Subject HCPCS Codes,

including but not limited to all fee schedules, reimbursement tables, and any state MAC, FUL, or

other maximum payment amount. If maximum payment amounts applied to the Subject Drugs

or Subject HCPCS Codes, all Documents concerning how the maximum payment amounts were

set.

3.      *Findings & Assurances*. 42 C.F.R. § 447.518 provides as follows:

> (b) Upon proposing significant State plan changes in payments for
> prescription drugs, and at least annually for multiple source drugs
> and triennially for all other drugs, the agency must make the
> following findings and assurances: (1) Findings. The agency must
> make the following separate and distinct findings: (i) In the
> aggregate, its Medicaid expenditures for multiple source drugs,
> identified and listed in accordance with § 447.514(a) of this
> subpart, are in accordance with the upper limits specified in §
> 447.514(b) of this subpart; and (ii) In the aggregate, its Medicaid
> expenditures for all other drugs are in accordance with § 447.512
> of this subpart. (2) Assurances. The agency must make assurances
> satisfactory to CMS that the requirements set forth in § § 447.512

> and 447.514 of this subpart concerning upper limits and in paragraph (b)(1) of this section concerning agency findings are met.
>
> (c) Recordkeeping. The agency must maintain and make available to CMS, upon request, data, mathematical or statistical computations, comparisons, and any other pertinent records to support its findings and assurances.

From January 1, 1991 to the present, all materials created or maintained pursuant to 42 C.F.R. § 447.518, including but not limited to the "data, mathematical or statistical computations, comparisons, and any other pertinent records to support" the state's findings and assurances, and all Communications, guidance or interpretations provided by the U.S. Government relating to such findings and assurances.

4.      ***Examples of Claims Forms***.  For the time period from January 1, 1991 to the present, examples of each type of claim form used by Providers to seek reimbursement from the State Medicaid Program for the Subject Drugs or Subject HCPCS Codes, whether reimbursed on an NDC reimbursement basis or a HCPCS Code reimbursement basis, including but not limited to screen shots from any Point of Sale System.

5.      ***Non-Medicaid Drug Reimbursement.***  Documents sufficient to identify the methodologies or formulas used by state governmental agencies or entities other than Medicaid to reimburse the Subject Drugs.

6.      ***State Drug Purchases.***  Documents, sufficient to identify the purchase of any Subject Drugs by any state governmental agency, or entity acting on the state's behalf and any contract related thereto.

7.      ***Cost Savings.***  All Documents concerning any action, administrative or otherwise, considered, rejected, or taken by the State Medicaid Program, to implement any cost savings

measures regarding the Subject Drugs, including, but not limited to, use of managed care organizations, pharmacy benefit mangers, supplemental rebate agreements, prior authorization requirements, or participation in group purchasing organizations.

8. ***Establishment of Payment Rates.*** From January 1, 1988 to the present, all Documents concerning how the State Medicaid Program or the state legislature established the payment amount to Providers for prescription drugs and/or the professional services associated with the dispensing or administration of drugs under the State Medicaid Program.

9. ***Proposed and Actual Reimbursement Rate Changes.*** All Documents evidencing, constituting, concerning or referring to Communications with any person concerning the effects or potential effects on Medicaid providers and Medicaid beneficiaries of any actual or proposed change in the amount or calculation of Medicaid reimbursement paid to Medicaid providers for prescription drugs or dispensing fees, including, but not limited to, all such Communications with Medicaid providers, Medicaid beneficiaries, advocacy groups, the U.S. Government, members of the state legislature, or employees of other state non-Medicaid agencies.

10. ***Reimbursement of Drug Ingredient and Dispensing Costs.*** From January 1, 1984 to the present, all Documents concerning whether the payment formula for the drug ingredient cost could compensate for or offset professional services associated with the dispensing or administration of drugs under Medicaid, or as a mechanism to encourage treatment outside of the hospital setting.

11. ***Acquisition Cost/Price Studies.*** From January 1, 1984 to the present, any document, data, report, presentation, correspondence, draft of legislative testimony,

Communication, testimony, audit, study, analysis, or survey (whether completed or not) relating to (a) the methodologies or formulas used to determine reimbursement for drugs or the administration or dispensing of drugs within the State Medicaid Program; (b) the acquisition costs for prescription drugs by Providers; (c) the difference between any Medicaid Pricing Element and acquisition cost for any prescription drug; (d) EAC, FUL, AWP, WAC, AMP, or any Pricing Element; or (e) the cost of Providers to dispense or administer prescription drugs, including but not limited to any studies or surveys performed by Myers & Stauffer LLC.

12.     ***Understanding of Terms***.   For the time period from January 1, 1984 to the present, all Documents concerning the meaning and calculation of AWP, WAC, EAC, List Price, Direct Price, any other Pricing Element, or actual acquisition cost, including all Documents related to Your understanding of these figures and the State Medicaid Program's consideration of whether to use any of these figures in determining reimbursement of prescription drugs.

13.     ***Communications with Governmental Groups***.   From January 1, 1984 to the present, all Communications between the State Medicaid Program and any member of the state legislature, the U.S. Government, any other state Medicaid program, any Medicaid fiscal intermediary, any Medicare contractor, NAMFCU, any MFCU, any Publisher, any Provider, the National Association of State Medicaid Directors, the National Governors' Association, or Ven-A-Care concerning (a) the methodologies or formulas to be used in determining reimbursement for prescription drugs or the administration or dispensing of drugs (such as Program Memoranda, National Coverage Decisions, Local Medical Review Policies, Bulletins, newsletters meetings, seminars, circulars, governmental reports, or any transmission of data); (b) the acquisition costs of Providers for prescription drugs; (c) the difference between AWP and acquisition cost for any prescription drug; or (d) the cost of Providers to dispense or administer prescription drugs.  This

request includes but is not limited to all memoranda, reports or data provided by the CMS/HCFA, United States Department of Health and Human Services – Office of Inspector General, and the General Accounting Office.

14.   ***Communications with Non-Governmental Groups***.  From January 1, 1984 to the present, all Communications between the State Medicaid Program and any Manufacturer, Provider, professional or trade group, patients' rights group, law firm, or any other non-government organization relating to the methodologies or formulas used to determine reimbursement of prescription drugs or professional services associated with the dispensing or administration of drugs.

15.   ***DOJ AWPs.***  All Documents concerning the revised AWP prices provided to You by the United States Department of Justice and NAMFCU, including but not limited to, Documents concerning Your decisions to use or not use the revised AWP prices in reimbursing for pharmaceutical products and any Communications related thereto.

16.   ***Documents Concerning Communications about AWP Defendants***.   All Communications between the State Medicaid Program and the U.S. Government, including but not limited to the Department of Justice, CMS, or OIG, concerning any drug manufacturer that is a defendant in any litigation relating to AWP, WAC, any other Pricing Element, and/or the pricing of drugs under Medicare or Medicaid.

17.   ***Drug   Pricing Proceedings.***   All Documents concerning any proceedings, including, but not limited to, lawsuits, administrative or legislative proceedings, or criminal or civil investigations, in which Your employees or agents have testified, provided statements, or

been interviewed concerning the pricing or reimbursement of pharmaceutical products, or access to care.

18.    *Publishers.*    All Documents, including any Communications, contracts or other Documents reflecting a relationship between the state and any Publisher regarding the purchase of or access to information regarding prescription drug pricing.

19.    *Average Manufacturer Price.*    From January 1, 1991 to the present, all Documents concerning whether and how the State Medicaid Program has utilized AMP information or compared AMP information with AWP, WAC, List Price, Direct Price, any other Pricing Element, or the amount at which the State Medicaid Program reimbursed for drugs.

20.    *Documents Previously Produced.*    From January 1, 1991 to the present, all Documents produced and statements or testimony given by any current or former employee of the State Medicaid Program concerning any evaluation or investigation of drug pricing.

21.    *Document Retention.*    Documents sufficient to describe Your document retention or destruction policies applicable to the Documents sought by this subpoena, including any changes to, or departures from, such policies.

22.    *Communications with Dey and Roxane Defendants.*    From January 1, 1991 to the present, all Communications with Dey or Roxane Defendants regarding the Subject Drugs and/or Medicaid or Medicare reimbursement, including new product letters and pricing notification letters sent by Dey or Roxane Defendants to state Medicaid officials or employees.

23.    *Provider Handbooks.*    The provider handbooks and any Medicaid manuals in effect from 1989 to 2005.

24.   *Rebate Agreement.*  All Documents concerning the federal Medicaid drug rebate program and any Medicaid drug rebate agreement pursuant to 42 U.S.C. § 1396r-8 that relate to Dey, Inc. and Dey, L.P, and Boehringer Ingelheim Roxane, Inc. and Roxane Laboratories, Inc.,; all Documents containing AMPs sent from CMS to any state Medicaid agency or official; Documents sufficient to identify the amounts received each year by state under the Medicaid Drug Rebate Program for the Subject Drugs; Documents concerning the Medicaid Rebates for the Subject Drugs, including, but not limited to, Documents containing AMPs and/or unit rebate amounts and other Documents concerning Medicaid Rebates for the Subject Drugs; Documents exchanged by and between state and the Federal Government concerning how unit rebate amount ("URA") is determined; and Documents sufficient to explain the process by which the State Medicaid Program shares any amounts received by a drug manufacturer pursuant to the Medicaid Rebate Program with the Federal Government, if any.

25.   *Usual and Customary Charge.*  All Documents concerning the "usual and customary" prices for the Subject Drugs, including but not limited to all Documents concerning any audits and/or compliance efforts performed on or behalf of the State Medicaid Program regarding the usual and customary charges of providers.

## EXHIBIT 3

### DEFINITIONS AND INSTRUCTIONS

#### Definitions

1.      "Actual Acquisition Cost" shall mean the net price (after discounts, rebates, or chargebacks) that a Provider pays to purchase a prescription drug intended for resale.

2.      "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

3.      "AWP" or "Average Wholesale Price" shall mean the pricing element as periodically published by any Publisher or pharmaceuticals industry compendia, including the Drug Topics Red Book (the "Red Book"), American Druggist First Databank Annual Directory of Pharmaceuticals ("First DataBank"), Essential Directory of Pharmaceuticals (the "Blue Book"), and Medi-Span's Master Drug Database ("Medi-Span").

4.      "CMS/HCFA" shall mean "Centers for Medicare and Medicaid Services," its predecessor agencies, including the Health Care Financing Administration ("HCFA"), and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

5.      "Communication" shall mean any oral or written exchange of words, thoughts or ideas to another person or entity, whether in person, in a group, by telephone, by letter, by telex or by any other process, electric, electronic or otherwise.  All such Communications in writing shall include, without limitation, printed, typed, handwritten, or other readable Documents,

whether in hardcopy, electronic mail or stored electronically on a computer disk or otherwise, contracts, correspondence, diaries, drafts (initial and all subsequent), forecasts, invoices, logbooks, memoranda, minutes, notes, reports, statements, studies, surveys and any and all non-identical copies thereof.

6.     "Concern," "concerning," "relating to," or "relate to" shall mean refer to, regard, concern, describe, explain, state, evidence, record, constitute, pertain to, reflect, comprise, contain, embody, mention, show, support, contradict, and discuss, whether directly or indirectly, as required by the context to bring within the scope of the requests in this request for production of Documents any Documents that might be deemed outside their scope by another construction.

7.     "Dey" shall mean Dey, Inc., Dey, L.P, and Dey, L.P., Inc. and any of their past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on their behalf or under their control.

8.     "Documents" shall mean all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, Communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies,

recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers. A draft or non-identical copy is a separate Document within the meaning of this term.

9.      "EAC" or "Estimated Acquisition Cost" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.502.

10.      "Each," "any," and "all" shall mean "each and every."

11.      "Federal government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, attorneys, or representatives of any of the foregoing. The United States Government includes, but is not limited to, CMS/HCFA, Congress, Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, Pharmacy Support Services Center, and the National Association of Medicaid Fraud Control Units, and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of the foregoing.

12.      "FUL" or "Federal Upper Limit" shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.332 prior to January 2, 2008, and 42 C.F.R. § 447.514 as of January 2, 2008.

13.     "J-Code reimbursement basis" shall mean the reimbursement of drugs through use of a subset of the HCPCS code set with a high-order value of "J" (compare to "NDC reimbursement basis").

14.     "MAC" shall mean "Maximum Allowable Cost" and includes the meaning ascribed to that term in any state Medicaid plan, or as defined by any state Medicaid department or agency.

15.     "Manufacturer" shall mean a company that manufactures pharmaceutical products.

16.     "Medicaid" shall mean the jointly funded federal-state health insurance program enacted in 1965 under Title XIX of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

17.     "Medicaid Crossover Claim" shall mean claims for which Medicare is the primary payor and the state Medicaid agency is the secondary payor.

18.     "Medicaid Drug Rebate Program" shall mean and refers to the program established by the Omnibus Budget Reconciliation Act of 1990, 42 U.S.C. § 1396r-8, as amended by the Veterans Health Act of 1992, whereby drug manufacturers have national drug rebate agreements with HHS and a pricing agreement with HHS for the Public Health Service Section 340B Drug Pricing Program.

19.     "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

20.    "Meeting" shall mean any discussion between two or more persons either in person, telephonically, or through other electronic means.

21.    "MFCU" shall mean individual state Medicaid Fraud Control Units, including its administrators, staff, employees, agents, consultants, accountants, or attorneys.

22.    "Medicare" shall mean the federal program enacted in 1965 under Title XVIII of the Social Security Act to pay for the costs of certain healthcare expenses of eligible beneficiaries.

23.    "Myers & Stauffer" shall mean Myers & Stauffer, L.C. and any of its representatives, agents, employees, or other person or entity acting or purporting to act on its behalf or under its control.

24.    "NAMFCU" shall mean National Association of Medicaid Fraud Control Units and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.

25.    "NDC reimbursement basis" shall mean the reimbursement of drugs based on a Provider's submission of a National Drug Code ("NDC") (compare to "J-code reimbursement basis").

26.    "Person" shall mean any natural person or any firm, business, legal, or governmental agency or association, or any other organization or entity.

27.    "Point of Sale System" shall mean a computer-transmitted claims processing system used by Providers to submit claims to the state Medicaid agency.

28.  "Pricing Element" shall mean any of the following:

(a)  Average Wholesale Price or "AWP";

(b)  Blue Book Average Wholesale Unit Price;

(c)  Blue Book Average Wholesale Package Price;

(d)  Calculated Average Wholesale Package Price;

(e)  Wholesale Unit Price;

(f)  Wholesale Acquisition Cost or "WAC";

(g)  Maximum Allowable Cost or "MAC";

(h)  Suggested Wholesale Price "SWP";

(i)  Wholesale Net Price;

(j)  Direct Price;

(k)  List Price;

(l)  Actual Sale Price;

(m)  BaseLine Price;

(n)  BaseLine AWP Unit Price;

(o)  BaseLine Direct Price Unit Price;

(p)  BaseLine Net Wholesale Price Unit Price;

(q)  Estimated Acquisition Cost or "EAC";

(r)  Federal Maximum Allowable Cost (a/k/a Federal Upper Limit or "FUL");

(s)  Department of Justice Medicaid Average Wholesale Price;

(t)  Generic Price Indicator;

(u)  Generic Price Spread Indicator;

(v)  State Maximum Allowable Cost or "SMAC";

(w)  Usual and customary charge; or

(x)  Any pricing element created by the federal government or state Medicaid agencies.

29.  "Provider" or "Providers" shall mean any and all persons or entities that render health care services or products, including but not limited to pharmacists, institutional pharmacies, home health agencies, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

30.    "Publisher" or "Publishers" shall mean Red Book, First DataBank, Blue Book, and Medi-Span, their predecessors and successors, and all employees, agents, consultants, accountants, or attorneys of any of the foregoing.

31.    "Reimbursement" shall mean the amount of, or formula for calculating, the payment under Medicare, Medicaid, or a medical assistance program at which healthcare providers are reimbursed for administering or dispensing prescription drugs to a beneficiary.

32.    "Roxane Defendants" shall mean Boehringer Ingelheim Corp., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Roxane, Inc., and Roxane Laboratories, Inc., and any of their past or present officials, officers, representatives, agents, assigns, attorneys, or employeesand all other persons or entities acting or purporting to act on their behalf or under their control.

33.    "Subject Drugs" shall mean those drugs listed on attached Schedule 1.

34.    "Subject HCPCS Codes" shall mean those J-Codes and K-Codes associated with the Subject Drugs, including but not limited to those J-Codes and K-Codes identified in attached Schedule 2.

35.    "U.S. Government" shall mean all legislative and executive branches, agencies, departments, or committees of the United States Government, including the administrators, staff, employees, agents, consultants, accountants, or attorneys of any of the foregoing.   U.S. Government includes but is not limited to CMS/HCFA, Congress, Department of Commerce, Department of Defense, Department of Justice, Department of Health and Human Services, Department of Health and Human Services-Office of Inspector General, Department of Veterans

Affairs General Accounting Office, Medicare Payment Advisory Commission (MedPac), Office of Management and Budget, Office of Pharmacy Affairs/Pharmacy Affairs Branch, and Pharmacy Support Services Center.

36.    "Ven-A-Care" shall mean Ven-A-Care of the Florida Keys, Inc., a corporation organized under the laws of Florida, and all predecessor or successor corporations, and any of its past or present officials, officers, representatives, agents, assigns, attorneys, employees, divisions, departments, agencies, affiliates, subsidiaries, and all other persons or entities acting or purporting to act on its behalf or under its control.

37.    "WAC" shall mean "Wholesale Acquisition Cost" and refers to any price represented as a price to any entity that purchases pharmaceutical products from a Manufacturer, or any price as periodically published as WAC by a Publisher.

38.    "You" or "Your" shall mean the "State Medicaid Program" and all branches, agencies, committees, or departments, including the administrators, staff, employees, agents, consultants, accountants, or attorneys and all other persons or entities acting or purporting to act on their behalf or under their control..

39.    "340B Provider" shall mean any provider described in Section 340B of the Public Health Act, 42 U.S.C. § 256(b).

40.    The terms "and" and "or" shall mean "and/or."

## Instructions

1.      Unless otherwise specifically stated, the requests below refer to the time-period from January 1, 1984 to present.

2.      The singular form of a noun or pronoun includes the plural form, and the plural form includes the singular.

3.      In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," and "every," the intended meaning is inclusive rather than exclusive.

4.      These requests seek responsive Documents in Your possession, as well as any responsive Documents that are within Your control or are otherwise available to You, such as Documents in the possession of Medicaid fiscal intermediaries and related agencies.

5.      When an objection is made to any request or any subpart thereof, please state with specificity the part or subpart of the Document request considered to be objectionable and all grounds for the objection.

6.      If You find the meaning of any term in these Document requests to be unclear, please assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning, or, contact counsel for the party that served the subpoena for further clarification.

7.      Each request for Documents seeks production of the Document in its entirety, without abbreviation or redaction, including all attachments or other matters affixed thereto.

8.   With respect to each Document that is withheld from production for any reason, or any portion of any Document that has been redacted for any reason in connection with the production of a Document, please provide a statement setting forth:

(a)   its date;
(b)   its title;
(c)   its author;
(d)   its addressee;
(e)   the specific privilege under which it is withheld;
(f)   its general subject matter;
(g)   its present custodian; and
(h)   a description of it that You contend is adequate to support the contention that it is privileged.

9.   All electronic files should be produced where possible in electronic form, along with any software needed to access the information contained in the file and appropriate legends, keys, or other information needed to access and understand the data.

## SCHEDULE 1:  SUBJECT DRUGS

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 49502-0303-17 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| 49502-0333-17 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| 49502-0303-27 | ALBUTEROL INHALATION AEROSOL MDI REFILL, 17G |
| 49502-0196-20 | ALBUTEROL SULFATE INHALATION SOLUTION .5% 5MG/ML SIZE, 20ML MD |
| 49502-105-01 | ALBUTEROL SULFATE .5% (STERILE) 20ML MD |
| 49502-0697-03 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 25, 2.5 MG/3ML |
| 49502-0697-33 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 30, 2.5 MG/3ML |
| 49502-0697-60 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 60, 2.5 MG/3ML |
| 49502-0689-12 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 120S |
| 49502-0689-02 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 60S |
| 49502-0685-33 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 30S |
| 49502-0685-60 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 60S |
| 49502-0685-03 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 25S |
| 00054-4084-25 | AZATHIOPRINE USP 50MG TABLET 100S (10 X 10) |
| 00054-4221-25 | DICLOFENAC SODIUM 50MG TABLET 100S (10 X 10) |

i

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 00054-4222-25 | DICLOFENAC SODIUM 75MG TABLET 100S (10 X 10) |
| 00054-3294-46 | FUROSEMIDE 10MG/ML SOLUTION 60ML |
| 00054-3294-50 | FUROSEMIDE 10MG/ML SOLUTION 120ML |
| 00054-4297-25 | FUROSEMIDE 20MG TABLET 100S (10 X 10) |
| 00054-8297-25 | FUROSEMIDE 20MG TABLET 100S UD |
| 00054-4297-31 | FUROSEMIDE 20MG TABLET 1000S |
| 00054-4299-25 | FUROSEMIDE 40MG TABLET 100S (10 X 10) |
| 00054-8299-25 | FUROSEMIDE 40MG TABLET 100S UD |
| 00054-4299-31 | FUROSEMIDE 40MG TABLET 1000S |
| 00054-4301-25 | FUROSEMIDE 80MG TABLET 100S (10 X 10) |
| 00054-8301-25 | FUROSEMIDE 80MG TABLET 100S UD |
| 00054-4301-29 | FUROSEMIDE 80MG TABLET 500S |
| 00054-4392-25 | HYDROMORPHONE 2MG TABLET 100S (4 X 25) |
| 00054-4394-25 | HYDROMORPHONE 4MG TABLET 100S (4 X 25) |
| 00054-4790-25 | ORAMORPH SR 15MG TABLET 100S (4 X 25) |
| 00054-4805-19 | ORAMORPH SR 30MG TABLET 50S |
| 00054-4805-25 | ORAMORPH SR 30MG TABLET 100S (4 X 25) |
| 00054-4805-27 | ORAMORPH SR 30MG TABLET 250S |
| 00054-4792-25 | ORAMORPH SR 60MG TABLET 100S |
| 00054-4793-25 | ORAMORPH SR 100MG TABLET 100S |
| 00054-3751-44 | ROXANOL 20MG/ML SOLUTION 30ML |
| 00054-3751-50 | ROXANOL 20MG/ML SOLUTION 120ML |
| 00054-3751-58 | ROXANOL 100 20MG/ML SOLUTION 240ML |
| 00054-4658-25 | ROXICODONE 15MG TABLET 100S (4 X 25) |
| 00054-4665-25 | ROXICODONE 30MG TABLET 100S (4 X 25) |

| NATIONAL DRUG CODE | DRUG DESCRIPTION |
|---|---|
| 00054-3805-63 | SODIUM POLYSTYRENE O/S 15G/60ML 500 ML |
| 00054-8816-11 | SODIUM POLYSTYRENE O/S 15G/60ML 60 ML 10S UD |
| 00054-8402-11 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 25S |
| 00054-8402-13 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 30S |
| 00054-8402-21 | IPRATROPIUM BROMIDE .02% 2.5ML SOLUTION 60S |

## SCHEDULE 2: SUBJECT HCPCS CODES

| HCPCS CODE | DRUG DESCRIPTION |
|---|---|
| J3535 | ALBUTEROL INHALATION AEROSOL METERED-DOSE INHALER, 17G |
| J7611, J7618, J7625 | ALBUTEROL SULFATE .5% (STERILE) 20ML MD |
| J7620, K0505 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 25, 2.5 MG/3ML |
| J7613, J7619 | ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 30, 2.5 MG/3ML; ALBUTEROL SULFATE UNIT DOSE, 0.083% INHALATION SOLUTION, PACKAGE OF 60, 2.5 MG/3ML |
| J7631, J7630; K0503; K0511 | CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 120S; CROMOLYN SODIUM INHALATION SOLUTION 20 MG/2ML, UNIT DOSE VIALS, 60S |
| J7644, J7645, K0518 | IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 30S; IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 60S; IPRATROPIUM BROMIDE INHALATION SOLUTION .02%, .5MG/2.5 ML, 25S |
| J7500, K0119 | AZATHIOPRINE USP 50MG TABLET 100S (10 X 10) |

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>)<br>)<br>) |
| **THIS DOCUMENT RELATES TO:** | )<br>) |
| | ) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,* Civil Action No. 05-11084-PBS, and *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corp., et al.,* Civil Action No. 07-10248-PBS | )<br>)<br>)<br>)<br>)<br>)<br>) |

MDL No. 1456
Civil Action No. 01-12257-PBS

Hon. Patti B. Saris

UNITED STATES' NOTICE OF DEPOSITION
OF THE STATE OF GEORGIA DEPARTMENT OF COMMUNITY HEALTH

PLEASE TAKE NOTICE that, pursuant to Rules 30(b)(6) and 45 of the Federal Rules of Civil Procedure, the United States of America by and through its undersigned attorneys, will take the deposition upon oral examination of a representative of the State of Georgia Department of Community Health on the Topics of Inquiry listed in Exhibit A of the Attached Subpoena, beginning October 8, 2008, at 9:00 a.m. and continuing from day to day until completed. The deposition will take place at the offices of the United States Attorney's Office, 600 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, GA 30303-3309. The deposition will be conducted under oath by an officer authorized to take such testimony. The deposition may be used for any purpose, including trial.

The State of Georgia shall designate a person or persons to testify under oath about the subjects set forth in the Areas of Inquiry set forth in Exhibit A of the attached Subpoena. The relevant time period for these purposes is January 1, 1991, to the present.

For the United States of America,

GREGORY G. KATSAS
ASSISTANT ATTORNEY GENERAL

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

*Laurie A. Oberembt*

GEORGE B. HENDERSON, II
BARBRA HEALY SMITH
JEFFERY J. FAUCI
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
(617) 748-3272

JOYCE R. BRANDA
DANIEL R. ANDERSON
LAURIE A. OBEREMBT
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044

For the relator, Ven-A-Care of the
Florida Keys, Inc.,

JAMES J. BREEN
The Breen Law Firm, P.A.
3350 S.W. 148th Avenue
Suite 110
Miramar, FL 33027
Tel:  (954) 874-1635
Fax: (954) 874-1705

SHERRIE R. SAVETT
ROSLYN POLLACK
GARY L. AZORSKY
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-875-3000
Facsimile: 215-875-4636

Dated: July 11, 2008

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above document was served upon the attorney of record for each party by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated: July 11, 2008

*Laurie A. Oberembt*

Laurie A. Oberembt
Senior Trial Attorney

2

## SUBPOENA EXHIBIT A: TOPICS OF INQUIRY

### Topics of Inquiry

1.   From January 1, 1991, to the present, the methodology by which your Department of Community Health determined the amount paid to pharmacy providers for claims they submitted for prescription drugs. This topic shall cover the source of that drug payment methodology (i.e., statute, regulation, Administrative Rule, state plan).

2.   From January 1, 1991, to the present, the manner in which the Department of Community Health or its fiscal agent implemented the payment methodology described in Topic #1. This topic shall include how you or your fiscal agent

   (a)   determined the Estimated Acquisition Cost for prescription drugs and the extent to which published drug pricing was used,

   (b)   obtained the Federal Upper Limit,

   (c)   calculated the Maximum Allowable Cost,

   (d)   determined "usual and customary" charges, and

   (e)   determined the lowest of the above criteria.

3.   From January 1, 1991, to the present, the manner in which your State used the Average Wholesale Price, Wholesale Acquisition Cost, Direct Price published in First DataBank's Blue Book or any other drug pricing publication.

4.   From January 1, 1991, to the present, the dispensing fee normally paid by your State to providers for prescription drugs.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

<u>NORTHERN</u> DISTRICT OF <u>GEORGIA</u>

United States ex rel. Ven-A-Care of the Florida
Keys, Inc., *et al.*
V.
Dey, Inc., *et al.*, Civil Action No. 05-11084-PBS,
and Boehringer Ingelheim Corp., *et al.*, Civil
Action No. 07-10248-PBS

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   MDL No. 1456
01-12257-PBS  (D. Mass)

TO:   Georgia Department of Community Health
c/o Angela Branch
2100 East Exchange Place, Suite 200, Building 1
Tucker, GA 30084-5336

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| United States Attorney's Office, 600 U.S. Courthouse, 75 Spring Street, S.W., Atlanta, GA  30303-3309 | October 8, 2008 at 9:00 a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Laurie A. Oberembt*   Senior Trial Counsel for Plaintiff | July 11, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Laurie A. Oberembt, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 261, Ben Franklin Station, Washington, D.C. 20044, (202) 514-3345

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

¹ If action is pending in district other than district of issuance, state district under case number.
AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Angela Branch | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

**Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).