# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - -

 4    IN RE:  PHARMACEUTICAL       )   MDL NO. 1456

 5    INDUSTRY AVERAGE WHOLESALE   )   CIVIL ACTION

 6    PRICE LITIGATION             )   01-CV-12257-PBS

 7    THIS DOCUMENT RELATES TO     )

 8    U.S. ex rel. Ven-a-Care of   )   Judge Patti B. Saris

 9    the Florida Keys, Inc.       )

10        v.                       )   Chief Magistrate

11    Abbott Laboratories, Inc.,   )   Judge Marianne B.

12    No. 06-CV-11337-PBS          )   Bowler

13    - - - - - - - - - - - - - - -

14         (captions continue on following pages)

15

16

17       Videotaped deposition of LUIS E. COBO

18                    Volume I

19

20                   Washington, D.C.

21                   Friday, January 18, 2008

22                   8:00 a.m.
```

```
 1        IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS

 2                  201st JUDICIAL DISTRICT

 3     - - - - - - - - - - - - - - - -

 4     THE STATE OF TEXAS,              )

 5     ex rel. VEN-A-CARE OF THE        )

 6     FLORIDA KEYS, INC.,              )

 7              Plaintiffs,             ) Cause No. GV401286

 8         vs.                          )

 9     ABBOTT LABORATORIES INC., et     )

10     al.,                             )

11              Defendants.             )

12     - - - - - - - - - - - - - - - -

13

14        Videotaped deposition of LUIS E. COBO, held at

15     the law offices of Jones Day, 51 Louisiana Avenue,

16     N.W., Washington, D.C. 20001-2113, the proceedings

17     being recorded stenographically by Jonathan Wonnell,

18     a Registered Professional Court Reporter and Notary

19     Public of the District of Columbia, and transcribed

20     under his direction.

21

22
```

```
 1      A P P E A R A N C E S    O F    C O U N S E L

 2

 3        On behalf of the United States of America:

 4              RENEE BROOKER, ESQ.

 5              U.S. Department of Justice

 6              Civil Division, Commercial Litigation

 7              601 D Street, N.W., Room 9918

 8              Washington, D.C. 20004

 9              (202) 616-3797

10              renee.brooker@usdoj.gov

11

12        On behalf of the State of Texas:

13              MARGARET MOORE, ESQ.

14              Office of the Attorney General of the

15                State of Texas

16              301 West 15th

17              Austin, Texas 78701

18              (512) 936-1319

19

20

21

22
```

Page 4

```
 1              A P P E A R A N C E S   (Cont'd)

 2

 3        On behalf of Ven-A-Care of the Florida Keys,

 4             Inc.:

 5             JAMES JOSEPH BREEN, ESQ.

 6             The Breen Law Firm

 7             5755 North Point Parkway, Suite 39

 8             Alpharetta, Georgia 30022

 9             (770) 740-0008

10             jbreen@breenlaw.com

11

12        On behalf of Abbott Laboratories, Inc.:

13             R. CHRISTOPHER COOK, ESQ.

14             LOUIS P. GABEL, ESQ.

15             Jones Day

16             51 Louisiana Avenue, N.W.

17             Washington, D.C. 20001-2113

18             (202) 879-3939

19             christophercook@jonesday.com

20             lgabel@jonesday.com

21

22
```

```
 1              A P P E A R A N C E S   (Cont'd)

 2

 3        On behalf of Dey, Inc. and Dey, L.P. and

 4             Mylan:

 5             WILLIAM ESCOBAR, ESQ.

 6             Kelley, Drye & Warren LLP

 7             101 Park Avenue

 8             New York, New York 10178

 9             (212) 808-7771

10             wescobar@kelleydrye.com

11

12        On behalf of Roxane Laboratories and

13             Boehringer Ingelheim:

14             ERIC GORTNER, ESQ.

15             Kirkland & Ellis

16             200 East Randolph Drive

17             Chicago, Illinois 60601

18             (312) 861-2285

19             egortner@kirkland.com

20

21

22
```

1          A P P E A R A N C E S   (Cont'd)

2       ALSO PRESENT:

3            T. MARK JONES, Ven-A-Care

4            JOHN LOCKWOOD, Ven-A-Care

5            EMILY WATSON, legal assistant

6            KATHY KRAUSE, legal assistant

7            RICK SANBORN, videographer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Cobo, Luis E.                                                    January 18, 2008

Page 31

1    pharmacy, then that would happen electronically.

2    And then there would be a feedback to the pharmacist

3    submitting the claim and the results of the claim

4    and how it was handled were shown.

5         Q.    We've mentioned it a couple of times in

6    passing, but you have worked in the past both for

7    Ven-A-Care, which as I understand it was an infusion

8    pharmacy, correct?

9         A.    Correct.

10        Q.    And you have worked in the past for the

11   Cobo Pharmacy, which as I understand it was a retail

12   pharmacy?

13        A.    Correct.  A community pharmacy, yes.

14        Q.    Could you tell me what are the years for

15   which you were working as a pharmacist for the Cobo

16   Pharmacy?

17        A.    As a pharmacist -- I grew up in the

18   pharmacy.  But as a pharmacist when I came out of

19   the University of Florida in 1976 I immediately

20   started working at Cobo Pharmacy with my father.  I

21   eventually purchased the pharmacy and continued its

22   operation until -- I think the closing time was June

Cobo, Luis E.                                                                    January 18, 2008

Page 32

```
 1    1 of 2000.

 2          Q.    Why did you close the pharmacy?

 3          A.    We had just come off of a long and hard

 4    battle through Ven-A-Care.  It was a very exhaustive

 5    thing and a very demanding things and we were able

 6    to get a reward on that based on the conclusion of

 7    the claim that was finally settled by the

 8    government.  And it gave me the opportunity to get

 9    out of the community type of practice and start

10    dedicating my time completely in Ven-A-Care.

11          Q.    Do I hear you telling me that you made a

12    lot of money and didn't need to make money in a

13    community pharmacy anymore?

14          MR. BREEN:  Objection, form.

15          A.    Say that again.

16          Q.    As I hear what you're telling me, it

17    sounds like you made a lot of money through

18    litigation with Ven-A-Care and no longer needed to

19    run a pharmacy in order to make a living?

20          MR. BREEN:  Objection, form.

21          A.    Well, I could have run the pharmacy and

22    continued to make a living.  I was not not making a
```

Cobo, Luis E.

January 18, 2008

Page 37

1   was.

2       Q.    And in 2000 you received a $2.4 million

3   payout from Ven-A-Care, correct?

4       A.    That's correct.

5       Q.    And shortly thereafter decided to close

6   the pharmacy, correct?

7       A.    Correct.

8       Q.    Devoted full time your efforts to

9   Ven-A-Care after that?

10      A.    Yes.

11      Q.    You received several other payouts from

12  Ven-A-Care over the years from settlements of

13  litigation, correct?

14      A.    Yes.

15      Q.    Do you have a number in mind what the

16  total amount you've received from litigation

17  settlements has been from Ven-A-Care?

18      A.    I do not.  And I can only go back to when

19  Dr. Lockwood was doing his deposition and giving the

20  recounting.  He's much more capable of that type of

21  retention.  And I would have to say following that

22  scenario of the various settlements that we've had

Cobo, Luis E.                                                        January 18, 2008

```
 1    and that he pointed out, that I guess $10 million,

 2    $12 million, $10 million before taxes figure is in

 3    the that unreasonable.

 4         Q.    Now, as I understood it, your stake in

 5    Ven-A-Care was greater than Dr. Lockwood's, wasn't

 6    it?  Or do I have that incorrect?

 7         A.    What do you mean by stake?

 8         Q.    Your percentage ownership of Ven-A-Care.

 9         A.    Eventually we evened out the ownership

10    situation from a stock perspective and from a salary

11    perspective.  Initially when Dr. Lockwood came in to

12    Ven-A-Care, you know, working he was basically a 5

13    percent minority shareholder.  He helped to start

14    the concept to Ven-A-Care and help fund it.  He was

15    one of the people their went to as an investor in

16    the community and he believed in the concept and

17    bought into it.

18              So as he became more active and

19    productive in Ven-A-Care then those things changed

20    and eventually evened out.

21         Q.    By 2000 was your share of Ven-A-Care

22    equal to Dr. Lockwood's?
```

Cobo, Luis E.                                                    January 18, 2008

Page 41

```
 1    and $12 million as a result of --

 2         A.    I think we're all in the same ballpark.

 3               MR. BREEN:  Objection to form.  And I'd

 4    ask the witness to just pause so that if I have an

 5    objection which sometimes I do I can interpose them.

 6               THE WITNESS:  I'm noticed.

 7         Q.    So as a result of your relationship with

 8    Ven-A-Care, your best estimate, realizing that you

 9    haven't tallied it up mathematically, would be

10    between 10 and $12 million, correct?

11               MR. BREEN:  Objection to form.

12         A.    I don't know if it would be my best

13    estimate, but the estimate that I think I can

14    comfortably stand by today.

15         Q.    Okay.  What would your best estimate be?

16               MR. BREEN:  Objection to form.

17         A.    (No response.)

18         Q.    While you were a pharmacist at Cobo

19    Pharmacy -- let's go back to 1976 -- what were your

20    duties at the Cobo Pharmacy?

21         A.    I think far probably -- well, initially I

22    was one of the pharmacists.  I obviously was working
```

Page 42

```
 1    with my father and he was the owner and certainly in

 2    charge of everything.  But he gave me a leeway and

 3    allowed me to sort of expand in my roles rapidly.  I

 4    could understand why he would be anxious to want to

 5    retire.  And I think during most of my tenure there

 6    as a pharmacist I think I was also manager in charge

 7    of records and what have you.  Pharmacy records

 8    concerning narcotics and those types of aspects.

 9        Q.    Did you keep the books?

10        A.    Did I keep the books?

11        Q.    The books.  The accounting.

12        A.    The accounting books?  Yeah, we had an

13    office.  Traditionally I grew up in a situation

14    where my mother always kept the books for my father.

15    I mean, it was a regular mom and pop type of

16    community pharmacy.  And my wife at the time sort of

17    took over that role as well and continued making the

18    payments or what have you.  And then we had an

19    accountant that sort of oversaw, regulated and took

20    care of all the state and government filings and

21    things that needed to be done.  We kept the books

22    and it was overseen by an accounting firm.
```

1        Q.      Who was primarily responsible in the Cobo

2    Pharmacy over the years for submitting claims to

3    mostly I guess Medicaid, but if it were appropriate,

4    Medicare, for payment?

5        A.      In the State of Florida, at least, claims

6    can be submitted -- you're allowed to have pharmacy

7    technicians.  And that's something that has changed.

8    The ratio of which can change.  And as long as

9    they're working under the direct supervision of a

10   pharmacist then they can also submit the claims.

11   However, the responsibility ultimately lands on the

12   pharmacists on duty at the time.

13           Part of that is recognized in when the

14   claims were submitted there was always a field on

15   the claim form, electronically or otherwise, where

16   you had to indicate the pharmacist that was on duty.

17   I think all they required were initials at the time.

18   But that would identify who the pharmacist of record

19   was.

20       Q.      On the claim forms, whether they were

21   paper or electronic, there would be a field for the

22   billed charge, correct?

Page 98

1    products in your home?

2         A.    No, I do not.

3         Q.    Those would be the documents that you

4    have in storage relating to the Cobo Pharmacy,

5    correct?

6         A.    Well, again, I'm trying to think.  Those

7    billing items, those types of documents and records

8    would have been turned over to CVS, if that's what

9    you're referring to.  So that would have been over

10   the previous five years.  And anything beyond that,

11   I don't think there's anything left in that regard.

12        Q.    You mentioned archived documents from

13   Cobo Pharmacy that you did retain.

14        A.    Mm-hmm.

15        Q.    Could you describe those documents for

16   me?

17        A.    Shh I've not been through them.  But they

18   were just basic -- the same reputation of documents

19   that we have from year to year where we have

20   whatever it took to run Cobo Pharmacy as a business,

21   utility bills, invoices from wholesalers.  We would

22   use two primary wholesalers, one primary wholesaler.

 1    Another was a secondary backup wholesaler.  So we

 2    would get invoices and statements and what have you.

 3            We also had a reasonable durable medical

 4    equipment department, so we have invoices from the

 5    different medical equipment suppliers and what have

 6    you.  And then we also ran a front end of somewhat

 7    boutique items and perfumes and cosmetics and

 8    Hallmark cards and Pampers and that type of thing.

 9    So all those different entities that we dealt with

10    that would encompass and be responsible for the

11    business.

12        Q.    So how far back beyond 2000 would you

13    believe that those business records would stretch?

14        A.    I don't know offhand.  I want to say '95

15    off the top of my head.

16        Q.    What's the volume of the records?

17        A.    Six banker's boxes?  I don't know.  We

18    could put all our stuff basically into one banker's

19    box.  I would have to say it's about that.

20        Q.    You understand that you're here in

21    connection with in particular two lawsuits relating

22    to Abbott, one that Ven-A-Care has brought into

1    When it was in operation.

2         A.     It's a corner drug store on the corner of

3    Fleming and Grinnell Streets in Key West, Florida.

4    The pharmacy portion, the main portion, is about

5    2500 square feet.  Of that probably one fourth of

6    that is dedicated to prescription pharmacy services.

7    There is a storeroom in the back of the prescription

8    service for receiving and checking in stock.

9              There was an office space.  And then

10   there was some -- next to that some additional

11   office space, all interconnected.  Excuse me.  Not

12   office space.  It was a room that was used for

13   storage.  Not office.

14        Q.     You also over the years have been

15   affiliated with Ven-A-Care, the infusion pharmacy,

16   correct?

17        A.     Yes.

18        Q.     Could you describe for me what the

19   physical layout of the Ven-A-Care facilities?

20        A.     Ven-A-Care was located directly next

21   door.  It was a property that became available with

22   the inception of Ven-A-Care.  And we occupied what

```
 1    actually was two different areas that we opened up

 2    and turned into one operating unit.  And in it -- I

 3    don't know what the square footage was, but I would

 4    say maybe, you know, a thousand square feet total,

 5    part of which was office space just to accommodate a

 6    desk area and office things and another part that

 7    had a secretary's working area, conference table,

 8    bathroom and then there was a back room that

 9    contained -- that we turned into storage, shelfed it

10    out and made storage area from it.  And of course a

11    bathroom.

12         Q.    Where would drug products in Ven-A-Care's

13    inventory be maintained?

14         A.    There was a pharmacy room as well, a

15    mixing room as well.  And drug product we would keep

16    in one of two places, either things that we were

17    using and had to be special storage consideration we

18    would keep directly in the pharmacy area under

19    prescribed legal lock situation whether it's

20    narcotic, scheduled drugs and what have you.  And

21    that was kept in the clean room area.

22                 And then we had products that we would
```

Page 250

1      Q.    Mr. Cobo, in your deposition in Texas you

2   described an approximately $40,000 repayment that

3   you made on behalf of the Cobo Pharmacy in 2000?

4      A.    Yes.

5      Q.    Just as a matter of timing, did you make

6   that repayment or did the Cobo Pharmacy make that

7   repayment after it closed up shop or before you

8   closed it as a pharmacy?

9      A.    After.  After Cobo Pharmacy had closed.

10      Q.    So this would be after you had sold it to

11   CVS, correct?

12      A.    Correct.

13      Q.    How much did CVS pay for the pharmacy, by

14   the way?

15      A.    I think it was $165,000 for the business,

16   the pharmacy portion of the business.

17      Q.    Do you know for which specific claims

18   Cobo Pharmacy made the repayment that you described

19   in your Texas testimony?

20      A.    For which specific claims?

21      Q.    Yes, sir.

22      A.    Well, I tried to cover -- include all

Page 251

1   claims that might be in question.   And in doing so

2   there were specific claims that were used so that I

3   could accurately determine some percentage, some

4   value, with which to calculate a final number.   So

5   there were specific claims that were selected that

6   sort of gave me the accurate information or as

7   accurate as possible in order for me to follow

8   through that methodology.

9        Q.    Did you repay these claims because you

10   felt you or the Cobo Pharmacy had acted

11   inappropriately in any way in originally obtaining

12   the payments from Medicaid?

13       A.    Well, I wouldn't characterize it as

14   acting inappropriately.   When I came over from Cobo

15   Pharmacy and began working at Ven-A-Care and started

16   getting an appreciation of the impact of our claims

17   and the affect of false price reporting by

18   manufacturers in the Medicaid arena, which had been

19   my primary exposure and experience, and saw the

20   impact of how that filtered throughout that entire

21   reimbursement methodology, if you will, I went back

22   and felt obligated to review the claims that I had

Page 252

1    still in my possession, as best I could, and try to

2    offset any reimbursements that Cobo Pharmacy would

3    have, in my opinion, inadvertently received as a

4    result of the paying mechanism that was in place.

5    And that's when I took on this project, self imposed

6    project.

7         Q.    When did you begin your work with

8    Ven-A-Care?

9              MR. BREEN:  Objection, form.

10        A.    Well, let's put it this way.  As a

11   pharmacist, obviously I began day one, in 1987,

12   whatever that incorporation date was and what have

13   you.  As the direction of Ven-A-Care changed because

14   of the lawsuit and the redirection of our patients

15   and then the demand to have a pharmacist on the

16   premises most of the day taking care of pharmacy

17   issues and compounding and what have you, and then

18   also because of the financial strain that began

19   being put on the individuals, I sort of backed out

20   of Ven-A-Care from that -- from the time that I was

21   spending there, minimized my time, and concentrated

22   my efforts more on Cobo Pharmacy.

Page 271

1

2

3

4

5

6

7                                    _____

8                              SIGNATURE OF THE WITNESS

9

10    Subscribed and sworn to and before me

11    this _____ day of _____, 20____.

12

13

14    _____

15            Notary Public

16

17

18

19

20

21

22