# EXHIBIT C

Page 592

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3                   MDL No. 1456

 4            Master File No. 01-CV-12257-PBS

 5      -------------------------------------X

 6      In Re:  PHARMACEUTICAL INDUSTRY       )

 7      AVERAGE WHOLESALE PRICE LITIGATION    )

 8      -------------------------------------X

 9      UNITED STATES OF AMERICA ex rel.      )

10      VEN-A-CARE OF THE FLORIDA KEYS,       )

11      INC., et al.,                         )

12           Plaintiffs,                      )

13      v.                                    )

14      DEY, INC., et al., (Civil Action      )

15      No. 05-11084-PBS),                    )

16           Defendants.                      )

17      -------------------------------------X

18            CAPTIONS CONTINUE ON FOLLOWING PAGES

19

20                    VOLUME III

21      CONTINUED VIDEOTAPED DEPOSITION OF LUIS COBO

22
```

Page 593

1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                    MDL No. 1456

4            Master File No. 01-CV-12257-PBS

5    -------------------------------------X

6    In Re:  PHARMACEUTICAL INDUSTRY        )

7    AVERAGE WHOLESALE PRICE LITIGATION     )

8    -------------------------------------X

9    UNITED STATES OF AMERICA ex rel.       )

10   VEN-A-CARE OF THE FLORIDA KEYS,        )

11   INC., et al.,                          )

12        Plaintiffs,                       )

13   v.                                     )

14   BOEHRINGER INGELHEIM CORPORATION,      )

15   et al., (Civil Action No.              )

16   07-10248-PBS),                         )

17        Defendants.                       )

18   -------------------------------------X

19

20

21

22

Page 594

1          IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

2                         STATE OF MISSOURI

3                 CASE NO. 054-2486   DIV. 3

4     --------------------------------------X

5     STATE OF MISSOURI, ex rel, JEREMIAH  )

6     W. (JAY) NIXON ATTORNEY GENERAL, and )

7     MISSOURI DEPARTMENT OF SOCIAL        )

8     SERVICES, DIVISION OF MEDICAL        )

9     SERVICES,                            )

10         Plaintiffs,                     )

11    v.                                   )

12    MYLAN LABORATORIES INC., et al.,     )

13        Defendants.                      )

14    --------------------------------------X

15

16

17

18

19

20

21

22

Page 595

1                    VOLUME III

2        CONTINUED VIDEOTAPED DEPOSITION OF LUIS COBO

3    Taken before Gina Garcia, RPR, CRR, Notary Public in

4    and for the State of Florida at Large, pursuant to

5    Notice of Continued Deposition filed in the above

6    cause.

7

8

9                      2 South Biscayne Boulevard

10                     21st Floor

11                     Miami, Florida

12                     Thursday, 8:59 a.m. - 4:55 p.m.

13                     July 31, 2008

14

15

16

17

18

19

20

21

22

Page 596

```
 1    APPEARANCES:

 2

 3    For Ven-A-Care of the Florida Keys:

 4

 5          THE BREEN LAW FIRM

 6          By:  JAMES JOSEPH BREEN, ESQUIRE

 7          and  ALISON WARREN SIMON, ESQUIRE

 8          Suite 110

 9          3350 S.W. 148th Avenue

10          Miramar, Florida  33027

11          (954)874-1635

12          Jbreen@breenlaw.com

13

14

15    For the United States Department of Justice:

16

17          UNITED STATES ATTORNEY'S OFFICE

18          SOUTHERN DISTRICT OF FLORIDA

19          By:  ANN ST. PETER-GRIFFITH, ESQUIRE

20          99 N.E. 4th Street

21          Miami, Florida  33132

22
```

Page 597

```
 1    APPEARANCES: (CONTINUED)

 2

 3    For Roxane Laboratories and Boehringer Ingelheim:

 4

 5            KIRKLAND & ELLIS

 6            By:  ERIC GORTNER, ESQUIRE

 7            200 East Randolph Drive

 8            Chicago, Illinois  60601

 9            (312)861-2285

10            egortner@kirkland.com

11

12

13    For Dey, Inc. and Mylan:

14

15            KELLEY DRYE & WARREN, LLP

16            By:  WILLIAM A. ESCOBAR, ESQUIRE

17            and  CLIFFORD KATZ, ESQUIRE

18            101 Park Avenue

19            New York, New York  10178-0002

20            (212)808-7609

21            wescobar@kelleydrye.com

22
```

Page 598

```
1                    I N D E X

2    WITNESS:   LUIS COBO (VOLUME III)           PAGE

3       Cross-Examination by Mr. Escobar............ 600

4       Examination by Mr. Gortner.................. 834

5

6

7                  D E Y   E X H I B I T S

8    NUMBER           DESCRIPTION                  PAGE

9    Exhibit Dey 180-Compilations of claim forms for

10                   Ven-A-Care.................... 736

11   Exhibit Dey 181-File on Cobo Pharmacy in the

12                   Florida Medicaid program.

13                   FL-AG-0002871 - 2970.......... 806

14

15

16                R O X A N E   E X H I B I T S

17   NUMBER           DESCRIPTION                  PAGE

18   Exhibit Roxane 098-Fax to Rob Vitto,

19                   R1-030714 - 0716............ 840

20   Exhibit Roxane 099-Fax transmittal sheet to Rob

21                   Vitto, re:  Current

22                   Albuterol prices........... 856
```

Page 606

1     Q.   Let me turn for a bit to the Cobo

2  Pharmacy.  And the Cobo Pharmacy during -- and

3  let's take the period 1990 until it terminated,

4  which I think was in 2000, correct?

5     A.   Somewhere in the middle, about June of

6  2000, yes.

7     Q.   So the Cobo Pharmacy was in business in

8  Key West, Florida, as an independent pharmacy

9  throughout the '90s and into mid-2000, correct?

10     A.   That is correct.

11     Q.   And during that whole period from 1990

12  to mid-2000, you were the person really

13  responsible for running it on a day-to-day basis?

14     A.   That would be correct.

15     Q.   Just in general, how many customers

16  would you say that the Cobo Pharmacy had in terms

17  of its prescription business?

18     A.   I couldn't give you a number of the

19  customer base; I can give you a range of

20  prescriptions that we would fill.  And I would

21  say on, you know, some days, you know, 250 to 300

22  prescriptions; on some days, you know, maybe 50

Cobo, Luis - Vol. III

Miami, FL

July 31, 2008

Page 637

1    there may have been one -- Eckerds may have just

2    started to move into the area or might have just

3    opened up a store or just had opened up its first

4    store in Key West.  By the time I left, there

5    were only two independents left.  And we had

6    Eckerds, which had become CVS.  And we had gone

7    through now Publix had a pharmacy, Winn Dixie had

8    a pharmacy, Albertson's had a pharmacy.  Each of

9    those had -- would have more than one pharmacy on

10   the island.  So whatever those numbers are, there

11   were several.

12        Q.   When you say "the island," you're

13   referring to what?

14        A.   Key West, in particular.

15        Q.   Key West.  And what was the -- so how

16   many -- when you closed up Cobo, when you sold it

17   in mid-2000, how many pharmacies were there in

18   Key West that one could go to and get any

19   prescription filled?

20        A.   All right.  I may have missed one, but,

21   excluding me, I think that would have left seven,

22   seven entities on the island, in Key West.

1       Q.   So prior to Cobo closing, prior to you

2   closing, there would have been about eight

3   pharmacies that people could go to to get

4   prescriptions filled in Key West?

5       A.   I believe that's seven or eight, yes.

6       Q.   And was that the highest number of

7   pharmacies that there had ever been?

8       A.   Probably so.

9       Q.   And if you went back ten years, if you

10  went back to the early '90s, how many pharmacies

11  would you say there were in Key West that would

12  fill prescriptions?

13      A.   Well, by the early '90s, I mean, we

14  still had probably six -- you know, five or six

15  pharmacies.  I think the Walgreens chain was a --

16  one of the later ones to move in.  And they

17  expanded with a second -- with a second store.

18  So, you know, I don't know, probably six.

19      Q.   And were there more independent

20  pharmacies in the early '90s than there were when

21  you closed?

22      A.   I think in the early '90s there was

Page 650

1   ballpark -- any ballpark number as to what that

2   was?

3          A.    A ballpark figure may be over a million

4   dollars on prescription items, and there was a --

5   I would say over a million dollars in the last --

6   in the last year.  And that may be 1.2 or -- I

7   think that's a reasonable big ballpark figure.

8          Q.    And are there still records that you

9   have that would show these numbers in some detail

10  what your revenues were from pharmacy?

11         A.    I've got -- I have to check.  I've got

12  some records that have been kept behind.  We used

13  to do a record purge every seven years.  And when

14  we closed, I'm just trying to think what records.

15  I know we had to move some of our records into

16  storage, and there were some records that were

17  purged, you know, just because of the volume in

18  the storage.  You know, I did keep some documents

19  that I thought would be of interest and personal

20  things, but I'd have to go back and see.  I don't

21  specifically know.

22         Q.    So you -- sitting here today, your best

Page 651

```
 1    recollection is that you have some records of the

 2    Cobo Pharmacy that you still have in your

 3    possession, is that right?

 4        A.    Yes.

 5        Q.    And there are records -- the pharmacy

 6    itself had records related to the pharmacy; some

 7    of those went to Eckerds, which acquired the

 8    pharmacy, is that right?

 9        A.    That's correct.

10        Q.    And if you think about it now, in terms

11    of all the records that you have that you

12    retained for the Cobo Pharmacy, where are those

13    kept?

14        A.    I've got some in storage at a room that

15    I kept at what used to be the Cobo Pharmacy

16    building.  And I've got some stored in the attic

17    at Ven-A-Care.  And thinking about that, I think

18    what I do have access to are my accounting

19    records that would also have, I believe, the

20    breakdown that you're inquiring about.

21        Q.    Now, you don't have any plans to get

22    rid of those documents that you have in your
```

Page 652

```
 1    possession now with respect to Cobo?

 2        A.   No.

 3        Q.   And we would ask that those be retained

 4    for purposes of discovery.

 5        A.   Yeah, I'll retain them.

 6        Q.   Now, taking your ballpark figure of

 7    about a million dollars or so in terms of

 8    revenues on the pharmacy side in that last full

 9    year you were in operation, again, on a ballpark

10    basis, what was the profit on that?

11            MR. BREEN:  Objection, form.

12        A.   That I don't have a -- an answer to,

13    and I would -- I've not revisited that

14    information since you asked just now.  And it

15    would obviously vary from day to day.  I don't

16    know, I would have to revisit the accounting

17    records and see how that, you know, how that

18    comes out.  It was -- it was an exorbitant

19    profit.

20        Q.   Do you have a general sense of on

21    average, in your mind, what the profit margin was

22    on the pharmacy side of your business?
```

Page 653

1            MR. BREEN:   Objection to the form.

2       A.   Without committing to a number, I don't

3   know why around 20 percent is a comfort zone in

4   what I had -- in the overall pharmacy --

5       Q.   And would that be --

6       A.   -- dispensing arena.

7       Q.   And that would be in the dispensing of

8   pharmaceutical products as opposed to anything

9   else you sold in the store?

10      A.   That's correct.

11      Q.   And did your -- the profit margin in

12  connection with your pharmacy business, was that

13  something that over the years increased,

14  decreased, generally stayed the same?  How would

15  you characterize it?

16           MR. BREEN:   Objection to the form.

17      A.   The trend that we often spoke to in

18  reviewing records with, you know, the accountant

19  was that overall revenues were increasing and the

20  cost of doing business was increasing and the

21  profits were staying the same or maybe tightening

22  up.  I mean, there was a point in time prior to

Page 654

1    me beginning practicing, you know, with my father

2    and before that when the marketplace was

3    different, the drugs that were available were

4    different and what have you.  You know, it wasn't

5    unusual, I would say, to have a 33 percent profit

6    margin that one could appreciate.  But, you know,

7    it was a totally different marketplace

8    circumstances, obviously, and economics as well.

9        Q.    So if you were -- if you were to take

10   your recollection and your records and go back

11   through 1976 when I think you first started at

12   the pharmacy and you drew a line of your -- of

13   the profit margin on the pharmacy side, would you

14   say that that line was over the years a declining

15   profit margin?

16            MR. BREEN:  Objection to the form.

17       A.    I believe that would be -- that would

18   be the case, yes.

19       Q.    Now, who was the -- you mentioned an

20   accountant.  Did you have a -- who was the

21   accountant for Cobo?

22       A.    Jack Niles.

Page 655

1        Q.   Jack Niles?  N-I --

2        A.   N-I-L-E-S.

3        Q.   And was he an accountant -- a CPA in

4   Key West?

5        A.   He was an accountant at a firm, and

6   still does, Niles, Willis and Moore.

7        Q.   For what period of time was Mr. Niles

8   and his firm the accountants for Cobo?

9        A.   I don't remember the exact year that I

10  changed accountants, but I want to think it was

11  maybe '98, maybe in the late '90s.

12       Q.   And that's when you retained Mr. Niles?

13       A.   No, that's when I changed from Mr.

14  Niles to Randy Moore.

15       Q.   Randy Moore?

16       A.   Uh-huh.

17       Q.   And what was his firm?

18       A.   Moore and Spottswood.

19       Q.   Any particular reason you changed?

20       A.   Both Jack and Randy were -- you know,

21  are friends of mine.  We've known each year for

22  many years.  In Jack's case, we went to school

```
 1    together.   Randy I met later on in life, but is -
 2    - is a dear friend and has always been -- acted
 3    as a confidant and consultant to me.   And there
 4    was a point in time when I was -- Cobo Pharmacy
 5    was going under some big economic stress.   I was
 6    having problems financially, and he offered to
 7    provide services for me for free.   And I took
 8    advantage of that, not just because they were for
 9    free, but because he was also somebody that I
10    respected professionally.
11         Q.   And was that a period of time of the
12    economic stress around 1998?
13         A.   I believe so.   But, you know, I don't -
14    - I don't have an exact time I could put a finger
15    on.   But yeah, I mean, it was -- I mean, it was
16    through that whole time period, mid to late '90s.
17         Q.   And what is it that was the cause of
18    this economic stress that Cobo was facing during
19    that period of time?
20         A.   The profit margins, shrinking profit
21    margins, cost of doing business going up.   You
22    know, it's very difficult to -- from my
```

1    perspective, it was becoming very difficult to

2    sustain the pharmacy, and I was experiencing

3    economic difficulties and having to do some

4    creative financing and things like that.

5         Q.   Was there a -- was it your impression

6    that that period of economic difficulties was --

7    that it was something unique at Cobo Pharmacy or

8    that that was some strain that independent

9    pharmacies that you know were also facing at that

10   time?

11        A.   I think, you know, it's no secret that

12   economic impact has had on independent

13   pharmacists has been felt across the nation.

14   It's very -- it's one of the reasons that I

15   expanded my practice at Cobo Pharmacy and

16   included a home healthcare center and durable

17   medical equipment and things like that that sort

18   of gave me a little more unique niche and profit

19   center.

20             But with the increase in third-party

21   payors, things like that, yeah, that's put a

22   significant economic clench on independence, in

Page 658

1    particular.

2         Q.    And were there a -- was there ever a

3    year or years where Cobo Pharmacy lost money?

4         A.    No.

5         Q.    So you always had a profit, but over a

6    period of time, the profit margin was being

7    squeezed?

8         A.    Yes.

9         Q.    Now, in terms of -- trying to focus

10   again during the time period of the 1990's, at

11   the Cobo Pharmacy, were you the person that made

12   decisions on where to acquire the drugs that --

13   the prescription drugs that you would dispense?

14        A.    Yes.

15        Q.    And how you would go about doing that

16   in terms of determining what outfits to buy drugs

17   from?

18        A.    I basically had a relationship with two

19   wholesalers, I think as we traditionally always

20   have had, one being McKesson and the other was

21   Gulf Drugs that was then purchased by Bergin

22   Brunswig, and that was my secondary wholesaler.

Page 728

1    to page -- before we get there, if you look at

2    the next page, 2895, that gives you a

3    certification statement that would appear on the

4    back of the claim, right?  And it's in fact

5    entitled:  "Illustration 62 Reverse Side of the

6    Claim Form"?

7         A.   Yes.

8         Q.   And you were familiar, Mr. Cobo,

9    weren't you, with the certification statement

10   that went with the claim?

11        A.   I must have been exposed to it, but I

12   can't -- if you would ask me if I could remember

13   the certification statement on the back of the

14   claim, I would have said, no, I didn't recall

15   that.

16        Q.   Well, did you know that when you were

17   submitting a claim, you were certifying to

18   Florida Medicaid that the information you were

19   providing was true, accurate and complete?

20        A.   Yes.

21        Q.   And take a moment now to just go

22   through and read the three paragraphs of the

```
 1        A.    Um, I would say in the course of Ven-A-

 2   Care's lifetime, there may have been three or

 3   four people who would have had an opportunity to

 4   fill out a claim form.

 5        Q.    And during the period of 1990 and 2000,

 6   besides yourself, who would have been the people

 7   who were authorized to submit a claim?

 8        A.    That would have been my responsibility.

 9        Q.    Anybody else?

10        A.    As the pharmacist in charge, I should

11   be the only one authorized on that.

12        Q.    I think there were some that were

13   signed -- that I've seen similar claims submitted

14   by Ven-A-Care that were signed by Mark Jones.

15   Was he authorized to sign by himself without your

16   signature?

17        A.    Um, I'm not exactly clear as an owner

18   of Ven-A-Care if he would have been authorized or

19   not or had to be the pharmacist.   My

20   understanding was the pharmacist should be the

21   one to authorize the claim.

22        Q.    Okay.  And all of the claims that are
```

```
 1        A.    Correct.  Well, it would be assigned --

 2   each number would be assigned to one

 3   prescription.  It may be used multiple times for

 4   billing purposes if the prescription is

 5   refillable and is billed multiple times.

 6        Q.    Okay.  And what is the number right

 7   below that?

 8        A.    That is the doctor's in Florida DPR

 9   license number, which is the identification

10   number required if he's going to be prescribing

11   or involved in activity with Florida Medicaid

12   patients.

13        Q.    Now, the -- on this particular form

14   that we're looking at, there were four entries,

15   0, 1, 2, 3 and 4.  This all related to the same

16   patient?

17        A.    Yes.

18        Q.    And would each page always relate to

19   one patient?

20        A.    Yes.

21        Q.    And so there were -- on this particular

22   patient, there were -- there are four entries,
```

Page 748

1    and were they all dispensed at the same time or

2    at different times?

3         A.   Item -- on the second line of that

4    first entry, Item 15A says "date filled."  That

5    would reflect the date that this particular claim

6    was dispensed.

7         Q.   So that's June 1st, '96 in this

8    particular claim, right?

9         A.   That is correct.

10        Q.   So June 1st, '96, is the date the

11   person came in and got the prescription filled?

12        A.   It is the date the prescription was

13   filled.  The patient did not necessarily have to

14   come in.  Most of these patients were receiving

15   medications that were being administered in a

16   home environment.  They're anti -- infusion

17   pharmacy drugs and what have you.  And, generally

18   speaking, they would be prepared at Ven-A-Care,

19   and the nurse -- the nurse that was taking care

20   of that particular patient, if necessary, someone

21   from Ven-A-Care would take the dispensed

22   prescription to the patient's house.

Cobo, Luis - Vol. III                                          July 31, 2008
                              Miami, FL

Page 749

1          Q.    So the date filled for Ven-A-Care, in

2     the example that we're looking at, that would be

3     the date on which Ven-A-Care had done what it had

4     to do to get the drug ready and it was ready to

5     go, is that right?

6          A.    It is -- yes, it is the date that the

7     prescription was dispensed.

8          Q.    Okay.  And right above the date of --

9     the prescription was filled, tell us what the

10    numbers there indicate under -- it looks like

11    manufacturer?

12         A.    That is the NDC number.

13         Q.    Okay.  And the NDC number -- one

14    component of the NDC number would indicate the

15    manufacturer, correct?

16         A.    It identifies the manufacturer, the

17    particular drug and the package size of that

18    drug.

19         Q.    And each one of those headings is

20    indicated there, right?  Manufacturer, item and

21    package?

22         A.    Correct.

Page 750

```
 1        Q.    Okay.   Now, if you continue working

 2   your way to the right, there's an entry that's

 3   quantity, right?

 4        A.    Uh-huh.   Correct.

 5        Q.    In this case it says "one"?

 6        A.    Yes.

 7        Q.    So would that be one item of that

 8   particular drug?

 9        A.    One billed.   One unit of this

10   particular drug, yes.

11        Q.    And below that, there's a box that has

12   an R in it.   What does that mean?

13        A.    Indicating it as a refill.

14        Q.    Okay.   So this is a prescription that

15   they had gotten and this -- they were refilling?

16        A.    Correct.

17        Q.    And then next there's a box there

18   that's -- tell us what the next box is.

19        A.    The days' supply, that quantity that

20   was dispensed.   Um, indicates how many days

21   supply that represents, that quantity.   In this

22   case, that product was administered, and it
```

Page 751

1    represented one day, one day's supply.

2        Q.   Okay.   And then next to that is an

3    entry that's entitled "Amount Billed," right?

4        A.   Yes.

5        Q.   And in this particular entry, can you

6    tell us what the amount billed is?

7        A.   $98.75.

8        Q.   Okay.   And that is the -- that's the

9    amount that you wrote in as the amount that Ven-

10   A-Care was billing Florida Medicaid for

11   dispensing that drug, correct?

12       A.   That is correct.

13       Q.   And that's the number that, from

14   looking at the provider manual, you understood

15   could not exceed the usual and customary,

16   correct?

17       A.   Correct.   That would be correct, yes.

18       Q.   Okay.   Now, with respect to coming up

19   with the number of $98.75, do you know how you

20   did that with this particular claim?

21       A.   I do not.

22       Q.   Now, at the moment that you filled out

Page 752

```
 1    the claim we're looking at on -- in Page 01 --

 2    0017932, the amount billed that you submitted to

 3    Medicaid, that was a true and correct amount

 4    billed, right?

 5         A.   I'm -- what do you mean by a "true and

 6    correct amount billed"?

 7         Q.   Well, when you put the 98.75 there, you

 8    understood that you were certifying that that was

 9    true and accurate?

10         A.   Yes.

11         Q.   Okay.  So 98.75 was the true and

12    accurate billed amount that you were submitting

13    to Florida Medicaid, right?

14              MR. BREEN:  Objection, form.

15         A.   Just I'm not real clear on the --

16    $98.75 was the amount that was billed to Florida

17    Medicaid.

18         Q.   And that was a true and accurate number

19    in the sense that it wasn't a number that you

20    just made up out of thin air, was it?

21              MR. BREEN:  Objection, form.

22         A.   No.
```

Page 789

```
 1        Q.    Is there any other instance besides the

 2   one you referenced where you were offered to

 3   receive anything of value from Dey to you in

 4   order to get you to buy Dey's products other than

 5   the instance you just mentioned?

 6             MR. BREEN:  Objection, form.

 7        A.    In other words, you want to know if

 8   somebody from Dey came to me and offered me a

 9   gift or money or anything of that nature?

10        Q.    Right.

11        A.    Not that I am aware of.  Certainly not

12   me.

13        Q.    You testified in an earlier session of

14   your deposition that at some point in around 2000

15   when you were closing up or selling the Cobo

16   Pharmacy, you made a payment of $40,000 to the

17   Medicaid program in connection with inflated

18   reimbursements.  Do you recall that?

19        A.    I do.

20        Q.    Okay.  And when exactly did you decide

21   to make that payment?

22        A.    I'd have to go revisit, but I want to
```

Page 790

1     say either late 2000, early 2001.

2          Q.    And that payment, how did you come up

3     with the amount of 40,000?

4          A.    I testified earlier I had come across

5     some article, and I haven't revisited this, that

6     basically went over again a methodology that had

7     been applied in trying to recover overpayments

8     made to a provider.  And I don't recall if it was

9     in the Medicare/Medicaid arena.  And I took that

10    information to my accountant at the time, Randy,

11    and told him what I was trying to do.  And he

12    helped me sort of fine-tune it based on the

13    information that I had available on how to get a

14    -- reach a more reasonable representation and

15    factor that could be applied -- let me back up --

16    factor based on actual payments that I received

17    from Medicaid and actual invoices that I had from

18    Cobo Pharmacy that I could match to those

19    payments in that point in time.

20              And then, using that, determined --

21    accurately determined what the reimbursement

22    should have been and find out -- you know, take

1    out the dispensing fee that was involved so we

2    were just dealing with the cost of the drug

3    product itself.  And then used an array of

4    percentages and applied them to the overall money

5    that I had been paid on generics.  Made a

6    determination what that was.  I was able to do a

7    sampling; I think I did four years.  And then I

8    took that sampling and applied it to a seven-year

9    period and came up with an amount that turned out

10   to be around $33,000 -- or 35,000, excuse me.

11   $35,000.  And then added seven percent interest.

12   And wrote a check to Florida Medicaid and it came

13   out to about $40,000.

14        Q.   And so you worked on that with Randy

15   Moore?

16        A.   I worked on that by myself.  I only

17   worked with him on the theory of the accounting

18   principle that should be applied that would --

19   that would be reasonable and least challenged

20   under the circumstances.  In other words, I

21   wanted to do something that I had some

22   professional direction in rather than something

Page 792

```
 1    that I would have sat down and tried to figure

 2    out myself and someone might challenge saying it

 3    favors you or it favors -- you know?  I wanted to

 4    get a good representation.  And it wasn't huge

 5    sums of money we were dealing with.  And I just

 6    wanted to ensure the accuracy to the extent that

 7    I could.

 8        Q.   And before I turn back to how you did

 9    it and follow up on that, what is it that and at

10    what point -- strike that.

11             What is it that in your own mind

12    triggered your desire to go forth and figure this

13    out and pay back some amount?

14        A.   Well, um, my involvement with Ven-A-

15    Care had not been real intimate because I was

16    either fulfilling the pharmacist consultant role

17    in that aspect, taking care of those issues, or

18    when we were just running as an infusion

19    pharmacy, just working back and forth between

20    Cobo Pharmacy and Ven-A-Care.  So I never really

21    got fully sensitized and appreciated the issues

22    in our complaint until I closed down Cobo
```

Page 793

1   Pharmacy and started working more in the, you

2   know, in the actual data gathering and what have

3   you.

4          It was an idea that really Zack Bentley

5   brought to mind, that I was reluctant to do at

6   first because I felt very confident, comfortable

7   with my behavior and performance with how I had

8   billed the Medicaid program in my career at Cobo

9   Pharmacy.  But at the same time, as I fought over

10  his challenge, it seemed reasonable to think that

11  I could do something there that would set maybe

12  an example or at least a tone for the

13  imperfections of the system that I was dealing

14  with because of the fraudulent drug prices the

15  manufacturers had been providing the Medicaid

16  system.

17      Q.   So what did Mr. Bentley tell you?

18      A.   He just I think briefly indicated you

19  have a problem with Cobo Pharmacy, you need to

20  sit down and look at your Medicaid billing.  You

21  know, I was familiar with the concepts there,

22  and, you know, I understood what he was saying.

Page 794

```
 1       Q.   Well, when he said "You have a problem
 2    at Cobo," what was your understanding, what was
 3    the problem?
 4       A.   Well, I think -- I can't speak for him,
 5    and I won't.  I felt -- I felt that if I'm going
 6    to be an active participant in this lawsuit, then
 7    certainly I had an obligation to try to, you
 8    know, rectify anything that I had seen that would
 9    -- that has been problematic for the program on a
10    much, much larger scale.  I certainly needed to
11    at least make an effort to try to minimize what
12    had happened in my business as a result of that.
13       Q.   What is it that Mr. Bentley told you
14    exactly as to what the problem was that you had
15    at Cobo?
16       A.   Again, I don't know that it was long or
17    winded.  It was just him trying to sensitize me
18    and do -- that I've got similar issues because,
19    as we all recognized, I mean, we've -- anybody
20    who has participated in the Florida Medicaid
21    program has been a victim, a victim of the
22    fraudulent billing system that's in place.
```

Page 795

```
1        Q.    Were you -- was Cobo Pharmacy a victim

2   of the billing system that was in place?

3        A.    Well, I think my audit showed that -- I

4   think I was reaping, you know, some additional

5   profits that I don't think it's what the Medicaid

6   program had in mind or intended in trying to base

7   its reimbursement on estimated acquisition.  And,

8   you know, since I seem to be unique in having

9   sensitivity to information on the fraudulent drug

10  reporting practices, I was a lone person in the

11  country probably that had the ability to go back

12  and try to rectify, you know, what had

13  transpired.

14       Q.    Did Mr. Bentley ever sit down with you

15  and go through Cobo records to show you how you

16  were violating the law from his standpoint?

17            MR. BREEN:   Objection to form.

18       A.    His feelings on that -- and he was very

19  adamant -- that this was a Cobo Pharmacy issue.

20  And as far as he, from Ven-A-Care, was concerned,

21  he didn't want to participate or have anything to

22  do with it.  He thought it was an internal Cobo
```

Page 796

1   Pharmacy issue that I needed to address.

2       Q.   And did he tell you that you needed to

3   address this because otherwise it would look bad

4   for you in the litigation?

5           MR. BREEN:   Objection, form.

6       A.   I don't know that -- that may have been

7   the inference and the concern.  As I said, it

8   wasn't anything that neither he or I expressed

9   that needed to be mandatory.  I looked at it as

10  an exercise that would allow me certainly to be

11  more comfortable with -- with the practices that

12  transpired at Cobo Pharmacy, my involvement in

13  the program.

14      Q.   And at -- Did Mr. Bentley first bring

15  this up to you; is that how it first started?

16      A.   I think that's correct.  I think the

17  notion, the idea, the challenge was first

18  introduced by Zack Bentley, yes.

19      Q.   And when was that?

20      A.   Here again, in a general time frame, I

21  don't know if it was late 2000; that might be

22  reasonable.  But I'd have to go back and see the

Page 797

1    dating on the documents and see.  You know, the -

2    - the project itself took several months, and I

3    just don't recall if it's something that began in

4    late 2000 or early 2001.

5         Q.   And did you -- when you say the project

6    took several months, was there -- were there

7    records that -- notes, spreadsheets that were

8    created as you were working your way through this

9    project to get to the amount that you would pay?

10        A.   Yeah, I was trying to turn up my -- my

11   Medicare -- Medicaid, excuse me, claim forms.  I

12   was trying to go through my files that I had that

13   either had been preserved.  I -- and pulled

14   invoices, primarily from McKesson and secondarily

15   from, you know, Bergin Gulf or Bergin Brunswick.

16   So each one of those tasks was something because

17   it was a lot of stuff that was in storage and,

18   you know, boxes that needed to be taken down and

19   taken apart and all that information gathered and

20   going through it one by one, line item by line

21   item.

22        Q.   And -- and do you have all the work

Page 798

```
 1   papers that were part of this project to come up

 2   with the $40,000 payment?

 3        A.   Um, the original work papers I do not

 4   have.

 5        Q.   Where are they?

 6        A.   That was turned over to Mr. Breen.

 7        Q.   When?

 8        A.   I don't know, possibly late last year.

 9             MR. ESCOBAR:  Do you know --

10        A.   Late last year --

11             MR. ESCOBAR:  Do you know, Jim, whether

12   those have been produced?

13             MR. BREEN:  I don't think they've been

14   requested.

15             MR. ESCOBAR:  Well, we would like all

16   the work papers, every scrap of paper that

17   relates to this project.

18             MR. BREEN:  We'll address it at the

19   appropriate time.

20             MR. ESCOBAR:  Now -- It's okay.

21             MR. BREEN:  Have you guys requested

22   these things before today?
```

Cobo, Luis - Vol. III                                         July 31, 2008
Miami, FL

Page 803

```
 1   an overpayment amount that would reflect an

 2   accurate WAC-based reimbursement, wholesale or

 3   acquisition costs, you know, plus a percent and

 4   dispensing fee, rather than an AWP figure that

 5   was, you know, totally unrelated and detached

 6   from the WAC.  No relationship.

 7       Q.   So the 40,000 was to some extent a

 8   product of trying to figure out the difference

 9   between what you would have gotten on an AWP

10   reimbursement as against the WAC reimbursement?

11       MR. BREEN:  Objection to form.

12       A.   The 40,000, as best I recall, was the

13   difference.  Once I -- once I subtracted the

14   dispensing fee, because that doesn't change,

15   between what Florida Medicaid reimbursed me and

16   what I calculated to be the more accurate

17   reimbursement, which would have been my

18   acquisition cost plus -- plus seven percent, that

19   difference is what I figured after getting a

20   factor and applying it to all my generics across

21   the board.

22       Q.   And your acquisition cost plus seven
```

Page 821

```
 1    about that payment?

 2         A.    No, I assumed that by them signing the

 3    check in the back and cashing it, that they were

 4    accepting the terms of the check.

 5         Q.    So you sent the check along with the

 6    letter explaining what you were doing, and then

 7    you never heard from them; you just got back a

 8    cancelled check at some point through the normal

 9    course of banking?

10         A.    That is correct.

11         Q.    And -- now, Ven-A-Care is a relator in

12    a case brought on behalf of the State of Florida

13    regarding the Medicaid program, right?

14         A.    That is correct.

15         Q.    And when you made the $40,000 payment,

16    was that before or after Ven-A-Care had filed

17    sealed complaints against various manufacturers?

18         A.    It was after.

19         Q.    Okay.  So at the time that you made the

20    payment to Florida Medicaid and Florida Medicaid

21    closed the file on the -- on the -- on the audit

22    that had recommended recoveries against Cobo
```

Cobo, Luis - Vol. III                                                       July 31, 2008
Miami, FL

Page 873

1                    SIGNATURE OF THE WITNESS

2

3

4

5

6                              _____

7                              LUIS COBO

8

9        Subscribed and sworn to and before me

10       this _____ day of _____, 20____.

11

12

13       _____

14              Notary Public

15

16

17

18

19

20

21

22

Cobo, Luis - Vol. III                                                July 31, 2008
Miami, FL

Page 874

1                    CERTIFICATE OF OATH

2        STATE OF FLORIDA
         COUNTY OF BROWARD
3
             I, GINA GARCIA , Registered Professional Reporter and
4        Certified Realtime Reporter, hereby certify that the Witness
         personally appeared before me and was duly sworn.
5            WITNESS my hand and official seal this _____ day of
         _____, 2008.
6

7        _____
             GINA GARCIA , RPR, CRR
8             My Commission#DD758413
         My commission expires March 23, 2012
9

10              REPORTER'S DEPOSITION CERTIFICATE

11       STATE OF FLORIDA
         COUNTY OF BROWARD
12
             I, GINA GARCIA, Registered Professional Reporter and
13       Certified Realtime Reporter, certify that I was authorized to
         and did stenographically report the foregoing deposition, and
14       that the transcript is a true and complete record of my
         stenographic notes.
15
             I further certify that I am not a relative, employee,
16       attorney or counsel of any of the parties, nor am I a relative
         or employee of any of the parties' attorney or counsel connected
17       with the action, nor am I financially interested in the action.
             DATED this _____ day of _____, 2008.
18       _____
             GINA GARCIA, RPR, CRR
19

20

21

22