UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) | |
| VEN-A-CARE OF THE FLORIDA | ) | |
| KEYS, INC., a Florida Corporation, | ) | MDL No. 1456 |
| by and through its principal | ) | Civil Action No. 01-12257-PBS |
| officers and directors, ZACHARY | ) | |
| T. BENTLEY, T. MARK JONES, | ) | Hon. Patti B. Saris |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MOTION FOR LEAVE TO** |
| BOEHRINGHER INGELHEIM CORPORATION; | ) | **FILE AMENDED COMPLAINT** |
| BOEHRINGER INGELHEIM | ) | **GRANTED ON NOVEMBER 25,** |
| PHARMACEUTICALS, INC.; ROXANE | ) | **2008** |
| LABORATORIES, INC.; and  ROXANE | ) | |
| LABORATORIES, INC., n/k/a BOEHRINGER | ) | |
| INGELHEIM ROXANE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## UNITED STATES' FIRST AMENDED COMPLAINT

The United States brings this action to recover losses sustained by the Medicare and

Medicaid programs as a result of the sustained efforts of the defendants Roxane Laboratories,

Inc., n/k/a Boehringer Ingelheim Roxane, Inc., Roxane Laboratories, Inc. (collectively

"Roxane"), Boehringer Ingelheim Corporation ("BIC"), and Boehringer Ingelheim

Pharmaceuticals, Inc. ("BIPI") to defraud these programs.  Over the course of a number of years,

the defendants have reported inflated drug prices knowing that Medicare and Medicaid would

rely on those prices to set reimbursement rates for Roxane's pharmaceutical products.   Roxane's

actual sales prices for its pharmaceutical products were and are far less than the prices reported

by Roxane.   By knowingly reporting fraudulently inflated prices – sometimes more than 1000%

higher than Roxane's actual prices – the defendants have ensured that Roxane's retail customers

and other providers who dispense Roxane drugs received inflated reimbursement and profits from Medicare and Medicaid.  The defendants have used the public fisc as a marketing tool, actively promoting the government-funded "spread" between (1) Roxane's fraudulently inflated prices and (2) Roxane's actual sales prices as an inducement to its customers.  These efforts have allowed Roxane to increase its profits by boosting sales for its drugs.

## I.  NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

2.      The United States bases its claims on the defendants having caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of 31 U.S.C. § 3729(a)(2).

3.      The defendants have engaged in a fraudulent scheme that has caused the Medicare and Medicaid programs to pay excessive reimbursement to Roxane's customers, including pharmacies, homecare pharmacies, and other purchasers of Roxane products.  In furtherance of this scheme, the defendants reported false, fraudulent and inflated drug prices for certain drugs (listed in Exhibit A) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Roxane's customers.  A chart showing examples of the differences between the prices at which Roxane actually has sold its drugs and the false prices reported by the defendants is attached as Exhibit B.

4.      At all relevant times, the defendants knew that the Medicare and Medicaid programs relied on Roxane's reported prices to those compendia to set reimbursement rates for claims submitted for Roxane's drugs.  Roxane then sold its drugs for far lower prices, and marketed to existing and potential customers the government-funded "spread" between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost Roxane's sales and profits.

5.      At all relevant times, the defendants knew that Roxane's false price reporting and marketing efforts would cause its customers to submit claims for fraudulently inflated Medicare and Medicaid reimbursement.

6.      The defendants' fraudulent scheme to induce customers to purchase Roxane products by ensuring that federal and state reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), common law and numerous state laws.

7.      In order to get fraudulent claims paid by the United States, the defendants also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

8.      The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

## II.  JURISDICTION

9.      The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law causes of action

pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because the defendant Roxane transacts business in the District of Massachusetts and caused the submission of false or fraudulent claims in Massachusetts.

### III.  VENUE

10.     Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because the defendants have transacted business in this District.

### IV.  PARTIES

11.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administer the Medicare and Medicaid programs.

12.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care is a pharmacy licensed to provide prescription drugs specified in this Complaint and has been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.  Ven-A-Care's principal officers and/or directors during the relevant time period have included John M. Lockwood, M.D., Zachary Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought this action against the defendants on behalf of itself and the United States.

13.     Defendant Boehringer Ingelheim Corporation ("BIC"), is a corporation organized under the laws of Nevada, with its principal offices in Ridgefield, Connecticut.  BIC was established in 1986 to serve as the parent corporation in the United States of subsidiary U.S. corporations within the group of corporations owned by the German parent company, Boehringer Ingelheim Auslandsbeteiligungs Gmbh.

14.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") is a corporation organized under the laws of Delaware, with its principal offices located in Ridgefield, Connecticut.  BIPI is a subsidiary of BIC.

15.     Defendant Roxane Laboratories, Inc., n/k/a Boehringer Ingelheim Roxane, Inc. ("BIRI") is a corporation organized under the laws of the State of Delaware with its principal offices in Columbus, Ohio.  Roxane Laboratories, Inc. was acquired in 1978 by BIC's predecessor, Boehringer Ingelheim Ltd.  On April 5, 2005, Roxane Laboratories, Inc. changed its name from Roxane Laboratories, Inc., to BIRI and filed the appropriate certificate of amendment of its certificate of incorporation with the Secretary of State for the State of Delaware.  BIRI is a subsidiary of BIC and a sister corporation to BIPI.

16.     Defendant Roxane Laboratories, Inc. ("RLI") is a corporation organized under the laws of Nevada, and was incorporated therein in or about February 2005.  Its principal place of business is Columbus, Ohio.  It is a subsidiary of BIC.  BIRI and RLI, incorporated in Nevada, are the successors to Roxane Laboratories, Inc., a Delaware corporation.  BIRI and RLI will hereinafter be referred to as "Roxane."  Roxane is a sister company to BIPI.

17.     Pursuant to Rule 15(c) of the Federal Rules of Civil Procedure, the claims against the defendants relate back to the dates of the original pleadings in this case.

18.     At all times material to this action, Roxane and BIPI transacted business in the District of Massachusetts by, including but not limited to, selling and distributing pharmaceutical products, including the drugs identified in this Complaint, to purchasers within the District of Massachusetts.

19.     The management, supervision, control, reporting, and financial exchanges by and between BIC and its subsidiaries, BIPI and Roxane, are so inextricably intertwined that these defendants in effect operated as one single entity.  BIC, BIPI, and Roxane acted in concert together to foster, facilitate, and promote the unlawful conduct alleged more specifically below.

20.     More specifically, BIC and BIPI shared a common headquarters where Roxane financial department strategy meetings were held.  BIC and BIPI had supervisory control over Roxane, controlled the day-to-day finance department strategies and performed tax reporting and legal functions for Roxane.  At all times material to this Complaint, sales and marketing officials at BIC, while holding identical positions at BIPI, directly oversaw, managed, and controlled the pricing and sales and marketing operations of Roxane.

## V.  THE LAW

A.     <u>The False Claims Act</u>

21.     The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government . . . .

* * *

6

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

22.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

**B**.     **The Federal Anti-Kickback Statute**

23.     Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a-7b(b), in 1972 to protect the integrity of the Medicare and Medicaid programs.  Congress strengthened the statute in 1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

24.     The anti-kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical items, including items provided under the Medicare and Medicaid programs.  In pertinent part, the statute provides:

> (b)  Illegal remuneration
>
>     \*   \*   \*
>
> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --
> >
> > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Those who violate the statute also are subject to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a(a)(7).

### VI.  THE FEDERAL HEALTHCARE PROGRAMS

    25.    The Medicare and Medicaid programs were created in order to provide access to healthcare for elderly, indigent or disabled residents of the United States.

8

A.     **The Medicaid Program**

26.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

27.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. § 1396a.

28.     The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

29.     The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

30.     The Medicaid programs of all states reimburse for prescription drugs.

31.     The vast majority of states award contracts to private companies to evaluate and process claims by providers for reimbursement under the Medicaid program.  Typically, provider claims for reimbursement will be submitted electronically to the private company which will process the claims, and then will either pay the claims on behalf of the state or provide information to the state to enable the state to pay the claims.  Each calendar quarter, the state will submit a claim to the HHS for payment of the federal share of the state's Medicaid costs, including amounts paid for drug reimbursements.

32.     By becoming a participating supplier in Medicaid, suppliers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.     The Medicare Program**

33.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426-426a, 1395o.

34.     HHS is responsible for the administration and supervision of the Medicare program.  CMS is an agency of HHS and directly administers the Medicare program.  The Medicare program has several parts, including Medicare Part B ("Supplementary Medical Insurance for the Aged and Disabled"), which covers physician services, as well as durable medical equipment ("DME") and certain drug products and supplies.  42 U.S.C. § 1395k; 42 C.F.R. § 410.10.

35.     Medicare Part B generally covers drugs which are provided either:  (a) incident to a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (e.g., certain oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit.  42 C.F.R. §§ 405.517, 414.701.

36.     During the relevant time period, CMS contracted with private insurance carriers ("Contractors") to administer and pay Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395u.  In this capacity, the Contractors act on behalf of CMS.  42 C.F.R. § 421.5(b).

37.     Contractors receive, process and pay claims under Medicare Part B for drugs from various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the contractor then submits a payment request to a Medicare bank account funded by federal funds.

### C.     Drug Reimbursement Under Medicaid and Medicare

38.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug products.  The drugs and corresponding NDCs at issue in this case are listed in Exhibit A attached hereto.

39.     Drug manufacturers, such as Roxane, have not typically submitted claims for reimbursement to federal health care programs.  Instead, Roxane markets its products to its customers, who then purchase the product either directly or through wholesalers based on a price the customers negotiated with Roxane.  In addition to using wholesalers, customers also purchase Roxane products through group purchasing organizations ("GPOs"), who negotiate prices on behalf of Roxane's customers.

40.     Roxane's customers then submit claims for payment for Roxane products to Medicare and Medicaid after dispensing or administering the Roxane drug.

41.     For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

42.     The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs.  The HCPCS  utilizes 5-digit alphanumeric codes to identify and bill for medical products and supplies.  The HCPCS codes for the Roxane drugs reimbursed by Medicare at issue here are J7644, J7645, K0518, J7500, and K0119.

43.     During the relevant period, Roxane has usually reported or verified prices to various price publishers and services on an annual basis and on an ad hoc basis when new products were launched or price changes implemented.  The price publishers used the information to publish pricing compendia.

44.     The reimbursement amounts for claims submitted by Roxane's customers were directly influenced by Roxane's false price representations.  The information contained in the published pricing compendia has been used by most third party payor insurance companies, including the Medicare program and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Defendants' documents show that defendants knew of the impact of Roxane's price representations on government reimbursement for claims submitted by Roxane's customers for Roxane's drugs.  Defendants' documents also show that Roxane actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

45.     No governmental payor knew of or sanctioned the defendants' conduct as set forth in this Complaint, i.e., their deliberate manipulation of Roxane's published prices for certain of its products to induce its customers to purchase those products.

**D.     Medicaid Reimbursement Formulas**

46.     When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost

("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public.  Federal regulations define "estimated acquisition cost" in part as "the agency's best estimate of the price generally and currently paid by providers for a drug . . . ."  42 C.F.R. § 447.301.  To determine the EAC for a covered drug, State Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

47.     While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states,  (b) the maximum allowable cost ("MAC") set by the state Medicaid agency, or (c) the providers' usual and customary charge.  For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits.  42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

48.     The states' methodologies for arriving at EAC include:

A.      discounting a percentage off of the Average Wholesale Price ("AWP");

B.      adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

C.      requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

49.     AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail customer who then dispenses it to a patient.  WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer.

50.     While the majority of states have used published AWPs to calculate reimbursement, approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island, and Texas) have used the wholesale acquisition cost ("WAC") to set the EAC.

51.     The AWPs and WACs relied upon by the State Medicaid programs have generally been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span, Inc. are hereafter referred to as the "Publishers" and their various publications and data services are hereinafter referred to as "Price Publications."

52.     Pursuant to section 6001 of the Deficit Reduction Act of 2005, Pub. L. 109-171, effective January 1, 2007, CMS is to provide States with "average manufacturer price" data which will give States additional drug price information.

**E.      Medicare Reimbursement Formulas**

53.     From 1992 through 1997, Medicare based its reimbursement for multi-source generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median AWPs to set reimbursement rates.

54.     From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug. Balanced  Budget Act of 1997, 42 U.S.C. § 1395u(o).

14

55.     From 1999 through 2003, Medicare reimbursed for Part B covered drugs at the lower of (a) 95% of the median published AWP for the drug; or (b) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).  During 2004, Medicare reimbursed at a percentage of AWP dictated by statute, which, for Ipratropium Bromide was 80 percent, and for the other drugs that are the subject of this complaint, was 85 percent.  42 C.F.R. § 414.707 (2005).  For drugs furnished after January 1, 2005, reimbursement is no longer based on AWP but is generally based on average sales price.  42 C.F.R. § 414.904.

56.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

57.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium called the *Red Book*, as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

## VII.  THE DEFENDANTS' SCHEME

58.     From on or before 1996, and continuing through January 1, 2004, in the case of the Medicare program, and to the present in the case of the Medicaid program, the defendants have knowingly caused the Medicare and Medicaid programs to pay false or fraudulent claims for the following medications:

    Azathioprine
    Diclofenac Sodium
    Furosemide
    Hydromorphone
    Ipratropium Bromide
    Oramorph SR

15

Roxanol
Roxicodone
Sodium Polystyrene Sulfonate.

59.     As part of its unlawful conduct, Roxane knowingly made false or fraudulent representations about drug prices and costs to the *Red Book*, First DataBank, and Medispan, while knowing that Medicare and Medicaid would use this information in paying or approving claims for such drugs.  Roxane further made these representations in order to use the "spread" between cost and reimbursement to induce purchasers to buy Roxane's drugs.

60.     To inflate the spread, and thereby induce purchases of its drugs, Roxane purposely reported to the *Red Book*, First DataBank, and Medispan (and in some instances, the states) inflated AWPs and WACs for its drugs, while simultaneously arranging for its retail customers to purchase these drugs through wholesalers at far lower prices.  The Medicare and Medicaid payments, made in response to claims submitted by Roxane's customers, were set based on the inflated AWPs and WACs, and the payment amounts far exceeded the actual costs of the drugs.

61.     For example,  when the defendants prepared to launch Roxane's ipratropium bromide products in 1996, they developed a pricing strategy designed to create an attractive spread between the AWP and the actual price, so as to create an inducement–at the expense of the Medicare and Medicaid programs–for providers to purchase the Roxane product.  The defendants decided that Roxane would report to the compendia AWPs and WACs that far exceeded the price at which Roxane planned to sell the drug to wholesalers.  The express purpose of this pricing strategy was to create an attractive spread, greater than that available on the branded product, to entice providers to purchase the Roxane product.

16

62.     In addition, the defendants knew that actual prices would drop significantly after Roxane launched the products due to competition.  Rather than report accurate average wholesale prices reflecting the drop in real prices, they maintained artificially inflated prices in order to maintain the spreads on their products.  For example, the AWP per unit for Roxane's most popular ipratropium bromide solution (NDC# 00054-8402-11) stayed constant at $44.06 per unit from 1996 through 2004.  Meanwhile, the sales price to customers such as Ven-A-Care dropped from approximately $25.64 in 1996 to $7.50 in 2003.

63.     In another example of defendants' fraudulent conduct, in August 2000, employees at BIPI, in concert with employees of Roxane, decided to falsely increase the AWPs on Roxane's Furosemide products for the express purpose of creating a spread that would gain the company increased market share.  Before the decision was implemented, the AWP for Roxane's Furosemide, NDC #00054-4297-31, was $36.05.  Beginning August 2000, Roxane reported an increased AWP of $139.90 for the same drug.  This new AWP was published by the pricing compendia and relied upon by the Medicare and Medicaid programs in determining reimbursement.  The resulting spread was substantial.  The Relator Ven-A-Care of the Florida Keys, Inc. was able to purchase this drug through a wholesaler in October 2000 for $8.84.

64.     Roxane's reported AWPs bore little or no relationship to the actual prices being paid by Roxane's customers for the specified drugs.   Indeed, as stated by one of Roxane's senior marketing managers,  Roxane's  reported AWP and WAC for ipratropium bromide had "little relation to actual net selling price . . . ."  As a result, the spreads on Roxane's drugs were large and exceeded 500% in some instances.   Roxane manipulated and controlled the size of the "spread" on its drugs by reporting inflated AWPs and WACs, while simultaneously decreasing

17

its sales prices to wholesalers and providers.   A chart setting out some examples showing the difference between the prices at which Roxane actually sold its drugs and the false prices reported by Roxane is attached hereto as Exhibit B.

65.     Roxane trained its sales force on the significance of Medicare and Medicaid reimbursement and the importance of the "spread" between the AWP and the customer's actual cost.  In order to induce customers to purchase Roxane drugs, Roxane sales personnel actively marketed the spread between the AWP and its customers' actual costs.

66.     Roxane also reported falsely inflated WAC prices to the *Red Book*, First DataBank, and Medispan in order to create a spread in states that relied on WAC prices as a basis for Medicaid reimbursement.  For example, from 1995 through 1997, Roxane reported to the pricing compendia a WAC of $29.01 per unit for Roxane's Furosemide 40 mg Tablets, NDC#00054-4299-31.  The WAC reported by Roxane for this drug was far more than the actual net price at which Roxane sold its drug to wholesalers, and hence far more than the actual acquisition cost paid by providers.   State Medicaid agencies that relied on WAC prices reimbursed providers at the inflated levels.

67.     In early 1998, Roxane implemented significant decreases in its list prices to wholesalers on more than 200 drug products.  Roxane knowingly and intentionally began to actively conceal those prices from the pricing compendia, and hence from the Medicaid programs, by ceasing its reporting of these WAC prices to the pricing compendia.  Roxane knew that the compendia would continue to report the older higher WACs, and further knew that in the states that relied on WAC prices for determining Medicaid reimbursement, the inflated WAC prices  would serve as the basis for Medicaid reimbursement.

18

68.     As a result of the false reporting of AWP and WAC prices, the defendants caused pharmacists and other providers to submit millions of inflated claims for reimbursement to the Medicare and Medicaid programs, and caused those programs to pay hundreds of millions of dollars in excessive reimbursement.

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1))

69.     The United States repeats and realleges paragraphs 1 through 68 as if fully set forth herein.

70.     The defendants knowingly caused to be presented false or fraudulent claims for payment or approval to the United States for the drugs listed in Exhibit A for reimbursement that was substantially higher than providers' actual acquisition costs for those drugs and based on reported prices that were fraudulently and artificially created and manipulated by the defendants. The defendants knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

71.     By virtue of the false or fraudulent claims that the defendants caused to be made, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False

Records or Statements to Cause Claims to be Paid)

(31 U.S.C. § 3729(a)(2))

72.    The United States repeats and realleges paragraphs 1 through 71 as if fully set

forth herein.

73.    The defendants knowingly made, used, or caused to be made or used, false

records or statements to cause false or fraudulent claims paid or approved by the United States.

The false records or statements consisted of the false certifications and representations made or

caused to be made by Roxane to state Medicaid programs when seeking to ensure that the

Medicaid programs would reimburse for Roxane's drugs, and the false representations to the

pricing publishers and services upon which Medicare and Medicaid relied.

74.    By virtue of the false records or false statements made by Roxane, the United

States has suffered damages and therefore is entitled to treble damages under the False Claims

Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for

each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000

for each violation occurring on or after September 29, 1999.

## THIRD CAUSE OF ACTION

(Unjust Enrichment)

75.    The United States repeats and realleges paragraphs 1 through 74 as if fully set

forth herein.

76.     The United States claims the recovery of all monies by which the defendants have been unjustly enriched, including profits earned by the defendants because of illegal inducements defendants arranged to be paid to Roxane's customers.

77.     By obtaining monies as a result of its violations of federal and state law, the defendants were was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

78.     By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by defendants on sales to customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

### FOURTH CAUSE OF ACTION

(Common Law Fraud)

79.     The United States repeats and realleges paragraphs 1 through 78 as if fully set forth herein.

80.     The defendants made or caused to be made material and false representations concerning the pricing of Roxane's drugs with knowledge of their falsity or with reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon Roxane' misrepresentations by making payments on the false claims.

81.     Had the defendants made truthful representations, the United States would not have made such payments.

82.     By reason of these payments, the United States has been damaged in an as yet undetermined amount.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against  the defendants Roxane, BIC, and BIPI jointly and severally, as follows:

1.     On the First and Second Causes of Action, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Third Cause of Action, for the damages sustained and/or amounts by which the defendants were unjustly enriched, including an accounting of all revenues unlawfully obtained by the defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by the defendants, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.     On the Fourth Cause of Action, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

DATED this __2nd__ day of December, 2008.

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

By:     /s/ James J. Fauci_____
        GEORGE B. HENDERSON, II
        BARBARA HEALY SMITH
        JAMES J. FAUCI
        Assistant U.S. Attorney
        United States Courthouse
        1 Courthouse Way, Suite 9200
        Boston, MA 02210
        (617) 748-3282

        MICHAEL F. HERTZ
        JOYCE R. BRANDA
        JOHN K. NEAL
        LAURIE A. OBEREMBT
        Civil Division
        Commercial Litigation Branch
        P. O. Box 261
        Ben Franklin Station
        Washington, D.C.  20044
        (202) 514-3345