UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

MDL No. 1456

Civil Action: 01-CV-12257-PBS

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Judge Patti B. Saris

## SUPPLEMENTAL DECLARATION OF KENT M. WILLIAMS IN SUPPORT OF MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD, FOR COURT MONITORING OF CLASS COUNSEL TIME AND EXPENSE, AND FOR COURT ALLOCATION OF ALL FUTURE FEE AWARDS TO CLASS COUNSEL (REDACTED VERSION)

Kent M. Williams, being duly sworn and under oath, states as follows:

1.      I submit this Supplemental Declaration in Support of my firm's Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, for Court Monitoring of Class Counsel Time and Expense, and for Court Allocation of All Future Fee Awards to Class Counsel.

### A.      Lead Counsel Paid Themselves A Disproportionate Share Of The GSK Fee.

2.      Lead Counsel submit two time and expense reports which, if taken together, enable one to compare the percentage that each group of counsel received in fees, to that group's percentage of the reported lodestar in the case. *See* Declaration of Marc H. Edelson in Support of Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, for Court Monitoring of Class Counsel Time and Expense, and for Court Allocation of All Future Fee Awards to Class Counsel ("Edelson Decl.") Ex. 1; Declaration of Steve W. Berman in Support of Lead Class Counsel's Response to

Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award ("Berman Decl.") Ex. 4. Following is a table showing this comparison:

|  | Lodestar | | % of total Lodestar | Fee allocation | % of total allocation |
|---|---|---|---|---|---|
| ISHP Counsel | $ | 0 | 0 | $2,957,377.50 | 15.99 |
| Objector Counsel | | 0 | 0 | 100,000.00 | .54 |
| Tier I | | 49,208,132 | 68.11 | 12,814,150.84 | 69.28 |
| Tier II | | 10,271,190 | 14.22 | 1,543,873.60 | 8.35 |
| Tier III | | 12,773,881 | 17.68 | 1,080,711.52 | 5.84 |
| Totals | | $72,253,203 | 100.01 | $18,496,113.46 | 100.00 |

3.      Comparing these two reports also reveals that the four Tier I firms received multipliers on their lodestar ranging from .35665 (for Hagens Berman) to .16963 (for Hoffman Edelson). The two Tier II firms each received a multiplier of .15031 on their lodestar. The firms in Tier IIIA each received a multiplier of .10152 on their lodestar. The firms in Tier IIIB each received a multiplier of .09306 on their lodestar. And the firms in Tier IIIC each received a multiplier of .07326 on their lodestar. *Compare* Edelson Ex. 1 *with* Berman Decl. Ex. 1. Thus, the top Tier I firm (Hagens Berman) received a multiplier (.35665) that was nearly *five times* the multiplier (.07326) received by the thirteen Tier III firms, including mine.[1]

---

[1] Lead Counsel insist that there was no "multiplier" on the GSK fee because each firm received less than the full amount of its lodestar. *See* Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award ("Opp. Memo.") at 24-25. Lead Counsel apparently contend that any "multiplier" must be greater than 1. This silly assertion is contradicted by the petition Lead Counsel submitted in support of its request for fees, which calculates an overall "multiplier" of .38

4.     Mr. Berman, however, points out that my firm received the second-largest fee among Tier III firms[2] and asserts, "if Williams feels he is being punished or retaliated against, that is certainly not the case."  *See* Berman Decl. ¶ 48, at 17.  This statement is curious, because I did not accuse Lead Counsel of retaliating against me in allocating the GSK fee.  In fact, I made clear that my fear of retaliation was limited to *future* fee allocations, not this one.  *See* Memorandum in Support of Motion for Court Review of GSK Fee Award, For Court Monitoring of Class Counsel Time and Expense, and for Court Allocation of All Future Fee Awards (Dkt. No. 5645) ("Opening Memo."), at 23.

5.     Mr. Berman's defensive statement notwithstanding, Lead Counsel's declarations and other record evidence indicate that Lead Counsel were, in fact, biased against my firm and perhaps others in their allocation of the GSK fee.  And, although they insist that they have a "uniquely situated ability" to evaluate and reward counsels' efforts in this case, Lead Counsel have made material factual misrepresentations and other mistakes which further support the fact that all fee allocations in this case should be made by a disinterested, competent third party.

## B.     Lead Counsel Are Biased Because They Identify Me With Donald Haviland.

6.     As this Court is no doubt aware, there has been significant animosity in this case between Lead Counsel and other Class Counsel.  Lead Counsel's dispute with Donald E. Haviland, Jr. is well known and requires no further comment.   In addition,

---

on time accrued as of August 10, 2006, if the petition were granted.  *See* Class Plaintiffs' Memorandum of Law in Support of Class Counsel's Petition for Attorney's Fees, Reimbursement of Expenses, and Compensation to the Name [sic] Plaintiffs (Dkt. No. 4398), at 19-20.

[2]Mr. Berman, however, fails to mention that my firm also had the second-largest lodestar among the Tier III firms.

two former Lead Counsel law firms have dropped out of the case completely, with one of these firms, Heins Mills & Olson, explaining that it had "several divergences of opinion" with other Lead Counsel over "case strategy and management issues." *See* Memorandum in Support of Heins Mills & Olson, P.L.C.'s Petition for Attorney Fees and Reimbursement of Expenses in Relation to the GlaxoSmithKline Settlement (Dkt. 4379) at 2.

7.     Some of Lead Counsel's hostility was directed at me as well. For example, on October 3, 2007, when Mr. Berman learned that a reporter and I had been in contact about the dispute between Lead Counsel and Mr. Haviland, Mr. Berman sent me an email accusing me of defamation and threatening legal action. *See* Exhibit 1 attached hereto.

8.     Lead Counsel's comments demonstrate that they still have strong negative feelings about me, as well as Mr. Haviland. In their response to my firm's motion, Lead Counsel mention Mr. Haviland's name at least 22 times.[3]   For example, in describing my entry into this case, Mr. Berman states that "[Williams], along with **Don Haviland** of Kline & Specter, did not join this case until September 2005. . . . Williams (and **Haviland**) had no relationship to this MDL Litigation or Lead Class Counsel's role in it until he Fall of 2005, when Williams and **Haviland** threatened to intervene." Berman Decl. ¶ 43 at 15 (emphasis added). Mr. Berman also finds it "noteworthy" that "some of

---

[3]Furthermore, as I previously reported to this Court, when I first questioned the allocation my firm had received, Sean Matt, another of Mr. Berman's partners, accused me of doing "unauthorized" work. *See* Declaration of Kent M. Williams in Support of Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award, for Court Monitoring of Class Counsel Time and Expense, and for Court Allocation of All Future Fee Awards to Class Counsel ¶ 19, at 9-10. Although Lead Counsel refused to elaborate and have now dropped this accusation, what is significant now is that, according to Mr. Matt, this "unauthorized" work was supposedly done on "unauthorized assignments" given to me by "Don Haviland." *See* Exhibit 2 attached hereto, at 3.

the work Williams performed was, as he admits, done in conjunction with **Don Haviland** . . . [and] it appears that [Williams] was a *de facto* member of the **Don Haviland** Kline Specter team on this case." Berman Decl. ¶ 44 at 16 (emphasis added).    Mr. Berman goes on to state that "several of Williams' time entries for April and May 2006 indicate that he even drafted one of the declarations submitted under **Don Haviland's** name." *Id.*, n.1 (emphasis added).[4] Similarly, Elizabeth Fegan, one of Mr. Berman's partners, perceives her dissatisfaction with Mr. Haviland as somehow relevant to my firm's allocation. *See, e.g.,* Declaration of Elizabeth A. Fegan in Support of Lead Class Counsel's Response to Williams' Motion for Court Review of Lead Counsel's Allocation of GSK Fee Award ("Fegan Decl.") ¶ 7 at 2 ("I do not believe **Mr. Haviland** took the depositions of any witnesses") (emphasis added).

9.    Lead Counsel's dispute with Mr. Haviland should have no bearing on the allocation my firm received. Mr. Haviland is not a member of my firm. Lead Counsel's obsessive reference to Mr. Haviland as justification for their allocation raises serious questions about whether my firm was treated fairly.

---

[4]After checking my April and May 2006 the time records, it appears that the declaration in question was the May 8, 2006 Declaration of Donald E. Haviland, Jr., Esq. in Support of Plaintiffs' Motion to Certify Claims With Respect To Track 2 Defendants. I did draft and edit most of that Declaration, *at the direction of Mr. Berman* as well as Mr. Haviland. My email records show that on Friday, April 28, 2006, Mr. Haviland informed Mr. Berman that he had forwarded a draft of the Declaration to me so that I could add specific transactional information pertaining to the Track 2 class representatives. Mr. Berman responded to both Mr. Haviland and me that he needed to get the Declaration "in timely fashion." *See* Exhibit 3 attached hereto. I worked all weekend reviewing and adding detailed medical and transactional information, and emailed a new, substantially improved draft to Mr. Berman and Mr. Haviland on Sunday, April 30, 2006. *See* Exhibit 4 attached hereto. I continued adding to and revising the Declaration up to and including the day that it was filed, on May 8, 2006.

C.     **Lead Counsel Make Numerous Misrepresentations About My Firm's Involvement In This Case, And Commit Other Errors.**

10.     Lead Counsel make numerous misrepresentations in their effort to minimize my firm's contributions to this case.   These and other errors further demonstrate that the allocation was deeply flawed and should be rejected by this Court.

1.     **Lead Counsel make errors regarding expense, lodestar, and their own allocation.**

11.     Marc Edelson, the Lead Counsel member charged with overseeing the collection of time and expense in this case, has submitted a Declaration describing his effort to ensure that "only properly-incurred time and expenses [were] compensated." *See* Edelson Decl. ¶ 3, at 1-2.   According to Mr. Edelson, this effort was limited to periodically collecting and tracking Class Counsel's lodestar and expenses, which he reviewed for "reasonableness." *Id.*

12.     First, a word about the time and expense reports Mr. Edelson says he reviewed in this case.   The reports required firms to break time into categories, but did not record the specific tasks performed.   The report also broke expenses into categories, but again, did not require any specification of expenses or proof that an expense was actually incurred. *See* Exhibit 5 attached hereto.

13.     Mr. Edelson attaches the lodestar and expense figures Lead Counsel used in allocating the GSK fee. *See* Edelson Del. Ex. 1.   These figures contain material errors. For example, Mr. Edelson's Declaration lists my firm's expenses as $32,396.08. *See id.* This amount presumably includes a deduction for an interim partial expense

reimbursement of $5,722.19 made in September of 2007. *See* Exhibit 6 attached hereto. Thus, if Mr. Edelson is correct, my firm's total expenses (before deducting the interim reimbursement) were $38,118.27 through July of 2008. But, in his April 17, 2008 report to this Court in connection with the fee application on the AstraZeneca Class 1 settlement, Mr. Edelson stated (correctly) that my firm's expenses were $64,308.53. *Compare* Edelson Decl. Ex. 1 *with* Exhibit 1 to the April 16, 2008 Declaration of Marc Edelson ("April 16, 2008 Edelson Decl.") (Dkt. No. 5222). The April 17, 2008 expense report included a $25,000.00 contribution Lead Counsel asked me to make on April 3, 2007 due to my "significant time commitment to the case." *See* Exhibit 7 attached hereto. Mr. Edelson cites the April 17, 2008 report in his Declaration, but gives no explanation for the $26,190.26 reduction in my expense total. *See* Edelson Decl. ¶ 7, at 3.

14.     This is not the only mistake Mr. Edelson makes in his Declaration. The expenses listed for the Rossbacher,  Squitieri & Fearon, Audet & Partners, Carey & Danis, and Cohen Milstein firms indicate that last year's interim expense reimbursement to those firms were not deducted from their respective expense totals before calculating their 20% expense reimbursement from the GSK fee. *Compare* Edelson Decl. Ex. 1 *with* April 16, 2008 Edelson Decl. Ex. 1 (showing the same expense amounts for those firms in both reports). Therefore, unless Lead Counsel did not reimburse those firms their *pro rata* share of expenses in September of 2007, Lead Counsel used inflated expense amounts to calculate the 20% expense reimbursement for these firms.

15.     Mr. Edelson also calculated an inaccurate lodestar figure for my firm. According to Mr. Edelson's Declaration, my firm's lodestar through July of 2008 was $2,020,221. Edelson Del. Ex. 1. But, again, this is not what Mr. Edelson reported to the

Court last April, which was the (correct) lodestar figure of $1,834,287.50. *See* April 16, 2008 Edelson Decl. Ex. 1. Mr. Edelson and the other Lead Counsel do not account for this $185,934 overstatement of my lodestar. Nor do Lead Counsel explain why Kline & Specter's lodestar and expenses increased by over $1.4 million from August of 2006 to May of 2007 with no increase in hours, or why Milberg LLP (a firm with over $200,000 in lodestar and expenses, according to Mr. Edelson's April 17, 2008 Declaration) apparently received no allocation at all. *Compare* April 16, 2008 Edelson Decl. Ex. 1 *with* Berman Decl. Ex. 4 (omitting Milberg LLP from the list of firms that received funds).

16.     Mr. Berman submits inaccurate figures as well. For example, in accounting for how the GSK fee was distributed, Mr. Berman deducts $2,957,377.50 (for ISHP Group Counsel) and $100,000.00 (for objector counsel) from the overall $21,615,000 GSK award which, according to Mr. Berman, "left $17,247,807.51 for distribution, including accrued interest." *See* Berman Decl. ¶ 8 at 3. But $21,615,000 minus $3,057,377 equals $18,557,623, not $17,247,807. And, in further breaking down the allocation in Exhibit 4 to his Declaration, on the "Grand Total" line, Mr. Berman lists $1,794,752.93 (for reimbursed expenses) and $15,438,735.96 (for fees), which add up to $17,233,488.89, not the $17,247,807.51 that Mr. Berman says was the "Total Allocation." *See* Berman Decl. Ex. 4.

### 2.     Lead Counsel make numerous misrepresentations about the Williams Law Firm's involvement in the case.

17.     In addition to the above errors, Lead Counsel misrepresent the Williams Law Firm's involvement in this case, and otherwise try to mislead this Court about the work performed by my firm.

a.    The Baxter depositions.

18.    With respect to the Baxter depositions, Ms. Fegan accuses me of failing to follow through on some unspecified commitment to take one-third of all the Baxter depositions. *See* Fegan Decl. ¶ 7 at 2. This accusation is false. I never made such a commitment—although I would have been willing to do so, had I had only been asked. My email and other records show that on May 1, 2006, I sent an email to Ms. Fegan offering to help out with the Baxter depositions.    *See* Exhibit 8 attached hereto. Ms. Fegan thanked me for my offer, and then proceeded to schedule and take eleven Baxter depositions over the next three months without asking for my assistance or even letting me know that the depositions were occurring. *See* Reply In Support of Plaintiff's Motion for Sanctions and Default Judgment Against Baxter Healthcare for Obfuscation of Documents and Dilatory Tactics ("Reply to Baxter") (Docket No. 2982), at 4 n.6 (listing eleven Baxter employee depositions taken from May 17, 2006 to August 12, 2006).

19.    Not until August 14, 2006, did Ms. Fegan did take me up on my offer of assistance. On that date, she identified eleven additional Baxter depositions that had been scheduled for August and September, and seven more Baxter depositions that had not yet been scheduled. *See* Exhibit 9 attached hereto. Getting Ms. Fegan on the telephone to divvy up these depositions was difficult, however, because her schedule was consumed with Baxter depositions that she continued to take without asking for my assistance. Indeed, in an August 30, 2006 email, after Mr. Haviland and I had each left numerous messages over the course of the previous week, Ms. Fegan stated, "I know I owe you both a long call...but I have been caught up in these depos. How about tomorrow? (I

have one more Baxter depo this afternoon and then can breathe again)." *See* Exhibit 10 attached hereto.

20.     Ultimately, I was assigned to take the depositions of two Baxter witnesses: John Shannon and Scott Hippensteel, which I took on September 12 and 13, 2006, respectively. *See* Exhibit 11 attached hereto. I informed Ms. Fegan that I was available to take more Baxter depositions, but the only other deposition Ms. Fegan asked me to take was suspended pending resolution of a discovery dispute between Plaintiffs and Baxter. *See* Exhibit 12 attached hereto. I was never informed of the rescheduling of this deposition. Nor was I asked to take any other Baxter depositions, by Ms. Fegan or anybody else.

                    b.      The Baxter document review.

21.     Ms. Fegan also provides an inaccurate and misleading account of my firm's involvement in the Baxter document review. My email records show the following: initially, I was given one attorney "slot" for that review, which I filled with a Chicago attorney whom I personally interviewed and trained in Chicago, and whom Ms. Fegan supervised at Hagens & Berman's Chicago office. *See* Exhibit 13 attached hereto. After about a month, Ms. Fegan informed me that the attorney was frequently absent and not performing well. At about the same time, the attorney informed me that he had obtained a new job with a Chicago firm and would be unable to continue working on the review. *See* Exhibit 14 attached hereto.

22.     Because Mr. Haviland was having similar problems with the attorney he had hired and trained for the review, Ms. Fegan put us both in touch with a Chicago temporary agency that Hagens & Berman had previously used to staff the review of

10

documents produced by Defendant AstraZeneca. *See* Exhibit 15 attached hereto, at 3. Ms. Fegan insisted that we use this specific agency, and if we did not, that she been given the opportunity to see the resumes of any candidates. *Id.* at 1. Mr. Haviland and I had no problem with this, and in early March of 2006 we each agreed to pay the Chicago agency a rate of $40 an hour for contract attorneys to review the Baxter documents.

23.     Shortly afterward, Mr. Haviland informed me that his firm at the time, Kline & Specter, was growing disenchanted with the AWP litigation, and was no longer interested in funding commitments such as the Baxter document review (which ultimately lasted several months and entailed the review of millions of pages of documents). To keep the Baxter review fully staffed, I agreed to pay for a second contract attorney from the Chicago temp agency, so long as I received credit for the attorney's hours on my firm's lodestar.

24.     I continued staffing the Baxter document review over the next several months. For a period of time during the summer of 2006, Ms. Fegan had the Chicago agency send an additional attorney and a paralegal, for a total of three attorneys and one paralegal. *See* Exhibit 16 attached hereto. My firm was billed and paid for all of these reviewers. Ms. Fegan later reduced the headcount back to two attorneys, whom I continued to fund through the end of 2006 and into late January of 2007.

25.     In February of 2007, I suddenly stopped receiving invoices from the Chicago agency. When I called the agency to find out why, I was informed that Ms. Fegan had told them she no longer needed the reviewers. *See* Exhibit 17 attached hereto. I tried to reach Ms. Fegan by telephone and by email to find out what was going on, but received no response except for a statement by Ms. Fegan's assistant that the review had

been "suspended" for four months pursuant to a stipulation between the parties. Since the assistant said she knew nothing more, I left a message asking Ms. Fegan to give me a call about the document review.

26.     Ms. Fegan did not return my call, and to this day, I have never been informed of the specific reason for suspending the review. Nor have I ever been asked to resume providing attorneys to review Baxter documents.

27.     One more word about the Baxter document review: Mr. Berman claims that my firm's Baxter document review work "already has a substantial multiplier built-in" because I billed these contract attorneys at a higher rate than I paid for them. Berman Decl. ¶ 47 at 17. This statement is both misleading and hypocritical. First, Mr. Berman (and Ms. Fegan) incorrectly state the hourly rate that I paid for these contract attorneys as $30, when it was $40. This is comparable to the rate Hagens Berman pays for its contract attorneys. Not only did Hagens Berman used the same Chicago agency to staff the AstraZeneca document review, but Ms. Fegan previously hypothesized a cost of $35 per hour for attorneys to review the Baxter documents. *See* Reply to Baxter (Dkt. No. 2982) at 5 n.8. Second, Hagens Berman billed its contract attorneys at no less than $250 an hour (which is Hagens Berman's lowest rate in the table of ranges provided by Mr. Berman in his Declaration). *See* Berman Decl. ¶ 24 at 8. Third (and most importantly), in allocating the GSK Fee, Lead Counsel paid me *seven cents* on the dollar for time billed by *my* contract lawyers, while Hagens Berman paid itself *thirty-five cents* on the dollar for time billed by *its* contract lawyers. *See* ¶ 3 at 2, *supra*. At a billing rate of $275 per hour, this means I paid $40.00 per hour but only received $17.50 per hour for my contract lawyers, while Mr. Berman apparently paid $35.00 per hour and received $96.25 per hour

for his contract lawyers. If anyone received a "substantial multiplier" on their contract lawyers, it was Mr. Berman, not me.

          c.    The nearly $3 million payment to ISHP Group Counsel.

    28.    The Final Order and Judgment approving Class Counsel's fee application did not authorize the allocation of GSK fees to ISHP Group Counsel or to objector counsel. It only authorized payments to "Co-Lead Settlement Counsel" and "other Plaintiffs Class Counsel." *See* August 7, 2007 Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement with the GlaxoSmithKline Defendants, Approving Proposed Allocation of Settlement Funds, and Approving Class Counsel's Application for Attorney's Fees, Reimbursement of Litigation Expenses and Compensation to Class Representatives ("GSK Approval Order"), attached hereto as Exhibit 18, ¶ 14(k) at 9 (stating that Co-Lead Settlement Class Counsel are to "allocate fees to themselves and other Plaintiff's Class Counsel").[5]  "ISHP Group Counsel" and "Class Counsel" are defined differently in the GSK Settlement Agreement. *See* August 10, 2006 Settlement Agreement and Release of GlaxoSmithKline Defendants ("GSK Settlement Agreement") (Dkt. No. 2972) ¶¶ 2(b) at 7, 2 (x) at 11: *see also* ¶ 22(a)(iii) at 43 ("attorneys fees and expenses shall be paid to Lead Counsel for distribution to Class Counsel *and then*, in accordance with a separate agreement on legal fees, to ISHP Group Counsel") (emphasis added). "Objector counsel" are not mentioned anywhere in the GSK Settlement. Thus, the allocation Lead Counsel made to ISHP Group Counsel and objector counsel was not authorized by the Order providing Lead Counsel with discretion to allocate fees.

---

[5]Mr. Berman attaches a "proposed" version of this order to his Declaration as Exhibit 1. Attached hereto as Exhibit 18 is the order actually entered by the Court.

29.    Lead Counsel, however, state that the $3 million payment to ISHP Group Counsel was authorized by a provision in the GSK Settlement Agreement generally stating that an attorney's fee will be negotiated between ISHP Group Counsel and Lead Counsel. *See* Opp. Memo. at 24 (referring to GSK Settlement Agreement, ¶ 18 (b) at 41-42). But that provision also states that any such fee agreement must be "identified to the Court in accordance with F.R.C. P. 23(e)." *See* GSK Settlement Agreement at ¶ 18(b) at 42. To my knowledge this did not occur until Mr. Berman filed the fee agreement as an exhibit to his November 14, 2008 Declaration, after the allocation to ISHP Group Counsel had already occurred, and only in response to my request that it be disclosed.[6] *See* Berman Decl. Ex. 3.

30.    Moreover, although Lead Counsel note that I have "long been aware" of the provision calling for a fee negotiation, I was not informed that a fee had actually been negotiated, or that the amount of the fee was 15% of the total GSK fee, until after I questioned the GSK fee allocation—which was apparently over two years after the fee agreement was reached. Thus, I did not agree to pay ISHP Group Counsel 15% of the GSK Fee, especially with Lead Counsel funding that commitment essentially by deducting the money from everyone's share but their own.

31.    Even worse, the deal Lead Counsel made with ISHP Group Counsel requires that ISHP Group Counsel be paid "15% of *all* fees awarded by the Court to AWP Class Counsel in the AWP Cases." *See* Berman Decl. Ex. 3 at ¶ 1 (emphasis added). Thus, the agreement is not limited to the GSK fee, but extends to all AWP cases

---

[6]Curiously, the fee agreement, which was purportedly executed on August 11, 2006, is signed by only two parties to the eight-party agreement, and does not indicate who the signatories are for each of the firms. It also describes the members of the Lead Counsel group as "AWP Class Counsel." *See* Berman Decl. Ex. 3.

14

coordinated for pretrial purposes in MDL 1456. *See id.* at the first WHEREAS clause (describing "the AWP Cases" as collectively, "claims of overcharges against certain pharmaceutical manufacturers" which "have been consolidated for pretrial purposes as *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456"). Such an agreement is not authorized by any Court-approved settlement, order, or other authority of which I am aware.

32.     ISHP Group Counsel's demand for fees (and, to a lesser extent, the demand for fees by counsel for Demra Jordan) was extortionate, rather than reflective of some sort of "benefit" to GSK class members. I spent a considerable amount of time sitting across the table from two of the three firms who now make up the ISHP Counsel Group, negotiating an allocation of the GSK settlement between TPPs and consumers. At that time those firms were "TPP allocation counsel," not "ISHP Group Counsel." After two negotiation sessions in Boston that I attended personally (and which Dianne Nast attended by telephone), and after many more hours of discussion with Lead Counsel, state attorney representatives, consumer group representatives, consumers, and others, we agreed to an allocation of 30% for consumers and 70% for TPPs. But shortly after we reached that agreement, I learned that the same counsel with whom I had negotiated in good faith were now threatening to opt their clients out of the GSK settlement altogether if their demands were not met. If this opt-out threat had been carried out, it would have gutted the settlement class, thereby jeopardizing the GSK settlement and nullifying all the work that had gone into accomplishing it on behalf of the class. I do not believe such conduct should be rewarded with a $3 million windfall.

15

guilty plea, Mr. Berman (who was being copied on our emails) fired off an email claiming that Lead Counsel had to "redo" my work on the opposition brief. *Id.* at 1. This statement by Mr. Berman was patently false. At the hearing, if the Court wishes, I will have available copies of my original draft of the opposition brief and the filed version, for the Court to compare. The Court will find that only minor changes were made to my twenty-one page draft before it was filed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  December 2, 2008

/s/ Kent M. Williams
Kent M. Williams, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused an electronic copy of the above **SUPPLEMENTAL DECLARATION OF KENT M. WILLIAMS IN SUPPORT OF MOTION FOR COURT REVIEW OF LEAD COUNSEL'S ALLOCATION OF GSK FEE AWARD, FOR COURT MONITORING OF CLASS COUNSEL TIME AND EXPENSE, AND FOR COURT ALLOCATION OF ALL FUTURE FEE AWARDS TO CLASS COUNSEL (REDACTED VERSION)** to be filed with the Clerk of this Court and served electronically on all registered parties via the Court's CM/ECF system.

Dated: December 2, 2008

/s/ Kent M. Williams
Kent M. Williams, Esq.

33.     In sum, I did not, as Lead Counsel suggest, agree to a secret, back room deal with ISHP Group Counsel that paid them millions of dollars, with a promise of many millions more as future fees are awarded. Nor did I agree to fund this commitment at the expense of Class Counsel like me who remained loyal to the GSK class and continued to contribute time and capital in this case.

d.     Other misstatements by Lead Counsel.

34.     Lead Counsel make other misstatements about my firm's involvement in this case. For example, after acknowledging some of the work my firm did, Mr. Berman dismisses the remainder as a "handful of other miscellaneous tasks" which made up "the totality of Williams' role in the case." Berman Decl. ¶ 44 at 15-16. One of those "miscellaneous tasks" was to draft Plaintiffs' written response to AstraZeneca's Motion in Limine to Exclude Evidence Relating to Guilty Pleas, Civil Settlement, and Sampling Activity (Dkt 3939). *See* Class Plaintiffs' April 6, 2007 Memorandum of Law in Opposition to AstraZeneca's Motion in Limine to Exclude Evidence Relating to Guilty Pleas, Civil Settlement, and Sampling Activity. Although Mr. Berman plays down the significance of this task, he has previously acknowledged the importance of having the guilty plea admitted as evidence. *See* Exhibit 19 at 1-2.

35.     Lead Counsel, however, evidently forgot (or ignored) the fact that I worked on the AstraZeneca part of this case. In an October 16, 2007 email to me defending Lead Counsel's allocation, Mr. Matt stated, "the all-in approach will benefit firms, like yours, who did no work on, for example, the AstraZeneca case when it comes time to distribute the AstraZeneca Class 1 fee." *See* Exhibit 2, at 3. When I corrected Mr. Matt's mistake by pointing out my work on AstraZeneca's motion to exclude the

16

# Exhibit 1

Subj:     **Haviland**
Date:     10/3/2007 3:21:41 PM Central Daylight Time
From:     Steve@hbsslaw.com
To:       classcert@aol.com

I understand you have called or contacted reporters re havilands filing

What haviand says in a court filing maybe protected maybe not. But republication of false and defamatory material in other forums is not. We are putting you on notice that we will hold you equally responsible for damage caused if articles are published containing this material. We furtrher assume you are not furnishing unredacted material

# Exhibit 2
# (redacted)

# Exhibit 3

Subj:    **RE: i would like to get cracking o track 2 motion**
Date:    4/28/2006 9:57:30 AM Central Standard Time
From:    Steve@hbsslaw.com
To:      donald.haviland@klinespecter.com
CC:      classcert@aol.com

## i need to get it in timely fashion

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue
Suite 2900
Seattle WA 98101
206-224-9320

---

**From:** Haviland, Donald E. [mailto:Donald.Haviland@KlineSpecter.com]
**Sent:** Friday, April 28, 2006 7:52 AM
**To:** Steve Berman
**Cc:** Kent Williams
**Subject:** Re: i would like to get cracking o track 2 motion

I forwarded the drraft to Kent williams to add his piece and forward on to you.

-----Original Message-----
From: Steve Berman <Steve@hbsslaw.com>
To: Haviland, Donald E.
Sent: Fri Apr 28 10:37:16 2006
Subject: i would like to get cracking o track 2 motion

where are we on client info

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue
Suite 2900
Seattle WA 98101
206-224-9320

# Exhibit 4

Page 1 of 1

Subj:    **Re: i would like to get cracking o track 2 motion**
Date:    4/30/2006
To:      Donald.Haviland@KlineSpecter.com, Steve@hbsslaw.com
CC:      bill.molinari@klinespecter.com

This took longer than I thought; some of the client summaries forwarded to me were missing info and/or required additional work.  There are still a few gaps in citations to the record, the worst being Oral Roots. Hopefully whoever originally drafted the Roots summary is familiar with the documents they describe and can help Bill or Kathy identify them.

Anyway, here it is.  I followed the same format as before, without the discovery recap.

Kent

In a message dated 4/28/2006 9:52:37 AM Central Standard Time, Donald.Haviland@KlineSpecter.com writes:

> I forwarded the drraft to Kent williams to add his piece and forward on to you.
>
> -----Original Message-----
> From: Steve Berman <Steve@hbsslaw.com>
> To: Haviland, Donald E.
> Sent: Fri Apr 28 10:37:16 2006
> Subject: i would like to get cracking o track 2 motion
>
> where are we on client info
>
> Steve W. Berman
> Hagens Berman Sobol Shapiro LLP
> 1301 Fifth Avenue
> Suite 2900
> Seattle WA 98101
> 206-224-9320

# Exhibit 5

**In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL, No. 1456**

**TIME REPORT**

**FIRM:**

**REPORTING PERIOD:**

Categories:

(1) Investigation, Factual Research
(2) Document Discovery
(3) Deposition Discovery
(4) Pleadings, Briefs and Pretrial Motions
(5) Settlement
(6) Litigation, Strategy & Analysis
(7) Class Certification
(8) Court Appearances

| ATTORNEY OR PARALEGAL | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | CURRENT HOURS | CUMULATIVE HOURS | CURRENT RATE | CURRENT LODESTAR | CUMULATIVE LODESTAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| TOTAL |  |  |  |  |  |  |  |  |  |  |  |  |  |

P=Partner
A=Associate
PL=Paralegal

# IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION

## EXPENSE REPORT

Firm Name:

Reporting Period:

| Description | Monthly Expenses | Cumulative Expenses |
|---|---|---|
| Assessment Payment | | |
| Commercial Copies | | |
| Internal Reproduction/Copies | | |
| Court Fees | | |
| Court Reporters/Transcripts | | |
| Computer Research | | |
| Telephone/Fax/E-Mail | | |
| Postage/Express Delivery/Messenger | | |
| Professional Fees (expert, investigator, etc.) | | |
| Witness/Service Fees | | |
| Travel/Meals | | |
| Clerical Overtime | | |
| Miscellaneous (Describe) | | |
| **TOTAL EXPENSES:** | | |

# Exhibit 6



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

STEVE W. BERMAN
DIRECT • (206) 224-9320
STEVE@HBSSLAW.COM

September 21, 2007

Kent M. Williams
WILLIAMS LAW FIRM
1632 Homestead Trail
Long Lake, MN 55356

      Re:   *AWP Litigation*

Dear Counsel:

      We are writing in connection with the GSK settlement.

      It is currently on appeal and we will not take fees until that is resolved.

      We did decide to take one-fifth of our total costs and allocate this to GSK. We are disbursing that amount to each firm on a pro rata basis based on your contribution.

      You should understand that if the settlement were to be unwound and we did not recover you would have to repay.

               Sincerely,

               HAGENS BERMAN SOBOL SHAPIRO LLP

               Steve W. Berman

               Kenneth A. Wexler

               Marc H. Eledsen

               Jeffrey L. Kodroff

ATTORNEYS AT LAW       SEATTLE  LOS ANGELES  CAMBRIDGE  PHOENIX  CHICAGO
T 206.623.7292  F 206.623.0594
1301 FIFTH AVENUE • SUITE 2900 • SEATTLE, WASHINGTON 98101
www.hbsslaw.com

**HAGENS BERMAN LLP**
TRUST ACCOUNT
Williams Firm

3334

| Date | Type | Reference | | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---|---------------|-------------|----------|---------|
| 09/21/2007 | Bill | | | 5,722.19 | 5,722.19 | | 5,722.19 |
| | | | | | | Check Amount | 5,722.19 |

Checking - Frontier Bank

5,722.19

**HAGENS BERMAN LLP**
TRUST ACCOUNT
Williams Firm

9/21/2007

3334

| Date | Type | Reference | | Original Amt. | Balance Due | Discount | Payment |
|------|------|-----------|---|---------------|-------------|----------|---------|
| 09/21/2007 | Bill | | | 5,722.19 | 5,722.19 | | 5,722.19 |
| | | | | | | Check Amount | 5,722.19 |

Checking - Frontier Bank

5,722.19

# Exhibit 7

# HOFFMAN & EDELSON, LLC

ATTORNEYS AT LAW
45 WEST COURT STREET
DOYLESTOWN, PENNSYLVANIA 18901

215-230-8043
FAX 215-230-8735

JEROLD B. HOFFMAN*
MARC H. EDELSON* *

\* MEMBER PA. & N.J. BARS
\*\* MEMBER PA. & N.Y. BARS

ALAN V. KLEIN*
ADAM ARATEN*
ALLAN M. HOFFMAN*

April 3, 3007

VIA FAX and REGULAR MAIL

Kent M. Williams, Esq.
Williams Law Firm
1632A Homestead Trail
Long Lake, MN 55356

Re:    In re Pharmaceutical Average Wholesale Price Litigation

Dear Kent:

As you are aware, the third party payor trial against the fab four concluded in January, 2007. We are currently gearing up for the consumer trial against Astra Zeneca which is scheduled to begin at the end of April, 2007.

Lead counsel has continued to fund the majority of case costs in this litigation. At the present time we are seeking $25,000.00 from each of the non-lead firms that have made significant time commitments to the case. Please make your check payable to the "AWP Litigation Fund" and forward it to Gary Beisheim, Controller, Hagens Berman Sobol Shapiro LLP, 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101.

Very truly yours,

Marc H. Edelson

pd
4/25/07

MHE:kj
cc:    Lead Counsel

# Exhibit 8
# (redacted)

# Exhibit 9
# (redacted)

# Exhibit 10
# (redacted)

# Exhibit 11
# (redacted)

# Exhibit 12
# (redacted)

# Exhibit 13
# (redacted)

# Exhibit 14
# (redacted)

# Exhibit 15
# (redacted)

# Exhibit 16

## HIRECounsel Chicago, LLC

575 Madison Avenue, 3rd Floor
New York, NY 10022
Tel #(646) 356-0599
Fax #(646) 356-0585

**Invoice**

| Date | Invoice # |
|------|-----------|
| 6/4/2006 | 53 |

**Bill To**

Williams Law Firm
1632 Homestead Trail
Orono, MN  55356
Attention: Kent Williams, Esq.

| Terms | Due Date |
|-------|----------|
| Net 30 | 7/4/2006 |

| Week Ending | Employee Name | Hours | Rate | Net |
|-------------|---------------|-------|------|-----|
| 6/4/2006 | Collins, Annette | 32 | 40.00 | 1,280.00 |
| 6/4/2006 | Dumas, Joseph | 32 | 30.00 | 960.00 |
| 6/4/2006 | Fitzpatrick, Joseph | 32 | 40.00 | 1,280.00 |
| 6/4/2006 | Lynch, Ryan | 32 | 40.00 | 1,280.00 |

Make check payable to HIRECounsel Chicago, LLC.

| Total | |
|-------|--|
| | $4,800.00 |

# Exhibit 17

Subj:    **AWP: Baxter review**
Date:    2/23/2007
To:      beth@hbsslaw.com

Hi Beth--my contact at HireCounsel says there are no invoices for February on the Baxter review. What is the status? Thx.

Kent M. Williams, Esq.
Williams Law Firm
1632A Homestead Trail
Long Lake, MN 55356
612-940-4452 (c)
763-473-0314(f)

This message is protected by the attorney-client and work product privileges and is meant solely for the intended recipient(s). If you are not an intended recipient, or if you otherwise believe this message has been sent to you in error, please notify the sender and destroy this message immediately. Thank you.

# Exhibit 18

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE LITIGATION

MDL No. 1456

THIS DOCUMENT RELATES TO:

CIVIL ACTION: 01-CV-12257-PBS

Judge Patti B. Saris

ALL ACTIONS

### [PROPOSED] FINAL ORDER AND JUDGMENT GRANTING FINAL APPROVAL TO PROPOSED CLASS ACTION SETTLEMENT WITH THE GLAXOSMITHKLINE DEFENDANTS, APPROVING PROPOSED ALLOCATION OF SETTLEMENT FUNDS, AND APPROVING CLASS COUNSEL'S APPLICATION FOR ATTORNEYS FEES, REIMBURSEMENT OF LITIGATION EXPENSES AND COMPENSATION TO CLASS REPRESENTATIVES

This Court having considered: (a) the Settlement Agreement and Release of the

GlaxoSmithKline Defendants dated August 10, 2006, including all Exhibits thereto (as amended)

(the "Agreement"), between the Plaintiffs and Defendant SmithKline Beecham Corporation,

d/b/a GlaxoSmithKline ("GSK"), which is, along with GlaxoSmithKline, plc and Glaxo

Wellcome, Inc., a named defendant in the above-captioned matter (collectively the "GSK

Defendants"); (b) the proposed allocation and distribution of the Settlement Fund; and (c) Class

Counsel's application for attorneys' fees, reimbursement of litigation expenses and

compensation to the Class Representatives; and having held a hearing on July 19, 2007, and

having considered all of the submissions and arguments with respect thereto, and otherwise

being fully informed, and good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

- 1 -

1.      This Final Order and Judgment incorporates herein and makes a part hereof, the

Agreement, including the Exhibits thereto. Unless otherwise provided herein, the terms defined

in the Agreement shall have the same meanings for purposes of this Final Order and Judgment.

2.      The Court has personal jurisdiction over all Class Representatives, AWP Payor

Class Members and Defendant GSK for purposes of this settlement only, and has subject matter

jurisdiction to approve the Agreement.

3.      Based on the record before the Court, including all submissions in support of the

Settlement set forth in the Agreement ("Settlement"), the lack of any objections to the

Settlement, as well as the Agreement, the Court hereby incorporates the findings of its

August 16, 2005 and January 30, 2006 *Order Re: Motion for Class Certification* and further

certifies the following nationwide Classes (the "AWP Payor Classes") for settlement purposes

only:

> A.      Medicare Part B Co-Payment Class ("Medicare
>         Co-Payment Class")
>
>         All natural persons in the United States who made, or who
>         incurred a currently enforceable obligation to make, a co-
>         payment based on AWP for a Medicare Part B covered
>         drug manufactured by GSK set forth on Exhibit A hereto.
>         Excluded from the Class are persons who made flat co-
>         payments, who were reimbursed in full for any co-
>         payments, or who have the right to be fully reimbursed for
>         any co-payments.
>
> B.      Third-Party Payor MediGap Supplemental Insurance
>         ("MediGap TPP Class")
>
>         All Third-Party Payors in the United States who made
>         reimbursements for a Medicare Part B covered drug
>         manufactured by GSK and set forth on Exhibit A hereto,
>         based on AWP, during the Class Period.
>
> C.      Consumer and Third-Party Payor Class for Payments Made
>         for Medicare Part B Drugs Outside the Medicare Context

- 2 -

("Private Payor Class")

> All natural persons in the United States who made, or who
> incurred a currently enforceable obligation to make, a
> payment for, and all Third Party Payors in the United States
> who made reimbursements based on contracts expressly
> using AWP as a pricing standard for purchases of, a
> physician administered drug manufactured by GSK set
> forth on Exhibit A hereto, during the Class Period.
> Excluded from the Class are natural persons who made flat
> co-payments, who were reimbursed in full for any
> payments or co-payments, or who have the right to be fully
> reimbursed for any payments or co-payments.

The Class Period for the Medicare Co-Payment Class and the MediGap TPP Class is

January 1, 1991 through January 1, 2005. The Class Period for the Private Payor Class is

January 1, 1991 through August 10, 2005. Excluded from each of the AWP Payor Classes are

Defendants and their officers, directors, management, employees, subsidiaries, and affiliates.

Excluded from the MediGap TPP Class and the Private Payor Class are: (1) the United States

government and its agencies and departments, and all other governmental entities that made

payments pursuant to any state's Medicaid program; (2) the Independent Settling Health Plans

(ISHPs), as defined in Paragraph 2(w) of the Agreement; and (3) all federal, state or local

governmental entities, *except for* the following, which are *not* excluded from the MediGap TPP

or Private Payor Classes: (a) non-Medicaid state or local government entities that made AWP-

based prescription drug payments as part of a health benefit plan for their employees, but only

with respect to such payments, and (b) other non-Medicaid state government agencies or

programs of the Participating States and of the Additional Participating States, if any, *except that*

such agencies and programs in New York and Connecticut *are* excluded.

In so holding, the Court finds that the prerequisites of Rule 23(a) and (b)(3) have been

satisfied for certification of the nationwide AWP Payor Classes for settlement purposes only:

members of the nationwide AWP Payor Classes, numbering in the hundreds of thousands, are so
numerous that joinder of all members is impracticable; there are questions of law and fact
common to the nationwide AWP Payor Classes, such as whether Class Members were
overcharged for GSK Covered Drugs; the claims and defenses of the Class Representatives are
typical of the claims and defenses of the members of the nationwide AWP Payor Classes; the
Class Representatives have fairly and adequately protected the interests of the nationwide AWP
Payor Classes with regard to the consolidated claims of the nationwide AWP Payor Classes; the
common questions of law and fact predominate over questions affecting only individual
nationwide AWP Payor Class Members, rendering the nationwide AWP Payor Classes
sufficiently cohesive to warrant a nationwide class settlement; and the certification of the
nationwide AWP Payor Classes is superior to individual litigation and/or settlement as a method
for the fair and efficient resolution of the MDL Class Actions.

In making all of the foregoing findings, the Court has exercised its discretion in certifying
nationwide settlement classes.

4.     The record shows that Notice has been given to the nationwide AWP Payor
Classes in the manner approved by the Court in its Preliminary Approval Order of November 15,
2006 [Docket No. 3401]. The Court finds that such Notice: (i) constitutes reasonable and the
best practicable notice; (ii) constitutes notice that was reasonably calculated, under the
circumstances, to apprise members of the nationwide AWP Payor Classes of the pendency of the
MDL Class Actions, the terms of the Settlement, and nationwide AWP Payor Class Members'
right to object to or exclude themselves from the nationwide AWP Payor Classes and to appear
at the settlement fairness hearing held on July 19, 2007 (the "Fairness Hearing"); (iii) constitutes
due, adequate, and sufficient notice to all persons or entities entitled to receive notice; and

- 4 -

(iv) meets the requirements of due process and Rule 23 of the Federal Rules of Civil Procedure.

5.     No individuals or entities, other than those listed on Exhibit B hereto, have excluded themselves from the nationwide AWP Payor Classes. This Order shall have no force or effect on the persons or entities listed on Exhibit B hereto.

6.     The Court finds that extensive arm's-length negotiations have taken place in good faith between Lead Class Counsel and Defendant GSK's Counsel resulting in the Agreement. Additionally, the Court finds that extensive arm's-length negotiations have taken place on behalf of separate counsel appointed by Lead Class Counsel to represent the interests of Consumer Class Members and TPP Class Members in order to apportion the Settlement Fund between these constituencies and that these arm's-length negotiations afforded the structural protection required to ensure adequate representation of these constituencies.

7.     Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court hereby finally approves in all respects the Settlement set forth in the Agreement ("the Settlement") and finds that the Settlement, the Agreement, and the plan of distribution of the Settlement Fund as set forth in Paragraph 22 of the Agreement and Exhibit G to the Agreement, are, in all respects, fair, reasonable and adequate, and in the best interest of the nationwide AWP Payor Classes.

8.     The Court further approves the establishment of the Settlement Fund under the terms and conditions set forth in the Agreement and the Class Escrow Agreement submitted by the parties. The parties are hereby directed to implement and consummate the Settlement according to the terms and provisions of the Agreement. In addition, the parties are authorized to agree to and adopt such amendments and modifications to the Agreement as (i) shall be consistent in all material respects with this Final Order and Judgment, and (ii) do not limit the rights of nationwide AWP Payor Classes.

Case 1:01-cv-12257-PBS   Document 5734-3   Filed 12/02/08   Page 51 of 60
Case 1:01-cv-12257-PBS   Document 4619   Filed 08/07/2007   Page 6 of 11
Case 1:01-cv-12257-PBS   Document 4400   Filed 06/22/2007   Page 6 of 15

9.      The claims against the GSK Defendants in the MDL Class Actions are hereby dismissed with prejudice and without costs to any party, except as otherwise provided herein.

10.     Upon the Effective Date of the Agreement, the Class Releasors (as defined in Paragraph 2(g) of the Agreement) shall release and forever discharge the GSK Releasees (as defined in Paragraph 2(v) of the Agreement) from the Released Class Claims (as defined in Paragraph 2(oo) of the Agreement).

11.     The Court finds that the Class Escrow Account is a "Qualified Settlement Fund" as defined in section 1.468B-1(a) of the Treasury Regulations in that it satisfies each of the following requirements:

        (a)     The Class Escrow Account is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

        (b)     The Class Escrow Account is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liability arising out of an alleged violation of law; and

        (c)     The assets of the Class Escrow Account are segregated from other assets of GSK, the transferor of payments to the Settlement Fund, and from the assets of persons related to GSK.

12.     Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

        (a)     The Class Escrow Account met the requirements of paragraphs 12(b) and 12(c) of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

- 6 -

001534-16  173564 V1

(b)      GSK and the "administrator" under section 1.468B-2(k)(3) of the Treasury

Regulations may jointly elect to treat the Class Escrow Account as coming into existence as a

"Qualified Settlement Fund" on the later of the date the Class Escrow Account met the

requirements of paragraphs 11(b) and 11(c) of this Order or January 1 of the calendar year in

which all of the requirements of paragraph 11 of this Order are met. If such relation-back

election is made, the assets held by the Class Escrow Account on such date shall be treated as

having been transferred to the Class Escrow Account on that date.

13.      Nothing in this Final Order and Judgment, the Settlement, or the Agreement is or

shall be deemed or construed to be an admission or evidence of any violation of any statute or

law or of any liability or wrongdoing by any of the Defendants.

14.      Class Counsel have moved pursuant to Rules 23(h), 54(d) and 52(a) of the Federal

Rules of Civil Procedure for an award of attorneys' fees and reimbursement of expenses.

Pursuant to Rule 23(h)(3) and 52(a) this Court makes the following findings of fact and

conclusions of law:

(a)      that the Settlement confers a substantial benefit on the nationwide AWP

Payor Classes;

(b)      that the value conferred on the nationwide AWP Payor Classes is

immediate and readily quantifiable. Upon this Judgment becoming final, each nationwide AWP

Payor Class Member who has submitted a valid proof of claim will receive a cash payment that

represents a significant portion of the alleged financial harm alleged to have been incurred as a

result of the GSK Defendants' alleged conduct;

(c)      that Class Counsel vigorously and effectively pursued the nationwide

AWP Payor Class Members' claims before this Court in this highly complex case;

- 7 -

(d)     that the Settlement was obtained as a direct result of Class Counsel's skillful advocacy;

(e)     that the Settlement was reached following extensive negotiation between Lead Class Counsel and Defendant GSK's Counsel, and was negotiated in good-faith and in the absence of collusion;

(f)     that during the prosecution of the MDL Class Actions up to the date of the GSK Settlement on August 10, 2005, Class Counsel incurred expenses in the amount of $5,561,128.12, which included costs for expert witnesses and other expenses which the Court finds to be reasonable and necessary to the representation of the nationwide AWP Payor Classes;

(g)     that nationwide AWP Payor Class Members were advised in the "Notice of Pendency of Class Action, Proposed Settlement and Class Certification for the Settlement" approved by the Court that Class Counsel intended to apply for an award of attorneys' fees in an amount up to 33 1/3% of the Settlement Fund (plus interest thereon), plus the opportunity to petition the Court for a fee on any amounts refunded to GSK as a result of TPP Opt Outs under the circumstances described in Paragraph 17 of the Agreement, plus reimbursement of reasonable costs and expenses incurred in the prosecution of this action;

(h)     that no member(s) of the nationwide AWP Payor Classes has (have) submitted written objection(s) to the award of attorneys' fees and expenses;

(i)     that counsel who recover a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Blum v. Stenson*, 465 U.S. 866, 900 n.16 (1984);

(j)     that use of the percentage of the fund method in common fund cases is the

- 8 -

prevailing practice in this Circuit for awarding attorneys' fees and permits the Court to focus on a showing that a fund conferring benefit on a class resulted from the lawyers' efforts. *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); and

      (k)    the requested fee award of 33% of the Fund for both fees and litigation expenses is ~~well~~ within the applicable range of percentage awards in this Circuit; *In re Relafen Antitrust Litig.*, No. 01-12239 (D. Mass. April 9, 2004) [Doc. No. 297]; *Mowbray v. Waste Management Holdings*, No. 98-11534-WGY (D. Mass. Aug. 2, 2001); *In re Copley Pharmaceutical, Inc. Sec. Litig.*, No. 94-11897-WGY (D. Mass. Feb. 8, 1996); *Wilensky v. Digital Equipment Corp.*, No. 94-10752-JLT (D. Mass. July 11, 2001). Accordingly, Class Counsel are hereby awarded $21,615,000 from the balance of the Settlement Fund as their fee award which the Court finds to be fair and reasonable, and which amount shall be paid to Class Counsel from the Settlement Fund in accordance with the terms of the Agreement, with interest from November 29, 2006 (the date of the funding of the Settlement Fund) to the date of payment, at the same net interest rate earned by the Settlement Fund. Further, this amount is also meant to compensate Class Counsel for the litigation expenses as requested by Class Counsel in the fee petition. Co-Lead Settlement Class Counsel shall allocate fees to themselves and other Plaintiffs Class Counsel in their sole discretion, as appropriate.

      15.    The Class Representatives and other appropriate parties, as identified in the Order Granting Preliminary Approval of the GlaxoSmithKline Settlement, Certifying Class for Purposes of Settlement dated November 15, 2006, are hereby granted an compensation totaling $25,000 for all Consumer Class Representatives and $100,000 for all TPP Class Representatives, to be divided among them by Lead Class Counsel, which amount is in addition to whatever

*15. The class representatives are compensated in the amount set forth in their declarations to the conduct of time spent on this case. (Document 4509)*

monies the Class Representatives will receive from the Settlement Fund pursuant to the Agreement as members of the AWP Payor Classes.

16.     Without affecting the finality of this Final Order and Judgment, the Court retains continuing and exclusive jurisdiction over all matters relating to administration, consummation, enforcement and interpretation of the Agreement and of this Final Order and Judgment, to protect and effectuate this Final Order and Judgment, and for any other necessary purpose. Defendant GSK, Class Representatives and each member of the nationwide AWP Payor Classes are hereby deemed to have irrevocably submitted to the exclusive jurisdiction of this Court, for the purpose of any suit, action, proceeding or dispute arising out of or relating to the Agreement or the applicability of the Agreement, including the Exhibits thereto, and only for such purposes. Without limiting the generality of the foregoing, and without affecting the finality of this Final Order and Judgment, the Court retains exclusive jurisdiction over any such suit, action or proceeding. Solely for purposes of such suit, action or proceeding, to the fullest extent they may effectively do so under applicable law, the parties hereto are deemed to have irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

17.     In the event that the Settlement does not become effective according to the terms of the Agreement, this Order and Final Judgment shall be rendered null and void as provided by the Agreement, shall be vacated, and all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Agreement.

18.     No nationwide AWP Payor Class Member, either directly, representatively, or in any other capacity (other than a nationwide AWP Payor Class Member who validly and timely

- 10 -

elected to be excluded from the Class), shall commence, continue or prosecute against any or all

GSK Releasees any action or proceeding in any court or tribunal asserting any of the Released

Claims defined in the Agreement, and are hereby permanently enjoined from so proceeding.


DATED: _____    _____
                                Hon. Patti B. Saris


- 11 -

## Exhibit A -- GSK Covered Drugs and HCPCS Codes

| NDC | Drug | Description | HCPCS Code(s) |
|---|---|---|---|
| **GSK Category A Drugs** | | | |
| 00029414901 | Kytril | KYTRIL INJ SINGLE DOSE VIAL 1MG/ML | J1625, J1626 |
| 00029414975 | Kytril | KYTRIL INJ SGL DOSE VIAL 1MG/ML VHA | J1625, J1626 |
| 00029415201 | Kytril | KYTRIL 1MG/ML INJECTION 4ML VIAL | J1625, J1626 |
| 00173044200 | Zofran | ZOFRAN INJ 2MG/ML 20ML | J2405 |
| 00173044202 | Zofran | ZOFRAN INJ 2MG/ML 2ML 5S | J2405 |
| 00173046100 | Zofran | ZOFRAN INJ PRMXD 32MG/50ML | J2405 |
| 00173046200 | Zofran | ZOFRAN INJ PRMXD 4MG/50ML | J2405 |
| **GSK Category B Drugs** | | | |
| 00173004535 | Alkeran | ALKERAN TAB 2MG 50S | J8600 |
| 00173013093 | Alkeran | ALKERAN I.V. INJ 50 MG | J9245 |
| 00173044901 | Imitrex | IMITREX INJ 12MG/ML 0.5ML 2S PFLD SRNG | J3030 |
| 00173044902 | Imitrex | IMITREX INJ 0.5ML 12MG/ML 5S VIALS | J3030 |
| 00173044903 | Imitrex | IMITREX INJ 12MG/ML 0.5ML2S KIT,SELFDOSE | J3030 |
| 00173047800 | Imitrex | IMITREX INJ 12MG/ML STAT DOSE RFL 2'S | J3030 |
| 00173047900 | Imitrex | IMITREX INJ 12MG/ML STAT DOSE KIT | J3030 |
| 00029415105 | Kytril | KYTRIL 1 MG TABS 20'S SUP | Q0166 |
| 00029415139 | Kytril | KYTRIL 1MG TABS 2'S | Q0166 |
| 00173026010 | Lanoxin | LANOXIN INJ 0.5MG | J1160 |
| 00173026035 | Lanoxin | LANOXIN INJ 0.5MG 2ML 50S | J1160 |
| 00173026210 | Lanoxin | LANOXIN INJ PEDIATRIC 0.1MG/ML | J1160 |
| 00173071325 | Myleran | MYLERAN TAB 2MG 25S | J8510 |
| 00173065601 | Navelbine | NAVELBINE INJ 10MG 1ML | J9390 |
| 00173065644 | Navelbine | NAVELBINE INJ 50MG 5ML | J9390 |
| 00173010793 | Retrovir | RETROVIR IV INF 10MG/ML 20ML 10 | J3485 |
| 00173038558 | Ventolin | VENTOLIN SOL INH 0.5% 5MG/ML 20ML | J7618-19, J7620, J7625 |
| 00173041900 | Ventolin | VENTOLIN NEB SOL INH   0.083% 3ML 25S | J7618-19, J7620, J7625 |
| 00173044600 | Zofran | ZOFRAN TAB 4MG 30S | Q0179 |
| 00173044601 | Zofran | ZOFRAN TAB 4MG 100S | Q0179 |
| 00173044602 | Zofran | ZOFRAN TAB 4MG 100S UD | Q0179 |
| 00173044604 | Zofran | ZOFRAN TAB 4MG 3S | Q0179 |
| 00173044700 | Zofran | ZOFRAN TAB 8MG 30S | Q0179 |
| 00173044701 | Zofran | ZOFRAN TAB 8MG 100S | Q0179 |
| 00173044702 | Zofran | ZOFRAN TAB 8MG 100S UD | Q0179 |
| 00173044704 | Zofran | ZOFRAN TAB 8MG 3S | Q0179 |
| 00173048900 | Zofran | ZOFRAN ORAL SOL 4MG/5ML  50ML | Q0179 |
| 00173056900 | Zofran | ZOFRAN ODT 4MG 5X2 30S | Q0179 |
| 00173057000 | Zofran | ZOFRAN ODT 8MG 5X2 30S | Q0179 |
| 00173057004 | Zofran | ZOFRAN ODT 8MG 5X2 10'S | Q0179 |
| 00173068000 | Zofran | ZOFRAN TAB 24MG 1S | Q0179 |
| 00173095201 | Zovirax | ZOVIRAX FOR INJECTION 1000MG 20ML 10S (C | Q4075 |
| 00173099501 | Zovirax | ZOVIRAX FOR INJECTION 500MG 10ML 10S (C# | Q4075 |
| 00173036200 | Zantac | ZANTAC INJ 25MG/ML 2ML  PFLD SRNG | J2780 |
| 00173036238 | Zantac | ZANTAC INJ 25MG/ML 2ML 10S | J2780 |
| 00173036300 | Zantac | ZANTAC INJ 25MG/ML 40ML | J2780 |
| 00173036301 | Zantac | ZANTAC INJ 25MG/ML 6ML | J2780 |
| 00173036339 | Zantac | ZANTAC INJ 25MG/ML 10ML | J2780 |
| 00173040700 | Zantac | ZANTAC INJ PRMXD 50MG/100ML 24S | J2780 |
| 00173044100 | Zantac | ZANTAC INJ PRMXD 50MG/50ML 24S | J2780 |

## EXHIBIT B

**Third-Party Payor Filing Valid Requests for Exclusion from the GSK Settlement**

| Exclusion No. | Name |
| --- | --- |
| 1 | United States Fire Insurance Company |
| 2 | Crum and Forster Insurance Company |
| 3 | The North River Insurance Company |
| 4 | Crum & Forster Indemnity Company |
| 5 | Thermo Fisher Scientific |
| 6 | Haljohn San Antonio |
| 7 | Calhoun Apparel |
| 8 | Costco Wholesale |
| 9 | Office of the Attorney General |
| 10 | Seattle Pacific |
| 11 | RLI |
| 12 | Schaeffler Group USA Inc |

## EXHIBIT B

### Consumer Filing Valid Requests for Exclusion from the GSK Settlement

[List to be provided under seal prior to Final Approval]

# Exhibit 19
# (redacted)