**EXHIBIT 1**

## EXHIBIT 1

| Additional Assertions Of Deliberative Process Privilege By The Government To Prevent Witnesses From Answering Questions ||
|---|---|
| **Donald Thompson** ||
| **Thompson 1** (62:1 – 63:12) | Q. Yes. I'm asking in your 30(b)(1) capacity, in your personal capacity. <br> A. Can you repeat the question? <br> Q. Certainly. Has cross-subsidization ever been a motivating factor for CMS taking any action of which you are aware? <br> MR. DRAYCOTT: Objection. <br> A. I have no personal opinion on that. <br> Q. Did you do you have any knowledge about that? <br> MR. DRAYCOTT: Objection. <br> A. I'm sorry. Just to make sure, one more time on the question? <br> Q. Has cross-subsidization ever been a motivating factor for CMS taking any action of which you are aware? <br> MR. DRAYCOTT: Objection continues. <br> A. When you speak of a motivating factor for a government agency, what does that mean? <br> Q. I can break it down a little bit. Has anybody within CMS ever expressed to you the belief that Medicare pays more for the ingredient cost to make up for absence of payment in some other respect? <br> MR. DRAYCOTT: Objection. You can answer the question only insofar it doesn't go to deliberations that occurred in the context of the rulemaking process. <br> A. I cannot answer the question. <br> Q. You have an answer but you're simply following your lawyer's instruction; is that correct? <br> MR. DRAYCOTT: You can state that. <br> A. That's correct. |
| **Thompson 2** (73:15 – 75:5, 77:3 – 79:11) | Q. All right. Let me ask the question in a slightly different way. Have you ever had a conversation with anybody within CMS about whether past agency policies in fact cross- subsidized? <br> MR. WINGET-HERNANDEZ: Objection, form. <br> MR. DRAYCOTT: You can answer to the extent it's yes or no if you ever had such a conversation. <br> A. Just so I can be clear, to the extent that they did cross-subsidize is your question? Did cross- subsidize? <br> Q. In the past tense, yes. <br> A. So as a factual matter that cross- subsidization was occurring is your question to me? <br> Q. Or that you suspected it was occurring. <br> MR. DRAYCOTT: The question is did you ever have such a conversation with anybody. He hasn't asked you the point what the content of that conversation |

was, but just whether or not it occurred.
Q. I'll ask you in a slightly different way. Have you ever had any conversations about past cross-subsidization under Medicare Part B payment methodologies?
A. In the context that commenters had raised the issue.
Q. And focusing on your internal discussions can you recall any specific discussions about that past cross-subsidization? MR. DRAYCOTT: Again, you can answer yes or no without revealing at this point – you can state whether or not you have a recollection. But don't yet state the recollection.
* * *
MR. COOK: And Justin, just so we're clear, with the foundation that we've laid I assume that you're not going to let the witness testify about this internal conversations about cross-subsidization? I didn't ask him about the substance of the conversations. If you tell me that that's futile I'm more than happy to avoid asking him what was the content of those conversations.
MR. DRAYCOTT: And just so it's clear, we're talking about ones that are associated with a final rule that was ultimately promulgated in 2004? January. I think the notice of the final rule was January 2004; is that correct?
THE WITNESS: Correct. But then in addition there is the annual Medicare physician fee rulemaking cycle.
MR. DRAYCOTT: Right. It's not clear to me, but you do have a recollection?
THE WITNESS: I have a recollection of conversations with respect to comments that different provider groups had made with respect to cross-subsidization.
MR. DRAYCOTT: Then you're right, Chris, with respect to the actual content of the deliberations that occurred in connection with the annual rulemaking cycle -- and here we're talking about a rulemaking cycle that was principally involved in 2004 -- you're right, I would instruct the witness not to answer as to the content of those deliberations.
MR. COOK: And if there are any cross-subsidization conversations that the witness has had internally that would fall outside of your instruction that he not answer, feel free to talk to him over a break, whenever. If you could just advise me of that. But I'm working under the assumption that all out of internal conversations relating to cross-subsidization are out of bounds for me. I'm more than happy to ask did you have any conversations internally regarding cross-subsidization, but I'm not going to try to play hide and go seek to try and figure out which ones I can ask about.
MR. DRAYCOTT: Well, I think -- yeah. I don't know that there's anything more that – I think you've covered this issue at length and it doesn't strike me that there's somehow a conversation that would fall within the bounds of what you can inquire about.
MR. COOK: Okay.

United States of America (F. Don Thompson)                            March 28, 2008
                          Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL | ) | MDL NO. 1456 |
| INDUSTRY AVERAGE WHOLESALE | ) | CIVIL ACTION |
| PRICE LITIGATION | ) | 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | ) | |
| U.S. ex rel. Ven-a-Care of | ) | Judge Patti B. Saris |
| the Florida Keys, Inc. | ) | |
| v. | ) | Chief Magistrate |
| Abbott Laboratories, Inc., | ) | Judge Marianne B. |
| No. 06-CV-11337-PBS | ) | Bowler |

- - - - - - - - - - - - - - - -

(captions continue on following pages)

Washington, D.C.

Friday, March 28, 2008

8:00 a.m.

Videotaped deposition of F. DON THOMPSON as 30(b)(6)

witness for the UNITED STATES OF AMERICA

Volume I

United States of America (F. Don Thompson)  March 28, 2008
Washington, DC

Page 62

1   Q. Yes. I'm asking in your 30(b)(1)
2   capacity, in your personal capacity.
3   A. Can you repeat the question?
4   Q. Certainly. Has cross-subsidization
5   ever been a motivating factor for CMS taking any
6   action of which you are aware?
7        MR. DRAYCOTT: Objection.
8   A. I have no personal opinion on that.
9   Q. Did you do you have any knowledge about
10  that?
11       MR. DRAYCOTT: Objection.
12  A. I'm sorry. Just to make sure, one more
13  time on the question?
14  Q. Has cross-subsidization ever been a
15  motivating factor for CMS taking any action of
16  which you are aware?
17       MR. DRAYCOTT: Objection continues.
18  A. When you speak of a motivating factor
19  for a government agency, what does that mean?
20  Q. I can break it down a little bit. Has
21  anybody within CMS ever expressed to you the
22  belief that Medicare pays more for the ingredient

Page 63

1   cost to make up for absence of payment in some
2   other respect?
3        MR. DRAYCOTT: Objection. You can
4   answer the question only insofar it doesn't go to
5   deliberations that occurred in the context of the
6   rulemaking process.
7   A. I cannot answer the question.
8   Q. You have an answer but you're simply
9   following your lawyer's instruction; is that
10  correct?
11       MR. DRAYCOTT: You can state that.
12  A. That's correct.
13  Q. When did these conversations take
14  place?
15  A. My primary recollection would be in the
16  development of the -- both the January 7th 2003
17  Federal Register notice and the August 20th 2003
18  Federal Register notice, Medicare program payment
19  reform for Medicare Part B drugs proposed rule.
20       MR. DRAYCOTT: Just a clarification on
21  my instruction, though. If it was adopted as a
22  rationale in the rulemaking that occurred, you

Page 64

1   can state that.
2        MR. COOK: I'm still asking
3   foundational questions.
4   BY MR. COOK:
5   Q. With whom did you have these
6   conversations, Mr. Thompson?
7        MR. DRAYCOTT: You can answer that.
8   A. In the context of the development of
9   the rules, the briefing papers that we developed,
10  in those papers my recollection is that we would
11  have raised the issue as presented to us by
12  commenters.
13  Q. Was there any discussion of cross-
14  subsidization with anyone at CMS after the rule
15  was adopted?
16       MR. DRAYCOTT: Objection. You can
17  answer.
18  A. In the context of continuing statements
19  by groups representing providers that cross-
20  subsidization was still an issue?
21  Q. Yes.
22  A. Yes.

Page 65

1   Q. With whom did you have those
2   conversations?
3   A. I don't necessarily recall specific
4   conversations. What my recollection is is that
5   as we -- in the course of meeting with outside
6   groups the groups would raise the issue and then
7   we would discuss the fact that the groups were
8   continuing to say that the drug administration
9   payments were inadequate.
10  Q. What groups are these in particular
11  that you have in mind?
12  A. There's the ASCO -- American Society of
13  Clinical Oncology, I believe -- COA, which I
14  believe is -- I'd have to look up what their
15  acronym stands for. Groups representing other
16  specialties that administer Medicare Part B
17  drugs. Again, I'm not sure of the acronyms. But
18  the rheumatologists would be an example.
19       Bear with me one moment.
20       (Witness reading a document.)
21       Groups representing hematology,
22  oncology, urology, DME and other medical

17 (Pages 62 to 65)

United States of America (F. Don Thompson)                                    March 28, 2008
Washington, DC

Page 70

1  promulgated?
2      A.  In the context that groups representing
3  providers continued to raise the issue of cross-
4  subsidization.
5      Q.  All right.  Can you describe those
6  internal discussions within CMS relating to
7  cross-subsidization after promulgation of the
8  rule?
9          MR. DRAYCOTT:  I'm going to object.
10 And I think I need to consult with the witness to
11 find out what the context -- if there were such
12 conversations that were internal and in what
13 context they occurred.
14         MR. COOK:  Well, I can ask a
15 foundational question.
16 BY MR. COOK:
17     Q.  Were these conversations leading up to
18 the promulgation of any additional rule?
19         MR. WINGET-HERNANDEZ:  Objection, form.
20     A.  Again, just to clarify, I'm not in a
21 30(b)(6) capacity?
22     Q.  That's correct.  I'm just asking your

Page 71

1  personal memory.
2      A.  The agency goes through annual
3  rulemaking cycles.  So generally speaking what we
4  do is we have the proposed rule early in the year
5  followed by a comment period followed by
6  promulgation of a final rule.  And specifically
7  under the physician fee schedule that is an
8  annual activity.
9          So when you asked me was it related --
10 when you asked me was it related to rulemaking,
11 because this is kind of the -- updates to the
12 Medicare fee schedule occur annually, it's
13 difficult for me to parse your question.
14     Q.  It can't be that all internal
15 discussions at CMS are somehow related to some
16 rule that might or might not be promulgated, can
17 it?
18         MR. DRAYCOTT:  Objection.
19     A.  Well, when you say might or might not
20 be promulgated, we promulgate a physician fee
21 schedule rule every year.  So it's not a question
22 of whether there would be a payment regulation

Page 72

1  relating to the Medicare physician fee schedule.
2  There will be.  There will be this year.  There
3  will be next year.
4      Q.  The conversations that you're
5  describing, did they constitute deliberations
6  about what should be in an upcoming rule?
7      A.  When you say should, should be, in what
8  context and from whose perspective?
9      Q.  Well, were you discussing with people
10 within CMS what the content of that future rule
11 would be?
12     A.  So you're asking from the agency's
13 perspective -- and again, not operating in a
14 30(b)(6) context here.  You're asking from the
15 agency's perspective were these discussions
16 related to decision-making with respect to what
17 the content should be of the upcoming Medicare
18 physician fee schedule rule?
19     Q.  Yes.
20     A.  I have no personal opinion on that.
21     Q.  You don't know --
22     A.  The way the question was phrased.

Page 73

1      Q.  You don't know one way or the other
2  whether the conversations in which you were
3  involved somehow related to what you and the
4  other person on the other side of the
5  conversation were considering putting into a
6  future rule?
7          MR. WINGET-HERNANDEZ:  Objection, form.
8      A.  My interpretation of your question is
9  how did the agency view those conversations.
10     Q.  I'm asking how you viewed the
11 conversation.
12     A.  And I'm saying I don't have a personal
13 opinion because I don't know how the agency
14 viewed the conversations.
15     Q.  All right.  Let me ask the question in
16 a slightly different way.  Have you ever had a
17 conversation with anybody within CMS about
18 whether past agency policies in fact cross-
19 subsidized?
20         MR. WINGET-HERNANDEZ:  Objection, form.
21         MR. DRAYCOTT:  You can answer to the
22 extent it's yes or no if you ever had such a

19 (Pages 70 to 73)

c4a90db7-db15-4dd9-a8ce-4ec6450c90d2

United States of America (F. Don Thompson)  March 28, 2008
Washington, DC

Page 74

1  conversation.
2      A.  Just so I can be clear, to the extent
3  that they did cross-subsidize is your question?
4  Did cross- subsidize?
5      Q.  In the past tense, yes.
6      A.  So as a factual matter that cross-
7  subsidization was occurring is your question to
8  me?
9      Q.  Or that you suspected it was occurring.
10         MR. DRAYCOTT:  The question is did you
11  ever have such a conversation with anybody. He
12  hasn't asked you the point what the content of
13  that conversation was, but just whether or not it
14  occurred.
15      Q.  I'll ask you in a slightly different
16  way. Have you ever had any conversations about
17  past cross-subsidization under Medicare Part B
18  payment methodologies?
19      A.  In the context that commenters had
20  raised the issue.
21      Q.  And focusing on your internal
22  discussions can you recall any specific

Page 75

1  discussions about that past cross-subsidization?
2         MR. DRAYCOTT:  Again, you can answer
3  yes or no without revealing at this point -- you
4  can state whether or not you have a recollection.
5  But don't yet state the recollection.
6      A.  The reason I'm struggling with your
7  question is that there is in my mind a difference
8  between saying did you have a conversation with
9  respect to comments that provider groups were
10  making with respect to cross-subsidization and
11  the question did you have a conversation about
12  was cross- subsidization actually occurring.
13  That's the distinction I'm drawing.
14      Q.  Let me help clear that distinction up.
15  When you had these conversations with providers
16  that claimed that they were using ingredient cost
17  payments to cross-subsidize either inadequate or
18  nonexistent professional or dispensing fees, did
19  you believe any of them?
20         MR. DRAYCOTT:  Objection.
21      A.  I have no personal opinion on that.
22      Q.  Well, you were sitting there across the

Page 76

1  table from them talking to them, right?
2      A.  (Nods head).
3      Q.  And you were completely agnostic about
4  whether they were telling the truth?
5      A.  I had no information on which to base
6  an opinion.
7      Q.  But people talk to us all the time and
8  we form a belief about whether they're truthful
9  or not. Did you form an opinion about whether
10  the providers who were making these statements to
11  you were being truthful to you?
12         MR. DRAYCOTT:  Objection.
13      A.  I had no information on which to base
14  an opinion.
15      Q.  So did you have any opinion about their
16  truthfulness at all?
17         MR. DRAYCOTT:  Objection. You can --
18      A.  I had no information on which to base
19  an opinion.
20      Q.  But did you form an opinion? Is the
21  answer no you did not form an opinion?
22         MR. DRAYCOTT:  Objection.

Page 77

1      A.  Having no basis on which to form the
2  opinion, that's correct.
3      Q.  If you could turn back to --
4         MR. COOK:  And Justin, just so we're
5  clear, with the foundation that we've laid I
6  assume that you're not going to let the witness
7  testify about this internal conversations about
8  cross-subsidization? I didn't ask him about the
9  substance of the conversations. If you tell me
10  that that's futile I'm more than happy to avoid
11  asking him what was the content of those
12  conversations.
13         MR. DRAYCOTT:  And just so it's clear,
14  we're talking about ones that are associated with
15  a final rule that was ultimately promulgated in
16  2004? January. I think the notice of the final
17  rule was January 2004; is that correct?
18         THE WITNESS:  Correct. But then in
19  addition there is the annual Medicare physician
20  fee rulemaking cycle.
21         MR. DRAYCOTT:  Right. It's not clear
22  to me, but you do have a recollection?

20 (Pages 74 to 77)

United States of America (F. Don Thompson)  March 28, 2008
Washington, DC

Page 78

1  THE WITNESS: I have a recollection of
2  conversations with respect to comments that
3  different provider groups had made with respect
4  to cross- subsidization.
5  MR. DRAYCOTT: Then you're right,
6  Chris, with respect to the actual content of the
7  deliberations that occurred in connection with
8  the annual rulemaking cycle -- and here we're
9  talking about a rulemaking cycle that was
10  principally involved in 2004 -- you're right, I
11  would instruct the witness not to answer as to
12  the content of those deliberations.
13  MR. COOK: And if there are any cross-
14  subsidization conversations that the witness has
15  had internally that would fall outside of your
16  instruction that he not answer, feel free to talk
17  to him over a break, whenever. If you could just
18  advise me of that. But I'm working under the
19  assumption that all out of internal conversations
20  relating to cross-subsidization are out of bounds
21  for me.
22  I'm more than happy to ask did you have

Page 79

1  any conversations internally regarding cross-
2  subsidization, but I'm not going to try to play
3  hide and go seek to try and figure out which ones
4  I can ask about.
5  MR. DRAYCOTT: Well, I think -- yeah.
6  I don't know that there's anything more that -- I
7  think you've covered this issue at length and it
8  doesn't strike me that there's somehow a
9  conversation that would fall within the bounds of
10  what you can inquire about.
11  MR. COOK: Okay.
12  BY MR. COOK:
13  Q. Abbott Exhibit 381, so we can go ahead
14  and wrap up that document and put the binder
15  away, if you could turn to page B-4 of Abbott
16  Exhibit 381, there's a topic issues related to
17  brand/generic distinction. And I'm particularly
18  interested in the bullet points that read, first,
19  "Spread is generally uniform and narrow for brand
20  name," and below that, "spread wider and more
21  variable for generics." Do you recall that
22  conversation of the expert panel?

Page 80

1  A. No.
2  Q. And then at the bottom of the page the
3  last heading reads "Comments related to the
4  pharmaceutical manufacturers." Do you see that?
5  A. Yes.
6  Q. And the two bullet points immediately
7  under that read "agreement that manufacturers
8  should have an obligation to be reasonable in
9  reporting AWP," and then below that, "AWP needs
10  to be better defined." Was there agreement on the
11  panel that manufacturers should have an
12  obligation to be reasonable in reporting AWP?
13  MR. DRAYCOTT: Objection.
14  A. I don't have a personal recollection of
15  the --
16  Q. Do you recall there being any
17  discussion of AWP needing to be better defined?
18  A. My recollection of that meeting was an
19  exchange between Rob Vito -- and I don't know the
20  gentleman that he was speaking to -- with respect
21  to the list AWP.
22  Q. And what was the nature of that

Page 81

1  discussion? Do you recall?
2  A. I couldn't tell you, you know, verbatim
3  how the conversation went. My general
4  recollection would be that Rob was making the
5  points that had been raised in the Office of the
6  Inspector General reports. And the individual to
7  whom he was discussing this was essentially, my
8  recollection would be, arguing that in their
9  opinion what the OIG had found in its reports was
10  appropriate.
11  Q. Do you know whether AWP needs to be
12  better defined?
13  MR. DRAYCOTT: Objection.
14  A. Do I know whether AWP needs to be
15  better defined. I don't really have a personal
16  opinion on that.
17  Q. Okay. And so when Exhibit 381 has a
18  bullet point that states "AWP needs to be better
19  defined," you can neither confirm nor contradict
20  that assertion, correct?
21  MR. DRAYCOTT: Objection.
22  A. The context in which the phrase is

21 (Pages 78 to 81)

Henderson Legal Services, Inc.
202-220-4158                  www.hendersonlegalservices.com