UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | )<br>)<br>)  MDL No. 1456<br>)  Civil Action No. 01-12257-PBS<br>) |
| **THIS DOCUMENT RELATES TO:** | )  Hon. Patti Saris<br>) |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc.*<br>CIVIL ACTION NO. 06-11337-PBS | )<br>)<br>)<br>)<br>) |

## DECLARATION OF BRIAN P. RITCHIE

I, Brian P. Ritchie, declare as follows:

1. I am Assistant Inspector General for the Office of Evaluation and Inspections (OEI) in the Office of Inspector General (OIG). The OIG is a component of the Department of Health and Human Services ("HHS" or the "agency").

2. The OIG for HHS was established through the Inspector General Act of 1978. The mission of the OIG is to protect the integrity of HHS programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by four components of the OIG. These components are the Office of Audit Services, the Office of

Investigations, the Office of Counsel to the Inspector General, and the Office of Evaluation and Inspections. The role and focus of each component is unique.

3. I have worked at HHS OIG for over 20 years. I joined OIG as a program analyst in 1987. I served as a lead analyst in the Office of Evaluation and Inspections (OEI) Technical Support Staff and was selected as the staff Director in 2000. In that role, I was responsible for managing the staff that provides advisory services and expert knowledge to evaluation teams in the areas of computer programming, databases, statistical sampling and other mathematical techniques. In 2005, I spent several months as the Acting Deputy Inspector General for OEI before accepting my current position as Assistant Inspector General for Evaluation and Inspections.

4. As the Assistant Inspector General, I manage the quality and production of the OIG's nationwide program evaluations. These evaluations protect the integrity of HHS programs, as well as the health and welfare of beneficiaries, by providing timely, useful, and reliable information and recommendations to decision makers and the public. My duties and responsibilities include establishing inspection priorities and determining the topics that will be evaluated; assessing the progress of inspection designs and reports and reviewing them to ensure that they are readable, compelling, persuasive and correct; and reporting to the Deputy Inspector General for Evaluation and Inspections on the effectiveness of these inspection reports and the contributions that they will make to the overall mission of the OIG.

5.   The Office of Evaluation and Inspections conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, and abuse, and promoting economy, efficient, and effectiveness in HHS programs. Our reports often present recommendations for improving program operations. The findings on which we base our recommendations are developed from information that OEI collects from a wide variety of sources, including self-reported data from survey respondents. On the whole, our work involves nationwide evaluations that identify vulnerabilities in departmental programs. Our work generally targets systematic weaknesses and not individual cases of fraud.

6.   I am informed that documents in the possession of the OIG have been requested in the course of the above-captioned litigation. I understand that OIG requested that certain of these documents not be produced. Rather, the documents were withheld because they are privileged documents. I am informed that the OIG documents that were withheld are described on privilege logs that have been served on the defendants (the "Privilege Log").

7.   I understand that the Court has requested that certain of the documents on the Privilege Log be submitted for in camera review. I have reviewed those documents, listed on the schedule prepared by Department of Justice attorneys, that were maintained in OIG files and attest that their production in this litigation would be detrimental to the OIG's ability to carry out its mission. Production of the documents submitted for the Court's review would inhibit the frank and candid discussions necessary to effective government. I am confident

that employees under my supervision would hesitate to engage in a robust exchange of ideas if they were aware that anything they say may become a public record.

8. The documents submitted for in camera review consist of two broad categories of documents. The first category consists of notes relating to pre-decisional discussions held at various stages in developing and producing reports. These discussions may be held at pre-determined stages in the evaluations process, as with "entrance" and "exit" conferences, which may be attended by other offices within HHS. The notes may also reflect occasional meetings held by the evaluation review teams to discuss various aspects of an evaluation, including discussions pertaining to non-final agency policy. The second category consists of draft versions of public final reports, including excerpts of draft sections of the final reports.

9. The Office of Evaluation and Inspections follows a deliberative and methodical process in connection with the evaluations we conduct and the reports we produce. Sometimes the process is lengthy. The process can very generally be divided into four phases—the planning, implementation, drafting, and finalization phases. With regard to the planning phase, after the determination has been made to conduct an evaluation of a particular topic, the OEI personnel assigned to the evaluation discuss, and sometimes debate, the methodology that will be followed to conduct the evaluation. This dialogue includes a discussion of what data should serve as the basis for the evaluation, how and the sources from which data will be collected, and how the data will be analyzed. As part of our planning, we draft and then finalize a "design" for each evaluation. I am informed that the final "designs" have been

produced to the Defendants in the above-captioned matter. Draft versions of these designs may reflect candid disagreements within the agency regarding the appropriate scope of an evaluation and should not be released.

10. As part of the planning process, OEI personnel also meet with the agency responsible for administering the programs being studied to discuss our planned evaluation with them. In the case of the documents at issue here, the agency responsible for administering the programs being studied in the planned evaluations is the Centers for Medicare & Medicaid Services (CMS). These meetings are known as our "entrance conferences." The entrance conferences with CMS provide OEI personnel with additional insight and information that is very useful as we conduct our evaluations. "Entrance conference" notes are core deliberative process materials, as they reflect candid intra-agency exchanges of views on important policy matters. The release of "entrance conference" notes would create confusion as to final agency policies, undermine the integrity of established agency decision-making processes, and chill the type of robust debate critical to the development of effective government policies.

11. Phase two of our evaluation process is the implementation phase. After making decisions about the process and data that will be used for the evaluation, our next step is to request and collect the data. Our steps during this phase of the evaluation will vary depending on the type and quantity of data being requested and the sources of the data. Once the data is collected, we analyze the data, discuss it internally, and begin to form conclusions about it.

We often have many conversations about the data, its significance, and what conclusions may appropriately be drawn from it. This evaluative process is, of course, conducted within the framework of our knowledge about the existing legal requirements relating to the topic under review (for instance, the reimbursement for prescription drugs under the Medicare Part B or Medicaid programs.) Some of our internal discussions occur during review team meetings which involve the OEI team members assigned to the project. Review team meeting notes are core deliberative process materials, as they reflect candid exchanges of views within the agency on important policy matters. The release of review team meeting notes would create confusion as to final agency policies, undermine the integrity of established agency decision-making processes, and chill the type of robust debate critical to the development of effective government policies.

12. The next phase of our work involves drafting a report that summarizes our work, our conclusions, and our recommendations. This phase necessarily involves deliberations among staff. The discussion and debate about conclusions and recommendations that began during the second phase continues during our report-writing phase. As part of this third phase, OEI personnel also meet again with staff from the program agency to discuss our findings and preliminary conclusions. These meetings are known as "exit conferences". We find the exit conferences to be very important as they also allow for face-to-face discussion about our evaluation and findings with staff from the operative agency. "Exit conference" notes are core deliberative process materials, as they reflect candid exchanges of views within the agency on

important policy matters. The release of "exit conference" notes would create confusion as to final agency policies, undermine the integrity of established agency decision-making processes, and chill the type of robust debate critical to the development of effective government policies.

13. Internal reviews and discussions continue during the last phase of our process which is focused on producing a final report that is disseminated publicly and posted on the OIG's website. This phase involves internal reviews of the draft reports by individuals in the regional office and our headquarters. We also provide the relevant agency (*e.g.*, CMS) with a copy of the draft report and request written comments from the agency. Formal written comments from the agency are incorporated into the final published version of the report. Our reports also summarize and respond to the comments from the agency. The OIG often engages in internal discussions and deliberations about the agency comments and what the appropriate response should be. Final OIG positions about our evaluations, our conclusions, and our recommendations are reflected in the language contained in our final reports.

14. The Office of Audit Services (OAS) within HHS OIG follows a similarly deliberative and methodical process in connection with the audits they conduct and the reports they produce. As relevant here, OAS engages in planning, implementation, drafting, and review processes that are analogous to those described above for OEI. The OAS processes include entrance and exit conferences and review team meetings; meetings with the agency responsible for administering the programs being audited; and draft versions of the reports

issued to summarize the findings of the audits, along with conclusions and recommendations. OAS reports are generally provided to the public in a final version that includes comments from the agency responsible for administering the programs being audited.

### Formal Assertion of the Deliberative Process Privilege

15. I hereby assert a formal claim of the deliberative process privilege over the OIG documents so designated on the Privilege Log and submitted to the Court for its review. This assertion is based on my personal review of each of the submitted documents, as described in the schedules prepared by the Department of Justice.

16. In order to effectively conduct our evaluations and write meaningful reports that may lead to the improvement of HHS programs, it is absolutely critical that the OIG staff communicate freely with each other as they move through the four-part report process. It is equally imperative that OIG staff communicate freely with CMS staff during our entire evaluation and report process. It would be ill-advised for the OIG to conduct an evaluation and write a report without being able to discuss the underlying programmatic issues, our work, and our findings with the CMS staff who handle the issues daily. We gain invaluable perspectives and information from our counterparts at CMS during our entire process and our discussions must be frank and full.

17. It is also very important to bear in mind that unpublished drafts reflecting the opinions or suggestions of the authors or reviewers and the comments from other agency staff do not constitute the final position of the OIG on any matter or recommendation in the report

unless and until they are embodied in a final report. I believe that the release of documents, including draft reports, which contain statements or opinions by agency personnel that may have been rejected or revised during later discussions and deliberations could disrupt and undermine the process by which the OIG conducts evaluations and produces reports.

18.     Based on my many years of experience in the OIG, I believe that open, candid exchanges of ideas and information among OIG and other agency personnel regarding our evaluations and reports would be seriously undermined if OIG personnel believed that their internal discussions, analyses, opinions, views, and recommendations would be disclosed publicly even if the disclosure occurred on a limited basis some time after the reports were published. Since the OIG follows the deliberative and methodical process described above for all its evaluations and reports, even limited disclosures are likely to have a broad chilling effect. I believe that if the discussions and recommendations contained or referenced in the deliberative process documents listed on the Privilege Log were subject to public disclosure, OIG personnel would feel constrained in their discussions and deliberations about all evaluations and reports.

19.     I believe the foregoing concerns about the potential chilling effect on the candid exchange of opinions and recommendations among agency personnel are heightened in the context of litigation, especially any case in which the Government is a party. As a longtime government employee in a supervisory position, I have no doubt that if my staff or others within the OIG expected that their comments, criticisms, suggestions, or proposed edits made

during our report process to be publicly displayed in the context of a lawsuit, this would stifle much of the very necessary candid dialogue among us. The OIG's work would suffer as a result, to the ultimate detriment of HHS programs and the public.

20.     I have conferred regarding the documents being submitted to the Court for review with my counterpart at OAS, George Reeb, who holds the title of Assistant Inspector General for the Centers for Medicare and Medicaid Audits. Mr. Reeb understands the statements set forth in paragraphs 16 through 19 above to apply with the same force to all OIG staff, including OAS staff, who are engaged in the development and production of audit reports. Because the same fundamental interests apply to the protection of deliberative processes in the development of audit reports, the production of draft materials and transcripts or summaries of discussions during the planning and implementation phases of audits are subject to the same deliberative process privilege that attaches to other OIG reports, including those prepared by OEI.

21.     For the reasons stated above, I consider that the release of the documents for which OIG asserted the deliberative process privilege would be detrimental to OIG functions and thus contrary to the public interest. I therefore respectfully assert the privilege for governmental deliberative communications to withhold those documents from disclosure to the defendants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 8th day of December, 2008, in Washington, D.C.

*[signature: Brian P. Ritchie]*

Brian P. Ritchie
Assistant Inspector General,
Office of Evaluation and Inspections
Office of Inspector General
Department of Health and Human Services