# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 Master File No. 01-CV-12257-PBS Subcategory Case No. 06-CV-11337-PBS |
| THIS DOCUMENT RELATES TO: *United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Boehringer Ingelheim Corporation, et al.*, Civil Action No. 07-10248-PBS | Judge Patti B. Saris Magistrate Judge Marianne B. Bowler |

## DEFENDANT BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.'S ANSWER AND DEFENSES TO UNITED STATES' FIRST AMENDED COMPLAINT

Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") hereby answers the First

Amended Complaint of Plaintiff United States of America ("Plaintiff") as follows:

BIPI denies all allegations contained in headings, unnumbered Paragraphs, the

"Wherefore" clause in the Complaint, and the unnumbered Paragraph on pages 1 and 2.

## I.      NATURE OF ACTION

1.      The United States brings this action to recover treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and to recover damages and other monetary relief under the common law or equitable theories of fraud and unjust enrichment.

ANSWER:     BIPI admits that Plaintiff United States purports to bring this action for treble

damages, civil penalties, and other relief under Federal law, but denies there exists any basis for

doing so.  BIPI denies the remaining allegations in Paragraph 1.

2.      The United States bases its claims on the defendants having caused the submission of false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1), and having made and used false statements to get false or fraudulent claims paid by the United States in violation of  31 U.S.C. § 3729(a)(2).

ANSWER:      BIPI admits that Plaintiff United States purports to bring its claims under

31 U.S.C. §§ 3729(a)(1) and 3729(a)(2), but denies there exists any basis for doing so.  BIPI

denies the remaining allegations in Paragraph 2.


3.      The defendants have engaged in a fraudulent scheme that has caused the Medicare and Medicaid programs to pay excessive reimbursement to Roxane's customers, including pharmacies, homecare pharmacies, and other purchasers of Roxane products.  In furtherance of this scheme, the defendants reported false, fraudulent and inflated drug prices for certain drugs (listed in Exhibit A) to several price reporting compendia that the Medicare and Medicaid programs relied upon to set reimbursement rates for Roxane's customers.  A chart showing examples of the differences between the prices at which Roxane actually has sold its drugs and the false prices reported by the defendants is attached as Exhibit B.

ANSWER:      BIPI denies the allegations in Paragraph 3 as to itself and adopts the answers of

Roxane and BIC to Paragraph 3 to the extent the allegations are directed to those entities.


4.      At all relevant times, the defendants knew that the Medicare and Medicaid programs relied on Roxane's reported prices to those compendia to set reimbursement rates for claims submitted for Roxane's drugs.  Roxane then sold its drugs for far lower prices, and marketed to existing and potential customers the government-funded "spread" between the inflated reimbursement amounts and the actual acquisition costs of the drugs to boost Roxane's sales and profits.

ANSWER:      BIPI denies the allegations in Paragraph 4 as to itself and adopts the answers of

Roxane and BIC to Paragraph 4 to the extent the allegations are directed to those entities.


5.      At all relevant times, the defendants knew that Roxane's false price reporting and marketing efforts would cause its customers to submit claims for fraudulently inflated Medicare and Medicaid reimbursement.

ANSWER:      BIPI denies the allegations in Paragraph 5 as to itself and adopts the answers of

Roxane and BIC to Paragraph 5 to the extent the allegations are directed to those entities.

6.      The defendants' fraudulent scheme to induce customers to purchase Roxane products by ensuring that federal and state reimbursement rates for those products would be set at artificially inflated levels violated the FCA, the federal anti-kickback statute, 42 U.S.C. § 1320a- 7b(b), common law and numerous state laws.

ANSWER:      BIPI denies the allegations in Paragraph 6 as to itself and adopts the answers of

Roxane and BIC to Paragraph 6 to the extent the allegations are directed to those entities.

7.      In order to get fraudulent claims paid by the United States, the defendants also routinely made false statements directly to state Medicaid programs by reporting these same fraudulently inflated prices to the states.  These statements violated the FCA, common law and various state laws.

ANSWER:      BIPI denies the allegations in Paragraph 7 as to itself and adopts the answers of

Roxane and BIC to Paragraph 7 to the extent the allegations are directed to those entities.

8.      The United States timely asserts the causes of action alleged herein based on the filing of relator's complaint in this action.

ANSWER:      BIPI denies the allegations in Paragraph 8.

## II.      JURISDICTION

9.      The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345 and supplemental jurisdiction to entertain the common law causes of action pursuant to 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because the defendant Roxane transacts business in the District of Massachusetts and caused the submission of false or fraudulent claims in Massachusetts.

ANSWER:      BIPI admits that Plaintiff United States alleges that there is subject matter

jurisdiction under 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction under 28 U.S.C.

§ 1367(a), but denies that the Court in fact has subject matter or supplemental jurisdiction

because Relator Ven-A-Care is not a proper relator under the requirements of the False Claims

Act, and, accordingly, the Court lacks jurisdiction to entertain this action.  BIPI also admits that

Roxane has transacted business within the District of Massachusetts, but otherwise denies the allegations in Paragraph 9.

### III.     VENUE

10.     Venue is proper in the District of Massachusetts under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because the defendants have transacted business in this District.

ANSWER:     BIPI admits that the venue would be proper in the District of Massachusetts under

31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) if Relator Ven-A-Care were a proper relator

under the requirements of the False Claims Act.  BIPI admits that it and Roxane have transacted

business within the District of Massachusetts, but denies the remaining allegations in Paragraph

10.

### IV.     PARTIES

11.     The United States brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), which administer the Medicare and Medicaid programs.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 11.

12.     Relator Ven-A-Care of the Florida Keys, Inc. ("Ven-A-Care"), is a corporation organized under the laws of Florida, with its principal offices in Key West, Florida.  Ven-A-Care is a pharmacy licensed to provide prescription drugs specified in this Complaint and has been, during the relevant period of this Complaint, a Medicare and Florida Medicaid provider.  Ven-A-Care's principal officers and/or directors during the relevant time period have included John M. Lockwood, M.D., Zachary Bentley, Luis Cobo and T. Mark Jones, who are each citizens of the United States and reside in Key West, Florida.  The FCA, 31 U.S.C. § 3730(b)(1), provides that private parties may bring a lawsuit on behalf of the United States to recover damages for false claims.  Ven-A-Care brought this action against the defendants on behalf of itself and the United States.

ANSWER:      BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in the first, second, and third sentences of Paragraph 12.  In response to

the statements in the fourth sentence of Paragraph 12, BIPI admits that, in certain circumstances,

private parties may bring a lawsuit on behalf of the United States to recover damages for false

claims, but denies that there is a proper basis here.  BIPI admits that Relator Ven-A-Care

purports to bring this action on behalf of itself and the United States, but denies there exists any

basis for doing so.


13.      Defendant Boehringer Ingelheim Corporation ("BIC"), is a corporation organized
under the laws of Nevada, with its principal offices in Ridgefield, Connecticut.  BIC was
established in 1986 to serve as the parent corporation in the United States of subsidiary U.S.
corporations within the group of corporations owned by the German parent company, Boehringer
Ingelheim Auslandsbeteiligungs Gmbh.

ANSWER:      BIPI admits the allegations in Paragraph 13.


14.      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") is a corporation
organized under the laws of Delaware, with its principal offices located in Ridgefield,
Connecticut.  BIPI is a subsidiary of BIC.

ANSWER:      BIPI admits the allegations in Paragraph 14.


15.      Defendant Roxane Laboratories, Inc., n/k/a Boehringer Ingelheim Roxane, Inc.
("BIRI") is a corporation organized under the laws of the State of Delaware with its principal
offices in Columbus, Ohio.  Roxane Laboratories, Inc. was acquired in 1978 by BIC's
predecessor, Boehringer Ingelheim Ltd.  On April 5, 2005, Roxane Laboratories, Inc. changed its
name from Roxane Laboratories, Inc., to BIRI and filed the appropriate certificate of amendment
of its certificate of incorporation with the Secretary of State for the State of Delaware.  BIRI is a
subsidiary of BIC and a sister corporation to BIPI.

ANSWER:      BIPI admits the allegations in the first sentence of Paragraph 15.  BIPI admits that

Roxane Laboratories, Inc., n/k/a BIRI was acquired in 1978 by Boehringer Ingelheim Ltd., but

otherwise denies the allegations in the second sentence of Paragraph 15.  BIPI admits the

allegations in the third sentence of Paragraph 15.  BIPI admits that RLI, BIRI, and BIPI are

subsidiaries of BIC, but otherwise denies the allegations in the fourth sentence of Paragraph 15.

16.     Defendant Roxane Laboratories, Inc. ("RLI") is a corporation organized under the laws of Nevada, and was incorporated therein in or about February 2005.  Its principal place of business is Columbus, Ohio.  It is a subsidiary of BIC. BIRI and RLI, incorporated in Nevada, are the successors to Roxane Laboratories, Inc., a Delaware corporation.  BIRI and RLI will hereinafter be referred to as "Roxane."  Roxane is a sister company to BIPI.

ANSWER:     BIPI admits that BIRI is a Delaware corporation and that BIRI was originally

named Roxane Laboratories, Inc.  BIPI further admits that RLI was incorporated in Nevada in

February 2005 and that RLI, BIRI, and BIPI are subsidiaries of BIC.  BIPI denies the remaining

allegations in Paragraph 16.

17.     Pursuant to Rule 15(c) of the Federal Rules of Civil Procedure, the claims against the defendants relate back to the dates of the original pleadings in this case.

ANSWER:     BIPI denies the allegations in Paragraph 17.

18.     At all times material to this action, Roxane and BIPI transacted business in the District of Massachusetts by, including but not limited to, selling and distributing pharmaceutical products, including the drugs identified in this Complaint, to purchasers within the District of Massachusetts.

ANSWER:      BIPI admits that Roxane sells pharmaceutical products, including some of the

products listed in Exhibits A and B of the Complaint, to customers in the District of

Massachusetts.  BIPI further admits that it sells pharmaceutical products to customers in the

District of Massachusetts, but denies that it sells the drugs identified in the Complaint.  BIPI

denies that it or Roxane is a "distributor" of pharmaceutical products, as that term is commonly

used in the industry.  BIPI further denies the remaining allegations in Paragraph 18.

19.     The management, supervision, control, reporting, and financial exchanges by and between BIC and its subsidiaries, BIPI and Roxane, are so inextricably intertwined that these

defendants in effect operated as one single entity.  BIC, BIPI, and Roxane acted in concert together to foster, facilitate, and promote the unlawful conduct alleged more specifically below.

ANSWER:      To the extent that the allegations in Paragraph 19 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the allegations in Paragraph 19 as to itself and adopts the answers of Roxane and BIC to Paragraph 19 to the extent the allegations are directed to those entities.

20.    More specifically, BIC and BIPI shared a common headquarters where Roxane financial department strategy meetings were held.  BIC and BIPI had supervisory control over Roxane, controlled the day-to-day finance department strategies and performed tax reporting and legal functions for Roxane.  At all times material to this Complaint, sales and marketing officials at BIC, while holding identical positions at BIPI, directly oversaw, managed, and controlled the pricing and sales and marketing operations of Roxane.

ANSWER:      BIPI admits that certain of Roxane's legal and tax reporting functions are or have been performed by BIPI employees and that BIPI and BIC share a common headquarters site in Ridgefield, Connecticut.  BIPI denies the remaining allegations in Paragraph 20 as to itself and adopts the answers of Roxane and BIC to Paragraph 20 to the extent the allegations are directed to those entities.

## V.      THE LAW

### A.    The False Claims Act

21.     The FCA provides in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government. . . .

\* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

ANSWER:    To the extent that the allegations in Paragraph 21 purport to recite laws or regulations, no response is required.  To the extent a response is required, BIPI admits that the False Claims Act has been quoted accurately, but denies that it is appropriately relied on here. BIPI respectfully refers the Court to the referenced statute for a complete statement of its terms.

22.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

ANSWER:    To the extent that the allegations in Paragraph 22 purport to recite laws or regulations, no response is required.  To the extent a response is required, BIPI admits that Paragraph 22 accurately describes certain of the provisions of the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), but denies that it is appropriately relied on here.  BIPI respectfully refers the Court to the referenced statute and regulations for a complete statement of their terms.

**B.**     **The Federal Anti-Kickback Statute**

23.     Congress first enacted the federal anti-kickback statute, 42 U.S.C. § 1320a- 7b(b), in 1972 to protect the integrity of the Medicare and Medicaid programs.  Congress strengthened the statute in 1977, and again in 1987, to ensure that kickbacks masquerading as legitimate transactions would not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

ANSWER:     To the extent that the allegations in Paragraph 23 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 23.  BIPI respectfully refers the Court to the

referenced statutes for a complete statement of their terms, and denies any characterization of the

statute or its purposes.

24.     The anti-kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical items, including items provided under the Medicare and Medicaid programs.  In pertinent part, the statute provides:

> (b) Illegal remuneration
>
> * * *
>
>> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --
>>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

42 U.S.C. § 1320a- 7b(b).  Those who violate the statute also are subject to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of up to $50,000 per violation and up to three times the amount of remuneration paid. 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a(a)(7).

ANSWER:      To the extent that the allegations in Paragraph 24 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 24.  BIPI respectfully refers the Court to the

referenced statutes for a complete statement of their terms, and denies any characterization

thereof.


## VI.       THE FEDERAL HEALTHCARE PROGRAMS

        25.      The Medicare and Medicaid programs were created in order to provide access to healthcare for elderly, indigent or disabled residents of the United States.

ANSWER:      To the extent that the allegations in Paragraph 25 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI admits

that the Medicare and Medicaid programs were created to provide access to certain health care

services for certain categories of disadvantaged persons and the elderly.


## A.      The Medicaid Program

        26.      Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

ANSWER:      To the extent that the allegations in Paragraph 26 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI admits the allegations in Paragraph 26.

27.      The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding. 42 U.S.C. § 1396a.

ANSWER:      To the extent that the allegations in Paragraph 27 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.  BIPI respectfully refers the Court to the referenced statute for a complete statement of its terms, and denies any characterization thereof.

28.      The federal portion of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50%, and as high as 83%.

ANSWER:      To the extent that the allegations in Paragraph 28 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.  BIPI respectfully refers the Court to the referenced statute for a complete statement of its terms, and denies any characterization thereof.

29.      The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), 1396a(a)(30)(A).

ANSWER:      To the extent that the allegations in Paragraph 29 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 29.  BIPI respectfully refers the Court to the referenced statutes for a complete statement of their terms, and denies any characterization thereof.

30.     The Medicaid programs of all states reimburse for prescription drugs.

ANSWER:     BIPI admits that some states reimburse for prescription drugs under the Medicaid program.  BIPI denies having knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30.

31.     The vast majority of states award contracts to private companies to evaluate and process claims by providers for reimbursement under the Medicaid program.  Typically, provider claims for reimbursement will be submitted electronically to the private company which will process the claims, and then will either pay the claims on behalf of the state or provide information to the state to enable the state to pay the claims.  Each calendar quarter, the state will submit a claim to the HHS for payment of the federal share of the state's Medicaid costs, including amounts paid for drug reimbursements.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.     By becoming a participating supplier in Medicaid, suppliers agree to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

**B.     The Medicare Program**

33.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services and items.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. 42 U.S.C. §§ 426-426a, 1395o.

ANSWER:     BIPI admits that Congress enacted Title XVIII of the Social Security Act in 1965.

To the extent that the remaining allegations in Paragraph 33 purport to recite laws or regulations

and/or state legal arguments and/or conclusions, no response is required.  To the extent a

response is required, BIPI denies having knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 33.  BIPI respectfully refers the Court to the

referenced statutes for a complete statement of their terms, and denies any characterization

thereof.


34.     HHS is responsible for the administration and supervision of the Medicare
program.  CMS is an agency of HHS and directly administers the Medicare program.  The
Medicare program has several parts, including Medicare Part B ("Supplementary Medical
Insurance for the Aged and Disabled"), which covers physician services, as well as durable
medical equipment ("DME") and certain drug products and supplies. 42 U.S.C. § 1395k; 42
C.F.R. § 410.10.

ANSWER:     To the extent that the allegations in Paragraph 34 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 34.  BIPI respectfully refers the Court to the

referenced statute and regulation for a complete statement of their terms, and denies any

characterization thereof.


35.     Medicare Part B generally covers drugs which are provided either: (a) incident to
a physician's service and cannot usually be self-administered (42 C.F.R. § 410.26 (e.g., certain
oncology drugs)); or (b) in conjunction with the medical necessity of an infusion pump or
nebulizer or other DME device payable under Medicare's DME benefit. 42 C.F.R. §§ 405.517,
414.701.

ANSWER:     To the extent that the allegations in Paragraph 35 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 35.  BIPI respectfully refers the Court to the

referenced regulations for a complete statement of their terms, and denies any characterization

thereof.

36.     During the relevant time period, CMS contracted with private insurance carriers
("Contractors") to administer and pay Part B claims from the Medicare Trust Fund. 42 U.S.C. §
1395u.  In this capacity, the Contractors act on behalf of CMS. 42 C.F.R. § 421.5(b).

ANSWER:     To the extent that the allegations in Paragraph 36 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 36.  BIPI respectfully refers the Court to the

referenced statute and regulation for a complete statement of their terms, and denies any

characterization thereof.

37.     Contractors receive, process and pay claims under Medicare Part B for drugs from
various Medicare providers and suppliers.  Typically, once a contractor approves a claim, the
contractor then submits a payment request to a Medicare bank account funded by federal funds.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 37.

C.     **Drug Reimbursement Under Medicaid and Medicare**

38.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-97, requires
pharmaceutical companies to submit to the Food and Drug Administration ("FDA") a listing of
every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA provides for the
assignment to each listed drug product of a unique 11-digit, 3-segment number, known as the
National Drug Code ("NDC").  FDA has assigned approximately 170,000 NDCs to drug
products.  The drugs and corresponding NDCs at issue in this case are listed in Exhibit A
attached hereto.

ANSWER:     BIPI admits that the FDA assigns 11-digit numbers to pharmaceutical products

and that the NDCs listed in Exhibit A identify drugs manufactured and sold by Roxane at some

periods of time.  To the extent that the remaining allegations in Paragraph 38 purport to recite

laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To

the extent an additional response is required, BIPI denies having knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 38.  BIPI respectfully

refers the Court to the referenced statutes for a complete statement of their terms, and denies any

characterization thereof.

39.     Drug manufacturers, such as Roxane, have not typically submitted claims for reimbursement to federal health care programs.  Instead, Roxane markets its products to its customers, who then purchase the product either directly or through wholesalers based on a price the customers negotiated with Roxane.  In addition to using wholesalers, customers also purchase Roxane products through group purchasing organizations ("GPOs"), who negotiate prices on behalf of Roxane's customers.

ANSWER:     BIPI admits that it has not typically submitted claims for reimbursement to federal

health care programs.  To the extent the allegations in Paragraph 39 are directed at Roxane, BIPI

adopts Roxane's answer to those allegations.  BIPI denies having knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39.

40.     Roxane's customers then submit claims for payment for Roxane products to Medicare and Medicaid after dispensing or administering the Roxane drug.

ANSWER:     To the extent the allegations in Paragraph 40 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.

41.     For the most part, in the Medicaid program, claims submitted by retail pharmacies are processed and tracked using the NDC of the drug.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 41.

15

42.     The Medicare program generally uses the Healthcare Common Procedural Coding System ("HCPCS") to reimburse for drugs.  The HCPCS utilizes 5-digit alphanumeric codes to identify and bill for medical products and supplies.  The HCPCS codes for the Roxane drugs reimbursed by Medicare at issue here are J7644, J7645, K0518, and J7500.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 42.

43.     During the relevant period, Roxane has usually reported or verified prices to various price publishers and services on an annual basis and on an ad hoc basis when new products were launched or price changes implemented.  The price publishers used the information to publish pricing compendia.

ANSWER:     To the extent the allegations in the first sentence of Paragraph 43 are directed at

Roxane, BIPI adopts Roxane's answer to those allegations.  BIPI denies having knowledge or

information sufficient to form a belief as to the truth of the allegations in the second sentence of

Paragraph 43.

44.     The reimbursement amounts for claims submitted by Roxane's customers were directly influenced by Roxane's false price representations.  The information contained in the published pricing compendia has been used by most third party payor insurance companies, including the Medicare program and Medicaid programs, in determining the reimbursement rates for prescription drugs.  Defendants' documents show that defendants knew of the impact of Roxane's price representations on government reimbursement for claims submitted by Roxane's customers for Roxane's drugs.  Defendants' documents also show that Roxane actively marketed the government-funded profits or "spreads" on its drugs created by its false price representations.

ANSWER:     To the extent the allegations in the first sentence of Paragraph 44 are directed at

Roxane, BIPI adopts Roxane's answer to those allegations.  BIPI admits that some third-party

payors and government programs use some pricing information published by pricing compendia,

but denies having knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in the second sentence of Paragraph 44.  BIPI denies the allegations in the

third and fourth sentences of Paragraph 44 as to itself and adopts the answers of Roxane and BIC

to Paragraph 44 to the extent the allegations are directed to those entities.

16

45.     No governmental payor knew of or sanctioned the defendants' conduct as set forth in this Complaint, i.e., their deliberate manipulation of Roxane's published prices for certain of its products to induce its customers to purchase those products.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

### D.     <u>Medicaid Reimbursement Formulas</u>

46.     When reimbursing for drugs, the State Medicaid programs' goal has been to pay an amount which, in the aggregate, reflects the lower of (1) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable dispensing fee, or (2) a provider's usual and customary charges to the general public.  Federal regulations define "estimated acquisition cost" in part as "the agency's best estimate of the price generally and currently paid by providers for a drug. . . ."  42 C.F.R. § 447.301.  To determine the EAC for a covered drug, State Medicaid programs are required to develop reimbursement formulas that must be approved by the Secretary of HHS.  42 C.F.R. §§ 447.331, 447.332, and 447.333 (2005).

ANSWER:     To the extent that the allegations in Paragraph 46 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.  BIPI respectfully refers the Court to the referenced regulations for a complete statement of their terms, and denies any characterization thereof.

47.     While the specific reimbursement formulas vary from state to state, the various State Medicaid programs have generally reimbursed for each drug based on the lowest of (a) the EAC as set by the states, (b) the maximum allowable cost ("MAC") set by the state Medicaid agency, or (c) the providers' usual and customary charge.  For multiple source drugs subject to a federal upper limit, states must in the aggregate not pay more than those limits.  42 C.F.R. §§ 447.331, 447.332 and 447.333 (2005).

ANSWER:     To the extent that the allegations in Paragraph 47 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 47.  BIPI respectfully refers the Court to the

referenced regulations for a complete statement of their terms, and denies any characterization

thereof.

        48.      The states' methodologies for arriving at EAC include:

        A.  discounting a percentage off of the Average Wholesale Price ("AWP");

        B.  adding a percentage to the Wholesale Acquisition Cost ("WAC") ; and/or,

        C.  requiring the drug companies to certify prices directly in writing to the Medicaid program in response to state requests for particular pricing information.

ANSWER:      BIPI admits that, at some times, some states used AWP and/or WAC as an

element of their Medicaid reimbursement formulae, but denies having knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48.

        49.      AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler sells a drug to a retail customer who then dispenses it to a patient.  WAC is used to refer to the price at which a pharmaceutical firm typically sells a drug to wholesalers who would then resell it to a retail customer.

ANSWER:      BIPI denies the allegations in the first sentence of Paragraph 49.  BIPI admits the

term WAC is often used to refer to the undiscounted price at which a pharmaceutical firm sells a

drug to wholesalers who may then resell the drug to retail customers.

        50.      While the majority of states have used published AWPs to calculate reimbursement, approximately six states (Alabama, Florida, Maryland, Massachusetts, Rhode Island, and Texas) have used the wholesale acquisition cost ("WAC") to set the EAC.

ANSWER:      BIPI admits that some states, including Alabama, Florida, Massachusetts, and

Texas, have at some times used WAC as an element of their Medicaid reimbursement formulae,

but denies having knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 50.

51.     The AWPs and WACs relied upon by the State Medicaid programs have generally
been those published by (1) Thomson Publishing, publisher of the *Red Book* and various other
price publications, (2) First Databank, publisher of the *Blue Book* and other electronic price
publications; or (3) Medi-Span, Inc., publisher of an electronic or automated price service and
the Hospital Formulary Pricing Guide.  Thompson Publishing, First Databank and Medi-Span,
Inc. are hereafter referred to as the "Publishers" and their various publications and data services
are hereinafter referred to as "Price Publications."

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 51.

52.     Pursuant to section 6001 of the Deficit Reduction Act of  2005, Pub. L. 109-171,
effective January 1, 2007, CMS is to provide States with "average manufacturer price" data
which will give States additional drug price information.

ANSWER:     To the extent that the allegations in Paragraph 52 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 52.  BIPI respectfully refers the Court to the

referenced regulations for a complete statement of their terms, and denies any characterization

thereof.

**E.     Medicare Reimbursement Formulas**

53.     From 1992 through 1997, Medicare based its reimbursement for multi-source
generic drugs, the drugs at issue here, at the lower of the EAC or the median AWP of all generic
forms of a drug.  42 C.F.R. § 405.517 (1992-1998).  In general, Medicare relied on median
AWPs to set reimbursement rates.

ANSWER:     To the extent that the allegations in Paragraph 53 purport to recite laws or

regulations and/or state legal arguments and/or conclusions, no response is required.  To the

extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.  BIPI respectfully refers the Court to the referenced regulations for a complete statement of their terms, and denies any characterization thereof.

54.     From January 1, 1998, until December 31, 1998, Medicare based its reimbursement for all generic forms of a drug at 95% of the median AWP for the drug. Balanced Budget Act of 1997, 42 U.S.C. § 1395u(o).

ANSWER:     To the extent that the allegations in Paragraph 54 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.  BIPI respectfully refers the Court to the referenced regulations for a complete statement of their terms, and denies any characterization thereof.

55.     From 1999 through 2003, Medicare reimbursed for Part B covered drugs at the lower of (a) 95% of the median published AWP for the drug; or (b) the AWP of the least expensive brand-name drug.  42 U.S.C. § 1395u(o); 42 C.F.R. § 405.517 (1999-2004).  During 2004, Medicare reimbursed at a percentage of AWP dictated by statute, which, for Ipratropium Bromide was 80 percent, and for the other drugs that are the subject of this complaint, was 85 percent.  42 C.F.R. § 414.707 (2005).  For drugs furnished after January 1, 2005, reimbursement is no longer based on AWP but is generally based on average sales price. 42 C.F.R. § 414.904.

ANSWER:     To the extent that the allegations in Paragraph 55 purport to recite laws or regulations and/or state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies having knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.  BIPI respectfully refers the Court to the referenced regulations for a complete statement of their terms, and denies any characterization thereof.

56.     After the reimbursement amount is calculated, Medicare pays 80 percent and the Medicare beneficiary is responsible for the remaining 20 percent co-payment.  If the Medicare beneficiary is also a Medicaid recipient, the Medicaid program generally pays the 20 percent Medicare co-payment.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 56.

57.     Medicare generally relied upon the AWPs published by Thomson Publishing in its annual national compendium called the *Red Book*, as well as *Red Book* monthly updates to set reimbursement rates for covered drugs.

ANSWER:     BIPI denies having knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 57.

## VII.     THE DEFENDANTS' SCHEME

58.     From on or before 1996, and continuing through January 1, 2004, in the case of the Medicare program, and to the present in the case of the Medicaid program, the defendants have knowingly caused the Medicare and Medicaid programs to pay false or fraudulent claims for the following medications:

    Azathioprine
    Diclofenac Sodium
    Furosemide
    Hydromorphone
    Ipratropium Bromide
    Oramorph SR
    Roxanol
    Roxicodone
    Sodium Polystyrene Sulfonate.

ANSWER:     BIPI denies the allegations in Paragraph 58 as to itself and adopts the answers of

Roxane and BIC to Paragraph 58 to the extent the allegations are directed to those entities.

59.     As part of its unlawful conduct, Roxane knowingly made false or fraudulent representations about drug prices and costs to the *Red Book*, First DataBank, and Medispan, while knowing that Medicare and Medicaid would use this information in paying or approving

claims for such drugs.  Roxane further made these representations in order to use the "spread" between cost and reimbursement to induce purchasers to buy Roxane's drugs.

ANSWER:      To the extent the allegations in Paragraph 59 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.


60.      To inflate the spread, and thereby induce purchases of its drugs, Roxane purposely reported to the *Red Book*, First DataBank, and Medispan (and in some instances, the states) inflated AWPs and WACs for its drugs, while simultaneously arranging for its retail customers to purchase these drugs through wholesalers at far lower prices.  The Medicare and Medicaid payments, made in response to claims submitted by Roxane's customers, were set based on the inflated AWPs and WACs, and the payment amounts far exceeded the actual costs of the drugs.

ANSWER:      To the extent the allegations in Paragraph 60 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.


61.      For example, when the defendants prepared to launch Roxane's ipratropium bromide products in 1996, they developed a pricing strategy designed to create an attractive spread between the AWP and the actual price, so as to create an inducement-at the expense of the Medicare and Medicaid programs-for providers to purchase the Roxane product.  The defendants decided that Roxane would report to the compendia AWPs and WACs that far exceeded the price at which Roxane planned to sell the drug to wholesalers.  The express purpose of this pricing strategy was to create an attractive spread, greater than that available on the branded product, to entice providers to purchase the Roxane product.

ANSWER:      BIPI admits that Roxane developed a pricing strategy for the launch of

ipratropium bromide products in 1996 that considered the relation between AWP and WAC

prices.  BIPI denies the remaining allegations in Paragraph 61 as to itself and adopts the answers

of Roxane and BIC to Paragraph 61 to the extent the allegations are directed to those entities.


62.      In addition, the defendants knew that actual prices would drop significantly after Roxane launched the products due to competition.  Rather than report accurate average wholesale prices reflecting the drop in real prices, they maintained artificially inflated prices in order to maintain the spreads on their products.  For example, the AWP per unit for Roxane's most popular ipratropium bromide solution (NDC# 00054-8402-11) stayed constant at $44.06 per unit from 1996 through 2004.  Meanwhile, the sales price to customers such as Ven-A-Care dropped from approximately $25.64 in 1996 to $7.50 in 2003.

ANSWER:     To the extent the allegations in the third sentence of Paragraph 62 are directed at

Roxane, BIPI adopts Roxane's answer to those allegations.  BIPI denies having knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 62

concerning Ven-A-Care of the Florida Keys, Inc.  BIPI denies the remaining allegations in

Paragraph 62 as to itself and adopts the answers of Roxane and BIC to Paragraph 62 to the extent

the allegations are directed to those entities.


63.     In another example of defendants' fraudulent conduct, in August 2000, employees
at BIPI, in concert with employees of Roxane, decided to falsely increase the AWPs on Roxane's
Furosemide products for the express purpose of creating a spread that would gain the company
increased market share.  Before the decision was implemented, the AWP for Roxane's
Furosemide, NDC #00054-4297-31, was $36.05.  Beginning August 2000, Roxane reported an
increased AWP of $139.90 for the same drug.  This new AWP was published by the pricing
compendia and relied upon by the Medicare and Medicaid programs in determining
reimbursement.  The resulting spread was substantial.  The Relator Ven-A-Care of the Florida
Keys, Inc. was able to purchase this drug through a wholesaler in October 2000 for $8.84.

ANSWER:     To the extent the allegations in the second and third sentences of Paragraph 63 are

directed at Roxane, BIPI adopts Roxane's answer to those allegations.  BIPI denies having

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 63 concerning Ven-A-Care of the Florida Keys, Inc., and the Medicare and Medicaid

programs.  BIPI denies the remaining allegations in Paragraph 63 as to itself and adopts the

answers of Roxane and BIC to Paragraph 63 to the extent the allegations are directed to those

entities.


64.     Roxane's reported AWPs bore little or no relationship to the actual prices being
paid by Roxane's customers for the specified drugs.  Indeed, as stated by one of Roxane's senior
marketing managers, Roxane's reported AWP and WAC for ipratropium bromide had "little
relation to actual net selling price. . . ."  As a result, the spreads on Roxane's drugs were large and
exceeded 500% in some instances.  Roxane manipulated and controlled the size of the "spread"
on its drugs by reporting inflated AWPs and WACs, while simultaneously decreasing its sales
prices to wholesalers and providers.  A chart setting out some examples showing the difference

between the prices at which Roxane actually sold its drugs and the false prices reported by Roxane is attached hereto as Exhibit B.

ANSWER:     To the extent the allegations in Paragraph 64 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.


65.     Roxane trained its sales force on the significance of Medicare and Medicaid reimbursement and the importance of the "spread" between the AWP and the customer's actual cost.  In order to induce customers to purchase Roxane drugs, Roxane sales personnel actively marketed the spread between the AWP and its customers' actual costs.

ANSWER:     To the extent the allegations in Paragraph 65 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.


66.     Roxane also reported falsely inflated WAC prices to the *Red Book*, First DataBank, and Medispan in order to create a spread in states that relied on WAC prices as a basis for Medicaid reimbursement.  For example, from 1995 through 1997, Roxane reported to the pricing compendia a WAC of $29.01 per unit for Roxane's Furosemide 40 mg Tablets, NDC#00054-4299-31.  The WAC reported by Roxane for this drug was far more than the actual net price at which Roxane sold its drug to wholesalers, and hence far more than the actual acquisition cost paid by providers.  State Medicaid agencies that relied on WAC prices reimbursed providers at the inflated levels.

ANSWER:     To the extent the allegations in Paragraph 66 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.


67.     In early 1998, Roxane implemented significant decreases in its list prices to wholesalers on more than 200 drug products.  Roxane knowingly and intentionally began to actively conceal those prices from the pricing compendia, and hence from the Medicaid programs, by ceasing its reporting of these WAC prices to the pricing compendia.  Roxane knew that the compendia would continue to report the older higher WACs, and further knew that in the states that relied on WAC prices for determining Medicaid reimbursement, the inflated WAC prices would serve as the basis for Medicaid reimbursement.

ANSWER:     To the extent the allegations in Paragraph 67 are directed at Roxane, BIPI adopts

Roxane's answer to those allegations.

68.     As a result of the false reporting of AWP and WAC prices, the defendants caused pharmacists and other providers to submit millions of inflated claims for reimbursement to the Medicare and Medicaid programs, and caused those programs to pay hundreds of millions of dollars in excessive reimbursement.

ANSWER:     BIPI denies the allegations in Paragraph 68 as to itself and adopts the answers of

Roxane and BIC to Paragraph 68 to the extent the allegations are directed to those entities.


## FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)

(31 U.S.C. § 3729(a)(1))

69.     The United States repeats and realleges paragraphs 1 though 68 as if fully set forth herein.

ANSWER:     BIPI reasserts and incorporates herein by reference its answers to the allegations

contained in Paragraphs 1 through 68.


70.     The defendants knowingly caused to be presented false or fraudulent claims for payment or approval to the United States for the drugs listed in Exhibit A for reimbursement that was substantially higher than providers' actual acquisition costs for those drugs and based on reported prices that were fraudulently and artificially created and manipulated by the defendants. The defendants knowingly used the spread as an unlawful inducement in violation of the federal anti-kickback statute, causing resulting false and fraudulent claims to be submitted.

ANSWER:     To the extent that the allegations in Paragraph 70 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 70 as to itself and adopts the answers of Roxane and BIC to Paragraph

70 to the extent the allegations are directed to those entities.


71.     By virtue of the false or fraudulent claims that the defendants caused to be made, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to

$10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

ANSWER:     To the extent that the allegations in Paragraph 71 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 71 as to itself and adopts the answers of Roxane and BIC to Paragraph

71 to the extent the allegations are directed to those entities.

### SECOND CAUSE OF ACTION

(False Claims Act:  Making or Using False

Records or Statements to Cause Claims to be Paid)

(31 U.S.C. § 3729(a)(2))

72.     The United States repeats and realleges paragraphs 1 through 71 as if fully set forth herein.

ANSWER:     BIPI reasserts and incorporates herein by reference its answers to the allegations

contained in Paragraphs 1 through 71.

73.     The defendants knowingly made, used, or caused to be made or used, false records or statements to cause false or fraudulent claims paid or approved by the United States. The false records or statements consisted of the false certifications and representations made or caused to be made by Roxane to state Medicaid programs when seeking to ensure that the Medicaid programs would reimburse for Roxane's drugs, and the false representations to the pricing publishers and services upon which Medicare and Medicaid relied.

ANSWER:     To the extent that the allegations in Paragraph 73 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 73 as to itself and adopts the answers of Roxane and BIC to Paragraph

73 to the extent the allegations are directed to those entities.

74.     By virtue of the false records or false statements made by Roxane, the United States has suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,000 and up to $10,000 for each violation occurring before September 29, 1999, and not less than $5,500 and up to $11,000 for each violation occurring on or after September 29, 1999.

ANSWER:     To the extent that the allegations in Paragraph 74 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the allegations in Paragraph 74 as to itself and adopts the answers of Roxane and BIC to Paragraph 74 to the extent the allegations are directed to those entities.

## THIRD CAUSE OF ACTION

(Unjust Enrichment)

75.     The United States repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

ANSWER:     BIPI reasserts and incorporates herein by reference its answers to the allegations contained in Paragraphs 1 through 74.

76.     The United States claims the recovery of all monies by which the defendants have been unjustly enriched, including profits earned by the defendants because of illegal inducements defendants arranged to be paid to Roxane's customers.

ANSWER:     To the extent that the allegations in Paragraph 76 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the allegations in Paragraph 76 as to itself and adopts the answers of Roxane and BIC to Paragraph 76 to the extent the allegations are directed to those entities.

77.     By obtaining monies as a result of its violations of federal and state law, the defendants were was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

ANSWER:      To the extent that the allegations in Paragraph 77 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the allegations in Paragraph 77 as to itself and adopts the answers of Roxane and BIC to Paragraph 77 to the extent the allegations are directed to those entities.

78.      By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by defendants on sales to customers to whom it arranged for unlawful inducements, and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

ANSWER:      To the extent that the allegations in Paragraph 78 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the allegations in Paragraph 78 as to itself and adopts the answers of Roxane and BIC to Paragraph 78 to the extent the allegations are directed to those entities.

## FOURTH CAUSE OF ACTION

### (Common Law Fraud)

79.      The United States repeats and realleges paragraphs 1 through 78 as if fully set forth herein.

ANSWER:      BIPI reasserts and incorporates herein by reference its answers to the allegations contained in Paragraphs 1 through 78.

80.      The defendants made or caused to be made material and false representations concerning the pricing of Roxane's drugs with knowledge of their falsity or with reckless disregard for the truth, with the intention that the United States act upon the misrepresentations to its detriment.  The United States acted in justifiable reliance upon Roxane' misrepresentations by making payments on the false claims.

ANSWER:      To the extent that the allegations in Paragraph 80 purport to state legal arguments and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 80 as to itself and adopts the answers of Roxane and BIC to Paragraph

80 to the extent the allegations are directed to those entities.

81.     Had the defendants made truthful representations, the United States would not have made such payments.

ANSWER:     To the extent that the allegations in Paragraph 81 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 81 as to itself and adopts the answers of Roxane and BIC to Paragraph

81 to the extent the allegations are directed to those entities.

82.     By reason of these payments, the United States has been damaged in an as yet undetermined amount.

ANSWER:     To the extent that the allegations in Paragraph 82 purport to state legal arguments

and/or conclusions, no response is required.  To the extent a response is required, BIPI denies the

allegations in Paragraph 82 as to itself and adopts the answers of Roxane and BIC to Paragraph

82 to the extent the allegations are directed to those entities.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against the defendants Roxane, BIC, and BIPI jointly and severally, as follows:

1.     On the First and Second Causes of Action for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Third Cause of Action, for the damages sustained and/or amounts by which the defendants were unjustly enriched, including an accounting of all revenues unlawfully obtained by the defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by the defendants, plus interest, costs, and expenses, and all such further relief as may be just and proper.

ANSWER:      BIPI admits that Plaintiff United States purports to bring this action for treble

damages, civil penalties, and other relief under Federal law, but denies there exists any basis for

doing so.


## AFFIRMATIVE AND OTHER DEFENSES

By asserting the defenses set forth below and herein, BIPI does not allege or admit that it

has the burden of proof and/or the burden of persuasion with respect to any of these defenses or

that Plaintiff is relieved of its burden to prove each and every element of its claims and the

damages, if any, to which it is entitled.  As for its affirmative defenses, BIPI reasserts and

reincorporates as if fully set forth herein its responses to Paragraphs 1 through 82 above.

### FIRST AFFIRMATIVE DEFENSE

This Court lacks subject matter jurisdiction over all or some of the claims asserted by

Plaintiff for failure to comply with the terms of the federal False Claims Act, 31 U.S.C. § 3729-

3733.

### SECOND AFFIRMATIVE DEFENSE

This Court lacks subject matter jurisdiction based on the doctrines of exclusive and

primary jurisdiction and failure to exhaust administrative remedies. Specifically, the action

brought by Plaintiff is within the exclusive, or in the alternative, primary jurisdiction of the

Department of Health and Human Services.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the political question and separation

of powers doctrines.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert all or some of its claims in this lawsuit.  In particular, Relator Ven-A-Care of the Florida Keys, Inc. lacks standing to pursue this action because the allegations in the Complaint are based upon public disclosures of information and it was not the "original source" of that information pursuant to 31 U.S.C. § 3730, and therefore the United States lacks standing to intervene in case filed by Relator Ven-A-Care.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are preempted by the Commerce Clause and/or the dormant Commerce Clause of the United States Constitution.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the *Noerr-Pennington* doctrine to the extent that such claims are premised, in whole or in part, on alleged statements or conduct by BIPI or Roxane in judicial, legislative, or administrative proceedings of any kind or at any level of government.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against BIPI are barred, in whole or in part, by the applicable statutes of limitations and repose, including but not limited to the limitations set forth in 31 U.S.C. § 3731(b)(1) and 28 U.S.C. § 2415(a) and (b), and by the doctrines of laches, estoppel and waiver.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because they violate BIPI's rights under the Due Process and *Ex Post Facto* Clauses of the United States Constitution, insofar as Plaintiff seeks to impose liability retroactively for conduct that was not actionable at the time it occurred.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief against BIPI are barred by the doctrines of *in pari delicto* and/or unclean hands.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because any injuries sustained by the United States were the result of its own conduct or the intervening or superseding conduct of third parties.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against BIPI for damages are barred, in whole or in part, because: (1) the United States and individual States failed to mitigate damages claimed in this case, and that failure to mitigate damages should proportionately reduce the recovery of such persons and the allocation of fault, if any exists, attributable to BIPI; (2) Plaintiff would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint; (3) by the doctrine of consent and/or ratification to the extent that the United States has received and paid for drugs produced, marketed and sold by Roxane after the filing of Relator's Complaint in 2000; and (4) Plaintiff's claims are speculative and remote and because of the impossibility of ascertaining and allocating those alleged damages.

## TWELFTH AFFIRMATIVE DEFENSE

To the extent that Plaintiff attempts to seek equitable relief against BIPI, Plaintiff is not entitled to such relief because Plaintiff has an adequate remedy at law.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the First Amendment to the United States Constitution.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the filed rate doctrine.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of contributory and/or comparative fault because Plaintiff's own actions or failures to act helped to bring about any injuries sustained.

## SIXTEENTH AFFIRMATIVE DEFENSE

The United States has not suffered, and will not suffer, any injury to a legally-protected or cognizable interest by reason of the conduct of BIPI as alleged in the Complaint, and Plaintiff's claims should be barred for failure to prosecute.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against BIPI are barred, in whole or in part, because BIPI did not make any false statements to the United States or to any State.  As to any statement asserted against BIPI that Plaintiff alleges to be false or misleading, BIPI had no reasonable grounds to believe, and did not believe at the time such a statement was made, that the statement was false or misleading.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that the claims involve drugs reimbursed or paid for without reference to AWP or WAC.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims against are barred, in whole or on part, due to its failure to join indispensable parties.

## TWENTIETH AFFIRMATIVE DEFENSE

BIPI is entitled to a set-off, should any damages be awarded against it, for the entire amount of all damages or settlement amounts recovered by Plaintiff, with respect to the same alleged injuries.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to allege facts or a cause of action against BIPI sufficient to support a claim for attorneys' fees or treble damages.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's punitive damages claims and statutory penalty claims against BIPI:  (1) have no basis in law or fact; (2) are not recoverable because the allegations are legally insufficient to support a claim against BIPI for punitive damages; (3) cannot be sustained because laws regarding the standards for determining liability for and the amount of punitive damages fail to give BIPI prior notice of the conduct for which punitive damages may be imposed and the severity of the penalty that may be imposed and are void for vagueness in violation of BIPI's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution; (4) cannot be sustained because any award of punitive damages exceeding the limits authorized by the applicable law would violate BIPI's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and would be improper under the constitutions, common law, and applicable statutes of the

individual states; (5) cannot be sustained because any award of punitive damages without the apportionment of the award separately and severally between or among the joint tortfeasors, as determined by the alleged percentage of the wrong committed by each alleged tortfeasor, would violate BIPI's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution; and (6) cannot be sustained because any award of punitive damages, which are penal in nature, without according BIPI the same protections that are accorded to all criminal defendants, including the protection against unreasonable searches and seizures, the privilege against self-incrimination, and the rights to confront adverse witnesses, a speedy trial, and the effective assistance of counsel, would violate BIPI's rights guaranteed by the Fourth, Fifth, and Sixth Amendment as incorporated into the Fourteenth Amendment to the United States Constitution.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

In the event of a determination that this action, or some part thereof, is governed by the substantive law of one or more States other than that of the United States, BIPI asserts all defenses available to it under those States' common laws or statutes.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because BIPI did not owe a duty to the United States. Plaintiff's claims are barred, in whole or in part, because of a lack of privity between BIPI and the United States.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

To the extent Plaintiff's claims are based on alleged certifications, express or implied, those claims are barred, in whole or in part, because the payments at issue were not conditioned on the alleged certifications and the alleged certifications did not influence the payments at issue.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

To the extent civil penalties are sought against BIPI, such civil penalties cannot be sustained because an award of the civil penalties would violate the Excessive Fines Clause of the Eighth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments of the United States Constitution.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, are barred because the Attorney General did not have "good cause" for extensions of the seal.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims against BIPI are barred, in whole or in part, by the existence of and the terms of the written rebate agreement between Roxane and the Secretary of the Department of Health and Human Services ("HHS"), on behalf of HHS and all States, entitled, "Rebate Agreement Between the Secretary of Health and Human Services and the Manufacturer Identified in Section XI of this Agreement," which was entered into pursuant to 42 U.S.C. § 1396r-8.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims against BIPI for damages are barred, in whole or in part, because the United States would be unjustly enriched if allowed to recover any portion of the damages alleged in the Complaint.

## THIRTIETH AFFIRMATIVE DEFENSE

BIPI hereby gives notice that it intends to rely upon any other and additional defense that is now or may become available or appear during, or as a result of the discovery proceedings in this action and hereby reserves its right to amend its answer to assert such defense.

## DEMAND FOR JURY TRIAL

BIPI hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury on every claim and issue so triable.

**WHEREFORE,** BIPI respectfully requests that the Court:

1.  Dismiss the First Amended Complaint with prejudice and enter judgment in favor of BIPI and against Plaintiff;

2.  Award BIPI its costs, expenses, and attorneys' fees; and

3.  Grant BIPI such other, further, and different relief as the Court deems just and proper.

Dated: December 16, 2008

Respectfully submitted,

_____/s/ Eric T. Gortner_____
Helen E. Witt, P.C.
Eric T. Gortner
Jared T. Heck
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200
egortner@kirkland.com

*On behalf of Defendant Boehringer Ingelheim
Pharmaceuticals, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on December 16, 2008, a copy to LexisNexis File and Serve for posting and notification to all parties.

                    /s/ Eric T. Gortner
                    Eric T. Gortner