# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| | ) | MDL No. 1456 |
| | ) | Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | Hon. Patti Saris |
| | ) | |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) | Magistrate Judge Marianne B. Bowler |
| | ) | |

## THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER RELATING TO THE DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON

Abbott Laboratories Inc. (Abbott), Duane Burnham and Thomas Hodgson (collectively, Movants) have filed a Motion for a Protective Order barring the deposition of long-retired executives Duane Burnham and Thomas Hodgson (Burnham/Hodgson MPO). Mr. Burnham and Mr. Hodgson are not currently high-level or "apex" Abbott corporate officers; they are not entitled to the same legal protections from depositions that an apex government or corporate witness would have. Since apex protection is the only basis for the Burnham/Hodgson MPO, it should be summarily denied on this basis.

Regardless, both witnesses have extensive knowledge of the issues in this case sufficient to warrant their deposition even if they were current apex officers at Abbott. Mr. Hodgson has given two lengthy depositions in cases involving average wholesale price (AWP) issues, including as an Abbott 30(b)(6) corporate designee. The fact that Mr. Hodgson has given these depositions is conspicuously absent from the Burnham/Hodgson MPO or Mr. Hodgson's

declaration submitted therewith.  In those depositions, Mr. Hodgson showed a command of the concept of AWP and how it relates to government reimbursement.

Mr. Burnham was very active on AWP and government reimbursement matters for Abbott.  He directly – and successfully – lobbied Congress in 1997 to block legislation that would have (1) instructed the Department of Health and Human Services (HHS) to formally collect actual pricing information and (2) expressly granted HHS discretion over the setting of Medicare drug reimbursement levels.  The final law that passed – the Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 462-463 (1997) – contained no such provisions and codified AWP-based reimbursement in federal law.  Mr. Burnham's testimony direct involvement in this effort reflects his knowledge and experience on AWP and government reimbursement matters; his testimony is crucial and relates directly to key defenses advanced by Abbott.

There is absolutely no merit to the Burnham/Hodgson MPO.  The court should deny the motion and permit these long-delayed depositions of Abbott retirees to finally proceed.

## BACKGROUND

### I.    Meet and Confer Efforts

Movants submit a declaration from Abbott's counsel supposedly recounting the parties' meet and confer discussions. Burnham/Hodgson MPO, Exhibit A.  It is incomplete and should not be considered.

The United States requested Mr. Hodgson's deposition on June 28, 2007.  *See* Exhibit 1, June 28, 2007 email from G. Gobena to J. Winchester.  The declaration is correct in that a meet and confer was held on July 17, 2007; at that time, the United States requested Mr. Burnham's deposition as well.  Burnham/Hodgson MPO, Exhibit A, ¶ 4.  The next day, per a request from

2

government counsel, Abbott counsel transmitted via email over 600 pages of deposition testimony given by Mr. Hodgson in class action suits involving AWP fraud and the TAP Pharmaceutical (TAP) drug Lupron. *See* Exhibits 10 and 11 (which contain excerpts from the two depositions), Thomas Hodgson Deposition Transcripts. A subsequent meet and confer call was held on July 27, 2007. Burnham/Hodgson MPO, Exhibit A, ¶ 4.

During the meet and confers, Abbott counsel inquired into rationales for taking Mr. Hodgson's and Burnham's depositions, and government counsel gave Abbott counsel some reasons; the declaration from Abbott counsel – Burnham/Hodgson MPO, Exhibit A, ¶¶ 6-7 – does not fully capture the rationales for taking their depositions. Unvarnished justifications for taking these former executives' depositions are set forth in detail below.

Abbott counsel is correct, however, that the United States is willing to discuss ways to accommodate the Abbott retirees' schedules. *Id*. at ¶ 8.

## II. Mr. Burnham's Current Status and Knowledge of the Issues in This Case

Duane Burnham, Abbott's former chief executive officer (CEO) and chairman of the board, has been retired from Abbott since 1999. Burnham/Hodgson MPO, Exhibit B, ¶ 1. He is not currently employed on a full time basis; he works as a trustee for two organizations. *Id*. at ¶ 7. Mr. Burnham states his deposition will cause him substantial burden, but that burden is not evidenced in the two page, nine paragraph declaration he has provided this Court.

Further, Mr. Burnham has personal, unique knowledge regarding critical issues in this case, particularly regarding government reimbursement for Abbott drugs. Abbott's principal defense in this case is that the federal "government" – either the executive branch or Congress – was fully aware of the specific allegations in the United States' Complaint and *approved*

3

Abbott's price reporting and marketing conduct as alleged therein.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation,* 478 F. Supp. 2d 164, 174 (D. Mass. 2007) (denying motion to dismiss California FCA claim, noting that government approval of the particulars is necessary for a government knowledge defense).  Mere acquiescence is not enough to constitute the kind of government approval that negates FCA scienter. *See United States ex rel. Tyson v. Amerigroup,* 488 F. Supp.2d 719, 730 (N.D. Ill. 2007) (denying defendant's motion for new trial, noting that the proper test is whether the government knew and approved the particulars of defendant's conduct, and that mere acquiescence, rather than approval, by government employees is not sufficient to avoid FCA liability).

Abbott's government knowledge arguments rely heavily on the fact that HHS did not change from an AWP-based reimbursement system to an actual cost-based reimbursement system for several years despite generalized government knowledge of the existence of spreads. Abbott has argued that HHS knowingly used inflated AWP to set reimbursement benchmarks because it wanted to overpay Medicare and Medicaid providers for drug ingredient costs to compensate them for the cost of providing drug administration services.  *See* Abbott's Motion to Dismiss the United States' Original Complaint at 5-9, attached hereto as Exhibit 2.

It is a disingenuous defense.  HHS, as a policy matter or otherwise, has never embraced the practice of overpaying providers for drug ingredient costs by using inflated AWPs.  Indeed, HHS has attempted over the years to use more accurate pricing information to set drug reimbursement levels.  In 1997, for example, HHS sought to change Medicare drug reimbursement so that it was based on actual cost.  The President proposed legislation to codify such a reimbursement system; Abbott's Washington Affairs office carefully monitored this

legislative development.  *See* Exhibit 3, March 3, 1997 Fax Transmittal of Proposed Legislation

to Set Drug Reimbursement at Actual Cost.  The proposed legislation would have set Medicare

drug reimbursement at (1) actual cost, (2) an AWP set by the HHS secretary or (3) a median

actual acquisition cost. *Id*. at ABT 53035.

The United States has learned through discovery that Abbott – and ultimately Mr.

Burnham – directly participated in the effort to block this legislative effort.  Abbott's Washington

Affairs office – *i.e.*, its in-house lobbyists – spearheaded the company's individual efforts against

the actual cost legislation.  The Washington Affairs office engaged in a multi-pronged attack that

involved working with industry trade groups and direct Congressional lobbying.

Abbott closely coordinated with external trade groups representing the interests of its

customers as those groups developed arguments against the proposed legislation.  *See* Exhibit 4,

April 4, 1997 fax from C. Sensibaugh to M. Barmak. ("Mark, enclosed please find the position

paper on the President's acquisition cost proposal that is being used by the American Society of

Clinical Oncology.")  Ms. Sensibaugh noted to another colleague elsewhere in the faxed

document:

> As we discussed, this is what the oncologists are using. They are opposing the
> President's acquisition cost proposal and not offering any alternatives. The renal
> community plans to use this as a guide for drafting their paper

*Id.* at ABT-DOJ 296153.

Abbott's joint venture, TAP, manufactured the cancer drug Lupron; one of Abbott's

major drugs was Calcijex, a renal drug. As such, the concerns of customers in the oncology and

renal markets – as articulated by their advocacy groups – were critically important to Abbott.

David Landsidle, Abbott's Divisional Vice President in charge of its Washington Affairs office,

would later explain this to his supervisor at Abbott corporate, Mark Barmak, in a June 20, 1997

memorandum:

> Lupron and Calcijex benefit enormously from Medicare reimbursement. In 1994, (the last year for which I have data) the HHS allowance for TAP's Lupron was $381.2 million, by far the largest allowance. The second largest was only $74.3 million. HPD's Calcijex comprises 1/3 of division's profits.

Exhibit 5, June 20, 1997 Memorandum from D. Landsidle to M. Barmak Regarding Lobbying

Medicare Reimbursement.

Abbott's Washington Affairs office also directly lobbied members of Congress on this

Medicare drug reimbursement issue. Mr. Burnham was regularly kept abreast of these efforts. In

a June 5, 1997 monthly activities memorandum, Mr. Landsidle informed Mr. Burnham and

others of meetings he had with "Members of Congress and staff on the issue of Medicare drug

reimbursement being changed from average wholesale price to acquisition cost." Exhibit 6, June

5, 1997 Washington Office Monthly Highlights Report.

These legislative efforts and industry advocacy ultimately culminated in competing

House and Senate bills. As an internal Abbott Washington Affairs memorandum shows, the

House bill would have set Medicare drug reimbursement at 95% of AWP; the Senate version

would have given the Secretary discretion to set Medicare drug reimbursement at amounts other

than the AWP reported by drug companies. *See, e.g.,* Exhibit 7, July 15, 1997 Memorandum

from C. Sensibaugh on House Version of Budget Reconciliation Bill.

Abbott was greatly concerned with the Senate version of the Medicare drug reimbursement

legislation. In the June 20, 1997 memorandum referenced above, Mr. Landsidle wrote to Mr.

Barmak that there was a pending Senate bill on Medicare drug reimbursement that was "not good"

because it would require HHS to study drug acquisition costs and determine the appropriate reimbursement level from drugs. Exhibit 5, June 20, 1997 Memorandum On Lobbying Medicare Drug Reimbursement. In that memorandum, Mr. Landsidle suggested that Abbott needed to substantially augment its direct lobbying efforts:

> . . . I suggest having Duane [Burnham] come to town to lobby . . . Abbott has a lot at stake in the reimbursement fight. I do not want to feel, or having others feel, we did not do everything possible to win in conference. Duane could help. I cannot get an appointment with [House Ways and Means Committee Chairman Bill] Archer. With Duane I can. A visit by him increases the importance of Abbott to the issue.

*Id.* The decision to involve Mr. Burnham was made with some trepidation; Mr. Landsidle noted further, "[th]e downside is Duane being exposed to having to defend our position which is profit motivated." *Id.* In other words, the proposed active lobbying by Mr. Burnham to block legislation giving HHS discretion to set Medicare drug reimbursement levels at some level untethered to AWP was "profit motivated" and was a "reimbursement fight" in which Abbott "has a lot at stake."

Mr. Burnham was ultimately asked to, and did, directly lobby against the Senate bill. On June 30, 1997, Mr. Landsidle wrote a memorandum to Mr. Burnham explaining why and how Mr. Burnham should lobby against the Senate bill on Medicare drug reimbursement. Mr. Landsidle wrote:

> The House and the Senate have passed different changes to how Medicare reimburses for drugs (i.e., Lupron and Calcijex). The basic change is that future reimbursement will be 95% of average wholesale price (AWP) rather than AWP. However, the Senate bill has additional language we oppose.
>
> . . . The Senate bill calls on the Secretary of HHS to do a study of AWP and report back to Congress within 6 months. *This gets HHS looking at prices.* The House bill has no such language.

7

> . . . Your message to both [Congressmen] is simple:

> Abbott thinks the house language providing for Medicare reimbursement of drugs at 95% of AWP . . . is much better than the Senate language.

Exhibit 8, June 30, 1997 Memorandum from D. Landsidle to D. Burnham (emphasis added). Mr. Landsidle could not have been any clearer; Abbott was going to lobby Congress to push for the adoption of the House bill (which set reimbursement at 95% of AWP with no HHS survey of actual prices) over the Senate bill to prevent HHS from having the statutory mandate to survey Abbott's actual transaction prices to set appropriate reimbursement levels.

Ultimately, Mr. Burnham contacted members of Congress, seeking support for the Medicare drug reimbursement provisions in the House version of the bill. *See* Exhibit 9, August 5, 1997 letter from D. Burnham to a Member of Congress. As evidenced by Exhibit 9, the effort by Abbott and others in the industry helped defeat the Senate version and codified AWP-based reimbursement in the Medicare statute.

The documents provided with this Opposition show that Abbott had a direct interest in government drug reimbursement policies and preserving the use of AWP in setting government drug reimbursements levels.[1] Mr. Burnham's involvement in these lobbying activities demonstrate that he has unique and important knowledge about these issues that warrants his deposition.

In addition, There are other issues for which Mr. Burnham's testimony is critical including, but not limited to:

---

[1] Mr. Burnham has filed an declaration claiming not to remember participating in these efforts. *See generally* Burnham/Hodgson MPO, Exhibit B. Mr. Burnham's statements are not credible in light of the documentary record in this case, and it is not clear whether Abbott or its counsel engaged in any effort to refresh his recollection prior to securing his declaration.

•     Mr. Burnham's involvement in the review and approval of marketing, business or sales plans for Abbott divisions, including the division whose conduct is at issue in this case.

•     Mr. Burnham's involvement in the review or approval of any and all pricing decisions.

•     Mr. Burnham's involvement in the decision to create and/or maintain Abbott's home infusion operation, which entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of government reimbursements for its drugs.

## III.    Mr. Hodgson's Current Status and Knowledge of the Issues in This Case

Thomas Hodgson, Abbott's former president and chief operating officer (COO), has been retired from Abbott since January 1999. Burnham/Hodgson MPO, Exhibit C at ¶ 1. He is not currently employed full time; he serves on a few boards of directors. *Id.* at ¶ 6. He vaguely claims his board work is "time-consuming," but provides no evidence to support how much time is consumed by these activities. For example, Mr. Hodgson provides no information on how often the corporate boards he serves on meet or how many hours per year he spends on board of directors' matters. Mr. Hodgson has established no burden.

Further, Mr. Hodgson has direct, personal knowledge of the issues in this case. Movants claim that the government has "not identified *any* action that Mr. Hodgson took that would justify his deposition." Burnham/Hodgson MPO at 10. Mr. Hodgson also filed a "know nothing" eight paragraph declaration where he – Abbott's former President and COO – claims to have had no responsibility for the pricing, marketing or sales Abbott's products. Burnham/Hodgson MPO, Exhibit C.

The United States does not want to take Mr. Hodgson's deposition solely because of actions he took, but also what he knows. Indeed, both Mr. Hodgson's declaration and the Burnham/Hodgson MPO mask the depth of his knowledge of AWP and government

9

reimbursement issues.  Thomas Hodgson has testified twice in cases dealing with AWP issues.

*See* Exhibits 10 and 11, February 19, 2004 and February 20, 2004 Hodgson Deposition

Transcripts.  He testified both in his individual capacity and a corporate Rule 30(b)(6) designee on

behalf of Abbott.  *See, e.g.,* Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 16.

He testified regarding a number of matters at issue in this litigation:

- Mr. Hodgson is familiar with AWP.  "Q. You've heard of the term "average wholesale price" in connection with drug pricing. A. Yes."  Exhibit 11, February 20, 2004 Hodgson Deposition Transcript at 13.

-  He also knows how AWP is used for reimbursement: "Q. And you'd agree that AWP is used as a basis for reimbursement by Medicare as well, wouldn't you? A. Yes." *Id*. at 15.

- Mr. Hodgson testified that he knew what a "spread" was; "I understand that to mean the difference between the acquisition cost or price to the physician and what he was reimbursed." *Id*. at 100.  He also testified that he knew the spread on drugs can be increased various ways, including by decreasing actual acquisition cost. *Id*. at 225.

- Mr. Hodgson is familiar with various alternatives the federal government considered to AWP-based drug reimbursement. "Q. Do you recall that HCFA was looking at the alternative of reimbursing on straight cost [in the mid-1990s]. A. I think that was one option. Another option was steeper discount off AWP, and there were probably three or four other options that I don't recall or maybe nobody knows about." Exhibit 10, February 19, 2004 Hodgson Deposition Transcript at 225.

- Mr. Hodgson further testified of his knowledge and education regarding developments in Medicare drug reimbursement. Mr. Hodgson was questioned about his receipt of a memorandum in 1995 discussing HCFA and OMB surveys of actual prices. "Q. Did you know then or do you know now that HCFA . . . and OMB, were attempting to survey acquisition costs of physicians [at the time of the memorandum] for Lupron? A. I knew, as we discussed earlier, that HCFA was considering a number of alternatives to AWP reimbursement. In terms of how they were actually pursuing that, I wasn't aware, other than, obviously, I got this memo or I was briefed on it." *Id*. at 252-253.

Although Mr. Hodgson was being deposed in his personal capacity and as Rule 30(b)(6)

Abbott corporate designee in those depositions, the subject matter concerned a multi-district

litigation regarding TAP's drug Lupron.  There are additional documents and lines of Abbott-

10

specific questions the United States has for Mr. Hodgson that cannot be satisfied merely by reference to these prior depositions, including but not limited to:

•     A further, more in-depth examination of Mr. Hodgson's personal and/or unique knowledge about AWP, spread or government reimbursement issues.

•     Mr. Hodgson's involvement in the review and approval of marketing, business or sales plans for Abbott divisions, including the division whose conduct is at issue in this case. The divisional vice president for the group whose marketing conduct is at issue in this case recently testified that Mr. Hodgson would review and approve any such plans. Exhibit 12, Donald Robertson Deposition Transcript at 90-92.

•     Mr. Hodgson's involvement in the review or approval of any and all pricing decisions.

•     Mr. Hodgson's involvement in the decision to create and/or maintain Abbott's Home Infusion business, which entered into profit-sharing partnerships with health care providers that allowed Abbott to directly profit off Abbott's manipulation of third party reimbursements for its drugs. The divisional vice president for the group whose marketing conduct is at issue in this case recently testified that Mr. Hodgson would have been involved in any business decisions regard that unit. Exhibit 12, Donald Robertson Deposition Transcript at 93.

## ARGUMENT

**I.**     **Mr. Hodgson and Mr. Burnham Are Not Apex Witnesses and Are Not Shielded from Being Deposed.**

    Both Mr. Burnham and Mr. Hodgson have been retired from Abbott for over seven years. They are not currently high level corporate officers at Abbott or elsewhere. There is no case law to suggest that protections afforded current high level apex witnesses – whether government or corporate – apply to corporate retirees. *Cf. State ex rel. Ford Motor Co. v. Messina*, 71 S.W.3d 602, 608 (Mo. 2002) (court concludes that arguments for apex protection of executive were moot in light of his retirement). Considerations such as harassment or business disruption that normally inform a court's decision making regarding the permissibility of apex depositions do not apply to retired executives. *See generally*, *Six West Retail Acquisition, Inc. v. Sony Theatre Management*

11

*Corp.*, 203 F.R.D. 98, 102 (S.D.N.Y. 2001). Indeed, broadening apex protections to impede the depositions of long retired corporate executives would be inconsistent with the well recognized notion that notwithstanding the protections that may be afforded an apex witness, "it is very unusual . . . for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances, as such an order would likely be in error." *WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567 (S.D. Ca. April 6, 2007) at *2.

Abbott contends that apex witness protection does indeed apply to all retired senior corporate executives, citing *In re Ski Train Fire of November 11, 2000*, 2006 WL 1328259 (S.D.N.Y. May 16, 2006) and the *WebSideStory* case noted immediately above. These cases are easily distinguishable and do not stand for that extraordinarily broad proposition. In *In re Ski Train Fire*, the only apex witness in that case remotely analogous to the retired executives in this litigation was the "recently" retired CEO of the defendant, who still continued as the chairman of its board of directors. That Court did not consider the effect of the board chairman's retirement from his CEO position on his status as an apex witness, perhaps due to his continued role as a senior corporate official.

The deponent in the *WebSideStory* case was also a current chairman of the board who had retired from his CEO position at the plaintiff corporation. The court in *WebSideStory* considered the deponent an apex witness was because he (1) continued to be a top executive for the plaintiff corporation and (2) was also the CEO and chairman of the board of a new company. 2007 WL 1120567 at *3 ("since Mr. Lunsford is currently the CEO and Chairman of the Board of Directors for another company, Limelight Networks, as well as a member of the Board of Directors for WebSideStory and its former CEO, Mr. Lunsford is an official at the highest level or "apex" of a

corporation, and while he may not possess the celebrity status of apex deponents in other cases, the Court finds his responsibilities to current and prior employers to be of similar proportions.") Neither Mr. Burnham nor Mr. Hodgson hold any top corporate positions at Abbott or elsewhere,[2] and neither have responsibilities to Abbott any more, whether as a corporate officer or director.

Therefore, apex witness protection does not apply to Mr. Burnham or Mr. Hodgson. Since this was the only rationale advanced for blocking their testimony, the motion should be summarily denied.

## II.    The Depositions of Mr. Burnham and Mr. Hodgson Are Permissible Even Under the Rules Governing Apex Witnesses.

Even if the Court were to afford Mr. Burnham and Mr. Hodgson apex status, their depositions should be permitted. The United States "may obtain discovery regarding any matter, not privileged, that is relevant to [a] claim or defense," and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). Further, "[h]ighly-placed executives are not immune from discovery[, and] 'the fact that [an executive] has a busy schedule'" does not exempt them from being deposed. *Consolidated Rail Corp. v. Primary Industries Corp*., No. 92 Civ. 4927, 1993 WL 364471, at * 1 (S.D.N.Y. Sept. 10, 1993) (*quoting CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y.1984)). "Federal courts have permitted the depositions of high level executives when conduct and knowledge at the

---

[2] Mr. Hodgson is a member of the board of two public companies. Burnham/Hodgson MPO, Ex. C at ¶6. There is nothing in the scant case law on former senior corporate executives seeking apex protection to suggest that merely being the member of the board of a company qualifies a deponent for apex status, particularly when the case involves the board member's tenure at a previous corporation.

highest corporate levels of the defendant are relevant in the case." *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 205 F.R.D. 535, 536 (S.D. Ind. 2002).

As the *WebSideStory* decision cited by Abbott notes, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." 2007 WL 1120567 at *2; *see also, Travelers Rental Co., Inc. v. Ford Motor Company*, 116 F.R.D. 140 (D. Mass 1981); *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp*., 203 F.R.D. 98 (S.D.N.Y. 2001) (deposition of high-level corporate officials permitted when officials have some unique or superior knowledge of the issues in the case. ). That sentiment is echoed in the *In re Sky Train Fire* decision as well, which noted that courts allow apex depositions where "they have personal knowledge of relevant facts or some unique knowledge that is relevant to the action." 2006 WL 1328259 at *10.

As detailed above and discussed below, Mr. Burnham and Mr. Hodgson have extensive personal and unique knowledge of relevant, critical issues in this case.

### A. The Movants Have Failed to Meet Their Burden to Show That a Protective Order Is Warranted.

It is the burden of the party seeking a protective order to prove that an apex official does not possess information relevant to the issues in the case or that his knowledge of particular issues in a case is completely duplicative of other witnesses. *General Star Indem. Co. v. Platinum Indem. Ltd.*, 210 F.R.D. 80, 83 (S.D.N.Y. 2002). Both Mr. Burnham and Mr. Hodgson submitted declarations claiming that (1) they have no unique or superior knowledge on the issues in this litigation and (2) they do not recall any of their work on AWP and government reimbursement issues. Both declarations are vague, conclusory and wholly insufficient to support a motion for a

protective order. *Rolscreen*, 145 F.R.D. at 96 ("party requesting a protective order must make a specific demonstration of facts in support of the request as opposed to conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.") (citations omitted.)

Regardless, in the *Travelers* case, several high level Ford employees filed similar "know nothing" declarations in a failed attempt to evade being deposed. *Id*. at 143. As that court noted, "[t]he plaintiff is entitled to 'test' the claim of lack of knowledge or lack of recollection by deposing the witness." *Id*. at 143, *citing Amherst Leasing Corp. v. Emhart Corp*., 65 F.R.D. 121, 121-23 (D. Conn., 1974) (citations omitted). *Travelers* further noted:

> [T]here is nothing in the law which would indicate that Travelers has to accept the claimed failures on their face or rely on whatever efforts Ford's counsel may have undertaken to refresh recollections. Considering that Travelers has demonstrated that these individuals were personally involved in matters relevant to this case, it would be extremely rare that an asserted failure of recollection would be sufficient to entitle the deponent to an order quashing the deposition.

*Travelers*, 116 F.R.D. at 143; *see also Six West* 203 F.R.D. at 102.

This reasoning is especially apt in Mr. Burnham's and Mr. Hodgson's cases, where their declarations lack credibility in light of the documentary record. As discussed above, Mr. Burnham was personally involved in major government reimbursement policymaking that company officials claimed to be of the utmost importance to Abbott. His "know nothing" declaration is ripe for challenge, and the United States is entitled to direct testimony about his personal work on Abbott's behalf related to government reimbursement for drugs. *See Travelers*, 116 F.R.D. at 146 ("[T]hose with greater authority may have the last word on why [the company] formulated and/or administered the plan in the manner which the lower-level executives described

15

it as being formulated and/or administered. And as the ultimate authority, their views as to why may be of far greater probative value on the issue of intent and motive than the views of the lower-level executives.") All aspects of Mr. Burnham's efforts to lobby Congress to prohibit HHS from having statutory discretion in the setting Medicare drug reimbursement levels must be queried as they bear on Abbott's scienter and affirmative defenses. As a court in this district noted, "[w]hen the motives behind corporate action are at issue, an opposing party usually has to depose those officers and employees who in fact approved and/or administered the particular action." *Travelers*, 116 F.R.D. at 142; *see also Rolscreen Co. v. Pella Products of St. Louis Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992).

The appropriateness of Mr. Hodgson's deposition is similarly clear. Mr. Hodgson has been proffered by Abbott as a corporate designee in other AWP litigation. *See, supra,* at 9-12. He was asked about AWP and government reimbursement issues and has shown that he was knowledgeable about them. *Id*; *see also* Exhibits 12 and 13. That questioning was not done in the context of the Abbott conduct at issue here; the United States should be permitted to explore Mr. Hodgson's – Abbott's former President and Chief Operating Officer – unique knowledge of AWP and government reimbursement issues as they apply to this case.

**B.**     **The United States Need Not Exhaust Other Means of Discovery Before Deposing Mr. Burnham and Mr. Hodgson.**

Abbott asserts, "[t]he case law uniformly instructs that, before a party is permitted to conduct an apex deposition, it must first pursue other avenues, such as (I) depositions of lower-level employees or corporate 30(b)(6) designees; or (ii) written discovery." Burnham/Hodgson MPO at 11. Even if the Court considered Mr. Hodgson and Mr. Burnham

apex witnesses, these lesser means of discovery are not required when an apex witness has

personal knowledge.  Since the United States has shown clearly that both Mr. Burnham and Mr.

Hodgson have unique or personal knowledge of key issues in this matter, the United States need

not depose lower-level employees or pursue written discovery before taking his deposition.  *See*

*WebSideStory*, 2007 WL 1120567 at *2.  The evidence of that personal and/or unique knowledge

has been set froth in detail above.[3]

    As Abbott notes, the United States has deposed several of Mr. Burnham's and Mr.

Hodgson's subordinates at Abbott.  Their testimony cannot substitute for direct testimony from

Mr. Burnham and Mr. Hodgson about their knowledge and actions.  The period for completing

fact discovery in this matter is closing soon, and there is no time for additional delays for

interrogatories or written deposition questions that yield vague and incomplete responses.

---

[3] In some cases, courts have directed that lower-level employees be deposed before the opposing party can ask for discovery from the apex officials. *See, e.g.,  Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Baine v General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991).   Those courts sought to protect these officials from repetitive and harassing depositions where unique or direct knowledge cannot be shown.  These cases are easily distinguishable. Many of these decisions involve personal injury, employment or contract disputes where the upper-level officials had no personal involvement.  *Bridgestone/Firestone*, 205 F.R.D. at 536 ("Nearly every decision Ford has cited [in support of its protective order] involves an individual personal injury, employment, or contract dispute with which the "apex" official had no personal involvement."), citing *Thomas v. IBM*, 48 F.3d 478 (10th Cir. 1995) (individual employment case); *Salter*, 593 F.2d 649 (individual negligence case); *Baine*, 141 F.R.D. 332 (individual personal injury case); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364 (D.R.I. 1985) (individual personal injury case).  In the present case, the claims involve conduct and knowledge at the highest corporate level; thus, the justification for apex official protection is lacking.  *See* Fed. R. Civ. P. 26 (b)(2) (in weighing whether to limit discovery, courts take into consideration the importance of the issues).

# CONCLUSION

For the reasons set forth herein, Abbott's Motion for a Protective Order Barring the Deposition of Mr. Burnham and Mr. White should be denied.

For the United States of America,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley
U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
Phone: (617) 748-3272
Fax: (617) 748-3971

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF
FLORIDA

/s/ Mark A. Lavine
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney
General
99 N.E. 4th Street, 3rd Floor
Miami, FL 33132
Phone: (305) 961-9003
Fax: (305) 536-4101

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

/s/ Gejaa T. Gobena
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Rebecca A. Ford
Gejaa T. Gobena
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 307-1088
Fax: (202) 307-3852

Dated: September 21, 2007

# CERTIFICATE OF SERVICE

I hereby certify that I have this day caused an electronic copy of the above **THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S MOTION FOR A PROTECTIVE ORDER BARRING THE DEPOSITION OF MR. BURNHAM AND MR. HODGSON** to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

/s/ Gejaa T. Gobena

Dated: September 21, 2007          Gejaa T. Gobena

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 8

**▢ ABBOTT**

**From:**  David W. Landsidle
Divisional Vice President
Washington

**INTEROFFICE CORRESPONDENCE**

**Dept:**  Washington Office

**TO:**  Duane L. Burnham

**DATE:** June 30, 1997

————————VIA FAX————————

RE:    Medicare Drug Reimbursement

The House and Senate have passed different changes to how Medicare reimburses drugs (i. e., Lupron and Calcijex).  The basic change is that future reimbursement will be 95% of average wholesale price (AWP) rather than full AWP.  However, the Senate bill has additional language we oppose.

o The Senate bill makes the reimbursement rate retroactive to May 1, 1997.  The reimbursement rate would  the AWP on that date.  The House bill's effective date is January 1, 1998.

o The Senate bill says that the amount reimbursed can not exceed the May 1, 1997, amount increased annually by the CPI.  The House has no CPI lanuage.

o The Senate bill calls on the Secretary of HHS to do a study of AWP and report back to Congress within 6 months.  This gets HHS looking at prices.  The House bill has no such language.

I am putting together phone calls between you and Ways and Means Chairman Bill Archer (R-TX) and Congressman Denny Hastert (R-IL).  Both will be House conferees when the House and Senate meet to reconcile differences.  Your message to both men is simple:

o Abbott thinks the House language providing for Medicare reimbursement of drugs at 95% of AWP, effective January 1, 1998, is much better than the Senate language. It raises $300 million without the unnecessary Senate provisions.

o Abbott asks that you fight to retain the House language in the conference committee and that Abbott joins you in fighting for their language.

You should also congratulate both congressmen for putting together legislation that will bring the Federal budget into balance for the first time since 1969.  This was a massive undertaking and Archer and Hastert were crucial to the deal being struck.

Archer will call you.  I have given his office your number.  I will not know until tomorrow if Hastert will call you or if you are to call him.  I will tell Debbie which way it is scheduled and get her a phone number, if necessary.

cc:  Mark Barmak

Highly Confidential

ABT-DOJ 295996


EXHIBIT
Plaintiffs 1139

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**


# EXHIBIT 10

1

1    STATE OF NORTH CAROLINA IN THE GENERAL COURT

2        NEW HANOVER COUNTY OF JUSTICE

3          SUPERIOR COURT DIVISION

                                    CONFIDENTIAL

4

5   HARRY E. STETSER, et al.,              )

6          Plaintiffs,                     )

7    vs.                                   ) No. 1-CV-5268

8   TAP PHARMACEUTICAL PRODUCTS, INC.,)

9   et al.,                               )

10         Defendants.                     )

11

12    The videotaped deposition of Thomas Hodgson,

13   taken pursuant to notice in the above-entitled

14   cause on the 19th day of February, 2004, at

15   225 East Illinois Road, Lake Forest, Illinois, at

16   9:00 a.m.

17

18

19

20

21

22

23   REPORTED BY ELVIRA M. KOKOTT

24   CERTIFIED SHORTHAND REPORTER LICENSE NO. 84-3309

ABT-DOJ 0297310
Highly Confidential

5 (Pages 14 to 17)

14

1  deposition of Mr. Hodgson or in the litigation --
2  or in the federal litigation, and I believe that's
3  something that Mr. Haviland has -- has assented to.
4      MR. HAVILAND: I agree that the signature on
5  the agreements to abide by the protective orders in
6  Walker and Stetser does not by that signature give
7  up any rights that MDL has to claim whatever they
8  will with respect to this deposition transcript.
9  It's simply to make clear that counsel in MDL has
10  agreed to be bound by the protective orders in the
11  cases for which this deposition has been noticed.
12     I am going to hand the court reporter now
13  the agreement signed by counsel for the MDL in
14  Stetser as Hodgson Exhibit 1A and Walker as Hodgson
15  Exhibit 1B.
16         (Whereupon, Hodgson Deposition
17         Exhibit Nos. 1A-1B were marked for
18         identification as of 2/19/04.)
19     MR. PORCELLI: Mr. Haviland, now that the
20  preliminaries are out of the way, and it appears
21  this deposition will be going forward in both the
22  Walker and the Stetser cases, I would like to
23  restate that I am here on behalf of Takeda in the
24  Walker case only, pursuant to the North Carolina

15

1  Appellate Court's February 3rd ruling in the
2  Stetser case.
3      MR. HAVILAND: I don't know that that requires
4  a response of plaintiff's counsel. Counsel is here
5  appearing in one case. What is happening in
6  Stetser in the Appellate Courts is happening in
7  Stetser in the Appellate Courts.
8      Any other preliminaries? Okay.
9         Thomas Hodgson,
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12         EXAMINATION
13  BY MR. HAVILAND:
14     Q. Mr. Hodgson, my name is Don Haviland. I
15  am counsel for the plaintiff in the class in a case
16  that's been certified as a national class action in
17  North Carolina State Court.
18     I am also counsel for plaintiffs in a
19  class that's been certified in New Jersey State
20  Court.
21     I would like you to start by please
22  telling the court reporter and the jury in this
23  case your full name.
24     A. Thomas R. Hodgson.

16

1      Q. Can you tell me where you presently live,
2  sir.
3      A. 1015 Ashley Road, Lake Forest, Illinois.
4      Q. And, for how long have you lived in
5  Lake Forest, Illinois?
6      A. Approximately, I would say about 25 years.
7      Q. And, you understand that you're appearing
8  today to give deposition testimony in the two cases
9  I referenced?
10     A. I do.
11     Q. Do you also understand that you're
12  appearing today not only in your individual
13  capacity, but also as a corporate designee on
14  behalf of Abbott Laboratories?
15     A. Yes.
16     Q. Okay. Can you tell me when you first
17  learned that you would be appearing today as a
18  corporate designee on behalf of Abbott?
19     A. Specifically this date or generally?
20     Q. Just generally.
21     A. I think I was aware of it some time last
22  year.
23     Q. All right. Can you tell me what your
24  understanding was then in terms of what role you

17

1  would be playing on behalf of Abbott at the
2  deposition today?
3      A. I didn't have a very clear understanding
4  at that point. I do now.
5      Q. Okay. Could you tell me what your
6  understanding is today?
7      A. My understanding today is that there are
8  certain points that were raised, and I am to cover
9  those points.
10     Q. Okay. Could you tell me what those points
11  are as you know them today?
12     A. Basically, Abbott's relationship to TAP,
13  the various business practices of TAP, and Abbott's
14  knowledge of those previous practices.
15     Q. Anything else?
16     A. That's, basically, my understanding.
17  There may be more points, but my overall
18  understanding is that I am to testify relative to
19  Abbott's relationship to TAP.
20     Q. Okay. And, can you tell me in greater
21  detail what your understanding of what the
22  testimony is you can provide today with respect to
23  that topic?
24     MS. RUSSO: Objection, form.

ABT-DOJ 0297314
Highly Confidential

57 (Pages 222 to 225)

**222**

1  these tactical elements.
2  Q. One of the subjects you have been asked to
3  testify on behalf of Abbott, too, has to deal with
4  marketing and sales programs, and so I just want to
5  explore the depth of your knowledge.
6  A. No, I understand.
7  Q. And beyond any --
8  A. And, I didn't have a lot of knowledge, and
9  if I didn't have the knowledge, nobody would have
10  the knowledge, because I was closest to it. The
11  fact of the matter was this was an independent
12  company. Abbott was not involved in the detail
13  nitty-gritty operations of this company.
14  Q. Did -- do you recall if at any time at a
15  board meeting did anyone from TAP present
16  specifically on issues relating to educating
17  doctors about the business aspects of Lupron?
18  A. I don't remember the specifics.
19  Q. In general, prior to board meetings, did
20  you receive any documents from anyone at TAP to
21  prepare for the board meetings?
22  A. No, but I, as I said, because typically we
23  were heavily involved in the plan and update
24  process, I had a pretty good understanding of the

**223**

1  overall operation and what was going to be proposed
2  in terms of plans, financials and so forth.
3  Q. Okay. So, you had some knowledge going in
4  what was going to be discussed?
5  A. I did because of my interface role as did
6  Kunio Takeda.
7  Q. Okay. So, there were no periodic
8  documents, to your knowledge, prepared for
9  Mr. Burnham, Mr. Konishi, and others at the board
10  in advance of board meetings?
11  A. I don't recall any. In -- in specific
12  situations where, for example, the Syntex patent
13  buyout issue, that wasn't handled within the
14  context of a board meeting, because we typically
15  only met once or twice a year. And, Burnham and
16  Konishi or Morita would have been briefed by myself
17  and Kunio Takeda respectively on those issues.
18  (Whereupon, Hodgson Deposition
19  Exhibit No. 21 was marked for
20  identification as of 2/19/04.)
21  BY MR. HAVILAND:
22  Q. Mr. Hodgson, I am showing you what I've
23  marked as Hodgson Exhibit 21, the minutes of the
24  meeting of the board of directors of TAP for

**224**

1  July 11, 1994.
2  Q. Do you see in the first paragraph you're
3  listed as an attendee? And, do you have any reason
4  to believe you're not at this meeting?
5  A. No, I know I was at this meeting.
6  Q. Okay. How do you know you were at this
7  one?
8  A. Because I remember playing golf with
9  Mr. Morita.
10  Q. Did you play skins?
11  A. No, but he took nine shots to get out of
12  the sand trap.
13  Q. That Pebble Beach course was a hard one,
14  huh?
15  A. I said use your hand wedge, pal. Let's
16  move on.
17  Q. Mr. Hasegawa now as the president
18  conducted the agenda of the meeting, and in the
19  fourth paragraph he indicates that he outlined what
20  he deemed critical factors for 1994, 1995. And,
21  then, he says, prepare a contingency plan for
22  Lupron depot 7.5 milligram in the face of changes
23  to the Medicare program.
24  Do you have any recollection as to what,

**225**

1  in light of the fact that Pebble Beach comes to
2  mind, whether or not you recall what the Medicare
3  changes or the contingency plan were that
4  Mr. Hasegawa described?
5  A. Well, this says prepare contingency plan,
6  so I don't know if one actually was prepared or
7  not. But I think at this point in time, roughly,
8  we had Hillary Clinton doing her thing in terms of
9  reformation of the entire health care system. And,
10  I think at the same time there was some discussions
11  and analyses under way at HCFA relative to
12  reimbursement and alternate forms of reimbursement
13  of drugs prescribed in physician offices.
14  Q. Do you recall that HCFA was looking at the
15  alternative of reimbursing on straight acquisition
16  cost at that time?
17  A. I think that was one option. Another
18  option was steeper discount off AWP, and there were
19  probably three or four other options that I don't
20  recall or maybe nobody knows about.
21  Q. Do you recall what was discussed with TAP
22  either between TAP and the board or TAP and you
23  specifically in this time frame with respect to
24  what TAP should do to prepare for those eventual

ABT-DOJ 0297365
Highly Confidential

64 (Pages 250 to 253)

**250**

1  A. No. I didn't get into this kind of
2  detail.
3  Q. Did you know that TAP had engaged a
4  company to assist it on reimbursement issues with
5  physicians?
6  MS. RUSSO: Objection, form.
7  THE WITNESS: On reimbursement issues with
8  physicians? To represent it vis-a-vis whom?
9  BY MR. HAVILAND:
10  Q. Well, I was looking on the document for --
11  I think there was a page missing.
12  Did you ever hear of a company called
13  Rescon Reimbursement Consultants?
14  A. No.
15  Q. Did you know that TAP had a -- did you
16  ever hear of a company called discovery
17  international?
18  A. No.
19  Q. Did you know that TAP had engaged either
20  of those companies to work with TAP on these
21  consultant programs?
22  A. No.
23  MS. RUSSO: Object to the form.
24  (Whereupon, Hodgson Deposition

**251**

1  Exhibit No. 27 was marked for
2  identification as of 2/19/04.)
3  BY MR. HAVILAND:
4  Q. Mr. Hodgson, I am showing you what I
5  marked as Hodgson Exhibit 27, memorandum dated
6  September 6, 1995, from Mr. Alan MacKenzie to
7  Yasu Hasegawa and Mr. Patton.
8  You're not listed as a recipient, but in
9  the first paragraph, after the subject, it says,
10  HCFA reimbursement update and current action plans.
11  Mr. MacKenzie writes, Yasu, per our recent
12  discussion, I wanted to update you, Tom Hodgson,
13  and Kunio Takeda on the current status of any
14  threats to Medicare reimbursement policy for Lupron
15  depot.
16  Let me first ask you, do you recall in
17  1995 having a discussion with Mr. Takeda and/or
18  Mr. Hasegawa about reimbursement?
19  A. No.
20  Q. All right. Mr. MacKenzie sets forth here,
21  he says, I wanted to review our direct consumer
22  campaign we are piloting in response to the
23  changing reimbursement landscape. And, then, he
24  goes on to say, first a review of the threats.

**252**

1  Q. Do you know why it is Mr. MacKenzie deemed
2  changes in Medicare reimbursement a threat to TAP?
3  MR. BUCHMAN: Object to the form.
4  THE WITNESS: I don't know specifically what
5  was in his mind. Obviously, any time you have
6  something as significant as reimbursement changes,
7  marketing and salespeople are concerned.
8  BY MR. HAVILAND:
9  Q. In the memorandum, he talks about the HCFA
10  enforcing OBRA 89 estimated acquisition cost policy
11  for drugs paid by Medicare. And, he reports, the
12  current status is health care finance
13  administration, HCFA, and the office of management
14  and budget, OMB, are having difficulty agreeing on
15  survey methodology to establish estimated
16  acquisition cost.
17  Skip down. He says, for the short term
18  '95 and '96, AWP reimbursement seems safe.
19  Did you know then or do you know now that
20  the HCFA, H-C-F-A, and OMB, were attempting to
21  survey acquisition costs of physicians for Lupron?
22  A. I knew that, as we discussed earlier, that
23  HCFA was considering a number of alternatives to
24  AWP reimbursement. In terms of how they were

**253**

1  actually pursuing that, I wasn't aware, other than,
2  obviously, I got this memo or I was briefed on it.
3  So, at that time, I was, obviously, aware that they
4  were doing a survey.
5  Q. Do you know what the results of the survey
6  were, or do you know if, in fact, the survey was
7  actually concluded?
8  A. I don't know.
9  Q. Did you ever have occasion to speak to
10  anyone at the American Urological Association?
11  A. No. Oh, you mean a representative of --
12  Q. Yes.
13  A. -- the association?
14  No, not that I know of. I have met a few
15  doctors, but I don't think they were members. I
16  don't think they were in the executive management
17  of the AUA. That's what you really mean, right?
18  Q. Yes.
19  A. People employed by the trade association.
20  Q. Correct.
21  A. Yes. Not to my knowledge.
22  Q. Did you know that TAP individuals had
23  contacts with individuals at AUA?
24  A. Yes, because that would have been part of

ABT-DOJ 0297372
Highly Confidential

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 11

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
**February 20, 2004**

---

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MASSACHUSETTS

3   -----------------------------

4   IN RE:          : MDL No. 1430
    LUPRON MARKETING AND SALES  :
5   PRACTICES LITIGATION   : Master File No.
    : 01-CV-10861
6   THIS DOCUMENT RELATES TO   :
    ALL ACTIONS        : Judge
7   : Richard Stearns

8   -----------------------------

9   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

11   VIDEOTAPED 30(b)(6) DEPOSITION of Abbott

12   Laboratories through its representative THOMAS

13   RICHARD HODGSON, taken in the hereinbefore-

14   entitled action, taken before Rebecca L.

15   Stonerock, at the Deerpath Inn, Windsor Hall II,

16   255 East Illinois Road, Lake Forest, Illinois,

17   on February 20, 2004, commencing at 8:10 a.m.

18   pursuant to notice.

19

20                    * * *

21

22   JOSEPH ALBANESE & ASSOCIATES
     Certified Shorthand Reporters
23   805 Main Street
     Toms River, New Jersey 08753

24   Telephone (732) 244-6100
     Fax (732) 286-6316

25

---

**Page 2**

1   A P P E A R A N C E 'S:

2   SPECTOR, ROSEMAN & KODROFF
    1818 Market Street, Suite 2500
3   Philadelphia, Pennsylvania 19103
    BY: JOHN A. MACORETTA
4   Attorneys for Plaintiffs

5   HAGENS BERMAN
    225 Franklin Street, 26th Floor
6   Boston, Massachusetts 02210
    BY: EDWARD NOTARGIACOMO
7   Attorneys for Plaintiffs

8   McDERMOTT, WILL & EMERY
    227 West Monroe Street
9   Chicago, Illinois 60606-5096
    BY: JOSHUA T. BUCHMAN
10  Attorneys for Defendant
    Abbott Laboratories

11  ABBOTT LABORATORIES
    Department 324, Building AP6D
12  100 Abbott Park Road
    Abbott Park, Illinois 60064-3500
13  BY: CATHERINE McCAIN
    In-House Counsel for Abbott Laboratories
14

15  JONES, DAY, REAVIS & POGUE
    77 West Wacker Drive
16  Chicago, Illinois 60601-1692
    BY: LEE ANN RUSSO
17  Attorneys for Defendants TAP
    Pharmaceutical Products, Inc.
18

19  JENNER & BLOCK
    One IBM Plaza
20  Chicago, Illinois 60611-7603
    BY: ANTHONY C. PORCELLI
21  Attorneys for Defendants Takeda
    Chemical Industries Limited and
22  Takeda America Holdings, Inc.

23  WINSTON & STRAWN
    35 West Wacker Drive
24  Chicago, Illinois 60601-9703
    BY: ROBERT L. MICHELS
25  Attorneys for Witness Thomas Hodgson

---

**Page 3**

1   APPEARANCES (Continued)

2

3   Also Present:

4   John D'Andrea, Videotape Specialist

5                    * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 4**

1                  I N D E X

2   NAME OF WITNESS   DIRECT CROSS REDIR RECRO

3   THOMAS RICHARD HODGSON

4   by Mr. Macoretta   9

5

6            HODGSON EXHIBITS

7   No.   Description              Page

8   1 Notice of Rule 30(b)(6) Deposition   20

9   2 Bates Nos. TAP 2045698 - 709      30

10  3 Bates Nos. TAP 1047928 - 931      42

11  4 Bates Nos. TAP 2013907 - 912      56

12  5 Bates Nos. TAP 2007748           70

13  6 Bates Nos. TAP 2007910 - 812      72

14  7 Bates Nos. TAP 1003798 - 801      74

15  8 Bates Nos. TCI 001934 - 936       77

16  9 Bates Nos. TAP 2016812           82

17  10 Bates Nos. TAP 00045096         83

18  11 Bates Nos. TAP 2012062          109

19  12 Bates Nos. TAP 2066246 - 250     112

20  13 Bates Nos. TAP 2066854 - 855     123

21  14 Bates Nos. TCI 001420 - 423      127

22  15 Bates Nos. TAP 8003431 - 434, 8003421   141

23  16 Bates Nos. TAP 00063741 - 742    144

24  17 Bates Nos. TAP 2011336 - 352     149

25  18 Bates Nos. ABT 02903 - 919       152

---

**ALBANESE & ASSOCIATES**          732-244-6100          (1) Page 1 to Page 4

ABT-DOJ 0297453
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

**Thomas Richard Hodgson**
**February 20, 2004**

---

13

1    Q    Okay.  You've heard the term
2  "average wholesale price" in connection with
3  drug pricing?
4    A    Yes.
5    Q    Could you tell me what you
6  understand that term to mean?
7    A    It's the definition that is developed by
8  the Red Book based on inputs from pharmaceutical
9  companies.
10   Q    Okay.  What is that definition?
11 Do you know?
12   A    It's a markup on the wholesaler
13 acquisition price or cost.
14   Q    And what is -- could you tell me
15 what "wholesaler acquisition cost" means?
16   A    It's the average price that the
17 wholesaler would pay to the pharmaceutical
18 company.
19   Q    To purchase the drug in question?
20   A    To purchase the drug in question.
21   Q    Now, that definition that you just
22 gave me of AWP, was that the definition that was
23 used by TAP when discussing AWP?
24   A    I don't know what definition they used.
25 I didn't get into that degree of detail with

---

14

1  them.
2    Q    Okay.  How about Abbott?  Did
3  Abbott have some definition of AWP?
4    A    I wasn't aware of any particular
5  definition of it.
6    Q    Well, an AWP was published for
7  Abbott drugs as well, correct?
8    A    That's correct.
9    Q    Okay.  Do you have any knowledge
10 as to how Red Book creates -- or calculates AWP?
11   A    Broadstroke-wise I do.  Basically they
12 take the wholesaler acquisition cost and mark it
13 up by a percentage.
14   Q    Do you know how that percentage is
15 chosen for the markup?
16   A    No, I don't.
17   Q    Okay.  Do you know if that
18 percentage is given to Red Book by the
19 pharmaceutical company?
20   A    I don't believe it is, but I'm not
21 familiar or in any way conversant with what the
22 Red Book does.
23   Q    Okay.  And when we say "Red Book,"
24 that's one of several industry compendia that
25 publishes an AWP; is that correct?

---

15

1    A    It's -- it's one.  I don't know if there
2  are others that publish it or not.  That's the
3  one I'm familiar with.
4    Q    Okay.  And you would agree that
5  AWP is used as a basis for reimbursement by
6  certain private insurers, wouldn't you?
7    A    Yes.
8         MS. RUSSO:  Objection, form.
9    Q    And you'd agree that AWP is used
10 as a basis for reimbursement by Medicare as
11 well, wouldn't you?
12   A    Yes.
13   Q    What -- what do you understand the
14 term "list price" to mean?
15   A    In what context?
16   Q    In the context of a list price for
17 Lupron.
18   A    I didn't use that terminology.
19   Q    Okay.  How about the term "direct
20 price"?  Have you ever heard that terminology?
21   A    No.
22   Q    Did TAP have something equivalent
23 to a list price for Lupron?
24         MR. BUCHMAN:  Object to the form.
25   A    I believe they had a wholesaler

---

16

1  acquisition cost type of price.
2    Q    How did TAP calculate the
3  wholesaler acquisition cost for Lupron?
4    A    I don't know.
5         MS. RUSSO:  Objection, form.
6    A    I didn't get into those details.
7    Q    But that's -- we can agree that
8  that's a number that TAP would generate
9  internally, correct?
10   A    Correct.
11   Q    Okay.  How was wholesale
12 acquisition price calculated for drugs by
13 Abbott?
14         MR. BUCHMAN:  Object.  Object to
15 this witness testifying as to drugs other than
16 Lupron.
17   Q    You can answer the question.
18   A    I don't know because I didn't get into
19 that degree of detail.  That kind of detail was
20 multiple levels of staff below where I operated.
21   Q    So you don't know if there was a
22 companywide policy or formula for how WAC is
23 going to be calculated at Abbott?
24   A    I don't know if there was a company-wide
25 formula, no.

---

ABT-DOJ 0297456
Highly Confidential

Lupron Marketing and                                    **Thomas Richard Hodgson**
Sales Practices Litigation                                   **February 20, 2004**

97

1           MR. BUCHMAN: Objection.
2    A    I don't believe that the economics of the
3    proposition were the driving force for the --
4    for the product marketing strategy. I think
5    that the critical aspect of Lupron was that it
6    was a very innovative product and it provided
7    the physician with a form of therapy which was
8    truly a breakthrough.
9           Q     And when we say -- and when you
10   say "the economics," you're talking about the
11   economics to the physician?
12   A    Yes.
13          Q     Okay. And when you don't say --
14   when you say you don't believe that was a
15   driving force, you're talking about from
16   whenever the one-month came on up through the
17   present?
18          MS. RUSSO: Objection to form.
19   A    I -- I believe physicians make judgments
20   relative to therapy based on what's in the best
21   interests of the patient. I think that's their
22   primary focus.
23          Q     Okay. Would you agree with me
24   that at certain points one of the ways TAP
25   marketed to Lupron -- marketed Lupron to

98

1    physicians was by demonstrating to the
2    physicians how much money they could make by
3    prescribing Lupron?
4           MS. RUSSO: Objection, form.
5    A    I don't think that was a stress of their
6    marketing effort. I think that as part of their
7    dialogue with the physician relative to the
8    reimbursement process, the subject of economics
9    may or may not have come up. And in that
10   context they would have dealt with it.
11          Q     Okay. So you would agree that --
12   all right. I understand that it wasn't the
13   thrust of the marketing effort and I'm not
14   asking you what percentage of marketing related
15   to one or the other. I'm asking you did TAP
16   ever, to your knowledge, make any efforts to
17   market Lupron based on profit to the physicians.
18   A    Not based on profit to physicians. As I
19   said, there was a business aspect to it that
20   they would discuss with the physician. They
21   would point out to the physician, if they asked,
22   what the economics were.
23          I don't think that was the principal
24   thrust. I think the principal thrust, as I said
25   before, was, number one, creating awareness in

99

1    the medical community of prostate cancer and the
2    ways to diagnose it, and number two, to -- to
3    recommend Lupron as an innovative therapy. I
4    think the business aspects were secondary to
5    most physicians. Perhaps not all.
6           Q     Okay. So do you know if TAP made
7    marketing materials available to the sales
8    representatives that talked about the business
9    aspects of Lupron?
10   A    I know that at one point in time that the
11   TAP representatives had computers -- laptop
12   computers and computer systems that would show
13   the economic aspects of the physician
14   prescribing the drug.
15          Q     Okay. And that was a computer
16   program created by somebody at TAP or for TAP,
17   correct?
18   A    Yes.
19          Q     Okay. So at least in that
20   instance TAP made an effort to market Lupron by
21   talking about how much money the physician could
22   make?
23          MR. BUCHMAN: Objection to the
24   form of the question.
25   A    Well, you keep talking about marketing

100

1    and I keep trying to direct you to what I think
2    the principal thrust of the marketing was. That
3    was an element of it, but I don't think it was a
4    major element.
5           Q     I understand that.
6    A    Okay.
7           Q     And by the way, so we get to -- to
8    terminology, would you agree with me that --
9    well, let me try it this way: The term "return
10   to practice," what do you understand that to
11   mean?
12   A    I understand it to mean contribution to
13   the overhead of a physician's practice.
14          Q     How about the spread on Lupron?
15   What do you understand that to mean?
16   A    I understand that to mean the difference
17   between the acquisition cost or price to the
18   physician and what he was reimbursed.
19          Q     Okay. And understanding that you
20   don't think that this was a thrust of the
21   marketing effort, when TAP made any marketing
22   effort to talk about profit to the physician, is
23   that referred to internally as "marketing the
24   spread"?
25          MR. BUCHMAN: Object to the form

ABT-DOJ 0297477
Highly Confidential

Lupron Marketing and
Sales Practices Litigation

Thomas Richard Hodgson
February 20, 2004

225

1 call the "spread," what you would call
2 "contribution to overhead" --
3 A    Uh-huh.
4        Q    -- and I think we agreed
5 earlier -- tell me if I'm wrong -- that what
6 we're talking about is the difference between
7 what a physician pays for the drug and the
8 amount he is reimbursed for the drug.
9 A    Yes.
10       Q    Okay.  And as to Lupron, would you
11 agree that TAP could make that amount bigger by
12 reducing the amount it charges the physician for
13 the drug?
14       MS. RUSSO:  Objection, form.
15 A    By reducing their price.
16       Q    Yes.
17 A    Yes.
18       Q    Okay.  Either directly or through
19 some form of discount or rebate?
20 A    Yes.
21       Q    Okay.  That's regardless -- and
22 TAP could do that, could lower the bottom half
23 of what we're calling -- what I'll call your
24 contribution to overhead, TAP could lower the
25 bottom half in that irrespective of what

226

1 happened to the top number, right?  I mean,
2 regardless of whether or not the top number,
3 meaning the reimbursement, goes up, down or
4 stays the same, TAP had the ability to lower the
5 bottom half?
6       MR. BUCHMAN:  Object to form.
7 A    Through the -- the ways that we
8 discussed.
9       Q    Let me show you -- I want to chat
10 with you for a few minutes about some of the
11 Board of Directors minutes.  I'm going to
12 start -- we'll mark this number 35.  I'm going
13 to start with the -- I'm going to start with the
14 October 15, '91 Board of Directors minutes.
15       (Discussion off the record.)
16       (HODGSON Exhibit Number 35 was marked for
17 identification.)
18       Q    Now, at this time, October '91,
19 the board was meeting twice a year, do you
20 recollect, or --
21 A    I believe they were.
22       MR. BUCHMAN:  What did you mark
23 this, 35?
24       MR. MACORETTA:  Yes.
25       Q    And I'm looking at the third --

227

1 this says you were at the meeting?
2 A    Yes.
3       Q    Have no reason to think that's
4 wrong, right?
5 A    Right.
6       Q    Okay.  I'm looking at the,
7 "Mr. Pietraszek presented" -- third paragraph,
8 "Mr. Pietraszek presented his Executive
9 Overview," "cited 1991 TAP highlights and TAP's
10 1992 challenges."  There's a list of challenges.
11 The next-to-last line says, "expansion of
12 patient reimbursement program."  What does that
13 mean?
14 A    I don't know.  I think it's a typo.
15       Q    Which part's the typo?
16 A    We weren't reimbursing patients.
17       Q    I didn't think so.  So you think
18 that should say, "physician reimbursement
19 program"?
20 A    And I -- I don't -- I really don't know
21 what it is because we didn't reimburse
22 physicians either.  So I think that whoever
23 wrote this was confused and I have no idea what
24 this really means.
25       Q    I'll give you a chance to take

228

1 that back when we turn to the last page and we
2 see Maureen McShane is the secretary who wrote
3 the minutes.
4 A    Well, she could have been confused.
5       Q    Okay.
6 A    Because I don't know what it means.
7 Patient reimbursement, clearly patients weren't
8 being reimbursed.  And we weren't reimbursing
9 anybody.  So --
10       Q    Okay.  And obviously had somebody
11 stood up at the Board of Directors meeting and
12 talked about patient reimbursement, you would
13 have said, "What are you talking about?"
14 A    Exactly.  Now, I can speculate what --
15 what was really being discussed here.
16       Q    I understand you're speculating,
17 but go ahead.
18 A    I think he was really talking about
19 expansion of the program whereby we assisted
20 physicians in working their way through the
21 laborious process of -- of obtaining
22 reimbursement.  That's what I think this means.
23 Because it clearly doesn't mean what the words
24 say.
25       Q    Okay.  And that was an effort that

ABT-DOJ 0297509
Highly Confidential

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | ) ) ) | Hon. Patti Saris |
| *United States of America ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories Inc.*, CIVIL ACTION NO. 06-11337-PBS | ) ) ) ) ) | Magistrate Judge Marianne B. Bowler |

**THE UNITED STATES' OPPOSITION TO ABBOTT LABORATORIES INC.'S
MOTION FOR A PROTECTIVE ORDER RELATING TO THE
DEPOSITION OF DUANE BURNHAM AND THOMAS HODGSON**

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE         )
LITIGATION                      )   MDL No. 1456
_____ )   Civil Action No. 01-12257
                                )
THIS DOCUMENT RELATES TO:       )   Judge Patti B. Saris
_____ )
                                )
United States of America,       )
ex res. Ven-A-Care of the       )
Florida Keys, Inc. v. Abbott    )
Laboratories, Inc.              )
CIVIL ACTION NO. 06-11337-PBS   )
                                )
                                )


VIDEO DEPOSITION OF DONALD C. ROBERTSON


        DATE TAKEN:    Thursday, September 13, 2007

        TIME:          8:54 a.m. to 4:28 p.m.

        BEHALF OF:     The United States

        PLACE TAKEN:   United States Attorney's Office
                       2110 First Street,
                       Fort Myers, Florida

        REPORTER:      Lisa L. Rios, Court Reporter,
                       and Notary Public, State of
                       Florida at Large

_____

            MARTINA REPORTING SERVICES
          Courtney Building, Suite 201
                2069 First Street
            Fort Myers, Florida  33901
                  (239) 334-6545
              FAX  (239) 332-2913

Page 90

1   BY MS. ST. PETER-GRIFFITH:

2       Q    Okay.

3            What about do you recall as you sit here today

4   furnishing any documents to - incident to one of those

5   memos?

6       A    Any -- No, ma'am, I don't.  But any document that I

7   had with regard to a sales plan are - my supervisor would

8   also have had.

9       Q    Oh, okay.

10           So do you send all the sales plans up to the

11  president?

12      A    Well, he would have had copies of those; yes,

13  ma'am.

14      Q    Okay.

15           So Mr. Kringel, initially, and then Mr. Gonzalez?

16      A    Yes; they would have copies of our sales plans.

17      Q    Would you discuss the sales plans with either

18  Mr. Kringel or Mr. Gonzalez?

19      A    Either Mr. Kringel or Mr. Gonzalez would approve

20  our sales plan and then we would present it to the

21  corporation, and after corporate approval it would become

22  cast in stone as our sales plan.

23      Q    Okay.

24           Who would -- And would this be done on an annual

25  basis?

Page 91

1       A    The sales plan would be done on an annual basis and

2   it would be updated.

3       Q    How frequently would it be updated?

4       A    In April and August.

5       Q    In April and August?

6            And who in corporate would sign off on the sales

7   plans for your business units?

8       A    As I recall, Hodgson, the president of the

9   corporation.

10      Q    Mr. Hodgson would?

11      A    Mr. Hodgson, yes.

12      Q    Okay.

13           And who else was the president of the corporation

14  while you were there?

15      A    While I worked for the corporation?  Boy, there

16  must have been - there were a lot of them; Kirk Robb, Jim

17  Vincent, Jack Schuler - there were at least four.

18      Q    Okay.

19           Did you ever work with Miles White?

20      A    No.

21      Q    Okay.

22           Did you work with Mr. White when you were in

23  Diagnostics at all?

24      A    No -- Oh - hold on - yes; I made a sales call with

25  Mr. White probably in 1983 on the largest customer we had -

Page 92

1    he was in national accounts then and I had Physiological

2    Diagnostics - we made a sales call on MetPath in Teterboro,

3    New Jersey, and Mr. White accompanied me on that call.

4        Q    Okay.

5             Do you recall when Mr. White took over as president

6    of the company?

7        A    Probably in 1999 or --

8        Q    Okay.

9        A    -- 2000.

10       Q    Do you remember who preceded him?

11       A    Who preceded him as president?  It may have been

12   Jack Schuler - I don't even remember - Mr. Schuler as

13   president?

14       Q    Okay.

15            So when Mr. White --

16       A    No - excuse me - Tom Hodgson was president.

17       Q    Tom Hodgson; okay.

18       A    Yeah.

19       Q    So when Mr. White took over in '99 and 2- --

20       A    Mr. White is CEO.

21       Q    Is CEO.

22       A    Right.

23       Q    Okay.

24            Would he sign off on the plans?

25       A    I don't know if he dealt in the level of detail

Page 93

1    that would include a business like Alternate Site Product

2    Sales or Home Infusion Services.

3         I am sure that, as president -- Well, the president

4    was a gentleman named Bob Parkinson - Mr. White was

5    chairman.  Mr. Parkinson, I'm sure would -- But whether

6    Mr. White as chairman would sign off at that level of

7    detail, I doubt -- I don't know.

8         Q   Okay.

9         What about you talked earlier about trying to phase

10   out of the Home Infusion Business Unit --

11        A   Yes, ma'am.

12        Q   -- would that be a decision that would need to be

13   made above you?

14        A   Yes, it would.

15        Q   Who would you expect would need to be consulted and

16   conferred with and ultimately make that decision?

17        A   Mr. Kringel or Mr. Gonzalez, and then probably

18   Mr. Hodgson or Mr. Parkinson.

19             COURT REPORTER:  Give me one second.

20             MS. ST. PETER-GRIFFITH:  Okay.

21             Why don't we take a brief break.

22             VIDEOGRAPHER:  Going off the record.

23             (Whereupon, a brief recess was taken)

24             VIDEOGRAPHER:  We're back on the record.

25   BY MS. ST. PETER-GRIFFITH:

9d08c905-b265-4985-b6be-b8c9e568b1fc