# Exhibit 1



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Civil Action No. 01-12257-PBS |
| **THIS DOCUMENT RELATES TO:** | Hon. Patti B. Saris |
| *United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>CIVIL ACTION NO. 06–CV-11337-PBS | |

### UNITED STATES' AND VEN-A-CARE'S EXPERT DISCLOSURE FOR MARK G. DUGGAN, PH.D.

Pursuant to the requirements of F.R.C.P. 26(a)(2)(B), and this Court's CMO-29, as amended, the United States and Relator Ven-A-Care of the Florida Keys, Inc., respectfully submit the following disclosure, including a report of the expert opinions intended to be expressed at trial by Mark G. Duggan, Ph.D, his curriculum vitae, and identification or production of all materials and information required by F.R.C.P. 26(a)(2)(B)(i)-(vi). In providing an identification or production of "data or other information considered by the witness in forming his opinions," the United States is incorporating materials that may fall into any of the following categories: (1) data or information provided to Dr. Duggan in connection with this case; (2) data or information considered by Dr. Duggan, whether or not relied upon or cited by Dr. Duggan, in connection with this case; (3) communications between Dr. Duggan and anyone, including counsel and consultants, in connection with this case; (4) notes taken by Dr. Duggan, either electronically or handwritten, in connection with this case; (5) contracts, agreements, and invoices entered or submitted by Dr. Duggan in connection with this case; (6) Dr. Duggan's

drafts of his expert report; (7) documents created by others, including consultants, at the direction of Dr. Duggan, or which conveyed information for consideration by Dr. Duggan, in connection with this case; and (8) communications between Meyers & Stauffer and others that were either made at the direction of Dr. Duggan, or which conveyed information for consideration by Dr. Duggan, in connection with this case.

Dr. Duggan's opinions are based on his education, training, professional experience, teaching and research in the fields of health economics and public economics, as detailed in the curriculum vitae accompanying his report, as well as the related literature in his fields. As a health care economist, Dr. Duggan endeavors to keep himself informed of new developments in his fields through a review of the published literature, and will continue to do so.

Plaintiffs in *State of Texas ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., et al.*, in the District Court of Travis County, Texas, 201st Judicial District, Cause No. D-1-GV-04-001286, disclosed and produced to Abbott all "documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for Dr. Duggan in anticipation of his testimony." These materials are expressly incorporated herein by this disclosure, and for efficiency are not being re-produced, except upon request.

Dr. Duggan may review additional data and information, including documents, data, or other materials, produced by defendants, third parties, or other parties or entities. Accordingly, Dr. Duggan may offer additional opinions, or additional reasons for his opinions, or may supplement the materials considered, as a result of late document productions, or ongoing review of data and information relevant to his fields, or in response to issues that may be raised by defendant in this case. Furthermore, Plaintiffs reserve the right to supplement this disclosure to

provide additional areas of testimony, additional opinions, and/or additional bases for opinions based upon continuing discovery, additional defenses or arguments raised by defendant, and/or additional research, study or publication.  In addition, Plaintiffs reserve the right to supplement this disclosure with additional charts, graphs, or other visual representations of Dr. Duggan's expert opinions.  Supplementation may take the form of amendments to this disclosure, a further disclosure, deposition testimony or any other form sufficient to apprise defendants of additional areas of testimony, additional materials considered, additional opinions or additional grounds for opinions.

In formulating his opinions, Dr. Duggan has been asked to consider positions taken by defendant in its legal briefs, pleadings, written discovery, employees' testimony, or other official or legal documents, or by expert witnesses in other related cases.  In considering these materials, Dr. Duggan may have addressed anticipated defenses or arguments that defendant, defendant's witnesses, its counsel, or its experts may make in defending this action.  By asking Dr. Duggan to address anticipated defense arguments or defenses, the United States does not concede that arguments or defenses are relevant or admissible at trial.  Moreover, Dr. Duggan's review of documents produced by defendant, its employees' testimony or third party testimony, or expert disclosures and testimony in related cases, is not a concession by the United States as to the relevance or admissibility of those materials in this case.

The United States expressly reserves its rights to withdraw any opinions in this expert disclosure for any reason, including in the event that defendant withdraws or abandons at any time during the pendency of this case, any argument or defense addressed by Dr. Duggan in this disclosure.  The United States further reserves its rights to move to strike, move for summary judgment of, move to exclude *in limine*, or otherwise pursue any legal remedy with regard to,

defense arguments, evidence, or defenses addressed by Dr. Duggan in his expert report.

Dr. Duggan was being compensated by Plaintiffs at the rate of $300 per hour through March 6, 2008, and $400 per hour beginning March 7, 2008, in connection with his study, preparation of this report and anticipated deposition and trial testimony.

Respectfully submitted,
For the United States of America,

| | |
|---|---|
| MICHAEL J. SULLIVAN<br>UNITED STATES ATTORNEY | GREGORY G. KATSAS<br>ACTING ASSISTANT ATTORNEY GENERAL |

 /s/ George B. Henderson, II  
George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
(617) 748-3398
(617) 748-3272

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

/s/ Mark A. Lavine  
Mark A. Lavine
Ana Maria Martinez
Ann St.Peter-Griffith
Special Attorneys for the Attorney General
99 N.E. 4th Street, 3rd Floor
Miami, FL  33132
Phone:  (305) 961-9003
Fax: (305) 536-4101

 /s/ Renée Brooker  
Joyce R. Branda
Daniel R. Anderson
Renée Brooker
Justin Draycott
Gejaa T. Gobena
Rebecca Ford
Civil Division
Commercial Litigation Branch
P. O. Box 261
Ben Franklin Station
Washington, D.C.  20044
Phone:  (202) 307-1088

Dated: June 20, 2008

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day caused an electronic copy of the above **UNITED STATES' AND VEN-A-CARE'S EXPERT DISCLOSURE FOR MARK G. DUGGAN, PH.D.,** the expert report, exhibits, and curriculum vitae to be served on all counsel of record via electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties and via electronic service by email to James R. Daly, Jones Day at jrdaly@jonesday.com, and all other materials by Federal Express overnight deliveries on June 19 and June 20 to: James R. Daly, Jones Day, 77 W. Wacker, Suite 3500, Chicago, IL 60601.

|  |  |
|---|---|
|  |   /s/ Renée Brooker   |
| Dated: June 20, 2008 | Renée Brooker |



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*United States of America, ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc.*,<br>CIVIL ACTION NO. 06-CV-11337-PBS | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |
| | |

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                                 1

505,076 in Illinois. Aggregating across all states, this aggregate CMS data indicates that the total number of prescriptions filled and the amount reimbursed by Medicaid for the Complaint products during the eleven-year period of interest are equal to 3.254 million and $146.837 million, respectively.

The next three columns of Table 11 provide a breakdown of the number of prescriptions and total Medicaid spending by NDC. As the table shows, Medicaid spending varies substantially across the products listed in the Complaint, with a high of $38.951 million for the Vancomycin 74653301 product discussed above and a low of $276,000 for the Sterile Water product 74488750. The number of prescriptions also varies substantially, with just 3,816 prescriptions filled for the product 74613922 compared with a high of 778,607 for the Sodium Chloride 74196607 product.

The final three columns of Table 11 list the total number of prescriptions and total Medicaid spending in each of the 44 quarters from 1991 through and including 2001. Medicaid spending for the Complaint products increases steadily during the first ten years of the period, reaching a maximum of $6.218 million in the first quarter of 2001. Spending then declines by 59.1 percent (to $2.543 million) during the next two quarters, despite the fact that the number of prescriptions declines by just 11.6 percent during this same period. This decline is primarily driven by the change in the published prices (such as the AWP) for the Abbott products listed in the Complaint that occurred in 2001 and was described and depicted graphically for the Vancomycin 74653301 product above.

**VI. CMS Medicaid SMRF / MAX Data**

In addition to the aggregate Medicaid data described above, CMS also maintains a large amount of Medicaid claims data, much of which is summarized on the CMS website at the page with the heading *Medicaid Analytic eXtract (MAX) General Information*.[19]  For the 1999 to 2004 data, the MAX data summarized at this site consists of five sets of files (person summary, inpatient hospital, long-term care, prescription drugs, and other services) for all fifty states and the District of Columbia.  The prescription drug claim files are the ones that I summarize in this section.  Similar data for prescription drug claims are also available for 30 states in one or more years from 1991 through 1998, with the data referred to as the State Medicaid Research Files (SMRF) during this earlier period.

Table 12A provides a summary of Medicaid spending and the number of claims for the 44 Complaint NDCs for each state from 1999 through 2001.  This table also lists state-level Medicaid spending and the number of prescriptions for Complaint products during the same three-year period as reported in the SDUD data described above.  Before comparing these two sets of data, it is worth noting that my summary of the claims data is based on service dates whereas the SDUD data are based on the date of payment.  Thus one would not expect an exact correspondence between the two sets of data.

As the table shows, for most of the states with relatively high Medicaid spending, there is a close correspondence between Medicaid spending in the two sets of files.  The one exception is Indiana, for which spending in the MAX data is 28.5 percent greater than in the SDUD data.  My examination of the SDUD data for Indiana indicates that it is incomplete during this period, with for example Medicaid spending of just $49,274 in the third quarter of 2000 versus an average of $631,918 per quarter in the second and fourth quarters of the same year.  Quarterly Medicaid

---

[19] See http://www.cms.hhs.gov/MedicaidDataSourcesGenInfo/07_MAXGeneralInformation.asp.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                                                    27

spending for Indiana is much more consistent in the MAX data, with spending of $526,456 in the third quarter of 2000 versus an average of $651,325 in the surrounding two quarters.

An examination of Medicaid spending in the two data sets for the remaining states reveals that some other states have large discrepancies.  For example, in Mississippi, Medicaid spending in the MAX data is 49.3 percent higher than in the SDUD data.  But as Table 12A shows, only 8 quarters of data were available for Mississippi in the SDUD data.  If Mississippi's SDUD Medicaid spending is accurate for these 8 quarters, then one would expect a difference of approximately 50 percent.  In other states with large discrepancies, such as Colorado, Maryland, South Carolina, and Iowa, my examination of both sets of data suggest the discrepancies are typically due to incomplete SDUD data. Overall, total Medicaid spending for Complaint products from 1999 to 2001 is very similar in the two data sets, with $61.9 million in the SDUD data versus $62.9 million in the MAX data.

Table 12B repeats this comparison for the 1996 – 1998 period.  The key difference between this table and the previous one is that SMRF data (the name used from 1991 to 1998, the name MAX was used from 1999 to 2001) is only available for 28 states during this three-year period.  Additionally, only two years of data are provided for the state of California.  Once again with the exception of Indiana, there is a close correspondence between Medicaid spending in the two data sets for states with relatively high Medicaid spending during this three-year period.  For example, in Florida according to the SMRF data, there was $7.432 million in Medicaid spending on Complaint products from 1996 to 1998 versus $7.240 million in the SDUD data.  SMRF Medicaid spending is 32.9 percent lower in California than in the SDUD data, though this is approximately what one would expect given there are just two years of SMRF data for this state.

Medicaid spending for Indiana in the SMRF is more than four times greater than is implied by the SDUD data, though this is primarily driven by the fact that this state has just four quarters of utilization data in the SDUD data set versus 12 in the SMRF. If one excludes this one state, Medicaid spending for the 27 states in the SMRF is $29.636 million versus $29.571 million in the SDUD for these same states for a difference of just 0.2 percent.

In Table 12C I report state-level SDUD Medicaid spending and prescriptions versus SMRF Medicaid spending and claims for the 1991 – 1995 period. Because almost none of the states have SMRF data for all five years, the correspondence between Medicaid spending in the two data sets is not as close. For example, Medicaid spending in the state of New Jersey, which is first in both data sets in terms of Medicaid spending on Complaint products during this five-year period, is 23.6 percent lower in the SMRF than in the SDUD data. This is primarily because there is no SMRF data for New Jersey in 1991. If one instead compares spending in New Jersey during the four years from 1992 to 1995, when I have both SDUD and SMRF data, the difference is just 2.7 percent.

To sum up, Medicaid spending in the SDUD and SMRF/MAX data for the Complaint products from 1991 to 2001 yields a similar picture. The most striking difference is for the state of Indiana, which according to the SMRF/MAX data has spending of $14.808 million (for 1992 to 2001) versus $8.147 million in the SDUD data (for 1991 to 2001). This discrepancy appears to be driven by incomplete SDUD data for this state. Most of the other differences among states with relatively high Medicaid spending in Tables 12A, 12B, and 12C are also driven by incomplete data, either because the SMRF/MAX file is not available in a particular year for a state or because the SDUD data for a state in a certain year is incomplete.

Report of Mark G. Duggan, Ph.D., June 19, 2008.                                                                 29

**VII. Illinois Medicaid**

According to the CMS SDUD data, the state of Illinois was second among all states in terms of total Medicaid spending from 1991 to 2001 on Abbott products in the Complaint. Because the state-level Medicaid claims data are somewhat more complete for Illinois than for Florida (the state ranked first), I begin my state-level Medicaid analyses with Illinois.

The Illinois Department of Health and Family Services provided the United States with Medicaid claims data. The data were provided in two different formats, one including claims adjudicated from 1991 through 1996 and the other including claims adjudicated in 1996 through 2007. The data included claims with an adjudication date of May 6, 1991 and later, with the first service date in the files of April 1, 1991. I restrict attention to those Medicaid claims with a service date during the eleven-year period of interest.

The Illinois Medicaid NDC-based claims data are summarized in Table 13A. There are 535,493 claims for one of the 44 Complaint NDCs with a service date during the relevant period, with Medicaid spending for these claims equal to $16.589 million. The first panel of this table lists the number of claims and total Medicaid spending by NDC. All 44 Complaint NDCs appear in the Illinois Medicaid claims data. Consistent with the data for the U.S. as a whole, Illinois Medicaid spending is greater for the 74653301 product than for any other one in the Complaint.

The second panel lists the number of claims and total Medicaid spending by year and quarter. When assigning claims to time periods, I use the service date instead of, for example, the prescription date or the adjudication date. As the table shows, there are no claims in the first

columns list the corresponding information for the total value of DIFFERENCE and the total amount of Medicaid spending.  My results indicate that Medicaid spending would have been lower by $81.222 million out of $109.444 million paid.  This value of DIFFERENCE is 74.2 percent of total Medicaid spending.

In the next column, I report the federal share of this DIFFERENCE. In calculating this, I use the federal matching rate in effect for each state in each year.[41]  As shown in the table, the federal share of DIFFERENCE for these first twelve states is $45.786 million.  The final column lists the number of pharmacy payments with at least one claim with a value of DIFFERENCE greater than zero.  My results indicate that there were at least 375,059 unique pharmacy payments with at least one Medicaid claim with a value of DIFFERENCE greater than zero in these twelve states during the 1991 to 2001 period.

**XX. Medicaid for the Remaining 38 States**

For analyses for the remaining 38 states, I utilize the SMRF / MAX data and SDUD data described above.  When it is available I use the SMRF / MAX claims data, which allows me to construct analysis samples analogous to those described above with the state-level claims data. When this data is not available for a state in a particular year, I instead use the SDUD data.

Table 26A summarizes Medicaid spending on Abbott's 44 Complaint products by state and year for these 38 states in the SMRF / MAX data.  States are sorted in descending order of SDUD Medicaid spending as listed in Table 11.  Total NDC-based Medicaid spending in the SMRF / MAX data for these 38 states (including the District of Columbia but excluding

---

[41] This information was downloaded from the CMS website, which provides the Federal Medicaid Assistance Percentage for each state in each year from 1985 through 2004 at: http://aspe.hhs.gov/health/fmap.htm.

Arizona) during the 1992 to 2001 period[42] is $34.432 million while the total number of claims is 632,673.  Table 26B provides a similar summary of these same states from the SDUD data.  However in this table, a state-year cell is only populated if there is not SMRF / MAX data for the state in the same year.[43]  Total NDC-based Medicaid spending summarized in this table is $13.944 million with the total number of claims equal to 286,259.

I begin my analysis of each state's SMRF / MAX data by applying inclusion criteria analogous to those described above for the twelve preceding states.  For example, I drop claims with a paid amount of zero or with a strictly positive third party payment amount.  I then aggregate the number of claims and total Medicaid spending for each state by NDC-quarter.

I then merge this claims data for each of the remaining 38 states to a data set in which the unit of observation is the NDC-quarter and that is constructed using the eleven states' Medicaid claims data described above.[44]  For each NDC-quarter, I first calculate the average fraction of claims with DIFFERENCE greater than zero across all eleven states (fewer if not all eleven have data).  I also calculate the average value of the ratio of DIFFERENCE to the amount of Medicaid spending on these claims.  In calculating these averages, I weight each of the eleven states that have data for that NDC-quarter equally, while states with no claims data for that NDC-quarter have a weight of zero.  I subsequently refer to these averages for NDC j in quarter t as POS-DIFF11$_{jt}$ and DIFF-FRAC11$_{jt}$, respectively.

My comparison of the Medicaid adjudication algorithms used by the 11 states described above with the 38 remaining states suggests that the two groups are very similar.[45]  The vast

---

[42] Only Hawaii and Alabama had SMRF data in 1991 and I rely on SDUD data for both of these states in 1991.
[43] Neither SDUD nor SMRF data is available for Tennessee from 1995 to 1998 and for Idaho in 1993.
[44] I do not include Indiana because as described above I used SMRF / MAX and SDUD data for that state.
[45] The same is true for Medicaid reimbursement per claim.  For example from 1999 to 2001 when all 50 states have SMRF / MAX claims, the average amount spent per claim is actually higher in the remaining 38 states than it is in the 11 states for which we use claims data.  Considering this one NDC at a time, in 24 of 44 cases, the average per claim Medicaid spending is higher for the remaining 38 states and these 24 NDCs account for 74.6 percent of

# Exhibit 2



U.S. Department of Justice

Civil Division, Fraud Section

---

601 D Street, NW  
Washington, D.C. 20004

Telephone: (202) 514-3345  
Telecopier: (202) 616-3085

*Via Electronic Transmission*  
*(Enclosures by Over-night Delivery)*

August 20, 2008

Neil Merkl  
Kelley Drye & Warren LLP  
101 Park Avenue  
New York, NY 10178

Re: Average Wholesale Price Multi-District Litigation  
M.L. No. 1456/C.A. No. 01-12257-PBS (D. Mass.)

Dear Counsel:

Enclosed please find compact disc HHD272 containing CMS MSIS and SMRF/MAX claims data and supporting documentation pertaining to Dey Laboratories, Inc. Please note that while we anticipate we will receive claims data from at least one additional state, with the production of this disc, we have provided subsets for Dey of all relevant datasets currently in our possession.

Thank you for your attention.

Very Truly Yours,

/s/  
Laurie Oberembt  
Senior Trial Counsel  
Commercial Litigation Branch

Enclosure  
cc: James Breen (w/o enclosure)  
    George B. Henderson (w/o enclosure)  
    William A. Escobar  
    Sarah L. Reid  
    Marisa A. Lorenzo