# EXHIBIT F

00001

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME

TRIAL COURT CAUSE NO. D-1-GV-04-001286

THE STATE OF TEXAS * IN THE DISTRICT COURT
EX REL *
*
VEN-A-CARE OF THE *
FLORIDA KEYS, INC. * TRAVIS COUNTY, TEXAS
*
VS. *
*
ABBOTT LABORATORIES, INC., *
ET AL * 201ST JUDICIAL DISTRICT

*******************************************************

PRETRIAL MOTIONS HEARING

*******************************************************

On the 18th day of December, 2006, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott Jenkins, Judge presiding, held in Austin, Travis County, Texas.

Proceedings reported by machine shorthand.

00128

find out the answer to that.

THE COURT: And all will be revealed.

MR. BERLIN: Well, their questions will be answered. But in terms of this discrepancy amounting to fraud, which then leads to a crime fraud exception, which opens up the discovery into all the attorneys' privileged work, it's just not even close. It doesn't come close to meeting --

THE COURT: I understand the legal argument on that. I thought perhaps you -- you were talking about the misrepresentations, the specific misrepresentations they alluded to. I didn't know if that was one you wanted to address.

But I understand your point on the law, on what it takes to get the crime fraud exception.

MR. BERLIN: Well, I want to honor the time commitment. I could speak more, but I know you've got to keep it to a certain minute, so I'll sit down now. If you have any other questions, I'll be happy to answer them.

THE COURT: You've answered my questions. Ms. Moore, you wanted another two or three minutes, I believe? You're yielding the floor?

MR. BREEN: Your Honor, they appointed me for the two-minute drill. I promise not to read from

00129

any cases.

Your Honor, I just want to go through a couple of quick points. No. 1, the at-issue issue. What happened here? Abbott chose to have their in-house counsel send a letter that contains misrepresentations.

There is no way to read that letter against the information that has since come out in discovery and not at least feel or conclude that there is an issue here about misrepresentation.

There's just no way. They say that the WAC on Vancomycin was $38.50, and their internal documents before and after the letter showed that it's less than half that. So there's no way that this is not a misleading letter.

Lawyers send letters all the time. It doesn't mean we get deposed for sending letters on behalf of our clients. Sometimes our clients don't tell us everything and the letter is not exactly accurate.

You can't depose a lawyer for that every time. We know that, but the issue in this case is how is Abbott Laboratories going to reconcile having their general counsel send a letter saying "We made this good faith representation and investigation," and then they make misstatements?

How are they going to reconcile that? We

00130

have got a right to discover that. That's the issue. How is Abbott going to explain this? And when Mr. Daly said, "Take Ms. Chronis' deposition," they rang the bell.

They can't unring that bell. We now have a right to fully depose Ms. Chronis, because they put her up and said, "Take her deposition. She's the one who wrote the letter."

There was no requirement what that we be limited to asking her questions as to "Who told you what, and who gave you what?" If there's an attorney/client privilege, it would cover that, also.

That's a waiver. They waived that. So they've absolutely let us inquire, and they cannot allow us to inquire just up to the point where they decide they want to reassert the privilege. A waiver of an attorney/client privilege doesn't work that way.

Abbott is going to have to answer these questions about these statements in this letter, and they chose to offer Ms. Chronis up to do it. That's No. 1.

No. 2, we're talking about -- and I believe that would be waiver under any state's waiver law.

I can't imagine any better example of a


00131

waiver than a client that's presented with a letter that it sent like this, saying, "Ask the lawyer who wrote the letter in a deposition." If that is not a waiver, I don't know what is.

And we started the deposition and -- while they had a good faith defense up, and then they pull the defense and they don't let us finish these questions in the deposition.

They can't unring the bell with this witness.

Next Your Honor, they make this statement that we somehow didn't limit our questions to the letter. And I don't have time to go through each of the questions, but I think the context of each and every one of these shows it was directly related to the letter or it was the natural kind of information that, if she was in possession of it when she did the letter, she would acknowledge it in making these good faith representations.

I asked her a question, for example -- she made this statement in the letter. It's right in there. "We don't have a price to distributors, and our direct prices to pharmacies are listed. We only -- our distributors only supply on a commission or sell on commission," or words to that effect.

00132

So I showed her this document, which was a list of prices, direct prices to pharmacists. And this is at Page J -- the exhibit is J, Exhibit J, and it's at Page 123, Line 8.

And I asked her this question. "Do you recall reviewing anything like this when you made your representation to Ms. McNeill that the direct price to the pharmacy is, in fact, prices -- a list price that's charged to customers, quote, 'that wishes to purchase the product,' end quote, 'usually' -- or comma, 'usually in small quantities, without negotiating an individual contract,'" end quote.

I asked that question, "When you made your representation, did you look at any document like this?

Mr. Berlin says, "That could solicit work product information, but she's already testified she hadn't seen this document or anything like it."

And then she says "No." Then I go on, "Okay, so you never saw anything like this when you made that representation?" Answer: "No."

Then I asked her to go -- "Now, if you'll go to the second volume of this huge thing, and it begins with TX, T-X, ABT 159354.

"Yes."

"And just look at the first page, and

00133

you'll see it's a two-column chart there. Do you see that?"

"Yes."

And I go through this document with her.

I'm trying to get down to the specific objection.

Now, beginning on Page 126, Line 12, I show her Exhibit 193, and I say, "It appears to be dated September 11, 2001. Do you see that?" Answer: "I do."

"Now -- and then it says, 'Subject: List prices' -- 'List price versus total sales. Do you see that?"

Answer: "I do."

Then it's marked attorney work product -- Question: "Attorney work product?" Answer: "Yes."

Question: "So if it was attorney work product in September 2001 -- or on September 11, 2001, were you still working on this project then?"

I'm trying to get down to the exact objection, Your Honor. Let me just argue generally, and I will try to find the specific one in a minute, because I know my time is running out.

THE COURT: I've given you much more time than that. I'm going to have to have you wrap it up.

MR. BREEN: I apologize, and I'll just

rely upon our papers. And you'll see that I asked her questions about, "Did they show you this document?" And the answer was no.

And then the question was, "Well, had you seen a document like that, would you have done something differently? What would you have done?" That's the area they didn't want us to go into. That's one example.

Ms. Moore asked her about other pricing studies she saw. I asked her if she had ever seen a price that was a thousand percent higher than the actual prices. They wouldn't let her answer that question.

All this information goes to what she knew and what she did with that knowledge at the time that she sent this letter, or she signed this letter representing good faith on behalf of Abbott.

In all those instances we were stopped from finishing the deposition, which is important, because Abbott may not intend to present Ms. Chronis to the jury, but we certainly will present Ms. Chronis to the jury.

And since Ms. Chronis is the one that Abbott has offered up both when they communicated with Texas Medicaid and when they represented to the Court that we could go take her deposition as the person to

00135

explain all this, we have got a right to present to the jury her full explanation.

So if she said, "I acted in good faith," but she didn't do anything in response to -- she wasn't shown any documents by the client, or if she was shown the documents, she didn't do anything about it, we have a right to run that to ground to get that information before the jury. Thank you.

THE COURT: I've read the record that you have presented to me and I have read, of course, all of the excerpts which you have highlighted.

The ones that you were talking about, Mr. Breen, were not highlighted in your motion, so I didn't focus so much on those. I focused on what counsel asked me to focus on.

You've asked me to make some very broad rulings from the plaintiff's standpoint. You've asked me to find that there's waiver, and that because of the at-issue doctrine, because of voluntary disclosure, you can ask any and all questions concerning anything pertaining to Ms. Chronis' activities, other investigations, opinions, and you start off -- though I appreciate you waiving it -- wanting to take the other two lawyers' depositions, all prior to taking the two fact witnesses who apparently compiled all the data

00136

which you say is false, and finally, the crime fraud exception.

So those are the four big bases for fairly broad rulings. There were some of the questions that I would have said -- in fact, I wrote little notes to myself, "Maybe." I might compel this question, "Maybe," and on some, "No."

You highlighted Page 83, Lines 2 through 6, Page 113, Lines 1 through 17. And I wrote "Maybe" by that.

I wrote "No" by Page 131, 3 through 12, "No" by Page 140 to 143 -- 140, Line 20 to 143, Line 8, "Maýbe" to Page 137, 24, to 138, 10.

But now I'm breaking down and going through the deposition question by question, saying, "I think that's legitimate, or maybe I would compel that," versus "Absolutely not."

But the way I read the motion and the response was a more broad brush, "We want full and complete and unfettered" -- this is your words -- "discovery. We want absolutely every objection overruled."

And Ms. Moore candidly said that's what she wants, based on waiver, at-issue, voluntary disclosure and crime fraud. That motion is denied. And

I'm going to let you go take these fact witness depositions.

If there's another more discrete record and discrete questions that are targeted along the lines of the colloquy I had with Mr. Berlin -- there are questions, I think, that could be asked and there are doors that probably could be opened, but it will be one by one, step by step.

This sort of broad approach to, "Identify any and all investigations you've ever made," well, it wasn't presented for that, and at some point there is -- you haven't opened that door to walk in.

So based on my review of the record -- and I did read every case she cited and think about the at-issue doctrine, et cetera -- my best analysis of this based on the record before me is that this motion should be denied, and is. Do you have an order for me to sign?

MR. BERLIN: No, we don't. We do not have an order, Your Honor.

THE COURT: Well, then, present an order that is necessary on that, and I'll see where you go with that.

That's why I tried to ask some of the questions the way I did, to try to indicate what I think legitimate questions should be asked and how they could

00138

be asked.

Sometimes that helps. Sometimes it doesn't. Sometimes I can telegraph what I'm thinking and the legitimate way to ask it, and sometimes I can't.

MR. LEWIS: Might I ask one brief question, Your Honor?

THE COURT: Sure.

MR. LEWIS: Should that order simply say that basically you have reviewed the record and the motion is denied? Otherwise, we'll get into lots of language about the various things that you said.

THE COURT: No. It's going to be very simple. "Based on this record, this motion is denied," just that simple.

MR. LEWIS: Thank you, Your Honor.

THE COURT: Otherwise, there will be hearing after hearing on the language of the order, and we're not going to do that.

The next item is the scheduling order. I guess we can discuss this without a record, can't we?

Let me just say that I really want a scheduling order that gets this case tried as promptly as possible, and so if anyone ever wonders why I'm deviating from the scheduling order or why I'm refusing to deviate from the scheduling order, we can be clear on

00139

why we're doing this.

You've handed me -- and we have agreed we will replace the first amended scheduling order, which was signed by me on July 7th, 2005. This case, as I recall, came to me late in '04. Am I right about that? Was it late in '04?

MR. WINTERS: Yes, sir, approximately August of 2004.

THE COURT: I just remember not really thinking about this case until late '04, and I don't remember when Judge Dietz assigned it to me. But I think the very first hearing I had was late '04, wasn't it?

MR. WINTERS: That's true, Your Honor. I think the first hearing you had was actually for the entry of the scheduling order and the protective order.

THE COURT: Okay, which was just an agreed order. That's all I did, right?

MR. WINTERS: We did them, I think -- if I recall correctly, Judge, we did both the scheduling order and the protective order simultaneously or in really close proximity.

THE COURT: They were all done pretty much by agreement.

MR. WINTERS: Well, more or less, although

00140

as I recall, Mr. Brothers, Mr. Lewis' partner, was here and he said, "We're not" -- something to the effect of "I can't agree to it, but we want you to approve this one."

THE COURT: All right. Well, in any event, it seems like I had my first hearing some time late in '04. '05 was just completely lost, because I understand the parties entered into negotiations not long after I had a hearing in February or March.

At the conclusion of that, the case was removed to federal court. It was remanded back right before Christmas of '05, and so that whole year was just kind of lost, at least from this Court's standpoint, subject to what I brought up and certain suggestions -- you might have read certain suggestions otherwise with regard to mandamus issues, like "The Court is waiting to rule on something."

I'm anxious to rule on things as quickly as I can. But now, since we're started in earnest, now a whole year has gone by, and we need to get a scheduling order that we can live with and that there's almost no possibility that we're going to deviate from.

So that's our goal for this. Does everybody agree that that's what we're going to try to do?

00141

MR. BERLIN: Yes, Your Honor.

THE COURT: And you've handed me a list of things that you want in a scheduling order, starting with joinder of parties and ending with expert witnesses, and a lot of things in between, including, of course, the trial setting, and mediation.

And you have just got some differences on dates. But otherwise I think this is what you want to work from. Is that right?

MR. WINTERS: Your Honor, a slight modification as to what we gave you before, because there has been some narrowing of the dates. The defendants have presented me with some revised dates, so the current dates that you have, that I believe are in pen and ink in the column under plaintiff's current proposals, those are, indeed, the current plaintiff's dates.

THE COURT: All right.

MR. WINTERS: The defendants have presented me with some compromise positions, and so we have narrowed the gap on the dates considerably, but there are still some issues that remain, so it may be --

THE COURT: All right. Well, I think I've said all I need to say. I want to give Betty a break, but is there anything else you need on the record about

00142

why we're doing this, what we're doing or any dispute you have about it? Is there any of that you will need on the record?

MR. BERLIN: We have reasons for why we want certain dates and why we want it structured. I'm not sure that needs to go on the record.

THE COURT: That's my question, because if someone thought I was just being too Draconian with the deadline for defendant's experts after plaintiff's experts, that could be a basis for saying that was just so unfair as to be tantamount to preventing you from having a fair opportunity to get experts.

But apparently no one needs that because you're so -- at least what you're both proposing, though you disagree on it, is within a range of what a Court has discretion to do, and so there's no need for a record on any of these particular scheduling issues. Is that right?

MR. BERLIN: If if we're going to be within the range of what we're negotiating, then I would think that would be correct.

THE COURT: Fair enough. Same for you?

MR. WINTERS: Well, Your Honor, before I answer that, I need to speak with Mr. Breen about how some of today's rulings impacts the scheduling order,

00143

because I think the Chapter 41 issue does play a part. May I have five minutes to discuss with him?

THE COURT: You certainly may. My only question at the outset is, do we need the court reporter to take down the arguments? Is there had a chance you would, Mr. Breen?

MR. BREEN: I don't need a record of the argument. It's just that I want to go through my mind -- we now know what your inclination is on Chapter 41.

I haven't thought about how that might affect the scheduling order, verdict form, times, and all that. I don't think it's argument. I just think I need to think it through.

MR. WINTERS: No, we don't need a court reporter.

THE COURT: All right. I just want to make sure that people have all the record they could ever need, in case anyone ever wants to question what I've done or why I've done it.

(The court reporter was excused.)

00144

THE STATE OF TEXAS )

COUNTY OF TRAVIS )

I, Betty Haygood, Substitute Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $750.00 and was paid/will be paid by the Attorney General's Office.

WITNESS MY OFFICIAL HAND this the 24th day of January, 2007.

______________________________

BETTY HAYGOOD, Texas CSR 471
Expiration Date: 12/31/08
Certified Shorthand Reporter
P.O. Box 537
Manchaca, Texas 78652
(512) 585-4901