IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                              )
                                    )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE     )
WHOLESALE PRICE LITIGATION          )  Pages 1-33
                                    )




STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 16, 2008, 2:10 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro,
      LLP, One Main Street, Cambridge, Massachusetts, 02142,
      for the Class Plaintiffs.

4

5        STEVEN F. BARLEY, ESQ., Hogan & Hartson, LLP,
      111 South Calvert Street, Suite 1600, Baltimore, Maryland,
      21202, for AmGen Corporation.

6

7        PETER W. MORGAN, ESQ. and J. ANDREW JACKSON, ESQ.,
      Dickstein Shapiro, LLP, 1825 Eye Street, N.W., Washington,
      D.C., 20006-5403, for Baxter International, Inc.

8

9        JAMES P. MUEHLBERGER, ESQ., Shook, Hardy & Bacon, LLP,
      2555 Grand Boulevard, Kansas City, Missouri, 64108-2613,
      for Aventis Pharmaceutical.

10

11       J. CLAYTON EVERETT, JR., ESQ., Morgan, Lewis & Bockius,
      LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C.,
      20004, for Pharmacia Corporation.

12

13       TINA M. TABACCHI, ESQ., Jones Day,
      77 West Wacker, Chicago, Illinois, 60601-1692,
      for Abbott Laboratories.

14

15       RICHARD F. LANDRIGAN, ESQ., Costello & Landrigan,
      421 Highland Avenue, Davis Square, Somerville,
      Massachusetts, 02144, for Patricia Weatherly.

16

17       ALEX SUGERMAN-BROZAN, ESQ., Director, Prescription
      Access Litigation Project, 30 Winter Street, Floor 10,
      Boston, Massachusetts, 02108.

18

19   ALSO PRESENT:

20       COURTNEY A. CLARK, ESQ., Sherin and Lodgen, LLP,
      101 Federal Street, Boston, Massachusetts, 02110,
21    for Watson Pharmaceuticals, Inc.

22       MICHAEL DOSS, ESQ., Sidley Austin, LLP,
      One South Dearborn, Chicago, Illinois, 60603,
23    for Bayer Corporation.

24

25

```
1    ALSO PRESENT:  (Continued)

2

         MICHAEL C. OCCHUIZZO, ESQ., Kirkland & Ellis, LLP,
3    655 Fifteenth Street, N.W., Washington, D.C., 20005,
     for Sicor, Inc.
4
         CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren,
5    LLP, 101 Park Avenue, New York, New York, 10178,
     for Dey, Inc.
6
         DOUGLAS K. SPAULDING, ESQ., Reed Smith, LLP,
7    1301 K Street, N.W., Suite 1100, East Tower, Washington,
     D.C., 20005, for Fujisawa USA, Inc.
8
         ANDREW W. YUNG, ESQ., Scott Yung, LLP,
9    The Awalt Building, Suite 200, 208 N. Market Street, Dallas,
     Texas, 75202, for Health Care Service Corporation.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action

4    No. 01-12257, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6          MR. NOTARGIACOMO:  Ed Notargiacomo, your Honor,

7    for the plaintiffs.

8          MR. BARLEY:  Steven Barley for Amgen, Inc.

9          MR. MORGAN:  Peter Morgan for Baxter.

10          MR. MUEHLBERGER:  James Muehlberger for Aventis.

11          MS. TABACCHI:  Tina Tabacchi for Abbott

12    Laboratories.

13          MR. EVERETT:  Clay Everett for Pharmacia.

14          THE COURT: Anybody else?  All right.  First of

15    all, is there anyone here -- today was supposed to be the

16    final approval hearing, right?

17          MR. NOTARGIACOMO:  That's correct, your Honor.

18          THE COURT:  I don't like to cancel hearings at the

19    last minute when this has been the hearing publicized over

20    all the notices and airwaves, et cetera.  So let me start

21    off by saying, is there anyone here who is objecting to the

22    settlement?

23          MR. LANDRIGAN:  Yes, your Honor.  Richard

24    Landrigan representing Patricia Weatherly.

25          THE COURT:  Why don't you come up, why don't you

1   come up.  Are you objecting to the continuance -- I don't

2   know if you know this, sir, but there has been a request to

3   continue the time for submission of claims.

4           MR. LANDRIGAN:  Yes, your Honor.  I saw those.

5           THE COURT:  Which firm are you with?

6           MR. LANDRIGAN:  I'm with my own firm, Costello &

7   Landrigan in Somerville, Massachusetts.

8           THE COURT:  Okay, what is the basis for the

9   objection?

10          MR. LANDRIGAN:  Your Honor, a couple of things,

11  but the most salient is that we were looking for money to

12  help finance the obtaining of documentation, specifically

13  bills and medical records needed by consumers in Class 3 to

14  justify or substantiate their claims.

15          THE COURT:  You're objecting to -- what are you

16  objecting to?

17          MR. LANDRIGAN:  Well, your Honor, we're looking

18  for the addition of funds to the settlement that would

19  facilitate the obtaining of the records.  As it stands, it

20  may be more expensive for a consumer to try to get the

21  records than it is in terms of what he could possibly

22  recover, he or she could possibly recover for the claim.

23          THE COURT:  So how much does it cost?

24          MR. LANDRIGAN:  Well, I would guess the records

25  probably cost $50, $60 a shot, just as a rough guess, for

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1   obtaining medical records/billing records.

2           THE COURT:  And how much will the average person

3   stand to benefit?  Maybe you know this.

4           MR. LANDRIGAN:  Well, your Honor, the --

5           THE COURT:  Well, just hold on for a second.  From

6   plaintiffs' point of view, is that accurate?

7           MR. NOTARGIACOMO:  In my general experience,

8   medical records can range, depending on how large the record

9   is and how many providers you have to get records from, it

10  can range from $15 to $150, depending on the individual.

11          THE COURT:  And what's the average recovery?

12          MR. NOTARGIACOMO:  I don't know what the average

13  recovery is, your Honor.  It depends from settlement to

14  settlement.

15          THE COURT:  Well, is he correct that it could cost

16  more to get the medical records than to actually recover?

17          MR. NOTARGIACOMO:  Well, it depends on which kind

18  of consumer.  We have Class 1 consumers, they don't need to

19  get any medical records.  We're going to get that

20  information from CMS.

21          THE COURT:  All right, so this is useful.  So

22  yours is the Class 3 consumers?

23          MR. LANDRIGAN:  Just the Class 3 consumers.

24          THE COURT:  Good, thank you.

25          MR. NOTARGIACOMO:  So for Class 3 consumers, there

1   is an option in the settlement.  If a consumer feels that it

2   would cost them more to get records than it really is worth

3   their time and effort that they're going to receive in

4   monetary recovery, there's an option for them to receive a

5   flat payment, as long as they can certify under penalties of

6   perjury that they have made percentage copayments.

7           THE COURT:  And how much would they get?

8           MR. NOTARGIACOMO:  We believe they'd be getting,

9   depending on how many claims we receive, we believe they

10  would receive $35.  That's the goal.  It's possible that we

11  may be, you know, after all is said and done, we may be able

12  to increase that amount; but we can't promise people an

13  amount that ultimately we can't deliver because there's not

14  enough money to go around.

15          THE COURT:  So she's a Class 3 person?

16          MR. LANDRIGAN:  She is, your Honor.

17          THE COURT:  So have you got any -- is this a

18  personal problem for her?

19          MR. LANDRIGAN:  Well, I would think it would apply

20  to anybody that falls into that category of the --

21          THE COURT:  It's the first time I've come up with

22  the issue, so I'm thinking out loud, what's the solution,

23  because potentially it could swamp the entire Class 3.

24          MR. LANDRIGAN:  Well, that's not the intent here,

25  your Honor, but there would be others who would be in that

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    same position who don't have the access to information

2    through the Medicare system, who have to go out and get

3    their own billing records going back to 1997, I think it is;

4    and they're eligible, as it is under the proposed

5    settlement, up to three times the recovery under Class A and

6    one time for Class B drugs.

7              THE COURT:  So what's the solution?

8              MR. LANDRIGAN:  Well, the solution would be to add

9    some funds to the settlement to facilitate people in this

10   class obtaining some medical records.  Probably --

11             THE COURT:  But help me out.  I mean, if it's

12   true, it's true of everybody.  If I gave everybody -- so I'm

13   trying to work this through -- $50 to $150 to get records,

14   it could be potentially that's all could be in the class.

15   Have you done out the math?

16             MR. LANDRIGAN:  I don't know how many people are

17   in the class, your Honor.

18             THE COURT:  How many people?

19             MR. NOTARGIACOMO:  We don't have accurate records

20   of how many people total are in the class.  It could be

21   millions of people.

22             THE COURT:  So does it make more sense to just

23   increase the amount that somebody just gets by putting in an

24   affidavit, and so that there's no need to go back and get

25   medical records?  Is that a better practical solution?  How

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1   much is in Class 3, how much money?

2           MR. LANDRIGAN:  $21.8 million, I'm told, your

3   Honor.

4           MR. NOTARGIACOMO:  $21.8 million for both Class --

5           THE COURT:  Somebody's here from the consumers',

6   right, point of view?  What do you think?

7           MR. SUGERMAN-BROZAN:  Well, your Honor, I

8   believe that -- Alex Sugerman-Brozan for Prescription Access

9   Litigation -- I believe that defendants' counsel and the

10  parties took account of this difficulty by instituting a

11  mechanism whereby a consumer claimant could get a flat

12  payment of $35.  Honestly, I don't know whether --

13          THE COURT:  How much do they get in Class 1 as a

14  class payment?

15          MR. NOTARGIACOMO:  There's no provision for a flat

16  payment because those records are going to come from CMS.

17  They don't have to do anything but review them.  If they

18  have some quarrel with the records as they receive them from

19  CMS, there's a mechanism by which they can let that be

20  known.  But if they agree with what the data shows from CMS,

21  they need do nothing more; their claim will be calculated,

22  and a check will be mailed.

23          THE COURT:  Well, can I go back to you as an

24  objector.  Would there be any way that most consumers would

25  know how much it was without going back and getting the

1   records?

2          MR. LANDRIGAN:  I would think it would be

3   difficult, given the time frame.

4          THE COURT:  See, the issue really is, if everybody

5   is costing $150, is it better to just give everybody a flat

6   $150 rate?  Would there be enough money in that pot?  Do you

7   know?

8          MR. NOTARGIACOMO:  It's impossible to know because

9   I don't know ultimately how many claims we're going to have,

10  so I don't know, you know --

11         THE COURT:  We've always had extra.  See, that's

12  the problem we run into at the end of the day.

13         MR. NOTARGIACOMO:  Well, your Honor, I would

14  suggest that if we do have extra, we'll have those records,

15  we'll know who got the flat payment, and if there is extra,

16  and I haven't gone over this with defendants, but --

17         THE COURT:  But how could we work this?  We could

18  see how many claims are actually submitted, and then see if

19  there's enough money to reimburse people who put in for a

20  hardship in not being able to get the records, and create

21  some sort of payment mechanism.  In other words, sir, as an

22  objector, you've got to help me here a little bit.  It's not

23  so transparent what the right answer is.

24         So suppose we were to say that -- you don't care,

25  right, as long as the amount of the fund is capped?

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    MR. BARLEY:  That's correct, your Honor.

2    THE COURT:  You don't care.  And as I understand

3 it, you're not objecting to the amounts we're talking about.

4 You want to help people who may have only $60 worth of a

5 copay not to -- you know, it's more than the $35 flat, but

6 it's going to cost $150 to get the records to prove it.

7    MR. LANDRIGAN:  That precisely the issue, your

8 Honor.

9    THE COURT:  Because if it's going to be $1,000,

10 the $150 is more than worth it.  So tell me about your

11 client so that maybe we have an idea of what the issue is.

12    MR. LANDRIGAN:  Your Honor, she has, I am told --

13 I'm filling in for counsel in Texas who asked me to take

14 this for him -- she has records of some payments but not all

15 the records, and it goes back to the 1997 time frame.  And

16 she and others in her position, it would be incumbent upon

17 them, according to the terms of the proposed agreement,

18 proposed settlement, to get records justifying or

19 substantiating any claims that they intend to make.  Some of

20 these claims, as I say, the Class A claims could be treble

21 damages, so it might be worth their time to do this.  But

22 they don't know exactly what they're going to get, and they

23 don't know how much it's going to cost them to get records,

24 so it's kind of a shot in the dark here for them.

25    THE COURT:  Would it be acceptable to you if we

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    allowed somebody to petition for a severe hardship, that

2    they couldn't pay to get the records?  And if there's funds

3    left over, essentially the person would be reimbursed pro

4    rata kind of thing, depending how many people put in for it?

5              MR. LANDRIGAN:  I would say "yes" except that some

6    people might be dissuaded from even trying to apply, given

7    that they'll --

8              THE COURT:  Well, you need to help me here a

9    little.  So remind me what the settlement is.  I'm going to

10   get to the deadlines in a minute, but it's a fair point, and

11   it's why -- so it's a fair point that if somebody is going

12   to have to spend $150 to get the records, they're not going

13   to bother putting in for it, if in fact, you know, they only

14   have $150 in damages or $300 in damages, right?

15             MR. NOTARGIACOMO:  I understand the point, your

16   Honor.  I think that the solution may be to see what we have

17   left at the end of the day.  As you say, there's always

18   money left over, and that may or may not be true, given some

19   of the aggressive methods we have for trying to seek direct

20   mail notice.

21             THE COURT:  Well, remind me because I've got so

22   many of these settlements.

23             MR. NOTARGIACOMO:  With respect to Class 1 --

24             THE COURT:  No, just Class 3.

25             MR. NOTARGIACAMO:  With respect to Class 3, we

1   have obtained data from the ISHPs, data from their computers

2   identifying potential Class 3 members, and we will be

3   mailing direct mail notice to those Class 3 individuals.

4   We've also done Internet banner ads --

5               THE COURT:  I wasn't clear.

6               MR. NOTARGIACOMO:  I'm sorry.

7               THE COURT:  So in Class 3, I just don't remember

8   how it happened.  So let's assume that you were in my

9   heartland area, you'd get what, triple?

10              MR. NOTARGIACOMO:  You would get triple damages

11  for Class A drugs.  Those are the name-brand drugs.

12              THE COURT:  Okay.  And then --

13              MR. NOTARGIACOMO:  On the bookends, as we call

14  them, you would get single damages for all class of drugs,

15  Class A and Class B.

16              THE COURT:  So do we have any idea, with respect

17  to any of this, how many claimants we might have based on

18  prior cases?

19              MR. NOTARGIACOMO:  It's not -- it's apples and

20  oranges, your Honor.  It's difficult to say that because in

21  GSK we had 14,000 claims, that we're going to have, you

22  know, the same number of claims in this settlement because

23  we're doing things differently by way of notice.

24              THE COURT:  Suppose -- the flat pay is whether or

25  not the bookend groups are in the heartland group?

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1          MR. NOTARGIACOMO:  Irrespective of whether --

2          THE COURT:  Well, what if you were to have for the

3    triple group three times $35?  That would take care of

4    basically people who are heartland, but it may well cost

5    this amount of money, so it wouldn't be a disincentive to

6    them.  They could just pick up the $105 or something like

7    that which is a larger amount, and they can make that

8    trade-off.  And then at the end, if there were extra moneys,

9    we could deal with maybe a financial aid package, if there

10   was some extra money.  Does that make some sense?  Is that

11   feasible?

12          MR. NOTARGIACOMO:  It makes some sense.  The only

13   problem I see with that, your Honor, is that certain notice

14   has already gone out on the airwaves; and certain people,

15   you know, consumers in Class 3, would have seen that notice,

16   and it doesn't say anything about tripling that $35.  So

17   unless we want to redo that notice to tell people that --

18          THE COURT:  Well, you need to help me because it's

19   not a terrible point.  I hadn't thought of it, and it didn't

20   to come up at the preliminary approval, and in a final

21   approval, if we wanted to take care of the point, I need

22   some creative thought here.

23          MR. NOTARGIACOMO:  And I'm happy to provide that,

24   your Honor.  It's not something that, frankly, I've had a

25   chance to really work through, given the complexities of

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    this settlement.  I'd be happy to put my mind to it and --

2          THE COURT:  I suppose, since I'm not doing the

3    final one today, what I -- I didn't -- you know, I find that

4    Hagens Berman has been doing this a lot to me lately, which

5    is, two days before the hearing you cancel, you move to

6    cancel.  I think that's a terrible idea because I've got the

7    notice out over the entire country that this is going to be

8    my day, and I'm not going to do it.  It keeps coming up, so

9    make sure you tell them.

10          MR. NOTARGIACOMO:  I will, message received, and I

11   will bring it back --

12          THE COURT:  I don't want -- you know, not two days

13   before, not three days before, because then it feels like

14   there might be people out there who want to say something.

15          Can I make this suggestion:  You work with counsel

16   and see if there's a solution, so it's not a fait accompli

17   when I come in here for the final approval because I

18   obviously can't do it today because notice didn't go out to

19   everybody.  And maybe there's a way that we can take care of

20   a group of people who fall in the category of, it's not a

21   big enough sum that they'd likely be seeking that it is

22   worth the expenditure and the effort and the anxiety of

23   going out and trying to find these records.

24          MR. LANDRIGAN:  I will do that, your Honor.

25          THE COURT:  And maybe it's a way of tripling it.

1  Maybe it's a way of a scholarship at the end, because

2  typically we have had some left over, if people have spent

3  that much.  Or possibly what I do in securities fraud cases,

4  which is not the exact same, is that we allow, if there's

5  any kind of documentation that struck someone as reasonable

6  as an estimate of what someone paid, to accept an affidavit

7  as an estimate.  It's only if we doubted, we thought it was

8  a fraud -- you know, unfortunately there have been

9  increasing amounts of fraud in these kind of cases -- you

10  know, if there's no paper documentation at all or some

11  concern about it, that we could require someone to go back

12  in and get the paperwork.  So there are other ways of trying

13  to do this without making someone go through both the effort

14  and the dollar issues.  And then maybe we could have like a

15  scholarship fund at the back end, if in fact you could prove

16  you fall in this gray area where it wouldn't have been worth

17  it.  So could you all talk --

18          MR. LANDRIGAN:  Yes, your Honor.

19          THE COURT:  -- and within the next -- I know it's

20  Christmas -- can we say within 30 days come up with a set of

21  proposals on how to address this?  I'm very glad you came in

22  today.  Is there anyone else -- that's the objection, right?

23          MR. LANDRIGAN:  That is the essence of the

24  objection, yes, your Honor.

25          THE COURT:  Is there anyone else who has an

1   objection?  Have you heard of any other objections?

2          MR. NOTARGIACOMO:  There are three letters of

3   objection and one on behalf of Patricia Weatherly which my

4   brother just mentioned.

5          MR. LANDRIGAN:  Your Honor, that letter was

6   incorporated into the objection I'm presenting here today.

7          THE COURT:  All right.

8          MR. LANDRIGAN:  One and the same.

9          MR. NOTARGIACOMO:  There is also an objection

10  filed by class member James Wilson.

11          THE COURT:  Saying?

12          MR. NOTARGIACOMO:  I have to review it, your

13  Honor.  It's rather vague as to the exact reasons for the --

14  it says, "The settlement is not adequate and not

15  reasonable."

16          THE COURT:  Who signed it?  Pro se?

17          MR. NOTARGIACOMO:  James King of Offerman & King

18  in Beaumont, Texas.

19          THE COURT:  Is he here at all?  Is he an attorney

20  that says that?

21          MR. NOTARGIACOMO:  Yes, your Honor.

22          MR. LANDRIGAN:  Your Honor, if I may, he called me

23  yesterday out of the blue.  I knew nothing of this, and I

24  told him that it would not be in my client's interest to try

25  to represent his client at the same time in the same

1    setting.  All I know is, I've read it, it's an objection to

2    attorneys' fees, and I think that's the sum and substance of

3    it.

4              THE COURT:  Why don't you give it to us.  I didn't

5    come in here with a plan of resolving it today.  On the

6    other hand, I would like to know what the objections are so

7    that they could be worked out, since we are going to end up

8    having to extend some of the deadlines.  Is there anyone

9    here opposing the extension of the deadline?

10             MR. NOTARGIACOMO:  I apologize, these copies have

11   my own highlighting on them.  The third one is from

12   Mr. Haviland on behalf of --

13             THE COURT:  Is this an attorneys' fees issue?

14             MR. NOTARGIACOMO:  Mr. Haviland's letter is sort

15   of soup to nuts.  It's attorneys' fees and reasonableness

16   and lots of other issues.

17             THE COURT:  So the more time would be helpful for

18   you too, right?  So let me go through each one of these.

19   One is the need for some help for the bills, so you'll talk

20   about that.

21             The second is, "Class members should be afforded

22   more time to redeem their benefits."  Well, that's basically

23   going to happen under this.

24             The third is -- and as I'm thinking aloud, maybe

25   somebody can put in an affidavit about what kind of effort

1    it would be and what kind of expense and an estimate of how

2    much they think they're owed, and we could leave it to the

3    claims administrator as to whether that's a fair amount.  I

4    mean, that would be another way of handling this, unless

5    there were some red flags around a fraud.

6              Is it true that the precise amount of each

7    released company's contribution towards settlement is

8    confidential?

9              MR. NOTARGIACOMO:  That is true, your Honor.

10             THE COURT:  What's the problem with that?

11             MR. MORGAN:  Your Honor, this is Peter Morgan for

12   Baxter.  The confidentiality of each individual defendant's

13   contribution was part of the whole way it was negotiated

14   before and under the auspices of Professor Greene, and that

15   was one of the devices we talked about (Inaudible) put in

16   various amounts of money.  Our perspective -- and we have

17   case law to support it, and we're happy to submit

18   something -- it shouldn't matter to class members, it should

19   be neutral to class members if the total amount of the

20   package is fair and reasonable under Rule 23, and we have

21   case support for that.

22             THE COURT:  Well, the point really was -- right

23   now, I could care less, but suppose -- is the money already

24   in a pot so that it's protected in case -- in this wonderful

25   economic environment, is it protected right now?

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1          MR. MORGAN:  It is not, your Honor, but that would

2    have been the same as if there were one defendant.

3          THE COURT:  Yes, but I'm continuing it for six

4    months, or at least that's what the proposal is.  I don't

5    know if I'm going to go that far.  So is there a way of

6    having everyone put that money in a pot and have it be

7    protected?

8          MR. MORGAN:  Well, I can only speak for one

9    company, so we would need to confer, but obviously that's

10   the only concern there would be, would be the security.

11         Now, let me point out one thing, your Honor.

12   Unlike a settlement, as you know, that goes on for ten years

13   or five years that involves claims over time, this is going

14   to be one date certain we're going to put the money in and

15   it will all be there.  So there shouldn't be any concern

16   about the program over the life of the program.  It will be

17   very simple.  But at the moment, we're supposed to put the

18   money up upon final approval, but obviously --

19         THE COURT:  Well, but you were expecting that

20   today.  What if we put it in an escrow account in the court,

21   if we're going to continue it six months?  If it's only a

22   month or two, I don't really care so much, but six months is

23   a long time and the economy is horrible.  So maybe is that

24   something that you could consult with everyone and find out

25   what it is you can do?

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1        MR. MORGAN:  Yes, your Honor.

2        THE COURT:  And then -- no, I think Paragraph 4 is

3   not correct.  I don't understand your Paragraph 5, sir.

4        MR. LANDRIGAN:  Well, your Honor, that's part of

5   the unknown that each person -- that's why this relates back

6   in a way to the cost of the medical records.  If people

7   don't know what they're going to get, why would they spend

8   money on medical records?

9        THE COURT:  Well, no, they get $35 if they don't

10  want to bother, at least under the way it's written now; or

11  they can get, if they submit medical records, as much as

12  it's worth, you know, divided up into the pot.  So I don't

13  know that I agree with that.  I do agree that there's some

14  concern of disincentive if in fact you -- I do agree with

15  your initial point.

16        Attorneys' fees, when are you going to submit

17  your --

18        MR. NOTARGIACOMO:  I have a proposed schedule.  We

19  would submit them on March 2 along with all the other

20  materials in support of final approval.

21        THE COURT:  When is my hearing?

22        MR. NOTARGIACOMO:  April 15 or later, depending on

23  the Court's schedule.

24        THE COURT:  So on the attorneys' fees, I've been a

25  little concerned based on what I've heard on some of the

1    other attorneys' fees things.  It should only be the

2    attorneys' fees that's fairly attributable to Class 2.  So

3    when you do the application, are you planning on a

4    percentage of this pot of money?

5              MR. NOTARGIACOMO:  I believe that's what we plan.

6              THE COURT:  Okay, so when you do the lodestar, it

7    should be what are the hourly rates, and what is the time

8    that's fairly and reasonably attributed to this class?

9              What about expenses?

10             MR. NOTARGIACOMO:  I assume we would also put in

11   for reasonable litigation expenses associated with --

12             THE COURT:  This class.

13             MR. SOBOL:  -- this class.

14             THE COURT:  You know, I understand the

15   complications.  Maybe seven years ago when you started this

16   you weren't thinking this way, but at the end of the day,

17   I've noticed in one of the other attorney's bills things,

18   the way it was done was divvied up by just up to a certain

19   date rather than allocated to the different -- that's how

20   you distribute it to the different counsel involved?  It

21   should be based on this class.  And to the extent that

22   there's overlapping issues, I suppose we can discuss that,

23   but it shouldn't be having anything to do uniquely with any

24   of the other defendants.  This case, I don't know how much

25   happened unique to this as opposed to that was crosscutting.

1    I don't remember, but I think of this as unique enough that

2    it shouldn't be so hard to allocate when I do the lodestar,

3    because what's the overall amount, settlement amount?

4              MR. NOTARGIACOMO:  125, your Honor.

5              THE COURT:  So what are you looking for, one-third

6    or 30 percent?

7              MR. NOTARGIACOMO:  I believe -- I'd have to

8    check -- I believe it says here up to 30 percent.  I'm not

9    sure we're going to ask for 30 percent.

10             THE COURT:  And then expenses are in addition?

11             MR. NOTARGIACOMO:  That's correct.

12             THE COURT:  So were there any other big issues,

13   sir?

14             MR. LANDRIGAN:  No, your Honor.  Again, it's the

15   cost of the medical records that we see as the disincentive.

16             THE COURT:  Yes, that's the driver here.  I

17   understand that.

18             And then James Wilson. . .all right, so that's

19   primarily about attorneys' fees.  And so there's the new

20   deadline for filing objections, right, as well?

21             MR. NOTARGIACOMO:  There will be, your Honor.

22             THE COURT:  He objects to the lack of adequate

23   consumer representatives.  Have those been added?  I don't

24   know what he's referring to.

25             MR. NOTARGIACOMO:  I'd have to check, your Honor.

1   I know there was discussion about that, and we were going to

2   file -- I believe we still have to file an amended complaint

3   with the consumers.

4           THE COURT:  When can that be done?

5           MR. BARLEY:  My recollection is that they

6   identified a consumer representative, but the complaint

7   hasn't been formally amended to add that person as a party

8   at this time.

9           THE COURT:  Who represented the consumers, the

10  Class 1 consumers in the settlement?

11          MR. NOTARGIACOMO:  I'd have to check, your Honor.

12  I don't know as I stand here.

13          THE COURT:  Was there a separate attorney for the

14  Class 3?

15          MR. NOTARGIACOMO:  I don't believe there was a

16  separate attorney for Class 1 and Class 3.  Again, I'd have

17  to go back and check.

18          THE COURT:  You typically have done that, but if

19  not, what I want is somebody to look at that to make sure

20  that within the amount that they're talking about, it's a

21  fair allocation, especially since there's been no consumer

22  rep.

23          MR. SUGERMAN-BROZAN:  Are you asking about the

24  representation for purposes of allocation?

25          THE COURT:  Well, here's the issue, which is that

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    there's been no class rep separately representing the

2    consumers, and if there's been no class counsel --

3              MR. SUGERMAN-BROZAN:  Separate from whether or not

4    an individual member of the class was representing us as a

5    class representative for Class 1, there were -- and I'm not

6    sure that you're asking about this as well -- there were

7    counsel separately appointed to represent consumers and

8    third-party payors strictly for purposes of allocation.

9              THE COURT:  Oh, that's just what I'm asking.  Oh,

10   so there were.

11             MR. SUGERMAN-BROZAN:  Yes.

12             MR. NOTARGIACOMO:  I thought you meant as between

13   Class 1 and Class 3.

14             THE COURT:  No, no, just --

15             MR. NOTARGIACOMO:  Consumers.

16             THE COURT:  Yes.

17             MR. SUGERMAN-BROZAN:  There were two attorneys

18   appointed to represent consumers for the purposes of

19   allocation.  I was one of those.

20             THE COURT:  Yes, and who's the other one?

21             MR. SUGERMAN-BROZAN:  I believe his name was

22   Jeffrey Goldenberg.

23             THE COURT:  Okay, thank you.

24             So when are you going to add those class

25   representatives?

1        MR. NOTARGIACOMO:  Before the end of the year

2    we'll file the amended complaint or leave to file amended

3    complaint.

4        THE COURT:  And, ideally speaking, you will

5    respond to the objections.

6        MR. NOTARGIACOMO:  I would assume that we would

7    respond to all the objections at the same time according to

8    the new proposed schedule or whatever schedule your Honor

9    enters.  I assume that we may get some additional objections

10   in addition to these three, so I would prefer to respond to

11   all of them at the same date rather than --

12       THE COURT:  Yes, but some of them might be able to

13   be fixed, like this issue of people spending too much money

14   on medical records.  Some of them could be fixed.  It could

15   just be as simple as if people call up or come in and it's

16   too expensive to get it, create an alternative mechanism.

17   We've done that in securities fraud cases, so -- and I think

18   Mr. McGovern has done some sort of claims-made kinds of

19   opportunities for folks, so, you know, we could possibly --

20   now, let me go back to the way you want to amend this thing

21   because there are all sorts of different deadlines.

22       MR. NOTARGIACOMO:  Basically, your Honor, it

23   pushes the deadlines out approximately four and a half

24   months each.  We tried to maintain a parallel structure in

25   relationship to the various dates.

0da6df68-2af0-4510-a9de-c67d8f1fe33a

1    THE COURT:  And how are you going to let all the

2    consumers and third-party payors know that these deadlines

3    have been extended?

4    MR. NOTARGIACOMO:  Well, with respect to

5    third-party payors, our filing on December 9 also included a

6    proposed letter to go to the third-party payors to fix or to

7    clarify the list of drugs that are involved in the

8    litigation.  So that letter would go to all the third-party

9    payors, and it would have a new date for the final approval

10   hearing.  So third-party payors would all get direct notice.

11   The notice that would be going out to the Class 3 consumers

12   as well as the Class 1 consumers would have -- the direct

13   mail notice would all have the new date, so they would all

14   get direct mail notice of the new date.  And for anyone else

15   who was interested and didn't happen to get direct mail

16   notice, you know, we will change the Web site and make it

17   clear in a big red box that there's a new schedule, "Click

18   here for the new schedule."

19   THE COURT:  Do you have the lists of everybody

20   who's contacted you from Class 3 consumers so that you could

21   recontact them with the new date?

22   MR. NOTARGIACOMO:  I don't have that list, but

23   Complete Claim Solutions has the list of contact people from

24   either class.

25   THE COURT:  So you'll send out to anyone who's

1  contacted you.

2          MR. NOTARGIACOMO:  We can do that.

3          THE COURT:  You know, that didn't file a claim,

4  letting them know that -- can anyone think of any other way

5  short of -- because we don't have their addresses, there's

6  no way of immediately getting to them, so that's the best

7  we're going to do.

8          So where does it say here that you respond to the

9  objections on March 16 to the settlement, so just within the

10  two weeks one normally gets under the rule?

11          MR. NOTARGIACOMO:  I guess we don't have a

12  separate date.  There is a notice of intention to appear at

13  the fairness hearing, and that's the proposed --

14          THE COURT:  And so two weeks later, March. . .so

15  you file your petition for attorney's fees on March 2.  I

16  think that gives people enough time to object to them by

17  March 16, and then two weeks later -- so that makes it what,

18  March 30?

19          MR. NOTARGIACOMO:  Yes, your Honor.

20          THE COURT:  -- you'll file any opposition.

21          MR. NOTARGIACOMO:  Would your Honor like to have a

22  revised order with the specific delineation of that date?

23          THE COURT:  Yes, but why do you have here "Filing

24  and service of appearance of counsel at fairness hearing"?

25  What is that?

1          MR. NOTARGIACOMO:  That just parallels what was in

2    the original proposed order, your Honor.  Just that some

3    people file objections and you never hear anything, they

4    don't intend to actually show up.

5          THE COURT:  Yes, but you have them doing that on

6    March 16, so I'm not sure you need that.  "Notice of

7    intention to appear at fairness hearing," blah-blah-blah, so

8    I don't think you need that date, okay, so we'll X that out.

9          Final approval hearing, Robert, I just want to

10   make sure it's not school vacation week for me, and then

11   Massachusetts has Patriots Day, so maybe --

12         THE CLERK:  I'm not sure I have the 2009 calendar

13   here.

14         THE COURT:  April 10, does that make more sense?

15         (Discussion off the record between the Court and

16   Clerk.)

17         THE COURT:  We'll make it April 7.  When's Easter?

18   Wait a minute.  All right, Easter is the 12th.  And I don't

19   know if school vacation is the week of the 12th or the 19th,

20   so we can make it either the week of the 5th or the week of

21   the 26th of April.  Do you have any strong preferences?

22         MR. NOTARGIACOMO:  A number of individuals,

23   including myself, will be involved in a trial in early

24   April.  That's why we --

25         THE COURT:  All right, why don't I make it

1  April 26 in the afternoon.

2          MR. NOTARGIACOMO:  The 26th, your Honor, not the

3  27th?

4          THE CLERK:  It's a Sunday.

5          THE COURT:  That's not a good day.  April 27,

6  okay?

7          MR. NOTARGIACOMO:  At 2:00 p.m., your Honor?

8          THE COURT:  Fine.

9          THE CLERK:  Sounds good.

10          THE COURT:  Is there anything else anyone can

11  think of right now?  So you are going to give me a revised

12  order.  I've allowed the motion for extension of schedules.

13  Are you absolutely certain at this point that you will have

14  all the appropriate information from the Centers for

15  Medicare and Medicaid Services?

16          MR. NOTARGIACOMO:  I've spoken to everyone, and

17  everyone tells me that I will.

18          THE COURT:  Because I don't want to do this again.

19          MR. NOTARGIACOMO:  Understood.

20          THE COURT:  And I won't cancel these hearings.

21          MR. NOTARGIACOMO:  And we will push as hard as we

22  can to make sure that we don't have to do it.

23          THE COURT:  And the issue that I have is the

24  escrow issue.  That's a long way out.

25          MR. BARLEY:  I'll speak with our clients, your

0da6df68-2af0-4510-a9de-c67d8f11e33a

1    Honor.  I just can't represent right now without talking to

2    my clients.

3                THE COURT:  As far as I'm concerned, it can be

4    under all your attorneys' names.  I mean, it's not that I

5    need it in the court.  In fact, I prefer not to have it in

6    the court; just so that if anything happens in terms of

7    bankruptcy filings or whatever, that this is protected

8    money.

9                MR. BARLEY:  We understand.

10               THE COURT:  Okay.  So you should put it -- I mean,

11   I don't need it -- in interest-bearing.  I would say you

12   should invest it, except God only knows what you'd invest it

13   in.

14               (Laugher.)

15               THE COURT:  You know, put it in gold, so maybe

16   spread it out to -- how much is the FDIC insuring funds for

17   these days?

18               (Laughter.)

19               MR. BARLEY:  I have a very large mattress, your

20   Honor.  I'm happy to supply that.

21               THE COURT:  So just to protect that money.  Who

22   would have ever thought we would even be talking this way,

23   but. . .  Oh, and you should add that within 30 days you're

24   going to -- was that what we said for class reps?

25               MR. NOTARGIACOMO:  Yes, your Honor.

0da6df68-2af0-4510-a9de-c67d8f11fe33a

1        THE COURT:  That's what we said.  And if there are

2   any oppositions, they would have to come in in an

3   appropriate time frame.

4        What I'm really most worried about is, I don't

5   have a clean solution for the medical records issue, and I

6   do think it's -- I learned this from Professor McGovern:

7   You can't have too high a hurdle.  I had no idea it cost

8   that much to get medical records.  You could disincentivize

9   people.  So, I mean, would you be satisfied if there was

10  some documentation and an estimate for the rest, that that

11  would be enough to --

12       MR. LANDRIGAN:  I think we could work towards

13  that, your Honor, but --

14       THE COURT:  Yes, work towards something like that

15  because -- does anyone have a problem?  I am concerned that

16  I hear about these stories of fraud.  Maybe if it's only up

17  to a certain amount, you don't have to get records.  That

18  would be another solution.  Like, if it's whatever the --

19  let's say up to $300 worth, you wouldn't have to get records

20  because it wouldn't be worth the hassle and the amount?  In

21  other words, there are ways we could calibrate this, and

22  over that amount you would have to get records?  I mean,

23  there are ways -- maybe you'd work with Prescription

24  Access -- that we could do this.

25       MR. NOTARGIACOMO:  I'm sure we can come up with

0da6df68-2af0-4510-a9de-c67d8f1fe33a

Page 33

1    some creative solutions, your Honor.  My only question is

2    that the more complicated and complex we make it, the more

3    you tend to drive people away, they don't understand it.  So

4    whatever solution we come up with has to be relatively

5    simple.

6                 THE COURT:  That's why I'm looking to all of you.

7    My goal is not to create a disincentive for someone to

8    apply.  I don't remember all these.  They're not as old and

9    geriatric as my last set of classes, you know, because most

10   of those were old cancer drugs, tended to be older and

11   sicker.  These are things that are more -- right, could be

12   anybody?

13                MR. NOTARGIACOMO:  They range -- there's a number

14   of drugs.  Some of them are cancer.  Some of them have

15   nothing to do --

16                THE COURT:  That's exactly right.  So thank you

17   very much.  Have a wonderful holiday.

18                MR. NOTARGIACOMO:  Thank you, your Honor.

19                THE COURT:  No one else wants to be heard?  Great.

20   Thank you.

21                MR. BARLEY:  Your Honor, happy holidays.

22                THE CLERK:  Court is in recess.

23                (Adjourned, 2:45 p.m.)

24

25

1                     C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8    Reporter, do hereby certify that the foregoing transcript,

9    Pages 1 through 33 inclusive, was recorded by me

10   stenographically at the time and place aforesaid in Civil

11   Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

12   Average Wholesale Price Litigation, and thereafter by me

13   reduced to typewriting and is a true and accurate record of

14   the proceedings.

15          In witness whereof I have hereunto set my hand

16   this 1st day of January, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
            _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25