# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>Master File No. 01-CV-12257<br>Subcategory Case. No. 06-11337 |
| THIS DOCUMENT RELATES TO:<br>*U.S. ex rel. Ven-A-Care of the Florida Keys,*<br>*Inc. v. Dey, Inc., et al.*<br><br>Civil Action No. 05-11084-PBS | Hon. Patti B. Saris |

**DECLARATION OF DAMON SUDEN IN SUPPORT OF DEFENDANTS DEY, INC., DEY, L.P., AND DEY L.P., INC.'S REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO EXTEND THE PRODUCTION DEADLINE FOR THE LIMITED PURPOSE OF RECEIVING MEDICAID CLAIMS DATA FROM STATES**

**DAMON SUDEN** declares, pursuant to 28 U.S.C. § 1746, that:

1.     I am associated with the law firm of Kelley Drye & Warren LLP, counsel to Dey, Inc., Dey L.P., Inc., and Dey, L.P. (collectively "Dey"). I am admitted to practice law in the State of New York and have been admitted *pro hac vice* in this action.

2.     I make this Declaration in support of Dey's Motion to Extend the Production Deadline for the Limited Purpose of Receiving Medicaid Claims Data From States.

3.     The basis for my knowledge is my review of the files maintained by Kelley Drye & Warren LLP as part of its representation of Dey, including the documents attached hereto, information supplied by other attorneys of Kelley Drye & Warren LLP representing Dey, and my own personal knowledge of the facts and circumstances.

4.     Attached hereto as Exhibit A are two tables which show MAX/SMRF and state claims data for claims submitted to Illinois for Albuterol NDC 49502069703 on June 5, 2002.

5.     The first page of Exhibit A contains the Illinois state claims data. The Illinois state claims data includes 82 records. The first seven columns on this page show excerpts of the data as it was provided. The final two columns show the ingredient cost and unit ingredient cost derived from analysis of the provided data.

6.     The unit reimbursement amount derived from analysis of the state claims data corresponds to several values that can be matched to payment bases.[1]

7.     The second page of Exhibit A contains MAX/SMRF data. This data includes only 71 records. The first five columns on this page show excerpts of the data as they appear in MAX/SMRF claims data.

8.     The MAX/SMRF data does not include the prescription number for each claim, so there is no way to match the records in the MAX/SMRF data to the records from the Illinois state claims data.

9.     The payment information for the MAX/SMRF data is rounded to the nearest dollar and does not contain dispensing fee or co-payment amounts.

10.    The columns labeled "Illinois Policy" list the then-current Illinois dispensing fee and copay, which were used to attempt an analysis of the ingredient amount and unit ingredient cost, shown in the final two columns.

11.    The unit ingredient amounts calculated from the available MAX/SMRF data do not agree with the state claims data and do not match any known payment bases.

12.    Attached hereto as Exhibit B is a true and correct copy of excerpts of the deposition of Jerry Wells dated May 25, 2004 at 454:7-458:17.

---

[1]     The claims basis for this NDC on this date are as follows: AWP less 20% equals 0.3226; FUL equals 0.1450; DOJ AWP equals 0.1223. Most claims shown on the first page of exhibit A (the state claims data) can be matched to FUL or DOJ-AWP within 0.25%.

13.     Attached hereto as Exhibit C is a true and correct copy of a fax from Mark S.
Thomas and Mary S. Miller dated June 29, 2006 providing the change in reimbursement for
Dey's drugs stemming from the alleged reimbursement formula error as calculated by the Florida
MFCU.

14.     Attached hereto as Exhibit D is a true and correct copy of excerpts of the
deposition of Lynn Donovan dated April 29, 2008 at 174:4-188:14.

15.     Attached hereto as Exhibit E is a true and correct copy of a document bates
numbered HHC016-0338 - HHC016-0343.

16.     Attached hereto as Exhibit F is a true and correct copy of excerpts of the
deposition of David Campana dated August 21, 2008 at 240:16-242:17.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6, 2009.

Damon Suden

# Exhibit A

Illinois state claims data for Albuterol NDC 49502069703 on 06/05/2002

| | State claims data | | | | | | Payment basis analysis | |
|---|---|---|---|---|---|---|---|---|
| Rx number | Billed amount | Paid amount | Quantity | Dispensing fee | Copay | Third party payment | Ingredient cost | Unit ingredient cost |
| 643484 | 16.55 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 361696 | 35.89 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 3458198 | 34.25 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 436357 | 52.7 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 944814 | 80.86 | 26.11 | 180 | 5.1 | 0 | 1 | 22.01 | 0.1223 |
| 887586 | 30.59 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 344532 | 31.59 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 6105840 | 15.98 | 12.46 | 75 | 5.1 | 0 | 0 | 7.36 | 0.0981 |
| 1053339 | 87.21 | 26.85 | 150 | 5.1 | 0 | 0 | 21.75 | 0.1450 |
| 111505 | 38.75 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 260574 | 92.99 | 31.61 | 225 | 5.1 | 0 | 1 | 27.51 | 0.1223 |
| 6640869 | 28.49 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 3448835 | 38.53 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 782121 | 41.65 | 15.98 | 75 | 5.1 | 0 | 0 | 10.88 | 0.1451 |
| 1008769 | 49.48 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 261468 | 149.17 | 54.85 | 350 | 5.1 | 0 | 1 | 50.75 | 0.1450 |
| 2926685 | 53.2 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 573858 | 29.52 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 643039 | 37.11 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 6020258 | 88.39 | 41.78 | 300 | 5.1 | 0 | 0 | 36.68 | 0.1223 |
| 111570 | 37.75 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 258571 | 61.59 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 1659005 | 87.21 | 26.85 | 150 | 5.1 | 0 | 0 | 21.75 | 0.1450 |
| 358820 | 87.21 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 362733 | 35.89 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 587405 | 21.12 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 6983840 | 14.05 | 14.05 | 75 | 5.1 | 0 | 0 | 8.95 | 0.1193 |
| 573948 | 29.52 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 2926684 | 53.2 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 6638900 | 48.6 | 58.67 | 300 | 5.1 | 0 | 0 | 53.57 | 0.1786 |
| 6759691 | 45.13 | 44.13 | 300 | 5.1 | 0 | 0 | 39.03 | 0.1301 |
| 44193 | 58.64 | 26.85 | 150 | 5.1 | 0 | 0 | 21.75 | 0.1450 |
| 6618589 | 157.26 | 49.95 | 375 | 5.1 | 0 | 1 | 45.85 | 0.1223 |
| 6839923 | 263.6 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 280923 | 57.3 | 70.09 | 360 | 5.1 | 0 | 0 | 64.99 | 0.1805 |
| 6105840 | 15.98 | 12.46 | 75 | 5.1 | 0 | 0 | 7.36 | 0.0981 |
| 498716 | 185.06 | 41.78 | 300 | 5.1 | 0 | 0 | 36.68 | 0.1223 |
| 1453992 | 37 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 491034 | 59.48 | 72.95 | 375 | 5.1 | 0 | 0 | 67.85 | 0.1809 |
| 3457532 | 39.36 | 6.65 | 75 | 5.1 | 0 | 7.62 | 9.17 | 0.1223 |
| 784659 | 42.65 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 1409638 | 37 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 6217236 | 36 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 6638900 | 48.6 | 58.67 | 300 | 5.1 | 0 | 0 | 53.57 | 0.1786 |
| 981635 | 15.98 | 16.83 | 75 | 5.1 | 0 | 0 | 11.73 | 0.1564 |
| 1147530 | 64.08 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 1453992 | 37 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 363020 | 45.08 | 10.86 | 75 | 5.1 | 0 | 5.12 | 10.88 | 0.1451 |
| 6115124 | 43.63 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 6614089 | 87.18 | 40.78 | 300 | 5.1 | 0 | 1 | 36.68 | 0.1223 |
| 799729 | 18.7 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 1008687 | 48.48 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 586569 | 61.59 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 536513 | 30.59 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 2511947 | 33.83 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 268425 | 22.2 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 280923 | 57.3 | 70.09 | 360 | 5.1 | 0 | 0 | 64.99 | 0.1805 |
| 1409638 | 37 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 8839923 | 263.6 | 13.27 | 75 | 5.1 | 0 | 1 | 9.17 | 0.1223 |
| 279538 | 111.69 | 40.78 | 300 | 5.1 | 0 | 1 | 36.68 | 0.1223 |
| 6271852 | 48.95 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 491034 | 59.48 | 72.95 | 375 | 5.1 | 0 | 0 | 67.85 | 0.1809 |
| 397359 | 30.59 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 573711 | 29.52 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 1476617 | 35.25 | 15.98 | 75 | 5.1 | 0 | 0 | 10.88 | 0.1451 |
| 643250 | 19.81 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 573660 | 29.52 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 786889 | 78.74 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 981635 | 15.98 | 16.83 | 75 | 5.1 | 0 | 0 | 11.73 | 0.1564 |
| 498721 | 48.96 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 44126 | 31.11 | 15.98 | 75 | 5.1 | 0 | 0 | 10.88 | 0.1451 |
| 6759691 | 45.13 | 44.13 | 300 | 5.1 | 0 | 0 | 39.03 | 0.1301 |
| 627987 | 16.55 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 1224665 | 49.34 | 15.98 | 75 | 5.1 | 0 | 0 | 10.88 | 0.1451 |
| 357365 | 33.84 | 15.98 | 75 | 5.1 | 0 | 0 | 10.88 | 0.1451 |
| 5007 | 56.9 | 18.77 | 120 | 5.1 | 0 | 1 | 14.67 | 0.1223 |
| 788717 | 41.65 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 322519 | 59.48 | 72.95 | 375 | 5.1 | 0 | 0 | 67.85 | 0.1809 |
| 322519 | 59.48 | 72.95 | 375 | 5.1 | 0 | 0 | 67.85 | 0.1809 |
| 573662 | 29.52 | 14.27 | 75 | 5.1 | 0 | 0 | 9.17 | 0.1223 |
| 2926394 | 53.2 | 23.44 | 150 | 5.1 | 0 | 0 | 18.34 | 0.1223 |
| 6135118 | 128.3 | 49.95 | 375 | 5.1 | 0 | 1 | 45.85 | 0.1223 |

Illinois MAX/SMRF data for Albuterol NDC 49502069703 on 06/05/2002

| MAX/SMRF data | | | | Illinois policy | | Payment basis analysis | |
|---|---|---|---|---|---|---|---|
| Billed amount | Paid amount | Quantity | Third party payment | Dispensing fee | Copay | Ingredient cost | Unit ingredient cost |
| 87 | 27 | 150 | 0 | 5.1 | 1 | 22.9 | 0.1527 |
| 35 | 16 | 75 | 0 | 5.1 | 1 | 11.9 | 0.1587 |
| 156 | 50 | 375 | 0 | 5.1 | 1 | 45.9 | 0.1224 |
| 59 | 27 | 150 | 0 | 5.1 | 1 | 22.9 | 0.1527 |
| 30 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 49 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 53 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 87 | 22 | 150 | 0 | 5.1 | 1 | 17.9 | 0.1193 |
| 185 | 42 | 300 | 0 | 5.1 | 1 | 37.9 | 0.1263 |
| 36 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 69 | 22 | 150 | 0 | 5.1 | 1 | 17.9 | 0.1193 |
| 127 | 50 | 375 | 0 | 5.1 | 1 | 45.9 | 0.1224 |
| 34 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 39 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 31 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 53 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 31 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 49 | 16 | 75 | 0 | 5.1 | 1 | 11.9 | 0.1587 |
| 31 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 88 | 42 | 300 | 0 | 5.1 | 1 | 37.9 | 0.1263 |
| 42 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 53 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 79 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 37 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 17 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 28 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 43 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 80 | 26 | 180 | 0 | 5.1 | 1 | 21.9 | 0.1217 |
| 34 | 16 | 75 | 0 | 5.1 | 1 | 11.9 | 0.1587 |
| 87 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 30 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 34 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 36 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 62 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 31 | 16 | 75 | 0 | 5.1 | 1 | 11.9 | 0.1587 |
| 48 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 49 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 42 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 20 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 111 | 41 | 300 | 0 | 5.1 | 1 | 36.9 | 0.1230 |
| 38 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 263 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 22 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 72 | 9 | 150 | 14 | 5.1 | 1 | 18.9 | 0.1260 |
| 32 | 7 | 75 | 7 | 5.1 | 1 | 9.9 | 0.1320 |
| 86 | 41 | 300 | 0 | 5.1 | 1 | 36.9 | 0.1230 |
| 62 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 30 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 38 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 42 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 52 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 37 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 17 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 42 | 16 | 75 | 0 | 5.1 | 1 | 11.9 | 0.1587 |
| 56 | 19 | 120 | 0 | 5.1 | 1 | 14.9 | 0.1242 |
| 20 | 13 | 75 | 0 | 5.1 | 1 | 8.9 | 0.1187 |
| 37 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 48 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 36 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 64 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 30 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 42 | 16 | 90 | 0 | 5.1 | 1 | 11.9 | 0.1322 |
| 19 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 40 | 11 | 75 | 5 | 5.1 | 1 | 11.9 | 0.1587 |
| 30 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 92 | 32 | 225 | 0 | 5.1 | 1 | 27.9 | 0.1240 |
| 87 | 27 | 150 | 0 | 5.1 | 1 | 22.9 | 0.1527 |
| 49 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 75 | 23 | 150 | 0 | 5.1 | 1 | 18.9 | 0.1260 |
| 31 | 14 | 75 | 0 | 5.1 | 1 | 9.9 | 0.1320 |
| 148 | 55 | 350 | 0 | 5.1 | 1 | 50.9 | 0.1454 |

# Exhibit B

IN THE CIRCUIT COURT OF THE
SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA
CASE NO. 98-3032A

THE STATE OF FLORIDA, ex rel,

VEN-A-CARE OF THE FLORIDA
KEYS, INC., a Florida
corporation, by and through
its principal officers and
directors, ZACHARY T. BENTLEY
and T. MARK JONES,

Plaintiffs,

vs.

BOEHRINGER INGELHEIM
CORPORATION; DEY, INC.; DEY,
L.P.; EMD PHARMACEUTICALS,
INC.; LIPHA, S.A. MERCK, KGaA;
MERCK-LIPHA, S.A.; SCHERING
CORPORATION; SCHERING-PLOUGH
CORPORATION; ROXANE
LABORATORIES, INC., and
WARRICK PHARMACEUTICALS
CORPORATION,

Defendants.

VOLUME 4
PAGES 419 - 617

_____

CONTINUED VIDEOTAPED
DEPOSITION OF:          JERRY WELLS

TAKEN AT INSTANCE OF:   The Defendants

DATE:                   May 25, 2005

TIME:                   Recommenced at 9:04 a.m.
                        Adjourned at 4:00 p.m.

LOCATION:               215 S. Monroe Street
                        Tallahassee, Florida

REPORTED BY:            SANDRA L. NARGIZ
                        Certified Realtime Reporter

ACCURATE STENOTYPE REPORTERS, INC.
2894 REMINGTON GREEN LANE
TALLAHASSEE, FL 32308   (850)878-2221

453

1  were blank.

2      Q   Any other changes?

3      A   I don't recall.  I don't think there were.

4      Q   And then you signed it -- did you meet with

5  Ms. Miller yesterday?

6      A   I did.

7      Q   Can you -- if you look at the affidavit, can

8  you tell us where the changes were that you made to the

9  first draft?

10      A   I think those were on page 2.

11      Q   Which paragraph?

12      A   I am checking.  On paragraph 7, that was -- I

13  am not looking at the original now.  I don't know what

14  was left blank and what was incorrect, but there was one

15  date that was incorrect and others that were just blank

16  because we didn't have the information at the time.

17  We've since got that and inserted what we believe to be

18  the correct dates there.  Then there was something in

19  paragraph 9 I think we also either corrected or

20  inserted.

21      Q   But you don't recall specifically what that

22  was?

23      A   Not looking at the original, I don't know what

24  it said originally, whether that was where the blank was

25  or if it just a question about a date and whether it was

ACCURATE STENOTYPE REPORTERS, INC.

454

1  one that was incorrect.

2       Q    Now you had previously submitted an affidavit
3  in this case and as I understand it, this amended
4  affidavit is changing some of the things that were in
5  that original affidavit, correct?

6       A    I think so.

7       Q    Let me show what we marked as Exhibit 7 in
8  your prior deposition session, which is your original
9  affidavit.

10          Let me direct your attention to paragraph 7 of
11  your new affidavit.  In the second sentence it says --
12  actually third sentence, "Pursuant to a legislative
13  change effective July 1, 2000, an additional test to
14  determine EAC was added.  Based on this legislative
15  change, EAC was the lower of average wholesale price
16  minus 13.25 percent, WAC plus 7 percent, the FUL, or
17  SMAC," S-M-A-C.

18          Now that's not entirely correct, is it?

19          MR. AZORSKY:  Object to the form.

20          MS. MILLER:  Object to the form.

21          THE WITNESS:  I don't know what's not correct
22      about it.

23  BY MR. ESCOBAR:

24       Q    You say that effective July 1, 2000, EAC was
25  the lower of AWP minus 13.25 percent, WAC plus 7

ACCURATE STENOTYPE REPORTERS, INC.

455

1    percent.

2            From July 1, 2000 to April 2002, WAC was not

3    in the logic, correct?

4        **A**    It was removed from the logic.

5        **Q**    Right.  So when you say in this sworn

6    affidavit that effective July 1, 2000, EAC was the lower

7    of AWP minus 13.25, WAC plus 7 percent, that's not

8    correct, is it?

9            MR. AZORSKY:  Object to form.

10           MS. MILLER:  Objection to form.

11           THE WITNESS:  That is correct.  That's what it

12       should have been.  The fact that we omitted that

13       from the logic doesn't change the fact that it

14       should have been there.

15   BY MR. ESCOBAR:

16       **Q**    Well, the affidavit doesn't say that it should

17   have been that.  It says that it was, right?

18           MR. AZORSKY:  Objection to the form.

19           MS. MILLER:  Objection to form.

20           THE WITNESS:  The affidavit says that it was.

21   BY MR. ESCOBAR:

22       **Q**    Right.  And to the extent the affidavit says

23   that from July 1, 2000 to April 2002, which I think is

24   when it was changed back, that WAC was one of the

25   elements for determining EAC, that is not correct, is

456

1  it?

2          MR. AZORSKY:  Objection to form.

3          MS. MILLER:  Objection to form.

4          THE WITNESS:  Would you like to have the

5      affidavit amended to reflect that point?

6  BY MR. ESCOBAR:

7      Q    It's not what I would like.  I am just trying

8  to establish that this affidavit as we read it, based on

9  the way it's set, is not entirely accurate, is it?

10         MR. AZORSKY:  You're mischaracterizing what

11     the affidavit says.  Objection to form.

12  BY MR. ESCOBAR:

13     Q    Do you agree with me that a reader of the

14  affidavit could conclude, based on what it says in

15  paragraph 7, that WAC plus 7 percent was part of the

16  pricing logic in 2000; if somebody just read that, it

17  would be logical to conclude that, right?

18         MS. MILLER:  Again, objection to form.

19         MR. AZORSKY:  Objection to form.

20         THE WITNESS:  They might conclude that.

21  BY MR. ESCOBAR:

22     Q    And that would not be correct, right?

23         MR. AZORSKY:  Objection to the form.

24         MS. MILLER:  Objection to form.

25         THE WITNESS:  That could be construed

ACCURATE STENOTYPE REPORTERS, INC.

457

1          incorrectly.

2     BY MR. ESCOBAR:

3          Q     Let's take a look at paragraph 10.

4                In the next-to-the-last sentence of

5     paragraph 10 of your amended affidavit, you state, "An

6     erroneous computer programming change inadvertently

7     deleted the WAC plus 7 percent reimbursement methodology

8     from the reimbursement system."

9                You see that?

10         A     I do.

11         Q     Who made the error, the computer programming

12    error?

13         A     I do not know.

14         Q     How do you know that there was an erroneous

15    computer programming change?

16         A     Because it was discovered that that logic had

17    been bypassed or marked out.

18         Q     Well, do you know whether that was -- the

19    removal of WAC was an error or a specific instruction

20    given to ACS?

21         A     I think that ACS contends that was their

22    instructions and it may have been.

23         Q     Is it the Florida Medicaid office view that

24    ACS made an error?

25         A     Not necessarily.  I think that the

ACCURATE STENOTYPE REPORTERS, INC.

458

1  instructions were not clear to them that we wanted to

2  retain that.  In fact, I think at one point it was -- go

3  ahead.

4      Q    When you say in your affidavit, which you

5  signed yesterday, "an erroneous computer programming

6  change," what is the erroneous computer programming

7  change that you are referring to there?

8      A    That we marked out the WAC plus 7 percent

9  logic.

10     Q    And to the best of your knowledge, who's the

11 person responsible for that error?

12     A    I don't know where that responsibility lied.

13 It was an error.  It was something that was done

14 inadvertently, either ill instructions from our office

15 or because of their assumption by the way they read the

16 instruction, it's one of those things that happened and

17 it had to be corrected.

18     Q    Now when you say that this was an erroneous

19 computer programming change that inadvertently deleted

20 the WAC, that's not true, that's not true, is it?

21          MR. AZORSKY:   Objection to form.

22          MS. MILLER:   Object to the form

23          THE WITNESS:   I don't understand your

24     question.

25

459

1 | BY MR. ESCOBAR:

2 |    Q   The statement, "An erroneous computer

3 | programming change inadvertently deleted the WAC plus 7

4 | percent reimbursement methodology from the reimbursement

5 | system," the statement that it was erroneous and

6 | inadvertent, that is not a true statement, is it?

7 |       MR. AZORSKY:  Objection to the form.

8 |       MS. MILLER:  Object to the form

9 |       THE WITNESS:  I do not understand your

10 |    question.

11 |       (Exhibit No. 60 was marked for

12 |    identification.)

13 | BY MR. ESCOBAR:

14 |    Q   I am showing you what has been marked as

15 | Exhibit 60.  Exhibit 60 is a one-page document entitled

16 | at the top, it says State of Florida, AHCA, and this

17 | relates to Contract Management CSR control number 0232.

18 | And take a look at Exhibit 60 and let me know when you

19 | have had a chance to review it.

20 |    A   (Examining document.)  Okay.

21 |    Q   Okay.  Now this is a document that's provided

22 | to your fiscal agent to make a change in the

23 | reimbursement methodology, correct?

24 |    A   That's correct.

25 |    Q   And based on looking at the document where you

616

CERTIFICATE OF OATH

1

2

3

4

5    STATE OF FLORIDA          )

6    COUNTY OF LEON            )

7

8

9

10           I, the undersigned authority, certify that

11   the above-named witness personally appeared before me

12   and was duly sworn.

13

14

15

16           WITNESS my hand and official seal this

17   31st day of May, 2005.

18

19   Sandra L. Nargiz
     MY COMMISSION # DD101024  EXPIRES
20   March 17, 2006
     BONDED THRU TROY FAIN INSURANCE, INC.

21

22   _Sandra L. Nargiz_

23                   SANDRA L. NARGIZ, RMR, CRR
                     1-800-934-9090
24                   850-878-2221

25

ACCURATE STENOTYPE REPORTERS, INC.

617

1
2
3           **CERTIFICATE OF REPORTER**
4
5    STATE OF FLORIDA      )
6    COUNTY OF LEON        )
7              I, SANDRA L. NARGIZ, Registered Professional
8    Reporter, certify that the foregoing proceedings were
9    taken before me at the time and place therein
10   designated; that my shorthand notes were thereafter
11   translated under my supervision; and the foregoing pages
12   numbered 419 through 617 are a true and correct record
13   of the aforesaid proceedings.
14
15             I further certify that I am not a relative,
16   employee, attorney or counsel of any of the parties, nor
17   am I a relative or employee of any of the parties'
18   attorney or counsel connected with the action, nor am I
19   financially interested in the action.
20
21             DATED this 31st day of May, 2005.
22                              _Sandra L. Nargiz_
23                              SANDRA L. NARGIZ, RMR, CRR
                                Notary Public
24                              1-800-934-9090
                                850-878-2221
25

ACCURATE STENOTYPE REPORTERS, INC.

# Exhibit C



**CHARLIE CRIST**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

OFFICE OF THE ATTORNEY GENERAL
Medicaid Fraud Control Unit - Tallahassee

PL-01 The Capitol
Tallahassee, Florida 32399-1050
Telephone (850) 414-3600, SunCom 994-3600
Fax (850) 487-9475, SunCom 277-9475

# MFCU FAX TRANSMITTAL SHEET

Total pages including cover sheet: ___3___          Date: __June 29, 2006__

Original Documents: Will ___X___   Will Not _____   Follow by Mail.

## PLEASE DELIVER IMMEDIATELY TO:

| | |
|---|---|
| Gary Azorsky, Esq./Rosalyn Pollack/Susan Thomas, Esq. | ] 215- 875-4604 |
| James Breen, Esq. | ] 770-740-9109 |
| Alison Simon, Esq. | ] 954-874-1705 |
| Jarret Anderson, Esq. | ] 512-532-0585 |
| Kelly Overstreet Johnson, Esq. | ] 850-521-1446 |
| Christopher Palermo, Esq. | ] 212-808-7897 |
| Bill Bryant, Esq. | ] 850-222-0103 |
| John McDonald, Esq. | ] 214- 756-8758 |
| Christopher Dillion, Esq. | ] 617-951-7050 |
| Carisa A. Klemeyer, Esq. | ] |
| John T. Montgomery, Esq. | ] |
| Dana Toole, Esq. | ] 850-385-7636 |
| Brian Kavanaugh, Esq. | ] 312-861-2200 |
| Helen E. Witt, Esq. | ] |
| Anne M. Sydrys, Esq. | ] |
| Jonathan Heinz, Esq. | ] |
| Maria P. Rivera, Esq. | ] |
| Sara K. Rankin, Esq. | ] |

MESSAGE: Please see attached.  Thank you. _____

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

FROM: Mark S. Thomas/Mary S. Miller, Assistant Attorneys General

## STATEMENT OF CONFIDENTIALITY

The documents included with this facsimile transmittal sheet contain information which is confidential and/or privileged. This information is intended to be for the use of the addressee named on this transmittal sheet. If you are not the addressee, note that any disclosure, photocopying, distribution or use of the contents of this faxed information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately so that we can retrieve the original documents.



**CHARLIE CRIST**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

OFFICE OF THE ATTORNEY GENERAL

Mary S. Miller
Assistant Attorney General
mary_miller@oag.state.fl.us
Medicaid Fraud Control Unit
Pl-01 The Capitol
Tallahassee, Florida 32399-1050
Telephone (850) 414-3600, SunCom 994-3600
Fax (850) 487-9475, SunCom 227-9475

June 28, 2006

**VIA HAND DELIVERY**

Kelly Overstreet Johnson, Esquire
Broad and Cassel
215 South Monroe Street
Suite 400
Tallahassee, Florida 32301

RE:  *State of Florida ex rel. Ven-A-Care of the Florida Keys, Inc. v. Boehringer Ingelheim Corporation et al.*

Dear Kelly:

Without waiving and subject to plaintiffs' previously asserted objections to your clients' Third Interrogatories, enclosed you will find a spreadsheet bearing Bates Number **OAG FL 0039794** responsive to such Interrogatories. This spreadsheet shows the reimbursement difference for your clients' products from July 1, 2000 through April 23, 2002 if WAC had remained in the reimbursement logic.

Please feel free to give me a call if you have any questions.

Sincerely,

Mary S. Miller
Assistant Attorney General

MSM/mm

cc: Counsel of Record – VIA US MAIL (w/Enclosures)

| | | | | |
|---|---|---|---|---|
| Dey | Albuterol Sulfate .083% | 25s | 49502-0697-03 | $63,803.52 |
| Dey | Albuterol Sulfate .083% | 30s | 49502-0697-33 | $12,024.18 |
| Dey | Albuterol Sulfate .083% | 60s | 49502-0697-60 | $84,640.74 |
| Dey | Albuterol Sulfate 5 mg/ml Solution | 20 ml | 49502-0105-01 | $22,180.54 |
| Dey | Acetylcysteine Solution 10% | 4 ml | 49502-0181-04 | $14,584.15 |
| Dey | Acetylcysteine Solution 10% | 10 ml | 49502-0181-10 | $375.66 |
| Dey | Acetylcysteine Solution 10% | 30 ml | 49502-0181-30 | $55,767.78 |
| Dey | Acetylcysteine Solution 20% | 4 ml | 49502-0182-04 | $553.84 |
| Dey | Acetylcysteine Solution 20% | 10 ml | 49502-0182-10 | $0.35 |
| Dey | Acetylcysteine Solution 20% | 30 ml | 49502-0182-30 | $208.51 |
| Dey | Cromolyn Sodium 2 ml | 60s | 49502-0689-02 | $21,470.96 |
| Dey | Cromolyn Sodium 2 ml | 120s | 49502-0689-12 | $17,867.15 |
| Dey | Ipratropium Bromide 2.5 ml | 25s | 49502-0685-03 | $207,157.42 |
| Dey | Ipratropium Bromide 2.5 ml | 30s | 49502-0685-33 | $31,105.97 |
| Dey | Ipratropium Bromide 2.5 ml | 60s | 49502-0685-60 | $323,133.45 |
| Dey | Albuterol 90 mcg Aerosol Inhaler | 17 gm | 49502-0303-17 | $4,448.65 |
| Dey | Albuterol 90 mcg Aerosol Refill | 17 gm | 49502-0303-27 | $1,120.51 |
| | | | | $840,443.36 |

1

6/28/2006

TOTAL P.03

# Exhibit D

1          IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

2                    STATE OF HAWAII

3     -------------------------------

4     STATE OF HAWAII,                    )

5                 Plaintiff,             )

6          v.                            ) CIVIL NO.

7     ABBOTT LABORATORIES INC.,          ) 06-1-0720-04 EEH

8     et al.,                            ) 07-1-1639-09 EEH

9                 Defendants.            )

10    -------------------------------

11    STATE OF HAWAII                     )

12                Plaintiff,             )

13         v.                            )

14    SCHERING CORPORATION; DOE           )

15    CORPORATIONS 1-100; DOE             )

16    ENTITIES 1-100,                     )

17                Defendants.            )

18    -------------------------------

19

20              DEPOSITION OF LYNN DONOVAN

21                  APRIL 29, 2008

22                HONOLULU, HAWAII

1    total?

2         A.    I don't recall in total.

3         Q.    Okay.  All right.

4               MR. MOORE:  Exhibit Number 10.

5                    (Exhibit Donovan 010 marked.)

6         Q.    (BY MR. MOORE)  All right.  Ms.

7    Donovan, Exhibit Number 10 is a document that I

8    found in the Hawaii production.  You see it's got

9    the Hawaii Bates stamp down there on the bottom

10   right-hand corner and it's called Hawaii Medicaid

11   prescription payment algorithm analysis at the

12   top.  Do you see that?

13        A.    Yes, I do.

14        Q.    And are you familiar with this

15   document?

16        A.    Yes, I've seen it.

17        Q.    All right.  How are you familiar with

18   this document?  This is Exhibit Number 10.  What

19   is it?

20        A.    It was a recommendation provided by our

21   contractor, First Health.

22        Q.    Okay.  First -- it mentions at the top,

1    First Health Services, Corp., FHSC.  Is that who

2    you're referring to?

3         A.    Yes.

4         Q.    And it says evaluated the current

5    Hawaii prescription payment algorithm to

6    determine possible changes that would result in

7    savings while providing fair reimbursement for

8    pharmacy providers and keeping the State within

9    CMS State Plan guidelines.  Did I read that

10   correctly?

11        A.    I think so.

12        Q.    And were you involved in this

13   evaluation by FHSC?

14        A.    Involved?

15        Q.    What involvement, if any, did you have

16   in this?

17        A.    I can -- I -- I probably -- because I

18   don't -- I probably worked with them as far as

19   providing them with basic information regarding

20   what the program currently was paying and

21   providing them with information that they needed

22   in order to provide recommendations.

Donovan, Lynn

Honolulu, HI

April 29, 2008

Page 176

1      Q.   Okay.  That's good.  Now, Exhibit

2   Number 10, is this work product from FHSC or is

3   this something prepared by the department, this

4   piece of paper we are looking at right here?

5         A.   This was prepared by First Health.

6         Q.   And was this Exhibit 10 then presented

7   to the Hawaii Medicaid program as a -- as sort of

8   a summary of the analyses that were performed?

9         A.   Yes.

10        Q.   Let's go through them, please and let

11   me ask you about them.

12        A.   Okay.

13        Q.   Number one says, we -- and I guess when

14   they refer to we, they're talking about First

15   Health Services, Corp., correct?  The first

16   paragraph, we?

17        A.   We.

18        Q.   Okay.

19        A.   I -- sounds logical.

20        Q.   All right.  Well, let's don't get --

21   let's don't get bogged down on that.

22              It says, we compared the current Hawaii

1    MAC price list with the FHSC MAC price list,

2    correct?

3         A.   Yes.

4         Q.   That's what it says.  Now, is it true

5    that Hawaii had -- starting in the 1997 -- '96,

6    '97 time frame Hawaii had its own MAC list for

7    certain drugs, correct?

8         A.   It was not implemented until 2001.

9         Q.   Why is that?  If you were looking at

10   setting MACs in the '96, '97 range, why would

11   that not be implemented until three or four years

12   later?

13        A.   Other priorities, resources.

14        Q.   But if it's a cost -- it would be a

15   significant cost saving exercise for the State,

16   would it not, to have those State MACs in place?

17        A.   It would be -- there would be cost

18   savings.

19        Q.   Yeah.

20             And what were -- what caused it to be

21   delayed for so long? .

22        A.   I don't recall.  Other priorities.

1    Q.   Was there political pressure not to put

2    the MACs into place, because they would reduce

3    pharmacy reimbursement?

4         A.   Not that I recall.  There were meetings

5    with the pharmacists regarding the State MAC.

6         Q.   The pharmacy association in Hawaii was

7    certainly not in favor of putting the State MACs

8    in place, were they?

9         A.   No, but there was input.  They had

10   input.

11        Q.   All right.  I understand they had

12   input, but their input was we don't want those

13   State MACs, right, because that's going to lower

14   our reimbursement from Medicaid, true?

15        A.   It would lower their reimbursement --

16        Q.   But -- go ahead.

17        A.   -- but they had input on it.

18        Q.   Right.  But their -- I'm getting more

19   to not that they had input but what their input

20   was.  Their input was we don't want those State

21   MACs.  We would just rather have you stick with

22   just the AWP based reimbursement, correct?

```
1              MR. WINGET-HERNANDEZ:  Objection, form.

2       Q.   (BY MR. MOORE)  True?

3       A.   Providers want the highest

4  reimbursement.

5       Q.   Right.  In fact, they -- we are going

6  to get to this in a minute.

7              The pharmacists in Hawaii would -- even

8  wanted -- they would rather have FULs based

9  reimbursement than State MAC based reimbursement,

10 correct?

11      A.   Yes.

12      Q.   Because it was generally higher, right?

13      A.   That's what -- that was their input.

14      Q.   Yeah.  When you were going to do the

15 State MAC program, how were you going -- and

16 again, you the department, how were you going to

17 set the MACs, the State MACs?  What was the

18 methodology to do that?

19      A.   That was in our rules and regulations.

20 It's spelled out there.

21      Q.   Do you remember -- you know, without us

22 pulling out the rules and regulations, what do
```

1    you remember about it?

2         A.    It's an average.

3         Q.    An average of what?

4         A.    It's the average of -- three -- three

5    products, but you'll have to go back to the

6    rules.

7         Q.    Let me try to help you a little bit if

8    I may, and if I say this wrong, you -- you swat

9    me down right away.

10             It was an average of some multisource

11   drug prices on the marketplace; is that true?

12        A.    Multisource drugs.

13        Q.    Right.

14        A.    Yes, average.

15        Q.    All right.   Now, is that how -- when it

16   was ultimately implemented in 2001, is that

17   generally the methodology that was used, some

18   average of multisource drug prices in the

19   marketplace?

20        A.    Yes.

21        Q.    All right.   Let's go on with Exhibit

22   10.   Let's kind of use this as a jumping off

1    point.  It says -- well, first let me ask you it

2    says, there's also an FHSC MAC price list.  What

3    is that?

4         A.    First Health had a MAC price list.

5         Q.    Has Hawaii Medicaid ever used in its

6    fee for service program the First Health

7    Services, Corp. MAC price list?

8         A.    No.

9         Q.    It says in the report from First

10   Health, Exhibit 10, the State could save an

11   estimated 3.3 million per year, 2.86 percent, if

12   the FHSC MAC replaced the Hawaii MAC and the

13   remainder of the algorithm remained the same.  Do

14   you see that?

15        A.    Yes.

16        Q.    So what was being considered here and

17   being analyzed was if you took this FHSC MAC list

18   and substituted it for Hawaii's MAC list, the

19   program could save approximately $3 million a

20   year, true?

21        A.    That's what it says there.

22        Q.    Okay.  But that was never done by the

1    State of Hawaii, was it?

2        A.    No.

3        Q.    So those monies were never -- those

4    savings were never achieved by the State of

5    Hawaii, were they?

6        A.    No.

7        Q.    And the reason you couldn't just

8    implement that First Health Services MAC list and

9    cut reimbursement by $3.3 million was because of

10   the -- you had serious opposition from the

11   providers, correct?

12       A.    There -- the program has just been so

13   short of people, resources, other priorities --

14       Q.    Okay.

15       A.    -- provider objections, yes.

16       Q.    All right.  What you're telling me is a

17   combination of reasons?

18       A.    A combination of reasons.

19       Q.    I accept that.

20             One reason, though, is -- seriously one

21   reason -- I'm not saying it's the only reason.

22   One reason you couldn't just adopt this First

1    Health MAC list and cut reimbursement by 3.3

2    million a year, one reason would be provider

3    opposition, true?

4         A.    That would be -- that would be likely.

5    I don't know that they ever knew about this,

6    but...

7         Q.    That's a fair point.

8              You think, though, if you rolled this

9    out, this 3.3 million -- we are going to go to

10   this FHSC MAC list and we are going to cut $3

11   million out of the reimbursement, is it -- is it

12   likely you would have provider opposition to

13   that?

14            MR. WINGET-HERNANDEZ:   Objection, form,

15   speculative.

16        Q.    (BY MR. MOORE)   Based on your

17   experience.

18        A.    My opinion?

19        Q.    Yes, ma'am.

20        A.    The providers would not have been

21   happy.

22        Q.    Right.   Now, from an administrative

Donovan, Lynn

April 29, 2008

Honolulu, HI

Page 184

1    standpoint, First Health Services, Corp., at the

2    time of Exhibit 10 was already a contractor to

3    the State of Hawaii, correct?

4        A.    Correct.

5        Q.    And what did you understand they did

6    pursuant to their contract?

7        A.    They had -- this was -- part of their

8    contract was reimbursement issues.

9        Q.    And how long had First Health Services,

10   Corp. been a contractor to Hawaii Medicaid?

11       A.    I believe they started in 2004.

12       Q.    Started in 2003?

13       A.    '04 I believe.

14       Q.    '04, all right.

15             Did they replace someone else?

16       A.    For some of the services, yes.

17       Q.    Can you break --

18       A.    For this, no.

19       Q.    So this was a new service they were

20   providing in -- starting in '04 to help you with

21   reimbursement issues?

22       A.    Right, uh-huh.

Henderson Legal Services, Inc.

202-220-4158                                          www.hendersonlegalservices.com

1          Q.    And who was the company that they

2    replaced that was -- that had other -- other

3    responsibilities as a contractor?

4          A.    ACS.

5          Q.    Say again.

6          A.    ACS.

7          Q.    ACS, Affiliated Computer Services?

8          A.    Yes.

9                MR. MOORE:   We have got to change the

10   tape.  Let's take a break and change the tape and

11   then start back.

12               MR. WINGET-HERNANDEZ:   How much of a

13   break do you want?

14               THE VIDEOGRAPHER:   We are off the

15   record --

16               MR. MOORE:   As short as we can do to

17   get the tape changed and then start back.

18               THE VIDEOGRAPHER:   We are off the

19   record at 3:20 p.m.

20                       (Recess 3:20 to 3:29 p.m.)

21               THE VIDEOGRAPHER:   Back on the record

22   at 3:30 p.m., this is the start of tape number 4.

1        Q.    (BY MR. MOORE)   Ms. Donovan, staying

2    with Exhibit 10, I've got quite a few questions

3    just on this document.   Were you recommending

4    that the State substitute the First Health MAC

5    prices for the Hawaii MAC prices to save money?

6        A.    I wouldn't say I was recommending it,

7    but then I wasn't opposing it.   I -- the

8    contractor was hired and they were making

9    recommendations.

10       Q.    Okay.  But you weren't -- were you just

11   neutral on the subject or did you have a view one

12   way or the other?

13       A.    Did I have a view?  It seemed like it

14   would save the program money based on the

15   recommendation, and if that's what the program

16   wanted, fine.

17       Q.    Okay.  Let's go to the next one.   The

18   second paragraph in Exhibit 10 it says, currently

19   the Hawaii algorithm requires the FUL to override

20   the Hawaii MAC.  Do you see that?

21       A.    Yes.

22       Q.    And in your testimony when you started

Page 187

1    the deposition today, you mentioned briefly

2    something about this, that the -- under the

3    Hawaii reimbursement system that it was set up so

4    that the FUL price would override the Hawaii MAC

5    price; is that true?

6        A.    That's correct.

7        Q.    Okay.  And that's even if the FUL price

8    is higher, right?

9        A.    That's correct.

10       Q.    So in other words, you could have even

11   -- and has this been the case since you

12   implemented the State MAC program in 2001?

13             Has it always been that way, to your

14   knowledge, that the FUL -- the higher FUL price

15   would override a lower Hawaii MAC price?

16       A.    Well, the FUL overrides the SMAC

17   regardless --

18       Q.    Okay.

19       A.    -- of whether it's more or less.

20       Q.    Okay.  But I want to concentrate on the

21   situation where the FUL is higher than the SMAC,

22   okay?

1      A.    Uh-huh.

2           Q.    Since you implemented the State MAC

3      program in 2001, if you had a FUL in the system

4      that was higher than the State MAC, it would

5      override on the reimbursement, correct?

6           A.    It would pay at the FUL.

7           Q.    It would pay at the higher price,

8      right?

9           A.    Whatever the FUL is.

10          Q.    Okay.  And that's been the case all the

11     way up until today, correct?

12          A.    That's correct.

13          Q.    It's still being done that way?

14          A.    Yes.

15          Q.    Why would you have a system where you

16     have a lower MAC price and a higher federal FUL

17     price and use the highest of the two prices

18     rather than the lowest of the two prices?  Why do

19     you do that?

20          A.    That was the input from the Hawaii

21     Pharmacy Association and that was the agreement.

22          Q.    Okay.  So I think you said -- picking

# Exhibit E

FORM APPROVED
OMB NO. 0938-0193

HEALTH CARE FINANCING ADMINISTRATION

| TRANSMITTAL AND NOTICE OF APPROVAL OF STATE PLAN MATERIAL <br> FOR: HEALTH CARE FINANCING ADMINISTRATION | 1. TRANSMITTAL NUMBER: <br> 0 1 — 0 0 4 | 2. STATE: <br> HAWAII |
|---|---|---|

3. PROGRAM IDENTIFICATION: TITLE XIX OF THE SOCIAL SECURITY ACT (MEDICAID)
MEDICAL ASSISTANCE

| TO: REGIONAL ADMINISTRATOR <br> HEALTH CARE FINANCING ADMINISTRATION <br> DEPARTMENT OF HEALTH AND HUMAN SERVICES | 4. PROPOSED EFFECTIVE DATE <br> JANUARY 1, 2001 |
|---|---|

5. TYPE OF PLAN MATERIAL (Check One):

☐ NEW STATE PLAN          ☐ AMENDMENT TO BE CONSIDERED AS NEW PLAN          ☒ AMENDMENT

COMPLETE BLOCKS 6 THRU 10 IF THIS IS AN AMENDMENT (Separate Transmittal for each amendment)

| 6. FEDERAL STATUTE/REGULATION CITATION: <br> 42 C.F.R. 8440.120 | 7. FEDERAL BUDGET IMPACT: <br> a. FFY _2001_ $ _12,000_ <br> b. FFY _2002_ $ _17,000_ |
|---|---|

| 8. PAGE NUMBER OF THE PLAN SECTION OR ATTACHMENT: <br> ATTACHMENT 4.19-B, PAGES 6 AND 7 <br> SUPPLEMENT TO ATTACHMENT 3.1-A AND 3.1-B, <br> PAGES 3.2, 3.3 AND 3.4 | 9. PAGE NUMBER OF THE SUPERSEDED PLAN SECTION OR ATTACHMENT (If Applicable): <br> ATTACHMENT 4.19-B, PAGES 6 AND 7 <br> SUPPLEMENT TO ATTACHMENT 3.1-A AND 3.1-B, <br> PAGES 3.2, 3.3 AND 3.4 |
|---|---|

10. SUBJECT OF AMENDMENT:

PRESCRIBED DRUGS

11. GOVERNOR'S REVIEW (Check One):

☐ GOVERNOR'S OFFICE REPORTED NO COMMENT
☐ COMMENTS OF GOVERNOR'S OFFICE ENCLOSED
☐ NO REPLY RECEIVED WITHIN 45 DAYS OF SUBMITTAL

☒ OTHER, AS SPECIFIED:
    AS APPROVED BY GOVERNOR

| 12. SIGNATURE OF STATE AGENCY OFFICIAL: <br> *Susan M Chandler* | 16. RETURN TO: <br> STATE OF HAWAII <br> DEPARTMENT OF HUMAN SERVICES <br> MED-QUEST DIVISION <br> P.O. BOX 339 <br> HONOLULU, HAWAII 96809-0339 |
|---|---|
| 13. TYPED NAME: <br> Susan M. Chandler | |
| 14. TITLE: <br> Director | |
| 15. DATE SUBMITTED: <br> 3/27/01 | |

FOR REGIONAL OFFICE USE ONLY

| 17. DATE RECEIVED: <br> March 28, 2001 | 18. DATE APPROVED: <br> June 7, 2001 |
|---|---|

PLAN APPROVED - ONE COPY ATTACHED

| 19. EFFECTIVE DATE OF APPROVED MATERIAL <br> January 1, 2001 | 20. SIGNATURE OF REGIONAL OFFICIAL |
|---|---|
| 21. TYPED NAME <br> Linda Minamoto | 22. TITLE <br> Associate Regional Administrator |

23. REMARKS:

FORM HCFA-179 (07-92)          *Instructions on Back*

HHC016-0338

SUPPLEMENT TO ATTACHMENT 3.1-A and 3.1-B

12a.    Prescribed drugs must be listed in the Hawaii
        Medicaid Drug Formulary: all other prescribed
        drugs require prior authorization.

        (1)    Those drug products produced by manufactures
               who have entered into and comply with an
               agreement under Section 1927(a) of the Act are
               payable by being listed in the Hawaii Medicaid
               Drug Formulary or by prior authorization, except
               those drugs:

               (a)    Used for cosmetic purposes or hair growth;

               (b)    With associated tests or monitoring
                      purchased exclusively from the
                      manufacturer or designee as a condition
                      of sale;

               (c)    Which are classed as "less than
                      effective" as described in Section 107(c)(3)
                      of the Drug Amendments of 1962 or are
                      identical, similar or related; and

               (d)    Used to promote fertility.

        (2)    The following drugs or classes of drugs, produced
               by manufacturers complying with Section 1927(a)
               of the Act, or their medical uses will be
               selectively covered as decided by the Advisory
               Medicaid Formulary Committee (the
               responsibilities for which have been delegated to
               the State Drug Use Review Board);

| TN No. | 01-004 | JUN - 1 2001 | | |
|--------|--------|----------------|--------|--------|
| Supersedes | | Approval Date: | Effective Date: JAN  1  2001 | |
| TN No. | 00-005 | | | |

– 3.2 –

SUPPLEMENT TO ATTACHMENT 3.1-A and 3.1-B

    (a)   Agents used for the symptomatic relief of cough and colds.

    (b)   Vitamins and minerals products except prenatal and fluoride preparations;

    (c)   Non-prescription drugs;

    (d)   Barbiturates;

    (e)   Benzodiazepines; and

    (f)   Agents used for anorexia or weight gain.

(3)   The State will not enter into any separate or any rebate agreements without amendment to the State Plan nor without reporting any rebates received from any separate agreements. Any Possible future rebate agreement will be submitted to the Health Care Financing Administration (HCFA) for approval implementation.

(4)   Prior authorization imposed on any covered outpatient drug will meet the following conditions:

    (a)   Prior authorization requests will be responded to within 24 hours of receipt by telephone or other telecommunication; and

    (b)   In an emergency, a seventy-two hour supply of the drug desired by the prescribing physician will be allowed (an emergency is defined as a situation that exists when the withholding of medication chosen by the prescribing physician will cause the patient's medical condition to worsen

TN No.   01-004
Supersedes     Approval Date:JUN - 7 2001   Effective Date: JAN 1 2001
TN No.   96-002

– 3.3 –

HHC016-0340

and the person designated to approve prior authorization is not available for approval by telephone or other means).

(5) The maximum quantity of any medication to be paid equals the larger of a one month supply or one hundred units.

(6) In compliance with Section 1927(b)(2) of the Social Security Act, the fiscal agent is engaged to report to each manufacturer not later than sixty days after the end of each calendar quarter and in a form consistent with a standard reporting format established by the Secretary, information on the total number of dosage units of each covered outpatient drug dispensed under the plan during the quarter and shall promptly transmit a copy of such report to the Secretary as instructed by HCFA.

12b. Partial dentures limited to fill the space due to the loss of one or more anterior teeth and to fill the space due to the loss of two or more posterior teeth exclusive of third molars. Temporary dentures allowed only when teeth have been extracted recently with prior authorization and subject to maximums or prosthetics.

Only one prosthetic appliances in any five year period is allowed for a maximum of one for each type, partial and full dentures, per arch per recipient; lifetime. This is allowed when present or previous dentures cannot be repaired or adjusted.

12c. Prosthetic devices require prior authorization when the cost of purchase, repair or manufacture exceeds $50.00.

| TN No. | 01-004 | | | | |
|--------|--------|---|---|---|---|
| Supersedes | | Approval Date: JUN ¨ 7 2001 | Effective Date: | JAN | 1 2001 |
| TN No. | 96-002 | | | | |

3.   Medicare's upper limit of payment.

The payment to an emergency room physician for the screening and assessment of a patient who receives non-emergency care in the emergency room shall not exceed the payment for a problem focused history, examination, and straightforward medical decision making.

(q)   The upper limits on payments for all noninstitutional items and services shall be established by the department in accordance with section 346-59, HRS, and other applicable state statutes.

## 4.   PAYMENT FOR CERTAIN OTHER NON-INSTITUTIONAL ITEMS AND SERVICES:

a.   Payment for prescribed drugs:

1.   For single source drugs, shall not exceed the lower of:

A.   The billed charged;

B.   The provider's usual and customary charge to the general public; or

C.   The estimated acquisition cost (EAC) or the average wholesale price (AWP) when the AWP is the average selling price, plus a reasonable dispensing fee.

2.   For multiple source drugs, shall not exceed the lower of:

A.   The billed charges;

B.   The provider's usual and customary charge to the general public;

C.   The estimated acquisition cost (EAC) or the average wholesale price (AWP) when the AWP is the average selling price, plus a reasonable dispensing fee;

D.   The Federal Upper Limit (FUL) price plus a reasonable dispensing fee; or

E.   The State Maximum Allowable Cost (MAC) plus a reasonable dispensing fee;

| TN No. | 01-004 | | | | | | | |
|--------|--------|--|--|--|--|--|--|--|
| Supersedes | | Approval Date: JUN 7 2001 | | Effective Date: | JAN 1 2001 | | | |
| TN No. | 99-003 | | | | | | | |

– 6 –

HHC016-0342

3. Over-The-Counter (OTC) drugs shall not exceed the lower of:

   A. The billed charges;

   B. The provider's usual and customary charge to the general public including any sale item which may be available on the day of service;

   C. The allowance set by the program (State maximum allowable costs);

   D. The estimated acquisition cost (EAC) or the average wholesale (AWP) when the AWP is the average selling price, plus a reasonable dispensing fee; or

   E. The Federal Upper Limit (FUL) price plus a reasonable dispensing fee;

     Under no circumstances shall the program pay more than the general public for the same prescription or item.

4. Payments for medical supplies shall be made as described in section 3 (I) above.

5. The Federal Upper Limit (FUL) price does not apply if a physician:

   A. Certifies in his or her own handwriting that a specific brand is medically necessary for a particular recipient. A checkoff box on a form is not acceptable by a notation of "brand medically necessary" or do not substitute" is allowable.

   B. Obtains medical authorization for medical necessity from the state medical assistance program for specific brands of medication designated by the program.

In such cases, the payment shall not exceed the lower of:

   A. The billed charge;

---

| TN No. | 01-004 | | | | | | |
|--------|--------|---|---|---|---|---|---|
| Supersedes | | Approval Date: JUN | 7 2001 | Effective Date: | JAN | 1 | 2001 |
| TN No. | 99-003 | | | | | | |

– 7 –

HHC016-0343  L

# Exhibit F

Page 1

1               UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3      MDL No. 1456    Master File No. 01-CV-12257-PBS

4      ------------------------------------X

5      In re:  PHARMACEUTICAL INDUSTRY       )

6      AVERAGE WHOLESALE PRICE LITIGATION    )

7      ------------------------------------X

8      United States of America ex rel       )

9      Ven-A-Care of the Florida Keys,       )

10     Inc., et al. v. Dey, Inc., et al.,    )

11     Civil Action No. 05-11084-PBS         )

12     ------------------------------------X

13     United States of America ex rel       )

14     Ven-A-Care of the Florida Keys, Inc.,)

15     et al. v. Boehringer Ingelheim Corp.,)

16     et al., Civil Action No. 07-10248-PBS)

17     ------------------------------------X

18        30(b)(6) DEPOSITION OF THE STATE OF ALASKA

19        DEPARTMENT OF HEALTH AND SOCIAL SERVICES

20               DESIGNEE:  DAVID CAMPANA

21              Thursday, August 21, 2008

22                 Anchorage, Alaska

1    referred to as generic drugs.

2              First, let me ask you whether generally

3    the terms multi-source drugs and generic drugs

4    are used to mean the same thing?

5         A.    Generally, they are.

6         Q.    So a multi-source drug could include a

7    brand version of a generic drug, but that's

8    really the only difference?  Would you agree with

9    that?

10        A.    Yes.

11        Q.    So can we assume that when you have

12   used the term "generic drugs" or the term "multi-

13   source drugs," generally, you have been talking

14   about the same thing?

15        A.    Yes.

16        Q.    Now, we talked a little bit yesterday

17   about the formulas that the State of Alaska has

18   used for reimbursement of multi-source drugs.

19              And I want to just clarify during the

20   pre-2003 time frame.  There are a number of drugs

21   reimbursed by the State of Alaska that were

22   subject to federal upper limits or FULs, correct?

1      A.    Correct.

2            Q.    And did I understand your testimony

3      correctly this morning that prior to May of 2003,

4      a drug that was subject to a FUL was not

5      reimbursed at the lower of the FUL or the EAC

6      level, it was reimbursed at either the FUL or the

7      billed charge, whichever was lower?

8            A.    That is correct.

9            Q.    So there was no AWP-based formula at

10     issue at all for any drug prior to May 2003 that

11     had a federal upper limit?

12                 MR. HENDERSON:   Objection.

13           A.    Let's go over that again.

14           Q.    Sure.   For a drug that was subject to a

15     FUL, prior to May 2003, that drug's AWP didn't

16     play any role in Alaska's reimbursement

17     determination for that drug?

18           A.    That is correct.

19                 MR. HENDERSON:   Objection.

20           A.    If there was a FUL, that FUL was paid,

21     unless the billed amount was less than that FUL

22     plus a dispensing fee.

Anchorage, AK

1    Q.   All right.  Why was that determination

2  -- strike that.

3         Why was the AWP-based EAC portion of

4  Alaska's reimbursement methodology not used in

5  connection with drugs that had a FUL prior to May

6  of 2003?

7    A.   As far as I know, the payment

8  methodology had failed to incorporate that prior

9  to that time.

10   Q.   And when you say the "payment

11 methodology," you mean the regulations and the

12 actual processing of the claims that were done

13 then?

14   A.   Well, it was -- the actual processing

15 of the claims did not include that step of

16 comparing the billed, the FUL plus dispensing

17 fee, or the EAC plus dispensing fee.

18        MS. WITT:  All right.  No further

19 questions.

20        VIDEOGRAPHER:  Mr. Henderson, I have

21 got about 17 minutes before I need a tape change.

22        MR. HENDERSON:  Okay.  Thank you.  If