EXHIBIT "A"

Cobo Tr., at 659:5-9

Cobo, Luis - Vol. III                                   July 31, 2008

Miami, FL

659

1     recollection is that you have some records of the

2     Cobo Pharmacy that you still have in your

3     possession, is that right?

4          **A.    Yes.**

5          Q.    And there are records -- the pharmacy

6     itself had records related to the pharmacy; some

7     of those went to Eckerds, which acquired the

8     pharmacy, is that right?

9          **A.    That's correct.**

10         Q.    And if you think about it now, in terms

11    of all the records that you have that you

12    retained for the Cobo Pharmacy, where are those

13    kept?

14         **A.    I've got some in storage at a room that**

15    **I kept at what used to be the Cobo Pharmacy**

16    **building.  And I've got some stored in the attic**

17    **at Ven-A-Care.  And thinking about that, I think**

18    **what I do have access to are my accounting**

19    **records that would also have, I believe, the**

20    **breakdown that you're inquiring about.**

21         Q.    Now, you don't have any plans to get

22    rid of those documents that you have in your

Cobo Tr., at 614:1-14

Cobo, Luis - Vol. III                                    July 31, 2008
Miami, FL

614

1          Q.   Let me turn for a bit to the Cobo

2     Pharmacy.   And the Cobo Pharmacy during -- and

3     let's take the period 1990 until it terminated,

4     which I think was in 2000, correct?

5          **A.   Somewhere in the middle, about June of**

6     **2000, yes.**

7          Q.   So the Cobo Pharmacy was in business in

8     Key West, Florida, as an independent pharmacy

9     throughout the '90s and into mid-2000, correct?

10         **A.   That is correct.**

11         Q.   And during that whole period from 1990

12    to mid-2000, you were the person really

13    responsible for running it on a day-to-day basis?

14         **A.   That would be correct.**

15         Q.   Just in general, how many customers

16    would you say that the Cobo Pharmacy had in terms

17    of its prescription business?

18         **A.   I couldn't give you a number of the**

19    **customer base; I can give you a range of**

20    **prescriptions that we would fill.   And I would**

21    **say on, you know, some days, you know, 250 to 300**

22    **prescriptions; on some days, you know, maybe 50**

Cobo Tr., at 658:22-659:9

658

1    ballpark -- any ballpark number as to what that

2    was?

3         A.   A ballpark figure may be over a million

4    dollars on prescription items, and there was a --

5    I would say over a million dollars in the last --

6    in the last year.  And that may be 1.2 or -- I

7    think that's a reasonable big ballpark figure.

8         Q.   And are there still records that you

9    have that would show these numbers in some detail

10   what your revenues were from pharmacy?

11        A.   I've got -- I have to check.  I've got

12   some records that have been kept behind.  We used

13   to do a record purge every seven years.  And when

14   we closed, I'm just trying to think what records.

15   I know we had to move some of our records into

16   storage, and there were some records that were

17   purged, you know, just because of the volume in

18   the storage.  You know, I did keep some documents

19   that I thought would be of interest and personal

20   things, but I'd have to go back and see.  I don't

21   specifically know.

22        Q.   So you -- sitting here today, your best

659

1    recollection is that you have some records of the

2    Cobo Pharmacy that you still have in your

3    possession, is that right?

4         **A.    Yes.**

5         Q.    And there are records -- the pharmacy

6    itself had records related to the pharmacy; some

7    of those went to Eckerds, which acquired the

8    pharmacy, is that right?

9         **A.    That's correct.**

10        Q.    And if you think about it now, in terms

11   of all the records that you have that you

12   retained for the Cobo Pharmacy, where are those

13   kept?

14        **A.    I've got some in storage at a room that**

15   **I kept at what used to be the Cobo Pharmacy**

16   **building.  And I've got some stored in the attic**

17   **at Ven-A-Care.  And thinking about that, I think**

18   **what I do have access to are my accounting**

19   **records that would also have, I believe, the**

20   **breakdown that you're inquiring about.**

21        Q.    Now, you don't have any plans to get

22   rid of those documents that you have in your

Cobo Tr., at 797:13-812:22

797

1        Q.    Is there any other instance besides the

2   one you referenced where you were offered to

3   receive anything of value from Dey to you in

4   order to get you to buy Dey's products other than

5   the instance you just mentioned?

6            MR. BREEN:  Objection, form.

7        **A.    In other words, you want to know if**

8   **somebody from Dey came to me and offered me a**

9   **gift or money or anything of that nature?**

10       Q.    Right.

11       **A.    Not that I am aware of.  Certainly not**

12  **me.**

13       Q.    You testified in an earlier session of

14  your deposition that at some point in around 2000

15  when you were closing up or selling the Cobo

16  Pharmacy, you made a payment of $40,000 to the

17  Medicaid program in connection with inflated

18  reimbursements.  Do you recall that?

19       **A.    I do.**

20       Q.    Okay.  And when exactly did you decide

21  to make that payment?

22       **A.    I'd have to go revisit, but I want to**

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

798

1    say either late 2000, early 2001.

2         Q.   And that payment, how did you come up

3    with the amount of 40,000?

4         A.   I testified earlier I had come across

5    some article, and I haven't revisited this, that

6    basically went over again a methodology that had

7    been applied in trying to recover overpayments

8    made to a provider.  And I don't recall if it was

9    in the Medicare/Medicaid arena.  And I took that

10   information to my accountant at the time, Randy,

11   and told him what I was trying to do.  And he

12   helped me sort of fine-tune it based on the

13   information that I had available on how to get a

14   -- reach a more reasonable representation and

15   factor that could be applied -- let me back up --

16   factor based on actual payments that I received

17   from Medicaid and actual invoices that I had from

18   Cobo Pharmacy that I could match to those

19   payments in that point in time.

20              And then, using that, determined --

21   accurately determined what the reimbursement

22   should have been and find out -- you know, take

Miami, FL

799

1    out the dispensing fee that was involved so we

2    were just dealing with the cost of the drug

3    product itself.  And then used an array of

4    percentages and applied them to the overall money

5    that I had been paid on generics.  Made a

6    determination what that was.  I was able to do a

7    sampling; I think I did four years.  And then I

8    took that sampling and applied it to a seven-year

9    period and came up with an amount that turned out

10   to be around $33,000 -- or 35,000, excuse me.

11   $35,000.  And then added seven percent interest.

12   And wrote a check to Florida Medicaid and it came

13   out to about $40,000.

14        Q.   And so you worked on that with Randy

15   Moore?

16        A.   I worked on that by myself.  I only

17   worked with him on the theory of the accounting

18   principle that should be applied that would --

19   that would be reasonable and least challenged

20   under the circumstances.  In other words, I

21   wanted to do something that I had some

22   professional direction in rather than something

Cobo, Luis - Vol. III                                July 31, 2008

Miami, FL

800

1    that I would have sat down and tried to figure

2    out myself and someone might challenge saying it

3    favors you or it favors -- you know?  I wanted to

4    get a good representation.  And it wasn't huge

5    sums of money we were dealing with.  And I just

6    wanted to ensure the accuracy to the extent that

7    I could.

8        Q.   And before I turn back to how you did

9    it and follow up on that, what is it that and at

10   what point -- strike that.

11            What is it that in your own mind

12   triggered your desire to go forth and figure this

13   out and pay back some amount?

14       A.   Well, um, my involvement with Ven-A-

15   Care had not been real intimate because I was

16   either fulfilling the pharmacist consultant role

17   in that aspect, taking care of those issues, or

18   when we were just running as an infusion

19   pharmacy, just working back and forth between

20   Cobo Pharmacy and Ven-A-Care.  So I never really

21   got fully sensitized and appreciated the issues

22   in our complaint until I closed down Cobo

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

801

1   Pharmacy and started working more in the, you

2   know, in the actual data gathering and what have

3   you.

4           It was an idea that really Zack Bentley

5   brought to mind, that I was reluctant to do at

6   first because I felt very confident, comfortable

7   with my behavior and performance with how I had

8   billed the Medicaid program in my career at Cobo

9   Pharmacy.  But at the same time, as I fought over

10  his challenge, it seemed reasonable to think that

11  I could do something there that would set maybe

12  an example or at least a tone for the

13  imperfections of the system that I was dealing

14  with because of the fraudulent drug prices the

15  manufacturers had been providing the Medicaid

16  system.

17          Q.   So what did Mr. Bentley tell you?

18          A.   He just I think briefly indicated you

19  have a problem with Cobo Pharmacy, you need to

20  sit down and look at your Medicaid billing.  You

21  know, I was familiar with the concepts there,

22  and, you know, I understood what he was saying.

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

802

1       Q.   Well, when he said "You have a problem

2   at Cobo," what was your understanding, what was

3   the problem?

4       A.   Well, I think -- I can't speak for him,

5   and I won't.  I felt -- I felt that if I'm going

6   to be an active participant in this lawsuit, then

7   certainly I had an obligation to try to, you

8   know, rectify anything that I had seen that would

9   -- that has been problematic for the program on a

10  much, much larger scale.  I certainly needed to

11  at least make an effort to try to minimize what

12  had happened in my business as a result of that.

13      Q.   What is it that Mr. Bentley told you

14  exactly as to what the problem was that you had

15  at Cobo?

16      A.   Again, I don't know that it was long or

17  winded.  It was just him trying to sensitize me

18  and do -- that I've got similar issues because,

19  as we all recognized, I mean, we've -- anybody

20  who has participated in the Florida Medicaid

21  program has been a victim, a victim of the

22  fraudulent billing system that's in place.

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

803

1      Q.   Were you -- was Cobo Pharmacy a victim

2   of the billing system that was in place?

3      **A.   Well, I think my audit showed that -- I**

4   **think I was reaping, you know, some additional**

5   **profits that I don't think it's what the Medicaid**

6   **program had in mind or intended in trying to base**

7   **its reimbursement on estimated acquisition.  And,**

8   **you know, since I seem to be unique in having**

9   **sensitivity to information on the fraudulent drug**

10  **reporting practices, I was a lone person in the**

11  **country probably that had the ability to go back**

12  **and try to rectify, you know, what had**

13  **transpired.**

14     Q.   Did Mr. Bentley ever sit down with you

15  and go through Cobo records to show you how you

16  were violating the law from his standpoint?

17          MR. BREEN:  Objection to form.

18     **A.   His feelings on that -- and he was very**

19  **adamant -- that this was a Cobo Pharmacy issue.**

20  **And as far as he, from Ven-A-Care, was concerned,**

21  **he didn't want to participate or have anything to**

22  **do with it.  He thought it was an internal Cobo**

804

1   Pharmacy issue that I needed to address.

2        Q.   And did he tell you that you needed to

3   address this because otherwise it would look bad

4   for you in the litigation?

5             MR. BREEN:   Objection, form.

6        A.   I don't know that -- that may have been

7   the inference and the concern.  As I said, it

8   wasn't anything that neither he or I expressed

9   that needed to be mandatory.  I looked at it as

10  an exercise that would allow me certainly to be

11  more comfortable with -- with the practices that

12  transpired at Cobo Pharmacy, my involvement in

13  the program.

14       Q.   And at -- Did Mr. Bentley first bring

15  this up to you; is that how it first started?

16       A.   I think that's correct.  I think the

17  notion, the idea, the challenge was first

18  introduced by Zack Bentley, yes.

19       Q.   And when was that?

20       A.   Here again, in a general time frame, I

21  don't know if it was late 2000; that might be

22  reasonable.  But I'd have to go back and see the

1   dating on the documents and see.  You know, the -

2   - the project itself took several months, and I

3   just don't recall if it's something that began in

4   late 2000 or early 2001.

5       Q.   And did you -- when you say the project

6   took several months, was there -- were there

7   records that -- notes, spreadsheets that were

8   created as you were working your way through this

9   project to get to the amount that you would pay?

10      A.   Yeah, I was trying to turn up my -- my

11  Medicare -- Medicaid, excuse me, claim forms.  I

12  was trying to go through my files that I had that

13  either had been preserved.  I -- and pulled

14  invoices, primarily from McKesson and secondarily

15  from, you know, Bergin Gulf or Bergin Brunswick.

16  So each one of those tasks was something because

17  it was a lot of stuff that was in storage and,

18  you know, boxes that needed to be taken down and

19  taken apart and all that information gathered and

20  going through it one by one, line item by line

21  item.

22      Q.   And -- and do you have all the work

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

806

1    papers that were part of this project to come up

2    with the $40,000 payment?

3        **A.    Um, the original work papers I do not**

4    **have.**

5        Q.    Where are they?

6        **A.    That was turned over to Mr. Breen.**

7        Q.    When?

8        **A.    I don't know, possibly late last year.**

9             MR. ESCOBAR:  Do you know --

10       **A.    Late last year --**

11            MR. ESCOBAR:  Do you know, Jim, whether

12   those have been produced?

13            MR. BREEN:  I don't think they've been

14   requested.

15            MR. ESCOBAR:  Well, we would like all

16   the work papers, every scrap of paper that

17   relates to this project.

18            MR. BREEN:  We'll address it at the

19   appropriate time.

20            MR. ESCOBAR:  Now -- It's okay.

21            MR. BREEN:  Have you guys requested

22   these things before today?

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

807

1          MR. GORTNER:  I would have to look over

2    my document request.  I think -- I will let you

3    know for sure.

4          MS. ST. PETER-GRIFFITH:  Cobo Pharmacy

5    is a third-party, isn't it?  It would have to be

6    a subpoena.

7          MR. BREEN:  We can address it.  I'm

8    just saying that I don't think that it's been

9    requested.

10         MR. ESCOBAR:  Well, we're going to send

11   a subpoena that calls for every document that

12   relates to the Cobo Pharmacy that either he or

13   you guys have, whatever it is.

14         MR. BREEN:  Then we can deal with a

15   subpoena, which has its own issues associated

16   with it.

17         MR. ESCOBAR:  But was -- the work

18   papers on those $40,000, if you want, we'll put

19   that in a specific request.

20   BY MR. ESCOBAR:

21      Q.   Now, did -- after you did this project

22   and came up with the number, did you come to the

Cobo, Luis - Vol. III                                                July 31, 2008

Miami, FL

808

1   conclusion, Mr. Cobo, that you had defrauded the

2   Medicaid program?

3        **A.    No, I came to the conclusion that**

4   **because of the fraudulent pricing that was in**

5   **place by the manufacturers and being utilized by**

6   **the State of Florida Medicaid system, I somewhat**

7   **had been victimized as well.**

8        Q.    Oh, so -- so you made the payment of

9   $40,000 because you had concluded that you were a

10  victim of the fraud --

11            MR. BREEN:  Objection, form.

12       Q.    -- is that right?

13       **A.    You asked me earlier if I thought --**

14  **I'll have to go back -- if I had been defrauded,**

15  **I believe?**

16       Q.    No.  My question was:  After you did

17  the project and you reviewed it and you came to

18  the conclusion that you should pay money back to

19  Medicaid, as doing -- in doing that, did you

20  conclude that you had been overpaid by Medicaid?

21            MR. BREEN:  Objection, form.

22       **A.    I don't know that I would classify it**

Miami, FL

809

1    as I felt that I had been overpaid by Medicaid.

2    I think that I had been paid appropriately by

3    Medicaid based on the formulations and the

4    reimbursement methodology.  I think that I had

5    been unfairly overreimbursed because that

6    methodology is based on fraudulent prices that

7    are given them by the manufacturers.  So, you

8    know, I didn't feel that I was overpaid; I just

9    thought that I wasn't participating in the

10   reimbursement program with what I thought was the

11   real intent of -- of Florida Medicaid.

12        Q.   But you didn't --

13        A.   That's why I made that -- that refund.

14        Q.   Did you conclude that you had done

15   anything wrong?

16        A.   I did not feel that I had done anything

17   wrong, no.

18        Q.   And did the $40,000 that you came up,

19   after the project, the exercise that you

20   described, did you view that as the full

21   compensation to Medicaid that you felt that Cobo

22   Pharmacy should make?

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

810

1        A.    Again, I -- that represented over a

2    period of, and I believe seven years, and as

3    accurately as I could -- I could determine, I

4    think that represented what I saw was the

5    overcompensation as a result of the system.  And

6    I feel somewhat, you know, comfortable with that

7    figure.  A bulk of the drug products that account

8    for the monies that I'm reimbursed for in

9    Medicaid were actually from brand products.  You

10   know, with the brand products, the reimbursement

11   actually has some validity and integrity.  It's

12   only in the generic world where these spreads and

13   what have you incorrectly apply the intent of the

14   system, I think.

15       Q.    And, now, as you were doing the

16   calculation of the 40,000, did you -- as part of

17   that analysis, did you come up with a -- an

18   amount that you thought was an appropriate spread

19   or differential that you would keep?

20            MR. BREEN:  Objection to the form.

21       A.    I wouldn't -- I think in my analysis, I

22   tried to determine a factor that would represent

1    an overpayment amount that would reflect an

2    accurate WAC-based reimbursement, wholesale or

3    acquisition costs, you know, plus a percent and

4    dispensing fee, rather than an AWP figure that

5    was, you know, totally unrelated and detached

6    from the WAC.  No relationship.

7         Q.   So the 40,000 was to some extent a

8    product of trying to figure out the difference

9    between what you would have gotten on an AWP

10   reimbursement as against the WAC reimbursement?

11              MR. BREEN:  Objection to form.

12        A.   The 40,000, as best I recall, was the

13   difference.  Once I -- once I subtracted the

14   dispensing fee, because that doesn't change,

15   between what Florida Medicaid reimbursed me and

16   what I calculated to be the more accurate

17   reimbursement, which would have been my

18   acquisition cost plus -- plus seven percent, that

19   difference is what I figured after getting a

20   factor and applying it to all my generics across

21   the board.

22        Q.   And your acquisition cost plus seven

812

1    percent, as you understood that, that would be

2    the wholesale acquisition cost plus seven

3    percent?

4         **A.    That is correct.**

5         Q.   So even as you were doing -- as you

6    were doing this exercise, you thought that a

7    reimbursement that was based on a wholesale

8    acquisition cost plus seven percent, that that

9    was a fair reimbursement, is that right?

10            MR. BREEN:  Objection, form.

11       **A.    I didn't have an opinion on whether it**

12   **was a fair reimbursement.  I was just trying to**

13   **do that to accurately reflect I think the**

14   **parameters that were in place.  I don't know that**

15   **I went into it with an opinion of whether I**

16   **thought it was fair or not.**

17       Q.   Now, is that -- is the $40,000 the only

18   payment that you made -- that you made to

19   Medicaid in connection with what you thought had

20   been overreimbursement?

21       **A.    I believe that is correct.**

22       Q.   Now, at -- at one of the earlier

Cobo Tr., at 815:1-825:4

815

1       Q.   And 181, as I understand it, this was

2    something that was produced to us in the Florida

3    case.  And as I understand it, this is a file on

4    the Cobo Pharmacy in the Florida Medicaid

5    program.  And let me -- first of all, have you

6    ever seen this before?

7       **A.   No, I can't say that I have.  Parts of**

8    **it obviously I have because I filled it out.**

9       Q.   Right.

10      **A.   But there are parts that I am not**

11   **familiar with, but certainly parts that I am**

12   **familiar with because it's various signing of**

13   **contracts and information on the pharmacy and**

14   **application it looks like and files with**

15   **licensure information.**

16      Q.   The Exhibit 181 has Bates numbers FL-

17   AG-0002871 through 2970.  Turn, if you would, to

18   Page 2874.

19      **A.   Okay.**

20      Q.   And this is a memorandum at ACHA dated

21   September 16th, 2002.  And it's signed by a

22   couple of people at -- in the Medicaid program.

816

1    And it relates to Cobo Pharmacy.  And attached to

2    it is a final report of a pharmacy audit that was

3    conducted by an outfit called Heritage.  Do you

4    remember that audit?

5         **A.    I believe so.  I believe so.  But it's**

6    **been a while since I've had to think about it,**

7    **but I believe I remember this audit.**

8         Q.   Were you -- were you notified -- take a

9    look at Page 2876 which has the pharmacy audit

10   final report.

11        **A.    Yes.**

12        Q.   And you see that there is -- the

13   results of the audit are indicated there.  And it

14   indicates that, based on the audit, there are

15   total recommended recoveries from Cobo of

16   $374,476.56.  Do you see that?

17        **A.    I do.**

18        Q.   And that that was a result of 139

19   discrepancies in the -- found by the audit.  Do

20   you see that?

21        **A.    I do.**

22        Q.   Have you seen this before?

817

1       **A.    No.**

2            Q.    Did you ever pay Florida Medicaid

3       $374,476.56 for these discrepancies?

4       **A.    No.**

5            Q.    Now, none of these discrepancies that

6       are listed here relate to you being paid more

7       than you should have been on reimbursement, do

8       they?

9       **A.    I'm not -- I'm not familiar with this**

10      **audit in particular at all.**

11           Q.    Did Florida Medicaid ever ask you to

12      pay them this amount?

13      **A.    No.  This is dated October 26 of 2000.**

14      **I didn't even have the pharmacy at that time.**

15           Q.    So is this the first time that you've

16      seen this?

17      **A.    Uh-huh.**

18           Q.    Yes?

19      **A.    Yes.**

20           Q.    Well, did you know that you owe Florida

21      Medicaid $374,000?

22                MR. BREEN:   Objection to the form.

818

1              MS. ST. PETER-GRIFFITH:  Objection to

2       the form.

3              MR. ESCOBAR:  That's what it says.

4              MR. BREEN:  That's not what it says.

5              MS. ST. PETER-GRIFFITH:  Object to the

6       form.

7              MR. ESCOBAR:  I would suggest that you

8       go and get that money back for Florida Medicaid.

9              MR. BREEN:  You know, if you're going

10      to be commenting on the record, I suggest you

11      read the whole thing where it indicates -- they

12      did this at Eckerd's Pharmacy.  Cobo wasn't

13      present.  And they couldn't get into the computer

14      system due to the Y2K problem, so --

15             MR. ESCOBAR:  So it could be more.

16             MR. BREEN:  -- that might be why they

17      didn't submit it to Mr. Cobo.  So my suggestion

18      is do not misrepresent this on the record.

19             MR. ESCOBAR:  I'm not misrepresenting

20      anything.

21             MS. ST. PETER-GRIFFITH:  You are.  Yes,

22      you are.

819

```
1              MR. ESCOBAR:  It says total recommended
2    recoveries:  $374,476.95 --and 56 cents.
3              MR. BREEN:  Based upon plugging -- this
4    is the first I've seen it.  Based upon plugging
5    and chugging, based upon an inability to get into
6    a computer system.  Where Mr. Cobo was never even
7    notified about this.
8              THE WITNESS:  No, this is -- this is
9    without a doubt challengeable.  I don't know what
10   this indicates, and I don't know -- I can't -- at
11   this point in time, Eckerd Drugs had -- had the
12   records.  And if this is based on discrepancies
13   because there was a problem with the records, um,
14   that's not -- you know, they -- that's -- I don't
15   see that being a Cobo Pharmacy issue.
16             I had been audited before that.  This
17   is audit time period 6/24/1998 to 5/26/2000.
18   BY MR. ESCOBAR:
19        Q.   In that entire audit period, you owned
20   Cobo Pharmacy, right?
21             MS. ST. PETER-GRIFFITH:  And he never
22   received notice of this.
```

820

1           MR. ESCOBAR:  I'm not asking you any

2    questions, so -- if you have an objection, so

3    object --

4           MS. ST. PETER-GRIFFITH:  I object.

5           MR. ESCOBAR:  -- otherwise, I don't

6    want to hear you.

7           MS. ST. PETER-GRIFFITH:  Well, if

8    you're going to misrepresent things.

9           MR. BREEN:  But, Counsel, if you're

10   going to misstate this document.

11          MR. ESCOBAR:  I'm not misrepresenting

12   anything.

13          MR. BREEN:  You're misrepresenting the

14   document.  And if you're going to misrepresent a

15   document and make those kinds of accusations --

16          MR. ESCOBAR:  I am not making any

17   accusations.  This is in the document.

18          MR. BREEN:  Never -- you're misstating

19   the document, Counsel, so I'll assert my

20   objections as appropriate.

21          Plus, as a matter of fact, I don't ask,

22   I demand, this witness will not answer one more

821

1    question about this until he takes the time to

2    read every page.

3            MR. ESCOBAR:  Okay.  Go ahead.

4            MR. BREEN:  That way he doesn't have to

5    sit here and let you mischaracterize the

6    document.

7            MR. ESCOBAR:  Go ahead.  Go ahead.

8            MR. BREEN:  So we're going to take a

9    break right now and you can review the document.

10           MR. ESCOBAR:  Fine.

11           THE VIDEOGRAPHER:  Going off the

12   record.  The time is 3:31.

13                   (A recess was taken from 3:31 to

14   3:39 p.m., after which the following proceedings

15   were had:)

16           THE VIDEOGRAPHER:  Going back on the

17   record.  The Videotape Number 6.  The time is

18   3:39.

19   BY MR. ESCOBAR:

20       Q.   Mr. Cobo, have you had a chance to

21   review the portions of 181 that you wanted to

22   look at or your counsel wanted you to look at?

822

1              MR. BREEN:   Before proceeding, I've got

2     a question.   This ACHA document, State of Florida

3     Agency for Healthcare Administration, which bears

4     a Florida AG Bates number on it, and which I -- I

5     will represent on the record that I've seen for

6     the first time today and specifically states a

7     finding of no abuse was made and the file was

8     closed.   I'll ask if this document was ever

9     produced in this case?

10             MR. ESCOBAR:   I think --

11             MR. BREEN:   Was it ever produced to

12    Ven-A-Care in another case, to your knowledge?

13             MR. ESCOBAR:   I think this is a

14    document produced by Florida, your client.

15             MR. BREEN:   My client is not Florida.

16    This --

17             MR. ESCOBAR:   Well --

18             MR. BREEN:   This document was produced

19    by the Florida attorney general.

20             MR. ESCOBAR:   That's my understanding.

21             MR. BREEN:   But it's not a document

22    that you either put on a disclosure or otherwise

Miami, FL

823

1    provided in the instant case until today, is that

2    correct?

3              MR. ESCOBAR:  I don't know that.  I

4    don't know if it's ever been requested; I don't

5    know that you've ever asked for documents like

6    this.

7              MS. ST. PETER-GRIFFITH:  But you've

8    never made an initial disclosure in this case?

9              MR. ESCOBAR:  I don't know.

10             MR. BREEN:  But I just want to make

11   sure the question that you were asking him.  When

12   you were representing on the record that he owes

13   $374,000, you were talking about the same audit

14   which specifically was closed with a no abuse

15   finding, correct?  Is that the audit you're

16   talking about?

17             MR. ESCOBAR:  There's a note of

18   reference here and there's a recommendation that

19   says: Close the case with no abuse.

20             MR. BREEN:  Okay.  That's the one

21   you're talking about, right?

22             MR. ESCOBAR:  That's the one that's in

824

1  here.

2        MR. BREEN:  Okay.  I just want to make

3  sure that the record is clear that when we read

4  back your question and your representation on the

5  record, that you weren't mistaken and you were in

6  fact talking about one you were looking at that

7  specifically said:  Close the file with a no

8  abuse finding.  I just want to make sure the

9  record is clear.

10       MR. ESCOBAR:  Look, there could be a

11  lot of investigations that you guys have done or

12  some other people have done of your clients that

13  I am not aware of.

14       MR. BREEN:  I just want to make sure --

15       MR. ESCOBAR:  That's highly possible.

16       MS. ST. PETER-GRIFFITH:  That's an

17  improper -- improper statement, and you know it,

18  Mr. Escobar.

19       MR. BREEN:  Counsel, I just want to

20  make -- if for some reason I am mistaken and you

21  weren't talking about a document that

22  specifically found no abuse when you made that

825

1    representation, I wanted you to be able to

2    correct it on the record.  But since we're

3    talking about the same one, the record is clear,

4    we can go on.

5             MR. ESCOBAR:  Are you done?

6             MR. BREEN:  I'm done.  And we've got an

7    hour and fifteen minutes more of this deposition

8    --

9             MR. ESCOBAR:  Oh good.

10             MR. BREEN:  -- and then it's over.

11             MR. ESCOBAR:  Okay.

12             MR. BREEN:  So I don't know if Mr.

13   Gortner's got questions.

14             MR. ESCOBAR:  Well, we'll work it --

15   we'll work it out amongst ourselves, right?

16             MR. BREEN:  Well, you better work it

17   out fast because we told you before the

18   deposition --

19             MR. ESCOBAR:  Yeah.

20             MR. BREEN:  -- that you guys need to

21   coordinate this thing.  And I'm not staying here

22   and we're not putting him up for more repetitious

Cobo Tr., at 827:3-9

827

1   appropriate.

2   BY MR. ESCOBAR:

3       Q.    Did you have any conversations, Mr.

4   Cobo, with Florida Medicaid or Medicaid Program

5   Integrity regarding the audit that's referenced

6   in Exhibit 181?

7       **A.    This is the absolute first time I see**

8   **this.  I have had no conversations with anybody**

9   **regarding this.**

10      Q.    And this -- you read the document which

11  references also the $40,000 check that you sent?

12      **A.    Let me see.**

13      Q.    It's at the bottom of Page --

14      **A.    I saw the $40,000 figure, but I didn't**

15  **--**

16      Q.    Page 2874.  You see where it says:

17  "However Medicaid Program Integrity received a

18  $40,000.00 check from Cobo Pharmacy on October

19  12th, 2001 for a self-audit and opened C.I. O1-

20  1769-000 on October 29th, 2001."  You see that?

21      **A.    Yes, on the same paragraph where it**

22  **states that:  The instructions from the Chief of**

Cobo Tr., at 835:10-842:5

835

1    auditors have determined a total calculated

2    overpayment of $472,568.91, right?

3        **A.    Correct.**

4        Q.    And then they deducted that from the

5    amounts paid to Cobo Pharmacy on the claims --

6        **A.    Right.**

7        Q.    -- to come up with a total recommended

8    recovery, right?

9        **A.    Uh-huh.**

10       Q.    So the auditors who conducted this

11   audit for Florida Medicaid reached a total

12   recommended recovery of $374,476.56, right?

13           MR. BREEN:   Objection to form.

14       **A.    Yes.**

15       Q.    Okay.   All right, now -- and then

16   attached to the audit -- pharmacy audit report is

17   a discrepancy listing random sample and it has

18   item by item for several pages, right?

19       **A.    Yeah.**

20       Q.    Okay.   Now, and then in the memo --

21       **A.    May I -- you went over one page, and**

22   **while we're still on the pharmacy audit final**

Cobo, Luis - Vol. III                                          July 31, 2008
Miami, FL

836

1    report introduction, I guess those first two

2    pages --

3        Q.    The memo?

4        A.    Yes.   I would like to comment that to

5    me it is absurd to accept the premise that

6    roughly almost two-thirds of the claims that I

7    have submitted to Florida Medicaid over that

8    period of time had discrepancies.   I would -- I

9    wish I had been, and I should have been, involved

10   in this.   The conclusion on the back about the

11   Y2K unreliability of the computer is bogus.   When

12   I turned that computer over, it was fully

13   functioning, and it had all the information in

14   there and probably in about three of the relevant

15   years of this particular audit and certainly

16   could have been used for a backup to access any

17   prescription information and billing information.

18            And I will also represent that the --

19   that the auditors were directed to the -- let me

20   read it for you into the record.   Cobo Pharmacy

21   records -

22       Q.    Where are you reading?   Just so --

837

```
1        A.    I'm on Page 2 --

2        Q.    This is --

3        A.    -- of FL-AG-0002877.

4        Q.    Okay.  And this is the --

5        A.    The comments.  The notes.

6        Q.    The comments section of the Pharmacy
```

Audit Final Report that's attached to the

memorandum for the record by the Florida Agency

for Healthcare Administration under the

letterhead of ACHA with Jeb Bush as the governor

and Rhonda Medows as the secretary, right?

        MR. BREEN:  No, that's not what it is

at all.

        THE WITNESS:  That's not where I am.  I

don't know what --

        MR. BREEN:  He's on Page 2 of the audit

that you went through the first page of and did

not go to the second page.

        MR. ESCOBAR:  Right and that's attached

to the memo.

        MR. BREEN:  Correct.

        MR. ESCOBAR:  Okay.  All right, let's

838

1    go through that second page.  You're getting --

2              MR. BREEN:  The witness was in the

3    middle of making a --

4              THE WITNESS:  I'm in the middle of --

5    since you had breezed past it, I would like to

6    address it.

7              MR. ESCOBAR:  Okay, well, I hadn't

8    finished, but go ahead since you want to go

9    through it.

10             THE WITNESS:  Okay.  It only seemed

11   that that would have been the next logical, you

12   know, after two would have been number three.

13             MR. ESCOBAR:  We hadn't -- we hadn't

14   passed Number 2.

15             THE WITNESS:  I also have a problem

16   with each paragraph.  The audit checked from

17   records which were bought from Eckerds on

18   5/31/2000, and Cobo Pharmacy is no longer in

19   operation.  The previous owner was not on site

20   during the audit.

21             I was easily available, as they had my

22   address here at Ven-A-Care and could have

1    informed me.  I would have been more than happy

2    to participate and help them read through this.

3                 "The Eckerd pharmacist on duty directed

4    the auditors to the Cobo Pharmacy records stored

5    away from the Eckerd Pharmacy area."

6                 Normally, when an auditor is going

7    through records, I would assist them because

8    there's always times when an auditor has problems

9    and there are things that are inherent in filing

10   and cataloging hard copies that occur in a

11   pharmacy -- in a pharmacy recordkeeping system.

12   And they're easily retrievable because they are

13   separated by the types of prescriptions.  And

14   oftentimes the Medicaid prescriptions you try to

15   separate and segregate, but sometimes they do

16   find themselves into the regular files.

17                 The second paragraph about the Y2K

18   problem is totally bogus.  That prescription

19   computer was working totally operational and

20   functioning until the last day it was at Cobo

21   Pharmacy.

22                 The third paragraph.  "The Cobo

840

1    Pharmacy records were audited."  "Of the 225

2    records in the sample, 139 could not be located.

3    The auditors employed a double check system to

4    avoid overlooking prescriptions."  I don't know

5    what that is.

6             "It is noteworthy that the filing

7    system is not accurate.  For example, there were

8    instances in which the prescription numbers

9    marked on the outside of the spindle boxes did

10   not match the prescriptions filed inside."

11            To that I could address that of all the

12   many prescription boxes that were had, those were

13   accurately kept.  If things had been taken out of

14   those boxes and looked at, gone through,

15   whatever, by somebody else in possession of those

16   prescriptions and not accurately put back into

17   the proper boxes, that may in fact be the case.

18   But while they were at Cobo Pharmacy, we had a

19   storeroom full of those boxes that we often had

20   to access.  And I don't know if you're familiar

21   with the recordkeeping, you know, Bates numbers

22   on prescriptions, but each box would hold

841

1    approximately, let's say for the sake of

2    argument, 500 prescriptions. And on the outside

3    of that box, the prescription number beginning on

4    such and such -- prescription number on such and

5    such a date and ending on such-and-such a

6    prescription number on such and such a date.

7              So a pharmacist could retrieve that

8    box. And if we had to refer the original hard

9    copy, which was often the case, it was easily

10   available and retrievable. So I don't know where

11   that -- that mix-up of boxes came through.

12             Also the -- "None of the prescriptions

13   were filed in true numerical order." I don't

14   know what that is, but prescriptions have to be

15   filed in numerical order. If you have to use,

16   retrieve, you have to participate in an audit

17   that is vital. And I've been through many audits

18   in Cobo Pharmacy, whether it's Medicaid, private

19   insurance audits and have never had a problem

20   like this occur. So I don't know what's happened

21   there, what the issue is. I don't know why I

22   wasn't called to help the auditors go through

842

1   this -- this problem and explain perhaps what was

2   going on or what -- what their issue was, but I

3   thought that needed to be addressed.

4        Q.   Did you ever meet Kenneth Yon?

5        **A.   No.**

6             MR. ESCOBAR:   Thanks, Mr. Cobo.   That's

7   all I have for you.   We will reserve our rights

8   to call the witness again.

9             MR. GORTNER:   Off the record a second.

10            THE VIDEOGRAPHER:   Going off the

11  record.   The time is 3:58.

12                 (A recess was taken from 3:58 to

13  4:04 p.m., after which the following proceedings

14  were had:)

15            THE VIDEOGRAPHER:   Back on the record.

16  The time is 4:04.

17

18                 EXAMINATION

19  BY MR. GORTNER:

20       Q.   Good afternoon, Mr. Cobo.   As you know,

21  my name is Eric Gortner, and I represent Roxane

22  Laboratories.   And, as you know, Ven-A-Care filed

Cobo Tr., at 838:15-842:3

Cobo, Luis - Vol. III                                    July 31, 2008

Miami, FL

838

1    go through that second page.  You're getting --

2         MR. BREEN:  The witness was in the

3    middle of making a --

4         THE WITNESS:  I'm in the middle of --

5    since you had breezed past it, I would like to

6    address it.

7         MR. ESCOBAR:  Okay, well, I hadn't

8    finished, but go ahead since you want to go

9    through it.

10        THE WITNESS:  Okay.  It only seemed

11   that that would have been the next logical, you

12   know, after two would have been number three.

13        MR. ESCOBAR:  We hadn't -- we hadn't

14   passed Number 2.

15        THE WITNESS:  I also have a problem

16   with each paragraph.  The audit checked from

17   records which were bought from Eckerds on

18   5/31/2000, and Cobo Pharmacy is no longer in

19   operation.  The previous owner was not on site

20   during the audit.

21        I was easily available, as they had my

22   address here at Ven-A-Care and could have

1    informed me.  I would have been more than happy

2    to participate and help them read through this.

3              "The Eckerd pharmacist on duty directed

4    the auditors to the Cobo Pharmacy records stored

5    away from the Eckerd Pharmacy area."

6              Normally, when an auditor is going

7    through records, I would assist them because

8    there's always times when an auditor has problems

9    and there are things that are inherent in filing

10   and cataloging hard copies that occur in a

11   pharmacy -- in a pharmacy recordkeeping system.

12   And they're easily retrievable because they are

13   separated by the types of prescriptions.  And

14   oftentimes the Medicaid prescriptions you try to

15   separate and segregate, but sometimes they do

16   find themselves into the regular files.

17             The second paragraph about the Y2K

18   problem is totally bogus.  That prescription

19   computer was working totally operational and

20   functioning until the last day it was at Cobo

21   Pharmacy.

22             The third paragraph.  "The Cobo

1    Pharmacy records were audited."  "Of the 225

2    records in the sample, 139 could not be located.

3    The auditors employed a double check system to

4    avoid overlooking prescriptions."  I don't know

5    what that is.

6              "It is noteworthy that the filing

7    system is not accurate.  For example, there were

8    instances in which the prescription numbers

9    marked on the outside of the spindle boxes did

10   not match the prescriptions filed inside."

11             To that I could address that of all the

12   many prescription boxes that were had, those were

13   accurately kept.  If things had been taken out of

14   those boxes and looked at, gone through,

15   whatever, by somebody else in possession of those

16   prescriptions and not accurately put back into

17   the proper boxes, that may in fact be the case.

18   But while they were at Cobo Pharmacy, we had a

19   storeroom full of those boxes that we often had

20   to access.  And I don't know if you're familiar

21   with the recordkeeping, you know, Bates numbers

22   on prescriptions, but each box would hold

841

1    approximately, let's say for the sake of

2    argument, 500 prescriptions.  And on the outside

3    of that box, the prescription number beginning on

4    such and such -- prescription number on such and

5    such a date and ending on such-and-such a

6    prescription number on such and such a date.

7            So a pharmacist could retrieve that

8    box.  And if we had to refer the original hard

9    copy, which was often the case, it was easily

10   available and retrievable.  So I don't know where

11   that -- that mix-up of boxes came through.

12           Also the -- "None of the prescriptions

13   were filed in true numerical order."  I don't

14   know what that is, but prescriptions have to be

15   filed in numerical order.  If you have to use,

16   retrieve, you have to participate in an audit

17   that is vital.  And I've been through many audits

18   in Cobo Pharmacy, whether it's Medicaid, private

19   insurance audits and have never had a problem

20   like this occur.  So I don't know what's happened

21   there, what the issue is.  I don't know why I

22   wasn't called to help the auditors go through

842

1    this -- this problem and explain perhaps what was

2    going on or what -- what their issue was, but I

3    thought that needed to be addressed.

4        Q.   Did you ever meet Kenneth Yon?

5        **A.   No.**

6            MR. ESCOBAR:  Thanks, Mr. Cobo.  That's

7    all I have for you.  We will reserve our rights

8    to call the witness again.

9            MR. GORTNER:  Off the record a second.

10           THE VIDEOGRAPHER:  Going off the

11   record.  The time is 3:58.

12               (A recess was taken from 3:58 to

13   4:04 p.m., after which the following proceedings

14   were had:)

15           THE VIDEOGRAPHER:  Back on the record.

16   The time is 4:04.

17

18                    EXAMINATION

19   BY MR. GORTNER:

20       Q.   Good afternoon, Mr. Cobo.  As you know,

21   my name is Eric Gortner, and I represent Roxane

22   Laboratories.  And, as you know, Ven-A-Care filed