```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2


 3
     In Re:                             )
 4   PHARMACEUTICAL INDUSTRY             ) CA No. 01-12257-PBS
     AVERAGE WHOLESALE PRICE             ) MDL No. 1456
 5   LITIGATION                          ) Pages 1 - 53


 6


 7


 8                          MOTION HEARING

 9              BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10


11


12


13
                                   United States District Court
14                                 1 Courthouse Way, Courtroom 19
                                   Boston, Massachusetts
15                                 July 26, 2007, 2:05 p.m.


16


17


18


19


20


21


22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                      United States District Court
24                    1 Courthouse Way, Room 3205
                          Boston, MA  02210
25                          (617)345-6787
```

Page 2

1  A P P E A R A N C E S:
2  For the Plaintiffs:
3      JOANNE M. CICALA, ESQ., JAMES P. CARROLL, ESQ.,
   AARON D. HOVAN, ESQ., and J. BRADLEY VATRT, ESQ.,
4  Kirby, McInerney & Squire, LLP, 830 Third Avenue, New York,
   New York, 10022, appearing for the City of New York and all
5  New York counties except Nassau.
6      ROSS B. BROOKS, ESQ., Milberg Weiss & Bershad, LLP,
   One Pennsylvania Plaza, New York, New York, 10119,
7  appearing for Nassau County.
8      THERESA A. VITELLO, ESQ., Levy, Phillips & Konigsberg,
   LLP, 800 Third Avenue, New York, New York, 10022, appearing
9  for Orange County.
10 For the Defendants:
11     LYNDON M. TRETTER, ESQ. and HOA T. T. HOANG, ESQ.,
   Hogan & Hartson, 875 Third Avenue, New York, New York, 10022,
12 appearing for Bristol-Myers Squibb and as liaison counsel for
   the defendants.
13
       JOHN T. MONTGOMERY, ESQ. and JOHN P. BUEKER, ESQ.,
14 Ropes & Gray, LLP, One International Place, Boston,
   Massachusetts, 02110, appearing for Schering and Warrick.
15
       MARK H. LYNCH, ESQ., Covington & Burling, LLP,
16 1201 Pennsylvania Avenue, N.W., Washington, D.C., 20004-2401,
   appearing for GlaxoSmithKline.
17
18
19
20
21
22
23
24
25

Page 3

1              P R O C E E D I N G S
2      THE CLERK:  In Re:  Pharmaceutical Industry Average
3  Wholesale Price Litigation, Civil Action No. 01-12257, will
4  now be heard before this Court.  Will counsel please identify
5  themselves for the record.
6      MS. CICALA:  Good afternoon, your Honor.  Joanne
7  Cicala from Kirby, McInerney & Squire on behalf of the City
8  of New York and all New York counties in the first amended
9  consolidated complaint except for Nassau.
10     MR. HOVAN:  Aaron Hovan, also with Kirby, McInerney
11 & Squire.
12     MR. CARROLL:  James Carroll from Kirby, McInerney &
13 Squire.
14     MR. BROOKS:  Good morning, your Honor.  Ross Brook,
15 Milberg Weiss, on behalf of Nassau County.
16     MR. VATRT:  Brad Vatrt, also with Kirby, McInerney
17 & Squire.
18     MR. VITELLO:  Good afternoon, your Honor.  Theresa
19 Vitello with with Levy Phillips on behalf of Orange County.
20     MR. TRETTER:  Lyndon Tretter, Hogan & Hartson, on
21 behalf of BMS and as liaison counsel for the defense.
22     MR. BUEKER:  Good afternoon, your Honor.  John
23 Bueker from Ropes & Gray on behalf of Schering and Warrick.
24     MR. MONTGOMERY:  John Montgomery for Schering and
25 Warrick as well.

Page 4

1      MR. DAVIS:  William Davis from Mintz Levin on
2  behalf of Eli Lilly, your Honor.
3      MR. LYNCH:  Mark Lynch for GlaxoSmithKline.
4      THE COURT:  All right, many familiar faces.  Is
5  there anyone up here who wants to introduce themselves?
6  Okay.
7      So we're in the next round, and maybe as a few
8  preliminary matters, I know you've seen the memo from the
9  United States on how FUL works, and I'm assuming that
10 everyone in this room agrees that that's basically how it
11 works.  Is that right?
12     MS. CICALA:  We do, your Honor.
13     MR. BUEKER:  I don't think we have any
14 disagreement.  I think that --
15     THE COURT:  It was a point of enormous confusion to
16 me before, and I think that that was an extremely helpful
17 description that both sides seemed to agree to.
18     MS. CICALA:  We do agree.
19     THE COURT:  So that helps me understand the FUL
20 claim, which was the primary reason why I permitted some sort
21 of an amendment, is because we didn't really know what it
22 was.  So to backtrack, it's the big issue outstanding in my
23 mind.  Let me just say this.  It strikes me that if a FUL
24 claim is to survive, it must be based on published price.  Is
25 that right?

Page 5

1      MS. CICALA:  Yes, absolutely, your Honor, the FUL
2  is based on the lowest published price.
3      THE COURT:  And if you looked at their little
4  example, and I think the defendant actually laid it out in
5  the brief, you know, Example 1, Example 2, Example 3 -- that
6  was extremely helpful to me in understanding it -- I don't
7  know if it was to you -- but it can't just be any published
8  price.  It would have to have made a difference.
9      MS. CICALA:  I completely agree.  It was actually
10 set out in our brief, your Honor.
11     THE COURT:  So it was yours?
12     MS. CICALA:  Yes.
13     THE COURT:  So don't you have to allege that for
14 each drug, that whatever the published price is was, A,
15 false, and, B, would have made a difference?
16     MS. CICALA:  Yes, your Honor, that's absolutely
17 what we have to allege and what we believe we have alleged in
18 our first amended complaint.
19     THE COURT:  So it's not relying on transactional
20 price?
21     MS. CICALA:  Well, it is relying on transactional
22 prices to the extent that what our argument is is that the
23 published prices must be tethered to what the actual provider
24 acquisition costs were, and we believe that's consistent
25 with what HCFA and the OIG and the DOJ say.

Page 6

1  THE COURT: But suppose --
2  MS. CICALA: So, for example, the defendants --
3  THE COURT: But have you actually done the checkup
4  to say -- let's say that the AWP was or the WAC you would say
5  was fictitious, under whatever measure it is.
6  MS. CICALA: Right, under whatever measure you use.
7  THE COURT: Did you then go back and look at the
8  FUL for whatever time period we're talking about, a quarter
9  or a year?
10 MS. CICALA: Absolutely.
11 THE COURT: And say whether or not that would have
12 taken it down?
13 MS. CICALA: Yes, that's exactly what we did. What
14 we did, first, we calculated what we believed the true
15 published price should have been based on the actual prices
16 to the providers, and then we applied to that number -- let's
17 call it an ASP, a true ASP -- we applied to that number
18 150 percent. If we come up with a figure that is below the
19 FUL, then, we argue, had defendants reported their true ASP,
20 the FUL would have been lower. And that's precisely what
21 we've --
22 THE COURT: Now, in doing the ASP, I -- and maybe
23 I'm jumping too far ahead here --
24 MS. CICALA: No, that's fine.
25 THE COURT: -- I completely agree with the

Page 7

1  defendants that the pennies don't count. There are too
2  many -- it creates a distortion. And maybe to some extent
3  I'm importing knowledge that I've gained through my big
4  trial, but that's also one of the reasons of having an MDL
5  judge.
6  MS. CICALA: Sure.
7  THE COURT: They're sometimes used for samples,
8  sometimes for charity, it could have been for other reasons,
9  but no one's selling stuff at a fraction of a penny. I think
10 that creates a distortion. So if at some point you get
11 expert testimony that there is some other thing that I don't
12 understand, maybe; but I'm not going to let thousands of
13 drugs be a matter of discovery. It's just too big an
14 expansion, based on what I understand. So take those out.
15 MS. CICALA: May I comment on that?
16 THE COURT: And you've now recalculated based on
17 some sort of weighted average.
18 MS. CICALA: Sure.
19 THE COURT: So what does that do to the complaint?
20 MS. CICALA: I can answer that precisely. There
21 are 344 penny drugs at issue based on the AACs that we put in
22 Exhibit B to the complaint. If we recalculate those based on
23 a weighted average, all but 26 would still be in the case.
24 THE COURT: All right, so those 26 should come out
25 until you provide some sort of a good-faith basis, through

Page 8

1  discovery or whatever --
2  MS. CICALA: That's fine.
3  THE COURT: -- that this isn't a sample, because
4  samples are handed out, and it isn't a charity, and it isn't
5  just an accounting placeholder. Typically these drugs are
6  sold -- well, I want a typical price.
7  MS. CICALA: Sure.
8  THE COURT: Not something that's likely to be
9  something else, all right. So that's point one. So you
10 would say all the 26, if I use the 20 to 25 percent markup
11 range.
12 MS. CICALA: Exactly right, yes. And then, I mean,
13 I entirely respect where your Honor is coming from on the
14 pennies. We put them in based on our understanding of the
15 wholesale data and given how many of them are pursuant to
16 contract and given the classes of trade we used.
17 And, also, we had run weighted averages before we
18 filed the first amended consolidated complaint, and as we saw
19 that in large part due to binary exercises they are out, we
20 felt comfortable with the methodology. But, in any event,
21 your Honor, I guess the bottom line is, of the 344 penny
22 prices in the complaint, all but 26 would stay in based on a
23 weighted average.
24 THE COURT: So the next issue is, the defendants
25 allege -- and it's a little hard for us, we didn't sit and

Page 9

1  bean count through -- that there are a huge number of
2  additional drugs. What is it, 300 plus?
3  MS. CICALA: Your Honor, we have disagreement on
4  the number of new drugs, but --
5  MR. TRETTER: Your Honor, I'm prepared to go
6  through that in very abbreviated fashion.
7  THE COURT: Yes, I'm just saying any new drug
8  should go out. That wasn't what the purpose of this was.
9  MS. CICALA: Your Honor, if I may, I guess the
10 question that we --
11 THE COURT: We may have a fight as to what was new
12 and what wasn't new.
13 MS. CICALA: Right, that's the issue. I mean, we
14 had -- your Honor's pleading standard was such, when we filed
15 the consolidated complaint in June of 2005, that there was
16 not required an NDC-by-NDC allegation of spread.
17 THE COURT: Let me just say, NDC is different.
18 Different NDCs can come in.
19 MS. CICALA: Right.
20 THE COURT: But what I said was no new drugs. And
21 they say there are some wholly new drugs in there, right?
22 MS. CICALA: Well, they say there are some wholly
23 new drugs. They also say that some of the drugs were in the
24 case previously but assigned -- the drug belonged to a
25 different defendant, and if the drug belonged to a different

Page 10
1  defendant --
2      THE COURT:  No, I'm not going to play that, but any
3  brand-new drug -- this was not the purpose for the
4  amendment -- should be out.  So how many brand-new --
5      MS. CICALA:  And you don't mean branded, right.
6      THE COURT:  But how many new drugs that were never
7  listed before?  Not a new NDC but a new drug.
8      MR. TRETTER:  Our view is 710, but the reason --
9      THE COURT:  700?  Why are you both so far apart?
10     MR. TRETTER:  If I may?
11     THE COURT:  Yes.
12     MR. TRETTER:  Let's say they say albuterol is in
13 the case as to Warrick, but they never mentioned it before as
14 to Dey or fifteen other defendants in this case.  If it
15 appears for the first time as to Dey and these other
16 defendants in this first amended consolidated complaint, for
17 that defendant, it's a very new drug.  And, as you know, your
18 Honor --
19     THE COURT:  How many are completely new drugs?
20     MR. TRETTER:  I take them at their word that it's
21 300 and whatever completely new as to any defendant.
22     THE COURT:  Those are the ones that come out.
23     MR. TRETTER:  But what about the ones where, you
24 know, a defendant never -- because, as you know, your Honor,
25 when you have to go looking for the median or the lowest

Page 11
1  price, or whatever it is, every single defendant now has
2  to --
3      THE COURT:  Well, I'm drawing -- the only thing I
4  said was no new drugs.  And I actually viewed it as a direct
5  violation, and I don't know why you didn't flag it or why you
6  did that, or at least asked permission to go beyond that.
7  The theory wasn't -- I was trying to constrict, not add, and
8  you added 300 new drugs, completely contrary to what I said.
9      MS. CICALA:  Your Honor, I have two responses.  We
10 absolutely did not intend to violate an express order of the
11 Court.  After your Honor made that directive at the last
12 status conference, I responded by saying, yes, your Honor,
13 but there's the question of which drugs off of our master
14 list are in the case.  And I can quote to you from the
15 transcript, if you'd like.
16     THE COURT:  In any event, they're gone.
17     MS. CICALA:  And that's fine, your Honor.
18     THE COURT:  I don't even want to debate them.  This
19 has got to have some constraint, not expansion.
20     MS. CICALA:  Okay.
21     THE COURT:  On new drugs, I didn't say that.  I had
22 a direct order before that no new drugs, and so --
23     MR. TRETTER:  Right, and the issue is what's new.
24     THE COURT:  Yes, I know, and I'm not -- that's what
25 I'm defining now, no brand-new, never-before-mentioned drug.

Page 12
1  And I understand your point, but I have to draw certain lines
2  here, so that's what I'm doing.
3      And the other issue is, with respect to some didn't
4  have spreads and they've added in a spread, that's okay, but
5  no completely -- we're not adding.  And this is it.  This is
6  the frozen list right now.
7      MS. CICALA:  That's fine, your Honor.
8      THE COURT:  Now, with respect to
9  physician-administered drugs, I have to admit I don't
10 understand the issue, and I found it very confusing.
11     MR. TRETTER:  I'm prepared to discuss that, and I
12 would also like to discuss the 30 percent rule as it applies
13 to single-source because that's an important gating decision
14 as well.
15     THE COURT:  I understand.  But the
16 physician-administered drugs --
17     MR. TRETTER:  I can explain that in two shakes,
18 your Honor.
19     THE COURT:  Yes.
20     MR. TRETTER:  Where we started is that when the
21 drug is administered by a physician in a physician's office,
22 it is not reimbursed on an AWP logic, and therefore it is out
23 of the case.  Everybody agrees with that.
24     THE COURT:  Right, and they still do.
25     MR. TRETTER:  Now, you have the same drug that

Page 13
1  could be theoretically brown-bagged to the physician's
2  office.  In other words, it can be purchased or picked up by
3  the Medicaid patient from a retail pharmacist, for example,
4  and walked over to the doctor's office.  And in that case,
5  what the plaintiffs are alleging is, the retail pharmacist is
6  entitled to be reimbursed for that same
7  physician-administered drug on an AWP logic.  So it's the
8  situs of where it's infused or dispensed.
9      THE COURT:  Okay, so why isn't that enough to
10 count?
11     MR. TRETTER:  Because what they do is, they have
12 one allegation that we spent $1.4 billion on such drugs for
13 such non-physician providers.  And we say, and your
14 Honor's --
15     THE COURT:  They say they get it out of their
16 records that they paid for these based on AWP, so they came
17 from the pharmacy.
18     MR. TRETTER:  Right, but what we're saying is that
19 they don't have any particularization as to any county.  For
20 instance, we don't know whether Onondaga County --
21     THE COURT:  Why does it matter?
22     MR. TRETTER:  Well, it matters because each
23 defendant is a separate defendant in this case, and we don't
24 know whether this all relates to one physician-administered
25 drug, 20 physician-administered drugs, because take my --

Page 14

1    THE COURT: Excuse me. They don't list the
2 specific physician-administered drugs?
3    MR. TRETTER: They list physician-administered
4 drugs but not bearing any relationship to whether a county
5 reimbursed a nonphysician provider for it. In other words,
6 physician-administered drugs are listed in the abstract.
7    Take my client's drugs, Vepesid, which you're
8 familiar with. These are oncology products.
9    THE COURT: So they don't say that so much Vepesid
10 was purchased at AWP?
11    MR. TRETTER: Correct. They don't have that, nor
12 do they have, and most importantly --
13    THE COURT: I don't think it matters, though, one
14 county versus another, because they're representing all
15 the --
16    MR. TRETTER: All right, but, your Honor, at least
17 we should break it down by drug. And the reason it's very
18 important, your Honor, is because ultimately they have to
19 allege a spread, and a retailer --
20    THE COURT: Did you allege the
21 physician-administered drugs drug by drug?
22    MS. CICALA: We did not identify which drugs in
23 Exhibit B are, quote, "physician-administered drugs," your
24 Honor. What we allege and what is simply a fact is -- and if
25 you want an affidavit from the New York State Department of

Page 15

1 Medicaid pharmacy director, we will supply it -- that every
2 single drug in our Exhibit B was reimbursed on the basis of
3 either AWP or FUL.
4    THE COURT: So why doesn't he list the specific
5 ones which they believe were physician-administered based on
6 AWP?
7    MR. TRETTER: And what the spread was to those
8 particular providers as opposed to physicians. Part of what
9 the problem is, your Honor, is the physicians who
10 purchased --
11    THE COURT: Did you allege the spreads?
12    MS. CICALA: Yes, of course. Every single NDC in
13 Exhibit B has a spread, your Honor, for a relevant class of
14 trade, meaning the class of trade that's reimbursed based on
15 AWP or FUL.
16    THE COURT: I don't understand what the issue is.
17 I mean, if you want to get from discovery exactly what
18 those -- or even automatic disclosure, I'll order her to do
19 it.
20    MS. CICALA: We're happy to do that, your Honor.
21 We can supply the claims data to show the reimbursement price
22 and the method of reimbursement to the retail pharmacy, the
23 specialty pharmacy and --
24    THE COURT: That should be enough.
25    MS. CICALA: And, your Honor, with respect to the

Page 16

1 class drugs, the counties spent over $180 million based on
2 AWP or FUL on the class drugs, not based on actual cost,
3 based on AWP or FUL. We've done the research. Every one of
4 the class drugs is in Exhibit B.
5    THE COURT: When you say "class drug," what do you
6 mean?
7    MS. CICALA: I'm saying the drugs -- I'm sorry --
8 the drugs that your Honor considered in the context of the
9 recent MDL class trial, those drugs were reimbursed on the
10 basis of AWP.
11    THE COURT: So you're going to turn over to them
12 exactly what drugs that you're talking about are the
13 physician-administered drugs that are typically reimbursed
14 based on a different basis and you're alleging were
15 reimbursed out of a pharmacy based on AWP.
16    MR. TRETTER: I would like to just put a practical
17 point on it, your Honor. I would like to know for a
18 chemotherapy drug how much they're really contending was
19 issued out of retail pharmacies and whether the retail
20 pharmacist gets it at the doctor's price or --
21    THE COURT: You know what, that's why you have
22 discovery. I'm not doing that on a motion to dismiss. So
23 you want that on automatic disclosure. We should do that.
24 When can you do that by?
25    MS. CICALA: I want to be clear what the automatic

Page 17

1 disclosure is, your Honor, if I may.
2    THE COURT: I think he's saying he doesn't know
3 which ones you're alleging are the physician-administered
4 drugs that are being reimbursed out of AWP. Like, Vepesid
5 would be his example.
6    MS. CICALA: I do not understand why we would need
7 to single out the physician-administered drugs as a subset of
8 the whole if our spread allegations are --
9    THE COURT: I'm not dismissing the compliant. I'm
10 just simply saying that it should be -- if you say you can do
11 it, do it. It helps move it along, that's all. I'm not
12 dismissing on that ground.
13    Now, let me jump back to you.
14    MS. CICALA: Sure.
15    THE COURT: Which is, I understand you're not bound
16 by what I did in my major trial. You're not. You don't have
17 to agree with Raymond Hartman, Dr. Hartman. Maybe there's
18 some other guy out there who disagrees, okay? On the other
19 hand, this case is massive. As was just pointed out, it's a
20 gateway issue. It's how much discovery has to be done. It's
21 not like my typical case where I say, "Huh, manana, I'll
22 worry about it later." If I say "Go ahead," then I'm opening
23 huge amounts of expensive discovery. I have to have the
24 basis for believing that some expert somewhere disagrees with
25 what Raymond Hartman says because he was viewed as

Page 18

1 problematic, even by them. You notice I hedge. There are
2 places they agree with him. But that was supported by the
3 evidence at trial.
4      MS. CICALA: Absolutely, we have tremendous respect
5 for Professor Hartman's conclusions in the class trial. It
6 just seems to us he considered -- a two-part answer, your
7 Honor. Professor Hartman considered the knowledge and
8 expectations of the plaintiffs that were before your Honor in
9 connection with the class trial. Those were not Medicaid
10 payors, nor were they even government entities. I'm not
11 sure, I don't think any of us as we sit here today --
12      THE COURT: Well, there was overwhelming evidence
13 that the federal government understood that. I would grant
14 you, I don't think we mentioned New York once, so I -- not
15 that I know that New York did, but I am simply saying, it was
16 uncontested and a pretty hard-fought battle with outstanding
17 lawyers, okay. I'm not dealing with somebody who was being
18 overwhelmed or something. Both sides were duking it out.
19      MS. CICALA: Right, and we're not disputing
20 Professor Hartman's conclusions with respect to the
21 plaintiffs for whom he offered an opinion, and nor are we
22 even necessarily disputing his conclusions if they were
23 imported into this case. What I'm saying, your Honor, is, he
24 has not offered an opinion on the knowledge or expectations
25 of government Medicaid and Medicare payors, and it would be

Page 19

1 premature on the record we have before us to conclude that
2 his opinion regarding expectations automatically will apply.
3      THE COURT: I agree with you a hundred percent that
4 it doesn't automatically apply. On the other hand, I
5 heard -- there were many major battles going on in my trial,
6 but that wasn't one of them.
7      MS. CICALA: Understood, understood.
8      THE COURT: Okay? Of the many things we had, that
9 was the one piece that I would say was virtually undisputed.
10 That's why I never really understood the defendants' attack
11 on the reliability because that was pretty undisputed.
12      MS. CICALA: Right.
13      THE COURT: So this is what I'm going to do: We
14 are going to stay discovery on any drug that doesn't have a
15 30 percent --
16      MS. CICALA: Okay, all right.
17      THE COURT: What did we call it?
18      MR. TRETTER: Spread.
19      THE COURT: Spread, speed limit, whatever you want
20 to call it, we're going to stay discovery on it. And I would
21 need some really good-faith expert opinion as well as
22 affidavit evidence that there's a good-faith basis for me
23 jumping it down to the 20 to 25 percent. So I think at the
24 time we talked last, I don't think I'd issued my --
25      MS. CICALA: You hadn't.

Page 20

1      THE COURT: I hadn't worked everything through. So
2 what you did was in good faith in reliance on what I had
3 said, but the issue really -- you're not bound by it.
4      MS. CICALA: I understand.
5      THE COURT: You just, in order to open up that
6 floodgate of additional new drugs -- how many would you say
7 are in the 30 percent range?
8      MR. TRETTER: Well, we have an actual slide on
9 that, and it depends.
10      THE COURT: You mean someone did this fabulous
11 layout, and I'm going too fast?
12      MR. TRETTER: Hoa did it all.
13      THE COURT: Who did it?
14      MR. TRETTER: Hoa.
15      MS. HOANG: Hi, your Honor.
16      THE COURT: Hi. Well, just put it on just so it
17 wasn't all for not.
18      MR. TRETTER: First, you have to break it into two
19 pieces. You've got the self-administered drugs at 30 percent
20 and the physician-administered drugs at 30 percent.
21      THE COURT: I believe you were always encouraging
22 me to say that they would be roughly the same, the
23 expectations in the industry.
24      MR. TRETTER: Yes, I think, I mean, I don't see any
25 reason to distinguish between the two. Just this happens to

Page 21

1 be -- you have 1,448 NDCs that are out based on 30 percent,
2 as we see it. Assuming, of course, you take either price
3 that the plaintiffs used, either the McKesson ServALL or the
4 average that they calculated --
5      THE COURT: I'm not going to get into those weeds
6 for purposes of the motion to dismiss as to which class of
7 trade or how you calculate it. It can't be with the
8 pennies. That's where I'm --
9      MR. TRETTER: Right, I understand that. Then we're
10 going to have to work through some sort of way of deciding
11 what's stayed because you've got to say 30 percent of what?
12      THE COURT: Well, you want -- it's either a typical
13 price in McKesson or an average price. I'm not going to get
14 into what class of trade should be there. That's not motion
15 to dismiss material.
16      MR. TRETTER: All right, your Honor.
17      THE COURT: I don't know, and I'm not going to do
18 that, and I would need expert reports about what's fair. I
19 don't even remember, although you probably told me, what
20 Medicare is using as their classes of trade.
21      MR. TRETTER: You mean Medicaid or Medicare?
22      THE COURT: Medicare, when they're doing their
23 ASPs, I don't know how they're coming up with them.
24      MS. CICALA: They're different classes, your Honor.
25      MR. TRETTER: Yes, totally different classes of

Page 22
1  trade because there's really not much of a retail class of
2  trade there.
3       THE COURT:  I understand that, but for at least the
4  physician-administered drugs, which is why it's useful to
5  have the list, it should roughly reflect where Medicare is
6  going because they're the, you know, the big elephant in the
7  room.  With respect to self-administered drugs, how is
8  Medicare deciding what to do under the new Part D?
9       MR. TRETTER:  Oh, under Part D as in "dog"?
10      THE COURT:  Are they doing anything like this?
11 This is why we need discovery.  I can't address that here.
12 And so you take a typical price in good faith, and that's
13 going to be enough, and it's going to be 30 percent, and
14 everything else is stayed.  And once I get further into this
15 case and I decide whether it's 30 or 24 or 25 percent, and
16 once I decide what classes of trade make sense according to
17 expert opinion, then I'll be able to start pruning down.
18      MR. TRETTER:  All right.  What I'm hearing, though,
19 your Honor, is, we're not engaging in nearly as much pruning
20 as the defendants hoped, because I think you'll get rid of
21 some NDCs here.  But, you know, remember, we had 133 in the
22 MDL, and you have 11,000 here.
23      THE COURT:  I understand that.  I'm on the same
24 page with you, but -- so I'm limiting you to 30 percent, and
25 it's a good-faith, whether it's median or average or typical

Page 23
1  through some publication, excluding pennies or low fliers --
2  median maybe makes sense -- but whatever you want to use
3  that's in good faith --
4       MS. CICALA:  Yes, the weighted average, I mean, the
5  weighted average is in good faith.
6       THE COURT:  Well, get rid of the pennies, though.
7       MS. CICALA:  Yes, but I gave you the statistics on
8  what happens to the pennies with the weighted average.
9  There's very little impact on the NDC.
10      THE COURT:  What if I added 30 percent?
11      MS. CICALA:  It sounds like Mr. Tretter is
12 representing something like 1,400 NDCs would fall out.
13      MR. TRETTER:  Well, that's just on the pills, and
14 then a few more would end up out in the PADs.  But once you
15 take out the pennies, probably it would be a little bit more.
16 But that was with the pennies.
17      THE COURT:  All right, what you're just going to
18 do, we're not going to have a new complaint here.  We're just
19 going to have a new exhibit.
20      MS. CICALA:  Okay.
21      THE COURT:  And you don't have to answer it.  It's
22 going to be called a "substitute exhibit" because I can't
23 keep going through these rounds of motions to dismiss.
24      MS. CICALA:  Your Honor, I would like to include
25 the below 30s in the exhibit so the Court has a complete list

Page 24
1  of NDCs --
2       THE COURT:  No.
3       MS. CICALA:  -- even though discovery is stayed as
4  to them.
5       THE COURT:  Then do them as a separate exhibit.
6       MS. CICALA:  Fine.  That's fine, your Honor.
7       THE COURT:  All right, now --
8       MR. TRETTER:  I think that leaves the FULs.
9       THE COURT:  Okay, so that's the hard one.  All
10 right, go ahead.
11      MR. BUEKER:  And I guess, your Honor, if I might be
12 heard on that, I'm prepared, I have an example to talk
13 through that I think would help the Court even to further
14 appreciate the FUL --
15      THE COURT:  They say, though -- and I haven't sat
16 and walked through all these enormous charts -- they say
17 they've done what the federal government said; that they've
18 only taken drugs where the accurately stated published price,
19 not transactional price, published price would have brought
20 down the FUL.
21      MR. BUEKER:  Well, I guess I have trouble
22 understanding --
23      THE COURT:  You in your brief say that's not true,
24 and that's hard for me to resolve right here.
25      MR. BUEKER:  I mean, I guess I have trouble

Page 25
1  understanding how that could be so for a couple of reasons.
2  First, just to jump off from a framework with which the
3  Court's familiar, we're not talking about a median situation
4  like in the Medicare context.  Here we're talking about a
5  single price that's going to set the FUL.  So I think that's
6  the first distinction to be made.  The second distinction is,
7  we're not talking about any based on AWP.  The FULs --
8       THE COURT:  I know, but it doesn't have to be.
9  That was the other suit.  If they want another theory, they
10 can.
11      MR. BUEKER:  Right.  And I guess in that theory, I
12 don't know how you square another theory here with the FUL
13 regulatory regime that HCFA established in 1987, knowing full
14 well what the published prices were and how the market for
15 generic drugs was going to operate within the FUL regime.
16      THE COURT:  You know, one of the hardest issues in
17 the big class action, if you will, was BMS's actually very
18 hard-fought defense, which I accepted in large part, which is
19 what is a fair -- actually, in that case was more the WAC --
20 you know, how do you decide what's fair?  And there was
21 actually surprisingly little case law talking about it.
22 There was one FTC guidance thing with very little court.  So
23 I did what I thought was fair, which was, if 51 percent of
24 sales were at or about that WAC, then it was fair.
25      So I'm trying to figure out, although you're not

Page 26

1  bound by that, if in fact the published prices without, you
2  know, maybe eliminating the prompt-pay discount or something,
3  were roughly at or about WAC, then it's not fraudulent.
4      So are you saying they're transgressing that,
5  they're saying just because there were a few transactions at
6  the low end?
7      MR. BUEKER: No, no. I guess what I'm trying to
8  say is, I'm not sure how the Court is thinking about fair in
9  this context. I think, to think about what is fair in this
10 context, you'd have to do so with reference to the regulatory
11 history, which in relevant part --
12     THE COURT: You have to have honest prices,
13 published prices.
14     MR. BUEKER: You have to have honest prices, but
15 HCFA had an expectation. Just like PBMs had an understanding
16 of how the market was going to work, HCFA had an
17 understanding of how the market was going to work in this
18 context. And what they understood was that initially people
19 were going to report a published price; and that over time,
20 as a result of discounting, which HCFA was seeking to
21 encourage here because that's generic substitution and a
22 lower overall price -- that's what they were seeking to
23 encourage -- was that the price, the reported published price
24 would become increasingly obsolete. The idea of the whole
25 regime was just that. So I think one has to measure fair in

Page 27

1  that context. And I think that's actually driven home when
2  you start looking at what alternative measure one might
3  choose for, you know, what is fair. It can't be AMP. The
4  recent OIG reports --
5      THE COURT: Well, because it wasn't published, so
6  AMP played no role in the FUL.
7      MR. BUEKER: Right. And it can't be an average as
8  the plaintiffs say. I think, if you look at the average and
9  just take 150 percent of some average price to a wholesaler,
10 leave aside --
11     THE COURT: But let me just pose a tough case,
12 though. What if, like happened eventually with some of the
13 Bristol-Myers drugs, in the beginning it was roughly fair,
14 and then by the end, only 5 percent of the drugs were being
15 sold at WAC? And so, you know, for huge periods it was a
16 fairer way, even though there was substantial discounting for
17 certain groups, but still something like, you know,
18 90 percent of the sales or 80 percent of the sales were at
19 the wholesale sale acquisition cost, but at some point it
20 drops to 5 percent. So you're saying, even when it drops to
21 the 5 percent, it's fair for them to continue reporting it?
22     MR. BUEKER: Yes. I think the system was designed
23 to work on the basis of published prices, and I --
24     THE COURT: I guess I'm not prepared to do that in
25 the context of a motion to dismiss. On the other hand, I

Page 28

1  don't want you to come in -- I mean, if 80 -- let me put it
2  this way: I found this to be a difficult issue in the last
3  case. It's not just -- the fact that a substantial number of
4  discounts took place is not going to give you a cause of
5  action if there's a substantial number of sales also being
6  sold at wholesale acquisition cost, right?
7      MS. CICALA: You're right, your Honor. That's why
8  I think a weighted average approach really does make a
9  tremendous amount of sense.
10     THE COURT: I don't know, and I'm not willing to
11 put my stake in the ground. I think what really might be
12 called for is taking -- why don't we just take -- I mean,
13 there are so many of these. Would it make some sense for
14 each side to take your best five and your best five, and try
15 and at least figure out the methodology, rather than do
16 discovery on these millions -- how many -- however many we
17 end up with to find out what makes sense?
18     MS. CICALA: I mean, in terms of methodology, one
19 of the many benefits of the very high pleading standards that
20 we have on these issues is that a substantial amount of the
21 work we're going to need to do ultimately in this case for
22 liability and damages purposes is in large part done. Now,
23 it's not entirely done because we don't have all the
24 defendants' data, nor do we have all of the data from the
25 wholesalers. But what we do have is and what we've used is

Page 29

1  sufficient data to demonstrate on a good-faith basis how the
2  failures to report accurate provider acquisition costs led to
3  these FULs, led to the issuance of these FULs.
4      THE COURT: But doesn't it make sense to brief
5  summary judgment early on with respect to with some expert
6  guidance and a record with your case? This was really
7  helpful in BMS. We had drugs at both ends of the spectrum.
8      MR. BUEKER: Trust me, your Honor, I don't disagree
9  at all with the idea of narrowing and doing discovery on a
10 smaller number of drugs here. I think it would be
11 informative. But I'm not sure we should even have to get
12 that far. I think this is a --
13     THE COURT: I'm not doing that for you on a motion
14 to dismiss. But I am willing to because -- I've been looking
15 for, and I think I'm not really looking anymore to do this
16 because every time I give you the opportunity, you expand
17 it. So I think what I would like to do is come up with a
18 schedule where each side takes -- how many defendants are
19 there again?
20     MS. CICALA: There are 38 defendant groups, but
21 only a certain number of them manufacture drugs that were
22 ever subject to FULs, your Honor, so we could pick isolated
23 multi-source drugs, innovator or noninnovator, multi-sources
24 that were a subject --
25     THE COURT: And maybe you pick five and you pick


Page 30

1  five, and we brief it before we do discovery on any other
2  FULs, and just get to what I think might be some fair way of
3  thinking about this issue for purposes of discovery, because
4  normally I would say, "Go ahead, do discovery." Like, I have
5  a Neurontin case; just Neurontin, do Neurontin. Or just some
6  other drug, do that drug. You can't possibly expect to do
7  discovery on these 1,400 drugs on both sides, and then have
8  me then say, "Oops, I actually don't agree with the
9  methodology." It would be a waste of money.
10       MS. CICALA: Yes. No, I agree, I agree. And we
11 have no problem with this approach at all, your Honor. The
12 methodology is -- because I think it will do a number of
13 things. First of all, essential -- let me make one point
14 first -- essential to our ability to meaningfully present
15 this to your Honor is to obtain the transaction data that
16 would be necessary to calculate an ASP on these drugs from
17 the defendants. That's not something that we have now. But
18 assuming we can -- let's say we come up with a list of
19 innovator and noninnovator multi-sources that were ever
20 subject to a FUL, we come up with a list of 10, or whatever
21 number your Honor wants to propose, we need the transaction
22 data for those so that we can calculate a true ASP based on
23 defendants' own data. Or we can use the wholesaler data. We
24 don't have any problem using the wholesaler data, given that
25 the overwhelming majority of the wholesaler prices were

Page 31

1  prices that defendants negotiated with the providers. But
2  we'd need the ASP data --
3        THE COURT: So let's say ten of them. You're doing
4  ongoing discovery now anyway, right?
5        MS. CICALA: Yes.
6        THE COURT: So on the FULs, let's fast track that
7  because that's really a big issue for you, right?
8        MR. BUEKER: It is, it is a big issue. I think
9  it's a question of plausibility of any kind of a theory, and
10 I'm not --
11       THE COURT: It's plausible. It may not win,
12 though. You know, it's plausible. You're in the AWP mode,
13 and you're right that there's no -- I don't think you're
14 competing with each other based on the FUL. That was an
15 issue as well with the median price. But if they're not
16 truthful prices, they're not truthful prices, so --
17       MR. TRETTER: It does lead to an issue of motive in
18 a fraud case. But may I make one point that's a legal point
19 on the FULs?
20       THE COURT: I'm not saying it's irrelevant, but it
21 isn't dispositive.
22       MR. TRETTER: The FUL, the Federal Upper Limit, is
23 not a reimbursement rate. That's the most important thing
24 you get out of the government's brief. All it is is a
25 ceiling under which, if the states pay more than that, the

Page 32

1  federal government will not give the state its FFP, the
2  Federal Financial Participation.
3        Some states like New York, notwithstanding a
4  warning by HCFA, "Do not use our FUL as a reimbursement rate
5  for an individual generic drug," have chosen to do so.
6  There's a legal issue there, which was, HCFA warned them and
7  said, "For Pete's sake, these published prices bear no
8  relationship to acquisition costs. If you use our FULs,
9  which are only supposed to be whether we're going to
10 contribute to your Medicaid program, to actually reimburse a
11 pharmacist, you're going to be in trouble."
12       THE COURT: That sounds like a fabulous summary
13 judgment issue.
14       MR. TRETTER: Well, I think it's a motion to
15 dismiss issue as well.
16       THE COURT: Well, I'm not doing it, okay, no,
17 because you also have a statute -- how far back were you
18 planning on going?
19       MS. CICALA: '92.
20       THE COURT: You can preserve the argument. Unless
21 you come up with a reason to go back that -- I don't want to
22 constrain discovery where it's likely to be useful.
23       MS. CICALA: Okay, your Honor.
24       THE COURT: Unless you come up with a great reason,
25 I don't know why, if I say that third-party payors should be

Page 33

1  on notice of something Congress is doing, why the state of
2  New York shouldn't be. So I think for these purposes -- I'm
3  thinking in terms, well, you're not bound by it, and you can
4  give me a pitch as to why it should go back earlier --
5  preserve it for the record if you decide to go up. It's too
6  many drugs. It's too expensive. You know, we've got to --
7  and then if in fact something happens, that's great. But if
8  it doesn't, you know, in terms of you find some new
9  information or whatever, but I think it makes sense, at least
10 for the FUL, to try and figure -- that's the one I'm least
11 familiar with, I haven't ruled on -- to at least -- what
12 would you say, discovery for six months or three months and
13 then motions?
14       MS. CICALA: We could agree to go back just to '96,
15 1996.
16       THE COURT: Whenever Congress passed the -- the
17 trigger date was 1997 with respect to AWP. Now, that may be
18 different with respect to wholesale acquisition cost. I've
19 never ruled on that.
20       MR. TRETTER: This consolidated complaint was filed
21 in '05. So, I mean, even if you went back to 2001 when you
22 said there was a perfect storm of information about AWPs, I
23 mean, that seems to me to be far enough. I mean, that's
24 going to blow most of the statutes of limitations on these
25 New York causes of action anyway, like 349.

Page 34

1  THE COURT: Maybe. It's a plausible argument.
2  MS. CICALA: Yes, you know, your Honor, I mean,
3  your Honor's perfect storm didn't say a word about FUL, the
4  knowledge of inflation of FULs, so that's really conflated.
5  THE COURT: That's why I'm not ruling off the bench
6  on that.
7  MS. CICALA: You know, I think this methodology
8  will also help to demonstrate to the Court how much simpler
9  the issues here will ultimately be than the issues your Honor
10 grappled with in the class trial.
11 THE COURT: So you guys will all meet, and you'll
12 come up with a scheduling conference order under Rule 16 on
13 how to get to me a full record, no pun intended. So what I
14 really want, though, is -- and maybe I'm getting too
15 hopeful. There's a whole settlement regime going forward
16 right now.
17 MS. CICALA: We're aware that your Honor entered
18 the mediation order. I don't know if that's --
19 THE COURT: Many states have asked to participate.
20 Are you one of them?
21 MS. CICALA: Yes. I have two remarks. We learned
22 this morning -- your Honor's order signing off on the
23 mediation only appeared on ECF this morning. I'm aware that
24 your Honor entered it two days ago. We only learned of it
25 this morning.

Page 35

1  THE COURT: That's fine.
2  MS. CICALA: I would like to ask on behalf of my
3  clients -- we are entirely open to participating in the
4  mediation, and we have the highest respect for
5  Professor Green. My understanding of the order, and I
6  haven't even read it, is that your Honor asked that the
7  parties, if they're going to object to the process or file
8  any papers, do so within seven days of entry of the order.
9  Given that we've already lost two, I would like to ask your
10 Honor if we could have till a week from tomorrow.
11 THE COURT: You've lost two?
12 MS. CICALA: We've lost two.
13 THE COURT: Two days?
14 MS. CICALA: Yes.
15 THE COURT: I haven't lost two states, right?
16 MS. CICALA: No.
17 THE COURT: See, I've been with this case since
18 2001.
19 MS. CICALA: I'm only two years behind you.
20 THE COURT: And the case is expanding because the
21 states are coming in and the federal government is coming in,
22 enormous expense to everyone. And Professor Green has been
23 pretty successful in trying to reach some global resolutions,
24 which I think at least many of the -- I don't know who all
25 the 30 plus defendants were in this case, but, at the very

Page 36

1  least, some have said that maybe we can wrap this up. And
2  so --
3  MS. CICALA: We're entirely open to participating,
4  but I would like to ask, if we could, your Honor, to have
5  until a week from tomorrow to respond to the order.
6  THE COURT: Yes.
7  MS. CICALA: And also I conferred with counsel for
8  Ven-A-Care and for the State of California who also wanted to
9  join in that request because all of us just learned of entry
10 of the order today.
11 THE COURT: Fine.
12 MS. CICALA: Thank you, your Honor.
13 THE COURT: And you probably -- has Professor Green
14 set up a date yet?
15 MR. TRETTER: I don't think so, your Honor. He
16 just knows about it, and we're supposed to work with him over
17 the next fourteen days to get dates. I mean, he's a very
18 busy individual, and he's got a tremendous number of
19 defendants and parties being thrown at him now, and so it's
20 going to take a little sorting, given his schedule.
21 THE COURT: I like to think of it as throwing
22 themselves at him. In any event, I understand it's huge. On
23 the other hand, if there's a chance at it, I've never
24 scripted the issues in FUL, so there's no guidance, and I
25 don't plan to give any at this point; but certainly some of

Page 37

1  the other issues, there's at least a template for thinking
2  about it. You disagree with some of it. I'm sure class
3  plaintiffs disagree with some of it.
4  MR. TRETTER: Did you finish your thought, though,
5  on statute of limitations? Did we finish that thought?
6  THE COURT: With respect to knowledge about AWPs,
7  I've put my stake in the ground. So the question that's
8  going to be a problem for you is, if you should have known
9  that the AWPs should have been a lot lower, doesn't that by
10 definition pull down the FULs?
11 MR. TRETTER: They're a formulaic relationship, as
12 your Honor noted many times.
13 THE COURT: The problem really is that many of the
14 FULs are predicated on WAC.
15 MR. TRETTER: Which are formulaically related to
16 the AWPs.
17 THE COURT: Sometimes.
18 MS. CICALA: Sometimes, yes. We can talk about
19 that --
20 THE COURT: I don't want to go there. It's very
21 complicated, but I am simply saying, you both -- you have an
22 excellent argument that's likely to win on AWP, although I
23 haven't thought about the 2001 as opposed to the 1997, but
24 with respect to 2001 sounds also like a good date for you
25 anyway. And you've got to deal with --

Page 38

1    MS. CICALA: In what respect, your Honor? If I
2 may, I'm sorry.
3    THE COURT: With respect to AWP.
4    MS. CICALA: In respect to the perfect storm of
5 knowledge, right, but we're not talking --
6    THE COURT: You know, for purposes of statute of
7 limitations.
8    MS. CICALA: Fair enough. Our first case was filed
9 in '03. I have no problems with that. But for purposes of
10 the FUL analysis that your Honor is describing, I'm not yet
11 clear on what the range is --
12    THE COURT: I haven't ruled at all.
13    MS. CICALA: Okay, I'm sorry.
14    THE COURT: I'm thinking about it for the first
15 time right now.
16    MS. CICALA: Okay.
17    THE COURT: I didn't even understand it until the
18 government sent in its brief, and my guess is, a lot of
19 people in the room were in the same position.
20    So you're going to let us know in a week about
21 settlement. And you're just going to file a substitute. I
22 don't expect you to respond. It's not a new complaint. This
23 was the fifth time already. All drugs that have never been
24 mentioned before are out. I'm permitting new NDCs, and if
25 it's a previously mentioned drug, I will allow it to be added

Page 39

1 to defendants. I hadn't ruled on that before, but no --
2 those are gone. Right now 30 percent. You can do two
3 separate exhibits, but all discovery is only going forward on
4 the 30 percent yardstick, unless you get me an economist or
5 someone who's a specialist in this area telling me that
6 that's wrong.
7    MS. CICALA: Okay, that's fine, your Honor.
8    THE COURT: And then the third thing would be --
9 and then I'll think about it.
10    MR. TRETTER: Do we have to answer that other
11 complaint? I don't remember whether we've answered it.
12    THE COURT: You never answered it?
13    MR. TRETTER: I don't know. We answered --
14    MS. CICALA: No, you haven't answered.
15    MR. TRETTER: We haven't answered any of them, so I
16 guess we need to answer --
17    THE COURT: You need to answer.
18    MR. TRETTER: I guess we need to ask for a lot of
19 time.
20    THE COURT: How long is it?
21    MR. BUEKER: It's 580 paragraphs or something.
22    MR. TRETTER: First amended consolidated complaint.
23    THE COURT: I suppose "denied" doesn't do it? You
24 know, it does seem like whatever period of time you want --
25    MR. TRETTER: Okay, we'll work that out.

Page 40

1    MR. BUEKER: Now, on the FUL, just so we're clear,
2 ten NDCs, five picked by the defendants, five picked by the
3 plaintiffs.
4    THE COURT: I think that's a great idea.
5    MS. CICALA: It has to be by drug. NDC doesn't
6 have relevance to FUL. We have to do it by drug, not by NDC.
7    THE COURT: See, this is where I'm not so in the
8 weeds. I'm happy to take what you just suggested.
9    MR. BUEKER: That's fine. I agree with that. And
10 then six months for discovery, expert -- or three?
11    THE COURT: Whatever you agree to.
12    MR. BUEKER: Three?
13    THE COURT: Whatever you agree to, just so that we
14 can vet this issue, but I don't want to stop any mediation
15 from going forward.
16    MS. CICALA: That's fine. And, your Honor, for the
17 discovery for the FUL drugs, back to '97?
18    THE COURT: I haven't addressed that.
19    MS. CICALA: Oh, okay, so we'll await a ruling, I
20 guess, on the scope of the discovery for the ASP data that we
21 seek?
22    THE COURT: Well, why don't we, since we know that
23 anything in recent years, we know that's timely, why don't
24 you stick with 2001 to the present. At least you'll know
25 then so you won't be wasting your time.

Page 41

1    MS. CICALA: Well, I think cutting it off at 2000
2 to the present would be prejudicial to us, your Honor.
3    THE COURT: Because?
4    MS. CICALA: Because the data that we have reviewed
5 shows that the spreads start growing in the '90s. They're
6 enormous in the late '90s, and then we see them starting to
7 diminish as the government starts to pay attention to the
8 practice. So I'm very reluctant to have it go back --
9    THE COURT: How long is the statute of
10 limitations?
11    MS. CICALA: It varies. Some of them have the
12 six-year statute, your Honor. Some of them have the
13 three-year statute. We filed our complaint in 2003. I'm
14 asking to go back to '97.
15    THE COURT: Fair enough.
16    MS. CICALA: Thank you.
17    THE COURT: Thank you. Have a lovely rest of the
18 summer.
19    MS. VITELLO: Your Honor, just two minutes of your
20 time on behalf of Orange County, if I might. Just to clarify
21 our role in the case, I know we're a late entry into the
22 case, and I'm sure --
23    THE COURT: You know, can I ask, where is Orange
24 County?
25    MS. VITELLO: Orange County is about an hour and a

Page 42

1  half to two hours north of New York City.
2      THE COURT:  Which city's in it?
3      MS. VITELLO:  Goshen.
4      THE COURT:  I got the picture.
5      (Laughter).
6      MS. VITELLO:  The one time I went up there.  We've
7  had an opportunity to speak with our client because I know it
8  was an issue at your last hearing as to what's going on with
9  Orange here all of a sudden, and we would like to join the
10 consolidated complaint.  We have spoken with Ms. Cicala and
11 Mr. Brooks, and they are amenable to that.  We have one
12 issue, which I think I know your answer already, and I
13 hesitate to even say anything, but I must because my clients
14 have asked me to, and that is, we have a number of unique
15 defendants; and it is a strong preference of my clients that
16 those defendants be added to the case, to the consolidated
17 complaint.
18     THE COURT:  Have you filed a separate complaint?
19     MS. VITELLO:  Yes.
20     THE COURT:  And so you're just moving to
21 consolidate your complaint with this?
22     MS. VITELLO:  Well, we would like to join in the
23 most recent consolidated complaint that's been filed.
24     THE COURT:  So who are the new defendants?  Are
25 they even here?  Have they been served?

Page 43

1      MR. TRETTER:  See, there are some defendants who
2  have never been named in any other case other than Orange
3  County.  Instead of the Suffolk 13, we call them the
4  Orange Only, the Oranginas.
5      (Laughter.)
6      MR. TRETTER:  I don't know what we'll call them,
7  but they exist.
8      THE COURT:  That's good.
9      MR. TRETTER:  They may well have been served,
10 but -- and I know you like that, your Honor, and I think that
11 the Suffolk 13 are going to make a plea, since you like that,
12 they're going to make a quick plea.  But I guess I don't have
13 any problem with that, although we have to speak to them, as
14 long as the other counties don't then therefore jump on the
15 band wagon against these people who are only joined in Orange
16 County only.
17     THE COURT:  Well, to the extent that they recently
18 filed, they have to deal with the severe statute of
19 limitations issue.
20     MR. TRETTER:  Yes, well, that's another reason why.
21     THE COURT:  Let me put it this way:  Of course.
22 Each county is a separate entity.  If you want to sue, if
23 there are additional people.  It's just you don't get the
24 benefit of the earlier filed for statute of limitations.
25 That's your problem.

Page 44

1      MS. VITELLO:  For the unique defendants?
2      THE COURT:  For the unique defendants.
3      MS. VITELLO:  Understood.
4      MR. TRETTER:  And then the question is, what is
5  going to happen?  Is Nassau County going to now sue the
6  people that were never sued before and that only were sued in
7  Orange County?
8      THE COURT:  I can't stop someone from suing.  The
9  only thing that stops at some point is the statute of
10 limitations, and they just -- and I don't know what you want
11 me to do.
12     MR. TRETTER:  There's nothing.  I think the best
13 thing would have been to sever and stay as to those new
14 defendants, but what I will do is let them be apprised.
15 They'll get a copy of the transcript and speak for
16 themselves.
17     THE COURT:  People can keep suing.  They're just
18 stuck with whatever statute of limitations they've got, and
19 they can't sort of sneak in through the relation back to the
20 original complaint.
21     MR. TRETTER:  I agree with that, your Honor.
22     THE COURT:  So with that understanding.
23     MS. VITELLO:  Okay, understood.
24     THE COURT:  I should know, but there are thousands
25 of docket entries, has it been filed already?

Page 45

1      MS. VITELLO:  It was filed.  It was filed in the
2  Southern District of New York in April.  It was transferred
3  to the MDL a couple of days before your last hearing on
4  May 16.
5      THE COURT:  So one thing I will order, though, is,
6  with respect to all the common issues, don't do to me what
7  happened with Nassau last time where I had separate
8  complaints and separate counts, and it was brutal for me to
9  walk through, well, this count in this complaint, this count
10 in this complaint.  So they are going to be the lead
11 counsel.  I don't want separate briefing from you except
12 where it involves a unique defendant.
13     MS. VITELLO:  Understood.
14     MR. TRETTER:  Your Honor, Mr. Lynch just reminded
15 me that at the last conference, you said, "We're not adding
16 new defendants, new drugs, nothing."
17     MS. VITELLO:  And that's why I hesitated.
18     MR. TRETTER:  So the question is to Ms. Cicala, and
19 the question is whether her clients can add these new Orange-
20 only defendants --
21     THE COURT:  And I said that about the amended
22 complaint, right?
23     MR. TRETTER:  Correct.
24     THE COURT:  I can't stop a county from suing.
25 Right?

Page 46

1    MR. TRETTER: Well, I think you could say --
2    THE COURT: I'm just going to say that it's not an
3  amendment; it's a new complaint. It's a statute of
4  limitations. We're not dealing with relation back.
5    MR. TRETTER: Well, I mean, I don't know how it's
6  going to work, since we don't have a new complaint.
7    THE COURT: You don't (Inaudible) any Orange
8  County, right?
9    MR. TRETTER: There are certain defendants that
10 only sued in Orange County.
11   THE COURT: Were you representing Orange County?
12   MS. CICALA: Your Honor, no, I'm not representing
13 Orange County.
14   THE COURT: I don't know what you want me to do
15 here. Anybody who's been represented by Ms. Cicala is bound
16 by that order, but I'm just saying, if I have a county that
17 wasn't part of it, there's nothing I can do.
18   MR. TRETTER: Then that's fine. Okay.
19   THE COURT: I don't think there's anything I can
20 do.
21   MR. TRETTER: Then I think you've clarified it for
22 me. And now maybe the Suffolk 13?
23   MR. DAVIS: Thank you, your Honor. William Davis
24 for Eli Lilly, one of the Suffolk 13. I'm going to keep it
25 very short and very simple. I don't even know what half of

Page 47

1  these acronyms mean. I'm not going to use any of the
2  acronyms, so this is going to be the simplest thing you've
3  heard today. All I want to do -- I know you have two clerks
4  leaving --
5    THE COURT: Just "I settle"?
6    (Laughter.)
7    MR. DAVIS: Easier because it's going to be the
8  word "dismissed," not because I'm asking for anything new,
9  because you already did it. So all I want is for one of your
10 clerks before they leave next month to just look back through
11 what you already did. I'll give the dates of the orders,
12 because Ms. Cicala and we have a disagreement on what the
13 Court already did. This is nothing new the Court has to do,
14 and I'll just go through three decisions, bullet point for
15 each, and I'll sit down. September 30, '04 --
16   THE COURT: With respect to it, you want me to do
17 the same with respect to this complaint? What do you want me
18 to do with them?
19   MR. DAVIS: Eli Lilly should be out of the case. I
20 was here last year, and when I raised this with the Court,
21 the Court said on the record that you thought you'd thrown it
22 out already, and that maybe we were in the case just for
23 appeal. Ms. Cicala said, "No no, no, it's not just for
24 appeal. We're litigating against the Suffolk 13." You then
25 took it under advisement and haven't issued a subsequent --

Page 48

1    THE COURT: Did you actually give me a motion and
2  you've papered me already?
3    MR. DAVIS: Yes, yes.
4    THE COURT: And I just haven't ruled on it?
5    MR. DAVIS: Yes.
6    THE COURT: I missed it.
7    MR. DAVIS: Yes.
8    THE COURT: All right, so what's the motion?
9    MR. DAVIS: Here's the motion. The motion is,
10 Eli Lilly, and I think it applies to the Suffolk 13 equally,
11 are already out. It's already been ruled on. What happened
12 was --
13   THE COURT: So what docket numbers do you want me
14 to read?
15   MR. DAVIS: Well, I've got the dates of the order
16 rather than the docket number, but October 26, '04, was the
17 company-specific issues order. You said on Suffolk 13
18 there --
19   THE COURT: Don't read it. We'll read it.
20   MR. DAVIS: You deferred, that's what you did. And
21 then you asked Ms. Cicala to replead with specificity under
22 Rule 8, Rule 12, and Rule 9 why they were suing the
23 Suffolk 13. Mr. Hovan came with his declaration saying,
24 "Here's why we sued the Suffolk 13." You then had a
25 subsequent memorandum and order which was April 8, '05, and

Page 49

1  then you granted the motion. As to the Suffolk 13 members,
2  you said, "The motion to dismiss is allowed."
3    THE COURT: I granted it on 4/8?
4    MR. DAVIS: 4/8/05 you granted it. Ms. Cicala
5  thinks when you said "allowed," you meant somehow denied. It
6  just says "allowed." That should be the end of it.
7    THE COURT: So you want me to clarify what the
8  record is?
9    MR. DAVIS: Well, I don't think there's anything to
10 clarify, but --
11   THE COURT: Then what are you asking from me?
12   MR. DAVIS: Well, I want them to stop suing us.
13 We're out of the case. I just want to go home, your Honor.
14   (Laughter.)
15   MR. DAVIS: So then --
16   THE COURT: Wait, wait, wait. So 4/8/05, so what
17 was the motion that you had in front of me?
18   MR. DAVIS: They didn't file a motion for
19 reconsideration. I was here a year ago.
20   THE COURT: Yes, but what do you want me to do?
21 What kind of order?
22   MR. DAVIS: Just say their implied oral motion for
23 reconsideration is denied.
24   THE COURT: But I don't have a motion for
25 reconsideration. Do you agree that they're out?

Page 50

1  MS. CICALA: You dismissed them from Suffolk, your
2  Honor, and then we filed another complaint on behalf of the
3  City of New York and 41 other counties, and we named Lilly.
4  And you denied the motion to dismiss on all the crosscutting
5  issues, including the crosscutting issues as to Lilly.
6  THE COURT: Excuse me. Did you have a specific
7  motion you wanted me to deal with?
8  MR. DAVIS: Yes. What she's saying that they did
9  is, when the Court threw out the Suffolk 13 in the Suffolk
10 case, that we should forget about all that; when she filed
11 for a new client, New York City, that that revived all the
12 claims.
13 THE COURT: All right, maybe it did, and maybe I
14 just need to dismiss it again if it's the same reasoning, but
15 that's not as simple as you just said.
16 MR. DAVIS: I thought --
17 THE COURT: So is there a motion there that moves
18 to dismiss all her claims based on the same argument as the
19 Suffolk 13?
20 MS. CICALA: Yes. They have an individual motion
21 to dismiss the first amended consolidated complaint, which
22 we've opposed. And they filed no reply, so we filed no
23 surreply, and your Honor has the briefing on that.
24 THE COURT: Do you happen to know what the dockets
25 are on those? So there is something outstanding.

Page 51

1  MS. CICALA: Well, your Honor never had ruled on
2  the Eli Lilly individual motion to dismiss.
3  THE COURT: I haven't done the individual ones yet.
4  MR. DAVIS: Right.
5  MS. CICALA: That's right.
6  THE COURT: It went into the deep back burner of
7  this case because I had so much else going on, those little
8  individual motions. You're just asking me to get to them.
9  MR. DAVIS: Two things: The April 8, '05 decision
10 where you granted it on the Suffolk 13, and the June 16,
11 '06 --
12 THE COURT: I just haven't ruled yet, so fair
13 enough, you're reminding me. You're trying to bring it to
14 the front burner.
15 MR. DAVIS: No, but there's one thing that's
16 confusing here, your Honor, that I've never heard before, and
17 that's when you ruled on the Suffolk complaint, that that
18 wasn't a test case for her other clients, that that order
19 only applied to Suffolk.
20 THE COURT: I haven't thought of this. You're
21 making this sound simple. I don't know. So is this
22 something you raised in the motions, the individual motions?
23 MR. DAVIS: This has never been raised by anyone
24 till now that they have the right to reargue on behalf of the
25 new client. Everyone's assumed, in my understanding, that --

Page 52

1  THE COURT: I just need --
2  MR. DAVIS: -- that hasn't been briefed, your
3  Honor.
4  THE COURT: I need a motion, okay? So if you want
5  to amend your individual motion on behalf of the Suffolk 13,
6  you can do that, and that will just sort of push it right
7  onto my front burner.
8  MR. DAVIS: We have a motion, your Honor, but no
9  one's briefed the issue of for her second client that she
10 could reargue the Suffolk decision, so we may have to put
11 supplemental --
12 MS. CICALA: It's briefed in our opposition.
13 THE COURT: I grant your motion for an extension of
14 time of two years to now reply.
15 MR. DAVIS: Thank you, your Honor.
16 THE COURT: Okay, okay? There we go. Have a
17 wonderful summer.
18 MS. CICALA: Thank you, your Honor.
19 MR. MONTGOMERY: Your Honor, one thing. I think we
20 ought to have a date by which we are going to submit to you
21 the proposed case management order.
22 THE COURT: Perfect. What do you want?
23 MR. MONTGOMERY: Ten days, a week from Monday?
24 THE COURT: Ten days. Everybody's got a life. Ten
25 days.

Page 53

1  MS. CICALA: No, we need a little more time than
2  that, your Honor. I have a lot of clients to consider. If
3  we can do two weeks, please.
4  THE COURT: Two weeks? Perfect.
5  MS. CICALA: Thank you.
6  MR. MONTGOMERY: Thank you, your Honor.
7  (Adjourned, 3:05 p.m.)

```
 1              C E R T I F I C A T E
 2
 3
    UNITED STATES DISTRICT COURT )
 4  DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
 5
 6
 7
 8         I, Lee A. Marzilli, Official Federal Court
 9  Reporter, do hereby certify that the foregoing transcript,
10  Pages 1 through 53 inclusive, was recorded by me
11  stenographically at the time and place aforesaid in Civil
12  Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical
13  Industry Average Wholesale Price Litigation, and thereafter
14  by me reduced to typewriting and is a true and accurate
15  record of the proceedings.
16         In witness whereof I have hereunto set my hand this
17  31st day of July, 2007.
18
19
20
21         /s/ Lee A. Marzilli
           _____
22         LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
23
24
25
```