# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CA No. 07-10248-PBS |
| PHARMACEUTICAL INDUSTRY AVERAGE | ) | CA No. 06-11337-PBS |
| WHOLESALE PRICE LITIGATION | ) | CA No. 05-11084-PBS |
| | ) | Pages 1-47 |

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 13, 2008, 3:45 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA 02210
(617)345-6787

APPEARANCES:

FOR THE PLAINTIFFS:

GEJAA T. GOBENA, ESQ. and JUSTIN DRAYCOTT, ESQ., United States Department of Justice, Civil Division, P.O. Box 261, Ben Franklin Station, Washington, D.C., 20044, for the United States of America.

GEORGE B. HENDERSON, ESQ. and BARBARA HEALY SMITH, ESQ., United States Attorney's Office, United States Courthouse, 1 Courthouse Way, Suite 9200, Boston, Massachusetts, 02210, for the United States of America.

JAMES JOSEPH BREEN, ESQ., The Breen Law Firm, 5755 North Point Parkway, Suite 39, Alpharetta, Georgia, 30022, for the Relator, Ven-A-Care of the Florida Keys, Inc.

FOR THE DEFENDANTS:

NEIL MERKL, ESQ., Kelley Drye & Warren, LLP, 101 Park Avenue, New York, New York, 10178k, for Dey, Inc.

JOHN W. REALE, ESQ., Kirkland & Ellis, LLP, 200 East Randolph Drive, Chicago, Illinois, 60601, for Boehringer Ingelheim Corporation, et al.

JAMES R. DALY, ESQ., Jones Day, 77 West Wacker, Chicago, Illinois, 60601-1692, for Abbott Laboratories.

PROCEEDINGS

THE CLERK: In re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Action Nos. 07-10248, 06-11337, and 05-11084, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. HENDERSON: George Henderson for the United States, your Honor.

MS. SMITH: Barbara Healy Smith, also for the United States.

MR. GOBENA: Gejaa Gobena on behalf of the United States.

MR. BREEN: Jim Breen on behalf of the relator, Ven-A-Care of the Florida Keys.

MR. MERKL: Neil Merkl on behalf of defendant Dey.

MR. REALE: John Reale on behalf of the Boehringer defendants.

MR. DALY: Good afternoon, Judge. Jim Daly on behalf of Abbott Labs.

THE COURT: Great. Today is a status conference, and I at least received a few things from the defendants. I'm not sure, did I receive anything from you?

MR. HENDERSON: No, your Honor.

THE COURT: All right, I always want to check because it's such a messy docket, no fault of our Clerk's

office, but it all gets intermingled with other cases. I want to make sure I didn't miss anything.

And, by the way, did you all notice we have now deconstructed our docket, so hopefully we can follow the case more easily with respect to the subcategories. If anyone has confusion about that, please ask Mr. Alba because it should be a lot easier now to follow what's happening in these cases as opposed to the New York cases and the California cases and the like, so we're going to do that.

Now, this is, as far as I'm concerned, unless you think otherwise, only the Ven-A-Care cases. Is that right?

MR. HENDERSON: Correct, your Honor.

THE COURT: Because I received some notice coming in from New York telling me that they don't plan on attending, and inasmuch as I'd love to see them, I wasn't planning on them attending. Is there anyone here from another case that didn't understand that?

Okay, just on the Ven-A-Care cases, what is it that I need to resolve?

MR. HENDERSON: Your Honor, as I understand it, the defendants are essentially seeking an extension of the discovery schedule and at least for seven states which are in litigation in which they have just issued notices for the last -- I'm sorry, five states, I think, which are in litigation. Is it five or seven? Seven, seven states.

THE COURT: Right now the discovery cutoff is December 15. Is that correct?

MR. HENDERSON: That's correct. The defendants have announced that -- they've requested us to agree to an extension of the discovery schedule for at least these seven states that are in litigation elsewhere, and they would like to be able to essentially have our discovery take place according to the litigation schedules of those seven other jurisdictions, which --

THE COURT: Short of that, though, do you have the other depositions scheduled?

MR. MERKL: Yes, your Honor.

THE COURT: I'm not inclined to wait. I'm very eager. This was an agreed-upon schedule. I, of course, would extend a schedule if somebody got sick or, you know, something happens to you personally, but I don't want to wait for the schedules in the other states.

MR. MERKL: Your Honor, we've basically completed twenty-two states, okay? That leaves twenty-nine that we need to do. Twenty-one of those states we have issued, in accordance with the procedure we discussed with your Honor, the 30(b)(6) and in some cases the 30(b)(1) and the document subpoenas. We have dates for those or most of those before the 15th.

THE COURT: Okay.

MR. MERKL: What we'd like is, could we extend that time 60 days?

What Mr. Henderson was referring to was a separate proposal I made, which is, there are seven states where the discovery in those states -- those are litigating states -- is actively going on or about to start. We felt that rather than dropping our own 30(b)(6) notice and our own document demand in the middle of those proceedings, that could we work with them and cross-notice --

THE COURT: You know what, let me just say, normally I would say "Yes, sure," but I'm not willing to wait the time that it would take. It puts us too far behind the eight ball.

MR. MERKL: Well, the understanding would be, your Honor, on those seven states is that what we were proposing there was that would not affect things like experts and summary judgment. It would just --

THE COURT: Well, how could it not? I mean, take Massachusetts, which is the one that I've now got my sleeves rolled up on. It's a mess understanding what happened to that Medicaid program. It changed from year to year; there were different policies at different points. You've got to do discovery state by state, as far as I can tell. And it matters. It matters to, you know, issues like causation. If in fact you're going to litigate all these states and

you're going to defend all these states, each state has its own story, doesn't it, for Medicaid? Are you finding that?

MR. MERKL: Yes, your Honor, and I guess the reason we were proposing carving those out, realizing that you prefer not to do that now, was just to hope to take advantage of that massive ongoing discovery that other parties are already doing so that we could focus this. If that's not workable, I guess we'd still like an extra 60 days to try and get it all done.

THE COURT: Well, let me just ask you this. Let me just back up. Understanding that every single state might have a different story, by December 15, how many states will we be done with without those that are heavily litigating?

MR. HENDERSON: Your Honor, if I might say so, we don't need to do discovery in all of the states in order to establish what their Medicaid reimbursement formulas have been over time. Those changes are established as a matter of law in state plan amendments. Ninety-nine percent of the discovery of states that has been going on has been "the government knowledge" defense, and the reason --

THE COURT: All right, that may be true too. My point is, what if we did this? I'm not inclined to extend the schedule. This case is taking too long. It's going forever. But what if -- what is it, seven states that are

being heavily litigated? Is that it?

MR. MERKL: Well, there's seven that are being heavily litigated, twenty-one that are less so. But we have actually everything noticed, and it's going to be this mad dash --

THE COURT: Excuse me. What are the ones that are currently under litigation in these other states?

MR. MERKL: The seven states that I was referring to are Idaho, Mississippi, New York, Utah, South Carolina, Pennsylvania, Iowa.

MR. HENDERSON: And Kansas has just filed suit.

MR. MERKL: Well, Kansas we would propose to do with the standard 30(b)(6) approach by December 15 because it has to start --

THE COURT: So with the exception of these, can't we -- listen, I view this as potentially overwhelming to do the summary judgment in all the states anyway. What if we were just to let these go their normal -- let them pick up discovery in these other cases but keep to December 15 for every other state?

MR. MERKL: Yes.

THE COURT: And not put off, not put off anything by 60 days, not put off -- do summary judgment on the other --

MR. MERKL: Forty-one.

THE COURT: -- forty-three or whatever -- I don't know how many states we're talking about -- states. In other words, keep completely on the schedule. You finish -- I'm not going to extend the December 15. This is just getting too far beyond, and everyone agreed to the schedule, but we basically carve off these states because we're going to have plenty on our plate.

MR. HENDERSON: Your Honor, I don't think -- I mean, as far as we're concerned, those seven states, they've just been noticed too late. And I will report to the Court that we've been in touch with counsel for those litigating states, except for South Carolina which we haven't really conferred with. All of them oppose this --

THE COURT: Are you moving for summary judgment, or are you? Everybody is, right?

MR. MERKL: Everybody is, your Honor.

MR. HENDERSON: Yeah, I'm not sure we're going to be moving for summary judgment on all issues for all states.

THE COURT: I don't know. I think what's going to happen is going to be overwhelming to me. And short of the First Circuit just dramatically changing the territory, I think it is going to crush my session -- I'm just putting it out there, all right? -- to try and figure out, you know, forty-three, forty-one states. I think I'll have plenty to do. So I think what makes sense is, why don't we -- I'm not

going to extend the schedule. We are going to keep to this schedule. If these states can do -- rather than kill you over Thanksgiving and Christmas to try and put all these in, it is cost-effective to piggyback on what's happening with these other states, and in the meantime, put all the other states on the schedule we agreed to.

MR. HENDERSON: The difficulty with that, your Honor, is then we don't know what the schedules of those other states are, and we're essentially putting off discovery indefinitely.

THE COURT: Well, that's why I'm for sure not putting off the whole of Florida. If at some point when we're much closer, if it looks like they are lost in Never-Never-Land, then tell me that that's impossible. But I just don't see how -- I've watched Mylan I'm working through, okay, and it is unbelievably fact-intensive and difficult to go through what the Medicaid policies are. It is not just a question of law. It's who knew what, how did it happen, when did the policies change? It's hard, it's really hard, and we're working through that right now. So if there are other states that look like that, that's going to be -- it's going to be state by state: What did they know, when did they know it, what was the statutory scheme? And so I think I'll have plenty to do and so will you. I don't think you'll be wanting for things to do.

MR. HENDERSON: I might want a vacation, your Honor, at the end of it all.

THE COURT: You get Thanksgiving and Christmas. And so I'm not putting this off. We are kick-starting this. We need this to happen. And so I don't think it's so terrible if we do forty-one or forty-three states rather than fifty; and the truth is, if I start ruling your way on a bunch of these, it may refine our knowledge with respect to the others and then vice versa as well.

MR. MERKL: I understand you to mean rule in my way?

THE COURT: Yes, either way. I mean, it will start focusing people on the summary judgment. So as I'm hearing it, everything was going to be done except for these states, right?

MR. MERKL: Yes. Well, everything is noticed, but the problem --

THE COURT: Then you're going to have to live with it. You agreed to that schedule; live with it.

MR. MERKL: Can I just point out one thing that's happening with the states?

THE COURT: Yes.

MR. MERKL: The starting point, of course, is the documents. What we're finding with the states is, it's not as though they got the memo five years ago that these were

starting and they stored all their documents and kept all their documents. It's not. Some of them are starting from the get-go, and it's a struggle getting them to turn the stuff around quickly.

THE COURT: That's your fault for waiting so long. Basically we all agreed with the schedule. I think it was -- I went back to look. It says joint, joint.

MR. MERKL: Yes, your Honor, yes.

THE COURT: All right, so understand, I'm not here to make people spend a fortune. If someone else is going to do Utah, all power to them. I mean, we'll see about that later. But I think we can move this case, we can start working it through and just getting it going on the other states. You agreed; you're stuck with it. If you don't get your documents, as far as I'm concerned, I'm sorry, but you took too long to start it going. So, you know, it's got to be reasonable. They'll do what they reasonably can do, and that's what we'll do.

Now, that having been said, now I -- I think that's it for that issue, right?

MR. MERKL: Well, Medicaid, yes, your Honor, on the discovery. There's some other pending discovery motions.

THE COURT: Yes, I think there are. Now, I called Judge Bowler this morning, and I'm trying to figure out what

the status was, and do you have a bunch of -- do you have any -- various motions for protective order have been filed, is that it? Have they been opposed? What's the status of all that?

MR. HENDERSON: I can't -- there are a bunch of -- the defendants have a bunch of motions, pending motions that have been fully briefed to compel. We, I think, just filed a motion for protective order. In the Roxane case, we only just on Monday got delivered two hard drives and four CDs of materials that have been requested way back in 2007, and we just got them now. So there are going to be issues like this that probably have to be dealt with on a case-by-case basis on separate motions. The defendants have some motions to compel. We may have some.

THE COURT: Does that affect these joint scheduling orders? Were these produced too late? Or is this just a question of -- does it affect depositions or anything that you just got these documents?

MR. HENDERSON: It may. We have to look at them and see whether -- right now in the Roxane case, for example, that's the main one, from our perspective, where we're just in the process of noticing five depositions of current or former employees.

THE COURT: Why did it take so long to get to them?

MR. HENDERSON: To the documents?

THE COURT: Yes.

MR. REALE: Your Honor, I'm not familiar with the intricacies of this. I don't know that he's necessarily giving you the full story.

THE COURT: This is a joint scheduling order, joint, agreed upon, so how are they --

MR. REALE: Your Honor, we were just compelled to produce some documents, and I know that --

THE COURT: Well, all right, that's different, but did you do a basic document production long before now?

MR. REALE: Yes, your Honor.

MR. HENDERSON: They provided to us, your Honor, what they had produced in other litigation without undertaking any independent search for the documents that we requested, and it took a long time until we -- it took a while. We finally moved to compel. We haven't even gotten the information, for example, the e-mails that Judge --

THE COURT: When is the Roxane deposition scheduled for?

MR. HENDERSON: Between now and December 15. We're still working with counsel to set these dates.

THE COURT: But what's pending in front of Judge Bowler? Is there anything pending?

MR. HENDERSON: Right now there's just one

deposition in the Dey case that we want to take a deposition of a former employee who happens to be in prison, so we have to go -- we are required under the rule -- long story, your Honor, nothing to do with their Dey employment. It's post-employment conduct. But, in any event, the rules require that we file a motion to take a deposition.

THE COURT: So I suggest you try and schedule a hearing before Judge Bowler, like, soon. I was trying to look on the docket. I saw some of your motions, your motions, like, on deliberative process privilege? I think you're being -- it took me -- I know we're going to get there -- it took me forever. I feel sorry for whoever you entrusted this task with, but it took me forever to go through the twelve documents because it's not all or nothing, you know. I mean, when you go through them, some of it's protected, some of it's not, some of it I'd have to balance. It takes forever, and I can guarantee you I am not going to sit -- or I just talked to Judge Bowler. She said it would be impossible for her to go through. I think you were overprotective of the deliberative -- I mean, I understand the institutional pressures that make you do that. It was overprotective. And most of these were old documents. It was just unnecessary.

MR. HENDERSON: Your Honor, we followed your instructions to the T in that regard.

THE COURT: But some of them weren't even protected. They were cover memos. Some of them were factual recitations or they were post-policy. I mean, it wasn't even protected. Some of it was core, as you would say, but some of it wasn't even subject to it, and I don't know what to do with that. You know, there were cover memos. I didn't understand why they were being -- there were ones that were from outside the agency, I forget, some carrier. They weren't even protected.

So I don't know what to do. I think a master makes sense. I can't possibly do it myself, I can't. It took me personally -- I didn't send it to a magistrate judge. I didn't give it to a law clerk. I sat and read them and balanced, and I can't possibly do it for the volume of documents we're talking about.

MR. HENDERSON: What I recommend, your Honor, since we haven't filed an opposition to the motion, that we be permitted to file an opposition to that particular motion. And I think it's probably inevitable that some of these motions, whether it's the defense motions or a motion that we make, may require in individual circumstances for some particular depositions that we're going to go beyond the December 15 deadline, just because it takes that time for a motion to be heard and decided.

THE COURT: I'm not extending the deadline short

of family illness or personal illness. I mean, something that's human, of course I'm going to do that.

MR. HENDERSON: Well, we're not suggesting that. We're just saying that in order to resolve a motion -- I don't think all of these motions are going to be decided in time to get these depositions done by the 15th.

THE COURT: Well, it might be that Judge Bowler decides it after, but I think I would go in there with all the information and try and schedule them. I mean, I don't know why this is all coming up at the last minute, but I know just as a practical matter that's what happens in litigation, but I am not generally reopening it.

And so the big issue really is for me, on the deliberative process privilege, many of these were old documents. Many of them were uncontroversial. I just couldn't even understand why it was worth the dime not to disclose them, even if there was argument for it. There were a couple where it was really heartland, you know, "This is what I think, and this is what you think." You know, what you think about is deliberative of what a jury might do, but most of it wasn't. You've seen it now.

MR. REALE: No, your Honor, we haven't.

THE COURT: Why?

MR. REALE: They haven't produced it to us yet.

MR. DALY: Mr. Draycott tells me that we'll have

them tomorrow, but we don't have them yet, Judge.

THE COURT: So any carrier documents shouldn't be. Any cover memos shouldn't be. Any factual recitations shouldn't be. Any drafts can be withheld, and anything that's what you referred to in the memo occasionally as "core" deliberative, like core, the back-and-forth before a policy, arguably. But the older it is, the less important this thing is. And anything post-2003 you don't need to put in unless it's referencing backwards; you know, "As we knew back then, we knew that these inhalers were --" But that doesn't need to come in. A, it's probably not relevant, and, B, it's -- so the weighing would be different. But I don't -- how many of these documents did you say were now subject to this privilege?

MR. DALY: Judge, there's the eight that you ordered produced. There's forty-two that have been previously submitted to Judge Bowler that she has yet to rule on. I think she may have been waiting on your Honor's ruling. But there were two in camera submissions to her, one December, '07, one in June of this year, forty-two there. And then, as I put in our motion, Judge, based on your ruling, it appears that a variety of documents that should have been submitted were not. And there's no way in the world I'd want your Honor -- I would suggest your Honor do this. That's why I think we should appoint a special



master and get it over with.

THE COURT: Why don't you talk about who might be a special master. And let me just say this: I know this poor guy asked for additional time who was doing it initially. It must have taken him longer than -- what was his name again? I am so sorry because it's really brutal. And maybe you didn't want to do it page by page and paragraph by paragraph. I sort of did. And so in the ones where I'm saying, like, there's no way the cover memo was, well, something maybe internal to it was, and you just basically across the board claimed the privilege.

MR. DRAYCOTT: We took, your Honor, no exaggeration here, hundreds and hundreds of attorney and paralegal time in trying to respond to directions that your Honor gave us on the 24th, and the thing that I would actually implore you to do is to let us file a response to the motion that has been filed with your Honor and --

THE COURT: To this master thing.

MR. DRAYCOTT: To the request. We just got it yesterday. We --

THE COURT: Well, let me just say this: We need to move this forward. I, quite candidly, don't think anything is proving up at all that the government both knew and approved of what I have been calling the "mega spreads." They do support the 20 to 25 to 30 percent understanding,



but I can't prevent them from seeing what's there in order to mount the defense. And if I ever reject it, it goes up on appeal. So that's the issue. You want me to prejudge the defense, and I'm not willing to do that. I don't disagree with you that a lot of it doesn't support their theory, but they can't know that.

MR. DRAYCOTT: Your Honor, there were a lot of issues raised and a lot said in the motion that was just filed, and I think that this is an area where a couple of things: We would be well advised to listen and to reflect on everything that your Honor said today, and I think that we listened very carefully to what your Honor said on July 24, and we devoted an enormous amount of resources in trying to comply with that. So I would again implore you for an opportunity to respond. And we will also, while we're responding to the motion that was filed yesterday, we will consider all the points that your Honor has made.

Your Honor has also, I think, said some things that were both helpful and, you know, caused more work for us. We'll consider all of that. We'll look anew at the privilege assertions that we've made, and we'll be doing that while we're also at the same time responding to the motion, but if we can both try to respond to your Honor's comments in a constructive way but at the same time also address the request for a special master that has been made.



And, for example, one clarification I can offer you that relieved us of a lot of burden, you've heard mention of the forty-two documents that were submitted to Judge Bowler, but far and away, the bulk of those is prior drafts of final OIG reports. Now, when your Honor ruled on the 24th, she said you can just exclude those. If that principle were applied, for example, to the documents that are before Judge Bowler, it virtually -- I haven't looked at those in preparation for today, but my recollection is that that would remove a huge number of percentage of the documents that were submitted to Judge Bowler for in camera review.

THE COURT: Well, why haven't you at least turned over to them --

MR. DRAYCOTT: Oh, your Honor, that was -- as soon as we got your order, we forwarded it on to the Office of General Counsel for the CMS division. It was just a matter of advising the client agency. What I'm hoping your Honor recognized from the declarations that had been filed by the agency in support of this privilege assertion, it was a matter of enormous importance.

THE COURT: But they didn't even go through them document by document of the twelve. I mean, it was sort of this -- it was an across-the-board thing.

MR. DRAYCOTT: But, your Honor, again, just to answer your question, as soon as we got your order, we

conferred with the client agency. We wanted to make sure that there was nothing further they wanted to require us -- there was nothing more that they would ask of us by way of reconsideration. I confirmed as late as this morning that that's not going to occur, and I advised Mr. Daly that we would turn over the documents. But I think that was a minimal delay, and it was for that purpose.

THE COURT: What I'm going to ask you to do, and I mean this: Turn over everything that's relevant except where it's core deliberative process and you care -- and you care, that's the big thing, and you care -- because otherwise the burden is overwhelming. If we're left with forty documents, now that I've set up the basic standards, I can go "thumbs up, thumbs down," and you don't have to do a master. But if we're at -- how many documents did you say we're at, 2,000 or something like that? -- I'm going to make the government pay for the master because I can't do 2,000 documents. And, you know, you spent hours on this.

MR. DRAYCOTT: I assure you I did.

THE COURT: But, for example, there was a cover memo or there was the memo from a carrier. That's not even a prayer for those being --

MR. DRAYCOTT: Well, your Honor, with respect the cover memo, in my defense, it really didn't present as part of the same document, and the cover memo was just a couple

of sentences, so that's how that got added. But --

THE COURT: But even in a lot of the memos, about 90 percent of them were just factual recitations. They weren't deliberative. So, in fairness, it took me paragraph by paragraph. I don't understand the lingo. I didn't understand the abbreviations. I can't guarantee I got it right. I can't. I mean, I just don't understand some of it, so --

MR. DRAYCOTT: Well, your Honor, I guess if I can respectfully get some clarification from your Honor then with respect to the current state. I take it that we are at the same time permitted to respond to the motion that was filed. In the interim, we have direction from your Honor with respect to some broad categories that we can both, you know, take in and take out. We'll try to respond to that, but at this point we can, I think -- I'm hoping that I understand your Honor correctly that we can respond on both fronts, that we can both go back and revisit our privilege assertions, try to refine them, and look at them with the guidance that we've received from your Honor today in mind, but that we still may respond to the motion for a special master?

THE COURT: Here's the problem. I remember being a lawyer. We all remember. I'm sure you do this for attorney-client privilege. You look at whether there's a

plausible basis, and you assert it. Usually the first stab through most attorneys overassert, and on the theory that, well, we'll chisel back. My problem is that I have to decide, A, if the privilege applies, and then, B, do a weighing, okay. So I've got Part B, and I couldn't entrust that to the government as a matter of law to just do the weighing. That's something I think I have to do. And so since government knowledge is both relevant to the various issues we've talked about -- scienter, reliance, there's a common law fraud claim, it's relevant to the government knowledge defense -- they may go down in flames on it, but I can't say they can't have the discovery.

MR. DRAYCOTT: No, no, and I've heard your Honor today, and I heard your Honor back on the 24th, but I'm just trying to make -- I'm trying to be clear in my own mind what I need to do after today, and I take it that I still owe your Honor a brief.

THE COURT: Do you have little stickies on the ones you really care about of the 2,000? How many documents did you say are subject to the deliberative privilege right now?

MR. DRAYCOTT: Your Honor, we did throughout the process of logging these documents also review them, and we did attorney review on them, so I'm hard-pressed right now to answer your question off the cuff. But we can certainly

go back, take another cut through these documents and, you know, try to refine the -- and talk about -- we're going to need to talk about the issue with the client.

THE COURT: But I set a December 15 deadline, and they're taking depositions, so -- and then do I want to reopen them again? And so --

MR. DRAYCOTT: But, your Honor, I don't know that appointment of a special master and giving it to a special master would be --

THE COURT: Who's going to do this? Who's going to do it?

MR. DRAYCOTT: A great amount of that is going to fall to me, your Honor, and --

THE COURT: No, but I've got to no matter what. You told me how many you thought there were.

MR. DALY: Well, from their privilege log alone, Judge, we had 200, but there is, like, boxes of documents that they never even logged. These documents from the Legislative office, three of which you've ordered produced to us, they've never even logged them. So the log is one thing. We gave you a list of 200 we think ought to be looked at. Perhaps counsel can look at those, decide which one he wants to give us. Whatever is left we would put to a special master. But there's a bunch of stuff, Judge, that they never logged. They took the Office of Legislation and

in a broad sweep just said, "That's" all DPP. That's all deliberative process privilege." We don't even know what the particulars are, so --

MR. DRAYCOTT: You Honor, can I get a clarification? I mean, again, in terms of the questions you've asked of me, I'm assuming that we're working within the parameters that your Honor set on July 24. There what you indicated for us to submit for in camera review are documents which showed the existence of the mega spreads for both infusions and inhalants.

THE COURT: The kind of drugs that they manufacture, isn't that what they are?

MR. MERKL: Yes, your Honor.

MR. DALY: Vancomycin.

MR. DRAYCOTT: The infusions, inhalants, vancomycin, and then your Honor also addressed the cross-subsidization issue, and then we were also talking about anything that related particularly to Abbott, Dey, or Roxane. So it's that, if I'm understanding --

THE COURT: That sounds fair, yes.

MR. DRAYCOTT: Now, we've essentially complied with the order and your Honor has done that work and has issued the order on what documents we have to turn over. I think what Mr. Daly is now alluding to is documents that were withheld that may relate to policy-making generally but

don't specifically reference a mega spread or an infusion drug or a -- and if we're talking about that, then there's very little more to do because the work has been done. So if we're staying within the parameters that your Honor set on July 24, then there's very little work to do, if any.

THE COURT: Don't forget, don't forget, this is what I think -- I agree totally with the way you just described it, but they've got to be privileged to begin with. They've got to be deliberative or attorney-client, whatever, so they've got to be privileged to begin with. So it's not enough -- in other words, they may be relevant, broadly speaking, but not privileged. So on the privilege, when I did the weighing, anything that shows knowledge of that almost automatically I'm going to weigh in their favor.

MR. DRAYCOTT: But, your Honor, what I'm saying is, what we've done is, we've complied with the direction that you gave us on the 24th.

THE COURT: Some of the stuff just wasn't privileged. It didn't even get to Point A.

MR. DRAYCOTT: Right, at which point -- and you've ordered it turned over, and it will be in their hands tomorrow.

THE COURT: But the issue is, I haven't looked at the other 200.

MR. DRAYCOTT: But if what you're asking for is

the documents which show knowledge of the --

THE COURT: Excuse me, you're not hearing me. First, you have to figure out, are they privileged? Does it even apply? Otherwise, shovel it over. Is it deliberative? Was it predecisional and deliberative? If it's not predecisional and deliberative, regardless of this other subcategory, it's got to be turned over, and it's got to be done page by page and paragraph by paragraph. If in fact it is predecisional and deliberative, that's when I've got to come into it: Well, what about the weighing? As a general category, I'm going to weigh it in their favor if it involves vancomycin, infusions and inhalants. If it doesn't involve those, I'm likely to weigh it your way.

MR. DRAYCOTT: But what I'm saying, your Honor, is we've done that work and you've done that work now.

THE COURT: Well, but for twelve, twelve sets of documents.

MR. DRAYCOTT: Well, with respect to the category that you directed us to submit in camera on the 24th; that is, the documents that show knowledge of the mega spreads for infusions, inhalants, vancomycin, and for the documents that mention --

THE COURT: Why didn't you disclose it to them then?

MR. DRAYCOTT: Well, your Honor, again, this goes

back to, we conferred with the client agency, and they're going to be turned over tomorrow.

THE COURT: No, but why did I have to go through the exercise of the in camera review?

MR. DRAYCOTT: But, your Honor, my --

THE COURT: You know what, are there 200 of them? Is that it?

MR. DALY: 200 on the privilege log, Judge, yes.

MR. DRAYCOTT: I'm not sure to which that --

THE COURT: Why don't you give them to him?

MR. DRAYCOTT: Which, the --

THE COURT: The 200 --

MR. DRAYCOTT: I'm not sure which --

THE COURT: -- that you've asserted deliberative process privilege.

MR. DRAYCOTT: I'm not sure to what group of documents Mr. Daly is making reference, which is why I'm having trouble, your Honor.

MR. DALY: Your Honor, it's the motion that we filed. It's Schedule 1 to the motion. We selected 200 by number from your privilege log and said, "Judge, based on these titles, these ought to be looked at." We didn't even ask to do the whole privilege log, Judge.

THE COURT: Well, what if I looked at -- maybe take every fifth one, and if I think there's a problem, I'll

send it to a master?

MR. DALY: We've got this other problem, Judge, that with respect to these documents that were not reviewed in response to your July 24 order, in their brief, Judge, they say that they looked at the log, the log was the parameter of what they looked at to determine what you wanted from your July 24 order. According to their own briefing, the rule-making files were not reviewed, the legislative files were not reviewed, and I cannot let --

MR. DRAYCOTT: But that's what took the greatest bulk of the time was reviewing the rule-making support files. We were told they want them in detail to this in the document that was submitted --

THE COURT: And it may well be that earlier drafts of rules and all that aren't going to qualify. I don't want to spend -- I'm going to take a look at -- you show him the 200 documents. You give it to me, and if I think it's a mess, I'm going to appoint a special master. Who do we want? We're getting to December 15. I can't wait. It's Thanksgiving. You all have families. I can't have you working over Thanksgiving. I'm not bucking the December 15 date. We're moving.

MR. DALY: Judge, we'll take anybody that your Honor has a confidence and faith in that you've worked with before. We're happy with whatever your Honor chooses.

MR. DRAYCOTT: Your Honor, I need to confer with Mr. Henderson and Ms. Smith.

THE COURT: I'm thinking some retired Superior Court judge.

MR. HENDERSON: Judge, I don't think that it's going to affect the discovery, the deposition schedule. These depositions -- there are no depositions that are pending.

THE COURT: I'm just simply saying, I need to get some closure on this. I need to move on. I understand how the government works very well, and deliberative process privilege is a very difficult privilege because it requires -- you're going to weigh it differently than I am. So I went through just as a sample. I deliberately didn't refer it to a magistrate judge because they care so much, they've been sort of over the top on this, so I thought, "All right, I'll look." And sometimes I agreed, sometimes I disagreed, sometimes I partially agreed and partially disagreed. Everyone's going to call this differently. I'm not saying this is bad faith. I am simply saying I have not got the resources to go through a gazillion documents and write up a memo like I did on this on every single one. I can't. So we can either go to a master, or I can spot-check a few of them, and if I think that there's a problem, then I'll appoint a master.

MR. HENDERSON: Well, it depends whether you're going to narrow the categories to the ones, the categories, the ones that were addressed at the last hearing and which Mr. Draycott just described, or now you're expanding them to the entire universe.

THE COURT: I just want you to turn them over because I don't want to do this. Okay, that's what I really want. But you're not willing to do that, okay? Because I hate doing it. More than life itself, I hate going through these documents. I hate it. So if I've got to, I will. So the reality is, the basic thing I want to say is, if you don't care, turn them over. It's only where you really care --

MR. DRAYCOTT: Your Honor, the one thing that I would ask you to understand -- and, believe me, your Honor, as much time as you spent, I guarantee you I was hour for hour doing it with you. But we do have a client agency whose interests we are representing here, and so while you're saying, you know, "Do you care?" there's two levels of which you're speaking to me: one, as an attorney for the Department of Justice, and then -- but also I have CMS as a client, and it is CMS that has asserted that privilege.

THE COURT: Well, then let their attorneys do it.

MR. DRAYCOTT: And we're certainly going to bring them in, and we will consult with them. But I will get back

to the issue that Mr. Henderson just raised, which is, in order for me to go forward, I need to be very clear if we're on the same criteria that your Honor established back on the 24th, which is the mega spreads for the infusions, inhalants, the vancomycin, the cross-subsidization. If that's what you're asking us to corral, we did a tremendous amount of work in advance of the submission that we filed to you and which you've now ruled upon, and what's left to do is not going to be burdensome, if at all, because that's the criteria we're looking for, those documents within that criteria that we're going to be looking at.

THE COURT: Those criteria were the ones where I said I thought the deliberative process privilege would be outweighed by the defendants' needs, but you have to make the threshold decision first about whether they're deliberative and predecisional. In other words, there might be tons of other documents that you need to produce that don't fall in that category but aren't protected by the deliberative process privilege.

MR. DRAYCOTT: One moment, your Honor. If I can --

THE COURT: Do you understand what I'm saying?

MR. HENDERSON: Now I get it, now I get it. Okay.

MR. REALE: Your Honor, I'd like to raise one additional issue, if I may, and that is that they are

seeking recovery on behalf of their expenditures to the Medicaid programs to all fifty states. And here we are in November, and we've asked for it, and they've agreed to produce claims data from all fifty states; but for Roxane, we still haven't received complete claims data from nineteen states, and we still haven't received MAC data from thirty-eight states.

THE COURT: When is that going to be produced?

MR. MERK: Dey as well, your Honor.

THE COURT: When is all that going to be produced?

MR. HENDERSON: We've produced what we've got. There are going to be a lot of states where -- there are two categories -- let me -- I have to back up so you'll understand.

THE COURT: I don't know why this is all happening a month before the deadline after four years on both sides, why Roxane did a dump and why you haven't done a dump yet.

MR. HENDERSON: Well, we can't produce what we don't have, your Honor.

THE COURT: Excuse me. You should have produced it. It shouldn't have happened last week, okay? I know we've been dithering with Roxane for a while now. It should have been produced. But now let's go to your issue.

MR. HENDERSON: On the claims data, your Honor, we can't produce what we don't have. There are many states

where we do not have claims data that we've obtained from the states. What we have is a different level. There is a top level that CMS does obtain on a routine basis that is on a Web site. It's always been available to the defendants. They've got it. They've had it for a long time.

There is another level of claims data that we have obtained from the states. We've produced that. They've had it for a long time, with the exception that in the last month or so there may be one or two states where we just recently got something. We have to process it. We'll produce it as soon as we can. Then there are a whole mess of other states where we don't have any data other than that top level that they've already got. That's what Mr. Reale is talking about is this data that we haven't collected, and we're going to have to make our case without it, your Honor, but we don't have it. The states haven't produced it.

THE COURT: If they don't have it, they don't have it, which means they may lose on those claims because I can't create something out of nothing.

MR. REALE: Your Honor, they have to drop those claims if they don't have it.

THE COURT: You know what, I'm not doing that right here.

MR. REALE: I understand that, but --

THE COURT: This is about discovery. If they

don't produce it, they've got a problem, but I have no idea -- I see he's going like this and like this. I don't know whether it's dispositive or not. I don't know. I don't understand it, so I'll get to that at summary judgment.

So this is what we're going to end up doing on this, okay, this is what we're doing: The discovery deadline is still December 15. I agree with you that it is -- we will have enough on our plate so that if in fact you can piggyback on these other states, I don't see the need for both sides to be spending this kind of money on them. At some point, if they're too slow, I will leave it up to the parties to let me know that it's too slow, and I will have to let you do these seven other states. You know, I'm not going to wait.

MR. MERKL: I understand.

THE COURT: But I think we have enough to do. We will go with the other states. The December 15 deadline for the other states is on. We're going to stick with the expert discovery schedule, et cetera.

With respect to the deliberative process privilege, you're going to give me the 200 documents he's talking about, and then I'm going to take a look, and then I'm going to appoint a master if I think that it's just going to be too time-consuming. My guess is from my review

of the twelve sets of documents you gave me, it took -- I would not be able to do 200, and I called Judge Bowler, and she doesn't have the time either. You need to go down to Judge Bowler and see her and get a ruling because I am not reopening the December 15 deadline. Now, if she makes certain rulings that need by force to come in afterwards, that's a different story, but I'm not generally extending that deadline.

MR. DRAYCOTT: Two points of clarification, and thank you, your Honor, and I do have, I think, a clearer understanding. But, one, with respect to the 200 documents, I take it that you would have us go back, rereview those. You don't want the 200 right away, but just turn over to you any which we propose to continue to withhold from defendants. Is that right?

THE COURT: When can you do that? How about -- today is Thursday -- how about next week? Is next week Thanksgiving?

MR. MERKL: The week after, your Honor.

MR. DRAYCOTT: Your Honor, knowing how long and how much work went into the last submission to you, I would like to take some more time. I will try to do it with all deliberative speed.

THE COURT: It might be quicker to have me do it, like, "yes, no, yes, no."

MR. DRAYCOTT: But I would like to -- we will, your Honor, try to glean this down to the ones that, again, which you -- you asked me if there were ones that have a tab on it of being of special importance, and I've indicated that that hasn't been done yet, but it's the first thing I'm going to do. I only got Mr. Daly's -- sorry -- the Abbott, the joint submission yesterday. I really barely had time to look at it before today. We'll go back to the 200 documents. We'll look very closely at them, and then we will submit to you any which we're not going to turn over. And we'll go back to the agency and ask them whether or not they're willing to --

THE COURT: I know, but how long is this going to take? We have December 15, and I can't --

MR. DRAYCOTT: Your Honor, I'm going to start the process tomorrow.

THE COURT: Because it took you three months last time.

MR. DRAYCOTT: I will endeavor --

THE COURT: And I'm not for a minute saying you didn't work hard. If anything, I pity you right now because, I mean, it's like going back and re-eating food you didn't like the first time around.

MR. DRAYCOTT: The pity doesn't seem to be getting me too far today, but I will endeavor to do this by a week

from tomorrow.

THE COURT: Fair enough, fair enough. And then I'll just do a quick "yes, no, yes, no." I can't begin to do it paragraph by paragraph the way I did the last time, but the reality is that it was -- I think what you did is, you saw a document; if there was something there that was deliberative, you withheld it. I think that the law doesn't let you do it so broadly.

MR. DRAYCOTT: No, but the thing that we didn't do generally, your Honor, is we didn't go through redactions. Of course, we were never asked to do that, but we can also consider redactions at this point, which is --

THE COURT: It will take you forever.

MR. DRAYCOTT: Well, again, we'll try to get this done.

THE COURT: Most of these documents were from the late 1990s. They're ten years old, right?

MR. DRAYCOTT: Your Honor, believe me, I've heard everything that your Honor said today, the concerns that you've raised and the places where you think we're on firmer ground and less firm ground. Just to clarify, though, I take it the one thing -- the greatest bulk of the documents for which we have asserted privilege are drafts of OIG reports, and your Honor excluded that from the last time we were here. If that's still excluded, I think that makes it

easier for me. I think it also makes it easier for Judge Bowler with respect to the documents that are now --

THE COURT: The drafts, as long as the final is produced.

MR. DRAYCOTT: Absolutely.

THE COURT: Yes, sure. And there was one other memo you gave me you said was just a draft, so it was hard for me to understand because you didn't give me a declaration that went document by document. At least I didn't find it.

MR. DRAYCOTT: No, no, we were relying on prior declarations.

THE COURT: But they were broad-sweeping, the end of the Republic if these are produced.

MR. DRAYCOTT: Your Honor, thank you. I think I've got the clarification I need, and we will endeavor --

THE COURT: Next week. And you saw what I excluded, I mean, the real back-and-forth: "I recommend that you do this policy thing for this reason," and the guy says "No." I mean, that's like core stuff, but 99 percent of it wasn't that.

MR. DRAYCOTT: Your Honor, I gave your order a very careful reading and will continue to do so. Thank you.

MR. HENDERSON: Just a couple of fine points, your Honor.

THE COURT: I'm sure they're fine.

MR. HENDERSON: Well, yes. On the seven states that are going to go after December 15, am I correct in understanding it will be one 30(b)(6) and one 30(b)(1) deposition per state?

MR. MERKL: Your Honor, what we propose to do is, we'll just cross-notice whatever they do. If they do three or four depositions in the state, we'll do three or four. The whole idea is to avoid having to go out and making them do this extra process.

MR. HENDERSON: Some of these states have had dozens of depositions that just --

THE COURT: I can't answer that in advance. I mean, my theory was on this that it would have some limits on it per state, but if somebody is already taking a deposition --

MR. MERKL: Exactly, your Honor, these are happening anyway.

THE COURT: What?

MR. MERKL: These are all depositions that would be happening anyway.

THE COURT: Yes, I know, but at some point it's a burden on the -- the litigating burden. It's whatever it was for these other states: one 30(b)(6), one 30(b)(1), you can cross-notice. Do you want to attend the rest and I

would use the information? Sure. But I can't make the government attend all of these if there are eight per state. You can still use the materials, but you just won't --

MR. MERKL: Be able to ask questions, but we can use the material.

THE COURT: Yes, but you can use the material.

MR. MERKL: Or we can ask questions of one and notice a 30(b)(6) of --

THE COURT: Yes.

MR. MERKL: Okay.

THE COURT: But they can use the material. If it's out there under oath, it can be used.

MR. HENDERSON: On summary judgment, I think anybody can use anything that's under oath basically.

One other fine point, your Honor. The last time around, I think it was in the Abbott case, there were a couple of situations -- and I think I speak on behalf of all the parties here -- where a witness got sick or something and the deposition had to be postponed.

THE COURT: Sure.

MR. HENDERSON: And the question is, can we, if we all agree that a deposition has to be scheduled for that type of reason, can we do it ourselves without seeking leave of Court?

THE COURT: Of course, of course.

MR. HENDERSON: Thank you, because last time it took many months.

THE COURT: If you all agree, I mostly agree. My biggest issue is that this case is getting very old, and short of the First Circuit just ending the entire case, we're all going to grow old together unless we get this moving, right? I mean, this case, I'm still getting new cases in it.

MR. MERKL: Kansas.

THE COURT: It's been seven years since I started, so we need to get some momentum on the case. Even if I just had five sample cases that could be briefed all the way through to give people a sense of how I might come down on these things. Maybe I could even divvy it up, and then you could go on appeal or something, just something, and then maybe have some serious -- have you started talking settlement?

MR. HENDERSON: Yes, your Honor. In fact, Mr. Merkl --

THE COURT: We need to go off the record for this.

MR. MERKL: We can do that in a second. Can I just ask for clarification on the claims data? I understand, obviously, if the government doesn't have it, we won't get it; and the consequences of not having it, we'll litigate that later.

THE COURT: Right.

MR. MERKL: What I don't understand is, is the government saying, for the seventeen states that we don't have the claims data for yet, we don't have it because it doesn't exist at the state level? Or is it some problem where they're having trouble getting it from the states where the onus is kind of now on me to go to these states and get it?

THE COURT: Which is it, that it doesn't exist or the states won't give it to you?

MR. HENDERSON: I think probably every state has claims data. They process claims. We have not had, quite frankly, the resources to go out and -- it's very time-consuming to collect this data, so we have not done it for all fifty states, and some states simply haven't produced it to us. So we just don't have it all, and we're unlikely to get much more. It's possible we could get another state or two before December 15, but --

THE COURT: Do they understand they won't get their half if they don't do it?

MR. HENDERSON: Your Honor, we're going to rely on the data, more summary data that is reported to CMS that's on the Web site. That's what's been done in the Abbott case, for example.

THE COURT: And that may be enough or not. I just

don't understand it well enough.

MR. HENDERSON: And the defendants will move to exclude our damages estimates to the extent that they rely on that high-level data, and the Court will have to decide, but we can't produce what we don't have.

THE COURT: All right, that's where it is. I can't refine it any more.

MR. MERKL: No, I understand, your Honor. I guess what I'm saying is, if it really exists, CMS can direct the states to give it to us. I understand the states may not want to do it, but they're claiming these states. The data we're talking about, your Honor, is the type of thing you're looking at in Massachusetts --

THE COURT: I tell you what, if you want to subpoena it, subpoena it. They're stuck with whatever they produce.

MR. HENDERSON: One final thing, your Honor. I think we should have a scheduling conference scheduled at some point, certainly both to talk about what the status is of these other seven states later on down the road, and also I think, too, when we get closer to summary judgment, to talk about how we're going to approach summary judgment. We don't have a game plan right now. We've had a little bit of discussion amongst us, but I think it's going to -- some months from now --

THE COURT: What are you thinking of?
MR. HENDERSON: January-February time period.
THE COURT: I'm thinking you're going to have to brief it state by state, right?
MR. MERKL: That's our view.
MR. DALY: Not necessarily, Judge.
MR. HENDERSON: I don't think we're going to have fifty summary judgment motions.
THE COURT: I don't know enough. If Mylan is any indication, it's so sui generis.
MR. HENDERSON: Well, there are going to be state-by-state issues, but, in any event, it just seems to me we may need a scheduling conference or a status conference. If your Honor doesn't want to do it, that's fine. It just seems to me --
THE COURT: Let me put it this way: I had this and I thought this was very helpful today, and I thank you all for coming. I'm just simply saying, I don't know when to schedule it for. I don't have theoretical opposition, but I don't want to create problems. The way we have this now, you're going to be done with --
MR. HENDERSON: How about after the close of expert discovery?
THE COURT: Which is when?
MR. HENDERSON: I've forgotten. Does anybody

know? The beginning of March maybe?
MR. MERKL: March --
THE COURT: Close of expert discovery, May 22?
MR. MERKL: Yes, May 22, your Honor. Close of expert for the Abbott, Dey, and Roxane cases, May 22, 2009.
THE COURT: Robert, why don't we give them a date in May, and it's without prejudice to anyone asking to come in sooner, if that's necessary, because this was useful today. When should we do this in May?
THE CLERK: May 28 at 2:00 p.m.
MR. MERKL: Is that Memorial Day?
THE CLERK: The Thursday of Memorial Day week.
THE COURT: Now let's go off the record.
(Discussion off the record.)
(Adjourned, 4:45 p.m.)

CERTIFICATE

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 47 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action Nos. 07-12048, 06-11337, and 05-11084, In Re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 19th day of November, 2008.

/s/ Lee A. Marzilli

LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER