# EXHIBIT G

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DELAWARE HEALTH AND SOCIAL )
SERVICES, DELAWARE DIVISION OF )
MEDICAID AND MEDICAL )
ASSISTANCE, )
)
        Plaintiff, )
)
v. )    **C.M. No. 08-215 (SLR)**
)
DEY, INC; DEY L.R., INC.; and DEY, )
L.P., )
)
        Defendants. )
)

## DEFENDANTS DEY, INC., DEY L.P., AND DEY L.P., INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION TO TRANSFER PLAINTIFF'S MOTION TO QUASH TO THE DISTRICT OF MASSACHUSETTS AND OPPOSITION TO PLAINTIFF'S MOTION TO QUASH

Defendants Dey, Inc., Dey L.P., and Dey L.P., Inc., captioned herein as Dey, Inc.,

Dey L.R., Inc. and Dey, L.P. (collectively, "Dey"), through their undersigned counsel, hereby

cross-move to transfer Plaintiff Delaware Health and Social Services, Delaware Division of

Medicaid and Medical Assistance's ("DMMA") motion to quash Dey's subpoena to the United

States District Court for the District of Massachusetts and, in the alternative, oppose DMMA's

motion to quash. Defendants respectfully request that the Court grant Dey's cross-motion to

transfer this matter to the District of Massachusetts where the underlying multidistrict litigation

is pending, or in the alternative deny DMMA's motion to quash.

## BACKGROUND

On November 21, 2008, Dey served upon DMMA a non-party subpoena

requesting Medicaid claims data in connection with a multidistrict litigation, *United States of*

*America ex rel. Ven-A-Care of the Florida Keys v. Dey, Inc. et al.*, Civil Action No. 05-11084-

PBS, MDL 1456, pending in the United States District Court for the District of Massachusetts before Judge Saris.  (A copy of the subpoena is attached hereto as **Exhibit A.**)

The underlying action is a complex litigation concerning Medicaid and Medicare reimbursements in nearly every state in the country.  Plaintiff in the underlying action, the United States of America ("Federal Government"), brings various claims against Dey seeking, *inter alia*, recovery of the federal share paid to the Medicaid programs of almost every state, including Delaware.[1]  The Federal Government's claim for damages is based on the individual state Medicaid transactions.  Claims data from Delaware is therefore critical to Dey's defense of the action and for a complete understanding of the Federal Government's proposed damages.  In 2007, Dey requested that the Federal Government produce such claims data, and the Federal Government indicated it would request and produce same.  Thereafter, the Federal Government produced some data from some states.  The Federal Government did not produce Medicaid claims data for the state of Delaware for the time period from 1991 until 2002; Dey's subpoena requested the missing data.

At a status conference held before Judge Saris on  November 13, 2008 (a copy of the transcript is attached hereto as **Exhibit B**), near the close of fact discovery, Dey's counsel noted the Federal Government's failure to produce complete claims data and pressed upon the Court the importance of obtaining state Medicaid claims data to Dey's defense of the action.  (Ex. B at 45:10-13.)  The court stated that if Dey wanted state claims data which had not been produced by the Federal Government, it should subpoena each state.  (Ex. B at 45:14-16.)  Immediately thereafter, Dey drafted subpoenas for individual states requesting all outstanding claims data which had not been produced by the Federal Government.  These subpoenas included DMMA.

---

[1]    Dey has settled the Federal Government's claims concerning Texas.

Dey served its subpoena on DMMA on November 21, 2008 and requested compliance by December 3, 2008. The close of fact discovery in the MDL was December 15, 2008. (Ex. B at 36:7-8.) On December 4, 2008, DMMA filed its motion to quash.

Dey has filed two companion motions in the MDL Court. First, on December 10, 2008, Dey moved to extend the production deadline for the purpose of receiving Medicaid claims data from the states. Second, on December 15, 2008, in response to the objections of fours states—including DMMA's motion to quash—Dey made a motion to compel the production of responsive documents by the Medicaid programs of Delaware, North Carolina, Oklahoma, and South Dakota. Both motions are pending.

## ARGUMENT

## I.   THIS COURT SHOULD TRANSFER DMMA'S MOTION TO QUASH TO THE DISTRICT OF MASSACHUSETTS TO AVOID INCONSISTENT RULINGS

The underlying lawsuit against Dey has been consolidated with other similar lawsuits for discovery purposes in the District of Massachusetts. Both the case law and the practicalities of the pending action, strongly weigh in favor of transferring DMMA's motion to quash to the District of Massachusetts. Under the prevailing case law, Judge Saris has the authority to adjudicate issues concerning third-party subpoenas – and in the case of multidistrict litigation, consolidated and centralized handling of all discovery issues is preferred. Moreover, the transfer of DMMA's motion to the District of Massachusetts will ensure consistency, both with prior rulings and with the various motions currently pending before Judge Saris, including Dey's motion to compel DMMA (and 3 other State Medicaid agencies) to comply with Dey's subpoenas.

## A.    28 U.S.C. § 1407(b) Authorizes the Transfer of this Motion to the MDL Court

This Court has the authority to transfer the pending motion to the District of Massachusetts. 28 U.S.C. § 1407(b) "explicitly authorizes the MDL court to hear discovery disputes from other districts." *See Stanziale v. Pepper Hamilton LLP*, No. M8-85, 2007 WL 473703, at *4 (S.D.N.Y. Feb. 9, 2007); 28 U.S.C. § 1407(b). Under the multidistrict statute, an MDL judge may "exercise the powers of a district judge in any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(b). This is because an MDL judge's "powers as a transferee judge are nothing less than plenary." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 117 F.R.D. 30, 31-33 (D.P.R. 1987) (citing *In re Multi-Piece Rim Products Liability Litig.*, 653 F.2d 671, 676-77 (D.C. Cir. 1981)).

28 U.S.C. § 1407(b) authorizes the transfer of motions for protective orders regarding subpoenas *duces tecum*, motions to quash subpoenas, and motions to compel non-parties to the MDL district court. *See, e.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 274-75 (D.D.C. 2002) (MDL court has power to enforce subpoenas *duces tecum* issued by court in which action originated); *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 586 (E.D. Pa. 1989) ("multidistrict judge may decide a motion to compel a non-party in other districts even if he or she is not physically situated in those districts"); *In re Corrugated Container Antitrust Litig.*, 662 F.2d 875, 880-81 (D.C. Cir. 1981) ("multidistrict judge is granted the same powers as a judge of those courts where the depositions are being taken"). Thus, this Court has the power to transfer DMMA's motion to quash to the District of Massachusetts.

**B.**     **The Need for Consistency and Judicial Economy Necessitates the Transfer of this Motion to the MDL Court**

Not only may the MDL court hear disputes over non-party subpoenas under 28

U.S.C. § 1407(b), but courts have held that the MDL court is in fact the best venue for such

disputes. For example, in *In re: Orthopedic Bone Screw Products Liability Litigation*, 79 F.3d

46 (7th Cir. 1996), the Court of Appeals for the Seventh Circuit denied petitions for mandamus

and approved of the transfer of protective orders filed by third-party witnesses in Wisconsin

Federal Court to the Eastern District of Pennsylvania where the underlying action was

consolidated in a MDL for pretrial discovery. In denying the petitions, the court stated:

> A principal purpose of § 1407 is to allow one judge to take control
> of complex proceedings, the better to avoid unnecessary
> duplication in discovery. Judge Bechtle is much better situated
> than is any of the three district judges in Wisconsin to know
> whether the depositions plaintiffs seek to take, and the questions
> they propose to ask, are appropriate, cost-justified steps toward
> resolution of the litigation. So the district judges in Wisconsin
> acted wisely, as well as within their power, in calling on Judge
> Bechtle to handle the motions for protective orders.

*Id.* at 48. *See also In re Subpoenas Served on Wilmer, Cutler & Pickering and Goodwin Proctor

LLP*, 255 F. Supp. 2d 1, 3 (D. D.C. 2003) (transferring motions to quash to MDL judge who was

already familiar with the massive litigation served interests of justice, efficiency, and consistency

underlying MDL rules). By transferring the instant motion from the District of Delaware to the

District of Massachusetts, this Court can likewise ensure consistent outcomes and increase

judicial economy and efficiency.

Judge Saris has already expressed the need for Dey, together with other parties in

related actions, to gather information from the Medicaid programs of each of the fifty (50) states.

At a hearing held on July 24, 2008 (a copy of the transcript is attached hereto as **Exhibit C**),

Judge Saris stated: "I'd like a coordinated [summary judgment] brief. What I'd like is one cross-

cutting brief per state, and then, ideally speaking, once I've resolved the legal issues, I can go

drug by drug, company by company." (Ex. C at 27:21-25.)  In order to present a summary

judgment motion for each state, as contemplated by Judge Saris, Dey and the other defendants

need documents and testimony from each state – including the claims data requested in the

subpoena at issue on this motion.  A transfer of this motion to Judge Saris would allow her to

determine the scope and necessity of the discovery from DMMA consistent with the needs of the

underlying litigation.

　　　　　In addition to ensuring consistency with Judge Saris's prior rulings, a transfer to

the District of Massachusetts would allow for consistency amongst various motions to quash and

motions to compel.  As mentioned above, Dey filed a motion in the District of Massachusetts to

compel the production of Medicaid claims data against four states, including Delaware.

Adjudication of DMMA's motion to quash by this Court and Dey's motion to compel by Judge

Saris in the District of Massachusetts poses a significant risk of inconsistent rulings.  By

consolidating the motions before Judge Saris, inconsistent results can be avoided.[2]

　　　　　Finally, Judge Saris is in a unique position to determine the outcome of this

motion to quash, because she is intimately familiar with the issues in the case.  For the last seven

years, Judge Saris has dealt almost exclusively with litigation concerning "average wholesale

prices" in numerous federal actions.  Thus, Judge Saris is familiar with the complex and varied

issues involved in the underlying action brought by the Federal Government against Dey and the

import of individualized Medicaid claims data.  *Cf. Stanziale*, 2007 WL 473703, at * 5 ("A judge

who is fully familiar with the underlying litigation is in a better position to resolve such issues

---

[2]　Other courts have recognized the importance of consistency in adjudication of the various
motions in this case.  Dey subpoenaed the Commonwealth of Pennsylvania, Department of Public
Welfare, Office of Medical Assistance Program.  On November 7, 2008, Pennsylvania moved to
quash Dey's subpoena in the District Court for the Middle District of Pennsylvania.  On
November 17, 2008, that court issued an Order transferring *sua sponte* the motion to the District
of Massachusetts.

than a judge in a different district with no knowledge of the case.")  In another MDL pending

before the District of Massachusetts, the court stated that:

> [T]his Court has jurisdiction to issue orders related to the
> subpoenas at issue. The purpose of a multidistrict litigation
> consolidation is to "avoid duplicative discovery, prevent
> inconsistent pretrial rulings and conserve judicial resources." *In re
> Air Disaster*, 486 F.Supp. 241, 243 (Jud. Pan. Mult. Lit. 1980).
> The relevant statutes and caselaw provide for an MDL Court to
> resolve disputes arising from the service of Rule 45 subpoenas on
> non-parties located in other districts . . .

*In re Neurontin Mktg.*, 245 F.R.D. 55, 57 (D. Mass. 2007) (overruling non-party's objection to

MDL Court's exercise of jurisdiction over motion to compel documents pursuant to subpoena).

Here, judicial economy is best served by transferring the DMMA's motion to quash to the

District of Massachusetts because that is the court that has the most familiarity with these issues.

## II.    ALTERNATIVELY, THIS COURT SHOULD DENY DMMA'S MOTION

The MDL rules and principles of judicial economy strongly favor transferring this

motion to the District of Massachusetts to be decided by Judge Saris.  However, should the Court

decide to hear the motion to quash, the motion should be denied as DMMA's objections are

unsupported and meritless.

### A.    Dey's Subpoena Provided Reasonable Time For Compliance Under the Circumstances

DMMA incorrectly alleges that Dey's subpoena *duces tecum* was served on

Tuesday, November 25, 2008.  (DMMA Mot. ¶ 1.)  In fact, the subpoena was served on Friday,

November 21, 2008.  (A copy of the Affidavit of Service is attached hereto as **Exhibit D**.)  The

return date of the subpoena was Wednesday, December 3, 2008, allowing six business days for

compliance. DMMA argues that Dey's subpoena fails to allow a reasonable time for compliance pursuant to Rule 45 of the Federal Rules of Civil Procedure. (DMMA Mot. ¶ 2.)[3]

Rule 45 does not provide for any minimum amount of time necessary to comply with a subpoena. *See* Fed. R. Civ. P. 45(c)(3); *see also Kupritz v. Savannah College of Art & Design*, 155 F.F.D. 84, 88 (E.D. Pa. 1994) (requiring compliance "forthwith" may be permissible in certain circumstances because Rule 45 "provides neither a maximum nor a minimum period of time for compliance"). A "reasonable time" to comply must therefore be determined upon consideration of all the circumstances. *See Hardin v. Belmont Textile Machinery Co.*, No. 3:05CV492, 2007 WL 2300795, at *4 (W.D.N.C. Aug. 7, 2007) (where defendant issued subpoena close to discovery deadline seeking information of which it had been previously unaware, the court held that nine days' notice was a reasonable time for compliance based on the circumstances). In the present case, the discovery deadline of December 15, 2008 was quickly approaching when it became clear, at the November 13 status conference before Judge Saris, that Dey would have to subpoena individual states in order to obtain the data vital to its damages defense in that action. The notice provided by Dey's subpoena was justified by the importance of the information sought and Judge Saris's requirement that the discovery deadline be met.

Moreover, had DMMA contacted Dey's counsel before filing its motion to quash, Dey would have readily agreed to give DMMA any reasonable time it needed to comply with the subpoena. Indeed, Dey has agreed to extensions with nearly every subpoenaed state and has moved the District of Massachusetts to extend the discovery deadline for the specific purpose of receiving state Medicaid claims data. Instead, DMMA chose to take no steps whatsoever to

---

3 DMMA further objects that Dey's subpoena does not comply with the seven-day notice required by Local Rule 30.1. (DMMA Mot. ¶ 2.) Local Rule 30.1, titled "Reasonable Notice for Taking Depositions," however, concerns the notice necessary for depositions – not for document subpoenas. Thus, Local Rule 30.1 is inapplicable here.

comply with the subpoena or to contact Dey's counsel and instead filed the present motion to quash.

**B.   DMMA's Objections As To Undue Burden of Time And Cost Are Meritless**

DMMA further objects to Dey's subpoena on the grounds that the data requested places upon it an undue burden.[4] DMMA alleges that compliance with Dey's subpoena would require approximately one year and several million dollars. (DMMA Mot. ¶ 3.) DMMA has not set forth any evidence to support these contentions. Instead, DMMA merely asserts that the "data are stored on tapes in a format that is not in a useable format" and "[i]t would be expensive and time-consuming to recreate the data in the format demanded in the subpoena." (DMMA Mot. ¶ 3.) It is unclear, based on these self-serving and vague objections, how much of the requested data is inaccessible and exactly how much it would cost to procure any such data.[5]

Moreover, Dey has agreed to pay the reasonable costs in connection with the production of requested claims data for any state that has asked. Thus, Dey's subpoena would not impose an undue burden on DMMA.

**C.   Confidential Health Information Is Protected**

DMMA also states: "[i]t may be that the data contain information that would identify Medicaid recipients and, under state law, that information would need to be removed before the date could be released." (DMMA Mot. ¶ 4.) To the extent that DMMA's argument is that removing any such confidential information would increase its burden of production, that

---

[4]   DMMA also appears to object to the subpoena on the grounds that the data requested therein is available on the federal CMS website. (DMMA Mot. ¶ 3.) This is wrong; the CMS website does not contain claim-by-claim reimbursement data for Delaware.

[5]   For example, is older data more difficult to acquire than more recent data? What is the cost and time required for each year of data requested? Had DMMA contacted Dey's counsel in advance of filing this motion to quash, the parties could likely have reached a compromise on what claims data to produce, and in what format.

argument is meritless. All confidential health information produced in the MDL is subject to a

stipulated protective order, obviating DMMA's need to expend time and money redacting the

personal identification information of Medicaid recipients. (A copy of the protective order is

attached hereto as **Exhibit E.**)

## CONCLUSION

For the above reasons, Dey respectfully requests Dey's cross-motion to transfer

be granted and that an Order be issued transferring DMMA's motion to quash to Judge Saris in

the United States District Court for the District of Massachusetts. In the alternative, Dey

respectfully requests that DMMA's motion to quash be denied in its entirety and DMMA be

compelled to comply with Dey's subpoena.

Dated: December 22, 2008

Respectfully Submitted,

SAUL EWING LLP

Candice Toll Aaron, Esquire (DE ID #4465)
222 Delaware Avenue, 12th Floor
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813
caaron@saul.com

-and-

KELLEY DRYE & WARREN LLP

Paul F. Doyle
Sarah L. Reid
William A. Escobar
Neil Merkl
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Defendants Dey, Inc.*
*Dey, L.P., and Dey, L.P., Inc*

# EXHIBIT A

A088 (rev. 12/06) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | Pending in: |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO<br><br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.,*<br>Civil Action No. 05-11084-PBS | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**<br><br>MDL NO. 1456<br>Master File No. 01-CV-12257-PBS<br><br>Hon. Patti B. Saris |

## SUBPOENA

TO:   Delaware Health and Social Services
      Division of Medicaid and Medical Assistance
      c/o Harry Hill, Director
      1901 N. Du Pont Highway, Lewis Bldg.
      New Castle, DE 19720

☐   YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  The deposition will be recorded by stenographic means and videotape.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
*See* Exhibit A.

| PLACE<br>Wilcox & Fetzer, Ltd.<br>1330 King Street<br>Wilmington, DE  19801 | DATE AND TIME<br>December 3, 2008 |
|---|---|

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Defendants Dey, Inc., Dey L.P., Inc. and Dey, L.P. | November 19, 2008 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Neil Merkl, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (212) 808-7800
(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

---

## PROOF OF SERVICE

| DATE | | PLACE |
|------|--|-------|
| | | |

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                 DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the

testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

## EXHIBIT A: DOCUMENTS REQUESTED

1.   ***Claims Data.***  For the time period from January 1, 1991 to December 31, 2001, complete claims data for each instance that the State Medicaid program provided reimbursement of a claim relating to the dispensing of the Subject Drugs, with related file layouts, field definitions, manuals, data dictionaries, source tables, relationship tables, and business rules.  These data are requested in electronic form used by SQL Server, Microsoft Access, Microsoft Excel, or a delimited file that can be readily uploaded into one of those programs.  The complete claims data requested includes all fields, other than individual patient identifiers, contained on the Provider's claim submission and all additional fields added to process the claim, including:

   (a)   *Identifier*:  claim number, sequence number representing each line item of the claim, and other identifying information;

   (b)   *Provider type*:  pharmacy, physician, physician supplier, outpatient care provider, home health provider, institutional pharmacy, physician crossover, etc.;

   (c)   *Claim Type*:  any available claim type information, including but not limited to any information that indicates whether the State Medicaid Program is the secondary payor including Medicare Crossover Claims;

   (d)   *Transaction Type*:  all available transaction type information, such as correction, cancellation, etc., identifiers, and source transaction information (*e.g.*, if one claim corrects another claim, information about which claim is being corrected);

   (e)   *Status*:  all status information, including the payment code indicating whether the claim has been accepted, processed, and/or paid and the type of program the claim will be processed under (*e.g.*, Medicaid, Managed Care, etc.);

   (f)   *Dates*:  all available dates, including the date service was provided, the date the claim was received, and the date the claim was paid;

   (g)   *Basis of payment*:  coding within the claim payment transaction which identifies the reference point from which the claim payment amount is determined (*e.g.*, AWP, usual & customary, EAC, FUL, MAC, Billed Amount, Charges, etc.);

   (h)   *Provider*:  all information for all relevant Providers, including number, name, address, contact information, and area/field of practice (where relevant);

   (i)   *Product*:  all product information, including:

      (i)   NDC.  Please provide all 11 digits (do not drop leading or trailing 0's) and ideally in three separate fields – labeler (first five digits), product (next four digits) and package size (final two digits);

(ii)     Name;

(iii)    Type (*e.g.*, single source, multi-source);

(iv)    Therapeutic class; and

(v)     Related items like diagnosis codes, place of service, and type of service (where relevant).

(j)     *Units*: all units information with decimals in the correct position, including submitted units, allowed units, and unit of measure (*e.g.*, capsule vs. bottle, milliliter, etc.);

(k)    *Other Data for Payment*: any other data used to determine the amount of the payment not listed above (*e.g.*, channel of procurement, etc.);

(l)     *Payments*: all fields related to billed amounts, payment limit amounts, allowed amount, and actual amounts paid along with the bases for the payment, all with decimals in the correct position, including:

(i)     Billed charges;

(ii)     Basis of payment (*e.g.*, billed charges, ingredient cost, EAC, FUL, MAC, Billed Amount, acquisition cost, AWP, WAC, etc.);

(iii)    Dispensing fee;

(iv)    Service administration fee (*e.g.*, provider service fees);

(v)     Allowed amount or contracted amount;

(vi)    Any other payment amount (*e.g.*, inventory management fee/profit factor, delivery fee, generic incentive fee, etc.);

(vii)   Any amounts used to reduce amount paid (*e.g.*, payments received from other payors and the number, name, and other information associated with such payors, co-insurance, co-payment, deductible); and

(viii)   Amount paid.

(m)    *Comments*: all other memo or free-form fields.

## EXHIBIT B

### DEFINITIONS AND INSTRUCTIONS

#### Definitions

1.      "AWP" or "Average Wholesale Price" means any figures so categorized and periodically published by any Publisher.

2.      "Documents" means all original written, recorded, or graphic matters whatsoever, and any and all non-identical copies thereof, including but not limited to advertisements, affidavits, agreements, analyses, applications, appointment books, bills, binders, books, books of account, brochures, calendars, charts, checks or other records of payment, communications, computer printouts, computer stores data, conferences, or other meetings, contracts, correspondence, diaries, electronic mail, evaluations, facsimiles, files, filings, folders, forms, interviews, invoices, jottings, letters, lists, manuals, memoranda, microfilm or other data compilations from which information can be derived, minutes, notations, notebooks, notes, opinions, pamphlets, papers, photocopies, photographs or other visual images, policies, recordings of telephone or other conversations, records, reports, resumes, schedules, scraps of paper, statements, studies, summaries, tangible things, tapes, telegraphs, telephone logs, telex messages, transcripts, website postings, and work papers, which are in the possession of the Carrier as defined above. A draft or non-identical copy is a separate document within the meaning of this term.

3.      "EAC" or "Estimated Acquisition Cost" shall have the meaning set forth in 42 C.F.R. § 447.301

4.      "FUL" means "Federal Upper Limit" and shall have the meaning ascribed to that term pursuant to 42 C.F.R. § 447.332.

5.      "J-Code reimbursement basis" refers to the reimbursement of drugs through use of a subset of the HCPCS code set with a high-order value of "J" (compare to "NDC reimbursement basis").

6.      "MAC" or "Maximum Allowable Cost" shall have the meaning set forth in 42 C.F.R. § 447.332.

7.      "Manufacturer" means a company that manufacturers pharmaceutical products.

8.      "Medicaid" means and refers to the jointly-funded Federal-State health insurance program enacted in 1965 as an amendment to the Social Security Act to pay for the costs of certain medical services and care.

9.      "Medicaid Crossover Claim" means claims for which Medicare is the primary payor and the State Medicaid is the secondary payor.

10.     "NDC reimbursement basis" refers to the reimbursement of drugs based on a Provider's submission of a National Drug Code ("NDC") (compare to "J-code reimbursement basis").

11.     "Person" means any natural person or any business, legal, or governmental agency or association.

12.     "Point of Sale System" means a computer-transmitted claims processing system used by Providers to submit claims to Medicaid.

13.     "Provider" or "Providers" means and refers to any and all persons or entities that render health care services, including but not limited to pharmacists, institutional pharmacies, home health agencies, physicians, nurses, nurse practitioners, physicians' assistants, specialty pharmacy, nursing home personnel, laboratory technicians, x-ray and other medical equipment technicians, and other hospital or physician-office personnel.

14.     "Subject Drugs" means and refers to those drugs listed on attached Schedule A.

15.     "Subject J-Codes" means those J-Codes identified in attached Schedule B.

16.     "WAC" means "Wholesale Acquisition Cost."

17.     The terms "and" and "or" shall mean "and/or."

18.     Any word written in the singular shall include the plural and vice versa.

19.     In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each," and "every," the intended meaning is inclusive rather than exclusive.

### Instructions

1.     When an objection is made to any request or any subpart thereof, please state with specificity the part or subpart of the document request considered to be objectionable and all grounds for the objection.

2.     If you find the meaning of any term in these document requests to be unclear, please assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

## SCHEDULE 1: SUBJECT DRUGS

| DRUG DESCRIPTION | NDC |
|---|---|
| Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | 49502-0303-17 |
| Albuterol Inhalation Aerosol Metered-Dose Inhaler, 17g | 49502-0333-17 |
| Albuterol Inhalation Aerosol MDI Refill, 17g | 49502-0303-27 |
| Albuterol Inhalation Aerosol MDI Refill, 17g | 49502-0333-27 |
| Albuterol Sulfate Inhalation Solution 0.5%, 5mg/ml, 20mL multi-dose | 49502-0196-20 |
| Albuterol Sulfate Inhalation Solution 0.5% (Sterile) 20mL multi-dose | 49502-0105-01 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3ml, package of 25 | 49502-0697-03 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3ml, package of 25 | 49502-0697-24 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3ml, package of 30 | 49502-0697-33 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5 mg/3mL, package of 30 | 49502-0697-29 |
| Albuterol Sulfate Inhalation Solution Single-Pak™, 0.083% 3 mL, package of 30 | 49502-0697-30 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5mg/3ml, package of 60 | 49502-0697-60 |
| Albuterol Sulfate Unit Dose, 0.083% inhalation solution, 2.5mg/3ml, package of 60 | 49502-0697-61 |
| Cromolyn Sodium Inhalation Solution 20 mg/2 ml, unit dose vials, package of 120 | 49502-0689-12 |
| Cromolyn Sodium, Inhalation Solution 20 mg/2 ml, unit dose vials, package of 60 | 49502-0689-02 |
| Cromolyn Sodium, Inhalation Solution 20 mg/2 ml, unit dose vials, package of 60 | 49502-0689-61 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5 ml, package of 25 | 49502-0685-03 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5 ml, package of 25 | 49502-0685-24 |
| Ipratropium Bromide Inhalation Solution 0.02%, 2.5 ml, package of 25 | 49502-0685-26 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5 ml, package of 30 | 49502-0685-33 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5 ml, package of 30 | 49502-0685-29 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5 ml, package of 30 | 49502-0685-31 |
| Ipratropium Bromide Inhalation Solution 0.02%, Single-Pak™ 2.5 ml, package of 30 | 49502-0685-30 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5ml, package of 60 | 49502-0685-60 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5ml, package of 60 | 49502-0685-61 |
| Ipratropium Bromide Inhalation Solution 0.02%, 0.5mg/2.5ml, package of 60 | 49502-0685-62 |

## SCHEDULE 2: SUBJECT HCPCS CODES

| HCPCS CODE | DRUG DESCRIPTION |
|---|---|
| J7611 | Albuterol, Inhalation Solution, FDC-Approved Final Product, Non-Compounded, Administered Through DME, Concentrated Form, 1 mg |
| J7613, J7618 | Albuterol, Inhalation Solution, Administered Through DME, Unit Dose, 1 mg |
| J7619, J7620, K0505 | Albuterol, All Formulations Including Separated Isomers, Inhalation Solution Administered Through DME, Unit Dose, per 1 mg (Albuterol) or per 0.5 mg (Levalbuterol) |
| J7625, K0504 | Albuterol Sulfate, 0.5%, per ml, Inhalation Solution, Administered Through DME |
| J7630, J7631, K0511 | Cromolyn Sodium, Inhalation Solution Administered Through DME, Unit Dose Form, per 10 Milligrams |
| J7644, J7645, K0518 | Ipratropium Bromide, Inhalation Solution Administered Through DME, Unit Dose Form, per milligram |

# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                  )
                                        )   CA No. 07-10248-PBS
PHARMACEUTICAL INDUSTRY AVERAGE         )   CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION              )   CA No. 05-11084-PBS
                                        )   Pages 1-47

STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 13, 2008, 3:45 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1d6916c2-82b9-4146-8491-39690bca10fc

**Page 2**

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4      GEJAA T. GOBENA, ESQ. and JUSTIN DRAYCOTT, ESQ.,
    United States Department of Justice, Civil Division,
    P.O. Box 261, Ben Franklin Station, Washington, D.C., 20044,
5  for the United States of America.
6      GEORGE B. HENDERSON, ESQ. and BARBARA HEALY SMITH,
    ESQ., United States Attorney's Office, United States
7  Courthouse, 1 Courthouse Way, Suite 9200, Boston,
    Massachusetts, 02210, for the United States of America.
8
9      JAMES JOSEPH BREEN, ESQ., The Breen Law Firm,
    5755 North Point Parkway, Suite 39, Alpharetta, Georgia,
    30022, for the Relator, Ven-A-Care of the Florida Keys, Inc.
10
11  FOR THE DEFENDANTS:
12      NEIL MERKL, ESQ., Kelley Drye & Warren, LLP,
    101 Park Avenue, New York, New York, 10178k,
13  for Dey, Inc.
14      JOHN W. REALE, ESQ., Kirkland & Ellis, LLP,
    200 East Randolph Drive, Chicago, Illinois, 60601,
15  for Boehringer Ingelheim Corporation, et al.
16      JAMES R. DALY, ESQ., Jones Day,
    77 West Wacker, Chicago, Illinois, 60601-1692,
17  for Abbott Laboratories.
18
19
20
21
22
23
24
25

**Page 3**

1      PROCEEDINGS
2      THE CLERK:  In re:  Pharmaceutical Industry
3  Average Wholesale Price Litigation, Civil Action
4  Nos. 07-10248, 06-11337, and 05-11084, will now be heard
5  before this Court.  Will counsel please identify themselves
6  for the record.
7      MR. HENDERSON:  George Henderson for the United
8  States, your Honor.
9      MS. SMITH:  Barbara Healy Smith, also for the
10  United States.
11      MR. GOBENA:  Gejaa Gobena on behalf of the United
12  States.
13      MR. BREEN:  Jim Breen on behalf of the relator,
14  Ven-A-Care of the Florida Keys.
15      MR. MERKL:  Neil Merkl on behalf of defendant Dey.
16      MR. REALE:  John Reale on behalf of the Boehringer
17  defendants.
18      MR. DALY:  Good afternoon, Judge.  Jim Daly on
19  behalf of Abbott Labs.
20      THE COURT:  Great.  Today is a status conference,
21  and I at least received a few things from the defendants.
22  I'm not sure, did I receive anything from you?
23      MR. HENDERSON:  No, your Honor.
24      THE COURT:  All right, I always want to check
25  because it's such a messy docket, no fault of our Clerk's

**Page 4**

1  office, but it all gets intermingled with other cases.  I
2  want to make sure I didn't miss anything.
3      And, by the way, did you all notice we have now
4  deconstructed our docket, so hopefully we can follow the
5  case more easily with respect to the subcategories.  If
6  anyone has confusion about that, please ask Mr. Alba because
7  it should be a lot easier now to follow what's happening in
8  these cases as opposed to the New York cases and the
9  California cases and the like, so we're going to do that.
10      Now, this is, as far as I'm concerned, unless you
11  think otherwise, only the Ven-A-Care cases.  Is that right?
12      MR. HENDERSON:  Correct, your Honor.
13      THE COURT:  Because I received some notice coming
14  in from New York telling me that they don't plan on
15  attending, and inasmuch as I'd love to see them, I wasn't
16  planning on them attending.  Is there anyone here from
17  another case that didn't understand that?
18      Okay, just on the Ven-A-Care cases, what is it
19  that I need to resolve?
20      MR. HENDERSON:  Your Honor, as I understand it,
21  the defendants are essentially seeking an extension of the
22  discovery schedule and in cases for seven states which are
23  in litigation in which they have just issued notices for
24  last -- I'm sorry, five states, I think, which are in
25  litigation.  Is it five or seven?  Seven, seven states.

**Page 5**

1      THE COURT:  Right now the discovery cutoff is
2  December 15.  Is that correct?
3      MR. HENDERSON:  That's correct.  The defendants
4  have announced that -- they've requested us to agree to an
5  extension of the discovery schedule for at least those seven
6  states that are in litigation elsewhere, and they would like
7  to be able to essentially have our discovery take place
8  according to the litigation schedules of those seven other
9  jurisdictions, which --
10      THE COURT:  Short of that, though, do you have the
11  other depositions scheduled?
12      MR. MERKL:  Yes, your Honor.
13      THE COURT:  I'm not inclined to wait.  I'm very
14  eager.  This was an agreed-upon schedule.  I, of course,
15  would extend a schedule if somebody got sick or, you know,
16  something happens to you personally, but I don't want to
17  wait for the schedules in the other states.
18      MR. MERKL:  Your Honor, we've basically completed
19  twenty-two states, okay?  That leaves twenty-nine that we
20  need to do.  Twenty-one of those states we have issued, in
21  accordance with the procedure we discussed with your Honor,
22  the 30(b)(6) and in some cases the 30(b)(1) and the document
23  subpoenas.  We have dates for those or most of those before
24  the 15th.
25      THE COURT:  Okay.

2  (Pages 2 to 5)

**Page 6**

1     MR. MERKL: What we'd like is, could we extend
2  that time 60 days?
3        What Mr. Henderson was referring to was a separate
4  proposal I made, which is, there are seven states where the
5  discovery in those states -- those are litigating states --
6  is actively going on or about to start. We felt that rather
7  than dropping our own 30(b)(6) notice and our own document
8  demand in the middle of those proceedings, that could we
9  work with them and cross-notice --
10       THE COURT: You know what, let me just say,
11 normally I would say "Yes, sure," but I'm not willing to
12 wait the time that it would take. It puts us too far behind
13 the eight ball.
14       MR. MERKL: Well, the understanding would be, your
15 Honor, on those seven states is that what we were proposing
16 there was that would not affect things like experts and
17 summary judgment. It would just --
18       THE COURT: Well, how could it not? I mean, take
19 Massachusetts, which is the one that I've now got my sleeves
20 rolled up on. It's a mess understanding what happened to
21 that Medicaid program. It changed from year to year; there
22 were different policies at different points. You've got to
23 do discovery state by state, as far as I can tell. And it
24 matters. It matters to, you know, issues like causation.
25 If in fact you're going to litigate all these states and

**Page 7**

1  you're going to defend all these states, each state has its
2  own story, doesn't it, for Medicaid? Are you finding that?
3        MR. MERKL: Yes, your Honor, and I guess the
4  reason we were proposing carving those out, realizing that
5  you prefer not to do that now, was just to hope to take
6  advantage of that massive ongoing discovery that other
7  parties are already doing so that we could focus this. If
8  that's not workable, I guess we'd still like an extra
9  60 days to try and get it all done.
10       THE COURT: Well, let me just ask you this. Let
11 me just back up. Understanding that every single state
12 might have a different story, by December 15, how many
13 states will we be done with without those that are heavily
14 litigating?
15       MR. HENDERSON: Your Honor, if I might say so, we
16 don't need to do discovery in all of the states in order to
17 establish what their Medicaid reimbursement formulas have
18 been over time. Those changes are established as a matter
19 of law in state plan amendments. Ninety-nine percent of the
20 discovery of states that has been going on has been
21 "the government knowledge" defense, and the reason --
22       THE COURT: All right, that may be true too. My
23 point is, what if we did this? I'm not inclined to extend
24 the schedule. This case is taking too long. It's going
25 forever. But what if -- what is it, seven states that are

**Page 8**

1  being heavily litigated? Is that it?
2        MR. MERKL: Well, there's seven that are being
3  heavily litigated, twenty-one that are less so. But we have
4  actually everything noticed, and it's going to be this mad
5  dash --
6        THE COURT: Excuse me. What are the ones that are
7  currently under litigation in these other states?
8        MR. MERKL: The seven states that I was referring
9  to are Idaho, Mississippi, New York, Utah, South Carolina,
10 Pennsylvania, Iowa.
11       MR. HENDERSON: And Kansas has just filed suit.
12       MR. MERKL: And, Kansas we would propose to do
13 with the standard 30(b)(6) approach by December 15 because
14 it has to start --
15       THE COURT: So with the exception of these, can't
16 we -- listen, I view this as potentially overwhelming to do
17 the summary judgment in all the states anyway. What if we
18 were just to let these go their normal -- let them pick up
19 discovery in these other cases but keep to December 15 for
20 every other state?
21       MR. MERKL: Yes.
22       THE COURT: And not put off, not put off anything
23 by 60 days, not put off -- do summary judgment on the
24 other --
25       MR. MERKL: Forty-one.

**Page 9**

1        THE COURT: -- forty-three or whatever -- I don't
2  know how many states we're talking about -- states. In
3  other words, keep completely on the schedule. You finish --
4  I'm not going to extend the December 15. This is just
5  getting too far beyond, and everyone agreed to the schedule,
6  but we basically carve off these states because we're going
7  to have plenty on our plate.
8        MR. HENDERSON: Your Honor, I don't think -- I
9  mean, as far as we're concerned, those seven states, they've
10 just been noticed too late. And I will report to the Court
11 that we've been in touch with counsel for those litigating
12 states, except for South Carolina which we haven't really
13 conferred with. All of them oppose this --
14       THE COURT: Are you moving for summary judgment,
15 or are you? Everybody is, right?
16       MR. MERKL: Everybody is, your Honor.
17       MR. HENDERSON: Yeah, I'm not sure we're going to
18 be moving for summary judgment on all issues for all states.
19       THE COURT: I don't know. I think what's going to
20 happen is going to be overwhelming to me. And short of the
21 First Circuit just dramatically changing the territory, I
22 think it is going to crush my session -- I'm just putting it
23 out there, all right? -- to try and figure out, you know,
24 forty-three, forty-one states. I think I'll have plenty to
25 do. So I think what makes sense is, why don't we -- I'm not

3  (Pages 6 to 9)

Page 10

1  going to extend the schedule. We are going to keep to this
2  schedule. If these states can do -- rather than kill you
3  over Thanksgiving and Christmas to try and put all these in,
4  it is cost-effective to piggyback on what's happening with
5  these other states, and in the meantime, put all the other
6  states on the schedule we agreed to.
7        MR. HENDERSON: The difficulty with that, your
8  Honor, is then we don't know what the schedules of those
9  other states are, and we're essentially putting off
10 discovery indefinitely.
11       THE COURT: Well, that's why I'm for sure not
12 putting off the whole of Florida. If at some point when
13 we're much closer, if it looks like they are lost in
14 Never-Never-Land, then tell me that that's impossible. But
15 I just don't see how -- I've watched Mylan I'm working
16 through, okay, and it is unbelievably fact-intensive and
17 difficult to go through what the Medicaid policies are. It
18 is not just a question of law. It's who knew what, how did
19 it happen, when did the policies change? It's hard, it's
20 really hard, and we're working through that right now. So
21 if there are other states that look like that, that's going
22 to be -- it's going to be state by state. What did they
23 know, when did they know it, what was the statutory scheme?
24 And so I think I'll have plenty to do and so will you. I
25 don't think you'll be wanting for things to do.

Page 11

1        MR. HENDERSON: I might want a vacation, your
2  Honor, at the end of it all.
3        THE COURT: You get Thanksgiving and Christmas.
4  And so I'm not putting this off. We are kick-starting this.
5  We need this to happen. And so I don't think it's so
6  terrible if we do forty-one or forty-three states rather
7  than fifty; and the truth is, if I start ruling your way on
8  a bunch of these, it may refine our knowledge with respect
9  to the others and then vice versa as well.
10       MR. MERKL: I understand you to mean rule in my
11 way?
12       THE COURT: Yes, either way. I mean, it will
13 start focusing people on the summary judgment. So as I'm
14 hearing it, everything was going to be done except for these
15 states, right?
16       MR. MERKL: Yes. Well, everything is noticed, but
17 the problem --
18       THE COURT: Then you're going to have to live with
19 it. You agreed to that schedule; live with it.
20       MR. MERKL: Can I just point out one thing that's
21 happening with the states?
22       THE COURT: Yes.
23       MR. MERKL: The starting point, of course, is the
24 documents. What we're finding with the states is, it's not
25 as though they got the memo five years ago that these were

Page 12

1  starting and they stored all their documents and kept all
2  their documents. It's not. Some of them are starting from
3  the get-go, and it's a struggle getting them to turn the
4  stuff around quickly.
5        THE COURT: That's your fault for waiting so long.
6  Basically we all agreed with the schedule. I think it
7  was -- I went back to look. It says joint, joint.
8        MR. MERKL: Yes, your Honor, yes.
9        THE COURT: All right, so understand, I'm not here
10 to make people spend a fortune. If someone else is going to
11 do Utah, all power to them. I mean, we'll see about that
12 later. But I think we can move this case, we can start
13 working it through and just getting it going on the other
14 states. You agreed; you're stuck with it. If you don't get
15 your documents, as far as I'm concerned, I'm sorry, but you
16 took too long to start it going. So, you know, it's got to
17 be separate. They'll do what they reasonably can do, and
18 that's what we'll do.
19       Now, that having been said, now I -- I think
20 that's it for that issue, right?
21       MR. MERKL: Well, Medicaid, yes, your Honor, on
22 the discovery. There's some other pending discovery
23 motions.
24       THE COURT: Yes, I think there are. Now, I called
25 Judge Bowler this morning, and I'm trying to figure out what

Page 13

1  the status was, and do you have a bunch of -- do you have
2  any -- various motions for protective order have been filed,
3  is that it? Have they been opposed? What's the status of
4  all that?
5        MR. HENDERSON: I can't -- there are a bunch of --
6  the defendants have a bunch of motions, pending motions that
7  have been fully briefed to compel. We, I think, just filed
8  a motion for protective order. In the Roxane case, we only
9  just on Monday got delivered two hard drives and four CDs of
10 materials that have been requested way back in 2007, and we
11 just got them now. So there are going to be issues like
12 this that probably have to be dealt with on a case-by-case
13 basis on separate motions. The defendants have some motions
14 to compel. We may have some.
15       THE COURT: Does that affect these joint
16 scheduling orders? Were these produced too late? Or is
17 this just a question of -- does it affect depositions or
18 anything that you just got these documents?
19       MR. HENDERSON: It may. We have to look at them
20 and see whether -- right now in the Roxane case, for
21 example, that's the main one, from our perspective, where
22 we're just in the process of noticing five depositions of
23 current or former employees.
24       THE COURT: Why did it take so long to get to
25 them?

4  (Pages 10 to 13)

Page 14

1      MR. HENDERSON: To the documents?

2      THE COURT: Yes.

3      MR. REALE: Your Honor, I'm not familiar with the

4   intricacies of this. I don't know that he's necessarily

5   giving you the full story.

6      THE COURT: This is a joint scheduling order,

7   joint, agreed upon, so how are they --

8      MR. REALE: Your Honor, we were just compelled to

9   produce some documents, and I know that --

10      THE COURT: Well, all right, that's different, but

11   did you do a basic document production long before now?

12      MR. REALE: Yes, your Honor.

13      MR. HENDERSON: They provided to us, your Honor,

14   what they had produced in other litigation without

15   undertaking any independent search for the documents that we

16   requested, and it took a long time until we -- it took a

17   while. We finally moved to compel. We haven't even gotten

18   the information, for example, the e-mails that Judge --

19      THE COURT: When is the Roxane deposition

20   scheduled for?

21      MR. HENDERSON: Between now and December 15.

22   We're still working with counsel to set these dates.

23      THE COURT: But what's pending in front of

24   Judge Bowler? Is there anything pending?

25      MR. HENDERSON: Right now there's just one

Page 15

1   deposition in the Dey case that we want to take a deposition

2   of a former employee who happens to be in prison, so we have

3   to go -- we are required under the rule -- long story, your

4   Honor, nothing to do with their Dey employment. It's post-

5   employment conduct. But, in any event, the rules require

6   that we file a motion to take a deposition.

7      THE COURT: So I suggest you try and schedule a

8   hearing before Judge Bowler, like, soon. I'm trying to

9   look on the docket. I saw some of your motions, your

10   motions, like, on deliberative process privilege? I think

11   you're being -- it took me -- I know we're going to get

12   there -- it took me forever. I feel sorry for whoever you

13   entrusted this task with, but it took me forever to go

14   through the twelve documents because it's not all or

15   nothing, you know. I mean, when you go through them, some

16   of it's protected, some of it's not, some of it I'd have to

17   balance. It takes forever, and I can guarantee you I am not

18   going to sit -- or I just talked to Judge Bowler. She said

19   it would be impossible for her to go through. I think you

20   were overprotective of the deliberative -- I mean, I

21   understand the institutional pressures that make you do

22   that. It was overprotective. And most of these were old

23   documents. It was just unnecessary.

24      MR. HENDERSON: Your Honor, we followed your

25   instructions to the T in that regard.

Page 16

1      THE COURT: But some of them weren't even

2   protected. They were cover memos. Some of them were

3   factual recitations or they were post-policy. I mean, it

4   wasn't even protected. Some of it was core, as you would

5   say, but some of it wasn't even subject to it, and I don't

6   know what to do with that. You know, there were cover

7   memos. I didn't understand why they were being -- there

8   were ones that were from outside the agency, I forget, some

9   carrier. They weren't even protected.

10      So I don't know what to do. I think a master

11   makes sense. I can't possibly do it myself, I can't. It

12   took me personally -- I didn't send it to a magistrate

13   judge. I didn't give it to a law clerk. I sat and read

14   them and balanced, and I can't possibly do it for the volume

15   of documents we're talking about.

16      MR. HENDERSON: What I recommend, your Honor,

17   since we haven't filed an opposition to the motion, that we

18   be permitted to file an opposition to that particular

19   motion. And I think it's probably inevitable that some of

20   these motions, whether it's the defense motions or a motion

21   that we make, may require in individual circumstances for

22   some particular depositions that we're going to go beyond

23   the December 15 deadline, just because it takes that time

24   for a motion to be heard and decided.

25      THE COURT: I'm not extending the deadline short

Page 17

1   of family illness or personal illness. I mean, something

2   that's human, of course I'm going to do that.

3      MR. HENDERSON: Well, we're not suggesting that.

4   We're just saying that in order to resolve a motion -- I

5   don't think all of these motions are going to be decided in

6   time to get these depositions done by the 15th.

7      THE COURT: Well, it might be that Judge Bowler

8   decides it after, but I think I would go in there with all

9   the information and try and schedule them. I mean, I don't

10   know why this is all coming up at the last minute, but I

11   know just as a practical matter that's what happens in

12   litigation, but I am not generally reopening it.

13      And so the big issue really is for me, on the

14   deliberative process privilege, many of these were old

15   documents. Many of them were uncontroversial. I just

16   couldn't even understand why it was worth the dime not to

17   disclose them, even if there was argument for it. There

18   were a couple where it was really heartland, you know, "This

19   is what I think, and this is what you think." You know,

20   what you think about is deliberative of what a jury might

21   do, but most of it wasn't. You've seen it now.

22      MR. REALE: No, your Honor, we haven't.

23      THE COURT: Why?

24      MR. REALE: They haven't produced it to us yet.

25      MR. DALY: Mr. Draycott tells me that we'll have

5 (Pages 14 to 17)

## Page 18

1  them tomorrow, but we don't have them yet, Judge.
2      THE COURT: So any carrier documents shouldn't be.
3  Any cover memos shouldn't be. Any factual recitations
4  shouldn't be. Any drafts can be withheld, and anything
5  that's what you referred to in the memo occasionally as
6  "core" deliberative, like core, the back-and-forth before a
7  policy, arguably. But the older it is, the less important
8  this thing is. And anything post-2003 you don't need to put
9  in unless it's referencing backwards; you know, "As we knew
10 back then, we knew that these inhalers were --" But that
11 doesn't need to come in. A, it's probably not relevant,
12 and, B, it's -- so the weighing would be different. But I
13 don't -- how many of these documents did you say were now
14 subject to this privilege?
15     MR. DALY: Judge, there's the eight that you
16 ordered produced. There's forty-two that have been
17 previously submitted to Judge Bowler that she has yet to
18 rule on. I think she may have been waiting on your Honor's
19 ruling. But there were two in camera submissions to her,
20 one December, '07, one in June of this year, forty-two
21 there. And then, as I put in our motion, Judge, based on
22 your ruling, it appears that a variety of documents that
23 should have been submitted were not. And there's no way in
24 the world I'd want your Honor -- I would suggest your Honor
25 do this. That's why I think we should appoint a special

## Page 19

1  master and get it over with.
2      THE COURT: Why don't you talk about who might be
3  a special master. And let me just say this: I know this
4  poor guy asked for additional time who was doing it
5  initially. It must have taken him longer than -- what was
6  his name again? I am so sorry because it's really brutal.
7  And maybe you didn't want to do it page by page and
8  paragraph by paragraph. I sort of did. And so in the ones
9  where I'm saying, like, there's no way the cover memo was,
10 well, something maybe internal to it was, and you just
11 basically across the board claimed the privilege.
12     MR. DRAYCOTT: We took, your Honor, no
13 exaggeration here, hundreds and hundreds of attorney and
14 paralegal time in trying to respond to directions that your
15 Honor gave us on the 24th, and the thing that I would
16 actually implore you to do is to let us file a response to
17 the motion that has been filed with your Honor and --
18     THE COURT: To this master thing.
19     MR. DRAYCOTT: To the request. We just got it
20 yesterday. We --
21     THE COURT: Well, let me just say this: We need
22 to move this forward. I, quite candidly, don't think
23 anything is proving up at all that the government both knew
24 and approved of what I have been calling the "mega spreads."
25 They do support the 20 to 25 to 30 percent understanding,

## Page 20

1  but I can't prevent them from seeing what's there in order
2  to mount the defense. And if I ever reject it, it goes up
3  on appeal. So that's the issue. You want me to prejudge
4  the defense, and I'm not willing to do that. I don't
5  disagree with you that a lot of it doesn't support their
6  theory, but they can't know that.
7      MR. DRAYCOTT: Your Honor, there were a lot of
8  issues raised and a lot said in the motion that was just
9  filed, and I think that this is an area where a couple of
10 things: We would be well advised to listen and to reflect
11 on everything that your Honor said today, and I think that
12 we listened very carefully to what your Honor said on
13 July 24, and we devoted an enormous amount of resources in
14 trying to comply with that. So I would again implore you
15 for an opportunity to respond. And we will also, while
16 we're responding to the motion that was filed yesterday, we
17 will consider all the points that your Honor has made.
18     Your Honor has also, I think, said some things
19 that were both helpful and, you know, caused more work for
20 us. We'll consider all of that. We'll look anew at the
21 privilege assertions that we've made, and we'll be doing
22 that while we're also at the same time responding to the
23 motion, but if we can both try to respond to your Honor's
24 comments in a constructive way but at the same time also
25 address the request for a special master that has been made.

## Page 21

1  And, for example, one clarification I can offer you that
2  relieved us of a lot of burden, you've heard mention of the
3  forty-two documents that were submitted to Judge Bowler, but
4  far and away, the bulk of those is prior drafts of final OIG
5  reports. Now, when your Honor ruled on the 24th, she said
6  you can just exclude those. If that principle were applied,
7  for example, to the documents that are before Judge Bowler,
8  it virtually -- I haven't looked at those in preparation for
9  today, but my recollection is that that would remove a huge
10 number of percentage of the documents that were submitted to
11 Judge Bowler for in camera review.
12     THE COURT: Well, why haven't you at least turned
13 over to them --
14     MR. DRAYCOTT: Oh, your Honor, that was -- as soon
15 as we got your order, we forwarded it on to the Office of
16 General Counsel for the CMS division. It was just a matter
17 of advising the client agency. What I'm hoping your Honor
18 recognized from the declarations that had been filed by the
19 agency in support of this privilege assertion, it was a
20 matter of enormous importance.
21     THE COURT: But they didn't even go through them
22 document by document of the twelve. I mean, it was sort of
23 this -- it was an across-the-board thing.
24     MR. DRAYCOTT: But, your Honor, again, just to
25 answer your question, as soon as we got your order, we

6 (Pages 18 to 21)

1d6916c2-82b9-4146-8491-39690bca10fc

## Page 22

1 conferred with the client agency. We wanted to make sure
2 that there was nothing further they wanted to require us --
3 there was nothing more that they would ask of us by way of
4 reconsideration. I confirmed as late as this morning that
5 that's not going to occur, and I advised Mr. Daly that we
6 would turn over the documents. But I think that was a
7 minimal delay, and it was for that purpose.
8      THE COURT: What I'm going to ask you to do, and I
9 mean this: Turn over everything that's relevant except
10 where it's core deliberative process and you care -- and you
11 care, that's the big thing, and you care -- because
12 otherwise the burden is overwhelming. If we're left with
13 forty documents, now that I've set up the basic standards, I
14 can go "thumbs up, thumbs down," and you don't have to do a
15 master. But if we're at -- how many documents did you say
16 we're at, 2,000 or something like that? -- I'm going to make
17 the government pay for the master because I can't do 2,000
18 documents. And, you know, you spent hours on this.
19      MR. DRAYCOTT: I assure you I did.
20      THE COURT: But, for example, there was a cover
21 memo or there was the memo from a carrier. That's not even
22 a prayer for those being --
23      MR. DRAYCOTT: Well, your Honor, with respect the
24 cover memo, in my defense, it really didn't present as part
25 of the same document, and the cover memo was just a couple

## Page 23

1 of sentences, so that's how that got added. But --
2      THE COURT: But even in a lot of the memos, about
3 90 percent of them were just factual recitations. They
4 weren't deliberative. So, in fairness, it took me paragraph
5 by paragraph. I don't understand the lingo. I didn't
6 understand the abbreviations. I can't guarantee I got it
7 right. I can't. I mean, I just don't understand some of
8 it, so --
9      MR. DRAYCOTT: Well, your Honor, I guess if I can
10 respectfully get some clarification from your Honor then
11 with respect to the current state. I take it that we are at
12 the same time permitted to respond to the motion that was
13 filed. In the interim, we have direction from your Honor
14 with respect to some broad categories that we can both, you
15 know, take in and take out. We'll try to respond to that,
16 but at this point we can, I think -- I'm hoping that I
17 understand your Honor correctly that we can respond on both
18 fronts, that we can both go back and revisit our privilege
19 assertions, try to refine them, and look at them with the
20 guidance that we've received from your Honor today in mind,
21 but that we still may respond to the motion for a special
22 master?
23      THE COURT: Here's the problem. I remember being
24 a lawyer. We all remember. I'm sure you do this for
25 attorney-client privilege. You look at whether there's a

## Page 24

1 plausible basis, and you assert it. Usually the first stab
2 through most attorneys overassert, and on the theory that,
3 well, we'll chisel back. My problem is that I have to
4 decide, A, if the privilege applies, and then, B, do a
5 weighing, okay. So I've got Part B, and I couldn't entrust
6 that to the government as a matter of law to just do the
7 weighing. That's something I think I have to do. And so
8 since government knowledge is both relevant to the various
9 issues we've talked about -- scienter, reliance, there's a
10 common law fraud claim, it's relevant to the government
11 knowledge defense -- they may go down in flames on it, but I
12 can't say they can't have the discovery.
13      MR. DRAYCOTT: No, no, and I've heard your Honor
14 today, and I heard your Honor back on the 24th, but I'm just
15 trying to make -- I'm trying to be clear in my own mind what
16 I need to do after today, and I take it that I still owe
17 your Honor a brief.
18      THE COURT: Do you have little stickies on the
19 ones you really care about of the 2,000? How many documents
20 did you say are subject to the deliberative privilege right
21 now?
22      MR. DRAYCOTT: Your Honor, we did throughout the
23 process of logging these documents also review them, and we
24 did attorney review on them, so I'm hard-pressed right now
25 to answer your question off the cuff. But we can certainly

## Page 25

1 go back, take another cut through these documents and, you
2 know, try to refine the -- and talk about -- we're going to
3 need to talk about the issue with the client.
4      THE COURT: But I set a December 15 deadline, and
5 they're taking depositions, so -- and then do I want to
6 reopen them again? And so --
7      MR. DRAYCOTT: But, your Honor, I don't know that
8 appointment of a special master and giving it to a special
9 master would be --
10      THE COURT: Who's going to do this? Who's going
11 to do it?
12      MR. DRAYCOTT: A great amount of that is going to
13 fall to me, your Honor, and --
14      THE COURT: No, but I've got to no matter what.
15 You told me how many you thought there were.
16      MR. DALY: Well, from their privilege log alone,
17 Judge, we had 200, but there is, like, boxes of documents
18 that they never even logged. These documents from the
19 Legislative office, three of which you've ordered produced
20 to us, they've never even logged them. So the log is one
21 thing. We gave you a list of 200 we think ought to be
22 looked at. Perhaps counsel can look at those, decide which
23 one he wants to give us. Whatever is left we would put to a
24 special master. But there's a bunch of stuff, Judge, that
25 they never logged. They took the Office of Legislation and

7 (Pages 22 to 25)

**Page 26**

1  in a broad sweep just said, "That's" all DPP. That's all
2  deliberative process privilege." We don't even know what
3  the particulars are, so --
4       MR. DRAYCOTT: You Honor, can I get a
5  clarification? I mean, again, in terms of the questions
6  you've asked of me, I'm assuming that we're working within
7  the parameters that your Honor set on July 24. There what
8  you indicated for us to submit for in camera review are
9  documents which showed the existence of the mega spreads for
10 both infusions and inhalants.
11      THE COURT: The kind of drugs that they
12 manufacture, isn't that what they are?
13      MR. MERKL: Yes, your Honor.
14      MR. DALY: Vancomycin.
15      MR. DRAYCOTT: The infusions, inhalants,
16 vancomycin, and then your Honor also addressed the
17 cross-subsidization issue, and then we were also talking
18 about anything that related particularly to Abbott, Dey, or
19 Roxane. So it's that, if I'm understanding --
20      THE COURT: That sounds fair, yes.
21      MR. DRAYCOTT: Now, we've essentially complied
22 with the order and your Honor has done that work and has
23 issued the order on what documents we have to turn over. I
24 think what Mr. Daly is now alluding to is documents that
25 were withheld that may relate to policy-making generally but

**Page 27**

1  don't specifically reference a mega spread or an infusion
2  drug or a -- and if we're talking about that, then there's
3  very little more to do because the work has been done. So
4  if we're staying within the parameters that your Honor set
5  on July 24, then there's very little work to do, if any.
6       THE COURT: Don't forget, don't forget, this is
7  what I think -- I agree totally with the way you just
8  described it, but they've got to be privileged to begin
9  with. They've got to be deliberative or attorney-client,
10 whatever, so they've got to be privileged to begin with. So
11 it's not enough -- in other words, they may be relevant,
12 broadly speaking, but not privileged. So on the privilege,
13 when I did the weighing, anything that shows knowledge of
14 that almost automatically I'm going to weigh in their favor.
15      MR. DRAYCOTT: But, your Honor, what I'm saying
16 is, what we've done is, we've complied with the direction
17 that you gave us on the 24th.
18      THE COURT: Some of the stuff just wasn't
19 privileged. It didn't even get to Point A.
20      MR. DRAYCOTT: Right, at which point -- and you've
21 ordered it turned over, and it will be in their hands
22 tomorrow.
23      THE COURT: But the issue is, I haven't looked at
24 the other 200.
25      MR. DRAYCOTT: But if what you're asking for is

**Page 28**

1  the documents which show knowledge of the --
2       THE COURT: Excuse me, you're not hearing me.
3  First, you have to figure out, are they privileged? Does it
4  even apply? Otherwise, shovel it over. Is it deliberative?
5  Was it predecisional and deliberative? If it's not
6  predecisional and deliberative, regardless of this other
7  subcategory, it's got to be turned over, and it's got to be
8  done page by page and paragraph by paragraph. If in fact it
9  is predecisional and deliberative, that's when I've got to
10 come into it: Well, what about the weighing? As a general
11 category, I'm going to weigh it in their favor if it
12 involves vancomycin, infusions and inhalants. If it doesn't
13 involve those, I'm likely to weigh it your way.
14      MR. DRAYCOTT: But what I'm saying, your Honor, is
15 we've done that work and you've done that work now.
16      THE COURT: Well, but for twelve, twelve sets of
17 documents.
18      MR. DRAYCOTT: Well, with respect to the category
19 that you directed us to submit in camera on the 24th; that
20 is, the documents that show knowledge of the mega spreads
21 for infusions, inhalants, vancomycin, and for the documents
22 that mention --
23      THE COURT: Why didn't you disclose it to them
24 then?
25      MR. DRAYCOTT: Well, your Honor, again, this goes

**Page 29**

1  back to, we conferred with the client agency, and they're
2  going to be turned over tomorrow.
3       THE COURT: No, but why did I have to go through
4  the exercise of the in camera review?
5       MR. DRAYCOTT: But, your Honor, my --
6       THE COURT: You know what, are there 200 of them?
7  Is that it?
8       MR. DALY: 200 on the privilege log, Judge, yes.
9       MR. DRAYCOTT: I'm not sure to which that --
10      THE COURT: Why don't you give them to him?
11      MR. DRAYCOTT: Which, the --
12      THE COURT: The 200 --
13      MR. DRAYCOTT: I'm not sure which --
14      THE COURT: -- that you've asserted deliberative
15 process privilege.
16      MR. DRAYCOTT: I'm not sure to what group of
17 documents Mr. Daly is making reference, which is why I'm
18 having trouble, your Honor.
19      MR. DALY: Your Honor, it's the motion that we
20 filed. It's Schedule 1 to the motion. We selected 200 by
21 number from your privilege log and said, "Judge, based on
22 these titles, these ought to be looked at." We didn't even
23 ask to do the whole privilege log, Judge.
24      THE COURT: Well, what if I looked at -- maybe
25 take every fifth one, and if I think there's a problem, I'll

Page 30

1   send it to a master?
2       MR. DALY: We've got this other problem, Judge,
3   that with respect to these documents that were not reviewed
4   in response to your July 24 order, in their brief, Judge,
5   they say that they looked at the log, the log was the
6   parameter of what they looked at to determine what you
7   wanted from your July 24 order. According to their own
8   briefing, the rule-making files were not reviewed, the
9   legislative files were not reviewed, and I cannot let --
10      MR. DRAYCOTT: But that's what took the greatest
11  bulk of the time was reviewing the rule-making support
12  files. We were told they want them in detail to this in the
13  document that was submitted --
14      THE COURT: And it may well be that earlier drafts
15  of rules and all that aren't going to qualify. I don't want
16  to spend -- I'm going to take a look at -- you show him the
17  200 documents. You give it to me, and if I think it's a
18  mess, I'm going to appoint a special master. Who do we
19  want? We're getting to December 15. I can't wait. It's
20  Thanksgiving. You all have families. I can't have you
21  working over Thanksgiving. I'm not bucking the December 15
22  date. We're moving.
23      MR. DALY: Judge, we'll take anybody that your
24  Honor has a confidence and faith in that you've worked with
25  before. We're happy with whatever your Honor chooses.

Page 31

1       MR. DRAYCOTT: Your Honor, I need to confer with
2   Mr. Henderson and Ms. Smith.
3       THE COURT: I'm thinking some retired Superior
4   Court judge.
5       MR. HENDERSON: Judge, I don't think that it's
6   going to affect the discovery, the deposition schedule.
7   These depositions -- there are no depositions that are
8   pending.
9       THE COURT: I'm just simply saying, I need to get
10  some closure on this. I need to move on. I understand how
11  the government works very well, and deliberative process
12  privilege is a very difficult privilege because it
13  requires -- you're going to weigh it differently than I am.
14  So I went through just as a sample. I deliberately didn't
15  refer it to a magistrate judge because they care so much,
16  they've been sort of over the top on this, so I thought,
17  "All right, I'll look." And sometimes I agreed, sometimes I
18  disagreed, sometimes I partially agreed and partially
19  disagreed. Everyone's going to call this differently. I'm
20  not saying this is bad faith. I am simply saying I have not
21  got the resources to go through a gazillion documents and
22  write up a memo like I did on this on every single one. I
23  can't. So we can either go to a master, or I can spot-check
24  a few of them, and if I think that there's a problem, then
25  I'll appoint a master.

Page 32

1       MR. HENDERSON: Well, it depends whether you're
2   going to narrow the categories to the ones, the categories,
3   the ones that were addressed at the last hearing and which
4   Mr. Draycott just described, or now you're expanding them to
5   the entire universe.
6       THE COURT: I just want you to turn them over
7   because I don't want to do this. Okay, that's what I really
8   want. But you're not willing to do that, okay? Because I
9   hate doing it. More than life itself, I hate going through
10  these documents. I hate it. So if I've got to, I will. So
11  the reality is, the basic thing I want to say is, if you
12  don't care, turn them over. It's only where you really
13  care --
14      MR. DRAYCOTT: Your Honor, the one thing that I
15  would ask you to understand -- and, believe me, your Honor,
16  as much time as you spent, I guarantee you I was hour for
17  hour doing it with you. But we do have a client agency
18  whose interests we are representing here, and so while
19  you're saying, you know, "Do you care?" there's two levels
20  of which you're speaking to me: one, as an attorney for the
21  Department of Justice, and then -- but also I have CMS as a
22  client, and it is CMS that has asserted that privilege.
23      THE COURT: Well, then let their attorneys do it.
24      MR. DRAYCOTT: And we're certainly going to bring
25  them in, and we will consult with them. But I will get back

Page 33

1   to the issue that Mr. Henderson just raised, which is, in
2   order for me to go forward, I need to be very clear if we're
3   on the same criteria that your Honor established back on the
4   24th, which is the mega spreads for the infusions,
5   inhalants, the vancomycin, the cross-subsidization. If
6   that's what you're asking us to corral, we did a tremendous
7   amount of work in advance of the submission that we filed to
8   you and which you've now ruled upon, and what's left to do
9   is not going to be burdensome, if at all, because that's the
10  criteria we're looking for, those documents within that
11  criteria that we're going to be looking at.
12      THE COURT: Those criteria were the ones where I
13  said I thought the deliberative process privilege would be
14  outweighed by the defendants' needs, but you have to make
15  the threshold decision first about whether they're
16  deliberative and predecisional. In other words, there might
17  be tons of other documents that you need to produce that
18  don't fall in that category but aren't protected by the
19  deliberative process privilege.
20      MR. DRAYCOTT: One moment, your Honor. If I
21  can --
22      THE COURT: Do you understand what I'm saying?
23      MR. HENDERSON: Now I get it, now I get it. Okay.
24      MR. REALE: Your Honor, I'd like to raise one
25  additional issue, if I may, and that is that they are

Page 34

1 seeking recovery on behalf of their expenditures to the
2 Medicaid programs to all fifty states. And here we are in
3 November, and we've asked for it, and they've agreed to
4 produce claims data from all fifty states; but for Roxane,
5 we still haven't received complete claims data from nineteen
6 states, and we still haven't received MAC data from
7 thirty-eight states.
8        THE COURT: When is that going to be produced?
9        MR. MERK: Dey as well, your Honor.
10        THE COURT: When is all that going to be produced?
11        MR. HENDERSON: We've produced what we've got.
12 There are going to be a lot of states where -- there are two
13 categories -- let me -- I have to back up so you'll
14 understand.
15        THE COURT: I don't know why this is all happening
16 a month before the deadline after four years on both sides,
17 why Roxane did a dump and why you haven't done a dump yet.
18        MR. HENDERSON: Well, we can't produce what we
19 don't have, your Honor.
20        THE COURT: Excuse me. You should have produced
21 it. It shouldn't have happened last week, okay? I know
22 we've been dithering with Roxane for a while now. It should
23 have been produced. But now let's go to your issue.
24        MR. HENDERSON: On the claims data, your Honor, we
25 can't produce what we don't have. There are many states

Page 35

1 where we do not have claims data that we've obtained from
2 the states. What we have is a different level. There is a
3 top level that CMS does obtain on a routine basis that is on
4 a Web site. It's always been available to the defendants.
5 They've got it. They've had it for a long time.
6        There is another level of claims data that we have
7 obtained from the states. We've produced that. They've had
8 it for a long time, with the exception that in the last
9 month or so there may be one or two states where we just
10 recently got something. We have to process it. We'll
11 produce it as soon as we can. Then there are a whole mess
12 of other states where we don't have any data other than that
13 top level that they've already got. That's what Mr. Reale
14 is talking about is this data that we haven't collected, and
15 we're going to have to make our case without it, your Honor,
16 but we don't have it. The states haven't produced it.
17        THE COURT: If they don't have it, they don't have
18 it, which means they may lose on those claims because I
19 can't create something out of nothing.
20        MR. REALE: Your Honor, they have to drop those
21 claims if they don't have it.
22        THE COURT: You know what, I'm not doing that
23 right here.
24        MR. REALE: I understand that, but --
25        THE COURT: This is about discovery. If they

Page 36

1 don't produce it, they've got a problem, but I have no
2 idea -- I see he's going like this and like this. I don't
3 know whether it's dispositive or not. I don't know. I
4 don't understand it, so I'll get to that at summary
5 judgment.
6        So this is what we're going to end up doing on
7 this, okay, this is what we're doing: The discovery
8 deadline is still December 15. I agree with you that it
9 is -- we will have enough on our plate so that if in fact
10 you can piggyback on these other states, I don't see the
11 need for both sides to be spending this kind of money on
12 them. At some point, if they're too slow, I will leave it
13 up to the parties to let me know that it's too slow, and I
14 will have to let you do these seven other states. You know,
15 I'm not going to wait.
16        MR. MERKL: I understand.
17        THE COURT: But I think we have enough to do. We
18 will go with the other states. The December 15 deadline for
19 the other states is on. We're going to stick with the
20 expert discovery schedule, et cetera.
21        With respect to the deliberative process
22 privilege, you're going to give me the 200 documents he's
23 talking about, and then I'm going to take a look, and then
24 I'm going to appoint a master if I think that it's just
25 going to be too time-consuming. My guess is from my review

Page 37

1 of the twelve sets of documents you gave me, it took -- I
2 would not be able to do 200, and I called Judge Bowler, and
3 she doesn't have the time either. You need to go down to
4 Judge Bowler and see her and get a ruling because I am not
5 reopening the December 15 deadline. Now, if she makes
6 certain rulings that need by force to come in afterwards,
7 that's a different story, but I'm not generally extending
8 that deadline.
9        MR. DRAYCOTT: Two points of clarification, and
10 thank you, your Honor, and I do have, I think, a clearer
11 understanding. But, one, with respect to the 200 documents,
12 I take it that you would have us go back, rereview those.
13 You don't want the 200 right away, but just turn over to you
14 any which we propose to continue to withhold from
15 defendants. Is that right?
16        THE COURT: When can you do that? How about --
17 today is Thursday -- how about next week? Is next week
18 Thanksgiving?
19        MR. MERKL: The week after, your Honor.
20        MR. DRAYCOTT: Your Honor, knowing how long and
21 how much work went into the last submission to you, I would
22 like to take some more time. I will try to do it with all
23 deliberative speed.
24        THE COURT: It might be quicker to have me do it,
25 like, "yes, no, yes, no."

10 (Pages 34 to 37)

**Page 38**

1  MR. DRAYCOTT: But I would like to -- we will,
2  your Honor, try to glean this down to the ones that, again,
3  which you -- you asked me if there were ones that have a tab
4  on it of being of special importance, and I've indicated
5  that that hasn't been done yet, but it's the first thing I'm
6  going to do. I only got Mr. Daly's -- sorry -- the Abbott,
7  the joint submission yesterday. I really barely had time to
8  look at it before today. We'll go back to the 200
9  documents. We'll look very closely at them, and then we
10  will submit to you any which we're not going to turn over.
11  And we'll go back to the agency and ask them whether or not
12  they're willing to --
13  THE COURT: I know, but how long is this going to
14  take? We have December 15, and I can't --
15  MR. DRAYCOTT: Your Honor, I'm going to start the
16  process tomorrow.
17  THE COURT: Because it took you three months last
18  time.
19  MR. DRAYCOTT: I will endeavor --
20  THE COURT: And I'm not for a minute saying you
21  didn't work hard. If anything, I pity you right now
22  because, I mean, it's like going back and re-eating food you
23  didn't like the first time around.
24  MR. DRAYCOTT: The pity doesn't seem to be getting
25  me too far today, but I will endeavor to do this by a week

**Page 39**

1  from tomorrow.
2  THE COURT: Fair enough, fair enough. And then
3  I'll just do a quick "yes, no, yes, no." I can't begin to
4  do it paragraph by paragraph the way I did the last time,
5  but the reality is that it was -- I think what you did is,
6  you saw a document; if there was something there that was
7  deliberative, you withheld it. I think that the law doesn't
8  let you do it so broadly.
9  MR. DRAYCOTT: No, but the thing that we didn't do
10  generally, your Honor, is we didn't go through redactions.
11  Of course, we were never asked to do that, but we can also
12  consider redactions at this point, which is --
13  THE COURT: It will take you forever.
14  MR. DRAYCOTT: Well, again, we'll try to get this
15  done.
16  THE COURT: Most of these documents were from the
17  late 1990s. They're ten years old, right?
18  MR. DRAYCOTT: Your Honor, believe me, I've heard
19  everything that your Honor said today, the concerns that
20  you've raised and the places where you think we're on firmer
21  ground and less firm ground. Just to clarify, though, I
22  take it the one thing -- the greatest bulk of the documents
23  for which we have asserted privilege are drafts of OIG
24  reports, and your Honor excluded that from the last time we
25  were here. If that's still excluded, I think that makes it

**Page 40**

1  easier for me. I think it also makes it easier for
2  Judge Bowler with respect to the documents that are now --
3  THE COURT: The drafts, as long as the final is
4  produced.
5  MR. DRAYCOTT: Absolutely.
6  THE COURT: Yes, sure. And there was one other
7  memo you gave me you said was just a draft, so it was hard
8  for me to understand because you didn't give me a
9  declaration that went document by document. At least I
10  didn't find it.
11  MR. DRAYCOTT: No, no, we were relying on prior
12  declarations.
13  THE COURT: But they were broad-sweeping, the end
14  of the Republic if these are produced.
15  MR. DRAYCOTT: Your Honor, thank you. I think
16  I've got the clarification I need, and we will endeavor --
17  THE COURT: Next week. And you saw what I
18  excluded, I mean, the real back-and-forth: "I recommend
19  that you do this policy thing for this reason," and the guy
20  says "No." I mean, that's like core stuff, but 99 percent
21  of it wasn't that.
22  MR. DRAYCOTT: Your Honor, I gave your order a
23  very careful reading and will continue to do so. Thank you.
24  MR. HENDERSON: Just a couple of fine points, your
25  Honor.

**Page 41**

1  THE COURT: I'm sure they're fine.
2  MR. HENDERSON: Well, yes. On the seven states
3  that are going to go after December 15, am I correct in
4  understanding it will be one 30(b)(6) and one 30(b)(1)
5  deposition per state?
6  MR. MERKL: Your Honor, what we propose to do is,
7  we'll just cross-notice whatever they do. If they do three
8  or four depositions in the state, we'll do three or four.
9  The whole idea is to avoid having to go out and making them
10  do this extra process.
11  MR. HENDERSON: Some of these states have had
12  dozens of depositions that just --
13  THE COURT: I can't answer that in advance. I
14  mean, my theory was on this that it would have some limits
15  on it per state, but if somebody is already taking a
16  deposition --
17  MR. MERKL: Exactly, your Honor, these are
18  happening anyway.
19  THE COURT: What?
20  MR. MERKL: These are all depositions that would
21  be happening anyway.
22  THE COURT: Yes, I know, but at some point it's a
23  burden on the -- the litigating burden. It's whatever it
24  was for these other states: one 30(b)(6), one 30(b)(1), you
25  can cross-notice. Do you want to attend the rest and I

11 (Pages 38 to 41)

1d6916c2-82b9-4146-8491-39690bca10fc

Page 42

1  would use the information? Sure. But I can't make the
2  government attend all of these if there are eight per state.
3  You can still use the materials, but you just won't --
4        MR. MERKL:  Be able to ask questions, but we can
5  use the material.
6        THE COURT:  Yes, but you can use the material.
7        MR. MERKL:  Or we can ask questions of one and
8  notice a 30(b)(6) of --
9        THE COURT:  Yes.
10       MR. MERKL:  Okay.
11       THE COURT:  But they can use the material.  If
12  it's out there under oath, it can be used.
13       MR. HENDERSON:  On summary judgment, I think
14  anybody can use anything that's under oath basically.
15       One other fine point, your Honor.  The last time
16  around, I think it was in the Abbott case, there were a
17  couple of situations -- and I think I speak on behalf of all
18  the parties here -- where a witness got sick or something
19  and the deposition had to be postponed.
20       THE COURT:  Sure.
21       MR. HENDERSON:  And the question is, can we, if we
22  all agree that a deposition has to be scheduled for that
23  type of reason, can we do it ourselves without seeking leave
24  of Court?
25       THE COURT:  Of course, of course.

Page 43

1        MR. HENDERSON:  Thank you, because last time it
2  took many months.
3        THE COURT:  If you all agree, I mostly agree.  My
4  biggest issue is that this case is getting very old, and
5  short of the First Circuit just ending the entire case,
6  we're all going to grow old together unless we get this
7  moving, right?  I mean, this case, I'm still getting new
8  cases in it.
9        MR. MERKL:  Kansas.
10       THE COURT:  It's been seven years since I started,
11  so we need to get some momentum on the case.  Even if I just
12  had five sample cases that could be briefed all the way
13  through to give people a sense of how I might come down on
14  these things.  Maybe I could even divvy it up, and then you
15  could go on appeal or something, just something, and then
16  maybe have some serious -- have you started talking
17  settlement?
18       MR. HENDERSON:  Yes, your Honor.  In fact,
19  Mr. Merkl --
20       THE COURT:  We need to go off the record for this.
21       MR. MERKL:  We can do that in a second.  Can I
22  just ask for clarification on the claims data?  I
23  understand, obviously, if the government doesn't have it, we
24  won't get it; and the consequences of not having it, we'll
25  litigate that later.

Page 44

1        THE COURT:  Right.
2        MR. MERKL:  What I don't understand is, is the
3  government saying, for the seventeen states that we don't
4  have the claims data for yet, we don't have it because it
5  doesn't exist at the state level?  Or is it some problem
6  where they're having trouble getting it from the states
7  where the onus is kind of now on me to go to these states
8  and get it?
9        THE COURT:  Which is it, that it doesn't exist or
10  the states won't give it to you?
11       MR. HENDERSON:  I think probably every state has
12  claims data.  They process claims.  We have not had, quite
13  frankly, the resources to go out and -- it's very
14  time-consuming to collect this data, so we have not done it
15  for all fifty states, and some states simply haven't
16  produced it to us.  So we just don't have it all, and we're
17  unlikely to get much more.  It's possible we could get
18  another state or two before December 15, but --
19       THE COURT:  Do they understand they won't get
20  their half if they don't do it?
21       MR. HENDERSON:  Your Honor, we're going to rely on
22  the data, more summary data that is reported to CMS that's
23  on the Web site.  That's what's been done in the Abbott
24  case, for example.
25       THE COURT:  And that may be enough or not.  I just

Page 45

1  don't understand it well enough.
2        MR. HENDERSON:  And the defendants will move to
3  exclude our damages estimates to the extent that they rely
4  on that high-level data, and the Court will have to decide,
5  but we can't produce what we don't have.
6        THE COURT:  All right, that's where it is.  I
7  can't refine it any more.
8        MR. MERKL:  No, I understand, your Honor.  I guess
9  what I'm saying is, if it really exists, CMS can direct the
10  states to give it to us.  I understand the states may not
11  want to do it, but they're claiming these states.  The data
12  we're talking about, your Honor, is the type of thing you're
13  looking at in Massachusetts --
14       THE COURT:  I tell you what, if you want to
15  subpoena it, subpoena it.  They're stuck with whatever they
16  produce.
17       MR. HENDERSON:  One final thing, your Honor.  I
18  think we should have a scheduling conference scheduled at
19  some point, certainly both to talk about what the status is
20  of these other seven states later on down the road, and also
21  I think, too, when we get closer to summary judgment, to
22  talk about how we're going to approach summary judgment.  We
23  don't have a game plan right now.  We've had a little bit of
24  discussion amongst us, but I think it's going to -- some
25  months from now --

12 (Pages 42 to 45)

**Page 46**

1      THE COURT: What are you thinking of?

2      MR. HENDERSON: January-February time period.

3      THE COURT: I'm thinking you're going to have to

4  brief it state by state, right?

5      MR. MERKL: That's our view.

6      MR. DALY: Not necessarily, Judge.

7      MR. HENDERSON: I don't think we're going to have

8  fifty summary judgment motions.

9      THE COURT: I don't know enough. If Mylan is any

10  indication, it's su sui generis.

11      MR. HENDERSON: Well, there are going to be

12  state-by-state issues, but, in any event, it just seems to

13  me we may need a scheduling conference or a status

14  conference. If your Honor doesn't want to do it, that's

15  fine. It just seems to me --

16      THE COURT: Let me put it this way: I had this

17  and I thought this was very helpful today, and I thank you

18  all for coming. I'm just simply saying, I don't know when

19  to schedule it for. I don't have theoretical opposition,

20  but I don't want to create problems. The way we have this

21  now, you're going to be done with --

22      MR. HENDERSON: How about after the close of

23  expert discovery?

24      THE COURT: Which is when?

25      MR. HENDERSON: I've forgotten. Does anybody

**Page 47**

1  know? The beginning of March maybe?

2      MR. MERKL: March --

3      THE COURT: Close of expert discovery, May 22?

4      MR. MERKL: Yes, May 22, your Honor. Close of

5  expert for the Abbott, Dey, and Roxane cases, May 22, 2009.

6      THE COURT: Robert, why don't we give them a date

7  in May, and it's without prejudice to anyone asking to come

8  in sooner, if that's necessary, because this was useful

9  today. When should we do this in May?

10      THE CLERK: May 28 at 2:00 p.m.

11      MR. MERKL: Is that Memorial Day?

12      THE CLERK: The Thursday of Memorial Day week.

13      THE COURT: Now let's go off the record.

14      (Discussion off the record.)

15      (Adjourned, 4:45 p.m.)

16

17

18

19

20

21

22

23

24

25

**Page 48**

1              C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )

4  DISTRICT OF MASSACHUSETTS   ) ss.

   CITY OF BOSTON              )

5

6

7      I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 47 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action Nos. 07-12048, 06-11337, and 05-11084, In Re:

12  Pharmaceutical Industry Average Wholesale Price Litigation,

13  and thereafter by me reduced to typewriting and is a true

14  and accurate record of the proceedings.

15      In witness whereof I have hereunto set my hand

16  this 19th day of November, 2008.

17

18

19

20

21      /s/ Lee A. Marzilli

22      LEE A. MARZILLI, CRR

        OFFICIAL FEDERAL COURT REPORTER

23

24

25

1d6916c2-82b9-4146-8491-39690bca10fc

# EXHIBIT C

1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3      ------------------------------
 4      IN RE:  PHARMACEUTICAL
        INDUSTRY AVERAGE WHOLESALE
 5      PRICE LITIGATION,            Civil Action
                                     No. 07-10248-PBS
 6                                   MDL No. 1456

 7                                   July 24, 2008, 3:16 p.m.

 8      ------------------------------

 9

10            TRANSCRIPT OF STATUS CONFERENCE

11         BEFORE THE HONORABLE PATTI B. SARIS

12            UNITED STATES DISTRICT COURT

13          JOHN J. MOAKLEY U.S. COURTHOUSE

14                 1 COURTHOUSE WAY

15              BOSTON, MA   02210

16

17

18

19
                    DEBRA M. JOYCE, RMR, CRR
20                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
21               1 Courthouse Way, Room 5204
                      Boston, MA   02210
22                      617-737-4410

23

24

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    JAMES J. BREEN, ESQ.
      The Breen Law Firm, P.A.
 4    3562 Old Milton Parkway
      Alpharetta, GA 30005
 5    770-740-0008

 6
      FOR THE DEFENDANTS:
 7
      NEIL MERKL, ESQ.
 8    SARAH L. REID, ESQ.
      Kelley Drye & Warren LLP
 9    101 Park Avenue
      New York, NY 10178
10    212-808-7800

11    ERIC GORTNER, ESQ.
      Kirkland & Ellis LLP
12    200 East Randolph Drive
      Suite 7400
13    Chicago, IL 60601
      312-861-2285
14
      JAMES R. DALY, ESQ.
15    Jones Day
      77 West Wacker
16    Chicago, IL  60601-1692
      312-782-3939
17
      FOR THE UNITED STATES OF AMERICA:
18
      GEORGE B. HENDERSON, ESQ.
19    BARBARA HEALY SMITH, ESQ.
      United States Attorney's Office
20    1 Courthouse Way
      Suite 9200
21    Boston, MA 02210
      617-748-3272
22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

3

```
 1    GEJAA T. GOBENA, ESQ.
      United States Department of Justice
 2    601 D Street NW
      Patrick Henry Building, Room 9028
 3    Washington, DC 20004
      202-307-1088
 4
      ANN M. ST. PETER-GRIFFITH, ESQ.
 5    United States Attorney's Office
      99 N.E. Fourth Street
 6    Miami, FL  33132
      305-961-9419
 7
      JUSTIN DRAYCOTT, ESQ.
 8    United States Department of Justice
      P.O. Box 261
 9    Ben Franklin Station
      Washington, DC  20044
10    202-305-9300

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1              P R O C E E D I N G S
2              (The following proceedings were held in open
3   court before the Honorable Patti B. Saris, United States
4   District Judge, United States District Court, District
5   of Massachusetts, at the John J. Moakley United States
6   Courthouse, 1 Courthouse Way, Boston, Massachusetts, on
7   July 23, 2008.)
8              THE CLERK:  In re: Pharmaceutical Industry
9   Average Wholesale Price Litigation, 07-10248 will now be
10  heard before this Court.
11             Will counsel please identify themselves for the
12  record.
13             MR. HENDERSON:  George Henderson, Assistant US
14  Attorney for United States, your Honor.  With me is
15  Barbara Healy Smith, also of the U.S. Attorney's Office.
16             MR. BREEN:  Jim Breen, Ven-A-Care, one of the
17  plaintiffs, your Honor.
18             MR. GOBENA:  Gejaa Gobena from the Department of
19  Justice for the United States.
20             MS. ST. PETER-GRIFFITH:  Ann St. Peter-Griffith,
21  United States Attorney's Office Southern District of
22  Florida on behalf of the United States.
23             THE COURT:  You flew up for this?
24             MS. ST. PETER-GRIFFITH:  I was at deposition in
25  New York, so I took a train over.
```

1            THE COURT:  All right.

2            MR. DRAYCOTT:  Justin Draycott, civil division,

3      DOJ.

4            THE COURT:  Washington.

5            MR. DRAYCOTT:  Correct.

6            MR. GORTNER:  Good afternoon, your Honor.  Eric

7      Gortner from Kirkland and Ellis in Chicago representing

8      Boehringer.

9            MR. MERKL:  Neil Merkl, your Honor, with my

10     partner Sarah Reid from Kelly Drye, and we represent

11     Dey.

12           MR. DALY:  Good afternoon, your Honor.  Jim

13     Daly representing Abbott Labs.

14           THE COURT:  All right.  So what I would like to

15     try do is get all the Vena-A-Care cases on a coordinated

16     schedule to minimize discovery, duplication and

17     redundancy, and to actually try and deal with the

18     cross-cutting issues at one time rather than at three

19     separate times because I won't probably give each one a

20     fresh look otherwise.

21           On the other hand, I don't know very much about

22     the merits of all the cases yet or even what the

23     differences are, so it may be some of them are

24     physician-administered drugs in somebody's office as

25     opposed to self-administered and they may be so

PDF created with pdfFactory trial version www.pdffactory.com

6

```
 1   different that this is not a worthwhile goal.
 2           So let me ask, everybody agrees they should be
 3   on the same track, except Abbott; is that right?
 4           MR. DALY:   That's right.
 5           THE COURT:   Tell me why you're different?   What
 6   are your drugs all about?
 7           MR. DALY:   Our drugs are all
 8   physician-administered.   They're all solutions,
 9   dextrose, sodium chloride, salt water, regular water,
10   and Vanco, which is Vancomycin, which is also an
11   injection.   So all of our drugs are
12   physician-administered, all -- as I understand it, all
13   of Dey and Roxanne's drugs are self-administered.   So
14   the issues that come in there are very different, in our
15   view.   Also, the time periods are very different.
16           THE COURT:   So you all know this by heart, but I
17   have so many aspects to this multidistrict litigation
18   that I actually I don't remember.   Where are we on
19   Abbott?
20           MR. DALY:   We are in the expert discovery phase.
21   The United States has produced its expert reports, we
22   are in the process of this month and through August 21
23   deposing their folks.   We're going to be filing our
24   expert reports on the 21st.
25           THE COURT:   Are you completely done with --
```

```
 1            MR. DALY:  Fact discovery.
 2            THE COURT:  -- fact discovery?
 3            MR. DALY:  Yes, except we do have some motions
 4    that do remain pending in front of Magistrate Judge
 5    Bowler that have yet to be ruled on.
 6            THE COURT:  So when we would be doing motions
 7    for summary judgment?
 8            MR. DALY:  We have a schedule that your Honor
 9    just entered about two weeks ago, which puts us at
10    completing our summary judgment briefing, I think, on
11    December 23, just before the holiday.
12            THE COURT:  As far as you know, are there --
13    what's the primary defense?
14            MR. DALY:  In my case?
15            THE COURT:  Yeah, I mean -- I phrased that
16    incorrectly.
17            What would be the primary ground for motions for
18    summary judgment?  Can you tell that yet?
19            MR. DALY:  Judge, I think we would want to be
20    talking about some time period, some statute of
21    limitations issues, some government knowledge issues.
22            THE COURT:  I'm just trying -- to be more
23    precise, I'm just trying to figure out how much is
24    overlapping with what the other two cases are going to
25    involve.
```

8

```
 1              MR. DALY:  I'm not as familiar with the Dey and
 2    Roxanne cases, obviously.  I do know we have different
 3    drugs, I do know we have different time periods.
 4              For example, my case, Judge, you may recall,
 5    they're suing my client from 1991 to 2001, the
 6    government cuts off their liability with some price
 7    changes that Abbott did in 2001.
 8              My understanding of Dey and Roxanne, it's like
 9    1995 or 1996 up to the present.  So even the -- and as
10    the Court is aware, I think when we get up into the
11    present, the issues are very different.
12              THE COURT:  Very different.
13              MR. DALY:  So we are heading towards trial in my
14    case, Judge.  I think this came up -- we weren't at the
15    last hearing because we weren't supposed to be here.
16              THE COURT:  You're absolutely right, I'm not
17    faulting anyone, that's why I wanted everyone in the
18    same room.
19              MR. DALY:  This case, my case came out of the
20    Southern District of Florida with Judge Gold.  So under
21    the rules of the MDL, my case is going to be sent back
22    at some point to Judge Gold for trial.
23              THE COURT:  We all agree, at least for purposes
24    of this MDL, that I'll at least get summary judgment,
25    right?
```

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. DALY:  Well, Judge, I would throw out to
2    your Honor that Judge Gold has no familiarity with this
3    case as things stand now, and I don't know why --
4          THE COURT:  I think I would be hated by every
5    judge in America if I started taking this state by
6    state.  Right now there's only one miserable judge.
7          So you think I should stay here through summary
8    judgment.  Is everyone sort of in agreement at this
9    point?  And if it survives to that, then I send it back
10   to Florida?
11         MR. HENDERSON:  It's certainly our agreement,
12   your Honor, that you should keep the cases through
13   summary judgment.
14         THE COURT:  And then afterwards, it, for sure,
15   goes back there, right?
16         MR. DALY:  For sure.
17         THE COURT:  At least the way --
18         MR. HENDERSON:  That's what the statute
19   provides, your Honor.
20         THE COURT:  That's right.
21         MR. HENDERSON:  I think there's some discretion
22   in the original transfer of the court to make a request.
23         THE COURT:  I have no idea if everyone can agree
24   to the contrary, but short of agreement, I think I send
25   it back.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          So help me -- that's not as important to me to
 2   figure out whether it's worth slowing you down and
 3   putting you on the same track as the others.  I'm just
 4   trying to understand it.
 5          So will I be going -- my fear is do I have to go
 6   through a 50-state analysis of the Medicaid statutes?
 7          MR. DALY:  Judge, in the Abbott case, here's
 8   what happened:  In the initial 26(a)(1) disclosures, the
 9   government said they didn't think they needed any
10   Medicaid witnesses and there wouldn't be any.
11          In November of last year, just before -- like a
12   month before discovery closed, they added 23 witnesses
13   from state Medicaid.  We came in and tried to get your
14   Honor to strike them because it was too late with only a
15   month left.  The Court disagreed with us, and we took
16   discovery of those 23 people or those of them that we
17   felt we needed to, case done, case over.
18          Our problem now is that what's being suggested
19   is kind of -- even though we're done and we spent
20   millions of dollars and based our defense on what the
21   government said was going to be their witnesses and was
22   going to be their issues, the suggestion of the
23   government is that we just kind of reopen discovery for
24   Abbott and all of a sudden we've got a hundred
25   depositions when discovery has actually been closed for
```

PDF created with pdfFactory trial version www.pdffactory.com

1  two or three months and we're working on our expert

2  reports.

3          THE COURT:  So you're one step ahead of me.

4  You're viewing what the proposed new schedule is as to

5  opening up discovery with respect to you, too.

6          MR. DALY:  That's what's suggested by the papers

7  that's filed by the government.

8          THE COURT:  Is he right?

9          MR. HENDERSON:  With respect to state discovery,

10  we are suggesting that Abbott be on the same track as

11  state discovery.  Abbott did take --

12          THE COURT:  Can I just say this -- based on what

13  we've got now, this is important for me -- do you

14  anticipate that I am going to have to construe the

15  statutes and practices of 50 states' Medicaid programs?

16          MR. HENDERSON:  I can't answer that, your Honor,

17  right now.  I think in general the answer is no.

18          We haven't seen definitions in states of average

19  wholesale price.  So we haven't seen anything to change

20  the plain meaning analysis amongst the states.  We

21  haven't seen any state that has a definition of average

22  wholesale price.

23          THE COURT:  So discovery is closed.  Let me ask

24  you this.  Were you planning on moving state by state?

25          MR. DALY:  Judge, part of our position is that

1    they didn't get the discovery from a bunch of the

2    states.  We tried to move our expert reports by a month

3    like two weeks ago.

4           THE COURT:  Tell me what your motion for summary

5    judgment is going to be.  These are Medicaid claims,

6    right?

7           MR. DALY:  In part, and Medicare.

8           THE COURT:  Medicare is easy, I can do Medicare,

9    Medicare I know -- I don't know, but I at least think

10   it's national and it's one body of law and I can do it.

11          So were you planning on moving separately on

12   each of the 50 states?

13          MR. DALY:  Not as a separate motion, Judge, no.

14   I think what we would do --

15          THE COURT:  Well, under Nebraska, AWP has been

16   construed this way and then Idaho the practice is to do

17   it on usual and customary.  Am I going to get those kind

18   of motions?

19          MR. DALY:  There will be -- not motions so much,

20   but each state does it different when it comes to

21   Medicaid.

22          THE COURT:  I don't want to do it twice, that's

23   the key here.

24          If you told me -- I don't want to hold you

25   hostage here to the other two cases.  If you told me,

PDF created with pdfFactory trial version www.pdffactory.com

1    no, there were some cross-cutting issues that weren't
2    going to be specific to each different state's Medicaid
3    statute, I am happy to do that on a different track that
4    are unique to your drugs, that are unique to your
5    statute of limitations, that are unique to maybe
6    specific knowledge with your drugs.  I'll do that
7    differently, I don't need to wait for the other two.
8    But if what you're telling me is I have to do that and
9    master 50 state Medicaid statutes and then do it again
10   for Dey and then do it again for Boehringer, I'm not
11   going to do it.  I'm going to do that all at once.  I'm
12   going to learn the statutes at once.
13            MR. DALY:  I would say -- and just to be clear,
14   I do suggest we go back to Judge Gold even for summary
15   judgment -- but I hear what you're saying.
16            I want to separate the summary judgment
17   schedule --
18            THE COURT:  Would Judge Gold have to do what I
19   have to do?  That's what MDL is all about.  Would Judge
20   Gold have to go through all 50 Medicaid statutes?
21            MR. DALY:  At least some of them.
22            THE COURT:  I'm not going to do that to someone
23   else.  Although I could be persuaded.
24            MR. DALY:  You certainly have to do it once, you
25   only have to do it for Dey and Roxanne.

1       But let me separate, if I can, the summary
2  judgment schedule from discovery being opened up out of
3  nowhere.  I mean, my client has spent millions of
4  dollars on this, and the federal government has, too.  I
5  mean, this has been to get this done -- we're done,
6  we've been done for months.  The suggestion that we're
7  going to have to do a hundred more depositions when the
8  United States government never --
9       THE COURT:  I'm not faulting you, I'm simply
10 saying what I don't want -- I want to hear what you're
11 going to move on.
12      MR. DALY:  Okay.
13      THE COURT:  Tell me the case.  Do you know yet?
14      MR. DALY:  Well, as a general proposition,
15 Judge, when you get to the states, you have a couple of
16 things.  You have kind of a mini federal government.  In
17 other words, some of the states you have situations
18 where the Medicaid people knew a lot, they understood a
19 lot, they made decisions.  Some of them use AWP, some of
20 them don't use AWP.  Some of them do AWP minus 5, 10,
21 15, 20, 25 percent.  Some of them have documents that
22 show that they were actively cross-subsidizing, in other
23 words, purposely overpaying their pharmacists for drugs
24 because their dispensing fees were low.
25      So it's very similar on the state level to what

PDF created with pdfFactory trial version www.pdffactory.com

1    we see at the federal level on the Medicare side.

2         THE COURT:  But it's going to have to be state

3    by state.

4         MR. DALY:  To a certain extent, if the federal

5    government, you know, puts on evidence.  In other words,

6    it's their burden.  They have to prove what happened in

7    each state and that we're liable in each state.

8         THE COURT:  Absolutely.  But I don't want to do

9    it twice.  See, that's where I'm trying to balance the

10   equities here.  In other words, if they -- I doubt --

11   tell me if I'm wrong -- I doubt we're going to have this

12   information with respect to Abbott but not with respect

13   to Dey.  My guess is it's going to be a more generalized

14   set of practices, right?

15        MR. DALY:  Certainly some of the information

16   would be common, Judge, I can't say it wouldn't be, but

17   there may be specific things about each defendant which

18   may be very different, including our drugs.

19        THE COURT:  Can I just say, one way of doing

20   this would be essentially take your motions for summary

21   judgment on non-Medicaid kinds of issues in terms of --

22   so I can do that in a coordinated way with all three,

23   but take the things that are unique to your drugs on the

24   schedule that we have set.

25        MR. DALY:  That would work.

PDF created with pdfFactory trial version www.pdffactory.com

```
1            THE COURT:  And then with respect to additional
2   discovery, if -- let me get to them in a minute, you
3   won't have to do it, but if they want to take the
4   laboring oar and go state by state, it will be in the
5   record when I get to all three of you.
6            MR. DALY:  That's where I have a problem, Judge,
7   in the sense that --
8            THE COURT:  I wouldn't require that, I'm just
9   simply saying you could -- I'm not going to do it twice.
10           MR. DALY:  I hear you on that, Judge, I give up
11  on that.
12           THE COURT:  And you can understand that.
13           So maybe what we do is we stay -- let me hear
14  you on this -- we stay with the Abbott schedule on
15  everything other than things -- issues that are unique
16  to an individual state's governance of its Medicaid
17  system, what Nebraska knew or didn't know.
18           (Discussion off the record.)
19           MR. HENDERSON:  I don't think we have any
20  problem in principle.  The devil is in the detail, of
21  course, and it seems that, for example, the government
22  knowledge issue, I think, is going to be common to all
23  three cases to the extent -- certainly the great thrust
24  of the defendants' discovery of states goes to the
25  government knowledge issue.  And we haven't seen -- I
```

```
 1    don't think we've seen anything in particular that
 2    differentiates one defendant from another.  These are
 3    all generic drugs, and --
 4          THE COURT:  But I have to do that state by state
 5    factually.
 6          MR. HENDERSON:  State by state, but not
 7    defendant by defendant.
 8          THE COURT:  The law is pretty -- did they know
 9    and approve of -- I forget exactly how it's worded.
10          MR. HENDERSON:  Correct, my point is --
11          THE COURT:  That I have to do state by state,
12    it's not like there's such an elaborate legal standard.
13          MR. HENDERSON:  That's right, but not defendant
14    by defendant, because I really think these issues are
15    common to all three defendants.
16          THE COURT:  I don't know if any of these
17    particular companies had particular relationships
18    with -- but assume for a minute you're right.  But
19    otherwise, they have statute of limitations issues, as
20    I've learned it's pill by pill, company by company.
21          There are things probably unique to your company
22    having to do with statute of limitation, right?  Would
23    that be unique to every state?
24          MR. DALY:  I think it would be, Judge, from our
25    perspective.  Also, in addition --
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            THE COURT:  It would or wouldn't be?

 2            MR. DALY:  I think it would be different because

 3   different conduct, as I said, the time period we're

 4   being sued for are different by years and years and

 5   years.

 6            THE COURT:  Hear me out.  Do you think the

 7   statute of limitations argument would vary depending on

 8   whether you were in North Dakota or Nebraska?

 9            MR. DALY:  Yes, Judge, because in some states,

10   statute of limitations are held to apply to the state

11   and some of them they don't, and then you'd have to

12   actually get into each state's statute of limitation.

13            MR. HENDERSON:  I don't think we would agree

14   with that, your Honor.  There's a federal statute of

15   limitations.

16            THE COURT:  So you're just proceeding under the

17   federal False Claims Act.

18            MR. HENDERSON:  That's right.

19            THE COURT:  You haven't asserted the state

20   causes of action, have you?

21            MR. HENDERSON:  No.

22            THE COURT:  You're Uncle Sam.

23            MR. DALY:  Common law fraud is Count II in this

24   case, let's be clear, Judge.  They've sued us for common

25   law fraud.
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              MR. HENDERSON:  And I think the question is not
 2    state reliance but the reliance of the United States.
 3              THE COURT:  No -- well, that's a legal question.
 4    But you do have to rely on the fraud statute of the
 5    individual state, right?
 6              MR. HENDERSON:  No, no, it's a federal common
 7    law.
 8              THE COURT:  You would say federal common law.
 9              MR. HENDERSON:  Yes.
10              THE COURT:  Would you disagree with that?
11              MR. DALY:  I'm not sure, Judge.
12              THE COURT:  But those are the kinds of things we
13    can vet.  And if I decide to take it and wait for
14    theirs, so be it.  We'll keep them on that schedule but
15    with the knowledge -- and we'll get to the discovery
16    issues in a minute -- that I'm not going to do the 50
17    state survey twice.  I sort of want to know when that is
18    going to happen because I'm going to beg for another
19    law clerk because that's going to be huge.
20              Let's get to you all.
21              Do you agree roughly on the schedule but not the
22    discovery limitations?
23              MR. HENDERSON:  Correct.  We agree generally on
24    the schedule.  I think defendants would not schedule out
25    anything after the initial briefing on summary judgment,
```

1   whereas our proposal completes the scheduling on the

2   briefing in large part to have dates in place, but also

3   to make it clear that there should be some common

4   coordinated briefing.

5           THE COURT:  Say it again.  Where do you

6   disagree?

7           MR. HENDERSON:  The United States is proposing

8   for scheduling on the -- for the state discovery and

9   summary judgment proceedings, our schedule goes out

10  through the completion of the summary judgment briefing.

11  Dey and Roxanne are in agreement except that they would

12  propose to have the schedule -- the Court enter a

13  schedule that simply goes up to the submission of the

14  initial briefs, the principal briefs on summary

15  judgment.

16          THE COURT:  Have you conferred on that?  You

17  can't work that out?

18          So when would your -- cross-motions for summary

19  judgment, or not?

20          MR. HENDERSON:  Yes.

21          THE COURT:  Is that what's being anticipated?

22          MR. HENDERSON:  It's not a big deal, your Honor.

23  I just thought --

24          THE COURT:  Well, you can confer and work out a

25  complete schedule, just give it to me, the motions, the

```
 1    opposition, the sur-reply.  You can't agree on that?
 2              MR. MERKL:  We can, your Honor.
 3              THE COURT:  You haven't conferred with the
 4    defendants?
 5              MR. HENDERSON:  We did, your Honor, except I
 6    think I understood the defendants didn't want to have
 7    any schedule beyond that first briefing, they wanted to
 8    leave it open.
 9              THE COURT:  We're not going to do that.  When is
10    the first motion for summary judgment, set of motions?
11              MR. MERKL:  It's in the --
12              MR. GORTNER:  I believe it's May 30, 2009.
13              In terms -- to clarify what the potential
14    disagreement was, in our view it makes sense -- we have
15    a status schedule for December for close of discovery in
16    the Dey and Roxanne cases, and the view was to figure
17    out what the joint briefs on cross-cutting issues would
18    look like once we had taken that discovery and
19    understand a little bit more.  Our disagreement wasn't
20    dates --
21              THE COURT:  You can always change it.
22              May 30th.  We'll do 6/30 for the oppositions,
23    then we'll have 7/15 for the replies, 7/30 for the
24    sur-reply, and then we'll have hearings in early
25    September 2009.
```

```
 1                So, Robert, why don't we do that.

 2                MR. HENDERSON:   That's fine.

 3                THE COURT:   So a new set of law clerks come in.

 4                MR. HENDERSON:   So then I think the big issue is

 5      limitations on discovery.

 6                THE COURT:   Yes, we'll get to that in a minute.

 7                THE CLERK:   September 17th at 2:00 p.m.

 8                THE COURT:   What limitation do you want to put

 9      on?

10                MR. HENDERSON:   What we did, your Honor, was we

11      looked at the states where discovery has taken place,

12      and we divided them into two classes -- this is in --

13      Exhibit D is our proposed order -- and one class

14      consists of states where there has been litigation and a

15      lot of discovery, multiple depositions.   And in that we

16      provided -- we propose that the parties are allowed one

17      Rule 30(b)(6) -- I'm sorry, in those states discovery is

18      completed.

19                THE COURT:   Has there already been a 30(b)(6)

20      and one -- I think we gave the possibility of one

21      regular deposition?

22                MR. MERKL:   No, your Honor.

23                MR. HENDERSON:   In the states that we have

24      already laid out, I don't think any party knows for sure

25      in every single state whether there has been a 30(b)(6)
```

```
 1    deposition, some of these have been multiple 30(b)(1)s.

 2              THE COURT:  What I'll do is I'll issue an order

 3    to incorporate all of those so there may be less of a

 4    need for something, but I can't stop them from having

 5    any that are unique to this case.  I don't know in what

 6    context all those depositions took place in.

 7              MR. HENDERSON:  Well, I'm not sure I understand

 8    your concern.

 9              Alabama, for example, they're trying their cases

10    now.  There have been 30-odd days of depositions in

11    Alabama.  Virtually every person with any involvement in

12    Medicaid reimbursement in that state has been deposed.

13              THE COURT:  Maybe you can agree on Alabama with

14    one cleanup day or something like that.  They're not out

15    to spend money --

16              MR. MERKL:  Exactly, your Honor.  What we've

17    proposed are certainly on these we're not going to go

18    ahead and notice them up right now.  An example would be

19    Massachusetts, your Honor.  Massachusetts, I know from

20    the other case has been -- is as done as you can do just

21    about.  On the other hand, they settled out very early.

22    If there's Dey-specific matters, such as did Dey

23    correspond with Massachusetts about Albuterol, that

24    could be a topic we might need the claims, things like

25    that --
```

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT: I'll incorporate all those
2    depositions, but I will not preclude them from doing at
3    least one 30(b)(6) in every state. I mean, that's --
4    and it's limited by the rules to eight hours or whatever
5    it is, ten hours, whatever it is.
6           MR. HENDERSON: Even in states where there have
7    already been 30(b)(6) -- Hawaii, for example.
8           THE COURT: If they've already taken a 30(b)(6),
9    you don't get a second one. We're going to do, I think,
10   one 30(b)(6), at least, and it's got to be coordinated.
11   If there's a huge amount of discovery, that will be
12   incorporated by reference.
13          Now, what they were upset about was I was
14   limiting it to one deposition, so then they argued for,
15   I think -- I think the compromise was one additional
16   deposition, right?
17          MR. MERKL: Yes, your Honor.
18          THE COURT: So maybe that's where if you think
19   it's repetitive, you can come in for a protective order.
20   We've got two defendants, eight hours every state, it's
21   expensive, but aren't you looking for billions and
22   billions of dollars from these people?
23          MR. HENDERSON: I wouldn't put it in the
24   billions.
25          THE COURT: How much?

PDF created with pdfFactory trial version www.pdffactory.com

```
1                MR. HENDERSON:  A few hundred million.
2                THE COURT:  All right.  A few hundred million.
3      It's a lot of money.
4                MR. HENDERSON:  Small change, your Honor.
5                I guess the devil is in the details.  There are
6      some states there have been 30(b)(6) depositions
7      already, some states, a few states where, for example,
8      the parties -- all parties, United States included, have
9      already participated in a 30(b)(6) deposition.  So it
10     seems to me, certainly in those states, there shouldn't
11     be yet another one.
12               THE COURT:  These guys are the ones that took
13     them?
14               MR. HENDERSON:  In --
15               THE COURT:  If they took them, they don't get a
16     second one.
17               MR. HENDERSON:  Hawaii, for example.  The United
18     States can --
19               THE COURT:  You don't want to go back to Hawaii?
20               MR. HENDERSON:  I'm saying no.
21               MR. GORTNER:  That's the only case I'm aware of,
22     what counsel is referring to states where 30(b)(6) may
23     have been taken years ago.  For instance, Montana,
24     Nevada is a case Roxanne wasn't even involved in.
25               THE COURT:  The general rule of thumb is one
```

PDF created with pdfFactory trial version www.pdffactory.com

1  30(b)(6) and one other deposition in every state be
2  coordinated.  So that doesn't make two 30(b)(6)s or
3  two -- two depositions per state.  If there was a huge
4  amount of discovery done, those are incorporated by
5  reference, and you can't be repetitive, why bother?  It
6  costs too much money.  To the extent you want to do
7  more, you think you have good cause to do more 30(b)(1),
8  regular depositions, that's what you mean by a regular
9  Notice of Deposition.
10         MR. GORTNER:  Yes.
11         THE COURT:  So if you want to do more, you've
12  got to ask leave of the Court, after you confer.  You
13  think there's 30(b)(6) to death and there's nothing else
14  to be said and they start going over new ground, you can
15  come in for a protective order.  But I'm hoping they
16  won't do that.  At most you're talking about two days
17  per state.  I've got six U.S. attorneys here, you've got
18  six, exclude Massachusetts for a minute -- maybe not
19  even excluding Massachusetts.  So 50 divided by six,
20  that's not undoable.  You don't need six people at every
21  deposition.  Okay?
22         MR. HENDERSON:  No, it's -- for these
23  depositions, it would pretty much be one attorney per
24  deposition.
25         THE COURT:  So that's nine depositions.

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. HENDERSON:  We'll be pretty busy in
 2   September and October, your Honor.
 3            THE COURT:  But it's a lot of money, and one
 4   thing I did learn from Massachusetts cases is that each
 5   Medicaid program -- it's not what first meets the eye.
 6   Each one is very complicated with its own culture,
 7   traditions, practices, policies.  I just can't, with the
 8   amount of money we're talking about, say they can't take
 9   depositions.  I think I've limited it fairly, and
10   they're not thrilled because I've limited it to one
11   30(b)(1), unless they prove why a second one is
12   necessary.  So that's what we'll do.
13            Now, the briefing on the Medicaid stuff, I need
14   to have Abbott be able to jump into that.  So how do you
15   want to handle that?  I'm assuming whatever I get come
16   the following year is going to be huge and extensive,
17   almost like I would have to assume, at least, what,
18   five-page brief per state almost, right?  At least,
19   right?
20            MR. DALY:  I would think so.
21            THE COURT:  That's huge.  I'd like a coordinated
22   brief.  What I'd like is one cross-cutting brief per
23   state, and then, ideally speaking, once I've resolved
24   the legal issues, I can go drug by drug, company by
25   company.
```

```
 1          You've thought about the issues, how can I do
 2  this?  Can I group them?  Are there certain states that
 3  are going to be identical?
 4          MR. HENDERSON:  It all depends on the issues,
 5  your Honor.
 6          From the United States perspective, there are
 7  sort of two broad categories of issues, one is the
 8  government's prima facie case to prove causation and
 9  liability.  In that regard, we don't think we need a
10  huge amount of information per state.  As our submission
11  indicated, Judge, the state's methodology, reimbursement
12  methodology, over time is memorialized in an official
13  state plan amendment, and we provided an example to you.
14          THE COURT:  You're doing huge spans of time.
15  You're putting huge, huge workload on me.  I'm not -- it
16  will take me a half a year to get through this.
17          MR. HENDERSON:  Let me show you how we've done
18  it, your Honor, for our -- in the Abbott case.
19          THE COURT:  Do you think it would make sense to
20  send each summary judgment motion out to each state?  In
21  other words, I'll just organize it all --
22          MR. HENDERSON:  No, I don't think so.
23          If I may, your Honor, can I give you just a very
24  brief picture of what we're going to do?
25          THE COURT:  Sure.
```

```
 1            MR. HENDERSON:  If you wouldn't mind, your
 2   Honor, start by looking at -- if you have it --
 3            THE COURT:  I haven't brought them all down
 4   so --
 5            MR. HENDERSON:  Okay.
 6            THE COURT:  Just describe it to me.
 7            MR. HENDERSON:  Well, can I show you a summary
 8   of one example state?  This was part of our attachment.
 9   And this is a summary of the state methodology over
10   time -- I'm sorry, this is for Massachusetts, which
11   was -- I just gave you the wrong thing, I meant to give
12   you one that was attached.  But this has Massachusetts
13   so it's okay.
14            This is a summary -- it's a bad example because
15   it relies a lot on declarations that were filed in the
16   Massachusetts case.
17            Most of our summaries rely on Medicaid state
18   plan amendment information.  Those state plan
19   amendments, each amendment shows the date of approval,
20   the effective date, and identifies the prior state plan
21   amendment that was superseded.  So it can be followed
22   over time.  And each state plan amendment regarding
23   reimbursement spells out the reimbursement methodology.
24   Myers & Stauffer, a consultant working under the
25   direction of our damages expert, Professor Duggan, has
```

1  summarized the state plan amendments, supplemented them
2  with some additional information when there are gaps in
3  the state plan amendments because there are some --
4       THE COURT:   That's where you say the devil is in
5  the details.   That's where they're going to want to take
6  the deposition of whoever is filling in those gaps.
7       MR. HENDERSON:   I'm not denying, your Honor,
8  that there might be -- that there may be some details
9  that have to be filled in, but what we have found out is
10 that overall, the state plan amendments and some
11 supplemental information consisting of pharmaceutical
12 benefit surveys, which are surveys that were done by --
13      THE COURT:   I have another hearing right behind
14 this one.
15      MR. HENDERSON:   In any event, I think these
16 summaries, they will be part of our case in chief, will
17 spell out over time the state methodology and the
18 state's use of AWP or WAC, the amount to which it was
19 discounted, AWP minus ten percent, the date which it
20 changed.   We have the dispensing fee, we have different
21 treatment of generics versus brands, whether or not they
22 relied on FULs or state max, and the dates.   It's all in
23 here.
24      Now, I'm not saying, your Honor, that there are
25 no states where there's going to be any issue about any

```
 1   of this stuff, but what I am saying is you're not going
 2   to have to try each state, because I think, in large
 3   part, these summaries of information will not be
 4   disputed.
 5             THE COURT:  Okay.  And you're going to --
 6             MR. MERKL:  We anticipate there will be
 7   substantial disputes.
 8             THE COURT:  About what?
 9             MR. MERKL:  Well, for instance, in this document
10   here --
11             THE COURT:  Forget Massachusetts, that's unique.
12             So you're going to say each one is unique
13   because you have the usual and customary issue.
14             MR. MERKL:  Exactly.  You don't have that.  For
15   instance, the formula here they're showing where they
16   paid based on WAC, we learned in Massachusetts, that
17   even if you have a WAC, sometimes they don't use WAC,
18   they use AWP for reasons that are unclear.
19             THE COURT:  Right, right.  You're saying you're
20   going to find that in every state, many states.
21             MR. MERKL:  I think many, certainly.  And we
22   don't really know until we look at the claim's data.
23             THE COURT:  In any event, we need Abbott coming
24   into this.  They're going to be going across the country
25   doing depositions, they've done some already.  How do
```

```
 1   you want to be involved?
 2           MR. DALY:  Can I ask the Court a question?
 3           If I'm going to be on the same schedule,
 4   cross-cutting issues -- and is all this evidence from
 5   these other states that the government never decided to
 6   make part of their case against my client -- going to
 7   come in against my client?  Sounds like that's what you
 8   have in mind.
 9           THE COURT:  What I have in mind is that I am not
10   going to do this twice.
11           MR. DALY:  I hear you loud and clear, Judge.
12           THE COURT:  I'm not going to require you -- let
13   them spend the money --
14           MR. DALY:  But is this work -- in my case, the
15   government decided, you know what, we're not going to do
16   any state discovery, they didn't do any of the work --
17           THE COURT:  But don't you understand, they can
18   just put in affidavits that he's talking about -- like
19   this.  I wouldn't preclude them from doing that.
20           MR. DALY:  Okay.
21           THE COURT:  All right.  So then you're in a
22   position of saying, no, it's not so without the
23   discovery.
24           MR. DALY:  Right, so that -- so if this --
25           THE COURT:  I could play your game because they
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   haven't done it.  I have each one of them done now,
 2   they'll just go and get the affidavits from each of
 3   these people, they'll support -- just as Mr. Brennan
 4   just spun it out, and you won't have the discovery
 5   rules.  I'm not going to stop them from doing that.
 6            MR. DALY:  If we're in for a penny, we need to
 7   be in for a pound.
 8            THE COURT:  I don't know.  They can spend the
 9   money.
10            MR. DALY:  What they propose in their paper -- I
11   don't know if your Honor had a chance to study it --
12   they have all these restrictions on Abbott because
13   Abbott --
14            THE COURT:  No, no, that's not fair.  What's
15   sauce for the goose is sauce for the gander.  If we're
16   going to open up the state discovery, we're going to do
17   it.  If you want to proceed, fair enough.  I'm happy to
18   do it right now, but I'm not going to stop them from
19   putting in affidavits from their state Medicaid people.
20            MR. DALY:  I hear you, Judge.  So, therefore --
21   we just don't -- we want to be the same footing as Dey
22   and Roxanne.  If this evidence is going to come in
23   against us on summary judgment; it seems fair.
24            THE COURT:  Same footing is true.  I don't see
25   how you can argue against that.
```

```
 1           MR. DALY:  Now, the other thing, Judge, is
 2    that --
 3           THE COURT:  It's one 30(b)(6) and one 12(b)(1)
 4    for the three of you.
 5           MR. DALY:  And we would participate or not or be
 6    able to use it.  I don't think we're going to go to them
 7    all, Judge.
 8           THE COURT:  You just divvy it up between the
 9    three of you.  Look it, you've got all the government
10    here and --
11           MR. DALY:  So many.
12           Schedule, Judge.  If -- as I said, we're in the
13    midst of expert land.  The schedule that they're
14    proposing with Dey and Roxanne puts their expert stuff
15    out.  Why should I have to file my expert report in
16    three weeks when I'm going so have a hundred depositions
17    that I have to assume?
18           THE COURT:  You don't.  You're the one that
19    wanted a schedule for issues unique to you.  Are you
20    changing that?
21           MR. DALY:  No.  I'm saying my expert reports are
22    due August 21, but there's going to be all this
23    discovery.
24           THE COURT:  What do you want?
25           MR. DALY:  I want to be on the same expert
```

```
 1    discovery they have.
 2              THE COURT:  All right.  So now you're back on
 3    the train.
 4              MR. GOBENA:  Your Honor, if we do that, it might
 5    effect the motions practice with respect to the unique
 6    issues that Abbott has.
 7              THE COURT:  Yes.  I wanted to just go through
 8    this thought process.  So why don't we do this.  You all
 9    submit a massive case management order with everybody on
10    it subject to what we just said and that's what we're
11    going to do.
12              MR. BREEN:  Your Honor, we have another Abbott
13    Ven-A-Care case, the erythromycin case, which your Honor
14    denied the motion to certify the appeal, and we're in
15    discussions of case management.  You said all Ven-A-Care
16    cases.  Are you suggesting we try to incorporate that
17    discovery on that also?
18              THE COURT:  Yes.  I don't know if there's
19    anything unique there.
20              MR. DALY:  We haven't started that case.  I
21    think trying to put that on the same track at this -- we
22    don't have a CM out yet.
23              THE COURT:  All right.  You should confer and
24    come up with a separate case management order.  I will
25    say I'm not going to redo these issues state by state
```

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   with erythromycin.
 2              MR. DALY:  I hear you.
 3              MR. BREEN:  That's all I was talking about.
 4              THE COURT:  Just within two weeks you can give
 5   me a case management order for all three and then
 6   another case management order just for erythromycin.
 7              Now what I want to do is move into deliberative
 8   process privilege.  We're done with this particular
 9   thing, are we?  Who's arguing this?
10              MR. DALY:  I am.
11              MR. HENDERSON:  Just one addition -- on the
12   Abbott case, your Honor --
13              THE COURT:  Which one are we talking about now?
14              MR. HENDERSON:  It's part of the scheduling --
15              THE COURT:  Okay.
16              MR. HENDERSON:  -- overall.  I think Abbott's
17   expert disclosures with regard to things other than
18   state discovery, they should finish up that on the
19   original schedule.
20              THE COURT:  Why don't you try and negotiate
21   this, but I feel not strongly at all about that.
22              MR. HENDERSON:  Okay.
23              THE COURT:  Because what I need to do is have
24   this on a coordinated schedule because it became crystal
25   clear to me last time I've got all these cases going off
```

37

```
 1   on their own and it made no sense.
 2          MR. HENDERSON:  I think a lot of Abbott's expert
 3   disclosures are really going to relate to damages
 4   issues, issues that are unique to their drugs.
 5          THE COURT:  Then maybe they should stay on track
 6   but give them a little bit of breather because he's also
 7   got to jump on this stuff.  So just negotiate something.
 8          MR. DALY:  We will talk.
 9          (Court adjourned at 3:55 p.m.)
10
11                 - - - - - - - - - - - -
12                       CERTIFICATION
13          I certify that the foregoing is a correct
14   transcript of the record of proceedings in the
15   above-entitled matter to the best of my skill and
16   ability.
17
18
19
20   /s/Debra M. Joyce
     Debra M. Joyce, RMR, CRR        Date
21   Official Court Reporter
22
23
24
25
```

PDF created with pdfFactory trial version www.pdffactory.com

# EXHIBIT D

NOU-24-2008  15:51      SERVING BY .......

| COURT | UNITED STATES DISTRICT COURT |
|---|---|

COUNTY OF _____   DISTRICT OF DELAWARE

IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE
LITIGATION

THIS DOCUMENT RELATES TO

*against*

UNITED STATES OF AMERICA EX REL. VEN-A-CARE OF THE FLORIDA
KEYS, INC., ET AL. V. DEY, INC., ET AL.,
CIVIL ACTION NO. 05-11084-PBS

MDL
XXXX No  1456
MASTER FILE NO. 01-CV-12257-PBS

*Plaintiff(s)*

**AFFIDAVIT OF
SERVICE OF SUBPOENA**

*Defendant(s)*

DELAWARE
STATE OF XXXXXXX, COUNTY OF NEW CASTLE      SS:  The undersigned, being duly sworn, deposes and says; deponent is not a
party herein, is over 18 years of age and resides ☒  IN THE STATE OF  DELAWARE
That on  11/21/08      at  4:50 P.M., at  1901 N. DU PONT HIGHWAY, NEW CASTLE, DELAWARE
deponent served the within subpoena on    DELAWARE HEALTH AND SOCIAL SERVICES      witness therein named,
                                           DIVISION OF MEDICAID AND MEDICAL ASSISTANCE

**INDIVIDUAL**
1. ☐  by delivering a true copy to said witness personally; deponent knew the person so served to be the witness described in said
       subpoena.

**CORPORATION**
2. ☒  a  DOMESTIC      corporation, by delivering thereat a true copy to    SLANIA CASTRO
       personally, deponent knew said corporation so served to be the corporation witness and knew said individual to be
       MANAGING AGENT  thereof.

**SUITABLE AGE PERSON**
3. ☐  by delivering thereat a true copy to                                                      a person of suitable age
       and discretion. Said premises is witness'—actual place of business—dwelling place—usual place of abode—within the state.

**AFFIXING TO DOOR, ETC.**
4. ☐  by affixing a true copy to the door of said premises, which is witness'—actual place of business—dwelling place—usual place
       of abode—within the state. Deponent was unable, with due diligence to find witness or a person of suitable age and discretion
       thereat, having called there

**MAILING TO RESIDENCE USE WITH 1 OR 4**
4A. ☐  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a postpaid envelope properly addressed to witness
        at witness' last known residence, at                                                      and deposited
        said envelope in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

**MAILING TO BUSINESS USE WITH 2 OR 4**
4B. ☐  Within 20 days of such delivery or affixing, deponent enclosed a copy of same in a first class postpaid envelope properly
        addressed to witness at witness' actual place of business, at
        in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore
        the legend "Personal and Confidential" and did not indicate on the outside thereof, by return address or otherwise, that the
        communication was from an attorney or concerned an action against the witness.

**DESCRIPTION USE WITH 1, 2, OR 3**
☒

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Male · | ☐ White Skin | ☐ Black Hair | ☐ White Hair | ☐ 14-20 Yrs. | ☐ Under 5' | ☐ Under 100 Lbs. |
| ☒ Female | ☐ Black Skin | ☒ Brown Hair | ☐ Balding | ☒ 21-35 Yrs. | ☒ 5'0"-5'3" | ☒ 100-130 Lbs. |
| | ☐ Yellow Skin | ☐ Blonde Hair | ☐ Mustache | ☐ 36-50 Yrs. | ☐ 5'4"-5'8" | ☐ 131-160 Lbs. |
| | ☒ Brown Skin | ☐ Gray Hair | ☐ Beard | ☐ 51-65 Yrs. | ☐ 5'9"-6'0" | ☐ 161-200 Lbs. |
| | ☐ Red Skin | ☐ Red Hair | ☐ Glasses | ☐ Over 65 Yrs. | ☐ Over 6' | ☐ Over 200 Lbs. |

Other identifying features:

At the time of said service, deponent paid (tendered) in advance $  NO FEE                 the authorized traveling expenses and one day's witness fee.

Sworn to before me on  11/25/08

**CAREY M. SHEA**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
My commission expires May 24, 2011

MICHAEL POWERS

License No. _____

NOU-24-2008  15:57        212 3490338

99%

TOTAL P.02
P.02

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) | MDL NO. 1456 |
|  | ) | CIVIL ACTION: 01-12257-PBS |
|  | ) |  |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) | Judge Patti B. Saris |

## STIPULATED PROTECTIVE ORDER GOVERNING CONFIDENTIAL HEALTH INFORMATION

To adequately protect individually identifiable health information entitled to be kept confidential, it is, pursuant to the Court's authority under Rule 26(c) of the Federal Rules of Civil Procedure, and with consent of the parties, ORDERED:

1. **Definitions** :

    (A)   As used in this Order, the term **"party"** shall mean all named parties to any action in the above-captioned Multi-District Litigation (MDL), including any named party added or joined to any complaint in this action, as well as named parties to tag-along actions added to this litigation by the Judicial Panel on Multi-District Litigation.

    (B)   The term **"third-party"** shall mean any individual, corporation, other natural person or entity, or any state, federal, or local government agency, specifically including the United States Department of Health and Human Services.

    (C)   The term **"documents"** as used herein is intended to be comprehensive and includes any and all materials in the broadest sense contemplated by Rule 34 of the Federal Rules of Civil Procedure, and shall include all written, oral, recorded, or graphic

material, however produced or reproduced, including, but not limited to, all written or printed matter of any kind, computer data, all graphic or manual records or representations of any kind, and electronic, mechanical, or electric records or representations of any kind.

(D)    As used in this Order, the term "**confidential health information**" means any document or information supplied in any form, or any portion thereof, that identifies an individual or subscriber in any manner and relates to the past, present, or future care, services, or supplies relating to the physical or mental health or condition of such individual, the provision of health care to such individual, or the past, present, or future payment for the provision of health care to such individual.  These terms specifically include "protected health information" as such term is defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Parts 160 and 164, promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996. See 45 C.F.R. § 164.501("protected health information") and 160.103 ("individually identifiable health information").  "Confidential health information" includes, but is not limited to, medical bills, claims forms, charge sheets, medical records, medical charts, test results, notes, dictation, invoices, itemized billing statements, remittance advice forms, explanations of benefits, checks, notices, and requests.  "Confidential health information" also includes all notes, summaries, compilations, extracts, abstracts, or oral communications that contain, are based on, or are derived from confidential health information.

2.    **General Provisions:**

(A)    Production of Health Information That May Be Subject To The Privacy Act, 5 U.S.C. § 552a, to 45 C.F.R. §§ 164.102-164.534, or to 42 U.S.C. § 1306, or Other

2

Privacy Protections. Several subpoenas duces tecum have been served and will be served in the future in the above-captioned Multi-District Litigation (MDL) which may seek information and documents subject to the provisions of the Privacy Act, 5 U.S.C. § 552a, to the provisions of 45 C.F.R. §§ 164.102-164.534, or to the provisions of 42 U.S.C. § 1306, or there may be no waiver by the patient to produce the records to any entity outside of the subpoenaed party. In order to facilitate the production of these records and to protect their confidentiality, the subpoenaed parties are permitted to produce these documents to any party to the MDL in an unredacted form. Upon producing these documents, the producing party shall designate them as "confidential" in the manner set forth in paragraph II. B. below. All parties receiving these documents may use such designated records only for purposes of the above-captioned Multi-District Litigation and may disclose them to non-parties to this litigation only as specified within this Order and only if the nonparty signs the form of acknowledgment attached to this Order as set forth below.

(B)     Designation of Material Subject to this Protective Order. To designate "confidential health information" material covered by this Protective Order, the producing party shall so designate, on the material itself, in an accompanying cover letter, or on a diskette cover by using the following designation: "CONFIDENTIAL HEALTH INFORMATION- SUBJECT TO PROTECTIVE ORDER."

(C)     Scope of Order. The terms and conditions of this Order shall govern all documents designated as confidential as set forth in section II. B. Should a document or record contain information that is protected under the terms and conditions of this Order

3

as well as the terms and conditions of any other Protective Order entered in the above-captioned MDL, the terms and conditions of this Order shall govern in the event of any conflict between the Orders.

III. **Provisions Governing Use and Disclosure of Confidential Health Information:**

    (A)    The parties may not use or disclose confidential health information for any purpose other than use in the above-captioned MDL.

    (B)    Subject to Paragraph III.C., confidential health information may be disclosed only to:

        1.    This Court and all persons assisting this Court in this action, including court reporters taking testimony involving such information, and necessary stenographic and clerical personnel;

        2.    Persons retained as consultants or experts for any party and principals and employees of the firms with which consultants or experts are associated;

        3.    Persons other than consultants or experts who are retained to provide purely administrative assistance to counsel for any party for the purpose of this action, including litigation support services and outside copying services;

        4.    Any person who may testify as a witness at a deposition, hearing, mediation, trial, or other proceeding in this action, and for the purpose of assisting in the preparation or examination of the witness, provided that counsel first comply with the requirements of Paragraph III. C. of this Order;

4

5. And other person hereafter designated by written stipulation of the parties and, if applicable, the third-party who produced or supplied the confidential health information, or by further order of this Court; and,

6. The parties, the parties' counsel and their partners, associates, paralegals, and clerical and support personnel.

(C) No confidential health information may be disclosed to any person pursuant to the provision of Paragraph III.B. of this Order unless counsel first informs such person that pursuant to this Order the material to be disclosed may only be used for purposes of preparing and presenting evidence in this litigation and must be kept confidential. No confidential health information may be disclosed to any person identified in subparagraphs III.B.2 through III.B.6 of this Order unless such person first is given a copy of this Order and advised that the information contained in the document is confidential health information and informed that an unauthorized disclosure of the information in the document may constitute a contempt of this Court. Each person to whom confidential health information is disclosed pursuant to Subparagraph III.B. of this Order shall execute a Certification in the form attached hereto as Exhibit A and shall agree to be bound by this Order prior to receiving any confidential health information. Copies of the executed Certifications, and a current log of the materials disclosed to each person executing a Certification, shall be retained by counsel for the party or parties who disclosed the confidential health information to such persons. Copies of all Certifications executed pursuant to this Paragraph shall be disclosed to the party or third-party who produced or supplied the confidential health information a) within thirty (30) days after the final resolution of this action (including resolution of all appellate proceedings), b) within thirty (30) days after settlement of this action, or c) on good cause shown.

5

(D)    No person, firm, corporation, or other entity subject to this order shall give, show, disclose, make available, or communicate confidential health information to any person, firm, corporation, or other entity not expressly authorized by this Order to receive such confidential health information.

(E)    **Confidential Health Information in Depositions.** Parties may show deponents designated confidential documents. However, efforts should first be made, if practicable, to conceal the identity of the subject of the record by coding the documents to substitute a numerical or other designation for the patient's name or other identifying information. The parties shall, within 30 business days after receiving a deposition, designate those pages of the transcript (and exhibits thereto) as confidential which contain any references to, or discussions confidential health information or individually identifiable health information. Until expiration of the 30-day period, the entire deposition will be treated as subject to protection against disclosure under this Protective Order. Confidential health information within the deposition transcript must be designated by underlining the portions of the pages that are confidential and marking such pages with the following legend: "CONFIDENTIAL HEALTH INFORMATION SUBJECT TO PROTECTIVE ORDER." When such designation is made, the confidential portions and exhibits shall be filed under seal separate from the portions and exhibits not so marked. The terms and conditions of this Order shall apply to all such designated portions of any deposition transcript.

(F)    **Use of Confidential Health Information in Court Filings.** In the event any party wishes to use confidential health information in any affidavits, briefs, memoranda of law, exhibits to motions, or other papers filed in Court in this action, such party shall take appropriate steps to safeguard such confidential health information in

6

documents filed with the Court, which steps may include redaction. In the event this Court wishes to review the redacted material, this Court may review the redacted material *in camera* or order that the documents containing confidential health information be filed under seal. Alternatively, the parties may file such affidavits, briefs, memoranda of law, exhibits to motions, or other papers under seal with this Court. The Clerk of Court shall accept for filing under seal any documents or filings so marked by the parties pursuant to this paragraph.

(G)   **Confidential Health Information in Open Court.** The procedures for use of documents designated as containing confidential health information during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. The parties shall consider redacting confidential documents to remove individual patient identifiers, request the Court to submit such documents under seal, code the documents to substitute a numerical or other designation for the patient's name or other identifying information, request that any exhibit be placed under seal, introduce summary evidence where practicable which may be more easily redacted, and assure that all Social Security and HIC numbers associated with the names of individual patients have been removed. No party shall disclose designated documents containing confidential health information in open Court without a prior court order.

IV.   **Destruction of Confidential Health Information At Completion of Litigation:**

(A).   Within sixty (60) days after the final resolution of the above-captioned action, including resolution of all appellate proceedings, all documents and copies of documents produced or supplied pursuant to a third-party subpoena which are designated

7

as containing confidential health information, as well as all notes, memoranda, and summaries taken or made of such documents that contain confidential health information, shall be either returned to the producing party or destroyed.

(B)     All counsel of record who received documents shall certify compliance herewith and shall deliver the same to the producing party not more than sixty (60) days after the final resolution of this action. The return of documents or certifications of destruction relating to documents produced by the United States shall be provided to the U.S. Department of Health and Human Services, Office of General Counsel, Centers for Medicare & Medicaid Division.

V.     **Miscellaneous Provisions:**

(A)     **No Waiver.** The failure to designate any materials as provided in paragraph II.B shall not constitute a waiver of the assertion that the materials are covered by this Protective Order.

(B)     **Third-Party Request or Demand for Disclosure.** Should any party bound by this Order receive a subpoena, civil investigative demand, or other process from a third-party seeking, requesting, or requiring disclosure of confidential health information in any form, such person shall give notice immediately to the producing party so that the producing party may seek appropriate relief, if any. Notice shall be made within ten (10) days of the request for production and shall be in writing. Notice to the United States shall take the form of written notification to U.S. Department of Health and Human Services, Office of General Counsel, Centers for Medicare & Medicaid Division. No person bound by this Order who receives a subpoena, civil investigative demand, or other process from a third-party seeking, requesting, or requiring the disclosure of confidential health information shall produce or disclose such documents or

8

information unless and until a) ordered by a court having competent jurisdiction, or b) such production or disclosure is in accordance with the provisions herein and is expressly consented to by the producing party.

(C)    **The Application of Other Privacy Provisions of Law.** Notwithstanding any provision of this Order to the contrary, in accordance with any applicable Federal, State, or local laws that afford heightened protection to certain categories of confidential health information, including, but not limited to, records or diagnosis or treatment for alcohol or substance abuse, certain sexually transmitted diseases such as HIV/AIDS, mental health, and research pertaining to genetic testing, the producing party may completely exclude from production any information afforded heightened protection by such Federal, State, or local laws.

(D)    Nothing in this Order shall affect the rights of the parties or third-parties to object to discovery on grounds other than those related to the protection of confidential health information, nor shall it preclude any party or third-party from seeking further relief or protective orders from this Court as may be appropriate under the Federal Rules of Civil Procedure.

(E)    Any person requiring further protection of confidential health information may petition this Court for a separate order governing the disclosure of its information.

(F). The provisions of this Order shall survive the conclusion of this action.

SO ORDERED, this ___8___ day of ___June___ 2004.

Patti B. Saris United States District Judge

9

10

## <u>CERTIFICATION - EXHIBIT A</u>

I certify that I have read the attached Stipulated Protective Order Governing Confidential

Health Information in *In Re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL

No. 1456, Civil Action No. 01-12257-PBS, dated _____, 2004 (the Order), and I

agree that I will not use or disclose Confidential Health Information or Individually Identifiable

Health Information for any purpose other than this litigation and that, within sixty days (60) after

the final resolution of this action, I will either return all Confidential Health Information to the

United States or destroy such Confidential Health Information. I will otherwise keep all

Confidential Health Information in accordance with this Order. I agree that the United States

District Court for the District of Massachusetts has jurisdiction to enforce the terms of the Order,

and I consent to jurisdiction of that Court over my person for that purpose. I will otherwise be

bound the strictures of the Order.


Dated:_____   _____
                 [Print Name]
                 [Company]
                 [Address]

11