# EXHIBIT G

Page 725

1                UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - X

4     IN RE:  PHARMACEUTICAL          ) MDL NO.: 1456

5     INDUSTRY AVERAGE WHOLESALE      )

6     PRICE LITIGATION                ) CIVIL ACTION NO.:

7     THIS DOCUMENT RELATES TO        ) 01-CV-12257-PBS

8     U.S. ex rel. Ven-a-Care of      )

9     the Florida Keys, Inc., et al.) Judge Patti B. Saris

10    vs. Dey, Inc., et al.,          )

11    No. 05-11084-PBS                )

12    - - - - - - - - - - - - - - X

13         (Captions continued on following pages)

14

15        DEPOSITION OF ZACHARY BENTLEY - VOLUME III

16      Videotaped deposition of Zachary Bentley, held

17    at the Law Offices of Broad & Cassel, One Biscayne

18    Tower, Suite 2100, 2 South Biscayne Boulevard,

19    Miami, Florida, 33131, on Thursday, November 6,

20    2008, commencing at 9:19 a.m., before Donald W.

21    McKay, RMR, CRR, a Notary Public for the State of

22    Florida.

Page 726

1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - - - X

4    IN RE:  PHARMACEUTICAL         )  MDL NO.: 1456

5    INDUSTRY AVERAGE WHOLESALE     )

6    PRICE LITIGATION               )  CIVIL ACTION NO.:

7    THIS DOCUMENT RELATES TO       )  01-CV-12257-PBS

8    U.S. ex rel. Ven-a-Care of     )

9    the Florida Keys, Inc., et al.)  Judge Patti B. Saris

10   vs. Boehringer Ingelheim       )

11   Corporation, et al.,           )

12   No. 07-10248-PBS               )

13     - - - - - - - - - - - - - - - X

14                  STATE OF WISCONSIN

15        CIRCUIT COURT - BRANCH 9 - DANE COUNTY

16     - - - - - - - - - - - - - - -

17   STATE OF WISCONSIN,            )

18          Plaintiff,              )

19   vs.                            )  Case No. 04-CV-1709

20   ABBOTT LABORATORIES, et al.,   )

21          Defendants.             )

22     - - - - - - - - - - - - - - -

Bentley, II, Zachary Taylor - Vol. III                                    November 6, 2008
                                    Miami, FL

Page 727

```
 1        IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

 2                    STATE OF MISSOURI

 3     - - - - - - - - - - - - - - - -

 4     STATE OF MISSOURI, ex rel.      )

 5     JEREMIAH W. (JAY) NIXON,        )

 6     ATTORNEY GENERAL, et al.,       )

 7            Plaintiffs,              )   Case No. 054-2486

 8     vs.                            )

 9     MYLAN LABORATORIES, INC.,       )

10     et al.,                        )

11            Defendants.              )

12     - - - - - - - - - - - - - - - -

13

14       STATE OF SOUTH CAROLINA - COUNTY OF RICHLAND

15      IN THE COURT OF COMMON PLEAS-FIFTH JUDICIAL CIRCUIT

16     - - - - - - - - - - - - - -

17     STATE OF SOUTH CAROLINA,   )    MASTER FILE NO.:

18            Plaintiff,          )    06-CP-40-4394

19     vs.                       )    CIVIL ACTION NOS.:

20     MYLAN LABORATORIES, INC., )    07-CP-40-0282

21            Defendant          )    07-CP-40-0283

22     - - - - - - - - - - - - -
```

Page 728

```
 1          A P P E A R A N C E S   O F   C O U N S E L

 2

 3    On behalf of the United States of America:

 4

 5          ANN ST. PETER-GRIFFITH, ESQ.

 6          United States Department of Justice

 7          99 N.E. 4th Street

 8          Miami, FL  33132

 9          (305) 961-9419

10          ann.st.peter-griffithw@usdoj.gov

11

12    On behalf of Ven-a-Care of the Florida Keys, Inc.:

13

14          JAMES J. BREEN, ESQ.

15          The Breen Law Firm

16          5755 North Point Parkway

17          Suite 39

18          Alpharetta, GA  30022-1136

19          (770) 740-0008

20          jbreen@breenlaw.com

21

22    (Cont'd)
```

Bentley, II, Zachary Taylor - Vol. III

Miami, FL

November 6, 2008

Page 729

1                A P P E A R A N C E S   (Cont'd)

2

3    On behalf of Dey, Inc.; Dey, LP; and Mylan

4    Laboratories, Inc.:

5

6              WILLIAM A. ESCOBAR, ESQ.

7              Kelley Drye & Warren, LLP

8              101 Park Avenue

9              New York, NY  10178

10             (212) 808-7771

11             wescobar@kelleydrye.com

12

13   On behalf of Roxane Laboratories,

14   Boehringer Ingelheim Corporation, and

15   Boehringer Ingelheim Pharmaceuticals, Inc.

16

17             ERIC GORTNER, ESQ.

18             Kirkland & Ellis

19             200 East Randolph Drive

20             Chicago, IL  60601

21             (312) 861-2285

22             egortner@kirkland.com

Bentley, II, Zachary Taylor - Vol. III                                    November 6, 2008
                                    Miami, FL

Page 730

```
 1              A P P E A R A N C E S   (Cont'd)

 2    On behalf of Amgen, Inc:

 3

 4          JENNIFER A. WALKER, ESQ. (via phone)

 5          MARC A. MARINACCIO, ESQ. (via phone)

 6          Hogan & Hartson, LLP

 7          111 South Calvert Street

 8          Suite 1600

 9          Baltimore, MD   21202

10          (410) 659-2700

11          jawalker@hhlaw.com

12          mmarinaccio@hhlaw.com

13

14    On behalf of Zachary Bentley

15

16          JOHN SCAROLA, ESQ.

17          Searcy Denney Scarola Barnhart &

18          Shipley, P.A.

19          2139 Palm Beach Lakes Boulevard

20          West Palm Beach, FL   33409

21          (561) 686-6300

22          mep@searcylaw.com
```

Page 731

```
 1              A P P E A R A N C E S   (Cont'd)

 2

 3     ALSO PRESENT:

 4

 5              Peggy Forrest, Paralegal,

 6              The Breen Law Firm

 7

 8              Alejandro Montalvo, Videographer

 9

10              T. Mark Jones

11

12

13

14

15

16

17

18

19

20

21

22
```

Bentley, II, Zachary Taylor - Vol. III
Miami, FL
November 6, 2008

Page 732

```
 1                    I N D E X

 2

 3   WITNESS:   ZACHARY TAYLOR BENTLEY, II          PAGE

 4      CROSS-EXAMINATION BY MR. ESCOBAR........... 734

 5

 6

 7                  E X H I B I T S

 8

 9   NUMBER            DESCRIPTION                   PAGE

10   Exhibit Dey 215-R1-019102 to R1-019110......... 868

11   Exhibit Dey 216-VAC MDL 43968 to 43973......... 877

12   Exhibit Dey 217-R2-039406 to R2-039415......... 907

13   Exhibit Dey 218-VAC MDL 43333 to 43336......... 934

14   Exhibit Dey 219-R1-014856...................... 936

15   Exhibit Dey 220-VAC MDL 44236 to 44599......... 945

16   Exhibit Dey 221-MA052850 to 053644............. 946

17

18

19

20

21

22
```

Page 773

```
 1    qualified to answer that question.

 2    BY MR. ESCOBAR:

 3        Q.   Why not?

 4        A.   You're asking me about the business of

 5    somebody else.  You know, like Walgreen's or

 6    Eckerd's or something like that.  I mean, I can't

 7    tell you whether they did it in a nefarious

 8    manner or not.  I can't even tell you if they did

 9    it.

10        Q.   Mr. Cobo testified in his deposition

11    that there came a point in time where he looked

12    at claims for reimbursement that he had submitted

13    to Medicaid; and based on an analysis that he

14    did, he made a payment back to the government.

15    Are you aware of that?

16            MR. BREEN:  Objection, form.

17            THE WITNESS:  Yes.

18    BY MR. ESCOBAR:

19        Q.   How did you become aware of that?

20        A.   He -- Mr. Cobo -- left a copy of the

21    letter that he sent to Medicaid, stating that he

22    was making the repayment for claims by Cobo
```

1    Pharmacy.

2         Q.   What was your understanding as to what

3    that repayment was for?

4         A.   My understanding was that Mr. Cobo was

5    repaying to Florida Medicaid, an amount that was

6    -- that he determined to -- for specific

7    pharmaceuticals that he was reimbursed for that

8    exceeded the amount that Florida Medicaid, had

9    they been provided with the truthful information

10   by the pharmaceutical manufacturers, that they

11   had really intended to pay pharmacies.

12        Q.   So, in effect, he was paying back some

13   amount of a spread.  Is that right?

14        A.   You could characterize it as that.

15        Q.   And he indicated that one reason he

16   undertook that exercise is because you suggested

17   to him that he should do that.  Is that right?

18        A.   Yes.

19        Q.   Tell me exactly what you recall, to the

20   best of your recollection, what it is that you

21   told your brother-in-law, Mr. Cobo, regarding

22   what he should -- what steps he should take on

Miami, FL

1    that issue.

2        A.   I told Mr. Cobo, basically, my

3    philosophical belief that he just -- you know,

4    that it had happened.  It wasn't, I mean, a big

5    deal to me that it happened.  I don't know how it

6    happened.  It happened.  And that he needed to

7    acknowledge it and make restitution.

8        Q.   When you say that it happened, what was

9    the "it" that you had learned about?

10       A.   Well, that he had been reimbursed by

11   Florida Medicaid more than Florida Medicaid had

12   intended to reimburse, not only him, but to

13   reimburse pharmacies, but for the false

14   information that was provided by the

15   pharmaceutical manufacturers.

16       Q.   And how did you learn that?

17       A.   I first learned that from an attorney

18   at the Florida Attorney General's Office.

19       Q.   Who was that?

20       MR. BREEN:  I'm going to object.  Just

21   give me a second to consult.

22       MR. ESCOBAR:  Well, there is no

Bentley, II, Zachary Taylor - Vol. III

Miami, FL

November 6, 2008

Page 776

1    objection to, "Who was that?"  So let's hear who

2    you have in mind.

3              MR. SCAROLA:  You can identify the

4    lawyer that you spoke to.

5              THE WITNESS:  David Honig.

6    BY MR. ESCOBAR:

7        Q.   I'm sorry.  David Honig?

8        A.   Yes.  H-O-N-I-G, I think.

9        Q.   And where did you understand Mr. Honig

10   worked at the time?

11       A.   He was a -- well, he was an attorney at

12   the Florida Attorney General's Office.  I can't

13   recall his exact title.

14       Q.   Was this a face-to-face conversation

15   that you had with Mr. Honig?

16       A.   No.  It was on the telephone.

17       Q.   Who called who?

18       A.   Mr. Honig called me.

19       Q.   Was he calling you on his own

20   initiative or was he responding to an earlier

21   call from you?

22       A.   Both.

```
 1        Q.   Who had called whom first?

 2        A.   I mean, this really gets into --

 3             MS. ST. PETER-GRIFFITH:  Do you want to

 4   take a break to ascertain privilege?

 5             MR. ESCOBAR:  Well, there is nothing

 6   privileged -- I haven't gotten into any

 7   substance.  I'm just trying to identify the

 8   parameters.

 9             MR. BREEN:  I know you are.  That's why

10   I haven't --

11             MR. ESCOBAR:  When we get to the

12   substance, if you have an objection -- I just

13   want to identify the parameters here.

14             MR. BREEN:  Let me just give the

15   witness a caution.  It's Ven-a-Care's position,

16   as your -- as Ven-a-Care's counsel -- that your

17   substantive communications with the Florida

18   Attorney General's Office are subject to the

19   common interest attorney-client privilege.  It is

20   my understanding that the Attorney General of

21   Florida would also assert that privilege.  So I

22   would caution you not to disclose the substance
```

Page 778

1    of your conversations with Mr. Honig on this

2    topic.  You can certainly disclose that you had a

3    conversation, when the conversation occurred, how

4    it occurred, those types of things, which I think

5    is what Mr. Escobar is attempting to elicit at

6    this time.  And I don't know if your counsel

7    joins in that instruction --

8          MR. SCAROLA:  I concur that that is an

9    accurate instruction with regard to restrictions

10   on what you ought to disclose.

11   BY MR. ESCOBAR:

12      Q.   Okay.  So I think the -- all I'm trying

13   to establish at the moment is -- you've

14   identified a conversation with Mr. Honig of the

15   Florida AG's office.  And I want to just find out

16   how that conversation came about in terms of who

17   initiated the initial contact that led to the

18   conversation.

19      A.   Yeah.  And I'm doing my best to try to

20   answer you without making a disclosure that I

21   have no authorization to make.

22      Q.   Okay.

Page 779

```
1         A.   Mr. Honig and I had a number of things
2    that were going on at that time.  When Mr. Honig
3    called me that morning, I can't tell you that the
4    purpose of his call was to inform me that he had
5    learned about --
6              MR. SCAROLA:  Excuse me.
7              THE WITNESS:  I'm sorry.
8              MR. SCAROLA:  You're getting into more
9    detail than you ought to get into at that point.
10             THE WITNESS:  Okay.
11             MR. SCAROLA:  If you don't know the
12   answer to the specific question that's asked, all
13   you need to say is that you don't know.
14             THE WITNESS:  I'm sorry.  Can you read
15   the question back.
16   BY MR. ESCOBAR:
17        Q.   The question was, how did it come about
18   that you had the conversation with Mr. Honig that
19   then led to your conversation with Mr. Cobo?
20        A.   I think I can't answer that without
21   violating a privilege between myself and the
22   Florida Attorney General's Office.
```

Page 780

1              MR. ESCOBAR:  And I take it you're

2       instructing him not to answer the question -- the

3       point that he got where you asserted the

4       objection, you're instructing him not to answer?

5              MR. SCAROLA:  I am instructing him not

6       to answer on the basis of privilege.

7              MR. ESCOBAR:  I disagree with the

8       privilege assertion here, but we'll go from there

9       and see what we can do.

10      BY MR. ESCOBAR:

11          Q.   Can you tell us when these

12      conversations that you're describing that you

13      have in mind now -- when those occurred?

14          A.   The conversation that I had with Mr.

15      Honig regarding Mr. Cobo happened sometime -- you

16      know, I'm doing my best to estimate -- sometime

17      in 1989.  Late '89.

18              MR. BREEN:  I would suggest, Mr.

19      Escobar, that you ask that question again and let

20      the witness hear his answer back.

21      BY MR. ESCOBAR:

22          Q.   You said sometime in late 1989.  Is

Bentley, II, Zachary Taylor - Vol. III

November 6, 2008

Miami, FL

Page 781

```
 1    that correct?

 2         A.   Yes.   To the best of my recollection.

 3    I'm sorry.  Read the question -- are you talking

 4    about the conversation I had with Mr. Cobo or Mr.

 5    Honig?

 6         Q.   I'm talking about the conversation with

 7    Mr. Honig that I think you identified as being in

 8    the chain that led to you talking to Mr. Cobo.

 9         A.   Yes.

10         Q.   Okay.  So when did the conversation

11    with Mr. Honig take place?

12         A.   The conversation with Mr. Honig, to the

13    best of my knowledge, occurred sometime in late

14    1989.

15         Q.   And you're certain --

16         A.   I'm sorry.  I'm sorry.  I see why --

17    I'm sorry.

18         Q.   You mean 1999.

19         A.   I mean 1999.

20         Q.   Okay.

21         A.   I wasn't -- yeah.

22         Q.   So just so that we're clear --
```

Page 782

1        A.    I was a decade off.

2        Q.    So that we're clear, the conversation

3    that you were referring to with Mr. Honig that

4    then led to you talking to Mr. Cobo, that

5    occurred sometime in late 1999.   Correct?

6        A.    I'm sorry.   1998.

7        Q.    1998.   Okay.

8        A.    1998.

9        Q.    All right.   And the conversation with

10   Mr. Honig that you're describing had something to

11   do with the Cobo Pharmacy.   Correct?

12            MR. BREEN:   I'll just caution the

13   witness that other than the general nature of the

14   topic, which I think that's what this question

15   goes to,  is fine, but not to discuss any of the

16   substance  of the conversation.

17            MR. ESCOBAR:   Yeah.   I'm asking about

18   the  topic as you would in a --

19            MR. BREEN:   In a privilege log.

20            MR. ESCOBAR:   -- you have to put in a

21   privilege log.

22            MR. BREEN:   Yes.

```
 1          THE WITNESS:  The conversation with Mr.

 2    Honig  regarding Mr. Cobo came up as a result of

 3    another  conversation that was ongoing and

 4    transpiring  between myself and the Florida

 5    Attorney General's  Office.

 6    BY MR. ESCOBAR:

 7          Q.   So you had been having conversations

 8    with  Mr. Honig and the Florida Attorney

 9    General's Office  about topics other than Mr.

10    Cobo before the  conversation about Mr. Cobo.

11          A.   Correct.

12          Q.   And then there was a conversation that

13    you  had with Mr. Honig where Mr. Honig talked to

14    you about  Mr. Cobo.  Yes or no?

15          A.   Yes.

16          Q.   Again, just on a topical basis.  Not

17    the  details of it, because of the instruction

18    you were given.  But just topically, the

19    conversation with Mr. Honig related to claims

20    submitted by Mr. Cobo's pharmacy for Medicaid

21    reimbursement.  Correct?

22          A.   Yes, sir.
```

1       Q.   And the topic included that Mr. Cobo

2  had submitted claims where he had -- in his

3  pharmacy, he had been reimbursed by Florida

4  Medicaid.   Correct?

5            MR. SCAROLA:   I think we've gone far

6  enough into a discussion of the nature of the

7  communication, itself.   I think we've provided

8  you sufficient information to identify the

9  general subject matter.   And I instruct you not

10  to answer that question on the basis of

11  privilege.

12            THE WITNESS:   Thank you, Mr. Scarola.

13  BY MR. ESCOBAR:

14       Q.   Did you take any notes of the

15  conversation with Mr. Honig?

16       A.   I did not take any written notes

17  regarding that, no.

18       Q.   And do you recall where you were when

19  you had that telephone conversation with Mr.

20  Honig about Mr. Cobo?

21       A.   At my office at Ven-a-Care.

22       Q.   And after you had -- now, the

Page 785

```
 1    conversation with Mr. Honig about Mr. Cobo, that

 2    was one where Mr. Honig had called you.  Is that

 3    right?

 4             MR. BREEN:  Objection, form.

 5             THE WITNESS:  That is correct.

 6    BY MR. ESCOBAR:

 7        Q.   And after you spoke to Mr. Honig, at

 8    some point after that conversation you spoke to

 9    Mr. Cobo.  Right?

10        A.   Yes.

11        Q.   And tell us what you told Mr. Cobo.

12        A.   I told Mr. Cobo that, you know, I was

13    disappointed that it had happened.  I didn't know

14    how or why it had happened.  And that I believed

15    that he needed to make proper restitution to

16    Florida Medicaid.

17        Q.   And, again, the "it" is that Mr. Cobo

18    had submitted claims to Florida Medicaid, and he

19    had gotten reimbursed an amount that, based on

20    the information you had, you believed was higher

21    than he should have been reimbursed.

22        A.   Well, I think we have to qualify that.
```

```
 1    Because -- here is the thing:  Under federal law,

 2    pharmacies were required to submit claims to

 3    Medicaid for their usual and customary.  I had no

 4    idea what Mr. Cobo's usual and customary was.  I

 5    also know that he may very well have been in a

 6    predicament, because you can't have two usual and

 7    customary charges.  You can only have one usual

 8    and customary.  So it's kind of like a dilemma.

 9    We were making certainly allegations that due to

10    the false pricing representations by the

11    pharmaceutical manufacturers, they had led to

12    reimbursement amounts that were more than

13    Medicaid had intended to pay.

14            So -- I can't say that Mr. Cobo did

15    anything wrong by being reimbursed more than what

16    Florida Medicaid intended to pay, because he was

17    only reimbursed more by virtue of the fact of the

18    false pricing representations.  To me, he did

19    what he was legally bound to do, and he submitted

20    his, quote, usual and customary charges -- or I

21    assume.  I mean, you know, I'm making an

22    assumption here which I'm probably not qualified
```

Bentley, II, Zachary Taylor - Vol. III

Miami, FL

November 6, 2008

Page 787

1    to do.   I'm hypothecating that Mr. Cobo followed

2    the law and he submitted his usual and customary,

3    and that, in fact, his usual and customary was

4    more than Florida Medicaid had intended to

5    reimburse but for the prices that were in their

6    computer that were obtained directly or

7    indirectly from the various pharmaceutical

8    manufacturers.

9         Q.   Were you concerned that what Mr. Cobo

10   had done in processing his claims was essentially

11   what you were complaining about in complaints

12   that were filed at the time and in conversations

13   that you were having with the government?

14        MR. BREEN:   Objection, form.

15        THE WITNESS:   No.   I think Mr. Cobo was

16   a prime example to show the government that there

17   was this dilemma by virtue of the fact that there

18   was a federal law in place that said pharmacies

19   are required to bill usual and customary charges;

20   and that for probably 99 percent of the

21   pharmaceuticals, that their usual and customary

22   was greater than what Medicaid intended to repay

Page 788

1   but for the information that was in their

2   computer.

3           So, if I can further explain, the

4   Medicaid program had in their computer --

5   although you wouldn't call it a MAC -- but they

6   had a limiting amount that they would pay on

7   every NDC number.  Okay?  So if they had a

8   limiting amount that was $10, you could bill $100

9   -- okay? -- but you would only be reimbursed ten.

10  So that if a pharmacy's usual and customary

11  charge was $12, they would only have been

12  reimbursed, had the drug companies provided the

13  truthful information, $10, if, in fact, that

14  represented the true prices that were in the

15  marketplace.

16          So Mr. Cobo, by virtue of the fact of

17  the false prices, received $2 more than what

18  Florida Medicaid had intended to repay, but, in

19  fact, $12 was the truthful usual and customary

20  charge forhis pharmaceutical.

21  BY MR. ESCOBAR:

22      Q.   Okay.  And what you're describing now,

Page 789

1    isthat based on actual facts as to what Mr. Cobo

2    did?

3              MR. BREEN:  Objection, form.

4              THE WITNESS:  I would say it was based

5    onactual facts as to the limited knowledge that

6    Ihad.

7    BY MR. ESCOBAR:

8         Q.   And did Mr. Cobo show you any records

9    whenyou were having this conversation following

10   yourconversation with Mr. Honig?

11        A.   No.

12        Q.   Did he show you how -- any claims that

13   hesubmitted to Medicaid or Medicare?

14             MR. BREEN:  Objection, form.

15             THE WITNESS:  No.

16   BY MR. ESCOBAR:

17        Q.   Did he show you how he calculated his

18   usualand customary?

19        A.   No.

20        Q.   Did he show you what he had paid for

21   anydrugs that he had acquired on which he had

22   submittedclaims to Medicaid?

Bentley, II, Zachary Taylor - Vol. III                                November 6, 2008
                                    Miami, FL

                                                                          Page 790
1        A.    No.

2        Q.    So you had no facts as to what he

3    actuallywas doing.

4        A.    That would be a correct assumption.

5        Q.    But you did know that Mr. Cobo, in the

6    course of submitting claims to Medicaid, had,

7    from your standpoint, been repaid more than --

8    been reimbursed more than he should have been.

9        A.    Here again, I knew it for approximately

10   four or five drugs.

11       Q.    Okay.  Based on the conversation with

12   Mr. Honig.

13            MR. BREEN:  Objection, form.

14   BY MR. ESCOBAR:

15       Q.    Right?

16            MR. BREEN:  Objection.

17   BY MR. ESCOBAR:

18       Q.    You only had information from Mr.

19   Honig.  Correct?

20            MR. BREEN:  Objection, form.

21            MR. ESCOBAR:  You can answer.

22            MR. BREEN:  Also, to the extent you've

Page 791

1    got to reveal information provided by Mr. Honig,

2    I instruct you not to answer.  If you had

3    information separate and apart from information

4    given to you by Mr. Honig -- in other words, if

5    you had information you gave to Mr. Honig, that

6    you had, you can testify about the information

7    you had, but not about your conversation with Mr.

8    Honig.  Do you understand that?

9              THE WITNESS:  I do.

10             I had no independent knowledge of any

11   of Mr. Cobo's business whatsoever.  So whatever

12   transpired in this, I learned from Mr. Honig.

13   BY MR. ESCOBAR:

14        Q.   Did you share the information on

15   specific claims that you got from Mr. Honig with

16   Mr. Cobo?

17        A.   For those specific claims, I did not.

18        Q.   Did you give Mr. Cobo any specific

19   information as to specific claims at all?

20        A.   I basically reiterated to Mr. Cobo how

21   I learned of what had happened for three or four

22   drugs.  I can't tell you that I even remembered

Page 792

```
 1   the names of the drugs, at the time I spoke to

 2   Mr. Cobo, that were at issue.  And when I say

 3   that, they were NDC number specific.  So, you

 4   know, it was not only the exact drug; we're

 5   talking about the exact drug, the exact strength,

 6   and the exact -- strength and --

 7        Q.   Dosage?

 8        A.   No.  The size.  Like a 50 milligram

 9   versus a 100 milligram.  I'm sorry.

10        Q.   Did Mr. Honig e-mail you, fax you, or

11   send you, in any way, any documents with respect

12   to what you and he were discussing?

13        A.   No.  Absolutely not.

14        Q.   In the conversation with Mr. Cobo, did

15   you suggest to him that he should go back and

16   look at his claims and calculate an amount that

17   he should send back to the Medicaid program?

18        A.   Yes.

19        Q.   And to your knowledge, he did that.

20   Right?

21        A.   Yes.

22        Q.   Did you discuss with him the
```

Page 793

1    methodology that he should use in calculating

2    what that amount that he should send back to

3    Florida Medicaid should be?

4         A.    I didn't have a Chinaman's clue as to

5    how you would go about doing that.

6         Q.    So whatever the methodology that was

7    used for Mr. Cobo to calculate an amount that he

8    would repay to Florida Medicaid, that was

9    entirely Mr. Cobo's or somebody else's than

10   yourself.  Right?

11        A.    I didn't have any knowledge about that

12   whatsoever.

13        Q.    Did you ever learn how Mr. Cobo -- what

14   methodology he used to come up with the amount

15   that he would pay back to Florida Medicaid?

16        A.    I have no idea.

17        Q.    Was it your understanding that whatever

18   that amount was, that Mr. Cobo had then

19   eliminated any excess amount in reimbursement

20   that he had gotten from Florida Medicaid?

21             MR. BREEN:  Objection to form.

22             THE WITNESS:  Well, I think probably

Page 794

```
 1    the -- what Mr. Cobo and I discussed was that to

 2    the best of his ability, that he go back and try

 3    to identify claims that were submitted.  I mean,

 4    this was, you know, difficult.  Because like I

 5    said, there is this dilemma that Mr. Cobo

 6    submitted claims based upon his usual and

 7    customary versus his price.  And to me, it gets

 8    complicated.  Because, I mean, what price do you

 9    use if you have, in fact, an invoice for one

10    amount; and a month or two later, the drug goes

11    up, you know, by 20 percent?  And then you've got

12    a Medicaid claim.  You know.  Do you use the --

13    and trying to locate invoices for specific drugs.

14    You know, I can't tell you how Mr. Cobo went

15    about it, but I would imagine it was a fairly

16    tedious task.

17    BY MR. ESCOBAR:

18         Q.   And was it your understanding, after he

19    went through whatever tedious task was involved

20    and he had made a repayment to Florida Medicaid,

21    that as far as Mr. Cobo understood it, he had

22    paid back an amount -- the excess amount of
```

Page 795

1    reimbursement?

2        A.   Well, like I said, we're talking about

3    -- you know, I don't know how many claims were

4    involved, and I don't know about what time

5    period.   Certainly, I know that Luis did his very

6    best, to the best of his ability -- I mean, he

7    wasn't, you know -- when we spoke, he didn't have

8    any idea about how to go about it.   I don't know,

9    without -- you know, I assume he spoke to counsel

10   and maybe a statistician or somebody else as to

11   how one would undertake such a task.

12           I do know that it was Mr. Cobo's

13   intention that he go back and, to the best of his

14   ability, pay any monies that had been received

15   that were more than Florida Medicaid had intended

16   for him -- not only him, any pharmacy in Florida

17   to receive.

18       Q.   When you learned this information that

19   led to the conversation with Mr. Cobo, you were

20   pretty upset that this was going on at the Cobo

21   Pharmacy, because it might be inconsistent with

22   what you were alleging; isn't that right?

Page 796

```
 1              MS. ST. PETER-GRIFFITH:  Object to the

 2    form.

 3              THE WITNESS:  Well, you know, I am an

 4    alcoholic.  I was an alcoholic.  Was I -- was I

 5    mad?  Yes.  You know.  In retrospect, did I

 6    handle it right?  Did I speak to Mr. Cobo in a

 7    non-confrontational manner?  No.  And, you know,

 8    I regret that.

 9    BY MR. ESCOBAR:

10        Q.   Can you describe for us how you did

11    speak to him on the issue of this excess

12    reimbursement and the information you had found

13    out from Mr. Honig.

14        A.   You know -- I can't -- you know, I was

15    just -- let's put it this way:  I was just mad.

16    I was mad at Mr. Cobo because I didn't think he

17    was pulling his weight at Ven-a-Care.  I think

18    that, you know, I was mad because I thought he

19    could have helped us a lot more than he helped us

20    or that -- in my mind -- that he helped us with

21    the NMC case.  You know, there was just -- there

22    was a lot of anger and hostilities that I had.
```

Page 797

```
 1            But here again, in a calm and more
 2     profound manner, he was damned if he did and
 3     damned if he didn't.
 4        Q.   But one of the reasons you were angry
 5     was because Mr. Cobo, who was part of your -- of
 6     Ven-a-Care, in his pharmacy, was getting excess
 7     reimbursement, while you were going around the
 8     country talking to agencies about excess
 9     reimbursement.  Isn't that right?
10            MS. ST. PETER-GRIFFITH:  Object to the
11     form.
12            THE WITNESS:  Yes.  But not thinking it
13     through, I don't know what his alternatives were.
14     Because if he established a usual and customary
15     that was approximately what the program had
16     intended to pay, then he was cheating himself off
17     of all the customers that he would have to charge
18     -- that was his usual and customary charge.  So,
19     unfortunately, like I said, you know, I didn't
20     think it through.  I was rash.  I was mad about -
21     - angry about other things.  And, you know, I let
22     my anger about all of these other things that had
```

Bentley, II, Zachary Taylor - Vol. III                     November 6, 2008

Miami, FL

Page 798

```
 1   nothing to do about it, spill over into that.  He

 2   became an easy target.  Okay? That's the best way

 3   I can explain it.

 4   BY MR. ESCOBAR:

 5        Q.   Were you yelling at him?  Were you

 6   violent with him?  How would you describe the

 7   encounter?

 8        A.   I probably scared him.

 9        Q.   Why or how?

10             MR. SCAROLA:  Which question?

11             MR. ESCOBAR:  How?

12             THE WITNESS:  I -- you know, I lost my

13   cool.

14   BY MR. ESCOBAR:

15        Q.   But what did you do that, looking back

16   on it, would have scared Mr. Cobo?

17        A.   I was, you know, ranting and raving.

18        Q.   Were you throwing things?  Did you hit

19   him? What did you do?

20        A.   No.  At the time, I mean, you know, I

21   was like -- you know, I didn't throw anything at

22   him or, you know, strike him.  But, you know, I
```