# Exhibit G

ver 3

TO:      Kevin Thurm
         Deputy Secretary
         Through: ES_____
                  COS_____

FROM:    Michael M. Hash
         Deputy Administrator

SUBJECT: Use of Department of Justice (DOJ) Data in Pricing of Drugs Currently Covered by Medicare -- INFORMATION

Issue: We have been considering options for using the alternative average wholesale price (AWP) data provided by DOJ. While we believe that Medicare overpays for the drugs identified by DOJ, we also must assure continued beneficiary access to these drugs. Per your request, we have met with physician and provider groups who furnish Medicare beneficiaries with the drugs on the DOJ list. We have also conducted some impact analyses. This memo presents the strategy we plan to pursue.

Discussion: We recently met with organizations representing: oncologists; urologists; the end-stage renal disease community; hemophilia suppliers; and suppliers of asthma equipment/drugs and home infusion therapy. Based on our discussions with the groups and our analysis, the following major issues exist in using the DOJ data.

*Cross-Subsidies.* Notably, the groups generally agreed that these drugs could be obtained at the lower DOJ AWP levels. However, some groups indicated that the DOJ levels would be below their costs in certain situations. The groups generally argued that they needed to "profit" on their Medicare drug payments in order to compensate or "cross-subsidize" Medicare payments related to other aspects of provision of the service that they claim are either inadequate or not covered at all. For example, oncologists argue that their Medicare drug profits cross-subsidize what they believe are inadequate Medicare payments for chemotherapy administration. Similarly, hemophilia centers argue that since payment for drugs is the payment they receive from Medicare, they use their Medicare drug profits to cover administration of drug. ESRD facilities argued that their Medicare drug profits are used in part to compensate for cost-sharing bad-debts.

Providers of home infusion and asthma care argued that their Medicare drug profits were used to cover related services such as checking that the patient has an appropriate supply of drugs and is following the prescribed regime. However, it is not clear how the payment for these services is not included in Medicare's current payment for the equipment itself and equipment servicing fees. (Medicare pays monthly rental fees for certain medical equipment where the total payment for a specific Medicare beneficiary equals 150 percent of the equipment costs with the supplier owning the equipment and reusing it subsequently for another Medicare beneficiary).

BBRA gave ESRD facilities received a 1.2 percent increase in 2000, and another 1.2 percent increase in 2001. The Administration's recent Medicare give-back program

HHC902-0251

**RELEASED**

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | !LEX03FB4D_INT |
| Description: | C:\OFFICE\WPWIN\WPDOCS\SELF-INT.429 |
| Submitted: | May 11, 1999    9:06:45 am |
| Printed: | May 11, 1999    9:06:54 am |

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0252

RELEASED

2

proposed to increase payments by an additional 1.2 percent in 2001 (total of 2.4 percent increase). About two-thirds of oncologist Medicare revenues comes from drugs, and ~~less~~ STET ~~approx.~~ ~~than~~ any 10 percent is from chemotherapy administration. Oncologists reportedly rejected a policy that would pay drugs using the DOJ data, and use their aggregate Medicare drug profits to increase their chemotherapy administration payments. Such a policy would also result in higher payments for chemotherapy administration in a physician's office than in hospital outpatient departments.

*Access to Care.* All the groups expressed concern that beneficiaries would possibly have to receive their care to more costly, less convenient settings, such as hospital outpatient departments (e.g., chemotherapy) or emergency rooms (e.g., hemophilia or respiratory therapy). Oncologists argued that if they lost their Medicare drug profits, they could not cross-subsidize inadequate chemotherapy administration payments and would have to shift care from the office setting into hospitals and outpatient clinics. This could be more of a problem in rural settings where beneficiaries could face increased travel time and expenses.
Apria, a company which furnishes home infusion and asthma care, reported a recent decision to not take new Medicaid patients in twelve states when the DOJ data were implemented for Medicaid through First Data Bank.

Sub drugs

*Quality of Care.* Groups expressed concern about two aspects of quality of care. First, since the DOJ list is does not cover all drugs, there would be substitution of alternative and potentially less effective drugs for which the inflated payment could still be obtained. For example, there could be substitution of plasma-generated Factor IX for recombinant-generated Factor IX. Plasma-generated Factor IX carries the risk of HIV contamination and is not as effective in controlling hemorrhage if the beneficiary is already infected with HIV, which is a relatively common circumstance in hemophiliacs due to receipt of frequent transfusions. Another example is the substitution of a drug that would need to be provided through a different, more painful route – intramuscular instead of subcutaneous, or provided more frequently.

all albuterol ex.

Second, some groups argued that there would be deterioration in quality controls and related support services that are not covered. An example is the provision of albuterol without intermittent monitoring of the beneficiary to ascertain if they are actually taking their respiratory treatments, and checking refill prescriptions against physician orders that may have been revised or having a 24-hour capacity for access to respiratory therapists if the need should arise. However, there is a concern that some of these additional services might be used more as marketing devices than as patient quality controls.   Disp fee

*Operational Constraints and Transition.* Groups expressed concern that there was insufficient information both for them to understand and evaluate the basis for the policy shift (including the source of the alternative AWPs) and to successfully implement the change. Some groups complained that the policy was announced without adequate comment from stakeholders, and that significant reductions in prices could even possibly violate the law under this circumstance.
More lead-time and a transition period were seen as critical to prevent assure access to care and avoid confusion among providers and beneficiaries. A longer lead-time than October 1, 2000 and a transition period were seen as important to orderly change. Some groups pointed to the need to renegotiate contracts, make systems changes, and conduct business

HHC902-0253

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | ILEX03FB4D_INT |
| Description: | G:\OHP\DPPS\DRUG\SELF-ADM.426 |
| Submitted: | May 11, 1999   9:16:12 am |
| Printed: | May 11, 1999   9:16:20 am |

# XL02

# LST:

This file was printed using the Network Option on the
Lexmark Optra LaserPrinter

HHC902-0254

RELEASED

3

planning for the anticipated reductions in revenue. Further, beneficiaries would need to be educated. Apria pointed out that the impact on small businesses of a poor transition and lost revenues would be significantly more profound than on large organizations. Finally, some groups were concerns about a potential ripple effect on private purchaser and HMO drug prices.   *ed*

*Savings Estimates and Impact Analysis.* Medicare carrier payments in 1999 for the approximately 50 drugs on the DOJ list totaled roughly $1.8 billion. If carriers were to fully use the DOJ data immediately, instead of the AWP data from the Red Book (the source used by all by one carrier), full year savings of roughly $650 million would be achieved. (This is not an actuarial estimate and savings could be lower given assumptions about a variety of slippages). The savings occur because Red Book AWPs are neither an average nor a wholesale price, but rather a manufacturer's list price whereas the DOJ data reflect prices from wholesaler catalogs. (Verify numbers!!!)  OK

However, this estimate needs to be reduced because of substitute drugs that are not on the DOJ list. Approximately three-quarters of carriers have implemented a least costly alternative for lupon which represents about 34 percent of Medicare spending for drugs on the DOJ list. As a result, Medicare payment for lupon has already been reduced to the price of zoladex which is still less expensive than the DOJ price for lupon.

Sherry K — Savings also need to be considered in the context of the physician sustainable growth rate system (SGR). Medicare spending for drugs is included in the measurement of performance under the SGR. However, achieving the savings through administrative action would not result in a comparable reduction in the physician SGR target (since it is not a change in law or regulation). Thus, actual spending for SGR measurement purposes would be reduced but the SGR target would not be reduced. As a result, physicians would achieve the bulk of the savings through higher future updates and neither the Medicare program nor Medicare beneficiaries would financially benefit from savings achieved. (This problem might be resolved with a legislative fix). *or regulatory?*

*Actual Acquisition Costs:* We also heard concerns about basing Medicare payment for drugs on actual acquisition costs. There was a view that acquisition costs should include an amount for breakage, spillage, storage and taxes. There was also concern about the paperwork to determine actual acquisition costs for drugs net of discounts. And there was concern that our prior legislative proposal had a national limit, i.e., our payment of actual acquisition costs was subject to a limit of the median actual acquisition costs in Medicare in a prior year. As in other items and services in Medicare in which a median limit is applied, the theory is that if half the country can acquire drugs at or below the limit, the other half of the country should be able to acquire it at the median acquisition cost. Such a limit provides incentives for efficiency in purchasing drugs and eliminates the blank check incentive that an unconstrained actual acquisition costs would provide.

Plan of Action and Timeline: Based on the information received and our analysis, we plan to pursue a strategy that would:

o   Send to Medicare carriers the DOJ data for all drugs. Instruct carriers not to implement the DOJ data for oncology and hemophilia drugs at this time while we consider related Medicare payment policies which could affect access for

HHC902-0255

RELEASED

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | !LEX03FB4D_INT |
| Description: | C:\OFFICE\WPWIN\WPDOCS\AMBUL\PARA-INT\BPPARAIN.599 |
| Submitted: | May 11, 1999    3:44:16 pm |
| Printed: | May 11, 1999    3:44:23 pm |

# XL02

# LST:

This file was printed using the Network Option on the Lexmark Optra LaserPrinter

HHC902-0256

RELEASED

4

    ✓    beneficiaries. Carriers would determine which, if any, of the remaining drugs for which the DOJ source of AWP data should be used. Delay the effective date until January 1, 2000 to provide more time for necessary systems changes and transitioning. Require carriers assess access to the drugs and report to us in November on the data source they use for setting Medicare drug allowances.

- Submit legislation in September to set Medicare prices at the Average Manufacturers Price (AMP) plus a reasonable mark-up. We believe that instead of proposing to base Medicare payment on actual acquisition costs, we should propose AMP plus a reasonable mark-up instead. AMP is auditable and we currently have and use it in computing Medicaid drugs rebates.

- Submit legislation in September for targetted fixes in policies related to the provision of drugs which could not be addressed administratively. Such legislation would include increasing the ESRD composite rate, increasing payments for chemotherapy administration and establishing a hemophilia administration fee for certain entities. Submit legislation to reduce the physician SGR target by the amount of savings estimated to be achieved.

We would convey these plans through a Program Memorandum that will be released in late August or early September. This approach would be consistent with the comittment to Chairman Bliley. Exempting oncology and hemophilia drugs would focus on the drugs representing about 70 percent of the savings. Delaying until January would provide time for system changes and transition as well as time for carriers to assess access at the local level and report their findings to us. However, although access problems for oncology and hemophilia drugs seem most compelling, it may be difficult to explain why the DOJ data are more accurate, but we are not implementing them for certain drugs at this time. As a result, there might be legal challenge. However, we would consider putting oncology and hemophilia drugs back on the table if legislation we propose on related policies were adopted.

HHC902-0257

**RELEASED**

| | |
|---|---|
| User Name: | XL02 |
| File Name: | |
| Directory: | |
| Server: | HCFABPD2 |
| Queue: | |
| Printer: | ILEX03FB4D_INT |
| Description: | WPMail Print |
| Submitted: | May 11, 1999     3:53:43 pm |
| Printed: | May 11, 1999     3:53:51 pm |

# XL02

# LST:

This file was printed using the Network Option on the Lexmark Optra LaserPrinter

HHC902-0258

**RELEASED**