Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                            )
                                  )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE   )
WHOLESALE PRICE LITIGATION        )  Pages 1-37
                                  )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 4, 2009, 3:50 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

3        JENIPHR A.E. BRECKENRIDGE, ESQ., Hagens Berman Sobol
     Shapiro, LLP, 1301 Fifth Avenue, Suite 2900, Seattle,
     Washington, 98101, for the State of Arizona.

4

5        THOMAS J. SWEENEY, III, ESQ., Hogan & Hartson, LLP,
     875 Third Avenue, New York, New York, 10022, for BMS.

6        KIMBERLEY D. HARRIS, ESQ., Davis Polk & Wardwell,
     450 Lexington Avenue, New York, New York, 10017,

7    for AstraZenica.

8        JOHN T. MONTGOMERY, ESQ. and DANIEL J. BENNETT, ESQ.
     Ropes & Gray, LLP, One International Place, Boston,

9    Massachusetts, 02110, for Warrick Pharmaceuticals and
     Schering-Plough Corporation.

10

11       BRENDAN J. CYR, ESQ., Kelley Drye & Warren, LLP,
     101 Park Avenue, New York, New York, 10178,
     for Dey, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2           THE CLERK:  In re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action 01-12257,

4    will now be heard before this Court.  Will counsel please

5    identify themselves for the record.

6           MS. BRECKENRIDGE:  Jeniphr Breckenridge here on

7    behalf of the state of Arizona.

8           THE COURT:  Are you with the Attorney General's

9    office or with Hagens Berman?

10          MS. BRECKENRIDGE:  I'm with Hagens Berman.

11          THE COURT:  So you're fairly new to arguing these,

12   right?

13          MS. BRECKENRIDGE:  In the background on the state

14   cases.  I've never had the pleasure of appearing in front of

15   you yet.

16          THE COURT:  Mr. Montgomery has been.

17          MR. MONTGOMERY:  John Montgomery for Warrick

18   Pharmaceuticals.

19          MR. BENNETT:  And Dan Bennett, also for Warrick

20   Pharmaceuticals.

21          MR. MONTGOMERY:  Actually, I guess we're here for

22   Schering as well.

23          MS. HARRIS:  Kim Harris from Davis Polk for

24   AstraZeneca.

25          THE COURT:  Also no stranger.

1          MR. SWEENEY:  Tom Sweeney from Hogan & Hartson for

2    BMS.

3          MR. CYR:  Brendan Cyr from Kelley Drye & Warren

4    for Dey.

5          THE COURT:  There are a lot more defendants,

6    right?  It's just people decided --

7          MR. MONTGOMERY:  Yes, your Honor.  I'm arguing on

8    behalf of all the defendants, though several of them may

9    wish to have something to add, but there are many, many

10   defendants.

11         THE COURT:  Yes, and many, many drugs.  So can I

12   just stop.  Let me ask you this:  Have you been involved in

13   the big case at all, what I call the --

14         MS. BRECKENRIDGE:  In the MDL case?

15         THE COURT:  Yes.

16         MS. BRECKENRIDGE:  I was not involved in the

17   trial, but I have been involved in the MDL case, yes.

18         THE COURT:  So I'm just trying to, when I was

19   reading the briefs, trying to get a handle on whether or not

20   you're seeking to duplicate the recovery that will be

21   recovered if all of these settlements go through.

22         MS. BRECKENRIDGE:  We are not, and that is a good

23   question, and I anticipated you might want to start off

24   there.  We are not seeking to duplicate anything.  What the

25   Attorney General of Arizona is interested in pursuing, and

0540e980-a097-47ef-a293-74853b9b734e

1    one of the reasons he brought the suit, is the civil

2    penalties on behalf of the state.

3            THE COURT:  So you're not looking, assuming that

4    all the settlements are approved, you're not looking for

5    restitution on behalf of the consumers or third-party

6    payors, or any disgorgement or any of that sort of thing?

7    You're simply looking for either injunctive relief and/or

8    penalties?

9            MS. BRECKENRIDGE:  Yes, that is correct.  To the

10   extent that the claims of the citizens of Arizona are

11   covered by other settlements that will eventually become

12   final --

13           THE COURT:  And when you were sitting in these

14   settlement discussions with Eric Green, was it disclosed

15   that you were looking for these penalties in addition to --

16   when I was sitting there on my couch last night reading

17   these, I was taken aback.  Now, it could just be this is in

18   lieu of all the stuff settling, but for me to go -- I

19   understand your suit is sort of almost an end run around the

20   class action, because I have to go third-party payor by

21   third-party payor -- let's assume there are thousands in

22   Arizona, I don't know how many thousands -- the citizens are

23   pretty easy because they won't know anything -- but I would

24   have to go literally, or some poor Arizona federal judge

25   would have to go, as you would have it done, third-party

0540e980-a097-47ef-a293-74853b9b734e

1    payor by third-party payor to be able to decide whether

2    there were civil penalties, right?

3              MS. BRECKENRIDGE:  I am not sure.  To start with

4    that question first, I am not sure how many third-party

5    payors there are in Arizona.

6              THE COURT:  Well, let's say there are hundreds.

7              MS. BRECKENRIDGE:  That is one possibility.  We do

8    not have the information on the third- --

9              THE COURT:  So you're thinking that -- to some

10   extent, I was misquoted in defendants' brief on all the

11   things I said in terms -- it was mostly in the context of I

12   can't certify a class because the individualized knowledge

13   of each third-party payor would make it unmanageable.  That

14   was primarily what a lot of the language had to do with.

15   But why wouldn't it be the exact -- I don't know how you

16   even go about handling a parens patriae claim when you've

17   got hundreds and hundreds of third-party payors, each with

18   different levels of knowledge and different practices.

19   You're saying, as a parens patriae, I shouldn't even think

20   that way?  Is that basically it?

21             MS. BRECKENRIDGE:  I'm not saying that the Court

22   shouldn't think that way, but that is one area that we will

23   have to conduct discovery into.

24             THE COURT:  Was it disclosed during settlement

25   discussions that it wouldn't preclude you from doing this?

1           MS. BRECKENRIDGE:  These claims were not released.

2    This case has actually been pending since 2005, I believe.

3    This was not in any way an end run around the class action,

4    which of course hadn't gone to trial at that point.  This

5    was a real effort on behalf of the Attorney General of

6    Arizona, as have other Attorneys General brought similar

7    suits, to recover civil penalties on behalf of the state,

8    and also to seek injunctive relief.

9           THE COURT:  Injunctive relief might be different

10   because I -- I thought this was filed in 2006 actually.

11          MS. BRECKENRIDGE:  You could be -- the minute I

12   said 2005 I thought --

13          MR. MONTGOMERY:  December of 2005.

14          THE COURT:  December, all right, fair enough.  So

15   as all of these cases were being on Track One and Track Two

16   and all this -- and maybe you don't know the answer to

17   this -- it was never sort of flagged that you could still

18   seek civil penalties as these cases were settling?

19          MS. BRECKENRIDGE:  I can't answer that because I

20   wasn't necessarily in all the negotiations, but it has

21   always been a part of our complaint as well as the

22   complaints of other Attorneys General in other state cases.

23          THE COURT:  I just don't remember it coming up

24   this way again before, and maybe -- I sort of thought these

25   cases were starting to go away.  And I've been doing this

1    for seven years, and I'm sort of getting tired.

2          Now, let me ask you another question.  You have an

3    appendix at the back of your -- how many drugs do you allege

4    both what you claim is a false price and what you think is

5    the real price?  They claim you've -- I didn't have time

6    last night.  I haven't gone through all of them.  They claim

7    you've appended thousands and thousands of drugs, and in

8    none of them have you asserted what the real price should

9    have been, either a spread or what the real price would have

10   been.

11         MS. BRECKENRIDGE:  I did not count the number of

12   drugs for which we did provide the two numbers that you're

13   referring to.  It is true -- I have the appendix here --

14   that information does not appear in the appendix, but it

15   does appear in different places within the complaint.

16         THE COURT:  So are there drugs that do not have

17   that spread or that differential in market price?

18         MS. BRECKENRIDGE:  I believe we could gather that

19   information.

20         THE COURT:  No.  I want to know it's there now.

21         MS. BRECKENRIDGE:  Okay.  Yes, it appears in the

22   corpus, the body of the complaint.  It does not appear in

23   the appendix.

24         THE COURT:  No, but I don't care where it is,

25   whether it's in the appendix or it's in the body.  Does

0540e980-a097-47ef-a293-74853b9b734e

1    every single drug listed have the spread in it?

2                MS. BRECKENRIDGE:  No.

3                THE COURT:  So how many, roughly, have a spread

4    alleged with specificity and particularity, what the price

5    it's listed is and what the real price should have been?

6                MS. BRECKENRIDGE:  I really couldn't estimate.  I

7    could look at the --

8                THE COURT:  Do you know?

9                MR. MONTGOMERY:  We haven't counted, your Honor.

10   The appendices have about a thousand NDCs.  The complaint

11   appears to have a pattern of alleging a spread with respect

12   to one, maybe two, maybe three drugs per defendant.  So

13   we've got a small fraction of the total drugs that they --

14               THE COURT:  Does that seem right to you?

15               MS. BRECKENRIDGE:  Probably not the

16   characterization.  I think they called it a "smattering" in

17   their briefing.  When I went through to address that point,

18   I did look at the number.  It is far more than a smattering.

19   Mr. Montgomery is probably correct --

20               THE COURT:  But three or four per defendant, is

21   that what it would be?

22               MS. BRECKENRIDGE:  No, that isn't correct.  I

23   think in some instances there's more than a dozen.

24               THE COURT:  All right, so a dozen per defendant,

25   but not thousands?

0540e980-a097-47ef-a293-74853b9b734e

Case 1:01-cv-12257-PBS   Document 5885   Filed 02/09/09   Page 10 of 37

Page 10

1    MS. BRECKENRIDGE:  Not thousands.  And if I could

2  just raise a housekeeping matter that neither Mr. Montgomery

3  nor I raised.  Two of the appendices actually are now

4  irrelevant, I believe, because as of yesterday, the state

5  agreed to dismiss Biogen and Merck.  That would be

6  Appendix B and Appendix C, your Honor.

7    THE COURT:  Okay.  So as you probably know, I

8  completely botched the New York case because people kept

9  filing new appendices and new substitute things, and there

10  was one whole slew of motions, but I was on an older

11  appendix, not a new one.  So I want to make sure that I'm

12  always getting them because I had thousands of entries, and

13  I looked at one and not the other, so I've got to always

14  make sure.  So at this point, though, those appendices

15  attached to which complaint?

16    MS. BRECKENRIDGE:  There's only been one

17  amendment, so it is the -- I think we've called it the

18  amended complaint.  It is the first amended complaint, and

19  it is the only amended complaint.

20    THE COURT:  And as I understand it, you've dropped

21  all claims having to do with non-AWP-based methodologies,

22  right?

23    MS. BRECKENRIDGE:  That is correct.  This is a

24  case about average wholesale pricing.

25    THE COURT:  Okay.  So at this point, as far as --

0540e980-a097-47ef-a293-74853b9b734e

1    there was a third -- I understand that on appeal right now

2    is the issue about whether, with respect to consumers, the

3    30 percent spread can be viewed as a matter of undisputed

4    facts or matter of law, or whatever the right words are.  It

5    makes sense -- what I did in other cases is, I can't hold

6    the State of Arizona to the 30 percent yardstick in the MDL.

7    However, since I've never seen an iota of evidence that

8    there wasn't some spread in the physician-administered drugs

9    arena, what I've done in other cases is, I was going to hold

10   you to the spread.  I forget what I said in other cases.

11   Was it 30 or 25?

12            MR. MONTGOMERY:  30, your Honor.

13            THE COURT:  30.  I'm going to hold people to the

14   spread, so that we don't have unnecessary discovery, until

15   someone gives me another plausible theory.  So for how many

16   people would -- would that be knocking out a lot of drugs?

17   In other words, I don't want discovery, I don't want all of

18   this unless there's some viable theory, either from the

19   First Circuit or from Dr. Hartman or whoever you're relying

20   on now.  So how much does that affect right now?

21            MS. BRECKENRIDGE:  I am not sure how much that

22   affects right now.  I was aware of your holdings in the Iowa

23   and the New York case, and I followed that.  In looking at

24   the defendants' briefing on the matter, they have identified

25   just eight drugs in their papers that they can say fall

0540e980-a097-47ef-a293-74853b9b734e

1   below the 30 percent threshold.  I --

2          THE COURT:  What I'm going to be inclined to do --

3   and, I mean, I just want to short-circuit some of this --

4   is, to the extent that the complaint does not follow the

5   clear guidelines I have done over seven years, which is that

6   you have to put both the price and a spread, or the AWP and

7   the real market price, something to show that someone's done

8   their homework and there really was a discrepancy and it

9   exceeded the 30 percent, which was the number Hartman gave

10   me and I've lived with -- I didn't make it up -- I knew

11   nothing about this before I walked in the door -- that I

12   wasn't going to just waste people's time and go with it.

13   Now, I understand that there are thousands of drugs where I

14   don't have that information and at least twelve drugs where

15   it's below the 30 percent, so I'm inclined to either stay or

16   dismiss any case that doesn't meet those two requirements;

17   A, that it be over 30 percent, and, B, that a spread not be

18   alleged.

19          Now, that may leave 60 drugs.  I don't know how

20   many it leaves, 60, 100 drugs.  It will leave something.

21   And so we can get going on the discovery on that, stay the

22   under-30-percent issue and come back to it.  Also I want to

23   stay all discovery having to do with things subject to a

24   settlement.  I'm hoping it won't fall through, but I

25   understand why you want a placeholder.  That's fair enough.

1   But I don't want to waste people's money going through

2   anything that's already been subject to a settlement, by

3   which I mean the disgorgement/restitution claims would

4   overlap, I think you'd agree, with the recovery in the

5   national class actions that have been agreed upon, or

6   possibly would come up -- you know, I've stayed the -- what

7   have I stayed now?  I've stayed the national class action,

8   so that could come back up again, but it would overlap, and

9   I wouldn't -- right?

10          MS. BRECKENRIDGE:  Yes, I'm trying to follow.

11  Yes.

12          THE COURT:  I think that that's right.  So I just

13  wanted to get through what we can just get through easily.

14          Now, on the self-administered drugs, I'm the least

15  confident because I didn't do a class action on the

16  self-administered drugs because I said there was no

17  possibility of a class action on them.  And I don't

18  remember -- I've done generics through the Mylan case, but I

19  don't know that I've ever dealt with self-administered

20  branded drugs in any great detail so far, and I just thought

21  we should maybe focus some argument on that.  And I don't

22  know how many drugs that are left fall in that capacity.  I

23  don't know.  Do you know?

24          MS. BRECKENRIDGE:  I do not know the number, your

25  Honor.

1          THE COURT:  And then there's the issue, are there

2     self-administered generic drugs?

3          MS. BRECKENRIDGE:  There will be.

4          THE COURT:  Or have those all been eliminated

5     because of the --

6          MR. MONTGOMERY:  Well, there's of course the

7     self-administered generic drug that our client sells, which

8     is albuterol.  And, of course, we had a judgment that runs

9     precisely in parallel with the claims that have been made

10    here.  In light of that judgment, you know, we suggest that

11    your Honor ought to be applying the Bell Atlantic V. Twombly

12    standard to determine that there simply is no plausible

13    basis upon which --

14         THE COURT:  But that only applies to one drug,

15    right?

16         MR. MONTGOMERY:  That's right, that's right, but

17    we have, as you've seen in the briefs -- and I know the

18    briefs are very complicated, and they're complicated because

19    they go through the whole history of all of the rulings that

20    you've made in the last seven years, and we seek to have all

21    of them applied.

22         THE COURT:  But, see, here's my problem with that,

23    which is, I understand why you do, and to some extent I'm

24    either going to stay the case pending the First Circuit

25    resolution of certain issues or pending the approvals of the

0540e980-a097-47ef-a293-74853b9b734e

1   settlements.  I think both sides are very fair about that

2   because if the settlements fall apart for some reason, they

3   should be able to have a placeholder.  If the First Circuit

4   rules against you -- I think a million issues went up,

5   whatever -- that they can -- fair enough.  But you've asked

6   for me to dismiss under Twombly the self-administered drugs

7   based somewhat on my holdings way back when, but I actually

8   was ruling on class cert issues primarily.

9           MR. MONTGOMERY:  That's right, and we maintain,

10  your Honor, that those class cert rulings are significant,

11  that we're entitled to rely on them; that we're not supposed

12  to be subject, if the integrity of the MDL process and the

13  class action process is going to be sustained, to do this

14  all over again years later because for the reasons you

15  actually started --

16          THE COURT:  Could you carve -- carve albuterol out

17  of it because I've gone through a whole trial on it.  But on

18  all these other things, why is it implausible that if there

19  was a big mega spread between the AWP and the actual market

20  price -- now, I don't know if we're talking about branded --

21          MR. MONTGOMERY:  We're talking about both.

22          THE COURT:   -- or generic, probably both -- I

23  don't know why it's implausible that that draw caused them

24  harm.

25          MR. MONTGOMERY:  Well, let me take first --

1          THE COURT:  Alleging that --

2          MR. MONTGOMERY:  Let's take first the generics.

3    They have abandoned non-MAC claims.  In other words, they're

4    focusing just on AWP.  At a minimum, I think we ought to

5    have some allegations that actually show that there's a

6    plausible basis for believing there are any such claims,

7    there are any such drugs, because we know the whole world is

8    subject to MAC pricing.  It's exactly the reason that

9    generally with --

10         THE COURT:  But that's why I required this

11   particularity.  She claims -- and I must admit, last night I

12   didn't go through the complaint -- that there are X number

13   of drugs for which she alleged a false AWP and an actual

14   market price.

15         MR. MONTGOMERY:  That's right, but what they

16   haven't alleged is that there are any transactions based on

17   AWP with respect to any of the third-party payors or

18   consumers that they purport to represent here.  So what they

19   want to do is, after the fact they want to have us go

20   through a process that you determined to be impractical,

21   unmanageable.

22         THE COURT:  But that was --

23         MR. MONTGOMERY:  And they're going to say, sort of

24   as their insurance against dismissal by you, "Well, we're

25   really not dealing with MAC here.  We're just dealing with

1    AWP."  Well, where are those transactions?

2           THE COURT:  Well, we're only in a motion to

3    dismiss stage.

4           MR. MONTGOMERY:  I understand.

5           THE COURT:  So you can shoot out interrogatories

6    and make them list it.  I mean, I just -- I'm fully with you

7    in the sense that I have trotted through branded

8    physician-administered drugs, and I have this view that,

9    based on everything the plaintiffs have given me over seven

10   years, that there is an understanding in the industry that

11   developed at some point -- and we can debate when, in 2001,

12   we can debate when -- that there was at least some spread;

13   not a mega spread, some spread.  But I haven't had the same

14   level of education in the self-administered area.

15          MR. MONTGOMERY:  All right, let's move --

16          THE COURT:  Because I threw it out before it even

17   got to class action stage.

18          MR. MONTGOMERY:  So let's move from the private

19   market to the Medicare claims.  You have addressed --

20   Medicare is almost exclusively a physician-administered drug

21   program, but there are several self-administered drugs, the

22   most prominent of which is albuterol.  And I would say to

23   you with respect to Medicare and albuterol:  You've been

24   there and we've done that.

25          THE COURT:  I understand, you keep coming back to

1    it, but there are a lot of other drugs.

2            MR. MONTGOMERY:  Well, they ought to identify

3    them.

4            THE COURT:  I thought they did.

5            MR. MONTGOMERY:  Because I'm not sure that there

6    is a single additional drug in their list that is a Medicare

7    drug.  So I take your point, your Honor, that they ought to

8    tailor this complaint; they ought to do the work of going

9    through and actually tailoring it to the rulings that we've

10   discussed in our briefs.

11           THE COURT:  Well, but they want to preserve

12   things.  Maybe what I should just do is have it briefed that

13   way, I mean, in terms of -- because I don't know that you're

14   going to win a total knock-out punch on the kind of drugs

15   that I've never looked at, at least for purposes of a motion

16   to dismiss.

17           MR. MONTGOMERY:  Yes, although, remember, there is

18   another way of looking at it, and the other way of looking

19   at it I think is where you started, which is, there is

20   something fundamentally wrong, while we're in our eighth

21   year of AWP litigation, for Arizona to be raising its hand

22   for the first time.  And I should say, they're only raising

23   their hand because we filed a motion to dismiss.  They have

24   been sitting in the weeds.  And I went back the other day

25   and looked at the transcripts of hearings that you held,

1    your Honor, in 2005 and 2006 in which state AGs, not

2    represented by Mr. Berman but state AG's, Pennsylvania,

3    Iowa, Illinois, and others, raised questions about the

4    effect of your class certification ruling and what it was

5    going to mean for them.  And you issued an order in Case

6    Management Order No. 10 that said, to the extent that there

7    were settlements, that the plaintiffs had to give notice to

8    state AGs.  Mr. Berman stood here and twice said, "I assure

9    you, your Honor, if there are ever settlements, I will make

10   sure that the AGs are invited to the table."

11           Now, the Arizona AG I suppose you could say was

12   always on notice that these settlement discussions were

13   under way, that the trials were under way, that you were

14   making rulings because, of course, Mr. Berman was here for

15   all of it.  But whether or not you go that far, you

16   recognized that --

17           THE COURT:  Well, when you were trying to settle

18   these cases, I mean, I can't remember all the different

19   companies and all the different iterations, but were you

20   aware that -- well, at least since 2006 you were aware that

21   Arizona had filed this thing.

22           MR. MONTGOMERY:  We were aware that Arizona had

23   filed, correct, but it wasn't our obligation to figure out

24   or any defendant's obligation to figure out whether Arizona

25   was serious, whether they intended to press this case or

1   not.  It was Mr. Berman's obligation to bring them to the

2   table.  So that when various parties have trotted in here

3   and you've gone through this very complicated settlement

4   process and made other rulings, you know, Arizona was, you

5   know, nowhere around that any defendant was aware.

6          So I think we were all entitled to assume that

7   Arizona was satisfied because Arizona's case is

8   sui generis.  It is the only one of these state AG cases

9   that is a mirror image of the MDL class action.  Every

10  single other state AG case focuses principally or

11  exclusively on Medicaid.  So we're talking about something

12  that none of us have ever seen.  And that's why the motion

13  to dismiss we presented to you is so unusual, it's why it's

14  so complicated, because we have to march through the history

15  of these cases seeking relief --

16         THE COURT:  None of the other state AG cases are

17  seeking civil penalties for each of the fraudulent claims

18  that are being settled?

19         MR. MONTGOMERY:  I can't -- well, not that --

20         MS. BRECKENRIDGE:  I can address that.  I

21  represent two other states, Nevada and Montana, and in both

22  of those cases, in which many of these defendants are

23  involved, we are seeking civil penalties.  I believe that

24  there are three or five other states --

25         THE COURT:  What happened to those cases?

1          MS. BRECKENRIDGE:  You sent them back to their

2     home courts, and we're pursuing them there.  We're actually

3     going to be in front of Judge Molloy next week in Montana.

4          THE COURT:  I haven't gotten a hate e-mail yet

5     from him, so maybe --

6          MS. BRECKENRIDGE:  We filed some status reports,

7     but we haven't been in front of him.  But I would like to

8     address some of these points.

9          MR. MONTGOMERY:  But just one cleanup point, which

10     is that this is the only case that I'm aware of that is

11     seeking cleanup civil penalties for Medicare in the private

12     market after all we have been through in the last seven plus

13     years.

14          THE COURT:  Is that true?

15          MR. MONTGOMERY:  That's just fundamentally wrong

16     here, your Honor.

17          MS. BRECKENRIDGE:  I think that the reason why

18     that may seem to be the case is because of the point we are

19     at in this case procedurally.  It just so happens that sort

20     of in the aftermath of the settlements, sort of at the

21     middle to end of last year, these motions to dismiss were

22     filed.  Prior to that, there weren't any settlements.  At

23     least in the other cases that would have affected the

24     claims, at least in the other cases I am involved in, the

25     issue just hasn't come up, but we haven't done any extensive

1    briefing on it.

2           THE COURT:  Well, here's my sense -- and if you

3    could bring it back -- it feels wrong to me.  I'm going to

4    call the mediator, actually, and find out whether he's

5    understood that this is part of it.  I don't have any

6    problem at all with a placeholder, and maybe that's what it

7    was meant to be, if the settlements fall apart.  And I

8    actually don't have a problem with the request for

9    injunctive relief.  And I've already dealt with Iowa,

10   Massachusetts, and I can remember, several others dealing

11   with their Medicaid programs.  And, of course, I have the

12   McKesson suit.  But this is -- I just feel -- I looked at

13   this and I said, I thought this was behind us, or I thought

14   this was going to be part of the national class action that

15   I sort of mucked through these millions of laws on.  I

16   didn't understand that there's the same lawyer looking for

17   duplicative relief.  That's my concern.

18          MS. BRECKENRIDGE:  Well, it is the same lawyer,

19   but it's a different state, and there are other states

20   seeking civil penalties as well.

21          THE COURT:  But the national class action I think

22   includes Arizona, doesn't it?

23          MS. BRECKENRIDGE:  The national class action, the

24   consumers?

25          THE COURT:  Yes, the one that I stayed.

0540e980-a097-47ef-a293-74853b9b734e

1          MS. HARRIS:  It does include Class 2, your Honor.

2          THE COURT:  Yes.  I mean, it does.  I mean, I --

3          MS. BRECKENRIDGE:  But, for instance, your Honor,

4    the argument was made here that it was incumbent upon

5    Mr. Berman, quote/unquote, to "bring Arizona to the table,"

6    and it wasn't incumbent upon these defendants to settle

7    these claims.  This case has been on file since December of

8    2005.

9          THE COURT:  I know, but, listen, I'm trying to

10   bring some closure to these suits.  I'm very much hoping

11   that the First Circuit decision will help clarify things:

12   Either this case is in a wastebasket, and you can all go

13   home after paying for your kids' college education, or it's

14   very alive and well, and I'm hoping it will settle.  If not,

15   I'm here to do the -- I'll certify the national class

16   action, and it will go up again.  But what is my nightmare

17   is that these cases keep coming in, and to the extent

18   it's -- I don't want to be surprised by them after a decade

19   of litigation.  That's what I felt surprised by last night.

20          Now, I'm not going to make a legal ruling on that,

21   but I do think it adds a certain trust level, the "trust"

22   word, to the settlement discussions, if that's sort of like,

23   won't they all fall apart if they think all these AG things

24   aren't going to be resolved?  Civil penalties for every

25   third-party payor transaction?

1          MS. BRECKENRIDGE:  Well, not every Attorney

2    General has filed a case.  The defendants are on these

3    cases.  We have been in contact with the defendants.  I

4    object to the characterization, and I'm not going to nitpick

5    here, but there were some delays on their side that were

6    inexcusable that I won't embarrass them by.  We filed a

7    motion in July that's still pending, July, 2008, or June,

8    2008.

9          THE COURT:  On what?

10          MS. BRECKENRIDGE:  On discovery, the fact that the

11    state has this tremendous burdensome --

12          THE COURT:  You filed what, a motion to compel?

13          MS. BRECKENRIDGE:  I styled it as a motion for

14    protective order and to limit discovery, I believe.

15          THE COURT:  Well, they should file an opposition

16    to it.

17          MS. BRECKENRIDGE:  They did file an opposition to

18    it --

19          THE COURT:  And is it pending in front of

20    Judge Bowler?

21          MS. BRECKENRIDGE:  -- but it's not briefed,

22    nothing --

23          MR. MONTGOMERY:  We don't want any discovery, your

24    Honor.

25          THE COURT:  I understand.

1      MS. BRECKENRIDGE:  It's not as if nothing has

2  been going on --

3      THE COURT:  All right, so let me back up.  There

4  seems to be a potential viable claim if the spreads are

5  alleged -- if they're not, I'm not touching them -- with

6  respect to some drugs.  Do you know whether they're

7  self-administered drugs?

8      MS. BRECKENRIDGE:  There are self-administered

9  drugs.

10      THE COURT:  Where the spread was alleged?

11      MS. BRECKENRIDGE:  Yes.  Well, I believe so.  I

12  would have to go back and confirm.

13      THE COURT:  All right, so assume for a minute that

14  there's some self-administered.  So tell me what the claim

15  is.  Do you know for a fact whether any of the

16  self-administered drugs, whether they be branded or generic,

17  whether in fact the state paid for them -- actually, it's

18  not even the state.  It's --

19      MR. MONTGOMERY:  It's not the state.

20      THE COURT:  It's third-party payors, I guess --

21  whether any third-party payors actually paid for them based

22  on AWP?

23      MS. BRECKENRIDGE:  Yes.  We did prefiling research

24  on sales of the drugs in the state.

25      THE COURT:  So wait.  So you actually have

1    information that some of the third-party payors paid based

2    on AWP for the self-administered drugs?

3              MS. BRECKENRIDGE:  Yes.

4              THE COURT:  And you must have looked this up

5    because if you're going to do civil penalties, you have to

6    know how many third-party payors there are in the state.

7              MS. BRECKENRIDGE:  I do not know that information,

8    but I could find it out.

9              THE COURT:  Okay.  So I'm just trying to, you

10   know, under basic pleadings.  So for every single one of

11   these drugs, you have at least one third-party payor who

12   paid based on AWP, rather than MAC or FUL or --

13             MS. BRECKENRIDGE:  I should clarify, your Honor.

14   I mean, we have just recently sort of, I guess, conceded in

15   connection with the pleadings here that we are not -- and

16   part of what has come out in the MDL, Arizona is very

17   realistic.  I don't want to say for now one appendix that is

18   so voluminous, I can't stand here and make an outright

19   representation that I might have to come back and modify.  I

20   don't want to say that without having looked at the data

21   myself.  But we can go back and remodel the appendix,

22   provide the information you've asked for, and file an

23   amended complaint, or at least an amended appendix, on that

24   basis.

25             THE COURT:  I don't want to start the whole --

1    it's been a 2006 case.  All I want is some representation

2    that for every drug for which a spread has been alleged,

3    that you think at least one third-party payor has paid the

4    AWP rather than the actual market price and that those were

5    mega-spread cases.  Are all the ones that are actually

6    listed in the body of the complaint ones where the spread is

7    over 30 percent?

8            MS. BRECKENRIDGE:  I believe the defendants have

9    identified eight that they say do not meet the 30 percent

10   threshold.

11           THE COURT:  Well, let me ask, how do you suggest I

12   go about this?  It's a massive complaint that's undoable by

13   me or a federal judge in Arizona.  It's undoable, so --

14           MS. BRECKENRIDGE:  Well, I did come prepared to

15   talk about that a little bit, and the first thing I'll

16   say -- and this isn't just fortuitous -- the state of

17   Arizona, as I think we've demonstrated already by dismissing

18   two defendants with unique circumstances, we've remodeled

19   our complaint once based on complaints by the defendants

20   that they thought that we had left language in there that

21   would allow us to bring claims on behalf of access to the

22   state Medicaid program.  They complained.  We asked them for

23   their specific points that they didn't like in the

24   complaint, and, frankly, we took it out.  We have indicated

25   that we -- we see the map of how these cases are unfolding.

0540e980-a097-47ef-a293-74853b9b734e

1    We are not going to pursue claims that are not based on AWP.

2            My suggestion is that the state be given a chance

3    to go back, take into account the inclination that you've

4    stated, that if we cannot demonstrate -- and I think what

5    you said is that if we can't demonstrate the spread for the

6    drug, you don't want to see it.

7            THE COURT:  The thing that's frustrating me is,

8    I've been saying this -- I said it in the New York cases,

9    I've said it in the Massachusetts cases, I've said it --

10   so we're three years into this litigation.  Why hasn't it

11   been done yet?

12           MS. BRECKENRIDGE:  Well, I'll give you a very

13   practical response, and it's also in our brief.  When we

14   filed the Montana and Nevada cases, we had an appendix just

15   like this one, and it was acceptable, and it did pass the

16   motion to dismiss stage.  And in that instance, the Court

17   said that because it was a state bringing the claims, the

18   states did not have to identify the individual payors, we

19   didn't have to do that.

20           THE COURT:  I'm not so worried about the

21   individual payors.  I don't remember because it was so long

22   ago and I've had a lot of cases in between.  There weren't

23   allegations, or at least it wasn't pressed in front of me,

24   with respect to what the spread was?

25           MS. BRECKENRIDGE:  We did not provide that

1    information in those days.

2            THE COURT:  You didn't provide a spread on all

3    of -- I don't remember.  I don't remember if it was pressed

4    at that time or whether people just pressed the big issues.

5    I just don't remember.  But since then, I've certainly had a

6    lot of cases.  Since then, I know New York has, that's been

7    a big issue, and I can't remember, there's several other

8    cases where I've said:  You can't just list thousands of

9    drugs.  You have to do your research before you come in

10   here.  I think, was it New York?  Were there any others?

11   You all know my case.  I don't even remember.

12           MS. HARRIS:  Iowa.

13           MS. BRECKENRIDGE:  Iowa and New York, I believe.

14           THE COURT:  So I need to look at this.  But at

15   least as we sit here right now, we're going to do the

16   following:  There should be -- when we go forward, we're not

17   going to do -- we maybe will go forward on self-administered

18   drugs, but we're not going to go forward on anything that's

19   been litigated, anything that's on appeal, anything that's

20   less than 30 percent of the spread, and anything where there

21   hasn't been a spread alleged.  I need to go look and see

22   what you did allege company by company.  There's going to be

23   something left, likely, but then there's going to be some

24   expectation that you either prove up or throw out anything

25   where you can't show that anyone actually purchased at that

0540e980-a097-47ef-a293-74853b9b734e

1    amount.  If there's a spread alleged and it's over the

2    30 percent, you've got to do that.

3           Now, this is on a slow boat.  McKesson is on my

4    fast boat.  I don't remember if any of you are part of that.

5    That's on a faster boat.  I have stayed the class action.

6    The Mylan case is still there somewhere.  I don't know what

7    kind of boat that's on.  But this is on my back burner

8    because I'm hoping, before this gets into full speed, that

9    at some point I get a ruling from the First Circuit, which

10   is what I really want to happen because this will either go

11   away or there's a better chance of settlement, I've got to

12   assume.

13          Now, let me just go off the record and ask this

14   for one minute here.

15          (Discussion off the record.)

16          THE COURT:  Can we go back on for one minute.

17   That's what I was grappling with, whether or not there's a

18   one-year statute of limitations or a multiple-year.  And at

19   least with respect to the disgorgement and the restitution,

20   et cetera, it would have to be a one-year, right, citizen by

21   citizen and third party?  And you're just saying, for the

22   civil penalties, it's really the state?  Is that what --

23          MS. BRECKENRIDGE:  I haven't really looked at the

24   issue for the consumers, but the state, there is no statute

25   of limitations that applies to the state.  I haven't looked

1    at --

2              THE COURT:  So I know that's the debate, but let's

3    assume for a minute it cuts out roughly like that, you know,

4    you're saying the state gets to go back to the beginning of

5    time?  There's no statute of limitations?

6              MS. BRECKENRIDGE:  That is what the law is in

7    Arizona.

8              MR. MONTGOMERY:  Well, and, your Honor, let me

9    just state even further how outrageous we think the penalty

10   claim is, for example.  Their position, if you read it,

11   doesn't have anything to do with the timing of the filing of

12   their complaint.  Mr. Berman could go or Hagens Berman could

13   go in the business of simply piggybacking on MDL settlements

14   all over the country for any state.  He could do it in

15   securities cases, he could do it in drug cases, with respect

16   to a state that has no statute of limitations as to

17   sovereign claims, and there are quite a few states.

18             THE COURT:  Well, what if they -- maybe they can.

19   I mean, there's nothing I can do about that, but --

20             MR. MONTGOMERY:  Well, we think there is something

21   you can do about it.  We think Baldwin United is the pathway

22   to do something about it, Bridgestone/Firestone, all cases

23   that have dealt with the integrity and manageability of

24   large MDL proceedings and have concluded the Federal Court

25   does have the power to stop state private class actions; in

1  Baldwin United, to stop state AGs from bringing actions

2  which interfere with ongoing MDL proceedings.  So you

3  can't -- I mean, so there is -- the Second Circuit was very

4  clear that that authority is there.

5            THE COURT:  And I take it Arizona isn't suing at

6  all on behalf of its Medicaid program?

7            MS. BRECKENRIDGE:  It is not, your Honor.  I would

8  like to respond to the Baldwin United argument, though.

9            THE COURT:  Well, as you can tell, I find this

10  troubling, and I have -- I want to just make it clear -- no

11  problems with your putting a placeholder for the state if

12  all the settlements and the rest, the class actions don't

13  work out for one reason or another.  What I have a problem

14  with is, basically all that could be worked out, and then

15  you want a penalty going back to the beginning of time for

16  every transaction.

17            MS. BRECKENRIDGE:  And I will say that this case

18  has been on file, this case has been on file, and the

19  Attorney General did bring restitution claims on behalf of

20  the citizens of Arizona, as the Arizona Consumer Fraud Act

21  allows them to.  There's only one cause of action here; it

22  is the Arizona Consumer Fraud Act.  And the Fraud Act is

23  also very explicit as to the Attorney General's ability to

24  seek penalties, which will be paid to the state and then

25  held in a separate fund --

0540e980-a097-47ef-a293-74853b9b734e

1       THE COURT:  No, but answer me point-blank about

2  this.  Assume for a minute we give through settlement,

3  trial, or class action trial, Arizona full recovery,

4  sometimes treble recovery to the consumers -- I think I've

5  given treble in several suits already -- to the consumers

6  and the third-party payors full recovery, are you still

7  planning on going forward and asking civil penalty by civil

8  penalty for each third-party payor and consumer?

9       MS. BRECKENRIDGE:  At this time I'd have to say

10  "yes," but as I said, we're going to be responsive to what

11  happens in the settlements and in our discussions with

12  defendants.  Baldwin United does not stand --

13       THE COURT:  Have you asked the Attorney General

14  that question?

15       MS. BRECKENRIDGE:  Yes.  I have been in contact

16  with the Attorney General's office quite closely in

17  connection with these --

18       THE COURT:  So even if I give treble damages to

19  all the injured people -- I'm not saying I am -- indeed the

20  whole case would get --

21       MS. BRECKENRIDGE:  Well, I haven't asked that

22  question but --

23       THE COURT:  I understand the Attorney Generals

24  position, if for some reason the class action gets thrown

25  out, or there may be a different decision by the First

1   Circuit on something, so I understand that.  It's perfectly

2   valid to keep a placeholder there.  But what's worrying me

3   is, I will do everything in my power to provide restitution

4   to people, and maybe treble damages, and then I'm still

5   going to be with a suit looking at thousands and thousands

6   and thousands of drugs and claims, each one seeking -- what

7   did you say it was per false claim?

8           MS. BRECKENRIDGE:  The penalty per violation is up

9   to $10,000.

10          THE COURT:  Is it required, or is it equitable?

11          MS. BRECKENRIDGE:  It's, at the discretion of the

12  court, equitable.

13          THE COURT:  Just I've never seen that in this

14  case.  Maybe it's out there.  Maybe I've missed it.  There's

15  been a lot going on.  I'm worried about it.

16          So maybe you can jump into the settlement process

17  here.  As I understand it, the national class action is

18  dead, right, because I've stayed it?  There's no

19  discussions, no nothing, right?  We're going to wait for the

20  First Circuit.  Is anyone involved in that?

21          MS. HARRIS:  Yes, right now you're right, your

22  honor; it's going to stay in place, no discussions are going

23  on.

24          THE COURT:  Right, so maybe what the right answer

25  is -- and I'd ask you to go talk about it back at the

1   office -- is to stay this litigation and just wait and see

2   what happens, and then we can ask the Attorney General what

3   he wants to do.  That would be one way of handling this.  Or

4   dismiss without prejudice if in fact it's true that -- well,

5   you'd better not do that because there's statute of

6   limitations issues, but -- because that's what's really

7   worrying me.  I mean, I can go trek through all the

8   little -- would that solve your problem, is we just put it

9   on a stay and figure out what to do?

10          MR. MONTGOMERY:  Your Honor, it certainly would

11  solve our problem for now.  You know, we have briefed most

12  of these issues.  We'd be glad to talk about them on a more

13  complete record.  You're right that there are developments

14  to come, both in the settlements and from the First Circuit,

15  and we could reassess.  It of course would make sense in the

16  meantime for Arizona to get its act together on the scope of

17  what they really maintain is alive.

18          THE COURT:  So let me know, what makes sense, a

19  week or two for you to think about whether or not the case

20  should just go on stay status pending the First Circuit

21  decision?  That's what I did on the national class action.

22  If you want to move forward with it, fine, just tell me

23  that, fine.  But I want you to sort of make a demand and see

24  if you can get into the settlement discussions.  There are

25  settlement discussions going on with the states, and

1    apparently you're not part of it.  Okay?

2           So let me know within a week what you want to do

3    with all of that.  And if you don't want a stay it and

4    settlement looks unlikely, then I'll rule.  But what I will

5    individually do, as a matter of judicial case management

6    discretion, is stay all the stuff that's going to be

7    directly impacted, either by the settlement or the First

8    Circuit opinion.

9           MS. BRECKENRIDGE:  And we would like the

10   opportunity to revise our complaint to include the

11   information that your Honor mentioned earlier.

12          THE COURT:  Maybe, maybe.  Let me look at it.  I

13   want to read the complaint now.  How long is it?

14          MS. BRECKENRIDGE:  Long.

15          MR. MONTGOMERY:  Long.

16          THE COURT:  Let me see it.

17          MS. BRECKENRIDGE:  That's not double-sided.

18          THE COURT:  Is that with or without the appendix?

19          MR. MONTGOMERY:  This is the complaint, and this

20   is the appendix.

21          THE COURT:  It's not as bad as some of my others.

22   You should see the New York appendix, or the one I misread.

23   And I will say that we -- let me just ask you off the

24   record.

25          (Discussion off the record.)

0540e980-a097-47ef-a293-74853b9b734e

Page 37

1          THE CLERK:  Court is in recess.

2          (Adjourned, 4:35 p.m.)

3

4                    C E R T I F I C A T E

5

6

   UNITED STATES DISTRICT COURT )
7  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
8

9

10          I, Lee A. Marzilli, Official Federal Court

11  Reporter, do hereby certify that the foregoing transcript,

12  Pages 1 through 37 inclusive, was recorded by me

13  stenographically at the time and place aforesaid in Civil

14  Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

15  Average Wholesale Price Litigation, and thereafter by me

16  reduced to typewriting and is a true and accurate record of

17  the proceedings.

18          In witness whereof I have hereunto set my hand

19  this 9th day of February, 2009.

20

21

22

23

24          /s/ Lee A. Marzilli
                                                    _____
25          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER

0540e980-a097-47ef-a293-74853b9b734e