# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et al.* | ) ) |
| *v.* | ) |
| *Abbott Laboratories, et al.* | ) ) ) |

MDL NO. 1456
Civil Action No. 01-12257-PBS
Subcategory Case No: 03-10643-PBS

Judge Patti B. Saris

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SMITHKLINE BEECHAM CORPORATION, D/B/A GLAXOSMITHKLINE'S (GSK'S) MOTION FOR PARTIAL SUMMARY JUDGEMENT**

## INTRODUCTION

GSK has moved for partial summary judgment with respect to 208 GSK NDCs in Exhibit B to Plaintiffs' Revised First Amended Consolidated Complaint (hereinafter "RFACC Ex. B"), which GSK says meet the Court's "WAC List Price" test set forth in the Court's Findings of Fact and Conclusions of Law from the Track One trial. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F.Supp.2d 20, 105 (D. Mass. 2007) (hereinafter "*Track One Opinion*"). GSK argues that "the undisputed evidence clearly shows" that 208 of the 262 GSK NDCs at issue in this case[1] pass the WAC List Price test and submits

---

[1] GSK implies that only those NDCs listed in RFACC Ex. B are at issue. Plaintiffs disagree. If a plaintiff adequately has pled a spread for a particular drug, all NDCs for that drug are in the case. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 WL 1051642, at *15 (D. Mass. Apr. 2, 2007) ("[T]he Court concludes that the plaintiffs have satisfied Rule 9(b) with respect to those drugs (specifically identified in the complaint as (2) purchased by the counties in any year subject to this lawsuit along with (3) an allegedly fraudulent AWP calculated on a good faith basis, together with a spread. . . . Thus for those drugs listed in the Exhibits identified above, plaintiffs have complied with Rule 9(b)."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 498 F. Supp. 2d 402, 405 (D. Mass. 2007) ("The Court **ALLOWS** defendants' motion to dismiss all new drugs not listed in the

the affidavit of its expert, Eric M. Gaier, Ph.D.   GSK says that given Dr. Gaier's conclusions, all of plaintiffs' claims for these 208 NDCs should be dismissed.   *See* Defendant SmithKline Beecham Corporation, D/B/A GlaxoSmithKline's ("GSK's") Memorandum of Law in Support of its Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Mem.") at 1-2, *et seq.*, and Affidavit of Eric M. Gaier, Ph.D., sworn to November 24, 2008 (hereinafter "Gaier Aff.") at ¶7.

Respectfully, GSK is overstating both the reach of the WAC test and GSK's satisfaction of it.   The parties agree that the Track One trial included the holding that "if more than 50% of all sales were made at or about the list price [WAC], the list price will not be deemed fictitious." *Track One Opinion*, 491 F.Supp. 2d at 105.  However, plaintiffs do not agree that GSK (or any defendant's) liability for all claims in the New York Counties' case turns on this test alone.  The "WAC List Price Test" was merely one part of the second factor in a three-factor analysis the Court conducted in determining liability in a non-Medicaid context for unfair or deceptive conduct under Massachusetts law, specifically M.G.L.c.93A.  *Id.* at 101.   GSK's does not argue satisfaction of the other two factors, nor could it given the instant record and plaintiffs' case. One factor  concerned spreads over the 30% yardstick (a yardstick based on the expectations of the Track One Private Third Party Payor Class- not Medicaid plaintiffs- there is no record before this Court as to the expectations of the instant plaintiffs or the New York Medicaid program). *Id.*  at 102. The other factor concerned "a proactive scheme to market the spreads to doctors" (a class of trade irrelevant entirely for plaintiffs' case). *Id.*  Given this, and given that the Court expressly

---

initial Consolidated Complaint . . . .  Defendants' Motion is **DENIED** with respect to new NDCs and spreads pleaded in the FACC for the remaining drugs.").

held that "no single factor [was] necessarily determinative" in its analysis, GSK's motion to hinge all liability on the WAC Test alone is a baseless overreach that must fail.[2]

Even if GSK's liability for any or all claims in the instant matter turned only on satisfaction of the WAC List Price test, and it does not, GSK's motion must be denied because Dr. Gaier simply did not do the work that both he and GSK say must be done to determine whether a particular NDC satisfies the WAC List Price Test.

Dr. Gaier described his methodology for determining which GSK NDCs satisfied the WAC List Price Test as follows:

> Using the GSK sales and rebate data, I calculate for each customer in every class of trade, by NDC and year, quantity-weighted average transaction prices, conservatively *including all discounts, chargebacks, and rebates paid to those customers*.  Specifically, I include in my analysis all of Plaintiffs' alleged Medicaid classes of trade as well as all others…and exclude only distributions to charities, samples and returns ….  *I include all credits, discounts, chargebacks, and provider-based rebates in my calculation* . . .   I then compare the average transaction price to the average WAC price for each customer, by NDC and year.

Gaier Aff. at ¶6.  (emphasis added).

GSK summarized the process in a similar manner: Dr. Gaier "(a) reduced each sale transaction price by 2% based on an assumption that a 2% prompt pay discount was paid for all of GSK's direct sales to wholesalers or providers, and (b) calculated transaction prices by taking into account all discounts and rebates given to customers and all chargebacks credited as a result of contracts with customers."  GSK Mem. at 11.

---

[2] In what is perhaps a tacit acknowledgement that the WAC test alone is not enough, GSK asked its expert to also calculate spreads for the GSK NDCs in RFACC Exh. B.  Gaier Aff. at ¶8.  Dr. Gaier does this without any consideration of GSK ASPs (which were used by the parties in the Track One Trial, *See* Track One Opinion, 491 F.Supp. 2d at 102 *et seq., e.g.*) or the net sales prices that are the primary focus of his affidavit.  Instead, he calculates spreads based on wholesaler data and GSK's published AWPs.  Gaier Aff. at ¶8.  The analysis is meaningless entirely.  Gaier himself explained at his deposition that the Court's "spread testing" relies on ASPs using manufacturer data.  Deposition of Eric M. Gaier, Ph.D., January 14, 2009 ("Gaier Dep.") at 26:1-7 (attached as Exhibit A to the Affidavit of Joanne M. Cicala, sworn to February 11, 2009 ("Cicala Aff.").  Perhaps that is why GSK expressly does *not* move for summary judgment based on Gaier's spreads. (GSK Mem. at 13, n. 16; 17, n.19).  On a full record, plaintiffs will present the Court with a proper spread analysis based on GSK's ASPs so that a complete evaluation of GSK's liability can be determined.

Plaintiffs do not necessarily disagree with either GSK or Dr. Gaier's description of the work that can be done in order to determine if a particular NDC passes the Court's WAC List Price Test.  The problem with GSK's motion, however, is Dr. Gaier did not do that work.  Dr. Gaier adopted a methodology that unnecessarily separated GSK's sales to its customers into direct and indirect categories, thereby permitting him to grossly inflate GSK's actual sales prices to its largest direct customers, the wholesalers.  *See* Affidavit of Harris L. Devor, sworn to February 11, 2009 ("Devor Aff.") at ¶11.  Dr. Gaier then compounded his error by excluding over $4 billion in rebates paid by GSK (3.96% of GSK's total direct sales 1997-2005) to its customers who purchase and sell large quantities of drugs (PBMs with mail order pharmacies, IPAs, GPOs, Nursing Home Providers, Long Term Care Pharmacies, Hospitals, Retailer-Wholesalers and Retailers) from his analysis thereby permitting him to also grossly inflate GSK's actual sales prices to these customers.  *Id.* at ¶¶17, 23.  In addition, Dr. Gaier did not "reduce each sale transaction price by 2% based on an assumption that a 2% prompt pay discount was paid for all of GSK's direct sales to wholesaler or providers" as he said. GSK Mem. at 11.  Dr. Gaier only accounted for the 2% prompt pay discount when he calculated his inflated wholesaler price.   Devor Aff. at ¶14.  The 2% prompt pay discount was completely ignored by Dr. Gaier in the context of the indirect sales analysis.  *Id.*

 The net effect of Dr. Gaier's choices is that GSK has inflated its true net sales price for the 262 NDCs listed in RFACC Exhibit B and, therefore, its conclusion that 208 of those NDCs "pass" the WAC List Price Test is simply wrong.

The more accurate way to conduct the WAC List Price Test is to first calculate GSK's sales to its customers and then account for all relevant rebates and/or chargebacks paid to same.  Devor Aff. at ¶11.  Doing this work properly is not difficult.  Indeed, the correct method is far

simpler than what Dr. Gaier employed through his bifurcated and flawed approach.  But the difference in results is dramatic and perhaps that is why Dr. Gaier chose more tortured road.

For example, if GSK's sales to wholesaler are not bifurcated, even BEFORE accounting for all or any portion of the $4.3 billion in rebates GSK paid its customers from 1997-2005 on account of drug purchases that Gaier ignored, the "failing"[3] NDC count increases from 54 to 149.  *Id*. at ¶13 and Exh. B thereto.  When rebates are properly accounted for, it is indisputable that the failing NDC count will increase further given the volume of rebates at issue.  *Id* at ¶23.  On the instant record, it cannot be determined precisely how much further the passing NDC count would drop but that is of no moment.  Plaintiffs are conducting the necessary additional discovery, as is their right at this stage of the litigation, to develop the record completely.  The point is that, even if the WAC List Price test alone were dispositive of all liability for all claims, and it is not, GSK's motion cannot be granted as to the 208 NDCs.[4]

## RESPONSE TO STATEMENT OF UNDISPUTED FACT

GSK's "Statement of Undisputed Material Facts" (hereinafter "GSK's Statement") contains statements that are largely irrelevant to the instant motion and are, in any event, disputed.  *See* Plaintiffs' Response to GSK's Statement, filed together herewith and incorporated herein. The relevant facts for purposes of this opposition are:

---

[3] An NDC "fails" the WAC List Price Test if more than 50% of its sales were not within 5% of WAC.  *Track One Opinion*, 491 F.Supp. 2d at 102.

[4] GSK also sought summary judgment as to two GSK NDCs (Zofran 2 mg/ml vial (NDC 00017-3044200), Amoxil 500 mg capsules (NDC 00029600732)) that appeared in RFACC Ex. B.   Had GSK properly conferred with plaintiffs prior to filing its motion, as required by Local Rule 7.1, plaintiffs would have agreed that these two NDCs were listed in RFACC Ex. B inadvertently, that plaintiffs were not pursuing claims for these NDCs and that there was no reason whatsoever to burden the Court with this non-issue. Plaintiffs and GSK now have conferred on this subject and have agreed to stipulate that plaintiffs are not pursuing any claims for these two NDCs in this matter. The parties will file such stipulation presently.  This prong of GSK's motion is therefore moot and deemed withdrawn.

Dr. Gaier elected, in his analysis, to compute prices for wholesalers based not on all sales to wholesalers but rather on the smaller set of sales to wholesalers for which chargebacks did not occur.  Devor Aff. at ¶11.  The result of this selective application was the inflation of GSK's net sales price to wholesalers as computed by Dr. Gaier and, thereby, an inflation of the number of NDCs passing the "WAC List Price" test he was attempting to replicate.  *Id*. and Exhs. B and C thereto.

GSK paid $2.7 billion in rebates to PBMs from 1997-2005. Devor Aff. at ¶25 and Exh. I and D.1, D.2,, and D.3 thereto.  Dr. Gaier did not include PBM rebates in his calculations, other than the nominal $2,000 rebate detailed in the Devor affidavit.  Devor Aff. at ¶25 and Exh. E.3 thereto.  Dr Gaier agrees that rebates paid to PBMs in connection with their mail order or "sales channel" operations had to be included in any calculation of an accurate GSK net sales price. Gaier Dep. at 53:7-54:15.  Given that no other PBM rebates appear in the GSK data, and none of the $2.7 billion in rebates referenced here were included, it cannot be disputed that some portion of these rebates are attributable to PBM mail order operations.

GSK paid $147 million in rebates to GPOs. Devor Aff. at ¶ 28 and Exh. I thereto.  GPOs purchase and sell GSK products. Cicala Aff. Exh. B.  Dr. Gaier agrees that rebates paid to entities that purchase and sell GSK products have to be included in any calculation of an accurate GSK net sales price. Gaier Dep. at 53:7-54:15.  Dr. Gaier did not include the majority of GPO rebates in his calculations. Devor Aff. at ¶29 and Exhs. G.1 and G.2 thereto.

GSK paid $1.4 billion in rebates to its Institutional Pharmacy (IPA) Customers.  Devor Aff. at ¶26 and Exh. I thereto.  IPA customers purchase and sell GSK products.  Cicala Aff., Exhs. B, C.  *See also,*  Affidavit of Eric M. Gaier, Ph.D., submitted as Direct Testimony in Case-in-Chief of Track 1 Defendants in the Trial of Class 2 and Class 3 Claims, sworn to November

10, 2006 at ¶¶ 32-33 [Dkt. No. 3343] (hereinafter "Gaier Aff. Track 1").  Dr. Gaier agrees that rebates paid to entities that purchase and sell GSK products have to be included in any calculation of an accurate GSK net sales price.  Gaier Dep. at 53:7-54:15.  Dr. Gaier did not include any IPA rebates in his calculations. Devor Aff. at ¶26.

GSK paid $52.7 million in rebates to customers in the following classes of trade: Retailer-Wholesalers, Nursing Homes, Hospitals, Long Term Care Facilities and Staff Model HMOs.  Devor Aff. at ¶31 and Exh. I thereto.  Each of these classes of trade purchase and sell GSK products. Cicala Aff. Exh. B.  Dr. Gaier testified that GSK's rebates to such customers in respect of their purchases should have been included in any calculation of an accurate GSK net sales price.  Gaier Dep. at 53:7-54:15.  Dr. Gaier did not include the majority of rebates to these classes of trade in his calculations.  See Devor Aff. at ¶31 and Exh. I, H.1 and H.2 thereto.

Dr. Gaier did not "reduce each sale transaction price by 2% based on an assumption that a 2% prompt pay discount was paid for all of GSK's direct sales to wholesaler or providers" as he said. GSK Mem. at 11.  Dr. Gaier only accounted for the 2% prompt pay discount when he calculated his inflated wholesaler price. Devor Aff. at ¶14.  The 2% prompt pay discount was completely ignored by Dr. Gaier in the context of the indirect sales analysis.  *Id*.

## THE GAIER METHOD

### A.  Gaier's General Approach

Dr. Gaier applied the WAC List Price test by calculating an "average [price] for a particular customer for a particular NDC for a particular year".  *See* Gaier Aff. at ¶6; Gaier Dep. at 31:1-9; 45:9-11; 54:19-55:22.  If GSK's net price to a customer for any given NDC was within 5% of the WAC, then all of GSK's sales for that NDC to that customer were considered by Gaier as to be within 5% of WAC.  *See* Gaier Aff. at ¶6 ("If the average transaction price is greater

than 95% of WAC for a customer-NDC-year observation (*i.e.* greater than WAC-5%), I consider the sales for that to be 'at or about WAC . . .'"); Gaier Dep. at 31:1-9; 45:9-11.  Conversely, if GSK's net sales price to a particular customer for any given NDC was not within 5% of the WAC, then none of GSK's sales for that NDC counted as a sale within 5% of WAC.  *See* Gaier Aff. at ¶6; Gaier Dep. at 31:1-9.

### B. Gaier's Treatment of the Wholesaler Data

Dr. Gaier performed the following steps to calculate GSK's net sales price to the wholesalers.  First, Dr. Gaier analyzed all GSK sales to the wholesalers to determine the total units sold and total revenue per wholesaler, per year and per NDC.  Gaier Dep. at 91:11-92:2.  Second, Dr. Gaier examined the sales to all wholesalers and determined the number of units for which GSK paid chargebacks to all wholesalers. *Id.* at 96:11-97:10.  Third, Dr. Gaier subtracted the units for which GSK paid chargebacks to wholesalers (the "Chargeback Units") from the total for each wholesaler sale by prorating total Chargeback Units according to GSKs sales to each wholesaler, and subtracting that prorated number from each wholesaler's sales. *Id* at 97:16-99:1.  Fourth, Dr. Gaier calculated total revenue for each wholesaler's sales for which GSK did not pay chargebacks ("Wholesaler Non-Chargeback Sales").  Devor Aff. at ¶10.   Finally, Dr. Gaier divided this number by total units to get what he represents to be GSK's average sales price per wholesaler.[5]   *Id.*

The problem is that Dr. Gaier's method does not calculate GSK's true sales prices to wholesalers. By excluding from his wholesaler analysis all Wholesaler Chargeback Sales, Gaier concluded that GSK's net sales price to wholesalers was higher than it actually is. *Id.* at ¶11.  By

---

[5] Dr. Gaier performed a similar calculation to calculate GSK's net sales price for direct sales to non-wholesalers, but without gerrymandering non-wholesalers into direct and indirect customers.  Dr. Gaier's calculation of GSK's net sales price to its non-wholesaler direct purchasers is not problematic from plaintiffs' perspective.

treating "Wholesaler Chargeback Sales" separately and packing the wholesaler category with undiscounted sales, Gaier was able to conclude, mistakenly, that the majority of GSK's sales to wholesalers were made at prices at or about WAC.

### C.  Gaier's Treatment of Rebates

Dr. Gaier stated that he intended to include in his net price calculations all rebates paid to entities who purchase and sell drugs (i.e. "providers"), and to exclude rebates paid to those entities who pay for drugs without actually purchasing or selling them (i.e. "payors").  Gaier Dep at 53:7-54:7.  Dr. Gaier divided GSKs rebates into purchase and utilization rebates in an attempt to affect this division, intending to include all purchase rebates (i.e. rebates paid to providers) and all utilization rebates paid to those entities who purchase and sell drugs.[6]  *Id*.  In applying the WAC List Price test, however, and despite the foregoing assertions, Dr. Gaier did not include rebates paid by GSK to the following classes of trade that both purchase and sell GSK drugs: PBM's mail order operations, Institutional Pharmacies ("IPAs"), Nursing Homes, Nursing Home Providers, Long Term Care Providers, Mail Order Pharmacies, Hospitals, Retailer-Wholesalers and Group Purchasing Organizations ("GPOs").  Devor Aff. at ¶¶15, 16, 17 23-32 and Exhibits D.1, D.2, D.3, F.1, F.2, F.3, G.1, G.2, H.1 and H.2 thereto.

Ultimately, Dr. Gaier excluded more than $4 billion in rebates from his computations of net prices to wholesalers and other customers.  *Id*. at ¶23. That amount represented 3.96% of GSK's total direct sales during the relevant timeframe.  *Id*.  Needless to say, in a computation whose threshold resides at 5% from reported WAC prices, there mere fact that excluded rebates

---

[6] Dr. Gaier testified that utilization rebates were made up of two categories:  rebates "not associated with the sale [or purchase] of the product," Gaier Dep. at 51:2-3, and rebates associated with the sale or purchase of the product.  *Id*. at 52-53:22-1.  Dr. Gaier testified that utilization rebates associated with the sale or purchase of a GSK product had to be included in order to calculate an accurate net sales price.  *Id*. at 50:12-14, ("we will parse out the utilization rebates so that we keep only those associated with providers.")

represents an average 3.96% reduction of the gross sales prices immediately calls into question both the feasibility and supportability of Dr. Gaier's findings.  *Id.*

Gaier's analysis did not achieve his intentions because his processing of data contained in the GSK tables was inconsistent therewith    *See* Discussion of Gaier's treatment of data contained in GSK rebate tables in Devor Aff. at ¶¶17-21.

## ARGUMENT

## I.    LEGAL STANDARD

GSK's moving papers accurately state that summary judgment cannot be granted where there are specific facts showing a genuine issue for trial. GSK Mem. at 13 *citing Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).   The specific questions of facts here which require denial of GSK's motion include:

(a) Had Dr. Gaier not unnecessarily bifurcated direct and indirect sales in his analysis, even before accounting for rebates, 149 NDCs (not 54 NDCs, as Dr. Gaier opines) would have failed the WAC List Price Test. *See* Devor Aff. at ¶13, and Exh. B thereto.

(b) How many additional NDCs, beyond the 149, would fail the WAC List Price Test if Dr. Gaier accounted for all rebates paid by GSK to PBM Mail Order customers in connection with the PBMs' purchases of GSK products?  Dr. Gaier testified that he intended to include such rebates in his analysis. *See* Gaier Dep. at 52:10-16 (attached as Exhibit A to the Cicala Aff.). However, Dr. Gaier did not follow his intentions and did not account for these rebates.  Devor Aff. at ¶¶17, 24-25 and Exh. I thereto.

(c) How many additional NDCs, beyond the 149, would fail the WAC List Price Test if Dr. Gaier accounted for all rebates paid by GSK to GPOs in connection with their purchases of

GSK products?  Dr. Gaier testified that rebates associated with the "sales channel" had to be included in a calculation of net sales price. Gaier Dep. at 49:2-10.  Yet, of the $147.7 million in rebates GSK paid to GPOs from 1997-2005, Dr. Gaier included only $196,726 in his net price calculations and completely ignored approximately $147.5 million.  Devor Aff. at ¶¶28-29 and Exhs. G.1 and G.2 thereto.

(d) How many additional NDCs, beyond the 149, would fail the WAC List Price Test if Dr. Gaier accounted for the $1.4 billion in rebates paid by GSK to customers in the IPA class of trade in connection with their purchases of GSK products?  Dr. Gaier testified that rebates associated with the "sales channel" had to be included in any calculation of an accurate net sales price. Gaier Dep. at 49:2-10; 54:1-18.  Yet, GSK's $1.4 billion in rebate payments to IPAs were ignored in Dr. Gaier's net price calculations.  Devor Aff. at ¶¶26-27 and Exh. I thereto.

(e)  How many additional NDCs, beyond the 149, would fail the WAC List Price Test if Dr. Gaier accounted for the rebates paid by GSK to GSK customers in the Retailer-Wholesaler, Hospital, Nursing Home, Nursing Home Provider or Long Term Care classes of trade in connection with their purchases of GSK products?  Dr. Gaier testified that rebates associated with the "sales channel" had to be included in any calculation of an accurate net sales price. *See* Gaier Dep. at 49:2-10; 53:7-54:15, ("whether or not they're a retail pharmacy or a mail order pharmacy or a physician or a clinic or a hospital.  Those would all be included in the utilization-based rebates that are reserved and used in the analysis.").  GSK omitted $52.7 million in rebates to customers in these "sales channel" classes of trade from 1997-2005 from his net price calculations.  Devor Aff. at ¶31.  However, again, these rebates were entirely ignored by Dr. Gaier.  *Id.*

## II.    Gaier's Methodology Inflates GSK's Net Sales Price To Wholesalers

In evaluating GSK's net sales prices to its wholesaler customers, Dr. Gaier did not do what GSK says he did. Specifically, Dr. Gaier neither "(a) reduced each sale transaction price by 2% based on an assumption that a 2% prompt pay discount was paid for all of GSK's direct sales to wholesalers or providers, [nor] (b) calculated transaction prices by taking into account all discounts and rebates given to customers and all chargebacks credited as a result of contracts with customers."   GSK Mem. at 11.   Rather, for no valid reason, Dr. Gaier removed from his analysis of GSK net sales price to its wholesaler customers: (1) ALL transactions for which GSK ultimately paid chargebacks to wholesalers ("Wholesaler Chargeback Sales"); and, (2) the prompt pay discounts paid to wholesaler in connection with those "Wholesaler Chargeback Sales."[7]   Devor Aff. at ¶¶11-13.   This unnecessary and improper choice skewed Gaier's conclusions in GSK's favor.  *See* Devor Aff. at ¶11.

Consider the following for purposes of illustration:

GSK NDC #1 has WAC of $80. GSK sells 100 units to Wholesaler X at the $80 WAC, minus a 2% prompt pay discount for a total of $7840, i.e. $8000-$160.  Wholesaler X sells 51 of the 100 units at WAC ($80). Wholesaler X sells the remaining 49 units at the contract price of $20 and GSK pays Wholesaler X a chargeback in the amount of $60 for each of those 49 units or $2940.  The question is: what is GSK's sales price to Wholesaler X for these 100 units.  Simple math provides the answer: GSK's sales price is ($7840-$2940)/100 or $49.  Since WAC is $80 and 95% of $80 is $76, then 100% of GSK's sales to Wholesaler X at $49 fail the WAC List Price test (i.e. are within 5% of WAC) and no NDCs pass.

---

[7] Dr. Gaier testified at deposition that, "we have to remove the indirect sales [manufacturer-to-wholesaler chargeback payments] from the direct sales database [of wholesaler sales] … otherwise there will be double-counting of a direct sale which also becomes an indirect sale. …." *See* Gaier Dep. at 61:20-62:2 and "We preserve all of the indirect sales [Chargebacks] and net out the indirect sales [chargebacks] against the direct sales [to wholesalers].  So what's lost is the duplication of the direct sales that otherwise become indirect sales." *Id.* at 96:19-22.  In fact, there is no risk of a double count if direct sales and rebates are properly analyzed. Devor Aff. at ¶12.

GSK's view is that when calculating GSK's sales price to Wholesaler X for these same 100 units, one must first remove entirely any consideration of the 49 Wholesaler Chargeback Sales and instead consider only the sales price for the 51 Wholesaler Non-Chargeback Sales.  In other words, GSK says there are 2 sets of sales to two different groups of customers:  51 sales to Wholesaler X at WAC, all of which pass the WAC List Price test and 49 sales to various GSK indirect customers, all of which fail the WAC List Price test, but were initially sold and invoiced to Wholesaler X then discounted via chargeback.

Dr. Gaier's methodology thus artificially permits him to raise the number of units sold within 5% of WAC by removing certain sales to Wholesaler X from his calculations.  Devor Aff. at ¶11-13.  In the example above, his methodology results in 51 units passing the WAC List Price test.  If Dr. Gaier did not bifurcate, all 100 units would fail, as the average price per unit for Wholesaler X would be $49, well below 95% of the $80 WAC (or $76).

The better approach to the WAC List Price test is to simply calculate GSK's sales to its direct customers like wholesalers and then subtract rebates.  *Id*.  Indeed, GSK defines the WAC List Price test as calling for this.  GSK writes:

> In applying this test, which we refer to herein as the "WAC List Price" test, the Court considered a sale to be "at or about" the list price if the transaction price (after deducting discounts, rebates and chargebacks) to the manufacturer's ***direct*** customers (usually wholesalers) was within 5% of the list price.

GSK Mem. at 15 (emphasis added).

Query why GSK's expert did not conduct the WAC List Price Test as GSK described other than to skew his results.  In any event, Dr. Gaier's improper treatment of the wholesaler data renders his conclusions unreliable and calls for the denial of GSK's motion.

### III.   Dr. Gaier Did Not Include All Relevant Rebates In His Analysis

Dr. Gaier acknowledges that in order to calculate GSK's net sales price accurately, one must account for the rebates paid to those of GSK's customers who purchase GSK's products. *See* Gaier Dep. at 49:2-10; 54:2-7.   Dr. Gaier testified that inclusion of "all provider based [rebates] whether or not they are a retail pharmacy or a mail order pharmacy or a physician or a clinic or a hospital," *id.*, was necessary to arrive at an accurate net price. *Id.* at 54:8-15.  Yet, Dr. Gaier's treatment of rebates did not conform to the standard he himself articulated.  In fact, Dr. Gaier did not account for the majority of rebates paid by GSK to the following classes of trade that both purchase and sell GSK products:  PBM mail order operations, Institutional Pharmacies run by, for example, HMOs and insurance companies, Nursing Homes, Nursing Home Providers, Long Term Care Providers and Group Purchasing Organizations.  Devor Aff. at ¶17.

GSK paid over $4 billion in rebates to these customers in the "sales channel" from 1997-2005 (representing over 3.96% of GSK's net sales).  Devor Aff. at ¶23 and Exhibit I thereto.  Dr. Gaier excludes them almost entirely.  Dr. Gaier's failure to properly account for the rebates paid to these entities renders his conclusions unreliable and requires the denial of GSK's motion.

### A.     Gaier Did Not Account For Any PBM Rebates In His Analysis.

Gaier testified that rebates paid by GSK to its PBM mail order pharmacy customers had to be accounted for in the WAC List Price Test.  Gaier Dep. at 54:2-7; 130:16-131:10.  In other words, GSK's net sales price to PBM Mail Order customers had to include rebates paid to such customers to the extent the rebates were paid for GSK drugs that the PBM customer purchased.   *Id.* at 52:6-54:18; 131:6-16.  Gaier testified further that he *did* include purchase rebates paid to PBM Mail Order entities in his analysis.  *Id.* at 131:9-132:6.

In fact, Dr. Gaier included only 2 extremely small rebates GSK paid to Medco totaling less than $3000 in his analysis. Other than this nominal amount, there are simply no instances of

any rebate to any PBM being included in Dr. Gaier's net prices.  Devor Aff. at ¶¶24-25 and Exhs. I, D.1, D.2 and D.3 thereto.

GSK's rebate data shows GSK paid over $2.2 billion in rebates to Advance PCS, Caremark, Express Scripts and Medco from 1997 – 2005.  *Id.* at ¶24 and Exh. I thereto.

GSK makes substantial sales to each of these entities.  Cicala Aff., Exh. B.  GSK's contracts with PBMs require GSK to pay rebates based on *inter alia*, the market shares they maintain through their own "mail service pharmacies."  *Id.* at Exh. D.  And, GSK's own rebate data reveals that GSK makes such rebate payments.  Devor Aff. at ¶24 and Exh. I thereto.

In light of the foregoing, it is indisputable that some portion of the massive rebates paid to PBMs should have been accounted for in Gaier's analysis.  Again, Dr. Gaier acknowledged this in his deposition and testified that his analysis intended to capture rebates paid to PBMs based on their mail order operations.  Gaier Dep. at 131:9-132:6.  As set forth herein, it did not.  Devor Aff. at ¶24-5.  Had these massive rebates, or even a portion thereof, been properly accounted for it is indisputable that Gaier would have computed a lower GSK sales price to these customers.  Devor Aff. at ¶24-25.

 The improper exclusion of these PBM rebates from Dr. Gaier's calculation of GSK's net sales prices means that Gaier's calculation of a GSK's sales price to these customers is inflated.  This error alone renders Gaier's conclusions unreliable and calls for the denial of GSK's motion.

### B.  Gaier did not Properly Include the Rebates GSK Paid to the IPA Class of Trade in his Analysis.

As stated, Dr. Gaier testified that he intended to account for all rebates paid to entities that purchase and sell GSK products in his analysis.  Gaier Dep. at 49:2-10.  GSK sells drugs to customers in the Institutional Pharmacy, or "IPA" class of trade.  Cicala Aff., Exh. B.  These IPA customers own and operate pharmacies and purchase drugs, as is indisputably established by

their 10-Ks and GSK data.  Cicala Aff., Exhs. B and C.  In fact, CIGNA generated over $1.1 billion from its pharmacy operations (i.e. its purchase and sales of drugs) in 2007, over $1.1 billion in 2006 and $883 million in 2005.  *Id*. at Exh. C.

GSK customers in the IPA class of trade include Cigna, Aetna, Humana, Prudential Insurance Company, among others. [8]  Cicala Aff., Exh. B; Devor Aff., Exh. F.1, F.2, and F.3 thereto.   GSK sold its products to these IPA customers.  *Id.*   Dr. Gaier acknowledged this in his MDL Track One testimony.  *See* Gaier Aff. Track One at ¶32.  (CIGNA, a member of the IPA class of trade in GSK's database, "purchased physician-administered drugs directly through contracts with manufacturers, Group Purchasing Organizations ("GPOs"), or drug wholesalers.") GSK paid rebates to these IPA customers.  Devor Aff. at ¶26 and Exh. I thereto. Indeed, between 1997-2005 GSK paid over $1.4 billion in rebates to IPA customers.  *Id*.

Yet, *none* of these rebates were accounted for by Gaier in his WAC List Price test. Devor Aff. ¶26.  Why?  Because, at his deposition, Dr. Gaier contradicted his own Track One testimony *and* the GSK documents *and* data, and mistakenly testified that Cigna is an entity "not associated with the sale of a product."  *See* Gaier Dep. at 51:2-13.

In fact, given Dr. Gaier's objective to capture "all provider based [rebates] whether or not they are a retail pharmacy or a mail order pharmacy or a physician or a clinic or a hospital" (Gaier Dep. at 54:2-7) and all "sales channel" rebates (*id*. at 49:2-10) it is undeniable that these IPA rebates should have been included in his analysis.

Had Dr. Gaier included these massive rebates in his analysis, his net price to these customers would have been lower.  Devor Aff. at ¶27.   Dr. Gaier's failure to include GSK

---

[8] Cigna and Aetna also appear in GSK's data in non-IPA classes of trade and are paid rebates in that capacity. Plaintiffs' argument here does not concern these "non-IPA" rebates.  Plaintiffs argument is focused on the rebates paid to these GSK customers in their capacity as members of the IPA class of trade.

rebates to IPA customers in his analysis renders his conclusions unreliable and again calls for the denial of GSK's motion.

### C.   Dr. Gaier did not Properly Account for the Rebates GSK Paid to GPOs

GSK sells its products to Group Purchasing Organizations ("GPOs") such as Premier, Novation, Owen Healthcare, Tenet and Amerinet.   Cicala Aff., Exh. B.  And, GSK pays rebates to these "sales channel" customers.   Devor Aff. at ¶28.   However, unlike the IPA and PBM classes of trade, where no rebates were included in Dr. Gaier's net price calculations, rebates to the GPO class of trade were subject to inconsistent treatment by Gaier.  *Id.* at ¶29.  Dr. Gaier included GPO rebates in his analysis when the GPO rebates appeared in GSK's "CN_REB_Fee_INST_V" rebate table, but excluded them when the GPO rebates appeared in GSK's "CN_REB_FEE_HLDR_V" rebate table.  Devor Aff. at ¶¶19-22, 29 and Exhs. G.1 and G.2 thereto.  The impact of the inconsistent treatment is material.  Only $196,726 of GSK's rebates to GPOs appear in the INST table and were included.  *Id.* at ¶29.  Over $147 million in rebates from GSK to its GPO customers appear in the HLDR table. *Id.* at ¶28.   These substantial payments were entirely ignored by Gaier.  *Id.*at 29.

 It cannot be disputed that if all the relevant GPO rebates had been considered, GSKs' net sales price to its GPO customers would have been reduced.  *Id*. at ¶30.  The failure to account for all GSK rebates to its GPO customers again renders Gaier's conclusions unreliable and calls for the denial of GSK's motion.

### D.   Gaier did not Properly Account for the Rebates GSK Paid to Retailer-Wholesaler, Hospitals, Long Term Care Pharmacies, Nursing Homes and Nursing Home Providers

GSK sells its products to customers in the following classes of trade:  Retailer-Wholesaler, Hospitals, Long Term Care Pharmacies, Nursing Homes and Nursing Home

Providers.  Gaier acknowledges this.  Gaier Dep. at 53:7-54:7.  Under Gaier's logic, therefore, rebates paid by GSK to these entities on account of their "sales channel" activity have to be included in any calculation of GSK's net sales price.  *Id.* at 49:2-10.  Yet, Gaier did not include all of the rebates GSK paid to these customers from 1997-2005.  Devor Aff. at ¶31.

As in all of the above examples, it cannot be disputed that if these rebates been accounted for properly, GSKs' net sales price to these customers would have been reduced.  *Id.* at ¶32.

This failure also renders Gaier's conclusions unreliable and calls for the denial of GSK's motion.

## IV. Satisfaction of WAC Test is not Enough

The foregoing makes entirely clear that GSK has not presented undisputed facts demonstrating satisfaction of the WAC List Price Test.  But even if it had, GSK would not be entitled to the relief it seeks by this motion.  No defendant's liability for all claims in the New York Counties' case turns on satisfaction of the WAC test alone.  The "WAC List Price test" was merely part of one prong of a three-prong analysis the Court conducted in connection with determining liability for unfair or deceptive conduct under Mass.Gen.Law Chapter 93A.  *Track One Opinion,* 491 F. Supp. 2d at 101.  GSK's motion expressly does not move for summary judgment on any ground other than satisfaction of the WAC test.  GSK Mem. at 1, 17, n.19.

The Court explicitly stated that it was considering "three salient factors relevant to a finding of unfair conduct under Chapter 93A for both Class 2 and Class 3." *Id.*

"First, the most important inquiry asks:  were there egregious spreads above the 30% yardstick expected in the industry." *Id.* at ¶102.  GSK does not move on this basis, nor has it presented any record as to whether the New York Counties shared the same expectations as the Track One Private Third Party Payor Plaintiffs.  GSK does place spread calculations before the

Court (Gaier Aff. Exh. C) but (a) GSK expressly states that the Court need not consider them (GSK Mem. at 13, n.16; 17, n.19) and (b) the spread calculations are not performed in a manner consistent with what GSK's expert says is proper.  Dr. Gaier testified that he was, "trying to mimic the tests in a conservative way that Judge Saris put forward in the spread testing, if you will.  She relies I believe on Dr. Hartman's work where he calculated an *average selling price using the manufacturer's data*.  And that's what I'm doing here."  Gaier Dep. at 26:1-7.

In fact, that is *not* what Gaier did when calculating the spreads he presents in Exhibit C to his Affidavit.  Gaier did not use GSK's ASPs, nor did he use the net prices he calculated for the WAC test, nor did he use *any* GSK sales data.  Rather, Gaier used wholesaler data to compute spreads.  Gaier Aff. at ¶8.  It is no wonder GSK elected not to move on the basis of the Gaier spreads.  GSK Mem. at 13, n.16; 17, n.19.  Dr. Gaier's spread calculations carry no freight whatsoever for GSK.

The second prong of the Court's test for liability under M.G.L. c93A included the WAC List Price Test.  The Court wrote:

> Second, I will look at the company's history of creating spread. Did the manufacturer actually increase the AWP and/or the list price as opposed to just increasing the spread through discounts and rebates? … Also relevant to this analysis is the legitimacy of the list price from which the markup is derived:  is it a real list price which at which substantial sales were made on an unfair and deceptive price used to jack up the AWP?

Track One Opinion, 491 F.Supp. 2d at 102.

As stated, GSK's motion focuses only on the list price aspect of this second prong and, as demonstrated throughout this brief, GSK has not satisfied this test.

The third prong of this Court's 93A analysis was, "did the defendant engage in a proactive scheme to market the spread to doctors by encouraging them to purchase drugs because

of their profitability rather than their therapeutic qualities." *Id*.  GSK does not move on the basis of this prong nor does it present any record regarding it.  The fact that this prong references "doctors" (an entirely irrelevant class of trade) again begs the question as to the applicability of this analysis - at all – to the Counties' case.

GSK is also incorrect when it argues that payor expectations are irrelevant to the Court's evaluation of liability.  GSK Mem. at 15, n.17.  Any fair read of the defendant-by-defendant discussion which follows the Court's presentation of the three-prong M.G.L. 93A liability analysis reveals that the Track One plaintiffs' knowledge and expectations were entirely relevant.  *See, e.g.*, *Track One Opinion* 491 F.Supp. 2d at 103 (Astrazeneca) ("while it is true that some data regarding the acquisition costs of Zoladex was leaking into the public domain, this did not mitigate the unfairness of using a grossly inflated AWP (or WAC).");  *id.* at 104.  (Johnson & Johnson) ("furthermore, the 30% AWP markup was published by the industry compendia, contributing to the expectation that the spread would be approximately 30%.")  GSK has put nothing in the instant record regarding the New York Counties' expectations.

In short, GSK has not demonstrated satisfaction of the WAC List Price Test for any NDCs and, even if it had, that fact alone would not translate into the relief sought by the instant motion.

**<u>CONCLUSION</u>**

For all the foregoing reasons, plaintiffs respectfully submit that GSK's motion for partial summary judgment must be denied.

Dated:  February 11, 2009

Respectfully Submitted:

**KIRBY McINERNEY LLP**

_____/s/_____

Joanne M. Cicala
James P. Carroll Jr.
Aaron D. Hovan

825 Third Avenue
New York, NY 10022
(212) 371-6600

_Counsel for the City of New York and New York
Counties in MDL 1456 except Nassau and Orange_

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

_Special Counsel for the County of Nassau_

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &
KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022
(212) 605-6205
_Counsel for the County of Orange_