# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | MDL NO. 1456 |
| | Civil Action No. 01-12257-PBS |
| | Subcategory Case No: 03-10643-PBS |
| THIS DOCUMENT RELATES TO: | ) ) |
| *The City of New York, et al.* | ) Judge Patti B. Saris |
| *v.* | ) ) ) |
| *Abbott Laboratories, et al.* | ) ) ) |

## AFFIDAVIT OF JOANNE M. CICALA

Joanne M. Cicala, being duly sworn, deposes and says as follows:

1.      I am a partner at Kirby McInerney LLP and counsel for the City of New York and all New York Counties in MDL 1456, except Nassau and Orange.  In this capacity, I am personally knowledgeable about the matters set forth herein.  This affidavit is submitted in opposition to Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") Motion for Summary Judgment ("GSK's motion").

2.      Attached as Exhibit A is a true and complete copy of the January 14, 2009 deposition of Eric M. Gaier, Ph.D., taken in connection with GSK's motion and the exhibits thereto.

3.      Attached as Exhibit B are documents produced by GSK to plaintiffs in this action which demonstrate that between 1997-2005:

(a)      GSK sold its products to PBM customers including, but not limited to, Medco, Advance/PCS, Express Scripts, Caremark (GSK-MDL-WZ01-0000829

through 30; GSK-MDL-WZ01-0018312; GSK-MDL-WZ02-0000835; GSK-MDL-WZ01-0077901 through 03);

       (b)    GSK sold its products to IPA customers (GSK-MDL-WZ01-0000829 through 30);

       (c)    GSK sold its products to GPO customers (GSK-MDL-WZ01-0000829 through 30; GSK-MDL-WZ01-0077901 through 03; GSK-CONN-03-0567809)

    4.    Attached as Exhibit C is an excerpt from Cigna's 2007 10K establishing that Cigna generated over $1.1 billion from its pharmacy operations in 2007; $1.1 billion in 2006 and $883 million in 2005.

    5.    Attached as Exhibit D is a sample GSK contract with a PBM (in this case, Caremark), providing for the payment of rebates by GSK to the PBM in respect of, *inter alia*, the PBM's mail order pharmacy activities. This example (GSK-MDL-ZN01-025273 through 025291) was produced to plaintiffs in this litigation by GSK.

                                          Joanne M. Cicala

Sworn to before me on this 11ᵗʰ day
of February 2009.

Notary Public

JANICE E TOGAL
NOTARY PUBLIC
State of Texas
Comm. Exp. 05-27-2012

# Cicala Affidavit In Support of Opposition to GSK Motion For Summary Judgment

# EXHIBIT A

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3      -------------------------------X

 4    IN RE PHARMACEUTICAL INDUSTRY    ) MDL No. 1456

 5    AVERAGE WHOLESALE PRICE          ) 01-12257-PBS

 6    LITIGATION                       ) Master File No.

 7      ------------------------------X Subcategory Case

 8    THIS DOCUMENT RELATES TO:        ) No. 03-10643-PBS

 9    CITY OF NEW YORK, et al.,        )

10            -v-                      )

11    ABBOTT LABORATORIES, et al.,     )

12      -------------------------------X

13

14                  January 14, 2009

15                    9:39 a.m.

16

17       Videotaped Deposition of ERIC GAIER, Ph.D.,

18    taken by Plaintiffs, pursuant to Notice, at the

19    offices of Kirby McInerney, LLP, 825 Third

20    Avenue, New York, New York, before SUZANNE

21    PASTOR, a Shorthand Reporter and Notary Public

22    within and for the State of New York.
```

Gaier, Ph.D., Eric                                                        January 14, 2009

New York, NY

Page 2

1      A P P E A R A N C E S:

2

3      Attorneys for City of New York and New York

4      Counties

5

6         KIRBY McINERNEY LLP

7         101 College Street

8         Dripping Springs, Texas 78620

9         BY:  JOANNE M. CICALA, ESQ.

10        (512) 858-1800

11        jcicala@kmllp.com

12

13     Attorneys for GlaxoSmithKline

14

15        DECHERT LLP

16        1117 California Avenue

17        Palo Alto, California 94304-1106

18        BY:  FREDERICK G. HEROLD, ESQ.

19        (650) 813-4930

20        frederick.herold@dechert.com

21        AND:  RICHARD CUTLER, ESQ.

22           (By Telephone)

Page 4

1      A P P E A R A N C E S:  (CONTINUED)

2

3      Attorneys for Novartis Pharmaceutical Corp.

4

5         KAYE SCHOLER LLP

6         425 Park Avenue

7         New York, New York 10022-3598

8         BY:  NATHAN COHEN, ESQ.

9         (212) 836-7418

10        ncohen@kayescholer.com

11

12

13

14     ALSO PRESENT:

15

16        LISA LIVOTE, Videographer

17

18

19

20

21

22

Page 3

1      A P P E A R A N C E S:  (CONTINUED)

2

3      Attorneys for GlaxoSmithKline

4

5         COVINGTON & BURLING

6         1201 Pennsylvania Avenue, N.W.

7         Washington, D.C. 20004-2401

8         BY:  RONALD G. DOVE, JR., ESQ.

9            (By Telephone)

10        (202) 622-5685

11        rdove@cov.com

12

13     Attorneys for Merck & Company, Inc.

14

15        HUGHES, HUBBARD & REED LLP

16        1775 I Street, N.W.

17        Washington, D.C. 20006-2401

18        BY:  ERIC S. PARNES, ESQ.

19        (202) 721-4699

20        parnes@hugheshubbard.com

21

22     (CONTINUED)

Page 5

1            I N D E X

2

3      WITNESS          EXAMINATION BY          PAGE

4      Dr. Gaier..........Ms. Cicala.................. 009

5

6

7            E X H I B I T S

8      NUMBER           DESCRIPTION           PAGE

9      Exhibit Gaier 001 - Affidavit of Dr. Gaier..... 012

10     Exhibit Gaier 002 - Attachments B-E of Gaier

11            Affidavit.................. 028

12     Exhibit Gaier 003 - GSK Systems and

13            Corresponding Data Tables.. 034

14     Exhibit Gaier 004 - Direct Sales Data

15            Extraction Code............ 038

16     Exhibit Gaier 005 - Data Restriction File...... 039

17     Exhibit Gaier 006 - Rebate Data Extraction

18            Code...................... 047

19     Exhibit Gaier 007 - Chargeback Data Extraction

20            Code...................... 056

21     Exhibit Gaier 008 - "Prepare Chargeback Data"

22            Code...................... 060

2 (Pages 2 to 5)

Gaier, Ph.D., Eric                                                                                   January 14, 2009
New York, NY

Page 6

1        E X H I B I T S   (CONTINUED)
2    NUMBER          DESCRIPTION          PAGE
3    Exhibit Gaier 009 - Chargeback Indirect
4              Customers Document......... 064
5    Exhibit Gaier 010 - Total Purchase Rebates/
6              Total Utilization Rebates
7              Document................... 080
8    Exhibit Gaier 011 - "Prepare Direct Sales Data"
9              Code....................... 083
10   Exhibit Gaier 012 - Direct Sales Customer List. 086
11   Exhibit Gaier 013 - Sales at WAC Analyses...... 095
12   Exhibit Gaier 014 - NDC Extract................ 100
13   Exhibit Gaier 015 - Sales at WAC Results (agg). 110
14   Exhibit Gaier 016 - WAC Indirect Sales CB/
15              Analysis................... 111
16   Exhibit Gaier 017 - Utilization Rebates........ 115
17   Exhibit Gaier 018 - Utilization Rebates Paid to
18              Retail Wholesalers......... 123
19   Exhibit Gaier 019 - "Other" and "Retail"
20              Customer Category List..... 128
21   Exhibit Gaier 020 - Utilization Rebates Paid
22              to PBMs.................... 129

Page 7

1        E X H I B I T S   (CONTINUED)
2    NUMBER          DESCRIPTION          PAGE
3    Exhibit Gaier 021 - ABC STAR Item Table
4              Document................... 145
5    Exhibit Gaier 022 - Amerisource, McKesson and
6              Cardinal Datasets.......... 146
7    Exhibit Gaier 023 - Prep Transactional
8              Wholesaler Data............ 147
9    Exhibit Gaier 024 - ORS Data................... 148
10   Exhibit Gaier 025 - Wholesale Unit Price Code.. 155
11   Exhibit Gaier 026 - Open Pricing Data Code..... 155
12   Exhibit Gaier 027 - Spread Results (aggregate)
13              Code....................... 158
14   Exhibit Gaier 028 - Deposition Notice.......... 165
15
16
17
18
19
20
21
22

Page 8

1              P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Good morning, we are
4    on the record.  This begins tape number 1 in the
5    deposition of Eric Gaier in the matter of In Re
6    Pharmaceutical Industry before the United States
7    District Court for the District of Massachusetts.
8    The case number is MDL 1456.
9        This deposition is being held at 825
10   Third Avenue on the 16th floor in New York, New
11   York on January 14th, 2009.  The time is 9:39 a.m.
12        My name is Lisa Livote, I am the legal
13   videographer with Henderson Legal Services.  The
14   court reporter is Suzanne Pastor.
15        Would counsel please introduce
16   yourselves and affiliation.
17        MS. CICALA:  Joanne Cicala from Kirby
18   McInerney on behalf of the City of New York and
19   New York Counties in MDL 1456.
20        MR. HEROLD:  Fred Herold, Dechert, on
21   behalf of GlaxoSmithKline.
22        MR. PARNES:  Eric Parnes, Hughes Hubbard

Page 9

1    & Reed, on behalf of Merck.
2        MR. COHEN:  Nathan Cohen, Kaye Scholer
3    on behalf of Novartis Pharmaceuticals Corporation.
4        THE VIDEOGRAPHER:  And the people by
5    phone.  Would counsel by phone introduce
6    themselves.
7        MR. DOVE:  This is Ron Dove, Covington &
8    Burling, on behalf of defendant GlaxoSmithKline.
9        MS. CICALA:  We were told there are six
10   other people on the phone.  Could you please make
11   your appearances for the record?
12        MR. CUTLER:  Richard Cutler, Dechert
13   LLP, for GlaxoSmithKline.
14        THE VIDEOGRAPHER:  Would the reporter
15   please swear in the witness.
16
17        ERIC GAIER, Ph.D.,
18   having been first duly sworn by the Notary Public
19   (Suzanne Pastor), was examined and testified as
20   follows:
21
22        EXAMINATION

3 (Pages 6 to 9)

Page 10

1  BY MS. CICALA:
2      Q.  Good morning, let me reintroduce myself.
3  I'm Joanne Cicala from Kirby McInerney.  We
4  represent City of New York and 43 counties in the
5  litigation against GlaxoSmithKline in Federal
6  Court.  Do you understand that?
7      A.  Yes.  Good morning.
8      Q.  Good, morning.
9          How do I pronounce your name correctly?
10     A.  Gaier.
11     Q.  Thank you, Dr. Gaier.
12         You understand that you're here today to
13 provide -- in connection with an affidavit that
14 you submitted on a motion for partial summary
15 judgment by GlaxoSmithKline, correct?
16     A.  I do understand that.
17     Q.  And you understand that your testimony
18 is being recorded by a stenographer and a
19 videographer, and your testimony may be used at a
20 trial before a judge or jury in this matter.  Do
21 you understand that?
22     A.  Yes, ma'am.

Page 11

1      Q.  And you're doing already, please let me
2  finish my questions before you respond and please
3  respond orally so that your responses can be taken
4  by the court reporter and the stenographer -- and
5  the videographer.
6      A.  I will.
7      Q.  We'll take breaks routinely throughout
8  the day, but if you have any need for a break, let
9  me know and I'll do my best to find a place to
10 pause in my notes so that we can accommodate you,
11 okay?
12     A.  I appreciate that.
13     Q.  And if you answer my question, I will
14 assume that understood it, okay?
15     A.  Okay.
16     Q.  If you don't understand my question in
17 any way, let me know and I'll be happy to try to
18 clarify it.
19     A.  Okay.
20     Q.  Thank you.  Your counsel may from time
21 to time object to one of my questions.  Unless you
22 are instructed not to answer, you should answer my

Page 12

1  question.  Do you understand that?
2      A.  Yes, ma'am.
3      Q.  Now, I know you've been deposed quite a
4  few times before, correct?
5      A.  A number of times, yes.
6      Q.  And I believe that your deposition
7  testimony -- let's mark it.
8          MS. CICALA:  Let's mark as Gaier Exhibit
9  1 the affidavit that Dr. Gaier submitted in this
10 matter.
11         (Exhibit Gaier 001 for
12 identification, Affidavit of Dr. Gaier.)
13     Q.  Dr. Gaier, can you confirm that Exhibit
14 1 that's just been marked is a true and complete
15 copy of the affidavit that you submitted on behalf
16 of GlaxoSmithKline in this case without the
17 accompanying exhibits?
18     A.  Right.  I was just going to note for the
19 record that it appears to be with the exception of
20 the appendices or attachments, exhibits that I
21 provided.
22     Q.  It does actually have a copy, I believe,

Page 13

1  of Attachment A, which is your curriculum vitae,
2  correct?
3      A.  Correct.
4      Q.  If you could turn, please, to the first
5  page of the Attachment A, which is actually page
6  10 of your 130-page submission, and if you could
7  review the testimony that is set forth on page 10
8  and let me know if that represents the entirety of
9  your testimony, whether at trial or deposition,
10 over the last four years.
11     A.  I will.  (The witness reviews the
12 document.)
13         I believe it does.
14     Q.  The first case listed on page 10 is the
15 Commonwealth of Massachusetts versus Mylan
16 Laboratories.  Do you see that?
17     A.  Yes, ma'am.
18     Q.  And this particular document indicates
19 you sat for deposition in April 2008, correct?
20     A.  That's correct.
21     Q.  Did you submit any expert report in the
22 Mylan versus -- the Massachusetts versus Mylan

Gaier, Ph.D., Eric

January 14, 2009

New York, NY

Page 14

1  case?
2      A.  Yes, I did.
3      Q.  And that expert report was on behalf a
4  number of the defendants in that case, correct?
5      A.  Correct.
6      Q.  Did you provide any testimony at the
7  hearing on the Massachusetts motion for summary
8  judgment?
9      A.  No, ma'am, I did not.
10     Q.  Are you aware whether the expert report
11 you provided in that case was related to the
12 Massachusetts summary judgment motion?
13     A.  I haven't followed those proceedings to
14 know.
15     Q.  Are you aware whether the court has
16 issued any rulings in respect of the Mylan-
17 Massachusetts summary judgment proceeding?
18     A.  Yes.
19     Q.  What are you aware of?
20     A.  I'm aware of a December 23rd I think
21 opinion by Judge Saris that relates to your
22 question.

Page 15

1      Q.  Have you read that particular opinion?
2      A.  Yes, ma'am.
3      Q.  Do you recall if the court relied on or
4  referred in any way to your deposition or your
5  expert report in the context of that decision?
6      A.  I don't recall seeing my name cited.  I
7  suppose not.
8      Q.  And your work in the Massachusetts case
9  was on behalf of generic manufacturers -- drug
10 manufacturers, right?
11     A.  Correct.
12     Q.  And GlaxoSmithKline is a brand
13 manufacturer, correct?
14     A.  Correct.
15     Q.  And you're here today simply to talk
16 about GlaxoSmithKline, is that right?
17     A.  That's right.
18     Q.  When were you first contacted by
19 GlaxoSmithKline in connection with the New York
20 Counties case?
21     A.  I'm not sure of the precise date, but it
22 was sometime over the summer, July time frame.

Page 16

1      Q.  July 2008?
2      A.  Correct.
3      Q.  And at the time that you were contacted
4  by GlaxoSmithKline in connection with the New York
5  Counties case, were you doing any work or was your
6  firm engaged in any work on behalf of any other
7  prescription drug brand manufacturers?
8      A.  At all?
9      Q.  At all.
10     A.  Likely, yes.  I'd have to think about
11 the specifics to see if that were totally true.
12     Q.  Well, how about if I ask you the
13 question with regard to your work personally, were
14 you personally doing any work -- let me rephrase.
15         Were you involved in any work in July of
16 2008 on behalf of any brand manufacturers?
17     A.  In any case?
18     Q.  In any case.
19     A.  Yes, ma'am.
20     Q.  And which cases were those?
21     A.  I was involved at that time submitting a
22 disclosure and preparing for deposition and

Page 17

1  ultimately for trial on behalf of Bristol-Myers
2  Squibb in the Alabama matter.  That was my
3  personal -- taking up my personal attention at
4  that point in time.
5      Q.  Did you have any involvement in the
6  Alabama trials against Novartis or
7  GlaxoSmithKline?
8         MR. HEROLD:  Objection to the form.
9      Q.  Withdrawn.  Are you aware that the State
10 of Alabama is prosecuting AWP-related claims
11 against GlaxoSmithKline?
12     A.  Yes.
13     Q.  And are you aware that they went to
14 trial?
15     A.  Yes.
16     Q.  And did you have any involvement in that
17 trial?
18     A.  In the trial itself?
19     Q.  In the trial or the activities leading
20 to the trial.
21     A.  I'm not sure how to characterize it, but
22 let me just say I was disclosed as an expert

5 (Pages 14 to 17)

Gaier, Ph.D., Eric                                                                 January 14, 2009
New York, NY

Page 18

1 witness. I gave deposition testimony and I was
2 not called at trial.
3      Q.   Are you aware that the State of Alabama
4 was prosecuting claims against the brand
5 manufacturer Novartis?
6      A.   Correct.
7      Q.   And did you have any involvement
8 whatsoever in the Alabama-Novartis case?
9      A.   Same answer as to GlaxoSmithKline.
10     Q.   Did you sit for a deposition with regard
11 to Novartis?
12     A.   Yes. It was a combined deposition on
13 behalf of the first three manufacturers,
14 AstraZeneca, Novartis and GlaxoSmithKline.
15     Q.   And did you submit expert reports in the
16 Alabama case as to any or all of those three
17 manufacturers?
18     A.   There were no expert reports in that
19 state court case.
20     Q.   So is it correct that there was just a
21 single deposition with regard to those three
22 manufacturers that you participated in?

Page 19

1      A.   Correct.
2      Q.   Have you done any work with any other
3 brand manufacturers in respect of the Alabama AWP
4 case?
5      A.   Well, I mentioned Bristol-Myers.
6      Q.   Thank you. Any others?
7      A.   So let me explain. There was a time
8 when there were six manufacturers who were
9 purportedly going to trial at the same time. And
10 so it would be the four that we've been
11 discussing, plus Johnson & Johnson, and the sixth
12 escapes me. But I was -- prior to the court
13 restricting its attention to the first three, I
14 was personally doing work involving all six.
15     Q.   What is your understanding as to whether
16 you'll be doing any additional work for the State
17 of Alabama with regard to Johnson & Johnson?
18          MR. HEROLD: Objection to the form.
19     A.   I have not been contacted in one way or
20 the other. I don't know.
21     Q.   Are you doing any work in connection
22 with the Alabama AWP case at this time?

Page 20

1      A.   Me personally, I'm not.
2      Q.   Are you aware whether your firm is?
3      A.   I'm actually not aware.
4      Q.   So that I'm clear, with respect to the
5 Alabama proceeding, the extent of your activity
6 was at -- let me rephrase. The extent of your
7 activity with regard to GlaxoSmithKline, Novartis
8 and AstraZeneca was a deposition, is that right?
9      A.   With respect to AstraZeneca, I was a
10 trial witness as well.
11     Q.   With respect to Novartis and GSK, the
12 extent of your activity was a deposition.
13     A.   That's correct.
14     Q.   And with AstraZeneca, you also testified
15 at trial.
16     A.   That's correct.
17     Q.   And I presume you are aware of the jury
18 verdict against AstraZeneca in the Alabama
19 proceeding.
20     A.   I am.
21     Q.   Are you involved in any way in the
22 appeal of the AstraZeneca verdict?

Page 21

1      A.   No, ma'am.
2      Q.   Are you aware of the GlaxoSmithKline and
3 Novartis appeals in Alabama?
4      A.   I was aware of the AstraZeneca. I guess
5 I'm vaguely aware of GlaxoSmithKline and Novartis
6 appeals.
7      Q.   Are you doing any work in respect of the
8 GlaxoSmithKline or Novartis appeals?
9      A.   No.
10     Q.   Do you know what the status of Alabama's
11 case against Bristol-Myers Squibb is at this time?
12     A.   My understanding is that there was a
13 settlement.
14          MS. CICALA: Off the record.
15          THE VIDEOGRAPHER: Off the record. The
16 time is 9:53 a.m.
17          (Recess taken.)
18          THE VIDEOGRAPHER: Back on the record,
19 it's 9:54 a.m
20 BY MS. CICALA:
21     Q.   Do you have any expectation of doing
22 additional work with regard to the Alabama AWP

6 (Pages 18 to 21)

Gaier, Ph.D., Eric                                                                  January 14, 2009
New York, NY

| Page 22 | Page 24 |
|---------|---------|
| 1 case at this time?<br>2    A.  I don't have an expectation one way or<br>3 another.<br>4    Q.  Can you describe the nature of any work<br>5 that you did with respect to Johnson & Johnson in<br>6 connection with the Alabama case?<br>7    A.  It would be similar sets of data<br>8 analysis that we ultimately provided on behalf of<br>9 the first three.  At some point that work was<br>10 stopped at an intermediate phase when the court<br>11 decided to restrict its attention to three<br>12 defendants rather than six.  So it would be<br>13 similar to that which was disclosed for which I<br>14 testified in the AstraZeneca trial.<br>15    Q.  And can you describe the nature of your<br>16 work with regard to GlaxoSmithKline in the Alabama<br>17 case?<br>18    A.  I think that work was disclosed.  It was<br>19 numerous analyses looking at pharmacies and<br>20 pharmacy margins, at manufacturer sales, at<br>21 markups or spreads.  A variety of analyses that<br>22 was all disclosed. | 1    A.  I would meet with counsel for the<br>2 various manufacturers, sometimes separately,<br>3 sometimes together.  I would report my own<br>4 thinking, interim analyses.  There would be<br>5 discussion about that and ultimately, most of that<br>6 work was disclosed in a massive set of binders.<br>7    Q.  And did the deposition for which you sat<br>8 in the Alabama case concern the analyses that<br>9 you've just described engaging in with respect to<br>10 Glaxo's prices?<br>11    A.  Yes.<br>12    Q.  Did you make any use of -- withdrawn.<br>13 You're familiar with the term "AMP"?<br>14    A.  Sure.<br>15    Q.  What does that mean?<br>16    A.  The average manufacturer price.<br>17    Q.  Did your Alabama analyses include or<br>18 consider GSK's AMPs in any way?<br>19    A.  I'd have to look back and check, but my<br>20 recollection is it did not.  My belief as I sit<br>21 here today is it did not.<br>22    Q.  Did your work in respect to the |

| Page 23 | Page 25 |
|---------|---------|
| 1    Q.  Did you engage in analysis in the State<br>2 of Alabama case for GlaxoSmithKline that involved<br>3 looking at what percentage of GSK's sales occurred<br>4 within 5 percent of WAC?<br>5    A.  I think that conceptually we were<br>6 evaluating that but it was done differently in<br>7 that case.  It was done as a ratio of the actual<br>8 selling price to WAC to show that for brand name<br>9 drugs in particular, they were very close to one<br>10 another.  But I don't think we did the 5 percent<br>11 testing per se.<br>12    Q.  And do you know why you did not do the 5<br>13 percent testing in Alabama?<br>14    A.  I would have to speculate.  I really<br>15 don't -- I wasn't asked to, I think is the best<br>16 answer I can give.<br>17    Q.  When you say you weren't asked to, who<br>18 would have asked you to do that?<br>19    MR. HEROLD:  Objection to form.<br>20    Q.  Fair enough.  Can you explain the<br>21 process by which you received your assignment in<br>22 connection with the Alabama case? | 1 Massachusetts v. Mylan case include an analysis or<br>2 include any reference to the defendants' AMPs?<br>3    A.  Again, I'd have to check back.  My<br>4 belief would be no, but I'd have to check that.<br>5    Q.  Why would your belief be no?<br>6    A.  I just don't have a recollection of<br>7 using and referring to the AMPs in that matter.<br>8 It's possible that I did, but that's not my<br>9 recollection.<br>10    Q.  Do you recall ever using AMPs in any of<br>11 your work in any of the AWP cases?<br>12    MR. HEROLD:  Objection to the form.<br>13    A.  I think perhaps conceptually I've<br>14 referred to AMP in making a government knowledge<br>15 point.  But I don't think I've done any analysis<br>16 of AMP.  Again, that's my recollection; we'd have<br>17 to look back and see.<br>18    Q.  And it's fair to say that you did not<br>19 use AMPs in connection with your work that is the<br>20 subject of this deposition here today.<br>21    A.  Correct.<br>22    Q.  And why is that? |

7 (Pages 22 to 25)

Gaier, Ph.D., Eric
New York, NY
January 14, 2009

Page 26

1    A.   Well, in the first instance, I'm merely
2  trying to mimic the tests in a conservative way
3  that Judge Saris put forward in the spread
4  testing, if you will.  She relies I believe on Dr.
5  Hartman's work where he calculated an average
6  selling price using the manufacturer data.  And
7  that's what I'm doing here.
8    Q.   Who defined the scope of the assignment
9  that you received in connection with the New York
10 Counties case?
11   A.   For this particular assignment?
12   Q.   Let me clarify.  Are you -- you
13 understand that the scope of the deposition here
14 today is limited to the affidavit that's been
15 marked as Exhibit 1, yes?
16   A.   I do.
17   Q.   Do you have any understanding or
18 expectation that you would do additional work on
19 behalf of GlaxoSmithKline in the New York Counties
20 case?
21   A.   I don't have any expectation one way or
22 the other.

Page 27

1    Q.   And can you describe for me how the
2  assignment that led to your creation of Exhibit 1
3  was presented to you?
4    A.   Sure.  Mr. Herold contacted me and my
5  staff and asked us to undertake an analysis to, as
6  I say, mimic the tests, if you will, that Judge
7  Saris put forward in her MDL opinion using the
8  GlaxoSmithKline relevant NDCs and data.  And
9  through time, that's exactly what we did.
10   Q.   And did Mr. Herold provide you with the
11 data that you would need in connection with this
12 exercise?
13   A.   I think probably we already had it.
14 It's my understanding that we're using the same
15 underlying source data as was produced in other
16 matters, in particular Alabama.  We worked with
17 that data in Alabama, and so my belief is we would
18 have had it already.
19       MR. HEROLD:  Just so there's a
20 clarification, were you talking about the
21 GlaxoSmithKline data?  Because he refers to a
22 number of datasets in his affidavit.

Page 28

1        MS. CICALA:  We'll get into the specific
2  --
3        MR. HEROLD:  Okay.
4        MS. CICALA:  Into the specifics shortly.
5        MR. HEROLD:  I just don't want the
6  record to be confused.
7        MS. CICALA:  No.  Thank you.
8    Q.   It's fair to say that your affidavit and
9  your conclusions concern a subset of
10 GlaxoSmithKline's entire product line, correct?
11   A.   I believe that's right.
12   Q.   How did you know which drugs or NDCs to
13 address?
14   A.   We began with those that were alleged in
15 the exhibit to the complaint.  We were instructed
16 about a handful of NDCs, for various reasons that
17 are covered in my footnotes, not to analyze those.
18 But I think that's a handful.  Largely we followed
19 the NDCs that are in the complaint in the matter.
20       MS. CICALA:  Let's mark as Exhibit 2
21 attachments B through E to the Gaier affidavit.
22       (Exhibit Gaier 002 for

Page 29

1  identification, Attachments B-E of Gaier
2  Affidavit.)
3        MS. CICALA:  I only made one extra set
4  of these I'm afraid.
5    Q.   Dr. Gaier, can you confirm that what
6  we've marked as Exhibit 2 to this deposition are
7  the exhibits -- Attachments B through E to your
8  affidavit?
9    A.   Yes, they appear to be.
10   Q.   Is it fair to say that the NDCs that are
11 listed in these exhibits are the only NDCs that
12 you analyzed in connection with your affidavit?
13   A.   Generally speaking, that's correct.  I
14 think the exclusion of a handful of NDCs that we
15 were instructed not to analyze actually comes
16 fairly late in the program, so it depends on what
17 you mean by "analyzed."  But certainly report
18 results for.
19   Q.   And I understand your answer.  As we go
20 through the code we'll reach the point where those
21 NDCs are withdrawn and we can clarify that process
22 at that time.

8 (Pages 26 to 29)

Gaier, Ph.D., Eric

New York, NY

January 14, 2009

Page 30

1    But generally speaking, these are the
2  NDC -- certainly the NDCs set forth in Exhibit 2
3  are the NDCs that you've drawn conclusions on in
4  this report.
5    A.  Correct.
6    Q.  Now, Table B-1 of Exhibit 2 sets forth
7  the NDCs with more than 50 percent of the units
8  sold at or about WAC, correct?
9    A.  Over the time period of available data
10  from 1997 to 2005, that would be correct.
11    Q.  Right.  The spreads and the conclusions
12  we see in Table B-1 pertain to the entire '97
13  through '05 time period, right?
14    MR. HEROLD:  Objection to the form.
15    A.  They're not spreads, but the WAC testing
16  that's in B-1 pertains to.  Those that have more
17  than 50 percent, as you say, within 5 percent of
18  WAC during the entire time period 1997 to 2005
19  where there were available data.
20    Q.  Thank you, and I appreciate the
21  clarification.  Obviously we're not talking about
22  spreads here.

Page 31

1    So that the record is clear, Table B-1
2  presents your conclusions as to what percentage of
3  sales units or sales dollars were sold at or about
4  WAC through the entire '97 through '05 period.
5    A.  That's correct.
6    Q.  Table D-1 sets forth the year-by-year
7  conclusions that are then aggregated to create B-
8  1, isn't that right?
9    A.  Yes.
10    Q.  And why did you aggregate your year-by-
11  year conclusions from D-1 to create Table B-1?
12    A.  Well, I think there's a conceptual
13  reason to do that.  I think the broader period of
14  time over which you're looking, I think you begin
15  to have more confidence that you're apportioning
16  the rebates to the transactions for which they
17  correspond appropriately.  The more narrow you
18  make that time frame, the more I think you risk
19  inappropriately attaching rebates to those.
20    So I think as I read parts of Judge
21  Saris's MDL, she refers to the sales within 50
22  percent over the entire time period in places, at

Page 32

1  other places she refers to it year by year.  And
2  so I thought the court would find both helpful.
3    Q.  Are you offering an opinion as to which
4  is the appropriate way to evaluate this issue on
5  an annual or aggregate basis?
6    A.  I mean, not as a legal matter.  I can
7  say, again, as an economist that I think looking
8  at a more aggregated time period does make sense
9  to me and makes more sense than reducing the time
10  period because of the issue that I've been
11  discussing associated with rebates.  But not as a
12  legal matter.
13    Q.  So why must -- can you provide some more
14  insight into the rebate concern that you've
15  identified that comes into play if you proceed on
16  an annual basis?
17    A.  Well, the rebates may be earned at a
18  time -- a time period that's offset from the
19  underlying transactions for which the rebate was
20  accrued.  And so in the limit you could have an
21  example where a certain customer, say, bought a
22  product for one year, and the next year bought no

Page 33

1  products.  And then you would attach all the
2  rebates perhaps in that second period under my
3  hypothetical.  And that would be an inappropriate
4  linking of the rebates.  So that problem is
5  alleviated the longer the time period over which
6  you look.
7    Q.  And when you referred to rebates, what
8  do you mean?
9    A.  I'm not talking about chargebacks.  I'm
10  not talking about invoice discounts.  I'm talking
11  about rebates, be they sales or certain
12  utilization rebates that are contained in the
13  manufacturers' indirect sales data.  Well, at
14  least as far as Glaxo is concerned.
15    Q.  Can you explain your method for
16  converting the information in Table D-1 to the
17  information set forth in Table B-1?
18    A.  It's just applying the tests across all
19  the years, if you will.  So whereas the test is
20  only applied on a year-by-year basis here in Table
21  D, in Attachment D, the test would be applied on
22  an overall basis in Table B-1.

9 (Pages 30 to 33)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 34

1      Q.   And again, when we get into the code
2  we'll see how the aggregation takes place.  Let me
3  move on for the moment.
4      Let's look at Table B-2.  Table B-2 from
5  Exhibit 2 represents GSK NDCs with 50 percent or
6  less of the units sold at or about WAC, correct?
7      A.   In the aggregate, again.
8      Q.   In the aggregate, right.  And then Table
9  D-2 provides the year-by-year detail I believe.
10  Is that correct?
11      A.   Yes, that is correct.
12      MS. CICALA:  Let's mark this as 3.
13      (Exhibit Gaier 003 for
14  identification, GSK Systems and Corresponding Data
15  Tables.)
16      Q.   Dr. Gaier, what we've marked as Exhibit
17  3 I will represent to you is a chart that we've
18  created that summarizes the GSK databases and data
19  tables that have been produced to plaintiffs in
20  this litigation.  If I could ask you to review it
21  and let me know if the information set forth on
22  this chart looks familiar to you.

Page 35

1      A.   Certainly some of the tables -- the
2  headings which you've listed by numbers 1, 2 and 3
3  and so forth, CSS, IMHC.  And then the underlying
4  tables of those, some are familiar to me and
5  others are not.
6      And similarly, with respect to number 5
7  on the ORS system, which is the indirect sales
8  database and rebate database for Glaxo, I
9  certainly recognize it at that level.  And also
10  some of the table names.
11      Q.   Can you tell me from Exhibit 3 which
12  database contains chargeback data?
13      A.   Sure.  It's not in the CSS.  It's in the
14  IMHC, and it's also in the ORS.  So IMHC is the
15  legacy SmithKline/Beecham system which is not in
16  use presently on the ORS system.  The legacy Glaxo
17  Wellcome system, which continues to be the system
18  used now by GlaxoSmithKline for indirect sales
19  including chargebacks.
20      Q.   Which system contains direct sales
21  information?
22      A.   CSS, number 2 on this list.

Page 36

1      Q.   Is it possible looking at Exhibit 3 for
2  you to tell -- to identify for the record from
3  which databases you pulled the information that
4  was used to create your affidavit?
5      A.   At the level of CSS, IMHC, ORS, it is.
6  Off the top of my head from the underlying code,
7  we could see which of the tables are pulled.  I
8  certainly recognize some of them as being pulled,
9  particularly in the CSS database and in the ORS
10  database.
11      Q.   Okay, it's very helpful.  So your work
12  would have been done using data from CSS, IMHC and
13  ORS.
14      MR. HEROLD:  Objection to the form.
15      A.   From just the Glaxo systems.  Of course
16  as we've earlier discussed, there's other data
17  sources: First Data Bank and other analyses.  But
18  pertaining just to GSK, that's my recollection.
19  There may be other sets of this that we used, but
20  we certainly focused on CSS, IMHC and ORS.
21      Q.   Looking at Exhibit 3, does it appear to
22  omit any GSK databases that you are aware of that

Page 37

1  are relevant to GSK pricing, rebates, chargebacks?
2      A.   To the best of my recollection, it does
3  not.
4      Q.   So it looks like a complete
5  representation of the GSK databases related to
6  those subjects.
7      MR. HEROLD:  Objection.  I mean, you're
8  asking him to look at something that's very
9  technical and make a conclusion about whether it's
10  complete.  I just object to that.  I don't think
11  it's fair to the witness.
12      A.   To the best of my abilities, it appears
13  to be complete in terms of databases that I'm
14  familiar with.
15      Q.   And as you sit here today, with regard
16  to the GSK data that you've worked with in
17  connection with this affidavit, you're not aware
18  of any other data sources from GSK, is that
19  correct?
20      A.   No.
21      MS. CICALA:  Off the record, please.
22      THE VIDEOGRAPHER:  Off the record, 10:19

10 (Pages 34 to 37)

Gaier, Ph.D., Eric                                                              January 14, 2009
New York, NY

Page 38

1  a.m.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  Back on the record,
4  the time is 10:19 a.m.
5       (Exhibit Gaier 004 for
6  identification, Direct Sales Data Extraction
7  Code.)
8  BY MS. CICALA:
9       Q.  Dr. Gaier, we've marked as Exhibit 4
10  what appears to be part of the code employed by
11  you in connection with the work you've done in the
12  New York Counties case, is that right?
13       A.  Yes, it is.
14       Q.  Can you identify specifically what this
15  code pertains to?
16       A.  This is code that is working with the
17  direct sales data, so it would be originally the
18  data that comes from CSS.  And this is
19  intermediate piece of code; it is after the
20  underlying data has been extracted from SQL.  And
21  this code actually functions in STATA, and it
22  processes the data and prepares it for ultimately

Page 39

1  the testing that we do.
2       Q.  Who extracted the underlying data that
3  was in SQL that you ran this code on?
4       A.  We were given an original production
5  that was a series of what I'll call flat files or
6  underlying text files.  We uploaded them, Bates
7  White staff, uploaded them into a SQL database and
8  then as often is the case, we extracted it from
9  SQL into something that's more amenable to
10  statistical analysis, which we used STATA for
11  that.  I think the short answer is we did.
12       Q.  Thank you.
13       MS. CICALA:  Let's mark this as 5.
14       (Exhibit Gaier 005 for
15  identification, Data Restriction File.)
16       Q.  Just staying with 4 for a moment, if I
17  may read into the record the top of the code.  It
18  reads, "This code extracts the direct sales data
19  prepared in SQL."  I read that correctly, yes?
20       A.  Yes.
21       Q.  "The code restricts sales by GSK
22  divestiture dates produced in the Alabama

Page 40

1  litigation before saving out an intermediary
2  workbook for quality control purposes," right?
3       A.  Mm-hmm.
4       Q.  Does Exhibit 5 represent the GSK
5  divestiture dates that the sentence I just read is
6  referring to?
7       A.  Yes.
8       Q.  Where did the information that's
9  contained in Exhibit 5 come from?
10       A.  I believe the information -- I mean,
11  this is a codified version of information that was
12  produced in the Alabama case.  I think there was a
13  written description which has been here by my
14  staff put into a form that the computer can
15  handle.
16       Q.  Is it fair to say that all of your
17  conclusions utilize the date restrictions set
18  forth in Exhibit 5 as appropriate?
19       A.  To the extent there are any.  So for the
20  vast majority of the NDCs, there are no
21  restrictions.  There certainly are some for which
22  we've been instructed to execute these

Page 41

1  restrictions.  And my conclusions as to those NDCs
2  utilize that instruction.
3       Q.  So wherever we see in your code a
4  reference to the date restrictions, is it fair to
5  say that those restrictions are set forth in toto
6  in Exhibit 5?
7       A.  Yes.  The only other date restriction
8  would be if sales data were not available.  But
9  short of something like that, you would be
10  correct.
11       Q.  Now, just for a moment, turning to page
12  4 of Exhibit 5, this is an example.  Do you see
13  NDC 81018598?
14       A.  Yes, ma'am.
15       Q.  And we see there's a 3/21/97
16  divestiture?
17       A.  Yes, ma'am.
18       Q.  Is it fair to say after that date this
19  NDC was divested to Monarch Pharmaceuticals, it
20  was no longer a GSK NDC?
21       A.  That's what it says.  And I proceeded
22  under that assumption.

11 (Pages 38 to 41)

Page 42

1     Q.   Using this as an example, if a
2  chargeback was paid to a wholesaler with respect
3  to this NDC one year after the divestiture for
4  example, how would you account for that chargeback
5  in your analysis?
6     A.   I'd need to look.  I honestly don't know
7  the answer to that detailed question off the top
8  of my head.
9     Q.   As a theoretical concept, if chargebacks
10  or rebates were paid to customers after a
11  divestiture, how would you handle those in your
12  analysis?
13     A.   Again, I'd need to look at the -- the
14  code would be clear.  We'd have to go through it
15  and find exactly.  But I'm not sure off the top of
16  my head.
17     Q.   Perhaps as we go through the code, it
18  will refresh you on this subject.
19        All right, let's go back to Exhibit 4
20  now, which is the code.  Would it be acceptable to
21  you to refer to Exhibit 4 as the code for the
22  direct sales data extraction?

Page 43

1     A.   Sure.
2     Q.   Okay.  Who wrote the code that we see in
3  Exhibit 4?
4     A.   There are two principal people that I
5  worked with in this assignment.  Scott Weishaar is
6  the manager, and a gentleman by the name of Ben
7  Wolfert was the consultant.  A combination of
8  those two would have actually written the code.
9     Q.   So going back up to the descriptive
10  information at the top of Exhibit 4, the third
11  sentence reads, "Sales are then limited by
12  transaction and order types."  Do you see that?
13     A.   Yes, ma'am.
14     Q.   Can you explain that sentence, please?
15     A.   Well, the GSK database to which this
16  refers has what's known as an order type and an
17  order subtype.  And that gives you a way to
18  restrict your attention to the commercial sales.
19  So as I say in my declaration, I've excluded
20  charities, returns, things of that nature.  And
21  these order type/subtypes is one way in which you
22  can restrict your attention to those commercial

Page 44

1  sales.
2        I'll just point out that the units that
3  are excluded by this part of the code are less
4  than 1 percent of the units.  So I don't expect
5  these exclusions to have a material effect.  But
6  nonetheless, that's what's done here.
7     Q.   Right, and the exclusions are de minimis
8  in part because your exercise here was to arrive
9  at, in the first instance, at an average sales
10  price across all classes of trade, right?
11        MR. HEROLD:  Objection.
12     A.   Well, this is for the WAC testing, so
13  we're not really calculating any notion of average
14  price.  I mean, we're testing to see whether any
15  particular sale to a particular customer is within
16  5 percent of WAC.
17     Q.   And you're doing that without regard to
18  the class of trade of that particular customer.
19     A.   Correct.  So long as it's not a charity
20  or -- and so this is one area where we're able to
21  exclude the charities and the returns that I
22  reference in my affidavit.

Page 45

1     Q.   In your affidavit you describe it as
2  you're calculating for each customer in every
3  class of trade by NDC and year, quantity-weighted
4  average transaction, prices, conservatively
5  including all discounts, chargebacks and rebates
6  paid to those customers.  This is paragraph 6.
7     A.   Let me look.  I want to make sure we're
8  talking about the right analysis here.
9        Yes, I did calculate the average for a
10  particular customer for a particular NDC for a
11  particular year, that's correct.
12     Q.   Without regard to the customer's class
13  of trade.
14     A.   Yes.
15     Q.   Good, thank you.  So the code that we
16  see in 4 is the first step, is it not, in
17  collecting from the direct sales data which NDCs
18  for which years you're going to be evaluating?
19     A.   I believe we've restricted the NDCs in
20  the very first SQL code to those that are in the
21  complaint.  So I think we've already restricted by
22  the time we get here.  But it certainly is early

12 (Pages 42 to 45)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 46

1   in the set of code.
2       Q.   Okay, thank you.
3           Now, let's see.  Okay, continuing with
4   the descriptive language at the top of Exhibit 4,
5   the last sentence reads, "The process data is then
6   saved into an intermediate file," correct?
7       A.   Yes, ma'am.
8       Q.   And that intermediate file was in fact
9   produced to us.
10      A.   I believe so.
11      Q.   It was.  So if we look down, do you see
12  at the bottom of the first page of Exhibit 4, it
13  says "limit order types"?
14      A.   Yes, ma'am.
15      Q.   Immediately above that you see it says,
16  "Drop sales for NDCs that were divested and then
17  reacquired"?
18      A.   Yes, ma'am.
19      Q.   Can you explain that, please?
20      A.   That is drawing upon Exhibit 5 to my
21  deposition where the dates -- there's cutoffs in
22  terms of when I've been instructed GSK is

Page 47

1   responsible for the sales or the pricing of a
2   particular NDC.  And this is the section of the
3   code that limits the attention -- excludes those
4   times when I've been instructed GSK is not
5   responsible.
6       Q.   So the information that you would
7   require to determine if the NDCs were reacquired
8   by GSK would be set forth in Exhibit 5?
9       A.   Yes, ma'am.
10          (Exhibit Gaier 006 for
11  identification, Rebate Data Extraction Code.)
12      Q.   Dr. Gaier, can you identify Exhibit 6 as
13  the code that concerned the extraction of the
14  rebate data that you used in your analysis?
15      A.   Yes, it appears to be that.
16      Q.   And the rebate data that was used by you
17  was pulled from the ORS system, is that correct?
18      A.   No.  It was pulled from both the IMHC
19  system and the ORS system.
20      Q.   The descriptive language at the top of
21  Exhibit 6 reads, "This code extracts the rebate
22  data prepared in SQL."

Page 48

1       A.   Yes, ma'am.
2       Q.   "Rebate amounts are aggregated to the
3   annual level," correct?
4       A.   Yes, ma'am.
5       Q.   "Negative rebates are then zeroed out
6   and an intermediate rebate dataset is saved out."
7   Did I read that correctly?
8       A.   Yes, ma'am.
9       Q.   So can you explain precisely what this
10  particular set of code was doing?
11      A.   Again, this code is similar to the
12  previous code that we looked at in the sense that
13  it's operating at an intermediate level between a
14  set of SQL code that's pulling together the
15  underlying data and the ultimate WAC analysis that
16  we do.  So it's a preparation phase of the data.
17      Q.   Do you see midway down the page the code
18  reads, "Break rebates out based on rebate type"?
19      A.   Yes, ma'am.
20      Q.   And the code is breaking it into
21  purchase rebates or utilization rebates?
22      A.   Yes, ma'am.

Page 49

1       Q.   Why did you engage in that separation?
2       A.   For the purpose of the WAC analysis we
3   do, we apply all of the purchase-based rebates.
4   We apply as far as the utilization-based rebates,
5   we apply the retail-only.  And that is the way
6   that we can exclude the PBM rebates, the payor
7   rebates, which are not associated with the sales
8   channel, if you will.  That's a separately
9   arranged agreement between a manufacturer and a
10  payor in many instances, or a PBM.
11          MS. CICALA:  We are at the end of the
12  video, so let's take a break.
13          THE VIDEOGRAPHER:  This is the end of
14  tape number 1 in the deposition of Dr. Eric Gaier.
15  Going off the record.  The time is 10:35 a.m.
16          (Recess taken.)
17          THE VIDEOGRAPHER:  We're back on the
18  record.  The time is 10:48 a.m.  This is the
19  beginning of tape number 2 in the deposition of
20  Dr. Eric Gaier.
21  BY MS. CICALA:
22      Q.   Hi.  What is a purchase rebate?

13 (Pages 46 to 49)

Gaier, Ph.D., Eric

New York, NY

January 14, 2009

Page 50

1    A.   So these are -- there are four types of
2  rebates that are identified by code in the GSK
3  databases.  And I forget the three letters.  The
4  purchase ones -- we've grouped the three that are
5  not utilization based.  The purchase-based are
6  associated with the sale of the product.
7    Q.   And so the code that we've marked as
8  Exhibit 6 demonstrates that you broke out the
9  purchase from the utilization rebates, right?
10   A.   Yes.  At this point because they'll be
11 processed separately.  As I said earlier, all the
12 purchase rebates will be included and we will
13 parse out the utilization rebates so that we keep
14 only those associated with providers.
15   Q.   Who made the decision to treat rebates
16 in the manner that you do?
17   A.   Myself in conjunction with my staff.
18   Q.   And why did you feel it was appropriate
19 to break out the purchase and utilization rebates?
20   A.   Well, for ease of processing at one
21 level because, as I said, we're going to keep all
22 the purchase ones.  The utilization ones is a way

Page 51

1  to exclude the rebates that are provided mainly to
2  payors and PBMs, which are not associated with the
3  sale of the product.  And so we researched how one
4  would make those exclusions in the data, and these
5  codes give you that ability.
6    Q.   What do you mean when you say "payors"
7  in this context?  You said utilization rebates are
8  --
9    A.   Party payors, CIGNA, insurance
10 companies.  I mean, we're looking here mainly at
11 commercial.  I do think there's some federal
12 rebates as well.  But those are the -- that's what
13 I have in mind when I say "payors."
14   Q.   Focussing for a moment on the
15 utilization rebates paid to payors, is it correct
16 you wanted to exclude those because the rebates
17 paid to the third party payors does not impact the
18 underlying sales price for the NDC?
19   A.   Right.  WAC is -- here we're looking at
20 testing WAC, which is list price into the
21 wholesaler chain and is used also for direct sales
22 as well.  So that has nothing to do with the

Page 52

1  payors or the PBMs.
2    Q.   From your prior testimony in
3  Massachusetts, I know that you are aware that PBMs
4  sometimes operate mail order pharmacies.
5    A.   Correct.
6    Q.   Are PBMs paid utilization rebates in
7  connection with that activity?
8    A.   So my understanding is this is exactly
9  how the purchase-based rebates versus the
10 utilization-based rebates separate, so that you
11 can get and apply the purchase-based rebates that
12 are coming from the mail order pharmacy operations
13 of a particular PBM but exclude the utilization-
14 based that are coming from, say, their formularies
15 or other arrangements they may have with a
16 particular manufacturer.
17   Q.   So is it your understanding that Glaxo
18 does not pay utilization rebates to PBMs in
19 connection with their mail order activities?
20   A.   That would not be under the provider
21 utilization category, right.
22   Q.   What do you mean when you say "provider

Page 53

1  utilization category"?
2    A.   Well, I'm speaking generally of
3  pharmacies, physicians in the case of physician-
4  administered drugs.  Those who dispense the
5  product, which would include mail order
6  pharmacies.
7    Q.   So is it correct to say that your
8  intention in excluding the utilization rebates was
9  to exclude those rebates that were paid to
10 entities that were not actually purchasing the
11 drugs?
12   A.   Right.  So that's why I say we processed
13 these separately.  We look at the utilization-
14 based rebates and keep those that are associated
15 with a provider, as I've been describing it, and
16 exclude those that are associated with a payor or
17 PBM.  And that's why we've separated them here for
18 processing.
19   Q.   And is it correct that you make those
20 exclusions on the basis of whether the entity is
21 categorized as retail or something other than
22 retail within the GSK data?

14 (Pages 50 to 53)

Page 54

1    A.  It's not limited to retail I think in
2  the sense that you mean.  It would be all
3  provider-based, whether or not they're a retail
4  pharmacy or a mail order pharmacy or a physician
5  or a clinic or a hospital.  Those would all be
6  included in the utilization-based rebates that are
7  reserved and used in the analysis.
8    Q.  And they would have to be included,
9  wouldn't they; otherwise you wouldn't be able to
10  calculate an accurate sales price for those
11  purchasing entities.
12    MR. HEROLD:  Objection to the form.
13    A.  Well, if you're interested in a net
14  price, then they should be included in the
15  analysis.
16    Q.  And your objective here was to arrive at
17  net prices.  Part of your objective.
18    A.  For comparison with the WAC.
19    Q.  We're staying on Exhibit 6 for a moment.
20  Do you see the entry -- the code that reads,
21  "Aggregate rebates to the annual level, collapse,
22  sum purchase rebate utilization rebate by NDC,

Page 55

1  year, customer number, customer category"?
2    A.  Yes, ma'am.
3    Q.  Can you explain that particular code?
4    A.  Sure.  So the collapse function -- maybe
5  I'll even back up a little further than that.
6    A starred line is a comment, so it
7  doesn't have any effect on the code.  So that's
8  our way of helping others understand what our code
9  is doing.
10    Q.  Thank you.
11    A.  Then the actual code itself is the line
12  that's just under that which says "collapse, sum
13  purchase rebate," et cetera.  And collapse is an
14  aggregation.  You could take the average, you
15  could take the weighted average.  But here sum is
16  telling us to sum all of the various variables
17  that follow, here purchase rebate, utilization
18  rebate.
19    And then the "by" statement tells you
20  over which variables do you make that summation.
21  And so here we're summing across an NDC, a year
22  and a customer number and a customer category.

Page 56

1    Q.  So this particular piece of code would
2  result in the total rebate to a particular
3  customer for a given year for a particular NDC.
4    A.  Correct.
5    Q.  And then the result of the code that we
6  see in Exhibit 6 creates another intermediate
7  dataset that pertains to the rebate payments, is
8  that right?
9    A.  Yes, ma'am.
10    MS. CICALA:  7.
11    (Exhibit Gaier 007 for
12  identification, Charge-Back Data Extraction Code.)
13    Q.  Dr. Gaier, can you confirm that Exhibit
14  7 is the code relating to the extraction of the
15  chargeback data?
16    A.  It is.  Again, it functions at an
17  intermediate step in the process after the basic
18  data has been compiled in SQL and passed out to an
19  intermediate file, which this program, Exhibit 7,
20  then calls.
21    Q.  And I guess the comment at the top
22  reads, "This code extracts the chargeback data

Page 57

1  prepared in SQL and then drops a customer with
2  incomplete transactional data."  Do you see that?
3    A.  I do.
4    Q.  Can you explain what's meant by "drops a
5  customer with incomplete transactional data"?
6    A.  That is referring to the code that is
7  several lines below that, begins with "drop
8  customer."
9    Q.  Mm-hmm.
10    A.  "With incomplete transactional data."
11  It says drop if customer number is H000.  So my
12  understanding, and based upon our research, is --
13  first of all, in the data there's almost no
14  information about that customer.
15    This literally is -- this and a
16  description as being Los Angeles County I think
17  are the only things that we know about this
18  customer.  I don't think that there's significant
19  volume here, and I believe -- and I can't remember
20  which way it is, but there's quantity without
21  dollars or dollars without quantity.  And my
22  understanding was this is not a commercial

Gaier, Ph.D., Eric                                                                        January 14, 2009

New York, NY

Page 58

1  transaction.
2      Q.  Are you able to quantify in any way how
3  many transactions in the aggregate fall into the
4  category pertaining to a customer with incomplete
5  transactional data?
6      A.  I believe they only pertain to this
7  particular customer.  I don't know how many
8  observations that represents.  I think it's very
9  small in comparison to the aggregate size.  But I
10  don't know offhand.  It could easily be
11  determined.
12      Q.  Thank you.  It's very helpful, though.
13  This particular issue of the incomplete
14  transactional data pertains to a single customer,
15  is that right?
16      A.  That is my understanding.
17      Q.  Thank you.
18          Going back up to the comments at the
19  top, they continue, "The code then restricts sales
20  by GSK divestiture dates produced in the Alabama
21  litigation."  That's Exhibit 5, correct?
22      A.  Correct.

Page 59

1      Q.  And once again, the processed data is
2  then saved into an intermediate file which you
3  produced to us, right?
4      A.  Yes, ma'am.
5      Q.  Would anything in Exhibit 7 refresh your
6  recollection regarding how you would account for
7  chargebacks in your analysis when the chargeback
8  is paid after a divestiture date?
9      A.  I think we could probably determine that
10  from the code.  Do you want me to spend a minute
11  to look at that?
12      Q.  Yes, thank you.
13      A.  (The witness reviews the document.)
14          My best understanding of the code, and
15  referencing also Exhibit 5 to my deposition, is
16  that we would completely exclude data of any kind,
17  sales, chargebacks or rebates, after the
18  divestiture date.
19      Q.  So then if, for example, a chargeback
20  was paid to a customer, or a rebate was paid to a
21  customer after a divestiture date in connection
22  with a sale that occurred prior to the divestiture

Page 60

1  date, the initial sale would be included in your
2  analysis, but any adjustment that might have been
3  made because of the rebate or chargeback would not
4  have occurred.
5      A.  I think mechanically you're correct.  I
6  wouldn't expect that to be much volume.  But I
7  think that mechanically you're correct.
8      Q.  Thank you.
9          Do you have any -- can you tell us what
10  the volume of incidence -- withdrawn.
11          Could you estimate or do you know how
12  often such an event may have occurred?
13      A.  Not as I sit here, no.
14      Q.  But your expectation is that it would be
15  small.
16      A.  I would expect it to be small.  And it
17  could be identified with minor modifications to
18  this code.
19      Q.  Understood.
20          (Exhibit Gaier 008 for
21  identification, "Prepare Charge-Back Data" Code.)
22      Q.  Dr. Gaier, we've marked as Exhibit 8

Page 61

1  another set of code that is entitled, or has the
2  comment at top "prepare chargeback data."  Do you
3  see that?
4      A.  Yes, ma'am.
5      Q.  Can you explain for the record what
6  Exhibit 8 is?
7      A.  Again, it's an intermediate processing
8  file.  This particular file loads I think data,
9  the intermediate file that we previously looked at
10  associated with the chargeback --
11      Q.  The chargeback extraction result?
12      A.  Correct.  And does a number of things to
13  ultimately prepare the data for the testing.
14  Merges on, for example, the First Data Bank WAC as
15  the very first set of commands.  It fills down
16  that WAC information so that every observation has
17  a WAC associated with it.  Things of that nature.
18  Standardizes some of the field names.  It
19  aggregates the chargeback data because in another
20  program, what we'll see is that we have to remove
21  the indirect sales from the direct sales database
22  so that -- otherwise there will be double-counting

16 (Pages 58 to 61)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 62

1   of a direct sale which also becomes an indirect
2   sale. So it prepares the data for that step.
3          So a number of data processing steps
4   such as that are done in this file.
5      Q.   And here -- this code is just being run
6   on the chargeback extract, right?
7      A.   Well, it also brings in the First Data
8   Bank WAC data, for example. But I think generally
9   speaking, you're correct. Well, it also draws in
10  the rebate data. About two-thirds of the way down
11  on page 1 where the comment says "apply and deduct
12  the rebates," it matches the rebate data to the
13  indirect sales, if there are any. So it matches
14  those and joins those into a larger dataset.
15     Q.   You're matching the purchase and
16  utilization rebates to the chargeback data if
17  possible, isn't that right?
18     A.   Yes.
19     Q.   Both. And then where there's no
20  matches, my understanding is that the rebates are
21  then applied to the direct sales results.
22     A.   Correct. They're preserved, they're

Page 63

1   saved out separately if they're not matching and
2   they are later applied to the direct sales data.
3      Q.   But with the exception of the non-retail
4   utilization rebates, right?
5      A.   Again, retail meaning all types of
6   provider, you would be correct.
7      Q.   So the non-retail -- I'd like to go
8   through the code if we can. Let's start with the
9   code that talks "apply and deduct rebates." Do you
10  see that comment with the three asterisks in the
11  middle of the page?
12     A.   Yes, ma'am.
13     Q.   That's a comment that's describing a
14  series of code that follows, right?
15     A.   Yes, ma'am.
16     Q.   So first we see "merge on rebate data."
17  Another comment, right?
18     A.   Yup.
19     Q.   And then is this the code, "sort NDC
20  year and customer number"?
21     A.   Yes, data -- before you actually merge,
22  you need to have both of the datasets ordered in

Page 64

1   the same quarter by sort fields. So that's
2   accomplishing that and feeding the very next line,
3   which is actually the merge.
4      Q.   And you see year, the customer, the
5   merge of -- the NDC year and the customer number
6   with the extract that you have for the rebates.
7      A.   I would say more properly, it's merging
8   by those variables. So those variables appear in
9   both of the datasets that we intend to merge. One
10  is the chargeback data, and one is the rebate
11  data. They're the bridge, if you will, between
12  those two datasets. Yes. So it joins all of the
13  various fields in those two datasets by those
14  linkages, if you will.
15         MS. CICALA: Off the record for a
16  moment.
17         THE VIDEOGRAPHER: Off the record, it's
18  11:08 a.m.
19         (Recess taken.)
20         THE VIDEOGRAPHER: Back on the record.
21  It's 11:09 a.m.
22         (Exhibit Gaier 009 for

Page 65

1   identification, Charge-Back Indirect Customers
2   Document.)
3   BY MS. CICALA:
4      Q.   Dr. Gaier, we've marked as Exhibit 9
5   what I'll tell you is a true and complete copy of
6   our extraction of the chargeback indirect
7   customers from the chargeback sales subject DTA
8   file that was produced to us.
9      A.   I see that.
10     Q.   Have you seen -- I don't know if you've
11  seen this in this format before, but are you
12  familiar with this particular file that contains
13  the indirect customers?
14     A.   I haven't seen it printed out in this
15  way. But it doesn't surprise me that these fields
16  exist in those files.
17     Q.   In Exhibit 9 you see the first column on
18  the left -- and just for the record, the document
19  is 1,500 pages. We reduced it and double-sided it
20  for ease. Although I acknowledge it makes the
21  printing rather small.
22         Do you see just focussing on page 1 of

17 (Pages 62 to 65)

Page 66

1  the document, you see in the far left there's a
2  field header entitled "customer number"?
3      A.  Yes, ma'am.
4      Q.  And then the middle field is customer
5  name, right?
6      A.  Yes, ma'am.
7      Q.  And the third field is customer
8  category.  Do you see that?
9      A.  I do.
10     Q.  So just focussing on customer number for
11 a moment and referring to the code that is Exhibit
12 8, we were talking about the merge on rebate data
13 and the instructions "sort NDC year, customer
14 number."
15     A.  Yes, ma'am.
16     Q.  So are the customer numbers that we see
17 in Exhibit 9 the customer numbers that are
18 referenced in that particular piece of code?
19     A.  I believe so.
20     Q.  These customer numbers are -- do you
21 know whether these customer numbers are assigned
22 by GSK?

Page 67

1      A.  Yes.  They're not assigned by my staff,
2  for example.
3      Q.  So in the context of your analysis and
4  your work with the rebates, pursuant to the prior
5  code, you had organized the rebates that were paid
6  to each of the customers, if any, listed in
7  Exhibit 9, is that right?
8      A.  Correct, yes.
9      Q.  So focussing on the code again in
10 Exhibit 8, you're now merging -- what exactly are
11 you doing with the rebate data when you sort --
12 when you merge the rebate data with the chargeback
13 extract?
14     A.  Right.  So we have chargeback extract on
15 the one hand and a rebate data extract on the
16 other hand.  And they have a set of customer
17 numbers, NDC numbers.  And the merge accomplishes
18 a join of those two separate databases, or those
19 two separate data tables, if you will, by NDC and
20 by customer number.
21     Q.  Very well.  Now, let's continue with the
22 code in Exhibit 8.  The next series -- the comment

Page 68

1  says "replace rebate amounts to zero if they are
2  missing."  Replace -- that's the comment, right?
3      A.  Yes.
4      Q.  Go ahead.
5      A.  That's what the comment says and then
6  the underlying two lines underneath that executes
7  that comment.
8      Q.  Can you explain the comment though?  I
9  don't understand the comment.  Can you explain --
10     A.  So if there's a join of these two pieces
11 of data fields but there are no rebates for a
12 particular customer in a particular year for a
13 particular NDC, they will mechanically result as
14 missing, which is to say that they're zero.  And
15 so we just apply zero to the missings.
16     Q.  That makes sense.
17         The next comment reads "zero out
18 utilization rebates to non-retail customers."  Do
19 you see that?
20     A.  Yes, I see that.
21     Q.  And is that the -- does that comment
22 reflect your earlier testimony that your objective

Page 69

1  was to remove -- was to not consider utilization
2  rebates that were paid to customers who were not
3  actually purchasing Glaxo's products?
4         MR. HEROLD:  Objection to the form.
5      A.  I would need to look -- in an earlier
6  step of the code we define what is retail.  We
7  take all the various customers and put them into
8  groups.  So to fully answer your question -- I
9  believe that's one of the very first SQL codes,
10 but I think I would want to look at that in order
11 to better answer your question.
12     Q.  Well, the code under this comment reads,
13 "Replace utilization rebate equals zero if
14 customer category equals retail."  Did I read that
15 right?
16     A.  No.  Is not equal to retail.  So the
17 exclamation point in this data is a not equal to.
18     Q.  So this code is saying if the customer
19 category is not retail, replace the utilization
20 rebate with a zero.  In other words, zero out any
21 rebate paid to the non-retail customer.
22         MR. HEROLD:  Objection.  Objection to

18 (Pages 66 to 69)

Gaier, Ph.D., Eric

January 14, 2009

New York, NY

Page 70

1  the use of the word "customer" in particular.
2      A.   That's why I would want to look at how
3  we've defined "retail" at an earlier step.  This
4  is our classification associated with the retail.
5  And I would just want to look at how we've defined
6  that.  But yes, mechanically that is what is
7  accomplished in that step.
8      Q.   Looking at Exhibit 9, you see there's a
9  column for the chargeback indirect customers
10 that's entitled "customer category"?
11     A.   Yes.
12     Q.   And do you see, just flipping through
13 the document, you see that some of the customers
14 are identified as being in the retail category?
15     A.   I see that.
16     Q.   And then we also have the category
17 "other."
18     A.   I see that as well.
19     Q.   Now, is it correct that the code that we
20 see in Exhibit 8 would be zeroing out the
21 utilization rebates paid to all of the "others" in
22 Exhibit 9?

Page 71

1      A.   If there are any, mechanically that's
2  correct.
3      Q.   What do you mean "if there are any" --
4  oh, if there are any rebates.
5      A.   If there are any rebates.
6      Q.   Do you know if there were any
7  utilization rebates paid to the entities that are
8  identified as "other" in Exhibit 9?
9      A.   I can't say offhand.
10     Q.   Were the customer category designations
11 in Exhibit 9, are those GSK's designations or
12 yours?
13     A.   The customer categories in Exhibit 9?
14     Q.   Yes.
15     A.   Well, it's based upon the underlying
16 documentation.  But we've made the categorization,
17 Bates White.
18     Q.   So you put the words "retail" or "other"
19 into this customer category column?
20     A.   Based on the other information about
21 these customers, that's correct.  And that occurs
22 in that first SQL code that I referenced a couple

Page 72

1  questions ago.
2      Q.   So what we see here then in Exhibit 9
3  would be -- would reflect your designations into
4  these categories pursuant to that SQL code.
5      A.   Yes.
6      Q.   If I could ask you to flip to page 108
7  of Exhibit 9.
8      A.   108 of Exhibit 9, okay.  I have it.
9      Q.   So looking at -- let's actually look at
10 -- we can look at almost -- let's look at page
11 106.  You see the reference to customer named Big
12 Bear Pharmacy.  There's quite a few entries there.
13     A.   Sure.
14     Q.   And do you see they're all in the
15 customer category of "other."
16     A.   I see that.
17     Q.   Can you explain why that would be?
18     A.   It would be based upon information
19 that's in the Glaxo database as to customer type
20 and customer subtype.  So again, that's processed
21 in that SQL code that we've been describing.
22     Q.   So is it fair to say, just so I

Page 73

1  understand your process, there was information
2  elsewhere -- there was information in Glaxo's data
3  systems that led you to conclude that Big Bear
4  Pharmacy was not a pharmacy, a retail pharmacy,
5  but was something else?
6      A.   Right.  The customer type or customer
7  subtype information would have led us to that
8  conclusion.
9      Q.   How about if you could flip to page 1156
10 of Exhibit 9.
11     A.   Okay, I have it.
12     Q.   You see the customer name on this --
13 actually, on all four pages -- let me just keep
14 the record clean.  You see reference to the
15 Safeway as a customer name?
16     A.   I may be on the wrong page.  What page
17 are you asking?
18     Q.   1156.
19     A.   Okay, I'm definitely on the wrong page.
20     Q.   My apologies, I may have been unclear.
21     A.   Okay, I have it.
22     Q.   Do you see the customer named Safeway

19 (Pages 70 to 73)

Gaier, Ph.D., Eric                                                                    January 14, 2009
New York, NY

Page 74

1    and there's many different Safeway stores listed?
2        A.   Mm-hmm.
3        Q.   And again, the customer category is
4    "other," correct?
5        A.   Right.  Based upon the customer subtype
6    -- type/subtype mapping.
7        Q.   It's fair to say that we could flip
8    through all 1,500 pages of this document and your
9    answer would be the same for every designation,
10   that whether it's retail or "other" reflects your
11   conclusions after reviewing GSK data as to the
12   customer category.
13       A.   And I just want to be clear that with
14   respect to all of these, the purchase-based
15   rebates are absolutely included.  The only thing
16   which would be excluded would be the utilization-
17   based rebates, if any.  And I believe those are
18   small, but we would have to check.  Those would be
19   excluded.
20       Q.   Let's look at, if we could, page 588 of
21   this same exhibit, Exhibit 9.
22       A.   I'm sorry, 588?

Page 75

1        Q.   Yes.  Actually, I'm sorry, I'm going to
2    go to another page.  Let me withdraw that, please.
3            Can you describe generally for me what
4    sort of other information in GSK's data systems
5    would lead you to conclude that an entity was not
6    a retail pharmacy?  I think you gave Safeway, for
7    example.  What sort of information would you see
8    in GSK's data that would suggest to you that
9    Safeway was not running a retail pharmacy?
10       A.   Again, I want to be clear that the
11   purchase-based rebates would be included.
12       Q.   I understand.  We're only talking about
13   utilization rebates.  I understand that.
14       A.   Right.
15           MR. HEROLD:  If any.
16       Q.   If any.
17       A.   If any.  We would have relied on the
18   order type/subtype designation.  There are
19   probably thousands and thousands of pharmacies in
20   here.  We did not undertake a manual exercise to
21   see whether the names completely corroborate those
22   order type and subtype -- excuse me, those

Page 76

1    customer type and subtype.  So it wasn't a manual
2    process.
3        Q.   Did you review the volume of utilization
4    rebates that were paid to the customers in the
5    "other" category?
6        A.   Yes.
7        Q.   And what was that volume?
8        A.   I don't know offhand.  I can say that
9    I've looked at a screen capture, if you will, of
10   listing from high to low, the most prominent non-
11   retail utilization rebate customers.  And on a
12   list of 20, I think every one or virtually every
13   one was a PBM or a payor.  So that's my basis for
14   saying that I think that the amounts that you're
15   asking me about are small.
16       Q.   Have you ever looked at a list of the
17   utilization rebates paid to all customers as
18   opposed to just the non-retail customers?
19       A.   Utilization-based?  Yes, I believe so.
20       Q.   That's the volume that I'm interested
21   in.
22       A.   So is retail in that?

Page 77

1        Q.   Yes.  Well, from your last answer, I
2    understand that you looked at the utilization
3    rebates paid to the non-retail customers.  And
4    when doing so you discovered that the majority of
5    them were paid to PBMs, correct?
6        A.   Yes.
7        Q.   We've seen the same results.  Have you
8    looked at the utilization rebates paid to all
9    customers, be they direct or indirect?
10       A.   Yes, I believe so.
11       Q.   And what is the volume of utilization
12   rebates that you've seen paid to all customers?
13       A.   I don't know the number offhand.
14       Q.   Do you know whether GSK pays utilization
15   rebates to pharmacies?
16       A.   I believe they did early in the time
17   period of the data, small amounts.  But that is
18   something that I believe that they no longer do to
19   any significant degree.
20       Q.   What's the basis for that belief?
21       A.   I've been describing the screen captures
22   that I looked at in order to look at the

20 (Pages 74 to 77)

Henderson Legal Services, Inc.

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 78

1    sensitivity of various inclusions and exclusions
2    that we make.  And that is my recollection of one
3    of those.
4        Q.   Did you conduct any sort of sensitivity
5    analysis with respect to the utilization rebates
6    paid to pharmacies during the early part of the
7    time period at issue here?
8        A.   I don't know what you mean by
9    "sensitivity analysis."  I described what I looked
10   at.  The only place that I recall seeing any
11   utilization-based rebates paid to retail were in
12   the early time frame, like '97, maybe '98.  But a
13   very small blip, if you will you.  The predominant
14   utilization-based rebates are paid to payors.
15       Q.   Does your analysis include the
16   utilization-based rebates that were paid to retail
17   in the early time frame?
18       A.   Yes.
19       Q.   And here, though, again, when we talk
20   about retail, we're talking about the retail
21   designation that you gave to the customers in
22   Exhibit 9, correct?

Page 79

1        A.   Correct.
2        Q.   So to the extent that designation may be
3    wrong, then your assessment of the impact of those
4    rebates on those entities' prices would be
5    incorrect, isn't that right?
6        MR. HEROLD:  Objection to the form.
7        A.   In response to your earlier question, I
8    said that I looked at all of them without respect
9    to the designation of "other" or "retail" here.
10   So I think not.  I think I've looked at it in
11   those ways.
12       Q.   Can you quantify what percentage of
13   utilization rebates were zeroed out in your
14   analysis?
15       A.   Well, this would zero out utilization-
16   based rebates to the payors and the PBMs, which,
17   as we've been discussing, are by far the vast
18   majority of those utilization rebates.  So it
19   would have appropriately zeroed out a substantial
20   portion.
21       Q.   So it wouldn't surprise you to hear, for
22   example, that only 3.5 percent of your utilization

Page 80

1    -- of the total utilization rebates were allocated
2    in your process.
3        A.   That would be about what I'd expect.
4        MS. CICALA:  Let's mark this as 10.
5        (Exhibit Gaier 010 for
6    identification, Total Purchase Rebates/Total
7    Utilization Rebates Document.)
8        Q.   Dr. Gaier, what we've marked is a
9    document that we've created from the sources that
10   are identified at the bottom left corner.  And
11   those sources are the GSK's rebates.dta file and
12   the intermediate row level results from your "'03
13   Calculate sales at WAC" script.
14       A.   Okay.
15       Q.   Consistent with my last question, this
16   document shows that only $11 million of total
17   utilization rebates were applied in your analysis
18   out of a total of $3.5 billion that was paid over
19   the time period in utilization rebates.  And that
20   ratio seems consistent with your expectation, is
21   that right?
22       A.   I know that the utilization-based

Page 81

1    rebates that did not go to payors and PBMs is very
2    small.  So I'm not surprised by that.
3        Q.   Let's continue with Exhibit 8.
4        A.   Okay.
5        Q.   Can you explain how you matched rebates?
6        A.   To the indirect sales, to the
7    chargebacks?
8        Q.   Yes.  My understanding is that you
9    matched purchase and utilization rebates to the
10   chargeback data where you could.
11       A.   Correct.
12       Q.   You'd match them by NDC year and
13   customer, is that it?
14       A.   Yes.
15       Q.   Anything that was not matched you
16   allocated to the direct sales extract, is that
17   right?
18       A.   That's right.
19       Q.   Looking at Exhibit 8, your comment "save
20   out unmatched rebates," is that comment associated
21   with the code where you're basically grabbing the
22   unmatched purchase and utilization rebates so that

21 (Pages 78 to 81)

Page 82

1   they may be applied to the direct sales dataset?
2       A.   Yes.  This part of the code saves them
3   out to a file that can then be read in in the
4   course of another program to attach them to the
5   direct sales so that they're entirely preserved.
6       Q.   Can you explain on page 2 of Exhibit 8
7   later in this series of code, I see a comment that
8   says "drop unmatched rebates."
9       A.   Yes.
10      Q.   Can you explain why that's there and
11  what that means?
12      A.   Well, having saved them out, they're
13  then dropped from the currently active processing
14  within this file.  But again, they're preserved
15  and saved out for later attachment to the direct
16  sales.
17      Q.   Okay, but you dropped them from the file
18  that's resulted from the code in 8, you dropped
19  the unmatched rebates so that you could then work
20  with the data that's left behind, so to speak.
21      A.   Precisely.
22      Q.   And then working with that data, you

Page 83

1   calculate essentially -- you calculate the average
2   transaction price to the customers that are
3   included in that dataset.
4       A.   No.  I think that happens later because
5   a customer may have some direct sales and some
6   indirect sales.  I'll look at the code, but I
7   don't think that happens at this point in the
8   code.  I don't think any of those calculations are
9   made on a partial dataset, as your question
10  implied.
11      Q.   I understand.  Thank you.
12          (Exhibit Gaier 011 for
13  identification, "Prepare Direct Sales Data" Code.)
14      Q.   We've marked as 11 another series of
15  code that's entitled "prepare direct sales data."
16  Do you see that?
17      A.   Yes, ma'am.
18      Q.   Can you describe what this particular
19  series of code is?
20      A.   It is analogous to the code that we were
21  just looking at.  That particular code that we
22  were previously looking at pertained to the

Page 84

1   indirect sales.  This is the analogous code which
2   further processes the direct sales data and
3   prepares it ultimately for the WAC analysis that
4   we did.
5       Q.   And does Exhibit 11 appear to be a
6   correct representation of the code connected with
7   that process?
8       A.   As far as I can tell sitting here, yes.
9       Q.   And for all of this code, would your
10  answer be the same as to who prepared it? You had
11  identified two gentlemen earlier.
12      A.   Yes.
13      Q.   A few questions on Exhibit 11.  Towards
14  the middle of the page, do you see the comment
15  that says, "Drop sales that are either missing WAC
16  or actual sales data"?
17      A.   Yes, ma'am.
18      Q.   Can you explain that particular code,
19  please.
20      A.   The code that's below it, it drops if
21  there's a missing WAC from First Data Bank or if
22  there simply are no direct quantity in the direct

Page 85

1   sales database associated with that particular
2   observation.  So that's what it does mechanically.
3       Q.   And do you know -- can you quantify what
4   percentage of sales were dropped for either of
5   these two reasons?
6       A.   I know on the WAC missing, it's very
7   small.  I can't quote you a number, but I think
8   significantly less than 1 percent.  And that
9   results from a period of time.
10      Typically when a new product is brought
11  to market, before First Data Bank has updated
12  their own system, the product may be in the market
13  selling.  And I'm not sure about the missing
14  direct quantity.  I'm not sure off the top of my
15  head.
16      Q.   The next comment reads, "Generate
17  uniform customer number for all direct sales to
18  wholesalers."  Do you see that?
19      A.   Yes, ma'am.
20      Q.   Why was that necessary?
21      A.   So the wholesalers appear under a
22  significant number of different customer numbers,

22 (Pages 82 to 85)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 86

1   which may all be associated with McKesson, for
2   example. Here we wanted to aggregate -- because
3   some of those customer numbers are used and we see
4   in the data received the sales and other customer
5   numbers received the rebates, for example, or
6   something of that sort.
7         So here we wanted to aggregate across
8   all of them because they're one customer. And
9   there's a mechanical reason, because we're going
10  to reduce the direct sales by the corresponding
11  indirect sales. So we want to make sure we
12  haven't dropped anything. We want to aggregate to
13  the broadest level for any particular wholesaler
14  in order to do that process accurately.
15        MS. CICALA: Let's mark this 12.
16        (Exhibit Gaier 012 for
17  identification, Direct Sales Customer List.)
18        Q.   Dr. Gaier, I'll represent to you that
19  Exhibit 12 is a document we created. We pulled it
20  from the source that's identified. It's the
21  direct sales subject DTA filed we received from
22  you. It's entitled "direct sales customer." It

Page 87

1   is a complete list of the direct sale customers
2   contained in the identified file.
3         Do these customers generally look
4   familiar to you as GSK's direct customers?
5         A.   Well, let me find some that I actually
6   recognize.
7         Sure. Amerisource is in here. This
8   looks familiar to me.
9         Q.   Let's just by way of example, let's turn
10  to page 57 of Exhibit 12.
11        A.   Okay.
12        Q.   You see there's the page consists of
13  multiple lines pertaining to Cardinal Health, Inc.
14  Do you see that?
15        A.   Yes, ma'am.
16        Q.   A variety of bill to numbers associated
17  with Cardinal Health, Inc.?
18        A.   Correct.
19        Q.   Would the code that we just reviewed
20  generating a uniform customer number for all
21  direct sales to wholesalers, would that code have
22  resulted in assigning a single number to Cardinal

Page 88

1   Health, Inc.? And I realize --
2         A.   That would have been the -- let me just
3   look at the code again.
4         So the code is going through and saying
5   if the word, in this particular case, "Cardinal"
6   appears in the customer bill-to name, then combine
7   that into the entity of -- a broader entity
8   "Cardinal."
9         Q.   And you see the headers in Exhibit 11,
10  the first field header is "bill to number" on the
11  left, right?
12        A.   Yes.
13        Q.   And then "bill to name" is the second.
14        A.   Correct.
15        Q.   And the third is "customer category."
16  Do you see that?
17        A.   I do.
18        Q.   Where did the information contained in
19  the customer category column come from, do you
20  know?
21        MR. HEROLD: Didn't you compile this?
22  You should know.

Page 89

1         MS. CICALA: Well, we extracted it
2   directly from the file.
3         Q.   Let me clarify my question. Do the
4   customer category designations that appear in
5   Exhibit 11 result from a process similar to what
6   you described when we were looking at the indirect
7   sales?
8         A.   Yes.
9         Q.   So these are not customer categories
10  that GSK assigns to these particular direct
11  customers.
12        A.   These are based upon the customer
13  type/customer subtype mapping using the same sort
14  of process that we described with respect to the
15  indirect sales data.
16        Q.   So could you explain, Dr. Gaier, why you
17  would have different categories assigned to
18  Cardinal Health, Inc.? Just looking at page 57
19  for example, you see sometimes it's retail
20  category, sometimes a wholesale category,
21  sometimes an "other."
22        A.   I see that. I don't have a ready

23 (Pages 86 to 89)

Gaier, Ph.D., Eric
New York, NY
January 14, 2009

Page 90

1  explanation for you.  I think it would have been
2  based upon the order -- excuse me, the customer
3  type/customer subtype information in the
4  GlaxoSmithKline database.
5      Q.   And I believe when we were talking about
6  the indirect sales you described that there was a
7  script that was written to arrive at the
8  categories that are presented in this exhibit, is
9  that right?
10     A.   Yes.  I think it's one of the very first
11 SQL scripts that actually calls the underlying
12 data and makes a customer categorization off of
13 the customer type/customer subtype information.
14     Q.   Do you know if that particular script is
15 one that's been produced to us?
16     A.   It would be my understanding.  I didn't
17 produce it myself.
18     Q.   That's fine.  Thank you.
19         MS. CICALA:  We are very close to the
20 end of the videotape so we're going to take
21 another break here.  Thank you.
22         THE VIDEOGRAPHER:  This is the end of

Page 91

1  tape number 2 in the deposition of Dr. Eric Gaier.
2  Going off the record, the time is 11:45 a.m.
3         (Recess taken.)
4         THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 12:04 p.m. This is the
6  beginning of tape number 3 in the deposition of
7  Dr. Eric Gaier.
8  BY MS. CICALA:
9      Q.   Hi there.
10     A.   Hi.
11     Q.   Back to Exhibit 11.  Now, there's a
12 comment that follows the code concerning the
13 disaggregation of the wholesaler customer numbers.
14 "Determine total direct sales dollars evaluated at
15 FDB WAC"?
16     A.   Yes.
17     Q.   Can you explain that comment and code?
18     A.   Well, when we ultimately do the WAC
19 testing, the way we do it is by comparing the
20 total net dollars for any given customer NDC and
21 year, with the total dollars of the same
22 quantities evaluated at the First Data Bank WAC.

Page 92

1         And here this is merely making that
2  calculation.
3      Q.   And then if we go down to the bottom of
4  the first page of -- to the bottom of the first
5  page of Exhibit 11, you see it says, "Apply
6  unmatched rebates to direct sales data"?
7      A.   Yes, ma'am.
8      Q.   So that's the application of the
9  unmatched rebate -- of the rebates that were not
10 able to be matched to the customers in the
11 indirect analysis, correct?
12     A.   That is correct.
13     Q.   And those unmatched rebates are applied
14 to the direct sales data on an annual basis,
15 correct?
16     A.   Let's see, I believe that's right.
17 Let's see.  On an NDC and year level I believe.
18     Q.   It appears that from the following code.
19 By NDC and by year.
20     A.   Yes.
21     Q.   We then see two comments that apply as
22 well to the unmatched rebates.  The first says,

Page 93

1  "Apply unmatched purchase-based rebates pro rata
2  to direct sales, sales and credits, to non-
3  wholesalers and non-retail classes of trade."  Do
4  you see that comment?
5      A.   I do.
6      Q.   Can you explain this particular part of
7  your process?
8      A.   So, again, we've separated for purposes
9  of our processing the purchase-based rebates from
10 the utilization-based rebates, which we'll likely
11 discuss below.  And the purchase-based rebates are
12 applied, as it says, pro rata to the direct sales,
13 to non-wholesalers and non-retail classes of
14 trade.  And that's because when we looked at where
15 the matched rebates occurred, that's the segments
16 of the industry, if you will, that they appeared
17 in.  So it's appropriate to apply them to the same
18 segment for which they matched.
19     Q.   So can one conclude, therefore, that GSK
20 is not paying rebates to wholesalers?
21     A.   Not in any measurable degree.  Purchase-
22 based.  Separately we'll look at utilization-

24 (Pages 90 to 93)

Gaier, Ph.D., Eric                                                          January 14, 2009
New York, NY

Page 94
1   based.  But here we're talking about purchase-
2   based.
3        Q.   Could you alternatively have instructed
4   -- have written code that simply said "apply
5   unmatched purchase-based rebates pro rata to
6   direct sales"?
7        A.   We could have.  In my view that would
8   have been less accurate because it would have
9   smoothed them across the variety of types of
10  purchases.  Rather than where we actually see the
11  matching ones being matched.  So I think it would
12  have been less accurate.  You could do that.
13       Q.   But it would have had a sort of diluting
14  effect on the -- never mind.  I'm going to
15  withdraw that.
16            You elected not to apply the unmatched
17  rebates across the board because of your
18  understanding that rebates were not paid across
19  the board, is that fair to say?
20       A.   Well, my understanding driven by having
21  looked at the data.  We're basing it upon where
22  the matched rebates were paid and, if you will,

Page 95
1   pro rata to the same segments for the unmatched.
2        Q.   So you had no reason to think the
3   unmatched rebates were paid to other segments.
4        A.   Right.
5        Q.   And why is that?
6        A.   I believe the substantial share of them
7   are matched.  So I think the unmatched one is not
8   the larger part when we're talking about the
9   purchase-based rebates at least.
10       Q.   And then by the same -- would your logic
11  be the same for the second comment here which
12  concerns the application of the unmatched
13  utilization-based rebates?
14       A.   Yes.  It's an analogous -- we distribute
15  them pro rata in the same segments where the
16  matched rebates are found.
17            MS. CICALA:  13.
18            (Exhibit Gaier 013 for
19  identification, Sales at WAC Analyses.)
20       Q.   We've marked as 13 another code extract.
21  This one's entitled "Sales at WAC analyses."  Do
22  you see that?

Page 96
1        A.   Yes, ma'am.
2        Q.   And can you explain what Exhibit 13 is,
3   please?
4        A.   Let me review it quickly.
5        Q.   Sure.
6        A.   I think this is where we actually
7   conduct -- bring all the various data sources
8   together and actually conduct the WAC analysis
9   that ultimately is then reported in the affidavit.
10  That's what goes on in this computer program.
11       Q.   Okay.  So taking it from the top, the
12  first comment is, "Load aggregated chargeback data
13  for netting out of direct sales."  And then
14  there's the actual code, correct?
15       A.   Correct.
16       Q.   Is it correct that this is your effort
17  to avoid double-counting from the direct sales?
18       A.   Correct.  We -- let me just be clear.
19  We preserve all of the indirect sales and net out
20  the indirect sales against the direct sales.  So
21  what's lost is the duplication of the direct sales
22  that otherwise become indirect sales.

Page 97
1        Q.   Understood.  The second comment is,
2   "Merge chargeback data to be netted out with
3   direct sales."  Do you see that?
4        A.   Yes, ma'am.
5        Q.   Can you explain that comment?
6        A.   So the first -- refer back to the very
7   first comment where we're loading the chargeback
8   data.  And then here we're going to merge it on
9   with the direct sales data.  And that will then
10  allow the netting out to occur.
11       Q.   Thank you.  Right, if you just load and
12  don't merge, then you haven't achieved your
13  objective, right?
14       A.   Correct.
15       Q.   Thank you.
16            Then the next -- the next comment is,
17  "Distribute chargebacks to wholesalers pro rata."
18  Can you explain why you did that?
19       A.   Well, there's no direct linkage between
20  an indirect sale and a direct sale.  So we don't
21  know exactly which direct sales to net out from
22  the wholesalers.  Although it turns out to be

25 (Pages 94 to 97)

Gaier, Ph.D., Eric                                                                    January 14, 2009
New York, NY

Page 98

1   immaterial because those go through at WAC in the
2   direct sales database. So we just apply them pro
3   rata in proportion to each wholesaler's sale.
4        So for example, if McKesson has 30
5   percent of the wholesaler sales for that NDC in
6   that year, then they will get 30 percent of those
7   direct sales -- 30 percent of the total volume of
8   indirect sales netted against their direct sales.
9        Q.   And I understand that. Now, how does
10  the chargeback distribution occur?
11       A.   Well, when I say indirect sales, I'm
12  talking about the chargebacks.
13       Q.   You're talking about the chargeback
14  payment.
15       A.   Correct.
16       Q.   Understood. The file that is created
17  with the code that we identified as Exhibit 7
18  would represent the total chargebacks that would
19  be distributed across the wholesalers, is that
20  right?
21       A.   Right. I mean, so let me just be clear.
22  The indirect sales data contains a net invoice

Page 99

1   price.
2        Q.   Right.
3        A.   And that's what we're using to replace
4   the direct sale and avoid that double-counting.
5   You're referring to it as a chargeback. And okay,
6   I think we understand each other, but it really is
7   just a sale, an indirect sale which has all the
8   items that correspond to a sale. Customer numbers
9   and so forth. And those are used to de-duplicate
10  the direct sales.
11       Q.   I understand, right. But it's not as if
12  the chargeback is applied as an offset to adjust
13  the direct sale price. Rather, the price that was
14  calculated on the indirect sales data replaces --
15       A.   Overrides, if you will, the volume
16  associated with the direct sale.
17       Q.   I understand. Thank you.
18       Moving down to the bottom of page 13,
19  you see there's three asterisks and a comment,
20  "Calculate sales, WAC sales and quantity for every
21  NDC year and customer."
22       A.   Yes.

Page 100

1        Q.   That comment reflects the code that
2   follows, which is where all this data really comes
3   together in terms of your analysis, isn't that
4   right?
5        A.   Yes.
6            (Exhibit Gaier 014 for
7   identification, NDC Extract.)
8        Q.   I've marked as Exhibit 14 something that
9   I'm going to refer to as the NDC extract. This is
10  simply the first, like, 17 rows of a file that was
11  generated by outputting an intermediate result
12  within your calculation script that's reflected in
13  Exhibit 13.
14       A.   Okay.
15       Q.   It's multiple pages, but it represents
16  all of the headers across an Excel spreadsheet.
17       A.   So we should set these up wide, if you
18  will.
19       Q.   We can.
20       A.   Conceptually to understand what's here -
21  -
22       Q.   Conceptually that would make the most

Page 101

1   sense. I could not come up with another way to do
2   this.
3        For the record, this is simply an
4   extract so that I can be sure we understand the
5   process and the field headings that are being
6   utilized by you in your WAC analysis.
7        A.   Okay.
8        Q.   With that lengthy introduction, does
9   Exhibit 14 -- does the format of Exhibit 14 look
10  familiar to you as an Excel spreadsheet that would
11  represent one of the intermediate results
12  generated by the code in Exhibit 13?
13       A.   Are you representing that this is an
14  extract from intermediate data table that is
15  produced by the code or that you've stopped the
16  code at some point in time and printed out
17  whatever the results of that point in time were?
18       Q.   This is the former. It's an extract of
19  a data table that was produced as a result of the
20  running of all code set forth in Exhibit 13.
21       A.   Okay.
22       Q.   And if you'd look at the last page of

26 (Pages 98 to 101)

Page 102

1  Exhibit 14, I'll note that at the very -- on the
2  last page we see what appears to actually be some
3  conclusions with respect to the NDC that's being
4  studied in Exhibit 14. Though again, Exhibit 14
5  is not complete, it's not meant to be a complete
6  summary. It's just an extract of one year for a
7  particular NDC.
8      A. Okay. I think I understand what Exhibit
9  14 is. They appear to be fields that I would
10 expect to see. I'm not sure I can go much beyond
11 that in terms of endorsing what it is.
12     Q. Okay. Let's see if we can proceed
13 nevertheless.
14         In order to conduct your WAC sales
15 analysis, we've established that you're drawing
16 from three basic datasets, correct? The rebate
17 data, the direct sales data and the chargeback
18 data.
19     A. And the FDB WAC data.
20     Q. Thank you. Just thinking of the GSK
21 data that you're drawing from. It's the rebate
22 data, the chargeback data and the direct sales

Page 103

1  data.
2      A. Roughly speaking, that's right.
3      Q. So all of that data, the codes that
4  we've reviewed this morning is applied to that
5  data and then now we're at the stage where the
6  data is actually -- where you're applying codes to
7  the resulting datasets in order to actually
8  conduct -- to reach the conclusion as to what
9  percentage of sales were at or about WAC.
10     A. Correct.
11     Q. And the code set forth in Exhibit 13 is
12 the code that produces those results on an annual
13 basis, as I understand it.
14     A. Yes. I think that's right.
15     Q. And Exhibit 14 is an excerpt of a much
16 larger collection of data that is meant merely to
17 represent the data fields that are involved in
18 some way in reaching the conclusions that are
19 generated by the code in Exhibit 13.
20     A. Right. I think Exhibit 14, I heard you
21 say 13 but maybe I just misheard that.
22     Q. No, I think I had it. But I appreciate

Page 104

1  it.
2      A. Sorry.
3      Q. That's fine.
4          Okay. Now, Exhibit 14, as I say, is an
5  excerpt really for illustrative purposes to
6  understand the way the code's operating. And
7  Exhibit 14 pertains to NDC 21921213. Do you see
8  that?
9      A. Yes, I do.
10     Q. Is it correct to say that you're
11 calculating on an annual basis, here we're talking
12 the year 2000, you're calculating what Cardinal,
13 the identified customer here, what Cardinal's
14 average price was for this NDC, net price for this
15 NDC in that calendar year?
16     A. Yes.
17     Q. And then once you've calculated that
18 price, you compare that price to the reported WAC,
19 correct?
20     A. Right. I think the actual comparison is
21 done at the level of pricing times quantity. So
22 it's measured in aggregate dollars. But

Page 105

1  conceptually speaking, what you've said is
2  correct.
3      Q. Right. And I see what you're referring
4  to. If you look to the last page of Exhibit 14,
5  it looks like we have the total quantity and the
6  total quantity at WAC -- let me try this by
7  referring to the actual field headers.
8          The second to last page of Exhibit 14
9  has as a column header "net sales." Do you see
10 that?
11     A. Yes.
12     Q. So that's the units times net price for
13 Cardinal for this NDC in that year.
14     A. Yes.
15     Q. And then looking at the last page of
16 Exhibit 14, you see it says "sales eval WAC"?
17     A. Yes, ma'am.
18     Q. Is that units times WAC?
19     A. Correct.
20     Q. And then the next is "total sales
21 quantity," which would be the result of units
22 times WAC.

27 (Pages 102 to 105)

Gaier, Ph.D., Eric                                                January 14, 2009
New York, NY

Page 106

1    A.   No.  That is just the number of units
2  sold I believe.
3    Q.  Okay, thank you.
4    A.  So --
5    Q.  You're right.  My apologies.  That's
6  just units sold.
7        The next column reads, "Price WAC
8  ratio."  Do you see that?
9    A.  Yes.
10   Q.  Can you explain what that column is?
11   A.  I believe that that is merely the ratio
12 of the "net sales column" to the "sales evaluated
13 at WAC column."
14   Q.  Okay, and then the column that says "WAC
15 95 sales," what is that column?
16   A.  That is the results of the test.  So
17 that is a flag which indicates whether or not it's
18 within 95 percent of the WAC.  In other words,
19 whether this price-WAC ratio over here is greater
20 than or less than .95.  And so as you look down
21 you can see many of the sales for this particular
22 NDC in this particular year passed, then there's

Page 107

1  one that sales.  Down at the bottom, or two that
2  fail down at the bottom.
3    Q.  I think you're just talking about the
4  WAC.95, the binary entries.
5    A.  Yes.
6    Q.  I confused myself perhaps here.  The 1
7  is a pass and the zero is a fail, right?
8    A.  Yes.
9    Q.  In your analysis, a pass means that the
10 sales were more than 50 percent of the -- sorry,
11 why don't you tell me what a pass means.
12   A.  A pass is whether or not for that
13 particular customer NDC and year they were within
14 5 percent of WAC.  We further accumulate each of
15 those pass/fails to determine whether 50 percent
16 of the sales quantity or sales dollars are within
17 -- pass the test within 5 percent.  So there's in
18 some sense two levels of testing that we have to
19 be clear about.
20   Q.  I understand, right.  Because you're
21 calculating this first on a per-customer basis.
22   A.  Correct.

Page 108

1    Q.  Per year, per customer, per NDC.  And
2  then you've got look at all the sales in the
3  aggregate for the year.
4    A.  Correct.
5    Q.  That is what the code in 13 does, right?
6  It brings us to that point where you could make a
7  conclusion for a given NDC, all sales for a given
8  year.
9    A.  Yes.
10   Q.  Now, I want to understand some of the
11 field headers on Exhibit 14 that concern rebates.
12   A.  Okay.
13   Q.  If you look at page 2 of Exhibit 14,
14 you'll see a field header for utilization rebate
15 and a field header for purchase rebate.
16   A.  Mm-hmm.
17   Q.  And then if you look at page 3 of
18 Exhibit 14, you'll see a field header for
19 allocation of purchase rebate and allocation of
20 utilization rebate.
21   A.  Mm-hmm.
22   Q.  Is it correct that the information

Page 109

1  contained in the allocation columns for purchase
2  and utilization rebate is the information that's
3  actually used by you in coming to the conclusions
4  in your WAC analysis?
5    A.  I think that these are the results of
6  applying the unmatched rebates.  And we're just
7  here tracking them separately, but they would of
8  course be included in the total net sales column,
9  which is the last entry on the third page.  So
10 they would be included.
11   Q.  That's my understanding as well.
12      Why are there field headers that show
13 utilization rebate and purchase rebate on page 2?
14   A.  Those would be the ones that are not --
15 those are coming from the ones that match.  So
16 there's no allocation, so they would be coming
17 from the matching from the indirect sales data.
18 So it's the summation of those that match and
19 those that don't match for any particular -- the
20 allocated portion of those that don't match for
21 any particular customer for any particular NDC in
22 each year.

28 (Pages 106 to 109)

Gaier, Ph.D., Eric

January 14, 2009

New York, NY

Page 110

1    Q.   So is it then correct to say you're only
2    allocating when you don't have a match?
3        A.   Mm-hmm.  That's the code that we looked
4    at before the break I think.
5        Q.   Okay, good, thank you.
6            (Exhibit Gaier 015 for
7    identification, Sales at WAC Results (agg).)
8        Q.   What we've marked as Exhibit 15 is
9    another code excerpt entitled "Sales at WAC
10   (agg.)"  Do you see that?
11       A.   Yes, ma'am.
12       Q.   Is it correct to say that Exhibit 15 is
13   the code by which you take the results of Exhibit
14   13 and aggregate them to the '97 through '05
15   period?
16       A.   It does two things.  I think there may
17   have been a little confusion about where we leave
18   off at the end of Exhibit 13 in the code.  So that
19   gives us the customer by customer, year by year,
20   NDC by NDC pass/fails.  This code then aggregates
21   across all the customers in a particular NDC in a
22   particular year to produce what's in tables D-1

Page 111

1    and D-2 and separately aggregates across the
2    entire time period, '97 to 2005, those same set of
3    test results in order to produce what's in Table
4    B-1 and B-2.
5        Q.   I see.  So at the end of the code in
6    Exhibit 13, you're left with by NDC by customer by
7    year, and you need to aggregate that in assorted
8    ways, as you've just described.
9        A.   Right.  And as shown here in Exhibit 14,
10   these are the results of each of the testing of
11   whether or not a particular customer is within 95
12   percent of WAC.  And then you can aggregate that
13   on an annual basis, as I do in Table D, or on an
14   overall basis, as I do in Table B.  And that's
15   what's accomplished -- that last part is
16   accomplished by the code in Exhibit 15.
17           (Exhibit Gaier 016 for
18   identification, WAC Indirect Sales CB/Analysis.)
19       Q.   Dr. Gaier, we've marked as Exhibit 16 a
20   document we've created.  The sources are
21   identified at the bottom of the first page.  The
22   source note reads "Gaier's production altered to

Page 112

1    drop direct sales prior to computing WAC ratio and
2    rerun."  And it's from the Gaier direct sales
3    subject DTA and the chargeback subject DTA file
4    and the rebates DTA file.
5            My understanding of Exhibit 16 is that
6    it presents the results of the code that we looked
7    at as Exhibit 8 where you apply the rebate --
8    where you apply the rebates to the chargeback to
9    the indirect file.
10       A.   I just need to find Exhibit 8, I'm
11   sorry.
12       Q.   Certainly, take your time.
13       A.   Okay, I have Exhibit 8.  I'm afraid
14   you'll have to repeat what you said.
15       Q.   That's fine.  My understanding --
16   Exhibit 16 is meant -- I'm sorry, Exhibit 15 is
17   meant to capture the results of your -- is meant
18   to capture the results basically of your WAC
19   analysis for the indirect sales.  So it's meant to
20   capture a moment in your overall analysis.
21       A.   Exhibit 15 or Exhibit 16?
22       Q.   Did I mismark my exhibit?  Exhibit 16 is

Page 113

1    meant to capture your WAC analysis for the
2    indirect sales only.
3        A.   So not looking at the direct sales.
4        Q.   That's right.
5        A.   Only at the indirect sales.
6        Q.   That's right.
7        A.   Okay.
8        Q.   Is that something that you did in the
9    course of your analysis, was apply the WAC test to
10   the indirect sales only?
11       A.   No.  I mean, I tried to follow as
12   conservatively as I possibly could what Judge
13   Saris laid out.  And that's an evaluation of all
14   the relevant sales I think.
15       Q.   Fair enough.  Have you ever conducted a
16   your WAC analysis for indirect sales only?
17       A.   No.  Not to my knowledge.
18       Q.   If you were to conduct the WAC analysis
19   that you've done confining it to the indirect
20   sales, would you have any expectation as to how
21   those prices would compare to WAC?
22       A.   I think you would get different answers

29 (Pages 110 to 113)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 114

1   by different classes of trade.  I think for the
2   retail segments, I think many, many of them would
3   pass and I think the results would probably not be
4   too different.  I think if you look at, for
5   example, hospitals, it may be that some of them
6   fail.  But I haven't done that analysis and I
7   don't think that's the appropriate analysis.
8           MS. CICALA:  I'd like to break here for
9   lunch.  It's 12 of 1.  So if we can go off the
10  record.
11          THE VIDEOGRAPHER:  Off the record.  The
12  time is 12:35 p.m.
13          (Luncheon Recess:  12:35 p.m.)
14
15
16
17
18
19
20
21
22

Page 115

1           A F T E R N O O N   S E S S I O N
2                   1:55 p.m.
3
4           THE VIDEOGRAPHER:  We're back on the
5   record.  The time is 1:55 p.m.
6
7           ERIC GAIER, Ph.D.
8   resumed, having been previously duly sworn, was
9   examined and testified further as follows:
10
11          CONTINUED EXAMINATION.
12  BY MS. CICALA:
13      Q.  Welcome back, Dr. Gaier.
14      A.  Thank you.
15      Q.  You understand you're still under oath
16  from this morning?
17      A.  I do.
18      Q.  I'm going to return to the subject of
19  utilization rebates.  Exhibit 17.
20          (Exhibit Gaier 017 for
21  identification, Utilization Rebates.)
22      Q.  Dr. Gaier, we've marked as Exhibit 17 a

Page 116

1   document that we've created.  We pulled the
2   columns from two different sources which are
3   identified at the top of each page.
4       A.  Okay.
5       Q.  For the record, you'll see the first six
6   columns come from the GSK rebates file that was
7   produced to us in connection with your materials
8   and your affidavit.
9       A.  Okay.
10      Q.  And then the last four columns on each
11  page come from the GSK ORS CNB and B1 file.  Do
12  you see those two designations?
13      A.  I do.
14      Q.  And I will represent to you -- well, my
15  understanding of Exhibit 17 is that it represents
16  the universe of utilization rebates paid to -- let
17  me withdraw that question.
18          This particular -- Exhibit 17 sets forth
19  utilization rebates paid to a variety of entities,
20  correct?
21      A.  The left half does.
22      Q.  Correct.

Page 117

1       A.  From the rebate .DTA file.
2       Q.  And you see that the second column on
3   the left side of the first page of Exhibit 17 is
4   customer number, and it has customer number 72139?
5       A.  I see that.
6       Q.  And next to that it says "customer
7   category retail."
8       A.  I see that.
9       Q.  And year 1999, correct?
10      A.  Yes.
11      Q.  Purchase rebate for this NDC was zero.
12  Do you see that?
13      A.  Uh-huh.
14      Q.  Utilization rebate, $851,000 and change,
15  right?
16      A.  Okay, yes.
17      Q.  Give or take.
18          Now we transition to the headers that
19  came from the GSK ORS database.
20      A.  Okay.
21      Q.  You see the first column is BU_ID?
22      A.  I see that.

Henderson Legal Services, Inc.

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 118

1      Q.   And which we take to mean business ID.
2      A.   Yes, that's my understanding as well.
3      Q.   And there once again we see 72139, which
4  is the same number we saw in the second column
5  from your rebate file.
6      A.   I see, yes.
7      Q.   And then the business name appears to be
8  Eckerd Drug.  Do you see that?
9      A.   I see that as well.
10     Q.   The next column says BU_TYP_CD?
11     A.   Yes.
12     Q.   And it says "retail CHN." Presumably
13  retail chain.
14     A.   Yes.  I believe that's business type
15  chain and retail chain is the entry for the first
16  row.
17     Q.   We created this exhibit in order to --
18  let me withdraw my remarks and just get to the
19  question.
20          So based on your earlier -- based on
21  your testimony this morning, could you tell me how
22  this utilization rebate that was paid to Eckerd

Page 119

1  Drug would be accounted for in your WAC analysis
2  for the relevant NDC?
3      A.   For Eckerd?
4      Q.   Well, for the NDC as a whole.
5      A.   Right.  This observation pertains to a
6  certain customer number which is identified as
7  Eckerd Drug.
8      Q.   Right.
9      A.   And I'm assuming here that the merge was
10  done correctly --
11     Q.   It was certainly our intent to do an
12  accurate merger.
13     A.   Right.  And the question is how would
14  this be used?  So let me see, this came from ORS,
15  right?  So this rebate would be -- it's a
16  utilization rebate but it's in the retail chain,
17  so it would actually be -- the retail customer
18  category, so it would actually be used and would
19  be applied to Eckerd for purposes of the WAC
20  testing.
21     Q.   If you could take a look for a moment at
22  Exhibit 9, and for the record, again, Exhibit 9

Page 120

1  was the list of indirect customers that we looked
2  at earlier this morning.
3      A.   Right.
4      Q.   And if you flip to page 359 of Exhibit
5  9.
6      A.   Okay, I have it.
7      Q.   You see here there's numerous entries
8  for Eckerd?
9      A.   I see that.
10     Q.   And you see the customer category for
11  all of them is "other"?
12     A.   I see that.
13     Q.   Now, in Exhibit 17 we see on the first
14  row from the rebate file that Eckerd is
15  categorized as a retail chain.
16     A.   Yes.
17     Q.   Yet in Exhibit 9 you see Eckerd as
18  categorized as "other."
19     A.   Right.
20     Q.   My question is, when it came to your
21  treatment of utilization rebates, did the customer
22  categories in the rebate file itself, the

Page 121

1  GSK_rebates.DTA file, control your treatment of
2  those utilization rebates?
3      A.   Customer category, yes.  So Eckerd would
4  have multiple customer numbers, and some of those
5  customer numbers would be based upon the customer
6  type/subtype mapping that we discussed earlier
7  from the GSK documentation.  Some of those would
8  be mapped to retail and some of them, as you've
9  shown here on these pages in Exhibit 9, would be
10  mapped to "other."
11     Q.   Thank you.
12          In terms of understanding how the
13  utilization rebates were accounted for though in
14  your analysis, is it correct that we can -- that
15  one can rely on the categories in the rebate file
16  itself in order to understand how a particular
17  utilization rebate should have been treated?
18     A.   I believe so, yes.
19     Q.   So if we see, for example, just to run
20  through this once more so that I'm clear, so we
21  see the utilization rebate here of 851,000 paid to
22  Eckerd on the first line of Exhibit 17, given that

31 (Pages 118 to 121)

Gaier, Ph.D., Eric

New York, NY

January 14, 2009

Page 122

1  that rebate is associated with the customer
2  category "retail," when you apply the rebates to
3  the indirect sales data pursuant to that earlier
4  code, first of all, it may have matched, right, if
5  it's the same customer.  If you could do a match,
6  you would do a match in the first instance.
7      A.   Right.  And it would have been included
8  in that case.
9      Q.   But alternative -- actually, the zeroing
10  out would not have occurred because this
11  utilization rebate was designated as "retail."
12      A.   Correct.
13      Q.   And the zeroing out occurs before the
14  matching, right, in terms of the sequence?
15      A.   We should look at the program, but I
16  believe that that's correct.
17      Q.   The program speaks for itself.
18      A.   Yes, the program speaks for itself.
19      Q.   So that I'm completely clear, the fact
20  that Eckerd may in another file be designated as
21  customer category "other" is really besides the
22  point when it comes to understanding your

Page 123

1  treatment of the utilization rebates.
2      A.   That's correct.  And so, again, just to
3  be very clear, Eckerd will have multiple
4  designations by customer number.  They may map to
5  multiple different types of customer entities.
6  But everything you've said is correct.
7      Q.   The customer category and the rebate
8  file would control the treatment of the
9  utilization rebate.
10      A.   That's my understanding, yes.
11      Q.   Thank you.
12          MS. CICALA:  Here's 18.
13          (Exhibit Gaier 018 for
14  identification, Utilization Rebates Paid to Retail
15  Wholesalers.)
16      Q.   Dr. Gaier, Exhibit 18 was created
17  through a similar process by us pulling the fields
18  on the left-hand side of the exhibit from the GSK
19  rebate file we obtained in connection with your
20  affidavit and merging fields that we have from the
21  ORS transactional database.
22      A.   Okay.

Page 124

1      Q.   And Exhibit 18 -- in Exhibit 18 we have
2  -- my understanding of Exhibit 18 is that it
3  captures all of the utilization rebates between
4  '97 and '05 that were paid to entities that the
5  ORS system has identified as retail wholesalers.
6      A.   Okay.
7      Q.   Do you have an understanding of what a
8  retail wholesaler is?
9      A.   No, I'm not certain I do.
10      Q.   Do you recognize the names of any of the
11  entities that appear in Exhibit 18?
12      A.   Well, I recognize about midway down a
13  reference to Amerisource, but it's designated as
14  Amerisource Family Pharmacy.  So I recognize some
15  of the names, but they seem to reference
16  subsidiaries or something that I'm less familiar
17  with.  Although I see McKesson on page 2.
18      Q.   Okay.  If you look at the customer
19  category column, which is the third column from
20  the left in Exhibit 18, you'll see that for all of
21  the entities in Exhibit 18 the customer category
22  is designated -- is "other."  Do you see that?

Page 125

1      A.   I see it on page 1.  I mean, is that
2  true for all of these?
3      Q.   I believe it is.
4      A.   Okay.  I understand.
5      Q.   And so consistent with the testimony you
6  gave a few minutes ago with regard to the retail -
7  - with regard to Exhibit 17, is it fair to say
8  that the category "other" would have governed your
9  treatment of the utilization rebates paid to these
10  entities when you allocated or considered those
11  rebates in the context of your analysis?
12      A.   Yes, that's my understanding.
13      Q.   And is it also fair to say that the
14  category "other" that we see here in Exhibit 18
15  would have resulted from the process that you've
16  described a number of times today where you ran
17  scripts on customer types and codes in order to
18  come to conclusions as to what categories were
19  appropriate?
20      A.   Yes.
21      Q.   There were -- what were the universe of
22  categories that were -- that you put the rebate

Henderson Legal Services, Inc.

202-220-4158

www.hendersonlegalservices.com

Gaier, Ph.D., Eric                                                                    January 14, 2009
New York, NY

---

Page 126

1    data into? Let me withdraw that. Let me try that
2    again.
3            How many categories did you create when
4    you organized the rebate data?
5       A.  I know for some sets of the data, we
6    organized it into wholesale, retail, government
7    and other. And for -- then I think we further
8    reduce that categorization into merely retail and
9    "other" for part of our analysis. So I'm not sure
10   at which point in the various programs we're using
11   one or the other of those characterizations.
12      Q.   So you don't recall offhand if your
13   indirect -- in the context of the indirect
14   customers if you had four categories or two or
15   some other number?
16      A.   Right. I know that one of the databases
17   has four and the other two. But I'm not sure
18   which one is which, to be honest.
19      Q.   I'll represent to you the DS database
20   has four; it has government, other, retailer and
21   wholesaler.
22      A.   The direct sales?

---

Page 127

1       Q.   The direct sales.
2       A.   That has four? And this likely has two.
3       Q.   Let me ask you, sitting here today, if
4    you were presented with a rebate that was paid to
5    a wholesaler, what category would you put that in?
6    Retail or "other"?
7       A.   It depends. Again, as I've said, I
8    would follow the mapping that we've been provided
9    by GSK. I think on the utilization rebates,
10   they're predominantly paid to payors. There may
11   be some of those that were paid to wholesalers.
12   But I'm not sure what the reason for that would
13   have been, so I'm not sure as I sit here.
14      Q.   That's fine. But it is fair to say, is
15   it not, that given that the customer category for
16   the entities identified in 18 is -- given that the
17   rebate customer category for these entities is
18   "other," utilization rebates paid to these
19   entities would have been zeroed out.
20      A.   I believe that's correct.
21      Q.   So that means then that the utilization
22   rebates that appear in Exhibit 18 would have been

---

Page 128

1    zeroed out from your analysis.
2            MR. HEROLD:  Objection to the form. He
3    doesn't know --
4            MS. CICALA:  That's fair, Fred. That's
5    fair. I'll withdraw the question.
6            (Exhibit Gaier 019 for
7    identification, "Other" and "Retail" Customer
8    Category List.)
9       Q.   Here's Exhibit 19. This is really just
10   for the record, Dr. Gaier. This is a document we
11   created. It's a record count from the chargeback
12   or indirect data that we received from you showing
13   only two categories of trade -- I'm sorry, only
14   two customer categories, "other" or retail.
15   47,000 of the records were categorized as "other"
16   and 3,000 is retail.
17           Does this confirm your testimony --
18      A.   This is from the indirect sales?
19      Q.   That's correct.
20      A.   Yes. This is what you pointed me to and
21   appears to be correct if it's taken from my data.
22      Q.   Thank you.

---

Page 129

1            MS. CICALA:  We'll mark this as 20.
2            (Exhibit Gaier 020 for
3    identification, Utilization Rebates Paid to PBMs.)
4       Q.   Exhibit 20, Dr. Gaier, just as with
5    Exhibits 17 and 18, is a document that we created
6    pulling from both your rebates file and the ORS
7    data that was produced to us directly by GSK. And
8    here we've meant to capture utilization rebates
9    paid to businesses -- or entities that GSK
10   characterizes as PBMs, or in some cases IPAs.
11           From your earlier testimony I understand
12   that utilization rebate payments to entities in
13   these categories tend to be the largest, is that
14   correct?
15      A.   Yes.
16      Q.   If you flip through the pages of Exhibit
17   20 you'll see that the customer category
18   designation and your rebate data for all of these
19   entities was "other." Do you see that?
20      A.   Yes.
21      Q.   And so according to the code and your
22   earlier testimony, my understanding is that all of

---

33 (Pages 126 to 129)

Gaier, Ph.D., Eric

January 14, 2009

New York, NY

Page 130

1   the rebates paid to the entities in Exhibit 20
2   would have been zeroed out to the extent the
3   customer category was "other" and therefore, those
4   rebates would not have impacted your analysis.
5       A.   Exactly.  These are rebates to PBMs and
6   they would be appropriately excluded.
7       Q.   Now, do you know whether any of the
8   rebates set forth in Exhibit 20 were paid to these
9   PBMs in connection with the PBMs' mail order
10  activities, assuming they have mail order
11  activities?
12      A.   My understanding is that that would be
13  captured by the customer type and subtype.  These
14  entities would not be paid those utilization
15  rebates.  Those entities would appear elsewhere.
16      Q.   And where would you -- do you have any
17  expectation as to where those -- say, for example,
18  Merck's mail order pharmacy, where would any
19  rebates paid to Merck's mail order pharmacy appear
20  in the data?
21      A.   Well, the purchase rebates would of
22  course all be captured.  The utilization rebates

Page 131

1   paid to Merck for its PBM would be categorized as
2   customer category "retail" and they would have
3   different customer numbers here, and maybe even
4   the same business name but they would have
5   different customer numbers.
6       Q.   As you sit here today, do you know
7   whether there were any utilization rebates paid to
8   a Merck mail order pharmacy?
9       A.   Well, I certainly know there were
10  purchase rebates paid.  I don't know whether there
11  were utilization rebates paid.
12      Q.   And how is it that you know there were
13  purchase rebates paid?
14      A.   I've seen their name on a list that I've
15  looked at on the computer screen, the top
16  purchase-based rebates.
17      Q.   Would it be correct to say that -- then
18  is it correct to say that the -- and I believe you
19  just testified to this fact -- that the mail order
20  component of a PBM's business would have an
21  independent customer number?
22      A.   They often have -- just looking here at

Page 132

1   Exhibit 20, there are many unique customer numbers
2   associated with Medco, for example.  So yes, they
3   will have multiple customer numbers.  Some of
4   which will have purchase rebates, some of which
5   will have utilization rebates, and some of which
6   may have both.
7       Q.   And the fact that in Exhibit 20 we don't
8   see purchase rebates for any of the entities
9   listed there for the years that are set forth,
10  would that suggest to you that, for example,
11  looking at the first line, Merck Medco Managed
12  Care, LLC did not receive any purchase rebates in
13  2005?
14      A.   Not by this particular business ID
15  number, but others may have.
16      Q.   Other entities that -- okay, I
17  understand.
18          Going back to Exhibit 9 for a moment,
19  and if we could look at page 379.
20      A.   Okay, I have it.
21      Q.   Do you see sort of in the middle of the
22  page there's a number of customer names beginning

Page 133

1   with Express Scripts?
2       A.   I see that.
3       Q.   You understand Express Scripts is one of
4   the largest PBMs in the country.
5       A.   I do.
6       Q.   And that they also have a mail order
7   pharmacy component to their business?
8       A.   I'm sure they do.
9       Q.   From our perspective, the fact that we
10  see sales to Express Scripts which are reflected
11  in this data means that the Express Scripts mail
12  order business was buying some GSK drugs.  Would
13  you agree that that's a fair conclusion to draw?
14      A.   I just want to make sure we're not
15  commingling the chargeback data with the rebate
16  data.  The source is identified as the chargeback
17  sales data, so I think you're right.
18      Q.   Yes, the chargeback sales data file we
19  understand to represent actual sales data that
20  occurred with indirect customers.
21      A.   Yes.
22      Q.   So when we run the customer number --

34 (Pages 130 to 133)

Page 134

1  the customer numbers that we see on page 379 for
2  Express Scripts through your rebate file, we get
3  no matches whatsoever.
4      A.   Okay.
5      Q.   Would it be fair to conclude from that
6  that there were no rebates paid to these
7  individual customers?
8      A.   Again, because someone like Express
9  Scripts probably has multiple numbers, some of
10  which may not even appear in the indirect sales
11  data, then I don't think that that's a fair leap.
12     Q.   So the fact that we don't see the
13  customer numbers in the rebate file does not
14  necessarily mean no rebates were paid to these
15  customers.
16     A.   That's right.
17     Q.   So if you wanted to determine if these
18  particular entities listed in the indirect
19  database were, if rebates were paid to these
20  entities, how would you go about doing that?
21     A.   I suppose one could do a procedure
22  similar to the procedure where we aggregate the

Page 135

1  wholesalers and we use basically name references
2  to do that to find whether there's any Express
3  Scripts rebate payments at all.  I mean, that's
4  the way that comes to mind as I sit here, so
5  something like that.
6      Q.   Did you engage in any exercise like that
7  when you determined how to treat the utilization
8  rebates that were paid to PBMs?  I want to
9  rephrase the question.  We're out of video, let's
10  take our break here.
11         THE VIDEOGRAPHER:  This is the end of
12  tape number 3 in the deposition of Eric Gaier.
13  Going off the record.  The time is 2:23 p.m.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  Back on the record.
16  The time is 2:25 p.m. This is the beginning of
17  tape number 4 in the deposition of Dr. Eric Gaier.
18  BY MS. CICALA:
19     Q.   Before we changed tape you had
20  referenced the procedure that you engaged in with
21  respect to the wholesalers where you used a name
22  reference to collapse, shall we say, multiple

Page 136

1  customer numbers for a given wholesaler into a
2  Cardinal sort of macro number.
3      A.   Correct.
4      Q.   And you described that -- my question is
5  whether you engaged in any sort of -- a procedure
6  along those lines for the -- with regard to PBMs
7  in the course of your analysis.
8      A.   Not along the lines that we've been
9  describing, but we did I believe look at the
10  utilization-based rebates that were paid to
11  entities that can have multiple lines of business
12  in order to assure ourselves that when we made
13  this cut along retail versus non-retail with the
14  utilization rebates, that we were doing so
15  appropriately.  I can talk in generalities about
16  that, but it was looked at by myself and by my
17  staff.
18     Q.   And so what did you look at in
19  connection with the process you just described?
20     A.   I believe it was all within the context
21  of the indirect -- in the ORS system and in the
22  IMHC system, both the rebates and the indirect

Page 137

1  purchases.
2      Q.   Okay, so what did you look at within
3  those indirect systems?
4      A.   I'm not sure I know any more detail than
5  what I've said.
6      Q.   What caused you to engage in the review
7  of those entities that had multiple lines of
8  business?
9      A.   Well, the documentation from GSK
10  suggested that we could identify the rebates that
11  I considered appropriate to include and to exclude
12  via the use of the purchase-based rebates and the
13  utilization-based rebates cut between different
14  kinds of customer types and customer subtypes.  So
15  we looked at that data to see if it comported with
16  what we expected to find.
17     Q.   And what did you expect to find?
18     A.   I expected to find that there were
19  entities, for example, within these PBMs that
20  would have had utilization-based rebates.  There
21  were entities that may have had purchase-based,
22  and that the utilization-based rebates would break

35 (Pages 134 to 137)

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 138

1  down along customer type and subtype categories.
2  I mean, that's what I was looking for.  And we did
3  see that.
4      Q.  So you did see utilization rebates then
5  paid to certain components of PBMs.
6      A.  Well, we saw utilization-based rebates
7  paid to PBMs certainly in general.
8      Q.  Mm-hmm.
9      A.  I think the question is did we see some
10  that we retained as being part of retail, and I
11  think we did.  But I can't recollect specifically.
12      Q.  Do you recall instances where you had to
13  allocate a utilization rebate to the retail
14  component of a PBM?
15      A.  Allocate a utilization-based rebate to a
16  PBM.  Perhaps.  I mean, we would need to look
17  carefully at the unmatched/matching results and
18  see.
19      Q.  Mm-hmm.
20      A.  I don't know that level of detail off
21  the top of my head.
22      Q.  If you were to look at the -- well,

Page 139

1  let's go back to the code for just a moment and
2  picking up on what you just said.  My
3  understanding is the zeroing out of the
4  utilization rebates occurred before the matching.
5      A.  That sounds correct.  We can look.
6      MR. HEROLD:  Which exhibit?
7      MS. CICALA:  It's one of the very early
8  ones.
9      MR. HEROLD:  8?
10      MS. CICALA:  It is Exhibit 8, yes, Fred.
11      A.  There's not a question pending, is
12  there?
13      Q.  There was, I'm sorry.  Does the zeroing
14  out of the utilization rebates to non-retail
15  customers occur before the matching?
16      A.  Yes.  Well, let me actually correct
17  myself.  It occurs before the unmatched rebates
18  are saved out, which I think is what you're
19  asking.  I don't think it occurs before the
20  matching within the direct -- within the indirect
21  sales data.  So let me confirm that.
22      So the rebates are merged on to the

Page 140

1  indirect sales.  Then the utilization rebates to
2  the non-retail are zeroed out.  Then the unmatched
3  rebates are saved out, which is I think what
4  you're asking.
5      Q.  Yes.  So if we were to look at an
6  intermediate file, is it fair to say we would see
7  the result of the merger before the zeroing out of
8  the utilization or the extraction of the unmatched
9  rebates?
10      A.  I think you'd have to modify the script
11  to output that.
12      Q.  Okay.
13      A.  But -- so in other words, that
14  intermediate file doesn't exist currently but
15  could easily be obtained by modifying and
16  rerunning part of the code to output an
17  intermediate file before that part of the process
18  happens.
19      Q.  Right.  That's not particularly
20  complicated.  That's just a save --
21      A.  Yes, that's very easy.
22      MR. HEROLD:  Speak for yourself.

Page 141

1      MS. CICALA:  I've learned a lot in the
2  last couple of weeks, Fred.
3      Q.  And the match I believe, from what we
4  have discussed earlier, it's a match based on
5  customer, NDC and year, correct?
6      A.  Let me confirm that.  I think that's
7  right, let's see.
8      Yes, NDC, year and customer number
9  within the indirect sales systems.
10      Q.  What if the rebate has a different
11  customer number than what appears in the indirect
12  system for that customer?
13      A.  Then it would become part of the
14  unmatched and it would be kept if it were
15  purchase-based and applied as part of the
16  unmatched algorithm.
17      Q.  We're going to move on to your AAC to
18  AWP spreads.
19      A.  Okay.
20      Q.  So to start with, let's pull -- you
21  prepared certain exhibits where you compared --
22  where you set forth spread between an AAC

36 (Pages 138 to 141)

Gaier, Ph.D., Eric                                                                                      January 14, 2009
New York, NY

Page 142

1  calculated using wholesaler data and rebate data
2  against the reported AWPs for the at-issue NDCs.
3      A.  Mm-hmm.
4      Q.  And the results of that work are set
5  forth in Tables C-1 and -- well, let me ask you.
6  Which attachments to your exhibit sets forth the
7  results of that work?
8      A.  It's analogous to the way the results
9  are set forward for the WAC testing.
10     Q.  Mm-hmm.
11     A.  The Attachment C contains results that
12 are aggregated across all of the years where we
13 had data between 1997 and 2005.  And Attachment E
14 is a year by year, of course by NDC analysis.
15     Q.  Why did you engage in this particular
16 exercise?
17     A.  Again, I was asked to by counsel.  I was
18 generally asked to mimic in as conservative a way
19 as I could the calculations that Judge Saris
20 relies on in her MDL opinion associated with
21 spreads.
22     Q.  And are you offering any opinion with

Page 143

1  regard to these spreads as to whether it's
2  appropriate for the court to be considering the
3  results on an annual versus aggregated basis?
4      A.  I think, again, with respect to the MDL
5  opinion, I found instances where Judge Saris
6  discusses the overall level of spreads for an NDC
7  for a particular set of years, and also places
8  where she looks at it year by year.  So I thought
9  both would be helpful to the court.
10     Q.  Are you offering an opinion in the
11 context of this affidavit as to which is the
12 proper course?
13     A.  Again, not as pertaining to legal
14 issues.  I do think looking over a broader period
15 of time is better from the standpoint of economics
16 as you're able to better match, as we've
17 discussed, the rebates to the underlying
18 transactions that generate those rebates.
19     Q.  So you are offering that opinion -- are
20 you offering an opinion on liability on an annual
21 versus aggregated basis?
22     A.  No, that's a legal question.  I'm merely

Page 144

1  pointing out that as a matter of economics, would
2  counsel need to look at a broader time frame as
3  compared to a narrower time frame.
4      Q.  Understood, thank you.
5          Now, in order to engage in the
6  calculations that resulted in Tables C-1 and E-1,
7  I understand that you used data obtained from the three
8  major wholesalers, correct?
9      A.  Right.  It's a total of four datasets
10 because Amerisource has two legacy systems.  But
11 it is for the three major wholesalers.
12     Q.  And can you generally describe your
13 process for pulling the data --
14     A.  Sure.
15     Q.  -- from the wholesaler datasets?
16     A.  So unlike the WAC testing where we're
17 looking at all classes of trade and excluding only
18 the charities and returns and that sort, here
19 we're focused on the retail class.  We've taken as
20 our definition the retail classes that I think you
21 have set forward in an affidavit.  Those pertain
22 particularly to I think the Cardinal database and

Page 145

1  one of the Amerisource databases.
2          We've extrapolated those classes of
3  trade to the other data sources by looking at the
4  various pharmacies and providers that are in them
5  and collecting them and the other classes of trade
6  for the other databases.
7          We take an average -- we also apply all
8  of the retail rebates from the manufacturer data
9  to these and come up with a net average
10 acquisition cost, if you will, by NDC and by year.
11 We then compare that to the corresponding weighted
12 average of AWPs over the same time period.
13     Q.  Which you presumably pulled from First
14 Data Bank.
15     A.  Correct.
16          (Exhibit Gaier 021 for
17 identification, ABC STAR Item Table Document.)
18     Q.  We've marked as Exhibit 21 another code
19 extract.  Can you -- that I believe is related to
20 the process you just described, Dr. Gaier.  Can
21 you explain what Exhibit 21 is?
22     A.  Right.  I'm just reviewing it quickly.

37 (Pages 142 to 145)

Gaier, Ph.D., Eric                                                                   January 14, 2009
New York, NY

Page 146

1         This appears to be a file in which we
2  load -- let me look at it for a moment.
3     Q.   Certainly.
4     A.   (The witness reviews the document.)
5     Q.   You know what, these exhibits -- the
6  exhibits that I have in front of me are not in the
7  order that I believed them to be. So if I may, if
8  we can set 21 aside and we can start with a
9  different exhibit.
10    A.   I was going to suggest this is a
11 preprocessing step pertaining to the two
12 Amerisource --
13    Q.   I think we can put Exhibit 21 to the
14 side and let's mark this as 22.
15         (Exhibit Gaier 022 for
16 identification, Amerisource, McKesson and Cardinal
17 Datasets.)
18    A.   This looks more familiar.
19    Q.   So Exhibit 22 I believe is extracting
20 the data from the four datasets, the two
21 Amerisource Bergens, McKesson and the Cardinal, is
22 that correct?

Page 147

1     A.   That's correct. From their native SQL
2  server database and putting them into a form of
3  DTA files of First Data.
4     Q.   And then here we'll mark as 23, 23 is
5  code that has the comment "prep transactional
6  wholesaler data."
7         (Exhibit Gaier 023 for
8  identification, Prep Transactional Wholesaler
9  Data.)
10    Q.   Can you explain what Exhibit 23 is
11 doing?
12    A.   This is where we -- it's the next step I
13 believe in the set of programs. It is combining
14 the data from all four wholesaler databases that
15 pertain to the three major wholesalers and then
16 summing the sales and the sales units in order to
17 calculate a measure of average costs. Acquisition
18 costs.
19    Q.   So part of your analysis, as I
20 understand it, is that you did calculate an
21 average across all the wholesaler datasets,
22 correct?

Page 148

1     A.   Correct.
2     Q.   A weighted average based on the sales at
3  each invoice price.
4     A.   Correct. Having also applied the
5  rebates.
6     Q.   We haven't seen that yet in the code,
7  right?
8     A.   That's right.
9     Q.   But I think we will now.
10         (Exhibit Gaier 024 for
11 identification, ORS Data.)
12    Q.   My understanding is Exhibit 24 is the
13 code that extracts rebates from the two relevant
14 GSK systems, ORS and IMHC. Is that an accurate
15 description of Exhibit 24?
16    A.   Right. For the rebates.
17    Q.   Chargebacks didn't factor into this
18 analysis, is that right?
19    A.   Chargebacks are already reflected in the
20 wholesaler data. The price between the wholesaler
21 and the retailer is both reflected in the
22 wholesaler data and separately reflected in

Page 149

1  something like GSK's indirect sales data.
2     Q.   How is a chargeback reflected in the
3  price from the wholesaler to the retailer?
4     A.   Well, the indirect sales database, first
5  of all, reflects -- from GSK reflects the price.
6  It refers to the difference between, say, the WAC,
7  the invoice price and the ultimate price paid for
8  by the provider as a chargeback. But it also has
9  in it there the net contracted price, just as the
10 wholesaler data has the net contracted price
11 between the wholesaler and the retailer.
12    Q.   And it's that net contracted price that
13 was -- that you extracted from the wholesaler
14 data, correct?
15    A.   Correct.
16    Q.   And your understanding is that net
17 contract price has already accounted for the
18 rebate. I'm sorry, the net contract price has
19 already accounted for any chargeback.
20    A.   That's correct. But not rebate, if any.
21    Q.   So can you describe what rebates were
22 pulled in connection with this particular aspect

Henderson Legal Services, Inc.

202-220-4158                                                          www.hendersonlegalservices.com

Gaier, Ph.D., Eric                                                    January 14, 2009
New York, NY

Page 150

1    of your analysis?
2        A.   We also extrapolated the relevant
3    classes of trade from your affidavit to the
4    manufacturer data, and we used those classes of
5    trade to pull out all of the purchase-based
6    rebates and I believe all of the utilization-based
7    rebates as well associated with those classes of
8    trade and netted them against the selling prices
9    in the wholesaler data.
10       Q.   When you say "netted them against the
11   selling prices," meaning essentially subtracted
12   them from a units times sales price number?
13       A.   Everything is done in terms of the total
14   dollars.  And so you can then just deduct off the
15   amount of the rebates that fall into these classes
16   of trade in the manufacturer data.  And I would
17   say regardless of whether a particular set of
18   customers appeared in the wholesaler data or not.
19   So in that sense it's conservative.
20       Q.   Understood.  So for example, rebates
21   paid to direct customers where the transactions
22   didn't go through the wholesaler would still have

Page 151

1    been included in this analysis.
2        A.   Right.  So Walgreen's or CVS or any sort
3    of the large chains, their rebates would be
4    applied to the wholesaler sales data even though
5    their sales aren't in the wholesaler sales data by
6    and large.
7        Q.   What field in the ORS databases did you
8    use to select the relevant classes of trade?
9        A.   Let me examine that.  (The witness
10   reviews the document.)
11           It appears in the code that we used, the
12   business type description.  That would I think be
13   the relevant code.
14       Q.   And is it correct that the business
15   types listed in the middle of the first page of
16   24, and I'll read them into the record in a
17   minute, that these are the business types whose
18   rebates you considered?  The types I see listed
19   are alternate healthcare, city, county, state,
20   clinic, home healthcare, et cetera.
21       A.   Yes.  And retail chain is another large
22   one that's in there.

Page 152

1        Q.   PBM is not in this list, correct?
2        A.   Right.
3        Q.   Mail order is though, right?
4        A.   Let's see.  Yes, mail order is.
5        Q.   So is it correct that you would you have
6    pulled all rebates paid, I believe you just
7    testified you would, all purchase rebates and
8    utilization rebates paid to the business types
9    listed here on Exhibit 24?
10       A.   Correct.
11       Q.   If you continue to the second page of
12   Exhibit 24, it looks like there's a second series
13   of code designed to pull the rebate data from the
14   IMHC database, is that right?
15       A.   Yes.
16       Q.   And was your approach here consistent
17   with the ORS?
18       A.   Yes.  It's conceptually identical.
19       Q.   So again, on the top of page 3 of
20   Exhibit 24, we appear to have a list of the
21   classes of trade whose rebates you would have
22   pulled from the IMHC system.  It begins with,

Page 153

1    "Where total sales amount," and it goes on to list
2    clinic, home healthcare provider, mail order, et
3    cetera.
4        A.   Correct.
5        Q.   I don't see a reference to pharmacies or
6    retail chains in this particular list.  Do you
7    know whether that's a function of just the
8    business types that would be contained in that
9    database?
10       A.   Yes.  They have different names than the
11   ORS.  Perhaps the ORS are more familiar with our
12   colloquial use of the terms.  But I believe that
13   the retail chain would be in here, to the extent
14   there are any.
15       Q.   So to the extent there's rebates to
16   retail chains or retail pharmacies in the IMHC
17   system, it would have been your intention to
18   include those.  And they may be among the business
19   types we see listed here, perhaps just not
20   recognizably so.
21       A.   Correct.
22       Q.   There's additional code that you had to

39 (Pages 150 to 153)

Gaier, Ph.D., Eric                                                          January 14, 2009
New York, NY

Page 154

1   create in order to ensure that you were comparing
2   similar units when you were dealing with the
3   wholesaler data and the reported AWPs, correct?
4       A.   You mean to make sure I had the
5   weighting -- as between calculating weighted
6   average selling price and weighted average AWP? Is
7   that what your question is?
8       Q.   Let me try it a different way.  And I'm
9   trying to avoid having to mark additional code.
10  Do you recall a conversion process or some sort of
11  check that you had to engage to make sure that you
12  were comparing prices at the same units --
13      A.   Yes.
14      Q.   -- from the wholesaler data to the units
15  that were -- the AWPs in the First Data Bank file
16  pertained to?
17      A.   Yes.  The package side.
18      Q.   Yes.
19      A.   Right.  I do know that we went through a
20  process associated with those as well.
21      Q.    Let me mark this quickly as Exhibits 25
22  and 26 and just ask you if this appears to be the

Page 155

1   code.  Exhibits 25 and 26, where you resolve any
2   package size or unit conversion issues.
3              (Exhibit Gaier 025 for
4   identification, Wholesale Unit Price Code .)
5              (Exhibit Gaier 026 for
6   identification, Open Pricing Data Code.)
7       Q.   Maybe to make the record more clear, or
8   to endeavor to make the record more clear, is
9   Exhibit 25 the code that was employed to ensure
10  that the wholesale unit prices were consistent
11  with the units reflected in the AWP -- in the
12  First Data Bank NDF file?
13      A.   Yes, I think so.
14      Q.   And then Exhibit 26, my understanding is
15  that it is the code where you compare the
16  wholesaler data to the AWPs at the proper unit
17  level.
18      A.   Right.  So this is the actual testing,
19  if you will, of the spreads relative to the 30
20  percent benchmark.
21      Q.   That's Exhibit 26, yes?
22      A.   I believe so.

Page 156

1       Q.   And does Exhibit 26 appear to be a true
2   and complete copy of the code relevant to the
3   actual testing of the spreads?
4       A.   As best I can tell sitting here, yes.
5       Q.   Do you know, Dr. Gaier, if there was an
6   intermediate file generated where you showed the
7   impact of the -- where you captured the impact of
8   the rebate reduction to the AACs that you had
9   computed?
10      A.   I don't think it's an intermediate file.
11  I think it all happens in the course of the
12  program that is Exhibit 26.
13      Q.   Is there a place within the code at
14  Exhibit 26 where you could insert a save or an
15  output so that you could capture the impact of the
16  rebate reductions to the AACs that you calculated?
17      A.   I think so.  I think on page 2 of
18  Exhibit 26 there's a comment that begins "merge on
19  the yearly rebates."
20      Q.   Right.
21      A.   And I think if you deleted that part of
22  the code and skip down to the output of the annual

Page 157

1   results, that I think you would do that which
2   you're asking about.
3       Q.   You'd be able to see the impact of the
4   rebate adjustment on the AACs that you calculated?
5       A.   Well, yes.  I think what you'd see is
6   the results of the testing without any of the
7   rebates on there.  So if it was just the AACs
8   coming out of the wholesalers --
9       Q.   Okay.
10      A.   But that's the point where you would
11  want to break the code to get the intermediate
12  file that I think you're asking about.
13      Q.   Right, you'd still have to account for -
14  - it would be another step to bring the rebates
15  into the mix.
16      A.   Right.
17      Q.   You'd see the AACs that were calculated,
18  capture those, then another set to bring rebates
19  in to capture that new net AAC, shall we say.
20      A.   Sure.  But you could easily modify this
21  to do a testing with and without the rebates.
22      Q.   And then Exhibit 27.

40 (Pages 154 to 157)

Page 158

1         (Exhibit Gaier 027 for
2    identification, Spread Results (Aggregate) Code.)
3         Q.  My understanding of Exhibit 27 is that
4    it's simply the code that aggregates and then I
5    guess outputs the results of your AAC to AMP
6    analysis, is that right?
7         A.  Right.  And makes the NDC restrictions
8    that we'd been instructed about.
9         Q.  Exhibit 5 that we looked at this
10   morning, right?
11        A.  No.  Not the effective dates.  The ones
12   for which I think Glaxo's counsel is alleging have
13   already been settled, for example.  Amoxil and
14   Kytril.  And I think those are the ones here that
15   are restricted.
16        Q.  Understood.  Have you engaged in a
17   comparison of GSK's AMPs with its reported AWPs?
18        A.  No.
19        Q.  It's not something you've been asked to
20   do.
21        A.  No.  As I said before, I tried to mimic
22   what my reading of what Judge Saris set forth and

Page 159

1    Dr. Hartman uses the manufacturers' data to
2    calculate an average cost, and that's what I've
3    done.
4         MS. CICALA:  I'd like to take ten
5    minutes if we may.
6         MR. HEROLD:  Okay.
7         MS. CICALA:  Thank you.
8         THE VIDEOGRAPHER:  Off the record.  The
9    time is 3:04 p.m.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  We're back on the
12   record.  The time is 3:29 p.m.
13   BY MS. CICALA:
14        Q.  Dr. Gaier, can you define what a
15   utilization rebate is?
16        A.  They're typically paid to entities such
17   as PBMs or payors for things like formulary
18   placement.  I mean, that's my general
19   understanding of what those utilization rebates
20   are for.
21        Q.  Do you know whether they're paid based
22   on -- let me rephrase the question.

Page 160

1         Do you know how they are calculated, or
2    what they're based upon?
3         A.  I think they would be based upon a
4    volume of prescriptions that flow through a given
5    PBM or payor.
6         Q.  And what do you mean when you say "a
7    volume of prescriptions that flow through"?
8         A.  Well, there can be target thresholds
9    either in terms of number of prescriptions that a
10   PBM pays on behalf of a payor for a particular
11   NDC, and meeting those thresholds can trigger
12   rebates.  I mean, that's one form that I'm
13   familiar with.
14        Q.  That description would certainly be
15   consistent with the plain meaning of the phrase
16   "utilization rebate," wouldn't you agree?
17        MR. HEROLD:  Are you asking in general
18   or about GSK here?
19        MS. CICALA:  I'm asking in general.
20        MR. HEROLD:  Okay.
21        A.  It sounds like a utilization rebate.
22        Q.  And do you understand GSK's practices

Page 161

1    and policies with regard to utilization rebates to
2    be other than what you just described?
3         A.  I don't know in great detail enough to
4    say whether they're similar to that or different.
5         Q.  Do you know -- so then is it fair to say
6    you don't know if the utilization rebates that
7    were excluded from your analysis were calculated
8    based on volume of GSK product that flowed through
9    the entities who received the rebates?
10        A.  That would be my assumption, but I can't
11   prove that.
12        Q.  Do you know why GSK would pay
13   utilization rebates to HMOs?
14        A.  Well, they have formularies I think.  So
15   that would make sense.
16        Q.  So then GSK would pay -- is it your
17   testimony GSK would pay rebates to HMOs for the
18   same reasons they would pay utilization rebates
19   for PBMs, for example?
20        A.  That could be one reason.
21        Q.  Can you think of any other reasons that
22   GSK would pay utilization rebates to HMOs?

41 (Pages 158 to 161)

Gaier, Ph.D., Eric                                                                    January 14, 2009
New York, NY

Page 162

1     A.  I'm not party to those negotiations.  I
2  don't know exactly what they may be paying rebates
3  for.
4     Q.  And you recall in Exhibit 18 that we saw
5  utilization rebates being paid to retail
6  wholesalers?
7     A.  What's labeled as retail wholesalers I
8  recall, yes.
9     Q.  Fair enough.
10       MR. HEROLD:  This is the one you
11  prepared?
12       MS. CICALA:  Yes.  This is the exhibit
13  we prepared using data from Dr. Gaier's GSK rebate
14  file and GSK's ORS file.
15     A.  Is there a question?
16     Q.  Yes.  I'm not asking you to vouch for
17  the authenticity of the exhibit.
18     A.  I understand.
19     Q.  To the extent the exhibit is accurate,
20  you see that it shows utilization rebates being
21  paid to business types that are retail
22  wholesalers?

Page 163

1     A.  I see that.  They tend to be very small
2  relative to the utilization rebates that we see on
3  the other exhibit, I think it's 20, which has --
4  the one we were discussing, Merck Medco, and it
5  has PBMs, and those are far more substantial
6  utilization rebates.  But there are some on
7  Exhibit 18.
8     Q.  Do you know why the utilization rebates
9  are so substantial from GSK to the PBMs that we
10  see in Exhibit 20?
11       MR. HEROLD:  Objection to the form.
12     A.  I think that's fairly common.  I think
13  PBMs generate significant competition to be on
14  formulary and demand rebate compensation on behalf
15  of their payors from the manufacturers.  That's
16  very common.
17     Q.  So then is it also common that
18  manufacturers reward the PBMs in exchange for the
19  formulary placement and the volume that results
20  from the formulary placement?
21       MR. HEROLD:  Objection to the form.
22     A.  I don't know about "reward."  I mean,

Page 164

1  there's a negotiation that occurs between PBMs and
2  manufacturers, and PBMs are in a very powerful
3  position in the industry.  This is the nature of
4  the competition that ensues.
5     Q.  So going back to my original question,
6  which I actually am going to need the court
7  reporter to read back.
8       My original question with regard to
9  Exhibit 18 was just whether you would acknowledge
10  that utilization rebates were, pursuant to this
11  exhibit, paid to entities that fall into the
12  business type of retail wholesaler.
13     A.  Small utilization rebates were
14  apparently paid.
15     Q.  Do you have any understanding as to why
16  GSK would pay utilization rebates to retail
17  wholesalers?
18     A.  I do not.
19     Q.  If GSK is paying utilization rebates to
20  a PBM in connection with the PBM's -- in
21  connection with the volume of GSK drugs that are
22  flowing through the PBM, would that not be

Page 165

1  relevant to your evaluation of the prices paid for
2  those that the PBM reimburses for its drugs?
3     A.  Not to my analysis here.  I think we're
4  looking at effectively testing whether or not
5  using Judge Saris's procedures, whether or not WAC
6  was an accurate list price.  And that's an
7  entirely different arrangement.
8       I think WAC is intended to be the list
9  price between manufacturers and wholesalers.  It
10  has nothing to do with whatever negotiations go on
11  between PBMs and manufacturers.
12     Q.  I have no further questions for you, Dr.
13  Gaier.  Thank you very much for your time this
14  afternoon.
15     A.  Thank you.
16       MR. HEROLD:  I have no questions.
17       MS. CICALA:  A formality.  I did not
18  mark the notice and I would like to.
19       MR. HEROLD:  Sure.
20       MS. CICALA:  We'll mark it as the last
21  exhibit.
22       (Exhibit Gaier 028 for

42 (Pages 162 to 165)

Gaier, Ph.D., Eric                                                            January 14, 2009
New York, NY

Page 166
1    identification, Deposition Notice.)
2          THE VIDEOGRAPHER:  This concludes
3    today's deposition of Dr. Eric Gaier.  Four
4    videotapes were used.  We're going off the record.
5    The time is 3:39 p.m.
6          (TIME NOTED:  3:39 p.m.)
7
8
9
10
11
12    _____
13        ERIC GAIER, Ph.D.
14
15    Subscribed and sworn to before me
16    this _____ day of _____, 2008.
17
18    _____
19
20
21
22

Page 167
1          C E R T I F I C A T E
2    STATE OF NEW YORK   )
3                 : ss.
4    COUNTY OF NEW YORK  )
5
6          I, SUZANNE PASTOR, a Shorthand
7    Reporter and Notary Public within and for the
8    State of New York, do hereby certify:
9          That ERIC GAIER, Ph.D., the witness
10    whose deposition is hereinbefore set forth, was
11    duly sworn by me and that such deposition is a
12    true record of the testimony given by the
13    witness.
14          I further certify that I am not
15    related to any of the parties to this action by
16    blood or marriage, and that I am in no way
17    interested in the outcome of this matter.
18          IN WITNESS WHEREOF, I have hereunto
19    set my hand this _____ day of _____, 2008.
20
21    _____
22        SUZANNE PASTOR

43 (Pages 166 to 167)

# Cicala Affidavit In Support of Opposition to GSK Motion For Summary Judgment

# EXHIBIT B

## WELLBUTRIN SALES AND DISCOUNTS 98-00 ... P 26 MANAGED MARKETS CUSTOMERS PER SEGMENT

| | 1998 | | | 1999 | | | 2000 | | | CAGR | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Gross Sales ($K) | Discounts ($K) | (%) | Gross Sales ($K) | Discounts ($K) | (%) | Gross Sales ($K) | Discounts ($K) | (%) | Gross Sales (%) | Discount trend* (index) |
| **PBM** | | | | | | | | | | | |
| Medco | 76,015 | 10,696 | 14.1% | 100,182 | 14,417 | 14.4% | 131,366 | 19,801 | 15.1% | 31.5% | 3.5% |
| Advance / PCS | 77,912 | 4,848 | 6.2% | 96,653 | 6,362 | 6.6% | 118,028 | 12,016 | 10.2% | 23.1% | 27.9% |
| Express Scripts | 70,969 | 8,538 | 12.0% | 83,409 | 10,774 | 12.9% | 92,913 | 8,505 | 9.2% | 14.4% | -12.8% |
| Caremark | 0 | | | 0 | | | 0 | 0 | | | |
| Nat'l Prescription Adm (NPA) | 6,607 | 69 | 1.0% | 8,354 | 261 | 3.1% | 9,982 | 360 | 3.6% | 22.9% | 85.8% |
| Prime Therapeutics | 9,210 | 239 | 2.6% | 9,251 | 340 | 3.7% | 10,725 | 425 | 4.0% | 7.9% | 23.6% |
| Pharmacare | 2,192 | 155 | 7.1% | 4,834 | 255 | 5.3% | 4,650 | 0 | 0.0% | 45.6% | -100.0% |
| Medimpact | 1,482 | 326 | 22.0% | 1,645 | 425 | 25.8% | 1,687 | 483 | 28.6% | 6.7% | 14.1% |
| **Total** | 244,388 | 24,870 | 10.2% | 304,328 | 32,834 | 10.8% | 369,351 | 41,591 | 11.3% | 22.9% | 5.2% |
| **IPA and Staff** | | | | | | | | | | | |
| Wellpoint | 15,215 | 1,751 | 11.5% | 19,160 | 2,601 | 13.6% | 31,081 | 4,897 | 15.8% | 42.9% | 17.0% |
| Prescription Solutions | 0 | 0 | | 0 | 0 | | 0 | 0 | | | |
| AETNA | 21,100 | 3,859 | 18.3% | 30,920 | 5,726 | 18.5% | 28,797 | 6,210 | 21.6% | 16.8% | 8.6% |
| Cigna | 7,490 | 224 | 3.0% | 3,711 | 174 | 4.7% | 8,517 | 1,612 | 18.9% | 6.6% | 151.6% |
| IPS | 6,685 | 1,174 | 17.6% | 8,962 | 1,615 | 18.0% | 9,464 | 2,202 | 23.3% | 19.0% | 15.1% |
| Anthem | 3,154 | 536 | 17.0% | 5,869 | 998 | 17.0% | 9,446 | 1,606 | 17.0% | 73.0% | 0.0% |
| Humana | 4,446 | 680 | 15.3% | 4,045 | 790 | 19.5% | 7,372 | 1,474 | 20.0% | 28.8% | 14.3% |
| BC/BS of Alabama | 2,205 | 33 | 1.5% | 3,009 | 265 | 8.8% | 3,678 | 319 | 8.7% | 29.2% | 140.6% |
| Harvard | 2,535 | 773 | 30.5% | 4,365 | 1,329 | 30.4% | 4,760 | 1,428 | 30.0% | 37.0% | -0.8% |
| **Total** | 62,828 | 9,031 | 14.4% | 80,041 | 13,498 | 16.9% | 103,114 | 19,748 | 19.2% | 28.1% | 15.4% |
| Kaiser | 11,317 | 2,395 | 21.2% | 18,318 | 4,506 | 24.6% | 19,510 | 5,905 | 30.3% | 31.3% | 19.6% |
| **GPO** | | | | | | | | | | | |
| Premier | 3,202 | 411 | 12.8% | 4,066 | 616 | 15.1% | 4,134 | 870 | 21.0% | 13.6% | 28.0% |
| Novation | 2,025 | 185 | 9.1% | 5,523 | 693 | 12.6% | 6,705 | 1,216 | 18.1% | 82.0% | 40.9% |
| CPS/Tenet | 247 | 28 | 11.4% | 380 | 39 | 10.4% | 452 | 82 | 18.2% | 35.4% | 26.3% |
| Owen | 240 | 28 | 11.7% | 342 | 47 | 13.8% | 344 | 40 | 11.6% | 19.7% | -0.4% |
| PACT | 266 | 32 | 11.9% | 337 | 47 | 13.9% | 381 | 51 | 13.5% | 19.7% | 6.7% |
| Consortia | 0 | 0 | | 512 | 48 | 9.5% | 641 | 49 | 7.6% | | |
| **Total** | 5,980 | 684 | 11.4% | 11,160 | 1,491 | 13.4% | 12,657 | 2,308 | 18.2% | 45.5% | 26.3% |
| **TOTAL** | 324,513 | 36,979 | 11.4% | 413,847 | 52,329 | 12.6% | 504,632 | 69,552 | 13.8% | 24.7% | 10.0% |

* CAGR of discount rates 97-01. Positive numbers means increasing discount rates

Note: Based on 1998 Actual and  December 2000 Forecast

Source: SPCM, GW & SB Historic Financials; BCG analysis

Highly Confidential under Protective Order/MDL No. 1456

## FLOVENT SALES AND DISCOUNTS 98-00 TO 1    16 MANAGED MARKETS CUSTOMERS PER SEGMENT

| | 1998 | | | 1999 | | | 2000 | | | CAGR | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gross Sales ($K) | Discounts ($K) | Discounts (%) | Gross Sales ($K) | Discounts ($K) | Discounts (%) | Gross Sales ($K) | Discounts ($K) | Discounts (%) | Gross Sales (%) | Discount trend* (index) |
| **PBM** | | | | | | | | | | | |
| Medco | 48,845 | 8,202 | 16.8% | 76,951 | 12,978 | 16.9% | 125,988 | 19,078 | 15.1% | 60.6% | -5.0% |
| Advance / PCS | 32,961 | 2,555 | 7.8% | 56,862 | 4,500 | 7.9% | 88,686 | 7,890 | 8.9% | 64.0% | 7.1% |
| Express Scripts | 32,356 | 3,673 | 11.4% | 48,574 | 5,958 | 12.3% | 68,091 | 7,092 | 10.4% | 45.1% | -4.2% |
| Caremark | 0 | 0 | - | 0 | 0 | - | 0 | 0 | - | - | - |
| Nat'l Prescription Adm (NPA) | 4,439 | 188 | 4.2% | 6,070 | 273 | 4.5% | 9,346 | 389 | 4.2% | 45.1% | -1.0% |
| Prime Therapeutics | 3,565 | 218 | 6.1% | 4,910 | 417 | 8.5% | 7,279 | 655 | 9.0% | 42.9% | 21.3% |
| Pharmacare | 1,040 | 92 | 8.9% | 5,487 | 249 | 4.5% | 7,590 | 455 | 6.0% | 170.2% | -17.8% |
| Medimpact | 668 | 84 | 12.6% | 892 | 127 | 14.2% | 1,266 | 233 | 18.4% | 37.7% | 21.0% |
| **Total** | **123,875** | **15,012** | **12.1%** | **199,746** | **24,503** | **12.3%** | **308,247** | **35,792** | **11.6%** | **57.7%** | **-2.1%** |
| **IPA and Staff** | | | | | | | | | | | |
| Wellpoint | 6,567 | 524 | 8.0% | 10,126 | 861 | 8.5% | 19,376 | 1,674 | 8.6% | 71.8% | 4.0% |
| Prescription Solutions | 2,890 | 424 | 14.7% | 6,452 | 1,091 | 16.9% | 8,560 | 1,538 | 18.0% | 72.1% | 10.6% |
| AETNA | 7,850 | 1,103 | 14.0% | 17,370 | 2,449 | 14.1% | 22,344 | 3,024 | 13.5% | 68.7% | -1.8% |
| Cigna | 3,146 | 71 | 2.3% | 7,877 | 933 | 11.8% | 17,024 | 3,018 | 17.7% | 132.6% | 180.6% |
| IPS | 2,361 | 0 | 0.0% | 4,406 | 659 | 15.0% | 6,481 | 1,129 | 17.4% | 65.7% | - |
| Anthem | 1,572 | 253 | 16.1% | 3,695 | 602 | 16.3% | 7,151 | 1,188 | 16.6% | 113.3% | 1.6% |
| Humana | 1,156 | 201 | 17.4% | 2,731 | 512 | 18.7% | 5,643 | 1,064 | 18.8% | 120.9% | 4.1% |
| BC/BS of Alabama | 750 | 76 | 10.1% | 1,268 | 154 | 12.1% | 2,020 | 254 | 12.6% | 64.1% | 11.7% |
| Harvard | 1,697 | 281 | 16.6% | 2,779 | 482 | 17.3% | 2,647 | 397 | 15.0% | 24.9% | -4.8% |
| **Total** | **27,990** | **2,933** | **10.5%** | **56,705** | **7,742** | **13.7%** | **91,247** | **13,288** | **14.6%** | **80.6%** | **17.9%** |
| Kaiser | 12,673 | 1,737 | 13.7% | 20,611 | 2,928 | 14.2% | 24,874 | 3,470 | 14.0% | 40.1% | 0.9% |
| **GPO** | | | | | | | | | | | |
| Premier | 8,438 | 1,079 | 12.8% | 13,098 | 2,183 | 16.7% | 19,939 | 3,929 | 19.7% | 53.7% | 24.1% |
| Novation | 5,151 | 429 | 8.3% | 12,736 | 1,420 | 11.1% | 20,662 | 3,896 | 18.9% | 100.3% | 50.4% |
| CPS/Tenet | 795 | 73 | 9.2% | 1,532 | 210 | 13.7% | 2,361 | 328 | 13.9% | 72.4% | 22.9% |
| Owen | 730 | 55 | 7.5% | 921 | 123 | 13.3% | 1,348 | 146 | 10.8% | 35.9% | 20.0% |
| PACT | 1,057 | 86 | 8.1% | 1,669 | 220 | 13.2% | 2,578 | 296 | 11.5% | 56.2% | 18.9% |
| Consortia | 0 | 0 | - | 1,784 | 223 | 12.5% | 2,957 | 341 | 11.5% | - | - |
| **Total** | **16,171** | **1,722** | **10.7%** | **31,740** | **4,378** | **13.8%** | **49,846** | **8,937** | **17.9%** | **75.6%** | **29.7%** |
| **TOTAL** | **180,708** | **21,405** | **11.8%** | **308,801** | **39,551** | **12.8%** | **474,213** | **61,487** | **13.0%** | **62.0%** | **4.6%** |

* CAGR of discount rates 97-01. Positive numbers means increasing discount rates

Note: Based on 1998 Actual and  December 2000 Forecast

Source: SPCM, GW & SB Historic Financials; BCG analysis

GSK-MDL-WZ01-0000830

| WELLBUTRIN SR 2002 CONTRACT SALES (Forecast II Data) | Contract Sales @ NWP | Total Discount | Total Discount % |
|---|---|---|---|
| MEDCO CONTAINMENT SERVICES - G319 | 258,625,579 | 43,966,676 | 17.0% |
| ADVANCEPCS HEALTH SYSTEMS INC. - G | 132,883,920 | 14,613,732 | 11.0% |
| EXPRESS SCRIPTS, INC. - G52993 | 65,803,695 | 5,263,752 | 8.0% |
| AETNA/US HEALTHCARE - G30909 | 55,281,000 | 13,318,280 | 24.1% |
| EXPRESS SCRIPTS, INC. - G31297 | 51,346,387 | 2,534,211 | 4.9% |
| WELLPOINT PHARMACY MANAGEMENT - | 46,233,543 | 4,623,797 | 10.0% |
| Kaiser | 33,604,991 | 7,681,593 | 22.9% |
| ADVANCE PCS - G30900 | 32,898,850 | 5,274,296 | 16.0% |
| CAREMARK INC., PRESCRIPTION SERVIC | 31,484,976 | - | 0.0% |
| KAISER - 401321 | 28,744,930 | 6,432,766 | 22.4% |
| CIGNA HEALTH CORPORATION - G35597 | 18,277,400 | 1,462,192 | 8.0% |
| ANTHEM PRESCRIPTION - G35851 | 17,729,807 | 3,014,067 | 17.0% |
| PRIME THERAPEUTICS INC. - G35513 | 17,322,642 | 539,519 | 3.1% |
| NATIONAL PRESCRIPTION ADMINISTRATO | 16,376,787 | 1,493,558 | 9.1% |
| HEALTH NET PHARMACEUTICAL SERVICE | 14,967,389 | 3,033,004 | 20.3% |
| PROVANTAGE PRESCRIPTION BENEFIT M | 14,384,523 | 1,006,920 | 7.0% |
| PHARMACARE, INC. - G37446 | 13,497,896 | 683,326 | 5.1% |
| HUMANA INC. - G37399 | 12,207,451 | 2,685,639 | 22.0% |
| WELLPOINT HEALTH NETWORKS INC. - G | 9,357,653 | 935,765 | 10.0% |
| BLUE SHIELD OF CALIFORNIA - G40837 | 8,539,162 | 1,703,624 | 20.0% |
| NOVATION ACUTE - 401356 | 6,923,899 | 727,533 | 10.5% |
| PREFERRED CARE (BC/BS OF AL) - G3805 | 5,293,536 | 79,403 | 1.5% |
| KAISER (SINGLE SOURCE) - 304629-00 | 4,860,061 | 1,248,828 | 25.7% |
| MHA LONG TERM CARE - 400051 | 4,842,998 | 464,249 | 9.6% |
| PREMIER, INC. - 303982-00 | 4,445,231 | 873,835 | 19.7% |
| HEALTHPARTNERS - G37869 | 4,313,580 | 647,037 | 15.0% |
| NHPA LONG TERM CARE - 400052 | 3,759,334 | 360,330 | 9.6% |
| BLUE CROSS BLUE SHIELD OF ALABAMA | 3,735,914 | 354,913 | 9.5% |
| COVENTRY CORPORATION - G32164 | 3,265,295 | 653,059 | 20.0% |
| IHC HEALTH PLANS, INC, (IPA) - G36085 | 3,135,378 | 192,905 | 6.2% |
| TDI MANAGED CARE SERVICES, INC. D-B | 3,027,309 | 98,387 | 3.2% |
| HARVARD PILGRIM HEALTH CARE PLAN'S | 2,925,555 | - | 0.0% |
| MEDIMPACT INC. (PBM) - G35853 | 2,903,601 | 929,152 | 32.0% |
| OMNICARE - 400656 | 2,843,424 | 327,194 | 11.5% |
| MEDICA - G58316 | 2,666,875 | 480,038 | 18.0% |
| MAXOR NATIONAL PHARMACY SERVICES | 2,489,210 | 96,206 | 3.9% |
| GERIMED LONG TERM CARE - 400053 | 2,457,435 | 235,536 | 9.6% |
| MINNESOTA MULTISTATE GOVERNMEN - | 2,415,932 | 133,439 | 5.5% |
| MINNESOTA MULTISTATE GOVERNMEN - | 2,256,171 | 357,928 | 15.9% |
| OWEN HEALTHCARE LTC - 401111 | 2,216,595 | 307,832 | 13.9% |
| JOHN DEERE HEALTH CARE INC. - G4938 | 2,213,294 | 442,659 | 20.0% |
| DPSC/DAPA - 304045-04 | 1,893,937 | 840,526 | 44.4% |
| NOVATION ALTERNATE CARE CONTRA | 1,865,607 | 476,351 | 25.5% |
| DEAN HEALTH PLAN - G50457 | 1,839,258 | 331,066 | 18.0% |
| MVP HEALTH PLAN INC. - G32139 | 1,819,839 | 491,357 | 27.0% |
| UPMC HEALTH PLAN - G53127 | 1,808,958 | 72,358 | 4.0% |
| SENTARA HEALTH MANAGEMENT - G379 | 1,806,320 | 234,821 | 13.0% |
| HEALTH SVS CORP OF AMER NONCOM | 1,701,837 | 221,122 | 13.0% |
| DEANCARE HMO - G36149 | 1,668,780 | 250,317 | 15.0% |
| NMHC SYSTEMS, INC. - G53791 | 1,614,573 | 144,859 | 9.0% |
| HEALTH ALLIANCE PLAN - G35725 | 1,493,833 | 35,968 | 2.4% |
| CIGNA STAFF CONTRACT - 400095 | 1,478,238 | 199,431 | 13.5% |
| AMERINET LINE-ITEM 304522 - 304522-0 | 1,355,379 | 113,641 | 8.4% |
| HEALTHPARTNERS - 401298 | 1,308,613 | 218,310 | 16.7% |
| REGENCE BLUE SHIELD OF IDAHO - G40 | 1,298,583 | 49,470 | 3.8% |
| HEALTH NET PHARMACEUTICAL SERVICE | 1,230,980 | 344,674 | 28.0% |
| CARE CHOICES HMO - G35490 | 1,210,195 | 205,733 | 17.0% |
| PHYSICIANS PLUS - G30899 | 1,165,434 | 174,815 | 15.0% |
| COMPCARE HEALTH SERVICES - G31313 | 1,149,148 | - | 0.0% |
| PHS GRANTEES - 401082-04 | 1,135,831 | 601,601 | 53.0% |
| HARVARD COMM. HEALTH - 400069 | 1,129,137 | 391,370 | 34.7% |
| HARVARD PILGRIM HEALTH CARE MEDIC | 1,111,584 | - | 0.0% |
| INDEPENDENT HEALTH - G42939 | 1,090,480 | 327,144 | 30.0% |
| HMSA CHOICE/SELECT - G30871 | 941,837 | 131,857 | 14.0% |
| TOUCHPOINT HEALTH PLAN - G39046 | 933,909 | 177,887 | 19.0% |
| COMPCARE - G31205 | 915,672 | 41,205 | 4.5% |
| PHARMACEUTICAL BUYERS, INC NHP | 817,718 | 78,377 | 9.6% |

## GLAXOSMITHKLINE N.A. PHARMACEUTICALS
### MANAGED CARE DIVISION: 2000 SALES AND GROWTH RATES

**Advance / PCS**
All Amounts $1000

| PRODUCT | 2000 | | | | MARKET SHARE | CAGR* GROSS SALES (1998 - 2000) | DISCOUNT TREND (**) |
|---|---|---|---|---|---|---|---|
| | GROSS SALES | DISCOUNTS | NET SALES | DISCOUNT % | | | |
| Paxil | 237,181 | 18,770 | 218,411 | 7.9% | 23.0% | 16.8% | -8.3% |
| Augmentin | 166,592 | 15,076 | 151,516 | 9.0% | 18.8% | 15.0% | 7.7% |
| Imitrex | 144,440 | 9,609 | 134,831 | 6.7% | 63.2% | 4.9% | 22.0% |
| Wellbutrin | 118,028 | 12,016 | 106,012 | 10.2% | 9.5% | 23.1% | 27.9% |
| Flonase | 89,731 | 10,872 | 78,859 | 12.1% | 35.6% | 29.1% | 9.4% |
| Flovent | 88,686 | 7,890 | 80,797 | 8.9% | 31.8% | 64.0% | 7.1% |
| Avandia | 75,581 | 4,873 | 70,709 | 6.4% | - | - | - |
| Serevent | 67,567 | 4,486 | 63,082 | 6.6% | 12.9% | 23.5% | 17.4% |
| Relafen | 47,259 | 4,307 | 42,953 | 9.1% | 9.8% | -13.8% | -11.9% |
| Valtrex | 38,557 | 3,213 | 35,344 | 8.3% | 63.5% | 27.7% | 30.4% |
| Zofran | 30,378 | 1,137 | 29,240 | 3.7% | 82.6% | 40.1% | 19.4% |
| Bactroban | 5,192 | 208 | 4,984 | 4.0% | - | 11.7% | -6.1% |
| Lanoxin | 950 | 32 | 918 | 3.4% | - | -38.6% | -7.0% |
| OTHER PRODUCTS | 41,525 | 2,959 | 38,566 | 7.1% | - | 6.0% | 12.0% |
| **TOTALS** | **1,151,667** | **95,447** | **1,056,220** | **8.3%** | - | **20.9%** | **5.6%** |

(*) Cumulative Average Growth Rate (CAGR)

(**) CAGR of discount rate 98-00

Highly Confidential under Protective Order/MDL No. 1456

| Customer | Expire Dt. | Source | % off NWP |
|---|---|---|---|
| HUMANA HEALTH PLAN | 09/30/01 | CONTRACTS | 33.34% |
| Harvard Pilgrim Health Care | 12/31/01 | CONTRACTS | 33.34% |
| Group Health Cooperative | 12/31/01 | CONTRACTS | 31.96% |
| KAISER PERMANENTE | 09/30/01 | CONTRACTS | 30.47% |
| Harvard Pilgrim Health Care Pl | 12/31/01 | IPA/PBM REBATES | 30.00% |
| MEDIMPACT INC. (PBM) | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Express Scripts, Inc. | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Harvard Pilgrim Health Care Me | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Independent Health | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 30.00% |
| HMSA Qwest | 03/31/02 | IPA/PBM REBATES | 30.00% |
| Univera | 12/31/01 | IPA/PBM REBATES | 29.00% |
| MVP Health Plan Inc. | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Partners Health Plan | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Aetna/US Healthcare | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Medicenter | 12/31/02 | CONTRACTS | 27.43% |
| Keystone Mercy Health Plan | 12/31/01 | IPA/PBM REBATES | 27.00% |
| WORTHINGTON INDUSTRIES | 12/31/01 | CONTRACTS | 26.18% |
| Massachusetts Institute of Tec | 12/31/01 | CONTRACTS | 25.72% |
| Massachusetts Institute of Tec | 12/31/01 | CONTRACTS | 25.72% |
| Teamsters Care | 12/31/01 | CONTRACTS | 25.72% |
| Teamsters Care | 12/31/01 | CONTRACTS | 25.72% |
| UNION PACIFIC RAILROAD EMPLOYE | 12/31/01 | CONTRACTS | 25.71% |
| PBM Plus | 03/31/02 | IPA/PBM REBATES | 25.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 25.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 25.00% |
| Care Choices HMO | 12/31/01 | IPA/PBM REBATES | 24.00% |
| MiM Health Plans Inc. | 12/31/01 | IPA/PBM REBATES | 24.00% |
| OCHSNER HEALTH PLAN | 12/31/01 | IPA/PBM REBATES | 23.50% |
| John Deere Health Care Inc. | 12/31/01 | IPA/PBM REBATES | 23.00% |
| Medica | 12/31/01 | IPA/PBM REBATES | 23.00% |
| Touchpoint Health Plan | 03/31/02 | IPA/PBM REBATES | 23.00% |
| COVENTRY CORPORATION | 12/31/02 | IPA/PBM REBATES | 22.00% |
| COUNTY OF LOS ANGELES/INTERNAL | 12/31/01 | CONTRACTS | 21.91% |
| Pan American/CAC Medical Cente | 12/31/01 | CONTRACTS | 20.95% |
| Blue Shield of California | 12/31/01 | IPA/PBM REBATES | 20.00% |
| Security Health Plan | 12/31/02 | IPA/PBM REBATES | 20.00% |
| ADVANCE PARADIGM CLINICAL | 12/31/01 | IPA/PBM REBATES | 20.00% |
| Novation/VHA Acute | 09/30/01 | CONTRACTS | 19.27% |
| Novation/VHA AHC | 09/30/01 | CONTRACTS | 19.27% |
| Novation/UHC Acute | 09/30/01 | CONTRACTS | 19.27% |
| Novation/UHC AHC | 09/30/01 | CONTRACTS | 19.27% |
| AmeriNet | 08/31/02 | CONTRACTS | 19.18% |
| HealthPartners | 06/30/02 | CONTRACTS | 19.04% |
| PREMIER, INC. | 12/31/04 | CONTRACTS | 19.04% |
| PREMIER, INC | 12/31/04 | CONTRACTS | 19.04% |
| Innovative Purchasing Concepts | 12/31/02 | CONTRACTS | 18.99% |
| Healthworks, Inc. | 06/14/02 | CONTRACTS | 18.37% |
| M-Plan | 12/31/01 | IPA/PBM REBATES | 18.00% |
| HIP Health Plan of New York | 12/31/01 | IPA/PBM REBATES | 17.00% |
| HEALTH PLAN OF THE REDWOODS | 12/31/01 | IPA/PBM REBATES | 17.00% |
| DIVERSIFIED PHARMACEUTICAL SVS | 12/31/01 | IPA/PBM REBATES | 16.20% |
| Express Scripts, Inc. | 12/31/01 | IPA/PBM REBATES | 16.20% |
| AdvancePCS Health Systems Inc. | 12/31/01 | IPA/PBM REBATES | 16.00% |
| PharmaCare, Inc. | 12/31/01 | IPA/PBM REBATES | 16.00% |
| MEDCO CONTAINMENT SERVICES | 12/31/01 | IPA/PBM REBATES | 15.00% |
| VALUERX INC. (PBM) | 12/31/01 | IPA/PBM REBATES | 15.00% |
| HIP Health Plan of Florida, In | 12/31/02 | IPA/PBM REBATES | 15.00% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 14.74% |
| THE JOHNS HOPKINS HOSPITAL | 12/31/01 | CONTRACTS | 14.28% |
| HMSA Choice/Select | 03/31/02 | IPA/PBM REBATES | 14.00% |
| Blue Cross Blue Shield of Alab | 12/31/01 | IPA/PBM REBATES | 13.50% |
| Grand Valley Health Plan | 12/31/01 | CONTRACTS | 13.33% |
| Rocky Mountain HMO | 12/31/01 | IPA/PBM REBATES | 13.00% |
| Union Health Services Inc of C | 12/31/01 | CONTRACTS | 12.92% |
| OWEN HEALTHCARE | 12/31/01 | CONTRACTS | 12.24% |
| PACT | 03/31/02 | CONTRACTS | 12.24% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 12.02% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 12.00% |
| UPMC Health Plan | 12/31/01 | IPA/PBM REBATES | 12.00% |
| The Oath | 12/31/01 | IPA/PBM REBATES | 11.50% |
| Omnicare, Inc. | 12/31/01 | CONTRACTS | 11.43% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| TENET HEALTHSYSTEM MEDICAL, IN | 12/31/01 | CONTRACTS | 11.33% |
| STATE OF OHIO | 08/31/01 | CONTRACTS | 10.20% |
| AmeriNet/State of Louisiana | 09/30/01 | CONTRACTS | 10.20% |
| STATE OF FLORIDA | 09/30/01 | CONTRACTS | 10.20% |
| MHA/Medecon | 09/30/01 | CONTRACTS | 10.20% |
| JEFFERSON COUNTY DEPARTMENT OF | 09/30/01 | CONTRACTS | 10.20% |
| STATE OF ILLINOIS | 11/30/01 | CONTRACTS | 10.20% |
| COOK COUNTY | 11/30/01 | CONTRACTS | 10.20% |
| STATE OF ARKANSAS | 12/31/01 | CONTRACTS | 10.20% |
| National Prescription Administ | 12/31/01 | IPA/PBM REBATES | 10.00% |
| ACIPCO | 09/30/01 | CONTRACTS | 9.52% |
| Corporate Health Dimensions | 12/31/01 | CONTRACTS | 9.52% |
| TENET HEALTHSYSTEM MEDICAL INC | 12/31/01 | CONTRACTS | 9.52% |
| Provider Synergies, Inc. | 12/31/01 | IPA/PBM REBATES | 8.00% |
| INNOVATIX | 12/31/01 | CONTRACTS | 7.62% |
| Novation/HPP/UNJHA | 09/30/01 | CONTRACTS | 7.61% |
| Pharmaceutical Buyers Inc. | 12/31/01 | CONTRACTS | 7.61% |
| Managed Healthcare Associates, | 12/31/01 | CONTRACTS | 7.61% |
| Nursing Home Purchasing Agency | 12/31/01 | CONTRACTS | 7.61% |
| GeriMed | 12/31/01 | CONTRACTS | 7.61% |
| INSOURCE HEALTH SERVICES | 12/31/01 | CONTRACTS | 7.61% |
| HEALTH SERVICES CORP OF AMERIC | 12/31/01 | CONTRACTS | 7.61% |

GSK-MDL-WZ01-0077901

| | | | |
|---|---|---|---|
| OWEN Healthcare LTC | 12/31/01 | CONTRACTS | 7.61% |
| DUKE UNIVERSITY | 03/31/02 | CONTRACTS | 7.61% |
| INSOURCE HEALTH SERVICES | 04/30/02 | CONTRACTS | 7.61% |
| AmeriNet Long Term Care | 08/31/02 | CONTRACTS | 7.61% |
| NATIONAL PURCHASING ALLIANCE A | 12/31/02 | CONTRACTS | 7.61% |
| Prime Therapeutics Inc. | 06/30/02 | IPA/PBM REBATES | 6.00% |
| Scott and White Prescription S | 12/31/02 | IPA/PBM REBATES | 6.00% |
| Mayo Foundation for Medical Ed | 09/30/03 | IPA/PBM REBATES | 6.00% |
| Mayo Foundation for Medical Ed | 06/30/03 | IPA/PBM REBATES | 6.00% |
| MHAMEDECON | 12/31/01 | CONTRACTS | 5.72% |
| MIDWESTERN REGIONAL MED CTR | 12/31/01 | CONTRACTS | 5.72% |
| MEMORIAL MEDICAL CENTER AND | 12/31/01 | CONTRACTS | 5.72% |
| SHARED SERVICES HEALTHCARE INC | 12/31/01 | CONTRACTS | 5.72% |
| THE REGENTS OF THE UNIVERSITY | 03/31/02 | CONTRACTS | 5.72% |
| MINNESOTA MULTISTATE GOVERNMEN | 04/30/02 | CONTRACTS | 5.72% |
| STATE OF TEXAS | 05/31/02 | CONTRACTS | 5.72% |
| JOINT PURCHASING CORPORATION | 06/30/02 | CONTRACTS | 5.72% |
| AmeriNet Fox Chase | 08/31/02 | CONTRACTS | 5.72% |
| NATIONAL PURCHASING ALLIANCE | 12/31/02 | CONTRACTS | 5.72% |
| TDI Managed Care Services, Inc | 12/31/01 | IPA/PBM REBATES | 5.00% |
| Centrus | 12/31/01 | IPA/PBM REBATES | 2.00% |
| **HUMANA HEALTH PLAN** | **09/30/01** | **CONTRACTS** | **33.34%** |
| Harvard Pilgrim Health Care | 12/31/01 | CONTRACTS | 33.34% |
| Group Health Cooperative | 12/31/01 | CONTRACTS | 31.97% |
| KAISER PERMANENTE | 09/30/01 | CONTRACTS | 30.48% |
| Harvard Pilgrim Health Care Pl | 12/31/01 | IPA/PBM REBATES | 30.00% |
| MEDIMPACT INC. (PBM) | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Express Scripts, Inc. | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Harvard Pilgrim Health Care Me | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Independent Health | 12/31/01 | IPA/PBM REBATES | 30.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 30.00% |
| HMSA Quest | 03/31/02 | IPA/PBM REBATES | 30.00% |
| Univera | 12/31/01 | IPA/PBM REBATES | 29.00% |
| MVP Health Plan Inc. | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Partners Health Plan | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Aetna/US Healthcare | 12/31/01 | IPA/PBM REBATES | 28.00% |
| Medicenter | 12/31/01 | CONTRACTS | 27.43% |
| Keystone Mercy Health Plan | 12/31/01 | IPA/PBM REBATES | 27.00% |
| WORTHINGTON INDUSTRIES | 12/31/01 | CONTRACTS | 26.19% |
| Massachusetts Institute of Tec | 12/31/01 | CONTRACTS | 25.72% |
| Massachusetts Institute of Tec | 12/31/01 | CONTRACTS | 25.72% |
| Teamsters Care | 12/31/01 | CONTRACTS | 25.72% |
| Teamsters Care | 12/31/01 | CONTRACTS | 25.72% |
| UNION PACIFIC RAILROAD EMPLOYE | 12/31/01 | CONTRACTS | 25.71% |
| PBM Plus | 03/31/02 | IPA/PBM REBATES | 25.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 25.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 25.00% |
| Care Choices HMO | 12/31/01 | IPA/PBM REBATES | 24.00% |
| MIM Health Plans Inc. | 12/31/01 | IPA/PBM REBATES | 24.00% |
| OCHSNER HEALTH PLAN | 12/31/02 | IPA/PBM REBATES | 23.50% |
| John Deere Health Care Inc. | 12/31/01 | IPA/PBM REBATES | 23.00% |
| Medica | 12/31/01 | IPA/PBM REBATES | 23.00% |
| Touchpoint Health Plan | 03/31/02 | IPA/PBM REBATES | 23.00% |
| COVENTRY CORPORATION | 12/31/02 | IPA/PBM REBATES | 22.00% |
| COUNTY OF LOS ANGELES/INTERNAL | 12/31/01 | CONTRACTS | 21.90% |
| Pan American/CAC Medical Cente | 12/31/01 | CONTRACTS | 20.95% |
| Blue Shield of California | 12/31/01 | CONTRACTS | 20.00% |
| Security Health Plan | 12/31/02 | IPA/PBM REBATES | 20.00% |
| ADVANCE PARADIGM CLINICAL | 12/31/01 | IPA/PBM REBATES | 20.00% |
| Novation/VHA Acute | 09/30/01 | CONTRACTS | 19.28% |
| Novation/VHA AHC | 09/30/01 | CONTRACTS | 19.28% |
| Novation/UHC Acute | 09/30/01 | CONTRACTS | 19.28% |
| Novation/UHC AHC | 09/30/01 | CONTRACTS | 19.28% |
| AmeriNet | 08/31/02 | CONTRACTS | 19.18% |
| HealthPartners | 06/30/02 | CONTRACTS | 19.05% |
| PREMIER, INC. | 12/31/04 | CONTRACTS | 19.05% |
| PREMIER, INC | 12/31/04 | CONTRACTS | 19.05% |
| Innovative Purchasing Concepts | 12/31/02 | CONTRACTS | 19.01% |
| Healthworks, Inc. | 06/14/02 | CONTRACTS | 18.37% |
| M-Plan | 12/31/01 | IPA/PBM REBATES | 18.00% |
| HIP Health Plan of New York | 12/31/01 | IPA/PBM REBATES | 17.00% |
| HEALTH PLAN OF THE REDWOODS | 12/31/01 | IPA/PBM REBATES | 17.00% |
| DIVERSIFIED PHARMACEUTICAL SVS | 12/31/01 | IPA/PBM REBATES | 16.20% |
| Express Scripts, Inc. | 12/31/01 | IPA/PBM REBATES | 16.20% |
| AdvancePCS Health Systems Inc. | 12/31/01 | IPA/PBM REBATES | 16.00% |
| PharmaCare, Inc. | 12/31/01 | IPA/PBM REBATES | 16.00% |
| MEDCO CONTAINMENT SERVICES | 12/31/01 | IPA/PBM REBATES | 15.00% |
| VALUERX INC. (PBM) | 12/31/01 | IPA/PBM REBATES | 15.00% |
| HIP Health Plan of Florida, In | 12/31/02 | IPA/PBM REBATES | 15.00% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 14.74% |
| THE JOHNS HOPKINS HOSPITAL | 12/31/01 | CONTRACTS | 14.29% |
| HMSA Choice/Select | 03/31/02 | IPA/PBM REBATES | 14.00% |
| Blue Cross Blue Shield of Alab | 12/31/01 | IPA/PBM REBATES | 13.50% |
| Grand Valley Health Plan | 12/31/01 | CONTRACTS | 13.34% |
| Rocky Mountain HMO | 12/31/01 | IPA/PBM REBATES | 13.00% |
| Union Health Services Inc of C | 12/31/01 | CONTRACTS | 12.92% |
| OWEN HEALTHCARE | 12/31/01 | CONTRACTS | 12.24% |
| PACT | 03/31/02 | CONTRACTS | 12.24% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 12.02% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 12.00% |
| UPMC Health Plan | 12/31/01 | IPA/PBM REBATES | 12.00% |
| The Oath | 12/31/01 | IPA/PBM REBATES | 11.50% |
| Omnicare, Inc. | 12/31/01 | CONTRACTS | 11.43% |
| TENET HEALTHSYSTEM MEDICAL, IN | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 11.33% |
| STATE OF OHIO | 08/31/01 | CONTRACTS | 10.20% |
| AmeriNet/State of Louisiana | 09/30/01 | CONTRACTS | 10.20% |

GSK-MDL-WZ01-0077902

| | | | |
|---|---|---|---|
| STATE OF FLORIDA | 09/30/01 | CONTRACTS | 10.20% |
| MHA/Medecon | 09/30/01 | CONTRACTS | 10.20% |
| JEFFERSON COUNTY DEPARTMENT OF | 09/30/01 | CONTRACTS | 10.20% |
| STATE OF ILLINOIS | 11/30/01 | CONTRACTS | 10.20% |
| COOK COUNTY | 11/30/01 | CONTRACTS | 10.20% |
| STATE OF ARKANSAS | 12/31/01 | CONTRACTS | 10.20% |
| National Prescription Administ | 12/31/01 | IPA/PBM REBATES | 10.00% |
| ACIPCO | 09/30/01 | CONTRACTS | 9.52% |
| Corporate Health Dimensions | 12/31/01 | CONTRACTS | 9.52% |
| TENET HEALTHSYSTEM MEDICAL INC | 12/31/01 | CONTRACTS | 9.52% |
| Provider Synergies, Inc. | 12/31/01 | IPA/PBM REBATES | 8.00% |
| Novation/HPPN/UHA | 09/30/01 | CONTRACTS | 7.62% |
| Pharmaceutical Buyers Inc. | 12/31/01 | CONTRACTS | 7.62% |
| Managed Healthcare Associates, | 12/31/01 | CONTRACTS | 7.62% |
| Nursing Home Purchasing Agency | 12/31/01 | CONTRACTS | 7.62% |
| GeriMed | 12/31/01 | CONTRACTS | 7.62% |
| INSOURCE HEALTH SERVICES | 12/31/01 | CONTRACTS | 7.62% |
| HEALTH SERVICES CORP OF AMERIC | 12/31/01 | CONTRACTS | 7.62% |
| OWEN Healthcare LTC | 12/31/01 | CONTRACTS | 7.62% |
| DUKE UNIVERSITY | 03/31/02 | CONTRACTS | 7.62% |
| INSOURCE HEALTH SERVICES | 04/30/02 | CONTRACTS | 7.62% |
| AmeriNet Long Term Care | 08/31/02 | CONTRACTS | 7.62% |
| NATIONAL PURCHASING ALLIANCE A | 12/31/01 | CONTRACTS | 7.62% |
| INNOVATIX | 12/31/01 | CONTRACTS | 7.61% |
| Prime Therapeutics Inc. | 06/30/02 | IPA/PBM REBATES | 6.00% |
| Scott and White Prescription S | 12/31/02 | IPA/PBM REBATES | 6.00% |
| Mayo Foundation for Medical Ed | 06/30/03 | IPA/PBM REBATES | 6.00% |
| Mayo Foundation for Medical Ed | 06/30/03 | IPA/PBM REBATES | 6.00% |
| MHAMEDECON | 12/31/01 | CONTRACTS | 5.71% |
| MIDWESTERN REGIONAL MED CTR | 12/31/01 | CONTRACTS | 5.71% |
| MEMORIAL MEDICAL CENTER AND | 12/31/01 | CONTRACTS | 5.71% |
| SHARED SERVICES HEALTHCARE INC | 12/31/01 | CONTRACTS | 5.71% |
| THE REGENTS OF THE UNIVERSITY | 03/31/02 | CONTRACTS | 5.71% |
| MINNESOTA MULTISTATE GOVERNMEN | 04/30/02 | CONTRACTS | 5.71% |
| STATE OF TEXAS | 05/31/02 | CONTRACTS | 5.71% |
| JOINT PURCHASING CORPORATION | 06/30/02 | CONTRACTS | 5.71% |
| AmeriNet Fox Chase | 08/31/02 | CONTRACTS | 5.71% |
| NATIONAL PURCHASING ALLIANCE | 12/31/02 | CONTRACTS | 5.71% |
| TDI Managed Care Services, Inc | 12/31/01 | IPA/PBM REBATES | 5.00% |
| Centrus | 12/31/01 | IPA/PBM REBATES | 2.00% |
| **MEDCO CONTAINMENT SERVICES** | **12/31/01** | **IPA/PBM REBATES** | **15.00%** |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 12.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 12.00% |
| Cigna Health Corporation | 12/31/01 | CONTRACTS | 10.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 10.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 10.00% |
| Medicenter | 12/31/02 | CONTRACTS | 9.05% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 8.00% |
| AdvancePCS Health Systems Inc. | 12/31/01 | IPA/PBM REBATES | 7.00% |
| Novation/VHA Acute | 09/30/01 | CONTRACTS | 5.71% |
| Novation/VHA AHC | 09/30/01 | CONTRACTS | 5.71% |
| AmeriNet/State of Louisiana | 09/30/01 | CONTRACTS | 5.71% |
| Novation/UHC Acute | 09/30/01 | CONTRACTS | 5.71% |
| Novation/UHC AHC | 09/30/01 | CONTRACTS | 5.71% |
| AmeriNet | 08/31/02 | CONTRACTS | 5.71% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 5.71% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 5.71% |
| PREMIER, INC. | 12/31/04 | CONTRACTS | 5.62% |
| PREMIER, INC | 12/31/04 | CONTRACTS | 5.62% |
| ADVANCE PARADIGM CLINICAL | 12/31/01 | IPA/PBM REBATES | 5.00% |
| MEDIMPACT INC. (PBM) | 12/31/01 | IPA/PBM REBATES | 5.00% |
| Independent Health | 12/31/01 | IPA/PBM REBATES | 5.00% |
| HMSA Quest | 03/31/02 | IPA/PBM REBATES | 5.00% |
| HUMANA HEALTH PLAN | 09/30/01 | CONTRACTS | 5.00% |
| UNION PACIFIC RAILROAD EMPLOYE | 12/31/01 | CONTRACTS | 4.00% |
| OWEN HEALTHCARE | 12/31/01 | CONTRACTS | 3.96% |
| PACT | 03/31/02 | CONTRACTS | 3.96% |
| Grand Valley Health Plan | 12/31/01 | CONTRACTS | 2.99% |
| WORTHINGTON INDUSTRIES | 12/31/01 | CONTRACTS | 2.99% |
| DUKE UNIVERSITY | 03/31/02 | CONTRACTS | 2.99% |
| TENET HEALTHSYSTEM MEDICAL, IN | 12/31/01 | CONTRACTS | 2.97% |
| HIP Health Plan of New York | 12/31/01 | IPA/PBM REBATES | 2.00% |
| Rocky Mountain HMO | 12/31/01 | IPA/PBM REBATES | 2.00% |
| HC PHARMACY CENTRAL, INC. | 12/31/01 | CONTRACTS | 1.49% |
| Prime Therapeutics Inc. | 06/30/02 | IPA/PBM REBATES | 1.00% |
| THE JOHNS HOPKINS HOSPITAL | 12/31/01 | CONTRACTS | 0.99% |
| MHAMEDECON | 12/31/01 | CONTRACTS | 0.99% |
| SHARED SERVICES HEALTHCARE INC | 12/31/01 | CONTRACTS | 0.99% |
| COUNTY OF LOS ANGELES/INTERNAL | 12/31/01 | CONTRACTS | 0.99% |
| TENET HEALTHSYSTEM MEDICAL INC | 12/31/01 | CONTRACTS | 0.99% |
| THE REGENTS OF THE UNIVERSITY | 03/31/02 | CONTRACTS | 0.99% |
| INSOURCE HEALTH SERVICES | 04/30/02 | CONTRACTS | 0.99% |
| JOINT PURCHASING CORPORATION | 06/30/02 | CONTRACTS | 0.99% |
| AmeriNet Fox Chase | 08/31/02 | CONTRACTS | 0.99% |
| NATIONAL PURCHASING ALLIANCE | 12/31/02 | CONTRACTS | 0.99% |
| **MEDCO CONTAINMENT SERVICES** | **12/31/01** | **IPA/PBM REBATES** | **15.00%** |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 12.00% |
| Prescription Solutions | 12/31/01 | IPA/PBM REBATES | 12.00% |
| Cigna Health Corporation | 12/31/01 | CONTRACTS | 10.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 10.00% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 10.00% |
| Medicenter | 12/31/02 | CONTRACTS | 9.05% |
| Health Net Pharmaceutical Serv | 12/31/01 | IPA/PBM REBATES | 8.00% |
| AdvancePCS Health Systems Inc. | 12/31/01 | IPA/PBM REBATES | 7.00% |
| Novation/VHA Acute | 09/30/01 | CONTRACTS | 5.72% |
| Novation/VHA AHC | 09/30/01 | CONTRACTS | 5.72% |
| AmeriNet/State of Louisiana | 09/30/01 | CONTRACTS | 5.72% |
| Novation/UHC Acute | 09/30/01 | CONTRACTS | 5.72% |
| Novation/UHC AHC | 09/30/01 | CONTRACTS | 5.72% |
| AmeriNet | 08/31/02 | CONTRACTS | 5.72% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 5.72% |
| HEALTH SERVICES CORP OF AMERIC | 09/30/02 | CONTRACTS | 5.72% |
| PREMIER, INC. | 12/31/04 | CONTRACTS | 5.62% |

**GSK KEY ACCOUNT RAR %**
Forecast II Data

| CUSTOMER | Key Product Total Sales | Key Product Total RARS |
|---|---|---|
| ADVANCE / PCS | 1,357,328,600 | 125,114,909 |
| CAREMARK | 285,463,320 | 9,002,543 |
| EXPRESS SCRIPTS | 1,181,280,338 | 85,052,354 |
| MEDCO | 2,443,495,572 | 234,297,149 |
| MEDIMPACT | 72,319,665 | 7,200,551 |
| NAT'L PRESCRIPTION ADM (NPA) | 167,619,614 | 13,306,424 |
| PHARMACARE | 97,651,538 | 5,240,299 |
| PRIME THERAPEUTICS | 131,564,887 | 7,635,325 |
| **subtotal PBM** | **5,737,744,032** | **487,649,364** |
| ANTHEM | 131,125,663 | 15,216,796 |
| AETNA | 411,807,273 | 59,225,296 |
| BC/BS OF ALABAMA | 47,399,096 | 4,030,408 |
| WELLPOINT | 462,125,990 | 57,604,951 |
| BLUE SHIELD OF CA | 58,519,886 | 8,664,278 |
| PRESCRIPTION SOLUTIONS | 133,366,761 | 24,569,160 |
| CIGNA | 293,422,501 | 35,041,644 |
| COVENTRY | 42,359,032 | 5,525,219 |
| HARVARD | 40,238,202 | 6,414,560 |
| HEALTHNET | 148,496,581 | 19,248,712 |
| HUMANA | 106,670,285 | 16,737,919 |
| KAISER | 219,397,050 | 69,562,782 |
| **subtotal Health Plan** | **2,097,928,320** | **321,831,726** |
| NOVATION^ | 138,439,545 | 15,392,621 |
| CONSORTA^ | 17,231,169 | 1,606,234 |
| CPS/ENET^ | 46,224,776 | 2,234,033 |
| OWEN^ | 42,429,165 | 4,279,156 |
| AMERINET^ | 25,726,444 | 1,976,983 |
| PACT^ | 17,915,603 | 2,089,564 |
| PREMIER^ | 114,627,506 | 18,998,201 |
| **subtotal GPO** | **402,594,208** | **46,576,193** |
| **Total Key Products** | **8,238,266,560** | **856,057,282** |
| **Total GSK Non-Mandated Sales** | **9,120,534,886** | **979,960,414** |

Notes to MCO Accts:
Health Net
Humana

Prescription Solutions
Regence
Medica
Excellus

* Institutional Sales accounts contract for respiratory institutional sizes only

Items in red reflect current GSK offer to Health Net for new GSK agmt eff 1/1/02
Slight adjustment to WBSR
Humana currently negotiating with APCS to shift pharmacy to APCS
Pulling Humana lives in current APCS contracts provide RAR upside to GSK
Ref APCS rebate levels
Changes noted per current offer

# Cicala Affidavit In Support of Opposition to GSK Motion For Summary Judgment

# EXHIBIT C

10-K 1 cigna10k.htm CIGNA CORPORATION FORM 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

(Mark One)

[X]  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2007
OR

[ ]  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file number 1-8323

**CIGNA Corporation**
(Exact name of registrant as specified in its charter)

| Delaware | 06-1059331 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

Two Liberty Place, Philadelphia, Pennsylvania     19192
(Address of principal executive offices)          (Zip Code)

Registrant's telephone number, including area code (215) 761-1000

Securities registered pursuant to section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $0.25 | New York Stock Exchange, Inc. |

Securities registered pursuant to section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes X No __

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes __ No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes X No __

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer", and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
Large accelerated filer [X]          Accelerated filer [ ]          Non-accelerated filer [ ]          Smaller Reporting Company [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes _ No X

The aggregate market value of the voting stock held by non-affiliates of the registrant as of June 30, 2007 was approximately $13.5 billion.

As of January 31, 2008, 280,085,645 shares of the registrant's Common Stock were outstanding.

Part III of this Form 10-K incorporates by reference information from the registrant's proxy statement to be dated on or about March 20, 2008.

## PART I

Item 1. *BUSINESS*

### A.   Description of Business

CIGNA Corporation and its subsidiaries constitute one of the largest investor-owned health service organizations in the United States. Its subsidiaries are major providers of health care and related benefits, the majority of which are offered through the workplace, including: health care products and services; group disability, life and accident insurance; and workers' compensation case management and related services. CIGNA Corporation had consolidated shareholders' equity of $4.7 billion and assets of $40.1 billion as of December 31, 2007, and revenues of $17.6 billion for the year then ended. CIGNA's major insurance subsidiary, Connecticut General Life Insurance Company ("CG Life"), traces its origins to 1865. CIGNA Corporation was incorporated in the State of Delaware in 1981.

As used in this document, "CIGNA" and the "Company" may refer to CIGNA Corporation itself, one or more of its subsidiaries, or CIGNA Corporation and its consolidated subsidiaries. CIGNA Corporation is a holding company and is not an insurance company. Its subsidiaries conduct various businesses, which are described in this Form 10-K.

CIGNA's revenues are derived principally from premiums, fees, mail order pharmacy, other revenues and investment income as described on page 41 and 42. The financial results of CIGNA's businesses are reported in the following segments:

- Health Care;

- Disability and Life;

- International;

- Other Operations; and

- Run-off Reinsurance.

*Available Information*

CIGNA's Internet address is http://www.cigna.com. CIGNA's annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports are available through CIGNA's website as soon as reasonably practicable after the filing or furnishing of such material with the Securities and Exchange Commission. See "Code of Ethics and Other Corporate Governance Disclosures" in Part III, Item 10 on page 106 of this Form 10-K for additional available information.

### B.   Financial Information about Business Segments

The financial information included in the tables that follow is presented in conformity with accounting principles generally accepted in the United States of America ("GAAP"), unless otherwise indicated. Certain reclassifications have been made to prior years' financial information to conform to the 2007 presentation. Industry rankings and percentages set forth below are for the year ended December 31, 2006, unless otherwise indicated. Unless otherwise noted, statements set forth in this document concerning CIGNA's rank or position in an industry or particular line of business have been developed internally, based on publicly available information.

Financial data for each of CIGNA's business segments is set forth in Note 19 to the Financial Statements on page 96 of this Form 10-K.

1

for anti-ulcer, hypertension, high cholesterol and allergic rhinitis medications through communications with the consumer and the consumer's physician.

*CIGNA Tel-Drug®.* CIGNA HealthCare also offers cost-effective mail order, telephone and on-line pharmaceutical fulfillment services through its CIGNA Tel-Drug® operation. CIGNA Tel-Drug Home Delivery Pharmacy provides a member-focused, efficient home delivery pharmacy with high standards of quality, accuracy and member care relating to maintenance and specialty medications. Orders may be submitted through the mail, via phone or through the internet at myCIGNA.com. Refill reminders, generic conversion programs and 24-hour access to licensed pharmacists support CIGNA's goals of low net cost, medication adherence and member service, resulting in a positive Return on Health $^{SM}$.

*Medicare Part D.* CIGNA's Medicare Part D prescription drug program, CIGNA Medicare Rx $^{SM}$, provides a number of plan options as well as service and information support to medicare-eligible members aged 65 and over. CIGNA Medicare Rx $^{SM}$ is available in all 50 states and the District of Columbia.

*Retail Pharmacies.* CIGNA operates 18 retail pharmacies, including on-site retail pharmacies for customers to serve the needs of CIGNA HealthCare members.

### Funding Arrangements

The segment's health care products and services are offered through the following funding arrangements:

- guaranteed cost;

- retrospectively experience-rated (including minimum premium funding arrangements); and

- service.

*Guaranteed Cost.* Under guaranteed cost funding arrangements, group policyholders pay a fixed premium and CIGNA bears the risk for claims and costs that exceed the premium. The HMO product is offered only on a guaranteed cost basis.

*Retrospectively Experience-rated (Including Minimum Premium).* Under retrospectively experience-rated funding arrangements, a premium that typically includes a margin to partially protect against adverse claim fluctuations is determined at the beginning of the policy period. CIGNA generally bears the risk if claims and expenses exceed premiums, but has the potential to recover these deficits from margins in future years if coverage is renewed. For additional discussion, see "Pricing, Reserves and Reinsurance" on page 7.

Under minimum premium funding arrangements, instead of simply paying a fixed monthly premium, the group policyholder establishes and funds a bank account and authorizes the insurer to draw upon funds in the account to pay claims. The policyholder pays a monthly residual premium while the policy is in effect and a supplemental premium (to cover reserves for run-out claims and expenses) upon termination. Minimum premium funding arrangements combine insurance protection with an element of self-funding. The policyholder is responsible for funding all claims up to a predetermined aggregate, maximum amount, and CIGNA bears the risk for claim costs incurred in excess of that amount. CIGNA has the potential to recover this deficit from margins in future years if the policy is renewed. Accordingly, minimum premium funding arrangements have a risk profile similar to retrospectively experience-rated insurance arrangements.

*Service.* Under the service funding arrangement, CIGNA HealthCare contracts with employers on an administrative services only ("ASO") basis to administer claims. CIGNA HealthCare collects administrative service fees in exchange for providing ASO plans with access to CIGNA HealthCare's applicable participating provider network and for providing other services and programs, including: quality management, utilization management; cost containment; health advocacy; 24-hour help line; case management; disease management; pharmacy benefit management; behavioral health care management services (through its provider networks); or a combination of the above. The employer/plan sponsor is responsible for self-funding all claims, but may purchase stop-loss insurance from CIGNA HealthCare or other insurers for claims in excess of some predetermined amount, for either individuals, the entire group in aggregate, or both.

Financial information regarding premiums and fees is presented on page 48 in the MD&A section of this Form 10-K. Other financial information about the Health Care segment is presented elsewhere in the MD&A section and

5

In addition, various non-U.S. jurisdictions prescribe minimum surplus requirements that are based upon solvency, liquidity and reserve coverage measures. During 2007, CIGNA's HMOs and life and health insurance subsidiaries, as well as non-U.S. insurance subsidiaries, were compliant with applicable RBC and non-U.S. surplus rules.

The NAIC is considering changing statutory reserving rules for variable annuities. Any changes would apply to CIGNA's reinsurance contracts covering guaranteed minimum death benefits and guaranteed minimum income benefits, and would impact CIGNA's overall surplus level.

*Holding Company Laws*

CIGNA's domestic insurance companies and certain of its HMOs are subject to state laws regulating subsidiaries of insurance holding companies. Under such laws, certain dividends, distributions and other transactions between an insurance or HMO subsidiary and its affiliates may require notification to, or approval by, one or more state insurance commissioners.

*Oversight of Marketing, Advertising and Broker Compensation*

State and/or federal regulatory scrutiny of life and health insurance company and HMO marketing and advertising practices, including the adequacy of disclosure regarding products and their administration, may result in increased regulation. Products offering limited benefits, such as those issued in connection with the Star HRG business acquired in July 2006, may attract increased regulatory scrutiny. States have responded to concerns about the marketing, advertising and administration of insurance and HMO products and administrative practices by increasing the number and frequency of market conduct examinations and imposing larger penalties for violations of applicable laws and regulations.

In recent years, perceived abuses in broker compensation practices have been the focus of greatly heightened regulatory scrutiny. This increased regulatory focus may lead to legislative or regulatory changes that would affect the manner in which CIGNA and its competitors compensate brokers. For more information regarding general governmental inquiries relating to CIGNA companies, see "Legal Proceedings" in Item 3 on pages 35 and 36.

### Licensing Requirements

*Pharmacy Licensure Laws*

Certain CIGNA companies are pharmacies which dispense prescription drugs to participants of benefit plans administered or insured by CIGNA subsidiary HMOs and insurance companies. These pharmacy-subsidiaries are subject to state licensing requirements and regulation.

*Claim Administration, Utilization Review and Related Services*

CIGNA subsidiaries contract for the provision of claim administration, utilization management and other related services with respect to the administration of self-insured benefit plans. These CIGNA subsidiaries are subject to state licensing requirements and regulation.

### Federal Regulations

*Employment Retirement Income Security Act*

CIGNA sells most of its products and services to sponsors of employee benefit plans that are governed by the Federal Employment Retirement Income Security Act ("ERISA"). CIGNA companies may be subject to requirements imposed by ERISA on plan fiduciaries and parties in interest, including regulations affecting claim and appeals procedures for health, dental, disability, life and accident plans.

*Medicare Regulations*

Several CIGNA subsidiaries engage in businesses that are subject to federal Medicare regulations such as:

- those offering individual and group Medicare Advantage (HMO) coverage in Arizona;

- contractual arrangements with the federal government for the processing of certain Medicare claims and other administrative services; and

- those offering Medicare Pharmacy (Part D) and Medicare Advantage Private fee-for-service products that are subject to federal Medicare regulations.

*Federal Audits of Government Sponsored Health Care Programs*

Participation in government sponsored health care programs subjects CIGNA to a variety of federal laws and regulations and risks associated with audits conducted

23

- utilization patterns of medical and other services;
- employment levels;
- the tort liability system;
- developments in the political environment both domestically and internationally;
- interest rates, equity market returns and foreign currency fluctuations;
- regulations and tax rules related to the administration of employee benefit plans; and
- federal and state regulation.

The Company regularly monitors the trends impacting operating results from the above mentioned key factors and economic and other factors. The Company develops strategic and tactical plans designed to improve performance and maximize its competitive position in the markets it serves. The Company's ability to achieve its financial objectives is dependent upon its ability to effectively execute these plans and to appropriately respond to emerging economic and company-specific trends.

The Company is continuing to improve the performance of and profitably grow the health care operations; as well as continuing to profitably grow the disability and life insurance and international businesses; and managing the risks associated with the run-off reinsurance operations. In the health care businesses, the Company has operational improvement initiatives (see pages 50-52) in place to:

    (1) offer products that meet emerging consumer and market trends;
    (2) underwrite and price products effectively;
    (3) grow medical membership;
    (4) effectively manage medical costs;
    (5) deliver quality member and provider service;
    (6) maintain and upgrade information technology systems; and
    (7) reduce other operating expenses.

The Company believes that the health care business model is evolving to one that focuses more directly on the role and needs of the health care consumer. The consumer-directed environment presents particular challenges by requiring a more complex service model and products specifically designed to meet the emerging market needs of the consumer. In order to meet the emerging market challenges, the Company is investing in product development, service, technology, educational resources and customer support tools to assist consumers in making more informed choices regarding their health care and to achieve better health outcomes. These investments and execution of related initiatives are critical to respond to increasing consumer demands. The Company believes that its investments in these areas will position it to more effectively meet emerging market needs and better position the Company to be a leader in the health care industry.

**CONSOLIDATED RESULTS OF OPERATIONS**

*(In millions)*

| Financial Summary | 2007 | | 2006 | | 2005 | |
|---|---|---|---|---|---|---|
| Premiums and fees | $ | 15,008 | $ | 13,641 | $ | 13,695 |
| Net investment income | | 1,114 | | 1,195 | | 1,359 |
| Mail order pharmacy revenues | | 1,118 | | 1,145 | | 883 |
| Other revenues | | 368 | | 346 | | 754 |
| Realized investment gains (losses) | | 15 | | 220 | | (7) |
| Total revenues | | 17,623 | | 16,547 | | 16,684 |
| Benefits and expenses | | 15,992 | | 14,816 | | 14,891 |
| Income from continuing operations before taxes | | 1,631 | | 1,731 | | 1,793 |
| Income taxes | | 511 | | 572 | | 517 |
| Income from continuing operations | | 1,120 | | 1,159 | | 1,276 |
| Income (loss) from discontinued operations, net of taxes | | (5) | | (4) | | 349 |
| Net income | $ | 1,115 | $ | 1,155 | $ | 1,625 |
| Realized investment gains (losses), net of taxes | $ | 10 | $ | 145 | $ | (11) |

The Company's consolidated results of operations include results from discontinued operations, which are discussed on page 56.

**Special Items**

In order to facilitate an understanding and comparison of results of operations and permit analysis of trends in underlying revenue, expenses and income from continuing operations, the following table presents special items, which management believes are not representative of the underlying results of operations. See "Quarterly Financial Data" on page 104 for special items reported quarterly in 2007 and 2006.

| SPECIAL ITEMS | Pre-Tax Benefit (Charge) | | After-Tax Benefit (Charge) | |
|---|---|---|---|---|
| *(In millions)* | | | | |
| **2007** | | | | |
| Completion of IRS examination | $ | - | $ | 23 |
| Reserve charge on guaranteed minimum | | | | |

| | | | | |
|---|---|---|---|---|
| income benefit contracts | | (86) | | (56) |
| Total | $ | (86) | $ | (33) |
| **2006** | | | | |
| Charge associated with settlement of | | | | |
| shareholder litigation | $ | (38) | $ | (25) |
| Cost reduction charge | | (37) | | (23) |
| Total | $ | (75) | $ | (48) |
| **2005** | | | | |
| Accelerated amortization of deferred | | | | |
| gain on sale of retirement benefits | | | | |
| business | $ | 322 | $ | 204 |
| Cost reduction charge | | (51) | | (33) |
| IRS tax settlement | | 6 | | 81 |
| Charge associated with a modified | | | | |
| coinsurance arrangement | | (12) | | (8) |
| Total | $ | 265 | $ | 244 |

40

# Cicala Affidavit In Support of Opposition to GSK Motion For Summary Judgment

# EXHIBIT D

GLX-MHC 181

*GlaxoWellcome*

304399
G36539

## GLAXO WELLCOME INC.

### REIMBURSEMENT AGREEMENT

This Reimbursement Agreement is made as of the *29TH* day of *NOVEMBER* 1996, by and between GLAXO WELLCOME INC., a North Carolina Corporation of Five Moore Drive, P. O. Box 13438, Research Triangle Park, North Carolina, 27709 ("GLAXO WELLCOME") and CAREMARK, INC., Pharmaceutical Services Group, a California Corporation, of 2211 Sanders Road, Northbrook, IL 60062 ("Caremark").

### WITNESSETH:

Glaxo Wellcome and its affiliates are in the business of manufacturing and selling pharmaceutical products in the United States, including those products listed on the attached Exhibit A and as further defined in paragraph 5 below (the "Glaxo Wellcome Products"). Caremark is in the business of administering pharmacy benefit services for employers, HMOs, PPOs, insurers and other payors ("Member Organizations") and their employees or patients ("Individual Members"). The purpose of this Agreement is to delineate the terms and conditions by which Glaxo Wellcome shall reimburse Caremark based upon the dispensing of Glaxo Wellcome Products to Individual Members by Caremark's own mail service pharmacies and by various pharmacies ("Participating Pharmacies") which have agreed to provide such services to Caremark and its Individual Members.

NOW, THEREFORE, for and in consideration of the mutual promises and obligations contained in this Agreement, the parties agree as follows:

    1.   **Term.**  The term of this Agreement shall commence as of April 1, 1996, and shall terminate on December 31, 1999, unless it is terminated sooner pursuant to Section 8 below.

    2.   **Member Organizations.**  Caremark represents to Glaxo Wellcome that it has entered into agreements with the Member Organizations under which Caremark agrees to administer and provide the pharmacy benefit for the Individual Members. For a pharmacy claim to qualify for rebate processing from Glaxo Wellcome, an active Caremark formulary must be in place with the Member Organization. The formulary and/or pharmacy benefit must be managed and enforced by Caremark and Glaxo Wellcome shall have the right to verify said formulary management. Evidence that formulary management exists by Caremark shall include, but shall not be limited to: 1) ability to institute electronic messaging with the payer and/or sponsor of the pharmacy benefit (entity financially at risk); 2) ability to affect NDC selection (lockout capabilities); and 3) physician, patient, and pharmacy education.  In the event Glaxo Wellcome determines that Caremark cannot enforce its formulary in the Member Organization, Glaxo Wellcome may, at its discretion, deny reimbursement of such claims submitted on behalf of said Member Organization.  All claims must be electronically processed by Caremark or another electronic claims processor. Additionally, non-funded (e.g. consumer cards) and paper-processed claims are not eligible for reimbursement. Any Member Organization or claim that does not meet the above-stated criteria shall not be included in data submitted for reimbursement. Caremark will provide a list of eligible Member Organizations as described in Section 5 upon signature of this contract and shall become Exhibit B.  Glaxo Wellcome reserves the right to delete any Member Organization from the list. Caremark will be notified and if a Member Organization is excluded, Caremark will have the ability to dispute.  Caremark will also provide quarterly updates to the list of eligible Member Organizations and Glaxo Wellcome reserves the right to delete any subsequent organization from that list.  Any Member Organization currently included on any other Member Organization list of a Managed Care Organization with which Glaxo Wellcome has an Agreement shall not be eligible for rebates under this Reimbursement Agreement, unless Caremark is responsible for the pharmacy benefit management for that existing organization and can authenticate this fact to Glaxo Wellcome.

**Glaxo Wellcome Inc.**

Five Moore Drive        Telephone
PO Box 13398         919 248 2100
Research Triangle Park
North Carolina 27709

GSK-MDL-ZN01- 025273

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

## HIGHLY
## CONFIDENTIAL

GLX-MHC 181

3. **Participating Pharmacies.** Caremark represents to Glaxo Wellcome that it has entered into agreements with the Participating Pharmacies under which the Participating Pharmacies agree to dispense pharmaceutical products to Individual Members, for their own use, in accordance with Caremark's conditions of sale and dispensing. Caremark's mail service pharmacies shall not violate Caremark's "own use" requirements. A current list of the Participating Pharmacies is attached as Exhibit C. Caremark shall maintain and keep current the list of Participating Pharmacies and shall provide the then current list, upon request, annually to Glaxo Wellcome. Caremark further represents that there are currently no dispensing physicians that are among the Participating Pharmacies, and that it will not hereafter include any dispensing physicians among the participating pharmacies.

4. **Audit.**

Glaxo Wellcome shall have the right to engage an independent auditing firm acceptable to both parties to perform appropriate procedures necessary to verify Caremark's performance and compliance with its obligations pursuant to the Agreement. Such independent auditing firm will be authorized to have complete and unrestricted access to any and all information required to perform the procedures requested, as well as any and all other information reasonably necessary to perform procedures pursuant to this section of the Agreement. Caremark shall have the right to specify certain confidential or proprietary information that should not be disclosed to Glaxo Wellcome; provided, however, that information shall be made available on an unrestricted basis to the independent auditing firm, as necessary, for such firm to perform necessary procedures to determine Caremark's compliance with the Agreement, which auditing firm shall be under an agreement of confidentiality not to disclose confidential or proprietary information to Glaxo Wellcome or any third party. The procedures requested by Glaxo Wellcome to be performed pursuant to this section of the Agreement, as well as any and all information required, will be communicated by Glaxo Wellcome and the independent auditing firm to Caremark and Caremark will make all reasonable efforts to ensure the requested information is made available to the independent auditing firm within a specified period of time as agreed to by Glaxo Wellcome and Caremark. Caremark will conduct reasonable audits of Participating Pharmacies with respect to claims submitted by Participating Pharmacies for Glaxo Wellcome Products dispensed to Individual Members and shall provide the methodology and results of such audits to Glaxo Wellcome upon the conclusion of such audits.

Any data or information provided by Glaxo Wellcome to Caremark pursuant to this Section shall be used by Caremark solely for the express purpose for which it is provided, and Caremark shall maintain the confidentiality of all such data or information.

Any data or information provided by Caremark to Glaxo Wellcome shall be used by Glaxo Wellcome and its agents as provided for in the section above, solely for the express purpose for which it is provided, and Glaxo Wellcome and its agents shall maintain the confidentiality of all such data or information.

5. **Quarterly Reports.** Caremark shall furnish to Glaxo Wellcome throughout the term of this Agreement quarterly reports, in an electronic format specified below and further defined in Exhibit D, with respect to each Glaxo Wellcome Product listed on Exhibit A which are sold and dispensed by the Participating Pharmacies to Individual Members, excluding any and all Medicaid or Medicare Members during the preceding calendar quarter. All data must be submitted within six (6) months of the last day of the quarter of concern. The quarterly reports shall include but shall not be limited to, at a minimum, the following data. The following is a description of Electronic Data Submission mapping elements. For a detailed description of items below, see attached Exhibit D National Council For Prescription Drug Programs (NCPDP) flat file formats."

Prescription Level Rebate Data Standard

1. Summary by Glaxo Wellcome Product NDC of total units dispensed to Individual Members.

2

GSK-MDL-ZN01- 025274

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts.



**HIGHLY
CONFIDENTIAL**

GLX-MHC 181

2. Report by NDC of each Glaxo Wellcome Product dispensed to Individual Members. This report must include:

    a. Date Dispensed
    b. Date Paid
    c. Prescription Number
    d. Quantity Dispensed
    e. Member Organization Reimbursement
    f. Product Size
    g. Pharmacy Identification Code

**Plan Data and Formulary Standard**

3. Membership report by Member Organization including:

    a. Member Organization name and address
    b. Number of lives
    c. Effective date with Caremark for all forthcoming Member Organizations
    d. Type of Member Organization (including employers, health maintenance organizations such as IPAS, Staff Model, PPOS, etc.)
    e. Plan Identification Code

4. Detail report containing Caremark's market share information (prescription level) for all products listed on Exhibit A-1.

**Tape Submissions:**

    3480 non-label cartridge
    3420 non-label reel to reel

**Diskette Submissions:**

    3/4 diskette with a ASCII text file(s)
    either semicolon, comma or asterisk delimited

6. **Reimbursement.** Within sixty (60) days of receipt of quarterly reports from Caremark as provided above, Glaxo Wellcome shall reimburse Caremark as indicated below and as more fully set forth on Exhibit E. For the purposes of this Agreement, "Glaxo Wellcome Products" shall mean all designated dosage forms and strengths of the products listed on Exhibit A and any reformulations or new dose forms (excluding generics and OTC) of any such products, provided, however, that reformulations of a product to treat a significantly different clinical disease state for which the product is not presently indicated shall be deemed a new product and not included in the definition of "Glaxo Wellcome Products" and will not be included in the Glaxo Wellcome product sales dollar volume. The exclusion for significantly different clinical disease states in the preceding sentence shall only apply if any particular use of the product can be determined by a unique NDC. If not, the product shall not be excluded as a new product. The parties agree to enter into good faith negotiations promptly after any such new product, whether developed, acquired or licensed by Glaxo Wellcome, becomes available with the objective of such new product becoming subject to this Agreement, if mutually

3

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

GSK-MDL-ZN01- 025275

**HIGHLY
CONFIDENTIAL**

GLX-MHC 181

agreed.  All rebates will be calculated and paid on the basis of sales of Glaxo Wellcome Products valued at the net wholesale price in effect on the last day of the quarter.  With the exception of Lanoxin, rebates will not apply to Glaxo Wellcome Products that are or become generically available.  When the products listed in Exhibit A are purchased through a wholesaler, the price to be paid, including any associated service charges, must be negotiated with and paid directly to that vendor.

A.   Base Rebate.  When on a quarterly basis, compared to the National Retail Average TRx market share for each of the Glaxo Wellcome Products listed in Exhibit A, the Caremark TRx brand share for each Glaxo Wellcome Product meets the National Retail Average for the applicable therapeutic class listed in Exhibit A-1, Glaxo Wellcome shall pay Caremark a base rebate ("Base Rebate") for each of the Glaxo Wellcome Products listed in Exhibit A in the percentage amounts listed on Exhibit E.  The Base Rebate shall be calculated for the entire Caremark book of approved Rx Drug Plan business by multiplying the designated percentage by the quarterly Glaxo Wellcome Product sales dollar volume expressed at the net wholesale price in effect on the last day of the quarter.

B.   Performance Rebate.  When on a quarterly basis, compared to the National Retail Average TRx market share for each of the Glaxo Wellcome Products listed in Exhibit A, the Caremark TRx Brand Share for each Glaxo Wellcome Product exceeds the National Retail Average for the applicable Glaxo Wellcome Product for the applicable therapeutic class listed in Exhibit A-1, Caremark shall be eligible for a performance rebate ("Performance Rebate") in the percentage amounts as set forth in Exhibit E, multiplied by the quarterly Glaxo Wellcome Product sales dollar volume expressed at the net wholesale price in effect on the last day of the quarter.  The Performance Rebate for each product shall be calculated for the entire Caremark's book of approved Rx Drug Plan business.

The maximum rebate percentage payable for each product under the terms of the Agreement shall be the percentages so designated on Exhibit E.  For the purposes of this paragraph 5, the term National Retail Average shall mean the national retail pharmacy total prescription brand share, which includes all retail activity, as reported by IMS or Walsh.

7.   Formulary.  Subject to other contractual obligations and Caremark customers' plan design requirements, as previously disclosed to Glaxo Wellcome, all Glaxo Wellcome Products covered by this agreement and for which a rebate is made available shall be available throughout Caremark's administration programs and/or system without restrictions which would differentiate the availability of the Glaxo Wellcome Product from any other product within that therapeutic class.  No electronic activity that disadvantages Glaxo Wellcome Products in their therapeutic class will be allowed.  Subject to other contractual obligations and Caremark customers' plan design requirements, as previously disclosed to Glaxo Wellcome, Caremark agrees to waive any Maximum Allowable Cost limitations or any mandatory substitution with regard to Lanoxin.

8.   Termination.

8.1   In the event of a material breach of the Agreement by either party, the party alleging the breach shall give written notice thereof to the other party.  If such breach is not cured in all material respects within thirty (30) days of such notice, the non-breaching party may terminate the Agreement immediately.  This Agreement may be terminated by either party, in whole or in part, with or without cause, by giving the other party sixty (60) days' advance written notice thereof.

4

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

GSK-MDL-ZN01- 025276

**HIGHLY
CONFIDENTIAL**

GLX-MHC 181

8.2     If (i) there shall hereafter be changes to any existing law, statute, rule or regulation (or interpretation of any thereof) or (ii) if any law, statute, or rule or regulation (or interpretation of any thereof) shall hereafter by promulgated, enacted, enforced or otherwise applied; or (iii) if any decree, order, judgment or permanent injunction shall be entered or enforced by any court of competent jurisdiction or any other government agency relating to the pricing of prescription drugs, the terms of the Agreement or relating to the Rebates called for hereunder, which adversely and materially affect the business of Glaxo Wellcome or Caremark, the affected party may terminate the Agreement, upon not less than thirty (30) days prior written notice to the other party.

8.3     In the event a termination notice is given pursuant to Section 8.1 or 8.2, if requested by the non-terminating party, the terminating party shall, during the period after notice has been given and before the date of termination, meet with the other party and discuss any proposals for amending the Agreement. In the event of a termination by Glaxo Wellcome, pursuant to Section 8.1 above, rebates shall accrue up to the date of notice of termination and only such accrued amount shall be payable by Glaxo Wellcome. In the event Caremark shall terminate this Agreement pursuant to Section 8.1 or Glaxo Wellcome or Caremark terminate this Agreement pursuant to Section 8.2, rebates shall accrue until the effective date of termination. Glaxo Wellcome shall pay Caremark all rebates earned up to that date.

9.  Confidentiality.

9.1     The terms and provisions of the Agreement are confidential. Caremark and Glaxo Wellcome each agree not to make any public announcement of the existence of the Agreement and not to disclose the terms or provisions of the Agreement to any party (except by Caremark as reasonably necessary to market and implement its programs and fulfill its obligations hereunder) without the prior written consent of the other party, unless disclosure is required by applicable law or regulations. Glaxo Wellcome agrees that the concepts, procedures and operations of or relating to programs implemented pursuant to the Agreement are confidential and proprietary to Caremark and Glaxo Wellcome agrees not to use or disclose any such information to any other party without the prior written consent of Caremark.

9.2     Nothing herein shall preclude (i) disclosure of the terms and provisions of the Agreement to counsel any parent of a party for the purpose of regulatory compliance, monitoring compliance with the Agreement, or rendering legal advice concerning the Agreement, or (ii) disclosure of the terms and provisions of the Agreement to independent auditors of a party or parent of a party.

10.  Miscellaneous.

10.1     Amendment. The Agreement may be modified or amended only in writing signed by a duly authorized representative of each party. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

10.2     Severability. In the event any term or provision of the Agreement is declared illegal or unenforceable or in conflict with any law or regulation, the validity of any other term or provision of the Agreement shall not be affected thereby.

10.3     Independent Contractors. The parties hereto are independent contractors engaged in the operation of their own respective business. Nothing herein shall be deemed or construed to create any other relationship between the parties.

GSK-MDL-ZN01- 025277

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

pisode

GLX-MHC 181

10.4    **Dispute Resolution; Arbitration.**  Both parties agree to meet and confer in good faith to resolve any controversy or claim arising out of or relating to the Agreement or the breach thereof.  Unless otherwise prohibited by law, any such controversy or claim which cannot be so resolved shall be submitted to binding arbitration.  Unless the parties agree in writing to modify the procedure of such arbitration, the following procedure shall be followed:  Arbitration may be initiated by either party making a written demand for arbitration to the other party within a reasonable time from the date the claim, dispute, or controversy arose, but in no event later than the date legal proceedings would be barred by applicable statute of limitations.  The party making such demand shall designate a competent and disinterested arbitrator in such written demand.  Within thirty days of such demand, the other party shall designate a competent and disinterested arbitrator and shall give written notice of such designation to the party making the initial demand for arbitration.  Within thirty days after such notices have been given, the two arbitrators so designated shall select a third competent and disinterested arbitrator and give notice of such selection to both parties.  If the two arbitrators designated by the parties are unable to agree on a third arbitrator within thirty days, then upon request of either party such third arbitrator shall be randomly selected from a list of available arbitrators as provided by the local Delaware chapter of the American Arbitration Association.  The arbitrators shall then hear and determine the question or questions in dispute, and the decision in writing of any two arbitrators shall be binding upon the parties.  The arbitration shall be held at a location to be determined by the parties or the three arbitrators.  Each party shall pay its chosen arbitrator, and shall bear equally the expenses of the third arbitrator and all other expenses of the arbitration, provided that attorney's fees and expert witness fees are not deemed to be expenses of arbitration but are to be borne by the party incurring them.  Except as otherwise provided in this Agreement, arbitration shall be governed by the Commercial Rules of the American Arbitration Association.

10.5    **Eligibility.**  None of the provisions of this Agreement shall apply to outpatient prescription drugs provided to any person who is eligible for and receiving outpatient prescription drug benefits under Title XVIII and Title XIX of the Social Security Act and the calculation of any rebate hereunder shall not include any outpatient prescription drugs reimbursed under Title XVIII and Title XIX of the Social Security Act.

Caremark represents and warrants that to the extent required by law (including any requirements under the Employee Retirement Income Security Act of 1974, as amended), it will disclose the existence or any other aspect of this Agreement to any party with whom it contracts for administrative services.

11.6    **Notice.**  Any notice to be given hereunder by any party to any other party shall be deemed to have been given (a) if mailed, at the time when mailed in any general or branch office of the United States Parcel Service, enclosed in a registered or certified postage-paid envelope, provided that any notice of change of address shall be effective only upon receipt, (b) if sent by facsimile transmission, when so sent and receipt acknowledged by an appropriate telephone or facsimile receipt or (c) if sent by other means, when actually received by the party to which such notice has been directed, in each case at the respective addresses or number set forth below or such other address or number as such party may have fixed by notice.

If to Caremark Inc.:
    Caremark Inc., Pharmaceutical Services Group
    2211 Sanders Road
    Northbrook, IL 60062

    Attention:   Jay Messeroff
                Vice President, Pharmaceutical Trade Relations
                With a copy to General Counsel

6

GSK-MDL-ZN01- 025278

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GLX-MHC 181

If to Glaxo Wellcome:
Glaxo Wellcome Inc.
Five Moore Drive
Research Triangle Park, NC 27709

Attention:    Stephen F. Stefano
Vice President and General Manager
Health Management Division
Fax:    (919) 483-7503
With a copy to General Counsel

11.7    Entire Agreement. The Agreement constitutes the entire Agreement between Glaxo Wellcome and Caremark in relation to the subject matter hereof and supersedes all prior agreements and understandings of any nature between the parties in relation hereto.

11.8    Indemnification. Each party (the "Indemnifying Party") shall indemnify and hold harmless the other party (the "Indemnified Party") from and against any and all losses, damage, liabilities, costs, expenses (including attorney's fees) and any other claims whatsoever which the Indemnified Party may suffer arising out of or relating to this Agreement if the claim against the Indemnified Party arises out of the negligent acts or omissions of the Indemnifying Party or its employees and agents, and Caremark shall be indemnified and held harmless by Glaxo Wellcome for claims alleging product liability regarding Glaxo Wellcome products.

11.9    Assignment. This Agreement is non-assignable by either party, whether by operation of law or otherwise, without the prior written consent of the other party, however, either party may without the consent of the other party assign its duties, rights and obligations under this Agreement in whole or in part to a subsidiary or affiliate or to an entity which purchases all or substantially all of such party's assets or which is merged with or consolidated into such party.

11.10    Governing Law. This Agreement shall be governed by and construed according to the laws of the State of North Carolina without regard to conflicts or choice of law principles.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

GLAXO WELLCOME INC.                    CAREMARK, INC.

Name _____          Name _____

Title _Vice President Manager Health Care_    Title _VP Pharma Trade Relations_

Date _1/16/97_                        Date _11/14/96_

Approved As To
Legal Form
Date: 10/4/96
Law

7

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025279

GLX-MHC 181



**EXHIBIT A**

**PRODUCTS**

Lanoxin

Valtrex
Zofran
Zovirax

8

GSK-MDL-ZN01- 025280

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**
REDACTED MATERIAL

GLX-MHC 181

**Exhibit A-1**

**Therapeutic Class Definitions**

Zovirax, Valtrex
(All forms)

Zovirax, Valtrex, and Famvir

Lanoxin
(Tablet form only)

Lanoxin and Digoxin

Zofran
(Injection and Oral forms only)

Zofran, Kytril, Compazine, Reglan,
Metoclopramide, Tigan

9

GSK-MDL-ZN01- 025281

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

REDACTED MATERIAL

GLX-MHC 181

**Exhibit B**

**Eligible Plans**

(To be provided by Carcmark)



10

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025282

GLX-MHC 181



**Exhibit C**

**Participating Pharmacies**

(To be provided by Caremark)

11

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025283

GLX-MHC 181

**Exhibit D**

**Example Format**

(To be provided by Glaxo Wellcome)

CAREMARK SHALL BEST ATTEMPT TO PROVIDE ALL NECESSARY DATA ~~INFORMATION~~ Regarding TO DEMONSTRATE PERFORMANCE + ADHERENCE ~~of~~ TO THIS AGREEMENT. SOME BUT NOT NECESSARILY ALL OF THE DATA DETAIL IN THE following LAYOUT (EXHIBIT D) WILL BE PROVIDED.

Caremark will provide all information outlined in Section 5.2.

12

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025284

GLX-MHC 181

**Exhibit E**

Rebate Percentage Rates

| Product | Basic Rebate Nat'l Share [2] | Performance Rebate for TRx Brand Share Performance Above National Retail Average [1] | | | |
|---|---|---|---|---|---|
| | | +0 to 2 Pct. Pts. | +2.1 to 4 Pct. Pts. | +4.1 to 6 Pct. Pts. | Over 6 Pct. Pts. [3] |
| Zofran | 1.0% | 1.5% | 2.0% | 2.5% | 3.0% |
| Valtrex | 2.0% | 2.5% | 3.0% | 3.5% | 4.0% |
| Zovirax | 0.5% | 1.5% | 2.0% | 2.5% | 3.0% |
| Lanoxin | 1.0% | N/A | N/A | N/A | N/A |

*Performance Rebates are calculated using the percentages listed in the appropriate column, not to be deemed a cumulative total.

[1]   Performance Rebates include the Basic Rebate for the product.

[2]   If Caremark's share for a brand falls below the national TRx market share then rebates are not applicable for the claims utilization for the brand for the quarter.

[3]   Maximum Rebate Percentage Rate Payable under the contract.



13

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

REDACTED MATERIAL

GSK-MDL-ZN01- 025285

EXHIBIT D (Cont'd)

**NCPDP**
**PLAN & FORMULARY TRACKING**
**FLAT FILE LAYOUT (DRAFT)**

**Plan Data and Formulary Standard**                    **Proposal Document**

## Plan Data Elements

| Contract ID Number | Contractual Agreement # | Contract ID. |
|---|---|---|
| Pharmacy Industry Contracting Organization (PICO) Name | | Pharmaceutical manufacturer entering into a rebate contract. |
| Pharmacy Management Organization (PMO) Name | | Any organization entering into contracts for pharmaceutical products |
| PMO ID Code Qualifier | 11=DEA # 21=HIN # 31=Tax ID Number 93=Manufacturer assigned ZZ=Mutually agreed | Code designating the system/method of code structure used for the PMO Identifier Code. |
| PMO ID Code | (See PMO Qualifier Field) | Code identifying the rebate request (PMO). |
| PMO Total Covered Lives | 9N | Control Total |
| Report Period Start Date | 10A | CCYY-MM-DD Beginning date of the period for which the membership is reported |
| Report Period End Date | 10A | CCYY-MM-DD Ending date of the period for which the membership is reported. |
| Plan Enrollees[1] | 9N | The total number of subscribers (employees) |
| Plan Name | 30A | The name of the plan. |
| Plan ID Code | 17A | Code identifying the PMO's clients/plans (PMO) |
| Plan Group Affiliaton No. | 17A | PMO-assigned number used to group individual groups under the plan to which they belong. |
| Plan ID Number Qualifier | 11=DEA # 21=HIN # 31=Tax ID Number 93=Manufacturer assigned ZZ=Mutually agreed | Code designating the system/method of code structure used for the PMO's clients/plans. Identifier Code |

[1] Enrollees - the number of subscribers (i.e. employees).

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GSK-MDL-ZN01- 025286

EXHIBIT D (Cont'd)

**NCPDP**
**PLAN & FORMULARY TRACKING**
**FLAT FILE LAYOUT (DRAFT)**

*Plan Data and Formulary Standard*                    *Proposal Document*



| Plan Type | 4A | |
|---|---|---|

1000 = Alternate Site Infusion
1010 = Blues Plan
1020 = Blues HMO
1030 = Blues Self Insured
         Employer Groups
1040 = Claims Processor
1050 = Chain Pharmacy
1060 = Clinic
1065 = Cash Card
1070 = Employer Group
1080 = Union Empl. Group
1090 = Salaried Empl. Group
1100 = Hourly Empl. Group
1110 = Retired Empl. Group
1115 = COBRA Empl. Group
1120 = Family Plan
1130 = Home Health
1140 = Hospital
1150 = HMO Group
1160 = HMO IPA
1170 = HMO Network
1180 = HMO Staff
1190 = HMO Combo/Mixed
1200 = Indemnity Insurer
1210 = Integrated Carve Out
1220 = Long Term Care Prov.
1230 = Mail Order
1240 = Medicaid
1250 = Nursing Home
1260 = Not Classified
1270 = Other (specify in descrip)
1280 = Phcy. Benefit Mgr (PBM)
1290 = PPO Full Service
1300 = PPO General
         Medical/Surgical
1310 = PPO Specialty
1320 = PPO Workers Comp
1330 = Preferred Phcy., Provider
         for Mgd. Cash Scripts
1340 = State Govt.-Self Insured
         Employer Group
1350 = Third Party Admin. (TPA)
1360 = Workers Compensation.

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025287

EXHIBIT D (Cont'd)

*NCPDP*
*PLAN & FORMULARY TRACKING*
*FLAT FILE LAYOUT (DRAFT)*

*Plan Data and Formulary Standard*      *Proposal Document*

| | | |
|---|---|---|
| Eligible Plan | Yes = Y<br>No = N | This flag indicates whether or not the plan is eligible for rebates as stated in the contractual agreement between the PMO and PICO. |
| Plan Street Address | 30A | The street address of the plan. |
| Plan City Address | 18A | The city where the plan is located. |
| Plan State Address | 2A | The state where the plan is located. |
| Plan Zip Code Address | 10A | The zip code of the plan. |
| Plan Type of Service | 4A | 3000 = Mail Order<br>3010 = Cash Retail<br>3020 = Managed Retail<br>3030 = Combination<br>3040 = Other (specify in descrip)<br>3050 = Not Classified |
| Plan Degree Managed (contractually agreed definition) | 4A | 2000 = Claims Processing only<br>2010 = Formulary Management<br>2020 = Disease Management<br>2030 = Intervention<br>2040 = Other (specify in descrip)<br>2050 = Not Classified |
| Calculation Method (for alternate reporting methods) | 1 = Beginning of Period<br>2 = End of Period<br>3 = Average of Period<br>4 = Minimum Count<br>5 = Maximum Count | Time period associated with membership |
| Membership Qualifier | 1A | 1 = Enrollees<br>2 = Beds<br>3 = Retail Stores |
| Covered Lives Qualifier[2] | Actual = A<br>Calculated = C<br>Projected = P | The code indicating if covered lives is actual or calculated. |
| Calculation Multiplier | 5A | The factor used to calculate covered lives from number of enrolees. |
| Plan Total Covered Lives | | The total number of covered lives for the plan |

[2]Actual Covered Lives – the number of enrollees plus the actual number of family members included.
Calculated Covered Lives – the number of enrollees multiplied by a factor (generally 2.5) to include family members, if the actual number is not available.

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025288

EXHIBIT D (Cont'd)

**NCPDP**
**PLAN & FORMULARY TRACKING**
**FLAT FILE LAYOUT (DRAFT)**

*Plan Data and Formulary Standard*          *Proposal Document*



## Plan Data Elements, cont'd

| Plan Change Date | 10A | Date of addition, deactivate or replacement |
|---|---|---|
| Effective Date of Covered Lives Information | | The point in time for which the enrollment information is effective. |
| Enrollment Information Qualifier | Monthly = M Quarterly = Q | The code indicating the time period for the covered lives number. |
| Plan Eligibility Date | | When plan was added to the Contract Organization |
| Plan Termination Date | | When plan terminated its affiliation with the Contract Organization |
| Plan "Change" Identifier | Addition = A Change = C (including termination) Delete = D | The action to be taken with the information transmitted as it relates to the Plan. |
| Plan: Total Formularies | 4N | Number of formularies for the plan |
| Plan: Total Adjudicators | 4N | Number of adjudicators for the plan |
| Filler | 30A | |

Sub-record

| Plan Formulary Date | | When the formulary was effective for the plan |
|---|---|---|
| Plan Formulary Identifier | Alphanumeric | Code identifying which Contract Organization formulary is used by this plan |

Produced subject to Protective Order entered in In Re: Pharmaceutical Industry Average Wholesale Price Litigation, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, United States District Court for the District of Massachusetts

**HIGHLY CONFIDENTIAL**

GSK-MDL-ZN01- 025289

# GlaxoWellcome

EXHIBIT H

TABLE 1

CONTRACT NO. 304002



| NDC# | PRODUCT DESCRIPTION | OLD PRICE | EXP DATE | NEW PRICE | DATE / EXCEPTIONS |
|---|---|---|---|---|---|
| 0173-0130-93 | ALKERAN® I.V. INJ 50 MG | | | | |
| 0173-0086-15 | ANECTINE® FLO-PACK 1000MG VIAL | | | | |
| 0173-0071-95 | ANECTINE® INJ 20 MG/ML 10ML | | | | |
| 0173-0085-15 | ANECTINE® FLO-PACK 500MG VIAL | | | | |
| 0173-0418-00 | CEPTAZ® 10GM/100ML 6S | | | | |
| 0173-0416-00 | CEPTAZ® 1GM/100ML 10S | | | | |
| 0173-0414-00 | CEPTAZ® 1GM/25ML 25S | | | | |
| 0173-0417-00 | CEPTAZ® 2GM/100ML 10S | | | | |
| 0173-0415-00 | CEPTAZ® 2GM/10ML 25S | | | | |
| 0173-0230-44 | DIGIBIND® INJ 40MG | | | | |
| 0173-0207-01 | EXOSURF NEONATAL® INJ 10ML | | | | |
| 0173-0434-00 | FORTAZ® ADD VTG 1GM 25S | | | | |
| 0173-0435-00 | FORTAZ® ADD VTG 2GM 10S | | | | |
| 0173-0412-00 | FORTAZ® SOL FRZ PRMX IV 1GM/50ML 24S | | | | |
| 0173-0380-32 | FORTAZ® 1GM/100ML 10S | | | | |
| 0173-0378-35 | FORTAZ® 1GM/25ML 25S | | | | |
| 0173-0413-00 | FORTAZ® SOL FRZ PRMX IV 2GM/50ML 24S | | | | |
| 0173-0381-32 | FORTAZ® 2MG/100ML 10S | | | | |
| 0173-0379-34 | FORTAZ® 2GM/50ML 10S | | | | |
| 0173-0377-31 | FORTAZ® 500MG/15ML 25S | | | | |
| 0173-0382-37 | FORTAZ® 6MG/100ML 6S | | | | |
| 0173-0449-02 | IMITREX® INJ 0.5ML 12 MG/ML 5S VIALS | | | | |
| 0173-0598-71 | IMURAN® INJ 100MG 20ML | | | | |
| 0173-0262-10 | LANOXIN® INJ PEDIATRIC 0.1MG/ML | $ 36.76 | | $ 37.86 | A |
| 0173-0260-10 | LANOXIN® INJ 0.5MG 2ML 10S | $ 14.44 | | $ 14.87 | A |
| 0173-0260-50 | LANOXIN® INJ 0.5MG 2ML 50S | $ 36.75 | | $ 37.85 | A |
| 0173-0705-44 | MIVACRON® INJ 2MG/ML 5ML 10S | | | | |
| 0173-0705-95 | MIVACRON® INJ 2MG/ML 10ML 10S | | | | |
| 0173-0542-00 | MIVACRON® INJ 2MG/ML 20ML 10S M | | | | |
| 0173-0538-00 | MIVACRON® 50ML X 3 | | | | |
| 0173-0656-01 | NAVELBINE® INJ 10MG 1ML | | | | |
| 0173-0656-44 | NAVELBINE® INJ 50MG 5ML | | | | |
| 0173-0543-01 | NIMBEX® 10MG/ML 20ML VIAL | | | | |
| 0173-0540-50 | NIMBEX® 2MG/ML 5ML VIAL | | | | |
| 0173-0546-00 | NIMBEX® 2MG/ML 10ML MDV | | | | |
| 0173-0763-44 | NUROMAX® INJ 1MG/ML 5ML MDV 10S | | | | |
| 0173-0545-00 | TRACRIUM® INJ 10MG/ML 10ML MDV | | | | |
| 0173-0940-44 | TRACRIUM® INJ 10MG/ML 5ML 10S | | | | |
| 0173-0350-57 | TRANDATE® INJ 5MG/ML 40ML | | | | |
| 0173-0350-58 | TRANDATE® INJ 5MG/ML 20ML | | | | |

Glaxo Wellcome Inc.

Five Moore Drive
PO Box 13398
Research Triangle Park
North Carolina 27709

Telephone
919 483 2100

Page 1

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts



HIGHLY REDACTED MATERIAL
CONFIDENTIAL

GSK-MDL-ZN01- 025290

EXHIBIT H

TABLE 1

CONTRACT NO. 304002

| NDC# | PRODUCT DESCRIPTION | OLD PRICE | EXP DATE | NEW PRICE | DATE / EXCEPTIONS |
|------|---------------------|-----------|----------|-----------|-------------------|
| 0173-0483-00 | ULTIVA™ INJ 1MG 10S | | | | |
| 0173-0484-00 | ULTIVA™ INJ 2MG 10S | | | | |
| 0173-0485-00 | ULTIVA™ INJ 5MG 10S | | | | |
| 0173-0957-10 | VASOXYL® INJ 20MG 1ML 10S | | | | |
| 0173-0638-93 | WELLCOVORIN INJ 100MG | | | | |
| 0173-0362-38 | ZANTAC® INJ 25MG/ML 2ML 10S | | | | |
| 0173-0363-00 | ZANTAC® INJ 25MG/ML 40ML | | | | |
| 0173-0363-01 | ZANTAC® INJ 25MG/ML 6ML | | | | |
| 0173-0441-00 | ZANTAC® INJ PRMXD 50MG/50ML 24S | | | | |
| 0173-0354-35 | ZINACEF® 1.5GM/25ML 25S | $ 160.00 | | $ 160.00 | 01/01/96 - 12/31/01 |
| 0173-0356-32 | ZINACEF® 1.5GM/100ML 10S | $ 66.50 | | $ 66.50 | 01/01/96 - 12/31/01 |
| 0173-0437-00 | ZINACEF® ADD VTG 1.5GM 10S | $ 65.00 | | $ 65.00 | 01/01/96 - 12/31/01 |
| 0173-0425-00 | ZINACEF® SOL FRZ PRMX IV 1.5GM/50ML 24S | $ 193.44 | | $ 193.44 | 01/01/96 - 12/31/01 |
| 0173-0400-00 | ZINACEF® 7.5GM/100ML 6S | $ 187.18 | | $ 187.18 | 01/01/96 - 12/31/01 |
| 0173-0352-31 | ZINACEF® 750MG/15ML 25S | $ 80.00 | | $ 80.00 | 01/01/96 - 12/31/01 |
| 0173-0353-32 | ZINACEF® 750MG/100ML 10S | $ 34.50 | | $ 34.50 | 01/01/96 - 12/31/01 |
| 0173-0436-00 | ZINACEF® ADD VTG 750MG 25S | $ 82.50 | | $ 82.50 | 01/01/96 - 12/31/01 |
| 0173-0424-00 | ZINACEF® SOL FRZ PRMX IV 750GM/50ML 24S | $ 116.64 | | $ 116.64 | 01/01/96 - 12/31/01 |
| 0173-0442-02 | ZOFRAN® INJ 2MG/ML 2ML 5S | $ 82.50 | 01/14/98 | $ 81.68 | 01/15/98 - 12/31/01 |
| 0173-0442-00 | ZOFRAN® INJ 2MG/ML 20ML | $ 165.00 | | $ 165.00 | 01/01/96 - 12/31/01 |
| 0173-0461-00 | ZOFRAN® INJ PRMXD 32MG/50ML | $ 792.00 | | $ 792.00 | 01/01/96 - 12/31/01 |
| 0173-0952-01 | ZOVIRAX® POWDER 1000MG 20ML 10S | $ 794.78 | | $ 460.00 | 01/01/96 - 12/31/01 |
| 0173-0995-01 | ZOVIRAX® POWDER 500MG 10ML 10S | $ 397.88 | | $ 230.00 | 01/01/96 - 12/31/01 |

PRICE EXCEPTIONS:   A:  Glaxo Wellcome shall have the right to increase the bid price in each successive contract year only by CPI.  The price increase will be effective on January 1 of each contract year.

CONTRACT PERIOD: This amendment will begin January 15, 1998 and will terminate on December 31, 2001.



Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

HIGHLY
REDACTED MATERIAL
CONFIDENTIAL

GSK-MDL-ZN01- 025291

GLX-MHC 181

**Exhibit D**

**Example Format**

(To be provided by Glaxo Wellcome)

CAREMARK SHALL BEST ATTEMPT TO PROVIDE ALL NECESSARY DATA information Required TO DEMONSTRATE PERFORMANCE & ADHERENCE of THIS AGREEMENT. SOME BUT NOT NECESSARILY ALL OF THE DATA DETAIL IN THE following LAYOUT (EXHIBIT D) WILL BE provided.

Caremark will provide all information outlined in Section 5.2

12

Produced subject to Protective Order entered
in In Re: Pharmaceutical Industry Average
Wholesale Price Litigation, MDL No. 1456, Civil Action
No. 01-CV-12257-PBS, United States District
Court for the District of Massachusetts

**HIGHLY
CONFIDENTIAL**

GSK-MDL-ZN01- 025284