UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL NO. 1456<br>) Civil Action No. 01-12257-PBS<br>) Subcategory Case No: 03-10643-PBS |
| THIS DOCUMENT RELATES TO:<br><br>　*The City of New York, et al.*<br>*v.*<br>　*Abbott Laboratories, et al.* | ) Judge Patti B. Saris |

**AFFIDAVIT OF HARRIS L. DEVOR**

Harris L. Devor, being duly sworn, deposes and states as follows:

Counsel for the Plaintiffs in the matter of *The City of New York, et al v. Abbott Laboratories, Inc., et al* (the "Litigation") has asked me to prepare this affidavit ("my Affidavit") in response to Defendant Smithkline Beecham Corporation, D/B/A GlaxoSmithKline's ("GSK's") Memorandum of Law in Support of its Motion for Partial Summary Judgment in the New York County Cases ("GSK's Memorandum of Law"), including the Affidavit of Eric M. Gaier, Ph.D. (the "Gaier Affidavit") attached thereto.

## I. QUALIFICATIONS

1. I am a Certified Public Accountant and a shareholder of the accounting firm Shechtman Marks Devor PC ("SMD"). My professional experience since graduating from Temple University in 1973 has been as an accountant and auditor for large and small companies in a variety of industries. I have also been engaged to provide litigation support services, including, in some instances, expert testimony, in connection with some of the most notable frauds/alleged frauds in the last ten years, including:

> In re: Sunbeam Securities Litigation in the United States District Court Southern District of Florida; Case No. 98-8258 – CIV Middlebrooks;
>
> United States of America v. Martin L. Grass, Franklin C. Brown, Franklyn M. Bergonzi; Criminal Nos. 1:CR-02-146-01, 1:CR-02-146-02, 1:CR-02-146-03 (Rite Aid);
>
> In re: The State of Texas *ex rel Ven-A-Care of the Florida Keys, Inc.* v. Warrick Pharmaceuticals Corporation, Schering Plough Corporation, and Schering Corporation in the District Court of Travis County, Texas, 53rd Judicial District; Cause No. GV002327
>
> In re: WorldCom, Inc. Securities Litigation in the United States District Court Southern District of New York; Master File No.: 02 Civ.3288 (DLC)
>
> In re: State of West Virginia *ex rel Darrell V. McGraw, Jr., Attorney General* v. Warrick Pharmaceuticals Corporation, Schering-Plough Corporation, Dey, Inc., Abbott Laboratories, and Abbott Laboratories, Inc. in the Circuit Court of Kanawha County, West Virginia; Civil Action No. 01-C-3011
>
> In re: The State of Texas *ex rel Ven-A-Care of the Florida Keys, Inc.* v. Abbot Laboratories, Inc. in the District Court of Travis County, Texas, 201st Judicial District; Cause No. GV401286
>
> In re: Tyco International, Ltd. Securities Litigation in the United States District Court District of New Hampshire; MDL Docket No. 02-1335-B
>
> In re: State of Missouri, *ex rel Jeremiah W. (Jay) Nixon, Attorney General* and Missouri Department of Social Services, Division of Medical Services v. Dey, Inc., et al and Warrick Pharmaceuticals

2

Corporation, Schering Plough Corporation, and Schering Corporation; Case No. 054-1216, Division: 31

In re: Pharmaceutical Industry Average Wholesale Price Litigation in the United States District Court District of Massachusetts; MDL Docket No. 1456

2.  I have lectured on various topics, including financial reporting to the Securities and Exchange Commission ("SEC"), accounting, auditing, statistical sampling and investigating accounting fraud, and have testified at trial in a number of matters, including the WorldCom and Rite Aid litigation referenced above and in two separate instances involving the reporting of drug prices to pricing compendia by pharmaceutical manufacturer defendants (the State of West Virginia and State of Missouri matters against Warrick Pharmaceuticals Corporation, Schering Plough Corporation and Schering Corporation listed above). A copy of my resume is attached to this affidavit as Exhibit A.

## II.  MATERIALS CONSIDERED

3.  As part of the analysis in preparation of my Affidavit, I, or staff working under my supervision, have reviewed GSK's Memorandum of Law, the Gaier Affidavit, including all related exhibits thereto and the underlying analysis - in electronic format - as produced by Dr. Gaier, as well as GSK's 1997 through 2005 transactional direct sales, chargeback, and commercial rebate data (as produced in this or related litigation).

## III.  SCOPE OF ASSIGNMENT

4.  Counsel for the Plaintiffs has asked me to respond to the analysis and conclusions set forth in the Gaier Affidavit and, thereby, to those expressed in GSK's Memorandum of Law. Specifically, Counsel for the Plaintiffs has asked me to evaluate the methodology employed by Dr. Gaier in arriving at the conclusion that 208 of the 262 GSK NDCs he analyzed "passed" the "WAC List Price" test established by this Court (with 54 NDCs failing the test) and, secondly, to summarize and describe any revisions I would propose to Dr. Gaier's methodology, including how the results of the analysis would change with respect to the 262 GSK NDCs included in Revised Exhibit B to Plaintiffs' First Amended Consolidated Complaint ("RFACC Exhibit B") as a result of such proposed revisions.

5. My work as an accountant and auditor for the past 36 years, as well as in the litigation services I have provided over the past 25 years, most specifically in the context of the numerous matters listed above (amongst others) relating to the reporting of prices to pricing compendia by pharmaceutical manufacturers for which I have been engaged, has provided me extensive experience in the review, consideration, and analysis of product pricing, reporting, the determination of WAC and of net prices paid by both wholesalers and pharmaceutical providers, as well as a familiarity with accounting records and other documents generated and maintained by corporations, including database and other query language tools used to analyze the foregoing. My observations regarding the conclusions of Dr. Gaier and my own conclusions, in the context of my experience with such matters and my review of the items set forth in the "Materials Considered" section above, are set forth herein, below.

## IV. DISCUSSION
### Objectives of the Gaier Affidavit

6. According thereto, the purpose of the Gaier Affidavit was to apply the "WAC List Price" test established by this Court to the GSK NDCs included in Revised Exhibit B to the FACC for purposes of determining which of those NDCs should be immune from ongoing future claims for damages in connection with this litigation.

### Overall Methodology Employed by Dr. Gaier

7. Upon review of the data underlying the Gaier Affidavit, Dr. Gaier applies the WAC List Price test by computing an "average [price] for a particular customer for a particular NDC for a particular year," then determining if his computed net price to a customer, for any given NDC, was within 5% of GSK's reported (to pricing compendia) WAC for that NDC, (Gaier, p. 45:9-11) If this was found to be the case, Dr. Gaier concludes that all of GSK's sales for that particular NDC to that customer were within 5% of WAC and that the particular NDC, for sales to the that customer, satisfied the WAC List Price test. (Gaier, p. 107:12-107:14) - "A pass is whether or not for that particular customer NDC and year they were within 5 percent of WAC."). Conversely, if GSK's net sales price to a particular customer for any given NDC was not within 5% of the WAC, then none of GSK's sales for that customer and NDC were counted by Dr.

4

Gaier as a sale within 5% of WAC, thereby failing the WAC List Price test for that customer's sales and units. (Gaier, pp. 106:14-107:2)

### Conclusions Set Forth in the Gaier Affidavit

8.  Based on the analysis described therein, and as indicated above, Dr. Gaier concludes in the Gaier Affidavit that 208 of the 262 GSK NDCs considered thereby would pass the "WAC Price List" test established by this Court.

### Methodology Employed by Dr. Gaier to Compute Net Prices to Wholesalers

9.  Dr. Gaier indicates in the Gaier Affidavit that, in order to arrive at prices for the NDCs in question – prices that would then be compared to prices reported to pricing compendia by GSK – for purposes of applying the "WAC List Price" test, all "discounts, chargebacks, and rebates paid" to customers in "every class of trade" were "conservatively" included. (Gaier Affidavit, ¶ 6) While I do not disagree that consideration of such reductions was appropriate, my consideration of the underlying data purportedly supporting the analysis and conclusions set forth in the Gaier Affidavit causes me to conclude that Dr. Gaier considered chargebacks in a manner that caused the number of NDCs passing the "WAC List Price" test to be improperly inflated.

10. Based upon my review of the Gaier Affidavit, my consideration of the data underlying the Gaier Affidavit, and review of the deposition of Dr. Gaier in the litigation, it is my understanding that Dr. Gaier performed the following steps to calculate GSK's net sales price to wholesalers. First, Dr. Gaier analyzed all GSK sales to its wholesaler customers to determine both (a) the total units sold and (b) total sales revenue recorded for each wholesaler, by year and for each NDC. Second, for each NDC, Dr. Gaier examined the sales to *all* wholesalers and determined the number of units of sales of that NDC pertaining to which GSK paid chargebacks to all wholesalers. Third, Dr. Gaier applied chargebacks to each wholesaler by prorating the total population of chargebacks paid to wholesalers ("Chargeback Units") according to the relative percentage of GSKs sales made to each wholesaler, and subtracted the pro-rata Chargeback Units from total sales by GSK to each wholesaler. Next, Dr. Gaier determined total sales recorded from transactions with each wholesaler pertaining to which GSK did not pay chargebacks

(referred to hereinafter as "Wholesaler Non-Chargeback Sales") and subtracted the 2% prompt-pay discounts from those sales. He achieved this, specifically, by multiplying the total revenue figure for each wholesaler (Wholesaler Non-Chargeback Sales) by .98. Finally, to arrive at an "average [price] for a particular customer for a particular NDC for a particular year," Dr. Gaier divided the net sales figure for each wholesaler by total units transacted (net of the Chargeback Units referred to above) to arrive at what he represents, in the Gaier Affidavit, to be GSK's average sales price to each wholesaler, on any particular NDC.

### *Flaws in the Approach Underlying the Gaier Affidavit with respect to Chargebacks*

11.   Based on my analysis of the work performed by Dr. Gaier, it has become evident that the computations of net prices paid by wholesalers set forth in the Gaier Affidavit do not adequately and/or appropriately reflect the net price paid by wholesalers to purchase the GSK NDCs at question in the Litigation and for which prices were computed by Dr. Gaier. When computing his net prices to wholesalers Dr. Gaier elected to compute prices for wholesalers based not on all sales to wholesalers, but rather on the smaller set of sales to wholesalers for which chargebacks did not occur. The result of this selective application was the inflation of GSK's net sales price to wholesalers as computed by Dr. Gaier and, thereby, an inflation of the number of NDCs passing the "WAC List Price" test he was attempting to apply. (See Exhibits B and C attached hereto, with conclusions at pages 8 and 51, respectively.)

### *Discussion of Proposed Revisions to Dr. Gaier's Methodology Regarding Chargebacks*

12.   In connection with my findings, I have recomputed GSK's net sales prices in a manner that appropriately includes all sales to wholesalers and that gives sufficient effect to the sales to wholesalers subject to chargeback that were excluded, improperly, by Dr. Gaier. Dr. Gaier has stated that he separated wholesaler sales into Chargeback and Non-Chargeback categories to avoid "double-counting" the wholesaler sales subject to chargeback as both a sale to a wholesaler and a sale to an indirect customer. This separation is unnecessary. I avoid "double-counting" by analyzing all GSK sales to wholesalers and all GSK chargebacks paid to wholesalers as sales to a single entity. I do not separately analyze Wholesaler Chargeback Sales as sales to an indirect customer. Thus, each sale to a wholesaler is accounted for only once, the chargeback is included in the analysis, and there is no double counting issue.

6

13.     Ultimately, I have allocated chargebacks from manufacturers in the same manner as that which was employed by Dr. Gaier (i.e., by allocating percentages of the total population of chargebacks to wholesalers based on the percentage of GSK's sales to each wholesaler). By including the sales subject to chargeback, GSK's purported net sales price to each wholesaler was reduced - often substantially - such that proper effect had been given thereto for purposes of the WAC List Price test. The net result of just this initial proposed revision to the methodology employed by Dr. Gaier is that 149 NDCs fail the WAC List Price test as opposed to the 54 noted in GSK's Memorandum of Law and in the Gaier Affidavit. (See Exhibit B attached hereto, with conclusion at page 8.)

## Other Flaws in the Methodologies Employed by Dr. Gaier

### *Methodology Employed by Dr. Gaier Regarding 2% Prompt-Pay Discount*

14.     The Gaier Affidavit expressly notes that, as part of the reductions of the price paid by wholesalers and other customers, a 2% prompt-pay discount was included (purportedly) for all direct sales transactions. (Gaier Affidavit, ¶ 6) GSK's Memorandum of Law notes specifically, in fact, that the 2% prompt-pay discount referenced in the Gaier Affidavit was included for all sales. (GSK's Memorandum of Law, p. 11) In reality, however, the 2% prompt-pay discount was only applied to computations performed by Dr. Gaier relating to Wholesaler Non-Chargeback Sales (which generally were already inflated and could bear, presumably, for purposes of the WAC List Price test under Dr. Gaier's watch, a 2% reduction). Dr. Gaier ignored the 2% prompt pay discount in his consideration of Wholesaler Chargeback Sales.

### *Methodology Employed by Dr. Gaier Regarding Rebates*

15.     As noted above, the Gaier Affidavit asserts that weighted average net transaction prices were computed "for every class of trade..., conservatively including *all* discounts, chargebacks, and rebates paid to those customers." (Gaier Affidavit, ¶ 6) (Emphasis added.) Elsewhere, however, the Gaier Affidavit contradicts the foregoing, instead noting that Dr. Gaier, in his analysis, does not include *all* rebates in his computations of weighted average net transaction price, but rather all **"provider-based"** rebates in his computations. (Gaier Affidavit, ¶ 6) It is my understanding, further, that Dr. Gaier was unable to affirm the initial assertion when asked about it in deposition. To the contrary, he testified that he did not account for *all* rebates in his

7

methodology when computing weighted-average net transaction prices but, as the Gaier Affidavit also later clarified, Dr. Gaier intended to include *only* provider-based rebates in those computations for purposes of performing his WAC List Price test. (Gaier, pp. 52:17-54:15)

16. Ultimately, despite an expressed intention to be conservative in his computations by including *all* price reductions when computing weighted average net transaction prices, to *all* entities who purchased and dispensed drugs (i.e., providers), whether the rebates were characterized as purchase-based or utilization-based rebates, Dr. Gaier's treatment of rebates is not consistent with this expressed intention and did not include all such items. This is evident from my detailed analysis of the data and formulas underlying his analysis.

### *Flaws Overall in the Methodology Employed by Dr. Gaier Regarding Rebates*

17. There are a number of notable flaws and inconsistencies to be noted regarding the manner in which Dr. Gaier reflects the impact of rebates on his computations of GSK's net sale prices to its customers. Despite stating that he intended to include, in his net price calculations, all rebates paid to providers, and to exclude rebates paid to those entities who pay for drugs without actually purchasing or selling them (i.e., "payors") (Gaier, pp. 53:7-54:15), Dr. Gaier divides GSKs rebates into purchase and utilization rebates in an attempt to effect this division. Specifically, he divided the rebates into these two categories in an attempt, it appears, to include (a) all purchase rebates (i.e., rebates paid to providers) and all utilization rebates paid to providers. (Gaier, pp. 49:1-10) In applying his WAC List Price test, however, and despite the foregoing assertions, Dr. Gaier's net price computations do not include rebates paid by GSK to the following classes of trade, despite the fact that customers in these classes of trade purchase and sell GSK drugs and qualify, therefore, as providers: PBM Mail Order operations, Institutional Pharmacies ("IPAs") run by, for example, HMOs and insurance companies, Group Purchasing Organizations ("GPOs"), Retailers, Nursing Homes, Nursing Home Providers, Long Term Care Providers, and Staff Model HMOs[1]. (See Exhibit I attached hereto, as well as Exhibits D, F, G and H.)

18. It is unclear why Dr. Gaier excludes rebates paid to the foregoing classes of trade in his computations, but is apparent that Dr. Gaier's analysis did not achieve the foregoing intentions to

---

[1] PBM Mail Order, PBM general rebates, and IPA rebates are never included in Dr. Gaier's net sales price computations. The other classes of trade listed above are sometimes appropriately included and sometimes inappropriately excluded.

reduce average net prices by all applicable rebates because his processing of data contained in the GSK tables was inconsistent therewith.

19. Dr. Gaier's analysis focuses on separately analyzing 3 different GSK rebate tables: CN_REB_Fee_INST_V (the "INST" table), CN_REB_FEE_HLDR_V, (the "HLDR" table), and TCUSTGATS (the "CUST" table). He analyzed each table according to the logic described in the following 3 paragraphs.

20. Rebates from the INST table are included or excluded from Dr. Gaier's computation of average net prices based on a field called "calc_basis_cd." Rebates with a calc_basis_cd of "A", "P" or "S" are included in Dr. Gaier's average net price calculations. Rebates with a calc_basis_cd of "U" are excluded from those calculations.

21. Rebates from the HLDR table are also included or excluded from Dr. Gaier's calculation of average net prices based on their calc_basis_cd classification. Rebates with a calc_basis_cd of A, P or S are excluded from Dr. Gaier's average net price computations, whereas rebates with a calc_basis_cd of "U" are included, so long as they were paid to the retail class of trade. Dr. Gaier defined the "retail class of trade" more narrowly in this context than he had defined "providers" in the above discussion. In his deposition Dr. Gaier defined providers as those entities who purchase and sell drugs (consistent with descriptions above, herein). (Gaier, pp. 50:7-14, 52:17-54:7) In his processing of rebates from the HLDR table, however, Dr. Gaier included only those rebates paid to the following classes of trade: "Retail," "Retail Chain," and "RXRewards." All other classes of trade were characterized as "other" for purposes of consideration in the HLDR table and, therefore, excluded from Dr. Gaier's average net price computations.

22. Rebates from the CUST table are treated differently than those in the preceding discussions. In this instance, rebates are included or excluded based primarily on the amount listed in the "Total Sales Amount" field of the table. If the Total Sales Amount is not equal to zero, the associated rebates are included in Dr. Gaier's net price analysis. If the Total Sales Amount is EQUAL to zero, the rebate may be included in his computations, but only if the

rebate was paid to a member of the following classes of trade: "RX RWDS buying group," "RxRWDS Chain/Corp," and "RX RWDs INDEP PHARM."

23. Ultimately, Dr. Gaier's treatment of the foregoing rebates causes him to exclude more than $4 billion in rebates from his computations of net prices to wholesalers and other customers[2]. (See Exhibit I attached hereto.) That amount represented 3.96% of GSK's total direct sales during the relevant timeframe. Needless to say, in a computation where the threshold resides at 5% from reported WAC prices, the mere fact that improperly excluded rebates alone represents an average 3.96% reduction of the gross sales prices immediately calls into question both the feasibility and supportability of Dr. Gaier's findings.

*Flaws in the Methodology Employed by Dr. Gaier Regarding Rebates Paid to the PBM Mail Order Class of Trade*

24. GSK's rebate data, as provided by Dr. Gaier in connection with GSK's Memorandum of Law and the Gaier Affidavit shows that GSK paid $2.2 billion in rebates to Advance PCS, Caremark, Express Scripts and Medco, all PBMs, between 1997 and 2005 alone. (Summary Exhibit I attached hereto; see also Exhibits E.1, E.2, and E.3. Dr. Gaier does not include a single rebate paid by GSK to any of the major PBMs listed above in his computations, other than 2 nominal payments to Medco totaling less than $2,000. (See Exhibit E.3)[3] With this exception, an analysis of the aforementioned and underlying data demonstrates that there are no instances of any rebate to any major PBM (mail order or otherwise) being included in the net prices computed by Dr. Gaier.[4] (See Exhibit D attached hereto.)

---

[2] It is not my position that all PBM rebates should be included. Rather, only those rebates attributable to PBM Mail Order operations would properly be included, and are in my analysis.

[3] Dr. Gaier excluded PBM rebates that appear in the HLDR Table based on the assumption that they were paid to a non-retail class of trade. Dr. Gaier excluded PBM rebates that appeared in the INST table because they had a calc_basis_cd classification of "U." PBM rebates in the CUST table were excluded because they all had Total Sales of zero and were paid to the PBM class of trade, which Gaier assumed meant "non-retail."

[4] I have examined the universe of rebates paid to each PBM as set forth in the underlying tables utilized by Dr. Gaier and found that none were included in Dr. Gaier's net sales price computations. I do not maintain that all rebates paid to PBMs should be included. Rather, according to Dr. Gaier's stated intention to include rebates paid to PBM Mail Order operations, some portion of total rebates paid to PBMs mail order operations should have been included in his computations. Given that (a) GSK paid mail order rebates to PBMs and (b) I have examined the universe of rebates GSK paid to PBMs, I conclude that at least some portion of total rebates paid to PBMs were attributable to the PBM mail order business.

10

25. By excluding rebates paid to PBM Mail Order operations, Dr. Gaier computes an inflated GSK net sales price for each pertinent NDC. Given the volume of rebates paid by GSK to all PBMs during the relevant timeframe, it is reasonable to assume that proper inclusion of such rebates would result in more NDCs failing the WAC List Price test, even as Dr. Gaier employs it. If Dr. Gaier had, as was his stated intention, included the significant amount of rebates paid to all PBMs mail order operations (Gaier, pp. 52:2-16) when computing GSK's net sales prices, his net transaction price to these customers would have been lowered by some portion of the $2.7 billion in rebates paid to all PBMs. (See Summary Exhibit I attached hereto; see also Exhibits D.1, D.2, and D.3.)

*Flaws in the Methodology Employed by Dr. Gaier Regarding Rebates Paid to the IPA Class of Trade*

26. GSK's rebate data shows that GSK paid $1.4 billion in rebates to the IPA class of trade between 1997 and 2005. (See Summary Exhibit I attached hereto; see also Exhibits F.1, F.2 and F.3.) Dr. Gaier fails, however, once again, to include a single rebate GSK paid to any IPA class of trade member in his computations of GSK's average net sales prices for purposes of the WAC List Price tests he performed. (See Summary Exhibit I attached hereto; see also Exhibits F.1, F.2 and F.3.) This omission appears to have occurred because rebates paid to the IPA class of trade fail to meet Dr. Gaier's strict, albeit inconsistent, criteria for consideration as a provider.

27. The improper exclusion of rebates paid to the IPA class of trade improperly inflates the average net sales prices computed by Dr. Gaier because excluding rebates increases the net price. Given the volume of rebates paid by GSK to the IPA class of trade during the relevant timeframe, it is reasonable to assume that proper inclusion of such rebates would result in more NDCs failing the WAC List Price test, even as Dr. Gaier employes it. If Dr. Gaier had, as was his stated intention, included the significant amount of rebates paid to providers (which would include the IPA class of trade) when computing GSK's net sales prices, his net transaction price would have been lowered as a result of the $1.4 billion in rebates paid to the IPA class of trade. At this time, I understand that Plaintiffs are engaged in ongoing discovery that should permit, in time and with a full record, an estimate of the impact of this improper exclusion on the WAC List Price Test for the GSK drugs at issue.

11

*.Flaws in the Methodology Employed by Dr. Gaier Regarding Rebates Paid to GPOs*

28.     GSK paid rebates to its GPO customers (such as Premier, Novation, Owen Healthcare, Tenet, and Amerinet) in the amount of $147 million between 1997 and 2005. (See Summary Exhibit I attached hereto; see also Exhibits G.1 and G.2.)

29.     In his computations, Dr. Gaier includes only a fraction of the rebates paid to the foregoing GPOs for purposes of performing the WAC List Price test described herein. (See Exhibits G.1 and G.2 attached hereto.) Specifically, Dr. Gaier includes only $196,726 in such rebates when computing average net sales prices, despite having stated in deposition that rebates to providers needed to be accounted for in the WAC List Price Test. (Gaier, pp. 54:2-7)

30.     Had these GPO rebates been included properly and completely, GSK's average net sales prices, as computed by Dr. Gaier, would have been reduced and it is reasonable to conclude that even more NDCs would have failed the WAC List Price test. Again, at this time, I understand that Plaintiffs are engaged in ongoing discovery that should permit, in time and with a full record, an estimate of the impact of this improper exclusion on the WAC List Price Test for the GSK drugs at issue.

*Flaws in the Methodology Employed by Dr. Gaier Regarding Rebates Paid to the Retailer-Wholesaler, Nursing Home, Hospital, Long Term Care Facilities and Staff Model HMO Classes of Trade*

31.     GSK paid over $52.7 million in rebates to its customers in the following classes of trade: Retailer-Wholesalers, Nursing Homes, Hospitals, Long Term Care Facilities and Staff Model HMOs. (See Exhibit I attached hereto; see also Exhibits H.1 and H.2.) Dr. Gaier does not include any of these rebates in his analysis because he mistakenly characterized them as rebates paid to entities that do not, generally, purchase and sell GSK pharmaceuticals. Dr. Gaier agreed at his deposition that entities that purchase and sell pharmaceuticals should have been in included in his analysis of net prices. (Gaier, pp. 53:7-54:15)

32.     If these rebates had been allocated properly, the net transaction prices from GSK to these customers would have been reduced. Again, I understand that Plaintiffs are engaged in ongoing discovery that should permit, in time and with a full record, an estimate of the impact of this improper exclusion on the WAC List Price Test for the GSK drugs at issue.

## V.    SUMMARY OF MY ANALYSIS AND CONCLUSIONS

33.     Based on the foregoing analysis and a re-computation of wholesaler and provider average net sales prices to correct for flaws and omissions in the methodology employed by Dr. Gaier, and for, specifically, purposes of re-performing the "WAC List Price" test established by this Court, it is my conclusion that Dr. Gaier's conclusions that 208 NDCs pass the WAC List Price Test is inaccurate. Even before accounting for the massive rebates discussed herein, proper treatment of the wholesaler data with respect to chargebacks increases the number of NDCs failing the WAC List Price test from 54 to 149.

34.     Further, it is my conclusion that the number of NDCs failing the WAC List Price test would increase further once the effect of rebates discussed herein can be quantified and included in a computation of average net sales prices.

February 11, 2009

Subscribed and sworn to before me this 11th day of February, 2009.

Notary Public

Daniel Hume
Notary Public, State of New York
No. 31-5056750
Qualified in New York County
Commission Expires 3/11/11