**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS Subcategory Case No: 03-10643-PBS |
| THIS DOCUMENT RELATES TO: | ) ) | Judge Patti B. Saris |
| *The City of New York, et al.* *v.* *Abbott Laboratories, et al.* | ) ) ) ) ) ) | |

**PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF DEFENDANT SMITHKLINE BEECHAM
CORPORATION, D/B/A GLAXOSMITHKLINE'S (GSK'S) MOTION FOR
SUMMARY JUDGMENT IN THE NEW YORK COUNTY CASES**

**INTRODUCTION**

Pursuant to Local Rule 56.1, the City of New York and all New York Counties in

MDL 1456 (hereinafter "plaintiffs" or "the NY Counties") submit this Response to

GSK's Statement of Undisputed Material Facts in support of Defendant SmithKline

Beecham Corporation, D/B/A GlaxoSmithKline ("GSK's") Motion for Partial Summary

Judgment in the New York County Cases ("GSK's Statement").

**GENERAL RESPONSES**

Plaintiffs generally object to GSK's Statement to the extent that it contains

improper unnumbered headings and/or improper footnotes that contain argumentative

and unsupported allegations that are inappropriate in a Statement of "Undisputed Facts."

Plaintiffs further object on the grounds that these argumentative headings and footnotes misstate, misconstrue and/or mischaracterize the underlying alleged "undisputed" facts they purport to introduce.

Plaintiffs further object to GSK's Statement in that these improper headings lack adequate foundation.   *See* Fed.R.Evid. 602.   Plaintiffs omit the improper and argumentative headings and footnotes in their Specific Responses and Objections below.

## SPECIFIC RESPONSES AND OBJECTIONS

### A.   GSK's List Price Reporting

**1.   GSK and its predecessors have, for the entire 1997-2005 period now at issue in this case, reported a "Wholesale Acquisition Cost" ("WAC"), or a WAC equivalent, to First DataBank and the other commercial price reporting services. GSK's 1997-2005 price reporting conventions can be broken into three time periods, as follows:**

**a.  Since shortly after the merger that formed GSK in 2001, GSK has reported a WAC, and only a WAC (*i.e.*, no AWP or anything like it), for all of its prescription pharmaceuticals.  Affidavit of David A. Moules dated February 25, 2004 at ¶ 5, appended as Ex. 3 (hereinafter "Moules 2004 Aff.").[1]   Since its formation, GSK has specifically defined its reported "WAC" in its routine pricing communications to First Databank and its customers as "the listed price to wholesalers and warehousing chains, not including prompt pay, stocking or distribution allowances, or other discounts, rebates, or chargebacks."  *Id.*; *see also* GSK price reporting letters, appended as Ex. 5.**

Response:      Disputed.   GSK and its predecessors' (hereinafter collectively referred to as "GSK")  price reporting practices caused AWPs to be published at all relevant times for GSK products by First DataBank ("FDB") and the other national

---

[1] **Mr. Moules has served as GSK's Rule 30(b)(6) deponent on price reporting issues, and his May 8, 2007 deposition in the Alabama AWP case was cross-noticed in this case by Stipulation.  *See* Stipulation dated April 18, 2007 at ¶ 6, appended as Ex. 4; *see also* Affidavit of Frederick G. Herold, Esq. (hereinafter "Herold Aff."), appended hereto as Exhibit 1, at ¶¶ 2-3.  All exhibits referred to herein are appended, and all exhibits are briefly described and *authenticated by the Herold Affidavit* appended as Exhibit 1, except for the Affidavit of Dr. Eric M. Gaier, an expert affidavit prepared in support of this Motion, which is appended as Exhibit 2.**

Response:  Disputed in part.  Plaintiffs dispute that all exhibits referred to in GSK's Statement have been properly authenticated pursuant to Fed. R. Civ. Evid. 902(11) or  otherwise satisfy Fed. R. Civ. P. 803(6).

pricing compendia, Redbook and Medispan.  *See*, *e.g.* Excerpt of FDB NDDF file (Exhibit A hereto).  Plaintiffs dispute this statement to the extent it suggests GSK did not control the WACs or AWPs that FDB published for GSK products.  GSK knew, expected, and intended that when it reported a price, FDB would predictably calculate an AWP that was 20 to 25 percent higher than WAC.  *See* Deposition of David A. Moules (July 13, 2006) (hereinafter "Moules Deposition (July 13, 2006)") at 62:24 to 64:3 (excerpt as Exhibit B hereto).  Moreover, GSK verified the accuracy of WAC and AWP prices that were published by FDB.  *See e.g*., FDB Turnaround Document, dated March 24, 2002 (FDB/ALA 141129-152 (Exhibit C hereto).  GSK also verified the accuracy of WAC and AWP prices that were published by Redbook.  *See* Deposition of Kristen Minne (Redbook) (November 18-19, 2008) ("Minne Deposition") at 251:21 to 253:19 (Exhibit D hereto); Minne Deposition Exhibit 39 (Exhibit E hereto).  Redbook would make whatever changes and exclusions that a manufacturer requested with regard the publication of WACs and AWPs.  *See* Minne Deposition at 605:9 to 606:1 (Exhibit D hereto).  In fact, at GSK's specific request Redbook once did not publish a WAC or an AWP for a particular drug and would have followed the same request for any other GSK drug or by any other manufacturer for its drugs.  *Id*. at 601:9 to 602:1.  Finally, Redbook documents reveal that GSK expressly instructed Redbook that GSK calculated AWP as "WAC x 1.25".  *See* SmithKlineBeecham Memorandum from Ronnie Lane to Dan O'Connor, dated August 7, 2007 (Redbook 15159) (Exhibit G hereto).

Plaintiffs further object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of it.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party

to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).

Plaintiffs dispute the Statement and object to the evidentiary basis of the alleged facts insofar as GSK relies on out-of-court statements to prove the truth of the matter asserted. *See* Fed.R.Evd. 801(c), 802; *Noviello v. City of Boston,* 398 F. 3d 76, 85 (1st Cir. 2005) (out-of-court statements are inadmissible hearsay and could not be considered on a motion for summary judgment); (*La Rou v. Ridlon,* 98 F.3d 659, 663 (1st Cir. 1996) (finding portions of a party's affidavit recounting inadmissible hearsay to be incompetent on summary judgment).

Moreover, plaintiffs object to the Statement insofar as it purports the present GSK's definition of "WAC" because GSK's definition of WAC has no relevance to the subject of GSK's motion which is the extent to which GSK's sales "were at or about [its published] WAC." *See* GSK Memorandum of Law in Support of Motion for Partial Summary Judgment ("GSK Mem.") at 1, 10, *et seq.*

**b. Prior to the merger that formed GSK in early 2001, (and since before 1997), GSK predecessor Glaxo Wellcome, Inc. ("GW") reported a WAC-equivalent that it called "NWP" ("Net Wholesale Price"). Affidavit of GSK Vice President David A. Moules dated September 25, 2006, at ¶ 4 (hereinafter "Moules 2006 Aff."), appended as Ex. 6. GW included the following definition of this WAC-equivalent in its routine pricing communications, starting in 1999: "List price to wholesalers and warehousing chains, not including prompt pay, stocking or distribution allowances, or other discounts, rebates or chargebacks." *See* GW price reporting letters, appended as Ex. 7. In addition, in a proposed Medicaid pricing contract submitted by GSK predecessor Glaxo, Inc. to the New York Medicaid Program as early as 1990, Glaxo explicitly defined its reported "Net Wholesale Price" as "the wholesale list price." *See* Market Adjustment Agreement at 2, appended as Ex. 9; Herold Aff. At ¶¶ 5, 6, 8 (Ex. 1).**

<u>Response</u>:     Disputed in part. Plaintiffs object to the Statement insofar as it purports to present GSK's definition of "WAC" or "NWP" or any "WAC-equivalent"

because such definitions have no relevance to the subject of GSK's motion which is the extent to which GSK's sales were "at or about [its published] WAC." *See* GSK Mem. at 1, 10, *et seq.*

Plaintiffs dispute this statement to the extent it suggests GSK did not control the WACs or AWPs that were published by the national compendia, like FDB, Rebook or Medi-Span. GSK knew, expected, and intended that when it reported a price, the national compendia would predictably calculate an AWP that was 20 to 25 percent higher than reported WAC. *See* Moules Deposition (July 13, 2006) at 62:24 to 64:3 (Exhibit B hereto). Moreover, GSK verified the accuracy of WAC and AWP prices that were published by FDB and Redbook. *See* Exhibits C, E and F hereto; Minne Deposition at 251:21 to 253:19 (Exhibit D hereto). Redbook would make whatever changes and exclusions that a manufacturer requested with regard the publication of WACs and AWPs. *See* Minne Dep. at 605:9 to 606:1. *Id.* In fact, at GSK's specific request Redbook once did not publish a WAC or an AWP for a particular drug and would have followed the same request for any other GSK drug or by any other manufacturer for its drugs. *Id.* at 601:9 to 602:1.

Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006). Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation. *See* Fed.R.Evid. 602.

Plaintiffs dispute the Statement and object to the evidentiary basis of the alleged facts insofar as GSK relies on out-of-court statements to prove the truth of the matter

asserted.  *See* Fed.R.Evd. 801(c), 802; *Noviello v. City of Boston,* 398 F. 3d 76, 85 (1st

Cir. 2005); *La Rou v. Ridlon,* 98 F.3d 659, 663 (1st Cir. 1996) (finding portions of a

party's affidavit recounting inadmissible hearsay to be incompetent on summary

judgment).

> **c. Prior to the 2001 merger (and since before 1997), GSK's other predecessor – SmithKline Beecham Corporation ("SB") – reported a WAC-equivalent that it called "WPP" ("Wholesale Purchase Price").  Moules 2006 Aff. ¶ 5 (Ex. 6).  SB defined this WAC-equivalent in its routine pricing communications, starting in 2000, as follows:  "SB's price to SB's wholesaler class of trade, without taking into account prompt pay discounts or other pricing or promotional concessions paid to wholesalers, or chargebacks paid to wholesalers on account of purchases by wholesalers' end user customers."  *See* SB price reporting letters, appended as Ex. 8.  Before SB became GSK in 2001, it also reported a "Suggested List Price" ("SLP"), which it defined as the "non-binding suggested resale price to end user purchasers who do not purchase under special contractual arrangements. Actual end user acquisition costs may be lower than the Suggested list Price, depending on wholesaler mark-ups, chargebacks or other pricing concessions."  *See* SB price reporting letters, appended as Ex. 8.  The amount of the SLP was typically 1.25 times the WPP. Moules 2006 Aff. At ¶ 5 (Ex. 6).**

> Response:    Disputed in part.  Plaintiffs object to the Statement insofar as it

purports the present GSK's definition of "WAC" or "NPP" or "SLP" or any "WAC-

equivalent" because such definitions of WAC have no relevance to the subject of GSK's

motion which is the extent to which GSK's sales were "at or about [its published] WAC."

*See* GSK Mem. at 1, 10, *et seq.*

Plaintiffs dispute this statement to the extent it suggests GSK did not control the

WACs or AWPs that were published by the national compendia, like FDB, Rebook or

Medi-Span.  GSK knew, expected, and intended that when it reported a price, the national

compendia would predictably calculate an AWP that was 20 to 25 percent higher than

reported WAC.  *See* Moules Deposition (July 13, 2006) at 62:24 to 64:3 (Exhibit B

hereto).  Moreover, GSK verified the accuracy of WAC and AWP prices that were

published by FDB and Redbook.  *See* Exhibits C, E and F attached hereto; Minne Deposition at 251:21 to 253:19 (Exhibit D hereto).  Redbook would make whatever changes and exclusions that a manufacturer requested with regard the publication of WACs and AWPs.  *See* Minne Dep. at 605:9 to 606:1 (Exhibit D hereto).  In fact, at GSK's specific request Redbook once did not publish a WAC or an AWP for a particular drug and would have followed the same request for any other GSK drug or by any other manufacturer for its drugs.  *Id*. at 601:9 to 602:1. Finally, Redbook documents reveal that GSK expressly instructed Redbook that GSK calculated AWP as "WAC x 1.25".  *See* SmithKlineBeecham Memorandum from Ronnie Lane to Dan O'Connor, dated August 7, 2007 (Redbook 15159) (Exhibit G hereto).

Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).  Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation.  *See* Fed.R.Evid. 602.

Plaintiffs dispute the Statement and object to the evidentiary basis of the alleged facts insofar as GSK relies on out-of-court statements to prove the truth of the matter asserted.  *See* Fed.R.Evid. 801(c), 802; *Noviello v. City of Boston,* 398 F. 3d 76, 85 (1st Cir. 2005); *La Rou v. Ridlon,* 98 F.3d 659, 663 (1st Cir. 1996) (finding portions of a party's affidavit recounting inadmissible hearsay to be incompetent on summary judgment).

**2.      These GSK-specific definitions of WAC (and WAC equivalents)[2] were widely shared outside of the company, including with First DataBank.   *See Collection of GSK price reporting letters produced from First DataBank's files appended as Exs. 5, 7 and 8.***

Response:      Disputed.   Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement.   *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).

Plaintiffs object to GSK's Statement insofar it lacks adequate foundation.   *See* Fed.R.Evid. 602.

Moreover, plaintiffs object to the Statement insofar as it concerns GSK's definition of "WAC".   GSK's definition of WAC has no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC."   *See* GSK Mem. at 1, 10, *et seq.*

**3.      GSK's definitions of WAC (and WAC equivalents) are entirely consistent with the definition of WAC as a "list price" that does not include discounts, which was set forth in numerous publications (including OIG reports and other government publications provided to state Medicaid agencies) as early as 1997.   *See, e.g. HHS OIG Report:  Cost Containment of Medicaid HIV/AIDs Drug Expenditures, OEI-05-99-00611* at 5-7 (2001) (states that "for brand name drugs, manufacturers set the wholesale acquisition price as a list price for wholesalers to purchase drugs from manufacturers. … Both the WAC and the AWP operate as suggested list prices and are typically not what is paid.  Buyers negotiate lower prices through the inclusion of discounts, rebates or free goods" (pp. 5-6); also contains a chart referring to WAC as a "list price" and AMP as the corresponding actual selling price for Medicaid (p. 7) (relevant portions appended as Ex. 10); *GAO Report: Medicare – Payments for Covered Outpatient Drugs Exceed Providers' Cost*, at 23 (2001) (states that "WAC is the list price a wholesaler pays to a manufacturer,***

---

**[2] For ease of reference, we sometimes use "WAC" in this GSK Statement of Facts to refer to both WAC and WAC equivalents such as NWP and WPP.  We also sometimes use "GSK" to refer to both GSK and its predecessor companies.**

Response:  Plaintiffs object to GSK's imprecise references to WAC or WAC equivalents as these references are irrelevant entirely to GSK's motion which concerns the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC."  GSK Mem. At 1, 10.

**but it does not include discounts that may affect the net price") (relevant portions appended as Ex. 11); E.M. (Mick) Kolassa,** *Elements of Pharmaceutical Pricing* **at 33 (1997) (states that "Wholesale Acquisition Cost (WAC) … is used by some publishers of pricing data to denote the ex-factory charge, before discounts, to the wholesaler") (relevant portions appended as Ex. 12).**

Response: Disputed. Plaintiffs dispute and object to the Statement as improper argument and contrary to the definition of WAC as defined by this Court. This Court has held that WAC means "the price that wholesalers actually paid to acquire the drug." *Commonwealth of Mass. v. Mylan Labs., et al*., No. 03-11865-PBS (D.Mass. Dec. 23, 2008)(Saris, J.) at 34-35. To paraphrase the Court, to argue that WAC is a mere list price that does not have to be tethered to real prices is "absurd" because "such an interpretation of WAC would give the defendants a virtual blank check" *Id*.

Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).

Plaintiffs object to GSK's Statement insofar it lacks adequate foundation. *See* Fed.R.Evid. 602.

Plaintiffs object to the Statement insofar as it concerns GSK's definition of "WAC" and/or "WAC-equivalents." GSK's definitions have no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC." *See* GSK Mem. at 1, 10, *et seq*.

**4.     GSK's definitions of WAC (and WAC-equivalents) are also consistent with the statutory definition of WAC that was enacted into the federal Medicare and Medicaid statutes in December 2003. That statute defines WAC as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price. …" 42 U.S.C. §1395w-3a (c)(6)(B) (Medicare**

**Modernization Act);** *see* **42 U.S.C. §1396r-8(b)(3)(A)(iii)(II) (incorporation of the MMA WAC definition into the Medicaid rebate statute.)**

Response:        Disputed.    Plaintiffs  dispute  and  object  to  the  Statement  as improper argument and contrary to the definition of WAC as defined by this Court.  This Court has held that WAC means "the price that wholesalers actually paid to acquire the drug."  *Commonwealth of Mass. v. Mylan Labs., et al.*, No. 03-11865-PBS (D.Mass. Dec. 23, 2008)(Saris, J.) at 34-35.  To paraphrase the Court, to argue that WAC is a mere list price that does not have to be tethered to real prices is "absurd" because "such an interpretation of WAC would give the defendants a virtual blank check."  *Id.*

Plaintiffs  object  to  the  Statement  on  the  grounds  that  GSK  fails  to  proffer admissible evidence in support of this Statement.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).  Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation.  *See* Fed.R.Evid. 602.

Plaintiffs  object  to  the  Statement  insofar  as  it  concerns  GSK's  definition  of "WAC" and/or "WAC-equivalents."  GSK's definition of WAC has no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC."  *See* GSK Mem. at 1, 10, *et seq*.  In addition, plaintiffs dispute that the statutes cited have any relevance whatsoever to the instant motion or to the definition of WAC during the entire time period at issue in this matter.

**5.        To determine an AWP for GSK's and GSK predecessors' drugs during the 1997-2005 period, the price reporting services have chosen and applied a standard mark-up to the company's reported WAC list price.  The mark-up has been either 1.20 or 1.25 depending on the particular drug, the time period and the reporting service.  Moules 2006 Aff. At ¶¶ 4-7 (Ex. 6).  From 1997 until after GSK**

was formed, the pricing publications typically published an AWP for GW products that was 1.20 times the WAC-equivalent that GW reported. *Id*. at ¶ 4. During that same period, the pricing publications typically published an AWP for SB products that was 1.25 times the WAC-equivalent that SB reported. *Id.* at ¶ 5. Since 2002, the AWPs that have been published for GSK products have differed between the major commercial price reporting publications. Since 2002 the Redbook, for example, has generally published an AWP for GSK products that is 1.20 times GSK's reported WAC, whereas First DataBank has generally published an AWP for GSK products that is 1.25 times GSK's reported WAC. These differing decisions concerning what AWPs to publish for GSK products, and what ratio should be applied to the WACs reported by GSK in order to derive those AWPs, were made by the price reporting services, not by GSK. *Id.* at ¶ 7; Moules 2004 Aff. at ¶ 5-11 (Ex. 3).

Response:       Disputed in part.  Plaintiffs dispute and object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).    Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation.  *See* Fed.R.Evid. 602.

Plaintiffs further dispute this statement to the extent it suggests GSK did not control the WACs or AWPs that were published by the national compendia, like FDB, Rebook or Medi-Span.  GSK knew, expected, and intended that when it reported a price, the national compendia would predictably calculate an AWP that was 20 to 25 percent higher than reported WAC.  *See* Moules Deposition (July 13, 2006) at 62:24 to 64:3 (Exhibit B hereto).  Moreover, GSK verified the accuracy of WAC and AWP prices that were published by FDB and Redbook.  *See* Exhibits C, E and F hereto; Minne Deposition at 251:21 to 253:19 (Exhibit D hereto).  Redbook would make whatever changes and exclusions that a manufacturer requested with regard the publication of WACs and AWPs.  *See* Minne Dep. at 605:9 to 606:1. *Id.*   In fact, at GSK's specific request

Redbook once did not publish a WAC or an AWP for a particular drug and would have followed the same request for any other GSK drug or by any other manufacturer for its drugs. *Id*. at 601:9 to 602:1. Finally, Redbook documents reveal that GSK expressly instructed Redbook that GSK calculated AWP as "WAC x 1.25". *See* SmithKlineBeecham Memorandum from Ronnie Lane to Dan O'Connor, dated August 7, 2007 (Redbook 15159) (Exhibit G hereto).

Plaintiffs further object to the Statement on the grounds that the price reporting service's markup of GSKs WAC has no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC." *See* GSK Mem. at 1, 10, *et seq*.

> **B.     Litigation and Settlement of Prior Pharmaceutical Pricing**
> **Litigation Filed Against GSK by the State of New York**
> **(Paragraphs 6-12 of GSK's Statement of Undisputed Material Facts**

Comment:     Plaintiffs are not pursuing any claims for the two NDCs (Zofran 2mg/ml vial (NDC0173044200) and Amoxil 500 mg capsules (NDC 00029600732) that GSK (unnecessarily) addressed in its moving papers. The parties will file a stipulation to this effect presently. As such, this aspect of GSK's motion is moot and deemed withdrawn. Plaintiffs are not responding to paragraphs 6-12 of GSK's Statement.

> **C.     The Claims Against GSK in the New York Counties' Revised**
> **First Amended Consolidated Complaint**

**13.     Although the WAC/AWP claims of the New York Counties in this lawsuit have been pled, dismissed and repled several times, those that remain against GSK are substantively the same as the claims previously asserted against GSK by the State of New York. The Counties allege, with respect to WAC reporters like GSK, that the reported WACs (or WAC equivalents) for Medicaid-covered drugs were "false and inflated," and that "drug manufacturers know that by reporting a false and inflated WAC or WAC equivalent they can trigger the publication of a false and inflated AWP on which reimbursements are made." Revised First Amended Consolidated Complaint ("hereinafter RFACC") at ¶ 12.**

Response:     Disputed in part. Plaintiffs object to the Statement on the grounds that it presents improper argument. Plaintiffs dispute GSK's characterization of their

complaint.  Plaintiffs further dispute GSK's assertion that the WAC/AWP claims have been pled, dismissed and repled several times.  Defendants' motions to dismiss plaintiffs' WAC/AWP claims have been thrice denied.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 498 F.Supp.2d 402 (D.Mass. Jul 30, 2007); *City of New York, et al. v. Abbott Labs., et al.*, No. 01-cv-12257, 2007 WL 1051642 (D. Mass. April 2, 2007); *County of Suffolk v. Abbott Labs., Inc,* 2004 WL 2387125 (D.Mass. Oct. 26, 2004)("*Suffolk II*"); *see also* Memorandum and Order (MDL Docket No. 1482, Apr. 8, 2004) ("*Suffolk III*")**.**

Plaintiffs dispute any implication that GSK has properly, fairly or accurately summarized their allegations.  Plaintiffs dispute and object to GSK's Statement to the extent it implies that plaintiffs' allegations are the same as those pled in the New York Attorney General's case against GSK.  Plaintiffs' causes include, for example, a claim under N.Y.Soc.Serv.Law § 145-b which was, as GSK knows, dismissed in the NYAG case.

**14.    The New York Counties allege, through Exhibits A and B-18 of the RFACC, that the reported WACs for 270 GSK NDCs (as well as the published AWPs that were allegedly "caused" by these WACs) were false and inflated.[3]**

---

[3] **The RFACC exhibit that lists the GSK drugs at issue (Exhibit B-18) lists two GSK NDCs – one for Amoxil 500mg capsules (NDC 00029600732) and one for Zofran 2 mg/ml vials (NDC 00173044200) – that were subject to the New York State settlement agreement's explicit release.**

Response:  The parties have stipulated that plaintiffs are not pursing claims for those Amoxil, Kytril and Zofran NDCs released by prior settlements between GSK and New York State.

**It also lists six NDCs for Ceftin, which are not GSK NDCs; those NDCs were for a time-period during which GSK did not distribute or report prices for Ceftin.  The two settled NDCs and six Ceftin NDCs distributed by a non-GSK entity were not analyzed under the WAC List Price test discussed below.  *See* Affidavit of Dr. Eric M. Gaier at ¶ 4, fn. 1 (Ex. 2).**

Response:  Disputed.  Nothing in defendant's motion or memorandum specifically identifies the six Ceftin NDCs to which GSK is referring, and the distribution agreement cited by Dr. Gaier was not included among the materials provided in support of defendant's motion.  Based on the labeler code provided by Dr. Gaier, plaintiffs believe that GSK is referring to the following six Ceftin NDCs: 65939040600, 65939038700, 65939038742, 65939055500, 65939039400, and 65939039442.  However defendant's

Response:   Disputed in part.  Plaintiffs dispute and object to the extent the Statement implies that plaintiffs' allegations are confined to the 270 GSK NDCs listed in FACC Exhibit B-18.  Plaintiffs' allegations pertain to all GSK drugs listed in RFACC B-18 (except the Amoxil and Zofran NDCs listed above).

**15.   On the basis of these allegations, the New York Counties assert that GSK violated New York's Deceptive Acts and Practices statute (N.Y. General Business Law § 349) (Count VI) and the New York statute prohibiting false statements to obtain public funds, N.Y. Social Services Law §145-b (Count III) – both of which were asserted in the New York State case.  They also assert a common law fraud claim (Count VIII).[4]**

Response:   Disputed in part.  Plaintiffs dispute and object to the Statement on the grounds that the operative complaint speaks for itself and should be read in its entirety.   Plaintiffs further dispute that GSK has accurately characterized their allegations.   Plaintiffs object to GSK's failure to acknowledge that GSK's motion to dismiss plaintiffs' claim under N.Y. Soc. Serv. L. §145-b was denied in this matter (whereas it was granted in the NYAG case).

Plaintiffs further object to the Statement to the extent it concerns matters that have no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC."  *See* GSK Mem. at 1, 10, *et seq*.

**D.   There Has Been Extensive Discovery In This Case With Respect to GSK's Medicaid-Covered Drugs.**

---

unsupported argument and casual reference to a distribution agreement--which was not supplied in its supporting materials--are insufficient to support its motion.  Moreover, GSK's motion does not seek any relief with respect to this argument so it is irrelevant anyway.

**[4] The Counties also asserted other WAC/AWP claims, but they were dismissed by this Court's Memorandum and Order dated April 2, 2007 and were included in the RFACC only for appellate purposes.**

Response:  Not disputed.

**16.     Although this Court stayed discovery with respect to drugs alleged by the Counties to have "spreads" between acquisition cost and published AWP of 30% or less, GSK has nevertheless produced voluminous data and documents to the New York Counties with respect to virtually all of its Medicaid-covered drugs.  On April 18, 2007, GSK entered into a Stipulation with the New York Counties under which it agreed to make the same "GSK Core Documents" and data available to the New York Counties as it produced in multiple other AWP cases around the country, and under which the parties also agreed that GSK's key Rule 30(b)(6) depositions would be cross-noticed in this case.  *See* Stipulation appended as Ex. 4 and Herold Aff. at ¶ 3 (Ex. 1).**

Response:     Disputed in part.  Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement.  *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).  Plaintiffs further dispute and object to the Statement to the extent it implies that GSK has produced discovery on all GSK products at issue in this matter.  The fact that GSK has produced some discovery does not mean that discovery is complete.  There is no discovery deadline in this case and discovery is on-going.  Moreover, the stipulation referred to in no way stated that GSK satisfied all its discovery obligations to plaintiffs.

Moreover, plaintiffs object to the Statement to the extent it concerns matters that have no relevance to the subject of GSK's motion which is whether GSK has presented a record sufficient to warrant summary judgment on 208 NDCs.  *See* GSK Mem. at 1, 10, *et seq*.

**17.     Pursuant to that Stipulation, GSK has produced detailed sales transaction data for its Medicaid-covered drugs to the New York Counties, as well as a massive quantity of documents (including documents produced in the MDL class action, depositions taken in that case, and multiple productions of documents produced in other state AWP cases).  *See* two GSK discovery letters to Joanne Cicala dated April 18, 2007 (appended as Ex. 16); *see also* GSK discovery letters to Joanne Cicala dated, June 13,  2007, February 28, 2008 and June 30, 2008, appended together as Ex. 17, and Herold Aff. at ¶¶ 15-16 (Ex. 1).**

Response: Disputed. Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence"); *O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006). Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation. *See* Fed.R.Evid. 602.

Plaintiffs further dispute and object to the Statement to the extent it implies that GSK has produced discovery on all GSK products at issue in this matter. The mere fact that GSK has produced some discovery does not mean that discovery is complete. There is no discovery deadline in this case and discovery is on-going. Moreover, the stipulation referred to between the parties in no way stated that GSK satisfied all its discovery obligations to plaintiffs.

Plaintiffs further object to the Statement to the extent it concerns matters that have no relevance to the subject of GSK's motion which is the extent to which GSK's net sales price for 208 NDCs were "at or about [its published] WAC." *See* GSK Mem. at 1, 10, *et seq*.

**18.    Between the voluminous discovery that GSK has produced to date and the data and documents otherwise available to the New York Counties (*e.g.*, prices published by the commercial price reporting services, wholesaler data and Medicaid claims data), the New York Counties have long had the data and documents necessary to evaluate their claims under applicable legal standards for all of the GSK drugs they are seeking to place at issue in this case.**

Response: Disputed. Plaintiffs object to the Statement on the grounds that GSK fails to proffer admissible evidence in support of this Statement. *See* Fed.R.Civ.P. 56(e)(1) (requiring moving party to proffer "facts that would be admissible in evidence");

*O'Brien v. Town of Agwam*, 440 F. Supp.2d 3, 5, n.1 (D. Mass. 2006).   Moreover, plaintiffs object to GSK's Statement insofar it lacks adequate foundation.   *See* Fed.R.Evid. 602.

Plaintiffs further dispute and object to the Statement's characterization of the discovery in plaintiffs possession and to the extent it implies that GSK has produced discovery on all GSK products at issue in this matter.   The fact that GSK has produced some discovery does not mean that discovery has been completed by plaintiffs.   There is no discovery deadline in this case and discovery is on-going.

Moreover, plaintiffs object to the Statement to the extent it concerns matters that have no relevance to the subject of GSK's motion which is whether GSK has presented a record sufficient to warrant summary judgment on 208 NDCs.   *See* GSK Mem. at 1, 10, *et seq*.

### E.     The Vast Majority of GSK's Sales to Its Customers Were Within 5% of GSK's Reported WAC List Price.

**19.     Dr. Eric M. Gaier, a Ph.D. economist who has previously testified before this Court as an expert in the AWP cases, has analyzed GSK's sales transaction data for 262 GSK NDCs at issue in this case (*see* note 3, *supra*) to determine what percentage of sales for each NDC were made by GSK at or about GSK's reported WAC list prices.  The results of Dr. Gaier's analysis are presented, in detail, in the Affidavit of Dr. Eric M. Gaier ("hereinafter Gaier Aff.") and in exhibits accompanying his affidavit, collectively appended hereto as Ex. 2.**

<u>Response</u>:     Disputed as written.   Plaintiffs dispute any implication that Dr. Gaier has conducted the analysis described accurately.   As set forth in detail in the Affidavit of Harris L. Devor, sworn to February 11, 2009 and submitted in opposition to GSK's motion and in Plaintiffs' Memorandum of Law in Opposition to GSK's Motion, Dr. Gaier's analysis is flawed and his conclusions are therefore unreliable.

Plaintiffs dispute any implication that there are only 262 GSK NDCs at issue in this matter.

**20.     To determine what percentage of GSK's sales were "at or about" GSK's WAC list prices, Dr. Gaier conservatively applied the guidelines set forth in this Court's decision concerning whether WAC list prices were deceptive.** *See In Re Pharmaceutical Industry Average Wholesale Price Litigation***, 491 F. Supp. 2d 20, 104-106 (D. Mass. 2007).**

<u>Response</u>:      Disputed.  For all the reasons set forth in plaintiffs' opposition to GSK's motion and the Devor Affidavit, Dr. Gaier did not "conservatively apply" the Court's guidelines to determine what percentage of GSK sales were "at or about WAC. Dr. Gaier made unnecessary and improper choices, inconsistent with his own stated objectives, in his treatment of the GSK data that permitted him to inflate the number of GSK NDCs that he said "passed" the WAC List Price Test. Devor Aff. at ¶¶11, 13.  Dr. Gaier did not properly account for rebates paid to GSK customers in the "sales channel" (Devor Aff. at ¶17) even though Dr. Gaier testified that such rebates should be included in a calculation of a net sales price.  Gaier Dep. at 49:1-10.  Dr. Gaier unnecessarily excluded GSK sales to wholesalers that were later subject to a chargeback from his calculation of GSK's net price to wholesalers.  Devor Aff. at ¶11.   Dr. Gaier did not "reduce each sale transaction price by 2%" to account for the prompt pay discount, even though he says he did. *Id.* at ¶14.

Plaintiffs further dispute the Statement to the extent it contains argument that is improper in a Statement of "Undisputed Fact."  .

**21.     Dr. Gaier analyzed GSK's transaction-by-transaction sales, rebate and chargeback data for all of the NDCs at issue for the period 1997-2005, on an NDC-by-NDC, year-by-year basis.  His universe included every GSK commercial U.S. sale to** *every class of trade* **(***i.e.***, every transaction other than those involving charities, samples or returns).  Gaier Aff. at ¶¶ 6-7 (Ex. 2).**

Response:       Disputed as written.  Dr. Gaier gerrymandered GSK's data in such a fashion as to present an inflated price for GSK sales to the wholesaler class of trade and he failed to account for massive rebates that he himself admits are relevant.  *See* Devor Aff. at ¶¶ 11, 13, 17, *e.g.*.  Dr. Gaier also did not "reduce each sale transaction price by 2%" to account for the prompt pay discount, even though he says he did. *Id.* at ¶14.

**22.     In addition, in order to be conservative in determining the GSK customers' transaction prices net of all discounts, rebates and chargebacks, Dr. Gaier (a) reduced each sale transaction price by 2% based on an assumption that a 2% prompt-pay discount was paid for *all* of GSK's direct sales to wholesalers or providers, and (b) calculated transaction prices by taking into account *all* discounts and rebates given to customers and *all* chargebacks credited as the result of contracts with customers.  Gaier Aff. at ¶¶ 6-7 (Ex. 2).**

Response:       Disputed.  Plaintiffs dispute the Statement that Dr. Gaier reduced each sale transaction price by 2%.  Rather, Dr. Gaier only applied the 2% prompt pay discount to direct sales to wholesalers not subject to chargeback.  Devor Aff. at ¶14;

Plaintiffs further dispute that Dr. Gaier calculated transaction prices by taking into account "all discounts and rebates given to customers."  He did not.  Devor Aff. at ¶17; Rather, Dr. Gaier improperly excluded some or all of $4 billion in rebates paid to the customers from the following classes of trade: PBM Mail Order, Institutional Pharmacies (IPA), Hospitals, Nursing Homes, Nursing Home Providers, GPOs, and Long Term Care Facilities.  *Id.*  It is indisputable that Dr. Gaier's net sales prices would be lower if these massive rebates were properly included in the analysis. *Id.* at ¶23.   Dr. Gaier testified that he intended to include such rebates in his analysis.  *Id.* at ¶17.

Plaintiffs further dispute any implication that Dr. Gaier properly calculated GSK's net prices to its wholesaler customers.  By improperly and unnecessarily removing sales subject to a chargeback from his analysis of GSK's prices to wholesaler, Dr. Gaier

artificially inflated GSK's net price to its single largest direct customer segment.   *Id*. at ¶¶11-13.

**23.     Dr. Gaier followed this Court's decision and concluded that a transaction price was "at or about" WAC only if it was within 5% of the applicable WAC list price.  *Id.*; *see* 491 F. Supp. At 106-08.  For each NDC, he determined the percentage of the total number of units sold each year that had a transaction price within 5% of the WAC list price.  For purposes of this motion, the NCS was deemed to have "passed" the WAC List Price test if (after appropriate weighting) more than 50% of the total number of units sold had a transaction price within 5% of the reported WAC.  Gaier Aff. at ¶¶ 6-7 (Ex. 2).**

<u>Response</u>:     Disputed in part.  Plaintiffs dispute that Dr. Gaier "followed this Court's decision."  Dr. Gaier did not determine the percentage of total units that had a transaction price within 5% fo the WAC list price "after appropriate weighting".  Rather, Dr. Gaier unnecessarily separated GSK's sales to wholesalers into chargeback and non-chargeback categories (thereby permitting him to overstate GSK's net sales price to wholesalers) and also failed to account for potentially billions of dollars in GSK rebates that Dr. Gaier admits should have been included in an accurate calculation of net sales price.  Devor Aff. at ¶¶11-13, 17-23, 33.

**24.     The overall results of Dr. Gaier's "WAC List Price" analysis for the GSK drugs at issue in this case are summarized in Attachment B to his Affidavit (Ex. 2).  The detailed year-by-year, NDC-by-NDC breakdown that went into the "WAC List Price" analysis summarized in Attachment B of the Gaier Affidavit is set forth in Attachment D to his Affidavit (Ex. 2).  Table D.1 provides the detailed back-up that went into the summary in Table B.1 for the 208 NDCs for which GSK now moves for summary judgment.**

<u>Response</u>:     Disputed.  To extent Statement implies that Dr. Gaier conducted the WAC List Price test accurately or that Dr. Gaier's results can serve as the basis for the relief GSK seeks by this motion.  For the reasons set forth in Response to Statements 22 and 23 above, which are incorporated herein, Dr. Gaier's methodology did not

produce accurate results.  *Id.* at ¶¶11-13, 17-23, 33.  Dr. Gaier has materially overstated

the number of GSK NDCs passing the WAC List Price Test.  *Id.* at ¶¶33-34.

**25.    For 208 of the GSK NDCs at issue here – listed in Table B.1 – the percentage of sales with transaction prices within 5% of WAC is over the 50% threshold for the relevant period, and for the vast majority of these NDCs the percentage is higher than 80% or even 90%.  Gaier Aff. at Table B.1 (Ex. 2).[5]**

> Response:        Disputed.  Dr. Gaier's methodology and treatment of the GSK data

is so severely flawed as to render his conclusions inaccurate and unreliable.  *See*

Responses to Statements 22 and 23 above, which are incorporated herein.  Devor Aff. at

¶¶11-13, 17-23.  Plaintiffs dispute Dr. Gaier's conclusions regarding which GSK NDCs

pass or fail the WAC test.  Even before accounting for rebates, proper treatment of the

wholesaler data results in 149 NDCs failing the WAC List Price Test (as opposed to 54).

*Id.* at ¶33.  This number will increase once, on a full record, the effect of the rebates can

be quantified.  *Id.* at ¶34.

**26.    To further demonstrate the impact that the WAC List Price test has on plaintiffs' claims in this case, Dr. Gaier also compared the alleged New York Medicaid reimbursement amounts associated with the GSK drugs that pass the WAC List Price test to the total alleged reimbursements for all of the GSK drugs at issue here.  Gaier Aff. at ¶ 7 (Ex. 2).  Of the approximately $2.143 billion that the New York Counties allege was reimbursed in total for the 262 GSK NDCs analyzed by Dr. Gaier here (a total which includes the New York county, state and federal shares), Dr. Gaier determined that 98.3% ($2.107 billion) of these alleged expenditures relate to the 208 GSK NDCs where more than 50% of the sales for the relevant period were made at transaction prices within 5% of the reported WAC list price.  *Id.***

---

[5] **Table B.2 of Dr. Gaier's Affidavit (Ex. 2) presents the remaining GSK drugs for which *less than* 50% of the sales – when assessed *either* by units sold or dollars sold – were at transaction prices within 5% of WAC.  GSK is not moving for summary judgment on these NDCs at this time.  All of them are relatively small-volume products – most had alleged total New York Medicaid reimbursements over the nine-year period at issue of less than $100,000.**

Response: Disputed as written.  For the reasons set forth in paragraphs 22 and 23 which are incorporated herein, plaintiffs dispute the accuracy of Dr. Gaier's conclusions.  Plaintiffs also object to GSK's unsupported Statement regarding total Medicaid expenditures for these drugs and GSK's characterizations thereof.  Plaintiffs further object to this Statement because it lacks adequate foundation. Fed.R.Evid. 602.

<u>Response</u>:      Disputed.  Dr. Gaier's methodology and treatment of the GSK data is so severely flawed as to render his conclusions inaccurate and unreliable.  *See* Response to Statements 22 and 23 above, which are incorporated herein.  Devor Aff. at ¶¶11-13, 17-23, 33-34.  Plaintiffs dispute Dr. Gaier's conclusions regarding which NDCs pass or fail the WAC test and therefore plaintiffs dispute the percentages and expenditure figures set forth herein.

Plaintiffs further object to this Statement on the ground that it presents argument that is not proper in a Statement of "Undisputed Facts".  Moreover plaintiffs object to this Statement to the extent it concerns matters entirely irrelevant to GSK's motion.

**27.    In addition, although GSK is not presently moving for summary judgment on the basis of the AWP "spreads" of its drugs, Dr. Gaier has examined those spreads and has conservatively determined that for the vast majority of the GSK NDCs in this case the spreads are less than 30%.[6]  Just as was done for other manufacturers in the Track One MDL trial, Dr. Gaier examined GSK's spreads on an NDC-by-NDC, year-by-year basis and calculated the "spread" percentages as a mark-up from the acquisition cost (instead of as a discount from the AWP).  Gaier Aff. at ¶ 8 (Ex. 2).  As set forth in Dr. Gaier's affidavit, he was instructed to apply a number of conservative assumptions for purposes of this exercise, so as to avoid potential factual disputes.  The overall results of Dr. Gaier's AWP "spread" analysis for the GSK NDCs at issue in this case are summarized in Attachment C to his affidavit (Ex. 2).  For all of the NDCs in Table C.1 – which account for more than 99% of the New York Counties' alleged expenditures for the GSK drugs in this case – the "spread" is less than or equal to 30% for the relevant period.  See Gaier Aff. at ¶¶ 8-9 and Table C.1 (Ex. 2).  In Attachment E to Dr. Gaier's affidavit, he sets for the NDC-by-NDC, year-by-year AWP "spread" analysis which formed the basis for the overall results set forth in the summary contained in Attachment C.  *Id.* at Attachment E (Ex. 2).**

<u>Response</u>:      Disputed and irrelevant.  For all the reasons set forth in the Devor Affidavit, plaintiffs' opposition to GSK's motion, and Responses to Statements 22-26 above, which are incorporated herein, Dr. Gaier did not "conservatively apply" the

---

[6] Because GSK is not moving for summary judgment on the basis of the AWP "spreads" of its drugs, the facts relating to those "spreads" are not "material" for purposes of the instant motion.

<u>Response</u>:  Plaintiffs object to this Statement because GSK admits it is irrelevant to this motion.

Court's guidelines to determine what percentage of GSK sales were "at or about WAC. Plaintiffs further dispute the Statement to the extent it contains argument that is improper in a Statement of "Undisputed Fact."  Plaintiffs further object on the grounds that Dr. Gaier's spread calculations were not conducted in accordance with the requirements of this Court at a liability stage.  Dr. Gaier did not calculate spreads based on GSK ASPs or GSK sales data, but rather calculated spreads based on wholesaler data.  Gaier Aff. at ¶7. Dr. Gaier did this notwithstanding that, at his deposition, Dr. Gaier claimed to have used GSK ASPs based on GSK data to calculate spreads because that is what the Court requires.  Gaier Dep. 26:107.

Plaintiffs further object on the grounds that GSK is not moving on the basis of the improper Gaier spreads and therefore this Statement is irrelevant.

**28.  With respect to the GSK NDCs for which GSK *is* moving for summary judgment now (*i.e.*, those which pass the WAC List Price test for the relevant period) all but four (out of 208) of them *also* have AWP "spreads" for plaintiffs' alleged Medicaid classes of trade that are less than or equal to 30%.  Dr. Gaier has placed an asterisk in the column on Table B.1 entitled "Percentage of sales units 'at or about' WAC" to indicate that that particular NDC *also* has an AWP "spread" for the relevant period of 30% or less.  Gaier Aff. at ¶ 10 and Table B.1 (Ex. 2); *see also* asterisks on year-by-year analysis presented in Gaier Aff. Table D.1 (Ex. 2).**

Response:      Disputed and irrelevant. Plaintiffs incorporate their Response to Statement 27 herein.

Dated:  February 11, 2009

Respectfully submitted,

**City of New York and all captioned Counties except Nassau and Orange, by**

**KIRBY McINERNEY, LLP**
825 Third Avenue
New York, New York 10022
(212) 371-6600

/s/ Joanne M. Cicala

By:  Joanne M. Cicala
       James P. Carroll Jr.
       Aaron D. Hovan

       Ross B. Brooks, Esq.
       MILBERG LLP
       One Pennsylvania Plaza
       New York, NY  10119
       (212) 594-5300
       *Special Counsel for the County of Nassau*

       Theresa A. Vitello, Esq.
       LEVY PHILLIPS &
       KONIGSBERG, LLP
       800 Third Avenue
       New York, NY  10022
       (212) 605-6205
       *Counsel for the County of Orange*