# Plaintiffs' Response to GSK Statement of Undisputed Facts

# EXHIBIT B

## DAVID A. MOULES

### Page 1

CONFIDENTIAL
STATE OF WISCONSIN CIRCUIT COURT
Branch 7
DANE COUNTY
Case No. 04 CV 1709

-------------------------

STATE OF WISCONSIN,
    Plaintiff,
v.
AMGEN, INC., A Delaware
Corporation, et al.,
    Defendants.

-------------------------

Philadelphia, Pennsylvania
Thursday, July 13, 2006

TRANSCRIPT of testimony of DAVID A. MOULES, as taken by and before Sean M. Fallon, a Federally-Approved Registered Professional Reporter and Notary Public, at the offices of DECHERT, LLP, Cira Centre, 2929 Arch Street, commencing at 10:09 o'clock in the forenoon.

### Page 2

APPEARANCES:
ARCHIBALD CONSUMER LAW CENTER
BY: P. JEFFREY ARCHIBALD, ESQ.
1914 Monroe Street
Madison, WI 53711
(608) 661-8855
archibaldlaw@tds.net
Attorneys for Plaintiff

DECHERT, LLP
BY: FREDERICK G. HEROLD, ESQ.
1117 California Avenue
Palo Alto, CA 94304-1106
(650) 813-4800
frederick.herold@dechert.com
Attorneys for GSK

HOLLAND & KNIGHT LLP
BY: MARK D. SELTZER, ESQ.
    BRIAN K. FRENCH, ESQ.
10 St. James Avenue
Boston, MA 02116
(617) 305-2018
mseltzer@hklaw.com
brian.french@hklaw.com
Attorneys for GSK

ELIZABETH J. HALLYBURTON
Assistant General Counsel
GlaxoSmithKline
Five Moore Drive
C.4160.4B
Research Triangle Park, NC 27709-3398
(919) 483-2212
beth.j.hallyburton@gsk.com
Attorney for GSK

SHOOK, HARDY & BACON LLP
BY: ELIZABETH S. ROWE, ESQ.
2555 Grand Boulevard
Kansas City, MO 64108
(816) 559-2324
erowe@shb.com
Attorneys for Aventis Pharmaceuticals, Inc.
(Via Telephone)

### Page 3

KIRKLAND & ELLIS LLP
BY: CEYLAN AYASLI EATHERTON, ESQ.
200 E. Randolph Drive
Chicago, IL 60601
(312) 469-7002
ceatherton@kirkland.com
Attorneys for Ben Venue Laboratories, Inc.,
Boehringer Ingelheim Pharmaceuticals, Inc.
and Roxane Laboratories, Inc.
(Via Telephone)

KAYE SCHOLER LLP
BY: NATHAN COHEN, ESQ.
425 Park Avenue
New York, NY 10022
(212) 836-7418
ncohen@kayescholer.com
Attorneys for Novartis Pharmaceuticals
Corporation
(Via Telephone)

PATTERSON BELKNAP WEBB & TYLER LLP
BY: MARK G. YOUNG, ESQ.
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2915
mgyoung@pbwt.com
Attorneys for Johnson & Johnson, Inc.
(Via Telephone)

DICKSTEIN SHAPIRO LLP
BY: JASON M. BRUNO, ESQ.
1825 Eye Street NW
Washington, DC 20006
(202) 420-2591
brunoj@dicksteinshapiro.com
Attorneys for Baxter International, Inc.
(Via Telephone)

### Page 4

```
                INDEX
WITNESS                              PAGE
DAVID A. MOULES
    By Mr. Archibald                   8

               EXHIBITS
NUMBER         DESCRIPTION           PAGE
Moules-55   Letter, April 25, 1995, Carter   211
            to Bartels

Moules-56   Letter, Feb. 6, 1995, Proctor    212
            to Wakerly

Moules-57   Memo, 6 August 1996, Deppe to    214
            Bartels and Chainani

Moules-58   Document entitled, "Financial    215
            Impact of Anzemet (Dolasetron)"

Moules-59   Documents entitled, "Pricing     217
            Document, Kaiser Contracting
            Strategy"

Moules-60   Document entitled, "1997         219
            Oncology Clinic Contracting
            Strategy"

Moules-61   Document entitled, "Kytril       220
            Reimbursement Workshop"

Moules-62   Document entitled, "AWP and      223
            WAC Prices"

Moules-63   Memo, 6 April 1994, Dorey to     224
            Nishi

Moules-64   Memo, 10-17-94, from Tom         225
            McLean; Subject, Kytril Profit
            Model
```

## DAVID A. MOULES

Page 61

1  joined SmithKline Beecham in the pharmaceutical
2  group in '97, so that was around April of '97, and
3  then, since I am the representative for the
4  company, and there are these two -- again we'll
5  use heritage companies, I've -- I've tried to
6  understand the facts pertinent to -- to this case
7  for the period of 1997 through 2002, and -- and I
8  could speak to up to current, and, so, my
9  understanding is, in that period of time, Glaxo
10 Wellcome did not follow the same practice that
11 SmithKline Beecham did with -- with publishing a
12 suggested list price.
13     Q.    Now, you keep using the term
14 "publish," and I'm not going there, because I just
15 want to know whether you suggest. So my question
16 only goes to suggesting a list price to the pricing
17 compendiums.
18         Are we -- are you following me?
19     A.    All right.
20         Well, let's -- and I guess what we
21 have to do, just to kind of re-ground ourselves,
22 is, now when you are talking about -- because we've
23 mixed a lot of different things -- when you are
24 saying "suggested list price," when we -- we

Page 62

1  establish a list price, it's -- it's the -- what is
2  today referred to as -- as WAC or wholesale
3  acquisition, that is the price -- that is -- that
4  is GSK's list price. That's the price that we
5  communicate to the wholesalers, communicate to --
6  to chains that take -- where we sell direct, so, if
7  there is a warehousing chain, and it's also the
8  same information that we communicate to the pricing
9  services. It's the -- that WAC price.
10        So, when you say "a suggested
11 price," and that -- just so -- I'm just trying to
12 make sure, when you use "price," that we are
13 talking about the same thing.
14    Q.    I've got some examples that I'll
15 show the jury with you in a moment, but let's move
16 where you went -- where you've gone right now.
17         You say that the only price that you
18 give to the pricing compendiums in the last five
19 years or so is the wholesale acquisition cost,
20 correct? Or it's equivalent?
21    A.    That's correct. To the best of my
22 understanding, that's all we've communicated, is
23 that price.
24    Q.    Let's see if we can agree on

Page 63

1  something.
2         We can agree that, once you give
3  that price, that WAC, to the pricing compendiums,
4  whether it be First DataBank or Red Book, those
5  companies have always, without exception, marked up
6  those WACs by either 20 or 25 percent, true?
7     A.    For the GSK products?
8     Q.    Of course, yes.
9     A.    It's my understanding, yes. I've
10 never seen it different.
11    Q.    And from the period 1997, when you
12 have knowledge, to 2001, covering the other
13 four-year period where you have knowledge, isn't it
14 also true that, regardless of what price -- what
15 WAC price or what price in addition to WAC you gave
16 to a pricing compendium such as First Databank or
17 Red Book, that those two pricing compendiums always
18 marked up the WAC price given to them by GSK at 20
19 or 25 percent, true?
20    A.    That's correct.
21    Q.    We have no disagreement in that
22 regard?
23    A.    That -- that the multiplier to get
24 to what is now referred to as AWP was either 20 or

Page 64

1  25 percent from that period of '97 to date?
2     Q.    Yes.
3     A.    That's correct.
4     Q.    I want to go back to Exhibit 26.
5         MR. HEROLD: Mr. Archibald, is this
6  a good time to take a quick bathroom break?
7         MR. ARCHIBALD: Any time you wish.
8         THE VIDEOGRAPHER: We are going off
9  the record. The time now is five minutes after
10 11:00 o'clock.
11        (Discussion is held off the record.)
12        (Pertinent portion of the record is
13 read.)
14        THE VIDEOGRAPHER: We are back on
15 the video record at 14 minutes past 11:00 o'clock.
16 BY MR. ARCHIBALD:
17    Q.    Referring again to Exhibit 26, Mr.
18 Moules, I just read the section "Marketers of
19 brand-name drugs tend to calculate their AWPs by
20 adding 20 or 25 percent to their published WACs."
21        Are you with me?
22    A.    I'm following along, yes.
23    Q.    "This practice prevails despite the
24 fact that, by the early 1990s, competition among

Pages 61 to 64

Reporting Associates, LLC   1-888-795-2323