# Exhibit E

 **U.S. Department of Justice**

**Michael J. Sullivan**
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*
23 December 2008

Via Electronic Mail

Eric Gortner, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, Illinois 60601-6636

       Re:    *U.S. ex rel Ven-a-Care of the Florida Keys Inc. v. Roxane Laboratories, Inc. et al,*
              MDL No. 1456/Civil Action No. 01-12257-PBS

Dear Eric:

       This letter is to follow up on our telephone conversations (yours with me on December 10, and separately with Jim Breen on the same date), surrounding the deposition of ▇▇▇▇ ▇▇▇▇▇▇▇. As I explained at the time, in e-mails and in our phone call, we are very sympathetic towards ▇▇▇▇▇▇▇▇▇▇ and ▇ serious medical condition. We cancelled the deposition so that it would not be a source of discomfort and suffering for ▇▇.

       At the same time, we would like to have another Roxane sales/marketing witness as a substitute, and we believe we are entitled to a deposition in place of the cancelled ▇▇▇▇▇▇ deposition. The relevant background facts are these: with limited exceptions, we did not seek to depose a string of company witnesses who had already been deposed, and specifically avoided this when selecting the few National Account Managers we sought to depose. We also limited the "company" depositions to a handful, in an effort to conserve resources all around.

       We asked on October 8 for dates to depose ▇▇▇▇▇▇▇▇▇ (and a few others). Three weeks later, on October 28, we still had heard nothing as to dates for any of them, and Laurie Oberembt sent a follow-up e-mail asking you where things stood. You forwarded the e-mail to Seth Gastwirth. It was *not until November 12 -- five weeks* after our initial request -- that we were offered a date for ▇▇▇▇▇▇▇▇▇▇ deposition, "in ▇▇▇▇ or ▇▇▇▇▇▇▇." Moreover, we were offered but one single date, December 12, the second to last day of the discovery period, and a date more than *nine weeks out* from our initial request.

       On December 9, three days before the deposition, we were informed for the first time that ▇▇▇▇▇▇▇▇▇▇ was terminally ill, on medication, and in constant pain. We were asked to cancel the deposition. After we obtained some additional information from Sara Rankin, we

Eric Gortner, Esq.
23 December 2008
Page 2

were asked to decide quickly whether we were willing to cancel because Sara was leaving
Chicago for ████ on Wednesday, December 9.  As you know, virtually all of our team was
traveling for depositions and it was difficult to confer.  I therefore told you that we would agree
to cancel the deposition on your representation that you would consider our proposal for an
alternate witness.

    The basis for our request for a deposition in place of ████ is simple:  had we been
given a date for ██ deposition more promptly, and an earlier date, the facts about ████
████ illness would have come to light on the eve of that earlier date, as they did three
days before the scheduled December 12 deposition.  On December 10, with virtually all of our
team on travel and booked with depositions, and the discovery period ending in three business
days, we had no chance to go to an alternate plan.  Had we learned the facts earlier, however, as
a result of prompt attention to scheduling on Roxane's part, we would have had the opportunity
to schedule an alternate sales/marketing witness, and would have done so.

    Accordingly, please provide possible dates for the deposition of Alex Dusek in January.
We feel strongly enough about this that we would be willing to ask the Court for a ruling, should
you be take the position that you will not make him available.

    Thank you for your consideration.  I look forward to hearing from you soon.

                                        Sincerely,

                                        /s/ *Barbara Healy Smith*

                                        Barbara Healy Smith

cc:    Laurie Oberembt
       Jeff Fauci
       Jim Breen
       Roslyn G. Pollack

# Exhibit F

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Eric T. Gortner
To Call Writer Directly:
312 861-2285
egortner@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 665-9665

February 2, 2009

**<u>Via Electronic Transmission</u>**

Barbara Healy Smith, Esq.
Department of Justice
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

Re:  *United States ex rel. Ven-A-Care of the Florida Keys v. Roxane
Laboratories, Inc., et al.*, Civil Action No. 07-10248-MEL

Dear Barbara:

I am writing in response to your December 23, 2008 letter and my subsequent meet-and-confer conversation with Jeff Fauci on January 16, 2009 regarding the deposition of ███████ ████████ As you know, shortly before ████████████ deposition date, we learned that certain medical issues would likely make a full-day videotaped deposition unnecessarily challenging for ██ in light of the Government's pending depositions of two other National Account Managers (███████████████████████. As we discussed during our conversations with you and Jim Breen, we believed that the sensible course was to allow the Government to complete the pending depositions of ███████████ and ████████ to determine whether testimony from ████████████ was truly necessary in this case.

The reason for this was obvious: ████████████ and ████████ held similar positions to ████████ and it was expected that the testimony from these deponents would be largely cumulative and duplicative of ████████████ testimony. In addition, numerous Roxane sales personnel have been deposed in many other AWP cases, and the Government has the benefit of all these deposition transcripts. We nonetheless invited the Government to identify any outstanding topics that ████████████ or ████████ were unable to address, and to which the Government reasonably believed ████████████ could testify. Under those circumstances, we agreed to re-visit the issue of deposing ████████████ We certainly never agreed with the Government's position that ████████████ condition entitled the Government to select a brand new deponent of its choosing. After all, the Government did not issue a Rule 30(b)(6) deposition notice for particular topics. Instead, it specifically requested ████████████, presumably for a particular reason.

Hong Kong      London      Los Angeles      Munich      New York      San Francisco      Washington, D.C.

## KIRKLAND & ELLIS LLP

Barbara Healy Smith, Esq.
February 2, 2009
Page 2

To-date, the Government has not identified any specific topics that it was precluded from exploring with ████████ or ████████. Nor has the Government given any indication that the cancellation of ████████'s deposition has materially impacted the Government's discovery efforts. Indeed, the Government has yet to provide a reason for why it must depose three (as opposed to two) National Account Managers – aside from the Government's apparently arbitrary preference for three deponents. Of course, nothing in the governing CMO entitles the Government to a pre-determined number of National Account Manager depositions.

Seeking to avoid burdening the Court with yet more discovery motion practice, Roxane has offered to once again reach out to ████████ and attempt to schedule a telephonic deposition. The Government, however, refuses this offer and insists on deposing a different National Account Manager, Mr. Dusek. Roxane cannot agree to the Government's proposal, which allows the Government to re-start discovery under its own selective parameters. Roxane respectfully requests that the Government reconsider its position here, and candidly assess whether additional deposition testimony is truly needed in this case.

Sincerely,

Eric T. Gortner

# Exhibit G

**From:**          Gerrity,Dan  MK BIP-US-R
**Sent:**          Thursday, May 03, 2001 12:48 PM
**Subject:**       Pricing Policy and Procedure - Draft

**Importance:**    High

**Follow Up Flag:** Reply
**Due By:**        Thursday, May 10, 2001 8:00 AM
**Flag Status:**   Flagged

All,
Please review the attached "Draft" Pricing Policy and Procedure and provide me any changes you deem appropriate.
The Final version will be published on the PAC Website on May 10th and your immediate response is appreciated.



Pricing Policy &
Procedure.DOC...

**Thanks,**

**Dan Gerrity**

Director, Contract System Support

Boehringer Ingelheim Pharmaceuticals, Inc.
Telephone (203) 798-4626
Fax (203) 791-6373
Email dgerrity@rdg.boehringer-ingelheim.com

1

EXHIBIT
3 1
10/31/08 Buckle

PENGAD 800-631-6989

D0120628

RLI-AWP-00337203
ROX058-1303    FL

# PRICING POLICY AND PROCEDURE

### Scope

This policy is applicable to Wholesale Acquisition Cost (WAC), Average Wholesaler Price (AWP), Minimum Bid Price (MBP) and Direct Price (DP) for Brand Products of Boehringer Ingelheim Pharmaceuticals, Inc and Roxane Laboratories, Inc.

### Pricing Approvals

Recommended prices must be approved in the following sequence:

| | |
|---|---|
| First | PTC Committee |
| Second | Executive Vice President, Ethical Pharmaceuticals |
| Third | President and CEO, Boehringer Ingelheim Corporation |

### Pricing, Terms and Conditions (PTC) Committee

The PTC Committee consists of:

Vice President, Marketing
Vice President, Sales
Head, Contract and Sales Administration
Executive Director, Managed Care Marketing & Disease Management
Executive Director, Marketing Controlling
Director, Forecasting and Sales Support
Senior Council

### Pricing Proposals

Product Management is responsible for developing Pricing Proposals that support New Product Prices and Established Product Price Adjustments. These Pricing Proposals are submitted to the PTC Committee for review and approval. The Pricing Proposals include, but are not limited to the following:

New Product Pricing Proposals:
Forecasted Net Sales generated based on the proposed price, Growth Rates, Market Conditions, current and anticipated Market Share of BI and Competitive Products, Daily Wholesale Prices of Direct Competitors, impact on Competitive Position, expected Discounts that will be given, probable reaction of Managed Care Organizations, impact on potential Medicaid Rebates, and any Market Research that was conducted.

Product Price Adjustment Proposals:
Overall expected impact on Net Sales of all price adjustments, Consumer Price Index (CPI), Daily Wholesale Prices of Direct Competitors, and Timing (should also take place at least four months prior to year end in order to allow trade purchases to rebound prior to the end of the year)

Planned changes to prices are extremely Confidential and should be kept to PTC – Pricing Committee Members only.

### Review and Approval Process – PTC Committee and Senior Management

D0120629
RLI-AWP-00337204
ROX058-1304      F

Product Managements' Pricing Proposals are submitted to PTC Committee Members at least 2 weeks prior to the monthly PTC meeting. Product Management presents their proposals to the PTC Committee at the monthly meeting and answer any questions posed by the Members.

> If the Committee cannot agree with the proposal, and determines that additional work is required, Product Management must address the issues and re-submit the proposal.
> If the Committee votes to approve the proposal, it is forwarded to Senior Management for review and approval.
> A cover memo and an information package is circulated First to Shelly Berkle, and Second to Werner Gerstenberg for approval. Included in the information package is price adjustment % by sku; expected annual price adjustment; and price adjustments recently taken by other pharmaceutical firms.   Signatures on the front cover memo of this information package indicate approval.  The approved document is delivered to the Director, Forecasting and Sales Support.

### Notification Process

After approval has been received, the Wholesale Acquisition Cost (WAC) and Average Wholesale Price (AWP) is forwarded to the Executive Director, Trade Relations for dissemination to internal (see list attached) and external parties.  Each department head is responsible for dissemination to the affected parties in his/her department.

In addition, the Director, Forecasting and Sales Support forwards a spreadsheet with the approved WAC and AWP prices to the Associate Director, Contracts to make any adjustments to the percentages used to calculate the following:
1.  Minimum Bid Pricing (MBP)
2.  Direct Price (DP)

Upon completion, the Associate Director, Contracts forwards this information to the Data Management Team (DMT) at the BISC for input into SAP.

### Abbott Products:

The Product Price (selling price to Abbott) is determined by the Marketing Controlling department and is communicated to the Data Management Team at the BISC for loading into SAP's Customer/Material Specific pricing table.

The WAC and AWP is determined by Abbott and communicated to the Marketing Controlling Department who then communicates this immediately to the Data Management Team upon receipt for input into SAP for contract related transactions (i.e., processing Wholesaler chargeback claims on co-promoted products).

### PAC Website:

Parties responsible for price notifications forward approved prices to the Director, Contract System Support for posting to the PAC Website. These Product Prices are available at all times to all BI U.S. employees on the PAC Website, which is located as follows:

- WebBI
    - Functions/Departments
        - Rx Hospital
            - Pricing & Contracting (PAC)
                - Pricing / Returns

Prices posted to the PAC site are as follows:

- Abbott Co-Promoted Product Prices (WAC & AWP)
- BIPI Brand Product Prices  (WAC & AWP)

D0120630
RLI-AWP-00337205
ROX058-1305

- RLI Brand Product Prices  (WAC & AWP)
- RLI Multisource Product Price (AWP)
- BIPI FSS (Federal Supply Schedule) Product Price
- RLI FSS (Federal Supply Schedule) Product Price
- BIPI PHS (Public Health Services) Product Price
- RLI PHS (Public Health Services) Product Price

**Pricing Activities**

WAC, AWP, MBP, and DP are the only prices for products that must be updated when prices are established or when adjustments are made.

Federal Supply Schedule (FSS) Prices are updated on a periodic basis by the Manager, Government Contracts & Reimbursement designate and are entered into the FSS Contract maintained in CARS.

Federal Price Protection Prices (COC/PHS Ceiling) are updated on a periodic basis by the Manager, Federal and Reimbursements or designate and are entered into SAP's pricing control tables with support from the Information Specialist, Contracts.

Medicaid Best Price is updated quarterly by the Medicaid Manager or designate and are entered into SAP's pricing control tables with support from the Information Specialist, Contracts.

Cash Discounts Accrual, Managed Care (Utilization based) Rebate Accrual, Medicaid Rebate Accrual, Abbott Accrual, Purchase Based Rebate Accrual, Royalty Accrual, Variable Distribution Accrual and Chargeback Accrual percentages are adjusted periodically and communicated by the Marketing Controlling Department.  This data is entered into SAP's pricing accrual tables with support from the Information Specialist, Contracts.

**Responsibilities:**

Product Management is responsible for establishing the proposed Wholesale Price (Wholesale Acquisition Cost – WAC) for new products and annual price adjustments. Product Management is also responsible for developing Pricing Proposals that support their decisions.

The PTC Committee reviews and endorses proposed prices for new products/line extensions for brand products, as well as price adjustments for existing brand products.  The recommended prices are then sent to the Executive Vice President, Ethical Pharmaceuticals and the Chief Executive Officer for sign off.

The Director, Forecasting and Sales Support is responsible for coordinating quarterly reviews of pricing with Product Management and submitting their Pricing Proposals to the PTC Committee Facilitator. The Director, Forecasting and Sales Support is also responsible for obtaining Senior Managements' approval for all Brand Products WAC and AWP prices endorsed by the PTC Committee. The Director also notifies the Executive Director, Trade relations when the approvals are received.

The Executive Director, Trade Relations is responsible for internal and external notification of new product prices and price adjustments and for notifying the Data Management Team at the BISC of these new prices.

The Managed Care Sales Force and Federal Market Field Force are responsible for establishing contracts within set guidelines.

The Sales and Contract Administration Department is responsible for managing contracts and payout of rebates. Additionally, this department, in conjunction with the Marketing Controlling Department, evaluates the total impact of various discount scenarios on Corporate Profitability and the Marketing & Sales Revenue Stream.

D0120631
RLI-AWP-00337206
ROX058-1306

**Internal Distribution List:**

Vice President, Marketing
Vice President, Sales
Head, Sales and Contract Administration
Head, Health Care Partners & Gov't Relations
Executive Director, MC Sales and Federal Markets
Executive Director, Managed Care Marketing & Disease Management
Regional Sales Directors
Director, Contract System Support
Director, Forecasting and Sales Support
Marketing Directors
BISC
Data Management Team
Associate Director, Contracts
Manager, Contract Analysis
Manager, Contract Operations
Manager, Medicaid
Manager, Federal and Reimbursements

D0120632
RLI-AWP-00337207
ROX058-1307      L

# Exhibit H



*experience does matter*

**CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litigation**
**DATE:  October 31, 2008**

Enclosed is the Original of the transcript of the testimony of **Sheldon Berkle** along with the errata sheet in the above-titled case.  Please have the witness read the deposition and sign the signature page before a Notary Public.

After the signature page has been notarized, please return the original transcript and errata sheets to the custodial attorney within 30 days of receipt for proper filing.

Thank you for your attention to this matter and please feel free to contact us with any questions or concerns.


Sincerely,

Henderson Legal Services



Encl.




Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Berkle, Sheldon                           October 31, 2008
                    Naples, FL

1    Was there a single policy applicable to those

2    prices for brand products of Boehringer Ingelheim

3    Pharmaceuticals and Roxane Labs?

4              MR. GASTWIRTH:  Objection.  Form.

5              THE DEPONENT:  A single policy?

6    BY MR. FAUCI:

7        Q.   Let me rephrase that.  It says, This

8    policy is applicable to various prices for brand

9    products of Boehringer Ingelheim Pharmaceuticals,

10   Inc. and Roxane Labs.  Do you see that?

11       A.   Yes, I do.

12       Q.   Does it surprise you that there's a

13   document out there that says that there's one --

14   that there's a policy that's applicable to prices

15   for both companies?

16             MR. GASTWIRTH:  Objection.  Form.

17             THE DEPONENT:  My understanding of this

18   is that it's applicable to the branded products.

19   Okay.  So BIPI and branded generics of Roxane.

20   BY MR. FAUCI:

21       Q.   So you think this pertains to a pricing

22   policy for Roxane's branded generics and BIPI's

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                          October 31, 2008
                    Naples, FL

1   brand products; is that correct?

2        A.   I believe so.  And, you know, again my

3   memory isn't a hundred percent, but this was in

4   May of '01, according to the cover memo -- cover

5   e-mail --

6        Q.   Cover e-mail.  Sure.

7        A.   -- and I believe this was approaching

8   the time when we divested of the Roxane branded

9   generic line.

10        Q.   What do you mean you divested of the

11   Roxane branded generic line?

12        A.   The -- Again, if I recall correctly

13   Viramune, which was under the Roxane label, was

14   transferred to the BIPI label and then the

15   palliative care line was in fact divested sold.

16        Q.   To who?

17        A.   It was initially sold to Elan who then

18   I know in turn sold it somewhere else.  So this

19   was -- you know, this would have been for a very

20   short period of time.

21        Q.   What was the -- the drug that you said

22   was transferred to BIPI?

Berkle, Sheldon                     October 31, 2008
                  Naples, FL

Page 220

1        Q.    Recommended prices must be approved in

2   the following sequence.  First, PTC committee.

3   Second, executive vice president ethical

4   pharmaceuticals.  Is that you?

5        A.    Yes, it is.

6        Q.    And third, president and CEO of

7   Boehringer Ingelheim Corporation.  Who is that?

8        A.    That was Mr. Gerstenberg.

9        Q.    Mr. Gerstenberg.

10       A.    Right.

11       Q.    And so according to this document you

12  were supposed to approve prices for BIPI brand

13  products and Roxane branded generics?

14            MR. GASTWIRTH:  Objection.  Form.

15            THE DEPONENT:  It appears to be.

16  BY MR. FAUCI:

17       Q.    And so -- and this policy applies to

18  wholesale acquisition costs?

19            MR. GASTWIRTH:  Objection.  Form.

20            THE DEPONENT:  Yes.

21  BY MR. FAUCI:

22       Q.    And average wholesale prices?

1          MR. GASTWIRTH:  Objection.

2          THE DEPONENT:  Again, you know, my

3    primary concern was the wholesale acquisition

4    cost and then the details in terms of

5    establishing reference prices was left to others.

6    BY MR. FAUCI:

7       Q.   But you had to approve them?

8          MR. GASTWIRTH:  Objection.  Form.

9          THE DEPONENT:  I can't recall

10   specifically exactly what I would have approved,

11   but certainly my focus would be on the WAC.

12   BY MR. FAUCI:

13      Q.   When you approve price, what was sent

14   to you?

15          MR. GASTWIRTH:  Objection.  Form.

16   Approve prices for what?

17   BY MR. FAUCI:

18      Q.   Any -- This document is saying that Mr.

19   Berkle recommended prices must be approved in the

20   following sequence.  First, PTC committee.

21   Second, executive vice president ethical

22   pharmaceuticals.  Was that you, Mr. Berkle?

Berkle, Sheldon                           October 31, 2008
                    Naples, FL

1          And in this case, as far as I can see,

2    it -- it allowed -- it was a competitive pricing

3    versus, you know, multiple tablets of a five-

4    milligram Oxycodone on the market.  So...

5          Q.   The fact that the suggested AWP for the

6    Roxicodone five-milligram 100s was twice as high

7    as the WAC, that wouldn't have jumped out at you?

8               MR. GASTWIRTH:  Objection.  Asked and

9    answered.

10              THE DEPONENT:  Yeah.  I mean, I said,

11   you know, you have to take that in context of

12   what the competitive environment was.

13   BY MR. FAUCI:

14        Q.   Mr. Berkle, thank you very much for

15   coming here today.

16              Oh, I guess I have one more question

17   for you.  I'm sorry.

18        A.   Good thing I didn't say you're welcome.

19              (Exhibit Berkle 036 was marked.)

20              THE DEPONENT:  Okay.

21   BY MR. FAUCI:

22        Q.   Who's Christine Ferrara?

Henderson Legal Services, Inc.
202-220-4158           www.hendersonlegalservices.com

Page 255

1        A.    Chris was a BIPI employee and was
2   involved in the contract pricing department.
3        Q.    Do you recognize this e-mail?
4        A.    No, I don't specifically.
5        Q.    Do you see that it's an e-mail --
6   there's two e-mails.  One's from Christine
7   Ferrara dated August 23rd to Fred Duy.  Do you
8   see that?
9        A.    Yes, I do.
10        Q.    The subject is price?
11        A.    Yes.
12        Q.    Dear Fred, Shelly assigned the
13   approval, but Werner won't be in until tomorrow
14   at which time I expect that he will review and
15   hopefully approve as well, regards, Chris.  Do
16   you see that?
17        A.    Yes, I do.
18        Q.    And then above it.  The top e-mail
19   again is from Christine Ferrara to Fred Duy.
20   It's dated August 24th.  Do you see that?
21        A.    Yes, I do.
22        Q.    It says, Attach, Roxicodone WAC AWP

19683184-bff4-4227-a96a-409b79dd21fe

Berkle, Sheldon                                    October 31, 2008
                        Naples, FL

1              THE DEPONENT:  Yeah.  You know, there

2      was a procedure that was established for branded

3      -- for BIPI brands and for Roxane branded

4      generics that stated that I would approve and Mr.

5      Gerstenberg would approve.

6      BY MR. BREEN:

7              Q.    And who established that procedure?

8              A.    That was a recommendation by a

9      committee.

10             Q.    And the committee was made up of whom?

11             A.    People from BIPI and from Roxane.

12             Q.    And when was that?

13             A.    You know, again, if we looked back at

14     the memos you'd be more definitive in terms of

15     the timing.  When was that?  That was around,

16     what, '99, 2000, something like that.

17             Q.    And the committee's recommendations

18     were made to whom?

19             A.    I think you're being redundant here.

20     Did I not already state that the recommendations

21     were made based on the memos I've seen to myself

22     and to Mr. Gerstenberg for branded generics.

# Exhibit I



*experience does matter*

**CASE:  In Re: Pharmaceutical Industry Average Wholesale Price Litiagation**
**DATE:  January 8, 2009**

Enclosed is the REVISED transcript of the testimony of **Thomas Russillo**.  The date on the previous version was incorrect, and the new transcript reflects the proper date of the proceedings.  Please destroy all transcript copies sent previously.

Thank you for your understanding.  If you have any questions or concerns, please contact us.

Sincerely,

Henderson Legal Services

Encl.

Henderson Legal Services
Phone: 202-220-4158
Fax: 202-220-4162
Website: www.hendersonlegalservices.com

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

1     Q    Is it consistent with your recollection that

2   you and Mr. Waterer reviewed and recommended AWP

3   changes for the multisource line of products?

4     A    I don't recall doing that.  No.

5     Q    You don't recall doing what?

6     A    Recommending AWP changes.

7     Q    Do you recall approving AWP changes?

8     A    I do.

9     Q    Did you ever ask anyone at Boehringer

10  Ingelheim to sign off on an AWP change that you

11  were involved with?

12        MS. RIVERA:  Object to form.

13        THE WITNESS:  There would have been -- it

14  would have been at my discretion.  I would have

15  asked Werner Gerstenberg, if I thought there was a

16  sensitive AWP issue.

17    Q    BY MR. FAUCI:  Is there anyone else you

18  would have talked to about a sensitive AWP issue?

19    A    No.

20    Q    What would make an AWP issue sensitive?

21    A    Well, at this time --

22        MS. RIVERA:  Hold on.  Object to form.

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

Page 99

1        THE WITNESS:  At this point in time, I was

2   very sensitive to the AWP litigation that was

3   floating around.

4        Q    BY MR. FAUCI:  So as of the late 1990s, you

5   were aware that there was investigations into

6   inflated AWPs?

7        A    Yes, I was.

8        Q    Let's turn to the first page of the exhibit,

9   of the attachment, where it says, "Impact of June

10   2000, BU Reorganization on PAC Process."

11        A    Yes.

12        Q    Was there a reorganization of the business

13   unit in or around June 2000?

14        A    Yes, there was.

15        Q    What was the result of that?

16        A    The result of that was, as best I recall,

17   the pricing decision committees, as you've shown me

18   in the previous things, were implemented on the

19   brand side, and we were left pretty much on the

20   side to do our own thing, on the multisource side.

21        Q    Turn to page 4 of the document, where it

22   says "PTC Team Post-June 2000."  What is the PTC

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                      Irvine, CA

1    documentation would consist of.

2        Q    And so as long as she showed you that the

3    AWP change was necessary to make Roxane's AWPs as

4    high as its competitors, that would be enough for

5    you to approve it?

6        A    In general, that would probably be enough.

7        Q    Were you concerned about the government's

8    investigations into AWP inflations?

9        A    Absolutely.

10       Q    Let's look at the top e-mail from

11   Ms. Waterer.  She says, "Bob, got the information

12   yet?  Discussed it with Tom; and depending on the

13   strength of the customer information you can pull

14   together, he'll support it.  No guarantees of

15   getting it through."

16           Do you see that?

17       A    Yes, I do.

18       Q    If you were -- if it was your decision as to

19   whether or not to approve it, why wouldn't there be

20   any guarantee of getting it through?

21       A    I don't know what she was referring to when

22   she said that.  She could have been referring no

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 172

1   brother wants to punish, they will, so why not make

2   some money meanwhile."

3        Do you see that?

4   A    Yes, I do.

5   Q    What do you understand Mr. Sykora to be

6   referring to when he writes "big brother"?

7        MS. RIVERA:  Object to form and foundation.

8        THE WITNESS:  I don't know for sure.  I can

9   only speculate who he meant.

10   Q    BY MR. FAUCI:  Have you ever heard of the

11   government referred to as big brother?

12   A    Yes.

13   Q    And you know the government was concerned

14   about inflated AWPs?

15   A    Yes.

16   Q    As early as 1999?

17   A    Yes, I do.

18   Q    Can you think of any reason why Boehringer

19   Ingelheim would be upset with Roxane for raising

20   its AWPs on furosemide?

21        MS. RIVERA:  Object to form.

22        THE WITNESS:  What do you mean by Boehringer

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                    January 8, 2009
                        Irvine, CA

1    Ingelheim?

2        Q    BY MR. FAUCI:  BIC and/or BIPI.

3            MS. RIVERA:  Object to form and foundation.

4            THE WITNESS:  Yeah.  You mean that the

5    company would be upset?

6        Q    BY MR. FAUCI:  Yeah.  The question is can

7    you think of any reason why BIC and/or BIPI would

8    punish Roxane for raising its AWPs?

9            MS. RIVERA:  Object to form and foundation.

10           THE WITNESS:  I don't know whether in this

11   case the AWP was actually raised or not.  All I

12   know is that I would have reviewed it.  If I

13   thought it was justified, I would have approved it.

14           And I believe that the people you're

15   referring to, BIC or BIPI or whomever, would not

16   have had any objection.  I wouldn't have signed off

17   on it if I thought there was going to be a problem.

18       Q    BY MR. FAUCI:  You wouldn't have signed off

19   on it without their approving?

20       A    I wouldn't have signed off on it if I

21   thought it was going to be a problem.

22           If I was concerned about it, I would have

Henderson Legal Services, Inc.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                              January 8, 2009
                        Irvine, CA

1    called Werner Gerstenberg and told him what I

2    thought was going on and what I thought should be

3    done.  And then he would have either agreed or

4    disagreed.

5        Q    So do you think you consulted with Werner

6    Gerstenberg about the decision as to whether or not

7    to raise AWPs for Roxane?

8        A    Don't recall.

9        Q    For furosemide, I apologize.

10       A    I don't recall.

11       Q    In the top e-mail from Ms. Waterer, the

12   second paragraph down, she writes, "You've

13   indicated that AWP on furosemide is critical now

14   and that we'd have real business opportunities if

15   we could change it.  As you've been informed, Tom

16   is prepared to take furosemide up the line."

17            Do you see that?

18       A    Yes.

19       Q    Who would you be taking furosemide up the

20   line to?

21       A    I believe she's referring to that if I

22   needed to, I would take it up the line.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                          January 8, 2009
                        Irvine, CA

Page 180

1    furosemide as sensitive?

2            MS. RIVERA:  Object to form.

3            THE WITNESS:  I regarded any decision to

4    raise AWPs as needing to be justified.

5        Q    BY MR. FAUCI:  You write, "Rich can assure

6    you of the mood in BI."  Do you see that?

7        A    Yes.

8        Q    Is "Rich" Richard Feldman?

9        A    I believe that's who I'm referring to.  Yes.

10       Q    What do you mean, the mood in BI?

11       A    The mood at Boehringer Ingelheim was the

12   same as mine.  It was very sensitive to AWP

13   changes.

14       Q    Because of its awareness of the lawsuits

15   that had been filed?

16       A    Yes.

17       Q    You can put that aside.  I'm going to show

18   you an exhibit marked Exhibit 27.

19            (Exhibit Russillo 027 is marked.)

20       Q    BY MR. FAUCI:  This is a somewhat lengthy

21   document.  Take a moment to review it, and just

22   indicate to me when you're ready for a question.

b616cdfb-3fc4-43b7-8ce8-4d9bb6fe8ccd

Russillo, Thomas                                January 8, 2009
                        Irvine, CA

1    this is a decision that you would have taken to

2    Werner Gerstenberg?

3        A    Based on the data that I've seen here and

4    the quick review, I would say I probably did not.

5        Q    What was the type of decision you would take

6    to him?

7        A    If we were raising an AWP without adequate

8    justification, meaning I didn't see a competitor's

9    analysis that showed we were just blending in with

10   the rest.

11       Q    So with knowledge the AWP investigations

12   were going on, and with knowledge that this AWP

13   increase raised the AWPs to 14 times the average

14   contract price, that would not have been reason for

15   you to go to Mr. Gerstenberg and say, "Is this

16   okay?"

17       A    I can't answer your question exactly,

18   because this -- as you've seen from the e-mail

19   trails on this and others, there were a number of

20   these going on.

21            Once I had established Werner Gerstenberg's

22   position on this, I would have implemented it.

Russillo, Thomas                                    January 8, 2009
                         Irvine, CA

1   So -- and I don't remember eight years ago how

2   concerned he was.

3           I might have brought it to him.  I don't

4   think I did, because we've had others before that.

5   I knew where he stood.

6       Q    Would you have done this without feeling

7   comfortable that Mr. Gerstenberg was okay with it?

8       A    I can't tell you at the time.  I don't know

9   whether I went to him or not.

10      Q    You said you knew where he stood.  What do

11  you mean by that?

12      A    I knew that his position was if we were

13  meeting competitors, to stay competitive and that's

14  why we were raising the AWP, we would not be

15  perceived as taking advantage of the AWP.

16      Q    Where did you get that understanding of

17  Mr. Gerstenberg's position from?

18      A    Over many conversations with him.

19      Q    Did you have those -- was anybody else

20  involved in those conversations?

21      A    There may have been.  I don't -- I don't

22  recall the specific conversations.

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

Page 194

1      Q    Could legal have been involved in those
2  conversations?
3      A    Could have been.  Yes.
4      Q    Would legal inside counsel -- were those
5  Boehringer Ingelheim employees, or Roxane
6  employees?
7      A    Which ones?
8      Q    Any inside counsel that might have been
9  involved in those decisions.
10          MS. RIVERA:  Object to form.
11          THE WITNESS:  Legal services was a shared
12  service.  We did not have, within Roxane or Ben
13  Venue, specific attorneys at that time.
14     Q    BY MR. FAUCI:  Where was the legal services
15  based?
16     A    Connecticut.
17     Q    With Boehringer Ingelheim?
18          MS. RIVERA:  Object to form.
19          THE WITNESS:  Well, they were in the
20  Boehringer Ingelheim environment.  Yes.
21     Q    BY MR. FAUCI:  Let's show you Exhibit 30.
22          (Exhibit Russillo 030 is marked.)

Russillo, Thomas                                    January 8, 2009
                          Irvine, CA

                                                          Page 206

1     the person that oversaw them on the Roxane branded

2     side was Shelly Berkle.

3        Q    And both you and Mr. Berkle did not actually

4     work for Roxane; correct?

5        A    I don't believe Shelly did.  I know I

6     didn't.

7        Q    But instead, were managing those two aspects

8     of Roxane's business at the direction of Boehringer

9     Ingelheim; correct?

10           MS. RIVERA:  Object to form.

11           THE WITNESS:  When you say Boehringer

12    Ingelheim, if you mean Werner Gerstenberg, the

13    answer is yes.

14       Q    BY MR. ANDERSON:  Is that what -- is that

15    consistent with your understanding?

16       A    Is what consistent?

17       Q    That Mr. Gerstenberg, as the head of BIC,

18    was directing you and Mr. Berkle to manage Roxane's

19    business.

20       A    Yes.

21       Q    Likewise, when Mr. Carroll became the

22    president of BIC and replaced Mr. Gerstenberg, did

Russillo, Thomas                        January 8, 2009
                    Irvine, CA

1    the same arrangement exist?

2        A    Yes, it did.

3            MS. RIVERA:  Object to form.

4        Q    BY MR. ANDERSON:  All right.  This morning,

5    I think you testified at one point that AWP is

6    arbitrary.  Do you recall that testimony?

7        A    Yes, I do.

8        Q    I'm switching gears, by the way.

9        A    That's okay.

10       Q    I'm sure you picked up on that.  Can you

11   elaborate on what you mean by that?

12       A    There's a whole lot of different adjectives

13   you could use.  You know, arbitrary meaning it's

14   not an important number.  It's a misnomer.  It's

15   not average wholesale price in three sense -- the

16   sense of the three words.

17           It's -- as I think I explained earlier, it

18   is the way we enter the market by listing a price,

19   typically 10 percent off the brand.

20       Q    Are you familiar with how AWPs are set for

21   brand drugs?

22       A    No, I am not.

# Exhibit J

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                    )
                                          )   CA No. 07-10248-PBS
PHARMACEUTICAL INDUSTRY AVERAGE           )   CA No. 06-11337-PBS
WHOLESALE PRICE LITIGATION                )   CA No. 05-11084-PBS
                                          )   Pages 1-47


STATUS CONFERENCE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 13, 2008, 3:45 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 42

1    would use the information?  Sure.  But I can't make the

2    government attend all of these if there are eight per state.

3    You can still use the materials, but you just won't --

4            MR. MERKL:  Be able to ask questions, but we can

5    use the material.

6            THE COURT:  Yes, but you can use the material.

7            MR. MERKL:  Or we can ask questions of one and

8    notice a 30(b)(6) of --

9            THE COURT:  Yes.

10           MR. MERKL:  Okay.

11           THE COURT:  But they can use the material.  If

12   it's out there under oath, it can be used.

13           MR. HENDERSON:  On summary judgment, I think

14   anybody can use anything that's under oath basically.

15           One other fine point, your Honor.  The last time

16   around, I think it was in the Abbott case, there were a

17   couple of situations -- and I think I speak on behalf of all

18   the parties here -- where a witness got sick or something

19   and the deposition had to be postponed.

20           THE COURT:  Sure.

21           MR. HENDERSON:  And the question is, can we, if we

22   all agree that a deposition has to be scheduled for that

23   type of reason, can we do it ourselves without seeking leave

24   of Court?

25           THE COURT:  Of course, of course.