## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

THIS DOCUMENT RELATES TO:

CLASS 1 SETTLEMENT WITH
ASTRAZENECA

MDL No. 1456

Civil Action No. 01-cv-12257-PBS

Judge Patti B. Saris

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR IMPOSITION OF APPEAL BOND UNDER FEDERAL RULE OF APPELLATE PROCEDURE 7

Plaintiffs, by Class Counsel, respectfully submit this Memorandum in Support of their Motion for Imposition of an Appeal Bond in the amount of $41,536 under Federal Rule of Appellate Procedure 7.[1]  Such a bond is appropriate under established case law because the objection lodged by Don Haviland on behalf of M. Joyce Howe against Plaintiffs' Class 1 settlement with AstraZeneca is frivolous and will serve no purpose but to delay the distribution of benefits to a class of old and sick people who have waited over seven years for relief.  In fact, to date, several named class representatives, including Ms. Howe's husband, have already passed away during the course of this litigation.  The Court should therefore order Ms. Howe ("Objector") to post the bond requested in Plaintiffs' Motion.

## I.        INTRODUCTION

On May 21, 2007, Plaintiffs and AstraZeneca presented the Court with a $24 million settlement of the Class 1's claims against AstraZeneca (the "Settlement").  That Settlement, which gives class members **triple** their actual damages, has resulted in over 10,000 consumer

---

[1]  This amount consists of $40,000 in administration costs due to the delay the appeal will cause (*see* Glenn Decl.) and $768.00 in anticipated costs incurred in fighting Objector's appeal(s) (*see* Berman Decl.).  Pursuant to First Circuit authority, Plaintiffs then doubled their anticipated costs.

claims.  Declaration of Thomas R. Glenn Regarding Status of Claims Administration Activities Related to Class 1 Settlement With Defendant AstraZeneca ("Glenn Decl.") ¶ 3.

After this Court granted preliminary approval, Objector moved for reconsideration on the grounds that Plaintiffs had purportedly failed to disclose that Objector did not approve the Settlement.  Briefing on that issue, in addition to involving a moving target of ever-changing substantive objections, also involved serious but false allegations against Class Counsel that took months to resolve.  Then, after Plaintiffs moved for final approval, Objector filed the only objection to the Settlement.  Her "objection" was a single pleading incorporating her previous pleadings by reference on a variety of topics, including Mr. Haviland's removal as Class Counsel.  It was only on the morning of the final approval hearing that she submitted a brief in support of that "objection."  Neither Objector nor Mr. Haviland appeared at the final approval hearing.

Objector claims that (1) the entire $24 million settlement amount should be paid out to those nearly 10,000 class members who have made claims in the amounts provided for in the CMS database; (2) class members should receive legal protection from alleged subrogation claims by TPPs; and (3) Class Counsel should only be paid fees and costs incurred pursuing the Class 1 AstraZeneca case.  Objector is also appealing the Court's January 3, 2008 order disqualifying her attorney, Mr. Haviland, as Class Counsel.  Objector's first claim is frivolous because it proposes to make awards not related to a class member's actual damages, when in this Settlement it is possible to calculate actual damages.  Objector's second claim is frivolous because, as this Court has found, there is no possibility class members will be exposed to subrogation claims.  Objector's third claim is likewise frivolous because Class Counsel's fee award is reasonable under the law of this Circuit as well as the circumstances surrounding the

litigation of this case.   Finally, Objector's appeal of the Haviland disqualification order is particularly frivolous since Mr. Haviland has ***already appealed*** this Order and the First Circuit has ***already found*** that the order cannot be appealed until this Court enters final judgment on all claims in this litigation.

Thus, as more fully discussed below, the objection is without merit and Objector's appeal, at a minimum, "might be frivolous."  *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, MDL No. 1361, 2003 WL 22417252, at *2 (D. Me. Oct. 7, 2003) (citing *Sckolnick v. Harlow*, 820 F.2d 13, 15 (1st Cir. 1987)).   Despite its clear lack of merit, the appeal will delay distribution of settlement proceeds and otherwise result in costs and expenses, as Mr. Haviland well knows.  *See* Glenn Decl. ¶¶ 5-10.

## II.      BACKGROUND

**A.     The Settlement**

On May 21, 2007, Plaintiffs sought preliminary approval of their settlement with Defendant AstraZeneca on behalf of Class 1.   As this Court will recall, Class 1 consists of individuals who made a full or partial co-payment for Zoladex® under the Medicare Part B program from January 1, 1991 through December 31, 2004.  As such, it is composed of old and sick people, most of whom suffer from or have suffered from prostate cancer.

The Settlement provides for AstraZeneca to pay class members who file valid claims up to an aggregate total of $24 million. After single damages are doubled, additional allocations are then made first inside and then outside the "Heartland Period" (December 1, 1998 through December 31, 2003), resulting in ***tripling*** actual damages**.  *See*** Memorandum and Order Re: Requested Final Approval of the AstraZeneca Class 1 Settlement, Doc. No. 5624, at 3.  After all claims are paid, the remaining amount, if any, will go to mutually-acceptable charitable

organizations funding cancer research or patient care.[2]  In addition, AstraZeneca agreed to pay the full costs of notice and administration of the Settlement as well as attorneys' fees and costs in the amount of $8,580,000, as well as compensation awards to the two class representatives of $4,500 (Mr. Townsend) and $5,000 (Objector).

The Settlement is consumer-friendly.  Class Members were required to complete a Claim Form, but, as proof of payment for Zoladex®, were only required to submit proof of just one of the following items:

1)      a receipt, cancelled check or a credit card statement that shows a payment for Zoladex®;

2)      a letter from a doctor saying that he or she prescribed Zoladex® and the class member paid part of the cost of Zoladex® at least once; or

3)      a statement under penalty of perjury saying that he or she made a co-pay or cash payment for Zoladex® during the Class Period.

In addition, each class member was required to specify the time period during which they took Zoladex®, as well as any time period during which the class member had supplemental insurance, if any.

---

[2]   The Settlement originally provided that if $10 million or less of the settlement amount remained after all authorized claims were paid, AstraZeneca would pay the remaining amount to charity.  If more than $10,000,000 of the settlement amount remained, AstraZeneca would pay the $10,000,000 *cy pres* amount and the amount of the valid claims, but no further amounts. Pursuant to the Court's concern that the amount of the *cy pres* distribution was going to be too high, the parties have twice amended the Settlement Agreement.  The Second Amendment to the Settlement Agreement [Doc. No. 5774] now provides that (1) total recognized claims will be doubled, then; (2) Heartland Allocations will be given for overcharges within the Heartland Period, but this amount is capped at the amount that would have been paid to *cy pres* under the original Agreement; and then (3) if the aggregate value of all Heartland Allocations is less than would have been paid to *cy pres* under the original Agreement, a second allocation will be given to non-Heartland overcharges, but this amount is capped at the amount that would have been paid to *cy pres* under the original Agreement.

The amount that a class member was able to receive was based on the number of months that he or she was prescribed Zoladex®.  Dr. Hartman calculated overcharge damages based on the year and whether the class member had supplemental insurance that paid part of the Medicare Part B co-pay during that year.  The amount to which a class member who filed a valid claim form would be entitled to receive will be calculated by taking the number of months the class member took Zoladex® and multiplying that number by the alleged overcharge that applies for the year. ***That amount will then be <u>tripled</u>***.[3]  Indeed, based on the number of claims filed to date, Plaintiffs estimate that $17,203,834.50 will be paid to class members.  *See* Declaration of Ryan M. Walter Regarding Distribution of Settlement Amounts to Claimants in Class 1 Settlement With Defendant AstraZeneca ¶ 3.

For example, class representative Leroy Townsend, received eleven (11) quarterly administrations of Zoladex® from 2001 to 2004.  Under the Settlement's recovery formula, Mr. Townsend will be entitled to receive at least $10,292.55.  Moreover, Objector's deceased husband, Robert Howe, received three quarterly injections of Zoladex® with partial co-pays, in 2003 and 2004.  Under the Settlement's recovery formula, the Howes will be entitled to receive $546.12.[4]  This amount is greater than the Howes' damages.  Indeed, the co-pay checks that Mrs. Howe filed with the claim form total $347.81.  *Id.*

---

[3]  Even this is a conservative statement, because Dr. Hartman's overcharge calculations were based on the assumption that this Court would apply a 0% benchmark to Class 1.  Since the time the Settlement was negotiated, this Court has indicated it would apply a 30% benchmark.

[4]  Class Counsel previously reported that Mrs. Howe would be entitled to receive $617.82.  *See* Doc. No. 5446 at 6.  However, since the filing of that brief, the Claims Administrator received refined information from Medicare, which revealed that, in certain cases, including the Howes, what were believed to be administrations of Zoladex® were actually ancillary charges related to the administration of Zoladex®, such as for office visits.  All settlement payments have been adjusted to reflect this refined information.

**B.      Settlement Negotiations**

The Settlement was reached after months of arm's-length, intensely-fought negotiations overseen by the Court-appointed mediator, Eric Green.  *See* Third Revised Final Order and Judgment Granting Final Approval to Proposed Class Action Settlement With AstraZeneca, Approving Proposed Allocation of Settlement Funds, and Approving Class Counsels' Application for Attorneys' Fees, Reimbursement of Litigation Expenses and Compensation Awards to Class Representatives, Doc. No. 5802 ¶ 6.  They began several months before the Class 2/Class 3 trial and ended a month before Class 1's claims against AstraZeneca were scheduled to be tried to a jury.

Mr. Haviland, Objector's counsel, was co-lead counsel at the time the Settlement was negotiated, and therefore participated in settlement negotiations.[5]

**C.      Mrs. Howe's Objection to Preliminary Approval**

Despite having participated in the negotiation of the Settlement, one day after Plaintiffs filed their motion for preliminary approval, Objector filed an objection, complaining about four different aspects of the Settlement.  In addition, while failing to submit a sworn declaration in support of such claims, Objector alleged that Class Counsel had improperly intermingled settlement and fee negotiations.  *See* Memo. of Named Class Representative, M. Joyce Howe, in Opposition to the Joint Motion for Preliminary Approval of Proposed Nationwide Settlement With AstraZeneca, Doc. No. 4243, at 4-5.

---

[5]  On March 26, 2007, Mr. Haviland moved for appointment as Co-Chair of the Lead Counsel Committee.  While Class Counsel originally opposed that motion, pursuant to an agreement reached with Mr. Haviland after an August 27, 2007 hearing, Class Counsel and Mr. Haviland reached a compromise which the Court approved.  However, on January 3, 2008, after this Court raised numerous concerns about Mr. Haviland's fitness to serve, and the parties extensively briefed the issue, this Court disqualified Mr. Haviland as Class Counsel.  *See* Memorandum and Order (Jan. 3, 2008) § II, Doc. No. 4972.

After the Court entered preliminary approval on May 22, 2007, Objector filed a motion for reconsideration the next day on the basis that there was new "evidence" that she had not approved of the terms of the Settlement.  *See* Doc. No. 4250.  Objector once again failed to file any sworn statement in support of her incendiary allegations.  Class Counsel filed an opposition to that motion (Doc. No. 4285) and, on June 12, 2007, this Court issued an electronic order denying it but requiring that, if Mr. Haviland wished to pursue the matter of his client's approval of the Settlement further, he submit a sworn declaration in support of his claims.  Over a month later, on July 13, 2007, Mr. Haviland did so.  *See* Declaration of Donald E. Haviland, Jr. in response to Court Directive Concerning AstraZeneca Settlement, Doc. No. 4460 (notice of filing same)**.**  On July 27, Class Counsel filed a response to the Haviland Declaration.  *See* Doc. Nos. 4510-4513 (including declarations filed in support of same).   On October 25, 2007, Class Counsel filed a supplemental submission in support of preliminary approval.  *See* Doc. No. 4813.  On November 1, 2007, this Court granted preliminary approval.

**D.**     **Mr. Haviland's Bid For Co-Lead Counsel**

Shortly after granting preliminary approval of the Settlement, this Court issued an order striking Mr. Haviland as Class Counsel.  *See* Doc. No. 4972.  One of the grounds this Court cited in support of its order striking Mr. Haviland was that, "Mr. Haviland filed declarations from his clients, proposed consumer representatives, threatening to withdraw if Haviland were not appointed as class counsel."  *Id.* at 9-10.  One of these declarations was submitted on behalf of Objector to this Settlement, and stated that "If Mr. Haviland and his firm cannot serve as Class Counsel, I would like to withdraw as a class representative."  *See* Declaration of M. Joyce Howe ¶ 9, Doc. No. 4647.  With regard to this and other similar declarations Mr. Haviland filed, this Court found that:

> As I explained at the August 27 and the September 11 hearings, I interpreted these declarations as threats to take his toys and go home if the court declined his request. Mr. Haviland intended to coerce the Court into appointing him as Co-Lead Class Counsel or risk losing class representatives in a class action involving the sick and elderly.

Doc. No. 4972, at 10 (internal transcript citations omitted).

In that same Order this Court also found that, in his declaration relating to this Settlement, Mr. Haviland had publicly submitted confidential information about the mediation proceedings. This Court found those actions to be "in direct violation of the confidentiality obligations under the mediation agreement." *Id.* at 10. This and other conduct,[6] led this Court to tell Mr. Haviland that "I don't trust you" and ultimately remove him as Class Counsel. *See* Hearing Tr. (Sept. 11, 2007) at 18:14-19:2.

### E.   Mrs. Howe's Objection to Final Approval

On April 17, 2008, Plaintiffs and AstraZeneca jointly moved for entry of final approval of the Settlement. *See* Class Counsel's and AstraZeneca's Joint Motion for Entry of an Order Granting Final Approval of the AstraZeneca Class 1 Settlement, Doc. No. 5218. In response, Objector filed a three-page placeholder objection stating that she objected to final approval of the Settlement "for the reasons stated previously in the following pleadings filed by her undersigned counsel." Objection of Named Class Representative, M. Joyce Howe, to the Final Approval of Proposed Nationwide Settlement With AstraZeneca, Doc. No. 5186 at 1. Other than that statement, Objector only alleged that the Settlement was "unfair, unreasonable and inadequate with respect to the payment of claims of consumers similarly situated to her." *Id.* at 3. Objector

---

[6] This Court originally convened a hearing to discuss Mr. Haviland's qualifications as Class Counsel because the New Jersey court in which Mr. Haviland also had AWP cases pending informed this Court that Mr. Haviland had represented, contrary to his representations to *this* Court that he would only seek a statewide class, that he was proceeding with a nationwide class in New Jersey. *See generally* Hearing Tr. (Sept. 11, 2007).

also claimed that the Settlement should be more like Plaintiffs' settlement with the Track 2 defendants, although Objector failed to explain why.  *Id.*   As this Court held, Objector's arguments that were incorporated by reference did not properly preserve her objections for appeal and were therefore waived.  *See* Hearing tr. (May 1, 2008), at 17:19-24 ("I mean, it's quite clear that he's setting it up for an appeal, but as far as I'm concerned, the only ones that have been fully vetted are the ones that he briefed to me.  He can't just string cite and expect me to know anything, so I think the rest are waived.").

On the morning of the final approval hearing, Objector submitted a "Reply Brief" in support of her Objection.  *See* Doc. No. 5265.  As this Court found, "[t]he brief in support of the objection was filed in an untimely fashion the morning of the hearing."  Memorandum and Order re:  Requested Final Approval of the AstraZeneca Class 1 Settlement, Doc. No. 5624, at 1.  *See also* Hearing tr. (May 1, 2008) at 4:16-18 ("I am going to consider it, but it is untimely.").  That "Reply Brief" purported to limit Objector's previous complaints about the Settlement to three concerns, which are discussed in greater detail below.

## F.   Additional Administrative Costs

As this Court will recall, the appeal of the GSK Settlement filed by a single objector, Demra Jordan, delayed the fruits of that settlement for over a year.  This Court granted final approval of that Settlement on July 19, 2007.  Although this Court imposed an appeal bond in the amount of $61,000 (*see* Doc. No. 4868), Ms. Jordan appealed that order in addition to the order granting final approval of the GSK settlement.  And, though the First Circuit placed the motion to dismiss the bond appeal on its expedited docket, by August 25, 2008, the date the parties submitted a stipulation for dismissal of the bond appeal as well as the appeal of the GSK settlement because they had negotiated a settlement with Ms. Jordan, the First Circuit had not issued an order on that motion, nor had it set a briefing schedule for Ms. Jordan's appeal of final

approval of the GSK Settlement.  In the meantime, over a year passed, and not a dime was distributed to class members.

Thus, it is not merely theoretical to say that, as outlined in the Glenn Declaration, the filing of Objector's appeal will delay distribution to the Class. As this Court has repeatedly observed, members of the Class are old and sick and have already waited over seven years to receive any type of payment.  Objector should not be permitted to engage in an exercise of gamesmanship on behalf of her counsel at the expense of these people.

More specifically, for each additional month that the Settlement Fund remains open, the claims administrator incurs significant costs and expenses, including such items as maintaining the post office box and the toll-free number, updating the website and responding to class member inquiries (which become more and more numerous as time passes).  Based on the claims administrator's own experience in *In re Warfarin Sodium Antitrust Litig.*, a settlement administration similar to this one, as well as administering the GSK settlement in this litigation, additional incremental administrative costs caused by the delay will run in the range of approximately $30-40,000.  *See* Glenn Decl. ¶ 11.  Because this estimate assumes an eight-month delay (which, given the timetable surrounding the appeal of the GSK settlement, is a very generous assumption), they are extremely conservative. *Cf. In re Cardizem CD Antitrust Litig.*, No. 99-md-1278, 2005 WL 2179383 (E.D. Mich. Sept. 9, 2005) (appeal dismissed 14 months after final approval; administration costs attributable to delay amounted to $255,683.10).  Even though under this Settlement these costs will be borne by AstraZeneca and not the Class, they should not have to be borne at all.

### III.   ARGUMENT

**A.    Requiring an Appeal Bond is Appropriate**

Rule 7 of the Federal Rules of Appellate Procedure provides in pertinent part as follows: "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal."  "[T]he nature and amount of the bond is a matter left to the sound discretion of the district court."  *Sckolnick v. Harlow*, 820 F.2d 13, 15 (1st Cir. 1987); *see also Adsani v. Miller*, 139 F.3d 67, 79 (2d Cir. 1998) ("A district court, familiar with the contours of the case appealed, has the discretion to impose a bond which reflects its determination of the likely outcome of the appeal.").

Costs on appeal include those costs itemized in Rule 39 of the Federal Rules of Appellate Procedure, such as the costs to prepare and reproduce the briefs and appendices.  As will be discussed more fully below, however, a Rule 7 appeal bond may also include other "damages" where the appeal is frivolous and sanctions are likely to be imposed under Rule 38 of the Federal Rule of Appellate Procedure.  *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *3 (D. Me. Oct. 7, 2003).  As discussed below, substantial grounds exist to support the assessment of an appeal bond here.

**B.    Objector's Appeal is Frivolous and May Subject Her to Sanctions Under Rule 38 of the Federal Rules of Appellate Procedure Because Objector Has Not Properly Preserved Her Objection for Appeal**

Because Objector articulated her objection by incorporating by reference at least thirteen different pleadings, many of which have voluminous accompanying exhibits, and because so many of Objector's original complaints were based on fundamental misunderstandings of the Settlement of which Class Counsel have attempted to disabuse her, it is difficult to determine on what basis Objector continues to object to the Settlement.  This reason alone is enough to determine that the Objection is frivolous.  *See Casilla-Diaz v. Officer Romualdo Palace*, 463

F.3d 77, 83 (1st Cir. 2006) (emphasis added) (internal citations omitted) ("Few principles are more a part of the warp and woof of appellate practice than the principle that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"  . . . "[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 36 (1st Cir. 1994) ("In his 50-page brief, [appellant] did not raise or address the issue of the other sixteen notes at any point except for the one-sentence statement, unsupported by any argument or case law, in his conclusion. . . .  This is simply insufficient presentation and argumentation of the issue for any meaningful analysis, and we therefore deem it waived.") (internal citations omitted); *Willhauk v. Halpin*, 953 F.2d 689, 700 (1st Cir. 1991) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.  Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold his or her peace.").

**C.      Objector's Appeal is Frivolous and May Subject Her to Sanctions Under Rule 38 of the Federal Rules of Appellate Procedure Because Objector Is Pursuing This Appeal Merely To Have Mr. Haviland Reinstated as Class Counsel**

Moreover, Objector's appeal is likely to be deemed frivolous because it is clear that she is only filing the appeal to pursue Mr. Haviland's agenda of having himself reinstated as Class Counsel.  "Federal courts are increasingly weary of professional objectors."  *O'Keefe v. Mercedes-Benz United States, LLC*, 214 F.R.D. 266,295 n.26 (E.D. Pa. 2003).  The objection, filed by an attorney determined to tie up this case in the First Circuit, must be regarded as "generic unhelpful protests," some of which are lodged by "professional objectors."  *See Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) ("some of the objections

were obviously 'canned' objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests"). Given Objector's clear motivation in filing her objection, she must be regarded as a "spoiler" most concerned with exercising leverage to prevent others from benefiting from the settlement. *Cf. Torrisi v. Tuscan Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) (characterizing objectors as "spoilers" when only twenty of 113,000 class members objected and only two appealed the settlement's approval).

Here, Objector has engaged in a now nearly-two year campaign to both derail this Settlement as well as disparage and ultimately displace Class Counsel. She not only filed objections to both preliminary and final approval that were constantly moving targets, but she supported Mr. Haviland's efforts to displace Class Counsel (and in doing so filed a declaration this Court characterized as a "threat"), and supported Mr. Haviland's filing false declarations claiming that Objector never supported the Settlement. She now compounds the abuse by taking an appeal, which will delay distribution of settlement proceeds to more thousands of consumers, notwithstanding this Court's exercise of discretion well within the bounds of applicable authority. These are sufficient grounds to deem her appeal frivolous. *See In re Compact Disc*, 2003 U.S. Dist. Lexis 25788, at *4 n.3 (noting that attorney who filed appeal had previously filed other groundless objections).

Mr. Haviland's behavior with this Settlement is likewise consistent with Mr. Haviland's behavior in front of other courts, where he has consistently acted to further his own interests at the expense of the interests of the class he purports to represent. As this Court previously found in disqualifying Mr. Haviland as Class Counsel, in the Lupron case, where Mr. Haviland had state cases pending at the time a settlement was reached in the MDL, Judge Stearns found that Mr. Haviland had established certain websites that Judge Stearns found "were intended to

mislead potential members of the MDL class." *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 82 (D. Mass. 2005).  Immediately after ruling on the websites, the court discovered that Mr. Haviland had sent letters to people who had registered on those websites.  *Id.*  Judge Stearns found those "Dear Client" letters to contain a number of "deliberate mispresentations and falsehoods" and therefore ordered that a curative notice be sent.  *Id.* at 83.  Similarly, in the *Bridgeport Fire Class Action Litigation* pending before Judge Steve T. O'Neill in the Court of Common Pleas of Montgomery County, Pennsylvania, Mr. Haviland sent a solicitation letter to class representatives that contained "false and misleading information."  After an emergency hearing, the court issued an order stating that Mr. Haviland could not solicit class members or encourage them to make an election of Class Counsel.  *See* Class Counsel's Submission Regarding Mr. Haviland's Participation As Co-Lead Counsel, Doc. No. 4723 § II(F).  After the Superior Court vacated that order and remanded for entry of a more specific order, Mr. Haviland sought to send another misleading communication to class members.  The *Bridgeport Fire* court enjoined that attempted communication as well, finding that "the Proposed Letter represents Mr. Haviland's latest attempt to improperly disrupt this Class Action by soliciting Class Members to contact him about this litigation, and thereby risk irreparably harming the Class in order to advance his own interests."  Order ¶ 36, Ex. 1 hereto.

All of these facts provide further support that Objector's appeal in this case is similarly frivolous because it is being used to pursue Mr. Haviland's own ends rather than the interests of the Class he claims to represent.  As this Court previously remarked regarding Mr. Haviland's conduct in this litigation, "you were more concerned about you than you were about the class reps."  Hearing Tr. (Sept. 11, 2007), at 18:24-25.

**D.     Objector's Appeal is Frivolous and May Subject Her to Sanctions Under Rule 38 of the Federal Rules of Appellate Procedure Because Her Substantive Objections Are Groundless[7]**

Objector's appeal is also frivolous because her substantive objections, to the extent they have been preserved for appeal – which Class Counsel dispute – lack merit.  This is especially true because this Court's decision to approve or reject a proposed settlement is committed to the Court's sound discretion.  *City P'ship Co. v. Atlantic Acquisition L.P.*, 100 F.3d 1041, 1043-44 (1st Cir. 1996).  Even interpreted in their best light (which, for the reasons set forth above, this Court does not have to do), Objector's substantive complaints about the Settlement amount to nothing more than asking this Court to second-guess Class Counsel about the manner in which this case was resolved.  But as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976).  The Court is not called upon to determine whether the Settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial.  *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."); *In re Compact Disc*, 216 F.R.D. at 211 (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case...and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *EEOC*

---

[7]  As far as Objector's "substantive" objections, Class Counsel are assuming that Objector is only pursuing the three objections set forth in her "Reply Brief" (Doc. No. 5265).  By making this assumption Class Counsel are not otherwise waiving their argument that that "Reply Brief" was untimely.

*v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *Isley v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)). Objector's claims are especially groundless given the standard under which the First Circuit will review the Settlement.

> **1.** **Sending checks in the amounts provided for in the CMS database could overcompensate those class members who were not as damaged, while under-compensating those class members who incurred more damages**

Objector claims that the Settlement should have been rejected in favor of one that sent checks to class members in the amounts provided for in the CMS database. Objector originally claimed that the Settlement was unfair because it paid reduced amounts to those class members who had supplemental insurance and therefore proposed that Class Counsel just send checks to *all* of the 445,550 Zoladex® beneficiaries identified by CMS, regardless of whether those beneficiaries had supplemental insurance that paid for all or part of their Medicare Part B co-payment. Once Class Counsel made clear that their distribution method made imminently more sense because class members with supplemental insurance had not suffered as many damages as those without such insurance, Objector abandoned that proposal. While Objector's "new" proposal resolves the problem of sending checks to all of the beneficiaries identified by CMS, it still results in inequities because of the wide disparity in the amount of damages suffered by class members. As this Court found, "Ms. Howe's proposed procedure would result in an overpayment of certain class members." Doc. No. 5624, at 5. *See also* Doc. No. 5802 ¶ 12.

At the May 1, 2008 hearing, Class Counsel highlighted for the Court the claims of three class members in order to provide the Court with a snapshot of the range of recoveries that class

members will receive under the Settlement.  More specifically, we reviewed the claims of the following three class members.

- Johnnie, Claim No. 18.  Johnnie, who received 32 Zoladex® administrations and made full co-pays, is projected to receive a $11,718.00 distribution.

- Steven, Claim No. 71.  Steven, who received four Zoladex® administrations and made partial co-pays, is projected to receive a $716.76 distribution.

- Robert, Claim No. 73.  Robert, who received eight Zoladex® administrations and made full co-pays, is projected to receive $4,240.59.[8]

Because the allocation model is based on the individual amount of damage that each class member incurred, the foregoing demonstrates that class members with no supplemental insurance coverage (like Johnnie and Robert) were damaged to a much greater extent than those with partial coverage (like Steven).  Therefore, they receive a greater recovery under the proposed settlement.  Yet, under Objector's proposal, Johnnie, Steven and Robert would receive the amount in CMS's database, which would include partial co-pays that Steven ***never made***.  Similarly, Objector – who unlike most class members with partial supplemental insurance coverage – did not have a standard policy covering 80% of the co-payment, would receive much more than her damages.  Therefore, Objector is suggesting that one settlement that treats class members differently but roughly equal based on out-of-pocket damages (as this Settlement does) be scrapped in favor of one that treats them all the same, even though class members with supplemental insurance would have incurred less damage.  In other words, Objector is advocating a result that favors her interests over those of the class members at large.

Objector also insists that the allocation model here should mimic that preliminarily approved by the Court for the Track 2 Settlement.  Objector's claim is again groundless.  The

---

[8]   The amounts for Johnnie and Steven changed from numbers previously reported by Class Counsel for the reasons stated in footnote 5.

Track 2 recovery is based on the concept of reimbursing Track 2 Class Members their out-of-pocket costs associated with the Subject Drugs; the recovery formula is not linked to specific damage per Class Member.  The Track 2 settlement was designed this way because it was not possible to apply the AstraZeneca Class 1 recovery formula to Track 2 since there are too many drugs at issue (190), different categories of drugs (both brand and generic, with a different distribution weighting assigned to each), three different classes, disparate time periods and, perhaps most significantly, no uniform dosing schedule.  Thus, even though the Track 2 model is a fair and reasonable way of allocating the Track 2 settlement proceeds, the out-of-pocket measure of recovery for Track 2 is a rougher measure of justice than the more precise model for AstraZeneca Class 1, and the AstraZeneca Class 1 Members will likely fare better than their Track 2 counterparts.  As this Court found, "Plaintiffs also plausibly explain why Track I and Track II should be treated differently as a practical matter."  Doc. No. 5624 at 5-6.

2.    **Class members do not need to be protected from subrogation claims by TPPs**

Citing the collateral source rule, Objector continues to maintain that the Settlement leaves Class Members exposed to "potential claims for subrogation by their insurance carriers."  Reply Br. at 7-8.  However, the members of Class 1 are not seeking amounts paid by the insurers to which subrogation would apply.  The recovery is based on co-payments made by the Class Members and not by supplemental insurance coverage.  Although Objector's Reply Brief attached a complaint from the unrelated *Vioxx Products Liability Litigation* which, apparently, seeks to preserve various TPPs' rights to collect money in subrogation from a class action personal injury settlement fund, that case is inapposite since the TPP class members there are presumably entitled to receive monies that, in the first instance, were paid by the TPPs for the treatment for personal injuries.  Again, this proposed Class 1 Settlement does not involve Zoladex® overcharges paid by TPPs, and, indeed, the claims against AstraZeneca on behalf of

TPPs are being pursued by different classes – Classes 2 and 3 – and their claims are still being litigated.    Thus, as this Court has found, Objector's subrogation argument remains a "red herring" and should be rejected.  *See* Doc. No. 5624 at 6 ("There is little likelihood that the TPPs can seek subrogation rights to monies paid as co-payments.").

> **3.      Class Counsel's request for fees and expenses is reasonable**

AstraZeneca agreed to pay attorneys' fees of $6,500,000 and costs of $2,100,000.  This Court approved a total amount of $8,580,000, with no segregation for attorneys' fees and expenses.  Objector claims that this amount is unreasonable because it purportedly consists of 35.8% of the fund and that, because the amount is unreasonable, Class Counsel should be restricted to receiving only those fees and costs attributable to their work on the Class 1 case against AstraZeneca.  Once again, Objector is wrong.

This Court properly used its discretion to award fees and expenses based on the percentage-of-the-fund ("POF") method.  Although the trial court's latitude in fashioning a fee award is "extremely broad," *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 309 (1st Cir. 1995) (quoting *Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992)), the First Circuit has recognized that POF should be favored in common fund cases and that POF is the prevailing method because it has distinct advantages in complex cases. *Id.* at 307.  It is less burdensome to administer, reduces the possibility of collateral disputes, enhances efficiency throughout the litigation, better approximates the workings of the marketplace and saves the Court from having to delve into the details of the lodestar.

Specifically, in this case in particular, where there are multiple defendants and the Court is considering only the fee related to settlement of a single Class against a single defendant, use of the POF method saves the Court and the parties from the daunting task of allocating the particular hours of the many attorneys involved to a particular defendant.

        **a.**      **An award of approximately 30 percent is reasonable**

Courts have approved fee awards in common fund cases in the range of 25-45%.  *See*, *e.g.*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (awarding class counsel $22,311,000 in fees or 33% of class fund of $67,000,000, plus a separate award of litigation expenses in the amount of $1,297,301); *In re Fleet/Norstar Secs. Litig.*, 935 F. Supp. 99, 109 (D.R.I. 1996); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998); *In re Compact Disc*, 216 F.R.D. 197, 216 n.45 (D. Me. 2003); *Gaskill v. Gordon*, 160 F.3d 361, 363-64 (7th Cir. 1998) (affirming award of 38% of class action settlement fund); *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (awarding 33% of $12 million common settlement fund); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. Lexis 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (awarding fees of 33⅓% of $220 million common fund to Direct Purchaser Plaintiff's Class Counsel); *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. Lexis 12344 (D.D.C. June 16, 2003) (awarding class counsel 30% of the common fund);  *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. Lexis 25067, at *57 (D.D.C. July 13, 2001) (determining that the one-third award was reasonable and granting class counsel fee petition in the amount of $123,188,032 plus interest, or approximately 34% of the total estimated settlement amount, in antitrust price fixing litigation); *In re Activision Sec. Litig.*, 723 F. Supp 1373, 1375 (N.D. Cal. 1989) (awarding a 32.8% fee and adopting a "policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case," as "well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable…").

While Objector claims this percentage is "well above the norm," (Reply Br. at 8), a 30% award (of $28.6 million) is eminently reasonable.  *See* Doc. No. 5624, at 3 ("I find that in light of the high risk and complexity of the litigation, and the contentiousness of the seven-year battle, it is appropriate to pay class counsel 30 percent of the common fund."); Doc. No. 5802 ¶ 13.

Objector suggests that Class Counsel should only be awarded their time and expenses associated with the Class 1 case against AstraZeneca.  However, as this Court found, "[a] percentage-of-fund approach makes more sense because this multi-district litigation has many moving pieces with common issues and it would be too difficult to calculate a fair lodestar for this piece of the litigation."  Doc. No. 5624, at 4.

### b.      Even using a lodestar crosscheck, Plaintiffs' fees and expenses are reasonable

Further, as set forth more fully in Section III of Class Counsel's supplemental memorandum in support of final approval [Doc. No. 5446], comparing the actual and projected fee and cost recovery in this case against Plaintiffs' counsel's collective lodestar accentuates the reasonableness of the percentage approach approved by the Court:

Objector claims that Class Counsel should not be able to recover for hours expended on losing against or against dismissed defendants; however, that assumes that Class Counsel are seeking some amount close to their total lodestar in the litigation as a whole.  As the foregoing analysis indicates, they are not.  Finally, Objector claims that the Court should adjust the fee awarded because there was a "wasteful and inefficient logging hours."  Reply Br. at 9.  Objector offers no analysis in support of her bare assertion.[9]  There is none.

Objector lastly claims that Class Counsel should not be permitted to have the discretion to distribute the fees and costs awarded to various counsel.  But this ignores that this Court held in its December 10, 2008 order that it would review any objections to Class Counsel's fee

---

[9]    Objector further claims that Class Counsel should have to show that their request for $2,100,000 in expenses is reasonable.  However, because this Court awarded a total amount of $8,580,000, with Class Counsel to distribute that amount as fees or costs as appropriate, such a complaint is no longer relevant.  *See* Doc. No. 5624, at 5 ("As stated earlier, I have found that $8,580,000 is the fair amount of attorneys' fees and costs.  Counsel can apportion that amount as a housekeeping matter between fees and costs without the Court's imprimatur (unless there is an objection)").

distributions on an abuse of discretion standard.  Indeed, in granting final approval of the Settlement, this Court stated that it will review "any challenges to the proposed distribution." Doc. No. 5624 at 6.[10]  Objector simply has no basis to object to Class Counsel's distribution of the funds when Objector has a remedy to challenge that distribution should she subsequently believe it to be unfair.

**E.**      **Objector's Appeal of Mr. Haviland's Disqualification as Class Counsel is Frivolous and May Subject Her to Sanctions Under Rule 38 of the Federal Rules of Appellate Procedure Because Mr. Haviland's Appeal Has Been Twice Rejected by the First Circuit**

Finally, Objector's appeal of Mr. Haviland's disqualification as Class Counsel is frivolous as well.  Mr. Haviland previously attempted to appeal this order and the First Circuit held, in two separate orders in two separate appeals, that the order was not appealable until final judgment.  *See* Judgment, Appeal No. 08-8001 (Apr. 2, 2008) (finding that this Court's order could not be appealed under Fed. R. Civ. P. 23(f)); Judgment, Appeal No. 08-1190 (June 4, 2008) (finding that this Court's order could not be appealed under Fed. R. Civ. P. 23(f) and that disqualification orders were not final orders under 28 U.S.C. §§ 1291 or 1292), Exs. A and B Declaration of Steve W. Berman ("Berman Decl.").

**F.**      **Where, as Here, the Appeal is Frivolous, Rule 38 Provides the Basis for an Appeal Bond Covering Double Costs and Other Damages**

An appeal bond under Rule 7 may include administrative costs where the award of such fees is authorized by statute.  In this case, Rule 38 of the Federal Rules of Appellate Procedure provides the basis for the award damages caused by a frivolous appeal.  Rule 38 provides as follows:

---

[10]   Objector also claims that allowing Class Counsel to distribute these monies contradicts the "express terms of the fee sharing agreement Mrs. Howe's counsel entered into with Co-Lead Counsel in September 2006."  Reply Br. at 10.  Class Counsel know of no aspect of that agreement that is relevant to whether Class Counsel may distribute fees.

> If a court appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee.

Fed. R. App. P. 38.

Where a district court believes that the recovery of sanctions is possible under Rule 38, such amounts should be considered in the assessment of an appeal bond.  In *Sckolnick v. Harlow*, the First Circuit ruled that a bond for sanctions that might be awarded under Rule 38 of the Federal Rules of Appellate Procedure may be appropriate.

> [T]he district court's decision to set the amount at $5,000 implied a view that the appeal might be frivolous and that an award of sanctions against plaintiff on appeal was a real possibility....We note, also, that the defendants introduced evidence below that a plaintiff is a litigious pro se who has filed numerous lawsuits in state court.

820 F.2d at 15.  Similarly, in *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, *3 (D. Me. Oct. 7, 2003), the district court addressed the propriety of an appeal bond that included both attorneys' fees and additional costs in the context of a frivolous appeal.  There the court found that the appeal "might be frivolous" and that an award of sanctions on appeal pursuant to Rule 38 was "a real probability."  It therefore concluded under those circumstances that a bond for "damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in a Rule 7 bond." *Id.* The court believed the probability of sanctions being awarded under Rule 38 was high enough to justify consideration of that fact for purposes of calculating the appropriate appeal bond.

A similar conclusion is warranted here.  Rule 38 expressly permits an award of damages including single or double costs upon determination that the appeal is frivolous. Fed. R. Civ. P. 38.  Given the fact that the Objector's appeal is groundless, this Court may justifiably conclude that Rule 38 provides for the recovery of damages.

As set forth above, recoverable damages include the costs of disruption and delay in settlement administration, estimated here to be at least $30-40,000.  *See* Glenn Decl ¶¶ 5-10.  *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *3 (D. Me. Oct. 7, 2003); *In re Cardizem CD Antitrust Litig.*, No 99-md-1278 Corrected Order No. 82 at 11-12 (same).

Finally, pursuant to Rule 38, the bond may also cover costs taxable on appeal, including the costs of reproduction, filing and brief and appendix preparation, as addressed in Rule 39. Plaintiffs estimate these costs to be approximately $768.00.  Berman Decl. ¶¶ 2-3.  They are clearly assessable in an appeal bond, see *O'Keefe v. Mercedes-Benz USA, LLC*, No. Civ. A. 01-CV-2902, 2003 WL 22097451 (E.D. Pa. June 4, 2003) (ordering $13,467 appeal bond), and may be doubled pursuant to Rule 38.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court enter an order under Federal Rule of Appellate Procedure 7 to require Objector to post an appeal bond in an amount sufficient to cover costs for her frivolous appeal, including the damages likely to result from the delay in settlement administration.  The amount of such bond should be $41,536.00.

Dated:  February 19, 2009

By: /s/ Jennifer Fountain Connolly
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003

*Liaison Counsel*

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Jeffrey Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611

Marc H. Edelson
Edelson & Associates LLC
45 W. Court Street
Doylestown, PA  18901
Telephone:  (215) 230-8043
Facsimile:  (215) 230-8735

***Co-Lead Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE</u>

### Docket No. MDL 1456

I, Jennifer Fountain Connolly, hereby certify that I am one of plaintiffs' attorneys and that, on February 19, 2009, I caused copies of ***Memorandum in Support of Plaintiffs' Motion for Imposition of Appeal Bond Under Federal Rule of Appellate Procedure 7*** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


/s/ Jennifer Fountain Connolly
Jennifer Fountain Connolly