```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


     IN RE:                          )
                                     )  CA No. 01-12257-PBS
     PHARMACEUTICAL INDUSTRY AVERAGE  )
     WHOLESALE PRICE LITIGATION       )  Pages 1-47
                                     )
```

STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
February 12, 2009, 10:40 a.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3

         KENNETH M. RESNIK, ESQ., Stern Shapiro Weissberg &
4    Garin, LLP, 90 Canal Street, Boston, Massachusetts,
     02114-2022.

5

         NICHOLAS N. PAUL, ESQ., Supervising Deputy Attorney
6    General, Civil Prosecutions Unit, P.O. Box 85266,
     110 West A Street, #1100, San Diego, California, 92186.

7

         JAMES JOSEPH BREEN, ESQ., The Breen Law Firm,
8    5755 North Point Parkway, Suite 260, Alpharetta, Georgia,
     30022.

9

10   FOR THE DEFENDANTS:

11       KEATHER K. McDEVITT, ESQ., White & Case,
     1155 Avenue of the Americas, New York, New York, 10036-2787.

12

         JOHN T. MONTGOMERY, ESQ., JOHN P. BUEKER, ESQ.,
13   and DANIEL J. BENNETT, ESQ., Ropes & Gray, LLP,
     One International Place, Boston, Massachusetts, 02110-2624.

14

         ANTONIA GIULIANA, ESQ., Kelley Drye & Warren, LLP,
15   101 Park Avenue, New York, New York, 10178-0002.

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2              THE CLERK:  In re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action 01-12257

4    and 06-11337, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6              MR. PAUL:  Nicholas Paul with the California

7    Department of Justice for California.  Good morning, your

8    Honor.

9              THE COURT:  Welcome.

10             MR. BREEN:  Good morning, Judge.  Jim Breen.  I

11   represent the Relator, Ven-A-Care of the Florida Keys.

12             MR. RESNIK:  Good morning, your Honor.  Kenneth

13   Resnik, Stern Shapiro Weissberg & Garin, also for Ven-A-Care

14   of the Florida Keys.

15             THE COURT:  Let me ask you this from California:

16   I said you could do this on the teleconference, but Mr. Alba

17   said you insisted on flying here.

18             MR. PAUL:  Well, your Honor, this is an important

19   case, and I felt the Court might be better served if --

20             THE COURT:  If I hear from the Attorney General

21   himself.

22             MR. PAUL:  Yes, your Honor.  We're glad to be

23   here.

24             THE COURT:  Well, it's not a good time to come.

25             All right, Mr. Montgomery, who are you

1   representing here?

2           MR. MONTGOMERY:  Schering and Warrick.

3           THE COURT:  Just the two of them.

4           MR. BUEKER:  Good morning, your Honor.  John

5   Bueker with Mr. Montgomery for Schering and Warrick.

6           MS. McDEVITT:  Good morning, your Honor.  Heather

7   McDevitt from White & Case for Sandoz, Inc.

8           MS. GIULIANA:  Antonia Giuliana for Dey and Mylan.

9           MR. BENNETT:  Dan Bennett, also from Ropes & Gray,

10  for Schering and Warrick.

11          THE COURT:  So how many defendants are there?

12          MR. BUEKER:  There are only three defendants

13  remaining in the case at this point.

14          MR. PAUL:  Well, three out of four.

15          THE COURT:  All right, so tell me about -- I am

16  worried that this case is taking so long, and from my point

17  of view, unlike for yours, every year I get a new law clerk.

18  So that when you extend out schedules, I get to start all

19  over again, unless I'm lucky enough to persuade the First

20  Circuit to extend something, and they don't tell me right

21  away.  So when you all agree to schedules that don't give me

22  enough time to complete it within a clerkship year, it

23  creates a problem for me.  That's unfortunately how these

24  cases are staffed.  And so I want to know what's happening

25  with production of documents.  Why are things taking so

1   long?  Do I have a definitive schedule that's really going

2   to stick?  So maybe you can just -- I'm glad you flew out

3   from California, it shows you care, so let me hear about it.

4           MR. PAUL:  Yes, your Honor.  I think the parties'

5   position is that the order that the Court signed in

6   mid-November --

7           THE COURT:  Yes, I know, and I goofed, okay,

8   because for some reason someone in my office put the same

9   order into my "in" box two different times; and one time I

10  signed it fast and I said agreed upon, and the second time,

11  when I saw how far it spun out, I got very worried.  So I

12  didn't know you all were relying on it, but let's just talk

13  about it now.

14          MR. PAUL:  To answer your question --

15          THE COURT:  Yes, I want to understand, and I

16  decided I needed to hear from you so it just doesn't get

17  kicked over and kicked over and kicked over.  I want it to

18  move.

19          MR. PAUL:  Yes, your Honor.  To answer your

20  question about what kind of schedule is going to stick here

21  that you can count on, that schedule will stick and you can

22  count on that schedule.

23          THE COURT:  So tell me what's happening, why it's

24  taking so long, what I can expect.  As you may know, I've

25  been at this case now for eight years, and every time I

1    think I see a light at the end of the tunnel --

2            MR. PAUL:  Your Honor, I appreciate that.  Just to

3    back up to the beginning a little bit, California originally

4    named a large number of defendants.  We've dismissed some.

5    We've been in mediation over the past year.  We've actually

6    settled the case with eleven different defendants here

7    through mediation.

8            THE COURT:  This is what I want to hear, okay.

9    See, I don't see this stuff.

10           MR. PAUL:  Sure.

11           THE COURT:  All right, you settled with eleven.

12   Who's left?

13           MR. PAUL:  There are four defendants left, your

14   Honor.  They have a couple of parents here, and they are

15   Mylan, Sandoz, Dey, and Warrick.

16           THE COURT:  Is everyone represented here?  Okay.

17           MR. PAUL:  So California has made ten document

18   productions since initial disclosures.  There's another one

19   being made tomorrow.

20           THE COURT:  About what?  What's still left?  Tell

21   me.

22           MR. PAUL:  From the point of view of California,

23   your Honor, what is on our plate that we owe the defendants

24   is a large production that stems from plugging in some

25   search terms that were specified by the defendants, and

1   there was a lot of back-and-forth over this last fall, and

2   we felt that possibly the search terms were too large, but

3   they stuck to their guns.  That's fine.  So those search

4   terms generated a large number of documents and a large

5   number of electronic database documents in Access and Excel

6   and other media that all take a long time to look at and go

7   through.  And we are producing the first --

8               THE COURT:  Like what were the search terms?

9               MR. PAUL:  Well, your Honor, these are 50 some odd

10  search terms with various --

11              THE COURT:  But are they unique to these

12  defendants, or are they about knowledge of the spread?  I

13  mean, what is this about?

14              MR. BUEKER:  Yes, some of them are unique to the

15  defendants, your Honor.  Some of them include terms like

16  "AWP" that may produce a lot of hits in terms of documents

17  but are kind of at the core of this case.  It's a list that

18  was narrowed by the defendants on three separate occasions.

19  This was a long process that was worked out.

20              THE COURT:  But just so I can understand it,

21  weren't most of these, except when they're

22  defendant-specific, weren't most of them produced for all

23  these eleven others?

24              MR. PAUL:  Actually, no, your Honor, no.  Abbott

25  Pharmaceuticals was sort of the lead defendant in the case

1    in terms of who was representing the defendants' side, and

2    we got one electronic search accomplished working with

3    Abbott as defendant representative.  That production has

4    been completed.  Then we were in mediation with Abbott and

5    other defendants, and Abbott sort of disappeared off the

6    scene.

7              THE COURT:  But didn't Abbott ask for all these?

8              MR. PAUL:  No, your Honor, no.  This is a far more

9    comprehensive, thorough.  You know, I'm using neutral

10   adjectives because I don't want to get into the nature of

11   the search, but it's a big search.

12             MR. BUEKER:  Actually, wait a minute.  The search

13   term list has only been narrowed down.  The original Abbott

14   search list included all of the terms that are at issue now

15   and has been narrowed further.

16             THE COURT:  I just want to know why this wasn't

17   produced -- when was this unsealed, like three years ago?

18             MR. PAUL:  Your Honor, the complaint was filed in

19   August, 2005, yes.

20             THE COURT:  It's just very late into the

21   litigation still to be producing documents.  But, in any

22   event, I don't understand why it's taken so long, but if you

23   produce these things when, tomorrow?

24             MR. PAUL:  No, your Honor.  We will not be able to

25   complete this electronic production until mid-March.  And as

1    I notified counsel last night, there are large numbers.

2              THE COURT:  Can't you do a rolling production?

3              MR. PAUL:  We are going to get this production out

4    the last week of February.  We will do a rolling production,

5    if it comes to that, of these electronic databases, these

6    spreadsheets that have been captured by the search terms,

7    and --

8              THE COURT:  I mean, do you have some now that are

9    ready to be produced?

10             MR. PAUL:  We have the entire volume of e-mails

11   and attached documents ready to be produced by the last week

12   of February.  There are electronic databases that we cannot

13   produce by the last week of February --

14             THE COURT:  But you'll produce it in a rolling

15   way.

16             MR. PAUL:  Yes, your Honor.

17             THE COURT:  Because now they don't get it till

18   mid-March.  So I don't know enough about what's in there,

19   whether it was an overly broad request or whatever.  Then

20   what happens to my schedule?  You haven't even started the

21   depositions in a three-and-a-half-year-old case.

22             MR. PAUL:  No, your Honor, no, that --

23             THE COURT:  So tell me, what's happening?

24             MR. PAUL:  A lot of depositions have been

25   happening, your Honor, actually.

1          THE COURT:  But what is it you told me you

2     couldn't do till the production happened?

3          MR. PAUL:  Well, I think from the defendants'

4     point of view, they want our documents so they can wrap up

5     depositions.  They have a list --

6          THE COURT:  I thought some, you were telling me,

7     haven't even been -- because I had put some limit on the

8     noticing, and everyone flipped out on me, so I don't

9     understand.  Let me just say, from my point of view, it was

10    filed a gazillion years ago, and it was unsealed in 2005.

11    It's now four years into the litigation.  It is

12    inconceivable to me as to -- I understand you did settle

13    with eleven.  That's making me feel better that you settled

14    with eleven, but it's still a very old case.

15         MR. BUEKER:  Your Honor, from defendants' point of

16    view, let me answer kind of what's been going on with the

17    depositions because we have taken some depositions.  We

18    started a 30(b)(6) deposition.  We've taken depositions

19    of --

20         THE COURT:  How many?

21         MR. BUEKER:  Eight fact and a 30(b)(6) deposition,

22    your Honor, some of which have been left open because there

23    will be additional electronic documents produced.  But

24    there's an efficiency --

25         THE COURT:  I understand that.

1          MR. BUEKER:  There's an efficiency issue with

2     several of the people who we have not noticed as of yet.

3          THE COURT:  You still haven't noticed everyone?

4          MR. BUEKER:  No, because of your Honor's order.

5          THE COURT:  How many are left?  How many are left?

6          MR. BUEKER:  I think we've identified a universe

7     of thirty-five possible people.

8          THE COURT:  That's crazy.

9          MR. BUEKER:  I think the number will turn out to

10    be much less than that, but it depends on seeing what's in

11    the electronic production.

12         THE COURT:  There are not going to be thirty-five

13    depositions, okay.  So now let's -- this is what I'm worried

14    about, right?  Right now, what is the proposal as to when

15    depositions finish?

16         MR. PAUL:  I'm sorry, your Honor?

17         THE COURT:  What's your proposal?  You're going to

18    have a rolling production.  You're going to give whatever

19    you have by the end of February, and then you're going to

20    finish up the production by what date?

21         MR. PAUL:  The middle of March, your Honor.

22         THE COURT:  The middle of March is what, the Ides?

23         MR. PAUL:  The Ides of March, your Honor.

24         THE COURT:  All right, March 15.

25         MR. PAUL:  Now, you know, I don't know if there

1    may be some complications that would make this rolling into

2    the end of March -- I'm being honest -- with these

3    electronic databases.  These are massive spreadsheets that

4    are captured by these search terms.  But I think what the

5    defendants are truly concerned about are documents, e-mails

6    and documents attached to e-mails, that they will get by the

7    end of February, by February 27.

8              THE COURT:  All right, by 2/27, all docs except

9    spreadsheets, right?

10             MR. PAUL:  Correct.

11             THE COURT:  And then I don't know what you mean by

12   spreadsheets.  Maybe that's just the spreads on the drugs?

13             MR. PAUL:  Well, these are spreadsheets prepared

14   at various times by individuals within the agency.

15             THE COURT:  Looking at the spreads and the costs,

16   is that it?

17             MR. PAUL:  Not that kind of spread, your Honor,

18   but looking at drugs and the cost of drugs and reimbursement

19   issues for budgeting purposes, just all sorts of analyses

20   that happen to embrace their drugs.  But those have to be

21   redacted of third-party manufacturer information because

22   it's sensitive proprietary information.

23             THE COURT:  You mean one of the other drug

24   companies.

25             MR. PAUL:  So that's part of the delay here.

1      THE COURT:  So, all right, let's assume everything

2  is coming in by March 15.  Beware, okay?  So now what?  So

3  what is your proposal?  You haven't even noticed all the

4  depositions.

5      MR. BUEKER:  The depositions will be completed by

6  June 15.

7      THE COURT:  And then what?

8      MR. BUEKER:  Then I would assume we would --

9      THE COURT:  Then I start with a new law clerk by

10  the time you brief the whole thing.  I mean, this is what

11  the big issue is for me.  What do you anticipate -- so you

12  couldn't possibly by March 15 go through all the

13  documents -- I mean, maybe it's great for the litigation

14  department at Ropes -- but go through all the documents and

15  take thirty-five depositions.

16      MR. BUEKER:  No, and as I think I've indicated, I

17  think we will be able to, when we see the documents, carve

18  down on the number of depositions we're talking about,

19  but we --

20      THE COURT:  Why couldn't you have noticed all the

21  depositions -- how many -- when you -- you need to create a

22  finite universe.  Otherwise this makes a -- I'm going to get

23  another motion for a continuance, I know it.  But let's

24  assume for a minute I say June 15, and if you don't finish,

25  you don't finish.  But then I always worry, then that means

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1   that ten associates are doing all-nighters, you know.  So I

2   want to understand, how many depositions would you want to

3   take?

4            MR. PAUL:  Your Honor, we haven't announced any

5   defendants for 30(b)(6) depositions, just one each.  We're

6   waiting for responses.  And we have a few more depositions

7   regarding transactional data, and we have a side issue

8   regarding whether or not depositions --

9            THE COURT:  Well, maybe your four can be taken in

10  the next month.

11           MR. PAUL:  They probably can, your Honor, but we

12  need their -- they're not complete with their transactional

13  data and --

14           THE COURT:  When can your data get to them?

15           MR. BUEKER:  By the end of the month.

16           THE COURT:  All right, so both are going to get

17  all the transactional data by 2/27.  But as a practical

18  matter, until you get him that budget information, he can't

19  begin to take depositions, right?  Or could he?

20           MR. PAUL:  Well, in my opinion, your Honor, once

21  they get the production that we're giving them by

22  February 27, they're going to be on the road.  They're also

23  getting a production tomorrow.  We have withdrawn virtually

24  all of our deliberative process privilege assertions.

25  Reading your orders and your hearing transcripts, we see the

Page 15

1   writing on the wall, and we understand the test that has to

2   be satisfied.  So they're getting a large number of

3   documents tomorrow from us that result from a rereview and a

4   purging of our privilege log, which is now far smaller.

5           THE COURT:  All right, so some comes in tomorrow

6   which is the 13th.  You'll start getting people working on

7   them.  Then the 27th and then the 15th.  And right now, how

8   many depositions have you taken so far?

9           MR. BUEKER:  We've taken eight fact depositions,

10  your Honor, and a --

11          MR. PAUL:  Seven.

12          MR. BUEKER:  Seven?  And a 30(b)(6).

13          THE COURT:  You know, I'm not going to allow you

14  take to thirty-five depositions, so we need to really pare

15  this down.  The local rules give you what, seven, ten?  And

16  I understand that this is an MDL case and I don't have to

17  follow them, but I'm not going to allow forty-two

18  depositions.

19          MR. BUEKER:  Okay.

20          THE COURT:  Okay?  So let's try and talk through

21  with me what you might need.

22          MR. BUEKER:  I think, your Honor -- and let me

23  break the depositions into three categories to start with.

24  There were twenty-three depositions that we -- in filing the

25  joint motion to amend the scheduling order, we tried to set

1    forth the universe of everyone we could think of who had

2    been identified to date, and we broke that universe into

3    three separate categories of people.  There are four

4    individuals who are associated with Ven-A-Care of the

5    Florida Keys who are the plaintiffs, the relators in this

6    case, so those four depositions.  There are thirteen of

7    those depositions --

8              THE COURT:  Well, wait a minute.  So four of them,

9    why do you need four people?  Are they just people who over

10   time oversaw their drug program?

11             MR. BUEKER:  These are people who are bringing

12   the -- these are the nominal plaintiffs in this case, the --

13             THE COURT:  Why do we care about them?  Are there

14   some technical whistleblower defenses?

15             MR. BUEKER:  Yes, and we need to understand what

16   information they came forward with when.

17             THE COURT:  Is this one of these, you know, it's

18   impossible, there's a thicket of case law and whether it was

19   publicly available?  Is that what you're getting at?

20             MR. BUEKER:  Yes, yes.

21             THE COURT:  So there are four people, and why

22   hasn't that been done yet?  That's just something that

23   wasn't dependent on these documents.  That can happen now,

24   right?

25             MR. BUEKER:  You're right.

Page 17

1      THE COURT:  Okay.  And you haven't noticed them

2  yet?

3      MR. BUEKER:  No.

4      MR. BREEN:  Your Honor, Jim Breen for Ven-A-Care.

5  My clients have been deposed for weeks in these cases, in

6  related cases, some by some of the parties here.

7      THE COURT:  On the exact same issues?

8      MR. BREEN:  The exact same issues.

9      THE COURT:  Is it this case?

10      MR. BREEN:  In this case.  They have been

11  deposed in the -- when I say "this case," in the MDL.

12      MR. BUEKER:  I'm happy to read transcripts, if he

13  wants to agree that they'll be made available in this case.

14      THE COURT:  Of course they're going to be made

15  available.  This is why I'm doing this hearing.  Of course.

16      All right, so you're not going to do any of the

17  Ven-A-Care parties unless you find that there's some gap

18  that applies to one of the four of you.

19      MR. BUEKER:  Okay.

20      MR. BREEN:  And we'll certainly cooperate in

21  scheduling those depositions.

22      THE COURT:  So what's the next group?

23      MR. BUEKER:  There are twenty-three individuals

24  who worked for the state Medicaid program.

25      THE COURT:  So you're going to produce the

1    Ven-A-Care transcripts by when?  By the end of the month,

2    2/27?

3             MR. BREEN:  I'm sorry, your Honor?

4             THE COURT:  By 2/27 you're going to produce all

5    the transcripts?  Or can you do it sooner?

6             MR. BREEN:  I think they've got them, but we can

7    do it sooner.

8             THE COURT:  Okay, but no later than.

9             MR. BREEN:  Definitely by 2/27.

10            THE COURT:  Okay, all the transcripts, okay, all

11   right.

12            MR. BUEKER:  There are twenty-three individuals

13   associated with the California Medicaid program who were

14   responsible in part for running the Medicaid program.  I

15   suspect that some of that will be duplicative, your Honor,

16   and we will endeavor to do --

17            THE COURT:  Is that because we're dealing with

18   different time periods?

19            MR. BUEKER:  Yes.

20            THE COURT:  Okay, rather than just different

21   people in the hierarchy?

22            MR. BUEKER:  Some of them are different people in

23   the hierarchy, but we've identified kind of the pharmacy

24   branch where there are four or five different people who

25   have -- there's been a significant amount of turnover over

1    time.  They tend to be the people, from the depositions

2    we've taken to date, are the people who were actually

3    running this day to day and had more of the knowledge.

4    There is, nevertheless, several layers of management within

5    the department, and some of those people are also reflected

6    in that twenty-three.  They too have changed significantly

7    over time, and that's why the number is what it is.  I

8    suspect that to the extent there is duplication, to the

9    extent we see in the documents an ability to narrow this

10   list down, we will do that.

11            THE COURT:  Well, we saw in Massachusetts, for

12   example, that there were, you know, like a handful of key

13   guys over time.  You know, they were -- I don't remember

14   even their names right now, but there were only, like, six

15   maybe.

16            MR. MONTGOMERY:  True, but in Massachusetts for

17   the entire time period from 1988 to date, there's really

18   only been two people who have run the pharmacy program,

19   so --

20            THE COURT:  And that's been dramatically different

21   in California?

22            MR. BUEKER:  Yes.

23            THE COURT:  What's the time span we're talking

24   about?

25            MR. BUEKER:  The same time span, your Honor.

1      THE COURT:  How many key people over that time

2   period would you say there were, so they can make sure that

3   every time period is covered without duplicating?  Who would

4   be the people?

5      MR. PAUL:  Well, your Honor, I think we have a

6   disagreement about the number of key people.  There has been

7   a layer of continuity.  They have deposed some prior people,

8   and I think they want to depose some other prior people, but

9   it's not as if everyone, there's been a wholesale

10  transition.

11     THE COURT:  Have you done a 30(b)(6) yet of the

12  Medicaid --

13     MR. BUEKER:  We've done part of the 30(b)(6), yes.

14     MR. PAUL:  We've done seven 30(b)(6) depositions

15  on 47 topics so far, your Honor.

16     THE COURT:  But has it covered all the time

17  periods?

18     MR. PAUL:  Yes, your Honor.  We have one 30(b)(6)

19  that is still open.

20     THE COURT:  So I don't understand why that isn't

21  sufficient, short of your seeing stuff in these documents

22  where you need -- you know, there's someone, you know, like

23  one or two key people like in the Massachusetts case -- why

24  the 30(b)(6) isn't -- as long as you're getting good

25  coverage.

 1          MR. BUEKER:  First of all, I would dispute that

 2   we're getting good coverage as to the time periods.  The

 3   witness that has been produced is currently in the program.

 4   You know, part of this is, the depositions we've taken, the

 5   fact witness depositions that we've taken so far have been

 6   of the earlier people, and that was a conscious decision

 7   made because we don't suspect we're going to see their

 8   e-mails.  What we've tried to do is --

 9          THE COURT:  Well, I think you are now.  I think

10   they say they've cut way back on deliberative and that

11   you're going to be getting all this stuff.

12          MR. PAUL:  I think he's just referring to the fact

13   that e-mail wasn't used as much in the early-mid-'90s as it

14   is now.

15          THE COURT:  Oh, I see what you mean.

16          MR. BUEKER:  So we've tried to structure this and

17   move this along as efficiently as possible by taking those

18   depositions we thought we were unlikely to need to redo when

19   we saw the electronic production.  What we've held off on

20   are people who are knowledgeable, we think, about the later

21   time period.  That's how we tried to --

22          THE COURT:  Well, why don't we do this because

23   that number you gave me seems totally out of whack.  Why

24   don't we do -- we're carving off the Ven-A-Care because

25   you're going to take theirs, unless there's some little nook

Page 22

1    that you need to clean up.  And then what you're going to do

2    is do this:  You can look at all the things, finish up the

3    30(b)(6)s, and then take ten other depositions.  And I think

4    that is realistic.

5         You need to start right away in dealing with

6    noticing what you think are the key people.

7              MR. BUEKER:  Okay.

8              THE COURT:  And set up the date so we don't get

9    into this -- you know, people have weddings and graduations,

10   people have lives.  And so you'll do a rain dance, and I

11   know at the end, if you don't set up these dates -- you need

12   to set up your dates with them.

13             MR. PAUL:  Yes, your Honor.  You mentioned a few

14   minutes ago that of course depositions that have been taken

15   earlier ought to be usable in this case.  We do have a

16   dispute with one defendant over that defendant's refusal to

17   agree that depositions of its clients that were taken in

18   other actions can be used as if taken here.

19             THE COURT:  Of course they can.  They're

20   admissions of a party opponent.

21             MR. PAUL:  Dey wishes to be heard on that.

22             THE COURT:  Of course they can.

23             MS. GIULIANA:  Good morning, your Honor.  With

24   respect to several of the depositions that we're arguing

25   about, we don't believe that the case law supports a finding

1   that they would be party admissions for several reasons.

2   For some of the employees, they were former employees at the

3   time their deposition was taken, and for others they were

4   former employees; and while they were employed, they were

5   low-level employees who could not bind the corporation.

6           THE COURT:  Okay, well, let me just make it clear:

7   Yes, they can be used.  We are going to cross-generate all

8   the depositions to minimize the expenses in this case.  Now,

9   I don't know what they said that you're so terrified of,

10  but, in any event, there may be additional items that need

11  to be -- does that satisfy you?  Are you done with Dey?  You

12  don't need any more depositions?

13          MR. PAUL:  There are a couple of people who have

14  never been deposed at Dey, your Honor, and we're evaluating

15  the need for deposition.  It's only one or two, three at the

16  most.

17          THE COURT:  All the other depositions from the

18  other cases can be used, but I'm not going to estop people

19  if there are little corners that need to be cleaned up.

20  That's what we do in these multidistrict litigations.  It

21  may be you'd have an argument about one of these people.  I

22  can't answer that.  You'll have to take the risk of that.

23          MS. GIULIANA:  Well, your Honor, you know, with

24  respect to -- and I just want to put this into perspective

25  so you can understand.

1          THE COURT:  Which firm are you with?

2          MS. GIULIANA:  I'm with Kelley Drye & Warren.

3          THE COURT:  Where are you from?

4          MS. GIULIANA:  I'm from New York.  You know, so

5   far, in the past year our client has sat for five days of

6   30(b)(6) depositions in this case, five sales

7   representatives have been deposed, and another individual

8   from the contracts department has been deposed.  So we sat

9   for about eleven days of depositions in this case.  In

10  addition, we also agreed that there are seven depositions

11  from prior actions that we would agree could be used in the

12  California case as if they were taken in California.

13          There are three depositions that we have not

14  agreed to because for those three witnesses, they were taken

15  in the Texas litigation a long time ago before all these

16  other cases, the pricing cases around the country were

17  filed.  And our view is that at the time those depositions

18  were taken, we did not have the motive or opportunity to

19  develop cross-examination of those witnesses that would be

20  relevant in California.

21          THE COURT:  But they were your people.

22          MS. GIULIANA:  They were former --

23          THE COURT:  You know what?  Tell you what, I can't

24  do this off the cuff.  You have an uphill battle, but if you

25  want to move to strike them, you can.  I can't rule off the

1   cuff.  I don't know if they may be -- were they people you

2   named?

3            MS. GIULIANA:  They were not people that we named.

4            THE COURT:  They were 30(b)(6) depositions?

5            MS. GIULIANA:  They weren't 30(b)(6).  Two were

6   former employees, and one was --

7            THE COURT:  Why will you take them all?  That's

8   ridiculous.

9            MS. GIULIANA:  Well, our argument is that if those

10  depositions are used, we think that they should be called

11  again in this case so that we have a chance because at this

12  point they're all former employees who are outside of our

13  control, and there's cross-examination of those witnesses

14  that we would like to have --

15           THE COURT:  Well, you're going to have to brief it

16  because at least right now I think that the odds are I'm

17  going to allow in all depositions from other cases involving

18  this issue.  So that's what I've done in multidistrict

19  litigation, which is this part of it.  It's been almost a

20  standing rule that we'd all designate.  So if you want to

21  move to strike them, you're just going to have to brief it,

22  but you can't -- I mean, I think it's ridiculous.  Maybe

23  what you do is a supplement of them, and then you can sort

24  of ask them to clarify.  I don't have a serious problem with

25  that, now that there's new case law, et cetera, but I'm not

1   going to start from scratch.  On the basic fact questions,

2   they'll be binding.

3         MR. BREEN:  Your Honor, just to kind of add to

4   what you just said, these are all depositions we took -- I

5   think I took these depositions in the Texas case.  Just like

6   the First DataBank depositions early on in this MDL that

7   were taken in the Texas case that your Honor under the name

8   of (Inaudible) brought in this case, so the only additional

9   deposition testimony was something that was supplemental or

10  necessary to augment or whatever.  And we would respectfully

11  request, obviously, that these depositions, like all the

12  other ones, be allowed in the case, and we'll be happy to

13  cooperate and supplement --

14        THE COURT:  Yes, all prior depositions.  All

15  right, so assume for a minute that all discovery will have

16  been produced by March.  And so you want all depositions to

17  be done, no more than ten depositions -- is that for

18  everyone?  You're talking for all the parties?

19        MR. BUEKER:  Well, I mean, if you'd allow ten

20  depositions for each party, that would be --

21        THE COURT:  No, no.

22        MR. BUEKER:  I thought I'd try.  Actually, what I

23  was standing back up to say is, there's a category of

24  potential discovery that we didn't talk about, which is

25  third-party discovery.  There were thirteen --

1          THE COURT:  This is why I am annoyed.  This case

2     is exploding.  Why haven't you deposed them already?

3          MR. BUEKER:  Of the thirteen we've listed, I'd ask

4     that we be permitted to take two.

5          THE COURT:  I said ten.  Of the ten, if you want

6     two of them to be that, fine.  I don't understand it.  But

7     here's my problem:  Once all the fact discovery is done,

8     then what?

9          MR. BUEKER:  I suspect that we, at least, will

10    make a partial motion, anyway, for summary judgment.

11         THE COURT:  How about just going to trial?  Are

12    there experts?  Is expert discovery complete?

13         MR. PAUL:  Your Honor, expert discovery has not

14    started.  We need the transactional data for our experts.  I

15    assume they have needs.

16         THE COURT:  Well, what are the big issues in the

17    case?

18         MR. PAUL:  This is a California False Claims Act

19    case, your Honor.  It's fairly simple in that respect.

20    There are four counts that survive your order on motion to

21    dismiss and --

22         THE COURT:  At some point I send it back, you

23    know, right?

24         MR. PAUL:  Yes, your Honor.  I assume you'll send

25    it back to the Central District in California.

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1          THE COURT:  Yes, yes, so where would it be,

2    Northern, Southern?

3          MR. PAUL:  Central, your Honor.

4          THE COURT:  Who was the judge who had it

5    initially, that poor soul?  Who has it?

6          MR. PAUL:  Pregerson, your Honor.

7          THE COURT:  Judge Pregerson?

8          MR. PAUL:  Yes, the younger of the District Court.

9          THE COURT:  So I want to get this to the point

10   where I can -- so, all right, this is now in 2005, we're now

11   in 2009, and we haven't started on expert discovery?

12         MR. PAUL:  Well, that's right, your Honor.  I

13   mean, the original effect cutoff date was mid-December, so I

14   don't think we're extraordinarily far behind.  We've labored

15   under some mutual confusion, obviously, at the end of 2008.

16   I mean, I don't think expert discovery is hideously overdue.

17         THE COURT:  So what's the proposal?

18         MR. PAUL:  Well, the proposal, your Honor, is

19   if -- I mean, it sounds to me like you're saying depositions

20   must be complete --

21         THE COURT:  I'm trying to understand whether I

22   need expert discovery in order to handle motions for summary

23   judgment.

24         MR. PAUL:  You do, your Honor, yes.

25         THE COURT:  Okay, so what kinds of issues will hit

1    me on summary judgment?  Are they the technical

2    whistleblower kinds of things, or are they whether it was in

3    the public domain?

4              MR. PAUL:  I think these are the same issues, your

5    Honor, that have are already come before you expertwise or

6    will come before you in the Ven-A-Care federal Abbott, Dey,

7    and Roxane case.  These have to do with the marketing of the

8    spread, explaining damages.  That from the plaintiff point

9    of view, that's the primary --

10             THE COURT:  So you're going to be moving for

11   summary judgment?

12             MR. PAUL:  At least partially, your Honor, yes.

13             THE COURT:  And are you going to be moving for

14   summary judgment probably?

15             MR. BUEKER:  I would think, at a minimum, the

16   statute of limitations --

17             THE COURT:  Do I need an expert for all of this?

18             MR. BUEKER:  Do we need an expert on the summary

19   judgment motion?  I don't know.  I would have to consult, I

20   think, with my codefendants before I could answer that.

21             THE COURT:  I'm not sure how I would, with you,

22   how I would need an expert.

23             MR. BREEN:  Your Honor, one of the areas that may

24   come in is in this whole area of government knowledge.

25   Depending upon what your Honor rules in terms of the

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1    substantive applicability of some of this evidence --

2             THE COURT:  This will be under California state

3    law, though, right?

4             MR. BREEN:  It will be under California state law

5    and on the general Medicaid federal law that applied to the

6    program.  So I can see -- and from our perspective, they're

7    the same experts or types of experts that we've already put

8    up in all of our other cases, including the federal cases

9    where we're just now finishing expert discovery.  But as

10   your Honor --

11            THE COURT:  That's partly factual.  I mean, that's

12   mostly factual, whether you knew it to the point of

13   embracing it versus --

14            MR. BREEN:  It is, and there's the speed bump

15   issue, how that's calculated.

16            THE COURT:  And what are you all doing with that?

17   Are you going to embrace the Hartman 30 percent?  Remember,

18   I've left that sort of open.

19            MR. BREEN:  Yes, your Honor.  I think what you're

20   going to see, your Honor, from the perspective of our

21   experts is, the damages models are going to allow for

22   sufficient variance that it will not be a relevant issue.

23   In other words, we're not -- in none of our Ven-A-Care

24   cases, including the California, have we looked for any kind

25   of damages or liability on these small spreads.  So they're

1    all going to be in excess of the 30 percent as a matter of

2    practicality.

3              THE COURT:  I think it was New York who wanted to

4    reserve the right to play with -- everyone agrees there's

5    some speed bump.  Everybody agrees there's some speed bump,

6    but there's some dispute as to whether it's 20 or 25 or 30

7    or --

8              MR. PAUL:  The way we filed our case, your Honor,

9    it incorporated the speed bump.  We said that we had to

10   exceed it by at least 20 percent, even to get the NDC in our

11   complaint exhibit, and that was all briefed in the motion to

12   dismiss.

13             THE COURT:  So for me that is the classic

14   government knowledge kind of issue:  Everyone knew it in

15   government and in industry who was sophisticated enough, not

16   these little plans, and the issue is the mega spreads.

17             MR. PAUL:  Yes, your Honor.

18             THE COURT:  So that is the big issue.  And I don't

19   know whether you all think that that's going to be summary

20   judgment-able, but if that's it, I don't see why I need to

21   wait for the experts.  That is something I can handle, I

22   think, without the experts, right?  Am I wrong?

23             MR. BREEN:  Your Honor, particularly if you find

24   an area that raises an issue of fact that might be pertinent

25   for expert testimony.  You've had enough expert reports in

Page 32

1  all these cases now where I think everybody kind of knows

2  what those issues are, so if there's something that raises

3  an issue of fact that would be pertinent for expert

4  testimony, then --

5          THE COURT:  Maybe you can agree to -- who's your

6  expert going to be?  Is it going to be Dr. Hartman or your

7  own?

8          MR. BREEN:  We've got our own, your Honor.

9          THE COURT:  Who is it?

10         MR. PAUL:  Our damages expert is a firm in

11  Los Angeles, an econometrics firm.

12         MR. BREEN:  For some of the defendants, we may use

13  Professor Duggan who we've used in these actions.

14         THE COURT:  So would I be wrong in doing this, is

15  a little bit of a fast-forward on the government knowledge

16  thing, so at least I can have some over- -- I mean, can't we

17  do the government knowledge thing sooner rather than later?

18         MR. BUEKER:  A lot of that's being developed

19  through the depositions.

20         THE COURT:  Fair enough, but not the experts.  I

21  don't think I need the experts.  In other words, I think, as

22  soon as your fact discovery is over, both sides can move for

23  summary judgment.

24         MR. PAUL:  Your Honor, you're referring to the

25  government knowledge issue, at least get it off the table?

1          THE COURT:  Yes.  In other words, you could have

2     damage discovery ongoing, but there's knowledge, and what

3     else would there be, statute of limitations?  Why do I need

4     an expert for that?  I'm just trying to play it out.  The

5     expert, of course there's going to be some damage model

6     issues.  Perhaps there's a causation issue like in some of

7     these cases.

8          MR. BUEKER:  I mean, that's what turned out to be

9     the case in Massachusetts was that there was a causation

10    issue on the U and C.

11         THE COURT:  A big one, and there's a big one in

12    the big trial.  So, I mean, is it the same kind of issues

13    over here?  How about FUL, which is one I've never totally

14    resolved?

15         MR. BUEKER:  Well, as I think about a California

16    summary judgment motion, your Honor, that is the issue that

17    comes to mind.  And in one instance, I can see at least one

18    need for an expert, which would be to analyze the claims

19    data that California has produced and to come up with and

20    identify the basis of payment, so that if FUL was an issue

21    that the Court resolved in defendants' favor, there would be

22    a record as it relates to the claims data and FULs in

23    California, the basis of payment.

24         THE COURT:  I should be getting that stuff in New

25    York, right, soon?

1        MR. BUEKER:  Very soon, your Honor.

2        THE COURT:  Would that be equally applicable to

3   you?  Could we litigate the FUL case all at once?  Is that

4   the same issue across the country?

5        MR. PAUL:  Well, there's only one FUL, your Honor.

6        THE COURT:  Right.

7        MR. PAUL:  And I'm not completely up to speed on

8   what the theory of the New York counties' case is regarding

9   FUL damages, but obviously there is only one FUL, and

10  California has paid some of these claims under a FUL.

11        THE COURT:  I think --

12        MR. BUEKER:  And, yes, your Honor, we've cross-

13  noticed all of that discovery into this California case.

14        THE COURT:  What I'd like you to do is, so I don't

15  have to do this twice and you can't claim foul, which you

16  might well if somehow I rule against New York and it affects

17  you, you need to be up to speed on that, prepared in full,

18  shall we say.  It's the Federal Upper Limit.  No one has

19  ever explained to me how it's calculated, and whether or not

20  if somebody magnified their AWP, let's say, in a way that

21  was inappropriate, whether you could ever possibly say that

22  any one firm's AWP -- am I saying this correctly?

23        MR. BUEKER:  You are.

24        THE COURT:  -- affected the Federal Upper Limit.

25        MR. BUEKER:  We intend to explain that to you very

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1    soon.

2              THE COURT:  Not even the lawyers, who know this

3    stuff better than I do, understood FUL.  But I think we're

4    all getting there, right?  We should be able to pinpoint

5    that.

6              MR. BREEN:  There's going to be two FUL issues in

7    this case, your Honor.  One is real simple, and that is a

8    simple straight damages analysis if they paid FUL but would

9    have paid less had a reported price been accurate or

10   truthful.  In other words, they're all lesser of, the lesser

11   of the FUL and the EAC.  So in that case our damages

12   model --

13             THE COURT:  That might be easier.

14             MR. BREEN:  That's just the incremental amount

15   between the FUL and what they should have paid.  The more

16   complicated issue is the fact that FULs were set 150 percent

17   of the lowest published price, and had a defendant reported

18   a truthful price, it would have been picked up as the FUL --

19             THE COURT:  Well, I know you disagree.

20             MR. BUEKER:  Well, and that's an open issue, and

21   that will be resolved --

22             THE COURT:  But that's why I want you all to be in

23   on it.

24             MR. BREEN:  I'm just stating the issue.  Those are

25   two different issues.

1          THE COURT:  That's the one I've never, I think,

2     resolved, and no one's really totally teed it up, and it's

3     going to be in New York.

4          MR. BREEN:  So do you want us to weigh in with the

5     New York case on the FUL?

6          THE COURT:  Yes, just so we don't have to litigate

7     it twice.  All right.  But we can do the government

8     knowledge one and the statute of limitations and likely

9     causation without expert reports.  Am I not seeing that

10    right?

11         MR. BREEN:  As long as it's understood that we can

12    eliminate factual issues that might be answered by an expert

13    just like any other factual issue.

14         THE COURT:  Well, why don't I do this.  I feel as

15    if you haven't really thought through your motion for

16    summary judgment completely, right?  I'm assuming government

17    knowledge will be there, but --

18         MR. BUEKER:  Right.  I don't know whether or not

19    we could do it with or without an expert.  I can't answer

20    that question definitively.  You're right, I have not

21    thought through that completely.

22         THE COURT:  So if you were to do experts, doesn't

23    that bring me into another year?

24         MR. BREEN:  We've got a pretty short time frame in

25    the orders up until now for experts, Judge.  I don't --

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1          MR. PAUL:  The order that had discovery cutoff in

2     mid-June had summary judgments filed in December of 2009.

3          THE COURT:  Yes, but now what do you have me

4     extend?  There's another seven or eight months.

5          MR. PAUL:  No, no, your Honor, I don't think

6     that's an issue at all.  I'm referring to the Court's

7     November order that had discovery cut off --

8          THE COURT:  Yes, but let's assume for a minute you

9     end up at June 15, all fact discovery closed.  When do your

10    expert reports come in?

11         MR. PAUL:  They were due at the end of August,

12    your Honor.

13         THE COURT:  Yours?

14         MR. PAUL:  Ours were.

15         MR. BUEKER:  And ours were due at the middle of

16    September.

17         THE COURT:  And then the depositions?

18         MR. BUEKER:  They would be completed in that

19    30-day -- you had allowed through December 15 to complete

20    all expert depositions.

21         THE COURT:  And then what?

22         MR. BREEN:  Summary judgments.

23         MR. BUEKER:  Summary judgments.

24         THE COURT:  When?

25         MR. BREEN:  15 December I think was the deadline.

1          MR. BUEKER:  It actually was January 15.

2          THE COURT:  2010.  So when were they originally

3     supposed to be done under the old order?  We were supposed

4     to be there almost, right?

5          MR. BUEKER:  No.  Fact discovery wasn't supposed

6     to close until I think summary judgment motions --

7          MR. PAUL:  July 15, your Honor, deadline to file

8     motions for summary judgment.

9          THE COURT:  So essentially this puts us behind six

10    or seven months, right?

11         MR. PAUL:  Yes, your Honor.  I realize how much

12    the Court hates this kind of delay.

13         THE COURT:  But then I've got --

14         MR. PAUL:  It's a large program.

15         THE COURT:  I know, but you create -- it's just

16    huge delay.  This probably all should have happened.  And

17    I've got to then -- I face the specter of not even not

18    having this year's clerk but next year's clerk not get to

19    it.  So if you finish -- I'm not sure we need to wait for

20    all these expert reports to do the motions for summary

21    judgment.  Maybe we can do this in pieces.

22         MR. PAUL:  Certainly, your Honor.  We could

23    certainly propose a schedule where we have at least motions

24    for summary judgment on the issues we've talked about this

25    morning.

1          THE COURT:  All right, so why don't we --

2          MR. BUEKER:  It strikes me, your Honor, just

3     thinking out loud here, that between September 15 and

4     December 15 is quite some time to take the experts'

5     discovery.  Maybe we could shorten the schedule by

6     shortening that period which --

7          THE COURT:  Well, how many experts are we talking

8     about?

9          MR. BREEN:  Usually there are about four on each

10    side, not including attorneys' fees and anything like that,

11    and sometimes there are supporting experts.  Usually you've

12    got a damages --

13         THE COURT:  But don't we have -- I don't know your

14    Medicaid scheme.  Is it unique?  Is that what's going to

15    create a causation -- like, we had this weird thing come up

16    in some of these other states, you know, some quirky thing

17    we didn't understand.

18         MR. PAUL:  No, I think California is going to be

19    fairly simple, your Honor.  There's not this usual and

20    customary issue that there was in Massachusetts in

21    California.

22         MR. BREEN:  The only thing in California is, some

23    defendants were direct-price defendants; and they're all

24    gone, we settled with them.  So all the defendants that were

25    remaining were AWP-based reimbursement.

fe044ee8-78fa-4a00-a2aa-0726d6956f3c

1       MR. PAUL:  This is, I think, your first state AWP

2  case, and Massachusetts is a WAC case.

3       THE COURT:  Yes, right.

4       MR. PAUL:  There's some distinction there.

5       THE COURT:  Okay, so what we're going to do is --

6  I don't see how you both read all the documents and you do

7  fact discovery and do it anywhere before June 15, even with

8  only ten depositions.  I just don't see it happening, all

9  right?  So why don't we do the expert report -- can't we get

10  it in, your expert reports, before that?

11       MR. PAUL:  Just to clarify, your Honor, you're

12  referring to addressing the issue of government knowledge?

13  That's really their --

14       THE COURT:  No.  Whatever you said you needed

15  experts for.

16       MR. PAUL:  Well, we think we do need an expert to

17  adequately establish damages, and I believe that we could

18  get that report in by the end of June.

19       THE COURT:  Right, because you're not dependent on

20  all these fact depositions.  So why don't we just say your

21  expert report by the end of June, your expert report -- so

22  let's just do this -- 6/30.  Just to not lose so much time,

23  your expert report by 7/30?  Can you do that?

24       MR. BUEKER:  Sure.

25       THE COURT:  The depositions by 9/30?  All right,

1    so I've regained some time here.  By 10/30 -- and if you can

2    do some before then, you can -- by 10/30 any motions for

3    summary judgment, opposition by 11/30, reply by 12/15,

4    surreply by -- I don't want to disrupt people's vacations

5    totally -- let's say by 1/8 so that people can have a

6    vacation and not get it done till 1/8, and then a hearing

7    sometime in the end of January.  I think you could even

8    break this up a little bit, but I think I'm going to have to

9    rule on it before I ship it off to California.  I think

10   these are the things I'm expected to do as an MDL judge.

11              MR. BREEN:  Can I make sure we understand where we

12   are, Judge?  Ten depositions?

13              THE COURT:  Yes.

14              MR. BREEN:  In total?

15              THE COURT:  Well, for their side.

16              MR. BREEN:  For their side, okay.

17              THE COURT:  And ten for you as well.  But I'm

18   assuming, the way you're talking, you don't really --

19              MR. PAUL:  That's fine.

20              THE COURT:  -- you might not need them all.  And

21   you incorporate all the other depositions.  That's why I'm

22   doing it is, you incorporate everything else.

23              MR. BREEN:  Fact discovery cutoff by 3/15, the

24   Ides of March.

25              MR. BUEKER:  No.

1          MR. BREEN:  June 15, I'm sorry.

2          THE COURT:  Gee, I was happy.  You've been

3   fighting so hard, I --

4          MR. BREEN:  Yes, that's why I don't want to talk

5   much.  Expert reports by the end of June, summary judgment

6   motions by October 30, oppositions by 11/30, replies by

7   12/15, surreplies by 8 January, and an MSJ hearing sometime

8   towards the end of the --

9          THE COURT:  Month.

10          MR. BREEN:  -- the end of the month.

11          THE COURT:  And then I've got plenty of time so

12   that whoever the new law clerk is will be up to speed, can

13   do it before he or she leaves.

14          MR. BREEN:  And our expert reports are due 8 --

15          MR. BUEKER:  June 30.

16          MR. BREEN:  June 30.  And the defendants' expert

17   reports are due?

18          MR. BUEKER:  July 30.

19          MR. BREEN:  July 30.

20          THE COURT:  Now, am I likely to see any motions to

21   compel that's going to hold this all up?

22          MR. PAUL:  There's one pending right now, your

23   Honor, that was filed last week that concerns a 30(b)(6)

24   witness issue.

25          THE COURT:  Who has filed it, you?

Page 43

1          MR. PAUL:  We filed it.  Sandoz did not want to

2     produce a 30(b)(6) witness.

3          THE COURT:  Who's Sandoz?

4          MS. McDEVITT:  That's me, your Honor, Heather

5     McDevitt.

6          THE COURT:  What's the issue?

7          MS. McDEVITT:  Well, there are a number of issues.

8     One is that we believe that some of the testimony sought,

9     which goes to Sandoz's knowledge or understanding of

10    California's Medicaid scheme, has already been -- he's

11    already testified as a fact witness.

12         THE COURT:  Well, good, so designate it.  We've

13    now established that you can designate that, but then are

14    there additional issues?

15         MS. McDEVITT:  The additional issue that we've

16    identified is that some of the topics seem to go to issues

17    that we don't believe are appropriate for 30(b)(6)

18    testimony.

19         THE COURT:  Like?

20         MS. McDEVITT:  Namely, Sandoz's understanding of

21    whether California explicitly approved its setting of AWP

22    and accepted it.  And it seems to be more of an ultimate

23    issue in the case, and we haven't believed that it's

24    appropriate for 30(b)(6) testimony.  We also believe that

25    we've had other witnesses who have testified to the fact --

1        THE COURT:  I think it's appropriate for 30(b)(6),

2   but I also think that if it's been done, it's been done.

3   They have the right, as I've said to all of you -- you know,

4   you're all unique parties -- if there's some little cleanup,

5   that you just put it all in and then just clean up what the

6   rest is.

7        MR. PAUL:  I understand, your Honor.  Some of

8   Sandoz's depositions will be taken of its former employees,

9   who obviously can't bind the corporation, and we just ask

10  for one.  The defendants have taken seven different 30(b)(6)

11  witnesses on 37 topics.  We ask for just one person on a

12  very narrow range of topics.  We think it's reasonable.

13       THE COURT:  So the big issue, which it goes back

14  to what Dey is saying, is that with respect to these former

15  employees who are not management -- there's still an issue

16  speaking within the -- I don't know how low down they are or

17  how high up they are -- if they're unavailable witnesses,

18  you have that rule, and that's what you're going to have to

19  talk about if for some reason -- at most, it's not going to

20  be binding on the corporation, but it may be admissible if

21  they're unavailable parties in a litigation, right?

22       MR. PAUL:  Yes, your Honor.

23       THE COURT:  I don't know, do we have to retake

24  them?  Can't we have some agreement on them, all the --

25       MS. McDEVITT:  I'll just raise this idea now

1    because we're here and we're talking about it.  One thought

2    that we had that we were planning on identifying in our

3    opposition to the motion to compel is that a number of the

4    categories of 30(b)(6) testimony that California has

5    identified we believe could be answered in an interrogatory

6    response, and --

7            THE COURT:  No.  They're allowed to take

8    depositions.  Interrogatories are disfavored.  What's going

9    on here, the company is giving -- it's a big suit, right?

10           MS. McDEVITT:  Indeed it is a big sue.

11           THE COURT:  You are allowed to have a 30(b)(6).  I

12   don't understand what the issue is.

13           MS. McDEVITT:  We will go back and confer, and I

14   will confer with Mr. Paul, and perhaps there's a way that

15   the topics could be narrowed.

16           THE COURT:  Yes, you can just, you know, see

17   what's been done.  If you feel it's not been done well

18   enough, you can have, you know, a few hours.  You know, of

19   course your understanding about how the Medicaid system

20   works is relevant to your scienter.  So, you know --

21           MS. McDEVITT:  We believe that we've already

22   proffered the witness.

23           THE COURT:  You may have.

24           MS. McDEVITT:  But I think that perhaps the best

25   course is that Mr. Paul and I will confer, and maybe there's

1   a way to narrow the topics as you suggest, bring somebody in

2   for a few hours.

3          THE COURT:  All right.  Now let me go off the

4   record just for one minute.

5          MR. BREEN:  I just want to make a suggestion.

6   What we did with the 30(b)(6)s with the Ven-A-Care

7   witnesses, and there was all kinds of these ultimate

8   question issues, we went ahead we put them up.  We agreed

9   amongst counsel that we would reserve objections during the

10  course of the deposition, leave a little bit more leeway

11  there --

12         THE COURT:  As always.

13         MR. BREEN:  Well, as opposed to making the

14  objection and getting a ruling on it in advance, and --

15         THE COURT:  You must have very tolerant courts

16  where you're from.  Around here, that's not the culture.

17         MR. BREEN:  The long and short, Judge, it worked

18  out fine.  We didn't have anything to bring back to your

19  Honor or to Judge Bowler on that issue, on these ultimate

20  question issues --

21         THE COURT:  All right, let's just go off the

22  record for a minute.

23         (Discussion off the record.)

24         THE COURT:  So we've got a firm schedule.  You all

25  will memorialize it.  No more motions to continue, short of

1    somebody getting sick, which I hope doesn't happen.  I mean,

2    if someone really, like, just -- I mean, obviously there are

3    certain life things that take us over which I would honor,

4    but, I mean, not just "The documents can't come in" or "I

5    can't review them" or whatever.

6              MR. PAUL:  So we'll jointly file an amendment to

7    the CMO pursuant to Dey.

8              THE COURT:  Yes.  No more motions to continue,

9    right?

10             MR. PAUL:  Right, your Honor.

11             MR. BUEKER:  Yes, your Honor.

12             THE COURT:  Scout's honor?

13             MR. BUEKER:  Yes, your Honor.

14             THE COURT:  All right.  Have a nice long weekend.

15             MR. PAUL:  Thank you, your Honor.

16             THE COURT:  Thank you for coming here.

17             MR. PAUL:  Yes, your Honor.

18             THE CLERK:  Court is in recess.

19             (Adjourned, 11:35 a.m.)

20

21

22

23

24

25

Page 48

1                 C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 47 inclusive, was recorded by me

10 stenographically at the time and place aforesaid in Civil

11 Action No. 01-12257-PBS, In Re:  Pharmaceutical Industry

12 Average Wholesale Price Litigation, and thereafter by me

13 reduced to typewriting and is a true and accurate record of

14 the proceedings.

15          In witness whereof I have hereunto set my hand

16 this 15th day of February, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
           _____
22         LEE A. MARZILLI, CRR
           OFFICIAL FEDERAL COURT REPORTER
23

24

25