# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | |
| THIS DOCUMENT RELATES TO:<br><br>*The City of New York v. Abbott Laboratories, Inc., et al.* (S.D.N.Y. No. 04-CV-06054)<br><br>*County of Albany v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00425)<br><br>*County of Allegany v. Abbott Laboratories, Inc., et al.* (W.D.N.Y. No. 05-CV-06231)<br><br>*County of Broome v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00456)<br><br>*County of Cattaraugus v. Abbott Laboratories, Inc., et al.* (W.D.N.Y. No. 05-CV-06242)<br><br>*County of Cayuga v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00423)<br><br>*County of Chautauqua v. Abbott Laboratories, Inc., et al.* (W.D.N.Y. No. 05-CV-06204)<br><br>*County of Chemung v. Abbott Laboratories, Inc., et al.* (W.D.N.Y. No. 05-CV-06744)<br><br>*County of Chenango v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00354)<br><br>*County of Columbia v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00867)<br><br>*County of Cortland v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00881)<br><br>*County of Dutchess v. Abbott Laboratories, Inc., et al.* (S.D.N.Y. No. 05-CV-06458)<br><br>*County of Essex County v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00878)<br><br>*County of Fulton v. Abbott Laboratories, Inc., et al.* (N.D.N.Y. No. 05-CV-00519) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br><br>Subcategory Case No. 03-10643-PBS<br><br>Judge Patti B. Saris<br><br><br>Oral Argument Requested<br><br><br><br>**REPLY BRIEF OF DEFENDANT SMITHKLINE BEECHAM CORPORATION, D/B/A GLAXOSMITHKLINE ("GSK") IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT IN THE NEW YORK COUNTY CASES** |

*County of Genesee v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06206)

*County of Greene v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00474)

*County of Herkimer v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00415)

*County of Jefferson v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00715)

*County of Lewis v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00839)

*County of Madison v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00714)

*County of Monroe v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06148)

*County of Nassau v. Abbott Laboratories, Inc., et al.*
(E.D.N.Y. No. 04-CV-5126)

*County of Niagara v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06296)

*County of Oneida v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00489)

*County of Onondaga v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00088)

*County of Ontario v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06373)

*County of Orange v. Abbott Laboratories, Inc., et al.*
(S.D.N.Y. No. 07-CV-2777)

*County of Orleans v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06371)

*County of Putnam v. Abbott Laboratories, Inc., et al.*
(S.D.N.Y. No. 05-CV-04740)

*County of Rensselaer v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00422)

*County of Rockland v. Abbott Laboratories, Inc., et al.*
(S.D.N.Y. No. 03-CV-7055)

*County of Saratoga v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00478)

*County of Schuyler v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06387)

*County of Seneca v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06370)

*County of St. Lawrence v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00479)

*County of Steuben v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06223)

*County of Suffolk v. Abbott Laboratories, Inc., et al.*
(E.D.N.Y. No. CV-03-229)

*County of Tompkins v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00397)

*County of Ulster v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 06-CV-0123)

*County of Warren v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00468)

*County of Washington v. Abbott Laboratories, Inc., et al.*
(N.D.N.Y. No. 05-CV-00408)

*County of Wayne v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06138)

*County of Westchester v. Abbott Laboratories, Inc., et al.*
(S.D.N.Y. No. 03-CV-6178)

*County of Wyoming v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 03-CV-6379)

*County of Yates v. Abbott Laboratories, Inc., et al.*
(W.D.N.Y. No. 05-CV-06172)

**Introduction**

In an effort to streamline this litigation and bring it closer to conclusion, GSK moved for summary judgment with respect to 208 NDCs which satisfy the "WAC List Price" liability test that this Court articulated and applied in its June 2007 decision following the Track One trial. *See In Re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F. Supp. 2d 20, 104-06 (D. Mass. 2007). Under that test, there can be no liability if more than 50% of a drug's sales each year were made at transaction prices that were within 5% of the manufacturer's reported WAC for that drug. *Id.*

The New York County Plaintiffs, in their Opposition Brief ("Pl. Opp."), do not quarrel with the Court's prior holding that application of the WAC List Price test is a legitimate way to assess whether reported WACs were deceptive.[1] Nor do Plaintiffs place in dispute any of the facts that are material to the resolution of this motion, namely:

- That during the relevant period GSK provided WACs (and WAC-equivalents) to First Databank, which is the pricing service used by New York Medicaid;

- That First Databank reported GSK's WACs and applied a standard mark-up of either 20% or 25% to each of them to determine the published AWPs for GSK's drugs;[2]

- That GSK's pricing communications to First Databank explicitly defined WAC (and its equivalents) as a list price;[3] and

---

[1]   Plaintiffs have also finally agreed to stipulate to the withdrawal of their claims as they relate to two NDCs that were dismissed with prejudice as part of a prior settlement of a substantially identical WAC/AWP lawsuit filed against GSK by the State of New York.

[2]   In fact, Plaintiffs themselves include as Exhibit A to their Response to GSK's Statement of Undisputed Facts a list of the GSK WACs and AWPs published by First Databank, which match the WACs and AWPs used in GSK's motion and which reveal the standard First Databank mark-up between WAC and AWP applied by First Databank..

[3]   Plaintiffs claim that GSK's price reporting letters, which were produced from GSK's and First Databank's files, may not be admissible. That is nonsense. GSK's price reporting practices were described in Affidavits prepared by David Moules, formerly the Vice President for Strategic Pricing, Contracting and Marketing for GSK, based on his personal knowledge. *See* Exhibits 3 and 6 to GSK's Motion. Furthermore, there can be no serious dispute that the price reporting letters themselves are business records that are clearly admissible under Fed. R. Evid. 803(6).

- That GSK maintained and produced detailed sales transaction, chargeback and rebate data that can be (and has been) used by both GSK's and Plaintiffs' experts to determine whether the WAC List Price test is satisfied by the NDCs at issue.[4]

Plaintiffs' opposition to GSK's motion is based on two principal legal arguments: First, that meeting this Court's "WAC List Price test," by itself, cannot excuse GSK from liability with respect to the WAC it reported for any drug, and second, that GSK did not apply the Court's WAC List Price test correctly, which resulted in a number of drugs passing the test that should have failed. Both arguments are fatally flawed.

With respect to the Plaintiffs' first argument, they are correct that the Court has articulated what we have called the "WAC List Price test" as just one of the tests that may be considered in determining whether the publication of a WAC is deceptive as a matter of law -- the other being the so-called "AWP spread" test.[5] Contrary to Plaintiffs' contention, GSK is not trying to run from the Court's AWP Spread test. In fact, virtually all of the 208 GSK NDCs that are subject to GSK's motion pass that test as well.[6] However, the Court need not consider the "AWP spread" test in order to grant GSK's motion.

When the Court examined the reported prices by the Track One trial defendant that reported WACs, it consistently found no liability for drugs for each year in which the WAC List Price test was satisfied, even if the "AWP spread" test was *not* satisfied for that year. Thus, without exception, if the drug's transaction prices were within 5% of reported WACs for at least 50% of the sales, the Court -- following the FTC Guides

---

[4]   There is also no dispute that the major drug wholesalers have produced substantial amounts of data concerning the prices they charged to providers (such as pharmacies).

[5]   Plaintiffs concede that whether spreads for a particular drug were marketed to doctors is not relevant here because the physician class of trade is "irrelevant entirely" to this case. Pl. Opp. at 2, 20.

[6]   Plaintiffs' criticism of the way GSK determined its AWP "spreads" is baseless, as discussed below.

Against Deceptive Pricing -- found that the WAC was not deceptive as a matter of law. Furthermore, because GSK is a WAC reporter and the New York Deceptive Acts and Practices Act itself contains a "complete defense" for conduct that complies with FTC "rules and regulations," applying the WAC List Price test alone is sufficient to determine whether GSK's reported prices cannot be deceptive as a matter of law.

With respect to Plaintiffs' second argument -- that GSK did not properly apply this Court's WAC List Price test -- Plaintiffs are simply incorrect, despite a Herculean effort to obfuscate the issues. Plaintiffs make two principal challenges to GSK's methodology for applying the test concerning: (1) its treatment of sales to wholesalers, and (2) its treatment of "utilization" rebates paid to PBMs and other entities. However, GSK's expert -- Dr. Eric Gaier -- has applied the same methodology that BMS's expert applied and that this Court relied on in the Track One trial. It is the method of the Counties' expert, not GSK's, that is at odds with this Court's prior decision.

As explained in more detail below, Plaintiffs' first and most significant challenge to GSK's and the Court's methodology -- how we have treated sales to wholesalers for purposes of the WAC List Price test -- is nothing but a clever trick designed to overcome the undisputed fact that for about 84% of GSK's sales to wholesalers, *GSK provides no discount to any subsequent purchaser and therefore no "chargeback" to the wholesaler.* For these sales, GSK merely sells to the wholesaler at WAC- 2% to 3% (that is, a 2% prompt payment discount and occasional other minimal discounts for services performed by the wholesaler) -- and the wholesaler simply resells the drug at the price it sets. Regardless of the discounts to end providers for the other 16% of the sales that go through wholesalers and generate "chargebacks," plaintiffs' argument that discounts greater than WAC-5% were given more than 50% of the time is completely baseless in

light of the fact that 84% of sales to wholesalers were at WAC-2% to 3% and involved no discounts to providers and no chargebacks to wholesalers at all.

Moreover, Plaintiffs' method of evaluating the other 16% of the sales to wholesalers at issue -- the ones that did involve downstream discounts to providers and "chargebacks" to wholesalers -- makes no practical or economic sense either.   Plaintiffs' expert's mistaken methodology attributes to the *wholesaler* (instead of to downstream *providers*, as the GSK and Track One trial experts did) the sometimes significant discounts earned by *providers* such as hospitals where the wholesaler merely acts as a "middle-man" that passes the entire discount along to the provider.  These provider discounts, having been misallocated to the wholesalers for 16% of their purchases, are then *combined* by Plaintiffs' expert with the other 84% of the wholesaler's purchases made at WAC-2% to 3%.  This sleight of hand often causes the so-called "average" price paid by the *wholesaler* for *all* of its purchases of the drug to dip below WAC-5%.

As explained below, Plaintiffs' expert's method of analyzing wholesaler sales suffers from three fatal defects:  First, it is totally inconsistent with the way sales to wholesalers were treated by the Track One Trial expert and the Court when it articulated the WAC List Price test as a matter of law.  Second, although the purpose of the WAC List Price test is to count the number and percentage of sales that are "close to WAC" to see if it is "substantial" (i.e., more than 50% of total sales), Plaintiff's method of "averaging" sales to wholesalers can cause *zero* sales to be close to WAC, even where 84% actually *were* well within 5% of WAC.   This is a classic statistical trick:  obscure reality through the use of averages.  Third, Plaintiffs' expert gets to his result only by pretending that discounts given to downstream *providers* are *actually* discounts to the

4

*wholesalers* -- a fiction that has no support in the record, in economics, in common sense or in the real world.

Plaintiffs' second major challenge to GSK's methodology concerns the way GSK treated "utilization-based" rebates paid to PBMs, IPAs and a variety of other entities. Plaintiffs concede that all utilization rebates paid to such entities need not be counted as purchase price reductions for purposes of applying the WAC List Price test, but argue that some of the utilization rebates that are paid to entities like PBMs and IPAs that themselves purchase and dispense drugs through mail order pharmacies should be counted. Again, as discussed in detail below, GSK properly excluded all of these utilization rebates for purposes of the WAC List Price test. But the Court need not wade into this technical thicket, because all of Plaintiffs' utilization rebate issues are *entirely immaterial* to GSK's motion, with the exception of just one NDC.[7] As demonstrated below and in Dr. Gaier's supplemental affidavit, even if the utilization rebates paid to PBMs and IPAs that have operated mail order pharmacies *are* counted (and allocated in accordance with the volume of such mail order pharmacy businesses) so as to artificially reduce the overall purchase price of the drugs at issue here, 207 of the 208 drugs at issue would still pass the WAC List Price test by a comfortable margin.[8]

For all of these reasons, the Court should put an end to Plaintiffs' efforts to keep drugs in this case that clearly pass the WAC List Price test by granting GSK's motion for partial summary judgment.

---

[7] As discussed below, this is also true of the other, even more minor, issues Plaintiffs raise (such as GSK's treatment of a small portion of potential prompt pay discounts). The only one of the 208 NDCs that is affected even if all of the rebate and prompt pay adjustments advocated by Plaintiffs' expert are made is NDC 00173042702 for Zantac, which plaintiffs' claim resulted in about $260,000 in New York Medicaid payments over the nine-year period at issue. *See* Supplemental Affidavit of Dr. Eric M. Gaier, Ph.D. , appended hereto as Exhibit A ("Suppl. Gaier Aff.) at ¶ 18 and Attachment C.2.

[8] In fact, as discussed below, the results do not change even if all of Plaintiffs' proffered technical adjustments related to utilization rebates and prompt pay discounts are made.

## Argument

I.     **Under This Court's Track One Ruling, WACs Are Not Deceptive As a Matter of Law if They Pass the "WAC List Price" Test.**

A.     **Satisfaction of the WAC List Price Test Alone Should Result in a Finding of No Liability as to GSK In This Case.**

Plaintiffs correctly point out that this Court has previously articulated what we have referred to as the "WAC List Price test" as just one of the tests that may be considered in determining whether the publication of a WAC is deceptive as a matter of law -- the other being the so-called "AWP spread" test. *In Re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F. Supp. 2d 20, 101-02; 104-05 (D. Mass. 2007).    However, as GSK pointed out in its Opening Brief, the WAC List Price test was employed by the Court as an *independent* basis for concluding that no liability could attach to a particular reported WAC as a matter of law.  When the Court examined the WACs reported by BMS, the Court consistently found no liability for drugs for each year in which the WAC List Price test was satisfied, even if the "AWP spread" test was *not* satisfied for that year.  *Id.* at 105-08.[9]  Thus, without exception, if the drug's transaction prices were within 5% of reported WACs for at least 50% of the sales, the Court (following the FTC Guides Against Deceptive Pricing) found that the WAC was not deceptive as a matter of law.  Plaintiffs here do not assert otherwise.  Accordingly, satisfaction of the WAC List Price test alone is sufficient to defeat liability.

---

[9]     *See* Track One holdings re Etopophos (no liability because the WAC List Price test was passed even though there was an AWP spread higher than 30% for one year); Paraplatin (no liability because the WAC List Price test was passed, even though the AWP spreads were as high as 67% in one year); Vepesid (no liability for one year out of five, *i.e.*, the year 2000, even though AWP spreads exceeded 30%, because for that year more than 55% of sales were within 5% of WAC); Rubex (even though AWP spreads were above 30% in 2001, no liability for that year because 62% of sales were within 5% of WLP, so the WLP for that year was a "true list price").  *Id.*

There are two additional reasons why it is particularly appropriate to apply a safe harbor test to GSK that focuses on reported WACs.  First, GSK has been a WAC reporter during the entire 1997-2005 period relevant here, and its AWPs have been determined simply by the application of the reporting services' standard mark-ups (which have differed at times between 1.20 and 1.25 based on the reporting service).  *See* Moules 2006 Aff. at ¶¶ 4-7 (Ex. 6).  Second, as GSK pointed out in its Opening Brief, application of the WAC List Price test -- which this Court derived from the FTC's Guides Against Deceptive Pricing -- is especially appropriate in the New York Counties' case, because the New York Deceptive Acts and Practices Act itself contains a "complete defense" for conduct that complies with FTC "rules and regulations."[10]  This Court will be on solid legal ground if it grants this motion and decides that the 208 GSK NDCs at issue pass a test that the Court designed to evaluate whether WACs were sufficiently tethered to actual purchase prices to satisfy the FTC Guides.[11]

## B.    The AWP Spread Test Has Not Been Ignored By GSK

Not surprisingly, the GSK NDCs that pass the WAC List Price Test do not present the kind of "egregious spreads" between relevant transaction prices and AWPs used by reimbursers (in this case, by New York Medicaid) that have concerned this Court since this litigation began.  *Id.* at 101-02.  In fact, virtually all of the 208 GSK NDCs that are subject to GSK's WAC List Price motion pass the AWP Spread test as well. Gaier

---

[10]    *See* GSK's Opening Brief at 18, n. 12 (citing N.Y. General Business Law § 349(d), which provides a "complete defense" if  "the act or practice is … subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission," as well as cases interpreting  § 349(d)).

[11]    GSK also pointed out in its Opening Brief at 17-18 that if there is no liability under the New York Deceptive Acts and Practices statute, there can be no liability for the 208 NDCs at issue under any of Plaintiffs' other legal theories.  Plaintiff has not contested this point.

Aff. (Ex. 2) at ¶¶9-10.[12]  These brand-name self-administered drugs do not have the kinds of "egregious spreads" that have concerned this Court.  GSK is not, however, relying on the "AWP Spread" test in this motion because it is unnecessary to complicate the Court's analysis any further for drugs that also pass the WAC List Price test.

## II.  GSK Correctly Applied the Court's WAC List Price Test with Respect to Sales through Wholesalers

Having failed to demonstrate that satisfaction of this Court's WAC List Price test would not, as a matter of law, provide a basis for granting GSK's motion for summary judgment on the 208 GSK NDCs at issue, Plaintiffs next seek to establish that GSK has not demonstrated that the test is met with respect to all 208 NDCs.  Plaintiffs' first and most significant argument is that GSK did not properly account for sales that went through wholesalers.  The way GSK treated these sales, however, was both (a) entirely consistent with the way BMS's expert treated them for purposes of the WAC List Price test during the MDL trial -- a method that this Court  relied on for all of its holdings concerning the test, and (b) consistent with the goal of the test of determining whether substantial sales were close to WAC, with the way the wholesaler distribution and chargeback system works, and with simple common sense.  By contrast, Plaintiff's expert advocates treating sales through wholesalers in a way that (a) is totally inconsistent with they way they were treated for purposes of the WAC List Price test during the Track One trial, (b) seeks to ignore, by inappropriate use of  "averaging," the

---

[12]  Dr. Gaier's method of calculating the relevant GSK actual transaction prices for the "AWP Spread" test was straightforward and conservative.  He started with the Medicaid classes of trade deemed relevant by the Plaintiffs (so as to avoid a dispute over any "class of trade" issue), he determined what the data from all of the major wholesalers showed the relevant providers paid them on average for each NDC (*i.e.*, he started with wholesaler data, just as Plaintiffs here have done) and then, to be conservative, he used the GSK manufacturer data to reduce the average transaction prices whenever there was a purchase-based rebate or other price concession to the relevant provider.  *See* Gaier Aff. at ¶ 8 (Ex. 2); Suppl. Gaier Aff. at ¶¶ 18-19.  Plaintiffs assert in footnote 2 of their Opposition Brief that Dr. Gaier ignored GSK's manufacturer data in determining the average selling price for the spread test.  This is simply incorrect.  Gaier Aff. at ¶ 8; Suppl. Gaier Aff. at ¶¶ 18-19 (Ex. A hereto).

undisputed fact that the most substantial segment of sales -- well over 50% for most of the 208 NDCs -- were sales to wholesalers at close to WAC with no subsequent discounts to providers, and (c) seeks to attribute to wholesalers the discounts given to providers merely because the wholesaler processed a chargeback.

It is not disputed that GSK's sales transaction data shows that GSK (like most brand-name manufacturers) sells the vast majority of its drugs through wholesalers, and that with respect to approximately 84% of those sales for the 208 NDCs at issue, *GSK provides no discount to any subsequent purchaser.* GSK merely sells to the wholesaler at WAC (with a 2% prompt payment discount and occasionally other minimal discounts for services performed by the wholesaler). The wholesaler then simply resells the drug (at a price the wholesaler sets) to a provider that has no discount arrangement with GSK at all. *See* Supplemental Affidavit of Dr. Eric M. Gaier, Ph.D. , appended hereto as Exhibit A ("Suppl. Gaier Aff.) at ¶ 4 and Attachment A. With respect to the other approximately 16% of sales through wholesalers for the drugs at issue, GSK still sells to wholesalers at WAC (with the conventional 2-3% discount to the wholesaler), but GSK *does* have a discount arrangement with a downstream provider. Those discounts, which are provided to entities such as hospitals reimbursed on a cost-plus basis and government purchasers with a right to special statutory discounts, can be substantial. In such cases, the wholesaler buys from GSK at its regular price (WAC minus 2% to 3%) but then sells the drug to the provider at the GSK discounted price. Subsequently, the wholesaler bills GSK for a "chargeback" to make the wholesaler whole for passing through the GSK discount to the provider. *See* Suppl. Gaier Aff. at ¶¶ 4 - 8.

GSK's expert here, like defendants' expert during the Track One trial on which the Court previously relied, evaluated these two kinds of sales through wholesalers

separately for purposes of the WAC List Price test.  *Id.* at ¶ 7.  For the 84% of the GSK

sales that had no associated discounts to providers and were sold to the wholesaler at

approximately WAC-2% to 3%,  GSK's  expert -- like BMS's expert -- placed the sales

in the "pass" column. *Id.*[13]  This was consistent with the goal of the WAC List Price test

to determine how many sales -- and what percentage of sales -- were close to WAC.

Common sense and simple economics dictate that all of these sales should be in the

"pass" column.  Simply put, they were, in fact, all sales made by GSK to its wholesaler

customers at well within the WAC-5% window.[14]

Furthermore, GSK's expert, following the same methodology as the Track One

trial expert on which the Court previously relied, did not ignore the 16% of GSK's sales

to wholesalers where downstream providers like hospitals received a discount (sometimes

a substantial one) from GSK.  Both GSK's expert and the Track One trial expert treated

these sales as discounted sales to the *providers* who actually received the discounts.

Because the provider discounts associated with this segment of sales were generally

much greater than 5% below WAC, the vast majority of sales in this segment were placed

in the "fail" column for purposes of the WAC List Price test -- but they represent in the

aggregate only 16% of GSK's sales through wholesalers.  *See* Suppl. Gaier Aff. at ¶¶ 7-

---

[13]  For the drugs at issue in the MDL trial, the percentage of "non-chargeback" sales with no downstream manufacturer discounts to providers was undoubtedly lower (on average) than 84%, as such manufacturer discounts are much more common with physician-administered drugs than with brand-name self-administered drugs sold primarily through pharmacies.

[14]  Moreover, for the sales to wholesalers for which GSK offered no subsequent discounts to the downstream provider, the wholesaler set the price to its downstream provider customer on its own. Because simple economics dictates (and wholesaler testimony confirms) that the wholesaler will not sell these units at a loss (except, perhaps, on very rare occasions), it is safe to say that the wholesalers' customers (*i.e.* providers) for these "non-chargeback" sales would almost always pay at least what the wholesaler paid -- WAC-2% to 3% -- if not more.  *See* Suppl. Gaier Aff. at ¶ 8.  Thus, whether these 84% of "non-chargeback" sales are examined at the wholesaler level or the provider level, they should all be in the "pass" column under the WAC List Price test.  *Id.*

8.[15]  The Counties' expert, however, treats this 16% of sales through wholesalers very differently from GSK's expert and the Track One trial expert.  Instead of counting them as discounted sales to the *providers* who got the discounts, he counts them as discounted sales to the *wholesaler* that merely passed the discounts through and that *itself* received no discount other than the standard 2-3% off WAC.  This approach makes no practical or economic sense.

Having thus misallocated these discounts to wholesalers that did not actually get them, Plaintiffs' expert then uses an additional ploy that makes even less sense and that often erroneously causes *all* of GSK's sales to wholesalers to be placed in the "fail" column under the WAC List Price test.  That is, Plaintiff's expert *combines* the 84% of sales to wholesalers at WAC-2% to 3% with the 16% of "chargeback" sales to wholesalers, to which he has artificially attributed the (sometimes substantial) *provider* discounts -- and then computes a so-called *average* price paid by wholesalers for <u>all</u> of these sales combined.  This misallocation, combining and averaging process completely obscures the undisputed fact that some 84% of these sales actually were at WAC-2% to 3% with no downstream discounts to any provider -- which in and of itself should make the drug pass the WAC List Price test in almost all cases.[16]  In addition, through this novel process the Plaintiffs' expert misleadingly makes *all* of the wholesaler sales appear to "fail" the WAC List Price test -- even where 84% of the actual sales to wholesalers are at the normal WAC- 2% to 3% and involve no discounts to downstream providers,  and

---

[15]   Because they were counted as sales to providers that "flunked" the test, neither GSK's expert nor the Track One trial expert counted them a second time as sales to the wholesalers who later got a "chargeback" to make them whole after they passed the discount through to the provider.  There is no disagreement about whether there should be such "double counting" of sales of the same batches of product, *i.e.* once at the wholesaler level and again at the provider level.

[16]   The only exception would be if there was a drug with a very high percentage of  "direct" sales to providers (*i.e.*, sales not involving wholesalers at all) that were made at substantially below WAC.  There are no such cases among the 208 NDCs at issue here.

only 16% of the sales to wholesalers involve more substantial discounts to downstream providers.[17]

Plaintiffs' expert's method of treating sales to wholesalers suffers from three fatal defects, rendering his opinion on how to treat these sales for purposes of the WAC List Price test baseless and unreliable:

First, his opinion is totally inconsistent with the way sales to wholesalers were treated by the Track One Trial expert and the Court when it articulated the WAC List Price test as a matter of law, based on the FTC Guides. *See* Suppl. Gaier Aff. at ¶¶ 7-8. Second, although the purpose of the WAC List Price test is to count the number and percentage of sales that are "close to WAC" to see if it is "substantial" (i.e., more than 50% of total sales), Plaintiff's method of "averaging" sales to wholesalers can *defeat* the purpose of the test by causing *zero* sales to be close to WAC, even where 84% actually *were* close to WAC.   This is a classic statistical trick:  obscure reality through the use of averages.  Third, Plaintiffs' expert gets to this result only by pretending that discounts

---

[17]    To illustrate how Plaintiffs' expert applies the test to create the illusion that all wholesaler sales "fail" under these circumstances, consider this hypothetical:  Assume that WAC is $100 and there were 100 sales through wholesalers, with 84% of them at WAC-3%, and 16% of them involving discounts to downstream providers of WAC-40%.  Thus, 84 out of the 100 sales were at WAC-3%, or $97, so the total paid for these sales would be $8,148.  If the other 16 sales to wholesalers are deemed to be made at WAC-40%, or $60 (due to 40% downstream discounts to providers), then the total of these "chargeback" sales would be $960.  By combining the two types of sales and attributing all provider discounts to wholesalers, as Plaintiffs' expert does, the total dollars associated with all 100 sales would be $9,108.  Plaintiffs' expert's so-called "average" price for the combined sales would thus be $9,108/100, or $91.08, which is more than 5% below WAC.  Thus, even though 84% of the sales were close to WAC, all 100 of the sales would be placed in the "fail" column under Plaintiffs' novel application of the WAC List Price test.   The same illogical result would apply to even more extreme hypotheticals, such as where 95% of the sales to a wholesaler were at WAC-2% ($98) and the other 5% of sales were discounted to providers (through use of chargebacks) to $25 -- say, for sales to a clinic entitled to statutory discounts.  The so-called "average" price paid by wholesalers in this scenario, according to Plaintiffs' expert, would be $94.35, which is more than 5% below WAC -- so all of these sales would be placed in the "fail" column too -- even though 95% of them were, in reality, at WAC-2%.  In his Supplemental Affidavit appended hereto, Dr. Gaier has provided yet another example -- this one a real example using the GSK drug Avandia -- of how Plaintiffs' expert's methodology creates the illusion that 2.43 million units of Avandia that were sold at WAC-2.5% should be placed in the "fail" column because of just 322 thousand units that were sold to providers at a 43% discount.  Suppl. Gaier Aff. at ¶ 5 (Table 1).

given to downstream *providers* are *actually* discounts to the *wholesalers* -- a fiction that has no support in the record, in economics, in common sense or in the real world.  *See* Suppl. Gaier Aff. at ¶¶ 4-8.

The case law is clear that a party cannot defeat summary judgment by proffering an unreliable and unfounded expert opinion that seeks to interpret undisputed facts so as to create the appearance of a factual dispute.  *See Munoz v. Orr,* 200 F.3d 291, 300-02 (5th Cir. 2000*)* ("if the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact,"); *King Records, Inc. v. Collectables, Inc.*, 153 Fed. Appx. 355, 358 (6th Cir. 2005) (same).; *see Watson v. Electrolux Prof'l Outdoor Prods.*, No. 04-11782, 2006 U.S. Dist. LEXIS 54386, 2-3 (D. Mass. Aug. 4, 2006) (Court precludes expert testimony and grants summary judgment as to certain claims because it finds the expert's methodology as to an alternative theory inadequate, and that without such expert testimony the opposing party will be unable to prevail on that alternative theory).  Plaintiffs' clever treatment of GSK's sales to wholesalers is an unfounded ploy that should not fool this Court.

**III.    GSK Properly Applied the WAC List Price Test With Respect to Utilization Rebates and the Prompt Pay Discount, But Even if the Adjustments Advocated by Plaintiffs Are Made, 207 of the 208 GSK NDCs At Issue Still <u>Pass the Test</u>.**

Plaintiffs' second major challenge to GSK's application of the WAC List Price test concerns the way GSK treated "utilization-based" rebates paid to PBMs, IPAs and a number of other entities.  Also, Plaintiffs claim that GSK should have assumed that *wholesalers* gave a 2% prompt pay discount *of their own* to their downstream customers

13

who had discount deals with GSK (that is, to the 16% of sales involving chargebacks).[18]

Again, Plaintiffs are stretching to find ways to make drugs "flunk" the WAC List Price

test, and -- as discussed below and in Dr. Gaier's Supplemental Affidavit -- GSK's expert

properly excluded the utilization rebates and prompt pay discounts that Plaintiff identifies

when he originally applied the WAC List Price test to the 208 NDCs at issue.

A any rate, the Court does not have to resolve the technical utilization rebate and

prompt pay discount issues raised by Plaintiffs, because all of them are *entirely*

*immaterial* to GSK's motion, with the exception of just one NDC.  That is, even if (a) the

utilization rebates paid to PBMs and IPAs that run mail order pharmacy operations *are*

counted (and allocated in accordance with the volume of such mail order pharmacy

businesses), and other (lower-volume) rebates are also counted so as to artificially reduce

the overall purchase price of the drugs at issue here, and (b) the 2% prompt pay discount

is assumed to have been made on the small segment of sales for which that assumption

was not previously made by GSK, *207 of the 208 drugs at issue in this motion would still*

*pass the WAC List Price test by a comfortable margin*.  Suppl. Gaier Aff. at ¶¶ 17-18.

> **A.     Utilization Rebates Paid to PBMs and IPAs Were Properly Excluded**
> **Because they Have No Impact on the Purchase Price of Any Drug, But**
> **Including Such Rebates Paid to PBMs and IPAs That Owned Mail**
> **Order Operations Makes No Difference to the Outcome of the WAC**
> **List Price Test.**

PBMs, as well as major third-party payors who operate their own formularies

(referred to in GSK's database as "IPAs")[19] often receive rebates for placing a drug on a

formulary and moving the overall "market share" of the drug for their members.  Such

---

[18]   GSK did conservatively assume that a 2% prompt pay discount was made on every *direct* sale that *it* made, whether to a wholesaler or to a provider, because GSK's direct customers could earn the discount *from GSK* on such direct sales.  Plaintiffs, however, are now advocating that the Court make an assumption (that is based on pure speculation) that *wholesalers* provided their own 2% prompt pay discount to all of their customers for the 16% of sales involving a chargeback.

[19]   Suppl. Gaier Aff. at ¶ 13.

"utilization-based" rebates benefit payors (not dispensers).[20]  These rebates are payable no matter what price any dispenser paid for the drug, *i.e.*, they would be payable as long as the relevant market share moves even if every purchaser of the drug paid WAC (or, for that matter, even if all drugs were dispensed by independent pharmacies entirely unrelated to the PBM or IPA).  Suppl. Gaier Aff. at ¶ 11-12.  Because such rebates do not affect the drug's purchase price for any dispenser, they have nothing to do with how many sales are within 5% of WAC and were properly excluded from the WAC List Price test analysis by GSK.  *Id.*

Plaintiffs' expert concedes that not all rebates paid to PBMs and similar entities should be included in determining whether a drug's price to any given purchaser is within 5% of WAC.  Devor Aff. at 10; Suppl. Gaier Aff. at ¶¶ 11-12.  Instead, he argues that such rebates should be included if they are associated with PBMs or IPAs that own mail order pharmacies through which drugs were dispensed.  He does not explain how a rebate paid for moving a drug's market share (through sales by any provider at any price) has any impact on any dispenser's purchase price, and for that reason cannot justify the inclusion of these utilization rebates in assessing net purchase price for purposes of the WAC List Price test.

Nevertheless, for purposes of this motion only, GSK's expert has done exactly what Plaintiffs' expert said should be done with the PBM and IPA rebates.  That is, he has determined, using easily available data about the mail order business of PBMs and IPAs as well as GSK and wholesaler data produced in this case, what share of the PBM

---

[20]   In contrast, "purchase-based rebates" are earned by certain providers in recognition of the volume of pharmaceutical product actually purchased, and they do have the effect of reducing (retroactively) the net price paid by the purchaser.  For example, a provider might earn a 10% purchased-based rebate for a particular NDC if it purchases more than 100 units a month, and if that rebate is earned it effectively reduces the net price for that month by 10%.  GSK included all such purchase-based rebates in its WAC List Price test analysis.  Suppl. Gaier Aff. at ¶11.

and IPA business is associated with mail order sales (erring on the high side).  He has then allocated that same share of the rebates that GSK paid to PBMs and IPAs to the number of GSK sales that could potentially have ended up going to PBM or IPA-owned mail order operations, which has the effect of creating a lower assumed net price paid for those units.  By doing this, more sales are deemed to have been made at less than WAC-5% -- but not nearly enough to make a difference in the outcome of the WAC List price test for any of the 208 NDCs at issue save one.  *See* Suppl. Gaier Aff. at ¶¶ 14-15 and Attachment B thereto.  In other words, 207 of the NDCs still pass the test.

**B.    Utilization Rebates Paid to Other Entities Identified by Plaintiffs Were Also Properly Excluded, But Including Them Makes No Difference to the Outcome of the WAC List Price Test.**

Plaintiffs' expert asserts that GSK should have included certain other utilization rebates paid to a variety of other entities.  *See* Devor Aff. at 12.  Although GSK continues to disagree, for purposes of this motion we have nevertheless included them, again causing more sales to be deemed to have been sold for less than WAC-5%.  Again, however, this makes no difference in the overall results, other than for one NDC.  Suppl. Gaier Aff. at ¶16.[21]  207 of the NDCs still pass  the test.

**C.    GSK Conservatively Assumed that a 2% Prompt Payment Discount Was Provided on All of GSK's Direct Sales, But Did Not Assume it was Provided by Wholesalers on Their "Indirect" Sales of GSK's Drugs to Providers that Got GSK Discounts.  Even if It is Assumed that Those Providers Also Earned a 2% Prompt Pay Discount from the Wholesaler, It Would Make No Difference in the Outcome of the WAC List Price Test.**

In applying the WAC List Price test, GSK conservatively assumed a 2% prompt payment discount was earned on every *direct* sale that *it* made, whether to a wholesaler or

---

[21]    Plaintiffs' expert also asserts that GSK failed to include certain rebates paid to "GPOs."  Devor Aff. at 12.  On this issue, however, with the exception of rebates totaling $421, he has simply misinterpreted the data, as those rebates were included in GSK's analysis.  Dr. Gaier has explained this in more detail in his Supplemental Affidavit.  *See* Suppl. Gaier Aff. at ¶ 15.

to a provider.  GSK did not, however, assume that wholesalers in turn gave providers a 2% prompt pay discount *of their own* for the 16% of GSK sales to wholesalers where the wholesalers resold GSK products to providers who had their own discount deals with GSK (*i.e*., when there were chargebacks).   Suppl. Gaier Aff. at ¶ 10.  Plaintiffs' expert asserts -- based purely on conjecture and without any factual support whatsoever -- that it should be assumed that wholesalers make this price concession as well and that it should somehow be included to reduce the relevant provider's net price for purposes of the WAC List Price test.

Whether the wholesaler passes on any portion of *its* prompt-payment discount from GSK to the provider in these circumstances is determined by a negotiation between the wholesaler and the provider and is not under GSK's control or even knowledge.  *Id.* While GSK continues to believe that its treatment of this small volume of potential prompt-payment discounts was appropriate, in order to be even more conservative, we have assumed that the 2% prompt-payment discount is earned for every transaction, including those involving sales by a wholesaler to a customer that has a discount deal with GSK -- just as Plaintiffs' expert advocates.  Again, however, this makes no difference in the overall results.  Suppl. Gaier Aff. at ¶ 10.  207 of the NDCs still pass the test.

D.    **Even if All of the Above-Described Adjustments Concerning Utilization Rebates and the Prompt Payment Discount Are Made as Advocated by Plaintiffs' Expert,  It Would Make No Difference in the <u>Outcome of the WAC List Price Test for All But One NDC.</u>**

For the reasons set forth above, Plaintiffs' expert has not provided any reliable or factually supportable reasons for performing the WAC List Price test any differently from the way it was performed by GSK's expert.  Nevertheless, in order to demonstrate that the Plaintiffs' expert's criticisms of GSK's methodology are immaterial with respect to

all of the complex rebate and prompt pay discount issues he raises, GSK's expert has determined how the application of the WAC List Price test to each of the 208 GSK NDCs at issue would differ if he made all of the following modifications to his calculations, as advocated by Mr. Devor:

- Include $837.7 million of PBM utilization-based rebates based on the volume of their mail-order operations

- Include $463.3 million of IPA utilization-based rebates based on the volume of their mail-order operations

- Include $52.7 million of utilization-based rebates paid to retailer-wholesalers, nursing homes, hospitals, long term care facilities and staff model HMOs

- Include $421 of non-duplicative GPO utilization-based rebates

- Deduct a 2% prompt-payment discount for all indirect sales

The answer:  It makes  absolutely no difference save for one low-volume Zantac NDC.  As shown in Attachment C to the Supplemental Affidavit of Dr. Gaier, even after making all of these alterations to GSK's original methodology, 207 of the 208 NDCs that he previously concluded passed the WAC List Price test still *continue to pass* the test. That is, for 207 GSK NDCs, after all of these adjustments, more than 50% of the sales still turn out to be within 5% of the published WAC for the period at issue -- and in most cases the percentage is still over 80% or even 90%.  Gaier Aff. at ¶¶ 17-18.[22]  Thus, all of Plaintiffs' alleged disputes about how GSK treated rebates and prompt pay discounts under its WAC List Price test analysis are nothing more than smoke and mirrors and are, at the end of the day, utterly immaterial.

---

[22]   These 207 NDCs account for $2.107 billion, or 98.3%, of plaintiffs' alleged reimbursements for challenged GSK drugs.  *Id.*  Attachment D to Dr. Gaier's Supplemental Affidavit reports the year-by-year results for the 207 still-passing NDCs.

## <u>Conclusion</u>

For all of the reasons set forth in GSK's Opening Brief and in this Reply Brief, this Court should grant GSK's motion for partial summary judgment and enter an Order that grants judgment in GSK's favor on all of the New York Counties' WAC/AWP claims with respect to all of the NDCs that pass the WAC List Price test.

Dated:  March 4, 2009

Respectfully submitted,

Defendant SmithKline Beecham Corporation,
d/b/a GlaxoSmithKline ("GSK")

By its attorneys,


/s/ Frederick G. Herold
Frederick G. Herold
Richard J. Cutler
DECHERT LLP
2440 W. El Camino Real/Suite 700
Mountain View, CA  94040
Tel: (650) 813-4800
Fax:  (650) 813-4848

Mark H. Lynch
Ronald G. Dove, Jr.
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
P.O. Box 7566
Washington, D.C.  20004-2401
Tel: (202) 662-6000
Fax:  (202) 662-6291

**CERTIFICATE OF SERVICE**

I hereby certify that today I have caused an electronic copy of the foregoing Reply Brief of SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK) in Support of Its Motion for Partial Summary Judgment in the New York County Cases to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL No. 1456 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

Dated:  March 4, 2009                                     /s/ Frederick G. Herold
                                                                    Frederick G. Herold