# EXHIBIT A



**U.S. Department of Justice**

Civil Division
Commercial Litigation Branch
Fraud Section

601 D Street, NW
Ninth Floor
Washington, D.C. 20004

*Telephone: (202) 514-3345*
*Telecopier: (202) 616-3085*

OCT 3 1 2008

Eric Gortner, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601-1692

Re:   *United States ex rel. Ven-a-Care of the Florida Keys Inc v. Roxane Laboratories, Inc.*,
      Civil Action No. 07-10248-PBS (D. Mass.)

Dear Eric:

    I am writing to request that defendants provide testimony pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure regarding the following topics:

1. Defendants' knowledge and understanding of the laws, practices, and policies of State Medicaid agencies regarding reimbursement for Defendants' drug products, including Defendants' knowledge and understanding concerning State Medicaid agencies' use of published AWPs or WAC prices.

2. Defendants' knowledge and understanding of the laws, practices, and policies of the U.S. Department of Health and Human Services (HHS) regarding Medicare reimbursement for Defendants' drug products, including Defendants' knowledge and understanding concerning the the Medicare program's use of published AWPs in determining reimbursement.

3. With regard to the plaintiffs' claim in the Complaint (at ¶ 59) that Defendants made false or fraudulent representations about drug prices and costs to *RedBook*, First DataBank, and Medispan, the factual basis for the statement in Defendants' Seventeenth Defense that, "As to any statement asserted against [Defendants] that Plaintiffs allege to be false or misleading, [Defendants] had no reasonable grounds to believe, and did not believe at the time such a statement was made, that the statement was false or misleading." This topic shall include but not be limited to:

-2-

      a.    The identity of each employee (current and former) of Defendants who held a belief that Defendants' price representations were not false or fraudulent;

      b.    The time period when such person held that belief;

      c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

      d.    All other information that formed a basis for the belief.

4.    Defendants' belief, if any, regarding any industry practice concerning drug manufacturers' setting or reporting of AWP (for purposes of publication by the compendia) for a new generic drug at the time of launch, and any industry practice concerning subsequently changing or not changing the reported or published AWP. This topic shall include but not be limited to:

      a.    The identity of each employee (current and former) of Defendants who held such a belief concerning such industry practice;

      b.    The time period when such person held that belief;

      c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

      d.    All other information that formed a basis for the belief.

5.    Defendants' belief, if any, that the United States government (or any agency or agent thereof) approved of or acquiesced in Defendants' practice of causing the publication of AWPs for Defendants' products that were higher than the average actual wholesale prices or WACs that were higher than actual wholesale acquisition costs (including all discounts, rebates and chargebacks), including:

      a.    The identity of each employee (current and former) of Defendants who held such a belief;

      b.    The time period when such person held that belief;

      c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

      d.    All other information that formed a basis for the person's belief.

6.    Defendants' belief, if any, that the United States government (or any agency or agent thereof) had knowledge of Defendants' practice of causing the publication of AWPs for

-3-

Defendants' products that were higher than the average actual wholesale prices or WACs that were higher than actual wholesale acquisition costs (including all discounts, rebates and chargebacks), including:

    a. The identity of each employee (current and former) of Defendants who held such a belief;

    b. The time period when such person held that belief;

    c. Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

    d. All other information that formed a basis for the person's belief.

7. Defendants' belief, if any, that the United States government (or any agency or agent thereof) approved of or acquiesced in Defendants causing the Medicare program to reimburse providers for Defendants drugs in amounts significantly in excess of provider acquisition costs plus any established dispensing fee, including:

    a. The identity of each employee (current and former) of Defendants who held such a belief;

    b. The time period when such person held that belief;

    c. Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

    d. All other information that formed a basis for the person's belief.

8. Defendants' belief, if any, that any State government (or any agency or agent thereof) had knowledge of Defendants' practice of causing the publication of AWPs for Defendants' drug products that were higher than actual average wholesale prices or WACs that were higher than actual wholesale acquisition costs (including all discounts, rebates and chargebacks), including:

    a. The identity of each employee (current and former) of Defendants who held such a belief;

    b. The time period when such person held that belief;

    c. Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

-4-

    d.    All other information that formed a basis for the person's belief.

9.    Defendants' belief, if any, that any State government (or any agency or agent thereof), approved of or acquiesced in Defendants' practice of causing the publication of AWPs for Defendants' drug products that were higher than the average actual wholesale prices or WACs that were higher than actual wholesale acquisition costs (including all discounts, rebates and chargebacks), including:

    a.    The identity of each employee (current and former) of Defendants who held such a belief;

    b.    The time period when such person held that belief;

    c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

    d.    All other information that formed a basis for the person's belief.

10.    Defendants' belief, if any, that any State Medicaid program (or any agency or agent thereof) approved of or acquiesced in Defendants causing the State Medicaid program to reimburse providers for Defendants drugs in amounts significantly in excess of provider acquisition costs plus any established dispensing fee, including:

    a.    The identity of each employee (current and former) of Defendants who held such a belief;

    b.    The time period when such person held that belief;

    c.    Each communication and the identity of each document relied upon, considered or used by the person in forming the belief;

    d.    All other information that formed a basis for the person's belief.

13.    Any and all actions on the part of any Defendants' management, employee, attorney or board representative to link compensation paid to Defendants' sales personnel to their performance of duties involving the marketing of reimbursement spreads to customers or potential customers.

12.    Defendants' practices and procedures, including accounting practices and procedures, with respect to sales and/or intra-company transfers of Azathioprine, Diclofenac Sodium, Furosemide, Hydromorphone, Ipratropium Bromide, Oramorph SR, Roxanol, Roxicodone, Sodium Polystyrene Sulfonate, and Atrovent, between and among Defendants.

-5-

13. The corporate structure of Defendants and changes thereto, dating from 1996 to the present, including the creation of Boehringer Ingelheim Roxane, Inc. and Roxane Laboratories, Inc., and whether Defendants held board meetings, and if so, the frequency of such board meetings.

14. Whether Defendants held board meetings, and if so,

    a. the date of each board meeting,
    b. the identity of each person attending each board meeting, and
    c. whether written minutes were taken at each board meeting.

15. Since January 1, 2003, to the present, all transfers of funds, stock, and other assets to or from one Defendant to another Defendant, or to or from a Defendant to any parent or sister corporation.

16. Since January 1, 2003, to the present, on an annual basis and for each Defendant, the gross income, net income, and operating expenses, of each Defendant, and the Defendant's budget for each year.

17. The ownership of the rights, including patent rights, licensing agreements, or other documents granting sales and distribution rights, with respect to the following drugs: Azathioprine, Diclofenac Sodium, Furosemide, Hydromorphone, Ipratropium Bromide, Oramorph SR, Roxanol, Roxicodone, and Sodium Polystyrene Sulfonate.

18. Defendants' decision to stop reporting wholesale acquisition costs (WACs) to pricing compendia in 1998 for multi-source products, and to request around late 1999 and early 2000, that the pricing compendia remove all historic WACs for Defendants' multi-source products.

19. Any efforts undertaken by Defendants to implement any type of compliance program consistent with the 2003 Compliance Guidelines issued by the HHS Office of Inspector General.

20. Any efforts undertaken by Defendants or any lobbying group on Defendants' behalf to advocate that the Medicare and/or Medicaid programs continue to use either AWP or WAC as a benchmark for reimbursement purposes, including

    a. Communications with HHS regarding government reimbursement for drugs or drug pricing, including, but not limited to, communications in connection with: (a) CMS's Proposed Rule published at 56 Fed. Reg. 25792 (June 5, 1991); (b) the Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997); (c) CMS's Proposed Rule published at 63 Fed. Reg. 30818 (June 5, 1998); (d) Program Memorandum Transmittal AB-00-86 (September 8, 2000);(e) CMS's Proposed Rule at 68 Fed. Reg. 50428 (August 20, 2003) and

-6-

      (f) any guidance, publication, decision, legislation, regulation or administrative action related to government reimbursement for drugs or drug pricing in a state Medicaid plan.

    b.    Communications with any state Medicaid agency or official regarding government reimbursement for drugs or drug pricing, including, but not limited to, communications in connection with: (a) CMS's Proposed Rule published at 56 Fed. Reg. 25792 (June 5, 1991); (b) the Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997); (c) CMS's Proposed Rule published at 63 Fed. Reg. 30818 (June 5, 1998); (d) Program Memorandum Transmittal AB-00-86 (September 8, 2000); (e) CMS's Proposed Rule at 68 Fed. Reg. 50428 (August 20, 2003); and (f) any guidance, publication, decision, legislation, regulation or administrative action related to government reimbursement for drugs or drug pricing under a state Medicaid plan.

21.    Any training provided to Defendants' employees regarding marketing the "spread" or the difference between the amount paid by a retail customer for a drug and the amount of third party reimbursement, including Medicare and Medicaid.

Thank you for your attention to this matter. In light of the impending discovery deadline, I propose holding our meet and confer on Wednesday, November 5.

Sincerely,

*Laurie Oberembt*
Laurie Oberembt
Senior Trial Counsel
Commercial Litigation Branch

cc:    AUSA Barbara H. Smith
       U.S. Dept. of Justice

       James Breen
       The Breen Law Firm

       Roslyn Pollack