# EXHIBIT D

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------X
In Re:  PHARMACEUTICAL          )
INDUSTRIES AVERAGE WHOLESALE    )  MDL No. 1456
PRICE LITIGATION                )  Civil Action No.
------------------------------X 01-12257-PBS
THIS DOCUMENT RELATES TO:       )
United States of America ex     )
rel. Ven-a-Care of the          )
Florida Keys, Inc., et al.      )
v. Boehringer Ingelheim         )
Corp., et al., Civil Action     )
No. 07-10248-PBS                )
------------------------------X

(CROSS-CAPTIONS APPEAR ON FOLLOWING PAGE)

VIDEOTAPED 30(b)(6) DEPOSITION OF ROXANE

LABORATORIES, INC., ROXANE LABORATORIES, INC.

n/k/a BOEHRINGER INGELHEIM ROXANE, INC.,

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., and

BOEHRINGER INGELHEIM CORPORATION by JUDY WATERER

DECEMBER 12, 2008

Page 34

1  the same type of pricing scenario that we do.
2  It's publicly available. It's published. And
3  it's virtually an industry standard on a generic
4  product that the AWP is typically set at 10
5  percent off of the brand's AWP at launch. So I -
6  - I guess someone could set it wherever they
7  want, but I don't know that that happens in the
8  industry.
9      Q. You said that it's the industry
10 standard to set AWP at 10 percent off the brand.
11 Are you referring to the AWP of the brand
12 product?
13     A. Yes, that that is a common formula that
14 we see lots of people -- it's very common to see
15 that when you launch a product, that that's where
16 the pricing ends up.
17     Q. Okay. Is that how Roxane typically
18 sets the AWP for its generic drugs?
19     A. When we launch a new generic drug, our
20 most common thing to do is take 10 percent of the
21 brand's AWP at launch. There are instances when
22 that does not occur.

Page 35

1      Q. And is that true regardless of where
2  Roxane sets its launch prices at which it sells
3  to customers?
4          MS. RIVERA: Hold on. Hold on. I'm
5  going to object. I mean, how Roxane sets its
6  prices and its practices for setting its prices
7  is not one of the topics that Ms. Waterer is here
8  to talk about. One of your topics is how the
9  industry sets prices for generic drugs and
10 Roxane's understanding of how the industry sets
11 prices. She's testified on numerous occasions
12 how Roxane goes about setting its prices and what
13 its methodologies are for that. So I'll give you
14 a little leeway on some of the basic questions,
15 but I don't want to go down a whole long line of
16 questioning about what Roxane's specific
17 practices are for how they set their prices
18 because it's not part of what we're here to talk
19 about today.
20         MR. HENDERSON: Fair enough. And I'll
21 try to avoid repeating prior questioning. At the
22 same time, I'm not limited by the topics. They

Page 36

1  don't limit the scope of my questions. They do
2  limit the effect of the testimony insofar as it
3  may or may not be binding on Roxane --
4          MS. RIVERA: Well, if you --
5          MR. HENDERSON: -- but the topics are
6  not a limitation on the scope of my questioning.
7          MS. RIVERA: If you can link your
8  questioning back to the subject of the topics,
9  then that's okay. But if they go off into topics
10 that are not and don't have any relationship to
11 the topics that are on the notice, then we're not
12 going to go down that path.
13         MR. HENDERSON: Ms. Rivera, the law is
14 crystal clear that I'm entitled to ask any
15 questions I want to seek non-privileged
16 information at this deposition, regardless of
17 whether they are within the scope of the topics.
18         MS. RIVERA: Well, that's not our
19 understanding of the law or the agreement that we
20 had, which is that this is a 30(b)(6) deposition,
21 and so Ms. Waterer is here designated pursuant to
22 specific topics to speak on behalf of the

Page 37

1  company. She has not been noticed in her
2  individual capacity. And you had many years to
3  notice her and take her deposition in her
4  individual capacity and she's not prepared here
5  today to talk about things that are not out --
6  that are outside of the scope of this notice, nor
7  were we given any indication that you would be
8  seeking to obtain testimony on other -- on topics
9  other than what are contained in the notice. So
10 --
11         MR. HENDERSON: We don't have to take
12 up a lot of space on the record for this.
13         MS. RIVERA: I agree.
14         MR. HENDERSON: I can provide you with
15 case law. You are -- you should know the law.
16         MS. RIVERA: I do know the law.
17         MR. HENDERSON: You're a lawyer. And
18 that's the law. We've never waived our rights,
19 and there's no agreement to that effect.
20 BY MR. HENDERSON:
21     Q. Ms. Waterer, you said it's industry
22 practice to set AWP's at 10 percent below the AWP

**102**

1  determine what the AWP is going to be for one of
2  those types of products; again, for the record, a
3  generic product that has many characteristics of
4  a branded product?
5      A.  It's typically an AWP of an older
6  product that has a long history of pricing.  And
7  whatever the price is, we take all of our list
8  prices up by the same percent.
9          It's common for us to base it on a
10 pharmaceutical price index.  We take price
11 increases, quite frankly, so infrequently that we
12 usually don't keep up with that.  But we look at
13 what would be a rational price increase, and once
14 we decide what would be rational to increase the
15 price, we increase the price from its existing --
16 from its existing price by that percent.
17     Q.  Okay.  So Roxane relies in part on the
18 AWP of another product?
19     A.  No, on its own product.  If we're the
20 only one in the market?
21     Q.  Yeah.  Maybe I --
22     A.  Our AWP is already set.  It's been in

**103**

1  place for a long time.
2      Q.  I see.
3      A.  So if we're going to take a price
4  increase, we decide what percent price increase
5  we're taking, and then we increase our prices by
6  that percent on that product.
7      Q.  I see.  And when the product was
8  originally launched, was -- is the scenario
9  you're describing one where the original AWP was
10 set at 10 percent below the brand?
11     A.  It may or may not have been.  And I
12 don't -- I don't know that we would be able to
13 track that because the majority of the products
14 that fall into this category date back so far
15 that we don't have records on that anymore.
16     Q.  Does Roxane market any branded
17 products?
18     A.  Currently?
19     Q.  Yeah.
20     A.  Again, I'm going to have to say how are
21 you going to define "branded."  We market some
22 products that have a brand name.

**104**

1      Q.  Which products are those?
2      A.  Roxicet.
3      Q.  Okay.  And how does -- how did AW --
4  how did Roxane set the AWP on Roxicet?
5      A.  I believe that -- that that was --
6  first happened so long ago that records don't
7  exist.  It's a very, very old product.
8      Q.  Okay.  It was set before your time?
9      A.  Way before, yes.
10     Q.  Okay.  Trying to come back to the
11 subject of changing or not changing the reported
12 AWP -- actually, let me -- let me back up.  I'm
13 going to diverge.  I'm sure counsel will object.
14         Is -- is NovaPlus a generic product?
15 I'm sorry.  The Ipratropium Bromide NovaPlus
16 product?
17         MS. RIVERA:  No, hold on.  Hold on.
18 Object.  Objection.  It's beyond the scope of the
19 deposition notice.
20         Go ahead.
21 BY MR. HENDERSON:
22     Q.  You may answer.

**105**

1          MS. RIVERA:  And to form.
2  BY THE WITNESS:
3      A.  NovaPlus is a private label.
4  BY MR. HENDERSON:
5      Q.  Yeah.
6      A.  It's not a -- it's not a specific
7  product.
8      Q.  How would you --
9      A.  It's -- it's a label.
10     Q.  Okay.  The product itself, would you
11 characterize it as a generic product?
12     A.  What product are you referring to?
13     Q.  The Ipratropium Bromide that is sold
14 under the NovaPlus label.
15     A.  Okay.  Yes.
16     Q.  Do you know whether or not -- do you
17 know how or whether --
18         (WHEREUPON, there was a short
19 interruption.)
20         MR. HENDERSON:  Let's take a short
21 break so that there's no interruption.
22         THE VIDEOGRAPHER:  We are off the

106

1  record at 11:18 a.m.
2       (WHEREUPON, a recess was had.)
3       THE VIDEOGRAPHER: We are back on the
4  record at 11:46 a.m.
5       MS. RIVERA: I wanted to make a quick
6  statement on the record, which is that Roxane
7  objects to questioning of Ms. Waterer in her
8  corporate representative capacity outside the
9  scope of the topics in the notice, and we will
10 put those objections on the record. And to the
11 extent that the questioning goes beyond what we
12 feel is the appropriate scope of the topics, we
13 will instruct the witness not to answer, end the
14 deposition if that be necessary.
15      In addition, Mr. Henderson is going to
16 try to clarify some of this, but there have been
17 some questions about Ms. Waterer's personal
18 knowledge and whether those questions also apply
19 to what the corporate position is on those
20 issues. And Roxane's position is to the extent
21 Ms. Waterer was questioned in her personal
22 knowledge, unless it is clarified in the record

107

1  that those aren't -- that testimony is not
2  binding on the corporation, that in the future,
3  the questions will be -- should be phrased in
4  terms of what Roxane's corporate knowledge is, as
5  that's the role that Ms. Waterer is playing
6  today.
7       MR. HENDERSON: Ms. Rivera's position
8  about the scope of the 30(b)(6) questioning is at
9  least the third time it has been stated. But in
10 any event, I am putting Roxane's counsel on
11 notice that the clear majority of courts hold
12 that a 30(b)(6) deposition notice and the topics
13 therein do not constitute a restriction or
14 limitation of the scope of questioning.
15      And I've given her citations to cases,
16 including the King case at 161 FRD 475 from the
17 Southern District of Florida, 1995. There's a
18 Cabot Corporation case, 194 FRD 499, Middle
19 District of Pennsylvania; United States EEOC
20 versus Caesar's Entertainment, 237 FRD 428 at
21 432, 2006 case; and Detoy, D-e-t-o-y, versus City
22 and County of San Francisco, 196 FRD 362 at 365,

108

1  California case; and Overseas Private Investment
2  Corp. case at 185 FRD 67, page 68. All of these
3  courts hold that the topics of a 30(b)(6)
4  deposition do not restrict the scope of
5  questioning and that the examiner is well within
6  his rights in asking questions outside the scope
7  of those topics. And if the -- Roxane's counsel
8  does instruct the witness not to answer on the
9  ground -- on that ground which the United States
10 believes to be unfounded, the United States
11 certainly reserves its rights and may well seek
12 to reconvene the deposition in Boston. And the
13 United States may seek costs of associated with
14 doing that.
15 BY MR. HENDERSON:
16      Q. Now, with regard to the questions
17 asking about your personal knowledge, Ms.
18 Waterer, I think a number of my questions, I
19 withdrew my comment about personal knowledge but
20 was asking focused questions based on your first-
21 hand knowledge. And we were talking about
22 industry practice regarding the setting of AWP

109

1  and then after that, I asked some questions about
2  industry practice regarding any changes to the
3  AWP after the time of launch.
4       With regard to the first set of
5  questions relating to industry practice about the
6  setting of the AWP for generic product at the
7  time of launch, was there anything in your
8  answers that you believe do not reflect the -- or
9  are not part of the corporate knowledge of Roxane
10 Laboratories?
11      A. Without reviewing the questions and the
12 answers, I'm not sure how to answer that.
13      Q. All right. Is there anything that you
14 recall telling me that you believe the
15 corporation, Roxane Laboratories, would disagree
16 with?
17      A. I'm not sure without reviewing what I
18 said. My -- I am concerned that during the
19 questioning, if the question was clearly preceded
20 with you're answering it in your capacity as the
21 corporate representative, that the answer to that
22 specific question would have been specific as the

110

1  corporate representative, and then the questions
2  where it was immediately preceded with as your
3  personal. But there was a number of times that
4  it switched back and forth, and I am concerned
5  that I might have answered something with a yes,
6  it's my personal or -- something with a clear yes
7  or no from my personal that might not be exactly
8  the same as the corporate's.
9     Q. Is there anything --
10    A. There's nothing that stands out.
11    Q. Okay.
12    A. But I'm uncertain unless I go through
13 and review it because it was flipping back and
14 forth a number of times without, as I recall it,
15 a clear awareness to me of which hat was on.
16    Q. Okay. Some of my questions related to
17 your direct first-hand knowledge of the setting
18 of AWPs for Roxane drugs and your experience in
19 that regard. Is there anything in those answers
20 that you gave that you believe does not reflect
21 the corporate knowledge of Roxane Laboratories
22 that you can think of?

111

1     A. I can't think of it. But again, one
2  question was prefaced with, you know, in your
3  personal knowledge. And then 15 questions later,
4  we're still asking questions and I didn't --
5  wasn't clear whether that was still personal
6  knowledge or not. So all I can say is that I'm
7  uncertain.
8     Q. Okay.
9        MS. RIVERA: Bunker, maybe --
10 BY MR. HENDERSON:
11    Q. At this point in time, nothing jumps
12 out at you as -- there is no informa- -- there is
13 no answer that you've given today so far that
14 jumps out at you that you think does not reflect
15 the corporate knowledge. Is that fair to say?
16    A. Yes.
17    Q. Okay. And I understand I had a few
18 questions about the Ipratropium Bromide NovaPlus.
19 Those are outside the scope of the 30(b)(6)
20 notice, and we'll just treat those differently.
21       I'm going to follow-up on a few more
22 questions on NovaPlus. If -- if counsel

112

1  instructs you not to answer, so be it.
2        MR. HENDERSON: But I'll put the
3  questions on the record and any instructions as
4  you give will be on the record.
5  BY MR. HENDERSON:
6     Q. Does -- do you have any understanding
7  as to whether or not the -- well, first of all,
8  the NovaPlus product, Ipratropium Bromide product
9  that Dey sells, is that sold to a company called
10 Novation?
11    A. That who sells?
12    Q. Roxane.
13    A. Okay.
14    Q. Did I say something else?
15       MS. RIVERA: You said Dey.
16       MR. HENDERSON: I'm sorry.
17 BY THE WITNESS:
18    A. Roxane no longer sells that product.
19 BY MR. HENDERSON:
20    Q. I see. Approximately how long did it
21 sell the product for?
22    A. Maybe a couple of years. I'm not sure

113

1  exactly.
2     Q. Did it start in about 2000 or 2001?
3     A. I don't remember exactly. That doesn't
4  seem unlikely, but I don't know that information.
5     Q. Okay. Do you know that the NDC for
6  that product was different than the NDC number
7  for the other Ipratropium Bromide products that
8  Roxane sold?
9     A. Yes.
10    Q. Did -- when -- did Roxane report AWPs
11 to Red Book for the Ipratropium Bromide NovaPlus
12 product?
13       MS. RIVERA: Objection. I'm going to
14 object to this as beyond the scope of the
15 deposition testimony and allow Ms. Waterer to
16 answer only to the extent that she has actual
17 knowledge of the answers to these questions and
18 put on the record that she has not been prepared
19 as a corporate representative on these questions.
20 It doesn't necessarily have or is aware of what
21 the corporate knowledge is on these issues.
22       MR. HENDERSON: Counsel, your

**114**

1   objections have been stated at least four times.
2        MS. RIVERA: I understand, but I'm
3   going to put it on the record every time that the
4   subject comes up.
5        MR. HENDERSON: Well --
6        MS. RIVERA: That is not -- and if it
7   goes too extensive on this and gets into too many
8   details, then I will instruct the witness not to
9   answer.
10       MR. HENDERSON: I respectfully suggest
11  that by stating it over and over and over again
12  you're wasting time. And you're --
13       MS. RIVERA: Well, I don't think I'm
14  wasting time.
15       MR. HENDERSON: All right.
16  BY MR. HENDERSON:
17       Q. My question is, Ms. Waterer, do you
18  know whether or not Roxane reported AWPs for the
19  NovaPlus Ipratropium Bromide product to Red Book?
20       A. I don't know specifically what got
21  reported to whom and when, no.
22       Q. Would it have been Roxane's normal

**115**

1   practice to report those AWPs to Red Book?
2        MS. RIVERA: Objection. I'm going to
3   instruct the witness not to answer. That's
4   beyond the scope of this deposition, and you're
5   getting into details about a subject that she has
6   not been prepared to testify on.
7   BY MR. HENDERSON:
8        Q. Do you know whether or not the AWPs
9   that were reported to Red Book for the
10  Ipratropium Bromide NovaPlus were the same as the
11  AWPs that Roxane reported for its other
12  Ipratropium Bromide, its corresponding
13  Ipratropium Bromide generic products?
14       MS. RIVERA: Same objection and same
15  instruction.
16  BY MR. HENDERSON:
17       Q. All right. Can you tell me whether or
18  not the -- in general whether the prices at which
19  the Ipratropium Bromide NovaPlus products were
20  sold to Novation were comparable to the prices at
21  which Roxane's other Ipratropium Bromide products
22  were sold to wholesalers?

**116**

1        MS. RIVERA: Same objection. Same
2   instruction.
3   BY MR. HENDERSON:
4        Q. What is Novation?
5        A. I believe it's a buying group for a
6   consortium of hospitals.
7        Q. Would it be characterized as a GPO,
8   group purchasing organization?
9        A. I think that would be fair.
10       Q. Do you know their -- how many hospitals
11  approximately are members of Novation?
12       A. No.
13       Q. Does Roxane --
14       A. Wait a minute. Am I answering as me or
15  as the company?
16       Q. Just you.
17       A. Just me, no.
18       Q. Yeah, this is --
19       A. Okay.
20       Q. I agree it's outside the scope of the
21  30(b)(6) notice.
22       Is -- does Roxane sell other products

**117**

1   to Novation under a -- a Novation or a similar
2   label?
3        A. As me?
4        Q. Yes, this is --
5        A. To the best of my knowledge, the
6   NovaPlus ipratropium was the only private label
7   activity that we did with Novation.
8        Q. Okay. Could you describe to me -- and
9   again, all these questions about Novation and
10  NovaPlus are just in your personal capacity and
11  outside the scope of the 30(b)(6) notice. Can
12  you describe to us what it means to sell a drug
13  on a private label?
14       MS. RIVERA: Objection. Same objection
15  as before and same instruction.
16       MR. HENDERSON: All right. Is it your
17  intention to make the same instruction and same
18  objection as to all other questions that are
19  specifically targeted towards the Ipratropium
20  Bromide NovaPlus drug?
21       MS. RIVERA: Well, yes, for now. I
22  would like to hear your questions and then maybe

118

1  we can determine after I have a chance to talk to
2  the witness about whether I'm going to allow her
3  to testify and answer those questions.
4      MR. HENDERSON: Okay.
5      MS. RIVERA: And there are some that
6  are so general I don't -- it's okay for her to
7  testify about. But if you get into any of the
8  details about the pricing for NovaPlus or
9  Roxane's specific practices related to NovaPlus,
10 then I will make that objection.
11 BY MR. HENDERSON:
12     Q. Ms. Waterer, did you have any
13 involvement in the decision making concerning
14 selling the -- Roxane's Ipratropium Bromide
15 generic products under a private label to
16 Novation?
17     A. To the best of my recollection, I was
18 involved with implementing the decision. I don't
19 remember if I was involved in -- I don't recall
20 being involved in any of the negotiations or that
21 sort of thing.
22     Q. Were you involved in negotiating the

119

1  price or prices at which the products were sold
2  to Novation?
3      A. Not that I recall.
4      Q. Did you have any involvement in
5  determining the AWPs for those products, for the
6  Novation products?
7      A. I'm not sure if I did or didn't. I
8  don't remember how that was determined.
9      Q. At the time, would that have been your
10 normal responsibility?
11     A. Because Novation was a one-time event
12 and it only occurred one time, and to the best of
13 my knowledge, we never did it before or since,
14 there wasn't a normal responsibility associated
15 with it.
16     Q. And I take it you don't recall whether
17 it was your responsibility at the time?
18     A. I'm not sure what your --
19     Q. I'm trying to figure out --
20     A. I don't know who decided what the AWP
21 should be.
22     Q. Okay.

120

1      A. I don't know if we decided it, if
2  someone else decided it. I don't recall anything
3  about how the AWP was set.
4      Q. All right. Okay. Now, I'm going to
5  come back to a piece of topic No. 4. And again,
6  this relates to the second piece of it, which is
7  any industry practice concerning changing or not
8  changing the reported or published AWP after the
9  time of launch. And I think you informed me that
10 -- and this, again, I'm now asking you questions
11 in your capacity as a corporate representative.
12     A. Mm-hmm.
13     Q. And I believe, if I recall correctly,
14 you informed me of Roxane's understanding that in
15 general, it's the industry practice not to change
16 the AWP of a generic product after the time of
17 launch. Did I understand you correctly,
18 generally?
19     A. Generally, yes. If it's a generic
20 product with multiple competitors and it's a
21 competitive generic product, yes.
22     Q. Okay. And could you tell me what

121

1  specific information informs the company in
2  having that belief?
3      A. That pricing doesn't change --
4      Q. Yes.
5      A. -- on a generic after it launches?
6      Q. Yep.
7      A. I think I've already stated that if the
8  pricing did change and we didn't change ours,
9  eventually it would be brought to our attention
10 most likely by a customer, and we did not
11 commonly see that. It was a rare instance of
12 that. I don't think it was because -- I don't
13 remember exactly how we ended up with a price
14 that was different.
15     Q. Okay.
16     A. But there was no indication that we
17 were doing anything that was different from what
18 the rest of the industry did because nobody
19 highlighted it.
20     Q. You -- in prior questions and answers
21 about the setting of AWP at the time of launch,
22 you described some of your own first-hand