UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF CLASS CERTIFICATION OF THE U&C CLASS FOR THE PURPOSES OF SETTLEMENT**

**[REDACTED]**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................. 1

II.   FACTS ................................................................................................ 3

    A.    U&C Class ................................................................................. 3

    B.    Correlation of U&C Prices with AWP .................................... 4

        1.    Retailers have no incentive to impair 90% of their revenue base by competing based on U&C price ................................ 4

        2.    As a result of these financial incentives, retailers set U&C based on AWP ............................................................ 5

            a.    AWP determined major retailers' U&C prices ............... 6

            b.    Independent Pharmacies also base their U&C prices on AWP ........................................................... 8

        3.    Data demonstrates that U&C prices are typically above AWPs .............. 11

            a.    IMS data ....................................................................... 11

            b.    TPP claims data ............................................................ 11

            c.    GAO analysis independently demonstrates the impact of the Scheme on the U&C class ................................. 12

            d.    Publicly reported U&C prices ....................................... 13

    C.    Class-Wide Impact ................................................................. 14

    D.    Damages .................................................................................. 15

III.  ARGUMENT ..................................................................................... 15

    A.    Rule 23 Standards in the First Circuit ................................... 15

    B.    Plaintiffs Satisfy the Rule 23(a) Requirement ...................... 16

        1.    The U&C Class meets the numerosity requirement because joinder of all members is impracticable ................................ 16

        2.    The Commonality requirement is met because questions of law and fact are common to all class members .............................. 16

        3.    Plaintiffs meet the typicality requirement because their claims arise from the same course of conduct alleged by the Class .................... 16

        4.     Plaintiffs meet the adequacy requirement because their interests will not conflict with those of other class members and because they have chosen qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation ........................ 17

   C.     Plaintiffs Meet the Requirement of Rules 23(b)(3)............................................... 18

       1.     Common questions predominate over individual issues........................... 18

       2.     Class treatment is superior to other forms of litigation.............................. 19

       3.     Plaintiffs do not require an individualized calculation of damages .......... 20

IV.   CONCLUSION ................................................................................................................. 20

001821-13 278164 V1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ....................................................................................... 17

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ............................................................................. 16

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ..................................................................................... 19

*Coffin v. Bowater Inc.*,
    228 F.R.D. 397 (D. Me. 2005) ................................................................................... 18

*Forbush v. J.C. Penney Co.*,
    994 F.2d 1101 (5th Cir. 1993) ................................................................................... 16

*Lessard v. Metropolitan Life Ins. Co.*,
    103 F.R.D. 608 (D. Me. 1984) ................................................................................... 15

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ......................................................................................... 19

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ...................................................................................... 17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005) ........................................................................ 16, 18, 20

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .................................................................................................. 19

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004) ........................................................................... 16, 19

*Smilow v. Southwestern Bell Mobile Sys.*,
    323 F.3d 32 (1st Cir. 2003) ....................................................................................... 18

*Waste Management Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ..................................................................................... 18

## STATUTES

42 C.F.R. § 403.806(7) ..................................................................................................... 4

## I.   INTRODUCTION

Class counsel has entered into a proposed global settlement agreement with McKesson to resolve claims on behalf of all private payors arising from a scheme to inflate AWPs. This settlement encompasses the claims of the certified TPP and Consumer Co-pay Classes as well as a proposed class of uninsured consumers. The Court requested additional briefing on Plaintiffs' motion to certify the Uninsured Class for purposes of settlement. Members of the Uninsured Class are the most vulnerable purchasers of all, consumers who were required to pay the full cash price (the "usual and customary" or "U&C" price) of such drugs out of pocket and thus absorbed the entire excess charge themselves.

The question before the Court is whether there is something about the U&C Class that makes it different from the other certified classes such that certification for this class for settlement purposes is not appropriate. The answer is no. Individual knowledge issues are not implicated here. No cash payor had knowledge of the scheme. Nor are there individual issues of reliance: causation is satisfied on a class-wide basis by the payments made by each class member without knowledge that their purchase price had been artificially rigged by McKesson.

Substantial evidence supports a direct correlation between AWP and the U&C price, such that the scheme's impact on AWP had a direct impact on the class. "IMS claims data suggest that the retailers automatically increased U&C with the increased AWPs induced by the Scheme."[1] Pricing policy documents from various retail pharmacies also confirm that retailers routinely base U&C prices on AWP. Additionally, McKesson provides a service through its strategic partner, RxNet, to help McKesson's pharmacy clients set U&C prices as a percentage of

---

[1] The Calculation of Damages to Cash Payors Using the Disaggregated IMS Data, Report of Raymond S. Hartman, dated December 10, 2008 ("12.10.08 Hartman Decl."), ¶ 16, attached hereto as Exhibit A.

- 1 -

AWP to maximize profits.  Thus, when McKesson and FDB implemented their scheme and raised AWP, cash prices also increased in a quantifiable fashion.

Setting cash prices based on the AWP makes economic sense for the pharmacies, which are largely dependent on third-party reimbursement contracts.  Competition for U&C consumers has little impact on U&C prices.  U&C purchases account for only a small percentage of pharmacies' prescription drug sales; the bulk of their sales are based on third-party reimbursement contracts, which uniformly set reimbursement rates at the ***lesser of*** the U&C price or the negotiated AWP-based reimbursement rate.[2]  There is no economic reason for pharmacies to risk losing a reduction in the vast bulk of their revenues by competition for the U&C business, which would trigger the lesser clause of TPP reimbursement.  On the contrary, they have an overwhelming incentive to maintain cash prices at or above third-party reimbursement rates.  For this reason, AWPs determine U&C prices of brand drugs at retail pharmacies, like Safeway, RiteAid and others, and thus the scheme to increase AWPs had a measurable impact on cash payors.

Class-wide impact is confirmed by Dr. Hartman's analysis of IMS data sampled for cash paying consumers as well as other claims data.  Dr. Hartman demonstrates that when the TPP price increased as a result of the scheme, the cash price increased in tandem.   Federal government survey data further demonstrates that when McKesson's markup increases were implemented, primarily in 2002 and 2003, U&C prices increased relative to the AWPs (as opposed, for example, to the underlying WACs prices).  The evidence on record therefore supports a finding of class-wide impact which can be measured for damage calculations on an aggregate basis.

---

[2] Declaration of Raymond S. Hartman in Support of Certification of the Class of Uninsured Cash Payers Paying U&C ("4.21.08 Hartman Decl."), n.8 filed under seal.

001821-13 278164 V1

## II.   FACTS

### A.   U&C Class

The U&C Class consists of consumers who do not have insurance coverage for purchases

of the brand-name drugs that are the subject of this lawsuit.  According to the U.S. Census

Bureau, there are an estimated 47 million Americans without health insurance.[3]  The U&C Class

therefore forms a group many times larger than either the Consumer Co-pay or TPP Classes.

These purchasers pay the cash or "usual and customary" ("U&C") charge.  U&C purchasers are

the most vulnerable consumers because they pay higher prices, have little or no bargaining

power and have to absorb the full impact of price increases.  Dr. Hartman observes:

> As a group, uninsured cash payors account for the smallest
> percentage of retail pharmacy revenue; they are arguably the least
> informed individuals purchasing pharmaceuticals.  Uninsured cash-
> payors are least likely to have the resources to "shop" the
> competition and use competitive information on U&C prices across
> retailers.  These payors have the least market power; they have no
> ability to negotiate volume discounts.  These payors are most likely
> to come into a pharmacy and inquire as to the cost of a script,
> which they might compare across several pharmacies.  However, I
> have seen no evidence demonstrating that pharmacies
> systematically alter their prices in response to such "shopping" of
> alternative pharmacies.  Rather, the evidence indicates that the cash
> prices charged by competitive pharmacies are related to AWP and,
> for the most part, are higher than AWP.  As a result, any
> "shopping" of one pharmacy against another most likely leads to a
> comparison of two U&C prices that are greater than AWP, resulting
> in small savings and continued injury from the 5% Spread Scheme.
> Furthermore, as discussed below, the financial incentives of retail
> pharmacies and PBMs make it irrational for retail pharmacies to
> compete meaningfully on prices to uninsured cash payors.[4]

---

[3] DENAVAS-WALT, C.B. PROCTOR, AND J. SMITH. INCOME, *Poverty, and Health Insurance Coverage in the United States:  2006*. U.S. CENSUS BUREAU., August 2007 at 18, available at: http://www.census.gov/prod/2007pubs/p60-233.pdf.

[4] 4.21.08 Hartman Decl., ¶ 7.

**B.      Correlation of U&C Prices with AWP**

Substantial evidence ties AWP to cash prices and can be used to establish class-wide

impact, including: (1) pharmacy reimbursement contracts; (2) the practices of retailers to use

AWP as a cash price benchmark; (3) IMS and TPP claims data; (4) publicly available data; and

(5) McKesson's own documents.

> **1.      Retailers have no incentive to impair 90% of their revenue base by competing based on U&C price**

Uninsured consumers lack the competitive information and market power to compel

pharmacies to reduce cash prices for prescription drugs.[5] Uninsured cash payors account for less

than 10% of all retail pharmacy drug reimbursement.[6] Due to the prevalence of third-party

reimbursement contracts, setting payment at the *lesser* of the U&C price or the AWP-based

reimbursement rate,[7] pharmacies are hard-pressed to drop their U&C prices below the highest

third-party reimbursement rates:

---

[5] 4.21.08 Hartman Decl., ¶ 9.

[6] 4.21.08 Hartman Decl., ¶ 9.

[7] *See, e.g.*, 4.21.08 Hartman Decl., n.8 (citing S. P. DESSELLE AND D.P. ZGARRICK, PHARMACY MANAGEMENT: ESSENTIALS FOR ALL PRACTICE SETTINGS (McGraw Hill, 2005) at 279 ("It is customary for third parties to require that the pharmacy charge the third party their U&C price if it is lower than the third party's reimbursement formula price.")); *see also* 4.21.08 Hartman Decl. at n.8 (discussing contracts in the AWP-MDL matter).  PBMs typically define the U&C rate for the purposes of reimbursement as the lowest available price. *See, e.g.*, Ex. 1 (CMK-AWP 010723, 771 (AdvancePCS Provider Manual) (defining U&C to include all discounts)); *accord* Ex. 2 (ESI-414-000000004; 13; 37 (2002)); Ex. 3 (ESI-414-000000816; 826; 827; 887 (12/2005) ESI Pharmacy Network Manual); Ex. 4 (CMK-AWP 010708; 717; 718 (Caremark Inc. Participating Pharmacy Administrative Manual)); Ex. 5 (Medco-1887, 1930, 1954 (1998)); Ex. 6 (Medco-2329, 2369, 2400 (2006) (Medco Pharmacy Services Manuals) (defining U&C to include all discounts & loss leaders)); Ex. 7 (Unnumbered Healthtrans doc at 4 of 4 (Healthtrans Participating Pharmacy Agreement) (includes lesser of clause)); accord Ex. 8 (Rx America (Exhibit 1 Pharmacy Services Summary Compensation)); Ex. 9 (NMHC/NEC 00432 at 449 (National Medical Health Card contract)).  Further, as a condition of participating in the Medicaid program, the federal government requires pharmacies to "provide the lower of the negotiated price or usual and customary price."  42 C.F.R. § 403.806(7).  All Exhibits referenced in Plaintiffs' Supplemental Brief are attached to the Declaration of Steve W. Berman submitted herewith.

> As a matter of economics, the incentive structure introduced by the PBM/TPP reimbursement contracts using the *lesser of* AWP – XX% and U&C for TPP reimbursement motivate pharmacies and PBMs to constrain U&C to be greater than AWP – XX%. Indeed, in order to constrain U&C prices from inadvertently upsetting third party reimbursement, U&C is frequently formulaically-related to AWP in a predictable fashion[.][8]

As Dr. Hartman observes, it is implausible that a retailer would risk lowering the vast bulk of reimbursement by setting U&C at a price below AWP-based reimbursement amounts:

> Given the terms of most brand-name drug reimbursement contracts between PBMs and TPPs for scripts filled at network pharmacies, the financial incentives of retail pharmacies and PBMs make it unlikely that retail pharmacies would allow U&C to fall below AWP – XX%. If they did, the retail pharmacies would risk being paid U&C for the large share of scripts reimbursed by TPPs (79% of revenue; see footnote 7 above). If the PBMs allowed retail pharmacies to set U&C below AWP – XX%, they would be forced to allow TPPs to reimburse them at U&C for the relevant drugs. In such a case, the prices of most scripts filled for the relevant drugs would be set by the negotiations of the smallest and economically least powerful group of payers. In such a case, *retailers and PBMs would allow a single uninsured "walk-in" cash payer to set the price for all TPPs' reimbursements* for that drug where the TPPs' contracts had the "lesser of AWP – XX% and U&C" language for a specific period.[9]

### 2.   As a result of these financial incentives, retailers set U&C based on AWP

To protect against a loss in insurance reimbursement, retailers therefore tie the U&C price to AWP.[10] This correlation is clearly stated in the pricing policies of many large pharmacies. Additionally, the Auto-Rx pricing service that McKesson provided to its independent pharmacies to help them set U&C prices profitably, also presumes this correlation.

---

[8] 4.21.08 Hartman Decl., ¶ 16.

[9] 4.21.08 Hartman Decl., ¶¶ 11-13 (emphasis in original).

[10] 4.21.08 Hartman Decl., ¶ 14.

### a.    AWP determined major retailers' U&C prices

Many national and regional retail pharmacists rely on AWPs to determine their U&C prices.  For example, Safeway provides: ███████████████████████████████████ ████████ Safeway sets prices so that ████████████████████████████████ ██████████████████ An internal Safeway e-mail explains:

████████████████████████████████████████████

[13]

For the same reason, at Stop and Shop,[14] Long's[15] and Meijer[16] U&C prices ██████ ████████████████████. As explained by Stop and Shop's pricing policy:

████████████████████████████████████████████

And at Supervalu, ████████████████████████████████████████ ██████████████████████ Walgreen's ██████████████████████████

---

[11] Ex. 10 (SFWY 000005); 4.21.08 Hartman Decl., ¶ 15(a).

[12] Ex. 11 (SFWY 000006).

[13] Ex. 12 (SFWY 000049).

[14] Ex. 13 (Stop and Shop Pricing Philosophy, Stop & Shop 001); 4.21.08 Hartman Decl., ¶ 16(a).

[15] Ex. 14 (LDS 00168 (███████████████████████████████████████ ████)).

[16] Ex. 15 (Unnumbered Meijer document, entitled Summary of General Pricing Guidelines for Key 63 (dated May 29, 2007) (██████████████████████████████ ██████████)).

[17] Ex. 13 (Stop & Shop 001 (Stop and Shop Pricing Philosophy)).

[18] Ex. 16 (Unnumbered Supervalu document, entitled "Description of Price Setting Methodology of Supervalu, Inc. for Brand Pharmaceutical New Drugs").

001821-13 278164 V1

████████████████████████████████ GeriMed, a buying organization for

pharmacies, states that "the normal price charged to a cash paying customer … is a function of

AWP,"[20] "usually AWP + X." At Hannaford Bros, the stated ████████████████

████████████████ " ███████ U&C prices " █████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████ Fred Meyers also sets ██████████████████████

█████████████████████████████████████████████████████████████████

    Rite Aid employs the following methods to ensure that its U&C prices are ████████████

█████████████████████████████████████ :



---

[19] Ex. 17 (WAL 004928).

[20] Ex. 18 (GM02041-70 at GM02061).

[21] Ex. 19 (Unnumbered Hannaford document, entitled "Pharmacy Pricing Strategy Hannaford, Kash N'Karry and Food Lion").

[22] Ex. 20 (Unnumbered Fred Meyer's documents, produced by Kroger's, entitled "Pricing Philosophy Pharmacy").

[23] Ex. 21 (RA-AWP-000022).

[24] Ex. 22 (RA-AWP-000024).

001821-13 278164 V1



Shopko also advises its pharmacies to maintain U&C pricing tables ▇▇▇▇▇▇▇

▇▇▇▇▇▇:

* * * *

### b.      Independent Pharmacies also base their U&C prices on AWP

The policy of letting AWP determine U&C prices makes good economic sense for

independent pharmacies, as well.  In a recent article, Michael Bunns, consultant with Pharmacy

Healthcare Solutions, a pharmaceutical consulting agency, writes:

> Traditional usual and customary (U&C) pricing for many retail
> pharmacies is established based on maximizing reimbursement
> from third-party payers, since they typically account for over 90%
> of a pharmacy's prescriptive business.
>
> For most brand drugs, U&C is set equal to or more comfortably
> above the most profitable pharmacy network rate.  Cash prices are
> set in this manner to avoid the "lower than U&C clauses in PBM
> contracts, which dictate that a PBM will not reimburse more than
> the cash price for any drug.[27]

---

[25] Ex. 23 (RA-AWP-000034).

[26] Ex. 24 (Shopko's Monitoring Price Tables (unnumbered document, produced by Shopko
March 2008)).

[27] Ex. 25 (Michael Bunns, *Picking a Cash Pricing Strategy*, COMPUTERTALK
(January/February 2007) at 50)); *see also* 4.21.08 Hartman Decl., n.8 (citing Desselle &

This policy is consistent with the 2004 deposition testimony of Joseph Dorsch, President, Owner and Manager of Voshell's Pharmacy, a Maryland-based independent pharmacy. Voshell's Pharmacy determines its usual and customary price by a pricing formula that adds a percentage of cost plus a fee, where the cost is the AWP.[28]

Finally, the Auto-Rx-Net, an Automatic Competitive Pricing Service that McKesson offers to its independent pharmacy customers, uses AWP to set brand prices. Auto-Rx-Net is an exclusive Pharmaserv service made available through an alliance between McKesson Pharmacy Systems and Rx-Net Inc.[29] Rx-Net is an "industry leader in price consulting services."[30] McKesson has offered a pricing service from Rx-Net for its customers since 2000.[31] The Auto-Rx service is an advance over previous versions because it allows customers to automatically update their prices with updated data.[32] The Auto-Rx service uses pricing information gathered by RelayHealth to help McKesson customers set their U&C prices consistent with the major chains or mass merchandizing stores in the same region and to increase cash purchases and third-party reimbursement.[33] In its AUTO-RX-NET PRICING, GETTING STARTED GUIDE, McKesson explains:

> Auto-Rx-Net creates [a] price table for each brand drug. ***The pricing table lists a mark-up or mark-down percentage that is***

---

Zgarrick, *supra* at 279 ("As noted earlier, the [third party] reimbursement rate is usually less than the pharmacy's U&C price[.]")).

[28] Ex. 26 (Deposition of Joseph Dorsch (AWP-MDL Dec. 8, 2004) at 57:4-10, 117:1-3).

[29] Ex. 27 (MCKAWP 0152030).

[30] Ex. 28 (MCKAWP 0151701 at 151702).

[31] Ex. 29 (MCKAWP 0151565).

[32] Ex. 30 (MCKAWP 0151641); Ex. 31 (MCKAWP 0151676-77).

[33] www.mckesson.com/static_files/McKesson.com/MPT/Documents/AutoRxNet.pdf (fact sheet on McKesson's website regarding its Auto-Rx service and its alliance with Rx-Net to provide the service). The Auto-Rx demo identifies RelayHealth as the source of its pricing information. http://www.rx-net-inc.com/rxnet01.htm.

*applied to the AWP.* The percentage applied is based on your [the pharmacy's] zip code area and varies based on the package size.

\* \* \* \*

*Auto-Rx-Net ensures that your U&C price is higher than the 3rd party price.*

If the cash price is lower than the 3rd party, the 3rd party price plus 1% is used.

If the cash price does not exist, 3rd party price plus 1% is used. The system further checks to ensure that the gross profit is more than AWP-10% for brand[.]

\* \* \* \*

Auto-Rx-Net ensures that the cash price is always higher than the 3d party price.[34]

A recent McKesson powerpoint describing its Auto-Rx service succinctly states the relationship between U&C prices and AWP:

| How items are priced? |
| :---: |
| Items priced as a percentage of AWP. |

| Automatic Audits |
| :---: |
| Cash pricing is higher than 3d party.[35] |

Indeed the effect of the automatic audit is to effectively eliminate competition at the cash price level, as documented in the following customer testimonial:

We have two pharmacies within one mile of each other. *Because of Auto-Rx-Net, the prescription prices are now exactly the same. I no longer have to worry about customers questioning the price variations between the stores.*[36]

---

[34] *Id.*

[35] Ex. 32 (MCKAWP 0151703).

[36] Ex. 33 (MCKAWP 0151707 (citing Wayne MacArdy, owner and RPh, Phillips Pharmacies) (emphasis added)).

- 10 -

Thus, because U&C prices are integrally related to AWP and third-party reimbursement rates, when TPP rates rose as a result of the scheme, so, too, did cash prices.[37]

### 3.    Data demonstrates that U&C prices are typically above AWPs

An analysis of available data indicates that U&C prices are set above third-party reimbursement rates, generally at or above AWP.[38]

#### a.    IMS data

Dr. Hartman analyzed IMS data sampled for the cash paying consumers for the subject drugs.[39] He found that "cash payors uniformly pay a considerably higher U&C amount above WAC for all" drugs identified as "bellwether drugs" by McKesson's former expert, Dr. Willig.[40] The data further demonstrate that the scheme had "an immediate impact upon U&C payments for all bellwether drugs" and that this "pattern is found for the preponderance of the challenged NDCs."[41] Thus, he concluded that "IMS data suggest that the retailers automatically increased U&C with the increased AWPs induced by the Scheme."[42]

#### b.    TPP claims data

Dr. Hartman's analysis of IMS claims data is also consistent with his analysis of claims data from the Teamsters Health and Union Fund and Philadelphia Federated Teachers Health and Welfare Fund. The Teamsters' data includes the January 2002 period, in which the markup for the four bellwether drugs identified by Dr. Willig increased to 25%. The Teamsters' data demonstrates the immediate impact of McKesson's scheme upon U&C/WAC for all four drugs (five NDCs), *i.e.*, the U&C price was immediately inflated relative to WAC, while the ratio of

---

[37] 4.21.08 Hartman Decl., ¶ 35.

[38] 4.21.08 Hartman Decl., ¶¶ 22(e), 23(b), 30; 12.10.08 Hartman Decl., ¶ 13(d).

[39] 12.10.08 Hartman Decl., ¶ 1.

[40] *Id.*, ¶ 13(a).

[41] *Id.*, ¶ 13(d).

[42] *Id.*, ¶ 16.

the U&C to the AWP remained reasonably stable.[43]  And although the Teacher's data only dated

back to May 2002, after the implementation of the 5% Spread Scheme for the four bellwether

drugs (*i.e.*, January 2002), the claims data for these drugs still demonstrate that U&C prices

move formulaically with AWP by pharmacy after the implementation of the 5% Spread Scheme,

confirming the pattern found with the Teamsters claims[44] :

> There was an immediate impact of the 5% Spread Scheme
> upon U&C/WAC for all four drugs (five NDCs); the cash
> price was immediately inflated relative to WAC; the ratio
> of U&C/AWP remained reasonably stable.

e)     Based upon these results, I conclude that the impact of the
5% Spread Scheme upon uninsured cash payers was
identical to that upon the other two Classes.[45]

**c.     GAO analysis independently demonstrates the impact of the Scheme
on the U&C class**

The United States Government Accountability Office ("GOA") has studied U&C prices

over the August 2000 through December 2004 period.  The GAO analyzed data summarizing

monthly U&C prices from two of the largest state pharmaceutical assistance programs which had

data from 2000:  Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE")

program and New York's Elderly Pharmaceutical Insurance Coverage ("EPIC") program.[46]  The

study identified and collected data for the 50 brand-name drugs[47] prescribed most frequently to

enrollees in the Blue Cross Blue Shield (BCBS) Federal Employee Program (FEP).  The results

---

[43] 4.21.08 Hartman Decl., ¶ 22(d) and Attachment E.1 and E.2.

[44] 4.21.08 Hartman Decl., ¶ 23 and Attachment E.

[45] 4.21.08 Hartman Decl., ¶ 22(d)-(e).

[46] 4.21.08 Hartman Decl., ¶ 18.

[47] An additional 46 generic drugs were sampled and analyzed.  Those results are reported in
the study but are not relevant to this analysis.  For both brand name and generic drugs, U&C
prices were sampled and reported for a typical 30-day supply.

- 12 -

of the study provide further support of class-wide impact. Additionally, the study indicates that U&C prices are typically above AWP.

The study noted that "*[w]hile U&C prices increased each year from 2000 through 2004, the greatest annual rate of increase – 6.1 percent – occurred from January 2002 to January 2003.*"[48] This period coincides with the timing of the increased markups for the preponderance of challenged drugs (by NDC).[49] Moreover, four out of the five NDCs the study identified as having the greatest effect on the U&C price index are various dosages of Dr. Willig's (McKesson's former expert) bellwether drugs (*i.e.*, Plavix 75 mg, Prevacid 30 mg and Lipitor 10 and 20 mg).[50] Further, the average U&C price for the top 50 brand-name drugs increased three times faster than the average for the 46 generic drugs sampled, which also suggests that McKesson's scheme impacted U&C prices for brand drugs. Finally, over the entire 2000-2004 period, on average U&C was greater than AWP, generally in the range of AWP +10% to AWP +6%.[51] Thus, a neutral and independent party, the GAO, confirms the impact of the McKesson scheme on the U&C Class.

   **d.**  **Publicly reported U&C prices**

Other data confirms that pharmacies set U&C prices above AWPs. The State of New Jersey has created the online New Jersey Prescription Drug Retail Price Registry to help consumers compare the retail prices charged by pharmacies for the 150 most-frequently prescribed prescription drugs.[52] Dr. Hartman's analysis of this data indicates that U&C is greater

---

[48] 4.21.08 Hartman Decl., ¶ 18 (emphasis added).

[49] 4.21.08 Hartman Decl., ¶ 18; *see* Third Amended Complaint ¶¶ 135-36, showing spike in prices during this time period.

[50] 4.21.08 Hartman Decl., ¶¶ 18-19.

[51] *Id.*

[52] https://www6.state.nj.us/LPSCA_DRUG/index.jsp.

- 13 -

than AWP for almost all pharmacies for all four bellwhether drugs.[53]  For example, the U&C for Lipitor 10 mg averages 111.5% higher than AWP.[54]  Dr. Hartman also notes that the U&C/AWP markup for the major chains tends to be the same, regardless of the location (within New Jersey), for example all four Rite Aids and both Eckerds had the same 111.07% mark-up, while the only pharmacy to post prices below AWP is a small, non-national pharmacy.[55]  This is consistent with the expectation that small non-national pharmacies are less reliant on national third-party reimbursement rates.[56]  Thus, an analysis of the New Jersey data leads to the conclusion that "[t]he average U&C rate is formulaically tied to AWP" such that when "the AWP is inflated relative to WAC ... the entire distribution of cash prices is inflated."[57]

C.     **Class-Wide Impact**

According to Dr. Hartman, absent the scheme, AWPs for the Marked Up Drugs would have been 4.167% lower.[58]  Like the TPP and Consumer Co-pay Classes, U&C purchasers were directly impacted by McKesson's scheme to increase AWP/WAC markups because they paid higher prices than they otherwise would have paid but for the AWP increases:

> U&C payments by uninsured cash payers are, on average, related to and greater than AWP over the Class Period.  These sources can be used to calculate how U&C payments have been related to AWP in a formulaic way.  Therefore, as a matter of economics, uninsured cash payers were impacted, injured and damaged on a Class-wide basis by the inflation of AWP.  Indeed, the bulk of consumer damages are in this group, and these are the most vulnerable of payors.[59]

---

[53] 4.21.08 Hartman Decl., ¶ 29, and Attachment F.

[54] 4.21.08 Hartman Decl., ¶ 29(b).

[55] 4.21.08 Hartman Decl., ¶ 29, pp. 14-15.

[56] 4.21.08 Hartman Decl., ¶ 29.

[57] 4.21.08 Hartman Decl., ¶ 30.

[58] Ex. 34 (Expert Report of Dr. Raymond Hartman, September 14, 2007, Attachment F, ¶ 6).

[59] *Id.* at ¶ 10.

- 14 -

> [T]he reimbursement rates (U&C) paid the class-wide were
> inflated immediately and lastingly as a direct result of the Scheme.
> The formulaic relationship makes calculation of aggregate class-
> wide damages straightforward.[60]

## D.   Damages

In his December 10, 2008 report, Dr. Hartman analyzed the IMS U&C payment data

using the same methodology applied to his analysis of the TPP and Consumer Co-pay Classes

and approved by the Court in its March 19, 2008 certification order.[61]  He concluded "that the

total damages (in nominal dollars through March 15, 2005) to the Class of uninsured cash payers

paying U&C was $57 million," or alternatively $239 million, if a "credit for negative damages"

is excluded from the calculation.[62]

## III.   ARGUMENT

## A.   Rule 23 Standards in the First Circuit

Class actions have long been recognized by the courts as an essential tool for adjudication

of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries,

and for which individual recovery might be too modest to warrant prosecution of the case on an

individual basis.  The policies underlying the need for class action litigation require that

certification under Rule 23 be "liberally construed." *Lessard v. Metropolitan Life Ins. Co.*, 103

F.R.D. 608, 610 (D. Me. 1984).

To determine whether the Rule 23 factors are satisfied, the Court undertakes "an analysis

of the issues and the nature of required proof at trial to determine whether the matters in dispute

---

[60] 4.21.08 Hartman Decl., ¶ 48.

[61] 12.10.08 Hartman Decl., ¶ 11.

[62] *Id.*  Plaintiffs' current damages estimate is considerably lower than the original estimate reported in Dr. Hartman's September 2007 damages report.  Dr. Hartman found, upon review of the special-order IMS data, that while cash payors of most NDCs were harmed by the scheme, their damages were "small relative to those for the TPPs and they do not last as long." *Id.* at ¶ 11(e). "[D]amages generally turn negative during the summer-to-fall of 2003.  This pattern is found for the preponderance of the challenged NDCs." *Id.* at ¶ 11(d).

- 15 -

and the nature of plaintiffs' proofs are principally individual in nature or *are susceptible of common proof* equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (emphasis added) (quoting *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997)). The "analysis should not involve a 'preliminary hearing into the merits,' … but rather an inquiry into 'whether the requirements of Rule 23 are met.'" *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 265 (D. Mass. 2004) (Young, J.) (quoting *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177 (1974)).

**B.      Plaintiffs Satisfy the Rule 23(a) Requirement**

**1.      The U&C Class meets the numerosity requirement because joinder of all members is impracticable**

Numerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable, given the relevant circumstances. *In Re Relafen Antitrust Litig.*, 221 F.R.D. at 267. Plaintiffs estimate that there are millions of consumers who meet the U&C Class definition, which easily satisfies the numerosity requirement of Rule 23(a)(1).

**2.      The Commonality requirement is met because questions of law and fact are common to all class members**

Generally, the commonality requirement is easily met, provided that at least one common question of law or fact exists. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005). The same common issues that warranted class treatment of the TPP and Consumer Co-pay claims are also present here and establish the existence of commonality required by Rule 23.

**3.      Plaintiffs meet the typicality requirement because their claims arise from the same course of conduct alleged by the Class**

Typicality is not a demanding test, *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993), and can be met when class members' claims are based on the same legal theory as the

- 16 -

representative plaintiffs and when class members allege to have been injured by the same course of conduct as that which allegedly injured the representatives. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 184 (3d Cir. 2001). Representative U&C Plaintiffs have each paid for or incurred a debt for the cost of one or more of the drugs identified in Exhibit A to the Third Amended Complaint and were uninsured at the time of the purchases. Third Amended Complaint, ¶¶ 29-30.[63] Plaintiffs and class members alike made excessive payments as a result of McKesson's scheme. These similarities establish a sufficient nexus for the purposes of Rule 23(a)(3).

4.   **Plaintiffs meet the adequacy requirement because their interests will not conflict with those of other class members and because they have chosen qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation**

The adequacy requirement has two parts: the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). Neither Plaintiffs nor their counsel have any interest adverse to those of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their counsel have vigorously prosecuted this action on behalf of the proposed Class and Class Counsel have expended substantial financial resources to do so.

---

[63] The drug purchases for Plaintiff Shelly Campbell include in addition to the Wellbutrin purchases identified in the Complaint, purchases of Clarinex 5 mg and Adderall XG 10 mg. Ex. 35 (CAMPBELL 000001-22). Although Plaintiff Jordan did take Prevacid, as stated in the Third Amended Complaint, she obtained samples of the drug and did not purchase it until much later. Ms. Jordan does have records of two other purchases of the Marked Up drugs that occurred in September 2007, Analpram-HC and Analpram-HC 1%. Ex. 36 (JORDAN 000004-10).

- 17 -

**C.     Plaintiffs Meet the Requirement of Rules 23(b)(3)**

The standard set forth in Rule 23(b)(3) is not overly burdensome on plaintiffs seeking

class certification and should be freely granted. *Coffin v. Bowater Inc.*, 228 F.R.D. 397, 406

(D. Me. 2005).  When class certification is sought for settlement only, the Court need not

consider class management problems. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288,

298 (1st Cir. 2000).

**1.     Common questions predominate over individual issues**

The Rule 23(b)(3) predominance test does not require "that all issues be common to the

class," *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 39 (1st Cir. 2003), but rather that

the proposed class is "sufficiently cohesive to warrant adjudication by representation." *In re

AWP*, 230 F.R.D. at 81.  Classes of consumers "are especially likely to satisfy the predominance

requirement." *Smilow*, 323 F.3d at 41-42.  McKesson engaged in a single scheme over the

course of the Class Period to defraud hundreds of thousands of uninsured consumers.  The

Court's prior orders on certification of the TPP and Consumer Co-pay Classes identify many of

the numerous legal and factual issues common to Representative U&C Plaintiffs and members of

the proposed U&C Class.

Additionally, the U&C-AWP link can be established via common, class-wide proof.

Retailers large and small routinely set U&C based on AWP *as a matter of policy*.  And IMS data

demonstrates that the scheme had an immediate impact on cash purchases nationwide.

Additionally, a sampling of actual data – from the GAO's analysis of Pennsylvania and New

York pharmacy programs, claims data from two of the named Plaintiffs, and data from New

Jersey's Prescription Drug Retail Price Registry (based on prices reported by, among other

pharmacies, Rite Aid and Eckerd) also support this correlation.

- 18 -

Dr. Hartman explains:

> The formulaic relationship between U&C and AWP implies that
> the 5% Spread Scheme had the same effect upon the Class of Cash
> Payors that I demonstrated in my prior declarations in this matter
> for the other Classes (see footnote 1 above). Specifically, the
> reimbursement rates (U&C) paid the class-wide were inflated
> immediately and lastingly as a direct result of the Scheme.[64]

This is also consistent with the First Circuit's recognition that class-wide impact is often

presumed in price-fixing cases. *See, e.g., In re New Motor Vehicles Canadian Exp. Antitrust*

*Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (citing cases).

At the class certification stage the First Circuit does not require "hard factual proof but

[rather] . . . a more thorough explanation of how the pivotal evidence behind plaintiffs' theory

can be established." *Id*. Plaintiffs meet this standard. They have identified the sources that

allow proof of impact based upon common proof.[65]   Plaintiffs have further provided an

assessment of U&C Class damages using IMS data sampled for cash purchases.[66]

### 2.    Class treatment is superior to other forms of litigation

The "superiority" factors identified by Fed. R. Civ. P. 23(b)(3) also favor class treatment

of the U&C claims. The small damages claim available to individual class members virtually

guarantees that a class action is a superior vehicle, *In re Relafen Antitrust Litig.*, 221 F.R.D. at

288, because "most of the plaintiffs would have no realistic day in court if a class action were not

available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Additionally, "the more

claimants there are, the more likely a class action is to yield substantial economies in litigation."

*Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). With an estimated

membership in the millions, it makes sense to proceed as a class.

---

[64] 4.21.08 Hartman Decl., ¶ 48.

[65] 4.21.08 Hartman Decl., ¶ 47.

[66] 12.10.08 Hartman Decl., ¶ 11.

- 19 -

### 3.   Plaintiffs do not require an individualized calculation of damages

"[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *In re AWP*, 230 F.R.D. at 86.  Dr. Hartman has calculated aggregate damages for the U&C Class using industry-wide survey information available from IMS.  If the Court certifies the class and approves the settlement agreement, allocation of the award will be made administratively upon the submission of claims, according to a court-approved formula.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion to certify the proposed U&C Class for settlement purposes.

DATED: December 19, 2008

By: /s/ **Steve W. Berman**

Thomas M. Sobol (BBO#471770)
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700
Facsimile:  (617) 482-3003

Steve W. Berman
Sean R. Matt
Nicholas Styant-Browne
Barbara A. Mahoney
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

Kenneth A. Wexler
Jennifer Fountain Connolly
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

Jeffrey Kodroff
John Macoretta
SPECTOR, ROSEMAN, KODROFF &
WILLIS, PC
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
Facsimile:  (215) 496-6611

Marc H. Edelson
EDELSON & ASSOCIATES
45 W. Court Street
Doylestown, PA  18901
Telephone:  (215) 230-8043
Facsimile:  (215) 230-8735

George E. Barrett
Edmund L. Carey, Jr.
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue, North
Nashville, TN  37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

***Counsel for Plaintiffs***

001821-13 278164 V1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 19, 2008.

/s/ Steve W. Berman
Steve W. Berman

001821-13 278164 V1