# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Judge Patti B. Saris |

## MEMORANDUM OF NAMED CONSUMER PLAINTIFFS IN OPPOSITION TO APPROVAL OF THE PROPOSED TRACK TWO NATIONWIDE CLASS CERTIFICATION AND SETTLEMENT

## I.    INTRODUCTION[1]

Named consumer plaintiffs, Rev. David Aaronson, individually and on behalf of the Estate of Susan Ruth Aaronson, M. Joyce Howe, individually and on behalf of the Estate of Robert Howe, Larry Young, individually and on behalf of the Estate of Patricia Young, Therese Shepley, individually and on behalf of the Estate of James Shepley, Harold Carter, Roger Clark, on behalf of the Estate of David Clark, Ethel Walters, individually and on behalf of the Estate of Hunter Walters, Katie Bean, individually and on behalf of the Estate of Harold Bean, James Monk, Virginia Newell, individually and on behalf of the Estate of William Newell, Oral Roots, Rebecca Hopkins and George Baker Thomson (hereinafter collectively "Named Consumer

---

[1]    As the instant Memorandum is an opposition to both final approval of a class action settlement and certification of a massive nationwide settlement class of consumers and TPPs involving eighteen (18) Track 2 Defendants, and therefore is not a typical memorandum in support of or opposition to a single motion, the undersigned assumes that the ordinary page limit is not applicable.  However, should this Court determine that the ordinary page limit applies, Named Consumer Plaintiffs respectfully seek leave to exceed the page limit to set forth  their principal objections and the reasons therefore, the balance of which may be addressed in a subsequent brief or at the Final Fairness Hearing set for April 27, 2009 at 2:00p.m., as needed.

Plaintiffs"),[2] by their undersigned individual counsel,[3] hereby file this objection to the proposed Track 2 nationwide class certification and settlement, pursuant to this Court's Order dated January 7, 2009 [at Docket No. 5828].

Named Consumer Plaintiffs object to the certification of the proposed nationwide Track 2 settlement class on grounds that, *inter alia*, it lacks any typical or adequate consumer class representative with Article III standing to sue, in view of Co-Lead Counsel's unilateral decision to supplant the Named Consumer Plaintiffs with associations which the Court twice dismissed as plaintiffs for lack of standing to sue, and found to be atypical and inadequate to represent consumer interests in a class action. The recent proffer of one individual consumer whose

---

[2]  Twelve (12) of the thirteen (13) Named Consumer Plaintiffs are currently listed as "Plaintiffs" in the Revised Fifth Amended Master Consolidated Complaint ("RFAMCC") under the headings "Proposed Class 1 Representatives (Medicare Part B Beneficiaries)" and "Proposed Class 3 Representatives (TPPs and Consumers for AWP-Based Charges on Physician Administered Drugs Outside of Medicare)". *See* RFAMCC [Docket No. 5902] at ¶¶ 15 (Aaronson), 16 (Carter), 17 (Clark), 18 (Howe), 19 (Monk), 20 (Shepley), 21 (Young), 22 (Newell), 23 (Roots), 24 (Walters), 60 (Hopkins) and 61 (Thomson). Specific allegations are made by Co-Lead Counsel – who signed the pleading pursuant to Fed.R.Civ.Proc. 11 -- as to the standing of these consumers to represent the Class 1 and Class 3 consumer classes in Track 2 by reason of their having paid AWPs for the listed Track 2 drugs. The Track 2 Defendants have chosen to not contest these allegations. *See* Stipulation dated February 18, 2009 [at Docket No. 5919](wherein Defendants state, "[b]ecause this Complaint is in furtherance of the proposed Track 2 settlement, the parties agree that, unless further ordered by the Court, no responsive pleading is required.")

As to the remaining Named Consumer Plaintiff, Mr. Bean, on June 6, 2006 this Court granted, by electronic order and therefore without a Docket number, Plaintiffs' Motion for Leave to Join Harold Bean as a Plaintiff and Class Representative [Docket No. 2584]. However, Co-Lead Counsel chose not to follow through with the relief and did not join Mr. Bean as a plaintiff in any amended complaint. Among other defendants for which Mr. Bean had demonstrated standing to sue (with documentation showing AWP-based payments) was Schering, which this Court summarily dismissed for the purported lack of an adequate consumer class representative.

For these reasons, Named Consumer Plaintiffs have standing to raise objections to the proposed Track 2 nationwide class certification, and the proposed settlement.

[3]  The Named Consumer Plaintiffs have been clients of the undersigned since 2004, when they retained counsel to represent their interests in the *Lupron* case. *See* Retainer Agreements signed by the Named Consumer Plaintiffs attached hereto collectively as Exhibit "A".

mother allegedly made an AWP-based payment for Aventis' drug Anzemet – after the settlement was consummated and presented to the Court for preliminary approval -- does nothing to cure this deficiency, as, at best, this individual could represent only an Aventis consumer Sub-Class, if she indeed had standing, which she does not.  The lack of adequate consumer class representatives prevents the Court from certifying a class, and renders suspect the proposed settlement reached without a consumer representative client.

Among other things, the overall settlement amount falls outside the range of reasonableness in light of the best possible recovery at trial and all the attendant risks of litigation, which are minimal now that this Court and many other courts have tried cases against these defendants with success, yielding verdicts and settlements against individual defendants in individual states that far eclipse what has been proposed here for the entire nation.  The allocation of the settlement fund for consumers was infected with an irreconcilable conflict of interest that does not pass muster under *Amchem*,[4] given that Co-Lead Counsel appointed the Director of Prescription Access Litigation (PAL), the creation of certain Co-Lead Counsel to create artificial *cy pres* funds in consumer class action litigation, as the principal negotiator on behalf of consumers: the resultant 17.5% share achieved for consumers speaks to the conflict when compared with, for example, the 30% achieved in the GlaxoSmithKline settlement.  The proposed release includes defendants (like G.D. Searle), claims (like antitrust and declaratory and injunctive relief) and drugs (like Eligard, Trelstar and Depo-Provera) that were never pursued in the litigation, thereby rendering the release unduly overbroad and overly generous to

---

[4]     *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

the Track 2 Defendants who never bargained for such peace.[5] Co-Lead Counsel's willingness to

set aside the *defendants'* hard fought for rulings under the settlement, like "no new drugs",

provides a window into their overall motivation with this settlement, which conveniently gets

them to near-lodestar with the anticipated 30%, $37.5 million fee award.

For these reasons, and those set forth more fully herein and in any supplement hereto that

may be made prior to or during the Fairness Hearing,[6] the Court should deny class certification

and final approval to the proposed settlement.

## II.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On December 19, 2001, this case was originated by fourteen (14) consumer associations,[7]

including Health Care For All, Inc. ("HCFA"), New York Statewide Senior Action Counsil

("NYSSAC"), Vermont Public Interest Research Group ("VPIRG") and Wisconsin Citizen

Action ("WCA"), four (4) of the five (5) associations appointed by this Court as representative

---

[5]     The Track 2 Defendants listed in the Track Two Settlement Agreement and Release: Abbott Laboratories, Amgen Inc., Aventis Pharmaceuticals Inc., Hoechst Marion Roussel, Baxter Healthcare Corp., Baxter International Inc., Bayer Corporation, Dey, Inc., Fujisawa Healthcare, Inc., Fujisawa USA, Inc., Immunex Corporation, Pharmacia Corporation, Pharmacia & Upjohn LLC (f/k/a Pharmacia & Upjohn, Inc.), Sicor, Inc., Gensia, Inc., Gensia Sicor Pharmaceuticals, Inc., Watson Pharmaceuticals, Inc., and ZLB Behring, L.L.C. (collectively, "Track Two Defendants"). *See* Docket No. 5133 at 1.

[6]     Named Consumer Plaintiffs reserve the right to supplement their response to the Motion for Final Approval in view of certain outstanding discovery propounded by subpoena on PAL and its affiliates, which subpoenas have not yet been answered. *See* Notice of Issuance of Subpoenas filed contemporaneously herewith. Also, in view of the limited evidentiary proffer by Co-Lead Counsel (and none by defendants) in support of final approval, Named Consumer Plaintiffs reserve the right to respond to any future submissions by the proponents of the settlement.

[7]     The other associations included: Citizens for Consumer Justice ("CCJ"), Colorado Progressive Coalition ("CPC"), Congress of California Seniors ("CCS"), Florida Alliance for Retired Americans ("FLARA"), Massachusetts Senior Action Counsil ("MSAC"), MASSPIRG, Minnesota Senior Federation ("MSF"), New Jersey Citizen Action ("NJCA"), Pennsylvania Alliance for Retired Americans ("PARA"), and West Virginia Citizen Action ("WVCA").

4

plaintiffs for consumer Class 1 of the Track 2 settlement class.[8]  All fourteen (14) associations

are members of PAL[9], a "project" and subsidiary of Community Catalyst located in Boston,

Massachusetts.[10]

The case was filed by Attorney Tom Sobol, then of the law firm of Lieff, Cabraser,

Heimann & Bernstein, LLP.  In addition to representing the individual PAL associations in the

lawsuit, Mr. Sobol represented PAL.  *See* April 6, 2006 Memorandum re "PAL Attorney

Relationships" at Exhibit "B" hereto.  Mr. Sobol was "hand-picked" by PAL to bring this case[11]

because he "share[d] PAL's mission" in class action cases – a mission which includes seeking an

allocation of class action settlement funds for "a separate *cy pres* fund to be used for consumer

benefits through increased advocacy for affordable health care."  *Id*. at 1.[12]  While Mr. Sobol

---

[8]     The Fifth Association is Citizen Action of New York, also a PAL coalition member.  *See* Exhibit "C".

[9]     CCJ – one of the 14 associations, See footnote 7, is apparently a defendant organization in that they appear to have to have vacated their Philadelphia based office, disconnected all CCJ phone serve and shut down the CCJ website.  In addition, CCJ was listed by PAL as a coalition member as late as 2007, but has not appeared on the PAL member list since.  *Compare* Exhibit "C" with Exhibit "D".

[10]    Both PAL and Community Catalyst are located at 30 Winter Street in Boston, Massachusetts: these are the same offices occupied by the Court-appointed Track 2 consumer settlement class representative, HCFA.  *See* Exhibits "E".  Respectively at: http://www.prescriptionaccess.org/contacts;   http://www.communitycatalyst.org/contact_us   ; http://www.hcfama.org; last visited March 12, 2009.

[11]    *See*  http://www.prescriptionaccess.org/lawsuitssettlements/current_lawsuits?id=0005  at Exhibit "F" hereto ("In December 2001, PAL members and others filed a lawsuit in federal court in Massachusetts against 28 drug companies for manipulating the AWP.")

[12]    One "separate *cy pres* fund" achieved for PAL in this litigation is currently the subject of an appeal taken by Named Consumer Plaintiff Joyce Howe, docketed at 5854.  Another was recently the subject of a hearing in *In re Lupron Marketing and Sales Practices Litig.*, MDL 1430, and is awaiting decision from Judge Stearns (though Judge Stearns' concluding remarks at the hearing indicated he was unlikely to award the $5 million requested by Co-Lead Counsel for Community Catalyst/PAL).

changed firms during the pendency of this litigation, he "has remained an integral part of PAL." *Id.* at 3. The Director of PAL, Alex Sugerman-Brozan,[13] a former staff attorney for Health Law Advocates, the legal arm and a subsidiary HCFA, described his role as one of coordinator of the PAL Member Coalition who "are plaintiffs in this lawsuit." *See* Exhibit "G".

No individual consumers were included in Mr. Sobol's original Complaint. *See* Complaint at Docket No. 1.

On March 18, 2002, a First Amended Complaint was filed by Mr. Sobol. *See* First Amended Complaint at Docket No. 56. The First Amended Complaint listed twenty-three (23) consumer associations: the fourteen (14) PAL members named in the original Complaint, including HCFA, NYSSAC, VPIRG and WCA, plus nine (9) more PAL members.[14]

Six (6) individual consumers also were listed in the First Amended Complaint.[15] Mr. Sobol alleged that all of them were all Medicare Part B beneficiaries who were administered drugs manufactured by defendants. First Amended Complaint at ¶¶ 36-41. He further alleged that either they, or their "Medigap insurer, paid the twenty percent (20%) co-payment." *Id.*

---

[13] Mr. Sugerman-Brozan was appointed by Mr. Sobol and the other Co-Lead Counsel to serve as consumer allocation counsel for the proposed Track 2 Settlement. *See* Track Two Settlement Agreement and Release at 8 [Docket No. 5133].

[14] The nine (9) additional PAL associations included: Citizen Action of New York ("CANY"), Connecticut Citizen Action Group ("CCAG"), Gray Panthers of Sacramento ("Gray Panthers"), Maine Consumers for Affordable Health Care ("MCAHC"), North Carolina Fair Share ("NCFS"), Oregon Health Action Campaign ("OHAC"), Oregon State Public Interest Research Group ("OSPIRG"), United Senior Action of Indiana, Inc. ("USAI") and Health Action New Mexico. (This last association was only listed in the caption of the First Amended Complaint.)

[15] The six (6) consumers included: Betty Sicher, Joan Lee, John Bennett, Pearl Munic, Sue Miles, and Jack Douglas.

After this MDL was created,[16] on September 6, 2002, a Master Consolidated Complaint ("MCC") was filed through counsel.[17] *See* Docket No. 148. The MCC listed twenty-two (22) total PAL member associations, including HCFA, NYSSAC, VPIRG and WCA.[18] The MCC listed eleven (11) consumers: the same six (6) consumers from the First Amended Complaint, plus five (5) more.[19] Only nine (9) of the eleven (11) consumers specifically alleged that they "overpaid for applicable drugs based, and in reliance on, the AWPs." *Id.* at ¶¶ 22, 337.[20] Finally, the MCC added four (4) third-party payors (TPPs) as class representatives of Class 2.[21]

On May 13, 2003, this Court issued its Order on the defendants' Motions to Dismiss the MCC. *See generally, In re Pharmaceutical Industry Average Wholesale Price Litigation ("In re*

---

[16]   *See In re Immunex Corp. Average Wholesale Price Litig.*, 201 F.Supp.2d 1378 (J.P.M.L. April 30, 2002).

[17]   Mr. Sobol and his new firm, Hagens Berman, LLP, filed the MCC along with other Court-appointed Co-Lead Counsel: Spector Roseman & Kodroff, P.C; Hoffman & Edelson; Kenneth A. Wexler & Associates, and Heins Mills and Olson, P.C. The MCC also listed a number of other firms as "Members of Lead Counsel Committee and Executive Committee", as well as other firms listed "Additional Attorneys for Plaintiffs". *See* Case Management Order No. 1 at Docket No. 100 (appointing "Liaison Counsel", "Chairs of the Lead Counsel Committee" and members of the "Lead Counsel Committee").

[18]   The MCC included the same group of PAL associations as in First Amended Complaint, except that it dropped CCS and Health Action for New Mexico, and added Action Alliance of Senior Citizens of Greater Philadelphia ("AASCGP"), also a PAL member.

[19]   The MCC added Dr. Shirley Geller, Leroy Townsend, Jean H. Aierstuck, by full name, and "Hudson" and "Robinson" by last name only. *See* MCC at ¶¶ 13-21, 337.

[20]   Specific allegations were made only as to the following consumers: Dr. Shirley Geller, Leroy Townsend, Betty Sicher, Joan Lee, John Bennett, Pearl Munic, Sue Miles, Jack Douglas, and Jean Aierstuck. *See* MCC at ¶¶ 13-21. No specific allegations were made as to Hudson and Robinson, though they were proffered as Class 1 consumer representatives. *See* MCC at ¶ 337.

[21]   These TPPs were: Board of Trustees of Carpenters and Millwrights of Houston and Vicinity Welfare Trust Fund ("CMHV") Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF"), Twin Cities Bakery Workers Health and Welfare Fund ("TCBW"), and United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund (UFCW).

AWP"), 263 F. Supp. 2d 172 (D.Mass. 2003). The Court's opinion listed the defendants

specifically named in the MCC. *Id.* at 176, n.1.[22] Under the general heading "Standing", the

Court addressed defendants' arguments that the association plaintiffs did not have Article III

standing to sue as follows:[23]

> "None of the associations alleges specific members who purchased a specific drug from a specific company. Instead, the allegations in the complaint and accompanying affidavits contain only bare bones assertions and empirically nonverifiable conclusions unsupported by specific facts concerning any injury-in-fact on the part of one of its members. (citation omitted). Thus, all the associations are *DISMISSED* as party plaintiffs."

*Id.* at 194 (emphasis in original). The Court's dismissal Order was without prejudice to allow

Co-Lead Counsel thirty (30) days to file "a motion to amend to cure any defects." *Id.* at 195.

On June 12, 2003, Co-Lead Counsel filed a Motion to Amend the Complaint, which was

granted by the Court on June 18, 2003. That same day, the Amended Master Consolidated Class

Action Complaint ("AMCC") was filed. In a process they would later describe as "triage",[24]

---

[22]    The Court's dismissal Order makes clear that the MCC did not include as a defendant a company known as G.D. Searle, which manufactures such drugs as Synarel -- a drug not listed in any complaint (or Appendix A thereto) ever filed in this case. *In re AWP*, 263 F. Supp. 2d at 176, n.1 (listing defendants). *See also,* Appendix A to SAMCC, TAMCC and FAMCC (listing covered drugs). Nevertheless, an Arizona state court, in reliance upon this Court's Order of September 11, 2007 calling for the dismissal of claims which overlap with this MDL, recently dismissed all Arizona consumer claims against this company on the strength of G.D. Searle's baseless claim that it is an "overlapping defendant" in this MDL. *See* Defendants' Brief in Response to Plaintiffs' Proposed Order Dismissing Overlapping Claims Without Prejudice, Dated August 15, 2008 at 4-5 (Exhibit "H" hereto)(requesting that "… this Court should dismiss *in toto* … G.D. Searle); Minute Entry Order of the Honorable John A. Buttrick dated March 4, 2009 at 5, 7 (granting request)(Exhibit "I" hereto). This is despite the fact that G.D. Searle is not listed as "Track Two Defendant" in the Track 2 Settlement Agreement. *See* Docket No. 5133 at 1.

[23]    While Defendants did not challenge the standing of any of the 11 individual consumer-plaintiffs, Co-Lead counsel inexplicably dropped all of them as plaintiffs in their subsequent AMCC filed in February 2005. *In re AWP*, 263 F. Supp. 2d at 193.

[24]    Docket No. 977 at 1. "Triage" is an interesting choice of words, given the dire position in which Co-Lead Counsel found themselves after this Court's May 13, 2003 dismissal Order. The

Co-Lead Counsel removed from the MCC and abandoned seventeen (17) of the twenty-two (22) PAL member associations, leaving only five (5) – four (4) of which are present Court-appointed Track 2 consumer settlement class representatives, *ie.* CANY, NYSSAC, VPIRG, and WCA. *See* Docket No.387. The fifth Court-appointed Track 2 consumer settlement class representative, HCFA, was dropped as a plaintiff altogether from the AMCC. The AMCC included the same four (4) TPPs as the MCC, and added an additional two (2) TPPs.[25]

Remarkably, all eleven (11) individual consumer plaintiffs listed in the MCC were abandoned in the AMCC, and no new consumer plaintiffs were added.

The AMCC also added, for the first time, two (2) appendices. "Appendix A" purported to identify specific drugs which had inflated AWPs. "Appendix B" purported to detail the specific drugs that were purchased by each individual plaintiff based upon AWP. As there were no consumers listed in the AMCC, no consumer drug purchases were listed in Appendix B.

On November 21, 2003, the Court held a hearing at which it instructed Co-Lead Counsel to modify the AMCC. On December 5, 2003, Co-Lead Counsel filed a Notice of Filing of AMCC *Modified Per the Court's Instruction at the November 21, 2003 Hearing* ("Notice"). *See* Docket No. 644. The Notice explained that a "modified" AMCC was being filed that same day to "add( ) allegations regarding the fact that plaintiffs' drug purchases are directly based upon AWP pricing", in direct response to defendants' argument that "under Count 1 plaintiffs have no standing to assert claims because none of the plaintiffs were covered by Medicare Part B drugs

---

word literally means "[a] process for sorting injured people into groups based on their need for or likely benefit from immediate medical treatment. Triage is used in hospital emergency rooms, on battlefields, and at disaster sites when limited medical resources must be allocated." It is "[a] system used to allocate a scarce commodity … only to those capable of deriving the greatest benefit from it." The American Heritage Dictionary of the English Language, Fourth Edition.

[25]     The two new TPPS were Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") and Man-U Service Contract Trust Fund (Man-U Service Fund").

…". *Id.* at 2. Co-Lead Counsel represented that "Appendix B has been amended to reflect purchase of drugs by individual plaintiffs." *Id.* at 3.

On December 19, 2003, defendants filed a Motion for Leave to File Response to the Notice. Docket No. 660. The focus of the response was the lack of standing of any of the named plaintiffs listed in the "modified" AMCC. The response pointed out that the "modified" AMCC "represent[ed] plaintiffs' fourth attempt to plead viable claims and establish that they have standing to bring them." Docket No. 977 at 2.[26] Defendants urged that "even this attempt has failed to cure plaintiffs' fundamental inability to establish standing." *Id.* Defendants reminded the Court that, at the November 21, 2003 hearing, they "noted that the associational plaintiffs had expressly disclaimed any claim for damages (AMCC ¶¶32-36)," a point which Co-Lead Counsel did not dispute. *Id.* at n.1.

Defendants accused Co-Lead Counsel of deliberately pleading in "vague terms" to circumvent the Court's clear ruling on standing in its May 13, 2003 dismissal Order, its leave to re-plead in thirty (30) days to plead standing, and its admonition at the November 21, 2003 hearing that Co-Lead Counsel were not to add any new claims or theories. *Id.* at 5, 7 (*citing* 11/21/03 Tr. at 22-23, 46). They challenged Co-Lead Counsel's claim of a "typographical error" in failing to plead that any plaintiff in the AMCC paid "either through co-pays or on their own." *Id.* at 7 (quoting the Court's query of Mr. Berman at the November 21, 2003 hearing). To "belie [Mr. Berman's] claim of a typographical error" in his failure to plead standing, they offered Mr. Berman's own words to the Court wherein he said:

> "On count one, there are five or six individual Medicare Part B plaintiffs who are identified early in the complaint in the associations who, we allege, made these co-payments. So they clearly fit within count one."

---

[26]     Docket Entry No. 977 is listed on the Docket as having been entered on August 24, 2004.

*Id.* at 8. As defendants pointed out, in fact "none of the individual plaintiffs are in this case",

presumably having fallen victim to the aforesaid "triage" by Co-Lead Counsel. *Id.* Defendants

hammered the point by repeating that "the [PAL] associations are not bringing damage claims,

and they would not have standing to do so." *Id.* In sum, defendants charged that Co-Lead

Counsel's claim of "a 'typographical error' ... is merely an attempt to avoid the fact that the

AMCC did not establish that any plaintiff had standing to bring a Medicare Part B claim."[27]

In view of Co-Lead Counsel's "shifting" position on standing to avoid this Court's clear

rulings and multiple chances to try to "cure" the defects,[28] defendants urged the Court:

> "This case illustrates the confusion that can occur when plaintiffs strive to bring a
> case that is as big as possible rather than bringing a case that is properly pleaded.
> After four attempts, plaintiffs no longer deserve the benefit of the doubt. By
> continuously shifting and expanding their claims through ambiguous pleadings,
> plaintiffs have expanded this case beyond constitutional bounds and denied the
> Court the opportunity to efficiently manage this proceeding. Plaintiffs cannot
> claim they were injured in the context of Medicare Part B if they made no
> payments under Medicare Part B."

*Id.* at 9.

Strangely, on January 22, 2004, Co-Lead Counsel filed a Motion to Intervene in order to

add two consumer representatives, Roberta S. Starks and Kimberley K. Hoover, as attorney in

fact for her mother Jeanne F. Kennedy, as putative class representatives, but only for claims

---

[27]     Indeed, defendants pointed out to the Court that "[t]his [was] not the first time that [Co-
Lead Counsel] have claimed a typographical error in response to exposure of a standing problem.
When defendants' pointed out a lack of Article III standing in the MCC during the January 13,
2003 hearing before this Court, [Co-Lead Counsel] stated that it was 'a drafting error'. 1/13/03
Tr. at 73. Rather than correct this 'error', [Co-Lead Counsel] dropped the individual plaintiffs
from the AMCC." *Id.* at 8, n. 7.

[28]     *In re AWP*, 263 F. Supp. 2d at 195.

involving the Together Rx Card Program. *See* Docket No. 699.[29]  On February 24, 2005, a

Second Amended Master Consolidated Class Action Complaint ("SAMCC") was filed. *See*

Docket No.1377.  The SAMCC listed the two (2) new consumer plaintiffs, Roberta S. Starks

and Kimberley K. Hoover, as putative class representatives, but, as discussed above, only for

claims involving the Together Rx Card Program.[30]  The SAMCC was also brought on behalf of

the same consumer associations and TPPs who filed the AMCC.  The SAMCC had no consumer

plaintiffs for Class 1.  The SAMCC also included the same Appendices as the SAMCC, updated

to reflect the individual purchases of the newly-added plaintiffs.

On February 24, 2004, the Court ruled on defendants' motions to dismiss the SAMCC.

Again, the defendants named in the lawsuit were listed in the Court's Order. *In re AWP*, 307

F.Supp.2d 196, 202, n.1 (D.Mass. 2004).[31]  Addressing defendants' standing arguments a second

time, the Court held that while the two proffered individual consumer Together Rx plaintiffs had

standing, it reserved decision as to whether these plaintiffs "have standing to assert claims on

behalf of elderly program enrollees." *Id.* at 214.  Since the association plaintiffs had disavowed

claims for damages in the revised AMCC, *see* AMCC ¶¶32-36, the Court did not further address

their lack of standing to represent consumers for damages.

---

[29]     The pleading is peculiar insofar as Co-Lead Counsel had never sought leave of Court to have individual consumer plaintiffs "intervene" in their own case, and have not satisfied the intervention requisites since, for any of their subsequent amendments to the complaint to add or remove parties.

[30]     While the SAMCC added claims for antitrust and injunctive relief involving the Together Rx Program, *see* SAMCC ¶¶ 36(a), 36(b), 542-594, 692-725, these claims were subsequently dropped by Co-Lead Counsel from a later amendment to the SAMCC.

[31]     G.D. Searle was not listed in the SAMCC, and has never been listed, as a defendant in any complaint filed in this case.  Nevertheless, this company is included in the Track 2 settlement release.  Named Consumer Plaintiffs object to the inclusion of G.D. Searle and its drugs in the release as a violation of the Court's express Orders to not add new claims or drugs.

Pursuant to Case Management Order No. 10, class certification briefing proceeded with respect to Track 1 during the fall of 2004. *See* Docket No. 756. The schedule for class certification briefing for the Track 2 case was set to begin after the Court's ruling on the Track 1 certification issues. Co-Lead Counsel filed their Motion for Class Certification in September 2004 along with their expert disclosures. Defendants' opposition to class certification was filed in October 2004.

In their opposition to class certification, defendants charged that "none of the named Plaintiffs can represent Medicare Part B Payers." *See* Track 1 Defendants' Memorandum in Opposition to Class Certification [Docket No. 1132] at 40. In particular, the defendants challenged the standing of the consumer associations listed in the SAMCC as follows:

> While the Medicare Part B Class includes potentially millions of individual Medicare Part B beneficiaries who made co-payments under the program, *not one of the named Plaintiffs is such an individual.* Although the Association plaintiffs claim, in self-serving affidavits submitted in support of Plaintiffs' Motion for Class Certification, that their constituate members made co-payments under Medicare Part B, the evidence does not support such allegations.
>
> * * *
>
> Moreover, the Association plaintiffs only assert claims for injunctive or declaratory relief and, therefore, cannot adequately represent class members asserting damage claims.
>
> * * *
>
> This absence of any individual plaintiff who is a Medicare Part B beneficiary is also significant to the typically analysis under Rule 23(a) because the health and welfare benefit funds who purport to be class representatives are situated very differently from the absent individual members they purport to represent.

*Id.* at 41.

On February 10, 2005, the Court held oral argument on the Motion for Class Certification respecting the Track 1 case. *See generally*, Feb. 10, 2005 Hrg. Tr. at Docket No. 1369. At the hearing and in response to the Court's specific questions about whether there were adequate

representatives for consumers in the case, Co-Lead Counsel conceded the associations were

controlling the case and there were no consumer plaintiffs:[32]

> THE COURT:  Is there any actual beneficiaries who are named Plaintiffs?
> MR. BERMAN:  No, only the associations who have put in declarations that say they have 6,000.
> THE COURT:  That's not so surprising since these people are old and may still have cancer.  Isn't that generally what a physician administrative is, you're basically relying on the third-party payor [or] the association?
> MR. BERMAN:  That's correct.  The associations couldn't find anyone who wanted a 67-year old who wants to be a Plaintiff in this massive litigation, but the associations voted to support the litigation.
> THE COURT:  And there's case law that you say would support them doing it?
> MR. BERMAN:  Yes.  Now, let me turn to the physician-administered --
> THE COURT:  Would the associations cover every drug?
> MR. BERMAN:  Yes, we cover every Defendant.  I can't say they cover every drug sitting here, I can't recollect.[33]

Feb. 10, 2005 Hrg. Tr. at 21:8-22:4.

In response to Co-Lead Counsel's assertions about association standing and typicality at

the hearing, defense counsel argued as follows:

> MR. CAVANAUGH:  Finally, your Honor, on typicality, under Part B, they don't have an individual representative --
> THE COURT:  It's a little harsh because by definition the class with the Medicaid B by definition is old just because they have to be Medicaid beneficiaries, and they've got to be sick.
> MR. CAVANAUGH:  Yes, your Honor.
> THE COURT:  Hopefully, they're not, they've survived, and it's a harder thing to say.
> MR. CAVANAUGH:  Your Honor, I have seen, in the Lupron case there were individuals, there have been individuals who have been named as class reps.[34]  They've

---

[32]    This concession by Co-Lead Counsel at the class certification hearing was in spite of the fact that both the MCC and SAMCC listed 13 separate consumers respectively as having paid for drugs based on the AWP and were thus purportedly adequate consumer class representatives.

[33]    Co-Lead Counsel's *ipse dixit* assertions at the hearing about the associations' members' purchases of drugs based upon AWP was contradicted by the evidence submitted by defendants. *See* Docket No. 1132 at 41.

[34]    *See infra.* Note 3 (all of the Named Consumer Plaintiffs herein were members of the class in *Lupron* with demonstrable standing).  *See also*, Declarations of Donald E. Haviland, Jr., dated December 15, 2005 and May 8, 2006 at Docket Nos. 1969 (Notice of Filing Under Seal) and

had three years to find a class rep. They can't use their associations as surrogates because their associations don't have a damage claim.

* * *

THE COURT: Why couldn't the association ask for damages?

MR. CAVANAUGH: They're not permitted by law to recover damages. They don't have a damage claim.

THE COURT: I understand they can't individually. Why can't they for the individual older people?

MR. CAVANAUGH: Well, the association is the named Plaintiff. They can't sue, the association has suffered no damages.

THE COURT: They can sue for a declaration. Why can't they have standing to represent? I don't know.

MR. CAVANAUGH: I don't believe the law would permit them to recover damages for their individual members.

THE COURT: Do you know that to be true?

MR. CAVANAUGH: Yes, your Honor, I know we cite cases in our brief, in our sur-reply on that.

Feb. 10, 2005 Hrg. Tr. at 77:3-17, 78:9-25.

On August 16, 2005, this Court issued its Order and Opinion on class certification. *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 FRD 61 (D.Mass 2005)(*"In re AWP"*). In response to the defendants' arguments about consumer representative standing, the Court held that the associations lacked standing to serve as class representatives for such patients. *See In re* AWP, 230 FRD at 78-82. In particular, the Court remarked that "[n]o individual Medicare Part B consumer-patients have been proposed as class representatives, so the *key question* is whether an association with members who are patients meets the typically requirement." *Id.* at 78 (emphasis added). In answer to this "key question", the Court ruled that "[t]he associations lack standing to serve as class representatives under Rule 23(b)(3)." *Id.* at 80.

The Court also rejected Co-Lead Counsel's argument that the TPPs could serve as adequate representatives of the consumer claims, noting that "there may be defenses unique to TPPs non-applicable to consumers" *e.g.*, statute of limitations." *Id.* The Court noted further

---

2615 respectively (setting forth the detailed history of each of the Named Consumer Plaintiffs' drug purchases and payments).

concern about a possible conflict between TPPs and Medicare Part B beneficiaries, especially in

the context of settlement:

> "There is also concern about a possible conflict between TPPs and Medicare Part
> B beneficiaries with respect to possible settlements, given the different economic
> interests of the groups.   Whether this concern is properly characterized as
> typicality or adequacy – the two inquiries frequently overlap – I am concerned
> that the TPPs will not serve as adequate and typical representatives of Medicare
> beneficiaries, particularly those who do not have supplemental health insurance."

*Id.*

Due to the lack of any adequate or typical class representative of the Track 1 consumer

Class 1 claims, the Court declined to certify a class of Medicare Part B consumers at that time.[35]

However, it allowed Co-Lead Counsel to move to amend their complaint within sixty (60) days,

based on their representation that "they have individuals waiting in the wings." *Id.*  Also based

on this representation, the Court proceeded to address the other certification requirements in its

opinion.

This representation by Co-Lead Counsel was repeated at a subsequent hearing on class

certification:

> MR. BERMAN:  Okay, and I will address that, your Honor.  When we told the Court we
> had people waiting in the wings, which you picked up in your order, we did.  …When we
> said we had people waiting in the wings, some of the people we had waiting in the wings
> when the case started weren't with us anymore when we contacted them, and others were
> just too sick.

January 19, 2006 Hrg Tr. at 3:25-4:8.

These representations, made both prior to and after this Court's August 16, 2005 Order

(upon which the Court explicitly relied in granting Co-Lead Counsel 60 days leave to seek to

---

[35]     The Court noted that the 2003 amendments to Rule 23 removed the provision that a class
certification "may be conditional".  *Id.*  The Court also acknowledged the Advisory Committee's
note that "[a] court that is not satisfied that the requirements of Rule 23 have not been met should
refuse certification until they have been met."  *Id.*

amend the SAMCC) are belied by a memorandum written by the same Co-Lead Counsel to all

"AWP Counsel" *one day after* the Court's Order issued:

> "Yesterday Judge Saris issued her class certification order.  It is 89 pages.
> Bottom line is if we come up with the right plaintiffs she will certify a nationwide
> class of Medicare Part B co-payors. ... We now need to find plaintiffs who used
> Part B or physician administered drugs from any defendant.  We need your help.
> ... If you can identify a plaintiff who paid a co-pay for one of these drugs this
> would be helpful."

August 17, 2005 Memorandum at Exhibit "J" hereto.

Presumably, this memorandum was sent to the dozens of plaintiffs firms in MDL 1456.

However, apparently none of the firms had an existing consumer client, as no consumer client

was produced by any of the existing "AWP Counsel" within the 60-day period allotted by the

Court for filing an amended complaint.[36]

Instead, Named Consumer Plaintiffs were asked by Co-Lead Counsel, through their

undersigned personal counsel, to join the lawsuit as consumer representative plaintiffs.  They

chose to do so on the express condition that their trusted personal advisor would be appointed as

Co-Lead Counsel to serve and protect their interests in the litigation.  *See generally*, Declarations

of Named Consumer Plaintiffs at Docket Nos. 4647 through 4650 and Nos. 4652 through 4653.

Having been through the *Lupron* case which was controlled by some of the same Co-Lead

Counsel as here, the Named Consumer Plaintiffs had cause for concern and wanted their

personal counsel in a controlling position to prevent a recurrence of the inappropriate

---

[36]   Despite the fact no MDL plaintiffs' firm had an existing Track 2 consumer client, Co-Lead Counsel continued to act as if they had clients by "meeting and conferring" with defendants about a proposed modification to the Track 2 discovery schedule premised upon their proffer of Track 2 class representatives by the October 15 deadline. *See, e.g.*, Plaintiffs' Motion to Modify the Track Two Discovery Schedule, filed September 28, 2005 [Docket No. 1741] at 3 (referencing "the additional class representatives that Plaintiffs *will propose* for Track Two")(emphasis added).

compromise of consumer interests experienced in *Lupron*.[37]  Co-Lead Counsel agreed to seek the

appointment of the undersigned and his firm as Co-Lead Counsel.  *See* Email Agreement at

Exhibit "K" hereto.  When the undersigned left his former law firm with his clients (and the

former firm chose to withdraw from the case without the requisite leave of this Court),[38] the

undersigned wrote to Co-Lead Counsel to ensure that they would honor their agreement with the

Named Consumer Plaintiffs.  At the time, Co-Lead Counsel agreed.[39]  *See* Email at Exhibit "L".

On October 17, 2005, a Third Amended Consolidated Class Action Complaint

("TAMCC") was filed in order to comply with the Court's class certification order.[40]  *See* Docket

---

[37]     *See In re Lupron Marketing Marketing and Sales Practice Litig.*, MDL 1430, 01-cv-10861-RGS [D. Mass. March 2, 2006 [Docket No. 487 at 3] (acknowledging that "[t]he clear benefit KSG conferred upon the MDL consumer class was the negotiated increase from 30% to 50% in the recovery of out-of-pocket expenditures by class members. ... [T]he difference in the recognized claim percentage of 30% to 50% is an increase to consumer plaintiffs of $5,855,390.00. ...The court is, however of the view that on balance, KSG's role was a positive one. ... For its efforts, the court will award KSG a bonus of $1.5 million (approximately 25% of the $5,855,390.00 difference to consumers) from the reserves of the settlement fund, an amount which approximates the actual dollar benefit conferred on the consumer class through KSG's successful negotiation of the reimbursement formula.").

[38]     *See In re AWP,* 2008 WL 53278 (D.Mass. Jan 3, 2008).

[39]     The history between Co-Lead Counsel and the undersigned's clients is set forth in other pleadings which appropriately detail the factual record.  Accordingly, such factual history will not be recounted here, but these pleadings and the record in support thereof are incorporated by reference thereto to the extent relevant to the Court's determinations of Track 2 settlement class certification and final settlement approval.  Certainly, they are relevant to this Court's decision to appoint Co-Lead Counsel as Track 2 settlement class counsel under Rules 23(a)(4) and 23(g).  As the Named Consumer Plaintiff Declarations state, "Mr. Haviland had previously represented us in the litigation against TAP Pharmaceuticals for unlawful conduct respecting TAP's marketing and sale of the drug, Lupron.  Because of Mr. Haviland's direct efforts on our behalf, we were able to recover 50% of our out-of-pocket costs for the Lupron ..., which was substantially greater than the 30% that had been originally negotiated by the class action attorneys in the case who settled the case with TAP."

[40]     *See In re AWP*, 230 F.R.D. 61, 66 (D.Mass 2005)(allowing "plaintiffs [to] amend the SAMCC to propose individual class plaintiffs who are Medicare Part B beneficiaries")

No.1781-1787.[41]  The TAMCC listed six (6) of the thirteen (13) Named Consumer Plaintiffs

(Susan Aaronson, David E. Clark, Robert Howe, James Shepley, the Estate of Patricia Young,

and the Estate of William Newell) and one additional consumer (Leroy Townsend) for a total of

seven (7) individuals as representatives of Class 1.  The TAMCC also listed two (2) of the

thirteen (13) Named Consumer Plaintiffs (Rebecca Hopkins and George Baker Thomson), plus

an additional twenty-one (21) consumers as representatives of Class 3.[42]  It listed the same six

(6) TPPs from the SAMCC, plus two (2) additional TPPs.[43]  Finally, the TAMCC listed five (5)

PAL consumer associations this time "for purposes of seeking declaratory, injunctive and other

non-monetary relief" only.  TAMCC at ¶¶ 55-59.  Four (4) out of the five (5) associations were

the Court-approved representative plaintiffs for the Track 2 Class 1 settlement class.[44]  The

TAMCC also included updated Appendices reflecting the individual purchases of the newly-

added plaintiffs.

　　　Approximately six months later on March 1, 2006, a Fourth Amended Master

Consolidated Class Action Complaint ("FAMCC") was filed.  *See* Docket No.2171-2176.[45]  The

FAMCC listed eleven (11) proposed Class 1 class representatives, including ten (10) of the

---

[41]　　　The TAMCC was filed in 7 parts on the docket.

[42]　　　Leroy Townsend, William Barnewolt, Cheryl Barreca, Cynthia Byrski, Mary Cauble, Anna Choice, Joyce Dison, Tracy Garcia, Donna Kendall, Sandra Leef, Gerald Miller, Joseph Miller, Constance Nelson, Andrea Palenica, Regina Shoemaker, Scott Tell, Kenneth Vanderwal, Pauline Vernick, Marilyn Vescovi, Susan Wessels, and Kathleen Weaver-Zech.

[43]　　　Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT"), and Sheet Metal Workers National Health Fund ("SMW Health Fund").

[44]　　　VPIRG, WCA, State Wide, and CANY.  The Fifth Association by the now defendants CCJ.

[45]　　　The FAMCC was filed in 6 parts on the docket.

thirteen (13) Named Consumer Plaintiffs.[46]  The FAMCC also listed the same twenty-two

consumer Class 3 representatives and the same three (3) TPP Class 2 Representatives as the

TAMCC, but added one additional TPP Class 2 representative, Blue Cross and Blue Shield of

Massachusetts, Inc., ("BCBSMA").  The FAMCC continued to list the same five (5) PAL

consumer associations for the same limited purpose as in the TAMCC.

Also on March 1, 2006, Co-Lead Counsel filed a "Proposed Consolidated Order Re:

Motion for Class Certification Track 2", Versions 1 and 2.  *See* Docket Nos. 2169 and 2170

respectively.  Co-Lead Counsel proposed that this Court certify the following Named Consumer

Plaintiffs as class representatives for Track 2, Class 1 for the listed defendant Sub-Classes:

- Harold Carter, as class representative against defendant Abbott, Fujisawa, Amgen;

- Roger Clark, as class representative against defendant Baxter, Abbott, Bayer, Sicor, Amgen and Pfizer;

- Susan Ruth Aaronson, as class representative against defendant Aventis, Baxter, Dey, Pfizer, Abbott, Sicor, Fujisawa, Watson;

- Joyce Howe, individually and on behalf of the Estate of Robert Howe, as class representative against Baxter, Fujisawa, Sicor, Watson, Aventis, Abbott, Immunex, Amgen;

- Larry Young, individually and on behalf of the Estate of Patricia Young, as class representative against defendants Aventis, Fujisawa, Pfizer, Pharmacia, Abbott, Bayer, Watson, Baxter, Sicor, Amgen;

- James Monk, as class representative against defendant Aventis;

- Virginia Newell, as class representative against defendants Amgen and Aventis;

- Oral Roots, as class representative against defendants Pfizer and Dey; and

---

[46]     The Named Consumer Plaintiffs that were listed for Class 1 included the Estates of Susan Ruth Aaronson, Robert Howe, Patricia Young, James Shepley, David Clark and William Newell, as well as Harold Carter, Hunter Walters, Oral Ray Roots and James Monk.

- Hunter Walters, as class representative against defendant Dey.

On March 14, 2006 Defendants filed Track Two Defendants' Motion to Strike Portions

of the Fourth amended Master Consolidated Complaint and Notice of Errata, alleging, *inter alia,*

that the plaintiffs were attempting to covertly expand the number of drugs for Track 2

defendants. *See* Docket No. 2249.  On April 10, 2006, this Court electronically entered its order

striking the added new drugs.  ("I strike the new drugs").  *See* Exhibit "M" attached hereto.

Approximately two months later, on May 8, 2006, Co-Lead Counsel filed Plaintiff's

Motion to Certify Claims with Respect to Track Two Defendants.[47]  The Affidavit of Donald E.

Haviland, Jr., Esquire, filed in support of the Motion, detailed the evidence of payments based on

AWP for Track 2 defendants' drugs made by the Named Consumer Plaintiffs.  The

Memorandum of Law in Support specifically stated that because "[p]laintiffs proffer as Track 2

representatives some of the previously appointed representatives for the Track 1 Defendants",

including M. Joyce Howe, Larry Young, and Reverend David Aaronson that there were "no

possible typicality or adequacy issues" with respect to these proffered class representatives.  Co-

Lead Counsel also proffered Hunter Walters, Harold Carter, Roger Clark, and Harold Bean as

additional Track 2 Class 1 consumer representatives in order to comply with the Court's August

2005 directive that there must be at least one class representative for each defendant.

---

[47]      Co-Lead Counsel chose to not propose Named Consumer Plaintiffs Virginia Newell, James Monk, Oral Ray Roots or George Baker Thomson because they purchased purportedly "new drugs" which this Court ordered stricken from the FAMCC on defendants' motion. Nevertheless, and without explanation by the settling parties, these drugs have been slipped into the list of drugs included in the Track 2 settlement.  The aforesaid Named Consumer Plaintiffs object to this reversal of position, and the inclusion of drugs like Aventis' Eligard (paid for by Mr. Monk), and Pharmacia's Trelstar (paid for by Mr. Thomson) and Depo-Provera (paid for by Mr. Roots) in the Track 2 settlement, because such inclusion violates this Court's prior "no new drugs" orders and deprives these plaintiffs of a full and fair adjudication and settlement of their claims for these drugs.

On June 15, 2006, defendants filed a brief in opposition to Track 2 class certification,

specifically challenging the standing of the consumer association HCFA as follows:

> **"The Proposed 23(b)(2) Plaintiff Lacks Standing to Pursue Injunctive Relief**
> Plaintiffs propose that Health Care For All (HCFA), a membership-based association, serve as the Rule 23(b)(2) representative for Class 3.   An association may assert standing on behalf of its members only if at least one of them possesses standing in his or her own right by meeting Article III requirements.   HCFA's 30(b)(6) designee testified, however, that the allegations in the FAMCC regarding its members' making payments for subject drugs based upon AWP are "inaccurate."[48]  HCFA conceded that it has no knowledge whether any of its members have been injured as a result of any alleged AWP scheme.[49]   HCFA also admitted that it – separate from its members – has not been injured by Plaintiffs' alleged WP scheme.[50]  Accordingly, HCFA lacks standing to sue."

Track Two Defendants' Memorandum in Opposition to Class Certification at 37-38 [Docket No.

2829](case citations omitted).

The Court never ruled on Plaintiff's Motion to Certify the Track Two case.  It never

certified a litigation class with respect to the claims of the Named Consumer Plaintiffs.

Instead, the Court allowed Co-Lead Counsel to communicate directly with members of

the GlaxoSmithKline Settlement Class, for which Reverend Aaronson served as the lone

---

[48]     May 23, 2006 Shannon Dep. At 53-54, 60.

While HCFA was removed from the complaint in this case in the SAMCC [*compare* MCC ¶34 *with* SAMCC ¶¶32-36], it has been resurrected by the RFAMCC [*See* Docket No. 5902 at ¶39a].  This same admittedly "inaccurate" allegation also has been resurrected, and has been relied upon by the Court in its Preliminary Approval Order.  *See* Docket No. 5426 at 5 ("The Court finds that each of these representatives, or an agent or member thereof, made a purchase or reimbursement for one or more of the Class Drugs manufactured, marketed, sold, or distributed by the Released Companies.").  The RFAMCC does not comport with Rule 11 of the Federal Rules.  *See* Fed.R.Civ.Proc. 11(b)("By presenting to the court a pleading…an attorney …certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances…the factual contentions have evidentiary support..")

[49]     *Id.* at 54, 56-57, 61-63.

[50]     *Id.* at 181.

consumer Class 1 representative. The Court authorized Co-Lead Counsel to solicit replacement plaintiffs, not only for Reverend Aaronson, but for the entire group of Named Consumer Plaintiffs who were asked by Co-Lead Counsel to join the lawsuit in October 2005. Despite such extraordinary leave of Court, Co-Lead Counsel found no suitable replacement, and proffered no suitable replacement plaintiffs. They have never filed any Motion to Substitute the Named Consumer Plaintiffs in this case, and they have not withdrawn their appearances for the Named Consumer Plaintiffs in view of their conflict of interest in representing PAL.

On April 26, 2007, Co-Lead Counsel filed Class Plaintiffs' Motion for Leave to File an Amended Complaint as well as a proposal Fifth Amended Master Consolidated Class Action Complaint. *See* Docket Nos. 4105 and 4106.

On May 10, 2007, Defendants file Track Two Defendants' opposition to Class Plaintiffs' Motion for Leave to File on Amended Complaint. Allegedly, *inter alia,* that the proposed Fifth Amended Complaint "added of dozens drugs previously excluded from this case ..." and asked this Court to reject "Plaintiffs' attempt to add drugs previously excluded if the Court's April 10, 2006 "no new drugs" order ...". *See* Docket No. 4181.

On September 10, 2007 this Court issued its Order re: Motion for Leave to File and Amended Complaint (Docket No. 4105), denying the Motion to Amend "to the extent the Amendment adds new drugs.". *See* Docket No. 4702 at 6.

On February 17, 2009, a Revised Fifth Amended Master Consolidated Class Action Complaint ("RFAMCC") was filed. *See* Docket No. 5902.[51] The RFAMCC listed twelve (12)

---

[51] Class Counsel filed a Motion to Amend the Complaint on April 26, 2007, which included a Proposed Fifth Amended Master Consolidated Complaint. *See* Docket at No. 4105. When that Motion was granted, Class Counsel filed the RFAMCC, therefore no Fifth Amended Master Consolidated Complaint was ever entered onto the docket.

consumer Class 1 class representatives, including nine (9) Named Consumer Plaintiffs, although some had passed away long ago.[52]  The RFAMCC lists the same Consumer Class 3 class representatives as the FAMCC, with one additional consumer, William Barnewolt, for a total of twenty-two (22). The RFAMCC lists the same four Class 2 class representatives as the FAMCC. It lists the same eight proposed Class 3 TPP, but it adds the PAL association HCFA back into the complaint as a Class 3 representative. (As this Court knows, it appointed HCFA as a Class 1, not Class 3, Track 2 settlement class representative). The late addition of HCFA to the RFAMCC – after all the dismissal motions were decided in this case – conveniently allows Co-Lead Counsel to try slip HCFA back into the case as a Track 2 consumer representative plaintiff unchallenged

---

[52]     The Named Consumer Plaintiffs that were listed included Harold Carter, Roger Clark on behalf of the Estate of David E. Clark, Larry Young representing the Estate of Patricia Young, Virginia Newell representing the Estate of William Newell, and Oral Ray Roots.

Susan Aaronson was also listed as a Class 1 class representative.   The RFAMCC inaccurately states that "Mrs. Anderson *resides* in Matthews, North Carolina" and further that "Mrs. Aaronson *lives* with breast cancer and *is currently* being treated for ovarian cancer." ¶ 15. (emphasis added).   Unfortunately, and apparently unbeknownst to Co-Lead Counsel, Mrs. Aaronson passed away years ago. The RFAMCC does not reference her Estate, or the fact that her husband, Rev. David Aaronson, is the Estate's representative.

Likewise, the RFAMCC describes James Shepley as a Class 1 class representative who "*resides* in Reno, Nevada, and *is* an 85 year-old Medicare beneficiary, *with* secondary insurance coverage through United American. ¶ 20. (emphasis added).   The RFAMCC further states that "Mr. Shepley is *living* with prostate cancer." *Id.* (emphasis added).   Again, Co-Lead Counsel apparently do not know that Mr. Shepley passed away some time ago. The RFAMCC does not reference his Estate, or the fact his wife, Therese Shepley, is the Estate's representative.

Hunter G. Walters is listed in the RFAMCC as a Class 1 class r who "*resides* in Bandalia, Michigan and *is* a Medicare recipient with no supplemental insurance." ¶ 24 (emphasis added). It further states that "Mr. Walters *receives* medication for emphysema and prostate cancer." *Id.* (emphasis added).   Mr. Walters passed away some time ago. The RFAMCC does not reference his Estate or anyone acting on its behalf.

Robert Howe is listed as a Class 1 class representative.   Unlike Mrs. Aaronson, Mr. Shepley, and Mr. Walters, the RFAMCC at least acknowledges that Mr. Howe has passed away, yet it still proposes Mr. Howe as a class representative and does not reference his estate or the fact that his wife, Joyce, has been acting on its behalf in this case, including taking an appeal from the Court's final approval of the AstraZeneca settlement. *See* RFAMCC at ¶ 18.

by any defendant motion to dismiss in view of the defense stipulation to not respond to the RFAMCC. *See* Docket No.5919.

1.    **The Proposed Track 2 Settlement and Nationwide Settlement Class Certification.**

Co-Lead Counsel proceeded to settle the case without any consumer representative plaintiffs for Class 1, under the auspices of the Court-appointed mediator, Eric Green. On March 7, 2008, Co-Lead Counsel filed Class Plaintiffs and Track Two Defendants' Joint Motion for Entry of an Order Granting Preliminary Approval of the Track Two Settlement, Certifying Classes for Purposes of Settlement, Directing Notice to The Classes and Scheduling Fairness Hearing. The Memorandum of Law in Support sought to incorporate the Court's prior rulings on the Rule 23(a) prerequisites, including typicality and adequacy of representation, even though the class representatives covered by such rulings were not included as representatives of the proposed Track 2 consumer settlement classes. *See, e.g.*, January 30, 2006 Class Certification Order (appointing Howe, Shepley, Aaronson and Young as Track 1 Class 1 representatives), GlaxoSmithKline Final Approval Order (appointing Susan Aaronson as representative) and AstraZeneca Final Approval Order (appointing Joyce Howe as representative). While seeking to incorporate prior rulings of this Court which expressly found certain Named Consumer Plaintiffs to be typical and adequate, Co-Lead Counsel did not provide the names of any consumer plaintiffs in their Motion for Preliminary Approval of the Track 2 settlement class. Instead, they listed only consumer associations. *See also*, Track Two Settlement Agreement and Release, appended to the Motion for Preliminary Approval (listing only the following consumer associations as proposed Track 2 Class 1 consumer settlement class representatives: VPIRG, WCA, NYSSAC, CANY, and HCFA).

25

On March 14, 2008, the Court convened the first of several preliminary approval hearings. At the hearing, Co-Lead Counsel represented that "plaintiffs have proposed and defendants have agreed that we will *replace* the current proposed representatives for Class 1, which are, I think, four or five advocacy organizations, with at least one or preferably more individual class members." *See* March 14, 2008 Hearing Transcript, at 5:44-25 at Docket No. 5147 (emphasis added). The Court pressed for disclosure of the name(s) of such individuals, but counsel indicated he could not tell the Court because the lone person counsel had "identified" was very elderly ("I think she's 85 years old") and "very ill with cancer". Indeed, Co-Lead Counsel admitted he was having trouble "getting in touch with her." *Id.* at 5:25-6:10. The Court advised counsel "to spend time with them and put in an affidavit that they understand the issues in the case", so that if there were challenges to adequacy, the individuals would have "the capability physically and mentally to sort of work with you." *Id.* at 7:13-20.

On April 9, 2008, the Court continued its hearing on preliminary approval. At that hearing, Co-Lead Counsel presented the signed Track Two Settlement Agreement and Release to the Court which listed only the consumer associations as putative representatives of the consumer class. Co-Lead Counsel apparently had withdrawn the individual consumer whom counsel had previously described to the Court, without prior notice to the Court, because the individual was no longer able or willing to serve as a class representative. *See* April 9, 2008 Hearing Transcript, at 4:8-5:3, at Docket No. 5259. Co-Lead Counsel again indicated that they had a new consumer representative seemingly waiting in the wings to serve as a consumer class representative; however, counsel stated that they "didn't have time to get those papers to [the Court] before [the] hearing". They claimed a motion to add that individual would be forthcoming within days. *See id.* at 5:3-13. Specifically, the colloquy proceeded as follows:

26

"MR. NOTARGIACOMO: Good afternoon, your Honor. We are here as a continuation of the hearing that was held on March 14 in support of preliminary approval of the Track Two settlement agreement and release. Your Honor brought up a number of issues that she wanted addressed. With respect to the settlement, the proposed settlement, this past Friday we filed a number of amended exhibits to the settlement agreement that addressed many of the Court's -- we hope all of the Court's concerns, and I just want to go through some of those with you today, and if the Court has additional questions, I'm happy to answer those. The first issue which was addressed on the 14th was the issue of class representatives. The current agreement as it stands, even after the amendments we filed on Friday, has only consumer organizations as class representatives, and when I was here on March 14, I represented that we would have -- we had identified an individual who could act as a class representative. Since that time, the woman unfortunately had some emergency surgery, and she's told us that she -- that particular individual will not be available as a class rep. Since that time, we have identified another individual. She is actually the daughter of a woman who is now deceased but who in 2003 was administered a Track Two drug and made payment for that drug under Medicare Part B. She has agreed to become or act as a class representative. We didn't have time to get those papers to your Honor before today's hearing, but by Monday we'll be submitting a motion to add that individual as a class representative. And as I said on March 14, we may between now and final approval seek the Court's leave to add additional individual persons as proposed class representatives.

THE COURT: Between now and when?

MR. NOTARGIACOMO: Final approval.

THE COURT: Okay."

*Id.* at 4:8-5:16.

On June 27, 2008, more than eleven (11) weeks after the preliminary approval hearing concluded, Co-Lead Counsel filed Class Plaintiffs' Motion to Add Individual Plaintiff as Class One Representative for Track Two Settlement and for Protective Order Related to Notice to Class 3 Consumers ("Motion to Add Individual Plaintiff"). *See* Docket No. 5409. In the Motion, Co-Lead Counsel averred that, pursuant to oral argument at the April 9, 2008 preliminary approval hearing, they were moving the Court for leave to add Ms. Murial Tonacchio, as representative of the Estate of Wilma Mort and as a Track 2, Class 1 consumer settlement class representative for the Aventis Sub-Class. Given that the Motion sought to "add" Ms. Tonaccio as a plaintiff, rather than "replace" one or more existing plaintiffs (as counsel

previously had represented to the Court on March 14, 2008 they would be doing), such addition likely was intended to supplement rather than supplant the existing representation by the Named Consumer Plaintiffs. Certainly, no request to remove the Named Consumer Plaintiffs was made.

On July 2, 2008, before the time for a responsive pleading had lapsed as to the Motion to Add Individual Plaintiff, and before the Court ruled on the Motion, the Court granted preliminary approval of the Track Two settlement and certified a nationwide settlement class of consumers. The Preliminary Approval Order named Class 1 consumer representatives as follows: "Muriel Tonacchio as representative of the Estate of Wilma Mort, Vermont Public Interest Group, Wisconsin Citizen Action, New York Statewide Senior Action Counsel, Citizen Action of New York, and Health Care For All." Docket No. 5426.

Nineteen (19) days later, on July 21, 2008, the Court granted the Motion to Add Individual Plaintiff and held that Ms. Tonacchio could be added as a representative plaintiff along with the associations. No amended complaint was presented by Co-Lead Counsel until February 19, 2009, when Co-Lead Counsel filed the RFAMCC, and no explanation was given for the seven (7) month delay which caused the RFAMCC to be amended after certain notice of the settlement was accomplished.

On December 16, 2008, this Court held a final fairness hearing, ostensibly on the TPP portion of the settlement only. At the hearing, however, a consumer objector appeared and the Court addressed consumer settlement issues, despite its prior decision and supplemental notice to the consumer class that such issues would be deferred until April 2009. Named Consumer Plaintiffs filed a timely objection to the Court's proceeding in such a bifurcated manner with respect to a singular, nationwide settlement of the class claims of TPPs and consumers. *See* Docket No. 5814.

28

On March 2, 2009, Co-Lead Counsel filed their Motion for Entry of an Order Granting Final Approval of the Track Two Settlement, Memorandum in Support ("Final Approval Mem."), a Motion for Fees, and other pleadings respecting the proposed Track 2 settlement. *See* Docket Nos. 5934-5939].

## III.   ARGUMENT

### A.   THE COURT SHOULD REFUSE TO CERTIFY THE PROPOSED NATIONWIDE CONSUMER SETTLEMENT CLASS FOR LACK OF A TYPICAL OR ADEQUATE CONSUMER CLASS REPRESENTATIVE.

Rule 23(a) of the Federal Rules of Civil Procedure requires that parties seeking class certification demonstrate: (1) the class is so numerous that joinder of all parties is impracticable; (2) there are questions of law or fact common to the class; (3) the claims and defenses of the representative parties are typical of those of the class; and (4) the representative party or parties will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23(a). Certification of a class requires a district court to determine whether a proposed class meets the exacting prerequisites established by Rule 23. *Natchitoches Parish Hosp. Services Dist. v. Tyco Intern., Ltd.* 247 F.R.D. 253, 263 (D. Mass. 2008)(citing *Simlow v. SW Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st. Cir. 2003). All four requirements of Rule 23(a) must be met in order for certification of a class to be proper. *Key v. Gillette Co.*, 782 F.2d 5, 6 (1st Cir. 1986)(citing *Katz v. Carte Blanche Corporation*, 496 F.2d 747, 756 (3rd Cir. 1974), *cert. denied,* 419 U.S. 885 (1974)). In determining the propriety of a class action under Rule 23, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Id. (citing Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)).

As a starting point, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *In re Credit Suisse-Aol Securities Litigation,* 253 F.R.D. 17, 21 (D. Mass. 2008)(quoting *Smilow v. Sw. Bell Mobile Sys.,* 323 F.3d 32, 38 (1st Cir. 2003) (citing *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982)). In conducting its analysis, a district court is entitled to look beyond the pleadings in its evaluation. *See In re PolyMedica Corp. Sec. Litig.,* 432 F.3d 1, 6 (1st Cir. 2005), *accord, In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 512 (1st Cir. 2005).

In the settlement context, however, the court's otherwise "rigorous analysis" is even more exacting.  The Supreme Court, in its seminal decision in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997), admonished that the discretion a district court has in certifying a class for settlement purposes does not permit a district court to ease the demands of Rule 23 of the Federal Rules of Civil Procedure.  To the contrary, a district court must apply "undiluted, even heightened attention" to the requirements of Rule 23 "in the settlement context." *Amchem,* 521 U.S. at 620.  *See also Walker v. Liggett Group, Inc.,* 175 F.R.D. 226, 230 (S.D.W.V. 1997) ("*Amchem* decimated the notion of some circuits that Rule 23 requisites were relaxed in the settlement context").

Of paramount concern under Rule 23(a) is the requirement that the representative party fairly and adequately represent the interests of the class.  *See* Fed.R.Civ.P. 23(a)(4); *Tilley v. TJX Companies, Inc.,* 212 F.R.D. 43, 46 (D. Mass. 2003), *vacated on other grounds,* 345 F.3d 34 (1st Cir. 2003).   The analysis has two steps: the court must determine, first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously.  *In re Credit Suisse-AOL Securities Litigation,* 253 F.R.D. at 23 (citing *Guckenberger v. Boston Univ.,*

30

957 F.Supp. 306, 326 (D.Mass.1997); *In re Bank of Boston,* 762 F.Supp. 1525, 1534 (D.Mass.1991); *Andrews v. Bechtel Power Corp.,* 780 F.2d 121, 130 (1st Cir. 1985)).

Basic considerations of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives (both the plaintiffs and Class Counsel) at all stages of the litigation where absent members will be bound by the court's judgment. *Susman v. Lincoln American Corp.,* 561 F.2d 86, 89 (7th Cir. 1977)(citing *National Association of Regional Medical Programs v. Matthews,* 551 F.2d 340 (D.C. Cir. 1976). That means that, even if a court previously adjudged the adequacy of the named representative plaintiffs and/or class counsel, such ruling must be re-visited at the point of settlement when a final judgment is sought. The requirement of adequacy is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff. *Key v. Gillette Co.,* 782 F.2d 5, 7 (1st Cir. 1986).

To decide whether class counsel will "fairly and adequately represent the interests of the class," the court must consider, *inter alia,* "the work counsel has done in identifying or investigating potential claims in the action, counsel's experience ..., counsel's knowledge of the applicable law, [and] the resources that counsel will commit to representing the class. Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv). Additionally, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

To decide whether the class representatives will be adequate to represent the class, the court must consider whether the named representative's interests coincide with those of the unnamed class members. *Gen. Tel. Co. of the Southwest,* 457 U.S. at 156 ("we have repeatedly

held that a class representative must be part of the class and posses the same interest and suffer the same injury as the class members.") (internal quotations omitted).   In essence, the interests of the named plaintiffs must not be antagonistic to the unnamed class members. *Andrews,* 780 F.2d at 130.  Thus "[t]wo basic guidelines for meeting adequacy of representation standard of Rule 23(a)(4) are : (1) the absence of potential conflict between the named plaintiffs and the class members and (2) assurance of vigorous prosecution." *Berenson v. Fanevil Hall,* 100 F.R.D. 468 (D. Mass. 1984).

Individuals should not serve as class representatives if they possess "so little knowledge of and involvement in the class action that they [are] unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir.1987).  With respect to the representative plaintiff's knowledge of the case, what is required is "general knowledge and a participation in discovery". *In re Carbon Black Antitrust Litigation,* 2005 WL 102966 at *15 (D. Mass 2005)(citing *Kriendler v. Chemical Waste Management, Inc.,* 877 F.Supp. 1140, 1159 (N.D. Ill. 1995).  The adequacy requirement is not satisfied if the class representatives "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d at 728.

In all cases, the court must be assured that the procedures designed to assure adequate representation have been carefully followed. *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303, 310 (D. Mass. 1987).

1. **The Court's Fiduciary Duty to the Class Compels "Undiluted, Heightened Attention" to Considerations of the Standing, Typicality and Adequacy of the Proposed Consumer Settlement Class Representatives and the Adequacy of Class Counsel.**

The district court owes a fiduciary duty to class members in approving a class action settlement. "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002 ("We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."). The fiduciary responsibility of the district court includes the obligation of ensuring that "the class members' interests were represented adequately." *Int'l Un. of Electronic, Electrical, Salaried, Machine & Furn Workers, AFL-CIO v. Unisys Corp.*, 858 F. Supp. 1243,1264 (E.D.N.Y. 1994). This duty does not allow the district court to acquiesce in the class representative's inadequate representation of class members. *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).

This Court previously acknowledged its fiduciary duty to the Class in its prior decision respecting the appointment of class counsel for Track 2 consumers. *See generally*, *In re AWP*, 2008 WL 53278 (D.Mass. Jan 3, 2008). In particular, the Court acknowledged the following guideposts respecting its decision on the class counsel appointment under Rule 23(g):

> In a class action, lead counsel must meet a demanding standard of trustworthiness because the Court must rely on representations made by counsel. *See, e.g., In re Vitamins Antitrust Litig., 398 F.Supp.2d 209, 237 (D.D.C.2005); In re Organogenesis Sec. Litig.,* 241 F.R.D. 397, 408 (D.Mass.2007) ("to understand the facts and issues presented to it in any case, including a class action, the court must employ and to some extent rely on representations made to it by counsel.")

> The presiding judge has a fiduciary obligation to the plaintiff class to pick an effective and trustworthy lead counsel team. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig., 466 F.Supp.2d 364, 367-68 (D.Me.2006)* (holding that the presiding judge has the final say on who should be on plaintiff's leadership committee and manage the activities of all the lawyers).

*In re AWP*, 2008 WL 53278 at * 2. These standards apply with equal, if not greater, force under *Amchem* once a case has been settled by the "lead counsel team" chosen by the Court to represent the consumer class.

The Court's fiduciary duty extends to its review of the terms of a proposed settlement and the conduct of counsel in achieving the settlement. *See generally, Reynolds v. Beneficial Nat. Bank,* 288 F.3d 277 (7th Cir. 2002). As the fiduciary for the consumer class and final arbiter of who is best suited to represent their interests,[53] the Court must review the record of these proceedings and make specific findings of fact and conclusions of law about Co-Lead Counsel's fitness to have served as consumer settlement counsel without any consumer client and with a separate fiduciary obligation to PAL and its member organizations to achieve a "separate *cy pres* fund." *See* Exhibit "B" hereto.[54]

---

[53]    Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court must undertake a distinct inquiry into whether Co-Lead Class Counsel was "best able to represent the interests of the class" for purposes of its mandatory consumer settlement class counsel appointment decision. Fed.R.Civ.Proc. 23(g)(2). *See also, In re AWP*, 2008 WL 53278 at * 1.

[54]    Indeed, the Court's chosen "lead counsel team" never represented any typical or adequate Track 2 consumer with standing to sue throughout the entire course of this litigation – from the initial filing in December 2001, through multiple rounds of amendments to the complaint, class certification briefing and argument, and finally settlement. While they presented complaints over the years which included dozens of consumer plaintiffs whom they represented had standing, all were withdrawn without explanation in the "triage" of the various hollow pleadings. That they finally were able to locate one, lone consumer after they settled the Track 2 case is of no moment, since that consumer had no role in either the prosecution of the litigation or its settlement, even assuming that consumer has standing to sue (which Named Consumer Plaintiffs do not concede). As detailed below, the proffered consumer representative, Ms. Tonacchio, has not shown that her mother made an AWP-based payment for any Track 2 drug.

This fiduciary duty extends to both the Court and the lawyers in the case.  Indeed, the fiduciary duty lawyers owe their clients applies in all cases, not just class action cases.  *See, e.g,* *Huber v. Taylor*, 469 F.3d 67, 81 (3rd Cir. 2006)("It is well-settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty."); *see also, In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,*55 F.3d 768, 801 (3rd Cir., 1995); *Soskel v. Texaco, Inc.*  94 F.R.D. 201, 203 (D.C.N.Y., 1982); *Deadwyler v. Volkswagen of America, Inc,*134 F.R.D. 128, 140 (W.D.N.C.,1991) ("As a court-appointed "fiduciary's fiduciary," class counsel assumes a particularly heavy responsibility even beyond that owed by a lawyer to an individual client").  Indeed, in class action cases, because of the representative nature of the suit and the ability of the representatives to bind absent parties who may never appear before the court (and may never receive actual notice of it) to a judgment which will be conclusive of their rights, there is imposed upon the lawyers for class plaintiffs a heightened duty to ensure that the named representative plaintiffs are informed at each stage of the process.  *See Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 831-832 (3rd Cir., 1973) ("Not the least important of the fiduciary duties shared by counsel and the court is their duty to ensure that absentee class members have knowledge of proceedings in which a final judgment may directly affect their interests.  'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'").

This principal was recently underscored by the Court of Appeals for the Third Circuit:

> "The fiduciary duty that an attorney owes clients is not a matter to be taken lightly.  The duty may not be dispensed with or modified simply for the conveniences and economies of class actions.  As then Judge Cardozo observed in *In the Matter of Rous*, '[m]embership in the bar is a privilege burdened with

conditions.'  221 N.Y. 81 (1917) (Cardozo, J.).  Among those conditions are the
ethical obligation of giving clients full and meaningful disclosure of conflicts of
interest so the client may decide if the representation is in his or her best interest
and of the terms of proposed settlement agreements, as it is the client's, not the
attorney's, decision whether to settle a case. Tex. Disciplinary R. Prof'l Conduct
1.03 (duty to keep client informed); 1.04(f) (fee division); 1.08(f) (disclosure of
aggregate settlements).  Even when clients are viewed as mere "inventory", they
are still owed the renowned "punctilio of an honor the most sensitive." *Meinhard
v. Salmon*, 249 N.Y. 458, 464 (N.Y. 1928) (Cardozo, J.).  As the Texas
Disciplinary Rules of Professional Conduct state the 'obligation of lawyers is to
maintain the highest standards of ethical conduct.'  Tex. Disciplinary R. Prof'l
Conduct, Preamble.

This is the cost of doing business as an attorney at law, and we will not
countenance shortcuts.  Disclosures to clients must be meaningful, by which we
mean something beyond form disclosures, as clients must understand a conflict to
give their informed consent to an intelligible waiver.  Indeed, we are embarrassed
to have to explain a matter so elementary to the legal profession that it speaks for
itself: all attorneys in a co-counsel relationship individually owe each and every
client the duty of loyalty.  For it to be otherwise is inconceivable.  There is no
question that defendant [class action] attorneys owed [class representative]
Plaintiffs fiduciary duties."

*Huber*, 469 F.3d at 82.

Thus, if the lawyer, through breach of his fiduciary obligations to the class, *See Zucker v.
Occidental Petroleum Corp.,* 192 F.3d 1323, 1327-28 (9th Cir.1999); *Sondel v. Northwest
Airlines, Inc.,* 56 F.3d 934, 938 (8th Cir.1995); *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th
Cir.1985); *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 832, (3rd Cir. 1973) or
otherwise, demonstrates that he is not an adequate representative of the interests of the class as a
whole, certification must be denied. *Dubin v. Miller,* 132 F.R.D. 269, 273 (D.Colo.1990)
("adequacy of representation also requires that counsel for the class fulfill a fiduciary obligation
to the class"); *Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643, 661 (N.D.Ill.1986)
("where there is reason to doubt [class] counsel's ability to meet those [fiduciary] duties [to the

class], class certification must be denied"); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir. 2002).

## 2. The Designated Representatives for Class 1 Consumers in the Track II Settlement Class Lack Standing to Sue for Damages, and Are Atypical and Inadequate.

### a. The Associations Continue to Lack Standing to Sue for Damages, and Remain Atypical and Inadequate To Serve As Consumer Class Representatives.

This Court dismissed the damages claims of the consumer associations in this case. It further ruled that they were atypical and inadequate to represent consumer damage claims in a class action. Nevertheless, the same PAL member associations that were subject to these rulings have been proffered again by Co-Lead Counsel and settling defendants as Track 2 consumer settlement class representatives. And, this Court has appointed them as Class 1 representatives of the Track 2 consumer settlement class in its Preliminary Approval Order.

In its August 16, 2005 Memorandum and Order on class certification, this Court stated that "'[s]tanding . . . frequently appear[s] as [a] threshold requirement for the maintenance of federal class actions and must be considered in addition to the requirements of Rule 23 when deciding whether a particular action may be certified.'" *Id.* at 79 (quoting 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1785.1(3rd ed. 2005)). The Court further noted, "'it is well settled that prior to the certification of a class, and technically speaking before any formal typicality or commonality review, the district court must determine that at least one named class representative have Article III standing to raise each subclass claim.'" *Id.* (quoting *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). With respect to the standing of the particular PAL plaintiff associations, the Court observed:

> "Most courts have held that associations do not have standing to seek damages on behalf of their members where both the fact and stated extent of injury would require individualized proof." *Id.* (citing *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004)("[W]e know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members."); *Irish Lesbian & Gay Org. v Giuliani*, 143 F.3d 638, 650 n. 5 (2d Cir. 1998)("An association generally cannot seek relief in damages for injuries to its members because unless the alleged injury is common to its entire membership, and shared by all to an equal degree, both the fact and extent of injury would require individualized proof.")"

Applying these principles in the instant case, the Court ruled that "[t]he [PAL] associations lack standing to serve as class representatives under Rule 23(b)(3) and that the court would not certify a class."[55] *Id.* at 80.

After finding the associations to be atypical and inadequate, the Court set out the standard for the typicality and adequacy of representative plaintiffs in this case, holding that there must be an individual class representative with standing to sue *each individual defendant. In re AWP*, 230 F.R.D. at 80 (emphasis added). No motions to reconsider this Court's August 2005 decision were filed by any party. No party sought certification of an interlocutory appeal from this Court, or extraordinary relief from the appellate court, as to this ruling.

---

[55]   Although this Court held that the associations did not have standing under Rule 23(b)(3), it held they might have standing under Rule 23(b)(2) to pursue injunctive relief. Indeed, the Court previously certified HCFA as the lone consumer class representative for consumer Class 3 Claims for injunctive relief under Rule 23(b)(2). *See In re AWP*, 233 F.R.D. 229 (D. Mass. 2006) (certifying "Health Care for All as the representative for this Class pursuant to Fed.R.Civ.P. 23(b)(2)"). However, for reasons unknown to Named Consumer Plaintiffs (as they have not been disclosed in the settlement papers filed of record), the PAL associations (including HCFA) have chosen to abandon any claim for declaratory or injunctive relief. Worse still, they have agreed to include such claim in the classwide release despite having received no consideration for such release. *See discussion infra.* The associations' failure to pursue such relief, as they had in Track 1 case, speaks to their inadequacy to serve consumer interests in the Track 2 case.

The Track 2 settling defendants – who vigorously and successfully opposed the appointment of these same associations as consumer class representatives in the litigation context, but now seek to have them appointed as settlement class representatives – offer no explanation for their changed view. They offer no basis for why this Court should reverse itself on a decision they fought hard to obtain.[56]

In its August 2005 Order, the Court provided Co-Lead Counsel with an additional opportunity to provide, within sixty (60) days, adequate class representatives that could meet the requirements of Rule 23(a)(3) and 23(a)(4). It did so based on the affirmative representations of Co-Lead Counsel that they had appropriate class representatives "waiting in the wings" apart from the associations. In more than three (3) years since the Court's August 2005 Order, Co-Lead Counsel have failed to proffer any adequate consumer class representatives that they represent as clients. Instead, this case has moved forward since August 2005 without a consumer plaintiff directing Co-Lead Counsel's effort. It has hobbled along exclusively with PAL association members hoping that one day some consumer might appear to legitimize the PAL-driven lawsuit and allow the case to settle, yielding *cy pres*. Indeed, the day after the Court's August 2005 Order was issued, Co-Lead Counsel issued a desperate plea for "help" in this

---

[56] *See generally*, Track I Defendants' Memorandum in Opposition to Class Certification [Docket No. 1132] at 40-41 ("None of the named plaintiffs can represent Medicare Part B payors. ... While the Medicare Part B Class includes potentially millions of individual Medicare Part B beneficiaries who made co-payments under the program, not one of the named plaintiffs is such an individual. ... [T]he Association plaintiffs only assert claims for injunctive or declaratory relief and, therefore, cannot adequately represent class members asserting damages claims."). *See* also, Defendant Bayer Corp's Individual Memorandum in Opposition to Class Certification [Docket No. 2687]. Track Two Defendants' Memorandum in Opposition to Class Certification [Docket No. 2829] at 32 ("Plaintiffs lack standing, their claims are a typical, and they can not adequately represent the proposed classes. ... Plaintiffs have failed to demonstrate, as required in the Court's August 2005 Order, that the proposed Class 1 representatives made co-insurance payments based on the AWP of the subject drug. After more than four years of litigation and voluminous discovery, ... [n]o Class One plaintiff purchased any Bayer drug.").

regard,[57] and began searching for a new lifeline for the case, a lifeline they admitted to the Court was not forthcoming from their client associations.[58]

In opposing class certification, defendants argued, and this Court agreed, that the associations were not adequate Track 2 consumer class representatives. Nothing has changed since that time, either with respect to the record of the associations or the law of association standing. The law of this case compels this Court to find that the requirements of Rule 23(a)(3) and 23(a)(4) have not been satisfied, and class certification should be denied.[59]

---

[57]   *See* August 17, 2005 memorandum by Mr. Berman at Exhibit "J" hereto ("We *now need to find plaintiffs* who used Part B or physician administered drugs from any defendant. *We need your help.* ... If you can identify a plaintiff who paid a co-pay for one of these drugs *this would be helpful.*")(emphasis added).

[58]   *See* Feb. 10, 2005 Hrg. Tr. at 21:8-22:4 (Mr. Berman: "The associations couldn't find anyone who wanted a 67-year old who wants to be a Plaintiff in this massive litigation, but the associations voted to support the litigation.")

[59]   As most commonly defined, the "law of the case" doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (internal citations omitted). Under the law of the case doctrine, a court may "depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Id.* No proffer has been made by the proponents of the Track 2 nationwide settlement class that this Court's prior rulings as to the lack of standing, typicality or adequacy of the associations were either "clearly erroneous" or "would work a manifest injustice." Given the proponents' joint desire to have this Court approve a nationwide class settlement over the objections of the only named consumer plaintiffs with demonstrated standing to sue, and who have previously been adjudged by this Court to be both typical and adequate to serve consumer Class 1 interests in Track 1, Named Consumer Plaintiffs respectfully submit such a showing could not be made. Indeed, if anything, a "manifest injustice" has been visited upon the Named Consumer Plaintiffs, who were asked by Co-Lead Counsel to join this lawsuit in October 2005 and to serve as fiduciaries for the consumer class going forward, only to have the lawyers unilaterally decide to strip the plaintiffs of that right and duty at the time of settlement when they perceived the consumers to be no longer useful – a settlement which conveniently pays the lawyers handsome fees of over $37.5 million, while consumers share a woefully inadequate allocated share of the proposed settlement of their meritorious claims.

Such a breach of trust by lawyers is a "manifest injustice."

**b.**   **Co-Lead Counsel's Previously Undisclosed But Existing Representation of PAL and the PAL Consumer Associations Places Them and Their Association Clients In an Irreconcilable Conflict With Consumers.**

Even were this Honorable Court to reverse its prior judgment that the associations do not have standing to act as Track 2 consumer class representatives, it could not certify the associations as either typical (under Rule 23(a)(3)) or adequate (under Rule 23(a)(4)) because the associations are in conflict with consumers by reason of their intimate and inextricable association and partnership with Prescription Access Litigation ("PAL"), the client of certain Co-Lead Counsel and the self-described director of the lawsuit.

The conflict between the associations and the consumer class is fundamental. *See Natchitoches Parish Hosp. Services Dist. v. Tyco Intern., Ltd.* 247 F.R.D. at 265. In this Court's July 2, 2008 Order granting Preliminary Approval of the Track Two Settlements, the Court appointed the following associations as representatives of Track 2 Consumer Class 1: Vermont Public Interest Research Group, Wisconsin Citizen Action, New York State Wide Senior Action Council, Citizen Action of New York, and Health Care for All. Each of these above associations is a member organization/coalition partner of PAL. *See* Exhibit "D" hereto.

PAL's offices are located at 30 Winter Street in Boston, Massachusetts, the same offices occupied by the Court-appointed Track 2 consumer class representative HCFA. PAL is a subsidiary of another advocacy organization, Community Catalyst, also located at 30 Winter Street in Boston, Massachusetts. *See* Exhibit "E".

PAL's core mission is to "make prescription drug prices more affordable for consumers, using class action litigation" as its tool of choice. *See* Exhibit "N" (available at www. prescriptionacesslitigation.org/about?id-0001, last visited on March 13, 2009). PAL claims to be a "national coalition of more than 130 organizations," including all of the dozens of associations

41

who have been listed as plaintiffs in the various complaints over the more than seven (7) years

this case has been pending. *See id.* PAL's stated goal in utilizing class action lawsuits is "to

force pharmaceutical companies to end unfair and illegal practices that [the drug companies] use

to abuse their monopoly power and keep prices high." *See* Exhibit "O" , PAL Current Lawsuits,

FAQ, available at www.prescriptionacesslitigation.org/lawsuitssettlements?id-0005, last visited

on March 13, 2009.   PAL's stated long term goal is to use the lawsuits as a way to "move the

issue of access to prescription drugs to the forefront of the public eye" and to "persuade state and

congressional legislative leaders to address the high price of prescription drugs . . . ."[60]  *Id.*

These lawsuits, PAL asserts, "have great potential to change industry behavior".  *Id.*[61]

PAL further states that it was "created to represent consumer interests" generally and is

"driven by consumer groups, senior citizen organizations and other public health advocates." *Id.*

PAL states that their "class action complaints have been specifically crafted to represent public

interests" and that the "[r]elief and remedies will look different than those sought in other legal

actions against drug companies, because of [PAL's] concern for these public interests – equity

and monetary proceeds for the greater good" as "primary considerations".  PAL further states

that PAL's approach to "class action lawsuits will be fundamentally different from other

lawsuits, and hopefully, the outcome of the cases will be fundamentally different as well – with

an eye towards achieving significant changes in how drug companies conduct themselves in the

---

[60]     Because PAL's goals coincide with the goals of Co-Lead Counsel, the Court must take account of Co-Lead Counsel's efforts to steer *cy pres* dollars to PAL as part of its overall consideration of appropriate fees to be paid Co-Lead Counsel out of the Track 2 settlement fund, if  approved.      *See*  Exhibit  "B"  and  Exhibit  "P",  available  at http://www.prescriptionaccess.org/about?id=0007.

[61]     It is ironic that one of PAL's purposes is to "change industry behavior", and yet its member associations abandoned completely their injunctive claims, the only claims for which this Court found them to have standing.

future." *Id.* PAL states that a plaintiff's motivation for becoming involved in a class action lawsuit with PAL will primarily come from the "desire to be involved in a worthy cause, namely making prescription drugs more accessible". *Id.*

PAL member organizations/coalition partners, attorneys and law firms are all dedicated to promoting PAL goals. All four Co-Lead Counsel firms approved by this Court under Rule 23(g) represent PAL, Hagens Berman Sobol Shapiro, LLP; Spector Roseman Kodroff & Willis, P.C.; Wexler Wallace, LLP and Edelson & Associates, LLC.

PAL member organizations/coalition partners, attorneys and law firms are dedicated to promoting PAL core efforts, which include, *inter alia*, fiduciary duties to obtain compensation for the advocacy organizations as well as guaranteed *cy pres* distributions in class actions. In an April 4, 2006 memorandum attempting to recruit the International Union of Operating Engineers as a PAL member organization, Renee Markus Hodan, then the Associate Director of PAL (until 2007 before joining Community Catalyst, the parent organization of PAL) stated that "PAL is represented in its cases by three law firms ... [one of which is] Hagens Berman Sobol Shapiro (key contacts: Steve Berman & Tom Sobol)(www.hbsslaw.com) . . .". She explained that "PAL hand picked these firms because [PAL] believe[s] they share [PAL's] mission [and] understand what PAL is seeking in its cases . . ." *See* Exhibit "B". The memo goes on to state that "[a]s an advisor, counselor and consultant to PAL member plaintiffs in matters of litigation strategy, proposed settlements, and other case-related matters, PAL works directly with the relevant law firms in each case." *Id.* Ms. Hodan's memo further states:

> "When formulating the concept of the Project [PAL], Community Catalyst consulted extensively with **Tom Sobol**, a highly respected and successful Boston class action litigator who at the time was becoming a major participant in the work of Health Law Advocates, the public interest law firm of **Health Care For All**, Massachusetts' statewide health advocacy organization. Tom understood well the role of **Community Catalyst** and local and state grass roots organizations in the movement for health care

justice. He was also enthusiastic about having class actions that attack high drug process closely aligned with our grass roots network. Finally, **he recognized that such an alignment would provide added legitimacy to his cases, and that would help persuade trial courts to appoint representatives from these cases to the executive committees responsible for prosecuting claims on behalf of all class members across the country.**

However, he **also understood that with such legitimacy would come responsibility**, on the part of both the lawyers representing the grass roots network and the representative grass roots organizations themselves. **That responsibility is to guarantee that the litigation reflects and promotes the goals and interests of the constituencies served by these grass roots organizations."**

*See* Exhibit "B". (emphasis added).

In addition to the above, the memorandum specifically states that PAL's core principles included obtaining *cy pres* distributions of settlement funds in class action cases involving PAL:

"When structuring compensation for work performed in litigation and for allocation of funds generated from litigation, we recognize that the details of this, too, must be undertaken on a case by case basis. However, **we believe that all lawyers either from the private bar or from the non-profit interest bar and health care advocacy organizations should be compensated for work and/or value contributed to each case. We also express the view that, as to allocation of class/and/or subclass funds, it is frequently in the best interests of the class to establish, in part, a separate cy pres fund to be used for consumer benefits through increased advocacy for affordable health care."**

*See* Exhibit "B". (emphasis added).

Given the lack of standing of the associations in this case, and their express disavowal of damage claims in the RFAMCC, *see* RFAMCC ¶¶63-67, consumers – if properly represented in this case – would say the PAL associations should get nothing and should not have been involved in any way in the negotiation of the settlement of the litigation or the allocation of consumer settlement proceeds. But, the Director of PAL was appointed by Co-Lead Counsel to serve in the critical role of consumer allocation counsel.[62] Unfortunately the proposed settlement

---

[62]     Alex Sugerman-Brozan has been the director of PAL of approximately the last five years, although he appears to have recently become affiliated with the Boston firm Pyle, Rome,

provides for an "at best" disappointing consumer allocation of settlement proceeds. *Compare* Track 2 Settlement Agreement at Docket No. 5133 (evidencing a split between consumer and TPP settlement funds of 17.5% and 82.5%, respectively) *with* GlaxoSmithKline Settlement Agreement at Docket No. 2972 (involving a consumer/TPP split of 30%/70%, respectively).

Respectfully, PAL's Director, Mr. Sugerman-Brozan, had no business negotiating the allocation of the Track 2 consumer settlement fund. As the current Director of PAL and overseer of all of the PAL member organizations/coalition partners, including all of the association plaintiffs appointed by this Court as the Track 2 consumer settlement class representatives, Mr. Sugerman-Brozan had a serious and debilitating conflict of interest.[63] His organization's "mission" is to recover "a separate *cy pres* fund." Such a fund can only be created if consumers are not paid the entirety of their share of settlement proceeds.

Similarly, Hagen Berman Sobol Shapiro, LLC, had no business representing consumer interests in the Track 2 settlement, given its existing representation of and fiduciary duties owed to PAL and its members and affiliates. PAL's goal with the AWP litigation was to obtain compensation for itself. The only way to do that would be to construct a settlement that would ensure that *cy pres* funds would be available for PAL. But, since this Court prevented earlier efforts by PAL to have its members serve as the lone consumer class representatives by ruling that the associations had no standing to recover damages, the only way for PAL to receive

---

Lichten, Ehrenberg & Liss – Riordan, P.C. However, because Mr. Sugerman-Brozan's relationship with PAL is currently unknown, he will be referred to as the director of PAL. *See* Exhibit "Q", available at http://www.prlc.com/attorneys/alex.htm.

[63]   Like Mr. Sobol, Mr. Sugerman-Brozan worked with Health Law Advocates, the legal arm and a subsidiary of HCFA, one of the Court-appointed Track 2 consumer settlement class representatives. It appears, however, that some time this year he left PAL to assume an associate attorney position with the law firm, *see* Exhibit "Q".

45

monies was to piggyback on consumers to achieve a settlement, and then seek to carve out a portion of the consumers' settlement for a guaranteed *cy pres* fund.[64]

Attorneys owe fiduciary duties to their clients, even in the context of a class action. *Huber v. Taylor*, 469 F.3d 67, 82 (3d Cir. 2006)("The duty may not be dispensed with or modified simply for the convenience and economies of class actions."). In reaching a compromise in settlement of a class action, the attorney representing the plaintiff class is placed in a particularly difficult position because he or she bears responsibility both toward the class as a whole and toward individual class members. *Ficalora v. Lockheed California, Co*, 751 F.2d 995, 996 (9th Cir. 1985)(citing *Mandujano v. Basic Vegetable Prods. Inc.* 541 F.2d 832, 834-35 (9th Cir. 1976)). When there exists such a substantial and prejudicial conflict between class counsel and the class, as here, class certification is improper and any resultant settlement is rendered suspect. *See, e.g., City Partnership Company v. Atlantic Acquisition Limited partnership*, 100 F.3d 1041, 1044 (1st Cir. 1996)*(quoting In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995)("if, however, the settlement negotiations are biased,

---

[64]     Joyce Howe, the Court-appointed class representative for the AstraZeneca Sub-Class I and the lone objector to the AstraZeneca settlement, can now finally understand why she seemed to be beating her head against the wall during settlement negotiations with Co-Lead Counsel in trying to not have there be a "guaranteed *cy pres* fund" in the AstraZeneca settlement. With two of the four other Co-Lead Counsel secretly negotiating for PAL, their rigid resistance to paying out all of the settlement proceeds to the consumer class members makes absolute sense. These lawyers were fulfilling their fiduciary obligations to PAL to ensure that a reserve fund would be available for distribution to the associations. Unfortunately, since this Court only partially responded to Mrs. Howe's objections about the guaranteed *cy pres* fund for PAL, by ordering that some, but not all, of the guaranteed reserve be paid out to consumers, absent some reconsideration by this Court (which may have the effect of mooting Mrs. Howe's appeal on that issue), the matter likely will have to await resolution in the Court of Appeals for the First Circuit.

or skewed by a conflict of interest, we cannot presume that the attorneys have reached a fair settlement.").[65]

Co-Lead Counsel never disclosed the above facts to any consumer client or this Court.[66] They never advised the Named Consumer Plaintiffs, prior to assuming representation of them, of their existing representation of PAL and the PAL associations, or of the conflicting goals of such representation in seeking guaranteed *cy pres* funds in this case. As a result, no consumer plaintiffs were reasonably informed and none of them could have provided any meaningful waiver of such conflict. *See Huber v. Taylor*, 469 F.3d 67, 82 (3d Cir. 2006) ("Disclosures to clients must be meaningful, by which we mean something beyond form disclosures, as clients must understand a conflict to give their informed consent to an intelligible waiver.")

Upon objection by a class plaintiff to representation by class counsel, class counsel must motion the court to withdraw as representative of that class objector. *See Saylor v. Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972)(If the named plaintiff objects to settlement, class counsel must so

---

[65]     Consumer further that class counsel, like all attorneys must comply with the ethical standards respecting the named plaintiffs. See e.g. Mass.R.Prof.C. 1.2 ("a lawyer shall seek the lawful objectives of his or her clients through reasonably unavailable means permitted by law … [and] shall abide by a client's decision whether to accept an offer of settlement of a matter:); 1.4 ("a lawyers shall keep a client reasonably informed about the status of a matter … [and] shall explain a matter to the extent reasonably recurring to permit the client to vale informed decisions regarding the representation"); 1.5 ("a lawyer shall not … collect on illegal or excessive fee …", and shall not divide a fee with "lawyers who are not in the same firm:, unless, "after informing the client that a division of fess will be made, the client consents to the joint participation and the total fee is reasonable."

[66]     The undersigned cannot say that Ms. Tonaccio was *not* so advised, but her Affidavit filed with this Court is silent on the matter. An appropriate inquiry of Ms. Tonaccio, however, would reveal whether she was informed of Co-Lead Counsel's conflict and knowingly and intelligently agreed to waive the conflict in agreeing to be represented by Co-Lead Counsel. However, in the absence of a record of such disclosure, and in light of this Court's clear admonition to counsel to "spend time" with Mr. Tonaccio to ensure that she "understand(s) the issues in the case", it must be presumed that no timely disclosure was made and no waiver was obtained. March 14, 2008 Hearing Transcript at 7:13-20 [Docket No. 5147](requiring an affidavit demonstrating the same).

inform the court so that the named plaintiff can pursue his or her objections with a new lawyer.);

*Flynn v. FMC*, 528 F.2d 1169, 1174 (4th Cir. 1975)(objecting plaintiffs "should be given the

opportunity to retain new counsel to represent them in objecting to the settlement and to be heard

in opposition"), *cert. denied,* 424 U.S. 967 (1976); *Olden v. La Farge Corp.*, 472 F.Supp 2d.

922, 938 (E.D. Mich. 2007)(If the named class representatives object to a settlement

recommended by class counsel, then class counsel cannot continue to represent that party); *Heit*

*v. Van Ochten,* 126 F.Supp. 487, 494 (W.D. Mich. 2001)("[Plaintiff] should have the right to

pursue his objections with a new lawyer if he chooses.  As such, the Court grants plaintiff

counsel's Motion to Withdraw as [plaintiff] counsel.").

 In addition to the above, class counsel may be disqualified where the actual prejudice to

the objectors of being opposed by their former class counsel outweighs the interest in the class in

continued representation by experienced counsel.   In *Lazy Oil*, class objectors attempted to

disqualify class counsel on the basis of a conflict of interest between class counsel, the class and

the class objectors. *See Lazy Oil Co. v. Witco Corporation*, 166 F.3d 581 (3d Cir. 1999).  The

Court of Appeals for the Third Circuit held that "once some class representatives object to a

settlement negotiated on their behalf, class counsel may continue to represent the remaining class

representatives and the class, as long as the interest of the class in continued representation by

experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed

by their former counsel."  *Id.* at 590.

 Here, a number of Named Consumer Plaintiffs have voiced their objections, both as to

Co-Lead Counsels' representation of their interests and the settlements that have been negotiated

allegedly on their behalf and on behalf of the consumer class by Co-Lead Counsel, but without

their authorization or consent. *See generally*, Declarations of Named Consumer Plaintiffs at

Docket Nos. 4647 through 4650 and Nos. 4652 through 4653.

For instance, in the context of the AstraZeneca settlement, Mrs. Howe took issue with

some of the settlement terms during the negotiations that now may viewed in a very different

light. She did not agree to the built-in set aside of up to $10 million for *cy pres* and so advised

Co-Lead Counsel through her personal counsel. Certain email evidence shown to this Court in

the AstraZeneca settlement approval record revealed that Co-Lead Counsel intended the

guaranteed *cy pres* fund to be earmarked for PAL. Nevertheless, Co-Lead Counsel ignored Mrs.

Howe's objections, they proceeded to settle the case without her consent, they signed documents

in her name without showing them to her beforehand, and then they essentially called her a liar

for allegedly changing her mind about the decision to settle.

In the BMS settlement context – or, more appropriately, the negotiation of the

memorandum of understanding since no settlement papers have been presented to this Court in

over twenty months, despite representations to the contrary[67] – Reverend Aaronson, the lone

certified class representative for Class 1 BMS Sub-Class consumers, refused to provide his prior

authorization to Co-Lead Counsel to enter into settlement negotiations with BMS until some of

the concerns raised in the AstraZeneca settlement negotiation were resolved. Again, Co-Lead

Counsel ignored their client's objections, and proceeded to enter into a settlement without any

client. It is not surprising that the BMS settlement has not been presented to this Court for

preliminary approval, since Co-Lead Counsel may very well be continuing their search for some

---

[67]     *See* July 3, 2007 Hearing Transcript at Docket No. 4432 (wherein Co-Lead Counsel indicated to the Court that preliminary settlement approval papers would be filed by August 2007).

consumer plaintiff to bless their already completed deal – just as here with the Track 2 settlement.

Under the above line of cases, Co-Lead Counsel were required, at a minimum, to notify this Court of the fact of those objections and to thereafter seek leave to withdraw as counsel, in order to allow these plaintiffs a meaningful opportunity to obtain independent counsel to proceed with their claims independently and/or press their objections to any effort by Co-Lead Counsel to bind them individually or as the representative of the consumer class. This has not happened. Instead, Co-Lead Counsel has continued to maintain their artifice of representation of the Named Consumer Plaintiffs, despite their obvious antagonism and conflict. They have done so simply to bridge the gap between this Court's August 2005 ultimatum -- to produce the consumer clients allegedly "waiting in the wings" or suffer denial of class certification and certain dismissal of the consumer claims in this case – and some as-yet-unknown point in the future when Co-Lead Counsel hope to find consumer plaintiffs. As defendants wrote in 2003 on this same subject, *i.e.*, the endless pursuit by Co-Lead Counsel of a plaintiff with standing to sue, "[a]fter four attempts, Plaintiffs no longer deserve the benefit of the doubt." Memorandum in Support of Motion for Leave to File Response to the Notice at 9. Docket No. 660.

The consumer interests to be protected here are the interests of sick people, like the Named Consumer Plaintiffs, in receiving recovery for their actual out-of-pocket payments that were inflated due to defendants' manipulation of the AWPs for their drugs. Neither HCFA nor PAL ever paid for drugs, and neither did their members. PAL's mission to obtain compensation through *cy pres* monies is completely at odds with the consumers' "mission" to get themselves paid fully and fairly for their actual out-of-pocket losses. At a minimum, *Amchem* required that these diverse plaintiffs have separate representation in this lawsuit and that their claims be settled

separately, so they could be separately valued by the defendants and negotiated by the respective plaintiffs through unconflicted counsel.  That did not happen here.

It is remarkable, but telling, that defendants would seek to proffer HCFA as an adequate and typical representative, after defendants directly rebuked this association in June of 2006 in the context of the litigation class certification.  It is even more telling that Track 2 defendant TAP, and its counsel at Jones Day, would embrace PAL and the PAL member organizations in the settlement of this case, when they fought against the application of PAL's parent, Community Catalyst, to receive a "separate *cy pres* fund" out of the residual consumer settlement funds in the *Lupron* case, wherein TAP is a defendant and paid part of the $150 million settlement and Jones Day is defense counsel.  *See* MDL 1430 Docket No. 520[68]

There have been no adequate consumer Class 1 representatives in the Track 2 case since the inception of this lawsuit, aside from the Named Consumer Plaintiffs.  Throughout its pendency from December 2001 up to the time of settlement in March 2008, no adequate consumer Class representative has been proffered by Co-Lead Counsel for Track 2.  Therefore, there can be no settlement class.  A class action case, like any case, needs a plaintiff with Article III standing.  Indeed, the Court in *Culver v. City of Milwaukee* noted, lack of a plaintiff" is a compelling reason for decertification unless the requirement that a class action, like any other suit, have a plaintiff is to be dropped and the class lawyer recognized as the true plaintiff, a step

---

[68]     In *Lupron*, the same Co-Lead Counsel here proposed giving nearly half of the residual consumer settlement fund to Community Catalyst.  *See* MDL 1430 Docket No. 519.  The undersigned objected on behalf of its *Lupron* clients, including Named Consumer Plaintiffs here, and proposed that the all of the money be paid to the consumer plaintiffs, not Community Catalyst or PAL.  *See* MDL 1430 Docket No. 533.  Though Judge Stearns has not issued his Order, and the transcript of the hearing is not yet available, the Court appeared to agree with the consumers' position that no residual funds should be paid to Community Catalyst/PAL.  (The record in this Court will be supplemented as soon as either an Order or hearing transcript becomes available in MDL 1430.)

that, however "logical" the courts and Congress have balked at taking." 277 F.3d 908, 913 (7th

Cir. 2002)(Posner, J.).

Co-Lead Counsel have essentially substituted themselves throughout the pendency of this

action as the consumer class representatives.  But named plaintiffs are required to be more than

window dressing or puppets for class counsel. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718,

727 (11th Cir. 1987).  Indeed, where the named plaintiffs have abandoned their role in the case

beyond that of furnishing their names as plaintiffs, the attorneys, in fact, become the

representatives of the class representatives. *See Helfard v. Cenco*, 80 F.R.D. 1, 7-8 (N.D. Ill

1977).  Courts have overwhelmingly ruled that an attorney may not serve both as class counsel

and class representative. *See Susman v. Lincoln American Corp.*, 561 F.2d 86, 90-92 (7th Cir.

1977)(citations omitted)(collecting cases); *In re California Micro Devices Securities,* 168 F.R.D.

257, 260 (N.D. Calif. 1996).  The danger of class counsel self-dealing is not limited to the

situation in which the attorney serves as both class representative and class counsel; rather, it is

present in every situation where class counsel is allowed to prosecute an action and to negotiate

settlement terms without meaningful oversight by the class representative. *In re California*

*Micro Devices Securities,* 168 F.R.D. at 262.  An informed and independent class representative

is necessary to monitor class counsel at every stage of the litigation. *Id.* at 269-70.

The associations could not serve as such representatives.   Ms. Tonaccio did not appear

until after the settlement was consummated and presented to the Court for preliminary approval.

So, she could not have provided the requisite meaningful oversight of Co-Lead Counsel's

negotiations.  Thus, at all times, Co-Lead Counsel were acting as the class representative, and by

all accounts, there was no meaningful oversight by any class representative whatsoever.

a.   **Murial Tonacchio, As Representative Of the Estate Of Wilma Mort, Has Failed to Demonstrate Her Standing to Sue and Is Not Typical or Adequate to Serve as a Track 2 Class 1 Consumer Settlement Class Representative.**

Ms. Murial Tonacchio lacks standing, and is not typical or adequate to be a Track 2 Class 1 consumer class representative. In this Court's August 16, 2005 Memorandum and Order, it stated that "'[s]tanding . . . frequently appear[s] as [a] threshold requirement[ ] for the maintenance of federal class actions and must be considered in addition to the requirements of Rule 23 when deciding whether a particular action may be certified.'" *In re AWP*, 230 F.R.D. at 79. The Court further observed that, "'it is well settled that prior to the certification of a class, and technically speaking before any formal typicality or commonality review, the district court must determine that at least one named class representative have Article III standing to raise each subclass claim.'" *Id.* (quoting *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).

As discussed above, none of the proffered consumer associations have standing to sue for damages, having not paid themselves for any drug based on AWP. These claims were first dismissed by the Court, and then dismissed by the associations themselves in the AMMC filed in June 2003 (and every amended complaint filed thereafter, including the operative RFAMCC filed February 17, 2009 [at Docket No. 5902]). Therefore, of the consumer representatives listed in this Court's July 2, 2008 Preliminary Approval Order [at Docket No. 5426], only Ms. Tonachio can potentially serve as a Track 2 Class 1 consumer settlement class representative – but only for the subclass claim against defendant Aventis, since she only alleges that her deceased mother paid for one Aventis drug based on AWP. Accordingly, she is potentially "at least one named class representative [to] have Article III standing to raise [a] subclass claim" that this Court acknowledged must exist in this case. *In re AWP*, 230 F.R.D. at 79. But, as the below analysis of her claim demonstrates, and in the absence of any discovery of Ms. Tonacchio

(as defendants have chosen to look the other way in favor of pressing the final approval of their settlement), this Court cannot find that Ms. Tonacchio has Article III standing pursuant to its requisite "rigorous analysis" and "heightened" scrutiny that applies at the settlement stage. The Court also cannot find that the requisites of Rule 23(a)(3) and (a)(4) have been satisfied by Ms. Tonacchio.

On standing, the Court explicitly directed Co-Lead Counsel in 2005 "[t]o address this issue, when plaintiffs amend the complaint to propose individual class representatives, they shall allege facts demonstrating typicality and adequacy of the class representatives and disclose the documents demonstrating that the proposed class representatives made co-insurance payments (at least in part) under Medicare Part B based on AWP". *Id.* at 81.

Ms. Tonacchio was not proffered as a Track 2 consumer class representative when Co-Lead Counsel filed the third AMCC in October 2005. *See* Docket No. 1781. She was not proffered as part of the fourth AMCC filed in March 2006. She was not proffered as part of the proposed fifth AMCC filed in 2008. She was not identified prior to the execution of the Track 2 Settlement Agreement on March 7, 2008. *See* Docket No. 5133. She was not included in the original Preliminary Approval Order filed with the Court on that same day. *See* Docket No. 5133-4 at 5. She was not proffered by the time of the preliminary approval hearing held on March 14, 2008. *See* generally, March 14, 2008 Hearing Transcript [Docket No. 5147]. She was not proffered at the continuation of such hearing on April 9, 2008. *See* generally, April 9, 2008 Hearing Transcript [Docket No. 5259].[69] She was not proffered by the following Monday, April 14, 1008, as promised by Co-Lead Counsel. *See* April 9, 2008 Hearing Transcript at 5:9-10 ("by

---

[69]     Vague reference was made to "the daughter of a woman who is now deceased," without more but even as to this unidentified individual counsel admitted "[w]e didn't have time to get these papers to your Honor before today's hearing." April 9, 2008 Hearing Transcript 5:4-5, 8-9.

Monday we'll be submitting a motion to add that individual as a class representative"). Indeed, she was not proffered until nearly eleven (11) weeks later when Co-Lead Counsel filed their Motion to Add Individual Plaintiff As Class One Representative for Track Two Settlement ("Motion to Add Individual Plaintiff"). *See* Docket No. 5409. She was finally listed as a plaintiff in the RFAMCC filed on February 17, 2009. *See* Docket No. 5902.

> The factual allegations as to Ms. Tonacchio in the RFAMCC consist of the following:
>
> "Plaintiff Muriel Tonacchio is the representative of the Estate of Wilma Mort. Ms. Mort was a resident of Weirton, West Virginia. Ms. Mort took prescription drug medications for the treatment of cancer and was a Medicare recipient at the time of her cancer treatments. During the applicable time period, Ms. Mort was prescribed and was charged for the physician administered drug Anzamet (sic)[70] based in whole or in part on AWP. Ms. Mort made one or more payments for this drug. Ms. Tonacchio, as the representative of the Estate of Wilma Mort, is a proposed class representative, for among other Track Two Defendants, Aventis."

RFAMCC at ¶ 24A. While Ms. Tonacchio's claim is added as a sub-part of the preceding averment in paragraph 24 (last averment as to the Named Consumer Plaintiffs[71]), it fails to demonstrate that Ms. Tonacchio's mother made any AWP-based payment for Aventis' Anzemet.

Co-Lead Counsel's Motion to Add Individual Plaintiff appended thereto an Affidavit, signed by Ms. Tonacchio, which attached a purported billing statement for $42.44 allegedly showing the charges for Aventis' Anzemet. *See* Docket No. 5409. In Ms. Tonacchio's Affidavit, she broadly asserts that her mother was on Medicare, that some (but presumably not all) of the drugs her mother received were covered by Medicare Part B, that her mother had supplemental insurance through something called "National Steel Workers' insurance" and that

---

[70]     "Anzamet" is spelled "Anzemet". (misspelling in original).

[71]     Named Consumer Plaintiffs were not consulted prior to the filing of the RFAMCC, and did not authorize the filing on their behalf by Co-Lead Counsel. *See* Fed.R.Civ.Proc. 11(b)("By presenting to the court a pleading … an attorney … certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances … the factual contentions have evidentiary support …").

this supplemental insurance carrier "refused to cover some portions of [her] mother's drugs".

Ms. Tonacchio further asserts that she spoke on the telephone to an unidentified "representative

of Weirton Medical Center" who orally "informed [her] over the phone that the amount [her]

mother was required to pay in this instance was due to [National Steel Worker's] unwillingness

to pay for all of the Anzemet she was administered." Ms. Tonacchio asserts, inferentially, that

she is the legal representative of her deceased mother's estate, and that, in such capacity, she

"support(s) [her] mother's estate serving as a class representative." Nowhere does she state

whether she (or her mother's estate) supports the Track 2 Settlement.

   Ms. Tonacchio's Affidavit and supporting documentation is devoid of the evidentiary

substance required to demonstrate standing to sue, or typicality or adequacy to serve as a class

representative. *In re AWP*, 230 F.R.D. at 80. The only documents submitted of record arguably

to demonstrate standing, typicality and adequacy is an incomplete, two-page statement attached

as Exhibit "A" to the Motion to Add Individual Plaintiff. *See* Docket No. 5409-2.[72] This lone

documentary evidence does not satisfy Ms. Tonacchio's burden to show standing, typicality or

adequacy, as the attached statement does not establish any AWP-based payment for Anzemet (or

any other Track 2 drug).

   First, the statement appears to show that Ms. Tonacchio's mother, Ms. Mort, may have

been treated at a hospital, the Weirton Medical Center,[73] on an in-patient basis, given that the

statement lists a "discharge date". As the Court knows, Medicare only covers hospital in-patient

---

[72]   The document has not been authenticated by any source, is not self-authenticating (as it lacks any title or indication as to its source) and is incomplete (consisting of pages 3 and 5 of a 7-page document ostensibly generated on April 8, 2008).

[73]   *See* Exhibit "O" hereto (describing "Weirton Medical Center [as] a 238-bed, non-profit, acute-care, general community hospital").

services and drugs under its Part A program, not Part B.  Part B covers out-patient drug therapy

in clinics and physician's offices.  The lack of attribution of the "Medicare Electronic Payment"

on page 5 of 7 of the statement, and the lack of a proffer of a Medicare Part B Explanation of

Benefits Form ("EOB") by either Ms. Tonacchio or Co-Lead Counsel, raises questions about Ms.

Tonacchio's claim that the Anzemet was administered on an "out-patient" basis under Medicare

Part B when such evidence exists and is readily available to Medicare Part B beneficiaries.

*Compare* Declaration of Donald E. Haviland, Jr. in Support of Plaintiff's Proposed Consolidated

Class Certification Order with Respect to Track II Defendants [Docket No.2615] ("Haviland

Track II Declaration") at Exhibits "A" (Howe), "E" (Young), "F" (Walters), "I" (Carter), "K"

(Clark), and "L" (Aaronson)[74].  Further, as a presumed member of the Track 2 Class I settlement

class, such documentation should be readily available for Ms. Mort's Anzemet administration on

May 30, 2003.  At a minimum, since Ms. Tonacchio is presumably recovering under the

proposed consumer class settlement, the CMS data pertaining to her mother's Part B drug

administrations should be available to Co-Lead Counsel.[75]

---

[74]     *See, e.g.,* AARON0088 (attached to Haviland Track II Declaration at Exhibit "L")(Medicare EOB demonstrating administrations of the drugs cisplatin and paclitaxel and coverage under "Part B Medical Insurance – *Outpatient Facility Claims*")(emphasis added).

[75]     The prior submissions by Co-Lead Counsel [*see* Docket No. 2522] incorporating Docket No. 2615] on behalf of Named Consumer Plaintiffs included detailed Medicare Part B claims histories, EOBs and other documents showing detailed administrations and Part B payments for Track II drugs). Ms. Tonacchio's documentation is appreciably less.  For instance, it shows no service charge for the injection the Anzemet administration, raising a question as to whether it was indeed a physician-administered injection (and therefore possibly covered under Part B) or a self-administered tablet (and possibly not covered).  *Compare* AARON0088 (attached to Haviland Track II Declaration at Exhibit "L")(listing $40 charges for various subcutaneous, intramuscular injections of defendant drugs).  *See also,* http://products.sanofi-aventis.us/anzemet_tablets/anzemet.html ("prescribing information" for Anzemet 100mg tablets).

Second, the statement shows one administration of "Anzemet 100mg/5ml" billed at $117.25.[76] There is no J-Code listed, which raises another concern that this treatment was not an AWP-based billing to Medicare Part B given that doctors use J-Codes on their HCFA 1500 forms to bill Medicare Part B. *Compare* AARON0088 (attached to Haviland Track II Declaration at Exhibit "L")(listing J Codes for the drugs cisplatin and paclitaxel in the Medicare Part B EOB).

Third, the AWP used by Medicare at the time alleged by Ms. Tonacchio was $17.32 for 10 mg of Anzemet, $173.20 for 100 mg. *See* Excerpts of HCPCS Pricing File attached hereto as Exhibit "R". The statement lists a billed charge of $117.25, clearly not an AWP-based charge. Indeed, it is apparent that Ms. Mort was billed substantially less than AWP, if she was billed at all for the drug.

Fourth, even assuming *arguendo* that the $117.25 was an AWP-based charge, which it is not, Medicare Part B only covered 95% of the Anzemet AWP at the time as the "allowable". Thus, the allowable charge would have been $111.39, and not the listed $117.25 (*i.e.,* 117.25 x .95). No evidence is submitted to show disallowance by Medicare of the difference of $5.86.

Fifth, at the time Ms. Mort received the administration of Anzemet, Medicare Part B only paid 80% of the allowable charge, leaving the patient and her Medigap insurer with a 20% co-insurance obligation. Thus, Medicare's allowable share of the Anzemet billed charge would have been $89.11 (117.25 x .95 x .80), leaving Ms. Mort and her Medigap insurer with a co-insurance obligation of 20%, or $22.27 (117.25 x .95 x .20). The statement does not reveal either a Medicare payment of $89.11 or a balance due of $22.27.

---

[76]   The evidence of this one administration of Anzemet undermines Ms. Tonacchio's averment that "Ms. Mort made *one or more payments* for this drug." RFAMCC at 24A.

Sixth, Ms. Tonacchio's claim in her Affidavit that the statement "reflect(s) my mother's *payment* of $42.44 in May 2003" is belied by the statement itself. The statement is neither a bill nor a receipt for a payment. Presumably, it was never sent to Ms. Mort in conjunction with her Anzemet treatment in 2003, since someone apparently got Weirton Medical Center to generate the statement on April 8, 2008 (the date listed on the document). The statement bears no indication that Ms. Mort was billed for anything or actually made a payment for anything.[77]  No cancelled checks, banks statements, receipts, EOBs, claims histories or other documentation typically used to demonstrate payment for a drug in this case, and required by this Court, have been supplied by Co-Lead Counsel.

Further, the statement does not demonstrate that a balance was due and owing by any party after Medicare and a commercial payor made their respective payments. The subject $42.44 amount is listed on the statement as a "Loss/Gain-Electronic Medicare" indicating that was an amount likely disallowed by Medicare. Indeed, the true balance shown to be due after Medicare's electronic payment was $90.00, which amount appears to have been paid in full by a commercial payor. Since Ms. Tonacchio claims that Ms. Mort's supplemental Medigap insurance paid for some, but not all, of Ms. Mort's drugs, that would mean that the listed commercial payor was "National Steel Worker's insurance". However, because the payment made was the full $90 residual amount due after Medicare's electronic payment, there is no evidence to support Ms. Tonacchio's claim that the insurer only made a partial payment for her mother's drugs and her mother paid the unpaid balance. No insurance EOB or other insurance

---

[77]     Further, Ms. Tonacchio states that she personally spoke on the telephone to a "representative of Weirton Medical Center" who orally stated that a $42.44 payment allegedly made by her mother to the Weirton Medical Center resulted from a refusal of her supplemental insurance carrier. However, Ms. Tonacchio does not identify the individual with whom she spoke. Notwithstanding the obvious hearsay surrounding the statement, it is far from adequate proof that Mrs. Mort was obligated to pay and subsequently paid an AWP-based payment.

documentation is provided from "National Steel Worker's insurance" to demonstrate the breakdown of amounts paid and amounts denied.[78]

At best, the statement might support a claim that a balance of $42.44 was due and owing on September 26, 2003. However, Ms. Mort had passed away, meaning she did *not* make such a payment, as Ms. Tonacchio erroneously claims.

Seventh, assuming that a balance of $42.44 remains due and owing to Weirton Medical Center – nearly six (6) years after Ms. Mort's treatment and death in September 2003 -- Ms. Mort's estate does not meet the settlement class definition for standing as it has not shown that it is a person who "made, or incurred an obligation to make" a payment based on AWP. No showing is made that a medical bill has survived Ms. Mort's death as a valid "obligation" of the Mort estate. (Typically, such an obligation would not survive.) If it did survive, no explanation is given by the legal representative of the estate – presumably Ms. Tonacchio[79] – as to why the estate failed to pay the bill when the estate was probated. Still further, no explanation is given as to why the administrator of the estate has not pursued "National Steel Worker's insurance" for its failure to meet its plan obligations in the intervening five (5) years, ten (10) months since the

---

[78]      Since Ms, Tonacchio is represented by the Wexler firm, and that firm represents several union funds as plaintiffs in this case that have provided other consumer plaintiffs, a question arises as to why no "National Steel Worker's insurance" documents have been proffered to explain the partial denial of drug coverage. The Wexler firm has provided such documentation before in this litigation.

[79]      Ms. Tonacchio fails to demonstrate that she is in fact the legal representative, and thus has legal standing, to represent the "Estate of Wilma Mort" under West Virginia law. As one of five children of Mrs. Mort, it is especially important that some measure of legal standing be proffered by Ms. Tonacchio, *i.e.*, Letters of Administration/Testamentary, to provide a sufficient legal basis to allow her to represent the estate in this matter. Without proper proof, Ms. Tonacchio has no legal standing to act on behalf of or represent the Estate as a class representative, no matter what the circumstances of her mother's claim.

Anzemet treatment.[80]  Indeed, since Ms. Mort was covered by a Medigap carrier, she did not "incur an obligation", the carrier did.  At a minimum, the matter of who owns the obligation would need to be sorted out before any claims administration process could go forward in order to prevent overlapping, duplicative claims from being made by both Ms. Tonacchio and "National Steel Workers insurance" against the settlement fund for the same Anzemet injection and charge.

Finally, even were this Court to find Ms Tonacchio adequate to represent the Track 2 Class 1 consumer settlement class, she could only be certified as the representative for the Aventis Sub-Class, since Anzemet is the only drug for which Ms. Tonacchio claims her mother an AWP-based payment.  *In re AWP*, 230 F.R.D. at 80 ("Plaintiffs must establish that there is an individual class representative with standing to sue each defendant.")

It is curious that Ms. Tonacchio never affirmatively states whether she or the Estate of Ms. Mort in fact approve of the settlement, Ms. Tonacchio's silence echoes that of Co-Lead Counsel, who avoided any discussion in their papers of their exclusion of the Named Consumer Plaintiffs from the settlement class and settlement, and their appointment of PAL, their *other* client, to allocate the settlement funds on behalf of consumers.  Unlike the Named Consumer Plaintiffs who provided substantial proof, including multiple depositions in some cases, of their standing, typicality and adequacy, Ms. Tonacchio has provided a scant Affidavit and a two-page, incomplete record which raise more questions than they answer about her mother's alleged AWP-based payment for Aventis' Anzemet.  It appears that Co-Lead Counsel have chosen, once more, simply to gloss over this Court's admonitions about proving standing, in hopes that they will get a final pass.

---

[80]      A question also arises as to whether the operative statute of limitations has run due to the estate's failure to timely act in this regard.

This Court's requisite "rigorous analysis" of and "heightened attention" to standing, typicality and adequacy at the settlement stage compel a more detailed showing and documentation than has been provided by Ms. Tonacchio to resolve these important issues. On this record, respectfully this Court cannot find that Ms. Tonacchio has standing or that she is typical or adequate to represent the Track 2 Class 1 consumers in the proposed settlement class.

## B.     THE COURT SHOULD NOT APPROVE THE SETTLEMENT BECAUSE IT IS NOT FAIR, REASONABLE OR ADEQUATE

Federal Rule of Civil Procedure 23(e) concerning class action settlements, provides:

> "The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
> (1)     The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> (2)     If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3)     The parties seeking approval must file a statement identifying any agreement made in connection with the proposal."

Fed.R.Civ.P. 23(e).

Approving a class action settlement is a two-step process. In the first step – preliminary approval – the court reviews the proposed settlement for obvious deficiencies, schedules a formal fairness hearing and determines the propriety and scope of the class to which to provide notice of the proposed settlement and hearing. In the second step, the court considers final approval of the proposed settlement at the previously scheduled fairness hearing, where arguments and evidence may be presented in support of and in opposition to the settlement. This two-step approach is widely used by federal and state courts throughout the country. *See generally, Newberg on Class Actions,* Second Ed. at § 11.25.

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court "may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a

hearing and on finding that the settlement, voluntary dismissal, or compromise is fair,

reasonable, and adequate." Fed.R.Civ.P. 23(e)(2).  Although there is overlap between this Rule

23(e) analysis and the decision to certify, courts are required to analyze fairness as a separate and

distinct issue.  *In re Lupron Marketing and Sales Practices Litigation*, 228 F.R.D. 75, 93

(D.Mass. 2005).  Rule 23(e) "was designed to function as an additional requirement, not a

superseding direction, for the 'class action' to which Rule 23(e) refers is one qualified for

certification under Rule 23(a) and (b)." *Amchem Products Inc. v. Windsor,* 521 U.S. 591, 621,

(1997).

     As this Court has noted, "[b]oth the United States Supreme Court and the Courts of

Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon

a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action

suit." *In re Relafen Antitrust Litig.,* 360 F.Supp.2d 166, 192 (D.Mass.2005) (citations omitted).

The court has a fiduciary duty to absent members of the class in light of the potential for

conflicts of interest among class representatives and class counsel and the absent members." *In*

*re Lupron Marketing and Sales Practices Litigation.* 228 F.R.D. 75, 94 (D. Mass 2005)(citing *In*

*re General Motors Corp. Pick-Up Truck Fuel Tank Prods.,* 55 F.3d 768, 805 (3d Cir.1995)

("Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the

court's assuring the settlement represents adequate compensation for the release of the class

claims.")); *See Amchem,* 521 U.S. at 623 (noting that Rule 23(e) prohibits settlement of a class

action without the court's approval and that Rule 23(e) protects unnamed class members from

"unjust or unfair settlements" agreed to by "fainthearted" or "self-interested class

representatives"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279-80 (7th Cir.2002)

(Posner, J.) (noting the concern that a lawyer's self interest may trump the interests of the class

members "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries."); *In re Relafen Antitrust Litig.,* 360 F.Supp.2d at 192 (quoting *Reynolds,* 288 F.3d 277).  In addition to the requirement that a settlement be fair, adequate and reasonable, a settlement must be untainted by collusion. *In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 71 (D.Mass 2005).

In the First Circuit, the determination of whether a settlement is fair, reasonable and accurate requires a wide-ranging review of the overall reasonableness of the settlement that relies on neither a fixed checklist of factors nor any specific litmus test. *See In re Lupron Mktg. & Sales Practices Litig.,* 228 F.R.D. 75, 93 (D.Mass.2005) ("[T]he First Circuit has not established a formal protocol for assessing the fairness of a settlement."); *Compact Disc,* 216 F.R.D. at 206 ("There is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement."); *Bussie v. Allmerica Fin. Corp.,* 50 F.Supp.2d 59, 72 (D.Mass.1999) ("This fairness determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation.").  In making the fairness determination, "a district court is not an umpire as in a typical adversary litigation but rather 'a guardian for class members who have not received notice or who lack intellectual or financial resources to press objections.'"  *Duhaime v. John Hancock life Insurance Company,* 177 F.R.D. 54, 67 (D. Mass. 1997) (*quoting Weinberger v. Kendrick,* 698 F.2d 61, 69 (2d Cir.1982), *cert. denied,* 464 U.S. 818 (1983)).

There is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement. *See In re Compact Disc Minimum Advertised Price Antitrust Litigation*, 216 F.R.D. 197, 206 (D. Me. 2003). Other circuits, however, generally consider the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial. *Id.* (*citing Weinberger v. Kendrick,* 698 F.2d 61, 73-74 (2d Cir.1982)). Specifically, appellate courts consider the following factors:

    (1)    a comparison of the proposed settlement with the likely result of litigation;

    (2)    the reaction of the class to the settlement;

    (3)    the stage of the litigation and the amount of discovery completed;

    (4)    the quality of counsel;

    (5)    the conduct of the negotiations; and

    (6)    the prospects of the case, including risk, complexity, expense and duration.

*Id.* (*citing Molski v. Gleich,* 318 F.3d 937, 953 (9th Cir.2003); *In re General Motors Corp. Pick-Up Truck Fuel Tank Litig.,* 55 F.3d 768, 785 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *Gottlieb v. Wiles,* 11 F.3d 1004, 1014 (10th Cir.1993); *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992); *and City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 465, 468-70 (2d Cir.1974)). The burden of proving the fairness of a settlement is squarely on the proponents.

Co-Lead Counsel give passing consideration to these standards in their final approval papers. *See generally*, Memorandum in Support at Docket No. 5935. Indeed, their Memorandum in Support devotes barely eleven (11) pages to demonstrating satisfaction of these prerequisites for a settlement of $125 million. *Id.* at 25-36. Indeed, their analysis begins from the

faulty assumption that they should be given a presumption that their proposed settlement is fair, reasonable and adequate. *Id.* at 25. *See City Partnership Company v. Atlantic Acquisition Limited partnership,* 100 F.3d 1041, 1044 (1st Cir. 1996)*(quoting In re Pacific Enterprises Securities Litigation,* 47 F.3d 373, 378 (9th Cir. 1995)("if, however, the settlement negotiations are biased, or skewed by a conflict of interest, we cannot presume that the attorneys have reached a fair settlement."). Counsel have not satisfied their burden here.

1.   **A Comparison of the Proposed Track 2 Settlement with the Likely Result of Litigation Shows that the Proposed Settlement Amount Is Inadequate.**

For a settlement to be fair, reasonable and adequate, the value of the consideration given by the plaintiffs should be equivalent to the value of the consideration given by the defendants – in this case, the present value of the releases given by the consumers should fairly match the amount of the total settlement fund created by Track 2 defendants.  The present value of the releases depends upon an assessment of the potential damages and likelihood of success on the merits. *See Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 285 (7th Cir. 2002) ("Determining that value would require estimating the range of possible outcomes and ascribing a probability to each point on the range... though as just noted those outcomes must be discounted to the present using a reasonable... interests rate.")(citing *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 n.44 (7th Cir. 1979).  Here, the present value of the releases grossly exceeds the amount of the consumer allocated share of the Track 2 settlement fund, leading inescapably to the conclusion that the proposed settlement is neither fair, nor reasonable, nor adequate for consumers.

Co-Lead Counsel makes no effort to value the releases – releases providing broader relief than the underlying litigation sought to obtain (in terms of the defendants, claims and drugs included)[81] – in terms of what might have been achieved at trial. They provide no expert report on the damages they expected to achieve at trials against the Track 2 defendants. They also make no effort to relate their proposed settlement for the entire nation of TPPs and consumers to the substantial verdicts and settlements that have been achieved by the litigating State Attorneys General, about which this Court is no doubt aware.

Co-Lead Counsel explain that "[t]he amount that each Track Two Defendant has agreed to contribute to the overall $125 million settlement amount was negotiated separately amongst Track Two Defendants and, as a condition of settlement, remains confidential." Memorandum in Support at 4, n.3. No further explanation is given as to why it is that the separate contributions of the settling defendants cannot be known by class members or this Court. In the absence of any notice as to the same, consumer class members in the various defendant Sub-Classes which this Court ruled must exist to be certified cannot reasonably be expected to evaluate the fairness, reasonableness or adequacy of the proposed settlement as it pertains to them. Further,

---

[81]    Class representatives cannot release claims with a different factual predicate that are held by other class members. *See National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18-19 (2d Cir. 1981). And, even with respect to claims based on an identical factual predicate, releases cannot simply be handed out to potentially liable third parties without consideration to the affected class members. *See, e.g., Reynolds*, 288 F.3d at 284; *Great Neck Capital Appreciation Inv. Partnership, L.P. v. Price WaterhouseCoopers*, 212 F.R.D. 400, 415 (E.D. Wis. 2002). "A class action judgment ... binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action." *Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993) (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 880 (1984)). *See also City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1044 (1st Cir. 1996) (holding that the purpose of the doctrine is to "achieve a comprehensive settlement that would prevent relitigation of settled questions *at the core* of a class action") (citing *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982)) (emphasis added).

respectfully, neither can this Court, in fulfillment of its fiduciary obligations, determine these issues on a defendant-by-defendant, as it has required of plaintiffs' proofs throughout this litigation.

The settlement proposed by Co-Lead Counsel excludes the powerful remedy of enjoining defendants from continuing their illegal practices, while the settlement nonetheless includes within its sweep a compromise of that remedy. This was the only remedy this court found the PAL associations had standing to pursue.[82] Nevertheless, the settlement does nothing to prohibit defendants from continuing their practices, and it seeks to protect them from future claims for such practices, in violation of *Amchem*. The ability to obtain injunctive relief against the defendants, had this litigation progressed to trial, would have been based on states' consumer protection laws.[83]

Such a release of claims for declaratory and injunctive relief cannot simply be glossed over as unnecessary in light of the change in Medicare laws. The changes in Medicare reimbursement to an ASP-based system does nothing for the millions of Class 3 non-Medicare purchasers who continue to suffer as a result of inflated AWPs, and Class 1 Medicare purchasers who pay for drugs not covered by the program. Yet, this proposed settlement releases the Track 2 defendants from any repercussions for their continuing practices of setting and promoting

---

[82]     As the United States Court of Appeals for the Second Circuit has held, "a determination that all of the settled claims arose from the same factual predicate does not necessarily end the inquiry. Claims arising from a shared set of facts will not be precluded where class plaintiffs have not adequately represented the interests of class members." *Wal-Mart Stores, Inc. v. Visa USA, Inc. and Mastercard International, Inc.*, 396 F.3d 96, 109 (2d Cir. 2005).

[83]     Many states' consumer protection laws permit private plaintiffs to seek injunctive relief. *See, e.g.*, Bob Cohen, J.D., *Right to Private Action under State Consumer Protection Act - - Equitable Relief Available*, 115 A.L.R.5th 709 at §3 (2004).

inflated AWPs, even for conduct extending past the cutoff of March 2008, the last date for which damages claims may be made.

Further, Co-Lead Counsel fail to demonstrate how the proposed consumer allocation of 17.5% is fair, reasonable or adequate in comparison with their prior settlement with GlaxoSmithKline, which achieved a 30% allocation for consumers, as well as other consumer drug cases that have achieved better results for consumers.

A plan of allocation is subject to the same standard applicable to the settlement as a whole, *i.e.* the distribution plan must be fair, reasonable and adequate. *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (quotation omitted). The adequacy of an allocation plan "turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *In re Paine Webber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 132 (S.D.N.Y. 1997), *aff'd*, 117 F.2d 721 (2d Cir. 1997).

The allocation of the proposed settlement between TPPs/ISHPs and consumer grossly favors the TPPs/ISHPs, at the expense of consumers. The settlement also provides lesser burdens for TPPs/ISHPs in their claims submissions, with the use of a "proxy period" and other measures that consumers don't get the benefit of. The reasons for these difference are unexplained, as is PAL's representation of consumers is bringing about such allocation.

## 2.    The Reaction of the Class to the Settlement

That no consumer had opted out, and only 2 objections had been filed, by March 2, 2009, the date of their filing, is more likely a function of the fact that the consumer notice plan had not been fully accomplished, by the admission of Co-Lead Counsel's own experts. Indeed, that all of the named class representatives for Track 2 in the TAMCC and further amendments thereto

have objected to the proposed settlement for the reasons set forth herein should be an important consideration by this Court. Furthermore, the evidence already of record before this court of Co-Lead Counsel having at least twice paid off objector's counsel with attorney's fees they did not earn – once in *Lupron* and once in the GlaxoSmithKline appeal in this case – should undermine any *ipse dixit* claims they make about a low number of objectors.

In addition, the Notice failed to comport with due process and was not the "best practicable under the circumstances" because it failed to provide first class mail notice to all reasonably identifiable consumers. It also failed to provide all material information that class members require, like Co-Lead Counsel's conflict of interest in simultaneously representing PAL and seeking to represent consumers, but without a consumer client. No information was provided as to the circumstances of the removal of Named Consumer Plaintiffs as the Court-appointed class representatives. Since the Track 2 settlement class includes patients who treated with cancer drugs of Track 1 defendants, the lack of such information is likely to have caused confusion. Also, the lack of a complete list of drugs, and the need to send out a "curative" notice due to Co-Lead Counsel's mistake, only added to the likely confusion. Final Approval Mem. at 5. The experience of the GSK settlement has shown that confusion is already a significant problem, only enhanced by lack of a fulsome and clear explanation of the progression of the case since the last notice was disseminated.

Since, as of March 2, 2009, CMS notice had not yet been sent to Class 1 consumers, *see* Final Approval Mem. at 8 ("a simple, one-page explanation of the Settlement *will soon be sent* to each individual identified in the CMS data), Co-Lead Counsel can hardly expect that consumers would know what they have been up to in the Track 2 case.

## IV.    CONCLUSION

For the foregoing reasons, named consumer plaintiffs, Rev. David Aaronson, individually and on behalf of the Estate of Susan Ruth Aaronson, M. Joyce Howe, individually and on behalf of the Estate of Robert Howe, Larry Young, individually and on behalf of the Estate of Patricia Young, Therese Shepley, individually and on behalf of the Estate of James Shepley, Harold Carter, Roger Clark, on behalf of the Estate of David Clark, Ethel Walters, individually and on behalf of the Estate of Hunter Walters, Katie Bean, individually and on behalf of the Estate of Harold Bean, James Monk, Virginia Newell, individually and on behalf of the Estate of William Newell, Oral Roots, Rebecca Hopkins and George Baker Thomson hereby request that this Honorable Court should deny class certification and final approval to the proposed settlement.


Dated: March 16, 2009                        Respectfully submitted,


                                             /s/ Donald E. Haviland, Jr.
                                             Donald E. Haviland, Jr., Esquire
                                             Michael J. Lorusso, Esquire
                                             **THE HAVILAND LAW FIRM, LLC**
                                             111 S. Independence Mall East, Suite 1000
                                             Philadelphia, PA 19106
                                             Telephone: (215) 609-4661
                                             Facsimile:  (215) 392-4400

## CERTIFICATE OF SERVICE

I, Donald E. Haviland, Jr., Esquire, hereby certify that on March 16, 2009, I filed the foregoing Memorandum of Named Consumer Plaintiffs in Opposition to Approval of the Proposed Track Two Nationwide Class Certification and Settlement, Declaration of Donald E. Haviland, Jr., in Support of Memorandum of Named Consumer Plaintiffs in Opposition to Approval of the Proposed Tract Two Nationwide Class Certification and Settlement and Exhibits with the Clerk of this Court and used the CM/ECF system to send notification of such filing to all registered person(s).

/s/ Donald E. Haviland, Jr.
Donald E. Haviland, Jr., Esquire
Michael J. Lorusso, Esquire
THE HAVILAND LAW FIRM, LLC
111 S. Independence Mall East, Suite 1000
Philadelphia, PA 19106
Telephone: (215) 609-4661
Facsimile: (215) 392-4400

*Counsel for Rev. David Aaronson, individually and on behalf of the Estate of Susan Ruth Aaronson, M. Joyce Howe, individually and on behalf of the Estate of Robert Howe, Larry Young, individually and on behalf of the Estate of Patricia Young, Therese Shepley, individually and on behalf of the Estate of James Shepley, Harold Carter, Roger Clark, on behalf of the Estate of David Clark, Ethel Walters, individually and on behalf of the Estate of Hunter Walters, Katie Bean, individually and on behalf of the Estate of Harold Bean, James Monk, Virginia Newell, individually and on behalf of the Estate of William Newell, Oral Roots, Rebecca Hopkins and George Baker Thomson*