# EXHIBIT F

Prescription Access Litigation (PAL) Project :: Prescription Access Litigation (PAL) Project ...

Case 1:01-cv-12257-PBS   Document 5954-7   Filed 03/16/09   Page 2 of 7

1 of 6

# PAL
Prescription Access Litigation

**FAIR PRICES
CONSUMER EDUCATION
INDUSTRY ACCOUNTABILITY**

## LAWSUITS & SETTLEMENTS

- **Current Lawsuits**
- **Past Lawsuits**
- **Settlements**
- **Suggest a New Case**
- **FAQ**
- **Amicus Briefs**
- **Cy Pres**

Get updates on drug lawsuits, settlements and PAL news.

Your Email here    GO

## Current Lawsuits

### Average Wholesale Price

To receive updates about this case please click here!

### About Average Wholesale Price

"Average Wholesale Price" or AWP has long been used as a pricing benchmark for almost all prescription drug sales in the United States. Health plans, Medicaid and other government programs, and employers determine how much to pay pharmacies and doctors to reimburse them for drugs that are dispensed to patients by using formulas based on the AWP for individual drugs. Lists of prescription drug AWPs are published by companies such as First Databank.

### Background

Drugs that are administered by a doctor, in a doctor's office ("physician-administered drugs," such as cancer treatments) are usually purchased directly by the doctor. The doctor then bills the patient's health plan and/or the patient. Medicare Part B pays for such physician-administered drugs. Until 2006, Medicare paid for such drugs using a formula that used the published AWPs.

Numerous reports in recent years have concluded that there is a significant difference between how much doctors pay for these drugs and how much they are "reimbursed" for them by Medicare and private health plans. Drug manufacturers routinely give physicians discounts that reduce the actual amount that the physician actually pays for the drugs. These discounts are not reflected in the

## CURRENT LAWSUITS

- **Average Wholesale Price**
- **Celebrex**
- **First Databank McKesson Medispan**
- **Ketek**
- **Neurontin Off-Label Promotions Case**
- **Nexium**
- **Norvir**
- **OxyContin**
- **Protonix**
- **Provigil**
- **Seroquel**
- **Vioxx**

Prescription Access Litigation (PAL) Project :: Prescription Access Litigation (PAL) Project ...

2 of 6

Case 1:01-cv-12257-PBS   Document 5954-7   Filed 03/16/09   Page 3 of 7

http://www.prescriptionaccess.org/lawsuitssettlements/current_lawsuits?id=0005



published price and reduce the amount providers actually pay to levels far below those published AWPs.

**Vytorin-Zetia**

**Zyprexa**

Drug companies have used the difference between what doctors pay for drugs and what Medicare reimburses them as a marketing tool. Drug companies are able to "persuade" physicians and providers to use their drugs by showing doctors that they can make more money with that company's drug rather than with a competitor's drug. This practice is referred to as "marketing the spread." The difference between what doctors pay for the drug and what Medicare pays the doctor is often referred to as the "return to practice."

Using AstraZeneca's Zoladex as an example, the Judge in the AWP case, Judge Patti Saris explained in her June 2007 decision how the spread is marketed in order to manipulate doctors:

> "In these circumstances, the doctor purchases the pharmaceutical from the manufacturer and bills the TPP [Third Party Payor, e.g. health plans or union benefit funds], making a profit on the difference between the acquisition cost and the reimbursement amount. When there is therapeutic or generic competition, some providers may be "preferred purchasers" from a manufacturer's perspective and be able to acquire the pharmaceutical at a lower price, increasing the spread." (June 2007 Order, p. 14).

Under Medicare's rules, Medicare pays 80% of the cost of physician-administered drugs. The remaining 20% (called "co-insurance") is paid by the patient, or by the patient's insurance, if they have a supplemental insurance plan that covers costs not paid by Medicare (usually referred to as a "Medigap" plan). Because the price of physician-administered drugs was based on an inflated and arbitrary AWP, Medicare patients who were given these drugs paid artificially inflated coinsurance payments.

**PAL Member Litigation**

In December 2001, PAL members and others filed a lawsuit in federal court in Massachusetts against 28 drug companies for manipulating the AWP. The lawsuit alleges that there is an industry-wide scheme to defraud the U.S. health care consumer by charging inflated prices for critically-needed medications. Specifically, the lawsuit charged that since 1991 the companies have engaged in "a pattern and practice" of selling drugs to physicians at prices well below the reimbursement amounts paid by Medicare.

The lawsuit said the defendant drug companies have unfairly promoted the sale of their products by artificially inflating the published AWPs and charging doctors far less than those AWPs. The spread between the acquisition price and the reimbursement price can reach into the hundreds of dollars and thousands of percentage points. The lawsuit estimates that Medicare and individual consumers using the drugs were overcharged

more than $800 million in illegal costs in 2000 alone.

## Chronology of the case

The Court split the more than two dozen defendant drug companies into two groups. "Track 1" included AstraZeneca, Bristol Myers Squibb, GlaxoSmithKline, Johnson & Johnson and Schering-Plough. "Track 2" contained all the other defendants. On August 17, 2005, the Court certified three classes of plaintiffs:

1. A nationwide class of Medicare beneficiaries who have paid for all or part of the patients' share of the cost of Medicare Part B drugs;
2. A "test" class of Massachusetts third-party payors that pay part or all the Medicare Part B co-insurance on behalf of their beneficiaries (i.e. so-called "Medigap" insurers; and
3. A "test" class of Massachusetts non-Medicare third-party payors and individual consumers who paid for all or part of the cost of certain physician-administered drugs.

On January 30, 2006, the Court issued an order certifying the classes for the first track of defendants. On March 1, 2006 the plaintiffs filed a fourth amended complaint on behalf of plaintiffs who purchased the drugs manufactured by the Track 2 defendants.

## Settlements as of 2007

On August 10, 2006, a settlement agreement for $70 million was reached between GlaxoSmithKline and the Plaintiffs. An individual who objected to the terms of the settlement with Glaxo Smith Kline filed an appeal of the Court's approval of that settlement, and that appeal is pending. No payments to class members who took the Glaxo drugs in question will be made until the appeal is resolved or dismissed.

In May 2007, Astra Zeneca agreed to settle the Class 1 claims against it for $24 Million. Notice of the proposed AstraZeneca settlement was mailed to Medicare beneficiaries in late 2007. Information abou the settlement, including how Medicare patients can submit a claim, can be found at astrazenecaawpsettlement.com

In early July 2007, Bristols Myers Squibb and the plaintiffs reported to the Court that they have reached a settlement of the Class 1 claims against BMS, but the settlement agreement and its details have not yet been filed with the Court.

## Trial of Track 1 Defendants

In fall 2006, the Court held the first trial in the case, over the course of several weeks. The trial addressed the claims of Classes 2 and 3 against AstraZeneca, Bristol-Myer Squibb, Johnson & Johnson and Schering-Plough.

In June 2007, Judge Saris issued a decision, finding that AstraZeneca, Bristol-Myers Squibb and Warrick (a subsidiary of Schering-Plough) engaged in illegal unfair and deceptive acts and practices by marketing the spreads of various drugs to physicians

and pharmacies over some course of the class period (1997-2002), and causing injury to both Class 2 and Class 3 class members. Judge Saris found that the conduct of AstraZeneca, Bristol-Myers Squibb, and Warrick violated Chapter 93A, the Massachusetts Consumer Protection Act. She calculated Class 3 damages for AstraZeneca at $4,451,429 and for Bristol-Myers Squibb at $183,454. The Court did not calculate damages for Class 2, saying that it did not have enough information.

On November 1, 2007, Judge Saris issued an Order calculating Class 2 damages. She found that both Bristol Myers Squibb's and Astra Zeneca's conduct was "willful and knowing." Based on that, she doubled the damages for both companies, as is required by Chapter 93A. She calculated Astra Zeneca's Class 2 damages at $5,557,370, and its total damages at $12,941.869. She calculated Bristol Myers Squibb's Class 2 damages at $388,557, and its total damages at $694,594.

**Update as of December 2008:**

On September 26, 2008, the Court approved two national classes in the continuing case against AstraZeneca and Bristol-Myers Squibb. The first nationwide class, the Medigap Class, consists of all third-party payors who made reimbursements for drugs based on AWP for a Medicare Part B covered subject drug. The second class is composed of any consumer or third-party payors who made a payment for certain physician-administered drugs manufactured by AstraZeneca or Bristol-Myers. The class period for both parties is Jan. 1, 1991 to Jan. 1, 2005. This ruling allows plaintiffs to pursue the against AstraZeneca and Bristol-Myers Squibb Co. under unfair and deceptive trade practice laws of more than 30 states.

In addition, the objection to the $70 million settlement with Glaxo-Smith-Kline has been resolved, and distribution of the settlement should proceed soon.

**Track 2 Settlement**

On March 7, 2008, the plaintiffs and the eleven Track 2 defendants announced a settlement for $125 Million, covering the drugs listed here. The court granted preliminary approval in May, 2008, and notice to third party payors, consumers who paid with private insurance, or consumers who paid with Medicare went out on August 1, 2008. The proposed settlement provides approximately $21.8 Million for consumers who paid a percentage co-payment for any of these covered drugs.

Class members had until December 1, 2008 to file an objection or opt-out of the settlement. Class members have until January 31, 2009 to file claims. Claims forms and instructions are available at awptrack2settlement.com

On Dec. 16, 2008, the Court held a Final Approval hearing for the Track 2 settlement. One objector raised a concern that consumers seeking to retrieve medical records in order to make a claim for a payment from the settlement could face potential costs associated with requesting copies of such records from medical providers. The objector argued that such costs might ask as a disincentive for a consumer to file a claim for an

uncertain amount, which would leave their only option of opting for a flat $35 refund without documents. The Judge asked Class Counsel to attempt to build in some mechanism to allow claimants to request a refund for any medical record costs, or to assess if a default claim of more than $35 would be appropriate.

A second 'Final Approval Hearing' was scheduled for April 27, 2009 at 2pm.

**Impacts:**

This litigation further exposed the inaccurate and fraudulent nature of AWPs, and contributed to legislative moves to do away with their use. As part of the Medicare Modernization Act of 2003, Congress did away with Medicare's use of AWPs to set its reimbursement levels for Part B-covered drugs and instead created a new benchmark, the Average Sales Price ("ASP"). Unlike the AWP, the ASP is based on actual sales. The Center of Medicare and Medicaid Services (CMS) has the power to audit drug companies' ASP data, with the potential for significant penalties if the data are fraudulent. In 2005, the Deficit Reduction Act eliminated the use of AWPs in the federal government's calculation of how much it reimburses states for their Medicaid generic prescription drug purchases. Instead of AWP, the federal reimbursement will be based on a figure called Average Manufacturer Price (AMP), which, like ASP, is based on actual sales data. In July 2007, CMS issued its final rule on how AMP will be defined and calculated.

**Court:** U.S. District Court, District of Massachusetts (Judge Saris)

**AWP Plaintiff Class**
Individual consumer class members for the AWP lawsuit are consumers who have paid some or all of the cost of drugs covered by Medicare Part B (those administered in a doctor's office or hospital), including both Medicare beneficiaries and non-Medicare beneficiaries.

**AWP Third-Party Payor Plaintiff Class**
Third-party payor class members for the AWP lawsuit are (1) third-party payors that pay part or all the Medicare Part B co-insurance on behalf of their beneficiaries; and (2) third-party payors and individual consumers who paid for all or part of the cost of the physician-administered drugs.

**Recent Court documents:**

- Court order certifying classes against AstraZeneca and Bristol Myers Squibb (September 26, 2008)
- Track 2 Settlement Agreement (March 7, 2008)
  - Motion for Preliminary Approval of Settlement
  - Memorandum of Law in Support of Motion for Preliminary Approval
  - List of drugs included in the Settlement
- Court's order on Astra Zeneca and Bristol Myers Squibb double damages (November 1, 2007)
- Court's Decision finding liability for AstraZeneca, Bristol-Myers Squibb and Warrick (June 21, 2007)

- AstraZeneca AWP Class 1 Settlement Agreement (May 21, 2007)
- GlaxoSmithKline AWP Settlement Agreement (August 10, 2006)

**Press Releases:**

- PAL Applauds Federal Court Damages Decision in AWP Case (November 2, 2007)
- Average Wholesale Price GSK Settlement Press Release
- Federal Court Permits Consumer Charges of Rx Industry-Wide Price Fixing and Conspiracy To Proceed  *Judge Lets Stand Conspiracy Charges on Together Rx Discount Card*
- Consumer Groups Charge Industry-Wide Price Manipulation – Over $800 Million in Illegal Profits from Medicare & Medicare Patients  *Federal Lawsuit Charges 28 Drug Companies with RICO, State and Federal Anti-Trust, and Consumer Protection Violations*

**Resources:**

- "Drug Spending and the Average Wholesale Price: Removing the AWP Albatross from Medicaid's Neck," Article by Alex Sugerman-Brozan and James Woolman, Bureau of National Affairs
- AWP Third Amended Consolidated Complaint (redacted)
- Court Order Denying Defendant's Motion to Dismiss

To receive updates about this case please click here!