## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | 
| | MDL NO. 1456 |

IN RE PHARMACEUTICAL INDUSTRY
AVERAGE WHOLESALE PRICE
LITIGATION

)
) MDL NO. 1456
) Civil Action No. 01-12257-PBS
) Subcategory Case No: 03-10643-PBS

THIS DOCUMENT RELATES TO:

)
)
) Judge Patti B. Saris

*The City of New York, et al.*

)
)

*v.*

)

*Abbott Laboratories, et al.*

)
)
)

### PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO SMITHKLINE BEECHAM CORPORATION, D/B/A GLAXOSMITHKLINE'S (GSK'S) MOTION FOR PARTIAL SUMMARY JUDGEMENT

### INTRODUCTION

In its moving brief, GSK said that the WAC List Price test required it to "calculate[] transaction prices by taking into account **all discounts and rebates** given to customers and **all chargebacks** credited as a result of contracts with customers."[1]  Now, GSK advances a methodology that renders at least $9 billion in chargebacks and rebates GSK paid to those who buy the drugs at issue in this case (approximately 8.5% of GSK's total sales 1997-2005) entirely irrelevant to the question of how much of GSK's net revenue is achieved at sales at or about WAC.[2]  GSK's retreat, if embraced by this Court, could eviscerate the intent and any practical potential of the WAC List Price test as an element of determining liability on any claims.  At the

---

[1] Defendant SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline's ("GSK's") Memorandum of Law in Support of its Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Mem.") at 11 (emphasis added).

[2] Reply Brief of Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK") in Support of its Motion for Partial Summary Judgment in the New York County Cases (hereinafter "GSK Reply") at 3-5.

very least, in addition to the fact questions presented in Plaintiffs' Opposition[3], GSK's new approach raises additional questions of fact requiring denial of its motion.

     GSK's reconfigured approach to the WAC List Price test requires GSK to take positions entirely at odds with the record and the prior rulings of this Court.  Most prominent among these is that GSK now argues that it is "a fiction" for plaintiffs to assert that chargebacks[4] paid by GSK to wholesalers are payments that impact the wholesalers' net price.   (GSK Reply at 4-5, 12-13). Of course, this is incorrect, and contrary to the Court's understanding that a manufacturer's net revenue is net of all discounts including chargebacks.  *See Section II, infra* at pp. 9-10. Regardless, GSK's new twist on what a chargeback is and what role it plays in the WAC List Price test raises another question of fact that requires denial of the motion.

     GSK also attempts to correct for its initial improper treatment of the more than $4.3 billion in rebates GSK paid to its customers in connection with "sales channel" activity.  But, remarkably, GSK does this by consulting the public filings of its customers rather than the actual contracts GSK has with them or the data underlying the rebate payments themselves.

     For example, GSK says that of the $2.7 billion in rebates GSK paid to PBMs, $837.7 million could be due to the PBM mail order purchases.  GSK Reply at 18.   GSK arrives at this number without any reference to GSK's own contracts with these entities, or other documents or data which would presumably demonstrate, with precision, what percentage of the rebates GSK paid to PBMs were paid on account of their sales channel activity.  Instead, GSK consults the PBMs' 10-K's to determine in general what percentage of PBM revenue is attributable to mail order business.  And then GSK uses that percentage to assume that it governs GSK's payments

---

[3]  Plaintiffs' Memorandum of Law in Opposition to SmithKline Beecham Corporation, d/b/a GlaxoSmithKline's ("GSK's") Motion for Partial Summary Judgment (hereinafter "Plaintiffs' Opposition" or "Pl. Opp.") at 10-11, *et seq.*
[4]  On Reply, GSK has  taken to putting quotations marks around the word "chargeback" for the first time as  if this somehow supports its newly-crafted position that this payment to a wholesaler is something other than  a payment to the wholesaler.

to its customers.  This is clearly not a sufficient record for entry of judgment on the point.  *See SMS Sys. Maint. Servicest, Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999) ("[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession. [...]  Expert testimony that offers only a bare conclusion is insufficient to prove the expert's point.").  There are genuine issues of fact regarding what percentage of the $2.7 billion in rebates paid by GSK to PBMs are relevant in the context of a WAC List Price test.

GSK's Reply also creates new questions of fact regarding the proper treatment of GSK rebates paid to GSK customers in the IPA class of trade.  The customers include entities such as Aetna, CIGNA and Humana.  Pl. Opp. at 16.  It is undisputed that these entities buy GSK drugs and are paid rebates by GSK in connection with those purchases. Affidavit of Eric M. Gaier, Ph.D., sworn to November 10, 2006 and submitted as Direct Trial Testimony by Track One Defendants ("Gaier Trial Aff.") (Exhibit A to Affidavit of Joanne M. Cicala, sworn to March 18, 2009 ("Cicala Suppl. Aff.") at ¶¶ 32-33 (testifying that CIGNA, a member of the IPA class of trade in GSK's database, "purchased physician-administered drugs directly through contracts with manufacturers, Group Purchasing Organizations ("GPOs"), or drug wholesalers."); *see also* Affidavit of Harris L. Devor, sworn to February 11, 2009 ("Devor Aff.") at ¶26 & Exhibit I. These same IPA entities sometimes appear in GSK datasets with other (i.e. non-IPA) class of trade designations.  *See* Cicala Suppl. Aff., Exhibit B.  GSK's data clearly shows that it pays rebates to these entities both in their IPA capacity and in other capacities.  *See* Cicala Suppl. Aff. Exhibit B. The genuine question of fact concerns the treatment of the rebates to these customers. Dr. Gaier acknowledges that the entities purchase GSK drugs and that rebates paid in connection

with such "sales channel" activities are relevant in the WAC List Price test.[5]  But, without proper record support, Dr. Gaier assumes that only a fraction of the total rebates paid to these entities (or $463.3 million) should be included in the WAC List Price test because only that amount reflects the sales channel activity.   Supplemental Affidavit of Eric M. Gaier, Ph.D., sworn to Nov. 24, 2008 (hereinafter "Gaier Suppl. Aff.") at ¶14.  Dr. Gaier concludes this based not on GSK's data, to which he obviously had access, but rather based on the IPA customers' public filings which generally describe what percentage of their business is attributable to pharmacy activity. This is not a sufficient record to support summary judgment.  *See SMS Sys. Maint. Services Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999).  There are genuine issues of act regarding what percentage of the $1.4 billion in rebates paid by GSK to IPA customers are relevant in the context of the WAC List Price test.

Ultimately, GSK attempts to deflect the Court's own analysis by stating, somewhat condescendingly, that when it comes to proper treatment of rebates, the Court "need not wade into this technical thicket."  GSK Reply at 5.  One person's technical thicket is another person's source for the truth and GSK knows that the truth regarding its net sales price for the subject drug in this case lies clearly within its own data.  There is no thicket to fear.  GSK's own contracts and data will inform as to exactly why GSK pays PBMs and IPAs and other customers the rebates it pays and what those payments are based on. That is precisely the work that must be done, and that plaintiffs are doing, in order to present a proper record to this Court regarding GSK's net sales price for the subject drugs and how that price relates to GSK's reported WAC.

GSK's Reply offers no help to GSK's flawed spread test either.  GSK still does not explain why its expert ignored GSK's own sales data when he performed the test, contrary to the

---

[5]  See Deposition of Eric M. Gaier, Ph.D. (Jan. 14, 2009) (hereinafter "Gaier Depo.") at 26:1-7 (Exhibit A to Affidavit of Joanne Cicala, sworn to on February 11, 2009 ("Cicala Aff.") at 49:1-10; 53:7-54:15.

Court's requirement.  *See* Gaier Depo. at 26:1-7 (Exhibit A to Cicala Aff.)   Yes, Dr. Gaier included GSK's rebate data in the analysis, but why did he use wholesaler sales data rather than GSK's own?  The choice is particularly suspect given that in the course of performing the WAC List Price test Dr. Gaier actually did all the necessary predicate work to run a proper spread test based on purely GSK information. Dr Gaier calculated net sales prices or ASPs to all of the relevant GSK classes of trade in connection with the WAC List Price test.  Affidavit of Eric M. Gaier, Ph.D., sworn to Nov. 24, 2008 (hereinafter "Gaier Aff.") at ¶6.  Those results absolutely could have been used by him in the spread test.  Yet, they were not.  Dr. Gaier left the universe of GSK sales data and instead pulled from the wholesaler sales data produced in this litigation, to which he then applied GSK rebate data.  Gaier Aff. at ¶8.  Why the more tortured road once again?  Because had Dr. Gaier used only GSK's data and Dr. Gaier's  own calculated ASPs, the results very likely would have been more favorable to plaintiffs.  *See* Supplemental Affidavit of Harris L. Devor, sworn to March 18, 2009 ("Devor Suppl. Aff.") at ¶15.

Moreover, even if GSK did the 30% spread test correctly (and it did not), GSK is not entitled to the relief it seeks because GSK expressly did not move on the basis of the 30% spread test and GSK has put nothing in the record before this Court to even permit a ruling that New York Medicaid had the same expectations as the Track One Private Third Party Payor Class and therefore the 30% speed limit is appropriate.  Pl. Opp. at 18-19; *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 491 F.Supp.2d 20, 102 ("*Track One Opinion*").

There are mischaracterizations in GSK's reply that must be addressed. In its opening brief, GSK expressly stated that "Dr. Gaier…reduced each sale price by 2% based on an assumption that a 2% prompt pay discount was paid for all of GSK's direct sales to wholesalers or providers".  GSK Mem at 11.  Plaintiffs noted in their Opposition that Dr. Gaier did not do what he said.  He did not "reduce each sale price by 2%".  Pl. Opp at 4.  On Reply, rather than

address the issue on the merits, GSK falsely asserts that "[p]laintiffs claim that GSK should have assumed that wholesalers gave a 2% prompt pay discount of their own to their downstream customers" (*See* GSK Reply at 13-14 with, notably, no citation to plaintiffs' brief) and "[p]laintiffs, however, are now advocating that the Court make an assumption (that is based on pure speculation) that wholesalers provided their own 2% prompt pay discount to all of their customers for the 16% of sale involving a chargeback." GSK Reply at 14, n. 18 (again with no citation to plaintiffs' brief).

This sort of mischaracterization simply cannot be ignored. GSK and its expert said, expressly, that in conducting the WAC List Price test, Dr. Gaier reduced every sales price by 2%. GSK Mem. at 11; Gaier Aff. at ¶6. Plaintiffs properly pointed out that those statements were false. Pl. Opp. at pp. 4-5; Devor Aff. at ¶14. Dr. Gaier did not make that reduction. Rather than acknowledging its error (whether it be an error in the calculation or description thereof), GSK distracts with baseless chiding. What is more, the distraction carries no freight because there is a genuine issue of fact whether the 2% prompt pay discount is passed on by wholesalers to GSK customers.

GSK's mischaracterizations continue. Contrary to what GSK says, there is indeed a genuine question whether, as GSK maintained in its moving papers, whether "***all rebates***" should be accounted for in the context of the WAC List Price test. GSK has not presented a record sufficient for the Court to rule, as a matter of law and or the subject drugs, "how much of GSK's net revenue is achieved at sales at list price."[6] That is precisely what the Court was concerned with in the context of the Track One Trial. *See* Bell Trial Testimony at 34:6-8 This question of fact by itself requires denial of GSK's motion.

---

[6] Track One Trial Transcript (December 7, 2006) (Testimony of Gregory Bell) ("Bell Trial Testimony") at 34:6-8 (attached as Exhibit C to Cicala Suppl. Aff.).

GSK criticizes plaintiffs for using averages but Dr. Gaier's analysis is based on averages as well.  Devor Aff. at ¶¶12-13.  For each customer and/or class of trade, Dr. Gaier computed an average sales price for each Customer, NDC and year.  Gaier Aff. at ¶6.  Some use of averages is necessary.  Application of the WAC List Price test would be on a transaction by transaction basis would be impracticable as GSK's data is not structured to allow a simple aggregation for each sales unit of all applicable credits, discounts, rebates and chargebacks to that unit. Devor Suppl. Aff. at 6, n.2.  Due to the difficulty of drilling down to the unit transactional level, both parties are constrained to group transactions by certain criteria instead of by individual transactions and compute an average for all transactions related to that criteria.  *See id.*  The only difference in plaintiffs' and Dr. Gaier's initial approach to the WAC test is that plaintiffs' did not bifurcate GSK's sales to wholesalers into chargeback and non-chargeback sales.  As set forth herein and in plaintiffs' opposition memorandum, there is a genuine issue of fact regarding which methodology is appropriate.  Given the Court's interest in GSK's net revenue from sales within 5% of WAC, plaintiffs argue that their averaging approach is more appropriate than GSK's because GSK's approach obscures the impact of the chargebacks paid on GSK's revenue for the subject drugs.

The bottom line is that GSK has not presented the Court with a record sufficient to grant the relief sought by this motion.  There are numerous questions of fact regarding GSK's approach to the WAC List Price test.  And, even if GSK had properly conducted this test, which it has not, the motion would fail because (a) the WAC List Price test is not "necessarily determinative" of liability (*Track One Opinion*, 491  F. Supp. 2d at 105); (b) GSK has not moved on any other basis; (c) GSK has not properly conducted an AWP Spread test; (d) GSK has not

presented a record establishing that New York Medicaid shared a 30% expectation; and, (e) GSK

has not in any way addressed the "marketing" prong of the Court's prior analysis.[7]

---

[7] As noted in Plaintiffs' Opposition, GSK ignores the absence of any record on that aspect of the Court's three factor test for liability under M.G.L.c.93A which concerns "a proactive scheme to market spread to doctors". Pl. Opp. at 2.

**ARGUMENT**

## I.   GSK'S REPLY RAISES ADDITIONAL QUESTIONS OF FACT REQUIRING DENIAL OF MOTION

GSK's Reply and the supplemental Gaier affidavit do not resolve any of the genuine issues of fact summarized in Plaintiffs' Opposition at pages 10-11.  Indeed, through its Reply, GSK has raised additional fact questions making plain that the record does not support the relief sought.  The additional questions of fact include:

(a) Is GSK correct that, contrary to the Court's understanding (*see Section II, infra* at 9-10), that chargebacks are not payments to wholesalers?  If GSK is incorrect, as set forth in Plaintiffs' Opposition, at least 149 NDCs (not 52 NDCs, as Dr. Gaier opines) would have failed the WAC List Price test. *See* Pl. Opp at 5; Devor Aff. at ¶13 & Exh. B thereto.

(b) Given that Dr. Gaier did not rely on GSK's own data or documents to determine what percentage of the $2.7 billion in rebates paid by GSK to PBMs related to sales channel activity, which Dr. Gaier himself acknowledges must be accounted for, there is a genuine issue of fact regarding how many additional NDCs, beyond the 149, would fail the WAC List Price test if Dr. Gaier properly accounted for all rebates paid by GSK to PBM Mail Order customers in connection with the PBMs' purchases of GSK products, at a minimum?

(c) Why did GSK pay rebates to its IPA customers?  Should all, some or any of the $1.4 billion in rebates paid to these customers be included in the WAC List Price test?

(d)   Initially GSK said that Dr. Gaier "reduced each sale transaction price by 2%" to account for the prompt pay discount. GSK Mem. at 11.  Plaintiffs pointed out in their opposition brief that Dr. Gaier did not do what he said.  Pl. Opp. at 12.  On Reply, GSK now says that reducing each sale transaction by 2% is a "stretching" "[a]dvocated" by plaintiffs (not Dr. Gaier) and based on "pure speculation".  GSK Reply at 13-14, n.18.  Setting aside GSK's gross

mischaracterization of what plaintiffs have said, the fact is that there is a genuine issue of fact whether wholesalers pass along the 2% prompt pay discount to customers.

(e) In GSK's opening brief, GSK said that to perform the WAC List Price test conservatively, its expert "calculated transaction prices by taking account all discounts and rebates given to customers and all chargebacks credited as a result of contracts with customers." (GSK Mem. at 11). As the briefing has made clear, Dr. Gaier did not do that work. The question of fact is whether GSK's initial description of what the WAC List Price test requires is correct. Should all rebates and all chargebacks and all discounts be included? Should only purchase based rebates or sales channel rebates be included?

## II.  GSK NOW ADVOCATES AN APPROACH TO THE WAC LIST PRICE TEST THAT EVICERATES ITS UTILITY

Under GSK's new formulation of the WAC List Price test, not one penny of the at least $9 billion in chargebacks and rebates paid by GSK to its customers have any relevance whatsoever. GSK Reply at 12-13, 14-16; Gaier Suppl. Aff. at ¶3. This is a far cry from GSK's initial motion which stated that in order to conduct the WAC List Price test one must account for "all discounts and rebates given to customers and all chargebacks credited as a result of contracts with customers." GSK Mem. at 11. That definition squares with the rulings of this Court which make clear that the Court seeks, in the context of the WAC List Price test, to determine wholesaler revenue net of all discounts including charge-backs. *See* Bell Trial Testimony (Exhibit C to Cicala Suppl. Aff.) at 10:13-16 ("The next column over is the actual amount of revenue that BMS recognized, so **that's net of discounts, rebates, charge-backs,** et cetera.") (emphasis added); *id.* at 34:4-9 (Bell confirms that his analysis looks at "how much of net revenue is achieved at sales at list price".); *id.* at 32:22-33:12 (The Court: "and some people got discounts or rebates?" The Witness: Some, but as you can see—" The Court: "So that's like the

list price, and some people were big enough or savvy enough or had enough market power to get discounts.  Is that right?  The Witness:  That's fair, yes.").(emphasis added).

As set forth in Plaintiffs' Opposition brief, GSK has rendered at least $9 billion in rebates irrelevant by improperly separating its sales to wholesalers into two artificial categories: sales subject to chargebacks and sales not subject to chargebacks.  GSK attempts to justify this improper bifurcation by arguing, against all reason, evidence and the rulings of this Court, that chargebacks are not, in fact, payments to wholesalers that reduce the wholesalers' net prices for the subject prices, but rather are payments to downstream providers.  GSK Reply at 4-5, 10.  At minimum, there is a genuine issue of fact regarding how chargebacks are to be accounted for in the WAC List Price test.

## III.   THE RECORD DOES NOT SUPPORT GSK'S ATTEMPT TO CORRECT FOR IMPROPER TREATMENT OF REBATES; GSK'S REBATE CORRECTIONS RAISE ADDITIONAL QUESTIONS OF FACT REQUIRING DENIAL OF MOTION

GSK's attempt to correct for the improper treatment of rebates fails entirely and raises additional questions of fact requiring denial of the motion.

### A.   There Are Genuine Issues of Fact Regarding GSK's Treatment of PBM and IPA Rebates

Dr. Gaier's attempt to correct for his mistreatment of the $2.7 billion in rebates paid by GSK to PBMs and the $1.4 billion dollars in rebates paid to IPAs fails on multiple levels.  First, Dr. Gaier does not use GSK's own data or documents to determine, with precision, how much of this combined $4.1 billion was paid for sales channel activity.  Rather, Dr. Gaier looks to the public filings of the PBMs and a single conclusory study for a general understanding of what percentage of the net claims to these classes of trade is derived from mail order operations. Gaier Suppl. Aff. at ¶ 14.  Dr. Gaier then assumes that GSK's rebate payments for mail order operations track those general percentages.  *Id*.  Specifically, Dr. Gaier states that he multiplied

the mail-order penetration share[8] of each PBM and IPA class of trade customer by GSK's total rebate payment to each PBM to arrive at what he calls his "alternate rebate number"[9]. *Id.*

Through this approach, Dr. Gaier concludes that of the $2.7 billion in rebates GSK paid to PBMs, approximately $837.7 million could be due to the PBM mail order purchases (GSK Reply at 18).  Likewise, Dr. Gaier concludes that of the $1.4 billion in rebates paid to IPA class of trade members, $463.3 million could be due to IPA class of trade members' mail order operations. Gaier Suppl. Aff. at ¶ 14.

It is entirely improper for GSK's expert to rely only on general percentages from the PBMs' or IPAs' publicly filed documents as a basis to conclude anything regarding why GSK paid the PBMs and IPA class of trade members what it did. This is not a proper record on summary judgment.  *See SMS Sys.Maint. Services, Inc.*, 188 F.3d at 25.

Moreover, on its face it is clear that Dr. Gaier's method for arriving at a mail order penetration percentage is flawed for both PBM and IPA class of trade members.  Dr. Gaier arrives at a mail order penetration percentage by considering what percentage of the PBM and IPA class of trade members *net claims* for the subject drugs were attributable to the mail order business, rather than by considering what percentage of the PBMs' net revenue is attributable to mail order business.  Gaier Suppl. Aff. at ¶ 14, Attachment B.  This approach potentially permits Dr. Gaier to understate the percentage of revenue derived from the mail order pharmacies of the

---

[8]  As defined by Caremark, "the percentage of mail service claims (adjusted for differences in average days' supply) to total pharmacy claims, referred to as our "mail penetration rate."  Caremark Rx, Inc., SEC Form 10-K for year ended December 31, 2005 ("Caremark 2005 10K") at 36 (Exhibit D to Cicala Suppl. Aff.).
[9]  Dr. Gaier "determined the annual share of [the four largest] PBM's mail-order operation from their publicly available '10-K' disclosures" and then "[f]or the remaining PBMs and IPAs, [he] used publicly available mail-order penetration statistics derived from a study of 23 PBMs." Gaier Suppl. Aff. at ¶ 14.

PBM and IPA class of trade members[10], and is in any event improper.  The proper allocation of rebate dollars should be based on the net revenue from PBM and IPA sales, not the claims.

In sum, Dr. Gaier's "solution" to the PBM and IPA class of trade rebate-omission error does not present a record sufficient for the relief sought and, by itself, raises numerous additional questions of fact requiring denial of GSK's motion.  Certainly, at minimum, GSK has not presented this Court with a record sufficient to rule as a matter of law that only $837.7 million in PBM rebates and $463.3 million in IPA rebates are relevant for the WAC List Price test.

> **B.  Even If GSK Had Now Properly Identified The Universe Of Relevant PBM And IPA Rebates To Be Included In Analysis (And It Has Not), GSK Has Not Accounted For These Rebates Properly.**

For the reasons set forth above, GSK has not presented a sufficient record for this Court to conclude that only $837.7 million of PBM rebates and only $463.3 million of IPA rebates are relevant for the WAC List Price test.  But even if it had, GSK's treatment of these amounts is so flawed as to present yet another basis for denying the motion.

Rather than applying the identified rebates across all of GSK's sales, Dr. Gaier without record support, allocates them only to a narrow subset of wholesaler non-chargeback sales. Specifically, he allocates the identified rebates to a subset of wholesaler non-chargeback sales based on the percentage of total wholesaler non-chargeback sales made to the following entities:

| Wholesaler Dataset | Class of Trade Included By Dr. Gaier |
|---|---|
| AmerisourceBergen RTS | ALT SITE MAIL SERVICE |
| | HEALTH SYSTEMS MAIL ORDER PHCY |
| | MAIL ORDER PHARMACY |
| AmerisourceBergen STAR | HIGH VOL MAIL ORDER WAREHOUSE |
| | MAIL ORDER RETAIL PHARMACY |
| Cardinal | MANAGED CARE MAIL ORDER |

---

[10] For example, Caremark's net revenue attributable to mail-order pharmaceutical sales was 35.14% in 2005, 33.68% in 2004, and 49.49% in 2003.  *See* Caremark 2005 10K at 33 (Exhibit D to Cicala Suppl. Aff.).  Yet, Dr. Gaier points to Caremark claims data that permits him to conclude the appropriate percentages are 26.8% in 2005, 22.5% in 2004, and 45.4% in 2003.  Gaier Suppl. Aff. Table B.2.

|  | CHAIN MAIL ORDER |
|---|---|
|  | MANAGED CARE/HMO/PPO |
| McKesson | MAIL ORDER FACILITY |

(Gaier Suppl. Aff., fn. 25.  *See also id*. Attachment B)

There is no record to support this narrow selection.  More to the point there is no record to support exclusion of the following classes of trade from the WAC List Price test:

| Wholesaler Dataset | Plaintiffs' Additional Classes Of Trade |
|---|---|
| AmerisourceBergen RTS | HMO/MCO |
| AmerisourceBergen STAR | HEALTH MAINTENANCE ORG. |
|  | HEALTH SYSTEMS MAIL ORDER PHCY |
| Cardinal | MANAGED CARE NURSING HOME |
|  | MANAGED CARE HOME INFUSION |
|  | MANAGED CARE WAREHOUSE |
|  | MANAGED CARE OTHER |
| McKesson | HMO WAREHOUSE |
|  | HMO PHARMACY (NON-HOSP) |

Dr. Gaier's failure to properly allocate rebates across all relevant classes further permits Dr. Gaier to understate the impact of the massive rebates on the net sales price and to skew the results of his WAC List Price test.  This presents yet another basis on which to deny GSK's motion.

## C.  GSK's Spread Test Was Not Conducted in Manner Consistent with Track One Trial and Is Irrelevant Anyway Since GSK Does Not Move on that Basis

Dr. Gaier did not properly conduct the ASP/AWP Spread test.  He did not compare GSK's average sales price to relevant providers with GSK's published AWPs.  By using only wholesaler sales data and GSK rebate data, Dr. Gaier did not capture GSK's sales to relevant providers that occur without the involvement of a wholesaler.  If Dr. Gaier had instead used the

ASPs he calculated for the relevant classes of trade, Dr. Gaier's spread test results would have been materially different. As setforth in Exhibits A & A.1 to the Devor Supplemental Affidavit, if Dr. Gaier had used the ASPs for the relevant classes 1208 NDCs would have spreads over 30% on an annual basis.  Dr. Gaier's failure to base his Spread test on GSK's ASPs to the relevant providers renders his Spread test unreliable and raises a genuine issue of fact regarding how many GSK NDCs actually have spreads between ASP and AWP of greater than 30%.

GSK did not move for partial summary judgment on the basis of the Spread test in the first instance.  Such basis would fail in all events, however, given that GSK's expert did not perform the AWP/ASP Spread test properly.

## CONCLUSION

For all the foregoing reasons, plaintiffs respectfully submit that GSK's motion for partial summary judgment must be denied.

Dated:  March 18, 2009

Respectfully Submitted:

**KIRBY McINERNEY LLP**

_____/s/_____

Joanne M. Cicala
James P. Carroll Jr.
Aaron D. Hovan

825 Third Avenue
New York, NY 10022
(212) 371-6600

*Counsel for the City of New York and New York Counties in MDL 1456 except Nassau and Orange*

Ross B. Brooks, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300

*Special Counsel for the County of Nassau*

Theresa A. Vitello, Esq.
**LEVY PHILLIPS &
KONIGSBERG, LLP**
800 Third Ave.
New York, NY 10022
(212) 605-6205
*Counsel for the County of Orange*