## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>C.A. No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Judge Patti B. Saris |

## REVISED MEMORANDUM OF NAMED CONSUMER PLAINTIFFS[1] IN OPPOSITION TO APPROVAL OF THE PROPOSED TRACK TWO NATIONWIDE CLASS CERTIFICATION AND SETTLEMENT

Named Consumer Plaintiffs, by their undersigned individual counsel, hereby file this objection to the proposed Track 2 nationwide class certification and settlement, pursuant to this Court's Order dated January 7, 2009 [at Docket No. 5828].[2]

## I.      PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On December 19, 2001, this case was originated by fourteen (14) consumer associations,[3] including Health Care For All, Inc. ("HCFA"), New York Statewide Senior Action Counsil

---

[1]     This revision is filed pursuant to this Court's Order dated March 24, 2009. Twelve (12) of the thirteen (13) Named Consumer Plaintiffs are currently listed as "Plaintiffs" in the Revised Fifth Amended Master Consolidated Complaint ("RFAMCC"). By electronic order on June 6, 2006, this Court granted Mr. Bean the right to be joined. *See* Docket No. 2584. The Named Consumer Plaintiffs have been clients of the undersigned since 2004, when they retained counsel to represent their interests in the *Lupron* case. *See* Exhibit "A".

[2]     Named Consumer Plaintiffs reserve the right to supplement their response to the Motion for Final Approval in view of certain outstanding discovery. S*ee* Notice of Issuance of Subpoenas.  Also, Named Consumer Plaintiffs reserve the right to respond to any future submissions by the proponents of the settlement.

[3]     The other associations included: Citizens for Consumer Justice ("CCJ"), Colorado Progressive Coalition ("CPC"), Congress of California Seniors ("CCS"), Florida Alliance for Retired Americans ("FLARA"), Massachusetts Senior Action Counsil ("MSAC"), MASSPIRG, Minnesota Senior Federation ("MSF"), New Jersey Citizen Action ("NJCA"), Pennsylvania Alliance for Retired Americans ("PARA"), and West Virginia Citizen Action ("WVCA"). CCJ

("NYSSAC"), Vermont Public Interest Research Group ("VPIRG"), Wisconsin Citizen Action

("WCA"), and Citizen Action of New York ("CANY"), the five (5) associations appointed by

this Court as representative plaintiffs for consumer Class 1 of the Track 2 settlement class.

These associations are members of PAL, a "project" and subsidiary of Community Catalyst

located in Boston, Massachusetts.[4]

The case was filed by Attorney Tom Sobol, then of the law firm of Lieff, Cabraser,

Heimann & Bernstein, LLP.  In addition to representing the individual PAL associations in the

lawsuit, Mr. Sobol represented PAL.  *See* April 6, 2006 Memorandum re "PAL Attorney

Relationships" at Exhibit "B" hereto.  Mr. Sobol was "hand-picked" by PAL to bring this case[5]

because he "share[d] PAL's mission" in class action cases – a mission which includes seeking an

allocation of class action settlement funds for "a separate *cy pres* fund to be used for consumer

benefits through increased advocacy for affordable health care." *Id.* at 1.[6]  While Mr. Sobol

---

is apparently a defunct organization in that they appear to have vacated their Philadelphia based-office.  Nevertheless, CCJ was listed by PAL as a coalition member as late as 2007.  *Compare* Exhibit "C" with Exhibit "D".

[4]     Both PAL and Community Catalyst are located at 30 Winter Street in Boston, Massachusetts: these are the same offices occupied by the Court-appointed Track 2 consumer settlement class representative, HCFA.   *See*  Exhibits  "E".  Respectively  at: http://www.prescriptionaccess.org/contacts;      http://www.communitycatalyst.org/contact_us; http://www.hcfama.org; last visited March 12, 2009.

[5]     *See*  http://www.prescriptionaccess.org/lawsuitssettlements/current_lawsuits?id=0005  at Exhibit "F" hereto ("In December 2001, PAL members and others filed a lawsuit in federal court in Massachusetts against 28 drug companies for manipulating the AWP.")

[6]     One "separate *cy pres* fund" achieved for PAL in this litigation is currently the subject of an appeal taken by Named Consumer Plaintiff Joyce Howe, docketed at 5854. Another was recently the subject of a hearing in *In re Lupron Marketing and Sales Practices Litig.*, MDL 1430, and is awaiting decision from Judge Stearns (though Judge Stearns' concluding remarks at the hearing indicated he was unlikely to award the $4.5 million requested by Co-Lead Counsel for Community Catalyst/PAL).

changed firms during the pendency of this litigation, he "has remained an integral part of PAL." *Id.* at 3. The Director of PAL, Alex Sugerman-Brozan,[7] a former staff attorney for Health Law Advocates, the legal arm and a subsidiary of HCFA, described his role as one of coordinator of the PAL Member Coalition who "are plaintiffs in this lawsuit." *See* Exhibit "G". No individual consumers were included in Mr. Sobol's original Complaint. *See* Complaint at Docket No. 1.

On March 18, 2002, a First Amended Complaint was filed by Mr. Sobol. *See* First Amended Complaint at Docket No. 56. The First Amended Complaint listed twenty-three (23) consumer associations: the fourteen (14) PAL members named in the original Complaint, including HCFA, NYSSAC, VPIRG and WCA, plus nine (9) more PAL members.[8] Six (6) individual consumers also were listed in the First Amended Complaint. Mr. Sobol alleged that all of them were all Medicare Part B beneficiaries who were administered drugs manufactured by defendants. First Amended Complaint at ¶¶ 36-41. He further alleged that either they, or their "Medigap insurer, paid the twenty percent (20%) co-payment." *Id.*

After this MDL was created, on September 6, 2002, a Master Consolidated Complaint ("MCC") was filed through counsel. *See* Docket No. 148. The MCC listed twenty-two (22)

---

[7]     Mr. Sugerman-Brozan was appointed by Mr. Sobol and the other Co-Lead Counsel to serve as consumer allocation counsel for the proposed Track 2 Settlement. *See* Track Two Settlement Agreement and Release at 8 [Docket No. 5133].

[8]     The nine (9) additional PAL associations included: Citizen Action of New York ("CANY"), Connecticut Citizen Action Group ("CCAG"), Gray Panthers of Sacramento ("Gray Panthers"), Maine Consumers for Affordable Health Care ("MCAHC"), North Carolina Fair Share ("NCFS"), Oregon Health Action Campaign ("OHAC"), Oregon State Public Interest Research Group ("OSPIRG"), United Senior Action of Indiana, Inc. ("USAI") and Health Action New Mexico. (This last association was only listed in the caption of the First Amended Complaint.)

total PAL member associations, including HCFA, NYSSAC, VPIRG, CANY and WCA.[9]  The

MCC listed eleven (11) consumers: the same six (6) consumers from the First Amended

Complaint, plus five (5) more.[10]  Only nine (9) of the eleven (11) consumers specifically alleged

that they "overpaid for applicable drugs based, and in reliance on, the AWPs." *Id.* at ¶¶ 22,

337.[11]  Finally, the MCC added four (4) third-party payors (TPPs) as class representatives.

On May 13, 2003, this Court issued its Order on the defendants' Motions to Dismiss the

MCC.  *See generally, In re Pharmaceutical Industry Average Wholesale Price Litigation* (*"In re*

*AWP"*), 263 F. Supp. 2d 172 (D.Mass. 2003).  The Court's opinion listed the defendants

specifically named in the MCC.  *Id.* at 176, n.1.[12]  Under the general heading "Standing", the

Court ruled that the association plaintiffs did not have Article III standing to sue.  *Id.* at 194

---

[9]      The MCC included the same group of PAL associations as in the First Amended Complaint, except that it dropped CCS and Health Action for New Mexico, and added Action Alliance of Senior Citizens of Greater Philadelphia ("AASCGP"), also a PAL member.

[10]     The MCC added Dr. Shirley Geller, Leroy Townsend, Jean H. Aierstuck, by full name, and "Hudson" and "Robinson" by last name only.  *See* MCC at ¶¶ 13-21, 337.

[11]     Specific allegations were made only as to the following consumers: Dr. Shirley Geller, Leroy Townsend, Betty Sicher, Joan Lee, John Bennett, Pearl Munic, Sue Miles, Jack Douglas, and Jean Aierstuck.  *See* MCC at ¶¶ 13-21.  No specific allegations were made as to Hudson and Robinson, though they were proffered as Class 1 consumer representatives.  *See* MCC at ¶ 337.

[12]     The Court's dismissal Order makes clear that the MCC did not include as a defendant a company known as G.D. Searle, which manufactures such drugs as Synarel -- a drug not listed in any complaint (or Appendix A thereto) ever filed in this case.  *In re AWP*, 263 F. Supp. 2d at 176, n.1 (listing defendants).  *See also,* Appendix A to SAMCC, TAMCC and FAMCC (listing covered drugs).  Nevertheless, an Arizona state court, in reliance upon this Court's Order of September 11, 2007 calling for the dismissal of claims which overlap with this MDL, recently dismissed all Arizona consumer claims against this company on the strength of G.D. Searle's baseless claim that it is an "overlapping defendant" in this MDL.  *See* Defendants' Brief in Response to Plaintiffs' Proposed Order Dismissing Overlapping Claims Without Prejudice, Dated August 15, 2008 at 4-5 (Exhibit "H" hereto)(requesting"... this Court should dismiss *in toto* ... G.D. Searle); Minute Entry Order of the Honorable John A. Buttrick dated March 4, 2009 at 5, 7 (granting request)(Exhibit "I" hereto).  This is despite the fact that G.D. Searle is not listed as "Track Two Defendant" in the Track 2 Settlement Agreement.  *See* Docket No. 5133 at 1.

(emphasis in original).  The Court's dismissal Order was without prejudice to allow Co-Lead

Counsel thirty (30) days to file "a motion to amend to cure any defects." *Id.* at 195.

On June 12, 2003, Co-Lead Counsel filed a Motion to Amend the Complaint, which was

granted by the Court on June 18, 2003.  That same day, the Amended Master Consolidated Class

Action Complaint ("AMCC") was filed.  In a process they would later describe as "triage", [13]

Co-Lead Counsel removed from the MCC and abandoned seventeen (17) of the twenty-two (22)

PAL member associations, leaving the four (4) present Court-appointed Track 2 consumer

settlement class representatives, *ie.* CANY, NYSSAC, VPIRG, and WCA.  *See* Docket No.387.

The fifth Court-appointed Track 2 consumer settlement class representative, HCFA, was

dropped.  The eleven (11) individual consumer plaintiffs listed in the MCC were dropped.

The AMCC also added, for the first time, two (2) appendices.  "Appendix A" purported

to identify specific drugs which had inflated AWPs.  "Appendix B" purported to detail the

specific drugs that were purchased by each individual plaintiff based upon AWP.  As there were

no consumers listed in the AMCC, no consumer drug purchases were listed in Appendix B.

On November 21, 2003, the Court held a hearing at which it instructed Co-Lead Counsel

to modify the AMCC.  On December 5, 2003, Co-Lead Counsel filed a Notice of Filing of

AMCC *Modified Per the Court's Instruction at the November 21, 2003 Hearing* ("Notice").  *See*

Docket No. 644.  The Notice explained that a "modified" AMCC was being filed that same day

to "add( ) allegations regarding the fact that plaintiffs' drug purchases are directly based upon

---

[13]     Docket No. 977 at 1.  "Triage" is an interesting choice of words, given the dire position in which Co-Lead Counsel found themselves after this Court's May 13, 2003 dismissal Order.  The word literally means "[a] process for sorting injured people into groups based on their need for or likely benefit from immediate medical treatment.  Triage is used in hospital emergency rooms, on battlefields, and at disaster sites when limited medical resources must be allocated."  It is "[a] system used to allocate a scarce commodity ... only to those capable of deriving the greatest benefit from it."  The American Heritage Dictionary of the English Language, Fourth Edition.

AWP pricing", in direct response to defendants' argument that "under Count 1 plaintiffs have no standing to assert claims because none of the plaintiffs were covered by Medicare Part B drugs …". *Id.* at 2. Co-Lead Counsel represented that "Appendix B has been amended to reflect purchase of drugs by individual plaintiffs." *Id.* at 3.

On December 19, 2003, defendants filed a Motion for Leave to File Response to the Notice. Docket No. 660. The response pointed out that the "modified" AMCC "represent[ed] plaintiffs' fourth attempt to plead viable claims and establish that they have standing to bring them." Docket No. 977 at 2.[14] Defendants urged that "even this attempt has failed to cure plaintiffs' fundamental inability to establish standing." *Id.* Defendants reminded the Court that, at the November 21, 2003 hearing, they "noted that the associational plaintiffs had expressly disclaimed any claim for damages (AMCC ¶¶32-36)," a point which Co-Lead Counsel did not dispute. *Id.* at n.1. Defendants also accused Co-Lead Counsel of deliberately pleading in "vague terms" to circumvent the Court's clear ruling on standing in its May 13, 2003 dismissal Order, its leave to re-plead in thirty (30) days to plead standing, and its admonition at the November 21, 2003 hearing that Co-Lead Counsel were not to add any new claims or theories. *Id.* at 5, 7 (*citing* 11/21/03 Tr. at 22-23, 46). They challenged Co-Lead Counsel's claim of a "typographical error" in failing to plead that any plaintiff in the AMCC paid "either through co-pays or on their own." *Id.* at 7, 8.[15] They also repeated that "the [PAL] associations are not bringing damage claims, and they would not have standing to do so." *Id.*

---

[14]      Docket Entry No. 977 is listed on the Docket as having been entered on August 24, 2004.

[15]      Indeed, defendants pointed out to the Court that "[t]his [was] not the first time that [Co-Lead Counsel] have claimed a typographical error in response to exposure of a standing problem. When defendants' pointed out a lack of Article III standing in the MCC during the January 13, 2003 hearing before this Court, [Co-Lead Counsel] stated that it was 'a drafting error'. 1/13/03

In view of Co-Lead Counsel's "shifting" position on standing to avoid this Court's clear rulings and multiple chances to try to "cure" the defects, defendants urged the Court:

> "This case illustrates the confusion that can occur when plaintiffs strive to bring a case that is as big as possible rather than bringing a case that is properly pleaded. After four attempts, plaintiffs no longer deserve the benefit of the doubt. By continuously shifting and expanding their claims through ambiguous pleadings, plaintiffs have expanded this case beyond constitutional bounds and denied the Court the opportunity to efficiently manage this proceeding. Plaintiffs cannot claim they were injured in the context of Medicare Part B if they made no payments under Medicare Part B."

*Id.* at 9.

On January 22, 2004, Co-Lead Counsel filed a Motion to Intervene in order to add two consumer representatives, Roberta S. Starks and Kimberley K. Hoover, as attorney in fact for her mother Jeanne F. Kennedy, as putative class representatives, but only for claims involving the Together Rx Card Program. *See* Docket No. 699.[16]  On February 24, 2005, a Second Amended Master Consolidated Class Action Complaint ("SAMCC") was filed. *See* Docket No.1377.  The SAMCC listed the two (2) new consumer plaintiffs, Roberta S. Starks and Kimberley K. Hoover, as putative class representatives, but, as discussed above, only for claims involving the Together Rx Card Program.[17]  The SAMCC was also brought on behalf of the same consumer associations and TPPs who filed the AMCC. The SAMCC had no consumer plaintiffs for Class 1. The

---

Tr. at 73.  Rather than correct this 'error', [Co-Lead Counsel] dropped the individual plaintiffs from the AMCC."  *Id.* at 8, n. 7.

[16]     This pleading is peculiar insofar as Co-Lead Counsel had never sought leave of Court to have individual consumer plaintiffs "intervene" in their own case, and have not satisfied the intervention requisites since, for any of their subsequent amendments to the complaint to add or remove parties.

[17]     While the SAMCC added claims for antitrust and injunctive relief involving the Together Rx Program, *see* SAMCC ¶¶ 36(a), 36(b), 542-594, 692-725, these claims were subsequently dropped by Co-Lead Counsel from a later amendment to the SAMCC.

SAMCC also included the same Appendices as the SAMCC, updated to reflect the individual purchases of the newly-added plaintiffs.

On February 24, 2004, the Court ruled on defendants' motions to dismiss the SAMCC. Again, the defendants named in the lawsuit were listed in the Court's Order. *In re AWP*, 307 F.Supp.2d 196, 202, n.1 (D.Mass. 2004).[18]  Addressing defendants' standing arguments a second time, the Court held that while the two proffered individual consumer Together Rx plaintiffs had standing, it reserved decision as to whether these plaintiffs "have standing to assert claims on behalf of elderly program enrollees." *Id*. at 214.  Since the association plaintiffs had disavowed claims for damages in the revised AMCC, *see* AMCC ¶¶32-36, the Court did not further address their lack of standing to represent consumers for damages.

Pursuant to Case Management Order No. 10, class certification briefing proceeded with respect to Track 1 during the fall of 2004. *See* Docket No. 756.  The schedule for class certification briefing for the Track 2 case was set to begin after the Court's ruling on the Track 1 certification issues.  Co-Lead Counsel filed their Motion for Class Certification in September 2004 along with their expert disclosures.  Defendants' opposition to class certification was filed in October 2004.  In their opposition to class certification, defendants charged that "none of the named Plaintiffs can represent Medicare Part B Payers." *See* Track 1 Defendants' Memorandum in Opposition to Class Certification [Docket No. 1132] at 40.  In particular, the defendants challenged the standing of the consumer associations listed in the SAMCC.  *Id.* at 41.

On February 10, 2005, the Court held oral argument on the Motion for Class Certification respecting the Track 1 case. *See generally*, Feb. 10, 2005 Hrg. Tr. at Docket No. 1369.  At the

---

[18]      G.D. Searle was not listed in the SAMCC, and has never been listed, as a defendant in any complaint filed in this case.  Nevertheless, this company is included in the Track 2 settlement release.  Named Consumer Plaintiffs object to the inclusion of G.D. Searle and its drugs in the release as a violation of the Court's express Orders to not add new claims or drugs.

hearing and in response to the Court's specific questions about whether there were adequate representatives for consumers in the case, Co-Lead Counsel conceded the associations were controlling the case and there were no consumer plaintiffs.[19]  Feb. 10, 2005 Hrg. Tr. at 21:8-22:4. Defense counsel challenged these claims.  Feb. 10, 2005 Hrg. Tr. at 77:3-17, 78:9-25.

On August 16, 2005, this Court issued its Order and Opinion on class certification.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 FRD 61 (D.Mass 2005)("*In re AWP*").  The Court held that the associations lacked standing to serve as class representatives.  *See In re* AWP, 230 FRD at 78-82.  The Court also rejected Co-Lead Counsel's argument that the TPPs could serve as adequate representatives of the consumer claims, noting that "there may be defenses unique to TPPs non-applicable to consumers" *e.g.*, statute of limitations." *Id*.  The Court noted further concern about a possible conflict between TPPs and Medicare Part B beneficiaries, especially in the context of settlement. *Id*.  Due to the lack of any adequate or typical class representative of the Track 1 consumer Class 1 claims, the Court declined to certify a class of Medicare Part B consumers at that time.  However, it allowed Co-Lead Counsel to move to amend their complaint within sixty (60) days, based on their representation that "they have individuals waiting in the wings." *Id*.[20]

These representations, made both prior to and after this Court's August 16, 2005 Order (upon which the Court explicitly relied in granting Co-Lead Counsel 60 days leave to seek to

---

[19]   This concession by Co-Lead Counsel at the class certification hearing was in spite of the fact that both the MCC and SAMCC listed 13 separate consumers respectively as having paid for drugs based on the AWP and were thus purportedly adequate consumer class representatives. Co-Lead Counsel's *ipse dixit* assertions at the hearing about the associations' members' purchases of drugs based upon AWP was contradicted by the evidence submitted by defendants. *See* Docket No. 1132 at 41.

[20]   This representation by Co-Lead Counsel was repeated at a subsequent hearing on class certification.  January 19, 2006 Hrg. Tr. At 3:25-4:8.

amend the SAMCC) are belied by a memorandum written by the same Co-Lead Counsel to all

"AWP Counsel" *one day after* the Court's Order issued. *See* August 17, 2005 Memorandum at

Exhibit "J" hereto (sealed by Court Order dated March 24, 2009).  Apparently, none of the

dozens of plaintiffs firms in MDL 1456 had an existing consumer client, as no consumer client

was produced within the 60-day period allotted by the Court for filing an amended complaint.[21]

Instead, Named Consumer Plaintiffs were asked by Co-Lead Counsel, through their

undersigned personal counsel, to join the lawsuit as consumer representative plaintiffs.  They

chose to do so on the express condition that their trusted personal advisor would be appointed as

Co-Lead Counsel to serve and protect their interests in the litigation. *See generally*, Declarations

of Named Consumer Plaintiffs at Docket Nos. 4647 through 4650 and Nos. 4652 through 4653.[22]

Co-Lead Counsel agreed to seek the appointment of the undersigned and his firm as Co-Lead

Counsel. *See* Email Agreement at Exhibit "K" hereto.  When the undersigned left his former law

firm with his clients, the undersigned wrote to Co-Lead Counsel to ensure that they would honor

their agreement with the Named Consumer Plaintiffs.  At the time, Co-Lead Counsel agreed.[23]

*See* Email at Exhibit "L".

---

[21]    Despite the fact no MDL plaintiffs' firm had an existing Track 2 consumer client, Co-Lead Counsel continued to act as if they had clients by "meeting and conferring" with defendants about a proposed modification to the Track 2 discovery schedule premised upon their proffer of Track 2 class representatives by the October 15 deadline. *See, e.g.*, Plaintiffs' Motion to Modify the Track Two Discovery Schedule, filed September 28, 2005 [Docket No. 1741] at 3 (referencing "the additional class representatives that Plaintiffs *will propose* for Track Two")(emphasis added).

[22]    *See In re Lupron Marketing Marketing and Sales Practice Litig.*, MDL 1430, 01-cv-10861-RGS [D. Mass. March 2, 2006 [Docket No. 487 at 3] (acknowledging that "[t]he clear benefit KSG conferred upon the MDL consumer class was the negotiated increase from 30% to 50% in the recovery of out-of-pocket expenditures by class members").

[23]    The history between Co-Lead Counsel and the undersigned's clients is set forth in other pleadings which appropriately detail the factual record.  Accordingly, such factual history will

On October 17, 2005, a Third Amended Consolidated Class Action Complaint

("TAMCC") was filed in order to comply with the Court's class certification order. *See* Docket

No.1781-1787.  The TAMCC listed six (6) of the thirteen (13) Named Consumer Plaintiffs as

representatives of Class 1.  The TAMCC also listed two (2) of the thirteen (13) Named

Consumer Plaintiffs as representatives of Class 3.  The TAMCC also listed five (5) PAL

consumer associations "for purposes of seeking declaratory, injunctive and other non-monetary

relief" only.  TAMCC at ¶¶ 55-59.  Four (4) out of the five (5) associations were the Court-

approved representative plaintiffs for the Track 2 Class 1 settlement class.

On March 1, 2006, a Fourth Amended Master Consolidated Class Action Complaint

("FAMCC") was filed.  *See* Docket No.2171-2176.  The FAMCC listed eleven (11) proposed

Class 1 class representatives, including ten (10) of the thirteen (13) Named Consumer Plaintiffs.

The FAMCC continued to list the same five (5) PAL consumer associations.  Also on March 1,

2006, Co-Lead Counsel filed a proposed class certification order for Track 2, listing Named

Consumer Plaintiffs.  *See* Docket Nos. 2169 and 2170 respectively.

On March 14, 2006, Defendants filed Track Two Defendants' Motion to Strike Portions

of the Fourth amended Master Consolidated Complaint and Notice of Errata, alleging, *inter alia,*

that the plaintiffs were attempting to covertly expand the number of drugs for Track 2

defendants.  *See* Docket No. 2249.  On April 10, 2006, this Court electronically entered its order

striking the added new drugs.  ("I strike the new drugs").  *See* Exhibit "M" attached hereto.

On May 8, 2006, Co-Lead Counsel filed Plaintiff's Motion to Certify Claims with

Respect to Track Two Defendants.  The Affidavit of Donald E. Haviland, Jr., Esquire, filed in

---

not be recounted here, but these pleadings and the record in support thereof are incorporated by
reference thereto to the extent relevant to the Court's determinations of Track 2 settlement class
certification and final settlement approval.

support of the Motion, detailed the evidence of payments based on AWP for Track 2 defendants'
drugs made by the Named Consumer Plaintiffs. The Memorandum of Law in Support
specifically stated that because "[p]laintiffs proffer as Track 2 representatives some of the
previously appointed representatives for the Track 1 Defendants", including M. Joyce Howe,
Larry Young, and Reverend David Aaronson that there were "no possible typicality or adequacy
issues" with respect to these proffered class representatives. Co-Lead Counsel also proffered
Hunter Walters, Harold Carter, Roger Clark, and Harold Bean as additional Track 2 Class 1
consumer representatives in order to comply with the Court's August 2005 directive that there
must be at least one class representative for each defendant. On June 15, 2006, defendants filed
their opposition brief, specifically challenging the standing of the consumer association HCFA.
Track Two Defendants' Memorandum in Opposition to Class Certification at 37-38 [Docket No.
2829](case citations omitted). The Court never ruled on the class certification motion.

On April 26, 2007, Co-Lead Counsel filed Class Plaintiffs' Motion for Leave to File an
Amended Complaint, as well as a proposed Fifth Amended Master Consolidated Class Action
Complaint. *See* Docket Nos. 4105 and 4106. On May 10, 2007, Defendants filed Track Two
Defendants' opposition to Class Plaintiffs' Motion for Leave to File an Amended Complaint
challenging that the proposed Fifth Amended Complaint "added dozens of drugs previously
excluded from this case ...". *See* Docket No. 4181. On September 10, 2007 this Court issued its
Order (Docket No. 4105), denying the Motion to Amend "to the extent the Amendment adds
new drugs.". *See* Docket No. 4702 at 6.

On February 17, 2009, a Revised Fifth Amended Master Consolidated Class Action
Complaint ("RFAMCC") was filed. *See* Docket No. 5902. The RFAMCC listed twelve (12)
consumer Class 1 class representatives, including nine (9) Named Consumer Plaintiffs, although

12

some had passed away long ago.  The RFAMCC added the PAL association HCFA back into the complaint as a Class 3 representative (although this Court appointed HCFA as a Class settlement class representative).

## A.    THE PROPOSED TRACK 2 SETTLEMENT AND NATIONWIDE SETTLEMENT CLASS CERTIFICATION

Co-Lead Counsel proceeded to settle the case without any appropriate consumer representative plaintiffs for Class 1.  On March 7, 2008, Co-Lead Counsel filed the Motion for Preliminary Approval of the Track Two Settlement.  The Memorandum of Law in Support sought to incorporate the Court's prior rulings on the Rule 23(a) prerequisites, including its findings as to typicality and adequacy of representation, even though none of the Class 1 class representatives covered by such rulings were included.

On March 14, 2008, the Court convened a preliminary approval hearing.  At the hearing, Co-Lead Counsel represented that "plaintiffs have proposed and defendants have agreed that we will *replace* the current proposed representatives for Class 1, which are, I think, four or five advocacy organizations, with at least one or preferably more individual class members."  *See* March 14, 2008 Hearing Transcript, at 5:44-25 at Docket No. 5147 (emphasis added).  The Court pressed for disclosure of the name(s) of such individuals, but counsel indicated he could not tell the Court because the lone person counsel had "identified" was very elderly ("I think she's 85 years old" and "very ill with cancer").  Indeed, Co-Lead Counsel admitted he was having trouble "getting in touch with her."  *Id.* at 5:25-6:10.  The Court advised counsel "to spend time with them and put in an affidavit that they understand the issues in the case", so that if there were challenges to adequacy, the individuals would have "the capability physically and mentally to sort of work with you."  *Id.* at 7:13-20.

On April 9, 2008, the Court continued its hearing on preliminary approval. Co-Lead Counsel apparently had withdrawn the individual consumer whom counsel had previously described to the Court. *See* April 9, 2008 Hearing Transcript, at 4:8-5:3, at Docket No. 5259. Co-Lead Counsel again indicated that they had a new consumer representative; however, counsel stated that they "didn't have time to get those papers to [the Court] before [the] hearing". They claimed a motion to add that individual would be forthcoming within days. *See id.* at 5:3-13.

On June 27, 2008, Co-Lead Counsel filed Class Plaintiffs' Motion to Add Individual Plaintiff as Class One Representative for Track Two Settlement and for Protective Order Related to Notice to Class 3 Consumers ("Motion to Add Individual Plaintiff"). *See* Docket No. 5409. In the Motion, Co-Lead Counsel moved the Court for leave to add Ms. Murial Tonacchio, as representative of the Estate of Wilma Mort and as a Track 2, Class 1 consumer settlement class representative for the Aventis Sub-Class.

On July 2, 2008, the Court granted preliminary approval of the Track Two settlement and certified a nationwide settlement class of consumers. Nineteen (19) days later, on July 21, 2008, the Court granted the Motion to Add Individual Plaintiff and held that Ms. Tonacchio could be added as a representative plaintiff along with the associations. No amended complaint was presented by Co-Lead Counsel until February 19, 2009, when Co-Lead Counsel filed the RFAMCC, and no explanation was given for the seven (7) month delay which caused the RFAMCC to be amended after certain notice of the settlement was accomplished.

On December 16, 2008, the Court held a final fairness hearing, ostensibly on the TPP portion of the settlement only. At the hearing, however, a consumer objector appeared and the Court addressed consumer settlement issues. Named Consumer Plaintiffs filed a timely

objection to the Court's proceeding in such a bifurcated manner with respect to a singular, nationwide settlement of the class claims of TPPs and consumers. *See* Docket No. 5814.

On March 2, 2009, Co-Lead Counsel filed their Motion for Entry of an Order Granting Final Approval of the Track Two Settlement, Memorandum in Support ("Final Approval Mem."), a Motion for Fees, and other pleadings. *See* Docket Nos. 5934-5939.

## II.    ARGUMENT

### A.    THE COURT SHOULD REFUSE TO CERTIFY THE PROPOSED NATIONWIDE CONSUMER SETTLEMENT CLASS FOR LACK OF A TYPICAL OR ADEQUATE CONSUMER CLASS REPRESENTATIVE

Certification of a class requires a district court to determine whether a proposed class meets the exacting prerequisites established by Rule 23. *Natchitoches Parish Hosp. Services Dist. v. Tyco Intern., Ltd.* 247 F.R.D. 253, 263 (D. Mass. 2008)(citing *Simlow v. SW Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st. Cir. 2003). All four requirements of Rule 23(a) must be met in order for certification of a class to be proper. *Key v. Gillette Co.*, 782 F.2d 5, 6 (1st Cir. 1986)(citing *Katz v. Carte Blanche Corporation*, 496 F.2d 747, 756 (3rd Cir. 1974), *cert. denied*, 419 U.S. 885 (1974)). In determining the propriety of a class action under Rule 23, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met. *Id.* (*citing Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)).

As a starting point, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *In re Credit Suisse-Aol Securities Litigation*, 253 F.R.D. 17, 21 (D. Mass. 2008)(quoting *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). In conducting its analysis, a district court is entitled to look beyond the pleadings in its evaluation.

*See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005), *accord, In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005).

In the settlement context, however, the court's otherwise "rigorous analysis" is even more exacting. The Supreme Court, in its seminal decision in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), admonished that the discretion a district court has in certifying a class for settlement purposes does not permit a district court to ease the demands of Rule 23 of the Federal Rules of Civil Procedure. To the contrary, a district court must apply "undiluted, even heightened attention" to the requirements of Rule 23 "in the settlement context." *Amchem*, 521 U.S. at 620. *See also Walker v. Liggett Group, Inc.*, 175 F.R.D. 226, 230 (S.D.W.V. 1997).

Of paramount concern under Rule 23(a) is the requirement that the representative party fairly and adequately represent the interests of the class. *See* Fed.R.Civ.P. 23(a)(4); *Tilley v. TJX Companies, Inc.*, 212 F.R.D. 43, 46 (D. Mass. 2003), *vacated on other grounds*, 345 F.3d 34 (1st Cir. 2003). The analysis has two steps: the court must determine, first, whether any potential conflicts exist between the named plaintiffs and the prospective class members, and, second, whether the named plaintiffs and their counsel will prosecute their case vigorously. *In re Credit Suisse-AOL Securities Litigation*, 253 F.R.D. at 23 (citing *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 326 (D.Mass.1997); *In re Bank of Boston*, 762 F.Supp. 1525, 1534 (D.Mass.1991); *Andrews v. Bechtel Power Corp.*, 780 F.2d 121, 130 (1st Cir. 1985)).

Basic considerations of fairness require that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives (both the plaintiffs and Class Counsel) at all stages of the litigation where absent members will be bound by the court's judgment. *Susman v. Lincoln American Corp.*, 561 F.2d 86, 89 (7th Cir. 1977)(citing *National Association of Regional Medical Programs v. Matthews*, 551 F.2d 340

16

(D.C. Cir. 1976). That means that, even if a court previously adjudged the adequacy of the named representative plaintiffs and/or class counsel, such ruling must be re-visited at the point of settlement when a final judgment is sought. The requirement of adequacy is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff. *Key v. Gillette Co.,* 782 F.2d 5, 7 (1st Cir. 1986). To decide whether class counsel will "fairly and adequately represent the interests of the class," the court must consider, *inter alia*, "the work counsel has done in identifying or investigating potential claims in the action". Fed.R.Civ.P. 23(g)(1)(A). The court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

In all cases, the court must be assured that the procedures designed to assure adequate representation have been carefully followed. *Kirby v. Cullinet Software, Inc.,* 116 F.R.D. 303, 310 (D. Mass. 1987).

1. **The Court's Fiduciary Duty to the Class Compels "Undiluted, Heightened Attention" to Considerations of the Standing, Typicality and Adequacy of the Proposed Consumer Settlement Class Representatives and the Adequacy of Class Counsel.**

The district court owes a fiduciary duty to class members in approving a class action settlement. "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002). The fiduciary responsibility of the district court includes the obligation of ensuring that "the class members' interests were represented adequately." *Int'l Un. of Electronic, Electrical, Salaried, Machine & Furn Workers, AFL-CIO v. Unisys Corp.*, 858 F. Supp. 1243,1264 (E.D.N.Y. 1994).

This duty does not allow the district court to acquiesce in the class representative's inadequate representation of class members. *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).

The Court's fiduciary duty extends to its review of the terms of a proposed settlement and the conduct of counsel in achieving the settlement. *See generally, Reynolds supra.* As the fiduciary for the consumer class and final arbiter of who is best suited to represent their interests,[24] the Court must review the record of these proceedings and make specific findings of fact and conclusions of law about Co-Lead Counsel's fitness to have served as consumer settlement counsel without any consumer client and with a separate fiduciary obligation to PAL and its member organizations to achieve a "separate *cy pres* fund." *See* Exhibit "B" hereto. This fiduciary duty extends to both the Court and the lawyers in the case. Indeed, the fiduciary duty lawyers owe their clients applies in all cases, not just class action cases. *See, e.g, Huber v. Taylor*, 469 F.3d 67, 81 (3rd Cir. 2006); *see also*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,*55 F.3d 768, 801 (3rd Cir., 1995); *Soskel v. Texaco, Inc.* 94 F.R.D. 201, 203 (D.C.N.Y., 1982); *Deadwyler v. Volkswagen of America, Inc,*134 F.R.D. 128, 140 (W.D.N.C.,1991). Indeed, in class action cases, a heightened duty is imposed upon the lawyers to ensure that the named representative plaintiffs are informed at each stage of the process. *See Greenfield v. Villager Industries, Inc.,* 483 F.2d 824, 831-832 (3rd Cir. 1973).

Thus, if the lawyer, through breach of his fiduciary obligations to the class, *see Zucker v. Occidental Petroleum Corp.,* 192 F.3d 1323, 1327-28 (9th Cir.1999); *Sondel v. Northwest Airlines, Inc.,* 56 F.3d 934, 938 (8th Cir.1995); *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th

---

[24]     Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court must undertake a distinct inquiry into whether Co-Lead Class Counsel was "best able to represent the interests of the class" for purposes of its mandatory consumer settlement class counsel appointment decision. Fed.R.Civ.Proc. 23(g)(2). *See also*, *In re AWP*, 2008 WL 53278 at * 1.

Cir.1985); *Greenfield,* 483 F.2d at 832, or otherwise, demonstrates that he is not an adequate

representative of the interests of the class as a whole, certification must be denied. *Dubin v.*

*Miller,* 132 F.R.D. 269, 273 (D.Colo.1990); *Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646

F.Supp. 643, 661 (N.D.Ill.1986); *Culver v. City of Milwaukee,* 277 F.3d 908, 913 (7th Cir. 2002).

> ## 2. The Designated Representatives for Class 1 Consumers in the Track II Settlement Class Lack Standing to Sue for Damages, and Are Atypical and Inadequate.
>
> ### a. The Associations Continue to Lack Standing to Sue for Damages, and Remain Atypical and Inadequate To Serve As Consumer Class Representatives.

This Court dismissed the damages claims of the consumer associations in this case. It

further ruled that they were atypical and inadequate to represent consumer damage claims in a

class action.[25] Nevertheless, the same PAL member associations that were subject to these

rulings have been appointed by this court as Track 2 Class 1 consumer representatives. The

Court set out the standard for the typicality and adequacy of representative plaintiffs in this case,

holding that there must be an individual class representative with standing to sue *each individual*

*defendant. In re AWP,* 230 F.R.D. at 80 (emphasis added). No motions to reconsider this

Court's August 2005 decision were filed by any party, and no party sought certification of an

interlocutory appeal from this ruling.

The Track 2 settling defendants – who vigorously and successfully opposed the

appointment of these same associations as consumer class representatives in the litigation context

---

[25]     Although this Court held that the associations did not have standing under Rule 23(b)(3), it held they might have standing under Rule 23(b)(2) to pursue injunctive relief. Indeed, the Court previously certified HCFA as the lone consumer class representative for consumer Class 3 Claims for injunctive relief under Rule 23(b)(2). *See In re AWP,* 233 F.R.D. 229 (D. Mass. 2006) (certifying "Health Care for All as the representative for this Class pursuant to Fed.R.Civ.P. 23(b)(2)"). The PAL associations (including HCFA) abandoned their claims for declaratory or injunctive relief, but agreed to release them. *See discussion infra.*

– offer no explanation for their changed view.  They offer no basis for why this Court should reverse itself on a decision they fought hard to obtain.[26]  The law of this case compels a finding that the requirements of Rule 23(a)(3) and 23(a)(4) have not been satisfied.[27]

### b.    Co-Lead Counsel's Existing Representation of PAL and the PAL Consumer Associations Places Them and Their Association Clients In an Irreconcilable Conflict With Consumers.

Even were this Honorable Court to reverse its prior judgment that the associations do not have standing, it could not certify the associations as either typical (under Rule 23(a)(3)) or adequate (under Rule 23(a)(4)) because the associations are in conflict with consumers.  The conflict between the associations and the consumer class is fundamental.  *See Natchitoches Parish Hosp. Services Dist. v. Tyco Intern., Ltd.* 247 F.R.D. at 265.  In this Court's July 2, 2008 Order granting Preliminary Approval of the Track Two Settlements, the Court appointed the following associations as representatives of Track 2 Consumer Class 1: Vermont Public Interest Research Group, Wisconsin Citizen Action, New York State Wide Senior Action Council, Citizen Action of New York, and Health Care for All.  Each of these above associations is a member organization/coalition partner of PAL.  *See* Exhibit "D" hereto.

PAL's core mission is to "make prescription drug prices more affordable for consumers, using class action litigation" as its tool of choice.  *See* Exhibit "N" (available at www. prescriptionacesslitigation.org/about?id-0001, last visited on March 13, 2009).  PAL claims to be

---

[26]    *See generally,* Track 1 Defendants' Memorandum in Opposition to Class Certification [Docket No. 1132]; Defendant Bayer Corp's Individual Memorandum in Opposition to Class Certification [Docket No. 2687]; Track Two Defendants' Memorandum in Opposition to Class Certification [Docket No. 2829].

[27]    As most commonly defined, the "law of the case" doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  *Arizona v. California,* 460 U.S. 605, 618 (1983) (internal citations omitted).

a "national coalition of more than 130 organizations," including all of the dozens of associations who have been listed as plaintiffs in the various complaints over the more than seven (7) years this case has been pending. *See id.* PAL's stated goal in utilizing class action lawsuits is "to force pharmaceutical companies to end unfair and illegal practices that [the drug companies] use to abuse their monopoly power and keep prices high." *See* Exhibit "O" , PAL Current Lawsuits, FAQ, available at www.prescriptionacesslitigation.org/lawsuitssettlements?id-0005, last visited on March 13, 2009.   PAL's stated long term goal is to use the lawsuits as a way to "move the issue of access to prescription drugs to the forefront of the public eye" and to "persuade state and congressional legislative leaders to address the high price of prescription drugs . . . ."[28]   *Id.* These lawsuits, PAL asserts, "have great potential to change industry behavior". *Id.*[29]

PAL member organizations/coalition partners, attorneys and law firms are all dedicated to promoting PAL goals.   All four Co-Lead Counsel firms approved by this Court under Rule 23(g) represent PAL.   PAL's core principles include obtaining *cy pres* distributions of settlement funds in class action cases involving PAL.   *See* Exhibit "B".

Given the lack of standing of the associations in this case, and their express disavowal of damage claims in the RFAMCC, *see* RFAMCC ¶¶63-67, consumers – if properly represented in this case – would say the PAL associations should get nothing and should not have been involved in any way in the negotiation of the settlement of the litigation or the allocation of consumer settlement proceeds.   But, the Director of PAL was appointed by Co-Lead Counsel to

---

[28]     Because PAL's goals coincide with the goals of Co-Lead Counsel, the Court must take account of Co-Lead Counsel's efforts to steer *cy pres* dollars to PAL as part of its overall consideration of appropriate fees to be paid Co-Lead Counsel out of the Track 2 settlement fund, if     approved.     *See*     Exhibit     "B"     and     Exhibit     "P",     available     at http://www.prescriptionaccess.org/about?id=0007.

[29]     It is ironic that one of PAL's purposes is to "change industry behavior", and yet its member associations abandoned completely their injunctive claims.

serve in the critical role of consumer allocation counsel.[30]  Unfortunately the proposed settlement

provides for an "at best" disappointing consumer allocation of settlement proceeds. *Compare*

Track 2 Settlement Agreement at Docket No. 5133 (evidencing a split between consumer and

TPP settlement funds of 17.5% and 82.5%, respectively) *with* GlaxoSmithKline Settlement

Agreement at Docket No. 2972 (involving a consumer/TPP split of 30%/70%, respectively).

Respectfully, PAL's Director, Mr. Sugerman-Brozan, had no business negotiating the

allocation of the Track 2 consumer settlement fund.  His organization's "mission" is to recover

"a separate *cy pres* fund."  Such a fund can only be created if consumers are not paid the entirety

of their share of settlement proceeds.

Similarly, Co-Lead Counsel had no business representing consumer interests in the Track

2 settlement, given their existing representation of and fiduciary duties owed to PAL and its

members and affiliates.  The only way for PAL to receive monies was to piggyback on

consumers to achieve a settlement, and then seek to carve out a portion of the consumers'

settlement for a guaranteed *cy pres* fund.[31]

Attorneys owe fiduciary duties to their clients, even in the context of a class action.

*Huber v. Taylor*, 469 F.3d 67, 82 (3d Cir. 2006).  In reaching a compromise in settlement of a

class action, the attorney representing the plaintiff class is placed in a particularly difficult

position because he or she bears responsibility both toward the class as a whole and toward

individual class members.  *Ficalora v. Lockheed California, Co*, 751 F.2d 995, 996 (9th Cir.

---

[30]     Alex Sugerman-Brozan has been the director of PAL for approximately the last five
years, although he appears to have recently become affiliated with the Boston firm Pyle, Rome,
Lichten, Ehrenberg & Liss – Riordan, P.C.  However, because Mr. Sugerman-Brozan's
relationship with PAL is currently unknown, he will be referred to as the director of PAL.  *See*
Exhibit "Q", available at http://www.prle.com/attorneys/alex.htm.

[31]     *See generally*, objections of M. Joyce Howe to the AstraZeneca settlement.

1985)(citing *Mandujano v. Basic Vegetable Prods. Inc.* 541 F.2d 832, 834-35 (9th Cir. 1976)).

When there exists such a substantial and prejudicial conflict between class counsel and the class,

as here, class certification is improper and any resultant settlement is rendered suspect. *See, e.g.,*

*City Partnership Company v. Atlantic Acquisition Limited partnership,* 100 F.3d 1041, 1044 (1st

Cir. 1996).[32]

Co-Lead Counsel never disclosed the above facts to any consumer client or this Court.[33]

Upon objection by a class plaintiff to representation by class counsel, class counsel must file a

motion with the court to withdraw as representative of that class objector. *See Saylor v.*

*Lindsley*, 456 F.2d 896, 900 (2d Cir. 1972). *Flynn v. FMC*, 528 F.2d 1169, 1174 (4th Cir. 1975);

*Olden v. La Farge Corp.*, 472 F.Supp 2d. 922, 938 (E.D. Mich. 2007); *Heit v. Van Ochten,* 126

F.Supp. 487, 494 (W.D. Mich. 2001).  In addition, class counsel may be disqualified where the

actual prejudice to the objectors of being opposed by their former class counsel outweighs the

interest in the class in continued representation by experienced counsel.  *See Lazy Oil Co. v.*

---

[32]    Class counsel, like all attorneys, must comply with the ethical standards respecting the named plaintiffs. *See, e.g.* Mass.R.Prof.C. 1.2 ("a lawyer shall seek the lawful objectives of his or her client through reasonably available means permitted by law … [and] shall abide by a client's decision whether to accept an offer of settlement of a matter); 1.4 ("a lawyers shall keep a client reasonably informed about the status of a matter … [and] shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"); 1.5 ("a lawyer shall not … collect an illegal or excessive fee …", and shall not divide a fee with "lawyers who are not in the same firm, unless, "after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable.")

[33]    The undersigned cannot say that Ms. Tonacchio was *not* so advised, but her Affidavit filed with this Court is silent on the matter.  An appropriate inquiry of Ms. Tonacchio, however, would reveal whether she was informed of Co-Lead Counsel's conflict and knowingly and intelligently agreed to waive the conflict in agreeing to be represented by Co-Lead Counsel. However, in the absence of a record of such disclosure, and in light of this Court's clear admonition to counsel to "spend time" with Ms. Tonacchio to ensure that she "understand(s) the issues in the case", it must be presumed that no timely disclosure was made and no waiver was obtained.  March 14, 2008 Hearing Transcript at 7:13-20 [Docket No. 5147](requiring an affidavit demonstrating the same).

*Witco Corporation*, 166 F.3d 581 (3d Cir. 1999). Here, Named Consumer Plaintiffs have voiced

their objections, both as to Co-Lead Counsels' representation of their interests and the

settlements that have been negotiated allegedly on their behalf, but without their authorization or

consent. *See generally*, Declarations of Named Consumer Plaintiffs at Docket Nos. 4647

through 4650 and Nos. 4652 through 4653.

It is telling that defendants would seek to proffer HCFA as an adequate and typical

representative, after defendants directly rebuked this association in June of 2006 in the context of

the litigation class certification. It is even more telling that Track 2 defendant TAP, and its

counsel at Jones Day, would embrace PAL and the PAL member organizations in the settlement

of this case, when they fought against the application of PAL's parent, Community Catalyst, to

receive a "separate *cy pres* fund" out of the residual consumer settlement funds in the *Lupron*

case. *See* MDL 1430 Docket No. 520.[34]

Co-Lead Counsel have essentially substituted themselves throughout the pendency of this

action as the consumer class representatives. But named plaintiffs are required to be more than

window dressing or puppets for class counsel. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718,

727 (11th Cir. 1987). Indeed, where the named plaintiffs have abandoned their role in the case

beyond that of furnishing their names as plaintiffs, the attorneys, in fact, become the

representatives of the class representatives. *See Helfard v. Cenco*, 80 F.R.D. 1, 7-8 (N.D. Ill

1977). Courts have overwhelmingly ruled that an attorney may not serve both as class counsel

and class representative. *See Susman v. Lincoln American Corp.*, 561 F.2d 86, 90-92 (7th Cir.

---

[34]     In *Lupron*, the same Co-Lead Counsel here proposed giving nearly half of the residual consumer settlement fund to Community Catalyst. *See* MDL 1430 Docket No. 519. The undersigned objected on behalf of its *Lupron* clients, including Named Consumer Plaintiffs here, and proposed that the all of the money be paid to the consumer plaintiffs, not Community Catalyst or PAL. *See* MDL 1430 Docket No. 533.

1977)(citations omitted)(collecting cases); *In re California Micro Devices Securities,* 168 F.R.D. 257, 260 (N.D. Calif. 1996). The danger of class counsel self-dealing is not limited to the situation in which the attorney serves as both class representative and class counsel; rather, it is present in every situation where class counsel is allowed to prosecute an action and to negotiate settlement terms without meaningful oversight by the class representative. *In re California Micro Devices Securities,* 168 F.R.D. at 262. An informed and independent class representative is necessary to monitor class counsel at every stage of the litigation. *Id.* at 269-70.

### c.  Muriel Tonacchio, As Representative Of the Estate Of Wilma Mort, Has Failed to Demonstrate Her Standing to Sue and Is Not Typical or Adequate to Serve as a Track 2 Class 1 Consumer Settlement Class Representative.

Ms. Murial Tonacchio lacks standing, and is not typical or adequate to be a Track 2 Class 1 consumer class representative. *In re AWP*, 230 F.R.D. at 79-80. Ms. Tonacchio's Affidavit and supporting statement is devoid of the evidentiary substance required to demonstrate standing to sue, or typicality or adequacy to serve as a class representative.

First, the statement appears to show that Ms. Tonacchio's mother, Ms. Mort, may have been treated at a hospital, the Weirton Medical Center,[35] on an in-patient basis, given that the statement lists a "discharge date". The lack of attribution of the "Medicare Electronic Payment" on page 5 of 7 of the statement, and the lack of a proffer of a Medicare Part B Explanation of Benefits Form ("EOB") by either Ms. Tonacchio or Co-Lead Counsel, raises questions about Ms. Tonacchio's claim that the Anzemet was administered on an "out-patient" basis under Medicare Part B when such evidence exists and is readily available to Medicare Part B beneficiaries. *Compare* Docket No.2615.

---

[35]     *See* Exhibit "O" hereto (describing "Weirton Medical Center [as] a 238-bed, non-profit, acute-care, general community hospital").

Second, the statement shows one administration of "Anzemet 100mg/5ml" billed at

$117.25.[36]  There is no J-Code listed, which raises another concern that this treatment was not an

AWP-based billing to Medicare Part B.  *Compare id. at* AARON0088 (Exhibit "L").

Third, the AWP used by Medicare at the time alleged by Ms. Tonacchio was $17.32 for

10 mg of Anzemet, $173.20 for 100 mg.  *See* Excerpts of HCPCS Pricing File at Exhibit "R".

The statement lists a billed charge of $117.25, not an AWP-based charge.  Indeed, it is apparent

that Ms. Mort was billed substantially less than AWP, if she was billed at all for the drug.

Fourth, even assuming *arguendo* that the $117.25 was an AWP-based charge, Medicare

Part B only covered 95% of the Anzemet AWP at the time as the "allowable".  Thus, the

allowable charge would have been $111.39, and not the listed $117.25 (*i.e.,* 117.25 x .95).  No

evidence is submitted to show disallowance by Medicare of the difference of $5.86.

Fifth, at the time Ms. Mort received the administration of Anzemet, Medicare Part B only

paid 80% of the allowable charge, leaving the patient and her Medigap insurer with a 20% co-

insurance obligation.  Thus, Medicare's allowable share of the Anzemet billed charge would

have been $89.11 (117.25 x .95 x .80), leaving Ms. Mort and her Medigap insurer with a co-

insurance obligation of 20%, or $22.27 (117.25 x .95 x .20).  The statement does not reveal

either a Medicare payment of $89.11 or a balance due of $22.27.

Sixth, Ms. Tonacchio's claim in her Affidavit that the statement "reflect(s) my mother's

*payment* of $42.44 in May 2003" is belied by the statement itself.  The statement is neither a bill

nor a receipt for a payment.  Presumably, it was never sent to Ms. Mort in conjunction with her

Anzemet treatment in 2003, since someone apparently got Weirton Medical Center to generate

---

[36]     The evidence of this one administration of Anzemet undermines Ms. Tonacchio's
averment that "Ms. Mort made *one or more payments* for this drug."  RFAMCC at 24A.

the statement on April 8, 2008. The statement bears no indication that Ms. Mort was billed for anything or actually made a payment for anything.[37] No cancelled checks, banks statements, receipts, EOBs, claims histories or other documentation typically used to demonstrate payment for a drug in this case, and required by this Court, have been supplied by Co-Lead Counsel.

Further, the statement does not demonstrate that a balance was due and owing by any party after Medicare and a commercial payor made their respective payments. The subject $42.44 amount is listed on the statement as a "Loss/Gain-Electronic Medicare" indicating that was an amount likely disallowed by Medicare. Indeed, the true balance shown to be due after Medicare's electronic payment was $90.00, which amount appears to have been paid in full by a commercial payor. Since Ms. Tonacchio claims that Ms. Mort's supplemental Medigap insurance paid for some, but not all, of Ms. Mort's drugs, that would mean that the listed commercial payor was "National Steel Worker's insurance". However, because the payment made was the full $90 residual amount due after Medicare's electronic payment, there is no evidence to support Ms. Tonacchio's claim that the insurer only made a partial payment for her mother's drugs and her mother paid the unpaid balance. No insurance EOB or other insurance documentation is provided from "National Steel Worker's insurance" to demonstrate the breakdown of amounts paid and amounts denied. While the statement might support a claim that a balance of $42.44 was due and owing on September 26, 2003, since Ms. Mort passed away, she likely did *not* make such a payment.

---

[37]   Further, Ms. Tonacchio states that she personally spoke on the telephone to a "representative of Weirton Medical Center" who orally stated that a $42.44 payment allegedly made by her mother to the Weirton Medical Center resulted from a refusal of her supplemental insurance carrier. However, Ms. Tonacchio does not identify the individual with whom she spoke. Notwithstanding the obvious hearsay surrounding the statement, it is far from adequate proof that Mrs. Mort was obligated to pay and subsequently paid an AWP-based payment.

Seventh, assuming that a balance of $42.44 remains due and owing to Weirton Medical Center – nearly six (6) years after Ms. Mort's treatment and death in September 2003 -- Ms. Mort's estate does not meet the settlement class definition for standing as it has not shown that it is a person who "made, or incurred an obligation to make" a payment based on AWP.  No showing is made that a medical bill has survived Ms. Mort's death as a valid "obligation" of the Mort estate.  (Typically, such an obligation would not survive.)  If it did survive, no explanation is given by the legal representative of the estate – presumably Ms. Tonacchio[38] – as to why the estate failed to pay the bill when the estate was probated.  Still further, no explanation is given as to why the administrator of the estate has not pursued "National Steel Worker's insurance" for its failure to meet its plan obligations in the intervening five (5) years, ten (10) months since the Anzemet treatment.[39]  Indeed, since Ms. Mort was covered by a Medigap carrier, she did not "incur an obligation", the carrier did.  At a minimum, the matter of who owns the obligation would need to be sorted out before any claims administration process could go forward in order to prevent overlapping, duplicative claims from being made by both Ms. Tonacchio and "National Steel Workers insurance" against the settlement fund for the same Anzemet injection and charge.

Finally, even were this Court to find Ms Tonacchio adequate to represent the Track 2 Class 1 consumer settlement class, she could only be certified as the representative for the

---

[38]     Ms. Tonacchio fails to demonstrate that she is in fact the legal representative, and thus has legal standing, to represent the "Estate of Wilma Mort" under West Virginia law.  As one of five children of Mrs. Mort, it is especially important that some measure of legal standing be proffered by Ms. Tonacchio, *i.e.*, Letters of Administration/Testamentary, to provide a sufficient legal basis to allow her to represent the estate in this matter.  Without proper proof, Ms. Tonacchio has no legal standing to act on behalf of or represent the Estate as a class representative, no matter what the circumstances of her mother's claim.

[39]     A question also arises as to whether the operative statute of limitations has run due to the estate's failure to timely act in this regard.

Aventis Sub-Class, since Anzemet is the only drug for which Ms. Tonacchio claims her mother an AWP-based payment. *In re AWP*, 230 F.R.D. at 80 ("Plaintiffs must establish that there is an individual class representative with standing to sue each defendant.")

Ms. Tonacchio never affirmatively states whether she or the Estate of Ms. Mort in fact approve of the settlement. This Court's requisite "rigorous analysis" of and "heightened attention" to standing, typicality and adequacy at the settlement stage compel a more detailed showing and documentation than has been provided by Ms. Tonacchio to resolve these important issues.

### B. THE COURT SHOULD NOT APPROVE THE SETTLEMENT BECAUSE IT IS NOT FAIR, REASONABLE OR ADEQUATE

#### 1. A Comparison of the Proposed Track 2 Settlement with the Likely Result of Litigation Shows that the Proposed Settlement Amount Is Inadequate.

For a settlement to be fair, reasonable and adequate, the value of the consideration given by the plaintiffs should be equivalent to the value of the consideration given by the defendants – in this case, the present value of the releases given by the consumers should fairly match the amount of the total settlement fund created by Track 2 defendants. The present value of the releases depends upon an assessment of the potential damages and likelihood of success on the merits. *See Reynolds*, 288 F.3d at, 285. Here, the present value of the releases grossly exceeds the amount of the consumer allocated share of the Track 2 settlement fund. Plus, Co-Lead Counsel make no effort to value the releases – releases providing broader relief than the underlying litigation sought to obtain (in terms of the defendants, claims and drugs included)[40] –

---

[40]     Class representatives cannot release claims with a different factual predicate that are held by other class members. *See National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18-19 (2d Cir. 1981). And, even with respect to claims based on an identical factual predicate, releases cannot simply be handed out to potentially liable third parties without consideration to the affected class members. *See, e.g., Reynolds*, 288 F.3d at 284; *Great Neck*

in terms of what might have been achieved at trial.  They provide no expert report on damages they expected to achieve at trial.  They make no effort to relate their proposed settlement to the substantial verdicts and settlements achieved by litigating State Attorneys General.

### 2.  The Reaction of the Class to the Settlement.

That no consumer had opted out, and only 2 objections had been filed, by March 2, 2009, the date of their filing, is a function of the fact that the consumer notice plan had not been fully accomplished, by the admission of Co-Lead Counsel's own experts.  Indeed, that all of the named class representatives for Track 2 in the TAMCC and further amendments thereto have objected to the proposed settlement for the reasons set forth herein should be an important consideration by this Court.

### III.   CONCLUSION

For the foregoing reasons, Named Consumer Plaintiffs, hereby request that this Honorable Court deny class certification and reject final approval of the proposed settlement.

Dated: March 24, 2009                    Respectfully submitted,

                                         /s/ Donald E. Haviland, Jr.
                                         Donald E. Haviland, Jr., Esquire
                                         THE HAVILAND LAW FIRM, LLC
                                         111 S. Independence Mall East, Suite 1000
                                         Philadelphia, PA 19106
                                         Telephone: (215) 609-4661

---

*Capital Appreciation Inv. Partnership, L.P. v. Price WaterhouseCoopers*, 212 F.R.D. 400, 415 (E.D. Wis. 2002).  "A class action judgment ... binds the class members as to matters actually litigated but does not resolve any claim based on individual circumstances that was not addressed in the class action." *Cameron v. Tomes*, 990 F.2d 14, 17 (1st Cir. 1993) (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 880 (1984)). *See also City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1044 (1st Cir. 1996) (holding that the purpose of the doctrine is to "achieve a comprehensive settlement that would prevent relitigation of settled questions *at the core* of a class action") (citing *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982)) (emphasis added).