# EXHIBIT A

# KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

**101 PARK AVENUE**

**NEW YORK, NEW YORK 10178**

(212) 808-7800

WASHINGTON, DC
CHICAGO, IL
STAMFORD, CT
PARSIPPANY, NJ

BRUSSELS, BELGIUM

AFFILIATE OFFICES
MUMBAI, INDIA

FACSIMILE
(212) 808-7897
www.kelleydrye.com

PHILIP D. ROBBEN
DIRECT LINE: (212) 808-7726
EMAIL: probben@kelleydrye.com

August 19, 2008

**VIA FACSIMILE & E-MAIL**

Nicholas N. Paul, Esq.
Supervising Deputy Attorney General
California Bureau of Medi-Cal Fraud & Elder Abuse
Office of the Attorney General
1455 Frazee Road, Suite 315
San Diego, CA 92108-4304

Re: State of California ex rel. Ven-A-Care of the Florida Keys Inc. v. Abbott Labs. et al., Case No. 01-cv-12257 (PBS), MDL 1456 (D. Mass)

Dear Nick:

Pursuant to Paragraph 8(G) of Case Management Order No. 31, and on behalf of remaining defendants Dey, Mylan, Sandoz, and Warrick (collectively, the "Remaining Defendants"), I am sending this letter to request that the State of California designate a witness or witnesses to testify concerning the following topics[*]:

1. The allegedly false or fraudulent statements or actions made or taken by the Remaining Defendants that relate in any way to the claims in the Complaint, including: false or fraudulent statements made or caused to be made by the Remaining Defendants and their agents; false or fraudulent claims filed by the Remaining Defendants and their agents; actions or statements that caused a false or fraudulent claim to be filed; and false or fraudulent price representations.

2. The facts and circumstances forming the basis for the allegation, in paragraph 1 of the Complaint, that, "Defendants defrauded [Medi-Cal] . . . by reporting excessively high and

---

[*] For the purposes of the list of topics to follow, the "Definitions" section of Defendants' First Set of Requests for Production to Plaintiff State of California, served in this action on October 4, 2007, is incorporated by reference.

NY01/ROBBP/1301871.3

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Two

false prices for some of their prescription drugs with knowledge that Medi-Cal used these reported prices for establishing reimbursement to its Medi-Cal providers for these drugs."

      3.      The facts and circumstances forming the basis for the allegation, in paragraph 29 of the Complaint, that, "The Defendant manufacturers, further caused the pricing information reported to Medi-Cal to be false and misleading for their products by providing off invoice financial inducements such as free goods and cash payments."

      4.      The facts and circumstances forming the basis for the allegation, in paragraph 34 of the Complaint, that, "The manufacturers control the prices that are reported by FDB."

      5.      The facts and circumstances forming the basis for the allegation, in paragraph 35(d) of the Complaint, that, "FDB reported AWPs, DPs, wholesale acquisition costs ("WACs") and FULs for the specified prescription drugs based on the price information provided by the Defendants for their respective drugs."

      6.      The facts and circumstances forming the basis for the allegation, in paragraph 36 of the Complaint, that, "The Defendants reported or caused to be reported false or misleading prices to Medi-Cal by providing false or misleading price information . . . to the compendia including FDB with knowledge that they in turn would utilize such false and misleading price information in determining the AWPs and DPs that were reported to Medi-Cal."

      7.      The facts and circumstances forming the basis for the allegation, in paragraph 38 of the Complaint, that, "Each Defendant, at a minimum, provided such pricing information at least annually to FDB for the express purpose of causing FDB to report such prices to Medi-Cal."

      8.      The facts and circumstances forming the basis for the allegation, in paragraph 42 of the Complaint, that, "Defendants' inflation of their reported prices caused many, if not most, claims paid by Medi-Cal for Defendants' specified prescription drugs to be false claims."

      9.      The facts and circumstances forming the basis for the allegation, in paragraph 44 of the Complaint, that, "Defendants competed with each other by inflating their spread. Defendants used the spread as an unlawful financial inducement to increase their market share and profits."

      10.      The facts and circumstances forming the basis for the allegation, in paragraph 47 of the Complaint, that, "As a result of their fraudulent scheme, Defendants and their customers have reaped hundreds of millions of dollars in illegal profits at the expense of California, and directly contributed to Medi-Cal's soaring cost of providing prescription drugs to California's needy, poor, elderly, and disabled."

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Three

11. The facts and circumstances forming the basis for the allegation, in paragraph 48 of the Complaint, that, "Because FULs were based on reported prices, Defendants' reporting of inflated prices corrupted the FULs and prevented California from gaining the full benefit of the FUL safeguard."

12. The facts and circumstances forming the basis for the allegation, in paragraph 48 of the Complaint, that, "However, if truthful prices had been reported, the FUL prices would have exceeded reimbursement based on many companies' reported prices and the FUL upper limit prices would not have been utilized for reimbursement."

13. The facts and circumstances forming the basis for the allegations: (a) in paragraphs 80 through 89 of the Complaint concerning Dey; (b) in paragraphs 90 through 93 and paragraph 129 through 132 concerning Sandoz; (c) in paragraphs 123 through 128 concerning Mylan; (d) in paragraphs 170 through 176 concerning Warrick; and (e) in paragraphs 177 through 180 to the extent these allegations are directed toward any of the Remaining Defendants.

14. The facts in California's possession relating to each and every instance in which any of the Remaining Defendants marketed the "spread" to any Provider as alleged, among other places, in paragraphs 82 (Dey), 125 (Mylan), and 174 (Warrick) of the Complaint, including, for each such instance: (a) the employee of who allegedly marketed the spread; (b) the Provider to whom the spread was marketed (and the individual employees of the Provider involved in the interaction); (c) the drug that was marketed; (d) the place and time of the alleged marketing; (e) the content of the alleged marketing (including the precise facts on which California bases its assertion that the employee "marketed the spread"); (f) whether the Provider purchased or did not purchase the product; and (g) if applicable, all evidence that supports or refutes California's contention that the Provider purchased the product because of the spread between acquisition cost and reimbursement, as opposed to some other reason.

15. The basis for any contention that the prices allegedly reported or represented by the Remaining Defendants for any drug were used in determining Medi-Cal reimbursement.

16. The actual prices the Remaining Defendants should have reported in lieu of the allegedly fraudulent prices, how those actual prices were determined, and whether California contends that the Remaining Defendants should have reported each of those prices to Medi-Cal.

17. Whether and to what extent California was aware of the market prices for the Remaining Defendants' Subject Drugs and that the Remaining Defendants were allegedly marketing the spread.

18. Any guidance, instruction, or requests communicated by California to any of the Remaining Defendants concerning how to establish published and list prices.

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Four

      19.     Any guidance, instruction, or requests communicated by California to any of the Remaining Defendants regarding marketing the spread.

      20.     The continued use of AWP, WAC, and other Pricing data as means for reimbursement to Medi-Cal Providers.

      21.     Any survey, study, report, or like document, concerning the acquisition costs of pharmaceuticals, including but not limited to the Myers and Stauffer LC survey alleged in paragraph 41 of the Complaint.

      22.     Any survey, study, report, or like document, concerning the cost to Providers to dispense pharmaceuticals.

      23.     California's knowledge of actual acquisition costs for the Subject Drugs for any Provider, including but not limited to, pharmacies, physicians, wholesalers, PBMs, drug purchasing pools, or the state itself.

      24.     All attempts by California to ascertain Providers' actual acquisition costs for any prescription drugs reimbursed by the state Medicaid program.

      25.     Communications between California and Providers regarding reimbursement for acquiring, dispensing, or administering the Subject Drugs.

      26.     California's administration or oversight of Medi-Cal, including but not limited to:

(a)     The utilization of Subject Drugs by patients covered by the Medi-Cal;

(b)     Your efforts to reduce or limit expenditures for Subject Drugs;

(c)     Information provided to or received from the federal government in connection with Medi-Cal relating to prescription drug pricing or dispensing fees;

(d)     Payments made by state or other entities, such as local agencies, to providers in connection with Medi-Cal;

(e)     Payments from the state to other entities, such as local agencies, in connection with Medi-Cal; and

(f)     The state budgetary source of the money used by California to make payments in connection with Medi-Cal.

      27.     The manner in which funds paid to California by the United States of America, or any Federal Agency, pursuant to 42 U.S.C. § 1396b, are applied for, calculated, received, processed, and allocated or distributed by California.

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Five

      28.    The administration of reimbursement to providers for any Subject Drug in connection with Medi-Cal, including but not limited to:

- (a) The manner in which claims for reimbursement of Subject Drugs are submitted and verified;
- (b) Calculation, monitoring, processing, and payment of claims for reimbursement to providers for Subject Drugs under Medi-Cal during the Relevant Period;
- (c) California's negotiation, authoring, or execution of any contract or memorandum of understanding or agreement, or contribution to any contract or memorandum of understanding or agreement, between California and any Provider relating to AWP or WAC or the reimbursement of prescription drugs;
- (d) California's establishment, consideration, determination, calculation, or setting of the dispensing fees or fees for other professional services payable in connection with the supply or administration of pharmacy-dispensed and physician-administered drugs;
- (e) All reports, meetings and other information relating to any analysis by California of any change to the reimbursement formula (including dispensing fee) under Medicaid for the Subject Drugs and California's adoption, rejection, or consideration of such proposal;
- (f) The circumstances surrounding each change or discussion of a potential change in Medi-Cal reimbursement rates;
- (g) California's use or consideration of any Pricing data provided to the state directly by any drug manufacturer, including how or if such information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under Medi-Cal.

      29.    California's adoption, rejection, or consideration of recommendations and information related to AWP, WAC, or other Pricing data, received from any other state, the federal government or any agency of the foregoing.

      30.    During the Relevant Period, the organizational structure of Medi-Cal, including but not limited to identifying which individuals held what positions, how long the individuals held those positions, and what were the job duties of those position.

      31.    State Medicaid plan provisions and state Medicaid plan amendments relating to prescription drugs and the process by which such plan amendments are approved, amended, and implemented.

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Six

      32.      The establishment, nature, and purpose of the state's MAIC program, including but not limited to the drugs that were subject to MAIC reimbursement, the procedure for selecting which drugs would be subject to MAIC reimbursement, the procedure for setting and changing MAICs, the criteria and information used to establish and change MAICs, and the changes to the MAIC program that were considered or implemented over time.

      33.      Communications between Medi-Cal and any member of the state legislature or representative of the governor concerning reimbursement rates for prescription drugs.

      34.      Communications between Medi-Cal and Congress, Federal Agencies, or any other agency or entity concerning implementation of the FUL regulations.

      35.      Any pending or threatened litigation, claims, allegations, or charges that Medi-Cal is not in compliance with Federal or state law or otherwise violates Federal or state law.

      36.      Any audits or compliance efforts California made to ensure that Providers were in compliance with their obligations to report usual and customary charges pursuant to 42 C.F.R. § 512(b)(2), or any applicable state regulation.

      37.      Communications between California and other states or Federal Agencies concerning the reimbursement of prescription drugs under Medicaid.

      38.      Communications, arrangements, contracts or other Documents reflecting a relationship between California and any Publisher regarding the purchase of or access to information regarding prescription drug pricing.

      39.      California's receipt, knowledge, review, adoption, or rejection of government surveys, studies, reports, audits, instructions, and recommendations concerning: (a) Medicaid reimbursement; (b) Medicare reimbursement; (c) the use of AWP and other Pricing data as the basis for Medicaid reimbursement; and (d) Provider's acquisition costs for pharmaceutical products.

      40.      The following topics concerning the Medicaid Drug Rebate Program: (a) the purpose and creation of the Medicaid Drug Rebate Program; (b) the prices used in determining Medicaid Rebates; (c) information provided by drug manufacturers; (d) determinations of Medicaid Rebate amounts; (e) invoices for Medicaid Rebates sent by or on behalf of California to any Remaining Defendant; (f) Communications between California and CMS concerning Medicaid Rebates; (g) Communications between any defendant and California concerning Medicaid Rebates; and (h) the terms of the agreements entered into by the Remaining Defendants in connection with the Medicaid Drug Rebate Program.

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Seven

      41.      The following topics concerning any California supplemental rebate program: (a) the purpose and creation of the supplemental rebate program; (b) the criteria used to select the drugs for which supplemental rebates would be required; (c) the prices used in determining supplemental rebates; (d) information provided by drug manufacturers; (e) negotiations with drug manufacturers; (f) determinations of supplemental rebate amounts; (g) invoices for supplemental rebates sent by or on behalf of California to any Remaining Defendant; (h) Communications between California and any defendant concerning supplemental rebates; (i) analyses performed by California or on California's behalf concerning implementation of a supplemental rebate program; and (j) the terms of any supplemental rebate agreements entered into by any of the Remaining Defendants.

      42.      California's knowledge and understanding of the calculation of AMP from the unit rebate amount ("URA") supplied to California by CMS pursuant to the Medicaid Drug Rebate Program.

      43.      Any actual calculation or approximation of AMP from URA.

      44.      Any analysis of AMP or URA, or proposed or actual use of AMP or URA, in connection with reimbursement under Medi-Cal.

      45.      Any comparison performed by California or on California's behalf between URA or AMP and any other price.

      46.      Communications between California and CMS concerning AMP.

      47.      Communications between California and CMS concerning URA.

      48.      Communications between California and any defendant concerning AMP.

      49.      Communications between California and any defendant concerning URA.

      50.      Communications between California (or entity acting on California's behalf) and any drug manufacturer, Provider, Provider association, government agency, or Person regarding AMP.

      51.      California's receipt, use, knowledge, understanding, and discussion of AMP information from CMS.

      52.      California's receipt, use, knowledge, understanding, and discussion of URA information from CMS.

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Eight

      53.    California's receipt, use, knowledge, understanding, and discussion of AMP information from any defendant.

      54.    The November 27-28, 1990 Pharmacy Reform Tag Meeting and the positions advocated by each attendee (including California's attendee) regarding the contemplated disclosure by HCFA to the states of AMP data.

      55.    The manner in which federal matching funds are applied for, calculated, received, processed, and allocated or distributed to California.

      56.    The manner in which rebates under the Medicaid Drug Rebate Program or any supplemental rebate program are calculated, received, processed, allocated, or distributed.

      57.    Communications between California and any defendant regarding AWP, WAC, Medicaid Rebates, supplemental rebates, drug prices, sales or marketing practices, Medi-Cal, or any allegation in the Complaint.

      58.    Communications with Ven-A-Care and any of its representatives, including but not limited to, Zachary T. Bentley, T. Mark Jones, Luis Cobo, John Lockwood, The Breen Law Firm, James J. Breen, Esq., Atlee Wampler, Esq., and Alison W. Simon, Esq.

      59.    Ven-A-Care's presentations to any state or federal government agency, department, division, or unit, including, but not limited to Ven-A-Care's presentation to the National Association of Medicaid Fraud Control Units in 1998, Ven-A-Care's presentation to Nancy-Ann Min DeParle in 1998, any Ven-A-Care presentation to CMS, any Ven-A-Care presentation to the U.S. Department of Justice, and any Ven-A-Care presentation to a State Medicaid agency.

      60.    Medi-Cal's definition of usual and customary charge, usual and customary billed charge, or any variation of the term for the amount submitted with a claim by the Provider to Medi-Cal (the "Usual and Customary Charge"), and how and why that definition has changed.

      61.    Communications with Providers regarding Medi-Cal's definition of the Usual and Customary Charge, including any guidance or instruction to providers regarding how to determine the Usual and Customary Charge submitted with a claim by the Provider to Medi-Cal.

      62.    Efforts made by California to encourage Providers to dispense or administer generic drugs and any actual or projected savings attributed to such efforts.

      63.    Each category of damages for which California seeks a recovery from the Remaining Defendants for each of such defendant's Subject Drugs in this action, including: (a) the amount of damages; (b) the methodology used to calculate or derive that amount; and (c) all

**KELLEY DRYE & WARREN LLP**

Nicholas N. Paul, Esq.
August 19, 2008
Page Nine

facts and documents upon which California relies to support its claims as to the nature and extent of each category of damages.

      64.    The dates, facts and circumstances describing when and how California learned of the fraud and false claims alleged in the Complaint.

      65.    How and when California learned of the facts underlying the allegations in paragraphs 49 through 176 of the Complaint.

      66.    The extensions of time to intervene in this action which were granted to California, including but not limited to the reasons given for the delay, the number of extensions granted, the legal bases for those extensions, and California's conduct of its investigation into the allegations in the Ven-A-Care *Qui Tam* Complaint.

      67.    California's retention, destruction and public disclosure policies regarding Documents and California's compliance with those policies.

      68.    California's computer systems, networks, or databases that might store or contain Documents, data, and Communications, including but not limited to e-mail, responsive to Defendants' First Set of Request for Production to Plaintiff State of California, served on October 4, 2007.

      \*        \*        \*

      Given the approaching discovery cut-off date in this action, and notwithstanding the generous outer time limits provided for in Paragraph 8(G) CMO 31, I would ask that you provide me with the names of California's designee or designees as soon as possible, along with proposed dates in the near future when the deposition or depositions may go forward. I also ask that you let me know, also as soon as possible, whether California objects to any of the topics set forth above so that we can set up a call to discuss such objections without delay.

      Very truly yours,

      Philip D. Robben

PDR:dd

cc:    All Counsel of Record (via LNFS)