# Exhibit 4

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------X

IN RE PHARMACEUTICAL INDUSTRY       ) MDL No. 1456

AVERAGE WHOLESALE PRICE LITIGATION) Civil Action:

---------------------------------X 01-12257-PBS

THIS DOCUMENT RELATES TO:           )

State of California, ex. rel.       ) Judge Patti B. Saris

Ven-A-Care v. Abbott                ) (Case pending in

Laboratories, Inc., et al.,         )  D. Mass.)

---------------------------------X


VIDEO DEPOSITION OF JANE LAMBORN, ESQ. AS A DESIGNEE

OF THE CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES


            Date:          February 11, 2009

            Time:          9:08 a.m.

            Location:      1300 I Street

                           Sacramento, California


            Reported by:   Jan W. Serra

                           CSR No. 8207

California Department of Health Care Services (Jane Lamborn)                February 11, 2009
Sacramento, CA

2

```
 1                  A P P E A R A N C E S

 2

 3    For Abbott Laboratories:

 4         KELLEY DRYE & WARREN

 5         BY:  BRENDAN J. CYR, ESQ.

 6         101 Park Avenue

 7         New York, New York 10178

 8         P. 212.808.7941

 9         F. 212.808.7897

10         agiuliana@kelleydrye.com

11

12

13    For Schering-Plough and Warrick:

14         ROPES & GRAY

15         BY:  DANIEL J. BENNETT, ESQ.

16         One International Place

17         Boston, Massachusetts 02110-2624

18         P. 617.951.7000

19         F. 617.951.7050

20         john.bueker@ropesgray.com

21

22
```

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

Sacramento, CA

3

1            A P P E A R A N C E S    (CONTINUED)

2

3    For the Relator Ven-A-Care:

4         LAW OFFICE OF DAVID B. ZLOTNICK

5         BY:  DAVID B. ZLOTNICK, ESQ.

6         625 Broadway

7         Suite 635

8         San Diego, California 92101

9         P. 619.232.0331

10        F. 619.232.4019

11        dzlotnick@kkbs-law.com

12

13   For Defendant Sandoz Inc.

14        WHITE & CASE

15        BY:  LARA BERWANGER, ESQ.

16        (APPEARING TELEPHONICALLY)

17        1155 Avenue of the Americas

18        New York, New York 10036

19        P. 212.819.8937

20        F. 212.354.8113

21        hmcdevitt@whitecase.com

22

4

```
1              A P P E A R A N C E S    (CONTINUED)

2

3     For the State of California:

4           BMFEA

5           BY:  JOHN FISHER, ESQ.

6           110 West A. Street

7           Suite 1100

8           San Diego, California 92186

9           P. 619.688.6411

10          F. 619.688.4200

11          randal.glaser@doj.ca.gov

12

13              -AND-

14

15          DEPARTMENT OF HEALTH SERVICES

16          BY:  JANET ALEXANDER, ESQ.

17          1501 Capitol Avenue

18          Sacramento, California 95814-5005

19          P. 916.440.7832

20

21     Also present:  Monty Gordon, videographer

22                    Suzanne Graydon
```

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

## Sacramento, CA

5

1                          I N D E X

2

3     WITNESS:   JANE LAMBORN                                    PAGE

4          Examination By Mr. Bennett................ 009

5          Examination By Mr. Cyr.................... 111

6          Examination By Ms. Berwanger............. 120

7

8

9                          E X H I B I T S

10    NUMBER                    DESCRIPTION                       PAGE

11    Exhibit Lamborn 001 - Notice of Deposition..... 011

12    Exhibit Lamborn 002 - State of California

13                          Objections and Responses

14                          to Defendant Abbott's

15                          First Set of

16                          interrogatories.......... 014

17    Exhibit Lamborn 003 - CAAG/DHS0057554 - 555.... 025

18    Exhibit Lamborn 004 - CAAG/DHS0057561 - 562.... 046

19    Exhibit Lamborn 005 - CAAG/DHS0057558 - 559.... 049

20    Exhibit Lamborn 006 - CAAG/DHS0089104 - 106.... 051

21    Exhibit Lamborn 007 - CAAG/DHS0057473 - 480.... 056

22    Exhibit Lamborn 008 - CAAG/DHS0057481 - 489.... 062

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
**Sacramento, CA**

6

1            E X H I B I T S    (CONTINUED)

2     NUMBER                      DESCRIPTION                    PAGE

3     Exhibit Lamborn 009 - CAAG/DHS0057556 - 557.... 082

4     Exhibit Lamborn 010 - CAAG/DHS0057563 - 569.... 084

5     Exhibit Lamborn 011 - CAAG/DHS0057571 - 573.... 086

6     Exhibit Lamborn 012 - CAAG/DHS0057542 - 543.... 090

7     Exhibit Lamborn 013 - CAAG/DHS0054544 - 545.... 098

8     Exhibit Lamborn 014 - CAAG/DHS0057505 - 506.... 116

9

10

11

12

13

14

15

16

17

18

19

20

21

22

California Department of Health Care Services (Jane Lamborn)                February 11, 2009

Sacramento, CA

18

1    "litigation hold?"

2         A.    Yes, I am.

3         Q.    How would you describe a litigation

4    hold?

5         A.    A litigation hold is a direction to

6    preserve all documents that may be relevant to

7    discovery and litigation needs in a pending case.

8         Q.    Did DHCS implement a litigation hold in

9    this action?

10        A.    Yes, we did.

11        Q.    When did they do that?

12        A.    We took several steps.

13              Starting in September 2003 we took steps

14   to gather and preserve documents within the

15   Pharmacy Policy section and the Rebate section,

16   and in September 2004 we gave a direction that

17   documents should not only be kept but that they

18   should be gathered and kept segregated.  I can

19   describe those steps in more detail if you wish.

20        Q.    I think we have some other documents we

21   can kind of March through.  It might help clear

22   things up.

California Department of Health Care Services (Jane Lamborn)                     February 11, 2009
Sacramento, CA

19

1       A.    Although actually I didn't really finish

2    answering your question.

3       Q.    Sure.

4       A.    In probably September, August/September

5    2005, at that point it was decided that Office of

6    Legal Services would be the main contact point for

7    imposing the litigation hold and for gathering and

8    preserving documents.  Partly in anticipation of

9    discovery requests, it was decided that it would

10   be better to have OLS gather all the documents and

11   keep them rather than having them gathered and

12   kept separately in different parts of the

13   department.  So at that point we put out specific

14   email notices to units within the department, we

15   also issued a notice to our information Technology

16   division to suspend all deletions and to preserve

17   everything on our servers, our email servers, and

18   to suspend all deletions or destruction of any

19   backup tapes.  So we took some additional actions

20   in December 2005.

21      Q.    When you said that it was decided that

22   it would be better for OLS to be the main contact

Sacramento, CA

25

1    different types and categories of documents and

2    sets specific periods of time for the retention of

3    those documents.

4         Q.   Is it your understanding that a

5    litigation hold overrides that generally

6    applicable records retention schedule?

7         A.   Yes, that's correct.

8              As a matter of fact, our notice

9    specifically stated that the notices we put out

10   starting in December 2005, that the documents

11   should be kept even if the retention period had

12   lapsed.

13             (Exhibit Lamborn 003 marked for

14   identification)

15   BY MR. BENNETT:

16        Q.   What's been marked Exhibit 3 is Bates

17   labeled CAAG/DHS0057544.  Ms. Lamborn, could you

18   take a minute to review that document and let me

19   he know if you recognize it.

20        A.   Yes, I do.

21        Q.   What is that exhibit?

22        A.   This was a notice that we put out after

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

## Sacramento, CA

26

1    our legal team -- that I described earlier -- had

2    met and the decision was made that the Office of

3    Legal Services would physically gather all the

4    documents we thought might be relevant.  This was

5    a notice put out to impose a litigation hold for

6    all of the paper documents and electronic

7    documents within the department.  It was sent to

8    the heads of the various divisions and branches

9    where we thought any of those documents might be.

10        Q.   Do you recognize the names of the

11   various people to whom it goes and the divisions

12   in which they work?

13        A.   Yes, I do.

14        Q.   Can you walk through -- I notice that

15   each person in the "To" box, there is an acronym

16   after their name.  I understand that to mean that

17   that describes the unit they work in; is that

18   correct?

19        A.   It describes the division or branch that

20   they work in.

21        Q.   Could you go through and specify what

22   each of these branches are that are represented on

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

34

1      Q.   Did assistant chief counsel Nolan, did

2   she issue document preservation instructions in

3   2003?

4      A.   Yes, at that time.  And it would have

5   been after September 2003 she had met with

6   Pharmacy Policy staff and had directed them to

7   gather documents.  And at that point they had

8   started to gather some documents.  And at that

9   point she was responsible for working with them

10  and turning some documents over to the Bureau.

11     Q.   What we have been looking at as Exhibit

12  3 in the December 2005 timeframe, I take it that

13  is the first time that certain, at least certain

14  of these branches and divisions had received these

15  instructions to preserve documents; is that

16  correct?

17     A.   That's probably too broad a statement.

18  I don't think that's correct, because in September

19  2004 I know -- let me back up.

20          I know Sheila Nolan had been working

21  with Pharmacy to start gathering documents.  And

22  in September -- it wasn't September -- I'm sorry -

35

1  - November 2004 I met personally with Vic Walker.

2  He was the person designated by the Pharmacy

3  Policy section and the Rebate section as their

4  contact person that I should work with in terms of

5  identifying documents and where they might be.

6         At that time we had a list of items

7  describing what we could be asked to produce

8  subject to discovery.  Which included -- and it's

9  part of your packet I'm sure -- I forget what the

10  title is.  Materials to be protected or materials

11  subject to discovery.  It contains a list of 53

12  items.  And in November 2004 I met with Vic Walker

13  and we went over that list in detail.  At that

14  time I did described to him the nature of the qui

15  tam litigation; that it had been filed by a

16  relator; that actions were pending in several

17  courts; that we had filed one in California.  I

18  reviewed with him that we would have to respond to

19  discovery.  We discussed what would be needed for

20  the subpoena.  I also discussed with him that we

21  did not have any discovery requests served on us

22  yet, but that we needed to gather all documents at

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

## Sacramento, CA

36

1    that time.

2            And at that time I issued a direction,

3    and a direction was issued to Pharmacy Policy that

4    all documents had to be identified, segregated and

5    preserved.  I then went through that document with

6    Vic Walker, discussing each item in turn, what --

7            The other thing I talked to Vic about is

8    that some of the documents might appear to be

9    privileged.  And I explained to him that when we

10   were served with the subpoena if it was overbroad

11   or burdensome or if it called for privileged

12   documents that we would object at that time.

13           If he had documents he felt should not

14   be produced when we were served with the subpoena,

15   we would look at that to see whether or not a

16   claim of privilege would apply, regardless of

17   whether he thought that the documents that were

18   covered seemed irrelevant or overbroad or

19   privileged; we had to gather everything.  So what

20   I stressed to Vic was that we had to gather

21   anything that might fit the descriptions in that

22   list; that we had to segregate them and keep them

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

37

1    reserved, and later, when we did get discovery

2    requests, we would go through those documents and

3    determine what we would be producing.

4           After doing that with Vic we started

5    going through it item by item.  And at that point

6    in talking to Vic we talked about for each item

7    where, what documents might be responsive, what we

8    might have, where they would be and what would be

9    necessary to get them.

10          And we went through item 20.  And at

11   that point Vic had identified most of the

12   documents as being within Pharmacy Policy and

13   within the Rebate section.  And he looked at the

14   next page and said, "You know, I understand what I

15   need to do.  And I can see where most of these

16   documents are.  So I'll take it back to our staff

17   and I'll work with them to gather all the

18   documents."

19          So I did not go through the remainder of

20   the items in great detail.  However, the items did

21   include communications with outside entities.  It

22   also asked for legislative materials and referred

Sacramento, CA

38

1    statutes and regulations.  So it was understood at

2    the time that not all the documents would be

3    within Pharmacy Policy and Rebates, that other

4    sections of the department would have them.

5            The other thing I did in November 2004

6    after the meeting with Vic, I met with -- I think

7    it was Kevin Gorospe.  I should probably check my

8    notes.  But I think this is one of the

9    conversations with Kevin and a couple of analysts

10   to review with him what we needed to do; that all

11   of these those documents had to be not just

12   identified and located, they had to be segregated

13   and preserved.  And we also talked about going up

14   through the chain of command, up through Roberto,

15   Martinez at that time.  He was the chief of the

16   Benefits branch, up to Stan Rosenstein.

17       Q.   In your September 2004 meeting with Mr.

18   Walker, was it your understanding that he was

19   going to take the instructions you had given to

20   him and forward those on to people in departments

21   other than his own?

22       A.   Yes, that's correct.  The meeting was in

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

56

1    filed under seal.  So I certainly didn't know it

2    at the time.  I don't know that other people would

3    have.  I have learned since then that it was filed

4    in 1998.

5         Q.   So, to the best of your recollection,

6    you would have learned in the 2002 timeframe about

7    the case?

8         A.   That's when I learned about it, yes.

9    Then just -- that's okay.  Go ahead.

10        Q.   You can go ahead.

11        A.   No, I just realized I had answered the

12   question.

13             (Exhibit Lamborn 007 marked for

14   identification)

15   BY MR. BENNETT:

16        Q.   What's been marked Exhibit 7 is Bates

17   CAAG/DHS 0057473 through 480.  Can you take a

18   minute to see if you recognize that document?

19        A.   I do recognize it.

20        Q.   Can you describe it for me?

21        A.   This is a memo addressed to Barbara

22   Yonemura, Chief Counsel.  It's dated September 25,

California Department of Health Care Services (Jane Lamborn)     February 11, 2009

Sacramento, CA

57

1    2003.  The memo is from Thomas A. Temmerman,

2    Senior Assistant Attorney General with the Bureau

3    of Medi-Cal Fraud and Elder Abuse.  The subject is

4    "Confidential Investigative Information."  And it

5    then goes on to discuss -- I can't think of a

6    shorthand way for doing this -- a case, an

7    investigation involving pharmaceutical

8    manufacturers.

9        Q.   Do you understand it to be in reference

10   to the case we are here about today?

11       A.   Yes, I do.

12       Q.   Ms. Yonemura, was she your boss at the

13   time?

14       A.   At that time she was chief counsel for

15   the Offices of Legal Services at the Department.

16       Q.   That's the department you were working

17   in; correct?

18       A.   Yes, that's correct.

19       Q.   In the second paragraph of this

20   memorandum Mr. Temmerman requests that OLS -- and

21   I'll read -- "begin the task of gathering items

22   now so as to avoid problems and potential

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

58

1    sanctions against the state should there be delays

2    in producing the items within time periods over

3    which we may have no control."

4            Did I read that correctly?

5    A.    Yes, you did.

6    Q.    When he refers to "items," he's talking

7    about what he's described in the previous

8    paragraph as "potential discoverable information?"

9    A.    Well, I think he was also referring to

10   the list attached to the memo.  Which is on pages,

11   starting with CAAG/DHS 005-7475 through 479.  And

12   it's titled "Material/documents," and it lists 53

13   items.  I think his reference in this second page

14   was also a reference to those items.

15   Q.    So looking at the second page of Exhibit

16   7 there is a list of -- says "Named Pharmaceutical

17   Companies;" correct?

18   A.    That's correct.

19   Q.    Do you understand that to refer to the

20   defendants named in the qui tam complaint that

21   California was investigating?

22   A.    You know, at this point I think the

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

Sacramento, CA

59

1      understanding would have been that these were

2      companies under investigation and in relation to

3      the complaint that was filed against Abbott and

4      Wyeth.  And that would be related to the case that

5      we are here on today.

6          Q.   So this is part of the instruction,

7      types of materials to gather, you were instructed

8      to gather materials relating to that is named

9      companies?

10         A.   That's correct.  When you look at the

11     list of items, it would be those items as they

12     would apply to everyone on the list.

13         Q.   The third page to the end, that's where

14     they list 53 items or types of materials that Mr.

15     Temmerman was instructing you to kind of start

16     collecting; correct?

17         A.   Yes.  That would be my understanding.

18         Q.   Do you know what was done by DHS after

19     receiving this memo?

20         A.   Yes, to a certain extent.

21              At that time Sheila Nolan was the

22     Assistant Chief Counsel of the Medi-Cal House

60

1    Counsel team, and she would have had that

2    assignment.  And I know from conversations with

3    her that, following the receipt of this letter

4    that the people involved -- which would have been

5    Pharmacy Policy, and I'm not sure what other

6    sections it may have gone out to, but certainly

7    Pharmacy Policy -- started gathering documents.

8    And Sheila then did turn, following the receipt of

9    this turned some documents over to the Bureau of

10   Medi-Cal Fraud.

11        Q.   So is it your understanding that this

12   document was shared with employees within the

13   Pharmacy Policy unit?

14        A.   That's correct.

15        Q.   And that was Sheila Nolan who would have

16   shared those materials?

17        A.   That's correct.  It would have been

18   Sheila who would have worked with Pharmacy Policy

19   or shared this document with them and asked them

20   to gather items for it.

21        Q.   Do you know who in Pharmacy Policy would

22   have received a copy of this?

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

80

1    accurately.

2         Q.   Do you remember the timeframe that that

3    conversation or those conversations would have

4    been?

5         A.   That would have been prior to December

6    2005, and it would have been after the November

7    '04 meeting with Vic Walker, and it would have

8    been at least somewhere between four and seven

9    months after that.

10        Q.   Aside from those conversations, I think

11   you said three --

12        A.   Two to three, with two different people.

13        Q.   You didn't have much involvement in the

14   collection or in the collection process until

15   December of 2005?

16        A.   That's correct.

17        Q.   Then once in 2005 you got more involved,

18   and what I'm thinking of in that timeframe are the

19   emails we were looking at previously.

20        A.   The OLS's involvement and direct

21   responsibility for leading that effort began in

22   December 2005 and continued forward from that

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
### Sacramento, CA

81

1    date.

2              **Does that answer your question?**

3         Q.    I think so.

4              When you say "OLS's" -- and I'm sorry if

5    this is repetitive of something we talked about

6    earlier.

7              When you say OLS's involvement in kind

8    of leading that effort, you are drawing a

9    distinction between a timeframe when it was the

10   business people themselves who were in charge of

11   collecting and gathering and in a time when OLS

12   was taking a more hands-on role and getting their

13   hands on everything? Is that correct?

14        **A.    That's correct.  Because we had clearly**

15   **put out the direction that these documents needed**

16   **to be identified and preserved.**

17             But starting in December of 2005 there

18   was a very high concern that if we were served

19   with discovery whether we would be able to

20   respond.  Because we really thought we were going

21   to have a large volume of documents.  So the

22   decision was made to physically collect everything

82

1    and keep everything together within OLS.

2              We took one of our conference rooms and

3    converted it.  It's been kept under lock ever

4    since then.  Only the attorneys or staff directly

5    assigned to the Ven-A-Care case have access to

6    that room.  So that at that point what we did is

7    we tried to get everything together, sorted, so

8    that we would be able to respond to a subpoena

9    quickly.

10                   (Exhibit Lamborn 009 marked for

11   identification)

12   BY MR. BENNETT:

13       Q.   What's been marked Exhibit 9 is CAAG/DHS

14   00575565 to 557.  Ms. Lamborn, this is another

15   email in the December 2005 timeframe; correct?

16       A.   That's correct.

17       Q.   It's another one in that same chain

18   where you had sent the email entitled "Document

19   Preservation" to a number of department heads or

20   bureau heads?

21       A.   That's correct.

22       Q.   In the sort of first email on the chain

California Department of Health Care Services (Jane Lamborn)          February 11, 2009
Sacramento, CA

109

1    personally became aware of it.  However, I know

2    there were contacts between the Bureau and OLS

3    prior to that and during that time when I became

4    involved in it too.

5         Q.   Understood.

6              Do you know when the State of California

7    intervened in the qui tam case?

8         A.   Which case are you referring to?  The

9    state case?

10        Q.   Yes.

11        A.   I thought the first complaint was filed

12   in 1998.

13        Q.   In the 1998 complaint, is it your

14   understanding that was the complaint filed by the

15   relator?

16        A.   No.  I, for some -- you know what, if

17   that's true then we would have intervened in '03.

18             I may not be remembering it correctly

19   when I said it was '98.  If 1998 was when the

20   relator filed the case then the State of

21   California would not yet have intervened.

22        Q.   I'm not trying to quiz you.  I'll

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

110

1   represent to you that my understanding is that the

2   State of California intervened in 2003.  I note

3   that that is around the same time that you've

4   testified that the efforts to collect documents

5   began.  I'm wondering if that's a usual policy in

6   the qui tam cases you worked on; that you don't

7   begin the document collection or preservation

8   efforts until after the state intervenes?

9        A.   I don't know that you could make that

10  broad a statement, because just the nature of a

11  qui tam case -- a relator has filed a complaint

12  under seal -- it's confidential, so the Bureau

13  then has a statutory duty to investigate those

14  allegations to make their decision whether or not

15  they want to intervene.

16            When they come to us for assistance and

17  information they cannot tell us, they cannot share

18  the complaint; they cannot give us specific

19  information as to what's in the complaint or the

20  evidence that supports it because it's under seal

21  and it's confidential.  So usually when they come

22  to us we understand that it's a confidential

111

1    investigation.  And they share enough information

2    with us for us to identify which programs would

3    have the information or the documents that they

4    need.  And we then assist them in getting that

5    information to make their decision.

6            So we're probably looking at gathering

7    documents or information from the very beginning.

8    But prior to their intervention we don't really --

9    depending upon the extent that they can share with

10   us -- we don't necessarily know the specific

11   allegations that are being made.  Not until it's

12   unsealed.

13           MR. BENNETT:  I think I'm all done.  I

14   don't know if Brendan or Lara have any questions.

15           MR. CYR:  I have a few.  Can we go off

16   the record?

17           THE VIDEOGRAPHER:  We are off the record

18   at 11:47 a.m.

19           THE VIDEOGRAPHER:  We are back on the

20   record at 11:51 a.m.

21

22                   EXAMINATION

Sacramento, CA

112

1    BY MR. CYR

2         Q.   Hi, Ms. Lamborn.  My name is Brendan Cyr

3    and I represent DEY Inc., Milan Inc., formerly

4    known as Milan Laboratories Inc., and Milan

5    Pharmaceuticals Inc.  And I just have a few

6    follow-up questions.

7              If you could take a look at what was

8    marked as Exhibit 8 please.

9         A.   (Complying)

10        Q.   If you could turn to the third page.  On

11   the top it says, "State of California Department

12   of Justice Confidential Privilege Investigative

13   Request."Like I said before, I represent Milan --

14   formerly known as Milan Laboratories Inc. and

15   Milan Pharmaceuticals Inc.  in this action.  And

16   do you see either of those entities on this list?

17        A.   You know, I'm not familiar with parent

18   companies or subsidiaries or mergers or whatever.

19   I do not see the two specific names that you just

20   mentioned.

21        Q.   I think you had testified before -- and

22   correct me if I'm wrong -- that you reviewed this

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009
Sacramento, CA

113

1    document in November of 2004 with Vic Walker?

2         A.    That's correct.

3         Q.    And you went over the list of names on

4    this, the list of names on the third sheet with

5    Mr. Walker?

6         A.    You know, I didn't discuss each name

7    specifically.  What I did was say these are the

8    names of the companies that are under

9    investigation and that the Bureau may file a

10   complaint against, so that these are the

11   defendants that we want to look for, potential

12   defendants.

13        Q.    Since Milan Laboratories Inc and Milan

14   Pharmaceuticals Inc. aren't on this list, is it

15   safe to assume that Mr. Walker wouldn't have been

16   looking for documents that related to those two

17   entities?

18             MR. FISHER:  Object to the form.

19             THE WITNESS:  It's really not safe to

20   assume that.  I've worked on several other cases

21   with the Pharmacy section, and my experience has

22   been that the company may be a subsidiary.

Henderson Legal Services, Inc.

California Department of Health Care Services (Jane Lamborn)                    February 11, 2009

## Sacramento, CA

123

```
 1                      CERTIFICATE

 2

 3          I, JAN W. SERRA, CSR #8207, do hereby

 4    certify:

 5              That prior to being examined, the witness

 6    named in the foregoing deposition was by me duly

 7    affirmed to testify to the truth, the whole truth, and

 8    nothing but the truth;

 9              That said deposition was taken down by me in

10    shorthand at the time and place therein named, and

11    thereafter reduced to typewriting under my direction.

12              I further certify that I am not interested in

13    the outcome of the action.

14              Witness my hand this _____ day of _____

15    2008.

16

17                          _____

18                          JAN W. SERRA    CSR NO. 8207

19

20

21

22
```