# Exhibit 6




Office of Attorney General
Bill Lockyer

September 10, 2004

Bureau of
Medi-Cal Fraud
and Elder Abuse

1425 River Park Drive
Suite 300
Sacramento, CA
95815-4524

Robert D. Tousignant
Acting Chief Counsel
Department of Health Services
1501 Capital Avenue, MS 0010
Sacramento, CA 95814

Information: (916) 263-3896
Facsimile: (916) 263-0855
Personal (916) 274-2942

Re:   Request Pursuant to 42 CFR 455.21

Dear Mr. Tousignant:

Please consider this a request pursuant to 42 CFR 455.21 for DHS to provide the Bureau of Medi-Cal Fraud and Elder Abuse for those materials previously identified in the attached memo from September 25, 2003 to then Chief Counsel Barbara Yonemura. We need these records to further our investigation into pricing misrepresentations by various pharmaceutical manufacturers which are also specified in the referenced memo.

Sincerely,

THOMAS A. TEMMERMAN
Senior Assistant Attorney General
Bureau of Medi-Cal Fraud and Elder Abuse

For   BILL LOCKYER
      Attorney General

TAT:klh
Atch.

cc:   Collin Wong, Director, BMFEA
      Mark Zahner, Chief Prosecutor, BMFEA
      Brian Frankel, SDAG, BMFEA

Lamborn      8

2.11.09

CAAG/DHS0057481

**State of California**
**Department of Justice**
**M e m o r a n d u m**

To:   Barbara Yonemura        Date: September 25, 2003
      Chief Counsel
      Department of Health Services
      1501 Capitol Ave.
      Sacramento, CA 94234-7320

From: Thomas A. Temmerman,                              Telephone: (916) 274 2942
      Sr. Assistant Attorney General                               CALNET (8) 436 2942
      Bureau of Medi-Cal Fraud and Elder Abuse          Facsimile: (916) 263-2929
      Office of the Attorney General
      1425 River Park Drive, Suite 300
      Sacramento, CA 95815-4524

Subject: **Confidential Investigative Information**

As you will recall we discussed giving Department of Health Services (DHS) advance notice of what the pharmaceutical manufacturers may ask for as discovery when our investigation into pricing manipulation results in the filing of a false claims act lawsuit. We received the discovery documents filed in the state of Texas by the pharmaceutical manufacturers in the case filed there by the Texas attorney general. Items 1-53 listed in the attachment were all extracted from those materials. I believe we can reasonably anticipate the same will be the subject of discovery in the California suit. The attachment also lists the companies from which we anticipate receiving discovery demands.

As mentioned in our conversation on this I request that you begin the task of gathering the items now so as to avoid problems and potential sanctions against the state should there be delays in producing the items within time periods over which we may have no control.

I suggest that all items, including those upon which there may be a claim of privilege, be gathered and lodged with our office. Those items in which a claim of privilege is known should be so noted. We can then use our resources rather than asking you to use yours to create a searchable data base (we use Concordance and if your department has access to it a copy could be maintained there as well as here). When we do receive discovery demands we will use our staff to search the documents then submit them to whomever you have assigned to determine whether there will be any claims of privilege on them. Suzanne Giorgi who used to be a DHS attorney will be returning to us mid November. She may be the most knowledgeable attorney we will have on matters related to DHS. If you feel more comfortable turning over the potentially discoverable materials to us by having us assign her to do the review and coordination with your assigned staff please let me know. In suggesting this method I hope to avoid the need to have each and every document reviewed by one of your lawyers under what may be some very short time frames for compliance.

CAAG/DHS0057482

# State of California
# Department of Justice

## CONFIDENTIAL – PRIVILEGED INVESTIGATIVE REQUEST

**Named Pharmaceutical Companies ("Named Companies"):**
ALPHA THERAPEUTIC CORP;
ARMOUR PHARMACEUTICAL CO.;
AVENTIS BEHRING, L.L.C.;
AVENTIS PHARMACETICALS, INC.;
BAXTER HEALTHCARE CORP.;
B. BRAUN MEDICAL, INC.;
BEDFORD LABORATORIES, a division of BEN VENUE LABORATORIES, INC.;
BOEHRINGER INGELHEM CORP.;
BRISTOL-MYERS SQUIBB COMPANY a/k/a BRISTOL-MYERS ONOCOLOGY DIVISION/HIV PRODUCTS;
CETUS ONCOLOGY CORP.;
CHIRON CORP.;
DEY, L.P.;
ELKINS-SINN, INC.;
FUJISAWA HEALTHCARE, INC.;
FUJISAWA USA, INC.;
GENSIA SICOR PHARMACEUTICALS, INC. f/k/a GENSIA LABORATORIES, LTD.;
GLAXO WELLCOME, INC.;
GLAXOSMITHKLINE PLC;
HOECHST MARION ROUSSELL, INC.;
IMMUNEX CORP.;
LEDERLE ONCOLOGY CORP.;
McGAW, INC.;
NOVARTIS PHARMACEUTICALS CORP. f/k/a SANDOZ PHARMACEUTICALS CORP. f/k/a SANDOX, INC.;
NOVARTIS AG;
PHARMACIA, INC.;
ROXANE LABORATORIES, INC.;
RHONE-POULENC RORER PHARMACEUTICALS, INC.;
SCHEIN PHARMACEUTICALS, INC.;
SCHERING-PLOUGH CORP.;
SMITHKLINE BEECHAM CORP.;
WARRICK PHARMACEUTICALS CORP.

**Relevant Time Period:** 1988 to the present.

**Relevant Drugs:** Drugs manufactured or marketed by the Named Pharmaceutical Companies.

1 of 7

CAAG/DHS0057483

**Materials/Documents Types:**

1. Drug Acquisition Cost Surveys performed by DHS.

2. Documents that explain, define or use the terms Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), "Price to Wholesaler and/or Distributor" or other drug pricing designations.

3. Documents which explain the consideration, if any, given by DHS to utilization of the Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC") or Government Upper Limit ("GUL") for any of the relevant drugs.

4. Documents which explain the consideration, if any, given by DHS to establishing a Maximum Allowable Ingredient Cost ("MAIC") for any of the relevant drugs.

5. State all efforts made by DHS from 1988 to the present to obtain pricing information from the named companies, wholesalers, and distributors.

6. Communications showing that DHS made an effort to obtain actual acquisition cost for the relevant drugs from the drug wholesalers who were selling directly to pharmacies and/or medical providers.

7. Communications showing that DHS made an effort to obtain actual acquisition cost for the relevant drugs from the pharmacies and/or medical providers who were obtaining reimbursement from Medi-Cal.

8. Documents showing that DHS obtained pricing information concerning the relevant drugs from sources other than the named companies.

9. Communications between DHS and First Data Bank, Blue Book or any other pharmaceutical price reporting service concerning the prices of the relevant drugs manufactured by the named companies.

10. Communications between DHS and First Data Bank, Blue Book or any other pharmaceutical price reporting service regarding changes in the methods to be used by any of those entities for calculating or reporting prices generally.

2 of 7   State of California Department of Justice CONFIDENTIAL – PRIVILEGED INVESTIGATIVE REQUEST

CAAG/DHS0057484

11. Documents identifying each Estimated Acquisition Cost ("EAC") used by the Medi-Cal Program to reimburse Medi-Cal Providers for each National Drug Code ("NDC") in issue.

12. The method used to calculate the Medi-Cal drug reimbursement amounts for the relevant drugs from 1988 to the present.

13. Prices which the named companies should have reported to DHS for its relevant drugs; Identify discounts and other price reductions that were to be accounted for in the calculation of those prices.

14. Documents showing what the named companies market share has been in California for each year, from 1988 to the present, for each relevant drug.

15. Documents showing Medi-Cal's inability to reasonably estimate acquisition costs for the named companies' relevant drugs.

16. Documents establishing the reimbursement amounts for providers that dispensed the named companies' relevant drugs.

17. Documents showing that the AWP is not the acquisition cost of drugs reimbursed by Medi-Cal.

18. Documents showing damages suffered by the Medi-Cal Program as a result of the Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), or "Price to Wholesaler and/or Distributor" reported by the named companies to First Data Bank and other pharmaceutical price reporting services.

19. Documents showing by unit amount, the reimbursement Medi-Cal would have paid for the relevant drugs if the named companies had reported their "actual prices" to wholesalers to Medi-Cal.

20. Documents showing any changes made by Medi-Cal in its calculations of Estimated Acquisition Cost or Wholesale Estimated Acquisition Cost for the named companies' relevant drugs since commencement of the drug pricing investigation, the date such changes occurred, and the pharmaceutical drugs to which such changes applied.

21. All training courses and training materials used by Medi-Cal to prepare, train or educate its employees as to the meanings of Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), "Price to Wholesaler and/or Distributor" or other drug pricing designation..

22. Documents identifying each provider participating in Medi-Cal from whom DHS solicited or received acquisition cost information about the named companies' pharmaceutical drugs.

23. Rebate Reconciliation of State Invoice ("ROSI") forms or reports relating to the named companies' relevant drugs.

24. Documents showing whether DHS ever questioned or complained to any pharmaceutical manufacturer that the manufacturer had failed to report prices for its products accurately.

25. Any documents showing the use by any Medi-Cal employee of the terms Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), and "Price to Wholesaler and/or Distributor" for the relevant drugs.

26. Any documents showing that AMP or Best Price was used by any of the named companies.

27. Names, titles, job descriptions, period employed and (for former employees) last known home and business address of any and all present or former employees of Medi-Cal or DHS who were or are responsible for any of the following: (a) setting levels of Medi-Cal reimbursement payments in general or for some or all of the relevant drugs; (b) determining Medi-Cal reimbursement levels in general or for some or all of the relevant drugs; (c) calculating Medi-Cal reimbursement levels in general or for some or all of the Relevant drugs; (d) supervising those who set, calculated or determined Medi-Cal reimbursement levels in general or for some or all of the relevant drugs; (e) supervising those who made Medi-Cal reimbursement payments in general or for some or all of the Relevant drugs; and (f) auditing reimbursement levels.

28. Names of pharmaceutical manufacturers, if any, who gave DHS its AMP for any of its products.

29. Names of pharmaceutical manufacturers, if any, who failed to update pricing information on a regular basis.

CAAG/DHS0057486

30. Documents reflecting how DHS calculates reimbursement amounts for prescription drugs, including but not limited to guidelines, manuals, instruction, computer systems, and programs.

31. Documents concerning the determination, calculation and/or setting of reimbursement amounts and/or setting the Maximum Allowable Ingredient Cost ("MAIC") for the relevant drugs from 1988 to the present; The reimbursement rates for the relevant drugs, and if such rates were changed from time to time, documents concerning the reasons for such changes.

32. Communications with any state or federal institution, agency, department or office regarding calculation of reimbursement amounts or rates, including but not limited to communications discussing use of Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), "Price to Wholesaler and/or Distributor" or other drug pricing designations.

33. Communications with any legislator, legislative body or office regarding calculation of reimbursement amounts or rates including, but not limited to, communications discussing use of Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), "Price to Wholesaler and/or Distributor" or other drug pricing designations.

34. Organizational charts or similar documents(s) that reflect the identity of all DHS employees of Medi-Cal, DHS or any other state agency involved or in any way responsible for calculation of Medi-Cal reimbursement rates, or review and/or approval of such rates.

35. Communications between DHS and agencies or officials of other State Medicaid programs or the federal government regarding calculation or determining reimbursement rates or amounts, including but not limited to communications regarding the use of Average Wholesale Price ("AWP"), Estimated Acquisition Cost ("EAC"), Direct Price ("DP"), DEAC, Wholesale Acquisition Cost ("WAC"), Average Manufacturing Price ("AMP"), Discount, Rebate, Chargeback, Best Price ("BP"), Federal Upper Limit ("FUL"), Federal Acquisition Cost ("FAC"), Maximum Allowable Ingredient Cost ("MAIC"), "Price to Wholesaler and/or Distributor" in connection with such calculations or determinations.

36. Communications to or from pharmaceutical manufacturers regarding compliance and/or non-compliance with applications, requests for updates of pricing information and/or submission of pricing information or updates and documents requesting pharmaceutical manufacturers to report AMP or BP.

CAAG/DHS0057487

37. Databases and/or computer systems or programs used by DHS to calculate, monitor, process and/or pay reimbursement claims for the Relevant drugs; Documents reflecting the identity of all employees having access to such documents, databases, systems or programs.

38. Internal communications between or among DHS and any California State Health Care Agency including, but not limited to, emails, notes, minutes of meetings, written memoranda or such documents, regarding calculation or determination of reimbursement rates for drugs listed in the California Drug Formulary, and/or processing of payment of Medi-Cal reimbursement claims.

39. The prices which the named companies should have reported to DHS for its Relevant drugs; include all documents identifying discounts and other price reductions that were to be accounted for in the calculation of those prices.

40. Documents which establish that the named companies promoted, marketed or manipulated the so-called "spread".

41. Documents constituting or concerning prescription drug vendor contracts and/or agreements between DHS and pharmacies or other providers relating to the provision of or payment for the relevant drugs.

42. Vendor contracts relating to the processing of Medi-Cal drug reimbursement claims including contracts or arrangements concerning data processing and third party administration of claims.

43. Documents concerning actual payments made by Medi-Cal to the various pharmacies and other providers relating to the relevant drugs and which show how the reimbursement amounts were determined and calculated for such drugs; Include documents reflecting adjusted reimbursement amounts for particular providers.

44. Documents concerning claims submitted by any person to any person or entity requesting payment by, through or on behalf of the California Medi-Cal Program relating to the relevant drugs.

45. Prescription drug fee schedules compiled by DHS.

46. Invoices which establish overpayments to Medi-Cal providers.

CAAG/DHS0057488

47. Documents concerning any action, administrative or otherwise, to recover the alleged "overpayments" from the pharmacies or other providers who actually received the alleged "overpaid" amounts for Medi-Cal drug reimbursement.

48. Documents concerning "Tracking" of California Medi-Cal drug reimbursement claims or alleged fraud in the California Medi-Cal Program.

49. Audits of pharmacies or other Medi-Cal providers of the relevant drugs performed pursuant to any California law, statute, regulation, rule, policy or procedure.

50. Proposals and programs relating to the implementation of comprehensive or targeted audits of the Medi-Cal Program.

51. Communications between Ven-A-Care and DHS.

52. Proposals and programs for the development of a database to help deter alleged fraud and abuse in the California Medi-Cal Program.

53. Educational training to DHS and EDS staff, and their agents regarding the identification and detection of Medi-Cal fraud.

CAAG/DHS0057489