# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 2 SETTLEMENT | Judge Patti B. Saris |

## CLASS PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE TRACK TWO SETTLEMENT

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT ...............................................................................................................1

    A.    The Overall Settlement Amount is Fair and Reasonable .........................................1

    B.    Cash Payors Are Included in the Settlement and Can Make Claims .......................6

    C.    The Proposed Allocation Between Consumers and TPPs is Fair and
    Reasonable ..............................................................................................................7

        1.    The allocation between consumers and TPPs was the result of an
        arm's-length negotiation between Allocation Counsel and is fair
        and reasonable ..............................................................................................8

        2.    An initial payment to the ISHPs is fair and reasonable and does not
        prejudice consumer Class members ............................................................11

    D.    Consumers Have Been Adequately Represented .....................................................13

        1.    Ms Tonacchio has proper standing to sue, is an adequate Class 1
        Medicare beneficiary representative, and has claims typical of the
        claims of Class 1 members. .........................................................................13

            a.    Ms. Tonacchio's mother was administered Anzemet in an
            oncology clinic .................................................................................15

            b.    The payment by Ms. Tonacchio's mother was based on AWP
            because she was a Medicare Part B beneficiary and paid for a
            Class drug .........................................................................................15

            c.    Ms. Tonacchio has established a payment for a Class drug. .........16

            d.    Ms. Tonacchio has the consent of her siblings to act as a class
            representative in this settlement ......................................................16

            e.    Ms. Tonacchio approves of the proposed settlement ....................17

        2.    The Association plaintiffs are also typical and adequate
        representatives for Class 1. ..........................................................................17

        3.    The Association plaintiffs do not have an irreconcilable conflict
        with consumers over potential *cy pres* distributions. ................................20

4.      The Taft-Hartley Fund representatives are typical and adequate representatives for Class 3. ........................................................24

E.      The Claims and Distribution Process is Fair and Reasonable ..............................27

1.      The notice and claim forms clearly indicate what Class 3 Consumers can do to document their claim. ...............................27

2.      Language indicating that consumer claims may be proportionately reduced is standard in consumer class actions. ...........................29

3.      The value of the Settlement to the Consumer Classes as a whole does not depend on any "take up" rate related to Class 3 Consumers. ...................................................................................29

4.      Retrieving payment data via subpoenas to ISHPs and pharmacies is impractical, unduly burdensome, and will swamp monies available for distribution to consumers. ............................................31

5.      A flat payment of $100 to $150 is impractical and factually unsupported. ........................................................................33

F.      Objections Relating to Attorneys' Fees .............................................35

1.      Class Counsel's request for a 30% fee, inclusive of litigation expenses, is fair and reasonable. ...............................................36

2.      Notice to the Class concerning attorneys fees is adequate. .......................37

3.      A fee request based in part on money paid to the ISHPs is reasonable and has previously been approved by the Court. ....................38

4.      The submitted lodestar is sufficient for the Court to perform a reasonability cross-check on the percentage-of-the-fund approach...........39

G.      Haviland's Objections are Fueled by Animosity towards Class Counsel and this Court ...........................................................................41

H.      The Court Should Be Wary Of The Lawyer-Driven Objections ............................44

III.    CONCLUSION ..........................................................................49

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*In re "Agent Orange" Prods. Liab. Litig.*,
  597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 8181 F.2d 145 (2d Cir. 1987)........................2, 5

*In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*,
  2008 U.S. Dist. LEXIS 107131 (M.D. Tenn. Nov. 14, 2008) ...........................................44

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)......................................................................................................19

*Azizian v. Federated Dep't Stores, Inc.*,
  2007 U.S. App. LEXIS 20844 (9th Cir. Aug. 23, 2007) ...................................................44

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004)......................................................................................18, 19

*Barnes v. FleetBoston Fin. Corp.*,
  2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006) ..............................44, 45, 46, 47

*Benacquisto v. America Express Fin. Corp.*,
  2001 U.S. Dist. LEXIS 23914 (D. Minn. May 14, 2001) ..................................................44

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)......................................................................................................39

*In re Cardinal Health, Inc. Sec. Litig.*,
  550 F. Supp. 2d 751 (S.D. Ohio May 5, 2008) .................................................................44

*In re Charter Communs., Inc.*,
  2005 U.S. Dist. LEXIS 14772 (E.D. Mo. June 30, 2005).................................................44

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) .........................................................................................6

*Colwell v. HHS*,
  2009 U.S. App. LEXIS 5561 (9th Cir. Mar. 18, 2009)....................................................18

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  2005 U.S. Dist. LEXIS 15306 (D. Me. July 27, 2005).....................................................44

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................................2

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
    236 F. Supp. 2d 445 (E.D. Pa. 2002) ...........................................................................33

*Downey v. Mortgage Guar. Ins. Corp.*,
    2001 U.S. Dist. LEXIS 24918 (S.D. Ga. Oct. 1, 2001) .................................................47

*In re Fleet/Norstar Sec. Litig.*,
    935 F. Supp. 99 (D.R.I. 1996) ......................................................................................40

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)......................................................................................................41

*In re Joint E. & S. Dist. Asbestos Litig.*,
    737 F. Supp. 735 (E.D.N.Y. 1990) ................................................................................5

*Kirby v. Cullinet Software, Inc.*,
    116 F.R.D. 303 (D. Mass. 1987)..................................................................................45

*In re Linerboard Antitrust Litig.*,
    333 F. Supp. 2d 343 (E.D. Pa. 2004) ...........................................................................39

*In re Linerboard Antitrust Litig.*,
    2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) ..................................................2

*In re Linerboard Antitrust Litig.*,
    2004 WL1240775 (E.D. Pa. June 4, 2004) ...................................................................39

*Lipuma v. America Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ........................................................................44

*In re Lucent Techs., Inc. Sec. Litig.*,
    327 F. Supp. 2d 426 (D.N.J. 2004) ..............................................................................44

*In re Lupron Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005).....................................................................................26

*In re Managed Care Litig.*,
    416 F. Supp. 2d 1347 (J.P.M.L. 2006)..........................................................................44

*Mangone v. First USA Bank*,
    206 F.R.D. 222 (S.D. Ill. 2001) ....................................................................................44

*McLaughlin v. Liberty Mut. Ins. Co.*,
224 F.R.D. 304 (D. Mass. 2004)............................................................................25

*In re Michael Milken & Assocs. Sec. Litig.*,
150 F.R.D. 46 (S.D.N.Y. 1993) ..............................................................................2

*Morris v. Lifescan, Inc.*,
2003 U.S. App. LEXIS 820 (9th Cir. Jan. 16, 2003) ..........................................44

*In re New York City Asbestos Litig.*,
129 F.R.D. 434 (E.D.N.Y. 1990) ............................................................................5

*In re PaineWebber Ltd. P'ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ................8

*In re Paypal Litig.*,
2004 U.S. Dist. LEXIS 22470 (N.D. Cal. Oct. 13, 2004)..................................44

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005).................................................................18, 19, 26

*In re Pharm. Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ..................................................................3, 4, 5

*In re Polymedica Corp. Secs. Litig.*,
224 F.R.D. 27 (D. Mass. 2004) , *vacated on other grounds*,
432 F.3d 1 (1st Cir. 2005)......................................................................................25

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)...................................................................................40

*In re Prudential Secs., Ltd. P'ships Litig.*,
1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995)....................................2

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005)..................................................................26, 44, 47

*Reynolds v. Benefit Nat'l Bank*,
288 F.3d 277 (7th Cir. 2002) ................................................................................44

*In re Royal Ahold N.V. Sec. & Erisa Litig.*,
2007 U.S. Dist. LEXIS 45935 (D. Md. June 18, 2007)......................................44

*Schwartz v. Citibank, N.A.*,
2002 U.S. App. LEXIS 21456 (9th Cir. Oct. 10, 2002)......................................44

*Schwartz v. Dallas Cowboys Football Club, Ltd.*,
   2001 U.S. Dist. LEXIS 24121 (E.D. Pa. Nov. 21, 2001)...................................................44

*In re Serzone Prods. Liab. Litig.*,
   231 F.R.D. 221 (S.D. W. Va. 2005)......................................................................46

*In re Serzone Prods. Liab. Litig.*,
   2006 U.S. Dist. LEXIS 60151 (S.D. W. Va. Aug. 23, 2006) ..........................................44

*Shaw v. Toshiba Am. Info. Sys.*,
   91 F. Supp. 2d 926 (E.D. Tex. 1999)....................................................................47

*Spark v. MBNA Corp.*,
   289 F. Supp. 2d 510 (D. Del. 2003)......................................................................46

*Spark v. MBNA Corp.*,
   2002 U.S. App. LEXIS 19594 (3d Cir. Sept. 16, 2002) ...................................................44

*Susman v. Lincoln Am. Corp.*,
   561 F.2d 86 (7th Cir. 1977) ...............................................................................46

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir. 2006) ..............................................................................44

*Taubenfeld v. Aon Corp.*,
   415 F.3d 597 (7th Cir. 2005) .........................................................................44, 45

*Tenuto v. Transworld Sys.*,
   2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002) ...............................................44, 45

*In re Terazosin Hydrochloride Antitrust Litig.*,
   220 F.R.D. 672 (S.D. Fla.), *rev'd on other grounds*,
   223 F.R.D. 666 (2004) ....................................................................................25

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995)..........................................................................40, 41

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
   718 F. Supp. 1099 (S.D.N.Y. 1989).......................................................................2

*Varacallo v. Mass. Mut. Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005)............................................................................47

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005).........................44

*Wal-Mart Sores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ..........................................................................................8

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ................................26

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ..........................................................................1, 2, 44, 47

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) .....................................................................................19

*Willhauk v. Halpin*,
    953 F.2d 689 (1st Cir. 1991) .....................................................................................36

## MISCELLANEOUS

Jack B. Weinstein & Eileen B. Hershenov, *Symposium in Honor of Edward W. Cleary:
    Evidence and Procedure for the Future: The Effect of Equity on Mass Tort Law*,
    1991 U. ILL. L. REV. 269 (1991) ................................................................................5

Kenneth R. Feinberg*, Symposium on Business Dispute Resolution: ADR and Beyond:
    Creative Use of ADR: The Court-Appointed Special Settlement Master*, 59 ALB.
    L. REV. 881, 888-90 (1996) ......................................................................................5

MANUAL FOR COMPLEX LITIGATION, FOURTH (2004) ...........................................................33, 37

## I.      INTRODUCTION

Class Plaintiffs respectfully submit this Memorandum in response to the objections filed to final approval of the proposed Track Two Settlement.  The objections, most of which are made by Don Haviland and "professional objector" counsel, are many and wide ranging.  But they share a single, common characteristic:  each objection is meritless.  As demonstrated in detail below, the Court should reject the objections.

## II.      ARGUMENT

The objections are advanced by four discrete groups of class members:  (i) James W. Wilson (Dkt. No. 5738) (the "Wilson Objection"); (ii) Patricia Weatherly (Dkt. No. 5921) (the "Weatherly Objection"); (iii) John and Connie Pentz and Corinna Connick, represented by professional objectors John J. Pentz and Edward Cochran (Dkt. No. 5947) (the "Pentz Objection"); and (iv) the group of clients represented by Don Haviland (Dkt. No. 5971) (the "Haviland Objection").  Their objections are summarized in Exhibit A hereto.

Because many of the objections overlap, Class Plaintiffs will address them by category.

**A.      The Overall Settlement Amount is Fair and Reasonable**

Haviland complains that the overall settlement amount is too low given that the risks of continued litigation are purportedly minimal because this and other courts have entered verdicts and settlements against some of these defendants.  Tellingly, Haviland does not undertake his own assessment of what he believes (i) the case is worth if a verdict of trial is rendered, and (ii) what a fair settlement would be in comparison.  Haviland also objects to the proposed release including drugs that were never pursued in the litigation.  Haviland Obj. at 29-30.  These objections, like his others, fail.

As explained in Plaintiffs' opening brief, courts routinely approve settlements that provide a small percentage of the recovery sought.  *See, e.g., In re Warfarin Sodium Antitrust*

*Litig.*, 391 F.3d 516, 539 (3d Cir. 2004) (noting that "typical recoveries in securities class actions range from 1.6% to 14%") (citing *Cendant*, 264 F.3d at 241); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *15-17 (E.D. Pa. June 2, 2004) (approving settlement of 10-12% of potential damages where substantial risks exist); *In re Prudential Secs., Ltd. P'ships Litig.*, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving of settlement of 1.6 - 5% of claimed damages); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) (approving settlement of 6-10% of damages); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 64-65 (S.D.N.Y. 1993); *In re "Agent Orange" Prods. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 8181 F.2d 145 (2d Cir. 1987).  But the overall percentage of recovery by itself is not the decisive factor, with the risks of proceeding towards trial the greater consideration.  *See, e.g., In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099 (S.D.N.Y. 1989).  The risks here, coupled with the settlement amount, demonstrate that this settlement is fair and reasonable.

As Dr. Hartman has calculated, applying the 30 percent yardstick to the total AWP inflation for the Track Two drugs yields approximately $1.2 billion.  Declaration of Steve W. Berman in Support of Class Plaintiffs' Response to Objections to Final Approval of the Track Two Settlement ("Berman Decl.") at ¶ 15.  Of this, approximately $316 million is attributable to brand-name drugs sold by Track Two defendants Amgen, Aventis, and Watson.  Thus, $316 million would be the damages that Plaintiffs would seek at trial against these three defendants. *Id.* at ¶ 16.

Of the remaining $800 million in Dr. Hartman's remaining inflation data, this is <u>not</u> the expected measure of damages against the remaining Track Two Defendants.  This is because of

the substantial challenges that confront Plaintiffs in proving liability and damages for the Track Two multi-source drugs remaining in the case.  *Id.* at ¶ 16.

In assessing the likelihood of success at trial against the Track Two Defendants on a drug-by-drug basis, Class Counsel applied the Court's "three salient factors" relevant to a finding of unfair conduct as set forth in *AWP*, 491 F. Supp. 2d at 101-02:  (i) whether there were egregious spreads above the 30% yardstick expected in the industry, focusing on the extent and duration of the spreads; (ii) the company's history of creating the spread, including an analysis of whether the defendant actually increased the AWP and/or list price as opposed to just increasing the spread through discounts and rebates; and (iii) whether the defendant engaged in a proactive scheme to market the spread.  Berman Decl. at ¶ 18.

Without going into all of the details of Class Counsel's assessment, which would be improper since it is possible that the Track Two settlement will not ultimately be consummated, we can represent to the Court that many concerns arose as we examined the evidence, including J-Code identification issues and the fact that there is very little marketing the spread evidence against the Track Two Defendants that manufactured generic drugs.

Furthermore, there are substantial concerns about proving damages given the Court's limitation on damages attributable to multi-source drugs, which the Court found to be the difference between the actual median AWP and the "but for" median AWP had the Defendant in question reported a true AWP.  *Id.* at 20; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 108 (D. Mass. 2007).  The Court underscored the difficulty of recovering such damages as follows:

> Plaintiffs must prove that Warrick was a "but for" cause of their injuries when purchasing albuterol sulfate.  In other words, plaintiffs must show that they would not have suffered the same injury if Warrick had reported a true AWP.  Given the procedure

- 3 -

for calculating a median this could only possibly be true when Warrick's AWP was at or above the median. In that case, reporting a true AWP (which would be well below the median) would cause the median to shift down to the AWP of the next manufacturer in the ordered series. If that manufacturer had reported a lower AWP (rather than the same AWP), then the median would drop. In this situation, Warrick would affect the reimbursement for every version of albuterol sulfate sold.

However, when Warrick's AWPs were below the median, moving them farther down to a true AWP would have had no effect on the median. In that case, reporting a true AWP could not change the median used for reimbursement and plaintiffs would sustain the same injury as when Warrick published an inflated AWP. Warrick would not be a "but for" cause of plaintiffs' injury. In sum, Warrick was a legal cause of plaintiffs' injury only when reporting a true AWP would have actually shifted the median.

*Id.* at 99. Indeed, the Court declined to find any damages for Warrick's albuterol sulfate, which was a multi-source drug throughout the class period. *AWP*, 491 F. Supp. 2d at 108.

Given these concerns, Class Counsel concluded that the expected damages for the truly multi-source Track Two drugs is but a fraction of the $800 million. There are even legitimate concerns that such damages could be *de minimus*. Berman Decl. at ¶ 21.

Haviland just assumes that the case is easy to prove against the Track Two Defendants and that damages are readily at hand. Nothing could be further from the truth. Of course, as is so often the case, Haviland fails to present <u>any</u> analysis supporting his conjecture. And he overlooks the critical impediments to both a liability and damages verdict, including the fact that there is very little marketing the spread evidence against the Track Two Defendants, and that the Court <u>drastically</u> limited the damages recoverable on generic drugs. And, damages issues aside, the Court has specifically raised concerns about the difficulty of proving the case against multi-source drugs:

The interchangeability of these drugs, coupled with the "J-Code" reimbursement system, makes it practically impossible for the plaintiffs to know which drug company's product was dispensed to

> any party at any point.  Plaintiffs must demonstrate that the unfair
> conduct caused them harm.  The method for reimbursing multi-
> source drugs and the difficulty in product identification create
> extremely difficult legal issues for the branded and generic multi-
> source drugs in Class 2.

*AWP*, 491 F. Supp. 2d at 97.  Moreover, as for Class 3, most multi-source drugs were not

reimbursed based on AWP but on other benchmarks like "maximum allowable cost."  *Id*. at 97

n.75.

Notwithstanding the foregoing challenges, Plaintiffs have garnered a proposed

$125,000,000 settlement that represents a substantial percentage of the actual damages

recoverable under this Court's prior rulings.  And the recovery is even greater when evaluated at

the level of each individual Consumer Class Member, where consumers making claims will

receive at least their out-of-pocket expenses and, for Class A drugs, three times their out-of-

pocket expenditures during the so-called "Heartland" damages period.  And note that the base

metric here is expenditure, which is actually greater than damage incurred.  By any measure, the

recovery obtained here is a substantial amount of the aggregate Class damage and, on an

individual claims-made basis, well exceeds the damages incurred by claiming Class Members.[1]

---

[1] Weatherly and Haviland, in prior filings now superseded, complained about the confidentiality of the Track Two Defendants' individual contributions to the settlement.  This confidentiality is a key requirement of the settlement, and the parties believe that a global settlement of claims would not have been possible without "blind contributions."  Multi-defendant settlements in large complex cases are difficult to achieve.  Believing that a global resolution would benefit all parties, the Track Two Defendants explored with mediator Eric Green possible ways to overcome these obstacles.  Under Professor Green's direction and management, Class Counsel and the Defendants agreed to employ the "blind contribution" device, believing that the obligation of anonymity held the greatest promise of generating the considerable amount of money necessary to resolve the class claims.  The blind contribution device has been approved for other class and aggregate settlements as an innovative way to surmount negotiation problems and maximize recovery for plaintiffs.  *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 863-64 (E.D.N.Y. 1984); *In re Joint E. & S. Dist. Asbestos Litig.*, 737 F. Supp. 735 (E.D.N.Y. 1990); *In re New York City Asbestos Litig.*, 129 F.R.D. 434 (E.D.N.Y. 1990); *see also* Jack B. Weinstein & Eileen B. Hershenov, *Symposium in Honor of Edward W. Cleary:  Evidence and Procedure for the Future: The Effect of Equity on Mass Tort Law*, 1991 U. ILL. L. REV. 269, 301-02 (1991); Kenneth R. Feinberg, *Symposium on Business Dispute Resolution: ADR and Beyond: Creative Use of ADR: The Court-Appointed Special Settlement Master*, 59 ALB. L. REV. 881, 888-90 (1996).

Finally, Haviland complains that the proposed consumer release includes drugs that were never pursued in the litigation.  This is not true.  Although the TPPs are releasing the Track Two Defendants from liability for conduct related to any drug sold by a released company, the consumer release only applies to the drugs listed on Exhibit B to the Settlement Agreement, which, in turn, lists only those drugs appearing in the Fifth Amended Master Consolidated Class Action Complaint.  *See* Track Two Settlement Agreement and Release, Sections II.JJ. (limiting "Released Consumer Claims" to conduct, events, or transactions relating to any drug "as listed on Exhibit B") & Exhibit B thereto.  Thus, the inclusion of additional drugs in the TPP release does not affect the consumer release and does not in any way diminish the amount of funds available for consumers or the anticipated payout.

In any event, it is common practice in settling litigation to include a release that is broader than the claims in the litigation.  *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) ("It is well-settled that 'in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'") (quoting *TBK Partners, Ltd.* v. *Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

## B.     Cash Payors Are Included in the Settlement and Can Make Claims

The Pentz Objection asserts that cash payors are required to release all claims yet receive nothing under the Settlement.  Pentz Obj. at 1-3.  However, cash payors are included in the Settlement and can make claims, and many have been submitting claims that will be honored by the Claims Administrator.  Berman Decl. at ¶ 9.

- 6 -

As the press release announcing the proposed Settlement provides, "[c]onsumers who paid percentage co-payments or full payments for any of the covered drugs between January 1, 1991 and March 1, 2008 are eligible for money back."  (Emphasis added.)  And the AWP Track 2 Settlement Class 3 Claim Form likewise makes it clear that all "Out-of-Pocket Expenditures" are eligible for reimbursement.  Berman Decl. at ¶¶ 10-11.

Class Counsel originally advised Claims Administrator Complete Claim Solutions, LLC ("CCS") that consumer claims should be honored whether they made cash payments or an insurance co-payment.  Berman Decl. at ¶ 12.  Consistent with this directive, CCS has always treated consumers as valid class members if they made an unreimbursed payment for a Track Two drug during the class period, whether or not they made full or partial cash payments or had health insurance and made co-payments.  *See* Declaration of Eric P. LaChance Regarding Consumer Class Members at ¶ 3.

Regrettably, a member of the Class Counsel team provided inaccurate information to counsel for Ms. Connick when he called and asked whether cash payors are included in the Settlement.  He was told that they were not, but this was an error.  Berman Decl. at ¶ 13.  However, as discussed below in Section II.H., Ms. Connick is not a class member, and her rights are unaffected by this Settlement, and she has no standing to object.  As to Mr. Pentz, he is able to submit his claim for his cash payment for Epogen.

**C.**    **The Proposed Allocation Between Consumers and TPPs is Fair and Reasonable**

A number of the objections relate to the proposed allocation between consumers and TPPs.  The Weatherly Objection simply states that the amount allocated to consumers is inadequate, without suggesting what would be an adequate amount.  Weatherly Obj. at 13-15.  The Pentz Objection maintains that the allocation should be revised so that at least one-third of the overall settlement funds go to consumer plaintiffs, including cash payors, although Pentz

does not submit any evidence supporting that conjecture.  Pentz Obj. at 3.  And Haviland asserts that amount allocated to consumers (17.5%) was too low as compared to, for example, the GSK settlement (30%).  Haviland Obj. at 22.  The Court should reject these objections because the allocation is fair and reasonable.

      1.      **The allocation between consumers and TPPs was the result of an arm's-length negotiation between Allocation Counsel and is fair and reasonable.**

Unencumbered by any facts related to the process by which an allocation of settlement funds between TPPs and consumers was achieved, objectors' counsel assume that because consumers were not awarded 30% of the settlement amount they were not adequately represented.  Pentz Obj. at 3; Haviland Obj. at 22.  Objectors provide no factual basis to support a 30% allocation other than the fact that other settlements have allocated 30% of settlement funds to consumers.[2]

In fact, the allocation of settlement funds between consumers and TPPs was the product of arm's-length, adversarial negotiation between counsel appointed to separately represent the interests of consumers and TPPs and conducted with participation of the Court-appointed mediator.  After Class Counsel negotiated an overall settlement with Defendants, Alex Sugerman-Brozan, then Director of Prescription Access Litigation Project ("PAL"), along with experienced class action litigator Jeffrey Goldenberg from Ohio, were asked to represent consumers in an allocation negotiation (Messrs. Sugerman-Brozan and Goldenberg are referred to as "Consumer Allocation Counsel").  Mark Fischer and Richard Cohen were asked to

---

[2] Objectors' counsel also cite no law in support of the argument that consumer should be awarded 30% of the settlement proceeds.  Such an inflexible rule is contrary to the "strong judicial policy in favor of settlements, particularly in the class action context."  *Wal-Mart Sores, Inc. v. Visa U.S.A., Inc*., 396 F. 3d 96, 116 (2d Cir. 2005) (internal quotes omitted).  The goal is an allocation that is fair and reasonable, not one that can be tied to a specific mathematical formula.  *In re PaineWebber Ltd. P'ships Litig*. 171 F.R.D. 104, 129 (S.D.N.Y. 1997) (settlement approved "as long as the settlement terms are 'rationally based on legitimate considerations'"), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

represent TPPs ("TPP Allocation Counsel").[3]  That negotiation took place on December 18,

2007, at the office of Eric Green, the Court-Appointed MDL mediator.  Mr. Green acted as the

mediator for the negotiations between TPPs and consumers.

The allocation was a product, in the first instance, of damage allocation information

provided to Allocation Counsel by Dr. Hartman.  Prior to the allocation negotiation, Class

Counsel had, for the purposes of analyzing the allocation, divided the total settlement into two

parts:  $100 million to be allocated to claims associated with named brand drugs made by

Aventis, Amgen and Watson, and $25 million allocated to claims associated with the primarily

generic drugs manufactured by the remaining Track Two Defendants.  This split reflected what

Class Counsel believed was the appropriate weighting due to the much stronger case against the

Avenits, Amgen and Watson brand-name drugs.  Within each of these pools, Allocation Counsel

then used damage allocation data provided by Dr. Hartman's office to determine an initial share

to be allocated to the three Classes.  Berman Decl. at ¶ 6.

Given other considerations, including a determination that overpayment by unwitting

consumers was one of the primary forces behind the success of the litigation and settlement,

Consumer Allocation Counsel sought and ultimately obtained an enhanced allocation to Class 1

consumers.  Declaration of Jeffrey S. Goldenberg ("Goldenberg Decl.") at ¶¶ 9-15; Declaration

of Alex Sugerman-Brozan ("Sugerman-Brozan Decl.") at ¶¶ 10-12.  Rather than allowing Class

1 consumers to recover a straight percentage of their out-of-pocket costs based on utilization

data, Consumer Allocation Counsel succeeded in arguing that Class 1 be allocated 3 times their

utilization percentage (an approach that mirrors treble damages and has been adopted by the

Court in prior settlements).  By adopting the three times multiplier and applying it to the

---

[3] Consumer Allocation Counsel and TPP Allocation Counsel are collectively referred to herein as "Allocation Counsel."

utilization numbers provided by Dr. Hartman, Consumer Allocation Counsel were able to increase the amount set aside for consumers for brand-name drugs from $5,500,000 to $13,200,000, and for multi-source drugs from $4,134,000 to $6,396,000.  Goldenberg Decl. at ¶¶ 12-15; Sugerman-Brozan Decl. at ¶¶ 11-12.

Allocation Counsel also agreed that Class 2's utilization percentage should be multiplied by a factor of two, and that Class 3's utilization percentage be used without a multiplier.[4] Sugerman-Brozan Decl. at ¶ 11.  The resulting percentages were then each proportionately reduced so that their sum equaled a total of 100%.  Sugerman-Brozan Decl. at ¶ 12.  Because Class 3 included both consumers and TPPs, Allocation Counsel again used information obtained from Dr. Hartman to do a breakdown within that class as between consumers and TPPs.  Sugerman-Brozan Decl. at ¶ 13; Goldenberg Decl. at ¶ 16.  When the percentages allocated to both the named brand and generic manufactures were combined, consumers in Class 1 and Class 3 were allocated a total of 17.5% of the settlement and TPPs a total of 82.5%.  Sugerman-Brozan Decl. at ¶ 16; Goldenberg Decl. at ¶ 17.  Upon completion of the negotiations, all of theses calculations were memorialized in a two page document and signed by each of the counsel in attendance.  Sugerman-Brozan Decl. at Ex. A; Goldenberg Decl. at Ex. A.

There was absolutely no collusion among the parties, and consumers were independently and adequately represented, and there is no evidence to suggest otherwise.  Indeed, the work of Consumer Allocation Counsel, as described above and more particularly in the Goldenberg and Sugerman-Brozan Declarations, demonstrates that consumer interests were vigorously represented during the allocation process.  *See* Sugerman-Brozan Decl. at ¶ 21; Goldenberg Decl. at ¶ 24.

---

[4] No multiplier was utilized for Class 3 because these were considered the weakest of the consumer claims because there was no statutory or regulatory basis requiring the use of AWP.  Goldenberg Decl. at ¶ 16.

The Pentz Objection argues that the consumer settlement fund should follow the *McKesson* settlement paradigm and be divided 11.5% to cash payors and 6% to co-payors.  Pentz Obj. at 3.  This division would make no sense, as most of the drugs included in the Track Two Settlement are physician-administered drugs, for which the vast majority of the patients did not pay the full cost of their treatment out-of-pocket.  Further, the Track Two Settlement already provides cash payors at least 100% of their out-of-pocket costs for class drugs, and there is no need to amend the settlement agreement to further divide the consumer fund.

While the Pentz Objectors approvingly cite the *McKesson* settlement in relation to their unfounded criticisms regarding allocation to cash payors, Pentz Obj. at 2-3, they fail to point out that the allocation of funds between consumers and TPPs in that case is <u>identical</u> to the allocation achieved in this settlement:  82.5% to TPPs and 17.5% to consumers (including co-pay and cash payor consumers).  The Court has preliminarily approved this allocation in the *McKesson* case,[5] and the allocation is reasonable here.

**2.     An initial payment to the ISHPs is fair and reasonable and does not prejudice consumer Class members.**

As the Pentz Objection notes, an initial payment of $25.5 million to the ISHPs will be made, and ISHPs are under no obligation to refund that money if the settlement is not approved.  Pentz maintains that this is unfair to consumers.  Pentz Obj. at 7.  But there is good reason for this separate treatment, which is not in any way prejudicial or unfair to the consumer class members (or, for that matter, the TPPs).

ISHPs are independent from class TPPs, are separately represented and, as private litigants, the settlement of ISHP claims against Defendants is not required to be approved by the

---

[5] *See* Amended Order Granting Preliminary Approval of the McKesson Settlement, *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 05-11148 (D. Mass. Mar. 4, 2009) (Dkt. No. 719).

Court.  As a result, ISHPs are able to provide a full release of claims to Defendants <u>without</u> the need for published or mailed notice or the approval process required by Rule 23.  Pursuant to Section VI.A.3 of the Settlement Agreement, in exchange for the initial payment, ISHPs have <u>already</u> released their claims against Defendants upon receipt of the initial payment.  If the Settlement Agreement is not approved by the Court, ISHPs will still have provided Defendants a full release of their AWP related claims.  Having provided a full release, it is only fair that they would also retain the payments made by Defendants to procure that release.

In recognition of the fact that ISHPs have provided a full release to Defendants and that the initial payment amount of $25.5 million represents only 75% of the initial allocation of 50% of the funds allocated to satisfy the claims of TPPs under the Settlement Agreement, Section IX.C. of the Settlement Agreement provides that ISHPs are entitled to receive an additional $8.5 million from Defendants in the event that the Settlement Agreement is not approved by the Court.  Because ISHPs have already demonstrated that they represent 60% of the covered lives in the United States, if the Settlement Agreement is not approved by the Court, ISHPs will have provided a full release for a total payment of $34 million – less than 50% of the amount initially allocated to them under the Settlement Agreement.

It is also important to note that the advanced payment to ISHPs as a result of their ability to provide an immediate and full release of claims does not prejudice TPP Class Members.  The Settlement Agreement provides for a complete "true-up" between the ISHPs and TPP class members.  ISHPs must provide the same documentation to the claims administrator as TPP class members, their claims submissions are subject to the same audit and review process, they are equally responsible for the costs associated with litigation and settlement (such as attorneys' fees and claims administration), and they will receive the same distribution on a dollar-for-dollar

basis.  That is, for every dollar an ISHP or TPP class member has spent on the covered drugs,

they will receive the same recovery.  As a result, TPP Class Members are not prejudiced by the

advanced payment to ISHP group members.  Nor are consumers, as the ISHP payment does not

come out of the consumer pool.  Notably, Allocation Counsel agreed to the separate ISHP

payments and did not believe that such payments in any way disadvantaged the interests that

they represented.

**D.      Consumers Have Been Adequately Represented**

The Pentz Objection maintains that Class 3 TPP representatives were inadequate to

represent consumers.  Pentz Obj. at 204.  The Haviland Objection launches an unwarranted and

mean-spirited attack on PAL, claiming that PAL and its affiliates lack standing to sue for

damages and are atypical and inadequate to represent the interests of individual consumers; that

allocation of the settlement fund for consumers was infected with an irreconcilable conflict of

interest given that Class Counsel appointed PAL and that PAL was organized to "create artificial

*cy pres* funds in consumer class action litigation" for its own use; and that Ms. Tonacchio has not

demonstrated standing to sue and is not typical or adequate.  Haviland Obj. at 19-29.  These

objections are all seriously misguided.

**1.      Ms Tonacchio has proper standing to sue, is an adequate Class 1 Medicare beneficiary representative, and has claims typical of the claims of Class 1 members.**

Even though Haviland has anointed himself as a "consumer representative" in this

litigation, he sees fit to attack the Class 1 consumer representative for the Track Two Settlement,

Muriel Tonacchio, claiming that she "lacks standing, and is not typical or adequate to be a Track

2 Class 1 consumer class representative."  Haviland Obj. at 25.  Haviland's thinly-disguised

attempts to have Ms. Tonacchio dismissed as a class representative so that his clients may take

her place should be rejected.

Contrary to Haviland's claims, Class Counsel already submitted information establishing that Ms. Tonacchio is both an adequate and typical representative of Class 1. *See* Affidavit of Muriel Tonacchio in Support of Plaintiffs' Motion to Add Estate of Wilma Mort as Class 1 Representative for Track 2 Settlement, Dkt. No. 5409-2 ("Tonacchio Aff."). Specifically, before passing away in September 2003, Ms. Tonacchio's mother, Wilma Mort, had cancer and, in trying to treat that disease, was administered chemotherapy over a period of two years in a clinic run by the Weirton Medical Center. *Id.* at ¶ 2. During the period that Ms. Tonacchio's mother was administered chemotherapy, she was enrolled in Medicare Part B. *Id.* at ¶ 3. Although Ms. Tonacchio's mother had supplemental insurance, that insurance refused to cover some portions of her mother's drugs, including $42.44 of her mother's purchases of Anzemet, a Class Drug. *Id.* Ms. Tonacchio attached billing statements that support her Affidavit. *See* Ex. A to Affidavit. After being provided information about Plaintiffs' settlement with the Track Two Defendants, and understanding the duties the position would entail, Ms. Tonacchio agreed to serve as a class representative for Class 1. *Id.* at ¶ 5.

Ms. Tonacchio's mother was a Medicare Part B beneficiary who was administered and paid for a Track Two Class Drug. In its previous orders, the Court has held that Class 1 plaintiffs established standing by similar means. *See, e.g.,* Dkt. No. 1648 ("[W]hen plaintiffs amend the complaint to propose individual class representatives, they shall allege facts demonstrating the typicality and adequacy of the class representatives and disclose the documents demonstrating that the proposed class representatives made co-insurance payments (at least in part) under Medicare Part B based on AWP.").

Haviland seeks to impose a heightened burden on Ms. Tonacchio and thereafter lists eight purported "defects" with her standing. However, the vast majority of Haviland's identified

"defects" are not defects at all; rather, Haviland is simply speculating about what Ms. Tonacchio's documents <u>might</u> mean and what Class Counsel <u>likely</u> have done.  *See, e.g.,* Havliand Obj. at 25 ("the statement appears to show . . . Ms. Mort may have been treated"), 26 ("Presumably, it was never sent to Ms. Mort . . ."), 27 ("she likely did *not* make such a payment").  As such, it is not Ms. Tonacchio's affidavit that is "devoid of evidentiary substance" (Haviland Obj. at 25), it is Haviland's attack on Ms. Tonacchio that is.

### a.    Ms. Tonacchio's mother was administered Anzemet in an oncology clinic.

Haviland speculates that Ms. Tonacchio's mother "may have been treated at a hospital," noting that "Weirton Medical Center [i]s a 238-bed, non-profit, acute-care general community hospital."  *See* Haviland Obj. at 25 & n.35.  But Ms. Tonacchio has clearly explained that her mother's "chemotherapy was administered at <u>a clinic run by</u> the Weirton Medical Center."  *See* Tonacchio Aff. at ¶ 2 (emphasis added).  The clinic, although located in the hospital, is a separate, outpatient facility known as the oncology clinic.  *See* April 8, 2009 letter from Barbara Urbowicz at Weirton Medical Center, Ex. 8 to the Berman Declaration.

### b.    The payment by Ms. Tonacchio's mother was based on AWP because she was a Medicare Part B beneficiary and paid for a Class drug.

Haviland next attacks the amount that Ms. Tonacchio's mother paid in order to claim that her payment was not based on AWP.  Haviland Obj. at 26.  Because Ms. Tonacchio's mother was a Medicare Part B beneficiary who paid for a Class Drug, Haviland's complaints about the amount of the payment, the lack of J-Codes on billing information, as well as his speculation that the payment does not appear to have been AWP-based are irrelevant.[6]  Furthermore, Haviland's

---

[6] The amount Medicare paid for Ms. Mort's Anzemet was indeed AWP-based.  The AWP for that dosage of Anzemet in May 2003 was $173.16.  85% of that amount is $147.18, and 80% of that amount is $117.75, the amount billed to Medicare shown on Ms. Mort's records.  While there may have been an error in billing Anzemet at AWP-15%, the amount was nonetheless AWP-based.  The unusual amount that Ms. Mort paid is likely due to the

new-borne protest is hypocritical given his prior position, taken many times before this Court, that Medicare beneficiaries who paid out-of-pocket for their covered drugs (other than flat co-pays under Medicare HMO) made payments based on AWP.

<strong>c.       Ms. Tonacchio has established a payment for a Class drug.</strong>

Haviland next claims that Ms. Tonacchio has not established that either her mother or her mother's estate paid for, or incurred an obligation to pay for, Anzemet.  Haviland Obj. at 26-27.  However, Ms. Tonacchio has signed a sworn affidavit to this effect.  *See* Tonacchio Aff. at ¶ 4 ("It is my understanding that those records, attached in part as Exhibit A to this Declaration, receit my mother's payment of $42.44 for Anzemet in May 2003.  I have also spoken with a representative of the Weirton Medical Center who informed me over the phone that the amount my mother was required to pay in this instance was due to her supplemental insurance's unwillingness to pay for all of the Anzemet she was administered.") (emphasis added).  Because such a sworn statement is sufficient for class members making claims under the settlement (*see, e.g.,* Class 3 Claim Form §F), it is equally sufficient for Ms. Tonacchio.

It has been many years since Ms. Tonacchio's mother was administered Anzemet and since her mother passed away.  As the claims process for this Settlement recognizes, it may be extremely difficult to locate canceled checks and credit card statements under these circumstances.  While Class Counsel continue to search for them for Ms. Tonacchio, this information is simply not required to establish her standing here.

<strong>d.       Ms. Tonacchio has the consent of her siblings to act as a class<br>representative in this settlement.</strong>

Haviland further implies that Ms. Tonacchio may not legally represent her deceased mother's estate.  *See* Haviland Obj. at 28 n.38.  Ms. Tonacchio is one of her mother's five

---

fact that Ms. Mort was required to pay for Anzemet only at the point at which her supplemental insurance refused to pay for it.

surviving children.  *See* Tonacchio Aff. at ¶ 1.  Ms. Tonacchio has acted as a class representative

in this settlement with the full consent from her remaining four siblings.  Haviland has no

evidence to the contrary.

### e.      Ms. Tonacchio approves of the proposed settlement.

Finally, Haviland states, with no support whatsoever, that "Ms. Tonacchio never

affirmatively states whether she or the Estate of Ms. Mort in fact approve of the settlement."

Haviland Obj. at 29.  However, Ms. Tonacchio has previously submitted an affidavit to the Court

that she made clear was "in support of Plaintiffs' Motion to Add the Estate of Wilma Mort as

Class 1 Representative for Track 2 Settlement."  *See* Tonacchio Aff. at ¶ 1.  The last paragraph

of that Affidavit similarly provided that:

> I have been provided with information regarding Plaintiffs'
> settlement with the corporations I understand are referred to as the
> Track Two Defendants in this litigation.  I support my mother's
> estate serving as a class representative for all Medicare Part B
> beneficiaries who paid or incurred an obligation to pay all or some
> portion of the 20% co-pay for the Track Two Defendants' drugs.  I
> understand the duties of a class representative, including that the
> Court may want additional information from me to support
> Plaintiffs' Motion, and am willing to fulfill those duties on behalf
> of my mother.

*Id.* at ¶ 5.  No more is required of Ms. Tonacchio.

### 2.      The Association plaintiffs are also typical and adequate representatives for Class 1.

In addition to individual class representative Muriel Tonacchio, Class 1 representation

has been bolstered by five organizations that pursue and vindicate the rights of consumers.

Consumer organizations Vermont Public Interest Research Group, Wisconsin Citizen Action,

New York Statewide Senior Action Council, Citizen Action of New York, and Health Care for

All are typical and adequate representatives for Class 1.  As the Court has found, an agent or

member of each of these organizations made a purchase or reimbursement for one or more of the Class Drugs.  Dkt. 5426 at 5.

In a prior opinion, the Court held that an association of affected patients could not serve as a class representative at trial to recover damages against manufacturers accused of inflating the patients' cost of drugs.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 80 (D. Mass. 2005) ("*AWP*").  The Court relied on *Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004), which declined to certify as a class representative in a damages action a grass-roots organization formed to help the victims of an explosion at a chemical manufacturing facility in India that killed thousands and injured hundreds-of-thousands of others.  The Court's earlier litigation class certification decision and *Bano* are distinguishable because they both involved certification for trial, not for settlement purposes only.

It is well-established that an association may have standing to bring claims on behalf of its members if the following requirements are met:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*AWP*, 230 F.R.D. at 79 (quoting *United Food & Commer. Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553 (1996)).  The first element is met if the association has members who purchased the drugs at issue at a price inflated by the defendant's fraudulent price increase, which is the case here.  The second requirement is satisfied because the purposes of the Associations include furthering the rights of consumers, especially with respect to the access-to-health care issues invoked in this lawsuit.  *See*, *e.g.*, *Colwell v. HHS*, 2009 U.S. App. LEXIS 5561, at *21-22 (9th Cir. Mar. 18, 2009) (applying the three factors).

The third prong represents a prudential rather than a constitutional requirement for standing. *Bano*, 361 F.3d at 715. It presented an obstacle to adequate representation in *Bano* because the complaint there claimed that "individuals have suffered bodily harm and damage to real property they own. Necessarily, each of those individuals would have to be involved in the proof of his or her claims." *Id*. at 714-15. At the time of litigation certification, this Court, too, faced similar concerns with respect to Class 1. *AWP*, 230 F.R.D. at 79-80. But the Court implicitly recognized that an association could be an appropriate representative of a class, where individualized proof was not necessary to establish the fact and extent of injury. *Id*. at 79 (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 650 n.5 (2d Cir. 1998) ("An association generally cannot seek relief in damages for injuries to its members because unless the alleged injury is common to its entire membership, and shared by all to an equal degree, both the fact and extent of injury would require individualized proof.")). This is precisely the case here, where the Court certified the class for settlement purposes only.

Individualized proof of damages is solely a management issue, *see AWP*, 230 F.R.D. at 81, which becomes moot when the class is certified for settlement purposes only. *See, e.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). This is particularly true in this case, where damages have been established on an aggregate basis, and individual claims can be easily adjudicated through the claims administration process. The Associations are therefore adequate and appropriate representatives because they meet the other requirements of adequacy and typicality and because individual members' participation is not necessary to establish the fact and extent of the damages to the Class for the purposes of settlement.

- 19 -

### 3. The Association plaintiffs do not have an irreconcilable conflict with consumers over potential *cy pres* distributions.

Haviland exclaims that PAL's "'mission' is to recover 'a separate *cy pres* fund'" in this litigation, and that this alleged motivation creates a conflict between the Association plaintiffs, who are members of PAL, and consumers. Haviland Obj. at 22. As support for his assertion, Haviland submits a contorted and misleading description of PAL's core mission and history of advancing consumer interests. Haviland Obj. at 2-24. Haviland then continues his long-standing attack on Class Counsel by announcing that Class Counsel never disclosed this conflict of interest to any consumer client or the Court. Haviland Obj. at 23. But there was no need for Class Counsel to ever disclose such a conflict for the simple reason that no such conflict existed or exists.

PAL is a national coalition of more than 130 organizations, including consumers, seniors, heath care, labor, legal services, women's health, and human services groups in 36 states and the District of Columbia. Its members in the Commonwealth of Massachusetts are Boston Building Service Employee Trust Fund (SEIU Local 615), Commonwealth Care Alliance, Community Catalyst, IUOE Local 4 Health and Welfare Fund, IUOE Local 98, Health Care For All Inc., Health Law Advocates, Lynn Health Task Force, Massachusetts Breast Cancer Coalition, MASSPIRG, Massachusetts Senior Action Council, New England Regional Council of Carpenters, Our Bodies Ourselves, Pipefitter's Local 537 Trust Funds, SEIU Local 615, Sheet Metal Workers Local Union 17 Insurance Fund, TeamstersCare, and Women's Health Institute. Declaration of Wells Wilkinson in Support of Final Approval of the Track Two Settlement ("Wilkinson Decl.") at ¶ 4.

PAL's mission is to make prescription drug prices more affordable for consumers. It seeks to accomplish this mission through public education and class action litigation challenging

illegal pricing tactics and deceptive marketing by drug companies, Pharmacy Benefit Managers, and other pharmaceutical industry players.  PAL and its members have been involved in more than 32 class action lawsuits challenging drug industry tactics to illegally raise the price of prescription drugs.  There have been 10 final settlements in these cases (for a combined total of $599 million), allowing consumers and health plans who were illegally overcharged to be reimbursed and putting drug companies on notice that their illegal tactics will not go unopposed. *Id.* at ¶ 5.

One of the goals of PAL is to ensure that settlements reached in any pharmaceutical litigation involving consumers provide consumers with fair compensation, and that other provisions of those settlements, such as notice and claims administration procedures, are as consumer-friendly as possible.  PAL's desire is that as much money as possible be returned to consumers who have suffered damage in the cases with which PAL is involved.  *Id.* at ¶ 7.  In addition, PAL's position is that any dollars unclaimed by consumers should not "spill over" to satisfy third party payor claims.  PAL helps ensure that this does not happen by advocating maximum payouts to consumers.  *Id.* at ¶ 8.  PAL has never applied for or received any *cy pres* funds from any litigation or settlement, *id.* at ¶ 10,[7] although Community Catalyst has been the beneficiary of *cy pres* distributions in cases in which it was not a named plaintiff.  Wilkinson Decl. at ¶¶ 13-16.[8]

---

[7] This is consistent with what Mr. Sobol has observed in working with PAL over the years, although Mr. Sobol has, typically, not represented PAL itself.  Declaration of Thomas M. Sobol in Support of Class Plaintiffs' Response to Objection to Final Approval of the Track Two Settlement ("Sobol Decl.") at ¶ 5.  As Mr. Sobol explains:  "[I]t is my understanding that PAL has never sought or accepted *cy pres* funds from any litigation or settlement, and that its non-profit parent, Community Catalyst, has not accepted *cy pres* funds from any litigation in which it was a plaintiff. . . ….  As far as I know, when the choice is between consumer recovery and *cy pres*, PAL has always sided on the need to obtain consumer recovery."  *Id.* at ¶¶ 6, 8.

[8] The only instance of a PAL member organization receiving a *cy pres* distribution in class litigation in which the member was a plaintiff was in *Relafen*, where United Senior Action of Indiana received a $17,000 sub-grant in order to educate consumers about the benefits of generic drugs.  *Id.* at ¶ 14.

- 21 -

These twin goals – advocating against a spillover to TPPs of monies in the consumer pool and seeking to maximize payouts to consumers – were pursued by Allocation Counsel here. Allocation Counsel Alex Sugerman-Brozan, PAL's former Executive Director, and attorney Jeff Goldenberg, vigorously represented the consumers' interests in the allocation negotiations. They were able to increase the overall amount originally earmarked for consumers under Dr. Hartman's utilization model; advocated for a treble damages payment to encourage claims and otherwise emphasized that the claim form and claim process should not be complicated; and strenuously objected to any spillover of unclaimed consumer monies to the TPPs and asserted that any unclaimed funds in the consumer pool be distributed in a manner that benefits consumers either in the form of direct payments to consumers or a court-approved *cy pres* mechanism. Goldenberg Decl. at ¶¶ 9-23; Sugerman-Brozan Decl. at ¶¶ 10-23.[9] Furthermore, Mr. Goldenberg, who is not affiliated with PAL or the Association Plaintiffs, was not aware of any evidence backing Haviland's theory that PAL has sought to funnel settlement funds to itself or its members at the expense of the consumer class members. Goldenberg Decl. at ¶ 24.

Haviland also misrepresents positions taken in the *Lupron* litigation in a misguided effort to paint himself as the sole savior for consumers. Haviland Obj. at 24 & n.34. In *Lupron*, a total settlement of $150 million was reached on behalf of third party payors and consumers. After appropriate allocation by the parties, payment of administrative expenses and fees, and payouts to third party payors and consumers, approximately $11.4 million in unclaimed funds remains in the consumer settlement pool. Sobol Decl. at ¶ 10. This large surplus is the direct result of CMS's initial refusal to provide class member data to assist with the *Lupron* claims

---

[9] Mr. Sugerman-Brozan was the genesis of the "easy refund" consumer claim option. He and PAL believed that inclusion of a flat payment option would motivate consumers not otherwise inclined to look for medical records to participate in the settlement. *Id.* at ¶ 23.

administration, despite counsel's efforts in *Lupron* to obtain administration data, including names and addresses, of Medicare beneficiaries who received Lupron.  *Id.* at 5 n.1.

Given CMS's apparent change of policy here in the *AWP* litigation and its willingness to provide administration data so that notice and claim forms can be provided to targeted Medicare beneficiaries, a proposal has been submitted to Judge Stearns that the remaining funds be used to obtain relevant names and addresses of Lupron recipients from CMS, provide a supplemental notice by direct mail to them, and then pay the valid claims submitted in response.  This would be in lieu of any *cy pres* payment to any organization.  *Id.* at ¶ 11.

Hagens Berman Sobol Shapiro LLP, Class Counsel here, as well as part of the class counsel team in *Lupron*, has argued that the consumer surplus in *Lupron* be distributed in this manner.  *Id.* at ¶¶ 11-12.  And even though PAL's parent Community Catalyst is advocating that the remaining funds be paid to organizations, including Community Catalyst, for the benefit of, among others, programs that will research the detection, treatment, and prevention of prostate cancer, endometriosis, and other diseases and educate consumers on their health and choices (as are other co-leads in *Lupron* but not HBSS), PAL itself took the position in *Lupron* that the remaining funds should be paid to eligible Medicare beneficiaries identified from the CMS database.  *Id.* at ¶¶ 11-12; *see also* Wilkinson Decl. at ¶ 12.  PAL supports a *cy pres* distribution to benefit consumers in *Lupron* only if the Court there rejects the renewed CMS-data based claims proposal (and only so that consumer monies do not spill-over to fund claims by TPPs).  Wilkinson Decl. at ¶¶ 22-24.  Thus, Haviland has it exactly backwards:  *Lupron* is an example of Hagens Berman Sobol Shapiro and PAL arguing against *cy pres*.[10]

---

[10] Another example of PAL advocacy in working to maximize benefits to consumers is provided by *Government Employees Hospital Association v. Serono International, S.A., et al.*, No. 1:05-cv-11935-PBS, where PAL worked with counsel to put together a novel, and ultimately effective, notice program by which class member names were obtained through the issuance of subpoenas to pharmacies and others.  Sobol Decl. at ¶ 8.  "As the

In contrast, Haviland's proposal in *Lupron* is for the remaining funds to be paid to consumers who already filed claims, even though those claimants have already been paid more than their full damages and even though written notice had not previously been sent to all Medicare beneficiaries who were administered Lupron.  Moreover, Haviland would dispose of the remainder in this manner only after additional attorneys fees to Haviland are taken out of the pool.  Notably, Haviland was the <u>only</u> attorney advocating that the remaining funds be diminished by the payment of additional attorneys' fees.  Sobol Decl. at ¶ 14.

Given his interference in *Lupron*, Haviland well knows that both Hagens Berman Sobol Shapiro and PAL have taken the position that the remaining consumer funds in *Lupron* be distributed to the Lupron consumers, and not in *cy pres*.  *Id.* at ¶ 13.  However, Haviland has failed to advise this Court of these facts, facts that are very material to, and indeed eviscerate, Haviland's own trumped-up conspiracy theory that Hagens Berman Sobol Shapiro and PAL have set out to minimize the consumer payout here in order to provide monies to others in *cy pres*.  <u>Once again, Haviland has sought to mislead this Court</u>.   But as the foregoing conclusively demonstrates, Haviland's theory of a conspiracy by PAL to deny consumers their rightful recovery in this case is supported by absolutely no evidence whatsoever and is but a charade in Haviland's long-running efforts to harass Class 1 for his own purposes and to deny Class members their long-awaited recovery.

### 4. The Taft-Hartley Fund representatives are typical and adequate representatives for Class 3.

The Court has preliminarily certified settlement Class 3 with the following six Taft-Hartley Funds as the representatives:  Teamsters Health & Welfare Fund of Philadelphia and

---

*Serono* case and PAL's track record makes clear, PAL has singularly advanced the interests of consumers in pharmaceutical litigation, maximizing returns to consumers."  *Id.*

Vicinity, Philadelphia Federation of Teachers Health and Welfare Fund, Man-U Service Contract

Trust Fund, Pipefitters Local Union 537 Trust Funds, Board of Trustees of Carpenters and

Millrights of Houston and Vicinity Welfare Trust Fund, United Food and Commercial Workers

Unions and Employers Midwest Health Benefits Fund.  Dkt. No. 5426 at 5.

With respect to payors representing consumer interests in Class 3, in its litigation class

certification decision the Court found that TPPs were typical and adequate representatives

because the "TPP serves as the intermediary for its plan beneficiaries in negotiating with

providers over reimbursement rates, and no conflict is immediately apparent" between TPP and

consumer interests.  *AWP*, 230 F.R.D. at 87 n.25.  Indeed, other courts have held that the claims

of consumer and TPPs are typical of the claims of all class members notwithstanding variations

in the amount of damages.  *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D.

672, 688-90 (S.D. Fla.), *rev'd on other grounds*, 223 F.R.D. 666 (2004).

"The central inquiry in determining whether a proposed class has typicality is 'whether

the class representatives' claims have the same essential characteristics as the claims of the other

members of the class.'"  *In re Polymedica Corp. Secs. Litig.*, 224 F.R.D. 27, 36 (D. Mass. 2004)

(quoting *In re Amerifirst Secs. Litig.*, 139 F.R.D. 423, 428 (S.D. Fla. 1991)), *vacated on other

grounds*, 432 F.3d 1 (1st Cir. 2005); *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 310

(D. Mass. 2004).  The plaintiff does not need to show "substantial identity between [his] claims

and those of absent class members," but only that "[his] claims arise from the same course of

conduct that gave rise to the claims of the absent members."  *In re Polymedica*, 224 F.R.D. at 36

(quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988) (internal quotation marks

omitted)).

The Class 3 consumers and TPPs engaged in the exact same type of transactions (retail payments for Subject Drugs), most often as partners in common transactions (as co-payers) and suffered the same damage as a result of AWP inflation – they paid more than they otherwise would have paid for the drugs.  There is no conflict between the interests of TPPs and consumers in Class 3.  Moreover, any potential for conflict was eliminated during the allocation phase by having the consumer interests represented by separate counsel (Messrs. Goldenberg and Sugerman-Brozan).  Such structural protections moot any objections of intra-class conflicts.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 74-76 (D. Mass. 2005) (separate blocks of attorneys were appointed to represent the interests of TPPs and individual consumers, respectively, for purposes of dividing the proposed settlement; court cited PAL's peripheral participation in the negotiations); *In re Lupron® Mktg. & Sales Practicies Litig.*, 228 F.R.D. 75, 90-91 (D. Mass. 2005) (approving settlement in which TPPs and consumers participated jointly and noting that no objector complained of the disparity in the benefits negotiated on behalf of consumer-purchasers and TPPs); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D. Del. 2002) (approving settlement and recognizing that the plan of allocation was agreed to by both consumer and TPP class representatives), *aff'd*, 391 F.3d 516 (3d Cir. 2004).

To be sure, the Court in its initial class certification decision was concerned that TPPs may be subject to unique defenses that would threaten to become the focus of the litigation in Class 1.  *AWP*, 230 F.R.D. at 80 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000)).  However, the Court did not cite the same concerns with respect to TPP representation of consumers in <u>Class 3</u> and, indeed, in awarding damages in favor of the

Massachusetts Class 3 after trial, the Court did not find that the TPPs there were subject to any unique defenses.[11]

E.      **The Claims and Distribution Process is Fair and Reasonable**

The Weatherly Objection posits a number of perceived flaws with the distribution, to wit, the proposed settlement fails to estimate how large Class 3 is, and it does not provide an estimate of how many members of Class 3 may be able to document their out-of-pocket expenditures (Weatherly Obj. at 7-9); the proposed settlement does not set forth clear guidelines for Class 3 members proving their out-of-pocket expenses or a meaningful or practical method for Class 3 members to recover the costs of obtaining required claims documentation (*id.* at 9); the proposed settlement does not inform class members exactly what they receive, leaving them unable to make a fully informed decision (*id.* at 10); the distribution should be changed to be direct payment based on billing records subpoenaed from the ISHPs and retail pharmacies (*id.* at 11-12); and the settlement should provide for a sufficiently high flat award without records so that offsetting the cost of records is less of an impediment to a fair settlement, but the settlement should still provide a mechanism for class members to recover their costs of obtaining documentation (*id.* at 15-16).  These criticisms are unwarranted.

1.      **The notice and claim forms clearly indicate what Class 3 Consumers can do to document their claim.**

Weatherly complains that the Notice to Class 3 consumers does not set forth how consumers can go about proving their out of pocket expenditures in order to make a claim. Weather Obj. at 9.  Weatherly is wrong.  Section 5 of the Class 3 Notice, titled "What do I need to do to get a payment?," explains that, in order to make a valid claim, a Class 3 consumer should "complete the attached claim form and provide documentation."  Section F of the claim

---

[11] The representatives of Class 3 for the Massachusetts trial were Pipefitters Local 537 Trust Funds, Blue Cross/Blue Shield of Massachusetts, and Health Care for All.  *See* Dkt. No. 2097-1 at 6.

form clearly indicates what a consumer can do to document their estimated out-of-pocket

expenditures:

> If you chose Option 2, you must provide proof that you made a
> percentage co-payment for each of the Class Drugs you are
> claiming in the charts in Section E above. You only need to
> provide one form of proof for each of the drugs.
>
> Any one of the following are acceptable as proof of a percentage
> co-payment for one of the Class Drugs:
>
> (1) A receipt, cancelled check, or credit card statement that shows
> a payment for one of the drugs (other than a fl at co-payment); or
> (2) A letter from a doctor saying that he or she prescribed one of
> the drugs and you paid part of the cost of one of the drugs (other
> than a flat co-payment) at least once; or
> (3) An EOB (explanation of benefits) from your insurer that shows
> you made or are obligated to make percentage co-payments for the
> Class Drugs; or
> (4) A notarized statement signed by you indicating you paid or are
> obligated to pay a percentage copayment for the Class Drugs
> between January 1, 1991 through March 1, 2008, including the
> total of all percentage co-payments for the drugs during the time
> period; or
> (5) Records from your pharmacy showing that you made
> percentage co-payments for the Class Drugs purchased between
> January 1, 1991 though March 1, 2008.

Weatherly does not specify what additional "meaningful or practical ways for Class 3

members to recover required claims documentation" she believes is required to be provided to

consumers.  The list of documentation is self-explanatory.  If and when class members have

questions concerning how to go about obtaining documentation, they are provided a toll-free

number to call to get further information and guidance.  If they are unsatisfied with the

information they receive or have questions beyond those that can be provided by the call center,

they are directed to Class Counsel for further information and direction.  Nothing more is

necessary.

## 2. Language indicating that consumer claims may be proportionately reduced is standard in consumer class actions.

Weatherly complains that the Notice to Class 3 Consumers indicates that an individual who chooses the "easy refund" may get "up to $35," and that in the event there is not enough money available to pay 100% of all consumer claims, "each consumer's claim will be reduced proportionately." Weatherly further asserts that, as a result of this language, consumers cannot adequately evaluate the fairness of the Settlement because they have not been informed of exactly how much they might receive from the Settlement. Weather Obj. at 10. This argument is unavailing.

Language in the notice indicating that awards may be proportionately reduced appears in almost all notices associated with class settlements simply because, despite the best information available and the experience of Class Counsel, it is always possible that there will be more claims than anticipated.[12] Consumers need to be informed that, although Class Counsel believe the Settlement is sufficient to pay 100% of claims including any flat payments such as the $35 easy refund, there is always the possibility that claims will exceed available distributable funds. Not to provide such information to consumers would be misleading and would surely meet with objection in the event there were insufficient funds. The experience of Class Counsel in the *AWP* MDL and in similar litigation is such that they believe the funds are adequate to pay all consumer claims, but they cannot guarantee that result.

## 3. The value of the Settlement to the Consumer Classes as a whole does not depend on any "take up" rate related to Class 3 Consumers.

Objector Weatherly, in arguing that the Settlement cannot be approved because Class Counsel has not provided an estimate of the size of Class 3 or of the "number of class members

---

[12] As examples, similar language appeared in the consumer notices approved and used in *Lupron*, *Relafen* and the AstraZeneca Class 1 settlements, to name a few.

that may be able to document their out-of-pocket expenses," suggests that the Court therefore cannot evaluate the value of the Settlement to consumers without these figures.  Weatherly Obj. at 10.  This has not been an issue in other settlements approved by this and other Courts, largely because the pool dedicated to consumers is known.

The 17.5% or $21,875,000 allocated to consumers under the proposed settlement will be paid out by Defendants for the benefit of consumers regardless of how many consumers file claims or how many Class 3 claimants opt for a full refund and provide documentation of their expenditures.  There is no provision for any reversion to Defendants of any monies allocated to consumers and, indeed, Consumer Allocation Counsel refused to agree to any spillover of consumer monies to the TPP pool.  If there are funds left after all consumers have been paid their claimed share of consumer funds, the Court, upon motion of Class Counsel, will determine the disposition of those funds.  For example, any excess funds could be used to further compensate consumers who already filed claims or to some *cy pres* use that would benefit Consumer Class members.

Weatherly further objects that Class Counsel have not estimated the number of consumers who will be able to document their out-of-pocket expenses, yet Weatherly fails to explain how this could be accomplished or what significance it has to whether the settlement is fair and reasonable.  Weather Obj. at 7-9.  Class Counsel are quite experienced in these and other consumer settlements but do not have a crystal ball.  It is impossible for Class Counsel to know or to reliably estimate how many consumers will submit claims and how many will choose the "easy refund" or full refund options.  We expect that consumer decisions will be based on their individual circumstances, including how much money the consumer paid out-of-pocket, the difficulty in obtaining one proof of purchase related to each drug for which the consumer would

make a claim for a full refund, and the inclination of each consumer to make the effort to make a claim for a full refund versus the "easy refund" option.[13]   There is no reason why we should have to foresee the future claims rate, especially given the lengths to which Class Counsel have gone to make the claims process as easy as possible.  What is important is that consumers have a real opportunity to participate (as they do), and that, as Allocation Counsel have guaranteed, the allocation to consumers is fair and reasonable.

> **4.    Retrieving payment data via subpoenas to ISHPs and pharmacies is impractical, unduly burdensome, and will swamp monies available for distribution to consumers.**

Weatherly and Pentz suggest that payment data be obtained from TPP insurers (such as ISHPs) and from pharmacies and PBMs in order to make a direct payment to Class 3 members. Weatherly Obj. at 11-12; Pentz Obj. at 5-6.  The goal is laudable and is shared by Class Counsel, many of whom were directly involved in the *Relafen* case and helped design and execute the subpoena project referenced as an example in Weatherly's objection.  However, *Relafen* is a poor model for the Track Two Settlement.

*Relafen* involved a single oral medication with a few dosage forms, and thus just a handful of related NDCs.  In contrast, this Settlement involves almost 200 drugs, most with multiple dosage forms, and thousands of related NDCs.  Furthermore, this proposed settlement primarily involves injectable drugs administered in physician offices and not oral medications dispensed from a pharmacy.

The fact that Relafen, an anti-inflammatory often prescribed by rheumatologists, was an oral medication is significant in that it was exclusively dispensed through retail pharmacies and mail-order pharmacies operated by PBMs.  Although a major undertaking, issuing subpoenas to

---

[13] As discussed above, the "easy refund" option was instituted to enhance recovery to consumers by providing money to those consumers who would not otherwise have made a claim at all because they do not have access to, or the inclination to look for, paperwork to substantiate a full refund.

the top ten retail pharmacies and the five largest mail-order PBM pharmacies meant that a significant portion of the class members' records were obtained.  In contrast, the vast majority of the drugs in this Settlement are injectable drugs not distributed through pharmacies.  Obtaining the payment records of consumers through retail and PBM pharmacies would not provide information for the vast majority of class purchases.  Instead, subpoenas would have to issue to thousands or tens-of-thousands of physicians, if they can be reasonably identified.  This would simply be unworkable.

And for the minority of drugs that are self-administered, the sheer logistics involved in coordinating and collating data from tens of pharmacy chains and potentially hundreds of TPPs would prove an insurmountable obstacle.  In *Relafen*, the claims administrator obtained data from approximately 15 entities (ten national retail pharmacies and five PBMs), each of which had separate computer systems.  Significant effort was involved in ensuring that the data obtained was in an identical and usable format and that the data fields obtained were identical across the pharmacies.  Because the same individual may fill prescriptions in a number of different pharmacies, and in order to avoid the cost of processing separate checks to the same individual, the data obtained from the different companies had to be combined.  Further, information related to individuals appearing in multiple data sets needed to be combined, so that a single check could be cut to that individual.  In many instances, this process was a manual one because identifying information was not always identical across the pharmacies.[14]

The logistical challenges posed in *Relafen* pale in comparison to those associated with this Track Two proposed settlement.  First, TPPs generally do not maintain insured claim information in their active databases for more than a three or four years.  Older data either exists

---

[14] For instance one TPP database may list an individual as "Bill Smith" and another as "William P. Smith." These entries need to be manually reviewed to ensure that other identifying information, such as a home address, are identical before the entries from separate databases are combined.

in an archived format that is expensive and difficult to restore or was maintained in computer systems that are no longer active and have been replaced. Second, the numbers of drugs and NDCs in this Settlement are significantly higher than in *Relafen*. Just the seven brand-name drugs involved here have a combined total of 129 associated NDCs. The remaining 183 drugs on the list have thousands of NDCs. Third, obtaining data from potentially hundreds of TPPs, all with separate data systems, and then combining them in a usable fashion and combining individual consumer information that appears in multiple databases would be prohibitively time consuming and costly.

Class Counsel do not suggest that this approach could not be undertaken. They do suggest however, that the time and money that would be required makes such an approach prohibitive and would likely consume a substantial, if not majority amount, of the money set aside for the consumers. Weatherly's speculation that such a monumental task is feasible is just that – speculation – and is not supported by any prior settlement paradigm or evidence.[15]

### 5.   A flat payment of $100 to $150 is impractical and factually unsupported.

Weatherly suggests as an alternative to the current distribution plan that each member of Class 3 be provided, without any documentation of their claim, a flat payment of $100 to $150 rather than the $35 "easy refund." Weatherly Obj. at 15-16. Weatherly suggests that this would

---

[15] The Pentz Objection also maintains that consumers should not be required to file claims and that, instead, a distribution method should be devised to send checks to consumers identified through serving subpoenas on the ten largest pharmacy chains. Pentz Obj. at 5-6. Even if feasible (and it is not), this will tell nothing about whether the consumer's payment went unreimbursed by insurance. As Special Master McGovern recently concluded in reporting to the Court on the fairness of the GSK settlement, a claims process involving proof of payment is "typical of this type of consumer settlement." Report of the Special Master to the Court at 5; *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 236 F. Supp. 2d 445 (E.D. Pa. 2002) (utilizing claims process in which claim had to be certified by a cardiologist or cardiothoracic surgeon); MANUAL FOR COMPLEX LITIGATION, FOURTH at 331 (2004) ("Class members must usually file claims forms providing details about their claims and other information needed to administer the settlement. . . . Verification of claims forms by oath or affirmation under 28 U.S.C. § 1746 may be required, and it may be appropriate to require substantiation of the claims (*e.g.*, through invoices, confirmations, or brokers' records).").

provide a "more equitable result" but provides no explanation as to why such an alternative is superior.

Weatherly contends that the $100 to $150 payment would be based on the "average cost of medical/billing records retrieval." *Id.*  But Weatherly provides no evidentiary support for the assertion.  During the December 16, 2008 status hearing, the Court asked Class Counsel how much medical records cost to retrieve.  The response was that, in general, it varied from person to person based on the volume of the records and the specific institutions producing the records. *See* December 16, 2008 Tr. at 6.[16]  Class Counsel has been involved in numerous settlements involving pharmaceuticals that include the same list of documentary evidence used in this Settlement and have never encountered consumer claimant complaints that the records needed to substantiate claims were prohibitively expensive, let alone in the $100 to $150 range.

It should be noted that Class 3 members need not provide records to substantiate <u>every</u> purchase or payment during the entire class period in order to obtain a full refund.  Class 3 consumers are required only to estimate their total out of pocket expenditures for each drug for which they are making a claim and provide <u>one</u> form of proof for each of the drugs for which they are making a claim.  This greatly reduces the amount of documentary evidence required to be submitted but ensures that the consumer has provided some evidence that they paid for the drugs in order to deter potential fraudulent claims.  The forms of proof do not even need to include medical records but can instead be a letter from their doctor or their own notarized statement attesting to the fact that they made percentage co-payments for the drugs – neither of which cost substantial amounts to obtain and in most instances are free.

---

[16] Counsel did say that he has seen bills for medical records vary from $15 to $150, but this figure was based on experience as legal counsel having obtained records in, for instance, personal injury matters, not specific costs that a Class 3 member might encounter.  Many institutions provide records to an individual requesting their own medical records free of charge, while they may charge attorneys or other third parties a per page fee.

Even if it were a reasonable assumption (which it is not) that it would cost the average consumer $100 to $150 for medical records, Weatherly fails to explain why this amount should form the basis of a recovery by consumers when no records are being required to substantiate a claim in Weatherly's alternative plan.  The $35 "easy refund" was designed to encourage the participation of class members who are not otherwise inclined to provide documentation.  It was set at an amount that Class Counsel believed would motivate legitimate class members to file a simple claim form, but not be a windfall amount that might either swamp the funds available to pay consumers who filed for full refunds with documentation or that would encourage fraudulent claims.

If unspent consumer funds exist after the initial distribution to class members based on the current plan, the Settlement provides that the Court will decide the disposition of those funds. If the Court is so inclined, the Court could then order that some or all residual funds be used to further compensate consumers who claimed the $35 easy refund.  This would increase the funds distributed to consumers but only after ensuring that all consumer claimants were already paid 100% of their claim, and it would not encourage fraudulent claims because such an additional distribution would be restricted to those who have already filed for the $35 payment.

## F.     Objections Relating to Attorneys' Fees

The objections relating to attorneys' fees are as follows:  requested attorneys fees are too high and the Notice is not sufficiently specific regarding fees, because it does not specify whether the percentage sought is from $21.8 million or $125 million (Wilson Obj. at 1); attorneys' fees were based in part on amounts that went to ISHPs, which were not represented by Class Counsel (Pentz Obj. at 7-10); and by failing to estimate lodestar applicable to Track Two Defendants, Class Counsel have not properly documented lodestar for purposes of the cross-check (Pentz Obj. at 8-9).  These objections are not well founded.

1.      **Class Counsel's request for a 30% fee, inclusive of litigation expenses, is fair and reasonable.**

In the Memorandum In Support of Class Counsel's Petition For Attorney's Fees, Reimbursement of Expenses, and Compensation to the Class Representatives in Association with the Track Two Settlement (Dkt. No. 5938) ("Fee Petition"), Class Counsel requested that the Court award a payment of attorneys' fees and litigation expenses of 30% of the common fund of $125 million or $ 37,500,000.  The Wilson Objection provides no detail as to why Wilson believes the requested fee is too high or unreasonable other than merely stating that such an award is "too high for the results obtained."  Wilson Obj. at 1.  Failure of an objector to provide any detail about his objection or to provide any substantive argument alone provides the Court with adequate basis to dismiss the objection.  *Willhauk v. Halpin*, 953 F.2d 689, 700 (1st Cir. 1991) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.  Judges are not expected to be mind readers . . . .").

In support of the Fee Petition, Class Counsel provided the Court with exhaustive briefing in support of a 30% award and in the interest of brevity will not repeat that briefing here. However, we reiterate that an award of 30% in this Settlement will still not result in a multiplier on Class Counsel's overall lodestar in the MDL.  Fee Petition at 9.  When the Court also considers the fact that Class Counsel is not separately requesting reimbursement of any portion of the more than $10 million in out-of-pocket expenses associated with the litigation, Class Counsel's request for a 30% fee is even more reasonable given the results achieved for the Class.

The Court has awarded a 33 1/3% attorneys fee and expense award in the GSK Settlement and a 30% award of fees in the AZ Class 1 Settlement.  A 30% fee and expense

award in the Track Two Settlement is also reasonable, and Mr. Wilson's unsupported objection should be rejected.

       2.       **Notice to the Class concerning attorneys fees is adequate.**

Weatherly complains that notice to consumers is inadequate because it does not state the specific amount of attorneys' fees requested and instead indicates that "Class Counsel will ask the Court to award them a fee of up to 33 1/3% plus interest and litigation expenses" but does not specify whether the percentage would be applied to the $21.8 million allocated to consumers or the total settlement fund of $125 million.[17]  Class Counsel believe that consumers reading the above quoted language would understand that the fee would be requested on the entire $125 million.  However, even if a consumer understood that the fee requested would relate only to that portion of the settlement funds allocated to consumers, he or she would still have the correct understanding of the impact of the fee request on his or her recovery.  Whether the fee request is one-third of each of the separate amounts allocated to consumers and TPPs or one-third of the entire settlement, the math is identical and the resulting attorneys' fee is the same.

Again Weatherly provides no case law or authority to support the contention that adequate notice must include a specific amount of fees being requested.  In fact, no such authority exists.  The *Manual on Complex Litigation* indicates that a valid notice, as it relates to the issue of attorneys fees, should "generally apprise class members that fees will be sought and awarded by the court at the settlement hearing or a subsequent hearing and indicate whether the defendants or the settlement fund will bear such costs."  MANUAL ON COMPLEX LITIGATION, FOURTH, § 8:32 (2004).  The class notice provides this information and is not deficient because it does not set forth a specific amount of fees to be requested by counsel.

---

[17] It should be noted that the Settlement website clearly indicates that the fee request of  33 1/3% would be of the entire settlement amount.  *See* http://www.awptrack2settlement.com/consumerclass3.htm.

3.    **A fee request based in part on money paid to the ISHPs is reasonable and has previously been approved by the Court.**

The Pentz objection fundamentally mischaracterizes the reason and effect of inclusion of the ISHPs in the Settlement stating that "the only effect of including the ISHP settlement funds in the Track Two Settlement is to inflate Class Counsel's attorney's fees."  Pentz Obj. at 8. Pentz fails to realize that, without Class Counsel's ability to ensure the participation of ISHPs, there would either be no settlement, or the value of the settlement to the Class would be diminished.  Participation of the ISHPs, who represent 60% or more of the covered lives in the United States, benefited the Class in a number of ways.  The ability to provide total peace to Defendants and include all or virtually all TPPs within the Settlement increased Class Counsel's negotiation power and inured to the benefit of the Class.  Inclusion of the ISHPs also means that they share in the costs associated with the litigation and settlement administration at the same rate as TPPs within the class so that class members do not bear a disproportionate burden as compared to ISHPs.

Pentz appears to be under the misimpression that there were two separate litigations, one involving the Class and another involving ISHPs.  "The $51.8 million that will be paid to the ISHPs was created by the ISHPs' counsel, who are entitled to fees based upon the ISHP settlement fund," Pentz proclaims.  Pentz Obj. at 8.  First, having stated that they do not object to the payment of 30% of the fund that Class Counsel created for members of the class (as opposed to the ISHPs), it is difficult to understand how the Pentz Objectors have standing to object to a fee being paid by entities outside the Class.  More important is the undeniable fact that Class Counsel were the only counsel litigating this case and have been doing so at their own risk, without contribution in money or effort from ISHP counsel, for eight years.  Any funds paid to the ISHPs will be the result of the efforts of Class Counsel who have vigorously litigated this

case.  In recognition of this fact, by both ISHPs and their counsel, they have agreed that Class

Counsel are entitled to whatever fee the Court awards with respect to the entire settlement fund,

including monies that will be paid to the ISHPs.[18]

Despite the fact that ISHPs are not class members, the Court clearly retains continuing

jurisdiction relating to the fees and costs requested by counsel from a common fund.  *See In re*

*Linerboard Antitrust Litig*., 333 F. Supp. 2d 343, 344  (E.D. Pa. 2004) ("The Court retains

continuing jurisdiction over this matter including jurisdiction over the Settlement Fund and its

distribution, the Funds to be distributed pursuant to this Order, as well as all issues relating to the

fees and cost of counsel in this action."); *In re Linerboard Antitrust Litig.*, 2004 WL1240775, at

*1 (E.D. Pa. June 4, 2004) (explains exercise of ancillary or supplemental jurisdiction was

necessary to protect the integrity of the court).  Thus the Court is not restrained from awarding a

fee on monies that will ultimately be paid to ISHPs.

Finally, the fee structure between ISHPs, ISHP counsel and Class Counsel in this

Settlement is identical to that used in the GSK AWP Settlement which was approved by this

Court as fair and reasonable.  There is no reason to change course now.

### 4.      The submitted lodestar is sufficient for the Court to perform a reasonability cross-check on the percentage-of-the-fund approach.

The Pentz Objectors complain that counsel have not segregated lodestar associated with

litigation against Track Two Defendants and that this provides insufficient information for the

---

[18] The Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citing *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *cf. Hall v. Cole*, 412 U.S. 1 (1973)).  The Court stated, "[t]he common-fund doctrine reflects the traditional practice in courts of equity…." *Id.* (citing *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527, 532-537 (1881)).  "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense… Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.* (citing *Mills*, 396 U.S. at 394).

- 39 -

Court to perform a cross-check on the percent of funds requested by Class Counsel.  Pentz Obj.
at 8.  Pentz is wrong.

When used as a cross-check, the lodestar calculation can be based on time and expense
summaries in lieu of detailed records.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.
Agent Actions*, 148 F.3d 283, 332 n.107 (3d Cir. 1998).  In other words, the Court's inquiry into
the lodestar is not as focused and detailed as it would otherwise be for an award primarily
determined under a lodestar method, which is consistent with the First Circuit's desire that
district courts focus on the benefit conferred on the class and not on a complex and time-
consuming "review [of] the time records of a multitude of attorneys in order to determine the
necessity and reasonableness of every hour expended . . . ."  *In re Thirteen Appeals Arising out
of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995) (quoting
*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991)).

More than 250 attorneys have spent time working on this case for plaintiffs.  The sheer
number of work hours underpinning the total lodestar of Class Counsel (206,789 hours as of
March 31, 2008) highlights how time-consuming and burdensome a detailed lodestar inquiry
would be and demonstrates why the Percent of Fund approach works best for this litigation.  *See
In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 331; *In re Fleet/Norstar Sec.
Litig.*, 935 F. Supp. 99, 108 (D.R.I. 1996).  It is extremely difficult to apportion those 206,789
hours by Defendant or to attribute a specific lodestar to the group of Track Two Defendants
given the breadth of common issues and the number of tasks completed over the last seven-and-
a-half years.

In addressing multiple claims based on a core of common facts, the Supreme Court has
recognized that the focus should be placed on the overall relief provided:

> In other cases the plaintiff's claims for relief will involve a
> "common core of facts" or will be based on related legal theories.
> Much of counsel's time will be devoted generally to the litigation
> as a whole, making it difficult to divide the hours expended on a
> claim-by-claim basis.  Such a lawsuit cannot be viewed as a series
> of discrete claims.  Instead the district court should focus on the
> significance of the overall relief obtained by the plaintiff in relation
> to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his
> attorneys should recover a fully compensatory fee.

*Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983).  The same concept applies here to claims

against multiple defendants where common issues are inextricably intertwined.  An immense

amount of work was done on common issues, work that cannot be segregated from other aspects

of the prosecution of this case.

Given the "extremely broad" discretion that the Court has in evaluating an attorneys' fee

and cost petition in class litigation, *In re Thirteen Appeals*, 56 F.3d at 309, the total lodestar and

expense information provided by Class Counsel suffices for purposes of a rough cross-check on

the reasonableness of the POF fee and cost award.

**G.      Haviland's Objections are Fueled by Animosity towards Class Counsel and this
         Court**

The Court has found that Haviland engaged in a "breach of trust as class counsel" when

he sought "a nationwide class in New Jersey at the same time he was seeking to represent a

nationwide class here without disclosing the conflict of interest to this Court."  Jan. 3, 2008,

Memorandum and Order at 8 (Dkt. No. 4972).  The Court found that Haviland made a material

misrepresentation to the New Jersey court regarding his status as Class Counsel here.  *Id.* at 9.

And the Court found that "Mr. Haviland intended to coerce the Court into appointing him as Co-

Lead Class Counsel or risk losing class representatives in a class action involving the sick and

elderly." *Id.* at 10.  To say that Haviland bears a substantial grudge against this Court and Class Counsel likely understates his true emotions.  It undoubtedly animates his every action.

As one example, Haviland's conspiracy theory here is eerily reminiscent of the arguments that he recently advanced in the *Bridgeport Fire* court, where that court found that Haviland's objections were "at least partially fueled by Mr. Haviland's animosity to his former law firm."  February 27, 2009 Order and Opinion, *In re: Bridgeport Fire Litig.* (Court of Common Pleas, Montgomery County, Pennsylvania) at 18 (Berman Decl. Ex. 4).  In quashing subpoenas that Haviland served in that case regarding the settlement, the court also found that "Mr. Haviland appears to have been trying to seek this information in support of a 'wild goose chase' to prove a self-created theory that the Settlement Agreement was a product of collusion, a theory that has absolutely no basis in fact.  Mr. Haviland had no independent basis to support such an outrageous and manufactured allegation. . . .  Mr. Haviland has continuously operated to delay and disrupt these proceedings and aggravate his former employer law firm."  *Id.* at 19-20.  So it is here, too, with Haviland's trumped up "PAL conspiracy."

The Court is well aware of Haviland's unbridled antics and the lengths to which he will go in misguided attempts to disrupt pending class litigation where Haviland perceives that he has not been provided the lead role that he believes he deserves.  From the deliberate misrepresentations that Judge Stearns found that Haviland made in *Lupron*, to the injunction issued against him in the *Bridgeport Fire* case, to the misrepresentations made to the New Jersey AWP court, and the misrepresentations made to this Court about his client's position in the AstraZeneca settlement, the scope of class he was seeking in New Jersey, and Class Counel's and PAL's position on *cy pres* in *Lupron*, Don Haviland has constructed a clear record of

harassing courts and counsel.  Without belaboring the point,[19] it is important to highlight the fact that Haviland's zeal to satisfy his quest for revenge necessarily colors <u>all</u> of his arguments, rendering them suspect and motivated by animosity.  Therefore, the Court should view the Haviland Objection with a jaundiced eye.

A final word is due about Haviland's recklessness.  If the Court adopted Haviland's arguments in abrogating the proposed settlement, what would Haviland leave in its wake? Nothing.  In his haste to lay waste to the settlement, Haviland loses sight of the fact that his clients may be unable to step up and assume the mantle of leadership for the Classes.  First, the Court has expressed substantial concerns about whether any of Haviland's clients have viable claims.  *See* Jan. 3, 2008 Memorandum and Order (Dkt. No. 4972) (the "Disqualification Order") at 10 & n.5 (noting that most if not all of his client's claims arose after the cut-off date for the litigation certification).  Second, the Court was troubled by Haviland engineering his clients' threats to withdraw if Haviland were not appointed as Class Counsel, *id.* at 10, making it extremely unlikely that the Court would appoint his clients as class representatives even if their claims had fallen within the class period.  Third, Haviland himself would be unable to represent a class as counsel, because the Court struck him as Class Counsel as a result of his material misrepresentations and disloyalty to the Classes.  *Id.* at 11 & *passim*.  Thus, Haviland's arguments would not only take away the relief that is close at hand under the proposed settlement but would leave the Classes without any relief from the Track Two Defendants – ever.  That would be the price of Haviland's grudge.

---

[19] We will not take the time here to catalog all of Haviland's many misdeeds before this and other Courts and instead incorporate prior filings on the issue.  *See* Plaintiffs' Response to the Haviland Memorandum Concerning the Appointment of Class Counsel for the Track 2 Classes Pursuant to Fed. R. Civ. P. 23(g), and Class Counsel's Submission Dated September 18, 2007 (Dkt. No. 4776); Class Counsel's Response to the Misrepresentations Contained in the Supplemental Memorandum of the Haviland Law Firm, LLC in Support of Motion for Appointment as Class Counsel for the Track 2 Consumer Sub-Classes Pursuant to Fed. R. Civ. P. 23(g) (Dkt. No. 4735); Class Counsel's Submission Regarding Mr. Haviland's Participation as Co-Lead Counsel (Dkt. No. 4723).

## H.      The Court Should Be Wary Of The Lawyer-Driven Objections

Unfortunately, a small cottage industry of objectors now plagues class action litigation,

seeking to interfere with fair and reasonable class settlements in order to extract attorneys' fee

payments.  As one court has observed:

> [C]lass actions also attract those in the legal profession who subsist
> primarily off of the skill and labor of, to say nothing of the risk
> borne by, more capable attorneys.  These are the opportunistic
> objectors.  Although they contribute nothing to the class, they
> object to the settlement, thereby obstructing payment to lead
> counsel or the class in the hope that lead plaintiff will pay them to
> go away.  Unfortunately, the class-action kingdom has seen a
> Malthusian explosion of these opportunistic objectors, which now
> seem to accompany every major securities litigation.

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio May 5, 2008).

John J. Pentz, counsel to objectors Pentz and Connick, is a frequent objector to class

settlements, having served as objector counsel in at least 24 cases according to a recent Lexis

search.[20]  Formerly appearing under the moniker of "The Objectors Group," Pentz has used his

---

[20] *See Azizian v. Federated Dep't Stores, Inc.*, 2007 U.S. App. LEXIS 20844 (9th Cir. Aug. 23, 2007); *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006); *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004); *Morris v. Lifescan, Inc.*, 2003 U.S. App. LEXIS 820 (9th Cir. Jan. 16, 2003); *Schwartz v. Citibank, N.A.*, 2002 U.S. App. LEXIS 21456 (9th Cir. Oct. 10, 2002); *Spark v. MBNA Corp.*, 2002 U.S. App. LEXIS 19594 (3d Cir. Sept. 16, 2002); *Reynolds v. Benefit Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002); *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*, 2008 U.S. Dist. LEXIS 107131 (M.D. Tenn. Nov. 14, 2008); *In re Royal Ahold N.V. Sec. & Erisa Litig.*, 2007 U.S. Dist. LEXIS 45935 (D. Md. June 18, 2007); *In re Serzone Prods. Liab. Litig.*, 2006 U.S. Dist. LEXIS 60151 (S.D. W. Va. Aug. 23, 2006); *Barnes v. FleetBoston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072, at *4 (D. Mass. Aug. 22, 2006); *In re Managed Care Litig.*, 416 F. Supp. 2d 1347 (J.P.M.L. 2006); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2005 U.S. Dist. LEXIS 15306 (D. Me. July 27, 2005); *In re Charter Communs., Inc.*, 2005 U.S. Dist. LEXIS 14772 (E.D. Mo. June 30, 2005); *In re Paypal Litig.*, 2004 U.S. Dist. LEXIS 22470 (N.D. Cal. Oct. 13, 2004); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426 (D.N.J. 2004); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005); *Tenuto v. Transworld Sys.*, 2002 U.S. Dist. LEXIS 1764 (E.D. Pa. Jan. 31, 2002); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 2001 U.S. Dist. LEXIS 24121 (E.D. Pa. Nov. 21, 2001); *Benacquisto v. Am. Express Fin. Corp.*, 2001 U.S. Dist. LEXIS 23914 (D. Minn. May 14, 2001); *Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001).

- 44 -

father,[21] wife,[22] mother-in-law,[23] and, apparently, even a deceased grandmother[24] to further his agenda as objector counsel.  Objector John Pentz here is counsel John Pentz's 81-year old father.

Federal courts have repeatedly held that there is an apparent and actual conflict of interest between a class representative and class counsel who are closely related.  *See Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90-91 (7th Cir. 1977) ("a majority of courts . . . have refused to permit class attorneys, their relatives, or business associates from acting as the class representative."). Even though Mr. Pentz has (likely quite deliberately) not sought to become a class representative and instead only objects to the settlement, the same reasoning should apply to an objector.  For example, in *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987), plaintiffs sought certification of a class in a securities case and proposed as one of their class representatives a man whose son was a partner in one of the firms that was class counsel in the case.  *Id.* at 308-09.  In holding that class representative to be inadequate, this Court adopted the reasoning of the cases following the Seventh Circuit's opinion in *Susman*, holding that a district court's independent ability to protect the Class by evaluating the adequacy of proposed class representatives and class counsel was not a substitute for the absolute requirement that a proposed class representative fairly and adequately represent the class.  *Id.* at 310.  This Court therefore held that "[t]he closeness of the father-son relationship and the active involvement and heavy reliance on the son create an unnecessary risk of conflict between the representative plaintiff and other class members."  *Id.*   Here the same concern exists.  Mr. Pentz repeatedly testified that he relied on his son regarding the substance of his objection.  Berman Decl. Ex. 6

---

[21] *See, e.g., Tenuto*, 2002 U.S. Dist. LEXIS 1764.

[22] *See, e.g., Taubenfeld*, 415 F.3d 597; *In re Compact Disc*, 2005 U.S. Dist. LEXIS 43704.

[23] *See, e.g., Barnes*, 2006 U.S. Dist. LEXIS 71072, at *4.

[24] *See* http://pslranugget.blogspot.com/2005/07/seventh-circuit-shoots-down.html.

- 45 -

(Deposition of John Pentz at 24:11-14; 32:11-18; 33:1-5; 52:4-8; 57:7-18; 59:4-10; and 62:4-9).

Especially given that heavy reliance, Mr. Pentz cannot be said to be asserting the best interests of

the class rather than the interests of his son, who seeks to get paid for his role in this litigation.

One court has referred to Mr. Pentz and the "clients" that he has represented as

"professional objectors, bringing this appeal not in the interests of the class, but in their own

interest." *Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3.  In commenting on one of Mr. Pentz's

objections, another court observed:

> The objector's "opposition" to class counsel's fee petition
> appears to be nothing more than an attempt to receive attorneys'
> fees.  The objector has done nothing more than propose an
> unsupported, alternative fee distribution scheme, apparently
> attempting to take advantage of the fact that defendants have not
> opposed class counsel's request.  Indeed, the objector does not
> dispute that class counsel is entitled to the requested fees.

*Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 514 (D. Del. 2003).  In ordering Pentz's mother-in-

law to post a $645,111.60 bond securing the appeal of the denial of her objection in a recent

case, Judge Gertner recognized the threat that professional objectors, like Pentz, pose to

providing relief to consumers:

> Repeat objectors to class action settlements can make a living
> simply by filing frivolous appeals and thereby slowing down the
> execution of settlements.  The larger the settlement, the more cost-
> effective it is to pay the objectors rather than suffer the delay of
> waiting for an appeal to be resolved (even an expedited appeal).
> Because of these economic realities, professional objectors can
> levy what is effectively a tax on class action settlements, a tax that
> has no benefit to anyone other than to the objectors.  Literally
> nothing is gained from the cost:  Settlements are not restructured
> and the class, on whose behalf the appeal is purportedly raised,
> gains nothing.

*     *     *

> Feldman and her attorney, John Pentz (who is also her son-
> in-law) are professional objectors, not unlike the plaintiff in
> Sckolnick, whom the First Circuit described as a "litigious pro se

> who has filed numerous lawsuits in state court." *Sckolnick*, 820 F.2d at 15.  In *In Re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2003 U.S. Dist. LEXIS 25788, No. MDL 1361, 2003 WL 22417252, at *3 (D. Me. Oct. 7, 2003), the court required Hannah Feldman, also represented by Mr. Pentz, to post a bond because that appeal "might be frivolous," and because imposition of sanctions on appeal pursuant to Rule 38 was "a real probability."  The court noted that a bond for "damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in Rule 7 bond."  Id.  Ms. Feldman voluntarily dismissed her appeal several days later.

*Barnes*, 2006 U.S. Dist. LEXIS 71072, at *3-5.

Although less prolific than Mr. Pentz, Edward Cochran, who represents Objector Connick, has also appeared as counsel to objectors in many class actions.[25]

In light of the foregoing, it is perhaps not surprising that the Connick and Pentz objections are lawyer-driven and should, therefore, be viewed skeptically.  As an initial matter, Ms. Connick lacks standing to act as an objector (and, as set forth in Plaintiffs' opposition to her motion to intervene, certainly cannot act as a class representative) because she is not a member of the Class she seeks to represent.  Ms. Connick took Climara, which is not a Class Drug.  *See* Ex. 5 to Berman Decl.; *see also id.* (Connick Dep. at 25:19-22 (testifying that Climara was the only Class Drug Ms. Connick took)).  While Ms. Connick's attorney has claimed in correspondence with Class Counsel that Ms. Connick has standing because Climara is the branded version of Estradiol, which is a Class Drug, the plain language of the Settlement Agreement makes clear that the only consumer claims released in this settlement are claims related to Class Drugs.  *See id.* § II (JJ).  Therefore, because Ms. Connick did not take a Class Drug, her claims are not being released in this case, and she lacks standing to object to the

---

[25] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221 (S.D. W. Va. 2005); *Downey v. Mortgage Guar. Ins. Corp.*, 2001 U.S. Dist. LEXIS 24918 (S.D. Ga. Oct. 1, 2001); *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 926 (E.D. Tex. 1999).

- 47 -

settlement or to intervene as a proposed class representative.  Mr. Pentz similarly cannot act as an objector because of the inherent conflict of interest that exists because Mr. Pentz is the attorney Pentz's father.[26]

Moreover, although consumer plaintiffs are not required to be experts in class litigation or be knowledgeable about all of the specific details underlying their positions in the case, they should at least be aware of the bases of their own objections.  But that is not the case here.  For example, Objector Connick was unable to articulate any specific knowledge about the Class 1 and 3 representatives notwithstanding her complaint that they are not adequate and was not aware that there is a consumer representative for Class 1;[27] had no information about whether the Association plaintiffs had interests adverse to consumers;[28] believed that consumers were not represented in the allocation proceedings (when, in fact, they were);[29] and had never looked at the claim form before taking the position that it is difficult to complete.[30]

Mr. Pentz, a retired attorney, was unfamiliar with the general allegations in the *AWP* litigation;[31] did not understand his objection that consumers were not adequately represented;[32] did not understand why he is alleging that the consumer/TPP fund allocation is unfair;[33] and was unaware that he had previously filed objections in other class cases with his son as counsel.[34]

---

[26] Connie Pentz, attorney Pentz's mother, lacks standing to pursue her objection as well.  She only claims standing by virtue of having paid for the Epogen Mr. Pentz took out of an account she holds jointly with Mr. Pentz. She has not taken or paid for a Class Drug herself.   *See* Berman Decl. Ex. 7 (Connie Pentz Dep. at 12:21-14:5).

[27] Connick Dep. at 15:14-16:9, attached as Ex. 5 to the Berman Decl.

[28] *Id.* at 16:10-17:21; 18:9-18:13.

[29] *Id.* at 50:21-51:12.

[30] *Id.* at 63:3-11.

[31] Pentz Dep. at 19, attached as Ex. 6 to the Berman Decl.

[32] *Id.* at 33.

[33] *Id.* at 36-37.

[34] *Id.* at 12-13.

Ms. Weatherly initially filed an objection solely asserting that members of Class 3 should be compensated for the cost of obtaining their medical records in order to file claims. *See* Dkt. No. 5744 (filed Dec. 1, 2008). Ms. Weatherly's attorney appeared at the December 16, 2008 fairness hearing and represented that to be the extent of Ms. Weatherly's objection. *See* Status Hearing Tr. at 5:8-22; 11:2-8; 15:25-16:24 ("That is the essence of the objection, yes, your Honor."). Ms. Weatherly's counsel pledged at that hearing to work with Class Counsel to attempt to resolve his objection. *See generally id.* at 15-17. Despite this pledge, Ms. Weatherly's attorneys never took the meet and confer process seriously and, instead, two months later, filed an amended objection listing a number of additional, but unsupported, objections as set forth above. *See* Dkt. No. 5921 (filed Feb. 23, 2009).

Little is known about Mr. Wilson's counsel, James King, who resides in Beaumont, Texas, even though Mr. Wilson resides in New Jersey. Mr. King has not moved for admission *pro hac vice* as required and has not affiliated with local counsel. The Wilson Objection is less than two pages in length, contains no specifics whatsoever other than the unsupported assertion that "attorneys fees are too high," and appears to be nothing more than an "appellate placeholder."

Such lawyer-driven objections, as we have here, cast doubt on the veracity of the positions advanced by these objectors.

### III.    CONCLUSION

The Settlement here is the result of hard fought litigation and negotiation. The Settlement provides an excellent result. The Court should grant final approval to the Settlement Agreement and reject the positions advanced by the various Objectors.

DATED:  April 9, 2009                    By\_\_\_\_**/s/ Steve W. Berman**_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CLASS COUNSEL**

**EXHIBIT A:**
**SUMMARY OF OBJECTIONS**

The objections are advanced by four discrete groups of class members: (i) James W. Wilson (Dkt. No. 5738) (the "Wilson Objection"); (ii) Patricia Weatherly (Dkt. No. 5921) (the "Weatherly Objection"); (iii) John and Connie Pentz and Corinna Connick, represented by professional objectors John J. Pentz and Edward Cochran (Dkt. No. 5947) (the "Pentz Objection"); and (iv) the group of clients represented by Don Haviland (Dkt. No. 5971) (the "Haviland Objection"). Their objections are summarized as follows:

The Wilson Objection

- Requested attorneys fees are too high.

- The Notice is not sufficiently specific regarding fees, because it does not specify whether the percentage sought is from $21.8 million or $125 million.

The Weatherly Objection

- The proposed settlement fails to estimate how large Class 3 is, and it does not provide an estimate of how many members of Class 3 may be able to document their out-of-pocket expenditures.

- The proposed settlement does not set forth clear guidelines for Class 3 members proving their out-of-pocket expenses. For example, the affidavit option is mentioned only on the claim form and not in the notices. And the settlement does not otherwise outline a meaningful or practical method for Class 3 members to recover required claims documentation.

- The proposed settlement does not inform class members exactly what they receive, leaving them unable to make a fully informed decision. It should state with specificity the range of potential awards based on definable factors.

- The distribution should be changed to be direct payment based on billing records subpoenaed from the ISHPs and retail pharmacies.

- The amount allocated to consumers is inadequate.

- The settlement should provide for a sufficiently high flat award without records so that offsetting the cost of obtaining records is less of an

- 51 -

impediment to a fair settlement.  But it should still provide a mechanism for class members to recover their costs of obtaining documentation.

The Pentz Objection

- The Class 3 TPP representatives were inadequate to represent consumer; a consumer representative is necessary.

- Cash payors are required to release all claims yet receive nothing under the settlement.

- The allocation should be revised so that at least one-third of the overall settlement funds go to consumer plaintiffs, including cash payors.

- Consumers should not be required to file claims.  Instead, a distribution method should be devised to send checks to consumers identified through serving subpoenas on the ten largest pharmacy chains.

- It was unfair for ISHPs to be paid first.

- Attorneys' fees were based in part on amounts that went to ISHPs, which were not represented by class counsel.

- By failing to estimate lodestar applicable to T2 defendants, Class Counsel have not properly documented lodestar for purposes of the cross-check.

The Haviland Objection

- Consumer organizations lack standing to sue for damages and are atypical and inadequate to represent the interests of individual consumers.

- The overall settlement amount is too low given that the risks of continued litigation are minimal because this and other courts have entered verdicts and settlements against some of these defendants.

- Allocation of the settlement fund for consumers was infected with an irreconcilable conflict of interest given that class counsel appointed PAL and that PAL was organized to "create artificial cy pres funds in consumer class action litigation" for its own use.

- Ms. Tonacchio has not demonstrated standing to sue and is not typical or adequate.

- Amount allocated to consumers (17.5%) was too low as compared to, for example, the GSK settlement (30%).

- 52 -

- Proposed release includes defendants and drugs that were never pursued in the litigation.

001534-16  293238 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on April 9, 2009, I caused copies of CLASS PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE TRACK TWO SETTLEMENT to be served on all counsel of record by causing same to be posted electronically via LEXIS-Nexis File & Serve.


 /s/ Steve W. Berman
Steve W. Berman

001534-16  293238 V1