UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>IN RE PHARMACEUTICAL INDUSTRY )<br>AVERAGE WHOLESALE PRICE )<br>LITIGATION )<br>)<br>)<br>THIS DOCUMENT RELATES TO: )<br>)<br>TRACK 2 SETTLEMENT )<br>) | MDL No. 1456<br><br>CIVIL ACTION:  01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF
CLASS PLAINTIFFS' RESPONSE TO OBJECTIONS TO
<u>FINAL APPROVAL OF THE TRACK TWO SETTLEMENT</u>**

I, Steve W. Berman, duly declare as follows:

1.      I am a partner of Hagens Berman Sobol Shapiro LLP, resident in its Seattle,

Washington office, and I am co-lead counsel for the plaintiffs in the above-captioned matter.  I

submit this declaration in support of Class Plaintiffs' Response to Objections to Final Approval

of the Track Two Settlement.

<u>**Background on Allocation Mediation**</u>

2.      The allocation of settlement funds between consumers and TPPs was the product

of arm's-length, adversarial negotiation between counsel appointed to separately represent the

interests of consumers and TPPs and conducted with participation of the Court-appointed

mediator.  After Class Counsel negotiated an overall settlement with Defendants, we sought out

counsel to represent various class interests in separate allocation proceedings.

3.      Alex Sugerman-Brozan, then Director of Prescription Access Litigation Project

("PAL"), and Jeffrey Goldenberg, an experienced class litigator, were asked to represent

consumers in an allocation negotiation.  I refer to Messrs. Sugerman-Brozan and Goldenberg as "Consumer Allocation Counsel."

4.     Mark Fischer and Richard Cohen were asked to represent TPPs, and I will refer to them as "TPP Allocation Counsel".[1]

5.     The allocation negotiations took place on December 18, 2007, at the office of Eric Green, the Court-Appointed MDL mediator.  Mr. Green acted as the mediator for the negotiations between TPPs and consumers.

6.      The allocation was a product, in the first instance, of damage allocation information provided to Allocation Counsel by Dr. Hartman.  Prior to the allocation negotiation, Class Counsel had, for the purposes of analyzing the allocation, divided the total settlement into two parts:  $100 million to be allocated to claims associated with named brand drugs made by Aventis, Amgen and Watson and $25 million allocated to claims associated with the primarily generic drugs manufactured by the remaining Track Two Defendants.  This split reflected what we believed was the appropriate weighting due to the much stronger case against the Avenits, Amgen and Watson brand-name drugs.  Within each of these pools, Allocation Counsel then used damage allocation data provided by Dr. Hartman's office to determine an initial share to be allocated to the three Classes.

7.     The end result of the allocation negotiations was the agreement attached as Exhibit 1 hereto and signed by Professor Green, Class Counsel and Allocation Counsel.  The allocation negotiations were hard-fought, and it is my opinion that Consumer Allocation Counsel vigorously and adequately represented the interests of the consumer class members, and that TPP

---

[1] Consumer Allocation Counsel and TPP Allocation Counsel are collectively referred to herein as "Allocation Counsel."

Allocation Counsel vigorously and adequately represented the interests of the TPP class members.

8.     Suggestions by Don Haviland and others that this was not are simply not true based on what I observed.

**The Inclusion of Cash Payors in the Settlement**

9.     Cash payors are included in the settlement and can make claims, and many have been submitting claims that will be honored by the Claims Administrator.

10.    As the press release announcing the proposed settlement provides, "[c]onsumers who paid percentage co-payments or full payments for any of the covered drugs between January 1, 1991 and March 1, 2008, are eligible for money back." *See* Exhibit 2.

11.    The AWP Track 2 Settlement Class 3 Claim Form likewise makes it clear that "Out-of-Pocket Expenditures" are eligible for reimbursement. *See* Exhibit 3.

12.    And we had originally advised Claims Administrator Complete Claim Solutions, LLC ("CCS") that consumer claims should be honored whether they made cash payments or an insurance co-payment.  It is my understanding that CCS has always treated consumers as valid class members if they made an unreimbursed payment for a Track Two drug during the class period, whether or not they made full or partial cash payments or had health insurance and made co-payments. *See also* Declaration of Eric P. LaChance Regarding Consumer Class Members.

13.    Regrettably, a member of the Class Counsel team provided inaccurate information to Edward Cochran, counsel for Ms. Connick when he called and asked whether cash payors are included in the settlement.  He was told that they were not, but this was an error.  (As it turns out, Ms. Connick is not a class member because the drug that she purchased is not included in the settlement, and her rights are unaffected by this settlement.)

- 3 -

001534-16 296809 V1

**The Overall Settlement Amount is Fair and Reasonable**

14.     Objectors who believe that the $125 million settlement is too low simply do not understand the risks of proving liability and damages at a trial of the Track Two Defendants.

15.     Applying the 30 percent yardstick to the total AWP inflation for the Track Two drugs, Dr. Hartman came up with approximately $1.2 billion in potential damages.

16.     Of this, approximately $316 million is attributable to brand-name drugs sold by Track Two defendants Amgen, Aventis, and Watson.  Thus, $316 million would be the damages that Plaintiffs would seek at trial against these three defendants.

17.     Of the remaining $800 million in Dr. Hartman's remaining inflation data for multi-source drugs, this is not the expected measure of damages against the remaining Track Two Defendants.  This is because of the challenges that confront Plaintiffs in proving liability and damages for the Track Two multi-source drugs remaining in the case.

18.     In assessing the likelihood of success at trial against the Track Two Defendants, on a drug-by-drug basis, Class Counsel applied the Court's "three salient factors" relevant to a finding of unfair conduct as set forth in *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 101-02 (D. Mass. 2007):  (i) whether there were egregious spreads above the 30% yardstick expected in the industry, focusing on the extent and duration of the spreads; (ii) the company's history of creating the spread, including an analysis of whether the defendant actually increased the AWP and/or list price as opposed to just increasing the spread through discounts and rebates; and (iii) whether the defendant engaged in a proactive scheme to market the spread.

19.     Without going into all of the details of Class Counsel's assessment, which would be improper since it is possible that the Track Two Settlement will not ultimately be

consummated, we can represent to the Court that many concerns arose as we examined the evidence, including J-Code identification issues and the fact that there is very little marketing the spread evidence against the Track Two Defendants that manufactured generic drugs.

20.     Furthermore, we were and are cognizant that the multi-source drugs are subject to the Court's limitation on damages as the difference between the actual median AWP and the "but for" median AWP had the Defendant in question reported a true AWP.  *See AWP*, 491 F. Supp. 2d at 108.  For example, the Court declined to find any damages for Warrick's albuterol sulfate, which was multi-source throughout the class period.  *Id.* at 108.

21.     Given these concerns, Class Counsel concluded that the expected damages for the truly multi-source Track Two drugs is but a fraction of the $800 million.  Indeed, there are legitimate concerns that such damages could be *de minimus*.

22.     Notwithstanding our very real and significant concerns, Plaintiffs have garnered a proposed $125,000,000 settlement that represents a substantial percentage of the actual damages recoverable under this Court's prior rulings.  And the recovery is even greater when evaluated at the level of each individual Consumer Class Member, where consumers making claims will receive at least their out-of-pocket expenses and, for Class A drugs, <u>three times</u> their out-of-pocket expenditures on Class A drugs during the so-called "Heartland" damages period.  And note that the base metric here is expenditure, which is actually greater than damage incurred.

23.     We believe that, by any measure, the recovery obtained here is a substantial amount of the aggregate Class damage and, on an individual claims-made basis, well <u>exceeds</u> the damages incurred by claiming Class Members.

**<u>Exhibits</u>**

24.     Attached hereto are true and correct copies of the following exhibits:

- 5 -

| Ex. 1 | AWP Track 2 Settlement Allocation Between Consumers and Third-Party Payors, December 18, 2007 |
|-------|-----|
| Ex. 2 | September 11, 2008 Press Release titled "Proposed Class Action Settlement Provides Consumers, Medicare Recipients, and Insurers With Money Back." |
| Ex. 3 | Original AWP Track 2 Settlement Class 3 Claim Form |
| Ex. 4 | February 27, 2009 Order and Opinion, *In re: Bridgeport Fire Litig.* (Court of Common Pleas, Montgomery County, Pennsylvania) |
| Ex. 5 | Excerpts from the Deposition of Corinna Connick taken on March 24, 2009 and Exhibit 1 to same (Medical Expenses Summary identifying drugs taken by Connick) |
| Ex. 6 | Excerpts from the Deposition of John Pentz taken on March 23, 2009 |
| Ex. 7 | Excerpts from the Deposition of Constance Pentz taken on March 23, 2009 |
| Ex. 8 | April 8, 2009 letter from Barbara Urbowicz at Weirton Medical Center |

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of April, 2009.


                                                        **/s/ Steve W. Berman**
                                                        STEVE W. BERMAN

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, DECLARATION OF STEVE W. BERMAN IN SUPPORT OF CLASS PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE TRACK TWO SETTLEMENT**,** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 9, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.

By_____**/s/ Steve W. Berman**_____
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

# Exhibit 1

# AWP Track 2 Settlement Allocation Between Consumers and Third Party Payors

## December 18, 2007

I.   ALLOCATION OF $100M FOR AVENTIS, AMGEN, WATSON:

A. Computation based on Hartman utilization numbers adjusted by trebeling for Class 1 consumers, doubling for Class 2 TPP's, and single damages for Class 3:

|         | RH utiliz     | % share ($$ in millions) | multiplier | Adjusted % share ($$ in millions) | Adjusted share of $100m (prev col ÷ 1.26) |
|---------|---------------|--------------------------|------------|-----------------------------------|-------------------------------------------|
| Class 1 | $17,548,098   | 5.527                    | 3          | $16.581                           | $13,159,524                               |
| Class 2 | $47,797,023   | 15.055                   | 2          | $30.110                           | $23,896,825                               |
| Class 3 | $252,135,098  | 79.417                   | 1          | $79.417                           | $63,029,365                               |
| TOTAL   | $317,480,219  | 100                      |            | $126.108                          | $100m                                     |

B. Class 3 damages allocated 3.5% to consumers:

$63,029,365 x 0.035 = $2,206,028

C. Consumer allocation =                    $13,159,524        Class 1
                                              2,206,028        Class 3 3.5% share
   **Total consumer share =**            **$15,365,552**       (15.4%)

D. **Third Party Payor allocation =**    $100,000,000
                                          -15,365,552
                                         **$84,634,448**       (84.6%)

AWP Track 2 Settlement Allocation
December 18, 2007
Page 2

II.  ALLOCATION OF $25M FOR OTHER DEFENDANTS

A.  Computation based on Hartman utilization numbers adjusted by trebeling for Class 1
    consumers, doubling for Class 2 TPP's, and single damage for Class 3:

|  | % of $25m | Single damage share of $25m | multiplier | Adjusted damages | Adjusted % of $25m | Allocated amount |
|---|---|---|---|---|---|---|
| Class 1 | .165374 | $4,134,400 | 3 | $12,403,200 | 25.585% | $6,396,250 |
| Class 2 | .608386 | $15,209,650 | 2 | $30,419,300 | 62.748% | $15,687,000 |
| Class 3 | .226238 | $5,655,950 | 1 | $5,655,950 | 11.667% | $2,916,750 |
| TOTAL | 1.00 | $25,000,000 |  | $48,478,450 | 100% | $25,000,000 |

A.  Class 3 damages allocation 3.5% to consumers:

$2,916,750 x 0.035 = $102,086

B.  Consumer allocation =            $6,396,250
                                     102,086
    **Total consumer share =**       $6,498,336   (26%)

C.  **Third Party Payor allocation =**   $25,000,000
                                         - 6,498,336
                                         $18,501,664   (74%)

III.  ALLOCATION OF TOTAL $125 M SETTLEMENT AMOUNT*

**Consumer Allocations**              **TTP Allocations**

$15,365,552                           $84,634,448
6,498,336                             18,501,664
$21,863,888   (17.5%)                 $103,136,112   (82.5%)

* If class period is reduced, $25m shall be adjusted to $20m utilizing same methodology.

# Exhibit 2

*In re: Pharmaceutical Industry Average Wholesale Price Litigation*
**(Track II Settlement)**

---

*PRESS RELEASE*          **          *PRESS RELEASE*          **          *PRESS RELEASE*
**For Immediate Release**                                                      **Contact:** Leigh Anna Thomure
September 11, 2008                                                                          202-379-1162

## Proposed Class Action Settlement Provides Consumers, Medicare Recipients, and Insurers With Money Back

(Boston, MA) -- The United States District Court for the District of Massachusetts has granted preliminary approval of a Proposed Settlement related to the average wholesale prices of certain prescription drugs. In the lawsuit, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-CV-12257-PBS, MDL No. 1456, plaintiffs claimed that drug manufacturers unlawfully inflated the published average wholesale price of certain drugs, increasing what certain consumers and others paid. The defendants deny any wrongdoing.

The Proposed Settlement includes approximately $21.8 million for payments to consumers who file valid claims. Qualifying consumers can get a minimum of $35 by certifying under oath that they paid percentage co-payments for the covered drugs. Or, with receipts or bills for percentage co-payments for the covered drugs, they can receive more money back. For some of the drugs, the payment is up to three times the amount of the co-payment.

The approximately 200 covered drugs are used for the treatment of many medical conditions and they are often, but not always, injected in a doctor's office or clinic. The drugs include those for treatment of cancer, HIV, asthma, allergies, infections, inflammation, pain, gastrointestinal, lung and blood issues, and other conditions.

Consumers who paid percentage co-payments or full payments for any of the covered drugs between January 1, 1991 and March 1, 2008 are eligible for money back. A percentage co-payment varies with the cost of the drug; refunds are not available to those who paid flat co-payments.

Medicare recipients who paid percentage co-payments for the covered drugs between January 1, 1991 and January 1, 2005 should have already received information, including a return postcard, about this Proposed Settlement. Third-party payors who reimbursed for the drugs are also included.

"The Proposed Settlement ensures that consumers, Medicare, and insurers have the opportunity to get back some of the money they paid for these drugs," said Steve W. Berman of Hagens Berman Sobol Shapiro LLP, Counsel for the Plaintiffs in this case.

The Defendants, 11 drug manufacturers, deny any wrongdoing, and have stated that while they believe they have strong defenses to the claims asserted, they have entered into the settlement as a reasonable way to resolve the litigation and avoid the further expense, burden, and inconvenience that would result if they continued to litigate.

The Court will hold a Final Approval Hearing on December 16, 2008 at 2:00 p.m. to consider whether the Proposed Settlement is fair, reasonable, and adequate and the motion for attorneys' fees and expenses. For detailed information, including a list of all the covered drugs and a claim form, call toll-free 1-877-465-8136, visit www.AWPTrack2Settlement.com, or write:  AWP Track 2 Settlement Administrator, P.O. Box 951, Minneapolis, MN  55440-0951.

###

# Exhibit 3



1-10

OFFICIAL USE ONLY

**Must be Received or Postmarked On or Before January 31, 2009**

# AWP TRACK 2 SETTLEMENT CLASS 3 CLAIM FORM

## FOR PAYMENTS MADE OUTSIDE OF MEDICARE PART B

### How to Apply for a Payment from the Proposed Settlement

If you would like to submit a claim in the Settlement, complete this form and mail it to the address below.

**YOUR CLAIM MUST BE RECEIVED OR POSTMARKED <u>ON OR BEFORE JANUARY 31, 2009</u>.**

Your claim should be mailed to:     AWP Track 2 Settlement Administrator
P.O. Box 951
Minneapolis, MN 55440-0951

## Section A: Claimant Identification

Please provide us with the following information related to the individual who was prescribed one or more of the Class Drugs. This person is referred to as the "Claimant."

Claimant's First Name:

Claimant's Last Name:

Address:

City:

State:

Zip Code:

Daytime Telephone Number:

## Section B: Claimant Representative Information

If you are the Claimant, do not complete this section. Complete this section only if you are a representative (such as a spouse, guardian, executor or personal representative) filing this claim on behalf of the Claimant listed above. Please provide YOUR name, relationship to the Claimant, and YOUR contact information in the spaces provided below.

Contact Name:

Relationship to Claimant:

Address:

City:

State:

Zip Code:

Daytime Telephone Number:

TKC3



2-10

## Section C: Should I file a Claim Form?

Please answer the following questions in order to determine if the Claimant is eligible for cash from the Proposed Settlement:

1. Were you, or the Claimant that you are filing on behalf of, prescribed any of the drugs listed in Attachment A of the Notice during the period from January 1, 1991 to March 1, 2008?   ☐ **Yes**   ☐ **No**

2. Did you, or the Claimant that you are filing on behalf of, pay a percentage of the cost of the drug(s)?   ☐ **Yes**   ☐ **No**

   Note: If you paid a flat co-payment (i.e., your out-of-pocket expense was always the same for every drug, like a $10 or $25 co-pay) you did not pay a percentage of the cost.

If you answered *No* to either of the questions above, you are not eligible to receive any benefits from this Proposed Settlement. You may disregard this Notice and Claim Form. If you answered *Yes* to both of the questions above, you should fill out Section D, Section E and Section G below.

## Section D: Choose a Refund Option – You Have Two Options

Please check *only one* of the boxes below in order to choose your refund option:

☐ **Option 1:** I choose the **EASY REFUND** option. I understand that I will receive a payment of up to $35.00 from the Settlement and that I will not be required to provide additional documentation unless requested by the Claims Administrator **AND** you must sign and date the Claim Form in Section G on page 10 and mail it to the Claims Administration at the address indicated on page 10.

☐ **Option 2:** I choose the **FULL REFUND** option. I understand that in order to receive a full refund I must provide one form of proof of a percentage co-payment for each separate Class Drug listed on the charts in Section E for which I am seeking a refund. The list of acceptable forms of proof are listed below in Section F under "Option 2: FULL REFUND." Please include all proof(s) of payment when submitting this Claim Form.

## Section E: Drug Purchase Information - Fill out ONLY if you chose Option 2 – FULL REFUND

### Instructions for Completing the Out-of-Pocket Expenditures on Class A & B Drugs Chart

In the Out-of-Pocket Expenditures on Class A & B Drug Charts below, please provide the total amount paid (not monthly) by the Claimant, or the amount the Claimant is obligated to pay, for each of the drugs listed during the time periods in the chart.

- Print clearly
- Do not include flat co-payments in the total amounts paid
- Enter the full amount paid, not a monthly amount



3-10

## Out-of-Pocket Expenditures on Class A Drugs

| Drug Name | Total Amount Paid From *January 1, 1991* to *November 30, 1997* | Total Amount Paid From *December 1, 1997* to *December 31, 2003* | Total Amount Paid From *January 1, 2004* to *March 1, 2008* |
|---|---|---|---|
| Anzemet (injection & tablets) | $ | $ | $ |
| Aranesp | $ | $ | $ |
| Epogen | $ | $ | $ |
| Ferrlecit | $ | $ | $ |
| InFed | $ | $ | $ |
| Neulasta | $ | $ | $ |
| Neupogen | $ | $ | $ |

## Out-of-Pocket Expenditures on Class B Drugs

| Drug Name | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
|---|---|
| AccuNeb | $ |
| Acetylcysteine | $ |
| Acyclovir sodium | $ |
| Adenosine | $ |
| Adriamycin PFS/RFS | $ |
| Adrucil | $ |
| Aggrastat | $ |
| Albuterol sulfate | $ |
| Alcohol injection | $ |
| A-methapred | $ |
| Amikacin sulfate | $ |



4-10

## Out-of-Pocket Expenditures on Class B Drugs (continued)

| Drug Name | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
|---|---|
| Aminocaproic acid | $ |
| Aminosyn / Aminosyn II / Amino acid | $ |
| Amphocin / Amphotericin B | $ |
| Aristocort / Aristospan | $ |
| Aromasin | $ |
| Ativan | $ |
| Azmacort | $ |
| Bebulin | $ |
| Bioclate | $ |
| Bleomycin sulfate | $ |
| Brevibloc | $ |
| Buminate | $ |
| Bupivacaine | $ |
| Calcijex | $ |
| Calcimar | $ |
| Camptosar / Irinotecan hydrochloride | $ |
| Carbocaine / Mepivicaine | $ |
| Cefizox | $ |
| Chromium tr meta / Chromic chloride | $ |
| Cimetidine hydrochloride | $ |
| Cipro / Ciprofloxacin hydrochloride | $ |
| Cisplatin | $ |



5-10

| Out-of-Pocket Expenditures on Class B Drugs (continued) | |
|---|---|
| **Drug Name** | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
| Claforan | $ |
| Cleocin T / Clindamycin phosphate | $ |
| Copper trace / Cupric chloride | $ |
| Cromolyn sodium | $ |
| Cytosar-U / Cytarabine | $ |
| Depo provera / Medroxyprogesterone acetate | $ |
| Depo-testosterone / Testosterone cypionate | $ |
| Dexamethasone acetate / Dexamethasone sodium / Dexamethasone sodium phosphate | $ |
| Dextrose / Dextrose sodium chloride / Ringers lactated with dextrose | $ |
| Diazepam | $ |
| Dicarbazine (dtic – dome) | $ |
| Diltiazem hydrochloride | $ |
| Dopamine hydrochloride | $ |
| Doxorubicin / Doxorubicin hydrochloride | $ |
| DTIC Dome | $ |
| Eligard | $ |
| Ellence / Epirubicin HCL | $ |
| Enalaprilat | $ |
| Enbrel | $ |
| Epinephrine | $ |
| Erythromycin / Erythromycin base | $ |



6-10

| Out-of-Pocket Expenditures on Class B Drugs (continued) | |
|---|---|
| **Drug Name** | **Total Amount Paid From** *January 1, 1991* to *March 1, 2008* |
| Estradiol | $ |
| Etoposide | $ |
| Famotidine | $ |
| Fentanyl citrate | $ |
| Fluorouracil | $ |
| Fluphenazine HCL | $ |
| Furosemide | $ |
| Gamimune N / Gammagard / Gammagard S/D / Gammar / Gammar P.I.V. | $ |
| Gentamicin sulfate | $ |
| Gentran / Gentran NACL | $ |
| Glycopyrrolate | $ |
| Helixate / Helixate FS | $ |
| Heparin / Heparin lock flush / Heparin sodium | $ |
| Humate-P | $ |
| Hydromorphine | $ |
| Idamycin / Idarubicin hydrochloride | $ |
| Imipramine HCL | $ |
| Intal | $ |
| Ipratropium bromide | $ |
| Iveegam | $ |
| Ketorolac / Ketorolac tromethamine | $ |



7-10

## Out-of-Pocket Expenditures on Class B Drugs (continued)

| Drug Name | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
|---|---|
| Kineret | $ |
| Koate- HP | $ |
| Kogenate | $ |
| Labetalol | $ |
| Lasix | $ |
| Leucovorin calcium | $ |
| Leukine | $ |
| Levofloxacin | $ |
| Lidocaine hydrochloride | $ |
| Liposyn II / Fat emulsion | $ |
| Lorazepam | $ |
| Lovenox | $ |
| Lyphocin | $ |
| Magnese chloride | $ |
| Magnesium sulfate | $ |
| Mannitol | $ |
| Marcaine | $ |
| Medrol / Methylprednisolone | $ |
| Metaproterenol sulfate | $ |
| Methotrexate sodium | $ |
| Metoclopramide | $ |



8-10

| Out-of-Pocket Expenditures on Class B Drugs (continued) | |
|---|---|
| **Drug Name** | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
| Midazolam hydrochloride | $ |
| Mithracin | $ |
| Monoclate / Monoclate-P | $ |
| Mononine | $ |
| Morphine sulfate | $ |
| Nadolol | $ |
| Nalbuphine | $ |
| Nebupent | $ |
| Neosar / Cyclophospamide | $ |
| Neostigmine methylsulfate | $ |
| Novacaine / Procaine | $ |
| Novantrone | $ |
| Osmitrol | $ |
| Pancuronium bromide | $ |
| Pentam / Pentamidine isethionate | $ |
| Perphenazine | $ |
| Phenylephrine | $ |
| Potassium acetate / Potassium chloride | $ |
| Prograf | $ |
| Promethazine | $ |
| Propranolol HCL | $ |



9-10

## Out-of-Pocket Expenditures on Class B Drugs (continued)

| Drug Name | Total Amount Paid From *January 1, 1991* to *March 1, 2008* |
|---|---|
| Propofol | $ |
| Ranitidine HCL | $ |
| Recombinate | $ |
| Sodium acetate | $ |
| Sodium chloride | $ |
| Solu-cortef / Hydrocortisone sodium succinate | $ |
| Solu-medrol | $ |
| Succinylcholine chloride | $ |
| Taxotere | $ |
| Thioplex / Thiotepa | $ |
| Tobramycin sulfate / Tobramycin/ sodium chloride | $ |
| Toposar | $ |
| Travasol / Travasol with dextrose | $ |
| Trelstar / Triptorelin pamoate | $ |
| Vancocin / Vancocin HCL / Vancomycin / Vancomycin HCL | $ |
| Verapamil HCL | $ |
| Vinblastine sulfate | $ |
| Vincasar / Vincristine / Vinscristine sulfate | $ |
| Water for injection bacteriostatic | $ |
| Zemplar | $ |
| Zinc chloride | $ |



10-10

---

**Section F: Proof of Payment – Provide ONLY if you chose Option 2 – FULL REFUND**

If you chose Option 2, you must provide proof that you made a percentage co-payment for each of the Class Drugs you are claiming in the charts in Section E above. You only need to provide one form of proof for each of the drugs.

Any one of the following are acceptable as proof of a percentage co-payment for one of the Class Drugs:

(1) A receipt, cancelled check, or credit card statement that shows a payment for one of the drugs (other than a flat co-payment); or

(2) A letter from a doctor saying that he or she prescribed one of the drugs and you paid part of the cost of one of the drugs (other than a flat co-payment) at least once; or

(3) An EOB (explanation of benefits) from your insurer that shows you made or are obligated to make percentage co-payments for the Class Drugs; or

(4) A notarized statement signed by you indicating you paid or are obligated to pay a percentage co-payment for the Class Drugs between January 1, 1991 through March 1, 2008, including the total of all percentage co-payments for the drugs during the time period; or

(5) Records from your pharmacy showing that you made percentage co-payments for the Class Drugs purchased between January 1, 1991 though March 1, 2008.

---

**Section G: Sworn Statement Regarding Payments Made**

**I declare under penalty of perjury that the information provided here is, to the best of my knowledge, correct. I also declare under penalty of perjury that I paid a percentage co-pay for one or more of the Class Drugs as indicated in this Claim Form at some time during the period from January 1, 1991 through March 1, 2008. If not submitting this for myself, I am authorized to submit this form on behalf of the Claimant identified above.** [1]

*Signature*                    *Print Name*

*Date*

**Mail all pages of this Claim Form along with proof(s) of payment, if any, to the following address:**

**AWP Track 2 Settlement Administrator**
**P.O. Box 951**
**Minneapolis, MN 55440-0951**

**Toll-Free Telephone: 1-877-465-8136**
**www.AWPTrack2Settlement.com**

---

[1]  Please note that your signature on this Claim Form indicates that you declare, under penalty of perjury, that you (or someone on whose behalf you are acting) made a percentage co-payment for one or more of the Class Drugs at some time during January 1, 1991 through March 1, 2008.  As a result, providing false information on this Claim Form could constitute perjury.

# Exhibit 4

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

IN RE: BRIDGEPORT FIRE LITIGATION   :   MASTER FILE NO. 05-20924

### ORDER

AND NOW, this _27_ day of _February_ , 2009, this Court having

issued an Opinion pursuant to Pa.R.A.P. 1925(a) with respect to several appeals filed by The

Haviland Law Firm to the Superior Court of Pennsylvania, and this Court having served a copy

of said Opinion on The Haviland Law Firm, it is hereby **ORDERED** and **DECREED** that The

Haviland Law Firm shall serve a copy of the 1925(a) Opinion and of this Order on all counsel of

record and file with the Montgomery County Prothonotary a certificate of service demonstrating

compliance with this directive.

BY THE COURT:

STEVEN T. O'NEILL     J.

Copies of this Order mailed on _2/27/09_
to the following:
Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
Prothonotary

Secretary

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

| | | |
|---|---|---|
| IN RE: BRIDGEPORT FIRE LITIGATION | : | **Consolidated:** |
| | : | 2917 EDA 2008    2922 EDA 2008 |
| | : | 2918 EDA 2008    2923 EDA 2008 |
| | : | 2919 EDA 2008    2924 EDA 2008 |
| | : | 2920 EDA 2008    2926 EDA 2008 |
| | : | 2921 EDA 2008 |
| | : | |
| | : | |
| | : | CCP Master File No. 05-20924 |

## OPINION

O'NEILL, J.                                                        FEBRUARY 27, 2009

Certain Class Plaintiffs, Professional Flooring Co., Inc.; Renu Electronics, Inc.; Rose Line, Inc.; and Limerick Carpet & Flooring, Inc. ("Appellants"), have filed nine (9) appeals with respect to this class action litigation. The appeals are docketed as set forth above. On December 23, 2008, the Superior Court directed that the appeals be consolidated. This Opinion pursuant to Pa.R.A.P. 1925(a) will address the issues raised by all of the above referenced appeals. Specifically, Appellants are appealing the following:

1.  This Court's Order dated November 16, 2006, striking the Praecipe to Reinstate Complaint as to Defendant, Montgomery County Industrial Development Authority.

2.  This Court's Order dated January 3, 2008, granting summary judgment in favor of Defendant, C.J. Robsinson Co.

3.  This Court's Order dated January 3, 2008, granting summary judgment in favor of Defendant, Scatton Heating & Cooling.

4.  This Court's Order dated January 3, 2008, granting summary judgment in favor of Defendant, Cadet Manufacturing Co.

5.  This Court's Order dated January 3, 2008, granting summary judgment in favor of Defendant, Alpha Electric.

6.  This Court's Order dated January 3, 2008, granting summary judgment in favor of Defendant, Shihadeh Carpet.

7.  This Court's Order dated January 3, 2008, granting summary judgment in favor

of Defendant, Pennsylvania-American Water Co.

8.    This Court's Order dated July 10, 2008, approving the Settlement Agreement between Class Plaintiffs and Settling Defendants.

9.    This Court's Order dated August 29, 2008, approving Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Expenses.

For the reasons set forth below, the above referenced Orders should be affirmed.

## FACTS AND PROCEDURAL HISTORY

### A.    Background

This litigation arises out of a fire that occurred on or about May 15, 2001 at the Continental Business Center in the Borough of Bridgeport. Numerous separate actions were filed on behalf of entities that lost personal property or suffered other damage as a result of the fire, the first of which was filed on May 21, 2001. On April 14, 2003, this Court certified the litigation as a Class Action, in which Class Members are the entities that suffered property damage as a result of the fire. The Court appointed the law firms of Kline & Specter, P.C. ("Kline & Specter") and High, Swartz, Roberts & Seidel, LLP ("High Swartz") to serve as Class Counsel. Over thirty (30) parties were originally named as Defendants.

Over the next several years, extensive discovery occurred, during the course of which over one hundred (100) depositions were taken. After the entry of six (6) Case Management Orders, trial was ultimately scheduled to begin on February 4, 2008. On January 3, 2008, a month prior to the scheduled start date of trial, this Court granted Motions for Summary Judgment filed by the following Defendants, dismissing them from the litigation: Alpha Electric; Cadet Manufacturing; C.J. Robinson Co.; Pennsylvania-American Water Co.; Scatton Heating & Cooling; and Shihadeh Carpet. The remaining seventeen (17) Defendants proceeded to trial.[1]

---

[1] The Defendants remaining for trial were: ARB Breadcrumbs, Arkwright Boiler, Richard Blahosky, the Bushar Defendants, the Challenger Defendants, Durr Marketing, Energy Tech Systems, Erie Insurance Group, George, Inc.,

A cumulative one hundred seven (107) motions in limine were filed prior to trial by the remaining parties, twenty-four (24) of which were filed by Class Counsel on behalf of Class Plaintiffs. The majority of the remaining eighty-three (83) were filed by individual Defendants against Class Plaintiffs. Because of the wealth of pretrial matters to be argued before this Court, an extended hearing on same began on February 4, 2008 and continued virtually uninterrupted for nearly a month.

Contemporaneously with these pretrial matters, Class Counsel was engaging in lengthy settlement discussions with various Defendants and this Court. On February 19, 2008, weeks after trial had been scheduled to commence in this matter, Class Plaintiffs entered into a Partial Settlement Agreement with fifteen (15) Defendants in this case for the sum of thirty million dollars ($30,000,000.00).[2] The Partial Settlement Agreement was the result of substantial time and effort put forth by all parties involved.

In March, Class Plaintiffs proceeded to trial against the remaining two (2) Defendants: the Challenger Defendants and Universal Electrical Services Company.[3] Several days into the Class's case-in-chief, Class Counsel, on behalf of Class Plaintiffs, settled with the Challenger Defendants for the sum of four million dollars ($4,000,000.00). This settlement with the Challenger Defendants was incorporated into the initial Settlement Agreement. On April 8, 2008, this Court *preliminarily* approved the Settlement Agreement and set a date for a final Fairness Hearing.

For several weeks, the trial continued against the sole remaining Defendant, Universal

---

MCC Warehousing, Panther Products, Penncora Productions, Pittsburgh Bakery, Royal Bank of Pennsylvania, Sweetzels Cookies, Universal Electrical Services Co., and Valley Forge Candle Co.

[2] These fourteen (14) Settling Defendants were: ARB Breadcrumbs, Arkwright Boiler, Richard Blahosky, the Bushar Defendants, Durr Marketing, Energy Tech Systems, Erie Insurance Group, George, Inc., MCC Warehousing, Panther Products, Penncora Productions, Pittsburgh Bakery, Royal Bank of Pennsylvania, Sweetzels Cookies, and Valley Forge Candle Co.

[3] Eight of the "Settling Defendants" remained at trial, however, because the Challenger Defendants and Universal Electrical were proceeding with cross claims against them.

Electrical. On April 24, 2008, at the end of trial, while the jury was deliberating, Class Plaintiffs settled with Universal Electrical for the sum of one million dollars ($1,000,000.00). This settlement with Universal Electrical was incorporated into the Settlement Agreement with the other Settling Defendants. A proposed global settlement thus had been reached in favor of the Class in the amount of thirty-five million dollars ($35,000,000.00).

Notice of the Settlement was distributed by Class Counsel, and a Fairness Hearing occurred on June 23, 2008, in which any and all interested parties were permitted to speak, including those who had raised objections in advance thereof. On July 8, 2008, this Court approved the settlement in the amount of thirty-five million dollars ($35,000,000.00), appointed a claims' administrator, and approved the proposed claims administration form. On August 29, 2008, this Court reviewed and approved Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Expenses, awarding attorneys' fees in the amount of one-third (1/3) of the Settlement Fund, or $11,666,666.66, and expenses incurred in prosecuting the class action in the amount of $1,266,800.67.

**B.    Mr. Haviland and Certain Class Plaintiffs**

The instant appeals must be viewed in context with the conflict that occurred between certain counsel simultaneously with the pendency of the litigation. As stated previously, the class action was created as a result of several separate actions filed by parties allegedly suffering losses in the fire. The first distinct action was instituted on May 21, 2001 by Appellants along with other Plaintiffs.[4] This first Complaint was filed by attorneys of the law firm Levin, Fishbein, Sedran & Berman, including Donald E. Haviland, Jr., Esquire ("Mr Haviland"). Less than six (6) months later, on November 8, 2001, though, Mr. Haviland withdrew his appearance with the Levin Fishbein firm and entered his appearance with Kline & Specter, P.C. Specifically

---

[4] This action was docketed in Montgomery County as 2001-10504.

at the time of this Court's appointment of Class Counsel on April 14, 2003, Mr. Haviland was an associate with Kline & Specter. Mr. Haviland would remain an associate with Kline & Specter until either August or September 2006, when he gave notice to Kline & Specter of his intention to leave the firm. He left thereafter on September 6, 2006 to become an attorney with a new law firm, known as The Haviland Law Firm.[5]

The departure of Mr. Haviland from Kline & Specter created a schism, with Mr. Haviland now claiming to be the "rightful" Class Counsel. On September 6, 2006, the day of his departure, Mr. Haviland forwarded a correspondence to various Class Representatives in this litigation, stating that he had formed The Haviland Law Firm and seeking Class Representatives to make a decision on the election of Class Counsel in this matter: Kline & Specter or The Haviland Law Firm. On September 7, 2006, Kline & Specter filed a Petition to Bar Mr. Haviland from Communicating with the Class, and a hearing was scheduled before this Court.

On September 8, 2006, the hearing on the Petition was held before the Court. On September 11, 2006, this Court issued an Order barring Mr. Haviland from soliciting Class Members and seeking from them an election of Class Counsel. On October 10, 2006, Mr. Haviland filed a Notice of Appeal of this Collateral Order to the Superior Court.

Meanwhile, on or about September 13, 2006, Mr. Haviland filed with the Court a Petition for Appointment as Class Counsel. Also on that date, Mr. Haviland filed a Praecipe for Change of Entry of Appearance for Class Representatives, Professional Flooring Co., Inc., Limerick Carpet & Flooring, Inc., Rose Line, Inc., Salmons Industries, Inc. a/t/a Millie Switch and Renu Electronics. Class Plaintiffs filed a timely response to Mr. Haviland's Petition, as well as a Motion to Strike Mr. Haviland's "Praecipe for Change of Entry of Appearance."

---

[5] The actual circumstances surrounding Mr. Haviland's departure remain in dispute. Mr. Haviland alleges that he voluntarily left. Kline & Specter contends that he was fired for cause.

5

Thereafter, on November 17, 2006, the Court commenced an evidentiary hearing with regard to Mr. Haviland's Petition for Appointment as Class Counsel. Due to the extensive nature of the Petition and this class action litigation, the Evidentiary Hearing continued on for three additional days of testimony and evidence.

Immediately prior to the fifth hearing day, on December 13, 2006, Mr. Haviland voluntarily filed a Praecipe to Withdraw his Petition for Appointment as Counsel for the Class. By way of Order dated December 19, 2006, the undersigned directed that the Petition be withdrawn, and Kline & Specter thus remained Class Counsel. The Court deferred ruling upon the Petition to Strike Mr. Haviland's Appearance, as Mr. Haviland was permitted to represent the named [Certain Class] Plaintiffs as *personal* counsel. With respect to the class action, Certain Class Plaintiffs would continue to be represented by the appointed Class Counsel, Kline & Specter and High Swartz. On April 29, 2007, this Court filed an Opinion pursuant to Pa.R.A.P. 1925(a) with regard to Mr. Haviland's Notice of Appeal (filed October 10, 2006) of this Court's September 11, 2006 Order barring solicitation with Class Members about their preference for Class Counsel, noting that the appeal was now moot because Mr. Haviland had withdrawn his Petition for Appointment as Class Counsel.

Notwithstanding Mr. Haviland's voluntary withdrawal of his Petition for Appointment as Class Counsel, Mr. Haviland continued from this point forward to make filings *with respect to the class action* on behalf of his personal clients. This Court disregarded or denied these filings made by Mr. Haviland, which were made outside of his scope as personal counsel for his clients and were not made by Class Counsel. It is the Court who must make the determination as to which law firm or firms are the *sole* firms to make filings on behalf of the Class. See Pa.R.C.P. 1709 and 1713.

6

Mr. Haviland's interference with the class action continued through the scheduled date of trial. On February 14, 2008, notwithstanding this Court's position that the pending appeal was now moot, the Superior Court entered an Order vacating this Court's September 11, 2006 Order and remanding "for entry of a more specific order that explicitly states the limitations on contact that the court obviously intended." On February 21, 2008, three weeks after commencement of trial and during the ongoing hearing on pretrial matters, Mr. Haviland filed with the Court, and served on all counsel, a document titled "Notice of Issuance of Communications with Members of the Class," in which Mr. Haviland sought to solicit communications from Class Members concerning their rights with respect to the class action.

On February 22, 2008, Class Counsel, Kline & Specter, filed an "Emergency Application to Temporarily Restrain Mr. Haviland and the Haviland Law Firm from Communicating with the Entire Class without Prior Approval of the Court." A hearing on the Emergency Application was held the morning of the next business day, Monday, February 25, 2008.

The February 25, 2008 hearing proceeded through five (5) more days, effectively stalling the ongoing jury trial in the underlying litigation. During the hearing, Class Counsel filed a "Motion to Bar Mr. Haviland and the Haviland Law Firm from Using Any Lists of Class Members' Names and Addresses That Were Unlawfully Acquired." At the conclusion of the hearing, this Court barred Mr. Haviland from communicating with any Class Member other than those he represents in a personal capacity, specifically Certain Class Plaintiffs,[6] Professional Flooring Co., Inc., Limerick Carpet & Flooring, Inc., Rose Line, Inc., and Renu Electronics, Inc. (Appellants, herein).

Mr. Haviland continued to make numerous other filings on behalf of Certain Class Plaintiffs throughout the rest of the trial and thereafter. In addition, he has filed several

---

[6] The coinage of the designation "Certain Class Plaintiffs" was originally made by Mr. Haviland.

contemporaneous appeals to the Superior Court purportedly on behalf of Certain Class Plaintiffs

of various Orders by this Court, specifically: (a) the six (6) Orders dated January 3, 2008,

granting various Defendants' Motions for Summary Judgment; (b) the Order dated July 10,

2008, approving the Settlement Agreement between Class Plaintiffs and Settling Defendants; and

(c) the Order dated August 29, 2008, granting Class Counsel's Motion for Approval of

Attorneys' Fees and Reimbursement of Expenses; and (d) the Order dated November 16, 2006,

striking Appellants' Praecipe to Reinstate Complaint as to Defendant Montgomery County

Industrial Development Authority.

### ISSUES

Appellants raise the following allegations of error against this Court:

I.    Motions for Summary Judgment

    a.   Whether this Court erred in granting the Motions for Summary Judgment of
        Defendants, Alpha Electric; Cadet Manufacturing; C.J. Robinson Co.;
        Pennsylvania-American Water Co.; Scatton Heating & Cooling; and
        Shihadeh Carpet?

II.   The Settlement Agreement

    a.   Whether the Trial Court erred in approving the Settlement over the
        objections of Appellants without following the requisites of Pa.R.C.P. 1701,
        et seq.?

    b.   Whether the Trial Court erred in approving a "classwide settlement" with and
        release of Defendant, Pittsburgh Bakery, against whom the claims of the
        Class had been dismissed by Class Counsel, with prejudice, prior to the
        Settlement?

    c.   Whether the Trial Court erred in approving a Class Notice that contained
        material misrepresentations and omissions about the Settlement terms and
        that was not sent to all Class Members who could be identified with
        reasonable effort?

    d.   Whether the Trial Court erred in denying Appellants' discovery into issues of
        Class Counsel conflicts and collusion with Defendants in relation to the
        Settlement?

III.   Approval of Attorneys' Fees

    a.   Whether the Trial Court erred in approving Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Expenses by failing to follow the requisites of Pa.R.C.P. 1716?

IV.   Montgomery County Industrial Development Authority

    a.   Whether the Trial Court erred in striking the Praecipe to Reinstate Complaint against Defendant, Montgomery County Industrial Development Authority?

## DISCUSSION

I.   **This Court properly granted the Motions for Summary Judgment of Defendants, Alpha Electric; Cadet Manufacturing; C.J. Robinson Co.; Pennsylvania-American Water Co.; Scatton Heating & Cooling; and Shihadeh Carpet.**

Six of Appellants' appeals allege that this Court erred in granting the Motions for Summary Judgment of Defendants, Alpha Electric; Cadet Manufacturing; C.J. Robinson Co.; Pennsylvania-American Water Co.; Scatton Heating & Cooling; and Shihadeh Carpet (the "Dismissed Defendants"). The Court granted the Motions on January 3, 2008, approximately one month prior to the scheduled trial commencement date.

    A.   **Mr. Haviland does not have standing to appeal the Orders granting summary judgment with regard to the Dismissed Defendants.**

As has been discussed *supra*, this Court is of the position that Mr. Haviland, as Appellants' personal counsel, does not have standing to appeal the January 3, 2008 Orders granting summary judgment in favor of the Dismissed Defendants. He is *not* counsel for the Class. Class Counsel has always been the firms of Kline & Specter, P.C. and High Swartz, LLP. Mr. Haviland left the firm of Kline & Specter on September 6, 2006. Furthermore, he *voluntarily withdrew* his Petition for Appointment as Class Counsel. He does *not* represent the Class. He does *not* represent Appellants as Members of the Class. He represents them in their personal capacity only. Appellants, as Class Members, have, at all times, been competently

represented by the two Class Counsel firms.

The Orders granting summary judgment disposed of the *Class's* claims against the Dismissed Defendants in favor of the Dismissed Defendants. As such, only the Class as a whole, represented by Class Counsel, has standing to appeal.[7] Mr. Haviland, representing specific entities who also happen to be Members of the Class, does not.

### B. Notwithstanding Mr. Haviland's lack of standing, this Court properly granted summary judgment in favor of the Dismissed Defendants.

Class Plaintiffs did not oppose the entry of summary judgment in favor of the Dismissed Defendants. They did so for good reason. Pursuant to Case Management Order No. 6, dated April 12, 2007, all discovery, including the production of expert reports, closed on October 1, 2007. No party, Class Plaintiffs or otherwise, produced an expert report even hinting at liability of any of the Dismissed Defendants. In a case such as this, an expert report is essential for a factfinder to establish liability due to a fire. See Swartz v. General Elec. Co., 474 A.2d 1172 (Pa. Super. 1984); see also Marrazzo v. Scranton Nehl Bottling Co., 223 A.2d 17 (Pa. 1966).

A party may move for summary judgment "if, after the completion of discovery relevant to the motion, *including the production of expert reports*, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(b) (emphasis added). "Where a plaintiff fails to produce an expert report in a situation requiring one, the court should grant the defendant's motion for summary judgment." Masgal v. Franklin, 787 A.2d 982 (Pa. Super. 2001). Class Plaintiffs would have been unable to meet their burden at trial to succeed on their claims against the Dismissed Defendants because they had failed to produce any expert reports establishing liability on their behalf. Indeed, by filing

---

[7] However, as set forth in the next subsection, the Class did not object to the entry of summary judgment in favor of the Dismissed Defendants.

responses to Dismissed Defendants' Motions for Summary Judgment stating that the Class did not oppose the entry of same, Class Plaintiffs effectively admitted that they could not meet their burden under Rule 1035.2(b). Thus, this Court properly granted summary judgment.

II.    **This Court properly approved the Settlement Agreement made between Class Counsel and Settling Defendants.**

    A.    **Class Notice**

Appellants argue that this Court improperly approved the Settlement in violation of Pa.R.C.P. 1701, *et seq.*  The specific Rule concerning settlement of class actions is Rule 1714, specifically subsections (a) and (c), which read as follows:

> (a) No class action shall be compromised, settled or continued without the approval of court after hearing.
>
> . . .
> (c) If an action has been certified as a class action, notice of the proposed compromise, settlement or discontinuance shall be given to all members of the class in such manner as the court may direct.

See also Brophy v. Philadelphia Gas Works, et al., 921 A.2d 80 (Pa. Cmwlth. 2007).

Appellants' argument is meritless because this Court strictly followed the requirements of Rule 1714.  After the Court preliminarily approved the Settlement, Class Counsel provided written notice to all three hundred twenty-one (321) known Class Members.  Additionally, the Settlement was featured in the local news, and stories ran in major publications such as The Philadelphia Inquirer and were broadcast on KYW News Radio.  Kline & Specter, P.C. also posted information about the Settlement on its firm's website.  Specifically, notice of a settlement hearing by publication both in print media and on the internet is sufficient constructive notice as to unknown entity that may be impacted by a class action settlement agreement.  See Prince George Center, Inc. v. U.S. Gypsum Co., 704 A.2d 141 (Pa. Super. 1997).  It thus stands to reason that all interested parties who had been injured by the Bridgeport fire knew or should have known of the proposed Settlement.

Despite Appellants' contention to the contrary, the Class Notice was detailed and thorough; it did not contain any material omissions or misrepresentations, but rather conveyed to the Class Members an accurate representation of the proposed Settlement. The detailed five-page Settlement Notice was prepared by Class Counsel and reviewed and ratified by this Court on April 24, 2008, sixty (60) days prior to the Fairness Hearing. The statements contained in the Notice are factual and correct and nothing material was omitted. The Notice included several sections:

A.  A heading, in bold and capitalized text, informing anyone who has lost property or income in the May 15, 2001 fire that destroyed the Continental Business Center, that his or her rights may be affected by the proposed Settlement.

B.  An introductory section, identifying the parties to the Settlement, the amount of the proposed Settlement, the date, location and purpose of the Fairness Hearing, and the deadline for objections to the proposed Settlement.

C.  A thorough section detailing the underlying lawsuit.

D.  A section setting forth who is and is not in the Certified Class.

E.  A thorough section setting forth the terms of the proposed Settlement.

F.  A detailed section discussing the Fairness Hearing.

G.  Class Counsel's phone number for those who seek additional information, questions, or inquiries as to whether they are included in the Class.

Notice of a proposed settlement agreement in a class action must present a fair recital of the subject matter and proposed terms and inform the class members of an opportunity to be heard, but it "need not provide a complete source of settlement information, and class members are not expected to rely upon the notices as such." Fischer v. Madway, 485 A.2d 809, 811 (Pa. Super. 1984). In fact, it "may consist of a very general description of the proposed settlement, including a summary of the monetary or other benefits that the class would receive and an estimation of attorneys' fees and other expenses." Id. Therefore, the sufficiency of the Fairness

12

Hearing Notice sent by Class Counsel in the instant action went above and beyond the required notice adequacy.

### B.    The Settlement Agreement

"Settlements are favored in class action lawsuits and that the standard of review of the trial court's acceptance or rejection of a settlement proposal is abuse of discretion." Dauphin Deposit Bank and Trust Co. v. Hess, 727 A.2d 1076 (Pa. 1999). There are several criteria a trial court should consider in determining whether a class action settlement is fair and reasonable and adequately protects the members of the class:

1.    The risks of establishing liability and damages;

2.    The range of reasonableness of the settlement in the light of the best possible recovery;

3.    The range of reasonableness of the settlement in light of all the attendant risks of litigation;

4.    The complexity, expense and likely duration of litigation;

5.    The stage of the proceedings and the amount of discovery completed;

6.    The recommendations of competent counsel; and

7.    The reaction of the class to the settlement.

Buchanan v. Century Federal Savings & Loan Ass'n., 393 A.2d 704 (Pa. Super. 1978).

As was stated *surpa,* the Settlement in this case was created over a period of nearly three (3) months. Discussions began immediately following the commencement date of trial, February 4, 2008. These discussions occurred among the Court, Class Counsel, and Counsel for the individual Defendants.[8]  After more than a week of negotiations which had not produced any meaningful result, some Defendants joined to negotiate with Class Counsel as a group. Again, this Court facilitated discussions. While Class Counsel remained very stringent in its high

---

[8] The discussions were occurring contemporaneously with the numerous other pretrial matters.

settlement demand, over the next week, the range between the settlement offers began to shrink as the number of Defendants joining the prospective settlement "group" began to increase. On February 19, 2008, a settlement in the amount of $30 million had been reached between the Class and all Defendants still in the case except for the Challenger Defendants and Universal Electrical. Even as trial proceeded against these two remaining Defendants, further settlement discussions among the Court, Class Counsel, and the respective Counsel for the Challenger Defendants and Universal Electrical continued unabated. In early March, after the jury trial already had begun, Class Counsel reached a settlement with the Challenger Defendants in the amount of $4 million. As trial continued against the remaining Defendant, Universal Electrical,[9] settlement discussions among this Court, Class Counsel and Counsel for Universal Electrical carried on. Finally, on April 24, 2008, over two and a half months after the commencement of trial, and while the jury was deliberating, settlement discussions concluded, and the Class settled with Universal Electrical for $1 million.

The $35 million Global Settlement in the instant case is unique in that its ultimate conclusion occurred at the last possible moment of the litigation, during the jury deliberations after the close of the evidence and argument. As such, the Court's predictions with regard many of the Buchanan factors were based, in part, on what actually occurred in this case.

In this class action, the Class alleged that the fire in the Continental Business Center was sparked by a malfunctioning circuit breaker panel box in unit C-158. The liability of numerous Defendants was premised on this allegedly faulty panel box, including: (a) the Challenger Defendants, who manufactured the panel box; (b) Universal Electrical Services Co., who remediated flood damage caused by Hurricane Floyd in September 1999 allegedly in and around

---

[9] It should be noted that the majority of the Settling Defendants were still in the case and present in the courtroom due to Universal's cross claims against them.

14

unit C-158; (c) Erie Insurance Group and (d) Arkwright Insurance, who were, respectively, the primary and secondary insurers supervising the flood remediation; (e) Sweetzels Cookies, (f) ARB Breadcrumbs and (g) Valley Forge Candles, who were the tenants of C-158 at the time of the 1999 flood; (h) Panther Products, the tenant of C-158 at the time of the fire; and (i) Penncora Productions, who was also storing equipment in C-158 at the time of the fire.

During jury deliberations but prior to a final settlement being reached, the jury returned with a question for the Court as to how to proceed if they were to find no negligence on the part of the sole remaining Defendant at the time, Universal Electrical. The case settled almost immediately thereafter. After trial it was discovered that the jury had been stuck on whether Universal Electrical had been negligent in flood remediation. However, they *had already found* that such negligence was *not a factual cause of the fire*. This finding suggests that the jury did not believe there was sufficient evidence linking the damage from 1999 Hurricane Floyd flood to the cause of the fire from the C-158 panel box. This finding of lack of causation should have ended their deliberations and allowed them to return with a verdict in favor of Universal Electrical. This oversight by the jury in continuing to deliberate on whether Universal Electrical was negligent after they had already found no factual causation, allowed the Class to settle with Universal Electrical and a global settlement was then reached.

While, of course, the aforementioned "finding" by the jury is not part of the record because the jury never finished its deliberations and returned with a verdict, this "inside knowledge" does give the court perspective into the real risks of liability that were at stake in this litigation. If the Settlement Agreement were to be deemed invalid, and the case retried against all Defendants, a similar jury may also find insufficient evidence supporting a finding that the fire began in C-158's panel box. If this were the situation, then the Challenger

15

Defendants; Universal Electrical; Erie Insurance Group; Arkwright Insurance; Sweetzels Cookies; ARB Breadcrumbs; Valley Forge Candle Co.; Panther Products, and Penncora Productions would be found to be not liable for the fire. This would severely handicap the Class's recovery of damages.

The aforementioned "C-158" Defendants contributed substantially to the $35,000,000.00 global Settlement in the following amounts:

| | |
|---|---|
| Challenger Defendants | $4,000,000.00 |
| Universal Electrical | $1,000,000.00 |
| Erie Insurance Group | $4,000,000.00 |
| Arkwright Insurance | $3,800,000.00 |
| Sweetzels & ARB | $4,000,000.00 |
| Valley Forge Candles | $100,000.00 |
| Panther Products | $1,380,000.00 |
| Penncora Productions | $2,000,000.00 |
| **TOTAL** | **$20,280,000.00** |

If this Court had disapproved this Settlement Agreement, it would place a very real risk on the Class of being unable to recover against the above C-158 Defendants, which would cost them $20,280,000.00, or 57.94% of the total $35,000,000.00 Settlement. By approving the Settlement, this Court was able to protect the interests of the Class against a real risk of substantial non-recovery.

Appellants also argue that the Court erred in approving the Settlement, in that Defendant, Pittsburgh Bakery Equipment Co., had contributed "only" $50,000.00 to same. What Appellants

16

fail to acknowledge is that the Class's case against Pittsburgh Bakery was woefully weak.[10] The only piece of evidence connecting Pittsburgh Bakery to the underlying litigation is a one-page "invoice" identifying flood remediation work in unit C-158. Pittsburgh Bakery, however, contended at all times that it *never* performed any remediation work in C-158 after the Hurricane Floyd flood. Rather, they asserted that the one-page document was actually an "estimate" for work they could complete but had been mistakenly labeled as an invoice. The Court ultimately denied Pittsburgh Bakery's Motion for Summary Judgment because, viewing the facts in the light most favorable to the Bushar Defendants as the opposing party, the Court found that a jury *could* find based on the allegedly incorrectly worded document that Pittsburgh Bakery had performed the said remediation work. Nevertheless, had Pittsburgh Bakery put on a defense at trial, it is highly probable that they would have been able to successfully defend their claims. The $50,000.00 they contributed to the Settlement can be viewed as nuisance expenses to keep them out of a prolonged trial. Without any additional evidence presented by anyone, the likelihood of recovery against Pittsburgh Bakery, while possible, was extremely remote.[11]

With regard to the complexity, expense and likely duration of litigation, this also can be reasonably estimated by the Court, since this case went all the way through to the end of trial before it finally settled. The trial had been scheduled to begin on February 4, 2008. For approximately three weeks, pretrial motions, including over one hundred motions in limine were argued before the Court. As has been discussed at length *supra*, during this time the Court also involved itself in countless hours of settlement negotiations. Ultimately, all Defendants except for the Challenger Defendants and Universal Electrical settled with the Class. A lengthy jury

---

[10] The Class ultimately did not oppose Pittsburgh Bakery's Motion for Summary Judgment. The Motion instead was opposed by the Bushar Defendants.

[11] Furthermore, if the case were tried again and the jury were to find, as discussed *supra*, that the fire did not begin in the C-158 panel box, then no recovery could be had against Pittsburgh Bakery.

17

selection process immediately commenced, and trial proceeded on a full-time basis against the remaining two Defendants, with the Challenger Defendants settling in early March 2008 and Universal Electrical settling on April 24, 2008. All in all, the pretrial process and trial proper proceeded on a full-time basis for over two and a half months. The legal expense of just this portion of the litigation was enormous.

Numerous experts were retained and testified, including the Class's damages expert, David L. Hopkins. Other expert witnesses included experts in the fields of electricity and flood remediation. There were also multiple lay witnesses. In total, over one hundred (100) depositions had been taken during discovery. The numerous different theories of liability against each Defendant made the complexity of this litigation enormous.

The Settlement was a collaborative creation of weeks of ongoing negotiations. First Class Counsel negotiated with the Defendants individually. Eventually, several of the Defendants joined together to offer a group settlement. Originally, this amount was less than ten million dollars. Class Counsel continued a hard-line approach until they accepted an offer from all Defendants except Challenger and Universal for thirty million dollars. This is not a situation where counsel jumped on the first settlement offer that passed the gate. Class Counsel was meticulous in getting a settlement they felt was fair and just and in the best interest of the Class.

The most vocal of the objections against the Settlement were raised by Appellants herein, which this Court believes are at least partially fueled by Mr. Haviland's animosity to his former law firm. Other objections came from subrogated insurance carriers who wished to make claims against the Settlement Fund. During the Fairness Hearing, this Court directed Class Counsel to draft a form that subrogated insurance carriers could use to make such claims. Class Counsel consequently did so.

18

### C.    Appellants' subpoenas

On or about March 20, 2008, during the trial, in which Mr. Haviland was not participating, Mr. Haviland provided Notice of Intent to Serve Subpoenas Pursuant to Pa.R.C.P. 4009.21 on specific parties, including Sweetzels, ARB, Valley Forge Candle, Panther Products, Penncora Productions, Erie Insurance Group, Cadet Manufacturing, and the Bushar Defendants.[12] Appellants sought to compel the production, at Mr. Haviland's office, of certain documents concerning legal and other expenses, in advance of the Fairness Hearing. In April 24, 2008, the various parties filed Motions to Quash and/or for Protective Orders. This Court reviewed the matter and issued Orders quashing the subpoenas on May 16, 2008.

The subpoenas were improper for various reasons. First, the Settling Defendants are parties to this action. A subpoena issued pursuant to Pa.R.C.P. 4009.21 is a method to obtain documents from *non-parties* only. Furthermore, even if Appellants had issued a Notice to Attend and Produce pursuant to Pa.R.C.P. 234.3, this Rule would only allow production of documents *at the trial or hearing*, not at the private offices of counsel, which was what Mr. Haviland was seeking.

Secondly, and more importantly, Mr. Haviland is not counsel for the Class. Mr. Haviland represents Appellants in their personal capacity only. He does not represent them as part of a Class. He does not represent a "party" to this litigation, and thus cannot utilize the vehicles provided by either Rule 4009.21 or Rule 234.3.

Finally, the subpoenas requested privileged information relating to the details of settlement negotiations and the drafting of the Settlement Agreement. Mr. Haviland appears to have been trying to seek this information in support of a "wild goose chase" to prove a self-

---

[12] Mr. Haviland also mailed a Notice of Intent to Serve Subpoena to the office of the personal counsel for Defendant, Charles Bushar, the law firm of Powell, Trachtman, Logan, Carrle & Lombardo, P.C.. This firm is and was not counsel for the Bushar Defendants in the Bridgeport fire litigation, nor were they a party to this action.

created theory that the Settlement Agreement was a product of collusion, a theory that has absolutely no basis in fact. Mr. Haviland had no independent basis to support such an outrageous and manufactured allegation.

A court may quash a subpoena or grant a protective order to protect a person from unreasonable annoyance, embarrassment, oppression, burden or expense. See Pa.R.C.P. 234.4(b) and 4012. In this instance, the subpoenas Mr. Haviland sought to issue represented yet another example of his improper interference in the class action proceedings. He had no right or basis to demand documents from the various parties and non-parties. Mr. Haviland has continuously operated to delay and disrupt these proceedings and aggravate his former employer law firm. This Court properly denied the subpoenas that were designed to achieve such improper purposes.

III. **This Court properly granted Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Expenses.**

On August 29, 2008, this Court approved Class Counsel's Motion for Approval of Attorneys' Fees and Reimbursement of Expenses, awarding attorneys' fees in the amount of one-third (1/3) of the Settlement Fund, or $11,666,666.66, and expenses incurred in prosecuting the class action in the amount of $1,266,800.67.[13] Appellants argue that the Court erred under Pa.R.C.P. 1716 by: allowing fees in the amount of one-third the gross Settlement Fund; refusing to require submission of backup documentation and failing to ensure that all work and expenses were reasonably expended; and finding that Class Counsel's hourly rates charged were reasonable.

Rule 1716 identifies five factors a court should consider in cases where the court is authorized to fix the amount of counsel fees with respect to a class action:

(1) the time and effort reasonably expended by the attorney in the litigation;

---

[13] In doing so, this Court issued a detailed Order, complete with findings of fact and conclusions of law.

(2) the quality of the services rendered;

(3) the results achieved and benefits conferred upon the class or upon the public;

(4) the magnitude, complexity and uniqueness of the litigation; and

(5) whether the receipt of a fee was contingent on success.

Additionally, the Third Circuit, in Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d

Cir. 2000), identified seven factors:

(1) the size of the fund created and number of persons benefited;

(2) the presence or absence of substantial objections by members of the class;

(3) the skill and efficency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by class counsel; and

(7) awards in similar cases.

Class Counsel's involvement in this matter has been thorough and continuous, beginning from the time this litigation was consolidated as a class action and Class Counsel was appointed through the end of trial several years later. Class Counsel participated in exhaustive discovery, including over one hundred (100) depositions, as well as copious pretrial motions, including the one hundred seven (107) motions in limine. During the pretrial process before this Court that began on February 4, 2008, and through the final settlement with Universal Electrical in April, the Class was actively represented by several very capable and diligent attorneys from Kline & Specter, P.C. and High Swartz, LLC.

The attorneys for the Class demonstrated great skill in proceeding through the class action that was both thorough and as efficiently as possible given the complexity of the litigation. The great complexity of this action was pervasive in both the liability and damages spheres, with

experts being retained by Class Counsel for each. Due to the complexity of the litigation, Class Counsel properly devoted substantial time to the case in order to adequately represent the Class's interests. Class Counsel attorneys worked with great skill and devotion along with the equally assiduous attorneys for Defendants in order to obtain a sizeable thirty-five million dollar ($35,000,000.00) Settlement Fund. The Fund was created as a result of several weeks of ongoing negotiation.

Appellants, in their opposition to the Motion, contended that a contingency fee in the amount of twenty-five percent (25%) would have been a more appropriate award. There is no basis for such a reduced award. In finding that a contingency fee in the amount of thirty-three and a third percent (33 1/3%) was reasonable, this Court examined this case alongside other class actions in the Third Circuit. See In re: Automotive Refinishing Paint Antitrust Litigation, 2008 WL 63269 (E.D. Pa. 2008) (33 1/3% fee award from a $35 million settlement fund, exclusive of costs); Bradburn Parent-Teacher Store, Inc. v. 3M, 513 F.Supp.2d 322 (E.D. Pa. 2003) (35% fee award from a $39.75 million settlement fund); In re: Coral Corp., 293 F.Supp.2d 423 (E.D. Pa. 2001) (33 1/3% fee award from a $7 million settlement fund, exclusive of costs). Class Counsel has done a commendable job with a very difficult and complex case. The amount of time devoted to same was evident in their preparedness and thoroughness, much of which this Court bore direct witness to on a full time basis for over two and half months straight. The award was proper under both Pa.R.C.P. 1716 and the factors in Gunter, supra.

## V.   The Montgomery County Industrial Development Authority was properly dismissed as a Defendant in this litigation.

Appellants' final appeal argues that this Court erred when struck Appellants' Praecipe to Reinstate Complaint as to Defendant, Montgomery County Industrial Development Authority ("MCIDA"). MCIDA was originally a Defendant in this litigation and had filed Preliminary

22

Objections to the Class Plaintiffs' Complaint. On November 17, 2005, upon agreement of the parties, this Court entered an Order dismissing MCIDA from this litigation "without prejudice and subject to the additional condition that MCIDA has agreed to the suspension of any applicable statute of limitations that may affect any parties' rights to pursue claims against MCIDA until thirty (30) days after expert reports related to liability and any responses and replies thereto have been exchanged by the parties in this litigation."

On November 16, 2006, more than two (2) months *after* his departure from Class Counsel law firm, Kline & Specter, Mr. Haviland filed with the Prothonotary a document entitled "Praecipe to Reinstate Complaint as to Defendant Montgomery County Industrial Development Authority," the body of which read simply: "TO THE PROTHONOTARY: Pursuant to the Court's Agreed Order entered in this case, kindly reinstate Montgomery County Industrial Development Authority as a defendant in the above-captioned matter." Mr. Haviland attached to the Praecipe an unsigned copy of the above referenced November 17, 2005 Order. This Court struck the Praecipe on the same day it was filed.

This Court was correct in striking the Praecipe. Mr. Haviland at this time was no longer a member of the Kline & Specter law firm and thus was *not* Class Counsel. He did not represent any party to this litigation other than certain Class Members as personal counsel. Mr. Haviland had filed a Petition for Appointment as Class Counsel, which was scheduled for a hearing on November 17, 2006, the following day. As was discussed *supra,* after four days of hearings and immediately prior to the fifth hearing day, Mr. Haviland voluntarily withdrew his Petition. Mr. Haviland, since his departure from Kline & Specter in September 2006, was and is not counsel for the Class. He had no authority to file anything on behalf of the Class, including the Praecipe to Reinstate Complaint.

23

## CONCLUSION

Based upon the foregoing reasons, this Court respectfully requests that the Superior Court

affirm the nine above referenced Court Orders.

BY THE COURT:

STEVEN T. O'NEILL            J.

Copies mailed on  2/22/09
to the following:
Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
Prothonotary

Helen M Donahue
Secretary

24

# Exhibit 5

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3    --------------------------X

4    IN RE:  PHARMACEUTICAL    : MDL NO.  1456

5    INDUSTRY AVERAGE          : CIVIL ACTION

6    WHOLESALE PRICE           : 01-CV-12257-PBS

7    LITIGATION                : Judge Patti B. Saris

8    --------------------------X Chief Magistrate

9    THIS DOCUMENT RELATES TO  : Judge Marianne B.

10   ALL CASES IN MDL NO. 1456 : Bowler

11   --------------------------X

12

13           DEPOSITION OF CORINNA CONNICK

14                   -  -  -

15           Tuesday, March 24, 2009

16              10:06 o'clock a.m.

17               Webster & Dubyak

18       1220 West 6th Street, Suite 600

19            Cleveland, Ohio  44113

20                   -  -  -

21                  ANN FORD

22     REGISTERED PROFESSIONAL REPORTER

Connick, Corinna                                                    March 24, 2009
Cleveland, OH

Page 10

1    Q.   That's okay.
2    A.   I understand that the institutional
3  payers -- or the institutional providers have
4  already received payment -- partial payment and
5  have made a settlement with the defendants.
6        I know that there is a proposed
7  settlement that offers the percentage co-payors
8  17-and-a-half percent.  And I know that me as a
9  self-pay is receiving no benefits.  And our rights
10  are being released with the inability to file any
11  claims.
12    Q.   Okay.  The first thing you said was that
13  the institutional providers had already gotten
14  payments.
15    A.   Partial.
16    Q.   Partial payments.
17    A.   From my knowledge -- to the best of my
18  knowledge.
19    Q.   Okay.  When you say institutional
20  providers, are you referring to what the
21  settlement has called the ISHPs?
22    A.   ISHPs.

Page 11

1    Q.   Okay.  And where did you gain the
2  understanding that the ISHPs are receiving a
3  partial payment or have already received a partial
4  payment?
5    A.   I discussed it with my husband who told
6  me.
7    Q.   Is your husband an attorney?
8    A.   Yes, he is.
9    Q.   What type of law does he practice?
10    A.   He's a trial attorney.
11    Q.   Did you learn about this settlement from
12  your husband?
13    A.   Yes, I did.
14    Q.   Do you know how he learned about it?
15    A.   I'm not really sure.  No.
16    Q.   So is most of your understanding of the
17  terms of this settlement based on what your
18  husband has told you?
19    A.   Based -- he had showed me a copy of the
20  proposed settlement, and through our discussions,
21  yes.
22    Q.   Have you had any discussions with anyone

Page 12

1  else, other than Mr. Cochran, about this
2  settlement?
3    A.   No, I have not.
4    Q.   What documents did you review with your
5  husband in order to understand the terms of the
6  settlement?
7    A.   The -- I believe it was the actual
8  filing of the class action filing.  And he did
9  show me the settlement proposal.
10    Q.   When you say class action filing, do you
11  think that might have been the plaintiff's motion
12  for preliminary approval?
13    A.   I -- I don't understand the terms.  So
14  it's possible.
15    Q.   Okay.  Some type of pleadings.
16    A.   Some type of document.  Sure.  I'm sorry
17  if I used the --
18        MR. COCHRAN:  Let her finish.
19        THE WITNESS:  Okay.
20  BY MS. FOUNTAIN CONNOLLY:
21    Q.   And then you believe you may have seen a
22  copy of the settlement agreement itself?

Page 13

1    A.   Possibly, yes.
2    Q.   So do you understand that the total
3  settlement amount is $125 million?
4    A.   Yes, I do.
5        MR. COCHRAN:  Again, let her finish.
6        THE WITNESS:  I'm sorry.
7        MR. COCHRAN:  You need to hear the
8  entire question.  She may add another sentence on
9  to that.
10        THE WITNESS:  Got you.
11        MS. FOUNTAIN CONNOLLY:  It's natural.
12        THE WITNESS:  I know.
13        MS. FOUNTAIN CONNOLLY:  It's normal
14  speak.
15  BY MS. FOUNTAIN CONNOLLY:
16    Q.   So I've read your objection.  But in
17  your own words, how would you explain what you
18  find objectionable about the Track Two Settlement?
19    A.   Okay.  I -- what I object to in the
20  settlement agreement is that there is no consumer
21  class representative.  There are some public
22  interest groups but no actual consumer class

Henderson Legal Services, Inc.

Connick, Corinna                                                                    March 24, 2009
Cleveland, OH

---

Page 14

1    representative.
2         The whole payer has not been considered
3    for benefit, and yet we're releasing our rights to
4    file any claims against the defendant.
5         Q.  Anything else?
6         A.  Yes.  If I may just --
7         Q.  Sure.  The record will reflect that
8    she's consulting -- is that your objection?
9         A.  Uh-huh.
10        Q.  Yes.  Consulting her objection.
11        A.  The whole payer receives no benefit.
12   The percentage co-payor does not receive enough
13   benefit.  They should receive more.  I also think
14   that the large -- the largest pharmacy companies,
15   the ten largest pharmacy companies should be
16   subpoenaed to gain prescription data and have the
17   benefits automatically calculated for the
18   consumers instead of having to file claims.
19        Q.  I'm just waiting on you.
20        A.  The institutional providers, from what I
21   understand, have already been paid $25 million,
22   and no consumer has been paid yet.  Almost seems

---

Page 15

1    as though they're getting preferential treatment.
2         And I also object to the attorney fees
3    from the consumers' plaintiff attorneys.  They are
4    required -- they are requesting 30 percent of the
5    settlement of $125 million where the ISHPs have
6    already received 52 million.  And of that 52
7    million, they are probably paying their attorneys
8    out of that.
9         And it's -- the attorneys that are
10   representing the consumer class do not represent
11   the institutional providers, therefore, should not
12   be entitled to a percentage of their settlement.
13   They should receive a percentage, 30 percent,
14   based on the remaining 73 million.
15        Q.  Is that it?  The first thing you talked
16   about was that there's no consumer class
17   representative.  Are you aware that there is a
18   consumer class representative for Class 1 or the
19   Medicare beneficiaries?
20        A.  I know there's no consumer class
21   representative for me, the whole payer.  And I
22   understand that there are some activist groups

---

Page 16

1    that are representing the consumer, but there is
2    no named consumer.
3         Q.  So your concern is that there's not a
4    representative for your particular type of payer?
5         A.  And there's no named consumer for, from
6    what I understand, there's no named consumer for
7    the partial -- or the -- I'm sorry -- percentage
8    co-payor, other than some special interest groups
9    who basically are not the consumer.
10        Q.  Do you have any information that these
11   special interest groups, as you were calling them,
12   have interests that are adverse to consumers?
13        A.  No.  But they don't represent me.  They
14   can't negotiate on my behalf.  They don't have the
15   authority to decide what is proper for me as the
16   consumer.
17        Q.  Do you mean that as a legal matter or
18   what do you mean when you say they can't negotiate
19   on your behalf?
20        MR. COCHRAN:  Objection.  Of course,
21   she's not an attorney.  I don't expect her to
22   answer something that is a legal issue, but

---

Page 17

1    subject to that, go ahead.
2         A.  Can you repeat the question?
3         Q.  Sure.  Can you explain to me what you
4    mean when you're saying they can't represent you?
5         A.  They don't have my best interest.  I
6    have no say-so.  They can't speak for me.  They
7    don't -- they're not coming to me as a class
8    representative and asking me if I agree to the
9    settlement.
10        Q.  Why do you believe they don't have your
11   best interest at heart?
12        A.  I'm not saying they don't have my best
13   interest at heart.  What I'm saying is they can't
14   negotiate for me.  They -- they don't have -- they
15   don't know what I want.  They don't -- they've
16   never consulted me or another consumers as to what
17   we want -- or they have not consulted me as to
18   what I want.
19        Q.  So unless someone has consulted you,
20   they couldn't adequately represent you?
21        A.  Or someone that represents the class.
22        Q.  And do you know whether any of these

---

Henderson Legal Services, Inc.

202-220-4158                                                    www.hendersonlegalservices.com

Connick, Corinna                                                                              March 24, 2009
Cleveland, OH

Page 18

1   institutional parties have, in fact, consulted
2   with consumers in the course of representing them?
3       A.   Not that I'm aware of.
4       Q.   Would it change your view of their
5   adequacy for consumers if you knew that they had,
6   in fact, consulted with consumers?
7       A.   I'm not sure.  I would have to hear what
8   happened.
9       Q.   Have you done any independent research
10  on these organizations?
11      A.   No, I have not.
12      Q.   So you don't know what their goals are?
13      A.   No, I do not.
14      Q.   You've also said that the co-payors
15  aren't getting enough under the settlement; is
16  that correct?
17      A.   Uh-huh.  Yes.
18      Q.   On what basis do you believe that
19  they're not getting enough?
20      A.   Based on other cases, such as, the
21  McKesson and the Relafen, those consumers were
22  given 30 to 33 percent of the settlement.

Page 19

1       Q.   Have you looked at what the co-pay
2   consumers had as damages in those cases versus
3   what co-pay consumers have as damages in this
4   case?
5           MR. COCHRAN:  Objection.  Go ahead.
6       A.   No, I have not.
7       Q.   If someone were to establish for you
8   that co-pay consumers in this case, in fact, had 5
9   percent of the damages but were getting 17.5
10  percent of the settlement, would that assuage your
11  concern that co-pay consumers aren't getting
12  enough?
13      A.   I'm not sure.  It's my understanding
14  that the -- can I scratch that?
15      Q.   Sure.  Of course.  It's your answer that
16  you're not sure?
17      A.   Can you repeat the question for me
18  again? I'm sorry.
19      Q.   Sure.  If I were to tell you that co-pay
20  consumers in this case only had 5 percent of the
21  damages, for example, would it assuage your
22  concern that they're getting 17.5 percent in this

Page 20

1   settlement?
2           MR. COCHRAN:  Do you mean, you're
3   referring to, I presume, to percentage co-pay?
4           MS. FOUNTAIN CONNOLLY:  That's what I
5   said.  I think I said co-pay consumers.
6           MR. COCHRAN:  Well, I mean, excluding a
7   flat rate co-pay.
8           MS. FOUNTAIN CONNOLLY:  Right.
9           THE WITNESS:  I'm not sure.  I'm not
10  sure.
11  BY MS. FOUNTAIN CONNOLLY:
12      Q.   Do you think in general that in a
13  settlement like this one, that there should be a
14  relationship between actual damages and the amount
15  that is awarded to a particular class in the
16  settlement?
17      A.   Yes.
18      Q.   That sounds like a fair concept to you?
19      A.   Yes.
20      Q.   But in this case, you haven't looked at,
21  for example, the damages report of plaintiff's
22  expert that talks about the damages that are

Page 21

1   suffered by any particular class?
2       A.   I understand based on the McKesson case
3   that the uninsured consumer is the largest -- I
4   guess it would be the largest consumer, larger
5   than the consumer -- the co-pay consumer.  So I'm
6   not sure I really answered your question.
7       Q.   But in this particular case, the AWP
8   case, have you looked at, for example, Dr.
9   Hartman's expert reports on damages?
10      A.   No.
11      Q.   Has anyone told you what those expert
12  reports say?
13      A.   No.
14      Q.   Okay.  You also said that you wanted the
15  largest pharmacy companies to be subpoenaed for
16  consumer contact information so that consumers
17  would not have to fill out claim forms; is that
18  correct?
19      A.   Uh-huh.  Correct.
20      Q.   Do you have any idea how much it would
21  cost to do that?
22      A.   I do not.  But I do know that it was

Henderson Legal Services, Inc.

Connick, Corinna                                                                                      March 24, 2009
Cleveland, OH

Page 22

1  done in the past.
2      Q.   You're referring to the Relafen case?
3      A.   Relafen.
4      Q.   Do you know that the Relafen case
5  involved a single drug, while this case involves
6  over 200 drugs?
7      A.   I wasn't aware of that.
8      Q.   Were you involved in the Relafen case at
9  all?
10     A.   No, I was not.
11     Q.   And do you have any information that
12 would suggest whether there would actually be a
13 lot of information in the possession of pharmacies
14 as opposed to other providers, like doctors?
15     A.   Can you repeat that, please?
16     Q.   Do you have any information that would
17 suggest that subpoenaing pharmacies in this case
18 would actually be the appropriate entity as
19 opposed to other medical providers, like doctors?
20     A.   No, I do not.
21     Q.   You've also talked about your objection
22 to what we as lawyers call the quick pay

Page 23

1  provision, which is the provision under which the
2  ISHPs got a portion of their recovery in advance
3  of everyone else; is that correct that you're
4  objecting to that provision?
5      A.   Yes.
6      Q.   Are you aware that that type of
7  provision is common in pharmaceutical pricing
8  settlements?
9      A.   No.  I'm not familiar with that.
10     Q.   Do you have any understanding of the
11 reason that class plaintiffs enter into what we
12 call quick pay provisions in pharmaceutical
13 pricing settlements?
14     A.   No.
15     Q.   And then you've talked about your
16 objection to the attorney's fees that the
17 plaintiffs are receiving --
18     A.   Uh-huh.
19     Q.   -- is that correct?
20     A.   Yes.
21     Q.   Do you have any understanding of how
22 much time the class lawyers have spent in

Page 24

1  litigating this case?
2      A.   I'm sure it's considerable.
3      Q.   But you're not aware of exact numbers?
4      A.   No.
5      Q.   Do you have an idea in your head of what
6  you believe to be a reasonable attorney's fees for
7  class counsel in this case?
8      A.   I think that the 30 percent on the 73
9  million would be reasonable.
10     Q.   So, in other words, if we were to remove
11 the ISHP portion of the settlement and get fees on
12 the remaining amount, that to you would be
13 reasonable?
14     A.   I believe that would be reasonable.
15     Q.   I'm sorry?
16     A.   I believe that would be reasonable.
17     Q.   Let's go ahead and look at what the
18 court reporter has already marked as Connick
19 Exhibit 1, which was -- which you produced this
20 morning pursuant to our subpoena, I believe.  Can
21 you identify for me what this document is?
22     A.   This is the list of medications that I

Page 25

1  had filled at the Giant Eagle Pharmacy in Chardon,
2  Ohio from January of '07 to December of '07.
3      Q.   And why did you pull these records from
4  this particular time period?
5      A.   Because during this time frame is when I
6  purchased the prescription Climara, which is
7  Estradiol, and it was during your -- the class
8  period, the class action period.
9      Q.   Is this the only document that you have
10 showing your purchase of what we call a class
11 drug, or one of the drugs that's at issue in this
12 settlement?
13         MR. COCHRAN:  Excuse me.  Are you by
14 that question referring to the two statements?
15         MS. FOUNTAIN CONNOLLY:  Yes.  The entire
16 exhibit.
17         THE WITNESS:  Yes.
18 BY MS. FOUNTAIN CONNOLLY:
19     Q.   So to your knowledge, Estradiol is the
20 only class drug that you took during the class
21 period?
22     A.   That I'm aware of, yes.

7 (Pages 22 to 25)

Connick, Corinna                                                                March 24, 2009
Cleveland, OH

Page 42

1  case for seven years?
2         MR. COCHRAN: Objection. Do you mean
3  the whole payers?
4         MS. FOUNTAIN CONNOLLY: Any of the
5  consumers.
6         MR. COCHRAN: Any consumer. Okay.
7         THE WITNESS: I'm aware of that.
8  BY MS. FOUNTAIN CONNOLLY:
9         Q.  So you realize that the filing of your
10 objection may have the effect of delaying payments
11 to some of those people who are so sick?
12        MR. COCHRAN: Objection. You're
13 referring to the appeal, not the objection.
14        MS. FOUNTAIN CONNOLLY: Well, the
15 objection could delay it too.
16        MR. COCHRAN: All right. Go ahead and
17 answer. You were talking about the appeal before.
18 I think it's confusing her.
19        THE WITNESS: Can you repeat the
20 question, please?
21 BY MS. FOUNTAIN CONNOLLY:
22        Q.  Sure. Do you have any understanding

Page 43

1  that your filing of this objection and the
2  resolution of it may delay payments to people who
3  are very sick and elderly?
4         A.  I believe it's possible. I would
5  discuss that with my attorneys.
6         Q.  One of the reasons that you're objecting
7  to this settlement is because you're concerned
8  that the ISHPs got a quick pay but consumers are
9  still waiting for their payments, right?
10        A.  Yes.
11        Q.  That's a concern to you?
12        A.  Yes.
13        Q.  And you would like for consumers to get
14 paid as soon as possible; is that right?
15        A.  I want it to be fair though. That's
16 most important.
17        Q.  And your view of fair is to make sure
18 that cash payers get some type of distribution
19 from the settlement; is that correct?
20        A.  Correct.
21        Q.  Okay. You understand that you, as
22 opposed to the Pentzes, have sought to become a

Page 44

1  class representative in this case. Do you have
2  that understanding?
3         A.  Yes.
4         Q.  What is your understanding of what a
5  class representative is?
6         A.  I represent the co -- or I'm
7  representing for the whole payer and I'm
8  representing the co-pay plaintiffs.
9         Q.  And when you say co-pay plaintiffs, you
10 mean percentage co-pays, right?
11        A.  Yes.
12        Q.  I'm just glancing at Exhibit 1 again,
13 and it looks like the co-pays, at least for this
14 one drug on here, are flat co-pays. Do you have
15 evidence of your having paid percentage co-pays
16 for the drugs at issue in this case?
17        A.  I want to make sure I understand your
18 question. Can you repeat that?
19        Q.  Sure. Do you have evidence of your
20 having paid a percentage co-pay for any of the
21 drugs at issue in this case?
22        A.  No.

Page 45

1         Q.  Do you still want to represent that
2  group of consumers?
3         A.  I want to represent the whole payers for
4  sure. I don't believe that the percentage co-
5  payors were adequately represented in the
6  settlement amount.
7         Q.  What's your understanding of the duties
8  of the class representative?
9         A.  My duty is to make sure that people such
10 as myself receive benefit, and that it's proper
11 and reasonable, with the help of my attorneys, and
12 my rights are considered.
13        Q.  Do you have an understanding that part
14 of your duties as a class representative is to,
15 for example, appear for today's deposition, to
16 produce documents, and things like that?
17        A.  Yes.
18        Q.  Have you heard the term that class
19 representatives have a fiduciary duty to the class
20 that they seek to represent? Have you ever heard
21 that term?
22        A.  No.

Henderson Legal Services, Inc.

202-220-4158                                                        www.hendersonlegalservices.com

Connick, Corinna                                                                           March 24, 2009
Cleveland, OH

Page 50

1   question is.
2   BY MS. FOUNTAIN CONNOLLY:
3       Q.   Do you understand the question?
4       A.   I am --
5       Q.   Restate it?
6       A.   Can you please restate it.
7       Q.   Is your objection regarding the
8   allocation process, is the objection the fact that
9   there were no consumers on the allocation
10  committee, or is your objection to the result of
11  the allocation?
12      MR. COCHRAN:  Well, you're excluding
13  both, doesn't have to be one or the other.  It's a
14  non-fair question.
15      MS. FOUNTAIN CONNOLLY:  Well, that's
16  your objection.
17  BY MS. FOUNTAIN CONNOLLY:
18      Q.   Do you understand the question?
19      A.   I understand the question.  I'm not --
20  I'm not sure I understand.
21      Q.   This sentence says, "No consumer
22  plaintiffs were involved in negotiations about the

Page 51

1   allocation of the settlement fund."
2       Are you objecting to the fact that there
3   were no consumers who were involved in the
4   allocation itself?
5       A.   I am objecting to that we were -- the
6   settlement allocation -- we were excluded in the
7   settlement allocation.
8       Q.   So you were excluded by not having
9   consumers on the allocation committee, or you were
10  excluded because there was no portion that was
11  allocated to cash payers?
12      A.   I believe I'm objecting to both.
13      Q.   That's what I wanted to understand.
14  You've referred to in your testimony when you talk
15  about in this objection on Page 2 the McKesson
16  case; is that right?
17      A.   Yes.
18      Q.   Have you reviewed any documents from the
19  McKesson case?
20      A.   I have just gone over it with my
21  husband, and that was about it.  I have not
22  reviewed the document itself.

Page 52

1       Q.   So your husband's just explained to you
2   what happened in that case?
3       A.   Right.
4       Q.   What, in general, has he told you about
5   that case?
6       MR. COCHRAN:  Objection.
7   Attorney/client privilege.
8       MS. FOUNTAIN CONNOLLY:  Her husband is
9   acting as her attorney?
10      THE WITNESS:  He's my personal attorney.
11  BY MS. FOUNTAIN CONNOLLY:
12      Q.   In this case?  Where is your retainer
13  agreement with him?
14      MR. COCHRAN:  For the record, it's her
15  husband.  He's not charging her.
16      MS. FOUNTAIN CONNOLLY:  What do you mean
17  he's not charging her?
18      MR. COCHRAN:  I'm not sure what you
19  mean.
20      MS. FOUNTAIN CONNOLLY:  I don't
21  understand what you mean by he's not charging her.
22      MR. COCHRAN:  I mean by that what I just

Page 53

1   said.
2       MS. FOUNTAIN CONNOLLY:  Well, you
3   haven't raised the objection to any other
4   discussions that she's had with her husband the
5   entire morning.
6       MR. COCHRAN:  You haven't asked for
7   specific communications, what did he say to her,
8   what did she say to him until now.  You've asked
9   who did they consult with and what subject matter
10  and how did she find out.  I understand -- if you
11  want to read back the question, maybe I'm
12  misstating it.
13      (Question read back.)
14      MR. COCHRAN:  Yeah.  I think you can ask
15  her what she knows about the case, but I don't
16  think you can ask her what her attorney -- one of
17  her attorneys specifically has said to her.
18      MS. FOUNTAIN CONNOLLY:  Okay.
19      MR. COCHRAN:  You can ask her what the
20  source of her knowledge of it, what she knows.
21  But to ask her specifically what did your husband
22  say to you when he's acting as her attorney in

14 (Pages 50 to 53)

Connick, Corinna                                                    March 24, 2009
Cleveland, OH

Page 62

1        MR. COCHRAN:  Okay.
2        THE WITNESS:  I'm not sure.
3    BY MS. FOUNTAIN CONNOLLY:
4        Q.   You have, if you turn to Page 6 of your
5    objection, the last sentence of the partial first
6    paragraph, so above, "The Court should require the
7    parties," it says, "The suspect allocation of the
8    settlement fund between consumers and
9    institutional plaintiffs in this case is
10   compounded by the difficulty of filing a consumer
11   claim form."  And I'll represent that the sentence
12   goes on, but I'm going to stop there.
13       What do you believe to be difficult
14   about filling out the consumer claim form in this
15   case?
16       A.   Well, I feel that there's a lot of
17   people that don't even know this is going on.
18   They may never find out this is going on.  And
19   there are older people, there are people who are
20   mentally not capable of filling out the form, but
21   yet they are entitled to receive their benefits.
22       And if there's an easier way out there

Page 63

1    to get it to them, that's what we should do;
2    that's what should happen.
3        Q.   Have you looked at the claim form
4    itself?
5        A.   No, I have not.
6        Q.   So you're just saying in general it
7    would be easier for people to get checks --
8        A.   Yes.
9        Q.   -- than to fill out a form?
10       A.   Yes.  If the information is there, it
11   should be used.
12       MR. COCHRAN:  Page 7.
13       MS. FOUNTAIN CONNOLLY:  Page 7?
14       MR. COCHRAN:  Oh, I thought that's where
15   we were going.
16   BY MS. FOUNTAIN CONNOLLY:
17       Q.   No.  We've covered a lot of this.  So I
18   don't want to duplicate what we've talked about
19   before already.
20       If you turn to Page 8, in the first full
21   paragraph it starts with, "Class counsel have
22   requested," there's a sentence there that starts

Page 64

1    with, "There is only one problem, Class Counsel
2    does not represent the ISHPs, who will receive
3    51.8 million of the $125 million total, and,
4    therefore, there is no basis for Class Counsel to
5    request any portion of that 51.8 million under the
6    common benefit doctrine."
7        I just wanted to clarify that that is
8    actually your position, that there is no basis for
9    class counsel to request any portion of those
10   funds; is that the case?
11       A.   I don't think they should get 30 percent
12   of the 51 or the 52 million.  That seems awfully
13   high for a group that has their own attorneys and
14   who were charged by their attorneys.
15       Q.   Do you have any understanding that class
16   counsel represented those large ISHPs throughout
17   the course of this litigation?
18       A.   That -- I do not believe that to be my
19   understanding.  I believe they had their own
20   attorneys.
21       Q.   Would that change your understanding of
22   class counsel's entitlement to some of that fee if

Page 65

1    you knew that class counsel had represented some
2    of these ISHPs throughout the course of the
3    litigation?
4        A.   I would have to discuss that with my
5    attorneys.
6        MR. COCHRAN:  Couldn't that be a
7    conflict of interest?
8        MS. FOUNTAIN CONNOLLY:  I don't think
9    I'm the one under examination here.
10       MR. COCHRAN:  No.  I'm just saying your
11   suggestion that you're representing the class and
12   at the same time you're representing the ISHPs,
13   that suggested that in the question to the
14   witness.  I'm saying, how could that be?  Wouldn't
15   that be a conflict of interest since they're
16   fighting against each other for the same fund?
17       MS. FOUNTAIN CONNOLLY:  The question was
18   throughout the course of the litigation, not
19   during the allocation process.
20       MR. COCHRAN:  Well, in the course of the
21   litigation, wouldn't that still be a conflict of
22   interest?

17 (Pages 62 to 65)

Connick, Corinna                                                                                          March 24, 2009
Cleveland, OH

Page 70

1    lodestar to the Track Two cases."?
2         MR. COCHRAN:  Now, wait a minute.  For
3    the record, we don't want to trick the witness I
4    don't think, do you?  I mean, that is thrown out
5    as an example to illustrate -- he's not saying
6    there that they do represent 10 percent.  He's
7    just saying if there's 10 percent, they should get
8    10 percent of the lodestar roughly.  If they're 20
9    percent, the lodestar should be 20 percent.
10        I don't know if you're trying to examine
11   the factual question which is just a postulation
12   in the pleading.
13        MS. FOUNTAIN CONNOLLY:  I asked her what
14   she meant by that sentence.  I don't think there's
15   anything tricky about that if she actually read
16   the objection.
17   BY MS. FOUNTAIN CONNOLLY:
18        Q.  Can you tell me what you mean by that
19   sentence?
20        A.  I believe what that means is if the
21   Track Two defendant in this case represents 10
22   percent -- represents 10 percent of the total

Page 71

1    defendants in this case, the overall of the
2    defendants in this case, that 10 percent of the, I
3    would say the judgment should fall on their
4    shoulders.
5         Q.  So, in other words, let's say
6    hypothetically there were only ten defendants in
7    this case.  And one of those defendants was the
8    Track Two defendant, so 10 percent.
9              That's the basis that you're using to
10   pick the -- that's the basis that you're using to
11   conclude that class counsel should get 10 percent
12   of an overall lodestar?
13        A.  That's my understanding.
14        Q.  So it's just the number of the
15   defendants should determine the relationship of
16   the percentage of lodestar that class counsel
17   gets; is that what you're saying?
18        A.  I believe that's reasonable.
19        MR. COCHRAN:  Are we done with that
20   exhibit?
21        MS. FOUNTAIN CONNOLLY:  Yes.  We're done
22   with that exhibit.

Page 72

1         MR. COCHRAN:  More exhibits.
2         MS. FOUNTAIN CONNOLLY:  More filings.
3              (And thereupon, Exhibit Connick 004
4    was marked for purposes of identification.)
5    BY MS. FOUNTAIN CONNOLLY:
6         Q.  I've handed you what's been marked as
7    Connick Exhibit 4.  Can you tell me what that is,
8    please?
9         A.  I want to intervene in this class
10   action.  I feel that the designated counsel has
11   not done an adequate job in representing consumer
12   plaintiffs.
13        MR. COCHRAN:  Off the record.
14        (Off the record.)
15        (Question read back.)
16   BY MS. FOUNTAIN CONNOLLY:
17        Q.  So what is your understanding of what
18   you would actually be doing in intervening?
19        MR. COCHRAN:  Objection.  Go ahead.
20        A.  Repeat that for me, please.
21        Q.  You've moved to intervene.  What's your
22   understanding of what that means?

Page 73

1         A.  I'm -- I do not feel that the designated
2    counsel has done a good job in representing the
3    consumers in this case.  And I'm not sure I
4    finished.  Repeat it again.
5         Q.  Do you have any understanding -- let me
6    rephrase the question.
7              Do you have an understanding of the
8    difference between objecting to a class action
9    settlement and moving to intervene in a case?
10        A.  Yes.  Intervening means I want to
11   basically, with the help of my attorneys, take
12   over the consumer portion of the claim because the
13   designated counsel did not do an adequate job of
14   representing the consumer plaintiffs.
15        Q.  And when you say take over the consumer
16   portion, are you referring to the percentage co-
17   pay portion and the cash pay portion, or just the
18   cash pay portion?
19        MR. COCHRAN:  Or and/or.
20        A.  Both.  Or one.  Or the whole, one.
21        Q.  Other than what's stated in your
22   objection, which we talked about extensively

19 (Pages 70 to 73)

Henderson Legal Services, Inc.

Page: 1

M E D I C A L   E X P E N S E S

CONNCO1
Patient: CONNICK, CORINNA            Pharmacy: GIANT EAGLE PHARMACY #4098
RespPty:                                       351 CENTER STREET
                                               CHARDON      OH 44024
**REDACTED**                                   RPh: URBANIAK, DOUGLAS E
                                               NCPDP#: 3668300
 Birth: 06/10/1965

Prescriptions:                       Date: 01/01/2007 TO 12/31/2007

| LastFill | Rx # | Drug Name | Qty | Physician Name | T/P | Price | RPh |
|---|---|---|---|---|---|---|---|
| 01/27/07 | 6131051 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | BS |
| 02/20/07 | 6131051 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | MER |
| 03/23/07 | 6131051 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | BS |
| 04/17/07 | 6131051 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | MER |
| 05/11/07 | 6131051 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | BS |
| 07/06/07 | 6160142 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | BS |
| 08/04/07 | 6163220 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | DEU |
| 08/29/07 | 6165883 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | MER |
| 09/06/07 | 6165883 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | MER |
| 10/22/07 | 6165883 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | MER |
| 11/09/07 | 6165883 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | BS |
| 12/08/07 | 6176764 | CLIMARA   0.1MG | 4 | Dr.MCGREW | | 55.99 | BS |
| 12/17/07 | 6165883 | JUNEL FE 1.5-30 | 28 | Dr.MCGREW | ATH | 10.00 | DEU |

 Report Date: 03/11/2009                              $175.99


 Attested To By:  _____
                  Registered Pharmacist

Connick Exhibit 1
Date 3-24-09 Pages 2



REDACTED

# OUR GENERIC DRUG PROGRAM JUST GOT BETTER!

## Your prescription may qualify for our new three-month program. Now get 90 days of medication for just $10!



**Physician prescription required to convert from a 30-day to a 90-day supply.**

Generic pricing covers a 30-day supply for $4.00 or a 90-day supply for $10.00. Additional medications are offered at various reduced rates. See GiantEagle.com or a pharmacist for details. $4 program covers medications for a 30-day supply of eligible drugs at commonly prescribed dosages. $10 program covers medications for a 90-day supply of eligible drugs at commonly prescribed dosages. Physician permission may be required to change from a 30-day to a 90-day prescription.

Some insurance plans, including government-funded prescription programs, may not cover a 90-day supply. Program enrollment may be required to receive reduced pricing, depending on state of residence. Some restrictions may apply. See pharmacy for details. Giant Eagle reserves the right to discontinue or modify these programs at any time.

# Exhibit 6

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4      ----------------------------X

5      IN RE: PHARMACEUTICAL          : MDL NO. 1456

6      INDUSTRY AVERAGE WHOLESALE     : C.A. No.

7      PRICING LITIGATION             : 01-CV-12257-PBS

8      ----------------------------X

9      THIS DOCUMENT RELATES TO:      :

10     ALL CASES.                     :

11     ----------------------------X

12

13

14              DEPOSITION OF JOHN PENTZ

15

16

17          Taken in the offices of Monroe County

18     Bar Association, 913 Main Street, Stroudsburg,

19     Pennsylvania, on Monday, March 23, 2009, commencing

20     at 10:07 a.m. before Melissa A. Snerr, Registered

21     Professional Reporter.

22

Pentz, John                                                                                    March 23, 2009
Stroudsburg, PA

Page 10

1      A.   No.
2      Q.   Okay.  The drug -- well, before we talk
3   about the details of your claim, what is it you're
4   hoping to accomplish by being an objector?
5      A.   Well, to receive the amount that we had
6   to pay for that drug.
7      Q.   And the drug we're talking about is
8   Epogen today?
9      A.   Yeah.  Epogen.
10     Q.   Do you know why you were taking that?
11     A.   Well, it was prescribed by the doctor
12   that was treating me.
13     Q.   I understand.
14     A.   And --
15     Q.   You don't know what -- what condition
16   you were taking the Epogen for?
17     A.   No.  I wasn't familiar with that.  I was
18   really -- really out of it when I was initially
19   hospitalized, and I had to take that drug among --
20   you know, it seemed to be a whole lot of other
21   drugs, and -- and I never did go back and review
22   and say, well, why did I have to take this or take

Page 11

1   that or --
2      Q.   Okay.
3      A.   I relied on the -- on the physicians.
4      Q.   So when you say your hope being an
5   objector is to get what you paid, we're talking
6   about that $800 number or whatever you mentioned
7   before?
8      A.   Whatever it was, our out-of-pocket that
9   was not paid for by Medicare.  And I think we had
10   a Blue Cross/Blue Shield supplement that paid a
11   little, too.
12     Q.   Do you -- do you have any hope or
13   expectation to get anything beyond that out-of-
14   pocket payment?
15     A.   No.
16     Q.   Do you have any hope or expectation that
17   your attorney will get anything beyond you getting
18   an out-of-pocket payment?
19     A.   Well, I -- he's pro bono as far as we're
20   concerned.  But I mean, I hope he will be paid for
21   his time and services.
22     Q.   Who would you expect to be paying him

Page 12

1   for this?
2      A.   Well, it would be the drug company that
3   -- what did you say it was?  The Epogen?
4      Q.   Epogen is one of the drugs made by a
5   company named Amgen; is that what you're asking?
6      A.   Right.
7      Q.   Have you been -- have you made claims in
8   class actions previously?
9      A.   No.
10     Q.   Have you ever been an objector to class
11   actions --
12     A.   No.
13     Q.   -- previously?  Do you own a company
14   called Tri-County Abstract Company?
15     A.   Yes.
16     Q.   Okay.  And are you aware that Tri-County
17   Abstract Company made an objection in an MCI case?
18     A.   I vaguely recall that that --
19         MR. PENTZ:  I'm going to object.
20   Generally, you're talking about a different party,
21   Tri-County Abstract, not my father.  He's here
22   today as John Pentz, individual consumer, not --

Page 13

1   not a company.
2         MR. MACORETTA:  Fair enough.
3   BY MR. MACORETTA:
4      Q.   Did you -- did you personally make any
5   objections in the MCI case?
6      A.   No.
7      Q.   Okay.  And if there's an objection with
8   your name on it as an objector in the MCI case,
9   you're not aware of that?
10     A.   No.
11     Q.   Okay.  Do you know if your wife made an
12   objection in the Tri-County -- in the MCI case?
13     A.   I don't know how she would be involved
14   if she were.  I -- whether she was or was not.  I
15   don't know.
16     Q.   Does your wife have a realty company?
17     A.   Yes.
18     Q.   Connie Pentz Realty?
19     A.   Yeah.
20     Q.   Do you know of any other -- and you
21   don't remember any other cases in which you were
22   an objector?

4 (Pages 10 to 13)

Pentz, John                                                                                    March 23, 2009
Stroudsburg, PA

Page 18

1  aware of any other drugs that you purchased that
2  were on any of those lists that you've seen, Mr.
3  Pentz?
4       A.   I think my wife had spotted one or two,
5  and when she comes in, you can get that from her.
6            MR. MACORETTA:  You know what?  Why
7  don't we mark -- why don't we mark that one as
8  well.
9            (Exhibit Pentz 003 was marked for
10 identification.)
11 BY MR. MACORETTA:
12      Q.   And I should ask you, do you have some
13 kind of overall philosophical objection or
14 disagreement with class action suits generally?
15      A.   No.
16      Q.   And this case we're here about, the AWP
17 litigation, can you tell me generally what you
18 understand the case to be about?
19      A.   The main class action suit?
20      Q.   Yes.  The main suit.
21      A.   I know very little about it, except the
22 general aspect of class actions which is suits on

Page 19

1  behalf of everybody that may have suffered loss or
2  have claims for the defendants in the class action
3  suit.
4       Q.   I understand that's what a class action
5  is generally.  I'm asking if you understand what
6  the main allegations of the AWP case are.
7       A.   No.  No.
8       Q.   Do you -- but you understand that --
9  well, you're claiming to be in a class of people
10 who are part of the plaintiff class, right?
11      A.   I assume so.  I rely on my son to know
12 what the legal aspects are of this class action
13 suit.
14      Q.   So the plaintiff class that you may or
15 may not be a part of, do you know what they're
16 claiming or why they're suing these folks?
17      A.   I don't know the details of the actions.
18      Q.   You don't know who any of the defendants
19 are?
20      A.   No.
21      Q.   Okay.  And you don't know what law the
22 case is proceeding under?

Page 20

1       A.   No.
2       Q.   Do you know how long the case has been
3  going on?
4       A.   No.
5       Q.   The -- all right.  We'll come back to
6  that.
7            Mr. Pentz, I'm going to show you three
8  documents which we've marked as Exhibits 1, 2, and
9  3.  I'm probably going to start with Exhibit 3,
10 but take a look at all of them right now
11 (handing).
12      A.   Oh, yeah.  These are the drugs that I --
13      Q.   Okay.  Let's just -- I'm going to talk
14 to you about that in a second.  I just want you to
15 take a look at it right now.
16           MR. PENTZ:  Do you recognize this?
17           THE WITNESS:  Yes.
18           MR. PENTZ:  This is the subpoena they
19 served on you?
20           THE WITNESS:  Yeah.  Uh-huh.
21           MR. PENTZ:  That is the objection.
22           THE WITNESS:  Uh-huh.

Page 21

1  BY MR. MACORETTA:
2       Q.   All right.  Let's look at that Exhibit 3
3  first -- or let me know when you've taken a look
4  at all three, Mr. Pentz.
5       A.   Yes.  Yeah.
6       Q.   I don't want to rush you.  Let's look at
7  that Exhibit 3, first of all.  This is a document
8  you sent to us saying that this is a record that
9  supports the amount of money you paid relevant to
10 this case?
11      A.   Yes.  Yes.
12      Q.   You've seen this before?
13      A.   Yes.
14      Q.   Now, according to your lawyer, this is
15 the only document you have that supports your
16 claim here.  Do you know of any other documents
17 you have relating to your Epogen prescriptions?
18      A.   Well, I assumed we did get receipts for
19 these when they were purchased, but we wouldn't
20 have those now.
21      Q.   Do you know how you would've paid this
22 $527, and 300-and-some-dollar amount?

Henderson Legal Services, Inc.

202-220-4158                                                            www.hendersonlegalservices.com

Pentz, John                                                                                          March 23, 2009

Stroudsburg, PA

Page 22

1    A.   Well, I would assume -- and I am fairly
2  certain it was by check.
3    Q.   That's how you typically paid for
4  things?
5    A.   Yes.
6    Q.   And this piece of paper shows one, two,
7  three, four prescriptions or Epogen.  Do you have
8  a recollection that you were on Epogen longer than
9  that or --
10   A.   No.
11   Q.   So you think that you only got four
12 prescriptions for Epogen?
13   A.   That's my knowledge.  And my wife was in
14 charge of all of this at the time, and I was --
15   Q.   This Epogen, did you have to -- how did
16 you take that?
17   A.   I think it was a pill.
18   Q.   Do you remember getting any medicines
19 that you had to get injected with a syringe?
20   A.   No.  But they could have been.  I
21 wouldn't remember.
22   Q.   And at least some of the time, it seems

Page 23

1  like an insurance company paid for your Epogen; is
2  that your understanding?
3    A.   Well, we had Medicare, and then we had
4  this supplement, which I think was through Blue
5  Cross and Blue Shield.  But my wife had arranged
6  for that, and she's familiar with what that's all
7  about.
8    Q.   Okay.  But at least on one occasion, it
9  seems like the insurance company didn't pay for
10 it.  Was that your understanding, too?
11   A.   Yes.
12   Q.   Do you know why that was, that they
13 didn't pay -- that they paid for it some of the
14 time and not others?
15   A.   No.
16   Q.   You still have the same coverage with
17 Blue Cross?
18   A.   Yes.
19   Q.   If you notice on there, there's also a
20 notation for some syringes.  You see it says B-D
21 TB syringe a couple of places if you look below
22 the Epogen prescriptions?  Do you know -- do you

Page 24

1  have any recollection of buying or getting any
2  syringes at the pharmacy?
3    A.   I do not have any recollection of that
4  or what they were used for.
5    Q.   You don't recollect taking the Epogen in
6  a syringe?
7    A.   No.  I would not recall how I took any
8  of these drugs back at that period of time.
9    Q.   And do you know who makes Epogen?
10   A.   No.
11   Q.   Do you know if the company that makes
12 Epogen is a defendant in the AWP litigation?
13   A.   No.  I would rely on my son to be aware
14 of that.
15   Q.   So as it relates to Epogen, what -- do
16 you understand what it is that all the defendants
17 are alleged to have done wrong in connection with
18 Epogen?
19   A.   Well, there was an excessive -- where we
20 had to pay for them, and I thought at the time it
21 was an excessive charge for that drug.
22   Q.   Do you know what -- what the allegation

Page 25

1  was as to why it was excessive at all?
2    A.   No.
3    Q.   Ever heard of the AWP price?
4    A.   No.
5    Q.   The average wholesale price?
6    A.   No.
7    Q.   Do you know if you ever paid for any
8  drugs based on an average wholesale price?
9    A.   No.  I don't know at all about that.
10   Q.   And -- well, since it appears that your
11 insurance company didn't pay for this -- at least
12 one injection of Epogen, do you know if you ever
13 called the insurance company and asked them or
14 tried to dispute that nonpayment?
15   A.   I would not have done it.  If it were
16 done, it would be my wife who would have made the
17 call.  And I'm not quite certain what she knew or
18 didn't know or what she did at that time.
19   Q.   Sure.  And so -- okay.  And you said
20 you're 81 now?
21   A.   Well, 80 and a half.  September 2nd, I
22 am 81.

7 (Pages 22 to 25)

Henderson Legal Services, Inc.

Pentz, John                                                                              March 23, 2009
Stroudsburg, PA

Page 30

1    Q.   Okay.  So you don't remember what, if
2  anything, you got for being an objector in that
3  Tri-County Abstract -- in that MCI case?
4        MR. PENTZ:  Objection.  To --
5        MR. MACORETTA:  What's the objection?
6        MR. PENTZ:  No foundation.  What you
7  got, you said.
8  BY MR. MACORETTA:
9    Q.   Were you an objector in the MCI case,
10  Mr. Pentz?
11        MR. PENTZ:  Asked and answered.  He
12  doesn't remember, no.
13    Q.   Do you know if you received anything of
14  value for being an objector in the MCI case?
15    A.   I would guess that I didn't receive
16  anything.
17    Q.   Do you know why you were an objector in
18  that case?
19    A.   Is that the Tri-County Abstract case?
20    Q.   Tri-County Abstract was an objector in a
21  case against MCI.
22    A.   Uh-huh.

Page 31

1    Q.   Do you know what the basis of it was, of
2  your objection?
3        MR. PENTZ:  Objection.  It's Tri-County
4  Abstract, not my father.
5        MR. MACORETTA:  Well, it's both of them
6  actually, when I read the objection.
7        MR. PENTZ:  But he didn't recall it at
8  all, so --
9        MR. MACORETTA:  Well, then he'll tell me
10  he doesn't recall it.
11        THE WITNESS:  I don't recall.
12        MR. PENTZ:  He's already said that.
13  BY MR. MACORETTA:
14    Q.   Do you know what happened with that
15  objection, whether or not it was withdrawn or
16  something --
17    A.   No.
18    Q.   -- changed in -- no?  Okay.
19        And as we sit here today, do you know of
20  any other cases in which you -- or in which you or
21  any business you have an interest in was an
22  objector?

Page 32

1    A.   No.
2    Q.   Do you know of any other cases in which
3  your son represented any of your family member
4  members as an objector?
5    A.   No.
6    Q.   Do you know in the MCI case whether or
7  not your attorney received anything of value?
8    A.   My attorney?
9    Q.   Yes.
10    A.   No.  I don't know anything about that.
11    Q.   Is it your plan that you would file a
12  claim as a class member in this settlement to get
13  some of your money back for your Epogen?
14    A.   I assume that that is the procedure that
15  is followed.  I would rely on my son as the
16  attorney and who has knowledge in this field to
17  advise me as to what -- whether I would be a part
18  of a certain class or what have you.
19    Q.   And if you were a member of the class,
20  would you intend then to file a claim to get some
21  of your money back?
22    A.   Yes.

Page 33

1    Q.   Do you have any idea or expectation as
2  to how much of your money you would expect to get
3  back as part of the settlement?
4    A.   No.  I would rely on what my son would
5  advise on that score.
6    Q.   If you could take a look at your
7  objection, which we marked previously as Exhibit 1
8  --
9    A.   Yes.
10    Q.   -- and the bottom of page one, there's a
11  heading that says Roman Numeral I?
12    A.   Yes.
13    Q.   Consumer class members have not been
14  adequately represented and the settlement
15  allocation excludes those class members who were
16  most harmed.  What do you mean when you say class
17  members have not been adequately represented?
18    A.   Well, here I would rely on my son, who
19  must have investigated that aspect of this class
20  action suit.
21    Q.   Okay.  Well -- so you don't know
22  anything about it yourself?

9 (Pages 30 to 33)

Page 34

1    A.   No.  No.
2    Q.   And at the bottom of page one into page
3  two, it says -- it references Jeffrey Goldenberg
4  of Cincinnati.  It says, Mr. Goldenberg was
5  particularly inadequate as he agreed to an
6  allocation that provides no portion of the
7  settlement fund to class members.
8       Do you know Mr. Goldenberg?
9    A.   No.
10    Q.   What's your basis for saying he was
11  inadequate?
12    A.   Well, number one, this is recommended
13  after my son had examined the records and that
14  sort of thing.  But just what I know generally
15  about class action suits, I can't imagine this
16  attorney not going to bat for the class members
17  that weren't part of insurance claims and that
18  sort of thing.
19    Q.   So you don't think he went to bat for
20  class members?
21    A.   Well, he didn't.
22    Q.   Why is that?

Page 35

1    A.   If he did, there would have been notices
2  sent out, I assume, advising of this class action
3  suit, and we --
4    Q.   Well, how did you learn about the class
5  action suit?
6    A.   My son advised Connie.  I guess she
7  asked him about this Epogen, I believe.
8    Q.   I'm sorry.  Did -- did your son tell
9  your wife, or did your wife ask your son?
10    A.   You'll have to get her.  I think --
11       MR. PENTZ:  I object to that.  You're
12  asking about knowledge of someone not in the room.
13       MR. MACORETTA:  Fair enough.
14       THE WITNESS:  Yeah.
15  BY MR. MACORETTA:
16    Q.   And you don't know how many defendants
17  are in the suit, right?
18    A.   No.
19    Q.   Do you know if there have been
20  settlements with other defendants?
21    A.   No.
22    Q.   You don't know the terms of any of the

Page 36

1  settlements then, do you?
2    A.   No.
3    Q.   And the settlement we're talking about
4  here, do you know how big it is overall?
5    A.   No, except what's in the brief that was
6  present -- or not the brief, but the objections.
7    Q.   Okay.  Well, the settlement overall
8  we're talking about here is $125 million.  Does
9  that figure sound familiar to you?
10    A.   I think that was set forth in these
11  objections, yes.
12    Q.   And do you understand that that money is
13  split somehow between consumers and insurance
14  companies?
15    A.   Yes.
16    Q.   Do you know how that split between
17  consumers and insurance companies was arrived at?
18    A.   Absolutely not.
19    Q.   Do you know anything about the
20  negotiations that led to that split?
21    A.   No.
22    Q.   Do you know what factors were considered

Page 37

1  by the people representing the insurance companies
2  or the consumers?
3    A.   No.
4    Q.   Then what's your basis for saying that
5  split was inadequate?
6    A.   Advice of my son who's knowledgeable in
7  these things.
8    Q.   But you don't know -- as you sit here
9  today, you can't tell me any factor?
10    A.   No.
11    Q.   And there were some pretty good shots at
12  attorneys in this objection, Mr. Pentz.  On page
13  three, middle of the page, there's a suggestion
14  that, while the consumers' interests were
15  allegedly, quote, represented, close quote, by
16  attorneys who were merely assigned to be a proxy
17  for the consumers but who actually -- but who did
18  not actually represent any.  Do you know who these
19  attorneys you're talking about here are?
20    A.   No.
21    Q.   Okay.  Do you have any -- what is your
22  basis for concluding that they somehow did not

Pentz, John                                                                                         March 23, 2009
Stroudsburg, PA

Page 50

1       MR. MACORETTA: Sure. That's no --
2       MR. PENTZ: Thank you.
3       MR. MACORETTA: Sure.
4           (A recess was taken from 10:53 a.m.
5   to 11:04 a.m.)
6           (Andrew Hurst, Esq., called in on
7   conference call.)
8       MR. MACORETTA: We're back on the
9   record.
10      THE WITNESS: I wanted to make a
11  statement to you in reference to your questions
12  pertaining to the contingent fees that are
13  involved in this action. I am not at all familiar
14  with what is the status of these various parties
15  and their attorneys, and I didn't mean to tell you
16  or say anything at all about whether or not any
17  fees that were being charged were fair or not
18  fair. That's -- my son is the one who has the
19  knowledge of the -- what's involved in these
20  cases, and -- and I've entirely relied on him for
21  that determination.
22  BY MR. MACORETTA:

Page 51

1       Q.   Okay. I understand, but you're -- you
2   are the objector, right?
3       A.   Yeah.
4       Q.   Okay. And you're an attorney as well,
5   right?
6       A.   Yes.
7       Q.   And as an attorney, you don't feel that
8   you would have some obligation to understand the
9   basis of an objection you're making to somebody
10  else's fees?
11      A.   If I have another attorney that has
12  analyzed the case involved, I would rely on his
13  expertise and opinion, yes.
14      Q.   Okay. And you don't know any of the
15  factors yourself, right? You're completely
16  relying on your attorney's --
17      A.   Yes.
18      Q.   And one of the objections is about these
19  ISHPs, these independent settlement health plans.
20  And you understand that you're objecting that the
21  attorneys who generated the settlement shouldn't
22  get paid a fee on the money going to the ISHPs?

Page 52

1   Do you understand that to be part of your
2   objection?
3       A.   No.
4       Q.   Do you know if you're objecting to that
5   or not?
6       A.   I would have to read this again to see
7   if that is a specific objection. I would rely on
8   my son to tell me whether that is or is not.
9       Q.   Well, let's say it is one of your
10  objections, that you're objecting to the attorneys
11  -- the class counsel getting a fee on money going
12  to the ISHPs. Here's my question, Mr. Pentz. How
13  does that harm you? Is there some way that you get
14  less money because the attorneys are getting a fee
15  on a different portion of the settlement?
16      MR. PENTZ: Objection. He says he
17  doesn't know what ISHPs are. He didn't know that
18  one of the objections is going to them. And how
19  could he --
20      MR. MACORETTA: It's his objection. I
21  don't know. He can tell me he doesn't know the
22  answer.

Page 53

1       THE WITNESS: I don't know the answer.
2   BY MR. MACORETTA:
3       Q.   Okay. Do you understand generally that
4   fees are awarded here on a percentage of what's
5   recovered?
6       A.   I don't know that, either.
7       MR. PENTZ: Object to the form of the
8   question, here.
9       Q.   Do you understand that in the AWP
10  litigation in prior settlements, fees have been
11  awarded as a percentage of the amount recovered?
12      A.   No.
13      Q.   Do you understand that in this
14  particular settlement to which you have objected,
15  class counsel is asking for fees as a percentage
16  of the amount obtained?
17      A.   I believe that's stated in the
18  objections, and to that extent, I am aware of it.
19      Q.   So you don't have any opinion at all as
20  to what a fair percentage of fees would be for the
21  attorneys who generated the settlement?
22      A.   No.

14 (Pages 50 to 53)

Pentz, John                                                                                                       March 23, 2009
Stroudsburg, PA

Page 54

1      Q.   Would you agree they get something?
2      A.   Pardon?
3      Q.   Would you agree that they get -- they
4   should get something?
5      A.   Oh, of course.
6      Q.   Okay.  Let me direct your attention to
7   the bottom of page eight and the top of page nine
8   of your objection.  The bottom of page eight,
9   there's a sentence that says, the total lodestar
10  is $81.8 million as of March of '08.  Then the
11  next sentence says, if the track two defendants
12  represent approximately ten percent of the total
13  defendants in the case, one may fairly apportion
14  ten percent of the overall lodestar to the track
15  two cases.  Do you see that?
16     A.   Yes.
17     Q.   Do you understand that the settlement
18  we're involved with here today involves the track
19  two defendants, right?
20     A.   I believe so.  I would request that I
21  would verify that with my son who is familiar with
22  the facts in the case.

Page 55

1      Q.   And if I told you the track two
2   defendants consist of about 14 drug companies, do
3   you have any reason to think that I'm wrong in
4   saying that?
5      A.   No.
6      Q.   Do you know how many other defendants
7   there are in the case?
8      A.   No.
9      Q.   Okay.  And if I read the sentence in
10  your objection, you're suggesting that counsel's
11  lodestar should be apportioned by what percentage
12  of the track two defendants are to the total
13  number of defendants in the case.  Is that your
14  understanding of what that sentence says?
15         MR. PENTZ:  Objection.  His
16  understanding -- he's already said he's standing
17  on his objection.  His understanding of it is not
18  material.
19         MR. MACORETTA:  He's the objector.  I'm
20  asking him for the understand -- if he can explain
21  to me what the sentence says.
22         MR. PENTZ:  He's the objector, but he's

Page 56

1   not the drafter and researcher of the objections.
2   He's made that clear.
3   BY MR. MACORETTA:
4      Q.   Okay.  Mr. Pentz, did you review this
5   objection at all before it was filed?
6      A.   I read it over and I -- when you started
7   talking about these percentages and on the basis
8   for them and so forth -- is completely out of my
9   field of knowledge of the facts in the case and
10  also what are the recommended divisions of --
11         MR. PENTZ:  Just give a yes or no
12  answer.  Did you read this over?
13         THE WITNESS:  Yes.
14  BY MR. MACORETTA:
15     Q.   After reading it over, did you have any
16  questions or comments on it?
17     A.   I had many questions, but I relied on my
18  son to advise me of why this, why that, and I have
19  -- I don't have the background or the knowledge of
20  facts or the law in -- in class action cases to
21  make a determination as to what is right or wrong.
22     Q.   So you read it over, and you ultimately

Page 57

1   approved your son filing it on your behalf, right?
2      A.   Of course.
3      Q.   Okay.  And in this objection, you're --
4   you're objecting both to the substance of the
5   settlement and the attorney's fees, right?
6      A.   Yes.
7      Q.   Okay.  But as to the attorney's fees,
8   you're telling me today you don't really have any
9   understanding of the percentage of the -- or the
10  arguments involving attorney's fees in your
11  objection, right?
12     A.   Well, I rely on what is set forth in
13  this brief by my son.
14     Q.   But you don't -- and I understand that
15  you rely on your son.  But I'm asking what your
16  understanding is beyond relying on him.
17     A.   I don't have any understanding beyond
18  that.
19     Q.   Okay.  So when you talk -- so that your
20  objection, which you read before, suggests that
21  lodestar could be an apportioned by a percentage
22  of total defendants in the case, you don't really

Henderson Legal Services, Inc.

202-220-4158                                                                          www.hendersonlegalservices.com

Pentz, John                                                                              March 23, 2009
Stroudsburg, PA

Page 58

1    know what that's talking about, do you?
2        A.   No.
3        Q.   Okay.  And you don't know what
4    percentage of the total defendants the track two
5    defendants are, right?
6        A.   No.
7        Q.   Okay.  And earlier on, the first half of
8    your objection, talking about really the
9    allocation among consumers of settlement funds,
10   you don't know the details behind any of those
11   objections, right?
12       A.   No.  Well, that's right, I don't know
13   the basis behind it.
14       Q.   Okay.  But you understand that you're
15   accusing the lawyers at least of inadequately
16   representing part of the class; is that right?
17       A.   Yeah.  The consumers right now are
18   not represented in this action.
19       Q.   And earlier on, you said that your
20   expectation from this would -- would be that you
21   would get some money back for the amount you
22   overpaid, right?

Page 59

1        A.   Right.
2        Q.   That's why you're doing this?
3        A.   Yes.
4        Q.   What do you think your -- what is your
5    expectation from your objection about attorney's
6    fees?  Meaning, what are you hoping to accomplish
7    by objecting to the attorney's fees?
8        A.   I would rely, again, on my son, who has
9    the knowledge and the background to determine
10   whether that should or should not be done.
11       Q.   Now, I understand whether -- the issue
12   is whether or not the attorney's fees should be
13   reduced.  My question is, what benefit are you
14   hoping to get by objecting to somebody else's
15   attorney fees?
16       A.   Well --
17           MR. PENTZ:  If you understand.
18       A.   I don't understand all of this.  You'd
19   have to -- I'd have to spend --
20       Q.   No.  No.  Okay.  Let me try again.  Let
21   me try again.
22           You would agree with me, wouldn't you,

Page 60

1    that you filed an objection, in part, to
2    attorney's fees in this case?
3        A.   Yes.
4        Q.   Okay.  What were you hoping to
5    accomplish by objecting to these attorney's fees?
6    Why are you objecting to attorney's fees?
7        A.   Well, to make more funds available from
8    this total settlement for my benefit, and to
9    reimburse my son for his services.
10       Q.   Okay.  And to reimburse your son for his
11   services.  Do you have any expectation or hope as
12   to what kind of reimbursement your son would get
13   for his services here?
14       A.   I haven't got any of that.  I don't know
15   now would what that would be.
16       Q.   There's no kind of referral arrangement
17   between you and your son --
18       A.   No.
19       Q.   -- over any fees you would get here --
20       A.   No.
21       Q.   -- right?
22       A.   No.

Page 61

1        Q.   What -- what value do you think your
2    son's services bring to the litigation here?
3        A.   Well, it brings a total value to get the
4    funds back that we didn't get reimbursed for from
5    the insurance companies.  And --
6        Q.   And on page three of your objection, you
7    object to the fact that consumers get a mere 17.5
8    percent of the settlement, while the insurance
9    companies, meaning the TPPs and the ISHPs, get
10   82.5 percent of the settlement.  Do you see that?
11   That's right in the middle of page three, that
12   first full paragraph, first sentence?
13       A.   Yeah.
14       Q.   Okay.  What is your basis for suggesting
15   that 17.5 percent is insufficient for consumers?
16       A.   Here again, I don't have the knowledge
17   in all this to make a determination.  I'm relying
18   upon my son.
19       Q.   So you -- you personally have no basis?
20       A.   No.  I personally don't have the
21   knowledge.
22           MR. PENTZ:  Objection.  He's answered

16 (Pages 58 to 61)

Pentz, John                                                                      March 23, 2009
Stroudsburg, PA

Page 62

1    that his basis is that he had an attorney research
2    it for him and he's relying on that.  That's not
3    no basis.
4        Q.   Other than what your attorney told you,
5    do you have any basis for objecting to this
6    allocation?
7        A.   I would say I don't have any knowledge
8    at all, and -- so I rely on his assessment and
9    determination as to that.
10       Q.   Okay.  Did you know that there were
11   other settlements in this case with other
12   defendants?
13       A.   I was aware that there were some made,
14   yes.
15       Q.   And you -- and did you know that in
16   those settlements, the settlement money was also
17   allocated between insurance companies and
18   consumers?
19       A.   No.
20       Q.   Oh, you didn't know that?
21       A.   No.
22       Q.   Okay.  So you don't know the basis or

Page 63

1    the factors that went into any allocation?
2        A.   No.
3        Q.   What do you think -- let me go back to
4    your attorney's fees for a second.  What would
5    resolve your objection?  What would be a fair
6    attorney's fee to resolve your objection, Mr.
7    Pentz?
8            MR. PENTZ:  Objection, form of the
9    question.
10           MR. MACORETTA:  What's wrong with the
11   form?
12           MR. PENTZ:  You're asking what would be
13   a fair attorney's fee to resolve his objections.
14   He's not an attorney.
15           MR. MACORETTA:  He is an attorney.
16           MR. PENTZ:  He's an attorney, but in
17   this case, he's the client.  He's the consumer.
18   He's the class member.
19   BY MR. MACORETTA:
20       Q.   Okay.  I'll try it this way.
21           Mr. Pentz, you objected that the
22   attorney's fees are excessive.  Is that your

Page 64

1    understanding?
2        A.   I am not too certain that the contingent
3    fee results in a fair determination as to what is
4    a fair fee for the various attorneys involved.  I
5    -- I don't have the knowledge.
6        Q.   Okay.  Then what do you think would be a
7    fair fee for the attorneys involved?
8        A.   I wouldn't have -- until I would study
9    all of these factors, I wouldn't be able to give
10   you that estimate.
11       Q.   Then how do you know the fee they're
12   asking for isn't fair?
13       A.   Well, I rely, again, on my knowledge.
14   It just seems like a tremendously high fee for
15   what is involved.  But --
16       Q.   Wait.  A tremendously high fee for what
17   is involved?
18       A.   Yes.
19       Q.   You mean in dollar amount or percentage
20   amount?
21       A.   Well, I think the percentage is a dollar
22   amount which results in millions of dollars, and I

Page 65

1    don't know whether that is or is not proper and
2    reasonable compensation.
3        Q.   That's right.  Because you have no
4    reason to think that the amount spent by the class
5    counsel up to now isn't $73 million, right?
6        A.   Right.
7        Q.   So if $73 million total spent on the
8    case -- is what class counsel spent on the case,
9    why do you think that the requested fee is too
10   much?
11           MR. PENTZ:  Objection to the form of the
12   question.  The case is vague.
13       Q.   On this litigation?
14           MR. PENTZ:  Again, vague.  The track two
15   settlement or the entire case?
16       Q.   Well, you allege, I believe, that the
17   total amount spent on the entire litigation to
18   date was $73.1 million.  And so if counsel -- and
19   you don't know -- let me back up, Mr. Pentz.
20           You don't know how this settlement fits
21   into the overall litigation, right, if this is a
22   big part of the case or a small part of the case,

17 (Pages 62 to 65)

# Exhibit 7

Pentz, Constance B.                                    March 23, 2009
Stroudsburg, PA

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4      ----------------------------X

5      IN RE: PHARMACEUTICAL        : MDL NO. 1456

6      INDUSTRY AVERAGE WHOLESALE   : C.A. No.

7      PRICING LITIGATION           : 01-CV-12257-PBS

8      ----------------------------X

9      THIS DOCUMENT RELATES TO:    :

10     ALL CASES.                   :

11     ----------------------------X

12

13

14           DEPOSITION OF CONSTANCE B. PENTZ

15

16

17          Taken in the offices of Monroe County

18     Bar Association, 913 Main Street, Stroudsburg,

19     Pennsylvania, on Monday, March 23, 2009,

20     commencing at 12:06 p.m. before Melissa A. Snerr,

21     Registered Professional Reporter.

22

Pentz, Constance B.                                                                    March 23, 2009
Stroudsburg, PA

Page 10

1    A.   And then again, when he called me in
2  January telling me we weren't going to get
3  anything -- see, he dealt solely with me, not with
4  my husband because I, in a sense, am really the
5  guardian.
6        MR. PENTZ:  Can we restate the question,
7  though?
8        MR. MACORETTA:  I -- look, I understand
9  what she's saying.
10       MR. PENTZ:  But what was the question?
11       MR. MACORETTA:  Are you asking the court
12 reporter to read it back?
13       MR. PENTZ:  You asked about class
14 membership? Did it -- I'm asking.
15       MR. MACORETTA:  That's why we have a
16 record.  It doesn't matter.  She answered it.
17 I'll move on to the next question.
18 BY MR. MACORETTA:
19    Q.   If you could take a look at what we have
20 marked as Exhibit 2, which -- which is a subpoena
21 that we sent --
22       MR. MACORETTA:  Actually, you know what?

Page 11

1  We need to mark it as Exhibit 4.  That one's to
2  your husband.  Let's mark as Exhibit 4 a subpoena
3  we sent to you.
4        (Exhibit Pentz 004 was marked for
5  identification.)
6  BY MR. MACORETTA:
7     Q.   Okay.  The court reporter is handing you
8  what we've marked as Pentz Exhibit 4, which
9  appears to be a subpoena issued to you.  Have you
10 ever seen that before, Mrs. Pentz?
11    A.   Yes.  Yes.
12    Q.   Okay.  And in the subpoena, we ask you
13 to produce some documents.  And this document says
14 -- I'm on page number three, request for
15 production.
16    A.   Um-hum.
17    Q.   All documents that concern -- that
18 confirm, prove, or establish that from January 1,
19 1991, to March 1st, 2008, you took Epogen or paid
20 for Epogen or any other class action drugs without
21 receiving reimbursement from Medicare or other
22 insurance.  So did you attempt to find such

Page 12

1  documents?
2     A.   Yes.
3     Q.   Okay.  And other than the piece of paper
4  we've marked as Exhibit 3, did you find any
5  documents?
6     A.   Yes.  And I paid for them.  Our account
7  is the same, one and the same, and I am a class
8  member.
9     Q.   Whoa, whoa, whoa.  You're anticipating
10 my question, not listening to it.
11    A.   No.  I'm --
12    Q.   Other than Exhibit 3, did you find any
13 documents responsive to request number one?
14    A.   Yes.  Through CVS.
15    Q.   Okay.  That's this piece of paper we're
16 looking at as Exhibit 3?
17    A.   Yes.
18    Q.   Other than this piece of paper, did you
19 find any other documents?
20    A.   No.  I don't think I needed to.
21    Q.   Okay.  So your basis of believing that
22 somebody's in the class is what we see on Exhibit

Page 13

1  3 here on this piece of paper, right?
2     A.   Yes.
3     Q.   Okay.  And Exhibit 3 relates to
4  prescriptions for your husband for Epogen and a
5  couple of other drugs, right?
6     A.   Yes.  I don't know if the other drugs
7  are member of the class or not, but Epogen is.
8     Q.   And are you aware of any other drugs
9  that you took -- not your husband, that you took
10 that are within this case?
11    A.   Under the class one or the -- or the --
12    Q.   Under anything.  Take a look at that
13 list on the back of the subpoena if it helps you.
14    A.   Um-hum.  Well, there's the possibility
15 of the erythromycin.
16    Q.   But you don't have any records for that?
17    A.   No.
18    Q.   Okay.  So if it came time to fill out a
19 claim form today for this case, you would make a
20 claim for the Epogen, and what else?
21    A.   Well, that's what this whole case is
22 about, the Epogen.

4 (Pages 10 to 13)

Henderson Legal Services, Inc.

202-220-4158                                                        www.hendersonlegalservices.com

Pentz, Constance B.                                                                                March 23, 2009
Stroudsburg, PA

Page 14

1    Q.   Okay.  And you never took Epogen, right?
2    A.   Pardon?
3    Q.   You never took any Epogen, right?  It
4    was your husband.
5    A.   No, I never took any.
6    Q.   Okay.  Great.  By the way, what was he
7    taking the Epogen for?
8    A.   All right.  To raise his hemoglobin
9    level so that if he had the heart valve -- aortic
10   heart valve replacement surgery, he would have a
11   high enough hemoglobin level to be safe in the
12   surgery.  His hemoglobin level was way too low for
13   a man.
14   Q.   And this piece of paper, Exhibit 3, from
15   CVS, this one, the printout from CVS, which was
16   marked as Exhibit 3 --
17   A.   Oh, yes.
18   Q.   -- that piece of paper, that shows four
19   prescriptions for Epogen.  Is that all the Epogen
20   your husband got?
21   A.   Yes.
22   Q.   And you're the person who filled these

Page 15

1    prescriptions and went to CVS?
2    A.   Yes.
3    Q.   And it also shows some syringes on here.
4    The Epogen he got, was that injected by syringe?
5    A.   Yes.
6    Q.   Were you the one doing the injecting?
7    A.   No.  The home health nurse came up to
8    our home every day at that time -- at that point
9    in time, during those four weekly shots, and even
10   before and after.  But, yes, she administered all
11   four of them.
12   Q.   And during this time, your husband was
13   covered by Medicare, right?
14   A.   Yes.
15   Q.   And then did you have a supplemental
16   insurance beyond Medicare?
17   A.   Yes.
18   Q.   What was that?
19   A.   Blue Cross/Blue Shield.
20   Q.   And then -- well, do you understand that
21   -- well, were some of these Epogen payments
22   covered, at least in part, by Medicare or Blue

Page 16

1    Cross?
2    A.   Would you repeat that?
3    Q.   Were some of the Epogen payments on here
4    covered, at least in part, by Medicare or Blue
5    Cross?
6    A.   It is my understanding, yes.
7    Q.   Okay.  Do you have some understanding as
8    to how that's supposed to work, what Medicare pays
9    versus what Blue Cross pays versus what you pay?
10   A.   To the best of my understanding, Blue
11   Cross/Blue Shield supplement is taken first out.
12   And then Medicare pays secondly for these drugs
13   you get from the drug store, from CVS.
14   Q.   And then what do you pay?  Is there some
15   co-payment or additional payment or --
16   A.   There is a co-payment.  And it varies
17   from drug to drug.
18   Q.   Do you understand that the co-payment is
19   a -- is a percentage of the price of the drug, or
20   does it vary from $5 to $10 or --
21   A.   Well, some of the pills he takes are $5
22   co-payment, but some -- one is a bit higher.  And,

Page 17

1    yeah, it varies, but I don't know the variation as
2    to percentage or how they determine it.
3    Q.   How long have you had this same coverage
4    with Blue Cross?
5    A.   The Blue Cross/Blue Shield supplement?
6    Q.   Yes.
7    A.   How long have we had that?
8    Q.   Yes.
9    A.   Since being on Medicare.
10   Q.   So your husband told me he's 80 and a
11   half, so about 15 years?
12   A.   I stopped --
13   Q.   I won't hold you to an exact date.
14   A.   -- because my husband is 81.
15       MR. PENTZ:  He got his age wrong
16   earlier.
17   Q.   Let me try it this way.  Do you believe
18   your husband went on Medicare when he was about
19   65?
20   A.   So he went on Medicare at age 65.
21   Q.   And ever since then, you've also had the
22   Blue Cross supplemental coverage?

5 (Pages 14 to 17)

# Exhibit 8

# WEIRTON MEDICAL CENTER

601 Colliers Way        Weirton, WV 26062-5091    304-797-6000

April 8, 2009

Reference: Patient control number 6030613854

To Whom It May Concern:

Wilma Mort was seen in our outpatient Oncology Clinic 5/30/2003.  These charges were billed to Wilma Mort's Medicare Part B benefits.  Medicare processed these charges under Medicare Part B benefits.  These services were outpatient services not inpatient services.

If you have any questions, please feel free to contact me at the number listed below.

Sincerely

Barbara Urbowicz
Patient Financial Services
(304) 797-6467