UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| TRACK 2 SETTLEMENT | Judge Patti B. Saris |

**DECLARATION OF THOMAS M. SOBOL IN SUPPORT OF CLASS PLAINTIFFS' RESPONSE TO OBJECTIONS TO FINAL APPROVAL TO THE TRACK TWO SETTLEMENT**

I, Thomas M. Sobol, depose and state under oath as follows:

1. I, Thomas M. Sobol, am an attorney and member of the bar of the Supreme Judicial Court of the Commonwealth of Massachusetts. I am admitted to practice in the United States District Court for the District of Massachusetts. I am a partner at the law firm of Hagens Berman Sobol Shapiro, LLP ("HBSS"), court-appointed co-lead counsel in the above referenced matter.

2. I have been asked to submit this declaration to respond to some items raised by Donald Haviland in connection with his objection to the Track Two settlement (*see* Doc. No. 5971). I believe that Mr. Haviland inaccurately depicts the nature of the relationship of HBSS to the Prescription Access Litigation Project ("PAL") and with organizations, consumers and third-party payors working with PAL.

**The Prescription Access Litigation Project and *Cy Pres* Generally**

3.  The Prescription Access Litigation Project, known as "PAL," was formed almost ten years ago. My understanding is that PAL is an unincorporated association that works as an umbrella organization on behalf of other consumers associations, consumers and third-party payors. The mission of PAL is it to make prescription drug prices more affordable for consumers, and it seeks to accomplish this mission through public education and by working with litigants in class action litigation challenging illegal pricing practices and deceptive marketing by drug companies, pharmacy benefit managers, and other pharmaceutical industry players. My understanding is that PAL works as a resource for organizations, consumers and third-party payors that are litigants in pharmaceutical litigation in order to provide them the knowledge, resources and tools to better advocate their interests in order to ensure an effective role for class representatives in class litigation.

4.  PAL has often turned to HBSS and a small group of other law firms to have these firms represent one or more of PAL's members in class pharmaceutical litigation. My understanding is that PAL does this because it knows that HBSS and these other law firms will responsibly represent PAL's members (organizations, consumers and/or third-party payors) in connection with a particular matter and consistent with applicable rules.

5.  Typically, HBSS (and/or other law firms, depending upon the case) is retained by one or more of PAL's members and not by PAL itself. HBSS and the other law firms at that point represent the named class plaintiffs and the putative or actual class

in a manner consistent with law and Rule 23. We typically do not represent PAL itself. PAL does, however, have in-house lawyer(s) on its staff.

6. It is my understanding that over all the years, PAL has articulated and enforced ethical standards to ensure a proper role in providing advocacy and assistance for litigants in pharmaceutical class litigation. For example, it is my understanding that PAL has never sought or accepted *cy pres* funds from any litigation or settlement, and that its non-profit parent, Community Catalyst, has not accepted *cy pres* funds from any litigation in which it was a plaintiff.

7. Over the years, PAL has facilitated its members in improving class litigation involving prescription drugs on behalf of consumers in a variety of ways. As litigants in pharmaceutical class litigation, PAL members have (i) advocated for and obtained settlement agreements that avoided "spillover" to third-party payors, (ii) maximized consumer allocations of settlement proceeds, and (iii) advocated for and facilitated substantially higher claims participation by consumers.

8. One example of PAL advocacy in working with its members and litigants in pharmaceutical litigation is *Government Employees Hospital Association v. Serono International, S.A. et al. C.A.* No. 1:05-cv-11935-PBS. In that matter, PAL assisted in a variety of ways in connection with the notice program to a difficult population of persons suffering HIV. PAL worked with class counsel to put together a novel, and ultimately effective, program by which to obtain class member names through the issuance of subpoenas to pharmacies and others. As the *Serono* case and PAL's track record makes clear, PAL has singularly advanced the interests of consumers in pharmaceutical litigation, maximizing returns to consumers. As far as I know, when the choice is

between consumer recovery and *cy pres*, PAL has always sided on the need to obtain consumer recovery.

**PAL's and HBSS's Position on *Cy Pres* in the *Lupron* Litigation**

9. Mr. Haviland mischaracterizes what has occurred in *In re Lupron Marketing and Sales Practices Litigation, MDL No. 1430.* C.A. No. 01-10861, ("*Lupron*").

10. In *Lupron*, a total settlement of $150 million was reached on behalf of third-party payors and consumers. After appropriate allocation by the parties, payment of administrative expenses and fees, and payments to third-party payors and consumers, approximately $11.4 million in unclaimed funds remains in the consumer settlement pool. Accordingly, now before the Court (Stearns, J.) is the question as to how to disperse those funds.

11. The lineup of positions being taken on disbursement of the $11.4 million is as follows: (i) the co-lead law firms (except HBSS) take the position that all the remaining funds should be distributed for *cy pres* purposes, including some funds to Community Catalyst, an organization that works with PAL; (ii) HBSS takes the position that the Court should obtain data from the Centers for Medicare and Medicaid Services ("CMS") in order to get the names and identifying information on individual consumer class members who overpaid for Lupron, and perhaps thereafter distribute the funds to currently unidentified consumer members;[1] (iii) counsel for third-party payors advocate

---

[1] In the *AWP* litigation, this Court and lead Class Counsel have had success in obtaining names and identifying information about consumer class members who overpaid the Medicare Part B copayment requirement for certain drugs. The *Lupron* litigation predated the *AWP* litigation, and, at that time, CMS had taken the position that it could not, or would not, provide that data. Now that we know that CMS can and will do it, HBSS has taken the position that we use CMS data to expand the notice and claims

that some of the remaining dollars should go to third-party payor class members; and (iv) Mr. Haviland takes the position that those consumers that have already received disbursements (which amount to greater than their estimated damages) should nevertheless receive supplemental disbursements.  The final position is that of PAL: PAL takes the position that funds should go back to consumers and supports *cy pres* as an alternative distribution mechanism if, and only if, the Court rejects the renewed CMS-data based claims proposal and so that no funds spillover to the TPP class.

12.     Put differently, the *Lupron* situation involves an example of the exact opposite of what Mr. Haviland claims.  HBSS has parted ranks with the other co-leads and advocated for return of funds to unidentified consumers or others, rather than for *cy pres*.  PAL similarly advocates for return of funds to consumers, and thus against *cy pres* that might otherwise go to Community Catalyst with whom it is affiliated, unless the Court does not approve the CMS-data based claims proposal.

13.     Given his involvement in *Lupron*, Don Haviland knows that both HBSS and PAL have taken the position that the remaining consumer funds in *Lupron* be distributed to the Lupron consumers, yet he has failed to advise this Court of these facts.

14.     Mr. Haviland's proposal in *Lupron* is for the remaining funds to be paid to consumers who already filed claims, even though those claimants have already been paid more than their full damages[2] and even though written notice had not previously been sent to all Medicare beneficiaries who were administered Lupron.  Notably, Mr. Haviland

---

opportunity in *Lupron* and, hopefully, distribute the remaining $11.4 million to Medicare Part B beneficiaries who took Lupron.

[2] Calculations made at the time of the *Lupron* settlement indicated that each consumer paid approximately 30 percent too much for Lupron as a result of the AWP inflation.  However, all claimants were compensated at the rate of 50% of their claimed payment amounts.  Thus, anyone submitting a valid claim received more than 150% of their actual damages.

was the only attorney who initially advocated that the remaining funds be diminished by the payment of additional attorneys' fees for himself (a position that HBSS opposed and all counsel accepted).

Dated:  April 8, 2009.

                                                                 _____*/s/ Thomas M. Sobol*_____
                                                                     Thomas M. Sobol

**CERTIFICATE OF SERVICE**

       I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, DECLARATION OF THOMAS M. SOBOL IN SUPPORT OF CLASS PLAINTIFFS' RESPONSE TO OBJECTION TO FINAL APPROVAL TO THE TRACK TWO SETTLEMENT, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on April 9, 2009, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                       /s/ **Steve W. Berman**
                                                      Steve W. Berman