IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                           )
                                 )  CA No. 01-12257-PBS
PHARMACEUTICAL INDUSTRY AVERAGE  )
WHOLESALE PRICE LITIGATION       )  Pages 1-52
                                 )




MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
April 16, 2009, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 2

1    A P P E A R A N C E S:

2

3        JOANNE M. CICALA, ESQ., JAMES P. CARROLL, JR., ESQ.,
     and AARON D. HOVAN, ESQ., Kirby McInerney, LLP,
4    830 Third Avenue, 10th Floor, New York, New York, 10022,
     for the City of New York and New York Counties.

5        THERESA ANN VITELLO, ESQ., Levy, Phillips & Konigsberg,
     LLP, 800 Third Avenue, 13th Floor, New York, New York,
6    10022, for Orange County.

7        FREDERICK G. HEROLD, ESQ., Dechert, LLP,
     2440 W. El Camino Road, Suite 700, Mountain View,
8    California, 94040-1499, for GSK.

9        RONALD G. DOVE, JR., ESQ. and MARK H. LYNCH, ESQ.,
     Covington & Burling, LLP, 1201 Pennsylvania Avenue, NW,
10   Washington, DC, 20004-2401, for GSK.

11       DAVID P. SAYRES, ESQ., Tangent Litigation Services,
     877 Baltimore-Annapolis Boulevard, Suite 112, Severna Park,
12   Maryland, 21146, for GSK.

13   ALSO PRESENT:

14       JOHN P. BUEKER, ESQ., Ropes & Gray, LLP,
     1 International Place, Boston, Massachusetts, 02210,
15   for Schering-Plough Corporation and Warrick Pharmaceuticals
     Corporation.

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  In Re:  Pharmaceutical Industry

3    Average Wholesale Price Litigation, Civil Action 01-12257,

4    and 03-10643, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6              MS. CICALA:  Joanne Cicala from Kirby McInerney on

7    behalf of the City of New York and the New York Counties in

8    MDL 1456.

9              MR. CARROLL:  James Carroll, Kirby McInerney, for

10   the same plaintiffs.

11             MR. HOVAN:  Aaron Hovan from Kirby McInerney for

12   the same plaintiffs.

13             MS. VITELLO:  Theresa Vitello from Levy, Phillips

14   & Konigsberg for the County of Orange.

15             MR. HEROLD:  Good morning, your Honor.  Fred

16   Herold for GSK.

17             MR. DOVE:  Ron Dove for GSK.

18             MR. LYNCH:  Mark Lynch for GSK.

19             MR. SAYRES:  James Sayres for GSK.

20             THE COURT:  Who else do you represent, Mr. Lynch?

21   Don't you represent --

22             MR. LYNCH:  Only GSK in this, your Honor.

23             THE COURT:  Yes, but aren't you part of other --

24   am I mixing you up with someone?

25             MR. LYNCH:  I think so, a lot of Lynches.

1      THE COURT:  All right, I thought you were part of

2  the other AWP.  I have like seven buckets here.

3      So we're here on a -- I guess it's a motion for

4  summary judgment.  The briefs helped clarify that the drugs

5  at issue in the settlement are not at issue anymore in this

6  litigation, so I think we're only talking about the

7  methodology for calculating pricing?  Is that right?

8      MR. HEROLD:  That's correct, your Honor.

9      MS. CICALA:  Yes, your Honor.  And you're

10  referring to the New York settlement, correct?

11      THE COURT:  Yes, yes.

12      MS. CICALA:  Yes, thank you.

13      THE COURT:  Okay.  So are they cross-motions or

14  just your motion?

15      MR. HEROLD:  Just GSK's motion, your Honor.

16      THE COURT:  Okay.  So you know what would be

17  helpful to start, I felt like the briefs were ships crossing

18  in the night, just start off, what was your methodology, and

19  how did you go about figuring out your prices?  And I will

20  clarify that while I continue to believe, unless I'm

21  persuaded otherwise, that my test in AWP was the correct

22  one, the FTC guidelines, I actually never had to address the

23  methodology for getting there because it wasn't challenged

24  in the first litigation, so I didn't bless one particular

25  methodology or another.  So you may be right or they may be

1    right, but you argued extensively why I already did this.

2    Maybe I did, maybe I didn't, but it wasn't really a point of

3    contention, that I remember anyway, okay?

4          MR. HEROLD:  I understand.  May I approach the

5    podium, your Honor?

6          THE COURT:  Yes.

7          MR. HEROLD:  Thank you.  Your Honor, just quickly

8    by way of background, we filed the motion in an effort to

9    cut back on the drugs at issue in this case.

10         THE COURT:  I think, you know, there are a lot of

11   people really interested in what you have to say, so if you

12   don't boom it out -- you're all welcome to sit in the jury

13   box if you want, without a vote, but I think this is of

14   interest to other -- as I mentioned, I think we're now in

15   seven different buckets of litigation, and what we do in any

16   one has effects for the others, so I think that's why a fair

17   number of the people here are very interested in what you

18   have to say.

19         Are we all set?  Okay.

20         MR. HEROLD:  Thank you.

21         THE COURT:  Is the mike on?

22         MR. HEROLD:  I believe so.  Is it on?

23         THE COURT:  Yes, so we just need to catch you.

24   You're nice and tall.  All right, there we go.  All right,

25   so let's start again.  Your name for the record is?

1    MR. HEROLD:  Fred Herold, your Honor, for GSK.

2    THE COURT:  Everyone can hear now?  Good.

3    MR. HEROLD:  And, your Honor, if I may just

4  reserve a little bit of rebuttal time.  I'm going to try to

5  cover as much as I can, but I'm sure --

6    THE COURT:  Sure.  I don't have the green, red,

7  and yellow lights, but we'll go for it.  Here's my big

8  problem:  It's a really busy day today, and we have

9  something at 11:00.  It's already 9:15.  So would we assume,

10  for example, you'll go fifteen minutes, fifteen minutes, and

11  then brief rebuttal will bring us to the hour, okay?

12    MR. HEROLD:  Fine, your Honor, I'll try to keep it

13  to fifteen minutes.

14    Your Honor, as I said, the purpose of this motion

15  is to drastically reduce the number of drugs at issue in

16  this case.  And if you grant the motion, the vast majority

17  of the NDCs for GSK will be out of the case, and about

18  98 percent of the dollars involved in the case will be out

19  of the case, so the case, frankly, becomes relatively easy

20  to resolve.

21    And we're not talking here, your Honor, about

22  physician-administered drugs.  Now, that's my first point.

23  As you've already pointed out, GSK has settled its dispute

24  with New York and the counties with respect to

25  physician-administered drugs.  We're not talking about

1    generic drugs.  We're talking about sort of classic

2    brand-name drugs sold primarily through retail pharmacies,

3    which had very little discounting and which the Court and

4    experts during your long years here have recognized are the

5    kinds of drugs for which the system actually works.  These

6    are not discounted to retail pharmacies, your Honor, for a

7    simple reason, which is, there's no economic reason for the

8    manufacturers to do so.  The doctors prescribe the drug.

9    It's sold to pharmacies.  The pharmacies dispense it.

10   There's no incentive to discount or to market to either

11   doctors, on price, at least, or pharmacies.

12           Now, your Honor, your test which you articulated,

13   which I want to just state so we're all on the same page,

14   and then I'll get to exactly how we applied it, is a

15   relatively straightforward one based on the FTC.  That is,

16   if more than 50 percent of all sales were made at or about

17   the list price, which you defined as within 5 percent of

18   WAC, then there's no liability, the drug is insulated from

19   liability.  So the test deals with a percentage:  more than

20   50 percent of all sales close to WAC, at or about WAC.

21           And, your Honor, why don't I just jump right into

22   how we did it because I know that's really what you're

23   interested in.  I prepared some PowerPoints, and I believe

24   your Honor should have a copy of the slides.  Do you have

25   them, your Honor?

738c421b-2de5-454c-87ac-ac25b6625282

1        THE COURT:  Yes.

2        MR. HEROLD:  Okay.  And before we get into that,

3   I'd like to also hand you one other exhibit, which is the

4   results of the tests, just so you have that in front of you

5   as we go through this.  And I've already handed this out to

6   the plaintiffs' counsel, and it's in our affidavit as a part

7   of the briefs.

8        Now, your Honor, the way the test is applied here

9   by GSK is really quite straightforward.  It's a matter of

10  essentially counting the number of units sold and figuring

11  out if the number of units sold for a particular drug unit

12  by unit are sold within 5 percent of WAC.  So --

13       THE COURT:  All units, no matter who purchases?

14       MR. HEROLD:  Correct.  The only exception is

15  charity sales, which we don't consider sales.  We include

16  government sales, sales with statutory discounts.  There are

17  a lot of sales in there that are by statute required to be

18  discounted.  They're all in.  And the question is, for all

19  those sales, you sort of put them in one pile or another;

20  either the sales were made within 5 percent of WAC or they

21  weren't; and then you count them up at the end to determine

22  whether there are more than 50 percent or not.

23       And as the chart that I just handed to you shows,

24  these NDCs, almost all -- they all pass, all the one that

25  we're moving on pass the test, and almost all of them pass

1   with flying colors, your Honor.  It's not close.

2   Eighty percent or 90 percent or 95 percent of the sales are

3   within 5 percent of WAC.  And it goes back to what I said

4   before:  These are brand-name drugs.  There isn't an

5   incentive to discount.  There are certain statutory

6   discounts and things like that out there.  Sales to

7   hospitals are included, which are discounted, although not

8   reimbursed based on AWP.  So these drugs pass with flying

9   colors.

10          And there's really only one issue about

11  application of the test that really matters here, the

12  dispute that we have between us, and that issue is:  What do

13  you do when the drug is sold through a wholesaler?  That's

14  the issue, and I'm going to walk you through that to try to

15  help you understand it, your Honor.

16          Before I do, most drugs by GSK, like most drugs

17  sold by brand-name companies, are sold through wholesalers,

18  the vast majority are sold through wholesalers, so that you

19  don't have to get involved in the business of trying to

20  distribute to thousands of pharmacists.  There are some

21  direct sales to places like CVS and Walgreens and those

22  kinds of places.  The direct sales, your Honor, there's no

23  dispute here, the vast majority of them, almost all of them

24  are within 5 percent of WAC, because when GSK sells to CVS,

25  it sells at very close to WAC.  And that was analyzed by our

1    expert, Dr. Gaier, and the plaintiff has conceded that they

2    don't have a problem with the way Dr. Gaier analyzed those

3    sales.  Those are the direct sales.  There's no wholesaler

4    at all, okay?

5          The attack by the plaintiffs comes with respect to

6    the treatment of sales that go to or through a wholesaler.

7    In the very first graphic, your Honor, if you could put that

8    up on the PowerPoint -- it's the one we have on the big

9    chart here -- which breaks down these sales to or through

10   wholesalers into two categories, and this is the way

11   Dr. Gaier performed the test.  The first category, your

12   Honor, are sales --

13          THE COURT:  Since this adds up to 100 percent,

14   which pot do the CVS's fall in?

15          MR. HEROLD:  The CVS's are not in either of these

16   pots.  The CVS's are the direct sales where there's no

17   dispute, vast majority close to WAC, okay?  So we're already

18   sort of starting off with a head start on the math because

19   of that.  This is the key issue, though:  These are sales

20   that go to or through a wholesaler, and 84 percent of those

21   sales are sales made to a wholesaler at WAC minus 2, prompt

22   pay discount, maybe another percentage or so for stocking

23   allowances, things like that, and there is no subsequent

24   contract, there's no deal with any provider.  All right,

25   that's the first bucket.  The next slide gets into that.

1            The second bucket, your Honor, about 16 percent of

2      the sales, those are sales that go through a wholesaler, but

3      GSK does have a contract with the downstream provider.  So

4      those are sales where GSK has a discount deal with somebody

5      downstream, all right?  So you've got sales with no

6      downstream deal at all and sales with a downstream deal.

7      Those are the two categories.

8            Now, the sales in the 84 percent bucket are the

9      ones that plaintiffs have to flunk in order for all these

10     drugs that are at issue not to pass your test because it's a

11     big, big bucket.  They're sold at WAC minus 2 to 3, well

12     within your test, and there's no deal.  So they have to come

13     up with a way to try to flunk those sales, and that's really

14     what the key dispute is.

15            THE COURT:  But if the denominator is all sales,

16     so I understand there are three big buckets, directly to CVS

17     type places --

18            MR. HEROLD:  Correct.

19            THE COURT:  Through a wholesaler with a separate

20     contract with a provider, and to a wholesaler and they do

21     what they will with them.

22            MR. HEROLD:  Correct.

23            THE COURT:  Why isn't that the denominator for

24     purposes of --

25            MR. HEROLD:  It is the denominator, your Honor,

1    but what I was trying to say is, the sales that are direct,

2    about 88 percent of them pass.  They're within 5 percent of

3    WAC, and it's about 15 to 20 percent of sales.  It's a small

4    amount.  And so we get a head start because of those sales.

5    But they don't attack that.  They don't fight about it.

6    This is the only issue they fight about.  That's why we're

7    focusing on this.

8              THE COURT:  Well, the issue is the chargebacks.

9              MR. HEROLD:  Correct, correct.

10             So if your Honor will turn to the next slide, what

11   I've tried to do here is describe in a graphic each of these

12   buckets.  And this one deals with the first bucket, the

13   84 percent bucket.  And, again, this is a classic brand-name

14   scenario:  The drug is sold to a wholesaler at WAC minus 2

15   or 3, no downstream deal, and you can see the wholesaler is

16   buying at WAC minus 2 to 3.  It's selling the drug to a

17   provider.  And typical providers, your Honor, who buy under

18   this arrangement, no deal with GSK, retail pharmacies, PBM

19   and third-party payor mail order pharmacies, they'd simply

20   buy on the open market from a wholesaler.  And they're

21   buying at something more than the wholesaler paid, okay?  We

22   don't know exactly how much.  There's some markup.  We don't

23   know exactly what it is, but it doesn't matter for purposes

24   of this test because they're buying at more than WAC minus 2

25   or 3, therefore more than WAC minus 5, all right?

1          Now, again, our view is that all these sales pass

2     the test.  And you can look at this either from the point of

3     view of analyzing the sales, what does the wholesaler pay?

4     Or you can look at it from the point of view, what does the

5     provider pay?  Either way it doesn't matter; they pass

6     because they're sold at greater than WAC minus 5.

7          Now, the next diagram, your Honor, deals with

8     sales through wholesalers where there is a downstream

9     contract which provides for a discount, and this is only

10    16 percent of the sales typically.  Now, what we've done

11    here in this slide is, we've tried to help you -- I hope it

12    does help -- by providing numbers.  We're assuming that WAC

13    is $100 and that the contract here provides a 45 percent

14    discount, the kind of discount the VA might get or a public

15    health clinic or an entity like that.

16          And the way this works, your Honor, is, the

17    manufacturer, if you look on the left, again sells to the

18    wholesaler at WAC minus 2 or 3, exactly the same as before,

19    but the wholesaler, there is a contract -- if you look at

20    the bottom of the diagram -- there is a contract between GSK

21    and the provider that says:  This provider, whether it's a

22    hospital, the VA, a public health clinic, they get a

23    discount of 45 percent.  It's a contractual discount with

24    GSK, as I said, sometimes statutory.  So the provider

25    actually buys the drug from the wholesaler for 45 percent

738c421b-2de5-454c-87ac-ac25b6625282

1    off, so in this scenario, 45 percent off of $155.  So the

2    wholesaler is buying the drug for 97 or 98 and is reselling

3    it for 55.

4              THE COURT:  Right.

5              MR. HEROLD:  Okay?  And then GSK pays a chargeback

6    to the wholesaler to cover the shortfall, all right?

7              Now, the way Dr. Gaier and GSK treat these sales

8    for purposes of your test, the WAC list price test, is, they

9    attribute these discounts, they count them, and they're a

10   lot, they're over $5 billion, but they're attributed to the

11   providers who get them, not to the wholesaler, because it is

12   the provider who has the deal and gets the discount.  The

13   wholesaler is just the middleman, if you will.

14             THE COURT:  If the goal here is to have a fair

15   price that's being charged to governments or third-party

16   payors, why wouldn't I essentially, if we go back to what

17   the denominator is, all unit sales, whether 50 percent of

18   all unit sales -- in other words, instead of creating these

19   separate pots, the 84 percent and the 16 percent, if you

20   were to aggregate, how many drugs would pass the test if you

21   included chargebacks in the reduced price?

22             MR. HEROLD:  Well, we do include chargebacks in

23   the reduced price.

24             THE COURT:  No, I'm talking about across -- using

25   the aggregate denominator.

1            MR. HEROLD:  208 drugs would pass.

2            THE COURT:  Instead of, what are you urging me

3       for?

4            MR. HEROLD:  208, they all pass.

5            THE COURT:  No, no, no, no.  You're not hearing

6       me.

7            MR. HEROLD:  Okay, I'm not hearing you.

8            THE COURT:  Okay.  If I don't agree that the

9       chargebacks don't count --

10           MR. HEROLD:  Well, the chargebacks do count.

11           THE COURT:  Then I'm not understanding your

12      methodology.  In other words --

13           MR. HEROLD:  Your Honor, let's go to the next

14      slide because I think --

15           THE COURT:  -- if I consider a chargeback a

16      discount, how many drugs pass?

17           MR. HEROLD:  208.  If you go to the next slide,

18      your Honor, I'll try to explain why this is --

19           THE COURT:  Okay, then I don't get what you're

20      trying to -- I don't understand then --

21           MR. HEROLD:  Let me try to walk you through it,

22      and I think the next slide really helps, your Honor, okay?

23           Now, on this slide we've created a hypothetical

24      that is similar to these two circles, all right?  Again,

25      we're dealing with the wholesalers.  You've got nine sales

1    that go to a wholesaler at WAC minus 2, all right?  Then

2    you've got one sale, the red dot on the left-hand side, that

3    is going through the wholesaler to the provider, and there

4    is a 45 percent discount, just like the prior slide, all

5    right?

6              Now, your test says, "I find and hold that if more

7    than 50 percent of all sales were made at or about the list

8    price within 5 percent of WAC, the list price would be

9    deemed nonfictitious."

10             So how does Dr. Gaier apply this test to these

11   wholesaler sales?  Direct sales, most pass, no dispute.  To

12   these wholesaler sales, how does Dr. Gaier apply this test?

13   Well, he says nine sales pass because they're within

14   5 percent of WAC, and one sale fails.  He counts that sale.

15   He counts that discount which is administered through a

16   chargeback, he counts it, okay?  That sale fails.  So the

17   result of this is 90 percent pass.

18             Now, what do the plaintiffs do, your Honor?  And,

19   by the way, this is the way Dr. Bell did it, and Dr. Gaier

20   explains that, and I understand your Honor wasn't really

21   focused on that.

22             THE COURT:  I don't think --

23             MR. HEROLD:  It's the same way Dr. Bell did it.

24             THE COURT:  I may not remember, but I don't

25   believe that was a point of contention at the last trial, so

1  I didn't even think about the issue.

2          MR. HEROLD:  Yes, understood, your Honor, but this

3  is the way he did it, all right?

4          So what does the plaintiff do with this exact same

5  scenario, okay?  And that's the part on the bottom.  The

6  plaintiff changes this to some sort of averaging test, not

7  what percentage or how do you count but averaging.  The

8  first thing they do, your Honor, is, they attribute the

9  discount that went in this hypothetical to the provider like

10 the VA.  They don't attribute it to the provider that got

11 it, which Dr. Gaier does.  They attribute it to the

12 wholesaler as if the wholesaler got a discount, okay?

13 That's the first thing they do.

14         The second thing they do is, then they say,

15 all right, since the wholesaler got that discount, even

16 though it really didn't, what's the average discount for all

17 wholesaler sales; that is, the ones with no discount and

18 this one?  And then they do the math that you see at the

19 bottom of this, and they say, well, we've got nine sales at

20 2 percent off, we've got one at 45 percent off, one sale to

21 the VA or whoever; that creates an average discount of

22 6.3 percent.  And guess what, that's lower than 5 percent,

23 so all of these sales fail the test, every one of them.  So

24 they've taken that 84 percent --

25         THE COURT:  So they're not doing it by unit price?

1          MR. HEROLD:  Correct.

2          THE COURT:  They're doing it on the average?

3          MR. HEROLD:  They're averaging, correct.  So

4    they're taking this 84 percent circle here, and they're just

5    making it fail.  They're essentially throwing the red circle

6    into the white circle and turning it all sort of pink, even

7    though there's no getting around the fact that nine out of

8    ten, or 84 percent, actually, of the sales are at WAC minus

9    2 with no discount.  That's what they're doing.  And we

10   think it simply makes no sense, your Honor, and it's

11   inconsistent with the purpose of the test and the purpose of

12   the FTC guidelines, which is --

13         THE COURT:  And what happens when you throw in the

14   direct sales to CVS, et cetera?  What percentage of your

15   sales fall into that third category?

16         MR. HEROLD:  It's about 17 percent of sales, your

17   Honor, and about 88 percent of them pass, okay?

18         THE COURT:  So I need the aggregate, right?

19         MR. HEROLD:  Yes.

20         THE COURT:  If we're talking about basically

21   under -- I'm not saying it's the gospel.  I looked the last

22   time at the FTC guidelines because most of these unfair

23   trade practices acts are called little FTC acts, so people

24   look at the guidelines.  I mean, it's not rocket science,

25   and that's how I got there.

1          MR. HEROLD:  Understood.

2          THE COURT:  So the issue is, that's their test,

3    which says all sales.  I don't think there's a serious

4    problem -- maybe I'm wrong -- about excluding charities.

5          MR. HEROLD:  Right.

6          THE COURT:  So assume that we're talking about all

7    sales, has somebody done the number for all units as the

8    denominator?

9          MR. HEROLD:  Yes, your Honor.  That's exactly

10   what's in Table 1 that I just gave to you.  They're all

11   included.  And, as I said, the numbers get better from GSK's

12   perspective when you include the direct sales.

13         THE COURT:  Well, that's what you said, right.

14         MR. HEROLD:  Right, because the direct sales pass

15   at about an 88 percent rate, okay?  And in fact some of

16   these 16 percent where there is a chargeback, they don't

17   fail because it's a small discount.  There is a discount,

18   but it's small.  It's less than WAC minus 5, okay?  And the

19   numbers that are presented in that table and are explained

20   in Dr. Gaier's affidavit account for all of them.  They have

21   the denominator that includes all sales other than charity,

22   okay?  It's just that this is the only attack the plaintiffs

23   made, the key attack.

24         THE COURT:  And is this the only issue, as far as

25   you can tell?

1          MR. HEROLD:  Well, there's one other issue --

2    well, I should say "no."  There are other issues that the

3    plaintiffs raise, but none of them matter.  This is the only

4    one that matters, okay, in terms of changing the results

5    from more than 50 percent to less than 50 percent.  The

6    other issues that they raise --

7          THE COURT:  If you took their approach per drug --

8    well, let's assume they win everything, how many of your

9    drugs would you still say pass the FTC test?

10          MR. HEROLD:  You mean if you took --

11          THE COURT:  If you took their averaging approach.

12          MR. HEROLD:  Their approach to the wholesalers?

13    Well, I think they say there are about 111 NDCs that still

14    pass, although they don't really say that because they say

15    that this wholesaler issue would flunk all but 111.  But

16    then there are other issues that they talk about that they

17    say matter that really don't matter.

18          THE COURT:  And then there's the other issue which

19    I've actually not thought about in a long time till I hit

20    yours.  So suppose you had some huge spread of 1,000 percent

21    or something between AWP and the actual price paid by the

22    government, something that's upsetting, all right, and I

23    went with your methodology but I was concerned about that

24    spread, do any of them -- you say in your papers somewhere

25    that none flunk the gag test.

1    MR. HEROLD:  Right.  Your Honor, we also showed

2    you the results of the 30 percent test, the AWP spread test.

3         THE COURT:  Right.

4         MR. HEROLD:  And of the 208 NDCs, I think four

5    don't pass, and they're very small sellers.

6         THE COURT:  Four don't pass the 30 percent, or

7    four don't pass --

8         MR. HEROLD:  The 30 percent.  They all pass the

9    WAC list price, and there are only four, and they're small

10   sellers, that don't pass the AWP spread, all right?  Now --

11        THE COURT:  And what are their spreads on those

12   four?  How bad does it get?  What's the worst of them?

13        MR. HEROLD:  Your Honor, I have to look at the

14   table.  I can't answer that off the top of my head.

15        THE COURT:  Are we up near 1,000 percent?

16        MR. HEROLD:  No, no.  No, they're not.

17        THE COURT:  I think some of the drugs I found were

18   too high were like two or three.

19        MR. HEROLD:  Yes, they're nothing like that.

20   These are brand-name drugs, your Honor.  And typically, if

21   it doesn't pass, and there are only four out of 208, it's

22   because it's facing generic competition; it's become a

23   multi-source drug, and there's more discounting.

24        THE COURT:  Sure.

25        MR. HEROLD:  But that's it.  Now, the plaintiffs

Page 22

1    attack the spread test too, and I'm happy to get to that.

2               THE COURT:  The 30 percent.

3               MR. HEROLD:  Correct.  Even though we're not

4    moving on that --

5               THE COURT:  I remember we sort of put that on our

6    back burner to see if there was going to be expert testimony

7    on that because I felt that this, while the plaintiffs in

8    the big class action stuck with that 30 percent yardstick, I

9    couldn't stick the others with it.  On the other hand, at

10   this point the federal government has gone with the

11   30 percent test and the massive class action.  So it would

12   take a lot to persuade me to change, but maybe they can.

13              MR. HEROLD:  Understood.

14              THE COURT:  So has there been an expert report on

15   that?

16              MR. HEROLD:  Well, we have submitted the results

17   of the straightforward application of the 30 percent test,

18   which the plaintiffs have tried to undercut, but we haven't

19   fully completed discovery on everything necessary to deal

20   with that test because in part it deals with payor

21   expectations.  Whereas, the WAC list price test is a legal

22   test based on the FTC guidelines.  So we felt it was

23   appropriate --

24              THE COURT:  Okay, you thought this would

25   streamline it.

1           MR. HEROLD:  Right, exactly.

2           THE COURT:  So, in your view, if I agree with you,

3    are there any drugs left?

4           MR. HEROLD:  Well, there are still drugs left for

5    GSK that aren't in the 208 that we moved on.

6           THE COURT:  So how many are left afterwards?

7           MR. HEROLD:  There are about 62?  No, wait.  It's

8    262 minus 208, whatever that is, your Honor.  I think it's

9    54?  But, again, the ones that are left account for less

10   than 2 percent of the New York expenditures at issue.

11          THE COURT:  Okay, thank you.

12          MR. HEROLD:  They're small drugs.

13          THE COURT:  You know, I've really got to focus

14   because I have a sentencing at --

15          MR. HEROLD:  Your Honor, if I can just --

16          THE COURT:  No, actually, you've now gone --

17          MR. HEROLD:  I'll save it for rebuttal.

18          THE COURT:  You'll have to save it.

19          MR. HEROLD:  Thank you, your Honor.

20          THE COURT:  I need to give Ms. Cicala enough time,

21   and I've got a really busy morning.  I have four cases on.

22   Just when I thought things couldn't get busier, I had a

23   motion for an emergency preliminary injunction last night,

24   so I am busy.

25          MR. HEROLD:  No problem.

Page 24

1          THE COURT:  Okay, thank you.  And you've all done

2    such a great job briefing, as usual, but this is just

3    helpful and explanatory.

4          MS. CICALA:  Good morning, your Honor.

5          THE COURT:  Good morning.

6          MS. CICALA:  Preliminarily, I just wanted to

7    remind that in the context of the class trial, your Honor

8    made very clear the WAC test was one part of a three-prong

9    test; and as Mr. Herold has just acknowledged, GSK has not

10   moved on the spread test, which was another prong of your

11   Honor's three-prong test.  And with regard to the third

12   prong which concerned marketing, GSK has not moved on the

13   basis of marketing one way or the other.  So just as an

14   initial matter, plaintiffs' view is, even if GSK is entirely

15   right regarding the methodology of the WAC list price test,

16   the motion still would have to be denied because one prong

17   is not enough.  And in fact, your Honor --

18          THE COURT:  Just help me out because their

19   position has an intuitive appeal.

20          MS. CICALA:  Understood.

21          THE COURT:  We didn't focus on it, but if I ruled

22   on it as opposed to saying it's premature, wouldn't it help

23   you settle the case?

24          MS. CICALA:  It would not.  Well, perhaps it would

25   for an inappropriately low amount of money, and I say that,

1    your Honor, for a number of reasons.  First, I have to take

2    issue with a few of the characterizations that Mr. Herold

3    made regarding GSK's economic incentives in the brand arena

4    and the extent to which a brand's pill case has been

5    developed before this Court.

6            THE COURT:  Can I back up for just one minute.  Do

7    you agree with him that that was the methodology that you

8    followed and that he followed, that you basically averaged?

9            MS. CICALA:  I would say that we have both

10   averaged, but we've averaged in different ways.  What GSK --

11           THE COURT:  I just want to understand.  Before we

12   get into the legal argument, I just want to understand the

13   methodology, which was not crystal clear from the briefs.

14           MS. CICALA:  Fair enough.  What GSK has done is

15   has averaged GSK's net sales price, what it says its net

16   sales price is, to different customer segments, to

17   providers, to indirect customers --

18           THE COURT:  No, but they say quite clear that they

19   haven't averaged, that they've gone unit by unit, and that

20   they basically have taken into account the chargebacks per

21   unit.

22           MS. CICALA:  Yes, what we have done and what they

23   have done is look at a net sales price at a unit level.

24   They come up with a net sales price for different customer

25   traunches.  We say, do not bifurcate, do not divide up your

1   net sales into your different types of customers, but look

2   at all sales, subtract from all sales all rebates,

3   chargebacks, incentives, et cetera, and divide by total

4   number of units.

5          THE COURT:  So you are agreeing with what they

6   basically put down as your methodology?

7          MS. CICALA:  Yes.  We don't disagree with each

8   other's characterizations of methodology.  What we disagree

9   with is which is a more accurate reflection of what GSK's

10  net sales price for the drugs at issue was.

11         THE COURT:  It seems to me that what the FTC was

12  getting at -- and maybe there's cases that say to the

13  contrary -- is that you can't -- I remember for

14  Bristol-Myers -- I'm looking over here at my friend from

15  here -- with some of the drugs, they would list the price,

16  and no one in America ever paid it.

17         MS. CICALA:  That's right.

18         THE COURT:  Ever.

19         MS. CICALA:  That's right.

20         THE COURT:  Okay?  Now, there were other drugs

21  where most people did, and that's sort of how I divvied it

22  up.

23         MS. CICALA:  We understand, yes.  And BMS didn't

24  want to lose the revenue associated for those customers for

25  whom they could charge the larger price.

1          THE COURT:  But if in fact the vast majority of

2    the people are actually paying at WAC, as adjusted but WAC,

3    why isn't that going to meet the FTC standard?

4          MS. CICALA:  Were that the case, it would meet the

5    FTC standard.  What we say is that that is not the case, and

6    by bifurcating into different customer segments, GSK is

7    obscuring what the true net sales price is for its units.

8    And I think looking at the ASP test that your Honor

9    references in the class opinions is instructive in this

10   matter.  It's a very simple test.  It doesn't require us to

11   create separate traunches for each individual type provider;

12   you know, the indirect sales to the retailers, you've got

13   these rebates, the sales to the PBMs who received these

14   types of rebates.  Rather, we look at all sales across the

15   board, and we subtract from that all chargebacks and rebates

16   across the board.

17          What GSK is doing is changing what the meaning of

18   a WAC is, really.  I mean, a wholesaler when it purchases

19   the GSK's product, it doesn't know in advance what

20   percentage of those products are going to be resold subject

21   to a contract or pursuant to some other arrangement that GSK

22   may have with that end provider.  The wholesaler purchases

23   at WAC and thereafter receives discounts from GSK and

24   receives chargebacks.  And when the wholesaler considers,

25   what is my dead net price for this GSK product, it

1   calculates that price based on its initial invoice prices

2   minus all the chargebacks and rebates that it has received

3   from the manufacturer.

4           THE COURT:  But are they calculated on a per-unit

5   basis?

6           MS. CICALA:  And they do calculate that on a

7   per-unit basis to come up with the WAC at the unit level,

8   and that's exactly what our expert did.  Our expert looked

9   at all wholesaler sales, total sales to wholesalers per

10  unit, and subtracted from that all rebates and chargebacks,

11  et cetera, paid to wholesalers.

12          THE COURT:  You aggregate it?

13          MS. CICALA:  We do nothing different than GSK

14  except we don't bifurcate those wholesaler sales into

15  chargeback and non-chargeback buckets.  GSK splits up the

16  wholesaler sales and essentially says -- here's the example

17  we use in our brief --

18          THE COURT:  See, but I'm looking out at the

19  marketplace is what I'm concerned about.

20          MS. CICALA:  Right.

21          THE COURT:  Like, you know, Joe Blow salesman goes

22  to CVS or goes to --

23          MS. CICALA:  And sees a retail price.

24          THE COURT:  -- and charges WAC.  So how many

25  people are actually paying that?

1          MS. CICALA:  That's right, and --

2          THE COURT:  And then I look at that sale, not an

3     aggregate, even if everyone is going through McKesson, to

4     take a wholesaler I've come to know and love.  I mean, you

5     know, like, so assume it's McKesson.  And I'm not looking at

6     aggregate across McKesson; I'm looking at each sale.

7          MS. CICALA:  That's exactly right, your Honor, but

8     if you're going to consider what each wholesaler's sale is,

9     the plaintiffs' view is that the simplest way to do that is

10    to calculate what the wholesaler's net price is at the unit

11    level for the sale, regardless of where the drug is resold

12    to.

13          If a wholesaler purchases 100 units from GSK of

14    Paxil, for example, okay, the wholesaler pays WAC for those

15    100 units.  Thereafter the wholesaler may receive some

16    amount of rebates or chargebacks or something from GSK with

17    respect to that purchase of the 100 units.  We say that the

18    wholesaler's net -- well, we don't say this.  The wholesaler

19    says it.  Our net price for those 100 units of Paxil are the

20    initial price that we paid minus the chargebacks and rebates

21    that we received.  And that is entirely consistent with the

22    ASP test that is included in the --

23          THE COURT:  Well, ASP is a statutory test.

24          MS. CICALA:  That's right, but I reference it only

25    because it's included in your Honor's findings as

1   instructive on how one might approach a WAC list price test

2   and how one might approach what is a net sales price.

3          I mean, one of the issues, the test it seems to us

4   that the Court was driving at, is GSK's WAC, or anyone's WAC

5   in the context of this test, misleading, unfair and

6   misleading?  So if the perspective is going to be from GSK's

7   perspective when it publishes that WAC, then isn't it

8   appropriate to look at what GSK's net sales price at the

9   unit level is across the board, across all sales for that

10  drug, without creating these individual traunches to

11  different customers that permit GSK to obscure what the true

12  net sales price is for the unit at the end of the day?

13         THE COURT:  So you're saying it's irrelevant, for

14  example, that CVS may buy it flat out at a unit price right

15  next to WAC?

16         MS. CICALA:  Right.  Well, that's accounted for.

17  We're not saying you don't include that in your analysis.

18  That's accounted for certainly in the analysis, but GSK

19  knows what its net sales price is for every single one of

20  its drugs.  And if that perspective, if GSK's net sales

21  price, if GSK's net revenue, which is something the Court

22  was talking about with Dr. Hartman during the class trial,

23  what is, you know, BMS's net revenue for each of this drug,

24  then it seems to us it is not logical to say, well, what's

25  GSK's net revenue if it sold to this PBM mail order

1    pharmacy, and what's its net revenue if it sold to CVS, and

2    what's it net revenue if it sold --

3            THE COURT:  The FTC guideline, unfortunately for

4    us, is not a perfect match because it was done in terms of

5    consumer sales, really.

6            MS. CICALA:  Well, that's true.

7            THE COURT:  And so they wanted to know, is some

8    retailer creating a faux price which no one realistically

9    ever got and then created discounts off it?  And they're

10   talking about sales to consumers primarily or smaller

11   businesses.  Here we have the wholesaler in between, so it's

12   not so clear how they would want it to work.

13           MS. CICALA:  No, but we could actually look at the

14   defendants' own statements, Dr. Bell's tutorial and

15   Dr. Gaier's supplemental affidavit at Paragraph 6 where he

16   talks about the fact that -- and this sort of gets into the

17   question of what portion of the rebates that GSK paid are

18   relevant in this analysis?  And I do need to comment briefly

19   on this notion that the brand companies do not have any

20   incentive to discount or market their drugs, which

21   plaintiffs disagree with.  First of all, as Mr. Herold

22   acknowledged, GSK, and as we say in our papers, GSK pays

23   very substantial rebates to PBMs, billions of dollars.

24   Somewhere north of 3 1/2 percent of their total sales are

25   paid in rebates to PBMs and others who have the power to

1    move market share.  And in the Medicaid context, your Honor,

2    and in the context -- not just Medicaid at all, but in the

3    context of pills and brands, those entities are very much in

4    the shoes of the physician in the pad context, who the

5    manufacturers could create financial incentives for to move

6    their product.  Why does GSK and the other brand

7    manufacturers, why do they pay those massive rebates to

8    PBMs?  They pay it to incentivize the PBMs to put their

9    products on formularies, which increase market share.  Now,

10   that's plaintiffs' position, and defendants' own experts

11   have acknowledged that rebates that are paid to the

12   customers impact the reimbursements amount, impact the

13   retail prices --

14            THE COURT:  I'll assume everything you're saying

15   is true.  I'm still stuck back on which paradigm do I use in

16   understanding the methodology?

17            MS. CICALA:  That's fine, and what I'm talking

18   about now is a different issue, and it's nevertheless an

19   issue that's important to plaintiffs because if the Court

20   determines that it is appropriate to go with GSK's paradigm

21   on the WAC list price test, which would mean accepting the

22   proposition that we should be looking at not net sales price

23   overall, but, rather, net sales prices to individual

24   customer traunches, if that is the approach the Court is

25   going to take, then plaintiffs' position is, GSK's motion

Page 33

1    still must fail because they have not put before the Court a

2    sufficient record for the Court to rule as a matter of law

3    what portion of these massive rebates should be applied and

4    where to the individual customer segments.  And we say that

5    with regard to both what Dr. Gaier calls provider-based

6    rebates and utilization rebates, where there's a real

7    question as to what portion of those utilization rebates

8    need to be accounted for in this analysis.

9               On reply, in response to some of the arguments

10   that plaintiffs made with regard to this issue of allocation

11   of rebates, Dr. Gaier endeavored to incorporate certain

12   rebates into his analysis that he had not previously

13   incorporated.  Specifically, he endeavored to incorporate

14   rebates that he said were paid to PBMs on account of their

15   mail order --

16              THE COURT:  But at this point he's now

17   representing that they've all been taken into account.

18              MS. CICALA:  No, no, he's not.  He's representing

19   that portions have been taken into account; and plaintiffs'

20   response to that, as we say in our surreply, is that the

21   basis for the assumptions that Dr. Gaier employs when he

22   calculates what portion of rebates should be accounted for

23   is flawed and certainly not sufficient for summary judgment

24   purposes.

25              THE COURT:  So that's part of the methodology.  So

1    would you say, under your theory, more flunk?

2            MS. CICALA:  Yes, absolutely.

3            THE COURT:  But does it make a difference here?

4            MS. CICALA:  It makes an enormous difference.

5            THE COURT:  So what are you saying that Gaier

6    isn't taking into account?

7            MS. CICALA:  Let me answer both of your --

8            THE COURT:  Let's assume I take their methodology

9    and I don't aggregate.

10           MS. CICALA:  Right.

11           THE COURT:  But you're now saying more should

12   flunk out of that second traunch, right?

13           MS. CICALA:  What we're saying is that there is

14   not a complete record before the Court to determine what

15   additional number of NDCs should flunk, that GSK has not

16   presented the Court with an adequate record to determine

17   what percentage of the somewhere around $9 billion in

18   rebates paid to GSK customers should be accounted for in

19   this test.  So, in other words, even if you --

20           THE COURT:  So how do you know that there is

21   additional chargebacks which would undercut their percentage

22   of flunking --

23           MS. CICALA:  I don't know that there are

24   additional chargebacks, but what Dr. Gaier does on reply is,

25   he says, "Okay, we've got these 84 percent of sales to the

738c421b-2de5-454c-87ac-ac25b6625282

1   wholesalers that were not subject to chargebacks."

2           THE COURT:  Right.

3           MS. CICALA:  "Plaintiffs have said that I should

4   be accounting within this group for the rebates that were

5   paid to these customers of the wholesalers by GSK."

6           THE COURT:  They haven't been?  I thought they

7   have been.

8           MS. CICALA:  No.  Well, if I may explain, for

9   example, PBM mail order pharmacies, for example, purchase

10  from wholesalers, not pursuant to contract prices with GSK.

11  So there's no chargeback.

12          THE COURT:  Right.

13          MS. CICALA:  Okay?  Nevertheless, GSK pays massive

14  rebates to those PBMs based on the volume of GSK product

15  that they move right to their -- for their beneficiaries.

16          THE COURT:  Right, so that's a second

17  methodological problem.  So you say those haven't been

18  accounted for in the pass/fail test?

19          MS. CICALA:  Well, here's what we say.  Dr. Gaier

20  on reply endeavors to account for some of them, and what we

21  say is, his method even there -- his method there is flawed.

22          THE COURT:  Because?

23          MS. CICALA:  Because, first of all, with regard to

24  PBMs, he does not look at GSK's own data and contracts with

25  the PBMs which govern why PBMs pay billions of dollars of

Page 36

1    rebates to each of the -- I'm sorry -- which governs why

2    GSK --

3              THE COURT:  Excuse me.  Does your expert look at

4    them and find flaws which would be a greater flunk test?  At

5    this point we're at summary judgment, so I need -- they say

6    they've accounted for it all.

7              MS. CICALA:  Right.

8              THE COURT:  Have you got an expert to say, no,

9    they haven't, so it's a bigger flunk test than the

10   84 percent?

11             MS. CICALA:  Yes.  In our opposition papers, our

12   expert, Harris Devor, has put in an affidavit explaining why

13   our methodology on both points, whether you bifurcate or

14   not, and then treatment of rebates would produce different

15   results.  Now, we --

16             THE COURT:  So assume I took their methodology,

17   but you're right that some -- but more flunk if you take

18   into account full amount of rebates, how many drugs survive?

19             MS. CICALA:  We don't have a record on that, your

20   Honor.  Plaintiffs have not cross-moved.  Plaintiffs have

21   served deposition --

22             THE COURT:  But I want to --

23             MS. CICALA:  I'm very happy to set a timetable

24   to wrap this --

25             THE COURT:  No, but when -- is discovery over now?

1    MS. CICALA:  No, it's not.  We do not have a

2  discovery deadline in the New York counties case, your

3  Honor.

4    THE COURT:  Well, we're going to take care of that

5  today.

6    MS. CICALA:  That's fine.  That's fine, your

7  Honor.  We're very happy to do that.

8    THE COURT:  How did that happen?  I've seen case

9  management orders in every other case, and there are no

10  discovery deadlines in this case?

11    MS. CICALA:  With regard to the FUL process, your

12  Honor, with regard to our briefing on the FULs, but not with

13  regard to the case in chief.

14    THE COURT:  All right, but I need something to

15  create a genuine issue of material fact.  So you're saying

16  that there are rebates that have not been accounted for and

17  that more flunk?

18    MS. CICALA:  Yes.  What we are saying, your Honor,

19  that even if you accept GSK's methodology, which we think is

20  a more tortured road to satisfy the WAC list price test, to

21  evaluate where GSK's net sales price was to all of its

22  customers across the board, if you agree with GSK that it's

23  appropriate to break up the wholesaler sales into different

24  customer traunches, nevertheless, GSK has not put before the

25  Court an adequate record to determine whether in fact

1    50 percent or more sales took place within 5 percent of WAC.

2    And the genuine issue --

3              THE COURT:  What discovery do you need to get

4    there?

5              MS. CICALA:  We need deposition of the GSK witness

6    on the subject of their PBMs, of their contracts with --

7              THE COURT:  Why haven't you done that yet?

8              MS. CICALA:  We have noticed the deposition,

9    counsel has resisted it, and we are going to have to meet

10   and confer and work that out and file a motion to compel,

11   unless your Honor directs that we're entitled to the

12   deposition right now.

13             THE COURT:  I may get there.  So --

14             MS. CICALA:  I would like to get there because I

15   do think this is ripe for a summary judgment.  This issue is

16   ripe.  I mean, this issue can be resolved in this manner,

17   but the record is not before the Court at this time.

18             THE COURT:  So who do you want to do, the GSK

19   person for --

20             MS. CICALA:  We want to do the person at GSK with

21   the most knowledge of their contracts with the three major

22   PBMs throughout the class period and the basis for the

23   rebates that were paid.

24             THE COURT:  Okay, thank you.  Let me just hear a

25   rebuttal here.

1          MR. HEROLD:  Thank you, your Honor.

2          THE COURT:  And then I am just amazed, actually,

3   that I -- we need to do a discovery cutoff.  This case has

4   been going on a long time, and this needs to end.  So do you

5   have an opposition to doing the GSK rebate person?

6          MR. HEROLD:  We don't think it's necessary, your

7   Honor, for reasons I'd like to explain.

8          THE COURT:  Yes, you'd better do it now because

9   even if I go with you on the methodology, I would want to be

10  confident that the pass/fail test was correctly done.

11         MR. HEROLD:  Understood, your Honor.  With respect

12  to where the record is, your Honor, GSK's expert's position

13  is that these utilization rebates to PBMs should not be

14  counted at all in the WAC list price.

15         THE COURT:  So there is another methodological

16  issue.

17         MR. HEROLD:  Correct.

18         THE COURT:  All right.

19         MR. HEROLD:  But it doesn't matter because if you

20  count them, it doesn't change anything.  That's the second

21  point.  The first point is, they shouldn't count, all right?

22  The reason they shouldn't count, your Honor, and if you turn

23  to the next slide that we had, I was going to get into

24  this -- yes, here we go.  These are rebates, your Honor, as

25  we all agree, that are paid based on how many units of a

Page 40

1    drug are dispensed.  They have nothing to do with the price

2    of the drug, nothing.

3            THE COURT:  You know what, I'm not going to buy

4    that position.

5            MR. HEROLD:  All right.

6            THE COURT:  Okay, so, now, you have a strong

7    argument -- I don't know where I'm going to end up -- at

8    least it's getting me thinking -- on how do I think about

9    the FTC test.

10           MR. HEROLD:  Right.

11           THE COURT:  But I would want to include all

12   rebates.

13           MR. HEROLD:  Okay.

14           THE COURT:  So utilization, that's just a rebate

15   by any other name, so --

16           MR. HEROLD:  Understood.  But understood, your

17   Honor, the plaintiffs, their expert, Mr. Devor, says quite

18   clearly that all PBM rebates should not be included.  He

19   recognizes that a lot of these PBMs --

20           THE COURT:  You mean, there are some kinds of

21   rebates and not others?

22           MR. HEROLD:  Medicaid rebates are included.  They

23   don't have any -- they lower what the payor pays.  They have

24   nothing to do with the purchase price of the pharmacy.

25           THE COURT:  If Medicaid pays, I'm not so worried,

1    but if you pay, I am.

2             MR. HEROLD:  Right.  No, we pay the rebates to

3    Medicaid.

4             THE COURT:  Oh, oh --

5             MR. HEROLD:  But they have nothing to do with the

6    purchase price --

7             THE COURT:  You know, I don't feel like I can

8    assess that, but I do think, in general, rebates count.

9             MR. HEROLD:  Right, okay.  But their expert --

10   there's no disagreement about this -- their expert concedes

11   that not all of these utilization rebates should count.  He

12   recognizes, for example, if you pay a rebate to a PBM, a lot

13   of them are passed on to the insurance company.  They have

14   nothing to do with mail order pharmacy purchases.  All he

15   says --

16            THE COURT:  I want to know what the actual price

17   is that each sale accounts for.  So assume, at least for

18   these purposes, I want to know what utilization rebates are

19   so I can make a decision.  If they're included --

20            MR. HEROLD:  Understood.

21            THE COURT:  If they're included -- Medicaid

22   rebates are different.  They're paid by statute to the

23   state.  I don't know --

24            MR. HEROLD:  Right.

25            THE COURT:  I guess my first instinct is, you'd be

1   right on that one, but there are all these other kinds,

2   right?

3                MR. HEROLD:  Right, yes.  All right, your Honor,

4   Dr. Gaier said, "Okay, we'll include the rebates that

5   plaintiffs are saying we should."

6                THE COURT:  All right.

7                MR. HEROLD:  Okay, these are rebates related to

8   PBMs, the big insurance companies that have mail order

9   operations, all right?  And he went back and he included

10  them.  This is in what we call his alternative analysis.

11               THE COURT:  And so how many pass and how many

12  fail?

13               MR. HEROLD:  207 pass out of 208.

14               THE COURT:  So you've lost one.

15               MR. HEROLD:  We've lost one, okay?  Now, what's

16  the plaintiffs' response to this, all right?  They file a

17  surreply.  Their expert says nothing, nothing about

18  Dr. Gaier's alternative analysis, not a word.  Counsel has

19  all kinds of things in the brief, but there is no evidence

20  to contradict what Dr. Gaier has done in his alternative

21  analysis.  And if you will, your Honor, for a minute --

22               THE COURT:  You know what, I actually have a

23  sentencing at 10:00, so what are you giving me?

24               MR. HEROLD:  I have one exhibit that I'd like to

25  hand up for your consideration.

1          THE COURT:  Have they seen it?

2          MR. HEROLD:  Yes, your Honor.

3          THE COURT:  Well, give it to them because they

4     don't know what you're --

5          MR. HEROLD:  I already did, but I'll give them

6     another one.

7          MS. CICALA:  Thanks.

8          MR. HEROLD:  This exhibit, your Honor, summarizes

9     the percentage, if you will, of rebates that are associated

10    with these PBMs and third-party payors, sometimes called

11    IPAs, that the plaintiff said should be included, all right?

12    And this chart shows what percentage of that 84 bucket right

13    there, the big circle, what percentage would go into the

14    flunk category, if you will, all right, if you include all

15    these rebates.  And you can see it's not that much.  It's

16    not going to change that dial.  It's not going to get it to

17    below 50 percent.

18          THE COURT:  I can't know that off -- Mr. Gaier did

19    the calculation?

20          MR. HEROLD:  He did, your Honor, and it's

21    explained in detail in his affidavit, and there's no expert

22    rebuttal.

23          Final point:  Plaintiffs have not filed a

24    Rule 56(f) affidavit here.  They haven't filed it.

25          THE COURT:  But we're not done with discovery, so

Page 44

1    if they want it, they want this deposition, what's wrong

2    with giving the rebate person to them for a deposition?

3              MR. HEROLD:  Well, we can keep going forever, your

4    Honor.

5              THE COURT:  We're going to do that.  All right,

6    we're going to do that.  But in the meantime, I might well

7    rule on a methodology.  I don't know that I'm going to wait

8    for that.  How much more time do you need for discovery?

9              MS. CICALA:  For GSK, your Honor?

10             THE COURT:  Well, I need a case management order.

11             MS. CICALA:  That's fine.  Your Honor, the Iowa

12   case has a discovery cutoff of April, 2010, for counsel in

13   Iowa, and I propose the same track for New York.

14             THE COURT:  Do you all agree?

15             MR. BUEKER:  Your Honor, we haven't consulted with

16   defendants, but that would be agreeable.

17             THE COURT:  Why don't you negotiate with that

18   timetable in mind a case management order that ends there,

19   that's consistent with that.

20             MS. CICALA:  That's fine.

21             THE COURT:  Everybody agree?

22             MR. BUEKER:  Yes, your Honor.

23             THE COURT:  So just come up with everything and --

24             MR. BUEKER:  We'll submit something.

25             THE COURT:  What else do I owe you?  You have a

1   motion for reconsideration.

2           MS. CICALA:  No, we do not, your Honor.

3           THE COURT:  Everything I've taken care of for you

4   at this point?

5           MS. CICALA:  Yes.  We'll be back before your Honor

6   presently on the full summary judgment.

7           THE COURT:  Okay.  Now, remember, because I spent

8   three weeks last summer on the wrong document because what

9   happens is, it goes from law clerk to law clerk, and many of

10  your documents have been sealed, so I need docket numbers on

11  every one.  Has this new system helped you at all where I've

12  subdivided up the MDL?  Maybe the paralegals and the people

13  who are actually in the weeds I should ask these questions,

14  but I intended -- we put everything into all the different

15  categories so there's no longer one massive MDL that you

16  have to go to, and I'm hoping that's going to help us all.

17  Do you know whether it's been working for you or not?

18          MS. CICALA:  I know we've done our best to follow

19  your Honor's directives.  I don't know that it's simplified

20  things from our perspective.  If it's helped the Court --

21          THE COURT:  If it hasn't, let us know, be a

22  squeaky wheel, because that was really done partly because

23  it was impossible at some point to follow the docket.  There

24  were too many docket entries, and they related to different

25  cases.

1            Do you know whether it's been helping you at all?

2            MR. HEROLD:  Your Honor, it's not my department,

3      to be honest with you.

4            THE COURT:  I know.  I should probably get every

5      paralegal who suffers in this case and get them in here to

6      see, but would you be squeaky and ask them because this was

7      supposed to be more user-friendly.

8            MS. CICALA:  I will say having to file in the main

9      docket and the sub creates additional filing.

10           THE COURT:  But does it increase ease of finding

11     the documents relevant to the case?

12           MS. CICALA:  I think, from our perspective, it

13     would be neutral.

14           THE COURT:  Neutral?  The balance across --

15           MS. CICALA:  Yes, on balance.  But in terms of

16     filing, we have to now file everything twice, which does

17     actually create an additional burden obviously.

18           THE COURT:  Fair enough.  How about you?

19           MR. BUEKER:  Your Honor, John Bueker on behalf of

20     Schering and Warrick.  As a party who's in multiple cases

21     and as a person who asks a paralegal quite regularly for

22     filings in this case, she has, I think, had an easier time

23     finding stuff because I can now say, "Could you find

24     something that was filed in the New York counties case," as

25     opposed to in the DOJ actions or the like.  So at least from

738c421b-2de5-454c-87ac-ac25b6625282

1   our perspective as a party in many cases, it does seem to be

2   helpful.

3          THE COURT:  It took an enormous amount of work to

4   go back and subdivide.  We haven't done it retroactively,

5   but I think there are a few, at least a couple of good years

6   left in this case.  So be squeaky if it's not working.  We

7   really are trying to improve it for all of you, and ask the

8   paralegals and the associates, you know, at the end of the

9   day if there are ways we can make it better for you.

10          So when can you do a case management order?  Do

11   you know?

12          MS. CICALA:  We can confer quickly, your Honor,

13   I'm sure.

14          MR. BUEKER:  Yes, by mid next week I think we can

15   submit something.

16          THE COURT:  Perfect.  Is there one person that's

17   the point person on the rebates?

18          MR. HEROLD:  Yes, your Honor, we can come up with

19   a person who can discuss that.

20          THE COURT:  I know next week, at least in

21   Massachusetts, is school vacation week.  I'm not here to

22   destroy people's trip with their or time with their family,

23   but could we possibly get this by the end of May, the

24   deposition and any supplementation that goes with it; in

25   other words, a deposition in a couple of weeks and then a

1    couple of weeks after that a supplementation?

2            MS. CICALA:  We can certainly shoot for that, your

3    Honor.  We have a lot of activity going on on the FUL side

4    of the case right now --

5            THE COURT:  Would this make sense to make this

6    May 30?  Would that be doable for all of you?

7            MS. CICALA:  At the earliest.

8            THE COURT:  Now, on the FUL thing, that's actually

9    a long time coming, and it affects multiple cases, I think,

10   on how I think about that.

11           MS. CICALA:  I suspect multiple cases are

12   interested in it, yes.

13           THE COURT:  So you're the lead in actually

14   briefing this?

15           MS. CICALA:  Yes, your Honor, I am.

16           MR. BUEKER:  Yes, your Honor.

17           THE COURT:  Okay.

18           MR. HEROLD:  Your Honor, it's no problem for GSK

19   on the time, none at all.

20           THE COURT:  Which firm are you with?

21           MR. HEROLD:  GSK.

22           THE COURT:  No, which law firm?

23           MR. HEROLD:  Oh, I'm sorry.  I'm with Dechert,

24   your Honor.

25           THE COURT:  Dechert?  And have you been

1   coordinating -- I should know all this.  There are other

2   cases that are concerned about this.

3             MR. HEROLD:  Yes.

4             THE COURT:  I don't know if other people want to

5   file amicus on it or -- do you know?

6             MR. BUEKER:  About the FUL issue, your Honor?

7             THE COURT:  Yes.

8             MR. BUEKER:  Yes, there are other cases, I think.

9   I know across, at least, the defense group there has been

10  some coordination.

11            THE COURT:  I think that's important.  I don't

12  want to rule on it and then have the next case say, "But I

13  wanted to be heard and you got it wrong," because that

14  creates, I think, bad law across the board.

15            MR. BUEKER:  Understood.

16            THE COURT:  So I think either you can take the

17  lead, sir, from Dechert and just take a lead in briefing it

18  and coordinate with others.  If you all feel as if you

19  haven't been heard, I could either take amicus briefs, or we

20  could just tee it up in all the cases.  I don't know how you

21  want to do it.

22            MR. HEROLD:  Your Honor, just for the record, I

23  represent GSK which is not involved in the FUL discovery.

24  It's a brand company.  The FUL is a generic issue, which is

25  why we asked Mr. Bueker to come up.

Page 50

1          THE COURT:  Mr. Bueker then.

2          MR. BUEKER:  I'm here on behalf of Schering and

3    Warrick.  Warrick being the generic sub is involved in the

4    FUL discovery, your Honor.

5          THE COURT:  So GSK has no multi-source?

6          MR. HEROLD:  It has multi-source, your Honor, but

7    it's a small part of its business.

8          THE COURT:  It's not at issue in your aspect of

9    the New York case?

10         MR. HEROLD:  Correct.

11         THE COURT:  Okay, fair enough.

12         MS. CICALA:  Just as a point of clarification with

13   regard to the motion that we're here on today, I just want

14   to understand it.  So we would be permitted some additional

15   discovery, and then your Honor would seek additional

16   briefing from us --

17         THE COURT:  No, no, no, no.  I think what's been

18   fairly teed up is whether or not I aggregate or I look at

19   unit sales.  I think that's been well briefed, and I

20   understand it now.  The new issue that came up is, if I go

21   with GSK's methodology, you have countered by saying, the

22   record is not complete enough for us to know how many pass

23   and fail because we haven't had discovery into the

24   utilization rebates.  I've allowed you to have that.

25         MS. CICALA:  Okay.

1          THE COURT:  And what I want is any supplement --

2    so you should have probably a deposition within the next

3    couple of weeks.

4          MS. CICALA:  Right.

5          THE COURT:  And then by the end of May any

6    supplemental briefs solely on the utilization rebate issue

7    and your expert affidavit because I'm not going to -- my

8    guess is that you're going to have to have an expert just

9    cherry-pick through.

10          MS. CICALA:  Oh, absolutely.

11          THE COURT:  And the question is, what I really

12    want at the end of the day is which drugs pass and which

13    drugs fail.

14          MS. CICALA:  Okay.

15          THE COURT:  You know what I mean?  You know, in

16    terms of --

17          MS. CICALA:  Understood, understood.  In terms of

18    plaintiffs' affirmative motion for summary judgment against

19    GSK addressing all three prongs, however, of your Honor's

20    test, that's the marketing, AWP spreads --

21          THE COURT:  I'm only dealing with the methodology,

22    but then --

23          MS. CICALA:  We're just now talking about -- well,

24    because before on the --

25          THE COURT:  I'm only dealing with the methodology.

Page 52

1          MS. CICALA:  Okay, I understand, your Honor.

2          THE COURT:  But I will expect a serious settlement

3    push with GSK one way or another, depending on how I rule.

4          MS. CICALA:  Understood.

5          THE COURT:  I just say this for the record:  They

6    were very reasonable and really a leader in my big giant one

7    last time around, and so I found them flexible and

8    appropriate in willingness to enter into settlement

9    discussions.  So I'm talking seriously the fact that this is

10   sort of something that's going to preclude settlement until

11   I rule on it one way or another, but then I'm going to send

12   you to settlement discussions afterwards.

13         MS. CICALA:  Understood.

14         THE COURT:  One way or another, however I rule.  I

15   think that's going to be key, the GSK piece.  How many other

16   defendants are there?

17         MS. CICALA:  Quite a few, your Honor.  There are

18   thirteen involved in the FUL activity.

19         THE COURT:  Okay, I've got to go.  I have a

20   criminal sentencing.

21         MS. CICALA:  Thank you, your Honor.

22         MR. BUEKER:  Thank you, your Honor.

23         MR. HEROLD:  Thank you, your Honor.

24         THE CLERK:  Court is in recess.

25         (Adjourned, 10:10 a.m.)

Page 53

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court

8  Reporter, do hereby certify that the foregoing transcript,

9  Pages 1 through 52 inclusive, was recorded by me

10 stenographically at the time and place aforesaid in Civil

11 Action No. 01-12257-PBS and 03-10643-PBS, In Re:

12 Pharmaceutical Industry Average Wholesale Price Litigation,

13 and thereafter by me reduced to typewriting and is a true

14 and accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand

16 this 21st day of April, 2009.

17

18

19

20

21          /s/ Lee A. Marzilli
                                   _____
22          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
23

24

25