# EXHIBIT A

0001
1              THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF MASSACHUSETTS
3
4
5      ----------------------------------X
6      IN RE:  PHARMACEUTICAL INDUSTRY    :  MDL DOCKET NO.
7      AVERAGE WHOLESALE PRICE          :  CIVIL ACTION
8      LITIGATION,               :  01CV12257-PBS
9      ----------------------------------:
10     THIS DOCUMENT RELATES TO:        :
11     ALL ACTIONS                :
12     ----------------------------------X
13            DEPOSITION OF REVEREND DAVID AARONSON
14             (Taken by the Defendant)
15             Charlotte, North Carolina
16               November 17, 2005
17
18       Deposition of REVEREND DAVID AARONSON, taken
19   by the Defendant, at Huseby, Inc., 1230 West Morehead
20   Street, Charlotte, North Carolina, on the 17th day of
21   November, 2005 at 1:00 p.m., before Jackie Johnson,
22   Court Reporter and Notary Public.
0002
1              APPEARANCES
2
3    For the Plaintiff:
4
5        TERRI ANNE BENEDETTO, Esq.
6        KILA B. BALDWIN, Esq.
7        Kline & Specter
8        1525 Locust Street
9        The Nineteenth Floor
10        Philadelphia, Pennsylvania  19102
11        Email:  terrianne.benedetto@klinespecter.com
12
13    For the Defendant Schering-Plough:
14
15        STEVEN A. KAUFMAN, Ph.D., Esq.
16        Ropes & Gray, LLP
17        One International Place
18        Boston, Massachusetts  02110-2624
19        Email:  steven.kaufman@ropesgray.com
20
21
22
0003
1    For the Defendant Bristol-Myers Squibb:  (via phone)
2
3        JAMES ZUCKER, Esq.
4        Hogan & Hartson
5        875 3rd Avenue
6        New York, New York  10022

7        Email:  jszucker@hhlaw.com
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
0004
1              C O N T E N T S
2  The Witness:  REVEREND DAVID AARONSON        Examination

3  By Mr. Kaufman. . . . . . . . . . . . . . . . . .5
4  By Mr. Zucker . . . . . . . . . . . . . . . . . 49

5
6        I N D E X   O F   T H E   E X H I B I T S

7  For the Defendant                       Page
8  Exhibit Aaronson 001  CMS Medicare Summary Notice
9                   dated May 19, 2005. . . . . . .6
10  Exhibit Aaronson 002  The Board of Pensions
11                   Explanation of Benefits dated
12                   March 1-30, 2005. . . . . . .6
13  Exhibit Aaronson 003  Cancelled checks Aaron
14                   028 - 039 . . . . . . . . . .7
15  Exhibit Aaronson 004  Excerpt of the Third Amended
16                   Master Consolidated Class
17                   Action Complaint. . . . . . 15
18  Exhibit Aaronson 005  Handwritten notes entitled
19                   Chemo Meds. . . . . . . . . 19
20  Exhibit Aaronson 006  Presbyterian Orthopaedic
21                   Hospital Records
22                   Aaron 0001 - 0027 . . . . . . 22

0005
1          P R O C E E D I N G S
2              Whereupon,
3          REVEREND DAVID AARONSON,
4              having been duly sworn,
5         was examined and testified as follows:
6          EXAMINATION BY COUNSEL FOR THE DEFENDANT
7          BY MR. KAUFMAN:
8     Q.   Good afternoon, Mr. Aaronson.  I appreciate
9  your appearing here today in lieu of your wife.
10          If you would, please explain on the Record
11  why that's so.
12     A.   My wife, Sue, is recovering from chemo
13  treatment for ovarian cancer and is weak and unable
14  to travel too much.

15   Q.   For the Record, it was only just this
16  morning that I learned that you would be appearing in
17  her stead; you understand that?
18   A.   Yes.
19   Q.   You brought with you or had your lawyers
20  bring, on your behalf, some additional documents to
21  provide today; is that correct?
22   A.   Yes.
0006
1   Q.   I'm going to show them to you and have you
2  identify them for the Record.
3   A.   All right.
4         (The document referred to was
5          thereupon marked Deposition Exhibit
6          Aaronson 001 for Identification.)
7        BY MR. KAUFMAN:
8   Q.   Reverend Aaronson, you have before you a
9  document marked Deposition Exhibit Aaronson 001.
10  Would you please say what that is?
11   A.   It's a Medicare summary of her chemo
12  treatment for the month of March '05.
13        MR. KAUFMAN:  Would you mark this, please,
14  as the next exhibit.
15         (The document referred to was
16          thereupon marked Deposition Exhibit
17          Aaronson 002 for Identification.)
18        BY MR. KAUFMAN:
19   Q.   You have in front of you what's been marked
20  as Exhibit Aaronson 002.  Would you please say what
21  that is?
22   A.   It is a statement from Blue Cross/Blue
0007
1  Shield High Mark, which is the Blue Cross coverage
2  provided by the Board of Pensions of the Presbyterian
3  Church for the same period, March 1st through March
4  30th of 2005, describing the IV therapy, the
5  medications received, and the pathology tests.
6        MR. KAUFMAN:  Thank you.
7        Please mark this as the next exhibit.
8         (The document referred to was
9          thereupon marked Deposition Exhibit
10          Aaronson 003 for Identification.)
11        BY MR. KAUFMAN:
12   Q.   You have in front of you what's been marked
13  as Exhibit Aaronson 003.  Would you please say what
14  that is?
15   A.   These are personal checks payable to
16  Presbyterian Health Care Associates or Presbyterian
17  Hospital starting in August of 2004 and going through
18  July 8th of 2005.
19   Q.   And are these all of the checks that were
20  paid on account of treatment your wife received
21  during that period?
22   A.   Yes.

0008
1    Q.    Thank you.
2          Your wife is currently covered by Medicare?
3    A.    Medicare is the primary coverer.
4    Q.    Since when has she had Medicare coverage?
5    A.    Since she became eligible May 26, 1991.
6    Q.    She's enrolled in Part B of Medicare?
7    A.    Yes.
8    Q.    Since that same date?
9    A.    Yes.
10   Q.    And there is, also, Medigap coverage?
11   A.    Yes.
12   Q.    Through what source?
13   A.    Blue Cross/Blue Shield High Mark program
14   administered by the Board of Pensions of the
15   Presbyterian Church.
16   Q.    And has she had that supplemental coverage?
17   A.    That's been --
18       MS. BENEDETTO:  Reverend Aaronson, I just
19   want to make sure you realize he has to finish his
20   question before you start your answer. I don't think
21   he was quite finished with his question.  So the
22   court reporter --
0009
1        MR. KAUFMAN:  Yes.  We just need to make it
2    easy for the court reporter.  But you anticipated
3    correctly what my question was.
4        BY MR. KAUFMAN:
5    Q.    Did she have that supplemental coverage in
6    place since she had that primary coverage from
7    Medicare in May of '91?
8    A.    The Blue Cross coverage has been in effect
9    since 1950.
10   Q.    1950.  I see.
11   A.    Yeah.
12   Q.    Then it became Medigap coverage, once she
13   became eligible for Medicare?
14   A.    Yes.
15   Q.    Have you been with the church since the
16   '50s?
17   A.    Yes.
18   Q.    That's a long time.
19   A.    Ordained May 16, 1950.
20   Q.    What is your wife's Social Security number?
21   A.    I have to look it up.
22   Q.    Okay.
0010
1    A.    It's right here (indicating).
2        MS. BENEDETTO:  Just for the Record, we
3    have redacted the Social Security numbers from the
4    documents as highly confidential.
5        MR. KAUFMAN:  I think all of these records
6    are highly confidential, and we will treat them as
7    such.

8        The Social Security number might be helpful
9   in tracing through claims data.
10        MS. BENEDETTO:  Just so long as it's
11   treated as highly confidential.
12        MR. KAUFMAN:  It should be.  It will be by
13   us.
14        THE WITNESS:  Her Social Security number is
15   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.
16        BY MR. KAUFMAN:
17   Q.   And her date of birth?
18   A.   May 26, 1926.
19   Q.   Now, you have lived with your wife for
20   since '91, at least?
21   A.   55 years in September.
22   Q.   So if I ask you how long you have lived in
0011
1   different places, you will be telling me, also, about
2   where your wife lived?
3   A.   Yes.
4   Q.   How long have you lived in Matthews, North
5   Carolina?
6   A.   October 1992.
7   Q.   Where did you live before then?
8   A.   Sparta, New Jersey.
9   Q.   And during what period of time did you live
10   in Sparta, New Jersey?
11   A.   1969 to 1992.
12   Q.   You're a person of longevity.
13        Is your wife currently employed?
14   A.   No.
15   Q.   Has she ever been employed outside the
16   house since you've been with her?
17   A.   Oh, yes.  Yes.
18   Q.   If you would, please describe her
19   employment history.
20   A.   She was first employed as a secretary
21   assistant, I guess you call it, to a doctor, to a
22   physician.
0012
1   Q.   And do you remember when that was?
2   A.   That was in 19 -- well, before we were
3   married.  So it was 1948, I think, through 1955.
4        The doctor only had one arm and one -- and
5   the use of one hand.  One arm was gone.  She was an
6   x-ray technician and a secretary and an assistant
7   whenever he couldn't -- like suturing, she knew --
8   they worked well as a team.  He hated me when I
9   married her and took her away.
10   Q.   And that's what you did in 1955?
11   A.   Yes.
12   Q.   And did she work after?
13   A.   And then she worked with another doctor in
14   Sparta, New Jersey for five years.  Then she went to
15   the public library in Sparta until I retired in '92.

16    Q.    What was her educational background?

17    A.    She is a graduate of Philadelphia Bible, I

18  guess it's called now, Bible College.  Philadelphia

19  Bible College in Philadelphia.  High school and

20  college.

21    Q.    What was the degree she received upon

22  graduation?

0013

1    A.    An Associate Christian Education Degree.

2  DRE it's called.

3    Q.    Since 1991, has your wife filed a tax

4  return in Massachusetts?

5    A.    In Massachusetts?

6    Q.    Right.

7    A.    No.

8    Q.    Has she owned property in Massachusetts?

9    A.    No.

10    Q.    Has she received medical care there?

11    A.    No.

12    Q.    Purchased pharmaceutical products in

13  Massachusetts?

14    A.    No.

15    Q.    Have you visited there since '91?

16    A.    No.

17    Q.    When was your wife first diagnosed with

18  breast cancer?

19    A.    Oh, she's had three bouts of breast cancer.

20  The first one was in New Jersey, in probably '85 --

21  no. '83.  Pardon me.  Then it reoccurred in --

22        MS. BENEDETTO:  He just asked about the

0014

1  first time your wife was diagnosed.

2        MR. KAUFMAN:  But he anticipates correctly

3  again.

4        BY MR. KAUFMAN:

5    Q.    And you say there was a recurrence?

6    A.    In '85.

7    Q.    And a subsequent recurrence after that?

8    A.    And then since we've been in Charlotte,

9  since it must be '93.

10    Q.    And has she been cancer free of breast

11  cancer since '93?

12    A.    As far as I know.

13    Q.    She has a strong will.

14    A.    (Nodding head affirmatively).

15    Q.    She has been diagnosed with ovarian cancer,

16  as well; is that correct?

17    A.    Yes.

18    Q.    When was that diagnosis made?

19    A.    I should have brought a time schedule,

20  shouldn't I?

21    Q.    Yes.  I'm sorry for the quiz.

22    A.    It's all right.  I can see how well I can

0015

1  remember.
2          She was diagnosed in May of 2004 and then
3  operated on in June of 2004.
4     Q.   Was she receiving cancer treatment before
5  2004?
6     A.   No.
7          MS. BENEDETTO: Objection to the form.  You
8  can answer.  You did answer.  You need to give
9  me a second.
10          THE WITNESS:  No.
11          MR. KAUFMAN:  Would you mark this, please,
12  as the next exhibit.
13              (The document referred to was
14              thereupon marked Deposition Exhibit
15              Aaronson 004 for Identification.)
16          BY MR. KAUFMAN:
17     Q.   Reverend Aaronson, you have in front of you
18  a document marked Exhibit Aaronson 004; do you
19  recognize it?
20     A.   Yes.
21     Q.   Will you say what you recognize it to be?
22  It's only an excerpt of the total document, which is
0016
1  400 pages almost.
2     A.   It's the Third Amended Class Action
3  Complaint.
4     Q.   Yes.  If you'd like to look through it, you
5  can confirm for yourself.  It's the first several
6  pages of that document, and only the first up to the
7  page numbered 6.  There's a lot more after that which
8  I didn't copy.
9      While you're looking through, what I'm going to
10  be asking you questions about principally is
11  Paragraph No. 15, which begins on the page numbered 5
12  and is about your wife, Susan Aaronson.
13          Do you see that?
14     A.   Yes.
15     Q.   If you'd like to look through it again,
16  you're welcome to, or you can wait until I ask you
17  specific questions, whichever you prefer.
18          Do you prefer to look through it now?  Yes,
19  go ahead, please.
20     A.   Yes.  Sorry.
21     Q.   Now, have you seen this paragraph before?
22     A.   Yes.
0017
1     Q.   Did you verify the accuracy of the
2  information in it on some prior occasion?
3          MS. BENEDETTO:  I just want to -- just so
4  that the attorney/client privileged
5  communication is not infringed, I just want you to --
6  I just want to direct you to answer that question yes
7  or no.
8          THE WITNESS:  Yes, I've seen it before.

9      BY MR. KAUFMAN:
10     Q.   You've answered that.
11          My next question is whether you verified
12  the accuracy of the information contained in that
13  paragraph?
14          MS. BENEDETTO:  I'm just going to direct
15  you to answer yes or no.
16          THE WITNESS:  Yes.
17          BY MR. KAUFMAN:
18     Q.   Is there anything in the paragraph that's
19  inaccurate?
20     A.   Not that I see.
21     Q.   Now, how do you know which drugs your wife
22  was given during the course of her treatment?
0018
1      A.   I was told by a surgeon --
2          MS. BENEDETTO:  Okay.  Go ahead.
3          THE WITNESS:  -- what drugs, and then we
4   had the Medicare summary of it.  I recognize
5   some of them.
6          BY MR. KAUFMAN:
7      Q.   Well, the Medicare summary that you pointed
8   to, when you said you had the Medicare summary, was
9   one you just gave me this morning, and that's dated
10  later than the date of the Complaint.  So it wasn't
11  the basis for your saying what drugs your wife had
12  been prescribed, right?
13          MS. BENEDETTO:  Objection to the form as
14  the Third Amended Complaint, I believe, is dated
15  October of '05, and this Exhibit Aaronson 002 -- I'm
16  sorry -- Exhibit Aaronson 001 is dated May 19th of
17  2005.
18          BY MR. KAUFMAN;
19     Q.   Okay.  Well, let me ask you that:  Did you
20  use Exhibit Aaronson 001 in ascertaining what drugs
21  your wife was given?
22     A.   I kept a list of the drugs she was given.
0019
1      Q.   And do you still have that list?
2      A.   I do.
3      Q.   May I have it?
4      A.   It's just my own notes.
5          MS. BENEDETTO:  I just need to confer with
6   the witness for a moment.
7          BY MR. KAUFMAN:
8      Q.   So the question is:  May I have it?
9          MS. BENEDETTO:  Yes.
10          THE WITNESS:  I see no reason why you
11  can't.
12          BY MR. KAUFMAN:
13     Q.   If you would hand it to the court reporter,
14  she'll mark it as the next exhibit.  That way, it
15  will be clear on the Record what we're referring to,
16  and you'll get it back.

17        MS. BENEDETTO:  One more second.
18            (The document referred to was
19            thereupon marked Deposition Exhibit
20            Aaronson 005 for Identification.)
21        BY MR. KAUFMAN:
22    Q.   Now, that list, when did you put it
0020
1  together?
2    A.   Oh, months ago.
3    Q.   Could you be more specific?
4    A.   I would say during the time of the
5  treatment, because they had to -- I had the strength
6  of the medications.  So I had it listed.  That's why
7  I knew the medication she was getting.
8    Q.   And what caused you to create the list?
9    A.   The need to be informed.
10    Q.   About your wife's treatment?
11    A.   Yeah.  I wanted to know what drugs she was
12  getting.
13    Q.   And how did you learn the information that
14  you wrote on that list?
15    A.   These came from Doctor Cantuaria, the
16  oncologist surgeon.
17    Q.   And it was in 2005 that you wrote the list,
18  was it?
19    A.   I would say it was before last Fall, when
20  she was getting the heaviest chemo treatment.
21    Q.   Now, I haven't looked at the list, but it's
22  all right.  It's a long table.  But it looks like
0021
1  it's a shorter list than the list of drugs that is in
2  Paragraph 15 of the Complaint which is Exhibit
3  Aaronson 004; is that correct?
4    A.   Yes.
5    Q.   So let me ask you first:  Did you use that
6  list, which is Exhibit Aaronson 005, in ascertaining
7  any of the information that's included in Paragraph
8  15 of the Complaint which is Exhibit Aaronson 004?
9    A.   I saw some of these were included in the
10  Complaint.
11    Q.   Well, how was the list -- you said you
12  verified, on a prior occasion, that the information
13  in Paragraph 15 is accurate, right?
14    A.   Yes.
15    Q.   What did you use to compare or to determine
16  -- sorry.
17        What did you use to determine that the
18  drugs shown in the Complaint were the right drugs?
19        MS. BENEDETTO:  And I just want to instruct
20  you, if you can answer that question without
21  divulging any attorney/client communications, you may
22  do so.
0022
1        THE WITNESS:  I had a complete listing from

2   the hospital.
3       MR. KAUFMAN:  That's what I was hoping you
4   would say, because I thought it would be true.
5       Would you mark this.
6           (The document referred to was
7           thereupon marked Deposition Exhibit
8           Aaronson 006 for Identification.)
9       BY MR. KAUFMAN:
10      Q.   Now, you have in front of you what's been
11  marked as Exhibit Aaronson 006, I believe.  Would you
12  say what that is, please?
13      A.   It's a listing of medications from
14  Presbyterian Hospital.
15      Q.   Now, have you seen that before?
16      A.   Yes.
17      Q.   Was that the list to which you just
18  referred when you said you used a list from the
19  hospital to determine which drugs your wife was
20  given?
21      A.   I determined what drugs she was given from
22  talking to Doctor Cantuaria, the surgeon.  The
0023
1   hospital provided more than I had listed.
2       Q.   And the list that the hospital provided
3   you, is it Exhibit Aaronson 006?
4       A.   Yes.
5       Q.   Now, you'll see in Paragraph 15, this is
6   now Exhibit Aaronson 004 again, the Complaint, near
7   the end of that paragraph on Page 6, a statement,
8   "To date, Mrs. Aaronson has paid several thousands
9   of dollars for these and other prescription drug
10  medications."
11          Do you see that?
12      A.   Yes.
13      Q.   Is that true?
14      A.   I would think so.  If we put all the drugs
15  together, I'm sure they would.
16      Q.   Well, did you ever determine that was so?
17      A.   I never added them up.
18      Q.   Well, did you ever ascertain, to satisfy
19  yourself that it was true, that she had spent several
20  thousands of dollars on drugs?
21      A.   Yes.  I would think so.  By the time we
22  have added them all up, it would be that much.
0024
1       Q.   Now, which are you adding up, since her
2   diagnosis of ovarian cancer in 2004?
3       A.   For this treatment, the ovarian cancer.
4       Q.   And we're only talking now about the drugs,
5   not the cost of any other aspect of the treatment,
6   right; do you understand that?
7       A.   Yes.
8       Q.   Do you know how much she paid for the drugs
9   in the course of her treatment for ovarian cancer?

10    A.   I have never added them up.

11    Q.   Do you know that it's more than a thousand

12   dollars --

13    A.   Oh, I think it would be.

14    Q.   -- out of her pocket?

15    A.   Out of our pocket.

16       MS. BENEDETTO:  Objection to form.

17       THE WITNESS:  Everything we have is joint.

18       BY MR. KAUFMAN:

19    Q.   Well, let's talk about the coverage that is

20   provided by Blue Cross/Blue Shield.

21       How much does that pay of what Medicare

22   doesn't pay?

0025

1    A.   Blue Cross covers 80 percent of what

2   Medicare does not cover.

3    Q.   And Medicare pays 80 percent --

4    A.   Of the total bill.

5       MS. BENEDETTO:  See, you're anticipating

6   the end of his question and finishing his question for

7   him.  You need to let him finish his question.

8       THE WITNESS:  All right.

9       MS. BENEDETTO:  And then you finish the

10   answer.

11       THE WITNESS:  All right.  I thought he was

12   finished.

13       MS. BENEDETTO:  No.  You finished it for

14   him.

15       BY MR. KAUFMAN:

16    Q.   So Medicare pays 80 percent of the total.

17   Then the Medigap insurance covers 80 percent of the

18   residual, 80 percent of the 20 percent, which is 16,

19   leaving 4 percent that's not paid by either of the

20   insurers?

21       MS. BENEDETTO:  Objection to the form.

22       BY MR. KAUFMAN:

0026

1    Q.   Is that correct?  It's arithmetic.

2    A.   Yes.

3    Q.   So a thousand dollars is 4 percent of

4   $40,000; is that right?

5       MS. BENEDETTO:  Objection to the form.  I

6   don't think we should be giving a witness a math test

7   during his deposition.

8       MR. KAUFMAN:  I'm just asking.

9       MS. BENEDETTO:  You can answer the

10   question, if you can.

11       BY MR. KAUFMAN:

12    Q.   Do you know the answer?

13       MS. BENEDETTO:  If you can.

14       BY MR. KAUFMAN:

15    Q.   A thousand dollars is 4 percent of what?

16       MS. BENEDETTO:  I'm just going to object to

17   the form again.  I think this is an inappropriate

18   type of question for the witness. But if the witness
19   is able to do the math in his head, he can.
20        BY MR. KAUFMAN:
21     Q.   25 times a thousand dollars, right, is
22   $25,000; is that correct?
0027
1     A.   The surgery alone was 33,000.
2     Q.   Right.  And the surgery --
3     A.   And the monthly chemo has been running an
4   average of about 10,000 a month.
5     Q.   And how much of that is for drugs?
6        MS. BENEDETTO:  Objection to the form.  You
7   can answer the question.
8        THE WITNESS:  I don't know.  I would think
9   most of it.
10        BY MS. KAUFMAN:
11     Q.   And on what basis do you think it's most of
12   it?
13     A.   Because of the cost of the drugs.
14     Q.   We'll come back to that.
15        Now, has your wife been covered by any
16   insurance since 1991, other than Medicare and Blue
17   Cross/Blue Shield?
18     A.   No.
19     Q.   Apart from yourself and your wife, has
20   anyone paid any part of her medical bills?
21     A.   No.
22     Q.   If you would, look at Exhibit Aaronson 006,
0028
1   please, which is the list from the hospital.
2        Do you have that in front of you there?
3        MS. BENEDETTO:  He'll direct you to a page.
4        THE WITNESS:  Yes.
5        BY MR. KAUFMAN:
6     Q.   I was going to look right at the beginning
7   of -- at the first page, Reverend.
8     A.   Oh, all right.
9     Q.   It says there that the charges shown are
10   for an admission to the Presbyterian Orthopaedic
11   Hospital that occurred between September of '99,
12   September 27th of '99 and September 30th of '99; do
13   you see that?
14     A.   Yes.
15     Q.   Was your wife hospitalized during that
16   period?
17     A.   For a knee replacement.
18     Q.   A knee replacement?  Having nothing to do
19   with the ovarian cancer?
20     A.   No.
21     Q.   This is knee replacement?
22     A.   Yes.
0029
1     Q.   And then if you flip over a few pages to
2   the one that has at the bottom AARON 0004 -- do you

3   see that?
4      A.   I see it.
5      Q.   -- that shows a physical therapy
6   evaluation, does it?
7      A.   Yes.  That was following the knee
8   replacement.
9      Q.   Well, the date of it, though, is before the
10   knee replacement.  The date is 9-13-99, at least it
11   looks like to me.  You tell me.
12      A.   It looks like it.
13      Q.   But it doesn't appear that there were any
14   drugs involved in that treatment for the physical
15   therapy?
16         MS. BENEDETTO:  Objection to the form.  You
17   can answer.
18         BY MR. KAUFMAN:
19      Q.   Do you see any indication of the charges
20   for drugs in that treatment?
21         MS. BENEDETTO:  Objection to the form.  You
22   can answer it.
0030
1         THE WITNESS:  Your question is?
2         BY MR. KAUFMAN:
3      Q.   On Page 0004 --
4      A.   Yes.
5      Q.   -- showing the PT evaluation, it doesn't
6   appear that the PT evaluation involved the
7   administration of any drugs, does it?
8      A.   No.
9      Q.   Turn to the next page.  It shows an
10   admission to the Presbyterian Orthopaedic Hospital
11   for September 30, '99 through October 5, '99, doesn't
12   it?
13         MS. BENEDETTO:  Objection to the form.  You
14   can answer.
15         THE WITNESS:  This is the surgery, and this
16   is the rehab.
17         MS. BENEDETTO:  Okay.  You're referring to
18   this is, and you pointed to?
19         THE WITNESS:  The first two pages of
20   Exhibit Aaronson 006.
21         MS. BENEDETTO:  With the bates number 0001.
22         THE WITNESS:  Yes.  That refers to the
0031
1   surgery at Presbyterian Hospital. When you go from
2   surgery to rehab, they start a whole new record, two
3   different billings.
4         BY MR. KAUFMAN:
5      Q.   But she was hospitalized for the entire
6   period, but in two different places; is that right?
7      A.   It was 9-27 through 10-5.
8      Q.   Then if you turn to the Page 0007 --
9      A.   All right.
10      Q.   -- that shows outpatient treatment, doesn't

11  it?
12    A.   Yes.
13    Q.   For what condition was that?
14        MS. BENEDETTO:  He's only referring to
15  AARON 0007.
16        THE WITNESS:  I'm trying to see if this
17  goes on, but it doesn't.
18        BY MR. KAUFMAN:
19    Q.   It says, the third item from the bottom,
20  eye surgery.
21    A.   Oh, that was cataract.
22    Q.   That's what I thought.
0032
1        Then the next week, she had the other eye
2  done?
3    A.   Yes.
4    Q.   And that is what's shown on the next page,
5  0008, right?
6    A.   Yes.
7    Q.   On the next page, 0009, there's an
8  admission to the hospital again.
9        Is this when she was diagnosed with ovarian
10  cancer, June of 2004?
11    A.   This is the date of the surgery.
12    Q.   So she was in for surgery during that
13  period between 6-21-04 and 6-28-04?
14    A.   Yeah.  Yes.
15    Q.   Now, inpatient coverage by Medicare is Part
16  A, right?
17    A.   Yes.
18    Q.   And this was an inpatient treatment,
19  correct?
20    A.   Yes.
21    Q.   Covered by Part A, rather than Part B,
22  right?
0033
1        MS. BENEDETTO:  Objection to the form.  You
2  can answer.
3        THE WITNESS:  This was in connection with
4  Part A.
5        BY MR. KAUFMAN:
6    Q.   Now, let me ask you this question in
7  general:  Do you know the basis on which the hospital
8  computed any of the charges that are shown in the
9  column charge amount?
10        MS. BENEDETTO:  Objection to the form.  You
11  can answer it.
12        THE WITNESS:  Do I know the basis on which
13  the hospital computed --
14        BY MR. KAUFMAN:
15    Q.   The charge?
16    A.   No, I do not.
17    Q.   Now, the Medicare Part A pays what
18  percentage of hospitalization?

19     A.   I don't know.
20     Q.   What percentage of hospitalization does
21  Blue Cross/Blue Shield pay?
22     A.   80 percent of what Medicare doesn't.
0034
1     Q.   Was there any amount for this
2  hospitalization between June 21st and June 28th of
3  '04 that you or your wife paid?
4     A.   We paid the remainder of the bill that was
5  left after the two.
6     Q.   But do you know that there was some that
7  was remaining?
8     A.   Oh, yes.
9     Q.   And how much of that was for drugs?
10     A.   I don't know.
11     Q.   And how are the drug charges calculated by
12  the hospital --
13        MS. BENEDETTO:  Objection to the form.  But
14  you can answer.
15        BY MR. KAUFMAN:
16     Q.   -- for that stay?
17     A.   I don't know.
18     Q.   Now, what was the course of your wife's
19  treatment after the surgery for ovarian cancer?
20     A.   Well, he found it was advanced cancer, and
21  he told me that he debunked her of everything --
22  that's a medical term, I gather -- debunked her of
0035
1  everything that he could.  We had given permission
2  for spleen, even, if it had to go.  I don't know what
3  condition -- he said he took out everything he could.
4        MS. BENEDETTO:  I think you need to listen
5  to the question again.
6        BY MS. KAUFMAN:
7     Q.   That's all right.
8        Did he prescribe treatment of some form for
9  her after the surgery?
10     A.   He said right away she would need
11  aggressive chemo.
12     Q.   And on what regimen did he put her for
13  aggressive chemo?
14     A.   We started immediately.
15        In fact, I was told by him or his staff
16  that usually you wait six weeks to start chemo to get
17  sufficiently over the surgery.  He felt it was so
18  advanced, he wanted to start within four weeks.  So
19  in four weeks, in July, she started the chemo.
20     Q.   With what frequency?
21     A.   I thought it was the first week every day,
22  and then it became once a week.
0036
1     Q.   I'm sorry.  The first week every day.  I
2  don't understand that.
3        So for the first week, it was seven days?

4     A.   The first week after she started chemo, it
5  was a heavy, heavy dosage.  In fact, she was a basket
6  case during that week.
7     Q.   And then after that first week, it became
8  once a month?
9     A.   Once a week.
10    Q.   Oh, once a week?
11    A.   Yeah.
12    Q.   And then it went to twice a month, every
13  other week?
14    A.   It graduated down.  I am not sure whether
15  it was -- I think it was every other week, and then
16  we finally got to every third week.  That's the way
17  it stayed through the eight months of chemo.
18    Q.   And has she concluded that now?
19        MS. BENEDETTO:  Objection to the form, but
20  you can answer the question.
21        THE WITNESS:  After she finished -- should
22  I tell him about the -- after she finished the chemo,
0037
1  the doctor suggested chemo maintenance.
2        BY MR. KAUFMAN:
3     Q.   Which involved what?
4     A.   More chemo, more drugs.
5     She finished the eight months.  Doctor Cantuaria
6  said it was -- based on a report in New England
7  Journal of Medicine, that those who finish the
8  traditional treatment have one to two years
9  reoccurrence.  Those that go on maintenance have
10  three to five years reoccurrence.  So she chose to go
11  on maintenance until the blood counts became very
12  weak.
13    Q.   Has that happened?
14    A.   It has happened.  So he stopped it for two
15  months.
16    Q.   Now, the intensive chemo, initially,
17  following her surgery in 2004, was that administered
18  at the Presbyterian Hospital?
19    A.   Yes.  It was all done through the Cancer
20  Center at Presbyterian Hospital.
21    Q.   And was that all covered by Part A of
22  Medicare?
0038
1        MS. BENEDETTO:  Objection to the form.  But
2  you can answer.
3        THE WITNESS:  Yes.
4        BY MR. KAUFMAN:
5     Q.   Not by Part B?
6        MS. BENEDETTO:  Objection to the form.  You
7  can answer.
8        THE WITNESS:  I think it was covered by
9  Part A.  It was all part of the original treatment.
10        BY MR. KAUFMAN:
11    Q.   Now, was any of your wife's treatment

12  administered in a doctor's office?

13    A.   It was all done at the Cancer Center.  Even

14  when we went in for a shot, it was done at the Cancer

15  Center.

16    Q.   So the drugs that your wife was prescribed

17  and administered as part of her treatment, did you

18  see those drugs, any of the packages that indicated

19  who made them?

20    A.   Yes.

21    Q.   So do you know who manufactured the drugs

22  that were administered to your wife?

0039

1    A.   I didn't look at them.  I looked at the

2  names of the drugs.  I didn't look at the

3  manufacturer.

4    Q.   So if we go back now to the Complaint,

5  which is Exhibit Aaronson 004, in Paragraph 15, you

6  see that after the description of each of the drugs,

7  there's a parenthetical remark that indicates the

8  names of drug companies; do you see that?

9    A.   Yes.

10    Q.   And in most instances, there's more than

11  one drug company listed after the description of the

12  drug?

13    A.   Yes.

14    Q.   Do you know which of the listed possible

15  manufacturers was the actual manufacturer of the drug

16  your wife received?

17    A.   No, I do not.

18    Q.   Is there any way you could find that out,

19  that you know of?

20        MS. BENEDETTO:  Objection to the form.

21        THE WITNESS:  Is there any way I could find

22  out?

0040

1        BY MR. KAUFMAN:

2    Q.   Who the manufacturer was?

3    A.   I don't think so.

4    Q.   Have you ever heard the expression average

5  wholesale price before you became involved in this

6  litigation?

7    A.   No.

8    Q.   Have you heard it since you've been

9  involved?

10    A.   I noticed it in the Complaint.

11    Q.   What were the circumstances of your -- and

12  by your now, I mean collectively you and your wife,

13  what were the circumstances of your becoming involved

14  in the lawsuit?

15        MS. BENEDETTO:  I just want to caution you

16  not to divulge any attorney/client privileged

17  communications in connection with answering this

18  question.

19        THE WITNESS:  The question was?

20      BY MR. KAUFMAN:
21      Q.   What were the circumstances of your
22   becoming involved in this lawsuit?  How did that come
0041
1    about?
2           MS. BENEDETTO:  In fact, I'm going to
3    instruct you not to answer the question based on
4    attorney/client privilege.
5           MR. KAUFMAN:  Well, there has to have been
6    a first step before there was any client
7    relationship.
8           MS. BENEDETTO:  Well, except that there was
9    a pre-existing client relationship.
10          MR. KAUFMAN:  I don't think so.  I don't
11   think you represent the members of the class until
12   there's a certification of the class.
13          MS. BENEDETTO:  The Aaronsons have been a
14   client of Kline & Specter since 2003.
15          MR. KAUFMAN:  In connection with this
16   litigation?
17          MS. BENEDETTO:  In connection with related
18   litigation.
19          BY MR. KAUFMAN:
20      Q.   Let me ask you this:  How did you learn of
21   this lawsuit?
22          MS. BENEDETTO:  And I'm going to direct you
0042
1    not to answer based on the attorney/client privilege.
2           BY MR. KAUFMAN:
3       Q.   Was your involvement in this litigation
4    solicited by an attorney?
5           MS. BENEDETTO:  I'm also going to advise
6    you --
7           MR. KAUFMAN:  That's not privileged.
8           BY MR. KAUFMAN:
9       Q.   Did an attorney solicit your involvement in
10   this lawsuit?  Did somebody, an attorney, come to you
11   and ask you or your wife to be involved in this
12   lawsuit?
13          MS. BENEDETTO:  I'm going to object and
14   instruct you not to answer based on the attorney/
15   client privilege.
16          MR. KAUFMAN:  That's not a privileged
17   communication.
18          MS. BENEDETTO:  Well, that's my
19   instruction.  They were pre-existing clients of our
20   firm, and my instruction is for the witness not to
21   answer the question.
22          BY MR. KAUFMAN:
0043
1       Q.   Do you understand what you've agreed to do
2    in agreeing to become a party to the litigation?
3       A.   Yes.
4       Q.   What is that?

5      A.   I'm a representative of a larger, much
6  larger group of people who I feel and they feel that
7  we've been overcharged.
8      Q.   And on what basis do you feel that you've
9  been overcharged?
10     A.   The extravagant cost of the drugs.
11     Q.   Anything else that makes you think you were
12  overcharged?
13     A.   That's the point of this Complaint, is the
14  overcharging of the drugs.
15     Q.   What makes it wrong, other than that it was
16  high?  The drugs prices were high.  I understand you
17  think that.  What makes that legally wrong, by your
18  length?  Why do you think that was legally wrong?
19  What was legally wrong about the amount of the
20  charges?
21        MS. BENEDETTO:  Objection to the form.  But
22  you can answer.
0044
1        THE WITNESS:  What was wrong was that it
2  was so much higher than it needed to be.
3        BY MR. KAUFMAN:
4      Q.   Needed for what?
5      A.   At a moderate price of drugs.
6      Q.   Do you understand that you have any
7  financial responsibility as a result of your agreeing
8  to be a class representative?
9        MS. BENEDETTO:  Objection to the form.  But
10  you can answer.
11        THE WITNESS:  Well, my financial, not
12  monetary, but my time in preparing the records, in
13  seeking out the documentation needed, my willingness
14  to come here, those expenses.
15        BY MR. KAUFMAN:
16     Q.   For the cost of the lawsuit, do you believe
17  you have any responsibility?
18     A.   No.
19     Q.   What do you understand AWP to be, now that
20  you've become somewhat familiar with that phrase?
21     A.   I understand it to be the ceiling of the
22  drugs involved.  It's the capstone that all the
0045
1  billing is looked at and directed to.
2      Q.   Well, let me ask you about that:  How do
3  you know that?
4        MS. BENEDETTO:  And I am going to instruct
5  you to restrict your answer to information that you
6  gleaned other than from counsel.
7        THE WITNESS:  Oh, I'm a member of AARP.  I
8  read constantly about that whole drug scene.  I
9  belong to Bottom Line Health, and I read there. Plus
10  the media and the newspapers occasionally carry
11  articles on extravagant costs of some drugs.
12        MR. KAUFMAN:  I'm also a member of AARP,

13  and I don't remember AARP saying word one about AWP.
14      MS. BENEDETTO: Objection, argumentative.
15      BY MR. KAUFMAN:
16   Q.   Has AARP said anything about AWP?
17   A.   No.  I didn't say they had.
18   Q.   Then maybe I'll ask my question again.
19       What do you understand about AWP, other
20  than what your lawyers have told you about it?
21   A.   I understand it's the price index which is
22  used to determine the billing for drugs.
0046
1    Q.   And what leads you to that conclusion,
2   other than what your lawyers tell you?
3    A.   It's a fact, isn't it, that it stands
4   there?
5    Q.   Would you answer my question, please?
6       MS. BENEDETTO: I believe he has answered
7   your question.  I think you're being argumentative
8   now.  He listed a grouping of publications. Just
9   because you're claiming that you never seen an
10  article in AARP related to AWP doesn't mean it
11  doesn't exist.
12      MR. KAUFMAN: Now he took that back.
13  Let's just go through this slowly here.
14      BY MR. KAUFMAN:
15   Q.   What leads you to believe, other than what
16  your lawyers tell you, that AWP is used in pricing
17  drugs?
18   A.   You mean have I read about it somewhere
19  else?  Is that what you're asking?
20   Q.   By any other means?  What leads you to
21  believe -- I think that's pretty clear.
22       What leads you to believe, other than what
0047
1   your lawyers tell you, that AWP is used in pricing
2   drugs?
3    A.   I read about AWP in the Complaint.
4    Q.   Anything else?
5    A.   No.
6    Q.   So your understanding of the role of AWP,
7   in pricing drugs, is limited entirely to what your
8   lawyers have told you and what's in the Complaint,
9   correct?
10      MS. BENEDETTO: Objection to the form.  You
11  can answer.
12      THE WITNESS: Yes.  I have talked about it
13  now, since I've read the Complaint, with other
14  people, and I understand other people know about
15  that.  In fact, I was surprised.
16      BY MR. KAUFMAN:
17   Q.   But you don't have any other independent
18  information, other than what your lawyers told you
19  and what is in the Complaint, right?
20   A.   I did some internet checking and saw that

21  it was used quite freely there.
22    Q.   When did you do that?
0048
1     A.   Since I read the Complaint.
2     Q.   Now, do you believe that your wife's
3   doctors have made decisions in her treatment based on
4   impact on them?
5        MS. BENEDETTO:  Objection to the form.  But
6   you can answer it.
7        THE WITNESS:  You mean based on what they
8   could profit by it?
9        BY MR. KAUFMAN:
10    Q.   Well, that would be one way.
11       Do you believe they have been motivated by
12  their own profit in their prescription --
13    A.   I think they allowed themselves to be
14  manipulated by it.
15    Q.   You do.  So doctor -- what's your wife's
16  treating physician?
17    A.   Cantuaria.
18    Q.   Doctor Cantuaria.
19       Has any of the treatment he's prescribed
20  for your wife been influenced by anything other than
21  his concern for your wife's health?
22       MS. BENEDETTO:  Objection to the form.  You
0049
1   can answer it.
2        THE WITNESS:  No.  I think he is concerned
3   about her well-being.
4        MR. KAUFMAN:  Now, the documents that have
5   been produced so far, it's our position -- this is
6   not a question for you.  It's a statement for the
7   Record. The documents that have been produced so far
8   are insufficient to satisfy the requirements of Judge
9   Saris' August 16th Order.  For that reason, we're not
10  going to conclude the deposition, but we will adjourn.
11   I have no further questions for you, and we will
12  take up with the judge whether the documentary and
13  other deficiencies to date, what effect they have.
14  But for now, thank you for your time, and good luck
15  with your wife.
16       THE WITNESS:  Thank you.
17       MR. ZUCKER:  This is Jim Zucker in New York
18  representing Bristol-Myers Squibb.  I'd just like to
19  ask one question.
20       EXAMINATION BY COUNSEL FOR THE DEFENDANT
21       BY MR. ZUCKER
22    Q.   Reverend Aaronson, can you recall when you
0050
1   first read the Complaint?
2     A.   I've had it for over a month.  The full
3   Complaint you mean?
4     Q.   Yes.
5     A.   I've had it for over a month.

6     Q.   Would it be fair to say then that you first
7  read the Complaint in the first or second week of
8  October?
9     A.   Probably.
10    Q.   Do you recall?
11    A.   I would say I read it as soon as it came,
12  and it would be the first week of October, I would
13  think.
14          MR. ZUCKER:  Okay.  Thank you very much.
15          MS. BENEDETTO:  I just want to place on the
16  Record that, obviously, we disagree about
17  whether or not the deposition is concluded
18  today.  Our position is the deposition is
19  concluded today.  But obviously, we will take
20  that up on another day.
21          MR. KAUFMAN:  Thank you, Reverend.
22           (Thereupon the taking of the
0051
1              deposition was concluded.)
2                - - - - - - - - -
3
4               -------------------------------
5        The signature above of REVEREND DAVID
6   AARONSON was subscribed and sworn to before me this
7   _____ day of _____ 2005.
8               -------------------------------
9                    Notary Public
10                    My commission expires
11
12
13
14
15
16
17
18
19
20
21
22
0052
1                    CERTIFICATE
2    STATE OF NORTH CAROLINA        )
3
4    COUNTY OF CLEVELAND            )
5
6
7          I, JACKIE JOHNSON, the officer before whom
8    the foregoing deposition was taken, do hereby certify
9    that the witness whose testimony appears in the
10   foregoing deposition was duly sworn by me; that the
11   testimony of said witness was taken by me to the best
12   of my ability and thereafter reduced to typewriting
13   under my direction; that I am neither counsel for

14  related to, nor employed by any of the parties to the
15  action in which this deposition was taken, and
16  further that I am not a relative or employee of any
17  attorney or counsel employed by the parties thereto,
18  nor financially or otherwise interested in the
19  outcome of the action.
20
21
22
0053
1       _____
2                    JACKIE JOHNSON
3                    Court Reporter
4                    Notary Public in and for
5                    County of Cleveland
6                    State of North Carolina
7    My commission expires August 30, 2006
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22