0001
1            UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3  -----------------------------------x
4  IN RE:  PHARMACEUTICAL INDUSTRY      )
5  AVERAGE WHOLESALE PRICE          ) MDL DOCKET NO.
6  LITIGATION                  ) CIVIL ACTION
7  -----------------------------------) 01CV12257PBS
8  THIS DOCUMENT RELATES TO:        )
9  ALL ACTIONS                 )
10  -----------------------------------)
11          DEPOSITION OF DAVID R. AARONSON
12                 VOLUME II
13        (Taken on behalf of the Defendants)
14             Charlotte, North Carolina
15                March 31, 2006
16
17       Deposition of DAVID R. AARONSON, taken on
18  behalf of the Defendants, at the offices of Huseby,
19  Inc., 1230 West Morehead Street, Charlotte, North
20  Carolina, on the 31st day of March, 2006, at
21  10:08 a.m., before Christine A. Taylor, Court
22  Reporter and Notary Public.
0002
1          A P P E A R A N C E S
2
3  For the Plaintiffs:
4        SCOTT ALAN GEORGE, ESQ.
5        Sheller, Ludwig & Badey, PC
6        1528 Walnut Street, 3rd Floor
7        Philadelphia, Pennsylvania  19102
8        Telephone: (215) 790-7300
9        Facsimile: (215) 546-0942
10        E-Mail:   sgeorge@sheller.com
11
12  For the Defendant Abbott Laboratories:
13        CAROL P. GEISLER, ESQ.
14        IRENE S. FIORENTINOS, ESQ.
15         (via telephone)
16        Jones Day
17        77 West Wacker Street
18        Chicago, Illinois  60601
19        Telephone: (312) 782-3939
20        Facsimile: (312) 782-8585
21        E-Mail:   cgeisler@jonesday.com
22               ifiorentinos@jonesday.com
0003
1          A P P E A R A N C E S (CONTINUED)
2
3  For the Defendant Amgen, Inc.:
4        JENNIFER A. WALKER, ESQ.
5         (via telephone)
6        Hogan & Hartson, LLP

```
 7        111 South Calvert Street
 8        Baltimore, Maryland  21202
 9        Telephone: (410) 659-2700
10        Facsimile: (410) 539-6981
11        E-Mail:  jawalker@hhlaw.com
12
13   For the Defendant Baxter International, Inc.:
14        EDEN M. HEARD, ESQ.
15          (via telephone)
16        Dickstein Shapiro Morin & Oshinsky LLP
17        2101 L Street, N.W.
18        Washington, DC  20037
19        Telephone: (202) 777-2571
20        Facsimile: (202) 887-0689
21        E-Mail:  hearde@dsmo.com
22   (CONTINUED)
0004
 1        A P P E A R A N C E S  (CONTINUED)
 2
 3   For the Defendant Bristol-Myers:
 4        SANDHYA P. KAWATRA, ESQ.
 5          (via telephone)
 6        Hogan & Hartson, LLP
 7        875 Third Avenue
 8        New York, New York  10022
 9        Telephone: (212) 918-3532
10        Facsimile: (212) 918-3100
11        E-Mail:  spkawatra@hhlaw.com
12
13   For the Defendant Dey, Inc.:
14        PHILIP D. ROBBEN, ESQ.
15          (via telephone)
16        Kelley Drye & Warren LLP
17        101 Park Avenue
18        New York, New York  10178
19        Telephone: (212) 808-7726
20        Facsimile: (212) 808-7897
21        E-Mail:  probben@kelleydrye.com
22   (CONTINUED)
0005
 1        A P P E A R A N C E S  (CONTINUED)
 2
 3   For the Defendant GlaxoSmithKline:
 4        H. B. ROBACK, ESQ.
 5          (via telephone)
 6        Covington & Burling
 7        1201 Pennsylvania Avenue, N.W.
 8        Washington, DC  20004
 9        Telephone: (202) 662-5174
10        Facsimile: (202) 662-6291
11        E-Mail:  hroback@cov.com
12
13   For the Defendants Pharmacia & Pfizer:
14        KEVIN P. MCCULLOCH, ESQ.
```

```
15          (via telephone)
16       Morgan, Lewis & Bockius LLP
17       1111 Pennsylvania Avenue, N.W.
18       Washington, DC  20004
19       Telephone: (202) 739-3000
20       Facsimile: (202) 739-3001
21       E-Mail:   kmcculloch@morganlewis.com
22    (CONTINUED)
0006
 1        A P P E A R A N C E S  (CONTINUED)
 2
 3  For the Defendant Sicor Group:
 4       KENDRA K. HARTMAN, ESQ.
 5          (via telephone)
 6       Sonnenschein Nath & Rosenthal LLP
 7       7800 Sears Tower
 8       233 South Wacker Drive
 9       Chicago, Illinois  60606
10       Telephone: (312) 876-8006
11       Facsimile: (312) 876-7934
12       E-Mail:   khartman@sonnenschein.com
13
14  For the Defendant Schering-Plough & Warrick:
15       ADAM WRIGHT, ESQ.
16          (via telephone)
17       Ropes & Gray LLP
18       One International Place
19       Boston, Massachusetts  02110
20       Telephone: (617) 951-7956
21       Facsimile: (617) 951-7050
22       E-Mail:   adam.wright@ropesgray.com
0007
 1        A P P E A R A N C E S  (CONTINUED)
 2
 3  For the Defendant Watson Pharmaceuticals, Inc.:
 4       MICHELLE L. BUTLER, ESQ.
 5          (via telephone)
 6       Hyman, Phelps & McNamara, PC
 7       700 Thirteenth Street, N.W.
 8       Suite 1200
 9       Washington, DC  20005
10       Telephone: (202) 737-7551
11       Facsimile: (202) 737-9329
12
13
14
15
16
17
18
19
20
21
22
```

0008
1          C O N T E N T S
2  EXAMINATION:                    PAGE

3   By Ms. Geisler................................ 009
4   By Mr. Robben................................ 100
5   By Ms. Hartman................................ 103
6   By Ms. Butler................................ 107
7   By Mr. McCulloch.............................. 110
8   By Ms. Heard.................................. 110
9   By Ms. Walker................................. 111
10  FURTHER EXAMINATION:
11   By Mr. Robben................................ 109
12   By Ms. Geisler................................ 109
13   By Ms. Butler................................ 110

14
15     I N D E X   O F   T H E   E X H I B I T S
16  NUMBER            DESCRIPTION          PAGE

17  Exhibit Aaronson V2 001, Errata Sheets........... 013
18  Exhibit Aaronson V2 002, AARON 046 to 049........ 021
19  Exhibit Aaronson V2 003, AARON 0084 to 0091...... 027
20  Exhibit Aaronson V2 004, AARON 040 to 045........ 034
21  Exhibit Aaronson V2 005, AARON 0001 to 0027...... 047
22  Exhibit Aaronson V2 006, Fourth Amended Complaint 062

0009
1          P R O C E E D I N G S
2
3   Whereupon, DAVID R. AARONSON, having been duly
4   sworn, was examined and testified as follows:
5
6          EXAMINATION
7   BY MS. GEISLER:
8      Q.  Good morning, Reverend Aaronson.  I'm
9   Carol Geisler, I'm from the law firm of Jones Day,
10  and we represent Abbott Laboratories in this
11  litigation.
12         Can you please state your full name for
13  the record?
14     A.  David Richard Aaronson.
15     Q.  Can you spell your last name for the court
16  reporter, please?
17     A.  A-a-r-o-n-s-o-n.
18     Q.  Other than the deposition that you gave
19  back in November 2005, have you ever been deposed
20  before?
21     A.  No.
22     Q.  I'd like to just take a couple of minutes
0010
1   and go over a couple of rules of the deposition so
2   that we're all on the same page.  First of all,
3   obviously, the court reporter has sworn you in and
4   so you are under oath.  We need you to make a verbal
5   response. You can't nod your head or make other body
6   motions so that the court reporter can take it down.
7          If there's a question that I ask you that

8  you're not clear about or you don't understand,
9  please ask me and I'll try to rephrase it for you so
10  that you do understand it.  Please let me finish my
11  questions completely before you answer and I'll do
12  my best to let you finish your answer before my next
13  question. If at any time you need a break, just let
14  me know and we'll try to accommodate you.
15          Okay, Reverend, as you prepared for this
16  deposition, did you speak with anyone before this
17  deposition about -- did you speak with anyone about
18  this deposition?
19      A.  This gentleman.
20      Q.  And you're pointing to your attorney?
21      A.  Attorney.
22      Q.  And when --
0011
1      A.  Scott George, if you want a name.
2      Q.  And when did you speak with him?
3      A.  Last evening.
4      Q.  And how long did that conversation last?
5          MR. GEORGE:  Just how long.
6          THE WITNESS:  One hour.
7  BY MS. GEISLER:
8      Q.  And who was present during the
9  conversation?
10      A.  Just he and I.
11      Q.  Okay.  And did you speak with anyone else
12  other than your lawyer regarding this deposition?
13      A.  No.
14      Q.  Did you review any documents in
15  preparation for this deposition?
16      A.  I read over the amended -- fourth amended
17  and I read over my last deposition.
18      Q.  When you say "fourth amended," are you
19  referring to the Fourth Amended Master Consolidated
20  Class Action Complaint?
21      A.  Yes.
22      Q.  Did you bring any of those documents with
0012
1  you today?
2      A.  I have them.
3      Q.  And have you given your attorney a copy of
4  every document that you've reviewed for this
5  deposition?
6          MR. GEORGE:  We have copies of the
7  documents he reviewed.
8          MS. GEISLER:  Have you produced all of
9  those documents?
10          MR. GEORGE:  They are the public documents
11  that your clients have and all the clients on the
12  phone has and everyone else has.
13          MS. GEISLER:  So there are no additional
14  documents?
15          MR. GEORGE:  No.

16      MS. GEISLER:  Okay.
17  BY MS. GEISLER:
18      Q.   You had your deposition previously taken
19  in this matter in November of 2005, I think it was
20  November 17th; correct?
21      A.   Yes.
22      Q.   And after that deposition did you review
0013
1  the transcript for accuracy?
2      A.   Yes, I did.
3      Q.   And did you have the opportunity at that
4  time to make any changes to the transcript?
5      A.   I did.
6      Q.   And did you make any changes to the
7  transcript?
8      A.   No.
9        MS. GEISLER:  I'm going to ask the court
10  reporter to mark this document as Exhibit Aaronson
11  V2 001.
12            (Exhibit Aaronson V2 001 marked for
13  identification.)
14  BY MS. GEISLER:
15      Q.   Okay.  Reverend Aaronson, if you would
16  take a look at that please.  The first page is a
17  letter from your attorney -- your attorney's firm to
18  another attorney that is a member of the defense
19  group.  If you look at the second page though.  Have
20  you ever seen this before?
21      A.   Yes.
22      Q.   Can you tell me what it is?
0014
1      A.   It's a page to put any errors that I found
2  in the deposition.
3      Q.   And at the top of the page it says "none
4  found;" is that your writing?
5      A.   That's mine.
6      Q.   So you're indicating there you found no
7  errors in your previous transcript?
8      A.   No.
9      Q.   Is that your signature on the top of that
10  page?
11      A.   It is.
12      Q.   And then you dated it January 11, 2006?
13      A.   Yes.
14      Q.   Okay.  If you look at the next page, is
15  that your writing there?
16      A.   Yes.
17      Q.   It says, "none found"?
18      A.   Yes.
19      Q.   And the last page --
20      A.   Yes.
21      Q.   -- that's your writing also, "none found"?
22      A.   Yes.
0015

1    Q.   Okay.  Thank you.  In your previous
2 deposition, Reverend Aaronson, the attorney that
3 took the deposition walked through all kinds of
4 background information on you and I don't want to go
5 through all of that again this morning.  I do want
6 to confirm, what is current address?
7    A.   9621 Marshbrooke Road in Matthews, North
8 Carolina 28105.
9    Q.   And can you give me your date of birth
10 please?
11    A.   My date of birth is 9/15/27.
12    Q.   And your wife's date of birth?
13    A.   5/26/26.
14    Q.   And are you still retired?
15    A.   Yes.
16    Q.   Can you tell me, has your wife ever been a
17 party to any other lawsuit?
18        MR. GEORGE:  Objection.  Asked and
19 answered.
20        THE WITNESS:  No.
21 BY MS. GEISLER:
22    Q.   And have you ever been a party to any
0016
1 other lawsuit?
2    A.   No.
3    Q.   Reverend, isn't it true that you were
4 represented by Kline & Specter in the Lupron
5 litigation?
6    A.   Yes.
7        MR. GEORGE:  Counsel, I'm going to --
8 maybe I should have prefaced this at the beginning.
9 There was a letter sent by Ms. Golden to Douglas
10 Farquhar on March 21st explaining we're representing
11 Reverend Aaronson today for himself and his wife,
12 who's still going through cancer therapy, but also
13 making clear that we're presenting Mr. Aaronson
14 today to answer questions about the Track 2 drugs.
15        The Court has already ruled on Rule 23
16 issues and they were -- he was presented in the
17 first deposition in November to answer questions on
18 that. His appearance now is for the benefit
19 exclusively regarding Track 2 drugs and the
20 defendants -- for those drugs as questions relating
21 to the products and not to retrack over ground the
22 Court has already disposed of and that could have or
0017
1 should have been greeted back in November.
2        MS. GEISLER:  Counsel, we're going to
3 respectfully disagree with you on that issue.  These
4 are new defendants, these are new drugs, and we have
5 the right to ask these questions.  Pursuant to CMO
6 16 we have the right to take this deposition, and so
7 we're going to ask the questions that we believe
8 need to be asked in this deposition that we believe

9   we have the right to ask.
10        MR. GEORGE:  Just so you understand, I'll
11   give you some leeway, but I'll be instructing my
12   witness -- my client not to answer if it goes too
13   far because it's an improper line of questioning
14   given the stage of the proceedings and the fact that
15   these new defendants as a quorum have been named
16   defendants since the initiation of this case and had
17   every right to appear at the first deposition where
18   Rule 23 issues were raised in advance of the
19   briefing.  And the Court has since declared that Mr.
20   Aaronson, along with other plaintiffs, are adequate
21   for class action purposes in this litigation.
22        MS. GEISLER:  We're going to disagree on
0018
1   that issue.  So let's go forward and see what we can
2   get done here this morning.
3        MR. GEORGE:  Okay.
4   BY MS. GEISLER:
5   Q.   Reverend, do you and your wife have a
6   joint checking account?
7   A.   Yes.
8   Q.   So both of your names are on the checks?
9   A.   Yes.
10   Q.   And both you and your wife have the right
11   to sign the checks?
12   A.   Yes.
13   Q.   Do you use this checking account to pay
14   all of your wife's medical bills?
15   A.   Yes.
16   Q.   Do you have a checking account to which
17   your wife does not have access?
18   A.   No.
19   Q.   Are you aware of whether your wife has a
20   checking account --
21   A.   No.
22   Q.   -- to which you do not have access?
0019
1        MR. GEORGE:  Let her finish.  Take your
2   time.
3        And also I'm objecting to this.  And if
4   you keep it closed in, that's fine, but I don't want
5   to go too far from this.  It's Rule 23 stuff.
6   BY MS. GEISLER:
7   Q.   I want to talk a little bit about your
8   wife's Medicare eligibility and I just want to
9   update a couple of issues here.  Can you tell me
10   when your wife became eligible for Medicare?
11        MR. GEORGE:  That's not an update.  If you
12   want to ask him if there's been any change in her
13   status since November of 2005, that's very fair.
14   But, again, this kind of inquiry is something that
15   was dealt with in the first deposition.  It's
16   harassment to my client and it's improper given the

17  Court's ruling on the Rule 23 issues.
18      MS. GEISLER:  Are you instructing your
19  client not to answer?
20      MR. GEORGE:  That question, yes.
21  BY MS. GEISLER:
22    Q.  Are you going to abide by your attorney's
0021

1  instructions, Reverend Aaronson?
2    A.  Yes.
3    Q.  Has your wife ever been declined Medicare
4  coverage?
5    A.  No.
6    Q.  Have there been any change in her Medicare
7  coverage since November of 2005?
8    A.  No.
9    Q.  Are you familiar with the term
10  "coinsurance"?
11    A.  Yes.
12    Q.  Does your wife have a coinsurance payment
13  with Medicare?
14      MR. GEORGE:  Asked and answered.  Again,
15  Counsel, this is Rule 23 stuff.  It was endeavored
16  into earlier.  You can answer this one question.
17  But I'm going to keep these lines of inquiry very
18  short. Your client can ask Track 2 questions and
19  that's what this is about.
20      THE WITNESS:  The question again?
21  BY MS. GEISLER:
22    Q.  Does your wife have a coinsurance payment
0021

1  with Medicare?
2    A.  No.  Coinsurance with Medicare?
3    Q.  Yes.
4      MR. GEORGE:  Do you understand the terms?
5      THE WITNESS:  No, I don't understand it.
6  BY MS. GEISLER:
7    Q.  Do you understand the term "coinsurance"?
8    A.  I thought I did.  I don't know what
9  connection that has to Medicare.
10    Q.  Have you ever paid anything for the drugs
11  your wife has received during her treatments?
12      MR. GEORGE:  You mean the Track 2 drugs?
13  I'll let him answer that.
14  BY MS. GEISLER:
15    Q.  Are you going to abide by your attorney's
16  instruction?
17    A.  Yes.
18    Q.  Have you ever paid for any of the Track 2
19  drugs that your wife received during her treatments?
20    A.  Yes.
21      MS. GEISLER:  Can you please mark that?
22        (Exhibit Aaronson V2 002 marked for
0022

1  identification.)

2  BY MS. GEISLER:
3      Q.  Okay.  Reverend, are you familiar with the
4  term "Bates number"?
5      A.  Base?
6      Q.  Bates number.
7          MR. GEORGE:  Objection.
8          THE WITNESS:  No.
9  BY MS. GEISLER:
10     Q.  At the bottom of the exhibit you have
11 there, do you see the letters A-A-R-O-N?
12     A.  Yes.
13     Q.  046?
14     A.  Yes.
15     Q.  That's a Bates number.
16     A.  All right.
17     Q.  Okay.  So when we refer to these
18 documents, I'm going to refer to them by Bates
19 number so that we're all sure that we're looking at
20 the same page.
21     A.  All right.
22         MR. GEORGE:  I don't know if I have a copy
0023
1  of my documents here, but I believe all the
2  documents we formally produced were formally printed
3  with AARON 001.  I notice these are handwritten.  I
4  don't know if this is unusual for this one sequence
5  or if something else is going on.
6          MS. GEISLER:  We have a group of documents
7  that you produced to us that were handwritten.
8          MR. GEORGE:  Okay.  Again, I'm just
9  pointing this out.  I don't know what the situation
10 is exactly.
11 BY MS. GEISLER:
12     Q.  Reverend Aaronson, do you know what this
13 document is?
14     A.  It's a listing of the drugs used in the
15 treatment for my wife from the cancer center at
16 Presbyterian Hospital.
17     Q.  And who created the document?
18     A.  Medicare.
19     Q.  And as we're looking at page 046 --
20     A.  Yes.
21     Q.  -- across the top we see "date of
22 service;" do you see that?
0024
1          I'm looking in this box that's on the page
2  here, date of service.
3          MR. GEORGE:  Are you looking down here?
4          MS. GEISLER:  Yes.
5          THE WITNESS:  Month of March?
6  BY MS. GEISLER:
7      Q.  Correct.  March 1, 2005 through March 30,
8  2005.
9          MR. GEORGE:  Objection.  Document speaks

10  for itself.
11       THE WITNESS:  Yes.
12  BY MS. GEISLER:
13     Q.  And then "services provided"?
14     A.  Yes.
15     Q.  "Amount charged"?
16     A.  Yes.
17       MR. GEORGE:  Same objection.
18  BY MS. GEISLER:
19     Q.  "Noncovered charges"?
20     A.  Yes.
21       MR. GEORGE:  You want him to confirm that
22  these columns are like that on the document?
0025
1        MS. GEISLER:  Yes.
2        MR. GEORGE:  The document speaks for
3  itself. Objection.
4  BY MS. GEISLER:
5     Q.  "Deductible and coinsurance"?
6     A.  I see it.
7     Q.  And "you may be billed"?
8     A.  Yes.
9     Q.  Now do you see the first line there marked
10  "pharmacy"?
11       MR. GEORGE:  You mean across from the
12  date, the date range?
13       THE WITNESS:  Yes.
14  BY MS. GEISLER:
15     Q.  It says amount charged $421.20?
16     A.  Yes.
17     Q.  Looking across that row where it says,
18  "you may be billed," can you tell me what amount is
19  in that column there?
20       MR. GEORGE:  Objection.  You can answer.
21       THE WITNESS:  None.
22  BY MS. GEISLER:
0026
1     Q.  It's a 0, isn't it, Reverend Aaronson?
2     A.  0.
3        MR. GEORGE:  Objection.
4  BY MS. GEISLER:
5     Q.  So for this particular item Medicare is
6  telling you that you paid 0 for these pharmacy
7  charges?
8        MR. GEORGE:  Objection.  Document speaks
9  for itself.
10       THE WITNESS:  Yes.
11  BY MS. GEISLER:
12     Q.  Now do you see that little F next to that
13  line?
14     A.  Yes.
15     Q.  If you refer now to page 048 --
16     A.  Yes.
17     Q.  -- that's the note section.  Can you read

18  to me what it says next to the letter F?
19      A.  "Payment is included in another service
20  received on the same day."
21      Q.  Going back to page 046, there's another
22  pharmacy line there, the second one?
0027
1   A.  Yes.
2   Q.  It says amount charged $499.40?
3       MR. GEORGE:  Objection.  Is that a
4  question?
5  BY MS. GEISLER:
6   Q.  Is that correct?
7   A.  I see it.
8   Q.  And what is the amount that you were
9  billed for those pharmacy charges?
10   A.  None.  0.
11       MR. GEORGE:  Are you done with that
12  document?
13       MS. GEISLER:  Yes.
14       Could you mark that please?
15          (Exhibit Aaronson V2 003 marked for
16  identification.)
17  BY MS. GEISLER:
18   Q.  Okay.  Reverend, can you tell me what this
19  document is?
20   A.  It's a listing of treatment for Sue during
21  the month of July.
22   Q.  And who created the document?
0028
1       MR. GEORGE:  Objection.  If you know.
2       THE WITNESS:  It's a billing from
3  Presbyterian Hospital through Medicare.
4  BY MS. GEISLER:
5   Q.  And did this document come from the Center
6  for Medicare & Medicaid Services?
7       MR. GEORGE:  Objection.  If you know.
8       THE WITNESS:  Did it come from --
9  BY MS. GEISLER:
10   Q.  CMS, from Medicare?
11   A.  Yes.
12   Q.  And it was mailed to you; correct?
13       MR. GEORGE:  Objection.
14       THE WITNESS:  Yes.
15       MR. GEORGE:  Document speaks for itself.
16  BY MS. GEISLER:
17   Q.  Can you look please at the first line
18  there in side the box marked pharmacy?
19   A.  Yes.
20       MR. GEORGE:  The box meaning "Part B
21  Medical Insurance"?
22       MS. GEISLER:  Yes.
0029
1  BY MS. GEISLER:
2   Q.  And the amount charged is $631.15; do you

3  see that?

4      A.  Yes.

5          MR. GEORGE:  Objection.

6  BY MS. GEISLER:

7      Q.  And under the "you may be billed" column,

8  can you tell me what's there?

9          MR. GEORGE:  Objection.

10         THE WITNESS:  0.

11  BY MS. GEISLER:

12     Q.  And then the little letter next to that is

13  letter E.  Can you please turn to page 0088?

14     A.  Yes.

15     Q.  And next to the letter E, can you tell me

16  what that says?

17     A.  "Payment is included in another service

18  received on the same day."

19     Q.  Thank you.  Okay.  Reverend, when I use

20  the word "provider" in this deposition, I'm going to

21  use that as shorthand for anyone who provided

22  medical services such AS a doctor, a nurse, a

0030

1  clinic, or a hospital; okay?

2      A.  All right.

3      Q.  Have you paid all of the amounts due to

4  any provider for any of your wife's treatments?

5          MR. GEORGE:  Objection.  In as much as it

6  relates to Track 2 or since November, you can answer

7  the question.

8          THE WITNESS:  Yes.

9  BY MS. GEISLER:

10     Q.  Did any of your providers allow you to pay

11  your obligations to them with a particular payment

12  arrangement?

13         MR. GEORGE:  Same objection.

14         THE WITNESS:  No.

15  BY MS. GEISLER:

16     Q.  Are there any obligations that you owe to

17  any providers for your wife's treatment which have

18  been forgiven by the provider?

19         MR. GEORGE:  Same objection.

20         THE WITNESS:  No.

21  BY MS. GEISLER:

22     Q.  Are there any obligations owed to any

0031

1  provider for your wife's treatment which have been

2  written off by the provider?

3          MR. GEORGE:  Objection.

4          THE WITNESS:  No.

5  BY MS. GEISLER:

6      Q.  Reverend, can you tell me currently who

7  your wife -- whether your wife has supplemental

8  insurance?

9      A.  Secondary insurance?

10     Q.  Yes.

11   A.  Yes.
12     Q.  And who is the -- what is the name of the
13  carrier of that secondary insurance?
14       MR. GEORGE:  Again, currently?
15       MS. GEISLER:  Yes.
16       THE WITNESS:  It's BlueCross BlueShield
17  with Highmark in Pittsburgh, Pennsylvania.  The
18  Board of Pensions at the Presbyterian Church is the
19  contractor.
20  BY MS. GEISLER:
21     Q.  And they contract with Highmark BlueCross
22  BlueShield?
0032
1     A.  Highmark BlueCross BlueShield in
2  Pittsburgh, Pennsylvania.
3     Q.  How did your wife obtain this supplemental
4  insurance?
5       MR. GEORGE:  Objection.  Don't answer that
6  question.
7  BY MS. GEISLER:
8     Q.  Are you going to abide by your attorney's
9  instruction?
10    A.  Yes.
11    Q.  Did your wife ever consider any other
12  supplemental policies?
13       MR. GEORGE:  Objection.  Instruct the
14  witness not to answer that question.
15       THE WITNESS:  No.
16  BY MS. GEISLER:
17    Q.  Are you -- does the supplemental insurance
18  that you currently have also cover you?
19    A.  Yes.
20    Q.  Can you tell me how the supplemental
21  insurance works?
22       MR. GEORGE:  Currently?
0033
1  BY MS. GEISLER:
2    Q.  Currently.
3    A.  It picks up 80 percent of what is not
4  provided by the primary carrier.
5    Q.  So what Medicare doesn't pay, it pays 80
6  percent of that?
7    A.  Yes.
8    Q.  Are there any deductibles associated with
9  this supplemental insurance?
10    A.  Yes.
11    Q.  Do you know what they are?
12    A.  It changes each year.  Right now it's
13  $250, $250 a year for each of us.
14    Q.  So it's $250 for you; correct?
15    A.  Yes.
16    Q.  And $250 for your wife; correct?
17    A.  Yes.
18    Q.  And do you know what the amount was in

19  2005?
20        MR. GEORGE:  Objection.  Don't answer that
21  question.  Don't answer.
22        THE WITNESS:  No.
0034
1  BY MS. GEISLER:
2     Q.  Once the deductible is reached on this
3  policy, do you pay anything else after that?
4        MR. GEORGE:  Presently?
5        THE WITNESS:  Currently we pay 20 percent
6  of the remainder.
7  BY MS. GEISLER:
8     Q.  Does your wife's supplemental policy
9  currently have an out-of-pocket maximum?
10    A.  You mean you reach a limit?
11    Q.  Correct.
12    A.  Yes, there's a cap on it.
13    Q.  And do you know what that amount is for
14  2006?
15    A.  No, I don't.
16    Q.  Do you know if that amount has changed
17  between 2005 and 2006?
18    A.  I don't think so.
19        It probably says right on there what the
20  out-of-pocket is.  Why don't you look at it?
21        MS. GEISLER:  Can you mark that please?
22          (Exhibit Aaronson V2 004 marked for
0035
1  identification.)
2  BY MS. GEISLER:
3     Q.  Okay.  Reverend, what I've shown you is
4  Bates labeled at the bottom AARON 040 through 045;
5  correct?
6     A.  Yes.
7     Q.  Can you tell me what this is?
8     A.  This is a statement from Board of Pension,
9  BlueCross BlueShield of what they've covered in
10  treatment for -- I can't even read the date -- from
11  March of 2005.
12    Q.  Okay.  Now can you look at the last page
13  which is marked AARON 045?
14    A.  Yes.
15    Q.  And this is very small print, but at the
16  bottom there there's a box that says "patient
17  benefit summary;" do you see that?
18    A.  Yes, I see it.
19    Q.  And there's a line that says --
20    A.  Yes, I see that.
21        MR. GEORGE:  Wait.
22  BY MS. GEISLER:
0036
1     Q.  -- $453.42 has been applied; do you see
2  that line?
3     A.  Yes.

4      Q.   And the notation there indicates that
5   there's a $1,820 individual out-of-pocket amount?
6          MR. GEORGE:  Objection.  The document
7   speaks for itself.
8   BY MS. GEISLER:
9      Q.   Do you see that?
10     A.   Yes.
11     Q.   Is this an accurate representation of what
12  the out-of-pocket is for your wife for 2005?
13     A.   Yes.
14     Q.   And once that out-of-pocket maximum, that
15  $1,820, is reached, are you required to pay any more
16  in addition to that?
17         MR. GEORGE:  Objection.
18         THE WITNESS:  I don't know.  I haven't had
19  that experience yet.
20  BY MS. GEISLER:
21     Q.   I can see from the documents that you've
22  produced, Reverend Aaronson, that your wife's
0037
1   supplemental insurance covered a portion of the
2   amount not paid by Medicare; is that correct?
3      A.   Yes.
4      Q.   And that's what I would refer to as a
5   coinsurance amount?
6      A.   All right.
7      Q.   Was the coinsurance amount required for
8   all medical services, drugs, treatment from doctors,
9   hospital visits, et cetera?
10         MR. GEORGE:  Counsel, again, I'll give you
11  a little more leeway on this one.  This is stuff
12  answered by the Court already.
13         THE WITNESS:  Yes.
14  BY MS. GEISLER:
15     Q.   And did you receive bills from the doctors
16  for the amount that wasn't covered by Medicare or
17  your supplemental insurance?
18     A.   Yes.
19     Q.   And did your wife actually pay the
20  coinsurance amount?
21         MR. GEORGE:  Objection to form.  You can
22  answer.
0038
1          THE WITNESS:  Yes.
2   BY MS. GEISLER:
3      Q.   And can you tell me how those bills were
4   paid?  By check?  By credit card?
5      A.   Always by check.
6      Q.   Is there any time period since your wife
7   became eligible for Medicare that she was not
8   covered by this supplemental insurance?
9      A.   No.
10     Q.   Do you know if your wife ever received a
11  document that detailed or explained the health

12  insurance benefits offered by her supplemental
13  insurance carrier?
14      MR. GEORGE:  Objection.  This is too much
15  into it.  I'll instruct him not to answer this line
16  of questions anymore.
17  BY MS. GEISLER:
18      Q.  In 2006, has your wife ever received a
19  copy of a document that detailed or explained the
20  health insurance benefits offered by her
21  supplemental insurance carrier?
22      A.  Each year we get a review from the Board
0039
1   of Pensions Presbyterian Church as to what the
2   program involves, and it has not changed.  It's a
3   review and --
4       Q.  Do you have a copy of that document?
5       A.  Not with me.
6       Q.  Do you have a copy of that document at
7   home?
8       A.  Yes.
9           MS. GEISLER:  We'd like to have a copy of
10  that document.
11          MR. GEORGE:  Okay.  We'll take that under
12  advisement.
13  BY MS. GEISLER:
14      Q.  And have you ever received a benefit
15  manual from your supplemental insurance carrier?
16      A.  Yes.
17      Q.  Do you have a copy of that document?
18      A.  No, not with me.  I have it at home.
19          MS. GEISLER:  We'd also like a copy of
20  that document, please.
21          MR. GEORGE:  Under advisement.
22  BY MS. GEISLER:
0040
1       Q.  Can you tell me, has there been any
2   changes in your wife's supplemental insurance
3   coverage?
4           MR. GEORGE:  Since what time?
5   BY MS. GEISLER:
6       Q.  Since November of 2005?
7       A.  No.
8       Q.  Have there been any changes to your wife's
9   supplemental insurance coverage since she became
10  eligible for supplemental insurance?
11          MR. GEORGE:  Objection.  Don't answer that
12  question.
13          MR. ROBBEN:  Excuse me.  This is Philip
14  Robben.  Was the witness directed not to answer?
15          MS. GEISLER:  Yes.
16          MR. ROBBEN:  I don't remember the name of
17  counsel defending this deposition.
18          MR. GEORGE:  Scott George.
19          MR. ROBBEN:  What's your basis for the

20  direction not to answer?

21        MR. GEORGE:  A couple of bases.  Most

22  importantly, this is general Rule 23 inquiry that

0041

1  the Court has already determined in Mr. Aaronson's

2  favor. Moreover, this was well the subject of

3  inquiry during the November deposition.

4        This deposition is for the benefit of the

5  Track 2 defendants to, you know, establish if their

6  drugs were used and/or paid for by the client

7  perhaps, but not to retread ground the Court

8  disposed of in its order granting certification of a

9  class and finding Mr. Aaronson adequate as

10  representative of a class.

11        MR. ROBBEN:  But those grounds, those

12  bases or purported bases, those aren't Rule 30(d)(1)

13  grounds.  What's your Rule 30(d)(1) grounds for

14  directing him not to answer?

15        MR. GEORGE:  We see this as an imposition

16  and improper line of inquiry and a burden on Mr.

17  Aaronson. I'm not asserting a privilege there.

18        MR. ROBBEN:  You can't direct him not to

19  answer because you think the questions are

20  harassing. You can only direct the witness not to

21  answer if you want to take the risk of stopping the

22  deposition for the day and making a motion.

0042

1        MR. GEORGE:  Well, if you want to stop the

2  deposition today, we'll make a motion, we can do

3  that. I think that we can all agree we'll proceed

4  with limitations that plaintiff feels is appropriate

5  in this instance.  And if that matter needs to be

6  brought to the Court's attention, we can do that

7  when it's timely.

8        MR. ROBBEN:  We're not going to agree --

9  we're going to continue the deposition, but we're

10  not going to agree that the limits that you're

11  placing on it are proper.

12        MR. GEORGE:  Okay.

13        MR. ROBBEN:  I'd ask you to reconsider

14  those objections.  I think they're without merit.

15        MR. GEORGE:  Okay.  Can we continue

16  questioning again?

17        MS. GEISLER:  Philip?

18        MR. ROBBEN:  Excuse me?

19        MS. GEISLER:  We're going to go forward.

20        MR. ROBBEN:  Yes.  I don't see any reason

21  that we should stop.  I think he's taking the risk

22  of making an improper direction not to answer.

0043

1  BY MS. GEISLER:

2    Q.  Did your wife pay an annual premium or

3  make a yearly contribution to her supplemental

4  insurance plan?

5      MR. GEORGE:  Since November of 2005?
6  BY MS. GEISLER:
7      Q.  Since she became eligible for supplemental
8  insurance?
9      MR. GEORGE:  Objection.  Don't answer the
10  question.
11  BY MS. GEISLER:
12      Q.  Has your wife paid an annual premium in
13  2006?
14      A.  We pay a monthly amount for the
15  supplemental insurance.
16      Q.  Can you tell me what that monthly amount
17  is?
18      A.  In 2006, it's $55 a month.
19      Q.  Can you tell me what that amount was in
20  November of 2005?
21      MR. GEORGE:  Objection.  If you can
22  establish when the payment is made.  If it's after
0044
1  deposition, I'll let him answer the question.
2      THE WITNESS:  I think it was $50, but I'm
3  not sure.  It changes every year, not a lot, but a
4  little bit.
5  BY MS. GEISLER:
6      Q.  And can you tell me how this amount was
7  paid?  By check?  By credit card?
8      A.  Deducted from pension.
9      Q.  And do you have a -- do you receive a
10  pension statement that includes that deduction?
11      A.  I receive a statement at the beginning of
12  the year showing what the monthly pension will be
13  minus the supplement charge.
14      MS. GEISLER:  We'd like to see a copy of
15  that too, Counsel.
16      MR. GEORGE:  Okay.  It's under advisement.
17  BY MS. GEISLER:
18      Q.  Was this deduction from your pension
19  mandatory in order to receive or maintain coverage
20  for supplemental insurance?
21      MR. GEORGE:  Objection.  For 2006, you can
22  answer.
0045
1      THE WITNESS:  Mandatory, it's -- you mean
2  I wouldn't get it if I didn't pay for it?
3  BY MS. GEISLER:
4      Q.  Correct.
5      A.  You can opt out without the supplemental
6  insurance.  You can -- the Board of Pensions allows
7  you to refuse that coverage if you want to go with
8  another carrier, but --
9      Q.  And if you hadn't made that payment or had
10  that amount deducted from your pension, you would
11  not have supplemental coverage; correct?
12      A.  We wouldn't have that one, Highmark, which

13  is the board's contracted carrier.

14      Q.   And were these monthly contributions from

15  your pension required even if your wife did not

16  receive any medical services during the month?

17          MR. GEORGE:  For 2006, you can answer.

18          THE WITNESS:  Yes.  It's a monthly charge.

19  BY MS. GEISLER:

20      Q.   Have you given to your lawyers all of the

21  records that relate to your wife's supplemental

22  insurance policy?

0046

1           MR. GEORGE:  Objection to form.

2           THE WITNESS:  As far as I know, yes.

3   BY MS. GEISLER:

4       Q.   Other than the ones that we've discussed

5   previously?

6       A.   Yeah.  Yes.

7       Q.   So there are no other records?

8       A.   No.

9           MS. GEISLER:  Let's take a break here.

10          MR. GEORGE:  Okay.

11          (Recess taken from 10:45 a.m. until

12  10:51 a.m.)

13  BY MS. GEISLER:

14      Q.   Reverend, you produced a group of

15  documents to us that had a list of drugs and

16  services that your wife received from the

17  Presbyterian Hospital --

18          MR. GEORGE:  Objection.  Ambiguous.

19  BY MS. GEISLER:

20      Q.   -- is that correct?

21      A.   Yes.

22      Q.   And on that list there are a lot of drugs

0047

1   listed on that statement from the hospital; correct?

2       A.   Yes.

3       Q.   Do you know which of those drugs are Track

4   2 drugs?

5           MR. GEORGE:  Sitting here now?

6           MS. GEISLER:  Yes.

7           MR. GEORGE:  Without the document in front

8   of him?

9           MS. GEISLER:  Yes.

10          MR. GEORGE:  Objection.

11          THE WITNESS:  No.

12  BY MS. GEISLER:

13      Q.   If I show you the list, can you tell me

14  which are the Track 2 drugs?

15      A.   I might be able to.

16          (Exhibit Aaronson V2 005 marked for

17  identification.)

18  BY MS. GEISLER:

19      Q.   Okay.  Reverend, we're going to show you a

20  series of pages marked AARON 001 through 0027.  Can

21  you tell me --
22      A.  All right.
0048
1      Q.  Okay?
2      A.  Yes.
3      Q.  Can you tell me what this document is?
4      A.  This is a listing of drugs my wife -- for
5  surgery.  It has no bearing on this case.
6      Q.  Can you look then at the next page?
7      A.  Same thing.
8      Q.  And the next page?
9      A.  Same thing.
10     Q.   And when you say these are -- this is a
11  list of drugs and services for your wife's surgery,
12  your wife was in the hospital during this time?
13     A.  Yes.
14     Q.  Can you go on to 004?
15     A.  Yes.
16     Q.  And these charges are related to what?
17     A.  Knee replacement in 1999.
18        MR. GEORGE:  Also, it's been asked and
19  answered.  The review of this document was done at
20  the prior deposition.  If you want to direct him to
21  a particular page where you think your client's drug
22  might be, I'm happy to do that.  This has been tried
0049
1  in prior deposition, this very document.
2        MS. FIORENTINOS:  I'm sorry.  Could you
3  repeat that objection.  I didn't understand it at
4  all.
5        MR. GEORGE:  This very document was done
6  in the exact same fashion in the first deposition.
7  I'm objecting to this as asked and answered.
8        MS. FIORENTINOS:  Is your basis that this
9  particular question has actually been asked before?
10       MR. GEORGE:  This line of questioning.
11       MS. FIORENTINOS:  Is your basis for your
12  objection that this question that is being asked
13  right now has actually been asked before.
14       MR. GEORGE:  I don't know if the exact
15  words were used, but the same testimony is being
16  elicited.
17       MS. FIORENTINOS:  Well, Counsel, obviously
18  --
19       MR. GEORGE:  I just stated it for the
20  record. I don't want to argue with you.
21       MS. FIORENTINOS:  -- your theory of what
22  can be asked or answered to something that's been
0050
1  asked before so we can follow up on it.
2        MR. GEORGE:  He's answering the question.
3  I'm pointing out --
4        MS. FIORENTINOS:  Appropriate just to
5  making an objection on a whole line of questioning

6  as opposed to something that was specifically asked
7  or answered. I also have a problem with you making
8  an objection on something that could have been asked
9  if it actually hasn't been asked.  And that's all
10  I'm trying to clarify.  And also I am not able to
11  really hear your objections because the connection
12  is not very good.
13       MR. GEORGE:  I agree the connection is
14  very poor.
15       MS. FIORENTINOS:  So if everybody down
16  there could speak up a little for the sake of those
17  listening in, we would appreciate it.
18  BY MS. GEISLER:
19    Q.  Reverend, can you look at AARON 0009,
20  please?
21    A.  Yes.
22    Q.  And can you tell me what this is?
0051
1    A.  This is a listing of the drugs used for
2  Sue's surgery in June of 2004, ovarian cancer
3  surgery.
4    Q.  And was she in the hospital during this
5  time?
6    A.  Yes.
7    Q.  As an in-patient?
8    A.  Yes.
9    Q.  And do you see any Track 2 drugs on this
10  list?
11    A.  I'm not sure I know what Track 2 drugs are
12  without getting --
13    Q.  Well, let's stay with the list.
14    A.  All right.
15    Q.  Can you identify any Track 2 drugs on this
16  list?
17    A.  No.
18    Q.  Can you go to AARON 015?
19    A.  Yes.
20    Q.  And can you tell me what this is?
21    A.  A listing of the drugs for the
22  chemotherapy in 2004, July, following the surgery.
0052
1    Q.  And was your wife in the hospital for
2  this?
3    A.  In the cancer center at the hospital, yes.
4    Q.  Was she an in-patient at this time?
5    A.  I don't think so.
6    Q.  Can you identify any Track 2 drugs on this
7  page?
8    A.  No.
9    Q.  Reverend, do you know if you have paid for
10  any Track 2 drugs?
11    A.  No.
12    Q.  Do you know whether every medical provider
13  that your wife has seen charges the same amount for

14   a particular service?
15      A.  No.
16      Q.  Do you know whether different providers
17   and different insurance companies charge or
18   reimburse the same for the same services?
19         MR. GEORGE:  Objection.  You mean in his
20   experience?
21         MS. GEISLER:  Yes, in his experience.
22         MR. GEORGE:  Also, I'll give you a little
0053
1   room here, but I'm going to cut this off soon.  You
2   can answer.
3         THE WITNESS:  Don't know.
4   BY MS. GEISLER:
5      Q.  Do you know whether different providers
6   and different insurance companies charge or
7   reimburse different amounts for the same medication?
8         MR. GEORGE:  Objection.  Other people?
9   Ambiguous.
10         THE WITNESS:  Don't know.
11   BY MS. GEISLER:
12      Q.  Do you know how medical service providers
13   determine the amount they're going to charge for --
14         MR. GEORGE:  That's it for this one.  This
15   is stuff that was decided by the Court's Rule 23
16   order and was covered in Track 1.  Don't answer any
17   more of these questions.
18   BY MS. GEISLER:
19      Q.  Since November 2005 do you know how your
20   wife's providers determined how -- what they were
21   going to charge for a particular prescription
22   medication?
0054
1         MR. GEORGE:  Has it changed?  I'll let him
2   answer if it's changed.  Answer if it's changed.
3         MS. GEISLER:  Are you objecting, Counsel?
4         MR. GEORGE:  Yes, I am.  I'm telling you
5   what I'm going to allow.
6         THE WITNESS:  I don't know.
7   BY MS. GEISLER:
8      Q.  Can you tell me what you expected your
9   wife's providers would charge for a particular drug?
10         MR. GEORGE:  Objection.  Don't answer that
11   question.
12         MS. GEISLER:  On what basis?
13         MR. GEORGE:  Again, the basis that this is
14   taking place after Rule 23 motion has been decided,
15   after the deposition has taken place, and it has
16   very limited purposes.
17   BY MS. GEISLER:
18      Q.  Did you expect that all of your wife's
19   providers would charge the same amount for a
20   particular drug?
21         MR. GEORGE:  Objection.  Don't answer.

22  BY MS. GEISLER:

0055

1    Q.  Did you expect that providers would charge
2  Medicare the same amount for a particular drug?
3        MR. GEORGE:  Same objection.  Don't
4  answer.
5  BY MS. GEISLER:
6    Q.  Did you expect that providers would charge
7  insurance companies the same amount for a particular
8  drug?
9        MR. GEORGE:  Same objection.  Don't
10  answer.
11  BY MS. GEISLER:
12    Q.  Do you have any expectations about what
13  your wife's providers should have charged for the
14  drugs she received?
15        MR. GEORGE:  Same objection.  Don't
16  answer. Track 2 says 2005.  That's like where it is
17  right now.
18  BY MS. GEISLER:
19    Q.  Do you have any expectations of what your
20  wife's providers should have charged for drugs,
21  Track 2 drugs since November 2005?
22        MR. GEORGE:  Did she receive any?  Lack of

0056

1  foundation.
2        THE WITNESS:  No.
3  BY MS. GEISLER:
4    Q.  Did you expect that your wife's providers
5  would charge your insurance company a particular
6  amount for a Track 2 drug since November 2005?
7    A.  I would expect them to.
8    Q.  And what amount did you expect your wife's
9  providers would charge for Track 2 drugs since
10  November 2005?
11        MR. GEORGE:  Same objection.  Lack of
12  foundation.
13        THE WITNESS:  I have no basis for making a
14  judgment.
15  BY MS. GEISLER:
16    Q.  So you have no expectation of what the
17  medical providers would have charged for Track 2
18  drugs since November 2005?
19        MR. GEORGE:  Objection.  Asked and
20  answered.
21        THE WITNESS:  I would expect them to be
22  covered.

0057

1  BY MS. GEISLER:
2    Q.  Covered by whom?
3    A.  By the provider.
4    Q.  When we're talking about providers, we're
5  talking about doctors and nurses and clinics and
6  hospitals.  You expect that providers would cover

7   the cost of Track 2 drugs?
8        MR. GEORGE:  Objection.
9        THE WITNESS:  You asked me about the
10  insurance coverage.  I said I would expect them to
11  cover what part they have agreed to cover.
12  BY MS. GEISLER:
13      Q.   You would expect the insurance to cover
14  the cost of Track 2 drugs since November 2005?
15        MR. GEORGE:  Objection.  This has gotten a
16  little confusing.
17  BY MS. GEISLER:
18      Q.   Do you understand the question?
19      A.   I don't understand your question.
20      Q.   What did you expect providers to charge
21  your wife's insurance company for Track 2 drugs?
22        MR. GEORGE:  Objection.  Same lack of
0058
1   foundation.
2        THE WITNESS:  I have no basis for
3   judgment.
4   BY MS. GEISLER:
5       Q.   Do you know how your wife's providers
6   determined the amount they would charge for a Track
7   2 drug?
8        MR. GEORGE:  Objection.  Lack of
9   foundation. Again since 2005?
10        THE WITNESS:  No.
11  BY MS. GEISLER:
12      Q.   Do you know on what the charge for a Track
13  2 drug by your wife's providers, what that was based
14  on?
15        MR. GEORGE:  Objection.
16        THE WITNESS:  No.
17  BY MS. GEISLER:
18      Q.   Do you have any understanding of who
19  determines drug prices for Track 2 drugs?
20        MR. GEORGE:  Objection.
21        THE WITNESS:  No.
22  BY MS. GEISLER:
0059
1       Q.   Are you familiar with the term "average
2   wholesale price"?
3        MR. GEORGE:  Objection.  This was asked
4   and answered, and we're getting out into that world
5   again. I'm going to instruct him not to answer.
6   BY MS. GEISLER:
7       Q.  Are you familiar with the term AWP?
8        MR. GEORGE:  Same objection.  Same
9   instruction, sir.
10  BY MS. GEISLER:
11      Q.   Do you know what the AWP was for any of
12  the Track 2 drugs?
13      A.   Only what I saw listed in the statement.
14      Q.   And do you believe that what you saw

15 listed in the statement was the AWP for the Track 2
16 drugs?
17     A.  I have no basis for judgment.  I just know
18 what the hospital charged.
19     Q.  And do you know if what the hospital
20 charged was AWP?
21     A.  I don't know.
22     Q.  Have you ever heard of red book?
0060
1     A.  Yes.
2     Q.  Can you tell me what it is?
3        MR. GEORGE:  Objection.  Instruct the
4 witness not to answer.
5 BY MS. GEISLER:
6     Q.  Have you ever heard of blue book?
7        MR. GEORGE:  Same objection.  Don't
8 answer.
9 BY MS. GEISLER:
10    Q.  Have you ever heard of Medi-Span?
11       MR. GEORGE:  Same objection.  Please don't
12 answer.
13 BY MS. GEISLER:
14    Q.  Can you tell me how you found out about
15 this lawsuit?
16       MR. GEORGE:  Same objection.  Asked and
17 answered.  Don't answer.  And privilege.
18 BY MS. GEISLER:
19    Q.  Do you know when this lawsuit was
20 originally filed?
21       MR. GEORGE:  Same objection.  Same
22 instruction to the witness.
0061
1        MS. FIORENTINOS:  Counsel, I am assuming
2 you're doing objections because you're saying asked
3 and answered that this particular question has
4 actually been asked in the prior deposition; is that
5 your position?
6        MR. GEORGE:  This line of questioning was
7 covered in the prior deposition, yes.
8        MS. FIORENTINOS:  Is it this line of
9 questioning meaning the fact that there's litigation
10 or this particular question, counsel?
11       MR. GEORGE:  Not the words themselves.
12 This question, I understand to be asked and
13 answered.
14       MS. FIORENTINOS:  We take issue with that.
15       MR. ROBBEN:  I join in that.
16 BY MS. GEISLER:
17    Q.  Can you tell me when you decided to join
18 this lawsuit?
19       MR. GEORGE:  Objection.  Don't answer.
20 BY MS. GEISLER:
21    Q.  Are you familiar with the Fourth Amended
22 Master Consolidated Class Action Complaint?

0062
1      A.   Yes.
2      Q.   Do you know when that was filed?
3      A.   I have a copy to look up the date if you
4   want me to.
5      Q.   No.  Do you know when that was filed?
6      A.   No, without looking it up.
7           (Exhibit Aaronson V2 006 marked for
8   identification.)
9   BY MS. GEISLER:
10     Q.   Okay.  Reverend, the court reporter has
11   marked this as an exhibit.  Do you know what this
12   document is?
13          MR. GEORGE:  Give him a second to review
14   it, if you would.
15          THE WITNESS:  Yes, I know what it is.
16   BY MS. GEISLER:
17     Q.   Can you tell me what it is?
18     A.   It's the fourth -- I'll read the line,
19   "Fourth Amended Master Consolidated Class Action
20   Complaint Amended to Comply With Court's Class
21   Certification Order."
22     Q.   And have you reviewed this document?
0063
1      A.   I have.
2      Q.   Have you reviewed the entire document or
3   just parts of the document?
4      A.   I paged through it.  I looked at what
5   concerned us and I looked at some of the explanation
6   of the drugs.
7      Q.   And when did you do that?
8      A.   After I received it.
9      Q.   And when did you receive it?
10     A.   I think it was in January.  I don't have a
11   date.  I looked at it when I got it, which probably
12   within ten days of when it was received, so whenever
13   it was dated.
14     Q.   I'm going to ask you to turn to page 5 of
15   the document.
16     A.   All right.
17     Q.   And do you see how the paragraphs are
18   numbered?
19     A.   Yes.
20     Q.   I'd like you to look at paragraph 15,
21   please.
22     A.   Yes.
0064
1      Q.   Did you review this paragraph --
2      A.   I did.
3      Q.   -- when you received it?
4      A.   I did.
5      Q.   Can you describe for me in your own terms
6   what the allegations are that are contained in this
7   document?

8    A.   In this document or this paragraph?

9    Q.   In this document.

10        MR. GEORGE:  Okay.  Can we have the

11 question read please?

12            (The reporter read the last

13 question.)

14        MR. GEORGE:  Generally?

15        MS. GEISLER:  Yes.

16        MR. GEORGE:  Okay.

17        THE WITNESS:  That the charges for the

18 medications received are exaggerated here.

19 BY MS. GEISLER:

20    Q.   Exaggerated based on what?

21    A.   They seem to be higher than what they

22 should be.

0065

1    Q.   And do you know what the basis for that

2 is?

3        MR. GEORGE:  Objection.  Ambiguous.  You

4 can answer.

5        THE WITNESS:  They just seem to be out of

6 line with what I would expect.

7 BY MS. GEISLER:

8    Q.   And what would you expect?

9    A.   I would expect them to be less.

10    Q.   And when you say "they," you're referring

11 to what?

12    A.   The various drug charges that were -- that

13 have been involved.

14    Q.   And why would you expect the drug charges

15 to be less?

16    A.   They just seem out of line for we who are

17 retired, especially on limited incomes.  They seem

18 to be exaggerated.

19    Q.   As you go through paragraph 15 in this

20 document, it lists a series of drugs.  Did you

21 confirm that your wife took all of these drugs?

22    A.   They all seem to be drugs that I remember

0066

1 seeing at one time or another in the listing that

2 we're -- that the hospital billed for.

3    Q.   So are you referring to Exhibit Aaronson

4 V2 005, this listing?

5    A.   Yes, some of those.

6    Q.   So the drugs that are listed in paragraph

7 15, you suggest are also listed on Exhibit Aaronson

8 V2 005 from the hospital?

9    A.   I see some of them, yes.

10    Q.   And did you review paragraph 15 to insure

11 that your wife did take all of those drugs?

12        MR. GEORGE:  You mean when he made his

13 review when he received the Fourth Amended

14 Complaint.

15        MS. GEISLER:  Yes.

16        MR. GEORGE:  Do you understand the
17  question?
18        THE WITNESS:  Paragraph 15 was no change
19  from the last -- from the third amended version.
20  BY MS. GEISLER:
21     Q.  So you didn't review paragraph 15 in the
22  Fourth?
0067
1     A.  Yes.  I say I didn't see any changes from
2  amended three to four.
3     Q.  And did you review it in the Third Amended
4  Complaint, review the paragraph in the Third Amended
5  Complaint?
6     A.  I had looked at each one and I had a
7  listing of the hospital drugs, and I found them in -
8  - some of them in the listing.
9     Q.  Did you find all of them in the listing?
10     A.  I didn't check them off to make sure that
11  every one was included.  I looked over it and saw
12  that there were a number that I recognized right off
13  the bat.
14     Q.  When you say "the listing," what are you
15  referring to?
16     A.  The listing here as compared to the
17  hospital listing.
18     Q.  So are you referring to Exhibit Aaronson
19  V2 005 again?
20     A.  Exhibit Aaronson V2 005, yes.
21        MR. GEORGE:  Just to make it clear,
22  Counsel, I'll give you a little leeway here, but
0068
1  again this is not the purpose of the deposition.
2  BY MS. GEISLER:
3     Q.  Do you understand, Reverend, that the
4  allegations of this complaint suggest that the drug
5  manufacturers allegedly committed fraud?
6     A.  I believe they inflated the prices
7  charged.  I don't know what you mean by fraud.
8     Q.  And did you or your wife ever contact
9  Medicare, Highmark BlueCross BlueShield, any federal
10  agency regarding this inflated price?
11     A.  No.
12     Q.  Did you ever contact any politician
13  regarding this inflated price?
14     A.  I've been in groups where we've had
15  politicians speak to us about the drug situation
16  especially for senior citizens.
17     Q.  When you say you've been in situations,
18  what are you referring to?
19     A.  We've had two or three politicians address
20  us on -- especially with the Medicare changes in
21  this last year.  I haven't talked to them about the
22  specific drugs.
0069

1    Q.  Did you, yourself, speak to these
2  politicians?
3    A.  I think I spoke to Sue Myrick who is one
4  of our state senators.
5    Q.  What did you speak to her about?
6    A.  Just about the fact that there has to be a
7  ceiling on what we're being -- senior citizens,
8  that's where my position, are just being charged out
9  of sight.
10    Q.  For drugs?
11    A.  I'm active in senior citizen activity.
12  I'm a member of the new senior center that we've
13  just opened in Matthews and this is one of the
14  topics that come up constantly.
15    Q.  And when you say that seniors are being
16  charged too much for drugs, what is the basis for
17  your -- for that determination?
18    A.  In proportion to their other expenses,
19  their drug bills seemed to be exaggerated.  They
20  can't pay them.  They're not taking their
21  medications.
22    Q.  In proportion to whose other expenses?
0070
1    A.  In contrast to their monthly expenses.
2    Q.  Are we talking about senior citizens?
3    A.  Senior citizens.
4      MR. GEORGE:  Counsel, if you want to focus
5  on meetings had since the last deposition, that's
6  okay.  This is getting well into areas that have been
7  decided by the Court's Rule 23 order.
8  BY MS. GEISLER:
9    Q.  So your basis for suggesting that drug
10  prices are inflated is a comparison between your
11  other expenses and the cost of drugs?
12      MR. GEORGE:  Objection.  That's ambiguous.
13      THE WITNESS:  In proportion to budgeting
14  for a senior citizen who's limited, it would seem to
15  me there has to be better control of the drug
16  industry because we're not able to pay our drug
17  costs.
18  BY MS. GEISLER:
19    Q.  Did you or your wife ever contact any of
20  her providers regarding the alleged fraud in this
21  case?
22    A.  No.
0071
1    Q.  Did you or your wife ever have any
2  conversations with her providers regarding the cost
3  of Track 2 drugs?
4    A.  No.
5    Q.  Do you have any knowledge of any of the
6  other drugs that are listed in this Fourth Amended
7  Complaint for any of the other proposed class
8  representatives?

9        MR. GEORGE:  I'm sorry.  Read that back,
10  please.
11           (The reporter read the last
12  question.)
13          MR. GEORGE:  In as much as it relates to
14  his review of the complaint we spoke about earlier,
15  I'll allow the question.
16          THE WITNESS:  As I leaf through, I
17  recognize some drugs because we had knowledge of
18  them. Especially the cancer patients that are being
19  -- that are members of the class suit.  I saw some
20  similarities.  I didn't review every one.
21  BY MS. GEISLER:
22    Q.  So your knowledge of the other drugs
0072
1  listed in this complaint is limited to your
2  knowledge of the drugs your wife took?
3    A.   Just the ones I experienced, we
4  experienced, she experienced.
5    Q.  Has your wife ever taken any other drugs
6  that are not listed in this Fourth Amended
7  Complaint?
8        MR. GEORGE:  Objection.  Pharmaceutical
9  drugs?  What's the scope of your question?
10        THE WITNESS:  Prescription drugs?
11  BY MS. GEISLER:
12    Q.  Yes.
13    A.  There are others, yes.
14    Q.  Do you know what those drugs are?
15        MR. GEORGE:  Objection.  Don't answer that
16  question.
17        MS. GEISLER:  What's the basis for that
18  objection?
19        MR. GEORGE:  Again, this is well beyond
20  the import of this deposition today.  This is a
21  matter that should have been covered in the November
22  deposition and has been resolved by the Court's
0073
1  order certifying less.
2        MS. GEISLER:  Are you suggesting this has
3  been covered in the previous deposition?
4        MR. GEORGE:  Should have, could have, I
5  don't know exactly if it was.  I know that the exact
6  representatives determined by the Court and this
7  sort of wide range inquiry can only be used to mount
8  an assault in opposition for Rule 23 motion, which
9  has been heard by the Court and resolved in
10  plaintiff's favor.
11  BY MS. GEISLER:
12    Q.  Does your wife have any interest in
13  pursuing claims on any other prescription drugs that
14  are not listed in this Fourth Amended Complaint?
15        MR. GEORGE:  Objection.  Same objection.
16  Please don't answer.

17 BY MS. GEISLER:
18     Q.  Do you know if your wife has taken any
19 Track 2 drugs that are not listed in paragraph 15 of
20 the complaint?
21     A.  I don't know.
22     Q.  Does your wife have any interest in
0074
1 pursuing claims on other Track 2 drugs that are not
2 listed in paragraph 15 of the complaint?
3     A.  No.
4     Q.  You told us earlier that your wife paid a
5 percentage copayment or a coinsurance amount for the
6 drugs and services that she received; correct?
7     A.  Yes.
8     Q.  Do you know how that percentage copayment
9 or coinsurance payment related to AWP?
10         MR. GEORGE:  Objection.
11         THE WITNESS:  No, I don't know.
12 BY MS. GEISLER:
13     Q.  Do you have any personal knowledge of the
14 manufacturer of any of the Track 2 drugs listed in
15 paragraph 15 of the complaint?
16         MR. GEORGE:  Objection.  You mean in terms
17 of what his wife took?
18         MS. GEISLER:  As I understand it, Counsel,
19 paragraph 15 is a list of the drugs his wife took.
20         MR. GEORGE:  I'm trying to clarify your
21 question meaning that -- not just those in general
22 because, obviously, each manufacturer made the drugs
0075
1 that are assigned to.  You mean the particular drugs
2 that his wife took?
3 BY MS. GEISLER:
4     Q.  Yes.  The Track 2 drugs that your wife
5 took, do you have any personal knowledge of the
6 manufacturer of any of those drugs?
7     A.  No.
8         MS. FIORENTINOS:  Was there an answer?  We
9 haven't heard.
10         MS. GEISLER:  He said no.
11         MS. FIORENTINOS:  Thank you.
12 BY MS. GEISLER:
13     Q.  Do you know if the charges for any of the
14 drugs listed in paragraph 15 was based on AWP?
15         MR. GEORGE:  Objection.  You can answer as
16 much as it relates to Track 2.
17         THE WITNESS:  No, I don't.
18 BY MS. GEISLER:
19     Q.  The drugs that are listed in paragraph 15,
20 do you know what those drugs are used for?
21         MR. GEORGE:  Same objection.  Same
22 instruction to the witness, Track 2 only.
0076
1         THE WITNESS:  They're used in treatment of

2   cancer.
3   BY MS. GEISLER:
4       Q.   As you look through the drugs that are
5   listed in paragraph 15, do you know which ones of
6   them are injections?
7           MR. GEORGE:  Same objection.  Same
8   instruction.  You can answer, that's Track 2.
9           THE WITNESS:  Some I do.
10  BY MS. GEISLER:
11      Q.   Can you tell me which ones are injections?
12      A.   The carboplatin.  You mean injection in
13  veins?
14      Q.   Correct.
15      A.   Drip type.  The carboplatin is one that
16  was used.  That's one I recognize.  I don't -- I
17  don't see any others that I know, that I recognize.
18      Q.   Do you know if any of the drugs listed in
19  paragraph 15 are pills?
20          MR. GEORGE:  Same objection.  Same
21  instruction.
22          THE WITNESS:  No.  Heparin is.
0077
1   BY MS. GEISLER:
2       Q.   Heparin is a pill?
3       A.   Yeah.
4       Q.   And how do you know that?
5       A.   Because it's part of her treatment.
6       Q.   How do you know that it's a pill?
7       A.   Because she takes it every morning.  I
8   give it to her.
9       Q.   Do you know looking at the list of drugs
10  in paragraph 15, were any of these drugs
11  administered to your wife while she was an in-
12  patient in the hospital?
13          MR. GEORGE:  Same objection.  Same
14  instruction.
15          THE WITNESS:  Not sure.
16  BY MS. GEISLER:
17      Q.   Do you know looking at the list of drugs
18  in paragraph 15, do you know if any of those drugs
19  were administered in a doctor's office?
20          MR. GEORGE:  Same objection.  Same
21  instruction.
22          THE WITNESS:  They were in the cancer
0078
1   center.
2   BY MS. GEISLER:
3       Q.   Do you know who administered these drugs?
4       A.   Cancer center staff.
5       Q.   Do you have any personal knowledge about
6   any of the remaining allegations in the complaint?
7           MR. GEORGE:  The whole complaint?
8           MS. GEISLER:  Yes.
9           MR. GEORGE:  Objection.

10      THE WITNESS:  No.

11  BY MS. GEISLER:

12      Q.  Can you look at page 276 of the complaint,

13  please?

14      A.  (Witness complied.)

15      Q.  Can you look through pages 276 through

16  279?

17      A.  (Witness complied.)

18          MR. GEORGE:  The question is -- I should

19  also point out this last of line was pushing too

20  close to Rule 23 for my liking, but I think I'll

21  have an objection to this.

22  BY MS. GEISLER:

0079

1       Q.  Do you know any of the lawyers that are

2  listed on any of these pages, Reverend Aaronson?

3          MR. GEORGE:  Object.

4          THE WITNESS:  Not personally, no.

5  BY MS. GEISLER:

6       Q.  Do you have any facts, other than what you

7  have said so far today, upon which you believe that

8  the manufacturers inflated the prices of their

9  drugs?

10          MR. GEORGE:  Objection.  This is way too

11  far into it.  Don't answer that question.

12          MS. FIORENTINOS:  I'm sorry, we did not

13  hear the objection.

14          MR. GEORGE:  Hi, Irene.  It's too far into

15  the Rule 23 area that we've discussed repeatedly

16  through this deposition.  I'm instructing the

17  witness not to answer.

18          MS. FIORENTINOS:  The question as I'm

19  hearing it, she's asking him as we sit here today if

20  he has any other facts, and you're instructing him

21  not to answer.

22          MR. GEORGE:  Yes.

0080

1          MS. FIORENTINOS:  We definitely take issue

2  with that instruction.  Is there any limitation that

3  can be placed so we can at least get some

4  substantive testimony at this time?

5          MR. GEORGE:  The Fourth Amended Complaint

6  amended something.  If you want to point out the

7  changes that were made from the third to the fourth

8  and ask the witness if he has any knowledge about

9  those, I guess I would allow that to a limited

10  degree.

11          MS. FIORENTINOS:  No.  I think we're

12  entitled to know as this witness stands here today -

13  -

14          MR. GEORGE:  I answered your question.

15          MS. FIORENTINOS:  -- if he has any other

16  facts to support the basis of one of his claims to

17  bring it up to date.  That's the basis of our

18  question.  Are you instructing him not to answer the
19  way the question has been asked?
20      MR. GEORGE:  Whose question am I answering
21  the question to?  The one that you just stated or
22  the one that's official on the record and pending?
0081
1       MS. FIORENTINOS:  No.  Carol's question as
2   she just stated it.
3       MR. GEORGE:  Could you read back the
4   question, please?
5          (The reporter read the last
6   question.)
7       MR. GEORGE:  Same objection.  Same
8   instruction.
9       MS. FIORENTINOS:  We take issue with your
10  instruction.
11      MR. GEORGE:  Okay.
12      MR. ROBBEN:  It's a perfectly proper
13  question.
14  BY MS. GEISLER:
15    Q.  Reverend Aaronson, can you tell us how
16  your lawyers are being paid?
17      MR. GEORGE:  Objection.  Don't answer that
18  question.
19      MS. GEISLER:  On what basis?
20      MR. GEORGE:  Same basis as it's been
21  throughout this whole thing.  This is all basic Rule
22  23 inquiries, been resolved by the Court, and was
0082
1   the proper subject of the first deposition.
2   BY MS. GEISLER:
3     Q.  Can you tell us, Reverend Aaronson, are
4   you paying your lawyers?
5       MR. GEORGE:  Objection.  Don't answer.
6       MS. GEISLER:  On what basis?
7       MR. GEORGE:  Same basis.
8   BY MS. GEISLER:
9     Q.  Do you know how your litigation costs are
10  being paid, Reverend Aaronson?
11      MR. GEORGE:  Same objection.  Same
12  instruction.
13  BY MS. GEISLER:
14    Q.  Can you describe for me the various
15  illnesses or surgery your wife has had which
16  resulted in her being prescribed Track 2 drugs?
17      MR. GEORGE:  I'm going to allow you very
18  limited inquiry into the course of her illness and
19  so forth and so on.  I'll allow a little bit, but
20  this is going to be going out to Rule 23 stuff, at
21  least covered in the first deposition, should have
22  been. You can answer.
0083
1   BY MS. GEISLER:
2     Q.  Do you need the question read back?

3      A.  Yes, I do.
4              (The reporter read the last
5  question.)
6          THE WITNESS:  I can't say definitely what
7  drugs she got, Track 2 drugs she got.  I know what
8  she's had.  I know what -- I can't pick them out.
9  BY MS. GEISLER:
10      Q.  Can you describe for me her illnesses or
11  surgeries?
12      A.  How far back?
13          MR. GEORGE:  Objection.  At that point in
14  time, answer.  The only thing that's a proper
15  question for this deposition.  Anything further
16  along those lines, instruct him not to answer.
17  BY MS. GEISLER:
18      Q.  In paragraph 15 of the complaint you list
19  a series of drugs that your wife has taken.  Can you
20  please describe for me the illnesses or surgeries
21  that she's had in which these drugs have been
22  prescribed?
0084
1          MR. GEORGE:  Objection.  It's not a
2  products case.  It would be properly raised in the
3  first deposition before a motion for classification
4  was heard by the Court and decided.
5  BY MS. GEISLER:
6      Q.  Have you provided us with all of your
7  wife's medical records?
8      A.  As far as I know.
9      Q.  Are there any records you've provided to
10  your attorney which -- since the last deposition?
11      A.  No.
12      Q.  Can you tell me when your wife was
13  diagnosed with ovarian cancer?
14      A.  May of 2005, operated in June 2005.
15      Q.  And who made the diagnosis?
16          MR. GEORGE:  Okay.  Again stop with this.
17  Objection.  Don't answer.
18  BY MS. GEISLER:
19      Q.  And was your wife in the hospital for a
20  time after she was diagnosed with ovarian cancer?
21          MR. GEORGE:  Objection.
22          THE WITNESS:  Yes.
0085
1  BY MS. GEISLER:
2      Q.  Can you tell me what time period she was
3  in the hospital?
4      A.  The last week of June 2005, about ten
5  days.
6      Q.  Is that all?
7      A.  In the hospital as an in-patient, yes.
8  Started chemo right away.
9      Q.  Can you tell me which doctors have treated
10  your wife for ovarian cancer?

11      MR. GEORGE:  Objection to that question
12 and don't answer that question.  Since -- I'll allow
13 the inquiry since the last deposition if she's still
14 in treatment, if she's receiving treatment, who is
15 treating her possibly to some degree, but not that
16 whole area that was covered before, should have been
17 covered, now resolved by the Court's order.
18      THE WITNESS:  Just the name of the doctor?
19      MR. GEORGE:  No.  No.
20 BY MS. GEISLER:
21    Q.  Since November 2005 can you tell me the
22 names of the doctors that have treated your wife for
0086
1 ovarian cancer?
2      MR. GEORGE:  Might want to establish first
3 if there's any Track 2 drugs involved in that or any
4 drugs.
5      MS. GEISLER:  Can you answer the question?
6      THE WITNESS:  Dr. Cantauria has been
7 directing the whole process from beginning to end,
8 the surgery, and the chemo treatment.  He's the
9 medical director of the Cancer Center at
10 Presbyterian Hospital in Charlotte.
11 BY MS. GEISLER:
12    Q.  Is your wife currently being treated for
13 ovarian cancer?
14    A.  Yes.
15    Q.  Can you tell me what treatments your wife
16 has received for ovarian cancer?
17      MR. GEORGE:  Objection.  I'd be glad to
18 allow since November 2005.  And I would rather you
19 establish that this is relevant litigation in the
20 first instance for Track 2 drugs, but I'll allow
21 that question very minimally.
22      THE WITNESS:  She had eight months of
0087
1 chemo following the surgery.  Then she had chemo
2 maintenance which is all described in the last
3 deposition and now she's still involved.  The last
4 drugs were not effective, so she's in a new program
5 now using different drugs, very aggressive.
6      MR. GEORGE:  Take a break?
7      THE WITNESS:  No, I'm fine.
8      MR. GEORGE:  Okay.
9      MS. GEISLER:  We're going to go back to
10 this Fourth Amended Complaint.
11      MR. GEORGE:  Right now?
12      MS. GEISLER:  Yes, please.
13      THE WITNESS:  Think of all these trees
14 that are wasted.
15      MR. GEORGE:  California actually requires
16 that pleadings in court be filed on recycled paper.
17      THE WITNESS:  Recycled paper?
18      MR. GEORGE:  Yeah, it's a requirement.  It

19  helps.
20         THE WITNESS:  Yeah, a little bit.  I just
21  see how many sheets that are involved and I think,
22  oh, man.
0088
 1  BY MS. GEISLER:
 2      Q.   Can you turn to page 27 of the document?
 3  Starting on page 27 and going through page 41 in the
 4  bold headings, do you see the number one Abbott?
 5      A.   Yes.
 6      Q.   Would you page through page 27 through
 7  page 41 and looking at all the names in bold, I'm
 8  going to represent to you that these are the
 9  defendants in this action.
10         MR. GEORGE:  Just want him to review right
11  now without a question pending?
12         MS. GEISLER:  Yes, please.
13         THE WITNESS:  (Witness reviewed document.)
14         Through to page 41, I see them.
15  BY MS. GEISLER:
16      Q.   Yes.
17      A.   Yes.
18      Q.   Have you ever had any relationship with
19  any of the defendants listed on any of these pages?
20         MR. GEORGE:  Objection as to relationship.
21         THE WITNESS:  No.
22  BY MS. GEISLER:
0089
 1      Q.   Has your wife ever had any relationship
 2  with any of the defendants listed on those pages?
 3      A.   No.
 4         MR. GEORGE:  Same objection.
 5  BY MS. GEISLER:
 6      Q.   Have you ever had any contact with any of
 7  the defendants listed on those pages?
 8         MR. GEORGE:  Objection.  Ambiguous.
 9         THE WITNESS:  No.
10  BY MS. GEISLER:
11      Q.   Has your wife ever had any contact with
12  any of the defendants listed on those pages?
13         MR. GEORGE:  Same objection.
14         THE WITNESS:  No.
15  BY MS. GEISLER:
16      Q.   Have you ever relied on any information
17  from any of the defendants in paying for any of your
18  wife's drugs?
19         MR. GEORGE:  Same objection.
20         THE WITNESS:  No.
21  BY MS. GEISLER:
22      Q.   Has your wife ever relied on any
0090
 1  information from any of these defendants in paying
 2  for her drugs?
 3         MR. GEORGE:  Objection.

4     THE WITNESS:  No.
5   BY MS. GEISLER:
6     Q.  Can you tell me what your understanding is
7   of the documents that you were supposed to produce
8   to defendants?
9     A.  My understanding of the documents?
10     Q.  Of what documents you were supposed to
11   produce to defendants.
12     A.  I don't know.
13       MR. GEORGE:  Do you understand the
14   question?
15       THE WITNESS:  Yeah, I'm not sure of the
16   question.
17   BY MS. GEISLER:
18     Q.  What documents were you supposed to
19   produce to the defendants?
20       MR. GEORGE:  Objection.  Ambiguous.  You
21   can answer if you understand the question.
22       THE WITNESS:  Any hospital records, any
0091
1   payment schedules, cancelled checks.
2   BY MS. GEISLER:
3     Q.  And did you limit your search for
4   documents to medications for a particular illness?
5       MR. GEORGE:  Actually, I'm going to object
6   to this.  You can ask him if he's been requested to
7   search for documents since his last deposition and
8   the scope of that search, but I'm not going to allow
9   you to inquire as to the efforts he made prior to
10   the November 2005 deposition.  So you can rephrase
11   the question if you want or I'll instruct him not to
12   answer your question as it's standing.
13       THE WITNESS:  I'm not sure I understand
14   it.
15   BY MS. GEISLER:
16     Q.  Did you limit your search for particular
17   documents to medications for a specific illness?
18       MR. GEORGE:  To the extent -- I'll allow
19   you to answer to the extent that you made any search
20   since your last deposition.  Otherwise, I'm
21   objecting to the question and instruct the witness
22   not to answer because it is overbroad.
0092
1       Do you understand the limitation I'm
2   placing on it?
3       THE WITNESS:  There have been no documents
4   since the last deposition.
5       MR. GEORGE:  Okay.
6       THE WITNESS:  There hasn't been any
7   question for any documents.
8       MR. GEORGE:  Okay.
9   BY MS. GEISLER:
10     Q.  Can you tell me what search you did for
11   documents regarding the medications your wife took?

12      MR. GEORGE:  Again.  Same objection.  Same
13  limitation, since your last deposition.
14      THE WITNESS:  We just submitted the
15  documents for that period of ovarian cancer,
16  although he went back and looked at some other
17  documents, the knee replacements, the cataracts.
18  BY MS. GEISLER:
19      Q.  And who --
20      A.  I don't see them as connected to this.  I
21  see this as just the 2005 expenses -- 2004 expenses
22  that are run now into 2005.
0093
1      Q.  Where did you search for documents?
2      MR. GEORGE:  Again, objection.  I'm going
3  to limit his answer to the time period since the
4  last deposition.
5      Do you understand?  Since November 2005.
6      THE WITNESS:  There haven't been any other
7  documents.
8      MR. GEORGE:  Exactly.
9  BY MS. GEISLER:
10      Q.  Did you make any requests from your wife's
11  medical service providers for documents?
12      MR. GEORGE:  Same objection.  Same
13  instruction to the witness to limit that since
14  November of 2005.
15      THE WITNESS:  She approved the request for
16  any documents for those persons that treated her.
17  BY MS. GEISLER:
18      Q.  So you did make requests to her medical
19  service providers for documents?
20      MR. GEORGE:  Did you make a request since
21  November 2005?
22      THE WITNESS:  We didn't make a request,
0094
1  no.
2  BY MS. GEISLER:
3      Q.  Who did?
4      MR. GEORGE:  Objection.
5      THE WITNESS:  We --
6      MR. GEORGE:  Do you know what was made?
7      THE WITNESS:  We signed releases for the
8  information to be gained, if that's what you mean.
9  BY MS. GEISLER:
10      Q.  When you say that you don't believe that
11  your wife's other illnesses are connected to this
12  lawsuit, can you explain to me what you mean?
13      MR. GEORGE:  Objection.  Which illnesses
14  are you referring to, the ones that have continued
15  since the last deposition or the ones concurrent
16  with or predated the treatment?
17      MS. GEISLER:  I believe if you go back a
18  couple of questions his response was, I don't find
19  these to be related.  Do you see that?

20        (The reporter read the requested

21  portion.)

22  BY MS. GEISLER:

0095

1      Q.  So what do you mean by "I don't see these

2  as connected to this"?

3      A.  We didn't research what drugs were used in

4  the knee replacements, for instance, with what we're

5  dealing with here.  The companies involved here may

6  or may not have been involved with the knee

7  replacements, I don't know.

8      Q.  So you only see your wife's ovarian cancer

9  as the time period during which she took the Track 2

10  drugs?

11      A.  That's what I feel we're dealing with

12  here.

13      Q.  Only the ovarian cancer?

14        MR. GEORGE:  Asked and answered.  Again,

15  this is going a little too far.  You clarified his

16  answer and we're getting into Rule 23 areas.

17        THE WITNESS:  Yes, that's all that we've

18  been talking about.

19        MR. GEORGE:  That's -- no more testimony

20  on that.

21  BY MS. GEISLER:

22      Q.  Have you produced all of the cancelled

0096

1  checks that represent all payments that you've made

2  to providers for the drugs your wife received?

3      A.  Yes.

4      Q.  Other than the documents you've already

5  provided to your attorneys, do you have any other

6  documents relevant to the claims in this action?

7        MR. GEORGE:  Objection as to relevant.

8  I'll limit you to any documents that came into

9  existence since your last deposition.

10        THE WITNESS:  Well, ongoing bills we've

11  been paying, same medications.  She's getting chemo

12  every three weeks.

13  BY MS. GEISLER:

14      Q.  And are you still looking for documents

15  that your attorney asked you to search for?

16      A.  I can produce them if they're requested.

17      Q.  Have you retained all of your wife's

18  medical records?

19      A.  Yes.

20        MS. GEISLER:  Why don't we take a break

21  here.

22        (Recess taken from 11:51 a.m. until

0097

1  11:57 a.m.)

2        MR. GEORGE:  Are you done with the

3  complaint?

4        MS. GEISLER:  Yes.

5   BY MS. GEISLER:
6       Q.  Reverend Aaronson, do you have any
7   documents which show that you have paid for Track 2
8   drugs?
9       A.  I'm not sure what Track 2 drugs are.
10      Q.  So you can't tell me whether you've paid
11  for any Track 2 drugs?
12      A.  No, without looking at the list.
13      Q.  Looking at what list?
14      A.  Well, whatever Track 2 drugs are.
15      Q.  Okay.  I'm going to apologize in advance
16  for these next couple of questions, but I have to
17  ask them.  Have you or your wife ever been convicted
18  of a felony?
19          MR. GEORGE:  Objection.  Don't answer.
20  Rule 23 question.
21  BY MS. GEISLER:
22      Q.  Have you or your wife ever been charged
0098
1   with a crime that involved fraud or false dealing?
2          MR. GEORGE:  Objection.  Don't answer.
3   BY MS. GEISLER:
4       Q.  Are you going to abide by your attorney's
5   instruction?
6       A.  Yes.
7          MS. GEISLER:  Okay.  I'm finished here.
8   Is there anyone on the phone.
9          MS. FIORENTINOS:  I would like to know the
10  basis for those last two instructions --
11         MR. GEORGE:  It's the basis we've been
12  discussing throughout this deposition.
13         MS. FIORENTINOS:  You're saying the same
14  basis even though the question is asking as of the
15  current time; correct?
16         MR. GEORGE:  You mean since November 2005,
17  was that the question?
18         MS. GEISLER:  Yes.
19         MR. GEORGE:  Oh, I'm sorry, I
20  misunderstood.  The good Reverend can answer the
21  question.
22         THE WITNESS:  Have we been convicted of
0099
1   anything?
2   BY MS. GEISLER:
3       Q.  Of a felony since November 2005?
4       A.  No.
5       Q.  Have you been charged with a crime
6   involving fraud or false dealing?
7       A.  No.
8       Q.  Has your wife ever been convicted --
9          MR. GEORGE:  Ever or since 2005.
10  BY MS. GEISLER:
11      Q.  Has your wife been convicted of a felony
12  since November 2005?

13    A.  No.

14    Q.  Has your wife been charged with a crime

15 involving false dealing or fraud since November

16 2005?

17    A.  No.

18        MS. GEISLER:  Okay.  I'm finished.  Is

19 there anyone on the phone that has questions?

20        MR. ROBBEN:  I'll ask a couple.  Can you

21 hear me?

22        MR. GEORGE:  If you could speak --

0100

1 unfortunately, the connection is very bad,

2 especially for the speaker folk.  So if you could

3 speak loudly and slowly, I think it will help the

4 Reverend understand you better.

5        MR. ROBBEN:  I will try.

6

7            EXAMINATION

8 BY MR. ROBBEN:

9    Q.  Good afternoon, Reverend.  My name is

10 Philip Robben.

11    A.  Hello.

12    Q.  I just have a couple of questions that go

13 to your understanding of which defendants are in

14 which track in the case.  We've been talking about

15 Track 1 and Track 2 today.  Do you know which track

16 the company Abbott is in?

17        MR. GEORGE:  Objection.

18        MR. ROBBEN:  Basis?

19        THE WITNESS:  No, I don't, without looking

20 it up.

21 BY MR. ROBBEN:

22    Q.  I would ask when I ask you these

0101

1 questions, please tell me you don't know if you

2 don't know.  I'd rather you not guess.

3        Do you know which track defendant Amgen is

4 in?

5        MR. GEORGE:  Objection.

6        THE WITNESS:  No.

7 BY MR. ROBBEN:

8    Q.  Do you know which track defendant

9 AstraZeneca is in?

10    A.  No.

11    Q.  Do you know which track defendant Aventis

12 Group is in?

13    A.  No.

14    Q.  Do you know which track defendant Baxter

15 is in?

16    A.  No.

17    Q.  Do you know which track defendant Bayer is

18 in?

19    A.  No.

20    Q.  Do you know which track defendant Bristol-

21  Myers Squibb Group is in?
22     A.  No.
0102
 1     Q.  Do you know which track defendant Dey is
 2  in?
 3     A.  No.
 4     Q.  Do you know which track defendant Fujisawa
 5  Group is in?
 6     A.  No.
 7     Q.  Do you know which track defendant
 8  GlaxoSmithKline Group is in?
 9     A.  No.
10     Q.  Do you know which track defendant Immunex
11  is in?
12     A.  No.
13     Q.  Do you know which track the defendant
14  Johnson & Johnson Group is in?
15     A.  No.
16     Q.  Do you know which track defendant Pfizer
17  is in?
18     A.  No.
19     Q.  Do you know which track defendant
20  Pharmacia Group is in?
21     A.  No.
22     Q.  Do you know which track defendant
0103
 1  Schering-Plough Group is in?
 2     A.  No.
 3     Q.  Do you know which track defendant Sicor
 4  Group is in?
 5     A.  No.
 6     Q.  Do you know which track defendant Warrick
 7  is in?
 8     A.  No.
 9     Q.  Do you know which track defendant Watson
10  is in?
11     A.  No.
12        MR. ROBBEN:  That's all the questions I
13  have. Thank you very much.
14        MS. GEISLER:  Anyone else?
15
16        EXAMINATION
17  BY MS. HARTMAN:
18     Q.  I'd like to ask a few questions.  Reverend
19  Aaronson, my name is Kendra Hartman.  I represent
20  the Sicor Group in this litigation.  A question for
21  you, has your wife taken any drug manufactured by
22  Sicor?
0104
 1     A.  I don't know.
 2     Q.  Has your wife taken any drug manufactured
 3  by Gensia?
 4     A.  I don't know.
 5     Q.  Has your wife taken any drug manufactured

6  Gensia Sicor?
7     A.  I don't know.
8     Q.  Did your wife take each of the drugs
9  listed in paragraph 15 of the Fourth Amended Master
10 Consolidated Class Action Complaint?
11        MR. GEORGE:  Objection.  You can answer.
12        MS. HARTMAN:  What's the basis of your
13 objection?
14        MR. GEORGE:  It's pushing the envelope a
15 little bit of what is proper in this deposition, so
16 I'm objecting as preserving that relevance aspect
17 and also signaling you that, you know, I don't want
18 that line of questioning going too far.  It's a Rule
19 23 inquiry.
20 BY MS. HARTMAN:
21    Q.  Reverend Aaronson, has your wife taken
22 each of the drugs listed in paragraph 15?
0105
1     A.  Don't know.
2     Q.  Are all of the drugs listed in paragraph
3  15 taken in connection with your wife's treatment
4  for ovarian cancer?
5     A.  They were taken from the hospital record.
6     Q.  The hospital record in connection with her
7  treatment for ovarian cancer or --
8     A.  For the surgery and the follow-up chemo.
9     Q.  For ovarian cancer only; is that correct?
10    A.  Yes.
11    Q.  Finally, which of the defendants is Mrs.
12 Aaronson seeking to be a class representative
13 against?
14        MR. GEORGE:  Objection.
15        MS. HARTMAN:  You can answer.
16        THE WITNESS:  For all of them.  To all of
17 them.
18 BY MS. HARTMAN:
19    Q.  All of them meaning which ones?
20    A.  The 17 listed.
21    Q.  Listed where?
22    A.  In the complaint.
0106
1     Q.  On pages 27 through 41; is that correct?
2     A.  Yes.
3     Q.  And you are not named as a class
4  representative in the Fourth Amended Master
5  Consolidated Class Action Complaint; is that
6  correct?
7     A.  I am not named?
8     Q.  Correct.
9     A.  No.  Sue is named.
10        MR. GEORGE:  That's going to be -- in the
11 next amendment we're going to be, as we've stated in
12 correspondence before, formally adding Mr. --
13 Reverend Aaronson alongside with Sue Aaronson.

14  BY MS. HARTMAN:
15     Q.  Reverend Aaronson, which defendants is it
16  your intention to seek to be a class representative
17  against?
18     A.  Which defendant?
19     Q.  Correct.
20     A.  Any of them that pertain to medications
21  that my wife received.
22     Q.  And which defendants are those?
0107
 1     A.  I don't know.
 2        MS. HARTMAN:  I have no further questions.
 3        MS. GEISLER:  Anyone else?
 4
 5           EXAMINATION
 6  BY MS. BUTLER:
 7     Q.  This is Michelle Butler.  I'm representing
 8  Watson Pharmaceutical.
 9        MR. GEORGE:  Michelle, you're a little
10  quieter than the other ones.  Just speak up a little
11  bit.  Thank you.
12        MS. BUTLER:  I'll speak up then.
13        THE WITNESS:  That's better.
14  BY MS. BUTLER:
15     Q.  Reverend Aaronson, are you aware that you
16  are proposed as a class representative with regard
17  to Watson?
18     A.  Yes.
19     Q.  Your wife has not been diagnosed with end
20  stage renal disease or renal failure, has she?
21     A.  She was in renal failure last month.
22     Q.  Do you know, did your wife receive any
0108
 1  dialysis treatment in association with that?
 2     A.  Not dialysis.  Borderline, but we didn't
 3  get to that.
 4     Q.  And do you know which drugs she was
 5  prescribed in association with that?
 6     A.  No, I don't because I haven't seen the
 7  hospital record.
 8     Q.  Are you familiar with how dialysis drugs
 9  are reimbursed?
10     A.  How what drugs?
11     Q.  Dialysis drugs are reimbursed.
12     A.  No, I don't.
13     Q.  Are you aware that the federal government
14  in 2000 considered and rejected the idea of
15  dramatically reducing Medicare reimbursements for
16  dialysis drugs?
17     A.  No.
18        MS. BUTLER:  I have no further questions.
19  Thank you.
20        MR. GEORGE:  Anyone else?
21        MR. ROBBEN:  If there's no one else, I

22  have one additional question.
0109
1          MR. GEORGE:  This is Philip again?
2          MR. ROBBEN:  Yes.
3
4          FURTHER EXAMINATION
5  BY MR. ROBBEN:
6     Q.   Reverend Aaronson, was your wife
7  administered or did she take any drugs manufactured
8  by Dey?
9     A.   I don't know.
10         MR. ROBBEN:  Thank you.
11         MS. GEISLER:  I have one more follow-up.
12  Is there anyone else?  If not, I have one more
13  follow-up.
14
15         FURTHER EXAMINATION
16  BY MS. GEISLER:
17     Q.   Reverend, has your wife taken any drugs
18  manufactured by Abbott?
19     A.   I don't know.
20         MS. GEISLER:  Anyone else?
21
22         FURTHER EXAMINATION
0110
1  BY MS. BUTLER:
2     Q.   Are you aware -- or has your wife taken
3  any drugs manufactured by Watson?
4     A.   I don't know.
5         MS. BUTLER:  Thank you.
6
7         EXAMINATION
8  BY MR. MCCULLOCH:
9     Q.   Mr. Aaronson, I was just wondering if you
10  have any knowledge that your wife has taken any
11  drugs manufactured by Pharmacia or Pfizer?
12     A.   I don't know.
13         MR. MCCULLOCH:  Thank you.
14
15         EXAMINATION
16  BY MS. HEARD:
17     Q.   Do you know if your wife has taken any
18  medication manufactured by Baxter?
19     A.   I don't know.
20         MS. HEARD:  Thank you.
21
22         EXAMINATION
0111
1  BY MS. WALKER:
2     Q.   Do you know if your wife has taken any
3  drugs manufactured by Amgen?
4     A.   I don't know.
5         MS. WALKER:  Thank you.
6         MS. GEISLER:  Anyone else?

7      At this point defendants are going to
8  reserve the right to continue this deposition at
9  such time as Mrs. Aaronson produces documents in
10 accordance with the Court's August 16, 2005 order.
11      MR. GEORGE:  Obviously, we disagree with
12 the status of this deposition and the import of that
13 order to Mrs. Aaronson and Reverend Aaronson.  But
14 if you could, if I could request that you give
15 correspondence to me or to Kline & Specter to
16 summarize what it is you're requesting that be
17 produced.
18      MS. GEISLER:  I will.
19      MR. GEORGE:  We'll take it under
20 advisement.
21         (Whereupon, at 12:10 p.m., the
22 deposition was concluded.  Signature was reserved.)
0112
1
2
3
4       _____
5              DAVID R. AARONSON
6
7  Subscribed and sworn to and before me
8  this _____ day of _____, 20_____.
9
10
11 _____
12      Notary Public
13
14
15
16
17
18
19
20
21
22
0113
1           CERTIFICATE OF REPORTER
2
3      I, CHRISTINE A. TAYLOR, the officer before whom
4  the foregoing deposition was taken, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; that the
7  testimony of said witness was taken in shorthand and
8  thereafter reduced to typewriting by me or under my
9  direction; that said deposition is a true record of the
10 testimony given by said witness; that I am neither
11 counsel for, related to, nor employed by, any of the
12 parties to the action in which this deposition was
13 taken; and, further, that I am not a relative or
14 employee of any attorney or counsel employed by the

15  parties hereto, nor financially or otherwise interested
16  in the outcome of the action.
17
18              CHRISTINE A. TAYLOR
19              Notary Public in and for
20              County of Union
21              State of North Carolina
22  My commission expires March 24, 2009.