# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                          *

                                * MDL DOCKET NO.

PHARMACEUTICAL INDUSTRY          * CIVIL ACTION

AVERAGE WHOLESALE PRICE          * 01CV12257-PBS

LITIGATION                       *

---

THIS DOCUMENT RELATES TO:

ALL ACTIONS

ORIGINAL

---

* * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION of HAROLD BEAN, produced as a

witness at the instance of the Defendant, and duly

sworn, was taken in the above-styled and numbered

cause on the 18th day of August, 2006, from 9:18 a.m.

to 10:59 a.m., before SYLVIA KERR, CSR, RPR, CRR in

and for the State of Texas, reported by machine

shorthand, at the Hampton Inn, 3677 Highway 35 North,

Rockport, Aransas County, Texas.

2

1                    A P P E A R A N C E S

2

3     COUNSEL FOR THE PLAINTIFFS:

4          MR. DONALD E. HAVILAND, JR.

5          MR. WILLIAM J. MOLINARI, III

6          Kline & Specter, P.C.

7          The Nineteenth Floor

8          1525 Locust Street

9          Philadelphia, Pennsylvania 19102

10

11    COUNSEL FOR THE DEFENDANT DEY, INC.:

12         MR. PHILIP D. ROBBEN

13         Kelley Drye & Warren, LLP

14         101 Park Avenue

15         New York, New York 10178

16

17    COUNSEL FOR THE DEFENDANT AMGEN, INC.

18         MR. STEVE BARLEY (Via Telephone)

19         Hogan & Hartson, LLP

20         111 South Calvert Street, Suite 1600

21         Baltimore, Maryland 21202

22

3

1            A P P E A R A N C E S ( CONTINUED)

2

3    COUNSEL FOR THE DEFENDANT PFIZER PHARMACIA

4    AND UPJOHN:

5        MR. J. CLAYTON EVERETT, JR.  (Via Telephone)

6        Morgan, Lewis & Bockius, LLP

7        1111 Pennsylvania Avenue, N.W.

8        Washington, D.C. 20004

9

10   COUNSEL FOR THE DEFENDANT FUJISAWA:

11       MR. ANDREW BERNASCONI  (Via Telephone)

12       Reed Smith, LLP

13       1301 K Street N.W.

14       Suite 1100 - East Tower

15       Washington, D.C. 20005

16

17   COUNSEL FOR THE DEFENDANT AVENTIS:

18       MR. BRIAN FEDOTIN  (Via Telephone)

19       Shook, Hardy & Bacon

20       2555 Grand Boulevard

21       Kansas City, Missouri 64108

22

4

         A P P E A R A N C E S ( CONTINUED)


COUNSEL FOR THE DEFENDANT BAXTER HEALTHCARE

CORPORATION:

      MR. JASON WALLACH  (Via Telephone)

      Dickstein Shapiro, LLP

      1825 Eye Street, N.W.

      Washington, D.C. 20006-5403


COUNSEL FOR THE DEFENDANT SICOR:

      MS. SHELLI CALLAND  (Via Telephone)

      Sonnenschein, Nath & Rosenthal

      1301 K Street, N.W.

      Suite 600 - East Tower

      Washington, D.C. 20005-3364


COUNSEL FOR THE DEFENDANT ABBOTT:

      MS. CAROL GEISLER  (Via Telephone)

      Jones Day

      77 West Wacker

      Chicago, Illinois 60601-1692

5

1              A P P E A R A N C E S  ( CONTINUED)

2

3     COUNSEL FOR THE DEFENDANTS SCHERING-PLOUGH

4     AND WARRICK PHARMACEUTICALS CORPORATION:

5          MR. DANIEL CHRISTMAS  (Via Telephone)

6          Ropes & Gray

7          One International Place

8          Boston, Massachusetts 02110-2624

9

10    COUNSEL FOR THE DEFENDANT ASTRAZENECA

11    PHARMACEUTICALS, LP:

12         MS. MELISSA AOYAGI  (Via Telephone)

13         Davis, Polk & Wardwell

14         450 Lexington Avenue

15         New York, New York 10017

16

17    ALSO PRESENT:

18         MRS. KATHERINE BEAN

19

20

21

22

6

1                          I N D E X

2                                                    PAGE

3      Appearances

4      HAROLD BEAN

5

6          Examination by Mr. Robben.................... 007

7          Examination by Mr. Barley................... 066

8          Examination by Mr. Fedotin.................. 074

9

10

11

12

13

14

15

16

17

18

19

20

21

22

7

1       HAROLD BEAN, having been first duly sworn,

2   testified as follows:

3       EXAMINATION BY MR. ROBBEN:

4     Q.   Good morning, Mr. Bean.   Thank you for

5   coming here today.   My name is Philip Robben.   I'm

6   from a law firm named Kelly Drye & Warren, and we

7   represent a company called Dey, Inc. in this case.

8   Could you state your full name for the record.

9     **A.     Harold Ray Bean.**

10     Q.     And that's B-E-A-N?

11     **A.     Yes.**

12     Q.     Have you ever given a deposition before?

13     **A.     Yes, once.**

14     Q.     One time.   What type of case was that?

15     **A.     It was an internal thing.   Some ex-**

16   **employees were suing me, claiming that they were**

17   **discharged -- not discharged, but --**

18       MR. HAVILAND:   It was a wrongful

19   termination company action.

20       THE WITNESS:   Yeah.

21     Q.   (By Mr. Robben)   About how long ago did

22   you sit for that deposition?

8

1      **A.    That's been 30 years ago.**

2      Q.    Have you ever given testimony at a trial?

3      **A.    Yeah.**

4      Q.    Was it in the same case?

5      **A.    No, no.**

6      Q.    What type of a trial?

7      **A.    It was -- I don't know, to tell you the**

8      **truth, it's been so long ago.  It was a local public**

9      **thing.**

10     Q.    Okay.

11     **A.    Criminal.**

12     Q.    Okay.  That's fine.  Well, I'll just go

13     over some sort of procedures just to make sure that

14     the record comes out clear.  As you probably

15     remember from the last time you gave a deposition,

16     everything is being taken down by the court reporter

17     who's going to reduce it to a written document.  So

18     everything that we say will get into the record, so

19     we have to give verbal responses back and forth.

20     And I'll try to not talk over you, and hopefully we

21     can keep that going. Sometimes it's difficult.

22            I'd ask if any question I ask you today is

1   unclear or you don't understand it or anything, that

2   you please ask me to clarify it, and I'll do the

3   best I can.

4        **A.    Okay.**

5        Q.    If I ask any questions this morning that

6   you feel are too personal or touch on things that

7   you're not comfortable talking about, let me know,

8   and maybe there's a way we can change the question

9   around so that you're not uncomfortable with it

10  because I don't want to make you uncomfortable.

11            MR. HAVILAND:  We appreciate that.

12       Q.   (By Mr. Robben)  Throughout the morning,

13  Mr. Haviland might object to some questions I ask.

14  Unless he asks you not to -- or directs you not to

15  answer my question, I'd ask you to give a response.

16  And if at any time you need a break to take a drink

17  of water, anything, just let me know because we

18  don't want to make you uncomfortable.

19            MR. HAVILAND:  Phil, just for planning

20  purposes, if we can go to about an hour, we'll see

21  how it goes in terms of his pace.

22            MR. ROBBEN:  Yeah, that's fine.

10

1          Q.   (By Mr. Robben)  Do you take any

2     medications on a regular basis?

3          **A.    I beg your pardon?**

4          Q.   Do you take any medications on a regular

5     basis?

6          **A.    Oh, yes.**

7          Q.   What medications have you taken in the

8     last 24 hours?

9          **A.    Let's see.**

10              MRS. BEAN:  We should have brought the

11     list.

12              MR. HAVILAND:  Yeah.

13         **A.    There's Tiazac, there's Digtex,**

14     **Fosinopril. And there's one in between.  I also take**

15     **--**

16              MRS. BEAN:  Advair.

17         **A.    -- Advair.**

18         Q.   Based on your experience with those

19     medications that you take every day, is there

20     anything about them that you feel that would

21     compromise your ability to give testimony here

22     today?

11

1     **A.   No.**

2     Q.   So you can testify truthfully?

3     **A.   Yes.**

4     Q.   You can remember details?

5     **A.   I think so.**

6     Q.   Okay.

7     **A.   I can't guarantee that.  My mind is not**

8     **all that sharp anymore, but...**

9     Q.   Fair enough.  Did you speak to anybody in

10    preparation for your testimony today?

11    **A.   Are you talking about other than the**

12    **attorneys?**

13    Q.   Well, did you meet with Mr. Haviland --

14    **A.   Yes.**

15    Q.   -- and Mr. Molinari?

16    **A.   Yes.**

17    Q.   When did you meet with them?

18    **A.   When?**

19    Q.   Yes.

20    **A.   Yesterday.**

21    Q.   About how long were you with them?

22    **A.   I don't remember.**

12

1    Q.   Was it half a day?

2    **A.   Approximately.**

3    Q.   Was anybody else there other than the

4    attorney?

5    **A.   My wife.**

6    Q.   Did you talk to anybody else about this

7    deposition other than your wife?

8    **A.   No.**

9         SPEAKER:  Excuse me, Philip.  I don't know

10   about others on the phone, but I'm having a little

11   trouble hearing Mr. Bean.  Is there a way that we

12   can move the microphone a little closer to him?

13        MR. HAVILAND:  Whoever that is, I'm going

14   to move the phone closer and see if that changes

15   things.

16        SPEAKER:  Thank you.

17        MR. HAVILAND:  Mr. Bean, you've got a

18   number of people listening to you.

19   Q.   (By Mr. Robben)  When you met with your

20   attorneys, did you review any documents with them?

21   **A.   No.**

22   Q.   What's your current address?

Bean, Harold        HIGHLY CONFIDENTIAL        August 18, 2006
                          Rockport, TX

13

1        A.     Post Office Box 1731, Rockport, Texas,

2    78381.

3        Q.     And that's a post office box.  Do you have

4    a home address, too?

5        A.     My home address is 539 -- 539 Club Lake

6    Drive.

7        Q.     And that's in Rockport, too?

8        A.     That's Rockport.

9        Q.     How long have you lived at that address?

10       A.     About 25 years.

11       Q.     Have you ever lived outside of Texas?

12       A.     Yes.

13       Q.     Where else have you lived?

14       A.     I've lived in -- I was in the Navy.

15              MR. HAVILAND:  He traveled a lot.

16       A.     Boston, San Diego, California, San

17   Francisco, California.

18              MR. HAVILAND:  Pearl Harbor.

19       A.     Pearl Harbor.  There's one out close to

20   China.

21              MR. HAVILAND:  Okinawa?

22       A.     Okinawa.

1          Q.    Now, when you lived in Boston and San

2    Diego, San Francisco, Pearl Harbor and Okinawa, were

3    all of those cities in connection with your Naval

4    service?

5          **A.    Yes.**

6          Q.    Before you went into the Navy, were you

7    living in Texas?

8          **A.    Yes.**

9          Q.    And then after you left the Navy, you

10   settled back to Texas?

11         **A.    I came back to Texas.**

12         Q.    And you've lived here ever since?

13         **A.    Uh-huh, yes.**

14         Q.    Approximately what dates -- what were the

15   dates of your Navy service?

16         **A.    From January 1941 until September 1946.**

17         Q.    Those were interesting times in the Navy.

18              MR. HAVILAND:    Interesting word.

19         **A.    I enjoyed it.**

20         Q.    Other than the time when you were in the

21   Navy, have you ever been to Massachusetts?

22         **A.    No.**

15

1         Q.   Now, do you understand that this -- the

2    case that you're giving testimony in today is

3    pending in a court in Massachusetts?

4         **A.   Yes.**

5         Q.   If you had to, would you be willing to

6    travel to Boston to testify?

7         **A.   Yes.**

8         Q.   Do you think that's something you could

9    do?

10        **A.   Yes.**

11        Q.   When did you first hear about this action?

12        **A.   I don't remember.**

13        Q.   Do you remember when you first talked to a

14   lawyer about this action?

15        **A.   No.**

16        Q.   Did there come a time where someone asked

17   you to look for documents in connection with this

18   case?

19        **A.   Yes.**

20        Q.   What was your understanding of what you

21   were supposed to be looking for?

22        **A.   Primarily they were cancelled checks.**

16

1          Q.   Did you look for any other types of

2     documents?

3               MR. HAVILAND:  Just so we're clear, Mr.

4     Robben, when you say "you," you're including his

5     wife as well?  Or are you just asking Mr. Bean?

6               MR. ROBBEN:  Well, you know, however

7     looked in connection with the case.

8               THE WITNESS:  Did we find anything besides

9     checks?  I don't think so.  I don't think so.

10              MRS. BEAN:  I can't remember.

11              MR. HAVILAND:  We have to be careful of

12    not asking too many questions of Mrs. Bean.  She's

13    not being deposed today.

14         I can represent for the record that we asked

15    the client to produce any existing medical records

16    and their file relating to the request you made.

17    The production you've got primarily has come from

18    the doctors and third-party sources.  But we're here

19    to say today that we produced everything that they

20    have in their files with the exception of some

21    current things, which I think relate to '06

22    treatments.  Those are marginally relevant.  But as

17

1   far as past documents, I'm confident we've got

2   everything.

3           MR. ROBBEN:  Okay.  When you say you're

4   confident you got everything, do you think that that

5   would have picked up all invoices in his possession?

6           MR. HAVILAND:  EOB's, bills from doctors,

7   cancelled checks relating to those bills, with the

8   exception of maybe some outlining issues that I

9   think we have pending.  But the core of the things

10  you've asked for, yes.

11          MR. ROBBEN:  How about things like

12  packaging materials; bottles, boxes, things like

13  that.

14          MR. HAVILAND:  We've asked.  And with the

15  exception of current medications, I don't think

16  there are any.  In the instance of the Advair he

17  described, we do have an Advair package today.

18      Q.   (By Mr. Robben)  Mr. Bean, you've heard my

19  conversation with Mr. Haviland --

20      **A.    Yeah.**

21      Q.   -- about the search for the documents and

22  what he found.  Is all of that accurate by your --

18

1    by your account?

2         **A.    Yes.**

3         Q.    Okay.   In terms of any documents or

4    cancelled checks that you found, did you give all of

5    those documents to your lawyer?

6         **A.    Yes.**

7         Q.    When were you born?

8         **A.    December the 14th, 1920.**

9         Q.    And I take it you're eligible for

10   Medicare?

11        **A.    Yes.**

12        Q.    Do you remember when you started

13   participating in the Medicare program?  Let me ask

14   it -- let me ask you this way.  Did you start

15   participating when you were 65?

16        **A.    I don't remember.  It may have been prior**

17   **to that.**

18        Q.    Was there ever a time that your Medicare

19   coverage was suspended or cancelled?

20        **A.    No.**

21        Q.    So once you enrolled, you've been eligible

22   the whole time --

19

1     **A.    Right.**

2         Q.    -- and participating the whole time?

3     **A.    Yes.**

4         Q.    Now, are you familiar with Medicare Part A

5     as opposed to Medicare Part B?

6     **A.    I may be, but I don't know.**

7         Q.    So those details you don't understand?

8     **A.    No.**

9         Q.    Now, during the time that you've been

10    enrolled in Medicare, have you also had other

11    insurance coverage?

12    **A.    Yes.**

13        Q.    Who provides that coverage?

14    **A.    Aetna.**

15        Q.    Has Aetna been the only company that's

16    insured you during the time you've been enrolled in

17    Medicare?

18    **A.    No.**

19        Q.    When did your coverage with Aetna begin?

20    **A.    When I retired from General Dynamics.**

21        Q.    Do you know the approximate date?

22    **A.    It was June 1950.**

20

1              MRS. BEAN:  When you retired?

2              THE WITNESS:  Yes.

3              MRS. BEAN:  You retired in 1980.

4         **A.    1980.  Excuse me.**

5         Q.    So it was June 1980?

6         **A.    Yes.**

7         Q.    You retired from General Dynamics?

8         **A.    Yes, took early retirement.**

9         Q.    And so at that time, you became enrolled

10   in an Aetna insurance program?

11        **A.    Well, Aetna insured General Dynamics**

12   **employees, and it was just an ongoing thing.**

13        Q.    Okay.

14        **A.    I had to sign for it, but it was ongoing.**

15        Q.    Did you pay for that insurance?

16        **A.    Yes.**

17        Q.    Did you pay for it when you were employed

18   by General Dynamics?

19        **A.    No.**

20        Q.    So once you retired from General Dynamics,

21   you then started to pay Aetna?

22        **A.    Yes.**

21

1          Q.   Now, since June 1980, have you been

2     insured by Aetna?

3          **A.   Yes.**

4          Q.   Continuously?

5          **A.   Yeah.**

6          Q.   Have you had any other insurance coverage?

7               MR. HAVILAND:  Other than Medicare and

8     Aetna?

9          Q.   (By Mr. Robben)  Other than Medicare and

10    Aetna?

11         **A.   Let me ask you a question.  Are we talking**

12    **about medicine, hospitals and that sort of**

13    **insurance?**

14              MR. HAVILAND:  Health insurance?

15         **A.   Or any kind?**

16         Q.   Health insurance.  Yeah, I'm sorry.

17         **A.   That's the only one I've had.**

18         Q.   So you've had car insurance or homeowners

19    insurance, but that's the only --

20         **A.   And life insurance.  I also had some**

21    **cancer insurance.**

22         Q.   What do you mean by cancer insurance?

22

1       **A.     If I developed a cancer and had some**

2    **medical expenses, they'd pay some of it.**

3       Q.    Who provided that coverage?

4       **A.    I can't tell you right offhand.**

5       Q.    Do you remember when that coverage started

6    in force?

7       **A.    At the same time I retired from General**

8    **Dynamics.**

9       Q.    What prompted you to obtain that coverage?

10      **A.    Well, I believed it was necessary to**

11   **protect my interest in case I developed a cancer.**

12      Q.    Was there -- was there anything in

13   particular that made you feel that you were at risk

14   for cancer?

15      **A.    Well, some members of my family have had**

16   **cancer.**

17      Q.    Was it any -- was anything related to your

18   work experience?

19      **A.    No.**

20      Q.    So it was nothing job related?

21      **A.    No.**

22      Q.    What were -- do you know what the terms of

23

1    that insurance were?

2         **A.    Not right offhand, no.**

3         Q.    Did that insurance ever cease to be

4    effective?

5         **A.    No.**

6         Q.    So is it in effect today?

7         **A.    Yes.**

8              MR. ROBBEN:   I'll ask you, Don, have

9    documents been produced about that one?

10             MR. HAVILAND:   I don't know that there's

11   any covered medications that have been under that

12   plan, so I'll have to look into that and get back to

13   you on it.  The answer is I don't believe so, but I

14   don't believe they're also covered because what

15   we've seen in the documents is that Medicare pays

16   80, Aetna picks up its share, and they pay the

17   balance for drugs.

18        Q.    (By Mr. Robben)  Have you ever obtained

19   any medical coverage or any medical procedures

20   through the Veterans Administration?

21        **A.    No.**

22        Q.    Do you know if you're eligible to receive

24

1    VA benefits?

2         **A.    Yeah.**

3         Q.    Are you?

4         **A.    Yeah.**

5         Q.    You are eligible?

6         **A.    I'm an eligible veteran, yeah.**

7         Q.    Is there a reason that you haven't

8    obtained benefits through the Veteran

9    Administration?

10        **A.    I haven't needed it.**

11        Q.    Have you ever -- have you ever explored

12   what your options were for Veterans Administration

13   coverage?

14        **A.    No.**

15        Q.    One thing I'd like to understand is that

16   you said you had Aetna coverage since you retired

17   from General Dynamics in June of 1980.

18        **A.    Yeah.**

19        Q.    Did that coverage ever change over the

20   course of time from then until now?

21        **A.    You mean the types of coverage?**

22        Q.    Right, the terms.

25

1      **A.     No, it's the same.**

2      Q.    Same policy?

3      **A.     Yeah.**

4      Q.    Can you tell me what your understanding is

5    of the coverage that you get under that policy?

6            MR. HAVILAND:   Generally or specifically

7    as to any area?

8      Q.    (By Mr. Robben)   Well, how about, what

9    coverage did the Aetna policy that started in 1980

10   provide you for medications, to the best you

11   understand?

12     **A.     I'm trying to recall how it goes.**

13   **Primarily it reimbursed me from the percentage of**

14   **the cost that Medicare didn't cover.**

15     Q.    Did that -- does the Aetna policy --

16   strike that.   Does the Aetna policy now have a

17   deductible amount?

18     **A.     Yes.**

19     Q.    Do you know what it is?

20     **A.     $100.**

21     Q.    Has the deductible changed over time?

22     **A.     No.**

26

1          Q.   It's always been $100?

2          **A.   Uh-huh, yes.**

3          Q.   So now, you said it paid the portion that

4     Medicare didn't cover, correct?

5               MR. HAVILAND:  No, that's not what he

6     said. He said they paid a percentage.

7          Q.   (By Mr. Robben)  Paid a percentage that

8     Medicare didn't pay.  Did you pay the part that

9     Aetna didn't cover?

10         **A.   Yes.**

11         Q.   Did you always pay that amount?

12         **A.   Yes.**

13         Q.   Did that amount change or was it fixed?

14         **A.   It's fixed.**

15         Q.   What was it fixed at?

16         **A.   It was -- whatever was left after Aetna**

17    **paid their share, which made it whatever.**

18         Q.   Okay.  So it was a fixed percentage, not a

19    fixed amount?

20         **A.   Well, are you saying what I paid?**

21         Q.   What you -- right, what you paid.

22         **A.   I'm not sure that my payments were fixed.**

27

1              MR. HAVILAND:  He's not suggesting that.

2    He's asking whether you had a fixed percentage as

3    opposed to a fixed dollar amount.

4         **A.    No, neither one.  After Aetna paid,**

5    **whatever is left, I had to pay.**

6         Q.   Did you ever receive any documents from

7    Aetna that explained what your coverage was going to

8    be under the policy?

9         **A.    Yeah.**

10             MR. ROBBEN:  I guess I'd just add to the

11   extent those are available, I don't think we've seen

12   any of those.  I would ask for their production.

13             MR. HAVILAND:  Okay.

14        Q.   (By Mr. Robben)  Do you think you have

15   those documents still in your possession?

16        **A.    I doubt it.**

17             MR. HAVILAND:  We will answer formally,

18   too.

19        Q.   (By Mr. Robben)  Now, other than the

20   Medicare, your Aetna coverage and the cancer

21   insurance, have you been covered by any other

22   insurance during the time you've been retired?

28

```
 1          A.    No.

 2          Q.    Now, your Aetna coverage started when you

 3     retired from General Dynamics, correct?

 4          A.    Well, let me explain.

 5          Q.    All right.  I understand.

 6                MR. HAVILAND:  He just wants to start in a

 7     different line of questioning.

 8          A.    For the purposes of what we're talking

 9     yeah, that's when it started.

10          Q.    So when you retired from General Dynamics,

11     your Aetna coverage continued and you started paying

12     for it at that point?

13          A.    Right.

14          Q.    Did you ever give any consideration to

15     changing to another insurance policy?

16          A.    No.

17          Q.    Did you ever explore other insurance

18     options?

19          A.    No.

20          Q.    Was there a reason that you didn't look

21     around?

22          A.    I didn't figure I'd ever find one any
```

29

1  better.

2      Q.  So you were satisfied with the Aetna

3  coverage?

4      **A.  Yes.**

5      Q.  What type of work did you do at General

6  Dynamics?

7      **A.  I was a manager of industrial accounting.**

8      Q.  Was that -- they had an operations

9  locally, local operations?

10     **A.  In Rockport, yes, a big plant.  We had**

11 **about 35,000 employees as a rule.**

12     Q.  What were they manufacturing?

13     **A.  Airplanes.**

14     Q.  Was that -- that was for the military?

15     **A.  Yes.**

16     Q.  Fighter jets and things?

17     **A.  Fighters, bombers, whatever we got at the**

18 **time.**

19     Q.  Now, since the time that you retired from

20 General Dynamics, has your wife been employed at any

21 point?

22     **A.  Has my wife been employed?**

Case 1:01-cv-12257-PBS   Document 6026-4   Filed 04/24/09   Page 31 of 79

30

1        Q.   Yes.

2        A.   I don't think so.

3             MRS. BEAN:   No.

4        Q.   (By Mr. Robben)   Now, over time, did you

5   receive program materials from the Medicare program?

6        A.   Define program materials.

7        Q.   Like a booklet or a brochure that

8   explained the program.

9        A.   Yes.

10       Q.   How often did you receive that type of

11  material?

12       A.   I don't recall.

13       Q.   Do you have any of those materials in your

14  possession?

15            THE WITNESS:   We have one of them, don't

16  we?

17       Q.   (By Mr. Robben)   You have some?

18       A.   Yes.

19       Q.   Are those from this year?

20       A.   No.

21       Q.   Or would you say from prior years?

22            MRS. BEAN:   Prior.

1        **A.    Prior years.  I look to her because she's**

2    **the one that keeps them.**

3        Q.    Okay.  Where do you keep things at home,

4    like your medical type documents?

5        **A.    The documents?**

6        Q.    Yeah.

7        **A.    In a file in a closet.**

8        Q.    But your wife usually keeps that file --

9        **A.    Yes.**

10       Q.    -- under control?

11       **A.    That's her assignment.**

12       Q.    We might have covered this a little bit

13   before, but in looking for documents that involve

14   this case, did you look in that file where you keep

15   your medical records?

16       **A.    Sure.**

17       Q.    And anything out of that file that might

18   have been responsive in this case, you gave to your

19   attorneys?

20       **A.    Yes.**

21            MR. HAVILAND:  If you would like the

22   Medicare booklet, we'll get you that.

Bean, Harold          HIGHLY CONFIDENTIAL          August 18, 2006
                            Rockport, TX

32

1              MR. ROBBEN:  Yeah, whatever he has in

2       terms of Medicare.

3              MR. HAVILAND:  Sure.

4         Q.   (By Mr. Robben)  Now, over the time that

5       you were -- that you have been a beneficiary of

6       Medicare, have you paid a premium?

7         **A.    To Medicare?**

8         Q.   Yes.

9         **A.    Yes.**

10        Q.   Do you know what the amount currently is?

11      Or strike that.  Do you know what the amount was as

12      of 2005?

13        **A.    No.**

14        Q.   Can you estimate what the premium was at

15      that point?

16        **A.    I have no idea.**

17             MR. HAVILAND:  Are you talking monthly?

18             MR. ROBBEN:  Yeah.

19             THE WITNESS:  I don't.

20        Q.   (By Mr. Robben)  But I take it you paid

21      whatever the premium was?

22        **A.    Right.**

                                                               33

1          Q.    How did you pay that premium?

2                MR. HAVILAND:  Can I ask, does it come out

3     of your social security?  Do they deduct it

4     automatically?

5                THE WITNESS:  Yeah.

6                MR. HAVILAND:  That's what typically

7     happens.

8          Q.    (By Mr. Robben)  And under Medicare, is it

9     your understanding that you had a deductible that

10    you needed to meet before coverage would start?

11         **A.    Yes.**

12         Q.    Do you know the amount of the deductible?

13         **A.    No.  I think -- I think it was $100.**

14         Q.    Do you know if it changed over time?  Do

15    you remember if it changed over time?

16         **A.    I don't know that it even changed.**

17         Q.    Going back to the cancer insurance that

18    you purchased -- or that you obtained, is that

19    something you applied for through your employer?

20         **A.    Yes.**

21         Q.    Was that something that they offered as

22    part of their benefits package?

34

1      **A.    Yes.**

2          Q.    And did you have to pay an extra premium

3      for that coverage?

4      **A.    Yes.**

5          Q.    And then after you retired from General

6      Dynamics, did you continue to make the premium

7      payments?

8      **A.    Yes.**

9          Q.    When you were at General Dynamics, how did

10     you apply for insurance coverage like that?

11              MR. HAVILAND:   Pre or post retirement?

12              MR. ROBBEN:   Well, pre.  Good point.

13         Q.    (By Mr. Robben)  Before you retired, how

14     would you have applied for insurance coverage such

15     as that?

16     **A.    Well, they would send me a document**

17     **offering the insurance, and I could take it or leave**

18     **it.  So I would sign a document and give it to them**

19     **and I'd get the insurance.**

20         Q.    Do you remember what department or what

21     office of General Dynamics you would submit the

22     paperwork to?

35

1      **A.    Sure; employee services.**

2      Q.    Was there any particular person that you

3   would deal with?

4      **A.    Yeah, but don't ask me his name.  I don't**

5   **remember.**

6      Q.    But it was a man?

7      **A.    Yeah.**

8      Q.    Do you remember approximately how old he

9   was around the time of your retirement?

10     **A.    Probably in the area of 35.**

11     Q.    Have you ever heard of the term copay?

12     **A.    Copay?**

13     Q.    Yes.

14     **A.    Not to my knowledge.**

15     Q.    Have you ever heard of the term co-

16   insurance?

17     **A.    Yeah.**

18     Q.    What does that mean to you?

19     **A.    Well, that means that if my house burned**

20   **down, I'd pay part of that insurance.**

21     Q.    Have you heard of the terms either copay

22   or co-insurance used with reference to Medicare?

36

1      **A.    No.**

2      Q.    I think you said before that there was a

3  percentage payment that you needed to make after

4  Medicare and after Aetna had covered for medical

5  services for you; is that fair?

6      **A.    I didn't say it was a percentage, I said**

7  **it was a balance.**

8      Q.    Balance.  Okay.  Do you know how the

9  charge, the initial charge, was calculated?

10          MR. HAVILAND:  By the doctor?

11          MR. ROBBEN:  Yeah.

12      **A.    No.**

13      Q.    Do you know how Medicare determined what

14  portion of the charge it was going to pay?

15      **A.    No.**

16      Q.    Do you know how your -- how Aetna

17  determined what portion it was going to pay?

18      **A.    They were going to pay 20 percent of**

19  **whatever Medicare didn't pay.**

20      Q.    Then when the balance was remaining, who

21  did you make your payment to?

22      **A.    The doctor or the hospital, whoever was**

37

1    **involved.**

2         Q.   So the provider?

3         **A.   Yes.**

4         Q.   Did the providers always expect that

5    payment?

6         **A.   Yes.**

7         Q.   And did the -- so if you didn't make the

8    payment, the providers would --

9         **A.   They would write me a letter.**

10        Q.   And would you typically make your

11   payments, the balance payment, by check?

12        **A.   Yes.**

13        Q.   Would it be a check that you wrote or that

14   your wife wrote?

15        **A.   It would be either one.  For a long time**

16   **it was me.  After I got sick, it's her.**

17        Q.   About when did you first become sick?

18        **A.   It was in December.**

19             MRS. BEAN:  December 2nd, 2002.

20        Q.   (By Mr. Robben)  So prior to that point,

21   you would typically make payments?

22        **A.   Yes.**

38

1      Q.    From a checking account that you had?

2      **A.    Yes.**

3      Q.    Now, have you ever heard of a term called

4    average wholesale price or AWP?

5      **A.    No.**

6      Q.    So you have no understanding of what the

7    term AWP means?

8      **A.    Well, since I've gotten into this**

9    **business, I've got a little bit of an understanding,**

10   **but I don't know all of it.**

11     Q.    Is it fair to say that your understanding

12   of average wholesale price, or AWP, comes from your

13   participation in this lawsuit?

14     **A.    Yes.**

15     Q.    Would you say that your knowledge of AWP

16   comes exclusively from your conversations with your

17   lawyers?

18     **A.    Yes.**

19     Q.    Do you know how AWP is determined?

20     **A.    No.**

21     Q.    Do you know what the AWP is or was for any

22   of the medications that you use?

                                                                39

1       **A.    No.**

2       Q.    In discussing your medical care with your

3   doctors over time, have you decided to take certain

4   therapies or certain drugs based on your AWP?

5       **A.    No.**

6       Q.    Do you have any understanding of how drug

7   prices in general are determined?

8       **A.    No.**

9       Q.    Do you know who determines the price for

10  drugs?

11      **A.    The drug company, I would assume.**

12      Q.    Have you ever heard of a term called

13  wholesale acquisition costs, sometimes abbreviated

14  as W-A-C, WAC?

15      **A.    No.**

16      Q.    So you don't know how WAC is calculated?

17      **A.    No.**

18      Q.    Have you ever heard of something called

19  the red book?

20      **A.    I've heard of red books, but not in**

21  **relationship to medicine.**

22      Q.    Have you always -- there's also something

40

1    called the blue book that relates to medicine.  Have

2    you ever heard of that?

3         **A.    No.**

4         Q.   Have you ever heard of something called

5    Medi-Span?

6         **A.    What?**

7         Q.   Medi-Span, M-E-D-I-S-P-A-N?

8         **A.    No.**

9              MR. ROBBEN:  We've been going about an

10   hour.  Do you want to take a break?

11             MR. HAVILAND:  It's entirely up to you. Do

12   you want to take a break?

13             THE WITNESS:  Yeah.

14             MR. HAVILAND:  We're going to take about a

15   ten minute break on the phone.  Do you want to hold

16   on?

17             SPEAKER:  Yeah.  Thank you.

18                  (A recess was taken.)

19             MR. HAVILAND:  We're back in.

20             SPEAKER:  Okay.  Thank you.

21        Q.   (By Mr. Robben)  Ready?

22        **A.    Uh-huh.**

41

1        Q.   I don't remember if I asked you this or

2    not, so pardon me if I'm repeating myself.  But when

3    did you first learn about this lawsuit?

4             MR. HAVILAND:  You did ask that, that's

5    right.

6        Q.   (By Mr. Robben)  Can you remind me of what

7    the answer was?

8        **A.   I beg your pardon?**

9        Q.   When you first learned about this lawsuit?

10       **A.   I can't give you an exact date.  It's been**

11   **some time back.**

12       Q.   Could you tell me how you learned about

13   it?

14       **A.   I read it in the paper.**

15       Q.   You read about it in the paper?

16       **A.   (Witness nods his head affirmatively.)**

17       Q.   Was it a newspaper article?

18       **A.   Yeah.**

19       Q.   So it wasn't an advertisement?

20       **A.   It was an advertisement in the paper.  I**

21   **call it an advertisement.  It's got another name,**

22   **but I can't think of what it is.**

42

1            MR. HAVILAND:  Notice?

2        **A.    Notice.**

3        Q.   Do you remember what newspaper that was

4    in?

5        **A.    Probably -- I can't say for sure, but it**

6    **was probably the Corpus Christi Caller-Times.**

7        Q.   Is that a newspaper you usually read?

8        **A.    Yes.**

9        Q.   What did the newspaper advertisement say,

10   to the best of your memory?

11       **A.    It said there was a class-action suit; if**

12   **you qualify to certain things, write them.**

13       Q.   Okay.  And did you contact any -- was an

14   attorney listed in the advertisement?

15       **A.    There probably was, but I don't remember.**

16   **I responded.  I can't remember.  It's been too far**

17   **back.**

18       Q.   Would you say that's more than five years

19   ago?

20       **A.    No.**

21       Q.   Less than five?

22       **A.    Yeah.**

43

1      Q.   Do you remember if that advertisement had

2   anything to do with a lawsuit involving a drug

3   called Lupron, L-U-P-R-O-N?

4      **A.   I don't think so.**

5      Q.   Once you wrote in, did anybody get in

6   touch with you?

7      **A.   We got a letter.**

8      Q.   Do you remember who it was from?

9      **A.   No.**

10     Q.   Was it from a law firm or a lawyer?

11     **A.   Yeah.**

12     Q.   After you got that letter back in response

13   to the letter you sent through the newspaper

14   advertisement, or in response to the newspaper

15   advertisement, what happened next?

16          MR. HAVILAND:   I would just object to the

17   form of the question, and caution you, Mr. Bean,

18   that Counsel doesn't want to know about the

19   substance of the conversations with your lawyers,

20   but if you can tell him the next step, if any, that

21   happened.

22     **A.   To the best of my memory, I didn't do**

44

1   **anything. I just let it drop for the time being.**

2   **And then later I got another one, and that one -- I**

3   **don't remember what they said and what I did, but...**

4          MR. HAVILAND:  I want to caution you not

5   to reveal the substance of any written communication

6   either from Counsel.

7          Q.   (By Mr. Robben)  But at some -- let me

8   make sure I understand.  At some point you received

9   another letter or notice?

10         **A.    Yeah.**

11         Q.   And then after that, you let the matter

12  drop?

13         **A.    Yes.**

14         Q.   Now, at some point subsequent to -- at

15  some point subsequent to the matter sort of

16  dropping, did you get -- did another attorney

17  contact you at some point?

18         **A.    I don't -- I don't remember how I did it.**

19  **It's been too far back, and my memory is not as good**

20  **as it used to be.**

21         Q.   At some point, though, I take it an

22  attorney did contact you about this lawsuit?

Bean, Harold          HIGHLY CONFIDENTIAL          August 18, 2006
                          Rockport, TX

45

1           MR. HAVILAND:  Answer yes or no, if you

2    can.

3        **A.    Yes.**

4        Q.    Do you remember the name of that lawyer?

5        **A.    No.**

6        Q.    Have you ever talked to any other non-

7    lawyers about this lawsuit?

8        **A.    No.**

9        Q.    So you've never talked about this case

10   with any friends or relatives?

11       **A.    No.**

12       Q.    Now, do you know who the defendants are in

13   this case?

14       **A.    Well, it's drug companies, that's all I**

15   **know.**

16       Q.    Do you know if there are any doctors that

17   are defendants?

18       **A.    I don't know.**

19       Q.    Do you know if there are any insurance

20   companies that are defendants?

21       **A.    I don't know.**

22       Q.    Do you know what the claims are in this

46

1    case?

2          **A.    No.**

3          Q.    Do you understand what I mean by claims?

4          **A.    You're talking about reimbursement of the**

5    **people that are in the class-action lawsuit?**

6          Q.    Well, what I'm talking about is do you

7    know what the plaintiffs are alleging that the

8    defendants have done?

9          **A.    Yes, I know that.**

10         Q.    Can you, in your own words, describe for

11   me what your understanding is of the claims?

12         **A.    The claim is that the drug companies have**

13   **jacked their prices up too high.**

14         Q.    Now, we talked a little bit before about

15   AWP, average wholesale price.  How do you understand

16   that average wholesale price relates to the claims

17   in this lawsuit?

18         **A.    I have no idea.**

19              MR. ROBBEN:  We'll just take a couple

20   minute break.

21                   (A recess was taken.)

22         Q.    (By Mr. Robben)  I was asking you some

47

1    questions of the lawsuit and your understanding of

2    it, and I'd like to ask you some more of those.

3         Now, as I understand it, you've taken certain

4    drugs that were covered by Medicare over time?

5         **A.    Yes.**

6         Q.    Now, do you know if the claims in this

7    lawsuit related to drugs other than the drugs that

8    you have taken?

9         **A.    No.**

10        Q.    Do you know if this case is about every

11   medication that Medicare pays for?

12        **A.    No.**

13        Q.    Do you know if there are claims in this

14   case that relate to drugs that Medicare doesn't pay?

15        **A.    No.**

16        Q.    Do you know if this case involves claims

17   relating to medications that you take, for example,

18   by a pill or at home?

19        **A.    Yes.**

20        Q.    Now, you mentioned before that the claims

21   in this case, as you understand them -- and if I'm

22   paraphrasing you wrong, you let me know.  I want to

1    sort what we say.

2         I think you said that the claims relate to

3    the drug companies jacking up prices; is that fair?

4         **A.    That's the way I understand it.**

5         Q.    Now, do you understand that Medicare is

6    paying too much for drugs?

7         **A.    I would think so, yes.**

8         Q.    How about insurance companies, do you

9    think they're paying too much for drugs?

10        **A.    Yes.**

11        Q.    Have you ever contacted Medicare or your

12   insurance company to let them know that you're

13   concerned that they are paying too much for drugs?

14        **A.    No.**

15        Q.    Why not?

16        **A.    That's their problem, not mine.**

17        Q.    Have you ever mentioned it to any of your

18   providers or your physicians, your pharmacists, that

19   you believe that you're overpaying for drugs?

20        **A.    Yeah.**

21        Q.    And what have they said?

22        **A.    No comment.**

Bean, Harold                HIGHLY CONFIDENTIAL            August 18, 2006
                                  Rockport, TX

49

1        Q.    So they haven't -- they haven't spoken to

2    that?

3        A.    No.

4        Q.    Each person you've mentioned it to?

5        A.    Only one.

6        Q.    Who was that?

7        A.    My physician.

8        Q.    What's his name or her name?

9        A.    His name is Haun, H-A-U-N.

10       Q.    What did you say to him?

11       A.    I just commented on the fact that their

12   prices were too high in my opinion.

13       Q.    And he -- what did he say back?

14       A.    He agreed with me.

15       Q.    But he didn't say anything more than that?

16       A.    No.  No, it was no big time discussion.

17       Q.    Do you think that drug companies talk

18   amongst themselves to plan or conspire to raise the

19   price of drugs?

20             MR. HAVILAND:  Objection to the form. You

21   can answer.  You can answer it.

22       A.    Yes, I do.

50

1       Q.    Do you think that they do that?

2       **A.    Yes.**

3       Q.    What do you base that belief on?

4       **A.    Just my opinion.**

5       Q.    So other than your opinion, are there any

6    facts that you know of that --

7       **A.    No.**

8       Q.    -- that make you believe that?

9             MR. HAVILAND:  Wait for his question.

10            THE WITNESS:  Okay.

11      Q.    (By Mr. Robben)  Now, you, I think, before

12   referred to this case as a class-action.  What's

13   your understanding of what a class-action is?

14      **A.    A class-action is a group of people who**

15   **get together and get an attorney to file a lawsuit**

16   **claiming that they have been overpaying for drugs,**

17   **in the kind of the one we're talking about.  There's**

18   **different kinds of class-actions, of course.  Then**

19   **they select a few of them to lead the lawsuit.**

20   **That's it.**

21      Q.    So is it your understanding that there is

22   people who form a class and go and retain an

51

1    attorney, who then is their attorney for purposes of

2    the case?

3         **A.    Say that again.**

4         Q.   Well, you said that in your understanding

5    -- I'm paraphrasing -- that class-actions start or

6    class- action is motivated by people who get

7    together and get an attorney to represent them?

8         **A.    Yes.**

9         Q.   Would it surprise you to learn that

10   attorneys sometimes come up with the idea of the

11   class-action first and then find people to be

12   members of the class?

13        MR. HAVILAND:  Objection to the form;

14   argumentative.  Go ahead, you can answer it.

15        **A.    That wouldn't surprise me, no.**

16        Q.   Do you think there's anything wrong with

17   that?

18        **A.    No.**

19        Q.   Well, now, you were proposed in this case

20   as a class representative.  You understand that,

21   correct?

22        **A.    Yes.**

52

1         Q.    Now, what's your understanding of the

2    class that you're going to represent if the Court

3    certifies you as a class representative?

4         A.    **Say again.**

5         Q.    What class are you going to represent?

6    What class do you propose to represent?

7         A.    **All the people that think they're**

8    **overpaying for drugs that joined into this lawsuit.**

9         Q.    Does the class, as you understand it,

10   include everybody who receives drugs?

11        A.    **No.**

12        Q.    What's the limit?  Who isn't in the class?

13        A.    **People that just didn't join.  They didn't**

14   **get into the action.  They may not even have known**

15   **about it.**

16        Q.    Do you know if the class includes only

17   Medicare beneficiaries?

18        A.    **No.**

19        Q.    So it could include more than Medicare

20   beneficiaries?

21        A.    **I would think so.**

22        Q.    Do you know if the class is made up only

1    of members that are in Texas?

2         **A.    No, I don't think so.**

3         Q.    So you think it's broader than Texas?

4         **A.    Yes.**

5         Q.    Do you know if it includes the whole

6    United States?

7         **A.    I would imagine.**

8         Q.    Do you know if it includes people outside

9    of the United States?

10        **A.    No.**

11        Q.    So do you believe it does or do you

12   believe it doesn't?

13        **A.    I don't know.**

14        Q.    Does the class that you're purporting to

15   represent, that you're planning to represent,

16   include insurance companies?

17        **A.    I don't know.**

18        Q.    Do you know if the class includes Medicare

19   itself?

20        **A.    I don't know.**

21        Q.    Have you ever heard of a program called

22   Medicaid?

54

1      **A.    Yeah.**

2      Q.    What's your understanding of Medicaid?

3      **A.    Medicaid is to cover people who can't**

4      **afford the premium on Medicare, is my understanding.**

5      Q.    Do you know if it involves people of all

6      ages or people who are senior citizens only?

7      **A.    No, I think it covers all ages.**

8      Q.    Do you know if the class that you would

9      represent includes Medicaid beneficiaries?

10     **A.    Say again.**

11     Q.    Do you know whether or not the class that

12     you're going to represent or that you propose to

13     represent includes Medicaid beneficiaries?

14     **A.    I don't know that.**

15     Q.    What do you understand your duties --

16     strike that.

17          If you become a class representative in this

18     case, what do you understand your duties to be in

19     that position?

20     **A.    To represent all the people of this class**

21     **and rely upon attorneys to do a good job and try to**

22     **get back some money.**

55

1          Q.   But in terms of -- in terms of your

2     responsibilities, what do you understand that you're

3     going to have to do as part of the litigation?

4          **A.   Whatever my attorney asks me to do.**

5          Q.   Do you know if the class includes people

6     who don't have any insurance at all?

7          **A.   No.**

8          Q.   Do you want to be a class representative

9     in this case?

10         **A.   I have no objection.**

11         Q.   Why do you think that you're in a good

12    position to serve as a class representative in here?

13              MR. HAVILAND:  Calls for a legal

14    conclusion.  You can answer if you can.

15         **A.   Well, I think since I have a fairly solid**

16    **foundation of records, that it would serve well.**

17         Q.   You said before that you don't have any

18    objection to serving as a class representative.

19         **A.   Uh-huh.**

20         Q.   Why do you want to serve as a class

21    representative?

22         **A.   I didn't say I wanted to.  But if I'm**

56

1    **asked, I have no objection.**

2         Q.   Do you feel any obligation to serve?

3         **A.   Sure.**

4         Q.   Why?

5         **A.   Because somebody has to do it.**

6         Q.   Do you expect to be compensated in any way

7    for your service?

8         **A.   You mean over and above whatever I get**

9    **back from the lawsuit?**

10        Q.   That's a good point.  Yes.  Anything

11   special?

12        **A.   I have no idea.**

13        Q.   Has anybody promised you any extra

14   compensation for participating --

15        **A.   No.**

16        Q.   -- in this case?  What are you hoping that

17   the class will obtain at the end of the day?

18        **A.   I'm hoping that they'll get a refund of**

19   **some of the premium they paid.**

20        Q.   Do you have a sense as to how to come up

21   with the proper amount?

22        **A.   No.**

Bean, Harold                HIGHLY CONFIDENTIAL            August 18, 2006
                              Rockport, TX

57

1        Q.   So do you have any idea how much money

2    each person should get?

3        **A.   No.**

4        Q.   Other than reimbursement or a refund of

5    money, is there anything else you would want to see

6    come about at the end of this case?

7        **A.   No.**

8        Q.   Prior to hearing about this case, have you

9    ever considered whether or not to bring a lawsuit

10   like this on your own?

11       **A.   No.**

12       Q.   You hadn't considered it one way or

13   another?

14       **A.   No.**

15       Q.   I had asked you before about the Veterans

16   Administration.  I think you said you hadn't

17   received care from the Veterans Administration

18   facility?

19       **A.   That's true.**

20       Q.   And I think you said that you hadn't

21   explored whether or not you could or whether or not

22   you should obtain care there; is that right?

58

1      **A.    That's right.**

2           Q.    Why didn't you ever explore that?

3                 MR. HAVILAND:  Asked and answered.  Go

4     ahead.

5      **A.    I don't believe that it's necessary to**

6     **impose on the Veterans Administration for something**

7     **that I can handle myself.**

8           Q.    So even if you could have gotten your

9     medical care for less money or for free from the

10    Veterans Administration, you'd prefer to pay for it

11    yourself because you are able to?

12                MR. HAVILAND:  Calls for speculation.

13          Go ahead and answer.

14     **A.    There's another facet to it besides that.**

15    **It's the convenience.  To deal with the Veterans**

16    **Administration, you have to travel, and I don't want**

17    **to travel.**

18          Q.    Do you know where the closest Veterans

19    Administration facility is to Rockport?

20     **A.    I think -- no, no.  It used to be in Waco,**

21    **but I think they closed that.  There may be one in**

22    **San Antonio.  I'm not sure.**

59

1     Q.    Have you ever heard of arrangements that

2     the Veterans Administration makes to provide medical

3     care to veterans that live in remote places?

4          MR. HAVILAND:  Lack of foundation.

5          You can answer.

6     **A.    No.**

7     Q.    We had talked before about the cancer

8     insurance policy that you have, and I did ask Mr.

9     Haviland to produce documents in connection with

10    that policy to the extent they exist.

11         Did you, over the course of time, though,

12    receive correspondence from the insurance company

13    that provided that coverage?

14    **A.    Yes.**

15    Q.    Did you keep that correspondence?

16    **A.    I'm not sure.  I'd have to look and see.**

17    Q.    Do you remember what the correspondence

18    was, what type of --

19    **A.    Essentially it had to do with furnishing**

20    **support for a claim I filed.**

21    Q.    Can you say that again?  I didn't

22    understand.

60

1       **A.    I said, it essentially involved asking for**

2  **documents supporting a claim I filed.**

3       Q.    Okay.  Do you remember when that claim was

4  filed?

5       **A.    No.**

6       Q.    Was it within the past few years?

7       **A.    Yes.**

8       Q.    Do you remember what type of documentation

9  they were looking for?

10      **A.    Well, they wanted to know who the doctor**

11  **was.**

12      Q.    Do you think you might have documents from

13  that company?

14      **A.    I probably have some, yes.**

15            MR. HAVILAND:  Again, to the extent

16  relevant, we'll look into that.

17      Q.    (By Mr. Robben)  Do you know how your

18  lawyers in the case, Mr. Haviland and Mr. Molinari

19  and the other lawyers, do you know how they're being

20  paid?

21      **A.    No.**

22      Q.    Do you pay them?

61

1          **A.     No.**

2               MR. HAVILAND:   That assumes we're being

3   paid.

4          Q.   (By Mr. Robben)   What do you think of

5   doctors?

6               MR. HAVILAND:   Overbroad.

7          **A.     They're a necessary evil.**

8          Q.   Well, okay.   Do you believe that they have

9   your best interest in mind, though?

10         **A.     Oh, yes.**

11         Q.   So what about them makes them an evil?

12  You said they're a necessary evil.   What part of the

13  -- what part is the evil?

14         **A.     It's just a manner of speaking.   I didn't**

15  **mean they were evil.**

16         Q.   Do you think that your doctors, in your

17  case, when you were getting medical care and get

18  medical care, do you believe that your doctors

19  formulate your treatment plan based on how much

20  money they'll make?

21         **A.     No.**

22         Q.   So you think that they come up with your

62

1    treatment based on what's best for you?

2        **A.    Yes.**

3        Q.    Do you know how much it costs your doctors

4    to purchase medications that they administer to you?

5        **A.    No.**

6        Q.    Do you know how much it costs them to

7    actually administer them in their office?

8        **A.    No.**

9        Q.    Do you know how much it costs them to

10   store them?

11       **A.    No.**

12       Q.    Do you feel that your doctors or any of

13   your other medical providers had an obligation to

14   tell you what they were paying for drugs and what

15   they might be reimbursed for those drugs?

16       **A.    No.**

17       Q.    To your knowledge, in paying for any

18   medications that you paid for, have you relied on

19   anything or any representation or any statement from

20   any of the defendants in this case in making the

21   payment?

22       **A.    No.**

63

1          Q.   Just to go back to something we talked

2     about before.  I had asked you and then Mr. Haviland

3     interjected about the search for documents in the

4     case. And I had asked Mr. Haviland whether or not

5     you had any -- or among your papers, any boxes or

6     bottles from your prescription medications were

7     located.  And I think Mr. Haviland said that they

8     located an Advair box but nothing else?

9          MR. HAVILAND:  I represent the current

10    medications are available.

11         Q.   (By Mr. Robben)  Do I have that correct,

12    that you don't have in your possession any old

13    packaging, any old boxes to your medication?

14    **A.    No.**

15         Q.   So you don't have any of those materials?

16    **A.    None.**

17         Q.   No boxes, no bottles; is that correct?

18    **A.    That's correct.**

19         MR. ROBBEN:  I don't think I have anymore

20    questions, although we've identified some documents

21    today that I think are interesting.  And Don, your

22    reply declaration said that there's still documents

64

1    that will be forthcoming from some providers.

2         MR. HAVILAND:  Just to be clear, we have

3    been, since identifying Mr. Bean as a proposed

4    representative, diligently have been trying to get

5    those records from the providers.  You've seen a

6    rolling production on that.  We've got a couple of

7    loose ends there.

8         I think as far as the Beans go, we've got

9    maybe a couple of loose checks that we need to

10   button down.  But in addition to the Medicare

11   document you've asked for, we will get the

12   supplemental issue identified and confirm whether or

13   not that's responsive.  But as far as the Beans go,

14   I think we can represent in short order that there's

15   been a full production beyond what's new.  And there

16   are some new records that are relevant and they'll

17   come, too, as well.

18        I just think that there may be one provider

19   that we've had some issues with in terms of just

20   buttoning down.  We identified some names of doctors

21   and groups that we want to make sure that the

22   providers are giving us everything and they're not

65

1    losing things in the development.  A group of cancer

2    specialists, for instance, there's a couple of

3    doctors that at times has treated Mr. Bean, so

4    there's more follow-up and confirming.  We've seen

5    the bulk of the material that's coming.

6         MR. ROBBEN:  Okay.  Out of an abundance of

7    caution, I feel that I need to say today that we

8    reserve the right to talk to Mr. Bean again, to

9    continue this at a later date.  You know, I

10   understand what you're saying about the documents,

11   so I just say that now.  Other people on the phone

12   might have more questions.

13        MR. HAVILAND:  Sure.  I'll just respond

14   that I acknowledge your position.  We, of course,

15   will take a counter position depending on what

16   happens, but reserve our respective rights on that.

17        MR. ROBBEN:  Does anybody else on the

18   phone have anything?

19        MR. BARLEY:  Phil, this is Steve Barley. I

20   have a few question.  Can you hear me okay?

21        MR. HAVILAND:  Mr. Barley, can you just

22   represent for Mr. Bean's purposes whom you

66

1    represent?

2              MR. BARLEY:  Sure.  I'll be happy to.  I

3    just wanted to make sure you can hear me first.

4              MR. HAVILAND:  Yeah, you're fine.  Thank

5    you.

6              EXAMINATION BY MR. BARLEY:

7         Q.   Mr. Bean, my name is Steve Barley, and I

8    represent a company by the name of Amgen, Inc.  And

9    I just have a few questions for you.  The same

10   ground rules that Mr. Robben went over with you

11   apply to my questions.  Specifically, if you don't

12   understand one of my questions, please let me know,

13   I'll be happy to take another crack at it.  Is that

14   agreeable?

15        **A.   Yes.**

16        Q.   Mr. Bean, have you ever been on dialysis

17   before?

18        **A.   No.**

19        Q.   Have you had -- have you been diagnosed

20   with prostate cancer?

21        **A.   Yes.**

22        Q.   And what treatment did you receive for

Bean, Harold      HIGHLY CONFIDENTIAL    August 18, 2006
Rockport, TX

67

1    your prostate cancer?

2        **A.    TUNA.**

3            MR. HAVILAND:  T-U-N-A.

4        Q.    (By Mr. Barley)  Did you receive any

5    medications as part of your treatment for prostate

6    cancer?

7        **A.    Yes.**

8        Q.    What medications did you receive?

9        **A.    Just a minute.**

10            THE WITNESS:  What the hell is that stuff

11    called?

12            MRS. BEAN:  Do you want me to answer?

13            MR. HAVILAND:  Yeah.

14            MRS. BEAN:  Lupron.

15        **A.    Lupron, yeah.**

16        Q.    Have you ever heard of the drug Epogen?

17        **A.    Epogen?**

18        Q.    E-P-O-G-E-N?

19        **A.    I think I've seen that somewhere.**

20        Q.    Do you know if you ever received Epogen?

21        **A.    I have no idea what it is.**

22        Q.    So you don't know if you've received it?

68

1      **A.    No.**

2      Q.    And do you know if you've ever made a

3   payment for any administration of Epogen?

4      **A.    I have no idea.**

5      Q.    And at any time, were you aware of an AWP

6   or average wholesale price for Epogen?

7      **A.    No.**

8      Q.    And do you know whether you made any

9   payment for Epogen based upon any published AWP?

10     **A.    No.**

11     Q.    Have you heard of the drug Procrit, P-R-O-

12   C- R-I-T?

13     **A.    Yes.**

14     Q.    Do you know if you've ever received

15   Procrit?

16     **A.    Yes.**

17     Q.    When did you receive that?

18     **A.    In the last year.   Within the last year or**

19   **so.**

20     Q.    Do you know if you received it before

21   2005?

22     **A.    No, I don't.**

1       Q.   Do you know what doctor prescribed it or

2    administered it to you?

3            MR. HAVILAND:   Do you know?

4       **A.   I'm trying to think.  I don't remember.**

5       Q.   When you were -- did you receive any

6    chemotherapy in connection with your prostate

7    treatment?

8       **A.   No.**

9       Q.   Do you know if you've ever been diagnosed

10   with anemia?

11      **A.   Yes.**

12      Q.   When were you diagnosed with anemia?

13      **A.   Around 2000 --**

14           MRS. BEAN:   2003.

15      **A.   2003.**

16      Q.   And what physician or physicians diagnosed

17   you and treated you for anemia?

18      **A.   There was two or three of them.  I'll have**

19   **to think of their names.**

20      Q.   The Cancer Specialists of South Texas?

21      **A.   No, they had nothing to do with that.**

22      Q.   All right.  Tell me from where you've

70

1    received your treatment for your prostate cancer.

2    In other words, has it been in a hospital, a

3    doctor's office, or some other setting?

4         **A.    It's in the doctor's office.**

5         Q.    Is the doctor's office located on the

6    hospital campus or is it separate?

7         **A.    It's separate.**

8         Q.    Do you believe it's appropriate for

9    physicians to make a profit in treating patients?

10        **A.    Well, sure.**

11        Q.    And does it matter to you whether they

12   make that profit on drugs or other treatment?

13        **A.    It matters not to me how they make it, as**

14   **long as they make it, within reason.**

15        Q.    And Mr. Bean, you had mentioned, I

16   believe, toward the beginning of the deposition that

17   when you became ill, your wife made the medical

18   payments for you; is that correct?

19        **A.    That's correct.**

20        Q.    And approximately when was that?

21        **A.    That was December 19 -- or 2004 -- 2,**

22   **2002.**

1       Q.   2002?

2       **A.   Yeah.**

3       Q.   And when she made payments -- and that

4    would be for payments for physicians and for

5    medications?

6       **A.   That was for whatever was involved in my**

7    **treatment.**

8       Q.   Yes, sir.  And would that have come out of

9    her checking account?

10      **A.   It was a joint checking account.**

11      Q.   Tell me about your checking accounts.  Do

12   you have any separate checking account?

13      **A.   That's a personal thing.  I don't know how**

14   **you need to know that.**

15           MR. HAVILAND:  Yeah, I think it would have

16   to be tied to a question of payment, if you don't

17   mind.

18           MR. BARLEY:  Well, that's what I'm trying

19   to get to, Mr. Haviland.  You can designate this is

20   confidential or highly confidential.

21      Q.   (By Mr. Barley)  And I apologize, Mr.

22   Bean. I'm certainly not trying to intrude on

72

1    anything personal.  Mr. Haviland can tell you he can

2    designate portions of the transcript confidential,

3    so --

4              MR. HAVILAND:  I think it's a separate

5    issue.  The issue is not one of whether we're

6    deeming it confidential.  It's a question of just

7    getting to the relevant aspects.  Mr. Robben

8    admonished us at the beginning that if there was a

9    concern of personal information.  You asked a very

10   broad question. Perhaps you can ask it a little more

11   specifically like you did as to Mrs. Bean, that she

12   --

13             MR. BARLEY:  I understand.  I'm trying to

14   establish a foundation so I'll know questions to

15   ask.

16       Q.   (By Mr. Barley)  The question was simply:

17   Mr. Bean, do you have separate checking accounts or

18   only joint -- or only a joint or joint checking

19   account?

20             MR. HAVILAND:  Today?  Today?

21       **A.   When?**

22       Q.   From December 2002 to the present?

Bean, Harold          HIGHLY CONFIDENTIAL          August 18, 2006
                      Rockport, TX

73

1          **A.    It was a joint account.**

2          Q.    Only joint account?

3          **A.    Yes.**

4          Q.    And where was that account held?

5               MR. HAVILAND:  What bank?  Do you want to

6    know the bank?

7               MR. BARLEY:  Yes.

8          **A.    Well, it's changed its name three or four**

9    **times in the last five years.  I'm not sure which**

10   **one it was in, but it was probably Wells Fargo.**

11         Q.    Do you have one joint checking account?

12         **A.    That's correct.**

13         Q.    And do both of social security checks go

14   into that account?

15         **A.    I beg your pardon?**

16         Q.    Do both of your social security checks and

17   other income --

18         **A.    Yes.**

19         Q.    -- go into that account?

20               MR. HAVILAND:  I'm sorry.  He said yes as

21   you were questioning.

22               MR. BARLEY:  Yeah.  I'm having a little

74

1    trouble with the phone.  Mr. Bean, I appreciate your

2    time.  That's all I have.  Thank you very much.

3              THE WITNESS:  You're welcome.

4              MR. HAVILAND:  Thank you.  Next? Anyone?

5              MR. FEDOTIN:  This is Brian Fedotin on

6    behalf of Aventis.  I have just a couple of

7    questions.

8         EXAMINATION BY MR. FEDOTIN:

9         Q.   First off, can you hear me okay, Mr. Bean?

10        **A.   Yes.**

11        Q.   Okay.  Great.  So what you've referred to

12   as your cancer insurance, what does that cover?

13        **A.   Cancer.**

14        Q.   Okay.  Does that -- does it cover cancer

15   drugs?

16             MR. HAVILAND:  If you know.

17        **A.   I don't know.**

18        Q.   Okay.  So my understanding is that when

19   you incur medical bills that Medicaid -- or I'm

20   sorry, that Medicare is your primary payer, and then

21   you have supplemental insurance through Aetna that

22   will pay after Medicare, correct?

75

1          **A.    Correct.**

2          Q.    Where -- does your cancer insurance pick

3    up anything that either of those two didn't pay?

4          **A.    Yes.**

5          Q.    Okay.  Do you know what amounts the cancer

6    coverage picks up -- or I'm sorry, the cancer

7    insurance picks up?

8          **A.    I can't tell you that.  I don't know.**

9          Q.    Do you know if it's a fixed percentage?

10         **A.    No, I don't think so, but it might be.**

11         Q.    Okay.  Do you know if there are any

12    limitations on how much the cancer insurance will

13    pick up?

14         **A.    Yes.**

15         Q.    Do you know what those are?

16         **A.    No.**

17         Q.    Okay.

18         **A.    Let me --**

19              MR. FEDOTIN:  That's all I have at this

20    time.  Thank you very much for your time.

21              MR. HAVILAND:  Next?

22              MR. ROBBEN:  Anyone else?

Bean, Harold          HIGHLY CONFIDENTIAL          August 18, 2006
                          Rockport, TX

76

1          MR. HAVILAND:  Going once, going twice,

2     sold in South Texas.  Thank you everyone.  Have a

3     good weekend.

4                         *  *  *  *  *  *  *

5

6

7                         _____

8                              Harold Bean

9

10    Subscribed and sworn to and before me

11    this _____ day of _____, 20____.

12

13

14    _____

15          Notary Public

16

17

18

19

20

21

22

1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2
     IN RE:                         *
3                                   *  MDL DOCKET NO.
     PHARMACEUTICAL INDUSTRY        *  CIVIL ACTION
4    AVERAGE WHOLESALE PRICE        *  01CV12257-PBS
     LITIGATION                     *
5
                     REPORTER'S CERTIFICATION
6                   DEPOSITION OF HAROLD BEAN
                     TAKEN ON AUGUST 18, 2006
7
        I, SYLVIA KERR, Certified Shorthand Reporter in and
8    for the State of Texas, hereby certify to the following:

9       That the witness, HAROLD BEAN, was duly sworn by the

10   officer and that the transcript of the oral deposition

11   is a true record of the testimony given by the witness;

12      That the deposition transcript was submitted on

13   _____, 2006 to MR. DONALD HAVILAND, JR., for

14   the witness to exam, sign and return to Henderson Legal

15   Services by _____, 2006;

16      That the amount of time used by each party at the

17   deposition is as follows:

18      MR. PHILIP ROBBEN - 01:10:54

19      MR. STEVE BARLEY - 00:07:37

20      MR. BRIAN FEDOTIN - 00:02:00

21

22      That pursuant to information given to the deposition

23   officer at the time said testimony was taken, the

24   following includes counsel for all parties of record:

25

1      That $_____ is the deposition officer's charges
to the Defendant for preparing the original deposition
2  transcript and any copies of exhibits;
      I further certify that I am neither counsel for,
3  related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
4  taken, and further that I am not financially or
otherwise interested in the outcome of the action.
5      Certified to by me this 18th of August, 2006.

6

7

                    _____
8                SYLVIA KERR, Texas CSR No. 4776
                Expiration Date:  12/31/06
9                Henderson Legal Services
                1120 G Street, N.W., Suite 1010
10               Washington, D.C. 20005
                (202) 202-4158

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25