# EXHIBIT C

0001
1            UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF MASSACHUSETTS
3   --------------------------)
4   IN RE:  PHARMACEUTICAL     ) MDL NO. 1456
5   INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION:
6   PRICE LITIGATION          ) 01-CV-12257-PBS
7   --------------------------)
8   THIS DOCUMENT RELATES TO   ) JUDGE PATTI B. SARIS
9   ALL CLASS ACTIONS         )
10  --------------------------)
11    ORAL AND VIDEOTAPED DEPOSITION OF HAROLD CARTER
12              MARCH 23, 2006
13  ORAL AND VIDEOTAPED DEPOSITION OF HAROLD CARTER,
14  produced as a witness at the instance of the
15  Defendant Amgen, and duly sworn, was taken in the
16  above-styled and numbered cause on the 23rd of March,
17  2006, from 10:04 a.m. to 1:00 p.m., before Lisa
18  Minister, CSR in and for the State of Texas, reported
19  by machine shorthand, at the Hampton Inn, 200 San
20  Jacinto Boulevard, Austin, Texas, pursuant to the
21  Federal Rules of Civil Procedure and the provisions
22  stated on the record or attached hereto.
0002
1         A P P E A R A N C E S
2
3   FOR THE PLAINTIFFS:
4         Mr. William J. Molinari, III
5         KLINE & SPECTER, P.C.
6         The Nineteenth Floor
7         1525 Locust Street
8         Philadelphia, Pennsylvania  19102
9         215.772.1000
10              -and-
11        Mr. Adam S. Levy
12        LAW OFFICE OF ADAM S. LEVY
13        P.O. Box 88
14        Oreland, Pennsylvania  19075
15        267.994.6952
16
17  FOR THE DEFENDANT AMGEN:
18        Mr. Steven F. Barley
19        HOGAN & HARTSON, LLP
20        111 South Calvert Street, Suite 1600
21        Baltimore, Maryland  21202
22        410.659.2724
0003
1      A P P E A R A N C E S  (CONTINUED)
2
3   FOR THE DEFENDANT ABBOTT LABORATORIES:
4         Mr. Brian J. Murray (Via Telephone)
5         JONES DAY
6         77 West Wacker Drive, Suite 3500

```
 7         Chicago, Illinois  60601
 8         312.269.1570
 9
10  FOR THE DEFENDANT FUJISAWA:
11         Mr. Andrew C. Bernasconi
12         Mr. Daniel Z. Herbst
13         REED SMITH LLP
14         1301 K Street, N.W.
15         Suite 1100 - East Tower
16         Washington, D.C.  20005
17         202.414.9200
18
19  ALSO PRESENT:
20         Ms. Evelyn Bradley, Videographer
21
22
```

0004

```
 1              I N D E X
 2  HAROLD CARTER                    PAGE
 3   Examination by Mr. Barley.................... 005
 4   Reporter's Certificate........................ 149
 5
 6             E X H I B I T S
 7  NUMBER          DESCRIPTION          PAGE
 8  Exhibit Carter 001, FOURTH AMENDED MASTER
 9                 CONSOLIDATED CLASS ACTION
10                 COMPLAINT AMENDED TO COMPLY
11                 WITH COURT'S CLASS
12                 CERTIFICATION ORDER
13                 REDACTED VERSION............. 010
14  Exhibit Carter 002, CARTER 0006 to 0069.......... 083
15  Exhibit Carter 003, CARTER 0287 to 0293,
16                 0295 to 0296................. 126
17  Exhibit Carter 004, CARTER 0326 to 0339.......... 144
18
19              *-*-*-*-*
20
21
22
```

0005

```
 1           P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  We're on the record.
 4  The time is 10:04.
 5
 6          HAROLD CARTER, having been first duly
 7  sworn, testified as follows:
 8
 9          EXAMINATION
10  BY MR. BARLEY:
11   Q.   Good morning, Mr. Carter.  I introduced
12  myself previously, but I'll do so on the record.  My
13  name is Steve Barley.  I represent Amgen, a
14  biologics manufacturer in the case in which this
```

15 deposition is being taken.  Do you understand that
16 we're here today to ask you some questions while
17 you're under oath about a lawsuit involving
18 pharmaceutical manufacturers?
19    A.  Yes.
20    Q.  Okay.  Let me go over some ground rules.
21 I assume you've never been deposed before?
22        MR. MURRAY:  Steve, on the phone we can
0006
1 hear you, but we can't hear the deponent.
2        MR. BARLEY:  Okay.  I'll move the speaker
3 closer.
4        THE WITNESS:  I'll speak up -- I'll speak
5 up a little bit.  Can you hear me now?
6        MR. BARLEY:  Is that better?
7        MR. MURRAY:  Yes, sir.  Thank you.
8    Q.  (By Mr. Barley)  Okay.
9    A.  All right.  I haven't been deposed before.
10    Q.  I thought that might be the case.  And
11 I've either had the benefit or misfortune of doing
12 this hundreds of times.  Let me go over some ground
13 rules for you.  One is that you keep your voice up
14 partly so it can be taken down on the video and
15 partly so people on the phone can hear you.  Also,
16 when you answer my questions, you may find that
17 you'll nod your head rather than giving an audible
18 answer, but it's hard for this nice young lady here
19 to take down a nod of the head.  So if you wouldn't
20 mind just saying "yes" or "no" in addition to
21 nodding your head, I would appreciate that. If there
22 is any time that you feel like you need to take a
0007
1 break, you just tell me and that's perfectly fine.
2 We'll take a break.  Okay?
3    A.  Right.
4    Q.  Okay.  Now, finally, if there are any
5 questions that I ask that you do not understand, you
6 let me know because I want to make sure that you're
7 answering a question that you understand.  Is that
8 fair?
9    A.  Yes.
10    Q.  Great, Mr. Carter.  Thanks.
11        Could you give me your current address,
12 please?
13    A.  3206 Merrie Lynn Avenue, Austin, Texas
14 78722.
15    Q.  How long have you lived at that address,
16 Mr. Carter?
17    A.  About 40 years.  Close to 40 years.
18    Q.  4-0?  40?
19    A.  Yes.
20    Q.  Great.  And I take it then you have not
21 resided outside the state of Texas; is that correct?
22    A.  Yes.

0008
1     Q.  Have you traveled outside the state of
2  Texas in the last 15 years?
3     A.  Oh, no. 15 years?  No.  And if I had, it
4  would have just been to Mexico.  So it wouldn't be
5  really much.  I don't think I've even been there.
6     Q.  Have you ever been prescribed or
7  administered any kind of medications outside the
8  state of Texas in the past 15 years?
9     A.  No.
10    Q.  And I assume -- well, let me ask you this.
11  Have you ever been to the state of Massachusetts?
12    A.  No.
13    Q.  You understand that this case in which you
14  are being deposed is pending in Massachusetts?
15        MR. LEVY:  Objection.
16    Q.  (By Mr. Barley)  You can answer.
17        MR. LEVY:  Do you know what he means by
18  "pending"?
19    A.  Well, I didn't know about Massachusetts.
20  I didn't know where it was.
21    Q.  (By Mr. Barley)  All right.  You don't
22  know where the case is pending?
0009
1        MR. LEVY:  Objection.  Mischaracterizes
2  his testimony.
3        MR. BARLEY:  Okay.  You can just state
4  your objection.
5     Q.  (By Mr. Barley)  Do you know where the
6  case was filed?
7     A.  No.
8     Q.  If this case goes to trial, would you be
9  willing to go to Massachusetts to testify?
10    A.  Yes.
11    Q.  What have you done to prepare for your
12  deposition today?
13    A.  Today I --
14        MR. LEVY:  Objection.  I just want to
15  state that to the extent -- you can answer his
16  questions, but to the extent it requires you to
17  answer anything that you and your attorneys have
18  discussed, you won't give him that information.  Do
19  you understand that?
20        THE WITNESS:  Yes.
21    Q.  (By Mr. Barley)  In other words, you can
22  tell me you met with them.  Just don't tell me what
0010
1  you talked about because that would be privileged.
2     A.  Well, I did meet with them.
3     Q.  All right.
4     A.  I had some papers to look over at home.
5  That's about it.
6     Q.  And these were papers that the attorneys
7  sent to you or were they papers that you had?

8        MR. LEVY:  Objection.
9        A.  I guess you would say both, I guess.
10       Q.  (By Mr. Barley)  All right.  Fair enough.
11   What did you look over?  What papers did you look
12   over?
13       A.   Some -- some of the class action material.
14       Q.  I'm going to mark a document as Exhibit
15   Carter 001 and show it to you and see if you can
16   identify it as maybe one of the things you looked
17   at.
18             (Exhibit Carter 001 marked)
19       Q.  (By Mr. Barley)  Mr. Carter, I'm going to
20   hand -- and I've made one copy that you can share,
21   if that's okay.  Mr. Carter, I'm going to show you
22   what's been marked as your Deposition Exhibit Carter
0011
1   001.  It's entitled the Fourth Amended Master
2   Consolidated Class Action Complaint Amended to
3   Comply with Court's Class Certification Order,
4   Redacted Version.  Can you tell me if that is one of
5   the documents you saw, the class action papers you
6   referred to?
7       A.  It's similar.
8        MR. LEVY:  Take your time to look at it.
9       A.  I remember this part (indicating).  I
10   don't remember about this.
11       Q.  (By Mr. Barley)  Okay.
12       A.   Fourth Amended Master Consolidated Action
13   Complaint.  I remember that.
14       Q.  You do remember that?
15       A.   And I remember "redacted" because I didn't
16   know what that was.
17       Q.  Okay.  Is that the paper you were
18   referring to or were there others?
19       A.  It doesn't look the same.
20       Q.  Maybe you can flip the page and maybe you
21   just didn't get the cover page.  Take a minute and
22   look through it.
0012
1        MR. LEVY:  For the record, I would like to
2   mention that this document appears to have multiple
3   pages on one page.
4        MR. BARLEY:  Right.  We copied it that
5   way.  It's the same.  I can represent it's the
6   Fourth Amended Complaint.
7        MR. LEVY:  That's what might be giving him
8   some trouble.
9        MR. BARLEY:  I see.  If you can just tell
10   me what you showed him, it might short-circuit this.
11       MR. LEVY:  He's seen this document.
12       MR. BARLEY:  Okay.  Great.
13       Q.  (By Mr. Barley)  You have seen this
14   document?
15       A.  Yes.

16    Q.  All right.  Have you seen other documents
17  in preparing for your deposition?
18    A.  No.
19    Q.  If you could turn to Page 6 of that
20  document.  You'll see the page numbers are on the
21  bottom.  As your attorney mentioned, we copied it
22  with two pages per piece of paper.
0013
1       MR. BARLEY:  Maybe you could give him a
2  hand.
3       MR. LEVY:  Which page would you like him
4  to turn to?
5       MR. BARLEY:  Page 6, Paragraph 16.
6       THE WITNESS:  Oh, I see it.
7    Q.  (By Mr. Barley)  Do you see it down there
8  on the bottom?
9    A.  I went too far.
10      MR. LEVY:  It's got two pages on every
11  page.  Small print, but --
12    A.  Yes.
13    Q.  (By Mr. Barley)  Do you see that?
14    A.  Yes.
15    Q.  All right.  Did you review Page -- or
16  Paragraph 16 in its entirety?
17    A.  Yes.
18    Q.  And the information in there, was that
19  accurate?
20    A.  Sterling -- I don't have any assistance
21  from Sterling Medical.
22    Q.  Okay.  Other than that, was it accurate?
0014
1       MR. LEVY:  Objection.  It continues on the
2  next page.
3    Q.  (By Mr. Barley)  It goes on to the next
4  page a little bit.  So take your time and look it
5  over.
6       MR. LEVY:  So it starts right here
7  (indicating), Mr. Carter, and it goes on to this
8  page right here (indicating).  Let me make sure I'm
9  correct.  I was incorrect.  16 starts here
10  (indicating) and continues up to 17 (indicating).
11    A.  Okay.  It looks correct.
12    Q.  (By Mr. Barley)  What is your date of
13  birth, Mr. Carter?
14    A.  September 13, 1931.
15    Q.  And you are eligible for Medicare; is that
16  correct?
17    A.  Yes.
18    Q.  When did you begin participating in the
19  Medicare program?  Do you remember?
20    A.  1987.
21    Q.  Is that when you were 65?
22    A.  That's when I went disabled.
0015

1    Q.   I see.  Okay.  And have you participated
2  in the Medicare Part B program?  Are you familiar
3  with Part A and Part B?
4    A.   Yes.
5    Q.   Have you participated in the Medicare Part
6  B program since you were enrolled in Medicare in
7  1987?
8    A.   Yes.
9    Q.   And since that time, since 1987, have you
10  ever been covered by supplemental insurance?
11    A.   Yes.
12    Q.   Tell me when you have been covered by
13  supplemental insurance.
14    A.   Most of the time I had Humana for a few
15  years and then I had Sterling, but I can't give you
16  exact dates.
17    Q.   Are those the only two insurers that you
18  used for your supplemental insurance?
19    A.   I can't think of any more.
20    Q.   So as far as you can remember sitting here
21  today, those are the only two?
22    A.   Yes.
0016
1    Q.   All right.  Was there any time from 1987
2  to the present that you did not have supplemental
3  insurance coverage?
4    A.   Yes.
5    Q.   Tell me when those occasions were.
6    A.   For the last year I haven't had any
7  supplemental insurance.
8    Q.   And why not?
9    A.   They went up too high for me.
10    Q.   Too expensive?
11    A.   Yes.  They charged me more and paid out
12  less.
13    Q.   Other than the past year, was there any
14  occasion from 1987 to the present where you did not
15  have supplemental insurance?
16    A.   There might have been a short period in
17  between going from one to the other, but I can't
18  give you dates there either.  I still can't.
19    Q.   Between Humana and Sterling?
20    A.   Yes.  There might have been a gap there.
21    Q.   Did -- do you remember -- I'm not trying
22  to get the exact date, Mr. Carter, because I know
0017
1  you don't know what it is, but do you have a sense
2  of when you might have switched from Humana to
3  Sterling?
4    A.   My best guess would be three years ago.
5        MR. LEVY:  Mr. Carter, I want to interject
6  that you're not to guess.  Okay?  If you don't know,
7  you can say you don't know.
8    A.   I really don't know.

9       MR. LEVY:  If you think you can answer
10  without guessing, you can give your answer.
11      Q.  (By Mr. Barley)  But you can also give me
12  a ballpark.  I understand.  I'm not trying to pin
13  you down to a particular date.  I'm trying to figure
14  out was it in the late '80s or early '90s or was it,
15  you think, more recently?  It sounds like you think
16  it was more recently.
17      A.  I would say in the '90s.
18      Q.  Okay.
19      A.  That's all I can say.
20      Q.  The late '90s, would you think?
21      MR. LEVY:  Objection.
22      A.  I couldn't tell you.
0018
1       Q.  (By Mr. Barley)  All right.  That's fair.
2           Can you tell me what type of supplemental
3   insurance you had?
4       A.  It was -- what do you call it?  Are you
5   familiar with Humana?
6       Q.  A little bit.
7       A.  Well, they would pay -- Medicare paid and
8   then they would pay a percentage of what Medicare
9   left, which was usually -- it always left me some.
10  They didn't pay it all.  They would leave me some.
11  And Sterling was the same, but Sterling is the one
12  that went up on me.
13      Q.  Let me back up.  For the supplemental
14  insurance there are standard policies A through J.
15  Are you familiar with those?
16      MR. LEVY:  Objection.
17      A.  (Shakes head).
18      Q.  (By Mr. Barley)  Okay.
19      A.  No.  Sorry.  I was shaking my head.
20      Q.  You did and I didn't even catch it.  You
21  caught yourself.  Thank you.
22          Are you -- you're not familiar with then
0019
1   standardized policies with an alphabetical letter
2   attached to them?
3       A.  No.
4       MR. LEVY:  Objection.
5       Q.  (By Mr. Barley)  All right.  So you don't
6   know what type of supplemental insurance coverage
7   you had if you had a standardized policy; is that
8   right?
9       MR. LEVY:  Objection.
10      A.  Right.
11      Q.  (By Mr. Barley)  You said that Humana paid
12  a percentage and you paid some, I believe.
13      A.  Yes.
14      Q.  Was the payment that you paid for the
15  supplemental -- let's say you went to go have some
16  treatment done and then Medicare paid a portion of

17  it and then there was a portion left over.  That's
18  when your supplemental insurance paid some and you
19  paid some?
20      A.  Yes.
21      Q.  All right.  When that occurred, your
22  supplemental insurance, was it a flat amount that
0020
1  you would pay and then the supplemental insurance
2  would pay the balance?  How did that work?
3          MR. LEVY:  Objection.  You can answer if
4  you understand it.
5      A.  A percentage.
6      Q.  (By Mr. Barley)  Okay.  So if there was --
7  just to use an example.  If Medicare paid and there
8  was $100 balance left over, then Humana would pay a
9  percentage of that and you would pay a percentage?
10      A.  Yes.
11      Q.  All right.  Do you know what those
12  percentages were?
13      A.  Somewhere -- no, not exactly.  I'm getting
14  -- I'm messing up.
15      Q.  Now, did Sterling function the same way,
16  where you paid a percentage as opposed to a flat
17  amount?
18      A.  Yes.
19      Q.  All right.  Did you always pay your
20  portion or were there times where you didn't pay it
21  or you only paid part of it?
22      A.  Yes.
0021
1          MR. LEVY:  Objection.
2      Q.  (By Mr. Barley)  Let me ask that again.
3  Let's use our example of $100 balance being left
4  over after Medicare paid.  Humana or Sterling would
5  pay a percentage of that.  Let's just say -- for
6  example, let's say they paid $50 and there was $50
7  left over for you to pay.  Did you always pay that
8  $50?
9      A.  Yes.  No.  I have trouble with your
10  figures, though.
11      Q.  Okay.
12          MR. LEVY:  You don't like the example.
13      A.  Let me tell you this.
14      Q.  (By Mr. Barley)  Why don't you tell me how
15  it worked.
16      A.  I have a doctor's appointment.  I go to
17  see the doctor.  The office visit is $160.
18      Q.  Uh-huh.
19      A.  By the time everybody else has paid, I pay
20  $16.
21      Q.  You paid 16.  So you ended up paying 10
22  percent of what the charge was?
0022
1      A.  Yes.

2      MR. LEVY:  Objection.
3      Q.  (By Mr. Barley)  Is that right?
4      A.  I would guess.
5      Q.  You don't know?
6      A.  No.
7      Q.  All right.  Was there a deductible that
8  you had to meet before the supplemental insurance
9  would pay?
10      MR. LEVY:  Objection.
11      Q.  (By Mr. Barley)  Do you know what a
12  deductible is?
13      A.  I don't think so.  I don't know.
14      MR. LEVY:  Your answer is fine.
15      Q.  (By Mr. Barley)  Do you have papers at
16  home describing or a policy describing your coverage
17  with either Humana or Sterling?
18      MR. LEVY:  Objection.
19      A.  I don't think I have anything on Sterling.
20  If I have Humana, it would be very old.
21      Q.  (By Mr. Barley)  Did you look for those
22  papers?
0023
1      A.  No.
2      Q.  You did not?
3      A.  No.
4      Q.  For either Sterling or Humana?
5      A.  No, I did not.
6      MR. BARLEY:  Counsel, we would ask that
7  Mr. Carter look for those records and if they are in
8  his possession, that he produce them to us.
9      MR. LEVY:  And I suppose you're going to
10  have a list of requests similar to -- that you're
11  making right now and I would just say I understand
12  you're putting it in the record, but I think the
13  wise practice would be to follow up by way of a
14  letter to lead counsel, the Kline & Specter firm.
15      MR. BARLEY:  That's fine.  I'll be happy
16  to do that.
17      Q.  (By Mr. Barley)  Mr. Carter, would you
18  describe for me your educational background, please.
19      A.  I don't have any.
20      Q.  Okay.
21      A.  I dropped out of school in the 10th grade.
22      Q.  All right.
0024
1      A.  I had to eat.
2      Q.  Tell me what you did for a living, if you
3  don't mind.  If you had many, many jobs, you can
4  just give me a thumbnail sketch.
5      A.  I don't have many, many.  I would call it,
6  I guess, three main jobs.
7      Q.  All right.  Tell me about those.
8      A.  I worked for BFGoodrich.  I changed tires.
9  I worked for a wholesale florist.  That's about 20

10  years of my work space there.  And I ended up with
11  Capitol Bolt & Supply, b-o-l-t, Bolt & Supply.
12  That's where I was working when I had the heart
13  attack.
14     Q.   You were working with them through 1987 or
15  so when you became disabled?
16     A.   Yes.
17     Q.   All right.  And how long had you worked
18  for Capitol Bolt & Supply?
19     A.   Maybe three years.
20     Q.   Did you have health insurance through
21  Capitol Bolt & Supply?
22     A.   Through them?  I had insurance, but I
0025
1  don't know if it was -- I don't remember if it was
2  paid through the company or what.  I don't remember.
3     Q.   You don't know if it was through the
4  company or whether you got it on your own?
5     A.   I don't remember.  I think so.  I think it
6  was through the company, but I'm not sure.
7     Q.   Do you know who it was with?
8        MR. LEVY:  Objection.
9     A.   No.
10     Q.   (By Mr. Barley)  By that, I mean, do you
11  know who the insurance company was?
12     A.   I can't tell you now.
13     Q.   It was only 20 years ago --
14     A.   Yeah.
15     Q.   -- so I don't blame you.
16        Do you know if that insurance covered
17  pharmaceuticals?
18        MR. LEVY:  Objection.  It's vague.
19     A.   I don't know.  Did you hear me?
20     Q.   (By Mr. Barley)  I did.
21        Mr. Carter, there's some water over here.
22  Would you like me to get you a glass?
0026
1     A.   No.  It's just cool.
2     Q.   It is a little chilly in here.
3        MR. LEVY:  It is a little chilly in here.
4     Q.   (By Mr. Barley)  It keeps us awake,
5  though.
6        Have you been a party to any other
7  lawsuits other than this one?
8        MR. LEVY:  Objection.
9     A.   I don't know if you call it a lawsuit.  Do
10  they call it a lawsuit?  Another class action or
11  something?
12     Q.   No.  Any kind of lawsuit.
13     A.   I don't know what to call it.
14        MR. LEVY:  If you don't know, say you
15  don't know.
16     A.   I don't know.
17     Q.   (By Mr. Barley)  Were you in another class

18  action?
19     A.  Yes.
20     Q.  All right.  What class action were you
21  involved in?
22     A.  Lupron.
0027
1     Q.  Okay.
2        THE COURT REPORTER:  Did you say Lupron?
3        THE WITNESS:  Lupron.
4        MR. LEVY:  L-u-p-r-o-n.
5        MR. BARLEY:  L-u-p-r-o-n.
6     Q.  (By Mr. Barley)  But you were not deposed
7  in that?
8     A.  No.
9     Q.  When did you first contact -- or were you
10  contacted by lawyers about this case?  Do you
11  remember?
12     A.  It's been less than a year.
13     Q.  Were you contacted by lawyers about the
14  Lupron case before that?
15     A.  No.
16     Q.  Tell me what your involvement was in the
17  Lupron case.
18     A.  I saw an ad in a magazine or a paper that
19  says if you've taken Lupron, you might have been
20  overcharged or something to that effect.  And I just
21  -- I wrote and they sent me a letter back and we got
22  together and that's how I got involved.
0028
1     Q.  I see.  Do you remember what magazine or
2  paper that was in?
3     A.  No.
4     Q.  Was this a lawyer from the Kline & Specter
5  firm?  Is that who you wrote to?
6     A.  Yes.
7     Q.  Do you remember who contacted you?
8     A.  No.
9     Q.  I'm going to ask you few questions about
10  your income and I apologize in advance.  It's not
11  something I would do if, you know, it were not for
12  the fact I needed the information.  Could you tell
13  me approximately what your income has been from 1990
14  to the present?  And if it's changed over time, you
15  can let me know.
16     A.  From '90 to the present?
17     Q.  Yes, sir.
18        MR. LEVY:  Objection.
19     A.  I've been on Medicare.  I had no other
20  income. My wife had a small income.
21     Q.  (By Mr. Barley)  You had -- all the income
22  you received was from Social Security --
0029
1     A.  Yes.
2     Q.  -- from 1990 to the present?

3    A.  Yes.
4    Q.  And do you know currently, for instance,
5  the amount that you receive on a monthly basis?
6    A.  $1,030.
7    Q.  All right.  And you said your wife
8  receives some income as well?
9    A.  She's also retired.
10    Q.  How much does she receive?
11    A.  Her's is approximately the same as mine.
12    Q.  Have you ever been -- have you ever
13  received benefits from Medicaid?
14    A.  No.
15    Q.  So maybe I can summarize here as far as
16  your insurance is concerned.  All the payments that
17  would have been made on your behalf for any of your
18  medical treatment for the past 15 years have either
19  been made by Medicare, Humana, Sterling, or
20  yourself, as far as you know sitting here today; is
21  that right?
22    A.  Yes.
0030
1    Q.  And that would include for any
2  pharmaceutical or medications you received.  Would
3  that be correct?
4    A.  Yes.
5    Q.  Somebody at my office did this really nice
6  outline for me and so I need to take a minute and
7  look through it here.
8        Was your -- was there any time since 1990
9  that Medicare declined coverage?
10    A.  Anything like hospitalization and all that
11  kind of stuff?
12    Q.  Any kind of treatment.
13    A.  No.
14    Q.  All right.
15        Was there any time where you dropped out
16  of Medicare?
17    A.  No.
18    Q.  And was your Medicare coverage ever
19  terminated or cancelled?
20    A.  No.
21    Q.  Can you tell me how your Part B Medicare
22  coverage works in terms of payments?  Do you have to
0031
1  pay them every month?  Do you pay them yearly?  How
2  are payments made for your Part B coverage?
3        MR. LEVY:  Objection.
4    Q.  (By Mr. Barley)  Let me rephrase that
5  because his objection was well-founded.
6        In terms of your Medicare Part B coverage,
7  how do you pay for that?
8    A.  It's deducted from my check.
9    Q.  From the Social Security check?
10    A.  Right.

11      Q.   How did you first enroll?  Do you
12  remember?
13      A.   No, I don't.
14      Q.   Do you remember if you sent in an
15  application or anything like that?
16      A.   I don't really.  I might have had help at
17  the hospital.  I don't know.
18      Q.   Do you know how much is deducted from your
19  Social Security check to pay for your Medicare
20  coverage?
21      A.   No.
22      Q.   Then I assume you also do not know the
0032
 1  amount specifically taken out for your Part B
 2  Medicare coverage.
 3      A.   No, I don't.
 4      Q.   I think you mentioned a few minutes ago
 5  that you receive approximately $1,030 a month from
 6  Social Security.
 7      A.   Right.
 8      Q.   Is that after the Medicare has been taken
 9  out?
10      A.   That's the amount that's deposited in my
11  bank every month.
12      Q.   So it's after the payment for the Medicare
13  coverage?
14      A.   Yes.
15      Q.   Have you received any publications from
16  Medicare describing how pharmaceuticals or
17  medications are paid for?
18          MR. LEVY:  Objection.
19      A.   No.
20      Q.   (By Mr. Barley)  Do you know if there's a
21  deductible with your Medicare coverage?
22          MR. LEVY:  Objection.
0033
 1      A.   I don't understand.
 2      Q.   (By Mr. Barley)  Do you know what a
 3  deductible is?
 4      A.   Yes.
 5      Q.   Is there an amount that you have to pay --
 6  for instance, on your Part B coverage, is there an
 7  amount that you have to pay before Medicare starts
 8  making payments on your behalf?
 9      A.   I don't know.  I've never heard of that.
10      Q.   When I asked you about that document in
11  front of you and asked you if the information in
12  Paragraph 16 was correct, I think you indicated that
13  something about Sterling was incorrect or --
14      A.   Yes.
15      Q.   Okay.  Tell me what was incorrect about
16  the reference to Sterling.
17      A.   It says, "Currently receives partial
18  assistance from Sterling."

19    Q.  I see.

20    A.  I haven't been with Sterling in over a

21  year.

22    Q.  Did you -- how did you obtain your

0034

1  supplemental insurance coverage?  In other words,

2  how did you decide to go with Humana or go with

3  Sterling?  Did you use some sort of insurance agent

4  or broker?

5    A.  I had people calling me.

6    Q.  I see.  These are people who solicit you,

7  call over the phone and try to get you to enroll?

8    A.  Yes.

9    Q.  And that's how you decided to go with

10  Humana or Sterling?

11    A.  Yes.

12    Q.  Did they send you any information after --

13  tell me how you got started with it.  You got a call

14  from somebody and then I guess you said you were

15  interested in participating in their insurance

16  program?

17    A.  Okay.  I'm currently looking at Humana to

18  rejoin.

19    Q.  Uh-huh.

20    A.  The agent came by and he left me all the

21  information I need and the books and everything

22  else, but I haven't joined yet.  She left the -- the

0035

1  -- I don't know -- I guess a book on everything that

2  -- how it works and everything.

3    Q.  All right.  When you were interested in

4  Humana the first time, did you receive similar

5  materials?

6    A.  I don't think there was -- I don't

7  remember exactly how it worked.

8    Q.  Do you remember if you -- strike that.

9        If you had received materials from Humana

10  when you were receiving supplemental insurance from

11  them, would you have kept them?

12        MR. LEVY:  Objection.

13    A.  No.

14    Q.  (By Mr. Barley)  With respect to Sterling,

15  did you receive materials from Sterling when you

16  purchased coverage from them?

17    A.  Not like Humana.

18    Q.  Was there a particular person that came to

19  your house like Humana has done?

20    A.  I don't know.  I really don't.

21    Q.  If you had received a booklet or other

22  materials about how the supplemental insurance

0036

1  worked from Sterling, do you think you would still

2  have that around the house?

3        MR. LEVY:  Objection.

4    A.  No.
5    Q.  (By Mr. Barley)  In deciding to go -- or
6  to purchase the Humana insurance, did you give any
7  consideration to how Humana was going to pay for
8  pharmaceuticals?
9    A.  No.
10    Q.  In deciding to go with Sterling, did you
11  give any consideration how Sterling was going to pay
12  for pharmaceuticals?
13    A.  No, I didn't.
14    Q.  All right.  How did you decide, then, what
15  coverage to purchase?
16    A.  I guess the price, the premium.
17    Q.  Were you trying to -- I assume you were
18  trying to get the lowest premium?
19    A.  With -- with good coverage.
20    Q.  In terms of the coverage, did you pay much
21  attention to the pharmaceutical benefit?
22    A.  No.
0037
1    Q.  Did the Humana and Sterling supplemental
2  policies also cover your wife?
3    A.  No.  This is just me.
4    Q.  Just you.  Okay.
5       You mentioned earlier that both with
6  Humana and Sterling they paid a percentage of your
7  copay.  Are you familiar with the term "copay"?
8    A.  Yeah.
9    Q.  Let me tell you how I'm going to use it
10  just so we understand and there's no confusion.
11  Medicare pays 80 percent -- after deductible pays 80
12  percent.
13    A.  Right.
14    Q.  And the copay -- how I'm using -- is going
15  to be the 20 percent that you or your supplemental
16  insurer are responsible for.  Is that agreeable that
17  we can use it in that way?
18    A.  Yes.
19    Q.  All right.  In terms of your copay, you
20  mentioned earlier that both with Humana and Sterling
21  they paid a percentage and you paid a percentage but
22  you just couldn't remember what the percentages
0038
1  were; is that right?
2    A.  Right.
3    Q.  All right.  Was that percentage system for
4  the copay in place for all medical services, for
5  hospitalization, for outpatient, doctor visits, and
6  for pharmaceuticals?  Were they all treated the same
7  way?
8       MR. LEVY:  Objection.
9       MR. BARLEY:  Is it the compound nature?  Do
10  you want me to go through each one?
11       MR. LEVY:  It's a long question and --

12     MR. BARLEY:  Long questions are okay.
13     MR. LEVY:  Long and compound and
14 convoluted.  So I think it makes it hard for him to
15 answer and I can see some struggling on his face.
16     MR. BARLEY:  I can break it down if you --
17     Q.  (By Mr. Barley) Did you understand it or
18 do you want me to --
19     A.  I want to clear one thing.
20     Q.  Sure.
21     A.  Pharmaceutical, are you talking about
22 prescription drugs?
0039
1     Q.  Yes, sir.  Either ones you got in the
2 doctor's office or ones you got in a pharmacy.
3     A.  In the hospital they would pay.  What I
4 get from a pharmacist, that came out of my pocket.
5     Q.  Okay.
6     A.  Drugstore, I mean.
7     Q.  The entire copay came out of your pocket
8 or the entire amount came out of your pocket for the
9 pharmacy?
10     A.  Yes.  I don't remember them paying any
11 prescription drugs to me.
12     Q.  Okay.  It was entirely out of your pocket
13 if you went to the pharmacy to get your prescription
14 filled?
15     MR. LEVY:  Objection.
16     Q.  (By Mr. Barley) That's how you understood
17 it to work?
18     MR. LEVY:  Objection.
19     Q.  (By Mr. Barley) You can answer.
20     A.  Yes.
21     Q.  Lawyers do that.  That's his job.  Unless
22 he tells you not to answer, you can answer the
0040
1 question. All right.
2         When you went and received medication from
3 a doctor, then Medicare would pay for part of it and
4 either Humana or Sterling would pay for part of it
5 and you would pay for part of it; is that right?
6     A.  From a doctor?
7     Q.  Yes, sir.  As opposed to going to the
8 pharmacy.
9     A.  From a doctor -- I don't -- I would get
10 medicine -- the doctor gave me a prescription.  I
11 take that to the pharmacy.  I paid for that.  When I
12 got medicine from the hospital when I'm in the
13 hospital, that goes on the bill.  See?
14     Q.  Are there occasions where you go to the
15 doctor for a visit and the doctor gives you an
16 injection of some medicine?
17     A.  Yes.
18     Q.  All right.  In those -- but that's just an
19 outpatient visit?  You're not admitted to the

20  hospital?
21     A.  Right.
22     Q.  All right.  On those occasions, how is the
0041
1  -- how is the medicine paid for?
2     A.  Okay.  Medicare -- yeah, you're right.
3  Medicare and me now because I don't have
4  supplemental.
5     Q.  All right.  How about when you did have
6  supplemental?  How were those situations covered?
7     A.  Yes.  They would pay part.
8     Q.  Let me see if I can make this clear for
9  the record.  If you went to a doctor and were not
10  admitted to the hospital, but you went to a doctor
11  for an outpatient visit and you got an injection of
12  some medicine, when you had supplemental insurance,
13  Medicare would pay for part of that?
14     A.  Right.
15     Q.  And then the copay, the supplemental would
16  pay for part and you would pay for part?
17     A.  Yes.
18     Q.  And in terms of how the copay worked, the
19  supplemental insurance paid a percentage and you
20  paid a percentage?
21        MR. LEVY:  Objection.  Asked and answered.
22     Q.  (By Mr. Barley)  Is that correct?
0042
1     A.  Yes.
2     Q.  All right.  Now, I think you said -- and I
3  just want to be sure -- there were occasions when
4  you did not pay your percentage; is that right?
5     A.  Yes.
6     Q.  How often did that occur roughly?
7        MR. LEVY:  Can you clarify your question?
8  Is it regarding when he described going to the
9  pharmacist or are you talking about in office --
10  doctor office medications?
11        MR. BARLEY:  I'm happy to clarify that.
12     Q.  (By Mr. Barley)  In the situations where
13  you go to the doctor for an outpatient visit and you
14  receive an injection, were there occasions where you
15  did not pay your portion of what was owed?
16     A.  Yes.
17     Q.  All right.  How often did that occur, Mr.
18  Carter?
19     A.  I would try to catch up.  I've gone as
20  much as three months when I was getting it
21  regularly.
22     Q.  Did you enter into any -- in those
0043
1  situations, did you enter into any kind of payment
2  plan with the provider where they accepted less than
3  what you owed?
4     A.  Yes.

5     Q.  How often did that occur?
6     A.  I'm currently -- currently paying $100 a
7   month on my back bill.
8     Q.  When did you start paying $100 a month?
9     A.  I don't know.
10    Q.  And let me be clear.  You don't have to
11  give me the exact date or month.  Again, if it's --
12  if you think it's been a year, two years, three
13  years.
14    A.  I would say a year.
15    Q.  Before -- strike that.
16        When you were covered by supplemental
17  insurance and you went to the doctor and received an
18  injection, were you -- on those occasions were there
19  times when you had entered into a payment plan with
20  the provider?
21        MR. LEVY:  Objection.
22    A.  I don't know.
0044
1     Q.  (By Mr. Barley)  Was there ever a time,
2   Mr. Carter, where you received an injection from a
3   physician and Medicare paid part of it and then
4   supplemental insurance paid a part and you had a
5   balance left over, was there ever an occasion where
6   you paid the full amount that you owed?
7     A.  You mean right there on the spot or when
8   they billed me?
9     Q.  At any time.  Either way.
10    A.  They always billed me.
11    Q.  Did you always pay the amount that you
12  owed?
13    A.  I tried.
14    Q.  And let me be clear, Mr. Carter.  I'm not
15  trying to imply anything by asking these questions.
16  It's just part of my job to understand if you made
17  the payment or not.  I'm not trying to imply
18  anything, whether you did or didn't make it.  So let
19  me back up and now ask it again.  Again, I apologize
20  if -- anyway.
21        On the situations where you went to the
22  doctor and received an injection and you had
0045
1   supplemental insurance and there was a balance left
2   over after Medicare paid and after supplemental
3   insurance had paid, and there was a balance left
4   over for you to pay, was there any occasion where
5   you paid the full amount that you owed?
6     A.  Yes.
7     Q.  All right.  And can you give me an idea of
8   how often you paid the full amount versus paying
9   less than that?
10    A.  No, I can't.
11    Q.  Do you think it was more than 50 percent
12  of the time, less than 50 percent of the time?

13    A.  Let's put it this way.  I didn't have
14  supplemental insurance for a long time there when I
15  was taking the injection or like right now I'm still
16  taking injections.
17    Q.  When you were getting injections from a
18  physician, were you ever covered by supplemental
19  insurance at the same time?
20    A.  Let's see.  Maybe Sterling a little while.
21  I don't know.  But never Humana.
22    Q.  All right.  But you don't -- do you know
0046
1  whether you were covered by Sterling at any time
2  when you were receiving injections or are you not
3  sure about that?
4    A.  I'm not sure.
5    Q.  In the situations where you did not have
6  supplemental insurance and you went to the doctor
7  and got an injection and Medicare paid 80 percent
8  and then you had a balance left over, did you ever
9  pay the full amount?
10    A.  I've been paying on it.
11    Q.  The $100 a month?
12    A.  (Nods head).
13    Q.  You need to answer rather than nod.  I
14  caught you this time.
15    A.  Yes.
16    Q.  Thank you very much.
17      MR. BARLEY:  Do you want to take a short
18  break?
19      MR. LEVY:  I think that would be a good
20  idea.
21      MR. BARLEY:  Thanks for hanging with me,
22  Mr. Carter.
0047
1      THE VIDEOGRAPHER:  Going off the record.
2  The time is 10:49.
3        (Recess from 10:49 a.m. to 10:59
4  a.m.)
5      THE VIDEOGRAPHER:  We're back on the
6  record.  This is tape number two.  The time is
7  10:59.
8    Q.  (By Mr. Barley)  Mr. Carter, your attorney
9  told me during the break that you might have
10  remembered something that you wanted to fill in on
11  one of my earlier questions.
12    A.  Yes.
13    Q.  He can either ask you or you can just
14  volunteer the information.  I'll defer to you.
15      MR. LEVY:  The question regarding the
16  sources of payment for his medications, he
17  remembered another source.
18    Q.  (By Mr. Barley)  Okay.  Why don't you tell
19  me what the other source is.
20    A.  It's called Patient Services Incorporated.

21  I've forgotten where they are based.  But they are
22  paying 180 on my injection and it's usually -- it's
0048
1  been mostly once a month.  Sometimes I can skip a
2  month when I'm not anemic.  But they help a lot.
3      Q.  So there's a -- is this something you pay
4  for?
5      A.  No.  No.
6      Q.  Do you know --
7      A.  No.
8      Q.  I'm sorry.  I interrupted you.  You
9  finish, please.
10      A.  The doctor knew I needed help and so he
11  got me enrolled and it's -- I don't know how they
12  are funded, but they are out of funds now.  So they
13  won't be paying anymore.
14      Q.  Do you know if they were funded by any
15  drug manufacturer?
16      A.  No.  It's mostly a volunteer donation or
17  whatever you want to call it, charity or whatever.
18      Q.  Have you asked your doctor if he's
19  considered having a drug manufacturer's patient
20  assistance program help with some of your payments?
21      A.  I talked to him two weeks ago about
22  getting me some help and he's working on it.  I
0049
1  don't know what's going to happen.
2      Q.  Did he say that the drug manufacturers --
3  some of them have programs to help people pay for
4  their medications?
5      A.  No, not to me.
6      Q.  So you don't know what sources he's going
7  to to look for this assistance.  You just know he's
8  doing that?
9      A.  No, I don't know.
10      Q.  And you do not know where Patient Services
11  Incorporated is based?
12          MR. LEVY:  Objection.
13      A.  No.
14      Q.  (By Mr. Barley)  Did they pay $180 per
15  injection for every injection you got?
16      A.  No.
17      Q.  Just some of them?
18      A.  Yes.
19      Q.  Do you know what --
20      A.  They told me -- I was taking the injection
21  months before I got really in deep trouble trying to
22  keep up.
0050
1      Q.  And how often or for what period of time
2  did they make these payments?
3      A.  I would say the last six to eight months.
4      Q.  Do you know what time period, Mr. Carter?
5      A.  Dates?

6    Q.   Approximate dates.
7    A.   The last one was for February.  It was
8  $180 in February and I think January.  But they had
9  been sending them directly to the Cancer Center.
10  Because the last two they sent to me -- well, no,
11  I'm sorry.  They sent me copies of the checks.
12  That's why I know about the last two, how much they
13  paid and stuff.
14    Q.   Patient Services Incorporated sent you
15  copies of the checks --
16        MR. LEVY:  Objection.
17    Q.   (By Mr. Barley)  -- that they paid to the
18  Cancer Center?
19    A.   Yes.
20    Q.   Do you have copies of those still?
21    A.   No.  I didn't know I needed them.
22    Q.   You threw them away?
0051
1    A.   Yes.
2    Q.   Okay.  Do you have any documents at home
3  from Patient Services Incorporated?
4        MR. LEVY:  Objection.
5    A.   I don't know.
6    Q.   (By Mr. Barley)  When you threw these
7  documents away, had you been told by your attorneys
8  to keep documents relating to your payments for
9  medication?
10        MR. LEVY:  Objection.
11    A.   No.
12    Q.   (By Mr. Barley)  All right.  Did -- any
13  time you had supplemental insurance, did the type of
14  coverage change or did you have the same type of
15  coverage?
16    A.   You mean between Humana and Sterling?
17    Q.   We'll take each one.  Probably be easier.
18  When you had the insurance with Humana, did the
19  coverage change or was it the same the whole time
20  you had Humana?
21    A.   For some reason I quit them.  I'm going to
22  say yes.
0052
1    Q.   Do you know how it changed?
2        MR. LEVY:  Objection.
3    A.   The coverage didn't change as much as the
4  premiums.
5    Q.   (By Mr. Barley)  I see.  Let's just talk
6  about the coverage part of it.  Did the coverage for
7  your Humana supplemental insurance change during the
8  time you were covered by Humana?
9    A.   I really don't know.
10    Q.   All right.  With regard to Sterling, did
11  your coverage change during the time you were
12  covered by Sterling?
13    A.   I can't tell you that either.  I do know

14   why I quit Sterling.  That's all I can tell you.
15      Q.  That was the expense you had mentioned?
16      A.  Right.
17      Q.  I assume then, Mr. Carter, you paid out of
18   pocket for your supplemental insurance coverage?
19      A.  Yes.
20      Q.  Did you pay that on a yearly basis?
21      A.  Monthly.
22      Q.  Do you remember how much it was?
0053
1      A.  No, I can't.  I didn't know I needed it.
2   I didn't even look it up.
3      Q.  I think you've answered this, but I'm not
4   sure. So if you have, I apologize for asking it
5   again.  Did you have a deductible with your
6   supplemental insurance?
7         MR. LEVY:  Asked and answered.  Objection.
8      Q.  (By Mr. Barley) He thinks I've asked it
9   before. He's probably right.  But I'm going to ask
10   it again because I don't remember.
11      A.  Did I have a what?
12      Q.  A deductible with your supplemental
13   insurance, either Humana or Sterling.
14         MR. LEVY:  Same objection.
15      A.  I don't know.
16      Q.  (By Mr. Barley) Have you produced to your
17   attorneys all documents and information that you
18   have regarding your supplemental insurance?
19      A.  Yes.
20         MR. LEVY:  Objection.
21      A.  I've tried.
22      Q.  (By Mr. Barley) Are you a veteran?
0054
1      A.  No.
2      Q.  Mr. Carter, do you know the drugs that you
3   received that Medicare paid for?
4      A.  Do I know them?
5      Q.  Yes, sir.  Do you know what they are, the
6   names of them?
7      A.  Aranesp.  Lupron.  I think that's all.
8      Q.  Did Sterling ever make -- to your
9   knowledge, ever make any payment for Aranesp?
10      A.  No.
11      Q.  They did not?
12      A.  No, they did not.
13      Q.  Did Humana ever make any payment for
14   Aranesp?
15      A.  No.
16      Q.  Did Sterling or Humana ever make a payment
17   for Lupron?
18      A.  Yes.  Sterling.
19      Q.  Sterling made some payments for Lupron?
20      A.  Yes.
21      Q.  Who -- what physician provides the Aranesp

22  to you?
0055
1      A.   Jason Melear, M-e-l-e-a-r.
2      Q.   Would you spell that again?
3      A.   M-e-l-e-a-r.  He's with Southwest Cancer -
4  - Southwest Regional Cancer Center.
5      Q.   Is he a urologist or an oncologist?  Do
6  you know what his specialty is?
7      A.   It's a cancer center.  I guess they are
8  all oncologists, I would guess.
9      Q.   You don't know?
10      A.   No.
11      Q.   All right.
12      A.   He's treating me for anemia for one thing.
13      Q.   Has the Aranesp made you feel better?
14      A.   Yes.
15      Q.   How has it done that?
16      A.   Gave me a little more stamina or strength.
17  I tire easily without -- that's why I went to the
18  doctor to begin with.
19      Q.   And this medication helps with that?
20      MR. LEVY:  Objection.
21      A.   Yes.
22      Q.   (By Mr. Barley)  And did the doctor
0056
1  suggest that you receive Aranesp or did you ask him?
2      A.   I wouldn't know what to ask him.
3      Q.   Did he offer you other medications that
4  might do the same thing or do similar things?
5      A.   Yes.  I think I did have another
6  medication before this.
7      Q.   Was that Procrit?
8      A.   Yeah, that's it.
9      Q.   Do you know if you ever -- do you recall
10  ever having received a medication called Epogen?
11      A.   I've never heard of it.
12      Q.   So you've never received Epogen?
13      A.   No, sir.
14      Q.   But you were on a medication called
15  Procrit.  Did your doctor switch you from Procrit to
16  Aranesp?
17      A.   Yes.
18      Q.   Did he explain why he did that?
19      A.   No.
20      Q.   Did he ask you if you wanted to switch?
21      A.   No.
22      Q.   When did you first start receiving
0057
1  Procrit?
2      A.   I think it was 2003.  It was somewhere in
3  that year.
4      Q.   And when did you first start receiving
5  Aranesp?
6      A.   I guess '04.  I'm not good on dates.

7    Q.  Mr. Carter, do you know how drug prices
8  are determined?
9    A.  From what I've been reading a little bit,
10  I -- it's kind of hard to understand, but I was
11  looking at the manufacturers and all that kind of
12  stuff and I guess they try to make up for what they
13  spent for researching and getting stuff together and
14  stuff like that.
15    Q.  Do you understand that manufacturers make
16  a profit on their drugs?
17    A.  Sure.
18    Q.  And you -- that's okay?
19    A.  Sure.
20       MR. LEVY:  Objection.
21    Q.  (By Mr. Barley)  And do you know if the
22  doctor, for instance, Dr. -- I've got the name right
0058
1  here.
2    A.  Melear.
3    Q.  -- Melear makes any profit on the drugs
4  that he gives to you?
5    A.  I don't know.
6    Q.  Do you think that would be okay if he did?
7    A.  Well, I -- if he's getting paid for
8  treating me and he's charging for the injection or
9  the -- the nurses and all that, why do you have to
10  get paid for the medicine?  I don't know.
11    Q.  You don't know?
12    A.  I don't see why he would have to mark it
13  up.
14    Q.  Do you think it would be okay for him to
15  mark it up to help pay for those nurses and some of
16  his overhead?
17       MR. LEVY:  Objection.
18    A.  No, I really don't.
19    Q.  (By Mr. Barley)  Do you think that Dr. --
20  do you trust Dr. Melear?
21       MR. LEVY:  Objection.
22    A.  Oh, yes.
0059
1    Q.  (By Mr. Barley)  Do you think that he
2  makes decisions as far as what medication to
3  recommend to you based on what's in your best
4  interest?
5       MR. LEVY:  Objection.
6    A.  Yes.
7    Q.  (By Mr. Barley)  Have you ever heard the
8  term "average wholesale price" --
9    A.  Yes.
10    Q.  -- or AWP?
11    A.  Yes.
12    Q.  Where have you heard that term?
13    A.  (Indicating).
14    Q.  In the complaint, Exhibit Carter 001?

15    A.  Excuse me.  Yes, in the complaint.
16    Q.  I didn't say you couldn't point.  I just
17 said not to nod your head, right?
18        So had you ever heard of average wholesale
19 price or AWP before you saw that complaint?
20    A.  No.
21        MR. LEVY:  Objection.
22          (Interruption)
0060
1        MR. BARLEY:  We need to take a break.
2 Let's go off the record.
3        THE VIDEOGRAPHER:  The time is 11:15.  Off
4 the record.
5          (Recess from 11:15 a.m. to 11:25
6 a.m.)
7        THE VIDEOGRAPHER:  Back on the record. The
8 time is 11:25.
9    Q.  (By Mr. Barley)  Mr. Carter, do you think
10 it's okay for physicians to make a profit in
11 treating patients?
12    A.  Well, yes.
13    Q.  All right.  We were talking about AWP,
14 that term "AWP," or average wholesale price, right
15 before we took a break.  Do you know how AWP is
16 determined?
17    A.  Not exactly.
18    Q.  What's your understanding of how it's
19 determined?
20    A.  I look at it where they can put a -- a
21 price like they want to -- to price it like they
22 want to price it.  That's the way I look at it.
0061
1    Q.  Do you know how they make that decision?
2    A.  No.
3    Q.  Do you know what the AWP was for Aranesp
4 at any time?
5        MR. LEVY:  Objection.
6    A.  No.
7    Q.  (By Mr. Barley)  Do you know what your
8 doctor paid for any of the Aranesp that he
9 administered to you?
10    A.  No.
11    Q.  I think you mentioned earlier you
12 understand that a large portion of the amount that
13 the drug manufacturer gets for the drugs go for
14 research and development.
15        MR. LEVY:  Objection.
16    Q.  (By Mr. Barley)  Is that right?
17    A.  A large portion?
18    Q.  A portion.  I don't want to quibble about
19 how they --
20    A.  Yes.
21    Q.  All right.  Who are the defendants in the
22 lawsuit?

0062
1    A.  The class?
2    Q.  No.  Who are the people that are being
3  sued or the entities being sued?
4    A.  The manufacturers.
5    Q.  Are any doctors being sued?
6    A.  No.
7    Q.  Do you think they should be?
8       MR. LEVY:  Objection.
9    A.  No.
10   Q.  (By Mr. Barley)  Why not?
11   A.  Because they actually -- well, let me just
12  put it this way.  My doctors I believe in and I
13  don't think they are just in it for the money.  I
14  know he has to make a living and got to pay for
15  stuff, but he's -- it seems like he cares more for
16  the patient than the -- more than the money, I would
17  say.
18   Q.  You understand that one of the allegations
19  in the case is that the doctors are buying the drugs
20  at one price and then charging you and Medicare,
21  insurance companies a higher price and making a
22  profit off of them?
0063
1    A.  Yes.
2    Q.  And the doctor is the one receiving the
3  money in that situation, the profit, not the drug
4  manufacturer.  Do you understand that?
5       MR. LEVY:  Objection.
6    A.  No.
7    Q.  (By Mr. Barley)  You don't understand
8  that?
9    A.  No.
10   Q.  All right.  If that's the case, that the
11  doctor is the one making that profit, do you think
12  the doctors should be defendants in the case?
13      MR. LEVY:  Objection.
14   A.  I would say if they -- if they were really
15  using you, you know, really charging you a lot more
16  than they should, maybe.
17   Q.  (By Mr. Barley)  But you don't believe
18  your doctor is doing that?
19      MR. LEVY:  Objection.
20   A.  No, I don't.  I would like to qualify
21  that.  My doctor is one of many in that office.  In
22  fact, he's one of the younger ones.
0064
1    Q.  (By Mr. Barley)  All right.
2    A.  He just might be -- might be called an
3  employee.
4    Q.  I see.  But you believe what he is doing
5  is in your best interest?
6    A.  Yes.
7       MR. LEVY:  Objection.

8    Q.  (By Mr. Barley)  Do you understand that
9  there are any insurance companies that are
10  defendants in this case?
11          MR. LEVY:  Objection.
12    A.  No.
13    Q.  (By Mr. Barley)  Tell me in your own words
14  what you think the defendants in this case did
15  wrong, why they are being sued.
16    A.  I think they charge too much for what they
17  did. They take your -- anybody is supposed to make a
18  fair share on their investment, what you might say.
19  But when you go -- let me put it like this.
20  Medicare is our federal government and people look
21  at the government like they got all the money in the
22  world, but it comes out of our pocket too.
0065
1    Q.  And you think in this case that the drug
2  manufacturers are making too much money?
3    A.  I would say they are charging too much for
4  certain things.
5    Q.  Do you think they are making too much
6  money?
7          MR. LEVY:  Objection.
8    A.  I wouldn't know how to answer that.
9    Q.  (By Mr. Barley)  All right.  What
10  medications are you claiming are in this lawsuit in
11  which you received?
12    A.  Aranesp.
13    Q.  Any others?
14    A.  In this one?
15    Q.  Yes, sir.
16    A.  No.
17    Q.  Just Aranesp.  Okay.  Do you know who
18  manufactures Aranesp?
19    A.  Just what I saw in the -- in the -- is it
20  Amgen?  That's the name I saw.
21    Q.  Did you know that before you saw the --
22    A.  No.
0066
1    Q.  -- complaint?
2    A.  No.
3    Q.  Have you ever had any contact with anyone
4  from Amgen, to your knowledge?
5    A.  No.
6    Q.  Did your doctor tell you that the Aranesp
7  was made by Amgen?
8    A.  No.
9    Q.  If you can turn -- or take a look at that
10  complaint again, if you don't mind, Mr. Carter.  It
11  says in here -- excuse me one second.
12          Do you see right on the bottom of Page 6
13  there it says, "During the applicable time period,
14  Mr. Carter was prescribed, and was charged for, the
15  following physician-administered prescription drugs

16    based in whole or in part on AWP."  And then it
17    mentions darbepoetin alfa, you'll see, which is
18    Aranesp.
19        A.   Okay.
20        Q.   What's the basis for your understanding
21    that Aranesp was charged -- you were charged for
22    Aranesp based on AWP?
0067
1         MR. LEVY:  Objection.  This document is
2     created by his attorneys with his attorneys'
3     assistance, and it's a legal document.  And with
4     that objection, you can answer the question to the
5     best of your knowledge.
6         A.   Say it again.
7         Q.   (By Mr. Barley)  Yes, sir.  You made the
8     allegation in here that you were charged for Aranesp
9     based on AWP and I'm asking you what the basis for
10    that statement is.
11        MR. LEVY:  Do you understand his question?
12        A.   No, not really.
13        Q.   (By Mr. Barley)  All right.  Do you know
14    if you were charged for Aranesp based on AWP?
15        A.   Do I know it?
16        Q.   Yes, sir.
17        A.   Yes.
18        Q.   Tell me how you know that.
19        A.   By the documents.
20        Q.   What documents told you that?
21        A.   I can't give you a page or nothing like
22    that, but when I was going through it, I saw some
0068
1     figures.
2         Q.   Do you know what the AWP of Aranesp was at
3     any time?
4         A.   Offhand, off my head, no.
5         Q.   Tell me how you determined that you paid
6     for Aranesp based on AWP.  You said you looked at
7     some documents.  What documents did you look at?
8         A.   The figures on here, it gave what it cost
9     them to make and I guess on the far side it had a
10    percentage of the markup on it.
11        Q.   I see.  You're talking about later in the
12    complaint where it has what the AWP for Aranesp was?
13        A.   Yeah.
14        Q.   Let's put that aside for a minute.  I'm
15    talking about what you were actually charged.  Do
16    you know whether you were charged and you actually
17    made a payment to your physician or anyone else for
18    Aranesp that was based on AWP?
19        MR. LEVY:  Objection.
20        A.   I don't know.  I don't know how it was
21    based.
22        Q.   (By Mr. Barley)  And I would assume that's
0069

1  because you don't know what the AWP was at any time;
2  is that right?
3        MR. LEVY:  Objection.
4     A.  No.  No more than what I saw in there.
5     Q.  (By Mr. Barley)  Was Dr. -- is it Melear?
6  I'll get it before the day is -- is Dr. Melear the
7  only physician that's administered Aranesp to you?
8     A.  Yes.
9     Q.  Tell me how it works that you get the
10  injection.  Walk me through your office visit and
11  how you get the injection.
12     A.  Okay.  I have an appointment.  I go in.  I
13  go to the lab.  They draw blood and check and see if
14  I need the injection.
15     Q.  To see what your hematocrit level is?
16     A.  Which one do you call it?  If I'm really
17  needing -- if I really need it this month or not.
18     Q.  All right.
19     A.  And then after -- after they get the
20  results, they take me back for the injection or not.
21  It depends on whether I need it or not.  Lately I
22  need it every time.  I haven't missed in about six
0070
1  or eight months since I skipped one.
2     Q.  And if you need it, how does the injection
3  work?  Does the doctor administer it or does a nurse
4  or someone else?
5     A.  A nurse.
6     Q.  A nurse does?
7     A.  Yes.
8     Q.  I see.  And you understand the doctor has
9  to pay for the nurse to do that?
10     A.  Yes.
11     Q.  And is anyone else involved in the
12  administration or just the nurse?
13     A.  The injection?
14     Q.  Uh-huh.
15     A.  Just the nurse.
16     Q.  Do they use any special equipment in
17  administering it?
18     A.  No.  Just in the shoulder (indicating).
19     Q.  In your arm?
20     A.  Yes.
21     Q.  Do you know how the Aranesp is stored?
22     A.  No.
0071
1     Q.  Do you know if they have to have special
2  equipment to store the Aranesp?
3     A.  Like a refrigerator?
4     Q.  Yes, sir.
5     A.  I don't know.  Sometimes I have to wait
6  till it comes.  They don't have it right there in
7  the building and I don't know where they get it
8  from.  Sometimes I have to wait.

9    Q.  Would you expect that the doctor would
10  charge you part of his cost in handling or storing
11  Aranesp?
12        MR. LEVY:  Objection.
13    A.  I would suspect, yes.
14    Q.  (By Mr. Barley) How many times have you
15  received Aranesp?
16    A.  I don't know when I quit the Procrit.  I
17  don't know.
18    Q.  You received the Aranesp in the doctor's
19  office?
20    A.  Yes.
21    Q.  Have you ever received it in the hospital?
22    A.  No.
0072
1    Q.  Is it more convenient for you to get in
2  the doctor's office instead of going to the
3  hospital?
4    A.  Yes.
5    Q.  Would you prefer to receive it in the
6  doctor's office?
7    A.  Yes.
8    Q.  Would you be willing to pay a little more
9  for the Aranesp to get it in the doctor's office
10  instead of the hospital?
11        MR. LEVY:  Objection.
12    A.  I think the doctor is cheaper than the
13  hospital.  If you have to be admitted to the
14  hospital -- if you got to be admitted to take this,
15  it would be expensive.
16    Q.  (By Mr. Barley) I see.  So you think it
17  actually might even save money to have it in the
18  doctor's office?
19        MR. LEVY:  Objection.  Mischaracterizes
20  his testimony.
21    A.  I don't know about saving.
22    Q.  (By Mr. Barley) Let me ask you the
0073
1  question I asked a minute ago.  Would you be willing
2  to pay more since it's more convenient to receive
3  Aranesp in the doctor's office instead of going to
4  the hospital?
5        MR. LEVY:  Objection.
6    A.  No.
7    Q.  (By Mr. Barley) Why not?
8    A.  I can barely pay for what I'm getting.
9  Barely getting by now.  Actually, I'm not getting
10  by.
11    Q.  Can you tell me who are members of the
12  class that you're seeking to represent in this case?
13    A.  Yes.  It's a large -- a large group of
14  people just like me, you know.
15    Q.  What do they have in common?
16    A.  Illness, for one thing.  If they are like

17  me, they are poor.  They all need the -- they need
18  the medicine, I would say that, to, I guess,
19  survive.
20      Q.  Are they only people from Texas?
21      A.  In my class?
22      Q.  Yes, sir.
0074
1       A.  I'm not sure.
2       Q.  Do you know if the class includes Medicaid
3   beneficiaries?
4       A.  No, I don't know.
5           MR. LEVY:  Objection.
6       Q.  (By Mr. Barley)  Do you know if it is only
7   Medicare beneficiaries?
8       A.  I really don't know.
9       Q.  Do you know if it includes insurance
10  companies?
11      A.  No, I don't know.
12      Q.  Do you know if it includes the government?
13      A.  Yes.
14      Q.  It does include the government?
15      A.  You mean like Medicare?
16      Q.  Yes, sir.
17      A.  I would think they are involved.
18      Q.  And I assume you want to be a class
19  representative?
20      A.  Do I want to?
21      Q.  Yes, sir.
22      A.  Yes, sir.  I would like to know what's
0075
1   going on.
2       Q.  And what do you understand your
3   obligations to be as a class representative?
4       A.  My obligation would be to assist my
5   attorneys in any way I can to make this thing work
6   out by sending in documents they ask for or giving
7   them any information I can to help them -- help this
8   along.
9       Q.  And do you expect to be compensated to act
10  as a class representative?
11          MR. LEVY:  Objection.
12      A.  No.  No, not -- not for that.
13      Q.  (By Mr. Barley)  And who are the attorneys
14  that represent you in this case?
15      A.  Kline & Specter.
16      Q.  And I think you had told me you did not --
17  you had never heard the term "AWP" before you
18  contacted them.  Is that --
19      A.  Right.
20      Q.  How many times have you met with your
21  attorneys?
22      A.  Two.
0076
1       Q.  I assume one was yesterday or earlier

2  today; is that right?
3      A.  I've talked to them on the phone a lot.
4      Q.  All right.  But you met them in person
5  twice?
6      A.  Yes.
7      Q.  And once was -- was it yesterday or today
8  that you met them?
9      A.  Yesterday.
10      Q.  Yesterday.  All right.  How long did you
11  meet yesterday?
12      A.  Not long.  Just long enough to get
13  acquainted and have a cup of coffee.
14      Q.  An hour or so?
15      A.  Something like that.
16          MR. LEVY:  Objection.
17      Q.  (By Mr. Barley)  And what was the other
18  occasion when you met with attorneys from Kline &
19  Specter?
20      A.  Today at the deposition.
21      Q.  So the first time you met them was
22  yesterday?
0077
1      A.  Yes, sir.
2      Q.  But you've talked to them on the phone
3  before?
4      A.  Yes, sir.
5      Q.  How many times do you think you've talked
6  to them on the phone?
7      A.  Six or eight.  Something like that.
8  Whenever they have called me.
9      Q.  All right.  Do you have any kind of
10  agreement with the attorneys -- written agreement as
11  to how they are going to be paid that outlines their
12  representation of you?
13          MR. LEVY:  Objection.
14      A.  No.
15      Q.  (By Mr. Barley)  And you have provided
16  documents to your attorneys?
17      A.  Yes.
18      Q.  What documents were you asked to look for?
19          MR. LEVY:  Objection.  Objection.
20  Objection.  That requires an attorney/client
21  communication and you're not going to get into that
22  ground.
0078
1      Q.  (By Mr. Barley)  Okay.  What documents did
2  you look for?
3          MR. LEVY:  Based on anybody requesting
4  them or not requesting them?
5          MR. BARLEY:  I have a right to know what
6  he looked for.
7          MR. LEVY:  You can ask him that question.
8          MR. BARLEY:  That's what I just asked him.
9      Q.  (By Mr. Barley)  You can answer.  Do you

10     want me to ask it again?
11        A.   What did I look for?
12        Q.   Yes, sir.  What documents did you look
13     for?
14           MR. LEVY:  He's asking what you looked for
15     on any occasion regarding this case.  My counsel to
16     you is not to reveal anything that you've done as a
17     result of your attorneys telling you to do something
18     or communications with your attorneys.
19           MR. BARLEY:  I think -- I don't think
20     that's --
21           MR. LEVY:  If it came out of an
22     attorney/client communication --
0079
1           MR. BARLEY:  For what he did in response
2     to it would not --
3           MR. LEVY:  It answers the question.  You
4     can ask the question as you've asked, but --
5           MR. BARLEY:  Okay.
6           MR. LEVY:  -- but I'm giving him the --
7     he's not to reveal anything that he's done as a
8     result of discussions with his attorneys.
9           MR. BARLEY:  And you're taking the
10     position that's covered by the attorney/client
11     privilege?
12           MR. LEVY:  I am taking that position.
13           MR. BARLEY:  Okay.
14        Q.   (By Mr. Barley)  Mr. Carter, I would like
15     to know what documents you've looked for to produce
16     in this case.
17        A.   I don't know how to answer that.  Maybe a
18     bill or something like that, but I -- I don't know.
19        Q.   Do you keep a file with all your --
20        A.   Not all, no.  I didn't know anything was
21     going to happen and so a lot of stuff I threw away.
22        Q.   When did you throw this stuff away?
0080
1        A.   Oh, like if it's after I keep a bill a
2     month and a new bill comes in, the old one goes out.
3     That kind of stuff.
4        Q.   And you've been doing this recently?
5           MR. LEVY:  Objection.
6        A.   That's my past -- in the past.
7        Q.   (By Mr. Barley)  Is this something you've
8     done in 2006, thrown bills away?
9        A.   No.
10        Q.   How about in 2005?
11        A.   Probably.
12        Q.   Do you know how your lawyers are being
13     paid?
14        A.   No.
15        Q.   Do you know how the costs -- their
16     expense, like, for instance, for him to fly down
17     here, how that's being paid?

18     A.  Not really.
19     Q.  Did your doctor tell you what your anemia
20  came from?
21     A.  I -- I understood it was some kind of
22  cancer.  I don't remember just exactly what he told
0081
1  me.  I do have prostate cancer.  I don't know if
2  that's caused it or not.
3     Q.  Are you receiving any treatment for your
4  prostate cancer?
5     A.  Yes.
6     Q.  What treatment are you receiving?
7     A.  Lupron.
8     Q.  I see.  You're still receiving that?
9     A.  When I need it.  PSA is pretty good right
10  now.
11     Q.  All right.  But if your PSA level gets
12  elevated, then they give you some more Lupron?
13     A.  Yes.
14     Q.  Do you understand it's the Lupron that
15  makes you anemic?  Do you know what's making you
16  anemic?
17     A.  No, I don't.
18     Q.  How often do you see your doctor, Dr.
19  Melear?
20     A.  Every three months.
21     Q.  Every three months.
22        Do you know what dose of Aranesp you
0082
1  receive?
2     A.  No.
3     Q.  Do you know how Dr. Melear or his group
4  determines how much they are going to pay for
5  Aranesp?
6     A.  No.
7     Q.  Do you know how much Aranesp costs?
8        MR. LEVY:  Objection.
9     A.  No.  I know on my bill sometimes I see
10  over $2,000.
11     Q.  (By Mr. Barley)  Do you know how much your
12  doctor pays for it?
13     A.  No.
14     Q.  Have you ever asked your doctor how much
15  they pay for Aranesp?
16     A.  No.
17     Q.  Why not?
18     A.  I never knew to ask him.
19        MR. BARLEY:  Let's go off the record a
20  minute.
21        THE VIDEOGRAPHER:  Going off the record.
22  The time is 11:58 (sic).
0083
1           (Recess from 11:50 a.m. to 11:54
2  a.m.)

3            (Exhibit Carter 002 marked)
4            THE VIDEOGRAPHER:  We're back on the
5    record.  The time is 11:54.
6        Q.  (By Mr. Barley)  Mr. Carter, I'm going to
7    hand you what I've had marked -- it's a stack of
8    documents that I've had marked Deposition Exhibit
9    Carter 002. Just for the record, they are documents
10   that are Bates stamped Carter 006 up and through
11   Carter 0069.  Do you recall seeing those documents
12   before?
13           MR. LEVY:  Take as much time as you need
14   to look at them.
15       Q.  (By Mr. Barley)  Absolutely.  No rush.
16       A.  Yes.
17       Q.  Are these documents you produced to your
18   attorneys?
19       A.  Yes.
20       Q.  And are these documents you received from
21   Medicare?
22       A.  Yes.
0084
1        Q.  What do you understand them to be?
2        A.  Medicare paid their part.  $787.20 is what
3    they approved on the bill.  It left a balance of
4    $193.33.
5        Q.  So you understand this is something you
6    get from Medicare that shows for an office visit
7    what was charged, what Medicare paid, and the amount
8    you might be billed?
9            MR. LEVY:  I object.  The documents speak
10   for themselves.  They are not his documents.
11       Q.  (By Mr. Barley)  Is that what you
12   understand it to be?
13       A.  Yeah.
14       Q.  All right.  So let's take the first page,
15   Carter 006.  Do you see down in the corner there's a
16   number?
17       A.  Yes.
18       Q.  All right.  We call that a Bates number.
19   So I will refer to that and we'll go through some of
20   these documents.  Do you understand that this
21   document, Carter 006, is a document you received
22   from Medicare explaining how much Medicare paid for
0085
1    an office visit to Dr. Melear on April 27th, 2004?
2            MR. LEVY:  Objection.
3        Q.  (By Mr. Barley)  Is that right?
4        A.  Okay.  Yes.
5        Q.  And you see on there the last charge is
6    for the -- it says, "40 darbepoetin alpha
7    injection."  Do you see that?
8        A.  Yes.
9        Q.  Do you know what darbepoetin alfa is?
10       A.  I think that's the Aranesp.

11    Q.  All right.  And on this visit it indicates
12  that Dr. Melear charged Medicare $2,120 for Aranesp.
13  Is that what you understand it to be saying?
14    A.  Yes.
15    Q.  Do you know what the AWP for Aranesp was
16  in April of 2004?
17    A.  No, I don't know.
18    Q.  And do you know if Medicare made a payment
19  on that occasion based upon Aranesp's AWP?
20    A.  I don't know how Medicare comes to their -
21  -
22    Q.  Now, it says that of the $2,120, Medicare
0086
1  paid Dr. Melear $678.40.  Do you see that?
2    A.  Yes.
3    Q.  And it says you may be billed $169.60.  Do
4  you see that?
5    A.  Yes.
6    Q.  Do you know if you paid any portion of
7  that $169.60 for the April 27, 2004, Aranesp
8  injection?
9         MR. LEVY:  I'm just going to object to
10  this entire line of questioning in that you've got
11  over 300 pages of documents produced.  You're asking
12  him to -- essentially a memory test based on one
13  document that he's looking at which might not tell
14  the entire story of his payment histories.  With
15  that objection, Mr. Carter can testify to what he
16  believes he knows.
17         MR. BARLEY:  That's all I'm asking him.
18    Q.  (By Mr. Barley)  So my question was:  It
19  indicates on here that you may be charged $169.60
20  for your April 27, 2004, Aranesp injection.  Do you
21  see that?
22    A.  Yes.
0087
1    Q.  Do you know if you made any part of that
2  payment?
3    A.  2004, that's an old year.  Yes, I'm sure I
4  did.
5    Q.  Do you know if you paid the entire amount?
6    A.  No, I don't.  I was paying so much a
7  month.
8    Q.  Do you know if the payment that you made
9  was based on AWP?
10         MR. LEVY:  Objection.
11    A.  No, I don't.
12    Q.  (By Mr. Barley)  I would ask you, Mr.
13  Carter, to -- you'll see there are paper clips on
14  there.  Turn to the next paper clipped document,
15  which I believe is Carter 0010.
16    A.  Yes.
17    Q.  Do you see that?
18    A.  Yes.

19    Q.  And this is a similar document that you
20  received from Medicare?
21    A.  Uh-huh.  Yes, sir.
22    Q.  And do you see on there on May 11, 2004,
0088
1  it looks like you were administered Aranesp?
2    A.  Yes.
3    Q.  Again by Dr. Melear.  And it says the
4  amount charged was $2,120 and Medicare paid $657.87.
5  Do you see that?
6    A.  Yes.
7    Q.  And it says you may be billed $190.13.  Do
8  you see that?
9    A.  Yes.
10    Q.  And do you know if you made the entire
11  $190.13 payment?
12        MR. LEVY:  Same objection as previously.
13    A.  No, I don't know.
14    Q.  (By Mr. Barley)  Do you think you were
15  paying this flat a hundred dollars a month at this
16  time?
17    A.  No.  Once I paid $400 at one time.  So
18  this might have been included in there.
19    Q.  But you don't know?
20    A.  No, I don't know.
21    Q.  Do you know if you -- if you made any
22  payments whether the payment for the May 11, 2004,
0089
1  Aranesp injection was based on AWP?
2        MR. LEVY:  Objection.
3    A.  I don't know.
4    Q.  (By Mr. Barley)  Now, do you see on there,
5  Mr. Carter, that there's a B after the $190.13?
6    A.  Yes.
7    Q.  And then you see on the bottom it says,
8  "Notes Section:  B, $25.66 of this approved amount
9  has been applied toward your deductible."
10    A.  Okay.
11    Q.  Do you see that?
12    A.  Yeah.
13    Q.  What do you understand that to mean?
14    A.  I've never seen it before.  I never looked
15  at that.
16    Q.  So do you know whether you had met your
17  deductible at this point or not?
18    A.  It seems like I did, but I didn't know
19  about it.  I really didn't.
20    Q.  All right.  Let's turn to the next
21  document, if we can, which I think begins Carter
22  0014.
0090
1    A.  Yes.
2    Q.  Do you see that?
3    A.  Yes.

4      Q.   And do you see on -- the large box here at
5   the bottom it indicates that on May 25th, 2004, you
6   received an Aranesp injection from Dr. Melear?
7      A.   Yes.
8      Q.   And it indicates Dr. Melear charged
9   Medicare $2,120 again.  Do you see that?
10      A.   Yes.
11      Q.   Do you know what the AWP for Aranesp was
12   in May of 2004?
13      A.   No, I don't.
14      Q.   All right.  And do you see that Medicare
15   paid Dr. Melear -- of the $2,120 that he charged,
16   Medicare paid $678.40?
17      A.   Right.
18      Q.   Do you see that?
19      A.   Yes.
20      Q.   And do you know if that payment was based
21   on AWP?
22      A.   No.
0091
1      Q.   It says that you may be charged $169.60
2   for the May 25th, 2004 Aranesp injection.  Do you
3   see that, Mr. Carter?
4      A.   Yes.
5      Q.   Do you know if you paid any or all of that
6   $169.60?
7      A.   I'm sure I paid some of it.
8      Q.   But you don't know?
9      A.   No, I don't.
10      Q.   And you don't know the amount you would
11   have paid?
12      A.   No.
13      Q.   And you don't know whether it was based on
14   AWP?
15      A.   No.
16           THE VIDEOGRAPHER:  Mr. Carter, your
17   microphone is scratching your jacket.
18           MR. BARLEY:  You may want to put it on
19   your jacket if that would help.  Put it on the
20   lapel.  I think your attorney can help you.  I think
21   maybe on his right side it --
22           MR. LEVY:  My fear is that whenever he
0092
1   moves that you're going to get more of the --
2           THE VIDEOGRAPHER:  It's better on the tie.
3           MR. BARLEY:  You're the expert.  Do you
4   think it's better on the tie?
5           THE VIDEOGRAPHER:  Yes.
6           MR. BARLEY:  The videographer says it's
7   better on the tie.  So I should have just been
8   quiet.
9      Q.   (By Mr. Barley)  Thank you, Mr. Carter.
10           If we could turn to the next paper clipped
11   document.  That should begin Carter 0018?

12    A.   Right.
13    Q.   And that indicates you received an
14  injection of Aranesp on June 8th, 2004.  Do you see
15  that?
16    A.   Yes.
17    Q.   And it looks like Dr. Melear charged
18  Medicare $2,120 for that Aranesp injection.  Do you
19  see that?
20    A.   Yes.
21    Q.   And it looks like Medicare paid $678.40?
22    A.   Yes.
0093
1    Q.   And it said you may be billed again
2  $169.60. Do you see that?
3    A.   Yes.
4    Q.   Do you know what the AWP for Aranesp was
5  in June of 2004?
6    A.   No.
7        MR. LEVY:  Objection.
8    Q.   (By Mr. Barley)  Do you know whether
9  Medicare paid its $678.40 to Dr. Melear based on
10  AWP?
11        MR. LEVY:  Objection.
12    A.   I don't know.
13    Q.   (By Mr. Barley)  Do you know whether you
14  paid any or all of the $169.60 for the June 8, 2004,
15  Aranesp injection?
16        MR. LEVY:  Objection.
17    A.   No, I don't know.
18    Q.   (By Mr. Barley)  And if you did so, do you
19  know whether that was based on AWP?
20        MR. LEVY:  Objection.
21    A.   I wouldn't know.
22    Q.   (By Mr. Barley)  All right.  This may get
0094
1  a little monotonous, but I need to go through these.
2        Mr. Carter, if you could turn to the next
3  one.  It begins Carter 0022.  Do you see that?
4    A.   Yes.
5    Q.   And it looks -- this is a document you
6  received from Medicare, correct?
7    A.   Yes.
8    Q.   And it looks like you received another
9  Aranesp injection in July of 2004?
10    A.   Yes.
11    Q.   And, again, Dr. Melear charged Medicare
12  $2,120. Do you see that?
13    A.   Yes.
14    Q.   Do you know what the AWP for Aranesp was
15  in July of 2004?
16    A.   No.
17        MR. LEVY:  Objection.
18    Q.   (By Mr. Barley)  And do you see that
19  Medicare paid Dr. Melear $678.40 --

20    A.  Yes.
21    Q.  -- for the Aranesp?  Do you see that?
22    A.  Yes.
0095
1    Q.  Do you know if that payment was based on
2  Aranesp's AWP?
3         MR. LEVY:  Objection.
4    A.  I don't know.
5    Q.  (By Mr. Barley)  And then it says that you
6  may be billed $169.60.  Do you see that, Mr. Carter?
7    A.  Yes, sir.
8    Q.  And do you know if you paid any or all of
9  that amount?
10    A.  No, I don't.
11         MR. LEVY:  Objection.
12    Q.  (By Mr. Barley)  Do you know if this was a
13  time when you were paying the flat $100 monthly
14  payments?
15         MR. LEVY:  Objection.
16    A.  I really don't know.
17    Q.  (By Mr. Barley)  And do you know if that
18  $169.60 was based on AWP for that charge?
19         MR. LEVY:  Objection.
20    A.  No, I don't.
21    Q.  (By Mr. Barley)  And do you know if you
22  made a payment whether your payment was based on
0096
1  AWP?
2         MR. LEVY:  Objection.
3    A.  No, I don't know.
4    Q.  (By Mr. Barley)  All right.  Let's turn to
5  the next one, which is Carter 0026.  Do you see
6  that?
7    A.  Yes.
8    Q.  Mr. Carter, this is again a document you
9  received from Medicare, correct?
10    A.  Right.
11    Q.  And this shows that you received an
12  Aranesp injection in November of 2004.  Do you see
13  that?
14    A.  Yes.
15    Q.  And that Dr. Melear charged Medicare
16  $2,120 for that injection.
17    A.  Yes.
18    Q.  Do you see that?
19    A.  Yes.
20    Q.  And do you know what the AWP for Aranesp
21  was in November of 2004?
22         MR. LEVY:  Objection.
0097
1    A.  No.
2    Q.  (By Mr. Barley)  And it looks like
3  Medicare paid Dr. Melear $678.40 for the Aranesp
4  injection.  Do you see that?

5     A.  Yes.
6     Q.  Do you know if that payment was based on
7  Aranesp's AWP?
8         MR. LEVY:  Objection.
9     A.  No, I don't.
10    Q.  (By Mr. Barley)  And then it indicates
11  that you may be billed $169.60.  Do you see that?
12    A.  Yes.
13    Q.  And do you know if you made -- strike
14  that.
15        Do you know if you paid any or all of that
16  amount?
17    A.  No, I don't know.
18        MR. LEVY:  Objection.
19    Q.  (By Mr. Barley)  And if you did make a
20  payment, do you know whether that payment was based
21  on AWP?
22        MR. LEVY:  Objection.
0098
1     A.  No.  I wouldn't know.
2     Q.  (By Mr. Barley)  Turn to the document
3  beginning Carter 0030.
4     A.  Right.
5     Q.  Are you with me?
6     A.  Yes.
7     Q.  This is a document you received from
8  Medicare?
9     A.  Yes.
10    Q.  And it appears that you received an
11  Aranesp injection in December of 2004.
12    A.  Yes.
13    Q.  And that Medicare was charged $2,120 for
14  that; is that correct?
15    A.  Yes.
16    Q.  And that Medicare paid $678.40.  Do you
17  see that?
18    A.  Yes.
19    Q.  Do you know what Aranesp's AWP was in
20  December of 2004?
21        MR. LEVY:  Objection.
22    A.  No.
0099
1     Q.  (By Mr. Barley)  Do you know if the
2  payment by Medicare in the amount of $678.40 was
3  based on Aranesp's AWP?
4         MR. LEVY:  Objection.
5     A.  No, I don't know.
6     Q.  (By Mr. Barley)  And it indicates in the
7  last column that you may be billed $169.60.  Do you
8  see that?
9     A.  Yes.
10    Q.  Do you know if you made any or all of that
11  payment, Mr. Carter?
12        MR. LEVY:  Objection.

13   A.  I don't know.
14   Q.  (By Mr. Barley)  If you did make that
15  payment or even a portion of it, do you know whether
16  that payment would have been based on Aranesp's AWP?
17      MR. LEVY:  Objection.
18   A.  No.
19   Q.  (By Mr. Barley)  Turn to Carter 0034,
20  please.
21   A.  All right.
22   Q.  The second line from the bottom in that
0100
1  box indicates that you received an Aranesp injection
2  in March of 2005.  Do you see that, Mr. Carter?
3   A.  Yes, sir.
4   Q.  And do you see that -- and this is a
5  document you received from Medicare?
6   A.  Yes.
7   Q.  And you see where Dr. Melear's office
8  charged Medicare $2,160 for Aranesp?
9   A.  Yes.
10   Q.  Thank you.  And you see that Medicare paid
11  his office $567.10 for Aranesp?  Do you see that?
12   A.  Yes.
13   Q.  And then in the last column it indicates
14  that you may be billed $141.78.  Do you see that,
15  Mr. Carter?
16   A.  Yes.
17   Q.  Do you know what the AWP for Aranesp was
18  in March of 2005?
19      MR. LEVY:  Objection.
20   A.  No.
21   Q.  (By Mr. Barley)  Do you know whether the
22  amount that Medicare paid to Dr. Melear's practice
0101
1  for this Aranesp injection was based on AWP?
2      MR. LEVY:  Objection.
3   A.  I don't know.
4   Q.  (By Mr. Barley)  Do you know if you paid
5  any or all of the $141.78 that it says you may be
6  billed?
7      MR. LEVY:  Objection.
8   A.  I don't know how much, no.
9   Q.  (By Mr. Barley)  And do you know if you
10  paid any?
11      MR. LEVY:  Objection.
12   A.  Let's see.  '05?  Yes.
13   Q.  (By Mr. Barley)  How much did you pay of
14  that amount?
15      MR. LEVY:  Objection.
16   A.  At this time I was paying a hundred
17  dollars a month.
18   Q.  (By Mr. Barley)  Would that be just for
19  the Aranesp or would that be for all the services
20  that Dr. Melear's office was providing?

21      MR. LEVY:  Objection.

22    A.  That would be, yes.

0102

1    Q.  (By Mr. Barley)  For all the services?

2    A.  Yes.

3      MR. LEVY:  Objection.

4    Q.  (By Mr. Barley)  So some of it would be

5  whatever the balance was after Medicare had paid for

6  the office visit portion and some would be for the

7  drug and perhaps other things?

8      MR. LEVY:  Objection.

9    A.  Yes.

10    Q.  (By Mr. Barley)  Is that right?

11    A.  The only thing on there is office visit.

12    Q.  Right.  So, for instance, on this

13  document, it indicates that you may be billed $10.64

14  for the office visit.

15    A.  Right.

16    Q.  All right.  But when you started making

17  these $100 payments and you've been making $100

18  payments, you understand that the payments are not

19  just for the drug, but they are for other services -

20  -

21      MR. LEVY:  Objection.

22    Q.  (By Mr. Barley)  -- that you may owe money

0103

1  for?

2    A.  I see what you're saying.  The drugs is

3  really the biggest part of it.

4    Q.  But it is for other things too.  Do you

5  understand that?

6      MR. LEVY:  Objection.

7    A.  Yes.

8    Q.  (By Mr. Barley)  You do?

9    A.  Yes.

10    Q.  Okay.  Do you know how the doctor or his

11  practice decided to allocate your $100?

12      MR. LEVY:  Objection.

13    Q.  (By Mr. Barley)  In other words, did they

14  put it all toward the drug?  Did they put it toward

15  other things?  Did they put some of it to the drug,

16  some of it to other things?

17      MR. LEVY:  Objection.

18    A.  I have no idea.

19    Q.  (By Mr. Barley)  So as far as you know, it

20  could be for the office visit and other things and

21  not go at all for the drug; is that right?

22      MR. LEVY:  Objection.

0104

1    A.  I couldn't say that.

2    Q.  (By Mr. Barley)  Okay.

3    A.  I don't know how it's done.

4    Q.  You don't know.  That's fair enough.

5      So in March of 2005 -- and I apologize if

6  I've already asked you this, but do you know if you
7  made any or all of the $141.78 that might be billed
8  to you? Do you know if you paid any of that --
9        MR. LEVY:  Objection.
10     Q.  (By Mr. Barley)  -- or all of it?
11     A.  No, I don't know.
12     Q.  And if you did make any payment, do you
13 know if that was based on AWP or not?
14     A.  I don't know.
15        MR. LEVY:  Objection.
16     Q.  (By Mr. Barley)  Mr. Carter, could we turn
17 then, please, to Carter 0038?
18     A.  Yes.
19     Q.  This is a document you received from
20 Medicare?
21     A.  Yes.
22     Q.  And it indicates on here that you received
0105
1  another Aranesp injection in April of 2005.  Do you
2  see that?
3     A.  Yes.
4     Q.  And this time it says 60 darbepoetin alfa
5  injection.  Do you see that?
6     A.  Yes.
7     Q.  And before it said 40?
8     A.  Oh.
9     Q.  You can look at the prior one if you want.
10     A.  Yes.
11     Q.  Do you remember that you got a different
12 dosage of Aranesp beginning in April of 2005?
13     A.  They never told me.
14     Q.  Okay.  Now, you see on there that Medicare
15 was charged $3,240 for that injection.  Do you see
16 that?
17     A.  Yes.
18     Q.  Do you know what Aranesp's AWP was in
19 April of 2005?
20        MR. LEVY:  Objection.
21     A.  No, sir.
22     Q.  (By Mr. Barley)  Do you know if that
0106
1  charge was based on AWP?
2        MR. LEVY:  Objection.
3     A.  I don't know.
4     Q.  (By Mr. Barley)  Do you know if any charge
5  for Aranesp by your doctors is based on AWP?
6        MR. LEVY:  Objection.
7     A.  No, I don't know.
8     Q.  (By Mr. Barley)  Do you know -- you see --
9  if you see on there in the third column it appears
10 that Medicare paid your physicians $773.76 for
11 Aranesp for that particular injection.  Do you see
12 that?
13     A.  Yes.

14     Q.   And do you know if that payment was based
15  upon AWP?
16          MR. LEVY:  Objection.
17     A.   No, sir.  I don't know.
18     Q.   (By Mr. Barley)  The final column
19  indicates that you may be billed $193.44 for
20  Aranesp.
21     A.   Yes.
22     Q.   Do you know if you paid any or all of that
0107
1  amount?
2     A.   I don't know.
3          MR. LEVY:  Objection.
4     Q.   (By Mr. Barley)  And if you did make any
5  payment, do you know if that payment was based on
6  AWP or not?
7     A.   No, I don't know.
8          MR. LEVY:  Objection.
9     Q.   (By Mr. Barley)  If you would turn to
10  Carter 0042, please.
11     A.   Yes.
12     Q.   This is a document you received from
13  Medicare?
14     A.   Yes.
15     Q.   And this document indicates that you
16  received, again, 60 darbepoetin alpha --
17     A.   Right.
18     Q.   -- in May of 2005.  Do you see that?
19     A.   Yes.
20     Q.   And do you see that the doctors charged
21  Medicare $3,240 for that injection?
22     A.   Yes.
0108
1     Q.   And do you know what Aranesp's AWP was in
2  May of 2005?
3          MR. LEVY:  Objection.
4     A.   No.
5     Q.   (By Mr. Barley)  You see on there, Mr.
6  Carter, that Medicare paid your provider $773.76?
7     A.   Yes.
8     Q.   Do you know if that payment was based upon
9  AWP?
10          MR. LEVY:  Objection.
11     A.   No.
12     Q.   (By Mr. Barley)  And it says on there in
13  the final column you may be billed $193.44.  Do you
14  see that?
15     A.   Yes.
16     Q.   Do you know if you paid any or all of that
17  amount?
18     A.   I don't know.
19          MR. LEVY:  Objection.
20     Q.   (By Mr. Barley)  And if you did make any
21  payment, do you know if the payment was based upon

22  AWP?

0109

1     A.  No.  I still don't know.

2         MR. LEVY:  Objection.  Hold on one moment.

3  Are you getting some feedback from the coat again?

4         THE VIDEOGRAPHER:  It's just when he

5  brushes up against it.

6         THE WITNESS:  I'm sorry.

7         MR. LEVY:  That's okay.  I just wasn't

8  sure if you were picking up anything.

9         MR. BARLEY:  Unfortunately it's so cold

10  you can't take it off.

11     Q.  (By Mr. Barley)  Okay.  If we could turn

12  to Carter 0046.

13     A.  Okay.

14     Q.  Do you see -- this is a document you

15  received from Medicare?

16     A.  Yes.

17     Q.  And it indicates on there that you

18  received a 60 darbepoetin alpha injection in June of

19  2005.

20     A.  Yes.

21     Q.  And that your doctors charged Medicare

22  $3,240 for that?

0110

1     A.  Yes.

2     Q.  Do you know what the AWP for Aranesp was

3  in June of 2005?

4         MR. LEVY:  Objection.

5     A.  No.

6     Q.  (By Mr. Barley)  It also -- do you know if

7  the charge was based on AWP?

8         MR. LEVY:  Objection.

9     A.  I don't know.

10     Q.  (By Mr. Barley)  There is a column

11  indicating that Medicare paid your provider $773.76

12  for that Aranesp injection.  Do you see that, Mr.

13  Carter?

14     A.  Yes.

15     Q.  Do you know if that payment was based upon

16  AWP?

17         MR. LEVY:  Objection.

18     A.  No, I don't know.

19     Q.  (By Mr. Barley)  It indicates in the final

20  column that you may be billed $193.44.  Do you see

21  that?

22     A.  Yes.

0111

1     Q.  And do you know if you paid any or all of

2  that amount?

3     A.  No, I don't know.

4         MR. LEVY:  Objection.

5     Q.  (By Mr. Barley)  And if you did make such

6  a payment, do you know whether that payment was

7 based on AWP?

8   A.  I don't know.

9       MR. LEVY:  Objection.

10   Q.  (By Mr. Barley)  You also see, Mr. Carter,

11 that there were a number of other items in that last

12 column that -- where it indicates you may be billed

13 for them. Do you see office/outpatient visit --

14   A.  Yes.

15   Q.  -- $16.68?

16   A.  Yes.

17   Q.  It has one hormonal antineoplastic, $7.46.

18   A.  Yeah.

19   Q.  It has one therapeutic diagnostic

20 injection, $3.87.

21   A.  Yes.

22   Q.  It has two leuprolide acetate suspensions,

0112

1 $77.07.

2   A.  Yes.

3   Q.  And it indicates with this visit, which

4 includes the Aranesp and these other things, that

5 you may be billed $298.52.  Do you see that?

6   A.  Yes.

7   Q.  And it's your understanding at this time

8 you were paying $100 for that visit --

9       MR. LEVY:  Objection.

10   Q.  (By Mr. Barley)  -- of the $298.52 you

11 might have been billed?

12       MR. LEVY:  Objection.

13   Q.  (By Mr. Barley)  Is that right?

14   A.  June '05?  Yes.  I was paying a hundred

15 dollars a month then for sure.

16   Q.  So you likely paid a hundred dollars of

17 the $298.52?

18       MR. LEVY:  Objection.

19   Q.  (By Mr. Barley)  Is that your

20 understanding?

21   A.  Yes.

22   Q.  And do you know how the doctor allocated

0113

1 that $100?  Whether they used it for the Aranesp or

2 these other things such as the leuprolide acetate or

3 the outpatient visit?

4       MR. LEVY:  Objection.

5   A.  I don't know.

6   Q.  (By Mr. Barley)  Why don't you turn to

7 Carter -- the document beginning Carter 0050.

8   A.  Yes.

9   Q.  We're in the home stretch here.

10       This is a document you received from

11 Medicare?

12   A.  Yes.

13   Q.  And this document indicates that you

14 received a 60 darbepoetin alfa injection in July of

15  '05?
16      A.  Yes.
17      Q.  And that your provider charged Medicare
18  $3,240 for that injection.  Do you see that?
19      A.  Yes.
20      Q.  Do you know what the AWP was for Aranesp
21  in July of 2005?
22          MR. LEVY:  Objection.
0114
1      A.  No.
2      Q.  (By Mr. Barley)  Do you know if that
3  amount that was charged was based upon AWP?
4      A.  No.
5          MR. LEVY:  Objection.
6      Q.  (By Mr. Barley)  And you see in the third
7  column that Medicare paid $734.16.  Do you see that?
8      A.  Yes.
9      Q.  Do you know whether that payment was based
10  upon Aranesp's --
11          MR. LEVY:  Objection.
12      Q.  (By Mr. Barley)  -- AWP?
13      A.  No, I don't know.
14      Q.  And then you'll see in the final column,
15  Mr. Carter, that this document indicates you may be
16  billed $183.54.  Do you see that?
17      A.  Yes.
18      Q.  And do you know if you paid any or all of
19  that amount?
20          MR. LEVY:  Objection.
21      A.  I don't know.
22      Q.  (By Mr. Barley)  And if you did make a
0115
1  payment of any or all of that amount, do you know if
2  it was based upon AWP?
3      A.  No, I don't know.
4          MR. LEVY:  Objection.
5      Q.  (By Mr. Barley)  Mr. Carter, do you see
6  also on there that there was a $3.87 charge for
7  which you might be billed?
8      A.  Yes.
9      Q.  Do you know if any of your payment went to
10  pay for that charge?
11          MR. LEVY:  Objection.
12      A.  I don't know.
13      Q.  (By Mr. Barley)  If you could turn to
14  Carter 00 -- the document beginning Carter 0054.  Is
15  this a document you received from Medicare, Mr.
16  Carter?
17      A.  Yes.
18      Q.  And this document indicates that you
19  received an Aranesp injection in August of 2005; is
20  that right?
21      A.  Yes.
22      Q.  And it also indicates that your providers

0116
1   charged Medicare $3,240 for that injection?
2       A.   Yes.
3       Q.   And do you know what the AWP for Aranesp
4   was in August of 2005?
5           MR. LEVY:  Objection.
6       A.   No.
7       Q.   (By Mr. Barley)  Do you know if that
8   charge was based upon AWP?
9           MR. LEVY:  Objection.
10      A.   No, sir.
11      Q.   (By Mr. Barley)  Do you know if any charge
12  that your providers made for Aranesp was based upon
13  AWP?
14          MR. LEVY:  Objection.
15      A.   No, I don't know.
16          MR. LEVY:  That may have been a good first
17  question.
18          MR. BARLEY:  Yeah, it would have.  I would
19  have to go through this anyway, though.
20      Q.   (By Mr. Barley)  Mr. Carter, do you see
21  the third column indicates that Medicare paid your
22  provider $734.16 --
0117
1       A.   Yes.
2       Q.   -- for the Aranesp injection in August of
3   2005?
4       A.   Yes.
5       Q.   Do you know if that payment was based upon
6   AWP?
7       A.   No, I don't.
8           MR. LEVY:  Objection.
9       Q.   (By Mr. Barley)  Do you know if it was
10  based on Aranesp's AWP?
11          MR. LEVY:  Objection.
12      A.   No.
13      Q.   (By Mr. Barley)  And it further indicates
14  that you may be billed $183.54 for the August 2005
15  Aranesp injection.  Do you see that?
16      A.   Yes.
17      Q.   Do you know if you made any or all of that
18  payment?
19          MR. LEVY:  Objection.
20      A.   No, I don't know.
21      Q.   (By Mr. Barley)  And if you did make any
22  or all of that payment, do you know whether it was
0118
1   based upon AWP?
2           MR. LEVY:  Objection.
3       A.   No, I don't know.
4       Q.   (By Mr. Barley)  Do you know if, in fact,
5   you made some payment to your provider how your
6   provider would have allocated the money toward your
7   injection in August of 2005?

8        MR. LEVY:  Objection.

9        A.  No, I don't know.

10       Q.  (By Mr. Barley)  If you would turn, Mr.

11   Carter, to the document beginning Carter 0058.

12       A.  Right.

13       Q.  This is a similar document that you

14   received from Medicare; is that correct?

15       A.  Yes.

16       Q.  And this indicates that you received an

17   Aranesp injection in September of 2005?

18       A.  Yes.

19       Q.  And do you know what the AWP for Aranesp

20   was in September of 2005?

21       MR. LEVY:  Objection.

22       A.  No.

0119

1        Q.  (By Mr. Barley)  Do you see your provider

2   charged Medicare $3,240 for that injection?

3        A.  Yes.

4        Q.  Do you know if that charge was based upon

5   AWP?

6        MR. LEVY:  Objection.

7        A.  No.

8        Q.  (By Mr. Barley)  Do you see that this

9   indicates your provider was paid $734.16 for the

10   Aranesp injection?

11       A.  Yes.

12       Q.  Do you know if that payment was based upon

13   AWP?

14       MR. LEVY:  Objection.

15       A.  No, I don't.

16       Q.  (By Mr. Barley)  I'm sorry.  Do you know

17   if that payment was based upon Aranesp's AWP?

18       A.  No, I don't.

19       MR. LEVY:  Objection.

20       Q.  (By Mr. Barley)  I'm going to catch myself

21   the next time.

22       And the final column, Mr. Carter,

0120

1   indicates that you may be billed $183.54.  Do you

2   see that?

3        A.  Yes.

4        Q.  Do you know if you were billed that?

5        MR. LEVY:  Objection.

6        A.  Do I know?

7        Q.  (By Mr. Barley)  Yes, sir.

8        A.  No.  Not off my head, no.

9        Q.  And do you know if you paid any or all of

10   that amount?

11       A.  No, I don't.

12       MR. LEVY:  Objection.

13       Q.  (By Mr. Barley)  And if you paid any or

14   all of that amount, do you know whether it was based

15   upon AW -- Aranesp's AWP?

16      MR. LEVY:  Objection.
17      A.  No.
18      Q.  (By Mr. Barley)  And you see there's some
19  other charges for which you might be billed in that
20  column, including $74.08 for leuprolide acetate
21  suspension?  It's right below Aranesp in the final
22  column.
0121
1      A.  Yes, I got it.
2      Q.  Do you know if you had paid some but not
3  all of the amount that you might have been billed
4  how your doctor would have allocated that?
5      MR. LEVY:  Objection.
6      Q.  (By Mr. Barley)  Toward Aranesp or this
7  leuprolide or something else.
8      MR. LEVY:  Objection.
9      A.  No.
10      Q.  (By Mr. Barley)  If you could turn to the
11  document beginning Carter 0062.  This is a document
12  you received from Medicare?
13      A.  Yes.
14      Q.  And it indicates that you received an
15  Aranesp injection in October of 2005.  Is that
16  right, Mr. Carter?
17      A.  Yes.
18      Q.  And do you know what the AWP for Aranesp
19  was in October of 2005?
20      MR. LEVY:  Objection.
21      A.  No.
22      Q.  (By Mr. Barley)  It indicates that your
0122
1  provider charged Medicare $3,240 for the Aranesp
2  injection.  Do you see that?
3      A.  Yes.
4      Q.  Do you know if that charge was based upon
5  AWP?
6      MR. LEVY:  Objection.
7      Q.  (By Mr. Barley)  I'm sorry.  Do you know
8  if that charge was base on Aranesp's AWP?
9      MR. LEVY:  Objection.
10      A.  No, I don't.
11      Q.  (By Mr. Barley)  And you see that it
12  indicates that Medicare paid your provider $722.93
13  for the Aranesp injection?
14      A.  Yes.
15      Q.  Do you know if that amount that was paid
16  by Medicare to your provider for Aranesp was based
17  on Aranesp's AWP?
18      A.  I don't know.
19      MR. LEVY:  Objection.
20      Q.  (By Mr. Barley)  And --
21      MR. BARLEY:  I think when you read it it
22  will make sense actually.
0123

1    Q.  (By Mr. Barley)  And you see the final
2  column indicates you may be billed $180.73 -- of the
3  $3,240 that your doctor charged, you may be billed
4  $180.73.  Do you see that?
5    A.  Yes.
6    Q.  Do you know if you were charged that
7  amount?
8        MR. LEVY:  Objection.
9    Q.  (By Mr. Barley)  Billed that amount?
10        MR. LEVY:  Objection.
11    A.  No.
12    Q.  (By Mr. Barley)  And do you know if you
13  made any or all of that payment?
14        MR. LEVY:  Objection.
15    A.  No, I don't.
16    Q.  (By Mr. Barley)  Do you know if you had
17  made a payment whether it was based upon AWP --
18  Aranesp's AWP?
19        MR. LEVY:  Objection.
20    A.  No, I don't know.
21    Q.  (By Mr. Barley)  And then the last one of
22  these that I have then -- and then I think we are
0124
1  going to need to change the tape -- begins Carter
2  0066.  Do you see that, Mr. Carter?
3    A.  Yes.
4    Q.  And this is a document you received from
5  Medicare?
6    A.  Yes.
7    Q.  And it indicates that you received an
8  Aranesp injection in November of 2005?
9    A.  Yes.
10    Q.  And that your provider charged Medicare
11  $3,240 for that injection.  Do you see that?
12    A.  Yes.
13    Q.  Do you know what Aranesp's AWP was in
14  November of 2005?
15    A.  No, I don't.
16        MR. LEVY:  Objection.
17    Q.  (By Mr. Barley)  Do you know if that
18  charge by your provider for Aranesp was based on
19  Aranesp's AWP?
20        MR. LEVY:  Objection.
21    A.  No.
22    Q.  (By Mr. Barley)  And do you see that in
0125
1  the third column it indicates that Medicare paid
2  your provider $722.93 for that injection?
3    A.  Yes.
4    Q.  Do you know if that payment was based upon
5  Aranesp's AWP?
6        MR. LEVY:  Objection.
7    A.  No, I don't.
8    Q.  (By Mr. Barley)  And then finally, it

9   indicates in the final column you may be billed
10   $180.73.  Do you see that?
11      A.  Yes.
12      Q.  And do you know if you were billed that
13   amount?
14         MR. LEVY:  Objection.
15      A.  No.
16      Q.  (By Mr. Barley)  Do you know whether you
17   paid any or all of that amount?
18         MR. LEVY:  Objection.
19      A.  No.
20      Q.  (By Mr. Barley)  And if you did make a
21   payment for that injection, do you know if it was
22   based on AWP?
0126
1         MR. LEVY:  Objection.
2      Q.  (By Mr. Barley)  Aranesp's AWP?
3         MR. LEVY:  Objection.
4      A.  No, I wouldn't know.
5         MR. BARLEY:  I think that we need to
6   change the tape.  This would probably be a good time
7   to take that short break.
8         THE VIDEOGRAPHER:  We're going off the
9   record.  The time is 12:29.
10            (Exhibit Carter 003 marked)
11            (Recess from 12:29 p.m. to 12:37
12   p.m.)
13         THE VIDEOGRAPHER:  Back on the record.
14   This is tape number three.  The time is 12:37.
15      Q.  (By Mr. Barley)  Mr. Carter, I'm going to
16   hand you several documents which are Bates stamped
17   Carter 0287 through Carter 0296, with the exception
18   of Page 0294.  Why don't you let your attorney take
19   a look at them and then I'll ask you if you
20   recognize those documents.
21         Mr. Carter, could you take a look at
22   Exhibit Carter 003, please?
0127
1      A.  Yes.
2      Q.  And these are checks -- they look like
3   they are from your bank account; is that right?
4      A.  That's right.
5      Q.  And each of these, I believe, is made
6   payable to Southwest Regional Cancer Center?
7      A.  Yes.
8      Q.  These checks -- are these all of the
9   checks that you've written to Southwest Cancer
10   Center for your treatments since June of 2004?
11      A.  I was thinking there was some earlier.
12      Q.  I can represent to you that these are the
13   only checks that were produced to us.  Do you think
14   there were some earlier checks?
15      A.  I think so.
16      Q.  Do you know if you have those in your

17    possession still?
18        A.  No.  These are all I found.
19        Q.  Okay.
20        A.  I don't know how far back my records went.
21        Q.  All right.  These checks were payments
22    that you made for what?
0128
1            MR. LEVY:  Do you understand his question?
2        A.  Specifically or -- or --
3            MR. LEVY:  Ask him to rephrase his
4    question if you don't understand.
5        A.  I don't understand how you want this.
6        Q.  (By Mr. Barley)  Okay.  That's fair.  What
7    were these checks making payments for?
8        A.  I can only say the injections.
9        Q.  Do you know if it made payment for other
10   things?
11        A.  I don't know what all is on the bills.  I
12   really don't.
13        Q.  But it's possible that a portion of this
14   was for paying for part of an office visit or
15   something else?
16            MR. LEVY:  Objection.
17        Q.  (By Mr. Barley)  Is that right?
18        A.  No.  I think my office visit was covered.
19        Q.  We looked earlier on Exhibit Carter 002
20   where you might have been billed -- it indicated you
21   might have been billed for other things like your
22   Lupron and some of the office visits.  Do you
0129
1    remember that?
2        A.  I didn't know -- I thought that Medicare
3    took care of office visits.
4        Q.  If you could see -- I'll hand this to you.
5    For instance, look at Exhibit Carter 002.  And look
6    at the very first page with the Bates stamp Carter
7    0006.
8        A.  $23.73.
9        Q.  Do you see where you may be billed $23.73
10   for an office visit?
11        A.  Yes.
12        Q.  Okay.  And there were other ones in there
13   -- if you remember -- where there were some charges
14   that you might be billed for in addition to the
15   Aranesp.  Do you remember that?
16        A.  Yeah, I think so.
17        Q.  All right.  So my question is, these
18   payments that you made that are represented in the
19   checks that are Exhibit Carter 003, do you know if
20   those payments were for the Aranesp or for something
21   else like the office visits or maybe it could have
22   been both?
0130
1            MR. LEVY:  Objection.

2    A.  I don't know how they break them down.
3    Q.  (By Mr. Barley)  And the first one was for
4  $408.  Do you see that?
5    A.  Yes.
6    Q.  Do you know what that payment was for?
7    A.  Not specifically.
8    Q.  Let's turn to the next one, which is -- is
9  this a December 22nd, 2004, check?
10    A.  Yes.
11    Q.  This is Carter 0288 Bates stamp number?
12    A.  Yes.
13    Q.  And that's in the amount of $50.  Do you
14  see that?
15    A.  Yes.
16    Q.  Do you know what that payment was for?
17    A.  Just paying on the bill.
18    Q.  All right.  Do you know if that payment
19  was for Aranesp?
20    A.  No, I don't.
21    Q.  Do you know if that payment -- if it was
22  for Aranesp -- was based on AWP?
0131
1        MR. LEVY:  Objection.
2    A.  I don't know.
3    Q.  (By Mr. Barley)  If you could turn to the
4  prior one, the $408 one.  I'll ask you the same
5  question, Mr. Carter.  Do you know if that payment
6  was for Aranesp?
7    A.  No, I don't know.
8    Q.  And if it was, do you know if the payment
9  was based upon AWP?
10        MR. LEVY:  Objection.
11    A.  No, I don't know.
12    Q.  (By Mr. Barley)  If you would turn to the
13  next page, which is Carter 0289.  Do you see that,
14  Mr. Carter?
15    A.  Okay.
16    Q.  And this looks to be dated February 1st,
17  2005, a check from you to Southwest Regional Cancer
18  Center --
19    A.  Yes.
20    Q.  -- in the amount of $50.  Do you see that?
21    A.  Yes.
22    Q.  Did you start your payment program with
0132
1  the Southwest Regional Cancer Center at $50 and then
2  go to $100?  Is that what happened?  Because these
3  first two checks are for $50.
4    A.  We hadn't set up a plan yet.
5    Q.  I see.
6    A.  I was just paying this when I went into
7  the --
8    Q.  Paying what you could afford to pay at
9  that time?

10    A.  Yeah.

11    Q.  All right.  And it wasn't set up on a

12  monthly basis because the first one is in December -

13  - or the first $50 dollar one is in December and the

14  next one is in February; is that right?

15        MR. LEVY:  Objection.

16    A.  Right.

17    Q.  (By Mr. Barley)  Is that correct?

18    A.  December, yes.

19    Q.  So you were paying what you could pay and

20  you could pay these two $50 payments.  Did there

21  come a time when you actually sat down with the

22  people from Southwest Regional Cancer Center and

0133

1  came to an agreement that you begin to pay a hundred

2  dollars a month?

3        MR. LEVY:  Objection.

4    A.  Yes.

5    Q.  (By Mr. Barley)  Or is that something you

6  were just paying what you could pay?

7        MR. LEVY:  Objection.

8    A.  I agreed to pay a hundred dollars since I

9  was getting behind.

10    Q.  (By Mr. Barley)  I see.  All right.

11    A.  Too far behind.

12    Q.  Let's talk about this February 1st, 2005,

13  check in the amount of $50 that's Carter 0289.  Do

14  you see that?

15    A.  Yes.

16    Q.  Do you know if that check -- any of that

17  $50 went to pay for Aranesp?

18    A.  I don't know.

19    Q.  And do you know if it did whether that

20  would have been based on AWP or not?

21        MR. LEVY:  Objection.

22    A.  I don't know.

0134

1    Q.  (By Mr. Barley)  Turn to the next one, Mr.

2  Carter, which I believe is -- what's the next

3  document number?

4    A.  0290.

5    Q.  90.  Thank you for helping me out.  I

6  appreciate it.

7        And that is a check in the amount of --

8  I'm missing mine in my packet.  Do you mind if I

9  lean over you?  I apologize.  It's a check in the

10  amount of a hundred dollars dated July 5th, 2005, to

11  Southwest Regional Cancer Center?

12    A.  Yes.

13    Q.  Is that when you believe that you entered

14  into this agreement with Southwest Regional Cancer

15  Center to pay a hundred dollars a month?

16        MR. LEVY:  Objection.

17    A.  Yes, I think so.

18     Q.  (By Mr. Barley)  And do you know if that
19  payment was for Aranesp?
20     A.  I think that was all that was on it for
21  that.
22     Q.  Have you gone back and looked at what you
0135
1  were billed and compared it to what you were paying
2  to make that determination?
3        MR. LEVY:  Objection.
4     A.  No.
5     Q.  (By Mr. Barley)  All right.
6     A.  But I wasn't taking anything else.  That's
7  why I'm saying this.
8     Q.  You were taking Lupron sometimes, right?
9     A.  No, not right then, I don't believe.
10     Q.  Do you know what bill this was being used
11  -- this was paying for?  In other words, you wrote
12  the check in July of 2005.  Was it for an office
13  visit in 2005 or was it for an earlier office visit?
14     A.  I was behind.  It could easily have been
15  for an earlier visit because I was getting behind on
16  my payments.
17     Q.  And do you know if -- but you can't say
18  what particular visit it would be for?
19     A.  No.
20     Q.  All right.  And then I guess you can't say
21  then for certain whether it would have been for
22  Aranesp?
0136
1        MR. LEVY:  Objection.
2     A.  I would think that was all I was having
3  then. I don't think I was doing Lupron then.  Was I?
4     Q.  (By Mr. Barley)  Do you know if part of it
5  was for an office visit?
6     A.  Oh, I see what you're saying.
7     Q.  Right.
8     A.  I don't know.
9     Q.  So you don't know whether that was all or
10  part for Aranesp or --
11     A.  I don't know how they broke it down.
12     Q.  Very well.  Thanks.  Turn to the next
13  check, which is Carter 0291.
14     A.  Yes.
15     Q.  And that's in the amount of $50 dated
16  April 12th, 2005.
17     A.  Yes.
18     Q.  And do you know if this check went to go
19  pay for Aranesp?
20     A.  I don't know.
21     Q.  And if it was for Aranesp, do you know
22  whether that payment would have been based on the
0137
1  AWP?
2     A.  I don't know.

3     Q.  All right.  Why don't we look at Carter
4  0292. And this is a check in the amount of $100 to
5  Southwest Regional Cancer Center for August 2005.
6  Do you see that?
7     A.  Yes.
8     Q.  And do you know if that check was paying -
9  - strike that.
10        Do you know if this payment was for
11  Aranesp?
12     A.  No, I don't.
13     Q.  And if it was for Aranesp, do you know if
14  that was based on the AWP?
15        MR. LEVY:  Objection.
16     A.  No, I don't.
17     Q.  (By Mr. Barley)  Let's look at the next
18  one, which is Carter 0293.  Do you see that, Mr.
19  Carter?
20     A.  Yes.
21     Q.  And that is a check from your bank account
22  dated September 7, 2005.  Do you see that?
0138
1     A.  Yes.
2     Q.  And it is to Southwest Regional Cancer
3  Center in the amount of $100?
4     A.  Yes.
5     Q.  And do you know if that payment went to
6  pay for Aranesp?
7     A.  I don't know.
8     Q.  And do you know if so, whether that
9  payment would have been based on AWP or not?
10        MR. LEVY:  Objection.
11     A.  No, I don't know.
12     Q.  (By Mr. Barley)  I'm sorry.  Let me strike
13  that.
14        If so, do you know if that payment would
15  have gone to pay for the drug based on it being
16  billed on AWP?
17        MR. LEVY:  Objection.
18     A.  I don't know.
19     Q.  (By Mr. Barley)  I think 094 we don't
20  have; is that right?  So the next one is 095?
21     A.  I've got 295.
22     Q.  And this is a check in the amount of $100
0139
1  and it looks like it's dated March 1st, 2005.  Do
2  you see that?
3     A.  Yes.
4     Q.  All right.  And that's to Southwest
5  Regional Cancer Center?
6     A.  Yes.
7     Q.  And this might have been earlier than the
8  one in July, I think, where you said you started
9  your $100 payments.  Do you know if this is when
10  your $100 payments began?

11      A.   That could be.  I know I had a
12   conversation with the lady in the office.  I don't
13   know what date it was.
14      Q.   Do you know who you dealt with there?  Do
15   you know what the lady's name was?
16      A.   They call her Bambi.
17      Q.   That makes it easy to remember.
18      A.   Yeah.
19      Q.   That's who you deal with on your billing
20   and paying?
21      A.   Yes.
22      Q.   Now, do you know if this payment reflected
0140
1    in this check that is on Carter 0295 went to pay for
2    Aranesp?
3           MR. LEVY:  Objection.
4      A.   I wouldn't know.  I don't know.
5      Q.   (By Mr. Barley)  And if it did, you
6    wouldn't know whether that charge was based on AWP?
7           MR. LEVY:  Objection.
8      A.   No.
9      Q.   (By Mr. Barley)  Finally, I think the last
10   one is Carter 0296.  Do you see that, Mr. Carter?
11      A.   Yes, sir.
12      Q.   And that is a check from your bank account
13   to Southwest Regional Cancer Center in June of 2005
14   in the amount of $100; is that right?
15      A.   Right.
16      Q.   And do you know whether that check went to
17   go pay for Aranesp?
18           MR. LEVY:  Objection.
19      A.   No, I don't.
20      Q.   (By Mr. Barley)  And if so, do you know if
21   it was based on Aranesp being billed based on AWP?
22           MR. LEVY:  Objection.
0141
1      A.   No, sir.
2      Q.   (By Mr. Barley)  Mr. Carter, do you think
3    that your doctor owes you an obligation to tell you
4    that reimbursement for a drug may also cover some
5    overhead costs?
6           MR. LEVY:  Objection.
7      A.   No, I don't think so.
8      Q.   (By Mr. Barley)  Do you think your doctor
9    is obligated to tell you if they make a profit off
10   of administering a drug to you?
11           MR. LEVY:  Objection.
12      A.   No, I don't think so.
13      Q.   (By Mr. Barley)  Do you know in your
14   particular situation whether your doctor ended up
15   being reimbursed the same, more, or less than they
16   paid for Aranesp?
17           MR. LEVY:  Objection.
18      A.   I have no way of knowing.

19        MR. BARLEY:  Is your objection because it
20  was compound?
21        MR. LEVY:  My objection is because you're
22  asking for the knowledge of somebody else, which is
0142
1  speculation and --
2        MR. BARLEY:  I was just --
3        MR. LEVY:  -- foundational issues and
4  there's a compound nature to the question.
5        MR. BARLEY:  Well, I was going to ask if
6  it was compound, I can ask three if you prefer.
7     Q.  (By Mr. Barley)  Do you know if your
8  doctor -- with respect to Aranesp, do you know if
9  your doctor paid the same amount for Aranesp that
10  they collected for administering the Aranesp?
11        MR. LEVY:  Objection.
12    A.  I wouldn't know.
13    Q.  (By Mr. Barley)  Do you know if your
14  doctor was paid more by you and Medicare and any
15  insurer than they actually paid for Aranesp?
16        MR. LEVY:  Objection.
17    A.  I don't know.
18    Q.  (By Mr. Barley)  Do you know if your
19  doctor actually received less in reimbursement from
20  Medicare and you and maybe your insurer than the
21  doctor paid for Aranesp?
22        MR. LEVY:  Objection.
0143
1     A.  I don't know.
2     Q.  (By Mr. Barley)  So do you think your
3  doctors overcharged you for Aranesp?
4         MR. LEVY:  Objection.
5     A.  I don't know who to blame.
6     Q.  (By Mr. Barley)  Well, I understand you
7  think you're paying too much.  Do you think the drug
8  is too expensive?
9     A.  Yes.
10    Q.  But do you think you're being overcharged?
11    A.  Yes, that's what I think.
12    Q.  Because it's too expensive?
13    A.  Partly.
14    Q.  What's the other part?
15    A.  I think -- I don't think it costs them
16  near as much as they are charging for.
17    Q.  But you don't know?
18    A.  I don't know.
19        MR. LEVY:  Objection.
20    A.  I've got a chart at home I can look at.
21        MR. BARLEY:  Let me take a minute to look
22  over my notes.  I may be finished.  We can either go
0144
1  off the record or stay on.  Either one is fine with
2  me.
3         MR. LEVY:  Your preference.

4        MR. BARLEY: Okay. We'll just stay on
5    because I think it will just take me a minute.
6        Q.  (By Mr. Barley)  Other than the documents
7    you've provided to your attorneys, do you know of
8    any other documents that might be relevant to this
9    case?
10       A.  No.
11       Q.  Do you know the amount of overhead --
12   strike that.
13           Do you know what the cost of your doctor's
14   overhead is for administering, storing, and
15   providing you with Aranesp?
16       MR. LEVY:  Objection.
17       A.  No.
18       MR. BARLEY:  Let's mark this as Exhibit
19   Carter 004.
20           (Exhibit Carter 004 marked)
21       Q.  (By Mr. Barley)  Mr. Carter, I'm going to
22   show you what I've had marked as Deposition Exhibit
0145
1    Carter 004, which is Bates stamped Carter 0326
2    through Carter 0339. I want you to take a look at
3    that and your attorney can take a look at that. You
4    tell me when you've had a chance to look at it and
5    you're ready to answer a couple of questions.
6        A.  Okay. I think --
7        MR. LEVY:  He hasn't asked you a question.
8    All he's asked you is to take a look at it.  You
9    don't need to answer anything yet.
10       THE WITNESS:  Yes.
11       Q.  (By Mr. Barley)  Do you recognize that
12   document?
13       A.  I don't know what it is.
14       Q.  You've never seen it before?
15       A.  No.
16       MR. BARLEY:  All right.  That's all the
17   questions I have for the moment.  I reserve the
18   right to keep the deposition open.  I know you'll
19   object to it.
20       MR. LEVY:  We strongly object.  We
21   consider the deposition closed after today.
22       MR. BARLEY:  I understand.
0146
1        MR. LEVY:  Okay.
2        MR. BARLEY:  But there are third party
3    documents we haven't received, including some that I
4    thought I had yesterday but your counsel or your
5    firm had asked to get back -- I think they were
6    Sterling Insurance Company -- to review, which I
7    wasn't able to get because I was already on the
8    plane.
9        MR. LEVY:  We obviously didn't have them
10   either.
11       MR. BARLEY:  Right.  I don't want to get

12  into a banter about that.  But I'll just reserve my
13  right and I may not choose to pursue that.
14        MR. LEVY:  I'm just stating -- our
15  position is clear as well.  We consider it closed
16  after today.
17        MR. BARLEY:  I absolutely understand your
18  position.
19        THE WITNESS:  I don't understand this.
20        MR. LEVY:  That's okay.  He hasn't asked
21  you any questions about it, so --
22        MR. BARLEY:  Does anyone else have
0147
1  questions on the defense side?
2        MR. MURRAY:  Nothing here.
3        MR. BARLEY:  Adam, do you have any
4  questions?
5        MR. LEVY:  I have no questions for this
6  witness as well.
7        MR. BARLEY:  Do you want to instruct him
8  about whether to read and sign or waive?
9        MR. LEVY:  We reserve the right to read
10  and sign and we would also like to designate the
11  deposition as highly confidential.
12        MR. BARLEY:  Including exhibits?
13        MR. LEVY:  Including exhibits.  It's the
14  entirety.
15        MR. BARLEY:  Great.  Okay.
16        Mr. Carter, thank you very much for your
17  patience.  I appreciate it.
18        THE WITNESS:  Thank you.
19        THE VIDEOGRAPHER:  We're going off the
20  record.  The time is 1:00 p.m.
21
22
0148
1
2        _____
3              HAROLD CARTER
4
5  Subscribed and sworn to and before me
6  this _____ day of _____, 20_____.
7
8
9  _____
10         Notary Public
11
12
13
14
15
16
17
18
19

```
20
21
22
0149
1          C E R T I F I C A T E
2  STATE OF TEXAS     )
3  COUNTY OF TRAVIS   )
4
5      I, LISA MINISTER, Certified Shorthand Reporter,
6  duly qualified in and for the State of Texas, do hereby
7  certify that, pursuant to the agreement hereinbefore set
8  forth, there came before me HAROLD CARTER, who was by me
9  duly sworn to testify the truth, the whole truth, and
10 nothing but the truth of his knowledge concerning the
11 matters in controversy in this case; and that he was
12 thereupon carefully examined upon his oath and his
13 examination reduced to typewriting by me or under my
14 supervision; that the deposition is a true record of the
15 testimony given by the witness before me pursuant to the
16 agreement of the parties.
17     That the amount of time used by each party at the
18 deposition is as follows:
19   Mr. Steven Barley - 2 hours and 24 minutes
20     That pursuant to information given to the
21 deposition officer at the time said testimony was taken,
22 the following includes counsel for all parties of
0150
1  record:
2    Mr. Adam S. Levy and Mr. William J. Molinari, III,
3  Attorneys for Plaintiffs
4    Mr. Steven F. Barley, Attorney for Defendant Amgen
5    Mr. Brian Murray, Attorney for Defendant Abbott
6  Laboratories
7    Mr. Andrew C. Bernasconi and Mr. Daniel Z. Herbst,
8  Attorneys for Defendant Fujisawa
9    I further certify that I am neither attorney nor
10 counsel for nor related to or employed by any of the
11 parties to the action in which this deposition is
12 taken, and further that I am not a relative or employee
13 of any attorney or counsel employed by the parties
14 hereto or financially interested in the action.
15     In witness whereof, I have hereunto set my hand and
16 affixed my seal this 27th of March, 2006.
17
18
19     _____
20     LISA MINISTER, Texas CSR 4459
21     Expiration Date: 12-31-2007
22
```