# EXHIBIT D

0001
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF MASSACHUSETTS
3               ---O0O---
4 -------------------------------------x
5 In re:  PHARMACEUTICAL INDUSTRY     ) MDL DOCKET NO.
6 AVERAGE WHOLESALE PRICE LITIGATION   ) CIVIL ACTION
7 _____) 01CV12257-PBS
8 THIS DOCUMENT RELATES TO:        )
9 ALL ACTIONS                )
10 -------------------------------------x
11      HIGHLY CONFIDENTIAL DEPOSITION OF ROGER CLARK
12           Show Low, Arizona
13           March 30, 2006
14             11:08 a.m.
15
16 Deposition of ROGER CLARK commenced at 11:08 a.m. on
17 March 30, 2006, at Show Low, Arizona, before Deborah
18 L. Moreash, RPR, Certified Shorthand Reporter #50294.
19
20 PREPARED BY: DEBORAH L. MOREASH, RPR
21 AZ Certified Court Reporter No. 50294
22               * * *
0002
1 APPEARANCES:
2
3     For Plaintiffs:
4        JENNINGS, HAUG & CUNNINGHAM, LLP
5        BY:  Larry J. Crown, Esq.
6        2800 North Central Avenue, Suite 1800
7        Phoenix, Arizona  85004
8
9     For Baxter:
10        DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
11        BY:  Eden M. Heard, Esq.
12        2101 L Street, NW
13        Washington, DC 20037
14          (Appeared Telephonically)
15
16     BOWMAN & BROOKE LLP
17        BY:  Curtis M. Bergen, Esq.
18        2901 North Central Avenue, Suite 1600
19        Phoenix, Arizona  85012
20
21
22   (CONTINUED)
0003
1 APPEARANCES:  (CONTINUED)
2
3     For Aventis:
4        SHOOK, HARDY & BACON LLP
5        BY:  Brian G. Fedotin, Esq.
6        2555 Grand Boulevard

```
 7          Kansas City, Missouri 64108
 8
 9      For Amgen:
10          HOGAN & HARTSON LLP
11          BY:  Kelleen McGinnis Scott, Esq.
12          555 Thirteenth Street, NW
13          Washington, DC 20004
14              (Appeared Telephonically)
15
16      For Watson Pharmaceuticals:
17          HYMAN, PHELPS & McNAMARA PC
18          BY:  Douglas B. Farquhar, Esq.
19          700 Thirteenth Street, NW, Suite 1200
20          Washington, DC 20005
21              (Appeared Telephonically)
22   (CONTINUED)
0004
 1  APPEARANCES:  (CONTINUED)
 2
 3      For GSK:
 4          COVINGTON & BURLING
 5          BY:  Harry B. Roback, Esq.
 6          1201 Pennsylvania Avenue, NW
 7          Washington, DC  20004
 8              (Appeared Telephonically)
 9
10      For Abbott:
11          JONES DAY
12          BY:  J. Ryan Mitchell, Esq.
13          77 West Wacker Drive
14          Chicago, Illinois  60601
15              (Appeared Telephonically)
16
17      For Johnson & Johnson:
18          PATTERSON BELKNAP WEBB & TYLER LLP
19          BY:  Niraj J. Parekh, Esq.
20          1133 Avenue of the Americas
21          New York, New York  10036
22              (Appeared Telephonically)
0005
 1  APPEARANCES:  (CONTINUED)
 2
 3      For Sicor:
 4          SONNENSCHEIN NATH & ROSENTHAL LLP
 5          BY:  Preston L. Pugh, Esq.
 6          7800 Sears Tower
 7          233 South Wacker Drive
 8          Chicago, Illinois  60606
 9              (Appeared Telephonically)
10
11      For Bayer:
12          SIDLEY AUSTIN LLP
13          BY:  Jaime L.M. Jones, Esq.
14          10 South Dearborn Street, 48th Floor
```

15    Chicago, Illinois  60603
16       (Appeared Telephonically)
17
18
19
20
21
22
0006
1                I N D E X
2  EXAMINATION BY                    PAGE

3   MS. HEARD.................................... 007
4   MR. FEDOTIN................................ 128
5   MR. FARQUHAR.............................. 174
6   MR. PUGH..................................... 182
7   MS. SCOTT.................................... 184
8   MR. MITCHELL................................ 190
9   MR. CROWN................................... 191

10
11
12           E X H I B I T S
13  NUMBER           DESCRIPTION                    PAGE

14  Exhibit Clark 001, 001534-16 97978 V1 to
15            001534-16 97978 V1............ 021
16  Exhibit Clark 002, CLARK 0028 to CLARK 0055...... 092
17  Exhibit Clark 003, CLARK 0082................... 096
18  Exhibit Clark 004, CLARK 0247 to CLARK 0253...... 098
19  Exhibit Clark 005, CLARK 0158 to CLARK 0160...... 106
20  Exhibit Clark 006, CLARK 0284 to CLARK 0288...... 175

21
22
0007
1                 Show Low, Arizona
2                 March 30, 2006
3                  11:08 a.m.
4
5           ROGER CLARK,
6  called as a witness herein, having been first duly
7  sworn, upon his oath, was examined and testified as
8  follows:
9
10          E X A M I N A T I O N
11  BY MS. HEARD:
12     Q.  Hello, Mr. Roger Clark, how are you?
13     A.  Good, how are you?
14     Q.  Fine, thank you.  I'm Eden Heard, I'm
15  representing Baxter today.  I'm from the law firm of
16  Dickstein, Shapiro, Morin, Oshinsky.  I'd like to
17  start by designating the deposition transcript as
18  highly confidential pursuant to the protective order
19  that's in place in this litigation.
20         Mr. Clark, can you please state your full
21  name for the record?
22     A.  Roger Lamar Clark.

0008
1     Q.  Have you ever been deposed before?
2     A.  No.
3     Q.  Okay.  I'm going to start by going over
4  some of the ground rules for a deposition, and feel
5  free to let me know if you have any questions.  The
6  most important thing is that you know you're under
7  oath today; do you understand what that means?
8     A.  Yes.
9     Q.  I would also emphasize that you should
10  only give verbal responses because the court
11  reporter can't take down for example a nod or a
12  gesture.  If any of my questions are unclear, please
13  feel free to ask me to restate them.
14     A.  Okay.
15     Q.  And I would also ask, just because there
16  might be a slight delay with the speaker phones,
17  that you try to let me finish as best you can before
18  you answer the question, and that will allow the
19  court reporter time to take down both the question
20  and the response, and I in turn will do the same.
21     A.  I'll try and do that.
22     Q.  Thank you.  If at any point you need a
0009
1  break, please let me know and I'll be happy to
2  accommodate you. The only thing I ask is, if we're
3  in the middle of a question, let's try to finish the
4  question before we take a break.
5     A.  That works.
6     Q.  Is there any reason at all that you feel
7  you shouldn't be able to give full and complete
8  testimony today?
9     A.  No.
10     Q.  Okay.  Are you currently under the
11  influence of any medication that might limit or
12  impair your ability to answer truthfully or
13  recollect facts for the deposition?
14     A.  No.
15     Q.  First I'd like to speak about your
16  preparation for the deposition today.  Did you speak
17  with anyone in preparation for the deposition?
18     A.  Yes.
19     Q.  Okay.  With whom did you speak?
20     A.  Larry Crown and Don Haviland.
21     Q.  I'm sorry, did you hear me?
22     A.  Yes, Larry Crown and Don Haviland.
0010
1     Q.  When did you speak with Mr. Crown and Mr.
2  Haviland?
3     A.  Tuesday afternoon.
4     Q.  For how long?
5     A.  Two hours.
6     Q.  Was that over the phone or in person?
7     A.  Don was on the phone and Larry was in

8  person.
9      Q.  Was anyone else present?
10     A.  Just me.
11     Q.  Okay.  Did you speak with anyone other
12  than those two attorneys regarding this deposition?
13     A.  No, I did not.
14     Q.  With regard to documents, did you review
15  any documents in preparation for this deposition?
16     A.  Yes, we did.
17     Q.  Can you describe those documents?
18     A.  Could you repeat that?
19     Q.  Describe those documents.
20     A.  Describe the documents?
21     Q.  Yes, please.
22     A.  We went over the amended number three
0011
1  Complaint, the amended number four Complaint, and
2  the documents that I put together and sent to Kline
3  and Specter.
4      Q.  Do you know if those were the documents
5  that have been produced to the defendants in this
6  case?
7          MR. CROWN:  Eden, I can state they are.
8          MS. HEARD:  Okay.
9          MR. CROWN:  They're the ones that are
10  Bates stamped.
11         MS. HEARD:  Correct, those would be Bates
12  one through 326?
13         MR. CROWN:  Yes.
14     Q.  BY MS. HEARD:  Have you identified or
15  produced any other documents, Mr. Clark?
16     A.  No.
17     Q.  And your attorney has a copy of all of the
18  documents that you have produced or identified in
19  this litigation?
20     A.  Yes.
21     Q.  Okay.  Why don't we start with some
22  background information.  I'm going to ask you a few
0012
1  questions about your residence and things like that.
2      A.  Okay.
3      Q.  What is your current residential address?
4      A.  Physical or mailing?
5      Q.  Let's start with physical.
6      A.  Are you ready?
7      Q.  I'm ready.
8      A.  Number 35 Dutch Mountain Estates, Concho,
9  Arizona, 85924.
10     Q.  I'm sorry, could you say the name of the
11  town again?
12     A.  Concho, C-O-N-C-H-O.
13     Q.  Okay.  And I take it from your initial
14  response that you might also have a mailing address?
15     A.  Correct.

16     Q.   What is that address?
17     A.   H as in house, C as in cat, 30, Box 135,
18  Concho, Arizona, 85924.
19     Q.   How long have you lived at 35 Dutch
20  Mountain Estates?
21     A.   Just about three years.
22     Q.   Where did you live before that?
0013
1      A.   In Indiana.
2      Q.   You've lived in the state of Arizona for
3  three years now?
4      A.   At this time, yes.
5      Q.   Prior to that, did you have any living
6  arrangement for example where you split your time
7  between states or were you living exclusively in
8  Indiana before that?
9      A.   Exclusively in Indiana.
10     Q.   Do you currently maintain any other
11  addresses or residences besides those that you've
12  mentioned?
13     A.   No.
14     Q.   Are you able to retrieve documents from
15  any other locations, perhaps your father's home?
16     A.   Yes.  I guess I would maintain that
17  residence currently.  I don't live there or get any
18  mail there, it's there.
19     Q.   Okay.  What is your date of birth?
20     A.   06/12/1960.
21     Q.   Can you tell me what your educational
22  background is?
0014
1      A.   I have a high school diploma with some
2  college.
3      Q.   Okay.  Do you have a college degree?
4      A.   No, I do not.
5      Q.   Okay.  Where did you attend college?
6      A.   Mesa Community College in Mesa, Arizona.
7      Q.   Any other advanced education?  For
8  example, any advanced degrees?
9      A.   No.
10     Q.   Now I'm going to ask you about your
11  father's background.  Can you provide his
12  residential address?
13     A.   42 Cozy Court, Tonto Basin, Arizona,
14  85534.
15     Q.   Do you know how long he had lived at that
16  address?
17     A.   About 13 years.
18     Q.   Where had he lived before that?
19     A.   In Mesa, Arizona.
20     Q.   How long had he lived in Mesa?
21     A.   20 years, 25 years.
22     Q.   Did your father maintain any other
0015

1  residences?
2     A.  No.
3     Q.  You mentioned previously that you are able
4  to retrieve documents from his address in Tonto
5  Basin?
6     A.  Yes.
7     Q.  Have you conducted any search for
8  documents there?
9     A.  Yes.
10    Q.  Were all the documents, if any, that you
11 identified there provided in the documents we
12 previously referenced as being Bates numbered Clark
13 one through 326?
14    A.  Yes.
15    Q.  What is your father's date of birth?
16    A.  9/5/31, 1931 I believe.
17    Q.  Do you know his educational background?
18    A.  High school diploma.  It might be '36.
19       MR. CROWN:  Do you want to clarify your
20 answer?
21       THE WITNESS:  Yeah, my dad's birthday is
22 09/05/1936.
0016
1     Q.  BY MS. HEARD:  Thank you.  And can you
2  tell me a little bit about your father's employment
3  history?  Was he retired?  Well, first of all, let's
4  strike that.  When did your father pass away?
5     A.  November 5th, 2005.
6     Q.  Are you okay with me referring throughout
7  this deposition to David Clark as your father?
8     A.  Yes.
9     Q.  Okay, great.  Had your father retired or
10 was he still working when he passed away?
11    A.  He had retired.
12    Q.  When did he retire?
13    A.  When he was 59 and a half years old,
14 however far back that was.
15    Q.  Okay.  Did he continue to work in any
16 capacity after his retirement?
17    A.  Just around his house.
18    Q.  Okay, fair enough.  Did he ever work for
19 federal, state, or local government?
20    A.  Can I ask her to clarify that?
21       MR. CROWN:  Yes.
22       THE WITNESS:  He worked for the Operating
0017
1  Engineers and they did work for federal, state, and
2  city governments.
3     Q.  BY MS. HEARD:  Is Operating Engineers a
4  union?
5     A.  Yes.
6     Q.  Is there a local union number there?
7     A.  There is, but I don't know it off the top
8  of my head.

9      Q.   How long did he work for the Operating
10  Engineers?
11      A.   Thirty-five plus years.
12      Q.   What did he do for them?
13      A.   Everything from operating equipment to
14  being a supervisor.
15      Q.   Did he have a particular title at the time
16  he retired?
17      A.   I wouldn't know what it was.
18      Q.   Okay.  But he changed positions with them
19  over the course of his 35 years with the Operating
20  Engineers?
21      A.   He did a lot of various things.
22      Q.   Okay.  Do you know if he had any other
0018
1   sources of income over the last 20 years or so
2   besides his income from his job at the Operating
3   Engineers?
4      A.   He might have had some rental income from
5   some trailer court lots he owned, but that's all I
6   know about.
7      Q.   Did he receive any kind of pension?
8      A.   Yes, he did.
9      Q.   And he started to receive that upon his
10  retirement?
11      A.   I believe so.
12      Q.   How long was your father married?
13      A.   Over 20 years.
14      Q.   Was his wife alive at the time of his
15  death?
16      A.   No.
17      Q.   And I presume that this is your mother?
18      A.   You presume wrong.
19      Q.   So he was married to his wife for about 20
20  years?
21      A.   Yes.
22      Q.   And he was married before that?
0019
1      A.   Yes.
2      Q.   Okay.  Do you know a time frame or number
3   of years for the prior marriage?
4      A.   No.
5      Q.   Okay.  Do you have any siblings?
6      A.   Yes, I do.
7      Q.   Can you tell me how many?
8      A.   One.
9      Q.   Is it a brother or sister?
10      A.   Sister.
11      Q.   How old is she?
12      A.   47.
13      Q.   Does she live in Arizona?
14      A.   Yes, she does.
15      Q.   Do you know how long she's lived in
16  Arizona?

17   A.   47 years.
18   Q.   Do you know where she lives?
19   A.   Yes, I do.
20   Q.   Can you tell me?
21   A.   Springerville, Arizona.
22   Q.   Do you know how long she's lived in that
0020
1   town?
2   A.   47 years.
3   Q.   Okay.  Now, I know you said your father
4   did a number of tasks for Operating Engineers, but
5   am I correct that you said you could not recall a
6   title or a job description for him?
7   A.   He was everything from an operator to a
8   supervisor, foreman, you know, that entails being a
9   blade operator, loader operator, cat operator.
10   Q.   Okay, you anticipated my question.  Were
11   all of his job functions related to road
12   construction?
13   A.   No.
14   Q.   Do you know what his other job functions
15   related to, what kind of work?
16   A.   They installed pipe, sewers, all kinds of
17   construction.
18   Q.   Okay.  During his time with the Operating
19   Engineers, did your father have health insurance
20   provided through the Operating Engineers?
21   A.   Could you restate that question?
22   Q.   Sure.  Did your father have employer-
0021
1   provided health insurance?
2   A.   Yes.
3   Q.   Do you know the name of that insurance
4   company?
5   A.   Not right off the top of my head.  It's in
6   there.  It's in the Complaint.
7   Q.   I'm sorry, could you state that again?
8        MR. CROWN:  He said it's in the Complaint.
9   Is he able to refer to the Fourth Amended Complaint?
10        MS. HEARD:  Sure.
11        MR. CROWN:  Okay.  So for the record, I'm
12   showing Mr. Clark paragraph 17 of the Fourth Amended
13   Complaint, that's on page seven, and I'm asking him
14   to review that to answer your question.
15        MS. HEARD:  I'd like to introduce the
16   Fourth Amended Master Consolidated Class Action
17   Complaint as an Exhibit, Exhibit Clark 001 at this
18   time.
19        MR. CROWN:  Okay.
20        MS. HEARD:  And I'd like that marked
21   highly confidential.
22             (Exhibit Clark 001 marked.)
0022
1   Q.   BY MS. HEARD:  Mr. Clark, did your father

2  have any employer-provided health insurance at any
3  time through his spouse?
4      A.  Not that I'm aware of.
5          MR. CROWN:  Did he answer your other
6  question? I don't think we have a name yet of the
7  insurance company, so you had a pending question
8  that prompted me to show him the Fourth Amended
9  Complaint.  You should probably tell us for the
10  record what his health insurance company was named.
11         MS. HEARD:  Thank you.
12         THE WITNESS:  Operating Engineers,
13  American Benefit Plan.
14     Q.   BY MS. HEARD:  Okay, and you answered my
15  next question, I'm going to come back to health
16  insurance shortly.  I want to ask you some questions
17  first though about your father's diagnosis and
18  relationship with his doctors.  Can you tell me when
19  your father was diagnosed with prostate cancer?
20     A.  Back in 2001, I don't know the exact day
21  or month or whatever.
22     Q.  When was your father diagnosed with brain
0023
1  cancer?
2      A.  August of 2005.
3      Q.  Who made the prostate cancer diagnosis?
4      A.  Some doctor in Payson.
5      Q.  I'm sorry, a doctor where?
6      A.  In Payson, Arizona.
7      Q.  Is that P-A-Y-S-O-N?
8      A.  Correct.
9      Q.  You don't remember the doctor's name?
10     A.  No, not right off the top of my head.
11     Q.  Who made the brain cancer diagnosis?
12     A.  He had an MRI in Payson and they saw the
13  mass there, and then he went to Mayo Clinic from
14  there.
15     Q.  Do you remember when he first started
16  treatment at the Mayo Clinic?
17     A.  It would have been in August of 2005.
18         MR. CROWN:  I assume your question was to
19  the brain cancer?
20         THE WITNESS:  To the brain cancer.
21     Q.  BY MS. HEARD:  I'm sorry, could you repeat
22  that?
0024
1      A.  I said for the brain cancer in August of
2  2005.
3      Q.  Started treatment at the Mayo Clinic?
4      A.  Yes.
5      Q.  Okay.  And was your father treated at the
6  Mayo Clinic at all for his prostate cancer?
7      A.  Yes, he was.
8      Q.  Do you know when that treatment began?
9      A.  Well, I'm wrong on that because he had

10 prostate surgery in Payson, but he went to the Mayo
11 after Payson in 2002.
12     Q.  So your father went to the Mayo Clinic for
13 treatment of his prostate cancer in 2002?
14     A.  Well, it really wasn't prostate cancer, it
15 was bladder.
16     Q.  It was bladder cancer?
17     A.  Yes, they didn't get it all in Payson.
18     Q.  And so at that point he began treatment at
19 Mayo in 2002 for the bladder cancer?
20     A.  Yes.
21     Q.  Okay, and do you know when he completed
22 his treatment for the bladder cancer?
0025
1     A.  It was kind of an ongoing thing because he
2 had six-month and three-month checkups, so it was
3 ongoing.
4     Q.  Well, I'll state the question differently.
5 Do you know if his treatment for the prostate cancer
6 overlapped with his treatment for the brain cancer
7 or was there a time period in between the two
8 cancers where he was not receiving any cancer
9 treatment?
10     A.  There was a time --
11         MR. CROWN:  Let me object to the form.
12 You can answer the question, I'm just going to
13 object to the form and foundation.  Go ahead.
14         THE WITNESS:  There was a time period
15 between.
16     Q.  BY MS. HEARD:  Okay.  Do you remember
17 approximately what that time period was?
18     A.  Approximately two years.
19     Q.  Well, you previously testified that your
20 father began treatment at the Mayo Clinic in August
21 2005; is that correct?
22     A.  For his brain cancer.
0026
1     Q.  I'm sorry, you're correct, for brain
2 cancer.  And so am I correct that, if there was a
3 two-year break in treatment, that he probably
4 stopped receiving treatment at the Mayo Clinic for
5 bladder cancer sometime around August 2003?
6     A.  Yeah, I'm going to say that's correct.
7     Q.  Do you know if your father received
8 treatment for his bladder cancer anywhere other than
9 Mayo?  You mentioned Payson but you didn't name the
10 facility.
11     A.  He had surgery at Payson Regional Medical
12 Center or whatever it's called down there.
13     Q.  Do you know the date for the surgery?
14     A.  Not right off the top of my head.
15     Q.  Did he receive treatment anywhere other
16 than the Mayo Clinic for his brain cancer?
17     A.  No, he did not.

18     Q.   With regard to his treatment at the Mayo
19   Clinic, was he treated only at the Mayo Clinic in
20   Scottsdale or was he treated in other locations for
21   the Mayo Clinic as well?
22     A.   There was a couple times that we had to go
0027
1   to the Mayo Hospital to receive his chemotherapy on
2   the weekends.
3     Q.   Is that the Mayo Hospital located in
4   Phoenix, Arizona?
5     A.   It's all the same to me, so I don't know.
6     Q.   Okay.  Do you know how your father found
7   the doctors that treated him?
8     A.   They were the doctors that had treated him
9   previously down there.
10     Q.   When you say previously, are you referring
11   to the bladder cancer?
12     A.   Yes.
13     Q.   How did he find them when he was looking
14   for doctors for treatment for the bladder cancer?
15     A.   He just went to Mayo Clinic and that's who
16   he was given.
17     Q.   Do you remember the name of his
18   physicians?
19     A.   Not right off the top of my head.
20     Q.   So are your father's doctors located at
21   any facilities other than Mayo Clinic?
22     A.   Not that I'm aware of.
0028
1     Q.   You're not aware of any private offices
2   for example where your father might have been
3   treated?
4     A.   No.
5     Q.   Mr. Clark, are you familiar with Medicare
6   Part B?
7     A.   A little bit.
8     Q.   Before I ask my next question, I'm going
9   to use the term provider and I'm going to use that
10   as a shorthand for anyone that provides medical
11   services, such as a doctor, nurse, or clinic, or
12   hospital.
13     A.   Okay.
14     Q.   Have you ever tried to negotiate a lower
15   provider charge for any Medicare Part B drugs?
16        MR. FEDOTIN:  You cut out a little bit, I
17   think you might want to re-ask the question.
18        MS. HEARD:  I'll restate it.
19     Q.   Did you understand my description of the
20   word provider?
21     A.   Yes.
22     Q.   Okay.  Well, let's step back for a moment.
0029
1   What is your understanding of Medicare Part B?
2     A.   They cover medications and durable medical

3  equipment, things like that, that the main part of
4  Medicare doesn't cover.
5      Q.  And what do you mean by the main part of
6  Medicare?
7      A.  I guess what I mean by that is what
8  everybody gets when they turn 62 or 65 or whatever
9  it is.
10     Q.  Are you referring to Medicare Part A?
11     A.  I would assume that.
12     Q.  Okay.  Do you know if your father enrolled
13 in Medicare Part A and Medicare Part B?
14     A.  I believe so.
15     Q.  Do you know if your father had in his
16 possession his Medicare card at the time he passed
17 away?
18     A.  Yes, he did.
19     Q.  Do you have that card?
20     A.  Not on my person.
21     Q.  Do you have it somewhere where you might
22 be able to produce it?
0030
1      A.  I believe I have it at my house.
2      Q.  Do you know the difference, Mr. Clark,
3  between inpatient and outpatient treatments and
4  medications?
5      A.  A little bit.
6      Q.  Would you explain your understanding?
7      A.  Inpatient would be at a hospital or say
8  Mayo Clinic, but they also have outpatient where
9  they could do it at the doctor's office or they have
10 outpatient clinics at Mayo Clinic.
11     Q.  Do you know whether Part B covers
12 inpatient and/or outpatient treatment and medicine?
13     A.  I believe it covers both depending on what
14 you're doing or what you're getting.
15     Q.  Okay, and now I'm going to go back to my
16 question about providers.  Do you know if your
17 father ever tried to negotiate a lower provider
18 charge for any Medicare Part B drug that he took?
19     A.  No, I don't believe he did.
20     Q.  Okay.  Do you know if your father was ever
21 prescribed or administered a Medicare Part B drug in
22 one state while he was living in another?
0031
1      A.  No, I do not believe he was.
2      Q.  Mr. Clark, have you ever lived in or
3  visited Massachusetts?
4      A.  I drove through Massachusetts one time.
5      Q.  Okay.  Was that after 1991?
6      A.  I don't recall the exact date.
7      Q.  Okay.  But that's the only contact with
8  Massachusetts in terms of a visit or residing there
9  that you recall?
10     A.  Yes.

11   Q.   Okay.  So did you ever work in
12  Massachusetts?
13     A.   No.
14     Q.   Did you ever own property there?
15     A.   No.
16     Q.   Now, with regard to your father, did your
17  father ever live in or visit Massachusetts?
18     A.   Definitely not.
19     Q.   Did he ever receive medical care there?
20  I'm guessing no from your prior answer?
21     A.   No.
22     Q.   Did he ever purchase medication there?
0032
1    A.   No.
2    Q.   Now I'm going to ask you a few more
3  questions about your father's health insurance.
4    A.   Okay.
5    Q.   You said when your father worked for the
6  Operating Engineers that he was insured through the
7  American Benefit Plan; correct?
8    A.   Correct.
9    Q.   Do you know at the time that he was still
10  working for Operating Engineers, was that his
11  primary insurance?
12     A.   I believe it was.
13     Q.   Do you know the time period in which that
14  was his primary insurance?
15     A.   No, not specifically.
16     Q.   Do you know if he had any other type of
17  insurance at the same time that he had American
18  Benefit Plan insurance as his primary insurance?
19     A.   No, I don't.
20     Q.   Do you know if during the time period in
21  which your father was employed with Operating
22  Engineers if he was provided with insurance by any
0033
1  other company other than American Benefit?
2    A.   No, I don't.
3    Q.   Okay.  Do you know if your father received
4  Social Security benefits?
5    A.   Yes, he did.
6    Q.   Did he have disability insurance?
7    A.   I don't believe he did.
8    Q.   Did your father ever receive any veterans
9  benefits?
10     A.   Not that I'm aware of.
11     Q.   Was your father eligible for Medicaid?
12     A.   I don't know.
13     Q.   Did he ever receive any Medicaid coverage?
14     A.   Not that I'm aware of.
15     Q.   Was your father eligible for Medicare?
16     A.   Yes.
17     Q.   Did you previously testify that you
18  thought he had Medicare A and B coverage for both

19  parts?
20      A.  I believe he does, or did.
21      Q.  Did your father have any other health
22  insurance at the same time that he was enrolled in
0034
1  Medicare?
2      A.  His American Benefit options, the
3  Operating Engineers insurance.
4      Q.  Was that his supplemental insurer?
5      A.  I believe that's what they were.
6      Q.  Do you know when your father's coverage
7  with American Benefit Administrators, I'm probably
8  getting that name wrong, with American Benefit Plan,
9  do you know when that switched from being his
10  primary insurance to his supplemental insurance?
11      A.  I believe it was when he -- either at 62,
12  well, I think at 65, when he started getting
13  Medicare.
14      Q.  Okay.  Can you describe the terms of the
15  coverage that your father had with American Benefit?
16      A.  No.
17      Q.  Do you know if he paid a premium for, I'm
18  going to refer to it going forward as his
19  supplemental insurance if that's okay with you?
20      A.  Okay.
21      Q.  Do you know if your father paid a premium
22  for his supplemental insurance?
0035
1      A.  I believe he did.
2      Q.  Do you know what that premium was?
3      A.  Not right off the top of my head.  They
4  took it out of what little retirement he got from
5  them.
6      Q.  Did they take it out of his pension?
7      A.  Yes.
8      Q.  Do you know whether that premium was paid
9  on a monthly or an annual basis?
10      A.  No, I don't.
11      Q.  Do you know if there was a deductible
12  under the supplemental insurance plan?
13      A.  I believe there was.
14      Q.  Do you know how much that was?
15      A.  Not right off the top of my head.
16      Q.  Do you know if there was a percentage or
17  fixed copayment with the supplemental insurance?
18      A.  No, I don't.
19      Q.  Do you know if there was a lifetime cap on
20  your father's supplemental insurance?
21      A.  I don't know that either.
22      Q.  Did your father's supplemental insurance
0036
1  cover prescription medication?
2      A.  I don't know.
3      Q.  Okay.  Is his supplemental insurance part

4  of an employee-sponsored benefit plan?

5      A.  I believe that's what it is.

6      Q.  Can you describe the manner in which your

7  father made payments for medication while he was

8  enrolled in Medicare and when he had the

9  supplemental insurance?

10     A.  Cash.

11     Q.  He made payments in cash?

12     A.  If he had to go buy a prescription, he

13  paid for it in cash.

14     Q.  How do you know that?

15     A.  Most of the time I was with him.

16     Q.  Using cash for prescriptions, did he

17  receive a receipt?

18     A.  Yes, he did.

19     Q.  Do you have those receipts?

20     A.  Probably not.

21     Q.  Do you know where you could find them?

22     A.  I think after he got enough of them

0037

1  together, he sent them in to American Benefit Plan.

2      Q.  And do you know if he retained a copy for

3  his records?

4      A.  I doubt it.

5      Q.  Okay.  When your father received

6  treatment, instead of paying for prescriptions from

7  for example a pharmacy, when he received treatment

8  at a facility, administered at the facility?

9      A.  Please repeat that.

10     Q.  When your father received medications

11  administered at a treatment facility like the Mayo

12  Clinic?

13     A.  Yes.

14     Q.  Do you know how he made payments for

15  medication then?

16     A.  With checks.

17     Q.  Okay.  Do you have those canceled checks?

18     A.  I have copies of those canceled checks.

19     Q.  Have you produced all of those to your

20  counsel?

21     A.  Yes, I have.

22     Q.  How do you know that the checks that you

0038

1  have were for drugs versus services?

2      A.  I can't differentiate between the two;

3  they are all to Mayo Clinic.

4      Q.  So do you believe your father was charged

5  for both medications and services together?

6      A.  Maybe.

7      Q.  Had anyone, any entity or person, paid or

8  helped pay for your father's medical bills,

9  including his prescription medications, during the

10  last 15 years?

11     A.  No.

12     Q.   We spoke previously about your father's
13  enrollment in Medicare Parts A and B.  Do you know
14  if he enrolled in both parts at the same time?
15     A.   I would just assume he did; I don't know
16  for sure.
17     Q.   Do you know when he enrolled in Medicare?
18     A.   Right around when he turned 65.
19     Q.   Was your father enrolled in a Medicare
20  Plus Choice Plan?
21     A.   Don't know.
22     Q.   Do you know what a Medicare Plus Choice
0039
1  Plan is?
2     A.   No.
3     Q.   If I help explain it to you, you might be
4  able to answer the question.  It's when an entity
5  stands on the shoes of Medicare and it gets payment
6  from Medicare and controls the payments to patients.
7  Some examples might be you might have heard of a
8  health maintenance organization like an HMO or a
9  preferred provider organization like a PPO.
10     A.   I don't think he was in that then.
11     Q.   Do you remember how your father enrolled
12  in Medicare?
13     A.   No, I don't.
14     Q.   Do you know if he submitted any kind of
15  application for Medicare?
16     A.   No, I don't.
17     Q.   Did Medicare ever decline your father's
18  coverage?
19     A.   What do you mean by decline?
20     Q.   Did he at any point ever seek to have a
21  drug or service covered by Medicare and receive a
22  notification from Medicare that it would not cover
0040
1  that drug or service?
2     A.   There could have been some stuff like
3  that.
4     Q.   If that did occur, do you know, would you
5  have the records to reflect that, any kind of
6  notification from Medicare for example?
7     A.   No.
8     Q.   Did your father ever drop out of Medicare?
9     A.   No.
10     Q.   Had your father's Medicare coverage ever
11  been terminated or canceled?
12     A.   No.
13     Q.   Did your father pay a yearly contribution
14  or premium to Medicare?
15     A.   Don't know; I don't think so.
16     Q.   Does Medicare have a yearly deductible, to
17  your knowledge?
18     A.   I believe they did.
19     Q.   Do you know the amount of your father's

20  deductible?

21    A.  No, I don't.

22    Q.  Do you know whether his deductible was set

0041

1  on an annual or some other basis?

2    A.  It seemed to me like it was an annual

3  thing.

4    Q.  How did he pay his deductibles?

5    A.  I'm assuming by cash or check.

6    Q.  Do you know which?

7    A.  Could have been both.

8    Q.  Do you have any documents such as receipts

9  or canceled checks reflecting payments of his

10  deductible?

11    A.  Not that I'm aware of.

12    Q.  Mr. Clark, are you familiar with the term

13  copay or copayment?

14    A.  Yes, I am.

15    Q.  What is your understanding of what that

16  term means?

17    A.  It's a percentage that someone's covered,

18  they pay for a doctor visit or a prescription or

19  whatever services they might get.

20    Q.  Is it always a percentage?

21    A.  Well, I'm not going to say it's a

22  percentage, it's just an amount.

0042

1    Q.  Okay.  But do you know if it's a, if it

2  could be a flat amount or a percentage or both?

3    A.  I don't know.

4    Q.  Is there a standard copay with Medicare?

5    A.  Don't know that either.

6    Q.  Okay.  Do you know if your father ever had

7  a copay with Medicare?

8    A.  I want to say 20 percent.

9    Q.  So you believe that Medicare paid the

10  other 80 percent?

11    A.  Yes.

12    Q.  Do you believe this was for drugs or

13  services?

14    A.  Both.

15    Q.  Do you know how your father made this

16  copay?

17    A.  Cash or check.

18    Q.  Do you have any receipts or canceled

19  checks reflecting his copayments?

20    A.  I'm going to assume that it's whatever

21  I've already turned in was part of the copayments.

22    Q.  Okay.  So other than what you've produced,

0043

1  you don't believe you have any other documentation

2  of receipts or canceled checks that your father

3  would have for copayments to Medicare?

4    A.  No.

5    Q.  Mr. Clark, does the copayment correspond
6  to Part A of Medicare or Part B?
7    A.  I don't know.
8    Q.  Do you know how your father obtained his
9  supplemental coverage with American Benefit Plan?
10    A.  I'm assuming from retiring from the
11  Operating Engineers.
12    Q.  Okay.  Did your father consider any other
13  supplemental insurance policies?
14    A.  I didn't hear the question.
15    Q.  Did your father consider any other
16  supplemental insurance policies?
17    A.  Don't know.
18    Q.  You testified earlier that your father was
19  first covered by American Benefit Plan when he
20  started working for the Operating Engineers; is that
21  correct?
22    A.  I'm going to assume that, you know, like
0044
1  anybody or any company, they could have changed
2  insurance 50 times, I'm assuming that.
3    Q.  Was there any period in which your father
4  was not covered by American Benefit Plan during
5  either his employment with Operating Engineers or
6  subsequent to his employment with them?
7    A.  Don't know.
8    Q.  Who paid for his American Benefit Plan
9  coverage?
10    A.  He did, with the premium.
11    Q.  Okay.  Did Operating Engineers make any
12  kind of financial contribution to your father's
13  coverage by American Benefit Plan?
14    A.  I don't know that.
15    Q.  Okay.  Can you describe the coverage your
16  father received from American Benefit Plan?
17    A.  No.
18    Q.  Do you know the type of policy that he had
19  with American Benefit Plan?
20    A.  No.
21    Q.  Okay.  Did your father receive any
22  documentation that detailed or explained the
0045
1  benefits offered by American Benefit Plan?
2    A.  He could have.
3    Q.  Okay.  Do you know for a fact of any such
4  documentation or where it might be?
5    A.  No, I don't.
6    Q.  Do you have a copy of your father's policy
7  with American Benefit Plan?
8    A.  No.
9    Q.  Are you aware of any changes to your
10  father's coverage while he had supplemental
11  insurance from American Benefit Plan?
12    A.  No, I'm not.

13    Q.  Do you know what services were covered by
14  American Benefit Plan?
15    A.  No.
16    Q.  Do you know if his American Benefit Plan
17  coverage covered prescription medications?
18    A.  I couldn't specifically say whether they
19  did or didn't.
20    Q.  Did your father have to make a copayment
21  under his plan with American Benefit?
22    A.  Don't know.

0046
1    Q.  Do you know if American Benefit Plan paid
2  the entire cost of any of your father's
3  prescriptions?
4    A.  No, I don't.
5    Q.  What amount, if any, of the cost of the
6  medication that your father was treated with did
7  your father personally pay?
8    A.  Could you be more specific?
9    Q.  I'll strike that, I'll restate.  You
10  testified so far that your father, that you believe
11  your father paid a 20 percent copay under Medicare?
12    A.  Correct.
13    Q.  You also testified that he had
14  supplemental insurance through American Benefit
15  Plan, that you don't know the terms of the coverage,
16  or if a portion of that 20 percent was paid for by
17  American Benefit Plan; is that correct?
18    A.  Correct.
19    Q.  So is it your understanding that your
20  father paid all of the 20 percent after Medicare
21  covered 80 percent of the cost of his medication?
22       MR. CROWN:  Objection to form.  Go ahead.

0047
1    Q.  BY MS. HEARD:  I'll rephrase it.  Do you
2  believe that your father paid the full 20 percent
3  after his prescription drugs were covered by
4  Medicare?
5       MR. CROWN:  Objection to form.  Go ahead.
6       THE WITNESS:  I don't know.
7    Q.  BY MS. HEARD:  Okay.  Were your father's
8  payments to American Benefit Plan the same
9  regardless of whether or not he was receiving
10  medical care?
11    A.  I believe it was the same amount taken out
12  each month or whenever it was taken out.
13    Q.  When your father paid for prescription
14  drugs, do you know if he ever paid nothing; in other
15  words, was there ever a time where Medicare and his
16  supplemental insurance together covered the entire
17  cost of his medication?
18    A.  I don't know.
19    Q.  Do you know if your father had a
20  deductible for his plan with American Benefit Plan?

21      A.  I couldn't specifically state that he did
22   or didn't.
0048
1       Q.  Mr. Clark, are you aware of any other
2   plans other than the one your father had offered by
3   American Benefit Plan that would have had lower
4   costs associated with them?
5       A.  No, I'm not.
6       Q.  Did your father ever indicate that he had
7   any problems with his supplemental insurance?
8           MR. CROWN:  Objection to form.
9           THE WITNESS:  Not that I'm aware of.
10      Q.  BY MS. HEARD:  Mr. Clark, I'm going to
11   shift gears and ask you some general questions about
12   health care payments in general terms.
13      A.  Okay.
14      Q.  Do you know whether every medical provider
15   charges the same amount for certain types of
16   services?
17      A.  Could you say that again?
18      Q.  Sure.  Do you know whether every medical
19   provider charges the same amount for certain
20   services?
21      A.  No, I don't.
22      Q.  Do you know whether different providers
0049
1   and different insurance companies charge or
2   reimburse different amounts for the same services?
3       A.  No, I don't.
4       Q.  Do you know whether different providers
5   and different insurance companies charge or
6   reimburse different amounts for the same medication?
7       A.  No, I don't.
8       Q.  Do you know how medical service providers
9   determine the amount that they are going to charge
10   for certain services?
11      A.  No, I don't.
12      Q.  Do you know how medical service providers
13   determine the amount that they're going to charge
14   for prescription medication?
15      A.  No.
16      Q.  Do you know how either a primary or
17   secondary insurer determines the amount it will pay
18   for medical services?
19      A.  Say that again.
20      Q.  Do you know how either a primary or
21   secondary insurer determines the amount it will pay
22   for medical services?
0050
1       A.  No, I don't.
2       Q.  Do you know how a primary or secondary
3   insurer determines the amount it will pay for
4   prescription medication?
5       A.  No, I do not.

6      Q.  Mr. Clark, are you familiar with the term
7  average wholesale price?
8      A.  AWP.
9      Q.  Yes.
10     A.  Yes.
11     Q.  Do you know how AWP is calculated?
12     A.  No.
13     Q.  Do you know who calculates AWP?
14     A.  I know what I've read.
15     Q.  Okay.  Can you tell me what you've read
16  about AWP calculations?
17     A.  Yeah, the drug makers decide whatever AWP
18  they want to make and they make it.
19     Q.  Where did you read that?
20     A.  I believe it was in a story in the Arizona
21  Republic.
22     Q.  Do you remember what date you read that
0051
1  article?
2      A.  I want to say back around the first of
3  December in 2005.
4      Q.  How is AWP used?
5      A.  Medicare and insurance companies base
6  their reimbursement rates off that.
7      Q.  Do you know if that's the only price point
8  off of which they base reimbursement?
9      A.  I couldn't specifically say.
10     Q.  Besides Medicare and insurance companies,
11  who else uses AWP?
12     A.  I couldn't say.
13     Q.  When did you first learn of AWP?
14     A.  When did I first learn of AWP?
15     Q.  Yes.
16     A.  I saw Terry Goddard on the 5:00 news
17  talking about drug companies and AWP.
18     Q.  When was that?
19     A.  Back in the first of December, 2005.
20     Q.  Okay.  And you said that was television
21  news?
22     A.  Television news.
0052
1      Q.  Was that local television?
2      A.  It's our local, it's actually out of
3  Phoenix.
4      Q.  Had you heard the term AWP prior to that?
5      A.  No, not really.
6      Q.  Has your understanding of the AWP changed
7  over time?
8      A.  Has my understanding of AWP changed over
9  time?
10     Q.  Yes.
11     A.  Yes, I guess.
12     Q.  Do you know what the AWP is or was at any
13  time for any of the drugs -- strike that, step back.

14    I'd like to refer you to Exhibit Clark 001.
15        A.   Okay.
16        Q.   Fourth Amended Master Class Action
17    Consolidated.
18        A.   Where are you referring me to?
19        Q.   To paragraph 17 on pages seven and eight.
20        A.   Okay.
21        Q.   Mr. Clark, do you see that there are a
22    series of drugs listed in paragraph 17?
0053
1        A.   Yes, I do.
2        Q.   Do you know what the AWP is or was at any
3    time for any of the drugs listed in paragraph 17?
4        A.   No, I don't.
5        Q.   Do you know what the AWP is or was at any
6    time for any other drugs in this litigation?
7        A.   No, I don't.
8        Q.   Have you ever heard of the Red Book?
9        A.   Yes.
10        Q.   Okay.  What's the Red Book?
11        A.   I don't know what it is; I read about it
12    in this Complaint.
13        Q.   What is your understanding of what it is?
14        A.   It's where the drug companies send all the
15    pricing of their drugs in to this company that
16    prints the Red Book and then the Medicare and
17    insurance companies base whatever they're going to
18    pay for drugs off of the average wholesale price.
19        Q.   Okay.  And what role does Red Book have in
20    deciding or determining the AWPs that it publishes?
21        A.   It doesn't, it publishes whatever they
22    send in, to my understanding.
0054
1        Q.   What is the basis for your understanding?
2        A.   Reading through this Complaint.
3        Q.   Do you have any other basis for your
4    understanding?
5        A.   No.
6        Q.   Are you familiar with the Blue Book?
7        A.   Other than in this Complaint.
8        Q.   So you are only familiar with the Blue
9    Book based on your reading of this complaint?
10        A.   Correct.
11        Q.   Are you familiar with Medi-Span?
12        A.   Other than with this Complaint, that's the
13    first I've heard of it.
14        Q.   First DataBank?
15        A.   Same.
16        Q.   So you're only aware of Red Book, Blue
17    Book, Medi-Span, and First DataBank based on your
18    reading of this Complaint; is that correct?
19        A.   Correct.
20        Q.   Mr. Clark, are you familiar with the term
21    wholesale acquisition cost?

22    A.  No, not really.
0055
1     Q.  Okay.  Have you ever heard the acronym for
2  it, have you ever heard the term WAC or W-A-C?
3     A.  No.
4     Q.  Mr. Clark, when did you first read the
5  Complaint version that's Exhibit Clark 001?
6     A.  This particular one, I think, I believe I
7  received it around the first of March sometime.
8     Q.  Had you read any drafts of this version,
9  the FAMCC?
10    A.  Of amendment four?
11    Q.  Correct.
12    A.  No.
13    Q.  Had you read prior versions of the
14  Complaint in this lawsuit?
15    A.  I've read amendment three.
16    Q.  The third AMCC?
17    A.  Yes.
18    Q.  When did you read that for the first time?
19    A.  I want to say back around the first of
20  October 2005.
21    Q.  Okay.  Was that the first version of a
22  Complaint in this case that you had read?
0056
1     A.  Yes, it was.
2     Q.  What is your understanding of what this
3  lawsuit is about?
4     A.  Could you say that again?
5     Q.  What is your understanding of what this
6  lawsuit is about?
7     A.  It is the illegal overcharging of what
8  drug manufacturers say it costs them to make or
9  charge for a drug and what they're actually
10  charging.
11    Q.  So I want to make sure I understand you
12  correctly.  Are you saying that you believe that
13  pharmaceutical companies overcharge for the drugs at
14  issue in this case?
15    A.  I believe they do.
16    Q.  And you stated that you believe those
17  overcharges are illegal?
18    A.  I believe they are.
19    Q.  Do you know how they're illegal?
20    A.  In my opinion?
21    Q.  Right.  I'll restate the question.  How do
22  you believe that they are illegal, the overcharges?
0057
1     A.  They're falsely inflating the AWP.
2     Q.  And you talked about in your explanation
3  about a difference in pricing.  Can you explain that
4  further? Would you like the court reporter to read
5  back your statement?
6     A.  Yeah.

7          (Record read.)
8          THE WITNESS:  Okay.  Ask your question
9   again.
10      Q.  BY MS. HEARD:  Okay.  Actually, I'll
11   strike my question and ask a different one.
12      A.  Okay.
13      Q.  How do you believe the cost of
14   manufacturing a drug is tied to what consumers are
15   charged for the drug?
16      A.  Manufacturing might have been a bad choice
17   of words.  I guess it's what they charge a hospital,
18   a doctor's office, a clinic, whatever, for the
19   prices, what it costs someone to buy the drug from
20   them.
21      Q.  And do consumers buy the drugs directly
22   from pharmaceutical companies?
0058
1      A.  No, not that I believe.
2      Q.  Okay.  Who do consumers buy their drugs
3   from?
4      A.  Pharmacies, clinics, hospitals, doctors.
5      Q.  And who do those entities buy their drugs
6   from?
7      A.  Probably a drug rep.
8      Q.  A drug rep for pharmaceutical companies?
9      A.  Yeah, or wholesale company or somebody
10   that sells drugs.
11      Q.  Okay.  Mr. Clark, how have you or your
12   father's estate been injured in this case?
13      A.  I believe by the inflated AWPs, my dad
14   paid more for drugs than he should have had to
15   actually pay for drugs, whether he paid it in
16   coinsurance or buying prescriptions or whatever he
17   had to buy.
18      Q.  Okay.  What should the relationship
19   between what hospitals and clinics and other
20   treatment centers pay be and what the patient is
21   charged?
22          Do you want me to restate that?
0059
1      A.  Yes.
2      Q.  What do you think the relationship should
3   be between what a hospital or clinic pays for the
4   drug and what the patient is charged for a drug?
5      A.  I believe the doctor or hospital should
6   charge the patient a -- I want to say a fair amount
7   for whatever services or drugs they are given.
8      Q.  So do you think there's anything wrong
9   with doctors charging for a drug in an amount above
10   their cost?
11          MR. CROWN:  Objection to form and
12   foundation.
13          THE WITNESS:  It would depend.
14      Q.  BY MS. HEARD:  What would it depend on?

15    A.  Well, if they got it for free and they
16  charged me for it, then I don't think I should be
17  charged for it.
18    Q.  You testified a moment ago that hospitals
19  and clinics should be allowed to charge a fair
20  amount above what they paid for the cost of the
21  drug; is that correct?
22    A.  Correct.
0060
1    Q.  Who decides what a fair amount is?
2    A.  I guess as a consumer I would, because if
3  I can buy a bottle of aspirin for 99 cents and a
4  doctor or a hospital or a clinic charges me nine
5  dollars for an aspirin, I think that's kind of an
6  exorbitant price.
7    Q.  But in the example you just gave you have
8  the choice of buying that drug elsewhere; is that
9  correct?
10    A.  Maybe I do and maybe I don't.
11    Q.  Okay.
12    A.  The hospital or a doctor or clinic won't
13  let me administer my own aspirin.
14    Q.  Okay.  Mr. Clark, is aspirin part of this
15  case?
16      MR. CROWN:  Excuse me, Eden, Mr. Clark
17  would like a break.  May we take, how much do you
18  need, five minutes?
19      THE WITNESS:  Yeah, five minutes will
20  work.
21      MR. CROWN:  Can we take a five-minute
22  break?
0061
1      MS. HEARD:  Can I just get an answer to
2  the question first?
3      MR. CROWN:  I didn't even hear your
4  question.  Is there one pending?
5      MS. HEARD:  I'll just ask it again and
6  then once I get an answer, I'll be happy to take a
7  break.
8      MR. CROWN:  Oh, sure, okay.  Why don't we
9  ask the court reporter, if there's a question, why
10  don't you just read it back.
11      (Record read.)
12      THE WITNESS:  Not to my knowledge, you
13  know, not that I'm aware of.
14      MS. HEARD:  Okay, thank you.  Why don't we
15  go off the record now and take a recess.
16      THE WITNESS:  Okay.
17      (Recess from 12:18 p.m. to 12:31
18  p.m.)
19    Q.  BY MS. HEARD:  Mr. Clark, I'm going to
20  speak with you a little bit now about what has been
21  marked as Exhibit Clark 001, Fourth Amended Master
22  Consolidated Class Action Complaint.

0062
1      A.   Okay.
2      Q.   When did your father decide to join this
3  lawsuit?
4      A.   Say again.
5      Q.   When did your father decide to participate
6  in this lawsuit?
7      A.   I don't know an exact date that he decided
8  to do that.
9      Q.   Do you have an approximate date?
10     A.   No.
11     Q.   Okay.  Do you know when your father first
12  learned of this lawsuit?
13     A.   No, I don't.
14     Q.   When did you decide to join this lawsuit?
15     A.   After my father passed away.
16     Q.   So was that in November 2005?
17     A.   Yes.
18     Q.   And you testified earlier that you first
19  reviewed the Fourth Amended Master Consolidated
20  Class Action Complaint on or around March 1st, 2005;
21  is that correct?
22     A.   2006.
0063
1      Q.   Correct, thank you, you are correct, 2006.
2  And did you review this Complaint before it was
3  filed?
4      A.   I don't have a clue.
5      Q.   Did anyone ask you whether the information
6  contained in the Complaint is correct?
7      A.   No.
8      Q.   Did you make any changes to the document,
9  to the Complaint or to earlier drafts of the
10  Complaint?
11     A.   No.
12     Q.   Did your father's lawyers for this
13  litigation contact you about becoming a plaintiff or
14  did you contact them?
15         MR. CROWN:  Objection; that calls for
16  attorney-client privilege and I'm going to instruct
17  the witness not to answer.
18         MS. HEARD:  I'll restate it.
19     Q.   Mr. Clark, how did you decide whether to
20  become a plaintiff in this case?
21     A.   Because my dad felt very strongly about
22  this case.
0064
1      Q.   Okay.  I'd like to turn now to paragraph
2  17 of the Complaint, Exhibit Clark 001.
3      A.   Okay.
4      Q.   Would you take a moment just to look over
5  the paragraph, Mr. Clark, and then I'll ask some
6  questions.
7      A.   Go ahead.

8      Q.   Is the information contained in this
9   paragraph accurate?
10     A.   To the best of my knowledge, it is.
11     Q.   Do you see the statement near the bottom
12   of page seven that states, "Mr. Clark has made
13   payments for the foregoing drugs totaling nearly
14   $10,000 to date"?
15     A.   Yes.
16     Q.   "As his supplemental insurance required
17   him to make percentage payments for his drugs"?
18     A.   Yes.
19     Q.   What is the basis for the statement that
20   your father made payments for the foregoing drugs
21   totalling nearly $10,000?
22     A.   I'm going to base that on the checks that
0065
1   were turned in and just being with him buying
2   prescriptions.
3      Q.   When you say the checks that were turned
4   in, Mr. Clark?
5      A.   Yes.
6      Q.   Can you specify what checks you're
7   referring to?
8      A.   I can't, but I'm sure Larry can.
9      Q.   Well, I'll restate it.  Are you referring
10   to the photocopies of checks that have already been
11   produced to the defendants in this case as Clark
12   documents one through 326?
13     A.   Yes.
14     Q.   And do the checks that are in that
15   production set total the amount of $10,000?
16     A.   I don't know; I didn't add them up.
17     Q.   So how did you arrive at that amount at
18   $10,000?
19     A.   I didn't arrive at that amount.
20     Q.   Who did?
21     A.   Pardon?
22     Q.   Who did arrive at that amount?
0066
1      A.   I'm going to assume they got that amount
2   from my father.
3      Q.   Do you know how your father arrived at
4   that amount?
5      A.   I'm just guessing from what he thought he
6   had paid for drugs.
7      Q.   But you don't know for certain; is that
8   correct?
9      A.   I don't know for certain.
10     Q.   Mr. Clark, do you see that there are a
11   series of drugs listed in paragraph 17?
12     A.   Yes.
13     Q.   Which of the drugs listed are currently
14   part of the lawsuit?
15     A.   Which ones are?

16    Q.   Correct.
17    A.   I'm going to assume that all of them are.
18    Q.   Do you know for sure?
19    A.   I don't know for sure.
20    Q.   Do you know how much your father has paid
21   for the drugs that are in the lawsuit?
22        MR. CROWN:  Object to form and foundation.
0067
1   You can answer if you know.
2        THE WITNESS:  I wouldn't have a clue
3   specifically how much he paid for each one of those.
4    Q.   BY MS. HEARD:  Mr. Clark, it states in
5   paragraph 17 that the drugs listed, there's a
6   sentence about, let's see, about four or five lines
7   down in the paragraph where it says, "During the
8   applicable time period, Mr. Clark was prescribed and
9   was charged for, among others, the following
10   physician-administered prescription drugs, based in
11   whole or in part on AWP."  Do you see that language?
12    A.   I see that language.
13    Q.   What is the basis for the allegation that
14   your father was charged for drugs listed in
15   paragraph 17 based in whole or in part on AWP?
16        MR. CROWN:  Object to form and foundation.
17    Q.   BY MS. HEARD:  Go ahead and answer.
18    A.   Restate the question.
19    Q.   Would you like the court reporter to read
20   it back?
21    A.   Sure.
22        (Record read.)
0068
1        THE WITNESS:  Because my dad received one
2   or all of these drugs when he was being treated for
3   his bouts with cancer and I'm going to assume that
4   they based their prices on AWP.
5    Q.   BY MS. HEARD:  Okay, but you don't know
6   for certain?
7    A.   Don't know for certain.
8    Q.   Okay.  And going, Mr. Clark, from the
9   bottom of page seven to the top of page eight, there
10   is a sentence that reads, "Mr. Clark has made
11   payments for the foregoing drugs totaling nearly
12   $10,000 to date, as his supplemental insurance
13   required him to make percentage payments for his
14   drugs."  Do you see that sentence?
15    A.   I see that.
16    Q.   Do you know if your father's supplemental
17   insurance payments for his drugs?
18    A.   You broke up, I didn't hear all the
19   question.
20    Q.   Okay, I'll restate it.  The sentence
21   states that your father's supplemental insurance
22   required him to make percentage payments for his
0069

1   drugs.  Do you know that your father in fact made
2   payments pursuant to his supplemental insurance plan
3   for the drugs in this paragraph?
4       A.  My dad was real good about paying his
5   bills; I'm going to assume he did.
6       Q.  But you don't know for certain?
7       A.  I can't say for certain.
8       Q.  If he made payments, do you know whether
9   they were percentage payments?
10      A.  I can't say for certain.
11      Q.  Do you know if your father made any kind
12  of copayments under his supplemental insurance plan
13  for the drugs in paragraph 17?
14      A.  What do you mean by copayments?
15      Q.  Well, do you know what a copayment is?
16      A.  We went over it before.
17      Q.  Correct.
18      A.  I'm going to say no, he didn't make
19  copayments.
20      Q.  Okay.  Mr. Clark, did your father seek any
21  other supplemental insurance plans either offered by
22  American Benefit or by other supplemental insurers?
0070
1       A.  Not to my knowledge.
2       Q.  Mr. Clark, do you have any personal
3   knowledge regarding the other paragraphs in the
4   Complaint?
5       A.  I'm going to say no.
6       Q.  Mr. Clark, are you aware that the FAMCC,
7   the Complaint we're looking at, alleges a conspiracy
8   between doctors and manufacturers?
9       A.  By reading the Complaint.
10      Q.  I'm sorry, did you respond, Mr. Clark?
11      A.  I did.
12      Q.  I'm sorry, I couldn't hear your response?
13      A.  I said by reading the Complaint.
14      Q.  So you're aware by reading the Complaint
15  that it alleges a conspiracy between doctors and
16  manufacturers?
17      A.  Yes.
18      Q.  Do you agree with that allegation?
19      A.  I'm going to say yes.
20      Q.  What is the basis for that belief?
21          MR. CROWN:  Objection to form and
22  foundation. Go ahead.
0071
1           THE WITNESS:  By the price that people are
2   charged for prescription drugs.
3       Q.  BY MS. HEARD:  Okay.  Do you know what the
4   AWP is or was at any time for the drugs listed in
5   paragraph 17?
6       A.  No, I do not.
7       Q.  Okay.  Do you know what the AWP is or was
8   at any time for any other drugs listed in the FAMCC

9   outside of paragraph 17?
10      A.  No, I do not.
11      Q.  Now I'm going to ask some questions, Mr.
12  Clark, about the drugs that are listed in paragraph
13  17.
14      A.  Okay.
15      Q.  And I'm just going to start with
16  cisplatin.  Do you see that drug in paragraph 17?
17      A.  Yeah, cisplatin.
18      Q.  Yes.
19      A.  Okay.  What about it?
20      Q.  Was your father ever treated with
21  cisplatin?
22      A.  I couldn't say without looking at all the
0072
1   medical records.
2       Q.  Okay.  So without looking at medical
3   records, would your answer be that you don't know?
4       A.  Don't know.
5       Q.  Do you know personally whether your father
6   ever paid for cisplatin?
7       A.  Don't know.
8       Q.  Do you know how much your father's
9   provider charged for cisplatin?
10      A.  Don't know that either.
11      Q.  Do you know how your father's provider
12  determined the price it charges for cisplatin?
13      A.  Don't know that either.
14      Q.  Do you know if the charges for the drug
15  were based on AWP?
16      A.  I missed the first part of the question.
17      Q.  Do you know if the charges for the drug
18  were based on AWP?
19      A.  Not for sure I don't.
20      Q.  Okay.  Do you know if your father's
21  Medicare or supplemental insurance ever paid for
22  cisplatin?
0073
1       A.  No, I do not.
2       Q.  Do you know if your father was ever
3   charged for cisplatin?
4       A.  Without looking at medical records, no, I
5   do not.
6       Q.  Do you know if your father ever made
7   payments for cisplatin?
8       A.  Specifically, no.
9       Q.  I'm going to ask some similar questions
10  with regard to dextrose injectable, which is also in
11  paragraph 17.
12      A.  Which one?
13      Q.  Dextrose injectable.
14      A.  Okay.  Go ahead.
15      Q.  Was your father ever administered or
16  treated with dextrose?

17    A.  Don't know.

18    Q.  Okay.  Do you know how much your father's

19  provider charged for dextrose?

20    A.  Don't know that either.

21    Q.  Do you know what the drug is used for?

22    A.  Don't know that either.

0074

1    Q.  Do you know how your father's provider

2  determined the prices it charges for dextrose?

3    A.  Don't know that either.

4    Q.  Okay.  Do you know if the charges for the

5  drug were based on AWP?

6    A.  Don't know that either.

7    Q.  Do you know if your father's Medicare

8  coverage or supplemental insurance ever paid for

9  dextrose?

10    A.  Don't know that either.

11    Q.  Do you know if your father was ever

12  charged for dextrose?

13    A.  Don't know that either.

14    Q.  Do you know if your father ever made

15  payments for dextrose?

16    A.  Specifically, I don't know.

17    Q.  The drug, I apologize if I'm pronouncing

18  this wrong, granisetron in paragraph 17?

19    A.  Okay, I see it.

20    Q.  Do you know if your father was ever

21  treated with granisetron?

22    A.  Don't know.

0075

1    Q.  Okay.  Do you know what the drug is used

2  for?

3    A.  Don't know.

4    Q.  Do you know how much your father's

5  provider charged for it?

6    A.  Don't know.

7    Q.  Do you know how your father's provider

8  determined the prices it charges for granisetron?

9    A.  Don't know.

10    Q.  Do you know if the charges for the drug

11  were based on AWP?

12    A.  Don't know.

13    Q.  Do you know if your father's Medicare

14  coverage or supplemental insurance ever paid for

15  your father's granisetron?

16    A.  Don't know.

17    Q.  Did your father ever make payments for

18  granisetron?

19    A.  Specifically, I don't know.

20    Q.  Mr. Clark, are you familiar with a drug

21  named Kytril, K-Y-T-R-I-L?

22    A.  No.

0076

1    MR. FEDOTIN:  It's Kytril.

2    Q.   BY MS. HEARD:  Are you not aware then that
3  Kytril is the brand name for granisetron?
4    A.   No.
5    Q.   Mr. Clark, I'm also going to ask you about
6  another drug that's not in paragraph 17 but is in
7  the documents you produced.
8    A.   Okay.
9    Q.   It's called Zofran or it's also referred
10  to as ondansetron, and I'll spell it for the record,
11  it's O-N-D-A-N-S-E-T-R-O-N, but I'm going to refer
12  to it as Zofran.
13    A.   Okay.
14    Q.   Do you know if your father was ever
15  treated with Zofran?
16    A.   Don't know.
17    Q.   Do you know whether your father ever paid
18  for Zofran?
19    A.   Don't know that either.
20    Q.   I'm sorry, could you repeat that?
21    A.   Don't know that either.
22    Q.   Okay.  Do you know what the drug is used
0077
1  for?
2    A.   Don't know.
3    Q.   Do you know how much your father's
4  provider charges for Zofran?
5    A.   Don't know that either.
6    Q.   Do you know how your father's provider
7  determines the prices it charges for Zofran?
8    A.   Don't know that either.
9    Q.   Do you know if the charges for Zofran are
10  based on AWP?
11    A.   Don't know that.
12    Q.   Do you know if Medicare or supplemental
13  insurance ever paid for Zofran for your father?
14    A.   Don't know that either.
15    Q.   Do you know if your father was ever
16  charged for Zofran?
17    A.   Specifically, I don't know.
18    Q.   Do you know if your father ever made
19  payments for Zofran?
20    A.   Don't know.
21    Q.   There's another drug in paragraph 17
22  called dexamethasone sodium phosphate.
0078
1    A.   Okay.
2    Q.   Do you see that in paragraph 17?
3    A.   Yep.
4    Q.   Do you recognize the name of that drug?
5    A.   No, I do not.
6    Q.   Do you know if it's a generic or a brand
7  name drug?
8    A.   No, I do not.
9    Q.   Do you know if dexamethasone sodium

10   phosphate is manufactured by more than one
11   pharmaceutical company?
12      A.   Don't know that.
13      Q.   Do you know who manufactures dexamethasone
14   sodium phosphate?
15      A.   No, I do not.
16      Q.   Would it surprise you that more than one
17   company manufactures dexamethasone sodium phosphate?
18      A.   No.
19      Q.   Do you know if your father took that drug?
20      A.   Don't know.
21      Q.   Do you know if your father ever was
22   charged for that drug?
0079
1      A.   Don't know.
2      Q.   Do you know if he ever paid for it?
3      A.   Don't know.
4      Q.   There's another drug in paragraph 17
5   called methylsulfate.
6      A.   Okay.
7      Q.   Do you recognize the name of that drug?
8      A.   No.
9      Q.   Do you know if it's a generic or a brand
10   name drug?
11      A.   Don't know.
12      Q.   Do you know if methylsulfate is
13   manufactured by more than one pharmaceutical
14   company?
15      A.   Don't know that either.
16      Q.   Do you know who manufactures
17   methylsulfate?
18      A.   I don't know.
19      Q.   Would it surprise you that more than one
20   company manufactures methylsulfate?
21      A.   No.
22      Q.   I'm sorry, did you respond, Mr. Clark?
0080
1      A.   Yes, I did; the answer was no.
2      Q.   Do you know if your father was ever
3   administered methylsulfate?
4      A.   Don't know.
5      Q.   Do you know if he was ever charged for
6   methylsulfate?
7      A.   Don't know.
8      Q.   Do you know if he ever paid for
9   methylsulfate?
10      A.   Don't know.
11      Q.   Okay.  Mr. Clark, do you see that
12   throughout paragraph 17 after each drug there's a
13   parentheses with the names of various pharmaceutical
14   companies?
15      A.   Yes.
16      Q.   Do you see that many, if not all, of those
17   parentheticals mention more than one pharmaceutical

18  company?
19      A.  I see that.
20      Q.  Okay.  Do you know which of those
21  manufacturers made each of the drugs that your
22  father allegedly took?
0081
1       A.  Not specifically I don't.
2       Q.  Mr. Clark, with regards to the questions
3  that I've been asking about these drugs in paragraph
4  17, would your answers to these questions be the
5  same with regard to all the other drugs that are
6  listed in this paragraph?
7       A.  I believe so, with the exception, sodium
8  chloride I believe is saline solution, isn't it?
9       Q.  It is.  Do you know if your father was
10  ever administered sodium chloride?
11      A.  At the Mayo Clinic he was given sodium
12  chloride.
13      Q.  Do you know what that drug is used for?
14      A.  Not specifically.
15      Q.  Do you remember when he was administered
16  sodium chloride?
17      A.  Not exact dates, no.
18      Q.  Do you know which manufacturer made the
19  sodium chloride that was administered to your
20  father?
21      A.  No, I do not.
22      Q.  Do you know if it was in the form of an
0082
1  injection or an infusion or a pill?
2       A.  I believe it was an infusion.
3       Q.  Okay.  Do you know how often he received
4  sodium chloride infusion?
5       A.  No, not specifically.
6       Q.  Do you know whether your father received
7  sodium chloride in an inpatient or outpatient
8  setting?
9       A.  It was in an outpatient setting.
10      Q.  How do you know that?
11      A.  I took him to the outpatient clinic.
12      Q.  When you say the outpatient clinic, are
13  you referring to the Mayo Clinic in Scottsdale?
14      A.  Yes, I am.
15      Q.  Is your understanding of that treatment
16  being outpatient based solely on the fact that it
17  was administered at the Mayo Clinic in Scottsdale?
18      A.  Yeah, it said outpatient services on the
19  door.
20      Q.  Okay.  Do you know if your father was
21  charged for the sodium chloride?
22      A.  I'm assuming he was; I don't know
0083
1  specifically if he was.
2       Q.  Don't know for sure, okay.  Do you know

3  how much your father's provider charged for the
4  sodium chloride?
5     A.  I do not.
6     Q.  Do you know how your father's provider
7  determined the price it charges?
8     A.  I do not.
9     Q.  Was your answer no?
10    A.  I do not know.
11    Q.  Do you know if the charges for sodium
12  chloride were based on AWP?
13    A.  I don't know.
14    Q.  Do you know if your father ever paid
15  personally for sodium chloride?
16    A.  I don't know that either.
17    Q.  Okay.  Do you know if the documents that
18  you produced would indicate whether or not your
19  father paid for sodium chloride?
20    A.  Without looking through them, I don't
21  know.
22    Q.  And is there any reason that you remember
0084
1  your father receiving sodium chloride and don't have
2  any recollection whether or not he received the
3  other drugs in paragraph 17?
4     A.  The only reason I remember the saline
5  solution is because I asked about it.
6     Q.  Did you ask your father's doctors about
7  it?
8     A.  Well, I actually asked the nurse that was
9  giving it to him if that was saline solution.
10    Q.  So your question was if it was saline
11  solution?
12    A.  Yeah, there was a whole bunch of stuff
13  hanging up there and.
14    Q.  Okay.  And why did you ask that?
15    A.  Curiosity.
16    Q.  Let's make sure we're on the same page.
17  Is it correct that your answers to these questions
18  about payment and charges and whether or not your
19  father took the drugs in paragraph 17 would all be
20  the same as the answers you've given thus far with
21  the exception of sodium chloride?
22    A.  Yes, that would be correct.
0085
1     Q.  Mr. Clark, do you have any receipts,
2  canceled checks, or credit card statements that
3  would reflect your father's payments, if any, for
4  any of the drugs in paragraph 17?
5     A.  I don't know that they're specifically for
6  the drugs in paragraph 17.
7     Q.  But if you do, would they be in the
8  documents you already produced to counsel?
9     A.  Yes.
10    Q.  Okay.  You had mentioned earlier in our

11  discussion, Mr. Clark, and correct me if I misstate
12  this, that your father provided receipts for
13  prescriptions he paid to his supplemental insurer;
14  is that correct?
15      A.  I believe that's, I believe that's what he
16  had to do, he would just let them pile up and then,
17  when he got so much, he would send them in.
18      Q.  And why did he do that?
19      A.  So that he didn't have to fill out the
20  form every single thing that he did.
21      Q.  Okay.  And what form are you referring to?
22      A.  It's an American Benefit Plan form that
0086
1  you fill out and send your receipts in and they pay
2  whatever.
3      Q.  So is it a form that your father would use
4  to get reimbursement from the plan?
5      A.  Maybe, I'm not for sure.
6      Q.  Not certain.  Do you know if your father
7  was reimbursed by the plan for any of his
8  prescription drugs?
9      A.  I couldn't say whether he was or wasn't.
10      Q.  I suspect I know the answer to this, but
11  do you know, if he was reimbursed, whether it was
12  for the entire cost of the drug or no?
13      A.  I don't know.
14      Q.  Do you have those forms that your father
15  submitted?
16      A.  No, I don't.
17      Q.  Do you know where they might be?
18      A.  I'm sure the insurance company has them.
19      Q.  So to your knowledge, your father didn't
20  retain a copy of those forms?
21      A.  No.
22      Q.  Okay.  I'm going to ask you some questions
0087
1  now, Mr. Clark, about the role of class
2  representative.
3      A.  Okay.
4      Q.  Before I do that, how are you doing?  I
5  don't know if you needed a lunch break on your end.
6      A.  I'm good.
7      Q.  You're okay to proceed?
8      A.  Let's go.
9      Q.  Okay.  What is your understanding of what
10  a class action is?
11      A.  My understanding of a class action is
12  where there's a whole lot of people that have the
13  same complaint and they all get together so that
14  they can be better heard.
15      Q.  Okay.  When you say that have the same
16  complaint, you mean against the same party or
17  against different parties?
18      A.  It could be either.

19     Q.  And do you want to be a class
20  representative?
21     A.  Yes.
22     Q.  Why?
0088
1      A.  Because I want to continue what my dad
2  wanted to do.
3      Q.  What do you understand the class
4  representative to be?
5      A.  I'm the voice for the rest of the class.
6      Q.  What do you understand your
7  responsibilities as a class representative to be?
8      A.  Whatever needs to be done, whatever
9  documents I can produce, depositions.
10     Q.  Why do you think you're in a position to
11  serve as a class representative in this case?
12         MR. CROWN:  Objection to form and
13  foundation. Go ahead.
14         THE WITNESS:  Because I'm, because I know
15  what my dad wanted.
16     Q.  BY MS. HEARD:  Any other reasons?
17     A.  No.
18     Q.  Describe the class that you're purporting
19  to represent?
20     A.  Pardon?
21     Q.  Can you describe the class that you're
22  purporting to represent?
0089
1      A.  Any and all that have Medicare or have
2  paid for prescription drugs or infusion drugs or
3  drugs administered through a hospital or whatever
4  the case might be.
5      Q.  So does the class include only
6  individuals?
7      A.  I don't believe it does.
8      Q.  And does the class only include
9  individuals and entities who paid for medications?
10     A.  I don't know the answer to that.
11     Q.  Does the class include only entities and
12  individuals who live in Arizona?
13     A.  No.
14     Q.  Okay.  Where else might class members
15  reside?
16     A.  Well, just looking at the document in
17  front of me, there's one in Mapleton, Oregon,
18  there's one in Lake Village, Arkansas, and there's
19  one in Reno, Nevada.
20     Q.  So is it your understanding that class
21  members might live throughout the country?
22     A.  Correct.
0090
1      Q.  Does the class include individuals or
2  entities who live throughout the United States?
3      A.  I would assume that they live throughout

4   the United States.
5       Q.  Do you know for certain?
6       A.  I couldn't say for certain; I don't know
7   every one of them.
8       Q.  Does the class include individuals or
9   entities who purchased drugs outside of Arizona?
10      A.  I believe it does.
11      Q.  Does the class include individuals who are
12  Medicare beneficiaries?
13      A.  I believe it does.
14      Q.  Do you know for certain?
15      A.  I think somewhere in here it says that
16  they do.
17      Q.  In the Complaint?
18      A.  I thought I read that.
19      Q.  Does the class include insurance
20  companies?
21      A.  I believe it does.
22      Q.  Does the class include the government?
0091
1       A.  I don't know.
2       Q.  Does the class include persons who paid
3   for drugs at pharmacies?
4       A.  I don't know.
5       Q.  Does the class include individuals that
6   don't have insurance?
7       A.  I don't know; I don't think so.
8       Q.  Okay.  Do you think your father was in the
9   same position as someone that had no health
10  insurance?
11          MR. CROWN:  Objection to form and
12  foundation.
13          THE WITNESS:  I don't know.
14      Q.  BY MS. HEARD:  Do you think your father
15  was in the same position as someone who didn't have
16  supplemental insurance?
17      A.  I don't know.
18          MR. CROWN:  Objection to form and
19  foundation.
20      Q.  BY MS. HEARD:  Do you think your father
21  was in the same position as someone who is not a
22  Medicare beneficiary?
0092
1           MR. CROWN:  Objection to form and
2   foundation.
3           THE WITNESS:  I don't know.
4       Q.  BY MS. HEARD:  Does the class include
5   people or individuals who would have paid for drugs
6   as part of inpatient treatment?
7       A.  I didn't hear your question.
8       Q.  Does the class include individuals who
9   would have paid for drugs as part of inpatient
10  treatment?
11          MR. CROWN:  Objection to form and

12  foundation.
13      THE WITNESS:  I would think that they
14  would qualify.
15      Q.  BY MS. HEARD:  Okay.  I'm going to mark
16  some documents now for exhibits for some later
17  discussion, Mr. Clark.
18      A.  Okay.
19      Q.  I would like to mark Clark pages 0028 to
20  0055 as Exhibit Clark 002.
21          (Exhibit Clark 002 marked.)
22      MR. BERGEN:  I am handing them to the
0093
1  witness. We're ready to go back on the record.
2      Q.  BY MS. HEARD:  Would you look at Exhibit
3  Clark 002?
4      MR. FEDOTIN:  You're kind of cutting in
5  and out.
6      Q.  BY MS. HEARD:  Can you hear me better now?
7      A.  Yes.
8      Q.  Okay.  I was just going to say please take
9  a moment to review the Exhibit Clark 002.
10      A.  Okay.
11      Q.  Can you identify this document?
12      A.  I believe these are my dad's medical stuff
13  he was charged for at the clinic or the hospital.
14      Q.  By the clinic or the hospital, do you mean
15  the Mayo Clinic or the Mayo Clinic Hospital?
16      A.  I believe that's what most of this stuff
17  is for, yeah.
18      Q.  Have you seen this document before?
19      A.  Yes.
20      Q.  Okay.  You'll see in this document that
21  there are a number of line items for treatments or
22  drugs that your father had.  I'd like to flip to
0094
1  page Clark 0041.  On that page there are some line
2  items near the bottom of the page that say payment
3  personal?
4      A.  Yes.
5      Q.  What proof, if any, do you have that your
6  father paid for the amounts listed there?
7      MR. CROWN:  Objection to form and
8  foundation.
9      THE WITNESS:  I'm going to say the checks
10  that we turned in.
11      Q.  BY MS. HEARD:  Okay.  Your father
12  personally made payments for any of these drugs or
13  services on page 41?
14      MR. PAREKH:  Can you repeat that?
15          (Record read.)
16      MR. FEDOTIN:  Have her re-ask the
17  question. Eden, the first part of your question got
18  cut off on the phone, if you could repeat it.
19      MS. HEARD:  That's okay, I'll restate it.

20    Q.  Mr. Clark, do you know if your father
21  personally paid for any of the drugs or treatments
22  that are itemized on page 41?
0095
1    A.  I'm going to say he signed the checks.
2    Q.  Can you identify or do you know if he
3  produced those checks?
4    A.  I'm assuming they're in that stack of
5  stuff.
6    Q.  Do you know for certain that the checks
7  produced correspond to these line items?
8    A.  I don't know, $11.77, my bet would be that
9  my dad paid cash for that.
10    Q.  Okay.  When you say that he paid for these
11  items, do you know if he paid with personal checks
12  or checks from for example the supplemental insurer?
13    A.  Personal --
14        MR. CROWN:  Objection to form and
15  foundation.
16        THE WITNESS:  -- I would say would be his
17  personal check.
18    Q.  BY MS. HEARD:  Okay.  Of the amounts that
19  your father would have paid, do you know what
20  portion of his payment would go to cover the cost of
21  drugs as opposed to other components of the service?
22    A.  I would not know that.
0096
1        MS. HEARD:  I'd like to mark another
2  document as an exhibit, Clark 0082.
3          (Exhibit Clark 003 marked.)
4    Q.  BY MS. HEARD:  Mr. Clark, will you take a
5  moment to review Clark page 0082?
6        MR. BERGEN:  That's Exhibit Clark 003,
7  Eden.
8        MS. HEARD:  Correct.
9    Q.  Mr. Clark, have you seen this document
10  before?
11    A.  No.
12    Q.  Okay.  Can you tell what it is?
13    A.  Yeah, it's a letter from Mayo Clinic
14  saying they billed Medicare is what it looks like to
15  me.
16    Q.  I'll read from halfway down in the letter,
17  Mayo Clinic indicates in this letter, "We have filed
18  a claim with Medicare.  Your supplemental insurance
19  is American Benefit Plan," and then paragraph number
20  four states, "The Medicare payment will be sent
21  directly to you.  You will be responsible for
22  forwarding this payment to Mayo Clinic if you
0097
1  haven't already resolved your bill."  Do you see
2  that language?
3    A.  Yes.
4    Q.  Then it says in paragraph five, "You will

5  be responsible for filing your supplemental
6  insurance.  We will mail you a CMS, HCFA 1500, red
7  and white insurance form with instructions for
8  filing the claim."  Do you see that sentence as
9  well?
10      A.  Yes.
11      Q.  Do you have or have you produced any HCFA
12  forms 1500 that your father submitted to the
13  supplemental insurer?
14      A.  No.
15      Q.  Okay.  Do you know where you would find
16  HCFA form 1500 that your father would have
17  completed?
18      A.  No.
19      Q.  Okay.  With regard to Exhibit Clark 003,
20  Mr. Clark, you testified that you believe your
21  father made at least some payments for drugs by
22  personal check?
0098
1      A.  I believe what I said was that I didn't
2  know whether the checks were for drugs or for
3  services or both.
4      Q.  Okay.  But you mentioned that there were
5  some documents in the production that were
6  photocopies of personal checks from your father; is
7  that correct?
8      A.  Correct.
9      Q.  Do you know if those checks reflect
10  payments simply for drugs or for drugs and services
11  together?
12      A.  I don't know specifically what part was
13  what.
14      Q.  Do you know if any or all of those
15  personal checks would have included amounts
16  reimbursed to your father by Medicare or his
17  supplemental insurer?
18      A.  I don't know that specifically.
19      Q.  I'd like to mark another exhibit at this
20  time. It will be pages Clark 247 to 253, Exhibit
21  Clark 004.
22          (Exhibit Clark 004 marked.)
0099
1      Q.  BY MS. HEARD:  Mr. Clark, have you seen
2  this document before?
3      A.  No, I have not.
4      Q.  Okay.  Describe page 247?
5      A.  Did she say --
6          MR. FEDOTIN:  Can you repeat that, Eden,
7  I'm sorry.
8          MS. HEARD:  Sure.
9      Q.  Mr. Clark, can you describe Exhibit Clark
10  004, the first page, which is 0247?
11      A.  It looks like a payment my dad made to
12  Mayo Clinic.

13     Q.  Okay.  Do you see where the letter says in
14  the middle, "Please see highlighted areas on the
15  enclosed guarantor statement of account detail for a
16  breakdown of these payments"?
17     A.  I can see where it says on the front of
18  that.
19     Q.  Right.  Now, can you look at the following
20  two pages.  My question is do you see any
21  highlighting on any of these pages?
22     A.  Do I see any highlighting on the pages
0100
1  that you gave me?
2     Q.  Correct.
3     A.  No.
4     Q.  Okay.  So do you know if the original copy
5  of this letter provided by your father to defense
6  counsel -- strike that, if the original copy of this
7  document had color highlighting on it?
8     A.  I don't know.
9     Q.  So you don't know if the version that
10  you're looking at now as Exhibit Clark 004 reflects
11  those marks that are made that are referenced in
12  that June 29th, 2004 letter?
13     A.  I don't know.
14     Q.  Okay.  Do you have any proof of the
15  payments referenced in this letter?
16         MR. CROWN:  Objection to form and
17  foundation.
18         THE WITNESS:  No.
19     Q.  BY MS. HEARD:  Do you have canceled checks
20  that reflect these payments?
21     A.  No.
22     Q.  Mr. Clark, if you look at the pages of
0101
1  line items, Clark 248 to 253?
2     A.  Yes.
3     Q.  The dates in the left column start with
4  June 14 of 2002 and the document through as late as
5  --
6         MR. BERGEN:  Eden, are you still there?
7         MS. HEARD:  I am.
8         MR. BERGEN:  You got cut off about mid
9  sentence.
10         MS. HEARD:  I'm sorry.  Should I restate
11  the question?
12         MR. BERGEN:  You'll need to, we didn't
13  hear any of it.
14     Q.  BY MS. HEARD:  With regard to the line
15  items on pages 0248 to 0253, do you see that there's
16  columns on the pages all the way to the left with
17  various service dates?
18     A.  Yes.
19     Q.  Do you see that those dates generally
20  range from around June 2002 to approximately June

21  2004?

22     A.  Yes.

0102

1      Q.  Why was your father making payments for

2  those various treatments at this time, at the time

3  of the letter from the Mayo Clinic?

4      A.  Why was he making payments after that

5  date?

6      Q.  Right.  For example, the letter from the

7  Mayo Clinic to your father is dated June 29, 2004;

8  do you see that on page 0247?

9      A.  Uh-huh.

10     Q.  So it looks like from the attachments like

11  he was making payments that reflected treatments

12  administered in 2002, 2003, and 2004, and my

13  question is why was he making payments for those

14  treatments at this particular time?

15     A.  Because he had a large bill.

16     Q.  Okay.  Do you know if your father received

17  payments from Medicare for drugs or services

18  provided by the Mayo Clinic?

19        MR. CROWN:  Objection to form and

20  foundation. Could you read that back?

21        (Record read.)

22        THE WITNESS:  I don't know.

0103

1      Q.  BY MS. HEARD:  Do you know if the payments

2  referenced in this letter reflect payments from

3  Medicare to your father?

4      A.  I pretty much know they don't.

5      Q.  Okay.  How do you know that?

6      A.  Because that $8,000 was cash.

7      Q.  You're saying the payment of $8,000 was

8  cash?

9      A.  I believe so.

10     Q.  What's the basis for your understanding?

11     A.  Because my dad was tired of making

12  payments to Mayo Clinic so he paid them off.

13     Q.  Okay.  Mr. Clark, do you see the second

14  sentence in the June 29th, 2004 letter in Exhibit

15  Clark 004?  I'll read it into the record, it says,

16  "These checks were posted toward various visits on

17  June 21st and June 29th, 2004."

18     A.  Okay.

19     Q.  Do you still think, reading that sentence,

20  that the $8,000 was a cash payment?

21     A.  It could have been a cashier's check, but

22  I know he got cash for it.

0104

1      Q.  When you say he got cash for it, do you

2  mean that he withdrew cash for a Mayo Clinic

3  payment?

4      A.  I don't know if he withdrew cash or not.

5      Q.  Okay.  How do you know he got cash for it?

6    A.   Because he told me.

7    Q.   Okay.  Are you sure that he told you with

8  regard to this specific payment?

9    A.   Yes.

10    Q.   Okay.  How do you know that?

11    A.   Because he was tired of paying Mayo and he

12  received some money and he paid them off.

13    Q.   When you say he received the money, from

14  whom did he receive the money?

15    A.   The United States Government.

16    Q.   Okay.  And can you explain why the

17  government was paying him that amount?

18    A.   I can.

19    Q.   Okay.  What was the reason the U.S.

20  Government was paying him that amount?

21    A.   The U.S. Government paid him because he

22  was part of the Down Winders settlement.

0105

1    Q.   Could you repeat the name of the

2  settlement again?

3    A.   All I know it is as the Down Winders

4  settlement.

5        MR. BERGEN:  Eden, that's a settlement up

6  here in Holbrook, Springerville from the nuclear

7  testing in the '50s up by Saint George, Utah.

8    Q.   BY MS. HEARD:  Was your father a part of a

9  class in a lawsuit for that settlement?

10    A.   I don't believe it was a class.

11    Q.   Well, do you know if he was a party to

12  that litigation?

13    A.   He received money from it so I'm assuming

14  he was a party of something.

15        MR. CROWN:  Eden, your local counsel here

16  seems to know all about this and may I suggest you

17  ask him questions about it.

18        MR. BERGEN:  Yeah, Eden, I believe that

19  was a statutory, I don't believe that was a

20  litigation, I believe that was a statutory

21  settlement fund set up by the U.S. Congress.

22        MS. HEARD:  I see, thank you very much.

0106

1        MR. CROWN:  The bottom line is David Clark

2  received money and he used it, according to what

3  Roger's telling us, to pay off a remaining balance

4  to the Mayo Clinic; correct?

5        THE WITNESS:  Correct.

6        MR. CROWN:  Okay.

7    Q.   BY MS. HEARD:  Thank you.  Okay.  I'm

8  going to move to one more exhibit now for marking,

9  Clark 158 to 160.  I'd like this marked Exhibit Clark

10  005.

11           (Exhibit Clark 005 marked.)

12    Q.   BY MS. HEARD:  Mr. Clark, will you please

13  take a moment to review this document?

14    A.   Okay.

15    Q.   Have you seen this document before?

16    A.   No.

17    Q.   Okay.  Can you describe what it is?

18    A.   Looks like a statement of account from

19  Mayo Clinic in Scottsdale.

20    Q.   Okay.  And do you see under the Mayo

21  Clinic Scottsdale address in the upper left-hand

22  corner of these pages where it lists the facility?

0107

1    A.   Yes.

2    Q.   What is the facility?

3    A.   The hospital.

4    Q.   Okay.  Can you tell me whether the charges

5  on these pages reflect charges for inpatient or

6  outpatient drugs or services?

7    A.   I'm going to say that they're outpatient

8  services at the hospital because of the weekend.

9    Q.   Did you say because of the weekends?

10    A.   Yeah, the Mayo Clinic isn't open on

11  Saturday and Sunday, and if you're scheduled to get

12  chemotherapy on a weekend day, you have to go to the

13  hospital to get it.

14    Q.   Okay.  And is that the only reason you

15  believe it's outpatient?

16    A.   Yes.

17    Q.   Do you know if your father was admitted to

18  the hospital on these dates?

19    A.   He could have been; this could have been

20  when he had his surgery.

21    Q.   What surgery is that?

22    A.   They took out his bladder.

0108

1    Q.   Okay, because it's August 2002?

2    A.   Correct.

3    Q.   I noticed that you said his other surgery.

4  Can you tell me what other surgeries your father had

5  for his cancers?

6    A.   He had his prostate surgery.

7    Q.   Okay.  When was that?

8    A.   It was either late 2001 or early 2002.  I

9  believe it might have been early 2002, January,

10  February, sometime, the one in Payson.

11    Q.   What kind of surgery did your father have

12  on his prostate?

13    A.   They took it out.

14    Q.   You had corrected me before that your

15  father didn't have prostate cancer, that he had

16  bladder cancer; is that correct?

17    A.   No, he had prostate cancer but it got into

18  his bladder.

19    Q.   I see, okay.  So he had prostate cancer

20  but it did get into his bladder, so when we referred

21  previously on the record to his prostate cancer

22  treatment and diagnosis or his bladder cancer
0109
1  treatment and diagnosis, we were essentially talking
2  about the same thing; right?
3      A.  Yes.
4      Q.  Okay.  Do you see on Clark page 0159?
5      A.  Do I see what?
6      Q.  Near the bottom of page 0159 in Exhibit
7  Clark 005 there's some line items listing sodium
8  chloride.
9      A.  Yes.
10     Q.  Can you tell me which manufacturer made
11  the sodium chloride that was administered to your
12  father on that date which was August 20th, 2002?
13     A.  No, I can't.
14     Q.  Can you tell me whether these line items
15  reflect inpatient or outpatient administration of
16  sodium chloride?
17     A.  Not specifically, no.
18     Q.  Okay.  Mr. Clark, if you look at page 160,
19  the column activity description, a lot of other line
20  items, some of which are for drugs, and I'll
21  represent that some of those drugs are in paragraph
22  17 of the FAMCC, including lidocaine and midazolam.
0110
1  Do you know who the manufacturer was for those drugs
2  that your father received?
3      A.  No, I do not.
4      Q.  Mr. Clark, if you look at page 0158.
5      A.  Okay.
6      Q.  Can you tell me what the first activity
7  description is on that page?
8      A.  Room and board private.
9      Q.  Right.  And if you look down to the first
10  August 20th, 2002 entry, can you read that one into
11  the record, please, the activity description?
12     A.  Room and board intermediate ICU.
13     Q.  Great, thank you very much.  Okay.  I'm
14  going to shift gears now away from some documents to
15  talking about some pricing again.
16     A.  Okay.
17     Q.  Do you know how much your father's doctors
18  paid for dextrose?
19     A.  No, I do not.
20     Q.  Did your father ever tell you what amount,
21  if any, he paid for dextrose?
22     A.  No, he did not.
0111
1      Q.  Do you think your father's doctor had an
2  obligation to tell your father that there was a
3  difference between what he paid for dextrose and
4  what he was charged for it?
5          MR. CROWN:  Objection; form and
6  foundation.

7      THE WITNESS:  I don't know.
8      Q.  BY MS. HEARD:  Did your father ever ask
9  his doctor how much the doctor paid for dextrose?
10      MR. CROWN:  Objection; form and
11  foundation.
12      THE WITNESS:  Not to my knowledge.
13      Q.  BY MS. HEARD:  Okay.  Has any defendant
14  prevented you or your father from asking your
15  father's doctors how much they paid for dextrose?
16      MR. CROWN:  Objection to form and
17  foundation.
18      THE WITNESS:  No.
19      Q.  BY MS. HEARD:  Is it your understanding
20  that doctors are paying a price to manufacturers or
21  wholesalers for dextrose that is lower than the
22  price that's being charged to patients and insurance
0112
1  companies?
2      MR. CROWN:  Objection to form and
3  foundation.
4      THE WITNESS:  Can you repeat that
5  question?
6      (Record read.)
7      THE WITNESS:  From reading the Complaint,
8  that would be my understanding.
9      Q.  BY MS. HEARD:  Mr. Clark, would your
10  answers to these questions about dextrose be the
11  same for all of the other drugs that are listed in
12  paragraph 17 of Exhibit Clark 001, the FAMCC?
13      A.  Yes.
14      Q.  Okay.  Mr. Clark, have you had any written
15  or oral contact with any of the defendants listed in
16  paragraph 17 of Exhibit Clark 001 regarding their
17  products?
18      A.  No, I have not.
19      Q.  Do you know if your father had any written
20  or oral contact with any of the defendants in
21  paragraph 17?
22      A.  No, I do not.
0113
1      Q.  Have you had any in-person contact with
2  any of the defendants in paragraph 17 regarding
3  their products?
4      (Record read.)
5      THE WITNESS:  No, I have not.
6      Q.  BY MS. HEARD:  Did your father have any
7  in-person contact with any of the defendants in
8  paragraph 17 regarding their products?
9      A.  Not to my knowledge.
10      Q.  Did you ever speak to a sales
11  representative regarding the products of any of the
12  defendants in paragraph 17?
13      A.  No, I haven't.
14      Q.  Did your father ever speak to a sales

15    representative regarding any of the products in
16    paragraph 17 -- or any of the defendants in
17    paragraph 17?
18         A.   Not to my knowledge.
19         Q.   Did you ever hear a statement from any of
20    the defendants in paragraph 17 regarding one of
21    their products or the price of one of their
22    products?
0114
 1         A.   No, I did not.
 2         Q.   Have you ever relied on any statements
 3    made by any of the defendants in paragraph 17?
 4         MR. CROWN:  Objection to form and
 5    foundation.
 6            (Record read.)
 7         THE WITNESS:  No, I haven't.
 8         Q.   BY MS. HEARD:  Mr. Clark, do you believe
 9    your father was harmed by the defendants?
10         A.   Yes.
11         Q.   How was he harmed?
12         A.   He was overcharged for the drugs that he
13    received while he was sick and getting treatment for
14    cancer.
15         Q.   Do you contend that your father suffered
16    harm from the defendants who manufactured the drugs
17    in paragraph 17?
18         A.   Yes.
19         Q.   How?
20         A.   They manipulated the AWP.
21         Q.   Okay.  Mr. Clark, can you tell me what you
22    want out of this lawsuit?
0115
 1         A.   For the drug companies not to overcharge
 2    people for the drugs that they received, whether
 3    they buy them from a pharmacy or they receive them
 4    in a hospital or they receive them in an outpatient
 5    setting.
 6         Q.   Okay, and when you say for the drug
 7    companies not to overcharge people, what people are
 8    you referring to?
 9         A.   The American people, anybody that receives
10    anything from all the drug companies.
11         Q.   Are you seeking any other type of relief?
12         A.   No.
13         Q.   Are you seeking any monetary relief?
14         A.   No.
15         Q.   Okay.  Anything else?  Are you seeking any
16    other type of relief?
17         A.   None other than I hope my dad would be
18    satisfied.
19         Q.   Fair enough.  In Exhibit Clark 001, Mr.
20    Clark.
21         A.   Just one second.  Okay.
22         Q.   Pages 276 through 279 of the FAMCC.

0116
1      A.   Okay, I'm on page 276.
2      Q.   Do you know any of the lawyers listed on
3  pages 276?
4      A.   I have talked to Donald E. Haviland,
5  Junior.
6      Q.   Okay.  Any others?
7      A.   Not on 276 I don't think.
8      Q.   Will you look through the other pages?
9      A.   On page 278.
10     Q.   Okay.
11     A.   Larry Crown and Jorge Franco.
12     Q.   Okay.  Who are the attorneys that
13  represent you in this action?
14     A.   Correct.
15     Q.   I'll restate the question, I don't think
16  you heard me all the way.  I asked who are the
17  attorneys that represent you in this action?
18         MR. CROWN:  Objection to form and
19  foundation.
20         THE WITNESS:  Well, I'm going to say Kline
21  and Specter and Jennings, Haug, and Cunningham.
22     Q.   BY MS. HEARD:  Okay.  Do you have an
0117
1  engagement letter with either of those firms?
2      A.   Yes.
3      Q.   Okay.  With both or just one?
4         MR. CROWN:  I'm going to object and
5  instruct him not to answer at this point.
6         MS. HEARD:  What's the basis for the
7  objection?
8         MR. CROWN:  Attorney-client privilege.
9         MS. HEARD:  As to whether he has an
10  engagement letter?
11         MR. CROWN:  He's told you he has an
12  engagement letter.  You're going beyond into the
13  scope of the representation and getting into what
14  would be privileged communications.
15         MS. HEARD:  It's not my intention to ask
16  about the scope of the representation.  My question
17  was whether the engagement letter was with both
18  firms or just one of them.
19         MR. CROWN:  Right, and I'm saying this
20  question's going to be cut off at this point.  The
21  answer to your question is he has an engagement
22  letter, and to go any further is to go into the
0118
1  attorney-client privilege.
2         MS. HEARD:  Okay.
3      Q.   Mr. Clark, how did you come into contact
4  with your attorneys?
5         MR. CROWN:  Objection, and I'm going to
6  instruct him not to answer.  Plus, he's already told
7  you the contact came when his father died and he

8   became the personal representative of his dad's
9   estate, so you really are repeating your areas now.
10       MS. HEARD:  I'm going to move on with my
11   questions.
12       MR. CROWN:  Thank you.
13   Q.  BY MS. HEARD:  Mr. Clark?
14   A.  Yes.
15   Q.  Okay, I just wanted to make sure you could
16   hear me.  Are the attorneys any of the same
17   attorneys that represented your father?
18   A.  Yes.
19   Q.  Okay.  Who's paying their fees and
20   expenses?
21       MR. CROWN:  Objection; I'm instructing him
22   not to answer.
0119
1       MS. HEARD:  On what grounds?
2       MR. CROWN:  You're now going into the
3   basis of the engagement; that's privileged
4   communication.
5       MS. HEARD:  I disagree.
6       MR. CROWN:  Okay.  Then to be clear, you
7   can --
8       MS. HEARD:  Are you instructing him not to
9   answer?
10       MR. CROWN:  I am instructing him not to
11   answer.
12   Q.  BY MS. HEARD:  Mr. Clark, are you paying
13   your lawyer?
14       MR. CROWN:  Objection.  I'm instructing
15   him not to answer.
16   Q.  BY MS. HEARD:  Mr. Clark, do you know how
17   your attorneys' litigation costs are being paid?
18       MR. CROWN:  Objection; I instruct my
19   client not to answer.
20   Q.  BY MS. HEARD:  Mr. Clark, are your
21   attorneys representing other people with similar
22   claims in other lawsuits?
0120
1   A.  Don't know.
2   Q.  Okay.  How many meetings have you had with
3   your attorneys in this action?
4   A.  I don't know an exact number.
5   Q.  Do you have an estimate?
6   A.  Ten to fifteen.
7   Q.  Were those in-person meetings?
8   A.  No.
9   Q.  Were they by telephone?
10   A.  Yes.
11   Q.  Have you had any in-person meetings with
12   your counsel?
13       MR. CROWN:  Again, Counsel, you heard
14   Tuesday of this week.  I don't mean to cut you off
15   but, you know, it is getting to be a long deposition

16  and you are repeating.
17      Q.  BY MS. HEARD:  Mr. Clark, besides the
18  meetings that you had with your counsel in
19  preparation for this deposition that you testified
20  to earlier, have you had any other in-person
21  meetings with your attorneys?
22      A.  No.
0121
1      Q.  Have you provided documents to your
2  attorneys?
3      A.  Yes.
4      Q.  Did your father provide documents to your
5  attorneys?
6      A.  Yes.
7      Q.  Were you asked to preserve documents
8  relevant to this litigation?
9      A.  No.
10      Q.  Was your father asked to preserve
11  documents relevant to this litigation?
12      A.  Not that I know about.
13      Q.  What is your understanding of the
14  documents that you were supposed to produce to the
15  defendants in this case?
16          (Record read.)
17          THE WITNESS:  Medical records and canceled
18  checks that my dad might have paid for drugs with.
19      Q.  BY MS. HEARD:  Any other types of
20  documents?
21      A.  That's it.
22      Q.  Did you do a search for documents
0122
1  regarding medications your father took?
2      A.  No.
3      Q.  Where did you search for relevant
4  documents?
5      A.  At his house.
6      Q.  Anywhere else?
7      A.  No.
8      Q.  Did you request documents from your
9  father's medical providers?
10      A.  Yes.
11      Q.  Are any of those requests to the medical
12  providers still pending?
13      A.  No.
14      Q.  Did you receive documents in response to
15  those requests to the medical providers?
16      A.  Yes, I did.
17      Q.  Have they all been produced?
18      A.  Yes, they have.
19      Q.  Okay.  Other than the documents you've
20  already provided to your attorneys, do you have any
21  other documents relevant to the claims in this
22  action?
0123

1    A.  No, I do not.
2    Q.  Are you still looking for any documents
3  that your attorneys asked you to search for?
4    A.  No, I am not.
5    Q.  Okay.  Did your father keep a checkbook?
6    A.  Yes, he did.
7    Q.  Does it reflect payments for medication?
8  Did you hear the question?
9    A.  I heard the question, I'm just not clear
10  on how to.  Yes and no.
11    Q.  Can you state the basis for your
12  understanding?
13    A.  Anything that went to Mayo Clinic could
14  have been for services, it could have been for
15  medications.
16    Q.  Do you have your father's checkbook?
17    A.  Yeah.
18    Q.  Okay.  Have you produced that to counsel?
19    A.  Not his checkbook, no.
20    Q.  Did your father keep credit card
21  statements?
22    A.  No.
0124
1    Q.  Did your father keep bank statements?
2    A.  Yes.
3    Q.  Did they reflect payments he made for
4  medications?
5    A.  I don't know.
6      MS. HEARD:  At this time I'd like to take
7  a quick recess.  We're almost done, I'll just make
8  sure I only have a few questions left, and then we
9  should be done.
10      MR. CROWN:  Okay.
11        (Recess from 1:50 p.m. to 2:03 p.m.)
12    Q.  BY MS. HEARD:  Mr. Clark, I'm going to
13  refer you back to Exhibit Clark 003.  Let me know
14  when you have that in front of you.
15    A.  Got it.  Go ahead.
16    Q.  Back to paragraph four, it says, "The
17  Medicare payment will be sent directly to you"?
18    A.  Okay.
19    Q.  Do you know if your father ever received
20  Medicare payments?
21    A.  I don't know that.
22    Q.  Okay.  The next sentence says, "You will
0125
1  be responsible for forwarding this payment to the
2  Mayo Clinic if you haven't already resolved your
3  bill."  Do you know if your father forwarded
4  Medicare payments to the Mayo Clinic?
5    A.  I couldn't specifically say.
6    Q.  Okay.  Then in paragraph five, it says,
7  "You will be responsible for filing your
8  supplemental insurance."  Do you know if your father

9   did that?
10      A.  Yes.
11      Q.  Okay.  What's the basis for your
12  understanding?
13      A.  I helped him fill them out.
14      Q.  Okay.  And then the next sentence says in
15  paragraph five, "We will mail you a CMS, HCFA 1500,
16  insurance form with instructions for filing the
17  claim.  Do you know if your father filed a HCFA form
18  1500?
19      A.  What was the question?
20          MR. FEDOTIN:  Can you re-ask the question,
21  you were kind of cutting in and out.
22      Q.  BY MS. HEARD:  I'll restate it.  Do you
0126
1   know if your father ever filed the HCFA form 1500
2   with his supplemental insurer?
3       A.  I believe he had to attach one of those to
4   the supplemental form.
5       Q.  Did your father retain copies of those
6   forms?
7       A.  No.
8           MR. CROWN:  It really was asked already.
9       Q.  BY MS. HEARD:  Okay, and my last question
10  on this exhibit, do you know if he ever, if your
11  father ever signed over checks from Medicare
12  directly to the Mayo Clinic?
13      A.  No, I don't.
14      Q.  Mr. Clark, at any time was your father
15  ever covered under anyone else's health insurance;
16  for example, a spouse's insurance?
17      A.  No.
18          MR. CROWN:  It also was asked.
19      Q.  BY MS. HEARD:  Mr. Clark, did your father
20  ever serve in the military?
21      A.  No.
22      Q.  At this time, Mr. Clark, we request that
0127
1   we receive all the documents relating, specifically
2   we ask for your father's Medicare card and his
3   checkbook, and that these be produced as soon as
4   possible so that we will have them for upcoming
5   class submissions.
6           MR. CROWN:  Well, I'm going to ask that
7   you put your requests either as a formal request to
8   produce or send it in a letter, send it to
9   plaintiff's counsel, and we will respond
10  appropriately.
11          MS. HEARD:  I will make the request
12  formally in a letter.  Should I send it to your
13  attention, Mr. Crown?
14          MR. CROWN:  You can send it to me, you can
15  send it to me and Don Haviland together.
16          MS. HEARD:  Okay.

17        MR. CROWN:  You could post it on
18  LexisNexis, but I'd appreciate, since we're dealing
19  with here specifically, why don't you send it to me
20  with a copy to Don Haviland and we will, like I say,
21  we'll respond appropriately.
22        MS. HEARD:  I will do that.
0128
1         MR. CROWN:  I'll tell you in advance, just
2   to have blanket checkbook registers, again, I'll
3   look at the way your language is phrased, but
4   blanket checkbook registers would go outside the
5   scope of relevance and would invade other areas that
6   would be private and not related to the lawsuit.
7   But that being said, I just say that so you know
8   just my initial thought today.  As far as the
9   Medicare card goes, again, I want to see your
10  request and we'll work with you on that.
11        MS. HEARD:  Okay.  I will make the request
12  formally in a letter.  I understand your position.
13  And defendants reserve the right to continue this
14  deposition at such time as Mr. Roger Clark or Mr.
15  Clark, David Clark's estate produce documents in
16  accordance with the Court's August 16, 2005 order,
17  and that's everything I have.
18        MR. CROWN:  Okay.
19
20        E X A M I N A T I O N
21  BY MR. FEDOTIN:
22    Q.  Mr. Clark, my name is Brian Fedotin, I am
0129
1   defending Aventis Pharmaceuticals and we met earlier
2   obviously.  The same rules that Eden went over with
3   you about the deposition apply here today.
4     A.  Okay.
5     Q.  Has an estate for your father been opened?
6     A.  Yes.
7     Q.  When?
8     A.  I'm going to say near the end of 2005.
9     Q.  Okay, and where was the estate opened?
10    A.  Apache County.
11    Q.  Okay, and was there a particular court in
12  the county that that was opened?
13    A.  I'm going to guess the Superior Court of
14  Apache County.
15    Q.  Do you have any position in the estate?
16    A.  Yeah, I'm personal representative.
17    Q.  And has the Court appointed you as
18  personal representative?
19    A.  Yes.
20    Q.  Okay.  I believe earlier today you
21  testified that you have a sister?
22    A.  Yes.
0130
1     Q.  And can you give me her name, please?

2    A.  Yes Edde M. Castillo.
3    Q.  I'm sorry, can you spell that for the
4  record, please?
5    A.  E-D-D-E M. Castillo, C-A-S-T-I-L-L-O.
6    Q.  Does she have any children?
7    A.  Yes.
8    Q.  Okay.  And how many children does she
9  have?
10    A.  Three.
11    Q.  Okay.  Does she have any grandchildren?
12    A.  Yes.
13    Q.  How many grandchildren?
14    A.  I don't know.
15    Q.  Do you have any children?
16    A.  Yes.
17    Q.  How many children do you have?
18    A.  Biological or total?
19    Q.  I guess total?
20    A.  Five.
21    Q.  Okay, and then how many of those are
22  biological?
0131
1    A.  Two.
2    Q.  Have the others been adopted?
3    A.  No.
4    Q.  Okay.
5    A.  They're my wife's kids.
6    Q.  Okay.  Are you presently married then?
7    A.  Yes.
8    Q.  Is your sister a beneficiary under the
9  estate?
10    A.  No.
11    Q.  She's not?
12    A.  No.
13    Q.  Are any of her children beneficiaries
14  under the estate?
15    A.  No.
16    Q.  Are any of her grandchildren beneficiaries
17  under the estate?
18    A.  No.
19    Q.  Are you a beneficiary under the estate?
20    A.  Yes.
21    Q.  Any of your children, and I'm including
22  all five children, beneficiaries under the estate?
0132
1    A.  No.
2    Q.  Is your wife a beneficiary under the
3  estate?
4    A.  No.
5    Q.  Okay.  Is there anybody besides you that
6  is a beneficiary under the estate?
7    A.  No.
8    Q.  Has anybody petitioned to become a
9  beneficiary as part of the estate?

10    A.   No.
11    Q.   Do you know if the time period for that
12 process has expired?
13    A.   Don't know.
14    Q.   I assume your father lived in Arizona
15 year-round?
16    A.   Yes.
17    Q.   Toward the end of his life, did he live
18 alone?
19    A.   Yes.
20    Q.   So there wasn't any full-time nursing care
21 or anything like that in the house?
22    A.   My wife.
0133
1    Q.   Okay.
2    A.   And then he lived with us up here.  He
3 passed away in Apache County.
4    Q.   Okay.  Besides your house or your
5 residence and his residence, did he ever live in any
6 kind of hospice or any kind of other facility like
7 that?
8    A.   No.
9    Q.   Earlier you had mentioned you had studied
10 at Mesa?
11    A.   Mesa Community College.
12    Q.   Roughly how long were you there?
13    A.   I just, I went there part time, I worked
14 and just went part time, part time probably for a
15 couple years.
16    Q.   Did you have a particular area of
17 concentration in terms of studies?
18    A.   No, just I did a lot of math.
19    Q.   Okay.  Better you than me.  Did your
20 father have a federal pension?
21    A.   Other than Medicare, no.
22    Q.   Okay.  You discussed that he might have
0134
1 received some rental income from a trailer court
2 lot, and my question is, just to try to keep things
3 short, would that property have been based in
4 Arizona, or I'm sorry, located in Arizona?
5    A.   Yes.
6    Q.   And you had mentioned a couple wives that
7 your father had, I just wanted to be clear for the
8 record.  Was he married twice?
9    A.   My dad was actually married five times.
10    Q.   Okay, five times.  If we can kind of go
11 through those.  Can you tell me who he was married
12 to the first time?
13    A.   Yes, Linda.  Do you want her whole name?
14    Q.   Please.
15    A.   Linda K. Browning.
16    Q.   Do you know if she's still alive?
17    A.   She passed away.

18     Q.  Do you know roughly when they were
19  married?
20     A.  I'm going to say 1960 to 1963.
21     Q.  Do you know if there were any children out
22  of that marriage?
0135
1     A.  Yes, I do, me and my sister.
2     Q.  I wasn't sure who your mother, I didn't
3  mean anything by that.  If we could move on to the
4  second marriage?
5     A.  Don't know.
6     Q.  Do you know if there were any children?
7     A.  The only two children my dad had was me
8  and my sister.
9     Q.  That helps matters greatly.  Do you know
10  if any of his spouses are still surviving?
11     A.  To my knowledge, they've all passed away.
12     Q.  Okay.  And we've talked about the
13  Operating Engineers American Benefit Plan and that
14  was his insurance plan.  Is your only knowledge that
15  that was his insurance from the Complaint?
16     A.  No, because I helped him fill out forms to
17  send stuff to them.
18     Q.  Okay.
19     A.  Before the Complaint.
20     Q.  Sure.  Just to clarify the record, you
21  talked about your father being treated at like
22  Payson Regional or something like that.  They're not
0136
1  affiliated or part of Mayo, are they?
2     A.  No.
3     Q.  Okay.  And just also for clarification,
4  you had talked about that he had gone to the Mayo
5  Hospital for treatment for chemo.  He's only been to
6  Mayo facilities in the state of Arizona though;
7  correct?
8     A.  Correct.
9     Q.  So he's never been to the Mayo in
10  Minnesota?
11     A.  No.
12     Q.  Okay.  You talked about that your father
13  paid cash for the medicine?
14     A.  Yes.
15     Q.  And just so I'm clear, you know how stores
16  sometimes will talk about cash as various things.
17  By cash, you mean actual dollar bills, currency?
18     A.  Actual dollar bills, currency.
19     Q.  Sure.  You were talking about that he
20  probably didn't have receipts for these medicines
21  that he would have purchased at pharmacies?
22     A.  No.  The little receipt would get torn
0137
1  off, thrown in this little dish, and when they piled
2  up enough, he would take them and send them off to

3    his secondary insurance.

4        Q.   When your father paid cash for these
5    medicines that he was picking up, was he buying them
6    at the pharmacy?

7        A.   The medicines that he picked up, yes.

8        Q.   Okay, and which pharmacies did your father
9    buy drugs at?

10       A.   Probably Bashas', Walgreens, and Wal-Mart.

11       Q.   Okay.

12       A.   Some at Target.

13       Q.   And as we've said, just to keep the record
14   clear, all of those pharmacies that he went to would
15   have been located in the state of Arizona?

16       A.   Yes.

17       Q.   And my notes are a little unclear so I
18   apologize.  My notes are a little unclear, so I
19   apologize if I'm asking this again, but I have
20   somewhere that you said he was 62 when he started
21   Medicare and somewhere where he was 65, and that's
22   probably my bookkeeping?

0138

1        A.   I believe when he turned 65 is when he
2    started Medicare.

3        Q.   Okay.  If we could walk through the
4    pharmacies, I'm sorry, could you read the pharmacies
5    back?  Where was the Target located, what city?

6        A.   I want to say Scottsdale.  It might not be
7    Scottsdale, it's the one down right as you come out
8    by the fountain.

9        Q.   Okay.

10           MR. BERGEN:  On the 87 and Shea Boulevard?

11           THE WITNESS:  Exactly.

12           MR. BERGEN:  That's in Fountain Hills.

13           THE WITNESS:  Okay, Fountain Hills.

14       Q.   BY MR. FEDOTIN:  Where was the Walgreens
15   located?

16       A.   Payson.

17       Q.   And you said Bashas'?

18       A.   Bashas'.

19       Q.   Bashas', I'm sorry.

20       A.   That's going to be in Payson too.

21       Q.   Okay, and I'm sorry?

22       A.   Wal-Mart.

0139

1        Q.   Was there a Wal-Mart?

2        A.   It could have either been in Payson, I
3    don't think we got any up here, but I believe it was
4    in Payson.

5        Q.   Okay.  In terms of you had been asked some
6    questions about AWP.  Do you believe that all drugs
7    are priced based or all drugs that are sold or
8    administered are sold or administered on the basis
9    of AWP?

10           MR. CROWN:  Objection; form, foundation.

11   Go ahead.
12        THE WITNESS:  Yes.
13        Q.  BY MR. FEDOTIN:  So anybody who purchases
14   any drugs, the price will be AWP based is your
15   understanding?
16        A.  That's my understanding.
17        Q.  Okay.  And I believe you testified that
18   your understanding of AWP has changed over time but
19   I don't think anybody ever asked you how it's
20   changed.  Can you tell me how it's changed?
21        A.  Other than I have a little better
22   understanding of what AWP is, how it's worked, how
0140
1   it works, and how everybody is using it.
2        Q.  Okay.
3        A.  As far as say Medicare is basing what they
4   pay on drugs, their portion that they pay on AWP,
5   those kind of things is the understanding I have
6   now.
7        Q.  Okay.  Do you have an understanding on
8   whether Mayo uses AWP?
9        A.  I couldn't say for certain whether they do
10   or don't.
11        Q.  And then we had talked a little bit about
12   Red Book, Blue Book, First DataBank, and some of the
13   pricing compendia.  Do you know if the prices in
14   each of those compendias are identical for the same
15   drug?
16        A.  I don't.
17        Q.  You've talked about that you believe this
18   suit is about overcharging by drug companies and you
19   believe they falsely inflated AWP; correct?
20        A.  Correct.
21        Q.  Can you explain to me how drug companies
22   profit by this alleged inflated AWP?
0141
1        MR. CROWN:  Objection to form and
2   foundation. Go ahead.
3        THE WITNESS:  From reading the Complaint,
4   they talk about the spread.  From just it's when
5   whoever buys drugs, it's AWP less whatever
6   percentage they get them for, and that's where
7   people make a profit.
8        Q.  BY MR. FEDOTIN:  Okay.  Do you believe
9   drug companies make a profit by this alleged
10   inflated AWP?
11        MR. CROWN:  Objection to form and
12   foundation.
13        THE WITNESS:  Yes.
14        Q.  BY MR. FEDOTIN:  How so?
15        MR. CROWN:  Objection to form and
16   foundation.
17        THE WITNESS:  By artificially inflating
18   the AWP.

19    Q.  BY MR. FEDOTIN:  Okay.  Do you know who
20  the recipient of the reimbursement based on AWP is?
21    A.  No, I do not.
22    Q.  Okay.  In Exhibit Clark 001, the large
0142
1  exhibit, on page 17, there was a list of drugs that
2  your father --
3    A.  Okay.
4    Q.  -- allegedly took.
5    A.  Go ahead.
6    Q.  Do you know how that list of drugs was
7  compiled?
8    A.  I am going to assume that it came off of
9  the medical records that were given to my attorneys.
10    Q.  Okay.  Is it accurate to say then that you
11  had no personal involvement in compiling that list?
12    A.  No, I did not have any personal.
13    Q.  Okay.  And I believe you testified about
14  recognizing sodium chloride, you had asked that it
15  was saline; correct?
16    A.  Correct.
17    Q.  Okay.  You realize that saline is
18  available in grocery stores and drug stores for
19  contact solution and things like that; correct?
20    A.  Correct.
21    Q.  And so is it fair to say that saline is
22  produced by all sorts of entities?
0143
1        MR. CROWN:  Objection to foundation.
2        THE WITNESS:  Yes.
3    Q.  BY MR. FEDOTIN:  Do you have any idea who
4  produced the saline that was allegedly given to your
5  father?
6    A.  No, I do not.
7    Q.  Do you have any way of identifying who
8  produced it?
9    A.  No, I do not.
10    Q.  In terms of serving as a class
11  representative, are you willing to travel to Boston
12  for trial?
13    A.  If that's what I have to do.
14    Q.  If we could go off the record for a
15  second.
16        (Discussion off the record.)
17    Q.  BY MR. FEDOTIN:  I apologize if this has
18  been asked before, but being the second or third
19  questioners, it's a little harder to stay organized.
20  Has your father ever been a party to any other
21  lawsuits?
22    A.  Not that I'm aware of.
0144
1    Q.  Have you ever been a party to any other
2  lawsuits?
3    A.  Qualify lawsuit.  Like this or?

4    Q.   Well, have you ever sued anybody?

5    A.   No.

6    Q.   Has anybody ever sued you?

7    A.   I'm in the process of fighting with my

8  neighbor over a prescriptive easement.

9    Q.   Okay.  And just so I'm clear, is your

10  neighbor bringing suit against you?

11    A.   Yes.

12    Q.   Aside from that, have you been involved in

13  any other lawsuits?

14    A.   No.

15    Q.   Okay.  Do you know what your dad's annual

16  income was during the '90s?

17    A.   I'm going to say around $18,000.

18    Q.   Okay, and do you have any idea what

19  portion of that would have come from Social

20  Security?

21    A.   The bulk of it, I'm going to say around

22  15,000, 14,000, 15,000.

0145

1    Q.   Okay, and I asked about the '90s.  In

2  terms of from 2000 to 2005, would you say that his

3  yearly income was consistent?

4    A.   Yes.

5    Q.   Okay.  And were your dad's Social

6  Security, I think you testified earlier your dad

7  received Social Security benefits?

8    A.   Correct.

9    Q.   What address would those benefits have

10  been sent to?

11    A.   P.O. Box 497, Tonto Basin, 85534.

12    Q.   Do you know if your dad had a managed care

13  option in his Medicare coverage?

14    A.   I don't know.

15    Q.   Do you know if your dad received

16  publications about the Medicare program?

17    A.   I'm going to say yeah, mail, you know,

18  flyers about Medicare and whatever.

19    Q.   Would you be able to describe the nature

20  of those publications?

21    A.   No.

22    Q.   Sure.

0146

1    A.   Junk mail.

2    Q.   Sure.  Based on what you said about your

3  dad and how he kept receipts, would he have been the

4  type that would have kept those publications or

5  would he have thrown them away?

6    A.   Thrown them away.

7    Q.   That's kind of what I thought.  Do you

8  have any idea how he would have obtained any of

9  those publications?

10    A.   Through the mail, junk mail.

11    Q.   It wouldn't have been something he would

12  have actively solicited then?
13      A.  No.
14      Q.  That's kind of what I gathered based on
15  what little I know of your dad from your description
16  today.  If this has been asked, I apologize, but the
17  Medicare deductible, was that for services or
18  medication?
19      A.  Don't know.
20      Q.  Are you familiar with the term
21  coinsurance?
22      A.  I'm going to say yes because I'm going to
0147
1  say his American Benefit Plan is a coinsurance I
2  guess.
3      Q.  Aside from that, do you know if your dad
4  had any other coinsurance with Medicare?
5      A.  As far as I know, no.
6      Q.  Okay.  Do you know, when your dad decided
7  to go with the American Benefit Plan, do you know if
8  he gave any thought to how prescription medications
9  were reimbursed under that plan?
10      A.  I don't know.
11      Q.  Okay.  Did your dad sign up for
12  supplemental insurance when he turned 65?
13      A.  Don't know.
14      Q.  Okay.  Do you know if a copay was required
15  for all medical services under his supplemental
16  insurance?
17      A.  All's I know is my dad paid his share.
18  Whatever his share he was supposed to pay, my dad
19  paid it. So whether that was a copay or 20 percent
20  or however anybody wants to phrase it, my dad paid
21  what my dad was supposed to pay.
22      Q.  Sure.  Do you know if your doctors always
0148
1  charged him the copay?  In other words, some
2  doctors' offices will elect not to collect the
3  copay?
4      A.  To the best of my knowledge, all of his
5  doctors did, and Mayo Clinic was real good about it.
6      Q.  Okay.  Do you know if your dad had a
7  choice of which health plans to join?
8      A.  No, I don't.
9      Q.  So you don't know if he considered any
10  others besides what he enrolled in?
11      A.  I don't.
12      Q.  Okay.  And I'm sorry, I know this was
13  asked, but you said your father was not a veteran,
14  is that?
15      A.  Correct, he wasn't a veteran.
16      Q.  Okay.  Do you know what medical services
17  the American Benefit Plan paid on your dad's behalf?
18      A.  No, I don't.
19      Q.  Do you know what drugs the American

20   Benefit Plan paid on your dad's behalf?
21      A.   No, I don't.
22      Q.   Okay.  Do you know who determines how much
0149
1   of the medical expenses that Medicare covers?
2      A.   No, not specifically.
3      Q.   Do you know who determines how much of the
4   medical expenses the American Benefit Plan covers?
5      A.   No, I do not.
6      Q.   Okay.  Do you have an understanding of how
7   drug prices are determined?
8      A.   Other than the AWP, no.
9      Q.   Do you know who determines AWP?
10      A.   My understanding from reading the
11   Complaint, it's the drug companies.
12      Q.   If you learned that someone other than the
13   drug companies determined AWP, would that change
14   your view of this litigation?
15          MR. CROWN:  Objection to form and
16   foundation.
17          THE WITNESS:  I still think something
18   should be done about the AWP.
19      Q.   BY MR. FEDOTIN:  Okay, but my question is
20   if somebody other than the drug companies calculate
21   the AWP, would that change the way, your thoughts on
22   pursuing an action against the drug companies?
0150
1      A.   It might, it would depend on the
2   circumstances I guess.
3      Q.   Okay.  Do you know what the term least
4   costly alternative means in the context of drug
5   pricing?
6      A.   I would assume that it means that you
7   would choose the one that costs the least.
8      Q.   And do you know if that would be a
9   voluntary or required thing?
10      A.   I don't know if it would be a voluntary, I
11   don't know.
12      Q.   Do you believe that large amounts of the
13   costs of a drug go into research and development?
14          MR. CROWN:  Objection to form and
15   foundation.
16          THE WITNESS:  In some situations, I would
17   believe that would be the case.
18      Q.   BY MR. FEDOTIN:  Who are the defendants in
19   this lawsuit?
20      A.   There's pages of them in this Complaint.
21      Q.   Sure, and rather than make you read them
22   all off, can you describe in general like what they
0151
1   are?
2      A.   They're pharmaceutical companies.
3      Q.   Are any doctors named defendants in the
4   lawsuit?

5      A.  I don't remember reading any.
6      Q.  Are any insurance companies named
7   defendants?
8      A.  Not that I remember.
9      Q.  Are any entities other than pharmaceutical
10  companies or drug manufacturers named as defendants
11  in this action?
12     A.  I don't recall reading any.
13     Q.  Okay.  Do you know what claims you've
14  brought against the defendants in the Fourth Amended
15  Complaint that you have in front of you?
16     A.   Reading, just I read the Complaint last
17  night, I don't remember exactly what they are, but I
18  read them last night.
19     Q.  Can you kind of tell me what your
20  understanding of those claims are?
21     A.  From the fraud or the unlawful
22  overcharging, what, all of them, what?
0152
1      Q.  Yeah, all of them.
2      A.  My understanding of the fraud is the
3   pharmaceutical companies, drug companies, whatever
4   you want to call them, setting their own AWP and
5   then either giving doctors free samples or selling
6   the drugs to doctors or hospitals, or however you
7   want to put it, to clinics, for less than the AWP,
8   and that's what they call the spread in the
9   Complaint.  I read in here about the RICO statute
10  because they use the mail.  I don't remember exactly
11  what else was in there.
12     Q.  No, that's fine.
13     A.  It was a lot of reading.
14     Q.  No, trust me, I understand.  Which
15  medications are you basing your claims on?
16     A.  Well, I would refer that to the attorney
17  because they have all the records of all the
18  medicines and whatever we've turned in that was
19  given to my dad either in infusion, in doctor,
20  outpatient, or inpatient.
21     Q.  So you personally don't know which drugs
22  pertain to which claims?
0153
1      A.  No.
2      Q.  Are you making any allegations against
3   drug companies who manufactured drugs that your dad
4   did not produce?
5      A.  Don't know.
6      Q.  Okay.  Does this case involve every
7   medication that Medicare pays for?
8      A.  No.
9      Q.  What kind of medications that Medicare
10  pays for are not part of this suit?
11     A.  I don't know which ones they don't pay for
12  that are not part of this suit.

13    Q.  Okay.  Can you give me some medications
14  though that aren't part of the suit?
15    A.  No.
16    Q.  Okay.  Does this lawsuit involve
17  medications that are taken in the form of a pill?
18    A.  No.
19    Q.  Okay.
20    A.  Well, it could, depending on if they were
21  cancer drugs, some of the drugs like that in pill
22  form Medicare does pay for.
0154
1    Q.  Do you know the difference between a
2  generic and a branded drug?
3    A.  I guess generics are the ones anybody can
4  make and the branded drugs are the ones that whoever
5  has the patents on it can make them.
6    Q.  Correct.  My purpose for asking that is
7  does this lawsuit involve both generic and branded
8  drugs?
9      MR. CROWN:  Objection to form and
10  foundation. Go ahead.
11      THE WITNESS:  I believe it does.
12    Q.  BY MR. FEDOTIN:  But you're not sure?
13    A.  I'm not sure.
14    Q.  Are you aware that the original Complaint
15  in this matter was filed in 2001?
16    A.  Yes.
17    Q.  Okay.  Wouldn't you expect that an
18  insurance company would not continue to pay
19  allegedly inflated prices for drugs once this suit
20  was filed?
21      MR. CROWN:  Objection to form and
22  foundation.
0155
1      THE WITNESS:  You might assume that but
2  maybe they don't have a choice.
3    Q.  BY MR. FEDOTIN:  Why would you think
4  insurance companies would not have a choice?
5      MR. CROWN:  Objection to form and
6  foundation.
7      THE WITNESS:  Because they, well, I guess
8  because they have to pay, as an insurance company,
9  they're going to pay for services maybe that they
10  don't necessarily agree with or they may not feel
11  the price is right, but they're still going to cover
12  either part of it or all of it.
13    Q.  BY MR. FEDOTIN:  Do you think insurance
14  companies have sufficient negotiating authority that
15  they can change what the price structure is if they
16  so choose?
17    A.  They might be able to negotiate, I'm not,
18  I don't know that they can change prices.
19    Q.  Okay.  Did your dad ever contact Medicare
20  regarding the alleged fraud in this case?

21    A.  I don't know.
22    Q.  Have you ever contacted Medicare about the
0156
1  alleged fraud in this case?
2    A.  No.
3    Q.  Have you or your dad ever contacted the
4  American Benefit Plan about any of the alleged fraud
5  in this case?
6    A.  I don't know if my dad has; I haven't.
7    Q.  Have either you or your dad contacted any
8  federal agency regarding the alleged fraud in this
9  case?
10    A.  I don't know that my dad has; I haven't.
11    Q.  Okay.  Do you know if either you or your
12  dad contacted any politicians regarding the alleged
13  fraud in this case?
14    A.  I don't know if my dad has; I haven't.
15    Q.  Okay.  Do you know if your dad ever
16  contacted any provider, and I'm using provider the
17  same way Eden did, regarding the alleged fraud in
18  this case?
19    A.  No, I do not.
20    Q.  Have you contacted any provider regarding
21  the alleged fraud in this case?
22    A.  No, I have not.
0157
1    Q.  How did your dad's percentage copay relate
2  to AWP?
3        MR. CROWN:  Objection to form and
4  foundation.
5        THE WITNESS:  My dad, like I said before,
6  paid whatever he needed to pay, whether it was
7  copay, 20 percent, whatever he had to pay.  If
8  there's an inflated AWP, then the percentage of
9  whatever my dad paid would have been higher than if
10  it wasn't inflated.
11    Q.  BY MR. FEDOTIN:  Okay.  Does the class
12  that you're seeking to represent only include
13  individuals that actually paid out-of-pocket
14  expenses for their medication?
15    A.  No.
16    Q.  Do you expect to be compensated for your
17  services as a class representative?
18    A.  Personally, no.  What I would expect is
19  that any monies generated by an inflated AWP be paid
20  back to the people that it came from.
21    Q.  Okay.  I know you said that you'd be
22  willing to travel to Boston for trial.  Is there
0158
1  anything that would prevent you from being able to
2  do so?
3    A.  No.
4    Q.  Are there any creditors to your dad's
5  estate?

6    A.  No.

7    Q.  Okay.  Are you aware of any possible

8 conflicts of interest that could arise between your

9 duties to your father's estate and your duties as a

10 class representative?

11    A.  No.

12    Q.  Did you contact your father's doctors to

13 get their view on whether you should be part of this

14 suit?

15    A.  No, I did not.

16    Q.  And I know you testified as to having an

17 engagement letter with at least one of the

18 plaintiffs' attorneys in this case.  We would

19 request a copy of the engagement letter.  Do you

20 have an engagement letter with the Jennings firm?

21         MR. CROWN: Objection.  I'm going to

22 instruct him not to answer.

0159

1         MR. FEDOTIN:  Okay.  It's simply a yes or

2 no, it's not getting into the content of the

3 agreement, it's just who his counsel is, which is

4 relevant.

5         MR. CROWN:  Well, we are part of the

6 cocounsel in this litigation, so we are his lawyers

7 and Specter are his lawyers, everybody that's listed

8 that's filed an appearance for the plaintiffs are

9 his lawyers.

10         MR. FEDOTIN:  Right, but we're entitled to

11 know I think if there's an engagement letter between

12 him and anybody else.  I just want to get it on the

13 record what your position is.

14         MR. CROWN:  Our position would be that

15 you've been told that there is and it's an agreement

16 for legal representation, and anything further goes

17 into the attorney-client privilege.  I'm going to

18 instruct him not to answer.

19         MR. FEDOTIN:  Okay.

20         MR. CROWN:  If you want to make a request

21 to produce, which I take it you're going to make, do

22 it formally and we'll respond appropriately.

0160

1    Q.  BY MR. FEDOTIN:  Okay.  I'm asking this in

2 the form of a yes or no question.  Do you know how

3 the litigation costs for this litigation are being

4 paid?

5         MR. CROWN:  I'm going to instruct him not

6 to answer.

7         MR. FEDOTIN:  Like I said, it's not

8 touching on the attorney-client privilege because

9 it's a yes or no, it's not asking how, it's just

10 going to his knowledge as a class representative.

11         MR. CROWN:  At this time, I'm going to

12 instruct him not to answer.  The basis would be

13 attorney-client privilege.

14    Q.  BY MR. FEDOTIN:  Did your dad talk with
15  his doctors about the possible treatments for his
16  cancer?
17    A.  Yes, he did.
18    Q.  Do you know which doctors?
19    A.  Not by name.
20    Q.  Would they have been at Mayo and the
21  Payson Regional?
22    A.  They would have been at Mayo.
0161
1    Q.  Do you know what other treatment
2  alternatives that he might have considered?
3    A.  Yes, none.
4    Q.  Okay.
5    A.  Mayo Clinic, that was his.
6    Q.  I'm sorry, I meant not where, but I meant
7  kind of in terms of like radiotherapy,
8  immunotherapy, transplants, if any of those kinds of
9  things were raised or considered?
10    A.  I don't believe; he received radiation but
11  other than that, there was no alternatives.
12    Q.  Sure.  Did he ever ask his doctors why
13  they prescribed a particular medicine?
14    A.  No.
15    Q.  Did you ever ask them?
16    A.  No.
17    Q.  Okay.  Did he ever try to negotiate lower
18  provider charges for any Medicare Part B drug?
19    A.  No.
20    Q.  What is your overall view of your dad's
21  treating doctors?
22        MR. CROWN:  Objection to form and
0162
1  foundation.
2    Q.  BY MR. FEDOTIN:  You can answer.
3    A.  My overall view of his doctors, they
4  seemed like good doctors; the Mayo Clinic, I loved
5  that they were on schedule.
6    Q.  Do you believe that your dad's doctors had
7  his best interests in mind when they treated him?
8        MR. CROWN:  Objection to form and
9  foundation.
10        THE WITNESS:  I believe that they had his
11  best interest at heart.
12    Q.  BY MR. FEDOTIN:  Do you believe your dad's
13  doctors prescribed him medicine based on how much
14  money that the doctors would make on the drugs?
15    A.  I don't know.
16    Q.  When it comes to trial, will you assert
17  that your dad's doctors conspired and colluded with
18  the drug companies to defraud the plaintiffs?
19        MR. CROWN:  Objection to form and
20  foundation.
21        THE WITNESS:  When you say assert, do you

22   mean will, do I mean yes?
0163
1        Q.  BY MR. FEDOTIN:  When it comes to trial,
2    will that be something that you're willing to argue,
3    that your dad's doctors colluded with the drug
4    companies?
5        A.  I don't know if they did or didn't.
6        Q.  Okay.  But you haven't brought any
7    lawsuits against any of the doctors?
8        A.  No, I have not.
9        Q.  Your dad received his treatment you said
10   at the clinic when it was available and otherwise he
11   would go to the hospital?
12       A.  Monday through Friday is when the clinic
13   is open, and if you're scheduled for chemo on the
14   weekends, you have to go to the hospital.
15       Q.  Did your dad prefer to get his chemo at
16   the clinic?
17       A.  Yes, in the sense that it was closer than
18   the hospital.
19       Q.  Do you know if your dad would have been
20   willing to pay a little extra to go somewhere
21   closer?
22       A.  I know my dad was going to Mayo Clinic and
0164
1    nowhere else.
2        Q.  Okay.  So if there was another place where
3    he could have received drugs less expensively, your
4    dad would have still gone to Mayo Clinic?
5            MR. CROWN:  Object to form and foundation.
6            THE WITNESS:  My dad would have still gone
7    to Mayo Clinic.
8        Q.  BY MR. FEDOTIN:  Okay.  Do you know what
9    it costs to administer injections?
10       A.  No, I do not.
11       Q.  Do you know what it costs to store drugs
12   for injection?
13       A.  No, I do not.
14       Q.  Do you think that doctors are under an
15   obligation to tell the patients if the reimbursement
16   that they receive for a drug covers not only the
17   costs of the drug but also covers costs such as
18   administering the injection, storing the injection,
19   and the like?
20           MR. CROWN:  Objection to form and
21   foundation.
22           THE WITNESS:  I do if they're also
0165
1    charging you to inject the drug.
2        Q.  BY MR. FEDOTIN:  Okay, but they don't have
3    an obligation to explain that this injection needs
4    to be kept at a certain temperature and there are
5    certain overhead charges?
6        A.  I believe everybody would assume that

7    there would be overhead charges to a drug.
8        Q.   Okay.   Do you have any understanding
9    whether for Part B injections the doctor is paying a
10   price to the drug company or wholesaler that is
11   lower than the price that the doctor is charging to
12   either Medicare or the insurance company?
13           MR. CROWN:  Objection; form --
14           THE WITNESS:  No.
15           MR. CROWN:  -- and foundation.
16           THE WITNESS:  No, I do not.
17       Q.   BY MR. FEDOTIN:  Okay.   Do you know if
18   your dad's doctors were paying the same amount for
19   prescription drugs as they were billing him and his
20   insurance company?
21       A.   No, I do not.
22       Q.   Okay.   Do you think your dad's doctors had
0166
1    an obligation to tell him if there was a difference
2    between what it cost for them to purchase the drugs
3    and what they charged him for the drugs?
4            MR. CROWN:  Objection to form and
5    foundation.
6            THE WITNESS:  Yes.
7        Q.   BY MR. FEDOTIN:  Okay.   Why?
8            MR. CROWN:  Objection to form.
9            THE WITNESS:  Because if they're making a
10   profit on an inflated AWP, they have a
11   responsibility to their patients to not charge
12   somebody that amount when they are probably the
13   sickest that they'll ever be and they're on a set
14   income for the rest of their life.
15       Q.   BY MR. FEDOTIN:  Do you think if your dad
16   knew that doctors charged more than it cost them to
17   obtain the drug, would that have changed which drugs
18   your father took?
19       A.   If he knew that they weren't supposed to
20   charge him more than what they paid for it, my dad
21   would have brought it up.
22       Q.   Well, that wasn't the question, it wasn't
0167
1    the supposed part.   The question is if he knew that
2    there was a difference in those prices, would your
3    dad have still taken those drugs?
4            MR. CROWN:  Objection to form and
5    foundation.
6            THE WITNESS:  Yes.
7        Q.   BY MR. FEDOTIN:  Okay.   So knowledge of
8    this wouldn't have affected which drugs your dad
9    took?
10       A.   No, because my dad wanted to get better.
11       Q.   Okay.   And do you think your dad would
12   have gone to other providers if somebody had told
13   him that there was a difference between what they
14   paid to acquire the drug and what they billed the

15  drug out at?
16      MR. CROWN:  Objection; form and
17  foundation.
18      THE WITNESS:  I believe my dad would have
19  went to Mayo Clinic.
20    Q.  BY MR. FEDOTIN:  Okay.  Do you think your
21  dad's doctors overcharged him for prescription
22  drugs?
0168
1    A.  I don't know.
2    Q.  How much money would you be willing to
3  accept to settle this case?
4      MR. CROWN:  Objection; form and
5  foundation, and I'm going to instruct him not to
6  answer.
7      MR. FEDOTIN:  What grounds?
8      MR. CROWN:  Well, that's an improper
9  question.  Number one, it would invade attorney-
10  client privilege, number one.  Number two, under the
11  rules of class action and what is controlling and
12  governing this litigation, any type of settlement
13  amount would go through an extremely rigorous
14  scrutiny, and to ask this of a class representative
15  at this deposition is a highly improper question.
16  So in the interest of being an unfair question,
17  burdensome, and not designed to lead to the
18  discovery of admissible evidence, and is not
19  reasonably calculated in that regard, I instruct him
20  not to answer.  Take it up with the judge.
21      MR. FEDOTIN:  There's no need, thank you.
22    Q.  Have you or your dad ever had any
0169
1  relationship with Aventis?
2    A.  No.
3    Q.  Have you or your dad ever had any contact
4  with Aventis?
5    A.  No.
6    Q.  Have you or your dad ever had any written
7  communication with Aventis?
8    A.  No.
9    Q.  To your knowledge, have you or your dad
10  ever had any contact or communication with an
11  Aventis employee?
12    A.  No.
13    Q.  Did you or your dad ever see an Aventis
14  sales representative in any of his doctors' offices?
15    A.  No.
16    Q.  Did you or your dad ever call the Aventis
17  customer service line?
18    A.  No.
19    Q.  Did you or your dad ever seek any
20  information on prescription drugs from Aventis?
21    A.  No.
22    Q.  Did Aventis ever make any representations

0170
1   to you or your dad?
2       A.  No.
3       Q.  Did Aventis ever make any statements
4   whatsoever to you or your dad?
5       A.  No, not that I know of.
6       Q.  Did Aventis ever provide you or your dad
7   with any information about prescription drugs?
8       A.  No.
9       Q.  Did you or your dad rely on any
10  information from Aventis in paying for any
11  prescription drugs?
12          MR. CROWN:  Objection to form and
13  foundation.
14          THE WITNESS:  No.
15      Q.  BY MR. FEDOTIN:  Have you or your dad ever
16  had any relationship with any of the other named
17  defendants?
18      A.  No.
19      Q.  In your document search, did you limit
20  your search to medications just for your dad's
21  cancer treatments?
22      A.  No, his medical records and whatever he
0171
1   had down there.
2       Q.  Do you have any canceled checked that show
3   payment for any medication manufactured by Aventis?
4          MR. CROWN:  Object to foundation.
5          THE WITNESS:  No, I don't have any
6   canceled checks made out to Aventis.
7       Q.  BY MR. FEDOTIN:  I'm sorry if that was
8   unclear. The question was a little broader than
9   that, it was if you have any canceled checks that
10  would show any payment for any medication
11  manufactured by Aventis?
12      A.  I would refer to the canceled checks there
13  and the bills, you know, any personal payments that
14  my dad made could have been for drugs and Aventis
15  could have made one of them drugs, I don't know for
16  sure.
17      Q.  Okay, but you can't trace the checks to a
18  particular manufacturer?
19      A.  No, I can't.
20      Q.  Going back to when your dad would have
21  purchased the drugs at issue, what was your dad's
22  expectation of any kind of physician markup on the
0172
1   physician-administered drugs?
2          MR. CROWN:  Objection to form and
3   foundation.
4          THE WITNESS:  I don't believe my dad had
5   any position on markup.
6       Q.  BY MR. FEDOTIN:  Okay.  So by that, are
7   you saying that you don't think he expected a markup

8 or that?
9     A.  I don't think my dad even knew of a
10 markup, expected a markup, knew what was going on
11 with the drugs that he was getting in that context.
12     Q.  BY MR. FEDOTIN:  As a class
13 representative, are you concerned about recovery for
14 drugs that your father didn't take or purchase?
15        MR. CROWN:  Objection to form and
16 foundation.
17        THE WITNESS:  Yes, if somebody else took a
18 drug that my father didn't take and they did the
19 same thing with that, those people should get their
20 money back if they were overcharged.
21     Q.  BY MR. FEDOTIN:  Okay.  What newspapers
22 and magazines do you subscribe to?
0173
1     A.  Don't subscribe to any.
2     Q.  Okay.  Are there any newspapers that you
3 regularly read?
4     A.  White Mountain Independent.
5     Q.  Okay.  Any magazines you regularly read?
6     A.  People magazine.
7     Q.  Okay.  What about your dad, do you know if
8 he had any subscriptions to any papers or magazines?
9     A.  My dad, he did not have a subscription to
10 the Arizona Republic but my dad read it every day.
11     Q.  Okay.  But he wouldn't, neither of you
12 would have read Barrons magazine for example?
13     A.  No.
14     Q.  Or the Wall Street Journal?
15     A.  No.
16     Q.  Or the New York Times?
17     A.  No.
18     Q.  Have you ever been convicted of a felony?
19     A.  No.
20     Q.  Have you ever been convicted of a
21 misdemeanor?
22     A.  No.
0174
1     Q.  Have you ever pled guilty to a felony or a
2 misdemeanor?
3     A.  No.
4     Q.  Okay.  I'm getting close to wrapping
5 things up, if we could take a break for a minute.
6        (Discussion off the record.)
7        MR. BERGEN:  Is there anyone else who
8 wants to ask questions?
9
10        E X A M I N A T I O N
11 BY MR. FARQUHAR:
12     Q.  Yes, this is Doug Farquhar, I represent
13 Watson Pharmaceuticals.  Mr. Clark, are you aware
14 that you are being proposed as a class
15 representative with regard to Watson?

16     A.   If you're named in this piece, in this
17  big, fat piece of paper, that's how I would know.
18     Q.   Well, let's look at that big, fat piece of
19  paper, if you would look at paragraph 17.
20     A.   Okay.
21     Q.   Which is the paragraph that I think many
22  questions have related to.  The way that I read that
0175
1  paragraph, it alleges that there were two drugs that
2  your father took that may have been made by Watson,
3  and those drugs are dexamethasone acetate and
4  dexamethasone sodium phosphate.  Are you with me on
5  that?
6     A.   Let me flip to, just a second.  Okay.
7  Yeah, okay, got it.
8     Q.   All right.  Now, I would ask if you would
9  look at what I think has been marked as your Exhibit
10  Clark 006, which is the Bates numbers at the bottom
11  of the pages should be 0284 to 0288.  Can you tell
12  me when you have that in front of you?
13             (Discussion off the record.)
14             (Exhibit Clark 006 marked.)
15     Q.  BY MR. FARQUHAR:  If you would look first
16  at 0284, the first page of Exhibit Clark 006.
17             MR. CROWN:  Did you say 0284?
18             MR. FARQUHAR:  Right.
19             MR. CROWN:  Okay.
20     Q.  BY MR. FARQUHAR:  If you look, Mr. Clark,
21  at 0284, it talks in the first paragraph of this
22  letter about how this is a summary of claims that
0176
1  were processed for your dad under Medicare Part B.
2  Would you agree with me on that?
3     A.   Yes.
4     Q.   And if you look at the dates that are on
5  the chart which is attached at the last page of this
6  exhibit, that would be 285 through 288, you'll see
7  that it covers a period from October 2001 to October
8  2005; am I correct?
9     A.   We're thumbing through, give us just a
10  second.
11     Q.   Of course.
12     A.   Okay.
13     Q.   Okay meaning you agree that that's
14  correct?
15     A.   Yeah.
16     Q.   Okay, thank you.  Now, when I look at this
17  chart, I see only two incidents in which either
18  dexamethasone acetate or dexamethasone sodium
19  phosphate is administered to your dad; one is on
20  October 24th, 2005; one is on February 13th, 2002.
21  Is that correct?
22             MR. CROWN:  Counsel, do you want him to go
0177

1  through every line item or do you want us to accept?
2     Q.  BY MR. FARQUHAR: I'd like him to go
3  through every line item in that last column.  I
4  think if he sees that dexamethasone mentioned
5  anywhere else.
6        MR. CROWN:  Well, again -- hello?  I mean,
7  the document would reflect what it reflects,
8  correct?
9        MR. FARQUHAR:  That's correct, but I would
10  like him to look at those items and tell me if I'm
11  missing something.
12        (Discussion off the record.)
13        MR. CROWN:  Counsel, back on this.  It's a
14  long deposition, we're trying to get done.  The
15  document would spoke for itself.  It shouldn't be a
16  test to ask him to go through line by line item
17  right now.  If you say through your thorough
18  analysis for your client's focus that it says it in
19  those two places, then that will be borne out by the
20  document.
21     Q.  BY MR. FARQUHAR:  Do you see, Mr. Clark,
22  any other places on this document where there is a
0178
1  discussion about administration of the drugs
2  dexamethasone acetate or dexamethasone sodium
3  phosphate other than the ones on October 24th, 2005
4  or the one that's on February 13, 2002?
5     A.  No, I do not.
6     Q.  All right.  I would like you to turn to
7  the administration of dexamethasone acetate on
8  October 24th, 2005 and ask you if that line in this
9  particular document does not indicate that all but
10  70 cents of the charge for that particular drug was
11  covered by Medicare?
12     A.  That's what I'm reading here.
13     Q.  All right.  Now, you also had, I'm sorry,
14  your dad at the time that this drug was administered
15  had secondary insurance with Operating Engineers
16  American Benefit Plan; is that correct?
17     A.  Correct.
18     Q.  And isn't it true that that secondary
19  insurance paid 80 percent of whatever Medicare did
20  not pay for the administration of a drug like this?
21     A.  I'm going to assume they did.
22     Q.  So that would mean that there was 14 cents
0179
1  for that particular administration of that
2  particular drug that your father would have had to
3  pay; is that correct?
4     A.  Your math sounds right.
5     Q.  Okay.  Now, you're alleging in the
6  Complaint that 14 cents was too much. How much
7  would have been appropriate in your view for your
8  dad to be charged for the administration of that

9   drug?
10         MR. CROWN:  Objection to form and
11  foundation.
12         THE WITNESS:  I couldn't say.
13     Q.  BY MR. FARQUHAR:  I'll ask you to turn to
14  the administration of the drug on February 13, 2002.
15     A.  Okay, I'm there.
16     Q.  Would you agree with me Medicare paid all
17  but 60 cents of the cost of the administration of
18  that drug?
19     A.  Correct.
20     Q.  And again, the secondary insurance covered
21  80 percent of that amount; is that correct?
22     A.  Correct.
0180
1      Q.  That would leave 12 cents that your dad
2   had to pay for that drug; is that correct?
3      A.  Your math is correct again.
4      Q.  And of the 12 cents that he would have had
5   to pay for the drug, how much do you think would
6   have been appropriate for him to have to pay for
7   that drug?
8      A.  I couldn't say.
9      Q.  I'm sorry?
10     A.  I couldn't say.
11     Q.  Thank you.  Now, Mr. Clark, are you aware,
12  well first of all, your dad did not have end stage
13  renal disease or kidney failure, did he?
14     A.  No, he did not.
15     Q.  So he didn't get dialysis treatments;
16  right?
17     A.  No, he did not.
18     Q.  Are you aware that some of the drugs that
19  this case relates to for Watson are drugs that are
20  administered almost exclusively to dialysis
21  patients?
22     A.  Other than you just telling me, no.
0181
1      Q.  Okay.  And are you aware of how dialysis
2   patients' medical bills for medication are
3   reimbursed?
4      A.  No, I am not.
5      Q.  Were you aware that there was extensive
6   discussion in the federal government in the early
7   part of 2000 about whether the formula should be
8   changed and the drug reimbursement for dialysis
9   patients should be reduced?
10     A.  No, I haven't heard anything about that.
11     Q.  No further questions.  Thank you, Mr.
12  Clark.
13     A.  You bet.
14         MR. CROWN:  Thank you.  Anybody else,
15  counsel?
16         MR. FEDOTIN:  I can say on the record that

17  I've got no further questions.
18       MR. CROWN: Okay. Thank you. Is there
19  anyone else that has questions for Mr. Clark on the
20  phone?
21       MR. PUGH:  This is Preston Pugh from
22  Sonnenschein, Nath, and Rosenthal.  I have a few
0182
1  questions.
2       MR. CROWN:  Sir, can you tell me who you
3  represent?
4       MR. PUGH:  I represent Sicor, S-I-C-O-R.
5       MR. CROWN:  Thank you.
6
7            E X A M I N A T I O N
8  BY MR. PUGH:
9       Q.  If you turn to paragraph 17 of the
10  Complaint, sir.
11       A.  I'm on it.
12       Q.  Okay.  Before we get to that, let me ask
13  you a quick question.  Do you have any knowledge of
14  your father having ever taken a drug manufactured by
15  Sicor?
16       A.  Not specifically.
17       Q.  When you say not specifically, what do you
18  mean?
19       A.  I don't know who made what he took.
20       Q.  Okay.  So with respect to, and you'll
21  pardon the pronunciation, the cisplatin that
22  paragraph 17 says he took, you have no knowledge
0183
1  that Sicor manufactured that drug; correct?
2       A.  No, I do not.
3       Q.  And with respect to the dexamethasone
4  sodium phosphate, you have no evidence that Sicor
5  manufactured that drug either; correct?
6       A.  No, I do not.
7       Q.  With respect to the enalaprilat, E-N-A-L-
8  A-P-R-I-L-A-T, also referred to in paragraph 17, you
9  have no evidence that Sicor manufactured that drug
10  that your father took and allegedly paid for?
11       A.  No, I do not.
12       Q.  And finally, with respect to sodium
13  chloride as referred to in paragraph 17, you have no
14  evidence that Sicor manufactured any sodium chloride
15  that your father took and/or paid for; correct?
16       A.  No, I do not.
17       Q.  That's it for us, thank you.
18       MR. CROWN:  Does anybody else have any
19  questions?
20       MS. SCOTT:  Kelleen Scott from Hogan and
21  Hartson representing Amgen, I have some questions.
22
0184
1            E X A M I N A T I O N

2   BY MS. SCOTT:

3      Q.  I wanted to point you again to Exhibit

4   Clark 001, paragraph 17, which is the Complaint.

5      A.  I'm there.

6      Q.  Okay.  Which notes that, and I believe,

7   correct me if I'm wrong, that the only drug named on

8   behalf of Amgen is epoetin alfa in the middle of

9   that paragraph; is that correct?

10     A.  Yes.

11     Q.  First, do you know if your father ever

12  personally paid anything in particular relating to

13  epoetin alfa charges?

14     A.  No, I do not.

15     Q.  Do you know if your father personally paid

16  anything relating to charges for a drug named

17  Epogen?

18     A.  No, I do not.

19     Q.  Do you know what your father was

20  prescribed epoetin alfa for?

21     A.  No, I do not.

22     Q.  Do you have any evidence that Amgen

0185

1   manufactured the epoetin alfa noted in the

2   Complaint?

3      A.  No, I do not.

4      Q.  Let's look at Exhibit Clark 002, if we

5   could.  I believe it starts with Clark 0028.

6      A.  I got it.

7      Q.  I want to point to a couple of pages

8   within that exhibit that list charges for epoetin

9   alfa or list that epoetin alfa was given by Mayo

10  Clinic.

11     A.  Okay.

12     Q.  Pages 30, 31, 33, and 36.  Just take a

13  general glance at them, I just wanted to bring you

14  to the document.

15     A.  Okay, I see it.

16     Q.  Is there any indication on this document

17  who manufactured the epoetin alfa that was

18  administered to your father by the Mayo Clinic?

19     A.  No, none that I see.

20     Q.  Again, going back to the Complaint,

21  according to the Complaint, am I correct that

22  epoetin alfa has listed after it two different

0186

1   manufacturers, Amgen and Johnson and Johnson Group;

2   is that correct?

3      A.  On paragraph 17, that's what it says.

4      Q.  Do you know the brand name of the

5   medication epoetin alfa that your father took?

6      A.  No, I do not.

7      Q.  Do you know if it was called Epogen?

8      A.  I don't know.

9      Q.  Do you know if it was called Procrit?

10    A.   No, I do not.
11    Q.   Do you know who prescribed the epoetin
12 alfa that was administered to your father?
13    A.   No, I do not.
14    Q.   If this drug an injection, infusion, or
15 pill, or do you know?
16    A.   I don't know.
17    Q.   Do you know whether he received treatments
18 of epoetin alfa at the Mayo Clinic in Scottsdale
19 which are reflected in those four pages in Exhibit
20 Clark 002 that I pointed you to, do you know if they
21 were administered while he was in an inpatient or
22 outpatient basis?
0187
1    A.   I don't.
2    Q.   Do you know if your father discussed
3 alternative treatments with providers in regard to
4 epoetin alfa?
5    A.   No, I do not.
6    Q.   Do you know if he discussed the cost of
7 epoetin alfa with his doctors?
8    A.   No, I do not.
9    Q.   Did you ever discuss those costs with his
10 doctors?
11    A.   No, I did not.
12    Q.   Do you know if he ever asked to take a
13 cheaper drug than the one he was administered for
14 epoetin alfa?
15    A.   No, I do not.
16    Q.   Did you ever ask for a cheaper drug to be
17 administered?
18    A.   No.
19    Q.   Do you know at the time of treatment
20 whether you or your father questioned his providers
21 concerning whether there was a margin between the
22 price of the epoetin alfa and what the provider
0188
1 paid?
2    A.   No, we did not.
3    Q.   Did either you or your father have an
4 expectation at that time what the margin should be?
5    A.   No.
6    Q.   Do you know how much your father's
7 provider charged for epoetin alfa?
8    A.   I'd have to refer to whatever the charges
9 are on this.
10    Q.   Okay.  Beyond the document, Exhibit Clark
11 002, do you have any idea what the charges were?
12    A.   No, I do not.
13    Q.   That's where you would get the information
14 about the charges?
15    A.   I would get them off of this bill.
16    Q.   Okay.  Do you know how your father's
17 provider determined its price for epoetin alfa?

18   A.  No, I do not.

19   Q.  Do you know if the charges for epoetin

20  alfa were based on AWP?

21   A.  No, I do not.

22   Q.  Do you know if your father's supplemental

0189

1  insurance ever paid for any portion of the epoetin

2  alfa charges that were charged here?

3   A.  No, I do not.

4   Q.  Do you know if your father ever personally

5  paid for epoetin alfa?

6   A.  Other than the personal payments he made

7  on these bills, which could have went to drugs or

8  whatever, I would have to refer you to the

9  documents.

10   Q.  Okay.  And am I correct based on the

11  documents that we've received that the payments your

12  father made for epoetin alfa would have gone to the

13  Mayo Clinic in Scottsdale?

14   A.  Correct, based on the documents.

15   Q.  Okay.  To your knowledge, has your father

16  paid any money to any defendant in this action?

17   A.  No.

18   Q.  And did you or your father ever try to

19  find out how the price for epoetin alfa was

20  determined?

21   A.  No.

22   Q.  Thank you very much, that's all I have.

0190

1   A.  Okay.

2

3       E X A M I N A T I O N

4  BY MR. MITCHELL:

5   Q.  This is Ryan Mitchell, I represent Abbott

6  Laboratories, just a couple of questions.  Sticking

7  with Exhibit Clark 001, the Fourth Amended

8  Complaint, paragraph 17, do you see where it says

9  fentanyl citrate kind of midway through the

10  paragraph?

11   A.  Yes.

12   Q.  Do you know who manufactures the fentanyl

13  citrate that your father was prescribed?

14   A.  No, I do not.

15   Q.  Same thing for the midazolam

16  hydrochloride?

17   A.  No.

18   Q.  Do you know who manufactured that drug

19  product that your father was?

20   A.  No, I do not.  Are you still there?

21   Q.  Yes, did you not hear me?

22   A.  I didn't hear, I answered no to the

0191

1  question on.

2   Q.  To the midazolam?

3      A.  Yes.
4      Q.  How about for any of the drugs, I think
5   you testified you don't know who manufactured any of
6   the drugs that are listed at paragraph 17; is that
7   correct?
8      A.  Correct.
9      Q.  No further questions.
10         MR. CROWN:  Nobody else?  Let's take a
11   couple-minute break, I'm going to have probably a
12   few questions, I just want to take a short break,
13   say about five minutes tops.
14            (Recess from 3:17 p.m. to 3:23 p.m.)
15         MR. CROWN:  I just have a few questions
16   for Mr. Clark.
17
18         E X A M I N A T I O N
19   BY MR. CROWN:
20      Q.  Mr. Clark, you had testified that your dad
21   paid his share of the drugs that were administered
22   to him during the time frame shown in these records;
0192
1   am I correct?
2      A.  Correct.
3      Q.  He paid whatever he was told to pay as
4   part of his share or his portion of what was owed on
5   these drugs; correct?
6         MR. FARQUHAR:  Objection as to form.
7         MR. MITCHELL:  Foundation.
8         MR. FEDOTIN:  Just for the record, we have
9   an agreement I assume an objection by one is okay?
10         MR. CROWN:  Yes.
11         MR. FEDOTIN:  That's fine.
12      Q.  BY MR. CROWN:  At one point during the
13   first counsel's questions among the series of
14   questions, you were asked did your dad ever make
15   copayments, and you said no. And I want to ask, were
16   you told a definition of a copayment by that lawyer
17   and did you understand what a copayment meant?
18      A.  No, not clearly.  What I want to say is
19   that my, as in the first point, my dad paid whatever
20   he was supposed to pay, whether it was, whether
21   anybody here wants to consider it a copay,
22   coinsurance, 20 percent, whatever, my dad paid his
0193
1   share on any bill that he was supposed to pay.
2      Q.  And whether that share is defined as a
3   copayment or defined with some other label, the
4   point you're making is he paid his share?
5         MR. FARQUHAR:  Objection as to form.  Doug
6   Farquhar speaking again.
7         THE WITNESS:  My dad paid his bills.
8      Q.  BY MR. CROWN:  Secondly, you were asked
9   questions about whether you had proof of various
10   payments for these drugs that were administered to

11  your dad, and in part you've answered based on
12  whatever personal knowledge you have as your dad's
13  son and now the representative of his estate;
14  correct?
15      A.  Correct.
16          MR. FARQUHAR:  Objection to form.
17      Q.  BY MR. CROWN:  In part, these documents
18  that you have been shown by lawyers that were here
19  today that ultimately were produced originally by
20  you, that's also proof of the personal payments made
21  by your dad; correct?
22          MR. FEDOTIN:  Objection.
0194
1          MR. FARQUHAR:  Objection as to form.
2          THE WITNESS:  I would refer anybody to the
3  documents that state, whether to Mayo Clinic, Mayo
4  Hospital, inpatient, outpatient, whatever it was, my
5  dad made personal payments, whether that was cash,
6  check, or whatever, my dad made personal payments,
7  he paid his share.
8      Q.  BY MR. CROWN:  There was a question
9  regarding your knowledge of the scope of the class
10  that you and the other class representatives in this
11  lawsuit are seeking to represent.  In short, can you
12  tell us your understanding of the scope of the
13  parties that you are looking to represent as one of
14  the class representatives?
15      A.  As a class representative, I want the
16  people that have been overcharged by inflated AWPs
17  to whatever they were overcharged, no matter who it
18  was that bought something, should get their portion
19  of whatever they were overcharged back.
20      Q.  And that brings me to this next question.
21  At one point by the first lawyer that asked you
22  questions you were asked what is your goal in this
0195
1  lawsuit, and you said it is to stop the drug
2  manufacturers from overcharging for drug medications
3  in this country; am I correct?
4      A.  Correct.
5      Q.  Based on your last answer, is there
6  another goal that you and your fellow class
7  representatives are seeking in this litigation?
8          MR. FEDOTIN:  Objection.
9          MR. FARQUHAR:  Objection as to form.  Doug
10  Farquhar speaking.
11          THE WITNESS:  I want the practice of the
12  inflated AWPs to stop and there to be, you know, I
13  don't know, be fair and equitable to everybody, but
14  also want, if someone's been overcharged in this
15  whole deal, they should get, whatever monies they
16  were overcharged should go back to the millions of
17  consumers that have purchased drugs based on this
18  practice.

19       MR. CROWN:  That's all the questions I
20  have for Mr. Clark.  Does anybody have any follow-up
21  based on what I asked?
22       Hearing nothing, this deposition is
0196
 1  concluded. And I would like to request Mr. Clark
 2  have the opportunity to read the transcript and sign
 3  it.
 4       MR. BERGEN:  We have a stipulation that
 5  the parties stipulate that Exhibit Clark 006 will be
 6  faxed to the court reporter directly, pages 284 to
 7  288.
 8       (The deposition concluded at 3:29
 9  p.m.)
10
11       ---o0o---
12
13
14    _____
15             ROGER CLARK
16
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20_____.
19
20
21  _____
22    Notary Public
0197
 1             CERTIFICATE
 2       I, Deborah L. Moreash, RPR, Certified Shorthand
 3  Reporter #50294 for the State of Arizona, certify:
 4       That the foregoing deposition was taken by me,
 5  that I am authorized to administer an oath; that the witness,
 6  before testifying, was duly sworn by me to testify to the whole
 7  truth; that the questions propounded by counsel and the answers
 8  of the witness were taken down by me in shorthand and thereafter
 9  reduced to print by computer-aided transcription under my direction;
10  that deposition review and signature was requested; that the
11  foregoing 159 pages are a full, true, and accurate transcript of all
12  proceedings and testimony had upon the taking of said deposition, all
13  done to the best of my skill and ability.
14       I FURTHER CERTIFY that I am in no way related
15  to or employed by any of the parties hereto nor am I in any
16  way interested in the outcome hereof.
17       DATED this 30th day of March, 2006.
18
19    _____
20       DEBORAH L. MOREASH, RPR
21       Certified Court Reporter #50294
22       For the State of Arizona